# EXHIBIT 10

*Original signed copy*

AGREEMENT, made and entered into this 1st day of June 1957 between ZONOLITE COMPANY, a Montana corporation, having its principal office at 135 South LaSalle Street, Chicago, Illinois (hereinafter called the "Company") and ROBINSON INSULATION COMPANY          a corporation having its principal office at 12th St., North & River Dr., Great Falls, Montana (hereinafter called the "Distributor").

WHEREAS, the Company is engaged in the mining of vermiculite ore which it is desirous of marketing through distributors; and

WHEREAS, the Distributor desires to engage in the business of expanding vermiculite ore and selling expanded vermiculite and the products that may be manufactured therefrom;

NOW, THEREFORE, in consideration of the promises and agreements hereinafter set forth, it is agreed between the parties hereto as follows:

1. The Distributor will, at its own cost and expense, provide adequate facilities for the expansion of vermiculite ore.

2. The Company will sell and the Distributor will purchase vermiculite ore having the specifications shown on Schedule "A" hereto attached, at the price and subject to the terms and conditions of sale shown on Schedule "B" hereto attached. The Company will use its best efforts to fill promptly all of the Distributor's orders therefor. A minimum of five hundred (500) tons shall be purchased each of the years that this agreement is in effect.

3. The Distributor agrees to expand the vermiculite ore purchased from the Company in accordance with the Company's specifications in order to produce materials of satisfactory and uniform quality.

4. The Company grants to the Distributor the exclusive right to use: (a) the registered trade-mark "Zonolite", registered in the United States Patent Office, Registry No. 216,862, August 24, 1926 (renewed); and (b) the registered trade-mark "Terra-Lite", registered in the United States Patent Office, Registry No. 431,731, August 5, 1947, in the territory

- 1 -

58020058322

WRG05251017

described on Schedule "C" hereto attached, in the sale of all products made from vermiculite ore purchased from the Company and expanded in accordance with the specifications of the Company.

The use of said trade-marks and the sale of all products bearing said trade-marks shall be in accordance with the following conditions:

(a) The bags, containers, or packages which bear said trade-marks shall be plainly marked "Zonolite" or "Terra-Lite", as the case may be, and such marking shall be followed by descriptive matter indicating the type of material to which the trade-mark is applied, which descriptive matter shall clearly indicate that the "Zonolite" or "Terra-Lite" brand is applied to the material contained in the bag, container, or package, e.g., "Zonolite Brand of Vermiculite Insulating Fill" or "Terra-Lite Brand of Vermiculite Fertilizer Conditioner". Such legend shall be followed by the words "Processing Distributor".

(b) Each bag, container, or package shall contain the statement "Zonolite (or Terra-Lite, as the case may be) is the registered trade-mark of Zonolite Company".

(c) The Company shall have the sole right to specify the uses to which the trade-marks "Zonolite" and "Terra-Lite", may be put, the products and articles to which they shall apply, and the manner in which they may be employed. The Company, in the exercise of this right, shall fully, entirely and exclusively govern and control the use of said trade-marks by the Distributor.

(d) The exclusive right herein granted shall not prohibit the shipment into the territory of the Distributor, nor the sale in such territory of mixed, formed or fabricated products containing vermiculite which may be manufactured by other persons, natural or corporate, and marked with the "Zonolite" or "Terra-Lite" trade-marks, under appropriate agreement with the Company.

The Company may, from time to time, own or acquire other trade-marks which will be used in the manufacture and sale of other products made from vermiculite. If such trade-marks shall be so acquired and the Distributor desires to use any such trade-marks in the manufacture and sale of products made from vermiculite purchased from the Company, the Company will, on the written request of the Distributor, grant the Distributor the right to use any trade-mark owned by it in the manufacture and sale of products made from vermiculite purchased from the Company on terms comparable to those above specified with reference to "Zonolite" and "Terra-Lite", provided such a grant shall not be in violation of existing contractual commitments of the Company or its plans for merchandising any product under a specific trade-mark.

5. The Distributor shall be privileged to purchase vermiculite ore from other sources but ore so purchased and expanded by the Distributor

231

WRG05251018

S8020058323

shall not be sold under the trade-marks "Zonolite" or "Terra-Lite" or other trade-marks of the Company. The Company will not sell vermiculite ore or expanded vermiculite to other persons, natural or corporate, in the territory shown on Schedule "C" which territory is hereby allotted to the Distributor, except as follows:

(a) The Company may sell vermiculite ore or expanded vermiculite to persons, natural or corporate, having expanding or manufacturing plants outside the territory allotted to the Distributor for use by the purchasers thereof in the manufacture of mixed, formed or fabricated products containing vermiculite, which products may be sold in the territory allotted to the Distributor by such manufacturers, their agents and distributors.

(b) The Company may sell expanded vermiculite or mixed, formed or fabricated products containing vermiculite, to persons, natural or corporate, who are engaged in nationwide distribution of merchandise and such nationwide distributors shall have the right to sell and deliver such products in the territory allotted to the Distributor. A nationwide distributor shall be considered as a person, natural or corporate, distributing its products through agents, or subsidiaries, dealers, distributors, or otherwise, in five or more states. The Company will use reasonable effort to arrange for the purchase from the Distributor by nationwide distributors for delivery in the territory allotted to the Distributor provided the Distributor shall be then manufacturing such products.

(c) The Company may sell vermiculite ore and equipment for the processing of vermiculite ore to persons, natural or corporate, within the territory allotted to the Distributor for the manufacture of mixed, formed or fabricated products containing vermiculite. Before such sales are made, the Company will advise the Distributor and will pay a commission, subject to negotiation, of not less than 5 percent and not more than 25 percent of the net selling price of all ore so sold.

(d) The Distributor shall have the privilege of requesting the approval of the Company to resell vermiculite ore purchased from the Company to persons, natural or corporate, within the territory allotted to the Distributor. As part of the request for approval the Distributor shall advise the Company the resale price of vermiculite by grades that will be quoted by the Distributor. The Distributor commission on such vermiculite ore sale shall be negotiated between the Company and the Distributor, and shall be for not less than 5 percent of the net selling price of all ore so sold.

(e) The Distributor shall not sell, under the trade-mark "Zonolite", expanded vermiculite manufactured by it or purchased through the Company outside the territory allotted to the Distributor. If the Distributor shall be engaged in the manufacture of mixed, formed or fabricated products containing vermiculite, it may sell such products outside of the territory allotted to it through its agents, subsidiaries, distributors or otherwise.

(f) Stabilized concrete and plaster aggregate, acoustical plaster and insulating cement shall not be considered as mixed products under the definitions used in the above paragraphs.

- 3 -

232
WRG05251019

S8020058324

6. This agreement shall remain in effect until December 31, 1961. Thereafter it shall continue from year to year, subject, however, to termination by either party hereto at the end of any yearly period by giving ninety (90) days written notice of cancellation to the other party. During such time the Company agrees:

(a) To furnish in suitable form such manufacturing and engineering information at a reasonable cost to the Distributor concerning the physical processing of expanded vermiculite as may be generally available from time to time.

(b) To make available to the Distributor advertising material being used from time to time by the Company for use by the Distributor.

(c) To sell to the Distributor, if it desires to purchase from the Company, at the current schedule of prices fixed by the Company, all containers, bags, packages and shipping fasteners that the Distributor may require.

The Distributor agrees during the time this agreement remains in effect:

(a) To aggressively promote the sale of expanded vermiculite in the territory allotted to it.

(b) Not to use any trade-mark of the Company without the written consent of the Company.

7. Failure to perform on the part of either party hereto shall be excused where such non-performance is due to fires, strikes, lockouts, government regulations, State or Federal, differences with workmen, accidents to machinery, war, delays or defaults of common carriers, orders, decrees or judgments of any court, failure of the usual source of supply of manufacturers, or other conditions beyond the control of either party hereto.

8. If either party hereto shall fail to continue in business for thirty (30) days, or if a receiver, trustee or other custodian shall be appointed for such party or such party shall make an assignment for the benefit of creditors or be adjudicated a voluntary or involuntary bankrupt, then the other party shall, in addition to any remedy accorded by law, be privileged to cancel this agreement as to the party who came within any of the conditions contained in this paragraph.

9. The Distributor shall not assign this contract without the written consent of the Company. The Company may assign this agreement

- 4 -

233
WRG05251020

S8020058325

provided its assignee shall assume all obligations of the Company hereunder.

10.  This agreement shall be binding when executed by a duly authorized officer of the Company at Chicago, Illinois, according to the laws of which State, Illinois, it shall be construed.  Wherever the word "it" is used in referring to the Distributor, it shall be taken to mean the party herein contracting with the Company, whether a corporation, partnership or individual.

11.  This agreement shall supersede any existing agreements between the Distributor and the Company, all previous agreements being hereby terminated and cancelled.

IN WITNESS WHEREOF, the Company and the Distributor have caused this agreement to be executed under their corporate seals, by their officers thereunto duly authorized, the day and year above set forth.

ZONOLITE COMPANY

BY _____
Vice President

ATTEST:

_____


ROBINSON INSULATION COMPANY

BY _____
V. pres.

ATTEST:

_____
Secty.

- 5 -

S8020058326

234
WRG05251021

## SCHEDULE A - SPECIFICATIONS

All screen sizes are to be Tyler Standard Screens. All grades of ore shall not have more than ten percent (10%) moisture loss on expansion. Items 1 and 2 below shall contain not more than ten percent (10%) non-micaceous gangue (rock); items 3, 4, and 5 not more than fifteen percent (15%) non-micaceous gangue (rock); item 6, not more than twenty percent (20%). Other specifications are as follows:

1. Minus 2 plus 4 mesh ore.

   This grade of ore shall not retain more than ten percent (10%) on a two (2) mesh screen, nor shall more than ten percent (10%) pass through a four (4) mesh screen.

2. Minus 3 plus 14 mesh ore.

   This grade of ore shall not retain more than ten percent (10%) on a three (3) mesh screen, nor shall more than ten percent (10%) pass through a fourteen (14) mesh screen.

3. Minus 8 plus 20 mesh ore.

   This grade of ore shall not retain more than ten percent (10%) on an eight (8) mesh screen nor shall more than twenty-five percent (25%) pass through a twenty (20) mesh screen.

4. Concrete aggregate ore.

   This grade of ore shall not retain more than ten percent (10%) on an eight (8) mesh screen and not more than fifteen percent (15%) shall pass a sixty-five (65) mesh screen.

5. Plaster aggregate ore.

   This grade of ore shall not retain more than ten percent (10%) on an eight (8) mesh screen and not more than fifteen percent (15%) shall pass a sixty-five (65) mesh screen.

6. Number four (4) ore.

   This grade of ore shall not retain more than fifteen percent (15%) on a twenty-eight (28) mesh screen and not more than fifteen percent (15%) shall pass a sixty-five (65) mesh screen.

- 1 -

235

WRG05251022

S8020058327

## SCHEDULE A

## METHOD OF TESTING CRUDE VERMICULITE

The analysis of crude vermiculite shall comprise (1) sampling,

(2) screen analysis, (3) ignition loss and impurities test, according to

the following procedure.

(1) Sampling. When a carload or large pile of ore is being tested, the sample tested shall accurately represent the whole pile. This can be done by taking a handful of ore from directly beneath the surface at five-foot intervals over the entire area of the pile. Surface material is to be avoided since it does not give a representative sample. This composit sample should not be less than 10 pounds for a carload of ore. This material is then mixed and reduced to a smaller size for assaying. This reduction shall be done with a Jones Riffle Sampler, or if this is not available, it may be done by the method of coning and quartering. The sample should be reduced to about 1-3/4 pounds or 800 grams.

(2) Screen Analysis. The screen analysis shall be made on a Ro-Tap testing sieve shaker and the screens used are to be Tyler Standard Testing Sieves. If the amount of oversize and undersize are wanted, the two screens are used which represent the size in the ore specifications. (For Example, 3 mesh and 14 mesh are the nominal limits of No. 1 ore and this size is called minus 3 plus 14. A complete screen analysis is made by using all of the standard screen sizes between these limits.) Five-hundred grams of the properly reduced sample is placed in the top screen and shaken in the Ro-Tap for exactly seven minutes. Each fraction is then weighed and the results computed to a percentage basis.

(3) Ignition Loss and Impurities Test. From the remaining part of the above prepared sample, weigh out two portions of 100 grams each. One sample is placed in a muffle furnace and heated to a dull red or until there is no further movement after the sample is shaken in the hot pan. A gas plate may be used for heating if care is taken to get complete expansion. The sample is then weighed and the loss in weight is the percentage loss on ignition or moisture loss. The sample is then cooled and used for the impurities test. Failure to cool the sample will cause the vermiculite to go with the impurities, particularly in the finer sizes. The vermiculite is separated from the impurities by floating off the vermiculite in a container of water. A pan 5" x 10" x 4" deep is a convenient size. The expanded sample is added to the water and stirred so that all heavy material drops to the bottom. The vermiculite is decanted with the water and the residue is further washed to remove all adhering particles of vermiculite. The residue is then completely dried and weighed and the percentage of impurity figured on the basis of the original 100-gram sample. After the gangue is dried, any remaining particles of micaceous material that remains shall be removed by hand picking or by gently blowing the micaceous material out of the gangue. The second 100-gram sample is then treated by exactly the same procedure and the results compared with the first test. If the two results vary by more than ½ of 1% of the original 100-gram sample, a third sample is run and the two closest results are averaged for the final answer.

236

WRG05251023

S8020058328

### SCHEDULE B - PRICES

Ore prices are as follows:

| | | |
|---|---|---|
| (1) | Minus 2 plus 3 mesh ore | $13.50 |
| (2) | Minus 3 plus 14 mesh ore | 15.00 |
| (3) | Minus 8 plus 20 mesh ore | 12.00 |
| (4) | Concrete aggregate ore | 10.50 |
| (5) | Plaster aggregate ore | 10.50 |
| (6) | Number 4 ore | 8.00 |

All prices shall be per ton of two thousand pounds (2,000 lbs.) f.o.b. cars Libby, Montana; terms net thirty (30) days. The above prices may be revised from time to time by the Company during the life of this agreement. Effective dates for price changes shall be January 1st, April 1st, July 1st and October 1st. At least sixty (60) days notice of price revision will be given by the Company to the Distributor before the same becomes effective. The Distributor shall pay, in addition to the prices above provided for, seventy-five cents a ton for national advertising costs.

237

WRG05251024

S8020058329

## SCHEDULE C - TERRITORY

The Distributor is assigned the following territory:

All of the State of Montana except and not including the counties of Lincoln, Flathead, Sanders, Lake, Mineral, Missoula and Ravalli.

That part of the State of North Dakota lying west of and including the counties of Towner, Eddy, Emmons, Ramsey, Wells, Benson and Burleigh.

The following counties in the State of Wyoming: Park, Washakie, Campbell, Yellow Stone National Park, Hot Springs, Sheridan, Crook, Big Horn, Johnson and Weston.

238 -
WRG05251025

S8020058330