# EXHIBIT 1A

## REMEDIATION AGREEMENT

## REMEDIATION AGREEMENT

This REMEDIATION AGREEMENT is made this 8th day of April 2005 by and between Hatco Corporation, a New Jersey corporation located at 1020 King Georges Post Road, Fords, New Jersey (hereinafter "HATCO"), W.R. Grace & Co.-Conn., a Connecticut corporation located at 7500 Grace Drive, Columbia, MD 21044 (hereinafter "GRACE"), and Remedium Group, Inc., a Delaware corporation located at 6401 Poplar Avenue, Suite 301, Memphis, TN 38119 (hereinafter "REMEDIUM" and collectively with HATCO and GRACE, the "CLIENT"), and Weston Solutions, Inc., a Pennsylvania corporation located at 1400 Weston Way, West Chester, PA 19380 (hereinafter "WESTON").

## WITNESSETH:

**WHEREAS,** HATCO is the current owner and operator of a specialty chemical manufacturing facility and real property located at 1020 King Georges Post Road, Fords, Middlesex County, New Jersey that was formerly owned and operated by GRACE (hereinafter referred to as the "Hatco Facility"); and

**WHEREAS,** environmental conditions on the Hatco Facility and adjoining real property have given rise to legal obligations on the part of GRACE and HATCO to investigate and remediate such conditions and may give rise to additional liabilities; and

**WHEREAS,** WESTON wishes to assume, and the CLIENT wishes to transfer and assign to WESTON all liability and responsibility on the part of the CLIENT in perpetuity for the environmental contamination resulting from Pollution Conditions occurring prior to November 4, 2002 whether at, on, under or migrating or migrated from the Hatco Facility;

**NOW, THEREFORE,** the Parties, in consideration of the mutual covenants set forth below, agree as follows:

### 1.    Definitions

A.    "ACO" shall mean the Administrative Consent Order attached to the Settlement Agreement.

B.    "Applicable Law" shall mean any federal, state or local statute, law, ordinance, regulation, directive, order, judicial decision or other enforceable requirement of any Governmental Authority, now in effect or enacted in the future, pertaining to the Investigation and Remediation or protection of human health and/or the environment. Such Applicable Law shall include, but shall not be limited to:  the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 *et seq.;* the Solid Waste Management Act, N.J.S.A. 13:1E-1 *et seq.;* the Water Pollution Control Act, N.J.S.A. 58:10A-1 *et seq.;* the

Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act and the Resource Conservation and Recovery Act ("SWDA" and "RCRA"), 42 U.S.C. §§ 6901 et seq.; the Clean Air Act, 42 U.S.C. §§ 7401 et seq.; the Clean Water Act, 33 U.S.C. §§ 1251 et seq.; and the Toxic Substances Control Act, 15 U.S.C. §§ 2601 et seq ("TSCA"). Applicable Law specifically includes, without limitation, all "environmental laws" as that term is defined in the Policy.

C.     "Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Delaware.

D.     "Contamination" or "Contaminant" shall mean any discharged hazardous substance as defined pursuant to N.J.S.A. 58:10-23.11b, hazardous waste as defined pursuant to N.J.S.A. 13:1E-38, or pollutant as defined pursuant to N.J.S.A. 58:10A-3.

E.     "Deed Notice" means the deed notice contained in the NJDEP regulations at N.J.A.C. 7:26E, Appendix E, as may be modified from time to time by NJDEP after public notice and comment.

F.     "Dispute Resolution" means the procedures by which a dispute between or among the Parties shall be resolved, as set forth in Section 10 of this REMEDIATION AGREEMENT.

G.     "Effective Date" shall mean the date set forth in Section 20 hereof.

H.     "Financial Assurance Requirements" means, collectively, a remediation funding source set forth at N.J.A.C. 7:26C-7.1 et seq. or other requirement imposed by Applicable Law to use, establish, employ or maintain any or some combination of financial mechanisms (including, without limitation, trust funds, surety bonds, letters of credit, insurance, and net worth tests) to assure performance of any obligation, or satisfaction of any liability, imposed by Applicable Law in connection with the Investigation and Remediation Liability including payment of any applicable remediation funding surcharge or other applicable surcharge imposed by Governmental Authorities.

I.     "FIRM" shall mean WESTON or an alternate firm retained to replace WESTON pursuant to the terms of this REMEDIATION AGREEMENT and the Policy.

J.     "Governmental Authority" shall mean any federal, state or local governmental regulatory or administrative agency, commission, department, board, or other governmental subdivision, court, tribunal, arbitral body or other governmental authority or other subdivision, department or branch of any of the foregoing.

K.     "Insurer" shall mean ACE American Insurance Company, a Pennsylvania domiciled stock property casualty insurance company, located at 1601 Chestnut Street, Philadelphia, Pennsylvania 19103.

2

L.    "Investigation and Remediation" shall mean all activities necessary to investigate and remediate Pre-existing Pollution Conditions at, under, or migrated or migrating from the Site to comply with Applicable Law and the requirements of Governmental Authorities, including the RAWP, ACO, the risk-based PCB remedy approval letter issued by the USEPA,  and all other orders, directives, decisions, permits, or requirements of any Governmental Authority regarding the Site and Pre-existing Pollution Conditions.  Investigation and Remediation shall include, but are not limited to, engineering, design, planning, permitting, and performance of sampling, analysis, modeling, other methods of environmental study of actual and potential Pre-existing Pollution Conditions, obtaining access, removal actions, remedial actions, wetlands mitigation, operations and maintenance, and disposal of waste materials, including signing waste profiles and manifests.  Investigation and Remediation shall include public participation, community involvement, transportation, permit fees, and other activities necessary to implement the RAWP and to comply with the ACO in order to obtain one or more No Further Action letter(s), to comply with any conditions in any such No Further Action letter(s), and to comply with the risk-based PCB remedy approval letter to be issued by the USEPA.  Investigation and Remediation shall include the work of attorneys engaged by the FIRM as necessary to facilitate and implement the foregoing activities and to respond to and negotiate with Governmental Authorities regarding the Site.

M.    "Investigation and Remediation Costs" shall mean all actual and necessary costs incurred by the FIRM for Investigation and Remediation, including reimbursement of oversight costs of any Governmental Authority and satisfying any and all Financial Assurance Requirements.  Investigation and Remediation Costs include costs related to liability for disposal of Pollutants that are removed and disposed off-Site as part of the Investigation and Remediation.

N.    "Investigation and Remediation Liability" shall mean the obligation of each CLIENT to perform Investigation and Remediation.

O.    "Losses" shall mean claims, costs, damages, expenses, judgments, liabilities, fines, penalties, and losses of any nature or kind whatsoever, including, but not limited to, legal costs and expenses.

P.    "New Pollution Conditions" shall mean Pollution Conditions on, under or migrated or migrating from the Site that commenced from discharges occurring on or after November 4, 2002.

Q.    "NJDEP" shall mean the New Jersey Department of Environmental Protection or any legal successor thereto.

R.    "NRD  Settlement Agreement" shall mean the settlement agreement addressing natural resource damages related to the Site dated April 7, 2005, entered into by GRACE, REMEDIUM, HATCO, WESTON, and NJDEP.

3

S.    "Parties" shall mean FIRM, HATCO, GRACE and REMEDIUM, collectively.

T.    "Policy" shall mean the Remediation Expense Containment and Premises Pollution Liability Insurance Policy attached as Exhibit F.

U.    "Pollutant" shall mean any substance, material or waste which is defined as or contains "Contamination", "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste," "restricted hazardous waste," "contaminant," "pollutant," "solid waste," "fill," "toxic waste" or "toxic substance" under any Applicable Law. The term Pollutants shall include, but not be limited to, petroleum; petroleum products; asbestos-containing material except where installed or applied in, on or to any building or any structure; radioactive materials; polychlorinated biphenyls; and all substances defined as Hazardous Substances, Oils, Pollutants or Contaminants in the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. § 300.5, and comparable state regulations.

V.    "Pollution Conditions" shall mean the discharge, dispersal, release, presence or escape of any Pollutants, directly or indirectly, into or upon land, the atmosphere or any watercourse or body of water, including groundwater at or emanating from the Site.

W.    "Pollution Liability" shall mean the obligation of each CLIENT for risks resulting from any Pre-existing Pollution Condition at, under or migrated or migrating from the Site, including, but not limited to, third-party bodily injury, property damage and natural resources damage, but excluding liability to employees of GRACE and/or HATCO, or members of the employees' families, arising out of workplace exposure to Pre-existing Pollution Conditions except to the extent caused by or arising from the acts or omissions of FIRM.

X.    "Pre-existing Pollution Conditions" shall mean Pollution Conditions at the Site caused by operations or conditions existing prior to November 4, 2002, including without limitation, the effects of continuing discharges of Pollutants from discharges commencing prior to November 4, 2002.

Y.    "RAWP" shall mean the Remedial Action Work Plan as approved by NJDEP, incorporating a certain Draft Remedial Action Work Plan for the Site dated March 29, 2001, prepared by URS, as amended by addendum letters dated March 27, 2002 and November 15, 2004, and any subsequent modifications approved in writing by NJDEP, including any modification required to incorporate the requirements of the risk-based PCB remedy approval letter issued by the USEPA on March 30, 2005.

Z.    "Settlement Agreement" shall mean the settlement agreement concerning the Site dated April 8, 2005, entered into by GRACE, REMEDIUM, HATCO, WESTON, Insurer and NJDEP.

4

NY\1011835.1

AA.    "Site" shall mean the Hatco Facility and all property (real or otherwise) to which Pollutants therefrom have emanated, are emanating or will emanate.

BB.    "USEPA" shall mean the United States Environmental Protection Agency or any legal successor thereto.

## 2.    Transfer and Assignment of Liability

A.    CLIENT hereby transfers and assigns to FIRM, which transfer and assignment FIRM hereby accepts, any and all Investigation and Remediation Liability and any and all Pollution Liability, except for Excluded Matters as defined in subparagraph (B), below. FIRM hereby agrees to hold harmless, defend and indemnify in perpetuity each CLIENT, its successors, affiliates, parents, subsidiaries, lessees and assigns, and its respective officers, directors, shareholders and employees for all costs or claims on account of, with respect to, or in any way connected with or arising out of the Pre-existing Pollution Conditions.    The foregoing transfer, assignment, and obligation to hold harmless shall not apply to Excluded Matters set forth below.

B.    Excluded Matters not assumed by FIRM and expressly retained by CLIENT are the following:

(i)    Any past costs including oversight costs incurred by any Governmental Authority or other party prior to November 4, 2002;

(ii)    New Pollution Conditions, for which responsibility is retained solely by HATCO;

(iii)    Other than Natural Resource Damages, any fines or penalties associated with Pollution Conditions occurring prior to November 4, 2002 regardless of when such fines or penalties are assessed; provided, however, that this exclusion shall not apply to such fines or penalties that are assessed due to FIRM's failure to comply with Applicable Law; and

(iv)    Any fines or penalties associated with noncompliance with Applicable Law unrelated to the Investigation and Remediation for which FIRM is responsible.

## 3.    Contract Price

A.    Within nine (9) days of the execution of the ACO by NJDEP (the "Closing Date"), GRACE shall pay to FIRM the sum of $21,353,794 and HATCO shall pay to FIRM the sum of $3,768,316 (collectively a total of $25,122,110, the "Contract Price") for the assumption by FIRM of the obligations set forth herein.  The Contract Price covers the cost of FIRM's services pursuant to this REMEDIATION AGREEMENT and the cost of the Policy.  The FIRM shall remit the premium for the Policy (as determined

5

in the Settlement Agreement) within five (5) days of the FIRM's receipt of the Contract Price.

B.    Within five (5) days of receipt of the Contract Price, FIRM shall deposit the sum of $1,747,500 (the "Trust Funds") into a Custody Safekeeping Account. Such account shall be governed by an agreement substantially similar to that set forth in Exhibit G, attached hereto and made a part hereof, and entered into by FIRM and HATCO. These funds will be used solely for operation and maintenance in perpetuity of the cap and storm water retention basins following the expiration of the Policy. Under no circumstances shall FIRM liquidate the Custody Safekeeping Account without written authorization by HATCO and, if required pursuant to the ACO, any No Further Action Letter or Applicable Law, by the State of New Jersey or other party designated therein.

### 4.    FIRM's Obligations

In consideration of the Contract Price set forth herein, FIRM shall have the obligation at its sole cost and expense:

A.    To assume CLIENT's liability pursuant to Applicable Law arising from Pre-Existing Pollution Conditions and Investigation and Remediation Liability;

B.    To diligently perform the Investigation and Remediation in a timely manner;

C.    To assume CLIENT's Pollution Liability and resolve any related claims;

D.    To pay all Investigation and Remediation Costs;

E.    To obtain the Policy;

F.    To comply with Applicable Law and the requirements of Governmental Authorities with regard to the Investigation and Remediation;

G.    To cooperate with HATCO in the planning and execution of the Investigation and Remediation, and to conduct all work in a manner which shall, to the extent practicable, avoid interference with or minimize disruptions to HATCO's operations at the Hatco Facility;

H.    To provide and pay for utilities required to complete the Investigation and Remediation;

I.    To obtain additional or modified permits required to conduct the Investigation and Remediation, except, without limiting FIRM's obligations herein and other than the TSCA risk-based disposal approval to be issued pursuant to 40 C.F.R. § 761.61(c) and any amendments thereto, FIRM shall not take any action in conducting

6

NY\1011835.1

the Investigation and Remediation which will require any permits pursuant to TSCA or impose any permitting obligations pursuant to TSCA on all or a portion of the Hatco Facility;

J.    To construct capital improvements required to conduct the Investigation and Remediation;

K.    To keep HATCO informed of regulatory agency interactions, provide an opportunity for HATCO to review and provide reasonable comment on submissions and commitments made by FIRM to Governmental Authorities concerning or arising from the Investigation and Remediation to the extent such submissions or commitments impact HATCO's operations, and address such comments to HATCO's reasonable satisfaction; and

L.    To obtain the necessary approvals from all off-Site property owners for implementation and maintenance of the Investigation and Remediation.

**5.    HATCO's Obligations**

HATCO shall have the obligation:

A.    To cooperate with FIRM in the planning and execution of the Investigation and Remediation;

B.    To provide FIRM with reasonable access to the Hatco Facility to conduct the Investigation and Remediation, and to provide NJDEP and USEPA with reasonable access to the Hatco Facility as each deems necessary to oversee the Investigation and Remediation;

C.    After its review and approval, which approval shall not be unreasonably withheld or delayed, to execute permit applications as owner of the Hatco Facility and allow FIRM to obtain permits in FIRM's name as necessary to implement the Investigation and Remediation, except that HATCO shall not be required to sign any permit applications pursuant to TSCA;

D.    To provide FIRM with copies of or access to all data, reports, and information that HATCO has in its possession concerning the Pollution Conditions at, under, or migrated or migrating from the Site;

E.    To repair any damage from plant construction or operations, beyond normal wear and tear, that impacts the cap or other portions of the remedial measures or any of FIRM's operations or equipment;

F.    To pay fifteen percent (15%) of the Contract Price;

G.    To execute a Deed Notice;

7

H.    To provide to FIRM access to information in HATCO's possession regarding the location or construction of underground utilities at the Hatco Facility; and

I.    To require any lessee of all or a portion of the Hatco Facility to provide reasonable access to FIRM to conduct the Investigation and Remediation.

### 6.    GRACE's and REMEDIUM's Obligations

GRACE and REMEDIUM shall have the obligation:

A.    To provide FIRM with copies of or access to all data, reports, and information that GRACE or REMEDIUM has in its possession or in the possession of URS concerning the Pollution Conditions at, under, or migrated or migrating from the Site; and

B.    To pay eighty-five (85%) of the Contract Price.

### 7.    Implementation Obligations

FIRM and HATCO shall fulfill their obligations set forth in Sections 4 and 5 above in a manner consistent with and in compliance with the following provisions:

A.    Amendment to RAWP. HATCO and FIRM shall seek concurrence on material amendments to the RAWP, if any, and schedules to implement the RAWP. Cooperation between the Parties is essential to ensure a cost effective completion of the remediation project and to minimize any impact on HATCO's facilities.    Where HATCO and FIRM cannot reach concurrence, the dispute shall be resolved by Dispute Resolution pursuant to Section 10 herein.

B.    Management Responsibility. Once work and schedule are agreed upon, FIRM shall have sole management responsibility for the means and methods to complete activities to implement the Investigation and Remediation, including, but not limited to, signing all contracts and manifests to implement the activities necessary to undertake the Investigation and Remediation and to pay all invoices of subcontractors.

C.    Project Coordinators. HATCO and FIRM each shall designate a single employee as its Project Coordinator to represent and otherwise initially act for that party. All communications, notices, consultations, and other actions between HATCO and FIRM shall be undertaken through the respective Project Coordinators. The Project Coordinators' addresses, telephone, facsimile, and other communication information shall be as designated on Exhibit B hereof. HATCO or FIRM, at any time, may change its designation of Project Coordinator by notice to the other's Project Coordinator, which notice shall include the name, title, address, and telephone number of the replacement.

8

NY\1011835.1

D.    Meetings.  FIRM and HATCO shall hold meetings at the Site or by teleconference as necessary to coordinate access to the Hatco Facility and to keep HATCO informed of progress on a monthly basis or on whatever schedule HATCO or FIRM deem appropriate.  At these meetings, schedules for the upcoming activities shall be reviewed and coordinated to avoid any material interference with ongoing HATCO operations.   Any planned activities that may impact the implementation of the Investigation and Remediation or HATCO's operations shall be reviewed and modified as necessary. FIRM shall provide HATCO with a layout/site plan identifying areas of the Hatco Facility for its use, including, but not limited to, equipment and waste staging, decon and office trailer for HATCO review and approval.

E.    Agreement on Reports and Communication.  HATCO and FIRM shall discuss all issues at the monthly or otherwise scheduled meetings. Prior to submission of any study or report or other communication to a third party relating to the Investigation and Remediation, HATCO and FIRM shall seek concurrence reasonably in advance of the required submission date.

F.    Facility Accommodation. Notwithstanding any other section of this REMEDIATION AGREEMENT, if HATCO claims remedial activity will materially disrupt its operations or make such operation more difficult or expensive, HATCO shall be reasonably accommodated (except if it would cause a violation of law or the ACO) regarding the timing of and reasonable conditions to be imposed on any activity which is reasonably likely to disrupt operations of the Hatco Facility, or make such operations significantly more difficult or expensive to conduct, or would otherwise materially adversely affect the ability of HATCO to operate, maintain, repair, replace, and expand the Hatco Facility.

G.    Communication with NJDEP and Other Agencies.   FIRM's Project Manager shall be designated as the contact for receipt of communications from NJDEP and shall have authority to initiate communications with NJDEP and any other federal, state, or local environmental regulatory agencies with respect to the Investigation and Remediation provided that HATCO shall be given the opportunity to participate in all meetings or conference calls with such agencies which relate to the subject matter of this REMEDIATION AGREEMENT.

H.    Agency Initiated Communications.    Should NJDEP or any other Governmental Authority initiate communication with FIRM with respect to the subject matter of this REMEDIATION AGREEMENT, FIRM shall promptly contact HATCO by e-mail to relate the substance of the communication. Any written communication received by HATCO or FIRM shall be forwarded promptly to the other.

I.    Adherence to Schedule. For specific tasks that may significantly impact HATCO's operations, FIRM and HATCO shall agree on a specific schedule for such tasks, and FIRM shall use sufficient labor and/or equipment to complete such tasks within the specified schedule.

9

J.    Labor and Materials.  FIRM shall furnish, at its own expense, all labor, materials, equipment, supplies, services, tools, transportation facilities and other facilities (including, but not limited to, all utilities such as water, gas, temporary lighting and electrical service) and will perform all things necessary to fulfill its obligations under this REMEDIATION AGREEMENT and to disconnect and remove or abandon all temporary services and utilities at the end of the Investigation and Remediation which were constructed or installed by FIRM or its subcontractors.

K.    Housekeeping.  FIRM shall during the Investigation and Remediation manage and store FIRM's tools, devices, equipment, machinery, facilities and materials, and keep the Site reasonably free from accumulated waste, rubbish and debris at all times, except for wastes including, but not limited to, excavated soil, excavated debris, and treatment residuals, which may be temporarily stored or stockpiled in areas approved pursuant to Paragraph 7.D., above, during the Investigation and Remediation for a reasonable period of time in accordance with Applicable Law prior to removal. FIRM shall remove from the Site, when no longer necessary to implement the Investigation and Remediation, all of FIRM's tools, equipment, machinery, facilities, surplus materials, and debris, and those of its subcontractors and any other persons or entities performing the Investigation and Remediation or portions of the Investigation and Remediation, except as otherwise approved in writing by HATCO.

L.    Location of Improvements.  FIRM shall consult with and obtain approval from HATCO for the location of all temporary and permanent improvements to the Hatco Facility required as part of or related to the Investigation and Remediation or to otherwise comply with this REMEDIATION AGREEMENT.

M.    Damage.  In the performance of its obligations under this REMEDIATION AGREEMENT, FIRM and its subcontractors and any other persons or entities performing the Investigation and Remediation or portions of the Investigation and Remediation will not disturb or damage any buildings, equipment, structures or other improvements on the Site, except that any pavement or concrete in areas of remediation may be disturbed as necessary, and monitoring wells may be removed or replaced as contemplated by the RAWP or otherwise as required or approved by NJDEP.  FIRM shall be responsible for restoring or repairing any damage to the Site and its improvements caused by the activities of FIRM, its subcontractors, and any other persons or entities performing portions of the Investigation and Remediation to pre-existing conditions.

N.    Codes and Standards.  All Investigation and Remediation shall be performed in accordance with all applicable codes and standards, and, except where more stringent requirements are imposed by this REMEDIATION AGREEMENT, in accordance with generally accepted practices in New Jersey for the type of work being performed.

O.    Utility Mark Out.  FIRM shall determine the location of all utilities at the Site.  FIRM acknowledges that various utilities and other parties have easements and

10

rights of way on the Site, including utilities, which may have underground electric, gas, or water lines traversing the Site. FIRM covenants that proper precautions and measures will be taken by FIRM not to endanger, interfere with, or cause any damage to such easements or rights of way. FIRM will not disturb or damage any pipes, poles, utilities, or other improvements over, on or under the Site which exist pursuant to easements or other agreements unless necessary for performance of the Investigation and Remediation and authorized by the relevant owner(s), in which case, FIRM shall, at its sole cost, be responsible for repair or replacement of such improvements.

P.    Improvements. FIRM shall be responsible, at its sole cost, to maintain, repair, or replace any improvements constructed by FIRM.

Q.    Defective Work. Observation by HATCO or HATCO's employees of the Investigation and Remediation shall not relieve FIRM of any of its obligations to perform all Investigation and Remediation in the manner required under this REMEDIATION AGREEMENT. Without limitations to HATCO's rights, if HATCO becomes aware of a failure of FIRM to have performed the Investigation and Remediation in accordance with applicable standards, specifications, and construction codes, plans and designs ("Defective Condition") and, if FIRM agrees, FIRM shall promptly remedy such Defective Condition. If FIRM does not agree, the matter shall be resolved in accordance with the Dispute Resolution process set forth in Section 10, hereof. In addition to the indemnification obligations required by Section 12 of this REMEDIATION AGREEMENT, FIRM shall be liable for any claims, expenses, loss or other costs, including but not limited to lost profits resulting from HATCO being unable to utilize the portions of the Hatco Facility at which the Investigation and Remediation is or was being performed, arising from a Defective Condition. To be valid, claims must be brought within five (5) years of the completion of the work associated with each Project Milestone set out in Exhibit A hereto.

R.    Patents. FIRM shall indemnify, hold harmless, and defend HATCO, its shareholders, officers, agents and employees, from and against all claims and liability of any nature or any kind, including costs and expenses (including attorneys fees), arising from or occasioned by any infringement or alleged infringement of patent rights, trademark or copyright on any invention, process, article or apparatus, or any part thereof, pertaining to or used in connection with the Investigation and Remediation.

S.    Liens. FIRM shall indemnify and save harmless HATCO, its shareholders, officers, employees and agents, from all claims, demands, causes of action, or suits of whatever nature arising out of the labor and materials furnished by FIRM and its subcontractors under this REMEDIATION AGREEMENT, and from all laborers', materialmen's and mechanics' liens upon the Investigation and Remediation or upon the Site upon which the Investigation and Remediation is located arising out of the labor and materials furnished by FIRM and its subcontractors under this REMEDIATION AGREEMENT, and shall keep the Investigation and Remediation and said Site free and clear of all liens, claims and encumbrances arising from the performance of this REMEDIATION AGREEMENT by FIRM and its subcontractors. If any subcontractor

11

refuses to furnish a release or receipt in full, FIRM may furnish a bond satisfactory to HATCO to indemnify HATCO against any lien claim.

T.    Safety.  FIRM and its employees, subcontractors, and agents and any other persons or entities performing the Investigation or Remediation or portions of the Investigation or Remediation shall provide and properly maintain all appropriate safety apparatus and devices, including, but not limited to, warning lights and signs, barricades, railings, temporary bridges, guards, watchmen and other safeguards or personnel for the protection of workers, delivery personnel and others, including the general public, on, about or adjacent to the Site as required by the conditions and progress of the Investigation and Remediation.  Where work is done on HATCO's premises, all of HATCO's safety rules, which may be amended from time to time, and which are attached hereto as Exhibit C, shall be strictly observed and smoking shall be limited to such locations and occasions as are specifically authorized by HATCO. HATCO will provide safety training on HATCO procedures to FIRM's supervisors who will then be responsible to train FIRM employees and subcontractors entering the Hatco Facility.  FIRM shall certify to HATCO in writing from time to time that such training has been given.    If FIRM determines that any provision of this REMEDIATION AGREEMENT shall call for work which is not safe, inadequate, or not in compliance with any occupational safety or health statute, law, rule, or regulation, then FIRM will immediately notify HATCO's Project Coordinator in writing and will cease any such work until receipt of instructions from HATCO's Project Coordinator.

U.    Hazardous Conditions.  FIRM acknowledges that the nature of HATCO's business creates an unsafe risk if activities are not conducted in strict compliance with applicable safety requirements.    Accordingly, FIRM shall not, without prior written consent of HATCO, perform or permit any work while on the premises of HATCO which involves a fire or explosion hazard, including, but not limited to, welding, torch cutting or disposal of debris by burning.  FIRM shall provide at least 48 hours in advance, or less time in case of an emergency, a written schedule of all such proposed activity, identifying its location and the time or times of day that it will be occurring.  No such scheduled activity shall occur until it is expressly approved in writing by HATCO's safety officer.    Without limiting HATCO's other rights and remedies, any violation of this requirement will result in immediate removal from the Hatco Facility of any person conducting such activity.

V.    Illegal Substances.  FIRM shall assure that all employees of FIRM and subcontractors and any other person or entity performing the work or portions of the work, are informed that prohibited items, such as weapons, illegal drugs, intoxicating liquors or any similar items, shall not be carried onto the Site.

W.    Security.  FIRM shall have access to the Hatco Facility through the south gate designated as the non-union gate (currently the gate at the west side of the property on Industrial Highway) or such other entrance as may be agreed to between HATCO and FIRM.  FIRM shall provide adequate security personnel at such designated gate at all times the gate is unlocked.  All workers, whether employees of FIRM or

12

subcontractors, shall be required by FIRM to sign in and out upon entry or exit from the Hatco Facility. All such personnel shall follow HATCO security procedures, which may be amended from time to time, attached as Exhibit D hereto, while at the Hatco Facility and are specifically prohibited from accessing manufacturing areas of the Hatco Facility as designated by HATCO, except for those workers specifically assigned to tasks within such areas and only after notice and approval by HATCO, and further procedures for daily operation in designated areas must be reviewed and approved by HATCO in advance of such daily access.

### 8.    New Pollution Conditions

A.    In the event a Pollution Condition is discovered at the Site which was not previously identified as a Pre-existing Pollution Condition, FIRM shall report such Pollution Condition to the appropriate Governmental Authority, if required by Applicable Law, and determine: (i) the nature and extent of the Pollution Condition; (ii) whether the Pollution Condition is a Pre-existing or New Pollution Condition; and  (iii)  if a Pre-existing Pollution Condition, the source or likely source of the Pollution Condition.  FIRM shall reasonably document the basis for its determination of whether the Pollution Condition is Pre-existing or New.

B.    If FIRM determines that the newly discovered Pollution Condition represents a Pre-existing Pollution Condition, FIRM shall be responsible for the Investigation and Remediation of such Pollution Condition.

C.    If FIRM determines that the Pollution Condition represents a New Pollution Condition, FIRM shall submit documentation of its determination to HATCO and Insurer.

D.    If HATCO accepts and agrees with FIRM's determination that the Pollution Condition is a New Pollution Condition, HATCO shall prepare a proposed plan for responding to such New Pollution Condition and conducting investigation and remediation of the New Pollution Condition, if necessary, in accordance with Applicable Law and the requirements of Governmental Authorities for such New Pollution Condition. In the event HATCO does not agree that FIRM has in fact established the existence of a New Pollution Condition, either party may invoke Dispute Resolution pursuant to Section 10 herein.

E.    HATCO shall take all steps reasonably necessary to assure that a New Pollution Condition does not interfere with FIRM's obligations in this REMEDIATION AGREEMENT with respect to Pre-existing Pollution Conditions.

F.    In the event a Governmental Authority requires response with respect to a Pollution Condition (i) which has not previously been identified as a Pre-existing Pollution Condition and (ii) with respect to which a determination as to whether it is a Pre-existing Pollution Condition has not yet been made, FIRM shall undertake such response pending such determination.  In the event such Pollution Condition is subsequently determined to be a New Pollution Condition and FIRM has provided

13

notice to HATCO prior to performance of any Investigation and Remediation by FIRM, HATCO shall compensate FIRM for the costs of such response at FIRM's rates attached hereto as Exhibit E.

      G.    Under no circumstances shall GRACE or REMEDIUM be held responsible for any New Pollution Condition.

### 9.    ISRA

A.    If necessary, the parties shall use best efforts to include terms in the ACO to effect a transfer, closure or other event requiring compliance with the Industrial Site Recovery Act ("ISRA"), as may be amended from time to time, in the event the provisions of ISRA become applicable to the Hatco Facility. Whether or not language is included in the ACO, HATCO shall bear the costs of completing a General Information Notice, and/or other initial submission required by ISRA and for seeking a limited site review approval, remediation in progress waiver, remediation agreement, or other type of ISRA approval as may be necessary for HATCO to effectuate the transfer, closure or other ISRA triggering event, including the cost of completing a Preliminary Assessment, if required to address any New Pollution Conditions. Except as noted in the preceding sentence, nothing associated with an ISRA triggering event shall change the FIRM's obligations under this REMEDIATION AGREEMENT, including but not limited to the FIRM's complete responsibility for Pre-existing Pollution Conditions.

      B. Financial Assurances.  HATCO may rely upon the then current Financial Assurance provided by FIRM or on behalf of FIRM in complying with ISRA and the FIRM shall sign any documents necessary thereto; provided however, FIRM shall not be obligated to increase the amount, or the term, of any Financial Assurance, except as required by the ACO or NJAC 7:26C-7.1 et seq., as may be amended from time to time.

### 10.    Dispute Resolution

      In the event of a disagreement among any of the Parties regarding any matter under this REMEDIATION AGREEMENT, those parties shall implement the procedures of this Section in good faith to obtain a resolution.

      A.    Negotiation Period.  Any party may commence a negotiation period by notifying the other party(ies) in writing that it is invoking Dispute Resolution pursuant to this Section 10. Such notice shall set forth the nature of the dispute and a proposed resolution. The other party(ies) shall respond in writing within 10 days, either accepting the proposed resolution or proposing an alternative resolution. During this negotiation period the parties shall work together in good faith to attempt to resolve the matter in dispute. The parties may extend this negotiation period, without limitation, by mutual agreement in writing and may seek to resolve any disputed issues or the entire dispute by non-binding alternative dispute resolution procedures, including mediation or other procedure agreed to by the parties. Unless extended by mutual written agreement, the negotiation period shall expire forty-five (45) days from the date of commencement.

The Parties agree that upon the exercise of this procedure and without any further writing among them, any statute of limitations applicable to the dispute in question shall be deemed to have been tolled for so long as the Parties are engaged in good faith negotiations pursuant to this subparagraph 10.A.

B.     Binding Arbitration.  In the event the parties do not resolve a dispute during the negotiation period, then the dispute shall be resolved by binding arbitration before one arbitrator conducted in Woodbridge Township, New Jersey in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") then in effect.  The arbitrator shall be a neutral and impartial person having at least 10 years experience in commercial and environmental matters who has acted as an arbitrator in similar disputes.  The arbitrator shall be selected by the agreement of the parties in the dispute within twenty (20) calendar days after the negotiation period has elapsed, and if not selected within those twenty (20) days, then shall be selected in accordance with the AAA Commercial Arbitration Rules.

C.     The arbitrator shall conduct the arbitration in accordance with the AAA Commercial Arbitration Rules; provided that (1) discovery shall consist solely of one set of interrogatories propounded by each side within twenty (20) days after the arbitrator has been selected and answered within thirty (30) days after the arbitrator has been selected; (2) each party shall provide to each other party written reports of any experts which the party will rely on during the arbitration and those reports must be received by each party within forty-five (45) days after the arbitrator has been selected; (3) the arbitration hearing will commence within sixty (60) days after the date that the arbitrator has been selected; and (4) the arbitrator will render his award within twenty (20) days after the end of the arbitration.

D.     The arbitrator shall render the arbitrator's award in writing, stating findings of fact and conclusions of law, and shall construe this REMEDIATION AGREEMENT in accordance with the laws of the State of New Jersey.  Judgment on the award shall not be subject to appeal or challenge and may be confirmed and entered in any court having jurisdiction.

E.     Costs of the arbitration, together with reasonable attorney's fees incurred by the prevailing party in the arbitration and in enforcement of the arbitration award shall be paid by the party(ies) in the dispute which is (are) not the prevailing party in the arbitration.  Should one party either dismiss or abandon its claim or counter claim before the hearing of it, the other party will be deemed the "prevailing party" pursuant to this REMEDIATION AGREEMENT.  Should both parties receive judgment or award on their respective claims, the arbitrator shall determine which party will be deemed the "prevailing party" for purposes of this Section 10.

F.     Dispute involving GRACE and/or REMEDIUM.  With the exception of a breach of Section 6, no dispute may be lodged against GRACE or REMEDIUM.

15

## 11.    Insurance

A.    FIRM shall obtain the Policy from Insurer, which shall be issued in the form attached hereto as Exhibit F.

B.    FIRM shall also maintain, at its sole cost and expense, the following insurance coverages:

(i)    Commercial General Liability insurance which shall be on a per occurrence basis and shall include, but not be limited to, coverage for all operations, FIRM's subcontractors' operations, Blanket Contractual Liability (oral or written), Completed Operations and Products Liability (including a period of two years following termination of the Investigation and Remediation including continued contractual indemnity), Broad Form Property Damage, Explosion, Collapse and Underground Hazards with limits of liability of not less than ten million dollars ($10,000,000) combined single limit per occurrence with a twenty million dollar ($20,000,000) aggregate limit, a deductible or self-insured retention amount no greater than $100,000, and Knowledge of Occurrence and Notice of Occurrence Endorsements and Unintentional Errors and Omissions Clause.

(ii)    FIRM's Pollution Liability insurance with a limit of not less than ten million dollars ($10,000,000).

(iii)    Business Automobile Liability insurance covering any auto or vehicle (including owned, hired, and non-owned autos or vehicles) providing Bodily Injury and Property Damage coverage on a per occurrence basis, with a limit of not less than ten million dollars ($10,000,000) combined single limit.

(iv)    Professional Liability/Errors and Omissions insurance with a minimum limit of not less than ten million dollars ($10,000,000).

(v)    Workers' compensation insurance with statutory limits and Employers' Liability limits of not less than ten million dollars ($10,000,000) each accident for bodily injury by accident or ten million dollars ($10,000,000) for each employee for bodily injury by disease.

(vi)    Umbrella insurance for not less than ten million dollars ($10,000,000). If umbrella insurance is written by more than one company, any layers above the first shall follow the form of the primary policy.

(vii)    All policies for each insurance required under this Section 11.B. shall: (a) name each CLIENT and such other entities as the CLIENT may require as additional insureds (this requirement shall not apply to workers' compensation insurance, employers' liability insurance, or professional liability insurance, however, each such policy shall include a waiver of subrogation by the insurer as against CLIENT); (b) hold each CLIENT free and harmless from all subrogation rights of the insurer; and (c)

16

provide that such required insurance hereunder is the primary insurance and that any other similar insurance that each CLIENT may have shall be deemed in excess of such primary insurance.

(viii)   FIRM shall submit to each CLIENT evidence of payment of the premiums and a certificate or certificates for each required insurance referenced above certifying that such insurance is in full force and effect and setting forth the information required by this Section 11.B. If requested by the CLIENT, FIRM shall provide certified copies of the policies.   Such policies shall be maintained as confidential except as may be required or requested by CLIENT's prospective purchaser, lessee, insurer, or lender, or as otherwise required by law, each of whom shall be required to maintain the confidentiality of such policies.   FIRM shall submit to each CLIENT copies of all endorsements which may be issued amending the coverage of any policy; however, in no event shall any endorsement be permitted which shall diminish the limits of any insurance required by this Section 11.B. FIRM shall promptly provide written notice to each additional insured by registered or certified mail of any cancellation, restrictive amendment, non-renewal or change in coverage as set forth in this REMEDIATION AGREEMENT.

(ix)   FIRM shall furnish to each CLIENT within thirty (30) days before the expiration date of the coverage of each required insurance set forth in this Section 11.B., a renewal certificate or certificates containing the information required below and certifying that such insurance has been renewed and remains in full force and effect. If at any time during the Investigation and Remediation for each required insurance set forth in this Section 11.B., any policy of insurance shall expire or for any reason be cancelled, or coverage for risks other than those provided for herein shall be required by law, FIRM shall promptly comply with the request to procure or to renew the cancelled or expired coverage or increase the amount of existing coverage, as the case may be, and upon FIRM's failure to so provide within five (5) days of the giving of notice thereof by CLIENT, CLIENT may provide therefore and charge the cost to FIRM.

(x)   If FIRM fails to provide any item required in this Section 11.B. on a timely basis, CLIENT may obtain such insurance and charge the cost thereof to FIRM.

C.   FIRM's contractors and/or subcontractors performing intrusive activities such as drilling, excavation, emergency response, grading, electrical and paving or the supervision of same at the Site shall carry the same level of insurance as required of FIRM in Section 11.B.

D.   FIRM shall require its contractors and/or subcontractors performing non-intrusive activities such as surveyors, laboratories (where sample pick-up is required), construction material vendors, air monitoring, photographers, portable sanitary services or the supervision of same at the Site to carry the level of insurance as specified below:

(i)   Workers   Compensation   insurance   in   accordance   with   statutory requirements.

17

(ii)     Employers Liability with a one million dollar ($1,000,000) limit of liability.

(iii)     Commercial General Liability insurance which shall be on a per occurrence basis and shall include, without limitation, coverage for all operations, subcontractors, Blanket Contractual Liability (oral or written), Completed Operations and Products Liability (which shall cover two years following termination of the Investigation and Remediation and shall include continued contractual indemnity), Broad Form Property Damage, Explosion, Collapse and Underground Hazards. The policy shall contain limits of liability not less than one million dollars ($1,000,000) Combined Single Limit per occurrence with a two million dollar ($2,000,000) Aggregate Limit. Said insurance shall not have any deductible or self-insured retention amount greater than $25,000 and shall include Knowledge of Occurrence and Notice of Occurrence Endorsements and an Unintentional Errors and Omission Clause. The contractor/subcontractor shall provide 30-day advance written notice of cancellation to all named and additional insureds.

(iv)     Professional Liability/Errors and Omissions insurance with a limit of liability of not less than one million dollars ($1,000,000).

(v)     Comprehensive Automobile Liability insurance, covering Owned, Non-Owned, and Hired Vehicles, providing Bodily Injury and Property Damage coverage all on a per occurrence basis. Limits of liability shall not be less than one million dollars ($1,000,000) Combined Single Limit.

(vi)     Umbrella insurance for not less than two million dollars ($2,000,000). If umbrella insurance is written by more than one company, any layers above the first shall follow the form of the primary policy.

E.     FIRM's contractors and/or subcontractors performing no activities on the Site or other field work shall be exempt from all insurance requirements except Professional Liability/Errors and Omissions coverage with a limit of liability of not less than one million dollars ($1,000,000).

F.     FIRM's contractors or subcontractors that are unable to procure or maintain the required insurance as outlined above shall immediately notify HATCO. Those situations will be dealt with on a case by case basis and individual insurance limits will be agreed to as appropriate based on the facts and circumstances of that case.

## 12.     Indemnification

A.     By the FIRM - FIRM agrees to indemnify, defend and hold harmless each CLIENT, its subsidiaries, affiliates, successors, assigns, directors, officers, agents and employees from any and all Losses, by reason of injury or death or damage to persons or property to the extent caused by the acts or omissions or misconduct of FIRM, its officers, agents, employees, and subcontractors, or to the extent caused by a breach by FIRM of the terms of this REMEDIATION AGREEMENT, including but not limited to a

18

failure or delay in performing the Investigation and Remediation. FIRM agrees to indemnify, defend and hold harmless each CLIENT, it subsidiaries, affiliates, successors, assigns, directors, officers, agents and employees in perpetuity from any and all Losses for any and all Investigation and Remediation Liability and any and all Pollution Liability, and for any claims arising from the off-Site disposal of any waste generated from the Investigation and Remediation.

B.     By HATCO – Except for Losses arising from FIRM's obligations pursuant to this REMEDIATION AGREEMENT, HATCO agrees to indemnify, defend and hold harmless FIRM, its subsidiaries, affiliates, successors, assigns, directors, officers, agents and employees from any and all Losses by reason of injury or death or damage to persons or property, but only to the extent caused by the acts or omissions or misconduct of HATCO, its officers, agents, employees, and subcontractors, or to the extent caused by a breach by HATCO of the terms of this REMEDIATION AGREEMENT.

## 13.     Representations and Warranties of FIRM

A.     FIRM acknowledges that it has reviewed available information concerning the Site and is sufficiently knowledgeable with regard to the nature and character of the Site, including but not limited to: (i) Pollution Conditions, (ii) Investigation and Remediation requirements, (iii) availability of labor, (iv) security requirements, (v) utilities, (vi) access and roads, (vii) surface and subsurface geologic and hydrologic conditions, including the character, quality and quantity of surface and subsurface materials to be encountered, (viii) equipment and facilities, (ix) Applicable Law and the potential for changes to the same, (x) the presence of threatened or endangered species, archaeological resources, and sensitive ecologic and cultural receptors, and (xi) weather conditions, and that FIRM has not and may not rely upon any statement, representation, or warranty of CLIENT except as expressly set forth in this REMEDIATION AGREEMENT.

B.     FIRM represents and warrants that it has the financial resources to execute the Investigation and Remediation, and FIRM agrees to use such resources as necessary.

C.     FIRM represents and warrants that it is qualified to perform the Investigation and Remediation consistent with this REMEDIATION AGREEMENT and that it has sufficient expertise and experience to accomplish same.

D.     FIRM is a corporation duly organized, validly existing, and in good standing under the laws of the state in which it was formed.

E.     The execution by FIRM of this REMEDIATION AGREEMENT does not constitute a breach of any provision contained in FIRM's organizational documents, nor does it constitute an event of default under any agreement to which FIRM is now or may hereafter become a party.

19

NY\1011835.1

F.     FIRM holds or will obtain all licenses, permits, franchises, approvals, and consents required for the performance of its obligations under this REMEDIATION AGREEMENT and for the ownership and operation of its assets.

G.     There are no actions, proceedings, or claims pending by or against FIRM before any court or administrative agency, and FIRM has no knowledge or notice of any pending, threatened, or imminent litigation, governmental investigations, or claims, complaints, actions, or prosecutions involving FIRM, except for ongoing collection matters in which FIRM is the plaintiff, which would have a material adverse effect on FIRM's ability to perform its obligations pursuant to this REMEDIATION AGREEMENT.

H.     To it's knowledge, all information provided by FIRM to CLIENT, including information in its proposal, is true, complete, and accurate and does not fail to state any fact which would make the information misleading or inaccurate.

I.     FIRM shall certify on the Closing Date that the representations and warranties made by it in the Remediation Agreement are true and accurate as of the Closing Date.

### 14.    Representations and Warranties of HATCO

A.     HATCO is a corporation duly organized, validly existing, and in good standing under the laws of the state in which it was formed.

B.     The execution by HATCO of this REMEDIATION AGREEMENT does not constitute a breach of any provision contained in HATCO's organizational documents, nor does it constitute an event of default under any agreement to which HATCO is now or may hereafter become a party.

C.     There are no actions, proceedings, or claims pending by or against HATCO before any court or administrative agency, and HATCO has no knowledge or notice of any pending, threatened, or imminent litigation, governmental investigations, or claims, complaints, actions, or prosecutions involving HATCO which would have a material adverse effect on HATCO's ability to perform its obligations pursuant to this REMEDIATION AGREEMENT.

D.     HATCO represents and warrants that it has the authority to provide reasonable and necessary access to the Hatco Facility in order for FIRM to implement and complete the Investigation and Remediation and to perform its obligations hereunder regarding the Hatco Facility.

E.     Except as set forth in Schedule 14B, to the best of HATCO's knowledge, there are no New Pollution Conditions existing as of April 6, 2005 at the Hatco Facility.

20

"HATCO's knowledge" as used herein is the actual knowledge of James J. Millikin, Manager of Environmental Affairs.

F. HATCO shall certify on the Closing Date that the representations and warranties made by it in the Remediation Agreement are true and accurate as of the Closing Date.

## 15.    Representations and Warranties of GRACE/REMEDIUM

A.    GRACE and REMEDIUM are each a corporation duly organized, validly existing, and in good standing under the laws of the state in which each was formed.

B.    The execution by GRACE and REMEDIUM of this REMEDIATION AGREEMENT does not constitute a breach of any provision contained in the organizational documents of GRACE or REMEDIUM, nor does it constitute an event of default under any agreement to which GRACE or REMEDIUM is now or may hereafter become a party.

C.    GRACE and REMEDIUM are subject to the jurisdiction of the United States Bankruptcy Court and have no ability to perform their obligations pursuant to this REMEDIATION AGREEMENT without approval from the Bankruptcy Court.

D.    To their actual knowledge, based on inquiry of M. Mitch Obradovic, the information provided or made available by GRACE and REMEDIUM is complete and includes accurate copies of all information in their possession or control relating to the Site.

## 16.    Independent Contractor

FIRM is an independent contractor, and the methods and means of its performance and the control thereof shall vest in its discretion. It is understood and agreed that neither FIRM nor CLIENT, by this REMEDIATION AGREEMENT, intends that FIRM or FIRM's employees, representatives, and agents shall be considered, or deemed to be, acting as employees of any CLIENT. FIRM shall not take any action or omit to take any action that is inconsistent with its status as an independent contractor. FIRM shall be solely responsible for all of its practices, procedures, means, methods, and protocols used in carrying out the Investigation and Remediation, for all governmental fees imposed upon its performance of the Investigation and Remediation and for payment of all compensation, benefits, contributions, and taxes, if any, due its employees, agents, contractors, and subcontractors. FIRM agrees that any and all persons whom it may employ or whose services it may retain in order to perform its

21

obligations under this REMEDIATION AGREEMENT shall remain FIRM's employees, contractors, consultants or agents exclusively.

## 17.    Enforcement

A.    In the event that FIRM fails to complete all Investigation and Remediation in accordance with the ACO or otherwise fails to comply with the terms and conditions of the ACO and any No Further Action letter(s), and the NJDEP seeks stipulated penalties, FIRM shall be liable for such stipulated penalties whether demanded of FIRM or HATCO or otherwise. The payment of stipulated penalties does not relieve FIRM of its responsibility to complete the Investigation and Remediation in accordance with this REMEDIATION AGREEMENT and the ACO.

B.    FIRM shall have no liability to CLIENT for a delay in performance of the Investigation and Remediation caused by circumstances beyond its reasonable control, such as acts of God, acts of government, riots, wars (declared or undeclared), terrorism, floods, fires, delays in transportation or inability to obtain material or equipment, labor disputes, newly discovered Pre-Existing Conditions, and delays caused by HATCO. Any time limits required to be met by FIRM which are subject to force majeure shall be automatically extended by the number of days by which any performance called for is delayed due to force majeure provided FIRM delivered to HATCO prompt written notice of the force majeure event. In no event shall a strike by FIRM's employees or informational picketing resulting from the performance of the Investigation and Remediation be considered a force majeure event.

## 18.    Standard of Care

FIRM shall perform the Remediation and Investigation in accordance with generally accepted professional standards of care and diligence normally practiced by nationally recognized firms performing similar work.

## 19.    Notices

Notices required hereunder shall be deemed given if sent by first-class mail or recognized overnight courier to the following duly authorized representatives, with same-day copies by fax or email:

> **For HATCO:**
> David J. Mason
> Vice President Regulatory Affairs
> Hatco Corporation
> 1020 King Georges Post Road
> Fords NJ 08863
> dmason@hatcocorporation.com
> Fax: (732) 738-3944

**For GRACE:**

William M. Corcoran
Vice President Public and Regulatory Affairs
W. R. Grace & Co.
7500 Grace Drive
Columbia MD 21044
William.Corcoran@Grace.com
Fax: 410-531-4233

**For REMEDIUM:**

M. Mitch Obradovic
Assistant Director
Remedium Group, Inc.
6401 Poplar Avenue, Suite 301
Memphis TN 38119
Mitch.Obradovic@Grace.com
Fax: 901-820-2061

**For FIRM:**

Daniel Kopcow
Project Manager
Weston Solutions, Inc.
205 Campus Drive
Edison NJ 08837
Daniel.Kopcow@westonsolutions.com
Fax: 732-417-5801

The Parties may change their duly authorized representatives at any time by providing written notice to the other Parties.


**20.    Effective Date.**

This REMEDIATION AGREEMENT will have no effect unless approved by order of the Bankruptcy Court, and the Effective Date shall be the date on which the Bankruptcy Court issues an order approving this REMEDIATION AGREEMENT. This REMEDIATION AGREEMENT may be executed prior to approval of the Bankruptcy Court, but will not be effective unless approved by order of the Bankruptcy Court. If this REMEDIATION AGREEMENT is not approved by the Bankruptcy Court, it is null and void. In the event the order of the Bankruptcy Court is stayed prior to any of the required dates for action set forth in Paragraph 26 of the Settlement Agreement, the Parties shall be put back into the position as if the Order had not been issued. In the event the order of the Bankruptcy Court is vacated or reversed prior to any of the required dates for action set forth in Paragraph 26 of the Settlement Agreement, this REMEDIATION AGREEMENT shall be null and void and the Parties shall not be bound hereunder or under any document executed in connection herewith.

23

## 21. Termination

A.    Cause for Termination.    The Parties hereby agree that because of the substantial duties and obligations undertaken herein, this REMEDIATION AGREEMENT may only be terminated for the following reasons:

(i)    Cause, which shall mean the failure of FIRM to fulfill a material obligation under this REMEDIATION AGREEMENT or the Policy; or

(ii)    Bankruptcy or insolvency of FIRM.

B.    Notice of Termination.    In order to terminate this REMEDIATION AGREEMENT, HATCO shall provide FIRM and the other Parties with written notice of its intent to terminate and a full and complete description of the cause for termination. FIRM shall have thirty (30) days in which to: (i) cure the alleged default, or (ii) begin to undertake activities necessary to cure if such activities cannot reasonably be completed within thirty (30) days. In the event FIRM is unable to cure within 30 days, it shall, within thirty (30) days, provide written notice to HATCO of its intent to cure and a written plan and schedule for implementing such cure within ninety (90) days.

C.    Termination.    In the event that FIRM has failed to cure, has failed to provide notice of its intent to cure, or has failed to cure within 90 days after providing notice of intent to cure, HATCO shall initiate termination and replacement of FIRM, subject to approval by NJDEP.

## 22. Governing Law

To the extent allowable under the United States Bankruptcy Code, this REMEDIATION AGREEMENT shall be governed by and construed and enforced in accordance with the laws of the State of New Jersey.

## 23. Entire Agreement

This REMEDIATION AGREEMENT, the Settlement Agreement, the ACO, the Policy and the NRD Settlement Agreement constitute the entire agreement of the Parties with respect to the subject matter hereof, and all prior or contemporaneous agreements, understandings, representations, letters of agreement or intent, and statements are merged herein.

## 24. Severability

If any term, covenant, condition, or provision of this REMEDIATION AGREEMENT is found by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of this REMEDIATION AGREEMENT shall remain in full force and effect, and shall in no way be affected, impaired, or invalidated thereby.

24

NY\1011835.1

## 25.    Waiver

No waiver of any provision of this REMEDIATION AGREEMENT shall be effective unless such waiver is in writing and signed by the party against whom enforcement of the same is sought.    Failure to enforce any provision of this REMEDIATION AGREEMENT or to require at any time performance of any provision hereof shall not be construed to be a waiver of such provision, or to affect the validity of this REMEDIATION AGREEMENT or the right of any party to enforce each and every provision in accordance with the terms hereof. No waiver of any provision of this REMEDIATION AGREEMENT shall affect the right of CLIENT or FIRM thereafter to enforce such provision or to exercise any right or remedy available to it in the event of any other default involving such provision or any other provision. Making payment or performing pursuant to this REMEDIATION AGREEMENT during the existence of a dispute shall not be deemed to be and shall not constitute a waiver of any claims or defenses of the party so paying or performing.

## 26.    Assignment

This REMEDIATION AGREEMENT is personal to the Parties hereto and is not intended for the benefit of any third party.    Except as set forth below, this REMEDIATION AGREEMENT shall not be assignable to any other party without the prior, written authorization of the other Parties hereto.  Such authorization may be denied by any Party in its sole discretion.  Notwithstanding the above, HATCO may assign this REMEDIATION AGREEMENT in its entirety to a related company (parent, sister, or subsidiary) or to a purchaser or lessee of the Hatco Facility without prior written authorization of the other Parties, provided at least forty-five (45) days prior written notice is submitted to such Parties and, provided any such purchaser, assignee or lessee agrees to assume all of HATCO's rights and obligations hereunder.

## 27.    Counterparts

This REMEDIATION AGREEMENT may be executed in multiple counterparts, each of which shall be deemed an original, but which together shall constitute one and the same instrument.

**IN WITNESS WHEREOF,** the undersigned Parties enter into this REMEDIATION AGREEMENT.

HATCO CORPORATION

By: _____      _April 7, 2005_____
     David J. Mason                         Date
     Vice President Regulatory Affairs

W.R. GRACE & CO.-CONN.

By: _____      _____
     William M. Corcoran                   Date
     Vice President Public and
     Regulatory Affairs

REMEDIUM GROUP, INC.

By: _____      _____
     Robert J. Medler                     Date
     Director

WESTON SOLUTIONS, INC.

By: _____      _____
     Patrick G. McCann                    Date
     President and CEO

26

NY1011835.1

**IN WITNESS WHEREOF,** the undersigned Parties enter into this REMEDIATION AGREEMENT.

HATCO CORPORATION

_____        _____
By:    David J. Mason                    Date
       Vice President Regulatory Affairs

W.R. GRACE & CO.-CONN.

_____        4/8/05
By:    William M. Corcoran               _____
       Vice President Public and         Date
       Regulatory Affairs

REMEDIUM GROUP, INC.

_____        _____
By:    Robert J. Medler                  Date
       Director

WESTON SOLUTIONS, INC.

_____        _____
By:    Patrick G. McCann                 Date
       President and CEO

26

**IN WITNESS WHEREOF,** the undersigned Parties enter into this REMEDIATION AGREEMENT.

HATCO CORPORATION


By:  David J. Mason                        Date
     Vice President Regulatory Affairs


W.R. GRACE & CO.-CONN.


By:  William M. Corcoran                   Date
     Vice President Public and
     Regulatory Affairs


REMEDIUM GROUP, INC.

*Robert J Medler*                          *4/8/05*
By:  Robert J. Medler                      Date
     Director


WESTON SOLUTIONS, INC.


By:  Patrick G. McCann                     Date
     President and CEO


26

**IN WITNESS WHEREOF,** the undersigned Parties enter into this REMEDIATION AGREEMENT.

HATCO CORPORATION

By:   David J. Mason                      Date
        Vice President Regulatory Affairs

W.R. GRACE & CO.-CONN.

By:   William M. Corcoran             Date
        Vice President Public and
        Regulatory Affairs

REMEDIUM GROUP, INC.

By:   Robert J. Medler                 Date
        Director

WESTON SOLUTIONS, INC.

By:   Patrick G. McCann            Date   4/7/05
        President and CEO

26

## List of Exhibits

| | |
|---|---|
| Exhibit A | Project Milestones |
| Exhibit B | Project Coordinators |
| Exhibit C | HATCO Safety Procedures |
| Exhibit D | HATCO Security Procedures |
| Exhibit E | Weston's Rates |
| Exhibit F | Remediation Expense Containment and Premises Pollution Liability Insurance Policy |
| Exhibit G | Custody Safekeeping Agreement/ Environmental Remediation Trust Agreement |

## List of Schedules

| | |
|---|---|
| Schedule 14B | New Pollution Conditions |

27

NY\1011835.1

**EXHIBIT A**
**PROJECT MILESTONES[1]**

| Milestone No. | Description |
|---|---|
| | |
| 1 | PRE-REMEDIATION |
| 2 | LNAPL AND SHALLOW GW CONSTRUCTION |
| 2.a | On-Site System Construction |
| 2.b | Off-Site Groundwater Plume Treatment |
| 3 | LAGOONS EXCAVATION AND BACKFILLING |
| 4 | ON-SITE SOIL SCRAPE AREAS |
| 5 | CHANNEL D EXCAVATION AND RESTORATION |
| 6 | PCB SOIL REMEDIATION |
| 6.a | Shoring |
| 6.b | Excavation and Backfilling |
| 7 | CAPPING |
| 7.a | Asphalt Cap Construction |
| 7.b | Soil Cap Construction |
| 8 | STORMWATER DRAINAGE BASIN CONSTRUCTION |
| 9 | OPERATION AND MAINTENANCE |
| 9.a | Wetlands Restoration Monitoring |
| 9.b | LNAPL/Shallow GW System |
| 9.c | Deep GW Monitored Natural Attenuation |

1. Completion dates for project milestones will be based upon substantial physical completion of the work.

**EXHIBIT B**
**PROJECT COORDINATORS**

<u>For Hatco Corporation:</u>

Mr. James J. Millikin
Hatco Corporation
1020 King George Post Road
Fords, New Jersey  08863
Voice: (732) 738-3552
Fax: (732) 738-3190
Email:  <u>jmillikin@hatcocorporation.com</u>

<u>For Weston Solutions:</u>

Mr. Daniel Kopcow
Project Manager
205 Campus Drive
Edison, New Jersey 08837
Voice:        (732) 417-5834
Fax:    (732) 417-5801
Email: <u>daniel.kopcow@westonsolutions.com</u>

EXHIBIT C

SAFETY PROCEDURES FOR CONTRACTOR AND/OR SUBCONTRACTORS

1.  Health and Safety Plan

Contractor shall, prior to performing any work, develop a Health and Safety Plan (HASP)
for all work to be performed. The HASP shall incorporate Hatco's site safety rules as
listed below and Hazardous Communication training based upon the types of chemicals
identified by Hatco. The Contractor will be responsible for assuring and demonstrating
that all Contractor and Subcontractor employees are aware of these rules and that any
violations will result in their expulsion from the site.

Contractor will be responsible for enforcement of all aspects of the HASP and the site
safety rules with respect to Contractor's and Subcontractors employees. However, Hatco
reserves the right to take any action necessary to enforce site rules that are not adequately
enforced by Contractor.

Prior to first access to the site, Hatco will provide safety training to key contractor
employees who in turn must provide similar training to all contractor and subcontractor
employees. Such training shall be documented and each employee shall sign an
acknowledgement that he or she has received such safety training.

2.  Minimum Safety Requirements

All contractor personnel shall wear the minimum safety attire at all times while on the
Hatco site. This attire includes hard hat, safety shoes and safety glasses with side shields
or goggles. This rule will be strictly enforced.

3.  Intoxicating and Illegal Substances

Contractor will assure that no drugs, alcohol, or controlled substances will be brought
on site by its employees and subcontractors and that no contractor or subcontractor
personnel will be under the influence of these substances while working on Hatco's
property. This rule will be strictly enforced.

4.  Firearms and Explosives

Contractor will ensure that contractor and subcontractor employees do not enter the site
with any firearms or explosive devices. This rule will be strictly enforced.

5.  Smoking

Smoking is prohibited in all areas of the site except those specifically designated as
Smoking Areas. Contractor may propose a designated Smoking Area for its employees

for approval by Hatco. If outdoors, the area shall be as far as practicable from process or storage areas or sewer openings. This rule will be strictly enforced.

6.  Emergency Ingress/Egress

Contractor shall not impede the access of emergency vehicles from the Industrial Highway gates. A sufficient ingress/egress route through these gates to the operational areas must be maintained at all times. In the event, contractor has contacted emergency services for an incident at the Hatco site, contractor shall give immediate notice to the Hatco Security Gate of the details of the incident and what emergency services group was contacted.

7.  Emergency Procedures and Evacuations

Contractor and Hatco shall develop a coordinated emergency procedure and evacuation plan for any potential events that could affect each company's respective employees. Hatco conducts an emergency response drill annually which includes all on site contractors. Contractor's participation in such drills is mandatory.

8.  Hot Work Permits

Contractor shall be responsible for instituting a hot work permit program subject to review and approval of the program by Hatco. Such program shall include a requirement that all hot work performed be subject to prior review and a determination by Hatco whether a Hatco hot work permit is also required. No hot work may be performed in, or near, any process, storage or wastewater conveyance facilities without first obtaining a hot work permit from Hatco. However, Hatco's issuance of a hot work permit in no way relieves contractor from any liability that results from performing such work. Contractor has sole responsibility for the determination that hot work may be performed in a safe manner.

9.  Confined Space Entries

Contractor shall be responsible for instituting a confined space entry permit program subject to review and approval of the program by Hatco. No confined space entries may be performed in any facility under Hatco's control without first having also received a confined space entry permit from Hatco. However, Hatco's issuance of a confined space entry permit in no way relieves Contractor from any liability that results from performing such work. Contractor has sole responsibility for the determination that confined space entry work may be performed in a safe manner.

10. Communications Coordination

Contractor shall develop a coordinated communication program with Hatco to assure that they will be able to communicate with each other in the event of an emergency.

Contractor's radio frequencies shall not interfere with Hatco radio frequencies or other radio communications.

11. Snow and Ice

Contractor is responsible for the removal of snow from the contractor access, parking and work areas and for salting/sanding icy surfaces used by contractor and subcontractor employees, except that Hatco will be responsible for snow and ice removal on plant roads.

12. Revisions to Site Safety Rules

Hatco's site safety rules may be revised from time to time. These revisions will be provided to Contractor and Contractor will be required to revise its procedures accordingly.

EXHIBIT D

## SECURITY PROCEDURES FOR CONTRACTOR AND/OR SUBCONTRACTORS PERFORMING WORK UNDER REMEDIATION AGREEMENT

1. Contractor Gate Accessibility and Security

Contractor will have unlimited access to a key to the active contractor gate. The active gate will be designated in accordance with contractor requirements and will be either the southwest gate located on Industrial Highway between the inactive lagoons and the railroad siding or the southeast gate located on Industrial Highway near Hatco's natural gas metering enclosure. The gate key will be available in the main facility guardhouse. The contractor will be required to sign the key out each day and return it when done at the end of the work day. Contractor will be responsible for providing security at the gate at all times the contractor has possession of the key, for taking all steps to prevent unauthorized entry to the facility through the gate and for locking the gate at the end of the work day and returning the key to the guard house. Contractor is relieved of any gate security obligation when it locks the gate and returns the key to the guard house.

2. Vehicle Requirements

The use of personal vehicles on the site is restricted. Personal vehicles may only be used to enter the site at the contractor's gate and must be parked in designated locations. Personal vehicular traffic outside of these areas is prohibited.

Contractor vehicles are restricted to locations and routes to such locations in which contractor is required to perform work. Operation of contractor vehicles outside of these areas is prohibited.

All vehicles that enter the site must be issued a Vehicle Pass that shall be prominently displayed in or near the front windshield. A contemporaneous log of all vehicles entering the contractor gate including the Vehicle Pass number, time of entry, time of departure, vehicle identification, company affiliation, and occupants must be kept by contractor at all times.

3. Personnel Requirements

Contractor must issue to its employees and subcontractor personnel accessing the site a Contractor Pass the design of which must be reasonably acceptable to Hatco. The Contractor Pass must be prominently displayed on outer garments at all times unless such display is not practicable due to specific work conditions (i.e., as in the case where PPE is in use).

Contractor security personnel must keep a contemporaneous log of all contractor/subcontractor personnel on site that includes name, Contractor Pass number, company affiliation, date of entry, time of entry and time of departure. Contractor will be responsible for the surrender of all passes from personnel who leave the site.

4.  Deliveries/Shipments

All deliveries and shipments for contractor and subcontractors shall be directed to the contractor gate. No deliveries or shipments shall be directed to or through the Main facility entrance.

5.  Access or Attempted Access by Unauthorized Personnel

Contractor security personnel shall bar all access by unauthorized personnel and take all reasonable steps to prevent such access including contacting local law enforcement authorities. Contractor will immediately notify Hatco security personnel in the event of a security breach, such as unauthorized or attempted unauthorized access or not having a record of all employees signing out and returning Contractor Passes.

For purposes of these security requirements, Authorized Personnel shall mean those employees of contractor or subcontractor who are necessary to perform work in accordance with the Remediation Agreement or persons conducting business with the contractor or subcontractor which relates to the work contemplated in the Remediation Agreement. All other persons shall be considered Unauthorized Personnel.

6.  Access by Regulatory Authorities

Contractor is not authorized to grant access to a representative of a Regulatory Authority when the official business of the authority relates in any way to the operations of Hatco. In such case, the representative shall be requested to access the Hatco facility at its main entrance at 1020 King Georges Post Road. If such representative demands access at the contractor's gate, contractor shall immediately notify Hatco Security personnel and keep the representative at the contractor's gate until met by a Hatco Security person or Hatco employee.

7.  Industry Standard Security Procedures

The chemical industry is continuously seeking opportunities for improving security practices and standards at its diverse facilities. Hatco, as a member of SOCMA and CC/NJ, is committed to providing those levels of security practices that are consistent with its operations. Contractor will be responsible for revising its security procedures as necessary to be consistent with such industry standards and practices as they develop and are adopted by Hatco from time to time.

**EXHIBIT E**
**WESTON LABOR RATE SCHEDULE** [1]

| Name | Title | Rate |
|---|---|---|
| Peter Ceribelli | Vice President | $225 |
| Richard Craig | Senior Client Service Manager | $185 |
| Daniel Kopcow, P.E. | Project Manager | $180 |
| John Woodyard, P.E. | QA/QC | $200 |
| Robert Gascoyne, P.G. | Soils Task Manager | $135 |
| Paul Bovitz, CPWS | Stream Sediments/Wetland Task Manager | $155 |
| Robert Mackie, P.E. | Design Task Manager | $145 |
| Matthew Egan | Remediation Site Manager | $100 |
| Laura Amend-Babcock, P.E. | Regulatory Compliance | $135 |
| Bruce Ehrich, CSP | Health and Safety | $145 |
| Michael Stratton, P.E. | Project Controls | $125 |
| Coleen Brockop | Project Administrator | $85 |
| Andrew Harpur, P.E. | Geotechnical Design | $120 |
| William Lowe, Ph.D., P.E. | LNAPL and Groundwater Treatment | $150 |
| Joseph Martino, P.E. | Treatability Studies | $150 |
| Michael Hughlock, P.E. | Mechanical Design | $145 |
| Richard Briele, P.E. | Electrical Design | $145 |
| Designer | | $110 |
| Draftsperson/CAD Operator | | $65 |
| Professional Staff | | $65 -135 |
| Financial, Administrative, & Clerical Services | | $65 |
| Editorial Services | | $95 |

[1]Rates for other Weston labor categories or personnel will be supplied as necessary. These labor rates are firm through 31 December 2005 and escalate at five percent annually thereafter. All labor invoiced is subject to a three percent administrative fee to cover certain copying, shipping, and communication costs. External expenses and subcontractor costs will be invoiced at cost plus ten percent. Attorneys fees will be in addition to these Weston charges.

Information contained on this page is proprietary to Weston Solutions, Inc.
**CONFIDENTIAL**

EXHIBIT F

REMEDIATION EXPENSE CONTAINMENT AND PREMISES POLLUTION
LIABILITY INSURANCE POLICY

EXHIBIT G

CUSTODY SAFEKEEPING AGREEMENT/
ENVIRONMENTAL REMEDIATION TRUST AGREEMENT

## CUSTODY SAFEKEEPING AGREEMENT

Account Name: _____          Account Number:_____          _____

### I. APPOINTMENT AND ACCEPTANCE

The customer appoints *Fleet National Bank*, (hereinafter referred to as "Fleet") as safekeeping custodian, to hold and maintain, securities and other property deposited with Fleet in accordance with this agreement and accompanying instructions incorporated herein. Fleet will not be responsible for any cash, securities or other property that is not delivered to it.  The customer will be solely responsible for cash and other property paid or delivered to any broker or other person at the direction of the customer.

### II. SEGREGATION OF SECURITIES AND OTHER PROPERTY

Fleet will provide the customer with a separate safekeeping account and will segregate on its books and records all securities and other property belonging to the customer.

### III. INVESTMENT ADVICE

Fleet will not provide investment advice and will not act in any fiduciary capacity for the customer.

### IV. CORPORATE ACTIONS

Fleet will not be responsible for monitoring reporting services and publications generally accepted by the securities industry and will not notify the customer of any information received by Fleet from these sources pertaining to calls or voluntary capital changes that require special action.  Fleet is not responsible for determining whether any securities are subject to calls or other actions prior to delivery.

The customer, as the registered holder of the securities, is responsible for withdrawing certificates for mandatory actions (i.e., reverse stock splits and conversions) and taking the necessary steps to turn in or exchange shares. Fleet will not collect and credit the safekeeping account with any dividends or additional shares issued by reason of stock split with respect to the securities held therein.

### V.    REGISTRATION

The securities held in the safekeeping account may not be registered in the name of Fleet or any of its nominees or its affiliates.

## VI. SETTLEMENT OF TRANSACTIONS

The settlement of all securities transactions will be made upon the instructions of the customer. Fleet will notify the customer promptly of any failure to receive or deliver securities. With respect to the purchase of securities, Fleet will debit the safekeeping account for the payment of securities and credit the safekeeping account with the securities. The Client will be responsible for ensuring funds availability in the safekeeping account on contractual settlement date. With respect to the sale of securities, Fleet will credit the safekeeping account with the sale price of the securities and debit the safekeeping account for the securities. The client is solely responsible for instructing Fleet as to the disposition of sale proceeds prior to actual settlement date. Fleet may reverse any credits if the transactions fail to settle within a reasonable period.

## VII. FRACTIONAL INTERESTS

Fleet will sell fractional interests that result from a rights issue, stock dividend or stock split with respect to the securities in the safekeeping account. Fleet also reserves the right to liquidate fractional interests or baby portions of debt securities having a face amount of less than $1,000.

## VIII. USE OF AFFILIATES, AGENTS AND DEPOSITORIES

Fleet may use affiliates, agents, correspondents and sub-custodians and is authorized to use the services of regulated clearing agents and securities depositories, both domestic and foreign, to assist in the fulfillment of Fleet's duties as safekeeping custodian. Fleet may utilize the services of registered broker or securities dealers, including, brokers or dealers owning or owned by or under common ownership or control with Fleet. Such broker or dealer (including any affiliated broker or dealer) may receive the usual commission or mark-up earned on such transactions without further or more specific authority from the customer. In the event that an affiliated broker or dealer is employed, the commission or mark-up received by such broker or dealer shall not be greater than that which would be charged to the most favored but unaffiliated customers of such broker or dealer.

## IX. FEES AND EXPENSES

Fees payable to Fleet for handling the account will be computed in accordance with Fleet's Fee Schedule as presently in effect and as amended from time to time. The customer acknowledges receipt of the Fee Schedule. Fleet will send the customer a copy of any amendment or superseding Fee Schedule, which will become effective no earlier than ten days after it is mailed to the customer. Unless otherwise agreed in writing, expenses and fees incurred by Fleet in connection with the account will be billed to:


Name:


Address:

## X. INSTRUCTIONS

Fleet shall act on securities trade instructions (to deliver or receive, present for payment or receive securities against payment), cash management instructions (including transfer of funds from one account to another by any method other than wire transfer), that are transmitted to Fleet either electronically, in writing or by facsimile. Fleet shall also act upon instructions made by a financial institution (including investment managers, brokers, etc.) authorized by the customer to act on its behalf pursuant to Article XIV. If any securities trade instructions need to be corrected or canceled, Fleet shall advise the appropriate broker or dealer of the corrective action to be taken and shall not be liable for actions taken or not taken by such broker or dealer. Fleet shall not be required to comply with any direction to purchase any securities unless there is sufficient cash in the customer's account or with any direction to sell any securities unless such securities are held in the account at that time in deliverable form.

Fleet shall not be liable for acting on any instruction (either written, oral, electronic or by facsimile) made by a person who Fleet, in good faith, believes to be so authorized on behalf of the customer. The customer acknowledges the inherent risks of reliance upon facsimile, telephone and electronic messages and assumes all responsibility for the use, security and confidentiality of such instructions by the customer, its employees, agents and third parties. The customer agrees to indemnify Fleet against any loss, liability or expense (including attorneys' fees and expenses) incurred by Fleet in reliance upon any instructions believed in good faith by Fleet to be authorized by or on behalf of the customer.

For customers who want to send wire transfer instructions to Fleet, a Funds Transfer Agreement will be required. All customer requests for wire transfers are subject to Fleet's funds transfer procedures which include funds availability requirements, verification procedures and a requirement that instructions be received prior to 2:45 p.m., Eastern Standard Time for same day processing.

All actions taken by Fleet under this agreement shall be for the customer's account and at the customer's risk. Fleet shall not have any liability or responsibility for any action taken or not taken or information given or not given in good faith, or for any loss or reduction in value, or lack of or reduction in income, resulting from any such action or information. Fleet shall not have any liability for failure to comply with any direction given by the customer or any instruction contained in this agreement if it has made a good faith effort to comply with such direction or instructions. Without limiting the generality of the foregoing, Fleet shall not be responsible for any losses or delays caused by late, unclear, incomplete, contradictory or duplicative instructions; provided, however, that, prior to complying with any direction from the or any other person designated by                            ., Fleet must be presented with evidence that                    .. is in material default of the terms and conditions of the                    , Agreement dated
, a copy of which has been provided to Fleet, and which is incorporated herein by this reference. It being understood that this Custodial Account is being and has been established solely for the benefit of                    ı, acting by and through the                    ı, to assure the performance of certain undertakings by '                    under the    . Agreement with            ., and that failing such presentation and demonstration,        has no authority to access the account or deliver any instruction to Fleet.

## XI. TERMINATION AND AMENDMENT

Fleet may terminate this agreement upon thirty days notice to the customer, provided that if Fleet determines, in its absolute discretion, that any activity in the account is inappropriate for any reason, then Fleet may terminate the account immediately. The customer may terminate this agreement upon thirty days notice to Fleet. The fees for the final period will be determined in accordance with the fee schedule in effect at the time of termination. After payment of any charges, Fleet will deliver to the customer (or to the successor safekeeping custodian at the written direction of the customer) all property held in the custody account. Fee charges may be changed in accordance with Article IX. Other terms of this agreement may be amended by a writing signed by Fleet and the customer.

The rights and obligations of Fleet under this agreement shall pass automatically to any bank or trust company into or with which Fleet merges, and may be transferred by Fleet to any other bank or trust company owning or owned by or under common ownership or control with Fleet.

## XII. VOTING

Fleet will not vote any securities held in the safekeeping account of the customer. Fleet will not be responsible for forwarding any proxies or proxy soliciting materials to the customer.

## XIII. SHAREHOLDER COMMUNICATIONS

Fleet will not be responsible for transmit to the customer any financial reports, stockholder communications and notices from the issuers of the securities held in the safekeeping account. In accordance with applicable regulations, Fleet will provide the customer's name, address and share position to a company issuing securities held by the customer's account.

## XIV. COLLECTION AND DISBURSEMENT OF INCOME

Fleet will not collect and credit the safekeeping account with any income and other distributions due or payable on the securities held.

## XVI. STATEMENTS

Fleet will furnish statements to the customer

    __x__ Monthly

    _____ Quarterly   _____ [Specify cycle]

    _____ Annually   _____ [Specify month]

reflecting the date of execution; identity, price and number of shares or units (or principal amount in the case of debt securities) of securities purchased or sold; the fees received or to be received from the customer by any broker/ dealer in connection with transactions; fees to be received by the bank; and the name of the broker-dealer used. Upon specific request of the customer, Fleet shall furnish the customer, without additional charge, with written notification of securities transactions as early as five days from the date of the transaction, or, if a broker-dealer is used, within five business days from receipt by Fleet of the broker-dealer's confirmation.

Statements shall be mailed to the customer (and/or authorized representatives) at the following address(es):

Name: _____.

Address: _____

_____

_____

Name: _____

Address: _____

_____

_____

## XVII. CHOICE OF LAW

This agreement is to be governed by the laws of the State of Rhode Island.

## XIX. REPRESENTATION

The person executing this agreement certifies that he or she is authorized to enter into this agreement and that a certified copy of the authorizing resolution or by-law (or other appropriate certifications) and a list of the names and titles of all persons authorized to give instructions and approvals regarding this account, along with specimen signatures, will be supplied to Fleet immediately. The authority of such persons shall continue until written notice is received by Fleet of the revocation of such persons' authority.

Customer:                                    Safekeeping Custodian:    Fleet National Bank

By:_____                                      By:_____
*(Its duly authorized)*                        *(Its duly authorized agent)*

Print Name:_                                  Print Name:_____

Title:                                        Title:_____

_____

Dated:_                                       Accepted:_____

Customer's fiscal year-end: _                 _____

Customer's employer identification number: _   _____

## SCHEDULE 14B

None