# EXHIBIT 1B

## ACE POLICY

 **ACE American Insurance Company**

# RECAPP - Remediation Expense Containment and Premises Pollution Liability Insurance Policy
## (Declarations)

*THE BINDING OF THIS INSURANCE IS SUBJECT TO THE SATISFACTION OF THE CONDITIONS SET FORTH IN THE SETTLEMENT AGREEMENT BETWEEN THE INSURER, WESTON, HATCO, GRACE AND NJDEP, DATED APRIL 8, 2005. THE PREMIUM AND THE INITIAL NOTIONAL EXPERIENCE CREDIT AMOUNT WILL BE RESET BY ACE IF THE PREMIUM IS NOT PAID ON OR BEFORE MAY 10, 2005 BASED IN INTEREST RATE MARKET CONDITIONS ON THE DATE THE PREMIUM IS PAID AND PREMIUM TAX ADJUSTMENTS*

**This Policy is issued by the stock insurance company listed above (herein called the "Insurer").**

THIS IS A CLAIMS MADE POLICY WHICH COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSURED AND REPORTED TO THE INSURER, IN WRITING, DURING THE POLICY PERIOD. PLEASE READ THIS POLICY CAREFULLY. SOME OF THE PROVISIONS CONTAINED IN THIS POLICY RESTRICT COVERAGE, SPECIFY WHAT IS AND IS NOT COVERED AND DESIGNATE RIGHTS AND DUTIES. LEGAL DEFENSE EXPENSES UNDER SECTION I. INSURING AGREEMENTS A. THROUGH F. ARE SUBJECT TO ANY APPLICABLE SELF-INSURED RETENTION AND, ONCE THE APPLICABLE SELF-INSURED RETENTION, IF ANY, IS SATISFIED WILL ERODE THE LIMITS OF LIABILITY.

THESE DECLARATIONS, TOGETHER WITH THE COMPLETED AND SIGNED APPLICATION, THE POLICY AND ANY ENDORSEMENTS OR SCHEDULES ATTACHED HERETO, CONSTITUTE THE INSURANCE POLICY.

| Policy No. : | Renewal of: |
|---|---|
| **Item 1.** | Named Insured:    **Weston Solutions, Inc.** <br><br> Principal Address:    **1400 Weston Way** <br> **West Chester, PA  19380** |
| **Item 2.** | Policy Period: <br><br> From:   **12:01 A.M.** <br><br> To:   earlier of:  (1) exhaustion of the Limit of Liability shown in Item 5.a. or (2) (a) 12:01 A.M. on _____, 2010 for Coverage Provided under Section I. E. or (b) 12:01 A.M. on _____, 2034 for all other **Coverages Provided** |
| **Item 3.** | Coverage(s) Provided (Coverage(s) Provided only for those specific coverages outlined in **Section I.** Insuring Agreements, which are identified here): <br><br> **Section I.A. through H.** |
| **Item 4.** | Retroactive Date: **Reverse Retroactive Date 11/4/2002** <br><br> (Applicable to Coverage(s) Provided under **Section I. A. through D. and F.**) |
| **Item 5.** | Limits of Liability: <br><br> **a.** Applicable to Coverage(s) Provided under **Section I. A. through H.** <br><br>      **$ 42,700,000** Policy Aggregate Limit <br><br> **b.** Applicable to Coverage(s) Provided under **Section I. A. through F.:** <br><br>      **(1) No Limit** Per Claim, Government Action, Remediation Cost, or Legal Defense Expense (except "Natural Resource Damages") |

| | |
|---|---|
| | (2) **$20,000,000** All Claims, Government Actions, Remediation Costs, and Legal Defense Expense Limit (except "Natural Resource Damages") |
| | **c.** Applicable to Coverage Provided under **Section I. G.** through **H.** |
| | **No Limit,** subject to **Item 5.a.** |
| | **d.** Applicable to "Natural Resource Damages" |
| | (1) **$5,000,000** Per Claim, Government Action, Remediation Cost, or Legal Defense Expense Limit |
| | (2) **$5,000,000** All Claims, Government Actions, Remediation Costs, and Legal Defense Expense Limit |
| **Item 6.** | Self Insured Retention: |
| | **a.** Applicable to Coverage(s) Provided under **Section I. A.** through **F.** (including "Natural Resource Damages"): |
| | **$ 100,000** Per Claim, Government Action, Remediation Cost, or Legal Defense Expense |
| | **b.** Applicable to Coverage(s) Provided under **Section I. G.** through **H.** |
| | **None** |
| **Item 7.** | Co-Insurance Percentage: (Applicable to Coverage(s) Provided, if any, under **Section I. G.** through **H.**) |
| | **None** |
| **Item 8.** | Premium: |
| | **[$ 20,408,000]**   (100% minimum earned) [*SUBJECT TO CHANGE AS PROVIDED ABOVE*] |
| **Item 9.** | Notice to Insurer: |
| | **a.**   Notice of Claim, Pollution Condition, Remediation Cost, or Legal Defense Expense: |
| | ACE Casualty Risk Claims<br>1133 Avenue of the Americas – 38th Floor<br>New York, NY  10036 |
| | **b.**   All Other Notices:<br>Unit Underwriting Officer<br>ACE Casualty Risk<br>1601 Chestnut Street<br>Philadelphia, PA  19103 |
| **Item 10.** | Schedule of Covered Locations: |
| | **1020 King George Post Road, Fords, Middlesex County, New Jersey designated as Blocks 60 and 67, Lots 100A and 1B1 on the Woodbridge Township municipal tax maps (as such maps existed on the Effective Date), located between Industrial Avenue and King George Post Road, Fords, Middlesex County, New Jersey** |
| **Item 11.** | Producer Name and Address: |
| | **None** |

| Item 12. | Maximum Crediting Rate |
|---|---|
| | **4%** |

| Item 13. | Initial Notional Experience Credit Amount |
|---|---|
| | **[$ 16,542,000]** *[SUBJECT TO CHANGE AS PROVIDED ABOVE]* |

**Forms and Endorsements Attached at Policy Issuance:**

| Endorsement Number: | Form Number: | Form Name: |
|---|---|---|
| Policy Form | MANU | **RECAPP – Remediation Expense Containment and Premises Pollution Liability Insurance Policy** |
| NA | MANU | **Remediation Plan Schedule** |
| NA | MANU | **Remediation Project Update Schedule** |
| NA | MANU | **Weston Payment Schedule** |
| NA | MANU | **HATCO Remediation Cost Summary** |
| NA | MANU | **Schedule of Non-Owned Disposal Sites** |
| NA | MANU | **GRACE HATCO Known Conditions Document List** |
| NA | PF-13246 (01/03) | **Schedule of Insured Contract(s)** |
| NA | PF-13294a (08/03) | **Schedule of Known Conditions** |
| NA | XS-1U96d (03/2002) | **Service of Suit Endorsement** |
| NA | MANU | **New Jersey Changes – Cancellation and Nonrenewal Endorsement** |
| NA | CC-1K11d (02/05) | **Signatures Endorsement** |
| NA | Exhibit A | **Remediation Agreement** |
| NA | Exhibit B | **Settlement Agreement** |
| NA | Exhibit C | **Form of Trust Agreement** |

**IN WITNESS WHEREOF, the Insurer has caused this Policy to be countersigned by a duly authorized representative of the Insurer.**

DATE: _____  
       MO/DAY/YR

_____  
AUTHORIZED REPRESENTATIVE

 **ACE American Insurance Company**

# RECAPP - Remediation Expense Containment and Premises Pollution Liability Insurance Policy

*THE BINDING OF THIS INSURANCE IS SUBJECT TO THE SATISFACTION OF THE CONDITIONS SET FORTH IN THE SETTLEMENT AGREEMENT BETWEEN THE INSURER, WESTON, HATCO, GRACE AND NJDEP, DATED APRIL 8, 2005. THE PREMIUM AND THE INITIAL NOTIONAL EXPERIENCE CREDIT AMOUNT SHOWN ON THE DRAFT DECLARATIONS WILL BE RESET BY ACE IF THE PREMIUM IS NOT PAID ON OR BEFORE MAY 10, 2005 BASED IN INTEREST RATE MARKET CONDITIONS ON THE DATE THE PREMIUM IS PAID AND PREMIUM TAX ADJUSTMENTS*

**This Policy is issued by the stock insurance company listed above (herein called "the Insurer").**

THIS IS A CLAIMS MADE POLICY WHICH COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSURED AND REPORTED TO THE INSURER, IN WRITING, DURING THE POLICY PERIOD. PLEASE READ THIS POLICY CAREFULLY. SOME OF THE PROVISIONS CONTAINED IN THIS POLICY RESTRICT COVERAGE, SPECIFY WHAT IS AND IS NOT COVERED AND DESIGNATE RIGHTS AND DUTIES. LEGAL DEFENSE EXPENSES UNDER SECTION I. INSURING AGREEMENTS A. THROUGH F. ARE SUBJECT TO ANY APPLICABLE SELF-INSURED RETENTION AND, ONCE THE APPLICABLE SELF-INSURED RETENTION, IF ANY, IS SATISFIED WILL ERODE THE LIMITS OF LIABILITY.

Throughout this Policy the words "the Insurer" shall refer to the company providing this insurance. Other words and phrases that appear in quotation marks have special meanings and are defined in Section IV. - Definitions.

In consideration of the payment of the Premium and in reliance upon all statements made in the Application including the information furnished in connection therewith, and subject to all terms, definitions, conditions, exclusions and limitations of this Policy, the Insurer agrees to provide insurance coverage to the "insured" as described herein.

I.   **INSURING AGREEMENTS**

The Insurer agrees to pay to or on behalf of (as applicable) the "insured" (any such payment to erode the Policy Aggregate Limit shown in Item **5.a.** of the Declarations and any applicable sublimits) for Coverage(s) Provided, as identified in Item **3.** of the Declarations for:

A.   "Remediation costs" in excess of any "self-insured retention" amount listed in the Declarations arising out of "pollution conditions" on, at, under, or migrated or migrating from the "covered location(s)" listed in the Declarations, where such "pollution conditions" are first discovered during the "policy period", are not previously included under or previously the subject of the work to be performed pursuant to the "remediation plan" or any "revised remediation plan", and are reported to the Insurer, in writing, during the "policy period" or any applicable "extended reporting period".

B.   "Remediation costs" in excess of any "self-insured retention" amount listed in the Declarations arising out of "pollution conditions" on, at, under, or migrated or migrating from the "covered location(s)" listed in the Declarations, where such "remediation costs" result from a "claim" first made or "government action" first commenced against the "insured" during the "policy period" and reported to the Insurer, in writing, during the "policy period" or any applicable "extended reporting period".

C.   All sums that the "insured" becomes legally obligated to pay in excess of any "self-insured retention" amount listed in the Declarations as a result of a "claim" or "government action" for "bodily injury" or "property damage" arising out of "pollution conditions" on, at, under, or migrated or migrating from the "covered location(s)" listed in the Declarations, where such "claim" is first made or "government action" is first commenced against the "insured" during the "policy period" and reported to the Insurer, in writing, during the "policy period" or any applicable "extended reporting period".

D.  All sums that the "insured" becomes legally obligated to pay in excess of any "self-insured retention" amount listed in the Declarations as a result of a "claim" or "government action" for "bodily injury", "property damage" or "remediation costs" arising out of "pollution conditions" caused by the "insured's" waste or products during the course of "transportation", where such "claim" is first made or "government action" is first commenced against the "insured" during the "policy period" and reported to the Insurer, in writing, during the "policy period" or any applicable "extended reporting period".

E.  All sums that the "insured" becomes legally obligated to pay in excess of any "self-insured retention" amount listed in the Declarations as a result of a "claim" or "government action" for "bodily injury", "property damage" or "remediation costs" arising out of "pollution conditions" migrating from a "non-owned disposal site", provided and to the extent such "pollution conditions" were caused by the disposal by the "insured" of waste from the "covered location" at the "non-owned disposal site" and only where such "claim" is first made or "government action" is first commenced against the "insured" during the "policy period" and reported to the Insurer, in writing, during the "policy period" or any applicable "extended reporting period".

F.  "Legal defense expense" in excess of any "self-insured retention" amount listed in the Declarations arising from a "claim" or "government action" to which coverage under Insuring Agreement **B., C., D.** or **E.** above applies.

G.  "Remediation costs" for work performed by the "approved contractor" and incurred during the "policy period" in accordance with the clean-up methods and standards specified in the "remediation plan" and in accordance with the "remediation project update" to remediate "pollution conditions" that are the subject of the work to be performed pursuant to the "remediation plan". For this coverage to apply, at the end of each calendar month during the "policy period", the "named insured" must provide a detailed written "remediation project update" consistent with the format, substance and schedule established in the <u>Remediation Project Update Schedule</u> attached to this Policy by endorsement.

H.  "Remediation costs" for work performed by the "approved contractor" and incurred during the "policy period" in accordance with the clean-up methods and standards specified in a "revised remediation plan" to remediate "pollution conditions" that are the subject of the work to be performed pursuant to the "remediation plan". For this coverage to apply:

1.  The "named insured" must submit a written request to the Insurer, during the "policy period", for approval of a change to the clean-up methods or standards at least thirty days prior to the effective implementation of such "revised remediation plan"; and

2.  The "revised remediation plan" shall not be implemented unless the Insurer, in its sole and absolute discretion, has given its written approval to such "revised remediation plan" in a form of an endorsement to this policy; provided, however, that such approval will not be withheld for any change that is required by any governmental entity with the authority to enforce such requirement or for any change that could not have a detrimental financial impact on the Insurer; and

3.  At the end of each calendar month during the "policy period", the "named insured" must provide a detailed written "remediation project update" consistent with the format, substance and schedule established in the <u>Remediation Project Update Schedule</u> attached to this Policy by endorsement.

II. **LIMITS OF LIABILITY AND SELF-INSURED RETENTION**

A.  Self-Insured Retention

1.  Section **I. A.** through **F.**

It is expressly agreed that liability for any covered "claim(s)", "government action(s)", or "remediation costs", and related or associated "legal defense expense(s)" under Section **I. A.** through **F.**, as applicable, shall attach to the Insurer only after the "insured" shall have paid, in the applicable legal currency, the full amount of the applicable "self-insured retention" amount shown in Item **6.a.** of the Declarations. A single "self-insured retention" shall apply to all "claim(s)", "government action(s)" or "remediation costs", including any related or associated "legal defense expense", arising from the same, continuous, repeated or related "pollution condition".

Under no circumstances shall the Insurer be liable to pay any amount within the "self-insured retention".

**B.** Limits of Liability

    **1.** Applicable to Section **I. A.** through **H.**:

        The Policy Aggregate Limit shown in Item **5.a.** of the Declarations shall be the maximum liability of the Insurer under this Policy for Coverage(s) provided under Section **I. A.** through **H.**

    **2.** Applicable to Section **I. A.** through **F.**:

        Subject to Paragraph **1.** above, the Limit shown in Item **5.b.(2)** of the Declarations shall be the maximum liability of the Insurer under this Policy for Coverage(s) provided under Section **I.A.** through **F.** Subject to Paragraph **1.** above, the Limit shown in Item **5.d.** of the Declarations shall be the maximum liability of the Insurer under this Policy for coverage of "natural resource damages" provided under Section **I.A.** through **F.**

## III. DEFENSE AND SETTLEMENT

**A.** With respect to Coverage(s) provided under Section **I. A.** through **E.**, the Insurer will have the right and the duty to defend the "insured" against a "claim" or "government action" to which this insurance applies. However, such duty to defend ends once the Limits of Liability are exhausted or are tendered into a court of applicable jurisdiction, or once the "insured" refuses a settlement offer as provided in Paragraph **D.** below.

**B.** The Insurer will have the right, but not the duty, to select legal counsel for the investigation, adjustment, and defense of any "claim(s)" or "government action(s)" covered under this Policy, which will not be done without the consent of the "insured", which consent will not be unreasonably conditioned, delayed or withheld.

**C.** "Legal defense expense" is subject to any "self-insured retention" shown in Item **6.a.** of the Declarations and, once the applicable "self-insured retention", if any, is satisfied, will erode the Limits of Liability shown in Item **5.** of the Declarations.

**D.** The Insurer will present all settlement offers to the "insured". The "insured" may accept settlement offers only in accordance with the terms and conditions of Section **VI.D.** of this Policy. If the Insurer recommends a settlement which is acceptable to a claimant, exceeds any applicable "self-insured retention", and is within the Limits of Liability, and the "insured" refuses to consent to such settlement offer, then the Insurer's duty to defend shall end. The "insured" shall defend such "claim" or "government action" independently. The Insurer's liability shall not exceed the amount for which the "claim" or "government action" could have been settled if the Insurer's recommendation had been accepted, exclusive of the "self-insured retention".

**E.** In the event an "insured" elects not to appeal a judgment in excess of any applicable "self-insured retention", the Insurer may elect to appeal such judgment. In the event the Insurer appeals a judgment and each "insured" subject to such judgment had notified the Insurer in writing at least ten business days prior to the deadline for filing such appeal that (i) it objects to the filing of an appeal and (ii) the Insurer's appeal shall be subject to the terms of this Section **III.E.**, the Insurer's liability under the Policy to such "insureds" with respect to the claim(s) subject to such judgment shall not be limited by the amount and terms set forth in Sections **I.A.** through **F.** and the limits of liability relating thereto, and all interest, excess judgment and legal defense expenses incurred in such appeal shall be borne by the Insurer and shall be in addition to the limits of this Policy, but the limits of liability under this Policy shall be permanently reduced by the amount of the original judgment and any reduction in the amount of the original judgment as a result of such appeal shall not reinstate or replenish the limits of liability. The notice required in the preceding sentence shall be sent to the Insurer at the addresses shown in Item **9.a.** and **9.b.** of the Declarations, with a copy sent to the Office of General Counsel, ACE USA, 1601 Chestnut Street, Philadelphia, PA 19103, or such other address or addresses as the Insurer may specify in writing.

## IV. DEFINITIONS

**A.** "Approved contractor" means only those contractors specifically designated to perform the "remediation plan" as identified in the <u>Remediation Plan Schedule</u> attached to this Policy by endorsement or as otherwise retained pursuant to Section **VIII.Q.** of this Policy.

**B.** "Bodily injury" means physical injury, illness, disease, mental anguish, or emotional distress, sustained by any person, including death resulting therefrom.

C. "Claim" means the assertion of a legal right, including but not limited to, correspondence, notices, suits or other actions alleging responsibility or liability on the part of the "insured" arising out of "pollution conditions" to which this insurance applies.

D. "Covered location" means any location(s) specifically listed in Item **10.** of the Declarations.

E. "Emergency response" means actions taken, and reasonable "remediation costs" incurred by the "insured" to abate and/or respond to an imminent and substantial threat to human health or the environment arising from a "pollution condition".

F. "Environmental laws" means any federal, state, county, municipal or other local laws, statutes, ordinances, regulations, and all amendments thereto, including state voluntary cleanup or risk-based corrective action guidance, governing the liability of the "insured" with respect to "pollution conditions".

G. "Extended reporting period" means the additional period of time after the end of the "policy period", as provided in Section VII., in which to report a "claim" first made or "government action" first commenced against the "insured" during the "policy period" or "pollution condition" first discovered during the "policy period", arising from a "pollution condition(s)" to which this insurance applies.

J. "Government action" means written demands made, action taken or liability imposed by any federal, state, county, municipal or other local government agency or body acting under the authority of "environmental laws".

K. "Hostile acts" means:

1. Use or threat of force or violence; or

2. The commission of or threat to commit a dangerous act; or

3. Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; or

4. Intimidation or coercion of a government or the civilian population or any segment thereof, or the disruption of the economy, or any segment of the economy; or

5. The release of pathogenic or poisonous biological or chemical materials, if such release was intentionally caused.

L. "Insured" means the "named insured", any additional "insured" specifically endorsed onto this Policy, which shall include any future owner of the "covered location" or the facilities located at the "covered location", any current or future parent or subsidiary companies of an "insured" who is a party to the "remediation agreement", and any past or present director, officer, partner, or employee thereof while acting within the scope of his or her duties as such.

M. "Interest credit" means the amount calculated as of the end of each calendar quarter while this Policy is in effect, and equal to the product of (x) times (y), where (x) and (y) equal the following:

(x) is equal to the "notional experience credit" as of the end of prior calendar quarter (for the first calculation, (x) is equal to the Initial Notional Experience Credit Amount shown in Item 13 of the Declarations), less all payments made by the Insurer under Section I. G. or H. of this Policy after the end of such calendar quarter; and

(y) is equal to $((1+r)^{.25})-1$  (for the first calculation, (y) is equal to $((1+r)^{((\text{number of days between June 30, 2005 and the first day of the "policy period"})/365)}-1)$; where

(r) is equal to the Treasury constant maturities 1-year rate prevailing at the close of business on the first day of the "policy period" for the calculations as of the end of each calendar quarter in 2005 and thereafter prevailing at the close of business on the December 31st immediately prior to the current calendar quarter ending, as shown in the Federal Reserve statistical release H.15 entitled "Selected Interest Rates" (or if there is no such rate shown on the first day of the "policy period" or such December 31st, as the case may be, the immediately prior business day on which such rate is shown), subject to a maximum crediting rate equal to the percentage shown in Item 12 of the Declarations.

N. "Legal defense expense" means reasonable legal costs, charges, and expenses, including expert charges, incurred by the "insured" in the investigation, adjustment, or defense of "claims" or "government actions".

O. "Named insured" means the person or entity shown in Item **1.** of the Declarations.

P. "Natural resource damages" means damages for, injury to, destruction of, or loss of fish, wildlife, biota, land, air, water, groundwater, drinking water supplies, and other similar resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States, any state or local government, any foreign government, or any Indian Tribe, including the reasonable costs of assessing such injury, destruction or loss resulting therefrom, including but not limited to, those described in or provided for by the New Jersey Spill Compensation and Control Act N.J.S.A. 58:10-23.11 *et. seq.*, as well as any and all amendments thereto or other laws or regulations enacted in the future.

Q. "Non-owned disposal site" means a site not owned or operated by the "insured" and in which the "insured" maintains no interest, which receives or has received the "insured's" waste, and is specifically listed on the <u>Schedule of Non-Owned Disposal Sites</u> attached to this Policy.

R. "Notional experience credit" means the greater of zero and an amount equal to:

(A) The "notional experience credit" as of the prior calendar quarter end (or, for the first calculation in 2005, the Initial Notional Experience Credit Amount shown in Item 13 of the Declarations), *less*

(B) All payments made by the Insurer under Section **I. G.** and **H.** of this Policy since the prior calendar quarter end, *plus*

(C) The "interest credit".

S. "Policy period" means the period shown in Item **2.** of the Declarations, or any shorter period resulting from the cancellation of this Policy.

T. "Pollution condition" means the presence, discovery, discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant including smoke, soot, vapors, fumes, acids, alkalis, chemicals, hazardous substances, hazardous materials, or waste materials, on, in, into, or upon land and structures thereupon, the atmosphere, surface water or groundwater.

U. "Property damage" means:

1. Physical injury to tangible property, including all resulting loss of use of that property;

2. Loss of use of tangible property that is not physically injured;

3. Diminished value of property owned by third parties;

4. Nuisance, trespass, wrongful eviction or wrongful entry affecting tangible property and caused by the "pollution conditions"; or

5. "Natural resource damages".

V. "Remediation agreement" means that agreement attached to this Policy as Exhibit A.

W. "Remediation costs" means reasonable expenses incurred to investigate, quantify, monitor, abate, remove, dispose, treat, neutralize, or immobilize "pollution conditions", including expenses to address the Investigation and Remediation Liability as defined in and required by the "remediation agreement" and the incorporated Administrative Consent Order and Remedial Action Work Plan, to the extent required by "environmental law". "Remediation costs" shall also include:

1. Reasonable legal costs, where such costs have been incurred with the written consent of the Insurer, which consent shall not be unreasonably withheld, conditioned or delayed; and

2. "Replacement costs".

X. "Remediation plan" means that work that is the subject of the <u>Remediation Plan Schedule</u> attached to this Policy by endorsement.

**Y.** "Remediation project update" means a written document prepared by or on behalf of the "named insured", in accordance with the schedule put forth in the <u>Remediation Project Update Schedule</u> attached to this Policy, outlining in detail the status of all activities contemplated in the "remediation plan" and in the "revised remediation plan", if any, and setting forth the "remediation costs" that have accrued.

**Z.** "Replacement costs" means those expenses necessarily incurred by the "insured" to repair or replace real property or physical improvements thereto, damaged during the course of responding to a "pollution condition" without deduction for depreciation. "Replacement costs" do not include costs associated with improvements or betterments.

**AA.** "Responsible insured" means any employee of the "named insured" responsible for environmental affairs, control, or compliance at a "covered location", or any officer, director, or partner of the "named insured".

**BB.** "Revised remediation plan" means that work that is the subject of a Revised Remediation Plan Schedule attached to this Policy by endorsement.

**CC.** "Settlement Agreement" means that agreement attached to this Policy as Exhibit B.

**DD.** "Self-insured retention" means, with respect to Coverage(s) provided under Section **I. A.** through **F.**, the amount shown in Item **6.a.** of the Declarations.

**EE.** "Transportation" means the movement of the "insured's" waste or products from the "covered location(s)" by automobile, aircraft, watercraft, or other conveyance to a location beyond the boundaries of the "covered location(s)" by a person or entity, other than the "insured", engaged in the business of transporting property for hire, until such time as the waste or product arrives at the boundaries of its final destination.

**FF.** "Underground storage tank" means any tank and associated piping and appurtenances connected thereto which tank has more than 10% of its volume below ground.

**GG.** "War" means:

    **1.** "War", including undeclared or civil war; or

    **2.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

    **3.** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

## V. EXCLUSIONS

**A.** In no event will the Insurer be liable for or obligated to pay, under this Policy or otherwise, any amount arising out of or relating to any fraud, such as can be proven in a court of law, on the part of an "insured".

**B.** This insurance does not apply to "claim(s)", "governmental actions", "remediation costs", or "legal defense expense(s)", in any way based upon, arising out of, related to or resulting from:

    **1.** Contractual Liability

    Liability of others assumed by the "insured" through contract or agreement, except if the liability would have attached to the "insured" in the absence of such contract or agreement. This exclusion does not apply to those contracts listed in the <u>Schedule of Insured Contracts</u> attached to this Policy, if any, but does apply to amendments and modifications of such contracts unless approved in writing by the Insurer, except if the liability would have attached to the "insured" in the absence of such amendment or modification.

    **2.** Fines and Penalties

    Payment of fines, penalties, punitive, exemplary or multiplied damages, or injunctive relief based upon or arising out of any "insured's" knowing, willful or deliberate noncompliance with any statute, regulation, ordinance or administrative complaint. This exclusion also applies to any legal costs, charge or expense associated with such fines and penalties.

    **3.** First Party Property Damage

    "Property damage" to real or personal property owned, leased, loaned, or rented to the "insured", or otherwise in the care, custody, or control of the "insured". This exclusion does not apply to "replacement costs" or "remediation costs" or "natural resource damages".

4.  Insured's Internal Expenses

Expenses incurred by the "insured" for services performed by the salaried staff and any employees of the "insured" except that this exclusion shall not apply to (i) "remediation costs" for work performed by the "named insured"; (ii) costs, charges or expenses incurred in an "emergency response"; or (iii) costs, charges or expenses incurred with the prior written approval of the Insurer.

5.  Naturally Occurring Materials

The presence or required removal of naturally occurring materials, except in those circumstances where removal of such materials is part of the "remediation plan" or "revised remediation plan" or such substances are present at the "covered location" in concentrations in excess of their natural concentration.

6.  Nuclear Hazard

a.  "Bodily injury" or "property damage":

(1)  With respect to which the "insured" under the Policy is also an "insured" under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, or Nuclear Insurance Association of Canada, or would be an "insured" under any such policy but for its termination upon exhaustion of its limits of liability; or

(2)  Resulting from the hazardous properties of nuclear material and with respect to which:

(a)  Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

(b)  The "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

b.  The hazardous properties of nuclear material, if:

(1)  The nuclear material

(a)  Is at any nuclear facility owned by, or operated by or on behalf of the "insured"; or

(b)  Has been discharged or dispersed therefrom;

(2)  The nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of the "insured"; or

(3)  The "bodily injury" or "property damage" arises out of the furnishing by the "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, located within the United States of America, its territories or possessions or Canada.

As used in this exclusion:

(1)  Hazardous properties include radioactive, toxic, or explosive properties.

(2)  Nuclear material means source material, special nuclear material, or byproduct material.

(3)  Source material, special nuclear material, and byproduct material have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

(4)  Spent fuel means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor.

(5)  Waste means any waste material:

(a)  Containing byproduct material other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content; and

(b)  Resulting from the operation by any person or organization of any nuclear facility included under the first two paragraphs of the definition of nuclear facility;

(6) Nuclear facility means:

    (a) Any nuclear reactor;

    (b) Any equipment or device designed or used for

        (i)  Separating the isotopes of uranium or plutonium;

        (ii) Processing or utilizing spent fuel; or

        (iii) Handling, processing or packaging waste;

    (c) Any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

    (d) Any structure, basin, excavation, premises, or place prepared or used for the storage or disposal of waste;

    (e) The site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

(7) Nuclear reactor means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

(8) "Property damage" includes all forms of radioactive contamination of property.

7.  War or Hostile Acts

    "Bodily injury" or "property damage" based upon, arising out of, or attributable to, whether directly or indirectly, any acts that involve, or that involve preparation for, "war" or "hostile acts" regardless of any other cause or event that contributes concurrently in any sequence to the injury or damage.

8.  Vehicles

    "Pollution conditions" resulting from the use, maintenance or operation, including loading or unloading, of an automobile, aircraft, watercraft, or other conveyance beyond the boundaries of the "covered location(s)".    This exclusion does not apply to Section I. D.

9.  Lead Based Paint and Asbestos

    Lead based paint, asbestos, or asbestos containing materials installed or applied in, on or to any building or any structure.  This exclusion does not apply to "claims" for "bodily injury" or "property damage", or to "remediation costs" for the remediation of soil or groundwater.

10. Excluded Work

    Costs specified in or associated with the sections of the "remediation plan" identified at SOV No. 1, No. 7.d. and No. 8.e. on the Weston Payment Schedule attached to this Policy.

11. Prior Expenses

    Any costs or expenses incurred by an "insured" prior to the inception of the Policy.

12. State Surcharges

    State surcharges or assessments including the Remediation Funding Source Surcharge under N.J.A.C. 7:26C, Subchapter 7.

13. Brokerage Fees

    Brokerage fees, costs, charges and expenses.

14. Employers Liability

    "Bodily injury" to:

    a.  Any employee of an "insured" or its parent, subsidiary or affiliate

     **(1)** Arising out of and in the course of employment by the "insured" or its parent, subsidiary or affiliate; or

     **(2)** Performing duties related to the conduct of the "insured's" business.

  **b.** The spouse, child, parent, brother or sister of such employee as a consequence of Paragraph **14.a.** above.

    This exclusion applies:

     **(1)** Whether the "insured" may be liable as an employer or in any other capacity; and

     **(2)** To any obligation to share damages with or repay someone else who must pay damages because of such "bodily injury".

**15.** Intentional Non-Compliance

The intentional disregard of or knowing, willful or deliberate non-compliance with any statute, regulation, ordinance, administrative complaint, notice of violation, notice letter, executive order or instruction of any governmental agency or body, or executive, judicial or administrative order by any "insured", "responsible insured", or "approved contractor". However, to the extent insurable under applicable law, this exclusion does not apply to non-compliance to the extent, and only to the extent, that it first commenced prior to November 4, 2002.

**16.** Known Conditions

"Pollution conditions" in existence prior to the "policy period" and reported to a "responsible insured" prior to the inception of the "policy period", but not identified in any document referenced in the <u>Schedule of Known Conditions</u> attached to this Policy.

**17.** Underground Storage Tanks

"Pollution conditions" emanating from an "underground storage tank", the presence of which "underground storage tank" was known to a "responsible insured" prior to the "policy period", and which "underground storage tank" is not individually identified in any document referenced in the <u>Schedule of Known Conditions</u> attached to this Policy.

**18.** Material Change in Use

Any change in the property use at a "covered location" during the "policy period" from the use at the inception date of this Policy that violates the deed notice set forth and incorporated into the "remediation agreement" and that results in a materially increased likelihood of "claims", "government actions" or "pollution conditions", unless the Insurer consents in writing to such change in use prior to the change. Any change of use at a "covered location" that results in more stringent remediation standards than those imposed on the "covered location" as of the inception of this Policy shall be considered to result in a materially increased likelihood of "claims", "government actions" or "pollution conditions".

**C.** Solely with respect to coverages under Sections I.G. and H., this insurance does not apply to "remediation costs" in any way based upon, arising out of, related to or resulting from:

  **1.** Approved Contractor Termination or License Suspension

The termination of a contract for services with an "approved contractor" or a subcontractor of an "approved contractor", when such termination is due to:

  **a.** Termination without the written consent of the Insurer; or

  **b.** The suspension, lapse, or cancellation of any license, permit or contract of an "approved contractor" performing work pursuant to the execution of an approved "remediation plan" or "revised remediation plan", if any, but only if such suspension, lapse or cancellation resulted directly or indirectly from some act or failure to act by the "approved contractor".

  **2.** Changes to the "remediation plan"

Any changes to the "remediation plan" or "revised remediation plan", if any, which were not approved in writing, by the Insurer, prior to implementation. This exclusion does not apply to "emergency response" costs, where the "insured" shall notify the Insurer of such a circumstance as soon as possible.

3. **Faulty Workmanship**

The faulty workmanship of any "approved contractors" or any of their subcontractors.

4. **Negligent Acts, Errors, or Omissions**

The negligent acts, errors, and/or omissions of any "approved contractor" or any of their subcontractors.

5. **Delays**

Any unreasonable delays in the performance of work under the "remediation plan" or a "revised remediation plan", if any, if such delay is within the direct control of any "insured", "approved contractor" or subcontractor.

6. **Bankruptcy**

The bankruptcy, default or insolvency of the "named insured" or any other person or organization involved in the performance of work under the "remediation plan" or a "revised remediation plan", if any.

7. **Strikes**

Any labor disputes, including but not limited to strikes.

8. **Misrepresentations**

"Remediation costs" in excess of those estimated in the "remediation plan" or a "revised remediation plan", if any, if the "named insured" intentionally misrepresented the estimated "remediation costs" for, or the work involved in performing, the "remediation plan" or a "revised remediation plan", if any.

**D.**  It is the intent that each of the foregoing exclusions apply to all "insureds" under all circumstances, regardless of the "insured", "responsible insured", "approved contractor" or other person whose act, omission, knowledge or condition resulted in the application of the exclusion.

## VI. REPORTING AND COOPERATION

**A.**  The "insured" must provide or cause to be provided to the Insurer prompt written notice, at the address specified in Item **9.a.** of the Declarations, of any "government action", "claim", "pollution condition" or any other circumstance (i) which may lead to "remediation costs" in excess of those estimated in the "remediation plan" or any "revised remediation plan" or (ii) for which the "insured" may seek coverage under any of Sections **I. A.** through **F.** Notice should include reasonably detailed information as to:

1. The identity of the "insured";

2. The "covered location";

3. The nature of the "government action", "claim", "pollution condition" or circumstance; and

4. Any steps undertaken by the "insured" to respond to the "government action", "claim", "pollution condition" or circumstance.

In the event of a "pollution condition", the "insured" must also take all reasonable measures to provide immediate oral notice to the Insurer.

**B.**  With respect to coverage provided under Section **I.H.**, if applicable, in the event the "insured" notifies the Insurer of any circumstance which may lead to any change in the clean-up methods or standards specified in the "remediation plan", the "named insured" shall work in cooperation with the Insurer to develop a "revised remediation plan". Except in the event of an "emergency response", any costs incurred by the "insured" related to a clean-up method or standard, other than as specified in the original "remediation plan" or incorporated into a "revised remediation plan" will not be afforded coverage.

**C.**  The "insured" must:

1. Immediately send the Insurer copies of any demands, notices, summonses or legal papers received in connection with any "claim" or "government action";

2. Authorize the Insurer to obtain records and other information;

3. Cooperate with the Insurer in the investigation, settlement or defense of any "claim" or "government action";

4. Assist the Insurer, upon the Insurer's request, in the enforcement of any right against any person or organization which may be liable to the "insured" because of injury or damage to which this Policy may also apply; and

5. Provide the Insurer with such information and cooperate as it may reasonably require.

D. No "insured(s)" shall make or authorize an admission of liability or attempt to settle or otherwise dispose of any "claim" or "government action" without the express prior written consent of the Insurer, except an "insured" may accept an offer to settle a "claim" or "government action" without the express prior written consent of the Insurer if (i) the "insured's" liability or obligation in connection with such settlement or other disposition is wholly within the "self-insured retention" and (ii) the "insured" does not make or authorize an admission of liability in connection with such settlement. Under no circumstances shall the "insured" make any settlement offer or proposal without the Insurer's prior written consent. Nor shall the "insured" incur any "remediation costs" without the express prior written consent of the Insurer, except in the event of an "emergency response".

E. Upon the discovery of a "pollution condition", the "insured" shall make every attempt to mitigate any loss and comply with applicable "environmental laws" and retain qualified contractors or consultants. The Insurer shall have an opportunity to participate in the selection, retention, and oversight of such contractors or consultants. The Insurer shall have the right, but not the duty, to mitigate such "pollution conditions" if, in the sole judgment of the Insurer, the "insured" fails to take reasonable steps to do so. The Insurer's participation, if any, in the selection, retention or oversight of contractors or consultants or mitigation, if any, of "pollution conditions" shall not expand, contract or otherwise modify the terms, conditions, limitations and exclusions under this Policy or create any liability on behalf of the Insurer under "environmental laws". Any "remediation costs" incurred by the Insurer shall be deemed incurred by the "insured", and shall be subject to the "self-insured retention" and Limits of Liability listed in the Declarations.

F. With respect to coverage under Section I. G. or H., the "insured" shall use reasonable and prudent efforts to perform the remediation and incur costs in connection therewith in accordance with all the terms of the "remediation plan" and the "revised remediation plan", if any.

G. The "approved contractor" shall make requests for payment of "remediation costs" by providing the Insurer a written invoice for such "remediation costs" together with its "remediation project update". The "approved contractor" shall also provide the Insurer additional supporting documentation and information as evidence of the incurrence of a "remediation costs" under this Policy as may be reasonably requested by the Insurer. The Insurer will pay all undisputed "remediation costs" within 30 calendar days of its receipt of the invoice, "remediation project update" and all supporting documentation reasonably requested by the Insurer. The Insurer will promptly notify the "approved contractor" of any dispute with respect to a "remediation cost."

## VII. EXTENDED REPORTING PERIOD

This Section **VII.** shall only apply with respect to coverages provided under Sections **I.A.** through **F.**

A. Subject to the terms of this Section **VII.**, the "insured" shall be entitled to a basic "extended reporting period", and the "named insured" or any additional "insured" specifically endorsed onto this Policy may purchase an optional supplemental "extended reporting period", following cancellation, as described in Paragraph **A.** of Section **VIII.** General Conditions, or nonrenewal.

B. "Extended reporting periods" shall not reinstate or increase any of the Limits of Liability. "Extended reporting periods" shall not extend the "policy period" or change the scope of coverage provided. A "claim", "government action" or "pollution condition" first reported to the Insurer within the basic "extended reporting period" or supplemental "extended reporting period", whichever is applicable, will be deemed to have been reported on the last day of the "policy period".

C. Provided the "insured" has not purchased any other insurance to replace this insurance, the "insured" shall have a sixty (60) day basic "extended reporting period" without additional charge.

D. The "named insured" and any additional "insured" specifically endorsed onto this Policy shall be entitled to purchase a supplemental "extended reporting period" of up to thirty-four (34) months for an amount of additional Premium determined by the Insurer, but not more than 200% of the full Policy Premium stated in Item **8.** of the Declarations. Such supplemental "extended reporting period" starts when the basic "extended reporting period"

ends. The Insurer will issue an endorsement providing a supplemental "extended reporting period" provided that the "named insured" or any additional "insured" specifically endorsed onto this policy:

1.  Makes a written request, to the address shown in Item **9.b.** of the Declarations, for such endorsement which the Insurer receives prior to the expiration of the "policy period"; and

2.  Pays the additional Premium when due. If that additional Premium is paid when due, the supplemental "extended reporting period" may not be cancelled, provided that all other terms and conditions of the Policy are met.

## VIII. GENERAL CONDITIONS

A.  Cancellation

1.  This Policy may be cancelled by the "named insured" only with the unanimous written consent of the additional "insureds" who are specifically endorsed onto this Policy and are parties to the "remediation agreement" (or their successors) on any anniversary of the effective date of this Policy on or after the fifth anniversary of such effective date by mailing to the Insurer, at the address listed in Item **9.b.** of the Declarations, written notice at least 90 days prior to the date when such cancellation shall be effective. Upon cancellation by the "named insured", the Insurer shall pay the "named insured" the amount of the "notional experience credit" as of the date such cancellation is effective, provided the Insurer has received satisfactory (in the Insurer's sole and absolute discretion) written confirmation from the "named insured" (and all applicable regulatory authorities and agencies) to the effect that the Insurer has been released from any and all past, present and future liability under this Policy and satisfactory (in the Insurer's sole and absolute discretion) indemnification from the "named insured" with respect to claims under the Policy, including but not limited to claims by any person seeking payment, coverage or defense under the Policy.

2.  This Policy may be cancelled by the Insurer only for the following reasons:

a.  Non-payment of Premium; or

b.  Fraud on the part of any "insured" which materially affects the insurability of the risk, such as can be proven in a court of law,

by mailing to all "insureds" party to the "remediation agreement" at their last known address, written notice stating when not less than sixty (60) days thereafter, or fifteen (15) days if cancellation is for non-payment of any unpaid portion of the Premium, such cancellation shall be effective. The mailing of notice shall be sufficient proof of notice. The "policy period" shall end at the effective date and hour of cancellation stated in the notice. Upon cancellation by the Insurer, the Insurer shall pay the "named insured" the amount of the "notional experience credit" as of the date of such termination, provided the Insurer has received satisfactory (in the Insurer's sole and absolute discretion) written confirmation from the "named insured" (and all applicable regulatory authorities and agencies) to the effect that the Insurer has been released from any and all past, present and future liability under this Policy and satisfactory (in the Insurer's sole and absolute discretion) indemnification from the "named insured" with respect to claims under the Policy, including but not limited to claims by any person seeking payment, coverage or defense under the Policy.

B.  Release of Funds

Except as set forth in Section **VIII.Q.**, the Insurer agrees, upon the written request of the "named insured", and subject to the terms and conditions of this Policy, to release the "notional experience credit" to the "named insured" or its designee once the remediation (other than operation and maintenance of the engineering and institutional controls) of the "covered location" is completed to the full and final satisfaction of the NJDEP as confirmed in writing by NJDEP. Any such release shall be subject to receipt by the Insurer of a release and indemnification from the "named insured" from any and all further liability under Section **I. G.** or **H.** of this Policy in a form acceptable to the Insurer in its sole and absolute discretion.

C.  Financial Strength

If the Insurer's Standard and Poor's Insurance Financial Strength Rating is reduced below A- or the Insurer's Moody's Insurer Financial Strength Rating is reduced below A3 during the "policy period", the Insurer will within 15 days of such reduction transfer assets in an amount equal to the then "notional experience credit", if any, to a trustee (to be mutually acceptable to the "named insured" and the Insurer) acting on behalf of the

Insurer (as grantor of such trust) under the terms of a trust agreement in the form attached hereto as <u>Exhibit C</u>; provided, however, that if after such transfer the Insurer's Standard and Poor's Insurance Financial Strength Rating is A- or better and the Insurer's Moody's Insurer Financial Strength Rating is A3 or better, the trust will be terminated within 15 days of such increase and all assets within the trust shall be transferred to the Insurer. If injunctive or other equitable relief is sought to require the Insurer's cooperation in connection with the selection of a trustee or the creation of or transfer of assets into a trust as set forth above, the Insurer covenants not to oppose or otherwise object to the acquisition of such relief on the ground that such relief is an inappropriate remedy. The Insurer shall be entitled to withdraw the assets held in the trust account to reimburse the Insurer for or to pay any and all trustee fees, expenses and disbursements, taxes imposed on the Insurer and indemnification obligations of the Insurer relating to the trust account (collectively, "Trust Costs") or to pay itself any amount held in the trust account in excess of the "notional experience credit" or to pay the "notional experience credit" to the owner of the "covered location" in accordance with Section **VIII.Q.** Any payments made by or from the Insurer or the trust account for Trust Costs (other than taxes imposed on the Insurer relating to the trust account) or for payments of losses under Section **I. G. or H.** of this Policy shall erode the limit of liability under this Policy. To the extent any assets are withdrawn from the trust account to pay the "notional experience credit" or losses under Section **I. G. or H.**, the Insurer shall be relieved from any obligation to pay such items and to the extent the Insurer pays such items directly, they shall not be payable from the trust account.

D.  Inspection and Audit

1.  To the extent of an "insured's" ability to provide such access, and with reasonable notice to the "insured", the Insurer shall be permitted, but not obligated, to inspect and sample the "covered location". The "insured" shall have the concurrent right to collect split samples.

2.  Neither the Insurer's right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the "insured" or others, to determine or warrant that such property or operations are safe or in compliance with "environmental law" or any other law.

3.  The Insurer may examine and audit each "named insured's" books and records during the "policy period" and extensions thereof and within three (3) years after the final termination of this Policy in connection with a claim made by any "insured" under the Policy.

E.  Legal Action Against the Insurer

No person or organization has a right under this Policy:

1.  To join the Insurer as a party or otherwise bring the Insurer into a suit against any "insured"; or

2.  To sue the Insurer in connection with this insurance unless all of the Policy terms have been fully complied with.

Provided that, a person or organization other than any "insured" may only sue the Insurer to recover on an agreed settlement or on a final judgment against an "insured". However, the Insurer will not be liable for amounts that are not payable under the terms of this Policy or that are in excess of the applicable Limit of Liability. An agreed settlement means a settlement and release of liability signed by the Insurer, the "insured" and the claimant or the claimant's legal representative.

Nothing expressed, implied or referred to in this Policy will be construed to give any person other than the Insurer and the "insured" any legal or equitable right, remedy or claim under or with respect to this Policy or any provision of this Policy.

This paragraph does not prohibit the "insured" from bringing a Declaratory Judgment action in the event that the "insured" and the Insurer dispute the "insured's" rights to coverage or defense under the Policy.

F.  Bankruptcy

Bankruptcy or insolvency of the "insured" or of the "insured's" estate shall not relieve the Insurer of any of its obligations hereunder, except as provided under Section **V.C.6.**

**G.** Subrogation

1. In the event of any payment under this Policy by the Insurer, the Insurer shall be subrogated to all of the rights of recovery against any person or organization, and the "insured" shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The "insured" shall do nothing to prejudice such rights.

2. With respect to Sections **I.A.** through **F.** only, if applicable, any recovery as a result of subrogation proceedings arising out of the Insurer's exercise of its rights under this Policy shall be subject to the following priority:

   **a.** Costs incurred by the "insured" in excess of the Limit of Liability;

   **b.** Costs incurred by the Insurer equal to payments made by the Insurer under the Policy; and

   **c.** Costs incurred by the "insured" equal to the "self-insured retention" amount.

**H.** Representations

By accepting this Policy, each "named insured" agrees that:

1. The statements in the declarations, schedules, and application for this Policy, and all other submissions made by the "named insured" to the Insurer or its agents or representatives in connection with the issuance of this Policy are accurate and complete;

2. Those statements are based upon representations the "named insured" made to the Insurer; and

3. This Policy has been issued in reliance upon the "named insured's" representations.

**I.** Severability

Except with respect to the Limits of Liability listed in the Declarations, the exclusions in Section **V.** of this Policy, and any rights or duties specifically assigned to the "named insured" stated in the Declarations, this Policy applies:

1. As if each "insured" were the only "insured";

2. Separately to each "insured" against whom a "claim" is made.

**J.** Other Insurance

If other valid and collectible insurance is available to the "named insured" covering a loss also covered by this Policy, the insurance afforded by this Policy shall be primary, except in the case of a policy that is specifically written to provide primary coverage to a loss also covered by this Policy, in which case this Policy shall apply in excess of and shall not contribute with such other insurance.

**K.** Sole Agent

The "named insured" shall serve as the sole agent of the "insured(s)" with respect to the return or payment of any premiums or retained amounts, as well as for any notices required by this Policy except for notices by the Insurer under this Policy regarding assignment of the Policy, change in "approved contractor" and cancellation of the Policy which shall be provided to each "named insured" and each additional "insured" specifically endorsed onto this Policy.

**L.** Jurisdiction and Venue

It is agreed that in the event of the failure of the Insurer to pay any amount claimed to be due hereunder, the Insurer and the "insured" will submit to the jurisdiction of any court of competent jurisdiction within the State of New Jersey and will comply with all requirements necessary to give such court jurisdiction. Nothing in this clause constitutes or should be understood to constitute a waiver of the Insurer's right to remove an action to a United States District Court.

**M.** Choice of Law

All matters arising hereunder including questions relating to the validity, interpretation, performance, and enforcement of this Policy shall be determined in accordance with the law and practices of the State of New Jersey.

**N** Changes and Assignment

Notice to or knowledge possessed by any person shall not effect waiver or change in any part of this Policy or estop the Insurer from asserting any right under the terms of this Policy. The terms, definitions, conditions, exclusions and limitations of this Policy shall not be waived or changed, and no assignment of any interest under this Policy, whether by merger or otherwise, shall bind the Insurer, except as provided by endorsement and attached to this Policy, signed by the Insurer or its authorized representative. Any assignment of this Policy may be made only with the consent of the Insurer as set forth in an assignment endorsement and, if required by the Insurer, only if the assigning "insured's" rights and obligation under the "remediation agreement" have been assigned to and assumed by the proposed assignee of this Policy, without revision thereto. The Insurer's consent to an assignment of this Policy shall be subject to the Insurer's underwriting standards and policies.

**O.** Headings

The descriptions in the headings and sub-headings of this Policy are inserted solely for convenience and do not constitute any part of the terms or conditions hereof.

**P.** Confidentiality

Any information disclosed by an "insured" to the Insurer or the Insurer's representative shall be treated as confidential by the Insurer. The restrictions in this section shall not apply to any information which is in the public domain at the time when it is provided to Insurer; becomes part of the public domain through no act, omission, or fault of Insurer; is obtained by Insurer from sources other than the "insured"; or is required to be disclosed by law, including, without limitation, pursuant to the terms of a valid subpoena or other similar document. The Insurer shall use its commercially reasonable efforts to preserve and protect the confidentiality of, and where applicable the privilege or protection to such information. Unless an "insured" gives prior written consent or unless compelled by law to disclose such information, the Insurer may not sell or disclose such information to any other person except the Insurer's legal representatives, accountants, or advisors or the Insurer's Reinsurers and their legal representatives, accountants, or advisors; provided, however, the Insurer shall obtain from any such person a written agreement substantially similar to the provisions of this Section to keep all such information confidential. The Insurer may not use such information for any purpose except in connection with the exercise of its rights and obligations under this Policy. The Insurer further agrees to take all appropriate steps, including but not limited to establishing internal protocols among its employees and agents, to assure that the information provided in connection with this Policy remains confidential and is not used by the Insurer internally or by its agents for any purpose unrelated to this Policy.

If the Insurer is required to provide any information disclosed by an "insured" to any other person, the Insurer shall use its commercially reasonable efforts to minimize the amount of information disclosed, taking into consideration the reason for the disclosure. The Insurer shall obtain from any such person a written agreement substantially similar to the provisions of this Section to keep all such information confidential. In the event the Insurer is served with a subpoena or court order compelling the disclosure by the Insurer of such information, the Insurer shall give written notice thereof to the "insured" and allow objections to be made to the disclosure. An "insured" may at its sole option and expense seek a protective order or otherwise resist such attempts to compel disclosure. If a protective order is not entered prior to the date on which such disclosure is required by the subpoena or court order, or if the Insurer will be penalized or censured as a result of failing to disclose, the Insurer may disclose the information required to be disclosed by the subpoena or court order in accordance with the terms thereof.

Notwithstanding the foregoing, the Insurer may use and disclose such information to the extent such disclosure is necessary or appropriate in connection with its prosecution or defense of any legal action (including administrative proceedings) relating to this Policy; however, the Insurer shall provide notice to the "insured" of the Insurer's intent to use and disclose such information to allow the "insured" to seek to maintain the confidentiality of such information.

**Q.** Retention of Contractor

The "approved contractor" may only be replaced by the owner of the "covered location" pursuant to the "remediation agreement". Should the "approved location" (or any succeeding contractor) be replaced pursuant to the above, the owner of the "covered location" shall select and retain a replacement contractor of its sole choice and require such replacement contractor to execute the "remediation agreement" or a revised "remediation agreement" with the owner and the Insurer shall use commercially reasonable efforts to assist the owner(s) of the "covered location" as requested by the owner during the selection and replacement process. After such

replacement contractor has been retained by the owner by entering into a revised "remediation agreement" with the owner or executing the "remediation agreement", the Insurer shall add such replacement contractor to this Policy as a "named insured" by endorsement; provided, however, that as a condition precedent to the Insurer's obligation to add the replacement contractor as a "named insured", the replacement contractor must agree in writing to assume all of the duties and obligations of the "named insured" (or of any succeeding contractor) under this Policy and, if a trust agreement has been entered into and remains in effect pursuant to Section **VIII.C.**, under the trust agreement. In the event the replacement contractor does not sign the "remediation agreement" and the Administrative Consent Order entered into by the Insurer, Weston Solutions, Inc. and the New Jersey Department of Environmental Protection with respect to the "covered location", it shall have no rights to the "notional experience credit" pursuant to Section **VIII.A.2.** or Section **VIII.B.**, and the replacement contractor shall acknowledge such in writing prior to being included as the "named insured" under this Policy; and further, in such case, the "notional experience credit" shall be released pursuant to Section **VIII.B.** to the owner of the "covered location" at such time.

**R.** Representation by Counsel

Each party acknowledges and agrees that it has been represented by competent, experienced legal counsel and other advisors in the negotiation and drafting of this Policy.

**S.** Financial Assurance

Annually until this Policy is cancelled or expires, and in accordance with Paragraph 26 of the "settlement agreement", the Insurer shall submit to the New Jersey Department of Environmental Protection a completed self-guarantee application in accordance with N.J.A.C. 7:26C- 7.7; provided, however, that: (i) the Insurer may include such additions to and notations on any application form it submits as the Insurer deems in its sole discretion to be necessary or appropriate to define the Insurer's limited role, as described in the "settlement agreement", this Policy or the Administrative Consent Order entered into by the Insurer, Weston Solutions, Inc. and the New Jersey Department of Environmental Protection with respect to the "covered location"; (ii) the Insurer's obligations under this Section **VIII.S.** shall at no time require the Insurer or any of its affiliates to agree to assume, undertake or otherwise subject itself to any liability, potential liability, obligation or potential obligation beyond or in addition to the terms, conditions and limits of liability contained elsewhere in this Policy (including but not limited to the posting of collateral or other security) or to incur any out of pocket costs or expenses other than nominal costs required for execution and delivery of the required submittals, and (iii) the "named insured" shall provide the Insurer with written notice of requirements to make any filings with New Jersey Department of Environmental Protection under N.J.A.C. 7:26C, Subchapter 7 at least thirty (30) days and not more than sixty (60) days in advance of the date on which such filing is required.

**T.** Disputes under the Remediation Agreement

The Insurer shall not be bound by any arbitration award, order, judgment or agreement to which it is not a party including any arising out of any dispute between or among the parties to the "remediation agreement" as to whether or not a pollution condition is a Pre-existing Pollution Condition as that term is used in the "remediation agreement". The foregoing provision shall not be deemed to be a waiver or relinquishment of any other rights or defenses the Insurer may have under law or this Policy with respect to any matter.

**TRUST AGREEMENT**

**Dated as of _____**

**among**

**ACE AMERICAN INSURANCE COMPANY,**
**as Grantor**

**WESTON SOLUTIONS, INC.**
**as Primary Beneficiary**

**HATCO CORPORATION**
**as Secondary Beneficiary**

**and**
**[NAME OF BANK],**
**as Trustee**

## TABLE OF CONTENTS

**PAGE**

1.   Deposit of Assets to the Trust Account ............................................................................1

2.   Withdrawal of Assets from the Trust Account ...................................................................2

3.   Redemption, Investment and Substitution of Assets .........................................................3

4.   Interest, Dividends and Income ........................................................................................4

5.   Right to Vote Assets .........................................................................................................4

6.   Additional Rights and Duties of the Trustee .....................................................................4

7.   The Trustee's Compensation, Expenses, etc .....................................................................6

8.   Resignation or Removal of the Trustee .............................................................................6

9.   Termination of the Trust Account .....................................................................................7

10.  Taxes .................................................................................................................................7

11.  Definitions ........................................................................................................................8

12.  Governing Law; Jurisdiction ............................................................................................9

13.  Successors and Assigns ...................................................................................................10

14.  Severability .....................................................................................................................10

15.  Entire Agreement ............................................................................................................10

16.  Amendments ...................................................................................................................10

17.  Notices, etc .....................................................................................................................10

18.  Headings .........................................................................................................................11

19.  Counterparts ....................................................................................................................11

Exhibits

EXHIBIT A    Amount of Assets Initially Deposited to the Trust Account

### TRUST AGREEMENT

This TRUST AGREEMENT, is effective as of _____ (the "Agreement"), among ACE American Insurance Company, a Pennsylvania insurance company (the "Grantor"), Weston Solutions, Inc. (the "Primary Beneficiary"), Hatco Corporation or its successors or assigns (the "Secondary Beneficiary"), and [*insert name of bank and state and type of organization*] (the "Trustee") (the Grantor, the Primary Beneficiary, the Secondary Beneficiary and the Trustee are hereinafter each sometimes referred to individually as a "Party" and collectively as the "Parties").

WITNESSETH:

**WHEREAS**, the Grantor has issued a Remediation Expense Containment and Premises Pollution Liability Insurance Policy, effective _____, 2005, to Weston Solutions, Inc. as the "named insured" thereunder (the "Policy");

**WHEREAS**, pursuant to the Policy, the Grantor is required, under certain conditions, to transfer to the Trustee for deposit into a trust account (the "Trust Account") an amount equal to the "notional experience credit" (as defined in the Policy) at the time of the transfer;

**WHEREAS**, the Trustee has agreed to act as Trustee hereunder, and to hold the assets transferred to the Trustee in trust in the Trust Account, for the sole use and benefit of the Grantor, the Primary Beneficiary and the Secondary Beneficiary as provided herein; and

**WHEREAS**, this Agreement is made for the purpose of setting forth the rights and obligations of the Grantor, the Primary Beneficiary and the Secondary Beneficiary and the duties and powers of the Trustee with respect to the Trust Account.

**NOW, THEREFORE**, for and in consideration of the premises and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereby agree as follows:

1.    <u>Deposit of Assets to the Trust Account.</u>

       (a)    The Grantor hereby establishes the Trust Account and the Trustee shall administer the Trust Account in the name of "ACE/Weston Trust Account for the benefit of ACE American Insurance Company and Weston Solutions, Inc. and Others" as Trustee to hold the assets transferred to the Trustee, which shall consist only of United States of America legal tender in cash ("Cash") and, if invested pursuant to Section 3, Eligible Securities (as hereinafter defined), together with all present and future income and distributions thereon and all proceeds of all of the foregoing (all such assets are herein referred to individually as an "Asset" and collectively as the "Assets"), for the sole use and benefit of the Grantor, the Primary Beneficiary and Secondary Beneficiary as provided herein. The Assets shall be subject to withdrawal by the Grantor, the Primary Beneficiary and Secondary Beneficiary solely as provided herein. The Trust Account shall be maintained at all times separate and distinct from all other assets of the Trustee or any other Person at any office or branch of the Trustee in the United States. The Trustee represents, warrants and covenants that: (i) it is, and at all times during the term of this Agreement shall be,

a bank that is a member of the Federal Reserve System, and (ii) it is not, and at all times during the term of this Agreement, shall not be a Parent, Subsidiary or Affiliate of the Grantor or the Primary Beneficiary.

(b)     The Grantor hereby transfers, conveys and assigns to the Trustee, for deposit to the Trust Account, all of its right, title and interest in and to the Assets listed in Exhibit A hereto, to have and to hold in trust for the sole use and benefit of the Grantor, the Primary Beneficiary and Secondary Beneficiary as provided herein.

(c)     Each of the Grantor, the Primary Beneficiary and Secondary Beneficiary hereby represents, warrants and covenants that (i) it has not and shall not grant or permit to be incurred any security interests or liens on the Assets or the Trust Account; (ii) it is a corporation duly organized, validly existing, and in good standing under the laws of its domicile; (iii) it has the corporate power to execute, deliver and perform the Agreement; (iv) it has taken all corporate action necessary to authorize the execution, delivery and performance of this Agreement and has duly executed and delivered it; and (v) this Agreement constitutes its valid obligation, legally binding upon it and is enforceable against it in accordance with the terms of the Agreement.

2.     <u>Withdrawal of Assets from the Trust Account</u>.

(a)     No funds shall be distributed by the Trustee to any Primary Beneficiary unless and until the Trustee has received written acknowledgement from the Grantor or final court order that the amount requested by the Primary Beneficiary pursuant to a Primary Beneficiary Withdrawal Notice (as defined below) is due and payable in accordance with the terms of the Policy and this Agreement, except as otherwise provided in Section 2(i) of this Agreement. Subject to the foregoing, the Person named herein as the Primary Beneficiary, for so long as such Person is the "approved contractor" (as defined in the Policy), shall be entitled to withdraw amounts from the Trust Account, but only for the following purposes: (i) to pay losses covered under Section I. G. or H. of the Policy; or (ii) to receive the "notional experience credit" in accordance with the terms and conditions of the Policy. All requests by the Primary Beneficiary to withdraw amounts from the Trust Account shall be in writing, signed by the Primary Beneficiary and delivered to the Trustee with a copy to the Grantor (a "Primary Beneficiary Withdrawal Notice"). The Primary Beneficiary shall provide the Grantor such documentation and information as is reasonably requested by the Grantor in connection with its review and consideration of a Primary Beneficiary Withdrawal Notice.

(b)     No funds shall be distributed by the Trustee to the Grantor unless and until the Trustee has received written acknowledgement from the Primary Beneficiary or a final court order that the amount requested by the Grantor pursuant to a Grantor Withdrawal Notice (as defined below) is due and payable to the Grantor in accordance with the terms of the Policy and this Agreement. Subject to the foregoing, the Grantor shall be entitled to withdraw amounts from the Trust Account solely for the following purposes: (i) to receive any amounts in excess of the amount of the "notional experience credit" as calculated under the Policy; (ii) to be reimbursed for any amount the Grantor pays the Trustee in accordance with Section 7(a) of this Agreement or any taxes paid by the Grantor in accordance with Section 10 of this Agreement; or (iii) to receive all of the Assets in the Trust Account upon the termination of the Trust Account in

accordance with the Policy. All requests by the Grantor to withdraw amounts from the Trust Account shall be in writing, signed by the Grantor and delivered to the Trustee with a copy to the Primary Beneficiary (a "Grantor Withdrawal Notice"). The Grantor shall provide the Primary Beneficiary such documentation and information as is reasonably requested by the Primary Beneficiary in connection with its review and consideration of a Grantor Withdrawal Notice.

(c)     No funds shall be distributed by the Trustee to any Secondary Beneficiary unless and until the Trustee has received written acknowledgement from the Grantor or final court order that the amount requested by the Secondary Beneficiary pursuant to a Secondary Beneficiary Withdrawal Notice (as defined below) is due and payable in accordance with the terms of the Policy and this Agreement, except as otherwise provided in Section 2(i) of this Agreement. The Secondary Beneficiary shall be entitled to withdraw amounts from the Trust Account solely for the purpose of receiving the "notional experience credit" as the owner of the "covered location" (as defined in the Policy) in accordance with Section VIII.Q of the Policy. All requests by the Secondary Beneficiary to withdraw amounts from the Trust Account shall be in writing, signed by the Secondary Beneficiary and delivered to the Trustee with a copy to the Grantor (a "Secondary Beneficiary Withdrawal Notice" and generally referred to together with any Primary Beneficiary Withdrawal Notice or Grantor Withdrawal Notice as a "Withdrawal Notice"). The Secondary Beneficiary shall provide the Grantor such documentation and information as is reasonably requested by the Grantor in connection with its review and consideration of the Secondary Beneficiary Withdrawal Notice.

(d)     The Trustee shall have no responsibility whatsoever to determine that any Assets withdrawn from the Trust Account pursuant to this Agreement will be used and applied for the purposes stated in paragraph (a), (b) or (c) of this Section 2 or that the amount requested in a Withdrawal Notice is due and payable in accordance with the terms of the Policy or this Agreement or, absent a written notice from the Grantor as provided in paragraph (g) of this Section 2, that any Person named herein (or in an addendum to this Agreement) as the Primary Beneficiary continues to be the Primary Beneficiary or, absent a written notice from the Grantor as provided in paragraph (h) of this Section 2, that any Person named herein (or in an addendum to this Agreement) as the Secondary Beneficiary continues to be the Secondary Beneficiary.

(e)     Upon receipt of a Withdrawal Notice and a written acknowledgement (except where no acknowledgement is required as provided in paragraph (i) of this Section 2) as set forth above, the Trustee shall immediately take any and all steps necessary to transfer, absolutely and unconditionally, all right, title and interest in the Assets specified in such Withdrawal Notice, and shall deliver physical custody of such Assets to or for the account of the Primary Beneficiary, Secondary Beneficiary or the Grantor as specified in such Withdrawal Notice. In the case of "book entry securities," delivery of "physical custody" shall be deemed to have occurred when appropriate book entries have been made to transfer title of any such Assets to the Grantor, the Primary Beneficiary or the Secondary Beneficiary, as applicable, it being recognized that there are no certificates or instruments to deliver.

(f)     Subject to Section 3, Section 7(a) and Section 9 of this Agreement, in the absence of a Withdrawal Notice and written acknowledgement (except where no acknowledgement is

required as provided in paragraph (i) of this Section 2) as set forth above, the Trustee shall allow no substitution or withdrawal of any Asset from the Trust Account.

(g)     If the Person named herein (or in an addendum to this Agreement) as the Primary Beneficiary ceases to be the "approved contractor" (as defined in the Policy), then such Person shall automatically cease to be the Primary Beneficiary and all of their rights and obligations under this Agreement shall automatically terminate except with respect to covered losses incurred by such Person under Section I. G. or H. of the Policy while such Person was the "approved contractor". If, in accordance with the terms of the Policy, (1) the "approved contractor" (as defined in the Policy) is replaced and (2) ACE names the replacement as the "named insured" (as defined in the Policy), then the replacement contractor shall become the Primary Beneficiary under this Agreement and have all of the rights and obligations of the Primary Beneficiary hereunder. The Grantor shall notify the Trustee in writing when any Person named herein as the Primary Beneficiary ceases to be the "approved contractor" (as defined in the Policy) and of the name of any replacement Primary Beneficiary. The Trustee is hereby authorized to rely on such notification in accordance with Section 6(g) of this Agreement. Any replacement Primary Beneficiary shall execute an addendum to this Agreement making it a party hereto.

(h)     If the Person named herein (or in an addendum to this Agreement) as the Secondary Beneficiary ceases to be the "owner" of the "covered location" (as defined in the Policy) (the "Prior Owner") and the new owner is added to the Policy as an additional "insured", then the Prior Owner shall automatically cease to be the Secondary Beneficiary and all of their rights and obligations under this Agreement shall terminate without effecting such Person's continuing rights as an "insured" under the Policy. In accordance with the terms of the Policy, when the new owner is endorsed to the Policy as an additional "insured" (as defined in the Policy), then the new owner shall become the Secondary Beneficiary under this Agreement and have all of the rights and obligations of the Secondary Beneficiary hereunder. The Grantor shall notify the Trustee in writing when any Person named herein as the Secondary Beneficiary ceases to be the "owner" of the "covered location" (as defined in the Policy) and of the name of any replacement Secondary Beneficiary. The Trustee is hereby authorized to rely on such notification in accordance with Section 6(g) of this Agreement. Any replacement Secondary Beneficiary shall execute an addendum to this Agreement making it a party hereto.

(i)     Except as provided below, if as a result of the liquidation of the business of the Grantor the Policy is cancelled or discontinued, this Agreement and the Assets referenced herein shall not be affected thereby, and this Agreement shall continue in full force and effect, including but not limited to those provisions incorporating terms and conditions of the Policy which terms and conditions shall continue to be used for the purposes of effectuating this Agreement. If a final, non-appealable order to liquidate the business of the Grantor (a "Liquidation Order") has been entered, the Primary Beneficiary (or Secondary Beneficiary as applicable) is not subject to any bankruptcy proceeding and the Primary Beneficiary (or Secondary Beneficiary as applicable) provides the Trustee with a Primary Beneficiary Withdrawal Notice (or Secondary Beneficiary Withdrawal Notice as applicable) and a written certification signed by an executive officer of the Primary Beneficiary (or Secondary Beneficiary as applicable) providing that (i) a Liquidator Order has been entered and (ii) the amount the Primary Beneficiary (or Secondary

Beneficiary as applicable) has requested to withdraw from the Trust Account represents the "notional experience credit" under the Policy and that the "notional experience credit" is due and payable to the Primary Beneficiary (or Secondary Beneficiary as applicable) in accordance Sections VII and/or VIII.Q of the Policy and this Agreement, then the Trustee may distribute the requested funds to the Primary Beneficiary (or Secondary Beneficiary as applicable) without having received a written acknowledgement from the Grantor that the amount requested by the Primary Beneficiary (or Secondary Beneficiary as applicable) is due and payable in accordance with the terms of the Policy and this Agreement. If the Primary Beneficiary (or Secondary Beneficiary as applicable) withdraws funds from the Trust Account in accordance with the procedures set forth in this Section 2(i), and the Primary Beneficiary (or Secondary Beneficiary as applicable) is determined to have not been entitled to all or a portion of the amount withdrawn as payment of the "notional experience credit" under the terms and conditions of the Policy, then the Primary Beneficiary (or Secondary Beneficiary as applicable) shall be deemed to hold such wrongfully withdrawn funds in trust for the Grantor and, without limitation to any other rights of or remedies available to the Grantor at or under common law, equity or statute, the Primary Beneficiary (or Secondary Beneficiary as applicable) shall immediately return such wrongfully withdrawn funds to the Trust Account together with interest thereon from the date withdrawn to the date returned at the Prime Rate plus 2% per annum or the maximum permissible rate, whichever is less, and indemnify the Grantor for all costs and expenses incurred in connection with its efforts to seek the return of the wrongfully withdrawn funds.

3.    Redemption, Investment and Substitution of Assets.

(a)    The Trustee shall surrender for payment all maturing Assets and all Assets called for redemption and deposit any such payment into the Trust Account for the Trustee to have and to hold in trust pursuant to this Agreement.

(b)    At the written order and direction of the Grantor or its designated investment advisor, the Trustee shall invest Assets in the Trust Account in Eligible Securities.

(c)    From time to time, the Grantor may direct the Trustee to substitute Assets of comparable value for other Assets presently held in the Trust Account. The Trustee shall comply with any such direction; provided that (i) the substitute Assets are first deposited in the Trust Account before any Assets are released from the Trust Account; (ii) the substitute Assets are Eligible Securities or Cash; and (iii) the Trustee has determined that the fair market value of the substituted Assets is not less than the fair market value of the Assets being replaced thereby.

(d)    All investments and substitutions of securities referred to in Sections 3(b) and 3(c) above shall be in compliance with the definition of "Eligible Securities" in Section 11 of this Agreement, and with the other requirements of this Agreement. Any instruction or order concerning such investments or substitutions of securities shall be referred to herein as an "Investment Order". The Trustee shall execute Investment Orders and settle securities transactions by itself or by means of an agent or broker. The Trustee shall not be responsible for any act or omission, or for the solvency, of any such agent or broker, except if said act or omission is the result of the Trustee's negligence, willful misconduct, or lack of good faith.

(e)     When the Trustee is directed by the Grantor or the Primary Beneficiary in accordance with this Agreement to deliver Assets, unless otherwise specified by the Grantor, the Primary Beneficiary or the Secondary Beneficiary, delivery will be made in accordance with generally accepted market practice.

(f)     Any loss incurred from any investment pursuant to the terms of this Section 3 shall be borne exclusively by the Trust Account.

4.     Interest, Dividends and Income.

All payments of interest, dividends and other income in respect to Assets in the Trust Account shall be posted and credited to the Trust Account for the Trustee to have and to hold in trust pursuant to this Agreement. Any interest, dividend or other income automatically posted and credited on the payment date to the Trust Account which is not subsequently received by the Trustee and which is deposited by the Trustee into the Trust Account from its own funds shall be reimbursed by the Grantor to the Trustee and the Trustee may debit the Trust Account for this purpose. Any amounts contained in the Trust Account are part of the Assets, and as such, are subject to the terms and conditions of this Agreement with respect to the Assets. The Trustee shall hold any Cash in the Trust Account in an interest bearing account or a money market account consisting solely of Eligible Securities which shall be part of the Trust and subject to the terms of this Agreement.

5.     Right to Vote Assets.

The Trustee shall forward all annual and interim stockholder reports and all proxies and proxy materials relating to the Assets in the Trust Account to the Grantor. The Grantor shall have the full and unqualified right to vote any Assets in the Trust Account. The Trustee will instruct any entities authorized to hold Assets in accordance with the terms hereof to transmit to the Grantor upon receipt, all financial reports, stockholder communications, notices, proxies and proxy soliciting materials received from issuers of Assets, and all information relating to exchange or tender offers received from offerors with respect to such Assets.

6.     Additional Rights and Duties of the Trustee.

(a)     The Trustee shall notify the Grantor and the Primary Beneficiary in writing within five business days following each deposit to and withdrawal from the Trust Account.

(b)     The Trustee shall have no responsibility whatsoever to determine that any Assets in the Trust Account are or continue to be Eligible Securities.

(c)     The Trustee may deposit any Assets in the Trust Account in a book-entry account maintained at the Federal Reserve [*name of bank*] or in depositories such as the Depository Trust Company. Assets may be held in the name of a nominee maintained by the Trustee or by any such depository.

(d)     The Trustee shall accept and open all mail directed to the Grantor or the Primary Beneficiary in care of the Trustee and shall forward all mail promptly to the addressee.

(e)     The Trustee shall furnish to the Grantor and the Primary Beneficiary a statement of all Assets in the Trust Account, including their fair market value and identifying all transactions or transfers relating thereto, (1) as of the inception of the Trust Account, within ten days of the inception and (2) as of the end of each calendar month, within fifteen days of the end of each calendar month.

(f)     Upon the request of the Grantor or the Primary Beneficiary, the Trustee shall promptly permit the Grantor or the Primary Beneficiary, their respective agents, employees or independent auditors to examine, audit, excerpt, transcribe and copy, during the Trustee's normal business hours, any books, documents, papers and records relating to the Trust Account or the Assets.

(g)     Unless otherwise provided in this Agreement, the Trustee is authorized to follow and rely upon all instructions and notices given by officers named in incumbency certificates furnished to the Trustee from time to time by the Grantor and the Primary Beneficiary, and by attorneys-in-fact acting under written authority furnished to the Trustee by the Grantor and the Primary Beneficiary, including, without limitation, instructions and notices given by letter, facsimile transmission or electronic media, if the Trustee believes such instructions or notices to be genuine and to have been signed, sent or presented by the proper party or parties; provided, however, that the Trustee shall be liable for its own negligence, willful misconduct or lack of good faith  The Trustee shall not incur any liability to anyone resulting from actions taken by the Trustee in reliance in good faith on such instructions or notices. The Trustee shall not incur any liability in executing or relying on instructions or notices (i) from any attorney-in-fact prior to receipt by it of notice of the revocation of the written authority of the attorney-in-fact or (ii) from any officer of the Grantor or the Primary Beneficiary named in an incumbency certificate delivered hereunder prior to receipt by it of a more current certificate.

(h)     The duties and obligations of the Trustee shall only be such as are specifically set forth in this Agreement, as it may from time to time be amended, and no implied duties or obligations shall be read into this Agreement against the Trustee.  The Trustee shall not be liable except for its own negligence, willful misconduct or lack of good faith.

(i)     No provision of this Agreement shall require the Trustee to take any action which, in the Trustee's reasonable judgment, would result in any violation of this Agreement or any provision of law.

(j)     Notwithstanding anything in this Agreement to the contrary, in no event shall the Trustee be liable under or in connection with this Agreement for indirect, special, incidental, punitive or consequential losses or damages of any kind whatsoever, including but not limited to lost profits, whether or not foreseeable, even if the Trustee has been advised of the possibility thereof and regardless of the form of action in which such damages are sought, except where such losses or damages result from the Trustee's negligence, willful misconduct or lack of good faith.

(k)     The Trustee shall not be responsible for the genuineness or value of any of the Assets or for the validity, perfection, priority or enforceability of liens in any of the Assets,

whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes negligence, willful misconduct or lack of good faith on the part of the Trustee, for the validity of title to the Assets, for insuring the Assets or for the payment of taxes, charges, assessments or liens upon the Assets.

7.    The Trustee's Compensation, Expenses, etc.

(a)    The Trustee's fees for its services under this Agreement shall be payable from the Trust Account and the Trustee shall be entitled to reimburse itself for all of its reasonable expenses and disbursements in connection with its duties under this Agreement (including attorneys' fees and expenses), except any such expense or disbursement as may arise from the Trustee's negligence, willful misconduct or lack of good faith, (collectively, "Fees and Expenses") from the Trust Account. To the extent the Assets in the Trust Account are insufficient to pay or reimburse the Trustee for Fees and Expenses, the Fees and Expenses shall be paid by the Grantor. The Grantor hereby indemnifies the Trustee for, and holds it harmless against, any loss, liability, costs or expenses (including attorney's fees and expenses) incurred or made without negligence, willful misconduct or lack of good faith on the part of the Trustee, arising out of or in connection with the performance of its obligations in accordance with the provisions of this Agreement, including any loss, liability, costs or expenses arising out of or in connection with the status of the Trustee and its nominee as the holder of record of the Assets; provided, however, that such indemnity shall be first payable out of the Trust Account to the extent of the Assets held therein. The Grantor hereby acknowledges that the foregoing indemnities shall survive the resignation or discharge of the Trustee or the termination of this Agreement.

(b)    No Assets shall be used in any manner for paying compensation to, or reimbursement or indemnification of, the Trustee, except as expressly permitted by Sections 4 and 7(a) hereof.

(c)    The Trustee will not voluntarily grant or permit to be incurred any security interest or lien on the Assets or the Trust Account.

(d)    Except for the claims and interest of the Trustee, the Grantor, the Primary Beneficiary and the Secondary Beneficiary in the Trust Account, the Trustee does not know of any lien or security interest in the Trust Account or the Assets. If any Person asserts any lien, encumbrance or adverse claim (including any writ, garnishment, judgment, warrant of attachment, execution or similar process) against the Trust Account or the Assets, the Trustee shall promptly notify the Grantor and the Primary Beneficiary and may thereafter respond to such service in any manner authorized by law or regulation, without further obligation to the Grantor or the Primary Beneficiary.

8.    Resignation or Removal of the Trustee.

(a)    The Trustee may resign at any time by giving not less than 90 days' written notice thereof to the Primary Beneficiary and to the Grantor. The Trustee may be removed by the

delivery of not less than 90 days' written notice of removal by the Grantor or the Primary Beneficiary to the Trustee and the other party to this Agreement ("Notice of Removal"). Such resignation or removal shall become effective on the acceptance of appointment by a successor Trustee and the transfer to such successor Trustee of all Assets in the Trust Account in accordance with paragraph (b) of this Section 8.

(b)    Upon receipt by the proper Parties of the Trustee's notice of resignation or the Notice of Removal, the Grantor and the Primary Beneficiary shall jointly approve and appoint a successor Trustee. Any successor Trustee shall be a bank that is a member of the Federal Reserve System or chartered in the State of New York and shall not be a Parent, a Subsidiary or an Affiliate of the Grantor or the Primary Beneficiary. Upon the acceptance of the appointment as Trustee hereunder by a successor Trustee, the execution by the Grantor, the Primary Beneficiary and the successor Trustee of a trust agreement, and the transfer to such successor Trustee of possession of, and title to, all Assets in the Trust Account, the resignation or removal of the Trustee shall become effective. Thereupon, such successor Trustee shall succeed to and become vested with all the rights, powers, privileges and duties of the resigning or removed Trustee, and the resigning or removed Trustee shall be discharged from any future duties and obligations under this Agreement, but the resigning or removed Trustee shall continue after such resignation or removal to be entitled to the benefits of the indemnities provided herein for the Trustee.

9.    Termination of the Trust Account.

(a)    The Trust Account and this Agreement, except for the indemnities provided herein, may be terminated only after (i) the Grantor and the Primary Beneficiary and the Secondary Beneficiary have jointly given the Trustee written notice of their intention to terminate the Trust Account (the "Notice of Intention"). The Notice of Intention shall specify the date on which the Grantor and the Primary Beneficiary and the Secondary Beneficiary intend the Trust Account to terminate (the "Termination Date").

(b)    On the Termination Date, the Trustee shall transfer to the Grantor any Assets remaining in the Trust Account, at which time all liability of the Trustee with respect to such Assets shall cease.

10.    Taxes.

The Grantor shall be responsible for causing to be prepared and filed in a timely fashion all tax returns of the Trust relating to the transactions contemplated by this Trust Agreement or otherwise contemplated hereby, and it shall send a copy of each such tax return to the Trustee and the Primary Beneficiary. The Trustee, upon request, will furnish the Grantor with all such information as it has in its possession and as may be reasonably required in connection with the preparation of such tax returns and shall, upon request of the Grantor, execute such returns if required to do so by the applicable taxing authority. The Grantor shall be solely liable for payment of all fees and taxes imposed on the Trust, but may reimburse itself for such fees and taxes from the Trust Account. The institution acting as Trustee shall not be personally liable for any tax due and payable in connection with this Trust Agreement except for any tax based on or

measured by the net income of the institution acting as Trustee resulting from the amounts paid to the Trustee as fees or compensation for acting as Trustee hereunder.

11.    Definitions.

Except as the context shall otherwise require, the following terms shall have the following meanings for all purposes of this Agreement (the definitions to be applicable to both the singular and the plural forms of each term defined if both forms of such term are used in this Agreement):

The term "Affiliate" with respect to any corporation shall mean a corporation which directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such corporation.

The term "control" (including the related terms "controlled by" and "under common control with") shall mean the ownership, directly or indirectly, of more than 10% of the voting stock of a corporation.

The term "Eligible Securities" shall mean and include the following:

(A) Cash (United States legal tender), or

(B) U.S. Treasury Obligations (as defined below) having a remaining maturity, as of the end of any month, of not more than 10 years, or

(C) Corporate Debt Obligations (as defined below), or

(D) Municipal Bonds (as defined below).

"Corporate Debt Obligation" shall mean any debt security with a long-term rating of AA or higher from Standard & Poors, issued by any U.S. Corporation (as defined below) which: (i) is in the form of bonds or notes; (ii) is denominated and payable by its terms solely in the lawful currency of the United States of America; (iii) is repayable in an amount equal to its outstanding principal balance; (iv) is not repayable in an amount determined by reference to any formula or index; (v) is not subject to any contingency with respect to repayment; (vi) bears simple interest at either a fixed or floating rate that is paid on a periodic basis and computed on a benchmark interest rate plus or minus a spread, if any; (vii) clears through the Depository Trust Company (or its successor); and (viii) has an original maturity of ten years or less; provided, however, that (a) the aggregate market value of all Corporate Debt Obligations from any one issuer or any one group of affiliated or related issuers shall not exceed 5% of the total outstanding market value of all Eligible Securities as of any given date and (b) no Corporate Debt Obligation from any issuer in or related to the telecommunications industry may be an Eligible Security.

"U.S. Corporation" means a corporation (which is not a special purpose vehicle (howsoever described)) organized and existing under the laws of one of the 50 states comprising the United States of America.

"Municipal Bonds" shall mean any debt security with a long-term rating of AA or higher from Standard & Poors, issued by any state, county, or other municipality located in the United States, which: (i) is in the form of bonds or notes; (ii) is denominated and payable by its terms solely in the lawful currency of the United States of America; (iii) is repayable in an amount equal to its outstanding principal balance; (iv) is not repayable in an amount determined by reference to any formula or index; (v) is not subject to any contingency with respect to repayment; (vi) bears simple interest at either a fixed or floating rate paid on a periodic basis and computed on a benchmark interest rate plus or minus a spread, if any; (vii) clears through the Depository Trust Company (or its successor); and (viii) has an original maturity of ten years or less.

"U.S. Treasury Obligations" means U.S. Dollar-denominated senior negotiable debt obligations issued by the United States Department of Treasury and backed by the full faith and credit of the United States of America. For the avoidance of doubt, U.S. Treasury Obligations that (i) are non-interest bearing, (ii) were originally interest-bearing securities from which coupons representing the right to payment of interest have been removed or (iii) are interest-bearing securities from which the right to the payment of principal have been removed, shall not constitute Eligible Securities hereunder.

The term "Grantor" shall include any successor of the Grantor by operation of law including, without limitation, any liquidator, rehabilitator, receiver or conservator.

The term "Person" shall mean and include an individual, a corporation, a partnership, an association, a trust, an unincorporated organization or a government or political subdivision thereof.

The term "Parent" shall mean an institution that, directly or indirectly, controls another institution.

The term "Primary Beneficiary" shall mean Weston Solutions, Inc. or any replacement "Primary Beneficiary" as provided herein.

The term "Secondary Beneficiary" shall mean Hatco Corporation and its successors and assigns.

The term "Subsidiary" shall mean an institution controlled, directly or indirectly, by another institution.

12.   Governing Law; Jurisdiction

This Agreement shall be subject to and governed by the laws of the Commonwealth of Pennsylvania. Any action or proceeding brought by any Party to this Agreement arising out of or relating to this Agreement must be brought in Pennsylvania. Process in any action or proceeding referred to in the preceding sentence may be served on any Party anywhere in the world.

13.   <u>Successors and Assigns.</u>

This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Neither this Agreement nor any right hereunder may be assigned by any Party without the prior written consent of the other Parties, except with respect to the Trustee as expressly permitted by Section 8 of this Agreement and with respect to the Primary Beneficiary and the Secondary Beneficiary as expressly permitted by Sections 2(g) and 2(h) of this Agreement, respectively. Notwithstanding the foregoing, this Agreement shall inure to the benefit of, and bind those who, by operation of law, become successors to any of the Parties, including, without limitation, any liquidator, rehabilitator, receiver or conservator and any successor merged or consolidated entity, and provided that, in the case of the Trustee, the successor trustee is eligible to be a trustee under the terms hereof.

14.   <u>Severability.</u>

In the event that any provision of this Agreement shall be declared invalid or unenforceable by any regulatory body or court having jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remaining portions of this Agreement.

15.   <u>Entire Agreement.</u>

This Agreement constitutes the entire agreement among the Parties, and there are no understandings or agreements, conditions or qualifications relative to this Agreement among the Parties which are not fully expressed in this Agreement. Notwithstanding the foregoing, the Primary Beneficiary, Secondary Beneficiary and the Grantor are parties to the Policy, which contains, among other things, rights, duties and obligations concerning the Trust Account. The Trustee shall have no responsibility whatsoever to determine that the actions of the Primary Beneficiary or the Grantor hereunder are in compliance with the provisions of the Policy.

16.   <u>Amendments.</u>

This Agreement may be modified or otherwise amended, and the observance of any term of this Agreement may be waived, if such modification, amendment or waiver is in writing and signed by the Parties.

17.   <u>Notices, etc.</u>

Unless otherwise provided in this Agreement, all notices, directions, requests, demands, acknowledgments and other communications required or permitted to be given or made under the terms hereof shall be in writing and shall be deemed to have been duly given or made (a)(i) when delivered personally, (ii) when made or given by telecopier or electronic transmission where the receipt thereof is confirmed immediately thereafter by the recipient, or (iii) when received if sent, all charges prepaid, by an internationally recognized overnight courier, and (b) when addressed as follows:

If to the Primary Beneficiary:

Weston Solutions, Inc.
1400 Weston Way
P.O. Box 2653
West Chester, PA 19380
Attn:   Peter Ceribelli
Facsimile: (610) 701-3100

If to the Grantor:

ACE American Insurance Company
1601 Chestnut Street
Philadelphia, PA 19103-0000
Attn: Collateral Manager
Facsimile: (215) 640-2223

If to the Secondary Beneficiary:

Hatco Corporation
1020 King George Post Road
Fords, NJ 08863
Attn: David J. Mason, Vice President, Regulatory Affairs
Facsimile: (732) 738-3944

If to the Trustee:

[Name of bank]

_____

Attn:

Each Party may from time to time designate a different address for notices, directions, requests, demands, acknowledgments and other communications by giving written notice of such change to the other Parties. All notices, directions, requests, demands, acknowledgments and other communications relating to the termination of the Trust Account shall be in writing and may not be made or given by telecopier or electronic transmission.

18.    Headings.

The headings of the Sections and the Table of Contents have been inserted for convenience of reference only and shall not be deemed to constitute a part of this Agreement.

19.    Counterparts.

This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall constitute an original, but such counterparts together shall constitute but one and the same Agreement.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

ACE AMERICAN INSURANCE COMPANY,
as Grantor


By: _____
         Name:
         Title:


WESTON SOLUTIONS, INC.,

as Primary Beneficiary


By: _____
         Name:
         Title:


HATCO CORPORATION,

as Secondary Beneficiary


By: _____
         Name:
         Title:


[NAME OF BANK],
as Trustee


By: _____
         Name:
         Title:

EXHIBIT A

(Amount of Assets Initially Deposited to the Trust Account)

PHLIT\518633\2

## REMEDIATION PLAN SCHEDULE

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol | Policy Number | Policy Period<br><br>to | Effective Date of Endorsement |
| Issued By (Name of Insurance Company) | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer, agree that this Policy applies to the "remediation plan":

REMEDIATION PLAN

The approved "Remediation Plan" means that work that is the subject of the Remedial Action Work Plan as approved by NJDEP on February 17, 2005, incorporating a certain "Draft Remedial Action Work Plan" for the Site dated March 29, 2001, prepared by URS, as amended by addendum letters dated March 27, 2002, and November 15, 2004, and any modification required to incorporate the requirements of the risk-based PCB remedy approval letter issued by the United States Environmental Protection Agency on March 30, 2005, subject to the limitations set forth below.  A summary of the tasks included within the foregoing documents is listed below and was copied from the tasks identified in the HATCO Remediation Cost Summary dated June 28, 2004 and the Weston Payment Schedule each attached to this Policy.

**LNAPL AND SHALLOW GW CONSTRUCTION**
Mobilization
Well Installation
Treatment System Installation
Start-up
Off-Site GW Plume Treatment

**LAGOONS**
Mobilization
Dewater
Existing Liner Disposal
Stabilize Sludge

**LAGOONS ADDITIONAL SCOPE**
Mobilization
Stabilize Lagoon Sediments
Excavate & T&D Lagoon
Sediments
Backfill Lagoons

**ON-SITE SOILS - AREAS A, B, C and D**
Mobilization
Excavation
Backfill Excavation

**CHANNEL D**
Mobilization

Excavation
Restoration

**CAPPING**

Mobilization
Asphalt over Existing Pavement
Asphalt over Gravel
Asphalt over Soil
Soil
Wetlands Bank Credits

**STORM WATER DRAINAGE BASIN**

Mobilization
Basin Construction
Basin O&M (30 Years)*

**OPERATION AND MAINTENANCE**

Wetlands Restoration Monitoring
LNAPL/Shallow GW System
Asphalt Cap O&M
Soil Cap O&M
Deep GW MNA

**PCB SOIL REMEDIATION**

Mobilization
Shoring
Excavation
Transportation & Disposal
Backfill Excavation

The scope of work covered by the Policy does not include:
1. pre-remediation activities; SOV No. 4 on Weston Payment Schedule
2. storm water drainage basin o & m in perpetuity activities; SOV No. 7.d. on Weston Payment Schedule
3. the cap o & m in perpetuity activities; SOV No. 8.e. on Weston Payment Schedule

ESTIMATED REMEDIATION COST

The estimated "Remediation Costs" associated with the above "Remediation Plan", consists of:

**$16,818,908** of estimated "Remediation Cost" as identified within the HATCO Remediation Cost Summary dated June 28, 2004.

APPROVED CONTRACTOR

The "Approved Contractor(s)" specifically designated to perform the "remediation plan" are identified as:

**Weston Solutions, Inc.**

All other terms and conditions remain the same.

# REMEDIATION PROJECT UPDATE SCHEDULE

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol | Policy Number | Policy Period<br>**to** | Effective Date of Endorsement |
| Issued By (Name of Insurance Company) | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer, agree that the "insured" must provide "remediation project updates" in accordance with the following:

UPDATE FREQUENCY:

"Remediation project update" reports are required under this Policy on a <u>Monthly basis</u> during the implementation of the "remediation plan" and/or during the implementation of any "revised remediation plan".

UPDATE FORMAT:

"Remediation project update" reports may be provided in a format most practical for the "insured" to provide, so long the "remediation project update" reports provide, at a minimum, the following information:

    A. "Remediation Plan" Summary (in written format):

        1.  Summary of tasks completed to date.
        2.  Summary of tasks completed since last update.
        3.  Summary of project schedule including revised completion dates for any task that are expected to exceed the original estimated schedule, if any.
        4.  Summary of any issues that have arisen to date that may lead to any increases in B.5. below.
        5.  Summary of any issues that have arisen since the last update that may lead to any increases in B.5. Below.

    B. Budget Report (in spreadsheet format):
        The Insurer will recognize the "Weston Payment Schedule" report as the basis of this budget reporting.

        1.  Include a line item for each task to be performed.
        2.  Include a line item for the original estimated costs associated with each task.
        3.  Include a line item for costs incurred to date for each task.*
        4.  Include a line item for percent complete for each task.*
        5.  Include a line item for estimated cost at completion.*

    *These line items should be revised with each "remediation project update" report

In addition, for any increases that are made to Item B.5. above, please provide a written explanation as to the reason for the increase.

Please send completed "remediation project updates" to:

Daniel A. Robinson, Esq.
Assistant Vice President
ACE Environmental Risk
1601 Chestnut Street - TL32C
Philadelphia, PA  19103



All other terms and conditions remain the same.

**WESTON**
**PAYMENT SCHEDULE**

| SOV No. | Description of Task | Estimated Cost | Measurement Unit | Measurement at Completion | Current Invoice Measurement | Measurement To Date | Current % Complete | % Complete To Date | Est. Cost at Completion | Current Invoice Amount | Invoice Amount To Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | PRE-REMEDIATION | $ 2,539,610 | Upon Remediation Agreement Execution | 1 | 0 | 0 | 0% | 0% | 0% | $ | $ - |
| 2 | LNAPL AND SHALLOW GW CONSTRUCTION | $ 2,724,987 | | | | | | | | $ | $ - |
| 2.a | Mobilization | $ 242,029 | Upon Site Mobilization | 1 | 0 | 0 | 0% | 0% | | $ | $ |
| 2.b | Well Installation | $ 1,430,130 | Well Installation | 14 | 0 | 0 | 0% | 0% | | $ | $ |
| 2.c | Treatment System Installation | $ 786,595 | At Substantial Physical Completion | 1 | 0 | 0 | 0% | 0% | | $ | $ |
| 2.d | Start-Up | $ 121,015 | Upon Successful Start-Up | 1 | 0 | 0 | 0% | 0% | | $ | $ |
| 2.e | Off-Site Groundwater Plume Treatment | $ 145,218 | Application per Plume | 2 | 0 | 0 | 0% | 0% | | $ | $ |
| 3 | LAGOONS | $ 555,065 | | | | | | | | $ | $ |
| 3.a | Mobilization | $ 42,682 | Upon Site Mobilization | 1 | 0 | 0 | 0% | 0% | | $ | $ |
| 3.b | Dewater | $ 380,799 | Gallon Removed | 200,000 | 0 | 0 | 0% | 0% | | $ | $ |
| 3.c | Existing Liner Disposal | $ 21,341 | At Substantial Physical Completion | 1 | 0 | 0 | 0% | 0% | | $ | $ |
| 3.d | Sublizee Sludge | $ 90,263 | Cubic Yard | 1,725 | 0 | 0 | 0% | 0% | | $ | $ |
| 3A | LAGOONS ADDITIONAL SCOPE | $ 1,117,877 | | | | | | | | $ | $ |
| 3A.a | Mobilization | $ 24,319 | Upon Site Mobilization | 1 | 0 | 0 | 0% | 0% | | $ | $ |
| 3A.b | Stabilize Lagoon Sediments | $ 65,671 | Cubic Yard | 2,500 | 0 | 0 | 0% | 0% | | $ | $ |
| 3A.c | Excavate & T&D Lagoon Sediments | $ 983,593 | Cubic Yard | 2,500 | 0 | 0 | 0% | 0% | | $ | $ |
| 3A.d | Backfill Lagoons | $ 44,294 | Cubic Yard | 3,000 | 0 | 0 | 0% | 0% | | $ | $ |
| 4 | ON-SITE SOILS - AREAS A,B,C and D | $ 322,587 | | | | | | | | $ | $ |
| 4.a | Mobilization | $ 42,682 | Upon Site Mobilization | 1 | 0 | 0 | 0% | 0% | | $ | $ |
| 4.b | Excavation | $ 219,398 | Cubic Yard | 3,700 | 0 | 0 | 0% | 0% | | $ | $ |
| 4.c | Backfill Excavation | $ 60,507 | Cubic Yard | 3,700 | 0 | 0 | 0% | 0% | | $ | $ |
| 5 | CHANNEL D | $ 221,119 | | | | | | | | $ | $ |
| 5.a | Mobilization | $ 21,341 | Upon Site Mobilization | 1 | 0 | 0 | 0% | 0% | | $ | $ |
| 5.b | Excavation | $ 163,474 | Cubic Yard | 161 | 0 | 0 | 0% | 0% | | $ | $ |
| 5.c | Restoration | $ 36,304 | Acre | 0.25 | 0 | 0 | 0% | 0% | | $ | $ |
| 6 | CAPPING | $ 3,931,326 | | | | | | | | $ | $ |
| 6.a | Mobilization | $ 96,345 | Upon Site Mobilization | 1 | 0 | 0 | 0% | 0% | | $ | $ |
| 6.b | Asphalt over Existing Pavement | $ 286,502 | Square Yard | 15,183 | 0 | 0 | 0% | 0% | | $ | $ |
| 6.c | Asphalt over Gravel | $ 528,268 | Square Yard | 14,078 | 0 | 0 | 0% | 0% | | $ | $ |
| 6.d | Asphalt over Soil | $ 595,215 | Square Yard | 14,239 | 0 | 0 | 0% | 0% | | $ | $ |
| 6.e | Soil | $ 1,074,240 | Square Yard | 73,776 | 0 | 0 | 0% | 0% | | $ | $ |
| 6.f | Wetlands Bank Credits | $ 1,352,755 | Wetland Acre Capped | 3.5 | 0 | 0 | 0% | 0% | | $ | $ |
| 7 | STORMWATER DRAINAGE BASIN | $ 749,443 | | | | | | | | $ | $ |
| 7.a | Mobilization | $ 43,277 | Upon Site Mobilization | 1 | 0 | 0 | 0% | 0% | | $ | $ |
| 7.b | Basin Construction | $ 188,682 | At Substantial Physical Completion per Basin | 2 | 0 | 0 | 0% | 0% | | $ | $ |
| 7.c | Basin Operation and Maintenance (first 30 years) | $ 255,994 | Commencement of Basin Operation | 1 | 0 | 0 | 0% | 0% | | $ | $ |
| 7.d | Basin Operation and Maintenance (after 30 years) | $ 262,500 | Commencement of Basin Operation | 1 | 0 | 0 | 0% | 0% | | $ | $ |
| 8 | OPERATION AND MAINTENANCE | $ 5,481,623 | | | | | | | | $ | $ |
| 8.a | Wetlands Restoration Monitoring | $ 26,896 | Month | 36 | 0 | 0 | 0% | 0% | | $ | $ |
| 8.b | LNAPL/Shallow GW System | $ 2,352,500 | Month | 84 | 0 | 0 | 0% | 0% | | $ | $ |
| 8.c | Asphalt Cap | $ 704,415 | Month | 240 | 0 | 0 | 0% | 0% | | $ | $ |
| 8.d | Soil Cap | $ 197,863 | Month | 240 | 0 | 0 | 0% | 0% | | $ | $ |
| 8.e | Cap O&M In-Perpetuity | $ 1,485,000 | Upon Remediation Agreement Execution | 1 | 0 | 0 | 0% | 0% | | $ | $ |
| 8.f | Deep GW MNA | $ 494,849 | Month | 84 | 0 | 0 | 0% | 0% | | $ | $ |
| 9 | PCB SOIL REMEDIATION | $ 3,462,361 | | | | | | | | $ | $ |
| 9.a | Mobilization | $ 93,160 | Upon Site Mobilization | 1 | 0 | 0 | 0% | 0% | | $ | $ |
| 9.b | Shoring | $ 471,971 | Linear Foot | 400 | 0 | 0 | 0% | 0% | | $ | $ |
| 9.c | Excavation | $ 371,088 | Cubic Yard | 11669 | 0 | 0 | 0% | 0% | | $ | $ |
| 9.d | Transportation & Disposal | $ 2,408,635 | Ton | 17504 | 0 | 0 | 0% | 0% | | $ | $ |
| 9.e | Backfill Excavation | $ 137,777 | Cubic Yard | 11669 | 0 | 0.0 | 0% | 0% | | $ | $ |
| | INSURED TOTALS: | $ 16,818,908 | | | | | | | | | |
| | PROJECT TOTALS: | $ 21,105,018 | | | | | | | | $ - | $ - |

Notes:

1. Subcontractor and vendor charges will be paid to Weston prior to purchase/rental on a Purchase Order basis.

## SCHEDULE OF
## NON-OWNED DISPOSAL SITE(S)
## ENDORSEMENT

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
| Issued By (Name of Insurance Company) | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

The "insured" and the Insurer, agree that this policy applies to the following location(s) shown in the Schedule of "Non-Owned Disposal Site(s)" listed below:

### SCHEDULE OF NONOWNED DISPOSAL SITE(S)

| LOCATION(S) |
|---|
| Waste Management, Inc.<br>CWM Chemical Services, LLC<br>1550 Balmer Road<br>Model City, NY 14107<br>EPA ID#: NYD049836679<br>(716)754-8231 |



All other terms and conditions of this policy remain unchanged.

_____
Authorized Signature

GRACE HATCO Known Conditions Document List

| Box/File # | Description | Document | Author | Recipient | Date |
|---|---|---|---|---|---|
| | Draft Remedial Action Work Plan, Hatco Corporation Site, Fords (Volumes 1 through 21) | Sitewide Remedial Action WP | URS Corporation | NJDEP | 3/29/2001 |
| | PCB Remediation Proposal and Human Health Risk Assessment for PCB Impacted Soils, Hatco Site Fords, New Jersey | Human Health Risk Assessment | David Crawford/AMEC | Grace/Hatco/URS | 8/31/2001 |
| | NJDEP Response to 3/29/2001 Draft RAWP | NJDEP Letter | Vicky Galofre | David Mason, Hatco/R, Medlar, Grace | 9/28/2001 |
| | Grace Hatco Response to NJDEP 9/28/01 Comments | Remediation Letter | M. Obradovic | Vicky Galofre,NJDEP | 3/27/2002 |
| | NJDEP Response to 3/27/02 Response | NJDEP Letter | Vicky Galofre | M. Obradovic, Grace | 6/7/2002 |
| | Surface Water Modeling Report | Technical Report | Woodward-Clyde | Grace/Hatco | 10/1/1998 |
| | Letter Transmitting multiple documents including "Comments to the Proposed Alternative Remedial Standards Report" | Letter with attached documents | J. LaJava, Latham & Watkins | Daniel R. Lavoie, Marsh | 7/2/2002 |
| | Administrative Consent Order with Hatco | NJDEP Order | NJDEP | Hatco | 9/9/1992 |
| | Project Hatco Guidance Memo | Bid Document | Marsh | All Bidders | 6/17/2002 |
| | URS Figure 6-1 Entitled "Proposed Cap and Existing Cover Hatco Site Fords, New Jersey" | Drawing | URS Corporation | Hatco/Grace | 5/29/2001 |
| | NJDEP Comments on Human Health Risk Assessment | NJDEP Letter | C. Kanakis, NJDEP | M. Obradovic, Remedium | 6/2/2003 |
| | Electronic Database of Site Contaminant Data and Site Plan | Compact disc | Grace/Hatco | All Bidders | 8/1/2002 |
| | Application for General Permit 14 including Wetland Delineation Field Map, Drawing No 64695054, Figure 5, dated 7/17/98 | Letter and NJDEP LURP Application | Gordon Jamieson,Woodward Clyde | Hatco | 7/30/1998 |
| | Grace Comments on offsite Wetlands Permit Application | Letter with attached documents | W.B. Porter, Grace | D.Mason, Hatco | 8/16/1998 |
| | Draft Wetland Delineation Report | Letter with attached Report | G. Jamieson, Woodward Clyde | J. Zigrand, NJDEP | 8/3/98 ltr, 7/23/98 rpt. |
| | Letter transmitting 1998 Crown Pacific access agreement | Letter & access agreement | D. Mason, Hatco | L. Matlews, Latham & Watkins | 6/18/1998 |
| | 1998 Trenton Road Access Agreement | Access agreement | Hatco/Grace | Trenton Road Corp | 3/6/1998 |
| | Appraisal of NJEIC Industrial Highway and Mack Lane, Woodbridge Township, Middlesex County, New Jersey | Appraisal of Trenton Road Parcel | A. Rinaldi Miller - Rinaldi & Co | A. Rellano, Herold & Haines | |
| | Letter regarding access to Trenton Road Property | Access correspondence | L. Droughton,Pinney Hardin | A. Rellano, Herold & Haines | 2/27/1998 |
| | The EDR Aerial Photography Print Service | Aerial Photography of Hatco Site | Environmental Data Resources Inc | Weston | 7/5/2002 |
| | Memorandum Entitled' Responses to Site Visit Questions | 1st Response to Bidder Questions | Daniel R. Lavoie, Marsh | All Bidders | 7/25/2002 |
| | Memorandum Entitled' Responses to second set of Questions' including pilot study report on LNAPL pumping and a 10/25/2001 NJDEP letter approving the pilot study | 2nd response to bidder questions | Daniel R. Lavoie, Marsh | All Bidders | 8/12/2002 memo 8/29/2001 rpt |
| | Memorandum entitled "Hatco-responses to Third set of questions" including an LNAPL data summary | 3rd response to bidder questions dated incorrectly as August 8, 2000, but transmitted by email to D. Jonas on August 8, 2002 | Jeffery LaJava, Latham & Watkins | All Bidders | 8/8/2002 |

4/7/2005

GRACE HATCO Known Conditions Document List

| Box/File # | Description | Document | Author | Recipient | Date |
|---|---|---|---|---|---|
| | Memorandum entitled "Hatco-responses to Fourth set of questions" | 4th response to bidder questions | J. LaJava, L&W | All Bidders | 8/9/2002 |
| | Memorandum entitled "Responses to Fifth set of questions" including excerpts from Remedial Investigation Report Vol 1 of 5 prepared by Dan Raviv Associates, And dated May 1993 | 5th response to bidder questions | D.R. Lavoie, Marsh | All Bidders | 8/14/2002 |
| | Email entitled "Additional Hatco Questions" and transmitting 8 7/20/01 Benzene Fate and Transport Model report prepared by URS | Email with attached file | D.R. Lavoie, Marsh | D. Kopcow, Weston | 8/22/2002 |
| | Email entitled "Additional Hatco Questions" and transmitting Benzene Modeling Appendix A.doc. | Email with attached file | D.R. Lavoie, Marsh | D. Kopcow, Weston | 8/22/2002 |
| | Email entitled "Re:Additional Hatco Questions Part 2" and transmitting Benzene Modeling Appendix A-1 doc. | Email with attached file | D.R. Lavoie, Marsh | D. Kopcow, Weston | 8/22/2002 |
| | Email entitled "Re:Additional Hatco Questions Part 3" and transmitting Benzene Modeling Appendix A-2 doc. | Email with attached file | D.R. Lavoie, Marsh | D. Kopcow, Weston | 8/22/2002 |
| | Email entitled "Re:Additional Hatco Questions Part 4" and transmitting Benzene Modeling Appendix A-3 doc. | Email with attached file | D.R. Lavoie, Marsh | D. Kopcow, Weston | 8/22/2002 |
| | Email entitled "Re:Additional Hatco Questions Part 5" and transmitting Benzene Modeling Appendix A-4 doc. | Email with attached file | D.R. Lavoie, Marsh | D. Kopcow, Weston | 8/22/2002 |
| | Email entitled "Re:Additional Hatco Questions Part 6" and transmitting Benzene Modeling Appendix A-5 doc. | Email with attached file | D.R. Lavoie, Marsh | D. Kopcow, Weston | 8/22/2002 |
| | Email entitled "Re:Additional Hatco Questions Part 7 (final)" and transmitting Benzene Modeling Appendix A-6 doc. | Email with attached file | D.R. Lavoie, Marsh | D. Kopcow, Weston | 8/22/2002 |
| | Email response to additional bidders questions | Response to bidder questions | D.R. Lavoie, Marsh | All Bidders | 9/24/2002 |
| | Email entitled "Grace/Hatco Revised Soil Excavation Volumes" which transmitted various soil excavation figures | Email with attached file | Dan Kopcow/Weston | S.Piatkowski,ACE, and J. Palis, ERM | 11/22/2002 |
| 1 | Conditional RAWP approval from NJDEP | NJDEP Letter | C. Kanaki, NJDEP | M. Obradovic, Remedium | 2/17/2005 |
| 2 | GC Forms and Data | Forms and Data(soil) | Accutest | Dan Raviv Associates | 8/31/1993 |
| 1 | Project no 86C289E Job No 934424 Vol1 of 2 | Technical Report(soil) | Accutest | Dan Raviv Associates | 8/31/1993 |
| 1 | Project no 86C289E Job No 934424 Vol2 of 2 | Technical Report(soil) | Accutest | Dan Raviv Associates | 8/31/1993 |
| 1 | Project no 86C289E Job No 932289 Vol 3 of 3 | Technical Report(soil) | Accutest | Dan Raviv Associates | 5/28/1993 |
| 1 | Job No H858 Vol 2 GC Forms and Data | General Chemistry Forms(soil) | Enviotech Research Inc | Dan Raviv Associates | |
| 1 | Job No H887 Vol 2 GC7MS Forms and Data (cont) | Petroleum Hydrocarbons | Enviotech Research Inc | Dan Raviv Associates | 11/16/1994 |
| 2 | Project 86C289-51C Job No 935297 | Technical Report(soil) | Accutest | Dan Raviv Associates | 9/24/1993 |
| 2 | Job No E891-Hatco | Lab Results(soil) | Michael Urban/Enviotech | Cecilia Collier/Dan Raviv Associates Inc. | 9/22/1993 |
| 2 | Job No C420-Hatco | Lab Results(soil) | Michael Urban/Enviotech | G. Alexander/Dan Raviv Associates | 10/5/1992 |
| 2 | Job No F606-Hatco | Lab Results(water) | Michael Urban/Enviotech | Rebecca Hollender/Dav Raviv Associates | 1/12/1994 |
| 2 | Project No 86C289-51C Job No 937652 | Technical Report(water, Groundwater) | Accutest | Dan Raviv Associates | 1/14/1994 |

4/7/2005

GRACE HATCO Known Conditions Document List

| Doc/File # | Description | Document Type | Author | Recipient | Date |
|---|---|---|---|---|---|
| 2 | Job No C017-Hatco | Lab Results(water, sediment, soil) | Envirotech Research Inc | Jim Kenny/Dan Raviv Associates Inc | 7/29/1992 |
| 2 | Project No.86C289-51 Job No 925231 Vol 3 of 3 | Technical Report(water, soil) | Accutest | Dan Raviv Associates | |

3

GRACE HATCO Known Conditions Document List

| Box/File # | Description | Document | Author | Recipient | Date |
|---|---|---|---|---|---|
| 2 | Project No 86C289-51 Job No 925231 Vol 2 of 3 | Technical Report(water, soil) | Accutest | Dan Raviv Associates | 9/14/1992 |
| 2 | Project No 86C289-51 Job No 925231 Vol 1 of 3 | Technical Report(water, soil) | Accutest | Dan Raviv Associates | 9/14/1992 |
| 3 | SDG No 925131 Drai 289-FRI Vol 1-4 of 8 | USEPA CLP Inorganics SOW Document(water) | Accutest | Dan Raviv Associates | 9/14/1992 |
| 3 | SDG 925103 Drai 289-Fri Vol 5 & 6 of 8 | Organic CLP Deliverables Sample Data Package(water) | Accutest | Dan Raviv Associates | 9/11/1992 |
| 3 | SDG 925103 Drai No 289-FRI Vol 7 & 8 | Organic CLP Deliverables Sample Data Package(water) | Accutest | Dan Raviv Associates | 9/11/1992 |
| 3 | SDG 925156 Drai No 289-FRI 1 of 3 | Organic CLP Deliverables Sample Data Package(soil) | Accutest | Dan Raviv Associates | 9/15/1992 |
| 3 | SDG No 925131 Drai 289-FRI Vol 5-6 of 8 | USEPA CLP Inorganics SOW Document(water) | Accutest | Dan Raviv Associates | 9/14/1992 |
| 3 | SDG 925131 Drai 289-FRI Vol 7 & 8 of 8 | USEPA CLP Inorganics SOW Document(soil) | Accutest | Dan Raviv Associates | 9/14/1992 |
| 3 | SDG 925156 Drai 289-Fri 2 of 3 | Organic CLP Deliverables Sample Data Package(water) | Accutest | Dan Raviv Associates | 9/15/1992 |
| 4 | Sdg 924888 Drai 289FRI Vol 1 & 2 of 9 | Organic CLP Deliverables Sample Data Summary Package(soil, water) | Accutest | Dan Raviv Associates | 8/31/1992 |
| 4 | SDG 924871 Drai 289-FRI Vol 6 of 10 | Organic CLP Deliverables Sample Data Summary Package(soil, water) | Accutest | Dan Raviv Associates | 8/28/1992 |
| 4 | SDG 924888 Vol 5 & 6 of 9 | Organic CLP Deliverables Sample Data Package(soil, water) | Accutest | Dan Raviv Associates | 8/31/1992 |
| 4 | SDG 924871 Drai 289-FRI Vol 7& 8 of 10 | Organic CLP Deliverables Sample Data Summary Package(soil, water) | Accutest | Dan Raviv Associates | 8/28/1992 |
| 4 | SDG 924871 Vol 9 & 10 of 10 | Organic CLP Deliverables Sample Data Package(soil, water) | Accutest | Dan Raviv Associates | 8/28/1992 |
| 4 | SDG 924888 Vol 3 & 4 of 9 | Organic CLP Deliverables Sample Data Package(soil, water) | Accutest | Dan Raviv Associates | 8/31/1992 |
| 4 | SDG 924888 Vol 7 & 8 of 9 | Organic CLP Deliverables Sample Data Package(soil, water) | Accutest | Dan Raviv Associates | 8/31/1992 |
| 4 | SDG 924888 Vol 7 & 8 of 9 | Organic CLP Deliverables Sample Data Package(soil, water) | Accutest | Dan Raviv Associates | 8/31/1992 |
| 5 | Report No 20880-118 (2 of 2) 2 copies | Technical Report(soil, water) | York Laboratories | Dan Raviv Associates | 2/16/1988 |
| 5 | Report No 20880-118 (1 of 2) | Technical Report(soil, water) | York Laboratories | Dan Raviv Associates | 2/16/1988 |
| 5 | Report No 20880-141 2 copies | Technical Report(soil, water) | York Laboratories | Dan Raviv Associates | 2/17/1988 |
| 5 | Report No 20880-109 | Technical Report(water) | York Laboratories | Dan Raviv Associates | 2/4/1988 |
| 5 | Report No 20880-107 | Technical Report(soil, water) | York Laboratories | Dan Raviv Associates | 2/4/1988 |
| 5 | Report No 20880-135 | Technical Report(soil, water) | York Laboratories | Dan Raviv Associates | 2/11/1988 |
| 6 | SDG 924888 Drai No 289-Fri Vol 9 of 9 | Organic CLP Deliverables Sample Data Package(soil) | Accutest | Dan Raviv Associates | 8/31/1992 |
| 6 | SDG 924909 Drai No 289-FRI Vol 1 & 2 of 10 | Organic CLP Deliverables Sample Data Package(soil) | Accutest | Dan Raviv Associates | 9/1/1992 |
| 6 | SDG 924909 Drai No 289-FRI Vol 3 of 10 | Sample Data Package(soil) | Accutest | Dan Raviv Associates | 9/1/1992 |

GRACE HATCO Known Conditions Document List

| Box/Box# | ID/Description | Document | Author | Recipient | Date |
|---|---|---|---|---|---|
| 6 | SDG 924909 Drai No 289-FRI Vol 4, 5, & 6 of 10 | Organic CLP Deliverables Sample Data Package(soil) | Accutest | Dan Raviv Associates | 9/1/1992 |
| 6 | SDG 924909 Drai No 289-FRI Vol 7& 8 of 10 | Organic CLP Deliverables Sample Data Package(soil, water) | Accutest | Dan Raviv Associates | 9/1/1992 |
| 6 | SDG 924909 DRAI 289-FRI Vol 9 & 10 of 10 | Organic CLP Deliverables Sample Data Package(soil, water) | Accutest | Dan Raviv Associates | 9/1/1992 |
| 6 | SDG 924942 Drai No 289-FRI Vol 1 & 2 of 12 | Organic CLP Deliverables Sample Data Package(soil, water) | Accutest | Dan Raviv Associates | 9/2/1992 |
| 7 | Project ID 86C289FRI Accutest Job No 924942R | Technical Report(soil) | Accutest | Dan Raviv Associates | 12/30/1992 |
| 7 | Project 86C289-FRI Accutest Job No 924811 | Technical Report(soil) | Accutest | Dan Raviv Associates | 1/4/1992 |
| 7 | Job No 924811 and 924827 metals only soil-8/25-26/92 | Inorganic Analysis Data Sheet(soil) | Accutest | Dan Raviv Associates | 1/4/1992 |
| 7 | Project 86C289FRI Accutest job no 924809 | Technical Report(soil) | Accutest | Dan Raviv Associates | 1/4/1992 |
| 7 | Project 86C289FRI Accutest job No 924827 | Technical Report(soil) | Accutest | Dan Raviv Associates | 1/4/1992 |
| 7 | Project 86C289FRI Job No 922339, 922250, 922511, 922338, 922249, 922622, 922337, 922416 | Technical Report(soil) | Accutest | Dan Raviv Associates | 5/7/1992 |
| 7 | Project 86C289FRI Job No 925156 | Technical Report(soil) | Accutest | Dan Raviv Associates | 1/3/1992 |
| 7 | Project 86C289FRI Job No 924948 | Technical Report(soil) | Accutest | Dan Raviv Associates | 1/14/1992 |
| 7 | Project 86C289FRI Job No 925131 | Technical Report(soil) | Accutest | Dan Raviv Associates | 1/14/1992 |
| 7 | Project 86C289FRI Job No 925103 | Technical Report(soil) | Accutest | Dan Raviv Associates | 1/31/1992 |
| 7 | Project 86C289FRI Job No 925400 | Technical Report(soil) | Accutest | Dan Raviv Associates | 1/14/1992 |
| 7 | Project 86C289FRI Job no 925008 | Technical Report(soil) | Accutest | Dan Raviv Associates | 1/14/1992 |
| 7 | Project 86C289FRI Job No 924982 | Technical Report(soil) | Accutest | Dan Raviv Associates | 1/31/1992 |
| 7 | Project 86C289FRI Job No 924942 | Technical Report(soil, water) | Accutest | Dan Raviv Associates | 1/14/1992 |
| 7 | Project 86C289FRI Job No 924888 | Technical Report(soil) | Accutest | Dan Raviv Associates | 1/14/1992 |
| 7 | Project 86C289FRI Job No 924871 | Technical Report(soil) | Accutest | Dan Raviv Associates | 1/14/1992 |
| 7 | Project 86C289-FRI Job No 924835 | Technical Report(soil, water) | Accutest | Dan Raviv Associates | 1/14/1992 |
| 8 | Project No 86C289-GW Job no 912711 Vol 2 of 3 | Technical Report(groundwater) | Accutest | Dan Raviv Associates | 6/5/1991 |
| 8 | Project No 86C289-GW Job no 912711 Vol 3 of 3 | Technical Report(groundwater) | Accutest | Dan Raviv Associates | 6/5/1991 |
| 8 | Project No 86C289-GW Job no 912711 Vol 1 of 3 | Technical Report(groundwater) | Accutest | Dan Raviv Associates | 6/5/1991 |
| 8 | Project No 86C289-50 Job No 916969 | Technical Report(groundwater) | Accutest | Dan Raviv Associates | 11/21/1991 |
| 8 | support data Job No 916969 Sample E132607 & E132810 GC/MS | Addendum | Accutest | Ray Simonds/Dan Raviv Associates Inc. | 11/26/1991 |
| 8 | Job No 916970, 916969 File names E916970.dat, E916969.dat | Disk | Accutest | Keith Gagnon/Dan Raviv Associates | 11/21/1991 |
| 8 | Project 96C289-GN Job No 916970 | Technical Report(groundwater) | Accutest | Dan Raviv Associates | 11/21/1991 |
| 8 | Project 86C289-GW Job No 914285 | Technical Report(groundwater) | Accutest | Ray Simonds/Dan Raviv Associates Inc. | 7/31/1991 |
| 8 | Project 96C289-GW Job No 914285 | Technical Report(groundwater) | Accutest | Ray Simonds/Dan Raviv Associates Inc. | 7/25/1991 |

GRACE HATCO Known Conditions Document List

| Box/Fld # | Description | Document Type | Author | Recipient | Date |
|---|---|---|---|---|---|
| 8 | Job No B533-Dan Raviv-Hatco Vol 2 GC/MS -Raw data Sample #'s 66287-66295 GC/EC-raw data chain of custody/lab chronicles | Raw Data Report(water) | Environtech Research Inc | Dan Raviv Associates | 6/2/1992 |
| 9 | Job No H920-Hatco | Lab Results(soil) | Michael Urban/Environtech | Cecelia Fontana/Dan Raviv Associates | 11/18/1994 |
| 9 | Job No H931-Hatco | Lab Results(soil) | Michael Urban/Environtech | Cecelia Fontana/Dan Raviv Associates | 11/21/1994 |
| 9 | Job No H901 Vol 2 GC/MS Forms and Data (cont) | GC Forms and Data(soil) | Environtech Research Inc | Dan Raviv Associates | 11/17/1994 |
| 9 | Job No H903-Hatco | Lab Results(soil) | Michael Urban/Environtech | Dan Raviv Associates | 12/7/1994 |
| 9 | Job No H974A-Hatco | Lab Results(soil) | Michael Urban/Environtech | Dan Raviv Associates | 12/7/1994 |
| 9 | Job No H875-Hatco | Lab Results(soil) | Michael Urban/Environtech | Dan Raviv Associates | 11/14/1994 |
| 10 | Drai 86C289 Vol 2 of 5 Figures RI Report | Remedial Investigation Report | Dan Raviv Associates | George Chryss#/Hatco | May-93 |
| 11 | Analytical Data Job No. 925031 Project 86C289FRI | Technical Report(soil, water) | Accutest | Ray Simonds/Dan Raviv Associates Inc. | 1/14/1992 |
| 11 | Analytical Data Job No. 925231 Project 86C289-51 | Technical Report(soil, water) | Accutest | Ray Simonds/Dan Raviv Associates Inc. | 11/10/1992 |
| 11 | Technical Report Job No 926157 Project 86C289-52 | Technical Report(soil) | Accutest | Cecelia Collier/Dan Raviv Associates Inc. | 11/19/1992 |
| 11 | Results Job No 1592A-Hatco | Lab Results | Michael Urban/Environtech | Cecelia Fontana/Dan Raviv Associates, Inc | 3/30/1995 |
| 11 | Laboratory Data sheets for IRM Report in NAPL in vicinity of the Hydrotherm Building | Lab Results(soil) | Accutest/Environtech Research | Dan Raviv Associates | 12/22/1994 |
| 11 | Job No P186-Hatco | Lab Results(soil, water) | Michael Urban/Environtech | Pete Grogan/Dan Raviv Associates | 7/22/1996 |
| 11 | Job No J873-Leak Investigation | Lab Results(soil) | Michael Urban/Environtech | Cecelia Fontana/Dan Raviv Associates, Inc | 7/24/1995 |
| 11 | Job No C972-Hatco | Lab Results(water) | Michael Urban/Environtech | Cecelia Collier/Dan Raviv Associates Inc. | 12/7/1992 |
| 11 | Job No C138-C143-Hatco | Lab Results(water) | Michael Urban/Environtech | Bruce Ross/Dan Raviv Associates Inc. | 8/26/1992 |
| 11 | Job No C175 | Lab Results(oil) | Michael Urban/Dan Raviv Associates Inc | James Millikin/Dan Raviv Associates Inc | 8/25/1992 |
| 11 | Job No C460-Hatco | Lab Results(soil) | Michael Urban/Environtech | R. Hollender/Dan Raviv Associates Inc | 10/6/1992 |
| 11 | Job No C700-Hatco | Lab Results(water, soil) | Michael Urban/Environtech | R. Hollender/Dan Raviv Associates Inc | 11/23/1992 |
| 11 | Job No B589-Hatco | Lab Results(soil) | Michael Urban/Environtech | Jim Kenny/Dan Raviv Associates Inc | 5/21/1992 |
| 11 | Job No A142 | Lab Results(water) | Michael Urban/Environtech | James Millikin/Dan Raviv Associates Inc | 10/23/1991 |
| 11 | Job No I133-Hatco | Lab Results(soil) | Michael Urban/Environtech | Cecilia Fontana/Dan Raviv Associates, Inc | 12/14/1994 |
| 12 | Job No D416 | Lab Results(soil, metal, water) | Michael Urban/Environtech | James Millikin/Dan Raviv Associates Inc | 2/10/1993 |
| 12 | Job No E810-hatco | Lab Results(soil) | Michael Urban/Environtech | Cecelia Collier/Dan Raviv Associates | 9/1/1993 |
| 12 | Job No E828 - hatco | Lab Results(soil) | Michael Urban/Environtech | Cecelia Collier/Dan Raviv Associates | 9/2/1993 |
| 12 | Job No E823-hatco | Lab Results(soil) | Michael Urban/Environtech | Cecelia Collier/Dan Raviv Associates | 9/2/1993 |
| 12 | Job No E806-hatco | Lab Results(soil) | Michael Urban/Environtech | Cecelia Collier/Dan Raviv Associates | 8/25/1993 |
| 12 | Job No E840-hatco | Lab Results(soil) | Michael Urban/Environtech | Cecelia Collier/Dan Raviv Associates | 9/13/1993 |
| 12 | Job No E802-hatco | Lab Results(soil) | Michael Urban/Environtech | Cecelia Collier/Dan Raviv Associates | 8/25/1993 |
| 12 | Job No E835-hatco | Lab Results(soil) | Michael Urban/Environtech | Cecelia Collier/Dan Raviv Associates | 9/3/1993 |
| 12 | Job No E864-51 Dewatering Pumps 1-2-3 | Lab Results(water) | Michael Urban/Environtech | Colette Jires/Dan Raviv Associates | 9/3/1993 |
| 12 1 of 3 | Project No 86C289E Accutest Job No 932289 Vol 2 | Technical Report(soil, water) | Accutest | Dan Raviv Associates | 5/27/1993 |

GRACE HATCO Known Conditions Document List

| Position | Condition | Document | Author | Recipient | Date |
|---|---|---|---|---|---|
| 12 | Accutest Job No 932289 | Laboratory Chronicle(soil, water) | Accutest | Dan Raviv Associates | 4/28/1993 |
| 12 | Project no 86C289E Accutest Job no 932289 Vol 1 of | Techical Report(soil, water) | Accutest | Dan Raviv Associates | 5/27/1993 |
| 13 | Job No. C689 Vol 2 GC/MS-Raw Data GC/EC-Raw Data Chain of Custody/Lab Chronicles | Raw Data Report(water) | Envirotech Research Inc | Dan Raviv Associates | 12/10/1992 |
| 13 | Job No C700 Vol 3 GC/MS-Raw Data Sample #'s 75136-75139A GC/EC-Raw Data Chain of Custody/Lab Chronicles | Raw Data Report(water,soil) | Envirotech Research Inc | Dan Raviv Associates | |
| 13 | Job No 8533-Hatco | Lab Results(water) | Michael Urban/Envirotech | James Kenny/Dan Raviv Associates, Inc | 5/21/1992 |
| 13 | Job No D416 | Lab Results(metals, soil) | Michael Urban/Envirotech | James Millikin/Dan Raviv Associates Inc | 2/10/1993 |
| 13 | Job No C700 Vol 2 GC/MS-Raw Data Sample #'s 75126-75135 | Raw Data Report(water,soil) | Envirotech Research Inc | Dan Raviv Associates | |
| 13 | Job No C689 - Hatco | Lab Results-(water) | Michael Urban/Envirotech | Rebecca Hollender/Dan Raviv Associates | 11/18/1992 |
| 13 | Job No 920349 Project No 86C289 | Sample Summary(groundwater) | Accutest | Ray Simonds/Dan Raviv Associates Inc. | 2/11/1992 |
| 13 | Data Listing for Volatiles | Analytical Report(metals) | Environ | Dan Raviv Associates | 7/11/88, 7/6/88 |
| 14 | Vol 3 of 5 Tables RI Report Draj Job No 86C289 Eccords Phase 1 Base Neutrals, Mar"ner Phase 1 | Remedial Investigation Report(soil, surface water, groundwater) | Dan Raviv Associates | George Chrysi/Hatco | May-93 |
| 15 | Job No E664-51 Dewatering Pumps 1-2-3 | Lab Results(water) | Michael Urban/Envirotech | Colette Jines/Dan Raviv Associates | 9/3/1993 |
| 15 | Project 86C289W Job No 910175 | Technical Report(water) | Accutest | Ray Simonds/Dan Raviv Associates Inc | 1/22/1991 |
| 15 | Project No 86C289-OW Job No 910196R | Technical Report(water) | Accutest | Ray Simonds/Dan Raviv Associates Inc. | 2/1/1991 |
| 15 | Project No 86C289W Job No 910196 | Technical Report(water) | Accutest | Ray Simonds/Dan Raviv Associates Inc. | 1/21/1991 |
| 15 | Project No 86C289-OW Job No 910253 | Technical Report(water) | Accutest | Ray Simonds/Dan Raviv Associates Inc. | 1/23/1991 |
| 15 | Project No 86C289-OW Job No 910253R | Technical Report(water) | Accutest | Ray Simonds/Dan Raviv Associates Inc. | 2/1/1991 |
| 15 | Project 86C289/OW Job No 910128 | Technical Report(water) | Accutest | Ray Simonds/Dan Raviv Associates Inc. | 1/22/1991 |
| 15 | Project 86C289/OW Job No 910128 | Technical Report(water) | Accutest | Ray Simonds/Dan Raviv Associates Inc. | 1/16/1991 |
| 15 | Project 86C289W Job No 910175 | Technical Report(water) | Accutest | Ray Simonds/Dan Raviv Associates Inc. | 1/17/1991 |
| 15 | Project 86C289W Job No 910196 | Technical Report(water) | Accutest | Ray Simonds/Dan Raviv Associates Inc. | 1/18/1991 |
| 15 | Sample No E100885 | Analysis Report(water) | Accutest | Dan Raviv Associates | 1/10/1991 |
| 15 | Project 86C289-OW Job No 910253 | Technical Report(water) | Accutest | Ray Simonds/Dan Raviv Associates Inc. | 1/22/1991 |
| 15 | Project 86C289W Job NO 910253R | Technical Report(other solid) | Accutest | Ray Simonds/Dan Raviv Associates Inc. | 1/29/1991 |
| 15 | Project 86C289 OW | Chain of Custody Report(water) | Dan Raviv Associates | Hatco | Jan-91 |
| 15 | Job No B673-Hatco | Lab Results(water) | Michael Urban/Envirotech | Bruce Ross/Dan Raviv Associates Inc. | 6/15/1992 |

GRACE HATCO Known Conditions Document List

4/7/2005

| Box/File | Description | Document | Author | Recipient | Date |
|---|---|---|---|---|---|
| 15 | Job No B674 Soil Samples 8-9/92 Oil/Grease & TPHC Analysis | Lab Results(soil) | Michael Urbanz/Enviotech | Bruce Ross/Dan Raviv Associates Inc. | 6/10/1992 |
| 15 | Hatco 86C289-FRI | Technical Report | Accutest | Cecilia Collier/Dan Raviv Associates Inc. | 12/30/1992 |
| 15 | Project 86C289 Job No 910016 | Technical Report(soil) | Accutest | Andrew Len/Dan Raviv Associates | 1/10/1991 |
| 15 | Project 86C289 Job No 907865 | Technical Report(other solid) | Accutest | Ray Simonds/Dan Raviv Associates Inc. | 1/28/1991 |
| 15 | Job No C017-Hatco | Lab Results(soil,sediment,water,oil,liquid) | Envirotech Research Inc | Jim Kenny/Dan Raviv Associates Inc | 7/29/1992 |
| 15 | Report No 20900-014 | Technical Report(water) | York Laboratories | Julie Spencer | 11/8/1989 |
| 15 | ETC Sample No N9699 Sample Point HC5S | Technical Report(water) | ETC | Dan Raviv Associates | 10/16/1986 |
| 15 | ETC Sample No M1851 Sample Point W5S | Technical Report(water) | ETC | Dan Raviv Associates | 6/4/1986 |
| 15 | ETC Sample No M1851 Sample Point W5S | Technical Report(water) | ETC | Dan Raviv Associates | 11/4/1986 |
| 15 | ETC Sample No M1853 Sample Point W5S | Technical Report(water) | ETC | Dan Raviv Associates | 6/10/1986 |
| 15 | ETC Sample No M1855 Sample Point W4S | Technical Report(water) | ETC | Dan Raviv Associates | 7/17/1986 |
| 15 | ETC Sample No M1857 Sample Point W3D | Technical Report(water) | ETC | Dan Raviv Associates | 7/17/1986 |
| 15 | ETC Sample No M1862 Sample Point W3S | Technical Report(water) | ETC | Dan Raviv Associates | 6/4/1986 |
| 15 | ETC Sample No M1858 Sample Point W2D | Technical Report(water) | ETC | Dan Raviv Associates | 6/12/1986 |
| 15 | ETC Sample No L9270 Sample Point BSED-3 | Technical Report(soil) | ETC | Dan Raviv Associates | 6/19/1986 |
| 15 | Summarized Ground Water Volatile Compounds from 1982-1984 Attachment 2 | Technical Report | ETC | Dan Raviv Associates | 1982-1984 |
| 15 | ETC Sample No M1856 Sample Point W1S | Technical Report(water) | ETC | Dan Raviv Associates | |
| 15 | ETC Sample No M1854 Sample Point W1D | Technical Report(water) | ETC | Dan Raviv Associates | |
| 15 | ETC Sample No L9268 Sample Point BSED-1 | Technical Report(water,sediment) | ETC | Dan Raviv Associates | 6/19/1986 |
| 15 | ETC Sample No L9269 Sample Point BSED-2 | Technical Report(water,sediment) | ETC | Dan Raviv Associates | 6/19/1986 |
| 15 | ETC Sample No L9271-72/74 | Report(water,sediment) | ETC | Dan Raviv Associates | 6/17/1986 |
| 15 | Summary of Analytical Results, Index of Samples, Site Plan, detailed analytical results for samples with significant results | Analytical Information(soil, sludge,water) | George Napack/Hatco | Dan Raviv/Dan Raviv Associates | 2/9/1988 |
| 16 | Report No 20880-312 | Technical Report(soil, water) | York Laboratories | Ray Simonds/Dan Raviv Associates Inc. | 5/13/1988 |
| 16 | Report No 20880-289 | Technical Report(soil, water) | York Laboratories | Ray Simonds/Dan Raviv Associates Inc. | 5/11/1988 |
| 16 | Report No 20880-302 | Technical Report(soil, water) | York Laboratories | Ray Simonds/Dan Raviv Associates Inc. | 5/13/1988 |
| 16 | Report No 20890-710 | Technical Report(water) | York Laboratories | Andrew Len/Dan Raviv Associates | 5/30/1989 |
| 16 | Report No 20890-653 2 copies | Technical Report(water) | York Laboratories | Ray Simonds/Dan Raviv Associates Inc. | 9/12/1988 |
| 16 | Report No 20890-710 Appendix B | Subcontractors Report(water) | York Laboratories | Andrew Len/Dan Raviv Associates | 6/15/1989 |
| 16 | Report No 20890-1348 | Technical Report(soil) | York Laboratories | Andrew Len/Dan Raviv Associates | 10/27/1989 |
| 16 | Report No 20890-1302 2 copies | Technical Report(soil) | York Laboratories | Andrew Len/Dan Raviv Associates | 9/19/1989 |
| 16 | Report No 20890-1038 2 copies | Technical Report(water) | York Laboratories | Ray Simonds/Dan Raviv Associates Inc. | 8/15/1989 |

4/7/2005

GRACE HATCO Known Conditions Document List

| Exhibit | Description | Document | Author | Recipient | Date |
|---|---|---|---|---|---|
| 16 | Report No 20980-300 | Technical Report(soil) | York Laboratories | Ray Simonds/Dan Raviv Associates Inc. | 5/12/1998 |
| 16 | Report No 20980-306 | Technical Report(soil) | York Laboratories | Ray Simonds/Dan Raviv Associates Inc. | 5/13/1988 |
| 16 | Report No 20980-1303 | Technical Report(soil, water) | York Laboratories | Andrew Lent/Dan Raviv Associates | 10/13/1989 |
| 17 | Report No 20980-1413 | Technical Report(soil) | York Laboratories | Ray Simonds/Dan Raviv Associates Inc. | 11/1/1989 |
| 17 | Report No 20980-343 | Technical Report(water) | York Laboratories | Dan Raviv Associates | 5/24/1988 |
| 17 | Report No 20980-259 & 261 | Technical Report(water) | York Laboratories | Frank Getchell/Dan Raviv Associates | 4/18/1988 |
| 17 | Report no 20980-300 | Technical Report(soil) | York Laboratories | Dan Raviv Associates | 5/12/1988 |
| 17 | Report no 20980-302 | Technical Report(soil, water) | York Laboratories | Dan Raviv Associates | 5/13/1988 |
| 17 | Report No 20980-118 (1 of 2) | Technical Report(water, soil) | York Laboratories | Dan Raviv Associates | 2/16/1988 |
| 17 | Report No 20980-124 | Technical Report(water, soil) | York Laboratories | Dan Raviv Associates | 2/8/1988 |
| 17 | Report no 20980-306 | Technical Report(soil) | York Laboratories | Dan Raviv Associates | 5/13/1988 |
| 17 | Report No 20980-135 | Technical Report(soil, water) | York Laboratories | Dan Raviv Associates | 2/11/1988 |
| 17 | Report No 20980-141 | Technical Report(soil, water) | York Laboratories | Dan Raviv Associates | 2/17/1988 |
| 18 | Job No C759 Surface/Water K024 Area Drai Job No 289-FRI | Analytical Report(water) | Envirotech Research Inc | Dan Raviv Associates | 10/28/1992 |
| 18 | Project 88C289-GW Job No 912711 | Technical Report(groundwater) | Accutest | Dan Raviv Associates | 5/30/1991 |
| 18 | Job No C757-Hatco | Lab Results(water) | Michael Urban/Envirotech | Cecilia Collier/Dan Raviv Associates Inc. | 12/3/1992 |
| 18 | Job C757-Dan Raviv-Hatco Vol 2 | Lab Results(water) | Michael Urban/Envirotech | Cecilia Collier/Dan Raviv Associates Inc. | 12/2/1992 |
| 18 | Job D923-Hatco | Lab Results(sediment) | Michael Urban/Envirotech | G. Alexander/Dan Raviv Associates | 5/24/1993 |
| 18 | Job No C689-Dan Raviv Associates, Inc.-Hatco Vol 2 GCMS-Raw Data GC/EC-Raw Data Chain of Custody/Lab Chronicles | Raw Data Report(water) | Envirotech Research Inc | Dan Raviv Associates | 11/18/1992 |
| 18 | Job No C689-Hatco | Lab Results(voltile organics) | Michael Urban/Envirotech | Rebecca Hollender/Dan Raviv Associates | 11/16/1992 |
| 18 | Job No C700-Hatco | Lab Results(water) | Michael Urban/Envirotech Jim Schwaije/Envirotech | Cecilia Collier/Dan Raviv Associates | 11/19/1992 |
| 18 | Fax Preliminary Hatco Data | Lab Results(water) | Research Inc | Dan Raviv/Dan Raviv Associates | 11/21/1992 |
| 18 | Job No B873-Hatco | Lab Results(water) | Michael Urban/Envirotech | Bruce Ross/Dan Raviv Associates Inc. | 6/15/1992 |
| 19 | Report No 20980-300 | Technical Report(soil) | York Laboratories | Ray Simonds/Dan Raviv Associates Inc. | 5/13/1998 |
| 19 | Report No 20980-289 & 300 3 copies | Technical Report(soil) | York Laboratories | Ray Simonds/Dan Raviv Associates Inc. | 5/11/1988 |
| 19 | Report No 20980-302 3 copies | Technical Report(soil) | York Laboratories | Ray Simonds/Dan Raviv Associates Inc. | 5/12/1988 |
| 19 | Report No 20980-306 & 312 2 copies | Technical Report(soil) | York Laboratories | Ray Simonds/Dan Raviv Associates Inc. | 5/13/1988 |
| 20 | Report No 20980-1348 Drai-Hatco | Analytical Report(soil, water) | York Laboratories | Drew Lent/Hatco | 10/27/1989 |
| 20 001GM | Attachment B to Air Report 1 of 1 Job No 9302671- | Air Monitoring Laboratory Data Package | Princeton testing laboratory inc | Hatco Corporation | |
| 20 001GM | Attachment A to air report 2 of 2 Job No 9302671- | Air Monitoring Laboratory Data Package | Princeton testing laboratory inc | Hatco Corporation | |
| 20 001GM | Attachment A to Air Report 1 of 2 Job No 9302671- | Air Monitoring Laboratory Data Package | Princeton testing laboratory inc | Hatco Corporation | |
| 20 011GM | Report No 20980-118 (3 copies) | Technical Report(soil, water) | York Laboratories | Frank Getchell/Dan Raviv Associates | 2/16/1988 |

4/7/2005

*GRACE HATCO Known Conditions Document List*

| Box/File | Description | Document | Author | Recipient | Date |
|---|---|---|---|---|---|
| 20 | Report No 20880-124 | Technical Report(soil, water) | York Laboratories | Frank Getchell/Dan Raviv Associates | 2/8/1988 |
| 20 | Report 20880-109 | Technical Report(water) | York Laboratories | Frank Getchell/Dan Raviv Associates | 2/4/1988 |
| 21 | Job No IS27-Hatco | Lab Results(oil) | Michael Urban/Envirotech | Cecilia Fontana/Dan Raviv Associates, Inc | 1/31/1995 |
| 21 | Job No HS72A-Hatco | Lab Results(oil) | Michael Urban/Envirotech | Cecilia Fontana/Dan Raviv Associates, Inc | 11/2/1994 |
| 21 | Job No 944324 Project ID 289-51T | Technical Report(soil) | Accutest | Dan Raviv Associates | 7/6/1994 |
| 21 | Client ID PROD 28S Lab ID 034830-0001-SA | Analytical Results(soil) | Enseco | Dan Raviv Associates | 6/14/1994 |
| 21 | Job No G453-Hatco | Lab Results(oil, water) | Michael Urban/Envirotech | Cecilia Collier/Dan Raviv Associates Inc. | 5/24/1994 |
| 21 | Job No G453-Hatco Vol 2 GC Forms and Data | Lab Results(oil, water) | Michael Urban/Envirotech | Cecilia Collier/Dan Raviv Associates Inc. | 5/24/1994 |
| 21 | Job No 932289 Project ID 86C289E 2 copies | Technical Report(water, soil) | Accutest | Dan Raviv Associates | 5/27/1993 |
| 21 | Project 86C289-52 Job No 924357 | Technical Report(oil, concrete) | Accutest | Dan Raviv Associates | 8/18/1992 |
| 21 | Job No G897-Dan Raviv Associates, Inc-Hatco Vol 3 GC Forms and Data | Technical Report(water,oil) | Envirotech Research Inc | Dan Raviv Associates | |
| 22 | SDG 924948 Drai No 289-FRI Vol 4, 5, & 6 | Organic CLP Deliverables Sample Data Summary Package(soil) | Accutest | Dan Raviv Associates | 9/3/1992 |
| 22 | SDG 924948 Drai No 289-FRI Vol 7 & 8 | Organic CLP Deliverables Sample Data Summary Package(soil) | Accutest | Dan Raviv Associates | 9/3/1992 |
| 22 | SDG 924948 Drai No 289-FRI Vol 9 & 10 | Organic CLP Deliverables Sample Data Summary Package(soil) | Accutest | Dan Raviv Associates | 9/3/1992 |
| 22 | SDG 924948 DRAI No 289-FRI Vol 1, 2, & 3 | Organic CLP Deliverables Sample Data Summary Package(soil, water) | Accutest | Dan Raviv Associates | 9/4/1992 |
| 22 | SDG 924982 Drai No 289-FRI Vol 7-10 of 10 | Organic CLP Deliverables Sample Data Summary Package(soil, water) | Accutest | Dan Raviv Associates | 9/4/1992 |
| 22 | SDG 924982 Drai No 289-FRI Vol 4, 5, & 6 of 10 | Organic CLP Deliverables Sample Data Summary Package(soil, water) | Accutest | Dan Raviv Associates | 9/4/1992 |
| 22 | Job No H875A-Hatco | Lab Results(oil) | Michael Urban/Envirotech | Dan Raviv Associates Cecilia Fontana/Dan Raviv Associates, Inc | 12/7/1994 |
| 22 | Job No I133-Hatco | Lab Results(sediment,soil) | Envirotech Research Inc | Cecilia Fontana/Dan Raviv Associates, Inc | 12/14/1994 |
| 22 | Job No H901-Hatco | Lab Results(soil) | Envirotech Research Inc | Cecilia Fontana/Dan Raviv Associates, Inc | 11/17/1994 |
| 22 | Job No H887-Hatco | Lab Results(soil) | Envirotech Research Inc | Cecilia Fontana/Dan Raviv Associates, Inc | 11/16/1994 |
| 22 | Job No H943-Hatco | Lab Results(soil) | Envirotech Research Inc | Cecilia Fontana/Dan Raviv Associates, Inc | 11/22/1994 |
| 22 | Job No H931-Hatco | Lab Results(soil) | Envirotech Research Inc | Cecilia Fontana/Dan Raviv Associates, Inc | 11/21/1994 |
| 22 | Job No H920-Hatco | Lab Results(soil) | Envirotech Research Inc | Cecilia Fontana/Dan Raviv Associates, Inc | 11/18/1994 |
| 22 | Job no I336-Hatco | Lab Results(water) | Michael Urban/Envirotech | Cecilia Fontana/Dan Raviv Associates, Inc | 1/6/1995 |

10

GRACE HATCO Known Conditions Document List

| Box/File | Description | Document | Author | Recipient | Date |
|---|---|---|---|---|---|
| 22 | Job No 1301-Hatco | Lab Results(water) | Michael Urban/Envirotech | Cecilia Fontana/Dan Raviv Associates, Inc | 1/10/1995 |
| 22 | Job No 1033-Hatco | Lab Results(water) | Envirotech Research Inc | Cecilia Fontana/Dan Raviv Associates, Inc | 12/5/1994 |
| 22 | Job No 1016-Hatco | Lab Results(water) | Envirotech Research Inc | Cecilia Fontana/Dan Raviv Associates, Inc | 12/5/1994 |
| 22 | Job No 1002-Hatco | Lab Results(water) Organic CLP Deliverables Sample Data Summary Package(soil, water) | Envirotech Research Inc | Cecilia Fontana/Dan Raviv Associates, Inc | 11/30/1994 |
| 23 | 924827 Drai No 289-FRI Vol 1, 2 & 3 | Organic CLP Deliverables Sample Data Summary Package(soil, water) | Accutest | Dan Raviv Associates | 8/26/1992 |
| 23 | 924811 Drai No 289-Fri Vol 3, 4 & 5 | Organic CLP Deliverables Sample Data Summary Package(soil, water) | Accutest | Dan Raviv Associates | 8/25/1992 |
| 23 | 924811 Drai No 289-Fri Vol 1 & 2 | Organic CLP Deliverables Sample Data Summary Package(soil, water) | Accutest | Dan Raviv Associates | 8/25/1992 |
| 23 | 924827 Drai No 289-FRI Vol 7 & 8 | Organic CLP Deliverables Sample Data Summary Package(soil, water) | Accutest | Dan Raviv Associates | 8/26/1992 |
| 23 | Job No 924835 Project No 86C289-FRI vol 1 & 2 | Organic CLP Deliverables Sample Data Summary Package(soil) Remedial Investigation Report(soil,sediment,groundwa ter,surface water) | Accutest | Dan Raviv Associates | 8/27/1992 |
| 24 | Vol 3 of 5 Tables RI Report Drai Job No 86C289 (2 copies) | Remedial Investigation Report(soil,sediment,groundwa ter,surface water) | Dan Raviv Associates | George Chryssi/Hatco | May 1993 |
| 24 | Vol 4 of 5 Appedices A - D RI Report Drai Job No 86C289 (2 copies) | Report(soil,sediment,groundwa ter,surface water) | Dan Raviv Associates | George Chryssi/Hatco | May 1993 |
| 25 | Job No 1593-Hatco | Lab Results(soil) | Michael Urban/Envirotech | Cecilia Fontana/Dan Raviv Associates, Inc | 2/22/1995 |
| 25 | Job No 1593A-Hatco | Lab Results(soil) | Michael Urban/Envirotech | Cecilia Fontana/Dan Raviv Associates, Inc | 3/6/1995 |
| 25 | Fraction VOC Client Sample ID P13 Sample No 19524 Job No 1523 | Tentatively Identified Compounds | Envirotech Research Inc | Dan Raviv Associates | |
| 25 | Fraction TLLBN No 1523 Client Sample ID PROD-P13 Sample No 19524 Job | Tentatively Identified Compounds | Envirotech Research Inc | Dan Raviv Associates | |
| 25 | Fraction VOC 19525 Job No 1523 Client Sample Identification Manhole Sample No | Tentatively Identified Compounds | Envirotech Research Inc | Dan Raviv Associates | |
| 25 | Fraction TLLBN Client Sample ID PRO-Manhole Sample No 19525 Job No 1523 | Tentatively Identified Compounds | Envirotech Research Inc | Dan Raviv Associates | |
| 25 | Fraction VOC Client Sample ID P8 Sample No 19526 Job No 1523 | Tentatively Identified Compounds | Envirotech Research Inc | Dan Raviv Associates | |
| 25 | Job No 1002-Hatco | Lab Results(water) | Envirotech Research Inc | Cecilia Fontana/Dan Raviv Associates, Inc | 11/30/1994 |
| 25 | Job No 1016-Hatco | Lab Results(water) | Envirotech Research Inc | Cecilia Fontana/Dan Raviv Associates, Inc | 12/5/1994 |
| 25 | Job No 1016-Dan Raviv-Hatco Vol 2 GC/MS Forms and Data GC Forms and Data Petroleum and Data | Lab Results(water) | Envirotech Research Inc | Dan Raviv Associates | 12/6/1994 |
| 25 | Hydrocarbons Forms and Data | | | | |

4/7/2005

**GRACE HATCO Known Conditions Document List**

| Box/File# | Description | Document | Author | Recipient | Date |
|---|---|---|---|---|---|
| 25 | Job No 1301-Hatco | Lab Results(water) | Michael Urban/Envirotech | Cecilia Fontana/Dan Raviv Associates, Inc | 1/10/1995 |
| 25 | Job No 1336-Hatco | Lab Results(water) | Michael Urban/Envirotech | Cecilia Fontana/Dan Raviv Associates, Inc | 1/6/1995 |
| 28 | Job No H943-Hatco | Lab Results(soil) | Envirotech Research Inc | Cecilia Fontana/Dan Raviv Associates, Inc | 11/22/1994 |
| 26 | Job No H943-Hatco Vol 2 GC/MS Forms and Data | GC Forms and Data(soil) | Envirotech Research Inc | Cecilia Fontana/Dan Raviv Associates, Inc | 11/22/1994 |
| 26 | Job No I033-Hatco | Lab Results(water) | Envirotech Research Inc | Cecilia Fontana/Dan Raviv Associates, Inc | 12/6/1994 |
| 26 | Job No I033-Hatco Vol 2 GC Forms and Data GC/FID Petroleum Hydrocarbons | Lab Results(water) | Envirotech Research Inc | Cecilia Fontana/Dan Raviv Associates, Inc | 12/6/1994 |
| 26 | Forms and Data | Forms and Data(water) | Acculest | Dan Raviv Associates | 3/21/1990 |
| 27 | Project 86C289-GW Job No 900520 | Technical Report(water, soil) | Acculest | Dan Raviv Associates | 5/10/1990 |
| 27 | Project 860289-GW Job No 902052 vol 2 of 3 | Technical Report(water) | Acculest | Dan Raviv Associates | 5/10/1990 |
| 27 | Project 860289-GW Job No 902052 vol 1 of 3 | Technical Report(water) | Acculest | Dan Raviv Associates | 5/10/1990 |
| 27 | Project 860289-GW Job No 900662 | Technical Report(soil) | Acculest | Dan Raviv Associates | 5/10/1990 |
| 27 | Project 860289-GW Job No 902052 vol 3 of 3 | Technical Report(groundwater) | Acculest | Dan Raviv Associates | 2/26/1990 |
| 27 | Project 86C286-GW Job No 900662 | Technical Report(soil) | Acculest | Andrew Lent/Dan Raviv Associates | 3/23/1990 |
| 27 | Project 86C289-GW Job No 901024 | Technical Report(groundwater) | Acculest | Dan Raviv Associates | 5/9/1990 |
| 27 | Project 860289-GW Job No 902052 | Technical Report(water,groundwater) | Acculest | Dan Raviv Associates | Jul-90 |
| 27 | Ground Water Analysis | Monitoring Well Reports | York Laboratories | Hatco Corporation | 2/8/1990 |
| 27 | Project 860172 Project 86C289-GW | Technical Report(water) | Acculest | Dan Raviv Associates | 3/2/1990 |
| 27 | Job No 900458 Project 86C289-GW | Technical Report(soil) | Acculest | Dan Raviv Associates | 2/22/1990 |
| 27 | Job No 900458 Project 86C289-GW | Technical Report(soil) | Acculest | Dan Raviv Associates | |
| 28 | Text Figures and Tables Drai Job No 86C289-RIR Vol 1 of 5 Text Figure and Tables Drai Job No | Draft revised Remedial Investigation Report(soil,sediment,water) | Dan Raviv Associates | George Chryss/Hatco | Aug-94 |
| 28 | 86C289 (2 copies) | Remedial Investigation Report(soil,sediment,water) | George Chryss/Hatco | Dan Raviv Associates | May-93 |
| 29 | SDg 925166 3 of 3 | Organic CLP Deliverables Sample Data Summary Package(soil,water) | Acculest | Dan Raviv Associates | 9/15/92 |
| 29 | Job No 924827 Vol 1 of 1 | Inorganics Conformance Summary(soil,water) | Acculest | Dan Raviv Associates | 8/28/92 |
| 29 | Job no 924835 Vol 2 of 2 | Technical Report(water,soil) | Acculest | Dan Raviv Associates | 8/27/92 |
| 29 | Job No 924835 Vol 1 of 2 | Inorganics Conformance Summary(water,soil) | Acculest | Dan Raviv Associates | 8/27/92 |
| 29 | Job No 924811 vol 1 of 1 | USEPA CLP Inorganics SOW Document(soil) | Acculest | Dan Raviv Associates | 8/25/92 |
| 30 | 924942 Vol 7, 8 & 9 of 12 Drai 289-Fri | Organic CLP Deliverables Sample Data Summary Package(soil,water) | Acculest | Dan Raviv Associates | Aug-92 |
| 30 | 924942 Vol 10 & 11 of 12 Drai 289-FRI | Organic CLP Deliverables Sample Data Summary Package(soil,water) | Acculest | Dan Raviv Associates | 9/2/1992 |

GRACE HATCO Known Conditions Document List

| Box/File | Description | Document | Author | Recipient | Date |
|---|---|---|---|---|---|
| 30 924942 Vol 12 of 12 Drai 289 Fri | Organic CLP Deliverables Sample Data Summary Package(soil,water) | Acculest | | Dan Raviv Associates | 9/2/1992 |
| 30 924942 Vol 3 & 4 of 12 Drai 289 Fri | Organic CLP Deliverables Sample Data Summary Package(soil,water) | Acculest | | Dan Raviv Associates | 9/2/1992 |
| 30 924942 Vol 5 & 6 of 12 Drai 289 FRI | Organic CLP Deliverables Sample Data Summary Package(soil,water) | Acculest | | Dan Raviv Associates | 9/2/1992 |
| 30 924948 vol 1, 2 & 3 of 10 Drai 289 FRI | Organic CLP Deliverables Sample Data Summary Package(soil,water) | Acculest | | Dan Raviv Associates | 9/3/1992 |
| 31 Report No 20880-275 | Technical Report(soil) | York Laboratories | | Dan Raviv Associates | 5/10/88 |
| 31 Report No 20880-124 | Technical Report(soil) | York Laboratories | | Dan Raviv Associates | 2/8/88 |
| 31 Report No 20880-262 | Technical Report(soil) | York Laboratories | | Dan Raviv Associates | 4/21/88 |
| 31 Report No 20880-312 | Technical Report(soil) | York Laboratories | | Dan Raviv Associates | 5/13/88 |
| 31 Report No 20880-263 | Technical Report(soil) | York Laboratories | | Dan Raviv Associates | 4/21/88 |
| 31 Report No 20880-201 | Technical Report(soil) | York Laboratories | | Dan Raviv Associates | 3/1/88 |
| 31 Report No 20880-275 | Technical Report(soil) | York Laboratories | | Ray Simonds/Dan Raviv Associates Inc. | 5/10/88 |
| 31 Report No 20880-135 | Technical Report(soil) | York Laboratories | | Frank Getchell/Dan Raviv Associates | 2/11/88 |
| 31 Sampling Protocol for Monitoring Wells | Protocol for Quarterly Sampling at Nucdex Inc | Robert Saar/Geraghty & Miller, Inc | | Mario Cepnini/Nucdex, Inc | 3/5/85 |
| 31 Report No 20880-118 (2 of 2) | Technical Report(soil) | York Laboratories | | Dan Raviv Associates Cecilia Fontana/Dan Raviv Associates, Inc | 2/16/88 |
| 32 Job No H205-Hatco | Lab Results(water) | Michael Urban/Envirotech Inc | | Cecilia Fontana/Dan Raviv Associates, Inc | 9/8/1994 |
| 32 Project 289-FRR Job No 948911 | Technical Report(air) | Acculest | | Dan Raviv Associates | 12/22/1994 |
| 32 Job No H672-Hatco | Lab Results(soil) | Michael Urban/Envirotech | | Dan Raviv Associates | 10/19/1994 |
| 32 Job No G897 Vol 2 GC/MS Forms and Data | Technical Report(soil,water) | Envirotech Research Inc | | Dan Raviv Associates | 1994 |
| 32 Job No G897-Hatco | Lab Results(water) | Michael Urban/Envirotech | | Dan Raviv Associates | 7/7/1994 |
| 32 Job No G324-Hatco | Lab Results(soil) | Michael Urban/Envirotech | | Dan Raviv Associates | 5/2/1994 |
| 32 Job No G295-Hatco | Lab Results(soil) | Michael Urban/Envirotech | | Dan Raviv Associates | 5/3/1994 |
| 33 Attachment 3 Surface Water Laboratory Data Sheets 10/28/92 Job No C757-Hatco 10 copies | Lab Results(water) | Michael Urban/Envirotech | | Cecilia Collier/Dan Raviv Associates Inc. | 12/3/1992 |
| 33 Attachment 2 Groundwater Lab Data Sheets 4/28 & 10/19, 2092 Job No E533-Hatco 9 copies | Lab Results(water) | Michael Urban/Envirotech | | James Kenny/Dan Raviv Associates, Inc | 5/21/1992 |
| 34 Report No 20880-209 2 copies | Technical Report(water) | York Laboratories | | Dan Raviv Associates | 3/2/1988 |
| 34 Report No 20880-101 | Technical Report(groundwater) | York Laboratories | | Dan Raviv Associates | 2/4/1988 |
| 34 Report No 20880-263 | Technical Report(water) | York Laboratories | | Dan Raviv Associates | 4/21/1988 |
| 34 Report No 20880-262 | Technical Report(soil) | York Laboratories | | Dan Raviv Associates | 4/21/1988 |
| 34 Report No 20880-218 2 copies | Technical Report(water) | York Laboratories | | Dan Raviv Associates | 3/2/1988 |
| 34 Report No 20880-200 | Technical Report(water) | York Laboratories | | Hatco/Dan Raviv Associates | 3/8/1988 |
| 34 Report No 20880-109 | Technical Report(water) | York Laboratories | | Dan Raviv Associates | 2/4/1988 |
| 34 Report No 20880-259 | Technical Report(water) | York Laboratories | | Frank Getchell/Dan Raviv Associates | 4/18/1988 |
| 34 Report No 20880-261 | Technical Report(water) | York Laboratories | | Frank Getchell/Dan Raviv Associates | 4/20/1988 |
| 34 Report No 20880-267 | Technical Report(water) | York Laboratories | | Frank Getchell/Dan Raviv Associates | 4/22/1988 |
| 34 Report No 20880-287 | Technical Report(soil,water) | York Laboratories | | Ray Simonds/Dan Raviv Associates Inc. | 5/10/1988 |

GRACE HATCO Known Conditions Document List

| RepoFile# | Description | Document | Author | Recipient | Date |
|---|---|---|---|---|---|
| 34 | Report No 20880-201 | Technical Report(soil,water) | | Frank Getchell/Dan Raniv Associates | 3/1/1988 |
| 34 | Report No 20880-107 | Technical Report(water) | York Laboratories | Dan Raniv Associates | 2/4/1988 |
| 35 86C289 (3 copies) | Vol 5 of 5 Appendices E - G RI Report Drai Job No 86C289 (5 copies) | Remedial Investigation Report(soil/surface water, groundwater) | Dan Raniv Associates | George Chrysai/Hatco | May-93 |
| 38 86C289 (3 copies) | Vol 4 of 5 Appendices A - D RI Report Drai Job No | Remedial Investigation Report(soil/surface water, groundwater) | Dan Raniv Associates | George Chrysai/Hatco | May-93 |
| 36 | Report No 20880-124 | Analytical Report(water,soil) | York Laboratories | Dan Raniv Associates | 2/8/1988 |
| 36 | Report No 20880-118 (1 of 2) | Analytical Report(water,soil) | York Laboratories | Dan Raniv Associates | 2/16/1988 |
| 36 | Report No 20880-101 | Analytical Report(water,soil) | York Laboratories | Dan Raniv Associates | 2/4/1988 |
| 36 | Report No 20880-118 (2 of 2) | Analytical Report(water,soil) | York Laboratories | Dan Raniv Associates | 2/16/1988 |
| 36 86C289 | Data tabulation and evaluation of chromatographs discussions with laboratory reganrding PCB analytical results | Invoice | Dan Raniv Associates | George Chrysai/Hatco | 8/15/1994 |
| 37 | Report # 20880-107 | Technical Report(water) | York Laboratories | Dan Raniv Associates | 2/4/1988 |
| 37 | Report # 20880-135 | Technical Report(water,soil) | York Laboratories | Dan Raniv Associates | 2/11/1988 |
| 37 | Report # 20880-109 | Technical Report(water) | York Laboratories | Dan Raniv Associates | 2/4/1988 |
| 37 | Summary of PCBs in soil | Table | Enviro | Dan Raniv Associates | 4/14/1994 |
| 37 | Summary of Pertoleum hydrocarbons and base neutrals in soil | Table | Enviro | Dan Raniv Associates | 4/14/1994 |
| 37 | Blank Summary of proposed vs. actual scope of work project 58 field activities | Table | Hatco | Dan Raniv Associates | |
| 37 | Job No C368-Hatco | Lab Results(soil) | Michael Urban/Enviotech | Cecilia Collier/Dan Raniv Associates Inc. | 5/17/1994 |
| 37 | Project 86C289-57 Job No 940313R | Technical Report(soil) | Acculest | Dan Raniv Associates | 2/16/1994 |
| 37 | Project 86C289-57 Job No 940397 | Technical Report(soil) | Acculest | Dan Raniv Associates | 2/8/1994 |
| 37 | Project 86C289-57 Job No 941936 | Technical Report(soil) | Acculest | Dan Raniv Associates | 4/20/1994 |
| 37 | Project 96C289-57 Job No 941417 Vol 1 of 2 | Technical Report(soil) | Acculest | Dan Raniv Associates | 2/15/1994 |
| 37 | Project 86C289-57 Job No 940313 | Technical Report(soil) | Acculest | Dan Raniv Associates | 2/3/1994 |
| 37 | Project 86C289-57 Job No 940288 | Technical Report(soil) | Acculest | Dan Raniv Associates | 2/1/1994 |
| 37 | Project 86C289-57 Job No 940312 | Technical Report(soil) | Acculest | Dan Raniv Associates | 2/3/1994 |
| 37 | Project 86C289-57 Job No 940417 vol 2 of 2 | Technical Report(water,soil) | Acculest | Dan Raniv Associates | 2/16/1994 |
| 37 | Project 86C289-57 Job No 941495 | Technical Report(soil) | Acculest | Dan Raniv Associates | 12/5/1994 |
| 37 | Project 86C289-57 Job No 944200 | Technical Report(soil) | Acculest | Dan Raniv Associates | 12/5/1994 |
| 37 | Job No C177-M-39092 | Technical Report(soil) | Acculest | Dan Raniv Associates | 4/1/1994 |
| 37 | Job No E912-New Happer Waste Pad-Pre-excavation samples | Lab Results(soil) | Acculest | Dan Raniv Associates | |
| 37 | Hatco Project for PCB analysis job no 940312 samples E401160, E401161, Job no 940313 sample E401162, Job no 940397 sample E401521, Job no 940417 sample E401523, E401529 | Lab Results(soil) | Michael Urban/Enviotech | Dan Raniv Associates | 9/15/1993 |
| 38 | Job No 924888 | USEPA CLP Inorganics SOW Document(water,soil) | Acculest | Dan Raniv Associates | 1/4/1993 |
| 38 | Job No 924909 | USEPA CLP Inorganics SOW Document(water,soil) | Acculest | Dan Raniv Associates | 1/15/1993 |

GRACE HATCO Known Conditions Document List

| Box/File # | Document | Author | Recipient | Date |
|---|---|---|---|---|
| 38 Job No 925031 | USEPA CLP Inorganics SOW Document(water,soil) | Accutest | Dan Raviv Associates | 2/2/1993 |
| 38 Job No 925040 | USEPA CLP Inorganics SOW Document(water,soil) | Accutest | Dan Raviv Associates | 12/11/1992 |
| 38 Job No 925131 Samples # E224352 E224354 | Hatco Project Lead Results USEPA CLP Inorganics SOW | Accutest | Cecilia Collier/Dan Raviv Associates | 1/26/1993 |
| 38 Job No 924942 | Document(water,soil) USEPA CLP Inorganics SOW | Accutest | Dan Raviv Associates | 2/1/1993 |
| 38 Job No 924948 | Document(water,soil) USEPA CLP Inorganics SOW | Accutest | Dan Raviv Associates | |
| 38 Job No 924811 | USEPA CLP Inorganics SOW Inorganics Conformance | Accutest | Dan Raviv Associates | 11/4/1992 |
| 38 Job No 924827 | USEPA CLP Inorganics SOW Summary(water,soil) | Accutest | Dan Raviv Associates | |
| 38 Job No 924835 | USEPA CLP Inorganics SOW Document(water,soil) | Accutest | Dan Raviv Associates | 2/2/1993 |
| 38 Job No 925031 | USEPA CLP Inorganics SOW Document(water,soil) | Accutest | Dan Raviv Associates | 2/2/1993 |
| 38 Job No 925040 | USEPA CLP Inorganics SOW Document(water,soil) | Accutest | Dan Raviv Associates | 12/11/1992 |
| 38 Job No 925131 Samples # E224352 E224354 | Hatco Project Lead Results USEPA CLP Inorganics SOW | Accutest | Cecilia Collier/Dan Raviv Associates Inc. | 1/27/1993 |
| 38 Job No 924871 | Document(water,soil) Inorganics Conformance | Accutest | Dan Raviv Associates | 12/21/1992 |
| 38 Job No 924871 | Summary(water,soil) Inorganics Conformance | Accutest | Dan Raviv Associates | |
| 38 Job No 924811 | Summary(water,soil) Document(water,soil) | Accutest | Dan Raviv Associates | |
| 39 DM 0001-0084, W0001-0233, | Dames & Moore Documents, Weston Consulting Documents, Killam Documents(water) | Margaret Cannistraro/Williams & Connolly | Dan Raviv/Dan Raviv Associates | 6/28/1991 |
| 39 Job No B674 | Lab Results(soil) | Michael Urban/Envirotech | Dan Raviv Associates | 6/10/1992 |
| 39 Project 88C289-L Job No 922249 | Technical Report(soil) | Accutest | Dan Raviv Associates | 5/4/1992 |
| 39 Project 88C289L Job No 922622 | Technical Report(soil) | Accutest | Dan Raviv Associates | 5/26/1992 |
| 39 Project 88C289-L Job No 922337 | Technical Report(soil) | Accutest | Dan Raviv Associates | 5/7/1992 |
| 39 Project 88C289-L Job No 922338 | Technical Report(soil) | Accutest | Dan Raviv Associates | 5/7/1992 |
| 39 Project 88C289-L Job No 922250 | Technical Report(soil) | Accutest | Dan Raviv Associates | 5/4/1992 |
| 39 Project 88C289-L Job No 922416 | Technical Report(soil) | Accutest | Dan Raviv Associates | 5/11/1992 |
| 39 Project 88C289-L Job No 922239 | Technical Report(soil) | Accutest | Dan Raviv Associates | 5/7/1992 |
| 39 Project 88C289L Job No 972511 | Technical Report(soil) | Accutest | Dan Raviv Associates | 5/19/1992 |
| 40 Report No 20880-263 & 262 2 copies | Technical Report(water,soil) | York Laboratories | Dan Raviv Associates | 4/21/1998 |
| 40 Report No 20880-281 | Technical Report(soil) | York Laboratories | Ray Simonds/Dan Raviv Associates Inc. | 5/10/1988 |
| 40 Report No 20880-281 & 287 & 275 (2 copies) | Technical Report(water,soil) | York Laboratories | Ray Simonds/Dan Raviv Associates Inc. | 5/10/1988 |
| 41 SGG 924871 Vol 5 of 10 | Organic CLP Deliverables Sample Data Summary Package(water,soil) | Accutest | Dan Raviv Associates | 8/28/1992 |
| 41 SDG 924871 Vol 1 & 2 of 10 | Organic CLP Deliverables Sample Data Summary Package(water,soil) | Accutest | Dan Raviv Associates | 8/28/1992 |

4/7/2005

GRACE HATCO Known Conditions Document List

4/7/2005

| Box/File # | Description | Document | Author | Recipient | Date |
|---|---|---|---|---|---|
| 41 | SDG 924871 Vol 3 & 4 of 10 | Organic CLP Deliverables Sample Data Summary Package(water,soil) | Accutest | Dan Raviv Associates | 8/28/1992 |
| 41 | Job No 924835 Vol 10 & 11 Project 86C289-FRI | Technical Report(soil) | Accutest | Ray Simonds/Dan Raviv Associates Inc. | 8/27/1992 |
| 41 | Job No 924835 Vol 7, 8 & 9 Project # 86C289-FRI | Technical Report(soil) | Accutest | Ray Simonds/Dan Raviv Associates Inc. | 8/27/1992 |
| 41 | Job No 924835 Vol 5 & 6 Project # 86C289-FRI | Technical Report(soil) | Accutest | Ray Simonds/Dan Raviv Associates Inc. | 8/27/1992 |
| 41 | Job No 924835 Vol 3 & 4 Project 86C289-FRI | Technical Report(soil) | Accutest | Ray Simonds/Dan Raviv Associates Inc. | 8/27/1992 |
| 42 | SDG 925103 vol 3 & 4 of 8 | Organic CLP Deliverables Sample Data Package(water) | Accutest | Dan Raviv Associates | 9/11/1992 |
| 42 | SDG 925040 Vol 7 & 8 of 8 | Organic CLP Deliverables Sample Data Summary Package(soil,water,sediment) | Accutest | Dan Raviv Associates | 9/10/1992 |
| 42 | SDG 925040 Vol 5 & 6 of 8 | Organic CLP Deliverables Sample Data Summary Package(soil,water,sediment) | Accutest | Dan Raviv Associates | 9/10/1992 |
| 42 | SDG 925040 Vol 3 & 4 of 8 | Organic CLP Deliverables Sample Data Summary Package(soil,water,sediment) | Accutest | Dan Raviv Associates | 9/10/1992 |
| 42 | SDG 925031 Vol 8 & 9 of 9 | Organic CLP Deliverables Sample Data Summary Package(water,soil) | Accutest | Dan Raviv Associates | 9/9/1992 |
| 42 | SDG 925040 Vol 1 & 2 of 8 | Organic CLP Deliverables Sample Data Summary Package(water,soil) | Accutest | Dan Raviv Associates | 9/10/1992 |
| 42 | SDG 925103 Vol 1 & 2 of 8 | Organic CLP Deliverables Sample Data Summary Package(water,soil) | Accutest | Dan Raviv Associates | 9/11/1992 |
| 43 | Job No H856-Hatco | Lab Results(soil) | Envirotech Research Inc | Cecilia Fontana/Dan Raviv Associates, Inc | 11/11/1994 |
| 43 | Vol 2 Job No H856-Dan Raviv Associates-Hatco GC Forms and Data | General Chemistry Forms(soil) | Envirotech Research Inc | Cecilia Fontana/Dan Raviv Associates, Inc | 11/11/1994 |
| 43 | Job No H887-Hatco | Lab Results(soil) | Envirotech Research Inc | Cecilia Fontana/Dan Raviv Associates, Inc | 11/16/1994 |
| 43 | Vol 2 Job No H887-Dan Raviv Associates, Inc - Hatco GCMS Forms and Data GC Forms and Data | Petroleum Hydrocarbons Forms and Data(soil) | Envirotech Research Inc | Cecilia Fontana/Dan Raviv Associates, Inc | 11/16/1994 |
| 44 | Job No 925006 Vol 7-9 of 9 | Organic CLP Deliverables Sample Data Summary Package(water,soil) | Accutest | Dan Raviv Associates | 9/5/1992 |

16

GRACE HATCO Known Conditions Document List

| Doc/File # | Description | Document | Author | Recipient | Date |
|---|---|---|---|---|---|
| 44 | SDG No 925031 Vol 1 & 2 of 9 | Organic CLP Deliverables Sample Data Summary Package(water,soil) | Accutest | Dan Raviv Associates | 9/9/1992 |
| 44 | SDG No 925031 Vol 3 & 4 of 9 | Organic CLP Deliverables Sample Data Summary Package(water,soil) | Accutest | Dan Raviv Associates | 9/9/1992 |
| 44 | SDG 925031 Vol 5 & 6 of 9 | Organic CLP Deliverables Sample Data Summary Package(water,soil) | Accutest | Dan Raviv Associates | 9/9/1992 |
| 44 | Job No 925006 Vol 4, 5 & 6 of 9 | Organic CLP Deliverables Sample Data Summary Package(water,soil) | Accutest | Dan Raviv Associates | 9/8/1992 |
| 44 | Job No 925006 Vol 1, 2 & 3 of 9 | Organic CLP Deliverables Sample Data Summary Package(water,soil) | Accutest | Dan Raviv Associates | 9/8/1992 |
| 45 | Job No 924871 Project # 86C289FRI 2 of 5 | Soil Lab Data Sheets Attachment 1 | Accutest | Ray Simonds/Dan Raviv Associates Inc. | August - September 1992 |
| 45 | Job No 924909 Project No 86C289FRI 3 of 5 | Soil Lab Data Sheets Attachment 1 | Accutest | Ray Simonds/Dan Raviv Associates Inc. | August - September 1992 |
| 45 | Job No 924948 Project No 86C289FRI 4 of 5 | Soil Lab Data Sheets Attachment 1 | Accutest | Ray Simonds/Dan Raviv Associates Inc. | August - September 1992 |
| 45 | Job No 925031 Project No 86C289FRI 5 of 5 | Soil Lab Data Sheets Attachment 1 | Accutest | Ray Simonds/Dan Raviv Associates Inc. | August - September 1992 |
| 46 | Job No 925131 Samples # E224352 & E 224354 vol 1 of 1 | Lead Results | Accutest | Cecilia Collier/Dan Raviv Associates Inc. | 1/16/1993 |
| 46 | Job No 925040 vol 1 of 1 | USEPA CLP Inorganics SOW Document(metals) | Accutest | Dan Raviv Associates | 9/10/1992 |
| 46 | Job No 925031 vol 2 of 2 | USEPA CLP Inorganics SOW Document(metals) | Accutest | Dan Raviv Associates | 9/9/1992 |
| 46 | Job No 924948 Vol1 of 1 | USEPA CLP Inorganics SOW Document(metals) | Accutest | Dan Raviv Associates | 9/3/1992 |
| 46 | Job No 924942 vol 1 of 1 | USEPA CLP Inorganics SOW Document(metals) | Accutest | Dan Raviv Associates | 9/2/1992 |
| 46 | Job No 924909 Vol 1 of 1 | USEPA CLP Inorganics SOW Document(metals) | Accutest | Dan Raviv Associates | 9/1/1992 |
| 46 | Job No 926031 vol 1 of 2 | USEPA CLP Inorganics SOW Document(metals) | Accutest | Dan Raviv Associates | 9/9/1992 |
| 46 | Job No 924888 vol 1 of 1 | USEPA CLP Inorganics SOW Document(metals) | Accutest | Dan Raviv Associates | 8/31/1992 |
| 47 | Report No 20880-141 2 copies | Technical Report(soil,water) | York Laboratories | Dan Raviv Associates | 2/17/1988 |
| 47 | Report No 20880-261 | Technical Report(soil,water) | York Laboratories | Dan Raviv Associates | 4/20/1988 |
| 47 | Report No 20880-259 & 261 2 copies | Technical Report(soil,water) | York Laboratories | Dan Raviv Associates | 4/18/1988 |

17

4/7/2005

GRACE HATCO Known Conditions Document List

| Box/Filter | Description | Document | Author | Recipient | Date |
|---|---|---|---|---|---|
| 47 | Report No 20880-259 | Technical Report(soil) | York Laboratories | Dan Raviv Associates | 4/18/1988 |
| 47 | Report # 87-2873 Project ECC Ford Case 878A | Technical Report(soil) | Century Laboratories | Environ Corp. | 2/16/1988 |
| 47 | Report # 87-2909 Project Ecc Fords Case 878A | Technical Report(soil) | Century Laboratories | Environ Corp. | 2/17/1988 |
| 47 | Report # 20880-218 | Technical Report(soil) | York Laboratories | Frank Getchel/Dan Raviv Associates | 3/2/1988 |
| 47 | Report # 20880-200 | Technical Report(water) | York Laboratories | Frank Getchel/Dan Raviv Associates | 3/8/1988 |
| 47 | Report # 20880-107 | Technical Report(water) | York Laboratories | Frank Getchel/Dan Raviv Associates | 2/4/1988 |
| 47 | Report # 20880-109 | Technical Report(water) | York Laboratories | Dan Raviv Associates | 2/4/1988 |
| 47 | NPDES Permit No 0000116 | Protocol for Quarterly Sampling | Robert Saar/Geraghty & Miller | Mario Caprini/Nurdex Inc. | 3/5/1985 |
| 47 | Report No 20880-101 | Technical Report(water) | York Laboratories | Dan Raviv Associates | 2/16/1988 |
| 47 | Report No 20880-118 (2 of 2) | Technical Report(water soil) | York Laboratories | Dan Raviv Associates | 2/16/1988 |
| 47 | Report No 20880-209 | Technical Report(water) | York Laboratories | Frank Getchel/Dan Raviv Associates | 3/2/1988 |
| 47 | Report No 20880-201 | Technical Report(soil) | York Laboratories | Frank Getchel/Dan Raviv Associates | 3/1/1988 |
| 1 | Project 86C2896_ Well No MW15S | Well Completion Report | Environmental Drilling Inc | Dan Raviv Associates | 4/21/1992 |
| 1 | Project No 86C289S1C Well No MW15SR | Soil Boring/Overburden Well Completion Report | James Anderson(Contractor) | Dan Raviv Associates | 8/27/1993 |
| 1 | Project No 86C289S1C Well No MW23S | Soil Boring/Overburden Well Completion Report | James Anderson(Contractor) | Dan Raviv Associates | 5/11/1993 |
| 1 | Project NO 86C289-S1C Well No MW24S | Soil Boring/Overburden Well Completion Report | James Anderson(Contractor) | Dan Raviv Associates | 5/15/1993 |
| 1 | Project No 86C289S1C Well No MW25S | Soil Boring/Overburden Well Completion Report | James Anderson(Contractor) | Dan Raviv Associates | 8/28/1993 |
| 1 | Project No 86C289S1C Well No MW26S | Soil Boring/Overburden Well Completion Report | James Anderson(Contractor) | Dan Raviv Associates | 5/15/1993 |
| 1 | Project No 86C289S1C Well No MW27S | Soil Boring/Overburden Well Completion Report | James Anderson(Contractor) | Dan Raviv Associates | 5/15/1993 |
| 1 | Project No 86C289S1C Well No MW28S | Soil Boring/Overburden Well Completion Report | James Anderson(Contractor) | Dan Raviv Associates | 3/30/1994 |
| 1 | Project No 86C289S1C Well No MW29s | Soil Boring/Overburden Well Completion Report | James Anderson(Contractor) | Dan Raviv Associates | 8/2/1993 |
| 1 | Project No 86C289S1C Well No MW30s | Soil Boring/Overburden Well Completion Report | James Anderson(Contractor) | Dan Raviv Associates | 3/31/1994 |
| 1 | Project No 86C289S1C Well No 31s | Soil Boring/Overburden Well Completion Report | James Anderson(Contractor) | Dan Raviv Associates | 3/29/1994 |
| 1 | Project No 86C289S1U Well No 32s | Soil Boring/Overburden Well Completion Report | James Anderson(Contractor) | Dan Raviv Associates | 4/6/1994 |
| 1 | Project No 86C289S1U Well No 33d | Soil Boring/Overburden Well Completion Report | James Anderson(Contractor) | Dan Raviv Associates | 4/6/1994 |
| 1 | Project No 86C289S1T Well No 34d | Soil Boring/Overburden Well Completion Report | James Anderson(Contractor) | Dan Raviv Associates | 4/26/1994 |
| 1 | Elevations | Fax | William Alburger/CA | Cecilia Collier/Dan Raviv Associates | 4/22/1994 |
| 2 | Report | Surface Water Modeling Report | Woodward-Clyde | WR Grace & Hatco | 10/1/1998 |
| 3 | Volume 1 of 3 (2 copies) | Evaluation of Treatability Studies | Woodward-Clyde | WR Grace & Hatco | Aug-98 |
| 4 | Iron Mountain | Box lists | Hatco | | Various |
| 4 | Container #'s and Description (2 copies) | Offsite/Law Room Inventory | Hatco | | |
| 4 | Files and Documents Sent to Pierce Leahy Archives | Contents and Box #'s | Hatco | Hatco | 7/24/1998 |
| 4 | Lists of Files Placed in boxes in their warehouse | Files and Box #'s | Hatco | Hatco | No Date |

**GRACE HATCO Known Conditions Document List**

| Box No | Description | Document | Author | Recipient | Date |
|---|---|---|---|---|---|
| 4 | Documents to be returned to Hatco | List | | | No Date |
| 4 | Remedium File Review | Notes | Dan Kopcow | | 3/10/2004 |
| 4 | Index Subject Files | Project Files-File Room | | | 10/4/2002 |
| 5 | Change in Status in Groundwater Discharge to MCUA MCUA Permit No 28074 | Letter | James Millikin/Hatco | Kevin Alello/Middlesex Cnty Utilities Authority | 12/19/2001 |
| 5 | MCUA Permit No 28074 Groundwater Flow Monitoring | Letter | Kevin Alello/Middlesex Cnty Utilities Authority | James Millikin/Hatco | 10/30/2001 |
| 5 | Response to comments (2 copies | Draft Non-Domestic Wastewater Discharge Permit | | | |
| 5 | Deposed Depositions | Public Inventory | | | 12/6/1993 |
| 5 | Hatco Chronology Re: ACO | Attorney Work Product | Williams & Connolly | Hatco | 11/18/1991 |
| 5 | Correspondence | Spills and Leaks Index | | | 10/2/1992 |
| 6 | Project No 86C289 | Soil Boring Reports | EDI | Dan Raviv Associates | Dec-87 |
| 6 | Job No 86C289 | Lagoon #1 Cross Section / Figures | | Hatco | 2/29/1988 |
| 6 | Project 87C487 Boring No Hb1-12 | Soil Boring Report | EDI | Dan Raviv Associates | Dec, Jan-87 |
| 6 | Project No 86C289-FRI | Soil Boring Reports Inspection Report/Monitoring Well Log | James Anderson(Contractor) | Dan Raviv Associates | Aug, September 1992 |
| 6 | Project No 415-002G Well Permit No 26107449, 26107490, 26107473, | Monitoring Well Certification | Paulus Sokolowski and Sartor | Hatco | 12/22/1992 |
| 6 | 26107457, 26107465, 26107481 | | Environ | | 1987 |
| 6 | Copies | Boring Logs | Walter Stephen/Wientz, Goldman & Spitzer | Gene Domnach/Hatco | 5/24/1983 |
| 6 | Job No 86C289 | Groundwater Measurement | Dan Raviv Associates | Hatco | 9/20/1988 |
| 7 | Hydrotherm Pump Leak Problem of 2/17/92 | Memo & Correspondence | J. Fabbro | J.V. Mastacchio | 3/2/1992 |
| 7 | Discharge Confirmation Reports for Case Nos. 91-8-119-1545-59, 92-02-05-0946-57 & 92-02-15-0859-40 | Letter & Correspondence | Darryl Jannus/NJDEP | James Millikin/Hatco | 7/1/1992 |
| 7/95 | Follow-Up and Conclusion of H-1510 Loss on 6-26-95 | Memo & Correspondence | James Millikin/Hatco | M. Kaufman | 7/31/1995 |
| 7 | Case No 02-07-10-0905-30 | Letter & Correspondence | Anthony Rellano/Herold and Haines | Vicky Galofre/NJDEP | 9/13/2002 |
| 7 | Written Report NJDEP Case No 95-7-28-0854-21 | Memo & Correspondence | James Millikin/Hatco | NJDEP | 9/8/1995 |
| 7 | Corrective Action Proposal for DIDP Rupture Disc Failure—1-416 incident | Correspondence | M. Goldberg | David Mason/Hatco | 1/7/1997 |
| 7 | Tank 208 Sump 1 overflow | Memo & Invident Report | Charles Ilsley | J.J. Millikin | 10/8/1998 |
| 7 | Summary of Discharges and Documented Leaks | Summary | Hatco | Hatco | 12/7/1995 |
| 8 | Rainfall Catchment and Limited Hydraulic Study | Report | Ivan Bogert/Clinton Bogert Associates | Hatco | 8/2/1994 |
| 8 | Written Report NJDEPE Case No 91-8-119-1545-59 | Report | James Millikin/Hatco | NJDEP | 4/8/1992 |
| 8 | Stormwater Pollution Prevention Plan | Report | David Mason/Hatco | Hatco | 4/6/1994 |
| 8 | Poly Chlorinated Biphenyls Spill Prevention Control and Countermeasure Plan | Report | EnTech Engineering, P.C. | Hatco | Sep-01 |
| 9 | Memo | Emergency response Plan | D. Mason | J.J. Millikin | 2/14/2003 |
| 9 | Spill Prevention, Control, and Countermeasure Plan | Report | EnTech Engineering, P.C. | Hatco | Jun-01 |
| 10 | Simulation of Groundwater Recovery Systems | Draft Appendix | Dan Raviv Associates | Hatco | No Date |

GRACE HATCO Known Conditions Document List

4/7/2005

| Group/Box | Description | Document | Author | Recipient | Date |
|---|---|---|---|---|---|
| 10 60 | Summary of LNAPL analytical results Project 51 U & | Table | Hatco | | No Date |
| 10 | Cross-Section of Phthalic Anhydride Sewer Line and Adjacent soil borings Job No 86C2891L | Figure | GRA/FWLB | Hatco | Nov-92 |
| 10 | Groundwater Surface Map Shallow Aquifer | Figure | RESDOL | Hatco | Jun-88 |
| 10 Figure | NDEP Unconsolidated Monitor Well Specifications | | Hatco | | Jun-87 |
| 10 | Ground Water Surface Map, Deep Aquifer | Figure | Hatco | | 4/12/1988 |
| 10 | Groundwater Surface Map Shallow Aquifer | Figure | Hatco | | 4/12/1988 |
| 10 | Ground Water Surface Map, Deep Aquifer | Figure | Hatco | | 12/21/1987 |
| 10 | Groundwater Surface Map Shallow Aquifer | Figure | Hatco | | 12/21/1987 |
| 10 | Job No 86C289-GW | Figure | RESDOL | Hatco | Oct-89 |
| 10 | Hydrogeologic Profile B-B | Figure | DJMNV | Hatco | Oct-89 |
| 10 | Hydrogeologic Cross Section A-A | Figure | DJMNV | Hatco | Oct-89 |
| 10 | Proposed Additional Monitoring Well Locations | Figure | RESDOL | Hatco | Nov-89 |
| 10 | Hydrogeologic Profile C-C | Figure | DJMDOL | Hatco | Oct-89 |
| 10 | Proposal No 699 System to remove LNAPL from Mounded Manhole | Proposal | Gordon Jamieson/URS Greiner | Mitch Obradovic/Remediation Group, Inc | 5/24/2000 |
| 10 | Proposal No 58 Scope and Cost for additional soil and LNAPL delineation | Proposal | Gordon Jamieson/URS Greiner | Mitch Obradovic/Remediation Group, Inc | 7/7/1999 |
| 10 | Figures, Sediment Comparison, Surface Water Comparison, Soil Comparison, Tables, Soil Sampling results summary, quality control/quality assurance results summary, soil sample summary, groundwater sampling results summary, water and sediment sampling results summary, Soil boring groundwater, surface water and sediment sampling results | Tables and Figures | | | |
| 10 | Health and Safety Plan for Work Activities in Hydrotherm Building Area | Memo & Correspondence | Various People | William Grassmyer/Hatco | 4/26/1993 |
| 10 | Exxon rail car PA Spill cleanup | Letter & Correspondence | J.V. Mustacchio/hatco | K.L. Bailey/Vinyl Intermediates | 3/19/1992 |
| 10 | Natural Gas Supply Pipe Line | Figure | Hatco | | No Date |
| 11 | Concept report on control of surface runoff | Report | Weston Solutions | Hatco | Jan-80 |
| 11 | Report of review of NJDEP Files-Downgradient properties | Draft Report | Woodward-Clyde | Grace Hatco | 8/6/1997 |
| 11 | Rainfall runoff evaluation | Estimates | Gerald Gardner/Clinton Bogart Associates | William Grassmyer/Hatco | 10/4/1990 |
| 11 | Spill Incident Report | Report | James Millikin/Hatco | Hatco | 5/27/1993 |
| 11 1159-14 | Confirmation Report for Case No 93-02-19 | Report | Darryl Jennus/NJDEP | James Millikin/Hatco | 5/17/1993 |
| 11 1159-14 | Incident Report Gas Tank Car GATX68383 | Memo & Correspondence | Williams Grassmyer/Hatco | George Chryssi/Hatco | 7/14/1994 |
| 11 1150-55 | Discharge Confirmation Report for Case No 94-07-15 | Letter & Correspondence | Darryl Jennus/NJDEP | James Millikin/Hatco | 2/16/1995 |
| 12 | Requested Information | Chemical Summaries | Carol Dixon/Williams & Connolly | George Chryssi/Hatco | 3/9/1992 |
| 12 | Sewer Survey | Draft Report | ENSR | Hatco | Sep-97 |
| 12 | Transmittal of Stage IA Archeological and Historical Sensitivity Evaluation | Letter/Document | Dan Ravv/Dan Ravv Associates | Joseph Karpa/NJDEP | 6/28/1993 |
| 12 | General Statewide General Permit No 14 | Permit Application | Woodward-Clyde | Grace Hatco | 8/25/1997 |
| 13 | Hatco Chemical Division | Pictures | Grace Hatco | | No Date |

4/7/2005

GRACE HATCO Known Conditions Document List

| BoxFileNo | Description | Document | Author | Recipient | Date |
|---|---|---|---|---|---|
| 13 | Long Term Groundwater level monitoring March 1 - September 13 2001 | Letter & Correspondence | Marion Craig/URS | Mitch Obradovic/Remediation Group, Inc | 10/2/2001 |
| 13 | Long Term Groundwater level monitoring March 1 - | Letter & Correspondence | Marion Craig/URS | Mitch Obradovic/Remediation Group, Inc | 8/1/2001 |
| 13 | July 2 2001 | Memo & Correspondence | Marion Craig/URS | Distribution | 5/25/2001 |
| 13 | LNAPL in Soil Samples and TOC samples | Memo & Correspondence | Marion Craig/URS | Distribution | 6/1/2001 |
| 13 | Pilot Study LNAPL Storage | Memo & Correspondence | Marion Craig/URS | Vicky Galofre/NJDEP | 8/29/2001 |
| 13 | NAPL Removal pilot studies | Report | Marion Craig/URS | Vicky Galofre/NJDEP | 8/29/2001 |
| 13 | Job No 86C289-LA | Photos | Hatco | | No Date |
| 14 | Report | Surface Water Modeling Report | Woodward-Clyde | Grace Hatco | 10/1/1998 |
| 15 | MCUA Draft Modified Permit & Comments Permit # 26074 | Self-Monitoring Report | Middlesex County Utility Authority | Hatco | 1996 |
| 15 | Claim No 912-0039195DL, Policy No BOG 209481405 Acknowledgement of Receipt of Let Rest Claim | Insurance | Kathy Traute/Zurich-American Insurance Group | Hatco | 4/12/2001 |
| 15 | Crown Pacific Remediation | Letter/Figure | Gordon Jamieson/URS Greiner Woodward Clyde | Mitch Obradovic/Remediation Group, Inc | 3/23/2000 |
| 16 | LNAPL Groundwater Elevation Study | Report | Woodward-Clyde | Grace Hatco | 4/23/1998 |
| 16 | Aerial Photos | Photos | | | 4/10/1997 |
| 17 | Operations and Maintnece Manual Seep Interceptor System Warehouse No 4 | Final report | URS Corporation James Millikin/Hatco | Remedium Group Inc, & Hatco Corp | 1/22/2001 |
| 18 | Effluent Reduction Work Plan PCB | Memo | Peter Reynolds/URS Greiner Woodward Clyde | George Chrysp/Hatco | 1/14/1994 |
| 18 | STL Envirotech Report No Y053 | Memo | Gordon Jamieson/URS Greiner Woodward Clyde | Gordon Jamieson | 4/5/2000 |
| 18 | Data from Crown Pacific Property | Memo | Gordon Jamieson/URS Greiner Woodward Clyde | David Mason/Hatco | 3/30/1998 |
| 18 | Report of soil and groundwater sampling analysis | Report | Scott Watkins/French & Parrello Joe Siscione/Crown Pacific | | 11/17/1997 |
| 18 | Letter Report- Impact of site remediation on the discharge to the MCUA | Report | Gordon Jamieson/URS Greiner Woodward Clyde | Mitch Obradovic/Remediation Group, Inc | 10/22/1999 |
| 18 | Benzene Fate and Transport Conceptual Model | Letter | Michael McGill/URS | Mitch Obradovic/Remediation Group, Inc | 2/27/2001 |
| 18 | Task No 63 Evaluation of Off-Site Wetland Mitigation Potential | Letter | Gordon Jamieson/URS Greiner Woodward Clyde | Mitch Obradovic/Remediation Group, Inc | 1/19/2000 |
| 18 | LNAPL in soil samples and TOC samples | Memo | Marion Craig/URS | Distribution | 5/25/2001 |
| 18 | Soil and Groundwater sampling results | Letter | Gordon Jamieson/URS Greiner | Joseph Karpa/NJDEP | 1/27/2000 |
| 18 | Long Term Groundwater Level Monitoring March 1 - September 13, 2001 | Letter | Marion Craig/URS | Mitch Obradovic/Remediation Group, Inc | 10/2/2001 |
| 19 | Wetlands Field Maps Project No 86C289L, 86C28951C, 86C28951T, 289- | Maps | | | |
| 19 | 51U | Well Completion Report | EDI | Hatco | 1994 |
| 19 | Charts and Notes | LNAPL Measurements | Woodward-Clyde | Grace Hatco | |
| 19 | Charts | LNAPL Thickness calculations | Woodward-Clyde | Hatco | Various |
| 19 | Figures | Stick Logs | Dot Nelson | Mike Camese | 6/25/1998 |
| 19 | Proposal 57 & Charts | Product Delineation measurements | | | |
| 19 | MW-52s | LNAPL baildown | Woodward-Clyde | Grace Hatco | Dec-98 |

4/7/2005

**GRACE HATCO Known Conditions Document List**

| Box/File # | Description | Document | Author | Recipient | Date |
|---|---|---|---|---|---|
| Binder | Discharge Prevention, countainment and countermeasure plan and discharge clean-up and removal plan | Plan Renewal | Hatco | Hatco | 1/15/2002 |
| 20 | Draft Report | Wetland Delineation Report | Woodward-Clyde | Grace Hatco | 7/31/1998 |
| 20 | Report | LNAPL and Groundwater Elevation Study | Woodward-Clyde | Grace Hatco | 4/23/1998 |
| 21 | Step 1 Report | Evaluation and Remediation of Groundwater Discharge to Railway Siding Swale | Woodward-Clyde | Grace Hatco | 12/1/1997 |
| 22 | Memo | Data from Crown Pacific Property | Woodward-Clyde | David Mason/Hatco Mitch Obradovic/Remedium Group Inc | 3/30/1998 |
| 22 | Operations and Maintence manual | Seep Interceptor System Warehouse No 4 | URS Corporation | Remedium Group Inc, & Hatco Corp | 1/22/2001 |
| 22 | Document | Benzene Fate and Transport Model | URS Corporation | Mitch Obradovic/Remediation Group, Inc | 6/20/2001 |

## SCHEDULE OF INSURED CONTRACT(S) ENDORSEMENT

| Named Insured | | | | Endorsement Number |
|---|---|---|---|---|
| Policy Symbol | Policy Number | Policy Period to | | Effective Date of Endorsement |
| Issued By (Name of Insurance Company) | | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

Premium (increase/reduction)    $0

In consideration of the indicated adjustment of Premium, the "insured" and the insurer, agree to the following Policy change(s):

The Schedule of Insured Contracts only includes those contracts listed in the Schedule below.

### SCHEDULE OF INSURED CONTRACTS:

| |
|---|
| Administrative Consent Order in the matter of the Hatco Site and Weston Solutions, Inc. and ACE American Insurance Company |
| Settlement Agreement, entered into April 8, 2005, by and among Hatco Corporation, W. R. Grace & Co.-Conn., W. R. Grace & Co., Remedium Group, Inc., Weston Solutions, Inc., ACE American Insurance Company and the New Jersey Department of Environmental Protection |
| Natural Resources Damages Settlement Agreement in the matter of the Hatco Site, Program Interest No. G000003843 and Hatco Corporation, W.R. Grace & Co., W.R. Grace & Co.-Conn., Remedium Group, Inc. and Weston Solutions, Inc. |
| Regulatory Contribution Agreement entered into April 7, 2005 by and between Weston Solutions, Inc., Hatco Corporation, W.R Grace & Co., W.R. Grace & Co.-Conn., Remedium Group, Inc. and Conservation Resources Inc. |
| Remediation Agreement by and among Hatco Corporation, W. R. Grace & Co.-Conn., Remedium Group, Inc. and Weston Solutions, Inc. |
| Third party access agreements as may be entered into by Weston Solutions, Inc. with respect to the "covered location" if the Insurer gives its written approval to the addition of such agreements |

All other terms and conditions of the policy remain unchanged.

_____
Authorized Agent

# SERVICE OF SUIT ENDORSEMENT

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| **Policy Symbol** | **Policy Number** | **Policy Period**<br>**to** | **Effective Date of Endorsement** |
| Issued By (Name of Insurance Company) | | | |

Insert the policy number. The remainder of the inf ormation is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

Information about service of "suits" upon us is given below. Service of process of "suits" against us may be made upon the following person, or another person we may designate:

> Saverio Rocca, Assistant General Counsel
> ACE USA Companies
> Two Liberty Place - TL35M
> 1601 Chestnut Street
> Philadelphia, PA 19103

The person named above is authorized and directed to accept service of process on our behalf in any action, "suit" or proceeding instituted against us. If you request, we will give you a written promise that a general appearance will be entered on our behalf if a "suit" is brought.

If you request, we will submit to the jurisdiction of any court of competent jurisdiction. We will accept the final decision of that court or any Appellate Court in the event of an appeal.

The law of some jurisdictions of the United States of America require that the Superintendent, Commissioner or Director of Insurance (or their successor in office) be designated as our agent for service of process. In these jurisdictions, we designate the Director of Insurance as our true and lawful attorney upon whom service of process on our behalf may be made. We also authorize the Director of Insurance to mail process received on our behalf to the company person named above.

If you are a resident of Canada, you may also serve "suit" upon us by serving the government official designated by the law of your province.

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED .

_____
Authorized Agent

XS-1U96d (03/2002)  (Readable)

## NEW JERSEY CHANGES - CANCELLATION AND NONRENEWAL

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol | Policy Number | Policy Period<br>to | Effective Date of Endorsement |
| Issued By (Name of Insurance Company) | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

If the policy or coverage part to which this endorsement applies contains cancellation or nonrenewal provisions more favorable to the Named Insured than this endorsement, then those provisions apply.

I.  Pursuant to New Jersey law, this policy cannot be cancelled or nonrenewed for any underwriting reason or guideline which is arbitrary, capricious or unfairly discriminatory or without adequate prior notice to the insured. The underwriting reasons or guidelines that an insurer can use to cancel or nonrenew this policy are maintained by the insurer in writing and will be furnished to the insured and/or the insured's lawful representative upon written request.

All other terms and conditions of the policy remain unchanged.

—————————————————————————————
Authorized Agent

## SIGNATURES

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Policy Symbol | Policy Number | Policy Period<br>to | Effective Date of Endorsement |
| Issued By (Name of Insurance Company) | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

THE ONLY SIGNATURES APPLICABLE TO THIS POLICY ARE THOSE REPRESENTING THE COMPANY NAMED ON THE FIRST PAGE OF THE DECLARATIONS.

By signing and delivering the policy to you, we state that it is a valid contract.

**INDEMNITY INSURANCE COMPANY OF NORTH AMERICA**
1601 Chestnut Street, P.O. Box 41484, Philadelphia, Pennsylvania 19101-1484

**BANKERS STANDARD FIRE AND MARINE COMPANY**
1601 Chestnut Street, P.O. Box 41484, Philadelphia, Pennsylvania 19101-1484

**BANKERS STANDARD INSURANCE COMPANY**
1601 Chestnut Street, P.O. Box 41484, Philadelphia, Pennsylvania 19101-1484

**ACE INDEMNITY INSURANCE COMPANY**
1601 Chestnut Street, P.O. Box 41484, Philadelphia, Pennsylvania 19101-1484

**ACE AMERICAN INSURANCE COMPANY**
1601 Chestnut Street, P.O. Box 41484, Philadelphia, Pennsylvania 19101-1484

**ACE PROPERTY AND CASUALTY INSURANCE COMPANY**
1601 Chestnut Street, P.O. Box 41484, Philadelphia, Pennsylvania 19101-1484

**INSURANCE COMPANY OF NORTH AMERICA**
1601 Chestnut Street, P.O. Box 41484, Philadelphia, Pennsylvania 19101-1484

**PACIFIC EMPLOYERS INSURANCE COMPANY**
1601 Chestnut Street, P.O. Box 41484, Philadelphia, Pennsylvania 19101-1484

**ACE FIRE UNDERWRITERS INSURANCE COMPANY**
1601 Chestnut Street, P.O. Box 41484, Philadelphia, Pennsylvania 19101-1484

GEORGE D. MULLIGAN, Secretary                    JOHN J. LUPICA, President

**WESTCHESTER FIRE INSURANCE COMPANY**
1133 Avenue of the Americas, 32nd Floor, New York, NY 10036

GEORGE D. MULLIGAN, Secretary                    DENNIS A. CROSBY, JR., President

Authorized Agent

CC-1K11d (02/05) Ptd. in U.S.A.