IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al., | ) | Case No. 01-01139 (JKF) |
| Debtors | ) | Jointly Administered |
| | ) | Re: Docket Nos. 7571, 7746, |
| | | 8087 & 8164 |

**DEBTORS' RESPONSE TO PACIFICORP AND THE VANCOTT BAGLEY
CORNWALL & MCCARTHY 401(K) PROFIT SHARING PLAN'S BRIEF IN SUPPORT
OF THEIR MOTION FOR LEAVE TO FILE LATE PROOFS OF CLAIM**

During the February 28, 2005 omnibus hearing, the Court directed Pacificorp and the

Vancott Bagley Cornwall & McCarthy 401(k) Profit Sharing Plan (collectively, the "Late

Claimants") to brief the issue of whether the Debtors had an obligation to search public records

for the purpose of identifying the Late Claimants as potential creditors to serve with actual notice

of the Bar Date.[1]  In response to the Court's request, the Late Claimants have filed a nineteen-

page brief that fails to cite a single case that requires a chapter 11 debtor to search through public

records to identify a potential creditor that is unidentifiable through a diligent search of the

debtor's books and records.  The Late Claimants' failure to locate any support for their position

is not surprising, as their position has no basis in existing law.

While one single title search may not be cost-prohibitive in isolation, the Late Claimants

are urging the creation of precedent that would require the Debtors to search the title records

with respect to any property (and adjacent property) where the Debtors' product might have been

---

[1] Capitalized terms not otherwise defined herein have the meanings given in the *Debtors'
Objection to the Pacificorp and Vancott Bagley & Cornwall & McCarthy 401(k) Profit Sharing
Plan's Motion for Leave to File Late Proofs of Claim* (the "Objection").

processed or used by the Debtors' hundreds of customers. This sort of open-ended and widespread investigation would be unduly burdensome, cost-prohibitive, and an administrative nightmare that would almost certainly impede the Debtors' ability to oversee these chapter 11 cases and operate its businesses. Courts, however, do not require a debtor to undertake such an elaborate investigation to identify claimants.

Instead, as set forth herein, courts have consistently held that a debtor generally need only *review its own books and records* for "known" creditors, and other potential creditors are only entitled to publication notice. The Debtors' search of their books and records was reasonable. Indeed, the Late Claimants do not dispute the reasonableness of the Debtors' review of their books and records to identify claimants, nor do they contend that such a search should have uncovered the Late Claimants. In fact, it is undisputed that the Debtors did not conduct any business transactions or have any contractual dealings with either of the Late Claimants with respect to the Site (as defined herein). Moreover, the Late Claimants never alerted, or otherwise gave notice, to the Debtors as to their claims relating to the Site. It is also not contested that the Debtors never (i) operated the Site, (ii) owned or leased the Site, or (iii) had any other connection to the Site - other than the fact that the Debtors sold vermiculite to a company that apparently processed the vermiculite at the Site. Therefore it is apparent that the Debtors had no actual knowledge, through a careful search of their books and records or otherwise, that the Late Claimants had any interests in the Site.

The Debtors had no obligation to undertake any ancillary review of the public records. The Late Claimants' reliance upon caselaw to assert that the Debtors' investigation was insufficient is misplaced. Indeed, the Late Claimants urge this Court to ignore controlling, factually-similar precedent, and to follow antiquated caselaw pertaining to factually

2

distinguishable situations outside of the bankruptcy context. As discussed herein, the applicable standard in this jurisdiction requires that a debtor's investigation to identify "known creditors" need not be vast and open-ended, and, instead, should focus on the debtor's own books and records. See Chemetron Corp. v. Jones, 72 F.3d 341, 346-47 (3d Cir. 1995).

In any event, while neither of the Late Claimants was entitled to actual notice of the Bar Date, the Debtors did properly serve Vancott with a copy of the Bar Date notice package. Moreover, Pacificorp obviously was adequately notified of these chapter 11 cases to enable it to file a timely proof of claim, because it filed a timely proof of claim well-before the Bar Date. Finally, the question of whether the Late Claimants received adequate notice of the Bar Date is ultimately a moot issue, as neither of the Late Claimants possess a valid claim against the Debtors.

Since (i) the Late Claimants are not "known" creditors that were entitled to actual notice, (ii) the Late Claimants have failed to argue any other basis for a finding of "excusable neglect," and (iii) this Court has already determined that allowing the Late Claimants to file proofs of claim at this time (nearly two years after the Bar Date and while the Debtors are moving towards confirmation of a plan of reorganization) would be prejudicial to the Debtors' estates,[2] the Court should enter an order denying the Motion.

---

[2] See February 28, 2005 Hearing Transcript, pg. 33, lns. 21-22.

3

### Facts and Background

1.      From 1940 until about 1984, the Debtors sold unprocessed vermiculite to Intermountain Insulation Co. ("Intermountain").  Upon information and belief, Intermountain processed the product, at least in part, at 333 W. First Street, Salt Lake City, Utah (the "Site"), and then Intermountain sold the product under the "Zonolite" name, pursuant to licenses that were issued by a predecessor of the Debtors.

2.      The Debtors (i) never owned, leased, or otherwise held any ownership interest in the Site or adjacent land, (ii) never owned, leased, or otherwise held any ownership in any land located or any business carried on adjacent to the Site and (iii) never operated any business or other activity at the Site or on adjacent land.  Further, the Debtors also (i) had no contractual dealings concerning the Site with either of the Late Claimants, (ii) did not know that either of the Late Claimants had any legal interest in the Site; and (iii) never received any communication from the Late Claimants, by which the Late Claimants expressed an intent to seek recovery from the Debtors on account of alleged contamination at the Site.

3.      On April 2, 2001 (the "Petition Date"), the Debtors filed for bankruptcy under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code").

4.      On January 14, 2005, almost two years after the Bar Date[3] had passed, the Late Claimants filed their Motion [Docket No. 7571].  The Motion seeks leave from the Bar Date Order so that each of the Late Claimants may file late proofs of claim on account of

---

[3] The Objection contains a detailed description of the Bar Date and the process by which the Bar Date and the associated notice materials were developed and approved.

4

"environmental cleanup costs" incurred and to be incurred to cleanup the Site and the adjacent

Land. According to the Late Claimants, (i) Pacificorp is the current owner of "Block 66," which

includes the Site, and (ii) in 1984, Pacificorp's predecessor in-interest, Utah Power & Light

Company, purchased a portion of Block 66 from Vancott. See *Reply Brief to W.R. Grace's*

*Objection to Pacificorp and the Vancott Bagley Cornwall & McCarthy 401(k) Profit Sharing*

*Plan's Motion for Leave to File Late Proofs of Claim* (the "Late Claimants' Brief"), pg. 2.

5.      On, February 10, 2005, the Debtors filed their Objection [Docket No. 7746]. In

the Objection, the Debtors argued that neither of the Late Claimants are entitled to the relief

requested in the Motion because (i) both of the Late Claimants were "unknown" creditors and,

therefore, not entitled to receive actual notice of the Bar Date; and, in any event, (ii) Vancott

received *actual notice* of the Bar Date, and Pacificorp knew the Debtors were in bankruptcy (and

filed a timely proof of claim) well before the Bar Date. The Debtors also argued that the

Claimants had failed to assert any grounds for establishing "excusable neglect."

6.      On February 28, 2005, the Court heard legal argument on the Motion, and the

Court found that allowing the Late Claimants to file a late proof of claim would be prejudicial to

the Debtors' estates. See February 28, 2005 Hearing Transcript at pg. 33, lns. 21-22. The Court,

however, permitted further briefing on the Motion with respect to "the issue of [a] debtor's

inquiry notice obligation to find a current owner of a property which [the] debtor does not lease

and does not use versus the creditor or interest holder['s] ... obligation to file a transfer of claim

or proof of claim timely." Id. at pg. 33, lns. 14-18.

5

## Argument

### I.    The Late Claimants Were Unknown Creditors and Were Not Entitled to Actual Notice of the Bar Date

7.    As the Late Claimants were "unknown" creditors, the Debtors had no obligation to serve them with actual notice of the Bar Date. A "known" creditor is one whose identity is either "known or reasonably ascertainable by the debtor." Tulsa Professional Collection Serv., Inc. v. Pope, 485 U.S. 478, 490 (1988). An "unknown" creditor is one whose "interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor]." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 317 (1950). A creditor's identity is "reasonably ascertainable" if that creditor can be identified through "reasonably diligent efforts." Mennonite Bd. Of Missions v. Adams, 462 U.S. 791, 798 n.4 (1983). The Court of Appeals for the Third Circuit (the "Third Circuit") held that "reasonable diligence" does not require "a vast, open-ended investigation. The requisite search instead focuses on the debtor's own books and records. Efforts beyond a careful examination of these documents are generally not required." Chemetron Corp. v. Jones, 72 F.3d 341, 346-47 (3d Cir. 1995) (internal citations and quotes omitted).

8.    The Debtors' efforts to identify "known" creditors were reasonable and satisfy Chemetron and its progeny. In, particular, the Debtors diligently reviewed their books and records to identify potential or actual claimants. Indeed, this search identified Intermountain (the entity that operated at the Site), as Intermountain conducted direct business transactions with the Debtors. The Late Claimants do not dispute the reasonableness of the Debtors' investigation of their books and records, nor do they contend that such a search would have uncovered the Late Claimants' alleged claims. In fact, it is undisputed that the Debtors did not conduct any business

6

transactions or have any contractual dealings with either of the Late Claimants with respect to

the Site. Therefore, it is apparent that the Late Claimants' interests concerning the Site did not

come to the knowledge of the Debtors in the due course of business. See Mullane v. Central

Hanover Bank & Trust Co., 339 U.S. at 317.

9.      Moreover, the particular factual circumstances only emphasize the Debtors'

unawareness of the Late Claimants' interests in the Site. It is undisputed that the Debtors (i)

never operated or arranged for the operation of the Site or adjacent land, (ii) never owned,

leased, or otherwise held any ownership interest in the Site or adjacent land, and (iii) never

owned, leased, or otherwise held any ownership in any business carried on at the Site or adjacent

land. Indeed, the Debtors had no reason to believe that Intermountain (an entity already

receiving notice of these chapter 11 cases and the Bar Date) was not the owner of the Site. It is

also undisputed that the Late Claimants never communicated, or otherwise gave notice, to the

Debtors of their claims relating to the Site.[4] Thus, the Debtors had no actual knowledge, through

---

[4] Therefore, the present situation is distinguishable from Solow Building Co., LLC v. ATC
Assoc., Inc., 175 F.Supp. 2d 465 (E.D.N.Y. 2001), which the Late Claimants cite in their reply.
In Solow, the court held that the debtor had a duty to provide actual notice to the owner of an
office building where the debtor had performed allegedly deficient asbestos-abatement. The
court found that such notice was required because the owner was a "known" creditor. The court
based this decision on a finding that the claimant had sent multiple letters to the debtor, before
the bar date, and these letters indicated that (i) the claimant believed that the debtor was
performing illegal procedures in its abatement and (ii) that the claimant would hold the debtor
liable for any damages or claims from the debtor's failure to properly control the asbestos in the
premises. Id. at 472.

7

a diligent search of their books and records or otherwise, that the Late Claimants had legal interests in the Site.[5]

10.     Finally, the EPA did notify the Debtors that the EPA had a potential claim by allleging that the Site may be contaminated. In response, the Debtors properly scheduled a claim for potential contamination for the Site. See Waterville Industries, Inc. v. First Hartford Corp., 124 B.R. 411(D. Me. 1991) (holding that the reorganized debtor's discharge was not applicable to a party that purchased contaminated property from the party that purchased the land from the debtor, because the debtor had failed to schedule a claim for the property in its bankruptcy filing). In addition, the Debtors properly gave actual notice to the EPA and Intermountain (as known creditors) of the chapter 11 cases and of the Bar Date.

11.     The Debtors did not have any obligation to investigate beyond their books and records to ascertain whether anyone else possessed a claim on account of alleged contamination at the Site. Indeed, courts have held that chapter 11 debtors that own (or previously owned) allegedly contaminated property have no obligation to undertake an ancillary investigation to locate parties that may assert claims on account of such contamination. For example, in Chemetron Corp. v. Jones, 72 F.3d 341 (3d Cir. 1995), the Third Circuit found that a chapter 11

---

[5] Unlike the debtor in In re Argonaut, 164 B.R. 107, 112 (N.D. Cal. 1994), the Debtors had no reason to know that other claimants existed. In Argonaut, the debtor, a lessee of real property, failed to provide notice of its chapter 11 cases to investors who had purchased interests in the deed of trust lender's interest in the property. The court found that these investors should have received actual notice of the debtors' bankruptcy cases because they were "known" creditors. The court based its decision on its finding that, "[t]here is some evidence, including a declaration by Duane Tucker, Argonaut's attorney at the time of the filing, that Argonaut knew that the Del Mar [the deed of trust lender] interest had been further assigned to some other entities [the investors]." Id. Here, there is no evidence whatsoever that the Debtors had any knowledge as to the ownership of the Site or that Intermountain was not the owner of the Site.

8

debtor that owned and operated a nuclear facility and nearby landfill had no obligation to provide
actual notice to parties that resided on (or visited) the land. In reaching this decision, the Third
Circuit noted that the bankruptcy court had incorrectly applied a "reasonably foreseeable" test,
rather than the appropriate "reasonably ascertainable" standard, and that the potential claimants
were not "reasonably ascertainable." Id at 346-47. In this respect, it was certainly "reasonably
foreseeable" to the debtor that such claimants may exist, but their identities were not "reasonably
ascertainable" to the debtor. See id. As a result, the Third Circuit held that such an
investigation, above and beyond an investigation of the debtor's books and records, was not
required. See id at 349.

12.     Similarly, In re Bicoastal Corp., 147 B.R. 807 (Bankr. M.D. Fla. 1992), the court
held that a claimant, which (i) owned property downstream from property that was formerly
owned by the chapter 11 debtors and (ii) claimed that its property was environmentally damaged
because of the actions of the debtor on the debtor's property, was not a known creditor of the
debtor. In particular, the court held that due process requirements did not require the debtor to
conduct an "impracticable and extended" search for all potential creditors. See id, citing
Mullane, 339 U.S. at 317-18. Instead, the court found that the debtor's publication notice was
reasonably calculated to provide the claimant with sufficient notice of the bar date. Likewise, in
In re Texaco Inc., 182 B.R. 937, 954-55 (Bankr. S.D.N.Y. 1995), the court found that the owner
of land adjacent to a chapter 11 debtor was an "unknown" creditor. The courts in each of these
cases based their determinations on findings that the respective debtors were not in a position to
determine the extent of the toxins emanating from their respective properties.

13.     The facts in the present case are even more compelling than the facts in
Chemetron, Bicoastal, and Texaco. In particular, the debtors in such cases each owned the

9

property where the contamination developed and operated the business from which such

contamination arose. Accordingly, they were in the best position to know the extent of any

contamination that stemmed from their respective businesses. Still, the courts, including the

Third Circuit, held that an investigation beyond the debtors' books and records was not required.

Here, however, the Debtors never owned the Site or had any involvement in Intermountain's

business on the Site. Therefore, the Debtors were even less-equipped to ascertain the extent of

any contamination caused by Intermountain on the Site (or adjacent land) than the debtors in

Chemetron, Bicoastal, and Texaco.

14.     Therefore, as the Debtors' diligent investigation of its books and records did not

uncover the claims of the Late Claimants relating to the Site, nor is there any evidence to indicate

that the Debtors otherwise had actual knowledge of such claims, the Late Claimants are

undeniably "unknown" creditors. As a result, the Late Claimants were not entitled to receive

actual notice of the Bar Date and the publication notice was sufficient to inform the Late

Claimants of the Bar Date.

## II.     The Debtors Had No Obligation to Conduct an Ancillary Investigation of the Public Records

15.     The Late Claimants incorrectly cite to three Supreme Court cases to support their

erroneous proposition that a debtor has an obligation to conduct an ancillary investigation of

public records in order to identify potential claimants. Each of the cases, however, addresses

whether specific statutes (each providing for publication notice by the state to notify affected

parties of specified events relating to real property) provided Constitutionally adequate notice to

affected parties. See Mennonite Bd. Of Missions v. Adams, 462 U.S. 791, 798 n.4 (1983);

Schroeder v. City of New York, 371 U.S. 208, 212-13 (1962); and Walker v. City of Hutchinson,

10

352 U.S. 112, 116 (1952) (collectively, the "State Foreclosure Cases"). For the following

reasons, the State Foreclosure Cases are inapposite to the pending issue of whether a chapter 11

debtor has an obligation to search public records (in addition to a search of its own books and

records) to identify potential claimants.

16.     *First*, the fact that the State Foreclosure Cases dealt with state entities is

significant because the public recording systems are kept by the state and, therefore, constitute

the state's own books and records. Therefore, the holding in the State Foreclosure Cases - that

the state entities had duties to check their public records - is effectively the same standard as the

rule enumerated in Chemetron (that a party must review its own books and records). Such an

investigation would be much more burdensome for a chapter 11 debtor, who would have to

undertake an ancillary, independent investigation of the public records to locate such parties,

with all of the corresponding effort and expense that such an investigation would require. It

would have been far from "easy"[6] for the Debtors to undertake such an investigation to identify

owners and part owners of every location where it sold its products (and every plot adjacent to

such locations). Such a time-intensive and burdensome endeavor would undermine the

"principal purpose of bankruptcy law, to secure within a limited period the prompt and effectual

administration and settlement of the debtor's estate." Katchen v. Landy, 382 U.S. 323, 328

(1966)

17.     *Second*, all of the State Foreclosure Cases addressed the limited issue of whether

the publication notice of a particular statutory scheme was sufficient to notify interested parties.

---

[6] See Late Claimants' Reply at pg. 11.

11

It is essential to note that none of the State Foreclosure Cases involved a debtor in a bankruptcy context. This distinction is critical because the issue of what constitutes sufficient notice in a bankruptcy context has been decided by courts in the wake of the State Foreclosure Cases. In particular, in Chemetron - which is controlling precedent and more recent than the State Foreclosure Cases - the Third Circuit held that a debtor's investigation to identify "known" creditors need not be vast and open-ended, and, instead, should focus on the debtor's own books and records. See Chemetron Corp. v. Jones, 72 F.3d at 346-47. The Late Claimants, however, are in effect asking the Court to ignore a controlling precedent specifically addressing the issue, in favor of cases that (i) deal with a different issue outside of a bankruptcy context, (ii) were decided before the most applicable line of controlling cases, and (iii) can be distinguished from the present situation.

18.     In any event, the issue of what constitutes sufficient publication notice (the precise issue in the State Foreclosure Cases) has already been determined by this Court. Indeed, the Debtors' publication notice was specifically developed to reach the Debtors' creditors. See Mennonite Bd. Of Missions v. Adams, 462 U.S. 791, 798 (1983), quoting Wiswall v. Sampson, 55 U.S. 52, 67 (1852) (publication notice must be "reasonably calculated" to reach the intended recipient). In these chapter 11 cases, the Debtors took unprecedented measures to ensure that potential claimants knew of the Bar Date. Specifically, the Debtors (i) retained a notice-consultant to design a notice program that would reach (with a high degree of probability) each of the Debtors' potential claimants, (ii) worked with the Court and every official committee in these cases, over the course of ten months, to develop a Bar Date notice program that would reach substantially all potential creditors, and (ii) spent over *$4 million* to publish the Bar Date

12

Notice in a myriad of national and local publications, including publication in the Utah area,

specifically including Salt Lake City.

19.     Further, the Court specifically determined that the Debtors' notice program was

legally sufficient.  In particular, in addition to approving the Bar Date Notice, the Bar Date Order

provides:

> ORDERED that notice of the entry of this Order and of the Bar Date to unknown
> claimants pursuant to the Debtors' Bar Date Notice Plan for Asbestos Property
> Damage Claims and Other Claims (the "Notice Plan"), as modified, and filed on
> April 12, 2002, shall be deemed good, adequate and sufficient notice of the Bar
> Date ...

Bar Date Order at pg. 5.

20.     Thus, for the reasons set forth, the State Foreclosure Cases are inapplicable to the

present circumstances and do not require the Debtors to sort through public records to identify

claims with respect to property (or property adjacent thereto) where its product may have been

used or processed.

**III.    The Debtors Properly Served Vancott with the Bar Date Notice**

21.     While neither of the Late Claimants were entitled to actual notice of the Bar Date,

the Debtors properly served Vancott with a copy of the Bar Date notice package.  The Debtors

sent the Bar Date materials to "Vancott, Bagley, Cornwall & McCarthy."  See Affidavit of

Service (attached as Exhibit C to the Objection).  While the notice may not have been

specifically sent to the firm's 401(k) profit sharing plan, this is a distinction without any material

difference.  Indeed, the 401(k) profit sharing plan is affiliated with the law firm.  In particular,

the 401(k) plan's offices are located in the same offices as the law firm (50 S. Main St., Salt

Lake City, Utah).  On April 14, 2005, the Debtors' counsel called the Vancott Bagley law firm

13

and asked the receptionist where one should send correspondence to the Vancott, Bagley,

Cornwall & McCarthy 401(k) Profit Sharing Plan. Without hesitating, the receptionist stated

that the correct mailing address is: "50 South Main Street, Salt Lake City, Utah 84144, Suite

1600." Therefore, service upon the law firm should be imputed to the 401(k) plan. See, e.g.,

Haynes v. Locks, 711 F.Supp. 901 (E.D. Tenn. 1989) (finding that service of process upon a

subsidiary is constructive notice to two parent corporations).

22.     The Late Claimants are apparently correct that the address listed in the Debtors'

records contains the incorrect zip code. However, courts have recognized that the failure to

include the correct zip code only weakens the presumption of receipt by the addressee. See In re

Longardner & Assoc., Inc., 855 F.2d 455 (7th Cir. 1988). In the present situation, it is highly

unlikely that the incorrect zip code resulted in the letter not being properly delivered, as there is

only one "South Main Street" in Salt Lake City, Utah. See Map of St. Lake City, Utah (a copy

of which is attached as Exhibit A). Also, the zip code listed in the Debtors' records (84144) is

not materially different from the allegedly correct zip code (84145). Therefore, the street address

and city were most-likely sufficient to ensure delivery.

## IV.     The Debtors Should Not be Held Accountable for Pacificorp's Incomplete Proof of Claim

23.     It appears that Pacificorp was not served with the Bar Date Notice Package.

Pacificorp by its own admission, however, did receive notice of the Debtors' chapter 11 cases,

and filed a proof of claim under its trade name, Utah Power & Light, before the Bar Date.

Pacificorp thus (i) knew that the Debtors were in bankruptcy; (ii) knew that the proof of claim

process was the appropriate method for asserting any claims against the Debtors; and (iii) could

have filed a similar claim with respect to the Site. Pacificorp has provided no justification for its

14

failure to set forth claims related to the Site in their timely proof of claim. The bottom line, however, is that Pacificorp obviously was sufficiently notified of these chapter 11 cases and the Bar Date to enable it to file a timely proof of claim, because it did exactly that.

**V.      Neither of the Late Claimants Have a Claim Against the Debtors**

24.      In any event, the issue of whether the Late Claimants received adequate notice of the Bar Date is ultimately moot, as neither of the Late Claimants possess a valid claim against the Debtors for either or both of the following reasons: *first*, The Debtors were not an "arranger" under CERCLA; and, *second*, the Late Claimants' attempt to assert a contribution claim under Section 113(f) of CERCLA is barred by Cooper Industries, Inc. v. Aviall Services, Inc., 543 U.S. ___, 125 S.Ct. 577 (2004) and Pharmacia Corp. v. Clayton Chemical Acquisition LLC, 2005 WL 615755 (S.D. Ill. 2005).

25.      The sole basis for the Late Claimants' claim against the Debtors is alleged liability as an "arranger" under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a). The Late Claimants allege that some of the Debtors "enter[ed] into processing agreements" with Intermountain with knowledge that "the manufacturing process itself results in significant contamination to the processor's property." Late Claimants' Reply at 7.

26.      The Debtors dispute the Late Claimants' characterization of the facts. Nonetheless, even accepting them at face value, the alleged facts fall short of CERCLA "arranger" status. There is no dispute that the vermiculate the Debtors sold to Intermountain was a valuable commercial product, nor was it in any sense a waste to the Debtors. In law as well as common parlance, a sale of a useful product does not constitute an arrangement for disposal, even though the ultimate fate of all products is to become waste and to be disposed.

15

27.    Dozens of cases hold that the sale of a useful product containing hazardous substances does not constitute an "arrangement for disposal" of the hazardous substances, so long as the "product" is not essentially a waste to the seller. E.g, G.J. Leasing Co., Inc. v. Union Elec. Co., 54 F.3d 379, 384 (7th Cir. 1995) ("[T]he sale of a product which contains a hazardous substance cannot be equated to the disposal of the substance itself or even the making of arrangements for its subsequent disposal . . . .") (citations omitted); United States v. Union Corp., 277 F. Supp. 2d 478, 489-91 (E.D. Pa. 2003) (sale of polychlorinated biphenyls by Monsanto did not constitute an arrangement for disposal of the polychlorinated biphenyls) ("CERCLA liability does not extend to the seller of a new or useful product because such a sale does not constitute an arrangement for disposal of a hazardous substance") (citing seven cases); United States v. Gordon Stafford, Inc., 810 F.Supp. 182, 185 (N.D. W.V. 1993) (sale of used transformers did not constitute an arrangement for disposal of PCBs contained in the transformers).

28.    Especially relevant are cases holding that sales of products containing asbestos were not arrangements for disposal of the asbestos in the products. Grace entities were defendants in some of these cases. E.g., Dayton Independent School District v. U.S. Mineral Products Co., 906 F.2d 1059, 1065 (5th Cir. 1990) ("there is no possible reasonable interpretation of the term 'disposal' that could encompass the sale of asbestos-containing useful building products by the defendant manufacturers and suppliers") (W.R. Grace & Co. was a defendant); Prudential Insurance Co. of America v. United States Gypsum Co., 711 F. Supp. 1244, 1253-55 (D. N.J. 1989) (there was no "disposal" where the defendant "convey[ed] a useful substance for a useful purpose"; sale of asbestos-containing products for use in building materials was not disposal "even though such substances may have come to eventually flake off and potentially pose a health risk") (W.R. Grace & Co. was a defendant).

16

29.     Courts have rejected "arranger" allegations in cases involving facts similar to

those alleged by the Late Claimants. E.g., Edward Hines Lumber Co. v. Vulcan Materials Co.,

685 F. Supp. 651, 656 (N.D. Ill. 1988) ("the mere sale of ... substances for use in the wood

treatment process does not constitute arranging for the disposal or treatment of a hazardous

substance), aff'd, 861 F.2d 155 (1989).

30.     The cases relied upon by the Late Claimants involve critical distinctions from the

facts alleged here. The Late Claimants prominently rely on three cases involving "toll"

manufacturing arrangements. In each case, the defendant sent materials to a contractor's facility

for processing, and later got back processed product. In each case, the contractor's facility

became contaminated. In finding the defendants liable, all of the courts placed central reliance

on the fact that the sender retained ownership of both the material and the hazardous substances

in it throughout the processing operation. United States v. Aceto Agric. Chem. Corp., 872 F.2d

1373, 1382 (8th Cir. 1989) (involving a pesticide processing facility; the defendants "actually

owned the hazardous substances, as well as the work in process"); Jones-Hamilton Co. v. Beazer

Materials & Services, Inc., 973 F.2d 688, 695 (9th Cir. 1992) (involving processor of wood

treating chemicals; under the parties' agreement the defendant "retained ownership of all the

materials it supplied to" the processing facility); United States v. Vertac Chemical Corp., 966

F.Supp. 1491, 1501 (E.D. Ark. 1997) ("[t]he Court concludes that the evidence establishes that

Uniroyal owned the TCB it supplied to Vertac for processing into 2,4,5-T, that Uniroyal retained

an ownership interest in its material during the processing stage, that Uniroyal owned the 2,4,5-T

that was returned . . . ."), aff'd sub nom United States v. Hercules Inc., 247 F.3d 706 (8th Cir.

2001). In Vertac, the court determined that the seller of hazardous material used as a raw

material in the same toll manufacturing process was not liable, stating "[t]he Court will not

17

extend CERCLA liability to SCD which sold a hazardous, but useful product to Vertac for its original use as raw material in Vertac's manufacturing operation". 966 F.Supp. at 1509.

31.     In contrast to the defendants in the cases cited by the Late Claimants, the Debtors were not involved in a "toll" manufacturing arrangement with Intermountain. The Debtors had no ownership of the vermiculite after it was sold. The Debtors got no product back from Intermountain. The alleged facts provide no basis to hold the Debtors as an "arranger" for disposal at the Site.

32.     Even if the Debtors qualified as a CERCLA "arranger," the Late Claimants fail to state a valid claim. Their alleged claim is one for contribution under Section 113(f)(1) and/or 113(f)(2) of CERCLA, 42 U.S.C § 9613(f)(1)-(2). The Late Claimants have not been sued by the EPA or any other agency for cleanup of the Site. Rather, they are parties to an "Administrative Order on Consent" under Section 106 of CERCLA issued by the EPA. The recent Supreme Court decision Cooper Industries, Inc. v. Aviall Services, Inc., 543 U.S. ___ , 125 S.Ct. 577, 584 (2004), held that, to sue for contribution under Section 113(f)(1) of CERCLA, a party must previously have been sued in a "civil action" as stated in Section 113(f)(1). The Court left open the question of whether an administrative order under Section 106 of CERCLA qualifies as a "civil action" for purposes of Section 113(f)(1). See id. The recent case Pharmacia Corp. v. Clayton Chemical Acquisition LLC, 2005 WL 615755 (S.D. Ill. 2005) answered this question "no." Pharmacia also held that an administrative order on consent under CERCLA Section 106 did not qualify as a "settlement," and therefore established no ground for a contribution claim under Section 113(f)(2) of CERCLA, which authorizes contribution claims by a party to a "judicially or administratively approved settlement." As a result of these holdings, the court dismissed the plaintiffs' contribution claims. Here, the Late Claimants'

18

alleged contribution claim suffers exactly the same defects and should be dismissed for the same reasons.

## Conclusion

33.     Since (i) the Late Claimants have failed to establish that they were "known" creditors that were entitled to actual notice of the Bar Date; (ii) the Late Claimants have failed to argue any other basis for a finding of "excusable neglect;" and (ii) this Court has already determined that allowing the Late Claimants to file proofs of claim at this time (nearly two years after the Bar Date and while the Debtors are moving towards confirmation of a plan of reorganization) would be prejudicial to the Debtors' estates, the Court should enter an order denying the Motion.

19

WHEREFORE, for the foregoing reasons, the Debtors request that this Court enter an order that (i) denies the Motion and (ii) grants such other relief as the Court deems just and proper (a proposed order is attached as Exhibit B).

Respectfully Submitted:

Dated: April 25, 2005

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
James W. Kapp III
Samuel L. Blatnick
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES
& WEINTRAUB P.C.

Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400

Co-Counsel for the Debtors and
Debtors in Possession

91100-001\DOCS_DE:107510.1