UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              . Case No. 01-01139(JKF)
                                    . Chapter 11
                                    . Jointly Administered
  W.R. GRACE & CO., et al.,         .
                                    . 824 Market Street
                                    . Wilmington, Delaware 19801
                    Debtors.        .
                                    . April 25, 2005
. . . . . . . . . . . . . . . . . 12:01 p.m.


TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:            Kirkland & Ellis, LLP
                            By:  JANET S. BAER, ESQ.
                            Aon Center
                            200 East Randolph Drive
                            Chicago, IL  60601

For the Debtors:            Pachulski, Stang, Ziehl, Young,
                             Jones & Weintraub, P.C.
                            By:  DAVID W. CARICKHOFF, JR.,
                                 ESQ.
                            919 Market Street
                            16th Floor
                            P.O. Box 8705
                            Wilmington, DE  19899

Audio Operator:             Jason Smith

Proceedings recorded by electronic sound recording, transcript
          produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**



APPEARANCES (Cont'd.):

For National Union:        Zeichner Ellman & Krause LLP
                        By:   YOAV M. GRIVER, ESQ.
                        575 Lexington Avenue
                        New York, NY   10022

For Sheldon Solow, et al.:  Richardson, Patrick, Westbrook
                         & Brickman, LLC
                        By:   EDWARD J. WESTBROOK, ESQ.
                        1037 Chuck Dawley Boulevard
                        Building A
                        Mount Pleasant, SC   29464

For Sheldon Solow, et al:   Buchanan Ingersoll, PC
                        By:   WILLIAM D. SULLIVAN, ESQ.
                        The Nemours Building
                        Suite 1110
                        1007 North Orange Street
                        Wilmington, DE 19801

For Maryland Casualty:      Connolly Bove Lodge & Hutz LLP
                        By:   JEFFREY C. WISLER, ESQ.
                        The Nemours Building
                        1007 North Orange Street
                        Wilmington, DE   19801

For Sealed Air Corporation:  Skadden, Arps, Slate, Meagher
                         & Flom, LLP
                        By:   DAVID R. HURST, ESQ.
                        One Rodney Square
                        P.O. Box 636
                        Wilmington, DE   19899

For Unigard and CU:        Drinker Biddle & Reath LLP
                        By:   MICHAEL F. BROWN, ESQ.
                        One Logan Square
                        18th & Cherry Streets
                        Philadelphia, PA   19103

For Unsecured Creditors'    Stroock & Stroock & Lavan, LLP
Committee:                By:   KENNETH PASQUALE, ESQ.
                            LEWIS KRUGER, ESQ.
                        180 Maiden Lane
                        New York, NY   10038
                        (Mr. Kruger, Telephonic
                          Appearance)

For the Equity Committee:   Kramer, Levin, Naftalis &
                         Frankel, LLP
                        By:   GARY BECKER, ESQ.
                        919 Third Avenue
                        New York, NY   10022

APPEARANCES (Cont'd.):

For the Equity Committee:          Klett Rooney Lieber & Schorling
                                   By:  TERESA K.D. CURRIER, ESQ.
                                   The Brandywine Building
                                   1000 West Street
                                   Suite 1410
                                   Wilmington, DE  18901

For the Future Claimants'          Swidler Berlin
Representative:                    By:  RICHARD WYRON, ESQ.
                                   The Washington Harbour
                                   3000 K Street, NW, Suite 300
                                   Washington, D.C. 20007

For the Asbestos Personal          Campbell & Levine, LLC
Injury Committee:                  By:  MARLA R. ESKIN, ESQ.
                                   800 N. King Street
                                   Suite 300
                                   Wilmington, DE  19801

For the U.S. Trustee:              Office of the U.S. Trustee
                                   By: FRANK PERCH, III, ESQ.
                                   601 Walnut Street, Room 950W
                                   Philadelphia, PA  19106
                                   (Telephonic Appearance)

For the U.S. Trustee:              Office of the U.S. Trustee
                                   By:  DAVID M. KLAUDER, ESQ.
                                   601 Walnut Street
                                   Room 950W
                                   Philadelphia, PA  19106
                                   (Telephonic Appearance)

For the Asbestos Property          Ferry, Joseph & Pearce, P.A.
Damage Committee:                  By:  Theodore J. TACCONELLI, ESQ.
                                   824 Market Street
                                   Suite 904
                                   P.O. Box 1351
                                   Wilmington, DE  19899

For the Asbestos Property          Bilzin Sumberg Baena Price
Damage Committee:                   & Axelrod LLP
                                   By:  JAY M. SAKALO, ESQ.
                                        SCOTT L. BAENA, ESQ.
                                   Wachovia Financial Center
                                   200 South Biscayne Boulevard
                                   Suite 2500
                                   Miami, FL  33131

APPEARANCES (Cont'd.):

For David Austern:                Swidler Berlin, LLP
                                  By:  JOSEPH RADECKI, ESQ.
                                         JONATHAN BROWNSTEIN, ESQ.
                                  The Chrysler Building
                                  405 Lexington Avenue
                                  New York, NY 10174
                                  (Telephonic Appearance)

For Spaulding & Slye:             Bernkopf Goodman LLP
                                  By:  BRUCE D. LEVIN, ESQ.
                                  125 Summer Street
                                  Boston, MA  02110
                                  (Telephonic Appearance)

For Royal Sun Alliance:           Wilson, Elser, Moskowitz, Edelman
                                   & Dicker, LLP
                                  By:  SARAH EDWARDS, ESQ.
                                  3 Gannett Drive
                                  White Plains, NY  10604
                                  (Telephonic Appearance)

For The Scotts Company:           Vorys, Sater, Seymour and Pease
                                   LLP
                                  By:  TIFFANY STRELOW COBB, ESQ.
                                  52 East Gay Street
                                  P.O. Box 1008
                                  Columbus, OH  43216
                                  (Telephonic Appearance)

For ZAI Additional               By:  Lukins & Annis, P.S.
Specialists Counsel:             By:  DARRELL SCOTT, ESQ.
                                  1600 Washington Trust
                                   Financial Center
                                  West 717 Sprague Avenue
                                  Spokane, WA  99201
                                  (Telephonic Appearance)

For CNA:                          Goodwin & Procter, LLP
                                  By:  DANIEL M. GLOSBAND, ESQ.
                                  Exchange Place
                                  Boston, MA  02109
                                  (Telephonic Appearance)

For the Asbestos Claimants'       Caplin & Drysdale, Chartered
Committee:                        By:  PETER VAN N. LOCKWOOD, ESQ.
                                  One Thomas Circle, N.W.
                                  Washington, DC  20005

APPEARANCES (Cont'd.):

For DK Acquisition, et al.:    Klehr, Harrison, Harvey,
                                 Branzburg & Ellers, LLP
                               By:  JENNIFER L. SCOLIARD, ESQ.
                               Mellon Bank Center
                               919 Market Street
                               Suite 1000
                               Wilmington, DE  19801

For Century:                   White and Williams LLP
                               By: LINDA M. CARMICHAEL, ESQ.
                               824 North Market Street
                               Suite 902
                               Wilmington, DE  19801

For the Committee:             Duane Morris LLP
                               By:  RICHARD W. RILEY, ESQ.
                               1100 North Market Street
                               Suite 1200
                               Wilmington, DE 19801

For Federal Insurance          Cozen O'Connor
                               By:  DAVID J. LIEBMAN, ESQ.
                               1900 Market Street
                               Philadelphia, PA  19103

For St. Paul:                  Whiteford, Taylor & Preston
                                 L.L.P.
                               By:  GEORGE J. BACHRACH, ESQ.
                               7 Saint Paul Street
                               Baltimore, MD  21202
                               (Telephonic Appearance)

For Continental Casualty:      Ford Marrin Esposito Witmeyer
                                 & Gleser, L.L.P.
                               By:  ELIZABETH DECHRISTOFARO,
                               ESQ.
                               Wall Street Plaza
                               New York, NY  10005

                               Reed Smith, LLP
                               By:  JAMES J. RESTIVO, JR., ESQ.
                               435 Sixth Avenue
                               Pittsburgh, PA  15219
                               (Telephonic Appearance)


                               ANDREW CRAIG, ESQ.

1          THE COURT:  Good afternoon.  Please be seated.  This
2    is the matter of W. R. Grace, Bankruptcy Number 01-1139.  The
3    participants I have listed by phone are Tiffany Cobb, Bruce
4    Levin, James Restivo, David Klauder, Sara Edwards, George
5    Bachrach, Joseph Radecki, Jonathan Brownstein, Daniel Glosband,
6    Andrew Craig, Lewis Kruger, and Darrell Scott.  Good afternoon.
7                    (Telephone malfunction)
8          THE COURT:  I didn't do anything, honest.
9          MS. BAER:  Good afternoon, Your Honor.  Janet Baer on
10   behalf of the debtor W.R. Grace.  Your Honor, the first matter
11   on your -- the first matter on the agenda this morning is the
12   debtors' motion for approval of a stipulation of the St. Paul
13   Companies.  Your Honor, this stipulation does two things.
14   Number one it seeks to resolve the classification, if you will,
15   of St. Paul's claim related to a piece of litigation known as
16   the "Solow" litigation.

17         Your Honor, under the stipulation, the Solow -- the
18   claim that St. Paul has against Grace for whatever it may pay
19   ultimately if the Solow judgment is upheld in any way, shape or
20   form, including attorney's fees, costs and the like, would be
21   treated as a general unsecured claim under the debtors' Chapter
22   11 plan.  The second purpose of the stipulation is to lift the
23   automatic stay so that the Solow appeal, debtors' appeal of the
24   Solow judgment and the cross appeal that has been filed by the
25   Solow plaintiffs, can proceed in the Appellate Court in New

1 York.

2 Your Honor, the history of this is that when the
3 debtor filed its plan and disclosure statement, the way in
4 which it treated its obligation to St. Paul was essentially as
5 a general unsecured claim.  It did not provide for, in its
6 judgment, the amount of money that needed to be put into the
7 asbestos trust, money to reimburse St. Paul.  The debtor, in
8 its books and records, has always treated that as a contract
9 claim.  It's a claim based on an indemnity.  It has long and
10 complicated relationship with St. Paul to indemnify them not
11 only for this obligation, but many other obligations.

12 When St. Paul saw the plan and disclosure statement
13 they objected, indicating that if they have an asbestos
14 property damage claim, which clearly they would on a
15 subrogation theory in the event that Solow would recover any
16 money from the debtor, then we should account for it like an
17 asbestos property damage claim.  On the other hand, if we
18 believe it's a general unsecured claim, that's the way we're
19 accounting for it, we should clarify that.  This stipulation is
20 really meant to clarify that and to be consistent with the
21 debtor's books and records, which, again, do treat this as a
22 general unsecured claim.  It was the debtor's feeling that it
23 would be less complicated to treat it this way, rather than
24 keep it in, or put it in, the asbestos property damage trust or
25 the asbestos trust in general.  That would be how certain

1 asbestos claimants would be paid under the Chapter 11 plan.

2        And again, given the fact that we've got a plan where

3 the debtor is indicating that it's a plan where all asbestos

4 property damage claims will be paid in full, and likewise

5 general unsecured claims will get a dividend of 85 percent in

6 cash, 15 percent in stock, we felt that it really, from a

7 financial perspective, was not tremendously different, and,

8 again, was consistent with the debtor's way in which it

9 accounts for its finances.  As a result, Your Honor, we agreed

10 with St. Paul to just simply agree that it was a general

11 unsecured claim, right now, frankly, in the amount of zero, but

12 would ultimately be amended to reflect whatever ultimate

13 judgment has to be paid against Solow in addition to St. Paul's

14 fees, expenses, and the like for the claim.

15        The second purpose, Your Honor, the lifting of the

16 stay.  This is a case which went to trial many years ago, a

17 complicated trial, and Jim Restivo, who was one of the trial

18 counsel for Grace, is on the phone to explain more about it.

19 Before I turn it over to Jim, just basically, Your Honor, the

20 objectors to this motion have essentially said that the timing

21 is not right to go forward to lift the stay and that there's

22 risk involved in lifting the stay because there, of course, is

23 a cross appeal.  Mr. Restivo will address the merits of the

24 appeal and the merits of the cross appeal.

25        With respect to timing, Your Honor, we believe that

1 the timing is actually very good.  This matter has been pending
2 now for the four and a half years we've been in bankruptcy.
3 It's a very significant judgment, in excess of $25 million.
4 Whatever plan is confirmed here, however we ultimately resolve
5 matters with asbestos claimants, with a kind of judgment this
6 large, we believe it's in everybody's best interest to go
7 forward to have the Appellate Courts take a look at it, have
8 the Appellate Courts rule, and then, in fact, know what the
9 final judgment is that has to be dealt with, if any, one way or
10 the other.  At this point, I'd ask that Mr. Restivo give the
11 Court some more background with respect to the case and the
12 appeal.

13          MR. RESTIVO:  Good afternoon, Your Honor.
14          THE COURT:  Good afternoon.
15          MR. RESTIVO:  Your Honor, Sheldon Solow built a
16 building on Central Park which was completed in 1973.  It was a
17 steel structure building and was protected by
18 asbestos-containing fireproofing material.  In 1987, Mr. Solow
19 sued Grace for removal of the asbestos fireproofing material in
20 his building.  The case was tried for two months before a
21 Manhattan jury, and the verdict sheet approved by the Court and
22 sent to the jury listed the various abatement costs which had
23 been incurred by Mr. Solow.  They fell into two categories,
24 Your Honor:  costs incurred up to April 3, 1995 for
25 approximately $3.2 million, and costs incurred after April 3,

1  1995, in approximately $26 million.  That date will become

2  significant on appeal, Your Honor, and I'll return to it in a

3  middle -- in a minute.

4      The total damages sought by Solow from the jury for

5  past and future abatement costs and for alleged loss of value

6  were submitted to the jury in the range of 108.5 million to

7  $178.8 million.  The jury returned a verdict, Your Honor, of

8  $30.6 million but found that Mr. Solow was contributorally

9  negligent and responsible for 62 percent of the verdict, with

10 Grace being responsible for the remaining 38 percent of the

11 verdict.  That meant the verdict on damages was approximately

12 $11.6 million.

13     The trial court then calculated interest on the

14 verdict, but ran interest from the date of the lawsuit in 1987,

15 rather than from the period Mr. Solow actually spent money

16 removing asbestos, the bulk of which occurred after 1995.  With

17 interest being calculated in that fashion, the verdict of

18 approximately $11.6 million was inflated to a judgment of

19 approximately $25 million.

20     Grace filed an appeal, and there are three appealable

21 issues being raised.  The first, Your Honor, is that under

22 existing New York law, Solow's claim was barred by the statute

23 of limitations.  Under New York law, the claim arose or accrued

24 in 1973, when the building was completed.  However, in 1986,

25 the New York legislature passed a reviable act which created a

1 window to revive asbestos claims which would have been barred
2 by the statute.  And so Mr. Solow's asbestos property damage
3 claim, which arose in 1973, was revived by the 1986 statute.

4           However, in 1973, when the cause of action arose, New
5 York was a contributory negligence state.  If plaintiff was
6 found to have been more than 51 percent negligent, then the
7 plaintiff took nothing by way of a verdict.  New York changed
8 this law in 1975 and abolished contributory negligence, but
9 under the law it is for "causes of action that accrued after
10 September 1, 1975."  And so the first appealable issue, which
11 we feel pretty strong about, is that under New York law, since
12 the cause of action arose in 1973, and since in 1973
13 contributory negligence was a total bar to recovery, our first
14 appealable issue is that since Solow was 62 percent
15 contributorally negligent, he should take nothing.

16           Secondly, Your Honor, we believe the trial judge
17 created reversible error when he calculated damages from 1987,
18 rather than calculating the damages from the dates that were
19 not in dispute that Mr. Solow, in fact, spent money, and by
20 calculating damages from 1987, rather than 1995, about $10
21 million was added to the judgment over and above the verdict
22 that we don't think should be there.

23           The third issue, Your Honor, relates to the fact that
24 a few years prior to the case being tried, namely 1995, and
25 you'll remember we talked about the date in 1995 on the verdict

1  slip, Mr. Solow transferred his ownership interest in the
2  building to two limited liability companies for tax and
3  liability protection reasons.  They became the new owners.  We
4  believe that the new owners as of 1995 were barred by the
5  statute of limitations from seeking damages because they missed
6  the window under the reviable statute.  We believe Solow, as
7  the prior owner, could not recover damages after 1985 because
8  he no longer owned the building.  And so our third appealable
9  issue is the new Solow owners were time barred from any damages
10 and the old Solow owners were limited to damages that occurred
11 before 1995, approximately $3.2 million before contributory
12 negligence.

13      So we have three issues we'd like decided on appeal.
14 If we win on contributory negligence, the Solow claim will be
15 reduced to zero.  If we win on the prejudgment interest issue,
16 the Solow claim will be reduced to approximately 15 to $16
17 million.  If we win on the issue that the building was sold in
18 1995, then the claim will be reduced to something less than
19 $3.2 million.

20      It is true, as pointed out in the papers of the
21 objectors, that Reed Smith tried the case to verdict for two
22 months in the New York Court.  Kevin Castel of the Cahill
23 Gordon firm, now Federal Judge Kevin Castel of the Southern
24 District of New York, did take responsibility for various
25 pleadings and briefs and oral arguments on issues of New York

1  law.   He did not participate in the trial of the case, but he

2  did handle pre-trial and some trial arguments on discovery, on

3  evidentiary issues, and on New York law issues.   Mr. Castel

4  assisted us in preparing the appeal papers, and if he had not

5  been appointed to the federal bench, he would have argued this

6  case in the New York Appellate Courts for us.   So, while Reed

7  Smith intends to handle the lion's share of the record on

8  appeal and the briefing on appeal, we need local New York

9  counsel to argue issues of New York law to the New York

10  Appellate Courts and, therefore, since Mr. Castel has gone on

11  the federal bench, we think another partner at Cahill Gordon

12  should be the person to do that, and, therefore, we're

13  supportive of the motion to retain Cahill Gordon.   And that's

14  kind of the background to the Solow case, Your Honor.

15          THE COURT:  All right, thank you.  Ms. Baer?

16          MS. BAER:  Your Honor, under these circumstances the

17  debtor is asking that the stipulation be approved to number

18  one, allow the claim of St. Paul as a general unsecured claim

19  currently in the amount of $1, with the right to amend that

20  claim if and when they need to pay anything with respect to the

21  Solow judgment as well as to compensate them under the

22  indemnity agreement with Grace for their attorney's fees,

23  costs, and the like.

24          And number two, we ask that the stay be lifted at

25  this time so the appeal of the Solow matter can go forward.

1   Interestingly here, the debtor, who is the movant on the

2   appeal, seeks to have it go forward.  The opposition here, the

3   asbestos property damage committee and counsel for Solow, don't

4   want the appeal to go forward.  As indicated by Mr. Restivo, we

5   believe that the appeal for the debtor has very strong legal

6   merit and really is more or less pretty much a pure legal issue

7   in terms of the various appellate issues.

8           With respect to the cross appeal filed by Solow, I

9   understand that they're essentially trying to overturn the jury

10  verdict and increase the verdict, a very different set of

11  circumstances, a much tougher standard on appeal.

12          Under these circumstances, Your Honor, we believe it

13  important to get this matter concluded, to get the appellate

14  process rolling, so that we know just what kind of a claim we

15  ultimately would have to pay here, if any.

16          THE COURT:  All right.  Mr. Baena?

17          MR. BAENA:  May it please the Court, Scott Baena on

18  behalf of the property damage committee.  We filed an

19  objection, as did, as Ms. Baer alluded to, counsel for Mr.

20  Solow.  Our objection was grounded on the fact that under the

21  Bankruptcy Code, there is no mystery to the nature of the claim

22  that a surety has if it pays an underlying claim that it

23  provided a surety in respect of.  And what offends us about

24  this particular settlement, be it for one minute, for a place

25  keeping purpose, which frankly I didn't even understand that

1  explanation, Your Honor, under the Bankruptcy Code, it is
2  absolutely clear that this claim of the surety has the same
3  status and priority as the claim that they pay.  And, thus, if
4  they are required to pay the claim for Mr. Solow's property
5  damage, the surety has no more than an asbestos property damage
6  claim.

7         Understand that the purpose of this motion, and it's
8  not concealed by the motion itself, is to effect an objection
9  to the plan that was filed by the debtor and to which St. Paul,
10  the surety company, is objecting.  And apparently by
11  reclassifying St. Paul's claim as a general unsecured claim,
12  St. Paul will be amenable to withdrawing its objection.  That
13  is not a sufficient reason to undermine what is clearly
14  provided for in 502(e)(1) and 509 of the Bankruptcy Code,
15  which, to be redundant, Your Honor, is and has always been that
16  St. Paul doesn't have a better claim than the claim it is
17  providing the surety for.  Whatever that claim is, is what
18  their claim is.  Under the debtor's plan of reorganization,
19  asbestos property damage claims are classified separately, and
20  they are not treated the same way that general unsecured claims
21  are, and, thus, St. Paul has no right to be treated any
22  differently than Mr. Solow would if he were advancing his
23  claim, promoting his claim, in this bankruptcy proceeding.  So,
24  we object on that basis.

25         What isn't revealed by either the motion or the

1 presentation, except in quick passing, is that there was a

2 cross appeal filed by Mr. Solow as well, and the property

3 damage committee is concerned about that.  Recognizing the fact

4 that this property damage claim, whether it be to Mr. Solow or

5 to St. Paul, will be treated with all other property damage

6 claims, the property damage committee is concerned about the

7 fact that there may be an undue result of this appeal.

8          And in particular, by way of cross appeal, we

9 understand that Mr. Solow is seeking damages, or claiming that

10 the Court erred below and he was entitled to damages of $70

11 million.  We are concerned that the debtor may lose, and there

12 is good reason to be concerned, because as best we can tell,

13 and as pointed out by Mr. Solow's counsel, in all of the years

14 that Grace has litigated property damage claims, in all of

15 those many dozens of years of litigation, in only one instance

16 was Grace able to reverse a jury verdict against him.  And so

17 we are quite concerned that Grace's track record remains the

18 same, and worse yet the amount of this claim will multiply from

19 $25 million to $70 million or more.

20          THE COURT:  Well, how many times has Grace lost a

21 cross appeal of this nature?

22          MR. BAENA:  I don't know how many times they've lost

23 a cross appeal, Your Honor.  I don't know.  But I know that

24 they don't have a very good track record setting aside

25 judgments that were obtained by jury trial.

1        In short, Judge, we don't think there is any basis
2   under the law for this relief.  We also don't believe that the
3   debtor has carried its burden.  It hasn't put forward any
4   evidence whatsoever, either in respect of the 9019 settlement
5   that they wish the Court to approve or in respect of their
6   motion to lift the stay, no evidence whatsoever.  The prospects
7   of success in this appeal are a centerpiece to being granted
8   the relief that Grace is seeking.  There has been no showing
9   whatsoever as to what those prospects are.  There has been no
10  showing, as I've alluded to already, as to what the prospects
11  are for losing this appeal, and, indeed, as Your Honor
12  inquires, there has been no showing whatsoever as to the
13  prospects of losing the cross appeal.  We therefore believe,
14  Your Honor, that as a matter of law, as a matter of fact, this
15  motion must fail.

16        THE COURT:  Okay.  When -- at what point -- I guess
17  you agree, Mr. Baena, at some point this issue has to be
18  addressed, that is, how much the claim, regardless of who holds
19  it, but how much the claim is --

20        MR. BAENA:  Absolutely.

21        THE COURT:  -- and how it's going to be paid.

22        MR. BAENA:  Yes, it does.

23        THE COURT:  All right, what's your suggestion as to
24  when and how that should happen?

25        MR. BAENA:  Well, right now there is a $25 million

1  claim that Solow has against this estate.  That is, for all
2  intents and purposes, the amount of the claim.  Depending upon
3  when and how a plan is confirmed in this case and depending
4  upon the terms of that plan, that claim may yet be vetted
5  further, but right now it's an abstract exercise, Your Honor,
6  and there is just a $25 million claim.  That's all there is
7  right now.

8        THE COURT:  Okay.  Counsel for Mr. Solow?  Good
9  afternoon.

10       MR. WESTBROOK:  Good afternoon, Your Honor.  Edward
11 Westbrook for Mr. Solow.  Your Honor, Mr. Solow, over the
12 course of 12 years of pre-trial proceedings, spent millions of
13 dollars to get his verdict.  In the course of that, his
14 counsel, and I was trial counsel along with the Boies &
15 Schiller firm at the trial against Mr. Restivo, confronted all
16 the all the arguments that Mr. Restivo has so expertly
17 summarized for Your Honor in pre-trial, post-trial, and then
18 even on reconsideration of some of the post-trial rulings by
19 the Court.

20       Under New York law, Your Honor, the trial judge --
21 I'm very familiar with New York law -- turned down each and
22 every one of Mr. Restivo's arguments.  In addition, the trial
23 judge turned down each and every one of Mr. Solow's cross
24 appeal arguments, and there we were.

25       Your Honor, the jury awarded Mr. Solow an amount of

1  damages for the abatement, as Mr. Restivo said, up to a certain
2  point in time.  On the cross appeal, however, we contend that
3  the jury was required to award Mr. Solow some amount of damages
4  for the undisputed future abatement that had to be undertaken.
5  You see, the abatement was not finished in the building.  In
6  addition, there was undisputed evidence that while the
7  abatement was going on, you could not rent the space to anyone.
8  For some inexplicable reason, the jury did not award any amount
9  for that element of damages, even though it had been charged on
10 that element of damages.

11          So, the first two issues on cross appeal were that
12 having found that Grace was negligent and responsible for a
13 percentage of the abatement costs already incurred, under New
14 York law it was incumbent upon the jury to award an amount for
15 the future abatement costs.  It just couldn't declare the game
16 over as of the time Mr. Solow had spent his money.

17          THE COURT:  Juries do a lot of things.

18          MR. WESTBROOK:  There's no question about that, Your
19 Honor.  Juries do a lot of things.  And that gets to the third
20 point on appeal, which is that the jury found that Mr. Solow
21 was liable for over 60 percent negligence, and we contend that
22 that was totally contrary to the evidence.  The evidence was
23 that Grace sold a product advertised on the commercial market,
24 urged Mr. Solow's people to buy it, urged that it was safe,
25 said it contained just a trace of asbestos, and Mr. Solow's

1 people purchased the product.  And under those facts, Your
2 Honor, we contend as one of our grounds for appeal that it was
3 inexplicable for the jury to reach the decision that it did.

4 The combination of the no finding of damages for the
5 future abatement, the no finding of damages for the lost rent,
6 and the adjustment of the comparative negligence percentages,
7 Your Honor, could bring the ultimate award much closer to Mr.
8 Solow's originally contended amount, which is well over $75
9 million.  The range that Your Honor has heard really depends on
10 which expert is looking at the costs, et cetera.

11 As to Grace's arguments on its appeal, Your Honor, I
12 can only say that not only were they well vetted before the
13 Courts in New York over the 12 years, but, Your Honor, Grace
14 has made very, very sincere arguments in every case I've tried
15 that we've won against them that they've taken on appeal in the
16 Fourth Circuit Court of Appeals and the Seventh Circuit Court
17 of Appeals, and they just don't win.  Except for once, as far
18 as I can tell, they just don't win.  Once the courts have fully
19 vetted these issues below, and certainly in this case these
20 issues have been analyzed agonizingly over 12 years, the
21 Appellate Courts, despite how they may sound superficially,
22 normally leave these alone.  So what we have here is a
23 situation --

24 THE COURT:  Where neither side is too likely to win.
25 So, why don't we go on with the $25 million claim, forget the

1  appeals, and figure out how it should be classified in the
2  plan?

3       MR. WESTBROOK:  Your Honor, that was my first
4  reaction when this came out of the woodwork.  When we're -- we
5  have 4,199 other asbestos property damage claims that Grace is
6  supposed to be sitting down and talking with Mr. Baena about
7  how to estimate them.  We have one more claim that's not only
8  been estimated, but it's essentially been liquidated.  Why
9  would we spend hundreds of thousands of dollars on each more,
10 after the sides have spent millions of dollars to get here, on
11 this one claim?  Why isn't there some rationality to this
12 process?  Why don't we do something about trying to get this
13 resolved and maybe take a small step for mankind in getting
14 this whole morass resolved and everybody can go home?

15      THE COURT:  That's a principle I heartedly endorse,
16 the latter, getting this whole morass resolved and letting
17 everybody go home.  That much I am wholly in support of, Mr.
18 Westbrook.

19      MR. WESTBROOK:  I'm with you, Your Honor.  And I
20 don't think that sending this case to a year and a half or two
21 years, or whatever, in the New York Appellate Courts --
22 remember, we're not even at the first level of appellate
23 review; after that we'd have discretionary review to the Court
24 of Appeals -- is going to move this process along.  I'd like to
25 find a way that we could move this along without us spending

1 | millions of dollars in New York.  Thank you.

2 | THE COURT:  Why don't you go to some binding

3 | arbitration on this issue?  Forget an appeal, get your claim

4 | allowed, figure out what it is.

5 | MR. WESTBROOK:  We can certainly sit down.  We're

6 | glad to talk with the debtor.

7 | THE COURT:  Or even mediation, if that's the need.

8 | If it has to be litigated, I'm really not sure that Mr. Baena

9 | is not correct, that for now there's a $25 million claim.  It

10 | seems to lie with the property damage claims, not as a general

11 | unsecured claim.  And I'm not exactly sure why that type of

12 | treatment that will probably discharge any further liability

13 | through a plan anyway isn't appropriate.  Why does this need to

14 | be further litigated?

15 | MR. WESTBROOK:  Your Honor --

16 | MR. RESTIVO:  Your Honor, Jim Restivo.  We believe

17 | the claim, when reviewed, either by this Court, if they want to

18 | do it by proof of claim or by binding arbitration, or if they

19 | want to do it in the New York Courts, will end up being a zero

20 | claim, that the contributory negligence of Mr. Solow of 68

21 | percent is a jury finding supported by the evidence, it won't

22 | be overturned.  And the pure issue of law on that point is

23 | whether or not the law in effect in 1973 when the claim arose,

24 | which was contributory negligence, whether it applies.  It is

25 | not a difficult question.  I mean, I hope we would win.  We

1 might lose.  But I mean it's a pure question of law.

2       I think what Mr. Westbrook and Mr. Baena are trying
3 to refer to, I assume, I wasn't involved in the appeals, I
4 appreciate, that if you're trying to overturn a jury verdict on
5 the grounds that there was no evidence to support it, not just
6 asbestos defendants, but any defendants, or any plaintiffs have
7 difficulty doing that on appeal, and the success is not good at
8 that.  I wouldn't quarrel with that if that's what they're
9 talking about.

10       We have three issues of pure law that will either
11 reduce this claim to zero or to about 15 or 16 million or less
12 than 3.2 million, and there ought to be some process to
13 determine the ultimate value of this claim, and right now it's
14 the New York Courts of Appeal, and we ought to determine what
15 this claim is worth.

16       THE COURT:  Well, why is this claim going to be
17 treated any differently from any of the others?  As I
18 understand it, you're going to do a plan.  I'm still not
19 convinced that you can put property damage claims into a trust
20 because it seems to me that they're all fixed.  There is no
21 future component aspect to them that I have heard about.  Maybe
22 there is some future abatement action that I'm not familiar
23 with that might get into a trust.  But let me bypass that issue
24 for a moment and assume that you can put the property damage
25 claims into a trust.  You're going to put them into a trust.

1   You're going to provide how they're going to get paid, and

2   anything that isn't paid is going to be discharged.  Why is

3   this claim any different from any of the rest?  I don't

4   understand why it's a general unsecured claim.  The surety

5   hasn't paid out yet.  The surety is still holding funds.  It's

6   a property damage claim.  If, in fact, there are funds that can

7   be used to pay it, then those funds might be able to go into a

8   trust, if there are other claimants subject to the surety.  I

9   don't know that either.  But why are we picking this particular

10  claim out for special treatment as opposed to any other

11  property damage claim?

12          MR. RESTIVO:  I think the answer to that, Your Honor

13  -- I don't have an answer on classification.  I don't know

14  anything about the classification.  But in terms of a claim

15  that has gone to trial, this one has, I don't know that we have

16  any other property damage claims like that, most of the

17  property damage treatments of which I am aware in bankruptcy

18  will not pay money on a claim, you know, which is barred by the

19  statute of limitations.  You know these trusts or these debtors

20  don't give money away.  Here in issue is, is this claim barred

21  by the statute of limitations?

22          THE COURT:  Well, the --

23          MR. RESTIVO:  That's one of our three appellate

24  issues.

25          THE COURT:  Okay, but the --

1          MR. RESTIVO:  So right now if they put a claim in, we

2     say we will value it at zero.

3          THE COURT:  Well, then you'll --

4          MR. RESTIVO:  They say they'll value it at 70 million

5     or more.

6          THE COURT:  Okay, then you'll -- but -- yes, and

7     you'll both lose, because you've got a judgment and that

8     judgment is res judicata unless and until it's turned aside on

9     appeal.

10          MR. RESTIVO:  That's correct.

11          THE COURT:  So right now Mr. Baena is a hundred

12     percent correct.  There's a $25 million property damage claim.

13     Why don't you reconcile with it and get on with life?

14          MR. RESTIVO:  And the -- and again, Your Honor, I'm

15     not trying to argue with the Court.  The reconciling we believe

16     is to exercise our rights of appeal which will end up, we

17     believe, in this claim having a value of zero or 3.2 million or

18     16 million, not 25 to 70 million --

19          THE COURT:  Okay, the debtor --

20          MR. RESTIVO:  -- and parties ought to know what the

21     claim is worth.

22          THE COURT:  It's been represented that the debtors

23     lost all but one of the appeals.  What about cross appeals?

24          MR. RESTIVO:  They do have a cross appeal.  They

25     would like to --

1          THE COURT:  No, no.

2          MR. RESTIVO:  -- as I understand it, throw out the

3 jury's finding --

4          THE COURT:  No.  Mr. Restivo, I understand what's the

5 situation here.  I'm asking, how many times has the debtor

6 faced cross appeals and what's been the outcome in similar

7 appeals?

8          MR. RESTIVO:  The only appeals our firm has been

9 involved with, Your Honor, have been in Pennsylvania and in

10 West Virginia.  Pennsylvania was a statute of limitations

11 question, not an overturn the verdict question, and so I don't

12 think there were cross appeals, as I recollect.  In West

13 Virginia, the trial court had determined as a matter of law

14 that the product was defective.  We got a jury verdict.  The

15 other plaintiff -- the plaintiff appealed.  The court granted a

16 new trial.  We appealed that, and so that went up to the

17 Supreme Court of Appeals of West Virginia on cross appeals.

18 The West Virginia Supreme Court affirmed the grant of a new

19 trial, disaffirmed the court's ruling that as a matter of law

20 the product was defective, and so I treat the Supreme Court of

21 Appeals of West Virginia as a decision in which parts of both

22 cross appeals were won and parts of both cross appeals were

23 lost by both the plaintiff and by Grace.

24          THE COURT:  Which is something else that could happen

25 in this case, and you might start this whole ball of wax all

1 over again.  I think you folks need some alternative to an
2 appeal to see if you can get this resolved consensually.  At
3 the moment, I don't see the need to lift the stay.  I don't see
4 a need for special treatment of this claim.  And it doesn't
5 seem to me that the debtor, in terms of its settlement motion,
6 has substantiated that it's likely to win on appeal any more
7 than the other side is likely to win on appeal, so that the
8 estate will benefit from pursuing this matter now.  I agree
9 that if the plan does not resolve the issues or if you're not
10 able to consensually resolve the amount of the claim prior to
11 the plan, that you're -- apparently you're going to have to
12 reconcile that issue.  It seems to me that right now there's a
13 $25 million claim.  It's apparently held by Mr. Solow, not by
14 the surety at this point.  I'm correct, the surety has not paid
15 out, correct?  It's Mr. Solow's claim.

16                 MR. WESTBROOK:  That's correct, Your Honor.

17                 THE COURT:  So, I see no need to have the surety pay
18 out at this point in time.  That issue ought to be reconciled
19 in the plan, too.  If the surety's only obligation is to pay
20 this claim, as opposed to any other, then that may be some
21 grounds for taking this claim outside the typical way that
22 asbestos property damage claims are going to be paid.  If the
23 surety stands to pay other property damage claims, that may not
24 be the case.  But I don't understand how, even if the surety
25 pays, it's going to get a general unsecured claim when the

1 payment that it's paying, the claim that it's paying, is a

2 property damage claim.

3 MR. BACHRACH: Your Honor, George Bachrach. I'm the

4 attorney for the surety, and I would disagree with you on that.

5 In order to get an appeal bond, Grace executed an indemnity

6 agreement, which is a contractual obligation. This appeal bond

7 that was issued by St. Paul has no relationship to any asbestos

8 property damage claim. It's merely a contractual obligation of

9 the debtor, a general unsecured claim, because we took no

10 collateral for this bond. So you've got a situation where the

11 debtor has agreed contractually to reimburse the surety in the

12 event the surety must make a payment in the future.

13 Now, I'm surprised that Solow would not want to go

14 forward with the appeal because the bond says specifically that

15 the surety only has to pay if the appeal is affirmed in part or

16 all or if the appeal is dismissed. So, Solow's failure to go

17 forward with the appeal may risk its rights to make a claim

18 under the appeal bond.

19 Solow says that we have no general unsecured claim

20 because of the fact that the -- you know, 502(e) says that --

21 502(e)(1)(a) means that we may not have a claim. But that

22 doesn't look at (d) and (c), which means that we may have an

23 indemnity claim or we may have a claim subrogated to Solow's

24 claims. And that's where this case really got started, is

25 because the debtor did not fund the asbestos property damage

1  claim under their plan because they considered the St. Paul
2  claim to be an unsecured claim, and we're not in a position a
3  this point to assert a subrogation claim.  So, you know, in
4  summary, we have an indemnity claim under the agreement of
5  indemnity, and we should be classified that way.

6          THE COURT:  All right, maybe I'm confused about the
7  nature.  Some of the pleadings identify this as what you just
8  said, an appeal bond.  Others say it's a surety bond.  What is
9  it?

10         MR. BACHRACH:  It is an undertaking on appeal.  It's
11 a surety bond, which is a contractual obligation by the surety
12 that if the debtor or Grace does not pay the judgment that the
13 surety will pay the judgment, which is a contractual
14 obligation.

15         THE COURT:  Yes, it is a contractual obligation, but
16 it's an obligation to pay an asbestos claim which the debtor
17 would otherwise have to pay and which is going to be addressed
18 in the debtor's plan as payment of an asbestos claim.  So, if
19 you're required to pay after the plan is confirmed, let's say,
20 this claim would -- Mr. Solow's claim would be put into the
21 claim category with the other asbestos property damage claims.
22 It's dividend will be paid out.  You, as the surety, will have
23 to pay out whatever that percentage is.  You will be subrogated
24 to that claim in the same class and entitled to get the payment
25 that Mr. Solow would get.

1    MR. BACHRACH:  Or we have a reimbursement claim as a
2 result of making the payments and, therefore, are entitled to
3 reimbursement under our contractual claim.  502(e) gives us the
4 ability to have a reimbursement claim or a subrogation claim,
5 and the reason for the stipulation was to put us in the
6 category that we really are in, which is a reimbursement claim
7 for indemnification under the indemnity agreement.

8    THE COURT:  Okay, well, I understand the nature of
9 your argument.  I'm not totally sure why you would have a
10 higher classification in the claim than the underlying claim
11 itself --

12    MR. BACHRACH:  Well --

13    THE COURT:  -- even if you have an indemnity claim.
14 I mean, you can't -- an indemnity doesn't get you higher than
15 the entity which you were indemnifying.  So, I -- maybe that's
16 something that I need to look at for plan confirmation.  I
17 don't think I need to look at it for now, because for now, I
18 don't see a basis for lifting the stay or to approve the
19 settlement.  It seems to me the issue is not that clear-cut,
20 and the debtor ought to make this at best a disclosure
21 statement or plan issue in terms of classification because it
22 seems to me, again, without the benefit of having studied this
23 specific issue, but it seems to me that if you're indemnifying
24 Mr. Solow's claim, Mr. Solow's in, for example, Class 3, that
25 you're in Class 3 if you pay his claim.  I don't think you get

1 into Class 2 just because you pay his claim.  Now, if I'm
2 wrong, then I think that's a classification issue that should
3 be undertaken.  But I'm not going to approve a settlement over
4 the objection of the underlying claimholders who would stand to
5 be paid less because they'd be paid through a plan and then the
6 indemnitor would be paid more.  That seems to me to be giving a
7 preference to the indemnitor over the underlying claim.  The
8 debtor would be better off just paying the underlying claim and
9 forgetting the surety.

10         MR. BACHRACH:  I disagree with that in the sense that
11 when Solow gets its appeal and the decision is made on the
12 appeal, if it's within the terms of the bond and the amount of
13 the bond, Solow will be paid and will be gone.  At that point
14 we have an indemnification claim or a subrogation claim.
15 Either have our indemnification claim under the indemnity
16 agreement or we have a claim being subrogated to Solow's claim
17 against the trust, and in this stipulation we agree to be
18 actually treated less -- certainly the present plan suggests
19 that the asbestos property damage claims will be paid a hundred
20 percent in cash.  We are willing to accept lesser treatment now
21 at whatever the numbers are, and that's what the stipulation
22 says.  So we are agreeing to lesser treatment now for certainty
23 in terms of the classification of our claim.

24         THE COURT:  Well, you're not really taking less.
25         MR. BACHRACH:  But we're not being treated better.

1  We're being treated worse.

2           THE COURT:  Well, no, you're not really.  You're just

3  being treated in different collateral.  The debtor is still

4  planning to pay a hundred percent to all creditors.  It's just

5  that 85 percent of the unsecured claims are to be in cash, with

6  15 percent in stock.  That may actually be favorable, not less

7  favorable.  I don't know that right now.  I don't know what

8  stock values are going to do.  But that could very well give

9  you a benefit, not a detriment.  But in any event, it won't be

10 worse treatment.  It'll be just different collateral.  I don't

11 see a basis for the settlement.  I don't think the debtor has

12 substantiated the elements necessary to approve the settlement

13 under Rule 9019, and I don't see the need for lifting the

14 automatic stay to have this particular claim treated any more

15 or less favorably than any other asbestos property damage

16 claim.  If you want relief from stay to attempt a mediation to

17 see if you can come to some negotiated solution to this without

18 pursuing the appeals that will take probably a considerable

19 amount of money, I would be willing to consider that.

20          MR. RESTIVO:  Your Honor, Jim Restivo.  Would the

21 Court be willing to consider liquidating this claim through a

22 proof of claim process --

23          THE COURT:  Well --

24          MR. RESTIVO:  -- that we would object to their claim

25 on the grounds of these appellate issues and have this Court

1  decide it by way of a proof of claim adjudication?

2         THE COURT:  Well, I mean, you could do that, Mr.

3  Restivo, but I think the outcome is going to be that their

4  claim is allowed because there is a judgment that's res

5  judicata.  This Court is not going to set aside findings of

6  fact and conclusions of law of another court.  If you want to

7  do that, your only remedy is to get back into the State Court

8  system, but I'm not sure it has to be done before plan

9  confirmation.  I think you'd be better off attempting to settle

10 the underlying claim and figuring out how you're going to pay

11 it, rather than do this.

12        Okay.  Ms, Baer, I will ask the debtor to submit an

13 order.  I understand it's not with your consent, but I'd still

14 like to have you submit the order that denies this motion for

15 the reasons that I've expressed on the record.

16        MS. BAER:  Yes, Your Honor, we will do so.

17        THE COURT:  Okay.

18        MS. BAER:  Your Honor, that takes us to agenda item

19 Number 2, which was the debtors' application to employ Cahill

20 Gordon to proceed with the appeal.  Under those -- under these

21 circumstances, that would be moot as we do not need at this

22 point in time to retain Cahill Gordon.

23        THE COURT:  All right, and I'll take that type of an

24 order too, and obviously that's without prejudice to

25 reinstating that application at an appropriate time.

1          MS. BAER:  Thank you, Your Honor.

2          MR. RESTIVO:  Your Honor, Jim Restivo.  May I get off

3  this call now?

4          THE COURT:  Yes, sir.  Thank you.

5          MR. RESTIVO:  Thank you, Your Honor.

6          MS. BAER:  Your Honor, agenda item Number 4, I'm

7  sorry, Number 3, is the application of the asbestos personal

8  injury committee to employ Anderson Kill as special insurance

9  counsel.  Your Honor, since this application was filed, the

10  debtors filed an objection and the personal injury committee

11  filed a reply.  Based on the personal injury committee's reply,

12  I believe we are almost in agreement with respect to the

13  retention of Anderson Kill.

14          As I understand it, Your Honor, the debtors objected

15  to Anderson Kill being retained only on behalf of the personal

16  injury committee.  The personal injury committee's reply

17  indicated that they had no objection to Anderson Kill also

18  working on behalf of both the asbestos property damage

19  committee and the futures claims representative.  They, of

20  course, and not surprisingly, did not agree that Anderson Kill

21  should also serve as an expert for the unsecured creditors'

22  committee and equity.  Although, frankly, we think on this one

23  everybody, including the debtors' interests, are exactly the

24  same.  We all want to get as much money as we can from

25  insurance proceeds either to fund the reorganized debtor, which

1 is what our current Chapter 11 plan calls for, or if things
2 changed, in a consensual plan, I supposed it could potentially
3 be in the trust.  In either case, Your Honor, we believe we're
4 all on the same page.  Again, we don't object to having
5 Anderson Kill employed to help out the asbestos side look at
6 it.  We kind of understand why they don't feel the unsecureds
7 and the equity are on their side of the equation.  Frankly,
8 again, the debtor is very much on top of this issue, and under
9 those circumstances we think we can still certainly go forward
10 and have them just represent the three asbestos interests, if
11 you will.

12        Number two, Your Honor, we objected to the scope of
13 the employment of Anderson Kill.  The language in the
14 application was very broad.  The reply filed by the personal
15 injury committee I believe addressed those concerns quite
16 clearly.  Number one, we were concerned that really Anderson
17 Kill be retained to review remaining asbestos coverage that the
18 debtors have, and I believe that the personal injury committee
19 has indicated that that is within -- or that is the scope that
20 they're willing to agree to, and that secondly we objected to
21 Anderson Kill going back and reviewing historical settlements,
22 but only to review settlements going forward as, in fact,
23 matters come up and we review and ultimately settle more
24 insurance coverage.  Again, the PI reply I think agreed with
25 the debtors with one further note of merit, and that is to the

1 extent that in reviewing a settlement historical information
2 has to be reviewed, we very much understand it, and I believe
3 all parties agree that certainly then Anderson Kill would have
4 to take a look at some of the historical information.

5        That really brought us, frankly, down to one and only
6 one issue, I believe, and that is the debtor had asked for
7 Anderson Kill to submit budgets.  Again, Your Honor, what we're
8 concerned about here is we have seen in other asbestos cases
9 that we've been in involved in that insurance counsel can spend
10 tremendous amounts of money on a lot of different paths because
11 these insurance situations are so complicated.  We thought it
12 would be in the best interest of everybody if Anderson Kill
13 submitted a budget with respect to the work that they're
14 performing.  Given the narrowness now of the application or the
15 narrowing of Anderson Kill's scope, the concern is not as great
16 as it was at one time, but certainly the debtors would still
17 support and request that budgets be submitted, so, again, we
18 can assure that we're not going down paths here and spend money
19 before it's too late to stop and make sure those paths are
20 worthwhile going down.

21        THE COURT:  All right.

22        MR. LOCKWOOD:  Your Honor, good day.  Peter Lockwood
23 for the asbestos claimants' committee.  In light of Ms. Baer's
24 statements, I'm not going to address anything other than the
25 budget issue here.  Our problem with --

1          THE COURT:  Do you agree with the limitations that
2   have been requested?

3          MR. LOCKWOOD:  They're in our -- she was quoting from
4   our reply brief, Your Honor --

5          THE COURT:  I just want to make sure.

6          MR. LOCKWOOD:  -- and we made those as
7   representations in that reply, and we are prepared to stand by
8   them.

9          THE COURT:  All right.

10          MR. LOCKWOOD:  The issue of the budget is really more
11   a problem of timing.  As Ms. Baer pointed out, the -- we've
12   narrowed substantially the scope of the proposed
13   representation, and if you look at one of the -- there are two
14   items that we're talking about now that Anderson Kill would be
15   doing, and I might add -- I should back up a moment.  We
16   brought this motion on almost four years into this case.  We
17   did not ask for the Anderson Kill or anything from the get-go
18   here, and the thing that precipitated it, as our papers make
19   clear, is the fact that there were proposed insurance
20   settlements being presented to the Court under Rule 9019 for
21   approval.  And among the people that are supposed to determine
22   whether they object or do not object to that sort of Rule 9019
23   motion is our committee, and as I think Your Honor is well
24   aware, Caplin & Drysdale, the committee's counsel, does not
25   hold itself out as experts in insurance law, although I guess

1  we're all becoming somewhat more familiar with that topic than
2  we otherwise might have anticipated at the beginning of this
3  round of bankruptcy cases.

4        The -- so the motivating factor for bringing this on
5  was the committee's need to have somebody that they could look
6  at these insurance settlements with some expertise and advise
7  the committee whether or not they thought the settlements made
8  sense, particularly given the possibility, with all due respect
9  to the debtors' current plan, that like most plans that the
10  Court has seen pending in these cases, there's at least a
11  distinct possibility that you mind up with some form of
12  insurance-funded trust down the road.  And in that connection
13  we don't see the relevance of sort of vague references to
14  insurance counsel running the meter in other cases or whatever.
15  I'm not -- I don't know what she's talking about, so I can't
16  really respond to it.

17        But here the motivating factor is going to be
18  essentially two things.  One, to review settlements.  By
19  hypothesis until the debtor files a 9019 motion, that topic is
20  not susceptible to being budgeted for because you don't know
21  what settlements are going to be coming down the pike, and the
22  Anderson Kill firm -- it's not like the investment bankers who
23  have the luxury of making these arrangements where they get a
24  flat monthly fee which, to my knowledge, is by and large the
25  primary area where the Court has enforced the idea of putting

1 caps on things because -- get large fees and not have to work
2 for them.  Here the Anderson Kill firm will be filing monthly
3 fee applications, which are -- which could be reviewed by the
4 debtor, the fee auditor, the U.S. Trustee, and if for some
5 reason or other somebody thinks that like any other
6 professional whose retention has been approved and is filing
7 fee applications, the professional is off on some frolic
8 running the meter on the debtor, those could be objected to.
9 But it's simply not possible in the time available.  I mean,
10 think about the time frame that a 9019 motion gets presented.
11 You file a 9019 motion.  You got what, two, three weeks to
12 respond to it.  Under this proposal, we -- 9019 motion gets
13 filed, we then have to create a budget, we then have to present
14 it I guess -- I don't know whether we have to present it to the
15 Court.  Normally budgets are imposed through the Court on this
16 process.  They're not unilaterally imposed by the debtor,
17 although I guess you could negotiate it with the debtor, but if
18 you and the debtor didn't agree, you would have to come back to
19 the Court.  By that time, the time to object would have
20 expired.

21       And it seems to me absent some preliminary showing of
22 the likelihood of abuse by the professional who will be, as I
23 say, filing on an hourly rate basis for work done, it just
24 doesn't make any sense as a practical matter to have a budget.
25 And so we would urge the Court that the retention be approved

1  on the same basis that the Court normally approves professional
2  retentions, which is the filing of monthly fee applications and
3  the ability of any party in interest to object.   Thank you.
4           THE COURT:   Good afternoon.
5           MR. WYRON:   Your Honor, Richard Wyron for the future
6  claimants' representative.   We do not object to the motion, but
7  I just wanted to raise one matter with the Court that was
8  prompted by Ms. Baer's suggestion that Anderson Kill should
9  represent all of the asbestos constituencies.   For the reasons
10  Mr. Lockwood articulated, that is when we saw 9019 motions, we
11  reached out to those in my firm who are insurance coverage
12  lawyers and involved them in this matter to the extent
13  necessary to evaluate Grace's insurance asset and the proposed
14  settlement.   And Grace knows about that because they cooperated
15  with us and they provided information and we talked to their
16  insurance people and we filed our fee apps and they've had a
17  chance to look at those interpose any objections if they think
18  anyone did something that was unnecessary.   But we do have that
19  expertise.   We don't need special counsel.   We have used it.
20  And I've offered to the committee to share what information we
21  have that's non-privileged so that their counsel can review it
22  as appropriate if they desire.

23           But our interests are not exactly the same when it
24  comes to insurance if insurance is to be passed to a trust
25  here, and we do want our own ability to examine settlements and

1  examine the insurance asset and determine what issues might
2  arise and what value might exist.  So, we're more than willing
3  to cooperate.  We're more than willing to avoid duplication,
4  but I would not want the Court's order to provide that Anderson
5  Kill represents the futures rep on insurance issues, because we
6  already have that counsel.  We have that expertise, and we have
7  interests that my diverge in the future.  Thank you, Your
8  Honor.

9          THE COURT:  Well --

10          MR. LOCKWOOD:  Your Honor, just one point of
11  clarification.  I had thought, and perhaps this is my fault,
12  that what we were envisioning here was that the Anderson Kill
13  firm would, in fact, be appointed to represent the committee,
14  but that its work product was able to be shared with the other
15  constituencies upon their request, much the same way that the
16  process has worked in some of the other cases.  I know our
17  financial advisor, Mr. Terseeni, has been made available to
18  other constituent groups on an as-requested basis, and all with
19  an eye toward reducing the possibility of duplicative work.

20          THE COURT:  Yes, I think that's --

21          MR. LOCKWOOD:  But we have not applied to have the
22  committee actually formally appointed to represent either the
23  futures rep or the PD committee.

24          THE COURT:  No --

25          MR. LOCKWOOD:  They -- the PD committee might well at

1  some point in the future conclude that for whatever reason

2  there might be some kind of a conflict or something and that

3  they would want their own counsel and they should have the

4  right to do that.

5         THE COURT:  Well, my understanding of the motion at

6  the moment is that Anderson Kill would represent the ACC and

7  its work product can be shared on request, and I do agree that

8  it should be shared with the futures rep and the property

9  damage committee.  I think to the extent that there are

10  different issues on insurance, the use of insurance proceeds,

11  there is a difference, especially between the equity committee

12  and the other constituencies.  I'm not so sure about the

13  creditors' committee for this purpose.

14         But here's the thing, gentlemen.  In evaluating the

15  reasonableness of a settlement proposal with respect to

16  insurance proceeds, that's not talking about the use of

17  proceeds where your interest do diverge.  On the reasonableness

18  of the settlement, your interests are not divergent.  They are

19  the same, and I don't expect to see duplication of work.  So,

20  although this is I think the motion of the committee, I think

21  it's appropriate.  I'm willing to entertain that motion

22  favorably, but I think that Anderson Kill is going to have to

23  communicate with your firm, Mr. Wyron, to make sure there is

24  not a duplication of effort in valuing the settlement

25  proposals.

1          MR. LOCKWOOD:  Well, let me reiterate something I
2   believe we said in our motion papers and I think Ms. Baer
3   adverted to as well in her presentation.  I mean, we anticipate
4   that Anderson Kill is going to be --

5          THE COURT:  Yes --

6          MR. LOCKWOOD:  Their starting point is going to be
7   discussions with the debtor and its counsel, and they're only
8   going to look at things to the extent that they've identified
9   something that maybe they feel like needs a little bit of
10  additional inquiry --

11         THE COURT:  Right.

12         MR. LOCKWOOD:  -- or it's vague or whatever.

13         THE COURT:  Yes, I understand that.

14         MR. LOCKWOOD:  I mean, I agree as a general
15  proposition there is a convergence of interest here.

16         THE COURT:  Yes, I understand that.  And with respect
17  to the budget request, although when the motion was first
18  presented it seemed to me that it was pretty broad and I was
19  favorably inclined to look at a budget issue, I think with the
20  limitation and scope it's not necessary now.  I believe
21  Anderson should simply be appointed on the same basis as the
22  other professionals.  If there is need to revisit that down the
23  road, I reserve the right to do it, but at the moment I don't
24  see that need.

25         What I don't recall, though, and it might just be

 1  that I read this awhile back and don't remember, I don't
 2  remember seeing the hourly rate structure for Anderson Kill set
 3  out.
 4          MR. LOCKWOOD:  I believe it was in Mr. Horkovich's
 5  affidavit --
 6          THE COURT:  Okay.
 7          MR. LOCKWOOD:  -- that was attached to the
 8  application, and it may well be in the application.  Let me
 9  just check, Your Honor.
10          THE COURT:  Okay.
11                     (Pause)
12          THE COURT:  Oh, yes.  I'm sorry.  My -- I raised this
13  with my law clerk, and she went through it.
14          MR. LOCKWOOD:  It's on Page 10 of the application,
15  Your Honor.
16          THE COURT:  Yes, she made a note for me, and I have
17  it laid out.  I apologize.  I did see it.  I've just forgotten.
18          MR. LOCKWOOD:  Thank you, Your Honor.
19          THE COURT:  Okay, so I guess I need an order that
20  will differ from the existing order so that you can limit the
21  retention as you've agreed.
22          MS. BAER:  Your Honor, I would suggest perhaps, Mr.
23  Lockwood did draft an order, but it does need to be modified,
24  and if they would just circulate a modified version to the
25  debtor and perhaps to the committees we can then get the order

45

1  submitted on a certification of counsel.

2           THE COURT:  Okay.  Let me ask, Mr. Baena, you did not

3  address this.  I take it you have no problem with what I'm

4  proposing.

5           MR. BAENA:  I do not, Your Honor.

6           THE COURT:  All right.  Okay, thank you.  I'll expect

7  to get a certification of counsel then.

8           MS. BAER:  Thank you, Your Honor.  Your Honor, that

9  takes us to agenda item Number 4, which is the debtors' fourth

10 omnibus objection to claims.  Your Honor, there is one

11 remaining claim in this objection.  It's the claim of Spaulding

12 & Slye, which is a rather substantial contract claim.  The

13 debtors are in negotiations with, and they have in fact reached

14 a settlement with, Spaulding & Slye.  We'd ask that this be

15 continued to the May 16th hearing in the hopes that we can move

16 forward with respect to resolving the claim.

17           THE COURT:  That's fine.

18           MS. BAER:  We do have an order on this one, I

19 believe.

20           THE COURT:  All right.

21                      (Pause)

22           MS. BAER:  Your Honor, I have an order.

23           THE COURT:  Thank you.

24                      (Pause)

25           THE COURT:  That's signed.  Thank you.

1          MS. BAER:  Thank you, Your Honor.  That moves us to
2    agenda item Number 5, the debtors' fifth omnibus objection to
3    claims.  Your Honor, with respect to this objection, there are
4    two matters that need to be addressed, and then the rest are
5    being continued to May 16.  The first matter is the claim of
6    Peter Pearson.  You may recall we argued this claim last time
7    and ultimately determined to set up a summary judgment briefing
8    schedule.  Since then, Your Honor, we -- two things have
9    occurred.  Number one, we've looked back in an attempt to put
10   together our summary judgment motion and determined that we
11   really can't do it.  There are too many factual allegations
12   going back and forth with no backup.  So, instead of filing a
13   summary judgment motion, we served discovery on Mr. Pearson.
14   Your Honor, at the same time, Mr. Pearson did file his own
15   motion for summary judgment.  Once again it's a -- scores of
16   factual allegations.  So what we'd ask, Your Honor, is to
17   vacate the summary judgment briefing schedule that we had
18   submitted, vacate the hearing date that had originally been set
19   for it, which was a telephonic hearing I believe on June 6th in
20   Pittsburgh, and once we get responses to the discovery that
21   we've propounded, we will then, at the appropriate time, file a
22   motion for summary judgment and then contact you about getting
23   it back on schedule.

24          THE COURT:  Okay.  Is counsel for Mr. Pearson aware
25   of this?

1            MS. BAER:  We did, Your Honor -- when we sent him the
2   discovery, we sent him a cover letter that informed him that
3   that was our intent, and we also informed him that we would be
4   saying that to you at this hearing.

5            THE COURT:  Is anybody present for Mr. Pearson?
6   Okay, he apparently does not choose to be represented, so I'll
7   -- do you have an order?

8            MS. BAER:  Your Honor, we have an order that takes
9   care of all of the fifth omnibus objections, so let me address
10  the other matter.  The U.S. Customs matter is subject to a
11  stipulation.  It's actually a claim that's being allowed in the
12  amount of zero dollars.  They're preserving their right to
13  amend at a future time in the event that they discover that
14  there are things they had not originally known about that would
15  constitute unsecured claims.  And so the order we're presenting
16  to you, it deals with Mr. Pearson's claim.  It deals with the
17  U.S. Customs stipulation, and then continues the rest of the
18  matters to May 16th.

19           THE COURT:  All right.  Thank you.

20                          (Pause)

21           THE COURT:  That order is signed.

22           MS. BAER:  Thank you, Your Honor.  Agenda item Number
23  6, Your Honor, is debtors' objection to the claim filed by the
24  Massachusetts Department of Environmental Protection.  We have
25  been negotiating a stipulation with Massachusetts for sometime.

1  Counsel for Massachusetts has been unable to address the issue

2  in the last number of weeks, as she's been dealing with some

3  appellate practice.  As a result, they've asked for us to

4  continue this to the May hearing.  We don't have an order

5  there, Your Honor.  We're just continuing it.

6          THE COURT:  All right, that's fine.

7          MS. BAER:  Agenda item Number 7, Your Honor, is the

8  debtors' eighth omnibus objection to claims.  With respect to

9  the eighth omnibus objection, there are a number of different

10 things happening, and they're attached as exhibits to the

11 order.  The matters on Exhibit A are being continued to the May

12 16 hearing.  Exhibit B is the one New York claim that's being

13 withdrawn.  Exhibit C is a New York claim that's being reduced

14 and allowed.  Exhibit T -- D, excuse me, is a Tennessee claim

15 which is being expunged.  Exhibit E is a Texas claim that's

16 been resolved by stipulation, which is attached to the order.

17 And Exhibit G is the claim of Mr. and Mrs. Paulette, which is

18 also resolved by stipulation that's attached to the order.  And

19 I'll have that order right now.

20         THE COURT:  All right.  Thank you.

21                    (Pause)

22         THE COURT:  That order is signed.

23         MS. BAER:  Thank you, Your Honor.  Your Honor, Agenda

24 Items 8 through 11 are all objections to various claims filed

25 on behalf of various unions.  These are claims, Your Honor,

1  that were effectively filed where they were somewhat, I would

2  call them placeholders.  At the time the bar date was set

3  certain claims were owed on collective bargaining agreements.

4  Those claims have all been paid.  We received no responses on

5  any of the objections, and we have orders resolving by

6  expunging all of the claims on claims -- Agenda Items 8 through

7  11.

8          THE COURT:  Okay.  Thank you.

9                     (Pause)

10         THE COURT:  Oh, I'm sorry.  There are separate orders

11 for all of them.  I thought at first they were all addressed in

12 one.

13         MS. BAER:  No, Your Honor.

14         THE COURT:  Pardon me just a second.  Okay, eight is

15 signed, nine is signed, ten is signed, and 11 is signed.

16         MS. BAER:  Thank you, Your Honor.

17         THE COURT:  Just one second, Ms. Baer, please.

18                     (Pause)

19         THE COURT:  Okay, thank you.

20         MS. BAER:  Your Honor, agenda item Number 12 is the

21 debtors' objection to the United Steel Workers of America Claim

22 Number 13283.  We have a stipulation and order with United

23 Steel Workers resolving this claim.  This too, Your Honor, was

24 a claim based on collective bargaining agreements.  United

25 Steel Workers agrees that all of the matters that they had

1  outlined in the claimed have, in fact, been paid.  This

2  stipulation simply again allows their claim at zero dollars,

3  but gives them the right to amend their claim in the event that

4  they discover additional pre-petition unsecured claims which

5  have not been paid.  They'll also, of course, have the right to

6  file an administrative claim if there are any administrative

7  claims.

8          THE COURT:  I'll take it.  Thanks.

9                      (Pause)

10         THE COURT:  Okay, that's signed.

11         MS. BAER:  Your Honor, Agenda Items 13, 14, 15, and

12 16, once again are debtors' objections to additional union

13 claims.  Same as the others, no responses were filed on any of

14 these.  We have orders to expunge each and every one of these.

15         THE COURT:  Okay.  Thank you.

16                      (Pause)

17         THE COURT:  All right, they're all signed.

18         MS. BAER:  Thank you, Your Honor.  Agenda Item 17 is

19 the motion of The Scotts Company to modify the preliminary

20 injunction entered by this Court so that they can proceed on

21 their declaratory judgment action in this court with respect to

22 a potential for shared insurance.  Your Honor, this matter was

23 before you a couple of months ago.  At that time, the debtors

24 and Scotts had entered into a stipulation that stayed this

25 matter until today.  It's back before you Your Honor today on

1  Scotts' motion.  There were a number of objections filed by

2  insurance carriers.  I know Scotts' counsel is here.

3          THE COURT:  All right.  Good afternoon.

4          MS. COBB:  Good afternoon, Your Honor.  Your Honor,

5  Tiffany Strelow Cobb on behalf of The Scotts Company.  As Ms.

6  Baer has noted, we were here in February, and at that time we

7  discussed in part the stipulation that had been entered between

8  the debtors and The Scotts Company.  The insurance defendants

9  were not a party to that stipulation.  But the terms of the

10 stipulation provide that in lieu of the temporary injunction

11 order that had been entered by this Court that's subject to

12 Your Honor's approval, the debtors were amenable to essentially

13 a replacement injunction that by its terms would expire today,

14 with the added agreement that we set this matter for a status

15 hearing today and permit the debtors to address the issue as to

16 whether they felt that that injunction should be extended.

17 Your Honor, in February, had asked that this be reset for a

18 hearing to determine if the debtors today would be seeking to

19 extend the temporary injunction further.  So, I think it might

20 make sense to first have the debtors discuss what their

21 intentions are, and if I could reserve some time to respond.

22         THE COURT:  All right.

23         MS. COBB:  Thank you.

24         MS. BAER:  Your Honor, as indicated by Ms. Cobb, the

25 debtors do not object to the jurisdiction of this Court to

1 ultimately decided the declaratory judgment action, if and when
2 that's appropriate.  However, the debtors do at this time
3 object to the matter going forward and ask that the motion be
4 denied.  We believe at this point in time it would be premature
5 and unnecessary to go forward with litigation in this court
6 over whether or not there are shared insurance proceeds.  The
7 debtor is in the process right now of dealing with asbestos
8 property damage estimation, asbestos personal injury
9 estimation, and then hopefully will go forward to charge into
10 the confirmation of the plan -- approval of the disclosure
11 statement and confirmation of the plan.

12      For purposes of estimation, we do not need to address
13 this shared insurance issue.  As you may recall under the plan,
14 insurance does not go into the asbestos trust.  The insurance
15 stays with the debtor, stays with the reorganized debtor.
16 Scotts did not file a proof of claim against the debtor for any
17 claims they may have.  It doesn't mean it doesn't have to be
18 determined whether or not they have a right to tap into some of
19 the Grace insurance, but ultimately they themselves do not have
20 an indemnity or contractual claim against Grace.

21      Under these circumstances, Your Honor, we believe
22 this would be a tremendous diversion of resources, both for
23 this Court as well as the debtor, when we do not need to get to
24 these issues now.  We may very well need to get to them
25 someday, someday in context of or in conjunction with the

1  Chapter 11 plan process.  But during this point in time, we
2  feel it just would be a tremendous diversion of the debtor's
3  resources that we do not have the resources to divert.

4          THE COURT:  All right.  Ms. Cobb?

5          MS. COBB:  Your Honor, respectfully, the stipulation
6  that was entered between the debtors and Scotts in Paragraph 1
7  specifically states in the first sentence, "Debtors do not
8  object to Scotts' motion."  So, it was agreed that we would
9  proceed after April 25th, unless the debtors would ask Your
10 Honor to extend this agreed upon shorter inunction.

11         I'd like to also address the issue of whether or not
12 Scotts has contractual or indemnification claims.  Certainly,
13 under Frenville, there may well be instances that haven't yet
14 accrued where Scotts would have indemnification claims against
15 the debtors.  More importantly, I'd like to address the
16 apparent suggestion by the debtors, and in the past by the
17 insurance defendants, that the insurance proceeds in essence
18 are not really at issue in the proposed plan of reorganization.
19 Of course they are, and indeed it is acknowledged in the
20 disclosure statement at Section 8.3.4., for example, that
21 Grace's ultimate recovery of insurance proceeds is addressed as
22 among the factors affecting the distribution to holders of
23 allowed claims.  To the extent that Scotts is an insured under
24 certain of the insurance policies, certainly there could be no
25 dispute that that will affect the amount of insurance proceeds

1  to which the debtors are entitled.

2          Also significant and related to this is the fact

3  that, again, if Scotts is an additional insured, which Scotts

4  maintains that it is, the continuing settlement negotiations

5  between the debtors and the insurance defendants and the

6  possible exhaustion of those policies would have the effect of

7  adversely impacting property rights to which Scotts contends it

8  is entitled.  So, we do think it's appropriate to proceed with

9  the litigation at this time.  Thank you, Your Honor.

10         THE COURT:  Good afternoon.

11         MR. WISLER:  Good afternoon, Your Honor.  Jeff Wisler

12  on behalf of Maryland Casualty Company.  Your Honor, we did

13  object to Scotts' motion and have made a presentation

14  previously on the motion.  Just to highlight, Your Honor, there

15  really can't be a dispute that the adversary proceeding that

16  Scotts has brought is barred by the preliminary injunction.  So

17  the question is, has Scotts shown the extraordinary

18  circumstances necessary under 60(b) to undo or somehow make an

19  exception to the preliminary injunction?  I think Your Honor

20  ruled in February that Scotts had not done that.  I don't -- I

21  am certain that really nothing has changed, at least in terms

22  of the status of this case, in the last two months.  So, I say

23  to Your Honor that your prior ruling should be upheld and there

24  will be a time to revisit this, but now is not the time.

25         THE COURT:  Okay.

1          (Pause)

2          THE COURT:  Good afternoon.

3          MS. DECHRISTOFARO:  Good afternoon, Your Honor.

4  Elizabeth Dechristofaro for Continental Casualty, and I won't

5  repeat the prior argument either, but only to make the point

6  that there are a lot of moving pieces here, and this one seems

7  to be one that needs to be addressed later rather than now,

8  because there may be other insurance issues and things that

9  would be properly addressed at the same time, and I don't think

10  putting this now is an effective means of dealing with this.

11          Second, I think what we raised in the first hearing

12  that is sort of lost in this discussion also, in addition to

13  Mr. Wisler's presentation, is that the issue raised by Scotts

14  is also going to directly implicate the debtor's liability and

15  its responsibility for claims and gets us into all those issues

16  that are on a much larger stage.  And for that reason as well I

17  think that needs to be not addressed at the present time.

18  Thank you, Your Honor.

19          THE COURT:  Wait, Ms. Baer.  One more.

20          MR. BROWN:  Good afternoon, Your Honor.

21          THE COURT:  Good afternoon.

22          MR. BROWN:  Michael Brown for Unigard and CU.  I

23  think at this point, we are prepared to have a brief recess of

24  this matter.  We would, however, like to have the opportunity

25  to revisit it in a couple months time because I think that

1 there are a lot of moving parts, and whether it makes sense to

2 move forward with this case today or two months from now, it

3 could change.  But for the moment, we're prepared to live with

4 the debtor's position.

5          THE COURT:  All right.

6          MR. BROWN:  Thank you.

7          MS. BAER:  Your Honor, just to clarify, I did not

8 mean to make an misstatement with respect to the debtor's

9 position and what they had put in the original stipulation.  We

10 do not ultimately disagree with the preliminary injunction

11 being modified for this matter to go forward.  It is simply a

12 matter of timing, and just as all of the insurance companies

13 have indicated, this is not the right time.  That right time

14 may very well come.  In fact, it will have to come unless

15 things are resolved in a different way, but it is not where the

16 time and attention of the debtor and the other constituents

17 should be spent at the present time.  We would ask for either

18 it to be denied without prejudice or for it simply to be

19 continued for another few months, as Ms. Cobb indicated,

20 another temporary stay if you will.

21          THE COURT:  Ms. Cobb?

22          MS. COBB:  Thank you, Your Honor.  Two brief points.

23 One, to respond to Maryland Casualty, again, the stipulation

24 between the debtors and Scotts, pursuant to which the debtors

25 have indicated they have no objection to the lifting of the

1  injunction order Your Honor entered previously in this case, I

2  think certainly goes quite a long way to show that we have

3  satisfied our burden to lift that injunction order as it

4  relates to non-debtors, who really are the only parties have

5  not agreed to a lifting of the preliminary injunction order.

6            THE COURT:  Yes, but the preliminary injunction order

7  is for their benefit.  I have -- I mean, admittedly they get

8  the benefit of not paying claims and having their insurance not

9  accessed, but that is the whole purpose of the preliminary

10  injunction order, so that they don't have to go back into the

11  tort system, or in this case the contract system I guess, to

12  defend claims until there is the possibility that they will

13  reconcile with the debtor and anybody else who claims insurance

14  rights under their policies, a whole resolution to the entire

15  matter to see how this case is going to go forward.  You know,

16  this plan right now, as crafted, doesn't set up a trust to be

17  paid with insurance proceeds.  Of course the debtor wants to

18  recover as much as it can on its insurance contracts so that it

19  can reimburse itself for what it has to pay out to creditors

20  under a plan, of course.  But I don't see that ultimately the

21  fact that the debtor may lose an issue that says that Scotts

22  can access some or all of its insurance proceeds is going to

23  affect this plan in that fashion, because this plan isn't

24  dependent on it.  Yes, it will indeed I think give creditors

25  who have to vote on this plan some pause of the fact that the

1 debtor says it's going to pay 100 percent of the claims and

2 maybe not recover them on insurance, but, you know, it's

3 disclosed.   That's up to creditors to vote on.

4          So, I don't think that that issue is reason why right

5 now this issue of whether Scotts can access or is an additional

6 insured under these policies has to go forward.   It's going to

7 have to be litigated at some point, but I'm not sure that it

8 needs to go forward now.   I mean, Scotts -- I'm still in the

9 same position I was on day one.   Scotts has its own insurance

10 policies.   I mean, you know, it's your product that's at issue,

11 so --

12          MS. COBB:   Your Honor, respectfully, that's certainly

13 an assumption that's not currently on the record.

14          THE COURT:   Well, I think it is.   Your contentions, I

15 believe, are that your product incorporated some of the

16 debtor's asbestos, but I'm not at --

17          MR. COBB:   I'm referring just to the assumption of

18 insurance coverage.   Whether it is or is not available is

19 certainly not something that's been addressed on the record I

20 don't think.

21          THE COURT:   Well, I thought that at one of the

22 hearing Scotts acknowledged that it had its own insurance

23 coverage.   That's not to say that it may not have this

24 additional coverage, but that's -- you know, how Scotts'

25 interests are affected by claiming to be a named insured for

1  selling its products using some of the debtor's product in its
2  products is certainly not something that's going to be an easy
3  issue to address in a simple proceeding that's going to get
4  done in a short period of time.  I mean, it's just not going to
5  be that easy.

6           MS. COBB:  Well certainly last -- as recently as --
7  well, as long ago as last June, Your Honor was willing to
8  permit the debtors breathing space, and I think that the issue
9  is how long is this breathing space?  I mean --

10           THE COURT:  Maybe through plan confirmation.

11           MS. COBB:  Well, at that point, there --
12  respectfully, there may be issues with respect to Scotts'
13  property rights that may be too late to address.

14           THE COURT:  Well, at some point in time I guess we're
15  going to have to get to the issue of whether Scotts has any
16  property rights.  So far I haven't seen something that gives me
17  the feeling that Scotts has a legitimate claim to any property
18  rights on the debtor's insurance for using -- incorporating
19  something that the debtor may have manufactured into Scotts'
20  own product.  I've looked at the policies in connection with
21  Scotts' various attempts in various ways to get this issue
22  litigated before, and it's not evident on the face.  That's not
23  to say that at a trial maybe or some other further evidentiary
24  proceedings, you can't prove a claim.  I'm simply saying that
25  from looking at the face of these policies, what Scotts is

1  attempting to do is anything but clear as to how it has a
2  property right under these policies.

3          MS. COBB:  And that is precisely what this
4  declaratory judgment action seeks to do.  Currently The Scotts
5  Company does not even have access to all of the debtor's
6  insurance policies.

7          THE COURT:  That's right, and right now is not the
8  time to get it.  In fact, I'm not sure you'll ever be entitled
9  to it.  But I don't think you need it right now.  There is no
10 claim filed.  Scotts is not a creditor of the debtor.  To the
11 extent that Scotts is anything, if it has any kind of claim,
12 it's to access one of the debtor's assets.  And, yes, we're
13 going to have to address whether, in fact, it's the debtor's
14 asset and/or a shared asset with Scotts at some point in time.
15 But to the extent that the policies have not been accessed,
16 there is no claim filed by Scotts.  Scotts isn't even a party
17 in interest from what I can tell in these proceedings yet, so I
18 certainly don't see why I need to lift the injunction at this
19 stage for someone that may not even be a party in interest.

20         MS. COBB:  Is there an appropriate compromise
21 pursuant to which The Scotts Company would at least be
22 permitted to review the insurance policies which would not seem
23 to be a burdensome request?

24         THE COURT:  How is Scotts claiming a property right
25 in an insurance policy that you claim you've never even seen?

1         MS. COBB:  Well, that -- what I meant to say, Your

2    Honor, is that we have not seen all of the policies.  There are

3    obviously a number of insurance policies, as reflected in the

4    exhibit to the disclosure statement.  We have seen certain

5    policies, all of which seem to uniformly provide for vendor

6    coverage, and there is authority, which if now is the

7    appropriate time to talk about the merits, we can certainly

8    brief this.  There is certainly authority for Scotts' position

9    that it is indeed a vendor under these policies.

10        THE COURT:  Well --

11        MS. COBB:  And I think we're sort of putting the cart

12   before the horse --

13        THE COURT:  Yes.

14        MS. COBB:  -- to assume otherwise.

15        THE COURT:  Well, no.  I think we're putting the cart

16   before the horse to assume that unless Scotts sold the debtor's

17   product that it's a vendor under these policies is a stretch.

18   I mean, it doesn't say that you can be a vendor of a -- I guess

19   a sub, a sub-vendor.  Like a general contractor, you have a

20   general vendor and a sub-vendor, and Scotts is somehow or other

21   a sub-vendor because you're selling your own products that use

22   the debtor's?  I don't know how that makes you a vendor of the

23   debtor's products, and I apologize, Ms. Cobb, if I've

24   forgotten, but I don't recall one word by Scotts ever

25   suggesting that Scotts has distributed the debtor's products.

1  The allegations, as I recall, were that Scotts incorporated

2  some of the debtor's product into Scotts' own product which

3  Scotts then sold.

4          MS. COBB:   There is significant case law, Your Honor,

5  that would find a vendor in this type of situation.   There are

6  instances I can -- I was not prepared to talk here today on the

7  merits, but there are cases, just as an example, where fabric

8  has been purchased by the equivalent of a debtor and that

9  fabric has been changed and sewn and designed into pajamas and

10  then sold, and that seller was deemed to have been found a

11  vendor under vendor endorsement language.   There are a whole

12  host of additional cases, and if it would perhaps be helpful to

13  Your Honor to have some sort of preliminary briefing to give

14  Your Honor some comfort that there -- that this is a

15  declaratory judgment action that has been brought in good faith

16  --

17          THE COURT:   But, look, to the extent that Scotts is

18  in that position, I don't know how many other vendors of the

19  debtor's products are going to also claim that they are

20  entitled to some coverage.   You know, this may simply be a plan

21  confirmation issue.   The debtor may have to decide that its

22  insurance proceeds are going to be accessible by X, Y, and Z

23  and Scotts and stick it into a plan that way.   It seems to me

24  that that is the place at which these issues, if they're

25  appropriate, are going to come up.   I don't see the need to get

1  them released by way of going into full-blown litigation at
2  this stage on lifting a preliminary injunction.

3       MS. COBB:  And in the interim prevent the debtor from
4  exhausting these insurance policies?  To the extent that
5  between now and the time that Scotts is permitted to litigate
6  if it were to ultimately be successful, it seems that there is
7  a real potential risk that the property rights that will
8  ultimately be -- you know, again, we're assuming that were
9  meritorious, but let's assume that for a moment, is there some
10 protection in the interim to prevent the debtors --

11      THE COURT:  I don't know --

12      MS. COBB:  -- from exhausting those policy limits?

13      THE COURT:  I don't know that the debtor is
14 exhausting any insurance.  Except for some settlement issues
15 where the debtor is getting proceeds in, I don't -- I haven't
16 been made aware that the debtor is paying claims, pre-petition
17 claims, through its insurance.

18      MS. COBB:  There has been testimony by the insurance
19 defendants in prior -- I believe it was during the February
20 omnibus hearing, Your Honor, where at least one of the
21 insurance defendants specifically said, look, we don't even
22 think we should be here because we've exhausted the policy
23 limits.

24      THE COURT:  Well, those were pre-petition exhaustion.
25      MS. COBB:  Right, but there are --