1          THE COURT:  Well, you haven't even raised this issue
2   before.  How can you complain about the fact that somebody
3   accessed policies before Scotts ever raised a contention?

4          MS. COBB:  No, no.  I'm just -- I'm contemplating the
5   possibility from today up until the point in time at which Your
6   Honor believes it is appropriate to litigate this issue that
7   there be some protection from this point forward.  I'm not
8   talking about anything that has occurred up to this point.

9          THE COURT:  I don't see that Scotts has any more
10  right to protection as an insured under a policy than anybody
11  else does.  To the extent that you are a named insured, I think
12  the preliminary injunction protects you to the same extent that
13  it protects everybody else.  I just don't see that you are a
14  named insured.  You're certainly not named.  If you have claims
15  under the vendor aspects of this, then to the extent that you
16  are sued, Scotts is sued because of a Grace liability, you're
17  protected.  To the extent that Scotts is sued for whatever you
18  do on your own, you're not protected.  We've already marched
19  down that road.

20         MS. COBB:  But to the extent that from today forward
21  an insurance policy that could ultimately be determined to be a
22  policy pursuant to which Scotts is an insured, we are
23  handicapped and indeed prejudiced if, if, that policy is
24  exhausted from today forward.

25         THE COURT:  So is every other vendor who has a claim

1  to vendor coverage under the policy.  You're in no different
2  shoes than anybody else who may have a claim on a policy.

3          MS. COBB:  I'm not aware of any other vendor who has
4  asserted an entitlement to coverage under these policies.

5          THE COURT:  Well, I'm not either, but that's not to
6  say they're not out there, and if and when Scotts is successful
7  in this coverage, I'm sure there will be a whole lot of other
8  vendors who will be knocking on the door.  So, I just don't see
9  the need.  I will do this.  You're monitoring this case, in any
10 event.  So to the extent that the debtor is going to raise
11 settlement issues with respect to its insurance policies, you
12 will see that.  To the extent that the debtor intends to access
13 coverage to pay pre-petition claims, I'm not permitting the
14 debtor to pay pre-petition claims absent plan confirmation,
15 with few exceptions, all of which have come up by motion.  So
16 you'd be aware of the fact that the motions are pending.  So I
17 don't think their coverage is for any current post-petition
18 periods, correct?  You're only talking about periods that were
19 pre-petition.  So, I don't see that there is going to be an
20 issue of exhaustion.  Am I missing something?

21         MS. COBB:  Under Frenville, of course, The Scotts
22 Company could be involved in current litigation where there is
23 no judgment yet decided, and under Frenville The Scotts Company
24 does not yet have an indemnification claim, but it may
25 ultimately relate to the policy periods --

1          THE COURT:  Right.

2          MS. COBB:  -- that existed pre-petition.

3          THE COURT:  Yes, I agree with that theory.  What I'm

4 saying, though is that those are all pre-petition periods, so

5 the debtor isn't paying pre-petition claims.  So, how could the

6 policies be exhausted, because if the debtor isn't paying

7 pre-petition claims, the debtor can't file an insurance claim

8 and so the insurance can't be exhausted because the claims

9 aren't being paid.  What am I missing?

10          MS. COBB:  Well, is the suggestion then that to the

11 extent that the debtors settle with an insurance carrier,

12 hypothetically from today forward until the time that Scotts is

13 permitted to litigate and to the extent that the debtors do

14 exhaust those policy limits, then Your Honor is suggesting that

15 The Scotts Company would then have a claim back against the

16 debtors for the proceeds that it otherwise would have been

17 entitled to?

18          THE COURT:  I'm not making any such suggestions.  I

19 don't know what Scotts has except a theory that somehow or

20 other by incorporating part of the debtor's product into your

21 own products, you have rights to coverage under the debtor's

22 insurance.  And if that's the case then maybe your insurance

23 somehow or other protects the debtor since its product was used

24 in your product to, you know, sell to people.  It seems like a

25 very tangential issue to whether or not these policies can be

1 accessed in this way. But, again, I'm saying that without
2 having heard the evidence and, you know, I've been known to
3 change my mind when I hear the evidence come in. So, I can't
4 say that as a matter of ruling, just as a matter of theory.
5 It's a little difficult for me to see how Scotts is prejudiced
6 by what's happening when there is a preliminary injunction in
7 place that prohibits the insurance companies from doing
8 anything with these policies, prohibits the debtor from
9 accessing them. To the extent that you do have rights, I can't
10 see where you're prejudiced. That's what I'm trying to get to.

11          MS. COBB: Okay. All right, well, is there a
12 proposal to revisit this at any point in time?

13          THE COURT: I think that may make sense, because I
14 believe Ms. Baer is correct. I mean, there are some heated
15 activities going on in the confirmation process right now that
16 probably mean that this issue should be deferred awhile, but
17 not indefinitely. It's going to have to come up at some point.
18 So, Ms. Baer, what's the debtor's expectation for getting
19 through the estimation and property damage issues?

20          MS. BAER: Your Honor, right now we have an order
21 that would set the property damage case management matter with
22 discovery, depositions, and the like and briefing going through
23 the end of the year and into January with a potential hearing
24 next February. On the personal injury side, we're probably not
25 going to have a hearing until August on the questionnaire and

1  bar date issues, so in terms of getting that resolved, I think

2  we're into next summer unfortunately.

3         THE COURT:  Well, how about let's just pick February.

4  I don't have the dates yet, Ms. Cobb, for when I'll be hearing

5  cases in 2006, but let's put this back on the February 2006

6  agenda, whatever day that happens to be.  The debtor will be

7  doing a notice when I give the debtor dates, but that's not

8  going to happen for a couple of months yet.

9         MS. COBB:  Okay.  Thank you, Your Honor.

10         THE COURT:  Okay.

11                        (Pause)

12         MS. BAER:  Your Honor, that takes us to agenda item

13  Number 18.  This is the debtors' motion to seek permission to

14  promote its chief operating officer to chief executive officer,

15  award him an appropriate compensation package, and also approve

16  a contract for its current chief executive officer to become a

17  consultant with the company, as well as remain chairman of the

18  board of the company.  Your Honor, this matter was up before

19  you last month.  It was continued for discovery, and we're here

20  once again.

21         The debtors seek to retain Mr. Festa as the chief

22  executive officer of the company and to provide Mr. Festa with

23  an appropriate and competitive compensation package.  In

24  deciding whether to approve the retention and compensation

25  package agreed to by the board and company, the Court must

1  determine that the debtors exercised sound business judgment
2  and there is some articulated business justification.

3      Your Honor, first of all, it's beyond question that
4  the retention and compensation of Mr. Festa as CEO is an
5  absolutely sound business decision.  Mr. Festa has a proven
6  track record with this debtor as an outstanding COO and
7  president.  His performance is exemplified both in the loyalty
8  that he has built with Grace's employees and the financial
9  results of the company in the last two years under his
10 leadership.

11      Your Honor, updating the operating reports now, we
12 have achieved a 14 percent increase in sales in 2004 versus
13 2003 under Mr. Festa, a 16 percent increase in the first
14 quarter of 2005 under Mr. Festa.  The debtors had pretax income
15 increases in core operations of 20 percent in 2004 and another
16 ten percent now for the first quarter of 2005.

17      The Grace board, in deciding to promote Mr. Festa as
18 chief executive officer, determined as outlined by the
19 deposition of Mr. Thomas Vanderslice, the chairman of board --
20 or the chairman of the executive committee of the Grace board,
21 his performance as chief operating officer was apparent.  "He
22 was hitting on all cylinders very quickly.  We had a great
23 internal candidate.  This guy could do the job, and we were
24 anxious to have -- and he was anxious to do the job and had
25 demonstrated performance for a year and a half, and it would be

1  seamless transition."  Your Honor, Mr. Vanderslice went on to
2  testify, "It was apparent if we had gone outside and gotten
3  another candidate the internal employees would be relatively
4  unhappy.  By that -- because by that time, Fred had really
5  assumed a leadership position for operations in their mind and
6  his mind and the board's mind."  Your Honor, these are on Page
7  36 of the deposition transcript of Thomas Vanderslice.

8        No one questions, Your Honor, the board's decision to
9  promote Mr. Festa to the chief executive position.  The real
10  question here, Your Honor, as came about last month, is there
11  was an objection which centered on Mr. Vanderslice's one
12  million seven hundred and five -- 750 thousand dollar bonus.
13  It was originally termed an "emergence bonus," but recognized
14  by all, including this Court, that it's really a retention
15  bonus with an emergence feature.  Discovery was requested by
16  the asbestos committees, both documentary discovery as well a
17  depositions of our two affiants, Nick Bubnovich and Thomas
18  Vanderslice.  The discovery was taken.  The debtor submitted a
19  revised order, Your Honor, with a revised compensation letter
20  from Mr. Festa.  The revised compensation letter changes the
21  terminology to make it very clear that the bonus we're talking
22  about here is a retention bonus with an emergence feature still
23  preserved.

24        We provided a chart, Your Honor, also, with a
25  supplemental affidavit from Mr. Bubnovich, that compared, as

1  the Court requested, Mr. Festa's compensation to other Chapter
2  11 debtors.  And once again, Your Honor, it showed that we were
3  well within the range, in fact, on the low end of the range, of
4  all -- of a number of other Chapter 11 asbestos debtors that
5  are actually pending before this Court.

6        Your Honor, on Monday night of last week, a
7  supplemental objection was filed by the asbestos committees.
8  Given it was already filed late, the debtors had no chance for
9  a timely reply and not wanting to bombard you with even more
10  paper, we did not file a reply to the supplemental objection.
11  But, Your Honor, it's not because we don't find it offensive.
12  Frankly, we found it to be misleading hyperbole.

13        What the asbestos committees did is they focused on
14  the compensation package and testimony by Mr. Bubnovich that
15  without the bonus, it's still within the range of competitive
16  practice.  The creditors then go on to say that because the
17  compensation without the bonus is still within the range that
18  the compensation package offered to Mr. Festa is too rich and
19  should not be allowed.  The creditors do not cite any authority
20  to support their conclusion that the package is too rich.  They
21  do not, for example, present any evidence that the package with
22  the bonus is not within the range of competitive practice.  The
23  reason for that is clear.  It is within the range of
24  competitive practice.

25        Your Honor, in order to understand a little bit

1  better what this means, Mr. Bubnovich explained to the
2  creditors in the deposition what this terminology means.  As
3  Mr. Bubnovich explained on Page 21 to 22 of the deposition,
4  "Across different industries and for that matter across
5  corporate America in general there are various amounts that are
6  paid to incumbents in particular positions.  In this case,
7  we're obviously talking about the CEO position, and when I say
8  "within the range of competitive practice," I refer to an
9  amount that is consistent with that paid to CEOs of similar
10 sized corporations or similar corporations within the company's
11 industry.  If you think of it in terms of distribution, there
12 would be a cluster around certain points.  If we thought about
13 all the pay of all the CEOs who are CEOs at companies between
14 and one and three billion in revenue, most of them would be
15 clustered in the center.  Think of a bell curve.  And so I'm
16 talking about that area in the center of the curve, not the
17 outliers.  To me that's the range of competitive practice.

18        Your Honor, no matter how you look at the numbers,
19 and we can rejigger them many different ways, the package that
20 we are presenting to Mr. Festa is within the range of
21 competitive practice.  For example, Your Honor, in the original
22 affidavits that we filed, when looking at total compensation
23 with the bonus and comparing it to the peer group companies
24 that the debtor compares itself to using 2003 proxy materials
25 the total direct compensation with the bonus was 46 percent, or

within the 46 percentile range.  The total direct compensation without the bonus was in the 33 percentile range.  And, Your Honor, as compared to the survey group, which is a larger group of corporations, and again using a $2 billion figure for Grace's benchmark revenues at the time, the total direct compensation with the bonus was in the 59 percentile range. The total direct compensation without the bonus was in the 52 percentile range.

Since the package was approved, actual figures have actually come out, Your Honor, for peer groups in terms of what they're actually paying their executives in 2005 and what they paid them in 2004, and the actual numbers in terms of Grace's revenue also came out.  The peer groups are now paying more. The survey groups are now paying more.  And Grace made more money than was projected when we put together the affidavits. So, if you look at all the numbers, Your Honor, if anything what's come clear is the direct -- the compensation package being presented to Mr. Festa, looking at the total direct compensation, including the bonus, is now even more reasonable, in other words, more within the range and less above the midrange than it would be under some of these scenarios.  And, Your Honor, just if you have any desire to look at the numbers, I have an exhibit which I'll hand to you, as well as the committees', which outlines the different ways to compare, and you can see basically we're in that range.

74

1         THE COURT:  Thank you.

2                  (Pause)

3         MS. BAER:  Your Honor, again, I don't need to spend a

4 lot of time on numbers here.  If you look at the chart you can

5 see the total direct compensation with the bonus, as compared

6 to the total direct compensation without the bonus, and see

7 clearly that with the bonus we are in the range of competitive

8 practice -- again, looking at the various comparisons, many of

9 them well below the midrange, and looking at the peer group,

10 very definitely within the midrange.

11        Your Honor, the point of all of this when you look at

12 the these numbers is we are in the range here.  This is not an

13 extraordinary outside type of bonus.  And also, Your Honor, if

14 you look at the package as compared to other Chapter 11

15 debtors, as outlined in the chart that we had submitted with

16 our revised order and with Mr. Bubnovich's supplemental

17 affidavit, the total direct compensation with this bonus to be

18 paid to Mr. Festa is absolutely in the range.  In fact, it's

19 lower than the total direct compensation for all other debtors

20 -- Owens Corning, Federal-Mogul, USG and Armstrong.  It's also

21 lower than Grace's current chief executive officer.  And, Your

22 Honor, out of convenience rather than pulling it out of the

23 affidavit, I have a copy of that for you here.

24        THE COURT:  Thank you.

25        MS. BAER:  I just note, Your Honor, on that chart

1  that if you look at the two companies, Owens Corning and USG,

2  that did not pay a retention bonus -- I'm sorry, Federal --

3  excuse me -- Federal-Mogul and Armstrong, in both of those

4  instances, the chief executive officers got rather substantial

5  sign-on bonuses, rather than a retention bonus, and in the case

6  of Federal-Mogul, their chief executive officer is receiving

7  four percent of the stock of the reorganized debtor.  We didn't

8  even put that number in because it would make that calculation

9  so far outside of anything we're talking about here.

10         Your Honor, the bottom line, no matter how you play

11  with the numbers, the package offered is within the range of

12  competitive practice.  As Mr. Bubnovich testified in his

13  deposition, it's a plain vanilla, middle of the road, contract.

14  It includes the sort of features that you would expect to see

15  in the contract of a CEO of a company that's in Chapter 11.  To

16  see a retention bonus in the context of the CEO of a Chapter 11

17  company is plain vanilla.  That's on Pages 64 to 66 of the

18  Bubnovich deposition.

19         Your Honor, again, no one questions the decision to

20  promote Mr. Festa.  And in deciding the appropriate

21  compensation package, the board had a very thoughtful and sound

22  business goal in mind, especially with respect to the retention

23  bonus.  And I'll point to the words of the board again, Your

24  Honor.  Thomas Vanderslice, who is the chairman of the

25  executive committee of the company, in deposition testified as

1  follows with respect to the retention bonus, "You need
2  continuity.  So the point is you want to encourage the guy to
3  come out of bankruptcy as quickly as possible, but you also
4  want some incentive for the bankruptcy, particularly if matters
5  outside his control get delayed and deferred and so forth, so
6  we don't have a discouraged CEO who says, God, I'll never see
7  that bonus anyway and who might be getting calls from outside
8  and we believe is in fact being approached for other jobs.

9         "So, combining the retention bonus with an emergence
10 bonus with the same dollars involved as the retention
11 agreement, basically it's a retention agreement with an
12 emergence override.  So, therefore, if he's out of bankruptcy
13 early, he gets the money early, and the retention portion of it
14 gets deferred for three or four years, which none of us want.
15 Then we have a guy who is sitting there thinking he hasn't lost
16 that, to be honest with you, small amount of money relative to
17 what I personally believe should have been.  I think the
18 continuity of management and particularly an operating guy
19 running a company is extremely important."  This is on Page 40
20 and 41 of the deposition transcript.

21        Likewise, Your Honor, the board was concerned about
22 losing their CEO, frankly, in the middle of a bankruptcy case
23 and, thus, in discussing the retention bonus, Mr. Vanderslice
24 testified as follows, and this is on Pages 24 to 26 of the
25 deposition.  "The rationale is the fact that during a

1  bankruptcy it's a discouraging process to be a CEO.  You don't
2  have price to measure yourself against.  Your options aren't
3  exactly falling into place.  Your peer groups look at you and
4  say, oh, that bankrupt company.  And they are demoralizing
5  times.  You say, oh, we almost got an agreement, then you don't
6  have an agreement.  And you guys, the committees, have trouble
7  pulling together each of the equity committee and all the rest
8  of the people.  So there are very discouraging times during
9  that period, and we thought that with Fred getting the
10 imprimatur of being CEO anybody who was looking at the company
11 who was knowledgeable could see that the operations had done
12 well.  Cash generations, earnings, wealth, the revenue and so
13 forth, under the difficult circumstances, he would become a
14 very attractive candidate for the headhunters.  He's a very
15 good guy, and so we were concerned about the -- one thing
16 getting discouraged in the process and going, he'll be
17 approached.  Maybe he already has been.  Believe it or not, the
18 right kind of experienced operations guy, a CEO kind of guy
19 with a proven track record without too much baggage, is
20 generally hard to find."

21        He goes on to say, "You can find some dummy and give
22 him the job, and we've all done that at times, but it was
23 really a question of even when you're coming out of bankruptcy
24 you want that fellow not to think that that's an event and I'll
25 leave now, because the employees of the company and even the

1 investors at the time need continuity.  So that was the whole
2 rationale between shifting to come out of bankruptcy,
3 combination with the retention plan."

4       Your Honor, when you look at the numbers, there is no
5 question that we're within the range here.  This is not out of
6 the ordinary.  It's not extraordinary.  And that takes us back
7 to the standard you need to measure it against.  Is approving
8 the package within the sound business judgment of the company?
9 The answer is absolutely.  We have an excellent CEO who has
10 been located.  His track record is outstanding.  Grace had a
11 look at him in action while he acted as COO, and he met all
12 expectations and then some.  Despite all the special challenges
13 that face a Chapter 11 debtor, the operations which he was in
14 charge of are performing extremely well.  Sound business
15 practice says, hire this guy as the CEO and provide him with
16 the incentive to stay.  Being in Chapter 11 is no fun.
17 Executives with a proven track record are hard to find and have
18 many alternatives.

19       Thanks to the Internet, frankly, and other news
20 sources, the employees of this company are watching the Court's
21 every move.  It would send a terrible signal to them for the
22 Court and the committees to override the board and the
23 company's decision on such a core issue as how to compensate
24 their CEO, a man who has gained their trust in a very short
25 period of time.  It would also send a terrible signal to Mr.

1  Festa himself.  He negotiated a fair compensation with the
2  board and the company.  He's expecting fair compensation from
3  the board and the company, and we want him to stay.  Once he
4  becomes CEO he will be a popular candidate for calls from
5  outside.

6  The current CEO, Your Honor, Mr. Norris, is leaving.
7  To go out in the marketplace and try to find somebody else who
8  would absolutely cost more, I don't think anybody could deny
9  that, would be a horribly debilitating thing for the company to
10 have to do.  The Grace board was careful and diligent in
11 identifying the appropriate replacement for Mr. Norris.  They
12 assembled and negotiated a fair compensation package.  They
13 hired an expert to confirm that the package was, in fact, fair.
14 They selected a person who had proven himself at Grace as
15 highly competent at the job.

16 And, Your Honor, who are the people making this sound
17 business judgment?  The Grace board of directors is comprised
18 of senior executives who have had decades of experience.  They
19 include the former chairman of the board of directors of IBM --
20 he's the chairman of the Grace compensation committee, in fact
21 -- a former chairman of Mercantile Bankshares, the chairman and
22 CEO of Newmont Mining, the chancellor of the University of
23 California at San Diego, and the chairman of the board of
24 Dresser Industries.  These are experienced executives who have
25 the necessary background to make these kinds of key decisions.

1       The board designed a sound compensation package that

2 is not unique.  Retention bonuses are commonplace in Chapter 11

3 cases.  Emergence bonuses are also not unusual.  The only thing

4 Grace did slightly different here is, as Mr. Bubnovich

5 testified, something a little creative.  They combined the two.

6 They provide for the future of the company by making sure the

7 CEO has incentive to stay through the Chapter 11 case and

8 beyond and they'll reward him earlier if the company can, in

9 fact, emerge earlier.  It's the best of both worlds for the

10 company and for all of the creditors.

11       Your Honor, the asbestos committees' judgment cannot

12 be substituted for the sound business judgment of the Grace

13 board and its management.  The board has the appropriate

14 business expertise to make this decision.  The board has the

15 long-term future of the company in mind.  The board has all

16 constituents of this Chapter 11 case at interest, not just

17 current asbestos claimants.

18       The board structured a fair and reasonable

19 competitive compensation program for its new CEO, a program

20 designed to make sure the debtor has competent management to

21 see it through Chapter 11.  The package is not too rich.  The

22 package is fair and reasonable.  It's what was negotiated with

23 Mr. Festa and accepted by Mr. Festa.  Approving this package

24 will help assure continuity and confidence in the company and

25 its leadership going forward for years to come.  The debtor,

1  Your Honor, requests that the compensation package with Mr.
2  Festa be approved.

3         MR. PASQUALE:  Good afternoon, Your Honor.  Ken
4  Pasquale from Stroock & Stroock & Lavan for the unsecured
5  creditors' committee.  Just so the record is complete, I just
6  wanted to stand and advise the Court that our committee
7  participated in the discovery.  We independently reviewed Mr.
8  Festa's compensation package, and it's the committee's
9  conclusion that the package is reasonable in the circumstances
10  of these cases, and we would urge the Court to approve it.
11  Thank you.

12         THE COURT:  All right.

13         MS. ESKIN:  Good afternoon, Your Honor.

14         THE COURT:  Good afternoon.

15         MS. ESKIN:  Marla Eskin for the asbestos claimants'
16  committee.  We're not here today stating that Mr. Festa is the
17  wrong person for the job, but we're here today because the
18  debtors are asking the Court to do something that has never
19  been done before.  They're asking for part of a compensation
20  package which has never been seen before.  Mr. Bubnovich, their
21  own expert, testified that he has never before seen a component
22  of a compensation package that is both an emergence bonus tied
23  to retention and the person gets it even if the company does
24  not emerge.  This was not Mr. -- this aspect of the
25  compensation agreement was not even Mr. Bubnovich's idea.  It

1  was an idea that came from the board.  This was something not
2  -- that Mr. Bubnovich did not come up with.  It's something
3  that the Board came up with.  It's not plain vanilla.  Mr.
4  Bubnovich says he's never seen something like this before.

5          The Court asked the debtors to make a revision to the
6  compensation package because it was titled an emergence bonus,
7  and as this Court said last month it was not an emergence bonus
8  because Mr. Festa would get it even if they didn't emerge.
9  What the debtor did here was simply change it to be called a
10  retention bonus in the papers, but they're still calling it a
11  retention/emergence bonus.

12          Mr. Bubnovich testified that this isn't really a
13  retention bonus.  It's a hybrid.  It's a retention/emergence
14  bonus.  So, when we look at what we have here, it's not going
15  to be a retention bonus.  When future packages are being drawn
16  up, they're -- companies are going to see this hybrid which has
17  never been seen before according to Mr. Bubnovich.

18          What's not in dispute here, and Mr. Bubnovich
19  testified that without this bonus, without this hybrid bonus,
20  Mr. Festa's compensation is still within the range of
21  competitive practice.  We don't even need to go through all of
22  the numbers because we know that.  Mr. Bubnovich testified to
23  that.  And with that --

24          THE COURT:  Pardon me.  Those of you on the phone,
25  please put your mute buttons on.  Try it Ms. Eskin.

1          MS. ESKIN:  With that in mind, that even without this
2  portion of the compensation, Mr. Festa's total compensation is
3  still within the range of competitive practice, we need to look
4  at why it's not appropriate either as an emergence or as a
5  retention.  It's not appropriate as an emergence for a number
6  of reasons.  For one, he gets it even if the company doesn't
7  emerge at some point in time.  Two, Mr. Vanderslice, the board
8  member, testified that it's an incentive for Mr. Festa to take
9  the company out of bankruptcy.  The CEO shouldn't need an
10 incentive to get the company out of bankruptcy.

11         It also doesn't make any sense because Mr. Festa is
12 not going to be the person responsible for leading this company
13 out of bankruptcy.  Mr. Norris has stayed on for the purpose of
14 leading this company out of bankruptcy.  So that's his job and
15 not Mr. Festa's job.

16         Mr. Vanderslice testified that the board wanted this
17 compensation package because they wanted continuity.  They
18 wanted a CEO who would stay after emergence, for six months or
19 so after emergence.  But under this scenario, Mr. Festa can
20 still get that bonus and leave before the company has ever
21 emerged if the emergence -- if this company emerges after the
22 last date for the bonus.  So, for that reason it doesn't make
23 sense as an emergence bonus.

24         And finally, as we all know from our experience from
25 sitting in these courtrooms, whether or not Grace emerges from

1 bankruptcy is not solely going to be left to the debtor.
2 There's a lot of other parties involved here.

3          If we look at the retention component, it doesn't
4 make sense as a retention bonus either.  Mr. Bubnovich
5 testified why we have retention bonuses.  When a company -- and
6 if you look at the sheet that Ms. Baer refers to, these CEOs
7 who did get retention bonuses had been with the company -- in
8 the Owens Corning case for about 30 years, in the USG case for
9 many years.  These were employees who had been with the company
10 for many years, and once they filed the debtor didn't want them
11 to leave.

12          And Mr. Bubnovich testified why you have a retention
13 bonus.  It's so when the company files for bankruptcy people
14 don't get scared and they don't take off, they don't worry --
15 they are then concerned, when a company files for bankruptcy,
16 about lost career opportunity.  There is no lost career
17 opportunity here for Mr. Festa.  He came to the company for a
18 career boost.  He came to the company after they filed for
19 bankruptcy.  He made that decision then.  And he didn't get a
20 retention bonus when he came onboard as the COO.  And the
21 reason, Mr. Vanderslice testified, is because they wanted to
22 make sure that he could do the job.  They wanted him to prove
23 himself and, therefore, they didn't give him a retention bonus.

24          Another reason Mr. Bubnovich said that you get a
25 retention bonus is to make up for lost profit opportunity.

J&J COURT TRANSCRIBERS, INC.

1 Many of the employees who did get these retention bonuses who
2 are part of KERPs had -- were part of the stock option plans
3 and the stocks tanked.  We don't have that in this situation,
4 again, because Mr. Festa joined later.  It doesn't -- it's not
5 necessary to restore money that he lost previously because he
6 was not part of the company.

7 He didn't have -- Mr. Festa didn't have a retention
8 when he joined them.  The board wanted to see how he'd do.  Let
9 us see how he does in this position.  Mr. Bubnovich said he
10 can't think of a circumstance where a person came into a
11 company after they filed -- after a petition had been filed and
12 when they moved up to CEO position got a retention bonus.

13 But very importantly, they don't need to -- I heard
14 Ms. Baer say today they're concerned he's going to leave.  It
15 was the testimony of both of the individuals deposed that there
16 is no reason to believe he is going to leave.  He came to the
17 company with the hope and the expectation that he would be made
18 CEO.  Mr. Vanderslice, who was a fabulous advocate for Mr.
19 Festa in what a good job he's doing, he said he had no reason
20 to believe that Mr. Festa was looking for a job or was going to
21 leave.  Mr. Bubnovich said that when he looked at this package
22 he can't even recall if he asked if there was a potential that
23 Mr. Festa was going to leave.

24 Your Honor, we get back to that it's inappropriate,
25 as a retention and/or as an emergence.  If the total

1   compensation package is going to be at this number, then it
2   should be done a little bit differently.  It should be done on
3   an incentive basis, perhaps.  There should be a -- he should
4   have to reach some financial targets.  When he came to the
5   company, he knew what he was getting into.  If the debtor wants
6   to pay him a healthy package, and compared to the other CEOs it
7   is a healthy package -- the comparison of the asbestos
8   companies, there are differences.  I think the revenue here is
9   2.3.  The revenue for Federal-Mogul I believe is 6.2.  And even
10  Mr. Bubnovich has said that the revenue -- that the amount the
11  CEO makes is dependent upon the revenue.  So, this number is a
12  healthy number.  But if he's going to make that number, then he
13  should have to earn that number by various targets.

14              THE COURT:  Good afternoon.

15              MR. SAKALO:  Good afternoon, Your Honor.  Jay Sakalo
16  on behalf of the asbestos property damage committee.  Ms. Eskin
17  covered many of the points I wish to cover, but there are a few
18  points that Ms. Baer made that I think are worth responding to.

19              Your Honor, when she pointed to Mr. Bubnovich's
20  affidavit regarding the Chapter 11 asbestos debtors she pointed
21  out that Mr. Festa, under his proposed agreement, would be
22  making less than each of the other current chief executive
23  officers or Mr. Norris.  That is correct, and as Ms. Baer
24  pointed out -- Ms. Eskin pointed out, Grace is substantially
25  smaller than many of these other companies.

1       But there is another interesting aspect to this.  In
2  questioning Mr. Bubnovich about the rationale of paying -- or
3  comparing asbestos debtors to one another versus comparing
4  asbestos debtors to other large Chapter 11 debtors, he made a
5  very interesting comment, and I think it's worth pointing out
6  to the Court.  "Is it your opinion that excluding the emergence
7  bonus or retention bonus, excluding the 1.75 million to that,
8  the pay package that's proposed to be paid to Mr. Festa is in
9  the competitive range that you've described, the median to the
10 75th percentile?"  Answer, "I've answered that question.
11 "Q   Your answer is yes?
12 "A   That's correct.  Although I didn't say it was between the
13 median and the 75th percentile.
14 "Q   Within the competitive range?
15 "A   I said it was within the competitive range.
16 "Q   And it's your view, though, that because these are
17 asbestos debtors as opposed to debtors who are suffering
18 operational difficulties, we should look at these slightly
19 different?
20 "A   There is no doubt that the management of these companies
21 received richer pay packages than those managers at companies
22 that are in Chapter 11 because of operational or financial
23 difficulties."
24       So, Mr. Bubnovich believes these are Chapter 11
25 debtors that are here because of asbestos, not operational

1 issues, so they should be paid more.  There's no basis for that
2 whatsoever, Your Honor.  You asked, what is the comparison of
3 Chapter 11 debtors?  Mr. Bubnovich limited it to other asbestos
4 debtors for two reasons.  One, the starting point is already
5 higher and, two, he's a consultant for all of those but Owens
6 Corning and was responsible for the pay packages installed into
7 those companies.  So, this is a fox in the henhouse situation,
8 Your Honor.  He's saying, these are reasonable because I say
9 they're reasonable.  I don't think that's the starting or
10 ending point for the analysis.

11        In addition, Your Honor, one of the other points that
12 Ms. Baer made was that Mr. -- I keep forgetting his name -- the
13 Federal-Mogul chief executive would receive four percent of the
14 equity of the company upon exit, Mr. Alapont.  What Ms. Baer
15 failed to state is that under the debtors' proposed plan that's
16 on the table, all existing management will once again receive
17 equity in the company upon its emergence from bankruptcy.  So
18 this is the current package we're looking at, a $1.75 million
19 emergence or retention bonus.  We don't know how much they're
20 planning on giving him in equity when the company emerges.
21 It's another piece of the component that needs to be added to
22 that.  Neither Mr. Bubnovich nor Mr. Vanderslice knew the
23 answer to that question when asked.  I think that's something
24 else that needs to be taken into account.

25        In addition, I find it ironic that Ms. Baer says that

1  you can't substitute the committee's judgment for that of the
2  board.  We were here in 2002, Your Honor, and in 2003
3  complaining that we thought these debtors were paying their
4  management too much money on a consistent basis.  Despite that
5  fact, the debtors did not come to us again when they wished to
6  give Mr. Festa a three and a half to $4 million package.  So to
7  suggest that they can't substitute our judgment for that of the
8  board is a little disingenuous when they never even inquired
9  into our position as to whether or not we thought this was
10 reasonable.  And that's the issue -- is this reasonable?  We
11 know that this is within the competitive range of practice, and
12 unless you take into account the fact that these are asbestos
13 debtors, we're setting a new precedent here, these are asbestos
14 debtors, so asbestos debtors get to be paid more than Chapter
15 11 debtors.  We're going to have people in here every time
16 there's a case, whether it's an asbestos case or a traditional
17 operating Chapter 11 case, that lays out these two different
18 analogs:  we're a Chapter 11 asbestos debtor, we get to be paid
19 more; this is not a Chapter 11 asbestos debtor, they get to be
20 paid less.  We don't think that's an appropriate analysis.

21          Without taking that into account, Mr. Bubnovich
22 clearly testified that these debtors would be paying Mr. Festa
23 within the range of competitive practice by counting them as an
24 asbestos debtor, including this retention/emergence bonus, it
25 just slides him further up the sale.  We submit there is no

1 basis for the debtors to do that, Your Honor.

2       It's also noteworthy, Your Honor, that the
3 compensation to be paid to Mr. Norris under the consulting
4 portion of this motion is approximately $425,000 a year, or an
5 annualized amount equal to what the debtors wish to pay Mr.
6 Festa for helping them reorganize and emerge or staying for
7 four years.  We don't believe it's worthwhile or beneficial for
8 the debtors to be paying that to two people to help them
9 emerge, when the testimony was clear that Mr. Norris will be
10 responsible for helping the debtors try to get out of
11 bankruptcy, recognizing all the other factors that may prohibit
12 that.

13       THE COURT:  Well, it may not be reasonable for the
14 debtor to try to look to two restructuring officers, but
15 certainly you're not suggesting that the debtor shouldn't have
16 a CEO in place.

17       MR. SAKALO:  No.

18       THE COURT:  Mr. Norris is leaving.

19       MR. SAKALO:  That's correct, Your Honor.

20       THE COURT:  So, there is a big --

21       MR. SAKALO:  We're not suggesting there should not --

22       THE COURT:  -- big hole at the top that needs to be
23 filled, and the question is, (a) who and (b) how is that going
24 to be filled?  No one seems to be contending that Mr. Festa is
25 an inappropriate person to fill that slot, so what does it take

1 to get him to come?  Isn't that the issue?

2          MR. SAKALO:  That is the issue, Your Honor.  We --

3          THE COURT:  Okay.

4          MR. SAKALO:  We believe that the amount the debtors

5 are proposing to pay is not necessary to get him to come.

6          THE COURT:  Well, it's a pretty rich proposal, but

7 has anybody bothered to take Mr. Festa's deposition?

8          MR. SAKALO:  We have not, Your Honor.

9          THE COURT:  Maybe -- well, you know, what's he have

10 to say?  I'm not comfortable with this -- with the way this

11 bonus is structured.  I have to tell you I -- it doesn't look

12 quite like an emergence.  It doesn't look like a restructuring.

13 And that's not to say that I'm opposed to creative financial

14 vehicles.  I'm not opposed to creative financial vehicles.  But

15 I'm not sure that this is the appropriate time and place to

16 attempt to take one on.

17          However, I'm also not offended by the overall nature

18 of the compensation package.  It seems that with or without the

19 bonus Mr. Festa's compensation package is within a range of

20 reasonableness, and it seems to me that the fight is more over

21 the labels to be put on this because of the fact that it's not

22 really a retention -- I'm sorry, it's not really an emergence

23 bonus because he gets paid whether the company emerges or not,

24 and I don't see an emergence aspect to it.

25          I also don't see that the CEO of this company really

1  needs an incentive to try to get the company out of bankruptcy.
2  If anything, you'd think that would be the CEO's chief
3  incentive at the moment just to make life easier so that you
4  don't have to deal with all of the committees and the court and
5  everybody else looking -- who doesn't normally look over your
6  shoulder looking over your shoulder.  So, I can't see that
7  that's a financial incentive.  That's just a human nature
8  incentive to hopefully go away and let me run my company with a
9  combination of the assistance of the board and the other
10 officers.  So, I don't see that that is a necessary aspect of
11 the financial component.

12         Keeping the gentleman happy so that he does the work
13 to the best of his ability and honors the commitment that the
14 debtor has to all of the aspects of this company in a fiduciary
15 relationship is important, and if takes this amount of money to
16 do it, then the debtor ought to figure out a way to pay this
17 amount of money, taking these pejorative labels out of the
18 equation, and pay the man what the board wants to pay him and
19 what he's demanded in a reasonable way that everybody can live
20 with.  I thought from the last hearing that if the label was
21 changed from "emergence" to "retention" that that was going to
22 solve the problem.  Little did I suspect that was only going to
23 be the tip of the iceberg, but it is apparently the tip of the
24 iceberg.

25         MR. SAKALO:  Your Honor, one of the reasons it's the

1  tip of the iceberg is just to take that bonus and spread it out
2  amongst the other components, put it into salary, put it into
3  annual incentive, that creates another host of problems because
4  the way Mr. Bubnovich does his analysis he determines the total
5  direct compensation of the debtor's compensation vis-a-vis
6  other debtors or other large companies.  And what he does is he
7  doesn't look at each individual component, looks at the overall
8  component, except when that component is either not within the
9  debtor's philosophy, a particular debtor's philosophy of paying
10 that executive, or when it's so eschewed to everybody else in
11 the industry.  He testified that this compensation package,
12 with the various components, is within the debtors' philosophy.

13         So, if we now take that bonus and spread it out, put
14 it into cash, put it into annual incentive awards, put it into
15 long-term incentive awards, it's not going to comport with the
16 debtors' philosophy, and that would be problematic for us as
17 well.  We believe that the debtors should continue to pay
18 within their philosophy.  This retention/emergence bonus is not
19 within their philosophy.  It was something that was creatively
20 thought up by the board.  Mr. Bubnovich, who in 20 years has
21 represented up to 50 Chapter 11 debtors, has never seen this
22 before.

23         THE COURT:  Well, that --

24         MR. SAKALO:  And why that's a problem though, Your
25 Honor, is once you lump it back into the other compensation, it

1  then goes beyond what the debtors' philosophy is to paying
2  their executives.  And I'm refraining from saying on the record
3  what their numbers are because I don't know if that's
4  confidential information for the debtors or not, but suffice it
5  to say Mr. Bubnovich testified that it's within their
6  philosophy, the amounts that they're proposing to pay to him
7  under the other components.  That will clearly not be the case
8  if we take that and just spread it into the other components.
9  They have a separate philosophy for annual salary, and they
10  have a separate philosophy for long-term incentive awards, and
11  they believe that they're meeting those with the existing
12  compensation.

13        THE COURT:  Well, I don't see how this is a long-term
14  incentive award per se.  It's not tied to incentives, except
15  that there is a retention aspect to it.  It's tied to retention
16  in that sense.  It's not tied to emergence because it's paid
17  whether there's emergence or not.  So, I mean, if it's just a
18  bonus, why don't you just call it a bonus?  I mean, I'm still
19  concerned about the fact that there is a label issue.  You
20  know, a rose is a rose, but the label we put on it sometimes
21  gives us a preset notion as to what that rose may look like,
22  and that seems to be the problem.  If -- you know, if the board
23  wants to pay Mr. Festa a certain salary and pay him bonuses at
24  a stated time, for reasons or for no reasons, then that's what
25  they ought to be doing, and an appropriate motion to that

1  effect should be filed and you folks can take your, you know,

2  shots at whatever you think is inappropriate about it at that

3  time.   But I can't see that overall this package for this

4  debtor with the financial performance that it has gone through

5  is inappropriate.   I may have a different view about that two

6  years from now if the debtor is still not very far along in

7  this plan, because it seems to me this case has not gone as

8  quickly as maybe it should.   I'm not saying -- laying all that

9  blame on the debtor.   It's not a question of blame.   I just

10  don't think this case has moved, but it seems to be moving now.

11  And to the extent that it's taking Mr. Norris's time to be a

12  restructuring officer and Mr. Festa's time to be a CEO to make

13  that happen, I wholly endorse it.   I think it's a good thing.

14  This case needs to end, and if it takes those two gentlemen

15  working in that capacity to get this case over, I applaud it.

16          How he is going to be paid and the labels you put on,

17  frankly, I'm not comfortable with these labels, but I'm not

18  uncomfortable with the package overall.   So, I don't see that

19  it's too rich given the circumstances, but I am unhappy with

20  the concept that it's called emergence when it isn't, because

21  it's going to be paid no matter what.   So, I think it still

22  needs to be tweaked in that sense, Ms. Baer.   I'm prepared to

23  approve the numbers.   I'm not prepared to approve the labels.

24  I still --

25          MS. BAER:   Your Honor --

1    THE COURT:  I don't understand the debtor or the
2 board's philosophy when it says that somehow or other this is
3 an emergence package.  It's not an emergence package.

4    MS. BAER:  Your Honor, and it doesn't say that.

5    THE COURT:  But you just argued that --

6    MS. BAER:  No, Your Honor.

7    THE COURT:  -- that it has retention and emergence
8 components to it.

9    MS. BAER:  If you look at the labels on this package,
10 it is a retention bonus.  We do not deny it's a retention
11 bonus.  We support the fact that there's a retention bonus.
12 The only thing the board did differently here was a little
13 creative, and that is they said it's a retention bonus, but if
14 you get out of Chapter 11 earlier than when the retention bonus
15 would be paid, you get it paid slightly earlier.  Your Honor,
16 what is the downside to that?  It sounds to me it's all upside.
17 The board feels good about the fact that there's a little extra
18 incentive there to get out early.  They're telling the world,
19 we don't want to stay in for four years and pay this guy to sit
20 around in court for four years.  We want to get out as soon as
21 possible, but we also want to make sure that this guy, who is
22 our good executive, our CEO, sticks around to make sure we do
23 it.  It's a retention bonus.  It says it's a retention bonus.
24 The order says it's a retention bonus, and that's what it is.
25 Your Honor, we cannot --

1          THE COURT:  So, to use the incentive word, I suppose
2   the incentive is that if the Chapter 11 completes sooner than
3   the bonus would otherwise be paid, the incentive is there to do
4   it because then the bonus gets paid early.  So the incentive is
5   to get the case out of Chapter 11 before you'd otherwise get
6   your bonus.  Now, knowing that you're getting your bonus
7   anyway, frankly, I don't know that that makes much difference
8   one way or the other.  As I said earlier, it seems to me that
9   the CEO of this company would want to be as far away from here
10  as quickly as possible for reasons that have anything (sic) to
11  do with his own compensation, but --

12          MS. BAER:  Absolutely, Your Honor.  And, Your Honor,
13  there is no downside to what we're asking here.  To send a
14  message to everybody we want to get out as soon as possible is
15  upside for everybody.  This is a retention bonus.  We need to
16  get our CEO employed.  Can you understand, Your Honor, how Mr.
17  Festa is feeling right now having come back here now a second
18  time on his package?  We need to get this order entered.

19          THE COURT:  Ms. Baer --

20          MS. BAER:  We need to get his retention approved.

21          THE COURT:  -- for somebody who is on Congress's
22  doorstep on a monthly basis for ten years in a row, actually
23  two months doesn't seem like a long time to me.

24          MS. BAER:  It is when you think you've negotiated a
25  fair compensation package, you're being told it's fair, and

1  then you can't get the darn thing signed up, and you have this
2  question mark out there, and in the meantime you're being told
3  to the world as an excellent CEO who is going to get calls from
4  headhunters.   Your Honor, we respectfully ask that you enter
5  this order, permit us to retain him under this retention bonus
6  scenario which is clearly outlined in the agreement, and we go
7  forward here.

8          THE COURT:   All right, I'm going to permit it, but
9  clearly as a retention with no emergence aspect.   I do not see
10 this in any way as an emergence bonus.   To the extent that
11 there is some incentive to get the case out of bankruptcy
12 earlier so that the bonus can be paid earlier, okay, I'll
13 accept that as an incentive component, I guess.   I'm a little
14 hesitant in that.   I really don't see how that incentivizes the
15 CEO any more than knowing that the bonus is going to be paid at
16 some point, but nonetheless I will accept that proposition
17 because I think it's appropriate to have the retention bonus,
18 and that's really what I view this as.

19         MS. BAER:   Thank you, Your Honor.   I have the order.
20         MR. SAKALO:   Your Honor, may I just get one point of
21 clarification?

22         THE COURT:   Thank you.

23         MR. SAKALO:   Are you conditioning the payment of the
24 retention bonus upon him staying with the company?   Because as
25 it's --

1        THE COURT:  Yes, absolutely.  Yes.

2        MR. SAKALO:  Because as the agreement is structured

3   now, if they emerge early, if they emerge before the four years

4   passes, he can leave the next day and still get that bonus.

5        THE COURT:  Well --

6        MR. SAKALO:  And if the purpose of the retention is

7   also to benefit the creditors and have continuity of the

8   business, we don't get any of that benefit if they emerge and

9   he leaves the next day.

10        THE COURT:  Ms. Baer is saying that's not --

11        MS. BAER:  Your Honor, that's not true.  Once again,

12   if you look at this package the emergence bonus is structured.

13   Half of -- or $750,000 of it is paid I believe in six months,

14   and the other amount is paid in 18 months.  Again, the whole

15   idea is keep him there.  Keep the continuity.  He doesn't get

16   paid the minute we emerge.  It's structured and it's stretched.

17        THE COURT:  Just on the event that the debtor, just

18   to pick a number, would emerge from bankruptcy seven months

19   from now, okay, when will Mr. Festa get paid his bonuses?

20        MS. BAER:  Seven hundred and fifty thousand dollars

21   gets paid -- and I'm sorry, I need to look at the timing.

22        THE COURT:  I believe he'd get the first 750,000 in

23   six months, whether the debtor is in or out of bankruptcy.  If

24   the debtor is out of bankruptcy --

25        MR. LOCKWOOD:  I think, Your Honor, in your

 1 hypothetical, he would get the first payment in 13 months and
 2 the second payment 12 months after that.

 3        MS. BAER:  The first payment is six months after
 4 emergence, which is seven fifty.  The next payment, the other
 5 million dollars, is 12 months after emergence.  The only way he
 6 would get it if he was not still there in 12 months is if he
 7 was fired because of the Chapter 11.

 8        THE COURT:  Okay, do we need some clarification in
 9 the order about the fact that he has to stay onboard in order
10 to be paid?

11        MS. BAER:  Your Honor, it says it clearly in the
12 letter.  That's what I was looking for.

13        THE COURT:  Okay.

14        MR. BAENA:  Judge, with all due respect --

15        THE COURT:  You need the -- I can't hear you, Mr.
16 Baena.  I'm sorry.

17        MR. BAENA:  In all due respect -- Scott Baena on
18 behalf of the property damage committee -- that's not quite the
19 point that we're making.  The point is, so there is no
20 misapprehension on the part of the Court, if he gets that last
21 payment under this bonus complement because of an early
22 emergence from bankruptcy --

23        THE COURT:  Yes.

24        MR. BAENA:  -- the next day he could leave the
25 employment of the company.

1          THE COURT:  But Ms. Baer is saying that's not
2  correct.
3          MR. BAENA:  That -- Ms. Baer didn't say that's not
4  correct.
5          THE COURT:  Well --
6          MR. BAENA:  That part she didn't say is incorrect.
7          THE COURT:  Well, let me find out.
8          MS. BAER:  I don't understand what he's saying.  Your
9  Honor --
10          MR. BAENA:  Well, if -- I'll pose a hypothetical if I
11  may, so she can answer the question, Judge.
12          THE COURT:  Oh, I love it.
13          MR. BAENA:  If Mr. Festa gets an accelerated payment
14  of this retention bonus, as you refer to it, because of an
15  emergence of the company from bankruptcy, after he gets that
16  payment, can he leave the employ of the company?
17          MS. BAER:  Well, he does not get the second payment
18  until 18 months after emergence, so the first day he could
19  leave would be 18 months and one day after emergence.
20          THE COURT:  In other words, he has to be onboard to
21  get the payments, both payments?  He must still be retained by
22  the company as an officer, as the CEO, in order to get both
23  payments.
24          MS. BAER:  In order to get --
25          THE COURT:  If he -- unless he's fired without cause?

1      MS. BAER:  No.  The first payment would be paid six

2 months after emergence.  So if he got the first payment six

3 months after emergence and he left, that's it.

4      THE COURT:  That's what I mean.  He has to be onboard

5 at the time that each payment is due or he doesn't get paid.

6      MS. BAER:  Correct, unless he is fired without cause.

7      THE COURT:  Cause.

8      MS. ESKIN:  Your Honor, Marla Eskin.  I think the

9 point we're trying to make here is that he doesn't have -- if

10 this is going to be a retention bonus, he doesn't have to be

11 retained onboard that long in order to get the whole 1.75,

12 because if they emerged -- you know, if they emerge in six

13 months from now --

14      THE COURT:  Right.

15      MS. ESKIN:  -- then he gets it in a year, and then,

16 you know, he gets it -- 18 months after that six months.

17      THE COURT:  Yes.

18      MS. ESKIN:  So, it's not -- it's -- he gets that 1.7

19 over a much shorter period of time --

20      THE COURT:  Right.

21      MS. ESKIN:  -- then and it's --

22      THE COURT:  That's right.  That's his incentive to

23 get the company out of bankruptcy earlier, that he gets paid on

24 a more expeditious basis.

25      MS. ESKIN:  But this is really retention bonus --

1           THE COURT:  But he has --

2           MS. ESKIN:  -- and if you want to keep him there,

3 then we're not keeping him there for a very long period of

4 time.  It could be a -- you know, a --

5           MS. BAER:  Eighteen months after emergence, that's

6 pretty long.

7           THE COURT:  You know, if this case were likely to

8 have a plan confirmation going forward within a month or two

9 I'd really worry about it, but since I think we're probably

10 close to a year away, he's going to be onboard for that year,

11 plus by the time we get through the plan process and it takes

12 effect, he's going to be onboard those several months, and then

13 he's going to be onboard a year after for the first payment and

14 then another six months after, frankly, I just don't think it's

15 a realistic problem that you're raising.  In theory, could it

16 come up?  Yes.  And you know I actually hope I'm wrong about

17 this one, but I really don't think I will be.  If it's not

18 clear that he must be onboard at the time the payments are due

19 in order to be paid, I want the order amended to make that

20 clear.  I didn't understand that this was an issue.  I thought

21 it was clear enough, but apparently there is some problem.

22           MS. BAER:  Your Honor, I think it's clear.  They just

23 wanted to make you understand that it might not run out four

24 years if we confirm a plan earlier --

25           THE COURT:  Well, yes, I understand that.

1          MS. BAER:  -- and I hope we have that problem.

2          THE COURT:  So do I.  Okay, the order is signed.

3          MS. BAER:  Thank you, Your Honor.  Your Honor, that
4  takes us to agenda item Number 19 which you asked us to put on
5  the call related to the revised 2019 order.

6          THE COURT:  Yes.

7          MS. BAER:  Your Honor, I don't know if you've
8  received any comments or objections.  I had one question about
9  the meaning of one of the phrases, but beyond that, of course,
10  we don't object to its entry.

11          THE COURT:  Okay, I've had some comments at some of
12  the other hearings that I'll fill you in about.  Why don't you
13  ask yours though?  It may be the same thing.

14          MS. BAER:  Your Honor, my question is about the last
15  ordered paragraph, and in fact it's the last clause of the last
16  ordered paragraph.  It provides who the debtor needs to serve a
17  copy of the order on, and it says the following:  "And on
18  persons or entities or any supplemental service lists used to
19  notify attorneys for claimants with asbestos, silica, and a
20  mixed-dust personal injury or property damage claims."  Your
21  Honor, what we're trying to understand is does this require the
22  debtor to serve notice on every proof of claim that's been
23  filed by an asbestos property damage claimant who's represented
24  by counsel?

25          THE COURT:  Well, you'd have to serve counsel.  The

1 problem is that some of the other cases -- I was trying to get
2 language that was broad enough to cover what's actually
3 happening in all of the cases, and I think that may be the
4 problem. Maybe this needs to be tweaked in terms of the
5 service for each specific case, because in some cases the
6 debtor is actually keeping supplemental lists as they are
7 coming in and claims are being filed. So, that's what that
8 supplemental is all about. Those debtors have their own
9 internal records that are being used for service. So, if that
10 isn't appropriate for this case, I'm not opposed to changing
11 the language to make it clear that the debtor has to serve
12 either the claimant or counsel, whoever filed the claim.

13       MS. BAER: Yes, at this point, this particular debtor
14 does not have a list of all counsel that have filed claims. We
15 can figure that out, but we don't have that list at the time,
16 and, of course, we don't have a bar date for personal injury
17 claims.

18       THE COURT: Right.

19       MS. BAER: We have no personal injury counsel, and I
20 didn't -- again, I didn't think you were requiring us to go and
21 look at all of our existing case files to find counsels' names.

22       THE COURT: Oh, no, no. I was not suggesting that.
23 I think the notice can go to the list that you're using of law
24 firms who represent asbestos plaintiffs, and I think all I can
25 do is ask perhaps the creditors' committees to take a look at

1  that list and make sure that if somebody is missing that they
2  call the debtor and the debtor make supplemental service, but
3  everybody should be on the matrix here in the court who needs
4  to be served, who -- because if you filed a 2019 statement you
5  should have been entered into the CMECF attorney database, so
6  you should be getting notice once this order is issued.  The
7  problem is that to the extent that some people are still filing
8  things on paper and not electronically, I don't know that the
9  court's records will generate a notice to those people.  I'm
10  not sure that we'll be locating them, and that's what the
11  purpose of the supplemental was.

12      MS. BAER:  I understand, Your Honor.  And, yes,
13  certainly you would not have a listing of the counsel who filed
14  claims.

15      THE COURT:  That's -- well, we may, but I'm not sure
16  that the bankruptcy noticing center will access it for purposes
17  of making service, and so to make sure that everybody who
18  needed service got service I was imposing on the debtor the
19  obligation to make sure that if the bankruptcy noticing center
20  hasn't gotten that person or they -- they're not on the
21  electronic service list, that the debtor makes sure that the
22  supplemental list is done.  That's what I was trying to get to,
23  inartfully, obviously.

24      MS. BAER:  Just trying to clarify it a little bit.
25      THE COURT:  Okay, if you have different language to

1 propose, why don't you contact Mr. Ziegler in Pittsburgh in the
2 PNC -- Pittsburgh Corning case. He's taken the lead in trying
3 to get this order in some fashion that works for everyone, and
4 as I said if the service paragraph needs to be modified, I'm
5 not opposed to that. What I want to keep the same is the
6 substance of the way the order operates for all creditors.

7 Okay, the issue came up earlier today as to how to
8 distinguish between entities that are being either added or
9 deleted from the existing list so that the debtor and the clerk
10 can purge the files of the old records and maintain only the
11 new records, and, Ms. Eskin, I guess are you going to try to
12 talk to the asbestos bar to see how best to facilitate that?

13 MS. ESKIN: As I said, Your Honor, at the Owens
14 Corning hearing this morning, I did -- in anticipation that
15 that issue might arise, I did talk to a number of the firms and
16 asked them if their systems would allow them -- if their
17 systems give them the capability to add an additional column,
18 or add that information to the Excel spreadsheet. Some of the
19 law firms said that they can add a column, that it won't be a
20 problem. Some of the law firms said it would be difficult to
21 do. And I think what we agreed to, and -- for this group, if
22 it works, is that those firms that are capable of indicating
23 the deletions from the prior list and indicating the additions
24 from the prior listing of claimants will do so. Those who
25 don't have that technological capability will put something on

1  the spreadsheet at the end indicating which ones were deleted,
2  which claims were deleted, including all the information that
3  was in the prior CD and which ones were added.

4         THE COURT:  Okay, that would be fine I think, just so
5  it's in there and it's searchable in some format.  The other
6  issue that came up, Ms. Baer, was the fact that the order is on
7  appeal in at least one, I'm not sure how many of the cases, and
8  there was a concern that if I call this an amended order that
9  that may somehow or other impact the appeal, and I believe the
10 word that was worked out was "supplemental order" rather than
11 "amended order" to make sure that it's not going to impact the
12 appeals.  I certainly don't intend to impact the appeals.  I
13 just want to get the file storage issue resolved.  That's all
14 this order is attempting to do, is to make the file management
15 reasonable, because right now it's not.  Okay.  Does anyone --
16 oh, I'm sorry.  Ms. Baer?

17        MS. BAER:  I was going to say we understand, Your
18 Honor, and we'll get out comments on the service issue to
19 counsel for Reed Smith -- at Reed Smith.

20        THE COURT:  Okay.  Does anyone else wish to be heard
21 on my request to supplement the 2019 statement?  Okay, if you
22 do have comments that occur to you then please contact Mr.
23 Ziegler.  As I indicated, he has taken the laboring oar, and I
24 do want to get one order that is the same in all the cases
25 because I think it would be a nightmare for people to try to

1  amend things or supplement things in different ways in
2  different cases.  Okay.  I think that was all that I had on
3  this issue.  He will be circulating an order.  When I get a
4  revised order, I will probably be entering it.  So, why don't
5  you read it once it's entered, and if there is some problem
6  with it then, you know, put it back on the agenda for the next
7  month.  I'll try to make the effective date of it after the
8  next round of omnibus hearings.  Oh, no, I'm sorry, I know what
9  I said this morning.  What I said was I would go over the terms
10 of the order at the next Pittsburgh Corning hearing.  So,
11 anybody who wants to find out what those revisions will be,
12 please make arrangements to dial into that Pittsburgh Corning
13 hearing.  And that was May 14?
14            THE CLERK:  Twenty-fourth.
15            THE COURT:  May 24th at what time?
16            THE CLERK:  At 9:00 --
17            THE COURT:  At nine o'clock.  Okay, so I will get a
18 final order that day that I will enter in all of the cases.  So
19 if you have some concerns, please dial into that case.  Okay.
20            MS. BAER:  Your Honor, we have a couple of
21 housekeeping matters --
22            THE COURT:  All right.
23            MS. BAER:  -- that we'd like to take up.  The first
24 is, Your Honor, we submitted on March 25th a certification of
25 counsel along with the case management order for asbestos

1  property damage, and that order has not yet been entered.  I do

2  have a copy of the certification of counsel and order here if I

3  could request that the Court enter it.

4        THE COURT:  Yes, please.  I don't remember -- I truly

5  don't recall seeing this one.  Thank you.

6        MS. BAER:  You may recall I went through the terms of

7  it in court last time.  We then worked with Mr. Baena's office

8  to get an agreement, circulated it to all committees, not just

9  to property damage, and ultimately agreed on the language.

10                        (Pause)

11        THE COURT:  Okay, so the next time, unless there is

12  some discovery issue, that I should expect to hear from you

13  folks about this will be at the December omnibus hearing?

14        MS. BAER:  That's correct, Your Honor.

15        THE COURT:  And then we'll take it further from

16  there.

17        MR. BAENA:  With one caveat, Judge.  That assumes

18  there's no discovery disputes, and the only thing that has come

19  up, and it's come up real recently, like last Thursday, was

20  something that perhaps we didn't appreciate altogether, Judge,

21  but -- and if so, I take responsibility for it, but I don't

22  think that's the case.  In the course of a meet and confer with

23  the debtor last Thursday, we found out that the debtor intends,

24  as part of an estimation hearing in respect of all asbestos

25  property damage claims, to challenge the notion that any of

1 their products are harmful.  They're doing that in spite of the
2 long history of losing that issue in the State and Circuit
3 Courts.  It's certainly not an issue that we immediately think
4 of when we sort envision what an estimation proceeding is going
5 to be like, and when we negotiated and drafted the CMO that is
6 before you, we certainly didn't contemplate that we were now
7 going to talk about shall we say 50 years of science that
8 relates to the debtor's products.  The principal product that
9 gave cause to asbestos property damage in this case is a
10 product called Monokote 3.  It was a fireproofing product.  It
11 contained vermiculite.  It was added to the product.  And the
12 debtor has lost that issue numerous times before, as I said.
13 That's going to obviously entail much more work in the context
14 of the estimation proceeding than I think anybody contemplated.
15 I suspect you didn't contemplate --

16            THE COURT:  You're right about that.

17            MR. BAENA:  Yes.  Now, in that regard, Judge, we have
18 been in discussions with the debtor about how we can do this as
19 painlessly as possible if the Court is inclined to actually
20 have a science trial now.  We find that they have a repository
21 that has over a million documents.  They suggest that, instead
22 of us looking at it, that we talk to others that have litigated
23 this issue before, which we'll do.  I suspect they'll tell us
24 that those -- whatever they got are their documents, not mine.
25 And obviously when I contemplated expert reports, I wasn't

1  thinking about scientists to talk about the product.  I wasn't
2  thinking about deposing their scientists.  I wasn't thinking
3  about any of that stuff, Judge, to be honest with you.

4       So, we have our expert reports due in July.  That's
5  the first real big event here.  And this new issue certainly
6  bears upon that, and I just want to be in a position of
7  deniability which I can come to you before July and say, Judge,
8  this issue about science is a lot bigger than I thought it was.
9  I'm not getting access, unless I actually go through a million
10 documents, to the documents that refer to 40 or 50 or 60 years
11 of science, and I -- and that's all I'm saying, Judge.

12       THE COURT:  Well, wouldn't it make more sense if the
13 debtor had to compile a list of what products it intends to
14 litigate?  I mean, for example, is the debtor going to litigate
15 at this point whether asbestos out of the Libby mines that went
16 into products is somehow not harmful?

17       MS. BAER:  Your Honor, I think the issue is whether
18 or not MK3 in a building is harmful and therefore needs to be
19 removed and, with all due respect to Mr. Baena, we've actually
20 won that issue more than we've lost it.  But the fact that
21 we've lost it has, in fact, of course created many asbestos
22 property damage claims and settlements over the years.  I look
23 at it as a data point that will be factored into the
24 estimation, and the Court will look at it as a data point and
25 determine how strong or how weak the position is in coming up

1 with a complete and total estimation of the value of asbestos
2 property damage claims.

3       THE COURT: So, you're going to value the likelihood
4 that you're going to either win or lose that issue in
5 litigation? You're not really going to determine the science
6 behind the MK3 product?

7       MS. BAER: Your Honor, I think that's right, although
8 I'm not an expert on evaluation, and I have not been the one
9 dealing on a day-to-day basis with our experts, but I would say
10 that what Mr. Baena raises is a good point, and that is, this
11 has to be a continuing dialogue among all of us. Frankly, I'm
12 afraid now that we're almost in May that a July deadline is
13 starting to loom at us very quickly, and my feeling is let's
14 see where we go. We are in dialogue with respect to document
15 production and what has to be produced, focusing, you know, on
16 current as well as historic settlement information before we
17 even get into the science issue. As I stand here, I really
18 don't even know ourselves what exactly we're intending to do.

19       THE COURT: Well, I think that's --

20       MR. BAENA: That's a pretty clear roadmap, Judge.

21       THE COURT: Well, I think that -- a roadmap is
22 exactly what we need I think. You know, maybe you need some
23 form of decision tree that tells you if discovery shows one
24 thing you're going this way, and if it shows something else,
25 you're going another. I don't know. But whatever way you

1  decide to do it, I think before we get into this whole
2  estimation process we need to know what issues both the debtor
3  and the committee are going to raise.

4       MR. BAENA:  I thought I was estimating 40 to a
5  hundred claims, Judge.  That's what I thought I was doing.  I
6  didn't know that I was now going to, in the context of this
7  bankruptcy, re-litigate science, and in all due respect, I've
8  read all the cases that talk about Monokote.  I hear them
9  telling me they won more than they've lost.  I guess they were
10 published and somebody burned all the books that all those
11 publications were in because I haven't found that.

12       THE COURT:  Well, you don't necessarily publish cases
13 all the time either.

14       MR. BAENA:  Yes, but, Judge, be that as it may, I
15 think the best thing to do is not sign that CMO at this point
16 and for us to discuss the discovery issue this week, over the
17 next week, because we are going to get together in a week, and
18 for us to have the continuing honest and candid conversations
19 we're having about what the likelihood is of us actually making
20 a July 1 deadline.

21       THE COURT:  Well, okay, I mean, it's up to you, but I
22 really do want to try this case before, you know, my age is
23 such that they kick me off the bench, so --

24       MS. BAER:  Your Honor, we are, in fact, estimating
25 forty-two hundred claims.  That is the goal here.  That is what

1 we're doing.  Again, however, there are many data points that
2 go into estimating forty-two hundred claims.  My concern is if
3 we don't have an order entered, we're going to be in July
4 before we submit another order.  We need some targets to try to
5 hit to move it along.

6       THE COURT:  All right.  I'll sign the order, but I'm
7 going to make one change to it, and that is that you are to put
8 it on the omnibus hearing which is June the 27th in Delaware so
9 that we can discuss whether you're really going to finish
10 discovery July 1st, which is the beginning of the next week.

11       MR. BAENA:  No, it's not discovery, Judge.  It's the
12 expert reports.

13       THE COURT:  I'm sorry, expert report -- oh.

14       MR. BAENA:  In all due respect, four days --

15       THE COURT:  I see.  That's not going to do you much
16 good, no.

17       MR. BAENA:  -- is not a spot to be in.  No.  I think
18 you could put it on for the next hearing, Judge, the next
19 omnibus hearing.  We are in dialogue.  Ms. Baer has been
20 terrific about getting back to us promptly.  We have another
21 discussion tentatively planned for this week, and we'll keep at
22 it.  Frankly, we've started to turn most of our attention to
23 this in our shop, and I suspect they're starting to turn that
24 way, too, in theirs.  So, I'm perfectly comfortable saying we
25 could come back to you next month and at least have addressed

1  the issues amongst ourselves.

2       THE COURT:  Well, it may make some sense.  I'm not

3  quite sure how you're going to get all the expert things done

4  by July if you don't know specifically what issues you need

5  experts on.

6       MR. BAENA:  Exactly.

7       MS. BAER:  Your Honor, given the timing, let's just

8  -- why don't we put the matter on for status on May 16, which

9  is the next time we're here?  It's only three weeks.

10      THE COURT:  That's fine.

11      MR. BAENA:  That's fine.

12      THE COURT:  Okay, why don't you try to take a stab at

13 a different order with dates that -- or the same order if

14 that's what you want entered next time, but, after you have had

15 a chance to talk, at the next hearing just give me an order if

16 you're able to agree to dates.

17      MS. BAER:  We'll do that, Your Honor.

18      THE COURT:  Okay.

19      MS. BAER:  The next housekeeping matter I'd like to

20 take up has to do with the personal injury order.  Your Honor,

21 last week, unbeknownst to us, the Court entered an order which

22 set out the personal injury schedule, and it's unfortunate that

23 we did not file a formal paper, although we had been in talks

24 with your clerk about changing those dates.  All of the parties

25 had agreed to change the dates, and we were working with your

1  clerk to get a new trial date.  Under these circumstances, Your
2  Honor, what we would ask is that Your Honor vacate the order
3  which was entered on the docket as Number 8239, and I have a
4  copy of the motion to vacate the order which we did file last
5  week and an order vacating, and then we're asking for the Court
6  to enter a new order setting a briefing schedule and hearing
7  with respect to the case management order issues on asbestos
8  personal injury.  And, Your Honor, on the new --

9       THE COURT:  Didn't I give the -- I'm sorry, maybe I'm
10  confused again.  Wasn't this the call that my office got about
11  dates and I told your office that it had to be certain dates in
12  August because that's when I have time?

13       MS. BAER:  That's the new order.

14       THE COURT:  The new order.

15       MS. BAER:  Unfortunately, Your Honor, the old order,
16  which already had briefs due and finished and a June hearing
17  date, was the one that got entered.

18       THE COURT:  I see.  Okay, I'm happy to correct it.

19                      (Pause)

20       MS. BAER:  Your Honor, and on the new order I'll just
21  note that it was the debtors' wish that we could have a hearing
22  before August 17th, but we understood the Court's schedule
23  would not permit.  To the extent a date opened up, we'd still
24  like to get heard.  The briefing, Your Honor, takes us through
25  the end of June.

1      THE COURT:  No, actually, I think I had several other
2  dates that were proposed, but parties had conflicts, but there
3  were not two days together.

4      MS. BAER:  Yes, you had a July 6th date which was
5  okay with the debtors, but Mr. Lockwood was going to be out of
6  town, and I think we began talking about separate dates, and we
7  were told it's August 17th.

8      THE COURT:  I still like that better.  Okay.  Thank
9  you.

10                         (Pause)

11      THE COURT:  All right, I've signed the order that
12  vacated the order at Docket Number 8239.  And I've signed the
13  order that sets the hearing on August 17.  If dates do open up,
14  I mean, I'm happy to have my staff call you, but who all will
15  you have to notify?  I mean, is it really realistic to expect
16  that you're going to get everybody there at an earlier date?

17      MS. BAER:  Your Honor, again, the briefing will be
18  done by the end of June, and this is the issue of the
19  questionnaire, the form of the questionnaire --

20      THE COURT:  Right.

21      MS. BAER:  -- the propriety of the questionnaire, and
22  the bar date.  So, you know, if a date opened up in mid-July, I
23  would think it would not be a problem to make that date, but I
24  guess we'll just have to see how things go.

25      THE COURT:  Okay, let me make a note.

1    MR. BAENA: Your Honor, just so we're clear, I'm
2 going to be out of the country between June 27th and July the
3 14th I think, and, as so, it would have to be in the second
4 half of July.

5    THE COURT: It's not going to happen in the second
6 half of July, so, if that's the case, it's going to be August
7 17th. Okay.

8    MS. BAER: We understand, Your Honor. Your Honor,
9 the final matter is, I just wanted to report that lest the
10 Court forget, we actually are talking to various constituents
11 in the hope to move things forward, and one thing I have to
12 remind the Court of is unfortunately ZAI continues to be an
13 impossible --

14    THE COURT: I'm working on it, and I'm going to get
15 there when I get there. That's the best I can tell you folks.
16 I have two other opinions that are going to be off my desk
17 before you get the ZAI opinion, so if you're opinion watchers,
18 you can look for them. And I'm working on it.

19    MS. BAER: Thank you, Your Honor. We appreciate it.
20 We certainly can't ask anymore than that, and it's unfortunate
21 that it's a stumbling block we can't seem to get over.

22    THE COURT: Okay. I guess I don't -- why is that?
23 Maybe if I understood what the stumbling block is -- I'm not --
24 do you mean because of the claim form?

25    MS. BAER: Because of the magnitude. If ZAI -- if

1  there is a legitimate basis for a ZAI claim, the magnitude of

2  the ZAI claims could be so large it would dwarf the other

3  claims.

4          THE COURT:  Oh, you're talking about for plan

5  negotiation process.

6          MS. BAER:  Correct.

7          THE COURT:  Okay, I thought you were talking about

8  all the other estimation hearings and things that still need to

9  be done.

10          MS. BAER:  No, it doesn't affect that at all.

11          THE COURT:  Okay.

12          MS. BAER:  It's for plan purposes in terms of moving

13  forward.

14          THE COURT:  I understand, but, as I said earlier, if

15  this case were coming up for plan confirmation next month, I

16  think I promised Mr. Lockwood or -- and Mr. Westbrook,

17  somebody, that I would get to it within 30 days, but since this

18  case isn't coming up for plan confirmation, I'm going to do it

19  when I can get to it.

20          MS. BAER:  We understand, Your Honor.

21          THE COURT:  Okay, thank you.  But I am working on it.

22          MS. BAER:  Thank you, Your Honor.  That concludes the

23  agenda from our listing here.

24          THE COURT:  Mr. Baena?

25          MR. BAENA:  May it please the Court, Your Honor, I

1  hadn't contemplated raising this matter with you today, and I
2  certainly, therefore, didn't expect to engage in any
3  substantive debate, and I gather at three o'clock in the
4  afternoon you don't wish to either, but I feel constrained to
5  say something nonetheless.  Last month at your omnibus hearings
6  I was apprised that in the U.S. Mineral case the Court made a
7  reference to the rights of property damage claimants to
8  treatment under 524(g).  I was not in attendance at that
9  hearing.  That statement was just alluded to as well earlier in
10 today's hearing.  Again, I don't want to debate it with you.  I
11 don't think time permits us to debate it, but I did want to
12 confirm that that was a view by the Court, not a ruling, and
13 that an event hasn't occurred where PD would have been expected
14 to react yet to that view.

15      THE COURT:  As far as I know, at the moment I haven't
16 got either the disclosure statement or the plan confirmation
17 hearings coming up, so you don't have to react to it.  If there
18 is the contemplation that there will be a property damage trust
19 to pay future claims, as there is with asbestos personal injury
20 claims, I do want some authority and some information as to how
21 that's going to work.  Because of my understanding, and if the
22 understanding is wrong, then maybe that's the short circuit
23 around this, that the property damage claims are known and
24 fixed.  You know, asbestos, as I understand it at least from
25 the debtor's point of view, is not an ongoing issue being used

1   in buildings.  If I'm incorrect and there is till that use and
2   there will still be future claims, then that's a different
3   issue.  Future claims maybe can be dealt with that way, but I
4   don't know how past claims are going to be dealt with that way.

5              MR. BAENA:  Okay.  I do understand the dichotomy in
6   the Court's view between present and future property damage
7   claims --

8              THE COURT:  Right.

9              MR. BAENA:  -- and how 524(g) may apply differently
10  in respect of the two.

11             THE COURT:  Yes.

12             MR. BAENA:  And I do understand the Court's inquiry
13  about whether or not there's a possibility of future claims of
14  the property damage nature in this and other cases.  And I make
15  the point, Judge, it may be different from case to case.

16             THE COURT:  It may be.

17             MR. BAENA:  And there is, in fact, an explanation
18  that will go a long way to clarifying the Court's views on it,
19  but I don't think this is the right platform for that, because,
20  as you say, we're just talking to ourselves for the moment.  I
21  do want to tell the Court, though, in case it somehow escaped
22  you, that there -- the plan that the debtor filed, those
23  contemplate the treatment of property damage claims --

24             THE COURT:  Yes.

25             MR. BAENA:  -- much the same way as it contemplates

1  treating personal injury claims, and indeed the estimation

2  process in respect of property damage that we're undertaking in

3  large part emanated from the fact that under the debtor's plan

4  it has capped the total amount that it will fund a 524(g) trust

5  for in respect of both personal injury and property damage.

6  And that was really the genesis of the estimation proceeding.

7  So, it's sort of here, but we put that plan on the side, and in

8  the right context we'll address these issues with the Court and

9  we'll show you how there is a propensity for future property

10 damage claims.  That's not an issue, though, that's engendered

11 by the estimation hearing, and I want to make sure that there's

12 no disconnect on that, because this estimation hearing as it's

13 been designed by the Court and the debtor is only in respect of

14 the forty-two hundred filed claims.

15         THE COURT:  That's all I understood that there were

16 going to be.

17         MR. BAENA:  Well, that's all there is by virtue of

18 filed proofs of claims.  And so, you know, the issue in this

19 estimation proceeding isn't, can there be a future property

20 damage claim and, if so, what is the value of it?  That has not

21 been teed up.  In fact, the estimation proceeding that they're

22 doing in respect of personal injury is likewise somewhat

23 limited because they're only seeking to estimate, as I recall,

24 based upon filed claims as of the date of the bankruptcy

25 petition, which is a different exercise, too.  So, I just don't

124

1 want us to get two years down the road, or a year down the
2 road, and everybody say, well, wait a second, what are we doing
3 here?

4          THE COURT:  If there is the possibility that there is
5 need for future property damage claims, then I said earlier
6 that's a fundamental misunderstanding on my part.  I thought
7 that in this case, at least in this case, the property damage
8 claims were a known universe, and therefore there was not a
9 future aspect to it.  I didn't think we were estimating future
10 property damage claims because I didn't think there were any
11 future property damage claims, not because if there are some
12 they don't need to be estimated.  If there are some, they do
13 need to be estimated, but then that's something that we need to
14 address.

15          MR. BAENA:  The problem, of course, Judge, is that
16 property damage hasn't emerged as a significant factor in many
17 asbestos bankruptcy cases.

18          THE COURT:  That's right.

19          MR. BAENA:  And in those cases where it has emerged,
20 where there's been confirmation, some have been pre-524(g), so
21 that doesn't provide us any information on this subject, and
22 the one case that had a 524(g) didn't deal with this issue
23 because it was a consensual plan.  That was the Celotex case.
24 But it clearly issued a 524(g) channeling injunction in respect
25 of present and future property damage claims.  There are a lot

 1  more moving parts in that case, but that's in a very general

 2  sense what happened there.

 3          As a result of that, there's an absolute void of any

 4  discussion by way of decisional law or treatise on what is a

 5  future property damage claim.  You alluded in your comment to

 6  an example, if there were future abatement costs I think you

 7  refer to.  I'm not so sure that that's the perfect definition

 8  of a future property damage claim, but, you know, I say

 9  rhetorically by way of example, what if in a jurisdiction an

10  action for property damage doesn't accrue until there's

11  contamination?  Is it the fact of contamination that gives rise

12  to the claim?  In that jurisdiction it is.  Is that a future

13  property damage claim?  I mean, there's a large debate here

14  that we can have.  I don't think five minutes to 3:00 on an

15  omnibus hearing date is the way to have it, but there is

16  clearly the possibility of future property damage claims.  I,

17  as counsel to the committee of asbestos property damage

18  claimants, like Mr. Lockwood, as counsel to the asbestos

19  personal injury claimants, don't view my role as representative

20  of future claimants.

21          THE COURT:  Well, that's because, as I said earlier,

22  I didn't expect that there were such things in this case, and

23  if there are then it seems to me that we need to get a future

24  claims rep in if there is going to be some 524(g) aspect for

25  future property damage claims.

1          MR. BAENA:  And that may be the larger discussion and
2  platform for this conversation.

3          THE COURT:  I had a headache before this started --

4          MR. BAENA:  I thought I'd leave this hearing on a
5  high note, Judge.

6          THE COURT:  Thank you so much.  Okay.

7          MR. BAENA:  Thank you.

8          THE COURT:  My understanding of the existing
9  estimation hearing is that it is for present the forty-two
10  hundred filed --

11          MR. BAENA:  The filed claims.

12          THE COURT:  -- claims.

13          MR. BAENA:  The filed claims.

14          THE COURT:  Yes, that's what my understanding was.
15  So, yes, if there is a broader issue, then I agree we need to
16  get it teed up for discussion.  My comments have been intended
17  to make people think about whether or not 524(g) is appropriate
18  in a context of property damage claims.  It has apparently had
19  that effect, maybe more so than I had hoped, but now that it's
20  out there we do need to have a discussion about it at some
21  point, either in a disclosure statement or plan context, or
22  sooner if it's appropriate.

23          MR. BAENA:  That's all I wanted to say, Judge.

24          THE COURT:  Okay.

25          MR. BAENA:  Thank you.

1        THE COURT:   Thank you.   Anybody else?   Okay, this

2   case is recessed.   Thank you.

3                        * * * * *

4                   **C E R T I F I C A T I O N**

5        I, DENISE M. O'DONNELL, court approved transcriber,

6   certify that the foregoing is a correct transcript from the

7   official electronic sound recording of the proceedings in the

8   above-entitled matter, to the best of my ability.

9   *Denise M. O'Donnell*

10  DENISE M. O'DONNELL

11  J&J COURT TRANSCRIBERS, INC.        Date:   May 2, 2005