## IN THE UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*, | ) | **Case No. 01-1139 (JKF)** |
| | ) | **(Jointly Administered)** |
| **Debtors.** | ) | |
| | ) | |

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF W.R. GRACE & CO.'S MOTION TO APPROVE PI CMO AND QUESTIONNAIRE

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet Baer
Jonathan P. Friedland
Salvatore F. Bianca
Joseph Nacca
Andrea L. Johnson
200 East Randolph Drive
Chicago, IL 60601
Telephone:    (312) 861-2000
Facsimile:    (312) 861-2200

KIRKLAND & ELLIS LLP
Barbara M. Harding
Brian T. Stansbury
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:    (202) 879-5000
Facsimile:    (202) 879-5200

Dated:  May 10, 2005

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
Laura Davis Jones (Bar No. 2436)
David Carickhoff (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession

## **TABLE OF CONTENTS**

TAB 1          Recent Procedural History

TAB 2          Relevant Factual History – How Did We Get Here?

TAB 3          Legal Argument

TAB 4          The Questionnaire

TAB 5          Conclusion

TAB 6          Appendix

i

# TAB 1

# RECENT PROCEDURAL HISTORY

## I.    THE PLAN AND DISCLOSURE STATEMENT

The Debtors filed their Plan and Disclosure Statement on November 15, 2004 (Docket Nos. 6895 and 6896) and Amended Plan and Disclosure Statement on January 13, 2005 (Docket Nos. 7560 and 7559) (when used herein, the term "Plan" refers to the Amended Plan).

The Plan divides Asbestos Claims[1] into two categories: (1) Asbestos PI Claims and (2) Asbestos PD Claims.   The Plan further divides Asbestos PI Claims into two Classes: (a) Asbestos PI-SE Claims (a.k.a. Asbestos Personal Injury Symptomatic/Eligible Claims), and (b) Asbestos PI-AO Claims (a.k.a. Asbestos Personal Injury Asymptomatic/Other Claims).

All Asbestos Claims would be channeled to an Asbestos Trust pursuant to the Plan and Bankruptcy Code § 1124(g), at which point the Holders of Asbestos PI Claims would have the option of settling their Claims with the Asbestos Trust or litigating such Claims against the Asbestos Trust.

## II.    THE ESTIMATION MOTION

Contemporaneously with filing the Plan and Disclosure Statement, the Debtors filed their Estimation Motion seeking an order that, among other things, estimates the total amount (to be contributed to the Asbestos Trust) that would fully satisfy asbestos-related claims as well as the expenses of the Asbestos Trust.   *See* Motion for Entry of an Order Seeking the Estimation of Asbestos Claims and Certain Related Relief (Docket No. 6899).  The Debtors intend to use such estimates to demonstrate the feasibility of the Plan and in support of the other factual findings that must be made to confirm the Plan.

---

[1]    Capitalized terms not defined in the Brief have the same meaning ascribed to them in the Plan.

1

At the January 21, 2005 hearing, the Court determined that it would estimate the value of asbestos-related claims and instructed the Debtors to work with the Asbestos PI Committee and the FCR and negotiate a Case Management Order for the estimation. Integral to an estimation process is the solicitation of information from Holders of Asbestos PI Claims that will assist the Debtors and the Court in determining the actual value of the Asbestos PI Claims. The Court already has approved the use of a questionnaire for this purpose in connection with asbestos property damage claims and has indicated that the same should be done for personal injury claims:

> It seems to me that if the debtor thinks that it has some value to do a questionnaire, and you know, the form of discovery, I think, is somewhat within the discretion of the Court and we could treat it as though it's a series of interrogatories . . . But, coming down to a reasonable type of questionnaire to get some information, so that the debtor's experts can decide what the debtor thinks is a proper valuation, it may have relevance to the committee. The committee may choose to use it for different purposes, I don't know. But, I'm not sure that it hurts to get that step done . . . But, I do agree with you, that the appropriate way to do this is through a battle of experts. So, whatever spin the experts put on the questionnaire, maybe they'll be the same spin. Maybe it won't be the same spin. I don't know. But, I think that should be an expert analysis function that goes forward.

Tr. of Hr'g. at 132-33 (Jan. 21, 2005). *See also id.* at 139 ("[T]he information that the debtor wants, I think, is appropriate for an expert to take a look at. Whether I'm going to consider it, what value I'll place on it, whether it meets *Daubert* or not, I think is an issue down the road. What the debtor intends to do seems to me, in an estimation process, to be calculated to lead to relevant admissible evidence. And for a discovery on an estimation process, that's all I need."); *id.* at 155 ("I think the questionnaire's a good idea, but it's not going to be 50 pages."); Order Setting Briefing Schedule and Hearing Regarding Case Management Order and Proof of Claim/Questionnaire for the Estimation of Asbestos Personal Injury Liabilities (Docket No.

2

8324) ("[A]t the Estimation Motion Hearing, the Court ordered the [PI Committee], the [FCR], and the Debtors to (a) negotiate a case management order to govern the estimation of asbestos personal injury claims [], and (b) the form of the Debtors' proposed proof of claim/questionnaire for asbestos personal injury pre-petition litigation claims [].").

Nonetheless, after considerable negotiation, the Asbestos PI Committee and FCR remain unwilling to agree to the Debtors' Questionnaire. The Debtors therefore seek the Court's approval of the CMO and Questionnaire.

**TAB 2**

**<u>RELEVANT FACTUAL HISTORY -</u>**

**<u>HOW DID WE GET HERE?</u>**

# I.  OVERVIEW

Courts, Congress, the medical community, legal commentators, and even certain plaintiffs' lawyers all have recognized the rampant problems and abuses that have plagued asbestos litigation for years.  For instance, the U.S. Supreme Court has called the situation an "elephantine mass"[1] and a "crisis."[2]  The Third Circuit has called it "an unparalleled situation in American tort law,"[3] while the U.S. District Courts have described it as a "crisis"[4] and "a festering wound on our society."[5]  Legal commentators have characterized asbestos litigation as a process which renders individualized justice a "chimera"[6] and as "a massively fraudulent enterprise" amounting to a legal "swindle[]."[7]

This section of the Brief chronicles the defects of the past asbestos claims resolution process, both in the tort and bankruptcy systems.  These problems are not a matter merely of historical interest.  Rather, this case has inherited those problems and cannot be further advanced unless the problems are addressed. Specifically, as described below, the common thread and

---

[1]  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 821 (1999).

[2]  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 597 (1997).

[3]  *In re School Asbestos Litig.*, 789 F.2d 996, 1000 (3d Cir. 1986).

[4]  *G-I Holdings, Inc. v. Baron & Budd*, 179 F.Supp.2d 233, 237 (S.D.N.Y. 2001).

[5]  *In re Joint E&S Dists. Asbestos Litig.*, 237 F. Supp. 2d 297, 300 (E&S.D.N.Y. 2002) (citation omitted).

[6]  Rand Institute for Civil Justice, *Asbestos Litigation Costs and Compensation: An Interim Report*, 88 (2002) (hereinafter "Rand Report, 2002") (Appendix Exhibit A).  (Note that a pre-publication final version of the report, *Asbestos Litigation*, was issued on May 10, 2005, the day this brief was filed, and can be found at http://www.rand.org/pubs/monographs/2005/RAND_MG162.pdf.  The Debtors have not reviewed the newly issued report at the time of the filing of this Brief but may seek the Court's permission to address it at a later time in a supplemental filing.)

[7]  *The Fairness in Asbestos Injury Resolution Act of 2003*, S. Rep. No. 108-118, at 98 (2003) (statement by Sen. Jon Kyl, Member, Sen. Comm. on the Judiciary) (quoting Lester Brickman, *The Great Asbestos Swindle*, Wall St. J., Jan. 6, 2003, at A18).

1

primary flaw of past attempts to manage asbestos litigation has been the failure to link the payment of an asbestos personal injury claim to: (1) the production of reliable medical evidence of a legally cognizable asbestos-related disease; and (2) reliable objective evidence of exposure to the defendant's product sufficient to cause disease. The Debtors seek the opportunity to propose an estimation procedure that avoids these problems. By contrast, an estimation based on historical settlements, as proposed by the Asbestos PI Committee and FCR, would knowingly perpetuate and magnify the mistakes of the past.

II.    **THE VICIOUS CYCLE OF ASBESTOS LITIGATION: MASSIVE CLAIMS LEAD TO MASS SETTLEMENTS AND LAX EVIDENTIARY REQUIREMENTS -- WHICH, IN TURN, LEAD AGAIN TO MEDICALLY IMPOSSIBLE NUMBERS OF NEW CLAIMS**

This section traces the emergence of problems in asbestos litigation from the original Manville Trust through the unprecedented new wave of claims in 1999-2000 that directly precipitated Grace's decision to file for bankruptcy under Chapter 11. A basic proposition emerges from this history. To wit: In an attempt to manage massive numbers of claims, defendants, debtors, and the courts have chosen "efficiency based" solutions over "evidence based" solutions, and thereby prompted a further massive influx of claims lacking a sound evidentiary basis.

A.    **The Johns-Manville Trust: Claims Surge and Medical Data Deteriorate When Medical and Exposure Evidence Are Not Required.**

Under the original, negotiated plan of reorganization in Johns-Manville, Manville's asbestos injury legal obligations were assumed (and expected to be fully satisfied) by the Manville Personal Injury Settlement Trust. *See Findley v. Blinken (In re Joint E&S Dists. Asbestos Litig.)*, 129 B.R. 710, 752 (E.&S.D.N.Y. 1991), *vacated by* 982 F.2d 721 (2d Cir. 1992), *opinion modified on reh'g*, 993 F.2d 7 (2d Cir. 1993). The Trust had no pre-determined evidentiary requirements concerning submission of proof of exposure to Manville asbestos or

2

proof of disease, and claimants were also allowed to re-enter the tort system.  *See id.* at 755-58.[8]

Consequently, within the first two years of operation, the Manville Trust "faced almost 50%

more claims than the *highest projection* made at the time of confirmation for the total number of

claims to be filed during the entire life of the Trust."  *In re Joint E&S Dists. Asbestos Litig.*, 129

B.R. at 758, 769 (at confirmation, highest estimate for the life of the trust was 80-100,000 claims

but after only 2 years, over 240,000 claims filed).  Judge Weinstein stepped in to stay claims

processing before the money ran out.  *Id.* at 762.

During "arduous and extensive" negotiations and related litigation between 1990 and

1995, the Manville Trust's payment process was restructured.  *Id.* at 766.  Access to the tort

system, for all practical purposes, was eliminated.  *Id.*  However, the reorganized process still did

not require scientifically reliable medical evidence of an asbestos-related disease.  *In re Joint*

*E&S Dists. Asbestos Litig.*, 237 F. Supp. 2d 297, 314 (E.&S.D.N.Y. 2002) ("[I]t [was] difficult if

not impossible to determine on the basis of the information required to be submitted to the Trust

the percentage of claimants who did or did not suffer impairment in their daily lives.").  The

Manville Trust's adoption of lax payment criteria prompted a massive influx of asbestosis

claims.  *See* Patricia G. Houser Dep. at 195-97, *Falise v. Am. Tobacco Co.*, CV 97-7640

(E.D.N.Y. Sept. 20, 1999) (Executive Director of Johns-Mansville Trust acknowledging that as a

result of numerous claims filed against the trust relying on X-rays and PFT's of a "highly

questionable nature and quality," annual "asbestosis claims exceeded projections by

approximately 50 percent.").

---

[8]    Lester Brickman, *Lawyers' Ethics and Fiduciary Obligations in the Brave New World of Aggregative Litigation*, 26 Wm. & Mary Environ. L. & Pol'y Rev. 243, 292 n. 136 (2001) (hereinafter "Brickman 2001")(Appendix Exhibit B).

In response to the flood of claims, the Manville Trust conducted an outside claims audit. This audit revealed massive abuse: 41% of claims presented *no* evidence of asbestos-related disease. *See* A.R. Localio *et al.*, Biostatics Section, Dept. of Health Evaluation Serv., Penn. State Univ. College of Medicine & Center for Clinical Epidemiology and Biostatics, *The Manville Personal Injury Settlement Trust X-ray Audit: An Assessment of the Identification of the Underlying Disease Process Implications for Medical Review by Certified B-Readers* at 14 (1998) (Appendix Exhibit C) (hereinafter, the "Penn. State Audit"). [9]  For a substantial percentage of the remaining claims, independent doctors could not replicate the diagnosis of an asbestos-related disease. *Id.*



_____
[9]    For a further discussion of the audit and the circumstances surrounding it, *see* Lester Brickman, *On the Theory Class's Theories of Asbestos Litigation: The Disconnect Between Scholarship and Reality*, 31 PEPP. L. REV. 34, 132 n. 344 (2003) (hereinafter "Brickman 2003") (Appendix Exhibit D); and Rand Report, 2002, *supra*.

Failure rates for replication were highest among a small group of doctors, as seen in the above chart. *Id.* Indeed, 63% of the asbestosis claims supported by this handful of doctors could not be replicated by independent experts and over 1/3 of these claims showed *no evidence* of asbestos-related disease. *Id.* The audit also discovered a statistically significant correlation between the failure rate of a doctor and the law firm by whom the doctor was retained. *Id.*[10] But the most startling fact of all was the revelation that this handful of doctors accounted for almost ½ of the *total claims* against the Manville Trust. *Id.*



As the chart above demonstrates -- for the single most active doctor, 49% of his claims showed *no evidence of disease* whatsoever. *Id.* Not surprisingly, referrals to this doctor

---

[10] *The Fairness in Asbestos Injury Resolution Act of 2003*, S. Rep. No. 108-118, at 98 (2003) (statement by Sen. Jon Kyl, Member, Sen. Comm. on the Judiciary). The biostatisticians conducting the audit concluded, in a written report submitted to the trust in February 1998, that the particular law firm that submitted any given claim was "a strikingly significant predictor" of whether that claim would fail the audit, and that those findings exhibited "huge levels of statistical significance."

91100-001\DOCS_DE:107964.1

increased over time.  *Id.*  In 1983, he submitted fewer than 1% of asbestosis claims received by the Manville Trust.  *Id.*  By 1996, as shown in the above chart, the diagnoses of this *one* doctor supported almost *one-third* of all asbestosis claims received by the Manville Trust.  *Id.*

Given the level of abuse uncovered by the audit, the Manville Trust sought to expand the audit program to include audits of all claims submitted by certain law firms and doctors.  *See The Fairness in Asbestos Injury Resolution Act of 2003*, S. Rep. No. 108-118, at 98 (2003) (statement by Sen. Jon Kyl, Member, Sen. Comm. on the Judiciary.)  Plaintiffs' attorneys, however, resisted the Trust's attempts to expand the audit program.  *See* Brickman 2001 at 290.[11]  Judge Weinstein accepted the plaintiffs' lawyers' arguments, and the Trust abandoned its audit program.[12]  Thus, the Manville Trust was forced to continue to pay substantial numbers of dubious claims.

The influx of claims over the following years ultimately became so severe that Manville temporarily imposed a moratorium on new claims in spring of 2001, then in June 2001 cut its payout in half, from ten cents on the dollar to just five cents on the dollar.  *See In re Joint E&S Dists. Asbestos Litig.* 237 F. Supp. 2d at 314.[13]

---

[11]  Nine plaintiffs' firm sued to stop the audits in 1998.  Brickman 2001, *supra,* at 290.  The case was heard by Judge Weinstein sitting without a jury.  *Id*.

[12]  Judge Weinstein questioned the authority of the trust to audit the claims, stating that "the Trust had no business medically auditing claims (regardless of any authority to do so in the Trust documents) and that absent 'manifest fraud' . . . the Trust was expected to pay every claim filed for the full amount of the claim." Brickman 2003, *supra*, at 134 (citing Letter from David T. Austern, President, Claims Resolution Management Corporation for the Manville Personal Injury Settlement Trust, to Lester Brickman (Oct. 3, 2001)); Brickman 2001, *supra*, at 291 (same).

[13]  Manville Trust, Highlights of the 4th Quarter 2001 Filing (2001), available at http://www.mantrust.org/FILINGS/q4_01/4THQTR01.htm (last visited May 6, 2005); MEALEY'S LITIG. REP.: ASBESTOS (August 3, 2001) at 14.

The Manville Trust's payment standards were changed again in 2002.  *See* 237 F. Supp. 2d at 324.  The new "TDP" adds a provision mandating that all diagnoses be based on physical examinations.  In addition, the Trust must be satisfied that all medical evidence submitted is:

> [c]redible and consistent with recognized medical standards and may direct the submission of such documentation as it requires to support this determination. These provisions will allow the Trust to ensure that claims meet adequate standards of proof (that is, standards of proof that would entitle them to compensation in the tort system). These requirements will likely require most facilities currently conducting asbestos screening to change their processing of potential claimants.

*Id.*  Critics  have asserted that these evidentiary requirements are still "inadequate to ensure that 'medical evidence provided in support of . . . claim[s] is credible and consistent with recognized medical standards'" and do "not adequately address the root of the problems facing the Trust, mass screenings." *Id.* at 328 (citations omitted).

### B.    Inventory Settlements Not Tied to Valid Medical and Exposure Evidence Caused Claims to Soar In the Tort System.

The Manville trends were also reflected in claiming trends against asbestos defendants as a whole.  In order to avoid the same fate as Manville, many companies chose to pursue a privatized claims resolution process in which they agreed to settle claims on a mass basis in lieu of traditional tort system litigation.[14]   These inventory settlements, however, repeated the mistakes of the Manville Trust because they were not adequately anchored to traditional proof of liability.  Instead, they focused on settling claims -- regardless of real validity -- simply to stave

---

[14]    *See In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1298 (7th Cir. 1995) (observing that aggregation exposes the defendant to "intense pressure to settle"); *id*. at 1304 ("The number of asbestos cases was so great as to exert a well-nigh irresistible pressure to bend the normal rules."); Francis E. McGovern, *Rethinking Cooperation Among Judges in Mass Tort Litigation*, 44 U.C.L.A. L. Rev. 1851, 1858 (1997)  ("Plaintiffs' attorneys rush to their favorite judges and demand draconian procedures to pressure defendants to make block settlements.); Jack B. Weinstein, *Ethical Dilemmas in Mass Tort Litigation*, 88 Nw. U. L. Rev. 469, 521 (1994) ("Often the pressure for block settlements comes from plaintiffs' attorneys who hope to get something for a large mass of questionable cases.  Some attorneys ... will take almost any case without regard to its merit, hoping for a global settlement.") (footnote omitted).

7

the tide of thousands of suits in hundreds of courts around the nation.  We now know that this *pay the ransom* strategy failed miserably, since the lax evidentiary requirements for settlement led to the prosecution of even more baseless claims.

The deficiencies of the inventory settlement approach are illustrated by the experience of Babcock & Wilcox ("B&W").  B&W negotiated its own inventory settlements with each plaintiffs' law firm to settle claims en masse.  *In re The Babcock & Wilcox Co.*, Report to the Court Regarding Asbestos Developments Generally and the Proofs of Claim Filed Here, Case Nos. 00-0558, 00-10992, Docket No. 101, at 28 (Bankr. E.D. La. Oct. 18, 2001).  However, B&W required "only minimal proofs of the claimant's medical condition and purported exposure to a B&W boiler."  *Id*.  Indeed, claimants were not required to submit any back-up documentation including X-rays or PFT results. *Id*. at 28, 36.[15]  Plaintiffs' lawyers took advantage of B&W's minimal claim criteria by submitting unsupportable claims.  *Id*. at 31.  During its Chapter 11 bankruptcy, B&W and its claim experts analyzed its historical database against other audits.  *See Expert Report of Frederick C. Dunbar, ACC v. Babcock & Wilcox Inv. Co. (In re Babcock & Wilcox Co.)*, Case No. 01-1155 (Bankr. E.D. La. 2001) (hereinafter "Dunbar Report").  Among the claims B&W could match, it found that 45% of the lung cancer claims, 100% of the asbestosis claims and over 50% of the disabling asbestosis had no evidence to support the claimed disease.  *Id.* at 23.  Because B&W required little documentation to support a claim, many claims were filed against B&W and paid for a "more severe disease than against other defendants."  *Id.* at 27 (for settlement purposes, B&W treated 3,720 claims as more severe diseases than similar claims were treated for settlement purposes by Manville).  B&W's claim

---

[15]  The rationale for this approach was to clear out large volumes of claims for low settlement amounts, thus, it was hoped, minimizing the overall dollars to be paid.

experts also found that the top 10 highest-volume doctors from the Manville Trust Audit were also responsible for more than 50% of the asbestosis claims against B&W.  *Id.* at 27.

In sum, rather than bringing about closure, these inventory settlements encouraged more filings because they made it easier for claimants to be paid even though they lacked scientifically reliable medical and exposure evidence.[16]

### C.    By 2000, the Real Cost of the Broken System Emerged

Beginning in late 1999 and early 2000, dramatic increases occurred in claims presented both to traditional asbestos defendants and even to those defendants and companies who had very little asbestos litigation exposure in the past and whose products contained only trace amounts of asbestos.  The massive increase in claims, however, was not supported, and indeed was contradicted by, trends in asbestos exposure and actual disease incidence.  Thus, defendants and courts found themselves flooded with asbestos claims that lacked proper foundation either in law or in science.

### 1.    Asbestos Claims Soar, Again

In 2000, defendants, debtors and the courts began observing "a dramatic increase in the total and rate of filing of asbestos lawsuits and claims."  *In re Joint E&S Dists. Asbestos Litig.*, 237 F. Supp. 2d at 300. Companies already in bankruptcy experienced this surge, and many of the companies entering the bankruptcy system around that time cited these increases, or "spikes," in the claims filed against them and in settlement demands as precipitating their bankruptcy petitions:

---

[16]    *See* Equitas Limited Reports and Accounts for the Year Ended 31 March 2001, 22-23 ("[I]nventory settlements have failed to reduce defendants' asbestos liabilities and now appear to have made the situation worse.  Many defendants have reported an increase in the number of pending asbestos claims . . . Inventory settlements have encouraged the filing of new claims because they have made it *increasingly easy for claimants' attorneys to recover money for unimpaired claimants.*") (emphasis added).

9

- ***Manville:***  As seen in the chart below, claim filings against Manville nearly doubled in 2000 as compared to 1999 and "[a]bout July of 2000, the Manville Trust began to experience a dramatic and unanticipated rise in the number of claims being filed and expansion in scope of the industries and occupations which generated those claims."[17]



- ***Owens Corning:***  "[T]he cost of resolving current and future claims, together with a flurry of recent new filings from plaintiff lawyers not participating in the NSP, led us to the conclusion that a Chapter 11 reorganization was prudent and necessary."[18]

- ***Eagle-Picher:***  In October 2000, the Eagle-Picher Trust saw "a significant increase in claim filings over and above what our expert consultants had predicted two years ago."[19]

- ***UNR:***  The UNR Trust also experienced a sharp and unexpected jump in claim filings.  In 2000, the UNR Trust cited a 33% rise in asbestos claims from the year

---

[17]  *See In re Joint E&S Dists. Asbestos Litig.*, 237 F. Supp. 2d at 313.  In 2001, the claim filing rate was more than double the rate in 2000 (which itself represented nearly a doubling from 1999).  In the first quarter of 2001, the Manville Trust received 24,500 new claims, in contrast to 10,400 new claims received in the first quarter of 2000 and 5,700 received during the first quarter of 1999.  Mealey's Litig. Rep.: Asbestos ( May 4, 2001) at 7.

[18]  *Owens Corning Files Voluntary Chapter 11 Petition to Resolve Asbestos Liability,* PR Newswire, Oct. 5, 2000.

[19]  Letter from William B. Nurre, Executive Director, EPI Trust, to Claimants' Counsel (Oct. 9, 2000).

10

before and noted that the forecast of new claims after the year 2000 had nearly doubled from 1998 projections.[20]

- **USG:**  The number of claims against USG, a minor user of asbestos in certain building materials, grew "dramatically as a result of the filing of thousands upon thousands of claims by plaintiffs without any legally cognizable bodily injury."[21] USG was deluged with claims "brought by people who did not work either with or near U.S. Gypsum products or in the construction trades at all," predominantly "unimpaired claimants."[22]

- **Burns & Roe**:  This engineering firm filed for bankruptcy in December 2000 because "[o]ver the past 12 months, demands from plaintiffs' lawyers spiked to levels dramatically above the historic pattern."[23]

- **Armstrong**:  Armstrong World Industries filed for bankruptcy in December 2000, stating that "companies that have had involvement with asbestos-containing products have seen the number of claims made each year escalate far beyond what one might expect based upon medical and scientific data" and that, as other defendants have "dropped out" of the tort system by filing Chapter 11, plaintiffs' lawyers "have focused more of their efforts on the [remaining] companies."[24]

- **G-I Holdings:**  Having already paid $1.5 billion to settle more than 500,000 asbestos claims, G-I Holdings (formerly GAF) filed for Chapter 11 in January 2001 due to a "dramatic increase in the number of claims," which the tort system was "not equipped to handle . . . efficiently and fairly."[25]

- **U.S. Mineral:**  In July 2001, U.S. Mineral filed for Chapter 11 protection due to an "overwhelming number" of asbestos claims.  *See* Mealey's Litig. Rep.:

---

[20]  *See* UNR Asbestos Trust Letter, Mealey's Litig. Rep. 21 (12/1/00) at D-1.

[21]  USG 6/27/01 Informational Br. at 1-2, 4, 10.  *See also,* P. Callahan, *USG Files for Chapter 11 After Referring to Senate's Power Shift as Latest Setback*, Wall St. J., June 26, 2001, at A4; USG 10-Q filed 8/8/00; M. Garza, CHI. TRIB., June 26, 2001, at 1 ("The Chapter 11 process was the only alternative to prevent the value drain that has been occurring as U.S. Gypsum was forced to pay for the asbestos costs of other companies that already had filed for Chapter 11," quoting W. Foote, USG CEO).

[22]  *Id.*

[23]  *Asbestos Woe Leads Burns & Roe to File for Bankruptcy Relief*, Eng. News-Rec., Dec. 18, 2000, at 22.

[24]  Aff. of W. Rodraun ¶¶ 26, 33, *In re Armstrong World Indus.*, No. 00-4471 (D. Del. Dec. 5, 2000).

[25]  Wall St. J., Jan. 8, 2001, at B12 (G-I said "there was no ebb in the tide of personal-injury claims," indeed "there was a 'dramatic increase in the number of claims.'").  *See also* 14 Asbestos & Lead Abatement Rep., Feb. 1, 2001 (almost 70,000 claims filed against G-I in 2000, nearly double the number filed in 1996).

11

Asbestos, Aug. 3, 2001, at 12-13. Between 1954 and 1972, the company sold approximately $14 million of spray-applied fire resistive material that contained asbestos. *Id.* It has since spent more than $275 million litigating more than 40,000 asbestos claims, and now has "more than 223,000 asbestos claims filed against it with more than 165,000 claims pending." *Id.*

- **Babcock & Wilcox**: Faced with hundreds of thousands of asbestos claims and increasing settlement demands, Babcock & Wilcox, a company that designed large commercial boiler systems, was compelled to seek refuge under Chapter 11 in February 2000.[26]

- **Pittsburg Corning:** In connection with its April 2000 filing, Pittsburgh Corning stated that "[h]igh defense costs and administrative costs, coupled with sharply increasing demands, combined to threaten PCC's long-term financial health and left it with no alternative means for resolving the [asbestos] claims brought against it."[27]

- **Federal-Mogul:** Over 59,000 new claims were filed against Federal-Mogul in the first six months of 2001. *See* Federal-Mogul Form 10-Q, at 10 (Aug. 1, 2001). On October 1, 2001, Federal-Mogul filed for Chapter 11 protection after being "overwhelmed by asbestos litigation." *Id.* The company and its subsidiaries faced over 365,000 asbestos claims, despite the fact that Federal-Mogul had "only limited involvement with asbestos." *Id.* Among the pending claims were thousands based on alleged exposure to asbestos from industrial gaskets that contained only "a small amount of asbestos bound in a latex material and surrounded by steel."[28]

### 2.    The Surge in Claims Ran Counter to the Incidence of Asbestos Exposure and Real Disease Rates, Which Have Been Decreasing.

Examples of the dramatic increase in claims discussed in the previous section are reflected in the chart below. *See* Rand Report, 2002, *supra*, at 44. As the chart below reflects,

---

[26]    *See Babcock & Wilcox Cite Asbestos Settlements in Filing for Bankruptcy,* Mealey's Litig. Rep.: Asbestos 18 (Mar. 3, 2000); Melanie Trottman, *Babcock Files for Protection of Chapter 11*, Wall. St. J., Feb. 23, 2000, at A10; Alan Sayre, *Babcock & Wilcox Seeks Bankruptcy*, AP Online (Feb. 22, 2000).

[27]    *Pittsburgh Corning Files for Bankruptcy Protection*, Mealey's Litig. Rep.: Asbestos 6 (Apr. 21, 2000).

[28]    Asbestos Primer, *at* http://www.federal-mogul.com/cda/content/front/0,2194,2336_2903_4292,00.html. *See also* M. Pacelle, *Federal-Mogul Plans to Seek Chapter 11 Protection*, Wall St. J., Oct. 1, 2001, at A3.

12

nonmalignant claims shot up steeply beginning around 1999, and the trend departed suddenly

and substantially from the filings of malignant disease claims.  *Id.*



This increase in claims is not and *cannot* possibly be attributable to actual exposure or disease

trends for several reasons.  *See In re E.&S Dists. Asbestos Litig.*, 237 F. Supp. 2d at 305

(attributing increase in claims to: electronic filing permitting plaintiffs' lawyers to file

duplicative claims at little cost, plaintiffs' firms advertising and mass screenings, and suing

peripheral defendants).

It has been almost 40 years since Dr. Irving Selikoff began publishing his medical studies

describing the dangers of asbestos dust to asbestos workers.[29]   The enactment of strict

government regulations followed, and the use of new asbestos essentially ceased in the United

---

[29]   I.J. Selikoff, J. Churg & E.C. Hammond, *The Occurrence of Asbestosis Among Insulation Workers in the United States*, 132 Annals of the N.Y. Academy of Sciences 139 (1965)

States.[30]  As the following timeline shows, use of asbestos – and consequently, worker exposures started to fall around 1950 and then fell off dramatically after OSHA set low exposure limits in 1971.



As exposures decreased dramatically, medical experts, including Drs. Doll & Peto, universally predicted a downward trend in both malignant and non-malignant diseases.  *See* R. Doll & J. Peto, *Asbestos: Effects on Health of Exposure to Asbestos*, HMS, (1988)*; In re Joint E&S Dists. Asbestos Litig.*, 237 F. Supp. 2d at 311 ("Mesothelioma and asbestos-related lung cancers are expected to result primarily from the sort of direct occupational exposure that was phased out as a result of increasingly stringent federal regulation.")

---

[30]     *In re Joint E&S Dists. Asbestos Litig.*, 129 B.R. at 737 (noting that with "the increased awareness of dangers and new government regulations, use of new asbestos essentially ceased in the United States in the early 1970's") (citations omitted).  *See also* Brickman 2003, *supra*, at 35-36; *Asbestos Litigation, Hearing Before the Senate Comm. on the Judiciary*, 107th Cong. 3 (2002) (statement of Steven Kazan) (quoting Rand Report, 2002, *supra*, at 12 ("drastic reduction in asbestos usage")); Alex Berenson, *Panel Urges Complete Ban on Product With Asbestos*, N.Y. Times, May 10, 2003, at C4 (noting that the "use of asbestos . . .  has fallen drastically since the early 1970s").

In keeping with the predictions of the scientific community, the actual incidence of asbestos-related disease has been declining in the U.S. since at least the early 1990s.[31] Asbestos-related malignant disease (mesothelioma and lung cancer) rates are declining and have been for at least the past 12 years.[32] National Cancer Institute data indicate that death rates for mesothelioma, the disease that requires the least amount of asbestos exposure and has a long latency period, *have been declining since 1992*.[33] As shown below, data on the incidence of mesothelioma among U.S. males confirms that there has been less and less asbestos disease in the U.S. population over the past decade.[34]



---

[31] Surveillance, Epidemiology and End Results (SEER) data from the National Cancer Institute available at http://seer.cancer.gov/faststats/html/inc_mesoth.html.

[32] *Id.*

[33] *Id.*

[34] *Id.*

15

As expected, data for real asbestosis reflects a more precipitous downward trend.  It is generally recognized that exposures substantial enough to induce asbestosis have not been present in occupational settings in the U.S. for decades.  *See* Nicholason WJ, *Airborne Asbestos Health Assessment Update.* Washington: Office of Health and Environmental Assessment, US Environmental Protection Agency (1986) (25 fiber years of asbestos exposure required for induction of asbestosis);  *see also* Asbestos: US Consumption & Threshold Limit Value or Permissible Exposure Level chart, *supra* (depicting declining asbestos exposures in U.S.). Consequently, since the early 1990s, leading medical researchers had stated that asbestosis was a "disappearing disease."  *In re Joint E&S Dists. Asbestos Litig.*, 237 F. Supp. 2d at 311.  In 1991, the authors of a published study of asbestos-exposed workers reported that "we have not seen a single case of significant asbestosis with first exposure during the past 30 years."  Gaensler, Jederlinic & Churg, *Idiopathic Pulmonary Fibrosis in Asbestos-exposed Workers*, 144(3) AM. REV. OF RESP. DISEASE 689-696 (1991) (emphasis added).

As reported by Dr. Andrew Churg, a leading pathologist of asbestos diseases, this "progressive lowering of standards [by OSHA] for permitted occupational exposure to asbestos has markedly decreased the incidence and severity of asbestosis."[35]  This is because, as Drs. Doll and Peto have reported, "With reduction in the amount of exposure, the development of incapacitating fibrosis slows down and the reaction becomes so slight and its spread so slow that no person with otherwise healthy lungs would develop significant disability before reaching an age when he was likely to die of other causes."  R. Doll & J. Peto, *Asbestos: Effects on Health of Exposure to Asbestos*, HMS, at 2 (1988).  Indeed Dr. Bertram Price observed, based on an

---

[35]  *Neoplastic Asbestos-Induced Disease,* in Pathology of Occupational Lung Disease 339 (Churg & Green, eds., 2d ed. 1998).

analysis of the incidence of asbestos-related disease, that U.S. asbestos disease has peaked, because "[a]sbestos regulations promulgated by the U.S. Occupational Safety and Health Administration (OSHA) in the early 1970s have led to dramatic reductions in exposure."[36]

Despite the overwhelming consensus that asbestosis as a real *disease* has been in decline *for decades* in this country -- asbestosis *claims* have been increasing dramatically both in total numbers, and as a proportion of all claims, as depicted in the chart below.[37]



The scientific facts thus belie the growth in claims. Despite the clear medical and scientific evidence demonstrating that there has been less and less actual asbestos-related *disease* in the U.S. population, *claims* for asbestos-related diseases have been growing astronomically, and, what's more, the claims have been growing fastest in the disease category in which the

---

[36]  Dr. Bertram Price, *Mesothelioma Trends in the United States: An Update Based on Surveillance, Epidemiology, and End Results Program Data for 1973 through 2003*, AM. J. EPIDEMIOLOGY, 159:107, 112 (2004).

[37]  Rand Report, 2002, *supra*, at 46.

scientific and medical evidence most clearly indicates that claim numbers should be falling.  *See*

*In re Joint E&S Distrs. Asbestos Litig.*, 237 F. Supp. 2d at 305 (recognizing disconnect between

decrease in incidence of exposure and disease and increase in asbestos claims).  There simply is

no foundation in science for the large numbers of asbestos claims currently pending against

asbestos defendants in and out of bankruptcy.  As Senator Orrin Hatch recently stated:  "This

defies common sense."[38]

### III.    LAX EVIDENTIARY REQUIREMENTS IN MASS SETTLEMENTS HAVE RESULTED IN ABUSES IN THE CLAIMS PROCESS

There is virtually universal agreement that the recent dramatic increases in asbestos

claims are the result of lax evidentiary requirements, giving rise to abuse in claims filings.  The

courts, Congress, the medical community and even plaintiff lawyers now agree that such abuse

exists.

Long ago, in *Raymark Indus., Inc. v. Stemple*, No. 88-1014-K, 1990 WL 72588 (D. Kan.

May 30, 1990), the court found the process in which the attorneys "recklessly acquiesce[d to] the

filing of a constant, steady flow of faulty claims" to be a "professional farce," noting that it

"makes a mockery of the practices of law and medicine."  *Id.* at *2.  The court stated that if it

chose to acquiesce to the faulty claims  "it would make a 'laughingstock' of the court!"  *Id.*

Matters have only deteriorated since.

---

[38] *Asbestos Litigation Crisis Continues: It is Time for Congress to Act, Hearing Before the Senate Committee on the Judiciary*, 108th Cong. (Mar. 5, 2003) (statement of Sen. Orrin Hatch); Brickman 2003, *supra*, at 36 ("Proving impervious to the predictions of medical science, the litigation has not only continued to grow, but has been reinvigorated by a huge influx of newly recruited claimants, most of whom share a common characteristic: they have no discernable illness.").

18

The following section outlines how (1) baseless diagnoses are made, (2) hard data now confirms the existence of unfounded diagnoses, and (3) these problems are exacerbated by loose claims about exposure to defendants' products.

### A. Problems in the Diagnosis of Non-Malignant Asbestos-Related Disease.

This sub-section outlines the unreliability of medical evidence of asbestos-related diseases, including mass screenings, use of accommodating B-Readers who "over-read" X-rays, and manipulation of pulmonary function tests.

### 1. Mass Screenings Manufacture Claims.

Starting around the mid-1980s and continuing today, huge numbers of claims have been based upon mass screenings sponsored by plaintiffs' law firms. *See* Suzanne L. Oliver & Leslie Spencer, *Who Will the Monster Devour Next?*, Forbes, Feb. 18, 1991, at 75; Michelle J. White, *Why the Asbestos Genie Won't Stay in the Bankruptcy Bottle*, 70 U. CIN. L. REV. 1319, 1330-31 (2002). Generally, it has been reported that plaintiffs' attorneys solicit new clients through advertisements, require them to sign a retainer agreement prior to any screenings, and herd them through mass screening programs held in mobile X-ray units set up in parking lots, hotel and motel rooms, and local union halls.[39] Once these potential clients are assembled, accommodating pro-plaintiff (and sometimes unlicensed and untrained) B-readers and doctors, take X-rays and perform pulmonary function tests. Mass screening doctors typically give no medical counseling or treatment plan.[40]

---

[39] *See discussion supra; see, e.g.,* Griffin B. Bell, *Asbestos & the Sleeping Constitution*, 31 PEPP. L. REV. 1, 5 (2003).

[40] *See, e.g., id.* at 5 (2003) (Many of the screenings do not even comply with federal or state health or safety laws and "[t]here often is no medical purpose for these screenings and claimants receive no medical followup.").

Courts, asbestos defendants, commentators, and even certain plaintiffs' counsel (in moments of interested candor) have criticized these mass screenings:

- "Claimants today are diagnosed largely through plaintiff-lawyer arranged mass screening programs targeting possibly asbestos-exposed workers and attraction of potential claimants through the mass media. The programs rely almost solely on chest X-rays and pro-plaintiff readers to identify the injured." *In re Joint E&S Dists. Asbestos Litig.*, 237 F. Supp. 2d 297, 309 (E.&S.D.N.Y. 2002) (internal citation omitted).

- Plaintiffs' counsel working with unions arrange to take X-rays at medical trailers of thousands of workers without manifestations of disease and then file complaints for those with "any hint of pleural plaque." *In re Joint E.&S. Dists. Asbestos Litig.*, 129 B.R. 710, 748. (E.&S.D.N.Y. 1991).

- Plaintiffs' attorneys founded a mass screening company in which they purchased an "examobile," toured the country giving free X-rays to those clients that signed a retainer and employed doctors who diagnosed "asbestos-related injuries" without regard to diagnostic standards, producing a "steady flow of faulty claims" and a "fraud on the court." *Raymark Indus.*, 1990 WL 72588, at \*2, \*5, \*8, \*22.

- Law firms aggressively advertise the mass screenings using such memorable and catchy slogans as "Find out if YOU have MILLION DOLLAR LUNGS."[41] The court in *Raymark Industries* described the defendant attorneys' "deceptive and coercive solicitation process" and noted that it was a "*knowing* violation of rules against solicitation." *Raymark Indus.*, 1990 WL 72588, at \*15.

- Judge Fullam of the District Court of Delaware noted that "[l]abor unions, attorneys, and other persons with suspect motives caused large numbers of people to undergo X-ray examinations (at no cost), thus triggering thousands of claims by persons who had never experienced adverse symptoms." *Owens Corning v. Credit Suisse First Boston*, Mem. & Order, Case No. 04-00905, Docket No. 106, at 6 (D. Del. Mar. 31, 2005).

- As Judge Weinstein observed when presiding over the Johns-Manville bankruptcy, some plaintiffs' attorneys "have filed all of their cases without regard to the extent of injury." *In re Joint E&S Dists. Asbestos Litig.*, 129 B.R. at 748. *See also Eagle-Picher Indus. v. Am. Employers' Ins. Co.*, 718 F. Supp. 1053, 1057 (D. Mass. 1989) ("[M]any of these cases result from mass X-ray screenings at occupational locations conducted by unions and/or plaintiffs' attorneys, and many claimants are functionally asymptomatic when suit is filed.

---

41    Stuart Taylor Jr., *The Greedy vs. the Sick*, Legal Times 60 (Sept. 30, 2002).

- In concluding that accepting evidence from a certain B-reader would "contravene public policy," the court noted that the B-reader had "participated in union screenings of certain plaintiffs, performed examinations, rendered diagnoses, and recommended treatment without being licensed in Washington, a criminal offense.  He also relied for his diagnoses on radiology reports from unregistered and uncertified technicians or radiologists using unregistered and uncertified equipment." Brickman 2003, *supra*, at 66 n. 98 (citing Order by the Honorable Sharon S. Armstrong, ACR XXIII (Superior Court of King County, Washington, October 15, 2002)).

- In one matter, a steelworker's widow sued the radiologist of a mass screening company for failing to inform her husband of his diagnosis.  The court found that there existed no doctor-patient relationship to justify a medical malpractice cause of action against the radiologist noting that he "never saw the individuals whose X-rays [he was] reviewing, and [he] had no information about the individuals other than their names." *Adams v. Harron*, 191 F.3d 447, 1999 WL 710326, *1 (4th Cir. 1999) (unpublished opinion).

- Indeed, even the most dedicated plaintiffs' experts have acknowledged the problem: plaintiff's lawyers "shop around" X-rays to numerous B-readers until a positive readings is reported.  David Egilman, Letter to the Editor, *Asbestos Screenings*, 42 Am. J. of Indus. Med. 163 (2002).

Certain plaintiffs' counsel have candidly acknowledged that such practices have burdened the courts with unmeritorious claims:

- Ron Motley, a prominent plaintiff's attorney, acknowledged in the early 1990s that "[t]here are gross abuses of our system.  We have lawyers who have absolutely no ethical concerns for their own clients that they represent — we have untrammeled screenings of marginally exposed people and the dumping of tens of thousands of cases in our court system, which is wrong [and] should be stopped."[42]

- Plaintiffs' attorney Steven Kazan stated much more recently that the increase in claims "is conjured up through systematic, for-profit screening programs designed to find potential plaintiffs with some X-ray evidence consistent with asbestosis" and concluded that "[i]f this were medicine, it would be malpractice.  But it is not medicine: It is the medical side of legal entrepreneurship." *Asbestos Litigation Crisis Continues: It is Time for Congress to Act, Hearing Before the Senate*

---

[42] *An Administrative Alternative to Tort Litigation to Resolve Asbestos Claims.* Transcript of the Administrative Conference of the United States 15 (Oct. 31, 1991) (remarks of Ronald L. Motley).

91100-001\DOCS_DE:107964.1

*Committee on the Judiciary*, 108th Cong. (Mar. 5, 2003) (statement of Mr. Steven Kazan).

In perhaps the most telling indication of the skepticism associated with mass screenings, Judge Weiner of the Eastern District of Pennsylvania, overseeing all asbestos cases in federal courts, *dismissed* all non-malignant asbestos-related lawsuits that were based only on lung X-rays obtained from mass screenings. *In re Asbestos Prods. Liab. Litig.*, No. MDL 875, 2002 WL 32151574, at *1 (E.D. Pa. Jan. 16, 2002). In doing so, Judge Weiner found that "the filing of mass screening cases is tantamount to a race to the courthouse and has the effect of depleting funds, some already stretched to the limit, which would otherwise be available for compensation to deserving plaintiffs." *Id.*

Another reported recurring problem with mass screenings is that the B-readers often are unqualified and highly motivated to find "positive" results. Certain doctors are known for "over-reading" X-rays. Other doctors are not educated in diagnosing asbestos-related conditions. *Eagle-Picher Indus.*, 718 F.Supp. at 1057 ("Moreover, many diagnoses are made by physicians not well schooled in the American Thoracic Society's criteria for the diagnosis of asbestosis and the medical literature does not provide standards for judging the diagnosability of asbestos-related disease."). In some cases, they are not even board certified or licensed to practice medicine. *Raymark Indus.*, 1990 WL 72588, at *5.[43] These accommodating pro-plaintiff B

---

[43] "[T]he medical defendant possessed, at best, the most limited of credentials - Bharadwaja was not licensed in the United States, Rao was a radiologist and not qualified to diagnose asbestos disease, and Gelbard had been previously sued for misrepresenting her qualifications and for submitting incompetent medical reports." *Raymark Indus.*, 1990 WL 72588, at *5. Dr. Bharadwaja testified that he "considered pleural plaques and pleural thickening to be the same thing" and did not know the latency period for asbestosis. *Id.* at *6 The court indicated that "the attorneys' certifications and the physicians' diagnoses are somehow intended to 'pass muster.' Not with this court!" *Id.* at *7; *Abadie v. Metro. Life Ins. Co.*, 784 So.2d 46, 72 (La. Ct. App. 2001) (the court noted that the doctor who examined most of the plaintiffs and whose reports were relied on by diagnosing doctors was *not* a board certified lung specialist).

22

readers have been described as "hired guns"[44] who would basically agree to find disease and attribute it to asbestos in order to get paid large sums of money.[45]  Other asbestos bankruptcy cases have found that a few accommodating "over-reading" B-readers are responsible for a large percentage of previously paid claims.[46]

Judge Fullam of the District of Delaware found that "[c]ertain pro-plaintiff B-readers were so biased that their readings were simply unreliable."  *Owens Corning v. Credit Suisse First Boston*, Memorandum & Order, Case No. 04-00905, Docket No. 106, at 6 (D. Del. Mar. 31, 2005).  Finally, in 1998, David Austern, general counsel for the Manville Trust, explained the lawyers' role:  "Part of the problem was sort of an amazing elasticity—which is about as calm a word as I can think of—on the part of claimants' lawyers to find doctors who will say that somebody suffers from minimal asbestos disease."[47]   Commentator Lester Brickman has summarized the B-reader, mass screening problem as follows:  A substantial portion of asbestos litigation is supported by "specious medical evidence" including "evidence generated by the

---

[44]   David E. Bernstein, *Keeping Junk Science Out of Asbestos Litigation*, 31 PEPP. L. REV. 11, 15 (2003).

[45]   In one case, two doctors allegedly were paid a total of $650,000 and $225,000 to diagnose X-rays in an assembly line fashion (100-150 potential plaintiffs were 'examined' each day).  *Raymark Indus.*, 1990 WL 72588, at *5, *14.  Another doctor employed by a screening company testified in a deposition that he was paid more than $1 million for diagnosing *every* potential plaintiff (14,000 in total) as having asbestosis even though he was not an expert in asbestosis, unfamiliar with medical criteria for asbestos-related diseases, unlicensed in the state he was working in and did not write his own reports.  *Id.*  Some screening companies charge substantially higher fees for readings showing asbestos-related diseases.  Brickman 2003, *supra*, at 122 (Testing service charged $700 for a positive result and $400 for a negative result).

[46]   For instance, in the Babcock & Wilcox bankruptcy, 16,267 asbestos claims paid by B&W – approximately one out of every seven asbestosis claims paid by B&W where the identity of the doctor was known – were diagnosed by the *same* doctor.  *See Dunbar Report* at *Ex. III-21A*.

[47]   Christine Biederman, Thomas Korosec, Julie Lyons & Patrick Williams, *Toxic Justice*, Dallas Observer Aug. 13, 1998 (Austern is currently both General Counsel of the Manville Trust and President and General Counsel of the Claims Resolution Management Corporation (CRMC) (a fully-owned subsidiary of the Manville Trust and its' and three other asbestos trusts' claims processing facility)).

23

entrepreneurial medical screening enterprises and B-readers -- specially certified X-ray readers that the enterprises or plaintiff lawyers select, who often conform their findings and reports to the expectations of the plaintiffs' lawyers who retain them."[48]    There simply is no dispute that, currently, massive numbers of asbestos claims, including substantial claims against this debtor (as discussed *infra*) have emanated from the practice of mass screenings - a practice that is loudly decried by the medical community and courts.

## 2.    Pulmonary Function Tests Also Have Been Abused.

Another recurring problem is that pulmonary function tests (PFTs) -- tests used to measure lung impairment -- can be easily manipulated.  *See Owens Corning v. Credit Suisse First Boston*, No. 04-00905, Docket No. 106, at 8 (D. Del. March 31, 2005).   Claimants are aware that in order to be eligible for compensation (or higher levels of compensation), they often must "fail" the PFT.[49]   Failing a PFT is easily accomplished by simply smoking cigarettes prior to the test, failing to inhale deeply or exhale completely, eating a large meal, wearing tight clothing, drinking alcohol or performing strenuous activity prior to the test.[50]   Because the PFT

---

[48]    Brickman 2003, *supra*, at 41.

[49]    *See* Brickman 2003 *supra*, at 94 (citing Dep. of Larry M. Mitchell, M.D. at 149, taken on June 19, 1996, *In re Consolidation of Maples & Lomax, P.A., Asbestos Pers. Injury Cases, Flight 1* (Miss. Cir. Ct. 1996) (supervisor of PFTs at a mass screening enterprise stated "we had some people that came in [for pulmonary function testing]... that didn't try.  They tried to give you an invalid test....  They wanted a positive test.  We had a lot of those."); Dep. of Charles E. Foster at 177, taken on June 4, 1996, *In re Consolidation of Maples & Lomax, P.A., Asbestos Pers. Injury Cases, Flight 1* (Miss. Cir. Ct. 1996) (Foster ran a mass screening enterprise and acknowledged that the "litigants" openly talked about how they can influence the PFT outcome by failing to exhale fully and thus "earn" a settlement check");  Dep. of Leon Hammonds at 280-81, taken on Feb. 21, 1996, *In re Consolidation of Maples & Lomax, P.A., Asbestos Pers. Injury Cases, Flight 1* (Miss. Cir. Ct. 1996) (head PFT technician at a mass screening enterprise acknowledged that "litigants" understood that failing the PFTs was "good" and that some deliberately tried to get a "failing" reading)).

[50]    *See* Brickman 2003, *supra*, at 94.

results are so sensitive and easily manipulated, the American Thoracic Society has established certain standards intended to limit the variability of these tests and make them more reliable.[51]

However, PFTs often do not conform to ATS standards.  For instance, a complete PFT should take up to 90 minutes to complete,[52] but mass screening PFT's typically take only 10 to 15 minutes.[53]    Another ATS guideline requires strict replication of results prior to their acceptance.[54]

The problems with both the sensitivity of pulmonary function tests and the way they are administered in practice, have contributed to the asbestos litigation crisis by making it easy for claimants to claim impairment when none truly exists.  Although compliance with standards from the American Thoracic Society and the American Medical Association are designed to address these problems, those standards have not been seriously integrated into asbestos claims resolution processes, either in the tort or bankruptcy systems.  For example, Owens Corning discovered that mass screening enterprises deviated from the required PFT standards in order to create false "positive" readings.[55]    As shown in the graphic below, Owens Corning's medical

---

[51]    ATS, *Lung Function Testing: Selection of Reference Values and Interpretive Strategies,* AM. REV. RESPIR. DIS., 144:1202 (1991).

[52]    The American Association for Respiratory Care Uniform Reporting Manual for Diagnostic Services (1999).

[53]    *See* Brickman 2003, *supra*, at 94-95 (citing Dep. of Deloris Bailey at 61, taken on May 21, 1996, *In re Consolidation of Maples & Lomax, P.A., Asbestos Pers. Injury Cases, Flight 1* (Miss.Cir. Ct. 1996) (stating that the PFTs she did at a mass screening enterprise required 15 minutes per test); Dep. of Charles Foster at 142, 165, taken on Aug. 6, 2002, *Morehouse v. N. Am. Refractories Co.* (Ala. Cir. Ct. 2002) (indicating that another mass screening enterprise took even less time to perform PFTs); Dep. of Michael G. Conner, M.D. at 67-70, taken on Mar. 29, 1993, *In re Asbestos Pls. v. Borden, Inc., No. 91-18397* (La Dist. Ct. 1993) (mass screening enterprise took 16-22 minutes per PFT).

[54]    ATS, *Lung Function Testing: Selection of Reference Values and Interpretive Strategies*, AM. REV. RESPIR. DIS. 144:1202 (1991).

[55]    Brickman 2003, *supra*, at 117-28 (citing Compl. at 5, *Owens Corning v. McNeese*, Civil Act 3:97CV29WS (S.D. La. 1997); Compl. at 60-67, *Owens Corning v. Pitts*, No. 96-CV-2095 (E.D. La. June 19, 1996)).  *See* (Continued…)

experts found that *over 95%* of 1,900 "positive" PFT cases did not meet ATS standards in the first case[56] and *over 98%* of 3,486 "positive" PFT cases did not meet ATS standards in the second case.[57]



B.    **Hard Data Now Confirms the Magnitude of the Problem.**

While the problems with the medical data and tests, including their abuse, have long been known by defendants, judges, and politicians, hard data now confirms the severity and pervasiveness of these problems throughout the tort and bankruptcy systems.  As shown in the

---

*also,* Tr. of Hr'g at 29-33, *Owens Corning v. Credit Suisse First Boston*, No. 04-CV-905 (Bankr. D. Del. Jan. 13, 2005) (Clyde M. Leff) (settled RICO claims against certain mass screening enterprises with false "positive" PFTs for "just under $3 million dollars").

56    Brickman 2003, *supra*, at 119-20 (citing Compl. at 60-67, *Owens Corning v. Pitts*, No. 96-CV-2095 (E.D. La. June 19, 1996)).

57    Brickman 2003, *supra*, at 126-27 n. 326 (citing Compl. at 60-62, *Owens Corning v. McNeese*, Civil Act 3:97CV29WS (S.D. La. 1997)).

chart below, the following scientific studies and expert analyses confirm the consistent and prevalent over-diagnosis of asbestos-related conditions:[58]



These studies demonstrate the abuse associated with a large percentage of asbestos-related claims.  Indeed, in the most recent study, over 95% of the claims *failed* to meet minimal diagnostic criteria.[59]

---

[58] R.B. Reger, W.S. Cole, E.N. Sargent & P.S. Wheeler, *Cases of Alleged Asbestos-Related Disease:  A Radiologic Re-Evaluation,* Vol. 32, No. 11, Journal of Occupational Medicine 1088 (Nov. 1990) (Appendix Exhibit E) (hereinafter "Tire Workers Study");  Penn State Audit, *supra*;  Babcock & Wilcox Claims Analyses, *In re The Babcock & Wilcox Co.*, B&W's Supplemental Brief in Further Support of its Proposed Litigation Protocol & Report to the Court Regarding Asbestos Developments Generally and the Proofs of Claim Filed Here, Case Nos. 00-0558, 00-10992 at 45, (Oct. 18, 2001 & Jan. 7, 2002) (hereinafter "Babcock & Wilcox Claims Analyses");  Expert Report of Dr. Gary K. Friedman, *In re Owens-Corning*, Case Nos. 00-3837 to 3854 at 4 (Bankr. D. Del. 2002) (Appendix Exhibit F) (hereinafter "Friedman Expert Report in *Owens Corning*");  and Joseph N. Gitlin, Leroy L. Cook, Otha W. Linton & Elizabeth Garrett-Mayer*, Comparison of "B" Readers' Interpretations of Chest Radiographs for Asbestos Related Changes,* Acad. Radiol. 2004; 11:843-856 (Appendix Exhibit G) (hereinafter "Johns Hopkins Study").

[59] *See* Johns Hopkins Study, *supra,* at 855.

27

In addition to the scientific studies, independent studies by courts demonstrate the problem of poor and/or fraudulent medical data in asbestos litigation. In the late 1980s, the United States District Court for the Southern District of Ohio appointed a standing panel of ten neutral experts to review the medical records of 65 pending asbestos bodily injury cases. Hon. Carl Rubin & Laura Ringenbach, *The Use of Court Experts in Asbestos Litigation*, 137 F.R.D. 35, 37, 39 (1991). Although all the plaintiffs claimed some asbestos-related condition, the court-appointed experts found that 65% *had no asbestos-related condition whatsoever*. *Id.*[60]

In another example, Raymark Industries sued certain attorneys and medical screeners alleging they had defrauded the company in connection with a class action settlement with tire workers allegedly injured from exposure to asbestos products. *See Raymark Indus.,* 1990 WL 72588 at *2, *8, *22. The court overseeing the case found that the medical screeners departed from accepted medical standards by diagnosing asbestos-related "injuries" that failed to meet minimum American Thoracic Society diagnostic criteria. *Id.* As a result, the court concluded that "many, if not most" of the cases were "without merit" and denied the attorneys' and medical screeners' motion for summary judgment on the fraud and RICO charges. *Id.* (Overall, the court concluded that the screening program produced a "steady flow of faulty claims" and a "fraud on the court.").

---

[60] In approximately 80% of the cases, the court-appointed experts found no asbestos disease, and in thirteen of sixteen cases in which the expert testified, the jury agreed with the expert. *Id*. at 41 ("The conclusion is inescapable: A Court's expert will be a persuasive witness and will have a significant effect upon a jury."). Judge Rubin concluded that Federal Rule of Evidence 706 which allows a federal court to appoint experts "on its own motion" was essential to guard against a "Battle of the Experts" and resolved to use Rule 706 in future asbestos cases where appropriate.

### C.    Problems in the Medical Data are Exacerbated by Other Litigation Abuses.

Problems with the medical data in asbestos personal injury cases have been exacerbated by poor exposure data.  As discussed *infra*, in an effort to gain control over massive numbers of claims, defendants and courts have required only minimal evidence of a claimant's exposure to a defendant's product.  As with medical data, the failure to require reliable evidence of exposure has had dire consequences.

The most prevalent, and perhaps the most costly and abusive, practice in asbestos litigation -- spawned by lax exposure evidence criteria -- is the shifting of large numbers of asbestos claims to newly-targeted asbestos defendants, without regard to whether the claimants ever were significantly exposed to the asbestos-containing product of the new defendants.  Evidence of this problem abounds -- and is largely undisputed by even the plaintiff's bar.  It clearly emerges when claims are (1) audited for reliable exposure evidence; (2) compared against the total population disease incidence; or (3) found to spike against a single defendant.

First, when defendants are able to audit asbestos claims, it becomes apparent that many claimants have no reliable evidence of exposure to the defendants' products. This was the experience of B&W, when it had an opportunity to audit its claims once in bankruptcy.  B&W found that the vast majority of proofs of claim failed to provide the most basic information needed to establish liability, including, in most cases, even a *prima facie* showing that the claimant worked near a B&W boiler or had exposure sufficient to cause disease.  Babcock & Wilcox Claims Analyses, *In re The Babcock & Wilcox Co.*, B&W's Supplemental Brief in Further Support of its Proposed Litigation Protocol & Report to the Court Regarding Asbestos Developments Generally and the Proofs of Claims Filed Here, Case Nos. 00-0558, 00-10992 (Oct. 18, 2001 & Jan. 7, 2002).  According to information provided in their proofs of claim, over

29

68% of the approximately 221,000 B&W claims (i.e., over 150,000 claims), were based on alleged exposures at sites that were shown to have *never housed B&W boilers. Id*. at 47. This is just one example demonstrating the specious nature of exposure evidence in substantial numbers of asbestos claims as asserted.

Second, statistics alone prove that many asbestos claims against defendants result from the transporting of existing claims to new or different defendants, without regard to actual exposure.[61]  It has become clear that numerous defendants are *each* being sued for large proportions of the *total* number of *actual* cases in any given year.  As just one example, from 1993-1999, B&W was presented with nearly 1/3 *of all* the mesothelioma cases that occurred during that entire time period across the United States, *see* Expert Report of Mark A. Peterson, *ACC v. Babcock & Wilcox Inv. Co.* (*In re Babcock & Wilcox Co.*), Case No. 01-1155 16-17 (Bankr. E.D. La. 2001) (hereinafter "Peterson Report"); R. at 60, *ACC v. Babcock & Wilcox Inv. Co.* (*In re Babcock & Wilcox Co.*), Case No. 01-1155 (Bankr. E.D. La. Oct. 23, 2001), even though B&W boilers could not have produced asbestos exposures that caused 1/3 of the nation's mesothelioma incidence during that time period.  Indeed, there are now legions of examples of claims being shifted to new defendants without regard to actual exposures of the claimants.  *Id.* It is now generally recognized that loss of cash flow (from bankrupt defendants, or depleted trusts) spawned searches for new defendants, like B&W "as plaintiff's attorneys s[ought] to

---

[61]  *See* Court, Congress, Leave Asbestos-Taint Companies to Vultures, DAILY BANKR. REV. 4, 11-12 (June 6, 2001) ("due to the declining number of solvent asbestos-tainted companies that lawsuits can target, attorneys are 'rushing to get claims in, because as more companies file for bankruptcy protection, the fewer there are to sue'" (quoting Omar Jama, Associate Director of Fitch bond rating agency)); A.M. Best, *Asbestos Claims Surge Set to Dampen Earnings for Commercial Insurers* 3 (May 7, 2001) ("A key driver of the explosion [in new asbestos claims] is the acceleration of bankruptcy filings by major asbestos producers seeking relief from rapidly escalating asbestos claims.  As increasing numbers of producers opt for federal bankruptcy protection, remaining defendants are targeted to shoulder larger shares of asbestos costs.").

recoup 'lost' settlements."[62]  Thus, claims that already have been "worked up" are simply copied

and filed against other defendants.[63]

Third, every time a new peripheral defendant has a spike in claims, this is evidence of the

abuse in the system.  There is no explanation for why a peripheral defendant would experience a

spike in claims other than that plaintiffs firms already had the claims put together and were

merely searching for a new deep pocket.  The chart below shows the increase of claims in the

Manville Trust for these peripheral defendants.[64]

---

[62]  A.M. Best, *Asbestos Claims Surge Set to Dampen Earnings for Commercial Insurers* 4 (May 7, 2001)
("Anecdotal evidence suggests that peripheral defendants (those that either produced or used asbestos in small
quantities within their products) are being sued for increasing sums as the resources available from the large,
more traditional defendants become exhausted.").  Whereas "prebankruptcy testimony in Philadelphia Naval
Yard Cases put Manville's share of product use as high as 80 percent; postbankrupcty testimony had Manville
exposure accounting for a quarter or less of the volume of asbestos-containing materials encountered by
plaintiffs."  Lester Brickman, *The Asbestos Claim Management Act of 1991*, 13 CARDOZO L. REV. 1891,
1917 n.13 (1992); *see also id.* at 1894 n.13 (noting that after the Johns-Manville filing, "plaintiffs' testimony
(and that of their witnesses) abruptly shifted from a predominantly Manville exposure frame to a predominantly
'other defendants' exposure").  The latest estimate is that over 6,000 companies have faced asbestos suits.  Rand
Report, 2002, *supra*, at 49.

[63]  *See, e.g., G-I Holdings, Inc. v. Baron & Budd*, 179 F.Supp.2d 233, 239 (S.D.N.Y. 2001) ("after the Manville
bankruptcy, asbestos plaintiffs' testimony abruptly appeared to shift from targeting Manville products to
targeting the products of other still-solvent manufacturers."); Lester Brickman, *The Asbestos Claims
management Act of 1991. A Proposal to the United States Congress,* 13 Cardozo L. Rev. 1891, 1917 n. 13
("after the Manville bankruptcy, plaintiffs' testimony (and that of their witnesses) abruptly shifted from a
predominantly Manville exposure frame to a predominantly 'other defendants' exposure; whereas
prebankruptcy testimony in Philadelphia Naval Yard Cases put Manville's share of product use as high as 80%,
postbankruptcy testimony had Manville exposure accounting for a quarter or less of the volume of asbestos-
containing materials encountered by plaintiffs.").

[64]  Graph, "Manville Filings by Selected Industry," *in* D. Austern's Mealey's Presentation (July 2, 2001).

31



The automotive industry in particular was singled out as part of a broad initiative by plaintiffs to find a new, solvent target. From 1999 to 2000, as depicted in the chart below, claims by the auto maintenance industry against the Manville Trust increased by a staggering 631.9%.[65] This was the largest one-year increase for any of the recorded industries, and claims continued to increase.[66]

---

[65]  Table, "Number of Claims by Year Received and Industry," *in* D. Austern Mealey's Presentation (July 2, 2001) (reporting 631.9% increase from 1999 to 2000 for "auto maintenance" claims).

[66]  *Id.*



This increase occurred despite mounting epidemiological evidence demonstrating no evidence of asbestos-related disease among brake workers.[67]

It has been reported that this claims shifting is achieved, in some cases, by witness coaching practices.    In 1997, a twenty-page memorandum entitled "Preparing for Your Deposition" was inadvertently disclosed during a deposition by an attorney at a plaintiffs' law firm.[68]  The court in *Abner v. Elliott*, 706 N.E.2d 765 (Ohio 1999), described this "script memo" as "purported to advise plaintiffs in asbestos personal-injury cases to testify in a manner that

---

[67]  Goodman, M, MJ Teta, PA Hessel, DH Garabrant, VA Craven, CG Scrafford, and MA Kelsh.  2004.  Mesothelioma and lung cancer among motor vehicle mechanics: A meta-analysis.  Ann Occup Hyg 48(4):309-326.

[68]  Some of the explicit instructions can be found at Appendix Exhibit H.  *See, e.g.,*  L. Brickman & R. Rotunda, *When Witnesses Are Told What to Say*, WASH. POST, Jan. 13, 1998, at A15; Rogers,  *Witness Preparation Memos Raise Questions About Ethical Limits*, 14 ABA/BNA LAWYERS MANUAL ON PROF. CONDUCT 48, 48-50 (1998); A. Nelson, *Deposition Conduct: Texas's New Discovery Rules End Up Taking Another Jab at the Rambos of Litigation*, 30 TEX. TECH. L. REV. 1471, 1476 (1999) (former Texas Supreme Court justice terming the memorandum a "cancer on the legal system").

91100-001\DOCS_DE:107964.1

would not necessarily be consistent with the truth." *Id.* at 767. Senator Orrin Hatch described

the memorandum as "a sad but startling insight into how asbestos claims are created and spun

into recoveries."[69]

In summary, the problems with unreliable or nonexistent exposure evidence are just as

pronounced as those associated with the unreliable medical evidence. *See* White, *supra*, at 1330

(Economies of scale encourage such multiple filing since much of the costs (advertisement, mass

screening, X-ray readings by B-readers, plaintiff interviews, drafting complaints) are fixed,

regardless of how many defendants are sued).

### D.    There Is Virtual Universal Recognition of the Problem

The severity of the problems with unreliable medical and exposure data in asbestos

litigation is almost universally recognized. It is not only asbestos defendants who are taking

notice of the problem. Courts, Congress, state legislatures, and even some plaintiffs' attorneys

recognize the reality of abuse in asbestos litigation.

As Justice Breyer summed up, "up to one-half of asbestos claims are now being filed by

people who have little or no physical impairment. Many of these claims produce substantial

payments (and substantial costs) even though the individual litigants will never become

impaired." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 629 (1997) (Breyer, J., concurring in

part and dissenting in part) (citations omitted). Former United States Attorney General Griffin

Bell noted that litigation "is worsening at a much more rapid pace than even the most pessimistic

projections." Hon. Griffin B. Bell, *Asbestos Litigation and Judicial Leadership: The Courts'*

*Duty to Help Solve the Asbestos Litigation Crisis*, Vol. 6, No. 6, June 2002, at 2 (Nat'l Legal

---

[69]    Sen. Orrin Hatch, Floor Statement: S.2290: *Some Lawyers are Improperly Coaching Clients*, April 22, 2004.

Center for Pub. Interest Monograph), available at http://www.nlcpi.org.  Senator Orrin Hatch

stated, "I don't think there can be any doubt that the crisis in asbestos litigation is a serious

problem. And it continues to get worse as the abuse continues and Congress has failed to act,

even as the Supreme Court has suggested that we must act in order to resolve this wreck, this

train wreck."  *Asbestos Litigation Crisis Continues: It is Time for Congress to Act, Hearing*

*Before the Senate Committee on the Judiciary*, 108th Cong. (Mar. 5, 2003) (statement of Sen.

Orrin Hatch).

　　　　Several states have recognized the severity of the problems in asbestos litigation and have

begun to take action.  For example, the practice of consolidating cases has been curtailed and/or

eliminated in several key jurisdictions where it occurred frequently in the past.  *See*, *e.g.*, Tex.

Code Ann. § 15.003 (requiring each plaintiff in a multi-plaintiff case to establish venue

independently); Miss. Code Ann. § 11-11-3 (same).  Also, in recent years, many state courts

have adopted inactive dockets, where a court does not consider unimpaired claims and tolls the

limitations period, ensuring that if impairment subsequently develops, the claimant has preserved

the right to sue.  Thus, unimpaired claimants are not compensated or litigated; a case only

becomes active if the claimant later becomes impaired.  State courts using this approach include

California, Georgia, Illinois, Maryland, Massachusetts, New York, Pennsylvania, South

Carolina, and Wisconsin.  *See* Victor E. Schwartz, et al., *Addressing the "Elephantine Mass" of*

*Asbestos Cases: Consolidation Versus Inactive Dockets (Pleural Registries) and Case*

*Management Plans that Defer Claims Filed by the Non-Sick*, 31 PEPP. L. REV. 271 (2004).

Ohio, which was among the top five states for asbestos filings in recent years, enacted a statute

in 2004 which prohibits unimpaired claimants from recovering any compensation.  *See* OHIO

REV. CODE ANN. § 2307.92(B) ("No person shall bring or maintain a tort action alleging an

35

asbestos claim based on a nonmalignant condition in the absence of a prima-facie showing . . . that the physical impairment is a result of a medical condition, and that the person's exposure to asbestos is a substantial contributing factor to the medical condition."). On April 12, 2005, Georgia enacted H.B. 416, which (1) requires, among other things, "prima-facie evidence of physical impairment" resulting from a medical condition for which exposure to asbestos was a substantial contributing factor, (2) prohibits claims relating to multiple plaintiffs from being joined for a single trial unless all parties agree, and (3) prohibits filing of asbestos claims outside of the county where the plaintiff resides or in which the exposure occurred. Recently, similar bills were passed by the Texas (SB15, passed on April 27, 2005) and Florida (HB1019, passed on May 6, 2005) state legislatures and are expected to be signed by their respective governors.

Some states have even curtailed the mass screening practice. For example, in Ohio, a statute was enacted in 2004 which effectively bans mass-screening by requiring that evidence supporting an asbestos-related impairment must be made by a treating physician who has or had a doctor-patient relationship with the claimant. *See* Ohio Rev. Code Ann. § 2307.91(Z) (defining a "competent medical authority" as a medical doctor who is, among other things, "actually treating or has treated the exposed person and has or had a doctor-patient relationship with the person."). The law enacted in Georgia and the bills passed by the Texas and Florida state legislatures contain similar provisions.

Trusts, too, are reacting. For example, as discussed earlier, in response to these issues, the Manville Trust somewhat tightened its medical and exposure criteria in 2002. *See* 237 F. Supp. 2d at 324. For example, the Manville Trust began to require evidence of significant occupational exposure for many of the disease categories. *Id.* The Manville Trust increased the medical criteria of those non-malignant claims that are entitled to receive a higher level of

36

payment than the rest of the non-malignant claims. *Id.*  Other recent trusts, such as the Pittsburgh

Corning Trust and the DII Trust (a Halliburton subsidiary) contain similar criteria.

Defendants and debtors, their stockholders, creditors and employees are not the only

entities impacted by the problems in asbestos litigation.  The impact on U.S. state and federal

courts has been extensively documented.  *See generally* Rand Report, 2002, *supra*.  But also,

those with true asbestos-related injuries suffer the results of massive numbers of baseless claims.

As discussed previously, the massive increase in new claims at the turn of the century came

largely from non-malignant claims.   For most of these claims, there exists no medical

foundation.  As the chart below illustrates, though, a substantial portion of the money available

to pay claims goes to these nonmalignant claimants and their lawyers.   Rand Report, 2002,

*supra,* at 64.



Consequently, the Manville Trust, Eagle-Picher Trust and UNR Trust have all been forced to significantly reduce their payouts for *all* claims, including payouts for claims relating to persons with mesothelioma, a fatal cancer.[70]  Judge Helen E. Freedman noted the problem:

> Recoveries by unimpaired or minimally impaired plaintiffs deplete the funds needed to compensate present and future claimants with serious illnesses, and resources are dwindling as the "elephantine mass of asbestos cases" nationwide drives large numbers of potentially culpable parties into bankruptcy.

*In re New York City Asbestos Litig.*, No. 40000/88, 2002 WL 32151568, at *1-2 (Sup. Ct. N.Y. Dec. 19, 2002).

## IV.    GRACE HAS THE SAME PROBLEMS:  MASSIVE NUMBERS OF CLAIMS WITH NO RELIABLE MEDICAL DATA AND EXPOSURE EVIDENCE

Grace finds itself in the same position as other bankrupt defendants -- it is faced with thousands of claims that have no basis in medicine or law and the potential for unlimited filings of such claims in the future.   The same lawyers are implicated, the same B-readers are implicated, and the same abusive claims practices are implicated.

### A.    Grace Experienced the Same Unpredicted and Unexplainable Increase in Claims as Other Asbestos Manufacturers.

The Debtors' bankruptcies were necessitated by a sudden and scientifically unexplainable surge of asbestos claim filings against the company. *See* W.R. Grace 4/2/01 Informational Br. at

---

[70]    *See* Mealey's Litig. Rep.: Asbestos (Aug. 3, 2001) at 14;  *Findley v. Trs. of the Manville Pers. Injury Settlement Trust (In re Joint E.&S Dists. Asbestos Litig.)*, 2001 WL 1464362, at *1 (E.&S.D.N.Y. 2001) ("The courts note that there is a continuing rise in the number of claims and that the amount payed [sic] pro rata on claims has been reduced from 10 percent to 5 percent of the original value."); Letter from William B. Nurre, Executive Director, EPI Trust, to claimants' counsel (Oct. 9, 2000)   (In October 2000, the Eagle-Picher Trust had to reduce its payout from 31.9 percent to 25.7 percent.); UNR Asbestos Trust Letter, Mealey's Litig. Rep. 21 (Dec. 1, 2000) at D-1 (In fall of 2000, claims against the UNR Trust had jumped so quickly that it was forced to lower its payout from 12.9 percent to 7.8 percent.).

38

38.[71]  Asbestos claims against Grace peaked in 1996 and showed a pronounced downward trend.

*Id.*  The downward trend continued for two more years with no sign of abating.  *Id.*  But the trend

reversed with a 28 % increase in 1999 and an 81% increase in 2000.  *Id.*  In January 2001, claims

were served on Grace at a rate 374% higher than the year before, and in February 2001 at a rate

207% higher than the year before. *Id.*  In April 2001, Grace was forced to file Chapter 11.  *Id.*



As reflected in the chart above, claims that had been declining suddenly skyrocketed in 2000,

overwhelming the Debtors' ability to resolve them through the tort system.

---

[71]    See also Andrews Asbestos Litig. Rep. 23(7) (April 12, 2001); WALL ST. J. B8 (4/3/01).



In addition, the recent surge in claims against Grace was *not* due to an increase in the most serious and best documented claims, *i.e.*, cancer claims, but overwhelmingly was due to non-malignant, unimpaired claims.   As depicted in the chart above, based upon Grace's statistical survey, *less than 7%* of the 1997 claims were for mesothelioma, lung cancer, or other cancers.   Seventeen percent of the claims included so little information that the type of disease could not even be determined.   And the remaining 76% were for non-malignant conditions.   The percentage of malignant claims declined even further in 2000.   *Less than 6%* of the claims were for cancer.   More than 30% of the year 2000 claims presented so little information that no disease could be identified.   The remaining 64% were for non-malignant conditions.   As discussed earlier, there's no valid medical or scientific foundation for these dramatic increases in claims.

> **B.    Many Claims Filed Against Grace Lack Foundation and are Based on Unreliable Medical and Exposure Data.**

Asbestos claims filed against Grace suffer all of the problems identified throughout this brief.   In a July 19, 2002 deposition taken by the Asbestos PI Committee's counsel, Grace's

40

senior counsel responsible for asbestos personal injury claims testified that the sheer volume of the claims against Grace in the mid- to later-1990s forced the company to settle the claims on a mass scale even though it knew most were of doubtful validity:

> Leaving aside the quality, the sheer volume of the cases and the resources available in the courts and the resources available to the company to defend the cases made an individual trial of the cases impossible. . . . In a situation where there's hundreds of thousands of cases being filed . . . . even though we knew and were well aware that there were significant problems with the credibility of most of this evidence and, but for the problems associated with the volumes of the cases, the money associated with the cases, that these cases probably were not legitimate claims against Grace, we were forced to pay them.

J. Hughes Dep. at 48-49 (July 19, 2002) (emphasis added).   Moreover, as Dr. Mark Peterson outlined in his affidavit of September 9, 2001, plaintiffs' lawyers have routinely sued first, and asked questions about the merits of their claims against Grace later – if at all.   Dr. Peterson arranged for a sample survey to be conducted of the information *in the plaintiff attorneys' own files* relating to the pre-petition claims against Grace and found that the claims lacked basic evidentiary support:

- Information indicating the claimant had actually been exposed to Grace's products was found in only 5 of the 24 sample claims.   *"Overall, no [product identification] information was available for 79 percent of claims."*   Peterson Aff. ¶ 34 (Sept. 9, 2001) (emphasis added)

- Peterson confirmed that *information showing an actual asbestos-related injury* (much less an injury attributable to Grace's products) *was even more lacking*:  The survey found that only one-third of the files contained the information about diagnosing physicians, less than half had all of the requested medical reports, only half had X-rays, and "only half [of the plaintiff attorneys] thought they could provide information about whether any doctors had identified alternative or non-asbestos causes." *Id.* at 36.

In light of those findings, and as detailed in the Debtors' February 12, 2002 CMO reply brief to this Court, Grace retained Dr. Daniel Rourke to perform a statistical study of 1,000 randomly selected pre-petition claims (500 each filed in 1997 and 2000).  *See* Rourke Decl.

41

(Nov. 12, 2001).  For each of the sample claims, Dr. Rourke used the Grace claims files as well as the CCR and Manville Trust claims database to compile as much information as possible about the occupational and medical histories of each claimant.[72]  The combined data from that survey confirms that the vast majority of the 1997 claims were invalid or of doubtful validity, and that valid claims in the year 2000 are even more scarce.  The analysis showed that the vast majority of the claims:

- provided no evidence of impairment (as demonstrated in the chart below),[73]

- failed to establish exposure to Grace's products, (See chart below)[74] and

---

[72]   *See* Claims Report, Exhibit K to Grace's Consolidated Reply in Support of CMO, Bar Date, Claim Form and Notice Program.

[73]   *Id.* (Analysis of diagnostic data relating to the sampled claims demonstrates that no new wave of disease is responsible for the new wave of claims.  When diagnostic criteria are applied to Grace's 1997 and 2000 sample claims, the claims are found to be grossly wanting.  Even if the 33 cancer claims in the 1997 sample are excluded, *less than 21.6%* of the remaining claims presented ILO ratings of 1/0 or higher and PFT results meeting the AMA criteria of "mild impairment."  Similarly, *only 11.4%* of the 2000 sample claims satisfied both standards.  In sum, the majority of the non-malignant claimants in both years failed to present the minimum medical evidence needed to substantiate *any* injury at all.)

[74]   *Id.* (The recent sampling of Grace's 1997 and 2000 claims also shows that very few claimants can establish any actionable exposure to Grace's asbestos products, either because they provide no exposure information or because the claimants worked in industries and occupations in which exposure to Grace's products would have been unlikely or impossible.  Half of the claims provide no exposure information whatsoever.  Of the 1997 sample claims, 47% provide no information about the site or location where the alleged exposure occurred, the worker's employer or industry, or the Grace product to which he was exposed.  Fifty-two percent of the 2000 sample claims fail to provide any of that critical information.  Even when Grace attempted to fill in these gaps by cross-referencing the claimant's Social Security number to the Manville Trust and CCR databases, it was unable to identify the industry involved for 20% of the 1997 sample claims, and 29% of the 2000 claims.  And, of course, the Manville Trust and CCR data provide no information about any exposure to Grace products.  For the other half of the claims, the meager exposure information that is provided rarely implicates Grace.  For example, Grace's Monokote-3 fireproofing product was applied by plasterers primarily at high rise steel construction sites.  Yet, only two of the 500 sample 1997 claims and only one of the year 2000 claims were filed by plasterers.  Indeed, only 8% of the 1997 Grace sample claimants and 3% of the 2000 claimants identified themselves as construction workers. Even after the Manville and CCR data was used to identify as many of the "unknown" claimants as possible, only 16% of the 1997 sample claims, and 12% of the 2000 claims, were found to be filed by construction workers.  The majority of the sample claims in which the claimant's industry can be identified (using the combined information from the Grace claim file as well as the Manville and CCR databases) were filed by workers who should *not* have been exposed to any Grace products.  Not surprisingly, most of these claimants submit no information about exposure to any Grace product.  When an attempt is made to implicate a Grace product, the product identification often makes no sense.  For example, seven sample claimants from the Kaiser Steel plant in Chicago claimed to have been exposed at that plant to

(Continued…)

- appeared to be the result of mass screenings.[75]



Thus, Grace now stands in shoes similar to past asbestos debtors, but seeks not to repeat the mistakes of those bankruptcy cases. Grace is not asking the court to fix the whole system of asbestos litigation -- but merely to employ a legally *available* and scientifically *valid* process to reduce the likelihood that fraudulent and invalid claims will be considered in estimating Grace's aggregate legal liability.

---

"Zonolite Spra-Tex," a *decorative* ceiling product that never would be used in a steel works. Others at the same plant listed "Zonolite Monokote," the fireproofing product used in *commercial* high-rise buildings.)

[75] *Id.* (Many of these new claims appear to be the result of recent mass screenings and claim recruiting efforts at large industrial plants. For example, during the Fall of 2000, a single plaintiffs' law firm submitted 1,672 claims to Grace, nearly all of which were for steelworkers in Pennsylvania, West Virginia and Ohio. In the winter of 2001, that same law firm submitted another 400 claims from a single plant in Gary, Indiana.)

43

# TAB 3

# <u>LEGAL ARGUMENT</u>

# I.    <u>INTRODUCTION</u>

It is undisputed that previous asbestos bankruptcy estimates have been woefully inaccurate and have underestimated the magnitude of future claims.  However, the original forecasts in these previous asbestos bankruptcy cases did not  inaccurately predict *actual* future disease rates or actual debtor liability.  Rather, the inaccuracies in the original forecasts were due in large part to the failure of the debtors, courts and the trusts responsible for the estimations (1) to require scientifically reliable evidence of asbestos-related disease; (2) to require reliable evidence of exposure to debtor's asbestos-containing products capable of causing asbestos-related diseases; and (3) to anticipate the level of abuse that would be involved in the filing of claims when this evidence is not required.

Grace, and the Court, now have the opportunity to ensure that estimation of Grace's present and future liability does not suffer from the same problems.  The solution is to determine, in connection with estimating Grace's current liability, the magnitude of invalid claims that ultimately may be disallowed.  This can be accomplished by adopting the Debtors' proposed PI CMO, which will set in motion a process that will permit the Debtors to gather necessary evidence to demonstrate that many of its current claims are invalid under state substantive law and pursuant to the Federal Rules of Evidence and Rule 9017 of the Federal Rules of Bankruptcy Procedure.

The estimation methodology advocated by the Asbestos PI Committee and FCR does not attempt in any way to distinguish between valid and invalid claims for estimation of either current or future liability.  Indeed, the Asbestos PI Committee and FCR would have this Court ignore the failings of past asbestos bankruptcy trusts and allow baseless claims to go unquestioned by adopting an estimation based solely on past litigation settlement history.  Settlement history cannot be adopted as the basis for estimation because: (1) it is fraught, by

1

many accounts, with unfounded claims, and (2) it is barred as a basis for estimation by both the Federal Rules of Evidence and applicable bankruptcy law.

By contrast, the Debtors' proposal comports with the law set out in the Bankruptcy Code and the Federal Rules of Evidence. To be considered in the estimation under the procedures proposed by the Debtors, claims must have reliable medical data and reliable exposure data that is admissible under the standards of *Daubert*, as incorporated in Federal Rule of Evidence 702.

It is important to keep in mind that use of the Debtors' PI CMO & Questionnaire *does not* automatically wed the Court to any particular estimation methodology or definition. Rather, it simply will permit the Debtors to gather data on existing claims and notify the claimants as to the methodologies and definitions the Debtors intend to advocate at the estimation proceeding. That data will then be used by the Debtors to demonstrate to the Court that substantial numbers of existing claims should be valued at zero for the purpose of estimating current liability because they cannot meet the threshold evidentiary requirements. Without this information, the Debtors are foreclosed even from presenting their proposed estimation methodology.

## II.    THE ESTIMATION PROCESS MUST CONSIDER THE VALIDITY OF CLAIMS.

The Bankruptcy Code requires a specific claims objection process to ensure that only valid claims receive compensation. A debtor must be afforded the opportunity to make objections to any asserted claims. *See* 11 U.S.C. § 502(a). Once a properly supported objection is lodged, the underlying burden is on the claimant to show, by a preponderance of the evidence, that the claim is valid. *See* 9 Collier on Bankruptcy ¶ 3001.09[2] at 3001–26 (15th ed. revised).

The Third Circuit has summarized the state of the law as follows:

> The burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A. § 502(a) rests on different parties at different times. Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of

2

> sufficiency, it is 'prima facie' valid. . . . The burden of going forward then shifts to the objector to produce evidence sufficient to negate the prima facie validity of the filed claim. . . . In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence.

*In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173–74 (3d Cir. 1992) (citations omitted).

Under the plain language of the Bankruptcy Code, these procedures must be employed to eliminate claims for which the debtor is not liable. *See, e.g., In re G.I. Indus. Inc.*, 204 F.3d 1276, 1281 (9th Cir. 2000) ("[A] claim cannot be allowed [under section 502(b)(1)] if it is unenforceable under nonbankruptcy law."); *In re Sanford*, 979 F.2d 1511, 1513 (11th Cir. 1992) ("A claim against the bankruptcy estate will not be allowed in a bankruptcy proceeding if the same claim would not be enforceable against the debtor outside of bankruptcy."); *In re Buchholz*, 224 B.R. 13, 19 (Bankr. D.N.J. 1998) (disallowing claim that was "defective under both Federal and New Jersey State law").

Not only does the Bankruptcy Code contemplate objections to the validity of claims, it expressly reserves the debtor's right to assert any and all defenses to claims: "[]the estate shall have the benefit of a defense available to the debtor as against any entity . . . including statute of limitations, statutes of brands, usury and other personal defenses." 11 U.S.C. § 558. *See In re Nuisance Corp.*, 17 B.R. 80, 82 (Bankr. D.N.J. 1981) ("If . . . the claim falls within one of the paragraphs of § 502(b), it is simply not allowable. . . . To the extent that applicable law, including state law, provides the debtor a defense to the claim of a creditor, absent bankruptcy, such defense is available . . . in objecting to the claim.").

3

Bankruptcy courts repeatedly have indicated that estimation is a streamlined adjudication to determine the merits of asserted claims.  In conducting an estimation, "[t]he court is bound by the legal rules which may govern the ultimate value of the claim."  *Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134, 136 (3d Cir. 1982)).  *See also In re O.P.M. Leasing Serv., Inc.*, 79 B.R. 161, 166 (S.D.N.Y. 1987) (same).  Accordingly, courts have made clear that these rules apply in *estimation* proceedings, as well as in the *liquidation* of individual claims.  *See Bittner,* 691 F.2d at 135-47 (affirming bankruptcy court's estimation where the bankruptcy court "estimated the value of . . . stockholder's claims according to the ultimate merits of their state court action").  *See also In re Brints Cotton Mktg., Inc.*, 737 F.2d 1338, 1340-41 (5th Cir. 1984) (affirming a bankruptcy court's estimation of the value of certain contingent "on-call" contracts for purposes of a liquidation based on applicable principles of bankruptcy law and state law); *In re Aspen Limousine Serv., Inc.*, 193 B.R. 325, 337 (D. Colo. 1996) (holding that in conducting an estimation, "the court is bound by the legal rules governing the ultimate value of the claim").  As the Third Circuit has recognized:

> [i]f parties were barred from presenting defenses and affirmative defenses to claims which have been filed against them, they would not only be unconstitutionally deprived of their opportunity to be heard, but they would invariably lose on the merits of the claims brought against them.  Such a serious deprivation of property without due process of law *cannot be countenanced in our constitutional system.*

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. City Savings, F.S.B.*, 28 F.3d 376, 394 (3d Cir. 1994) (emphasis added).

Thus, an estimation based on extrapolations from settlement history, particularly in asbestos litigation, ignores the clear requirements of the Bankruptcy Code.  By contrast, approval of the PI CMO and Questionnaire will provide this Court and all parties in interest the

4

information and opportunity to evaluate the validity of claims in accordance with the Bankruptcy Code and the Federal Rules of Evidence.

### III.    IN THE ESTIMATION PROCESS, THE COURT SHOULD ASSIGN VALUE ONLY TO CLAIMS THAT ARE SUPPORTED BY EVIDENCE ADMISSIBLE UNDER THE FEDERAL RULES OF EVIDENCE.

As demonstrated above, the Bankruptcy Code requires that only valid claims receive consideration during an estimation process.  Although the validity of a claim is determined by application of state substantive law, the Court must apply the Federal Rules of Evidence to the estimation proceedings.  Accordingly, an estimation of Grace's asbestos liability, both current and future, should assign value only to claims that are supported by evidence (1) admissible under the Federal Rules of Evidence, and (2) establishing each element of liability under state substantive law.

### A.    The Validity of a Claim For Estimation Purposes Is Determined By Application of State Substantive Law and Federal Procedural Law.

The estimation process is governed by the Bankruptcy Rules, which require the courts to apply the Federal Rules of Evidence.  *See* Fed. R. Bankr. P. 9017 ("The Federal Rules of Evidence . . . apply in cases under the Code.").  Accordingly, courts have universally recognized that even though bankruptcy courts can apply state substantive law, they are required to apply the Federal Rules of Evidence.  *See*, *e.g.*, *In re Lids Corp.*, 281 B.R. 535, 541 n. 3 (Bankr. D. Del. 2002) ("Federal Rules of Bankruptcy Procedure makes the Federal Rules of Evidence applicable in bankruptcy cases.").[1]

---

[1]    *See also* *In re Rafsky*, 300 B.R. 152, 153 (Bankr. D. Conn. 2003) ("Fed. R. Bankr. P. 9017 provides that the Federal Rules of Evidence apply in cases brought under the bankruptcy code."); *In re Barnes*, 266 B.R. 397, 403 (8th Cir. B.A.P. 2001) (holding that "even when the bankruptcy court applies state law to resolve substantive issues, it must apply the Federal Rules of Evidence to resolve evidentiary questions").

The applicability of the Federal Rules of Evidence to bankruptcy cases and proceedings is not altered in the estimation context. For example, in *In re USG Corp.*, 290 B.R. 223 (Bankr. D. Del. 2003), the court held that in presenting its defenses during an estimation proceeding regarding asbestos personal injury claims, the debtors may "attack certain medical evidence under the Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm.* . . . ." *Id.* at 227. *See also In re CLC of Am., Inc.*, 68 B.R. 512, 515 (Bankr. E.D. Mo. 1986) (applying Federal Rules of Evidence in estimation proceeding to determine admissibility of admissions made by debtor in underlying state court action). Accordingly, the Federal Rules of Evidence govern admission of evidence during the estimation proceeding that will take place in these Chapter 11 cases.

### B.    Federal Rules of Evidence Prohibit Consideration of Past Litigation Settlement History For Purposes of Estimating Liability.

As a threshold matter, the estimation procedure sought by the Asbestos PI Committee would *violate* the Federal Rules of Evidence and the Bankruptcy Code and simply is *not* an available option for the Court in this matter. Rule 408 of the Federal Rules of Evidence *prohibits* using settlement history to determine liability. Rule 408 makes clear that such evidence "is not admissible to prove liability for . . . the claim or its amount." Fed. R. Evid. 408.[2] The rationale of Rule 408's prohibition on the use of settlement history is equally applicable in an estimation proceeding. The exclusion of evidence of past settlements in determining liability is based upon

---

[2]    *See also Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1247 (3d Cir. 1993) (same), *cert. denied*, 510 U.S. 994 (1993); *New Jersey Turnpike Auth. v. PPG Indus., Inc.*, 16 F. Supp. 2d 460, 473 (D.N.J. 1998) (administrative consent order for environmental claims inadmissible in CERCLA cost recovery action); *In re Dow Corning Corp.*, 250 B.R. 298, 342 (Bankr. E.D. Mich. 2000) ("[T]he Debtor's tentative offer to settle with breast implant claimants has no bearing on whether it will be found liable in tort."); *Belton v. Fibreboard Corp.*, 724 F.2d 500, 505 (5th Cir. 1984) (improper for trier of fact to consider amounts of settlements with settling defendants as proof of amount of claim against non-settling asbestos defendants).

6

the recognition that a party may settle a particular case or a group of cases for any number of reasons unrelated to the actual merits of the dispute or the validity of the underlying claims. Conversely, allowing past settlements as evidence of liability would create a disincentive for parties to reach compromises for fear that such compromises subsequently would be used against them.[3]  Indeed, there most likely is no place where application of this rule, and its rationale, is more important than in the context of asbestos personal injury litigation, where the motivation to settle -- for these debtors, and for scores of other defendant debtors -- has virtually *no* connection to the underlying merits of most cases.

Rule 408 typically is not invoked in other Chapter 11 asbestos cases because other cases appear to involve estimations in which settlement history is used *with the consent of the debtors*. For example, in *Owens Corning,* the issue of whether past settlement history was admissible in estimating liability was not raised by any party in the case.[4]  Because all parties sought an estimation based on past settlement history, the only issue the court addressed was the extent to which adjustments should be made to historical values to account for changed circumstances.  *Id.* This and similar precedents, however, do not support the mandatory imposition of such methods over the objection of the debtor, and in clear violation of existing law.

---

[3]   As the Ninth Circuit stated, "[t]wo principles underlie Rule 408: (1) '[t]he evidence [of compromise] is irrelevant, since the offer may be motivated by desire for peace rather than from any concession of weakness of position;' (2) '[a] more consistently impressive ground is promotion of the public policy favoring the compromise and settlement of disputes.'" *Hudspeth v. Comm'r of Internal Revenue Service*, 914 F.2d 1207, 1213-14 (9th Cir. 1990) (quoting Fed. R. Evid. 408 advisory committee's note and finding that Commissioner of IRS would be inhibited from entering into settlements if such settlements could be binding in subsequent cases). *See also Playboy Enters., Inc. v. Chuckleberry Pub'g, Inc.,* 486 F. Supp. 414, 423 (S.D.N.Y. 1980) (in prohibiting use of settlement history, court stated that the policy underlying Rule 408 applied because "[a] host of factors may affect a litigant's decision to settle" and the fact that a party "might have made a mistake in not pursuing its rights with appropriate zeal" should not preclude it from protecting its rights going forward against another parties).

[4]   *See Owens Corning v. Credit Suisse First Boston*, Memorandum & Order, Case No. 04-00905, Docket No. 106 (D. Del. Mar. 31, 2005).

7

To extent the court in *Owens Corning* stands for the proposition that an estimation is of the cost of resolving claims in the tort system rather than actual liability, the decision was erroneously decided.  In its order, the court recognized that:

> The claims being valued arise under state law, hence state law determines their validity and value.  "The 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress 'generally left the determination of property rights in the assets of a bankrupt's estate to state law.'"  *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000), (*quoting Butner v. United States*, 440 U.S. 48, 54 (1979)).  The same principle applies to estimation proceedings under § 502(c).  *Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134, 135 (3d Cir. 1982).

*Owens Corning v. Credit Suisse First Boston*, Memorandum & Order, Case No. 04-00905, Docket No. 106, at 3 (D. Del. Mar. 31, 2005).  It is, however, a logical fallacy to conclude that merely because state substantive law determines a claim's validity and value, claims are to be valued according to what would happen in the state tort system.  There is a distinct difference between valuing claims pursuant to state law and valuing claims according to state court awards/settlements.  Indeed, it was undisputed in *Owens Corning* that although state substantive law applies in determining the validity of claims, federal procedural law applies in the estimation process.  Accordingly, an estimation must acknowledge claims will be determined under the application of federal procedures rather than state procedures.  Moreover, claims cannot be attributed tort system values when such claims would not be paid at tort system values due to limits on the allowance of claims in bankruptcy cases.  For example, Bankruptcy Code limitations on allowed claims such as Section 502(b)(6) are absolute notwithstanding what applicable state law would otherwise provide.

## C.    The Federal Rules of Evidence Require Scientifically Reliable Evidence for Proof of a Valid State Law Claim.

The U.S. Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), established that a federal trial "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589.  In 2000, Rule 702 of the Federal Rules of Evidence was amended to incorporate, among other things, the "reliability" requirement of *Daubert*.  Fed. R. Evid. 702 advisory committee's note (noting that the amendment affirms the trial court's responsibility to ensure the reliability of expert evidence).  As discussed above, estimation proceedings are governed by the Federal Rules of Evidence.  Thus, since an estimation proceeding is governed by the Federal Rules of Evidence, the assessment of whether proffered expert testimony is admissible under Fed. R. Evid. 702 and 703 in such proceeding must include an analysis of the reliability standards established in *Daubert*.  *See* Fed. R. Evid. 104(a); *Daubert*, 509 U.S. at 592-93; Tr. of Hr'g at 139 (Jan. 21, 2005).

The Supreme Court set forth the following non-exclusive factors for trial courts to use in determining reliability of expert testimony:  (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review; (3) the known or potential rate of error of the technique or theory; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.[5]  *See Daubert,* 509 U.S. at 593-94.  In addition, the trial court must

---

[5]    The Third Circuit subsequently added three additional factors to be considered during a *Daubert*-type analysis of expert testimony, namely: (1) the relationship of the technique to methods which have been established to be reliable; (2) the qualifications of the expert witness testifying based on the methodology; and (3) the non-judicial uses to which the method has been put. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n. 8 (3d Cir. 1994). *See also In re Townsend*, 309 B.R. 179, 183 (Bankr. W.D. Pa. 2004) (Fitzgerald, J.).

determine whether the proffered evidence is relevant, that is, "whether expert testimony proffered in the case is sufficiently tied to the facts of the case" and is a good "fit." *Id.* at 591-92.[6]

In fulfilling its obligation to ensure the reliability of scientific evidence, the court must make an "assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." This requires the court to bar "subjective belief" and "unsupported speculation" – that is, *junk science* – from entering the courtroom under the guise of expert testimony. *Daubert,* 509 U.S. at 593-94.

Thus, under *Daubert*, causation evidence is admissible only if it is based on reliable scientific data and methods, and the conclusions flow logically from those data and methods. *Daubert*, at 589-90; Fed. R. Evid. 702; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). In the context of personal injury claims brought on the basis of exposure to asbestos-containing materials, to prove causation, claimants must demonstrate that they were exposed to the alleged tortfeasor's products and that it is more likely than not that such exposure was a substantial factor in causing their injuries. *See*, *e.g.*, *In re Jackson v. Anchor Packing Co.*, 994 F.2d 1295, 1303 (8th Cir. 1993); *Joint E&S Dists. Asbestos Litig.*, 963 F. Supp. 314, 316-17 (E.&S.D.N.Y. 1997); *Hall v. John Crane-Houdaille, Inc.*, No. 86-3401 1990 WL 17827, at *9 (E.D. Pa. Feb. 16, 1990); *Vodanovich v. A.P. Green Indus., Inc.*, 869 So.2d 930, 932 (La. Ct. App. 2004); *Diel*

---

[6]  Under *Daubert*, claimants have the burden of demonstrating to the Court that their evidence is reliable. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Elkins v. Richardson-Merrell, Inc.*, 8 F.3d 1068, 1071 (6th Cir. 1993) (affirming grant of summary judgment on *Daubert* grounds). The "proponent of the expert testimony" must "prove by a preponderance of the evidence that the testimony is reliable." *Tanner v. Westbrook*, 174 F.3d 542, 546 (5th Cir. 1999). *See also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994) (same); *In re TMI Litig. Cases Consol. II*, 911 F. Supp. 775, 830 (M.D. Pa. 1996) (same).

*v. Flintkote Co.*, 204 A.D.2d 53, 54 (N.Y.A.D. 1994).    Pursuant to *Daubert*, the evidence

demonstrating that exposure to the defendant's product causes disease must be "reliable." *See*

*Daubert*, 509 U.S. AT 589.    Evidence linking a specific chemical or toxin, like asbestos, to

disease is inadmissible unless there is "an established scientific connection between exposure

and illness," including "information on the level of exposure necessary for a person to sustain

injuries. . . ." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 278 (5th Cir. 1998); *Allen v.*

*Pennsylvania Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996) ("[S]cientific knowledge of the

harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such

quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case.").

Courts routinely exclude expert evidence of causation in toxic tort cases when the testimony or

its basis is not reliable pursuant to *Daubert.    See, e.g.*, *Soldo v. Sandoz Pharmaceuticals*

*Corporation*, 244 F.Supp.2d 434, 534 (W.D. Pa. 2003) (in case in which plaintiff claimed that a

drug taken for control of postpartum lactation caused her to have a stroke, plaintiff's experts'

hypothesis about medical causation was not scientifically reliable); *Glastetter v. Novartis*

*Pharmaceuticals Corp.*, 107 F.Supp.2d 1015, 1028 (E.D. Mo. 2000) (concluding that doctors'

testimony that ingestion of drug caused plaintiff to suffer an intracerebral hemorrhage did not

pass the reliability standards under *Daubert*); *In re Breast Implant Litigation*, 11 F.Supp.2d

1217, 1244 (D. Col. 1998) (holding that with respect to product liability claims brought against

manufacturers of silicone breast implants, plaintiffs failed to meet their burden of proof in

establishing that medical opinions regarding causation (1) were based on valid, scientific

principles and reliable scientific methods, processes, reasoning, and data; (2) were based upon

---

11

data reasonably relied upon by experts in the field; and (3) would assist the trier of fact in resolving a factual dispute).

Similarly, expert medical testimony related to a medical diagnosis is only admissible if it is based upon reliable scientific data and methods. *See Daubert*, 509 U.S. at 589-90; *GE v. Joiner*, 522 U.S. 136, 146 (1997). S*ee also Summers v. Missouri Pacific R.R. Sys.*, 132 F.3d 599, 603-04 (10th Cir. 1997) (doctor's diagnosis of "chemical sensitivity" was inadmissible under *Daubert* and Fed.R.Evid. 702 because such diagnosis was based on tests that "have been the subject of much criticism by the scientific community as not having met acceptable scientific levels of methodology and criteria, and are not designed to test for the recognized medical condition of chemical sensitivity"); *Prohaska v. Sofamor, S.N.C.*, 138 F. Supp. 2d 422, 438-42 (W.D.N.Y. 2001) (medical expert's opinion was insufficiently reliable to be admissible in product liability suit against bone screw manufacturer where expert had never examined plaintiff, read her deposition testimony, spoken with any of her physicians, reviewed any of her diagnostic tests, and was unable to conclude to a reasonable degree of medical certainty that the plaintiff's pain was caused by defective screws); *Dombrowski v. Gould Elecs., Inc.*, 31 F.Supp.2d 436, 442-42 (M.D. Pa. 1998) (expert testimony regarding bone lead testing technology in connection with proposed medical monitoring program for lead poisoning was inadmissible under *Daubert* to establish plaintiffs' medical monitoring claim because (1) there was no set standard for comparison of test readings, (2) test results could vary significantly depending on the nature of the instrument and the person using it, and (3) the testing method had not gained wide acceptance in the scientific or medical communities).

Finally, the principles of *Daubert*, as articulated above, are relevant and applicable in bankruptcy claims estimation proceedings. Indeed, bankruptcy courts, pursuant to Rule 702 and

*Daubert*, have excluded unreliable scientific and medical evidence in contested proceedings involving the evaluation of bankruptcy claims.

For example, in *In re Armstrong*, 285 B.R. 864 (Bankr. D. Del. 2002), a proceeding to determine on the merits whether certain asbestos property damage claims were valid, the bankruptcy court excluded evidence of the amount of airborne asbestos in approximately 600 properties on the ground that the method used to measure such contamination did not meet the standards of scientific reliability and validity mandated by *Daubert*. Specifically, the *Armstrong* court found that (1) the method in question was not a scientifically valid method of quantifying the level of asbestos contamination in a room or building, and (2) because there was no statistical correlation between surface dust (which was collected by the method in question and then used to calculate the amount of airborne dust in the room or building) and airborne dust (which the method was meant to measure, ultimately), the method had "no valid scientific connection to the pertinent inquiry." *Id.* at 870-71. Because the proferred evidence in question did not meet the *Daubert* criteria, the *Armstrong* court granted the debtors' motion to exclude such evidence. *Id.; see also In re Townsend*, 309 B.R. 179 (Bankr. W.D. Pa. 2004) (Fitzgerald, J.) (*citing Armstrong*, and *Daubert* in the context of a Chapter 13 claim objection and disallowing expert evidence because the expert's methodology was unreliable and not generally accepted).

Just as bankruptcy courts subject evidence to *Daubert* standards before admitting such evidence in the context of determining whether claims should be allowed on the merits, this Court should, *a fortiori*, apply those same standards to the estimation process to determine whether evidence offered by claimants to demonstrate the validity of their claims is admissible for estimation purposes.

13

In summary, although state substantive law governs an estimation proceeding, it is the Federal Rules of Evidence that govern *what evidence* can be considered during the proceeding. Accordingly, for all the reasons discussed above, values of previous settlements are explicitly prohibited by the Federal Rules of Evidence, and they are not relevant in an estimation where the Court must not consider any evidence - and in turn any claims - that fail to meet the requirements of *Daubert*.

# TAB 4

# <u>THE QUESTIONNAIRE</u>

**THE PROPOSED QUESTIONNAIRE IS THE MOST EFFECTIVE
AND REASONABLE MEANS OF GATHERING
INFORMATION NECESSARY TO MAKE AN ESTIMATION
BASED ON ADMISSIBLE EVIDENCE**

As discussed in the Motion, the estimation process proposed by the Debtors envisions the

following steps:

>*First*, the Questionnaire will be sent to those claimants who filed a
>lawsuit against Grace before the Petition Date.

>*Second*, those claimants will complete and return the
>Questionnaire.

>*Third*, information from the Questionnaire will be compiled into a
>navigable database made available to the Debtors and the official
>committees' experts.

>*Fourth*, parties will submit expert reports and conduct discovery
>relevant to estimating the Debtors' asbestos liability.

>*Fifth,* the Court will hold a trial on the contested issues.

>*Finally*, the Court will weigh the proposed estimations based on
>the merits and evidence in the record and issue findings.

The following section explains how adoption of the Debtors' PI CMO and requiring an

Asbestos PI Claimant to respond to the proposed Questionnaire is the only way for this Court to

acquire the information necessary to distinguish valid from invalid claims and estimate the value

of the valid asbestos claims based on the requirements of the Federal Rules of Evidence.  The

question portion of the document is less than 20 pages.  The information called for is *specific* and

*central*, not voluminous or tangential.

The Questionnaire is designed to elicit information necessary to determine the following

two threshold evidentiary issues:   (a) whether the claim for an asbestos-related injury is

supported by objective and verifiable medical tests, performed in accordance with applicable

standards; and (b) whether the claim is supported by objective and verifiable evidence of an

1

exposure to a Grace asbestos-containing product sufficient to cause disease. Indeed, as this Court has stated, the Questionnaire is "calculated to lead to relevant admissible evidence." Tr. of Hr'g. at 155 (Jan. 21, 2005).

The Debtors maintain, and plan to argue, that the Court should consider, for estimation purposes, only those claims that can meet these threshold evidentiary standards. Importantly, without the information in the Questionnaire, the Debtors will be precluded from even presenting their estimation case.

> **A.     The Questionnaire Requires A Claimant To Demonstrate Exposure to a Grace Asbestos-Containing Product at a Level That Could Cause Asbestos Injury.**

As discussed further below, Claimants who allege that they have been injured because of exposure to a Grace asbestos-containing product are asked to disclose:

- The time periods in which they were exposed to Grace's products as well as those of other defendants;

- Their industry, occupation, and employer(s);

- The site locations where they were exposed to Grace's products;

- The name(s) of the Grace asbestos-containing products and how close they were to those products while they were being installed.

*Objective and reliable* exposure information is essential because without it, a claimant cannot prove (and it will be difficult for Grace to refute) that he or she was exposed to sufficient levels of Grace asbestos containing products such that Grace asbestos containing products could be a substantial contributing factor to whatever disease the claimant suffers.

Exposure evidence in asbestos litigation has been highly controversial (as chronicled extensively in Tab 2). Indeed, in this bankruptcy, an audit already has demonstrated that few claimants worked in industries and occupations where the possibility of exposure to a Grace asbestos-containing product was even present. The proposed Questionnaire herein simply seeks

2

basic information that will permit the Court to determine whether a claim is supported, on its face, by *any* objective and reliable evidence of exposure to a Grace asbestos-containing product. *See* Questionnaire, at 5-10.

The mere fact of exposure to a Grace asbestos-containing product, however, is not sufficient to pass the threshold evidentiary criteria applicable to this estimation proceeding. Again, as detailed in the discussion of asbestos litigation history, a significant problem, arising both in prior litigation and in the sample Grace claims noted above, is the lack of evidence of dose and exposure *sufficient to cause harm*. Virtually every person in North America has been exposed to asbestos.[1] Thus, in toxic tort cases, merely working at a site where an asbestos product was present does not give rise to a cause that is sustainable under the Federal Rules of Evidence. Plaintiffs must show that they were exposed to defendant's allegedly hazardous product or material at a level that has been demonstrated, through scientifically reliable evidence, to cause injury.

Unless and until the claimant establishes the existence of a harmful dose of a Grace asbestos-containing product – and further establishes actual exposure to an amount in excess of that dose – the trier of fact is left to *guess* whether that particular claimant's exposure was sufficient to cause disease. Guesswork is insufficient under *Daubert* or any other rule of evidence, and clearly is not sufficient in an estimation proceeding. In *Mitchell v. Gencorp.*, 165

---

[1] Indeed, pathology data show that individuals in the general population have thousands, even millions, of asbestos fibers in their lungs with no adverse effect. A. Churg, *Nomneopathic: Disease Caused by Asbestos*, Pathology of Occupational Disease, 293 (Churg & Green, 2d ed. 1998). According to Dr. Andrew Churg, a leading pathologist of asbestos diseases, "one may find as many as 40 million fibers of chrysotile, 40 million fibers of tremolite, and 400,000 fibers of amosite or crocidolite in the lungs of the general population of Vancouver, along with 40,000 asbestos bodies." *Id.* Even so, "there is no evidence that this fiber burden produces asbestos-related disease in the general population." *Id.* Hence, not every person who worked near a Grace asbestos-containing product can demonstrate causation of injury.

3

F.3d 778 (10th Cir. 1999), the Tenth Circuit affirmed summary judgment because the plaintiff had not shown sufficient reliable scientific information of "levels of exposure that are hazardous to human beings generally, as well as the plaintiff's actual level of exposure to the defendant's toxic substance." *Mitchell*, at 781. As the court explained: "Absent supporting scientific data, . . . estimates and . . . conclusions are little more than guesswork. Guesses, even if educated, are insufficient to prove the level of exposure in a toxic tort case." *Id.*

Thus, in addition to actual exposure to a Grace asbestos-containing product, a claimant has the burden of proving – by reliable and reproducible evidence – that (1) there is an established level of exposure to a Grace asbestos-containing product that causes disease in humans (*i.e.,* general causation) and (2) the claimant was in fact exposed to the requisite dose (*i.e., specific* causation).[2] Absent "accurate information on the level of [plaintiff's] exposure," a plaintiff's causation testimony must be excluded and summary judgment granted. *Moore v. Ashland Chem. Co.*, 151 F.3d 269, 278 (5th Cir. 1998).

Accordingly, the proposed Questionnaire asks each Asbestos PI Claimant to provide the specific information about the extent of the claimant's exposure to a Grace asbestos-containing product. *See* Questionnaire at 5-10. The Asbestos PI Claimant must list the duration of his or her employment at a job site in which he or she was exposed to Grace asbestos-containing products, as well as the nature of his or her employment at that job site, utilizing a list of industry and occupation codes. *See* Questionnaire, at 5. Additionally, an Asbestos PI Claimant must identify

---

[2]    *See Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1106 (8th Cir. 1996) ("[A] plaintiff in a toxic tort case must prove the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover."). *See also Reference Guide on Epidemiology, in* Federal Judicial Center, Reference Manual on Scientific Evidence 382 (2000) ("The plaintiff must establish not only that the defendant's agent is capable of causing disease, but also that it did not cause the plaintiff's disease.").

4

the specific Grace asbestos-containing product to which he or she was exposed and the basis of the identification. *Id.* at 6. Answers to those questions will identify the approximate level of exposure, if any, of a claimant to a Grace asbestos-containing product. Finally, the Questionnaire asks Asbestos PI Claimants to list *all* of their other exposures to asbestos products, their job history, as well as other information indicating whether they have sued or recovered from other companies or trusts for the same or similar alleged injuries. *Id.* at 7-14. These requirements will provide information about other potential causes of the disease.

In sum, these requests go to basic information about the claimants' exposures -- information that already should be known by the claimants and their lawyers in light of the fact that each had filed lawsuits, attesting that proper investigation into the facts underlying the lawsuits had been performed prior to their filing. *See* Fed. R. Civ. P. 11 (b)(3) ("By presenting to the court . . . a pleading . . . an attorney or unrepresented party is certifying that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances . . . the allegations and other factual contentions have evidentiary support . . . .").

**B.      The Questionnaire Requires Claimants to Supply Information Needed to Determine Whether Claims Are Supported by Reliable Medical Data in Accordance with *Daubert*.**

Claimants with legally cognizable asbestos-related *injuries* caused by Grace asbestos-containing products are entitled to compensation. Claimants without injuries are not entitled to compensation. And, under the Federal Rules of Evidence and *Daubert*, explained above, evidence of injury must be reliable before it can be considered in support of a claim used in an estimation proceeding.

The proposed Questionnaire asks for the following medical information so that Grace can put forth an estimation that values claims alleging no injury or alleging injury that is not supported by admissible evidence, at zero:

5

- The claimant's diagnosis, including the name of the diagnosing physician, the date of the diagnosis, and any non-asbestos causes identified in the diagnosis;

- The results of any X-rays and Pulmonary Function Tests;

- Basic information on the claimant's smoking history, if any; and

- Copies of the medical records relating to the diagnosis, along with any other X-ray results taken in the prior two years.

This information requested will provide objective data that the Court can consider in determining whether a claim alleges an actual injury and whether the evidence in support of the claim is reliable enough to pass muster under *Daubert* and Rule 702.

## 1.    Chest X-rays.

The Questionnaire requests each Asbestos PI Claimant to produce two B-reads, one independent, in support of a diagnosis of asbestosis, as well as the underlying, supporting X-rays. Such requirements are consistent with the standards set out by the American Thoracic Society and are the only way to ensure that claims for non-malignant lung disease are accurately diagnosed for the purpose of estimating the value of Grace's current and future asbestos personal injury liability.

As discussed in the Factual History Section of this Brief at Tab 2, substantial numbers of asbestos claims emanate from mass screenings where B-readers routinely "over-read" X-rays to find signs of asbestos-related disease despite the absence of true disease. The false or "over-read" X-rays are possible, to a large extent, because of the inherent variability and subjectivity associated with the reading of "ILO scores" given to the X-rays.[3] Numerous studies have shown

---

[3]    The International Labor Organization ("ILO") developed ILO Scores as part of a "standardized system for taking and classifying films for the presence of profusion and opacities consistent with pneumoconiosis and pleural changes . . . ." ATS, *Diagnosing and Initial Management of Nonmalignant Diseases Related to Asbestos*, Am. Journal of Resp. and Critical Care Med., Vol 170: 691, 696 (2004). "This system, which is the basis of the 'B-reader' qualification for designating persons as competent in classifying pneumoconiosis films, (Continued…)

that lung X-rays are interpreted with tremendous variability by different readers (inter-observer variability) and even by the same reader at different times (intra-observer variability). The ILO itself acknowledges that "there is significant variation in repeated readings of the same radiograph, not only from reader to reader, but also between readings by the same reader."[4] The variability problem is particularly pronounced when an ILO reading is at the lower end of the classification scale. As Dr. Hans Weill, a leading pulmonologist and asbestos researcher, has written: "It is in the lower categories (0/1 to 1/1) that the greatest degree of interobserver variability (disagreement) occurs."[5]

Daubert forbids analyses based on "subjective speculation" and on data where the results have such an enormous known rate of error. Daubert, 509 U.S. at 590, 594. Indeed, courts have considered an ILO reading of 1/0 to be too uncertain for reliable diagnostic use. See, e.g., Eagle Picher Indus. v. Liberty Mutual Ins. Co., 829 F.2d 227, 236 n.14 (1st Cir. 1987) ("a reading of 1/0 is too uncertain to be used to diagnose a particular case."); Raymark Indus., Inc. v. Stempel, No. 88-1014-K, 1990 WL 72588, at * 7 (D. Kan. May 30, 1990) ("On the ILO scale, a reading of 1/0 is only a 'suspect' finding of fibrosis, and is not sufficient to diagnose asbestosis.").

---

was developed for grading the radiographic severity of pneumoconiosis in epidemiologic studies but has been applied to clinical settings to maintain consistency in classifying chest films." *Id.* The ATS has recognized that films with an ILO Score of 1/0 or higher are "positive" for asbestosis. *Id.*

[4]   ILO 1980 International Classification of Radiographs of the Pneumoconioses International Labour Organization, Geneva 1980, at 20. As discussed above, NIOSH has further acknowledged that "[r]ecently, the [B-reader] program has been criticized, the main concern being that variability among readers is excessive despite the training and certification. ('1980 ILO Report") There is also the perception some B-readers systematically bias readings in legal proceedings." M. Attfield & D. Wagner, *A Report on a Workshop on the National Institute for Occupational Safety and Health B Reader Certification Program*, JOM 34: 875-78 (1992).

[5]   H. Weill, *Diagnosis of Asbestos-Related Disease*, Chest 91:802-03 (1987).

7

In the face of these problems, accepted scientific methodology for the diagnosis of asbestosis requires that ILO readings must be confirmed by two independent and qualified readers.  In fact, the ILO itself "strongly recommend[s] that at *least two, and preferably three independent readings are made for each radiograph*" prior to a diagnosis of asbestosis being made.[6]  Other experts agree.  As Dr. Ducatman has stated, "[a]t present, individual diagnoses, legal decisions and population assessments ought to rely on multiple readings."[7]

Consequently, the only way to ensure that a radiographic reading is reliable and reproducible is to have it examined by more than one certified and independent B-reader.  Thus the Questionnaire requests an independent B-reading and the actual X-ray that formed the basis of the independent read to allow a subsequent B-reader to replicate the diagnosis.  Such requirements are consistent with the scientific standards articulated by the ATS and ILO and provides the basis for requesting such information in the Questionnaire.

### 2.    Pulmonary Function Tests.

One of the greatest threats to this Court reaching an accurate estimate involves the prevalence of claims alleging asbestosis or pleural thickening in which the claimant has no physical impairment.  Preliminary assessments of the claims against Grace - for which the alleged asbestos-related disease has been identified - indicate that there are more than 29,000 claimants alleging that they have sustained asbestosis but only 1,500 alleging mesothelioma. While asbestosis - under certain working conditions, most of which have not been present in the

---

[6]    1980 ILO REPORT at 20.

[7]    Ducatman et al., *B-Readers and Asbestos Medical Surveillance*, JOM 30:644-47, 646 (1988) (emphasis added).

US for over 30 years[8] - may cause lung impairment, many individuals are diagnosed with asbestosis (based on an ILO reading) but do not have any impairment whatsoever.[9]

Thus, as discussed above, an Asbestos PI Claimant must demonstrate actual impairment in order to recover for an alleged non-malignant disease.  To diagnose "impairment," the medical community relies upon pulmonary function testing.  According to the American Medical Association, Pulmonary Function Tests ("PFT"), "performed on standardized equipment with validated administration techniques provide the framework for evaluation of respiratory system impairment."[10]  Thus, the Questionnaire requires a Claimant to submit the full results of all pulmonary function tests, including the following:  The Asbestos PI Claimant's total lung capacity (TLC); forced vital capacity (FVC); the FEV1/FVC ration; the names(s) of the doctor who performed the test; the date of the test; a replication of the test; and the reports of the data underlying the tests, results and interpretations.  *See* Questionnaire at iii-iv, 2.

The American Thoracic Society (ATS) has articulated standards governing the administration and interpretation of all aspects of pulmonary functions tests.  Additionally, the American Medical Association (AMA) has established criteria, based on pulmonary function test results, for determining impairment.  Consequently, the Questionnaire simply elicits the

---

[8]    Gaensler, Jederlinic & Churg, Idiopathic Pulmonary Fibrosis in Asbestos-exposed Workers, Am. Rev. Resp. Dis. 144(3):  689-696, 695 (1991) (emphasis added); Gaensler, et al., Radiographic Progression of Asbestosis With and Without Continued Exposure, in VIIth Int'l Pneumoconiosis Conf. (NIOSH-ILO), DHHS (NIOSH) Pub. No. 90-108, Part 1, 386-92 (1988) (study of all workers in 4 paper or asbestos product plants and all workers in certain occupational categories in 2 shipyards).

[9]    *Neoplastic Asbestos-Induced Disease,* in Pathology of Occupational Lung Disease (Churg & Green, eds., 2d ed. 1998) at 339.  *See also* In re the Babcock & Wilcox Co., Road Map to B&W's Defenses to Asbestos Personal-Injury Claims, Case Nos. 00-0558, 00-10992, at VII-1 (Oct. 18, 2001) (130,945 out of 176,982 asbestosis Proofs of Claim reported no lung impairment, in that they either had no Forced Vital Capacity (FVC-predicted) score at all or scored normal on lung-impairment testing).

[10]    *AMA Guides to the Evaluation of Permanent Impairment*, § 5.4d, p. 93 (5th ed. 2000).

9

information sufficient for determining whether the claimants' evidence of impairment conforms with the standards and criteria established by the appropriate governing medical and scientific institutions.   Without the underlying tests and data supporting them, this analysis cannot be performed.

Once again, however, the court need not determine, at this juncture, whether or not the court will adopt in this proceeding the AMA and ATS criteria for purposes of the estimation. Rather, the court need only decide whether it will permit the debtors to seek the underlying information from the claimants so that the debtors will have the opportunity to present an estimation that is based on those criteria.

### C.   Precedent Supports the Use of the Questionnaire to Determine Present and Future Asbestos Liability.

Detailed claims forms have been approved by numerous asbestos trusts for the payment of claims.   The Manville Trust's Proof of Claim Form for the 2002 TDP requires information regarding the claimant's exposure to Manville asbestos, asbestos-related injury (including medical documentation), and smoking history.   *See* Manville Personal Injury Settlement Trust, 2002 TDP, Proof of Claim Form, *at* http://www.mantrust.org/FTP/POC02.PDF.   The Manville Trust utilized a 21-page form to evaluate each claim individually for the purposes of liquidation and payment.   Courts also utilized individualized review forms for the Celotex and Eagle-Picher Trusts.   *See In re Celotex Corp.*, 204 B.R. 586, 593 (Bankr. M.D. Fla. 1996) (discussing court-approved special asbestos proof of claim form); *In re Eagle-Picher Indus., Inc.*, 158 B.R. 713, 716 (Bankr. S.D. Ohio 1993) (referencing court-approved detailed asbestos proof of claim).[11]

---

[11] Even outside of Chapter 11, similar forms have been used to streamline mass tort litigation in large cases involving injuries allegedly arising from diet drugs, orthopedic bone screws, and latex.   *See, e.g., In re Diet Drugs*, No. MDL 1203, 1999 WL 387322 (E.D. Pa. May 19, 1999) (utilizing claim forms in order to "minimize
(Continued…)

Most recently, the court overseeing the B&W bankruptcy approved the use of a proof of claim form which is similar in nature but does not go far enough.  *See* Order, *In re The Babcock & Wilcox Co.*, No. 00-0558, Docket No. 70 (E.D. La. Oct. 30, 2000).  In that case, the proof of claim form allowed  the debtors to ask questions regarding *prima facie* evidence of liability, including requests for: diagnostic reports supporting the claimed asbestos injuries; PFT and ILO results; the total number of years of asbestos exposure and the year of the first and last exposure; and the specific locations where the claimant was exposed to debtors' boilers, and the industry and occupation codes associated with each such location.

The B&W court was one of the first to recognize the importance and utility of a "discovery-based" claim form in asbestos bankruptcy proceedings.  Although the claim form adopted by the court in B&W, was less specific than that requested here, several critical distinctions must be noted.  First, the B&W case was unique because, unlike most debtors whose asbestos-containing products entered the stream of commence, B&W designed and installed asbestos-containing boilers at fixed locations during particular times and had historical records generally establishing the locations of these boilers.  *See In re the Babcock & Wilcox Co.*, Road Map to B&W's Defenses to Asbestos Personal-Injury Claims, Case Nos. 00-0558, 00-10992, at I-3-I-4 (Oct. 18, 2001).  Thus, B&W had the ability to verify, by the address or location of the claimants' employment, whether the claimant could possibly have been exposed to a B&W asbestos-containing product.  *Id.*  Grace asbestos-containing products, however, are not traceable

---

time consuming and expensive exchanges of discovery" by numerous plaintiffs); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, No. MDL 1014, 1997 WL 704702, at *4 (E.D. Pa. Aug. 22, 1997) (noting use of "questionnaire that requested, among other things, pertinent medical, employment, and worker's compensation information"); *In re Food Lion, Inc.*, No. 94-2360, 1998 WL 322682, at *11 (4th Cir. June 4, 1998) (questionnaires utilized "to streamline discovery" and "provide basic information about each plaintiff's claim").

11

in that fashion, and thus a more extensive inquiry of the claimant's occupational exposures is necessary.

Second, this Court now has the benefit of even more scientific evidence demonstrating the problems with over-diagnosing B-readers and false "positive" PFTs and the need for and importance of the replication of test results (like PFT's and B-reads) in asbestos litigation. Thus, while the B&W court did not include these replication requirements in the final proof of claim, it is clear today that independent replication of test results is essential to assessing the validity of claims in an estimation proceeding.

Finally, and perhaps most important, in B&W, the court was not, as is the case here, asked to approve a questionnaire to be sent solely to litigants who had already instituted litigation against the debtors pre-petition. Rather, in B&W, the court approved the claim form for all possible holders of present asbestos claims (whether they were known or unknown to the debtors), the vast majority of whom had never filed suit against B&W. *See* Order, *In re The Babcock & Wilcox Co.*, No. 00-0558 (E.D. La. Oct. 30, 2000). Here, on the other hand, all Claimants who are to receive the Questionnaire already have initiated actions against the Debtors in the Tort System. Thus, they should already have much of the information sought by the Debtors in the Questionnaire. Because such a defined universe of Claimants already exists, and because those Claimants should already have much of the information requested by the Questionnaire, there is simply no need to water down the Questionnaire to facilitate the process for unknown claimholders who may not yet have the requisite information. Furthermore, given that a number of those who assert claims against Grace have likely asserted claims against the Manville Trust and other asbestos trusts, the burden of completing the Questionnaire is reasonable.

12

Finally, it is a "fundamental maxim of discovery that '[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation.'" *Societe Nationale Industrielle Aerospatiale v. United States Dist. Court*, 482 U.S. 522, 540 n.25 (1987). "Discovery, in other words, is not a one-way proposition." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). *See* Tr. of Hr'g at 118 (Jan. 21, 2005) (in response to Asbestos PI Committee's argument that the Debtors did not need information regarding claims, the Court stated that "Just like you said earlier, that discovery's a two-way street and the Federal Rules of Evidence apply both ways.  I wholly endorse that concept and if there is additional discovery needed, I assure you, they're going to get it.").  Thus, in light of the Asbestos PI Committee and FCR's suggested use of claims settlement data obtained from Grace in their proposed estimation approach, it is fundamentally reasonable for Grace to seek reciprocal discovery of the basis on which claims are asserted for use in its proposed estimation approach.

13

# TAB 5

# <u>CONCLUSION</u>

An estimate based on abusive litigation and past settlement history could render a debtor insolvent, depriving shareholders of property and decreasing the recoveries of other unsecured creditors. Thus, estimating asbestos personal injury claims beyond the amount of actual liability would render a plan unconfirmable because Bankruptcy Code § 1129(b) provides that treatment of a dissenting class of impaired creditors be "fair and equitable" -- no premiums are allowed. 11 U.S.C. § 1129(b). As explained by a leading commentator:

> [A] major component of the 'fair and equitable' requirement [of § 1129(b)] is that no creditor or interest holder be paid a 'premium' over the allowed amount of its claim. Once the participant receives or retains property equal to its claim, it may receive no more.
> ***
> With respect to this part of section 1129(b), the House Report provided that 'one requirement applies generally to all classes before the court may confirm under this subsection. No class may be paid more than in full.'

Collier on Bankruptcy, *supra*, at ¶ 1129.04[4][a] (footnotes omitted) (citing H.R. Rep. 95-595, at 414 (1977)). Indeed, this Court has previously recognized the importance of the issue. *See* Tr. of Hr'g at 155 (Jan. 21, 2005) ("But I agree with you with your ultimate conclusion, which is creditors have the right to determine whether distributions are fair and reasonable with -- coming either from the -- that the debtor would put into the trust, on the one hand, versus what the debtor would be paying to other creditors whose claims don't go into the trust, on the other.").

The proposed Questionnaire is consistent with previous asbestos claim forms and is neither overly burdensome nor prejudicial to the Asbestos PI Claimants. On the contrary, the proposed Questionnaire will require far less of an Asbestos PI Claimant than what is demanded of him or her in an average asbestos trial. *In fact, assuming that all of the actions against Grace were filed with a good faith factual basis, each attorney representing each Asbestos PI Claimant should have reviewed his or her client's medical, occupational, and residential history prior to*

1

*filing a lawsuit and already should have possession of that information.* Any minimal burden the Questionnaire does generate is far outweighed by the possibility that it will reduce the calculation of fraudulent and unsupported claims from corrupting the estimation process. This, in turn, will benefit the truly sick as well as the holders of other valid claims against, and interests in, the Debtors.


Dated:    May 10, 2005

                                        Respectfully submitted,

                                        KIRKLAND & ELLIS LLP
                                        David M. Bernick, P.C.
                                        Janet Baer
                                        Jonathan P. Friedland
                                        Salvatore F. Bianca
                                        Joseph Nacca
                                        Andrea L. Johnson
                                        200 East Randolph Drive
                                        Chicago, IL 60601
                                        Telephone:    (312) 861-2000
                                        Facsimile:    (312) 861-2200

                                        KIRKLAND & ELLIS LLP
                                        Barbara M. Harding
                                        Brian T. Stansbury
                                        655 Fifteenth Street, N.W.
                                        Washington, D.C. 20005
                                        Telephone:    (202) 879-5000
                                        Facsimile:    (202) 879-5200

2

-and-

PACHULSKI, STANG, ZIEHL, YOUNG, JONES &
WEINTRAUB P.C.

Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:      (302) 652-4100
Facsimile:      (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession

3

**TAB 6**

# **APPENDIX**