

# *Mass Litigation Dynamics*

- **Statutes of limitations**
- **Mass filings**
- **Mass screenings**

A3823-22 08/02 RAND

In the early days of asbestos litigation, plaintiffs in some states were barred from filing suits for asbestos-related injuries because courts held that their injuries had occurred many years ago when the workers were first exposed, and therefore the allowable time for filing claims had expired. Later, legislatures adjusted their statutes of limitation so as to require that latent-injury victims file suit within one or two years of when they know or should have known that they were injured (Hensler et al., 1985). Although a person may receive a clinical diagnosis of injury (such as pleural plaques) without suffering any functional impairment, in most instances the law deems that the statutory period for filing starts to run when the plaintiff knows or should have known that he was "injured."

As a result, if a worker learns that he or she has been exposed to asbestos, seeks a medical examination to determine whether there has been a serious health consequence (e.g., cancer), and discovers that he or she has pleural plaques but no other signs of injury or impairment, a legal claim must be filed within a short time in order to protect his or her chance of seeking compensation.

Initially, asbestos manufacturers vigorously defended themselves against workers' claims, raising a host of issues, including the risks of exposure to asbestos, whether the plaintiffs had been exposed to the defendant's products and whether the statute of limitation had run (Hensler et al., 1985). Litigating individual claims against these major corporations was expensive and risky for plaintiff law firms and few were willing to take on asbestos workers' claims

22

(Brodeur, 1985). By the mid-1980s, however, plaintiff law firms in areas of heavy asbestos exposure (such as jurisdictions with shipyards or petrochemical facilities) had learned that they could succeed against asbestos defendants by filing large numbers of claims, grouping them together and negotiating with defendants on behalf of the entire group. Often defendants would agree to settle all of the claims that were so grouped, including those claims that were questionable, to reduce their overall costs of litigation. By agreeing to pay questionable smaller-value claims in exchange for also settling stronger and larger-value claims, defendants could also contain their financial risk. Some plaintiffs might receive lower values for claims that were settled as part of a group. But litigating claims en masse lowered the cost and risk per claim for plaintiff law firms (Hensler, 2002).

To identify more potential claimants, plaintiff law firms began to promote mass screenings of asbestos workers at or near their places of employment (Hensler et al., 1985). Plaintiff law firms would bring suit on behalf of all of the workers who showed signs of exposure, sometimes filing hundreds of cases under a single docket number (Hensler et al., 1985). Given the profile of asbestos disease, the majority of plaintiffs had little or no functional impairment at the time of filing, although they met the legal standard for injury.

Some asbestos workers who were part of this group litigation would never develop a malignancy or significant functional impairment as a result of their asbestos exposure. But for those who did, being required to file soon after they were first clinically diagnosed as injured imposed a significant risk. Because most jurisdictions followed a "one injury" rule, these plaintiffs would not be allowed to file a second claim for the later-appearing disease. Settlement amounts could be calculated to take the statistical risk of future disability or early death into account, but those individuals who were unfortunate enough to develop serious disease might be left without sufficient funds to deal with disease-related losses.

To address this issue, some courts established "pleural registries" that enabled plaintiffs to satisfy statutes of limitation by filing their lawsuits, but delayed processing and resolving those lawsuits until the plaintiffs' injuries had progressed further (Schuck, 1992; Rothstein, 2001). In some jurisdictions, plaintiffs could choose whether or not to place their claim on such a registry; in others, claims were removable from an inactive docket (the pleural registry) only if they met pre-specified clinical criteria (e.g. diagnosis of malignancy, certain radiological exam results and pulmonary function test ratings) or were otherwise able to persuade the court that their claims should be activated. States that established pleural registries included Arizona, Connecticut, Hawaii, Illinois, Maryland, and Massachusetts. Although registries preserve plaintiffs' right to pursue compensation in the future, they do not provide present

compensation for whatever losses the plaintiffs might already have suffered or for monitoring their health going forward. Importantly, this means also that plaintiffs' lawyers do not secure fees immediately, making it harder for them to spread the risks of litigating more serious cases and less financially attractive for them to represent asbestos plaintiffs generally. Not surprisingly, most plaintiff attorneys in most jurisdictions are unenthusiastic about pleural registries, and in some jurisdictions (e.g., Baltimore) some plaintiff attorneys have vigorously contested their establishment or requirements. Support for pleural registries may also have waned after many states, including Maryland, Ohio, New Jersey, New York, and Texas—all states with large asbestos caseloads—adopted a "two-disease" rule, allowing plaintiffs who initially had nonmalignant diseases to bring a second lawsuit if and when a malignancy is diagnosed. Some states, such as California, relaxed their statues of limitation for asbestos claims. For example, in California the statutory period does not begin until a plaintiff's ability to work at his or her ordinary occupation is impaired (CA Civ Proc §34.02).

24



# *Efficiency Efforts Promoted Additional Litigation*

- **Judicial case management**
- **Defendants' settlement programs**
- **Bankruptcy trust procedures**

A3823-25 08/02 **RAND**

As asbestos cases flooded courts in areas of the country where there had been heavy exposure to asbestos, the courts struggled to manage asbestos caseloads more efficiently so as to reduce private and public transaction costs (Hensler et al., 1985; Hensler, 1995; McGovern 1986, 1989, 1997; Peterson & Selvin, 1991; Willging, 1985). The efforts of innovative judges to handle their asbestos caseloads efficiently were widely admired and imitated by fellow federal and state court judges (McGovern, 1995).

Increasingly, defendants chose not to aggressively contest liability but instead negotiated settlements of large numbers of cases with leading plaintiff attorneys' firms. These agreements typically called for settling hundreds or thousands of cases per year at amounts specified in administrative schedules that reflected differences in injury severity and other characteristics deemed to affect the value of cases. Although such strategies made it likely that defendants would pay some claims that would not have succeeded in court, these defendants hoped that by reducing their transaction costs they would minimize their total litigation bill (Hensler et al., 1985; Hensler, 2002). Judges encouraged these large-scale group settlements by consolidating cases for pre-trial processing. Typically, cases were consolidated by law firms representing the plaintiffs or by plaintiffs' place of employment, not by injury severity or strength of the legal claim (Hensler et al., 1985; McGovern, 1986).

Soon, judges and lawyers also began to consider the possibility of consolidating cases for *trial*. In some instances, just a few cases were selected for trial together, with a goal of minimizing duplicative testimony on issues such as general causation (Hensler et al., 1985). In other instances, a small number of cases would be selected from a larger group, with the thought that the verdicts the jury reached in the selected cases would establish the settlement value of the group as a whole (Selvin & Picus, 1987). In a few instances, juries were asked to decide the outcome of thousands of cases that had been consolidated for trial, based on hearing a few cases that had been selected to represent the group. In these consolidated trials, cases of varying severity and strength of legal and factual claims were grouped together (as had become the practice for settlement purposes) and the plaintiffs whose cases were presented to juries were deliberately selected to represent a range of injury severity (Hensler & Peterson, 1993; Saks & Blanck, 1992).

As some corporations emerged from bankruptcy and established trusts to pay claims, the bankruptcy trust administrators also developed claims processing procedures that would minimize transaction costs. Such procedures typically call for minimal information necessary to determine a claimant's eligibility to collect from the trust and to categorize the claim with regard to severity in order to determine the amount of money to be paid (Peterson, 1990; Smith, 1990). As the number of bankruptcy trusts increased, the total amount of money available to claimants and their lawyers in return for minimal claim preparation effort also increased. Although the trusts paid only modest sums to each claimant, the total fees available to law firms for representing large numbers of claimants on their trust filings could be substantial.

Taken together, these efforts by courts, litigators, and bankruptcy trust administrators generally reduced the per-case costs of processing asbestos claims. In this way, asbestos litigation was transformed in fact—although not in form—into a quasi-administrative regime, with some, if not all, of the transaction cost benefits that one would expect as a result of such a transformation.

Importantly, reducing per-case transaction costs made filing small claims financially viable for more people, thereby encouraging mass filings. Typically, most low-value tort claims never enter the court system because the expense of filing them far outweighs the compensation that might be obtained. The evolution of asbestos litigation changed this equation. Although no one knows for sure how many claims would have been filed in the absence of the administrative transformation of the litigation, it is highly likely that the steps taken to streamline the litigation actually increased the total dollars spent on the litigation by increasing the numbers of claims filed and resolved.



# *Global Settlements Failed*

- **Multi-district litigation (MDL) did not produce a large-scale settlement**
- **Class action settlements overturned by U.S. Supreme Court**

A3823-27 08/02  **RAND**

Most mass tort litigation in the United States is resolved through large-scale "global" settlements. Sometimes those settlements take place within the context of class action litigation. Occasionally, they have occurred after the defendant filed for bankruptcy (Sobol, 1991). In many mass personal injury cases, however, global settlements follow on the heels of the transfer of all federal cases arising out of the relevant factual circumstances to a single judge, under the authority provided by 28 U.S.C. §1407 for MDL (Hensler, 2001a; Rheingold, 1996; Weinstein, 1995). The MDL procedure has been extensively used in mass tort litigation, but it was not applied to asbestos litigation until 1991, more than a decade after the litigation's inception. After the cases were transferred, some participants in the litigation anticipated that the judge to whom they were assigned would help parties negotiate a global settlement of all federal cases against all defendants that would in turn provide a model for resolving state cases as well (Hensler, 2002). However, efforts to fashion such a broad settlement among the large number of defendants and plaintiff attorneys involved—with diverse and opposing interests—ultimately failed.

After a number of years, some of the major asbestos defendants negotiated a class action settlement of all *future* claims against them with leading asbestos plaintiff attorneys under the aegis of the MDL court (George v. Amchem

Products, 157 F.R.D. 246 [E.D., Pa., 1994]). That settlement proved highly controversial (Baron, 1993; Hensler, 2002; Symposium, 1995). When the settlement was rejected by the U.S. Supreme Court (Amchem Products v. Windsor, 521 U.S. 591 [1997]), and when the Court subsequently rejected a class settlement of asbestos claims against another major defendant (Ortiz v. Fibreboard Corp., 527 U.S. 815 [1999]), efforts to achieve a global resolution of asbestos litigation through class action litigation collapsed (Cabraser, 1998).



Over time, Judge Charles Weiner, who presides over the federal MDL litigation, had dealt with a substantial number of suits. To date, 95,994 asbestos suits have been transferred to Judge Weiner, in addition to the 7,411 cases that were filed in the Eastern District of Pennsylvania.  Of these, about 73,000 cases have been closed; 265 have been remanded to their filing district for trial (communication with Clerk of the Court, Eastern District of Pennsylvania, August 30, 2002). But increasingly, plaintiff attorneys chose to avoid the federal courts and the MDL. Prior to 1988, 41 percent of the cases were filed in federal courts; by 1998, less than 20 percent were being filed in federal courts.  With smaller fractions of asbestos lawsuits under the aegis of the MDL judge, the likelihood of achieving a global settlement within the MDL framework faded.



By the early 1990s, asbestos litigation appeared to have stabilized; in the words of a leading commentator, it had become a "mature" litigation (McGovern, 1989). The leading asbestos manufacturers had been sued in tens of thousands or hundreds of thousands of cases and had evolved strategies for managing the litigation. A large fraction of the cases were being filed by a small number of plaintiff law firms (Hensler & Peterson, 1993). Over time, the litigation became more and more concentrated in a small number of firms. By 1992, ten firms represented half the annual filings against the defendants who provided data to us. By 1995, ten firms (many, but not all, of the same firms that had been in the 1992 "top ten") represented *three-quarters* of the annual filings against these defendants, which had themselves grown by a third. The leading firms had standing settlement agreements with the major defendants. Virtually all cases settled. Defendants paid settlement amounts that reflected the characteristics of the case, the reputation of the lawyer, and their own exposure. Lead defendants, mainly asbestos product manufacturers, paid substantial amounts; peripheral defendants—whose connection with asbestos products was attenuated—paid more modest amounts. Defendants did not accept liability, but they had decided that it made financial sense to settle most cases, rather than spend money to litigate aggressively.



*Number of Law Firms with Large Caseloads Has Increased Dramatically*

Law firms with 100 or more new filings

After the failure of the Amchem and Ortiz class action settlements in 1997 and 1999, the landscape of asbestos litigation began to change. Filings surged, perhaps as a result of the publicity engendered by the class action notices required by Amchem and Ortiz and the ensuing controversy, which was widely reported in the legal media. The number of law firms filing more than 100 cases annually increased dramatically, and the number of firms that were new to such large-scale filings shot up. A national settlement program that had been trumpeted by Owens-Corning Fiberglass Corporation as a solution to their asbestos litigation exposure collapsed under the weight of an unanticipated flood of claims, and the company petitioned for bankruptcy reorganization. The consortium of defendants that had hoped to contain their asbestos litigation exposure through the Amchem settlement suspended operations (Hensler, 2002), and many of their members also filed for Chapter 11 reorganization. As filings surged, many of the asbestos product manufacturers that plaintiff attorneys had traditionally targeted as lead defendants filed for bankruptcy. Plaintiff attorneys sought out new defendants and pressed defendants that they had heretofore treated as peripheral to the litigation for more money. With new firms engaged in litigating on the plaintiffs' behalf, and new corporations drawn into the litigation or assuming a more central role, the old settlement agreements began to unravel.

31



Deciding where to file a lawsuit is an important step in all litigation. The U.S. legal system offers litigants considerable flexibility with regard to forum selection. Depending on how they structure the litigation, plaintiffs may be able to choose between federal and state courts, among different state courts, and among different venues within a state. Plaintiffs in civil litigation and prosecutors in criminal litigation get to take the first step by filing in a particular jurisdiction. Civil defendants may contest the plaintiff's choice and, if successful, may remove the lawsuit to another jurisdiction. Criminal defendants may request a change in venue. Both can be hard to obtain.

"Forum shopping" is a term frequently used to refer to parties' strategic efforts to find the most attractive forum to pursue their case. The figure above illustrates the changes over time in the pattern of asbestos filings. In the early days of the litigation (1970–1987), 60 percent of asbestos personal injury cases filed in state courts were filed in four states: California, Pennsylvania, New Jersey, and Illinois. By 1998–2000, however, filings of asbestos cases in these states accounted for only 7 percent of the total. At the other extreme, five states—Mississippi, New York, West Virginia, Ohio, and Texas— that had accounted for 9 percent of the cases filed before 1988 accounted for 66 percent of filings between 1998 and 2000.

As a formal matter, the system frowns on such forum jockeying. The federal judiciary seeks to constrain forum shopping by applying the same procedural rules in all federal courts. But in diversity cases (private suits between parties

32

from different states), federal courts apply substantive state law. These state laws differ in ways that can determine outcomes of product liability cases such as asbestos lawsuits. Each state's laws also determine whether it is easy or difficult for out-of-state plaintiffs to file there, and how much latitude plaintiffs have for selecting venues within the state. As in the federal system, courts are supposed to apply uniform procedural rules within a state. Most states model their procedural rules upon the federal rules, but there are important differences between federal and state rules and among state rules. Because state substantive law and procedural rules differ—and because, in reality, informal practices differ across state *and* federal courts—our federal system provides strong incentives for plaintiffs to structure their lawsuits in ways that allow them to file in favorable forums. When defendants are able to do so, they in turn attempt to remove cases to forums that are favorable to them.

## Cases Migrated to New States

**Top five states with most asbestos filings
(federal and state cases combined)**

| Pre-1988 | 1988–1993 | 1994–1997 | 1998–2000 |
|----------|-----------|-----------|-----------|
| California | Texas | Texas | Texas |
| Pennsylvania | West Virginia | West Virginia | Mississippi |
| Maryland | Pennsylvania | Florida | New York |
| New Jersey | Mississippi | New York | Ohio |
| Illinois | Maryland | Louisiana | Maryland |

A3823-34 08/02    RAND

Historically, asbestos litigation has been heavily concentrated in a relatively small number of states. In the early days of the litigation, cases were filed in about a dozen federal and state courts in coastal areas where shipyard workers had been heavily exposed to asbestos and in the gulf states where there had been heavy use of asbestos in petrochemical facilities (Hensler et al., 1985). Just nine states' federal and state courts accounted for three-quarters of the cases filed through 1987.

By the last period available for analysis (when 86 percent of all cases were filed in state courts), ten states accounted for 84 percent of the cases. Five of the original nine leading states—Texas, Mississippi, Maryland, Pennsylvania, and New York—were in the 1998–2000 "top 10." Five states became centers of asbestos litigation later: Florida, Louisiana, Ohio, Virginia, and West Virginia.

Mississippi's liberal joinder rule, which allows plaintiffs from out of state to join a lawsuit filed by in-state plaintiffs against out-of-state defendants, provides one explanation for the concentration of filings there. The result is something akin to a multi-state class action, without the necessity for plaintiffs to meet the class certification requirement (F.R.C.P. 23[b][3]) that common issues predominate and without the protections against intra-class conflicts of interest required by the U.S. Supreme Court in Amchem (521 U.S. 591 [1997]).

34

In Maryland, Mississippi, and Virginia, trial judges have consolidated thousands of cases for trial. Trying asbestos claims together is not new, nor are consolidated trials unique to these jurisdictions. In 1984, Judge Robert Parker consolidated 30 cases for trial in the Eastern District of Texas (Selvin & Picus, 1987), and judges elsewhere have tried smaller numbers of cases together (Hensler et al., 1985). But trying thousands of cases together raises due process questions for plaintiffs and defendants alike (Trangsrud, 1989). If the jury decides in favor of the defendant, *all* of the plaintiffs, not just those whose cases were presented to the jury, lose—as indeed happened in a trial of 800 cases arising out of the use of Bendectin (Green, 1996). For defendants, the risk of a liability verdict and huge punitive damages, as well as the potential for juries to peg the amount of a compensation award to the most injured plaintiff, however unrepresentative that plaintiff may be, loom large. Defendants have challenged large-scale consolidations for trial of asbestos lawsuits on due process grounds. In 1998, the Fifth Circuit Court of Appeals vacated the results of a consolidated trial in which verdicts for 160 plaintiffs were extrapolated to a class of more than 3,000 plaintiffs (Cimino v. Raymark Indus., 151 F.3d 297 (Fifth Circuit, 1998). The court held that the trial plan violated the Seventh Amendment right to trial.  However, the West Virginia Supreme Court has upheld and indeed encouraged mass consolidations in that state (Rothstein, 2001).

In asbestos litigation, experience suggests that consolidation tilts the playing field against defendants, rather than against plaintiffs. As judges who favor mass consolidations as a calendar-clearing mechanism anticipate, defendants faced with a consolidated trial of thousands of cases are likely to settle.

Other procedural rules and practices may attract plaintiffs to certain states or pose special challenges for defendants who are sued there. Many of these rules and practices apply to civil litigation in general but have special "bite" in asbestos cases. Under Mississippi's rules, for example, trial courts lack the authority to order independent medical examinations of plaintiffs (Swan v. IP, Inc. 613 So. Fd 846 [1993]), limiting defendants' ability to challenge asbestos plaintiffs' disease allegations. In Texas, where asbestos cases are dispersed over multiple jurisdictions and there are many different law firms now representing plaintiffs, defendants who are named on thousands of cases may be noticed on the same day for scores of trials in a dozen or more jurisdictions. This creates special settlement pressures for defendants. In California, the Code of Civil Procedure §340.2 gives priority for trial scheduling to all plaintiffs with a terminal illness, allowing plaintiffs with mesothelioma to get to trial quickly. Similarly, New York City has a special expedited trial schedule for asbestos plaintiffs with mesothelioma and other cancers. Elsewhere, plaintiffs with terminal illnesses sometimes die before their cases reach trial.

## Cases Concentrated in Venues Favorable to Plaintiffs

**Top five state court venues**

| 1970–1987 | 1988–1993 | 1994–1997 | 1998–2000 |
|---|---|---|---|
| Los Angeles, CA | Kanawha County, WV | Harris County, TX | Cuyahoga County, OH |
| San Francisco, CA | Jackson County, MS | Galveston County, TX | Jefferson County, MS |
| Philadelphia, PA | Baltimore, MD | Jefferson County, TX | New York, NY |
| Baltimore, MD | Orange County, TX | Monongalia, WV | Baltimore, MD |
| Alameda, CA | Middlesex County, NJ | New York, NY | Claiborne County, MS |

A3823-36 08/02    **RAND**

Within the leading states, plaintiff attorneys favored certain venues. By the mid-1990s, three counties in Texas (Harris [Houston], Galveston, and Jefferson [Beaumont]) accounted for 42 percent of all new filings. In the last several years, two counties in Mississippi (Jefferson [Natchez] and Claiborne [Vicksburg]) joined the list of venues attracting large numbers of claims. In 1998–2000, close to 20,000 cases, 13 percent of the total filed over that period, were filed in these two counties.

Some of the states and venues in which asbestos filings were or are concentrated are areas with high levels of civil litigation generally. In 2000, New York and California led the nation in absolute numbers of civil case filings, with New Jersey in fourth place, and Texas following in eighth position (National Center for State Courts, 2001). Maryland led the nation in per capita civil case filings, with New Jersey and New York following in fifth and sixth places respectively. But the concentration of asbestos filings across states and venues within states primarily reflects the character and history of the litigation, as well as the perceived advantages that different venues offer plaintiffs. Many firms developed asbestos specialty practices because they were located in regions with high asbestos exposure. Not surprisingly, they tended to file cases in states and venues in these regions. Over time, some of these firms developed nationwide practices but continued to file cases in the jurisdictions where they had previously been successful. This partially explains why the Baltimore, Maryland, trial court was among the "top 5" venues in three of the four periods displayed

36

in the charts and why New York county (Manhattan) was among the leading venues in the two most recent periods. But these historical circumstances do not seem to entirely explain recently emerging patterns of concentration. Whereas case filings in some of the leading venues are distributed over time in the same proportions as total case filings, virtually all of the cases filed in Jefferson and Claiborne Counties were filed in the last few years. Concentrations of filings in some other counties (e.g., Cuyohoga, Ohio, and Erie, New York) also appeared quite recently. While it is possible that workers in these areas were exposed to asbestos more recently than elsewhere (and hence developed signs of disease more recently), it is much more likely that litigation dynamics—such as the establishment of new firms, more aggressive screening practices, or shifts in the perceived attractiveness of these forums—explain these patterns. Defendants assert that two developments have encouraged mass filings: the ability of plaintiff attorneys to choose venues most favorable to them—even if the plaintiffs were exposed to asbestos elsewhere—and trial management practices that defendants view as advantageous to plaintiffs (Rothstein, 2001).



## *Outline*

- **How did we get here?**

- **Where are we today?**

- **Is there a better way?**

A3823-38 08/02   RAND

 ### *Dimensions of the Litigation*

→ • **Claims**

• **Costs and compensation**

• **Economic effects**

• **Future outlook**

A3823-39 08/02  **RAND**

⚖️ *Over 600,000 Claimants to Date*

- **Number of claims filed annually has risen sharply**

- **Typical claimant files against several dozen defendants**

- **Average severity of claimed injuries is declining**
  - **Slow growth in number of seriously ill claimants**
  - **Very rapid growth in numbers of claims for less serious injuries**

A3823-40 08/02  RAND

We believe that over 600,000 individuals have brought claims for asbestos-related personal injuries through the end of 2000.

A number of major asbestos defendants and trusts have provided us, on a confidential basis, lists of the claimants who named them in an asbestos lawsuit before 2001. Because claimants typically file claims against multiple defendants, even if complete data on the number of claims filed against all defendants were available (which they are not), we could not simply add up all of these claims to get the total number of claimants. We deleted the observations on each list for which we did not have adequate information to determine whether the claimant was also included on one or more of the other lists. We then compared the lists to identify the total number of unique individuals who had brought a claim against one or more of these entities.

For several reasons, our total of 600,000 claimants to date is probably an underestimate. First, we obtained data on claims submitted through the end of 2000, but a large number of claimants filed claims in 2001. For example, nearly 91,000 claims were filed with the Manville Trust during 2001 (www.mantrust.org). Some of these claimants may have already filed against one of the entities that had provided lists to us, in which case they are included in our count. But many of those who filed with the Manville Trust in 2001 are probably not included in our estimate. Second, there may be individuals who

40

brought asbestos claims but did not name any of the entities from whom we had obtained data and are therefore not included on any of the lists available to us. Because the entities who provided these lists include many of the defendants and trusts who have been prominent in the litigation, we believe there are few claimants who did not name any of them. Nonetheless, there are probably some claimants who are not included on the various lists provided to us. Third, some of the claimants we deleted from one list because of inadequate identification information may not have been represented on any of our other lists and therefore are not included in our final tally.

Over the last decade, the annual number of claims filed against most defendants increased substantially, with some defendants seeing claims double in a single year. The patterns vary across defendants. In some years, the number of filings against one defendant rose sharply, while claims filed that year against another defendant decreased. Nonetheless, the general pattern shows a dramatic increase in the rate at which claims are entering the system.

Because most claimants file claims against multiple defendants, the magnitude of asbestos litigation is amplified beyond what it would be in more traditional tort litigation that has plaintiffs filing lawsuits against one defendant or a small number of defendants. Furthermore, the number of defendants named by the typical claimant is increasing. In the early 1980s, claimants typically named about 20 different defendants. The data we have now suggests that by the mid-1990s, the typical claimant named 60 to 70 defendants.

Although the number of claimants is increasing rapidly, the average severity of claims is declining in the sense that a growing fraction of claims are for less severe injuries. While the frequency of claims from people with malignant diseases has been increasing slightly, the frequency of claims from those who are less seriously ill, or asymptomatic, is growing very rapidly. In other words, not only has the number of claims been increasing but also the composition of those claims has been shifting.



This chart shows the number of claims filed each year over the last decade against five major defendants, including a bankruptcy trust, defendants who have entered bankruptcy, and non-bankrupt corporations. We gathered data for three of these defendants from public records. The two other datasets are private but have been shared with other analysts and/or presented elsewhere (see, e.g., Merrill Lynch, 2000). Each of these defendants has a particular posture in the litigation, so we would not expect their experiences to be identical. Nor would we expect their experiences to be representative of all defendants. However, in dozens of interviews we conducted with participants on all sides of the litigation, there has been near universal agreement that these defendants' experiences are broadly representative of the patterns of asbestos claim filings over the 1990s. We include only five defendants on the chart so as not to obscure the details of each defendant's experience.

The sharp year-to-year changes in annual filings against each of these defendants reflect events in the litigation in general or in the circumstances of a particular defendant. The general pattern, however, is the same for all of them: Over the past decade, the number of claims filed annually against each of these defendants increased substantially. Four of them were each receiving 15,000 to 20,000 claims per year at the beginning of the 1990s. That number grew throughout the decade until by the year 2000 it had grown to roughly 50,000 claims per year. The bottom line shows one company that appeared to have the litigation under control in the early 1990s when the annual

number of claims against it was actually drifting downward. But even this company experienced a sharp increase in claims toward the end of the decade Whether these trends will continue into the future is an open question. But it is clear from our interviews that recent changes in filing rates have played an important role in shaping the future expectations of attorneys, parties, and business analysts.



To illustrate trends over time by injury category, we computed the ratio of the number of claimants in each category who filed a claim each year to the number of claimants in that category who filed a claim in 1990. It is clear that the growth in the annual number of claims observed in the earlier chart is almost entirely due to increases in the numbers of nonmalignant claims entering the system.

In the early 1990s, the number of mesothelioma claims drifted downward. By 1993, the annual number of mesothelioma claims had fallen by about one-third. But as the chart shows, the number of mesothelioma claims began to climb again in the mid-1990s. By 2000, the annual number of mesothelioma claims entering the system had grown to about one and a half times the 1990 level. Although the annual number of mesothelioma claims grew over the decade, the absolute number of these claims is very small compared to the absolute number of nonmalignant claims. Hence, the growth in the annual number of mesothelioma claims accounted for only a very small part of the growth in the total number of claims entering the system each year. Nonetheless, because these are the most serious, and consequently most costly, some of the attorneys we interviewed cited the growth in the annual number of mesothelioma claims as the most important recent change in the litigation.

Claims for other cancers grew during the first half of the 1990s, then gradually declined. The annual number of claims for cancers other than mesothelioma

ended the decade at a level roughly ten percent greater than had been experienced at the outset of the decade.

Claims for nonmalignant injuries grew sharply through the the last half of the decade. Almost all the growth in the asbestos caseload can be attributed to the growth in the number of these claims, which include claims from people with little or no current functional impairment. Many of the participants we interviewed, including those involved on behalf of both plaintiffs and defendants, cited the rapid growth in the annual number of claims for nonmalignant conditions as the most important recent trend in the litigation.

Defendants do not generally agree on a classification scheme for nonmalignant injuries. For example, one defendant who provided information to us classified all nonmalignant claims into five categories. Another defendant divided them into 28 different categories, none of which matched any of the five categories used by the first defendant. Further, several defendants told us that they had changed the systems they used to classify claims over time. In these cases, we cannot even consistently classify nonmalignant claims by categories over time for the same defendant, let alone merge its claims data with the data provided by other defendants and trusts. Therefore, we have not been able to break down nonmalignant claims into finer categories.



The rapid growth in the annual number of claims filed for nonmalignant conditions has profoundly affected the overall distribution of claims entering the system. This chart shows the changing composition of claims by type.

Mesothelioma claims are shown at the bottom. Although the annual number of mesothelioma claims has been increasing in recent years, the number of all claims has been increasing much faster. Therefore, mesothelioma claims are decreasing as a proportion of the whole. Mesothelioma claims accounted for over ten percent of all claims in the 1970s, but fell as a percentage of total claims in the late 1970s, accounting for roughly five to seven percent of claims through most of the 1980s. In the late 1980s, the mesothelioma share of the claims entering the system each year fell further, to three to four percent of all claims, and remained at that level through the 1990s.

Other cancer claims, shown in the segment just above mesothelioma, show a similar picture. They accounted for 11–14 percent of annual total claims through the 1970s and most of the 1980s. The other cancer share of claims declined slowly in the late 1980s and 1990s to a relatively small proportion, about five percent of the whole, in 2000.

The top segment of each bar shows the proportion of claims that are for nonmalignant injuries. Nonmalignant claims accounted for roughly 80 percent of all claims entering the system through the mid 1980s. The fraction of claims that asserted nonmalignant conditions grew through the late 1980s and early 1990s, finally stabilizing at about 90 percent of annual claims in the late 1990s.

46

## Claims from Workers in Nontraditional Industries Are Growing Most Rapidly

| | 1999 | 2000 | 2001 | % increase 1999–2000 | 2000–2001 |
|---|---|---|---|---|---|
| Traditional | 16,997 | 31,496 | 43,397 | 85 | 54 |
| Nontraditional* | 11,420 | 23,582 | 40,453 | 107 | 71 |

*Food and beverage, textiles, paper, glass, iron/steel/nonferrous, durable (metal) goods, etc.

Source: Claims Resolution Management Corporation, 2001.

A3823-47 08/02    RAND

Another emerging trend is an increasing volume of claims by workers who were exposed to asbestos in nontraditional industries. Thus far, most of the asbestos claims have been brought by people who came into contact with asbestos in the course of their work. People have been exposed to asbestos in other ways and some claims do arise from other kinds of asbestos exposure. But most claims are based exposure to asbestos in a workplace.

In the initial phase of the litigation, most claimants came from industries in which workers physically manipulated asbestos or products containing asbestos and typically inhaled large amounts of asbestos fibers on an everyday basis. Nicholson and his colleagues focused on the industries in which occupational exposure to asbestos was substantial: asbestos mining, manufacture, or installation, shipyards, railroad and automobile maintenance, construction, chemical, and utilities. Because workers in these industries were so heavily exposed to asbestos and, consequently, accounted for the large majority of claimants in the early days of the litigation, these industries are often termed the "traditional" industries. More recently, however, there has been rapid growth in the numbers of claims brought by people who were exposed to asbestos while working at a job site where asbestos was present in the atmosphere but not to the degree typical of the traditional industries. For example, large numbers of claims have recently been brought by workers in the textile industry. Textile workers sometimes work with machines run by motors with gaskets that contain

47

asbestos or in facilities ventilated by ducts lined with asbestos. Some asbestos fibers may have been released into the air and, consequently, workers may breathe some amount of asbestos. But they are unlikely to handle it or inhale as much of it as the shipyard workers (who were working in enclosed, tight quarters, in an atmosphere thick with asbestos fibers) or asbestos installers. In fact, the growth rate in the annual number of claims from individuals who were exposed in these nontraditional industries is now significantly higher than growth rate in the annual number of claims from those in traditional industries. The number of claims per year from individuals who were exposed while working in the nontraditional industries is now about the same as the annual number of claims filed by workers from the traditional industries.

The growing proportion of claims from workers who were exposed to asbestos in the nontraditional industries implies that an increasing proportion of claims are being brought by people whose exposure to asbestos has been less severe than it was in the past. Because the severity of asbestosis is related to dose, the growth in the fraction of claims brought by people whose exposure to asbestos was less severe would imply a commensurate decline in the severity of claimed conditions.