# Appendix Exhibit B



26 WMMELPR 243                                                                          Page 1

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

c

William and Mary Environmental Law and Policy Review
Winter, 2001

**Symposium Issue II**
**Toxic Torts: Issues of Mass Litigation, Case Management, and Ethics**
**Article**

**\*243 LAWYERS' ETHICS AND FIDUCIARY OBLIGATION IN THE BRAVE NEW WORLD OF AGGREGATIVE LITIGATION**

Lester Brickman [FNa1]

Copyright © 2001 by William and Mary Environmental Law and Policy Review;

Lester Brickman

## I. INTRODUCTION

Over the past several decades and at a quickening pace, we have seen the rise of the mass tort phenomenon. [FN1] The term mass tort refers to an allegation of injury by large numbers of persons due to a calamity or exposure to defectively produced foods, drugs, products implanted in the body, or improperly designed or constructed vehicles, other products, materials or structures, which is sought to be redressed by combining (aggregating) large numbers of claims sharing like issues of fact and law [FN2] into a litigation against one or more defendants using such structural aggregative methods as class actions, consolidations, and other techniques.

Some mass torts are not a result of personal physical injury, but rather economic injury. [FN3] Typically, the injury to each claimant is small, but in the aggregate, the injury alleged is substantial. In actions based upon fraud, allegations are made that a bank, insurance company, credit **\*244** issuer, airline or other goods seller or service provider, in the course of selling the service or product, defrauded thousands or even hundreds of thousands of consumers. While such actions, if brought individually, would usually be denominated as breach of contract suits, and attempts to convert the claims into tort actions would usually be rejected by courts, [FN4] the sorcerer's elixir of aggregation magically transforms them into tort claims replete with demands for punitive damages.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 WMMELPR 243

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

Changes in social and legal trends in recent decades have facilitated the rise of the mass tort phenomenon. [FN5] Among these trends are increases in product marketing that have led to mass consumption of goods and services and therefore greater exposure to their potentially dangerous effects, advances in medical technology that enable doctors to connect injury with exposure to products or chemical substances, epidemiological studies, increased mass media reporting of potentially dangerous products or circumstances including the increased role of television journalism shows--productions that are sometimes assisted by lawyers who are financially interested in sensationalizing coverage of an issue in order to affect public opinion or generate a client base. Increased litigation activity is also facilitated by widespread solicitation of potential claimants by use of mass advertising, "800" phone numbers, and websites; close association with union officials in a position to steer large numbers of claimants to specific lawyers; the formation of victim support groups that are overtly or surreptitiously underwritten by lawyers; [FN6] the formation of networks of lawyers specialized to particular product claims; [FN7] rising **\*245** corporate wealth; judicial decisions maximizing insurance coverage; and procedural rules that facilitate litigation against manufacturers. [FN8]

However, the single most important factor accounting for the rise of the mass tort claim in recent decades is the enormous financial incentives that lawyers have structured and courts have condoned for bringing aggregative actions. [FN9] Plaintiff lawyers, charging contingency fees, are able to earn substantial, indeed enormous, fees which are not commensurate with either the effort required, the risks assumed, [FN10] or **\*246** ethical limitations on the reasonableness of fees. [FN11] These fees frequently amount to thousands and tens of thousands of dollars an hour and even as much as hundreds of thousands of dollars an hour. In addition, by aggregating claims, lawyers gain enormous bargaining power, which enables them to extract settlements usually without the need for trial. For these reasons, lawyers are constantly searching out opportunities to initiate mass tort litigations.

Aggregative litigation provides for economies of scale that can improve judicial efficiency, especially by reducing repetitive litigation. However, at the same time, aggregative litigation may result in sacrificing both procedural and substantive fairness, or produce perverse effects or other undesirable results. [FN12] For these reasons, the increasing use of aggregative litigation mechanisms have led to calls for Congress to create administrative mechanisms for dealing with certain types of mass torts, especially asbestos litigation. However, the plaintiffs' bar, exercising considerable if not overwhelming political power, has successfully countered such efforts. [FN13] In the face of congressional failure to create **\*248** alternative mechanisms to deal with mass tort litigation, courts have struggled to devise solutions using various forms of aggregative strategies. Indeed, an additional and critical factor in the increase of mass tort claims is that the very strategies courts have devised to deal with such claims facilitate the bringing of more mass tort claims and, in that sense, may be seen as perverse. [FN14] The most prominent and impactuous of these strategies is the Federal Rule 23 class action, [FN15] and, in particular, the manner in which courts have implemented the 1966 amendments to the rule, changing the procedure from claimants having to affirmatively opt-in to be a part of a class to allowing lawyers to seek certification of a class of claimants who are then automatically a part of the litigation unless they affirmatively choose to opt-out--a change that has yielded profound consequences, at least in part unintended by the drafters of the amendatory language. [FN16] Other strategies include: Federal Rule 42 consolidations; [FN17] **\*249** combinations of the class action and consolidation procedures; state court equivalents; joinder under Federal Rule 20; [FN18] settlement class actions; [FN19] use of "bellwether" plaintiffs as a model for disposition of large numbers of claims; [FN20] MDL proceedings; [FN21] as well as such other strategies as novel **\*251** procedural approaches; [FN22] successor liability rulings; revised evidentiary standards; [FN23] loosened standards for proving causation; and the interpretation of insurance contracts to maximize the availability of assets to meet claimants' demands. [FN24] In addition to these judicially crafted solutions, lawyers have also devised informal aggregative strategies that confer on them the same coercive powers as judicially crafted strategies. [FN25]

These judicially crafted solutions have generated a cornucopia of scholarly writings addressing the mass tort and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

class action phenomena. [FN26] Comparatively little, however, has been written about the perverse effect of these strategies on the generation of claims, including the creation of **\*252** substantial financial incentives for lawyers to recruit new claimants to supplement or replace those whose claims have been resolved. [FN27] This cycle maintains pressure on courts to devise new solutions in a continuing and ultimately unsuccessful effort to clear their dockets. [FN28] These recruitment efforts are one of several systemic strategies that may be seen to be abusive as they advance lawyers' interests but arguably do not increase social welfare.

A. Systemic Issues Raised by Mass Tort Litigation

1. The Coercive Effect of Aggregation

In response to burgeoning mass tort litigation, the tort system has struggled to get its arms around this relatively recent phenomenon of thousands of claimants alleging similar injuries that run the gamut from the severe to the minor to the nonexistent, asserting claims against one or a handful of corporate actors, posing problems of equity amongst the claimants and problems of fairness for the defendants. The fairness issue arises mainly because the aggregation of claims often pressures a defendant or defendants to settle claims irrespective of their merits. [FN29] Even if a defendant perceives that it has a substantial likelihood of prevailing, if the number of claims is high enough to constitute a threat to the economic viability of the company, a corporate decision maker, motivated by the short-term consideration of fear of losing the company on his or her watch, will often agree to settle the claims even if the long-term interests of the corporation are to litigate the claims fully. This is so because the aggregated claims, which invariably include a demand for punitive **\*253** damages, [FN30] potentially exceed the combined assets of the corporations and any available insurance. This presents a "bet-the-company" scenario especially since, if the claims are tried to verdict and yield a huge judgment, they become, in reality, essentially unappealable because of the typical requirement that a cash bond be posted of at least the amount of the verdict in order to stay execution of the judgment during appeal. [FN31] Thus, the incentive for plaintiff lawyers is to generate a sufficient number of claims in order to achieve a threat level that will compel settlement. "The more the merrier" approach induces lawyers to include as many persons as possible in aggregated claims irrespective of whether those included have suffered injury.

In re Rhone-Poulenc Rorer, Inc. [FN32] presents the most cogent discussion in the judicial literature of the effects of the bet-the-company scenario that are created when a court grants certification of a class in a class action. In that case, a group of hemophiliacs infected with HIV brought a nationwide class action against drug companies that manufactured blood solids infected with the virus. The district court certified one of the 300 cases that had been brought as a class action. [FN33] On appeal, Judge Richard Posner ordered that the class be decertified, adding that it was important that the Circuit Court do this at an early stage of the proceedings, rather than wait to decide the certification issue after a final **\*254** judgment was brought up on appeal, because the defendants would then be exposed to a great risk, which would likely lead to a settlement and thus foreclose the possibility of appeal. [FN34] It was therefore necessary to determine whether the level of risk necessarily created by certification was outweighed by the benefits that would accrue to the class. [FN35] Here that balancing test weighed heavily in favor of the defendant. First, this was not a case where the individual claims were small as compared to the cost of litigation and thus not otherwise litigable. In addition, the merits of the claim were doubtful. [FN36] It would therefore be unfair to the drug manufacturers to have to decide whether to put the company at grave risk by going forward with their defense against possibly meritless claims or to succumb to the financial pressures created by certification and settle early in the proceeding. Accordingly, the court reversed the class certification granted by the district court.

The cogency of Judge Posner's argument has had an ameliorating effect on the propensity of federal judges to certify class actions; [FN37] it may **\*255** also have contributed to a sea change in some state courts' propensities

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 WMMELPR 243

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

for certifying class actions, as well. [FN38]

**\*256** The Seventh Circuit has again focused on the coercive effect of class certification in Szabo v. Bridgeport Machines, Inc. [FN39] In Szabo, the District Court had certified a nationwide class of all persons who purchased a certain computerized machine after January 1996 and claimed breach of warranty, fraud, and negligent misrepresentation. [FN40] In response to the parties' factual dispute, the District Court held that is was obliged to accept the substantive allegations of the complaint as true and rejected Bridgeport's arguments as an inappropriate attempt to litigate the merits of the claims. [FN41] Judge Frank Easterbrook, joined by Judges Richard Posner and Ann Williams, granted Bridgeport's request for discretionary appellate review under new Federal Rule 23(f), [FN42] and vacated the district court's certification of the class, stating that the class certification:

turns a \$200,000 dispute ... into a \$200 million dispute. Such a claim puts a bet-your-company decision to Bridgeport's managers and may induce a substantial settlement even if the customers' position is weak. This is a prime occasion for the use of Rule 23(f), not only because of the pressure that class certification places on the defendant but also because the ensuing settlement prevents resolution of the underlying issues. [FN43]

The Szabo case thus instructs the trial court not to simply defer to a **\*257** plaintiff's allegations either as to the facts or as to the appropriate composition of the class and to instead at least preliminarily inquire into the merits of the claims because the coercive effect that certification and over-broad class periods or over-inclusive classes have on defendants deprives them of any realistic opportunity to later contest these issues. [FN44]

A "kissing cousin" of the extortive power granted to attorneys by Federal Rule 23 and state court equivalents is the use of Federal Rule 42 consolidations [FN45] and state court equivalents. By bringing hundreds and even thousands of individual lawsuits alleging substantially identical claims against a single or small group of defendants, lawyers are able to exert great pressures on judges to consolidate the cases for trial. The more cases filed, the greater the pressure on judges to consolidate them and resort to various short cuts such as "mini-trials" that invariably work to the disadvantage of defendants. [FN46]

**\*258** Indeed, once consolidated, the pressure is then on defendants to settle the cases because the aggregative strategy creates economic threats similar to those created by the certification of a class in a class action. Lawyers therefore have a strong incentive to bring claims not only on behalf of seriously injured claimants but also on behalf of claimants without any injury. [FN47] By including these latter claims in the consolidation, lawyers are able to gain settlements for unimpaired persons.

2. Other Systemic Abuses of Mass Tort Litigation

While forum shopping has always been an occasional form of litigation abuse, with the increased frequency of mass tort litigation, forum shopping abuse has become both more prevalent and has taken on new importance. Filing a case before a judge known or believed to be likely to act favorably toward plaintiffs' counsel or likely to be predisposed to finding in favor of the cause of action and where juries have a high propensity for favoring claimants over "big business" defendants is often a critical factor in coercing defendants to settle the claims. [FN48] Indeed, even as many jurists have come to realize the perverse nature of aggregating litigation as a "solution" for the mass tort phenomenon, a mere handful of state and federal judges, carefully and meticulously selected by lawyers exercising a choice of whether to file claims virtually anywhere in the country in state or federal courts, have nonetheless continued to approve aggregative strategies and thereby coerced defendants into paying billions of dollars to settle aggregated claims. For this reason, forum shopping has become a prominent factor in accounting for increased class action filings, particularly in state courts. [FN49] The "Gulf States" (Mississippi, Florida, **\*259** Alabama, Louisiana, and Texas), along with other rural areas, are particularly notorious venues for such forum shopping. [FN50]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 WMMELPR 243                                                                    Page 5

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

**\*260** One abuse that has become prevalent in this region is the use of ex parte or conditional certifications. [FN51] Also known as "drive-by certifications," these class certifications are provisionally granted by the court after a request by plaintiffs' lawyer before the defendant has been served with a complaint, thereby denying defendants' right to contest the certification. [FN52]

Up until 1997, when the Alabama Supreme Court, following a change in its elected membership, started to reverse lower courts' class certifications, [FN53] Alabama was the forum where "drive-by" certifications **\*261** flourished most, and where a hand-full of judges readily certified all class action filings almost without exception. [FN54]

Forum shopping abuse also occurs when plaintiff lawyers are denied class certification in a federal court and thereafter seek nationwide class action certification in a state court. [FN55] The propensity of certain state courts to grant certification under these circumstances has diminished in recent years as some state courts have begun to apply similar standards of certification as those set by the federal courts. [FN56] Still, in other state courts, forum shopping abuses continue unchecked. [FN57]

**\*262** Forum shopping abuses in federal court also occur, though to a much lesser extent and involve the use of strategies designed to select a particular federal judge known or believed to be favorable to the interests of the plaintiffs' lawyers to hear a matter. An example of one such strategy is filing a claim in a federal district in which there is a sole judge. [FN58]

**\*263** Another method is to invoke the policy of assigning cases to a specific judge if the claim is "related" to an existing case that the judge is hearing or has heard. [FN59] Because of his propensity for using tort litigation as **\*264** a tool for social and political reform, the Honorable Jack B. Weinstein of the Eastern District of New York, is one of the most sought after federal district court judges in the country by plaintiff lawyers filing mass tort actions. [FN60] Judge Weinstein has been selected by plaintiffs' lawyers to preside over several important mass tort litigations. [FN61] By his rulings, **\*265** Judge Weinstein has single-handedly changed the course of mass tort litigation in the federal arena. [FN62]

**\*266** B. Client Abuses in Mass Tort Litigation

In addition to the foregoing systemic abuses, mass tort litigation has created a new set of client abuses that current ethical rules are not equipped to address. [FN63] Many of these abuses are a function of the financial incentives that motivate the litigation. [FN64] In class action litigation, for example, plaintiffs' counsel have intrinsic incentives to seek excessive fees and at the time of settlement to often compromise the interests of the class in exchange for a defendant's agreement to support (or not to oppose) such a fee request. [FN65]

In addition to promoting systemic abuses and self-interested behavior, mass tort litigation invites large scale deviation from the standards of care and conduct owed by the lawyer to the client, including malpractice, breaches of ethical duties and therefore of the correlative ethical rights of clients, and breaches of fiduciary obligation--including the duty not to represent clients with conflicting interests. [FN66]

For example, lawyers may structure a mass tort settlement in order to maximize their fees. [FN67] In addition, when lawyers receive funds in settlement of consolidated actions, there is often little or no supervision of how they allocate the proceeds among their clients--leading to the possibility that such divisions reflect self-interested behavior--particularly **\*267** when the contingency fee percentages of the aggregated clients vary so that certain allocations yield higher fee monies than others or when the lawyers use their distributive power to reward claimants such as union officers or their relatives who were instrumental in recruiting other claimants, or when the lawyers

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 WMMELPR 243                                                                                                   Page 6

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

discriminate in favor of clients in certain jurisdictions at the expense of other clients living elsewhere. [FN68]

When lawyers represent one class of clients today and other classes of clients in the future, the opportunistic behavior possibilities collide with such traditional fiduciary obligations as avoidance of conflicts of interests. Consider one such intersection of tobacco and asbestos claims found in the 1997 Global Tobacco Settlement (the "Tobacco Settlement"). [FN69] The Tobacco Settlement included a provision that prohibited claims against the tobacco companies by third-party payors [FN70] such as the Manville Trust, [FN71] which was established under the Manville bankruptcy to be the registry for all tort claims based upon exposure to asbestos-containing products against the Manville Corporation. Trust payments to claimants from the Manville Trust are heavily discounted, [FN72] in part because of the huge numbers of claimants, [FN73] and also because so much of the Trust's funds **\*268** were dissipated in a first round of frenzied profit taking by lawyers. [FN74] Approximately 5-7% of claimants against the Trust have lung cancer. The dominant cause of lung cancer is cigarette smoking. Asbestos exposure is regarded as an adjuvant, that is, a factor that increases the likelihood that cigarette smoking will result in lung cancer. Lawsuits seeking damages for lung cancer are usually brought against former asbestos product manufacturers rather than tobacco companies because of the difficulty, at least to this point, in suing the latter. The Trust has been pursuing claims against the tobacco companies to recoup the cost of payout to lung cancer victims and thereby add assets that will enable higher payout amounts to claimants against the Trust. The Tobacco Settlement was negotiated by many of the same lawyers who represented and continued to represent lung cancer claimants against the Manville Trust. In negotiating the Tobacco Settlement, these lawyers agreed to a provision prohibiting third party payor claims against the tobacco companies even though it was diametrically opposed to the interests of their asbestos clients. In permitting this provision in the Tobacco Settlement, these attorneys agreed to foreclose their former clients' ability to recover greater compensation. Elsewhere than in the world of mass tort litigation, this would be seen as a conflict of interest. [FN75]

Another self-interested strategy that lawyers use in mass tort-type proceedings is to maximize fee income at the expense of some clients by structuring Federal Rule 42 consolidations or state equivalents thereof to include a small number of seriously injured claimants in a much larger group of lesser injured or arguably non-injured claimants. Empirical evidence indicates that such aggregations often lead to lower claim values for the seriously injured claimant and much higher claim values than would otherwise be the case for the lesser injured claimant. [FN76] Moreover, **\*269** by diluting the plaintiff class with less injured people, plaintiffs' attorneys are transferring money that would have gone to the seriously injured had the others not been in the class. As Professors Carrington and Apanovitch have observed:

  [T]he guesswork associated with mass tort aggregation action settlement effects a substantial modification of the property rights of class members. The modification of rights from those that can be enforced at trial to those that will be measured by weak conjecture effects a transfer of wealth from class members with clearly meritorious claims to those whose claims are more dubious. Intangible property rights are thus modified by any law conferring authority on a court to approve en masse a settlement of personal injury claims. [FN77]

This strategic positioning by plaintiff lawyers is done because it yields far higher contingency fee income than if the aggregations were limited to claims of similar severity. [FN78] While the fact of such self-interested behavior has been noted by some scholars, there has been little focus on whether such lawyer conduct breaches the ethical and fiduciary **\*270** obligations of the lawyer to severely injured clients who receive less so that their lawyers may receive more.

Another abusive technique that lawyers use to avoid the even meager fee superintendence that is involved in class actions is to aggregate hundreds and even thousands of individual cases into a single proceeding and then settle those claims en masse. Lawyers are then able to charge retail prices--standard contingency fees of 33?-40% and higher--against wholesale settlements, insulated from any ethical oversight. [FN79]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

Still another abuse occurs when plaintiffs' counsel enter into aggregate settlements with a defendant without the informed consent of their clients. [FN80] In an aggregate settlement, the defendant provides a lump sum of money for distribution to the claimants in the sole discretion of plaintiffs' counsel. [FN81] It is thus a zero sum game; whatever one client receives is at the expense of the other clients. Because of the conflicting interests of the clients, both the Model Rules and the Model Code require that each participant in an aggregate settlement must be informed of the nature of the settlement and give his or her informed consent to the distribution as determined by counsel. [FN82] Nonetheless, as aggregate *271 settlements have become more common, the application of ethical rules to aggregate settlements has become less common. [FN83]

The final abusive element of mass tort litigation that I will discuss is a reprise of my earlier discussion of the conflict of interest that lawyers face when they represent a large group of claimants alleging injury due to exposure to a toxic substance such as asbestos. When these claims include both presently injured claimants and potential claimants whose injuries have not yet--and may not ever--manifest themselves, such representation is tainted by an irremediable conflict of interest. The issue arises in its most pronounced form as the "settlement class action," a device based upon Federal Rule 23 that the United States Supreme Court essentially rejected in Amchem Products, Inc. v. Windsor [FN84] and in Ortiz v. Fibreboard Corp., [FN85] primarily because of the inherent conflict between the interests of present claimants and future claimants and the conflicting loyalties of the attorneys for the present claimants who purported to also represent the interest of the future claimants.

When proposed amendments to Rule 23 were published in March 1996, [FN86] which included a proposal to legitimate Rule 23 settlement *272 classes, [FN87] the academic community condemned the proposal. [FN88] Let me offer a distinct view from that of the academic community and the Supreme Court. Of course, lawyers in these two cases sold out the interests of potential future claimants in exchange for huge fees for settling their inventory of current claimants. Where I differ from the academics and the Court is that such actions cannot violate the rights of future claimants. To explain how I have come to this conclusion, I will first need to paint a picture of modern asbestos litigation. [FN89]

Today, perhaps 80% or more of the 70,000 asbestos claims that have been brought in the past year are on behalf of uninjured persons, so-called "exposure only" cases and a new generation of asbestosis claims. [FN90] *273 It is important to emphasize at the outset that without these claims, the "asbestos litigation crisis" would never have arisen and would not exist today. These claimants have a work history that includes exposure to asbestos-containing products. Though most "exposure only" claimants have no symptomatology, no impaired lung function, [FN91] no restrictions on movement, etc., their claims are supported by medical testimony [FN92] that exposure has resulted in the formation of "pleural plaques" which are areas of thickening of the pleura of the lungs that are observable on x-rays. [FN93] Moreover, while there is often expert testimony that the exposed claimants are therefore more likely to contract an asbestos related disease than non-exposed persons, there is no credible medical evidence to support that testimony. Nonetheless, while some jurisdictions hold that therefore there is no injury, other jurisdictions hold that there is enough "injury" to get the case to the jury and to thus enter the asbestos lottery sweepstakes where some are awarded zero and some get millions and lawyers, because of the huge numbers of such claimants, get hundreds of millions. [FN94]

Here then is how a typical "exposure only" case arises. First, the client is recruited. Often this is done through a union intermediary. [FN95] Let *274 us assume that the claimant-to-be is a former construction worker who worked on multiple sites. In order to "process" his claim, it will be necessary to establish that he was exposed to large quantities of asbestos-containing materials in friable or breathable form, the specific products to which he was exposed, and the nature of the consequent injury. [FN96] Those requirements are met in the following fashion.

After being recruited, upon his first visit to the law firm, a *275 paralegal [FN97] will quiz him about his work

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 WMMELPR 243                                                                                                    Page 8

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

history--what projects he worked on and what products he was exposed to. Assume, as is likely the case, that the would-be claimant has insufficient recollection of work sites 20-40 years in the past, let alone the products used at that site. To overcome this defect, the law firm will file a request with the Social Security Administration on behalf of the claimant for his work history. [FN98] Assume then the paralegal now has the Social Security work history summary.

Selecting a particular work site, say one from the early 1960s, the paralegal will ask what asbestos containing products were used at that site. Assume, as is likely the case, that the would-be claimant has no recollection. The paralegal will then consult the law firm's extensive data base [FN99] and then indicate: "Charlie and Ed worked at that site--you remember them, of course, and they have testified that there were five specific asbestos containing products used at that site in those years." [FN100] *276 The paralegal will then show the claimant pictures of the bags and boxes in which the products were contained, fill out a "work history sheet" listing the products to which the claimant was exposed [FN101] and instruct the claimant to memorize the details on the product label (as provided) because later the claimant will take a "test" in which he has to identify the *277 products and if he passes the test, he will be rewarded financially. [FN102] He is also instructed that if asked at the test, that is, at the deposition, if he saw any warning labels, to answer: "No." [FN103]

He is also instructed to say that there were certain products with which he did not come into contact. [FN104] These, of course, are the products of companies that have entered into bankruptcy and hence any portion of the product exposure that is attributed to these companies will only be paid at 5- 10% on the dollar. [FN105]

*278 He will also be told that the attorneys who will be administering the test will have no way of knowing what products were used on that job site so that anything the claimant says is not subject to challenge. [FN106] The inference is obvious and I need not spell it out for you. [FN107] In addition, he will be told never to mention the Script Memo, which has been provided to him. [FN108]

He will also be told that he will have to testify about how his health has been affected by his exposure. Let me read to you a sample of the instructions that have been used in this regard:

   This part of your deposition is about your health. It is very IMPORTANT that you give concrete examples of how your life has been "damaged" by your exposure to asbestos. While the answers to questions about your work history and the products you were exposed to should be as SHORT as possible, THIS part of your deposition is YOUR opportunity to state, for the record, why you DESERVE to be compensated for damage to your health caused by asbestos. The defense attorneys will not ask as many questions about your health. It will be up to YOU to give as many examples as you can.

   SHORTNESS OF BREATH. Think about it. There are very few things in life, which are not affected by your ability to breathe. Between now and your deposition, be thinking about all the activities you have given up or must do more slowly because of shortness of breath. Some examples might be:

   Do you have trouble sleeping at night because it is difficult to breathe lying down?

   Do you sleep propped up with pillows or sitting up in a chair in order to breathe easier?

   *279 Do you wake frequently at night to cough or do you wake up in the morning coughing?

   Do you take medications for breathing or anxiety or any other health problem? Bring ALL your medications along with you to the deposition so the Court Reporter can type the names onto the record, even if you don't take the medications regularly.

   You will be asked how much money you have spent on asbestos-related health problems. Since there is really no way to know exactly, it is best to say that your DOCTOR will have to answer that question ....

   WORK: Your ability to support your family and yourself has always been very important to you. The wages you have lost by not being able to work as long as you would have liked to are solid proof that you have been damaged financially by exposure to asbestos. Some examples of financial "damage" you have incurred from lost wages

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 WMMELPR 243    Page 9

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

might be:

Did you have to retire early because you could not keep up with the other workers your age?

Did you take a lower-paying position because you could no longer perform the strenuous tasks that typically pay more money? Have you turned down any overtime? Be thinking about how much money you have lost by having to refuse overtime, retire early or take a lower paying job.

HOUSEHOLD MAINTENANCE: The household repairs you can no longer do yourself or must PAY SOMEONE ELSE to do is another way to prove you have been "damaged" by asbestos exposure.

Do you pay someone else to mow your yard? If so, how much do you pay? Did you purchase a rider mower because you just couldn't use a push mower anymore?

**\*280** How big a yard do you mow?

Have you given up growing a vegetable garden? Do you have a much smaller garden than you used to? How big did your garden used to be? How small is it now? Have you lost any money by not being able to sell the extra produce?

Do you pay SOMEONE ELSE to do household repairs such as plumbing, electrical and roof repairs? Did you have gas heat installed because you can no longer cut firewood? Did you have aluminum siding put on because you don't have the energy to paint anymore? Can you think of more?

HOBBIES: The hobbies you once enjoyed gave meaning to your life. You worked all your life looking forward to retirement so you could enjoy them!

Have you given up or cut down on hunting, fishing, camping, boating, softball, golfing, travel, raising animals or any other activities you once enjoyed? Name as many as you can think of.

FAMILY: Your relationship with your family is one of your greatest joys in life.

Are you spending less time with young children or grandchildren because they make you too tired or irritable?

Would your spouse and other relatives say that you are short-tempered or easily frustrated because you are not able to do the things you once enjoyed?

Has your sex life been affected by shortness of breath?

ANXIETY: It is natural to be afraid about how your future will be affected by your health. Your fear is caused in part by health problems you might not have had if you had not been exposed to asbestos.

Are you depressed because of all the activities you have had **\*281** to give up or cut down on?

Are you afraid that your asbestos disease might develop into cancer?

Do you wonder if your life will be cut short by asbestos-related disease and you will leave your family with no one to provide for them?

Have you seen or heard about co-workers who have died from asbestos-related disease? Are you afraid the same thing will happen to you? If you are afraid YOU MUST SAY SO! ...

Can you think of other ways your life has been affected by your exposure to asbestos? This is YOUR DAY IN COURT, so to speak, although you won't actually be in a courtroom. It is YOUR opportunity to STATE FOR THE RECORD how your life has been "damaged" by these asbestos manufacturers

....

If you can give good, concrete examples of how your life has been damaged by your exposure to asbestos products made by these manufacturers they will want to offer you a settlement instead of taking a chance that a jury will award you more money.

Study hard, memorize as much as you can and practice saying all the product names out loud. The more you practice the more you will remember when you are under stress at your deposition. Try not to worry. Your deposition will be over before you know it! [FN109]

Now let me go on to discuss how the medical evidence that is used to support the claim is produced. A pulmonary function test ("PFT") will be done and will usually show that there has been some loss in lung **\*282** function. [FN110] A chest x-ray have been done and a medical doctor will **\*283** read the x-ray to see if there are pleural plaques visible. In many cases, reading the x-ray is like taking a Rorschacht test; whatever is there is totally in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 WMMELPR 243                                                                                    Page 10

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

eye of the beholder. [FN111] Not surprisingly, therefore, the reader **\*284** will virtually always conclude that there are pleural plaques.

In addition to pleural plaque claims, there have been very large increases in the number of asbestosis claims [FN112] brought on behalf of unimpaired claimants. Indeed, much medical evidence presented in support of asbestosis claims also suffers from the same malady as the evidence produced in support of pleural plaque claims. A United States District Court judge, using impartial medical expects and excluding the **\*285** parties' use of their own experts, determined that of 65 plaintiffs claiming to have contracted asbestosis -- who, but for the court's order, would have offered their own medical experts' testimony in support of their claims and on that basis would very likely have been awarded significant compensation by the jury -- only 10 (15%) in fact had in fact contracted asbestosis. [FN113]

Judge Rubin's finding is confirmed by the extensive experience of the Manville Personal Injury Settlement Trust (the "Trust") which was established as part of the Johns-Manville bankruptcy proceeding, as the entity to provide compensation to tort claimants, using assets transferred to it from Johns-Manville under the bankruptcy. [FN114]

**\*286** The Trust implements a schedule of "settlement values" for seven categories of asbestos-related disease, ranging from pleural plaques to asbestosis to malignancies, [FN115] and has the authority to require an x-ray from all claimants [FN116] and to audit all claim filings. [FN117] In 1995, the Trust instituted a medical audit program providing for a random audit of 5% of each law firms' claims submitted per payment cycle. [FN118] The core of the audit program was a process of review of claimants' x-rays by independent medical experts. [FN119] The review process was intentionally designed to operate in favor of confirming the disease documented by the claimants. [FN120]

**\*288** Upon reviewing claims using the audit procedure, the Trust discovered both a dramatic increase in the filing rates of asbestosis claims and a very high medical audit failure rate for these claims. [FN121] In light of this data, the Trust:

   had reason to believe, on a statistical basis alone, that a portion of the asbestosis claims might not be based on reliable medical evidence. At the same time, [the Trust] ... also observed that the nature of the claims being submitted had fundamentally shifted--it became widely known that the vast majority of new claims were being submitted through mass litigation screenings. In addition, many claimants appeared to have had lower or less direct exposure to asbestos than had been seen in pre-1995 claims filings and the documentation regarding both exposure and medical evidence became extremely limited. [FN122]

Against this background, the Trust became increasingly concerned about the high volume of questionable asbestosis claims [FN123] and based upon the results being obtained, placed some law firms on a 100% audit for the **\*289** next payment cycle. [FN124] To that point, the plaintiff lawyers' representative with an official role in the operation of the Trust had not seriously questioned the Trust's authority to require x-rays from claimants or to downgrade individual claims based on audit results. [FN125] However, in response to the results of the audit program, the plaintiff lawyers' representative pressed the Trust to re-design the audit program to focus on attempting to identify fraudulent doctors instead of focusing on law firms with high failure rates. [FN126] The Trust's staff, after extensive examination of various alternatives concluded that refocusing the medical audit program on doctors or medical facilities would be impractical and inefficient. [FN127] **\*290** Based upon the data that was being accumulated and the review of the x-ray portion of the audit program by bio-statisticians at two major universities, [FN128] the staff of the Trust recommended that the Trust implement an audit program requiring x-ray review for all non-malignancy claims (categories I-III). [FN129] The plaintiff lawyers' representative objected that the requirement was too burdensome. [FN130] Ultimately, the Trust adopted a less comprehensive new medical audit program in August 1998 providing for review of "x-rays for all Category II and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

Category III asbestosis claims and would no longer accept corroborating medical evidence or evidence of co-defendant settlements in lieu of x-rays for such claims." [FN131] The Trust's experience with the prior limited audit program indicated a reduction of $925 per claim in 1995 and "concluded on that basis that a 100% medical audit program would be beneficial to the Trust's bona fide claimants." [FN132]

The Trust's medical audit program was challenged by nine law firms in September 1998. [FN133] The case was heard by U.S. District Court Judge Jack Weinstein sitting without a jury in April 1999. [FN134] From the onset of the litigation, Judge Weinstein made known his view:

   that the Trust had no business medically auditing claims (regardless of any authority to do so in the Trust documents) and that absent "manifest fraud" ... the Trust **\*291** was expected to pay every claim filed for the full amount of the claim .... By the fifth day of the trial, the Trustees decided to settle the matter and except for several doctors that the plaintiffs' bar agreed filed x-ray reports of a suspicious nature, the Trust was required to accept (absent manifest fraud) all claims filed ... with respect to medical evidence [and to discontinue its medical audit program including its requirement that x-rays be submitted]. [FN135]

Since the full impact of the settlement realized in fall 1999, Manville Trust Claim Filings, on an annual basis, have almost doubled. [FN136]

**\*293** In assimilating and assessing the issue of the medical evidence presented in asbestos litigation, it is useful to understand the financial incentives that undergird the medical evidence producing business. [FN137] X-rays are usually read by specialized medical doctors called B-readers [FN138] who are paid for each x-ray. Since asbestos claiming is a high volume business, payments are substantial. Moreover, as noted by the Manville Trust, even as the quality of the medical evidence provided in support of asbestos claims declined, there has "been an increasing trend toward the use of a relatively small number of physicians." [FN139] The influence of lawyers who select the B-readers on the interpretation of the results is pronounced. Different asbestos lawyers have different disease mixes [FN140] that characterize their portfolio of claims. To meet these objectives, B-readers conform their outcomes to the preferences of the lawyers who hire them. [FN141] In light of this evidence, it may reasonably be presumed that a B-reader who reports results incompatible with a law firm's preferences is **\*294** likely to be an ex-B-reader.

So much for medical evidence and client testimony. Now let us look at the trial of the case, keeping in mind that it is virtually certain that the case will be settled--in part because of what happens at the relatively few trials that do take place. Evidentiary rulings by courts make it unnecessary for usual standards of causation to be satisfied. [FN142] If the **\*295** worker was at the site and there is testimony that the product was used at the site and the worker claims a pleural plaque or other asbestos-related condition, then the jury can draw the necessary inference and conclude that the product caused the "injury." [FN143] Moreover, for good measure, a demand for punitive damages will be included, often successfully. [FN144]

So why do I conclude that this branch of the Amchem [FN145] and Ortiz [FN146] decisions was wrongly decided? Consider the details of the settlements. The lawyers' present inventory of claims were settled for substantially inflated values. These included thousands and thousands of exposure only claims. "Future" claims--that is, claims of those who may at some point in the future present with injury, were also settled by setting aside funds to pay those claims. As for the "future" exposure--only claims, no moneys were set aside for them. They were valued at zero. [FN147] Instead of money, these "futures" were relieved of meeting any statute of limitations burden so if they did present with an actual injury, they could then seek compensation from the fund set up by the settlement.

The settling lawyers in Amchem and Ortiz received huge rewards, fees totaling several hundred million dollars, in part, for purporting to sell out the interests of future "exposure only" claimants by agreeing to a procedure which

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

valued those claims at zero unless and until actual injury was manifested. [FN148] That zero value is correct because the "futures" *296 claimants have not suffered any injury and therefore ought not to be entitled to any compensation. That truth, however is not the basis for my conclusion that the settlements should not have been invalidated because of a conflict of interest. The value of exposure -only claims in the tort *297 system is purely a function of the scheme that asbestos lawyers have created and which I have previously described. Because the claims are specious and only have value because of that scheme, the valuation is a property right rightfully belonging to the lawyers who invested substantial time, effort and money in creating those rights and not to their exposure-only clients, who have suffered no injury, have no impaired lung function, and are asymptomatic.

In a capitalist system, the rewards for the successful monetization of these claims rightfully ought to belong to the lawyers. [FN149] Future claimants who have no injury or impairment have no just cause for complaint that their specious claims have been assigned a zero valuation.

When the U.S. Supreme Court struck down the settlements, asbestos lawyers, of course, seized the opportunity to reestablish their fee stream. Not only have the lawyers been able to keep the hundreds of million dollars that they were paid as part of the settlements, they have regarded the striking down of the settlements as freeing them to file claims on behalf of the very future claimants for whom they had agreed to value claims at zero, but shorn of that limitation. [FN150] Thus, these lawyers are *298 building up new inventories of cases to sell off, consisting of those exposure -only claimants who were formerly in the "futures" class, and doing so at a more rapid rate than at any time during the course of the asbestos litigation crisis. [FN151]

C. Judicial Response to Aggregative Abuses

The abuses of aggregative litigation are compounded by recent judicial decisions that grant attorneys full rein to run roughshod over client interests. While individual clients have the right to seek redress from their attorneys for breaches of the standard of care, self-interested behavior, engaging in conflicts of interest, other breaches of fiduciary obligation, and, in some cases, for breaches of lawyers' ethical obligations, in aggregated actions involving large numbers of clients, particularly in class actions where the lawyer conscripts the client, such client rights have been largely eviscerated. [FN152] Even lawyers who submerge their clients' interest or who engage in self-dealing at their clients' expense are virtually immune from the traditional disciplinary systems. [FN153] This is so because *299 "[c]ourt approval of a settlement ... insulates class counsel from collateral attack by clients' aggrieved by an apparent sell-out of their claims by lawyers laden with conflicts of interest." [FN154]

This is borne out by three recent cases. In Kamilewicz v. Bank of Boston Corp., [FN155] plaintiffs Dexter and Gretchen Kamilewicz, mortgage holders with BancBoston, were two out of 715,000 conscripted plaintiffs in an Alabama state court class action, entitled Hoffman v. BancBoston Mortgage Corp., [FN156] involving the manner in which BancBoston calculated the amount of escrow surplus that each mortgage holder had to maintain (the "Hoffman action"). The claim in the Hoffman action was that BancBoston overcharged mortgage holders, whose mortgages it serviced, so that a very small surplus existed in the mortgage holders' escrow accounts. [FN157]

The plaintiff class in the Hoffman action was granted summary judgment, and a notice of proposed settlement was sent to the plaintiff class. [FN158] The Alabama state court held a fairness hearing on the proposed settlement and in January 1994, approved the settlement, which provided that class members would be awarded amounts between $0.00 and $8.76. [FN159] The court also found the attorneys' fees requested reasonable, and under the terms of the settlement, BancBoston would deduct the attorneys' fees from the mortgage holders' escrow accounts. [FN160] The method of calculation of these fees was designed to defraud the members *300 of the class. [FN161]

As part of their recovery, the Kamilewiczes were awarded $2.19, which was credited to their account, but their

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 WMMELPR 243                                                                                         Page 13

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)

statement from BancBoston **301** also indicated a miscellaneous disbursement of $91.33. [FN162] When they discovered that this deduction was to cover the expense of the attorneys' fees in the Hoffman action (the "Hoffman attorneys"), they and another plaintiff (the "Kamilewicz plaintiffs") brought a class action against the Hoffman attorneys in federal district court in Illinois. [FN163]

The Illinois federal district court (Plunkett, J.) granted the Hoffman action attorneys' motion to dismiss for lack of subject matter jurisdiction. It held that the Rooker-Feldman doctrine [FN164] precluded it from reviewing a decision of the Alabama state court because that would amount to a collateral attack on a state court judgment in a federal court proceeding. The doctrine recognizes the principle that the inferior federal courts do not have the power to exercise appellate review on state court decisions. [FN165] The district court found that during the fairness hearing in Alabama, the Hoffman action plaintiffs were in an adversarial position against their **302** attorneys. Because the Hoffman action attorneys were asking the court to grant them their fees, they were in the position of plaintiffs. The Hoffman action plaintiffs, on the other hand, were in the position of defendants because they did not have to put up any evidence on the issue of fees, but were allowed to object and cross-examine the Hoffman attorneys. Therefore when the Alabama state court rendered judgment on the settlement--by providing its approval--all of the issues between the Hoffman action plaintiffs and their attorneys had been already litigated.

On appeal, the Seventh Circuit affirmed the district court's decision. [FN166] It later denied rehearing of the motion en banc, but there was a strong dissent written by Judge Easterbrook who disagreed that the Rooker-Feldman doctrine was applicable to the Kamilewicz action. [FN167]

Judge Easterbrook went on to say that this action was not a collateral attack on the Hoffman action. Instead, this was a malpractice action, and since there is no requirement that a malpractice action be filed with the court that rendered the underlying judgment, the Rooker-Feldman **303** doctrine was again inapplicable. [FN168] Judge Easterbrook further stated that if a malpractice action could only be brought in the same court, then that would have the effect of eliminating all malpractice actions in federal court, even if the requirements of diversity jurisdiction were met. [FN169] Judge Easterbrook highlighted that the difference with malpractice actions is that "it is a suit against a nonparty (the lawyer) alleging harm from incompetent or deceitful acts. That the lawyer's misconduct occurred in a judicial proceeding doesn't insulate the lawyer from liability, even when the Rooker-Feldman doctrine insulates the judgment." [FN170]

Furthermore, he stated that the Kamilewicz plaintiffs could not have petitioned the Supreme Court for certiorari because their claims are outside the scope of §1257: [FN171]
   [T]hey did not discover the malpractice until later (it was not reflected in the record of the state proceeding); it was not litigated in the Hoffman case; class members can't seek appellate review without intervening, which further illustrates their non-party status; and of course malpractice is not a federal claim .... [FN172]

Judge Easterbrook was most troubled by the idea that if the panel's decision was adopted by other courts, there would be an end to malpractice litigation in any court. [FN173] He reiterated that a malpractice action is separate from the underlying action:
   **304** A (potential) defense of issue preclusion is defeated by the very theory of the claim: that the first judgment is unreliable because of the attorney's bungling. The bungler cannot point to the adverse judgment produced by his own incompetence to ward off the client's demand. The Kamilewicz class may fail in its proof, or it may encounter other obstacles, but the Rooker-Feldman doctrine does not close the door to the federal courthouse. [FN174]

Because the United States Supreme Court denied certiorari, [FN175] the Kamilewicz plaintiffs are now foreclosed from receiving any redress against the Hoffman action attorneys. Basically under the federal courts' holding, lawyers are immunized by a fairness hearing from a malpractice action by their clients no matter how

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

egregious their conduct.

In Epstein v. MCA, Inc., [FN176] the Ninth Circuit reversed the decision of a three judge panel and essentially agreed with the Seventh Circuit in a decision effectively concluding that clients' rights vis-a-vis their class lawyers are essentially terminated by a so-called "fairness" hearing. Judge Sporkin, in Thomas v. Albright, [FN177] barred a malpractice action brought by class members against class counsel, effectively holding that the adequacy of class counsel's representations was fully adjudicated at the fairness hearing. [FN178]

**\*305** Two other decisions, [FN179] however, have allowed plaintiffs to successfully sue their attorneys for breach of fiduciary duty. Arce v. Burrows, [FN180] a Texas state court action, held that attorneys entering into an aggregated settlement on behalf of their clients without obtaining their clients' consent breached their fiduciary duty. As a consequence, the attorneys had to forfeit a portion of their fees. In Arce, multiple plaintiffs hired attorneys, the defendants, to represent them individually in a personal injury case stemming from an explosion at a chemical plant. [FN181] They agreed to payment on a contingency fee basis. After their attorneys entered into an aggregate settlement without obtaining their consent, [FN182] the plaintiffs initiated a state court action. The court held that a fiduciary relationship imposes a "duty ... of loyalty and good faith, strict integrity, and fair and honest dealing." [FN183] Because a fiduciary relationship exists between an attorney and his client as a matter of law, the court held that fee forfeiture is a viable remedy when the attorney breaches his fiduciary duty to his client. [FN184] The client only needs to prove that a breach occurred, not actual damages in order to be entitled to fee forfeiture. [FN185]

Although Arce was not a class action, it did allow multiple plaintiffs who felt that they had been wronged (by their attorneys not seeking their informed consent to an aggregated settlement) to sue for **\*306** breach of fiduciary duty even though they had agreed to a settlement.

The Ninth Circuit similarly allowed a cause of action for malpractice by former clients against their attorneys who had settled a shareholder derivative action by court order in the case of Durkin v. Shea & Gould. [FN186] In that case, the plaintiffs argued that their former attorneys had breached their fiduciary duty with regard to the manner in which the settlement of the shareholder derivative suit was structured and had committed malpractice. To prove malpractice, plaintiffs had to prove common law negligence: duty, breach, causation and damage. The defendants asserted that issue preclusion prevented the litigation of malpractice because there had already been a full and fair litigation on the issue, as well as a final judgment on the merits. [FN187] The court held that plaintiffs had not had a full and fair opportunity to litigate the alleged malpractice because the malpractice action did not accrue until after the settlement became final. [FN188] The court, therefore, held that the plaintiffs' attorneys should not be immunized from a subsequent malpractice action simply because a court had approved a settlement or entered a judgment. "To hold otherwise would be to rule that where an attorney's negligence has caused a court to make an erroneous adjudication of an issue, the fact that the court has made that adjudication absolves the attorney of all accountability and responsibility for his negligence." [FN189]

The Arce and Durkin cases notwithstanding, the mass tort system has stripped the ability of the two core lawyer regulatory systems (disciplinary board enforcement of ethics codes and civil actions for breach of the standards of care and of conduct) to monitor attorneys. Courts have essentially joined together with plaintiff lawyers to overthrow fundamental client protections that have evolved over the past 600 years. Denying clients who have literally had their pockets picked by their lawyers the right, for example, to seek redress by invoking the same tort system that their ostensible lawyers are invoking to generate multi-million dollar fees for themselves may be seen to be a reflection of the immense power that aggregative attorneys have come to wield in our society. [FN190]

This power is, at base, a consequence of the enormous amounts of **\*307** fee income that aggregative litigation is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

generating. Stated simply, courts are awarding fees in many of these cases, which routinely and vastly overcompensate lawyers. Judges justify the fees awarded by noting that attorneys must be provided with sufficient compensation to yield the necessary incentives to undertake the litigation to effectuate client rights in an era when legislatures are stymied by special interests and administrative agencies are shackled by budgetary constraints. Even if that proposition were accepted at face value, however, it cannot justify the enormous fees--the tens and hundreds of million of dollars--being awarded.

One of the more pernicious fee setting devices that courts have permitted is the basing of the class action fee as a percentage of an artificial settlement value when the reality is that the actual payments to the class will be a fraction of the announced settlement value. Thus, in the reversionary settlement (as opposed to the pro-rata), where any funds unclaimed by the class revert to the defendant, the lawyers' fee can easily amount to 200% or more of the amount actually paid to class members. [FN191]

As a reaction against some of the excesses of the class action **\*308** system, some courts which had shifted fee setting from the lodestar to the percentage method have begun to refocus on the lodestar. However, use of the lodestar instead of the percentage method for fee setting does not eliminate overcompensation. Indeed, the unspoken truth about the lodestar is that it is often laden with uncountable numbers of hours, which are counted even though they lack accountability. [FN192] If law firms were audited to determine how many hours each lawyer in the firm was claiming in all of the class action cases they were participating in, I have no doubt that for some and probably for many, their fees would be out of this world--literally. Instead of a day being merely 24 hours long as it is on Earth, for many of these lawyers, the number of hours in a day would more closely correspond with that of some of the outer planets, Saturn for example. [FN193]

II. CONCLUSION

A principal consequence of overcompensation is the proliferation of much aggregative litigation, and, in particular, class action activity, **\*309** without any redeeming social value. It is simply fee driven. [FN194] The process may be seen as perverse in that the aggregative strategies that courts have devised to deal with the effects of mass tort claims on courts' dockets facilitate the bringing of more mass tort claims, requiring, in turn, additional aggregative responses.

Perhaps the most important article on the subject of aggregative litigation not yet written--at least in part because of the difficulty involved--is one about the aggregate social effect of aggregative litigation--for example, an analysis of the costs of aggregative litigation including class actions and who pays for them as well as of the benefits, and who receives them. The huge increase we have witnessed in aggregative litigation in the past decades as well as the enormous wealth transfers that have resulted are typically justified by the deterrence effect of such litigation on malevolent corporate behavior. This conclusion, however, is as least as much an article of faith as a matter of empirical reality. Just as it has become increasing clear that, on the whole, punitive damages have little deterrence effect [FN195] and indeed appear to inhibit improvements in product safety, so too, empirical and analytic attention to aggregative litigation may reveal a similar dysfunctionality.

[FNa1]. Professor of Law, Benjamin N. Cardozo School of Law of Yeshiva University.

[FN1]. See ADVISORY COMMITTEE ON CIVIL RULES AND THE WORKING GROUP ON MASS TORTS TO THE CHIEF JUSTICE OF THE UNITED STATES AND TO THE JUDICIAL CONFERENCE OF THE UNITED STATES, REPORT ON MASS TORT LITIGATION 9 et seq. (Feb. 15, 1999); see also John C. Coffee, Jr., Class Wars: The Dilemma of the Mass Tort Class Action, 95 COLUM. L. REV. 1343, 1344-45 (1995). Class action litigation, for example, has increased dramatically since the 1980s, with most of the increases taking place in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

state courts. A survey done by the Federalist Society found that between 1988 and 1998 class actions increased by 338% in federal courts while the increase in state courts was more than 1000%. Analysis: Class Action Litigation --A Federalist Society Survey, CLASS ACTION WATCH 3, Vol. 1, No. 1 (1999).

[FN2]. "[S]imilar factual issues and legal questions will arise in all claims in a mass tort litigation, or at least in a significant subset of claims. The same injuries will involve similar causation issues. Liability issues will be similar among claims alleging similar exposures to a particular defendant's products." Deborah R. Hensler & Mark A. Peterson, Understanding Mass Personal Injury Litigation: A Socio-Legal Analysis, 59 BROOK. L. REV. 961, 966 (1993).

[FN3]. For an account of several class actions based upon economic injury, see DEBORAH HENSLER ET AL., RAND INST. FOR CIVIL JUSTICE, CLASS ACTION DILEMMAS: PURSUING PUBLIC GOALS FOR PRIVATE GAIN 139 (2000).

[FN4]. Attempts to convert a cause of action for breach of contract under state law into an action for fraud usually fail. See, e.g., Richard A. Wagner, When Contract Claims and Fraud Claims Intersect, N.Y.L.J., Sept. 17,1999, at 1.

[FN5]. Hensler & Peterson, supra note 2, at 1013-14.

[FN6]. See Michael Moss, Plaintiffs' Attorneys Back Groups that Help Nursing Home Residents, WALL ST. J., Mar. 26, 1999, at 1 (indicating that persons calling a toll-free number expecting to reach an independent nursing-home advocacy group that fields complaints about nursing homes and lobbies for better treatment of elderly residents are instead first connected to a law firm which pays for the toll-free line and associated web sites; other lawyers provide direct financial support of similar advocacy groups). The article indicates that these undertakings by lawyers are shrouded in secrecy. Id.

[FN7]. See Mike France, The Litigation Machine, BUS. WK., Jan. 29, 2001, at 114 (reporting on pleading and strategy sharing on websites and sales of litigation packets with step -by-step instructions for filing products liability lawsuits); Steven Keeva, No Deficit of Attention Here: Ritalin Class Action Suits are Making Some Drug Companies Hyper, A.B.A.J., June 2001, at 28, 30 (June 2001) (quoting high-profile plaintiffs' lawyers on their attempts to structure multiple massive mass tort suits like "joint ventures," allocating work to different plaintiffs' firms around the country to avoid "duplication of effort"). For an account of the coordination between lawyers involved in gun litigation which is described as exceeding that in the tobacco litigation, see Philip C. Patterson & Jennifer M. Philpott, Note, In Search of a Smoking Gun: A Comparison of Public Entity Tobacco and Gun Litigation, 66 BROOK. L. REV. 549, 598-99 (2000).

[FN8]. Hensler & Peterson, supra note 2, at 1013-30.

[FN9]. Judith Resnick et al., Individuals Within the Aggregate: Relationships, Representation and Fees, 71 N.Y.U. L. REV. 296, 300 (1996) (the economic benefits to lawyers of large-scale litigation are well documented); see also Charles C. Wolfram, Mass Torts-Messy Ethics, 80 CORNELL L. REV. 1228, 1231 (1995) (stating "the class-action plaintiffs' bar is driven by ... easy money--a great deal of it").

[FN10]. The thesis that very high fees are being routinely obtained in contingency fee cases without meaningful risk, yielding what I have termed "windfall fees," is one that I have previously advanced. See Lester Brickman, ABA Regulation of Contingency Fees: Money Talks, Ethics Walks, 65 FORDHAM L. REV. 247, 280 n.112 (1996) ; Lester Brickman, Contingent Fees Without Contingencies: Hamlet Without the Prince of Denmark?, 37 UCLA L. REV. 29, 92- 93 (1989); see also Derek Bok, THE COST OF TALENT: HOW EXECUTIVES AND

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

PROFESSIONALS ARE PAID AND HOW IT AFFECTS AMERICA 140 (Free Press 1993) (noting that most plaintiffs do not know whether they have a strong case, and rare is the lawyer who will inform them (and agree to a lower percentage of the take) when they happen to have an extremely high probability of winning. In most instances, therefore, the contingent fee is a standard rate that seldom varies with the size of a likely settlement or the odds of prevailing in court.).

A particularly illustrative example of price gouging in a mass tort context occurs in asbestos litigation. When asbestos litigation first commenced in the early 1970s, contingency fees of 40% were common. This was a reflection of the high degree of risk posed by such litigation. But when Borel v. Fibreboard Prod. Corp., 493 F.2d 1076 (5th Cir. 1973), cert. denied, 419 U.S. 869 (1974), was decided, the risk equation changed considerably. By the mid-1980s, plaintiffs' lawyers had retooled their cases to reflect the Johns-Manville bankruptcy and the consequent need to perfect cases against thirty or so heretofore peripheral players. By then the risk in asbestos cases had shifted dramatically. Had lawyers' fees been responsive to market conditions, the contingency fee percentages would have dropped considerably to reflect the sea change that had occurred in the risk equation. It is a tribute to the power of the asbestos bar that contingency fees have remained at the extremely high levels that were set when litigation risks were considerable even though most claims today are settled through an essentially administrative process in batches of hundreds, thousands, and even tens of thousands with little or no lawyer time devoted to most of them and with effective hourly fees being generated ranging from $5,000 to $25,000. See Lester Brickman, The Asbestos Litigation Crisis: Is There A Need For An Administrative Alternative?, 13 CARDOZO L. REV. 1819, 1834 n.60 (1992) [hereinafter Brickman, Asbestos Litigation].

[FN11]. The rules of ethics require that attorneys' fees be reasonable. See MODEL RULES OF PROF'L CONDUCT R. 1.5(a) (1983); Model Code of Prof'l Responsibility DR 2-106(a) (1980). In fact, an ordinary lawyer has a duty to reject a compromise providing generous fees but modest relief for the client. Paul C. Carrington & Derek P. Apanovitch, The Constitutional Limits of Judicial Rulemaking: The Illegitimacy of Mass Tort Settlements Negotiated Under Federal Rule 23, 39 Ariz. L. Rev. 461, 468 (1997) (citing Restatement (Third) of the Law Governing Lawyers 206, cmt. F (1998)).

[FN12]. See Edith H. Jones, Rough Justice in Mass Future Claims: Should Bankruptcy Courts Direct Tort Reform?, 76 TEX. L. REV. 1695, 1696-97 (1998) ("A defendant's liability, which should be a critical factor in the fashioning of a just solution, becomes submerged beneath the overwhelming volume of claims and the huge transactional costs of defending them.").

[FN13]. While Congress (and the states) may "make no law ... abridging the right of the people peaceably to assemble, and to petition the Government for a redress of grievances ...." U.S. Const., amend. I, such a prohibition does not extend to plaintiffs' lawyers. Consider, for example, the asbestos bar, which exercises enormous power as evidenced by the means they have used to oppose proposed legislation to create an administrative alternative to asbestos litigation that would limit compensation to only those with actual injury, essentially as per the terms of the Amchem settlement, and then according to a specific schedule. See Fairness in Asbestos Compensation Act, H.R. 1283, 106th Cong. (1999); S.758, 106th Cong. (1999). For a discussion of asbestos litigation, see infra text accompanying notes 90-151. The details of the proposed legislation and the determined opposition of the leading asbestos lawyers are set forth in an essentially first hand account in First Amended Complaint, G-I Holdings, Inc. v. Baron & Budd et al., No. 01 Civ. 0216 (RWS), U.S.D.C., S.D.N.Y., filed April 30, 2001:

In the wake of Amchem, [see infra note 84] a number of companies formed the Coalition for Asbestos Resolution (CAR), the goal of which was to work toward the adoption of legislation establishing a fair and efficient administrative facility for resolving asbestos claims. When it was formed, CAR's members included Kaiser Aluminum Corporation (Kaiser Aluminum), Georgia Pacific Corporation (Georgia-Pacific), Westinghouse, United States Gypsum Company (U.S. Gypsum), ABB Combustion Engineering, Turner & Newell PLC (Turner), Armstrong, and GAF.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 WMMELPR 243                                                                                                    Page 18

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

[T]he Act was first introduced in October 1998, near the end of the 105th Congress. With the support of GAF and the CAR, it was reintroduced at the start of the 106th Congress, in early 1999. The Act was introduced in both houses of Congress and cosponsored by over 102 senators and congressmen, including nearly the entire Republican leadership and Democratic Senators Lieberman, Dodd, Toricelli, Schumer and Moynihan. This legislation was designed to compensate individuals who are actually sick and to defer resolution of the claims of "non-sick" individuals until such time as those individuals actually developed an asbestos-related illness.

[P]ursuant to the Act, an industry-funded national claims facility was to have been created that would have applied essentially the same objective medical criteria that were embodied in the Georgine settlement [that was the subject of Amchem] ....

The Act ... [also] cap[ped] [plaintiffs' attorneys] ... contingency fees, which were to be limited to 25% of a claimant's recovery ....

In February 1999, [one of the leading asbestos lawyers on behalf of his firm and] ... other firms working with them, invited the remaining companies supporting the Act and several other former asbestos producers to a meeting. The invitation stated that the plaintiffs' attorneys calling the meeting represented 80 percent of the pending asbestos plaintiffs' cases, and that they sought a meeting for a "frank discussion" of the current status of the national asbestos litigation.

The February 24 meeting was attended, on the asbestos plaintiffs' side, by [many of the leading asbestos lawyers] .... Representatives of GAF, Kaiser Aluminum, W.R. Grace & Co., Owens Corning, Owens-Illinois, Inc., U.S. Gypsum and others were also present
....

Acting as spokesman for the group, [a leading asbestos lawyer] ... stated that efforts to promote or support the Act were viewed by [plaintiffs' attorneys] ... as starting a "nuclear war." He said that the [lawyers] ... were prepared to "fight on whatever level necessary" to defeat the legislation. He also stated that further support for the Act would result in "war" that would break out on every front, and that any company that did not renounce its support for the legislation would be engulfed in asbestos litigation that "will rage like a fire you will never control."

[T]wo days after the February 24 meeting, [the leading asbestos lawyer referred to above] ... and the other asbestos plaintiffs' attorneys, invited the industry participants to a follow-up meeting to be held on April 8, 1999 ... At the April 8 meeting, [it is alleged that the asbestos plaintiffs' attorneys] ... made it clear that withdrawing support for the Act was no longer enough and that [they] ... were now demanding that companies sign letters opposing the Act ... [Following these meetings], Georgia-Pacific, ... ABB Combustion Engineering, ... Kaiser Aluminum, ... Westinghouse, ... U.S. Gypsum, ... Turner, ... [and] Armstrong [all] withdrew from CAR ....
Id. ¶¶ 95-128. For an account of these events, see Holman Jenkins, Jr., Now on Video: America's Scariest Special Interest, WALL ST. J., Apr. 21, 1999, at A23.

[FN14]. See Brickman, Asbestos Litigation, supra note 10, at 1825.

[FN15]. In order for the litigation to become a class action, it must first be certified under Rule 23(a). See Fed. R. Civ. P. 23(a). There are four prerequisites for obtaining certification:
  (1) the class is so numerous that joinder of all members in impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interest of the class.
Id.

[FN16]. For the history of the 1966 amendments and an analysis of the intended effect versus actual effects of the amendment, see Appendix, included at the end of this article.

[FN17]. Subsection (a) of Federal Rule 42 provides specifications for consolidating multiple actions. The Rule states that:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.
Fed. R. Civ. P. 42 .
Therefore, under Rule 42(a), a court may, for reasons of cost efficiency or to avoid delay, merge all of the actions before it that share similar foundations in law or fact. See Rose v. Medtronics, Inc., 107 Cal. App. 3d 150, 155 (1980) (citing a list of federal court cases declining to certify mass tort class actions and stating that "consolidation of actions is the preferred procedure"); see also Ripa v. Owens-Corning Fiberglass Corp., 660 A.2d 521, 533 (N.J. Super. 1995) (observing that "tens of thousands of asbestos claims are proceeding in the federal courts on a consolidated basis"); infra note 46.

[FN18]. The Federal Rules of Civil Procedure allow large number of plaintiffs to join a single action when claims arise out of the same transaction, occurrence, or series of transactions or occurrences. See Fed. R. Civ. P. 19 (governing compulsory joinder of parties); Fed. R. Civ. P. 20 (governing permissive joinder of parties); see also Federal Interpleader Act, 28 U.S.C. §§ 1335, 1397, 2361 (1994) (governing statutory interpleader); Fed. R. Civ. P. 14 (governing impleader); Fed. R. Civ. P. 22 (governing rule interpleader); Fed. R. Civ. P. 24 (governing intervention); Cal. Civ. Proc. Code §§ 378-79 (West 1973); N.Y. C.P.L.R. § 1002 (McKinney 1976).

[FN19]. See infra notes 83 -87.

[FN20]. The use of "bellwether" or test plaintiffs has developed as an alternative to the use of class actions. See Richard Faulk et al., Building a Better Mousetrap? A New Approach to Trying Mass Tort Cases, 29 TEX. TECH L. REV. 779, 791 -92 (1998); see also R. Joseph Barton, Note, Utilizing Statistics and Bellwether Trials in Mass Torts: What Do the Constitution and Federal Rules of Civil Procedure Permit?, 8 WM. & MARY BILL OF RIGHTS J. 199 (1999). "The term bellwether is derived from the ancient practice of belling a wether (a male sheep) selected to lead his flock." In re Chevron U.S.A., Inc., 109 F.3d 1016, 1019 (5th Cir. 1997). The ultimate purpose was to determine the confidence of the flock "that the wether would not lead them astray." Id.
A similar analogy applies to the use of test plaintiffs in mass torts. The bellwether approach focuses on the trial of a small number of plaintiffs (sometimes referred to as "mini-trials"), usually with the claims of the other plaintiffs stayed pending resolution of the test cases. See Shawn Copeland et al., Toxic Tort and Environmental Matters: Civil Litigation 64 ALI-ABA 33 (Jan. 22, 1998). For a controversial example of the structuring of mini-trials to the great disadvantage of defendants and the extrapolation to non -bellwether plaintiffs, see Cimino v. Raymark Indus., 751 F. Supp. 649, 663-64 (E.D. Tex 1990) (using statistically significant plaintiffs to determine average value), aff'd in part and vacated in part, 151 F.3d 297 (5th Cir. 1998); see also In re Chevron U.S.A., Inc., 109 F.3d at 1022 (granting mandamus relief to defendants because, "[c]onducting an imperfect bellwether trial in this case threatens ... to force defendants to settle even when they might have meritorious defenses.") (Jones, J., concurring); In re TMI Litig., 193 F.3d 613 (3d Cir. 1999) (reversing the extension of summary judgement to non-trial plaintiffs for failure to present sufficient evidence of exposure); Deluca v. Merrel Dow Pharmaceuticals, 911 F.2d 941, 952 (3d Cir. 1990) (explaining that collateral estoppel principles did not permit the extension of the findings of a multi-district litigation, consolidated common issues trial to plaintiffs not parties to that trial).

[FN21]. MDL or "multi -district litigation" is a form of aggregating cases where several similar actions have been filed nationwide and federal court judges ask the Judicial Panel on Multi-district Litigation to consolidate the actions before one judge for pretrial purposes. See 28 U.S.C. § 1407 (1994). Multi-district procedure provides that upon the motion of any party or upon the court's own motion, the nine-member Judicial Panel on Multi-district Litigation will order transfer if the following prerequisites are met: (1) the actions to be coordinated or consolidated involve one or more common questions of fact; (2) transfer will promote the convenience of the parties and witnesses; and (3) transfer must result in the just and efficient conduct of the actions transferred. See id.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

For example, the Judicial Panel on Multi-district Litigation consolidated a number of asbestos cases before Judge Jack Weinstein of the Eastern District of New York. See In re Asbestos Prod. Liab. Litig., 771 F. Supp. 415 (J.P.M.L. 1991); see also JACK B. WEINSTEIN, INDIVIDUAL JUSTICE IN MASS TORT LITIGATION 24 (Northwestern Univ. Press 1995). Although the MDL procedures contemplate that actions are transferred for the purposes of pretrial proceedings and are to be remanded for trial to the district from which the action was transferred, in practice only a small percentage of actions are remanded. See Copeland et al., supra note 20, at 40. Most actions are either settled in the transferee court or tried in the transferee court pursuant to 28 U.S.C. § 1404(a) , change of venue, or parties' consent. See id; see also 28 U.S.C. § 1404(a) (1994) (allowing transfer "[f]or the convenience of parties ... in the interest of justice"). Under any of the consolidation mechanisms, the primary prerequisite is that the actions involve a common question of law or fact, and that the common issue be central to the actions to be consolidated. See, e.g., Molever v. Levenson, 539 F.2d 996, 1003 (4th Cir. 1976) (demonstrating the harmful effects of erroneous consolidation when there is not a "common question of law or fact").

Although the consolidation improves the efficiency of the pre-trial process, courts still face the daunting possibility of adjudicating numerous similar claims. See MANUAL FOR COMPLEX LITIGATION (THIRD) 323 (1995) ("[I]n appropriate circumstances, a joint trial for common issues may be feasible, followed by separate trials of remaining issues."). Unlike a class action, consolidation of separate actions "does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." In re TMI Litig., 193 F.3d at 724 (quoting Johnson v. Manhattan Ry. Co., 289 U.S. 479, 497 (1933)); Advery v. Celotex, 962 F.2d 1177, 1180 (6th Cir. 1992) (explaining that consolidation "does not merge the independent actions into a single cause"); see also Charles Silver, Comparing Class Actions and Consolidations, 10 REV. LITIG. 495, 497 (1991) ("[A] class action is a single lawsuit that binds a large number of people, while a consolidation is a set of independent lawsuits that are processed in a coordinated and relatively efficient way."). Accordingly, consolidated actions do not permit a claimant the right to "opt-out" as does a class action certified under Rule 23(b)(3). See WEINSTEIN, supra at 139.

[FN22]. See, e.g., Jenkins v. Raymark Indus., Inc., 782 F.2d 468, 473 n.8 (5th Cir. 1986) (providing for the calculation of damages prior to a determination of liability--called a reverse bifurcation, in order to find the approximate tort value of a claim and thereby promote settlement); Flatt v. Johns-Manville Sales Corp., 488 F. Supp. 836 (E.D. Tex. 1980) (use of non-mutual offensive collateral estoppel to avoid duplicative litigation of such issues as the harmful effects of asbestos exposure).

[FN23]. See, e.g., Slaughter v. Southern Talc Co., 949 F.2d 167, 172-73 (5th Cir. 1991); Whatley v. Armstrong World Indus., 861 F.2d 837, 840 (5th Cir. 1989) (allowing the liberal use of circumstantial evidence to overcome plaintiff's inability otherwise to establish proximate cause in cases where proving exposure to particular products was not realistically possible); see also infra note 142.

[FN24]. For an analysis of how these other strategies have come to play a key role in asbestos litigation, see Brickman, Asbestos Litigation, supra note 10, at 1832 n.51, 1840-52, 1873-84. Litigation brought by governmental entities against tobacco or gun manufacturers, even though not aggregative in form, may be seen, nonetheless, as functionally aggregative in nature because the amounts of damages sought can have the same coercive effects as described in Part I.A of this Article.

[FN25]. Claims can also be aggregated by lawyers coordinating their activities to such an extent that even though the claims they bring are independent and proceed as separate lawsuits, the "litigation" is effectively "a single integrated whole." See Howard M. Erichson, Informal Aggregation: Procedural and Ethical Implications of Coordination Among Counsel in Related Lawsuits, 50 DUKE L.J. 381, 383-84 (2000).

[FN26]. See, e.g., Symposium, Complex Litigation at the Millennium, 64 LAW & CONTEMP. PROBS. 1 (2001);

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

Geoffrey C. Hazard, Jr., The Futures Problem, 148 U. PA. L. REV. 1901 (2000); Francis E. McGovern, Toward a Cooperative Strategy for Federal and State Judges in Mass Tort Litigation, 148 U. PA. L. REV. 1867 (2000); David Rosenberg, Mass Tort Class Actions: What Defendants Have and Plaintiffs Don't, 37 HARV. J. ON LEGIS. 393 (2000); Alan N. Resnick, Bankruptcy as a Vehicle for Resolving Enterprise-Threatening Mass Tort Liability, 148 U. PA. L. REV. 2045 (2000); Mark C. Weber, Mass Jury Trials in Mass Tort Cases: Some Preliminary Issues, 48 DEPAUL L. REV. 463 (1998); Symposium on Mass Tort, 31 LOY. L.A. L. REV. 353 (1998); Richard A. Nagareda, The Aftermath of the Mass Tort Class Action, 85 GEO. L.J. 295 (1996); Richard L. Marcus, They Can't Do That, Can They? Tort Reform Via Rule 23, 80 CORNELL L. REV. 858 (1995).

[FN27]. For one such analysis, see Victor E. Schwartz & Leah Lorber, A Letter to the Nation's Trial Judges: How the Focus on Efficiency is Hurting You and Innocent Victims in Asbestos Liability Cases, 24 AM J. TRIAL ADVOC. 247, 248-51 (2000). For an account of how a massive consolidation generated dramatic increases in claim filings, see Brickman, Asbestos Litigation, supra note 10, at 1873 n.231.

[FN28]. "Judges who move large numbers of highly elastic mass torts through their litigation process at low transaction costs create the opportunity for new filings. They increase the demand for new cases by their high resolution rates and low transaction costs. If you build a superhighway, there will be a traffic jam." Francis E. McGovern, The Defensive Use of Federal Class Actions in Mass Torts, 39 ARIZ. L. REV. 595, 606 (1997).

[FN29]. Aggregation "enables some plaintiffs' lawyers to bring weak if not false claims in sufficient quantity as to require defendants to choose between settlement and bankruptcy." Judith Resnick et al., Individuals Within the Aggregate: Relationships, Representation, and Fees, 71 N.Y.U. L. REV. 296, 306 n.31 (1996).

[FN30]. The threat of punitive damages exerts substantial pressures on defendants to settle mass tort cases. See Thomas Koenig, The Shadow Effect of Punitive Damages on Settlements, 1998 WISC. L. REV. 169, 208 (1998). Even when the plaintiff has very little chance of prevailing, inflates the settlement amount. See Theodore Eisenberg et al., The Predictability of Punitive Damages, 26 J. LEGAL STUD. 623, 625 (1997).

[FN31]. It may be thought that Fortune 500 companies, with their extensive lines of credit, could readily pass a bond of at least several billion dollars. No doubt several of the largest corporations with considerable liquid assets could do so, but most could not. If a multi-billion dollar judgment were assessed that threatened the economic viability of the corporation, banks would likely cancel lines of credit on the grounds of insolvency, leading to an eminent bankruptcy filing. It is precisely such a scenario that the general counsel of a Fortune 500 company would present to the CEO in assessing whether to settle an aggregated set of claims or litigate them. While CEOs have both short-term and long-term objectives in managing the corporation, the prospect, even though remote, of a judgment forcing a bankruptcy filing, the virtual equivalent of capital punishment for that set of managers, usually elevates short-term considerations ("not on my watch") over a corporation's longer term interests which may include stoutly resisting extortive litigation.

[FN32]. 51 F.3d 1293 (7th Cir. 1995). For a discussion of the implications of Rhone-Poulenc, see Research Memorandum No. 10 by Lester Brickman, Class Action Reform: Beyond Rhone-Poulenc Rorer, to the Manhattan Institute (Oct. 1995).

[FN33]. See Rhone-Poulenc, 51 F.3d at 1296.

[FN34]. Whereas without certification, individual plaintiffs could maintain separate actions against the drug manufacturers, who would then only be required to pay damages in successful cases, if the class certification remained, the drug manufacturers would have to defend against thousands of plaintiffs. Litigating against so many

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 WMMELPR 243                                                                                          Page 22

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

plaintiffs would expose the company to enormous risk, thus subjecting it to "intense pressure to settle." See id. at 1297-98. ("They might, therefore, easily be facing $25 billion in potential liability (conceivably more), and with it bankruptcy.").

[FN35]. Id. at 1299. The court discussed the types of factors that should be considered:

The first concern with forcing these defendants to stake their companies on the outcome of a single jury trial, or be forced by fear of the risk of bankruptcy to settle even if they have no legal liability, when it is entirely feasible to allow a final, authoritative determination of their liability for the colossal misfortune that has befallen the hemophiliac population to emerge from a decentralized process of multiple trials, involving different juries, and different standards of liability, in different jurisdictions; and when, in addition, the preliminary indications are that the defendants are not liable for the grievous harm that has befallen the members of the class. These qualifications are important.

Id.; see also Fed. R. Civ. P. 23(b)(3).

[FN36]. To that point, thirteen cases had previously been litigated and defendants had prevailed in twelve of these. See Rhone-Poulenc, 51 F.3d at 1296, 1299.

[FN37]. See, e.g., Castano v. Am. Tobacco Co., 84 F.3d 734 (5th Cir. 1996). "[C]lass certification magnifies and strengthens the number of unmeritorious claims ... [and] creates insurmountable pressure on defendants to settle, whereas individual trials would not." Id. at 746. The court noted that this phenomenon has been referred to as "judicial blackmail." Id.; see also In re Chevron U.S.A., Inc., 109 F.3d 1016, 1022 (5th Cir. 1997) (granting mandamus relief to defendants because "[c]onducting an imperfect bellwether trial in this case threatens a similar effect ... [to the effects that certification would have had in Rhone-Poulenc and Castano due to] its tendency to force defendants to settle even when they might have meritorious defenses"); In re Am. Med. Sys., Inc., 75 F.3d 1069, 1085 (6th Cir. 1996) (granting petitioners mandamus relief based on the abuse of discretion exercised by the district court judge in certifying the class despite the fact that "the economies of scale achieved by class treatment are more than offset by the individualization of numerous issues relevant only to a particular plaintiff," along with many other misjudgments made by the lower court); Andrews v. Am. Tel. & Telegraph Co., 95 F.3d 1014, 1023 (11th Cir. 1996) (reversing the class certification order largely due to appellants' assertion that "insurmountable difficulties in managing these actions make class action inferior to other available methods, specifically case-by-case litigation of individual claims"); In re Ford Motor Co. Bronco II Prod. Liab. Litig, 177 F.R.D. 360, 375 (E.D. La. 1997) (refusing to grant class certification because certification may create undue pressure on defendants to settle). See generally Mullinex, infra note 50, at 1709 (stating [F]ederal courts have articulated an increasingly conservative class action jurisprudence that has directed federal courts to stringently scrutinize proposed litigation and settlement classes. Consequently, it has become increasingly difficult for plaintiffs to pursue certain types of class actions in the federal arena"). See Glenn A. Danas, The Interstate Class Action Jurisdiction Act of 1999: Another Congressional Attempt to Federalize State Law, 49 EMORY L.J. 1305, 1306 (2000) ("[B]y the mid-1990's, federal courts became increasingly hostile towards damages class certification.").

[FN38]. See Linda Mullenix, Remarks at the New York ABA National Institute on Class Actions Meeting (Oct. 13, 2000), quoted in Gary Weinstein, Class Actions: A Look at the Future, and Some Controversies in Class Action Law, 8 METRO. CORP. COUNS. n.12, Dec. 2000, available at WL 12/00 METCC 40 (col.1):

An example of a quick change in class certification jurisprudence was cited by Professor Linda S. Mullenix, who reviewed state court rulings. This year in Texas, Mullenix noted, three decisions by the Texas Supreme Court resulted in significant restrictions on class certifications: Southwestern Refining Co. v. Bernal (960 S.W.2d 293, 1 CLASS 82, 5/26/00), Ford Motor Co. v. Sheldon (965 S.W.2d 65, 1 CLASS 85, 5/26/00), and Intratex Gas Co. v. Beeson (22 S.W.3d 398, 1 CLASS 119, 6/9/00).

In Bernal, the Texas Supreme Court overturned certification of a class of 904 plaintiffs allegedly harmed by a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

refinery explosion. The court said the plaintiffs failed to show a predominance of common issues of law and fact. The Sheldon court decertified a class of motor vehicle owners who alleged their cars were damaged by Ford Motor Co.'s paint process, holding that individual class members could not be easily identified. The Texas court in Beeson ruled that the parameters of a plaintiff class cannot be defined by a de facto determination of the merits of the class claims.

These cases, Ms. Mullenix said, establish strict new standards on class definitions in Texas and make it "much more difficult for plaintiffs to obtain class certification."

The impact of the Texas rulings, which have come to be known as the "Texas trilogy," is profound and immediate. The rulings may be followed by federal district courts, she said. And in Texas, there have been four class certifications that were withdrawn, remanded, or reversed, based on the trilogy.
Id.

[FN39]. 249 F.3d 672 (7th Cir. 2001).

[FN40]. Szabo v. Bridgeport Mach., Inc., 199 F.R.D. 280, 284 (N.D. Ind. 2001).

[FN41]. Id. at 284, 286, 293-94.

[FN42]. Fed. R. Civ. P. 23(f), added in 1998, provides that "[a] court of appeals may in its discretion permit an appeal from an order of a district court granting or denying class action certification." Fed. R. Civ. P. 23(f). Judge Easterbrook contended with the absence of guidelines for the exercise of discretion in Rule 23(f) appeals in Blair v. Equifax Check Servs., Inc., 181 F.3d 832, 834-35 (7th Cir. 1999), stating that "[d]isputes about class certification cannot be divorced from the merits--indeed, one of the fundamental unanswered questions is whether judges should be influenced by their tentative view of the merits when deciding whether to certify a class." Id. at 835.

[FN43]. Szabo, 249 F.3d at 675.

[FN44]. The Seventh Circuit thus adopted an argument that Professor George Priest had previously urged in commenting on Rhone-Poulenc:

I think given the great hydraulic pressure that is created by the aggregation of cases, that it's necessary to evaluate the ultimate merits of the case as best as possible at the point of certification. If the economic power of the certification of the class is such that, if certified, the defendant will settle on some terms, then it seems to me that it's necessary in order to achieve the goals of justice in our society, to evaluate the merits of the claims as to whether the claims have sufficient merit on their face without a lot of discovery and to examine whether the claims have sufficient potential merit to justify the creation of great economic power through class certification."
George Priest, Economics of Class Actions, 9 KAN. J.L. & PUB. POL'Y 481, 483 (2000). The implications of Szabo for Rule 10b-5 litigation is explored in Sarah S. Gold & Leon P. Gold, No Deference Given to Plaintiff Allegations in Class Certification, N.Y.L.J., July 11, 2001, at 3.

[FN45]. See Fed R. Civ. P. 42(a).

[FN46]. Consolidations typically enable plaintiff lawyers to literally overwhelm juries' capacities to distinguish between claims of those actually injured and claims on behalf of unimpaired persons. See Brickman, Asbestos Litigation, supra note 10, at 1873-81. It is not a matter of venal or incompetent judges but rather the ineluctable pressures generated by burdens on dockets. As noted by Conrad L. Mallett, Jr., former Chief Justice of the Supreme Court of Michigan:

Think about a country trial circuit judge who has dropped on her 5,000 asbestos cases all at the same time ... [I]f she scheduled all 5,000 cases for one week trials, she would not complete her task until the year 2095. The judge's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

first thought then is, "How do I handle these cases quickly and efficiently?" The judge does not purposely ignore, fairness and truth, but the demands of the system require [that certain values be sacrificed].
The Fairness in Asbestos Compensation Act of 1999: Hearings on H.R. 1283 Before the House Comm. on the Judiciary, 106th Cong. 155 (1999) (statement of the Hon. Conrad L. Mallet, Jr.).

[FN47]. Schwartz & Lorber, supra note 27, at 252-56.

[FN48]. As stated by Professor Wolfram:
   [T]he most critical element of luck is having the case end up before the right judge. Successful class-action fee awards require either a judge who is decidedly pro-plaintiff or one who is emphatically pro-settlement. Either will do and a combination of the two is optimal. The chances for judge-shopping are significant (although hardly infinite), particularly when dealing with a class with membership in many states.
Wolfram, supra note 9, at 1232; see also Gregory C. Read, Stand Up and Be Counted, 67 DEF. COUNS. J. 423, 424 (2000).

[FN49]. These lawyers manipulate the legal system by filing massive class actions in "hometown state courts." See Eddie Curran, Legal Growth Industry Has Made Plaintiffs of All of Us, MOBILE REGIS., Dec. 26, 1999 available at http:// www.al.com/news/mobile/Dec1999/5pt-11.html (last visited Dec. 1, 2001) [hereinafter Curran, Legal Growth]. In these smaller, rural forums they will often find "supportive judges, plaintiff-friendly rules, and generous juries." Id.; see generally Geoffrey P. Miller, Class Actions in the Gulf States: Empirical Analysis of a Cultural Stereotype, 74 TUL. L. REV. 1681 (2000).

[FN50]. See Miller, supra note 49, at 1681 (stating that "These states are paradise for plaintiffs' attorneys and purgatory for the defense"); Linda S. Mullenix, Abandoning the Federal Class Action Ship: Is There Smoother Sailing For Class Actions in Gulf Waters?, 74 TUL. L. REV. 1709 (2000) (stating that "[m]any class counsel have abandoned the federal courts in favor of what are perceived to be more receptive state court forums. Against this backdrop, the Gulf States have earned the reputation as 'magnet forums' for class action litigation"). Other jurisdictions that have become favorite venues for lawyers bringing class actions are: Madison County, Illinois, where 70 class actions were filed between January 1, 1998 and March 7, 2001; Jefferson County, Texas, where 41 class actions were filed between January 1, 1998 and January 31, 2001; and Palm Beach County, Florida, where 91 class actions were filed in the 1998 - 2000 period. See John H. Beisner & Jessica D. Miller, They're Making a Federal Case Out Of It ... In State Court, Manhattan Inst., Sept. 2001, at 12, 19, 23.
These states are chosen for a multitude of reasons. Some believe that class counsel selects these fora because they are so remote, thereby making the entire procedure more difficult for defendants. See Glenn A. Danas, The Interstate Class Action Jurisdiction Act of 1999: Another Congressional Attempt to Federalize State Law, 49 EMORY L.J. 1305, 1322 (2000) (quoting Susan Koniak about an approved settlement in Union County, Tennessee: "no one could get there, you couldn't fly to object. And that's common. Often these state courts are picked, and they are in the middle of nowhere. You can't have access to the documents.").
Others propose that these states' popularity with plaintiffs' lawyers may be due to their bias against out-of-state businesses and corporations, and their propensity not to be as rigorous as federal courts in applying the certification standards for a class action. See Victor E. Schwartz, Mark A. Behrens & Leah Lorber, Federal Courts Should Decide Interstate Class Actions: A Call For Federal Class Action Diversity Jurisdiction Reform, 37 HARV. J. ON LEGIS. 483, 484 (2000). "Unlike the scrupulous practice of federal judges, some state judges have taken laissez-faire attitudes toward class certification. As a result, entrepreneurial contingency fee attorneys can bypass the rigorous review given by the federal judges and obtain certification of questionable claims and approval or outrageous settlement agreements." Id. at 499; see also Eddie Curran, Plaintiffs-Friendly County, MOBILE REGIS., Dec. 26, 1999, available at http://www.al.com/news/mobile/Dec1999/5pt-1-5.html (last visited Dec. 1, 2001) (discussing why plaintiffs' lawyers flock to Greene County, Alabama, which has a strong reputation for being

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

pro-plaintiff).

Another theory advanced is that these rural state courts are more receptive to plaintiffs because state court judges are more likely to fraternize with local attorneys who initiate these lawsuits. See, e.g., Eddie Curran, Should Judges, Lawyers Travel Together?, MOBILE REGIS., Dec. 27, 1999, available at http://www.al.com/news/mobile/Dec1999/5pt-2-2.html (last visited Dec. 1, 2001) (citing many instances of such activity, such as state judges accompanying local firms to the Super Bowl, flying in their private planes, and in some cases joining those local firms after they retire from their judgeships. Federal judges, by comparison, are less likely to socialize with lawyers who regularly appear before them.). Aggregative strategies have been widely used in asbestos litigation and have contributed significantly to the enormous expansion of that litigation over the past decade. See Brickman, Asbestos Litigation, supra note 10, at 1868. In addition to the use of aggregations, another major factor in that enormous expansion has been the use of forum shopping. As set forth in infra text accompanying notes 89-151, a defining characteristic of asbestos litigation is the mass production of claims on behalf of unimpaired persons. The geographical distribution of these claims varies on the basis of the propensity for success in that jurisdiction.

In jurisdictions known to be favorable toward asbestos plaintiffs, the ratio of unimpaired, non-malignant claims to malignant claims is dramatically higher than in other jurisdictions, with no rational explanation attributable to medical or biological factors. A recent actuarial study graphically shows this wide variability among states which is not driven by disease but rather by the ability of plaintiffs' lawyers to bring unimpaired claims in pro-plaintiff jurisdictions ....

Babcock & Wilcox's Report to the Court Regarding Asbestos Developments Generally and the Proofs of Claims Filed Here at 13, In re Babcock & Wilcox Co., Civ. No. 00-0558, Bankr. Case No. 00-10992 (E.D. La. Oct. 18, 2001). Particularly pro-plaintiff courts for the bringing of unimpaired asbestos claims are located in certain counties in Texas and Mississippi. Id. at 16 (citation omitted). In Mississippi, the ratio of unimpaired non-malignant claims to malignant claims has been 47:1 since 1998 whereas in California, the ratio has been 2.8:1. Id. at 34 (citation omitted).

[FN51]. See Read, supra note 48, at 424.

[FN52]. See Max Boot, In the Land of Lawsuits, WALL ST. J., Oct. 30, 1996, at A22. (reporting that "the first the companies heard about [the class certification] was when they received notice in the mail that a class action had already been certified ...").

[FN53]. See, e.g., Ex parte Government Employees Ins. Co., 729 So. 2d 299 (Ala. 1999); Ex parte Water Works and Sewer Board of City of Birmingham., 738 So. 2d 783 (Ala. 1998); Ex parte AmSouth Bancorporation, 717 So. 2d 357 (Ala. 1998); Ex parte Citicorp Acceptance Co., 715 So. 2d 199 (Ala. 1997); Ex parte First Nat'l Bank of Jasper, 717 So. 2d 342 (Ala. 1997).

[FN54]. Certain rural counties in Alabama have been favorite havens for the filing of class actions because of the unusual propensity for certain state court judges in that county to certify class actions. See generally Curran, Legal Growth, supra note 49 (discussing the general history of class actions with special focus on the controversial role played by some Alabama attorneys and judges).

Although Alabama trial courts use a "blind lottery" for assigning new cases to judges, out of the seven judges in the Mobile court system, two law firms that specialize in class action suits were frequently able to get their cases assigned to two plaintiff-friendly judges, Judges Braxton Kittrell and Robert Kendall. In fact, in one year period from 1996 to 1997, eleven consecutive class action suits filed by one of these firms were assigned to one of these two judges, whereas no other class actions filed by that firm were assigned to any of the other five Mobile circuit judges. Suspicions raised by this supposedly random "blind lottery" were magnified when following Judge Kittrell's retirement, he was hired as a partner by one of these firms that often sought him out for class certification.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**


See id.

[FN55]. As stated by Professor Mullenix:

Perhaps the most notorious example of [this] ... occurred in the General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation, a consumer class action rejected by both the United States Court of Appeals for the Third Circuit and (subsequently) the Texas Supreme Court. Notwithstanding these well-reasoned and articulated decisions, the plaintiffs' attorneys simply regrouped and pursued separate statewide settlement classes in Louisiana and Georgia.

Mullenix, supra note 50, at 1716.

[FN56]. See id. at 1753-80 (stating that since 1997, the Louisiana Supreme Court and appellate courts have overturned at least five class certifications based on the Supreme Court decision of Amchem Prods., Inc. v. Windsor, 84 F.3d 734 (5th Cir. 1998). As noted, the Alabama Supreme Court has begun to follow many of these same federal standards set primarily by the Fifth and Eleventh Circuit, and the Texas Supreme Court has, since Spring of 2000, reversed class certification on three separate claims); see also Mullenix, supra note 38 (labeling these three Texas rulings as the "Texas trilogy," and further hypothesizing that these cases make it, "much more difficult for plaintiffs to obtain class certification").

[FN57]. This is especially the case in Mississippi, where, since 1995, juries have returned at least nineteen verdicts of nine million dollars or more in litigation involving the manufacturers of prescription drugs, cigarettes, lead paint, and asbestos products, including five verdicts that were over one hundred million dollars each:

[T]he Circuit Court in Jefferson County in rural southwest Mississippi--one of the poorest counties in one of the nation's poorest states--has indisputably become a popular destination for lawyers suing makers of prescription drugs, cigarettes, lead paint and asbestos products .... [The] president of the Mississippi Trial Lawyers Association, which represents plaintiffs' lawyers, said: "The general public may say, 'Who cares state court, federal court, what difference does it make?' In our state, it's the difference between winning and losing. I've gotten many multimillion-dollar judgments in state court over my 17-year career, but I've never won a judgment of any significant size for plaintiffs in federal court."

Robert Pear, Mississippi Gaining As Lawsuit Mecca: High Jury Awards Raise Stakes in Patients' Right Debate, N.Y. TIMES, Aug. 20, 2001, at A1. It is notable that in Jefferson County with only 9,740 occupants, more than 21,000 people were plaintiffs in the period 1995 to 2000. Id.; see also Mullenix, supra note 50, at 1778-80 (reinforcing that this trend of a more stringent standard is still tentative, and that it does not even hold true for all of the "Gulf States." "These federal decisions have had relatively no impact on Mississippi; Florida also remains a popular venue for forum shopping ....").

[FN58]. This was the method used in Texas v. Am. Tobacco Co., 14 F. Supp. 2d 956 (E.D. Tex. 1997) where plaintiffs' lawyers ("private counsel"), hired on a contingency fee basis by Texas Attorney General Dan Morales, filed an action against the tobacco manufacturers in federal district court in the Eastern District of Texas, Texarkana, Division, where U.S. District Court Judge David Folsom solely presided. Of the approximately forty cases filed by the states against tobacco manufacturers, this was the only one filed in federal court. See generally Complaint, Texas v. Am. Tobacco Co., No. 5:96-CV-91 (E.D. Tex. 1996). While Judge Folson did dismiss several of the State's claims, he did sustain the critical parts of the suit, and approved the State's proposed proof of damages by use of a statistical model, the details of which were not available to him when he made his decision. See Patterson & Philpott, supra note 7, at 563-64, 574-75. Most importantly, however, Judge Folsom fully merited the unusual efforts of private counsel to select him to preside over Texas' action against the tobacco companies by consistently ruling in favor of the financial interests of private counsel.

In January 1998, several Texas legislators filed a mandamus action in Texas state court challenging the authority of Attorney General Morales to bind the state to a contingency fee agreement. Private counsel removed that action

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

to the federal court. In re Senator Troy Fraser, No. 5:98-CV-45 (E.D. Tex. 1998). Later, for procedural reasons stemming from an arbitration panel's award of 3.3 billion dollars in fees over a 25-year period, the challenge to Morales' action was found mooted. Fraser v. Real Parties, Nos. 00-40024, 00-40036, 00-40038 (5th Cir. 2000). The effect of this maneuvering was to deny to Texas state courts any role in determining the reasonableness of the fees awarded private counsel under the disciplinary standards adopted by the Texas Supreme Court. Effectively then, Texas courts, and ultimately the Texas Supreme Court, were precluded from applying the Texas Rules of Professional Discipline to determine whether the fees in the tobacco litigation violated the ethical standards adopted by the Texas Supreme Court.

While these and other related proceedings were wending their way through the courts, the Texas press reported that noted Texas attorney, Joe Jamail, had been invited by Morales to be one of the private counsel but, as a condition of selection, would have to pay Morales one million dollars. Jamail stated that he refused the demand and was not one of those selected. See Deborah Tedford, Jury Eyes Tobacco Legal Fees, HOUS. CHRON., Nov. 30, 2000, at 37.

Attorney General Morales did not run for re-election, and in April 2000, a new Texas Attorney General, John Cornyn, filed an action in state court seeking to depose private counsel "to investigate potential claims it [the State of Texas] believes it may possess for conversion and breach of fiduciary duty." State of Texas v. Walter Umphrey et al., No. 00-40999, (5th Cir. 2001). Among the information the State was seeking was to discover whether they should have known that the fee agreement was unenforceable, whether they improperly sought to benefit themselves at the State's expense, and whether tobacco litigation documents were withheld from the state. Id. at note 6. Private counsel removed this action to federal court and Judge Folsom denied the State's motion to remand, invoking the All Writs Act, 28 U.S.C § 1651 (1994), to protect the federal court's judgment. This had the effect of quashing Attorney General Cornyn's investigation. The Fifth Circuit reversed, stating that the federal courts "cannot preclude the State of Texas from investigating potential claims in the milieu of the Texas courts pursuant to Texas law--unless and until such investigation poses an actual threat to the settlement agreement." Id.; see also Mark Ballard, Biggest Little Court in Texas: Plaintiffs Flock to Texarkana, with Billion-Dollar Suits, NAT'L L.J., Aug. 30, 1999, at A1. (The author was retained by the Counsel to the Governor of Texas who was seeking to intervene in the tobacco litigation fee-setting process, to provide an affidavit with regard to: (1) fiduciary issues raised by the actions of Attorney General Morales; and (2) the reasonableness of the attorney fee award. See Texas v. Am. Tobacco Co., No. 5:96-CV-91 (E.D. Tex. 1998) (affidavit of Lester Brickman)).

[FN59]. There are various jurisdictions that require counsel to indicate on a document filed along with their complaint whether any related litigation has been filed in that court. The intent is to assign any such "related" case to the judge already hearing the case to which the new one is "related." Some lawyers use this to their advantage by filing a particular case first to ensure that subsequent related cases are assigned to the judge that presided over the initial case. Georgene M. Vairo, Forum Selection: Judge Shopping, NAT'L L.J., Nov. 27, 2000, at A16 (describing how judge shopping, unlike forum shopping, is universally condemned because it "tends to undermine public confidence in the judicial system. Judge-shopping suggests that justice is not impartial."). Other strategies that counsel have used to better control which judge will be assigned their cases include: filing suit against the assigned judge to pressure him or her to decline presiding over the case; making false accusations against judges to force recusal; filing various lawsuits in a single district and dismissing all of the cases except the one assigned to the plaintiff-friendly judge; refiling previously dismissed lawsuits in the same or a different forum in attempting to win their favored judge; and securing a plaintiff-friendly judge with the assistance of a helpful filing clerk. Id.; see also Weyman I. Lundquist, The New Art of Forum-Shopping, 11 LITIG. 21, 22 (Spring 1985).

[FN60]. Judge Weinstein is "a judge with senior status who is known for unconventional rulings that often push the limits of tort law." See Bob Van Voris, N.Y.'s Judge-Shopping Channel: Tobacco and Gun Plaintiffs Steer Cases to a Brooklyn Court, NAT'L L.J., July 26, 1999, at A4; see also Linda S. Mullenix, Resolving Aggregate Mass Tort Litigation: The New Private Law Dispute Resolution Paradigm, 33 VAL. U. L. REV. 413 (1999) ("Judge

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 WMMELPR 243                                                                                                      Page 28

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

Weinstein, famously the federal judge who negotiated the agent orange settlement and has since managed numerous other mass tort cases, readily analogized mass tort litigation to the 1960s institutional reform litigation with which he was very familiar."). As explained by Judge Weinstein:

Mass tort cases are akin to public litigations involving court-ordered restructuring of institutions to protect constitutional rights. In dealing with such mass tort cases ... I have sensed an atmosphere similar to that of public interest cases I have supervised .... Mass tort cases and public litigations both implicate serious political and sociological issues. Both are restrained by economic imperatives. Both have psychological underpinnings. And both affect larger communities than those encompassed by the litigants before the court.

Jack B. Weinstein, Ethical Dilemmas in Mass Tort Litigation, 88 NW. U. L. REV. 469, 472-74 (1994). Judge Weinstein's activist philosophy is also reflected in his book on mass tort litigation, in which he states: "by their very nature, these [mass tort] cases involve unanticipated problems with wide-ranging social and political ramifications. A judge does not legislate from the bench simply because he or she considers the broadest implications of his or her decision in such a case. Judges not only may take such a view, they must." WEINSTEIN, supra note 21, at 92-93 (1995); see also William Glaberson, A Judge Shows Who's the Boss: Dressing Down Lawyers, and Dressing Up Gigante, N.Y. TIMES, July 20, 1997, at 21. "To liberals, [Weinstein] is an emblem of the 1960s notion that the country's problems can be solved by good intentions and that the legal system can be a tool for reform. To conservatives, he is the epitome of judicial power run amok." Id.

[FN61]. Separate groups of plaintiffs' lawyers targeting Big Tobacco and the gun industry are steering cases to a maverick federal judge in Brooklyn, N.Y., apparently hoping he will accept novel theories of industry-wide liability that might not succeed in any other courtroom in America.

In April, plaintiffs' lawyers quietly filed a nationwide smokers' class action against seven tobacco industry defendants in the Eastern District of New York. They had gotten the case assigned to Judge Jack B. Weinstein, a judge with senior status who is known for unconventional rulings that often push the limits of tort law. Sturgeon v. Philip Morris Inc., No. 99-1988.

Then on July 12, 1999, the National Association for the Advancement of Colored People (NAACP) announced that it planned to sue gun manufacturers and distributors throughout the country, in an effort to change radically the way guns are distributed and sold in the United States. The intended forum? Judge Weinstein's court.

Judge Weinstein was on the sidelines of the cigarette wars until asbestos industry lawyers sued Big Tobacco in 1997, trying to recover a share of the money paid to asbestos workers who smoked. That case was assigned to Judge Weinstein as a case related to his role in the asbestos litigation. The cases were seen as related because the Manville Trust, reformulated under the supervision of Judge Weinstein, had sued "Big Tobacco" in 1997 in an attempt to recover some of the damages they paid to claimants alleging lung cancer caused, at least in part, by exposure to asbestos-containing products, but who also smoked and had not sued tobacco companies for their injuries because suits against asbestos defendants were far more successful. Since then three major tobacco cases, including Sturgeon, have been assigned to Judge Weinstein, all on the ground that they are related to earlier cases.

Similarly, lawyers representing the NAACP plan to claim that their case is related to Hamilton v. Accu-tek, 62 F. Supp. 2d 802 (E.D.N.Y. 1999), a gun liability case tried in front of Judge Weinstein. Hamilton, in turn, was assigned to Judge Weinstein based on claims by plaintiffs' lawyers that it was related to a 1981 gun liability case and a case over the drug diethylstilbestrol (DES). Id.

Along the way, tobacco and gun defendants have challenged the assignment of Judge Weinstein, but to no avail. Normally, cases in the eastern district are assigned at random. When the complaint is filed, however, plaintiffs' lawyers state whether the case is "related to" another case in the courthouse.

Van Voris, supra note 60, at A4.

[FN62]. Judge Weinstein's attempts to change the law with regard to the manufacture, sale, and distribution of guns failed. In Hamilton, he held that gun manufacturers had a duty to control the marketing decisions of retailers in the distribution chain. Hamilton, 62 F. Supp. 2d at 808. This was an unprecedented expansion of existing tort law. See

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

Patterson & Philpott, supra note 7, at 593. Judge Weinstein was essentially reversed by the New York Court of Appeals in Hamilton v. Beretta, No. 36, 2001 N.Y. LEXIS 946 (N.Y. Apr. 26, 2001), when that court resoundingly answered "no" to two questions certified to it by the Second Circuit that emanated from Judge Weinstein's ruling in Hamilton. Hamilton v. Accu-tek, 62 F. Supp. 2d 802 (E.D.N.Y. 1999) questions certified, Hamilton v. Beretta U.S.A. Corp., 222 F.3d 36 (2d Cir. 2000), questions certified answered, No. 36, 2001 N.Y. LEXIS 946 (N.Y. Apr. 26, 2001). The questions certified were: "(I) Whether the defendants owed the plaintiffs a duty to exercise reasonable care in the marketing and distribution of the handguns they manufacture?, [and] (II) Whether liability in the case could be apportioned on a market share basis, and, if so, how?" Hamilton, 222 F.3d at 36. For a discussion of the Hamilton cases and of the failure of negligent marketing claims in firearm litigation, see Anne G. Kimball & Sarah L. Olson, When All Else Fails, Blame Madison Avenue: Negligent Marketing Claims in Firearm Litigation, 36 TORTS & INS. L.J. 981 (2001).

[FN63]. See Carrie Menkel-Meadow, Ethics and the Settlements of Mass Torts: When the Rules Meet the Road, 80 CORNELL L. REV. 1159, 1189-90 (1995).

[FN64]. In class actions and other aggregative forms of litigation, there is a conflict between the financial interests of the lawyers and the class they represent. MANUAL FOR COMPLEX LITIGATION (THIRD) § 23.24 (1995); see also supra notes 9-11.

[FN65]. See WEINSTEIN, supra note 21, at 74-76 (stating that "plaintiffs' attorneys in class and derivative cases ... operate with nearly total freedom from traditional forms of client monitoring"). Because most settlements are rarely the subject of published judicial decisions, it is likely that at least some of the most abusive settlements escape attention.

[FN66]. For discussion of ethical issues raised by mass tort litigation, see Sarah A. Toops, Ethically Representing Thousands of Plaintiffs: Conflict Problems in Mass Toxic Harm Cases, 67 DEF. COUN. J. 462 (2000).

[FN67]. See id. at 465-66.

[FN68]. See e.g., Eric Felton, The Asbestos Gospel of Baseball's St. Peter, WKLY. STANDARD, Sept. 18, 1995, at 46; Kate O'Beirne, How Trial Lawyers Bankroll the Democratic Party, NAT'L REV., Aug. 20, 2001, at 26; Peter Passell, Challenge to Multimillion Dollar Settlement Threatens Top Texas Lawyers, N.Y. TIMES, Mar. 24, 1995, at B6.

[FN69]. For an official report of the terms of the prospect settlement, see Proposed Resolution, June 20, 1997 (on file with author).

[FN70]. Id. Tit. VIII(B)(5).

[FN71]. For the history of the setting up of the Manville Trust, see Findley v. Blinken (In re Joint E. & S. Dist. Asbestos Litig.), 129 B.R. 710, 752- 54, Civ. A. No. 90-3973 (Bankr. E. & S.D.N.Y. 1991); see also infra note 114.

[FN72]. Currently, the Trust will pay five percent of the liquidated value of claims filed with it. See DEBORAH HENSLER ET AL., RAND INST. FOR CIVIL JUSTICE, DOCUMENTED BRIEFING, ASBESTOS LITIGATION IN THE U.S.: A NEW LOOK AT AN OLD ISSUE 35 (2001).

[FN73]. Future claims reduce the percentage paid of past claims because the percentage of the full value of claims that the Trust pays is a function of the total number of claims. Accordingly, plaintiff lawyers routinely violate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 WMMELPR 243                                                                                              Page 30

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

Model Rule 1.7 when they represent new clients whose potential awards will be jeopardized by the lawyers' actions to secure full compensation for their previous clients, as well as violate their fiduciary obligations to their previous clients because the new clients' claims will reduce the amounts to be actually paid to the previous clients. See Frank J. Macchiarola, The Manville Personal Injury Settlement Trust: Lessons for the Future, 17 CARDOZO L. REV. 583, 585 (1996). This problem is illustrated in Findley v. Falise, 878 F. Supp. 473 (E. & S.D.N.Y. 1996). If the attorney was successful in getting the earlier asbestos claims paid in full, there would be nothing for the later claimants that he also represented. The attorney therefore had an ethical obligation to disclose this conflict of interest to his clients and secure their waiver, which of course, he did not do.

[FN74]. Brickman, Asbestos Litigation, supra note 10, at 1835 n.62 (estimating that lawyers paid themselves between $226,600,000 and $306,000,000 at the rate of $5,000 an hour for the administrative task of settling the first round of claims against the Trust, in groups of hundreds and thousands).

[FN75]. The fact that the prohibition against the Trust bringing suit did not ultimately survive does not exonerate the asbestos/tobacco lawyers from having placed their financial self-interest above that of their clients' interests.

[FN76]. See Lester Brickman, On the Relevance of the Admissibility of Scientific Evidence: Tort System Outcomes are Principally Determined by Lawyers' Rates of Return, 15 CARDOZO L. REV. 1755, 1783-84 (1994). This article states that:
    In mass consolidations, one of the specific mechanisms by which higher valuations are created is the lumping together in one or more minitrials which are often a part of a mass consolidation, the claims of a few seriously injured claimants who merit substantial compensation with the claims of many who are unimpaired. In such circumstances juries apparently "lend" some of their sympathy for the seriously injured claimants to those who are unimpaired and significantly under compensate the seriously injured while substantially overcompensating those who are unimpaired. In the aggregate, however, the total valuation for the claims far exceeds what individual trials would yield.
Id. at 1783-84; see also Weinstein, supra note 60. Weinstein argues that:
    [C]onsolidations do tend to encourage the commencement of suits of questionable merit. Since consolidated cases probably will be settled in large groups, the less defensible claims are likely to obtain more than they would if they were litigated (assuming they would have been brought at all), while the more serious claims will probably be settled for less then they would in individual suits.
Id. at 480.

[FN77]. Carrington & Apanovitch, supra note 11, at 471.

[FN78]. See WEINSTEIN, supra note 21, at 64 (noting that "mixing the case for trial and settlement may result in a lower recovery for the more seriously injured, but generally it will result in a quicker fee for counsel").

[FN79]. See In re Polybutylene Plumbing Litig., 23 S.W.3d 428 (Tex. App. 2000), where the appellate court gave its blessing to the enforcement of 37,100 individual fee contracts, most of them providing for a 40% contingency fee, totaling $88.8 million in attorneys' fees, and reversing the district court's treatment of the case as in effect a class action. The lower court also had reduced the fee total to 20% for the cases that did not go to trial, and awarded a total fee of $33.1 million (a $55.7 million reduction).

[FN80]. See Menkel-Meadow, supra note 63, at 1181 (noting that "mass tort lawyers have long been settling 'inventories' of cases in which they settle for large amounts of 'fixed funds' and then allocate specific awards themselves to individual plaintiffs"). For an account of an aggregated settlement found to have violated Rule 1.8(g), see Arce v. Burrow, 958 S.W.2d 239 (Tex. App. 1997).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 WMMELPR 243                                                                                    Page 31

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

[FN81]. See generally Joshua H. Threadcraft, Note, The Class Action Settlement: When the Good Can Become the Bad and the Ugly, 25 J. LEGAL PROF. 227 (2001).

[FN82]. MODEL RULES OF PROF'L CONDUCT R. 1.8(g) (1983):
   A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients ... unless each client consents after consultation, including disclosure of the existence and nature of all the claims involved and of the participation of each person in the settlement.
See also DR 5-106 (22 NYCRR § 1200.25), entitled "Settling Similar Claims of Clients:"
   A lawyer who represents two or more clients shall not make or participate in the making of an aggregate settlement of the claims of or against the clients, unless each client has consented after full disclosure of the implications of the aggregate settlement and the advantages and risks involved, including the existence and nature of all the claims involved and the participation of each person in the settlement.

[FN83]. Menkel-Meadow, supra note 63, at 1181 n.93. Judge Weinstein has acknowledged that although aggregate settlements violate ethical rules, judges encourage them in order to rid their docket of many cases:
   Even though bulk settlements may technically violate ethical rules, judges often encourage their acceptance to terminate a large number of cases. The defendants generally prefer them because they save transaction costs and usually result in savings per case. Plaintiffs' counsel like them because they generally do not reduce their percentage fee per case so that, because of the large settlement amounts, their lawyer's hourly fees jump spectacularly.
WEINSTEIN, supra note 21, at 74.

[FN84]. 521 U.S. 591 (1997), aff'g 83 F.3d 610 (3d Cir. 1996), decision below, 878 F. Supp. 716 (E.D. Pa. 1994); see also Flanagan v. Ahearn, 134 F.3d 668 (5th Cir. 1998); see generally Susan P. Koniak, Feasting While the Widow Weeps: Georgine v. Amchem Products, Inc., 80 CORNELL L. REV. 1045 (1995) (discussing unethical behavior of class counsel).

[FN85]. 27 U.S. 815 (1999). Ortiz also involved the issue of whether the class action settlement qualified as a "limited fund." George M. Cohen, The "Fair" Is the Enemy of the Good: Ortiz v. Fibreboard Corporation and Class Action Settlements, 8 SUP. CT. ECON. REV. 23 (2000).

[FN86]. Committee Note, Proposed Rules: Amendments to Federal Rules, Proposed Amendments to the Federal Rules of Civil Procedure, Rule 23. Class Actions, 167 F.R.D. 523 (1996).

[FN87]. For a discussion of the proposed amendments, see Darren M. Franklin, The Mass Tort Defendants Strike Back: Are Settlement Class Actions A Collusive Threat or Just a Phantom Menace?, 53 STAN. L. REV. 163 (2000) .

[FN88]. See Eric D. Green, Advancing Individual Rights Through Group Justice, 30 U.C. DAVIS L. REV. 791, 794 (1997). Recent efforts to introduce settlement classes into the regime of Rule 23 "set off a firestorm of opposition by the academic community" leading more than 120 law professors to organize a steering committee to oppose the changes. Id.

[FN89]. For a description of asbestos litigation, see generally Brickman, Asbestos Litigation, supra note 10; Lester Brickman, The Asbestos Claims Management Act of 1991: A Proposal to the United States Congress, 13 CARDOZO L. REV. 1891 (1992); Effects of Asbestos Injury Litigation on Federal and State Court Systems: Hearings Before the Subcommittee on Intellectual Property and Judicial Administrations of the House Judiciary Comm., 102nd Cong., 1st (1991) (statement of Lester Brickman).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

[FN90]. The number of unimpaired "exposure only" pleural plaque claims, see infra note 93, has been far eclipsed in the past several years by a huge increase in the number of asbestosis claims brought on behalf of unimpaired persons. Asbestosis is defined infra note 112; the proposition that huge numbers of asbestos claims are being brought on behalf of unimpaired claimants is set forth in the infra text accompanying notes 112-36.

Overall, asbestos claiming activity has increased substantially in recent years--more than doubling in the past five years. The huge increase appears to be a function of the beginning of the end game in asbestos litigation. Plaintiff lawyers fear that the defendants they anointed in the mid-1980s to take the place of the Johns-Manville Corporation are on the verge of extinction--most have filed for bankruptcy and as for the few that have not yet done so, it is only a matter of time. Attempts to inculpate so-called non-traditional defendants such as Ford Motor Co., Pfizer, Dana (an auto parts manufacturer), Viacom (as successor to parts of Westinghouse Electric Corp.), Dow Chemical, 3M, Georgia-Pacific, IBM, AT&T, and Sears have sputtered along, although recent litigation against Metropolitan Life Insurance Co. and Halliburton has been quite successful. See Richard B. Schmitt, How Plaintiff Lawyers Have Turned Asbestos into a Court Perennial, WALL ST. J., Mar. 5, 2001 at A1; J. David Isaac, Asbestos Claims Run Amok: Is Halliburton Next Victim?, INVESTORS BUS. DAILY, Jan. 23, 2002, at A18; see also Gregory Zuckerman, Specter of Costly Asbestos Litigation Haunts Companies, WALL ST. J., Dec. 27, 2000 at C1; Editorial, Lawyers Torch the Economy, WALL ST. J., Apr. 6, 2001, at A14 ("[T]he net has stretched from asbestos makers to companies far removed from the scene of any punitive wrongdoing."). While "there is reason to believe that non-traditional defendants are paying an increasing share of the costs to resolve asbestos injury claims," HENSLER, supra note 72, at 11, it is yet unclear whether the attempts to inculpate a whole new set of defendants will succeed. Plaintiff lawyers, however, fearing that the end game may have begun, are rushing to bring new claims against the traditional defendants before all of their assets are totally dissipated. See also infra note 151.

[FN91]. For an account of how lung function tests are manipulated to produce "positive" results, that is, to indicate impaired lung function, see infra note 110.

[FN92]. There is ample reason to conclude that much medical testimony presented in asbestos litigation is specious. See infra notes 110-141.

[FN93]. See Brickman, Asbestos Litigation, supra note 10, at 1852.

[FN94]. Id. at 1855-59.

[FN95]. See Brickman, Asbestos Litigation, supra note 10, at 1853-54; see also In re Joint E. & S. Dists. Asbestos Litig., 129 B.R. 710, 748 (E. & S.D.N.Y. 1991) (working "[i]n conjunction with unions, [plaintiffs' lawyers] have arranged through the use of medical trailers and the like to have x-rays taken of thousands of workers without manifestations of disease and then filed complaints for those that had any hint of pleural plaque"); Eagle-Picher Indus. v. Am. Employers' Ins. Co., 718 F. Supp. 1053, 1057 (D. Mass 1989) (stating that "many of these cases result from mass x-ray screening at occupational locations conducted by unions and/or plaintiffs' attorneys, and many claimants are functionally asymptomatic when suit is filed"); Christine Biederman et al., Toxic Justice, DALLAS              OBSERVER,              Aug.              13,              1998,              available              at http://www.dallasobserver.com/issues/1998-08-13/feature.html/page1.html (last visited Dec. 1, 2001):

  Asbestos workers often find their way to [a leading Texas law firm which specializes in asbestos litigation, hereinafter, the "Firm"] ... after a health screening arranged by another law firm and a trade union. Together, the union and the local law firm round up a group of the skilled laborers who constitute [the Firm's] ... clientele, sending out notice of the free screening. The men, many of whom know someone who died from asbestos disease, come from miles around.

  According to trial testimony from doctors, the union and the law firm pay for a lung doctor to examine up to 200

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

men a day using equipment rented from a local hospital or hauled in by the doctor in a tractor-trailer rig. The union men are X-rayed, and the films are usually developed on the spot. Frequently, an attorney is standing by to sign up anyone whose examinations show any evidence of asbestos exposure.

After the workers are X-rayed and referred to a lawyer, the local attorney typically sends the case to [the Firm] .... (According to [a principal of the Firm] ... the referring firm usually gets up to one-third of [the Firm's] ... 40 percent contingency fee.)
Biederman et al., supra, at 14.
For commentary on the 40% contingency fee, see supra note 10. The use of medical screenings to amass large numbers of claimants is not restricted to asbestos-related claims:

Lawyers find potential clients through advertisements that offer "free screenings" and consultations. A typical advertisement this month in the Fayette Chronicle appealed to Jefferson County residents who had used two popular arthritis drugs.

....

"If you or someone you know has taken Vioxx or Celebrex and suffered any serious side effects (including death, heart attack, stroke, seizure, kidney and liver damage, pregnancy complications, birth defects or high blood pressure), you may have a claim!" the advertisement said. "Contact Stamps & Stamps, attorneys at law, to discuss your legal rights."
Robert Pear, Mississippi Gaining As Lawsuit Mecca, N.Y. TIMES, Aug. 20, 2001, at A1.

[FN96]. As for proximate cause, that step is basically finessed by evidence of exposure and medical testimony, which is always available, that exposure can lead to an asbestos-related disease. The jury then fills in the missing link by concluding that there is causation. See infra note 142.

[FN97]. Because of the high volume of asbestos claims and the automated nature of the claim preparation process, most if not all of the intake is done by paralegals. The claimant will typically not see a lawyer until the actual deposition. See Thomas Korosec, Homefryin' with Fred Baron; Dallas' Largest Plaintiff's Firm, Baron & Budd, Cultivates Friends, Punishes Enemies and Beats Allegations It Prompts Clients to Lie and Win, DALLAS OBSERVER, Mar. 29, 2001, available at http://www.dallasobserver.com/issues/2001-03-29/feature.html/page1.html (last visited Dec. 1 2001) (describing the firm's "high-volume legal assembly line," which consisted of seventy lawyers and 400 paralegals who move "tens of thousands of asbestos claims through the courts").

[FN98]. According to a paralegal that had worked at the Firm, the methods used by the Firm's product-identification staff included "start[ing] with a printout from the Social Security Administration listing every job the workers ever held. She would set up a meeting with the clients, usually at their homes, and she would spend weeks on the road traveling from interview to interview." Biederman et al., supra note 95, at 18.

[FN99]. See Korosec, supra note 97 (indicating that the Firm keeps a database on what asbestos products were used at various workplaces).

[FN100]. From here on in this hypothetical exposure-only claim development description, I am relying in part on a memorandum used by the firm in Texas and possibly elsewhere to "prepare" exposure-only claimants for depositions, which was inadvertently produced in response to a discovery request (on file with author). See testimony of Eugene Cook, former justice of the Texas Supreme Court; In re All Asbestos-Related Personal Injury or Death Cases Filed or To Be Filed in Bexar County, Texas, No. 94-CI-10078, 285 Jud. Dist. Bexar Cty. Dist. Ct., Oct. 20, 1997, at 73 (describing the Script Memo as "a cancer in the legal system"). The Script Memo has been the subject of extensive discussion. See, e.g., Abner et al. v. Elliot, 85 Ohio St. 3d 11 (Ct. App., Mar. 17, 1999); In re Beverly Jean Brown et al., No. 03-97-00609-CV (Tex. Ct. App., Jan. 29. 1998) (unpub. op.); Michael Saul, Grand

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 WMMELPR 243                                                                                                      Page 34

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

Jury Doesn't Act Against Law Firm that Had Been Accused of Coaching Clients, DALLAS MORNING NEWS, July 17, 1998, at 22A; Lester Brickman & Ronald Rotunda, When Witnesses Are Told What To Say, WASH. POST, Jan. 13, 1998, at A15; Witness Preparation Memos Raise Questions About Ethical Limits, [Current Reports] Laws. Man. on Prof. Conduct (ABA/BNA) at 48-54 (February 18, 1998); Charles Silver, Preliminary Thoughts on the Economics of Witness Preparation, 30 TEX. TECH L. REV. 1383, 1398-1401 (1999); W. William Hodes, The Professional Duty to Horseshed Witnesses-- Zealously, Within the Bounds of the Law, 30 TEX. TECH L. REV. 1343 (1999); Bob Van Voris, A Cautionary Tale, Client Memo Embarrasses Dallas Firm, Baron & Budd Coaching of Witnesses Called Improper, NAT'L L.J., Oct. 13, 1997, at A1.

[FN101]. See Biederman et al., supra note 95:
    The case then goes to [the Firm's] ... foot soldiers, the product-identification paralegals. These mostly young women make the initial face-to-face contact with the clients. They help the clients draft work histories and show them the "picture books" from which the clients, in theory, pick out the products they recall using.
    The paralegals have the primary contact with the workers, helping them prepare their answers and readying them for deposition and possible trial. ("Depo prep," as it is called at the firm, is an essential part of the process. By [a principal of the Firm's] ... own estimate, about 97 percent of the cases [the Firm] ... files do not go to trial, so the answer the workers give during depositions can play an important role in determining whether they get a settlement.)
    ....
    Paralegals say--and neither [of the two principles of the Firm] ... denies--that workers are selectively shown pictures of asbestos products they should identify. Kuntze [the paralegal] says that in meetings with clients, she would bring a "3-or 4-or 5-inch binder with pictures of asbestos products, divided up according to manufacturer. I'd go through page by page and encourage the client to recall the products they recall. It would be pretty strong encouragement. Most of the time when I left, I had ID for every manufacturer that we needed to get ID for."
    She already had the answers, she says. Kuntze just needed the worker to agree she had the correct ones. Most would wise up pretty quickly, she says. "Clients understood that products need to be ID'd for the manufacturers we sued," she says.
Id. at 15, 18; see also Korosec, supra note 97 (The article describes an interview with a former paralegal at the Firm in which the paralegal "says he was pretty good at his job [of finding witnesses to support claims] and he'd usually end up getting many men to say many things they had no idea about before he called. 'I'd get 'em to identify every one,' he says of his list of 20 or more products.").

[FN102]. "[Y]ou must study your work history sheets [that I have prepared for you] Over and Over and Over ... How well you know the name of each product and how you were exposed to it will determine whether that defendant will want to offer you a settlement." Script Memo, supra note 100, at 1. The Script Memo then goes on to describe in detail the various asbestos-containing products used at specific work sites, and how the product was used. Id. at 2-12. The claimant is instructed to say "you saw the NAMES [of the product] on the BAGS." Id. at 2. "The more often you were around the product [as indicated by your testimony], the better for your case." Id. The claimant is also told to know the names of his co-workers who have been designated as his witnesses, including being able to describe their appearance. Id. at 1. Finally, he is instructed to "[s]tudy hard, memorize as much as you can and practice saying all the product names out loud." Id. at 19.

[FN103]. "You will be asked if you ever saw any WARNING labels on container of asbestos. It is important to maintain that you NEVER saw labels on asbestos products that said WARNING or DANGER. You might even be asked to spell 'WARNING' or 'DANGER' to prove you would know what it meant if you saw it." Id. at 14. He is also instructed that if asked whether he ever used respiratory equipment to protect him from asbestos, the answer is "No" even if he did wear a mask for welding or other fumes. Id.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

[FN104]. "Do not mention product names that are not listed on your Work History Sheets." Id. at 15; see also Biederman et al., supra note 95, at 19 (indicating that a paralegal at the firm stated that "her supervisors, two lawyers, told her to discourage identification of Johns-Manville products because the Manville Trust was not paying claims rendered against it at the time"); HENSLER, supra note 72 (indicating that Manville Trust claims today are being paid at 5 percent of their liquidated value).

[FN105]. At the time of the Johns-Manville bankruptcy in 1982, plaintiffs had testified that Manville's products constituted 75-80% of the asbestos-containing products used at the U.S. Navy shipyards. However, once the bankruptcy took place, the larger the Johns-Manville share of the asbestos-containing products to which plaintiffs alleged exposure, the less the value of any judgment because judgments against Manville were all stayed for a significant period and then heavily discounted due to the bankruptcy. A sea change in plaintiffs' testimony then took place and the Johns-Manville share of the asbestos-containing products used at the work sites, ten, twenty and thirty years earlier, dropped dramatically. One witness who had apparently not sufficiently studied his script, testified after the bankruptcy that "basically, most of the material, Johns-Manville, I'm sure, was used on all of them." He then quickly added: "I wasn't supposed to mention that, was I?" Andrew T. Berry, Asbestos Personal Injury Compensation and The Tort System: Beyond "Fix It Cause It's Broke," 13 CARDOZO L. REV. 1949, 1951 n.9.

[FN106]. Script Memo, supra note 100, at 12.

[FN107]. See Korosec, supra note 97 (describing the interview previously referred to supra note 101, stating that the paralegal "recalls being uncomfortable from the start with telling witnesses how to testify. 'What I was doing was fraudulent. There was never any doubt in my mind about it.'").

[FN108]. Script Memo, supra note 100, at 14.

[FN109]. Id. at 17-19.

[FN110]. In some cases where impaired lung function is claimed, it is evidenced by a PFT test, which measures total lung capacity, forced vital capacity, and diffusion capacity by blowing into a tube as forcefully as possible. Any failure on the part of the claimant to blow into the tube as forcefully as possible can result in "evidence" of impaired lung function. However, the test administrator is required to note whether the patient has used "poor effort." In 1996, Owens-Corning-Fiberglass, Inc. ("OCF") filed suit in federal court in Louisiana against several businesses that were established to administer pulmonary function tests to would-be asbestos claimants. See First Amended Complaint, Owens-Corning v. Glenn E. Pitts, Jewel D. Pitts, Larry M. Mitchell, M.D., Leon Hammonds, Robert Colgan, Pulmonary Advisory Services, Inc., Pulmonary Advisory Services of Louisiana, Inc., and Pulmonary Testing Services, Inc., Civil Action No. 96-2095 (E.D. La., filed Aug. 14, 1998). The PFT enterprises were set up by an accountant with no medical training or experience in pulmonary testing. See Deposition of Glenn Pitts (a principal of the testing enterprises), Jackson, Mississippi, April 21, 1997 at 38-40, taken in Scott v. Metropolitan Life Ins. Co. et al., No. 74-681 (34th Judicial Dist. For Parish of St. Bernard, La., filed Aug. 1, 1994). Pitts states that he went into the PFT testing business because of the "big potential out there ...." Id. at 62. Much of the original business that the enterprises received was from law firms that wanted the enterprises to do retesting of would-be clients. Id. at 83-84. The x-ray work was performed at a chiropractic clinic across the street from the shopping center where one of the testing enterprises was located. Id. at 49. In August 1998, OCF filed its First Amended Complaint in this matter [hereinafter OCF, First Amended Complaint]. In it, OCF charged that defendants manipulated the administration of PFT tests in order to obtain false positive results, and alleged that:

  In tens of thousands of cases, Defendants, with the intent to defraud Owens Corning, systematically and deliberately deviated from [the] established [PFT testing] standards in order to create false "positive" PFT results,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 WMMELPR 243

Page 36

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

i.e., results, which falsely indicate pulmonary impairment. Specifically, Defendants, in performing spirometric PFTs:
• Systematically disregarded the well-established PFT requirement that, in order to produce valid PFT results, each subject must exhale for at least 6 seconds;
• Systematically disregarded the well-established PFT requirement that, in order to produce valid PFT results, each subject must be administrated three reproducible tests;
• Systematically disregarded the well-established PFT requirement that, in order to produce valid PFT results, each subject must be retested if the variability of his two highest test results exceeds 5%;
• Repeatedly instructed individuals not to exhale forcibly, as required to produce valid PFT results;
• Repeatedly instructed technicians to prevent the computerized PFT equipment from producing readily available data demonstrating the gross inadequacy of the tests being performed; and
Repeatedly instructed technicians to produce PFT reports that disguise the testing procedures used to generate the false-positive results.
OCF, First Amended Complaint ¶ 4.
OCF further alleged (and supplied documentary evidence in support) that these enterprises charged the attorneys who supplied most of the test-takers $700 if the tests were positive for diminished lung function but only $400 if the tests were negative. Id. ¶ 38. See Bill sent by Pulmonary Testing Services of LA, Inc. to Maples & Lomax, a Mississippi law firm, stating charges of $700 each for 33 positive test-takers and $400 apiece for 34 negative test takers, Mar. 15, 1993 (on file with author); a Bill dated May 10, 1993 stating 49 positive test takers at $700 apiece and 20 negative test takers at $400 apiece (copy of exhibit on file with author).
The complaint further alleged that in cases where test takers were not represented by an attorney at the time of the testing but then tested "positive," the enterprises referred those individuals to plaintiffs' asbestos law firms which had established relationships with the testing enterprises and which had agreed in advance with the testing enterprises to pay for the tests done on unrepresented individuals who produced "positive" PFT results. OCF, First Amended Complaint ¶ 39.
The complaint further alleged that several union officials were on the payroll of one or more of the testing enterprises. Id. ¶ 40.
The complaint further alleged that at one point in time, the testing enterprises had entered into fee splitting arrangements with certain plaintiffs' asbestos law firms. Id. ¶ 40. One such arrangement involved a 15% contingency fee paid attorney for which the enterprise did PFTs. See Deposition of Glenn Pitts, supra, at 132-35, 198.
The complaint further alleged that over a period of a few years, the testing enterprises were paid millions of dollars for their services. OCF, First Amended Complaint, ¶ 43.
OCF apparently discontinued this lawsuit when it entered into a global settlement with asbestos attorneys.

[FN111]. One of the ways in which the claims of unimpaired persons are monetized is through the testimony of medical experts. There is ample reason to believe that much medical testimony presented in asbestos litigation is specious. See, Brickman, Asbestos Litigation, supra note 10, at 1847 n.120. Dr. Robert Jones, an expert in internal and pulmonary medicine, has testified to the effect that "most asbestos-related disease claims are specious because they are manufactured for the purpose of litigation ... A lot of the claims in this case had been fabricated specifically to bring to court and to enrich attorneys." See Abadie et al. v. Metropolitan Life Ins. Co, 784 So. 46, 47 (La. Ct. App. 2001). "Courts have acknowledged the tendency of medical screeners to depart from accepted medical standards by diagnosing asbestos-related 'injuries' that fail to meet minimum diagnostic criteria set by the American Thoracic Society of the American Medical Association, which has no affiliation with or control by defendants." Schwartz & Lorber, supra note 27, at 252-53 (citation omitted).

[FN112]. Asbestosis is interstitial lung fibrosis, or scarring, caused by asbestos. See Andrew Chung, Nonneoplastic Disease Caused by Asbestos, in PATHOLOGY OF OCCUPATIONAL DISEASE 313 (Andrew Churg & Francis

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

H.Y. Green eds., 2d ed. 1998). For a discussion of asbestosis, see Brickman, Asbestos Litigation, supra note 10, at 1846 n.112. Out of 221,375 personal injury Proofs of Claim filed by the July 30, 2001 Bar Date in the Babcock & Wilcox bankruptcy, 176,982 (80%) asserted an asbestosis claim. Babcock & Wilcox's Report to the Court Regarding Asbestos Developments Generally and the Proofs of Claims Filed Here at 50, In re Babcock & Wilcox Co., Civ. No. 00-0558, Bankr. Case No. 00-10992 (E.D. La. Oct. 18, 2001). Of these, the vast majority, 130,945, showed no clinical impairment. Id. The sheer number of the claims asserted in the post-petition period is especially indicative in view of the fact that in the prior two decades, a total of 410,000 asbestos-related claims were submitted to Babcock & Wilcox. Id. at 49. The huge increases in asbestosis claims being brought on behalf of unimpaired claimants has been attributed to the massive Georgine settlement which was invalidated in Georgine v. Amchem Products, Inc., 83 F.3d 610 (3rd Cir. 1996), and in Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997), aff'g 83 F.3d 610 (3d Cir. 1996), decision below, 878 F. Supp. 716 (E.D. Pa. 1994). Under the terms of that settlement, future pleural plaque claims were awarded no compensation, see Babcock & Wilcox's Report to the Court Regarding Asbestos Developments Generally and the Proofs of Claims Filed Here at 34, In re Babcock & Wilcox Co., Civ. No. 00-0558, Bankr. Case No. 00-10992 (E.D. La. Oct. 18, 2001); see also infra text accompanying note 115, whereas future asbestosis claims were to be compensated. According to the filing in the Babcock & Wilcox bankruptcy, from 1993 to 1994, the number of asbestosis claims received by Babcock & Wilcox rose from 15,353 to 21,844 and in 1995, increased to 31,399. Babcock & Wilcox's Report to the Court Regarding Asbestos Developments Generally and the Proofs of Claims Filed Here at 34, In re Babcock & Wilcox Co., Civ. No. 00-0558, Bankruptcy Case No. 00-10992 (E.D. La. Oct. 18, 2001). For the Manville Trust, the number of (mostly unimpaired) asbestosis and pleural plaque claims increased from 28,059 in 1999, to 53,094 in 2000 to 65,672 in 2001 (up through November 30, 2001). See Chart, Evaluated TDP Claim Filings, filed by the Manville Trust in response to order of November 7, 2001 scheduling a hearing for December 13, 2001 to determine whether "changed circumstances warrant ... modifications of "prior judgments regarding use of medical audits. In re Asbestos Litigation, CV 91-875, CV 90-3973 (before J. Weinstein and J. Lifland). "[C]laimants' counsel were [thus] reclassifying their clients' unimpaired pleural claims as 'asbestosis' to defeat the Georgine exclusion for pleural claims." Babcock & Wilcox's Report to the Court Regarding Asbestos Developments Generally and the Proofs of Claims Filed Here at 34, In re Babcock & Wilcox Co., Civ. No. 00-0558, Bankr. Case No. 00-10992 (E.D. La. Oct. 18, 2001).

[FN113]. See Carl B. Rubin & Laura Ringenbach, The Use of Court Experts in Asbestos Litigation, 137 F.R.D. 35 (1991). "It became apparent [in asbestos cases] that the plaintiffs had available a group of experts who always found asbestosis. They were countered by a group of defendant experts who rarely if ever found asbestosis." Id. at 38. To combat this "battle of the experts," Judge Rubin appointed medical experts for the court in sixty-five (65) asbestos personal injury pending cases. Id. at 37. Judge Rubin's use of court-appointed experts resulted in a drastic decline in the diagnosis of asbestosis. Although plaintiff's experts undoubtedly would have testified that every single one of the 65 plaintiffs had asbestosis, the court-appointed experts found that 10 had asbestosis (15.38%), 13 had pleural plaques (20%), and 42 were found to have no asbestos related condition (64.62%). Id. at 45. In the September 1987-September 1990 period, the court-appointed experts testified in 16 cases, in only two of the 16 did the jury find asbestosis (12.5%). Id. at 39-40. The jury verdicts essentially followed the expert testimony. The findings of the medical experts that Judge Rubin appointed contrast sharply with the testimony of plaintiffs' medical experts and jury verdicts based upon that testimony.
Judge Rubin's data is consistent with what the Manville Personal Injury Trust has determined with regard to claims of asbestosis filed against the Trust. Based upon independent medical audits of x-ray's, the Trust concluded that 55- 60% of asbestosis claims are unsupportable by the medical evidence. Moreover, as a general rule, the more recent the asbestosis claim, the more likely is that it is unsupportable by the medical evidence presented. See Letters from David T. Austern, General Counsel, Manville Personal Injury Settlement Trust, to Lester Brickman (Mar. 5, 1998 and Apr. 30, 1998) (on file with author).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

[FN114]. In re Joint E. & S. Dists. Asbestos Litig. (Findley v. Blinken), 129 B.R. 710 (E. & S.D.N.Y. 1991). The Manville Personal Injury Settlement Trust Agreement (the "Trust Agreement") provides at § 2.02 that the main purpose of the Trust is:

   to use the assets of the Trust Estate to deliver fair, adequate and equitable compensation to bona fide Beneficiaries, whether presently known or unknown, without overpaying or underpaying any claims and with settlement to be preferred over arbitration, arbitration to be preferred over resort to the tort system, and fair and efficient resolution of claims to be preferred over all else.

Affidavit of Patricia G. Houser ¶ 3, In re Manville Pers. Injury Settlement Trust Med. Audit Procedures Litig., No. 98 Civ. 5693 (E. & S.D.N.Y. Mar. 31, 1999). Ms. Houser is the President of the Claims Resolution Management Corporation, a wholly-owned subsidiary of the Trust, which provides claims resolution services to the Trust. Id. ¶ 1.

[FN115]. The seven categories are:

   (I) bilateral pleural disease; (II) non-disabling bilateral interstitial lung disease ("non-disabling asbestosis"); (III) disabling bilateral interstitial lung disease ("disabling asbestosis"); (IV) other cancer; (V) lung cancer (one); (VI) lung cancer (two); and (VII) malignant mesothelioma. Each category of disease also calls for particular medical evidence to be submitted in support of a claim, including, among other things, documentation showing a diagnosis of disease on the basis of an x-ray, CAT scan, or high resolution CAT scan.

Houser Affidavit ¶ 4. For a schedule of the values ascribed to each disease category, see Manville Personal Injury Settlement Trust "Trust Distribution Process," at 8 (undated).

[FN116]. Houser Affidavit ¶ 5.

[FN117]. Id. ¶ 6.

[FN118]. Id. ¶¶ 10-11.

[FN119]. Houser Affidavit ¶ 13 states:

   The hallmark of the 1995 program was a two-tiered review of claimants' x-rays by independent B-readers. B-readers are physicians who have received the highest possible certification in the use of the International Labour Organization ("ILO") system of classifying x-rays for the presence of asbestos-related and other lung conditions. All B-readers are required to pass a rigorous National Institute for Occupational Safety and Health ("NIOSH") proficiency examination. We sought, received and acted upon suggestions from the plaintiffs' bar with regard to acceptable B-readers .... Ultimately, the Trust retained five B-readers to participate in the 1995 program, none of whom (to our knowledge) had testified on behalf of an asbestos defendant.

[FN120]. Houser Affidavit ¶¶ 14-18 states:

   Because the Trust is first and foremost a claims payment facility and seeks to avoid dispute, we intentionally designed the x-ray review process to operate in favor of confirming the disease documented by the claimant and to give the benefit of any doubt to the claimant. We began by providing for two independent B-readings. Even among certified experts, not all physicians reading the same x-ray will make the same finding--this is known as "inter-reader variability." Especially in the case of borderline asbestosis, there is significant inter-reader variability among B-readers, including the independent B-readers who review claims in the Trust's medical audit program. In order to offset the risk associated with inter-reader variability, each claim subject to medical audit was read by up to two B-readers. If the results of the first B-reading supported the same or a higher disease category than was documented by the claimant, the claim was released from audit and paid according to the B-reader's findings (even at a higher disease category than originally alleged by the claimant). If, however, the first B-reader's findings instead showed no compensable disease or a lesser compensable disease than documented by the claimant, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

x-ray was sent to a second independent B-reader. The second B-reader was not aware of the results of the first review, or that he or she was the second B-reader to review the film. Again, if the second B-reader's findings supported the same or a higher disease category than was documented by the claimant, the claim was released from medical audit, valued consistently with those findings, and paid. But if the second B-reader's findings also showed no compensable disease or a lesser compensable disease than was asserted by the claimant, the claim would be recategorized based on the most serious disease findings of the two independent B-readers. In other words, both B-readers had to disagree with the claimant's physician's diagnosis for the claim to be downgraded on the basis of their findings; if either B-reader agreed with the diagnosis, the claim was released from audit and paid. In addition, we told the independent B-readers to assume asbestos exposure for each claimant. By virtue of the very fact that a claim had been filed, the B-reader also knew that a doctor had already diagnosed disease.

Another way we attempted to give claimants the benefit of the doubt was to design the program to compensate even claimants who could demonstrate only "sub-diagnostic" indicia of disease. Under the standards of the American Thoracic Society there must be a minimal "profusion" level (densities on the lungs that show up on x-ray film as opacities) of 1/1 on the ILO Scale for an x-ray to be diagnostic of asbestosis .... The ILO scale is a standard scale used by x-ray readers to judge, among other things, opacities on the lungs ....

Despite this well-recognized "1/1" threshold for the diagnosis of asbestosis, in the interest of settling claims, the Trust paid claimants for whom a lesser profusion of "1/0" was supported. Only when even that low-level, sub-diagnostic x-ray evidence of interstitial fibrosis was not corroborated by either of two independent B-readers did the Trust conclude that the claimant's submission was unreliable, and downgrade the claim accordingly.

An additional way in which the medical audit program was designed to operate in favor of claimants was to provide claimants with a variety of remedies if their claims were downgraded as a result of medical audit. Claimants whose claims were downgraded following medical audit could submit newer x-rays for this progressive disease or other medical evidence and their claims would be re-evaluated by another randomly selected B-reader (or B-readers) and, where warranted, re-categorized. The Trust placed no limit on the number of times an audited claimant could submit a new x-ray or medical report to the Trust. Claimants could also choose to challenge the Trust's actions through ... arbitration and ... request independent evaluation of medical evidence by a member of a designated panel of experts ....

[S]hortly after implementation the program was modified to provide for the admission of evidence of co-defendant settlements and corroborating medical evidence in lieu of x-rays in appropriate circumstances ....

[FN121]. Houser Affidavit ¶ 20. "[T]he Trust's medical audit program has resulted in a significant number of claims being downgraded in severity." Quarterly Report of the Manville Personal Injury Settlement Trust at 4 (July 31, 1997). "Medical evidence of ... [asbestosis] has proven to be generally unreliable, and is confirmed by independent B-readers only approximately half the time." Quarterly Report of the Manville Personal Injury Settlement Trust at 4 (July 31, 1998) (emphasis in original).

[FN122]. Houser Affidavit ¶ 20.

[FN123]. Id. ¶ 21.

[FN124]. Id. ¶ 22.

[FN125]. Id. ¶ 23.

[FN126]. Id.

[FN127]. The reasons given were:

First, there are significant complexities in measuring the doctor pass/fail data. Some claims include multiple

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

medical reports with diagnoses of varying severity, making it difficult to identify accurately the physician primarily responsible for the diagnosis on which basis the claim was categorized. Second, a given doctor's pass rate varied considerably depending on the law firm submitting the claim, suggesting that focusing on doctors alone would be unfair to those claimants represented by law firms with better screening processes or higher quality claim populations. Third, a doctor-based audit meant that we would find ourselves in a perpetual search for the next "Dr. Bogus." The reliability of claims reported by any doctor with whom the Trust had not sufficient prior experience would be unknown until a sufficient number of claims supported by that doctor had passed medical audit. Fourth, once a doctor was found to be unreliable, all claimants who had been diagnosed by that physician--even bona fide claimants--would be forced to submit new medical reports. Thus, for example, of the nearly 60,000 claims that became eligible for payment in 1997, approximately 70% were diagnosed by doctors with less than a 60% pass rate. Under a doctor-based audit system all of those claimants would be required to obtain new medical reports, which would then be subject to further audit.

Due to the sheer number of claims being diagnosed by doctors with low pass rates, plus the administrative burden of discriminating among "good" doctors and "bad" doctors, confounded by the ongoing need for additional perpetual audits, we again concluded that the most efficient and equitable audit process was simply to require a chest x-ray from every claimant alleging a non-malignancy claim .... This approach would remove the need for costly, time-consuming and burdensome medical audit reporting and procedures and achieve the highest level of certainty regarding the reliability of medical evidence submitted to the Trust.
Houser Affidavit, ¶¶ 27-28.

[FN128]. Id. ¶¶ 29-30.

[FN129]. Id. ¶ 32; see also supra note 115.

[FN130]. Houser Affidavit ¶¶33-34.

[FN131]. Id. ¶38; see also Quarterly Report of the Manville Personal Injury Settlement Trust (Oct. 30, 1998); Memorandum titled Changes in Medical Audit/X-Ray Submission Policy (Aug. 20, 1998).

[FN132]. Houser Affidavit ¶40. Because the Trust was paying out only a fraction of the established settlement values of the claims presented, elimination of payment of unsustainable claims would result in greater payments to bona fide claimants.

[FN133]. See Quarterly Report of the Manville Personal Injury Settlement Trust, at 2-3 (Oct. 30, 1998).

[FN134]. Judge Weinstein took over judicial supervision of the Trust, including the power to appoint Trustees, after it became insolvent. Prior to the Trust's insolvency, it had paid out $677,445,619 in claims, of which plaintiffs' counsels' fees totaled approximately $250,000,000 despite the fact that claims were settled in groups of hundreds and thousands. See Brickman, Asbestos Litigation, supra note 10, at 1835 n.61. For an account of Judge Weinstein's role in mass tort litigation, see supra notes 60-62.

[FN135]. See Letter from David T. Austern, President of the Claims Resolution Management Corporation for the Manville Personal Injury Settlement Trust, to the author (Oct. 3, 2001) [hereinafter Austern Letter] (original on file with author).

[FN136]. Id. Recently, Judge Weinstein has, on his own motion, decided to hold hearings on whether to revisit a number of his prior rulings, stating:
    The courts have received and reviewed the Financial Statements and Report of the Manville Personal Injury

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

Settlement Trust for the period ending September 30, 2001. The courts note that there is a continuing rise in the number of claims and that the amount payed pro rata on claims has been reduced from 10 percent to 5 percent of the original value. The courts take judicial notice of the continuing media and other campaigns encouraging a flood of new claims.

This combination of events, together with the increasing number of bankruptcy filings by asbestos related entities, suggests that there may be a misallocation of available funds, inequitably favoring those who are less needy over those with pressing asbestos related injuries.

Findley v. Trustees (In re Joint E. & S. Dists. Asbestos Litigation), 90 CV 3973 (JBW) (E.D.N.Y. Nov. 7, 2001).

In its response to the November 7, 2001 Order, the Trust recommended a change in the Trust Distribution Process ("TDP") and provided additional data on the flood of new claims on behalf of those with no asbestos-related physical impairment:

[T]he Trustees ... recommended modifying the causation criteria of the TDP ... Currently, the criteria for each of the seven Scheduled Disease Categories simply require that a proof of a claim "identfy exposure to Manville asbestos products." We recommend adding that to qualify for compensation a claimant generally must identify industrial exposure to Manville asbestos products, meaning direct exposure to asbestos products when the products were manufactured, applied, disturbed, or otherwise altered in a manner that would normally produce asbestos dust. Where industrial exposure to Manville asbestos products is absent there would be a rebuttable presumption that the claimant has no asbestos-related disease.

While most trust claimants experienced industrial exposure to asbestos, during the past two years the Trust has been receiving large volumes of claims filed on behalf of claimants exposed only to "in-site" asbestos. Such claimants worked in factories or facilities where asbestos insulated pipes or other asbestos products were located, although the claimants were not present when the insulation was installed, which is substantially more likely to lead to the inhalation of asbestos fibers. Nonetheless, these claimants meet the current criteria TDP scheduled diseases. Needless to say, given the ubiquitousness of asbestos insulation and other products in American industrial sites through much of the last century, the population of potential Trust claimants would rise by tens of millions when non-industrial exposures to asbestos are considered.

The flood of new claims reported in our quarterly reports to the Courts and noted in the Courts' November 7, 2001 Order reflects an unforeseen, disproportionate increase in claims filed on behalf of claimants with no asbestos-related physical impairment whatsoever, whose daily life is unaffected by their past asbestos exposure. Indeed, a large share of the Trust's claimants now have "injuries" which are imperceptible, even to themselves, without the aid of x-ray or other imaging technology. These claimants are marshaled in mass screenings that have as their primary purpose the rounding up of claimants whose settlements will generate fees for the sponsors of the screenings. While each unimpaired claimant generates smaller fees, screening sponsors achieve desired aggregate fees through increased volume. Advances in data processing have greatly reduced the difficulty and costs of generating and tracking huge volumes of claim files. Together with the large number of potential claimants, this ensures that the number of unimpaired claims and the amount paid to them will continue to increase so long as they remain compensable.

For instance, from TDP inception (February, 1995) through November 30, 2001, the Trust has paid 76,268 Bilateral Pleural Disease claimants (a growing number of state courts have held that asymptomatic pleural disease is not a compensable disease) [citing to Simmons v. Pacor, Inc. et al., 543 Pa. 664, 674-76; 674 A.2d 232, 237-38 (Pa. 1996) (holding that asymptomatic pleural thickening is not a compensable injury that gives rise to a cause of action, and citing court decisions in other states which have held similarly)] ....

The flood of unimpaired claims can no longer be stopped simply by reviewing the quality of the x-ray evidence supporting the claims, as the Trust once tried to do, which in 1998, resulted in the plaintiffs' bar suing the Trustees in Judge Weinstein's Court, which suit terminated in a Court-approved settlement. There are millions of workers still living who were occupationally exposed to asbestos. A significant proportion of those workers genuinely exhibit x-ray changes, which meet the current TDP categorization criteria for Scheduled Diseases. In a report the Trustees reviewed just before concluding that the pro rata payment share had to be lowered, it was estimated that if

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

current claim filing trends under the TDP as it now stands continued, the Trust could expect to receive as many as 2.5 million additional claims (after 2000) ....

[A]s long as the Trust remains obligated to pay the ever-increasing number of unimpaired claims it receives, it will be unable to [properly] compensate its most deserving claimants ....

Letter from Robert A. Falise, Chairman and Managing Trustee of the Trust, to Judges Jack B. Weinstein and Burton R. Lifland (Dec. 5, 2001); Findley v. Falise (In re Joint E. & S. Dist. Asbestos Litig.) Case Nos. 82 B 11656 (BRL)--82 B 11676 (BRL), inclusive; (E.D.N.Y.) 90 CV 3973 (JBW).

[FN137]. For an account of that business, see supra note 111. For another account of a medical practice set up to generate medical evidence in asbestos cases, see Brickman, Asbestos Litigation, supra note 10, at 1878 n.249.

[FN138]. See supra note 119.

[FN139]. Quarterly Report of the Manville Personal Injury Settlement Trust at 4 (July 31, 1998).

[FN140]. For discussion of the disease mix in asbestos claiming, see Brickman, Asbestos Litigation, supra note 10, at 1860-61.

[FN141]. See Affidavit of Patricia G. Houser ¶ 27, In re Manville Pers. Injury Settlement Trust Med. Audit Procedures Litig., No. 98 Civ. 5693 (E. & S.D.N.Y. Mar. 31, 1999) ("[A] given doctor's pass rate [on the medical audit procedure] varied considerably depending on the law firm submitting the claim ...."); Exhibit 24 at 3, Houser Affidavit ("A doctor's pass rate can differ significantly by [law] firm."); Houser Affidavit at tbls. 2-4 (indicating the correlation between the x-ray readings by the same doctors as they differed depending on the law firm that had hired them). Thus, one B-reader's results for law firm A's clients might show a 95% pass rate in the audit procedure but that same B-reader may have only a 50% pass rate when reading law firm B's chest x-rays submitted in support of claims of asbestosis.

[FN142]. See Brickman, Asbestos Litigation, supra note 10, at 1840-52; see also Ruffing v. Union Carbide Corp., N.Y.L.J., Jan. 29, 2001, at 33 (N.Y. Sup. Ct.) (rejecting plaintiffs' claims for damages for alleged toxic chemical poisonings at an IBM semiconductor plant for failure to show that they had been exposed to a harmful level of the substances). That decision is expected to set the ground rules for nearly 200 pending claims. See Michael Riccardi, IBM Toxic Plaintiffs Face Strict Test, N.Y.L.J., Jan. 25, 2001, at 1. The court rejected plaintiffs' assertion that proof of the existence of the alleged harm, birth defects, is sufficient to support the conclusion that there had been exposure to a harmful level of the chemical, stating that "injury, no matter how horrible in dimension, cannot substitute for evidence that another is responsible for its cause." Ruffing, N.Y.L.J., Jan. 29, 2001, at 41. The court stated:

As support for their contention that a more liberal approach is taken in this State with respect to the exposure level issue, plaintiffs rely upon several State and Federal court decisions in which plaintiffs sought damages for injuries resulting from their exposure to asbestos or asbestos-containing products. As relates to the State court litigation, plaintiffs assert that "[t]he Appellate Division has repeatedly stressed that a plaintiff need only show that the dangerous substance was present at his work site in a form (i.e., out of its package or container), as in the present case, that would render the plaintiff vulnerable to being exposed." ... Similarly, plaintiffs maintain that "the federal courts applying New York law in toxic exposure cases have repeatedly held, on proofs not even remotely as rigorous as those in the present case, that plaintiffs' circumstantial exposure and causation proofs were fully adequate to support plaintiffs' verdicts."

....

As plaintiffs correctly observe, in our State courts causes of action for asbestos exposure have survived summary judgment motions where the plaintiffs' proofs established that they "worked with asbestos in confined, dusty areas"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

... or worked in a location where spraying of an asbestos-containing product "was going on all the time" .... Notably, the courts hearing these cases did not require greater proof of exposure because, in each, "plaintiffs showed the facts and conditions from which defendants' liability may be reasonably inferred" ....

Addressing New York-based claims for asbestos exposure, the Second Circuit Court of Appeals has taken a similar approach to proof of exposure levels ....

In view of the lack of a "signature" relationship between Zachary's birth defects and the Causation Chemicals, there is no basis for adopting the approach taken in asbestos exposure litigation, as urged by plaintiffs. Ruffing, N.Y. L.J., Jan. 29, 2001, at 39-40 (citations omitted).

[FN143]. See Brickman, Asbestos Litigation, supra note 10, at 1841 n.87. Aiding the jury in this regard is the presentation of documentary evidence inculpating one defendant, which is for the purpose of and has the effect of substantially increasing the verdicts against other defendants even though the evidence in question does not pertain to them. See id. at 1845 n. 110.

[FN144]. See id. at 1862-68 (stating the role of punitive damages in asbestos litigation cases that are tried). About one percent of asbestos claims are tried. Findley v. Blinken (In re Joint E. & S. Dists. Asbestos Litig.) 129 B.R. 710, 747 (E. & S.D.N.Y. 1991).

[FN145]. Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997), aff'g 83 F.3d 610 (3d Cir. 1996), decision below, 878 F. Supp. 716 (E.D. Pa. 1994).

[FN146]. Ortiz v. Fibreboard Corp, 527 U.S. 815 (1999).

[FN147]. Indeed, the very basis for the settlement was the zero valuation for "futures" claims of exposure-only claimants. The defendants' agreement to a global settlement was driven by their desire to cap future claims and bring asbestos litigation to a foreseeable conclusion. The only way that could be accomplished, short of a legislative solution, was to include the provision eliminating future exposure-only claims.

[FN148]. See First Amended Complaint, G-I Holdings, Inc. v. Baron & Budd et al., 179 F. Supp. 2d 233 (S.D.N.Y. 2001) (No. 01 Civ. 0216 (RWS)) (filed Apr. 30, 2001) for an essentially first hand account of the Georgine settlement process:

In connection with the negotiation of the Georgine settlement, the CCR [an association of 20 of the leading asbestos litigation defendants which had banded together in joint defense of asbestos lawsuits, see, Queena Sook Kim, Asbestos Claims Continue to Mount, WALL ST. J., Feb. 7, 2001, at B1] had entered into so-called futures agreements ("Futures Agreements") with many of the nation's leading plaintiffs' asbestos law firms ....

The Futures Agreements served as corollary to the Georgine settlement by incorporat[ing] the Georgine medical criteria and providing a mechanism by which any future filing of claims by "non-sick" individuals would be deferred .... The Futures Agreements provided that they would take effect if the Georgine settlement was not ultimately upheld and further provided that, in that event, the CCR would, as an alternative dispute mechanism, toll the running of the statute of limitations for defendants' clients (and future clients) who did not have any of the conditions set forth in the Georgine medical criteria (and whose claims were not already time barred). The defendants agreed, in turn, to recommend to their clients that they defer filing an asbestos claim until they met the criteria ....

In entering into their Futures Agreements at the time of the Georgine settlement, [plaintiff alleges that] defendants represented that they believed that the Georgine medical criteria were "reasonable" and that acceptance of the ADR procedure "will be in the interest of its future clients who do not have a medical condition" defined by the criteria in the Agreement "in that it offers such clients an alternative to immediate litigation or settlement and release of their claims for asbestos injury."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 WMMELPR 243                                                                 Page 44

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

The typical Futures Agreement expressly states that the subscribing firm will: recommend that its clients seriously consider this alternative dispute resolution procedure. With respect to all clients who accept this alternative dispute resolution procedure, [defendant law firm] agrees to defer filing any asbestos-related personal injury claims against CCR or any of its current members until such time if ever, as the claimant develops one of the asbestos-related diseases described [herein].

The consideration for the Futures Agreements included CCR's agreement to settle some 50,000 pending asbestos cases for approximately $750 million. That sum was paid to defendants by CCR ....
Id. ¶¶ 134-138.

[FN149]. Cf. Pittsburgh Athletic Co. v. KQV Broad. Co., 24 F. Supp. 490 (W.D. Pa. 1938). A similar argument has been to justify a million dollar fee in the "Adhesive Denture Menace." "This national peril arose after a manufacturer recalled certain [dental] adhesives containing traces of benzene, a potential carcinogen. Without evidence of any actual injuries, vigilant attorneys brought suit on behalf of purchasers unaware of their 'victimhood.' The settlement gave several hundred known buyers $7 and some twenty-eight hundred undocumented buyers the opportunity to fill out forms and receive a package of discount coupons." DEBORAH L. RHODE, IN THE INTERESTS OF JUSTICE: REFORMING THE LEGAL PROFESSION 176 (2001). While the nearly million dollar fee may seem like "a lot of money ... it cannot be easy, taking a case wherein it appears to the naked unarmed layperson eye that nobody has suffered any observable harm, and using legal skills, turning it into a financial transaction that involves thousands of people and a million dollars! Plus coupons!" Id. (quoting Dave Barry, Lawyers Put the Bite on Denture--Adhesive Maker, ORLANDO SENTINEL, Nov. 23, 1993, at 22.)
Lest anyone be misled by the merits of the arguments I have advanced, let me state explicitly that I proffer them in the same vein as did Johnathan Swift in proposing to prevent Irish children from being a burden by selling them as food for the table. See JOHNATHAN SWIFT, A MODEST PROPOSAL (Charles Beaumont ed., C. E. Merril Pub. Co. 1969) (1729).

[FN150]. In June 1997, the Supreme Court issued its decision in Amchem rejecting the Georgine settlement. By their express terms the Futures Agreements [see supra note 147] were thereupon triggered and became binding upon the participants.

Nonetheless, despite the plain language of their Futures Agreements and the hundreds of millions of dollars they received in connection with them, defendants ... [are not] recommend[ing] deferral of filing of claims on behalf of non-sick clients ... [and have] begun filing non-sick claims at an even greater rate than they had filed them before the Georgine settlement ....
First Amended Complaint, G -I Holdings (No. 01 Civ.0216 (RWS)) ¶¶ 139-40.

[FN151]. See id. Standard and Poor's has reported that insurers will set aside an additional 5 to 10 billion dollars in reserves in 2001 to cover asbestos-related claims because of the significant increase in asbestos claims being filed. See Christopher Oster, Insurers to Set Aside Additional Billions for Asbestos Claims, WALL ST. J., Aug. 1, 2001, at B10. Previously, insurers had paid out $21.6 billion in asbestos claims, and had already set aside $10.3 billion for new claims. Id. Other analysts and ratings agencies recently have estimated that the insurance industry will need to put up as much as $20 billion to $40 billion more to cover their asbestos exposure. Id. These amounts do not include the considerable amounts spent by asbestos defendants which were not covered by insurance and which has precipitated more than 30 bankruptcies. It is noteworthy that no reserve established by any of the asbestos defendants or their insurers has ever proved sufficient. See also Schmitt supra note 90.

[FN152]. "We agree with those who argue that lawyer abuse in class actions is rampant and that the current system, far from keeping this abuse in check, is set up to shield lawyers from the consequences of their misdeeds." Susan P. Koniak & George M. Cohen, Under Cloak of Settlement, 82 VA. L. REV. 1051, 1056 (1996).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

[FN153]. See Wolfram, supra note 9, at 1233 (arguing that class action lawyers are beyond reform, especially given the lack of policing methods and stating that "[w]hat is badly broken, and what badly needs mending, is the basic class action and mass-litigation system of litigation. The only effective way to rid the judicial system of Willie Suttons is to take the profit out of robbing banks.").

[FN154]. Carrington & Apanovitch, supra note 11, at 469.

[FN155]. 92 F.3d 506 (7th Cir. 1996), reh'g denied, 100 F.3d 1348, cert. denied, 520 U.S. 1204 (1997).

[FN156]. No. 91-1880 (Ala. Cir. Ct. Jan. 24, 1994).

[FN157]. There was no question that the excess moneys belonged to the mortgage holders. Instead, the main issue in the case was "the propriety of BancBoston's holding the surplus until the time it would be returned to the mortgagor." Kamilewicz, 92 F.3d at 508. It was an issue of timing--at which point should these excess moneys be credited to the mortgage holders' accounts. See Kamilewicz v. Bank of Boston Corp., No. 95-C6341, 1995 U.S. Dist. LEXIS 18973 (N.D. Ill. Dec. 15, 1995).

[FN158]. See Kamilewicz, 1995 U.S. Dist. Lexis 18973, at *3. The defendants in the Hoffman action objected to the proposed settlement on the basis that it did not disclose to the plaintiff class that there were "'substantial adverse effects' to the proposed settlement, including ... [that] the plaintiff class would suffer an actual out-of-pocket loss as a result of the lawsuit." Id. at *3-*4. According to the district court, this objection was withdrawn as moot. See id. at *4 n.1.

[FN159]. See Kamilewicz, 92 F.3d at 508.

[FN160]. See id. at 508-09.

[FN161]. Monthly mortgage bills are based on three components: principal, or the amount that was borrowed; interest on that principal; and escrow, which is money for property taxes and homeowners insurance that mortgage companies collect and then pay:

Because taxes and insurance fluctuate from year to year, banks estimate those costs and divide those estimates into 12 equal portions to smooth out monthly payments and prevent homeowners from getting slammed a couple of times a year, such as when property taxes come due. For decades, the industry used what's called the "itemized" method to calculate escrow. One lawyer described it as "like having separate little buckets" for each cost, then adding them together.

For various reasons, the itemized approach often overestimated people's escrow requirements and created surpluses, called cushions. The banks claimed that these cushions protected them from paying bills that come due when homeowners defaulted. They also argued that the itemized method was allowed by law, and noted that virtually every lender in the country used that method.

No one was accusing the banks of stealing the cushions. Annual statements sent to homeowners listed the balances, and the banks returned the money in full when customers paid off their loans, such as when they sold or refinanced their houses ....

Eddie Curran, You Win, You Pay, MOBILE REGISTER, Dec. 29, 1999, available at http://www.al.com/news/mobile/Dec1999/5pt-4-2.html (last visited Dec. 1 2000).

[In the settlement] BancBoston had agreed to give lost-interest credits to homeowners of no more than $8.76 apiece, and usually a fraction of that. If the value of the settlement was the total of those credits, a third of that amount probably would have resulted in a fee of several hundred thousand dollars.

But the ... [lawyers] contended that the settlement was worth something else entirely: It was, they said, the total

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

of the surplus that would be returned early to the class. At the hearing, it was estimated that BancBoston would reduce the $223 million then held in escrow by 19 percent, or by more than $42 million. [The lawyers] ... told [Judge] Kittrell that the benefit to class members was equal to the size of that reduction.
Eddie Curran, Bottom of the Class, MOBILE REGISTER, Dec. 30, 1999, available at http://www.al.com/news/mobile/Dec1999/5pt-4-2.html (last visited Jan. 24, 2000).
The $8.5 million attorneys fees that was thus approved was based on a percentage of the total amount held in the escrow accounts, not the much smaller benefit actually received by the plaintiffs in the settlement, that is, the time value of the escrowed surplus funds. The Hoffman action attorneys did not secure the escrow amount for the plaintiff class because they would have received this amount at some point in the future. The only recovery the attorneys got for their clients was that they had earlier access to excess monies held in their escrow accounts.

[FN162]. See Kamilewicz, 92 F.3d. at 508. For an extensive analysis of the Kamilewicz facts, see Koniak & Cohen, supra note 152, at 1056.

[FN163]. See Kamilewicz, 92 F.3d. at 509. The causes of action included: violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.§ 1962 (1994); violations of the Civil Rights Act, 42 U.S.C. § 1983 (1994); common law fraud; negligent misrepresentation; attorney malpractice; breach of fiduciary duty; and conversion. Kamilewicz, 92 F.3d. at 509 .

[FN164]. The Rooker-Feldman doctrine was set out in Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923) and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983). See, Kamilewicz, 92 F.3d. at 509. The Rooker-Feldman doctrine "bars federal suits where, although the claims were not argued in the state court proceedings, they are 'inextricably intertwined' with the state court judgment." Kamilewicz v. Bank of Boston Corp., No. 95-C6341, 1995 U.S. Dist. LEXIS 18973 (1995) (citing Wright v. Tackett, 39 F.3d. 155, 157 (7th Cir. 1994)). This doctrine "is a recognition of the principle that the inferior federal courts generally do not have the power to exercise appellate review over state court decisions." Kamilewicz, 92 F.3d at 509.

[FN165]. Kamilewicz, 92 F.3d. at 509. The district court found that during the fairness hearing in Alabama, the Hoffman action plaintiffs were in an adversarial position against their attorneys. Since the Hoffman action attorneys were asking the court to grant them their fees, they were in the position of plaintiffs. The Hoffman action plaintiffs, on the other hand, were in the position of defendants because they did not have to put up any evidence on the issue of fees, but were allowed to object and cross-examine the Hoffman attorneys. Therefore, when the Alabama state court rendered judgment on the settlement--by providing its approval--all of the issues between the Hoffman action plaintiffs and their attorneys had been already litigated. Thus, the district court found that in order to adjudicate the Kamilewicz plaintiffs' claims, it would have to reexamine the papers filed in the action below, and it was precluded from doing so under the Rooker-Feldman doctrine. The district court found that the only forum available to the Kamilewicz plaintiffs was the Alabama state court system. Id.

[FN166]. Id. The court held:
    The Kamilewiczes were class member/plaintiffs in the Alabama suit. The part of the judgment they are unhappy with is the approval of the settlement as to the fees to be paid to their attorneys--fees that were assessed against them. The district court concluded that the Kamilewicz plaintiffs were in the position of defendants in this aspect of the state court proceedings. That conclusion has some support in logic and bolsters a finding of a Rooker-Feldman bar. More important, however, is the fact that the plaintiffs' injuries are a result of the state court judgment. Their claim in federal court is a multi -pronged attack on the approval of the settlement regarding the attorney fees issue. Regardless of which of the specific federal claims that district court were to consider, it would run directly into the state court finding, entered after a two-day fairness hearing--that the fees were reasonable. The federal claims are "inextricably intertwined" with the state court judgment, whether that judgment is right or wrong.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

Id. at 511.

[FN167]. See Kamilewicz v. Bank of Boston Corp, 100 F. 3d. 1348 (7th Cir. 1996) (Easterbrook, J., dissenting). In his view, the Kamilewicz plaintiffs were seeking to collaterally attack the Alabama state court judgment based on lack of jurisdiction. If a court renders a decision without subject matter or personal jurisdictions, no court can give full faith and credit to that judgment. See Phillips Petroleum Co. v. Shutts, 472 U.S. 797 (1985). If the Alabama state court did not have jurisdiction over the Kamilewicz plaintiffs, as they argued, then there would be no reason why an action could not be brought in federal court to attack such a judgment. Therefore the Rooker-Feldman doctrine should not be an obstacle for the Kamilewicz plaintiffs to obtain review.

[FN168]. Kamilewicz, 100 F.3d. at 1351.

[FN169]. See id.

[FN170]. Id.

[FN171]. See 28 U.S.C. § 1257 (1994).

[FN172]. See Kamilewicz, 100 F.3d. at 1352. Moreover, Judge Easterbrook noted that the only way that the Kamilewicz plaintiffs could have been parties to the Hoffman action was if their interest was adequately represented by the named plaintiffs and that they had received adequate notice and opportunity to opt out of the class. Since the Kamilewicz plaintiffs were attempting to show that they had not been adequately brought into the action, Judge Easterbrook wrote that not enabling these plaintiffs to bring this claim "gets the cart before the horse." Id. He further rejected the notion that a fairness hearing provided the plaintiffs with a full and fair litigation. Id.

[FN173]. See id. at 1353. "If the Rooker-Feldman doctrine applies to suits by the absent class members because a malpractice action is a collateral attack on the order approving the settlement and awarding attorneys' fees, then the law of preclusion (res judicata) should bar malpractice actions in any court, state or federal, and without regard to which judicial system handled the first case." Id.

[FN174]. Id.

[FN175]. Kamilewicz v. Bank of Boston Corp., 520 U.S. 1204 (1997).

[FN176]. 179 F.3d 641 (9th Cir. 1999).

[FN177]. 77 F. Supp. 2d 114 (D.D.C. 1999).

[FN178]. Id. at 121. Judge Sporkin based much of his ruling on what he believed the consequences were of allowing such malpractice actions to go forward. He wrote that the threat of such actions "could discourage future class counsel from attempting to settle and compromise a class action ... [i]n actions where a class seeks prospective and retroactive injunctive relief, such handcuffing would sound a death knell to class counsel's ability to evaluate its case and negotiate a workable settlement in the best interest of the class as a whole, in a timely manner." Id. at 122. In referring to actions by lawyers in the Lincoln Savings and Loan matter that facilitated the commission of fraud, Judge Sporkin asked: "Where were [the lawyers] ... when these clearly improper transactions were being consummated? Why didn't any of them speak up or disassociate themselves from the transactions?" Lincoln Sav. & Loan Ass'n. v. Wall, 743 F. Supp. 901, 920 (D.D.C. 1990). One answer of course is that more than

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

eighty law firms were busily collecting an estimated $70 million for representing the parent company of Lincoln Savings in its five years of dealing with the Federal Bank Board. RHODE, supra note 149, at 109. Applying Judge Sporkin's cri de coeur to the class action context leads to a similar question to be posed: Where were the judges?

[FN179]. In a third case, Zimmer Paper Products, Inc. v. Berger & Montague P.C., 758 F.2d 86 (3d Cir. 1985), the court inferred that class members may sue class counsel for breach of fiduciary obligation.

[FN180]. 958 S.W.2d. 239 (Tex. App. 1997). For a discussion of Arce, see Errin Martin, Comment, The Line Has Been Drawn On The Attorney-Client Relationship: The Implications of Burrow v. Arce on Texas Practitioners, 32 TEX. TECH L. REV. 391 (2001).

[FN181]. See Arce, 958 S.W.2d. at 243.

[FN182]. This was a violation of the Texas Disciplinary Rules of Professional Conduct 1.08(f). Id. at 245 n.4.

[FN183]. Id. at 246.

[FN184]. Id.

[FN185]. See id. at 248. The court held that the amount of the forfeiture should be determined on a case-by-case basis because the attorney may have provided valuable services to the client prior to the breach, for which the attorney should be compensated. Id. at 250. The court looked to the Restatement (Third) of the Law Governing Lawyers for factors that would be considered in making the determination of the amount of fee forfeiture. Those factors include: "(1) the extent of the attorneys' misconduct; (2) the willfulness of the attorney's misconduct; (3) any threatened or actual harm to the client; and (4) the adequacy of other available remedies." Arce, 958 S.W.2d at 250 (quoting Restatement (Third) Of the Law Governing Lawyers § 49 cmt. D (Proposed Final No. 1 1996)).

[FN186]. 92 F.3d 1510 (9th Cir. 1996), cert denied, 520 U.S. 1197 (1997). Whether Durkin is still good law in the Ninth Circuit is an open question in view of Epstein v. MCA, Inc., 179 F.3d 641 (9th Cir. 1999).

[FN187]. Durkin, 92 F.3d. at 1515.

[FN188]. See id. at 1517.

[FN189]. Id. at 1518 (quoting Ruffalo v. Patterson, 285 Cal. Rptr. 647, 648 (1991)).

[FN190]. See supra note 13.

[FN191]. See Motion For Leave To File Amici Curiae and Brief Amici Curiae in Support of Petition, Int'l Precious Metals Corp. v. Waters, 530 U.S. 1223 (2000) (in support of petition for certiorari, June 5, 2000). This was likely the case in Waters where there was a forty million dollar reversionary fund settlement which provided that any amount of the fund not claimed by class members and not paid out as attorney's fees and expenses was to return to defendants. This agreement resulted in awarding class counsel, $13,333,333 (one-third of the reversionary fund), whereas the distribution to the class plaintiffs only amounted to $6,485,362.15. In other words, the fee award allowed by the District Court was more than twice the amount of the class' recovery. Int'l Precious Metals, 530 U.S. 1223 (2000). Although the Court dismissed the petition for certiorari seeking to challenge the fee award, Justice Sandra Day O'Connor filed a concurrence explaining her reason for denying the petition for a writ of certiorari. Justice O'Connor agreed that as a result of utilizing the reversionary settlement method, the award of attorney's fees

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

were "extraordinary." Id. at 1223. She also recognized that these settlements "potentially undermine the underlying purposes of class actions by providing defendants with a powerful means to enticing class counsel to settle lawsuits in a manner detrimental to the class [and] ... encourage the filing of needless lawsuits." Id. However, Justice O'Connor asserted that rehearing of this case did not provide a fitting opportunity to redress this injustice because of the existence of a "clear sailing" agreement, which provided that the petitioners would not, "directly or indirectly oppose [respondents'] application for fees." Id. Indeed, "as a result of ... [these 'clear sailing' agreements], courts often lack the information necessary to protect the interests of the class against the conflicts inherent in the settlement process." Brief of Amici Curiae, id. at 9-10, Waters. Justice O'Connor's shot-across-the bow, however, lands far short of doing damage to abusive reversionary settlements. So long as class counsel insist on "clear sailing" provisions, there may never be an opportunity, per Justice O'Connor's condition, for the court to eliminate this class abuse.

[FN192]. See Note, Developments in the Law--The Path of Civil Litigation, 113 HARV. L. REV. 1827 (2000) (stating "class counsel may inflate their hours, overstate the risks of litigation or otherwise exaggerate the compensation they deserve"). Because a fee dispute arose between the Chicago lawyers and the Alabama lawyers who were the plaintiff lawyers in Kamilewicz, that case provides a modest insight into hourly record keeping procedures in class actions. The lawyers had agreed to split their fees 60-40. The Chicago lawyers believed they had been short-changed and sought an accounting from the Alabama lawyers who had actually collected the fee. The latter refused but did send a copy of IRS Form 1099 provided by BancBoston showing a total fee payment of $7.18 million. When the Chicago lawyers went to BancBoston, they learned that the bank had actually paid $8,556,201. Litigation thereafter ensued with regard to the fee split. During the fee fight, both sides testified to the amount of time they had worked on the case. The Alabama lawyers filed a brief citing testimony by one of the Chicago lawyers that he had worked 130 hours on the case and the other Chicago lawyer, less than that. The Alabama firm stated that it worked about 2000 hours on the case and the Chicago lawyers worked, at most, 335 hours. Together these figures totaled 2,335 hours. See Curran, You Win, You Pay, supra note 161. At the hearing several years earlier to determine the fairness of the settlement and approve the fee, the lead Alabama lawyer testified that he and two other members of his firm performed about 60% of the work on the case--between 5,500 and 7,500 hours. He further testified that the Chicago lawyers did the other 40% and that their total hours on the case came to around 10,000--more than four times the number of hours claimed in the testimony presented in the later fee dispute law suit. Id.

[FN193]. A Saturn day, for example, is 244.8 Earth hours. See CALIF. INST. OF TECH., WELCOME TO THE PLANETS, available at http:// pds.jpl.nasa.gov/planets/special/saturn.htm (last visited Dec. 1, 2001).

[FN194]. To be sure, most all class action litigation is fee driven. My focus is on class action litigation where the assertion of wrongful conduct is pretextual or the alleged injury nonexistent and the use of the class action vehicle is simply a means of extracting a wealth transfer in order to generate fees.

[FN195]. See generally W. Kip Viscusi, The Social Costs of Punitive Damages Against Corporations on Environmental and Safety Torts, 87 GEO. L.J. 285 (1998); W. Kip Viscusi, Why There is No Defense of Punitive Damages, 87 GEO. L.J. 381 (1998); W. Kip Viscusi, The Challenge of Punitive Damages Mathematics, 30 J. LEGAL STUD. 313 (2001). For an argument that personal injury law does not have much deterrence effect, see Stephen D. Sugarman, Doing Away With Tort Law, 73 CALIF. L. REV. 558, 559-90 (1985); Stephen D. Sugarman, A Century of Change in Personal Injury Law, 88 CALIF. L. REV. 2403, 2431-31 (2000).

## *310 APPENDIX

## AN HISTORICAL ANALYSIS OF THE 1966 Amendment to Rule 23 of the Civil Rules

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

of Federal Procedure **[FN1]**

As class actions have proliferated and the amounts of wealth transferred under the aegis of amended Federal Rule of Civil Procedure 23 have grown exponentially, it is instructive to consider the effect of the 1966 amendments to Rule 23, and whether those effects were intended consequences of the amendments, and, if not, whether changes to Rule 23 are appropriate. The logical beginning point is an examination of the purposes of the 1966 amendments and some of the actual effects of those changes.

The former Rule 23 provided for three categories of class actions defined in terms of "jural relations:" the "true" class action, in which the rights were "joint, or common, or secondary;" the "hybrid" class action, in which rights were "several" and affecting "specific property;" and the "spurious" class action, in which rights to be enforced were "several" with "common questions of law or fact" and "common relief." [FN2] Judgments in the "true" and "hybrid" class actions extended to the class, while the judgment in a "spurious" class action extended only to the parties that intervened. [FN3] The Advisory Committee's objectives in amending Rule 23 were:

   (1) to redefine the cases that could proceed under rule 23, by adopting more functional definitions of class actions, (2) to clarify the effect of a class action judgment on members of the class, (3) to codify some of the better class action practices that federal judges had developed, (4) to provide district court judges more guidance regarding their procedural powers and responsibilities, and (5) to deal explicitly with the notice that should be provided to absent class members. [FN4]

**\*311** In drafting current Rule 23(b)(3), the Advisory Committee changed the "opt-in" procedure of "spurious" class actions to an "opt-out" procedure whereby absentee class members became bound by the judgment unless they "opted out" before trial. [FN5] This "opt-out" mechanism is described in Rule 23(c)(2). Under Rule 23(c)(2), members of a (b)(3) type class action receive "the best notice practicable under the circumstances," advising each member that the court "will exclude the member from the class if the member so requests." [FN6] Under Rule 23(c)(3), members of a (b)(3) class action who do not opt out are bound by the judgment "whether or not favorable to the class." [FN7] The intent of the Committee in making this revision is not clear. Most of the Committee's work product, notes, and correspondences have not been published and are accessible only by visiting the federal archives in Maryland, where the material is stored in boxes. [FN8] Therefore, "[t]he paucity of source material and research makes any inference about Committee intent somewhat hazardous and necessarily tentative." [FN9] The Advisory Committee's Notes in subdivision (c)(3) suggest that one possible reason for the change was to eliminate the "so-called 'one-way' intervention in 'spurious' [class] actions." [FN10]

Intervention by class members in the former spurious class actions was optional. If the class member did not intervene before trial of the liability issue, his claim was not precluded by the plaintiff's loss. Some courts, however, would allow the class member to intervene after the trial on **\*312** the liability issue if the plaintiff won, and to take advantage of the victory--so-called "one-way intervention." [FN11] The rationale of one-way intervention was to assist small claimants who could not obtain relief because they could not afford to intervene. [FN12]

As to the propriety of the one-way intervention, the Advisory Committee did not state explicitly in its Notes that it thought this type of intervention was unfair; it merely cited to cases representing conflicting views, and commented that the proposed rule excluded one-way intervention. [FN13] Benjamin Kaplan, who was the Reporter to the Advisory Committee on the Civil Rules at the time Rule 23 was amended in 1966, was "similarly cryptic" in discussing the Committee's reasoning for rejecting one-way intervention, [FN14] stating only that critics found the procedure "distasteful," "as lacking 'mutuality,'" and a "perverse anomaly" in that the class action "did not run fully for or against the class." [FN15] Nevertheless, the very fact that subdivision (c)(2) eliminates one-way intervention, combined with the Committee's lengthy discussion of the issue, indicate a high likelihood that the Committee drafted subdivision (c)(3) with the specific intention of eliminating one-way intervention. [FN16] There is no

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

discussion, however, of whether the Committee sought to or realized that it could eliminate one-way intervention without making the profound changes that it did make in Rule 23. [FN17]

**\*313** An additional reason for the change from "opt-in" to "opt-out" may have been to assist small claimants who, in the view of the drafters, would not act in their best interests by opting in prior to trial. [FN18] Accordingly, the drafters changed the consequences of non-action by small claimants by providing that non-action would automatically include them in the class action. Consider in this context the remarks of Benjamin Kaplan:

   If, now, we consider the class, rather than the party opposed, we see that requiring the individuals affirmatively to request inclusion in the lawsuit would result in freezing out the claims of people--especially small claims held by small people--who for one reason or another, ignorance, timidity, unfamiliarity with business or legal matters, will simply not take the affirmative step. The moral justification for treating such people as null quantities is questionable. For them the class action serves as something like the function of an administrative proceeding where scattered individual interests are represented by the Government. In the circumstances delineated in subdivision (b)(3), it seems fair for the silent to be considered as part of the class. [FN19]

**\*314** It is important to note, however, that the Advisory Committee's Notes to Rule 23(c)(2) and (c)(3) discussed only the elimination of one-way intervention as a possible basis for the opt-out mechanism, and did not mention as a rationale that small claimants were not opting in insufficient numbers to satisfy the drafters' political beliefs regarding the use of litigation to police corporate behavior. Additionally, the Committee did not indicate whether it had contemplated that class actions ought to be brought when all the class members had claims for just a few dollars and where there were thousands or hundreds of thousands of class members, and therefore the "opt-out" mechanism should be instituted to facilitate such actions. [FN20] Some commentators answered this question in the negative, including one plaintiff antitrust lawyer who stated:

   [I]t is sheer nonsense to say that the purpose of Rule 23 is or should be to secure redress to individuals whose damage is, on an individualized basis, minuscule. I do not believe that the efficient administration of justice is served by clogging the Courts with class action claims for the purpose of insuring that the so-called "Two-Dollar Bettor" gets his money back from a price-fixing conspiracy or a 10(b)(5) violation. That may well be the effect of the Rule's utilization, but I do not see myself on a white horse dressed in armor, lance extended doing battle with the dragons to recover $6.59 for Mrs. Housewife. [FN21]

**\*315** The changes in subdivisions (b)(3) and (c)(2) were not expected to have a profound effect on the litigation landscape. Arthur Miller contends that "in the main, the rulemakers apparently believed that they simply were making Rule 23 a more effective procedural tool" and that the "class action onslaught caught everyone, including the draftsmen by surprise." [FN22] Only some predicted the consequential expansion in class action litigation. [FN23] The Advisory Committee, however, recognized that the change from "opt-in" to "opt-out" was somewhat innovative. Thus, the Committee added the following special note in its 1964 proposed amendments: "The Advisory Committee recognizes that the proposal embodied in subdivision ... (c)(2) is novel. Accordingly, the Committee will particularly welcome comments on this proposal." [FN24] The significance of the proposal did not escape the attention of the legal community, [FN25] which for the most part reacted favorably at the time. [FN26]

**\*316** Charles Joiner, a member of the Committee, spoke approvingly of Rule 23, especially of subdivisions (b)(3) and (c)(2), stating that "persons are protected to a much greater degree than under the present rule." [FN27] Benjamin Kaplan, as previously discussed, appeared to contend that the new opt-out procedure was justified by the favorable effect it had on small claimants. [FN28]

Additionally, Kaplan argued that "as a practical matter the new rule is not a violent change injurious to the defendant," since under the previous regime the courts had often avoided the liability-limiting "opt-in" mechanism by allowing one-way interventions or classifying actions as "true." [FN29]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

In discussing the new opt -out rule, Judge Marvin Frankel remarked:
   To a generation raised on Pennoyer v. Neff [citation omitted], it is a rather heady and disturbing idea to be told that people in faraway places who receive a letter or are 'described' in a newspaper 'notice' which does not come to their attention are exposed to a binding judgment unless they take some affirmative action to exclude themselves ....
   That reaction is entirely understandable, but I suggest, with all deference, that our initial fears will prove in the end to be largely unfounded. [FN30]

**\*317** The main objection to the new opt-out mechanism was that the (b)(3) type action provided a device for bringing before the court "great numbers of passive litigants who would otherwise have remained silent." [FN31] The inclusion of these claimants in the judgment, so it was argued, would produce a direct conflict with the professed purpose of subdivision (b)(3), economy of time, expense, and effort. [FN32] Indeed that has been the case. [FN33] The opt-out change to Rule 23 has resulted in a vast expansion of the number of class actions brought. [FN34] The expansion is in large measure a function of the power that **\*318** certification of a class gives to lawyers for the class to effectively coerce a settlement. Indeed, there was some sense at the time of the 1966 amendments that this would be the case. Although several undesirable results of the approval of (b)(3) class actions were envisioned, in retrospect perhaps the most accurate concern raised  [FN35] was that the aggregate amount of claims in class actions would be of such magnitude that defendants would be forced to settle the claims, regardless of the merits of the claims. [FN36]

Other concerns raised about the (b)(3) class action included the unlawful solicitation of clients by plaintiffs' attorneys and the crushing economic and administrative burdens imposed upon the courts. [FN37] Another concern typically raised involved the mechanical problems of the notice requirement in subdivision (c)(2). [FN38] For example, neither the Rule nor the Committee's Notes clearly address the issues of who was required to prepare and pay for the notice. If a plaintiff's attorney prepared and sent notice, the ethical prohibition against client solicitation was a concern. [FN39] Additionally, if the plaintiff was to bear the cost of notice, "a requirement for certified mailing to each member of a very large class may have a chilling, if not prohibitive, effect on his prosecution of the class suit." [FN40]

The drafters did not think that the opt-in/opt-out revision would have an effect on mass torts. Indeed, they believed that the class action should not apply to mass torts.  [FN41] Thus, the Advisory Committee's Note accompanying **\*319** Rule 23 (b)(3) stated:
   A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried. [FN42]

Some commentators and judges questioned the Advisory Committee's note on mass torts within a few years of the 1966 amendments to Rule 23. [FN43] In 1972, a committee of the American College of Trial Lawyers recommended a return to the opt -in procedure for (b)(3) classes, stating:
   In the Committee's view, the current method for inclusion and exclusion of class members, "patterned after the highly successful procedures of the Book-of-the-Month Club" has created more serious problems than it purported to resolve. Contrary to the early predictions of the draftsmen that the "opt-out" provision was not a "violent change injurious to the defendant," this section of the amended rule has resulted in the creation of the vast, silent and indefinite classes which are only infrequently recognized as unmanageable and more commonly utilized to compel settlement by defendants as a **\*320** form of "ransom to be paid for total peace." [FN44]

Nonetheless, by the late 1970s, some federal district judges began making a de facto revision to Rule 23(b)(3) by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

certifying mass torts as class actions. [FN45] By the early 1980s, one member of the Advisory Committee, Charles Alan Wright, had become "profoundly convinced" that the Committee's position on mass torts had been mistaken. [FN46] It is clear that a "profound" change has occurred in the use of class actions in mass torts since the 1966 amendments to Rule 23. [FN47] While historically the certification of class actions in the case of mass torts was disfavored, increasingly courts have approved such certification. But for the amendments, moreover, more specifically the adoption of the opt-out mechanism in subdivision (b)(3), the considerable increase in the certification of mass torts could not have occurred as it did. [FN48] Yet the Advisory Committee, as noted above, **\*321** discouraged the use of Rule 23(b)(3) for mass torts; it is thus highly likely that the resultant substantial growth of class action litigation in mass torts was simply an unintended, unforeseen consequence of the change to the opt-out mechanism. [FN49] So too, though perhaps to a lesser extent, is the explosive growth of class actions in the consumer fraud area.

With the recognition that the 1966 amendments to Rule 23 have precipitated unforeseen and unintended changes, renewed efforts to again amend Rule 23 have gained momentum. [FN50] One of the principal objectives of the proponents of change is to return to a modified form of the opt-in procedure. In this regard, a Judicial Conference committee chair offered the following:

I believe that Rule 23 was never intended to be a tool to enhance enforcement of substantive claims. Rather, I believe, it was designed as a procedural device to facilitate the aggregation of claims for judicial efficiency. Others, however, believe that while judicial efficiency may have been the original intent of Rule 23, the rule has transformed by use into a mechanism to enhance substantive enforcement with the result that it actually supplements or even displaces government regulation. While there is plenty of evidence to support this observation, if it were to be legitimized as a purpose for Rule 23, such legitimization should, in my judgment, be effected by Congress, and Congress might well conclude that it is too anarchical to authorize private attorneys **\*322** to self-appoint themselves as enforcers of laws without adequate accountability to the lawmakers or to the public. [FN51]

Another set of efforts is directed against abusive practices of plaintiff lawyers bringing class actions in state courts and using subterfuges to prevent removal of the action to federal court. [FN52]

Whether any of these efforts will succeed in the face of opposition from both the class action bar--amply fueled by the enormous fees generated by such litigation--and consumer groups with which the plaintiffs' bar is typically allied, remains to be seen.

[FN1]. My research assistant, Allan Blutstein, has provided invaluable assistance in the preparation of this Appendix.

[FN2]. Norman C. Sabbey, Comment, Rule 23: Categories of Subsection (b), 10 B.C. INDUS. & COM. L. REV. 539 (1969).

[FN3]. Id.

[FN4]. Arthur R. Miller, Of Frankenstein Monsters and Shining Knights: Myth, Reality, and the "Class Action Problem," 92 HARV. L. REV. 664, 669 (1979); see also Proposed Amendments to the Rules of Civil Procedure for the United States District Courts, 39 F.R.D. 73, 98-107 (1966); DAVID LOUISELL & GEOFFREY C. HAZARD, JR., PLEADING AND PROCEDURE 833 (2d ed. 1968):

The 1966 revision undertook three tasks: First, it sought to eliminate the confusing classification system of original Rule 23. Second, it sought to make absolutely clear the availability of a class suit in cases where joinder of a large number of people was indicated under the necessary principles of Rule 19. Third, it provided

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

encouragement and machinery for new uses of the class suit.
Id. (citations omitted).

[FN5]. See Fed. R. Civ. P. 23(b)(3), (c)(2), (c)(3).

[FN6]. Fed. R. Civ. P. 23(c)(2)(A).

[FN7]. Fed. R. Civ. P. 23(c)(3).

[FN8]. Judith Resnik, From "Cases" to "Litigation," LAW & CONTEMP. PROBS., Summer 1991, at 9 n.17. Resnik suggests that the material in the federal archives "may well be incomplete" since she was unable to locate all off the references contained in the files. Id.

[FN9]. Robert Bone, Personal and Impersonal Litigative Forms: Reconceiving the History of Adjudicative Representation, 70 B.U. L. REV. 213, 292 (1990) (reviewing STEPHEN C. YEAZELL, FROM MEDIEVAL GROUP LITIGATION TO THE MODERN CLASS ACTION (1987)).

[FN10]. See Fed. R. Civ. P. 23(c)(3), advisory committee's notes, 39 F.R.D. 69, 105 (1966).

[FN11]. The leading case allowing one-way intervention was Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561 (10th Cir. 1961). For further cases dealing with one-way intervention, see Fed. R. Civ. P. 23(c)(3) advisory committee's notes, 39 F.R.D. 69, 105 (1966). It should be noted that only a minority of courts permitted one-way intervention in the 1960s. See John E. Kennedy, Class Actions: The Right To Opt Out, 25 Ariz. L. Rev. 3, 16 n.78 (1983).

[FN12]. See Sabbey, supra app. note 2, at 546.

[FN13]. See Fed. R. Civ. P. 23(c)(3), advisory committee's notes, 39 F.R.D. 69, 105 (1966); see also Developments in the Law --Class Actions, 89 Harv. L. Rev. 1318, 1395 (1976) (stating "the reasons the rulemakers opposed the one -way intervention are not clear").

[FN14]. Developments in the Law--Class Actions, supra app. note 13, at 1395.

[FN15]. Benjamin Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 HARV. L. REV. 356, 385-86 (1967).

[FN16]. See Kennedy, supra app. note 11, at 16-17 (stating that "the Rule reformers, paying heed to criticism of Union Carbide and 'one-way intervention,'" came up with a "brilliant new solution" to the debate over the binding effect of judgments on class members); Developments in the Law-- Class Actions, supra app. note 13, at 1394 ("One of the central purposes of the draftsmen was the elimination of one-way intervention.").

[FN17]. See Note, Multiparty Litigation: Proposed Changes in the Federal Rules, 50 IOWA L. REV. 1135, 1163-64 n.158 (1965) ("If the advisory committee was most worried about the possibilities of 'one-way intervention' it could have proposed a rule prohibiting such in express terms, rather than including a section specifically stating the effect of the judgment.").

[FN18]. See, e.g., Tom Ford, Federal Rule 23: A Device for Aiding the Small Claimant, 10 B.C. INDUS. & COM. L. REV. 501, 507 (1969) ("[T]he 'smaller guy' normally is not involved with lawyers and legal proceedings. Not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

many of such persons would take affirmative action to intervene in a spurious action under the former Rule." The article also asserts that subsection (c)(2) "is probably the most dramatic indication that the chief purpose of the amended Rule is to aid the small claimant.").

[FN19]. Kaplan, supra app. note 15, at 397-98. Kaplan specifically noted, however, that his views are "entirely personal and have no other status." Id. at 356 n.*. Judge Frankel described a phone call he made to Kaplan to ask about the background to Rule 23(c)(2):

Departing from sound practice, I made an ex parte call to Prof. Ben Kaplan of Harvard, who, as you know, was the Reporter of the new Rules, and who in a sense may be the missing Hamlet of this performance to show cause why he did what he did about this notice thing. Ben came graciously off the beach at Martha's Vineyard to take my call, and I should say that I have some doubts about whether a man who is caught in his shorts that way, without his notes, should be held firmly to everything he says. Nevertheless, with this private reservation, I did put him the question about this sub-section. He blushed and stammered a little bit--which is his way, as all of you who know him know--and then recalled that his committee had indeed thought at some length about how this notice should work. The reasoning, as he told it to me, relates to the fundamental conception that I have already touched of classes comprised of little people, who normally don't have much dealing with lawyers or with legal formalities. He got to speaking quite professorially--and I wrote down what he said--of the class action's "historic mission of taking care of the smaller guy." As he and the committee saw it, the likelihood is that this guy will routinely ignore, or at least fail to respond to, the notices contemplated under (c)(2). On that premise, the vote went the way we see, to the effect that a non-response means inclusion rather than exclusion.

Marvin Frankel, Amended Rule 23 From a Judge's Point of View, 32 ANTITRUST L.J. 295, 299 (1966).

[FN20]. Jonathan M. Landers, Of Legalized Blackmail and Legalized Theft: Consumer Class Actions and the Substance-Procedure Dilemma, 47 S. CAL. L. REV. 842, 847 (1974) (describing the Committee's intent as "shrouded in mystery").

[FN21]. Maxwell M. Bleicher, Is the Class Action Rule Doing the Job? (Plaintiff's Viewpoint), 55 F.R.D. 365, 369 (1972); see also Landers, supra note app. 20, at 848 (concluding from the lack of Congressional support in 1970 for legislation authorizing some consumer class actions that "[i]f rule 23 may be interpreted to permit consumer class actions by those whose claims are small and whose numbers are great, this development is nothing short of startling.") Landers further concludes that "[h]ad the full implications of rule 23 had been realized in 1966, its passage in statutory form must be regarded as doubtful." Id.

[FN22]. Miller, supra app. note 4, at 670. Miller argued, however, that "most, if not the vast majority, of the class actions instituted since 1966 would have entered the federal courts had rule 23 not been altered." Id. at 676. See also Richard Posner, The Decline of Law as an Autonomous Discipline: 1962-1987, 100 HARV. L. REV. 761, 770 (commenting on the "accidental growth of the class-action lawsuit, through a seemingly minor amendment to Rule 23 of the Federal Rules of Civil Procedure ..."). Cf. John Burritt McArthur, The Class Action Tool in Oilfield Litigation, 45 U. KAN. L. REV. 113, 185 n.433 (1996) (The opt-out provision "guaranteed the large increase in class litigation" and that it is "unthinkable ... that the Advisory Committee could have adopted that section [b(3)] without expecting a major expansion of litigation.").

[FN23]. See, e.g., Thomas J. Weithers, Amended Rule 23: A Defendant's Point of View, 10 B.C. INDUS. & COM. L REV. 515 (1969).

[FN24]. Amendments to the Rules of Civil Procedure for the U. S. District Courts Proposed by the Advisory Committee on Civil Rules, 34 F.R.D. 371, 395 (1964) (Special Note of Advisory Committee). See also Kaplan, supra app. note 15, at 391 (describing the "opt out" provision in (b)(3) and (c)(2) as "novel").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

[FN25]. See, e.g., Note, Proposed Rule 23: Class Actions Reclassified, 51 VA. L. REV. 629, 642 (1965) ("The most significant change made by the proposed new rule is its provision that the judgment in a class action based only on a common question of law or fact can operate conclusively on all members of the class.").

[FN26]. See, e.g., Comment, Federal Rules of Civil Procedure: Attacking the Party Problem, 38 S. CAL. L. REV. 80, 96 (1965) (describing the binding effect of the (b)(3) class action as "[p]erhaps the most beneficial and far reaching change introduced by the proposed Rule 23"). It should be noted that the author of the above article was commenting upon the 1964 Preliminary Draft in which the right to opt out was not unqualified. The Preliminary Draft stated that "[t]he court shall exclude those members who, by a date to be specified, request exclusion, unless the court finds that their exclusion is essential to the fair and efficient adjudication of the controversy and states its reason therefor [sic]." Amendments to the Rules of Civil Procedure for the United States District Courts Proposed by the Advisory Committee on Civil Rules, 34 F.R.D. 371, 386 (1964) (Proposed Rule 23(c)(2)). For an argument that the Preliminary Draft of Rule 23(c)(2) was preferable to the Rule as adopted in 1966, see Note, Revised Federal Rule 23, Class Actions: Surviving Difficulties and New Problems Require Further Amendment, 52 MINN. L. REV. 483, 525-26 (1967).
For an opposing pre-enactment view of the opt-out scheme and the binding effect of judgments in the proposed (b)(3) type class actions, see, e.g., Comm. on Fed. Rules of Civil Procedure, Judicial Conference--Ninth Circuit, Supplemental Report, 37 F.R.D. 71, 82-83 (1965).

[FN27]. Charles Joiner, The New Civil Rules, A Substantial Improvement, 40 F.R.D. 359, 366-67 (1966).

[FN28]. See supra app. note 19 and accompanying text. See also Ford, supra app. note 18 (expressing the view that the underlying purpose of class actions is to redress small injuries to a large number of persons).

[FN29]. Kaplan, supra app. note 15, at 397.

[FN30]. Marvin E. Frankel, Some Preliminary Observations Concerning Civil Rule 23, 43 F.R.D. 39, 45 (1967). Frankel believed that if the "non-exhaustive list" of criteria of subdivision (b)(3) were met, then "the preliminary shock of 'binding' absent people will subside or disappear." Id. at 45-46. Additionally, he argued that it was "not really unprecedented" to bind absentee members, pointing to the former "true" class action, in rem proceedings, and stare decisis, which binds "countless people in lawsuits in which they did not participate." Id. at 46. Frankel also remarked that the opt-out rule was limited, in that absent parties had a right to attack the judgment which purported to bind them, for example, on the ground of inadequacy of representation. Id. Moreover, the rule was limited by the fact that the judgment was only conclusive on the issues actually litigated. Id. at 47.

[FN31]. See Weithers, supra app. note 23, at 525; See also William Simon, Class Actions--Useful Tool or Engine of Destruction, 55 F.R.D. 375, 377-78 (1972):
   Failure to opt out cannot be interpreted as interest in the class action. This is shown by the fact that in settled cases, where members of the class get an automatic recovery by responding, most of those who do not opt out do not bother to file claims. The result therefore is not the consolidation of many viable claims in a single simplified lawsuit, but rather the generation of claims for people who have no interest in pursuing them.
Id.
Several objections were made concerning the validity of the enactment of Rule 23. One commentator argued that, by expressly stating the effect of a judgment in a class suit, the Rule violated the Federal Rules Enabling Act, which provides that the Supreme Court may prescribe rules of procedure for federal district courts but "shall not abridge, enlarge or modify any substantive right." See Note, supra app. note 17, at 1164-65 (citing 28 U.S.C. § 2072 (1958)). Another objection was that the Rule had the effect of extending jurisdiction in contradiction to Fed. R. Civ. P. 82, which provides that the rules "shall not be construed to extend the jurisdiction of the United States

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

district courts." See Sherman L. Cohn, The New Federal Rules of Civil Procedure, 54 Geo. L.J. 1204, 1219-22 (1966). For a response to the latter objection, see Kaplan, supra app. note 15, at 397.

[FN32]. Weithers, supra app. note 23, at 518. See also Simon supra app. note 31, at 377 (arguing that courts which view the Rule as providing a remedy to small claimants "frustrate the original goals of the intended reform" because "[i]nstead of improving efficiency, the amendment has fostered a flood of class litigations").

[FN33]. In fact, by 1972 a prominent group of trial lawyers had concluded that Rule 23 had "failed to achieve its purposes," and proposed six revisions of Rule 23, which included a return to the former opt-in mechanism. See Am. College of Trial Lawyers, Report and Recommendations of the Special Committee on Rule 23 of the Federal Rules of Civil Procedure 2, 6 (1972).

[FN34]. Evidence suggests that expansion of class action filings occurred shortly after the promulgation of the 1966 amendments. Thus, a statistical study of civil dockets of federal courts in the Southern District of New York indicated that nearly four times as many class actions were commenced in 1971 as were started in 1967, the first full year under the rule. Id. at 13. See also DEBORAH HENSLER ET AL., RAND INST. FOR CIVIL JUSTICE, CLASS ACTION DILEMMAS: PURSUING PUBLIC GOALS FOR PRIVATE GAIN (2000); 1 CLASS ACTION WATCH, Federalist Society's Litigation Practice Group Class Action Subcommittee at A1 (a survey of class actions pending in Texas state courts).

[FN35]. See, e.g., Milton Handler, The Shift from Substantive to Procedural Innovations in Antitrust Suits, 71 COLUM. L. REV. 1, 9 (1971) (likening the coercive effect to "legalized blackmail").

[FN36]. Weithers, supra app. note 23, at 522. An unsigned memo provided to the Advisory Committee in 1974 criticized amended Rule 23 because (b)(3) class actions "force defendants into settlements regardless of the merits of the claims because the cost of defense or the size of potential recovery is intimidating." See Resnik, supra app. note 8, at 16 n.45. For a discussion of the coercive effects of the certification of class actions, see Section I.A of main article.

[FN37]. Weithers, supra app. note 23, at 521-23.

[FN38]. See, e.g., Rodman Ward, Jr. & Wayne N. Elliot, The Contents and Mechanics of Rule 23 Notice, 10 B.C. INDUS. & COM. L. REV. 557 (1969).

[FN39]. Id. at 561-64.

[FN40]. Id. at 564-67.

[FN41]. Kaplan, supra app. note 15, at 393; see also Resnik, supra app. note 8, at 11 (The drafters of Rule 23 "did not see the class action as responsive to the problems of mass torts."); William W. Schwarzer, Structuring Multiclaim Litigation: Should Rule 23 Be Revised?, 94 MICH. L. REV. 1250, 1253 (1996) ("One purpose the drafters did not have, however, was to create a device for the aggregation of multiparty litigation. That type of litigation still lay largely in the future.").

[FN42]. Fed. R. Civ. P. 23, advisory committee's note, 39 F.R.D. 69, 98-107 (1966). At least one member of the Committee believed that mass torts should be absolutely excluded from certification as a class action. See Resnik, supra app. note 8, at 10 (describing a letter from John Frank to Benjamin Kaplan in which he writes, "I am, I believe, unpersuadably opposed to the use of class actions in the mass tort situation").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 WMMELPR 243                                                              Page 58

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

In considering whether to certify mass torts as class actions some courts have noted that the advisory committee's note does not mention or refer to mass torts, only "mass accidents." See Patricia Rimland,  National Asbestos Litigation: Procedural Problems Must Be Solved, 69 WASH. U. L.Q. 899, 903 n.35 (1991).

[FN43]. See Resnik, supra app. note 8, at 17 n.53.

[FN44]. Am. College of Trial Lawyers, Report and Recommendations of the Special Committee on  Rule 23 Approved by the Board of Regents 32 (1972) (citations omitted).

[FN45]. Id. at 17-19. See Bruce H. Neilson, Was the 1966 Advisory Committee Right?: Suggested Revisions of Rule 23 to Allow More Frequent Use of Class Actions in Mass Tort Litigation, 25 HARV. J. ON LEGIS. 461 (1988) (describing several techniques developed by federal district court judges to allow class actions in mass tort cases). Interestingly, Justice Hugo Black dissented from the adoption of the 1966 amendments because, inter alia, he thought that judges were given too much discretion in class suits. 39 F.R.D. 272, 274 (1967) (Mr. Justice Black's Statement). Of course, many judges declined to certify mass torts as class actions in accordance with the constraints suggested by the advisory committee's note. For a summary of some of these decisions, see Richard A. Chesley & Kathleen Woods Kolodgy, Mass Exposure Torts: An Efficient Solution to a Complex Problem, 54 U. CIN. L. REV. 467, 485-90 (1985).

[FN46]. Wright stated:
    I was an ex officio member of the Advisory Committee on Civil Rules when Rule 23 was amended, which came out with an Advisory Committee Note saying that mass torts are inappropriate for class certification. I thought then that was true. I am profoundly convinced now that this is untrue. Unless we can use the class action and devices built on the class action, our judicial system is simply not going to be able to cope with the challenge of the mass repetitive wrong that we see in this case and so many others.
In re  A.H. Robbins Co., 880 F.2d. 709, 731 (7th Cir. 1989) (quoting Statement of Charles Alan Wright, In Re School Asbestos Litigation, Master File No. 83-0286 (E.D. Pa. July 30, 1984)).

[FN47]. See Resnik, supra app. note 8, at 21.

[FN48]. While Arthur Miller has argued that Rule 23 cannot be blamed for the explosion of class action litigation in the fields of civil rights, antitrust, consumers' rights, and environmental protection, it is interesting to note that he did not explicitly address mass tort litigation. See text accompanying supra app. note 22. Regarding the new opt-out mechanism, Miller stated:
    It is true of course that the shift from an opt-in to an opt-out procedure has heightened the attractiveness of seeking damages under the federal antitrust and securities laws. The effect is to facilitate the aggregation of relatively small claims that are not individually economically viable into a group claim that is sufficiently credible to be taken seriously. It is difficult to believe, however, that an alternative procedure for achieving the same result would not have been developed by plaintiffs had they been left with the pre-1966 text.
Miller, supra app. note 4, at 674.

[FN49]. For an argument that the change to opt-out is unconstitutional in at least some applications, see Stephen J. Safranek, Do Class Action Plaintiffs Lose Their Constitutional Rights?, 1996 WIS. L. REV. 263 (1996).

[FN50]. See generally Edward H. Cooper, The (Cloudy) Future of Class Actions, 40 ARIZ. L. REV. 923 (1998); Leslie W. O'Leary, Mass Tort Class Actions: Will Amchem Spawn Creative Solutions?, 65 DEF. COUNS. J. 469 (1998); Thomas E. Willgren et al., An  Empirical Analysis of Rule 23 To Address The Rulemaking Challenges, 71 N.Y.U. L. REV. 74 (1996).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26 Wm. & Mary Envtl. L. & Pol'y Rev. 243

**(Cite as: 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243)**

[FN51]. Statement on Class Actions Before the Courts and Intellectual Property Subcomm. of the H. Comm. on the Judiciary, Mar. 5, 1998, 105th Cong. (statement of John P. Frank) (quoting Judge Paul Niemeyer, before the Senate Judiciary Comm., Dec. 16, 1997), available at http:// www.house.gov/judiciary/41158.htm (last visited Dec. 1, 2001). Mr. Frank, a member of the Civil Rules Committee at the time of the 1966 Amendment, sets forth several recommendations in his testimony to deal with the excesses that the amendments have spawned. Id.

[FN52]. See John H. Beisner, "Congressional Reform Efforts," reference materials for use in a presentation at "Understanding Class Actions," a conference of the Manhattan Institute's Center for Judicial Studies, Washington, D.C., May 20, 1998, (on file with author) for a compendium of materials on H.R. 3789, 105th Cong. (1998). The bill would allow removal of class actions filed in state courts to federal courts in some instances not now permitted to combat such abusive practices of plaintiffs' class action counsel as: adding a defendant to a state court class action proceeding to destroy "complete diversity" and then, after the one year period for removal to federal court, 28 U.S.C. § 1446(b) (2002), has expired, dropping that defendant; limiting the relief demanded in a state court class action to avoid removal to federal court because of the class amount, see Zahn v. Int'l Paper, 414 U.S. 291 (1973) (in a putative class action, the jurisdictional amount requirement-- now $75,000--applies to the claims of each and every class member, and then after the one year period for removal has expired, amending the complaint to seek relief in excess of the diversity jurisdictional amount threshold; and filing putative class actions in state court in states that have no deadline for providing service and then not serving the defendant until the one year deadline has expired).

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.