# Appendix Exhibit D



31 PEPLR 33                                                                  Page 1

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

c

Pepperdine Law Review
2003

**Asbestos Litigation & Tort Law: Trends, Ethics, & Solutions**

**\*33** ON THE THEORY CLASS'S THEORIES OF ASBESTOS LITIGATION: THE DISCONNECT
BETWEEN SCHOLARSHIP AND REALITY

Lester Brickman [FNa1]

Copyright © 2003 Pepperdine University School of Law; Lester Brickman

**\*34** Table of Contents

I. Introduction

II. Exposure to Asbestos Containing Materials: Medical Consequences

III. A Brief History of Asbestos Claiming

IV. The Phenomenon of the Unimpaired Claimant

  A. Unimpaired Pleural Plaque Claims

  B. Unimpaired Asbestosis Claims

V. Attorney-Sponsored Asbestos Screening

  A. Introduction

  B. How Screenings Are Conducted

    1. Two Screening Enterprises: A Description in Detail

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

C. Mass Screenings: The Percentage That Test Positive for Asbestosis

D. Financial Incentives That Permeate Attorney-Sponsored Asbestos Screenings

E. The National Tire Workers Litigation Project and Its Progeny

VI. Additional Analysis of the Medical Evidence in Asbestos Claiming

    A. Medical Evidence Produced by Asbestos Screenings Versus Medical Science

    B. The Sea Change in Medical Diagnoses That Resulted from the Georine

    Settlement

    C. Pulmonary Function Tests Administered in Asbestos Screenings

    D. The Effect of the Manville Audit on Asbestos Claiming

VII. The Role of Party and Witness Testimonial in Specious Claiming

    A. The Nunc Pro Tunc Change in Witness Testimony with Regard to the

    Percentage of Manville Product at Various Work Sites

    B. The Baron & Budd "Script Memo"

VIII. Scholarship About Asbestos Litigation

**\*35** I. Introduction

When the complete and unexpurgated history of asbestos litigation is finally written, that litigation will surely come to be considered for entry into the pantheon of such great American scandals as the Yazoo land scandals, Credit Mobilier, Teapot Dome, Billy Sol Estis, the salad oil scandals, the Savings & Loan scandals, WorldCom, and Enron. Even as that history is being written and assimilated, it has already become apparent that, for the most part, asbestos litigation has become a malignant enterprise. Despite mounting evidence of massive, specious claiming in asbestos litigation, few voices appear willing to acknowledge this reality. This article presents an analysis of that malignant enterprise; how it developed; how it came to prosper; how it is practiced; and why it has persisted.

Substantial exposure to certain forms of asbestos has had deadly consequences. Thousands of industrial and construction workers have been injured and killed by unlawful exposure to asbestos in their workplaces. [FN1] Hundreds of thousands more, assembled through an unprecedented recruitment effort by plaintiff lawyers (exceeded only by the "Uncle Sam Wants YOU" campaign launched at the outset of World War II), who have no discernable illness or impairment, have cashed in on this national tragedy. [FN2] Still hundreds of thousands, perhaps even millions more, will undoubtedly be recruited in the foreseeable future using the same recruitment process.

Even after 650,000 claims have already been advanced against scores of traditional defendants and thousands of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                          Page 3

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

peripheral defendants and at least hundreds of thousands of additional claims are certain to be brought over the remainder of the decade, the disconnect between asbestos-related injury claiming and asbestos-related injury continues apace. [FN3] It has been almost **\*36** thirty years since large numbers of industrial plant and construction workers have been exposed to high levels of friable asbestos fibers in the course of their employment. [FN4] Based upon the latency periods associated with asbestos-related diseases, rates of disease manifestation and claims based on such manifestation should have begun to significantly decline by no later than the mid 1990s. [FN5] Proving impervious to the predictions of medical science, the litigation has not only continued to grow, but has been reinvigorated by a huge influx of newly recruited claimants, most of whom share a common characteristic: they have no discernable illness. [FN6] As a legal phenomenon, the biggest litigation in history focuses attention on the role of courts in creating perverse litigation incentives by aggregating claims [FN7] and by reformulating tort law and procedure to accommodate the needs of asbestos claimants thereby inadvertently creating opportunities for meritless claiming. It has also focused attention on the existence of courts in Madison County, Illinois, West Virginia, Jefferson County, Mississippi, and Beaumont, Texas, inter alia, where courts' and plaintiff lawyers' interests appear closely aligned. As an economic phenomenon, asbestos litigation has attained catastrophic proportions: thousands of companies named as defendants, [FN8] nearly seventy companies bankrupted (and counting) of which one third have filed within the past three years, [FN9] thousands of jobs lost, **\*37** employee 401(k) plans decimated, and billions of dollars lost to investors. [FN10] As a political phenomenon, it has generated an enormous capital base for plaintiff lawyers, which is being redeployed to gain political clout and to fund such capital-intensive litigations, as the tobacco litigation. [FN11] As a cultural phenomenon, asbestos litigation has come to signify the Dickensian potentiality of modern products liability litigation; once begun, it is sustained by its own life force, enriching lawyers and others and impoverishing thousands of unseen victims. Indeed, the litigation may be seen to have taken on attributes of Pac-Man and the Energizer Bunny by gobbling up everything in sight, outlasting all other mass tort litigations, pausing only to search out new asset bases to consume, and showing no signs of exhaustion. Indeed, every estimate of the duration of the litigation **\*38** has fallen far short of the mark, [FN12] succumbing to the able talents of asbestos lawyers. [FN13]

Not surprisingly, the mother of all mass tort litigations has garnered an increasing share of study and commentary in law reviews and other scholarly publications. Much has already been written about it, [FN14] and much more will be written before it is finally concluded.

I have made my own contributions to that body of literature. [FN15] On the basis of my research, I have concluded that the substantial portion of asbestos litigation--upwards of 80% of claims being made in recent years and 90% currently--mostly consists of former industrial and construction workers:

   (1) recruited by an extensive network of entrepreneurial screening companies which are employed by lawyers to "screen" hundreds of thousands of potential litigants each year at local union halls, hotel and motel rooms, shopping center parking lots, and other locations throughout the country;

   (2) asserting claims of injury though they have no medically cognizable injury and usually cannot demonstrate any statistically significant increased likelihood of contracting an asbestos related disease in the future;

   **\*39** (3) in a civil justice system that has been significantly modified to accommodate the interests of these litigants by dispensing with many evidentiary requirements and proof of proximate cause;

   (4) mostly in forum-shopped jurisdictions, [FN16] where judges and juries often appear aligned with the interests of plaintiff lawyers; [FN17]

   **\*41** (5) often supported by specious medical evidence, including: (a) evidence generated by the entrepreneurial medical screening enterprises and B-readers--specially certified X-ray readers that the enterprises or plaintiff lawyers select, who often conform their findings and reports to the expectations of the plaintiff lawyers who retain them, and (b) pulmonary function tests (PFTs) which are often administered in violation of standards established by the American Thoracic Society and result in findings of impairment which would not be found if the tests were properly administered;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

   (6) who may frequently testify according to scripts prepared by their lawyers which include misstatements with regard to: (a) identifications and relative quantities of asbestos-containing products that they came in contact with at work sites, (b) the information printed on the containers in which the products were sold, and (c) their own physical impairments. Some may conclude on the basis of the evidence I present that these actions by plaintiff lawyers, the screening companies they employ, the medical experts they retain and the clients they represent, rise to the level of fraud. Fraud is defined as: "[a]n intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right. . . ." [FN18] While I do proffer the conclusion that many of these actions are "perversions of truth" which do induce defendants to pay substantial compensation, the reader will **\*42** have to sort through the evidence I present to determine whether the requisite intent to perpetrate fraud is present and, if so, how widespread it is.

In many instances, the evidence I present is circumstantial. Again, the burden will be on the reader to weigh the evidence. Circumstantial evidence can be quite compelling. If Robinson Crusoe, upon being shipwrecked on an apparently deserted isle, awakes one morning and finds fresh footprints in the sand which are not his own, the conclusion seems compelling - though it is based on circumstantial evidence. So, too, when a surgical instrument is found sewn up inside a patient who had recently undergone an operation. For each set of circumstantial evidence I present, the reader will have to determine the weight to be accorded to that evidence. For example, I present circumstantial evidence with regard to a sea change in party and witness testimony that occurred after the Johns-Manville bankruptcy and appears to recur with each succeeding bankruptcy of a major asbestos defendant. The underlying evidence is that both witness and party testimony in asbestos litigation regarding the percentages of various asbestos containing products used at various work sites in the 1950s and 1960s, appears to have dramatically changed over time. These changes appear to move in lockstep with defendant bankruptcies. When a defendant company goes bankrupt, party and witness testimony as to the percent of that company's products at various work sites at a particular time, shows a declining percentage; sometimes that decline is precipitous. Moreover, the changed testimony appears to maximize plaintiff recoveries. Various conclusions can be drawn from this evidence ranging from the effects of fading memories to pure happenstance to orchestration of testimony by plaintiff lawyers. It is my view, based on the evidence I present, that the sea change has been orchestrated by plaintiff lawyers. The evidence with regard to causation is circumstantial to be sure, but whether it is as compelling as Friday's footprints is for the reader to decide.

Some of the evidence that I will offer that B-readers and other medical experts are misdiagnosing claimants in order to generate substantial profits is subject to refutation on the ground that necessarily many of the X-ray readings and medical diagnoses involve quite subjective judgments. I acknowledge that. In any given case or even a set of hundreds of cases involving the X-ray detection of pleural plaques or very mild asbestosis, medical experts can and do differ in their interpretations of the X-rays. In the aggregate, however, where we are dealing with tens of thousands of X-ray readings, the possibility that huge and consistent discrepancies between the interpretations of neutral X-ray readers not concerned about a future flow of revenue and X-ray readers who read thousands and tens of thousands of X-rays and who realize tens of millions of dollars in repeat business from finding evidence of asbestosis or pleural plaques, can be explained as mere "inter-reader variability" recedes to near zero. Based on circumstantial evidence I present it is reasonable to conclude that the same B-readers who find evidence of mild asbestosis in very high percentages of those X-rays supplied to them by plaintiff lawyers and screening enterprises would, if reading the identical X-rays but in a different setting, such as routine pre-**\*43** operative intake X-rays done at hospitals, find virtually no asbestosis. Here, too, the effect of that evidence is one that the reader will have to measure.

Additionally, to enable the reader to determine whether there are substantial "perversions of truth" in asbestos litigation, I will focus on four broad categories of actions and events:
   (I). The actions of plaintiff lawyers in forming or contracting with screening enterprises to recruit hundreds of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

thousands of clients despite at least constructive knowledge that the medical evidence produced through the screening process is not intended to and does not meet minimal medical criteria for the performance of those medical procedures.

(II). The reliance by the plaintiff lawyers on these mass screenings to generate up to 90% of new claims in spite of the fact that the vast majority of the claimants thus produced have (a) no medically cognizable injury, and (b) have actual lung conditions which are not medically distinguishable from many, if not most, of the adult male population of the United States of similar age to those recruited which population has not had industrial exposure to asbestos.

(III). The generation of medical evidence in support of these claims by screening enterprise doctors which is distorted by powerful financial incentives.

(IV). The actions of some plaintiff lawyers in creating memories as part of preparation of parties and witnesses for deposition testimony with respect to: (1) the identification of asbestos-containing products used by claimants or with which they came into contact at various work sites; (2) the quantities of each of those products as a percentage of the total quantities of asbestos-containing product that claimants come in contact with at work sites; and (3) the state of the claimant's health. Irrespective of the conclusion a reader reaches as to the existence of "perversions of truth," it is beyond cavil that there has been a massive civil justice system failure with regard to asbestos litigation. Given the unique nature of asbestos claiming and its enormity, a naïve reader might expect to find some discussion of this massive civil justice system failure in the scholarly literature. But a review of those writings, in particular the theories of the litigation advanced by the theory class, indicates instead a primary focus on how transactional costs can be reduced. That is, ways in which the flow of money from defendants to plaintiffs and their lawyers can be more **\*44** expeditiously and efficiently prioritized and routed. The failure to either acknowledge or analyze the overriding reality of specious claiming and meritless claims demonstrates a disconnect between the scholarship and the reality of the litigation that is nearly as wide as the disconnect between rates of disease claiming and actual disease manifestation. I propose to offer some tentative explanations of this phenomenon.

To do so, I will first briefly examine the etiology of asbestos-related diseases and the history of asbestos claiming, including a discussion of the modifications to tort claiming wrought by courts in response to the asbestos litigation crisis and the phenomenon of the unimpaired claimant and their role in asbestos litigation. I then present a detailed discussion of attorney-sponsored asbestos screenings largely based upon the deposition testimony of owners of the screening enterprises and the doctors and technicians they employ, including analysis of how the screenings are conducted, the financial incentives that pervade the screening process and heavily influence the outcomes generated, and the evidence regarding the number of persons screened who are found "positive" for asbestosis on the basis of X-ray readings and impaired on the basis of performance on pulmonary function tests.

Following that I compare the medical data produced by medical science with the medical evidence produced by screening enterprises, including a discussion of how the medical data produced by screenings was tectonically shifted in response to litigation needs. I then carefully scrutinize the tremendous adjuvant effect on specious claiming of the failure of the Manville Trust to put a medical audit procedure into effect. Following that, I discuss evidence showing that some witness and party testimony is heavily influenced by lawyers' efforts to create memories irrespective of the underlying facts. Finally, I conclude with some brief almost-theories, heuristic notions, about why the theory class's theories about asbestos litigation largely ignore the phenomenon of the large and unprecedented scale of the specious claiming that characterizes asbestos litigation today.

### II. Exposure To Asbestos Containing Materials: Medical Consequences

Asbestos litigation is based largely upon three categories of injury: malignancies, asbestosis, and pleural plaques. Malignancies, including mesothelioma, lung cancer, and other cancers are the most severe of the asbestos-related illnesses that are alleged to result from substantial and prolonged exposures to asbestos dusts. Mesothelioma is a particularly virulent cancer, which is gruesome to behold and always results in death. [FN19] **\*45** Approximately

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

2000 mesothelioma cases are diagnosed each year, of which most are attributable to asbestos exposure. [FN20] Scientists do not have separate data on lung cancer deaths associated with asbestos exposure; about 1200 new asbestos-related lung cancer claims were filed annually in the 1990s. [FN21] In order for lung cancer to be attributable to asbestos exposure, the lung cancer must be primary and not metastasized from another part of the body, [FN22] and the weight of medical evidence is that there must be a finding of asbestosis. [FN23] Studies investigating a correlation between asbestos exposure and other cancers "provides very strong evidence that asbestos does not cause or enhance an individual's risk for [other] cancer [s]," [FN24] with the only **\*46** exception being a disputed relationship between asbestos and laryngeal cancer. [FN25]

Asbestosis is a term applied to a scarring of lung tissue when the cause is believed to be asbestos exposure. Prolonged exposure to scores of different dust particles which penetrate the lung's forward line of defenses results in the accumulation of macrophages and inflammatory cells in the alveoli (the air exchange sacks of the lung), which can lead to a scarring of lung tissue. [FN26] When that occurs, the condition is termed interstitial or parenchymal "fibrosis." [FN27] If the fibrosis is the result of exposure to silica (sand), the condition is termed "silicosis"; if it is the result of exposure to asbestos, it is called "asbestosis." [FN28] While fibrosis caused by silica exposure manifests differently on an X-ray than fibrosis caused by asbestos exposure, the principal difference ensuing from identifying a fibrosis as asbestosis, that is, caused by exposure to asbestos, rather than one of the other causes of fibrosis, does not lie in the medical realm. Rather, it is a function of the compensation system. Whereas a diagnosis of one cause of fibrosis may yield no compensable claim, a clinical diagnosis of asbestosis enables the subject to be eligible for compensation. [FN29]

**\*47** In its mildest form, asbestosis causes no breathing impairment and is detectable only by chest X-ray. In more severe cases, significant fibrosis can decrease the elasticity of the lungs, and "interfere with the lung's ability to oxygenate the blood." [FN30] In its most severe form, asbestosis is progressive and debilitating and can lead to death. The degree of asbestosis, as determined by X-ray reading, is usually evaluated according to a classification system developed by the International Labour Office (ILO). [FN31] The system uses a scale that was developed to systematically record the radiographic abnormalities in the chest provoked by the inhalation of dusts. [FN32] On the ILO scale, chest X-rays are classified according to the number of abnormalities (termed "opacities") in a given area of the chest film. They are usually read by B-readers, specially qualified persons who have been **\*48** certified by NIOSH as to their expertise. [FN33] A zero corresponds to no abnormalities, one to slight, two to moderate, and three to severe. "Since this process is to some degree inherently subjective, readers give two classifications, the category that they think most likely and next most likely. The result is a twelve point scale, with results ranging from 0/0 (normal [X-ray] appearance) to 3/3 (severe abnormalities)." [FN34] "The vast majority of screening x-rays (for which asbestosis is claimed) are read as "1/0", which means the x-ray on first impression is abnormal ("1"), but may be normal ("0")." [FN35] A reading of 1/1 is stronger than a 1/0 and means that the reader found clear evidence of irregularities. [FN36] For purposes of identifying and locating opacities, the ILO form divides the lungs into six zones, upper, middle and lower, left and right. For a diagnosis of asbestosis, the opacities should be found bilaterally in the lower zones. Nonetheless, a B-reader may assign a 1/0 grade even if he finds irregular opacities in only one of the six zones. While NIOSH and ILO standards permit a clinical finding of asbestosis based upon a 1/0 grade provided that the clinical diagnosis is based upon a complete medical examination and evidence of impairment, [FN37] the American Thoracic Society ("ATS"), which has adopted criteria to be used in the diagnosis of asbestosis, maintains that "the findings on the chest roentgenogram are the most important," [FN38] and that a reading of 1/1 or greater should be met to make a diagnosis of asbestosis; [FN39] otherwise, considerable caution is warranted because in readings of lesser degrees of abnormality, there can be "numerous causes of such roentgenologic shadowing other than [asbestosis]" . [FN40] This uncertainty is compounded by the fact that there are **\*49** more than 150 causes of fibrosis, other than exposure to asbestos, including obesity and old age, that present similarly to 1/0 asbestosis on X-rays. Nearly one-quarter of men "between the ages of 55 to 64 in the general population have lung abnormalities that register at least 1/0 on the ILO scale, and the prevalence of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

such X-ray readings continues to increase with age." [FN41] Finally, because asbestosis is one of the most ubiquitous of the Earth's minerals and in addition, millions of cars still spew thousands of asbestos fibers into the air each time a driver applies the brakes, many if not most adults in the general population have significant numbers of asbestos fibers in their lungs; however, despite breathing in millions of asbestos fibers annually, virtually none of the population thus exposed to ambient concentrations of asbestos fibers thereby suffer adverse effects on their health. [FN42] Nonetheless, the presence of millions of asbestos fibers in the **\*51** lungs of the general population including the lungs of occupationally exposed workers has led to misdiagnoses of asbestosis. [FN43]

Unlike asbestosis, pleural plaques are not found in lung tissue. They are deposits of collagen fibers, detectable only by X-rays, that are visible fifteen to twenty or more years after initial and substantial exposure to asbestos, as thickenings of the lining (pleura) of the lungs. [FN44] The vast majority of individuals with plaques have no lung impairment, no restrictions on movement, in fact, no symptomatology whatsoever. [FN45] For most, it is a **\*52** totally benign condition, which has been likened to freckles on the skin, which result from exposure to sunlight. [FN46] Furthermore, there is no scientifically credible evidence that those diagnosed with pleural plaques have any greater likelihood of contracting an asbestos-related disease than if no pleural plaques were found. [FN47] Indeed, someone diagnosed with pleural plaques who has not by then developed asbestosis has a lower likelihood of thereafter contracting asbestosis than a similarly exposed individual who does not have pleural plaques. [FN48] Moreover, there is no credible evidence **\*53** relating the existence of pleural plaques to malignancy. [FN49] Nonetheless, pleural plaques are considered a disease in some states, though in others, such a categorization is rejected. [FN50] Pleural plaque claims are also **\*54** denominated as a basis for "fear of cancer" claims in some states though this has been termed a "radical departure" from traditional tort law. [FN51] From 1985 to 1995, pleural plaques were a major factor in asbestos litigation. For reasons to be pointed out in this article, such claiming has declined precipitously since the mid-1990s.

### III. A Brief History of Asbestos Claiming

The beginning of the modern history of asbestos claiming may be traced to Borel v. Fibreboard. [FN52] Motivated by the discovery of damning evidence that the Johns-Manville Corporation had conspired with the Raybestos-Manhattan Corporation and others decades earlier to suppress information about the deadly hazards of inhaling asbestos in the course of mining and manufacturing asbestos-containing materials, [FN53] the court held manufacturers of asbestos containing materials strictly liable for failure to warn of an unreasonably dangerous product, thereby fundamentally enlarging what were workmen's compensation claims to also allow products liability claims, and thus expanding the scope of liability from employers to suppliers and installers of building materials. [FN54]

Asbestos litigation thereafter was mostly focused against the Johns-Manville Corporation, which mined most of the asbestos used on the United States and was by far the leading manufacturer of asbestos-containing materials. [FN55] In 1982, claims against Johns-Manville had mushroomed to 16,000 and surprising most everyone, the company declared bankruptcy. [FN56] **\*55** This posed a severe problem for plaintiff attorneys, setting off a concerted effort to find other deep pockets to supplant and supplement Manville, a process which inures to this day as seventy companies have joined Manville in entering bankruptcy. [FN57]

Shortly before the Manville bankruptcy, Judge David Bazelon of the District of Columbia Circuit Court of Appeals held that insurance companies that had issued liability policies to asbestos defendants at any time between workers' initial exposures to asbestos and actual disease manifestation, which therefore encompassed as much as a fifty year period, were liable up to policy limits for each and every policy issued in each and every year in that time frame. [FN58] The decision rewrote insurance policies to create, in one fell swoop, tens of billions of dollars in insurance coverage. The effect of this holding was intensely magnified by the application of successor liability

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

laws, [FN59] to inculpate corporate purchasers of asbestos-containing product manufacturers to the full extent of the assets of the purchaser including its insurance coverage.

Judge Bazelon's decision had consequences far beyond any that could have been contemplated at the time. It would later become known that a number of insurance companies had issued comprehensive general liability insurance to asbestos product manufacturers or to the successor companies that purchased the manufacturers that included per person or per occurrence limits but did not set aggregate policy limits, thus exposing these insurers to virtually unlimited liability, in the billions of dollars. [FN60] Unlimited coverage, **\*56** in turn, made plaintiff lawyers and asbestos defendants allies in some cases. In exchange for not putting them into bankruptcy, asbestos defendants entered into arrangements with plaintiff lawyers to not contest claims; instead, they would simply agree to settle them en masse or not contest them in court and accept default judgments and then tender these liabilities to the insurance companies for payment. In some cases, this appears to have encouraged plaintiff lawyers to put forward meritless claims secure in the knowledge that defendants would not give them close scrutiny.

In addition to substantially enlarging the asset pool, the courts also substantially altered the legal landscape in order to facilitate access to the huge asset pool that they had created. A typical asbestos claimant had worked ten, twenty, or even forty years earlier at multiple job sites such as shipyards, construction jobs, or industrial plants. Many different products that contained asbestos were used at those sites. Workers' recollections of those products were sometimes nonexistent and often limited; more importantly, in the absence of a "market share" theory of liability, it was difficult to tie a claim of disease to exposure to a specific product, that is, to establish the proximate cause that tort law required. To overcome the problems of proof and, in particular, the proximate cause obstacle, some courts modified substantive law and procedure to deal with asbestos-related injuries by creating what I have previously termed, "special asbestos law." [FN61] Special asbestos law included: a redefinition of injury to allow unimpaired persons to bring suit; a highly relaxed standard for proving that exposure to a specific defendant's products caused plaintiff's injury, a critical element of proximate cause; [FN62] changes in measurement of damages; the promiscuous availability of multiple punitive damage awards punishing defendants again and again for identical conduct as a way of herding cash cows to the settlement pasture; [FN63] procedural rule changes including allowing enormous **\*57** aggregations that created bet-the-company scenarios that forced defendants to settle cases that they often would have won had they been tried and cases that would never have even been filed but for the aggregations; [FN64] allowing plaintiff lawyers to effectively control courts' calendars, select the specific cases to be tried from among the many filed, and allow multiple suits against a defendant in several different courts simultaneously in order to maximize pressure on defendants to settle scores and even hundreds of cases which were typically aggregated and which usually included a few seriously ill claimants with the remainder unimpaired; resulting in large scale acquiescence by defendants to settlement policies demanded by plaintiff lawyers that allowed enormous numbers of claimants without any illness to be mass processed in so-called inventory settlements and "settlement programs" to settle future inventories of cases. [FN65]

**\*59** Many of these changes were made with the noblest of motives. But in adjusting substantive and procedural law to meet the exigencies of compelling asbestos claimants, that is, in creating a result-driven evidentiary regime for cases where the fullest compensation for serious injury seemed merited, trial and appellate courts failed to confine the application of special asbestos law to cases of serious injury. An unintended consequence of special asbestos law was that it created fertile ground in which meritless claiming could flourish. Plaintiff lawyers saw and seized the opportunities to recruit large numbers of new claimants who could also pass muster under special asbestos law even though their injuries were marginal at most and soon, purely pretextual.

IV. The Phenomenon of the Unimpaired Claimant

"Special asbestos law" has facilitated meritless claiming in a number of ways. First and foremost is the monetization of the claims of unimpaired workers who have no medically cognizable injury but who have

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

nonetheless been awarded billions of dollars in judgments and settlements. [FN66] Indeed, the crux of the asbestos litigation crisis is the unimpaired claimant.  [FN67] Unimpaired claimants allege two types of injury: pleural plaques and asbestosis. [FN68]

Plaintiff lawyers are able to maintain a near inexhaustible supply of such claimants by use of attorney-sponsored mass screenings to identify thousands who are then diagnosed by the processes used in the screenings, to have asbestos-related lung conditions. Special asbestos law further facilitates meritless claiming by allowing claims of unimpaired persons to get to juries if there is a doctor's statement that the X-ray is "consistent with asbestosis" even though that is not a diagnosis of illness or injury.  [FN69] Instead, *60 juries in those instances are allowed, in effect, to do their own medical diagnoses that are heavily influenced by parties' assertions of shortness of breath and other symptoms of lung impairment,  [FN70] which may be limited in duration to the time during which the claim is tried. [FN71]

A. Unimpaired Pleural Plaque Claims

Up until approximately the early to mid 1990s, the vast majority of unimpaired claimants alleged pleural plaques or "pleural disease" as the injury that they suffered from exposure to asbestos containing products. Termed in the trade as "exposure only claims" because the plaques are markers of extensive exposure to asbestos, the vast majority of pleural plaque claimants, as noted, have no symptomatology, no diminished lung capacity, no greater likelihood of contracting a malignancy than similarly exposed workers, and likely have a considerably diminished likelihood of thereafter developing asbestosis than similarly exposed workers who do not have pleural plaques. Thus, despite its denomination as a disease or injury in some states, there is no scientific basis for denominating most pleural plaque claimants as injured [FN72] and no legal basis for valuing such claims since no injury has occurred.

Compounding the illegitimacy of pleural plaque claiming is the medical diagnostic process by which the existence of pleural plaques is established. As noted, pleural plaques do not occur in the tissues of the lung; they are opacities in the thin membrane called the pleura which covers the surface of the lung and lines the chest wall. [FN73] In the relatively few cases where there is considerable thickening, X-ray evidence of such opacities is clear to specialized B-readers but most often, when dealing with the typical pleural plaque episode the diagnoses can be like Rorschach tests, mostly in the mind of the beholder. [FN74] Since the beholders are being paid substantial sums for their services, especially when they are retained to read thousands of such X-rays over time, they have an enormous financial incentive to find what they are being asked to look for. There is compelling evidence that some of these readers find pleural plaques in X-rays irrespective of whether they exist. [FN75]

*61 B. Unimpaired Asbestosis Claims

One feature of special asbestos law that is closely associated with specious claiming is the standard of proof of injury required to allow a case to go to a jury. For claims of asbestosis, the standard imposed is often satisfied by expert medical testimony that on the basis of an X-ray, the condition of a plaintiff's lungs is "consistent with asbestosis."  [FN76] While the "consistent with" standard is utterly inconsistent with both medical diagnostic protocols [FN77] and traditional legal standards of proof,  [FN78] it is not simply tolerant of specious claiming but an active inducement thereto. As noted earlier, asbestosis exists in both mild and severe forms. On the 12 point ILO scale,  [FN79] most current asbestosis claimants who submit X-rays in support of their claims, present a reading of 1/0.  [FN80] There is a substantial quantum of evidence that diagnoses of 1/0 asbestosis and findings of "consistent with asbestosis" are largely a function of enormous financial rewards, not good faith medical practice, and are produced with knowledge that they will be used to induce defendants to pay compensation to persons that have no injury or impairment. For example, "[t]here are more than 150 types or causes of interstitial lung disease

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                    Page 10

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[fibrosis] . . . which present similarly on X-rays" [FN81] as mild asbestosis, including smoking, obesity and the universally dreaded disease of old age. [FN82] Indeed, many individuals in the **\*62** general population have lung conditions that could be diagnosed as "consistent with asbestosis" [FN83] including populations that have not been exposed to asbestos in the workplace. [FN84] In addition, asbestosis has been characterized as a "disappearing disease;" almost no new actual cases of asbestosis have manifested in the past ten years. [FN85] The weight of the evidence presented in this article is that asbestosis as diagnosed by attorney-sponsored asbestos screenings exists primarily if not exclusively as a function of the compensation system. This conclusion will be amplified in the following sections.

V. Attorney-Sponsored Asbestos Screening

A. Introduction

The synergistic effects of creating billions of dollars in newly minted insurance coverage and the similar effects of successor liability laws; coupled with special asbestos law which intensely facilitated asbestos claiming by (1) substantially eliminating the critical requirement for an action in tort of establishing proximate cause and (2) allowing claims to go to a jury on the basis of testimony that the claimant's lung conditions are "consistent with asbestosis" (despite the fact that a substantial portion of the adult population likely have lung conditions "consistent with asbestosis"), presented plaintiff attorneys with unprecedented opportunities. With billions of dollars thus made available and numerous yellow brick roads carefully crafted by plaintiff lawyers that led to the vaults of a few score of corporate **\*63** defendants, [FN86] what was then needed to tap into this pool were claimants: not one-by-one as in traditional tort litigation as would be the case if asbestos litigation were confined to malignancies; not by the hundreds or thousands as would be the case if asbestos litigation were restricted, in addition, to actual cases of asbestosis; but by the tens and hundreds of thousands. The obstacle that plaintiff lawyers faced in the mid 1980s is that while they had crafted the proverbial sorcerer's stone that could turn base metal into gold, they could not yet conjure up enough claimants to take full advantage of the unique opportunities that beckoned. The need for masses of claimants that would enable attorneys to fully exploit the multi-billion dollar asset pools was met by the initiation of attorney-sponsored asbestos screenings in the mid-1980s. [FN87]

It is important, at the outset, to distinguish medical screening from asbestos screening. The former involve "the application of a test to detect a potential disease or condition in a person who has no known signs or symptoms of that disease or condition," for the purpose of detecting disease "early in its natural history when treatment might be more effective, less expensive, or both." [FN88] Asbestos screenings are quite different. [FN89] They are massive recruitment programs conducted by screening enterprises working for lawyers to target populations of current and former industrial and construction workers, typically referred to as "litigants," [FN90] who may have **\*64** been exposed at their work sites to asbestos-containing materials, in order to secure, on a mass basis, prodigious numbers of potential clients, and tap into the multi-billion dollar asset pools that were created. Asbestos screenings are not intended to detect disease for purposes of treatment; rather they are intended to identify "litigants" with the requisite characteristics that will generate tens of millions of dollars in fees and payments to screening companies and the doctors they hire and billions of dollars for lawyers who charge contingency fees typically ranging from 33% to 40%. [FN91] Nonetheless, in solicitation letters which are mailed to "litigants," some screening companies emphasize "medical concerns" about asbestos, promising that the screening will be "important and very beneficial." [FN92] Such letters typically promise that "[e]ach member of your union will be notified of his/her test results approximately four to six weeks following completion of the testing program," [FN93] thus implying that the results will be communicated by the doctor who interpreted the tests. Screening companies, however, generally do not provide those screened with copies of the test results; instead, they are sent to the lawyers who pay for the screenings "for the purpose of determining whether there will be a claim brought on behalf of the worker **\*65** who was screened." [FN94] Indeed, one of the largest of the screening enterprises has acknowledged that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

attorney-sponsored asbestos screenings serve no legitimate medical purpose:

[T]he sole purpose for [the law firm's] contractual relationship with Most [Health Services] and its decision to sponsor asbestos screening programs is in anticipation of future litigation against asbestos manufacturers . . . . [T]he entire screening process from the moment [the law firm] becomes involved is geared toward collecting evidence for future asbestos litigation. [FN95]

Screening enterprises administer X-rays in an assembly line basis using X-ray equipment on truck trailers brought to union halls, hotel and motel sites, and shopping center parking lots. In doing so, the complex requirements regarding the quality of the equipment, the electrical sources, and the actual administration may receive short shrift. [FN96] Moreover, because **\*66** the emphasis is on generating substantial financial returns by turning over huge volumes, and not on either providing medically useful information to a patient, or observing federal or state requirements in performing medical procedures, many asbestos screening enterprises "administer . . . X-rays in violation of state and federal safety regulations." [FN97] Often, the doctors who are hired to read the X-rays are "not . . . licensed to practice medicine in the state where the X-rays are taken." [FN98] In addition, many fail to follow medical **\*67** protocols for the detection of asbestos-related disease and instead use processes designed to maximize the revenues generated by the screenings. [FN99] Moreover, while "the recording of patient information such as medications, age, race, medical history, and exposure history are crucial to prevent errors in interpretation," [FN100] the persons hired by screening enterprises to gather that information typically lack any qualifications for the taking of exposure and medical histories and usually receive no training. [FN101] Besides processing high volumes of applicants for compensation, screening enterprises typically use doctors, in particular B-readers, who routinely read X-ray films differently than would occur if those films were being read in a pre-operative hospital setting rather than for litigation purposes. In addition, screening enterprises **\*68** administer pulmonary function tests in a manner that generates far higher numbers of lung-impaired persons than would be the case if the standards established by the American Thoracic Society were observed. [FN102]

The number of construction and plant workers that have undergone attorney-sponsored asbestosis screenings over the past seventeen years undoubtedly exceeds 1,000,000. Currently, hundreds of thousands of potential litigants are screened each year. According to the Manville Trust and others, more than 90% of all claims brought against the "trust in 2001 were brought by individuals with non-cancer claims, largely recruited through attorney-sponsored asbestos screenings." [FN103] At least one, Most Health Services, Inc., "has screened approximately 400,000 workers" from all fifty states as well as Puerto Rico; [FN104] it is likely that several others have each screened 100,000 or more workers.

B. How Screenings Are Conducted

No single method of organization or operation prevails; instead, screening enterprises follow many different methods of operation. [FN105] Based **\*70** upon a wide range of documentary evidence, I offer the following composites of typical operational formats: [FN106]

**\*71** Approximately fifteen screening enterprises have been created, of which approximately eight to ten are full service, that is, they perform both X-rays and PFT testing. [FN107] Most have been established by persons with no medical background or other qualifications to create or operate a service that administers medical diagnostic tests. Frequently, the principals are current or former local union officials who have themselves been recruited as "litigants" and have perceived the lucrative nature of the business. Some of **\*72** the principals worked for other screening companies and left to start their own enterprises. [FN108]

The screening companies purchase X-ray equipment which is installed in vans (one was called the "examobile") that are driven to the site of the screening. In addition, they purchase pulmonary function testing equipment which

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

is also installed in the same van or additional vans. Some screening companies contract out the performance of X-rays to other mobile van operators or to others with stationary equipment.

Once set up for business, the enterprise solicits lawyers who primarily do asbestos litigation to hire the screening enterprise to gather asbestos clients for the lawyers. [FN109] Often, the lawyers sponsoring the screening are acting as client collection agents for larger law firms, with which the collecting attorneys have referral fee arrangements, which amass thousands of such claims. [FN110] For example, claims collected in screenings done in the State of Washington, sponsored by a Texas attorney, may be sold off to **\*73** leading asbestos law firms in Maryland or Texas. [FN111] Claims are most likely to be filed in one or more of the "magic" jurisdictions, consolidated with other claims, including at least a few from the host jurisdiction. Many of these claims are presented for payment in inventory settlements or in pre-approved settlement programs, as was done for claims against Babcock & Wilcox and Combustion Engineering before both filed for bankruptcy. [FN112]

Upon retention, the enterprise or the attorney it is working for contacts labor union locals and seeks to conduct a screening at the union office or a nearby location. To facilitate this request, screening enterprises and asbestos lawyers conducting screenings often hire individuals who have been or are union officers to act as consultants, and ultimately use their union connections to arrange for screenings at union locals. [FN113]

If the union local agrees, as virtually all do, the union sends a letter to the lawyer who has retained the screening enterprise, which the lawyer has prepared, requesting the lawyer to conduct a screening. [FN114] In the alternative, the screening enterprise solicits the union local, and upon obtaining agreement, then solicits law firms to hire them and sponsor the screening. [FN115] **\*74** In either case, the law firms either pay the screening enterprise a fee for organizing and conducting the screening [FN116] or pay by the piece, i.e., $X per X-ray taken, $Y per X-ray read, $Z per PFT, another fee for interpretation of the PFT, etc. [FN117]

Payments by lawyers to screening companies and the requisite B-readers and doctors total tens of millions of dollars annually. [FN118] For lawyers, this is simply a cost of doing business: inventory acquisition. Lawyers' payments to screening enterprises and doctors largely come from the cash flow they receive from presenting previously screened "litigants" claims to asbestos defendants, who have agreed to enter into present and future inventory settlements of cases recruited by lawyer-sponsored screenings and, as well, of future cases to be recruited mainly by screenings. [FN119] Cash flow also comes from the presentation of these claims to some or all of the approximately fourteen bankruptcy trusts created after the bankruptcies of former manufacturers of asbestos containing products. [FN120] Indeed, the whole **\*76** screening process is dependent on the cash flow generated by previous screenings to fund future screenings. Attorney-sponsored asbestos screenings produce this cash flow by inundating defendants with huge volumes of claims generated by screenings--in the tens of thousands--that force defendants to pay the claims by effectively precluding them from meaningfully opposing these claims in the civil justice system. [FN121] Asbestos bankruptcy trusts also produce a substantial part of the cash flow. These trusts, which are set up by plaintiff lawyers and approved by bankruptcy courts, typically lack trust distribution procedures that would enable the trusts to reject the hundreds of thousands of meritless and specious claims presented for payment--claims which are supported by the findings of B-readers of the type described in this article, as well as by misadministered and mal-administered pulmonary function tests that generate false positive outcomes of impairment. [FN122]

Once it has a lawyer-sponsor, the screening enterprise mails out letters to the union local's members (or the union mails out the letters which are paid for by the screening enterprise or the lawyer), urging them to sign up for the screening. [FN123] The letters typically state that workers are eligible for free screenings if they have worked in occupations exposing them to asbestos containing products prior to 1972 (in some letters, prior to 1975). **\*77** Furthermore, if they have been screened previously and been found negative for an asbestos-related disease, they

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                    Page 13

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

can be rescreened provided at least one year has passed since the prior screening. The letters also contain several "hard sell" passages alerting the recipients to the fact that they may feel fine and be unaware of any medical problems and have no shortness of breath or other symptoms; however, they should still be screened because they may have an asbestos-related disease even if they are not so aware. Graphic descriptions of the dangerous consequences of exposure then follow. The letters also point out the availability of significant compensation if they qualify [FN124] and may include testimonials from others previously screened who have been richly rewarded for participating in a screening. Finally, the letter warns the recipients that if they do not attend the screening to determine whether they have a right to compensation, they may thereby end up forfeiting that right. [FN125]

In the alternative, some screening enterprises do not operate through union locals; instead they market directly to essentially the same audience by placing advertisements in local newspapers, sending out 15,000-20,000 mailings at a time to carefully selected audiences, and by using "800" phone numbers. These mailings are substantially similar to those used for screenings arranged through union locals. [FN126] Instead of holding the **\*78** screenings on union property, they are held at motel parking lots, strip shopping centers or shopping mall parking lots, and a variety of other locations to which the trailers are driven. In one case, screening enterprise personnel or the sponsoring lawyers involved in sponsoring the screenings--taking a page from high school groups advertising car washes by holding up signs at intersections--have actually stood on street corners holding placards which state in large bold letters: "Free Screening." [FN127]

**\*80** Once the screening site is set, most screening enterprises then bring a mobile van to the screening site which contains several X-ray machines and may also contain cubicles with PFT equipment for administering PFT tests. In some cases, taking the X-rays is contracted out to free-standing offices including those of chiropractors and clinics.

On the day of the screening, the "litigant," upon arrival at the designated site, meets with a representative of the law firm sponsoring the screening or their designee and signs a retainer agreement which provides that if the "litigant" tests positive for an asbestos-related condition, the law firm will represent that individual in a personal injury lawsuit for a contingency fee ranging from 33% to 40%. The agreement also provides that the client agrees to reimburse the lawyer for the costs of the screening from the proceeds of any recovery. Most everyone who attends the screening signs the agreement. If the "litigant" has already entered into a retainer agreement with a different lawyer, he is told that he is not eligible for the screening.

A screening enterprise employee then assists the "litigant" in filling out a form which includes some basic information such as social security number, height, weight, a work history and a medical release. He may be assisted in the process by an employee of the enterprise who can guide the "litigant" to convey work history and/or product exposure information that renders the "litigant" eligible for compensation and, therefore, eligible for the free screening.

The "litigant" is then X-rayed and the X-ray is read by a B-reader, on site, who was selected by the law firm. In cases where the X-ray film is not read immediately, it is sent to the law firm which then sends the X-rays taken at the screening to a B-reader who the firm has selected.

Where the X-rays are read on-site, those whose X-rays are read as positive [FN128] for an asbestos-related condition then undergo a battery of pulmonary function tests. [FN129] The report of the B-reader and the PFT printouts are then read by a doctor, who may also do a very brief physical exam, and who writes a report, which includes a diagnosis of the "litigant." If the B-reading is not done at the site, then those "litigants" whose X-rays are read as positive are contacted and arrangements are made for them to come to a site for the PFT tests. Most of the screening enterprises are full **\*81** service: they take the X-rays and administer the pulmonary functions tests. A

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

few enterprises only do X-rays, and lawyers separately arrange for PFT tests for those who read as positive. A few enterprises only do PFT tests. A few reverse the order, doing PFT tests first and then, depending on the outcome, the X-rays. With only rare exceptions, screening enterprises and on-site doctors do not provide the "litigant" with copies of their test results. The reports are instead sent to the lawyers who are paying for them, and if the reports permit suit, the lawyer then notifies the client of the results. [FN130]

1. Two Screening Enterprises: A Description In Detail

Charles Foster founded Respiratory Testing Services, Inc. (RTS), a screening company in 1994. [FN131] Before starting RTS, Foster worked as a pipe fitter and then left to join Pulmonary Testing Service (PTS), a screening company run by Jerry Pitts. [FN132] In 1994, he left PTS, purchased PFT and X-ray equipment, and started RTS, though he had no experience in medical technology or pulmonary lung function tests. [FN133]

Foster's RTS epitomizes some of the excesses of the screening industry: the focus on high volumes; the failure to follow ATS guidelines in performing PFTs; allowing plaintiffs' lawyers to select "predicted values" for PFTs in order to yield higher numbers of impaired lung functions; a lack of certification of technicians or equipment; the existence of enormous financial incentives to obtain positive X-ray and PFT readings as reflected in this instance by RTS's use of differential pricing--charging more than four times as much to lawyers for positive findings as for negative; and the very high rates of positive readings of X-rays and of lung impairment shown by PFTs which far exceed actual instances of disease and impairment, according to studies by neutral medical experts.

RTS does both X-rays and PFT tests; [FN134] it owns three X-ray machines and seven PFT devices. [FN135] PFTs are only administered if the X-rays, which are read on the spot, are diagnosed as consistent with asbestosis. [FN136] RTS operates in forty states (though it is licensed to do business only in Alabama) [FN137] and runs a high volume business. However, when asked how many persons he had screened in the period 1999-2002, Foster demurred; in **82** response to a follow-up question of whether it was in excess of 100,000 he said: "I can't give you a rough estimate." [FN138]

Foster operates his screening enterprise with an emphasis on quantity at the expense of accuracy of the medical data. [FN139] Indeed, in a deposition, he displayed a disturbing degree of ignorance of the ATS Standards for administering PFTs, a profound indifference to the need for monitoring the technicians hired by RTS who administered the PFTs to assure compliance with ATS Standards, and admitted, albeit unknowingly, that RTS's PFTs were administered in a manner so as to increase the yield of positives which would be in the interests of the plaintiff lawyers who were buying the product of Foster's labor. [FN140]

Foster and RTS worked primarily for the Fitzgerald Law Firm. Many of the claimants that RTS accumulated for that firm were presented to Babcock & Wilcox (B&W) under a pre-arranged settlement matrix, where B&W paid out claims upon their presentation. [FN141] Fitzgerald, however, did not pay RTS until Fitzgerald first received payment from an asbestos defendant, [FN142] thus creating severe payment problems when the well at B&W ran dry. [FN143]

Fitzgerald charged the cost of the screening to the claimants it represented. [FN144] The cost of the negative screenings were added to and blended with the charges amassed against those who were found positive so that Fitzgerald was reimbursed for the entire screening costs he incurred. [FN145] In addition, when RTS submitted X-rays to Dr. Segarra, the B-reader selected to read the X-rays, RTS compensated him directly per X-ray and then, through the law firms with which RTS contracted, billed the firm's clients for the charges, adding a premium on top of the amounts paid to Dr. Segarra. [FN146]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Charles Foster's nephew, Guy Wayne Foster, also had no prior medical or technical experience at the time he began work for RTS in January 1995; [FN147] he left RTS in March 2000 to start up American Medical Testing, **\*83** Inc. (AMT). [FN148] He testified that he earned $100,000 from RTS in 1999, and when he started up AMT, he grossed $1.5 million the first year of operation and netted $500,000. [FN149] He projected a gross of $2,000,000 for the year 2001. [FN150] G.W. Foster's AMT only does PFT testing and only after a law firm has had X-rays taken and a B-reader has declared them positive. [FN151] AMT worked for a number of law firms in Texas, North Carolina, and Mississippi, [FN152] but tested mostly in the Southeast. [FN153] G.W. Foster stated that he did not do any analysis on how many of the 14,000 PFT tests done in a little less than two years resulted in a showing of impairment, or less than 80% of projected lung capacity. [FN154]

C. Mass Screenings: The Percentage That Test Positive for Asbestosis

Lawyers rely on mass screenings to continuously replenish their inventory of asbestos cases. Screenings have proved to be a highly cost-effective way of securing claimants on a mass basis and generating enormous profits for lawyers. Cost effectiveness is a function of the cost of screenings and the yield from each screening, that is, the percentage of X-rays taken that yield positive readings from B-readers hired by the lawyers and secondarily, the percentage of "litigants" with such positive X-ray readings who also "pass" the PFT test by showing impairment.

A significant factor, therefore, to be gleaned from a review of the screening literature, is the percentage of those screened who test positive. Not surprisingly, the evidence is somewhat murky. Screening companies and the lawyers who hire them undoubtedly understand that a high percentage of positive readings would raise serious questions about the way screenings are conducted; this may very well explain the great reluctance to provide relevant information in deposition testimony. When they do provide that information, they claim that the percentage of those screened who test positive mostly ranges from 20- 35%. [FN155] This percentage is itself evidence of **\*84** systematic misdiagnosis of asbestosis. As indicated earlier, there are virtually no true cases of asbestosis manifesting today and that has been true for almost a decade. Moreover, since other data regarding the presence of asbestosis in large populations indicates that currently even industrial workers have extremely low incidences of asbestosis, [FN156] the very high percentages of positives yielded by screenings manifestly inculpates the screening processes used to cumulate asbestos claimants. [FN157]

Moreover, there are a number of reasons to doubt the accuracy of the testimony that positives range from 20-35% of those screened. First, since screenings are undertaken to generate claims, the cost of the screening must be justified by the rewards from claiming. While no precise figures are available, a positive yield of 20-35% of the hundreds of thousands screened would not appear to justify the expenditures required to conduct the screenings. Almost certainly, on this basis alone, the actual yield is much higher. Second, there is a significant lack of recall on the part of many doctors and screening company representatives as to the percent of the "litigants" screened that were characterized as positive. [FN158] This lack of recall strains credulity. [FN159] Third, screening enterprises often retain detailed records of their screenings, including whether litigants tested positive, on computer disks; however, there is a pervasive reluctance if not a concerted refusal to produce these records, and so allow for confirmation of whatever testimony they do offer regarding the percent of positives. [FN160] Even though **\*85** these records have been subpoenaed, I have not been able to find a single instance when such disks have been produced in discovery. Moreover, when screening company representatives or B-readers or doctors who have provided thousands and even tens of thousands of diagnoses are deposed, they uniformly refuse to produce their records of the screenings on various grounds, including doctor/patient privilege. [FN161] This assertion is both pretextual [FN162] and in error; no such privilege exists with regard to most litigants who are screened. [FN163]

**\*86** Finally, on the basis of the evidence I have examined, the actual positive rate is much higher. I have found that approximately 60-80% of the X-rays generated by screenings are classified as positive and that of these,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                    Page 16

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

approximately 60-80% are determined to have impaired lung function. The net positive rate is therefore in the range of 40-65%. [FN164] These high positives **\*89** are inconsistent with the medical evidence produced by neutral experts, which consistently indicate that most of those screened in fact have no asbestos related medical condition. [FN165] To determine whether it is plausible, **\*90** on this basis, to further conclude that the manner in which the screenings are administered constitutes an "intentional perversion of truth for the purpose" of obtaining payment from asbestos defendants, it is necessary to further explore the financial incentives that underlie screenings.

D. Financial Incentives That Permeate Attorney-Sponsored Asbestos Screenings

Financial incentives that permeate attorney-sponsored asbestos screenings and which may be seen to induce mass misdiagnoses of X-rays and misreporting of asbestosis can be categorized into five major components. First, the screening enterprises which generate the X-rays for the B-readers to read and which administer PFTs do so at a furious pace since volume equals income [FN166] and substantial volumes therefore generate substantial income. [FN167] But speed is inconsistent with accuracy. Moreover, both the X-ray equipment used and the process of administering the X-rays leave much to be desired. However, the resultant poor quality of X-rays [FN168] may actually improve B-readers' ability, if not propensity, to misread the X-ray. In addition, performing PFTs at a rapid rate enhances the propensity for finding impairment. [FN169] Second, some screening companies charge substantially higher fees to the lawyers who hire them for each positive outcome as they do for each negative outcome. [FN170] This creates a further **\*91** considerable financial incentive to administer the PFTs to generate outcomes consistent with a finding of asbestosis.

Third, while many of the B-readers and doctors hired by lawyers to read X-rays or provide diagnoses are paid relatively small and in some cases, paltry sums per X-ray read or per so-called medical report, [FN171] the income generated by these activities is substantial. [FN172] What is required to obtain substantial amounts of income is to be given high volumes of X-rays to read or so-called medical reports to write. [FN173] To obtain these high volumes, and **\*92** the consequent substantial income, the B-readers and doctors have to, in effect, pass a test administered by plaintiff lawyers: they have to find high percentages of positives. [FN174] The market for such services apparently works; a relative handful of B-readers and doctors are used to diagnose tens of thousands of screened "litigants." [FN175] Screening companies soliciting lawyers' business boast that they have relationships with the "right" B-readers. [FN176] Moreover, there is empirical evidence (that would be startling in any other context) that B-readers conform their findings to the specific requirements or demands of each different law firm for which they read X-rays. When, however, the market for B-reader services apparently fails to produce the desired numbers of positives, the market failure is resolved by **\*93** corrective action. Rather than "eat" the expenses incurred in generating a negative outcome for a "litigant," X-rays are "shopped around" for a right outcome. As a noted plaintiff lawyer representing mostly asbestos claimants with malignancies recently testified:

   If the doctor does not give the lawyer the right answer, the lawyer can get a second opinion, or a third, or a fourth . . . as many as it takes. Dr. David Egilman of Brown University, who regularly testifies as an expert for plaintiffs . . . said in a recent letter to the American Journal of Industrial Medicine, "I was amazed to discover, that in some of the screenings, the worker's X-ray had been 'shopped around' to as many as six radiologists until a slightly positive reading was reported by the last [doctor]." [FN177] A "slightly positive reading" usually does not even amount to a diagnosis of asbestosis--that requires a real physical examination and a great deal more information than is available from reading X-rays taken en masse in mobile vans. Rather, the reader of the X-ray merely concludes that the X-ray is "consistent with" asbestosis. [FN178]

Fourth, for the doctors who both read X-rays and also provide diagnoses based upon PFTs and a cursory medical exam, there is an additional financial incentive to read the X-rays as positive. [FN179] To be sure, if they find the X-ray negative, they charge the same as if they read it as positive. [FN180] However, a negative X-ray reading

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

limits their billing to that charge. [FN181] A positive reading enables a substantially higher charge for the complete **\*94** service, [FN182] and may further enable forensic services for additional fees of thousands of dollars a day. [FN183]

Finally, in addition to the substantial financial incentives that underlay the actions of screening enterprises and the B-readers and doctors they hire to read X-rays and render diagnoses of asbestosis, similar if not identical financial incentives motivate the actions of the "litigants" who volunteer to be tested at screenings. Some are no doubt motivated to attend screenings because of health concerns generated by the letters they receive advertising the screening which focus on the grave dangers faced by those exposed prior to 1975 to asbestos-containing products. [FN184] Most "litigants," however, appear motivated by the promise of financial rewards that are set out in the letters sent to them by, or at the instruction of, screening enterprises, hoping to have the "million dollar lungs" that will be the key to tax free wealth. [FN185] These "litigants" fully understand that in order to be eligible for compensation, they have to "fail" the pulmonary function tests that will be administered to them in order to succeed in their effort to gain compensation. [FN186] The likelihood of failing the test, that is, performing below 80% of the predicted value, can be augmented in numerous ways. For example, "litigants" may fail to inhale as deeply as they can in order to decrease the volume of air they exhale or they can, additionally, simply fail to exhale completely in the forced vital capacity (FVC) test, thus doubly assuring a failure. In addition, they can augment the likelihood of failure by smoking cigarettes before the tests are administered. [FN187] Experienced **\*95** pulmonary technicians who administer the tests can detect shirking and combat it by urging a complete effort. Moreover, they can determine from the PFT printout whether there has been a premature termination of the maneuver (the term used to describe an act of exhaling as part of the FVC test) and require a repeat of the test. [FN188] However, even experienced pulmonary technicians uninfluenced by the financial incentives that permeate the screening process would be hard put to obtain valid PFT tests, conforming to ATS standards, within the time constraints imposed by high volume screenings. [FN189] Moreover, the pulmonary technicians hired by screening enterprises are as aware as are all of the other participants in the process that the purpose of screenings is to provide lawyers with a constantly replenished inventory of cases.

The financial incentives that underlay attorney-sponsored asbestos screenings including those of the screening enterprises, plaintiff lawyers, the B-readers and doctors that the lawyers hire to render diagnoses, and the "litigants" who are screened thus account for the incredibly high percentage of "litigants" who are found positive for asbestosis. These financial incentives are not merely perverse from the perspective of the civil justice system and the use in that system of medical data generated by the screening process; they are an open invitation to meritless if not specious claiming--an invitation which the evidence indicates may be oversubscribed. [FN190]

**\*96** The opportunity for B-readers and others to meet what appears in reality, to amount to a quota system is augmented by the subjectiveness of their task. As noted earlier, reading most X-rays for the presence of pleural plaques is often the equivalent of a Rorshach test. The same conditions prevail with regard to 1/0 asbestosis. In both instances, B-readers who profit from misreading the X-rays can be reasonably secure in the belief that because of the subjective nature of the task, they are largely insulated from civil, let alone criminal process. The president of the Manville Trust, in commenting on the glaring disparity between medically supported injury claims and the diagnosis of neutral experts auditing the claims, stated that "the high audit-failure rates probably do not reflect fraud on anyone's part, but rather the intrinsic subjectivity of X-ray interpretation, especially when the alleged diseases are so mild. 'It's more art form than science.'" [FN191] Other commentators reviewing the available evidence conclude that there is insufficient evidence upon which to even base a conclusion of ethical improprieties by lawyers. [FN192] Moreover, the absence of any consideration of large scale specious claiming in any of the academic literature may be seen to be at least an implicit rejection of my conclusion that the medical evidence produced in the screening process is largely a function of the financial incentives I have reviewed and not a product of good faith medical practice.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                          Page 18

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

I respectfully dissent from these views. On the basis of the documentary evidence I have reviewed, the gulf between B-readers' findings as well as those of the other litigation doctors employed by attorney-sponsored screenings, which account for the bulk of the claims of asbestosis being processed today, and the results reached in studies done by neutral scientists and doctors as well as those performed by doctors retained by defendants, which are largely consistent with the results obtained by neutral scientists, cannot be accounted for by inherent inter-reader variability. Inter-reader variability can certainly explain reader differences as to whether an X-ray does or does not exhibit pleural plaques or 1/0 asbestosis; it can account for such variations in the readings of scores of X-rays, perhaps even hundreds. It cannot account for consistent variation in the reading of tens of thousands of X-rays. [FN193] Moreover, the evidence in support of the conclusion I draw **\*97** that the medical evidence produced by the screening process is a function of the financial incentives that permeate the process and not good faith medical practice is further buttressed by additional evidence including: [FN194] the fungibility, for litigation purposes, of diagnoses of pleural plaques and 1/0 asbestosis; the enormous disparity between the rates of asbestosis generated by screenings and the rates of asbestosis determined by neutral experts examining essentially the same population as well as broader segments of the general population; and as well, the evidence of specious claiming gathered by the Manville Trust. This additional evidence is considered in the following sections.

E. The National Tire Workers Litigation Project and Its Progeny

Among the first large scale attorney-sponsored asbestos screenings were those organized by two attorneys, Gordon Stemple and Charles Gerry, and **\*98** three doctors who formed the National Tire Workers Litigation Project ("NTWLP") in 1986 to sign up tire workers and file claims against, inter alia, Raymark Industries, Inc. ("Raymark") because they had allegedly been injured by exposure to asbestos manufactured by Raymark. [FN195] Raymark later sued the principals of NTWLP claiming that they had defrauded Raymark in connection with a class action settlement. In a series of U.S. District Court cases, [FN196] the modus operandi of the NTWLP was laid bare. [FN197]

In 1986, Raymark and its insurers entered into a class action settlement involving approximately 20,000 claims. [FN198] Among the claims submitted in the Wells settlement were approximately 7,000 tire worker claims represented by Stemple and Gerry. [FN199] Raymark later sued the NTWLP and its principals for fraud and sought to undo its part of the settlement based upon the fraudulent conduct of the two attorneys and their three doctors. [FN200] United States District Court Judge Patrick F. Kelly termed the claim process initiated by the NTWLP a "professional farce! . . . [a] mockery of the practices of law and medicine!" [FN201] He condemned the solicitation process that was at the heart of the screening, calling it deceptive and coercive. [FN202]

**\*99** He also implicitly agreed with Raymark's contention that the doctors hired to screen the tire workers were incompetent or worse and he decried **\*100** their work as exhibiting "reckless disregard for the truth." [FN203] On the basis of the evidence, he concluded that:

   [A] jury could reasonably conclude that either the attorney defendants knowingly retained doctors whom they knew would not make a "diagnosis" with a reasonable degree of medical certainty, thus that the cases would be without merit, or that the attorney defendants recklessly disregarded the truth of the type of "diagnoses" the doctors were in fact rendering. In addition, a jury could reasonably conclude that the medical defendants either **\*101** knowingly did not intend to distinguish one disease from another, and thus misrepresented that they had made a diagnosis, or they reckless [sic] disregarded normal medical procedure in making a diagnosis. Furthermore, a jury could reasonably conclude from the evidence in this case that the attorney and medical defendants entered into an agreement or scheme to process as many "diagnoses" as readily and cheaply as possible, with ample gains in mind under the Wells settlement agreement. . . . This fraud, as alleged, was not only upon Raymark, but upon this court. . . . [FN204] For these reasons Judge Kelly concluded that "the evidence indicates that many, if not most, of the tire workers' cases are in fact without merit." [FN205]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

Judge Kelly's conclusion is buttressed by the fact that the results that the doctors hired by Stemple and Gerry produced (that 65% of the thousands of tire workers had asbestosis or pleural plaques) deviates considerably from those reached by "a 1987 study done by the National Institute For Occupational Safety And Health that found evidence of asbestosis in 0.2% of tire workers and symptomless pleural changes in an additional 2.3%." [FN206] The NTWLP positive rate also differs radically from a comparative study done by medical researchers. [FN207] The NTWLP had determined that 439 of 700-750 tire workers screened (60%) had an asbestos-related condition. [FN208] The independent researchers determined that, realistically, at most only 11 of the claimants (2.5%) had an asbestos-related condition. [FN209]

Despite Judge Kelly's acknowledgment of the presence of numerous elements of fraud perpetrated by Stemple and Gerry and their doctors, he refused to permit invalidation of the Wells class action settlement though Raymark had paid out tens of millions of dollars on the basis of the diagnoses rendered by the NTWLP's doctors. [FN210]

**\*102** Judge Kelly's refusal to allow invalidation of the settlement may usefully be contrasted with the decision of U.S. District Court Judge Charles Weiner, who granted summary judgment dismissing approximately 1,000 tire worker cases against other "companies that allegedly supplied asbestos-containing products to tire plants." [FN211] Judge Weiner found that plaintiffs "had failed to satisfy the [requisite] causation standard . . . that a plaintiff in an asbestos case must present evidence of his exposure to a particular manufacturer or supplier's asbestos-containing product at the worksite." [FN212]

The mass screening techniques used by Stemple and Gerry in the tire workers project, though condemned by Judge Kelly, were quickly emulated by others. [FN213] In response to the huge rewards to be obtained, attorney-sponsored screening programs, both free-standing screening enterprises and those organized by lawyers, sprang up to process hundreds of thousands of "litigants" a year. [FN214]

**\*103** The results they have achieved can only be categorized as impressive if not monumental. Hundreds of thousands of "litigants" gathered and processed through attorney-sponsored asbestos screenings, aided by medical "diagnoses" which are largely a function of financial incentives and not of good faith medical practice and by misadministered and mal-administered pulmonary function tests, and further aided by witness preparation practices that created memories that provided the basis for testimony "recalling" asbestos containing product exposures that coincidentally maximized their rewards, have obtained billions of dollars in compensation for themselves and roughly equal amounts for their lawyers. According to the Manville Trust, "90% of the Trust's last 200,000 claims have come from attorney-sponsored X-ray screening programs . . . 91% of all claims [against the Trust] allege only non-malignant asbestos 'disease,' and . . . these cases currently receive 76% of all Trust funds." [FN215] Moreover, the massive civil justice failure seems destined to replicate itself over the course of the foreseeable future: hundreds of thousands, perhaps millions of additional "litigants," stand ready to be recruited using the same screening processes and to have their claims supported by the same variety of "medical" evidence and witness testimony described in this article.

VI. Additional Analysis Of The Medical Evidence In Asbestos Claiming

A. Medical Evidence Produced by Asbestos Screenings Versus Medical Science

In addition to the role of financial incentives on attorney-sponsored asbestos screenings and the effects of those incentives on the medical evidence produced in that process, there is additional evidence that much of the medical testimony in support of claims of asbestosis is unreliable and invalid and not the product of good faith medical practice. In a typical asbestos case, plaintiff and defendant's medical experts offer opposing testimony. [FN216] Plaintiff's medical experts always testify that there is an asbestos-related disease; defendant's experts rarely find

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

asbestosis. [FN217] On the basis of that disputed expert testimony and a plaintiff's own testimony **\*104** that he or she is short of breath and unable to engage in many of the activities that he or she formally undertook (as well as his or her testimony regarding product identification), a jury may find in favor of the plaintiff. [FN218] However, there is a considerable body of studies and other evidence to support the conclusion that much of the expert medical testimony in support of plaintiffs' claims of asbestosis, is as a matter of medical science, simply if not consistently mistaken.

In an aggregated asbestos litigation that occurred fifteen years ago, United States District Court Judge Carl B. Rubin excluded the parties' use of their own medical experts and instead substituted impartial medical experts. [FN219] These experts determined that of sixty-five plaintiffs claiming to have contracted asbestosis--who, but for the court's order, would have offered their own medical experts' testimony in support of their claims--only ten (15%) in fact had in fact contracted asbestosis. [FN220] Had Judge Rubin's decision been replicated in other asbestos litigations, billions of dollars of claim value created by asbestos lawyers would have been destroyed. [FN221]

In addition to Judge Rubin's study, other studies have demonstrated that "some plaintiffs' doctors consistently over-diagnose asbestos-related conditions." [FN222] In a 1990 study of 439 tire worker claimants who filed suit after a mass screening in 1986, four neutral professors and radiologists reexamined the X-rays of each of the 439 claimants. [FN223] Although the **\*105** plaintiffs' doctors had diagnosed all 439 with a compensable asbestos-related disease, the independent researchers determined that realistically, at most only eleven of the claimants (2.5%) had conditions consistent with asbestos exposure. [FN224] These findings led the researchers to conclude that the plaintiffs' doctors' diagnoses of asbestos related conditions was "mistakenly high." [FN225]

Another study reviewed 558 chest X-rays, which were provided by a plaintiffs' law firm and initially screened by B-readers chosen by that firm. [FN226] The plaintiffs' B-readers graded 91.7% of the films as 1/0 or higher, but a panel of six independent B-readers [FN227] retained by the two neutral experts conducting the study, graded only 4.5% of the films as 1/0 or higher. [FN228]

**\*106** Another study has indicated that, despite the very high rate of asbestosis that is regularly diagnosed during mass screenings of power plant workers and other construction workers, the actual rate of asbestosis and other lung impairments among such workers with significant asbestos exposure is markedly lower, at most, in the 1-5% range. [FN229] In that study, a medical expert determined that none of 114 power plant workers had asbestosis, and ninety five percent had no impaired lung function at all. [FN230] In a similar study of tire workers, the National Institute for Occupational Safety and Health found that though plaintiff experts found that 60% of tire workers had an asbestos related condition, only 0.2% of tire workers displayed any evidence of asbestosis and only 2.3% had any signs of pleural plaques. [FN231]

Doctors interviewed for a report for the American Bar Association Commission on Asbestos Litigation reported having "seen hundreds or even thousands of examples of over-reading of X-rays for litigation purposes." [FN232] One doctor reviewed the medical records of 15,000 people who had been diagnosed with asbestosis based solely on X-ray readings and determined **\*107** that "only 10% of the persons could validly be diagnosed with asbestosis." [FN233] "Another doctor reported a 62% error rate on review of X-ray screening results previously read as 'consistent with asbestosis,'" [FN234] and a third doctor reviewed 22,000 asbestos-related claims and "found a presumptive X-ray review error rate of up to 86% among five readers, none of whose results matched the general patterns in epidemiological studies." [FN235]

The evidence thus indicates that the extremely high rate of asbestosis diagnosed in the course of attorney-sponsored screenings of hundreds of thousands of former industrial plant and construction workers is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

without any redeeming medical value, and is largely, a function of the compensation system--a compensation system that has come to tolerate large scale specious claiming.

Additional evidence indicates that applying the diagnostic standards of the B-readers and litigation doctors employed in mass screenings to the general adult population would yield approximately the same percentage of "asbestosis" in the general population as is yielded by mass screenings of "litigants." [FN236] In a 1984 study, routine admission chest radiographs of hospitalized patients in an urban university medical center were examined. [FN237] Despite the fact that the patients were not known to have any industrial exposure to asbestos, out of the 200 radiographs screened, seventy-one patients (35.5%) were found to have possible or definite small opacities "consistent with asbestosis." [FN238] Of these seventy-one, thirty-five had opacities classified as 0/1 and thirty-six had small opacities at profusion levels of 1/0 or greater. [FN239] Of the thirty-six, only four had a history of exposure to asbestos. [FN240] Ten of the thirty-six had medical disorders that could produce small opacities in the lung parenchyma including sarcoidosis, chronic congestive heart failure, asthma, emphysyma and metastatic tumor. [FN241] On this basis, it is plausible to conclude that more than a third of the adult population could be categorized as having lung opacities "consistent with asbestosis" according to the standards used by B-readers and doctors employed by attorney-sponsored asbestos screenings. [FN242]

**\*108** Finally, the dramatic results of an audit conducted by the Manville Trust, [FN243] provide additional evidence in support of the conclusion that medical evidence presented in support of claims generated by attorney-sponsored screenings is often not the product of good faith medical practice but rather a function of the compensation available to those who consistently find high levels of asbestosis. The independent experts who audited the claims submitted to the Trust for payment determined, on the basis of criteria favorable to confirming the readings of the B-readers hired by plaintiff lawyers, that over 40% of the claims submitted during the first payment cycle they examined were inaccurate; the claimants were found to have either no asbestos related disease at all or a less severe condition than alleged in the submission. The ten B-readers with the highest volume of claims had a failure rate (including disagreement in the diagnosis of asbestosis) ranging from 34 percent to 70 percent, with an average failure rate of 63 percent. [FN244]

In addition to providing consistent and powerful evidence that a significant percentage of the 1/0 asbestosis diagnoses are in error and a function of the compensation paid for the diagnoses, comparative studies have also demonstrated that the medical procedures used to diagnose asbestos related conditions contribute to the high level of consistently mistaken diagnoses. [FN245]

B. The Sea Change in Medical Diagnoses That Resulted from the Georgine Settlement

In the period extending from the late 1980s to the early 1990s, pleural plaque claims amounted to approximately 45-60% of case volumes whereas mild asbestosis claims accounted for 15-25%. [FN246] This was consistent with the generally accepted estimate that the prevalence of pleural plaques in the asbestos-exposed population is greater than the prevalence of asbestosis. [FN247] **\*109** However, beginning by the mid-90s, a massive shift occurred in the disease mix. Pleural plaque claims declined precipitously while asbestosis claims climbed even more precipitously. Instead of a disease mix of 45-60% pleural plaques and 15-25% mild (1/0) asbestosis, [FN248] 70% of new claims were filed as asbestosis claims. [FN249] To accomplish this massive shift in diagnoses of asbestos-related conditions, B-readers had to essentially stop finding pleural plaques in X-rays and instead find a condition "consistent with asbestosis." Indeed, most new claimants were being mostly diagnosed in the mid 1990s as having asbestosis or conditions "consistent with asbestosis," not pleural plaques, even though these claimants had worked alongside other claimants at identical work sites at the same times who were previously mostly determined by B-readers to have pleural plaques, rather than asbestosis. [FN250] Medical experts can legitimately differ in some instances as to whether a pleural plaque exists in an X-ray. Pleural plaques occur in the linings

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                    Page 22

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

surrounding the lungs--not in lung tissue; whereas asbestosis, that is, in its generic form, pneumoconiosis, occurs in lung tissue. [FN251] Specialized X-ray readers can distinguish between the pleura surrounding the lungs and lung tissue. [FN252] No medically relevant event explains this sea change in asbestos claiming. [FN253] How then could such a tectonic shift have occurred in medical diagnoses? Unfortunately, academic writings on asbestos litigation provide no guidance. [FN254]

The explanation of this phenomenon is rooted in the terms of a global settlement entered into between most of the leading plaintiff lawyers and most of the then-solvent major asbestos defendants. Adjunct to the massive Georgine class action settlement, later invalidated by the Third Circuit and **\*110** the United States Supreme Court, [FN255] plaintiff attorneys settled their then current inventory of 45,000 claims including pleural plaque claims for approximately $750 million. [FN256] However, in exchange, in the separate Georgine settlement, they agreed to effectively value future pleural plaque claims at zero and to inform new potential claimants that they would not seek compensation on their behalf unless they manifested with actual disease. [FN257] In reaction to the settlement, many plaintiff lawyers, especially those not a party to the settlement who were seeking a piece of the pie, immediately began reclassifying what would almost certainly have been new pleural plaque claims as asbestosis claims. [FN258] This prestidigitational transformation from pleural plaque diagnoses to mild asbestosis, a "now-you-see-it-now-you-don't" form of medical diagnosis that permeates asbestos claims, is at least strongly suggestive that prior claimants did not have pleural plaques and that current claimants do not have 1/0 asbestosis. The compelling answer then to the question of how the tectonic shift came about is that most "diagnoses" of pleural plaques, as well as "diagnoses" of mild asbestosis (1/0), are a function of the compensation system, not of medical science. [FN259]

**\*111 C. Pulmonary Function Tests Administered in Asbestos Screenings**

While X-rays can determine whether a substantial pneumoconiosis condition exits, the diagnosis of mild forms of asbestosis, at the 1/0 level, often involves a subjective judgment. [FN260] For a proper diagnosis, corroborative physical evidence is required. [FN261] Moreover, even in clear cases of fibrosis, X-rays cannot measure the existence, degree or severity of pulmonary dysfunction. [FN262]

Pulmonary function is measured by performance on a variety of breathing tests called pulmonary function tests or PFTs. [FN263] These tests, when properly administered, provide objective, quantifiable measures of lung function to determine whether an individual is impaired and, if so, to what degree. [FN264] They are the primary means of evaluating non-malignant asbestos-related personal injury claims and are widely used by both plaintiffs and defendants to determine the settlement values of claims and as evidence in trials.

PFTs test pulmonary function "through spirometry, a process of pulmonary measurement in which the individual breathes through a mouthpiece into a machine called a spirometer." [FN265] The specific tests and the medical standards established for administering the tests are described in a complaint filed by Owens Corning, [FN266] once a leading manufacturer of asbestos containing materials, [FN267] against a number of screening enterprises and their principals alleging fraud and RICO violations: [FN268]

Forced spirometric PFTs involve the measurement of the movement of air into and out of the lungs during a variety of breathing maneuvers. It is the most widely used type of PFT, and it is one of the types conducted by Defendants in evaluating potential claimants.

In forced spirometry testing, an individual first deeply inhales air into his lungs (i.e., inspiration) and then blows the air out of his lungs (i.e., expiration) as forcibly as possible and for as long as possible, into a machine called a spirometer. The spirometer **\*112** measures certain values relating to the individual's inspiration, such as inspiratory volume and inspiratory peak, and the individual's expiration, including the force of the expiration, the volume of air expired, and the rate of expiration.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

The pulmonary measurements obtained through spirometry PFTs include:

a. forced vital capacity ("FVC"), which is the individual's vital capacity, or the total expiratory volume of the lung, performed with maximum expiratory effort;

b. forced expiratory volume during the first second of expiration ("FEV1") and with maximum effort, which is the volume of air exhaled during the first second of the FVC; and

c. the FEV1/FVC ratio, which represents the percentage of the individual's total forced vital capacity (FVC) which is exhaled during the patient's initial one second of expiration (FEV1).

These measurements are used to determine whether the individual has any pulmonary function impairment by comparing the individual's measurements to a set of predicted measurements for that individual based on age and other physical characteristics.

There are well-established standards that govern the administration of forced spirometric PFTs. The applicable standards are set forth by the American Thoracic Society ("ATS") in a written statement entitled "Standardization of Spirometry--1987 Update" (the "ATS Standards"). [FN269]

The principal purpose of the ATS Standards is to ensure the accuracy, integrity and validity of PFT results by establishing testing criteria that must be met by the medical doctor or technician administering spirometric tests.

A forced spirometry test does not produce valid measurements of pulmonary function unless the subject first takes a complete inspiration and then exhales forcibly for a sufficient time during the test with maximum expiratory effort. Thus, the ATS Standards require a subject to exhale forcibly for a minimum of six seconds or **\*113** until the subject reaches a plateau (no change in the volume of the subject's expiration) for at least 1- to-2 seconds.

If a subject does not exhale forcibly for the full mandatory minimum 6- second duration, or until there is no measurable volume change during the final 2 seconds of expiration, the subject will not fully express his total lung volume, resulting in an understated PVC reading and an overstated FEV1/FVC ratio.

The ATS Standards also require that the subject of an FVC test and an FEV1 test perform a minimum of three acceptable breathing maneuvers. If there is a variability in the results of the two largest FVCs or FEV1s of more than 5%, the results are not considered valid for interpretation and the subject should be required to perform an additional three-to-five maneuvers (depending on their variability).

If properly administered, forced spirometric testing, and in particular the FEV1/FVC ratio derived from such testing, can differentiate between two basic types of lung dysfunction: obstructive patterns and restrictive patterns. An obstructive pattern indicates that the flow of air out of an individual's lungs is obstructed. A restrictive pattern indicates that the individual's total lung volume is reduced. Asbestos-related lung impairment is restrictive in nature and pulmonary impairment that is obstructive in nature is not caused by asbestos.

Accordingly, accurate forced spirometric PFT results are particularly important not only in helping to determine whether pulmonary impairment exists in an individual, but also in distinguishing between lung impairment caused by exposure to asbestos and obstructive impairment unrelated to asbestos.

In addition to forced spirometric PFTs, there are two other types of PFTs commonly performed to measure an individual's pulmonary function. One of these tests involves an individual's performance of certain breathing maneuvers to determine an individual's total lung capacity ("TLC"). The other type of PFT involves the performance of certain breathing maneuvers to determine the individual's diffusing capacity ("DLCO"), which indicates the ability of the individual's lungs to properly transfer gases between the lungs and the blood.

**\*114** As with forced spirometric PFTs, in order to ensure the validity of the results of these types of PFTs, well-established standards must be followed when administering these types of PFTs. In addition, as with spirometric PFTs, these tests are at times used as an aid to determine whether pulmonary impairment exists in an individual and the severity of such impairment. . . . [FN270]

To interpret the results from performing the pulmonary function tests described above, it is necessary to compare them to a standard to determine whether the subject falls below that standard and, if so, by what degree. [FN271] This reference standard is referred to as the "predicted value." [FN272] While the need for such a standard may appear obvious today, one of the first comprehensive attempts to create a full set of "predicted values" took place a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                           Page 24

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

mere two decades ago. [FN273] At that time, Dr. Robert Crapo undertook a study to determine more precisely what "normal" lung function values were so as to be able to define abnormal values. [FN274] Dr. Crapo used Mormons of varying ages as the test group upon which to base normal lung function **115 values. [FN275] The representativeness of this sample may be subject to question. Mormons by and large do not smoke and do not drink alcoholic beverages. [FN276] For these and other reasons, the subjects also tended to be more physically fit than the population as a whole. [FN277] Finally, many of the Mormons may have lived in communities that were located well above sea level, thus developing more efficient lungs than sea level dwellers. [FN278] For a variety of these and similar reasons, it is likely that Dr. Crapo's test group, upon which he based his finding of normal lung function values, exhibited higher lung function values than would populations that included large numbers of smokers, consumers of alcoholic beverages, factory workers exposed to numerous industrial dusts, and urban residents living at sea level exposed to air pollution generated by auto exhaust and other pollutants. [FN279] The AMA Guides for 2000 adopt sets of predicted values based on Dr. Crapo's data. [FN280] Since Dr. Crapo's pioneering work, others have devised sets of "predicted values"; the most recent and comprehensive has been done by Dr. Hankinson and others. [FN281]

After measuring a subject's expirations, the PFT machine compares the actual result with the predicted value which has been programmed into the machine. Thus, the higher the predicted values that are used, the more likely subjects being tested are to be found to have impaired lung function. Dr. Crapo's predicated values are, by and large, one of the highest of those in use, especially for the DLCO test. [FN282] Presumably, that is why most screening enterprises use "Crapo" predicted values and why lawyers who hire screening enterprises to recruit "litigants" instruct the enterprises to use "Crapo" predicted values. [FN283]

**116 If medical accuracy were the objective, predicted values would be based on a sampling of persons with demographic characteristics that are similar to the population being tested for impairment. [FN284] However, I have not found a single screening enterprise that attempts to make such a determination and so adjust its predicted values.

For each set of predicted values that are used to calibrate PFT equipment, adjustments have to be made to take into account such factors as age, gender, weight, height and race. [FN285] Each one of these factors affects the actual predicted value for the subject being tested. Failure to make such adjustments, that is, to lower predicted values because of age or body size or race, will result in higher numbers of subjects being found impaired even if the PFTs are otherwise properly administered.

A complete PFT battery conforming to ATS standards requires approximately one to one and half hours depending on a number of variables. [FN286]

**117 In the Owens Corning complaint against the Pitts' Screening enterprises, [FN287] the company went on to allege that the defendant screening enterprises had "engaged in a scheme to generate false medical test results" [FN288] and had "systematically and deliberately deviated from these established standards in order to create false 'positive' PFT results, that is, results which falsely indicate pulmonary impairment." [FN289] They did so, **119 according to the complaint, by causing "the forced spirometry test reports to be performed in incomplete and improper fashion so as to disguise the fact that the . . . testing had not been performed correctly . . ." [FN290] and "failed to meet . . . well-established [ATS and medical] standards designed to ensue accurate PFT results . . . ." [FN291] Nonetheless, the screening enterprise principals allegedly "signed diagnostic reports which incorporated and referenced the false PFT data derived from those fraudulently performed tests." [FN292] Specifically, in performing PFTs, they were alleged to have:

Systematically disregarded the well-established PFT requirement that, in order to produce valid PFT results, each subject must exhale for at least 6 seconds;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                    Page 25

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

Systematically disregarded the well-established PFT requirement that, in order to produce valid PFT results, each subject must be administered three separate reproducible tests;

Systematically disregarded the well-established PFT requirement that, in order to produce valid PFT results, each subject must be re-tested if the variability of his two highest test results exceeds 5%;

Repeatedly instructed individuals not to exhale forcibly, as required to produce valid PFT results;

**\*120** Repeatedly instructed technicians to prevent the computerized PFT equipment from producing readily available data demonstrating the gross inadequacy of the tests being performed; and

Repeatedly instructed technicians to produce PFT reports that disguise the testing procedures used to generate the false-positive results. [FN293]

The complaint then goes on to allege as substantiation of its allegations that:

Medical experts have conducted a detailed examination of a sample consisting of approximately 1,900 cases in which Defendants administered PFTs to support asbestos-related injury claims against Owens Corning. This review confirms that Defendants' gross departure from ATS Standards on a systematic basis dramatically skewed forced spirometric measurements in order to create fraudulent medical documentation to: (a) make individuals appear to suffer from asbestos-related pulmonary impairment; or (b) make individuals appear to suffer from a more severe pulmonary impairment.

Specifically, Defendants systematically violated the ATS Standard requiring the subject to exhale for at least 6 seconds. In the sample of cases reviewed by medical experts, 1,672 of those cases contained data concerning the expiratory time. In over 95% of these cases, Defendants produced test results in which this standard was not met. Further, 52% of these subjects exhaled for less than 3 seconds, which is an extraordinary departure from ATS Standards.

In addition, Defendants systematically violated the ATS Standard requiring a subject's two largest FVCs or FEV1s to be reproducible within 5% of one another. In the sample of cases reviewed by medical experts, 1,722 of those cases contained data concerning reproducibility. Approximately 82% of those cases failed to meet this standard for both FVCs or FEV1s.

Moreover, by departing from ATS Standards for forced spirometry, Defendants succeeded in creating a decreased FVC and an abnormal FEV1/FVC ratio to create the impression of restrictive impairment. Thus, the Defendants' manipulation of the PFT process generated false "positive" PFT results used in the diagnoses of asbestos-related impairment.

**\*121** In certain circumstances, an individual who suffers from certain severe pulmonary disease may not--as a result of substantial impairment--be able to exhale for a full six seconds. However, such individuals would comprise an extremely small percentage (if any) of any group of individuals with marginal exposure who, like virtually all of the individuals tested by Defendants, were able to work and who walked into the testing facilities without assistance.

By contrast, a hospital testing purely for medical reasons rarely observes patients who are unable to exhale 6 seconds, even when testing individuals with severe pulmonary restrictions. A sample of 118 patients with various respiratory disorders tested at LDS Hospital in Salt Lake City, Utah, revealed that over 86% were able to achieve exhalation rates in excess of the 6-second standard. As noted above, the sample of approximately 1,672 subjects tested by Defendants met this standard in less than 5% of the tests reviewed. . . .

In addition to manipulating test results derived through forced spirometric PFTs, Defendants also manipulated the results of the other types of PFTs they performed. Through these manipulations, Defendants intentionally generated results which falsely understated individuals' TLC and DLCO measurements and often resulted in results which falsely showed an individual had pulmonary impairment.

In sum, the Defendants fraudulently generated PFT data which falsely understated the individuals' FVC measurements, falsely overstated the individuals' FEV1/FVC ratios, falsely understated the individuals' TLC and DLC measurements, and falsely substantiated diagnoses of asbestos-related conditions with accompanying pulmonary impairment. . . . [FN294]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

Most of the allegations made in the OC Complaint are borne out by deposition testimony in other litigations of the named defendants who operated the two screening enterprises named as defendants, Pulmonary Advisory Services and Pulmonary Testing Services, as well as that of employees of these enterprises. As noted earlier, Pulmonary Advisory Services (PAS) was started by Glenn Pitts in 1989. [FN295] Though he developed the operating procedures for PAS, when questioned, he stated that he had no **\*122** knowledge about guidelines for technicians to follow in performing PFTs and that he was generally unaware of ATS standards. [FN296] Jewel "Jerry" Pitts testified that when Glenn Pitts, his second cousin, wanted to leave Pulmonary Advisory Services of Louisiana, Jewel took over the business which was then reincorporated as Pulmonary Testing Services (PTS). [FN297] He screened 25-70 "litigants" per day at one of his facilities, 25-60 per day at another, [FN298] and charged $700 for each positive PFT outcome and $400 for each negative outcome. [FN299] Jewel Pitts acknowledged that he had little understanding of the standards for administering PFTs and that he relied entirely on his technicians for calibration of the machines. [FN300]

Leon Hammonds, a named defendant, began working in October 1990 for Pulmonary Advisory Services (PAS), a named defendant then run by Glenn Pitts and Jewel Pitts, each named defendants, and later worked for the successor to PAS, Pulmonary Testing Services, a named defendant, including full time service as head PFT technician commencing in 1993. [FN301] He was described by Glenn Pitts as an "independent contractor" hired by PAS who had the responsibility for administering the PFTs. [FN302] While with the PAS/PTS entities, he tested 13,000-15,000 litigants. [FN303] He was paid piecemeal by the "client," that is, the sponsoring lawyer: $10 for each "litigant" tested, later raised to $15, out of which he had to pay technicians he hired to administer the tests $12-$15 per hour--thus making it in his financial interest to run as many "litigants" through the PFT process per hour as possible. [FN304] Hammonds acknowledged that the PAS/PTS entities did not follow ATS standards in administering the PFTs and that by not following those standards, he and the technicians he employed were able to classify higher numbers of "litigants" as impaired than if he had followed the standards. [FN305] Moreover, he omitted printing out the majority of the test results that were generated, thus precluding assessment of the accuracy of those results. [FN306]

**\*123** Dr. Larry M. Mitchell, a named defendant, was employed by Glenn and/or Jewel Pitts from approximately 1990 through early 1995; he supervised the administration of PFTs and rendered diagnoses on the basis of those tests as well as on the basis of chest X-rays generated by the Pitts' enterprises. [FN307] Though he may have lacked the appropriate qualifications, [FN308] he was the de facto medical director of the Pitts' enterprises, [FN309] a description which he denied. [FN310] In that time, he examined and diagnosed 15,000-20,000 "litigants." [FN311] Dr. Mitchell revealed a profound ignorance of ATS standards **\*124** for the administration of PFTs and further indicated, albeit unknowingly, that PTS routinely deviated from ATS standards. [FN312] He also acknowledged that though he cited to the PFT test outcomes in his diagnoses and reports, he did not rely on them because they were unimportant. [FN313] However, he then went on to state that he did rely on them in reaching a conclusion whether the litigant was positive or negative for asbestosis. [FN314] He then further acknowledged that the PFT tests done by the Pitts' enterprises were "fraught with inconsistencies . . . [had] many errors in them . . ." and further stated that "I didn't take a lot of time to worry about these pulmonary function tests. If they fit, fine, if they didn't, fine." [FN315] This is contradicted by the testimony of Glenn Pitts who stated that Dr. Mitchell made his diagnoses of asbestosis on the basis of the PFTs and his cursory examinations of "litigants" [FN316] before the radiologist read the X-rays and therefore did not know what the X-ray reading was when he rendered his diagnosis; moreover that X-rays were only done if Dr. Mitchell first diagnosed the "litigant" as positive. [FN317]

The person whom Jewel "Jerry" Pitts hired to set up the PFT operation for Pulmonary Testing Service was Charles Foster. [FN318] While neither Charles Foster nor the screening company that he ran, Respiratory Testing Services (RTS), [FN319] were named as defendants in the OC Complaint, his testimony about how he ran RTS is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                    Page 27

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

relevant since upon leaving PTS in 1994 to go into business for himself, and starting up Respiratory Testing Services (RTS) that **\*125** same year, he presumably brought along with him the pulmonary function test administration process that he set up for PTS. [FN320] His operation, focused on processing high volumes, failed to apply ATS standards, failed to monitor the actions of his PFT technicians and used predicted values selected by plaintiff lawyers in order to maximize the number of "litigants" found to have impaired lung function. [FN321]

Dr. Segarra, who did extensive diagnoses for RTS, acknowledged that one way a "litigant" could fudge the test of forced vital capacity was not to **\*126** breathe in fully to start. [FN322] When shown that the PFT data for a "litigant" that he had examined and diagnosed as having asbestosis, indicated an inspiratory vital capacity of 0.05 liters, indicating that the "litigant" had not fully inhaled before exhaling, Dr. Segarra simply rejected the significance of that evidence, stating "we don't care what he was breathing in," it's just "not important." [FN323] Dr. Segarra then acknowledged other deviations by RTS from possible ATS standards. [FN324]

Finally, Charles Foster acknowledged that while he was at PTS, the average PFT administered took "three to eight minutes." [FN325] No single piece of testimony could be more revealing or dispositive. PFTs administered at the rate of fifteen to twenty minutes each, let alone three to eight minutes each, are not intended to generate reliable medical evidence; rather they are intended to generate printouts of graphs to be added to a "litigant's" file so that it can be sold to a lawyer.

On the basis of the evidence presented, it further appears reasonable to conclude that generating printouts of PFT's performed at the rate maintained by PTS resulted in the creation of false evidence that is used in litigation.

In a similar but unrelated case, Owens Corning brought suit against the Pulmonary Function Laboratory, Inc. (PFL) and its president, William McNeese, alleging that it "knowingly engaged in a systematic pattern of gross departures from the well-established [ATS] standards and thereby have generated false 'positive' PFT results, which falsely indicate pulmonary impairment." [FN326] The thrust of the complaint against PFL differs from that of the **\*127** OC Complaint where Owens Corning alleged that the Pitts' fabricated PFT reports - actively manipulated the tests - to generate false outcomes. [FN327] Here, Owens Corning alleged that McNeese and PFL were more sophisticated purveyors of PFTs, structuring them to be negligently administered rather than overtly manipulated. [FN328] These allegations are largely borne out by deposition testimony. [FN329]

**\*128** The mal-administration and misadministration of PFTs laid bare in the deposition testimony regarding Pulmonary Advisory Services, Pulmonary Function Laboratory, as well as Respiratory Testing Services is not confined to just those screening enterprises. Other screening enterprises that were examined through deposition testimony, as detailed in this article, also failed to adhere to ATS standards. The weight of the evidence examined and presented is to the effect that deviations from those standards resulted in far higher numbers of subjects found impaired than would have been the case if the standards were followed. [FN330]

D. The Effect of the Manville Audit on Asbestos Claiming

The analysis so far presented of attorney-sponsored asbestos screenings provides ample support for the conclusion that the process of collection of the medical evidence generated in mass screenings is fundamentally flawed by the financial incentives which infuse the process. Further support that high rates of asbestosis produced by screenings are not credible is provided by a comparison with studies showing at most, a five percent incidence of non-malignant asbestos related disease in the relevant population in the past decade.

Additional evidence that the incidence of misdiagnoses in screenings is pandemic in asbestos claiming is provided by the Manville Trust. Data it collected provides further evidence that a cadre of plaintiffs' doctors, sometimes

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

referred to in this article as "litigation doctors," regularly and systematically misdiagnose asbestos related conditions.

Until 1982, Johns-Manville was the principal defendant in asbestos litigation. [FN331] The company mined most of the asbestos consumed in the United States and had the largest market share of asbestos-containing product sales, and on the basis of witness testimony to that effect, was found to be principally liable for asbestos-related injuries. [FN332] In 1982, in the face of a deluge of claims, Johns-Manville, which at the time was number 181 on the Fortune 500 list, [FN333] declared bankruptcy under Chapter 11 and changed **\*129** its name to the Manville Corporation ("Manville"). After a long delay during the unprecedented Johns-Manville bankruptcy proceeding, the Manville Personal Injury Trust (the "Trust") was established, with almost $2 billion of Johns-Manville assets transferred to the Trust by the company, to provide compensation directly to tort claimants. [FN334] Under the Trust Distribution Process (TDP), which was established as part of Manville's class action settlement with asbestos claimants, the Trust paid a fixed monetary amount to each claimant based on the category of asbestos related condition that she or he presents. [FN335] The stated purpose of the Trust was to establish an administrative process that would deliver fair, adequate and equitable compensation to present and future asbestos claimants without the need for litigation. Claimants would be required to submit minimal proof of exposure to a Manville product and the existence of an asbestos related medical condition, for which a fixed sum payment would be made in accordance with the classification of the condition. [FN336] By opting for ease of filing over accuracy of the claims, the TDP created fertile ground for specious claiming. [FN337] When these enhanced possibilities for specious **\*130** claiming became manifest, some plaintiff lawyers began to generate even larger numbers of claimants through screenings, supporting those claims with medical evidence produced by litigation doctors handsomely rewarded for their propensity to find high levels of asbestosis in "litigants" despite consistent medical evidence that actual rates of asbestosis were under five percent. [FN338] Coupled with the impetus generated by the Georgine settlement to switch from pleural plaque claiming to claims of asbestosis because the settlement purported to limit the filing of future pleural plaque claims, the Trust soon experienced a dramatic increase in the number of claims by unimpaired people with non-malignant lung disease, diagnosed as 1/0 asbestosis. [FN339] In 1994, asbestosis claims exceeded anticipated rates by 94%, and by the end of 1995, the claims of asbestosis submitted to the Trust exceeded projections by almost 250%. [FN340]

In 1995, this spike spurred the Trust to take an unprecedented step and institute a medical audit program in which neutral academics analyzed and evaluated 5% of the claims submitted by each law firm during each payment cycle. [FN341] Notifications were sent to each firm requesting X-rays for the **\*131** claims selected for the audit, and once received, X-rays were reviewed by independent medical experts. [FN342] The review process was intentionally designed "in favor of confirming the disease documented by the claimant and to give the benefit of any doubt to the claimant." [FN343] Nevertheless, the **\*132** majority of plaintiffs' law firms initially failed to send the requested X-rays and corroborating medical evidence. [FN344] When compliance was eventually obtained, the results of the audit revealed that, even by the extremely conservative audit criteria, there was a very high medical audit failure rate, especially for the 1/0 asbestosis claims. [FN345] For example, analysis of the 1996 submissions revealed that approximately 41% of the claimants had either no disease at all, or had a less severe condition than alleged in the submission, [FN346] and that the ten physicians used most frequently by plaintiff law firms had an average failure rate of 63%. [FN347] One researcher has calculated that based on these numbers, the Trust alone may have paid $190 million dollars for inauthentic or inflated claims between 1995 and 2001. [FN348] **\*133** Applying a similar calculus to the entire panoply of asbestos litigation in that time period would yield an inauthentic and inflated claim value approaching $28.5 billion. [FN349]

Armed with evidence that specious claiming was rapidly increasing, the Manville Trust sought to expand the audit program to increase the percentage of audited claims submitted by firms with notably high failure rates. Specifically, the Trust demanded the right to audit 100% of the claims submitted by law firms with a passage rate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

of less than 80%. [FN350] Up until this point, the plaintiff lawyers' representative with an official role in the operation of the Trust had not "seriously question[ed] the Trust's authority to request X-rays from claimants or to downgrade individual claims based on audit results." [FN351] Representatives of plaintiffs' law firms objected to the expanded audit proposal, however, and pressed the Trust to focus on identifying fraudulent doctors instead of focusing on individual firms with high failure rates. [FN352] After extensive evaluations of various alternatives, however, the Trust concluded that focusing on doctors would be both impractical and inefficient. [FN353] The most striking reason for the Trust's **\*134** resistance to a doctor-focused audit procedure was that the disease mix and failure rate of a given B-reader often varied significantly depending on which law firm was employing him or her. [FN354] In other words, when employed by law firm A, the percentage of asbestosis found in a large batch of X-rays by one B-reader, and his/her determined failure rate, could be quite high, yet could be completely different, even average, when employed by law firm B, and still different again when employed by law firm C, thus providing empirical evidence that some B-readers, particularly those most used by law firms, often conform their diagnoses to the disease mix preferences of the lawyers who hire them. In fact, biostaticians from Pennsylvania State University and the University of Pennsylvania, who were commissioned by the Trust to assist with the analysis of the audit data, concluded "that the particular law firm that submitted any given claim was 'a strikingly significant predictor' of whether that claim would fail the audit, and that those findings exhibited 'huge levels of statistical significance.'" [FN355]

Based upon this evidence, the staff of the Trust recommended that the Trust implement an audit program requiring X-ray review for all non-malignancy claims. [FN356] The plaintiff lawyers' representative objected that the requirement was too burdensome. [FN357] Ultimately, the Trust adopted a less comprehensive new medical audit program in August 1998 providing for review of "X-rays for all [low level] . . . asbestosis claims and would no longer accept corroborating medical evidence or evidence of co-defendant settlements in lieu of X-rays for such claims." [FN358]

The Trust's medical audit program was challenged by plaintiff law firms in September 1998. [FN359] From the outset, U.S. District Court Judge Jack Weinstein made known his view:
   [T]he Trust had no business medically auditing claims (regardless of any authority to do so in the Trust documents) and that absent "manifest fraud" . . . the Trust was expected to pay every claim filed for the full amount of the claim . . . . By the fifth day of trial, the Trustees decided to settle the matter and except for several doctors that the plaintiffs' bar agreed filed X-ray reports of a suspicious nature, the Trust was required to accept (absent manifest fraud) all claims filed . . . with respect to medical evidence [and to **\*135** discontinue its medical audit program including its requirement that X-rays be submitted]. [FN360]

Judge Weinstein's declination to support the Trust's proposal to institute a new medical audit procedure in the face of plaintiff lawyers' opposition, despite the evidence of specious claiming reviewed here which eclipsed that found by the Raymark court, had a dramatic effect. Plaintiff lawyers and screening enterprises appeared to have viewed the resultant failure to institute a new medical audit procedure as an imprimatur of specious claiming not only against the Manville Trust but also against the other bankruptcy trusts and the remaining solvent defendants. [FN361] What had become a deluge now turned into a torrential flood of claims of the type condemned by the court in Raymark. In the few years that followed Judge Weinstein's declination, Manville Trust claim filings, on an annual basis, almost doubled, in substantial measure due to the efforts of a number of law firms that emerged on the asbestos litigation scene, which specialized in filing claims against bankruptcy trusts. [FN362] In 2000, the Manville Trust **\*136** received 55,077 new claims, representing "a 94 percent increase over the 28,416 claims received in 1999," and the most claims received in one year since the Trust's first full year of operation in 1989. [FN363] The number of claims filed against the Trust continued to increase in 2001. [FN364] Approximately 91,000 new claims were filed, despite the fact that there was a voluntary moratorium on claim filing for six weeks out of the year. [FN365] Most of the huge increase in claims was due to an increase in the claims of the 1/0

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                          Page 30

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

"consistent with asbestosis" variety generated by attorney-sponsored screenings.

As a consequence of the huge increase in unimpaired claims, the Trust was forced to reduce its pro rata pay out from 10% to 5% in June 2001. [FN366] Moreover, it was clear that a further reduction, to 2.5%, was imminent. In November 2001, Judge Weinstein took note of the consequences of failure to institute a new medical audit program and moved, sua sponte, to hold hearings on whether to revisit the audit issue. [FN367] In response, the Trust recommended a change in the distribution process. [FN368] Judge Weinstein's willingness to revisit the issue was followed by an agreement to amend the Trust's distribution process to incorporate additional claim requirements, which Judge Weinstein approved. [FN369] In addition to changes to the scheduled disease categories, additional evidentiary requirements that a claimant must meet in order to receive an award were instituted. [FN370] The approved amendments incorporate requirements that:

  [D]iagnosis of a nonmalignant asbestos-related disease must be based upon an X-ray read by a certified B-Reader and pulmonary function testing if the claimant is alive at the time the claim is filed. **\*137** The [amendments] . . . mandat[e] that all diagnoses be based on physical examinations. In addition, the Trust must be satisfied that all medical evidence submitted is "credible and consistent with recognized medical standards" and may direct the submission of such documentation as it requires to support this determination. These provisions will allow the Trust to ensure that claims meet adequate standards of proof (that is, standards of proof that would entitle them to compensation in the tort system). These requirements will likely require most facilities currently conducting asbestos screening to change their processing of potential claimants. [FN371]

The amendments were criticized by attorneys representing seriously ill claimants who contended "that screenings arranged by plaintiffs' lawyers mass produce claims involving no impairment on the basis of no real medical evidence, and that the revenues received by attorneys from these claims divert Trust assets from the sick and dying and are used in part to fund more inappropriate screenings." [FN372] These attorneys contended that the new evidentiary standard was not high enough. They argued that:

  The medical evidence required for submission of a claim, while an improvement, is . . . insufficient to verify that a claimant suffers from an injury caused in substantial part by asbestos exposure. The absence of a requirement of significant occupational exposure to Manville asbestos for . . . [unimpaired] claims will . . . increase the risk that claimants will be compensated for non-asbestos related respiratory disease arising out of occupational exposure in non-traditional industries. Furthermore, the . . . shift in the disease levels and scheduled values will actually encourage the proliferation of unimpaired claims. . . ." [FN373]

VII. The Role of Party and Witness Testimony in Specious Claiming

A. The Nunc Pro Tunc Change in Witness Testimony with Regard to the Percentage of Manville Product at Various Work Sites

When Johns-Manville declared bankruptcy in 1982, the bankruptcy court imposed an immediate stay on all payments to tort claimants. [FN374] After a considerable delay, the Johns-Manville plan of reorganization set up the **\*138** Manville Personal Injury Settlement Trust Fund in 1988 as a repository for Manville assets which would be used to satisfy tort claims. [FN375] "The Trust began evaluating and paying claims under its original operating procedures in 1989. By then claimants had been stayed from receiving compensation for some seven years." [FN376] Moreover, as claims against Manville were paid out under a bankruptcy plan which was largely designed by plaintiff lawyers, and generated approximately $250 million in fees at an effective hourly rate of $5,000 per hour for largely administrative claiming, [FN377] the Trust ran dry and had to be reorganized. [FN378] At that time, the Trust reduced the percentage of the value of each claim paid to 45%. [FN379] Thereafter, the Trust paid a steadily declining percent of the liquidated values of claims. [FN380] In fact, claimants currently receive only 5% of the liquidated values of their claims from the Manville Trust. [FN381]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                    Page 31

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

Upon Manville's bankruptcy, the prospect of a long delay coupled with expectations of considerably reduced compensation created a financial incentive for claimants to minimize the percentage of Manville products that they claimed exposure to, and instead allege exposure to asbestos products sold by solvent companies with the financial capability to promptly pay the full value of judgments and settlements. At the time of bankruptcy, plaintiffs' and other workers' testimony established that Johns-Manville had produced the dominant share of the asbestos-containing construction materials used or encountered by claimants. However, by the time the Trust began paying out claims in 1989, Manville's product share in claims filed before the bankruptcy but processed after the bankruptcy had fallen to 30%. [FN382] For example, testimony in the pre-bankruptcy Philadelphia Navy Yard cases put Manville's product share as high as 80%; immediately after the bankruptcy, however, there was a dramatic sea change in testimony. [FN383] Plaintiffs and other workers began testifying that Manville products accounted for an increasingly declining percentage of asbestos-containing products used at work sites. [FN384] "In the [post-bankruptcy] Brooklyn Navy Yard cases the jury apportioned between 9- 11% of the overall liability to the Johns-Manville Corporation." [FN385] The most plausible conclusion to be drawn **\*139** from this evidence is that this change was orchestrated by various plaintiff lawyers. [FN386]

In addition to the circumstantial evidence, there is direct evidence in support of this conclusion in the form of witness testimony. [FN387] Also instructive is an extensive series of reports by newspaper reporters who investigated the practices of Baron & Budd, one of the leading asbestos law firms in the country, which relies mostly on mass screenings to secure clients and largely represents claimants with minor impairments. [FN388] The reporters were told by former employees of the firm that "[w]orkers were routinely encouraged to remember seeing asbestos products on their jobs that they didn't truly recall." [FN389] The firm would get a printout from the Social Security Administration listing every job ever held by the client. [FN390] Then a paralegal would check that list against an internal database containing information about previous testimony on the asbestos-containing products used at the job sites (which may have itself been the product of just such a process). [FN391] The paralegal would then meet with the client armed with a binder containing pictures of certain products. [FN392]

One former paralegal explained, "I'd go through page by page and encourage the client to recall the products they used. It would be pretty strong encouragement. Most of the time when I left, I had ID for every manufacturer that we needed to get ID for." [FN393] She admitted that in many cases, the client had no individual recollection of the product prior to the **\*140** interview and that in 75% of her cases, she had clients "'identify at least one product they couldn't recall originally.'" [FN394]

Far from simply helping clients remember actual products that were used at their work sites, there is evidence that these techniques were often utilized to steer clients toward (or away from) identifying certain products and to "implant false memories." [FN395] One paralegal specifically recalled that "her supervisors, two lawyers, told her to discourage identification of Johns-Manville products." [FN396] Although her supervisors denied the allegations, according to reporters, the paralegal maintained that for certain periods of time when tactical reasons dictated it was better not to have exposure to a bankrupt company's products, identification of those products was discouraged. Thus, when a client would say he saw, for instance, a Johns-Manville pipe covering, [the paralegal said] she would hand them a line. "You'd say, 'You know, we've talked to some other people, other witnesses, and they recall working with Owens Corning's Kaylo. Don't you think you saw that?' And they'd say, 'Yeah, maybe you're right.'" [FN397]

Judges presumably were aware of the sea change in plaintiff workers' testimony, which overcame the barrier to profitable claiming that had been created by the Manville bankruptcy. There is no indication, however, that **\*141** any jurist raised questions about what appear to be falsifications of evidence. Perhaps judges were sympathetic to injured workers and were therefore unwilling to raise the issue. Or perhaps, "[l]ike the proverbial frog in the uncovered dinner pot brought to a slow [enough] boil" that it never notices the rising temperature, the changes in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33

31 Pepp. L. Rev. 33

(Cite as: 31 Pepp. L. Rev. 33)

Page 32

claimants' testimony were perceived so slowly that judges grew increasingly comfortable with uncritical acceptance of radical changes in claimants' testimony regarding product exposures. [FN398] Indeed, what appears to be judicial tolerance of this change in testimony remains unabated. [FN399]

B. The Baron & Budd "Script Memo"

I have ascribed to the orchestrations of plaintiff lawyers the seemingly uncanny ability of plaintiffs and witnesses on their behalf to tailor their product identification testimony to identify au courant defendants. Additional evidence exists to support this conclusion.

*142 In 1997, a novice lawyer from Baron & Budd, one of the largest asbestos law firms in the country, [FN400] inadvertently produced a twenty page internal memo in response to a defense lawyer's document production request in an asbestos litigation pending in Nueces County, Texas. [FN401] The memo was titled "Preparing For Your Deposition" and consisted of both general and specific instructions for the client being prepared for deposition testimony. [FN402] The document had numerous lines to be filled in for individual clients. [FN403] The first topic raised in the memo was "Insulating Cement." [FN404] After providing a description of the purpose and use of insulating cement, for example how it differs from sidewalk cement, the client was told that "[t]he more often you were around it, the better for your case. You MUST prove that you breathed the dust while insulating cement was being used." [FN405] The next lines of the memo were filled in by the paralegal: "The INSULATING CEMENTS I remember are: ____. I was close by while INSULATING CEMENT was being used because _____." [FN406]

The careful scripting of the client's testimony through use of the memo led many to refer to it as the "Script Memo." [FN407] The Script Memo was one step in an elaborate process of client preparation. As previously discussed, according to an extensive series of investigative newspaper reports, Baron & Budd paralegals instilled "memories" into the minds of clients so that they could "recall" the products that were financially remunerative for them to name and "not recall" the names of products that would have been financially counterproductive to identify. To assist in this process of creating "memories," paralegals showed clients pictures of the "right" products, which were then listed on the Script Memo. Parties were then provided product details to study so that they could pass the "test" that *143 would be administered, i.e., a deposition, and obtain suitable financial rewards. [FN408]

Much of this culminated in the Script Memo, which provided the client with a virtual script to memorize and recite. [FN409] The Script Memo was not *144 just a memory aid regarding the client's exposure to specific products at specific work sites; it also provided clients with instructions about what not to say. [FN410] For example, clients were instructed to deny that they ever saw warning labels on product packages. [FN411] They were also assured that defense lawyers administering the test would have no way of knowing what products were actually used at the relevant job sites, implying that anything the client testified to could not be challenged. [FN412] Clients were also instructed never to mention the Script Memo. [FN413]

Finally, clients were informed in the Script Memo that they would have to testify about how their health had been affected by their exposure. [FN414] The memo then listed a number of symptoms, effects, and lifestyle changes that clients, most of whom were in their senior years, could select from: *145 shortness of breath, trouble sleeping at night, paying someone to make household repairs, having to cut back on sports, activities, and hobbies, being short-tempered when the grandkids are about, a less enjoyable sex life, depression, and fear of cancer, to name a few. [FN415] The firm was apparently so certain that its clients would select one or more of these symptoms and effects that in a post-deposition analysis undertaken by the firm, there was a section where the attorney was supposed to place a check mark for each symptom or effect to which the client had testified.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN416]

Scholars' and others' characterizations of the Script Memo have varied widely. Some have characterized it as not only proper witness preparation but mandatory for the zealous lawyer, while others have called it subornation of perjury. [FN417]

Fred Baron, the founding partner of Baron & Budd, has argued that there is nothing unethical or illegal about the contents of the Script Memo. [FN418] According to Baron, the memo did not suborn perjury and was, in fact, **\*146** completely ethical "because lawyers have a duty to 'refresh' a client's memory." [FN419] As an example of this obligation, Baron explained to investigative reporters that:

   The lawyer . . . needs to sit [with the client] and say, "Now before I ask you whether you've been diagnosed by another doctor, you need to know that if you have been, your case will be barred by the statute of limitations. Now, have you been diagnosed by another doctor?"

"Does that mean I've gotten the client to lie?" Baron asks. "You know, if you don't like that, then you don't like the way law is practiced." [FN420] Baron went on to further defend his firm's tactics, stating that this is how "any lawyer in the country that is worth a damn" works. [FN421]

Legal ethics teachers and others will recognize Baron's description of witness preparation as reminiscent of "the Lecture," set out in the murder mystery Anatomy of a Murder, [FN422] which has been extracted for use in legal ethics courses for decades. The scene is a seedy trailer camp. [FN423] An outraged husband learns that his wife may have been raped by a bar owner. [FN424] The husband stalks the owner over a period of time and finally guns him down. [FN425] A big time lawyer vacationing in upper Michigan is convinced to interrupt his vacation to represent the accused. [FN426] He meets the accused for the first time in his jail cell. Before the accused can fully relate the facts, the lawyer tells him that, under Michigan law, insanity is a **\*147** complete defense to murder and indicates the kinds of facts that would be inconsistent with such a defense. [FN427] The attorney then proceeds to question the accused as to what occurred. [FN428]

**\*148** In countless legal ethics classes, the "Lecture" method has been presented for discussion as an example of what goes beyond the permissible line separating legitimate witness preparation from deliberately inducing the client to lie, and therefore engaging in unethical conduct.

Whether "the Lecture" is still regarded as unethical conduct today, given the actual practices of lawyers in preparing witnesses for testimony, is of considerable interest but is not a core issue for this article. [FN429] Two concerns, however, do underlie this article's discussion of the use, effect, and significance of the Script Memo. First, if the Script Memo does go beyond acceptable witness preparation standards, [FN430] was the memo or variations of it used extensively for preparation of witnesses in asbestos claiming? Second, does the Script Memo, and the protracted judicial proceedings that followed its inadvertent production (which are described below), provide the skeptical reader with a heightened ability to assess the contention that asbestos litigation today is largely based on specious medical evidence and client and witness testimony?

As noted above, Baron has argued that the witness preparation techniques represented by the Script Memo typify asbestos law as practiced, and that there was nothing unethical or illegal about its use. [FN431] Baron also argued that irrespective of whether the memo violated Texas law [FN432] or ethical requirements, it was an anomalous document produced by a paralegal acting entirely on her own [FN433] and used only in a small number of cases. [FN434] **\*149** These contentions may be inconsistent. If the techniques of witness preparation reflected in the Script Memo are the way asbestos law is practiced today, as contended by Baron, then why was the Script Memo the product of a lone paralegal and used in only a small number of cases? Since, as a former Texas Supreme Court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                              Page 34

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

Justice noted, the Script Memo worked superbly in preparing a claimant for testimony, why didn't the firm use it more extensively? A review of the evidence, which follows, sheds some light on the likely frequency of use of the script memo, although it does not permit a conclusive determination that it was widely used.

To begin, there is the document itself. It is a quite sophisticated legal document which, on its face, appears to have been prepared by one or more persons thoroughly familiar with asbestos law and its practice. [FN435] Moreover, the Script Memo fits hand-in-glove into the firm's witness preparation procedures, which have already been discussed. The witness preparation process itself may explain how the firm can process 5,000 to 7,000 or more new claimants each year that it recruits mostly through screenings and generate, over time, an average recovery of $60,000 for each unimpaired claimant. [FN436]

Much of the documentary evidence suggesting more frequent use of the Script Memo is set forth in a remarkable series of articles published by the Dallas Observer based upon an in-depth investigation into the practices of Baron & Budd. [FN437] That investigation revealed that evidence produced in response to a court order indicated that "the so-called Script Memo was used to prepare more than 200 clients in their lawsuits against large manufacturing companies and others that sold or used products containing the cancer-causing substance before it was banned in the 1970s." [FN438] It is **\*150** noteworthy that approximately 110-130 of the 200 clients who were named in a document produced in response to a Travis County Court order, had cases pending in that county. Travis County was the only Texas jurisdiction where a trial court permitted discovery by asbestos defendants regarding the plaintiffs' use of the Script Memo and where such evidence was produced before appellate courts precluded such discovery. [FN439] No such discovery occurred, for example, in Nueces County, where the litigation in which the Script Memo was produced was pending. Thus, it is pure happenstance that the evidence of the memo's use is largely limited to pending cases in Travis County. Indeed, on its face, it appears improbable that the Script Memo was only used to prepare clients whose cases were pending before the courts in Travis County, Texas at the time that the firm prepared a documentary response to the court's request for that information. Of critical importance, then, is whether (1) it was also used to prepare Baron & Budd clients who had filed claims in Travis County that were no longer pending because the claimants had settled with all of the named defendants; (2) it was also used to prepare clients who filed claims in other Texas jurisdictions; (3) it was also used to prepare clients who filed claims in jurisdictions outside of Texas; and (4) whether others in the firm used the memo for client preparation. As will be discussed, Baron & Budd successfully defeated attempts to answer these questions as well as attempts to to depose the person or persons who authored the Script Memo.

In addition, the Dallas Observer reported that former Baron & Budd employees made statements alleging that the memo was "part of a pattern of witness coaching," [FN440] and that "that the information and techniques contained in the memo [were] widely used, even taught to employees." [FN441] Additional documents obtained by the Dallas Observer arguably support these allegations. As described by an article in the Dallas Observer, these documents include:

A document titled "P.I.D Study Sheet," which was written by Baron & Budd paralegal Judy Bruton, [and which] gives **\*151** information that is similar to the [script memo]. Like the much longer [script] memo, the [product identification] "Study Sheet" contains detailed information on the different types of asbestos products that existed, their color, packaging, and common uses, and identifying information about specific products . . . . [ [FN442]]

. . . .
   . . . [P]hotocopies of handwritten notes apparently taken by an attorney named Angelyn Schmid during an internal training session. The notes admonish lawyers to explain to workers that their claims for damages might be weakened if they had seen warnings from manufacturers that asbestos was hazardous . . . . [ [FN443]]

. . . .

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                    Page 35

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

. . . [A] typewritten summary of notes taken at a training session given by deposition attorney Jennifer Calhoun on September 18, 1992, [which] contains heavy-handed instructions to clients that echo those contained in the [script] memo: "If client is asked if any other doctors told him about his condition before the diagnosing doctor named in the [interrogatory], client should answer NO." [FN444]

One of the documents referenced above that the Dallas Observer obtained bears emphasis because it suggests the central role of the Script Memo and documents of a similar nature in the firm's client preparation **\*152** process. That process was a dynamic one. As information was produced at depositions and trials which indicated that certain "product ID" information testified to by clients and prepared by the firm's paralegals would no longer sustain a recovery, the firm took steps to make certain that future testimony fit with the new facts. Thus, in a variety of memoranda, firm members appear to be issuing instructions to modify future testimony to accord with new information elicited in the course of its representation. For example, one four page firm memorandum referred to by the Dallas Observer stated the following: "warn . . . [the client] not to say you were around [a certain product]--even if you were--after you knew it was dangerous." [FN445]

**\*153** In addition to the documents reported about by the Dallas Observer, Baron & Budd employees created and used at least one other document similar to, but shorter than, the Script Memo. The document, entitled "Deposition Prep," also provided clients with work history sheets that contained detailed product identification information and warned them to "[t]alk only about products on your work history sheets. If it's not on there, do not talk about it." [FN446]

The law firm's claim that the script memo was prepared by a lone paralegal and used only in a small number of cases appears to be further called into question by what occurred in the aftermath of the memo's production. If indeed the script memo was produced by a lone paralegal and used only in a small number of cases, then the firm had little cause for concern. If, on the other hand, the memo was, for example, the product of a substantial and sustained effort by firm attorneys and was widely used to prepare clients for testimony, then there could be cause for concern.

After the memo's production, the firm launched an all-out effort to quash discovery with regard to who prepared the memo and how frequently it was used. In addition, it launched an extraordinary effort directly against the few attorneys intrepid enough to pursue discovery. As discussed below, the enormity of these efforts suggests that the firm believed that discovery regarding the memo's origin and use posed a potentially serious threat to the firm's efforts. [FN447]

Shortly after the Script Memo was produced, attorneys representing asbestos defendants sought discovery regarding Baron & Budd's use of the memo to determine whether plaintiffs that had sued those defendants had been prepared for their depositions by use of the memo. [FN448] These efforts **\*154** were rebuffed. Three attorneys, however, persisted in their efforts to undertake discovery: Elizabeth Pfifer, outside asbestos counsel for Borg-Warner; Robert Thackston, outside asbestos counsel for W.R. Grace; and William Skepnek, outside asbestos counsel for Raymark.

The initial discovery battle was waged over whether the Script Memo was privileged and, if so, whether the privilege was consumed by the "crime-fraud" exception. [FN449] A battle royale ensued in Texas courts over whether the Script Memo was a confidential attorney-client communication and therefore privileged. [FN450] The two trial courts that decided the issue held that it was not privileged and allowed discovery to proceed. [FN451] These decisions were stayed almost immediately and then reversed by appellate courts. [FN452]

**\*155** In one of the two cases, the trial court in Bexar County held that the Script Memo and information regarding

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

its use were not privileged because they fell within the crime-fraud exception to the privilege doctrine. [FN453] This decision was also reversed, however, by a Texas Court of Appeals which held, in effect, that the crime-fraud exception did not apply if the attorney was the one proposing to the client that they jointly engage in a crime. [FN454] That is, the court interpreted the Texas crime-fraud exception to apply only **\*156** if the client is seeking to further or commit a crime by enlisting the aid or advice of the attorney, and not if the lawyer initiates a proposed fraud and enlists the client's cooperation in such a pursuit. [FN455] Later, the court withdrew this improvident pronouncement. [FN456]

In a third judicial proceeding, Dallas District Court Judge John Marshall granted asbestos defendants' motion to stay all Baron & Budd cases then pending in his court until the Script Memo matter had been investigated by the State Bar (though the court did not reach a decision regarding whether the Script Memo was protected from discovery by the attorney-client privilege). [FN457] The Fifth District Court of Appeals overturned the stay two weeks later in response to an emergency appeal, holding that Judge Marshall did not have the authority to issue the stay without an evidentiary hearing. [FN458] During a later hearing, Judge Marshall stated that the Script Memo was "an affront to the integrity of the judicial system" and referred the matter to the Dallas County grand jury for consideration. [FN459]

None of the discovery cases that were decided by the appellate courts were appealed to the Texas Supreme Court. As will be indicated, before the appellate court decisions could be appealed, the three attorneys pursuing **\*157** discovery were dispossessed of clients. [FN460] In only one case did an appellate court uphold a lower court's order directing discovery. [FN461] In response to that Ohio decision, the firm dismissed all the suits it had brought on behalf of its clients rather than allow discovery to take place.

After successfully stifling all attempts to obtain discovery regarding use of the memo, Baron & Budd turned its attention to the three counsel who had pressed the discovery requests: Robert Thackston, outside asbestos counsel for W.R. Grace; Elizabeth Pfifer, outside asbestos counsel for Borg-Warner Corp.; and William Skepnek, who represented Raymark Corp. [FN462] Thackston and Pfifer were forced out of the hunt when intensifying litigation against their two clients resulted in their being replaced as outside counsel. [FN463]

**\*158** Because of stepped-up litigation, Raymark was forced into bankruptcy. [FN464] Of the three attorneys, Skepnek had been the most aggressive in seeking discovery with regard to the Script Memo. [FN465] Even though he no longer had an asbestos client and therefore could not press Script Memo discovery further, nonetheless, Baron & Budd engaged in a series of actions seeking professional punishment and possible imprisonment of Skepnek.

To comprehend the attack that Baron & Budd mounted against Skepnek, it is necessary to delve into the minutia of Texas law and procedure. Skepnek's client, the Raymark Corporation, had been named as a defendant in thousands of claims brought by Baron & Budd. [FN466] Many of these claims were filed in Texas despite the fact that a substantial number of the claimants were not Texas residents and were neither exposed to asbestos nor had suffered any injury in that state. [FN467] In addition, Skepnek was informed by his client that Raymark was not subject to jurisdiction in Texas. [FN468] In response to these out-of-state exposure claims filed in Texas, Skepnek and his staff [FN469] would file a special appearance motion challenging the court's personal jurisdiction over Raymark. [FN470] An affidavit from Raymark **\*159** president, James Cobb, was attached to each special appearance motion and incorporated by reference therein. [FN471] In the affidavit, Cobb asserted, inter alia, that, to the best of his knowledge, Raymark had never maintained an office in Texas and was never licensed to do business in the state. [FN472] In August 1997, however, Raymark CEO, Craig Smith, testified that Raymark had, in fact, been licensed to do business in Texas for a time. [FN473] Skepnek explained that the error occurred because Baron & Budd put Raymark into bankruptcy between 1989 and 1996, during which time the company

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                          Page 37

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

ceased all operations and many of Raymark's records were lost or destroyed. [FN474] Therefore, when the bankruptcy proceeding was terminated in the company's favor and it resumed operations, "it was a little hard to put [the corporate knowledge] together." [FN475]

Skepnek argued that Baron & Budd, which had put Raymark into bankruptcy to begin with, had all of Raymark's pre-1989 files --which Raymark no longer had--and thus was presumably aware all along of the fact that Raymark had been briefly licensed to do business in Texas. [FN476] Yet, the firm did not challenge the special appearances or accuse Skepnek of any wrongdoing when he began filing special appearance motions with the Cobb affidavit or for a substantial period of time thereafter. [FN477] Nor did Baron & Budd file any sanctions motions when Raymark CEO Smith testified on August 14, 1997 that Raymark had been licensed to do business in Texas for a time. [FN478]

**\*160** On February 9, 1998, however, Baron & Budd appeared threatened by a Skepnek-led effort to inquire into use of the Script Memo. On that day, state District Judge John Marshall stated that the use of the Script Memo was "an affront to the integrity of the judicial system" and referred the matter to the Dallas County grand jury for its consideration. [FN479]

Within approximately one week of Judge Marshall's ruling, Baron & Budd filed over 160 motions for sanctions against Skepnek in courts throughout Texas alleging that Skepnek had knowingly submitted false affidavits and special appearance motions. [FN480] Skepnek, who no longer had an asbestos client once Raymark re-entered bankruptcy in March of 1998, was left to hire his own lawyer and defend himself against these motions for sanctions in courts throughout the state of Texas. [FN481] Ultimately, the district courts imposed significant fines on Skepnek throughout Texas; these amounts were later substantially reduced on appeal. [FN482]

**\*161** In addition to the civil sanctions motions, Baron & Budd also pursued criminal contempt charges against Skepnek that threatened him not just financially but also professionally. [FN483] However, no such charges were sustained. [FN484] Other actions against Skepnek were also pursued. [FN485]

This assault on Skepnek, as well as the defense of Baron & Budd's use of the Script Memo, was assisted by Professor Charles Silver of the University of Texas Law School. [FN486] Professor Silver wrote an article **\*162** defending Baron & Budd's use of the script memo and strongly attacking Skepnek which appeared in a law review symposium; all of the articles in the symposium either directly or indirectly defended Baron & Budd's use of the Script Memo. [FN487] Nowhere in his article, however, did Silver acknowledge that he had been retained by Baron & Budd to give his blessing to the use of the Script Memo. [FN488] Even after being "outed" by the Dallas Observer for his failure to acknowledge, while defending the script memo and attacking Skepnek, that he had been retained by Baron & Budd, [FN489] Silver repeated some of his charges against Skepnek in another article; this time he did manage, if only obliquely, to acknowledge his retention. [FN490]

Silver also criticized Skepnek for his role in Arce v. Burrow, [FN491] a litigation which grew out of a Phillips 66 chemical plant explosion in 1989. The accident killed twenty-three workers and injured scores more, spawning a number of wrongful death and personal injury lawsuits. [FN492] A suit on behalf of 126 of those injured was filed by five of the leading torts lawyers in Texas who had formed a special purpose law firm to pursue asbestos litigation: Walter Umphrey, David Burrow, John E. Williams, Jr., F. Kenneth Bailey, Jr., and Wayne Reaud. [FN493] The case settled for approximately $190 million, **\*163** of which the lawyers received a contingent fee of more than $65 million. [FN494] Forty -nine of these 126 plaintiffs believed that their claims had been mishandled by the law firm and that they had been subjected to both professional and judicial misconduct. As a result, these plaintiffs sought to bring an action against their attorneys for breach of fiduciary duty. Bringing such a claim would have required taking on some of the most powerful lawyers in Texas, and no Texas lawyer was willing to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

represent them. Skepnek, a plaintiffs' lawyer from Kansas, agreed to represent these plaintiffs in an action, inter alia, for breach of fiduciary duty. [FN495] Skepnek persevered against tremendous odds, [FN496] and after losses at the district court and appellate level, ultimately achieved a victory in the Texas Supreme Court, which held that fee forfeiture was an appropriate remedy for a lawyer's breach of his fiduciary duty to his client irrespective of whether the client could show actual damages resulting from the breach. [FN497] Arce quickly became a leading case on attorney fee forfeiture for breach of fiduciary duty. Moreover, it raised a potential threat to the attorneys who had been selected by Texas Attorney General Dan Morales to represent the state in its litigation against the tobacco companies, and who had been awarded a fee of $3.3 billion. [FN498] Silver, who had been retained by the Texas tobacco attorneys to give his blessing to their fee request, was highly critical of the outcome in Arce and argued that political forces opposed to the trial lawyers brought it about. [FN499] In fact, there is no evidence that "political forces" assisted or contributed to Skepnek's persevering efforts.

After attacking Skepnek in the law review symposium article that supported the propriety of the use of the Script Memo, Silver withdrew some of his more extreme charges. [FN500]

Silver buttressed his support for Baron & Budd's use of the Script Memo by noting that no member of the firm "has been convicted of wrongdoing, disciplined, or sanctioned" for its use. [FN501] As has already been related, Baron & Budd was able to defend the propriety of the Script Memo **\*164** against all attack and turn aside all attempts to conduct discovery into its use. [FN502]

More recently, it again successfully prevented inquiry into its use of the Script Memo when it gained dismissal of counts alleging that Baron & Budd committed fraud in its use of the Script Memo, which were part of a suit by the former GAF Corporation. [FN503]

**\*165** Silver is also correct in noting that the criminal justice system in Texas failed to act against the firm for its use of the Script Memo. [FN504]

**\*166** In summary, the outcome of the extensive proceedings precipitated by Baron & Budd's inadvertent production of the Script Memo is that the firm has prevailed in preventing discovery into its origin and use. We do not know whether it was used more extensively than Baron & Budd have admitted, and its author or authors have never been deposed. [FN505] Indeed, we do not even know if it is still in use today. What we do know is that, under Texas law, the document is protected by the attorney-client privilege, and that protection is not stripped away by the crime-fraud exception. [FN506] The inadvertent production of the Script Memo and the proceedings it precipitated--an unparalleled if not unique confluence of events--have presented a rare opportunity for an up-close look at one aspect of asbestos law in action: how one of the leading asbestos law firms stopped all attempts to inquire into its use of a critical witness preparation document. The detailed exhibition of awesome power brought to bear by a leading asbestos litigation firm against asbestos defendants and the attorneys seeking to inquire into the use of the Script Memo may be seen to offer support for the view that most non-malignant asbestos litigation today has become a malignant enterprise.

VIII. Scholarship About Asbestos Litigation

Scholarship about asbestos litigation, which includes several judicial decisions that are the equivalent of scholarly articles, covers a wide gamut of issues. These issues include (a) the effects of landmark Supreme Court decisions dealing with the congruity of massive asbestos claims settlements with applicable federal law (most notably the Amchem [FN507] and Ortiz [FN508] cases); [FN509] (b) the apportionment of liability among former asbestos manufacturers; [FN510] (c) the ethics and efficacy of mass tort litigation and **\*167** settlement; [FN511] (d) the validity of "fear-of-cancer" claims; [FN512] (e) the state of asbestos litigation; [FN513] (f) issues surrounding the operation of the Manville Trust; [FN514] (g) bankruptcy issues raised by asbestos litigation; [FN515] (h) methods

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                    Page 39

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

for improving the efficiency of the adjudication of asbestos cases; [FN516] (i) the *168 use of pleural registries to deal with the claims of the unimpaired; [FN517] and (j) the establishment of large asbestos damages trusts, [FN518] among others. However, despite the weight of the evidence set forth in this article, which indicates that much asbestos litigation today involves the production and use of specious evidence including PFT printouts, other medical evidence produced by a small number of B-readers and doctors hired for their propensity to find high rates of asbestosis, and testimony of claimants according to prepared scripts, some scholars writing about asbestos litigation simply reject that view. [FN519] Most, however, simply ignore the subject. A few refer to "questionable cases" or to claims of "dubious merit." [FN520] But with few, if any, exceptions, [FN521] there is simply no acknowledgment of the thesis set forth and supported in this article: that for the most part, asbestos litigation consists of a massive client recruitment effort which relies on the creation and use of specious evidence in a process which has corrupted the civil justice system. Why is this so? Why does the theory class omit any *169 reference to or consideration of the proverbial 800 pound gorilla that occupies center stage in this litigation?

My explanation has five parts. First, as a matter of general observation, there are occasions when most everyone refuses to acknowledge certain facts because they are simply too disturbing--rationality is outweighed by the distastefulness or level of discomfort that would be occasioned by such acknowledgment. While the effects of denial can be benign, there are some instances where adopting the postures of the three brass monkeys can have disastrous effects. [FN522]

Second, I believe that torts scholars have a proclivity to stoutly resist acknowledging the possibility that the civil justice system has been corrupted. Torts scholars focusing on asbestos litigation have devoted considerable resources to analyzing agency costs, the effect of the maturity of the litigation on settlement practices and the use of aggregations, the ethics of mass tort settlements, bankruptcy trusts, legislatively imposed administrative alternatives to litigation, and pleural registries, to name a few of the focal points. [FN523] Acknowledging the central role of specious evidence in asbestos litigation would render this scholarship less meaningful. This, then, is one earthquake that simply does not register on their Richter scales.

Third, experience teaches us that observations that do not fit prevailing theories are simply disregarded. Before a paradigm shifts, a certain critical mass of inconsistent observations must first be recorded. This is especially true when prevailing theories heighten the impact of scholars' works and the inconsistent observations pose personal costs in the form of potentially depreciating the value of that scholarship. When the level of discomfort, which is occasioned by even the consideration of the possibility that much asbestos litigation is based on the production and use of specious evidence, is added to the personal costs, the possibility of such a large scale corruption of the civil justice system becomes philosophically, emotively, and professionally unthinkable. What is unthinkable does not exist according to most prevailing theories.

Fourth, most tort scholars believe that the tort system is an effective and efficient distributor of injury avoidance costs and a deterrent to egregious corporate behavior. [FN524] Countless numbers of articles by torts scholars incorporate those propositions as fundamental premises. [FN525] Though it does not necessarily follow that these premises are undermined if the evidence *170 and argument set forth in this article is essentially accurate, such recognition may pose a threat to the core if not organizing principles of modern tort law and scholarship.

Finally, most torts scholars and all plaintiffs lawyers see the tort system as a bulwark that holds back a tide of egregious corporate behavior that would otherwise engulf the polity. That may explain, at least in part, why most torts scholars align with tort lawyers in opposing most tort reform proposals. Tort reform is seen as potentially stripping away the protections created by the tort system's expansion of the scope of activity that can give rise to liability in tort. These expansions in the scope of tort liability are often championed or spearheaded by torts scholars. Thus, the tort system and its reform have a political dimension. Torts scholars and tort lawyers mutually

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                                    Page 40

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

reinforce each other's interests within such a political context. Tort lawyers ratify the validity of tort scholars' premises by uncovering examples of egregious conduct and depriving enterprises of the profits from their wrongdoing. There is also a second aspect to the political dimension of the tort system. Tort lawyers, as a class, are among the largest single-issue contributors to political campaigns and account for a substantial portion of one political party's funding. Without the profits from tort claiming, that political party's ability to advance policies and positions that many torts scholars espouse could be in jeopardy. [FN526] Political beliefs may therefore shape perceptions of reality. Scholars' failure to acknowledge or even perceive that asbestos litigation has come to be largely based on the production and use of specious evidence may therefore be a function of the political dimension of the tort system.

[FNa1]. Professor of Law, Benjamin N. Cardozo School of Law of Yeshiva University. I have benefited greatly from the efforts of several very talented research assistants. Sara Klein, my lead assistant, has done superb work and her efforts have been invaluable. My other research assistants, Kim Mamta Shah, Andrew Borteck, and Daniel Grusenmeyer have each made important contributions for which I am grateful. I am deeply indebted to the tireless efforts of the research librarians at Cardozo School of Law: Norma Feld, Beth Gordon, and Peter Lee as well as library director, Professor Lynn Wishart, whom I have inundated with hundreds of requests for obscure source materials. Like Sergeant Preston of the Royal Canadian Mounted Police, they have never failed to find a fugitive source. Finally, I also wish to acknowledge the contribution made by Roger Cramton. At the symposium on asbestos litigation held at the Pepperdine University School of Law, Cramton, one of the speakers, expressed the view that: on the basis of my published work and the paper I prepared for the symposium, I had provided "insufficient evidence" to prove ethical violations let alone to support my conclusion that asbestos litigation has become a malignant enterprise which mostly consists of a massive client recruitment effort that accounts for as much as ninety percent of all claims currently being generated, supported by baseless medical evidence which is not generated by good faith medical practice, but rather is primarily a function of the compensation paid, and by claimant testimony scripted by lawyers to identify exposure to certain defendants' products. After the symposium, we had further discussion. I indicated that if I had failed to convince him on the basis of the work I had done so far, then I had more work to do. This article is the product of the effort I then undertook to meet that self-imposed burden of "sufficient evidence."

[FN1]. See, e.g., Stephen Carroll et al., Rand Inst. for Civil Justice, Asbestos Litigation Costs and Compensation: An Interim Report at 16, 47 (2002) (stating that more than 225,000 deaths due to asbestos would occur from 1985 to 2009 due to exposure occurring between 1940 -1979) [hereinafter RAND Report]; William J. Nicholson et al., Occupational Exposure to Asbestos: Population at Risk and Projected Mortality --1980-2030, 3 Am. J. Indus. Med. 259, 306 (1982) (noting in 1982 that roughly 8,200 people were expected to die from asbestos-related cancer annually, with that number increasing to approximately 9,700 by the year 2000).

[FN2]. See, e.g., Richard B. Schmitt, Burning Issue: How Plaintiffs' Lawyers Have Turned Asbestos into a Court Perennial, Wall St. J., Mar. 5, 2001, at A1 (stating that asbestos lawsuits have resulted in roughly $20 billion in damages and costs against a wide range of businesses).

[FN3]. In 2002, more than 56,000 new asbestos-related injury claims were filed, down from the 90,000 new claims filed in 2001, which was approximately triple the claiming rate of three years earlier. Roger Parloff, The $200 Billion Miscarriage of Justice, Fortune, Mar. 4, 2002 [hereinafter Parloff, Miscarriage]. The decrease in 2002 has been reversed. As of July 31, 2003, 51,564 claims have been filed with the Manville Trust. Telephone interview with David Austern, President, Claims Resolution Management Corporation, Manville Personal Injury Settlement Trust (Aug. 13, 2003). Certain industries have reported huge increases in filing rates, including increases of 721% in the textile industry, 296% in the pulp and paper industry, and 284% in the food and beverage industry. Id.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN4]. Since 1973, there has been a "drastic reduction in asbestos usage" due in large part to fears of liability on the part of manufacturers. Hearing on Asbestos Litigation Before the Senate Comm. on the Judiciary, 107th Cong. 3 (2002) (statement of Steven Kazan) (citing Stephen Carroll et al., Rand Institute for Civil Justice, Asbestos Litigation Costs and Compensation: An Interim Report 12 (2002)) [hereinafter Kazan Statement]; Asbestos Strategies, Report of Findings and Recommendations on the Use and Management of Asbestos, Global Env't & Tech. Found. (2003); see also Alex Berenson, Panel Urges Complete Ban on Product With Asbestos, N.Y. Times, May 10, 2003, at C4 (noting that the "use of asbestos... has fallen drastically since the early 1970s"). Asbestos is still used in the manufacture of roofing materials, brake linings, cements and gaskets. Kazan Statement at 3. However, there is considerable evidence that the type of asbestos which is embedded in these products, chrysotile, poses much less of a health risk than the amphibole type of asbestos fiber. See Editorial, Mineral Fibres and Mesothelioma, 41 Thorax 161 (1986); A.R. Gibbs et al., Non-Occupational Malignant Mesothelioma, 90 IARC Scientific Publications 219-28 (1989); Seminar, The 1991 Asbestos Medicine Seminar, Defense Research Inst., A14-15 (1991); see also Lester Brickman, The Asbestos Litigation Crisis: Is There A Need For An Administrative Alternative?, 13 Cardozo L. Rev. 1819, 1842 n.92 (1992) [hereinafter Brickman, Asbestos Litigation].

[FN5]. See Amicus Curiae Memorandum of the Babcock & Wilcox Company Regarding Allocation of Settlement Trust Funds for Asbestos Claimants, Findley v. Trustees (In re Joint East & South Dist. Asbestos Litigation), 237 F. Supp. 2d 297 (E.D.N.Y. 2001) (Nos. 82B 11656 (BRL) - 82B 11676 (BRL)) [hereinafter Babcock & Wilcox Memorandum] (discussing medical researchers' characterization of asbestos as a "disappearing disease").

[FN6]. See discussion infra Parts IV, VI.A.

[FN7]. For discussion of the perverse effects of aggregation of claims on courts' dockets, and, its coercive effects on defendants, see generally Lester Brickman, Lawyers' Ethics and Fiduciary Obligation in the Brave New World of Aggregative Litigation, 26 Wm & Mary Envtl. L. & Pol'y. Rev. 243 (2001) [hereinafter Brickman, Aggregative Litigation].

[FN8]. See RAND Report, supra note 1, at 49 (2002) (stating that over 6,000 firms have been named defendants in asbestos suits).

[FN9]. See Senate Comm. On The Judiciary, 108th Cong., Report on S.1125, The Fairness In Asbestos Injury Resolution Act of 2003 16 (2003) [hereinafter Judiciary Comm. Asbestos Report].

[FN10]. It has been estimated that "the number of jobs not created because asbestos defendants spent $10 billion less on investment up to the year 2000 would be approximately 128,000. Also, the number of jobs that defendants would have created if they had not had to reduce their capital investments by $33 billion is estimated to be 423,000." RAND Report, supra note 1, at 74. In addition to loss of jobs, employees and shareholders of asbestos defendants that declared bankruptcy also suffered substantial financial losses. Because of the bankruptcies, an estimated 52,000-60,000 employees of asbestos defendants lost both their jobs and an average of 25% of the value of their 401(k) accounts. See Joseph E. Stiglitz et al., The Impact of Asbestos Liabilities on Workers in Bankrupt Firms (2002). In some instances, employees of asbestos defendants experienced even greater losses. For example, in 1998, Federal Mogul acquired a company with asbestos liability. See Judiciary Comm. Asbestos Report, supra note 9, at 25; Federal Mogul, at http://www.federal-mogul.com/cda/content/front/0,2194,2336_2903&uscore;4292,00.html (November 11, 2003) (discussing Federal Mogul's acquisition of companies in 1998 that manufactured asbestos products). By 2001, the parent company was threatened by bankruptcy as a result of multiple asbestos suits, and the value of the Federal Mogul stock in the accounts of its 22,000 employees declined more than $70 million. See id.; see also Griffin B. Bell, National Legal Center for the Public Interest, Asbestos Litigation and Judicial Leadership: The Court's Duty

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                Page 42

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

to Help Solve the Asbestos Litigation Crisis 26 (2002) [hereinafter Bell, Asbestos Litigation]; Parloff, Miscarriage, supra note 3, at 155-56 ("At the time of Federal-Mogul's bankruptcy filing this past October... employees held 16% of the company's stock, which had lost 99% of its value since January 1999. About 14% of Owens Corning's shares--which lost 97% of their value in the two years before its filing--were owned by employees."); Jessie David, The Secondary Impacts of Asbestos Liabilities, U.S. Chamber of Commerce (2003); American Bar Association Commission on Asbestos Litigation, ABA Report to the House of Delegates, Recommendation & Resolution, 7 (2003) [hereinafter ABA Report]. Shareholders were also adversely affected by asbestos litigation and the ensuing bankruptcies. After filing for bankruptcy, the market capitalization of five major asbestos producing companies fell dramatically. The market capitalization for Federal-Mogul declined 99% from $4 billion in January 1999 to $49 million after filing for bankruptcy in October 2001; Owens Corning's market capitalization fell from $1.8 billion to $75 million (96%); Armstrong's fell from $1.01 billion to $204 million (80%); W.R. Grace's declined from $1.1 billion to $114 million (90%); and USG's fell from $2.5 billion to $185 million (92%). See Babcock & Wilcox Memorandum, supra note 5, at 25. In addition, "the large uncertainty surrounding asbestos liabilities has impeded transactions that, if completed, would have benefited companies, their stockholders and employees, and the economy as a whole." Judiciary Comm. Asbestos Report, supra note 9, at 25 (quoting statement of Managing Director of Goldman Sachs).

[FN11]. Elizabeth Sanger, Law Firms Queue Up for NY Tobacco Suit, Newsday (Nassau and Suffolk Ed.), May 29, 1997, at A53 (A "Mississippi lawyer... became wealthy from suing asbestos manufacturers and has used much of that money in fighting the tobacco industry.").

[FN12]. In re Joint East & South. Dist. Asbestos Litig., 237 F. Supp. 2d 297, 304, 313 (E.D.N.Y. 2002). The principal reason why all attempts to predict the total number of asbestos claims have proven woefully inadequate is that claims are being compensated for illnesses that, according to the clear weight of medical evidence, either are not caused by asbestos or do not result in a significant impairment--i.e., are not generally regarded by the medical profession as an illness. Projection of these claims is inherently uncertain. Simply put, when medical research concludes that a condition is not caused by asbestos, or is not an illness at all, medical research will not be able to predict the number of such claims. Judiciary Comm. Asbestos Report, supra note 9, at 79 (quoting Letter from Dr. James Crapo to Senator Jon Kyle). That is why, for example, those who believed that asbestos claiming was a function of the quantum of injury, predicted in the 1980s that the number of claims would drop dramatically in the coming decade. See, e.g., Marc Galanter, The Life And Times of The Big Six; Or, The Federal Courts Since The Good Old Days, 1988 Wis. L. Rev. 921, 939-41 (predicting the passing of the wave of asbestos litigation because of the expiration of long latency periods and the elimination of use of asbestos-containing products from the workplace and stating that the "pool [of injured asbestos claimants] is destined to diminish over the coming decades"). For those still intrepid enough to advance actual head counts, one estimate from a leading expert is that the number of future asbestos claims could range from a low of 1,600,000 to a high of 2,100,000 with a possible additional several hundred thousand lung cancer claims if the approximately 150,000 people diagnosed each year with lung cancer who have at least one family member with asbestos exposure history are permitted to attribute their lung cancer to asbestos exposure. Letter from David Austern, President, Claims Resolution Management Corporation, Manville Personal Injury Settlement Trust to Honorable Patrick J. Leahy, United States Senate Committee on the Judiciary 2 (July 8, 2003) (on file with author).

[FN13]. For a recognition of the entrepreneurial talents of asbestos lawyers, see Brickman, Aggregative Litigation, supra note 7, at 246 n.13, 297.

[FN14]. See discussion infra Part VIII.

[FN15]. Brickman, Asbestos Litigation, supra note 4; Lester Brickman, The Asbestos Claims Management Act of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

1991: A Proposal to the United States Congress, 13 Cardozo L. Rev. 1891 (1992) [hereinafter Brickman, Asbestos Claims Management Proposal]; Brickman, Aggregative Litigation, supra note 7, at 272-98; Lester Brickman, Civil Justice Forum of the Manhattan Institute Asbestos Litigation, Malignancy in the Courts (2002).

[FN16]. For a discussion of the role of forum shopping in aggregative litigation, see Brickman, Aggregative Litigation, supra note 7, at 258.

[FN17]. Intrinsic to the success of plaintiff lawyers in asbestos litigation is their ability to choose locations where, frequently, the civil justice system gives every appearance of having been captured by plaintiff lawyers. See Judiciary Comm. Asbestos Report, supra note 7, at 10 ("increasingly one is able to forum shop and go to a jurisdiction, which will allow cases to be brought . . . by people who are not demonstrating that they're sick"). Elected judges in those jurisdictions, usually with plaintiff lawyers' financial support, conduct "trials" that are primarily designed to punish defendants who have the temerity or stupidity to actually take a case to trial rather than pay the settlements demanded by the lawyers. See Bell, Asbestos Litigation, supra note 10, at 16 (quoting Lisa Girion, Firms Hit Hard as Asbestos Claims Rise, L.A. Times, Dec. 17, 2001, at A1). Juries in those jurisdictions buy in to plaintiff lawyers' urgings to use their power as jurors to transfer wealth from the out-of-state defendants to in-state plaintiffs and plaintiffs' lawyers and perhaps spread some of that wealth around the local community. A leading plaintiff lawyer, Dickie Scruggs, has candidly acknowledged the existence of such jurisdictions, and their apparent appropriateness:
[W]hat I call the "magic jurisdiction" ... [is] where the judiciary is elected with verdict money. The trial lawyers have established relationships with the judges that are elected.... They've got large populations of voters who are in on the deal.... And so, it's a political force in their jurisdiction, and it's almost impossible to get a fair trial if you're a defendant in some of these places.... Any lawyer fresh out of law school can walk in there and win the case, so it doesn't matter what the evidence or the law is.
Jim Copland, The Tort Tax, Wall St. J., June 11, 2003, at A16 (quoting Dickie Scruggs). The impact of these "magic" jurisdictions on asbestos claiming cannot be overstated. Currently, 85% of all asbestos cases are filed in just 10 jurisdictions, with Mississippi, Texas and West Virginia being the leaders; moreover, the ratio of malignant to non-malignant claims in these jurisdictions is far too high to be explained by medical science. Robert J. Samuelson, Asbestos Fraud, Wash. Post, Nov. 20, 2002, at A25. Between 1998 and 2000, just five of these states (Mississippi, New York, West Virginia, Ohio and Texas) accounted for 66% of all asbestos filings. RAND Report, supra note 1, at 32; see also Babcock & Wilcox Memorandum, supra note 5, at 13, 34 (stating that "[t]he ratio of non-malignant to malignant claims brought against the Manville Trust is 3-to-1 for claims from relatively inactive states but 12-to-1 for claims from states with the most active plaintiffs' bar and the most claims.," and that "[i]n Mississippi, the ratio of non-malignant to malignant claims has been 47-to-1 since 1998. In California, the ratio has been just 2.8-to-1.").
In a case that epitomizes the conditions that prevail in some of the "magic" jurisdictions, on October 26, 2001, a jury in Mississippi returned a verdict for six co-plaintiffs in the amount of $25 million each for a total of $150 million in compensatory damages for "asbestos-related conditions." Parloff, Miscarriage, supra note 3, at 155. The six plaintiffs were plant "laborers, janitors, plant workers, or general maintenance men" who alleged exposure to asbestos-containing products at locations such as schools or boiler rooms. Id. "Four defense doctors had testified that none of the plaintiffs suffered from any asbestos-related condition whatsoever, but the plaintiffs' doctor, a Jackson pulmonologist, disagreed. None of the plaintiffs claimed to have incurred any medical expenses or to have ever lost a day of work due to asbestos exposure." Id. The transparency of the claims is also reflected in the testimony of one of the claimants who, when confronted with prior testimony that he was still jogging, simply changed his mind saying he had "made a mistake" and had actually stopped jogging in 1996. Id. The importance of Mississippi as a forum where asbestos litigation has reached its highest and most valuable form is further exhibited by a $160 million settlement in November 1999 with eighteen asbestos defendants involving 4000 plaintiffs from five states. See Stephen Labaton, Top Asbestos Makers Agree to Settle 2 Large Lawsuits, N.Y.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

Times, Jan. 23, 2000, at A22. While 2,645 residents of Ohio, Indiana and Pennsylvania received $14,000 apiece, and seven Texas plaintiffs received $43,500 apiece, the 246 plaintiffs from four "magic" counties in Mississippi, who claimed similar injuries, received $263,000 apiece. Id.

Another case that epitomizes "magic jurisdiction" jurisprudence in asbestos cases is the massive consolidation known as David Cosey, which occurred in Fayette, Mississippi in 1998. See Parloff, Miscarriage, supra note 3. In that case, a jury returned a verdict of $48.5 million in compensatory damages for twelve plaintiffs, including $2 million apiece for five plaintiffs who reported no respiratory problems and had totally normal pulmonary tests. Id. The same jury that imposed the massive compensatory damages then began deliberating on whether to impose punitive damages as well. Id. The prospect of analogously large punitive damages caused most of the defendants to settle the twelve individual claims. Id. The few defendants who decided not to settle soon received a call from the judge who advised them that he was considering reconvening the same jury to set damages for the remaining 1,700 claims if they did not settle them all within the next thirty days. Id. Allegedly he even implied during the conversation that they "would not be able to appeal the resulting aggregate verdict to the Mississippi Supreme Court, because they would not be able to afford the appeal bond required under Mississippi law, which, at the time, had to cover 125% of the total judgment." Id. Although the defendants did settle the twelve individual claims that afternoon, they resisted settling the remaining 1,700 co-plaintiff claims. Id. They were eventually forced to settle those claims as well after the judge scheduled a group trial for sixty three more claims and the Mississippi Supreme Court denied their emergency petition seeking to disqualify the judge for bias. Id.

One of the most effective ways in which courts align with plaintiff lawyers' interests is the mass consolidation, which can be used to effectively coerce settlements from defendants in cases without any cognizable injury. For a discussion of the role of mass consolidations in asbestos claiming, see Brickman, Asbestos Litigation, supra note 4, at 1873-81. Mass consolidations in the "magic" jurisdictions have achieved unprecedented levels of coerciveness. A recent example of such a mass consolidation has taken place in West Virginia involving at least 8,000 or more plaintiffs and 259 defendants. Brief for Petitioner at 13, Mobil Corp. v. Adkins, 563 S.E.2d 419 (2002) (No. 02-132). The 8,000 or more plaintiffs had worked in different types of jobs for different periods of time in many different locations across the country and were arguing different theories to recover for many different alleged injuries. See id. For the most part, what they shared in common was that they all filed complaints containing the word "asbestos." See id.

The trial court judge entered a "Report" which outlined that a mass trial format would be used in its adjudication. Mobil Corp. v. Gaughan, 563 S.E.2d 419, 421-22 (W. Va. 2002), cert. denied, 2002 U.S. LEXIS 7389 (2002). The "Report" indicated that the trial was to commence its first phase on September 23, 2002. Id. at 422. During this portion of the trial, the fault of each of the defendants would be determined as would assessment of punitive damages. Id. In the second phase, mini-trials would consider causation and damages issues. Id. at 423. The plan stated that at the end of the first phase but before determination of causation or injury, the jury would determine punitive damages. Id. In addition, the plan mandated that West Virginia substantive law would apply during the mass trial irrespective of the fact that as many as 5,000 claims were brought by plaintiffs who were neither exposed to asbestos in West Virginia nor residents of that state. State ex rel. Mobil Corp. v. Gaughan, 565 S.E. 2d 794 (W. Va. 2002). Though including specific details in the plan the judge concluded the "Report" by saying that "the trial plan has not been solidified." Gaughan, 563 S.E.2d at 422.

One defendant subsequently filed a petition for a writ of prohibition against the order arguing that the trial court's decision to "consolidate thousands of unrelated individual asbestos personal injury claims into a single trial was arbitrary and capricious' and that such a decision denied [their rights] to Due Process and Equal Protection." Id. Additionally, the defendant claimed that the trial court was "thwarting its 'efforts to secure review'"" by failing to finalize the plans for the trial format. Id. The Supreme Court of Appeals of West Virginia held that in the interest of the "judicial system's best efforts to address the unique challenges of managing this voluminous litigation, while at the same time trying to afford substantial justice to all the parties involved in a timely manner," the requested relief should be denied with respect to certain portions. Id. at 425. The court went on to say, however, that since the plan for the trial format had not been finalized, the defendants' contention of a denial of due process was simply

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                               Page 45

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

premature and the court could not render a decision before there was a final determination. Id. at 426. With this decision the state supreme court allowed the trial court to begin the trial by refusing "to conduct any inquiry into whether these 8,000 claims have enough in common that their mass trial will not unduly prejudice the defendants." Brief for Petitioner at 2-3, Mobil Corp. v. Adkins, 563 S.E.2d 419 (2002) (No. 02-132). After being denied a writ of certiorari by the U.S. Supreme Court, all but one of the defendants settled their claims out of court. Mobil Corp. v. Gaughan, 537 U.S. 944 (2002). The vast majority of the claims were thus settled even though an independent medical audit of a sample of these claims concluded that the vast majority of those diagnosed with asbestosis had been misdiagnosed. For an account of another mass consolidation which effectively coerced defendants to settle large numbers of meritless claims, see the discussion of the Cimino consolidation in Brickman, Asbestos Litigation, supra note 4, at 1877. See also Brief of Amicus Curiae American Tort Reform Association, Cimino v. Pittsburgh Corning Corp., 151 F.3d 297 (5th Cir. 1994) [hereinafter Cimino Amicus Brief].

Asbestos claiming on behalf of those who do not appear to have any illness, let alone an impairment, also occurs in jurisdictions where the civil justice process is not similarly affected but where some judges strongly favor the interests of plaintiffs and plaintiff attorneys. See, e.g., Dunn v. Owens-Corning Fiberglas, 774 F. Supp. 929 (D.V.I. 1991) (where the United States district court judge kept critical evidence from the jury that the allegedly impaired plaintiff had misled the jury with regard to his symptoms; this ruling and many others all favorable to the plaintiff tilted the playing field strongly in the plaintiff's favor). For a more detailed discussion of Dunn, see Brickman, Asbestos Litigation, supra note 4, at 1844-50. Compare Dunn with Cain v. Armstrong World Indus., 785 F. Supp. 1448, 1452-53, 1455 (S.D. Ala. 1992) (expressing considerable skepticism with regard to the veracity of plaintiffs' apparently well-rehearsed testimony as to their symptomology).

[FN18]. Black's Law Dictionary 594 (5th ed. 1979).

[FN19]. For a description of mesothelioma, see Brickman Asbestos Litigation, supra note 4, at 1842-44. It is commonly thought that mesothelioma, a particularly virulent malignancy of the pleural, pericardial and peritoneal cavities, is caused exclusively by exposure to asbestos. See, e.g., O'Brien v. National Gypsum Co., 944 F.2d 69 (2d Cir. 1991). However, approximately 20% of malignant mesotheliomas have been attributed to other causes. See Michele Carbone, Robert A. Kratzke & Joseph R. Testa, The Pathogenesis of Mesothelioma, 29 Seminars in Oncology 2 (2002); Mark Britton, The Epidemiology of Mesothelioma, 29 Seminars in Oncology 18 (2002).

[FN20]. See Mealey's Asbestos Conference (1999); Manville Personal Injury Settlement Trust, Claims Resolution Management Corporation, Selected Operations Data for Presentation at Courts Hearing 14 (2001) (the number of mesothelioma claims evaluated by the Manville Trust during the period of 1995-2001 ranged from 1118-1827.). This pace is predicted to continue unabated until 2017. Bertram Price, Analysis of Current Trends in United States Mesothelioma Incidence, 145 Am. J. Epidemiology 211, 216, fig. 4 (1997). In 1998, the number of mesothelioma deaths in the United States spiked at 2,535. Kazan Statement, supra note 4, at 5 n.16. But see National Cancer Institute, SEER Data, at www.seer.cancer.gov (last visited Nov. 4, 2003) (indicating that mortality rates from mesothelioma have been declining since 1992).

[FN21]. D.E. Lilienfeld et. al., Projection of Asbestos Related Diseases in the U.S., 1985-2009, 45 Brit. J. of Indus. Med. 283 (1988). Most lung cancer claims are brought on behalf of smokers who have also been exposed to asbestos since the risk of contracting lung cancer for those heavily exposed to asbestos dust is substantially increased for smokers. Studies conducted as early as the 1950s revealed that persons "who smoked had a risk of lung cancer more than 50 times higher than a comparable [person] who neither smoked nor was exposed to asbestos." Kazan Statement, supra note 4, at 4.

[FN22]. Babcock & Wilcox Memorandum, supra note 5, at 33.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN23]. "The medical literature shows that, while lung-cancer risk increases when significant asbestos is present, there is no such increase in risk in workers who are exposed to asbestos... but who do not have asbestosis." Letter from James D. Crapo, M.D., Professor and Chairman, Department of Medicine, National Jewish Medical and Research Center and University of Colorado Health Sciences Research, to Honorable Jon Kyl, Member, Committee on the Judiciary, United States Senate, in Judiciary Comm. Asbestos Report, supra note 9, at 165 (citing W. Weiss, Asbestos-Related Pleural Plaques and Lung Cancer, 103 Chest 1954-1959 (1993)). Dr. Crapo explained that "[p]rospective studies that have focused upon the question whether exposure alone, without accompanying asbestosis, is associated with increased lung cancer risk have found that lung cancer risk is associated with asbestosis and not with asbestos exposure alone." Id. at 65. See also Hughes J.M. and H. Weil, Asbestos as a Precursor of Asbestos Related Lung Cancer: Results of a Prospective Mortality Study, 48 Brit. J. Indus. Med. 220 (1991); Andrew Churg & Franics H.Y. Green, Pathology of Occupational Lung Disease 343 (2d ed. 1998) ("[S]tudies provide strong support for the notion that asbestosis is crucial to the development of asbestos-associated lung cancers."); W. Morgan & A. Seaton, Occupational Lung Diseases 151 (3d ed. 1995) ("[H]eavy cumulative exposures to asbestos which lead to asbestosis increase the risk of developing cancer.... [T]here is now considerable evidence that the risk of lung cancer only increases when asbestosis is present."); Judiciary Comm. Asbestos Report, supra note 9, at 64. But see Letter from James D. Crapo, M.D., Professor and Chairman, Department of Medicine, National Jewish Medical and Research Center and University of Colorado Health Sciences Research, to Honorable Jon Kyl, Member, Committee on the Judiciary, United States Senate, in Judiciary Comm. Asbestos Report, supra note 9, at 152 (acknowledging that there is the view within the medical community that "lung cancer can be related to asbestos exposure, even in the absence of asbestosis, if an individual had sufficient exposure to asbestos to cause asbestosis").

[FN24]. Judiciary Comm. Asbestos Report, supra note 9, at 103 (citing a letter from Dr. E.B. Ilgren). Testimony before the Committee also addressed this issue directly: "While the evidence suggests an association between asbestos and laryngeal carcinoma, no other form of cancer is clearly associated with asbestos exposure." Id. at 100. Other doctors testified that there was no causal relationship between asbestos and any of several other cancers, including colorectal, esophageal, and renal (kidney) cancer. Id.

[FN25]. Methodology concerns regarding the meta-study which suggested a link to laryngeal cancer leave the question of such a relationship unanswered. "[V]ariance in the studies relating to laryngeal cancer was so large that the possibility of no increased risk could not be excluded, and there was no evidence of a dose-response effect, raising serious question as to whether cancer of the larynx has a true correlation with asbestos exposure." Judiciary Comm. Asbestos Report, supra note 9, at 103. One doctor testified that "[t]he confounding factors previously mentioned, namely smoking and alcohol, remain major often-unadjusted factors in these diseases." Id.

[FN26]. See generally Ken Donaldson & C. Lang Tran, Inflammation Caused by Particles and Fibers, 14 Inhalation Toxicology 5 (2002).

[FN27]. For a more detailed consideration, see Brickman, Asbestos Litigation, supra note 4, at 1846 n.112.

[FN28]. W. Raymond Parkes, Occupational Lung Disorders 285, 411 (3d ed. 1994).

[FN29]. Since there are no significant symptomatic differences between asbestos pneumoconiosis and non-asbestos pneumoconiosis, many people exposed to other types of dusts are suing asbestos companies for "asbestosis" when in fact any fibrosis was caused by exposure to other dusts. Id. at 320, 431. For example, silicosis "occurs in persons exposed to coal and hard rock mining, quarry employees and sandblasters, and also those exposed to free silica.... Cotton dust is another example of a dust that causes a non-asbestos pneumoconiosis." Letter from David Austern, President, Claims Resolution Management Corporation, Manville Personal Injury Settlement Trust to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                          Page 47

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

Honorable Patrick J. Leahy, United States Senate Committee on the Judiciary 3 (July 8, 2003) (on file with author). In some cases, rather than making a choice between asbestosis and other clinical diagnoses of the cause of a fibrosis based upon which choice offers the best compensation, it would appear that attorneys may be suing multiple defendants, claiming in one suit or set of suits that the client has asbestosis, and separately claiming in another suit or set of suits that the client has silicosis. In an as yet unheralded "son of asbestos" claiming phenomenon, more than 33,000 individuals have sued claiming lung injuries from exposure to respirable silica. See Brief In Support Of Joinder And Response Of Textron Inc., Norton Company and Siebe North, Inc. In The Motion To Transfer Under 28 U.S.C. § 1407 at 3, In re Silica Products Liability Litigation, MDL Docket No. 1553 (2003). It is possible for an individual to have fibrosis caused by exposure to asbestos dusts and separately have fibrosis caused by exposure to silica dusts. Jonathan D. Glater, Suits on Silica Being Compared to Asbestos Cases, N.Y. Times, Sept. 6, 2003 at C1. However, the developing silicosis litigation phenomenon appears to be an attempt to both replicate asbestos litigation and recycle asbestos claims. As with asbestos suits, plaintiffs assert essentially the same claims against a core group of "131 companies that manufacture, distribute, or sell sand, sandblasting equipment, respiratory protection devices or air compressors." See Brief In Support Of Joinder And Response Of Textron Inc., Norton Company and Siebe North, Inc. In The Motion To Transfer Under 28 U.S.C. § 1407, In re: Silica Products Liability Litigation, MDL Docket No. 1553 (2003). "[S]ilica product liability litigation is more extensive and pervasive than what is reflected by... [filings that are the subject of this motion].... More than 17,000 plaintiffs filed cases in the first half of 2003 alone." Id. Though it is not likely that silica defendants have attempted to ascertain whether those suing them claiming silicosis have also sued others claiming asbestosis, there is a basis for such concern. See the x-ray evaluation, November 18, 2002 in which Dr. W. Allen Oaks found that the "parenchymal changes [listed above] are consistent with asbestosis ...." The x-ray evaluation report includes an ILO form graded 1/0. Id. Dr. Oaks provided a second x-ray evaluation of the same subject on the same date with the identical ILO form attached in which he stated that the "above parenchymal changes are consistent with silicosis ...." (Both reports are on file with the author). Since the attorney who hired Dr. Oakes had to pay for each report, it seems improbable that he was simply hedging his bet. It appears far more likely that two completely separate sets of claims are being filed that may include separate and inconsistent work histories. For more on silicosis litigation, see generally Susan Warren, Industry Focus: Silicosis Suits Rise Like Dust, Wall St. J., Sept. 4, 2003 at B5.

[FN30]. ABA Report, supra note 10, at 7 ("Asbestotic lungs are characterized by reduced capacity, i.e., they can process only a reduced volume of air compared to normal lungs. Workers who suffer from significant asbestosis generally have shortness of breath on exertion.").

[FN31]. International Labour Office, Guidelines For The Use of ILO International Classification of Radiographs of Pneumoconioses (Rev. ed. 1980) [hereinafter ILO Guidelines]; see also William S. Cole, M.D., The Classification of Radiographs of Pneumoconiosis, in A Study Syllabus for Classification of Radiographs of Pneumoconiosis (W.J. Tuddenham, M.D. ed. 1983) (a study guide for the application of the ILO radiographic classification system; prepared by the Division of Respiratory Disease Studies, NIOSH Centers for Disease Control and Prevention, Morgantown, W.V.).

[FN32]. ILO Guidelines, supra note 31, at 1, 2. According to the ILO:
The object of the Classification is to codify the radiographic abnormalities of pneumoconiosis in a simple reproducible manner. The Classification does not define pathological entities, nor take into account working capacity. The Classification does not imply legal definitions of pneumoconiosis for compensation purposes, nor set nor imply a level at which compensation is payable.
The Classification is based on a set of standard radiographs, a written text and a set of notes. In some parts of the scheme the standard radiographs take precedence over the text for the definitions; the text makes it clear when this is so.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

Id.

[FN33]. The National Institute for Occupational Safety and Health ("NIOSH") of the Centers for Disease Control and Prevention ("CDC") award B-Reader approvals to individuals who meet a specified level of proficiency in classifying chest X-rays according to the ILO scale; these B-Readers must be re-certified at 4 year intervals, and are usually, but not always, licensed doctors. ABA Report, supra note 10, at 14.

[FN34]. In re Joint East. & South. Dist. Asbestos Litigation, 237 F. Supp. 2d. 297, 308 (E.D.N.Y. 2002).

[FN35]. Lawrence Martin, M.D., FACP, FCCP, Runaway Asbestos Litigation--Why it's a Medical Problem, available at http:// www.mtsinai.org/pulmonary/Asbestos/AsbestosEditorial.htm (Nov. 18, 2002).

[FN36]. ABA Report, supra note 10, at 13.

[FN37]. See National Institute for Occupational Safety and Health, To B or Not to B a NIOSH B-Reader, at http://www.cdc.gov/niosh/pamphlet.html#new_ ilo (last visited Nov. 4, 2003).

[FN38]. Raymond L. Murphy, Jr. et al., American Thoracic Society, The Diagnosis of Nonmalignant Diseases Related to Asbestos, 134 Am. Rev. Respir. Dis. 363, 367 (1986).

[FN39]. The "authoritative consensus view" that has been articulated by the ATS is that only ILO readings of 1/1 or higher should be used to diagnose asbestosis. Id. at 363, 367. See Debtor's Consolidated Reply in Support of Their Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Claim Forms and Approval of the Notice Program at 48, In re W.R. Grace Co., 285 B.R. 148 (Bankr. D. Del. 2001) (No. 01-01139(27)) [hereinafter Grace Consolidated Reply 11/9/01] (citing cases in which the court held that unimpaired asbestosis was not a legally cognizable injury).

[FN40]. Another reason to be cautious about 1/0 diagnoses is that there is considerable inter-reader variability in the interpretation of x-rays, especially at the lowest levels. Grace Consolidated Reply 11/9/01, supra note 39, at 51 ("It is in the lower categories (0/1 to 1/1) that the greatest degree of interobserver variability (disagreement) occurs") (quoting H. Weill, Diagnosis of Asbestos-Related Disease, 91 Chest 802-03 (1987)); see also Raymond L. Murphy, Jr. et al., American Thoracic Soc'y, The Diagnosis of Nonmalignant Diseases Related to Asbestos, 134 Am. Rev. Respir. Dis. 363, 366 (1986) ("[T]he interpretation of the lesser degrees of abnormality on the [ILO] scale is subjective.... In the presence of marked diffuse pleural thickening, it is difficult to diagnose or grade the severity of interstitial fibrosis."); Alan M. Ducatman, Variability in Interpretation of Radiograpghs for Asbestosis Abnormalities: Problems and Solutions, 643 Annals N.Y. Acad. Sci. 108 (1991) (discussing inter-reader variability in greater detail).

[FN41]. Anders J. Zitting, Prevalence of Radiographic Small Lung Opacities and Pleural Abnormalities in a Representative Adult Population Sample, 107 Chest 126, 127 (1995). In a study done of a population not known to have industrial exposure to asbestos, 35.5% were nevertheless found to have conditions "consistent with" asbestosis. See David M. Epstein et al., Application of ILO Classification To A Population Without Industrial Exposure: Findings To Be Differentiated From Pneumoconiosis, 142 AJR 53 (1984).

[FN42]. The onset of the major asbestos-related diseases, asbestosis, mesothelioma and lung cancer, is a function of the duration and density of exposure to asbestos. In the parlance of medical science, the likelihood of contracting one of these diseases has been shown to be dose-related. See Hans Weill, Biological Effects: Asbestos-Cement Manufacturing, 38 Ann. Occup. Hyg. 533, 535 (1994).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                                                                    Page 49

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

The dose-response relationship is a general biological principle that refers to the correspondence between the extent of exposure (that is, the "dose") and the biological outcome of interest (the "response"). If one can demonstrate an increasing (or decreasing) risk of severity of response, for example, lung cancer, in association with an increased (or decreased) dose of exposure to the putative cause, for example, asbestos, then one can say there is a dose-response relationship.

The significance of the concept of a dose-response relationship is at least twofold. First, it is a key element in establishing a causal relationship between the dose and the response as well as a tool for explaining variations in biological response. Second, in practical terms, it provides information upon which to establish regulatory standards.

Closely related to the concept of a dose-response relationship is the notion of a threshold: that is, a level of dose below which no effect or no risk of illness or death will occur. When one charts a dose-response relationship on a graph to ascertain whether or not a threshold exists, one should examine the location and contour of the dose-response relationship at the point of zero dose. If the response at the point of zero dose is zero (or positive), and the slope of the dose-response line or curve is positive (that is, a line going out from the origin), this suggests there is no dose at which some response will not occur. In other words, this suggests that no threshold exists. If, on the other hand, there is zero response at a dose greater than zero, this suggests that there are doses at which no change in response is expected; that is, a threshold or "no-effect" level exists.

1 Royal Commission, Report On Matters of Health and Safety Arising From the Use of Asbestos In Ontario 274-75 (citations omitted) (1984) [hereinafter Ontario Royal Commission].

Though large numbers of industrial and construction workers have been exposed to asbestos at worksites, relatively small numbers contract mesothelioma, lung cancer or moderate to severe asbestosis. Moreover, large numbers of city dwellers and others are exposed to low levels of asbestos in the ambient air over long periods of time but do not contract an asbestos-related disease. It is therefore important for purposes of relating exposure levels to disease to determine the dose relationship. That, in turn, requires that exposures to asbestos be quantified.

The unit currently used to express the quantification of asbestos exposure is fiber.cc.years. This is defined to mean: the concentration of asbestos fibers, expressed as the number of fibers per cc (cubic centimeter) of air multiplied by the number of occupational years that an individual was exposed to that concentration of fibers. For purposes of this calculation, individuals are estimated to spend 1993 hours per year on the job. See L.M. Lacquet & L. van der Linden, Roentgenographic Lung Changes, Asbestosis and Mortality In A Belgian Asbestos-Cement Factory, 30 Iarc Sci. Publ. 783, 784 (1980).

The preponderance of data evidences a positive dose-response relationship for asbestosis. Ontario Royal Commission, supra at 275. According to various studies, the minimum cumulated inhaled dose for developing asbestosis is 25 fiber.cc.years; below that exposure threshold, asbestosis is very unlikely to be found. See id. at 281 ("[O]ur best judgment as to the lifetime occupational exposure to asbestos at which the fibrotic process cannot advance to the point of clinical manifestation of asbestosis is in the range of 25 f/cc-yrs and below."); see also G. Berry et al., Asbestosis: A Study of Dose-Response Relationships In An Asbestos Textile Factory, 36 British J. Indus. Med. 98, tbl. 4 (1979); Weill, supra at 535 ("little radiographic evidence of asbestosis below 30-40... [fiber.cc.] years"); L.M. Lacquet & L. van der Linden, supra at 788 ("[N]o case of asbestosis for an exposure below 100 [fiber.cc.years], and only one case in the range 100-200 fibre-years."). A cumulated inhaled dose of 25 fiber.cc.years can be calculated on the basis of exposure of 25 fibers/cc for one year or 5 fibers/cc for five years or 1 fiber/cc for 25 years. The effect of exposures exceeding 25 fiber.cc.years are variable. See Ontario Royal Commission, supra, at 280. One study found a 1% incidence of asbestosis in workers with a cumulative exposure of about 75 fiber.cc.years. See Berry et al., supra at 105. Other studies found an incidence of asbestosis of approximately 2% in workers with cumulative exposures of 50-60 fiber.cc.years and 50-99 fiber.cc.years respectively. See Weill, supra at fig. 4 (2% in 50-60 fiber.cc.years); Lacquet, supra at tbl. 2 (under 2% in 50-99 fiber.cc.years).

Virtually everyone is exposed to asbestos because fibers exist in ambient air in varying densities depending upon location. Tests of ambient air in a number of U.S. cities indicates levels of asbestos ranging from 0.001 fibers/cc to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

0.02. See William J. Nicolson and Arthur N. Rohl, Asbestos Air Pollution in New York City, in Proceedings of the Second International Clean Air Congress 136-139 (H.M. England & W.T. Berry eds. 1971) (concluding mid-town New York level is at 0.00075 -.002; Philadelphia is at 0.00125-.0015; and stating that the data establishes "the existence of a widespread background contamination of chrysotile asbestos in the ambient air"); Paul Chrostowski, supra at tbl. III (mid-town New York: 0.001; Philadelphia: 0.00233; Los Angeles: 0.00143); Carl A. Mangold, Asbestos Fibers In The Ambient Air In the Greater San Francisco Area 5 (March 1983) (unpublished study on file with author) (San Francisco: 0.02; Seattle, Portland, and Bremerton, Washington: 0.01-0.02); Joseph D. Wendlich, Ambient Asbestos Fiber Levels At Selected Sites in Philadelphia, Pennsylvania, at i (November 1984) (unpublished study on file with author) (Philadelphia: 0.01). But cf. Victor L. Roggli, M.D., Pathology of Asbestos Related Disease 29-30 (1992) (median level of asbestos fibers in the ambient air in 948 U.S. cities is 0.0005 fibers/cc; in public buildings, the mean concentration ranges from 0.00059- 0.00099 fibers/cc.). Based upon an average background asbestos concentration of 0.001 fibers/cc, the average person will inhale approximately 10,000 asbestos fibers per day, or about 3 million fibers per year.

The highly populated areas of the country with the highest levels of ambient asbestos from natural causes include eastern Pennsylvania, southeastern New York, southwestern Connecticut, greater Los Angeles and San Francisco. See id. at 26. Background air concentrations in Northern California in 1998 were on average equal to or less them 0.01 fiber/cc. See California Air Resources Board, Ambient Asbestos Concentrations in California, at http://www.arb.ca.gov/research/abstracts/a0-103-32.htm (last visited Sept. 17, 2003). This is equivalent to cumulative lifetime exposure to background asbestos concentration of 0.9 fiber.cc.years, adjusting for 24 hour exposure and time away from work. Thus, the total cumulative threshold exposure including both occupational and background air concentration is 5 fiber.cc.years (4+ .09).

In places where there are extensive natural asbestos deposits, higher levels are found in the ambient air. See California Air Resources Board, Measured Ambient Concentrations Near a Potential Asbestos Source in El Dorado County, Calif., at http://www.arb.ca.gov/toxics/asbestos/table2.htm (last visited Sept. 11, 2003) (indicating average ambient levels of 0.03 fibers per cc would which result in daily inhalation of 100,000 asbestos fibers or more than 35,000,000 fibers per year).

The current federal Permissible Exposure Limit (PEL) for asbestos as set by the Occupational Safety and Health Administration (OSHA) is 0.1f/cc for an 8- hour workday. 29 C.F.R. § 1910.1001(c)(1) (2003); see also Occupational Exposure to Asbestos, 59 Fed. Reg. 40964 (Aug. 10, 1994) (reducing PEL to 0.1 f/cc for an 8-hour workday from 0.2 f/cc). This is the equivalent of inhaling approximately 800,000 asbestos fibers in an 8-hour day for a working lifetime.

Because of ambient air and occupational exposures, most adults living in the United States and Canada cumulate significant amounts of asbestos fibers in their lungs but at levels that do not result in disease. For example, Dr. Andrew Churg, a leading researcher and pathologist, has concluded that "one may find as many as 40 million fibers of chrysotile, 40 million of tremolite, and 400,000 fibers of amosite or crocidolite in the lungs of the general population of Vancouver, along with 40,000 asbestos bodies.... [But] there is no evidence that this fiber burden produces asbestos-related disease in the general population." Andrew Churg, Nonneoplastic Disease Caused by Asbestos, Pathology of Occupational Lung Disease 293 (Churg & Green, eds. 1998) (quoted in Grace Consolidated Reply 11/9/02, supra note 39, at 41). But cf. Ronald Dodson et al., Tissue Burden of Asbestos in Nonoccupationally Exposed Individuals From East Texas, 35 Am. J. Indust. Medicine 281, tbl. II (reporting that 10 of 33 autopsy samples of individuals with no known occupational exposure to asbestos had no asbestos fibers in their lungs; the other 23 had levels of uncoated asbestos fibers ranging from 32,000 to 290,000, an average of 84,000 per sample and an average of 120,000 for samples with asbestos fibers).

[FN43]. As a leading textbook writer has stated, the fact that "[a]sbestos fibres and bodies are present in the lungs of occupationally exposed persons who do not have asbestosis as well as in the lungs of those who do" has led to misdiagnosis of asbestosis based upon their presence. Parkes, supra note 28, at 528-29, 532 (The presence of "asbestos bodies [in the lungs] do[es] not provide certain proof that asbestos is the cause of the fibrosis with which

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

they are associated.").

[FN44]. See Richard Doll and Julian Peto, Asbestos: Effects on Health of Exposure to Asbestos 2 (1985); Alfred P. Fishman, Pulmonary Diseases and Disorders, 840, 2038-39, 2135-36 (2d ed. 1988); H. Corwin Hinshaw & John F. Murray, Diseases of the Chest 726-27 (1980); Parkes, supra note 28, at 244; American Thoracic Soc'y, The Diagnosis of Nonmalignant Diseases Related to Asbestos, 134 Am. Rev. Respiratory Disease 363-64 (1986); Gunner Hillerdal, Pleural Lesion and the ILO Classification: The Need for a Revision, 19 Am. J. Indus. Med. 125-30 (1991); Gunner Hillerdal, Pleural Plaques in a Health Survey Material: Frequency, Development and Exposure to Asbestos, 59 Scandinavian J. Respiratory Diseases 257-63 (1978); Ruth Lilis et al., Pulmonary Function and Pleural Fibrosis: Qualitative Relationships with an Integrative Index of Pleural Abnormalities, 10 Am. J. Indus. Med. 145-47 (1991). For a discussion of these sources, see Brickman, Asbestos Litigation, supra note 4, at 1852; see also Paul Sterk, Imaging of Pleural Plaque, Thickening and Tumors, UpToDate, at http://www.uptodate.com (last visited April 30, 2002); Letter from J. Bernard L. Gee, M.D., Emeritus Professor of Medicine, Yale University School of Medicine, to the Honorable Jon Kyl, Member, Committee on the Judiciary, United States Senate, in Judiciary Comm, Asbestos Report, supra note 9.

[FN45]. See Hinshaw, supra note 44, at 727 ("ordinarily, pleural plaques do not produce symptoms and no significant functional impairment can be attributed to them."); Parkes, supra note 28, at 244 ("whether calcified or not pleural plaques alone are symptomless as they do not hinder the normal respiratory excursions of the lungs; hence, dyspnoea, chest pain, abnormal physical signs, and impairment of lung function are absent" (citations omitted)). Nonetheless, pleural plaque claimants often testify that they are short of breath or have other symptoms consistent with diminished lung capacity. For an account of how lung function tests may be manipulated to produce "positive" results, that is, to indicate impaired lung function, see infra Part V.C-D. For a description of how testimony about other "symptoms" may ensue, see infra Part VII.

[FN46]. See K. Browne, Asbestos-Related Disorders, Occupational Lung Disorders 458 (3d ed. 1994); Brickman, Asbestos Litigation, supra note 4, at 1853 n.140.

[FN47]. In a study of power plant workers, 172 workers were identified who had had significant exposure to asbestos; of these, nineteen had retired, nine had died, thirty declined to enter the study. See Dr. Joseph M. Miller, Benign Exposure to Asbestos Among Power Plant Workers 3 (1990) (unpublished manuscript on file with author). One hundred fourteen were still alive, employed at the plant and were agreeable to participating in the study. Id. Eighty percent had exceeded thirty years of latency and the mean latency of all participants was thirty-two years. Id. The 114 workers were monitored annually from 1982 to 1990. Id. at 3-4. Approximately forty to forty six percent were found to have pleural plaques. Id. at 5. Not one had a definite case of asbestosis. Id. Approximately 95% had no impaired lung function. Id. at 5. Six of the seven individuals with slight to moderate reduction in lung function were heavy smokers, whose impairments were not characteristic of asbestosis, and the seventh was an ex-smoker. Id. "There was no significant difference in the mean values" on lung performance tests between those with pleural plaques and those not found with pleural plaques. Id. at 6. Of the 172 workers identified in 1982, twenty-five deaths had been recorded by 1990. Id. None is known to have died of mesothelioma or asbestosis. Id. Two who were heavy cigarette smokers died of lung cancer. Id.
Included in the study was a review of other studies of power plant workers. Id. at 7-10. One study showed an increased prevalence of pleural plaques but "no significant difference in clinical symptoms" or in lung function when compared to a control group. Id. at 7. The study concluded: Despite the high prevalence of pleural plaques, "[t]he absence of clinical asbestosis, the lack of excess lung cancer and no finding of mesothelioma provide reasonable evidence of low risk to those workers during a full occupational lifespan.... [T]he finding of no significant difference in mean FVC [lung function] among those with and without plaques appear to absolve plaques as a cause of the minimal impairment of respiratory function noted in a few smokers." Id. at 8-9. "Only

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                          Page 52

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

when asbestosis was also detected in association with plaques did the risk of cancer increase, thus signifying heavier asbestos exposure as the cause of the increased risk, rather than the mere presence of pleural plaques. Id. at 10. But cf. Metro-North Commuter R.R. Co. v. Buckley, 521 U.S. 424 (1997). The plaintiff in Metro-North v. Buckley worked as a pipefitter where "[for] three years his job... exposed him to asbestos for about one hour per working day." Id. at 427. Even after taking his 15-year smoking habit into account, two expert witnesses testified that the exposure increased his risk of death due to cancer, either 1% to 5% (one expert) or 1% to 3% (second expert). Id. According to the Court, while there is an increased risk it is difficult to accurately estimate what that risk may be since the "relevant statistics themselves are controversial and uncertain." Id. at 435.

[FN48]. The medical logic behind this statement is that since serious forms of asbestosis are progressive, one who had heavy exposure to asbestos dusts twenty or so years earlier and has not had subsequent substantial exposures, is unlikely to manifest with asbestosis if he has not already done so by the time the pleural plaque has manifested or the later time that it was diagnosed. See Letter from J. Bernard L. Gee, M.D., Emeritus Professor of Medicine, Yale University School of Medicine, to the Honorable Jon Kyl, Member, Committee on the Judiciary, United States Senate, in Judiciary Comm. Asbestos Report, supra note 9, at 161, 163, Attachment H ("By the time (15+ years) plaques appear, asbestosis will have occurred where the asbestos exposure was sufficient enough to cause lung fibrosis as determined by the usual radiologic and physiologic criteria.").

[FN49]. See James A. Henderson, Jr. & Aaron D. Twerski, Asbestos Litigation Gone Mad: Exposure-Based Recovery for Increased Risk, Mental Distress, and Medical Monitoring, 53 S.C. L. Rev. 815, 820, 831-832 (2002). "Neither those diagnosed with pleural plaque or pleural thickening, nor even those who develop asbestosis, can establish that it is more probable than not that they will ultimately manifest some form of asbestos-related malignancy." Id. at 831-32. Henderson and Twerski explain that while plaintiffs argue that asymptomatic claimants who have pleural plaques are "five times more likely to contract cancer and 300 times more likely to develop mesothelioma than had they not been exposed to asbestos," these statistics are misleading because they do not assess "the baseline risk of cancer in the general population." Id. (citations omitted). They conclude that "the annual risk of a plaintiff developing cancer is 1/20 of 1%. The baseline risk of developing non-asbestos related mesothelioma is infinitesimal. The annual risk to an asymptomatic plaintiff who was exposed to asbestos is 1/32 of 1%." Id. at 832 (citing to E. Chailleux and M. Letourneux, Impact Medical du Despistage des Lesions Pleurales Benignes Liees a L'inhalation de Poussieres D'aminante, 16 Maladies Respiratoires 1286, 1286 (1999) ("there is no evidence of an increased risk in subjects with pleural plaques compared with subjects without plaques but an equivalent asbestos exposure")). See also Letter from William Weiss, M.D., Emeritus Professor of Medicine, Drexel University, to the Honorable Jon Kyl, Member, Committee on the Judiciary, United States Senate, in Judiciary Comm. Asbestos Report, supra note 9, at 157, Attachment F (citing W. Weiss, Asbestos-related Pleural Plaques and Lung Cancer, 103 Chest 1854 (1993) ("[Pleural plaques] do not predict an increased risk of lung cancer.")); Letter from J. Bernard L. Gee, M.D., Emeritus Professor of Medicine, Yale University School of Medicine, to the Honorable Jon Kyl, Member, Committee on the Judiciary, United States Senate, in Judiciary Comm. Asbestos Report, supra note 9, at 163, Attachment H ("Based on the results of some 12 published studies of the prevalence of cancers in persons with plaques, I consider there to be no increased risk.... Further, Harber et al., J. Occ. Med. 29, 641-4, 1987, did not detect a trend of association of pleural plaques with subsequent malignancy."); C. Peacock et al., Asbestos-Related Benign Pleural Disease, 55 Clinical Radiology 422, 425 (2000) (stating that "[t]here is no evidence that pleural plaques undergo malignant degeneration into mesothelioma").

[FN50]. See In re Joint East. & South. Dist. Asbestos Litig., 237 F. Supp. 2d 297, 317 (E.D.N.Y. 2002) ("state tort law governs whether individuals showing clinical evidence of such asbestos-related conditions as pleural plaques or pleural thickening have actionable claims in the absence of functional impairment.... Jurisdictions vary significantly on whether any or all of these types of claims are cognizable." (citation omitted)). Some jurisdictions deny recovery for asbestos related disease unaccompanied by functional impairment or harm. See, e.g., Burns v.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                    Page 53

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

Jaquays Mining Corp., 752 P.2d 28 (Ariz. Ct. App. 1987); In re Asbestos Litig., Nos. 87C-09-24, 90C-09-79, 87C-09-24, 88C-09-78, 1994 Del. Super LEXIS 693 (Del. Super. Ct. 1994); In re Hawaii Federal Asbestos Cases, 734 F. Supp 1563 (D. Haw. 1990); Owens-Illinois v. Armstrong, 591 A.2d 544 (Md. Ct. Spec. App. 1991), aff'd in part and rev'd on other grounds, 604 A.2d 47 (Md. 1992); Caterinicchio v. Pittsburgh Corning Corp., 605 A.2d 1092 (N.J. 1992); Howell v. Celotex Corp., 904 F.2d 3 (3rd Cir. 1990). But see Verbryke v. Owens-Corning Fiberglas Corp., 616 N.E.2d 1162 (Ohio Ct. App. 1992) ("[E]ven if the [worker's] disease [was] asymptomatic it [did] not necessarily mean that he [was] unharmed in the sense of the traditional negligence action."); Atkinson v. Celotex Corp., 633 So.2d 383 (La. Ct. App. 1994); Capital Holding Corp. v. Bailey, 873 S.W.2d 187 (Ky. 1994).

The experience in Pennsylvania is especially revealing. Up until the early 1990s, a diagnosis of pleural plaques qualified the Pennsylvania litigant for entry into the asbestos lottery with potential rewards of hundreds of thousands of dollars. See, e.g., Giovanetti v. Johns-Manville Corp., 539 A.2d 871, 874 (Pa. Super. Ct. 1988); Doe v. Johns-Manville Corp., 471 A.2d 1252, 1254 (Pa. Super. Ct. 1984); Blue v. Johns-Mansville Corp., 10 Phila. 23 (Phil. Ct. Com. Pleas Oct 12, 1983), aff'd, Blue v. Raymark Ind. 496 A.2d 848 (Pa. Super. Ct. 1985). Verdicts in the Pennsylvania "pleural plaque lottery" ranged from zero to $100,000 to $1,000,000. Brickman, Asbestos Litigation, supra note 4, at 1857. "No medical, occupational or personal factors distinguish[ed] the claimants" who prevailed from those that lost. Id. "Indeed, the facts making up the claims [were] often identical: the same claimed exposure, same age, same X-ray readings, same doctors testifying to the same set of medical facts; all that differ[ed] were] the verdict[s]." Id. For a more in-depth description of the "lottery" aspect of pleural plaque claiming, see In re Joint E. & S. Dist. Asbestos Litig., 129 B.R. 710, 749 (E. & S.D.N.Y. 1991). After at least tens of millions of dollars had been paid out through the asbestos lottery, the Pennsylvania courts essentially declared that henceforth pleural plaques were not a compensable injury. See Simmons v. Pacor Inc., 674 A.2d 232, 237 (Pa. 1996) ("[A]symptomatic pleural thickening is not a compensable injury which gives rise to a cause of action. We reach this conclusion not only because no physical injury has been established that necessitates the awarding of damages, but also because... appellants are not precluded from subsequently commencing an action for an asbestos related injury when symptoms develop and physiological impairment begins."). Thus, after causing defendants to pay out tens of millions of dollars on the basis of claims in which there was no injury, the Pennsylvania courts decided that in the absence of injury, claim values should be reduced to zero. Id. This now-you-see-it-now-you-don't "injury" characterizes pleural plaque claiming. More importantly, the successful invocation of claims for non-existent pleural plaque "injuries" set the stage for the more massive non-existent injury claiming that has come to characterize asbestosis claiming.

[FN51]. See Henderson & Twerski, supra note 49, at 817-18 (arguing that allowing "pre-injury" claims brought by plaintiffs exposed to asbestos for increased risk, negligent infliction of emotional distress and medical monitoring are "radical departures from longstanding norms of tort law").

[FN52]. 493 F.2d 1076 (5th Cir. 1973).

[FN53]. See Paul Brodeur, Outrageous Misconduct (1985).

[FN54]. See Borel, 493 F.2d 1076.

[FN55]. See Christine Biederman, Toxic Justice, Dallas Observer, Aug. 13, 1998, at 12, available at http://www.dallasobserver.com/issues/1998-08- 013/feature.html/page1.html [hereinafter Toxic Justice].

[FN56]. See supra note 10 and accompanying text (discussing the economic effects of asbestos litigation).

[FN57]. For further discussion of resulting bankruptcies, see supra note 10 and accompanying text.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                Page 54

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN58]. See Keene Corp. v. Ins. Co. of N. Am., 667 F.2d 1034, 1041 (D.C. Cir. 1981). For a discussion of Keene, see Brickman, Asbestos Litigation, supra note 4, at 1832 n.51 (pointing out the inconsistency between Judge Bazelon's reasoning in justifying assembly of the multi-billion dollar asset pool and the arguments made by plaintiffs thereafter seeking to tap into that pool).

[FN59]. See Brickman, Asbestos Litigation, supra note 4, at 1881-84. Most of the post-Manville asbestos defendants had ended up in the asbestos products business by purchasing much smaller companies that had manufactured products containing asbestos. Id. at 1881. Had these smaller companies remained independent, then asbestos litigation would long ago have ended when the assets of these small companies that had manufactured products containing asbestos and their insurance proceeds had been consumed. Id. The fortuity of their being bought up by larger companies enabled the courts to apply the doctrine of "successor liability" to multiply the effects of the decisions to rewrite insurance coverage. Id. at 1882. As applied, successor companies not only inherited the liabilities of the acquired companies to the extent of the assets of those acquired companies, but as well, to the full extent of the assets of the acquiring companies, including their newly-minted insurance coverage. Id. Thus the "successor companies [were] held liable not only for the acts they did not commit, but also for the consequences of the acts of their acquired companies that they were not aware of at the time of the acquisitions and of which they could not have been aware." Id.

[FN60]. See, e.g., Findings of Fact, Op. & Conclusions of Law Re: Debtor's Mot. to Employ the Kenesis Group at 2, In re AC and S, Inc., 297 B.R. 395 (2003) (No. 02-12607) ("Although Travelers' policies (some of which originated with Travelers, and some of which were purchases from Aetna Casualty and Surety Co.) contain a $1 million per occurrence limit, there is no aggregate limit for non-product liability claims."). Unlimited liability coverage was also found in the case of the insurers of Fiberboard. See Ortiz v. Fiberboard Corp., 527 U.S. 815 (1999). See also Asbestos Insurance Coverage Cases, Case No. CJC-90-001072 (Cal. Super. Ct. 1980), for an ongoing registry of actions that extend back to Oct. 29, 1980, dealing, inter alia, with non-aggregate limit insurance coverage. The potential availability of billions of dollars from insurers which issued policies without aggregate limits on liability may account, in part, for the opposition of plaintiff lawyers to S. 1125, which was reported out of the Senate Judiciary Committee with only one Democratic vote in support. See Judiciary Comm. Asbestos Report, supra note 9, at 15-16. Even though the bill purports to make available well over $100 billion for payment of claims, that appears to be insufficient to satisfy the demands of plaintiff lawyers based upon expectations of virtually unlimited liability exposure of at least five or six major carriers.

[FN61]. See Brickman, Asbestos Litigation, supra note 4, at 1840-52; see also George L. Priest, The Cumulative Sources of the Asbestos Litigation Phenomenon, 31 Pepp. L. Rev. (forthcoming 2003).

[FN62]. Specifically, some courts no longer require plaintiffs to prove that the defendant's asbestos containing products actually caused the injury. See Bell, Asbestos Litigation, supra note 10, at 15. Rather, to prevail at trial, the plaintiffs merely have to prove exposure to the products or, in some cases, that the products were "used at a job site simultaneous [to his/her employment at the site]." See Simcha David Schonfeld, Establishing the Causal Link in Asbestos Litigation: An Alternative Approach, 68 Brook. L. Rev. 379, 383 (2002); see also In re Hawaii Fed. Asbestos Cases, 960 F.2d 806, 817-18 (9th Cir. 1992) (following the approach that "as long as a plaintiff introduces evidence suggesting that the products of a particular defendant were present at the worksite and thus could be said to have contributed to the asbestos exposure of which she complains, she can recover from that defendant."); Lockwood v. AC & S, Inc., 722 P.2d 826, 839-40 (Wash. Ct. App. 1986) (holding that a plaintiff need not specifically identify a defendant's products for the products to be considered the proximate cause of the injury).

[FN63]. See Brickman, Asbestos Litigation, supra note 4, at 1862-68.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN64]. See Brickman, Asbestos Litigation, supra note 4, at 1873; see also supra note 17 (describing the recent West Virginia aggregation).

[FN65]. For example, W.R. Grace agreed to a large scale pre-petition claims settlement "because the tort system offered no means of limiting settlements to valid claims," and "[t]rying more cases would have been prohibitively expensive." Grace Consolidated Reply 11/9/02, supra note 39, at 17; see also W.R. Grace's Reply Brief on Procedures for Litigation of the Common Personal Injury Liability Issues at Exhibit C, In re W.R. Grace & Co., No. 01-01139 (27) (Bankr. D. Del. Aug. 21, 2002) (No. 01-01139 (27)) (citing Dep. of Jay Hughes, taken on July 19, 2002 at 49, In re W.R. Grace & Co., No. 01 -01139(27) (Bankr. D. Del. 2002)) [hereinafter, Grace Reply Brief, 8/21/02]. Mr. Hughes testified that:

[Y]ou can sit here and talk about the perfect world and say that... [under our] civil justice system... why don't we go into court and try every individual case. But we had a situation where there were hundreds of thousands of cases being filed.... [A]nd where there was objective, documentary evidence being submitted that met the - the bare-bones requirements of the law, even though we knew and were well aware that there were significant problems with the credibility of most of this evidence, and but for the problems associated with the volumes of the cases, the money associated with the case, that these cases probably were not legitimate claims against Grace, we were forced to pay them.

Id. The experience of Babcock and Wilcox (B&W) is also illustrative. According to B&W:

[I]t settled more than 300,000 claims because it was cheaper to resolve claims consensually before the start of litigation than it would have been to make a comprehensive liability assessment of each claim and pay the costs of defense.... Given the high cost of investigating, analyzing and defending multitudes of claims, B&W had little choice but to pursue the consensual settlement strategy. The only alternative--to allow the company to be subjected to mass trial settings in a broken tort system plagued by runaway costs, de facto enterprise liability and arbitrary verdicts unrelated to anyone's actual liability--was unacceptable.

Babcock & Wilcox Memorandum, supra note 5, at 1-2. In order for a claimant to recover under B&W's pre-petition settlement program, claimants simply had to submit a doctor's note that identified symptoms "consistent with asbestosis" and an affidavit from the claimants or a co-worker that the claimant had worked at a job site with a B&W boiler.

Claimants were not required to provide back-up documentation, such as X-rays, showing that they actually had [an] asbestos-related disease.... The medical and exposure proofs were so straightforward that plaintiffs' law firms could prepare compensable claims in a matter of minutes. One plaintiff's paralegal stated in an affidavit filed with [the] court that it took "approximately 10 minutes" to prepare a B&W claim. It took another paralegal only "approximately 5 minutes."

Id. at 28; see also Lisa Giron, Firms Hit Hard As Asbestos Claims Rise, L.A. Times, Dec. 17, 2001, at A1 (stating that until it went bankrupt in 2000, B&W paid out "$1.6 billion for 317,000 claims that took paralegals [less than] 10 minutes each to prepare," generating contingency fees that were often 40%; and that a company spokesman noted that the 15-year settlement strategy transformed the firm into a "field of dreams" for plaintiff lawyers).

An analysis of B&W's pre -petition settlement program payments, conducted by B&W and its claim experts, the NERA consulting firm, revealed that many of the settled claims were "unsupportable when they [were] subjected to a comprehensive individual review." Babcock & Wilcox Memorandum, supra note 5, at 32. B&W reported that "[u]nimpaired asbestosis and pleural claims had the greatest problems, as the result of claimants' counsel who took advantage of B&W's practice of not requiring ILO X-ray reports or evidence of lung impairment by filing numerous unsupported claims." Id. B&W's inability to require documentary evidence, such as X-rays, with each claim permitted even insufficient malignancy claims to be filed and paid.

A comparison of B&W's claim database to the Manville Trust database for claims filed with both facilities shows that some claimants' counsel tendered questionable malignant disease claims to B&W. For example, B&W settled 64 cases as mesothelioma claims, even though the Manville Trust settled the same claims for less severe diseases at a later date. B&W also settled 104 claims as lung cancer claims even though the Manville Trust settled these same

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                          Page 56

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

claims for non-malignant diseases at a later date.
Many lung cancer claims paid by B&W did not contain sufficient documentation to demonstrate that they were primary lung cancers. This is important because lung cancer must be primary (that is, not metastasized from elsewhere in the body) if it was caused by asbestos exposure. In other litigation, a pulmonologist educated at Harvard Medical School, Dr. Goldstein, analyzed lung cancer claims submitted to the Manville Trust. He found that 34 percent of these claims could not document that the lung cancers were primary. Analysis of the portion of Dr. Goldstein's Manville Trust sample that was also submitted to B&W shows that an even higher percentage of B&W claimants--45 percent--made an insufficient showing of primary lung cancer.
Id. at 32-33 (citing Expert Report of Frederick C. Dunbar at 23, 28, In Re The Babcock & Wilcox Co., No. 00-10992- 00-10995 (E.D. La. 2001) [hereinafter Dunbar Report]).

Despite the considerable if not overwhelming evidence that tens of thousands of meritless claims are being presented annually to scores of asbestos defendants, many of these defendants are nonetheless constrained under the operation of the civil justice system to pay these claims. The operative constraints are not simply the administrative ones described in Grace Reply Brief, supra. In addition, defendants have to contend with the ability of plaintiff lawyers to single out "uncooperative" defendants and take them to trial in "magic" jurisdictions leading inevitably to a bankruptcy filing. As has been noted:
Many defendants are reluctant to demand X-rays and conduct such audits for fear that plaintiff lawyers will target the company, refuse to settle any claims, and try their most serious cancer cases in plaintiff-friendly jurisdictions. While serious cases are relatively few in number compared to cases filed by the unimpaired, the risk of even a handful of multimillion dollar verdicts often dissuades defendants from a high-profile, contentious fight that could bankrupt the company in the short term. One business analyst has observed, "[I]n a sense, the plaintiffs' attorneys have the asbestos defendants held hostage." Defendants often conclude that rather than question this X-ray evidence, it is cheaper to treat the claims as administrative costs, regardless of merit, than to litigate. This strategy has failed for a number of defendants in the long run, as an endless supply of nonsick claimants have replenished the plaintiff lawyers' client base, leaving bankruptcy as the only realistic option for those companies.
Bell, Asbestos Litigation, supra note 10, at 16 (quoting Lisa Girion, Firms Hit Hard as Asbestos Claims Rise, L.A. Times, Dec. 17, 2001, at A1).
Plaintiff lawyers' strategy of loading substantial numbers of claims onto defendants in order to coerce them to settle meritless claims, while highly effective, on at least one occasion, did not succeed. See U.S. Lines, Inc. v. U.S. Lines Reorganization Trust, 262 B.R. 223 (S.D.N.Y. 2001), aff'd, 318 F.3d 432, 434 (2003) (The bankruptcy court expunged 23,963 claims alleging maritime asbestos-related causes of action against shipowners brought by the Maritime Asbestosis Legal Clinic (MALC), for failure to provide the level of documentation required. According to the bankruptcy judge, MALC "chose to pursue a path that was apparently premised on the theory that the sheer volume of claims would force a settlement without the necessity of producing the additional documentation as provided for [by the court's order].").


[FN66]. Meritless asbestos claiming thus far approaches $28.5 billion. Using a $400 per case value for those nonmalignant claims filed with the Manville Trust, the number of claimants included in the $190 million calculation would be 475,000. Using an estimated total value for each such claim of $60,000, that is, the aggregate value of each claim taking into account that each claim is filed against several score or more defendants and bankruptcy trusts, yields a total of $28.5 billion. See Thomas Korosec, Enough to Make you Sick, Dallas Observer, Sept. 26, 2002, available at http:// dallasobserver.com/issues/2002-09-26/feature.html/1/index.html (reporting that according to Fred Baron of Baron & Budd, "[w]orkers with no breathing impairment now collect an average of $60,000 total against multiple defendants, as opposed to the $80,000 to $100,000 two or three years ago" before the bankruptcies of several major defendants) [hereinafter Enough to Make you Sick].


[FN67]. See  In re Joint East. & South. Dist. Asbestos Litig., 237 F. Supp. 2d 297, 302 (2002).


© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                                Page 57

31 Pepp. L. Rev. 33

(Cite as: 31 Pepp. L. Rev. 33)

[FN68]. Id. at 309.

[FN69]. See, e.g., Aff. of Dr. Robert Steiner re: Medical Standards of Care for Diagnosing Asbestos-Related Diseases, Mot. for Case Mgmt Order Concerning Litigation Screenings at 2, 4, In re: Asbestos Prods. Liability Litig. (No. VI), Civ. Action Nos. MDL 875 (E.D. Pa. 2001) [hereinafter Steiner Affidavit]. ("To make a clinical diagnosis of an asbestos-related lung disease, a physician must, at a minimum, have the following information in addition to X-ray evidence of asbestosis:... [a] complete occupational history,... [a]ppropriate pulmonary function test... [and a] physical examination by a physician.... A statement that an X-ray is 'consistent with asbestosis' is not a medically sufficient diagnosis.... It is my opinion that an X-ray interpretation 'consistent with asbestosis' does not represent a diagnosis.... [D]iagnoses that result from incomplete medical investigation may be unreliable and may be inappropriate for use in determining eligibility for compensation.").

[FN70]. For a set of instructions to plaintiffs of possible symptoms to allege, see infra discussion, Part VII.B.

[FN71]. For an example of such duration-limited symptoms, see discussion of Dunn v. Owens-Corning Fiberglas, supra note 17.

[FN72]. Few would even be aware of the existence of plaques but for widespread screening done by or under the direction of plaintiff lawyers seeking a supply of claimants. See In re Joint East. & South. Dist. Asbestos Litig., 237 F. Supp. 2d 297, 307 (2002).

[FN73]. See id.

[FN74]. See id.

[FN75]. See infra Part VI.B.

[FN76]. See, e.g., Abadie v. Metropolitan Life Ins. Co., 784 So. 2d 46, 99-107 (La. App. 2001) (medical experts for plaintiff examining X-rays and finding asbestosis using the "consistent with" standard).

[FN77]. See, e.g., Steiner Affidavit, supra note 69, at 2, 4 ("To make a clinical diagnosis of an asbestos-related lung disease, a physician must, at a minimum, have the following information in addition to X-ray evidence of asbestosis:... [a] complete occupational history,... [a]ppropriate pulmonary function test... [and a] physical examination by a physician.... A statement that an X-ray is 'consistent with asbestosis' is not a medically sufficient diagnosis.... It is my opinion that an X-ray interpretation 'consistent with asbestosis' does not represent a diagnosis.... [D]iagnoses that result from incomplete medical investigation may be unreliable and may be inappropriate for use in determining eligibility for compensation.").

[FN78]. Outside of asbestos litigation, courts consistently reject "consistent with" diagnoses as sufficient to prove a medically cognizable injury. See e.g., In re Paoli R.R. Yard PCB Litig., 35 F. 3d 717, 769 (3d Cir. 1994); Turpin v. Merrell Dow Pharm., 959 F.2d 1349, 1359-60 (6th Cir. 1992); Haggerty v. Upjohn Co., 950 F. Supp. 1160, 1165-68 (S.D. Fla. 1996); Emigh v. Consol. Rail Corp., 710 F. Supp. 608, 612 (W.D. Pa. 1989); In re Agent Orange Prod. Liab. Litig., 611 F. Supp. 1223, 1250 (E.D.N.Y. 1985); Carter v. United States, 593 F. Supp 505, 514-15 (W.D. Mich. 1984).

[FN79]. In re Joint East. & South. Dist. Asbestos Litigation, 237 F. Supp. 2d. 297, 308 (E.D.N.Y. 2002).

[FN80]. Martin, supra note 35.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN81]. Kazan Statement, supra note 4, at 22 n.63 (citing Marvin I. Schwartz, Approach to the Understanding, Diagnosis, Management of Interstitial Lung Disease, in Interstitial Lung Disease 1, 4-5 tbl. 1-1 (Marvin I. Schwartz & Talmadge E. King, eds. 1998)).

[FN82]. See Steiner Affidavit, supra note 69, at 3. ("Some of the more commonly found conditions/diseases not related to asbestosis which appear as interstitial lung disease on X-rays include: old age, a smoking history, obesity, lupus, silicosis, or numerous other medical conditions."); see also Judiciary Comm. Asbestos Report, supra note 9, at 103 ("not[ing] that an ILO score of 1/0- one of the criteria... relie[d] on as evidence of asbestosis - is also consistent with long-term, heavy smoking").

[FN83]. See R.B. Reger et al., Cases of Alleged Asbestos-Related Disease: a Radiologic Re-Evaluation, 32 J. Occupational Med. 1088, 1089 (1990).

[FN84]. Most adults in the general population, including those with no known exposure to asbestos in the workplace, have been exposed to asbestos and have considerable amounts of asbestos fibers in their lungs. See supra note 42 and sources cited therein.

[FN85]. Asbestosis has been characterized by leading medical researchers as a "disappearing disease," which "should be declining since most asbestos exposure occurred [between] 30 and 70 years ago." Babcock & Wilcox Memorandum, supra note 5, at 5 (quoting K. Browne, Asbestos-Related Disorders, Occupational Lung Disorders 411-504, 410 (3d ed. 1994)). Indeed, "Dr. James Crapo, a nationally renowned expert in asbestos diseases and former president of the American Thoracic Society, testified before the [Senate] Committee [on the Judiciary] on June 19, 2003, that in his practice, serious asbestosis cases, which still occurred in the early 1990s, have now become exceedingly rare." Judiciary Comm. Asbestos Report, supra note 9, at 18; see also Gaensler, Jederlinic & Churg, Ideopathic Pulmonary Fibrosis in Asbestos-Exposed Workers, 144(3) Am. Rev. Resp. Dis. 689, 695 (1991) (reporting in a 1994 study of asbestos-exposed worker that "we have not seen a single case of significant asbestosis with first exposure during the past 30 yr."); Gaensler, et al., Radiographic Progression of Asbestosis With and Without Continued Exposure, in VIIth Int'l Pneumoconiosis Conf. (NIOSH-ILO), DHHS (NIOSH) Pub. No. 90-108, Pt. 1, 368-392 (1988) ("Asbestosis appears to be a disappearing disease in that the prevalence has decreased from 47.6 percent with exposure prior to 1950 to 2.0 percent among those first exposed since 1960."). Legitimate cases of asbestosis are, in fact, so rare that medical students have recently started questioning "their professors as to why asbestosis is even a part of their curriculum, since it is virtually never seen in patients... [outside of] mobile X-ray trailers set up by plaintiffs' lawyers." Babcock & Wilcox Memorandum, supra note 5, at 5 (citing an interview with Dr. Peter Barrett, Harvard Medical School).

[FN86]. See Brickman, Asbestos Litigation, supra note 4, at 1845 n.110.

[FN87]. According to the ABA Report, mass screenings for asbestos claimants began in the early 1990s. See ABA Report, supra note 10, at 6. In fact, however, mass screenings began at least by the mid-1980s. The NTWLP screenings began in 1986. Suzanne L. Oliver & Leslie Spencer, Who Will the Monster Devour Next?, Forbes, Feb. 18 1991, at 75. See also, Dep. of McNeese, 4/22/96, infra note 106, at 23-24 indicating that he began to do PFTs for attorneys beginning in 1978 though he did not begin PFL until after that.

[FN88]. David M. Eddy, How To Think About Screening, in Common Screening Tests 1, 1 (David M. Eddy ed., 1991), quoted in Brief For Amici Curiae W.R. Grace and Center For Claims Resolution at 19, In re: Asbestos Products Liability Litigation, Most Health Services, Inc. v. Robles & Gonzales, Nos. 98- 1165, 98-1166 (3d Cir. June 8, 1998) [hereinafter, Amici Brief (W.R. Grace)].

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                              Page 59

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN89]. Mass screenings for asbestos claimants are quite different than mass screenings as sometimes used to diagnose such diseases as breast cancer, high cholesterol, colon cancer and other conditions relating to health. The latter seek to identify persons with health conditions which can be treated by early identification; the former have no interest in disease or treatment but just in filling asbestos claiming queues. See Statement of Asbestos Screening, Association of Occupational and Environmental Clinics, AOEC News, Winter 2001, at 1 (opining that the current screening methods "fall short of the standard of care and ethical practice in occupational health").
Moreover, attorney-sponsored mass screenings are also different from the model of
[traditional] toxic tort litigation... [which] follows a medical model: a plaintiff sees a doctor to treat his illness or injury and then is referred to, or otherwise finds, a lawyer. [Asbestos] screening substitutes an entrepreneurial model: the lawyer recruits the plaintiff-who usually feels fine, has no symptoms or impairment, and is unaware of any 'injury' - and sends him to a screening company for an X-ray.
Kazan Statement, supra note 4, at 19 -20.

[FN90]. Doctors hired by screening enterprises often refer to those persons whose X-rays they have read and whom, in some cases, they have physically examined, as "litigants," or "claimants" and not as patients. See, e.g., Dep. of Dr. Harron, 1/19/02, infra note 106, at 15 (Dr. Harron, who reads X-rays and issues ILO reports for those screened stated: "I'd guess they'd all be claimants or potential litigants or actual litigants, but not patients.").

[FN91]. Asbestos litigation in the early 1970s involved considerable risk, justifying the 40% contingency fees then being charged. However, though the tide turned in favor of asbestos claiming by the early to mid-1980s, many lawyers continued to charge 40%. See Brickman, Asbestos Litigation, supra note 4, at 1834 n.60. Even when settling claims in batches of hundreds and thousands in submissions to bankruptcy trusts in what is essentially an administrative process, lawyers continue to charge the same contingency fee rates that prevailed when asbestos litigation involved high risk. See id. at 1835 n.61 for a calculation that contingency fees in the initial round of claims that were settled with the Manville Trust in large batches approximated an effective rate of $5000 per hour. Even more egregious is the charging of such substantial contingency fee rates in matrix or inventory settlements. For example, in Babcock and Wilcox's pre-petition settlement program one or more defendants agreed to pay fixed amounts per category of illness to settle all claims already in inventory as well as all future claims to be brought on behalf of claimants yet to be secured by large scale screenings. See also "Asbestos Litigation," a one page advertisement prepared by the law firm of Fitzgerald & Associates, undated circa 2000, stating:
Many firms take a fee of 40% from the total amount of the recovery. The client's 60% is then first used to reimburse the law firm for out of pocket expenses. The net result, in many cases, is that the check to the law firm is larger than the check to the client.
Exhibit 39, Dep. of C. Lewis, 9/12/02, infra note 106. When lawyers accumulate such claimants and present them for payment to various asbestos defendants in a process that may require ten minutes of paralegal time per claim filed, for example, Babcock & Wilcox Memorandum, supra note 5, at 28, it is quintessentially clear that charging a 40% "contingency fee" in that circumstance, or even a one third fee, violates the "reasonable fee" requirements set out in states' ethics codes. Nevertheless, I am unaware of any instance in which asbestos attorneys have been charged with, let alone disciplined for, violating the "reasonable fee" requirement of states' ethical codes. Indeed, it is equally clear based upon the near total absence of enforcement of rules of ethics in asbestos claiming, that "special asbestos law" includes an exemption from the purview of ethical rules. For consideration of conflicts of interest in asbestos claiming, see Brickman, Aggregative Litigation, supra note 7, at 267-72.

[FN92]. See Mem. In Support Of Mot. For Case Management Order Concerning Mass Litigation Screenings at 5-10, In re: Asbestos Prods. Liability Litig. (No. VI), Civ. Action Nos. MDL 875, 2 MDL 875 (E.D. Pa. 2001) (describing in detail, including references to depositions and exhibits, the operation of Most Health Services, Inc., a screening company) [hereinafter MDL Memorandum].

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN93]. MDL Memorandum, supra note 92, at 5-10.

[FN94]. Id. at 6 (internal quotations omitted).

[FN95]. Brief of Appellants at 19, In Re: Asbestos Prods. Liability Litig., Nos. 98-1166 and 98-1165 (3d Cir. 2000) (emphasis added), quoted in MDL Memorandum supra note 92.

[FN96]. Failure to follow precise guidelines with regard to equipment and administration greatly affects the quality of the film and therefore the interpretation of the X-ray. "It has long been recognized that the exposures received by radiographs of the chest have a marked influence on the radiographic appearance of lesions of pneumoconioses." ILO Guidelines, supra note 31, at 21. Additionally the ILO states that readers of the X-rays films will find it difficult to apply the ILO 1980 Classifications to interpretation of films unless the exposures used to produce the X-rays are conducted within an optimal range of specifications.

On physical grounds, a radiograph of satisfactory technical quality may be defined as one in which the exposure has been such that the optical densities of the images of interest fall between 0.3 and 1.7 and in which the difference in optical density between the darkest image of interest and the lightest is 1.0 or more. The inherent contrast (i.e. the density vs. log exposure gradient) of radiographs falls off rapidly as optical densities descend below 0.3 and hence, image quality becomes increasingly unsatisfactory as this occurs. Above an optical density of 1.7, the inherent contrast of radiographs remains good but extraneous light entering the observer's eyes from light sources other than the X-ray viewing boxes tends to impair the contrast of the radiographic image when projected on the retina. Hence, technical quality deteriorates for images having optical densities much above 1.7 density units.

Id. Because the quality of the X-ray films taken have a substantial impact on the detection of disease, the ILO states that it is critical that the X-ray equipment be of a certain type and the administration of the X-ray meet exacting standards. Id. at 22. "The installation and maintenance of the radiographic equipment is of the greatest importance." Id. The power source used for the machine should be independent of all other users with a specific capacity and stated maximum resistance. Id. The drop in voltage when the machine is operating at maximum output should not exceed ten percent and be regularly checked to meet this standard. Id. "The importance of image density and radiation exposure to technical excellence in chest radiography is difficult to over emphasize. It is known that by far the greatest causes of poor technical quality in the chest radiographs (well over ninety-percent) are over-exposure and under exposure, unsatisfactory gross image contrast, poor screen-film contact and fog." Id. at 21. The ILO explains that centering of the X-ray tube and proper positioning of the subject are important to allow the reader of the X-ray to adequately visualize anatomic structures. Id. at 24. "For the PA projection... [t]he shoulders should be positioned so that the scapulae are outside the lung fields. The exposure should be made at full inspiration and immediately after this has been reached, to avoid the Valsalva effect." Id. Additionally, the focal spot-film distance should ideally be 6 feet (72 inches) but not less than 5 feet (60 inches). Id.

There is deposition evidence that X-ray technicians providing films of asbestos claimants failed to conform to these standards in administering X-rays. See, e.g., Dep. of Dr. Netherland, 02/14/02, infra note 106, at 136-39. Netherland, a chiropractor, states that he was instructed by Dr. Segarra to position the X-ray tube forty inches from the subject during chest X-rays despite the ready availability of the machine's "Rare Earth Radiographic Technique Chart" which correctly stated the ILO focal spot-film distance standard of seventy two inches for chest X-rays. Id. at 136-39, Ex. 12. By thus positioning the subject, the X-ray films would be denser and murkier, perhaps making it more difficult to challenge a 1/0 grade. David M. Epstein et al., Application of ILO Classification to a Population without Industrial Exposure: Findings to Be Differentiated from Pneumoconiosis, 142 am. j. radiology 53, 54 (1984); Consent Order, In Re David Netherland, D.C., State of South Carolina Department of Health and Environmental Control, RXCO-07-2001 (March 16, 2001) (finding Dr. Netherland committed fifteen violations of regulations for the control of X-ray equipment including findings that the equipment failed to meet standards for linearity and kVp accuracy) (on file with author); Notice of Violation, Texas Department of Health, Registration

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

Number R26394-000 (Sep. 06, 2001) (finding U.S. X-ray, Inc., an Ohio based screening company, committed ten violations including a finding that the equipment produced over 50% more radiation than permitted) (on file with author); Notice of Violation, Ohio Department of Health, Registration Number 06-B-06453-01 (Nov. 15, 2001) (finding U.S. X-ray, Inc., committed fifteen violations including X-ray procedures not ordered by a licensed practitioner and failing to meet requirements for gonadal shielding) (on file with author).

[FN97]. ABA Report, supra note 10, at 8. For an example of how screening companies fail to abide by state regulatory requirements governing the exposure of persons to the ionizing radiation in X-rays and fail to abide by OSHA screening regulations and how this failure is widespread, see MDL Memorandum, supra note 92, at 6-8. For a list of states that have promulgated comprehensive regulations regarding X-ray use and screening, including a requirement that X-rays be ordered by a physician and indication that few screening enterprises comply with those requirements, see id. at 12-14. For a detailed discussion of the near unanimous agreement within the medical community that routine chest X-ray screenings of asymptomatic persons for lung cancer is not recommended, see id. at 11-12. See also the Dep. of Dr. Baucum, 09/12/02, infra note 106, where Dr. Baucum states that as an accommodation to his friend Charles Blackwell, an attorney, Dr. Baucum provided a standing order for X-rays to be taken by Dr. Netherland, who is actually a chiropractor. Dep. of Dr. Baucum, 09/12/02, infra note 106, at 86-91, 94. In his standing order letter to Netherland, Baucum said he had been "retained by Mr. Blackwell to review work histories to determine if his clients should be X-rayed," and that by this letter he was authorizing Netherland to proceed to administer X-rays. Id. at 91-95. In his testimony, however, Dr. Baucum acknowledged that he had not been so retained, that he had nothing to do with obtaining the work histories or making a determination of whether an X-ray was required, and that in fact, Dr. Netherland was making that determination without any input from him. Id. at 86-96. Dr. Netherland, in his own deposition, denied making any such determination and testified that he relied upon the "physician orders," which he identified as Dr. Baucum's letter. Dep. of Dr. Netherland, 02/14/02, infra note 106, at 43-44. See also Letter from Phillip H. Lucas, M.D. to Dr. David Netherland, (July 7, 1999) (informing any "Medical Facility" that Dr. Lucas requested PA and Lateral chest X-rays taken "of the attached individuals" and forwarded to a Texas law firm) (on file with author). In some cases, the subterfuge of issuing a standing order is dispensed with entirely; the sponsoring lawyer merely suggests that the "patient" have an X-ray, to which the "patient" agrees. See Dep. of Dr. Bass, 05/10/03, infra note 106, at 33-34.

[FN98]. ABA Report, supra note 10, at 8. For a relatively rare instance of exclusion of medical evidence on the ground of violation of such state laws, see In re Asbestos Cases (ACR XXIII Asbestos Cases), No. 89-2-18455-9-SEA (Wash Super. Ct. 1989) (order regarding numerous summary judgment motions), rejecting the evidence in support of the claim of lung disease based on the reports of Dr. Segarra (a doctor who appeared at numerous screenings in several states and provided thousands of reports stating that X-rays taken at those screenings were consistent with asbestosis) as a matter of public policy since "he participated in union screenings of certain plaintiffs, he performed examinations, rendered diagnoses, and recommended treatment without being licensed in Washington, a criminal offense. He also relied for his diagnoses on radiology reports from unregistered and uncertified technicians or radiologists using unregistered and uncertified equipment." Id. Dr. Jose E. Roman-Candelaria, who at the time was only licensed to practice medicine in Puerto Rico, attended screenings conducted by Respiratory Testing Services and American Medical Testing, inter alia, in Mississippi, Indiana, Alabama, Louisiana, Georgia, Oklahoma, Texas, and Florida to render diagnoses. See Dep. of Dr. Roman-Candelaria, 10/11/02, infra note 106, at 10-15.

[FN99]. According to all of the doctors interviewed by the American Bar Association Commission on Asbestos Litigation, an accurate diagnosis of an asbestos related condition:
requires assessment of a number of factors including the review of chest X-rays, pulmonary function tests, latency, and the taking of a complete occupational, exposure, medical and smoking history. Because many symptoms and findings are not specific to asbestos-related disease, this approach is necessary to enable a physician

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                      Page 62

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

to exclude other more probable causes for various findings. This then enables the physician to support a conclusion that the patient's medical condition is the result of asbestos exposure.
ABA Report, supra note 10, at 12. Screening companies, however, rarely complete all of these assessments and tests. Doing so would be uneconomic and therefore inconsistent with their primary purpose: to recruit tens of thousands of "litigants" in an enduring quest to refill plaintiff lawyers' inventories of asbestos claimants. Cf. id. at 12, 9 ("The examinations are completed in minutes; "reports" are written by assistants who are not on site.").

[FN100]. Dep. of Dr. Roman-Candelaria, 10/11/02, infra note 106, at 38.

[FN101]. See, e.g., Dep. of Charles Foster, 08/06/02, infra note 106, at 168-80, 168-71 (describing how work histories and a medical form are filled out by part-time personnel who were "[m]ostly high school graduates" without any training). Indeed, when asked how the interviewer knew what to ask, Foster replied: "Listen, I can take a six-year-old kid and put them at the [intake] desk and say fill this [form] out." Id. at 175. Physicians categorizing a condition as "consistent with asbestosis" or as being "asbestos-related" commonly rely on these work/medical histories to provide evidence of exposure. See, e.g., Dep. of Dr. Holmes, 04/12/96, infra note 106, at 189-90; Dep. of Dr. Nayden, 03/28/02, infra note 106, at 111-13. It does not appear to matter that these work/medical histories, taken by untrained, often part-time personnel, are poorly done. See, e.g., Dep. of Dr. Holmes, 04/12/96, infra note 106, at 194 ("Well, I'm provided their work history, and my assumption in that is that they are exposed to asbestos during this time."); Dep. of Dr. Nayden, 03/28/02, infra note 106, at 105-06 (explaining the process to determine the degree and duration of exposure from an incomplete work history in which required explanatory fields were left blank). Although Dr. Nayden was questioned regarding only one "diagnosis," he made similar extrapolations for no less than eleven other "litigants." Id. at Ex. 6.

[FN102]. 102. See infra, discussion Part V.C.

[FN103]. See Judiciary Comm. Asbestos Report, supra note 9, at 18 (citing Hearing on Asbestos Litigation, Before the Senate Comm. On the Judiciary, 107th Cong. (2002) (statement of David Austern)); Id. at 84 (citing Letter from Steven Kazan to the Honorable Jack B. Weinstein which states that "90% of the [Manville] Trust's last 200,000 claims have come from attorney-sponsored X-ray screening programs"); see also Kazan Statement, supra note 4, at 20.

[FN104]. MDL Memorandum, supra note 92, at 10.

[FN105]. See, e.g., Amici Brief (W.R. Grace), supra note 88, at 3-6 (citing testimony of Charles B. Kenney, President of Most Health Services, Inc. and describing in detail the operation of Most Health Services, Inc.). A fairly detailed description of an attorney-sponsored asbestos screening is set forth in a recent newspaper article:
At least four days of screenings were held last year [2002] at the union hall for Local 837 of the International Association of Machinists and Aerospace Workers in Hazelwood, [Missouri]. The gatherings had more the atmosphere of a retirement party than an all-day medical screening to determine whether the mechanics were dying of [a] yet-to-be-detected disease caused by asbestos.
These men and a handful of women had put in 20, 30 or more years on the assembly lines of the Boeing, Ford and General Motors plants here. With the functionality of an Army induction center, various rooms in the union hall had been converted into stations where medical technicians were creating medical files on the workers.
At two desks, technicians tested pulse and blood pressure. Three other desks were set up to extract medical histories, as far back as the workers could remember. In another part of the makeshift operation, the most experienced surveyors were coaxing workers to remember every job they'd ever had - especially any job that might have put them, at any time, anywhere near asbestos in furnaces, boilers, pipes, production lines, operations where asbestos was being stored, used or removed. Even walking beneath or by asbestos in any form was "important,"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

the workers were told.

The crucial piece of hardware to this operation was a 60-foot-long burgundy trailer parked outside the union hall's main door.

The trailer, which has "ASBESTOS TESTING" and a toll-free number painted on each side, was driven up from Mobile, Ala. Alabama is the home base of at least a dozen of these $100,000 screening units run by eight separate firms. More are based in Texas, California, Georgia and elsewhere.

"We were in Nashville and Indianapolis last week, and we'll be in Milwaukee, Dayton and Latrobe, Pennsylvania, next week," the driver said, proudly showing a map covered with scores of dots. "It has been a great year, and it's only half gone."

"Better than the lottery."

The "mobile clinic" has several examination stations separated by faux paneling. In addition to the X-ray machines and processing equipment, there are two stations with tubes attached to monitors and computers that are used to perform pulmonary function tests. If an X-ray shows a shadow in the lungs, the workers are given the pulmonary function test before being sent back inside the union hall to see a physician.

For a group in their late 50s, 60s or 70s, the workers appeared healthy. None complained of lung cancer or great difficulty breathing or any of the other symptoms of asbestosis or mesothelioma.

Two men and a woman said they worked with asbestos insulation years earlier and thought it was smart to get a checkup. Sixteen other workers or retirees who were interviewed admitted it might be a way to add a little cash to their retirement funds.

"I saw the notice in the union newsletter and said, 'Why not?'" said an automotive worker from Ford. Sitting on the tailgate of his shiny, new Chevy pickup and lighting a fresh cigarette off the one he had just finished, he added: "It's better than the lottery. If they find something, I get a few thousand dollars I didn't have. If they don't find anything, I've just lost an afternoon."

Standing nearby, a Boeing worker ten days from retirement volunteered, "The lawyers said I could get $10,000 or $12,000 if the shadow is big enough, and I know just the fishing boat I'd buy with that."

Asked if he'd ever worked with asbestos, he said, "No, but lawyers say it's all over the place, so I was probably exposed to it."

"We're doing it as a favor." The screenings at Local 837 were set up by [a nearby] law firm. Throughout the day, two lawyers from the firm hovered around the men being questioned at the various desks. The lawyers held screenings in March and again in December.

"We're here because the president of the retirees club called us and asked if we'd set up the screening. We're doing it as a favor," said ...one of the lawyers.

"He said what?" Claude Barnes, the president, said. "Hell, they called me a half-dozen times to let them set this up. I didn't think it could do any harm and maybe some of the guys would get a little money. But it was the lawyers who wanted to do this."

In the two screenings in March, about half of 600 men and women examined "came back positive for [an] asbestos-related disease," said... the other lawyer at the screening.

In December, the firm did another screening at the hall, and about 25 percent of the 140 people screened "had signs of illness," [the first lawyer] said.

When asked who his firm was going to sue on behalf of these more than 325 newly discovered asbestos victims, [the first lawyer] answered with blunt honesty, "Anyone who made products with asbestos who hasn't gone bankrupt yet."

Barnes, when interviewed last month, said he got two settlement checks already, "one for $280 and another for $320." He said that was after the lawyers took their cut. He says he has no idea how much he'll eventually get but, "I'm guessing a few thousand dollars if I'm lucky."

Meanwhile, he said he feels fine.

"I was tested positive and I haven't felt bad," Barnes said. "I don't have a breathing problem. Four or five of my officers tested positive, and they say they feel fine."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

Last year, the Texas-based law firm of Provost Umphrey screened hundreds of construction workers in St. Louis.

"We screened 559 members of the building trades unions at two separate halls," said Larry Sartin, national director for occupational disease programs for Paper, Allied-Industrial, Chemical & Energy Workers. "We did carpenters, pipe fitters, insulators, painters and sandblasters. We got about 100 asbestosis cases and another hundred cases of silicosis from guys who were sandblasters."

Sartin, who has five full-time people to set up screenings throughout the nation, works from an office in the law firm's headquarters, but he said he's paid by the union.

Provost Umphrey screened more than 10,000 workers in 2001, Sartin said.

"We used to get [a] settlement pretty quick, but now with 25 or so companies bankrupt, it can take three or four years," he said.

If their claims work like most of the others that are spawned by mass screenings, suits will be brought against between eight and 20 different companies who, at any time, sold products containing asbestos. For those with suspicious shadows on their X-rays - perhaps pleural plaque - the companies may settle for from $400 to $1,200 per person from each of the companies sued. If asbestosis can be claimed, the money could double or triple those amounts or more.

[According to an expert medical witness who has testified mostly on behalf of plaintiffs], "[A]ll too often these medical screenings are little more than rackets perpetrated by money-hungry lawyers.... Most workers usually don't know what they're getting involved in."

Plaintiffs' lawyers typically receive 25 percent to 50 percent of a settlement, and even though the settlements are small for the unimpaired victims, for the lawyers, their cut adds up to big money.

Andrew Schneider, Asbestos Lawsuits Anger Critics, St. Louis Post Dispatch, Feb. 9, 2003 at A1.

[FN106]. The composite description that I present of the methods of operation that characterize many, but not all, screening enterprises is based upon either deposition testimony or documentary evidence concerning principals of approximately ten of the fifteen screening enterprises that I was able to identify, as well as testimony of key employees, such as technicians. In addition, I rely on deposition testimony of B-readers and doctors closely associated with these screening enterprises. A partial list follows:

Dep. of Am. Med. Testing, Inc., Guy Wayne Foster, Designee, taken on Dec. 12, 2001, Bentley v. Crane Co., Civil Action No. 11-0064 (Miss. Cir. Ct. 2001) [hereinafter Dep. of G. Foster, 12/12/01].

Dep. of Deloris Bailey, taken on May 21, 1996, In re Consolidation of Maples & Lomax, P.A., Asbestos Pers. Injury Cases, Flight 1 (Miss.Cir. Ct. 1996) [hereinafter Dep. of Bailey, 05/21/96].

Dep. of Jeffrey H. Bass, M.D., taken on May 10, 2003, Caffey v. Foster Wheeler Corp., Cause No. B-150,896AD (Tex Jud. Dist. Ct. 2003) [hereinafter Dep. of Dr. Bass, 05/10/03].

Dep. of Zeb Vance Baucum, Jr., M.D., taken on Sept. 12, 2002, Bentley v. Crane Co., Civil Action No. 11-0064 (Miss. Dist. Ct. 2002) [hereinafter Dep. of Dr. Baucum, 09/12/02].

Dep. of Michael G. Conner, M.D., taken on Mar. 29, 1993, In re Asbestos Pls. v. Borden, Inc., No. 91-18397 (La Dist. Ct. 1993) [hereinafter Dep. of Dr. Conner, 03/29/93].

Dep. of Lloyd Criss, taken on Dec. 10, 2002, DeForest v. Am. Optical Corp., Cause No. 17165*JG01 (Tex.. Dist. Ct. 2002) [hereinafter Dep. of Criss, 12/10/02].

Dep. of Michael Fitzgerald, taken on July 26, 2002, Respiratory Testing Servs., Inc. v. Fitzgerald, Civil Action No. 01-0521-CB-C (S. D. Ala 2002) [hereinafter Dep. of Fitzgerald, 07/26/02].

Dep. of Charles Foster, taken on Aug. 6, 2002, Morehouse v. N. Am. Refractories Co. (Ala. Cir. Ct. 2002) [hereinafter Dep. of C. Foster, 08/06/02].

Dep. of Charles E. Foster, taken on June 4, 1996, In re Consolidation of Maples & Lomax, P.A., Asbestos Pers. Injury Cases, Flight 1 (Miss. Cir. Ct. 1996) [hereinafter Dep. of C. Foster, 06/04/96].

Dep. of Leon Hammonds, taken on Feb. 21, 1996, In re Consolidation of Maples & Lomax, P.A., Asbestos Pers. Injury Cases, Flight 1 (Miss. Cir. Ct. 1996) [hereinafter Dep. of Hammonds, 02/21/96].

Dep. of Roy A. Harron, M.D., taken on Jan. 18, 2002, In re Asbestos Pers. Injury Litigation, Civil Action No.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                          Page 65

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

01-C-9002 (W. Va. Cir. Ct. 2002) [hereinafter Dep. of Dr. Harron, 01/18/02].

Dep. of Edward Harris Holmes, M.D., taken on Apr. 12, 1996, Bailey v. AC & S, Inc., No. A-920-961-C (Tex. Dist. Ct. 1996) [hereinafter Dep. of Dr. Holmes, 04/12/96].

Dep. of Vanessa Dale Hughes, taken on Dec. 13, 2001, Bentley v. Crane Co., Civil Action No. 92-7655 (Miss. Cir. Ct. 2001) [hereinafter Dep. of Hughes, 12/13/01].

Dep. of Charles Lewis, taken on Sept. 12, 2002, In re Asbestos Cases (ACR XXIII Asbestos Cases), No. 89-2-18455-9-SEA (Wash. Super. Ct. 2002) [hereinafter Dep. of Lewis, 09/12/02].

Dep. of Dr. Phillip Lucas, taken on Mar. 31, 1999, In re Manville Pers. Injury Settlement Trust Med. Audit Procedures Litigation, No. 98 Civ 5693 (E.D.N.Y. & S.D.N.Y. 1999) [hereinafter Dep. of Dr. Lucas, 03/31/99].

Dep. of William McNeese, taken on Apr. 22, 1996, Abernathy v. AC & S, Inc., A-920,967-C (Tex. Dist. Ct. 1996) [hereinafter Dep. of McNeese, 04/22/96].

Dep. of Larry M. Mitchell, M.D., taken on June 19, 1996, In re Consolidation of Maples & Lomax, P.A., Asbestos Pers. Injury Cases, Flight 1 (Miss. Cir. Ct. 1996) [hereinafter Dep. of Dr. Mitchell, 06/19/96].

Dep. of Robert B. Mosher, taken on Feb. 1, 2002, Bentley v. Crane Co., Civil Action No. 11-0064 (Miss. Cir. Ct. 2002) [hereinafter Dep. of Mosher, 02/01/02].

Dep. of N & M, Inc., Charlie Heath Mason, Representative, taken on July 8, 2003, Johnson v. Am. Optical Corp., Civil Action No. 2002-0030 (Miss. Cir. Ct. 2003) [hereinafter Dep. of Mason, 07/08/03].

Dep. of Dr. Gregory A. Nayden, taken on Mar. 28, 2002, Bentley v. Crane Co., Civil Action No. 92-7655 (Miss. Cir. Ct. 2002) [hereinafter Dep. of Dr. Nayden, 03/28/02].

Dep. of David T. Netherland, D.C., taken on Feb. 14, 2002, Bentley v. Crane Co., Civil Action No. 92-7655 (Miss. Cir. Ct. 2002) [hereinafter Dep. of Dr. Netherland, 02/14/02].

Dep. of Molly Netherland, taken on Apr. 22, 1996, In re Consolidation of Maples & Lomax, P.A., Asbestos Pers. Injury Cases, Flight 1 (Miss. Cir. Ct. 1996) [hereinafter Dep. of M. Netherland, 04/22/96].

Dep. of Glenn Pitts, taken on Dec. 4, 1995, Adams v. Metro. Ins. Co., No. 433-992 (La. Dist. Ct. 1995) [hereinafter Dep. of G. Pitts, 12/04/95].

Dep. of Pulmonary Testing Servs., Inc., Glenn Pitts, Designee, taken on Mar. 7, 1996, Adams v. Metro. Ins. Co., No. 433-992 (La Dist. Ct. 1996) [hereinafter Dep. of G. Pitts, 03/07/96].

Dep. of Pulmonary Testing Servs., Inc., Jewel "Jerry" Pitts, Designee, taken on Mar. 14, 1996, Adams v. Metro. Life Ins. Co., No. 433-992 (La. Dist. Ct. 1996) [hereinafter Dep. of J. Pitts, 03/14/96].

Dep. of Helen Robinson, taken on Dec. 13, 2001, Bentley v. Crane Co., Civil Action No. 92-7655 (Miss. Cir. Ct. 2001) [hereinafter Dep. of Robinson, 12/13/01].

Dep. of Dr. Jose E. Roman-Candelaria, taken on Oct. 11, 2002, Koontz v. AC & S, Inc., Cause No. 49D02-9601-MI-0001-668 (Ind. Super. Ct. 2002) [hereinafter Dep. of Dr. Roman-Candelaria, 10/11/02].

Dep. of Dr. Jay T. Segarra, taken on Aug. 1, 1995, Abernathy v. Acands., Inc., No. A-290, 967-C (D. Tex. 1995) [hereinafter Dep. of Dr. Segarra, 08/01/95].

Dep. of Dr. Jay T. Segarra, taken on Apr. 24, 1996, Abernathy v. Acands, Inc., No. A-920, 967-C) (D. Tex. 1996) [hereinafter Dep. of Dr. Segarra, 04/24/96].

Dep. of Dr. Jay T. Segarra, taken on Aug. 14, 2002, Moorehouse v. N. Am Refractories Co., No. CI-2002-00253(2) (D. Miss. 2002) [hereinafter Dep. of Dr. Segarra, 10/14/02].

Dep. of William C. Spense, III, taken on Aug. 27, 1996, Bailey v. Acands, Inc., No. A-920, 961-C (D. Tex. 1996) [hereinafter Dep. of Spense, 08/27/96].

[FN107]. A partial list includes: Most Health Services, Healthscreen, Gulf Coast Marketing, American Medical Testing, Respiratory Testing Services, Pulmonary Function Laboratory, Pulmonary Advisory Services, Pulmonary Advisory Services of Louisiana, Pulmonary Testing Services, N & M, U.S.X-ray and U.S. Mobile X-ray, Holland & Beiber, Workers' Disease Detection Services, PFT Services, and Consultants For Pulmonary & Occupational Medicine (formerly known as Pulmonary Consultants In Critical Care in Austin).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33
Page 66

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN108]. See, e.g., Dep. of C. Foster, 08/06/02, supra note 106, at 127 (describing Respiratory Testing Services).

[FN109]. I have elected not to discuss the ethical issue of solicitation even though many elements of solicitation are often present: payment by the lawyer to others to recruit clients; in some cases, payments to union officials for agreeing to allow screenings at the locals in form of hiring the officials' wives to work at the screenings; rental payments to the union locals for agreeing to allow the screenings at their offices; and sometimes payments to the "litigants" in the form of door prizes or "giveaways" of TV sets, etc., to encourage attendance at the screenings. See Model Rules of Prof'l Conduct, R. 7.2 (c), 7.3 (1989). Many other ethical violations routinely occur in asbestos litigation. See, e.g., Dep. of Fitzgerald, 07/26/02, supra note 106, at 48 (showing a lawyer who tacked onto expenses charged against his clients' recoveries, the expenses for screening "litigants" who tested negative). From the perspective of actual practice, however, most rules of ethics simply do not apply to the actions of lawyers in asbestos litigation. See, e.g., Attorney U v. The Mississippi Bar, 678 So. 2d. 963 (Miss. 1996) (describing the payment arrangement that McNeese, the owner of Pulmonary Function Laboratory "PFL," had with an attorney designated as "Attorney S" in 1988. Id. at 964. In 1989, a dispute arose between S and PFL. Id. McNeese hired attorney U to represent him in this dispute. Id. McNeese showed U a contract which provided for a division of legal fees between McNeese and S "to split evenly $175 of a $400 fee for each client." Id. U advised McNeese that the agreement violated the Mississippi Rules of Professional Conduct. Id. McNeese then informed U "that PFL had been operating under an oral fee-splitting agreement with S for several months and that S was now denying the existence of the agreement and disputing the amounts owed PFL under it." Id. at 965. S's lawyer acknowledged in a letter that PFL had referred clients to S and agreed to finance the testing for S in return for one half of any fees realized by S, plus reimbursement of the medical costs. Id. Allegedly, as a form of blackmail, U then insisted that S pay $4000 per subject instead of the $423 a piece that PFL charged other attorneys; otherwise, McNeese would file a complaint against S with the bar association. Id. The Mississippi Supreme Court stated that it did "not in any manner condone the alleged acts of U," but determined that U had not violated the Mississippi ethics rules by failing to report that attorney S had violated the rules. Id. at 973. In his dissent, Justice McRae states:
To let Attorney U emerge unscathed and unsanctioned for his misdeeds reflects the majority's unabashed bias in favor of partners in major Jackson law firms.The majority's finding that Attorney U had no knowledge that Attorney S was engaged in a fee-splitting arrangement with McNeese and PFL, is incredible. Rather than insulting our intelligence, the majority should simply repeal a rule it so obviously dislikes. Better yet, why not discard the Rules of Professional Conduct altogether?
Id. at 975 (McRae, J., dissenting).

[FN110]. See Toxic Justice, supra note 55 (noting that the law firm of Baron & Budd, which has arrangements with lawyers who sponsor screenings, pays referring attorneys one third of its standard 40% contingency fee).

[FN111]. See, e.g., Dep. of Lewis, 9/12/02, infra note 106, at 35-36 (indicating that he was hired by Texas lawyer Tomblin to plan screenings in the Northwest, and that the cases thus generated were filed in Texas by Baron & Budd, to whom Tomblin referred the case).

[FN112]. See Babcock & Wilcox Memorandum, supra note 5, at 32.

[FN113]. See, e.g., infra part V.E (describing the NTWLP). A typical example of such an individual is Charles Lewis. Lewis was hired on a monthly basis to set up screenings at building trades union locals throughout the Northwest at a salary ranging from $1000 to $2000 per month plus travel expenses. Dep. of Lewis, 09/12/02, supra note 106, at 14, 29, 159. Lewis had an eighth-grade education, vocational training in welding and had been on the executive board of his union. Id. at 15, 18-19. Lewis went into the business after he had himself been screened some years earlier. Id. at 25. His own screening experience may have appropriately prepared him to engage in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

enterprise. Though he had tested positive and received several settlement payments, he had "no idea" of the nature of his own asbestos-related disease, as the following testimony makes clear:
Q. Do you have your own lawsuit for an asbestos-related disease?
A. Yes....
Q. Do you know what the nature of your own asbestos-related disease is?
A. I have no idea. I haven't heard from them in years.
Q. Do you know if a lawsuit has been filed?
A. Yes....
Q. Do you know what jurisdiction it's been filed in?...
A. I think it's in court in Pennsylvania.
Q. Have you received more than one settlement as a result of the lawsuit?
A. Yes....
Q. Was your lawsuit filed as a result of a union screening?
A. Yes....
Q. And do you have an asbestos-related disease?
A. Yes.
Q. What is it?
A. Asbestos in the lungs....

[FN114]. Is there another diagnosis that you have heard with regards to---

[FN115]. Not that I am aware of.
Id. at 22-26. The lawyers who hired him to arrange for screenings were themselves client collection agents for major asbestos law firms in Texas and Maryland where suit was usually brought on behalf of those who tested positive. Id. at 34. The former were not members of the bars of the states where Lewis did screenings (Washington, Oregon). Id. at 155. Lewis's task was to go to union locals and convince them to agree to allow the lawyer or screening enterprise that he was working for to conduct a screening. Id. at 158. If successful, he would have the union local send a letter to the lawyer that the lawyer had prepared, inviting him to conduct a screening. The lawyer would then pay for printing of notices and mailing costs for the invitations sent out to the union members as well as a rental fee to the union if its premises were to be used. Id. at 53-54, 86-87, 117.

[FN116]. A typical fee for a full day of screening is $20,000. Dep. of Criss, 12/10/02, supra note 106, at 226.

[FN117]. By-the-piece pricing for Most Health Services was, "$45 and $97 per worker X-rayed, depending on the number of views taken and whether an interpretation of the X-ray is provided." See MDL Memorandum, supra note 92, at 10, Ex. B.

[FN118]. See David M. Setter et al., Why We Have to Defend Against Screened Cases; Now is the Time for a Change, 18-20 Mealey's Litigation Rep.: Asb. 23 (2003).

[FN119]. See supra note 65 (describing the B&W settlement process).

[FN120]. In 1994, Congress enacted a special set of bankruptcy provisions designed to facilitate the reorganization of firms with large asbestos liabilities. See 11 U.S.C. § 524 (g)-(h) (1994).
The special asbestos bankruptcy provisions of Chapter 11 provide that asbestos defendants in Chapter 11 can receive a discharge from present and future personal injury and property damage claims. A determination must be made that the amount available to pay claims is less than their total value, so that the firm is insolvent. The firm's reorganization plan must provide for trusts to compensate both personal injury and property damage claimants.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

Each type of claim is "channeled" to the relevant trust. Personal injury claims are divided into present and future claims. A "bar date," or deadline, is established by which present claims must be filed. Based on the number of present claims that are allowed and estimates of the number of future claims by victims who will develop asbestos diseases in the future, the total value of present personal and future injury claims is estimated. Together, these values are used to negotiate the level of funding of the settlement trust, as well as how much of the reorganized firm's equity must go to the trust and a schedule of payments for victims based on type of disease. The Code requires: a representative be appointed to negotiate on behalf of the future personal injury claimants, present and future personal injury claimants must be treated "in substantially the same manner," at least half of the reorganized firm's equity go to the trust, and at least seventy-five percent of claimants vote to approve the reorganization plan. Thus, in return for half or more of the reorganized firm's equity, the firm can emerge from bankruptcy free of asbestos liabilities.

Michelle J. White, Why The Asbestos Genie Won't Stay In The Bankruptcy Bottle, 70 U. Cin. L. Rev. 1319, 1322 (2002) (footnotes omitted) [hereinafter White, Asbestos Bankruptcy]. Johns-Manville's "reorganization plan, adopted in 1988 after six years of negotiation, set a pattern for subsequent asbestos bankruptcies and as well as for the special asbestos provisions of the Bankruptcy Code." Id. Since the provisions of the Manville Trust were largely dictated by plaintiff lawyers, it is not surprising that these provisions favored their interests over those of future litigants, especially future claimants with actual demonstrable disease. With plaintiff lawyers in control and a former president of the Association of Trial Lawyers of America as the Trust Administrator, available funds were quickly depleted. See Brickman, Asbestos Litigation, supra note 4, at 1835 n.61. In particular, the Trust Distribution Procedures that were adopted did not limit payment of claims to persons with actual illness resulting in impairment, who could demonstrate that exposure to Johns-Manville products was a significant factor in causing their disease. White, Asbestos Bankruptcy, supra, at 1323. This failure proved disastrous.

The consequences of adopting such deficient Trust Distribution Procedures were not limited to its effects on the Manville Trust; most claims submitted to the Manville Trust are also submitted to many other asbestos bankruptcy trusts as well. Bankruptcy trusts have been established so far for the following debtors: Johns-Manville, Celotex, National Gypsum, Eagle-Picher, UNR, Keene, U.S. Lines, Prudential Lines, H.K. Porter, PACOR, E.J. Bartells, Lykes Bros. Steamship, Rutland Fire Clay Co., and Delaware Insulation Industries. Additional major bankruptcy trusts will be created as a result of the bankruptcies of W.R. Grace, Armstrong Industries, Babcock & Wilcox, USG, GAF, Combustion Engineering, and Owens Corning. See Soma Biswas, Judge Steps Down From Asbestos Cases, The Daily Deal, Nov. 7, 2003. As much as 90% of claims submitted to the Manville Trust and presumably the other trusts are generated by attorney-sponsored asbestos screenings. See supra note 103.In this article I argue that many of these claims are without merit. See infra §§ VI-VII. In addition to the evidence I am presenting in support of this proposition, there is also some indication that the minimal evidence of exposure to particular debtors' asbestos-containing products submitted with asbestos claims is, at least, contradictory. That is, attorneys are submitting exposure statements to the trusts which include conflicting product exposure assertions.

Circumstantial evidence in support of this proposition exists in the form of "the path not taken." All asbestos bankruptcy trusts have as part of the trust's "plan," a trust distribution procedure ("TDP"). The TDP (and sometimes an accompanying matrix) sets forth the parameters for claiming against the trust, the evidence required for submission of a claim including the required medical and exposure evidence, the prescribed value of certain claims, and the percent of that value that the trust will pay. Since most claims submitted to one trust are submitted to other trusts as well, one would expect as a matter of efficiency that the bankruptcy trusts would establish a joint claims resolution facility to process claims for most of the trusts. The Eagle Picher and UNR trusts have done so but on a limited scale. The largest processing entity is the Claims Resolution Management Corporation ("CRMC"), a division of the Manville Personal Injury Settlement Trust, which processes the Manville Trust's claims. The CRMC is actively bidding for newly emerging trusts' claim processing.

The absence, to date, of such a central processing entity highlights a significant inefficiency in the operation of bankruptcy trusts. On the basis of the inquiries I have made with regard to the operations of bankruptcy trusts, I believe there are two reasons that may account for the persistence of this inefficiency.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

First, a joint processing facility would undoubtedly "computerize" the data submitted with claims. This would easily enable the facility to assemble the complete composite work history of each claimant by combining the exposure claims for each claimant from the claimant's submissions to each trust. For example, claimant A's submission to Trust M might state, inter alia, that A worked at Jobsite M in June - November, 1960, and that is where he was exposed to M's products. Claimant A's submission to Trust C might state, inter alia, that he worked at Jobsite C from May - October 1960 and that is where he was exposed to C's products. The computer could easily be programmed to spit out such conflicting exposure claims. If plaintiff lawyers submit such conflicting exposure claims with some frequency, then a centralized processing facility would be unwelcome.

A second reason why trustees of the bankruptcy trusts may not have established an industry-wide joint claim processing facility is that claims processing is a lucrative business which presents substantial profit opportunities to trustees and claims processing entities. On rare occasions, these profit opportunities become quite visible. See, e.g. In re Nat'l Gypsum Co., 243 B.R. 676 (Bankr. N.D. Tex. 1999) (suggesting that the managing trustee of the bankruptcy trust resign as a condition for the trust to be allowed to purchase stock held by that trustee in a claims processing enterprise); Mem. of the United States Trustee In Support of Objection To Debtor's Application To Employ The Kenesis Group, In re A C and S, Inc. No. 02 - 12687 (RJN) (Bankr. D. Del. 2003) (In that filing, the U.S. Trustee concluded that the debtor had retained a claims handling firm that was owned by the debtor's law firm to do postpetition claims processing without disclosing the relationship or seeking bankruptcy court approval; and that the claims administrator then subcontracted that work to and paid over $1 million to another entity which was owned by a paralegal on leave from employment at the Ness, Motley firm--the same firm that was bringing thousands of claims against the debtor. The bankruptcy court ultimately disapproved the retention of the claims handling firm and ordered the disgorgement of 2.4 million dollars in fees paid by the debtor.)

Because the asbestos bankruptcy trusts are largely under the control of plaintiff lawyers who created the trusts' plans, established the criteria for the payment of claims, selected the trustees to operate the trusts (with the approval of a bankruptcy court), constituted the Trust Advisory Committees which maintain a continuing role for plaintiff lawyers in the trusts' administration, some features of the trusts' operations may not be available for public scrutiny. This is especially true with regard to the possible existence of inconsistent exposure statements submitted with claims. The civil justice system is largely incapable of penetrating the inner sanctum of bankruptcy trust administration. Perhaps the only way to effectuate the public's right to access the information that reposes in the files and computer disks of asbestos bankruptcy trusts, in order, for example, to compare exposure filings for identical claimants submitted to multiple trusts, would be through invoking investigative grand jury processes.

[FN121]. See Grace Consolidated Reply, 11/09/02, supra note 39, at 17 (indicating that because of the huge volume of claims generated by screenings, W.R. Grace and B&W could not even require that attorneys document the claims being presented). The speed of lawyers' payments to screening companies therefore is a function of the speed with which the lawyer is able to present and collect for the claims generated by the screening enterprise. When payment to the lawyer slows, he slows payment to the screening enterprise. And if payment stops, as when companies that have agreed to matrix or inventory settlements thereafter go bankrupt, as most all inevitably do, then the lawyer may fail to pay the screening enterprise for past inventory and the screening enterprise may, in turn, bring a collection action against the lawyer. See, e.g., Dep. of Fitzgerald, 07/26/02, supra note 106, at 25-29; infra note 167 (addressing PFL's suits against attorneys seeking to recover $27 million due for screenings).

[FN122]. For a description of the Manville Trust's attempt to limit meritless claiming, see infra notes 335-55 and accompanying text.

[FN123]. See Lester Brickman, Lawyers' Ethics and Fiduciary Obligation in the Brave New World of Aggregative Litigation, 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243, 273-74 (2001).

[FN124]. See, e.g., Letter from Cash Awards of Colorado, to the public via the internet at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

http://www.milliondollarlungs.com (reading like a Publisher's Clearinghouse sweepstakes mailing with a title of "Find out if YOU have MILLION DOLLAR LUNGS!") (on file with the author).

[FN125]. See, e.g., Amici Brief (W.R. Grace), supra note 88, at Attachment 5. The "Informational Notice" sent out by Wilson & Bailey as part of a screening solicitation states:
Workers and retirees who have worked with and around asbestos containing products and who have asbestosis or an asbestos-related disease have the legal right to file lawsuits seeking compensation for their injuries against the asbestos manufacturers to whose products they were exposed. Based upon recent national information, it is our belief that workers have only a limited time remaining in which to file cases against the manufacturers. Those persons wanting to pursue such cases should consult legal counsel immediately.
Id.

[FN126]. Similar to Charles Lewis, see supra note 106, Lloyd Criss had been involved with his union and went into the screening business as a consequence of having himself been screened, in his case, several times. Dep. of Criss, 12/10/02, supra note 106, at 35, 99-102, 107. Though he was found negative the first time, he was later found positive "for both asbestosis and silicosis." Id. at 100. Initially, Criss was employed by a law firm, paid $7500/month and traveled throughout Texas and Louisiana to set up screenings. Id. at 112, 117. He left the firm to set up his own screening company, Gulf Coast Marketing (GCM). which he co-owned with an attorney. Id. at 119.
GCM conducted screenings in Texas, Arkansas, Louisiana, Massachusetts, Oregon and Mississippi. Id. at 130. In one year, Criss gathered 7000 new cases through his efforts, most all of them diagnosed with asbestosis. Id. at 112, 119. In early 2000, GCM screened in excess of "1500 qualified people for a Houston Law firm" in the Houston and Beaumont, Texas areas. Id. at Ex. B. In the period February 2-August 17, 2001, GCM "interviewed and X-rayed" 7774 "Qualified Applicants." Id.
Criss used a different marketing plan than that used by Lewis. Instead of working through union locals, GCM would first solicit attorneys to hire GCM to conduct screenings for a flat fee of $17,000-$20,000 per screening event, which usually required one to two days for completion. Id. at 149-150, 160, 228. For an example of the letter of solicitation sent out by GCM to law firms, see Letter from Richard Kirkpatrick, Gulf Coast Marketing, to Mark Roberts, Robins, Cloud, Greenwood & Lubel, L.L.P. (Pasadena, Tx.) (July 25, 2000) (on file with author). In this letter, Kirkpatrick, a lawyer and the co-owner of GCM, offers as an alternative arrangement to bear all of the risk of the screening venture for a referral fee of 25% of the fees generated by the positives. Id. at 2. Once hired by a law firm, Criss selected an agreed-upon location, purchased mailing lists and mailed advertisements to every male in that community over the age of fifty. Dep. of Criss, 12/10/02, supra note 106, at 114-15. He described GCM's marketing plan as designing, printing and mailing an attractive ad to 15,000-20,000 qualified prospective male clients over the age of fifty within a fifty mile radius of a selected screening cite, usually a motel (the rental costs of which were included in the net price.). Id. at 149-150, 160, 228. Like advertisements to buy lottery tickets, Criss' solicitation letter, which is part of his marketing plan, "sells" the product by pointing out how much money some of those whom Criss had previously screened had received and from how many different defendants. Id. at 184. Criss' marketing extended to the internet, where his website provided an online form to submit contact information and a map providing "litigants" with directions to testing sites. Gulf Coast Marketing, Information About Next Meeting, at http://gcm.micronpcweb.com/page3.html (last visited Oct. 30, 2001) (on file with author).
GCM used its own X-ray machine and sent the X-rays directly to the lawyers who hired GCM who, in turn, sent the X-rays to the B-readers they had selected. Dep. of Criss, 12/10/02, supra note 106, at 133, 134. People showing up at the screenings would fill out a questionnaire prepared by the lawyers and sign a retainer agreement conditioned on their testing positive. Id. at 149-60. Anyone showing up at a screening who already had an attorney was turned away. Id. at 268-69. GCM screened about 14,000 prospective claimants in 2001 and about the some amount in 2002. Id. at 249.

[FN127]. Bureau of Radiation Control, Texas Dep't of Health, Compl. No 1685 (2002) (on file with author).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

Complaint/Technical Assistance Request Form filled out by Royce Harmon, X-ray Inspector, 6-24-02:

On June 24, 2002 I received a telephone call... regarding a... complaint from an anonymous individual....

The complainant stated that a group of people were conducting screening chest X-rays... [in] Fort Worth. He stated that there were several young women, standing on the sidewalk, holding up signs for passing traffic to see, indicating that "free" screening tests were being done at that location. The complainant requested that the Health Department check into this situation....

I went to the scene arriving at approximately 12:20 p.m. at the first location, which is in front of the Staples Office Supply,... and spoke with an elderly gentleman who was standing next to a card table in the parking lot. There were two young women standing at the entrance to the parking lot holding up signs. I asked the gentlemen if they were providing screening tests, what type and if they were providing chest X-ray exams. He replied that they were interviewing persons for asbestos and silica exposure, but denied that they were taking any chest X-ray studies. I then asked him what the disposition of the persons were that they were interviewing. He replied that they were just "interviewing." I then asked him if they had been taking chest X-ray studies at this location that morning and he answered, "They weren't taking any X-rays."

NOTE: I personally observed X-ray folders which are normally used to store or transport X-ray films on the card table next to him.

This same person then told me that they were taking X-ray (sic) studies just down the street at the Marriott Hotel. There was no further conversation and I went... to the second location....

At the street entrance... was a large sign indicating "Free Screening." As I drove into the side parking lot I observed a large white Chevrolet truck. On the side of the enclosed truck was written the following: Occupational Health Testing Unit, Respirator Medical Evaluations, Occupational Marketing, Inc., 1- 800... www.occupational.com. The truck also had an electrical generator on a small trailer hooked up at the rear.

I went into the Hotel, asked the hotel clerk how long the truck had been outside and she said since early that morning and that she was told that they might possibly be there another day. I thanked her, followed the signs and went into a room where I observed several persons seated at desks interviewing others.

I identified myself and asked to speak privately with whomever was in charge. A person, who identified himself as Mr. [], and I then went into another adjacent room where I asked him to explain what the type of screening [was] they were conducting.

He stated that he was a representative of the Law Office of [], L.L.P., Attorney & Counselor at Law... Fort Worth, Texas 76102. I asked him if he was an attorney and he replied, "No." He explained that this Law Firm was advertising Chest X-ray Screening for persons previously exposed to asbestos and/or silica. I explained that the Texas Department of Health has regulations governing procedures regarding screening and told him that our department's interpretation is "self referral." Since this was apparently what was occurring I asked him to provide me with additional information and asked to also see the inside of the Mobile X-ray truck parked outside. He explained that his Law Firm had hired the Mobile X-ray Company from Houston for this screening situation and that he had "checked" them out beforehand....

I told Mr. [] that the persons down the street from them [who were competitors] had notified my department the same morning, that his organization was conducting screening tests. His response was that he was aware of that and then told me that two of the women involved at the other scene were attorneys attempting to do the same type of screening.

He further stated that there had been a Mobile X-ray unit at the other location early that morning but it was seen leaving approximately mid-morning. He asked if I had spoken with them and I told him that I had stopped by there, but was going to return immediately following the conclusion of my business with him....

I then returned to the first location... where I observed that there were now only two other young women adjacent to the card table on the parking lot.

I introduced myself and explained my reason for being there. The first lady identified herself as [X]. I then asked her if she was an attorney and she replied, "Yes."

I asked her what type of service they were providing and she said that they were just interviewing people. I

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

mentioned that it had been reported earlier that a Mobile X-ray Unit had been on this scene and asked her if that was true. She said that it had been there but they had sent it away, "because there weren't any patients."

I asked her if she could provide me with the name of the company. She became very evasive and said, "I'm not sure of the company name." She then said she believed it came from Mississippi and she wasn't sure who made the arrangements. She went on to say that she and her associate, [Y], had met the mobile company's representatives at a convention at Fort Lauderdale before and that's how they got involved. I asked if she had a telephone number for the company and she denied that she did. She then said that I should speak with the [Y], who at the time was interviewing another person. I agreed and Ms. [X] immediately walked over to [Y] and began talking with her.

After a few minutes I spoke with the second lady, who identified herself as [Y] Jackson. I also asked her if she was an attorney and she replied, "Yes." I introduced myself and told her my purpose for being there.

She was even more evasive in her conversation than the [X]. I explained to her that if they are going to engage in any screening activity that it will be necessary to contact the Bureau of Radiation Control before they set up anything. I provided [X] with [Z's] telephone number and suggested that she contact her for additional information. Her response was, "We're just a couple of young attorneys trying to make a living."

I gave her my business card and asked her to contact me if she had any additional questions later. I left the scene approximately 2:30 p.m. and proceeded to the Regional Office.

Id.

[FN128]. By "positive" as I use the term in this article, I mean that first, on the basis of the X-rays and later on the basis of other tests done, a B-reader or doctor determines that the "litigant" either has asbestosis or has a lung condition consistent with asbestosis. I use the term "positives" to refer to those "litigants" who have been screened who have tested positive. I use the term "litigant" to describe those who are screened because it is a term that those in the trade use and other possible appellations are problematic. For example, the term "patient" is not appropriate because there is no medical treatment being afforded and there is no doctor-patient relationship created by the screening. See infra note 163. The term "worker" is plausible, but virtually all of those screened claim exposure to asbestos-containing materials prior to 1975 and many prior to 1972; accordingly, few are current "workers." Another possible term that could be used is "claimant." See, e.g., Dep. of Dr. Harron, 1/19/02, supra note 106, at 15 (Dr. Harron, who reads X-rays and issues ILO reports for those screened stated: "I'd guess they'd all be claimants or potential litigants or actual litigants, but not patients.").

[FN129]. See discussion, infra, Part VI.C.

[FN130]. If the "litigant" were to be provided with the test results, in theory he could take that to a different lawyer to represent him, a money losing proposition obviously to be avoided.

[FN131]. See Dep. of C. Foster, 8/6/02, supra note 106, at 127.

[FN132]. Id. at 125.

[FN133]. Id. at 126, 147-48. For his efforts, he was paid a salary plus $10 per person who tested positive which was later changed to simply $10 per positive "litigant." See id. at 52-53.

[FN134]. See id. at 130-34.

[FN135]. Dep. of C. Foster, 8/6/02, supra note 106, at 148.

[FN136]. Id. at 164, 188-89.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

Page 73

[FN137]. Id. at 128, 138.

[FN138]. Id. at 305. Most businesses, small and large, keep close track of their sales volumes.

[FN139]. See, e.g., id at 142, 165. (Foster indicated that RTS screened at the rate of eight persons per hour though he also claimed that administering PFTs required more time than the 7 and a half minute average time per person). He further testified that chest X-rays require two to five minutes each and ninety seconds to develop the film. Id. at 186-87.

[FN140]. See infra note 321 (summarizing the deposition of Charles Foster and highlighting portions where Foster expressed ignorance of ATS standards).

[FN141]. See Dep. of M. Fitzgerald, 6/26/02, supra note 106, at 25-27. For further discussion of the B&W settlement program that funded Fitzgerald's screening enterprise, see supra note 65.

[FN142]. Dep. of M. Fitzgerald, 7/26/02, supra note 106, at 25-29.

[FN143]. See id. (stating that when B&W entered bankruptcy, interrupting the flow of payments, Fitzgerald and Charles Foster changed the payment for positives from $775 payable upon being billed to $800 with $200 to be paid upon presentation of the invoice and the remaining $600 six months later). RTS then agreed to forbear payment from Fitzgerald until Fitzgerald received payment from B&W. Id. at 25. Over a several year period, RTS billed Fitzgerald $2,352,536.80 and received payment of $1,496,406.30. Id. at 32. When Fitzgerald did not pay RTS the balance, RTS sued Fitzgerald to recover the difference. See id. at 33-34.

[FN144]. Id. at 48.

[FN145]. Id.

[FN146]. Id. at 40-41.

[FN147]. See Dep. of G. Foster, 12/12/01, supra note 106, at 66.

[FN148]. See id. at 59 -60.

[FN149]. Id. at 61, 88.

[FN150]. Id. at 89.

[FN151]. Id. at 72, 91-93.

[FN152]. Id. at 39-40.

[FN153]. Dep. of G. Foster, 12/12/01, supra note 106, at 73.

[FN154]. Id. at 251. G.W. Foster's claim to be unaware of the number of PFT tests that AMT administered that generated positive results for lawyers who paid Foster to administer the tests strains credibility.

[FN155]. See, e.g., Dep. of C. Foster, 8/6/02, supra note 106, at 305 (Charles Foster testified that positive findings

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

were probably made in 20-35% of those that he (RTS) screened). Dr. Jay T. Segarra who did extensive work for RTS in the 1995-1999 period, likewise testified that 20-40% of the X-rays he reviewed were positive for asbestosis. Dep. of Dr. Segarra, 10/14/02, supra note 106, at 30-31, 40. Dr. Phillip Lucas who reads X-rays generated by screenings testified that the percent positives "typically [ran] around 20 to 30 percent." Dep. of Dr. Lucas, 3/31/99, supra note 106, at 42. At another point, Dr. Lucas testified that "30 percent are positive." Id. at 60. In a solicitation letter sent out to union locals, Most Health Services, one of the most prolific of the screening enterprises, listed statistics for 88,966 screened in the period from July 1990-July 1996, indicating that 19% tested positive. See MDL Memorandum, supra note 92, at Ex. A (quoting the letter).

[FN156]. For an overview and discussion of some of this data, see infra notes 217 et seq. and accompanying text.

[FN157]. Casting further doubt on the integrity of the medical evidence produced by the screening process is the following statement by a physician:
Several of my patients have come in saying that they've been diagnosed with asbestosis by "the union's lawyer's doctor." Needless to say, neither the union, nor the lawyer, nor the doctor ever share their findings with me, even when asked. And not one case has been confirmed by our local pulmonologist when I've referred them on. That is if they'll let me. Some of them don't want to have a second opinion - don't want to miss that payout.

[FN158]. See, e.g., Dep. of Dr. Segarra, 10/14/02, supra note 106, at 86 (testifying that he had no information regarding how many of the XX-rays and PFT tests that he reviewed he had diagnosed as having asbestosis). He further testified that he did not review his computer disks, where such information reposed, before his deposition so that he could have refreshed his recollection of the percent positives that he provided. Id. at 91.

[FN159]. While screening enterprise principals and employees frequently cannot recall or claim that they have no knowledge of the percentage that test positive, it is almost certainly the case that in selling the companies' services to lawyers, the enterprises include precisely that information that they claim they do not have. See, e.g., Dep. of C. Foster, 6/4/96, supra note 106, at 181 (when "I represented PTS in meetings with law firms .. . my sales point was... out of 100 people, we can deliver sixty to seventy positives or even better, according to how old they are.").

[FN160]. See,e.g., Dep. of Dr. Segarra, 10/14/02, supra note 106, at 91- 92 (acknowledging that he had electronic copies of his diagnoses but refusing to provide them in response to a subpoena); Dep. of J. Pitts, 3/14/96, supra note 106, at 58, 63 ("I've got all of the records from the time I started [including negatives]."); id. at 267 (PTS has the computer disks containing the PFT results); Dep. of G. Pitts, 3/7/96, supra note 106, at 208 (where Glenn Pitts acknowledged receiving computer disks containing the records of the PFTs that Pulmonary Testing Services administered but who didn't remember where they were at though he did "really look for them" in response to the subpoena). Charles Foster's testimony also reflects a strong aversion to providing accurate information that would enable determination of percentage of positives yielded by his screenings. See Dep. of C. Foster, 8/6/02, supra note 106, at 58-59 (declining to turn over copies of his records in response to subpoenas for those records). G.W. Foster, Charles Foster's nephew, who ran American Medical Testing (AMT), testified that he had no idea how many of the 14,000 PFT tests he administered in under two years resulted in findings of diminished lung capacity. See Dep. of G. Foster, 7/26/02, supra note 106, at 234-36, 251. That claim--that he kept no statistics and simply had no idea of the results of the PFTs that AMT administered --simply lacks credibility. Plaintiff lawyers hiring AMT would almost certainly have wanted to know what results AMT had produced before hiring AMT. And almost certainly, Lewis provided those law firms with reassuring answers. The "bottom line" of screenings is, of course, the yield of positives. That is the sole reason why screenings are conducted. Law firms hiring screening companies undoubtedly seek yield information before doing so. This concern no doubt accounts for the content of a solicitation letter sent by Most Health Services, Inc. to union locals stating "enclosed [is] a statistical report indicating the positive rate of particular unions we have tested. This will give you an idea how severe the problem

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

of asbestos exposure really is." See MDL Memorandum, supra note 92, at Ex. A (quoting the letter).

[FN161]. Dr. Phillip Lucas, who reads X-ray films generated by screenings for a number of attorneys and fills out ILO forms, maintains records of his B-readings on a computer disk, but refused to turn them over in response to a subpoena because "[i]t would be in violation of patient confidentiality." Dep. of Dr. Lucas, 3/31/99, supra note 106, at 11. Charles Foster refused to turn over copies of the screening results that he had retained claiming that this contained "privileged physician/patient information." Dep. of C. Foster, 8/6/02, supra note 106, at 58-59. He further claimed that the physician who made the diagnoses, Dr. Segarra, had a physician/patient relationship with those persons screened who tested positive, but (implicitly) not with those who tested negative. Id. at 60. Dr. Segarra, when deposed, refused to turn over records that he acknowledged having which would allow calculation of the number of positive and negative X-ray readings. Dep. of Dr. Segarra, 10/14/02, supra note 106, at 43, 91-92. Though these records had been subpoenaed, Dr. Segarra, at the urging of counsel for plaintiffs in the asbestos tort cases who, however, were not representing Dr. Segarra, refused to produce the records on the grounds of a "patient/doctor privilege." Id. at 43. When pressed, he stated that "I believe that I have some confidentiality obligation to them... a limited physician/patient relationship in terms of the records." Id.
Most doctors who read X-rays for those screened, or provide "consistent with asbestosis" diagnoses, deny that they have a physician/patient relationship with the person whose X-rays or PFTs they interpret. As stated in the ABA Report to the House of Delegates, Recommendation & Resolution, "[a]ccording to these doctors, no doctor/patient relationship is formed with the screened workers and no medical diagnoses are provided." ABA Report, supra note 10, at 8. These denials may reflect concern about liability for malpractice, see infra note 163, or concern about violating state licensing laws since these doctors frequently interpret medical records of litigants on site in states where these doctors are not licensed to practice. See supra note 98 and accompanying text.

[FN162]. Dr. Segarra's resort to the doctor/patient privilege, appears to be pretextual. See Dep. of Dr. Segarra, 10/14/02, supra note 106, at 43, Ex. 4, 9. Dr. Segarra did provide copies of his full medical reports on at least two persons without protest. See id. On one occasion, he acknowledged that the service he was providing was "a true medical service," id. at 356, but acknowledged that he was not licensed to practice medicine in several of the states where he appeared on site to do screenings, id. at 43-44, and further acknowledged that, other than in instances of suspected lung cancer, he did not provide the "plaintiffs" (his term) with copies of the medical reports that he prepared and sent to the lawyers who organized or paid for the screenings. See Dep. of Dr. Segarra, 8/1/95, supra note 106 at 32. Moreover, of the roughly 50+ or 100+ persons he diagnosed per screening as having asbestosis, he could not recall that he was sufficiently concerned about the health of any of those he so diagnosed that he made any attempt to contact their physician. Id. at 162-63. At another point in his testimony, he appeared to retract his claim of privilege and said that it was just "not proper" to turn over his records and simply refused to give a reason for his refusal. Id. at 45. In another deposition where Dr. Segarra was not subpoenaed to produce his records, he stated that "[i]n the vast majority of cases [where] the radiographs and medical records had been mailed to my house where I render an opinion based on the X-ray interpretation and review of clinical [records] without ever seeing the patient," no "physician-patient relationship exists." Dep. of Dr. Segarra, 9/1/95, supra note 106, at 29-30.
The pretextual nature of the assertion of a doctor-patient privilege is further laid bare in the testimony of Glen Pitts. When asked to produce medical reports that had been subpoenaed, his attorney instructed him not to answer on the ground that "the medical records... [are] privileged." Dep. of G. Pitts, 12/4/95, supra note 106, at 82. However, the agreement that Pulmonary Advisory Services, Inc., the screening enterprise that Pitts ran, had "litigants" sign, referred to the latter as "the Client" and stated that "[a]ll pulmonary function reports, X-rays, radiological reports, physician's reports and other documentation generated... [by PAS] shall be maintained under its sole and complete custody and control.... [and would] be delivered to Client's attorney", and implicitly, not to the client. Id. at Ex. 28. Moreover, at another point in his testimony, Pitts acknowledged that "the tests... were performed strictly for purposes of litigation... [they] were not perform[ed]... to render any diagnostic services [by]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

physicians...." Id. at 241-42.

[FN163]. In contexts other than requests for the production of records, screening company representatives deny the existence of a doctor-patient relationship. See, e.g., MDL Memorandum, supra note 92, at 8 (testimony of the President of Most Health Services stating that the doctors employed by Most are "absolutely not" providing a medical diagnosis); Dep. of Dr. Bass, 5/10/03, supra note 106, at 31 ("[W]e do not have a doctor-patient relationship with these patients in that we are not treating them. We are not trying to make them feel better."); Dep. of Dr. Nayden, 3/28/02, supra note 106, at 55 (stating that "litigants" were not patients because he was not treating them and that the examinations he made were "not considered practicing medicine."). Presumably, one reason for stoutly maintaining that what the doctors do with regard to screenings does not establish a doctor-patient relationship is concern that maintaining otherwise would expose both the doctors and screening companies to civil liability.

[FN164].
he Fourth Circuit's decision in Adams v. Harron, 191 F.3d 447, 1999 WL 710326 (4th Cir. Sept. 13, 1999) (unpublished per curiam decision), is illustrative. There, a law firm, "[a]s part of a client-solicitation process," offered free chest X-rays to steelworkers in Kentucky. Id. at *1. The law firm "collected the X-rays, numbering in the hundreds, and delivered them to two radiologists." Id. A radiologist noted that one of the steelworkers might have lung cancer and asked the law firm to advise him to see his family doctor. Id. The law firm failed to do so. Id. The steelworker's widow later brought a malpractice action against the radiologists, including Dr. Harron (who is one of the doctor's with high positives in asbestos screenings). Id. The Fourth Circuit affirmed the district court's dismissal of her action on the ground that no physician/patient relationship existed between her spouse and the radiologists:
The defendant doctors were retained by a law firm to give that firm consulting advice about which employees would qualify as plaintiffs in their solicitation efforts for asbestos litigation. None of the employees ϡ-rayed retained the doctors or even saw the doctors. Indeed, none of them even knew who the doctors were. Similarly, the doctors had no medical information about any of the individuals.... The doctors... were simply provided stacks of X-rays, with the name of an employee on each X-ray, so that they could determine whether the employee would qualify as a plaintiff in an asbestos law suit.
Id. at *2 (emphasis added).
See, e.g., Raymark Indus., Inc. v. Stemple, 1990 WL 72588, at *10 (D. Kan. 1990). In Raymark, a 94% positive rate was reported for the extensive screenings though an independent audit of those screened showed that, at most, 2.6% may have had an asbestos-related condition. For a discussion of these tire worker cases, see infra note 195 and accompanying text. The positive rate for the tire worker screenings is exceeded by the diagnoses of Dr. Gregory Nayden who examined roughly 15,000 to 16,000 "litigants" on behalf of American Medical Testing and Respiratory Testing Services. See Dep. of Dr. Nayden, 3/28/02, supra note 106, at 85-87. For Dr. Nayden, the diagnosis of asbestosis was pre-determined. Id. at 165. He testified that he never found anyone who did not have asbestosis when he worked at screenings:
Q. Okay. So, to answer my question, though, you're saying that all of the individuals are already considered by you as positive for asbestosis?
A. Well, like I said, I mean, they wouldn't reach me unless they had positive - a positive work history and a positive chest X-ray.
Q. All right. And, for you, that's sufficient for a diagnosis of asbestosis?
A. Yes.
Q. And where I'm going with this: Have you seen any individuals that came through that you did not render a report saying that they had asbestosis?
A. No.
Id. He applied this "asbestosis" assumption to approximately 14,000 people. Id. at 164-65. Based upon Dr.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                    Page 77

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

Nayden's deposition testimony, the Claims Resolution Management Corporation, which processes asbestos claims for the Manville Trust, suspended acceptance of any claims which relied on medical records prepared by Dr. Nayden. See Memorandum from David Austin, President of CRMC (regarding Suspension of Acceptance of Medical Records Prepared by Dr. Gregory Nayden and the American Medical Testing Facility (September 20, 2002)) (on file with author). The CRMC stated that the documents generated by AMT and Dr. Nayden "are bereft of credibility." Id. at 2. In a meticulously detailed six page letter, the CRMC documented Dr. Nayden's complete and total lack of comprehension of the diagnostic criteria for asbestos-related disease and the almost Keystone Cops-like procedures used by AMT to generate medical reports. Id. at 1-6.

See also supra note 105, where an account of a screening in Missouri in March 2002 indicated that about half of the 600 screened were tested positive. There is also considerable evidence set forth in deposition testimony. Charles Foster, who ran the PFT operation for PTS before he left to start up RTS, see supra notes 131, testified that during the time he was at PTS, 15,000-20,000 "litigants" were tested and that "rough[ly]... 70 percent" tested positive. See Dep. of C. Foster, 6/4/96, supra note 106, at 111-12. Dr. Michael G. Conner, who did diagnoses for the Pulmonary Function Laboratories run by William McNeese, testified that the rate of positives for the initial X-ray screening was "probably seventy percent." See Dep. of Dr. M. Conner, 3/29/93, supra note 106, at 130. Charles Lewis' screening enterprise took X-rays which were either read on the spot or sent to the lawyer who hired Lewis who in turn sent the X-rays to the B-reader chosen. See Dep. of C. Lewis, 9/12/02, supra note 106, at 50, 55-56. Copies of invoices that he sent to law firms, which he did produce in response to subpoena, provide the basis for an examination of the results of some of the screenings that he did. Id. at 40. For example, upon being shown invoices, he testified to the following results for screenings he did in the State of Washington: Bremerton: 26 positive of 67, 38% positive, Yakima: 32 positive of 77, 41% positive. Id. at 41. However, a closer examination of the evidence indicates that this testimony may not have been accurate. See id. at 47. In material subpoenaed from Lewis' files, an entry was found alongside the Bremerton screening records, in Lewis' handwriting, stating "81 percent [positive]." Id. at 48. When asked what this meant, he testified: "That is probably what I was after... 81 percent positives." Id. Another of Lewis' records showed the following results: Farmington, N.M.: 20 positives, 22 negatives; 48% positive. Id. at 104. Ex. 16 to Charles Lewis' deposition is particularly instructive. It is a summary of all screenings done in 1996-1997 at locations in Texas, Louisiana, Arkansas and Washington, which had been arranged by Luther Rogers, a consultant hired to set up screenings. Id. at Ex. 16. The "List of All Screenings" lists the location where the screening took place, the date, "P" (the number of positives who had brought suit), "PP" ("Preview"--that is, the number who had been X-rayed and found positive but who had not "brought suit"), "S" ("silicosis"), "RO" ("Rule Out Cancer"), "LC" ("Lung Cancer") and "M" ("Mesotheloma"). Id. Comparing the data on this page with the following page, which lists the total numbers screened at each location, indicates that of the 3406 screened in that period, 2133, or 62.6% were found positive on the basis of X-rays. Id. For the 22 screenings listed, the median positive percentage was 70%. Id. Moreover, it appears that for a screening in Tyler, Texas involving the second highest number screened but the lowest percent positive (37%), the low positive rate is accounted for by one-time factors and therefore the 62.6 percent positives understates the total. See id. at Ex. 16.

Similar results and discrepancies are set forth in the deposition testimony of Charles Foster. See Dep. of C. Foster, 8/6/02, supra note 106. His testimony that 20-30% of those that he screened tested positive is belied by Foster's invoices sent to the Fitzgerald Law Firm. See id. at Ex. 2-6, 8. All of these invoices read: "Sold To: Fitzgerald & Associates." Id. Because Lewis charged far more for positive results than negative results, these invoices allow for determination of the actual number of positive and negative results. See id. at Ex. 2. He testified to the following results:

Bremerton, WA: 11 positive of 25; 44% positive; id. at 39-41. Seattle, WA: 53 positive of 96, 55% positive; id. at Ex. 6. Everette, WA: 26 positive of 47; 55% positive; id. at Def's Ex. 8. An examination of the invoice Lewis submitted for the Bremerton screening, however, indicates that instead of 11 positives of the 25 screened, in billing the law firm for his services, he identified 21 of the 25 as positive for a total of 84% positive. See id. at Def's Ex. 4. In an invoice submitted for a screening on February 10, 2000 in Tacoma, Washington, he identified 17 of 42 as

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

positive for a 40% positive rate. See Def's Ex. 5. In an invoice submitted for screenings in Seattle, Washington, on February 8-9, 2000, he billed for 53 positives out of a total of 96, for a 55% positive rate. See id. at Def's Ex. 6. In another invoice, he billed for 185 positive results and 85 negative results, thus yielding a positive percentage of almost 70%. Dep. of C. Foster, 8/6/02, supra note 106, at 273. In another invoice for screenings in Pasco and Spokane, Washington, on October 26-29, 1998, he billed for a total of 104 positives and 70 negatives, for a 60% positive rate. Id. at Def. Ex. 2, invoice 98181, 12/15/98.

Dr. Segarra testifed that 20-35% of the X-rays he reviewed were positive for asbestosis, Dep. of Segarra, 10/14/02, supra note 106, at 40. His credibility, however, is undermined by his refusal to produce records he acknowledged having that would allow a precise determination of his percent positives. Id. at 40-46. Moreover, at another point, he testified that he diagnosed roughly half of a 100 plus batch of those screened in a several day period as having asbestosis. Id. at 162. An examination of his invoices to RTS for screenings in Seattle, Washington in 2000 indicates that of 224 X-rays he reviewed, he diagnosed 99 or 44% as positive. See id. at Ex. 3. In a screening done in October 26, 1998--October 29, 1998, for which Dr. Segarra billed RTS $23,750, he examined 151 X-rays; of these, 104 were sent on for the complete battery of tests including PFTs and a physical examination by Dr. Segarra. See id. Assuming that all those who went through the entire battery of tests in the screening were diagnosed as positive, then the net positive rate is 69%. Id. Dr. Segarra, however, testified that not everyone who went through a complete set of tests for which he charged $180 ended up with a diagnosis of asbestosis. Id. at 85-86. Some of the complete evaluations were of people that he stated that he ultimately found not to have an asbestos-related disease. Id. Dr. Segarra would not provide specific evidence of how many of those that went through the entire screening process (X-rays, PFTs, medical exam) were not diagnosed with asbestosis, but said that on a typical day, "maybe five or ten" of those who went through an entire evaluation were not diagnosed as having asbestosis. Id. at 85. Again, he declined to make available any documentary evidence that would enable one to determine the accuracy of his estimate. Id. at 85-87. Combining the two sets of screenings for which there are invoices which took place over nine days and taking into account that two of the days involved fewer persons screened and on that basis, assuming that six of those who went through the entire screening process on a full screening day were found negative and three on a light screening day, then we can estimate that 48 (7 x 6 = 42; 2 x 3 = 6; 42 + 6 = 48) were found negative of those who went though the entire process. Id. at Ex. 3. Subtracting that from the total of 104 to reflect Dr. Segarra's uncorroborated testimony yields a positive rate of 41%. Id.

Jewel "Jerry" Pitts testified on behalf of Pulmonary Testing Services, Inc., formerly Pulmonary Advisory Services of Louisiana, that in one invoice to Maples & Lomax, his total charges were $21,700 for 31 positives (at the rate of $700 each) and $10,400 for 26 negatives (at the rate of $400 each), for a positive percentage of 54%. See Dep. of J. Pitts, 3/14/96, supra note 106, at 128, 130. Another invoice reflected a 50% positive rate. Id. at 129. Another reflected 49 positives and 18 negatives for an over 70% positive rate. Id. at 190-91. When asked whether "more than 50 percent [of those he screened] tested positive," his attorney objected strenuously. Id. at 132. Finally, Pitts answered, "I wouldn't know unless I looked at the record what was positive and negative." Id. Later, he added, at the prodding of his attorney, that he did not know the overall percentage of positives. Id. at 192.

Dr. Larry Mitchell, who rendered diagnoses for the Pitts' screening enterprises, Pulmonary Advisory Services and Pulmonary Testing Services in the period 1990-1995, testified that "based upon 200 exams or so [that he had reviewed at a previous deposition]... [he] had a positive rate of around 60 percent." See Dep. of Dr. Mitchell, 6/19/96, supra note 106, at 99. He further testified that depending on the work site, his positive rate could be higher or lower than 60%. Id. at 100. In addition, he testified that for those who worked at the Central Foundry who were screened at the Pascagoula Clinic, the positive rate was in the 85-90% range. Id at 101.

In the case of Dr. Jose E. Roman-Candelaria, who would diagnose "litigants" for RTS and AMT after they had received a positive X-ray reading and undergone a PFT test, out of approximately 4500 persons he diagnosed, he found approximately 90% --all but 20 or 30--had asbestosis. See Dep. of Dr. Candelaria 10/12/02, supra note 106, at 20-21.

The yield rate for other doctors rendering "diagnoses" of "consistent with asbestosis" or an asbestos related

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

condition appears to be well within the 90% range. These doctors base their "diagnosis" on a 1/0 B-reader grading, a PFT, a cursory medical exam, and a work/medical history of asbestos exposure. See, e.g., Dep. of Dr. Nayden, 3/28/02, supra note 106, at 165-66 ("Q:... So all of the [approximately 14,000] individuals that you've seen have been concluded by you[,] on your asbestos medical evaluation[,] as having asbestosis? A: Yes."); Dep. of Dr. Bass, 5/10/03, supra note 106, at 27 (determined only "around one to two percent" of over 6000 cases did not have an asbestos related condition); Dep. of Dr. Holmes, 4/12/96,supra note 106, at 143 (determined only "5 or 10 percent" of approximately 5000 cases to be free of asbestos related diseases).

[FN165]. Even when confronted with direct and specific evidence that a chest X-ray read by a plaintiff lawyer-selected B-reader is inaccurate, screening enterprises and the lawyers that run or select them resolutely maintain the accuracy of their B-reader readings, irrespective of detriment to the persons screened, and going so far as to even threaten a potential claimant with loss of future claiming rights if he or she refuses to succumb to his or her (mis)diagnosis. For an example of one such communication, see Letter from Michael Fitzgerald, an attorney from Fitzgerald and Associates who is extensively involved in screenings, to [a person that received a positive diagnosis at a screening] (August 19, 2000) (on file with the author) in Dep. of C. Lewis, 9/12/02, supra note 106, at Ex. 19:
Dear Mr.[...]:
You wrote to us to advise that your personal physician recently reviewed your chest X-rays and had advised you that you do not have an asbestos related disease. Those X-rays were also reviewed by a radiologist who gave you the same opinion. You suggested that we should drop your claim because of that conflicting advice.
The X-rays that were taken at the union sponsored health screening were reviewed by two NIOSH certified B-readers. Both of those expressed the opinion that you do have asbestosis. A B-reader is a physician who has had special training reviewing X-rays for occupational lung diseases. Upon passing an examination, that physician receives the designation "B-reader" from NIOSH. The asbestos defendants will only accept the opinion of a NIOSH certified B-reader. Those defendants will not accept the opinion of a physician who has not received that certification.
Because your X-rays were reviewed by NIOSH certified B-readers who did express the opinion that you have an asbestos related disease, your applicable statute of limitations has begun to run. If we abandon your claim now, you could be forever barred from bringing a claim in the future should your condition worsen. We therefore recommend that you continue with this present claim and that as part of any settlement, we preserve your right to file an additional claim should your medical condition worsen. If you agree with our choice, you do not need to take any action. We will continue to assist you. However, if you do wish [to] ignore our advice and to abandon your claim, please notify us in writing.
Very truly yours,
/s/
Michael Fitzgerald
Id.

[FN166]. See, e.g., Dep. of C. Foster, 8/6/02, supra note 106, at 142, 186-87 (indicating that RTS screened at the rate of 8 persons per hour, that is, 7 minutes per "litigant," that chest X-rays required 2-5 minutes each and 90 seconds to develop the film); Dep. of G. Pitts, 12/4/95, supra note 106, at 37 (indicating that at one of his screening facilities, he tested as many as 75-100 "litigants" per day); Toxic Justice, infra note 333, at *12 (some screenings process 200 "litigants" per day).

[FN167]. See, e.g., Compl. at P37, Owens Corning v. McNeese and Pulmonary Function Lab., Inc., No. 3:97CV29WS (S.D. Miss. 1997), (indicating that Pulmonary Function Laboratory filed actions against several law firms in 1992 seeking to recover $27 million claimed to be due from these attorneys for PFT Administration).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN168]. See Steiner Affidavit, supra note 69, at P10-11, stating:
[f]or a period in the early 1990's, I read X-rays at the request of Most Health Services Inc.... ("MOST"). In my experience, the quality of the films was often suboptimal.... I recently had the opportunity to examine the chest radiographs of five individuals taken by MOST at the request of a... [law firm which has used MOST extensively] from 1991 through 1996. Of the 18 radiographs made by MOST technologists, 10 had serious technical flaws.
Id.

[FN169]. See infra notes 186 and accompanying text for a discussion of the mal - and misadministration of PFTs.

[FN170]. See, e.g., Dep. of C. Foster, 6/4/96, supra note 106, at 116-17 (stating while he worked at PTS, it charged the lawyers who were being supplied with inventory "a flat charge [for] positive cases" and nothing for a negative finding); Dep. of C. Foster, 8/6/02, supra note 106, at 272 (Foster's RTS charged a variable amount for each screening depending upon whether the results were positive or negative. For positive results, he charged $775 each and $175 for negative screenings); Dep. of J. Pitts, 3/14/96, supra note 106, at 128, 152-53, 284 -394 (Pulmonary Testing Services, Inc. charged $700 for each positive and $400 for each negative because a positive finding entailed more testing. As a component of that charge, he paid the facility that he used $140 for a positive reading and $115 for a negative and attempted to justify the difference on the basis of more services done in the case of the positive. Under relentless assault on cross-examination he conceded, however, that there was no real difference in the quantum of service). Glenn Pitts' Pulmonary Advisory Services (PAS) entered into 850 agreements with the law firm of David Nutt in which Nutt agreed to pay PAS not only for the testing done by PAS but also "fifteen percent (15%) of the gross amount of any settlement or judgment [sic] in any case in which [Nutt's] [c]lient was assisted by [PAS] pursuant to this agreement." Dep. of G. Pitts, 12/4/95, supra note 106, at Ex. 28,318. However, the agreements were later rescinded at the request of the attorney because of concern that it "could be implied that we were not administering good tests." Id. at 324.

[FN171]. See, e.g., MDL Memorandum, supra note 92, at 8 (indicating that Most Health Services, Inc. pays its doctors $10 to $11 per X-ray reviewed; if the sponsoring firm requests pulmonary function testing, it pays the doctor $5 per interpretation; and quoting the trial testimony of Dr. Ray Harron, a doctor who has interpreted thousands of X-rays taken at screenings: "I'm fast and I'm cheap."); Dep. of Dr. Harron, 1/18/02, supra note 106, at 30-32, 37 (indicating that he was a B-reader and initially charged $1.99 for each X-ray read, that he reads at least 10,000 such X-rays a year at screenings plus additional X-rays sent to him by plaintiff attorneys).

[FN172]. See, e.g., Raymark Indus., Inc. v. Stemple, 1990 WL 72588, at * 14 (D. Kan. May 30, 1990) (indicating that one doctor received $18.00 per medical report, of which $5 would go to another doctor to read the pulmonary function tests but further indicating that because of the "high volume of... reviews, they received a substantial income... $400,000 for [one doctor plus] a note for $250,000.00 more... [and] $225,000 [for the doctor netting $13 per report]." For a detailed description of this case, see infra note 197 and accompanying text; infra note 214 (indicating that the doctor who set up the Texas Lung Institute to partake in screenings done in Texas obtained approximately four million dollars a year in revenue); MDL Memorandum, supra note 92, at 10 (indicating that Most Health Services grossed as much as $2.5 million in a single year); Dep. of G. Pitts, 12/4/95, supra note 106, at 48 -49 (stating that for diagnosing 67 "clients" on July 20, 1991, for Pulmonary Advisory Services (PAS), PAS paid Dr. Mitchell $10,050 that same day. Moreover, there is no indication in the 327-page transcript of the deposition or accompanying exhibits that there was anything unusual about the screening that took place on July 20, 1991.) Indeed, according to the OC Complaint, see infra note 245, at P 26, Dr. Mitchell earned at least $3 to $4 million for his work on behalf of the Pitts' enterprises. See also Dep. of G. Foster, 12/12/01, supra note 106, at 88-89 (indicating that in the first year he ran AMT, he grossed $1.5 million and netted $500,000, and that he projected a gross for the year 2001 of $2 million); Dep. of Dr. Lucas, 3/31/99, supra note 106, at 35 (estimating that in 1998, his fees for reading X-rays for asbestos lawyers constituted 40% of his income); Dep. of Dr. Segarra,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

10/14/02, supra note 106, at 81-83 (indicating that for four days of screening on October 26- 29, 1998, for RTS, he billed $23,750), at 206 (indicating that he was paid $300,000--$350,000 for asbestos screenings in 1999 and that this was roughly 2/3's of his income that year) and at 207 (that he earned $2-$3 million from screening work in the period 1991-2001); Dep. of Dr. Harron, 1/18/02, supra note 106, at 48-49 (stating that he obtained 100% of his income from B-reading and was not sure whether his annual income was "more than $500,000"); See Dep. of Dr. Nayden, 3/28/02. supra note 106 at 81, 86-89 (indicating that AMT pays Dr. Nayden $80 for each examination he performs, that from 2000 to 2001 Dr. Nayden examined 15,000 workers, at the rate of 50-65 exams per day, and that AMT paid Dr. Nayden about $1,200,000 for this service). It is notable that in virtually all depositions of screening enterprise principals and the doctors associated with those enterprises, that I read, none of those deposed produced federal 1099 forms or income tax records in response to subpoenas.

[FN173]. See ABA Report, supra note 10, at 8 ("Some X-ray readers spend only minutes to make these findings, but are paid hundreds of thousands of dollars-- in some cases, millions--in the aggregate by the litigation screening companies due to the volume of films read."). One screening doctor admitted that he has received more than $1 million for examining 14,000 workers - all of whom he found to be suffering from asbestosis. Id. at 9. B-readers and diagnosing physicians are not the only participants in the screening process who realize that time is money. In his deposition testimony, Dr. Conner recounted a screening where three or four PFT technicians conducted PFTs and he conducted physical exams for over 200 individuals in approximately 18.5 hours. Dep. of Dr. Conner, 3/29/93, supra note 106, at 67-70. If four technicians were used, then the PFTs averaged 22 minutes; if three, the average would have been 16 minutes. Approximately forty-five minutes to one hour is required for a proper administration of a PFT battery. Dr. Conner, alone making the physical examinations, averaged 5.5 minutes per patient.

[FN174]. See, e.g., Dep. of Dr. Lucas, 3/31/99, supra note 106, an X-ray reader who apparently passed the test he was subjected to by plaintiff lawyers seeking to determine whether Dr. Lucas had the "right stuff" to read X-rays for them. Dr. Lucas contended at a deposition that he was not one of those other B-readers who automatically diagnosed high percentages of X-rays as positive for asbestosis; in support he testified that he was sent a batch of about 100 X-rays by John A. Eaves, an attorney in Mobile, Alabama, which had previously been read by two other B-readers as 100% positive; Dr. Lucas, however, found that only 75% were positive and 25% negative. Id. at 31-32. As for why the attorney had sent him 100 X-rays which had already been read as positive, he stated "I think they were just trying me out." Id. at 34. Dr. Lucas believed that about half of the X-rays subsequently submitted to him are "rereads" but had no idea why plaintiff lawyers send him such a high percentage of previously read X-rays. Id. at 80. The irony of the "tryout" reference, and the very high percentage of "rereads" sent to him by plaintiff lawyers in light of Dr. Lucas' assertion that he was a more conservative B-reader than others used by plaintiff lawyers apparently escaped Dr. Lucas.

[FN175]. Although there are approximately 500 certified B-Readers in the United States, relatively few are used in these mass screenings. See ABA Report, supra note 10, at 8. "According to the Manville Trust, 49.6% of the tens of thousands of non -malignancy claims it receives that identify a doctor are based on the B reads of just ten doctors. A single doctor accounted for over 30,000 non-malignancy claims submitted to the Trust over a six-year period." Id. See infra note 347 (indicating that referrals to one B-reader who apparently passed the test, increased from 1% in 1983 to an astounding 31.8% of all asbestos claims filed with the Manville Trust in 1996). The use of high volume doctors began to pick up steam in the early 1990s and may have been necessitated by the increased use of attorney-sponsored screenings. "In 1983, the first year that any of the [Manville Trust "ten" ] doctors were named on more than 10 asbestos claims, the[se] 10 doctors...accounted for 1% of all asbestosis claims filed in the U.S. against the Manville Trust. By 1995, these same 10 doctors were named in 60% of all asbestosis claims filed against the Trust that year." Dunbar Report, supra note 65, at 16.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN176]. See, e.g., Letter from Heath Mason, Vice President of N&M Testing, Inc. to lawyers (Aug. 16, 2002) (on file with the author). Advertising N&M's services, the letter states:
we offer out of town X-ray services... [and] pulmonary function test [sic] as well... We have one more advantage to using our service. Not only do we provide you with an excellent quality X-ray and pulmonary function test, we also provide you with a reading of the X-ray and physical by well-known and respected B-reader's [sic].
(emphasis added); Dep. of C. Foster, 6/4/96, supra note 106, at 181 (stating that he told lawyers who wanted to know how PTS could generate 70 percent positives on PFTs, that "we got professional doctors.").

[FN177]. David Egilman, M.D., Asbestos Screenings, 42 Am. J. Industrial Medicine 163 (May, 2002).

[FN178]. Kazan Statement, supra note 4, at 21-22 (citations omitted); id. at 21 n.60 (citing Dep. of Dr. Gregory A. Nayden, 3/28/02):
Not that it is usually hard to get a satisfactory opinion from the first doctor who reads an X-ray. One doctor who has evaluated about 14,000 individuals for two different screening companies admitted under oath that he has no experience in diagnosing asbestosis, and that he is not even practicing medicine. That doctor has concluded that every single person he has evaluated - all 14,000 - have asbestosis!)
See also Dep. of Dr. Harron, 1/18/02, supra note 106, at 43-46 (acknowledging that he had previously testified that a "litigant" had asbestosis though his only exposure to any potential asbestos-containing materials was for a 45-minute period and Dr. Harron's diagnosis of 1/0 asbestosis was based on a chest X-ray taken five months after the only exposure; Dr. Harron confirmed that he believed that scarring of the lungs (fibrosis) can occur as soon as six weeks after exposure to asbestos, which is somewhat sooner than the ten-year or more latency period that medical science indicates is necessary after extensive long-term exposure for manifestation of asbestosis.

[FN179]. See e.g., Dep. of Dr. Lucas, 3/31/99, supra note 106, at 39, 43 (indicating that he effectively charges twice as much for a positive reading than a negative reading because if the reading is positive, he then fills out an ILO for which he additionally charges the same amount as for reading the X-ray.)

[FN180]. Id..

[FN181]. Id..

[FN182]. Id..

[FN183]. The physician who set up the Texas Lung Institute, see infra note 214, charged $600 to diagnose a litigant. If however, he diagnosed the existence of an asbestos-related disease, then he might well have anticipated being deposed at $400 per hour (his rate a decade ago) and if trial testimony was required, then a fee of $3,500 per day. See Affidavit of Dr. Friedman, In re Asbestos Liability Litigation (No. VI), Civ. Action No. MOL87S (E.D. Pa. 2001). Thus, the more disease the doctor found, the more income he generated. See Oliver & Spencer, supra note 87, at 77-78.

[FN184]. See Mot. for Case Management Order Concerning Mass Litigation Screenings, In re Asbestos Products Liability Litigation (No. VI), Civil Actions Nos. MDL875-F, 2 MDL 875 (E.D. Pa. 2001).

[FN185]. See, e.g., Dep. of G. Foster, 12/12/01, supra note 106, at 177 (the "litigants" "know it's about money"); Schneider, supra note 106 (reporting that litigants admitted that they were attending the screenings to "get a little money," "add a little cash to their retirement funds," or get the $10,000 to buy "the fishing boat").

[FN186]. See, e.g., Dep. of Dr. Mitchell, 6/19/96, supra note 106, at 149 ("we had some people that came in [for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

pulmonary function testing]... that didn't try. They tried to give you an invalid test.... They wanted a positive test. We had a lot of those."); Dep. of G. Foster, 12/12/01, supra note 106, at 177 (acknowledging that the "litigants" openly talk about how they can influence the PFT outcome by failing to exhale fully and thus "earn" a settlement check, adding that AMT technicians insist that the claimants "try hard."); Dep. of L. Hammonds, 2/21/96, supra note 106, at 280-81 (Hammonds was the head PFT technician at PTS and acknowledged that "litigants" understood that failing the PFTs was "good" and that some deliberately tried to get a "failing" reading.)

[FN187]. See, Dep. of Dr. Mitchell, 6/19/96, supra note 106, at 198 (acknowledging that he saw "litigants" smoking immediately before taking PFTs); Dep. of H. Robinson, 12/13/01, supra note 106, at 79 (stating that she observed "litigants" smoking in front of the testing facility while testing was taking place). Other ways in which to augment the likelihood of failure include, eating a large meal before the test to prevent an individual's lungs from fully expanding; wearing tight clothing which can potentially restrict breathing; consuming alcohol or performing strenuous activity within 4-6 hours of the test, which can alter pulmonary capillary blood volume and increase the likelihood of an "impaired" outcome. See Vincent C. Madama, Pulmonary Function Testing And Cardiopulmonary Stress Testing 142-43 (1998).

[FN188]. The ATS cautions that because PFTs are so dependent on the cooperation of the patient, "[t]he effort-dependent spirogram must be carefully scrutinized for quality." American Thoracic Soc'y, Standardization of Spirometry-1987 Update, 136 Am. Rev. Respir. Dis. 1285-98 (1987). "Variability is greater in pulmonary function tests than in most other laboratory tests because of the need for consistent patient effort. Therefore, proper testing and valid results require an expert technician, as well as the patient's full cooperation and ability to understand and perform the test correctly." David J. Fitzgerald et al., Office Evaluation of pulmonary Function: Beyond the Numbers, 54 Am. Family Physician 525, 527 (1996). See Paul L. Enright & Robert E. Hyatt, A Practical Guide to the Selection and Use of Spirometerrs (depicting sample PTF printouts and explaining how to distinguish those properly administered and those in which the subject "quit too soon"). Contrast Example 6.1 showing "[a] well-performed maneuver [which] results in as spirogram starting with a steep slope upwards... [which] reach a plateau as exhalation continues for at least 6 sec," and an example of "premature termination of the maneuver [because] [t]he patient quit too soon," and pointing out that [m]ost adults can continue exhalation effort for at least 6 sec. [and] "[m]ost maneuvers that last for less than 6 sec. will not end in a horizontal plateau on the spirogram," so a technician can recognize premature termination from the spirogram. Id. at 147, 152. See also id. at 153-155.

[FN189]. To perform the battery of PFTs in conformance with ATS standards requires close to one hour per subject. Screening enterprises devote as little as 10-15 minutes to performing these tests. See, e.g., Dep. of D. Bailey, 5/21/96, supra note 106, at 61 (stating that the PFTs she did at PTS required 15 minutes per test); Deposition of C. Foster, 8/6/02, supra note 106, at 142, 165 (indicating that RTS took even less time to perform PFTs); Dep. of Dr. Conner, 3/29/93, supra note 106, at 67 -70 (16-22 minutes per PFT).

[FN190]. A leading jurist has acknowledged that "screenings arranged by plaintiffs' lawyers mass produce claims involving no impairment on the basis of no real medical evidence, and that the revenues received by attorneys from these claims divert Trust assets from the sick and dying and are used in part to fund more inappropriate screenings." In re Joint E. & S. Dist. Asbestos Litig., 237 F.Supp. 2d 297, 328 (E.D.N.Y. 2002) (referring to Supplemental Submissions of Solvent Co-defendants Regarding Amendments to the Manville TDP, at 5 (Sept. 24, 2002)).

[FN191]. See Parloff, Miscarriage, supra note 3, at 104.

[FN192]. See, e.g., Roger Cramton, Lawyer Ethics on the Lunar Landscape of Asbestos Litigation, 31 Pepp. L.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                           Page 84

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

Rev. (forthcoming 2003) ("On other issues, such as the mass recruitment of clients, the coaching or improper use of testimony, and the reasonableness of fees... there is insufficient empirical evidence to determine whether professional rules that are rarely enforced are in fact being violated.").

[FN193]. See Letter from Otha W. Linton, MSJ, to Senator Charles E. Grassley (describing the results of a study of 558 X-rays found by plaintiff B-readers to be 91.7 percent positive for 1/0 asbestosis but by a neutral panel set up in the study as 4.5 percent positive and stating: "We believe that our study demonstrates that the variation found between initial readers [plaintiffs' B-readers] and consultant readers is statistically significant and beyond reasonable inter-reader variability"), quoted in Judiciary Comm. Asbestos Report, supra note 9, at 140-43. For a more detailed account of this comparative study, see infra note 228.

[FN194]. Large scale financially self-interested medical misdiagnoses are not confined to asbestos litigation. Similar "misdiagnoses" appear to have been made by two physicians involved with claims against the trust established by the first Fen-Phen settlement. In re Diet Drugs Products Liability Litigation, 236 F.Supp 2d 445 (E.D. Pa. 2002) (pretrial order). According to the protocol outlined in the Settlement Agreement for the first Fen-Phen case, the determination of whether a claimant can receive benefits for a claim can only be made after the administration of an echocardiogram and submission of diagnostic documentation to the Trust. Id. at 448, 451, 453.

With money available for the taking, plaintiff lawyers trolled for claimants using "800" phone numbers and advertisements. In November 2002, U.S. District Court Judge Bartle enjoined the payment of settlement funds from the Trust to seventy-eight Fen-Phen claimants represented by two lawyers including one firm that was formed solely to solicit claimants; the doctors they hired read echocardiogram results in a manner that was determined to be "outside the bounds of medical reasonableness." Id. at 453, 454, 459, 464-65. An expert produced by the Trust reviewed the seventy-eight echocardiograms and testified that he found no significant injury at all, identifying "several recurring flaws in the interpretation of echocardiograms." Id. at 454. In addition to this testimony, further evidence of systemic "misdiagnoses" is revealed in a comparison between the physicians' results of examinations conducted for the two lawyers' claimants and examinations conducted during the course of a blinded clinical study examining the effects of the diet drug. Id. at 457. The results are reminiscent of the diagnostic comparisons between plaintiff-hired medical experts and non-party experts set forth in this article with regard to asbestosis. In the clinical study, only five percent of the diet drug patients were found to have compensable injuries, a significant difference from the finding that 60-70% of the lawyers' claimants exhibited these injuries. Id. at 456-57. One of the plaintiff-hired doctors had agreed to interpret 725 echocardiograms for a flat fee of $1000 apiece for the law firms that were the subject of this motion. Id. at 455-56. However, these 725 were only a small portion of the total number of echocardiograms that that doctor reviewed in relation to Fen-Phen litigation. Id. at 456 n.11. She was also involved with another group of law firms, where she interpreted approximately 10,000 echocardiograms, receiving $250 each, for a total of 2.5 million dollars. Id.

From the court's perspective, the contingent nature of the payment scheme that the law firms instituted with the second physician severely undermined his credibility and the reliability of his echocardiogram interpretations. Id. at 459. Under the financial arrangement with that doctor, he was to receive $1500 in addition to his base fee of $500, if the claimant obtained a benefit from the Trust. Id. at 458. Thus, he had an additional and compelling financial incentive to reach a particular result Id. at 459. This, too, is reminiscent of the financial incentives that permeate medical diagnoses in asbestos screenings.

[FN195]. The impetus for focusing on tire workers was, in part, that "Stemple and Gerry learned that tire workers were sometimes exposed to asbestos in the talc used on tire molds." Oliver & Spencer, supra note 87, at 75.

[FN196]. Raymark Industries, Inc. v. Stemple, 714 F.Supp. 460 (D. Kan. 1988); Raymark Industries, Inc. v. Stemple, No. 88-1014-K, 1988 WL 142123 (D. Kan. Dec. 21, 1988); Raymark Industries, Inc. v. Stemple, No.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

88-1014-K, 1990 WL 72588 (D. Kan. May 30, 1990).

[FN197]. The NTWLP purchased vans equipped with X-ray machines called an examobile and arranged large scale screenings of tire workers at or near the tire manufacturing plants, ostensibly to promote employee safety and awareness. Stemple, 1990 WL 72588 at *9. To facilitate the screenings, the NTWLP hired two former local union presidents to arrange for screenings at different plants around the country. Id. at *9-10. At meetings set up with large groups of present and former tire workers, the attorneys would address the workers and distribute a handout titled "INFORMATION SHEET-TIRE WORKERS' LITIGATION PROJECT" which stated that 64% of the first tire workers X-rayed showed positive for asbestosis and in the next group selected, 94% had asbestosis. Also included in the handout material was a sheet entitled "BENEFITS AND OBLIGATIONS OF MEMBERSHIP IN THE NATIONAL TIRE WORKERS' LITIGATION PROJECT." The tire workers were shown graphic slides of what asbestos does to human lungs as part of the "hard sell." Id. at *10. If the X-rays were read to indicate an asbestos-related condition, then the attorneys sent the worker a letter indicating that "unfortunately... you do have an asbestos-related disease" and requesting the worker to attend a meeting at which he would get a copy of the results and "also complete the necessary paperwork so that your lawsuit can be promptly filed." Id. Local attorneys were hired to actually file the claims. The foregoing description of how NTWLP operated is extracted from the three Raymark cases cited above.

[FN198]. Raymark Indus., Inc. v. Stemple, 714 F. Supp. 460, 463 (D. Kan. 1988) (discussing the history of "the Wells settlement.").

[FN199]. Id.

[FN200]. Id.

[FN201]. Stemple, 1990 WL 72588 at *2. In denying the attorney's motion to dismiss the fraud claim, Judge Kelly stated:
A requisite intent for fraud by these defendants is evidenced, however, by their desire to enrich themselves from the NTWLP. Moreover, the defendants' blatant disregard of professional and ethical obligations, and their arrogant disregard of all scientific findings inconsistent with their own findings, . . . also evidence the requisite fraudulent intent. In sum, it appears that this unusual, distasteful and disappointing case emanates from the attorneys' greed, which has clouded their professional judgment, i.e., their indifference as to whether any of the 6,000 claims meet professional standards or not.
Id. at *13.
The requisite intent for fraud is also evidenced by Stemple and Gerry's arrogant disregard of all scientific findings inconsistent with their own. For instance, in the summer of 1986, Firestone offered free testing of its tire workers through independent testing facilities at the Community Hospital of the Monterey Peninsula in California, and the Carle Clinic in Urbana, Illinois. In response to this offer of free testing, Stemple sent an impassioned newsletter to the tire workers warning them not to submit to the "DEFENSE MEDICAL" exam. The newsletter also suggests that the Firestone testing is part of a conspiratorial effort by Firestone to cover up the known asbestos problem in the tire industry, and... to cast doubt on [their own] medical findings "WHOSE EXPERTISE HAS ALREADY BEEN PROVEN THROUGH YEARS OF SHIPYARD ASBESTOS LITIGATION." In the media, Stemple vigorously attacked the Firestone testing and stated that "our testing results have been standing up in California and other states for the last eight years."
Such statements misrepresent the track record of the NTWLP by implying that the medical detection procedure used in the tire worker cases had been affirmed by the results of eight years of litigation success in the shipyard cases. However, the facts indicate that the medical procedures used in shipyard cases were very different than those used by the medical defendants in the NTWLP.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                    Page 86

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

The attorney defendants' arrogant disregard of all scientific findings inconsistent with their own is also evidenced by their reaction to the interim report from the U.S. governments' National Institute for Occupational Safety and Health (NIOSH).

In February, 1987, NIOSH released an interim report evaluating the X-rays of 795 tire workers. Of those cases, only two had any signs of parenchymal change and only 19 showed pleural abnormalities. Upon receiving the interim NIOSH report, Gerry and Stemple reflexively questioned everything about the report, including its methodology, the source of the X-rays, the source of the request to do the report (the URW International), and the persons who had done the report.

Id. at *16 (citation to record omitted.).

[FN202]. The defendants' deceptive and coercive solicitation process is evidenced by, among other things, the following: herding large numbers of tire workers and former tire workers into meeting halls and rooms; showing them graphic slides depicting the effects of asbestos on human lungs; showing them local television news coverage concerning the NTWLP; providing the tire workers with frightening notices which informed the tire workers of a "serious health risk within our industry;" stating that some union members will need medical examinations; informing them of the possibility of lawsuits; and offering to represent them.

In addition, after the tire workers had been herded through the examobiles for their medical screening tests, the defendants sent letters to the tire workers receiving a "positive" test result.... The letter then invites the tire worker to another group meeting with Stemple where the tire worker would be given the actual results of his physical exam and would be again solicited to retain the NTWLP.

Id. at *15.

Some of the techniques used by these attorneys to solicit cases and sell off percentages to others were related in the course of an opinion assessing them with a $10 million punitive damage award in a dispute with one of their expert witnesses. Brickman, Asbestos Litigation, supra note 4, at 1831 n.49 ("This court has never before experienced such deceit, willful disregard of client's protection and rights, overreaching in dealing with other attorneys, indifference to and avoidance of payments of business creditors, and outright disregard of the truth, whether under oath or not.") (quoting Olfacto Labs v. Crawford, No. 639967-2, slip op. at 6 (Cal. App. Dep't Super. Ct. March 11, 1991)); see also Todd Woody, Judicial Blackmail Costs Firm $10 Million, The Recorder, Mar. 18, 1991, at 7, 10.

[FN203]. According to the complaint, the medical defendants possessed, at best, the most limited of credentials--Bharadwaja was not licensed in the United States; Rao was a radiologist and not qualified to diagnose asbestos disease; and Gelbard had been previously sued for misrepresenting her qualifications and for submitting incompetent medical reports.... Their diagnoses were based solely on information supplied by the X-rays obtained in the examobile in an assembly line fashion (100-150 tire workers were "examined" each day); the medical defendants performed no personal examinations....

Drs. Rao and Bharadwaja admit that they had no idea what their medical reports were going to be used for and Dr. Rao further admits he did not care. In addition, Bharadwaja was not intending to make even a probable diagnosis of asbestos-related disease. Bharadwaja also contends that he was relying on Dr. Rao to make any diagnoses, but Rao understood that he was not in a position to diagnose asbestosis. Furthermore, there are many mistakes in Dr. Gelbard's medical reports. All of the medical defendants were paid very low prices for each tire worker evaluation they performed.

In addition, Dr. Rao testified in his deposition that he considered pleural plaques and pleural thickening to be the same thing. However, pleural plaques and pleural thickening are different in both appearances and etiology.....

Stemple, 1990 WL 72588 at *5-6 (citations to record omitted).

Furthermore, the medical defendants' intent to make lots of money from this venture is evidenced by their willingness to accept a very low amount for each diagnosis in exchange for the opportunity to do many diagnoses. For instance, Dr. Gelbard previously had done some medical/legal consultation work for Stemple in diagnosing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

asbestosis among shipyard workers. For her efforts, Dr. Gelband received $600.00-$800.00, or more, per report. In contrast, once the NTWLP was under way, Gelband received $150.00 per report thereafter. In addition, for each review he made, Dr. Rao received $18.00. Of this, $5.00 would go to Dr. Bharadwaja to read the pulmonary function tests, if necessary, and $3.00 would go to the transcriptionist (Bharadwaja's sister).

Now due to the fact that the doctors were able to do a high volume of tire worker reviews, they received a substantial income for their efforts. For instance, Stemple reports in his deposition that Dr. Gelbard received more than $400,000.00 for her efforts and had accepted a note for $250,000.00 more. In addition, Dr. Rao received approximately $225,000. for his efforts.

In addition, the medical defendants' reckless disregard for the truth is evidenced, in part, by the doctors' willingness to compromise their professional duty. A willingness to compromise their professional duty is shown by the following: the screening protocol established by Gelbard was contrary to the procedures used by her in her own prior practice; the screening protocol was contrary to the AMA Guides which the doctors were purportedly following; Rao and Bharadwaja admit they had no idea what their medical reports were going to be used for; there seems to be some confusion between Rao and Bharadwaja over who was making the diagnosis; the many mistakes that have been found in the medical reports; the doctors' willingness to accept a low per patient diagnosis payment in exchange for the opportunity to do a large number of diagnoses; and Gelbard's acceptance of a lien for the remainder owed.

Id. at *14 (citation to record and footnote omitted.).

[FN204]. Id. at *22 (citation omitted) (emphasis added). As part of his critique, he concluded that the doctors had not followed the standards set by the American Thoracic Society ("ATS") for the clinical diagnosis of asbestos related disease, stating that:

Contrary to the ATS criteria for diagnosing asbestosis (that a doctor should consider only fibrosis with a profusion of 1/1 or greater), both. . . [plaintiff doctors] reported the tire workers to have asbestos-related injuries where the fibrotic profusion was only 1/0 (only a "suspect" finding of fibrosis on the ILO scale).

Id. at *8.

Moreover, the information on the health questionnaires the NTWLP had the tire workers fill out was grossly insufficient to allow conformance with American Medical Association Guides. Id. at *7-9.

[FN205]. Id. at *22.

[FN206]. See Oliver & Spencer, supra note 87, at 77.

[FN207]. See infra note 228 (discussing comparative study).

[FN208]. Id.

[FN209]. Id.

[FN210]. See Stemple, 1990 WL72588 at *28-29 & n.1. Raymark's suit against Stemple and Gerry was ultimately settled; the terms of the settlement are confidential. See Notes: Raymark Action Against Attorneys, Doctors Settles, 6-12 Mealey's Litig. Rep. Asb. 9 (1991).

[FN211]. See In re Tire Worker Asbestos Litig. v. Allied Signal, Inc., C.A. Nos. 88-4702, 88-4703, 1989 U.S. Dist. LEXIS 14717 (E.D. Pa. Dec. 6, 1989).

[FN212]. Id. at *1-2. In another tire worker case, the Fifth Circuit Court of Appeals upheld a trial court's dismissal of 421 of 451 tire worker cases on the basis of an expert report submitted by defendant appellee's pulmonary

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

specialist's review of the X-rays and reports and his conclusion that "421 plaintiffs showed no signs of pulmonary disease." Slaughter v. Southern Talc Co., 919 F.2d. 304, 306 (5th Cir. 1990). Tireworker cases were also dismissed in other cases. See John D. Aldock et al., A Critical Analysis Of The Report Of The Ad Hoc Committee On Asbestos Litigation 13 (May 7, 1991) (unpublished paper on file with the author) (citing In re Ohio Asbestos Litig., Mardoc Order No. 38 (May 9, 1989) (dismissing 678 maritime docket cases for lack of any evidence of asbestos-related injury)). Some tireworker cases have, however, resulted in significant verdicts for plaintiffs. See, e.g., Calif. Tire Workers Awarded $ 1.03 Million 5-22 Mealey's Litig. Rep. Asb. 15 (1990).

[FN213]. See Oliver & Spencer, supra note 87, at 77.
There were only about 20 asbestos cases pending in Bucks Country, Pa., until 1988. Then the unions and the law firm of Timby & Dillon started screening steelworkers. Now [in 1991] there are over a thousand claims pending, filed by the law firms of Norman Perlberger, Lawrence Cohan and Timby & Dillon. Many of the claims are dubious. Cohan, for instance, filed suits on behalf of six men who had died of heart failure, kidney disease and other causes totally unrelated to asbestos.
Id.

[FN214]. At about the time the National Tire Workers Litigation Project was being implemented, a class action consisting of 2,300 oil refinery workers identified through a screening was being played out in federal court in Beaumont, Texas before a far more sympathetic judge. See Cimino v. Raymark Indus. Inc., 751 F.Supp. 649 (E.D. Tex. 1990); see also Cimino Amicus Brief, supra note 17 (characterizing Judge Parker's master plan for administering the cases as an attempt to coerce the defendants into settling the cases). These 2,300 cases were filed as a result of the screening of thousands of oil refinery workers by Dr. Gary Friedman, the sole proprietor of the Texas Lung Institute in Beaumont Texas, a non-profit clinic primarily devoted to screening workers referred by plaintiff attorneys and unions that generated substantial profits for Dr. Friedman. Oliver & Spencer, supra note 87, at 77. In the period from 1984 to February 1988, the Texas Lung Institute had generated at least $4 million in revenues. Id. at 78. "Doctors who reexamined some of the plaintiffs for the defense found that more than half showed no signs of asbestos exposure." Id. Moreover, though Dr. Friedman diagnosed 275 of the group as having malignancies, "a 1989 study of refinery workers published in the American Journal of Industrial Medicine showed that refinery workers have a lower incidence of cancer than the general population does." Id. More recently Dr. Friedman has acknowledged that there is a high incidence of failure to follow proper medical protocols in the diagnosis of those screened for asbestos exposure. See MDL Memorandum, supra note 92 (referring to Affidavit of Dr. Gary K. Friedman given on July 30, 2001, In re Asbestos Liability Litigation (No. VI), Civ. Action No. MDL875, U.S.D.C. (E.D. Pa. 2001) (Civ. Action No. MDL875)).

[FN215]. Letter from Steven Kazan, attorney, Kazan, McClain, Edises, Abrams, Fernandez, Lyons & Farrise, to the Honorable Jack B. Weinstein & the Honorable Burton Lifland (July 23, 2002) (on file with author) (reporting remarks by David Austern at an asbestos seminar, included as Attachment A to Judiciary Comm. Asbestos Report, supra note 9).

[FN216]. See Carl B. Rubin & Laura Ringenbach, The Use of Court Experts in Asbestos Litigation, 137 F.R.D. 35 (1991).

[FN217]. See id. "It became apparent [in asbestos cases] that the plaintiffs had available a group of experts who always found asbestosis. They were countered by a group of defendant experts who rarely if ever found asbestosis." Id. at 38.

[FN218]. See the commentary on Dunn v. Owens Corning Fiberglas, supra note 17.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN219]. Rubin & Ringenbach, supra note 216, at 36-37.

[FN220]. Id. at 45. Judge Rubin's use of court-appointed experts resulted in a drastic decline in the diagnosis of asbestosis. Id. Although the plaintiffs' experts undoubtedly would have testified that every single one of the sixty-five plaintiffs had asbestosis, the court-appointed experts found that ten had asbestosis (15.38%); thirteen had pleural plaques (20%); and forty-two were found to have no asbestos related condition (64.62%). Id. at 45. In the September 1987-September 1990 period, the court-appointed experts testified in sixteen cases. In only two of the sixteen did the jury find asbestosis (12.5%). Id. at 39-40. The jury verdicts essentially followed the medical expert testimony. The findings of the medical experts that Judge Rubin appointed contrast sharply with the testimony of plaintiffs' medical experts and jury verdicts based upon that testimony. Judge Rubin's data is consistent with what the Manville Personal Injury Trust has determined with regard to claims of asbestosis filed against the Trust. Based upon independent medical audits of X-rays, the Trust concluded that fifty-five to sixty percent of asbestosis claims are unsupportable by the medical evidence. Moreover, as a general rule, the more recent the asbestosis claim, the more likely it is that it is unsupportable by the medical evidence presented. See Letters from David T. Austern, General Counsel, Manville Personal Injury Settlement Trust, to Lester Brickman (Mar. 5, 1998 & Apr. 30, 1998) (on file with author).

[FN221]. See infra note 349 for a calculation that specious claiming in the period 1996-2001 amounts to no less than $28.5 billion. The failure to replicate Judge Rubin's "experiment" in subsequent asbestos litigation is not simply a function of plaintiff lawyers' domination of asbestos litigation and the availability of and resort to "magic" jurisdictions; it is also a function of agency costs - that is, it is also a function of defendant' lawyers' interests in maintaining a high volume of asbestos litigation.

[FN222]. In re Joint E. & S. Dists. Asbestos Litig., 237 F. Supp. 2d 297, 309 (E.D.N.Y. 2002). It is my contention in this article that "consistent over-diagnosis" involving hundreds and thousands of such diagnoses, when coupled with substantial financial incentives to misdiagnose claims, result in the creation of evidence which "perverts truth."

[FN223]. Between 700 and 750 tire workers were screened at a mass screening. The process included spirometric testing, the taking of medical and work histories, and X-rays. The screeners determined that 439 of the workers (60% of those screened) had an asbestos related condition that entitled them to compensation. R.B. Reger et al., Cases of Alleged Asbestos-Related Disease: A Radiologic Re-Evaluation, 32 J. Occupational Med. 1088, 1088 (1990). For a detailed description of the mass screenings of tire workers, see supra note V.E.

[FN224]. Id. at 1089. A review of the 439 subjects initially deemed positive for asbestos-related disease shows only sixteen, and more realistically eleven (2.5%), as having conditions consistent with exposure to asbestiform mineral. It is possible that even the 2.5% prevalence is overstated. For example, many of the subjects were classified as category 1/0, representing only minimal changes which could be the consequence of cigarette smoking, aging, or crowding of the vascularity in the lung bases due to poor inspiration. Moreover, these opacities could be the result of other conditions that mimic asbestosis. Id. at 1090. More specifically, they found that 265 of the claimants exhibited chest conditions that were considered normal for their age, and of the remaining 174 subjects, who exhibited some chest abnormalities, the vast majority (158) had conditions that were "non occupational in origin and consisted of conditions one might expect in an aged population." Id. In other words, the researchers concluded that the abnormalities that the claimants exhibited were not caused by exposure to asbestos, but rather by some other condition such as, "healed tuberculosis, histoplasmosis, emphysema, discoid stelectasis, effusions, healed rib fractures, scarring due to infection or old inflammatory disease, possible cancer, miscellaneous nonspecific linear markings consistent with cigarette smoking and aging, and heart and vascular diseases." Id. at 1089.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                    Page 90

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN225]. Id. at 1090. See also Bell, Asbestos Litigation, supra note 10, at 14 -15.

[FN226]. Judiciary Comm. Asbestos Report, supra note 10, at 96.

[FN227]. Notably, some of these B -readers had previously testified as plaintiff's experts. Id. at 141.

[FN228]. Id.; see also id., at Attachment D, at 140 (letter to the Senate Judiciary Committee from Otha Linton and Joseph Gitlin, the two experts who conducted the study). Many of the X-ray films provided were from the West Virginia aggregation described in supra note 17.

For some years, we have been following legal and clinical problems involved in workmen's compensation programs and litigation on behalf of persons claimed to have been exposed to asbestos. One of us, (OL), was for 25 years principal staff to the American College of Radiology Task Force on Pneumoconiosis and a consultant to the National Institute for Occupational Safety and Health, and for most of those years, a member of the International Labor Office (ILO) task force on its chest X-ray classification system. The other, (JG), is a medical imaging consultant, a faculty member of the department of radiology of the Johns Hopkins Medical Institutions and a participant in the design of many studies of X-ray readings.

This letter summarizes a paper prepared by us for submission to a scientific journal on the subject of inconsistencies in the interpretation of chest radiographs required as support for claims of health damages to workers exposed to asbestos products. The abstract is attached along with one table prepared for the article. Ordinarily, we would prefer to share the published article. However, the time required for submission, peer review and eventual publication may be too late to be of assistance to you in your current proposed legislation.

A few comments about the provenance of our effort may be helpful. Since 1996, we have been providing a service to several groups of attorneys involved in asbestos litigation. They approached us seeking a way to go beyond the frequently contrary interpretations proffered by plaintiffs' experts and defense experts, most all of them B readers.

We organized a panel of expert B readers  - radiologists and pulmonologists  - who agreed to interpret sets of radiographs for us with no knowledge of the patients' identity, the origin of the films or even the purpose of the study. Some of our panelists have read films for attorneys on both sides, some for only defense and some not at all except for participating in our studies. The films were masked as to patient and source information before being sent to the readers, along with ILO classification forms prepared by the National Institute for Occupational Safety and Health. The full paper describes our efforts to assure the integrity and validity of our study.

The films in the study came originally from plaintiffs' counsel who chose the X-ray facility and the initial readers noted in the attached table. Under legal rules, the 558 films were made available to defense counsel and by defense counsel to us for our proposed study. Our intent was to determine whether or not an objective group of expert readers would concur in the findings of readers selected by plaintiffs' counsel. The table reflects a wide disparity individually and collectively between the conclusions of the initial readers and the consultant readers. Only one initial reader read each film while all six of the consultant readers interpreted each film.

In addition to making the comparisons, we surveyed the world literature on X-ray studies of asbestos-related changes and could find no studies anywhere that reflected the 91.7 percent positivity (1/0 or higher for small opacities on the ILO 1980 classification) reported collectively by the initial readers who read the same set of films prior to the consultants reading them. The cumulative readings of our six experts was 4.5 percent positive.

The reliance of current law and regulations on chest radiographs is based upon the recognition that an X-ray film is a discrete piece of visual evidence which can be examined by many interpreters. The ILO classification system is intended to standardize interpretation and to provide a concise nomenclature for reporting findings. The dilemma is that presumably qualified interpreters may vary in their conclusions. We believe that our study demonstrates that the variation found between initial readers and consultant readers is statistically significant and beyond reasonable inter-reader variability.

Id. at 140-41.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN229]. See Miller, supra note 47.

[FN230]. See id.

[FN231]. See Oliver & Spencer, supra note 87, at 75.

[FN232]. ABA Report, supra note 10, at 13.

[FN233]. Id.

[FN234]. Id.

[FN235]. Id.

[FN236]. See David M. Epstein et al., Application of ILO Classification To A Population Without Industrial Exposure: Findings To Be Differentiated From Pneumoconiosis, 142 AJR 53, at 54-55 (1984).

[FN237]. See id at 54.

[FN238]. Id.

[FN239]. Id.

[FN240]. Id.

[FN241]. Id. Taking into account the financial incentives for B-readers to find 1/0 asbestosis, it is not unreasonable to suggest that many B-readers who are retained by plaintiff lawyers would read an X-ray that most radiologists would categorize as 0/1 as 1/0.

[FN242]. This outcome may be biased upwards because the population group studied had been hospitalized and many medical conditions can result in lung opacities "consistent with" asbestosis by B-readers retained by plaintiff lawyers. It is biased downward, however, when compared to industrial workers because a population of industrial workers is likely to have higher percentages of baseline opacities of 1/0 because of long term exposure to numerous dusts (other than asbestos) in the workplace. Taking the latter into account, one can readily comprehend how screening enterprises can show yields of positives of at least 40% and, not infrequently, up to the 60-85% range.

[FN243]. See discussion infra, part VC-D; see also A.R. Localio et al., Biostatistics Section, Dept. of Health Evaluation Sciences, Pa. State Univ. College of Medicine & Center for Clinical Epidemiology and Biostatistics, The Manville Personal Injury Settlement Trust X-Ray Audit: An Assessment Of The Identification Of The Underlying Disease Process Implications For Medical Review By Certified B-Readers (1998).

[FN244]. Id.

[FN245]. See Compl. at P60, Owens Corning v. Pitts, No 96-CV-2095 (E.D. La. June 19, 1996) [hereinafter, OC Complaint]. Experts retained by Owens Corning to review the pulmonary function tests administered by screening enterprises determined that American Thoracic Society standards for administering PFT tests were not met in 95% of the 1,672 cases where asbestos-related injuries were alleged. See id., at PP 60-67. The subject of specious

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                    Page 92

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

administration of PFTs is separately dealt with in Part VI, infra.

[FN246]. See Brickman, Asbestosis Litigation, supra note 4, at 1861 n.174.

[FN247]. Dunbar Report, supra note 65, at 11.

[FN248]. Id.

[FN249]. In 1996, 32% of claims submitted to the Manville Trust alleged pleural plaques and 49% alleged asbestosis. The first year that the Manville Trust was in operation after it ceased paying claims because of its virtual insolvency in 1990 was in 1996 and so its data is actually based on filings in earlier years. Id. In 2002, pleural plaque claims had fallen to 9.14% and asbestosis claims had risen to 76.6%. Telephone interview with David Austern, President, Claims Resolution Management Corporation, of the Manville Personal Injury Settlement Trust (Aug. 13, 2003). For the first half of 2003, pleural plaque claims accounted 14.5% of the total and asbestosis accounted for 75.3% (including claims submitted under the revised Trust Distribution Process). Id. In 1994, Babcock and Wilcox "received an immediate and dramatic increase in asbestosis claims... and received a simultaneous and corresponding decline in pleural claims." Babcock & Wilcox Memorandum, supra note 5, at 34. In 1993, B&W received 15,353 asbestosis claims. Id. In 1994, the number of asbestosis claims increased by approximately 42% to 21,844, and by 1995 the number of asbestosis claims had more than doubled, reaching a striking 31,399 claims. Id. This represented an increase in the ratio of asbestosis to pleural claims from "1.9-to-1 in 1993 to 2.9-to-1 in 1994, to 3.7-to-1 in 1995 and to 4.3-to-1 in 1996." Id. See also Brickman, Aggregative Litigation, supra note 7, at 284 n.112.

[FN250]. See supra notes 42-51 and accompanying text.

[FN251]. See id.

[FN252]. See id.

[FN253]. See id.

[FN254]. See infra notes 509-512.

[FN255]. See Georgine v. Amchem Products, inc., 878 F.Supp 716 (E.D. Pa. 1994), vacated by 83 F.3d 610 (3d Cir. 1996), aff'd sub nom. Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997) (noting that the proposed settlement sought to settle the claims of between 250,000 and 2,000,000 individuals against twenty companies).

[FN256]. See G-I Holdings, Inc. v. Baron & Budd, 179 F. Supp. 2d 233, 248-249 (S.D.N.Y. 2001) (discussing 750 million dollar Georgine settlement).

[FN257]. See Georgine, 83 F.3d, at 636. Specifically, the class in Georgine consisted of mostly workers who then had claims against twenty of the leading asbestos defendants and those who might become ill from exposure to their products in the future. See id. at 617. Illness, however, would not include pleural plaques. Id. at 620. The class excluded, however, thousands of pre-existing "present clients" of class counsel and other plaintiff lawyers, whose claims were settled in a separate settlement, not a part of the class action but which settlement was the plaintiffs' lawyers' price for agreeing to the Georgine settlement. See Susan P Konak and George M. Cohen, Under Cloak of Settlement, 82 Va. L. Rev. 1051, 1085-86 (1996) (arguing that the Georgine class counsel negotiated lucrative settlements for 14,000 individuals to the detriment of the class members). Those in the separate settlement

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                    Page 93

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

received a much more favorable settlement than the settlement reached in Georgine, including substantial cash awards for those "present clients" diagnosed with pleural plaques. See  id. at 1085-87; see also Susan P. Koniak, Feasting While the Widow Weeps: Georgine v. Amchem Products, Inc., 80 Cornell L. Rev. 1045, 1048-54 (1995) (reviewing evidence that indicates that the settlement for the "present clients" resulted in outcomes that were 54% or 72% better than the outcomes achieved by the members of the Georgine class). As part of the sweeping settlement agreement for the Georgine class, counsel agreed that Georgine class members diagnosed simply with pleural plaques would receive no cash compensation for their injuries, while exposure only plaintiffs who met certain medical criteria constituting the agreed upon diagnosis of asbestosis would receive cash compensation. See Georgine v. Amchem Products, Inc., 157 F.R.D. 246, 272-73 (E.D. Pa. 1994). For an ostensible dissent from the academic community's condemnation of the approval of the Georgine settlement by the lower court, see Brickman, Aggregative Litigation, supra note 7 at 272, 295-298.

[FN258]. On the basis of the statistics for Babcock & Wilcox, B&W concluded that "claimants' counsel were reclassifying their clients unimpaired pleural claims as 'asbestosis' to defeat the Georgine exclusion for pleural claims." Babcock & Wilcox Memorandum, supra note 5, at 34. (citations omitted). For a more detailed account of this phenomenon, see Brickman, Aggregative Litigation, supra note 7, at 284 n.112.

[FN259]. That is why attempts to predict the total numbers of asbestos claims based upon epidemiology have always fallen far short.

[FN260]. In re Joint E & S Dists. Asbestos Litig., 237 F.Supp 2d 297, 308-09 (E.D.N.Y. 2002).

[FN261]. Id.

[FN262]. OC Complaint, supra note 245, at P40.

[FN263]. See In re Joint E & S Dists. Asbestos Litig., 237 F.Supp 2d, at 308-09.

[FN264]. See id.

[FN265]. In re Joint E & S Dists. Asbestos Litig., 237 F. Supp. 297 at 308 (footnote omitted).

[FN266]. OC Complaint, supra note 245.

[FN267]. Owens Corning was formerly called Owens-Corning Fiberglas, and in the post-Manville bankruptcy era, was one of the leading asbestos defendants until it entered bankruptcy in 2000.

[FN268]. See generally OC Complaint, supra note 245.

[FN269]. See also American Thoracic Soc'y, Lung Function Testing: Selection of Reference Values and Interpretative Strategies, 144 Am. Rev. Respir. Dis. 1202 (1991) (setting forth the guidelines for reference for standardization) [hereinafter ATS, Lung Function Testing] (footnote not in original).

[FN270]. OC Complaint, supra note 245, at PP 42-54. Performing PFT tests accurately is a demanding task. According to the ATS:
All clinical measurements, including pulmonary function tests, are subject to (1) technical variation related to instrument, procedure, observer, subject, and their interactions; (2) biologic variation, the focus of interest of most of the nonclinical biological sciences; (3) variation caused by dysfunction or disease, the focus of clinical

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

medicine. In clinical pulmonary function testing, it is important to minimize the variation caused by technical factors and to take biologic variation into account so that variations caused by disease can be properly interpreted. ATS, Lung Function Testing, supra note 269, at 1202. The ATS further states that:

It.... [is] important to reemphasize [the] key role [of variation in spirometry] particularly in relation to the following points.

1. Laboratory directors should be constantly on guard to maintain the precision and accuracy of the measurements made in their laboratories and should be aware of the potential sources of technical variation. Quality control includes strict adherence to ATS guidelines for equipment performance and calibration.

2. Attention should be given to the spirometer temperature where the tests are performed. Temperature-related errors will be reduced when the spirometer temperature is between 17° and 40° C.

3. Computer calculations should be validated at the time equipment is purchased and after any changes are made in software or hardware.

Id. at 1213.

The sources of variation in PFT results include body position, head position, failure of the patient to use maximal effort, and circadian rhythms. Id. at 1203-04. Interindividual variations in lung function include sex, body size, aging, race, and past and present health. Id. at 1204. "Subjects who smoke cigarettes usually have lower values of spirometry and forced expiratory flows even if they meet the same health criteria for 'normal' as nonsmokers." Id. at 1206.

[FN271]. Id. at 1202.

[FN272]. Id. at 1206-13. "It is common practice for the results of lung function tests to be interpreted in relation to reference values, and in terms of whether or not they are considered to be within the 'normal' range." Id. at 1202.

[FN273]. Id. at 1206. (stating that "in the 1960s, a number of reference equations were published based on data gathered in specific population groups such as laboratory personnel, workers in a particular industry, school populations, subjects attending a specific clinic, volunteers and general industrial workers"). Dr. Crapo was the first to publish a comprehensive set of values. See Robert O. Crapo et al., Reference Spirometric Values Using Techniques and Equipment that Meet ATS Recommendations, 123 Am. Rev. Respir. Dis. 659 (1981).

[FN274]. See id.

[FN275]. See id. at 1 ("more than 90% of the subjects were volunteers from the Church of Jesus Christ of Latter-Day Saints (Mormon)").

[FN276]. Indeed, for the Crapo survey, only lifetime nonsmokers were selected. Id.

[FN277]. Subjects selected had "no symptoms of lung, heart, or chest wall disease." Id.

[FN278]. Id. at 652.

[FN279]. Id. ("In comparison with other studies, our population was more highly-screened, which might explain the higher spirometric values of the present study when compared to 3 of the 4 studies using nonsmokers.").

[FN280]. American Medical Association, Guides to the Evaluation of Permanent Impairment, 95-99 (5th ed. 2001) [hereinafter AMA Guides].

[FN281]. See John L. Hankinson et al., Spirometric Reference Values from a Sample of the General Population,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                          Page 95

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

159 Am. J. Respir. Crit. Care Med. 179 (1999). The "Hankinson" predicted values were derived from spirometry performed by the National Center for Health Statistics in the period 1988- 1994. Id. at 180. The 20,627 survey participants comprised a random sample of the U.S. population living in 81 counties across the United States. Id. at 179. Quality control of the spirometry data was conducted by the National Institute for Occupational Safety and Health. Id. at 181. The "Hankinson" survey is, by far, the most extensive attempt to determine predicted values for the general population ever undertaken. For comparative data for the other studies, see id. at 185-86, figures 7-12.

[FN282]. See Crapo, supra note 273, at 652.

[FN283]. Jewel "Jerry" Pitts indicated that Pulmonary Testing Services used the "Crapo" standard for predicted values. Dep. of J. Pitts, 3/14/96, supra note 106, at 119. Dr. Segarra, who did extensive diagnoses for RTS as well as other screening enterprises, acknowledged that using "Crapo" predicted values enables the enterprise to generate higher numbers of impaired "litigants." See Dep. of Dr. Jay T. Segarra, 10/14/2002, supra note 106, at 237. He also testified that ATS as well as other screening enterprises standards call for the use of confidence levels rather than fixed predicted values, and acknowledged that by using fixed values instead of meeting the ATS standard, more shorter, older people could be classified as impaired than if ATS standards were followed. Id. at 227-32. Dr. Roman-Candelaria amplified on this issue stating that the consequence of using fixed predicted values for spirometry, lung volume and diffusion, and thus not adjusting predicted values for height, weight, sex and age, and then arbitrarily applying a below-80%-of-predicted-value standard as a measure of impairment, is that the screening enterprises can more readily classify a "litigant" as impaired. See Dep of Dr. Roman-Candelaria, 10/11/02, supra note 106, at 49-50. Using "Crapo" predicted values instead of other sets has its greatest impact for certain categories of subjects. Dr. Segarra acknowledged that using "Crapo" instead of "Miller" values results in much higher predicted values for smokers. See Dep. of Dr. Segarra, 10/14/02, supra note 106, at 232. According to the ATS, use of "fixed [reference] value[s] will result in shorter, older subjects being more readily classified as 'abnormal'...." ATS, Lung Function Testing, supra note 273, at 1206.

[FN284]. See ATS, Lung Function Testing, supra note 273, at 1207.
Laboratories should use the published reference equations that most closely describe the populations tested in their laboratories. This may also be assessed empirically by comparing the results for a group of 20 to 40 local reference... equations. The local reference subject should be appropriately selected by age, ethnic group, and sex, to match the clientele of the laboratory and should meet the selection criteria listed in section CRITERIA FOR SELECTION OF REFERENCE VALUES.
Id.

[FN285]. See, e.g., Raymond L. Murphy, Jr. et al., American Thoracic Soc'y, The Diagnosis of Nonmalignant Diseases Related to Asbestos, 134 Am. Rev. Respir. Dis. 363, 367 (1986) ("Review of the prediction formulas for [PFTs] reveals that there is no one set applicable to all laboratories and patient populations. Predicted normal values used in pulmonary function laboratories should be based on regression equations from studies whose testing equipment, methodologies and control population most clearly resemble the patients under study."); AMA Guides, supra note 280, at 94 (North American whites have larger spirometric values for a given age, height, and gender than North American blacks..."); Hankinson, supra note 281, at 186 (the predicted values for African-Americans should be adjusted downward by 12-15% from the reference values derived).

[FN286]. The American Association For Respiratory Care Uniform Reporting Manual For Diagnostic Services (1999) provides guidance for determining and/or calculating relative value units from which an average time for each PFT test can be calculated. Based upon the information in the manual, spirometry requires 21 minutes; spirometry (pre and post bronchodilator), 37 minutes; DLCO, 19 minutes and lung volume (TLC etc.), 18 minutes.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                    Page 96

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

Therefore, a complete PFT (spirometer, no bronchodilator, DLCO and lung volume) requires 58 minutes. Including a pre and post bronchodilator brings the total time required to 74 minutes (1 hours, 14 minutes). See id. at D-3. Assuming a cooperative subject who gives his maximum effort and is not seeking to fudge the test in order to increase the likelihood of being found "impaired" and further assuming that the subject does not require resting time between maneuvers, and that tests results are consistent with each other and therefore no additional maneuvers are required, that is, assuming nearly perfect conditions, then according to the supervisor of a PFT lab at a major hospital, the approximate times required are as follows:

Programming the unit with the patient's height, weight and age (assuming that that information has been previously collected): 5 minutes

FVC: 10-15 minutes

TLC/Gas Wash Out: 15 minutes

DLCO: 10 minutes

TOTAL:

40-45 minutes

If a nitrogen washout is done prior to the DLCO, then add as waiting time: 15 minutes

If the nitrogen washout has to be repeated, then add an additional: 15 minutes

If more than three maneuvers are required to establish the FVC because at least one of the maneuvers does not extend for at least six seconds or until a plateau is reached, or because all three outcomes vary by more than 5 percent, then add for additional maneuvers: 5-15 minutes

If a bronchodilator is performed, then add: 30 minutes

See Notes of Conversation with Glenda DeMercado, Supervisor, Pulmonary Diagnostic Laboratory of the Department of Pulmonary Allergy and Critical Care, Department of Medicine, Columbia-Presbyterian Hospital, Oct. 23, 2003 (on file with the author). In some of the testimony reviewed in this article, PFT technicians administering tests to "litigants" stated that many had trouble with full forced expiration, indicating that more than three maneuvers would therefore likely be required to obtain an FVC that met ATS standards. Assuming the average "litigant" required somewhat more than three maneuvers to produce results that conformed to ATS standards, and assuming that the nitrogen washout is done prior to DLCO as appears to have been the case in many of the PFTs that were the subject of the deposition testimony cited in this article, and further assuming that the nitrogen washout did not have to be repeated, then the amount of time required for performance of a set of PFTs conforming to ATS standards would range from one hour to one hour and thirty minutes, depending on the subject. If a bronchodilator was administered, then the required time would range from one hour and thirty minutes to two hours.

[FN287]. Among the law firms and lawyers that PTS recruited for were Maples & Lomax, Dickie Scruggs, Jim Farragut, David Nutt, and Charles Blackwell. See Dep. of C. Foster, 6/4/96, supra note 106, at 87-89.

[FN288]. OC Complaint, supra note 245, at P 1.

[FN289]. OC Complaint, supra note 245, at P 4. Reliance on the OC Complaint for the proposition that the screening enterprises and principals named in the complaint deviated from ATS standards in order to create false positive PFT results has to be tempered by the fact that these are unproven allegations. The Owens Corning litigation was extensive; the docket indicates 562 entries. Civil Docket for Owens Corning v. Glenn E. Pitts, 96-CV-2095 (E.D. La. June 19, 1996) (96-CV-2095). Depositions were taken of all of the principals, including Glenn E. Pitts, Jerry "Jewel" Pitts, and Leon Hammonds and in addition, of Thomas H. Rhoden, an attorney, associated with the Pitts' screening enterprises. In each of these four depositions, the deponent refused to answer any questions, invoking his Fifth Amendment right under the U.S. Constitution. See Dep. of Glenn E. Pitts, taken on Sept, 29, 1997, at 14, Owens Corning v. Glenn E. Pitts, No. 96-CV-2095 (E.D. La. 1997) (96-CV-2095); Dep. of Jewel D. Pitts, taken on Oct. 15, 1997, at 12, Owens Corning (No. 96-CV-2095); Dep. of Leon Hammonds,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

taken on Jan. 21, 1998, at 10, Owens Corning (No. 96-CV-2095; Dep. of Thomas H. Rhoden, taken on Oct. 28, 1997, at 26, Owens Corning (No. 96- CV-2095). The case was settled in 1999. Most of the proceedings of the litigation are subject to protective orders; in dismissing the actions upon settlement, the court noted "that the parties are bound by the terms & conditions of the attached & SEALED Confidential Settlement Agreement & Release. . ." Civil Docket for Owens Corning (No. 96-CV-2095) (filed June 19, 1996, as of July 21, 2001, at entries 560 (10/21/99) and 562 (12/6/99)). Nonetheless, it is possible to determine on the basis of other judicial proceedings that the settlement included a payment by Pitts to Owens Corning of approximately $1.2 million and that Pitts obtained at least $300,000 of the amount he agreed to pay to Owens Corning from plaintiff lawyers who had sponsored ATS screenings. See Compl. at Ex. A, Rhoden v. Pitts, No. 2001- 245 (Miss. Cir. Ct. Oct. 15, 2001) (promissory note dated Nov. 2, 1999, evidencing a $100,000 loan from Thomas H. Rhoden to Jewell D. Pitts and Glenn E. Pitts); Aff. of Thomas H. Rhoden given on Nov. 20, 2001, Rhoden (No. 2001- 245); Mem. for Continuance of Summary Judgment Hr'g filed Jan. 10, 2002, Rhoden (No. 2001-245); Aff. of Glenn E. Pitts given on Jan. 10, 2002, Rhoden (No. 2001-245); Def's Opp'n to Mot. for Sum. J. filed on Jan. 11, 2002, Rhoden (No. 2001-245); Aff. of Hiram Eastland given on Oct. 17, 2002, Rhoden (No. 2001-245); Mot. in Limine to Exclude Evidence filed on Oct. 28, 2002, Rhoden (No. 2001-245); Def's Opp'n to Mot. in Limine filed Nov. 13, 2002, Rhoden (No. 2001-245). On the basis of the above cited filings in Rhoden, the following information is alleged by the parties, witnesses, and counsel.

Glenn Pitts agreed to settle the Owens Corning suit by paying the company $1.2 million and sought a $100,000 contribution from Rhoden towards paying that settlement amount. Aff. of Hiram Eastland, Rhoden (No. 2001-245). Rhoden was motivated in part to advance that sum because "if the Owens Corning litigation could be settled, a parallel Department of Justice criminal investigation that encompassed repeated questions about the asbestos attorneys that had utilized the pulmonary testing services of the defendants in the Owens Corning litigation would in all likelihood be resolved favorably." Aff. of Hiram Eastland at PP G-K, Rhoden (No. 2001-245); Aff. of Glenn Pitts at P 4, Rhoden (No. 2001-245). Pitts alleged that the $100,000, though in the form of a loan, was never intended to be paid. Rhoden denied that he had ever agreed to forbear collection. Glenn Pitts gave a deposition in this action on October 4, 2002, in which he alleged that Rhoden had engaged in illegal and unethical conduct in 1989. Mot. in Limine at P 3, Rhoden (No. 2001-245). Rhoden sought to exclude that testimony on grounds of relevance. Id. at P 4. On November 13, 2002, Pitts filed his opposition to the Motion in Limine, arguing that he and Rhoden had been doing business together since 1989 and the deals they made "were never what they actually look like on their face." Def's Opp'n to Mot. in Limine at PP 1-4, Rhoden (No. 2001-245) (emphasis added). Summary judgment in favor of Rhoden was rendered on December 2, 2002. The parties thereafter reached agreement "whereby the judgment entered will be fully satisfied." Letter from Vicki R. Slaten, attorney at law, to Judge Richardson (Jan. 17, 2003) (on file with author) A similar litigation was brought by David H. Nutt against Glenn E. Pitts. See Compl. Nutt v. Pitts, No. 251-02-186cv (Miss. Cir. Ct. Feb. 6, 2002); Answer of Glenn E. Pitts filed March 22, 2002, Nutt (No. 251-02186cv); Opp'n to Mot. for Summ. J. filed Dec. 11, 2002 Nutt (No. 251-02186cv). In these pleadings, Nutt claimed he loaned Pitts $200,000 so that Pitts could settle the Owens Corning litigation and was demanding repayment. Compl., Nutt (No. 251-02186cv). Pitts claimed that Nutt agreed not to collect on the note unless Pitts was successful in certain actions against his insurer for failure to provide coverage for other litigation, Answer, Nutt (No. 251-02-186cv); further that the "agreements [with Nutt and Rhoden] were effected to settle past and future claims brought by or which might be brought by Owens-Corning Fiberglas [sic] against ...Nutt and... Rhoden." Def's Resp. Interrogs. & Req. for Produc. of Docs. filed June 17, 2002 at Nos. 7, 8, Nutt (No. 251-02186cv).

Although some of the financial details of the settlement have been determined, the critical information generated by the extensive discovery undertaken in the OC litigation essentially lies entombed in the judicial summary. Nonetheless, by relying on deposition testimony of those listed as defendants in this action in cases which preceded the filing of the OC Complaint, which are discussed infra and which are not subject to the protective orders, confidentiality agreement or sealing of the record by the court, I have been able to confirm the essential accuracy of Owens Corning's allegations. However, I cannot confirm those portions of the complaint that allege that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                          Page 98

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

"[M]edical experts have conducted a detailed examination of a sample... [and their findings] confirms that Defendants' gross[ly] depart[ed] from ATS Standards on a systematic basis... "because that "detailed examination" is entombed. See OC Complaint, supra note 245, at P 60. I can, however, confirm that on the basis of deposition testimony, administration of PFTs by the Pitts' enterprises grossly departed from ATS standards. Finally, I note that this settlement coincided with a major settlement that Owens Corning, then the largest single defendant, had entered into with plaintiff lawyers, representing the vast majority of claimants, called the "national settlement program" (NSP). Maura J. Abeln, Prepared Statement of Maura J. Abeln: Hearing on H.R. 1283 Before the House Comm. On the Judiciary, 196th Cong. (1999), 137, 139. Though there is no clear evidence linking the NSP with the settlement of the OC Complaint, on the basis of the timing and my general knowledge of the subject, it appears not unlikely that a sealed settlement of the OC Complaint was a condition for plaintiffs' lawyers agreeing to the NSP--a settlement which staved off Owens Corning's bankruptcy for only a short period.

[FN290]. OC Complaint, supra note 245, at P 58.

[FN291]. Id. at P 59.

[FN292]. Id.

[FN293]. Id. at P 4.

[FN294]. Id. at PP 60-67.

[FN295]. See Dep. of G. Pitts, 12/04/95, supra note 106, at 12.

[FN296]. See id. at 31 (he had no "copy of any documents relating to the testing procedures utilized at PAS"); id at 138 (no record of criteria used at PAS for screenings); id. at 230 (had no idea of what "predicted values" meant); id. at 232 (PAS's PFT machines were only recalibrated once each day).

[FN297]. See Dep. of J. Pitts, 3/14/96, supra note 106, at 34-38.

[FN298]. Id. at 101.

[FN299]. Id. at 128.

[FN300]. Id. at 125-26. When asked for any documents in his possession with regard to predicted values, he replied that not only did he not have any but that he did not know what predicted values were. Id. at 118-19.

[FN301]. See Dep. of L. Hammonds, 2/21/96, supra note 106, at 59, 65-68.

[FN302]. See Dep. of G. Pitts, 3/7/96, supra note 106, at 12.

[FN303]. Dep. of L. Hammonds, 2/21/96, supra note 106, at 78-79.

[FN304]. Id. at 93-97.

[FN305]. Id. at 227-34.

[FN306]. Hammonds claimed that he and his technicians ran multiple spirometry tests on each "litigant" for each

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                    Page 99

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

test (referred to in the medical literature as "maneuvers,") but only printed out "the best one" as a matter of "brevity and being able to quickly get [the "litigants" ] in and quickly get them out." Id. at 167. Because ATS standards require three maneuvers for each test and results on each within 5%, before the test is considered valid, the absence of print outs of the other alleged maneuvers performed precludes determination of whether that ATS standard was met. 136 Am. Rev. Resp. Dis. 1285, 1291 (1987); see also ATS, supra note 188, at 1291. One way to achieve the extremely high rates of "impairments" would be to select as the "best" test, the one where the subject did poorest--assuming that multiple maneuvers were done. Hammonds also stated that they printed out only one graph for flow volumes and did not record the "flow volume loops" "because of the added time to print the thing out" even though the flow loops are a better determination of FVC and he did have them on the screen but selected not to print them." See id. at 170, 235. He acknowledged that had he followed ATS standards, "all three efforts, all two efforts, or whatever, that you tested the individual on [would be] printed out and part of the document." Id. at 173. Thus, according to Hammonds, the PFTs that he was in charge of administering were subject to considerable manipulation because at least half of the test data was not recorded. If he complied with ATS standards and did at least three maneuvers per test, then he made a record of only one third of the tests done. Hammonds also acknowledged that PTS did not adjust predicted values for race though when he previously worked at a hospital, the predicted values were race adjusted. Id. at 188-189. ATS standards indicate that predicted values for lung capacity of African-Americans should be adjusted downward 12%. Hankinson, supra note 281, at 186. Failure to do so would therefore generate higher numbers of impaired "litigants."

Hammonds was asked what the ATS standard was for measuring total expiratory lung volume, that is, how long the subject had to exhale with maximum expiratory effort, and he replied "less than three [seconds]." Id. at 206. In fact, the ATS standard requires forcible exhalation for a minimum of six seconds or until the subject reaches a plateau, that is, no change in the volume of the subject's expiration for at least 1-to-2 seconds. See ATS, supra note 188, at 1290. When informed that the ATS standard was 6 seconds, or reaching a plateau, Hammonds stated that they did not so require "[s]imply because most of the clients could not do it." See Dep. of L. Hammonds, 2/21/96, supra note 106, at 228. Hammonds was then taken through the PFT results of several "litigants" that PTS had determined to be impaired, who did not exhale for a minimum of 6 seconds or reach a plateau. Id. at 231-35. For each, he acknowledged that had the subjects exhaled longer, then they would not have been found to be impaired and effectively admitted the truth of the allegations later made in the OC Complaint regarding the FEV1/FVC ratio. Id. at 233. This was illustrated by a comparison of PFTs done on a subject in 1991 and again in 1995. Dep. of D. Bailey, 5/2196, supra note 106, at 166- 69. In 1991, he was found to be impaired at 78% for FVC. Id. at 168. In 1995, he tested at 91% of predicted FVC. Id. The difference, as acknowledged by another PFT technician, was that in 1991, the subject exhaled for 3.3 seconds whereas four years later, he exhaled for 7.2 seconds. Id. at 169. In answer to the question, "If we had this same individual blow seven seconds as opposed to 3.3 seconds four years later, that the FVC would have been in the normal range," that technician answered, "That's correct." See id. Finally, Hammonds's testimony was contradicted by that technician who stated that at least 95% of those tested could "blow past six seconds." See id. at 153. That technician further testified that Hammonds instructed her to instruct subjects "not to squeeze [all] the air out," which would have the effect of producing false positives. Id. at 159-60.

[FN307]. See Dep. of Dr. Mitchell, 6/19/96, supra note 106, at 52-54.

[FN308]. See id. at 30-31 (he never published anything on asbestos related disease); id. at 44 (sat for the B-reader test twice and failed each time); id. at 45 (was not a pulmonologist though he was board certified in internal medicine).

[FN309]. See Dep. of J. Pitts, 3/25/96, supra note 106, at 210-11 (Dr. Mitchell was the medical director of PTS); Dep. of D. Bailey, 5/21/96, supra note 106, at 56-57 (same).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN310]. Dep. of Dr. Mitchell, 6/19/96, supra note 106, at 52.

[FN311]. Id. at 64.

[FN312]. See, e.g., id. at 49 (when questioned about whether PTS used nitrogen or helium to wash out oxygen from the lungs (which would therefore affect how the PFTs were administered), he replied that he was "not sure. . . [and] just ordered the... test."); id. at 127 (instead of three maneuvers per PFT test as required by ATS standards, PTS did only one trial if they thought it was a good test); id. at 130-31 (when questioned about a particular litigant screened by PTS who was a black female, he indicated that the technicians did not adjust for race because it "didn't... make that much difference" and when asked whether the standard adjustment for race was 12% for African Americans because of smaller lung volume, he replied that he "[doesn't] think it is 12 percent"); id. at 133-78, 195-98, 218-57, 269-73, 278-80 (demonstrating repeatedly that the PFTs done on his watch by PTS were not in conformance with ATS standards and that, indeed, Dr. Mitchell had no idea what those standards were). At one point, he stated that for a lot of those that PTS tested, you could repeat the test 50 times and still not get a valid test. Id. at 149. Dr. Mitchell's acknowledgement that the PFTs were improperly done and invalid was confirmed by the testimony of a technician who performed 10,000 tests. See Dep. of D. Bailey, 5/21/96, supra note 106 at 47, 110-116, 141-46 (explaining she tested 10,000 people, describing the incorrect procedure she used, and admitting incorrect results).

[FN313]. Dep. of Dr. Mitchell, 6/19/96, supra note 106, at 152-53. This is contradicted by the medical reports that Dr. Mitchell prepared. For example, a report dated May 4, 1991 states that the "pulmonary function testing done on 5/4/91 reveals a forced vital capacity of 68% predicted.... DLCO is calculated at 57% predicted." Dep. of D. Bailey, 5/21/96, supra note 106, at Ex. 6. Moreover, the person who administered the PFT test acknowledged under examination that the test was invalid. Id. at 110-113, 116.

[FN314]. Dep. of Dr. Mitchell, 6/19/96, supra note 106, at 279-80.

[FN315]. Id. at 278.

[FN316]. See Dep. Of G. Pitts, 3/7/96, supra note 106, at 135 (Dr. Mitchell spent 5-10 minutes examining "litigants").

[FN317]. Id. at 159.

[FN318]. See Dep. of C. Foster, 8/6/02, supra note 106, at 125-26.

[FN319]. For a description of Respiratory Testing Services, see supra notes 131 et seq. and accompanying text.

[FN320]. Dep. of C. Foster, 8/6/02, supra note 106, at 127.

[FN321]. In his disposition testimony, he stated that he had no idea whether the X-ray or PFT technicians that he hired or the equipment that he used was certified by the states in which the screenings took place. Id. at 203-05. Moreover, when asked whether his technicians were certified, he responded that in setting up RTS, he followed ATS guidelines for "predicted values" but later responded to a question about use of predicted lung capacity values by stating: "[we] don't use any predicted values." Id. at 228. He did, however, have a manual prepared for RTS on performing PFTs but said that he had never read the manual. Id. at 229, Ex. 12. Finally, when pressed further on whether the PFT tests were being properly administered and who was monitoring the technicians, he answered as follows:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(Cite as: 31 Pepp. L. Rev. 33)**

Q. Did anyone from RTS make any inquiries into the predicted values that should be utilized for PFTs in the Pasco area? ...
A. No.
Q. For RTS at the Pasco screening, who was responsible for determining if your PFTs met ATS criteria?
A. The PFT tech themselves.
Q. Do you have some sort of compliance program set up?
A. The standards will tell you how to do it, whether it meets the criteria or not. If you don't meet the flow volume loops, the curves, then you haven't performed no correct tests. If the patient can't do that, then the PFT tech signs off and says that the patient was unable to perform the tests properly.
Q. From'94 to the present, do you know if Doctor Segarra has held any training classes for your PFT technicians?
A. No, I don't know.
Q. You're personally unaware of any?
A. If he did, I don't know of it.
Q. How does RTS keep track with whether a particular PFT tech is complying with ATS criteria?
A. They get the test back.
Q. Who reviews those to determine if they meet ATS criteria?
A. The girl in the office, Jennifer Seibert, compiles all of our records and everything to make sure they're met.
Q. Jennifer Seibert, what training has she had in ATS criteria?
A. She don't have any training in ATS. I guess, she is self-trained.
Id. at 268-269. Contrary to Foster's testimony, a doctor hired by Foster to attend RTS screenings and render diagnoses of asbestosis on the basis of positive X-ray readings and PFTs acknowledged that the predicted values used by RTS were selected by plaintiffs' attorneys and were "slightly higher than other predicteds." See Dep. of Dr. Roman-Candelaria, 10/11/02,, supra note 106, at 24-26 ("Q.. . . the lawyers overrode you on what predicteds should be utilized? A. Yes.... [The companies, i.e., RTS and AMT] are told that they have to get this set of values under this set of predicteds. Q. So the company gives the client [the lawyers] what they want? A. Yes, sir.") The doctor also testified that RTS had no medical director, that its machine does not automatically adjust predicted values for ethnicity or use confidence intervals as required by ATS standards, that he does not know who programmed the RTS PFT machines, and that he was not given any internal PFT manuals that RTS had produced or asked to review them or any of the procedures used at RTS. Id. at 26-28, 37.

[FN322]. Dep. of Dr. Segarra, 10/14/02, supra note 106, at 291-92.

[FN323]. Id. at 288-90.

[FN324]. Possible ATS standards provide for a fifteen-minute interval between nitrogen washout trials. See id. at 316-17 (The effect of nitrogen washout of the lungs is to over saturate the lungs with oxygen.). If a diffusion capacity test is then administered to the subject after a nitrogen washout but before the fifteen minutes interval set by ATS, the subject has not had a chance to regain his normal N level. See id. at 317-18. The effect of not waiting a full fifteen minutes is to render the DLCO test inaccurate. In the DLCO test result then being examined, it was acknowledged that the interval after the nitrogen washout was only three minutes. Id. at 315.

[FN325]. See Dep. of C. Foster, 6/4/96, supra note 106, at 160.

[FN326]. Owens Corning v. McNeese, Civil Action 3:97CV29WS, USDC, P 5 (S.D. La. 1997) [hereinafter McNeese Complaint]. The complaint alleges that:
Medical experts could have conducted an examination of a sample consisting of approximately 3,486 cases in which [McNeese and PFL] administered PFTs to substantiate asbestos-related injury claims against Owens Corning. This review confirms that [McNeese and PFL]'s gross departure from ATS Standards on a systematic basis dramatically

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                    Page 102

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

has skewed forced spirometric measurements which has: (a) made individuals appear to suffer from asbestos-related pulmonary impairment; or (b) made individuals appear to suffer from a more severe pulmonary impairment.
Specifically, [McNeese and PFL] systematically violated the ATS Standard requiring the subject to exhale for at least 6 seconds. In the sample of cases reviewed by medical experts, approximately 3,245 of those cases contained data concerning the expiratory time. In over 98% of these cases, [McNeese and PFL] produced test results in which this standard was not met. Further, over 54% of these subjects exhaled for less than 3 seconds, which is an extraordinary departure from ATS standards.
[Medical experts also concluded that] [McNeese and PFL] systematically violated the ATS Standards requiring a subject's two largest FVCs or FEV1s to be reproducible within 5% of one another.
Id. at PP 60-62.

[FN327]. See OC Complaint, supra note 245.

[FN328]. The consequence of failing to adhere to ATS Standards, with regard to the required time for administering a PFT, and the failure to use trained technicians for administering the tests, is to produce PFT results that "show" impairment. No amount of negligence or sloppiness or even deliberate manipulation in test administration can generate a measure of lung functioning higher than what the subject is actually capable of producing. See OC Complaint, supra note 245, at PP 3-6. On the other hand, negligence can generate measurements significantly lower than what the subject is capable of producing because the less rigorous the testing procedure utilized, the greater amount of measurement error is introduced into the result - increasing the number of test results which can be categorized as "impaired." See id.

[FN329]. As in the OC Complaint, the suit against McNeese and PFL was settled and the results of the discovery undertaken are hermetically sealed in the bowels of the courthouse. Here too, there is deposition testimony from McNeese, a technician that worked for him, and the doctor who relied on PFL's test results for his diagnoses, supporting the allegations made by Owens Corning. See generally Dep. of Spense, 8/27/96, supra note 106; Dep. of McNeese, 4/22/96, supra note 106; Dep. of Dr. Holmes, 4/12/96, supra note 106.
While McNeese and his technician, Spense, testified that they rigorously adhered to ATS Standards, when shown a PFT report that he had conducted where the subject's expiration terminated after only one second (instead of the at least six seconds required by ATS Standards), Spense acknowledged that the test was improperly done. Dep. of Spense, 4/27/96, supra note 106, at 148. Furthermore, while McNeese testified that he required his technicians to do three tests, Dep. of McNeese, 4/22/96, supra note 106, at 146, Spense acknowledged that he would sometimes only perform two tests. Dep. of Spense, 4/27/96, supra note 106, at 100. Even this contention, however, cannot be supported. Both McNeese and Spense testified that the PFT printout only included the "best" test, Dep. of McNeese, 4/22/96, supra note 106, at 150-51; Dep. of Spense, 4/8/96, supra note 106, at 114-15, and that this was PFL's standard operating procedure. Dep. of McNeese, 4/22/96, at 150-51. The computer automatically selects the "best" test for printing, but this selection can be altered by the technician. Dep. of McNeese, 4/22/96, supra note 106, at 151. See also Dep. of Dr. Bass, 5/10/03, supra note 106, at 128-32 (detailing the discovery on subsequent review of a PFT report which included a test result showing impairment rather than another test result showing no impairment). Printing only the "best" result allows printing the test that showed the lowest percentage of lung capacity versus predicted values and in any event precludes testing the veracity of their assertions. This violates ATS Standards and leaves the bulk of diagnostic information in PFL's computer preventing the diagnosing physician from making an independent evaluation. See ATS, supra note 188. In fact, Dr. Holmes, the board certified internist who made diagnoses based, in part, on the PFT reports produced by PFL, testified that when more than one report was included in the documents sent to him, he reviewed all the PFT reports and selected the "best" one to use in his diagnosis. Dep. of Dr. Holmes, 4/21/96, supra note 106, at 123. Perhaps the most damning testimony involved the amount of time for each battery of PFTs. ATS Standards require at least 45 minutes and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                         Page 103

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

more likely one hour per subject for proper administration. See ATS, supra note 188. Both McNeese and Spense testified that the technicians average three or more patients an hour, essentially fifteen to twenty minutes per patient. Dep. of McNeese, 4/22/96, supra note 106, at 170-71; Dep. of Spense, 8/8/96, supra note 106, at 79. In fact, McNeese, who is neither licensed nor certified, Dep. of McNeese, 4/22/96, supra note 106, at 37, claims to be able to do five per hour. Dep. of McNeese, 4/22/96, supra note 106, at 172. A PFT conforming to the ATS Standards cannot be performed in twenty minutes and a technician cannot average three patients an hour without systematic violation of the ATS Standards. See ATS, Lung Function Testing, supra note 269. Performing three, let alone five, sets of PFTs per hour not only violates ATS Standards but also significantly increases the yield of "impaired" subjects. See id.

[FN330]. As noted, to perform a battery of PFTs in conformance with ATS Standards requires approximately 45 minutes to one hour. See ATS, supra note 188. Though I was not able to review all of the screening enterprises, those that I was able to study did not come even remotely close to adhering to ATS standards. See, e.g., Dep. of C. Foster, 6/4/96, supra note 106, at 160-61 (the average PFT at PTS was done in three to eight minutes; at RTS, twelve to twenty minutes or twelve to thirty minutes); Dep. of Dr. Segarra, 10/14/03, supra note 106, at 322-26 (in which it was demonstrated by examining RTS printouts of PFTs, which included the exact time when certain tests are administered, that for a screening at Pasco, Washington, between the time 12:57 p.m. and 17:52 (5:52) p.m., a total elapsed time of five hours, thirty subjects were administered PFT tests, a rate, therefore, of ten minutes per set of tests; however Dr. Segarra, although unsure of how many patients were tested, stated thirty subjects in five hours would be impossible). PFL administered PFTs at the rate of three to five per hour. Dep. of McNeese, 8/22/96, supra note 106, at 172. The owner of N&M, Inc. recently testified that he was not familiar with ATS standards for spirometry and did not follow them. See Dep. of Mason, 7/8/03, supra note 106, at 281-83, 289-90.

[FN331]. See Brickman, Asbestos Claims Management Proposal, supra note 15, at 1894 n.13.

[FN332]. See id.

[FN333]. Toxic Justice, supra note 55.

[FN334]. The history of the creation of the Manville Trust is set out in In re Joint E. & S. Dists. Asbestos Litig., 129 B.R. 710 (E.D.N.Y. & S.D.N.Y. 1991). See also Roger Parloff, Mass Tort Medicine Men, The American Lawyer, Jan. 3, 2003, at 98 [hereinafter Parloff, Mass Tort].

[FN335]. See Aff. of Patricia G. Houser P 4, In re Manville Pers. Injury Settlement Trust Med. Audit Procedures Litig., No. 98 Civ. 5693 (E.D.N.Y. & S.D.N.Y. Mar. 31, 1999) (No. 98 Civ. 5693). Ms. Houser is the former president of the Claims Resolution Management Corporation, a wholly-owned subsidiary of the Trust, which provides claims resolution services to the Trust. Id. at P 1 [hereinafter Houser Affidavit].

[FN336]. Under the TDP, "[c]laimants fill out forms identifying the disease category they allegedly fall into, and the trust pays out fixed sums based on a grid schedule - x amount for nonimpairing asbestosis, y for asbestosis with impairment, z for lung cancer, and so on." Parloff, Mass Tort, supra note 334, at 98. Judge Weinstein, who oversaw and approved the TDP, stated that the process "almost completely removed the Trust as an active party from the tort system. It established a schedule of asbestos-related disease categories and values to enable most claims to be resolved quickly." In re Joint E. & S.. Dist. Asbestos Litig., 237 F. Supp.2d 297, 304 (E.D.N.Y. 2002) . Manville was not the only company to establish such a process. Other asbestos companies set up similar payment processes in which claimants only had to submit minimal evidence regarding exposure and the resultant medical condition to receive a payment. See supra note 65 (discussing the details of Babcock & Wilcox's pre-petition settlement program).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN337]. The Trust's failure to require proof of illness or exposure essentially mirrored what was transpiring in asbestos litigation against a number of the solvent defendants. There, defendants' perceived inability to demand submission of significant medical evidence to support claims, see supra note 65, combined with forum shopping, aggregation of claims to create high threat levels, and the use of matrix settlements as a way of forestalling but actually only postponing bankruptcy, have created an atmosphere in which plaintiffs' attorneys are emboldened to include plaintiffs in the claiming process who would not be able to sustain a claim even using specious medical evidence.

A recent Mississippi case provides a vivid illustration of plaintiffs' attorneys' willingness to include unsupported and unsustainable claims, even by the standards of "special asbestos law," in their large case filings. In that case, a Special Master appointed by Jasper County Circuit Court Judge Robert Evans ordered the plaintiffs' attorneys to disclose the following regarding each of the 2,500 plaintiffs: "their names, social security number, work history, work sites with years of exposure, disease, date of diagnosis, diagnosing physician, and a listing of the products to which each plaintiff allegedly was exposed." BELL, ASBESTOS LITIGATION, supra note 10, at 33. A week after the order was issued, plaintiffs' counsel moved to dismiss 2,200 of the claims. This provides a reasonable basis to conclude that the plaintiffs' attorneys would have been unable to substantiate the 2,200 claims with any medical evidence, including the specious variety detailed in this article. Nevertheless, the attorneys had decided to include the claims in the apparent belief that they would not be called on to offer proof of their claims. See id. Doubtless, plaintiffs' attorneys were confident that the worst possible consequences of submitting such claims was to have to withdraw them and perhaps refile them elsewhere where they would be processed and paid.

Further evidence plaintiffs' attorneys may file claims without gathering sufficient evidence to support them comes from a survey conducted of plaintiffs' attorneys' own files. Dr. Mark Peterson, an expert retained by the Plaintiffs' Official Committee of Asbestos Personal Injury Claimants (PI Committee), conducted a survey of the information contained in the plaintiffs' attorneys' own files and found that there was no product identification information in 79% of the records and "information showing an actual asbestos related injury (much less an injury attributable to Grace's products) was even more lacking." Grace Reply Brief, 8/21/02, supra note 65, at 11-12. Specifically, Dr. Peterson found that, "only one-third of the files contained the requested information about diagnosing physicians, less than half had all of the requested medical reports, [and] only half had X-rays." Id. at 12. Moreover, the same conclusion can be inferred from the fact that the PI Committee argued that it would be too burdensome for plaintiffs' attorneys to collect some basic information, such as when and where they were exposed to Grace's products and which products they were exposed to, before submitting a claim to Grace. Grace Consolidated Reply, 11/9/01, supra note 39, at 81-82.

[FN338]. See Bell, Asbestos Litigation, supra note 10, at 35-36.

[FN339]. Parloff, Mass Tort, supra note 334. The Georgine settlement, discussed supra, contributed to this dramatic increase in asbestosis claiming in the mid 1990s by making most future claims of pleural plaque non-compensable. As a result of the settlement, plaintiffs' attorneys, in particular, new entrants into the field of asbestos claiming, began filing at least 80% of their new claims as asbestosis, which remained a compensable illness. See Brickman, Aggregative Litigation, supra note 7, at 284 n.112.

[FN340]. See Houser Affidavit, supra note 335, at P 20. This dramatic increase in the number of asbestosis claims is particularly striking in light of the fact that asbestosis has been characterized by leading medical researchers as a "disappearing disease." Babcock & Wilcox Memorandum, supra note 5, at 5 (quoting K. Browne, Asbestos-Related Disorders, Occupational Lung Disorders 411-504, 410 (3d ed. 1994)).

[FN341]. See Houser Affidavit, supra note 335, at PP 10-11. Although such an audit program was unprecedented, plaintiffs initially assented to the plan:
Under the terms of the settlement that set up the trust, trustees needed the permission of a body called the Selected

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                    Page 105

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

Counsel for the Beneficiaries [SCB] to launch such an audit. The SCB consists of three leading national asbestos plaintiffs lawyers: Fred Baron of Dallas's Baron & Budd; Ron Motley of Mt. Pleasant, South Carolina's Ness Motley; and Robert Steinberg of Los Angeles's Rose, Klein & Marias. The SCB initially consented to the trustee's plan.

Parloff, Mass Tort, supra note 334, at 98. Furthermore, the Special Advisor to the Trust and the Legal Representative for Future Beneficiaries also consented to the audit and indicated agreement that such a program was necessary. See Houser Affidavit, supra note 335, at P 9.

[FN342]. See Houser Affidavit. supra note 335, at P 11, 13 (noting that the Trust "sought, received and acted upon suggestions from the plaintiffs' bar with regard to acceptable B-readers" and consulted the SCB regarding each B-reader).

[FN343]. See id. at PP 14-18. In her affidavit, Houser explains that:

Because the Trust is first and foremost a claims payment facility and seeks to avoid dispute, we intentionally designed the X-ray review process to operate in favor of confirming the disease documented by the claimant and to give the benefit of any doubt to the claimant. We began by providing for two independent B-readings. Even among certified experts, not all physicians reading the same X-ray will make the same finding--this is known as "inter-reader variability." Especially in the case of borderline asbestosis, there is significant inter-reader variability among B-readers, including the independent B-readers who review claims in the Trust's medical audit program. In order to offset the risk associated with inter-reader variability, each claim subject to medical audit was read by up to two B-readers. If the results of the first B-reading supported the same or a higher disease category than was documented by the claimant, the claim was released from audit and paid according to the B-reader's findings (even at a higher disease category than originally alleged by the claimant). If, however, the first B-reader's findings instead showed no compensable disease or a lesser compensable disease than documented by the claimant, the X-ray was sent to a second independent B-reader. The second B-reader was not aware of the results of the first review, or that he or she was the second B-reader to review the film. Again, if the second B-reader's findings supported the same or a higher disease category than was documented by the claimant, the claim was released from medical audit, valued consistently with those findings, and paid. But if the second B-reader's findings also showed no compensable disease or a lesser compensable disease than was asserted by the claimant, the claim would be recategorized based on the most serious disease findings of the two independent B-readers. In other words, both B-readers had to disagree with the claimant's physician's diagnosis for the claim to be downgraded on the basis of their findings; if either B-reader agreed with the diagnosis, the claim was released from audit and paid. In addition, we told the independent B-readers to assume asbestos exposure for each claimant. By virtue of the very fact that a claim had been filed, the B-reader also knew that a doctor had already diagnosed disease.

Another way we attempted to give claimants the benefit of the doubt was to design the program to compensate even claimants who could demonstrate only "sub-diagnostic" indicia of disease. Under the standards of the American Thoracic Society there must be a minimal "profusion" level (densities on the lungs that show up on X-ray film as opacities) of 1/1 on the "ILO Scale" for an X-ray to be diagnostic of asbestosis.... The ILO scale is a standard scale used by X-ray readers to judge, among other things, opacities on the lungs....

Despite this well-recognized "1/1" threshold for the diagnosis of asbestosis, in the interest of settling claims, the Trust paid claimants for whom a lesser profusion of "l/0" was supported. Only when even that low-level, sub-diagnostic X-ray evidence of interstitial fibrosis was not corroborated by either of two independent B-readers did the Trust conclude that the claimant's submission was unreliable, and downgrade the claim accordingly.

An additional way in which the medical audit program was designed to operate in favor of claimants was to provide claimants with a variety of remedies if their claims were downgraded as a result of medical audit. Claimants whose claims were downgraded following medical audit could submit newer X-rays for this progressive disease or other medical evidence and their claims would be re-evaluated by another randomly selected B-reader (or B-readers) and, where warranted, recategorized. The Trust placed no limit on the number of times an audited

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

claimant could submit a new X-ray or medical report to the Trust. Claimants could also choose to challenge the Trust's actions through... arbitration and... request independent evaluation of medical evidence by a member of a designated panel of experts....
[S]hortly after implementation the program was modified to provide for the admission of evidence of co-defendant settlements and corroborating medical evidence in lieu of X-rays in appropriate circumstances....
Id.

[FN344]. See Houser Affidavit, supra note 335, at PP 19-20. Sixty per cent of the law firms that received audit notices and requests for X-rays in June of 1995 did not respond to the requests after ninety days. Id. at P 19. Since such a failure to respond precluded any payment on the claim, the Trust "believed that many law firms might be failing to respond because their claims were based on insufficient evidence that might not withstand medical audit scrutiny." Id. at P 20.

[FN345]. See id. at P 20. Although asbestos-related cancers "did not have a troubling failure rate" in the Manville Trust Audit, there is evidence that specious claiming may extend to some malignancy claims as well.

[FN346]. See Localio, supra note 243. The report indicates a high degree of inter-reader variability among those B-readers selected by the Trust to audit the x-rays. An analysis prepared by medical experts retained by Babock & Wilcox which combined the findings of the Manville audit, the Georgine criteria (requiring impairment) and their own analysis determined that 75 percent of all Manville claims, which represents 55% of all dollars, failed reasonable standards for being bona fide and compensable. See Dunbar Report, supra note 65, at 14 and Ex. III-4A and 4B.

[FN347]. See Parloff, Mass Tort, supra note 334, at 98. The audit also revealed that only three doctors (each of whom had approximately 50% of their claims reclassified to no disease and an overall failure rate ranging from 66 percent to 70 percent) were responsible for almost 50 percent of asbestosis claims. See Dunbar Report, supra note 65, at 15. See also, Babcock & Wilcox Memorandum, supra note 5, at 38. Drawing on a 1998 letter from the Manville Trust, Babcock and Wilcox noted that:
For the single most active doctor, 49 percent of his claims showed no evidence of disease whatsoever. Not surprisingly, referrals to this doctor increased between 1983, when he submitted fewer than 1 percent of asbestosis claims received by the Manville Trust, and 1996, when this one doctor alone supported 31.8 percent of asbestosis claims received by the Trust.
Babcock & Wilcox Memorandum, supra note 5, at 38.

[FN348]. See Parloff, Mass Tort, supra note 334, at 98. Parloff implies that this figure may actually be too low because the calculations assume, "that most doctors who weren't monitored would have proven pure as driven snow." Id. It is also important to note that as striking as these numbers are, they:
don't begin to tell the whole story. Most claimants who file with the Manville Trust also file claims against numerous other bankruptcy trusts and then file full-fledged tort actions against scores of not-yet-bankrupt defendants as well. Most of those defendants and trusts can't scrutinize individual claims any more exactingly than the Manville Trust can. In fact, some accept the fact that the Manville Trust has already paid a claim as evidence of its validity!"
Id.

[FN349]. Using a $400 per case value for those nonmalignant claims filed with the Manville Trust, the number of claimants included in the $190 million calculation would be 475,000. Using an estimated total value for each such claim of $60,000, that is, the aggregate value of each claim taking into account that each claim is filed against several score or more defendants and bankruptcy trusts, yields a total of $28.5 billion. See Enough to Make you

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                    Page 107

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

Sick, supra note 66.

[FN350]. Parloff, Mass Tort, supra note 334, at 98.

[FN351]. Houser Affidavit, supra note 335, at P 23.

[FN352]. Parloff, Mass Tort, supra note 334, at 98. This proposal does seem facially appropriate, especially given the considerable evidence that plaintiffs' law firms disproportionately hire doctors with extremely high failure rates. Id. For example, the ten doctors who were used most frequently by plaintiffs' law firms had an average failure rate of 63%. Id. "Nine had failure rates ranging from 50 percent to 70 percent, while the [tenth] failed 36 percent of the time." Id. (citing to an April 1998 Manville Trust Memorandum). Similarly, one doctor, with a failure rate of 66%, was responsible for 30,467 diagnoses of asbestosis between 1995 and 2000. Id.

[FN353]. See Houser Affidavit, supra note 335, at PP 27-28. In her affidavit, Houser cites many reasons why focusing on doctors rather than firms would be "impractical, inefficient, ineffective and unfair." Id. Among the reasons noted are that measuring a doctor's pass/fail data can be extremely complicated since some claims include more than one medical report with different diagnoses, and that the Trust would potentially have to reevaluate tens of thousands of claims.
[O]nce a doctor was found to be unreliable, all claimants who had been diagnosed by that physician - even bona fide claimants - would be forced to submit new medical reports. Thus, for example, of the nearly 60,000 claims that became eligible for payment in 1997, approximately 70% were diagnosed by doctors with less than a 60% pass rate. Under a doctor-based audit system all of those claimants would be required to obtain new medical reports, which would then be subject to further audit.
Id. at P 27; see also Parloff, Mass Tort, supra note 334, at 98 ("[O]f the approximately 60,000 new asbestos claims that became eligible for payment in 1997, the trust would have had to reexamine 42,000 of them.").

[FN354]. See Houser Affidavit, supra note 335, at P 27 ("[A] given doctor's pass rate [on the medical audit procedure] varied considerably depending on the law firm submitting the claim...."); id. at tables 2-4 (indicating the correlation between the X-ray readings by the same doctors as they differed depending on the law firm that had hired them).

[FN355]. Parloff, Mass Tort, supra note 334, at 98 (quoting the Localio Report, supra note 243, submitted to the Trust by the biostaticians in February 1998).

[FN356]. See Houser Affidavit, supra note 335, at P 32.

[FN357]. Id. at PP 33-34.

[FN358]. Id. at P 38.

[FN359]. See MANVILLE PERSONAL INJURY SETTLEMENT TRUST, QUARTERLY REPORT, 2- 3 (1998).

[FN360]. See Letter from David T. Austern, President, Claims Resolution Management Corporation for the Manville Personal Injury Settlement Trust, to Lester Brickman (Oct. 3, 2001) [hereinafter Austern Letter] (on file with the author).

[FN361]. See, e.g., Babcock & Wilcox Memorandum, supra note 5, at 20 (relating the experience of W.R. Grace, which experienced a decline in claims between 1996 and 1998, followed by a dramatic increase in claims in 1999,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

2000 and 2001, which ultimately forced the company to file for Chapter 11 bankruptcy in April 2001). Of the 175,982 asbestosis claims submitted to Babcock & Wilcox prior to their July 2001 Bar Date, approximately 70% had no ILO data at all or had an ILO reading of 1/0 or below. Id. at 7-8. An analysis of 2000 randomly selected claims filed against W.R. Grace in 1997 and 2000 revealed that the medical and exposure evidence, which was scarce in the 1997 claims, was virtually non-existent in the 2000 claims, indicating an increased willingness on the part of plaintiffs' lawyers to submit unsubstantiated (and unsustainable) claims. See Grace Consolidated Reply, 11/9/01, supra note 39, at 12. Specifically, only 3.3% of the 2000 claims reviewed contained ILO readings of 1/1 or higher and PFT results that met the AMA standards for impairment; 47% of the claims failed to provide information on the claimant's work history, the time and place of his/her exposure or the product to which s/he was allegedly exposed; when the claim did include some exposure information, the information provided rarely indicated exposure to a W.R. Grace product. Id. at 12-15, Appendix K.

[FN362]. Austern Letter, supra note 360. Manville and the other Trusts have reported that a small number of firms filed a sizable portion of the 1999 and 2000 claims, and that many of those firms had not previously filed a substantial number of claims. "Seventeen law firms filed 22,500 more claims [against W.R. Grace] in 2000 than they had filed in 1999, and were therefore responsible for almost the entire 22,726 increase in total claims filed against Grace." Grace Consolidated Reply 11/9/01, supra note 39, at 8. In fact, whereas these seventeen firms previously generated only 11.8% of the claims against W.R. Grace, they accounted for more than 53% of the claims filed in 2000. Id. at 9. According to a 2001 RAND report, this trend is at least partly due to the emergence of new law firms that "specialize in filing claims against the bankruptcy trusts." Deborah Hensler et al., Rand Inst. For Civil Justice, Asbestos Litigation in the U.S.: A New Look at an Old Issue 24 (2001). The phenomenon is amplified in a B & W filing:

As evidence that plaintiffs' attorneys take advantage of the fact that historically bankruptcy trusts have less stringent requirements than the tort system, we have identified a number of law firms that appear to specialize in filing claims against trusts. Many claimants with claims against the Manville Trust may also have claims against another of the CCR members. [The CCR or Center for Claims Resolution was a group of 20 then solvent asbestos defendants who adopted a common defense program.] Thus, we would expect to find law firms that file claims against the Trust are also filing claims against the CCR. In fact, we found that 19.2% of the claims filed against the Trust in 2000 were filed by 124 law firms that did not file any claims against the CCR during the same year. Most of these claims were filed by only 14 of the law firms that each filed more than 100 claims against the Trust in 2000. These 14 firms accounted for 17.5% of the claims filed against the Trust in 2000, while not filing any claims against the CCR in the same year.

Dunbar Report, supra note 65, at 17.

[FN363]. Babcock & Wilcox Memorandum, supra note 5, at 7-8.

[FN364]. Grace Consolidated Reply 11/09/01, supra note 39, at 11.

[FN365]. Manville Trust, Highlights of the 4th Quarter 2001 Filing (2001), available at http://www.mantrust.org/FILINGS/q4-01/4THQTR01.htm (last visited Sept. 29, 2003). Babcock and Wilcox also note that the Manville Trust was not the only trust to experience a dramatic increase in claims, and that other asbestos trusts, including the Eagle Picher Trust and the UNR Trust were similarly inundated. Babcock & Wilcox Memorandum, supra note 5, at 8.

[FN366]. In re Joint E. & S. Dists. Asbestos Litig., 237 F. Supp. 2d 297, 306, 314 (E.D.N.Y. 2002).

[FN367]. In re Joint E. & S. Dists. Asbestos Litig., No. 4000, 2001WL1464362 (E.D.N.Y. Nov. 7, 2001).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN368]. For a detailed discussion of the proposed changes, see Brickman, Aggregative Litigation, supra note 7, at 291 n.136.

[FN369]. Manville Personal Injury Settlement Trust, Manville Trust TDP Changes and the Status of the Pro Rata Share Review (2002), at www.mantrust.org (last visited Nov.8, 2003).

[FN370]. In re Joint E. & S. Dists. Asbestos Litig., 237 F. Supp. 2d at 319.

[FN371]. Id. at 324 (citations omitted).

[FN372]. Id. at 328.

[FN373]. Id, at 329.

[FN374]. Id. at 302-03.

[FN375]. See In re Joint E. & S. Dists. Asbestos Litig., 129 B.R. 710 (E.D.N.Y. 1991) (setting out the history of the Manville Trust).

[FN376]. In re Joint E. & S. Dists. Asbestos Litig., 237 F. Supp. 2d at 303.

[FN377]. See Brickman, Asbestos Litigation, supra note 4, at 1834 n.60- 61 (examining effective hourly rates).

[FN378]. In re Joint E. & S. Dists. Asbestos Litig., 237 F. Supp. 2d at 303.

[FN379]. In re Joint E. & S. Dists. Asbestos Litig., 120 B.R. 648, 670 (E.D.N.Y. 1990).

[FN380]. In re Joint E. & S. Dists. Asbestos Litig., 237 F. Supp. 2d at 314.

[FN381]. Id.

[FN382]. In re Joint E. & S. Dists. Asbestos Litig., 129 B.R. 710, 913- 15 (E.D.N.Y. 1991).

[FN383]. See In re E. & S. Dists. Asbestos Litig., 772 F. Supp. 1380, 1398 (S.D.N.Y. 1991); Andrew T. Berry, Asbestos Personal Injury Compensation and the Tort System: Beyond "Fix It 'Cause It's Broke," 13 Cardozo L. Rev. 1949, 1951 n.9 (1992).

[FN384]. See id.

[FN385]. Id.

[FN386]. To be sure, this change occurred over time and involved different claimants and different lawyers. Nonetheless, those who would reject the conclusion that I offer as most plausible have the burden of demonstrating how else the change in testimony occurred. No such alternative explanation appears in the literature.

[FN387]. See Berry, supra note 42, at 1951 n.9. Berry explained:
[A]fter Johns-Manville went bankrupt in 1982, plaintiff descriptions of Manville products at worksites changed radically from a few months earlier. In a deposition taken in October 1981, while Johns-Manville was the premier

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

target for plaintiff attorneys, Wilbur Horan, a long-time worker at the New York Shipyard who was relied upon heavily by plaintiff attorneys to establish product identification, estimated that Johns-Manville had supplied between 75% and 80% of the asbestos-containing products used at the shipyard. But when another witness, Willie Lowe, was deposed in December 1982, just months after the Johns-Manville bankruptcy, that figure shrunk to a mere 25%. Earlier in the deposition, Lowe had at first estimated that "basically, most of the materials, Johns-Manville, I'm sure, was used on all of them, but then remarked, "I wasn't supposed to mention that, was I?" Id. (citations omitted).

[FN388]. Toxic Justice, supra note 55.

[FN389]. Id.

[FN390]. Id.

[FN391]. Id.

[FN392]. "Paralegals say--and neither Baron nor Budd denies--that workers are selectively shown pictures of asbestos products they should identify." Id. The partners in the firm claim that their knowledge of the "correct" product ID answers is "'one of the benefits that we bring to the table for these clients." " Id.

[FN393]. Id.

[FN394]. Id.

[FN395]. Id. According to the Dallas Observer, one former paralegal recalled that "[w]hen you were talking with the guy, you would say, 'We know this product was there.' This is where you'd get them to implant false memories." Id. According to another paralegal, she was asked to falsify product identification information during her first week at the firm:
"They were having me fill out the product IDs [forms that the paralegals had gathered from clients].... There was a man, he was some sort of contractor. He had absolutely no exposure to asbestos--none. There was nothing in his work history."
As she scanned the paperwork, [one of the partners in the firm] walked by the office she was working in. "I got up and walked out and said, 'I don't know what to do. This man has not had exposure at all.' He looked at me and said, 'Oh, you're a smart lady. Be creative,' and he turned and walked away."
She says she then went to her immediate supervisor, who she recalls also told her to "fill it in, make up stuff."
Id. (first alteration in original). The reporter from the Dallas Observer also interviewed a former attorney from the firm, who recalled the first deposition that she defended by herself at the firm.
"I knew my guy wasn't prepared to tell the lie," she says. "This gentleman did not know Kaylo [a product manufactured by an important defendant], had never seen pipe covering and never worked with it."
"It was on his work-history sheet. And for me not to get the testimony that some paralegal got... I'd have caught shit for that if that group went to trial."
"I pulled him out [of the deposition]," she says. "And I said, 'Could you just read off your work-history sheet?'... He goes, 'I don't know why it's on there. It shouldn't be on there. I don't remember it.'"
"... And I was in fear and feeling totally inadequate and knowing that in getting what I needed to get, I was crossing the line." She got the identification. "And this was a good man," she recalls--though he wasn't particularly sick. Afterward, she ran home in tears and told a family member that she couldn't continue.
Id.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN396]. Id.

[FN397]. Id. The reports also stated that "Later... Johns-Manville began paying settlements, and [the paralegal] was ordered to go out and 'meet these guys again' and get them once again to name Johns-Manville products." Id. Attorney Baron flatly denied these assertions saying that they were "[a]bsolutely not true." Instead, he claimed that Johns-Manville and many other companies that had been in bankruptcy were named in "virtually every case." Id.

[FN398]. See Lester Brickman, The Great Asbestos Swindle, Wall St. J., Jan. 6, 2003, at A18.

[FN399]. According to several defense lawyers, similar sea changes in witness testimony have occurred, and are continuing to occur, as other major asbestos defendants declare bankruptcy. See, e.g., Parloff, Miscarriage, supra note 3, at 166. Parloff explains:
No matter how many major asbestos defendants succumbed to bankruptcy, plaintiffs always seemed able to identify the products of ever more peripheral defendants as having been present at their work sites. In fact, plaintiffs usually managed to convince juries that these afterthought defendants, who never used to be sued at all, were actually the guiltiest parties. In [one claimant's] case, for instance, the jury apportioned 80% of his $25 million award between the two defendants who were left in his case after scores of others had already settled before trial. (Dozens of other key potential defendants had never even been named in the suit, of course, since they had already gone bankrupt.)
Id. Empirical support for this assertion could be obtained, though with considerable difficulty. The principal source would be deposition testimony of claimants and witnesses. Files in cases which went to trial would have to be located and examined to see if transcripts of trial testimony were prepared or whether the files include fact transcripts of witness depositions. In theory, far larger volumes of evidence would be available from settled cases since only a tiny percentage of asbestos claims, perhaps 3%, actually go to trial. In reality, there is much less such evidence in documentary form than would be expected. One reason is that many defendants entered into formal or informal arrangements with plaintiff lawyers whereby they agreed to settle claims according to an agreed-upon matrix, which allocated fixed amounts based upon disease categories. In the tens of thousands of such matrix settlements, no testimony was taken. In addition, to the extent that evidence with regard to product percentages was adduced in other settled cases, that evidence is largely unavailable for perusal. This is so because after an asbestos defendant has been adjudged bankrupt, the debtor comes under the control of the plaintiff lawyers representing the tort creditors who are hardly likely to allow access to evidence that could be considered inculpatory.
Vast quantities of data regarding product percentages at specific worksites in specific time frames as testified to by witnesses does exist in the databases maintained by leading plaintiff law firms. Here, again, plaintiff lawyers almost certainly would be unwilling to allow access to their extensive databases to conduct a study of whether changes, if any, in witness testimony regarding product percentages are a function of whether a company is solvent or has entered bankruptcy. See, e.g., infra notes 448 et seq. (discussing the Baron & Budd law firm's substantial efforts to avoid discovery of its client preparation procedures). Perhaps the only way in which these databases could be accessed would be through an investigatory grand jury process.

[FN400]. Ten years ago, it was estimated that Baron & Budd, a Texas based firm, had grossed over $800 million from their asbestos cases alone. Toxic Justice, supra note 55. It has been estimated that Baron & Budd and one other firm, Ness Motley of South Carolina "probably account for half the asbestos docket in the country." Samuel Isaacharoff, "Shocked": Mass Torts and Aggregate Asbestos Litigation After Amchem and Ortiz, 80 TEX. L. REV. 1925, 1930 (2002); see also Enough to Make You Sick, supra note 66 (asserting that Baron & Budd and its subsidiaries "control a double-digit percentage of the roughly 250,000 asbestos claims pending nationwide").

[FN401]. See Thomas Korosec, Homefryin' with Fred Baron, Dallas Observer, Mar. 29, 2001, at 1, available at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

http://www.dallasobserver.com/issues/2001-03- 29/feature.html/1/index.html (last visited Aug. 6, 2003) [hereinafter Homefryin']. According to Korosec, when the document was first disclosed, "lawyers from the two sides at one point literally grabbed opposite ends of the document in a fracas by a copy machine." Id.

[FN402]. Interoffice Memorandum, Baron & Budd, LLP, Preparing for Your Deposition (undated) (on file with author) [hereinafter Script Memo]. A redacted reproduction of the Script Memo is set forth in the Judiciary Comm. Asbestos Report, supra note 9, at 109.

[FN403]. Script Memo, supra note 402, at 2-10.

[FN404]. Id. at 2.

[FN405]. Id.

[FN406]. Id.

[FN407]. See 'Homefryin', supra note 401.

[FN408]. Script memo, supra note 402, at 1.

[FN409]. The process of "witness preparation" apparently did not end with the preparation and memorization of the script memo. In at least one case, it extended into the actual deposition of a Baron & Budd asbestos client. See Dep. of Jimmy Wayne Embry taken on May 25, 1996 at 128-31, Jasper v. Fireboard Corp., (Tex. Dist. Ct. 1996) [hereinafter Dep. of Embry, 05/25/96].
Q. Are you familiar with a company called Johns-Manville?
A. Yes.
Q. Do you know what type of product they make?
A. Yes, they make insulation, don't they?
Q. What type of insulation?
A. Pipe insulation....
Q. All right. Are you familiar with Georgia-Pacific Corporation?
A. Yes.
Q. How are you familiar with Georgia-Pacific Corporation?
A. That's a gasket, isn't it. No, that's - I'm getting confused again. Is that insulation too?
Q. I can't answer that I just need to get an answer from you.
MS. ROSE [Baron & Budd attorney]: You could if you wanted.
THE WITNESS: I - it's insulation too....
BY MR. BROOKS [counsel for a defendant]:
Q. Okay. Do you know what type of insulation you're referring to?
A. It would be pipe insulation.
Q. Okay. A pipe covering?
A. Yeah.
Q. Okay.
[Georgia Pacific did not manufacture pipe insulation or gaskets. The product it manufactured that accounts for its asbestos liability is joint compound used in installing sheet rock, which it also manufactures.]
MS. ROSE: Stuart, let's take a quick break....
MS. BROOKS: Okay.
(Short break taken.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**


BY MR. BROOKS:
Q. Mr. Embry, we're back from our short break....
Q. Okay. When is the last year you can recall seeing Georgia-Pacific pipe covering?...
A. Well, I - I got my wires crossed on that Georgia-Pacific....
Q. Sir, when you took that break out there did you have conversation with your attorney?...
THE WITNESS: No....
Q. Did you talk to your attorney at all?
MS. ROSE: Same objection. And I instruct you not to answer the question.
MR. BROOKS: I'm not asking -
MS. ROSE: You're seeking attorney-client privileged information, and I'm not going to allow him to answer that.
MR. BROOKS: I'm asking if he had any conversation with you.
MS. ROSE: Of course he had a conversation with us.
MR. BROOKS: Okay.
MS. ROSE: And I object to the extent it misconstrues anything that happened during the break....
BY MR. BROOKS:
Q. Did you have an [sic] conversation with your attorney during the break?
A.Yeah


[FN410]. Id.

[FN411]. Id.

[FN412]. Id. at 12. For a more detailed description and analysis of the Script Memo, see Brickman, Aggregative Litigation, supra note 7, at 275-81; Toxic Justice, supra note 55 (quoting from the Script Memo). The Script Memo contained "detailed descriptions of the packaging, appearance, and use of asbestos products [as well as] explicit instructions to Baron & Budd clients." Id. These instructions included the following:
"You may be asked how you are able to recall so many product names. The best answer is to say that you recall seeing the names on the containers or on the product itself. The more you thought about it, the more you remembered!"
"Remember to say you saw the NAMES on the BAGS."
"The more often you were around it, the better for your case. You MUST prove that you breathed the fibers..."
"Keep in mind that these [defense] attorneys are very young and WERE NOT PRESENT at the job sites you worked at. They have NO RECORDS to tell them what products were used on a particular job, even if they act like they do."
"You will be asked when you FIRST LEARNED asbestos was dangerous and HOW you found out. Most people learned about the danger when their doctor told them asbestos WAS IN THEIR LUNGS. It is important to emphasize that you had NO IDEA ASBESTOS WAS DANGEROUS when you were working around it. The defense attorneys believe that if you KNEW asbestos was dangerous and you continued to expose yourself to it without protection, then you should share the blame for being harmed by it."
"It is important to maintain that you NEVER saw any labels on asbestos products that said 'WARNING' or 'DANGER.'"
"Do NOT mention product names that are not listed on your Work History Sheets. The defense attorneys will jump at a chance to blame your asbestos exposure on companies that were not sued in your case."
"Be CONFIDENT that you saw just as much of one brand as all the others. All the manufacturers sued in your case should share the blame equally!"
"[B]y the mid 1970s most insulating products being installed no longer contained asbestos. The public was just beginning to hear reports that asbestos was dangerous... You want to be PERFECTLY CLEAR ON THE RECORD that you did not expose yourself to asbestos once you learned it was dangerous!"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

Id. (alterations in original). The Script Memo was so detailed and comprehensive that Eugene Cook, a former Texas Supreme Court Justice, said at the time that "With this document, you could almost go down the street, get a homeless person, spend a couple of hours with him, and he would be prepared to testify." Testimony of Eugene Cook, former Justice of the Texas Supreme Court, at 66, In re All Asbestos-Related Personal Injury or Death Cases To Be Filed in Bexar County, Texas, (Tex. Dist. Ct. 1997) (No. 94-CI-10078) [hereinafter Testimony of Eugene Cook].

[FN413]. Script Memo, supra note 402, at 14.

[FN414]. Id.

[FN415]. For a lengthy quotation of this part of the Script Memo, see Brickman, Aggregative Litigation, supra note 7, at 278-81.

[FN416]. Interoffice memorandum, Baron & Budd, LLP, Post-Deposition Attorney Summary (May 16, 1996) (on file with author). This memorandum was as follows:
DAMAGES DUE TO ASBESTOS DISEASE
Lost Wages: (Y) (N) ___
Fear of Cancer: (Y) ___ (N) ___
Pain and Suffering [: ](Y) ___ (N) ___
Cannot do house/yard work: (Y) ___ (N) ___
Cannot do hobbies/interests: (Y) ___ (N) ___
No enjoyment of grandkids: (Y) ___ (N) ___
No marital relations/Effects
on marriage: (Y) ___ (N) ___

[FN417]. For a discussion of the issues raised by the Script Memo, see Testimony of Eugene Cook, supra note 412, at 73 (describing the Script Memo as "a cancer in the legal system"). The Script Memo has been the subject of extensive discussion. See, e.g., Abner v. Elliot, 706 N.E.2d 765 (Ohio 1999); In re Brown, No. 03-97-00609-CV (Tex. Ct. App. Apr. 30, 1998); W. William Hodes, The Professional Duty To Horseshed Witnesses--Zealously, Within The Bounds Of the Law, 30 Tex. Tech L. Rev. 1343 (1999); Joan C. Rogers, Special Report: Witness Preparation Memos Raise Questions About Ethical Limits, ABA/BNA LAWYER'S MANUAL ON PROF. CONDUCT, Feb. 18, 1998, at 48-49; Charles Silver, Preliminary Thoughts on the Economics of Witness Preparation, 30 Tex. Tech L. Rev. 1383, 1398-1401 (1999); Lester Brickman & Ronald Rotunda, When Witnesses Are Told What to Say, Wash. Post, Jan. 13, 1998, at A15; Michael Saul, Grand Jury Doesn't Act Against Law Firm that Had Been Accused of Coaching Clients, Dallas Morning News, July 17, 1998, at 22A.

[FN418]. Homefryin', supra note 401. Indeed, Baron defends himself and his firm vigorously, stating:
We think we do this better than anyone in the country, and we think we do it honestly and honorably. We have a wonderful reputation. I've been a lawyer for 27 years. I've never been sued for malpractice, and I've never had a grievance. And not one lawyer in my office has ever had a grievance sustained against him by a client.
Julie Lyons, The Control Freak, Dallas Observer, Aug. 13, 1998, available at http://www.dallasobserver.com/issues/1998-08-13/columns.html/1/index.html (last visited Aug. 6, 2003) [hereinafter Control Freak].

[FN419]. Homefryin', supra note 401; see also Control Freak, supra note 418. In response to allegations about the propriety of the script memo, Baron and his partners reportedly said that:
as long as the firm doesn't literally tell anyone to lie, its lawyers are permitted to:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

* Coach asbestos exposed workers on their symptoms...;
* Coach workers on how they were harmed by asbestos...;
* Tell clients the "facts" of their asbestos exposure and implant memories where there were none.

Id. For example, Budd says that "'[i]f there were, you know, 20 products that were used at the shipyard that have been identified over and over and over and over again, by literally hundreds or maybe even thousands of witnesses... it would be [their] duty to say [to the client], 'these are the following products that have been used at that job site. Do you recall any of these?'" Id. Nevertheless, Baron insists:

that he does not condone the Terrell memo. "I would never sanction any of our people using a written document like that to give to a client, because it can be misinterpreted a million ways," he says. "That's number one. So, we don't use written material when we prepare clients. Number two, there are some statements that are in there, that, if taken out of context, are awful... I think that if you literally read some of the words in there, it sounds like she is telling a witness to say something that might not be true."

See Toxic Justice, supra note 55.

[FN420]. Toxic Justice, supra note 55.

[FN421]. Id.

[FN422]. Robert Traver, Anatomy of a Murder 35 (1958).

[FN423]. Id. at 25.

[FN424]. Id. at 30-32.

[FN425]. Id.

[FN426]. Id. at 7.

[FN427]. Id. at 34-48.

[FN428]. In Anatomy of a Murder, during the accused's first meeting with his attorney, the attorney quickly realizes that the only possible defense his client has is to plead insanity. Id. at 46-49. In order to have a successful insanity defense, the facts needed to bear out that the man was insane at the time of the incident, and the facts that the client was disclosing did not support that contention. Id. at 45-46. Therefore, before eliciting the remaining salient facts from his client, the lawyer delivers "the Lecture."

And what is the Lecture?

The lecture is an ancient device that lawyers use to coach their clients so that the client won't quite know he has been coached and his lawyer can still preserve the face-saving illusion that he hasn't done any coaching. For coaching clients, like robbing them, is not only frowned upon, it is downright unethical and bad, very bad. Hence the Lecture, an artful device as old as the law itself, and one used constantly by some of the nicest and most ethical lawyers in the land. "Who me? I didn't tell him what to say," the lawyer can later comfort himself. "I merely explained the law, see." It is good practice to scowl and shrug here and add virtuously: "That's my duty, isn't it?"

Verily, the question, like the expert lecturing, is unchallengeable.

Traver, supra note 422, at 35. The attorney then proceeds to "explore the absorbing subject of legal justification and excuse" with his client, systematically ruling out each legal defense as he goes, until he finally broaches the defense of insanity:

"Then finally there's the defense of insanity." [The attorney] paused and spoke abruptly, airily: "Well, that just about winds it up." [He] arose as though making ready to leave.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

"Tell me more."

"There is no more." [The attorney] slowly paced up and down the room.

"I mean about this insanity."

"Oh, insanity," [he] said, elaborately surprised. It was like luring a trained seal with a herring. "Well, insanity, where proven, is a complete defense to murder.... Our law requires that a punishable killing-in fact, any crime-must be committed by a sapient human being, one capable, as the law insists, of distinguishing between right and wrong. If a man is insane, legally insane, the act of homicide may still be murder but the law excuses the perpetrator."

[The attorney's] naïvete was somewhat excessive; it had been obvious to [him] from merely reading the newspaper the night before that insanity was the best, if not the only, legal defense the man had. And here [he'd] just slammed shut every other escape hatch and told him this was the last. Only a cretin could have missed it....

Id. at 45-6.

On this note, the attorney wraps up the Lecture, and turns the floor over to his client, who - not surprisingly-takes the cue:

"Maybe," [the client] said, "maybe I was insane... I-I guess I blacked out. I can't remember a thing after I saw [the victim] standing behind the bar that night until I got back to my trailer."

"You mean -you mean you don't remember shooting him?" [The attorney] shook [his] head in wonderment.

"Yes, that's what I mean."

"You don't even remember driving home?"

"No."

"You don't even remember threatening [the victim's] bartender when he followed you outside after the shooting-as the newspaper says you did?" [The attorney] paused and held [his] breath. "You don't remember telling him, 'Do you want some, too, Buster?'?"

The smoldering dark eyes flickered ever so little. "No, not a thing."

"My, my." [the attorney] said, blinking [his] eyes, contemplating the wonder of it all. "Maybe you've got something there."

The Lecture was over; [the attorney] had told [his] man the law; and now he had told [the attorney] things that might possibly invoke the defense of insanity. It had all been done with mirrors. Or rather with padded hammers.

Id. at 46-7.

[FN429]. Whether witness preparation procedures as practiced at Baron & Budd and, according to Baron, at most law firms representing asbestos plaintiffs, have become widely acceptable in general litigation practice is an question that is beyond the scope of this article. For discussion of whether these practices are widespread, see Roger C. Crampton, Lawyer Ethics on the Lunar Landscape of Asbestos Litigation, 31 Pepp. L. Rev. (forthcoming 2003) (stating that "[i]n the absence of ethics opinions, disciplinary decisions and cases involving judicial sanctions dealing with improper coaching as an ethics violation, patterns of 'aggressive' coaching are prevalent in many sectors of the litigation bar"). In this article, a few passing words will have to suffice. It may well be that the scholars who gave their imprimatur to the Script Memo, see supra note 402, reflect a changed perception in the profession as to where the line is to be drawn. More important than scholars drawing lines is what actually goes on inside lawyers' offices. Whether the Baron & Budd way reflects litigation practices generally will have to be grist for someone else's mill.

[FN430]. As I have previously indicated in writing about the Script Memo, I was retained by Raymark, an asbestos defendant at the time the Script Memo was the subject of inquiry, to provide an expert's affidavit. In that affidavit, I expressed the opinion that the Script Memo suborned perjury and violated Texas law and ethics rules. Other legal ethics scholars have offered differing views.

[FN431]. Toxic Justice, supra note 55.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                          Page 117

31 Pepp. L. Rev. 33

(Cite as: 31 Pepp. L. Rev. 33)

[FN432]. Id. Baron has also argued that even if the memo does suborn perjury, subornation of perjury is not against the law in Texas. Homefryin', supra note 401.

[FN433]. Toxic Justice, supra note 55. The paralegal, Lynell Terrell, signed an affidavit in which she took sole responsibility for writing the memo. Affidavit of Lynell Marian Terrell, McCray v. Owens-Corning Fiberglas Corp., No. 95-3109-A (Tx. Dist. Ct.) (on file with author).

[FN434]. Toxic Justice, supra note 55. The Dallas Observer reported that
In courts around the state, Baron and his lawyers defended the memo, claiming it was a one-of-a-kind document produced solely by Terrell.... "If there was an epidemic, we would have found evidence that other people were using this document, or... that other people were using documents at all or doing anything. No evidence at all. Period. None."
Id.; see also Disclosure of Baron & Budd Memo Sparks Ethics Dispute, 1997 Andrews Asbestos Litig. Rep. 36521 (1997) (noting that Fred Baron "says that his investigation of the document has revealed that the paralegal may have used the document in her preparation of approximately 110 clients" and that neither the paralegal's supervisor nor any of the Baron & Budd partners had ever seen the document before its [inadvertent] disclosure). Furthermore, in a hearing in Butler County, Ohio, a lawyer for Baron & Budd stated "[L]et me tell the court two things. Number one is we never did it; and number two, there is no evidence, direct or indirect, that we did it." Transcript of Hearing at 20, Abner v. A-Best Prods. Co., (Ohio Ct. Com. Pl 1997) (No. CV-86-01-0180).

[FN435]. Script Memo, supra note 402.

[FN436]. See Enough to Make you Sick, supra note 66, at 3. As is typical in asbestos litigation, the firm's forty percent share of settlements is applied to the gross recovery before recruitment expenses are deducted. All such expenses are charged against the client's share of settlements. Id. at 1. The estimate of the number of claims processed each year by the firm, including its affiliates, is based upon an examination of claims filed with various bankruptcy trusts.

[FN437]. See, e.g., Homefryin', supra note 401. For Baron & Budd's response to one of these articles, see Fred Baron's statement on the firm's web site at http://www.baronandbudd.com/News/record_straight.shtml (last visited Nov. 10, 2003).

[FN438]. See Homefryin', supra note 401; see also Toxic Justice, supra note 55 ("In affidavits submitted to authorities, Terrell [who, according to Baron & Budd was the sole author of the Script Memo] and others in Baron & Budd's employ have stated that Terrell gave her memo to about 200 Baron & Budd clients."). During the course of its investigation, the Dallas Observer obtained copies of sealed court documents from a proceeding in Travis County, Texas that listed the names of Baron & Budd clients whose actions were pending in Travis County, Texas, who may have received the Script Memo or been in some way "improperly coached for their depositions." Control Freak, supra note 418. In early June of 1998, Dallas Observer reporters traveled to Alabama to interview those Baron & Budd clients who resided in Alabama and who were on the sealed list of clients that the firm produced in response to Judge Dietz's order in Travis County. See Transcript of Hearing at 10, 21, 23, Brown v. Keene Corp. (Dist. Ct. 1998) (testimony of Christine Biederman) [hereinafter Biederman Transcript]. As part of their investigation, reporters also interviewed a number of former Baron & Budd employees regarding use of the Script Memo and other tactics employed by the firm. See Homefryin', supra note 481.

[FN439]. An appellate court reversed the trial court and prohibited further discovery regarding the Script Memo.

[FN440]. Toxic Justice, supra note 55.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33

31 Pepp. L. Rev. 33

(Cite as: 31 Pepp. L. Rev. 33)

[FN441]. Id. The former employees informed reporters that the Script Memo "was not truly an aberration, but a written example of how the product-identification staff works at Baron & Budd." Id.

[FN442]. Id. According to the Dallas Observer, Ms. Bruton admitted that she sent her memo to the majority of the clients she was assigned:
In a handwritten memo dated August 26, 1993, and addressed to several Baron & Budd attorneys, Bruton writes that she gives the attached "study sheet" to "all my clients who can read [and] ask them to be familiar [with] the information for their deposition." The attached two-page "study sheet" gives essential information on different types of asbestos products, from pipe covering to gaskets, and, most important, when each product might have released dust that the worker could have inhaled.
Id. (alterations in original).

[FN443]. Id. When questioned about these notes by Dallas Observer reporters, Baron responded, "'Did it originate at Baron & Budd? No doubt, it did.... Was it taken completely out of context? Absolutely. Listen--it's authentic. It's her handwriting... but Angelyn would be delighted to tell you what she meant when she wrote it.'" Id.

[FN444]. Id. (last alteration in original). These notes, which were taken at Baron & Budd training sessions, appear to weaken Baron's assertions that "neither Terrell's nor Schmid's documents were authorized by the firm," and that the Script Memo was an aberration created by a "rogue" paralegal. Id. However, As the Observer explained, Baron asserts that the documents supplied to the Observer were taken out of context, that the matters they touch upon are not important to asbestos litigation, and that his associates observe strict ethical and legal standards and counsel their clients to tell the truth. Coaching clients to give set answers to critical questions in their lawsuit is 'absolutely' permissible, he says, and attorneys who fail to do so are guilty of malpractice. Id. Indeed, according to the Dallas Observer, of the twelve former clients that they interviewed, "none said he believed he was improperly coached." Id.

[FN445]. Toxic Justice, supra note 55; see also Handwritten interoffice memorandum, Baron & Budd, LLP, Prep-Sam (undated) (on file with author) (emphasis added). This memorandum states:
When did you first notice: can be early (mid-70s) but you didn't realize it was related to asbestos exposure.
When did you first learn generally asbestos was harmful to your or anyone else's health.
[E]xplain assumption of risk
Warn [plaintiff] not to say you were around it --even if you were--after you knew it was dangerous.
[P]ersonal you found out harm when Dr. told you...
Id. at 1 (emphasis added).
[N]ame that product . . .
[P]icture books-show client filled out sheet showing what [plaintiff] picked out, get him to agree he picked out, she wrote down & this is it.. ..
When was the last time you were exposed to asbestos-
[Plaintiff]says he was exposed until late 80s - caution him to say no only until mid-late 1970s.
Id. at 1, 3. A number of statements in other office memoranda also relate to this point:
My witness indicated that packing is kept in the boxes (with the manufacturers' names on them, of course), because if the packing was otherwise out of the box it would pick up dust and dirt, thus contaminating the packing and rendering it unusable. This is a good angle to prep your witness with, so that when the defense lawyer asks the plaintiff if he can tell the difference between packings when they are out of the box, the witness can explain that they rarely are out of the box for this reason.
Interoffice Memorandum from Scott Hendler to Sam Richard, Angelyn Schmid, Jennifer Curry, Baron & Budd, LLP (Aug. 29, 1993) (on file with author).
From 1963 until 1975, Harbison Walker manufactured a refractory cement under the brand name "Micacrete." In

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                   Page 119

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

Work History Sheets and in Pretrials, this product has been misidentified as a firebrick. We must correct this error in future Work History Sheets beginning immediately. The deposition attorney should correct this mistake in cases where it pops up in deposition. The attorney should make it clear on the record that we, rather than the client, mislabelled [sic] this product as a firebrick. Harbison Walker denies that any of their firebrick ever contained asbestos, and now refuses to pay on any cases in which only their firebrick products are ID'd. It is therefore critically important that Micacrete be listed on Work History Sheets and in Pretrials whenever we can get ID, and that we and the client correctly identify Micacrete as a cement, not a firebrick.
Interoffice memorandum from Jeffrey to PID Dept., Baron & Budd, LLP (Aug. 2, 1994) (on file with the author).
Please distribute to your product i.d. department the following information with respect to Foster Wheeler boilers.
Morton International, Mosspoint, MS-National Gypsum Plant, Mobile, AL - No Foster Wheeler boilers present
Please be sure not to list Foster Wheeler as a boiler present at these jobsites as I have found out from Foster Wheeler that they do not have boilers at those sites.
Interoffice memorandum from Sarah Clark to Gloria McCurdy, Baron & Budd, LLP (June 29, 1994) (on file with author).

[FN446]. See Interoffice memorandum, Baron & Budd, Dep Prep, (undated) (on file with author).

[FN447]. There is also some evidence of the dimensions of the potential threat perceived by the firm. At a criminal contempt proceeding that the firm had initiated as part of its attack against William Skepnek, one of three lawyers most active in seeking to undertake discovery with regard to the origin and use of the Script Memo, see infra note 402, Lisa Blue, Fred Baron's wife and also an attorney representing the firm at the proceeding, stated that Skepnek "has done everything he could to ruin our law firm." See Transcript of Hearing at 10, Forrest v. Owens-Corning Fiberglass Corp., (Tex. Dist. Ct. 1998) (No. 97-08803-F). Baron & Budd also tried to derail the Dallas Observer's investigation of the firm's practices. According to the Dallas Observer:

[FN448]. lb;Baron] bullie[d] the Observer's every effort to investigate his firm's practices, even taking the newspaper to court to discover sources, in a pattern of intimidation and paranoia such as the Observer has never experienced before.
Baron did just about everything he could to interfere with the Observer's reporting and badger its sources, despite his protestations that Baron & Budd is the cleanest, most ethical shop in the country, and that he has nothing to hide.
[Among other things, Baron] [s]ent a letter demanding that the Observer immediately stop speaking to former Baron & Budd employees--despite these individuals' rights to free speech--and threatening legal action if we didn't. The ham-handed missive... displays a stunning ignorance of the First Amendment.... The scent of intimidation wafts from his letter.
Control Freak, supra note 418. One month after Dallas Observer reporters had traveled to Alabama to interview Baron & Budd clients whose names were on the list of Baron & Budd clients with cases were pending in Travis County, a reporter for the newspaper appeared before Judge Deitz seeking to quash a subpoena from the firm requiring it to identify those who had provided the newspaper with copies of the firm's documents. See Biederman Transcript, supra note 438, at 3-4. She stated that the newspaper's confidential sources were afraid "of retaliation, of ruination of careers and being hounded to the ends of the earth ...." Id. at 8.
See, e.g., In re Brown, No. 03-97-00609-CV (Tex. Ct. App. 1998) (per curiam) ("Asbestos defendants across the country, including those in this case, immediately requested production of the Memo in all cases in which it was used.").

[FN449]. For discussion of the crime-fraud exception to the attorney-client privilege that attaches to confidential communications between attorney and client, see infra note 453.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                       Page 120

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN450]. See Homefryin', supra note 401 ("Baron & Budd has consistently argued that talking to former employees about witness coaching violates the principle that communications between lawyers and their clients are confidential--the so-called attorney-client privilege."). The Script Memo itself contains language designed to establish that the contents are privileged. Specifically, it states "Any other notes, such as what you are reading right now, are 'privileged' and should never be mentioned." Script Memo at 12, supra note402.

[FN451]. In Travis County (Austin), Judge Dietz conducted "an in camera examination of certain documents for which the plaintiffs claim a privilege from production... [and] a representative of the law firm of Baron & Budd regarding the [memo's] creation and use," and determined that the memo was not protected from discovery under attorney-client privilege or the attorney work product doctrine. Brown v. Keene Corp., No. 93-10952 (Tex. Dist. Ct. 1997). As a result of this ruling, Baron & Budd had to produce, under seal, a list of all of the cases pending in Travis County involving plaintiffs who were prepared for their deposition using the Script Memo. See id. This list was apparently among those documents that the Dallas Observer obtained. See supra note 438. The Court of Appeals stayed and later reversed the trial court decision. See infra note 452. Similarly, a judge in Bexar County (San Antonio) allowed discovery to proceed and held that the Script Memo was not protected by the attorney-client privilege or the work product doctrine. In re All Asbestos-Related Personal Injury or Death Cases Filed or To Be Filed in Bexar County, Texas, No. 94-CI-10078 (Tex. Dist. Ct. 1997). For more information on the trial court's decision in the Bexar County case, see infra note 453.

[FN452]. Baron & Budd immediately appealed Judge Dietz's order in the Travis County case, arguing that Judge Dietz had abused his discretion when he determined that the memo was not a privileged attorney-client communication. See Baron & Budd Asks TX APP. CT. To Overturn Document Production Order, 1997 Andrews Asbestos Litig. Rep. 36625 (1997). On October 14, 1997, just six days after Judge Dietz allowed discovery to proceed, the Texas Court of Appeals stayed Dietz's order pending its own determination on the question of privilege. See Defense Effort to Stay Baron & Budd Cases Stalls, 1997 Andrews Asbestos Litig. Rep. 36545 (1997); TX Judge Finds Baron & Budd Document Not Privileged, Stays Action, 1997 Andrews Asbestos Litig. Rep. 36568 (1997). Subsequently, on January 29, 1998, the Court of Appeals conditionally granted a writ of mandamus and ordered the trial court to vacate its order allowing discovery and sustain the claim of attorney-client privilege. In re Brown, No. 03-97-00609-CV (Tex. Ct. App. 1998). In its decision, the court held that the memo was "protected by the attorney-client privilege as a confidential communication" and concluded that "the trial court abused its discretion by finding that the memo was not confidential." Id. This opinion was later withdrawn on March 24, 1998. In re Brown, No. 03-97- 00609-CV (Tex. Ct. App. Mar. 24, 1998). A new, virtually identical per curiam opinion was filed on April 30, 1998. In re Brown, No. 03-97-00609-CV (Tex. Ct. App. 1998). The only substantial difference between the two opinions was that the latter included a paragraph that referenced a San Antonio Court of Appeals decision, see infra note 451, which was itself later withdrawn. See id. Another panel of the Texas Court of Appeals reversed the trial court's decision in the Bexar County Case. In re Baron & Budd, P.C., No. 04-98- 00010-CV (Tex. Ct. App. Apr. 22, 1998) withdrawn, May 22, 1998. For more details on the Texas Court of Appeal's actions, see infra note 454.

[FN453]. In re All Asbestos-Related Personal Injury or Death Cases Filed or To Be Filed in Bexar County, Texas, No. 94-CI-10078 (Tex. Dist. Ct. 1997). As codified in Texas, the crime-fraud exception to attorney-client privilege bars the privilege from attaching "[i]f the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud." TEx. R. Evid. 503(d)(1); see also In re Monsanto Co., 998 S.W.2d 917, 933-34 (Tex. Ct. App. 1999) (establishing that "the party seeking the disputed documents" must assert the exception to the privilege and must offer prima facie proof of a fraud that was ongoing or imminent when the document was created). Thus, in the Bexar County case, Judge Penden concluded that "[t]he deposition script is not protected from discovery by the attorney client privilege or attorney work product doctrine, or any other privilege... because it also evidences a plan to commit a crime or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

fraud within the meaning of Texas Rule of Civil Evidence 503(d)(1)..." The judge ordered Baron & Budd to produce a list of all plaintiffs in the county who received or saw "all copies of any version" of the memo as well as other information and documentation regarding the firm's use of the memo. In re All Asbestos-Related Personal Injury or Death Cases Filed or To Be Filed in Bexar County, Texas, No. 94-CI-10078 (Tex. Dist. Ct. Dec. 29, 1997).

[FN454]. In re Baron & Budd, P.C., No. 04-98-00010-CV (Tex. Ct. App. Apr. 22, 1998), withdrawn, May 22, 1998. The court explained that
Although the defendants' cite federal cases contending that fraud by the attorney creates an exception, Texas cases hold that the client must be contemplating the commission of a fraud or crime or the client must have obtained the attorney's services to enable or aid in the commission of a fraud.
Id. Thus, the Texas Court of Appeals essentially adopted the argument set forth by an expert retained by Baron& Budd:
[T]he crime-fraud exception to the attorney-client privilege only applies when the client is seeking help in committing crime or fraud, regardless of whether the lawyer is a willing accomplice or an innocent dupe.... there was no evidence whatsoever that [a client] had approached the Baron & Budd law firm with a criminal plot to defraud the defendants in mind...
Hodes, supra note 419, at 1351 n.51 (citation omitted). One justice, however, dissented, stating that "[t]he evidence amply supports Judge Peden's finding that no privilege attached to the Deposition Script because of the crime/fraud exception and 'for all other reasons raised by Defendants.'" In re Baron & Budd, P.C., No. 04-98-00010-CV (Tex. Ct. App. Apr. 22, 1998)(Green J., dissenting), withdrawn May 22, 1998. Justice Green believed that "[s]uch a holding is an anathema to the purpose of the lawyer disciplinary rules, but also, the rules of evidence do not provide any safe harbor for such illegal conduct." Id. A majority of the court of appeals may have found some merit in Justice Green's dissent. On May 12, 1998, the en banc court, sua sponte, ordered en banc reconsideration of the panel's opinion and order. In re Baron & Budd, P.C., No. 04-98-00010-CV (Tex. Ct. App. May 12, 1998). See also infra note 456.

[FN455]. In re Baron & Budd, P.C., No. 04-98-00010-CV (Tex. Ct. App. 1998).

[FN456]. In re Baron & Budd, P.C., No. 04-98-00010-CV (Tex. Ct. App. 1998) (withdrawing the previous panel opinion and vacating Judge Peden's order as moot since Raymark had declared bankruptcy and the other defendants had settled and withdrawn their discovery requests). At the time of the original Court of Appeals decision, Baron & Budd appeared to be vulnerable to attempts to invoke discovery with regard to the origin and use of the Script Memo; however, in short order, all attempts at such discovery had been turned back by the courts. At that point, the appellate court in Bexar County withdrew its decision.

[FN457]. Transcript of Hearing at 16, Rice v. Owens-Corning Fiberglass, (Tx. Dist. Ct. 1997) (No. 96-06277 -B).

[FN458]. Allen Pusey, Judge's Halt of Asbestos Cases Involving Dallas Firm Overturned, DALLAS MORNING NEWS, October 4, 1997, at 35A. Prior to that, Justice Thomas of the Court of Appeals had granted an emergency stay of Judge Marshall's order only hours after it had been issued. See Homefryin', supra note 401.

[FN459]. Transcript of Hearing at 34, Manchie v. Owens-Corning Fiberglas Corp., No. 96-06398 (Tx. Dist. Ct. 1998) (No. 96-06308). Specifically, in a hearing regarding the defense's motion to disqualify Baron & Budd from the case, Judge Marshall said:
There has been wordsmithing and maneuvering throughout this matter as long as this Court has been involved in this particular issue which has been some months. It is time for the maneuvering and wordsmithing to come to an end, whether it's in this case or in any of the other cases before this court, or indeed, to be perfectly candid, whether

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33

Page 122

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

we're talking Austin or San Antonio or Timbuktu.

The mere creation and possible use of such a document in a court proceeding, particularly allegedly by a legal assistant employed by [a] prominent law firm and then utilized in whole or in part either by attorneys or other legal assistants within that law firm, is such an affront to the integrity of the judicial system... that the use or nonuse of that document in a particular case or a particular court is of no moment to us today.

The court is of the opinion that the only proper course of action at this point, given the potential as has been pointed out by counsel for perjurious testimony to have been generated by this, however unintended, is for this matter and the record of this hearing to be submitted to the Dallas County Grand Jury for its consideration.

Id. at 33-34. Shortly thereafter, Judge Marshall recused himself from 150 asbestos related cases brought by Baron & Budd, saying that it was "the only proper thing to do" after referring the matter to the grand jury. Tim Wyatt, State Judge Withdraws From 150 Asbestos Cases, Cites Request for Inquiry, Dallas Morning News, Feb. 14, 1998, at 31A.

[FN460]. See infra notes 463-464; see also Homefryin', supra note 401 (explaining that there was no one left to press forward on the memo or the pending appeals); Testimony of William Skepnek at 52, In re William Skepnek (Tex. Dist. Ct. 1998) ("Once they ran Raymark out of business, well, then I didn't have a client to represent anymore. I didn't have anybody who could take this matter up to the Texas Supreme Court.").

[FN461]. See Abner v. Elliot, 706 N.E.2d 765, 767 (Ohio 1999). In a series of unpublished orders from September to December of 1997, Judge Ted Elliott of the Court of Common Pleas, Butler County Ohio, where the firm had filed a number of asbestos lawsuits, ordered Baron & Budd to allow discovery "respecting allegedly improper preparation or coaching of witnesses" and permitted the defendants to re-depose any previously deposed witness. Id. Judge Elliott further provided for in camera review of any purportedly privileged documents. Id. After a failure by plaintiffs to either permit discovery or submit the requested information for in camera review, Judge Elliott ordered sanctions against plaintiffs on the basis that the Script Memo "constituted evidence of improper coaching of prospective deponents..." Id.

After a failed attempt by the plaintiffs to appeal the non-appeallable discovery orders and sanctions, plaintiffs filed a writ of prohibition against Judge Elliott to prevent him from enforcing his orders. Id. at 768. Both the Ohio Court of Appeals and the Supreme Court of Ohio found the writ to be an extraordinary remedy inapplicable to Judge Elliott's rulings. Id. at 769. Both courts refused to prevent the discovery, holding that the plaintiffs would have an adequate remedy on appeal. Id. The Ohio Supreme Court recognized, and dismissed, the split between their ruling and those of Texas courts in similar cases, finding that "res judicata [was] not a basis for prohibition..." and could be effectively raised on appeal. Id. at 770.

[FN462]. See, e.g., Homefryin', supra note 401 ("To a degree many say puts Baron & Budd in its own league, the firm went after those who took issue with the memo."). Additionally, Judge Marshall, who referred the Script Memo to the Dallas County District Attorney for a criminal investigation, see supra note 459, and who ran unopposed in 1992 and 1996, was not re-elected in 2000. Id. "Baron urged a Dallas trial lawyers group to target the judge with campaign money, enlisting the firm's lawyers in his cause. Campaign records show Baron & Budd was an early donor to Marshall's opponent, Mary Murphy, who said Baron was one of the first to urge her to run." Id. According to the Dallas Observer:

[s]everal lawyers interviewed... said Marshall's defeat sent a signal that it's hazardous to threaten Baron & Budd. "If I liked my comfortable seat on the bench, I'd think twice about ruling against them on these things," [quoting an unnamed attorney]...Says another who was close to the memo case, "No judge in Dallas will cross Baron & Budd after what happened in that election. They are scared to death...."

Id.; see also Thomas Korosec, Bench Press, Dallas Observer, Mar. 9, 2000, available at http://www.dallasobserver.com/issues/2000-03- 09/feature.html/1/index.html.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN463]. As a consequence of "stepped up asbestos litigation" against the lawyers' clients, Borg-Warner and W.R. Grace were soon forced to negotiate settlements with the firm, which apparently included dispensing with the services of both Pfifer and Thackston. See Homefryin', supra note 401. Pfifer stated that she had "never seen anything like them in [her] 17 years of practice." Id. ("'Everyone understood that if we took them on, they would go after our clients.' She said she just didn't realize how effective Baron's firm could be or that the lawyers themselves would be made to pay."). Thackston had been G.R. Grace's most successful outside asbestos counsel, having lost only one case for them. Nonetheless, after the stepped up litigation, Grace stopped assigning cases to Thackston. Telephone Interview with William Thackston (June 9, 2003) (notes on file with the author).

[FN464]. See, e.g., Homefryin', supra note 401 (stating that in April 1998, Raymark filed for bankruptcy and Skepnek lost his client).

[FN465]. See supra note 447.

[FN466]. According to Skepnek, Baron & Budd filed in excess of 3,000 claims against Raymark in one year. See Testimony of Willam Skepnek, supra note 460, at 9.

[FN467]. Id. at 36. Skepnek estimated that approximately 90% of the claims filed in Texas by Baron & Budd "had nothing to do with Texas." Id. Despite the lack of a connection to the state of Texas, these claims could nonetheless be filed there pursuant to Texas's former, and exceptionally broad, "long-arm" Statute, which authorized jurisdiction over non-residents who were "doing business" in Texas. TEX. CIV. PRAC. & REM. CODE ANN. §§ 17.041-17.045 (Vernon 1986 & Supp. 1993). Moreover, until 1997, Texas state law favoring plaintiff asbestos lawyers precluded dismissal of these claims under the doctrine of forum non conveniens. TEX. CIV. PRAC. & REM. CODE ANN. § 71.051(f)(5) (1997) ("A court may not stay or dismiss an action [under the doctrine of forum non conveniens]... in an action in which it is alleged that harm was caused by exposure to asbestos fibers."); see also Testimony of William Skepnek, supra note 460, at 38-9. Skepnek testified before the Grand Jury that there was also a "practical reason" for Baron & Budd's choice to file the out-of-state cases in Texas: to make it more difficult for the defendants to build a defense by impeding their access to records, job sites, and witnesses. Id. at 36-37.

[FN468]. Id.

[FN469]. Id. Skepnek testified that, due to the huge volume of claims being filed against Raymark, he trained his staff to file the appropriate response and stamp his signature on it. See Testimony of William Skepnek, supra note 460, at 9-11.

[FN470]. Id. at 10-11. In order for a court's jurisdiction to be constitutionally valid the defendant must have "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). If a defendant believes that there are insufficient contacts with the forum state to meet this constitutional threshold, the party can make a special appearance to object to personal jurisdiction without arguing the case on the merits and risking an adverse judgment. See, e.g., Tex. R. Civ. P. 120; see generally E. Wayne Thode, In Personam Jurisdiction; Article 2031B, The Texas "Long Arm" Jurisdiction Statute; and the Appearance to Challenge Jurisdiction in Texas and Elsewhere, 42 Tex. L. Rev. 279 (1964). For the complete argument against the Texas courts' personal jurisdiction over Raymark, see Brief in Support of the Special Appearance of Raymark Corporation and Raymark Industries, Mynatt v. Owens-Corning Fiberglas Corp., No. 97-1879 (Tx. Dist. Ct.) (No. 97-1879).

[FN471]. See, e.g., Skepnek v. Mynatt, 8 S.W.3d 377, 379 (Tex. Ct. App. 1999).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN472]. See id.

[FN473]. Id.

[FN474]. See Testimony of William Skepnek, supra note 460, at 17, 35. Specifically, many of Raymark's records were placed in a storage facility at a substantial cost. In early 1995, Cobb determined that given the small likelihood of Raymark ever coming out of bankruptcy or needing the records and the economic hardship faced by the company, the substantial cost of storage was not economically practical. Id. at 35. Therefore, he decided to stop paying the storage fee and the records were placed in dumpsters and removed by the storage company. Dep of James Frances Cobb, Taken on Aug. 5, 1997 at 14-16.

[FN475]. Testimony of William Skepnek, supra note 460, at 17.

[FN476]. Id. at 17 ("What we know is that throughout this period of time, Fred Baron... had all these records and he knew all of these facts about where Raymark was licensed..."). Moreover, Mr. Skepnek testified that:
Baron and Budd... were suing Raymark in 1975 to 1989, and during that period of time Baron and Budd knew all this stuff that Raymark didn't really know anymore because Raymark had gone out of business and lost all of its records.... Baron and Budd knew all along Raymark had been licensed all that period of time in Texas.
Id. at 28

[FN477]. Id. at 25. According to Skepnek, Baron & Budd first "talk[ed] about inaccuracies in the affidavit" in September 1997, but did not at that time claim that the affidavit was perjured. Id.

[FN478]. See Skepnek v. Mynatt, 8 S.W.3d 377, 379 (Tex. Ct. App. 1999). Even if Baron & Budd did not have actual knowledge of the license until that time, they certainly were aware of the error from that point forward. See id.

[FN479]. See Transcript of Hearing at 34, Manchie v. Owens-Corning Fiberglas Corp., No. 96-06308 (Tx. Dist. Ct. 1998) (No. 96-06308).

[FN480]. Homefryin', supra note 401 (Baron & Budd "filed contempt motions against him in 165 courts across Texas alleging he had knowingly produced a perjured affidavit by a Raymark official about the extent of its business in Texas."); Testimony of William Skepnek, supra note 460, at 21 (Baron & Budd "buried me all at one time with 168 sanctions motions that were a stack of boxes probably three or four feet high that went all the way down that wall.").
Baron & Budd have explained the suspect timing of their motions by asserting that they filed them days after Skepnek filed another special appearance using the same affidavit from Cobb. See Skepnek, 8 S.W.3d at 380. In his testimony before the Grand Jury, Skepnek acknowledged that he filed a special appearance with the Cobb affidavit in February 1998, after he discovered that Raymark had, in fact, been licensed to do business in Texas. See Testimony of William Skepnek, supra note 460, at 18-19. He explained that, at the time, he was conducting Raymark's defense in thousands of cases and trying the Script Memo issues in numerous other courts, so he did not think to go back through the three page affidavit and determine exactly what was incorrect. Id. at 19. Furthermore, he explained that finding and correcting the error in the affidavit was not necessary for two reasons. First, it was "not, as a matter of law... an important fact.... [and] [w]hether Raymark was licensed to do business in Texas for a five-or four-year period of time in the early '80s would not affect the outcome of [the] motion." Id. Second, the Cobb affidavit was hearsay, which could not be relied upon by the court at trial. Therefore, the statements in the affidavit would have to be supplemented by deposition testimony or live testimony at a hearing, which would correct the error. Id. at 21-23.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                    Page 125

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN481]. Regarding the hardship he incurred as a result of having to defend himself against the charges levied by Baron & Budd, Skepnek testified as follows:
I'll tell you, I feel like one of these asbestos defendants. You know, they file hundreds of claims against you and just the cost of defending hundreds of claims takes me--I mean, I have to hire lawyers to do it and I have to come take time away from myself and travel great distance out of my own pocket to defend myself on just hundreds of claims....
Testimony of William Skepnek, supra note 460, at 54. He also stated that he had probably spent over $100,000 of his own money on his defense. Id. at 61.

[FN482]. The Dallas Observer calculated in March of 2001 that Skepnek "was eventually fined $150,000 but has whittled that down to $30,000 after appeals." Homefryin', supra note 401. A trial court judge in Austin fined Skepnek $110,000 and threatened him with further fines if he unsuccessfully appealed the decision to the Texas Appellate and Supreme Courts. Flannagin v. Owens-Corning Fiberglas Corp., No. 95-10501 (Tex. Dist. Ct. 1998) (No. 95- 10501). Skepnek nevertheless appealed the decision, and the fine was reduced to $10,000. In re William J. Skepnek, No. 03-98-00388-CV (Tex. Ct. App. 1998). Similarly, in El Paso, Skepnek was fined $30,000 for filing the incorrect affidavit. Mynatt v. Owens-Corning Fiberglas Corp., No. 97-1879 (Tex. Dist. Ct. 1998). Additionally, in a number of other decisions, courts assessed attorneys fees against Skepnek and Raymark jointly and severally or simply against Skepnek alone. See, e.g., Allsep v. Owens-Corning Fiberglass Corp., No. 98-1073, slip op. (Bankr. W.D. Tex. July 15, 1998); Benson v. Owens-Corning Fiberglass Corp., No. 398-3465, slip op. (Bankr. N.D. Tex. July 17, 1998); Busby v. Owens-Corning Fiberglass Corp., No. 398-3462, slip op. (Bankr. N.D. Tex. June 4, 1998); Lambeth v. Owens-Corning Fiberglass Corp., No. 98-1014, slip op. (Bankr. S.D. Tex. July 28, 1998).

[FN483]. See Letters from William J. Skepnek to Lester Brickman (Sept. 3, 2003 & Sept. 10, 2003) (on file with author).

[FN484]. In Dallas, Baron & Budd pursued a criminal contempt motion against Skepnek in the District Court. Id. Skepnek objected to the proceeding and the fact that the motion was being prosecuted by a private prosecutor, Lisa Blue, Baron's wife. Id. Skepnek invoked his Fifth Amendment right to refuse to testify in a criminal proceeding, and the case was referred to the grand jury for investigation. Id. Skepnek met with the U.S. Attorney, the District Attorney, and the grand jury foreman. Id. There is no public record of any action having been taken. Id.
In El Paso, Baron initiated a grand jury investigation of Skepnek through the District Attorney's office, and Baron's lawyer, Alan Rich, went to El Paso to personally present the case to the grand jury. Skepnek waived his rights and testified before the grand jury, which opted not to indict. Id; see also Testimony of William Skepnek, supra note 460, at 60 ("I came down to El Paso today facing the end of my career.... Because if I'm convicted of a crime, if I'm charged with a crime and convicted with a crime as bad as perjury, I ought to not be able to practice law again.").

[FN485]. Skepnek had accepted an invitation to be part of the faculty at the Andrews Continuing Education Institute Asbestos Litigation 1998 Conference, to have been held in New Orleans on May 4-5, 1998. See Andrews Publications, Advertisement, ASBESTOS LITIGATION '(listing Skepnek as one of the faculty) (on file with author). His topic was to be "Ethical Issues in Client Preparation." Id. On April 7, 1998, he received a telephone call from Andrews withdrawing the invitation. Skepnek prepared the following transcript of that message left on his answering machine:
Hi, Good morning. This is Tom Hennessey calling for Bill Skepnek. Bill, it's Tuesday morning, 4/7/98 here, calling about the asbestos conference. Bill, I am sort of reluctant to tell you and inform you that I can't allow you to speak at the conference. The topic that we talked about is just too hot and too explosive. I have two very sound reasons for pulling the plug on the issue and the first one has to do with the fines imposed against you by that Judge

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

in Texas. I think that is pretty widely known at this point and it simply doesn't make sense, given your situation to have us featuring you as a speaker on ethics at this point. I'm sure we haven't heard the last word on those sanctions in Texas in any event. And the second point is, I'm getting a lot of flack from Baron & Budd about this issue, including threats of possible litigation aimed at Andrews if we allow anyone to discuss any privileged documents at the conference, and I simply don't see the point in getting us embroiled in your dispute at this point. We do aim to be a continuing education conference - we are not a political forum. So that's sort of the bottom line, Bill. The issue is just too sensitive at this point....

Finally, I just say, I have to apologize for this rather shabby treatment but I hope you can understand our situation here and I hope it won't interfere with our professional relationship in the future.

Thank you very much.

8:20 a.m.

See Transcript of telephone message from Tom Hennessey, Andrews Continuing Education Institute, left for William Skepnek (Apr. 7, 1998) (on file with author).

[FN486]. See Silver, Preliminary Thoughts, supra note 417, at 1401.

[FN487]. See id.; see also Hodes, supra note 419; Patricia J. Kerrigan, Witness Preparation, 30 Tex. Tech L. Rev. 1367 (1999); Bill Allison, Witness Preparation From the Criminal Defense Perspective, 30 Tex. Tech L. Rev. 1333 (1999).

[FN488]. See Silver, Preliminary Thoughts, supra note 417.

[FN489]. Homefryin' supra note 401. Korosec noted that
[Silver's] article defended the Baron & Budd's Script Memo as merely "poorly written," and turned to a lengthy discussion of Skepnek's affidavits, taking issue with him by name. Silver concluded that the media's interest in Baron & Budd, rather than Skepnek, was the outgrowth of a "propaganda war" financed by "well-organized, well-funded, smart and highly motivated" opponents of trial lawyers.
The professor's piece, however, failed to mention that Baron & Budd hired him to write an affidavit used in its coaching-memo defense. In it he argued that the firm "did more than duty required" when it stopped using the script document, which he called "awkward or clumsy rather than an effort to perpetrate a fraud."
Silver, who testified recently in California in favor of multimillion-dollar trial lawyers' fees, was one of the two ethics experts Baron says he retained to school his firm in ethics in 1998. He did not return several calls for comment.

[FN490]. Charles Silver, Symposium Issue II: Toxic Torts: Issues of Mass Litigation, Case Management, and Ethics: Article: A Critique of Burrow v. Arce, 26 Wm. & Mary Envtl. L. & Pol'y Rev. 323, 352 (2001). Silver used his failure to acknowledge his retention as a way of impugning other critics of the Script Memo. Silver criticized Walter Olson, a senior fellow at the Manhattan Institute, who had written critically of the use of the Script Memo, saying:
Walter Olson... reported that 'two University of Texas legal-ethics professors' gave Fred Baron opinions on the propriety of the witness preparation memorandum. He did not name the professors or, apparently, ask them for copies of their opinions. He certainly did not contact me, and I am one of the professors Mr. Baron consulted.
Id. at Addendum n.7. Since Baron had not publicly identified the law professors whom he had consulted, and Silver had not publicly acknowledged that he was one of the two professors, Olson presumably could not identify Silver. In this byzantine manner, however, Silver does acknowledge that he was retained by Baron & Budd to defend the use of the Script Memo. See id.

[FN491]. 958 S.W.2d 239 (Tex. Ct. App.1997).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                    Page 127

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN492]. Arce, 958 S.W.2d at 243.

[FN493]. Peter Passell, Challenge to Multimillion-Dollar Settlement Threatens Top Texas Lawyers, N.Y. TIMES, March 24, 1995, at B6.

[FN494]. Id.; Arce, 958 S.W.2d at 243.

[FN495]. See Passell, supra note 493 (describing the circumstances surrounding Skepnek agreeing to represent the plaintiffs).

[FN496]. Id. (noting that Skepnek was refused pro hac vice status and had to join the Texas bar in order to be able to continue with his representation).

[FN497]. Arce v. Burrow, 958 S.W.2d 239. 246, 248 (Tex. Ct. App.1997).

[FN498]. See Brickman, Aggregative Litigation, supra note 7, at 262, n.58 (discussing the successful effort to preclude Texas state courts from applying the Texas Rules of Professional Discipline to determine whether the fees in the tobacco litigation violated the Rules).

[FN499]. See Silver, A Critique, supra note 490, at 331.

[FN500]. See Silver, A Critique, supra note 490, at 355-56 (offering personal criticism of my critique of Baron & Budd's use of the Script Memo, yet failing to equally criticize Skepnek for engaging in sanctionable conduct). This section (VII.B) constitutes my response to Silver.

[FN501]. Silver, Preliminary Thoughts, supra note 417, at 1402.

[FN502]. Homefryin', supra note 481. No one ever deposed the paralegal who wrote the memo, her immediate supervisors, or the clients who supposedly were prepared with the memo to testify. See id. Baron does not take the position that these court decisions in his favor "'absolutely vindicate that the memo was proper,'" but he does insist that "the document cannot be evaluated properly without 'context,' and points to Terrell's sworn statement that she always orally instructed clients to tell the truth and that she never gave the memo to clients without also handing them a copy of a second article that admonishe[d] them to testify truthfully." Toxic Justice, supra note .. However, the alleged author of the memo was never made available for interviews. Even after Baron told Dallas Observer reporters "you have to know the context of how [the author] did this before you can draw a judgment," he nevertheless declined to arrange an interview. Id.

[FN503]. See Homefryin', supra note 401. G-I Holdings, the former (the former GAF Corporation, a former member of the Center for Claims Resolution (CCR), which negotiated the Georgine settlement), recently filed suit against the major plaintiff asbestos law firms asserting a number of common law fraud claims, mail and wire fraud allegations, and theories of witness tampering. Two of the counts were specifically directed at Baron & Budd because of its alleged use of the Script Memo to defraud GAF. See G-I Holdings, Inc. v. Baron & Budd, 199 F.R.D. 529 (S.D.N.Y. 2001); G-I Holdings, Inc. v. Baron & Budd, 179 F. Supp. 2d 233 (S.D.N.Y. 2001); G-I Holdings, Inc. v. Baron & Budd, 238 F. Supp. 2d 521 (S.D.N.Y. 2002); G-I Holdings, Inc. v. Baron & Budd, No. 01-0216, 2002 U.S. Dist. LEXIS 14571 (S.D.N.Y. Aug. 7, 2002); G-I Holdings, Inc. v. Baron & Budd, No. 01-0216, 2002 U.S. Dist. LEXIS 15443 (S.D.N.Y. Aug. 16, 2002); GI Holdings, Inc. v. Baron & Budd, No. 01-0216, 2002 U.S. Dist. LEXIS 19006 (S.D.N.Y. Oct. 8, 2002); GI Holdings, Inc. v. Baron & Budd, No. 01-0216, 2003 U.S. Dist. LEXIS 1107 (S.D.N.Y Jan. 29, 2003). In pursuit of those allegations, G-I Holdings sent

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

investigators to Dallas in 1999 to interview former Baron & Budd employees. G-I Holdings, 238 F. Supp. 2d 521. This attempt was thwarted when Baron & Budd obtained a temporary restraining order from a Texas judge forbidding G-I Holdings from "communicating in any manner" with former Baron & Budd employees because any information thus obtained was likely "privileged and confidential." Homefryin', supra note 401. Ultimately, U.S. District Court Judge Robert Sweet dismissed the claims based on the Script Memo because G-I Holdings, which had settled tens of thousands of claims, was unable to identify which of the claimants who had brought actions and settled their claims against G-I Holdings had been prepped for their deposition testimony using the memo. G-I Holdings, 238 F. Supp. 2d at 538-39. In his decision, Judge Sweet stated:

Holdings realleges that the Defendants used the "Baron & Budd Memorandum," entitled "Preparing Your Deposition," to manufacture evidence and coach answers from clients. This claim was dismissed from the FAC [First Amended Complaint] for lack of specificity.... [Despite adding a list of 30 claimants with whom the memo may have been] used to create false product identification testimony in the depositions... Holdings' [still] fails to allege which claimants were in which case, which claimants were actually deposed, and whether depositions were taken in the cases. In addition, Holdings still does not provide the date of a single deposition, the participating individuals, or the false identification made during the deposition. Importantly, it does not state that the deponents even viewed the Baron & Budd Memorandum.

Id. The predictable effect of Judge Sweet's ruling was to place Holdings in a classic "Catch 22" situation. Holdings was precluded by Texas court rulings obtained by Baron & Budd from interviewing former Baron & Budd employees on the grounds that this could result in the disclosure of confidential matters. Id. In addition, Holdings was precluded from directly approaching Baron & Budd clients by Texas rules of ethics, because doing so would violate rules that prohibit attorneys from approaching claimants that they know are represented by counsel. Id. (It is ironic that a principal effect of Texas rules of ethics with regard to asbestos litigation may be to insulate potential evidence of fraud from inquiry.) While Judge Sweet allowed Holdings to depose former Baron & Budd employees, it was under highly controlled circumstances and was ineffectual. See G-I Holdings, 179 F. Supp. 2d at 262-63 (dismissing Holdings' fraud allegations for lack of specificity over Holdings' objection that specific dates and times of fraudulent depositions were not available without discovery). Without the kinds of inquiries that, for example, the Dallas Observer was able to undertake, Holdings could not identify any Baron & Budd clients who had sued GAF who were prepared for deposition or trial by use of the Script Memo. Compare G-I Holdings, 179 F. Supp. 2d at 262-63 with Homefryin', supra note 401 (illustrating that the Dallas Observer's investigation was the type of investigation Holdings sought to conduct in order to substantiate its fraud claims). Holdings was similarly unable to determine if any of the 110-130 claimants who Baron & Budd had identified as being prepared using the Script Memo, and whose cases were pending in Travis County, were among the plaintiffs who had sued GAF. See Homefryin', supra note 401. Because Holdings could not identify any specific plaintiffs, it could not allege that the attorney-client privilege did not apply to protect both the client and Baron & Budd from discovery as to the use of the Script Memo because of the "crime-fraud" exception. See Tex. R. Evid. § 503 (listing the requirements of a crime-fraud exception); see also Tex. R. Civ. P. 192(c)(5) (listing exceptions to the protection of work product). It could attempt to invoke the latter to strip away the privilege only if it could first identify which Baron & Budd clients, if any, had been prepared by use of the Script Memo. Id. Since it could not do so, it could not argue the "crime-fraud" exception and could not engage in discovery that might have identified such clients because of the privilege. Id.

On September 22, 2003, G-I Holdings filed for leave to amend its complaint once again. In the proposed fifth amended complaint, GI Holdings alleged that two specific claimants were prepared using the Script Memo. Proposed Fifth Amended Complaint at PP 67-70, G-I Holdings Inc. v. Baron & Budd (S.D.N.Y. Sept. 22, 2003) (No. 01 Civ. 0216 (RWS)). One of the claimants whom GI Holdings identifies is Jimmy Wayne Embry. See id; see also supra note 409 (quoting from Mr. Embry's deposition).

Judge Sweet's dismissal of the two counts alleging fraudulent use of the Script Memo, as well as his dismissal of most of the other counts of Holdings' law suit, may be seen, from a perspective broader than simply a parsimonious application of pleading standards (which would go far to curb the litigation explosion), as expressing a high degree

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

of reluctance to preside over a trial in which the civil justice system is an unnamed defendant. Failure to dismiss Holdings' causes of action would have effectively allowed Holdings to seek to prove that a part of the civil justice system had been corrupted. The United States Supreme Court's refusal to grant certiorari in Mobil Corp. v. Gaughan, discussed supra note 17, may be seen as reflecting a similar reluctance. Had the Court granted certiorari and heard the appeal, it is likely that the Justices would have identified First, Seventh, and Fourteenth Amendment rights as the basis for any decision halting that proceeding. However, at base, such a decision might well have been widely perceived as the equivalent of an indictment of the West Virginia civil justice system.

The actions of Judge Sweet and the United States Supreme Court reinforce the view I have expressed in this article that some of the issues posed by asbestos litigation are incapable of resolution by civil justice reform. It appears that the only fora in which the issues of the production of medical evidence and client and witness testimony can be addressed is through an investigatory grand jury armed with subpoena power.

[FN504]. Silver, Preliminary Thoughts, supra note 417. Both state and federal officials investigated the firm's use of the Script Memo. Id. Regarding the Dallas County District Attorney's Office investigation, the Dallas Observer observed, "What the Observer uncovered somehow managed to elude the Dallas County District Attorney's Office, which has concluded a decidedly low-energy grand jury investigation into the circumstances surrounding a Baron & Budd witness-coaching memo...." Control Freak, supra note 418. In a letter written to Julie Lyons, the editor of the Dallas Observer, in response to the series of articles, a member of the grand jury stated that the investigation was a "'no-energy' grand jury investigation." Letter from Grand Jury Member to Julie Lyons, Editor, Dallas Observer (date unavailable) (on file with author). Dallas County prosecutors avoided becoming involved in the investigation by claiming that it had been "taken over" by the U.S. Attorney's Office. Toxic Justice, supra note 55. The Dallas Observer quoted one federal prosecutor as saying, "Because of the politics of it, they wanted to drop it, and so it ended up here." Id. It is worth noting that Baron & Budd is well-connected politically. See Amy Keller, Soft Sell, Roll Call, Mar. 18, 2002; available at http://www.fec.gov.

[FN505]. Homefryin', supra note 401 ("No one ever deposed the paralegal, her immediate supervisors or the clients who supposedly were prepared with the memo to testify.").

[FN506]. See Tex. R. Evid. § 503; Tex. R. Civ. P. § 192 (c)(5).

[FN507]. Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997).

[FN508]. Ortiz v. Fibreboard Corp., 527 U.S. 815 (1999).

[FN509]. Deborah R. Hensler, As Time Goes By: Asbestos Litigation after Amchem and Ortiz, 80 Tex. L. Rev. 1899, 1923 (2002) (suggesting that "it may well be that the most significant effect of Amchem and Ortiz was simply to keep the clock running for asbestos plaintiffs," thus giving currently unimpaired claimants the chance to sue when impairments arise); Susan P. Koniak, Feasting While the Widow Weeps: Georgine v. Amchem Products, Inc., 80 Cornell L. Rev. 1045 (1995) (criticizing the lower court's approval of the Amchem class action settlement, which had the purpose and effect of diminishing, if not eliminating, the value of claims of unimpaired future claimants unless and until they manifest in actual injury because of the conflict of interest that infected the attorneys for the class who negotiated the settlement).

[FN510]. See, e.g., Simcha David Schonfeld, Establishing the Causal Link in Asbestos Litigation: An Alternative Approach, 68 Brook. L. Rev. 379, 381 (2002) (examining the issue of liability apportionment when asbestos plaintiffs are unable to name a specific, single defendant); The Supreme Court, 1996 Term: Leading Cases, 111 Harv. L. Rev. 349, 358-59 (1997) (proposing Congressional action to apportion asbestos liability among manufacturers, not according to tort share, but according to how liable each manufacturer was for the claimant's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                                                    Page 130

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

injuries based on "the asbestos content of the products of the manufacturers, the relative risk posed by the type of asbestos included in products, and the amount of exposure related to each product")

[FN511]. See, e.g., Deborah R. Hensler & Mark A. Peterson, Understanding Mass Personal Injury Litigation: A Socio-Legal Analysis, 59 Brook. L. Rev. 961 (1993) (discussing problems with aggregating mass tort claims); Amy Schmidt Jones, The Use of Mandamus to Vacate Mass Exposure Tort Class Certification Orders, 72 N.Y.U. L. Rev. 232, 260 (1997) (exploring the difficulty faced by asbestos defendants who are forced to settle dubious claims against them in order to avoid the expense of litigation); Francis E. McGovern, The Tragedy of the Asbestos Commons, 88 Va. L. Rev. 1721 (2002) (suggesting use of a bankruptcy model to more efficiently transfer resources from asbestos defendants to plaintiffs in view of the scarcity of resources of asbestos defendants); Francis E. McGovern, Judicial Centralization and Devolution in Mass Torts, 95 Mich. L. Rev. 2077, 2080 (1997) (exploring the advantages and disadvantages of "aggregating mass tort claims"); David Rosenberg, The Causal Connection in Mass Exposure Cases: A "Public Law" Vision of the Tort System, 97 Harv. L. Rev. 851 (1984) (arguing for proportional liability in mass tort cases); Victor E. Schwartz & Rochelle M. Tedesco, The Law of Unintended Consequences in Asbestos Litigation: How Efforts to Streamline the Litigation Have Fueled More Claims, 71 Miss. L. J. 531 (2002) (discussing the unintended consequences of mass consolidations and recommending that their use be curtailed).

[FN512]. See, e.g., Henderson & Twerski, supra note 49 (discussing the invalidity of "fear of cancer claims); Samuel Issacharoff, Preclusion, Due Process, and the Right to Opt Out of Class Actions, 77 Notre Dame L. Rev. 1057, 1079 (2002) (comparing class action treatment of anticipatory "fear of cancer" claims and medical monitoring claims); Kimberly V. Rest, 'Fear of Cancer": Pennsylvania's Temporary Respite from Inadequate Compensation for Victims of Asbestos Exposure, 13 Temp. Envtl. L. & Tech. J. 319 (1994) (discussing the problems faced by juries in cases involving speculative anticipatory cancer claims).

[FN513]. RAND Report, supra note 1 (examining the trends related to the number of asbestos claims filed annually, number and type of firms named as defendants, costs of litigation, and division of compensation among claimants); Deborah Hensler et al., RAND Inst. for Civil Justice, Asbestos Litigation in the U.S.: A New Look at an Old Issue (2001) (discussing costs of asbestos litigation, bankruptcies and subsequent spread of litigation towards alternative defendants, public policy issues regarding adequate compensation for injured parties, delays in the judicial system and speculation regarding future funds availability); James S. Kakalik et al., RAND Inst. for Civil Justice, Costs of Asbestos Litigation (1983) (focusing on the money spent resolving asbestos-related claims: the money allocated by the defendants and the net compensation received by the claimants); James S. Kakalik et al., RAND Inst. for Civil Justice, Variation in Asbestos Litigation Compensation and Expenses (1984) (analyzing individual claims to explain variations in expenses borne and compensat ion received).

[FN514]. In re Joint E. and S. Dists. Asbestos Litig., 237 F. Supp. 2d 297 (E.D.N.Y. 2002); In re Joint E. & S. Dists. Asbestos Litig., 878 F. Supp. 473 (S.D.N.Y. 1995); In re Joint E. & S. Dists. Asbestos Litig., 129 B.R. 710 (E. D.N.Y. 1991).

[FN515]. See, e.g., Mark A. Behrens, Some Proposals for Courts Interested in Helping Sick Claimants and Solving Serious Problems in Asbestos Litigation, 54 Baylor L. Rev. 331, 339 (2002) (discussing the increased financial pressure on "remaining defendants" when one company seeks the protection of the bankruptcy courts due to a depleted pool of assets and the ripple effect caused by the declaration of bankruptcy through the entire business community) (quoting Christopher F. Edley, Jr. & Paul C. Weiler, Asbestos: A Multi -Billion-Dollar Crisis, 30 HARV. J. ON LEGIS. 383, 392 (1993)); Kathryn R. Heidt, Products Liability, Mass Torts and Environmental Obligations in Bankruptcy: Suggestions for Reform, 3 Am. Bankr. Inst. L. Rev. 117 (1995) (exploring the bankruptcy issues faced by mass tort defendants).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 PEPLR 33                                                                              Page 131

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN516]. See, e.g., McGovern, The Tragedy Of the Asbestos Commons, supra note 511; Francis E. McGovern, Toward a Cooperative Strategy for Federal and State Judges in Mass Tort Litigation, 148 U. Pa. L. Rev. 1867 (2000) (proposing a cooperative strategy for judges to use to resolve the cases raised by mass tort litigation in order to make the transfer of wealth through mass tort claiming in the court system more efficient, and implicitly rejecting the potential of promoting substantial fraud in mass tort claiming by such efficiency promoting methods); Richard A. Nagareda, Turning from Tort to Administration, 94 Mich. L. Rev. 899, 902 (1996) (arguing that mass tort claims should be adjudicated by administrative agencies); Briggs L. Tobin, Comment: The "Limited Generosity" Class Action and a Uniform Choice of Law Rule: An Approach to Fair and Effective Mass-Tort Punitive Damage Adjudication in the Federal Courts, 38 Emory L. J. 457 (1989) (exploring choice of law issues within federal asbestos cases involving punitive damages).

[FN517]. See, e.g., Mark A. Behrens & Monica G. Parham, Stewardship for the Sick: Preserving Assets for Asbestos Victims Through Inactive Docket Programs, 33 Tex. Tech L. Rev. 1, 8 (2001) ("properly managed [pleural registries] may provide an important partial solution to the ever-growing 'elephantine mass of asbestos cases.'") (quoting Ortiz v. Fibreboard Corp., 527 U.S. 815, 821 (1999)); Peter H. Schuck, The Worst Should Go First: Deferral Registries in Asbestos Litigation, 15 Harv. J. L. & Pub. Pol'y 541, 542 (1992) (arguing for mandatory deferral registries so that all asbestos claimants appearing before the court have actual impairments); Schwartz & Tedesco, supra note 511 (pointing out that the increase in premature asbestos filings delays recovery for victims with present impairments).

[FN518]. See In re Joint E. & S. Dists. Asbestos Litig., 237 F. Supp. 2d 297, 302 (reviewing the history of the creation of the Manville Trust as a repository for asbestos-related disease and property claims against the Johns-Manville Corporation under bankruptcy law).

[FN519]. See generally articles cited supra notes 511-517.

[FN520]. See e.g., Jones, supra note 511, at 260; Christopher R. Leslie, A Market-Based Approach to Coupon Settlements in Antitrust and Consumer Class Action Litigation, 49 UCLA L. Rev. 991, 1095 n.531 (2002) (discussing class action litigations, including asbestos cases, and how frivolous suits of dubious merit are brought by attorneys in order to collect huge fees upon settlement) (quoting Polar Int'l Brokerage Corp. v. Reeve, 187 F.R.D. 108, 120 (S.D.N.Y. 1999)); Richard A. Nagareda, The Preexistence Principle and the Structure of the Class Action, 103 Colum. L. Rev. 149, 225 (2003) (acknowledging the existence of asbestos "class members whose preexisting rights to sue are of dubious merit"); Thomas E. Willging, Mass Torts Problems and Proposals: A Report to the Mass Torts Working Group, 187 F.R.D. 328 (1999) (lamenting that asbestos defendants "suffer from delays associated with having immature claims of dubious merit").

[FN521]. See White, Asbestos Bankruptcy, supra note 120. White acknowledges that some asbestos claims are fraudulent, but then explains that "[o]ne reason why claims are still rising is that consumption of asbestos in the United States only peaked in 1974. . . [a]ssuming that the average latency period for development of asbestos disease is thirty years, the peak period of disease manifestation may be a few years in the future." Id. at 1329 (footnote omitted). In fact, the reason why the number of asbestos claims filed in the past decade has risen so precipitously is not a function of latency periods or of injury or disease manifestation. Rather, as pointed out in this article, it is mostly a function of specious claiming.

[FN522]. See, e.g., Albert Camus, The Plague (Stuart Gilbert trans., Vintage Int'l 1991) (1948) (explaining that, despite the considerable evidence that the town was overrun with thousands of rats, the government officials and residents refused to acknowledge that there was a rat problem; the consequence of the denial was to facilitate the spread of the plague).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

31 Pepp. L. Rev. 33

**(Cite as: 31 Pepp. L. Rev. 33)**

[FN523]. See supra notes 509-517.

[FN524]. See George L. Priest, The Cumulative Sources of the Asbestos Litigation Phenomenon, 31 Pepp. L. Rev. (forthcoming 2003) (emphasizing the "self-limiting and self-correcting nature of the system").

[FN525]. See generally articles cited supra notes 511-517.

[FN526]. See John O. McGinnis & Matthew Schwartz, Conservatives Need Not Apply, Wall St. J., Apr. 1, 2003, at A14.
[A]s the Anglican church was once described as the Tory Party at prayer, the legal academy today is best seen as the Democratic Party at the lectern. America splits evenly between the GOP and Democrats, but 74% of ... [law] professors [who contribute to political campaigns] contribute primarily to Democrats. Only 16% do so to Republicans.
Id. The article goes on to point out that the disparity is even higher than these numbers indicate because Republican contributing law professors are very disproportionately concentrated in two law schools.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.