# Appendix Exhibit F

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ———————————— x | : |
| | : |
| IN RE: | : Chapter 11 |
| | : |
| OWENS CORNING, et al., | : Case No.: 00-3837 to 3854 (JKF) |
| | : (Jointly Administered) |
| Debtors. | : |
| | : The Honorable John P. Fullam Has Withdrawn The Reference With Respect To This Matter [See Docket. No. 12520] |
| | : |
| | : Related to D.I. No. 12850 |
| | : |
| ———————————— x | |

**BRIEF IN SUPPORT OF MOTION OF CSFB, AS AGENT, TO ESTABLISH
PROCEDURES TO OBTAIN A SAMPLE OF MEDICAL RECORDS, INCLUDING
X-RAYS, FROM ASBESTOS PERSONAL INJURY CLAIMANTS
ASSERTING NONMALIGNANT CLAIMS AGAINST THE DEBTORS
AND TO MODIFY THE COURT'S AUGUST 19, 2004 SCHEDULING ORDER**

LANDIS RATH & COBB LLP
Richard S. Cobb (I.D. No. 3157)
Rebecca L. Butcher (I.D. No. 3816)
919 Market Street, Suite 600
Wilmington, DE 19810
        -and-
WEIL, GOTSHAL & MANGES LLP
Martin J. Bienenstock
Richard A. Rothman
767 Fifth Avenue
New York, NY 10153
        -and-
Ralph I. Miller
100 Crescent Court, Suite 1300
Dallas, TX  75201-6950
        -and-
David A. Hickerson
Peter M. Friedman
1501 K Street, N.W., Suite 100
Washington, D.C.  20005
        -and-

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
Kenneth H. Eckstein
919 Third Avenue
New York, New York 10022

ATTORNEYS FOR CREDIT SUISSE
FIRST BOSTON, AS AGENT FOR
THE BANK GROUP

Dated:  October 4, 2004

# TABLE OF CONTENTS

Page

I.   PRELIMINARY STATEMENT ........................................................................................ 1

II.  STATEMENT OF FACTS .............................................................................................. 8

    1.   The Debtors Delayed Estimation Proceedings and Concealed Their
         Internal Valuation Reports Until Now...................................................... 8

    2.   The Vasquez and Mayer Reports .............................................................. 10

    3.   The Friedman Report .................................................................................. 12

    4.   The Debtors' Concealed the Vasquez Report, the Mayer Report
         and the Friedman Report in Their Disclosure Statement......................... 17

    5.   The Johns Hopkins Study .......................................................................... 18

    6.   History Of Asbestos Litigation Relevant To This Motion...................... 20

    7.   The Debtors Are Aware that Owens Corning's Own Settlement
         History is Rife With Fraudulent Claims .................................................. 26

    8.   The Plan Proponents' Estimation Method Improperly Relies on the
         Debtors' Past Claims Payment History to Estimate Non-Malignant
         Claims ......................................................................................................... 27

III. ARGUMENT ................................................................................................................. 29

    A.   THE COURT SHOULD ESTABLISH PROCEDURES TO OBTAIN A
         RANDOM SAMPLE OF MEDICAL RECORDS, INCLUDING X-
         RAYS, SUFFICIENT TO CONDUCT A STUDY OF ASBESTOS
         PERSONAL INJURY CLAIMANTS FOR PURPOSES OF THIS
         ESTIMATION PROCEEDING................................................................. 29

    B.   THE COURT SHOULD MODIFY ITS AUGUST 19 ORDER ........................... 34

IV.  CONCLUSION............................................................................................................. 36

# TABLE OF AUTHORITIES

Page

## CASES

*Allison v. McGhan Medical Corp.*, 184 F.3d 1311 (11th Cir. 1999) ................................................33

*In re Asbestos Prod. Liab. Litig.* (No. VI), MDL 875, Admin. Order No. 8 (E.D. Pa. Jan. 14, 2002) .........................................................22

*In re Baldwin-United Corp.*, 55 B.R. 885 (Bankr. S.D. Ohio 1985) ................................................7

*In re Certain Asbestos Cases,* 112 F.R.D. 427 (N.D.Tex. 1986) ................................................33

*In re Dow Corning Corp.*, 211 B.R. 545, 596-598 (Bankr. E.D. Mich 1997) ...........................7

*In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702 (Bankr. S.D.N.Y. 1991) ...................33

*In re Enron Corp.*, 281 B.R. 836 (Bankr. S.D.N.Y. 2002) ................................................33

*Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387 (9th Cir. 2000) ................................................33

*In re Joint E. & S. Districts Asbestos Litigation*, 982 F.2d 721 (2d Cir. 1992) ...........................33

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ................................................7

*Pepper v. Litton*, 308 U.S. 295 (1939) ................................................7, 32

*In re Valley Forge Plaza Associate*, 109 B.R. 669 (Bankr. E.D.Pa. 1990) ................................32

## STATUTES AND RULES

*11 U.S.C. § 524(g)* ................................................29

*Health Insurance Portability and Accountability Act of 1996 (HIPAA)* 42 U.S.C. §§1320d-1329d-8 ................................................30

*Fed. R. Civ. P. 26* ................................................32

*Fed. R. Evid. 706* ................................................33

## LEGISLATIVE HISTORY AND HEARINGS

*S. Rep. No. 108-118 at 79, 84 (2003)* ................................................21

**TABLE OF AUTHORITIES**
(continued)

Page

*Asbestos Litigation Crisis: Hearing on S. Hrg. 108-141 Before the Senate Comm. on the Judiciary.* 108th Cong. 96 (2003) ................................................................25

**TREATISES**

6-26 MOORE'S FEDERAL PRACTICE CIVIL § 26.06 ........................................................32

**SECONDARY AUTHORITY**

American Bar Ass'n Commission on Asbestos Litig. (Feb. 2003) ...........................................20-21

Bell, Griffin B., *Asbestos Litigation and Judicial Leadership: The Courts' Duty to Help Solve the Asbestos Litigation Crisis*, NLCPI, Vol. 6 (June 2002)................................................25

Bell, Griffin B., *Asbestos Litigation & Tort Law: Trends, Ethics & Solutions: Asbestos & the Sleeping Constitution*, 31 Pepp. L. Rev. 1 (2003)..................................................21

Biggs, Jennifer et al., *Overview of Asbestos Issues and Trends* 3 (Dec. 2001) (http://www.actuary.org/mono.htm) ...............................................................21

Brehm, Alison J., David N. Copas, Jr., and Colleen Kotyk Vossler, *To Be, or Not to Be: The Undiscovered Country of Claims Estimation in Bankruptcy*, 8 J. Bankr. L. & Prac. 197, 255 (1999)....................................................................32

Carroll, Stephen J., et al., Rand Institute for Civil Justice, *Asbestos Litigation Costs and Compensation: An Interim Report* 40 (2002) ..............................................21

Curran, Eddie, *Diagnosing for Dollars*, Mobile Register, Apr. 4, 2004...............................24

Egilman, David, *Asbestos Screenings*, 42 Am. J. Indus. Med. 163 (2002) ...................................24

Gitlin, Joseph N., M.D., et al., *Comparison of "B" Readers Interpretations of Chest Radiographs For Asbestos Related Changes*, 11 J. Acad. Radiol. 843 n.8 (2004)...........................................................................18

Janower, Murray L. and Berlin, Leonard, *"B" Readers' Radiographic Interpretations in Asbestos Litigation: Is Something Rotten in the Courtroom?*, 11 J. Acad. Radiol. 841 n.8 (2004) .............................................................19, 20

Kazan, Steven, Testimony before the U. S. Sen. Comm. on the Judiciary (Mar. 2, 2003) (avail.at:http://judiciary.senate.gov/testimony.cfm?id=617&wit_id=1678) ..............22

Kim, Quenna Sook, *Asbestos Trust Says Assets are Reduced as the Medically Unimpaired File Claims*, Wall St. J., Dec. 14, 2001, at B6..........................................22

**TABLE OF AUTHORITIES**
(continued)

**Page**

Reger, R.B. et al., *Cases of Alleged Asbestos-Related Disease: A Radiologic Re-Evaluation*, 32 J. Occup. Med. 1088 n.11 (1990) ..........................................................18

Rubin, Hon. Carl B. and Laura Ringenbach, *The Use of Court Experts in Asbestos Litigation*, 137 F.R.D. 35, (1997)...........................................................................................33

Setter, David et al., *Why We Have to Defend Against Screened Cases -- Now is the Time For A Change*, 18-20 Mealey's Litig. Rep.: Asbestos 23 at 2 (2003)....................15, 24

## I.    **PRELIMINARY STATEMENT**

CSFB, as Agent for the prepetition institution lenders to Owens Corning and certain of its affiliates (the "Banks") files this brief in support of its motion (the "Motion") seeking an expedited procedure to obtain a random sampling of already-existing Medical Records (as hereinafter defined), including X-rays, of asbestos personal injury Claimants who have asserted nonmalignant claims against Owens Corning.[1]  As the Court knows, Owens Corning and certain of its subsidiaries as debtors and debtors-in-possession (collectively the "Debtors") have joined forces with the Official Committee of Asbestos Claimants (the "ACC") and the Legal Representative for Future Claimants (the "Futures Representative," and together with the Debtors and ACC, the "Plan Proponents") to propose a nonconsensual chapter 11 plan of reorganization (the "Plan") that is conditioned upon a finding that the Debtors' liability for asbestos-related claims be estimated at no less than $16 billion – including approximately $10.7 billion for Owens Corning alone.  The Plan Proponents contend that the quantification of the Debtors' asbestos personal injury liability may be arrived at by extrapolating from the Debtors' prepetition claims settlement history.

In its August 19, 2004 Order, the Court indicated that it had preliminarily determined that "the data now available -- the Debtors' claims history, the experience in other cases, etc. -- viewed in light of the expert testimony at the scheduled hearing, should probably suffice for claims estimation purposes."  (Order Upon Claims Estimation Issues, dated Aug. 19, 2004.)  As the Banks previously have argued to the Court, however, the Debtors' settlement history cannot be relied upon for a number of reasons, but especially because so many individual claims lacked

---

[1] In this context, references to Owens Corning refer only to the parent company of all the Debtors, the only company which has asbestos liability other than Fibreboard.

medical validity.[2]  The Banks' position in this regard has recently been vividly confirmed by the

Debtors' own long-suppressed internal reports demonstrating rampant fraud in the Debtors'

National Settlement Program ("NSP").[3]  If the Debtors' settlement history is to be used in this

estimation proceeding, it will be necessary to expeditiously conduct a scientific evaluation of that

history to cleanse the data of improprieties; without such an evaluation there cannot be an

accurate and legally supportable estimation of the Debtors' asbestos liabilities.

   Had the Debtors fulfilled their fiduciary duties, they would have produced these internal

reports more than two years ago when they were completed and then promptly commenced a

proceeding to estimate the asbestos claims at levels consistent with the internal analyses.

Instead, the Debtors proposed a plan completely at odds with their own internal analyses, resisted

all attempts by the Banks and other commercial creditors to commence formal estimation

proceedings (thereby manufacturing their present cries of urgency), and stonewalled and

obstructed the Banks' attempt to obtain these internal analyses.  In April of this year, months

before these reports were produced to the Banks, the Debtors even represented to the Bankruptcy

---

[2] *See* Reply Memorandum of Law to Objections of Official Committee of Asbestos Claimants
and Future Claims Representative and the Debtors' Joinder Thereto, to Joinder and Supplement
of Credit Suisse First Boston, As Agent, To Motion of the Official Committee of Unsecured
Creditors for An Order Establishing A Bar Date For Filing Proofs of Claim For Asbestos Claims
and the Content Therefore Pursuant to Bankruptcy Rule 3003(c)(3) at 6, 16.

[3] The NSP was, for all intents and purposes, the Debtors' prepetition capitulation to asbestos
plaintiffs' law firms.  Starting in 1998, the Debtors ceased contesting asbestos liability and began
paying out hundreds of millions of dollars to the most aggressive plaintiffs law firms to settle
those firms' "inventory" of cases.  A firms' inventory might consist of claims of varying
severity, ranging from mesothelioma to unimpaired.  The Debtors made these payments to
individual firms, assigning a dollar value to each "disease," and the firms agreed to
"recommend" to their clients that they accept the settlement payment.  The required "proof" for
an individual to establish a claim was gossamer thin, at best.  Indeed, based upon the evidence
the Banks have obtained so far, it appears that there was virtually no examination of the validity
of any claim before it was paid.

Court that they had already provided any party that wanted to challenge the Debtors' projections "with all of the information . . . reasonably require[d] to prepare its own analysis of the Debtors' present and future asbestos liabilities."[4]

It is now known what the Debtors were hiding -- and why: These recently-disclosed reports reveal that by 2002, the Debtors' own experts, retained with the approval of the Bankruptcy Court, had determined that the vast majority of nonmalignant claims settled and paid by the Debtors never should have been paid. Moreover, these reports value the Debtors' asbestos liabilities at a fraction of what the Debtors propose in their Plan. These expert valuation reports are 1) Thomas E. Vasquez, Ph.D., *Forecast of Future Asbestos Claims and Indemnity: Owens Corning and Fibreboard* (the "Vasquez Report" attached hereto as Exhibits "A1-A4"); and 2) Mark W. Mayer, *Report on Owens Corning's Pre-Petition Asbestos Personal Injury and Wrongful Death Claims* (the "Mayer Report" attached hereto as Exhibit "B").

The Debtors also belatedly produced to the Banks on September 3, 2004 the report of Dr. Gary Friedman, a medical expert the Debtor also retained with the Bankruptcy Court's approval. Although concealed by the Debtors until now, Dr. Friedman conducted a study more than two years ago, in 2002, reviewing 1,691 randomly selected claims files submitted to Owens Corning under the NSP. He concluded that 87% of these claims did not satisfy the minimal medical criteria set forth in settlement agreements between the Debtors and certain asbestos plaintiffs law firms under the NSP. Dr. Friedman further concluded that he had substantial concerns that, even among the remaining 13%, there were additional claims that did not meet the medical criteria in

---

[4] Debtors' Objection to Application of the Official Committee of Unsecured Creditors to Compel Production of Documents at 5 (the "Objection to the Motion to Compel" attached hereto as Exhibit "I").

the NSP. As Dr. Friedman found, for example, a "substantial downward pressure" on the 13% of claims was that a single suspect B-reader accounted for 45.6% of the claims in his study, and five B-readers accounted for more than 80% of these claims.[5] While Dr. Friedman did not have access to claimants' actual X-rays in conducting his study, he noted that if he had, the 13% of the claimants who ostensibly satisfied the medical criteria eligibility would likely be even lower. Significantly, for purposes of the instant motion, Dr. Friedman stated that **"the single greatest factor which may determine the future number of unimpaired nonmalignant claims rests largely on the willingness of all parties to provide for ongoing review of the claims and the underlying data including X-rays and PFTs."[6]** Gary K. Friedman, M.D., *"Owens Corning Impaired Nonmalignant Claim Submissions 1994-1999"* at 35 (the "Friedman Report," attached hereto as Exhibit "C1" and "C2"). (emphasis added).

The Friedman Report is remarkably consistent with a peer-reviewed study published in August 2004 by researchers at the Johns Hopkins Medical Institution, attached hereto as Exhibit "D." The Johns Hopkins researchers had a panel of six B-readers re-read X-rays that had been read in the first instance by B-readers selected by plaintiffs' attorneys. Shockingly, while the plaintiffs' B-readers had represented that 96% of the X-rays showed impairment in a range deemed to show compensable asbestos related nonmalignant injury (a reading of 1/0 or higher,

---

[5] To explain briefly, one method of determining whether an individual has nonmalignant asbestosis is to review a chest radiograph (a term synonymous with "X-Ray"). The radiographs are reported using a classification system devised by the International Labor Office ("ILO"). The minimum reading necessary to sustain a finding of nonmalignant asbestosis is a "1/0" on the ILO scale. The radiographs are read by a so-called "B-reader" certified by the Public Health Service's National Institute for Occupational Safety and Health.

[6] The Pulmonary Function Tests ("PFT") is a test submitted in connection with nonmalignant asbestosis claims which measures lung capacity.

as described in footnote 5), the Johns Hopkins panel of B-readers found that only 4.5% of the X-rays in fact had 1/0 or higher readings.  The Banks have recently been able to match the Johns Hopkins sample against the Owens Corning claims database, and have discovered that a very high percentage -- at least 306 of 478 claimants with readable X-rays, or about 64% of the claimants in the Johns Hopkins study -- are also claimants against Owens Corning.  The Friedman and Johns Hopkins studies make clear that healthy people routinely have been getting paid at the expense of the claims of the truly sick.

As detailed below, the ACC has complained that the Johns Hopkins study does not meet its supposed standards for constituting a representative and statistically significant population of cases, and claimed that the study is "meaningless as a serious analysis."  (Objection and Response of the Official Committee of Asbestos Claimants to the Motion of the Official Committee of Asbestos Property Damage Claimants at 15, *In re Federal-Mogul Global, Inc.*, Case No 01-10578 (RTL) (Bankr. D. Del. Sept. 21, 2004) (the "ACC Federal Mogul Brief," attached hereto as Exhibit "E")).[7]  While the Banks strongly disagree with this attack on the Johns Hopkins study, in light of the ACC's objections, and in order to be assured they can present their case in a manner that will not be subject to such criticisms, it is critical to conduct a study of Owens Corning claims along the lines of the Johns Hopkins study using a larger, randomized sample of X-rays.  If the Debtors and the ACC would stipulate to the results of the Johns Hopkins study as binding upon them for purposes of this estimation proceeding, this could

---

[7] The ACC will be unable to mount a similar attack on the Friedman study, given that the ACC cited Dr. Friedman as an authority and referred to him as a "well-known medical expert who testifies for both plaintiffs and defendants."  (ACC Federal Mogul Brief at 13.)

be avoided.  Unfortunately, however, given the ACC's recent attacks on the study, the Banks do not anticipate reaching any such agreement.

The Friedman and Johns Hopkins studies have profound implications for this estimation proceeding.  They highlight why it would be impermissible to simply extrapolate from the Debtors' settlement history to project the Debtors' asbestos liability fifty years into the future as the Debtors and the ACC would have this Court do.  Simply put, the Debtors and the ACC are asking this Court not only to ignore the widespread fraud that drove Owens Corning into bankruptcy in the first instance, but also to endorse and perpetuate the fraud when estimating future asbestos liability.

In this proceeding, the ACC's estimation expert, Dr. Mark Peterson, will likely extrapolate from the number of nonmalignant claims paid in the past by the Debtors to estimate the number of such nonmalignant claims that will be need to paid in the future.  Dr. Peterson's method of estimation makes the assumption that, because the Debtors paid a very high percentage of all nonmalignant claims submitted in the past, such claims must have been valid and, accordingly, the Debtors will be required to pay the same percentage of claims submitted in the future.

What the Friedman and Hopkins reports reveal is that Dr. Peterson's assumption is patently false and unsupportable in an estimation context.  The ACC's method of estimation would require this Court to set aside funds to pay nonmalignant claimants who cannot proffer evidence of any asbestos-related injury, at the expense of other creditors, including the truly sick asbestos claimants and the Banks.  As a result, if the Debtors' settlement history is to be used as any guide to this estimation proceeding, it is critical that the Banks and the Court be permitted to scrutinize the reliability of the history of nonmalignant claims against these Debtors.  To

accomplish this examination, the Banks' experts must be able to review the Medical Records, including X-rays, of a random sample of the nonmalignant claimants that are included in the Debtors' claims history.

It is well within the Court's power to order this review: the Supreme Court has commanded that a bankruptcy court "has the power [in the exercise of its equitable jurisdiction] to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in the administration of the bankrupt estate." *Pepper v. Litton*, 308 U.S. 295, 309 (1939). Moreover, the process of estimation is subject to procedural and substantive due process requirements and the Court must utilize appropriate procedural safeguards to protect the value of the Banks' claims against Owens Corning. The process of estimation is subject to the procedural and substantive requirements of due process. *See, e.g., In re Baldwin-United Corp.*, 55 B.R. 885 (Bankr. S.D. Ohio 1985). Due process requires that a claimant be given "an opportunity . . . granted at a meaningful time and in a meaningful manner for [a] hearing appropriate to the nature of the case." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 437 (1982).

Thus, the Court should make its estimation based upon a sample of valid medical reports, rather than blindly extrapolating from a history riddled with fraud. Courts have specifically approved the use of random sampling of claims in connection with estimation proceedings in mass tort cases. *In re Dow Corning Corp.*, 211 B.R. 545, 596-598 (Bankr. E.D. Mich. 1997).

Accordingly, the Motion seeks the following:

1.    An order establishing procedures for the prompt production of a random sampling of Medical Records, including X-rays, from asbestos personal injury claimants who have claims alleging nonmalignant asbestos personal injuries against Owens Corning; and procedures to establish a document depository for inspection by experts retained by CSFB; and

2.    modification of the Court's August 19, 2004 order to allow the parties sufficient time to conduct the aforementioned study.  Such modification is necessary for the Banks to prepare their case in light of the recent disclosure of the Friedman, Vasquez and Mayer Reports that the Debtors concealed, as well as the recent Johns Hopkins study.

This relief will permit the parties and the Court to estimate the Debtors' asbestos liability by only taking account of medically and legally valid claims so that all legitimate stakeholders of these Debtors will be treated in a fair and equitable manner.

## II.    STATEMENT OF FACTS

1.    The Debtors Delayed Estimation Proceedings and Concealed Their Internal Valuation Reports Until Now

The Debtors long ignored their responsibility to commence an estimation proceeding even after their own experts completed studies projecting their current and future asbestos liabilities.  As far back as August 2001, the Banks and the Official Committee of Unsecured Creditors (the "OCUC") made clear that asbestos estimation was a "principal driving force to the resolution of these cases."  (Reply in Further Support of Motion of Unsecured Creditors Committee For Appointment of Chapter 11 Trustee at 6, attached hereto as Exhibit "F").  In January 2002, the Debtors represented that they were already discussing with other parties scheduling an estimation proceeding, and in May of that year, the Debtors recognized the need for quick resolution of this issue.  *Id.*  The District Court advised the parties that it would set an estimation trial date if rapid progress was not made between the parties on scheduling, although no such proceedings were scheduled.  *Id.*  In November 2002, the Banks wrote to the district court to express their strong desire to establish estimation procedures for valuation of tort claims in order to facilitate resolution of those issues.  *Id.*  Even then, the Debtors refused to commence estimation proceedings.

8

Despite this, the Banks and the OCUC repeatedly sought discovery of documents relating to the Debtors' estimation of their asbestos liability. (*See* First Set of Interrogatories Propounded By the Official Committee of Unsecured Creditors to Owens Corning, Inc., at Interrogatory Number 3 (Oct. 24, 2003) (requesting that the Debtors "[i]dentify any consultant employed by Owens Corning with knowledge of Owens Corning's actual and/or estimated asbestos liability.") (attached hereto as Exhibit "G");[8] *see also* Letter from Steven H. Case to Norman L. Pernick and Charles O. Monk, Dec. 10, 2003 (seeking production of "all information in the Debtors' possession, custody, or control . . . bearing on any matter relating to the validity and value of [asbestos] claims," and seeking "[a]ll documents relating to estimation of asbestos-related personal injury liability made by Owens Corning or on its behalf from 1997 to the present.") (attached hereto as Exhibit "H.")). These efforts yielded no results. Thereafter, the OCUC formally requested documents reflecting "any attempt (completed or not) made between January 1, 1997 and the present to estimate or value OC's present and/or future incidence of asbestos litigation or asbestos-related liability." (Memorandum of Support of Application of the Official Committee of Unsecured Creditors to Compel Production of Documents at 3-4 (the "Motion to Compel" attached hereto as Exhibit "J")).

---

[8] These interrogatories were served in connection with the OCUC's motion to appoint a chapter 11 trustee filed on October 30, 2003. The basis for the motion, which is still pending before the Bankruptcy Court, is the Debtors' officers and directors' abdication of their fiduciary duty to all creditors while currying favor with the asbestos plaintiffs' law firms. As the OCUC stated the officers and directors "have essentially acted in this case as servants of the asbestos firms, not just failing to take steps to minimize the valuation of contested tort claims but also giving tort firms carte blanche to dictate the terms of a 'dream plan' of reorganization . . . without having to prove a single valid claim against the estate." (Motion of Unsecured Creditors Committee For Appointment of Chapter 11 Trustee at 2, dated Oct. 30, 2003.)

The Debtors consistently fought production of these documents to the Banks and the OCUC, although the Banks do not know when the Debtors shared them with the Plan Proponents. At first, the Debtors contended that they had discharged their duty to produce responsive documents by pointing to documents they had placed in a document depository consisting of investment analysts' reports commenting on Owens Corning's asbestos liability and auditor work papers relating to Owens Corning's asbestos-related reserve. (Motion to Compel at 3-4). Inexcusably, the Debtors did not produce the Friedman, Vasquez or Mayer Reports despite requests that clearly encompassed these materials, nor did the Debtors even disclose their existence. Despite repeated efforts by the Banks and the OCUC to obtain the Debtors' estimates of their asbestos liability (*see id.* at 4-6), the OCUC was ultimately forced to move to compel production of documents. Unbelievably, the Debtors responded by representing that "*the Debtors have already provided [the Committee] with all of the information [it] may reasonably require to prepare its own analysis of the Debtors' present and future asbestos liabilities.*" (Objection to the Motion to Compel at 5). The Debtors' subsequent production of the Friedman Report, the Vasquez Report and the Mayer Report demonstrates the falsity of that statement.

    2.    <u>The Vasquez and Mayer Reports</u>

The Vasquez Report was authored in 2002 by Thomas E. Vasquez, Ph.D., of the consulting firm ARPC, and was finally produced to the Banks two years later on August 27, 2004. Dr. Vasquez had been retained to estimate the value of future asbestos-related personal injury claims that will be filed against Owens Corning and Fibreboard. (Vasquez Report at 4). The results of his analysis showed that Owens Corning's future asbestos liability, discounted to present value, ranged from $2.0 billion to $3.2 billion. Significantly, Dr. Vasquez's estimates

included discounting to nuisance value the vast majority of the nonmalignant claims asserted against Owens Corning, based on the conclusion that these claimants did not assert claims that qualified on a medical basis for payment under Owens Corning's settlement agreements under the NSP. [9]

The Mayer Report, dated May 21, 2002, was only produced to the Banks on August 29, 2004. Mr. Mayer was the Controller, Vice President Restructuring for Owens Corning. Mayer Report at 2. The Mayer Report purports to summarize "the status of asbestos personal injury and wrongful death claims asserted against Owens Corning on or before October 4, 2000 ("prepetition claims")." *Id.* The results reported in the Mayer Report estimate the value of these claims between $1.414 and $1.736 billion. *Id.* at 3. However, the Mayer Report simply applied the NSP settlement values to all pending claims, without factoring in the discount Dr. Vasquez used -- or indeed any method at all -- to weed out bogus claims, which, as will be seen, accounted for the vast majority of the nonmalignant claims.

The Banks set forth the conclusions of the Vasquez Report and the Mayer Report in this brief not because they agree with them. Indeed, if allowed to develop their case through adequate discovery, the Banks will show that even these valuations are substantially overstated. Nevertheless, the Vazquez and Mayer conclusions highlight both the duplicity of the

---

[9] Despite the fact that Owens Corning knew it was insolvent, it paid out approximately $660 million to law firms as part of the NSP in the eleven months immediately preceding the filing of its chapter 11 petition, often in the form of unprecedented prepayments toward settlements not yet even submitted by individuals. The payments to the NSP law firms are the subject of fraudulent transfer and preference litigation. (*See* Motion of the Official Committee of Unsecured Creditors for an Order Authorizing it to Commence Certain Avoidance Actions on Behalf of the Debtors, dated Sept. 10, 2002, attached hereto as Exhibit "K.") Ultimately, the Debtors brought these actions, but only with the great reluctance, and have, with the Bankruptcy Court's permission, refused to prosecute them.

astronomical valuations proposed by the Debtors and the ACC for approval by this Court and their continuing attempts to obfuscate and perpetuate the fraudulent conduct on which the Debtors' settlement history is based.

In any event, the combined value of Owens Corning's asbestos liabilities reported in the Vasquez Report and Mayer Report range from $3.4 to $4.9 billion. The Debtors had these estimates in their possession in January 2003 when they submitted their proposed plan of reorganization to the Bankruptcy Court with an embedded future and current asbestos liability estimate of a minimum of approximately $10.7 billion for Owens Corning, but suppressed them. They also had but suppressed these estimates when they submitted a disclosure statement in respect of their plan which included the same $10.7 billion Owens Corning estimate. Of course, the Banks never had access to any of this information in connection with their review of the proposed plan and disclosure statement.

3.    The Friedman Report

The Friedman Report, entitled "Owens Corning Impaired Nonmalignant Claims Submissions 1994-1999 (approx.)" is even more revealing. It was authored by Dr. Gary K. Friedman, a board-certified pulmonologist who has testified "at trial or in deposition in asbestos related cases on more than 60 occasions at the request of plaintiff counsel." Friedman Report at 2. Although Dr. Friedman rendered his report in 2002, even its existence was concealed by the Debtors from the litigants -- and the Court -- until now. The Debtors applied to retain Dr. Friedman in December 2000, shortly after instituting these chapter 11 cases. The Debtors' retention application described Dr. Friedman as a "trustworthy expert, acceptable to both defendants and plaintiffs, for the review and analysis of asbestos-related claims." (Application for Order Under 11 U.S.C. §§ 327(a) and 329 Authorizing Employment and Retention of Texas

Occupational Medicine Institute, P.A. to Provide Expert Medical Services to Debtors Effective

As Of Petition Date dated Dec. 21, 2001, attached hereto as Exhibit "L.")  The Friedman Report

was conducted to assist Owens Corning to "estimate the percentage of impaired nonmalignant

claims under NSP criteria that can be anticipated to be included in the population of total future

claims asserted against [OC]," and to "generate a reliable base of evidence of information on

which the Debtors [asbestos valuation expert], Dr. Thomas Vasquez, could rely."  Friedman

Report at 3.  Specifically, the Friedman Report was designed to give Dr. Vasquez  information to

estimate the percentage of "impaired nonmalignant claims under NSP criteria that can be

anticipated to be included in the total population of total future claims asserted against the"

Debtors. *Id.*  Significantly, the Vasquez Report determined that approximately **91% of all future**

**claims against the Debtors would allege nonmalignant diseases**.  Vasquez Report at 15.

The Friedman Report analyzed the Medical Records of 1,691 cases of claimed

nonmalignant[10] asbestosis claims.  The cases were randomly selected from 22,578 nonmalignant

asbestos claims submitted to the Debtors under the NSP – a program with strong financial

incentives for submitting valid, properly documented claims.  Friedman Report at 2.  The case

files reviewed by Dr. Friedman included an analysis of X-ray reports, PFT reports, and other

data, with an emphasis on the X-ray reports and the PFT reports. *Id.*  Dr. Friedman was not able

to review actual X-rays.

Dr. Friedman concluded that only 13.3% of claims met the minimal medical standards

that had been agreed to by Owens Corning and asbestos plaintiffs' law firms to establish

compensable claims under the NSP.  The starkness of Dr. Friedman's finding that 87.3% of a

---

[10] Dr. Friedman defined "nonmalignant" claims as having no cancer.  Friedman Report at 63.

random sample of settled nonmalignant claims lacked supporting medical evidence is stunning.

However, even this number is apparently too low, as Dr. Friedman wrote that "a review of the

radiographic reports and ILO forms raises serious questions concerning their reliability. These

factors are likely to place downward pressure on the 13.3%." *Id.* at 4.[11]

As Dr. Friedman notes, "the first step in determining impairment is predicated upon a

reliable radiographic interpretation." *Id.* at 17.[12] Dr. Friedman sets forth disturbing and

overwhelming evidence that the radiographic interpretations of B-readers in the selected Owens

Corning cases submitted to Dr. Friedman are not reliable. He made some general observations

concerning B-readers, which underscores the need for the type of discovery sought by the Banks:

> During the years that these radiographs were interpreted [1994-
> 1999], there were over 600 [B] readers in the United States.
> Assuming that the 1,691 cases submitted represented a true
> 'national epidemic of asbestos disease as suggested by the recent
> onslaught of claim submissions, it would be reasonable to assume
> that there would be a broad representation of physicians detecting
> such disease. Of the 1,6971 claims submitted, 772 were submitted
> by Dr. H (46%), 229 by Dr. S, 212 by Dr. K, 87 by Dr. L
> accounting for 1300 cases or **76.8%** of all claims. If Dr. JB is

---

[11] Of the 1,691 cases Dr. Friedman reviewed, 282 lacked any PFTs, despite the requirement that these be submitted under the NSP standards. Of the remaining cases with a PFT record, Dr. Friedman found only 225 had test results which actually demonstrated impairment. He deemed over 760 cases with PFT records as unimpaired based on his review of the records. He also characterized 98 claims as "unimpaired" because of substantial technical flaws in the manner the PFTs were administered. An additional 95 cases were deemed unimpaired because of various other missing reports, illegible data and miscellaneous problems. Friedman Report at 7. Overall, Dr. Friedman found 13.3% impairment based on PFT readings alone. All of these were cases where there was a financial incentive for documentation of impairment. *Id.*

[12] While Dr. Friedman did not evaluate the underlying validity of X-rays (as the Johns Hopkins study did), he did "assess the impact the X-ray findings might have on the PFT results . . . by match[ing] impaired PFTs with X-ray [readings] showing evidence of disease." Friedman Report at 13. This review drove the impairment numbers even lower. Dr. Friedman estimated that overall, the percentage of claims which "might be attributable to asbestos in this cohort is between **8.16%** . . . and **10.46%**." *Id.* (emphasis in original).

added, these five B-readers account for 1360 (**80.4%**) of claims. Dr. H alone accounted for approximately 45.6% of all claims submitted in this study.

Because such a small number of physicians account for such a large percentage of the claims previously submitted, and because of the prominent role which . . . interpretation plays in the existing agreements, the need to objectively evaluate the reliability of their reports cannot be underestimated.

*Id.* at 20.[13]

None of the X-ray readings of these five B-readers withstands even cursory scrutiny.

That their medical work is so deeply ingrained in the Debtors' claims history necessarily makes

such claims history unreliable. Dr. Friedman concluded that as a group, these B-readers'

"interpretations differ from what would be anticipated from a randomly selected panel of reliable

'B' readers nationwide," *id.* at 21, and that "the readings generated by these 'B' readers yielded

---

[13] "Dr H" identified above is Dr. Raymond Harron. Friedman Report at App. X-4. He has previously testified, in effect, that he is part of the broken system that generates mass asbestos claims. He interprets between 100-125 X-rays in a day, and gave only a few minutes to each X-ray. *See* David Setter, et al., *Why We Have to Defend Against Screened Cases -- Now is the Time For A Change* -- 18-20 Mealey's Litig. Rep.: Asbestos 23 at 2 (2003) ("*Why We Have to Defend*"). Dr. Harron brazenly confessed to sending blank presigned "B-read" forms to law firms with whom he works. *Id.* In addition to these ethical issues, Dr. Friedman identified Dr. Harron's diagnostic techniques as "atypical" and "troubling." Friedman Report at 18. Moreover, Dr. Harron was prohibited from serving as the diagnosing physician for future claims in numerous NSP agreements.

"Dr. S" is Dr. Jay Segarra. A Washington state court found that he performed examinations, rendered diagnoses, and recommended treatment in violation of state law, and relied upon radiology reports from unregistered and uncertified technicians or radiologists using unregistered and uncertified equipment. *Id.* at 7.

"Dr. K" is Dr. Keubler. Dr. Friedman noted that Dr. Keubler had a propensity to make unusual diagnoses "not usually seen in the early stages of asbestosis," and observed several other unusual facets of Keubler's diagnostic evaluations. *Id.* at 19. Moreover, in 1998, the Manville Trust announced it would not accept any claims files with Kuebler as the B-reader or diagnosing physician unless the file was accompanied by an original X-ray the Trust could evaluate for itself. Dr. Kuebler was also barred from serving as a diagnosing physician for future claims in numerous NSP agreements.

results which were **not consistent** with the spectrum of nonmalignant asbestos related diseases identified within the **peer review literature** authored by plaintiffs' experts or authors deemed authoritative by plaintiffs' experts." *Id.* at 22 (emphasis in original).[14]

The Friedman Report's seminal conclusion was that "the current incidence of impaired nonmalignant **cases** is significantly **less** than the incidence of nonmalignant **claims,** [and] it is from this baseline and under similar scrutiny that future 'cases' should be gauged." *Id.* at 30 (emphasis in original). Significantly, Dr. Friedman also opined that the "single greatest factor which may determine the future number of impaired nonmalignant claims rests largely *on the willingness of all parties to provide for ongoing review of the claims and underlying data including X-rays and PFTs.*" *Id.* at 35 (emphasis added). He also found that "many of the current cases under study do *not* represent a diagnosis of nonmalignant disease," and that requiring a diagnosis of asbestosis based on published criteria and "*review of radiographs [also referred to as X-rays] by a random selection of reliable B readers or physicians will help focus on the truly impaired. . . .[and] reduce the number of marginal claims in the future.*" *Id.* at 31 (emphasis added). In sum, Dr. Friedman concluded that "[f]urther investigation of the cases through audit of the X-rays, review of occupational history and exclusion of other more probable

---

[14] The Friedman Report also highlights that the work and exposure history in many of the 1,691 case files was riddled with deficiencies – "[i]n many of the claims submissions determination of exposure [to asbestos] was difficult." Friedman Report at 26. The Friedman Report notes that "in some cases, occupational history suggested more probably causes other than asbestos for the X-ray findings." *Id.* More troubling, "in some cases, a word processed document appears to omit any description of occupation." *Id.* Unbelievably, another case listed "employment of chemist and worked in management" as being the relevant history for exposure. *Id.* In a dry understatement, Dr. Friedman wrote "exposures such as this would warrant more detailed explanation." *Id.* Finally, other "reports diagnosing asbestosis are drafted to allow attachment of employer and date of employment, but without detailed history of exposure by the examiner." *Id.* These deficiencies underscore the weakness of nonmalignant claims, and strengthen the case for a meaningful analysis into current claims.

causes may further reduce this number." *Id.* Based on only this portion of his evaluation (without the downward pressure), the Friedman Report concluded that "[f]uture impaired claims (2000-2049) should further decline if proper medical guidelines are enforced." *Id.* at 36.

Given the recommendation of the Debtors' Bankruptcy Court-approved medical expert, their concealment of that expert's report for more than two years and the ACC's recent attack on the Johns Hopkins study as being too small and not sufficiently representative or random, the Debtors and the ACC should be estopped from objecting to the Banks' request to expeditiously obtain the sample that Dr. Friedman urged was needed over two years ago.

        4.      <u>The Debtors' Concealed the Vasquez Report, the Mayer Report and the Friedman Report in Their Disclosure Statement</u>

In their Disclosure Statement With Respect to Fourth Amended Joint Plan of Reorganization, dated Nov. 21, 2003 ("the "Disclosure Statement"), the Debtors assert that all NSP settlements required "satisfactory evidence of a qualifying medical condition." (Disclosure Statement at 19.) The Debtors knew this representation was false when made, because the Debtors already knew from the Friedman Report that approximately 87%, and very possibly more, of the nonmalignant claims submitted to the Debtors under the NSP -- which, according to Vasquez, constituted 91% of all claims -- did not meet the specified medical criteria. Moreover, in the face of the assertion by the ACC and the Futures Representative that the $16 billion (including $10.7 billion for Owens Corning) was their "minimum acceptable valuation" for Asbestos Personal Injury Claims, the Debtors said nothing about the Friedman Report or the projections in the Vasquez and the Mayer Reports. (*Id.* at 26.)

5.    The Johns Hopkins Study

Dr. Friedman's findings and conclusions have now been vividly confirmed by a recent independent, controlled, peer reviewed report performed by a team at Johns Hopkins Medical Institutions, which found massive overreadings of nonmalignant asbestosis in a sample of 492 X-rays evaluated in the first instance by doctors retained by plaintiffs' attorneys. Joseph N. Gitlin, et al., *Comparison of "B" Readers Interpretations of Chest Radiographs For Asbestos Related Changes*, 11 J. Acad. Radiol. 843 n.8 (2004) (the "John Hopkins Study"). The Johns Hopkins Study was planned and conducted by Dr. Joseph N. Gitlin and his team, who engaged seven B-readers (one of whom was unable to finish participation in the study and was replaced) who reviewed 492 X-rays previously read by B-readers retained by plaintiffs' lawyers, of which 478 were deemed of readable quality. The panel of B-readers were "'blinded' as to the identities of the study sponsors, the possible litigants, the previous or initial readers, and the individuals whose examinations they interpreted." *Id.* at 846. Whereas the plaintiffs' readers had interpreted 96% of the chest X-rays deemed readable by the Hopkins panel as consistent with asbestosis, the Johns Hopkins researchers found only 4.5% of the same set of cases positive. *Id.* at 854. A Johns Hopkins researcher was 159 times more likely to conclude that an X-ray was negative than a B-reader retained in litigation operating under the economic incentives described above. *Id.* at 850. Based on a statistical analysis, the Johns Hopkins study determined that there was a probability of less than 1 in 10,000 "that the differences noted between initial and consultant readers are due to chance alone." *Id.* [15]

---

[15] An earlier study performed by Dr. R.B. Reger foreshadowed these two recent explosive studies from Dr. Friedman and Johns Hopkins. Dr. Reger re-evaluated 439 chest radiographs of individuals previously designated as having asbestos exposure. R.B. Reger, et al., *Cases of Alleged Asbestos-Related Disease: A Radiologic Re-Evaluation*, 32 J. Occup. Med. 1088 n.11

The difference between the readings in neutral B-readers and those who are financially yoked to plaintiffs' law firms cannot be explained by sheer coincidence. *See* Murray L. Janower & Leonard Berlin, *"B" Readers' Radiographic Interpretations in Asbestos Litigation: Is Something Rotten in the Courtroom ?*, 11 J. Acad. Radiol. 841 n.8 (2004). "Gitlin et al. have sounded an alarm with regard to the accuracy of B-readers in asbestos-related litigation. The alarm will undoubtedly reverberate, as it should throughout the courtrooms of the nation." *Id.* at 8:842. Indeed, the Johns Hopkins Study raises the question of whether "objectivity and truthfulness among certain B-reader radiologists have been supplanted by partisanship and distortion of or departure from the truth driven by financial gain." *Id.*

The results of the Johns Hopkins Study are directly applicable to this proceeding. A comparison of the X-rays read in the Johns Hopkins Study to the Owens Corning claims database has revealed that a very high percentage -- almost two-thirds -- of the claimants in the Johns Hopkins Study are plaintiffs who have filed claims against Owens Corning.

The ACC has criticized (in our view, erroneously) the Johns Hopkins Study in pleadings recently filed in the Federal Mogul case:

> The Property Damage Claimants also improperly rely upon the study conducted by the Department of Radiology at Johns Hopkins Medical Institutions as standing for the proposition that a representative or statistically meaningful percentage of nonmalignant asbestos disease claims filed in asbestos litigation are supported by expert medical witnesses whose testimony and review of chest X-rays are medically unsound and highly suspect.

---

(1990). Dr. Reger used three B-readers to evaluate each X-ray who were "blinded" to the purpose of their work. The individual B-readers found a likely prevalence of asbestos-related conditions in 3.7%, 3.0% and 2.7% of the X-rays. The collective judgment of the panel was that, at most, 3.6% (or 16) of the "439 subjects evaluated have conditions . . . that may be consistent with an asbestos exposure," but that the number could have been as low as 2.5%. *Id.*