(ACC Federal Mogul Brief at 14) (citation omitted).  According to the ACC, to properly evaluate

Owens Corning's settlement claims history and the John Hopkins finding, a larger statistically

significant sample of X-rays is necessary:

> In order to draw meaningful conclusions about asbestos claimants
> and whether they support their claims with unreliable X-ray
> evidence, the authors would have had to select a representative and
> statistically significant sample of asbestos claimants, obtain X-rays
> readings from the experts who supported the claims of that
> population, and compare those X-rays readings to the readings of
> the same X-rays by unbiased and independent B-readers.  The
> study follows none of those most basic guidelines for conducting a
> statistically meaningful study.

(*Id.*)

      While the Banks strongly disagree with this criticism, any objection by the ACC to this

Motion should be summarily rejected, as the Banks are merely seeking to conduct a study of

Owens Corning's claimants' Medical Records that will address the ACC's purported concerns.

The ACC cannot have it both ways -- it cannot object to the conclusions of the Johns Hopkins

Study and oppose the study sought herein.  Indeed, should the ACC object to the study sought by

the Banks in the Motion, it will demonstrate yet another attempt to shield Owens Corning's

dubious claims history from legitimate scrutiny.

      6.     History Of Asbestos Litigation Relevant To This Motion

      The findings of Dr. Friedman and the Johns Hopkins researchers that the overwhelming

percentage of nonmalignant claims against the Debtors were without medical support are the

latest confirmations that modern asbestos litigation has been permeated by massive fraud and

abuse of the legal system.  As the American Bar Association recognized in 2003, "by virtually all

accounts, contemporary asbestos litigation is no longer driven solely, or even primarily, by the

occurrence of disabling asbestos-related diseases."  Report of Am. Bar Ass'n Comm'n on

Asbestos Litig. at 7 (Feb. 2003) ("ABA Report").  Former United States Court of Appeals Judge and United States Attorney General Griffin Bell has written that "asbestos litigation now stands as the only part of our tort system in which people who can show no real physical injury are routinely allowed to recover."  Griffin B. Bell, *Asbestos Litigation & Tort Law: Trends, Ethics & Solutions: Asbestos & the Sleeping Constitution*, 31 Pepp. L. Rev. 1 (2003) ("*The Sleeping Constitution*").  The Rand Institute estimates that up to 90% of new asbestos claims are filed by plaintiffs with little or no impairment.  Stephen J. Carroll, et al., Rand Institute for Civil Justice, *Asbestos Litigation Costs and Compensation:  An Interim Report* 40, 65 (2002); *see also* Jennifer Biggs, et al., *Overview of Asbestos Issues and Trends* 3 (Dec. 2001) (http://www.actuary.org/mono.htm).  In a submission to another federal court, a plaintiffs' attorney noted that Manville Personal Injury Trust estimated in 2002 that "90% of the Trust's last 200,000 claims have come from attorney-sponsored X-ray screening programs . . . and 91% of all claims allege only nonmalignant asbestos 'disease,' and these cases receive 76% of all Trust funds."  S. Rep. No. 108-118 at 84 (2003) (citing letter from Steven Kazan to the Hon. Jack B. Weinstein, dated July 23, 2002).

The surge in unimpaired claims has occurred in the face of medical research describing asbestosis as a "disappearing disease," and a condition that is "exceedingly rare."  As a leading medical expert in asbestos-related diseases has stated: claimants are being compensated "for illnesses that, according to the clear weight of medical evidence, either are not caused by asbestos or do not result in a significant impairment -- i.e., are not generally regarded by the medical profession as an illness."  *Id.* at 79 (citing Letter from Dr. James Crapo to Senator John Kyl, dated June 23, 2003).

Lawyers who represent claimants with malignant conditions have also expressed their concern that this flood of claims threatens payments to the sick. A member of the asbestos plaintiffs' bar testified:

> The heart of the asbestos problem is that tens of thousands of
> questionable claims, many generated by mass, for-profit X-ray
> screenings, are filed every year. These are not diagnosed cases of
> asbestos disease in any real sense. The vast majority of the
> claimants today have no real illness and no real symptoms. All
> they have is an X-ray that shows marks that could have been
> caused by asbestos. In most cases, they have not even seen a
> doctor.
>
> In short, they aren't really sick. If they were your children, you
> would not even keep them home from school.

Testimony of Steven Kazan, United States Senate Committee on the Judiciary (Mar. 2, 2003) (available at: http://judiciary.senate.gov/testimony.cfm?id=617&wit_id=1678). The result of this is, as the trustees of the Manville Trust have publicly stated, that "a disproportionate amount of Trust settlement dollars have gone to the least injured claimants – many with no discernible asbestos-related physical impairment whatsoever." Quenna Sook Kim, *Asbestos Trust Says Assets are Reduced as the Medically Unimpaired File Claims*, Wall St. J., Dec. 14, 2001, at B6. As explained by a Senior Judge of this Court, "these suits are brought on behalf of individuals who are asymptomatic as to an asbestos-related illness and may not suffer in the future. Substantial transaction costs are expended, and therefore unavailable for compensation to truly ascertained asbestos victims." *In re Asbestos Prod. Liab. Litig.* (No. VI), MDL 875, Admin. Order No. 8, at 1-2 (E.D. Pa. Jan. 14, 2002).

The root of this problem are "for profit-litigation screenings," begun in the 1990s, which "systematically generat[ed] tens of thousands of new nonmalignant claims each year by individuals who had some degree of occupational asbestos exposure, but did not have, and

probably would never get, an impairing asbestos-related disease." ABA Report at 6. Plaintiffs'

lawyers rely heavily on "for-profit" litigation or X-ray screenings, which actively solicit anyone

who may have been occupationally exposed to asbestos.

    The screenings entice workers who may have had occupational exposure to asbestos by

touting that they may have "Million $ lungs," and send out promotions such as "Find out if YOU

have Million Dollar Lungs." Written Statement of Professor Lester Brickman, Subcommittee on

Commercial and Administrative Law of the United States House of Representatives Committee

on the Judiciary at 10 (July 21, 2004) ("Brickman Statement," attached hereto as Exhibit "M")

Mobile X-ray vans are brought to union halls, motels and strip malls, where X-rays are taken at

an astonishing rate of one every five minutes. *Id.* These mass X-ray screenings have effectively

driven up the flow of new asbestos claims by healthy plaintiffs. *Sleeping Constitution* at 5.

    The X-rays are read by "a small number of B-readers [who have] made reputations . . . by

consistently interpreting chest radiographs of asbestos claimants as positive in 90-100% of

cases." Johns Hopkins Study at 844. "A select few handfuls of B-readers and doctors cooperate

with the enterprises by 'diagnosing' massive numbers of those screened as having asbestosis or

'consistent with asbestosis.'" Brickman Statement at 10. The people who conduct the screenings

are "frequently unqualified to diagnose or test lung illness, such as those caused by asbestos and,

in many cases, are unlicensed to perform these functions." Eddie Curran, *Diagnosing for*

*Dollars*, Mobile Register, Apr. 4, 2004, at A1. One prominent screener, who processed at least

14,000 people stated that he had classified every single person he had screened as having

asbestosis. *Id.*

These screenings are "pay for play" -- that is, B-readers are compensated based on whether or not they diagnose someone as having a 1/0 reading.  Dr. David Egilman of Brown University, who has testified on behalf of plaintiffs, has written that:

> Many "screenings" consist of chest X-ray with a B-reading alone. No history, PFTs, smoking or continuing exposure-related counseling occurs. The B-reading manual specifically precludes the use of B-readings for individual diagnosis, yet this is often not the case. In one series of ongoing screenings, the reader knows he is reading for an "asbestos screening" for litigation, knows the cut off (1/0) that would qualify for compensation and receives differing payments based on the nature of the reading. This payment plan based on the reading result is incorporated into his reporting style; he does not fill out a B-reading report if the "reading" is less than 1/0. Therefore, he is paid $70 for 1/0 and $35 for 0/1 or lower.

David Egilman, *Asbestos Screenings*, 42 Am. J. Indus. Med. 163 (2002).  Egilman also noted that some workers' X-rays were shopped around to as many as six radiologists until one reported so little as a slightly positive reading.  *Id.*  Such practices simply cannot encourage objective, legitimate medical diagnostic practices.  And, indeed, as the Friedman Report and the Johns Hopkins Study establish, they do not.

The screenings also lack any medical value or necessity: They often "do not comply with federal or state health and safety law.  There often is no medical purpose for these screenings and claimants receive no medical follow-up." *The Sleeping Constitution* at 5.  Indeed, one screener testified that if someone already has an attorney, they are not permitted to be screened at a screening sponsored by another law firm. Setter, *Why We Have to Defend* at 7.[16]  The General Counsel of the Manville Trust contrasted medical diagnosis with the attorney-screening model:

---

[16] David Setter was counsel for Owens Corning in its lawsuits against companies administering PFTs for fraud and racketeering, described below in section 7.

> A medical model assumes a person becomes ill, is referred to a
> physician and thereafter is referred to a lawyer. However, based
> on a sampling of nonmalignant Trust claims reviewed during the
> past two years, it is obvious that a very large percentage of
> nonmalignant claims are based on so-called screenings pursuant to
> which mostly asymptomatic claimants are identified by screening
> facilities and then encouraged to file a claim.

*Asbestos Litigation Crisis: Hearing on S. Hrg. 108-141 Before the Senate Comm. on the*

*Judiciary.* 108th Cong. 96 (2003) (statement of David T. Austern, President, Claims Resolution

Management Corp., and General Counsel, Manville Personal Injury Settlement Trust).

> The Manville Trust has been hard hit hard by this fraud:

> Of the more than nine thousand claims submitted by plaintiff
> lawyers [to the Manville Personal Injury Trust], a mere ten doctors
> provided X-ray interpretations for 87% of the claims. The average
> failure rate for these doctors was a striking 59%. The highest
> volume doctor accounted for over half of the total X-ray
> interpretations, failing the audit 57% of the time.

Griffin B. Bell, *Asbestos Litigation and Judicial Leadership: The Courts' Duty to Help Solve the*

*Asbestos Litigation Crisis,* NLCPI, Vol. 6, Num. 6 at 14-15 (June 2002) ("*Judicial Leadership*").

As Judge Bell succinctly put it: "Our courts should put an end to mass X-ray screenings and the

unreliable medical evidence they general as the source of claims." *Sleeping Constitution* at 5.

The ABA Report confirms the findings of the Friedman Report and the Johns Hopkins

Study. Physicians interviewed by the ABA had seen "hundreds or even thousands of examples

of over-reading of X-rays for litigation purposes." ABA Report at 13. One doctor concluded

that of 15,000 X-rays he reviewed which were used to support a diagnosis of asbestos diseases,

only 10% supported a valid diagnosis. *Id.* Another doctor reported a 62% error rate, and

another's research of "22,000 asbestos-related bankruptcy claims found a presumptive X-ray

review error rate of up to 86% among 5 [B-readers], none of whose results matched the general

patterns in epidemiological studies." *Id.*

Despite this rampant problem, companies targeted by asbestos lawyers frequently have

not demanded X-rays as proof of settled claims, or scrutinized B-readers' methodologies.  As

Judge Bell explained:

> Many [asbestos] defendants are reluctant to demand X-rays and
> conduct such audits for fear that plaintiff lawyers will target the
> company, refuse to settle any claims, and try their most serious
> cancer cases in plaintiff-friendly jurisdictions.  While serious cases
> are relatively few in number compared to cases filed by the
> unimpaired, the risk of even a handful of multimillion dollar
> verdicts often dissuades defendants from a high-profile,
> contentious fight that could bankrupt the company in the short
> term.  One business analyst has observed, "[I]n a sense, the
> plaintiffs' attorneys have the asbestos defendants held hostage."
> Defendants often conclude that rather than question this X-ray
> evidence, it is cheaper to treat the claims as administrative costs,
> regardless of merit, than to litigate.  This strategy has failed for a
> number of defendants in the long run, as an endless supply of
> nonsick claimants have replenished the plaintiff lawyers' client
> base, leaving bankruptcy as the only realistic option for those
> companies.

*Judicial Leadership* at 16.

The proposal put forth by the Banks will prevent this from happening in this proceeding.

7.    The Debtors Are Aware that Owens Corning's Own Settlement History is
Rife With Fraudulent Claims

The Debtors have long been intimately aware that the overwhelming majority of

claims being filed against them were fraudulent.  The Banks have recently learned, that, in 1996

and 1997, Owens Corning filed lawsuits against entities who performed thousands of PFTs that

served as the basis for asbestos claims against them. *See Owens Corning v. Pitts*, Civil Action

No. 96-2095 (E.D. La. June 19, 1996); *Owens Corning v. McNeese*, Civil Action No.

3:97CV29WS (S.D. Miss. Jan. 22, 1997) (attached hereto as Exhibits "N" and "O"). In

*McNeese*, Owens Corning alleged that one PFT lab "systematically and continuously ...

generat[ed] false medical test results which have caused millions of dollars of damage to Owens

Corning." Complaint ¶ 1. Owens Corning further alleged that the lab generated "false medical

test results which have been used to substantiate the filing and settlement of approximately

10,000 non malignant, asbestos-related cases against Owens Corning." *Id.* In *Pitts*, Owens

Corning also alleged that false and fraudulent PFT results were generated by the defendants.

Owens Corning acknowledged it "has entered into settlements of claims alleging nonmalignant

lung disease lung disease which were substantiated by Defendants' false medical reports, and

thousands of other such claims are still pending against Owens Corning." Complaint ¶ 7.

Moreover, in both complaints, Owens Corning summarized the results of detailed

examinations by medical experts of samples of the PFTs performed by these screening

enterprises. In *Pitts*, Owens Corning alleged that appropriate standards were not met in 95% of

the 1,672 cases sampled where asbestos related injuries were alleged. *Id* ¶¶ 60-67. In *McNeese*

Owens Corning alleged that medical experts conducted an examination of a sample consisting of

approximately 3,486 cases in which the defendants administered PFTs to substantiate asbestos-

related injury claims against Owens Corning, and virtually every test was deficient. *McNeese*

Complaint ¶¶ 60-62.

      8.      <u>The Plan Proponents' Estimation Method Improperly Relies on the
Debtors' Past Claims Payment History to Estimate Non-Malignant
Claims.</u>

Although (apart from the Debtors' recently produced reports) none of the Plan

Proponents have yet submitted a report estimating the Debtors' liability for nonmalignant claims,

the methods used by the ACC's usual expert, Dr. Mark Peterson to estimate such claims is well

known. In previous estimations, as Dr. Peterson himself has explained, his simplistic method involves calculating a ratio of the malignant to nonmalignant claims filed against the debtor prior to bankruptcy and projecting forward that same ratio against his predictions of future malignant claims.[17] *See* Tr. of Testimony of Dr. Mark Peterson, Babcock & Wilcox Plan Confirmation Hearing, 95-96, Oct. 22, 2003 ("Peterson B&W Testimony," excerpt attached hereto as Exhibit "P"). Dr. Peterson readily admits there is no scientific evidence to support his projections of nonmalignant claims. (*See* Tr. of Testimony of Dr. Mark Peterson, Armstrong Plan Confirmation Hearing, 176:22 – 177:14, Nov. 17, 2003 ("Peterson Armstrong Testimony," excerpt attached hereto as Exhibit "Q")). He also admits that his estimation method does not account for what percentage of the claims that are filed could be supported by competent medical evidence. (*See* Peterson B&W Testimony at 189). Instead, Dr. Peterson's flawed reasoning insists that, if the debtor paid nonmalignant claims in the past, such claims must have been meritorious, and the debtor will continue to pay such claims in the future. (*See id.* at 188). In other words, Dr. Peterson makes the false assumption that the economic pressures present in the tort system will force the Debtors to pay meritless claims under the auspices of this Court.

Given the recently produced evidence (including both reports commissioned by the Debtors and a peer-reviewed study from a nationally renowned medical school) that a strikingly high percentage of nonmalignant claims have no medical or legal support, this Court must be provided the tools that will enable it to carefully scrutinize and evaluate Dr. Peterson's "past as predicate" method of estimation. If the Plan Proponents were willing to accept the findings of

---

[17] The Banks strongly disagree with Dr. Peterson's methods for estimation of malignant claims, and intend to present robust evidence in contradiction of such methods, but the focus of this Motion is to obtain evidence that will prove the Debtors' history of payment of nonmalignant claims is unreliable and cannot form the basis of estimation as Dr. Peterson would suggest.

the Johns Hopkins Study as applicable to the nonmalignant claims against the Debtors here, a

further sample of X-rays would not be needed. If not, however, the parties in interest in this case

are entitled to demonstrate to this Court that the estimation Dr. Peterson will offer is invalid.

The way to provide that opportunity is to allow an examination of randomly selected Medical

Records of claimants against Owens Corning as proposed by the Banks herein.

### III.    ARGUMENT

A.    THE COURT SHOULD ESTABLISH PROCEDURES TO OBTAIN A
RANDOM SAMPLE OF MEDICAL RECORDS, INCLUDING X-RAYS,
SUFFICIENT TO CONDUCT A STUDY OF ASBESTOS PERSONAL INJURY
CLAIMANTS FOR PURPOSES OF THIS ESTIMATION PROCEEDING.

As demonstrated above, it has now been well-documented by multiple credible

authorities -- from Judge Bell to plaintiffs' lawyers -- that the history of settlement payments in

asbestos litigation to nonmalignant claimants reflects not a fair value of injuries suffered by those

claimants, but a disturbing constellation of improprieties which certainly should not be replicated

in this estimation proceeding.  Even more disturbing and significant, it has now been

documented by empirical evidence in the Friedman Report and the Johns Hopkins study --

conducted independently of but entirely consistent with each other -- that the overwhelming

majority (87-96%) of nonmalignant claims lack a medical basis.  Even Owens Corning itself

brought litigation to address these frauds.  Against this backdrop, the notion that this very

settlement history and the payments previously made to uninjured claimants could form the basis

for estimating present and future claimants is untenable.[18]  If the settlement history is to be used

---

[18] This method is premised on the unsustainable notion that because Owens Corning previously
paid thousands of nonmalignant claims with no medical basis, when projecting its future liability
it should be assumed it will continue to pay such claims forever.

as a basis for estimation, it must be cleansed of the improprieties that permeated it.[19]  That is what this Motion seeks to do by proposing precisely the kind of statistically significant randomly generated sample urged by the Debtors' own expert, Dr. Friedman, who stated that the "single greatest factor which may determine the future number of impaired nonmalignant claims rests largely on the willingness of all parties to provide for ongoing review of the claims and underlying data including X-rays and PFTs."  Friedman Report at 35.

To implement Dr. Friedman's suggestions, CSFB respectfully requests the Court order that:

1.        Within three business days of the decision of this motion, NERA Economic Consulting ("NERA" (the Banks' retained consultant)) generate a random sample of Owens Corning claimants from Owens Corning's claims database (the "Random Sample").  CSFB will serve the random sample on all parties.  The Random Sample will be large enough to generate the Medical Records (including X-rays) of 1000 current claimants even assuming that not all claimants respond or provide X-rays.  Any party objecting to the Random Sample shall file and serve such objections within three (3) business days of the service of the Random Sample.

2.        CSFB will establish a depository for the X-rays and other Medical Records.  The depository will maintain the chain of custody, physical condition and confidentiality of the X-rays and other Medical Records consistent with the Health Insurance Portability and Accountability Act of 1996 (HIPAA), 42 U.S.C. § § 1320d-1329d-8.

---

[19] This study will have two additional benefits: First, showing how many claims filed against Owens Corning lack a medical basis puts in context the Plan Proponents' argument that anyone who submitted a prepetition claim should be entitled to vote on the Debtors plan of reorganization.  Second, the study will be an important aid in devising appropriately rigorous procedures to govern any trust established pursuant to 11 U.S.C. § 524(g).

3.      The Court should order the production (to the depository) for all claimants[20] listed on the Random Sample of (i) all original X-ray films and computer tomography scans and records; (ii) all records of pulmonary function tests; (iii) all reports generated in connection with the H readings of any X-rays; (iv) all medical histories or reports relating to the claimants' alleged asbestos-related disease or impairment from any medical doctor; and (v) any records of hospitalization or treatment relating to any alleged asbestos-related disease or impairment (collectively, the "Medical Records"). Such production shall be made within 30 days of resolution of any objections to the Random Sample.

4.      The Medical Records in the depository will be available for review and analysis by experts retained by the parties to this proceeding who have signed a depository procedures and confidentiality agreement;

5.      CSFB shall be permitted to conduct a study of the Medical Records (the "Study"), which shall be completed no later than one hundred (100) days[21] following the deadline for submission of Medical Records to the Depository;

6.      Experts retained by the parties may issue supplemental expert reports with respect to the Study within twenty (20) days of the completion of the Study.

7.      Each expert issuing a report shall make him or herself available for deposition within fifteen (15) days following the issuance of his or her supplemental report.

---

[20] The claimants are individuals who filed claims against Owens Corning prepetition that have not been settled. To the extent there is any objection that these claimants are not yet parties to this proceeding, the basis for that objection is rooted in the Plan Proponents' obstructionist objection to establishing a bar date for asbestos personal injury claims, which would have obviated any such issue long ago.

[21] The Banks have been advised that a study of this kind is likely to take approximately 100 days.

8.    A hearing for estimation of claims be held starting approximately 20 (twenty) days after completion of expert depositions.

While the Banks maintain that the Friedman Report and the Johns Hopkins Study alone form the basis to discard Owens Corning's history of settling nonmalignant claims as a basis for projecting its future asbestos liability, given the ACC's prior criticisms of the Johns Hopkins Study (*see* ACC Federal Mogul Brief at 15), there is no alternative but to conduct the study proposed by the Banks (and originally suggested by the Debtors' own expert).  And, given the lengthy concealment and very recent production of the Friedman, Vasquez and Mayer Reports, the Banks have no choice but to propose this study now.  Such a study will form the basis for accurate estimation of the Debtors' nonmalignant asbestos liability, a result that all parties to this proceeding should desire.

Ordering such a study is well-within the Court's powers.  In a bankruptcy proceeding this Court has "the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in the administration of the bankrupt estate." *Pepper v. Litton*, 308 U.S. 295, 309 (1939).  Under the Federal Rules of Civil Procedure, courts have wide latitude to supervise the discovery process.  *See, e.g.*, Fed. R. Civ. P. 26 advisory committee's note ("The court, however, retains authority to order discovery of any matter relevant to the subject matter involved in the action for good cause"; "The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested"); 6-26 Moore's Federal Practice Civil § 26.06 ("the Rules now provide a wide array of options for the judiciary to more aggressively control the discovery process").  Additionally, Bankruptcy Rule 2004 permits the bankruptcy court wide discretion to order discovery, *In re Valley Forge Plaza Assoc.*, 109 B.R. 669, 674 (Bankr. E.D.Pa. 1990),

32

particularly "for the purpose of . . . unearthing frauds." *In re Enron Corp.* 281 B.R. 836, 840

(Bankr. S.D.N.Y. 2002) (citing *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 711

(Bankr. S.D.N.Y. 1991)).

      In the context of estimation, a court can use its discretion and inherent power to create an

untainted and fair proceeding. Alison J. Brehm, David N. Copas, Jr., and Colleen Kotyk

Vossler, *To Be, or Not to Be: The Undiscovered Country of Claims Estimation in Bankruptcy*, 8

J. Bankr. L. & Prac. 197, 255 (1999) ("The range of options available to the bankruptcy judge in

the estimation of claims is limitless. Courts are free to fashion whatever method they deem

proper under the circumstances."); *see also* Hon. Carl B. Rubin and Laura Ringenbach, *The Use

of Court Experts in Asbestos Litigation*, 137 F.R.D. 35, 38 (1997) ("*Experts in Asbestos

Litigation*") (describing proceeding in which Judge Rubin proceeded under Fed. R. Evid. 706,

and appointed neutral experts in each case who were given all "reports, X-rays and other

pertinent material"); *In re Joint E. & S. Dists. Asbestos Litig.*, 982 F.2d 721 (2d Cir. 1992)

(stating that "we have no doubt of [the District Court's] authority to exercise its bankruptcy

powers to appoint experts to advise it on matters that concern the ongoing administration of the

Chapter 11 proceeding," in connection with projection of future asbestos claims)).[22] This power

clearly can be used in the targeted manner requested in the Motion to order the generation of a

---

[22] Pursuant to Rule 104 of the Federal Rules of Evidence, this Court also could appoint a
technical expert panel. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1331 n.10 (11th Cir.
1999) (*citing Hall v. Baxter Healthcare Corp.*, 947 F.Supp. 1387, 1392 n.8 (9th Cir. 2000)). The
Court could authorize the panel to prepare a report advising the Court as to the reliability of
Claimants' medical reports. Additionally, Rule 35 of the Federal Rules of Civil Procedure
permits a court to order the physical examination of a party, where the physical condition of the
party is in controversy and where there is good cause for an examination. *See In re Certain
Asbestos Cases*, 112 F.R.D. 427, 435 (N.D.Tex. 1986) (permitting postmortem examinations of
individual asbestos claimants – "a highly invasive procedure," and far more invasive than
producing X-rays.)

randomly selected and statistically significant survey, with the precise focus of establishing a legitimate estimation of the value of current and future nonmalignant claims.

### B.    THE COURT SHOULD MODIFY ITS AUGUST 19 ORDER

The Debtors have delayed these estimation proceedings for years, while the Banks have repeatedly tried to expedite the estimation process. In the short time frame the Debtors have produced documents, it has become clear that production and analysis of Medical Records is critical to any legitimate estimation. The Debtors should have followed through on Dr. Friedman's conclusion and done this themselves two years ago. At the least, the Vasquez, Mayer and Friedman Reports should have been produced so the Banks could have undertaken this review. Unfortunately, the opposite was done – the Debtors stonewalled discovery requests until after this Court had withdrawn the reference on estimation proceedings; they successfully urged the Court to set a tight schedule; and, they waited until only weeks before expert reports are scheduled to be filed before finally producing the critical reports that undermine the astronomical valuation on which their proposed plan is based. Under these disturbing circumstances, while mindful of the Court's desire to expedite these proceedings -- a desire shared by the Banks -- it has become clear that the schedule set forth in the August 19 Order does not provide adequate time for the Banks to prepare their case and will not permit the development of the record this Court will need to make a legally acceptable estimation.

The schedule set by the Court contemplates that expert reports are to be submitted on October 15, 2004, expert depositions to be conducted by December 15, 2004, and that the hearing be held on January 13, 2005. Although the Banks have been working diligently to meet this schedule, the recent disclosures detailed above have rendered it necessary to request that the

34

Court revisit the schedule at this point in the proceedings. In light of the Debtors' dilatory conduct, the Debtors should not now be heard to object.

Accordingly, the Banks seek adjournment of the January 13, 2005 estimation trial date. As set forth above, the schedule should be modified to permit the study requested by the Banks as set forth above (and in the attached proposed order). The most significant currently unknown scheduling factor is the time needed to obtain the Medical Records needed to conduct the study. The Banks believe that if the ACC and the plaintiffs' firms to which it reports cooperate with the gathering of Medical Records from their claimant clients who are selected to be part of the sample, rather than objecting and seeking to frustrate the process, then the schedule proposed herein by the Banks will be met.

## IV.    CONCLUSION

For the foregoing reasons, the Motion should be granted.

LANDIS RATH & COBB LLP

_[signature]_

Richard S. Cobb (I.D. No. 3157)
Rebecca L. Butcher (I.D. No. 3816)
919 Market Street, Suite 600
Wilmington, DE 19810
Telephone:  (302) 467-4400
Facsimile:  (302) 467-4450

    -and-

WEIL, GOTSHAL & MANGES LLP
Martin J. Bienenstock
Richard A. Rothman
767 Fifth Avenue
New York, NY 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

    -and-

Ralph I. Miller
100 Crescent Court, Suite 1300
Dallas, TX  75201-6950
Telephone:  ((214) 746-7700
Facsimile:  (214) 746-7777

    -and-

David A. Hickerson
Peter M. Friedman
1501 K Street, N.W., Suite 100
Washington, D.C.  20005
Telephone:  (202) 682-7000
Facsimile:  (202) 857-0940

    -and-

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
Kenneth H. Eckstein
919 Third Avenue
New York, New York 10022
Telephone:  (212) 715-9100
Facsimile:  (212) 715-8000

ATTORNEYS FOR CREDIT
SUISSE FIRST
BOSTON, AS AGENT FOR THE
BANK GROUP

Dated: October 4, 2004

36

*Rec'd 5/21/02*

**SUBJECT:**    Owens Coming Impaired Nonmalignant Claim Submissions
1994-1999 (approx.)

**Qualifications:**

My name is Dr. Gary K. Friedman.

I graduated from Baylor University Medical School in 1968 and have been a
practicing Pulmonologist in the City of Houston, Texas since 1973. I am Board
Certified in Internal Medicine and Occupational Medicine. I have been a Certified
"B" reader and have taught ILO x-ray interpretation at the University of Texas
Medical School. I have been the Director of the Pulmonary Function Laboratory at
Houston area hospitals over a period of 17 years. I am familiar with the American
Thoracic Society Standards for the performance of pulmonary function testing and
have taught medical students, interns and residents on this subject. I have been a
member of the faculty of the University of Texas Medical School Pulmonary
Division since 1985 and continue to lecture on occupational lung disease. I have
been actively involved in the evaluation of workers exposed to asbestos since
1984.

I have reviewed radiographs, pulmonary function studies, medical records
and performed IMEs on individuals alleging exposure to asbestos at the request of
plaintiffs counsel. More than 100,000 such evaluations have been performed either
by me personally or a member of my clinic. I have testified at trial or by deposition
in asbestos related cases on more than 60 occasions at the request of plaintiff
counsel including large class actions.

In August of 1999, 1 was retained by Owens Corning to serve as a medical
consultant to the National Settlement Program and I continue as a consultant in the
bankruptcy.

I currently evaluate individuals for both plaintiffs and defendants in
asbestos related matters.   I also see patients with asbestos exposure as part of my
medical practice.  I have been referred cases alleging asbestos related injury by the

1

United States Department of Labor. I render opinions as a Designated Doctor for Texas Workers Compensation Commission and have evaluated individuals at the request of Texas Rehabilitation Commission and am familiar with issues concerning impairment.

I am a past Chief of Staff of Memorial Hermann Hospital - Memorial City and a past President of the Western Branch of the Harris County Medical Society.

A copy of my curriculum vitae is attached (Exhibit #1).

Based on the above, I am qualified to render opinions in this matter.

**Methodology:**

This study represents an analysis of x-ray reports, pulmonary function reports and other data on a representative sample randomly selected from 22,578 asbestos nonmalignant claims submitted to the NSP under agreements where financial incentive existed for identification of impairment.

Dr. Thomas Vasquez determined the cohort size necessary to provide an adequate number of cases to yield an appropriate sampling rate. Dr. Vasquez performed a stratified random sample involving 12 stratifications with proportional sampling involving industry/occupation and year of birth(Exhibit #2).

A total of 1691 charts were submitted for review (Exhibit #3). I had no involvement in the selection of cases. The claims were submitted by numerous different plaintiff firms from various geographic locations. The identity of all plaintiff firms was redacted from all documents and represented by an assigned code. I was blinded as to the identity of the law firms.

The documents were carefully reviewed with emphasis placed on the ILO or X-ray reports as submitted and the pulmonary function studies (PFTs) - data was entered into a relational database (Access). Further details of the methodology are provided in Appendix 1.

**Introduction:**

These cases represent a snapshot of a select group from a given point in time (predominantly claims filed 1991-1999). These cases were reportedly "screened" from a larger general population allegedly at risk. The total number "screened" is unknown. The incidence of impairment in the entire exposed population at risk would presumably be much lower than the results cited in this report. Additionally, this cohort is likely to yield a higher incidence of impairment as substantially greater settlement compensation was paid for claimants meeting medical impairment criteria and selection bias may be present.

The reader is advised to refer to a glossary included at the end of this report to more easily understand the medical terminology.

**Primary Objective:**

The ultimate goal of this study was to generate a reliable base of information on which debtors valuation expert, Dr. Thomas Vasquez, could rely.   Dr. Vasquez is to perform a statistical analysis on this data to determine its reliability.  Subsequent to that review, Dr. Vasquez is to use this information in estimating the percentage of impaired nonmalignant claims under NSP criteria that can be anticipated to be included in the population of total future claims asserted against the debtors.

**NSP Criteria:**

Under the terms of the NSP Agreements, determination of qualification as a nonmalignant impaired case is largely predicated on three criteria:

1) **Exposure**

2) **Pulmonary Function Testing (PFT)** - performed according to ATS (American Thoracic Society) standards and meeting NSP impairment criteria

3) **Chest x-ray** interpretation according to ILO standards fulfilling at least the following criteria:

3

A) Pulmonary asbestosis  - an ILO profusion of 1/0 or greater

and/or

B) Pleural disease - ILO category B2 or greater with one costophrenic angle involved

Both x-ray and PFT criteria must be met before a case can qualify for compensation as impaired nonmalignant.

It was determined that **13.3%** of claims would have met NSP PFT criteria as **impaired**.   Additional impaired cases are likely to be found if PFTs meeting ATS standards were to be performed in 282 claimants without PFTs and in some of the 106 cases declared impaired deficient.   However, the finding of a 13.3% impairment rate was predicated on the acceptance of an underlying diagnosis of nonmalignant asbestos related disease based on all submitted x-ray reports without an audit of the actual films or exclusion of other more probable cause.  A review of the radiographic reports and ILO forms raises serious questions concerning their reliability.  These factors are likely to place downward pressure on the 13.3%.

4

**PULMONARY FUNCTION TESTING DETERMINATION OF IMPAIRMENT**

**Pulmonary Function Testing: Criteria for evaluating pulmonary function tests and determination of impairment.**

1) Determination of impairment of lung function is based on the performance of pulmonary function tests. Within the Agreement, Pulmonary Function Testing is defined as spirometry, lung volume or diffusing capacity that conforms to criteria established by the American Thoracic Society ("ATS") and is performed on equipment which meets ATS standards for quality and calibration, all as set forth, etc.... Appendix A (Exhibit #6).

2) **Material Compliance** with ATS criteria was set forth in Appendix B (Exhibit #7).

3) **Determination of Impairment** was based on criteria contained in Appendix A (Exhibits #6 & #8), Section 2 "Impaired NonMalignancy".

4) **ATS requirement** (Exhibit #9).

5) Also included as exhibits are certain of the "ATS" standards cited in Appendix A. (Exhibits #10, #11, #12)

6) Additional sources of information concerning pulmonary function tests:

Because several unique problems were encountered in the review of the PFTS, I made telephone inquiries to:

1) Certain pulmonary function laboratories
2) Pulmonary function equipment manufacturers
3) Hospital PFT labs
4) Dr. Hankinson, author of PFT interpretive software
5) Others.

**Examples of significant or unusual problems encountered with pulmonary function testing can be found in Appendix 2.**

6

**Pulmonary Function Testing - Results**

**1691** cases were submitted for review.  **282** of these cases had no PFTs (Exhibit 3A).

#3).   A Master List is enclosed (Exhibit #3).

**225 cases** (13.3%) were found to be **impaired** (Exhibit #4) based on PFTs which fulfilled the criteria of Appendix A and Appendix B and most operative ATS standards (with the exception of predicted values and ethnicity).

**106 additional cases** had numerical values which would have qualified for impairment but had 1 or more deficiencies in the PFT which disqualified the study (see Methodology) (Exhibit #5).  Examples of deficiencies included failure to provide any tracings, providing only one tracing, lack of proof of three efforts.

**1360** cases were deemed unimpaired.  768 were found unimpaired based on NSP criteria in Appendix A.  An additional 117 were unimpaired based on NSP criteria in Appendix A but lacked tracings.  It is unlikely that the presence of tracings would have materially changed their status and thus the total number of unimpaired based on NSP criteria was 885 (52.33%).  An additional 282 were determined to be unimpaired because PFT was not performed (16.6%).  98 were categorized as unimpaired because the spirometry was nonqualifying and the TLC was not properly performed (fatal flaw) (5.8%).  These factors accounted for 1265 (93%) of the 1360 unimpaired.  The remaining 95 cases (7%) were due to poor test performance (sufficient to render the study un-interpretable) missing ILO, illegible studies or other miscellaneous problems.

**PFT Review, Summary & opinion:**

In a group of 1691 asbestos claims having financial incentive for documentation of impairment 225 **(13.3%)** fulfilled applicable impairment criteria.

**A) Upward pressure** on this number: An additional 106 cases would have met the numerical values for compensation under a standard agreement, but either failed to meet terms of the "Agreement" ATS performance criteria, had no tracings or only one tracing. There was reasonable question that some of this group could be impaired if

7

retested.

In 282 cases, no PFT was performed.  Assuming a 7% incidence of impairment in this group, an additional 20 cases would occur.

**Downward pressure on the number of impaired:**

The 13.3% impairment rate is subject to downward pressure from at least three major sources:

    1) ILO and x-ray interpretation reliability

    2) Exposure history ( see occupation)

    3) Exclusion of other more probable cause for the x-ray findings

        A) occupational (coal mine, foundry, etc.)

        B) nonoccupational (heart failure, kidney failure, etc.)

Results of the pulmonary function review are summarized in Chart #1. Information is contained in Appendix A and on pages 7 and 8 related to the Review of Pulmonary Functions.