# Appendix Exhibit H

**ATTACHMENT B**

YOUR NAME: ______________________________
YOUR CLIENT NO.: ______________ YOUR GROUP NAME: ______________
THE DATE OF YOUR DEPOSITION: ______ THE DATE YOU WERE PREPARED: ______

**PREPARING FOR YOUR DEPOSITION**
Attorney Work Product

INTRODUCTION:

Your deposition is probably the single most important part of your lawsuit. It is an opportunity for the lawyers representing the asbestos manufacturers who are defendants in your lawsuit to ask you questions, under oath, about their product. The burden of proof is on you, the Plaintiff, to show how you *know* it was *their* product you were exposed to. How well you know the name of each product and how you were exposed to it will determine whether that defendant will want to offer you a settlement. If you are confident and knowledgeable, the manufacturer will be more likely to offer you settlements because they will feel they cannot win if your case goes to trial in front of a jury.

The idea of sitting at a table for several hours while a room full of attorneys asks you to recall specific names and products from thirty or forty years ago can be frightening. But it will be less stressful if you take time now to prepare, which means you must STUDY your work history sheets OVER and OVER and OVER. Not all brand names were stamped on the product itself. Most names were only on the containers it came in. If you cannot say what the container looked like, how can you know what name of the product was?

The things you must be able to do by MEMORY at your deposition are:

1. KNOW WHAT **GENERAL "TYPES"** OF ASBESTOS PRODUCTS YOU WORKED WITH OR AROUND (such as INSULATING CEMENTS, PIPE COVERING, GASKETS, etc.);

2. KNOW THE **NAMES** OF ALL THE PRODUCTS LISTED ON YOUR WORK HISTORY SHEETS (such as A.P. GREEN, KAYLO, GARLOCK, etc.);

3. KNOW WHICH **NAMES** GO WITH WHICH **"TYPES"** OF PRODUCT (for instance GARLOCK made GASKETS and KAYLO made PIPE COVERING, etc.)

4. KNOW WHICH **PRODUCTS** WERE AT EACH **JOBSITE**, according to your work history sheets;

5. KNOW WHAT KIND OF **PACKAGES** THESE ASBESTOS PRODUCTS TYPICALLY CAME IN, (such as INSULATING CEMENT came in BAGS and PIPE COVERING came in BOXES, etc.);

6. KNOW THE **TRADE** OR **CRAFT** OF THE MEN WHO TYPICALLY APPLIED **EACH TYPE** OF **PRODUCT** at your jobsite (such as PIPEFITTERS installed GASKETS and BRICKMASONS installed FIREBRICK, etc.)

7. KNOW THE **NAMES** OF YOUR CO-WORKERS, especially those who have been designated as your **WITNESSES**. You should be able to generally describe their appearance (black or white, approximate height, weight and age, their nicknames and what their TRADES were. Be thinking about how often you worked around each other (several times a year, almost every day, etc. – the more often, the better!) and how closely you worked together (side by side, in the same department, etc. – the closer, the better!). You don't have to be dear friends or even know them very well, but your CO-WORKERS are very important to your case because they may be asked to testify about products you were exposed to which you DON'T recall!

SPECIFIC PRODUCTS AND THEIR APPEARANCE AND APPLICATIONS

**INSULATING CEMENT:** Insulating cement was usually a gray powder which came in large 50 or 100lb sacks. Remember to say you saw the NAMES on the BAGS. Refer to it as "insulating cement" and not just "cement". Insulating cement is NOT like sidewalk concrete! Insulating cement had asbestos in it and sometimes had the word "asbestos" printed on the bag. It was typically used to insulate steampipes. Plain old concrete did NOT contain asbestos!

Insulating cement was mixed with water to make a mud which was then smeared on over pipecovering or at the joints and elbows of steam pipes, water lines and chemical pipes. Insulating cement was usually applied by asbestos workers, insulators or pipefitters who repaired or installed a section of pipe. Insulating cement was usually put on by hand or with trowels. It was dusty when the sacks were being dumped out and when it was mixed with water. Try to remember how close you were when it was being dumped and mixed. The more often you were around it, the better for your case. You MUST prove that you breathed the dust while insulating cement was being used.

Remember, the names you recall are NOT the only names there were. There were other names, too. They are JUST the names that YOU remember seeing on your jobsites.

The INSULATING CEMENTS I remember are: ____________________

____________________________________________

I was close by while INSULATING CEMENT was being used because ____________

____________________________________________

____________________________________________

The specific jobs or types of job I recall INSULATING CEMENT at are: ____________

---

**REFRACTORY CEMENT:** Refractory cement was usually a gray powder which came in large 50 or 100lb sacks. Remember to say you saw the NAMES on the BAGS. Refer to it as "Refractory cement" and not just "cement". Refractory cement was a high temperature cement used to coat the walls of furnaces, cupolas, crucibles and other containers which held molten metal or similar products. Refractory cement was also used to cast molds for forms and as mortar between firebrick in open hearths and furnaces. Refractory cement was used on boilers and whenever high temperature cement was needed.

Refractory cement was mixed with water to make a mud and was usually applied by brickmasons, boilermakers or aluminum workers. They usually put it on with trowels. It was also mixed with dough and poked with a long stick into holes and cracks in furnace walls. Refractory cement was dusty when the sacks were being dumped out and when it was mixed with water. Try to remember how close you were when it was being dumped and mixed. The more often you were around it, the better for your case. You MUST prove that you breathed the dust while refractory cement was being used.

Remember, the names you recall are NOT the only names there were. There were other names, too. These are JUST the names that YOU remember seeing on your jobsites.

The REFRACTORY CEMENTS I remember are: ______________________________

______________________________________________________________________

I was close by while REFRACTORY CEMENT was being used because ____________

______________________________________________________________________

______________________________________________________________________

The specific jobs or types of job I recall REFRACTORY CEMENT at are: __________

______________________________________________________________________

**GUN MIX:** Gun Mix was a gray powder which came in large 50 or 100lb sacks. Remember to say you saw the NAMES on the BAGS. Gun Mix was used like refractory cement except that it was dumped into large hoppers, mixed with liquid and then "gunned" onto the walls and ceilings of furnaces, boilers, cupolas, crucibles and other containers which hold molten metal or similar products.

It was dusty when the sacks were being dumped out and when it was mixed with liquid. Try to remember how close you were when it was being dumped and mixed and sprayed. The more often you were around it, the better for your case. You need to prove that you breathed the dust while Gun Mix was being used. When Gun Mix was being sprayed, the air was usually filled with dust!

Remember, the names you recall are NOT the only names there were. There were other names, too. These are JUST the names that YOU remember seeing on your jobsite.

The GUN MIX I remember is: ______________________________

I was close by while GUN MIX was being used because ______________________________

______________________________

______________________________

The specific jobs or types of job I recall GUN MIX at are: ______________________________

**PRE-CUT GASKETS:** Pre-cut gaskets were usually installed in high-pressure steam and chemical line fittings. Pre-cut gaskets came in cardboard boxes or in bundles with a name tag. High pressure gaskets needed to make a tight seal, so layers of paper usually separated the gaskets in the box to protect them from scratches or dents. Remember to say you saw the NAMES on the BOXES. Sometimes the name was stamped right on the gaskets, too.

Pre-cut gaskets were not dusty, but they gave off fibers when compressed as a pipe joint was tightened down. Pre-cut gaskets were typically installed by pipefitters and machinists but you may know of other trades who installed them, too. Try to remember how close you were when pre-cut gaskets were being installed. The more often you were around them, the better for your case. You MUST prove that you breathed the fibers while pre-cut gaskets were being used.

Remember, the names you recall are NOT the only names there were. There were other names, too. These are JUST the names that YOU remember seeing on your jobsites.

The PRE-CUT GASKETS I remember are: ______________________________

______________________________

I was close by while PRE-CUT GASKETS were being used because ______________________________

______________________________

The specific jobs or types of job I recall PRE-CUT GASKETS at are: ______________________________

______________________________

**SHEET GASKETS:** Sheet gaskets usually came on large rolls tied with a name tag. Usually the name or an emblem was stamped right on the sheets. Remember to say you saw the NAMES on the SHEETS! Many trades used sheet gaskets. Pipefitters and machinists used them to seal water lines at pipe joints and valves. Boilermakers used them to make a tight seal around the boiler and furnace

doors. Electricians used them to seal transformer boxes. You may know of other trades which used sheet gaskets, too.

Usually, a section of sheet gasket was cut from the roll with a utility knife. The sheet was then laid on a table and a gasket cutter (caliper) was used to measure the size gasket needed and perforate the edges. Then a blunt object like a ballpene hammer was used to knock off the excess gasket material. Sometimes holes were punched through the gasket where the valve bolts would be tightened down. All these procedures caused fibers from the gasket material to be relased into the air. The gaskets were then installed and gave off more fibers as they were compressed into place.

Try to remember how close you were when sheet gaskets were being cut, pounded and installed. The more often you were around them, the better for your case. You MUST prove that you breathed the fibers while sheet gaskets were being used.

Remember, the names you recall are NOT the only names there were. There were other names, too. These are JUST the names that YOU remember seeing on your jobsites.

The SHEET GASKETS I remember are: ______________________________

______________________________________________________________

I was close by while SHEET GASKETS were being used because ______________

______________________________________________________________

The specific jobs or types of job I recall SHEET GASKETS at are: ______________

______________________________________________________________

**ROPE PACKING:** Rope packing usually comes on spools packed in cardboard boxes. Remember to say you saw the NAMES on the BOXES or on the ENDS of the SPOOL. Rope packing was dark or light, and was a thick fiber with a waxy or graphite coating. Pipefitters and machinists used rope packing to pack their pipe joints and valves. Boilermakers used rope packing around the boiler doors to make a tight seal. Aluminum workers used rope packing to seal the seams between joints of castable mold forms and troughs. You may be able to think of other craftsmen who used rope packing, also.

When a length of rope was cut from the spool with a utility knife or snips, fibers were released into the air. Try to remember how close you were when rope packing was being used. The more often you were around it, the better for your case. You MUST prove that you breathed the fibers while rope packing was being cut.

Remember, the names you recall are NOT the only names there were. There were other names, too. These are JUST the names that YOU remember seeing on your jobsites.

The ROPE PACKING I remember is: ______________________________

______________________________________________________

I was close by wile ROPE PACKING was being used because ______________

______________________________________________________

The specific jobs or types of job I recall ROPE PACKING at are: ______________

______________________________________________________

**PIPE COVERING:** Pipe covering usually came in cardboard boxes. Remember to say you saw the NAMES on the BOXES. Pipe covering came in several colors. Some was white or off-white. Some was pink or tan. Some was a dark greenish-brown color. Pipe covering was a stiff fiber-like material which came in different diameters in a half-moon or split-circle shape, usually in 3 foot lengths. Insulators, asbestos workers, pipefitters and plumbers usually applied pipe covering, but you may be able to think of others, too. A handsaw was usually used to cut the length of pipe covering needed. It was then wrapped around steampipes, chemical lines, refrigerated lines or hot water pipes and secured with tape or wire bands until it could be covered with insulating cement, cloth or metal.

Whenever pipe covering was sawed, asbestos fibers were released into the air. Try to remember how close you were when pipe covering was being used. The more often you were around it, the better for your case. You MUST prove that you breathed the fibers while pipe covering was being cut and installed.

Remember, the names you recall are NOT the only names there were. There were other names, too. These are JUST the names that YOU remember seeing on your jobsites.

The greenish-brown PIPE COVERING was called: ______________________

The other PIPE COVERING names I remember are: ______________________

______________________________________________________

I was close by while PIPE COVERING was being used because ______________

______________________________________________________

______________________________________________________

The specific jobs or types of job I recall PIPE COVERING at are: ______________

---

**BLOCK INSULATION:** Block insulation usually came in cardboard boxes. Remember to say you saw the NAMES on the BOXES. Block insulation was usually white or tan, but some was dark brownish green color. Block insulation was a stiff fiber-like material which came in different thicknesses and sizes. Many different trades used block insulation. Thin sheets of insulation were glued or riveted to boiler walls. Thick sections were inserted between inner firebrick walls and the outer metal walls of furnaces. Block insulation was often used in awkward areas where pipe covering would not fit. On really big pipes, sheets of block insulation were laid along pipe sections side-by-side, until the whole pipe was covered.

A electric saw was usually used to cut the size of Block Insulation needed. Whenever Block Insulation was cut or sawed, asbestos fibers were released into the air. Try to remember how close you were when Block Insulation was being used. The more often you were around it, the better for your case. You MUST prove that you breathed the fibers while Block Insulation was being cut and installed.

Remember, the names you recall are NOT the only names there were. There were other names, too. These are JUST the names that YOU remember seeing on your jobsites.

The dark, brownish green BLOCK INSULATION was called: ____________________

The other BLOCK INSULATION names I remember are: ____________________

______________________________________________________________________

I was close by while BLOCK INSULATION was being used because ______________

______________________________________________________________________

______________________________________________________________________

The specific jobs or types of job I recall BLOCK INSULATION at are: ____________

______________________________________________________________________

**PLASTIC CEMENT:** Plastic cement was a thick, sticky tar, black in color, which came in 5 gallon and 10 gallon cans or pails. Remember to say you saw the NAMES on the CANS. Plastic cement was used wherever a waterright seal was needed. Pipefitters used plastic cement to seal pipe joints and valves and sometimes as a waterproof coating over pipecovering. Plastic cement was NOT used at a heat SOURCE, because it was asphalt-based and MELTED at high temperature. Pipefitters and Electricians often used plastic cement when they had to seal a pipe or conduit penetration through a floor, wall or roof. Millwrights, machinists and roofers used it to seal flashing around machinery and roof vents.

Plastic cement was not dusty when it was being applied, but once it was dry, then sawed or drilled through, fibers from the plastic cement were released into the air. Try to remember how close you were when plastic cement was being used. The more often you were around it, the better. You MUST prove that you breathed the fibers while plastic cement was being applied or drilled through.

Remember, the names you recall are NOT the only names there were. There were other names, too. These are JUST the names that YOU remember seeing on your jobsites.

The PLASTIC CEMENT names I remember are: ______________________________

______________________________________________________________

I was close by while PLASTIC CEMENT was being used because ______________

______________________________________________________________

The specific jobs or types of job I recall PLASTIC CEMENT at are: ____________

______________________________________________________________

**FIREPROOFING:** Fireproofing was a gray fiber-like material which came in 25, 50 and 100lb sacks. Remember to say you saw the NAMES on the SACKS. Usually, several bags of fireproofing material were ripped open and dumped into large hoppers at once, which created a lot of dust. Then the fireproofing material was mixed with liquid adhesive and "sprayed" onto steel beams and structural framework of large buildings to prevent the structure from collapsing if the building caught fire. Asbestos workers and insulators applied fireproofing, and outside-contractor "gun crews" were often brought in to spray buildings with fireproofing.

Fireproofing was dusty when the sacks were being dumped out and when the fireproofing was mixed with liquid. Try to remember how close you were when it was being dumped and mixed and sprayed. The more often you were around it, the better for your case. You need to prove that you breathed the dust while Fireproofing was being used. When Fireproofing was being sprayed, the air was usually FILLED with dust and workers all around it were covered from head to toe!

Remember, the names you recall are NOT the only names there were. There were other names, too. These are JUST the names that YOU remember seeing on your jobsites.

The FIREPROOFING I remember is: ______________________________

I was close by while FIREPROOFING was being sprayed because ______________

The specific jobs or types of job I recall FIREPROOFING at are: ______________

---

**ASBESTOS BOARDS AND PANELS:** Asbestos Millboard and transite sheets were usually shipped in stacks on pallets with the NAMES stamped on the SHEETS or printed on a label wrapped around the stack. Drywallers, carpenters, millwrights, sheetrock finishers and other trades used asbestos boards and panels to insulate walls of offices, storerooms and control rooms in large industrial plants, as well as to soundproof walls in homes, schools, hospitals and commercial buildings. Shipfitters used asbestos boards in the walls of bulkheads, galleys and living quarters aboard ship.

Asbestos boards and panels were very dusty when sawed, and gave off fibers into the air. Try to remember how close you were when boards were being sawed and installed. The more often you were around them, the better for your case. You need to prove that you breathed the dust while asbestos boards and panels were being sawed and installed.

Remember, the names you recall are NOT the only names there were. There were other names, too. These are JUST the names that YOU remember seeing on your jobsites.

The ASBESTOS BOARDS AND PANELS I remember are: ______________________

I was close by while ASBESTOS BOARDS AND PANELS were being sawed because

______________________________________________________________________

______________________________________________________________________

The specific jobs or types of job I recall ASBESTOS BOARDS AND PANELS at are:

______________________________________________________________________

**JOINT COMPOUND:** Joint compound was white or off-white and came in two different forms. Sometimes it was a powder which came in 5 to 25lb cardboard boxes or in heavy paper bags. It also came in paste form, in small cans or in 5 gallon buckets or pails. Either way, remember to say you saw the NAMES on the BAGS, BOXES or PAILS. Drywallers, carpenters, sheetrock finishers and millwrights usually dumped the powdered joint compound into an empty bucket, added water and then stirred it with a stick or with an auger attached to a drill until it formed a paste. If it came as a paste, they applied it right from the can.

As a paste, joint compound was used to fill in the seams between sheets of drywall, millboard and sheetrock. It was also used to fill nail holes and wall cracks. When it was dry, it was sanded. So joint compound was dusty TWICE, when it was mixed (if it came in powdered form) and again when it was sanded!

Try to remember how close you were when joint compound was being mixed and sanded. The more often you were around it, the better for your case. You need to prove that you breathed the dust while joint compound was being used.

Remember, the names you recall are NOT the only names there were. There were other names, too. These are JUST the names that YOU remember seeing on your jobsites.

The JOINT COMPOUND names I remember are: ______

______

______

I was close by while JOINT COMPOUND was being applied and sanded because ______

______

______

The specific jobs or types of job I recall JOINT COMPOUND at are: ______

**CLOTH AND FELT:** Asbestos cloth and felt usually came in rolls like carpet or in bundles banded with a name tag. Sometimes the NAME was printed on the CLOTH, and sometimes it was only on the NAME TAG.

Asbestos cloth had many uses and was applied by many different trades. Welders, machinists and pipefitters used asbestos cloth to "wrap their welds" or to protect machinery nearby from sparks and heat. Aluminum workers used heavy felt to cushion the trays onto which metal rods were laid to keep them from getting scratched. Papermakers used felt in the dryer machines at paper mills. Asbestos felt was also used under roofing material, and was sometimes wrapped around steampipes over pipe covering. Electricians used asbestos cloth to line their cable trays.

When asbestos cloth and felt was cut, fibers were released into the air. Try to remember how close you were when asbestos felt or cloth was being cut. The more often you were around it, the better for your case. You need to prove that you breathed the fibers while felt was being cut.

Remember, the names you recall are NOT the only names there were. There were other names, too. These are JUST the names that YOU remember seeing on your jobsites.

The names of ASBESTOS CLOTH AND FELT I remember are: ______

______

I was close by while CLOTH AND FELT was being cut because ______

______

______

The specific jobs or types of job I recall ASBESTOS CLOTH OR FELT at are: ______

---

**FIREBRICK:** Firebrick was larger than regular clay brick and not as dense or heavy. Firebrick came shipped on pallets wrapped with a paper or plastic banner with the NAME on the BANNER. Sometimes the NAME was STAMPED right on the BRICKS. Brickmasons and boilermakers usually sawed and installed firebrick. It was used to line the walls of open hearths, furnaces and kilns.

Firebrick often came shipped with rolls of felt, and brickmakers were instructed to lay felt between the layers of firebrick where it would act as an expansion joint. As the furnaces heated up, the cloth would burn away and leave room for the brick to expand. Firebrick was often custom made to order, with asbestos millboard glued to the ends or sides of each brick, depending upon where in the furnace it would be installed. Like the cloth, the millboard acted as an expansion joint, and burned away when the furnace was heated, leaving room for the brick to expand. Sometimes, firebrick was wrapped in a metal casing, again, leaving room between the brick and the casing for the brick to expand when heated.

Firebrick had to be cut with big masonry blades. This gave off a lot of dust! Try to remember how close you were when firebrick was being sawed. The more often you were around it, the better for your case. You need to prove that you breathed the dust while firebrick was being sawed.

Remember, the names you recall are NOT the only names there were. There were other names, too. These are JUST the names that YOU remember seeing on your jobsites.

The names of FIREBRICK I remember are: ____________________

I was close by while FIREBRICK was being sawed because ____________________

____________________

____________________

The specific jobs or types of job I recall FIREBRICK at are: ____________________

____________________

____________________

**OTHER ASBESTOS PRODUCTS:**

____________________

____________________

____________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

The coworkers who can testify about products I was exposed to are:

________________, whose nicknames is ________ and whose city and phone number is ____________________, worked with/around me at: __________ ________________________________ from ______ to _____

________________, whose nicknames is ________ and whose city and phone number is ____________________, worked with/around me at: __________ ________________________________ from ______ to _____

________________, whose nicknames is ________ and whose city and phone number is ____________________, worked with/around me at: __________ ________________________________ from ______ to _____

________________, whose nicknames is ________ and whose city and phone number is ____________________, worked with/around me at: __________ ________________________________ from ______ to _____

________________, whose nicknames is ________ and whose city and phone number is ____________________, worked with/around me at: __________ ________________________________ from ______ to _____

________________, whose nicknames is ________ and whose city and phone number is ____________________, worked with/around me at: __________

_______________________________________ from ________ to ________

_______________________, whose nicknames is __________ and whose city and phone number is _________________________, worked with/around me at: ____________

_______________________________________ from ________ to ________

The following are some of the typical questions and issues which will likely be discussed during your deposition, and some suggestions for how to deal with them.

QUESTIONS FROM THE DEFENSE ATTORNEYS:

Remember this verse as you answer questions during your deposition:

**K I S S = KEEP IT SHORT AND SIMPLE!**

It might help to pretend you are a "prisoner of war" in an enemy camp where you must only give "name, rank and serial number". Answer ONLY the question asked and DO NOT VOLUNTEER any information! Let the defense attorney complete his entire question BEFORE you start to give your answer. Do NOT interrupt him while he is talking. Take a moment BEFORE you answer to ask yourself if you can simply anser "YES" or "NO" or "I DO NOT RECALL". Do not give an explanation for "YES" or "NO" unless the attorney asks. If he wants to know more, he will ask.

Because it is sometimes difficult to determine which questions can be answered "YES" or "NO", keep this example in mind: If an attorney asks you if you know what products Johns Manville made, you might naturally tell him "insulating cement". But think about it. He did not ask you to tell him WHICH products, he asked if you KNEW what products were made by Johns Manville. The only correct answer to that question is "YES" or "NO"! You may believe that by volunteering information you think the defense attorney will ask about next, your deposition will go more quickly. Unfortunately, the opposite is often true, since he might not have thought to ask about what you volunteered, until YOU brought it up!

You are NOT being impolite or untruthful when you answer only "YES" or "NO". You are actually answering his question truthfully, without volunteering information he has not requested. If the defense attorney then asks you "What products were made by Johns Manville?" you can tell him which products you recall. BUT ONLY THEN! See how confusing it can be?

Be sure you understand a question BEFORE you start to answer. It is okay to ask a defense attorney to repeat his question or ask it in a different way if you are not sure you understand. If you begin to get confused or upset, ask your Baron & Budd attorney if you can take a short break. You and your attorney will leave the room for a few minutes. This will give your Baron & Budd attorney a chance to advise you, in private, how you are doing and to explain anything that is confusing or upsetting you. You may ask for a break at any time during your deposition, within reason, and you

should take advantage of these opportunities to talk to your attorney about whatever is on your mind.

Do NOT tell stories about your experiences at work or give long explanations for your answers. Doing so could accidently provide the defense attorneys with information they can use against you later! Do NOT use swear words or make negative remarks about race, laziness, or poor workmanship when talking about employers or co-workers. Those co-workers might be called upon to help you in your case! Be polite and courteous at all times, and keep your answers BRIEF and to the point.

Remember, if "YES" or "NO" or "I DON'T RECALL" will answer a defense attorney's question, then that is ALL YOU HAVE TO SAY!

THINGS TO WATCH OUT FOR:

1. LEADING QUESTIONS. Once you have answered a question, a defense attorney may try to trick you into changing your answer by repeating back what you just said using different words and asking if that is what you meant to say. Some examples of this are:

"So, in other words, what you are trying to say is..."

"What you really mean to say is..."

"Wouldn't you agree with me that..."

"Isn't it a fair statement to say that..."

"Let me see if I understand you correctly. You just stated that..."

When you hear a defense attorney start his question that way, he may be trying to twist your answer to mean something which could be used against you. Do NOT agree with a defense attorney's restatement of your response unless you are absolutely positive that is what you really meant to say!

2. IMPLICATIONS THAT YOU ARE NOT TELLING THE TRUTH OR ARE MISTAKEN. The questions asked by the defense attorneys are designed to prove that your were NOT exposed to their product. They will try to confuse you and make you unsure about what you remember. Some examples are:

"Do you mean to tell me that you saw plastic cement being used on *pipe* joints?"

"Are you saying you *really* saw fireproofing being sprayed at that hotel?"

"Did you actually *see* pipecovering put on pipes at residences?"

"How can you be so sure it was *that* brand you saw there?"

These questions are designed to make you believe *they* know something different from what *you* recall and what you are saying cannot be true. They may try to make you loose your temper or feel stupid because you have less education than they do. Keep in mind that these attorneys are very young and WERE NOT PRESENT at the jobsites you worked at. They have NO RECORDS to tell them what products were used on a particular job, even if they act like they do.

Your own recollection is your best asset. YOU know what YOU saw. If you begin to doubt your memory or change your answer to "Well, I think so", or "it could have been there", the attorneys will use your uncertainty against you and ask more and more questions about it. Never say "I guess so". The best way to respond to this kind of question is "Yes, I am SURE I saw it there!" or "I KNOW it was that brand because I saw the name on the container!".

Do NOT be disrespectful. Smart aleck responses read later in a courtroom will not make a jury want to take your side. If you get angry or confused, do NOT let it show. Just ask your attorney if you can take a short break. Remember, if you remain CONFIDENT about what you saw, the defense attorneys will move on to another subject and your deposition will be over a lot sooner.

3. QUESTIONS ABOUT "PRIVILEGED INFORMATION". Privileged information includes any and all conversations or written communications you have had with ANYONE at Baron & Budd. They are considered by law to be private, just like information between a doctor and a patient.

The defense attorneys will ask you questions about conversations you have had and documents you have seen. Some examples are:

"Have you discussed your lawsuit with anyone?"

"Do you have any notes or written material with you today?"

"Has anyone told you what to say or not to say at this deposition?"

"Did your attorney tell you to say that during your last break?"

DO NOT RESPOND TO THESE QUESTIONS RIGHT AWAY! Your Baron & Budd attorney will object to the question and will probably instruct you not to answer. Make sure you give your attorney TIME to object before blurting out an answer!

It is important to your case that you NOT discuss your lawsuit or products with co-workers because THOSE conversations are NOT PRIVILEGED, and the person you talked to could be subpoenaed to testify about the conversation!

The only documents you should ever refer to in your deposition are your Social Security Print Out, your Work History Sheets and photographs of products you were shown, but **ONLY** IF YOU ARE ASKED ABOUT THEM **AND ONLY** IF YOUR BARON & BUDD ATTORNEY INSTRUCTS YOU TO ANSWER! Any other notes, such as what you are reading right now, are "privileged" and should never be mentioned.

4. GENERAL QUESTIONS. You will be asked if you know what your lawsuit is about. You are seeking compensation for your injuries from exposure to asbestos products made by the defendants.

You will be asked WHY you think you have a case against the manufacturers of asbestos products. You are suing the asbestos manufacturers because they MADE a product they KNEW was harmful and they CONCEALED that danger from the public. Think about it. If they had made a dangerous product and TOLD everybody it was dangerous, then it would have been YOUR responsibility to stay away from it. Because they kept the danger a SECRET, they are liable for the harm they caused you.

You will be asked if you know what asbestos is. Listen carefully to the question. At this point, the defense attorneys are NOT asking if you knew asbestos was dangerous, they are just asking if you know what it is. Most people know that asbestos is an insulating fiber, so you would say, "YES". Then, if asked, you would simply say "it is an insulating fiber". Remember, NO long explanations!

You will be asked how you KNOW you were exposed to asbestos. In the 1950s, 1960s and early 1970s, many of the products included the word "Asbestos" in the name or had names that sounded like "asbestos", so it is likely that you knew you were working around it. That does NOT mean you ever saw a WARNING label or KNEW it was dangerous! Just say "I know I was exposed to it because I worked around it!"

You will be asked when you FIRST LEARNED asbestos was dangerous and HOW you found out. Most people learned about the danger when their doctor told them asbestos WAS IN THEIR LUNGS. It is important to emphasize that you had NO IDEA ASBESTOS WAS DANGEROUS when you were working around it. The defense attorneys believe that if you KNEW asbestos was dangerous and you continued to expose yourself to it without protection, then you should share the blame for being harmed by it.

You will be asked when you first learned YOU had been HARMED by asbestos. Most people first discovered they were harmed by asbestos when their doctor told them it WAS IN THEIR LUNGS and NEVER before that!

You will be asked if you ever saw any WARNING labels on containers of asbestos. It is important to maintain that you NEVER saw any labels on asbestos products that said WARNING or DANGER. You might even be asked to spell "WARNING" OR "DANGER" to prove you would know what it meant if you saw it.

You will be asked if you ever used respiratory equipment to protect you from asbestos. Listen carefully to the question! If you did wear a mask for welding or other fumes, that does NOT mean you wore it for protection from asbestos! The answer is still "NO"!

Finally, you will be asked how much YOU think your lawsuit is worth. Do NOT give an amount. Just say it is up to your attorneys to determine that. Remember, THERE IS NO AMOUNT OF MONEY WORTH YOUR HEALTH! You would rather have your health back than all the money in the world, wouldn't you? Then SAY SO!

QUESTIONS FROM YOUR BARON & BUDD ATTORNEY:

Your Baron & Budd attorney is there to help you and will be right by your side throughout the entire deposition. You must trust your attorney completely and listen carefully to everything you are told. Follow ALL your attorney's instructions! Your Baron & Budd attorney will not steer you wrong.

If you are answering a question and your Baron & Budd attorney interrupts you, STOP TALKING IMMEDIATELY! Your attorney is trying to fix something you said wrong, or stop you from saying something that contradicts your earlier testimony.

If your Baron & Budd attorney asks you any questions ON THE RECORD (in front of the other attorneys), listen carefully to your Baron & Budd attorney's suggestion. Some examples are:

"You mean to the best of your recollection, don't you?"

"You meant that insulating cement was used on steampipes, didn't you?"

"You didn't see that product before the 1980s, right?"

Your attorney will not ask you to say something wrong. Be wary ONLY if a DEFENSE ATTORNEY asks you a question like that!

QUESTIONS ABOUT ASBESTOS PRODUCTS:

Your responses to questions about asbestos products and how you were exposed to them is the most important part of your deposition. You must PROVE you worked with or around the products listed on your Work History Sheets. You must be CONFIDENT about the NAMES of each product, what TYPE of product it was, how it was PACKAGED, who used it and HOW it was used. You must be able to show that you were close to it often enough while it was being applied to have inhaled the fibers given off while it was being mixed, sanded, sawed, compressed, drilled or cut, etc.

You will be required do all this from MEMORY, which is why you MUST start studying your Work History Sheets NOW! If you are asked what product names you recall, and you know there are several names listed on your Work History sheets, but you can only remember a few of them, name the ones you CAN remember. Say that you know there are MORE names, but you are having trouble recalling them all. YOU MAY ASK to see your Work History Sheets to help refresh your memory, but your Baron & Budd attorney is NOT allowed to ask for you! Be sure to ask to see your "Work History Sheets". Do NOT refer to them as "notes" or "papers". Be aware that the

defense attorneys are allowed to REFUSE to let you look at your Work History Sheets! That is why it is best to MEMORIZE all your products and where you saw them BEFORE your deposition.

Do NOT mention product names that are not listed on your Work History Sheets. The defense attorneys will jump at a chance to blame your asbestos exposure on companies that were not sued in your case.

Do NOT say you saw more of one brand than another, or that one brand was more commonly used than another. At some jobs there may have been more of one brand. At other jobs there may have been more of another brand, so throughout your career you were probably exposed equally to ALL the brands. You NEVER want to give specific quantities or percentages of any product names. The reason for this is that the other manufacturers can say you were exposed more to another brand than to theirs, and so they are NOT as responsible for your illness! Be CONFIDENT that you saw just as much of one brand as all the others. All the manufacturers sued in your case should share the blame equally!

Be very careful about using the word "ONLY". The defense attorneys will ask you if the products you have named are the ONLY asbestos products which were at your jobsites. Of course they were not! There were lots of other names of pipecovering and insulating cement and gaskets, too! You should name all the products YOU RECALL, but be sure to say there were others, too. This way, your co-workers can testify about brands you cannot remember yourself. It is VERY important to say that there were LOTS of other brands. You just cannot recall ALL the names!

You must be able to pronounce the product names correctly and know WHICH products are pipecovering, WHICH are insulating cements and WHICH are plastic cements, for instance. Many of the product names should sound very similar to each other (Kaylo and Kaytherm, or Raybestos and Unibestos, for instance), but they might be different products entirely! Have a family member quiz you until you know ALL the product names listed on your Work History Sheets by heart.

The defense attorneys will ask you if you have ever heard of "Rostibestos" or some other PRETEND name. If a name does NOT sound familiar to you, do NOT say it does! Just say you do not recall that particular name.

The stress of a deposition will make you very nervous, so if you get confused about the names of certain products and which type of product you are being asked about, keep this handy tip in mind:

Let's say a defense attorney asks you to describe joint compound, what it looked like, what kind of package it came in and how it was applied. You give your description, to the best of your ability. Then he asks you to name all the joint compound names you can recall. You name one or two, but can't remember the rest. If he then asks you if you recall the name "TRIKO" and asks you what type of product "TRIKO" was, you can bet it was joint compound!

Whatever type of product was just being discussed will be the name you will be asked about, if you do not recall it on your own. So you can be confident in saying "TRIKO" was joint

compound, for instance, if you are asked in that way. If the defense attorney tries to slip in the name of a different TYPE of product, your Baron & Budd attorney will object. That is another reason why it is so important to ALWAYS HESITATE BEFORE ANSWERING ANY QUESTION, to give your attorney a chance to object and protect you from saying something wrong.

Unless your Baron & Budd attorney tells you otherwise, testify ONLY about INSTALLATION of NEW asbestos material, NOT tear-out of the OLD stuff. This is because it is almost impossible to prove what brand of material was being torn out, since heat probably destroyed any name printed on the product itself. You can only prove what the product name was when it was being installed in the first place, when the name was clearly marked on the material or on the container it came out of.

Make sure you concentrate on your exposure to asbestos products in the 1950s, 1960s and early 1970s. Do NOT talk about what went on at work in the 1980s and 1990s. The reason for this is that by the mid 1970s most insulating products being installed no longer contained asbestos. The public was just beginning to hear reports that asbestos was dangerous for the first time. You want to be PERFECTLY CLEAR ON THE RECORD that you did not expose yourself to asbestos once you learned it was dangerous! The simplest way to do this is to testify about what you recall from earlier years ONLY.

You may be asked how you are able to recall so many product names. The best answer is to say that you recall seeing the names on the containers or on the product itself. The more you thought about it, the more you remembered! If the defense attorney asks you if you were shown pictures of products, wait for your attorney to advise you to answer, then say that a girl from Baron & Budd showed you pictures of MANY products, and you picked out the ones you remembered.

If there is a MISTAKE on your Work History Sheets, explain that the "girl from Baron & Budd" must have misunderstood what you told her when she wrote it down. If there has been a CHANGE to your Work History Sheets, explain that you wanted to make the record clear. If you are asked why you certified a first (incorrect) version of your Work History Sheets to be correct are now saying it is NOT correct, explain that the first Work History Sheet is ALSO correct. The second version just makes the record MORE CLEAR.

If you are asked who MANUFACTURED a particular name of product, just repeat the name of the product. It is not your responsibility to know who the manufacturer was, unless the manufacturer's name was part of the trade name. For example:

"Who made Kaylo pipecovering?"

"KAYLO!"

"Who made A.P.Green firebrick?"

"A.P.Green!"

Never say "NEVER"! If a defense attorney asks if you saw a product being used in a certain way, describe how YOU saw it being used, and explain that it certainly COULD have been used in other ways, too.

DAMAGES

This part of your deposition is about your health. It is very IMPORTANT that you give concrete examples of how your life has been "damaged" by your exposure to asbestos. While the answers to questions about your work history and the products you were exposed to should be as SHORT as possible, THIS part of your deposition is YOUR opportunity to state, for the record, why you DESERVE to be compensated for damage to your health caused by asbestos. The defense attorneys will not ask as many questions about your health. It will be up to YOU to give as many examples as you can.

SHORTNESS OF BREATH. Think about it. There are very few things in life which are not affected by your ability to breathe. Between now and your deposition, be thinking about all the activities you have given up or must do more slowly because of shortness of breath. Some examples might be:

Do you have trouble sleeping at night because it is difficult to breathe lying down?

Do you sleep propped up with pillows or sitting up in a chair in order to breathe easier?

Do you wake frequently at night to cough or do you wake up in the morning coughing?

Do you take medications for breathing or anxiety or any other health problem? Bring ALL your medications along with you to the deposition so the Court Reporter can type the names onto the record, even if you don't take the medications regularly.

You will be asked how much money you have spent on asbestos-related health problems. Since there is really no way to know exactly, it is best to say that your DOCTOR will have to answer that question.

SMOKING, DRINKING AND DRUG ABUSE: You will be asked about these vices in order for the defense attorneys to establish your character and how well you take care of yourself. You will also be asked if you have ever been arrested and if so, what for. Be sure to tell your attorney BEFOREHAND about all arrests, no matter how long ago. Your attorney will advise you how to answer.

If you drink, you will be asked how much and how often. You will be asked if you have ever had a "drinking problem". If you no longer drink, you will be asked when you stopped and why.

If you smoke, you will be asked how much and what brands you have ever smoked. The defense attorneys will ask why you continue to expose yourself to cigarettes when you KNOW they are harmful! The difference between your exposure to asbestos and your exposure to cigarettes is

this: Cigarettes are ADDICTIVE and you would quit if you could! You didn't KNOW asbestos was harmful when you worked around it. If you did, you would have stayed away!

WORK: Your ability to support your family and yourself has always been very important to you. The wages you have lost by not being able to work as long as you would have liked to are solid proof that you have been damaged financially by exposure to asbestos. Some examples of financial "damage" you have incurred from lost wages might be:

Did you have to retire early because you could not keep up with the other workers your age?

Did you take a lower-paying position because you could no longer perform the strenuous tasks that typically pay more money? Have you turned down any overtime? Be thinking about how much money you have lost by having to refuse overtime, retire early or take a lower paying job.

HOUSEHOLD MAINTENANCE: The household repairs you can no longer do yourself or must PAY SOMEONE ELSE to do is another way to prove you have been "damaged" by asbestos exposure.

Do you pay someone else to mow your yard? If so, how much do you pay? Did you purchase a rider mower because you just couldn't use a push mower anymore? How big a yard do you mow?

Have you given up growing a vegetable garden? Do you tend a much smaller garden than you used to? How big did your garden used to be? How small is it now? Have you lost any money by not being able to sell the extra produce?

Do you pay SOMEONE ELSE to do household repairs such as plumbing, electrical and roof repairs? Did you have gas heat installed because you can no longer cut firewood? Did you have aluminum siding put on because you don't have the energy to paint anymore? Can you think of more?

HOBBIES: The hobbies you once enjoyed gave meaning to your life. You worked all your life looking forward to retirement so you could enjoy them!

Have you given up or cut down on hunting, fishing, camping, boating, softball, golfing, travel, raising animals or any other activities you once enjoyed? Name as many as you can think of.

FAMILY: Your relationship with your family is one of your greatest joys in life.

Are you spending less time with young children or grandchildren because they make you too tired or irritable?

Would your spouse and other relatives say that you are short-tempered or easily frustrated because you are not able to do the things you once enjoyed?

Has your sex life been affected by shortness of breath?

ANXIETY: It is natural to be afraid about how your future will be affected by your health. Your fear is caused in part by health problems you might not have had if you had not been exposed to asbestos.

Are you depressed because of all the activities you have had to give up or cut down on?

Are you afraid that your asbestos disease might develop into cancer?

Do you wonder if your life will be cut short by asbestos-related disease and you will leave your family with no one to provide for them?

Have you seen or heard about co-workers who have died from asbestos-related disease? Are you afraid the same thing will happen to you? If you are afraid YOU MUST SAY SO!

These issues are difficult to talk about in front of a Court Reporter and a room full of attorneys who are complete strangers. But you MUST put your feelings aside and discuss exactly how you feel about your future. It is the ONLY way to show the defense attorneys how much DAMAGE has been caused to your life because you were exposed to asbestos.

Can you think of other ways your life has been affected by your exposure to asbestos? This is YOUR DAY IN COURT, so to speak, although you won't actually be in a courtroom. It is YOUR opportunity to STATE FOR THE RECORD how your life has been "damaged" by these asbestos manufacturers.

CONCLUSION

You will meet with your Baron & Budd attorney for about an hour before the deposition begins to go over everything we have just discussed, and more. If you have questions about anything you might be asked or what to say or not say, be sure to ask your attorney before the deposition starts.

Bring a suit and tie along to wear during the deposition. All the attorneys at your deposition will be dressed up and it is crucial that you look and feel just as IMPORTANT as they do.

Remember, if you know the names of all the products listed on your Work History Sheets, what they looked like, what kind of containers they came in and how they were used, the defense attorneys will see you as a knowledgeable, confident witness.

If you keep your answers short and to the point, your deposition will go much faster and you will seem very sincere and believable to the defense attorneys.

If you can give good, concrete examples of how your life has been damaged by your exposure to asbestos products made by these manufacturers, they will want to offer you a settlement instead of taking a chance that a jury will award you more money.

Study hard, memorize as much as you can and practice saying all the product the names out loud. The more you practice, the more you will remember when you are under stress at your deposition. Try not to worry. Your deposition will be over before you know it!

IF YOU HAVE QUESTIONS ABOUT YOUR CASE

Below are some of the people to contact at Baron & Budd depending on the type of question you want to ask about your case. Any of us can be reached by calling our toll-free number:

**1-800 222-2766**

The ATTORNEY responsible for your case: ______________________

The ATTORNEY responsible for your deposition: ______________________

The PARALEGAL responsible for your work history: ______________________

The PARALEGAL responsible for your medical history: ______________________

The PARALEGAL responsible for your settlements: ______________________

CAUTION

If you are contacted by ANYONE who asks you questions about your lawsuit, FIND OUT if the caller is from Baron & Budd BEFORE you tell them ANYTHING! Write down their full NAME and the DATE and TIME of the call.

We have been getting reports that defense attorneys are contacting our clients WITHOUT OUR PERMISSION! Attorneys who represent the asbestos manufacturers are NOT ALLOWED to talk to you without your Baron & Budd attorney present. Do NOT answer ANY questions if you are not sure who the caller represents.

If you believe that you have received one of these calls, report it to us right away! Do NOT answer ANY questions about your lawsuit until you are POSITIVE you are talking to someone from Baron & Budd.