IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

**Objection Deadline: June 10, 2005**
**Hearing Date: June 27, 2005 at 12:00 p.m.**

**DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO MAKE LEGALLY REQUIRED MINIMUM CONTRIBUTIONS TO DEFINED BENEFIT PENSION PLANS COVERING DEBTORS' EMPLOYEES**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully move this Court for the entry of an order authorizing the Debtors to make the minimum contributions to the defined benefit retirement plans covering the Debtors' employees in the United States (the "Grace Retirement Plans") required under federal law during the period July 15, 2005 to April 15, 2006 (inclusive) (the "05-06 Funding Period"). The total of the legally required minimums for the 05-06 Funding Period will be approximately $38.2 million. In support of this Motion, the

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

Debtors respectfully state as follows:

**Jurisdiction**

1. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O). Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief sought herein is sectiono 105(a) and section 363(b) of title 11 of the United States Code (the "Bankruptcy Code").

**Background**

2. On April 2, 2001 (the "Petition Date"), each of the Debtors in these chapter 11 cases (collectively, the "Chapter 11 Cases") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Chapter 11 Cases have been consolidated for administrative purposes only, and, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors in possession.

3. As further explained below, in each of the last two calendar years (i.e., 2003 and 2004), the Debtors have requested and received Court permission to make contributions to the Grace Retirement Plans (collectively, the "Prior Funding Motions"). With respect to each such submission, prior to the applicable hearing date, the management of the Debtors discussed the Motion with the Official Committee of Unsecured Creditors, the Official Committee of Property Damage Claimants, the Official Committee of Personal Injury Claimants and the Official Committee of Equity Security Holders (collectively, the "Committees"), as requested by the Committees.

4. The Court signed orders approving the requests under each Prior Funding Motion. In accordance with those orders, the Debtors contributed approximately $40 million to the Grace Retirement Plans in 2003, and approximately $20 million in 2004.

5. In this motion, the Debtors are proposing to continue funding the Grace

Retirement Plans in a manner that Debtors believe is in the best interests of the Debtors' estate and its creditors (the "05/06 Funding Approach").

6. The Debtors have provided each of the Committees and the representative of future asbestos claimants with a prior draft of this motion and have discussed the motion with them and those of their representatives who have requested such discussions.

**Grace Retirement Plans**

7. The Prior Funding Motions included considerable background regarding the Grace Retirement Plans and the importance of maintaining those Plans and supporting their financial viability. That background continues to be valid. In summary, following is an update of some of the information noted originally in the Prior Funding Motions:

- The Grace Retirement Plans currently consist of fourteen funded, defined benefit pension plans, each of which is qualified under section 401(a) of the Internal Revenue Code (the "Code").
- The most significant Grace Retirement Plan is the W. R. Grace & Co. Retirement Plan for Salaried Employees (the "Grace Salaried Plan"), which comprises approximately 81% of the assets and 83% of the liability of the Grace Retirement Plans in the aggregate (depending on the measure of liability).
- The Debtors have a long history of providing employees with defined benefit pension plans.
- Many of the Grace Retirement Plans are maintained pursuant to collective bargaining agreements.
- The employers that are considered competitors or peers of the Debtors' businesses generally maintain defined benefit pension plans for their employees.

8. The "plan year" of each Grace Retirement Plan is a calendar year.

**Funded Status of the Grace Retirement Plans**

9. Exhibit A to this motion updates several different calculations to measure the

liabilities and assets of the Grace Retirement Plans, which were originally used in the Prior Funding Motions. All amounts on Exhibit A have been calculated by the actuary of the Grace Retirement Pension Plans.

10. As indicated on Exhibit A, the Grace Retirement Plans are currently underfunded by any generally accepted measure. As of January 1, 2005, the amount by which the Plans are underfunded ranges from $83 million to $329 million, depending on the measure used.

11. Also as indicated on Exhibit A, while the asset value increased by approximately $8 million during 2004, the "accumulated benefit obligation" ("ABO") and the "projected benefit obligation" ("PBO") liabilities increased significantly during that year. Based on the ERISA funding measure of liabilities and assets under Code section 412, the amount of the underfunding also increased significantly during 2004. Using the Economic Obligation as a measure of liabilities, the amount of underfunding was essentially unchanged from 2004 to 2005.[2]

12. As a result of the funded status of the Grace Retirement Plans, the Debtors were required to make an ERISA section 4010 filing with the Pension Benefit Guaranty Corporation (the "PBGC") for the 2004 plan year. That filing reported that the Plans were underfunded by approximately $487 million as of December 31, 2004, calculated on the basis required by the PBGC for such filing.[3]

13. From a cash flow perspective, Debtors believe that annual benefit payments

---

[2] The increase in the asset value during 2004 was the result of the Debtors' contribution of approximately $20 million to the Grace Retirement Plans and asset returns of approximately 9.8% during 2004; offset by approximately $80 million that was paid out of the Plans during 2004. According to the actuary of the Grace Retirement Plans, the increase in liabilities from 2004 to 2005 is largely the result of annual earned pension benefits for 2004, and a decrease in interest rates in the calculations: ABO and PBO 6.25% for 2004, and 5.50% for 2005; Economic Obligation interest rate remained unchanged at 8.0%.

[3] The Debtors were also required to make an ERISA section 4010 filing for previous years. In 2004, that filing specified that the Grace Retirement Plans were underfunded by approximately $394 million. The principal reason behind the increase in underfunding from 2004 to 2005 is a result of a decrease in the mandatory interest rate used to calculate plan benefits.

and other expenses from the Grace Retirement Plans will continue to be significant for the foreseeable future, totaling approximately $70 to $80 million per year. In 2004, approximately $80 million was paid out of the Grace Retirement Plans for benefit payments and to satisfy other expenses. As specified on Exhibit A, the total market value of assets as of January 1, 2005 was approximately $666 million. The Debtors believe that the amounts paid out each year represent a high proportion of total assets, when compared to comparable funded retirement plans of other employers, and highlights the necessity to continue to make significant contributions to the Grace Retirement Plans in order to assure their long-term financial viability.

**Employees Covered by the Grace Retirement Plans**

14. Virtually all of the Debtors' current employees are covered by one of the Grace Retirement Plans. The Grace Salaried Plan alone covers over 2,150 active, salaried employees (of a total U.S. workforce of approximately 3,300 employees), or 65% of the Debtors' U.S. workforce.

15. The Debtors' employees consider continued benefit accruals under the Grace Retirement Plans and the financial viability of those Plans important aspects of their employment relationship with the Debtors.

16. The Debtors' management believes that many of the Debtors' employees closely monitor the financial viability of the Grace Retirement Plans on an on-going basis through the Debtors' ERISA and SEC disclosures, as well as other research techniques.

17. The Debtors' management continues to receive many questions and comments from the Debtors' workforce regarding the funding of the Grace Retirement Plans and the Plans' long-term financial ability to fulfill pension promises made to current employees, as well as to the

employees' colleagues who are now retired.

18. The Debtors' management and employees are motivated to continue to work toward successfully creating value for the Debtors' estates by growing the revenues and profits of the Debtors' businesses, with the expectation that at least a portion of the cash generated by those efforts would be used to provide the funding necessary to assure the long-term financial viability of the Grace Retirement Plans. The efforts of the Debtors' management and employees were largely responsible for a successful 2004 for the Debtors' businesses.

19. Despite the Debtors' employees' expectations that the successful performance of the Debtors' businesses would help enhance the long-term financial viability of the Grace Retirement Plans, the employees continue to express increasing concern and anxiety regarding the future of those Plans.

20. The Debtors believe that continuing to make at least the legally required minimum contributions to each of the Grace Retirement Plans is essential to maintaining the morale of the Debtors' workforce and its confidence in management, and thereby the productivity and profitability of the Debtors' businesses. The employees are vital to maintaining and enhancing the value of the Debtors' estate and to the Debtors' successful reorganization.

**Prior Funding Approaches**

21. In 2003, the Debtors tailored several aspects of the 2003 funding motion to address concerns expressed by the Committees regarding the conservation of the Debtors' cash. At the same time, that motion recognized the concerns of the Debtors' employees regarding the financial viability of the Grace Retirement Plans, and the employees' value to the Debtors' estates and their vital role in a successful reorganization of the Debtors. The

2003 funding motion, as submitted, was intended to satisfy a set of specific objectives.[4]

22. In 2004, the Debtors funding motion was also intended to address the concerns expressed by the Committees, as well as the concerns of the Debtors' employees. That motion was designed to satisfy similar, but fewer, objectives than the 2003 funding motion. Specifically, the 2004 funding motion articulated an approach that was intended to satisfy only the following objectives: (a) satisfying all legally required minimum contributions under Code section 412 and (b) avoiding the requirement imposed by ERISA section 4011 to provide underfunding notices to Grace Retirement Plan participants for 2005.[5]

**<u>05/06 Funding Approach</u>**

23. The 05-06 Funding Approach seeks to continue the Debtors' objective of funding of the Grace Retirement Plans in a manner that takes into account the concerns of the Committees with regard to the conservation of the Debtors' cash. At the same time, it addresses the employees' concerns with regard to the long-term financial viability of the Grace Retirement Plans, in light of updated information and data regarding the funded status of the Grace Retirement Plans and the amount of projected required future contributions.

24. The 05/06 Funding Approach will satisfy only the single most important one of the multiple objectives that were considered in the Prior Funding Motions -- to make only those contributions to the Grace Retirement Plans that are necessary to satisfy the minimums that are legally

---

[4] Those objectives were as follows: (a) contributions of at least the annual required minimum for each Grace Retirement Plan, as calculated under Code section 412; (b) avoiding the requirement to provide an "underfunding notice" to Grace Retirement Plan participants under ERISA section 4011; (c) eliminating the underfunded status of the Grace Retirement Plans within a reasonable period; and (d) accomplishing these objectives through generally level annual contributions.

[5] In addition, the Debtors sought to minimize aggregate required funding over 2, 3, and 4 calendar year periods by slightly accelerating the timing of certain contributions. Also, the Debtors timed the contributions during 2003 and 2004 to maximize tax benefits to the Debtors.

required by Code section 412, for the 05-06 Funding Period.[6] Each such contribution shall be made no sooner than one month before the deadline imposed by federal law (unless a significant corporate income tax on PBGC variable premium advantage may be achieved by making a contribution earlier).

25. The funds to make the legally required minimum contributions under the 05-06 Funding Approach will not be drawn from the Debtors' DIP Credit Facility, but rather from available cash of the Debtors raised primarily from repatriated funds from their non-debtor affiliates.

26. The schedule of legally required minimum contributions to the Grace Retirement Plans for the 05-06 Funding Period are specified in the following schedule:

[6] The 05-06 Funding Approach does not include the objective of eliminating the requirement of the Grace Retirement Plans to pay PBGC variable rate premiums. It is estimated that the Grace Retirement Plans will be required to pay approximately $3.2 million in PBGC variable rate premiums for 2005. In order to avoid the requirement to pay all such premiums for 2005, the Debtors would be required to contribute approximately $79 million to the Plans by September 15, 2005, in addition to the legally required minimums under Code section 412.

However, in the case of the Debtors' Owensboro union pension plan (which is one of the Grace Retirement Plans), if the Debtors contribute $40,224 more than the legally required minimum, by September 15, 2005, then the Owensboro plan will not be required to pay a PBGC variable rate premium for 2005 of approximately the same amount as the additional contribution. Thus, in addition to satisfying the legally required minimums for the 05-06 Funding Period, the Debtors are seeking Court approval to make an additional contribution of $40,224 to the Owensboro union plan, in order to avoid paying approximately that same amount as a PBGC variable rate premium for 2005. The amount specified in the schedule in Paragraph 26 below includes $40,224 for this purpose, in addition to the legally required minimums.

This situation exists with respect to no other Grace Retirement Plan, except the Chattanooga union pension plan, which is the subject of the union pension plan funding motion filed at the same time as this motion for the June 23, 2005 hearing, as further discussed in footnote 9 to this motion. If the union pension plan motion is granted, then a 2005 variable rate premium will not be required for the Chattanooga plan. If the union pension plan motion is not granted, then the Debtors would also request under this motion that approval be granted to make an additional contribution of approximately $5,400 to the Chattanooga plan, in order to avoid paying approximately $15,700 as a PBGC variable rate premium for 2005.

| Payment Due Date[7] | Contributions[8] | Plan Year |
|---|---|---|
| **2005** | | |
| July 15 | $7,540,083 | 2005 |
| October 15 | 8,732,502 | 2005 |
| **2006** | | |
| January 15 | $8,732,909 | 2005 |
| April 15 | 13,224,000 | 2006 |
| | | |
| **Total** | **$38,229,494**[9] | |

27. All of the contributions listed on the Schedule for the 2005 plan year are finalized, and are not subject to change as a result of future market performance of the assets of the Grace Retirement Plans.

28. The contribution for the 2006 plan year is an estimate, and it may change depending on 2005 market performance of the assets of the Grace Retirement Plans and any changes in applicable federal law, as well as any changes in the Plans' demographics through December 31,

[7] Debtors may slightly accelerate the timing of the legally required minimum contributions during the 05-06 Funding Period to maximize tax benefits, as well as to minimize required PBGC variable rate premiums for the Grace Retirement Plans.

[8] All contributions specified in this motion and the exhibits hereto have been calculated by the actuary of the Grace Pension Plans. For informational purposes, an additional schedule specifying all projected minimum required contributions for the 2005, 2006 and 2007 calendar years is attached hereto as Exhibit B.

[9] Along with this Motion, the Debtors are also submitting a motion to the Court with regard to pension benefit increases under the Debtors' Lake Charles and Chattanooga union pension plans, for the June 27, 2005 hearing date. The listed amounts assume that the Lake Charles/Chattanooga motion is granted. In that case, under the union pension plan motion, an additional pension contribution of approximately $7,891,570 would be made to the union plans by no later than September 15, 2005. Therefore, the total of all retirement plan contributions during the 05-06 Funding Period would be approximately $46,121,064; and no additional contributions to the union plans would be required for the 05-06 Funding Period. If, on the other hand, the Lake Charles /Chattanooga motion is not granted, then the amount of each required contribution currently listed in the Schedule would increase slightly --by approximately 2% to 3%-- since those union pension plans would then also require additional minimum contributions for the 05-06 Funding Period.

2005.

29. If the market performance of the Plans' assets (or any other factors) results in lesser legally required minimums for the 2006 plan year under Code section 412, then the Debtors would make only the lesser required minimum for 2006, not the amount listed on the Schedule. The Order sought herein provides for contributing only the legally required minimums. If market performance (or other factors) result in larger minimum contributions for 2006, then the larger contribution for 2006 would be made when due.

30. The Debtors believe it is necessary to secure Court approval for the payment of legally required minimum contributions for the 05-06 Funding Period at this time because the first due date with respect to such contributions is July 15, 2005.

31. The Debtors request the Court approve the legally required minimum contributions due during the full period encompassed by the 05-06 Funding Period. This will eliminate the need for the Debtors (and the Committees and the Court) to incur the time and expense associated with the submission of another funding motion within approximately six months, again seeking approval to only contribute the legally required minimums.[10]

32. If the Court approves the Debtors' motion to fund the legally required minimums for the 05-06 Funding Period, then the Debtors do not anticipate filing another Grace Retirement Plan funding motion for approximately one year, in order to secure approval to make legally required minimum contributions for the subsequent twelve month period. The first such contribution would be due in July 2006, as specified in Exhibit B.

**<u>Addressing Employees' and Creditors' Concerns</u>**

33. The Debtors believe that the legitimate concerns of the employees will be

---

[10] Both Previous Funding Motions addressed funding on a calendar year basis, for 2003 and 2004. However, as noted above, the due dates for the next group of legally required contributions make it impractical to limit the current request to the 2005 calendar year.

addressed if management can report to the employees that the Court has approved legally required minimum funding for the Grace Retirement Plans for the period encompassed by the 05-06 Funding Period, since that approval would permit significant funding of the Plans for the next twelve months. Conversely, the Debtors believe that the concerns of the Debtors' employees will be heightened if the Debtors are, in addition to this motion, required to again seek approval to make even minimum contributions in less than one year.

34. The 05-06 Funding Approach will not satisfy the objective, specified in each of the Prior Funding Motions, to make contributions that would permit the Debtors to avoid the requirement to distribute to its employees the pension underfunding notices required by ERISA section 4011. If the Debtors make only the legally required minimum contributions, as proposed, employees will be notified that the Grace Retirement Plans are underfunded for the 2006 plan year. Such notification would occur by mail in the last quarter of 2006.[11]

35. Debtors believe that distributing the underfunding notices could have a significant adverse effect upon the morale of the Debtors' employees. However, Debtors also believe that this effect would be offset by the knowledge that the Debtors have secured Court approval to make all minimum required contributions for the 05-06 Funding Period.

36. The Debtors also believe that the legitimate concerns of the Committees will be addressed by the 05-06 Funding Approach because the cash of the Debtors will only be used to satisfy the minimum contribution requirements imposed by federal law, and not to make any additional contributions to satisfy any other objective.

[11] In order to avoid the requirement to distribute a 2006 underfunding notice to employees, it would be necessary to make a contribution to the Grace Retirement Plans of approximately $92 million by September 15, 2006, in addition to the legally required minimum contributions.

**Relief Requested**

37. By this Motion, the Debtors seek authority to make the minimum contributions required by Code section 412 to one or more of the Grace Retirement Plans for the period July 15, 2005 to April 15, 2006 (inclusive) and to make a small additional contribution to offset certain PBGC variable rate premiums.

**Basis for Relief**

38. Section 105(a) of the Bankruptcy Code "permits the court to issue any order that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business property of the estate." 11 U.S.C. § 363(b). A court has the statutory authority to authorize a debtor to use property of the estate pursuant to § 363(b)(1) of the Bankruptcy Code when such use is an exercise of the debtor's sound business judgment and when the use of the property is proposed in good faith. In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Lionel Corp., 722 F.2d 1063, 1071(2d Cir. 1983), see also Fulton State Bank v. Schipper, 993 F.2d 513, 515 (7th Cir. 1991) (a debtor's decision must be supported by "some articulated business justification"); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the "sound business purpose" standard for sales proposed pursuant to section 363(b); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (Bankr. D.Del. 1999); In re Ernst Rome Ctr Inc., 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997).

39. Under section 363(b) of the Bankruptcy Code, a debtor has the burden to establish that it has a valid business purpose for using estate property outside the ordinary course of business, See Lionel Corp., 722 F.2d at 1070-71. Once the debtor has articulated such a valid

business purpose, however, a presumption arises that the debtor's decision was made on an informed basis, in good faith and in the honest belief that the action was in the debtor's best interest. See In re Integrated Res., Inc., 147 B.R. 654, 656 (S.D. N.Y. 1992). A party in interest seeking to challenge the debtor's valid business purpose must "produce some evidence supporting its objections." Montgomery Ward, 242 B.R. at 155.

**The Proposed Transactions Are Supported by Sound Business Judgment**

40. The Debtors respectfully submit that implementing the 05-06 Funding Approach is the least costly approach to funding the Grace Retirement Plans in accordance with the requirements imposed by applicable federal law. Such implementation will also allow for the funding of the Grace Retirement Plans in a manner that helps to maintain the morale and productivity of Debtors' employees throughout the United States and that maintains competitive employee benefits vis-a-vis the Debtors' competitors and peers, which is key to continuing to maintain a dedicated, motivated and loyal work force. Such work force is a vital component of the Debtors' estates and restructuring efforts.

41. The Debtors have determined in their business judgment that implementing the 2005 Funding Approach is in the best interests of the Debtors' estates and creditors. As specified above, clear business reasons exist to justify, under section 363(b) of the Bankruptcy Code, such implementation.

**Notice**

42. Notice of this Motion has been given to (i) the Office of the United States Trustee, (ii) counsel to the Debtor-In-Possession lenders, (iii) counsel to each Official Committee appointed by the United States Trustee, and (iv) those parties that requested papers under

Fed.R.Bankr.P. 2002. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

**No Prior Request**

43. No prior Application for the relief requested herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter an Order substantially in the form attached hereto (i) authorizing the Debtors to make the minimum contributions to the Grace Retirement Plans for the 05-06 Funding Period required by Code section 412, (ii) authorizing the Debtors to make an additional contribution of approximately $40,224 to the PBGC insured Owensboro union pension plan to avoid paying a 2005 PBGC variable rate premium of approximately the same amount, and (iii) granting such other and further relief as the Court deems just and proper.

Dated: May 23, 2005

Respectfully submitted,

KIRKLAND & ELLIS
James H.M. Sprayregen, P.C.
James W. Kapp, III
Janet S. Baer
200 East Randolph Drive
Chicago, ILL 60601
(312) 861-2000

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB, P.C.

Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Floor
P. O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for the Debtors and Debtors-In-Possession