IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

**Objection Deadline:  June 10, 2005**
**Hearing Date:  June 27, 2005 at Noon**

## MOTION FOR THE ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO CONTRIBUTE FUNDS TO (A) THE LAKE CHARLES UNION PENSION PLAN AND (B) THE CHATTANOOGA UNION PENSION PLAN TO SUPPORT AMENDMENTS TO ENHANCE BENEFITS UNDER THOSE PLANS

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by

their undersigned counsel, respectfully move this Court (the "Motion") for the entry of an order

authorizing the Debtors to make a one-time, lump sum contribution to each of the following two

union pension plans, in an amount necessary to meet the Debtors' obligations to amend each plan

to increase benefits in accordance with the applicable collective bargaining agreement:

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

1

- the W. R. Grace & Co. – Conn. Retirement Plan for Hourly Employees of Lake Charles Plant (the "Lake Charles Union Pension Plan") in accordance with the recently negotiated collective bargaining agreement (the "2005 Lake Charles Union Agreement"), attached hereto as Exhibit A, between W. R. Grace & Co. – Conn., Grace Davision, Lake Charles Site and the Lake Charles Metal Trades Council, AFL-CIO (the "Lake Charles Union"), dated March 14, 2005, in the amount of $6,584,955; and

- the W. R. Grace & Co. – Conn. Retirement Plan for Hourly Employees – Tennessee (the "Chattanooga Union Pension Plan") in accordance with the "reopener clause" (the "Chattanooga Reopener") that is part of the collective bargaining agreement (the "2004 Chattanooga Union Agreement"), attached hereto as Exhibit B, between W. R. Grace & Co. – Conn., Grace Davison, Chattanooga, Tennessee, and United Steelworkers of America, Local 14087 (the "Chattanooga Union"), dated May 28, 2004, in the amount of $1,306,615.

The 2005 Lake Charles Union Agreement and the 2004 Chattanooga Union Agreement are attached hereto, as "Exhibit A" and "Exhibit B", respectively.

## Jurisdiction

1.      This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 157 and 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this motion is proper under 28 U.S.C. § 1408.

2.      The statutory predicates for this Motion are sections 105 and 363(b) of title 11 of the United States Code (as amended, the "Bankruptcy Code") and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

2

## Chapter 11 Background

3.      On April 2, 2001, the Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code commencing these chapter 11 cases (collectively, the "Chapter 11 Cases").

4.      The Chapter 11 Cases have been consolidated for administrative purposes only, and pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors in possession.

## Debtors' Union Pension Plan Background

5.      The Debtors currently maintain nine funded, defined benefit plans for employees represented by various unions throughout the United States.

6.      In the second half of 2002, the Debtors negotiated an agreement with the unionized employees of their largest facility in the United States, which is in Curtis Bay, Maryland, and agreed to an increase in pension benefits for those employees, subject to the approval of the Court (and the Internal Revenue Service (the "Service"), if necessary). As a result, the Debtors submitted a motion to the Court in early 2003 requesting the authority to make the contributions required by section 401(a)(33) of the Internal Revenue Code (the "Code") to effectuate those pension benefit increases. The Debtors discussed the motion with the representatives of various Creditor Committees. The Court signed the related order, pursuant to which the Debtors contributed approximately $8.1 million to the Curtis Bay union pension plan in 2003. As a result, the benefit level at Curtis Bay was increased to $50.00 per month, from $38.00 per month, for each year of service.

7.      Since the Curtis Bay negotiation in the second half of 2002, the Debtors

3

have negotiated with four other unions, each of which represents employees covered by a pension plan of the Debtors, in addition to the Chattanooga Union and the Lake Charles Union. In one such case, the union did not ask for a pension increase. In another such case, involving only approximately 30 employees, the Debtors agreed to a modest pension increase, which did not require any additional funding. Finally, in the two remaining cases, the Debtors were successful in negotiating a collective bargaining agreement that did not include increased pension benefits nor a contractual "reopener".

8.      As explained below, the Debtors negotiated with the Lake Charles Union early in 2005 and agreed to pension plan increases under the Lake Charles Union Pension Plan, pending approval of the Court (and the Service, if necessary).

9.      Also as explained below, the Debtors previously negotiated the 2004 Chattanooga Union Agreement with the Chattanooga Union, in May 2004, which provides for no pension increases, but also includes the Chattanooga Reopener. Under the Reopener, the Chattanooga Union has the authority to require the Debtors to implement an increase in pension benefits under the Chattanooga Union Pension Plan, in exchange for a decrease in current hourly wage rates, subject to the approval of the Court (and the Service, if necessary), but only in the event that the Debtors seek approval from the Court to increase pension benefits under any other union pension plan in the United States, during the pendency of the Chapter 11 Cases. The submission of a motion with respect to the Lake Charles Union Pension Plan constitutes such an event, and the Chattanooga Union has informed the Debtors that it has elected to exercise its authority under the Reopener.

4

### The Lake Charles Complex and the Lake Charles Union Agreement

10.    The Lake Charles complex is the Debtors' second largest manufacturing facility in the United States. (As stated, the largest such facility is at Curtis Bay Maryland.)  At Lake Charles, the Debtors' Davison business ("Davison") manufactures fluid cracking catalysts and hydroprocessing catalysts.

11.    At Lake Charles, the Debtors employ a total of approximately 345 hourly and salaried employees (which is approximately 36% of Davison's US workforce).  The total number of hourly employees currently represented by the Union is approximately 236 (the "Lake Charles Union Employees"), or 68% of the total workforce at Lake Charles.  The Union has represented the hourly workforce at Lake Charles since the 1950's.

12.    The collective bargaining agreement with the Union that preceded the 2005 Lake Charles Union Agreement was scheduled to expire on March 15, 2005.  Therefore, to avoid the possibility of a costly work stoppage, a new agreement to replace the prior agreement needed to be finalized on, or about, that date.

13.    In anticipation of the expiration of the prior collective bargaining agreement, the Debtors and the Lake Charles Union began formal negotiations on February 4, 2005, and those negotiations ended with the Debtors making a final offer, which included the Lake Charles Pension Amendments (as defined herein), on March 4, 2005.  The final offer became the 2005 Lake Charles Union Agreement when the Lake Charles Union Employees ratified the final offer on March 11, 2005, by a slim margin.

14.    The Debtors' objectives regarding the negotiations with the Lake Charles Union were to maintain employee morale and acceptable labor relations with the Union, to have the Union accept an increase in cost of medical coverage for active employees, and to avoid a

5

costly work stoppage by the Lake Charles Union Employees, by providing increased

compensation and benefits to the Union Employees that would still be equitable and competitive.

The Debtors also sought a four year, fixed term labor contract with no "reopener" or right to

strike. The Debtors believe that the 2005 Lake Charles Union Agreement accomplishes all of

these objectives in the most cost efficient manner.[2]

      15.    Prior to the commencement of the formal negotiations that ultimately led

to the 2005 Lake Charles Union Agreement, representatives of the Lake Charles Union made it

clear to Lake Charles management that employee benefits in general, and the benefits under the

retiree medical plan and the Lake Charles Union Pension Plan in particular, would be significant

topics of negotiation. In general, the Lake Charles Union took the position that: (a) the benefits

under the Plan were not equitable and competitive when compared to the pension benefits of

union employees at Davison's other large manufacturing facility, at Curtis Bay, Maryland[3] and

(b) the significant recent increases in retiree medical premiums were having a devastating impact

on current and future Lake Charles retirees for many reasons, including the failure of the Union

Pension Plan to provide benefits that would offset any meaningful portion of the increases in

---

[2] The negotiations with the Lake Charles Union and the Chattanooga Union, and the implementation of the resulting collective bargaining agreements, constitute conducting business in the ordinary course. Therefore, implementation of provisions of the 2005 Lake Charles Union Agreement (except for the Lake Charles Pension Amendments) and the 2004 Chattanooga Union Agreement (except for the pension provisions of the Chattanooga Reopener) would not require Court approval. The sole reason that the Debtors move for Court approval is to secure consent to fund the related union pension plans in an amount necessary to implement the applicable pension amendments, pursuant to the requirements of Internal Revenue Code section 401(a)(33).

[3] As stated, the pension benefits for unionized employees at Davison's largest US manufacturing facility, in Curtis Bay, Maryland, are currently $50.00 per month for each year of service. In addition, the hourly employees at the Davison plant in Cincinnati, Ohio currently have a flat-dollar monthly pension benefit of $50.00 per month for each year of service.

6

retiree medical premiums.[4] For these reasons, certain Lake Charles Union representatives indicated that the Debtors' failure to make concessions with respect to the Lake Charles Union Pension Plan would likely result in labor dissatisfaction at Lake Charles and the failure to achieve a new labor agreement, without which there would have been no protection against a strike.

16.    During the negotiations, the Debtors rejected the Lake Charles Union's demands for concessions regarding the cost and design of the Debtors' retiree medical plan. The Debtors did, however, agree to amend the Lake Charles Union Pension Plan to increase benefits (the "Lake Charles Pension Amendments"), provided that the Debtors could secure the requisite approval from the Court (and the Service, if necessary).

### The Lake Charles Union Pension Plan and Pension Amendments

17.    In general, the basic structure of the Lake Charles Union Pension Plan may be summarized as follows: the Plan is a defined-benefit pension plan, which satisfies the qualification requirements under Code section 401(a). The "plan year" applicable to the Plan is a calendar year. The Plan is funded with employer contributions, in accordance with Code section 412. Those contributions, and all related earnings, are in the trust that is tax-exempt under Code section 501(a). The Plan does not require employee contributions.

18.    The Plan is a so-called "flat-dollar unit benefit plan", which provides a specific dollar amount for each year of service thereunder, commencing at age 62, which is paid in the form of an annuity over the life of the retired employee (or in other forms of benefit of the

---

[4] From December 2002 to January 2005, the monthly retiree cost for retiree medical coverage from the Debtors increased by over 220%.

same actuarial value, but lower actual monthly benefit, including an annuity over the joint lives

of the retired employee and his or her spouse). Under the benefit formula that currently applies

(without implementation of the Lake Charles Pension Amendments), an eligible employee would

be entitled to a lifetime annuity commencing at age 62 (or later) in the amount of $44.00 per

month for each year of eligible service. Thus, an employee with 30 years of service would be

entitled to such an annuity in the amount of $1,320.00 per month ($44.00 times 30 years).

19.     As of January 1, 2005, estimated "current liability" (as defined by Code

section 412(l)(7)) under the Lake Charles Union Pension Plan totaled approximately

$17,447,000; and the "actuarial value" of plan assets totaled approximately $12,355,000. Also,

on that date, the "market value" of plan assets totaled approximately $13,107,000.

20.     The most significant aspect of the Lake Charles Pension Amendments is

that the monthly pension benefit for any Lake Charles Union Employee who retires on or after

March 15, 2005 would increase from $44.00 to $50.00 per year of service[5], representing an

increase of 13.6% over the four year term of the 2005 Lake Charles Union Agreement. This

means, for example, that for an eligible employee who retires with 30 years of service with the

Debtors, such employee's straight life annuity benefit, payable at age 62 (or thereafter), would be

$1,500.00 per month ($50.00 times 30 years), for life, instead of $1,320.00 per month ($44.00

times 30 years) under the present formula.

21.     As explained below, in order to implement the Pension Amendments, the

---

[5]  In addition to the pension increases noted above, the Lake Charles Pension Amendments
provide for an increase in the "cap" on disability benefits to $3200 per month (from $2800 per
month), and the elimination of the 40 year of service "cap" on benefits, with respect to covered
employees who retire on or after March 15, 2005.

8

Debtors are required to make a contribution of $6,584,955 (the "Lake Charles Required Contribution"), not later than by September 15, 2005, pursuant to Code section 401(a)(33).

22.    Aside from the Lake Charles Pension Amendments, the only other material cost to the Debtors as a result of the 2005 Lake Charles Union Agreement is a moderate wage increase. The hourly rate of the Lake Charles Union Employees is scheduled to increase by an average of about 3.2% annually from 2005 to 2008, under that Agreement.

23.    The 2005 Lake Charles Union Agreement provides that, in the event that the Debtors fail to secure the requisite approvals to make the Lake Charles Required Contribution, then the Debtors will instead pay each Lake Charles Union Employee a single cash payment in the amount of approximately $3,600.00. The total cost of those payments would be approximately $850,000.00. However, the Debtors believe that the failure to secure approval to make the Lake Charles Required Contribution, and therefore the failure to implement the Lake Charles Pension Amendments, would result in labor discord and morale problems, which, in turn, would result in lost productivity, even after the cash payments are made. The Debtors believe that implementing the Lake Charles Pension Amendments is the most cost effective manner to avoid these issues.

### The Chattanooga Site and the Chattanooga Reopener

24.    At their Chattanooga site, the Debtors' Davison business manufactures raney catalyst, rare earth chemicals and other products. The rare earth chemicals produced at Chattanooga are used as raw materials in the manufacture of fluid cracking catalysts and additives at the Lake Charles, Curtis Bay and Valleyfield (Canada) Davison plants. The Chattanooga site employs approximately 80 hourly and salaried employees (which is

9

approximately 8.5% of Davison's US workforce).  The total number of hourly employees

currently represented by the Union is approximately 50 (the "Chattanooga Union Employees"),

or 62% of the total workforce at Chattanooga. The Chattanooga Union has represented the

hourly workforce at Chattanooga since the late 1950's.

      25.     The basic structure of the Chattanooga Union Pension Plan is the same as

the structure of the Lake Charles Union Pension Plan.  In this regard, note the following with

respect to the Chattanooga Union Pension Plan:

- The Plan is a defined-benefit pension plan, which satisfies the qualification requirements under Code section 410(a)

- The "plan year" applicable to the Plan is a calendar year.

- The Plan is funded with employer contributions, in accordance with Code section 412.  The Plan does not require employee contributions.

- The Plan is a "flat-dollar unit benefit plan", which provides a specific dollar amount for each year of service, commencing at age 62, which is paid in the form of an annuity over the life of the retired employee (or in other available forms of benefit).

      26.     As of January 1, 2005, the estimated "current liability" (as defined by

Code section 412(l)(7)) under the Chattanooga Union Pension Plan totaled approximately

$3,629,000; and the "actuarial value" of plan assets totaled approximately $2,790,000.  Also, on

that date, the "market value" of plan assets totaled approximately $2,960,000.

      27.     Under the benefit formula that currently applies (without implementation

of the Chattanooga Reopener), an eligible employee would be entitled to a lifetime annuity

commencing at age 62 (or later) in the amount of $38.00 for each year of eligible service under

the Chattanooga Union Pension Plan.

      28.     While negotiating with the Chattanooga Union in May 2004, the Debtors

realized that the Union was unlikely to enter a final agreement with the Debtors that would

10

preclude the possibility of a strike, unless the Debtors committed to increase pension benefits under the Chattanooga Union Pension Plan. The Debtors did not wish to agree to increase pension benefits at Chattanooga at that time, but also continued to desire a final agreement that would eliminate the possibility of a strike. Therefore the Debtors addressed the Union's pension demand by agreeing to the Chattanooga Reopener, without any commitment to increase pensions at that time. The final result was the 2004 Chattanooga Union Agreement, which is a four year agreement that includes a "no strike" clause and the Chattanooga Reopener.

29.    Under the Chattanooga Reopener, the Chattanooga Union has the authority to require an increase in the monthly pension benefits from $38.00 to $50.00 per year of service under the Chattanooga Union Pension Plan (representing an increase of 31.5%), in exchange for a simultaneous decrease in hourly wages equal to $0.89 per hour (the "Wage Reductions").

30.    The Debtors estimate that the Wage Reductions will save the Debtors approximately $130,000 per year in annual wages.

31.    As stated, the Chattanooga Union has already informed the Debtors of its intention to exercise its authority under the Chattanooga Reopener.

32.    As explained below, in order to implement the pension increases under the Chattanooga Reopener, the Debtors are required to make a contribution to the Chattanooga Union Pension Plan of $1,306,615 (the "Chattanooga Required Contribution"), not later than by September 15, 2005, pursuant to Code section 401(a)(33).

33.    For the same reasons as applicable to the Lake Charles Union Employees,

11

the Debtors believe that failing to implement the pension benefit increases under the

Chattanooga Reopener, in exchange for the Wage Reductions, would result in labor discord and

morale problems at Chattanooga, which, in turn, would result in lost productivity.

## Code Section 401(a)(33)

34.      Code section 401(a)(33) generally prohibits the adoption of any

amendment to increase or enhance benefits under a defined benefit pension plan, during the

period that the employer which sponsors the plan is a "debtor in a case under title 11, United

States Code...", unless one of the exceptions provided by that Code section is satisfied. The

exception that is most relevant to the circumstances regarding the Lake Charles and Chattanooga

Union Pension Plans (collectively, the "Union Pension Plans") is specified in subpart (B)(i) of

Code section 401(a)(33), which provides that such amendments may be adopted where "the plan,

were such amendment to take effect, would have a funded current liability percentage (as defined

in section 412(l)(8)) of 100 percent or more"[6] (the "Funded Exception").

35.      The Funded Exception would apply to the Lake Charles Pension

Amendments and the pension increases under the Chattanooga Reopener, if the Debtors make

the Lake Charles Required Contribution and the Chattanooga Required Contribution

(collectively the "Required Contributions") by no later than September 15, 2005. In that case,

under Code section 412(c)(10), the Required Contributions would be deemed to have been made

on December 31, 2004 (i.e., the last day of the each Plan's 2004 plan year) for purposes of

calculating the "funded current liability percentage" under the Funded Exception, for the 2004

---

[6]  Section 412(l)(8) defines "funded current liability percentage" as "the percentage which--the
[the value of plan assets] is of the current liability under the plan."

plan year. The pension increases under the Lake Charles Pension Amendments and the

Chattanooga Reopener would be adopted effective on or after January 1, 2005; and, as of such

adoption, the Funded Exception would be satisfied for each Union Pension Plan.

### The Required Contributions

36.     The exact amount of each of the Required Contributions was calculated

by the actuary of the Union Pension Plans, as of December 31, 2004. The actuary calculates that

the Lake Charles Required Contribution will be $6,584,955, and the Chattanooga Required

Contribution will be $1,306,615.

37.     As stated above, each Required Contribution will be a one-time, lump sum

contribution, which must be made by no later than September 15, 2005, in order to satisfy the

Debtors' obligations with respect to the applicable pension increases. However, the Debtors will

make the Required Contributions as soon as possible after the exact amount has been calculated,

in order to demonstrate good faith to the Lake Charles Union and Chattanooga Union, in

accordance with the Debtors' objective of continuing acceptable labor relations with the two

Unions.

38.     At this time, the actuary of the Union Pension Plans estimates that, in

order to comply with the funding requirements under Code section 412, the Debtors will not be

required to make any additional minimum contributions to either of the Union Pension Plans

during 2005 or 2006, if the Required Contributions are made on a timely basis during 2005.

39.     The funds to make the Required Contributions will not be drawn from the

Debtors' DIP Credit Facility, but rather from currently available cash of the Debtors and their

non-debtor affiliates.

13

## Relief Requested

40.    By this Motion, the Debtors seek authority to (a) make a one-time, lump sum contribution to the Lake Charles Union Pension Plan in the minimum amount necessary to satisfy the Funded Exception under Code section 401(a)(33), in the amount of $6,584,955, by no later than September 15, 2005, (b) make a one-time, lump sum contribution to the Chattanooga Union Pension Plan in the minimum amount necessary to satisfy the Funded Exception, in the amount of $1,306,615, by no later than September 15, 2005, (c) effectuate the Lake Charles Pension Amendments in accordance with the Debtors' obligations under the 2005 Lake Charles Union Agreement, (d) effectuate the pension increases in accordance with the Debtors' obligations under the Chattanooga Reopener, and (e) take such other actions as may be necessary or appropriate to effectuate the intent of the Motion.

## Basis for Relief

41.    Section 105(a) of the Bankruptcy Code "permits the court to issue any order that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). A court has the statutory authority to authorize a debtor to use property of the estate pursuant to section 363(b)(1) of the Bankruptcy Code when such use is an exercise of the debtor's sound business judgment and when the use of the property is proposed in good faith. In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983). See also Fulton State Bank v. Schipper, 933 F.2d 513, 515 (7th Cir. 1991) (a debtor's decision must be supported by "some articulated

14

business justification"); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986)

(adopting the "sound business purpose" standard for sales proposed pursuant to section 363(b));

In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Ernst

Home Center, Inc., 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997).

42.     Under section 363(b) of the Bankruptcy Code, a debtor has the burden to

establish that it has a valid business purpose for using estate property outside the ordinary course

of business. See Lionel Corp., 722 F.2d at 1070-71. Once the debtor has articulated such a valid

business purpose, however, a presumption arises that the debtor's decision was made on an

informed basis, in good faith and in the honest belief that the action was in the debtor's best

interest. See In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992). A party in interest

seeking to challenge the debtor's valid business purpose must "produce some evidence

supporting its objections." Montgomery Ward, 242 B.R. at 155.

### The Proposed Transaction Is Supported by Sound Business Judgment

43.     The Debtors respectfully submit that the implementation of the increase

in pension benefits, in accordance with the Lake Charles Pension Amendments and the

Chattanooga Reopener, as agreed with the respective Union, will contribute significantly to

maintaining acceptable labor relations with the Lake Charles Union and the Chattanooga Union,

and to maintaining the morale of both the employees represented by either of these Unions, as

well as other employees.

44.     The Debtors' management has determined in its business judgment that

making each of the Required Contributions in a timely manner and effectuating the related

15

pension plan amendments is in the best interests of the Debtors' estates and creditors. As specified above, clear business reasons exist to justify under section 363(b) of the Bankruptcy Code the Debtors' proposed contribution of the Required Contributions and the implementation of the related pension amendments. At Lake Charles, the benefits increases under the Lake Charles Pension Amendments were essential in helping to persuade the Lake Charles Union Employees to ratify the 2005 Lake Charles Union Agreement. Without such ratification, there existed a significant possibility of a financially damaging work stoppage at Lake Charles. At Chattanooga, the Debtors were unable to conclude a final agreement that precluded a work stoppage, without agreeing to the Chattanooga Reopener.

## Notice

45.     Notice of this Motion has been given to: (a) the United States Trustee, (b) counsel to the DIP Lender, (c) counsel to The Chase Manhattan Bank as agent for the Debtors' prepetition lenders, (d) counsel to all official committees appointed by the United States Trustee, and (e) all those parties that requested service and notice of papers in accordance with Fed R. Bankr. P. 2002. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

## No Prior Request

46.     No prior Application for the relief requested herein has been made to this or any other Court.

16

WHEREFORE, the Debtors respectfully request that the Court (a) authorize the Debtors (i) to make a one-time lump sum contribution of $6,584,955 to the Lake Charles Union Pension Plan, (ii) to make a one-time lump sum contribution of $1,306,615 to the Chattanooga Union Pension Plan, (iii) to amend the Lake Charles Union Pension Plan in accordance with the Lake Charles Pension Amendments, (iv) to amend the Chattanooga Union Pension Plan in accordance with the Chattanooga Reopener, and (v) to take such other action as may be necessary or appropriate to effect the intent of this Motion; and (b) grant such other and further relief as the Court deems just and proper.

Dated: May 23, 2005

Respectfully submitted,

KIRKLAND & ELLIS
James H.M. Sprayregen, P.C.
James W. Kapp, III
Janet S. Baer
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES &
WEINTRAUB P.C.

Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
(302) 652-4100
Co-Counsel for the Debtors and Debtors in Possession

17