# Exhibit A

# MEMORANDUM OF AGREEMENT

## W. R. Grace & Co.-Conn.

## GRACE Davison

## Lake Charles, Louisiana

## Lake Charles Metal Trades Council, AFL-CIO

This Memorandum of Agreement is hereby entered into by and between W. R. Grace & Co.-Conn., GRACE Davison, Lake Charles, Louisiana (hereinafter the "Company"), and the Lake Charles Metal Trades Council, AFL-CIO (hereinafter the "Union").

The Company and the Union hereby mutually agree that all of the provisions and terms of the Collective Bargaining Agreement between the Company and the Union in effect from 7:00 a.m., March 15, 2001, until 7:00 a.m. March 15, 2005, shall be continued in full force and effect until 6:00 a.m. March 15, 2009, subject only to the following amendments and conditions to take effect, unless otherwise provided for herein, as of 7:00 a.m. on March 15, 2005.

1. **Contract Term**

   Four years – until 6 a.m., 3/15/09

2. **Wages:  Increase all hourly rates as follows:**

   Effective 3/15/05 – By 2.75%

   Effective 3/15/06 – By 3.0%

   Effective 3/15/07 – By 3.0%

   Effective 3/15/08 – By 4.0%

1

3. **Pension**

   (a) For employees who retire on or after March 15, 2005, increase the monthly benefit per year of credited service from $44.00 to $50.00.

   (b) For employees who become disabled on or after March 15, 2005 increase maximum monthly disability benefit from $2800 to $3200.

   (c) For employees who retire on or after March 15, 2005, eliminate the credited service cap.

   It is understood and agreed that the retirement related changes and retirement related benefit improvements described herein, and the effective dates thereof (collectively "Changes"), are subject to the approval of the U.S. Internal Revenue Service ("IRS") and/or the U.S. Bankruptcy Court ("Court"). In the event the IRS or the Court disapproves the Changes, in whole or in part, employees will receive a one-time only, single lump sum payment in accordance with the amounts set forth below, within two-weeks of the Company receiving notice of the Court's disapproval.

   | Disapproved Change | Lump Sum Payment Per Employee |
   | --- | --- |
   | Per $1.00 benefit increase | $574.00 |
   | Eliminate 40-year service cap | $140.00 |
   | Increase retiree disability cap from 2800 to 3200 | $40.00 |

   The payments specified herein are subject to deductions required by law

4. **Sickness & Accident Insurance**

   Effective March 15, 2005, the weekly benefit payment will be equal to sixty percent (60%) of the weighted average straight time weekly rate of pay (based on 40 hours per week). Based on this formula, employees who become disabled on or after the following effective dates will receive the applicable rate as shown below:

   Effective 3/15/05 – From $630 to $643

   Effective 3/15/06 – From $643 to $662

   Effective 3/15/07 – From $662 to $682

   Effective 3/15/08 – From $682 to $709

2

5. **Life Insurance**

   Effective 3/15/06 – From $70,000 to $80,000.

6. **Accidental Death & Disability Insurance**

   Effective 3/15/06 – From $35,000 to $40,000

7. **Article 14-Safety and Health**

   Modify to read a follows:

   SEC.2-Employee Recommendation

   Every recommendation for the protection for the safety and health of employees submitted by an employee to his immediate supervisor shall be promptly considered by the company and appropriate action taken whenever, in its judgment, deemed necessary. **Based on available volunteers**, there shall be two (2) safety **representatives** in the maintenance department……………………………..

   SEC.3-Safety Committees

   Safety related committees will be governed by the charters of those committees.

8. **Work Schedule**

   (a)  Provide that in maintenance, only overtime hours in their respective craft be counted towards charged overtime hours.

   (b)  Fitters will only be charged for hours worked.

9. **Laboratory**

   (a)  Establish two new classifications – Lead Technician II (vacation relief) and Junior Technician II

   (b)  Initial wage adjustment of 25 cents above the existing Lead Technician and Junior Technician wage rates.

10. **Warehouse Testing**

    The Company agrees to temporarily waive the Warehouse Test Battery currently in use for existing employees for either permanent or temporary placement in the Warehouseman job. The Company stresses that this is not a permanent ban but we

    3

will re-evaluate the test battery and make a determination for implementing the same or another test battery in the future.

11. **Article 4-Union Membership and Dues**

Modified to read as follows:

SEC.2-Payroll Deduction Authorization (second sentence)

The company shall deduct.............All such deductions shall be made from the fourth pay period each month and remitted promptly by Company to the Secretary-Treasurer of the Union, by separate checks made payable to the applicable union represented by the Lake Charles Metal Trades Council. Each separate check shall be accompanied by the applicable check-off list. The payroll deduction authorization..........................

Effective for dues deducts beginning April 2005

12. **Article 6-Seniority, Promotion, Transfer and Layoff**

Modify to read as follows:

SEC.5(D) Temporary Job Openings

When the company determines the need to fill a job opening on a temporary basis.....................................

When the Company determines a need to fill a warehouse position on a temporary basis or add warehouse positions on a temporary basis, the job(s) will be posted within the maintenance department. Bids will be considered in view of ability and department seniority. When qualified personnel are not available from among the maintenance department employees, the job opening will be posted plantwide and filled based upon ability and plant seniority. When qualified personnel are not available from among the Labor Department employees, the job opening will be filled in any manner found convenient to the company.

4

13. **Article 8–Work Schedule**

Modify to read as follows:

SEC.6-Payday

Paydays will be Friday...................................................

Further, each employee shall be required to execute a Direct Deposit Authorization such that the employee's paycheck shall be electronically deposited into a designated account, not to exceed a reasonable number of such accounts, at a recognized banking and savings institution authorized to accept electronic transfers. An appropriate notice will be made available on payday for each employee confirming the amount of the deposit.

Effective with first check deposited in June 2005

14. **Article 6–Seniority, Promotion, Transfer and Layoff**

Modify to read as follows:

SEC.5-Promotion and Bidding

(A)   Progression

Promotion and bidding will be as outlined in the progression charts and will be according to seniority, ability permitting.  No employee shall down-bid or cross-bid more then once in any twelve (12) month period and in such.....................................

15. **Medical**

See Attachment A, which is incorporated by reference herein.

16. **Severance Program for Involuntary Terminations**

See Attachment B, which is incorporated by reference herein.

17. **Voluntary Separation Program**

See Attachments C1, C2, which are incorporated by reference herein.

18. **Progression Charts**

See Attachments D1, D2, D3, which are incorporated by reference herein.

**19. Housekeeping Items:**

A.  Modify Agreement's applicable Articles and Sections to reflect the shift schedule (hours of work) changes and other contractual provisions so effected. Modifications were made as follows:

>>Agreement Page 6
>>Article 8 Section 7 (A&B)
>>Article 8 Section 10
>>Article 9 Section 7 (B)
>>Article 22 Section 1
>>Appendix F Page 66
>>Appendix G Section IV (B3)
>>Appendix G Section IV (D 1&2)
>>Appendix G Section IV (F)
>>Appendix G Section IV (L)

B.  Modify Article 6 Section 5 (C) due to several mistakes resulting in the use of the words "department" and "classification" when referring to the type of seniority. The following Section 5 (C) has been corrected to reflect the use of the word "classification" and "plant" seniority and the correction is in accordance with language agreed to in March 2001 negotiations.

(C)   Permanent Job Openings

In the event of permanent job openings in a department, such openings will be posted and bids received from within the department. Bids will be considered in view of ability and **classification** seniority. When qualified personnel are not available from among employees in the department, the openings will be posted plant-wide and bids received from within the plant. Bids will be considered in view of ability and **plant** seniority. When qualified personnel are not available from among the employees in the

6

plant, job openings will be filled in any manner found convenient to the Company.

C.  Modify Appendix G Section IV (3) to include the establishment of 12-Hour Shift Maintenance.

    3.  Identification of shifts (Article 8, Section 7)

      Operations Department (Including Shift Breakers), the Laboratory Department, and Shift Maintenance.

      Day Shift:   6:00 A.M.  to  6:00 P.M.

      Night Shift:  6:00 P.M.  to  6:00 A.M.

D.  The following memorandum of agreement between the parties will be carried forward and made part of the new collective bargaining agreement:

    (A)  Memorandum of Understanding effective March 15, 1986 pertaining to the W.R. Grace & Co. Hourly Employees Savings and Investment Plan.

7

IN WITNESS WHEREOF, the parties here to have caused this Agreement to be entered into and signed by their duly authorized representatives as of March 14, 2005.

AGREED

Lake Charles Metal Trades
Council, AFL-CIO

Kenneth R. Fugatt
Business Manager

Dennis C. Carruth

Jody Goodfriend

Cynthia A. Granger

Michael W. Reed

Kyle S. Westney

W. R. Grace & Co.-Conn.
GRACE Davison
Lake Charles Plant

Marvin V. Paggen
Plant Manager

Lawrence D. Courville

Calvin J. Jaetzold

David R. Rentrop

8

# ATTACHMENT A

**Medical**

Effective March 15, 2005, employees shall be covered by a Grace Contributory Medical Plan (hereinafter "GMP" or "Base Plan"), the features of which are described in documents entitled "Aetna Select/EPO", and "Grace Open Enrollment 2005", which are incorporated by reference herein. The Company reserves the right to change the carrier/administrator of the GMP. An employee will be required to pay a portion of the premium for the GMP in accordance with the following schedule:

| Annual Base Pay | Employee Contribution Effective Current | Toward Premium Effective 1/1/06 |
|---|---|---|
| Under $100,000 | 20% of premium | 25% of premium |

In lieu of participation in the GMP, the Company may provide employees with an opportunity to participate in a health maintenance organization or other alternative medical plans (hereinafter collectively "AMP"). The AMP providers may change from time to time at the discretion of the COMPANY. The terms of AMP may be changed or discontinued at any time including during the term of this Agreement without bargaining. The Union hereby waives all rights or claims of right to bargain or to arbitrate with respect to the AMP, or with respect to the application, interpretation, amendment or termination of the AMP, and further agrees that it will not attempt to require the Company or the AMP to bargain or arbitrate over such matters.

An employee may elect once per year during the open enrollment period to participate in either the GMP or the AMP, provided he/she is otherwise eligible under the terms and conditions of said plans. However, the Company will only pay an amount for AMP coverage that is equal to the amount that it would pay for an employee under the GMP, except that the employee shall never pay an amount that is less than fifty percent (50%) of what the employee would pay under the GMP.

9

Eligibility for participating in the AMP or for continuation of coverage under the AMP when an otherwise covered individual is not actively working, will be governed by the requirements set forth in the GMP, contrary provisions of the AMP notwithstanding.

An employee and any covered dependents of the employee, including his/her spouse, will be eligible to participate in post-retirement medical coverage under the same eligibility provisions as affect salaried employees when they retire, for so long as such coverage is available to salaried employees.

Under the Consolidated Omnibus Budget Reconciliation Act (COBRA), the Company is required to continue health insurance coverage (dental and medical) for employees and their dependents under circumstances which would normally exclude those individuals from coverage. Such continued coverage, if elected, would be at the employee's expense. COBRA continuation rights are an alternative to any company-provided continuation coverage. If an employee elects either, the company-provided medical continuation described in the GMP document(s) referenced above, or company-provided dental continuation (if such is made available), the employee gives up both dental and medical continuation coverage under COBRA.

# ATTACHMENT B

## SEVERANCE -- LAKE CHARLES

A.   Effective March 15, 2005 in the event an employee is **involuntarily** terminated by the Company, the Company shall provide a severance payment to said employee in an amount equal to one (1) week of regular base pay (exclusive of overtime or extra compensation of any kind) for each year of service, subject to a minimum of 4 weeks and a maximum of 52 weeks severance pay.  Any employee eligible for severance under this provision may elect to receive his or her severance pay in a single lump sum at time of termination, or in regular pay period installments following termination, less legal deductions.   If said employee elects to receive severance pay in a single lump sum, coverage under all Company benefit plans in which he or she was a participant will end as of his or her last scheduled work date, except with respect to medical and dental coverage's which will end as of the end of the month in which he or she receives this lump sum payment.  If said employee elects to receive his severance pay by installments, he or she will be covered by the following Company benefit plans, and no others, during the severance pay period, subject to the continued availability of such benefits to active hourly Company employees, provided he or she is a participant in said plans on his or her last day of employment with the Company, and continues to make any required contributions:

- The Medical Plan
- The Dental Plan
- The Life Insurance Plan

B.   Terminated employees will lose all seniority rights under Article 6, Section 3 of the Agreement entitled "Termination of Seniority" ("Section 3").

11

C.  Employees shall not be eligible for severance.

    (1)    If they are offered a job within the bargaining unit under the seniority provisions of the Agreement, whether they accept or reject the job offers, unless they cannot perform the available job for health reasons, as determined by the Company's doctor.

    (2)    If in the event the business is sold, they are offered continued employment by the purchaser, whether or not they accept or reject the offers.

    (3)    If their seniority rights have expired under Section 3.

    (4)    If they are terminated for misconduct or similar reasons.

    (5)    If they are laid off and retain seniority rights under Section 3.

    (6)    If they fail to faithfully perform their jobs until their scheduled termination dates.

    (7)    If they accept job offers from the Company outside the bargaining unit.

    (8)    They do not sign a Separation Agreement and General Release.

12

# ATTACHMENT C1

## VOLUNTARY SEPARATION PROGRAM ("PROGRAM") DESCRIPTION AND ELIGIBILITY REQUIREMENTS

Q.   What is the purpose of the Program?

A.   To offer employees who are thinking of retiring an incentive to do so.

Q.   Who is eligible for the Program?

A.   Employees who meet the following minimum age and service requirements.

Age         60
Service     10 years

Q.   Is there a limit on the number of employees who may participate?

A.   Yes.  The number of employees who are eligible to participate by department are as follows:

Operations    -    8
Maintenance -    8
Labor          -    1
Laboratory   -    <u>1</u>
                        18

Q.   What is the structure of the Program?

A.   Participation in the Program is purely voluntary.  Eligible employees who wish to retire or resign may complete the appropriate paperwork to apply for employment termination under the Program.   That paperwork will include, among other documents, a written Employment Law Release Agreement acceptable to the Company under which the employee releases the Company and its directors,

13

officers and employees (and other related parties) from any and all liability associated with the employee's employment with or termination from the Company ("Release Agreement").    Employees will have seven days after submitting their signed Release Agreement to rescind that Agreement, if they change their minds.

Q.    When will the Program begin and end?

A.    If the Company receives notice that the Bankruptcy Court has approved or disapproved the proposed pension plan Changes described in paragraph 3 of this Memorandum of Agreement ("Notice") prior to June 1, 2005, the Program will commence on June 1, 2005 and will continue until August 1, 2005.  Under such circumstances, the Company will inform each applicant whether or not his or her application under the Program has been accepted by September 1, 2005.

Q.    What if the Company does not receive such Notice prior to June 1, 2005.

A.    The Program will commence within two weeks of the Company receiving Notice and will continue for an eight week period.  Within four weeks following the close of the eight week application period, the Company will inform each applicant whether or not his or her application under the Program has been accepted.

Q.    If more eligible employees in a specific department volunteer for termination under the Program than the maximum allowed, how will the Company decide which volunteers will be accepted?

A.    Preference will be given to the most senior employee in the department.

Q.    What will be my final scheduled date of work if I apply for voluntary termination under the Program and my application is accepted by the Company?

14

A.    The Company will inform you of your termination date considering your objectives and the Company's need to continue business operations.

Q.    What happens if I do not sign a Release Agreement, or if I revoke the Release Agreement.

A.    You will not receive any severance or other benefits under the Program. You will also retain your employment with the Company.

Q.    If I sign a Release Agreement, will it negate any claim filed with the U.S. Bankruptcy Court with respect to my employee benefits related to Grace Chapter 11 proceedings?

A.    No. These claims will be specifically carved out of the coverage of the Release Agreement.

Q.    What would my severance benefits be if I was selected for the Program?

A.    Please refer to the document entitled Voluntary Separation Program, Severance Lake Charles, Union Employees.

Q.    What would happen under the Program if my application were accepted and I died before my last scheduled work date?

A.    No severance would be paid to a beneficiary.

Q.    What would happen under the Program if my application were accepted and I died on or after my last scheduled work date?

A.    Any unpaid amount of severance pay to which you were entitled would be paid in a lump sum either to your spouse or your estate (if you were not married on the date of your death.)

15

# ATTACHMENT C2

## VOLUNTARY SEPARATION PROGRAM

### SEVERANCE -- LAKE CHARLES

### UNION EMPLOYEES

A.  In the event an employee **voluntarily** terminates his employment with the Company in accordance with the terms and conditions set forth in the Voluntary Separation Program (Attachment C1), the Company shall provide a severance payment to said employee in an amount equal to one and one-half (1.5) weeks of regular base pay (exclusive of overtime or extra compensation of any kind) for each year of service, subject to a minimum of 4 weeks and a maximum of 52 weeks of severance pay. Any employee eligible for severance under this provision may elect to receive his or her severance pay in a single lump sum at time of termination, or in regular pay period installments following termination, less legal deductions.  If said employee elects to receive severance pay in a single lump sum, coverage under all Company benefit plans in which he or she was a participant will end as of his or her last scheduled work date, except with respect to medical and dental coverage's which will end as of the end of the month in which he or she receives this lump sum payment.  If said employee elects to receive his severance pay by installments, he or she will be covered by the following Company benefit plans, and no others, during the severance pay period, subject to the continued availability of such benefits to active hourly Company employees, provided he or she is a participant in said plans on his or her last day of employment with the Company, and continues to make any required contributions:

- The Medical Plan
- The Dental Plan
- The Life Insurance Plan

16

# ATTACHMENT D1

**APPENDIX A**                     **PROGRESSION CHART**



**OPERATIONS**

Roving A

Shift Breaker                     Shift Breaker

"A"    HPC                        XP Runoff
       Boiler House              XP Dryer
       Silicate                   DA
                                   Milling
                                   Code-550
                                   Silica-Sol
                                   Z-14 "A1"
                                   Z-14 "A2"
                                   Solids Recovery

"B"    HPC                        Pump
       Furnaces

"C"                       Silica-Sol "C1"
                          Silica-Sol "C2"
                          DA "C1"
                          DA "C2"
                          XP "C1"
                          XP "C2"
                          Milling
                          Solids Recovery
                          Code 550 "C1"
                          Code 550 "C2"
                          Z-14 "C1"
                          Z-14 "C2"
                          HPC "C1"
                          HPC "C2"

Loader/Unloader

17

# ATTACHMENT D2

APPENDIX B                          PROGRESSION CHART

MAINTENANCE DEPARTMENT

| MAINTENANCE | WAREHOUSE |

# ATTACHMENT D3

APPENDIX C                          PROGRESSION CHART

**LABORATORY**

