# Exhibit B

# MEMORANDUM OF AGREEMENT
# MAY 31, 2004

This Memorandum of Agreement is entered into by and between W. R. Grace & Co.-Conn., Grace Davison, Chattanooga Plant, 4000 North Hawthorne Street, Chattanooga, Tennessee (hereinafter referred to as the "Company"), and United Steelworkers of America, AFL-CIO-CLC, on behalf of Local Union 14087 (hereinafter referred to as the "Union").

The Company and the Union hereby mutually agree that all of the provisions and terms of the Collective Bargaining Agreement between the Company and the Union in effect from 12:01 a.m. on June 1, 2001 until 12:00 midnight May 31, 2004, shall continue in full force and effect until 12:00 Midnight, May 31, 2008 subject only to the following amendments and conditions to take effect, unless otherwise provided for herein, as of 12:01 a.m. on June 1, 2004.

## LANGUAGE CHANGES AS FOLLOWS:

1.
THIS AGREEMENT effective as of 12:01 a.m., on June 1, *2004*, is entered into between W. R. GRACE & CO.-CONN., GRACE DAVISON, Chattanooga Plant, 4000 North Hawthorne Street, Chattanooga, Tennessee, throughout this AGREEMENT referred to as the "COMPANY," and UNITED STEELWORKERS OF AMERICA, AFL-CIO-CLC, on behalf of LOCAL UNION 14087, throughout this AGREEMENT referred to as the "UNION."

************

2.
ARTICLE XV, SECTION 15.1 (paragraph 2):

This Agreement shall become effective at 12:01 a.m., June 1, *2004,* and shall remain in effect until 12:00 Midnight, May 31, *2008.* It shall automatically renew itself from year-to-year thereafter unless either party shall give written notice to the other party not less than sixty (60) days prior to May 31, *2008,* or any May 31, thereafter, that it desires to modify or terminate this Agreement.

************

1

3.
ARTICLE VIII, SECTION 8.3:

With the exception of the first year of employment, the period for taking vacations shall begin January 1, and end on December 31, of each year. **Any employee who is denied vacation or has vacation cancelled during the 4th quarter of a given year may request to have 5 days carried over into the following year provided those days are taken within the first quarter of that year. All other** vacations may not be accumulated by being carried over and taken during the following calendar year.

************

4.
ARTICLE V, SECTION 5.8 (d):

(d) Assigned Overtime Rotation

Once an employee has been assigned at least eight (8) hours of overtime work in a workweek, that employee will not be eligible to be assigned additional overtime work that week, until the overtime rotation is complete. **With respect to the assigning of overtime ONLY, the workweek will begin with the equalization period currently issued on Thursdays.**

************

5.
ARTICLE V, SECTION 5.8 (b)(1):

The **junior qualified** employee on the previous shift will be held over until relieved by the next employee scheduled for the job.

************

6.
ARTICLE VI, SECTION 6.9:

SECTION 6.9    Employees temporarily transferred by the Company from one job classification to another shall be paid for the period of the transfer at their present rate, or the minimum rate of the classification to which transferred, or the highest rate which that employee had been entitled to when working in such classification permanently, whichever is higher. Temporary transfers may be made without regard to seniority, and such transfers, where possible, shall be made from among employees then on

2

duty within the department. However, when the temporary transfer extends beyond twenty-four (24) hours, the most senior qualified employee within the work group in the department from which the transfer is made shall be offered the temporary transfer. If refused, the least senior qualified employee within the work group in the department in which the transfer is made shall be temporarily assigned. If the temporary transfer exceeds thirty (30) days, the time on such temporary transfer shall be counted toward qualifying the employee for progression increases in the job classification as set forth in Exhibit A. ***A temporary transfer of any length in no way will establish recall rights to that department as outlined in Section 6.8.***

************

7.
ARTICLE IX, SECTION 9.3:

**SECTION 5.3** For the purpose of determining whether an employee has worked in excess of eight (8) hours per day, a day shall be considered to be twenty-four (24) hours beginning at 7:01 A.M. each calendar day and ending at 7:00 A.M. on the succeeding calendar day. The provisions of Section 5.1 of this Article shall govern whether an employee has worked more than forty (40) hours per work week. A holiday specified in Article IX, which falls on a scheduled work day, and Company paid incentive days shall be considered as a day worked for the purpose of computing **weekly** overtime provided, however, that if an employee is scheduled or accepts an assignment to work on a holiday and fails to work, the holiday shall not be considered as a day worked for the purpose of computing **weekly** overtime.

New language would merely eliminate the word "weekly" in two (2) locations as highlighted above.

*****This language has been changed for the sole purpose of establishing the pay rate at 2-1/2 times an employees normal rate of pay should said employee be "called-in" outside of his normal shift on a Holiday. If an employee is scheduled to work a holiday, the first 8 hours worked on a holiday will be considered said employees "normal" shift and will be paid at 1-1/2 times his normal rate of pay in addition to his Holiday pay provided he meets all requirements for such pay.

************

## BENEFIT AND WAGE ADDITIONS AND CHANGES:

1. The company and union reviewed the Memorandum of Agreement from May 29, 1998 and affirmed that MetLife, the company's current dental provider, agreed to drop the Doctor's Profile component of Reasonable and Customary at that time.

2. The Company will re-issue the memo from Phil Ball dated June 1, 1998 regarding the use of contractors.

3. Notwithstanding the Company's right under the Agreement to change work schedules, if the workload requires a 7-day operation, prior to making any such change the company will discuss the matter with the Union.

4. In the event that an employee covered by this Agreement accepts an out-of-town assignment outside tha scope of the Chattanooga Plant's operation, said employee(s) hourly rate will be increased by $2.00 per hour for the duration of said assignment. (e.g. S-Brane Project in 2003)

5. Mike Connors will write a letter to the W.R. Grace Corporate Benefits Department asking for a review of the medical plans' mammogram policies and the dental plan's annual cap.

6. The Company agrees that each employee will be allowed three (3) days of unpaid excused absence for the purpose of attending scheduled medical appointments. The employee must inform the Company of their scheduled absence at least twenty-four (24) hours in advance.

7. LIFE INSURANCE
   - Effective June 1, 2004        From $50,000 to $55,000
   - Effective June 1, 2005        From $55,000 to $60,000
   - Effective June 1, 2006        From $60,000 to $65,000
   - Effective June 1, 2007        From $65,000 to $70,000

8. SICKNESS AND ACCIDENT INSURANCE – Weekly S&A benefits will be increased as follows:
   - Effective June 1, 2004        From $380 to $420
   - Effective June 1, 2005        From $420 to $440
   - Effective June 1, 2006        From $440 to $460
   - Effective June 1, 2007        From $460 to $480

9. RETIREMENT – See Attachment 1 "REOPENER"

10. WAGES – Increase hourly wages for all job classifications as follows:
    - Effective June 1, 2004        cents ($0.65) per hour
    - Effective June 1, 2005        cents ($0.65) per hour
    - Effective June 1, 2006        cents ($0.65) per hour

Effective June 1, 2007    cents ($0.65) per hour

11. AD&D – Accidental Death & Dismemberment benefits will be increased as follows:
    Effective June 1, 2004        From $25,000 to $27,500
    Effective June 1, 2005        From $27,500 to $30,000
    Effective June 1, 2006        From $30,000 to $32,500
    Effective June 1, 2007        From $32,500 to $35,000

5

IN WITNESS WHEREOF, the parties hereto, have caused their names to be subscribed below by their duly authorized officers and representatives as of this May 28, 2004.

United Steelworkers
of America, Local Union 14087

By: *James E Rose*
James Rose
Staff Representative

*Ronnie Elliott*
Ronnie W. Elliott
President, Local 14087

*Don Ramey*
Don Ramey
Vice President, Local 14087

*Donnie Cartwright*
Donnie Cartwright
Treasurer, Local 14087

*Victor Chambers*
Victor Chambers
Financial Secretary, Local 14087


Tommy Morrow
Recording Secretary, Local 14087

W.R. Grace & Co.-Conn.
Grace Davison

By: *Phil Ball*
Phil Ball
General Manager

*Michael Connors*
Michael Connors
Manager of Admin. & Eng.

*Bill Asbill*
Bill Asbill
Production Superintendent

*Marty Bourquin*
Marty Bourquin
EH&S Manager

*Mark Allen*
Mark Allen
Technical Superintendent

6

## Attachment 1

## REOPENER
### 5/28/04

Notwithstanding any provisions in the Agreement to the contrary, during the term of the Agreement, following the first twelve (12) months thereof, the Union shall have a one time only opportunity to reopen Section 11.2 (Retirement Plan) and Exhibit A (Wage Rates) of the Agreement for the purpose of "buying" prospective increases in the monthly retirement benefit rate ("Benefit Improvements") for active employees, by means of reducing the hourly wage rates in effect at the time such improvements are implemented, if any of the following contingencies occur:

1. The Company emerges from bankruptcy.
2. While still in bankruptcy the Company seeks approval from the U.S. Internal Revenue Service ("IRS") and/or the U.S. Bankruptcy Court ("Court") to make Benefit Improvements for a unionized facility of the Company located in the United States that is not subject to this Agreement, whose employees at the time are covered by a W.R. Grace & Co. retirement plan that does not meet the full funding requirements of Section 401(a)(33)(B)(i) of the Internal Revenue Code ("Code").
3. The retirement plan under this Agreement ("Chattanooga Plan"), were such Benefit Improvements to take effect, meets the full funding requirements of the Code as determined by application of paragraph (f) hereof.

If any of the aforesaid contingencies occur, this reopener provision ("Reopener") would be subject to the following additional terms and conditions:

(a) The Union shall give the Company sixty (60) days advance notice in writing of its desire to reopen ("Notice"). The Notice shall identify the contingency in the Reopener (paragraph 1, 2 or 3) upon which the Notice is based ("Contingency"). Following the Notice period the parties will discuss the matter. If the parties agree that the Contingency has occurred, they will enter into a signed written agreement that identifies the Contingency, the amount of Benefit Improvements and the amount of the reduction to the wage rates ("Acknowledgement").
(b) The Union's request to reopen shall be made no later than ninety (90) days prior to the expiration date of the Agreement.
(c) The cost to the Union per one dollar ($1.00) increase in the monthly retirement benefit rate ("Cost") will be 7.4 cents (¢) per hour.
(d) The Cost shall be fully funded by a reduction in the hourly wage rates in effect under this Agreement or any successor Agreement at the time such Benefit Improvements take effect, subject to the requirements of paragraph (g) hereof.
(e) All other terms and conditions of the Agreement shall remain in full force and effect until the expiration date of the Agreement.
(f) For the purposes of paragraph 3 hereof, following the elapse of the first twelve (12) months of this Agreement, the Union shall be afforded a one time only opportunity to request an actuarial evaluation of the Chattanooga Plan, at the Company's expense,

by an actuary selected by the Company. The request may be made prior or subsequent to the Notice.
(g) With respect to paragraph 2 hereof, any Benefit Improvements to the Chattanooga Plan, would be subject to the approval of the IRS and/or the Bankruptcy Court.
(h) The Union will be allowed to buy up to $12.00 of Benefit Improvements.
(i) All Benefit Improvements and wage rate reductions shall become effective on a singular date.
(j) Benefit Improvements and wage rate reductions based on the application of either paragraph 1 or 3 of the Reopener will take effect within one (1) month following the execution of the Acknowledgement.
(k) Benefit Improvements and wage rate reductions based on the application of paragraph 2 of the Reopener and the Acknowledgement ("Paragraph 2 Improvements") will take effect within one (1) month following the approval of the IRS and/or the Court ("Approval"). If the Approval occurs after the expiration of the Agreement, the Paragraph 2 Improvements will take effect under the successor agreement, following such Approval.
(l) Any employee who retires during the term of the Agreement prior to the date the Benefit Improvements take effect, shall be entitled to receive such Benefit Improvements on the date they become effective for active employees under the Reopener.
(m) Notwithstanding the foregoing, in the event the Union exercises its one time opportunity to reopen under paragraph 2 hereof and the Court disapproves the agreed upon Benefit Improvements, the Union will be afforded one more opportunity during the life of the Agreement to reopen under paragraph 1 or 3 hereof.