1  Peter P. Pearson
   P.O. Box 26301
2  Tucson, AZ. 85726
   (520) 247-1535
3  drp2p@email.arizona.edu

4

                    IN THE UNITED STATES BANKRUPTCY COURT
5                      FOR THE DISTRICT OF DELAWARE

6

   In re:                        ) Case No. 01-1139 (JKF)
7  W.R. GRACE & CO., et al.,     ) Claim Number: 2281
            Debtor.               ) Re: Docket Nos. 5527, 5637 & 5685
8                                 ) **CLAIMENT'S PRODUCTION OF DOCUMENTS**
                                  ) **AND ANSWER TO INTERROGATORIES**
9  _____

10
   Peter P. Pearson ("Claimant") has attached the requested documents and
11
   answered the interrogatories as put forth by the Debtors.
12

13 Respectfully Submitted this 20th day of May, 2005.

14
   By: _____
15
       Peter P. Pearson
16

17
                              Court's
18
                              Copy
19

20

21

22

23

24

25

                        CLAIMENT'S ANSWER - 1

**ANSWER TO INTERROGATORY NO. 1**

Peter Paul Pearson
P.O. Box 26301
Tucson, AZ. 85726

Born: Fort Collins, Colorado
Date of Birth: December 19, 1963
SSN: 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

Marital Status: Single / Divorced

**ANSWER TO INTERROGATORY NO. 2**

1.) 2137 E. Alta Vista Rd.   (Approximately from 1/1982 to 1/1990)

   Phoenix, AZ. 85042-4658

2.) 27203 N 204th Ave

   Wittmann, AZ. 85361-5319 (Approximately from 1/1990 to 1/1994)

3.) P.O Box 8200 (Approximately from 1/1994 to 8/2003)

   Florence, AZ. 85232-8200

4.) 1435 E. Benson Hwy. Apt 8# (Approximately from 8/2003 to Present)

   Tucson, AZ. 85714-1704

**ANSWER TO INTERROGATORY NO. 3**

   Peter P. Pearson was employed with W.R. Grace & Co., under the division of Grace Specialty Chemicals, between the dates of March 1986 through February 1992. He worked in the Warranty Service Department for the Grace Roofing Membrane (G.R.M.) product line. The office location was at the Grace vermiculite processing plant, 4220 W. Glenrosa, Phoenix, Arizona. 85019. His direct supervisors were Dan Kuball, Product Specialist between 1986 and 1988, and Ken Porter, Warranty Service Department, between 1988 and 1992.

     Peter P. Pearson was hired to handle G.R.M. repairs in the Phoenix / Tucson areas; later he was assigned work in Los Angeles, San Francisco, San Diego, Las Vegas, Reno, El Paso, along with several other cities in the Southwestern part of the United States. The position that Mr. Pearson had with the G.R.M. Warranty Department was that of an untrained working supervisor. He had between 1 and 3 men working under him at anyone time.

     Job responsibilities consisted of handling the G.R.M. product line of roofing and waterproofing materials on a daily basis, including support related materials, either manufactured by W.R. Grace or purchased from different vendors to complete necessary warranty and roof repairs as assigned by the direct supervisors. Typically, a job assignment went in the following manner: due to the delamination of the Tedlar ® surface material because of product failure, the seams were trimmed and hand cleaned using a sponge soaked in either Xylene, Acetone, or Toluene.

     Depending on the nature of the job, the G.R.M. product on the roof, repairs differed. The G.R.M. 100 and 200 series of roof materials required that after the seams were cleaned in the above manner, the roof had to be recoated. The rational was to stop the delamination process. Coating a roof was done with a spray rig in the back of a pickup truck. The coatings that were used complied with the G.R.M. product line and assigned by a direct supervisor. Generally, a G.R.M. primer was sprayed on a section of the roof to be coated; after the primer was dry, a top white-pigmented coating was applied. The primers and coatings were from old inventories that came from different locations in the United States, depending on the age of the product, it had to be diluted with either gallons of Xylene, Toluene, Acetone or a mixture of Xylene and Ethyl Benzene in order for it to be sprayed.

The primers and coatings consisted of several other active products and ingredients; Unprocessed Naphthenic oil, Styrene Butadiene polymer, Asphalt, Petroleum Extracts, Styrene Polymers and other unnamed chemicals. Following the top coating, the seams were treated again with a seam calk that was designed to stop the delamination process.

The worked also consisted of complete reproofing different buildings using the G.R.M. line of products. This was only if the coating process would not fix the delamination process. In this case, each seam on the roof was trimmed of the delaminated curl, then depending on how much of the area could be roofed in one day; an area was sprayed with a G.R.M. primer. After the primer was dry, the roof was affixed with the G.R.M. 500 roof product. This was a peel-and-stick product that has a contact paper on the back-side which was peeled off and the product was affixed to the primed areas.

Due to the nature of the products used, and all that was provided by the direct supervisors; tools, clothes, hands and areas of the body that were dirtied because of the chemical spraying, were cleaned with either Xylene, Toluene, or Acetone at the end of the workday, depending on what was on the truck.

**ANSWER TO INTERROGATORY NO. 4:**

**A.)**

Employment before W.R. Grace employment:

Advanced Roofing
1918 W Grant St
Phoenix, AZ 85009

**B.)** Approximately from the dates: 1985 - March 1986

**C.)** Residential roofing company.

**D.)** Mr. Pearson worked as roof loader and roof tile setter. There was no exposure to chemicals.

**E.)** Bill Spitz was the owner. (No other information available)

**ANSWER TO INTERROGATORY NO. 5:**

**A.)**

Employment after W.R. Grace employment:

Universal Roofers
5130 W Myrtle Ave (I believe this was the address)
Glendale, AZ 85301

**B.)** Approximately from the dates: February 1992 - December 1992.

**C.)** Residential roofing company.

**D.)** Mr. Pearson worked as a roof inspector for completed residential roofs, dealt with costumer complaints, and sales or new roofs. There was no direct roof labor work or exposure to chemicals.

**E.)** Terry Lyons was a supervisor. (No other information available)

**ANSWER TO INTERROGATORY NO. 6:**

   1.)     Mr. Pearson has suffered, and continues to suffer acute joint pain in both hands; the finger joints are swollen and always painful. Due to the pain, he is unable to grab items very tightly, (i.e. hammer or hand tools). Duration has been since 1989 and continued to present day.

   2.)     Mr. Pearson has suffered, and continues to suffer, diminished vision in both eyes where Grace chemicals were splashed and spilled on his face. Duration has been since 1989 and continues to present day.

1   3.)    Mr. Pearson has suffered, and continues to suffer, possible
2          return of skin cancer on the facial and hand areas where the
3          Grace chemicals were exposed to without the proper safety
4          equipment. Duration has been since 1989 and continues to
5          present day.
6   4.)    Mr. Pearson suffered sever head pains, blurred vision,
7          dizziness and unexplained skin rashes while working with the
8          Grace chemicals. Duration was from March 1986 to February
9          1992.
10  5.)    Mr. Pearson has suffered emotionally from the fear that her
11         will die of cancer caused by the exposure to the Grace
12         chemicals.
13  6.)    Mr. Pearson suffered humiliation, terroristic type harm, and
14         damage when he was threatened that he would lose his job if
15         he questioned his supervisors about safety and medical
16         problems that he was experiencing at the time.
17
18  **ANSWER TO INTERROGATORY NO. 7:**
19      In the early part of 2002, Mr. Pearson, while researching a cause for
20  the unexplained joint pains, skin problems, and diminished eyesight he
21  discovered that the chemicals he was exposed to while working for W.R. Grace
22  were the reason for the medical issues he was experiencing. I have since seen
23  a medical doctor to confirm the medical issues, Dr. Drew Malloy, M.D. with
    Campus Health Services.
24
25

**ANSWER TO INTERROGATORY NO. 8:**

Two medical doctors in Phoenix around 1991, but have forgot their names. Saw a doctor in Kingman Arizona in 1989 while driving back from a W.R. Grace job in Las Vegas, I think his name was M. Kogians MD. He suggested that I see a specialist because of the problems I was experiencing. When I told my direct supervisor (Dan Kuball or Ken Porter); that was when I was first threatened that I would lose my job if I continued to complain. My direct supervisors told me the chemicals were safe.

**ANSWER TO INTERROGATORY NO. 9:**

1) Mr. Pearson has suffered an acute form of joint pain in his hands, along with diminished vision in both eyes as a direct result of handling, in an unsafe and unprotected manner the G.R.M materials and application solvents. Mr. Pearson has had skin cancer removed twice from his hands and on the right forehead facial area where Xylene, as with other chemicals related to the W.R. Grace roofing products, which had accidentally spilled while working for W.R. Grace. Mr. Pearson was indirectly and/or directly threatened that he would lose his job if he questioned his supervisors about the chemicals being used, safety concerns, and medical problems that were being experienced at the time. Mr. Pearson was never told of the danger of the chemicals he was using, in accordance with Federal law, under the Right-to-Know Act; never trained in the proper handling of the hazardous materials offered by W.R. Grace. Mr. Pearson has suffered permanent harm because of W.R. Grace's inability to conform and follow Federal law.

1   **ANSWER TO INTERROGATORY NO. 10:**

2   All past and current Material Safety Data Sheets (MSDS) issued by W.R. Grace

3   for the W.R. Grace GRM related materials reflect that the products are

4   dangerous and that proper training and protective gear must be used while

5   handling these materials. All MSDS forms for chemicals that are associated

6   with the GRM product, whether these are solvents or other, they are

7   considered dangerous unless proper training and protective gear is used

8   during contact with the specific chemicals. If W.R. Grace had given Mr.

9   Pearson proper training and protective gear then the medical issues he is

10  currently suffering would not be present.

11

12  **ANSWER TO INTERROGATORY NO. 11:**

13              1. Material Safety Data Sheet (MSDS ID Number: M-85707)
14                 Attached as Exhibit A.
15              2. Material Safety Data Sheet (MSDS ID Number: M-85698)
16                 Attached as Exhibit B.
17              3. Material Safety Data Sheet (MSDS ID Number: M-85648)
18                 Attached as Exhibit C.
19              4. Material Safety Data Sheet (MSDS ID Number: M-85694)
20                 Attached as Exhibit D.
21              5. Material Safety Data Sheet (MSDS ID Number: T3913)
22                 Attached as Exhibit E.
23              6. Material Safety Data Sheet (MSDS ID Number: S71223)
24                 Attached as Exhibit F.
25              7. International Chemical Safety Card (ICSD ID Number:
                   0268) Attached as Exhibit G.

8. *Environmental Health Perspectives* Volume 109, Number 12, December 2001. Attached as Exhibit H.

9. *Xylenes Chemical Backgrounder*, National Safety Counsel, Attached as Exhibit I.

10. Material Safety Data Sheet (C.A.S.# 108-88-3, 142-82-5, 1330-20-7, 108-21-4) Attached as Exhibit J.

11. *High Production Volume (HVP) Chemical Challenge Program*, paper submitted to the US EPA by The Petroleum HVP Testing Group. Attached as Exhibit K.

12. All MSDS forms for G.R.M. products and related chemicals that he was exposed to and used during his employment with WR Grace that are currently unavailable to Mr. Pearson at this time.

**ANSWER TO INTERROGATORY NO. 12:**

Dr. M. Kogians.

Two doctors in Phoenix that treated my skin cancer, (I forgot their names).

**ANSWER TO INTERROGATORY NO. 13:**

Toluene (Chemical Abstract Service Number) (CAS # 108-88-3)

Heptane (CAS# 142-82-5)

Xylene (CAS# 1330-20-7)

Isopropyl Acetate (CAS# 108-21-4)

Ethylbenzene (CAS# 100-41-4)

Heavy Paraffinic Distillate Solvent Extract (CAS# 064742-04-7)

Petroleum Asphalt (CAS# 008052-42-4)

1. Styrene-Butadiene block copolymer (CAS# 009003-55-8)
2. Naphthenic Oil (CAS# 64742-52-5)
3. Asphalt (CAS# 08052-42-4/64742-93-4)
4. Heavy Paraffinic Distillate Solvent Extract (CAS# 064742-10-5)
5. Gasoline (CAS# 8006-61-9)
6. Acetone (CAS# 67-64-1)
7. Diesel (CAS# 68476-34-6)

Along with other chemicals listed in MSDS forms for the products which Mr. Pearson used during his time with W.R. Grace.

**ANSWER TO INTERROGATORY NO. 14:**

See attached Documents with respect to INTERROGATORY NO. 11.

**ANSWER TO INTERROGATORY NO. 15:**

Mr. Jim Nelson, Maintenance / Project Manager
Thomas & Mac Center
4505 Maryland Parkway
Las Vegas, NV. 89154-0003

**(See his attached letter in "Response to Debtors' Fifth Omnibus Objection")**

**ANSWER TO INTERROGATORY NO. 16:**

Other then my employment with W.R. Grace, I have never been exposed to hazardous materials or chemicals.

**ANSWER TO INTERROGATORY NO. 17:**

CLAIMENT'S ANSWER - 10

1  Other then my employment with W.R. Grace, I have never been exposed to
2  hazardous materials or chemicals.

**ANSWER TO INTERROGATORY NO. 18:**

I do not have any such correspondence.

**ANSWER TO INTERROGATORY NO. 19:**

Yes, in 1989 Dr. M. Kogians stated orally that chemicals would cause the dizziness and skin condition. In 1991, the two doctors in Phoenix asked me if I was being exposed to chemicals, the symptoms I was experiencing at the time, dizziness, shortness of breath and blurring of the vision was indicative of chemical exposure. These are the same doctors that froze the skin cancer off my face and hands. Finally, around April 2005 I spoke with Dr. Drew Malloy, M.D. with Campus Health Services about the continued pain in my finger joints and reoccurrence of skin cancer on the right side of my face and right ear.

**ANSWER TO INTERROGATORY NO. 20:**

There was no training provided on the handling of the specialty chemicals used by W.R. Grace for the G.R.M. product line. I watched a promotional video on how to affix the G.R.M. roofing materials to a roof deck. This was a video that was provided to contractors that were designated to put the products on commercial roofs. No chemical safety was covered, just the uniqueness on the peel-and-stick roofing idea.

**ANSWER TO INTERROGATORY NO. 21:**

There were at least three occasions, which I recall, when one or more of the other co-workers and me asked the direct supervisor about the chemicals we were using as a general safety concern. Each time we were told "not to worry and that we were luck to be working, after all we worked outside and the chemicals were safe" or something to that effect.

**ANSWER TO INTERROGATORY NO. 22:**

There were at least two occasions that I recall when I spoke to my direct supervisor about the lack of safety equipment, or equipment to help alleviate the chemical odors that took place when we sprayed. I was told by a direct supervisor, Ken Porter, that I was lucky to be working and that they could always replace me with a "cheap Mexican". A direct supervisor at the Phoenix Vermiculite Plant, (I forgot his name), told me that I should be happy that I had a job and that to get ahead in the company I should not "make waves about the chemicals being used". One time, after I expressed concern about what we were using and what the other workers were saying, my direct supervisor Ken Porter, alluded to a position in management if I could keep the other workers from complaining.

**ANSWER TO INTERROGATORY NO. 23:**

The Specialty Chemical division of W.R. Grace, which manufactured the G.R.M. roofing and waterproofing product line, was losing money in 1986. According to an article in *Professional Roofing* January 2003 http://www.professionalroofing.net/article.aspx?A_ID=200 stated, "GRM didn't fare as well and eventually was phased out (nobody ever withdraws a roofing product from the market". The cause for the G.R.M. failure was comprised of several factures, some of which was failure to properly test the new roofing product, and a willingness of the Board of Directors to exploit the untested

product onto the booming construction market of the late 1980s in the hopes of financially capitalizing on the Markey growth.

By the mid 1980s, the brunt of this market experiment and product failure came to bear on the Specialty Chemical division of W.R. Grace. The initial product sales line was that the G.R.M. roof would last 25 years and marketed as the best thing to come to the roofing industry ever. W.R. Grace backed this with a 10-year product warranty. If the product failed W.R. Grace would repair, free of charge, the roof. However, the product was a colossal failure, every single roof in the Southwestern part of the United States failed to some degree or another.

Because of this colossal product failure, the G.R.M. Roofing and Waterproofing line was terminated. This was done in the interest of shareholders and the company bottom line. W.R. Grace was faced with the financial responsibility of repairing millions of square feet of roof product. In 1985, W.R. Grace started using local roof contractors to do the repairs, however the cost was prohibitive, contractors were charging market rates to do the repairs. In 1986, it was suggested at the corporate level to find a way to stem the expenditures being put forth, one of these suggestions was to bring the warranty repairs "in-house" and start a warranty service department. With this agenda set forth, W.R. Grace Management devised a plan to maintain the roof warranties and at the same time spend as little as possible to comply with their warranty obligations. This management decision resulted in the lack of formal training for the "in-house" crew members that worked in the G.R.M. warranty division, denial of standard safety equipment, and a general position of apathy towards those men that worked in this sector of the company.

The motive and interest to protect the shareholders, company value, and share price, superseded the interest of the workers, myself specifically, that were employed to handle the G.R.M. warranty service issues. This

amounted to malicious intent because certain and specific Local, State and Federal laws dealing with a workers "right to know" with respects to handling chemicals and having the knowledge of what those chemicals can do to the human body, were deliberately ignored by W.R. Grace management in order comply with the company's motive to save money.

Because certain and specific Local, State and Federal laws dealing a workers "Right-to-Know", with respect to handling chemicals and having the knowledge of what those chemicals can do to the human body. W.R. Grace was negligent with tortuous intent that cause harm and injury by deliberately refusing to follow the law in order comply with the company's motive to save money.

The motive of W.R. Grace was to protect the shareholder, corporate image and the value of the company on the stock market above the worker. The result of this corporate agenda, at least with respect to the G.R.M. Warranty Services Department, was a negligent and tortuous intent that violated my civil and human rights. This was done by refusing to follow or comply with certain and specific Local, State and Federal laws dealing a workers "Right-to-Know", with respect to handling chemicals and having the knowledge of what those chemicals can do to the human body.

This is further exemplified by the fact that as an American the Fourteenth Amendment to the U.S. Constitution, to have Equal Protection under the law, protects me against those that would deny me equal protection. The U.S. Congressional act that mandated a "Right-to-Know" with respect to the chemicals a worker uses at a place of business and what they possibly could do to the body is a "Right" that cannot be given to some members or employees of a company and not others. The Fourteenth Amendment to the U.S. Constitution also guarantees a right to a "Due Process" to the system of laws our American system has in place. W.R. Grace violated my "Due Process" to the procedure that mandated I be informed that I was using specific chemicals.

**ANSWER TO INTERROGATORY NO. 24:**

The facts are contained in the evidence I have submitted, including all filing, affidavits, and attachments. Depending on the nature of further proceedings will determine the expert witnesses needed.

**ANSWER TO INTERROGATORY NO. 25:**

None

Respectfully Submitted this 20th Day of May, 2005.

By: _____

Peter P. Pearson
P.O. Box 26301
Tucson, AZ. 85726
(520) 247-1535
drp2p@email.arizona.edu
drp2p2@yahoo.com

Original and three (3) copies
Of the forgoing sent this
20th day of May, 2005.

To:

United States Bankruptcy Court
District of Delaware
Attn: Clerk of the Court
824 Market Street
Wilmington, Delaware. 19801

**Certified Mail Number:**

One Copy of the forgoing
Sent this 31st day of March, 2005.

To:

KIRKLAND & ELLIS LLP
Mr. James H.M. Sprayregen, P.C.
Attn: Rachel R. Schulman, Esq.
200 East Randolph Drive
Chicago, Illinois. 60601

**Certified Mail Number:**

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES &
WEINTRAUB P.C.
Ms. Laura Davis Jones (Bar No. 2436)

1 | 919 North Market Street, 16th Floor
P.O. Box 8705
2 | Wilmington, Delaware. 19899-8705

3 | **Certified Mail Number:**

By: _____
   Peter P. Pearson