# EXHIBIT "B"

# ORIGINAL

FILED
MISSOULA, MT

2005 FEB 7 PM 1 40

BY *C. Dahley*
DEPUTY CLERK

**THOMAS L. SANSONETTI**
**Assistant Attorney General, ENRD**
**DAVID M. UHLMANN**
**Chief, Environmental Crimes Section**
**KEVIN M. CASSIDY**
**Trial Attorney**
**Environmental Crimes Section**

**WILLIAM W. MERCER**
**United States Attorney**
**KRIS A. MCLEAN**
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**P.O. Box 8329**
**Missoula, MT 59807**
**105 E. Pine, 2nd Floor**
**Missoula, MT 59802**
**Phone: (406) 542-8851**
**FAX: (406) 542-1476**

**ATTORNEY FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

## MISSOULA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CR 05 - 07 -M-DWM** |
| **Plaintiff,** | **INDICTMENT** |
| **vs.** | **CONSPIRACY**<br>**(Count I)**<br>**Title 18 U.S.C. §371** |
| **W.R. GRACE, ALAN R. STRINGER, HENRY A. ESCHENBACH, JACK W. WOLTER, WILLIAM J. McCAIG, ROBERT J. BETTACCHI, O. MARIO FAVORITO, ROBERT C. WALSH** | **(Penalty: Five years imprisonment, $250,000 fine, and three years supervised release; $1,000,000 fine per violation for organization)** |
| **Defendants.** | **CLEAN AIR ACT VIOLATIONS**<br>**(Counts II, III, IV)**<br>**Title 42 U.S.C. § 7413(c)(5)(A)**<br>**(Penalty: Fifteen years imprisonment, $250,000 fine, and three years supervised release; $1,000,000 fine per violation for organization)** |

N:\crim04\0305\Grace Indictment 18.2.wpd

**WIRE FRAUD**
(Counts V, VI)
18 U.S.C. §§ 1343, 2
(Penalty: Ten years imprisonment, $250,000 fine, and three years supervised release)

**OBSTRUCTION OF JUSTICE**
(Counts VII, VIII, IX, X)
18 U.S.C. §§ 1505, 2
(Penalty: Five years imprisonment, $250,000 fine, and three years supervised release)

THE GRAND JURY CHARGES:

## INTRODUCTION

### A. BACKGROUND

At all times material to this Indictment:

1.  In the late 1800s, gold miners discovered a significant body of vermiculite ore in an area located in the mountains approximately seven miles northeast of the town of Libby, Montana (the "Libby Mine").

2.  Vermiculite is a mineral that expands, or pops, at high temperatures in an "expansion" or "exfoliation" process.

3.  Expanded vermiculite that originated at the Libby Mine had many uses, including as an attic insulation (marketed as "Zonolite Attic Insulation"), as an ingredient in fireproofing products (marketed as "Monokote"), as an ingredient in masonry fill, and as an additive in potting soils and fertilizers.

4.  The vermiculite deposits at the Libby Mine were contaminated with amphibole asbestos. The amphibole asbestos found at the Libby Mine is composed of a family of closely related minerals including tremolite, winchite, richterite, actinolite

and others. This amphibole asbestos has been commonly called "tremolite" and, for the purposes of this Indictment, it will be referred to as "tremolite," "tremolite asbestos" and "amphibole asbestos."

5.    On or about 1939, the Zonolite Company (originally known as Universal Zonolite Insulation Company) was formed to mine and process vermiculite from the ore deposit at the Libby Mine.

6.    Pursuant to the Agreement and Plan of Reorganization dated January 17, 1963, between W.R. Grace & Co., a Connecticut corporation, and the Zonolite Company ("Zonolite Agreement"), W.R. Grace & Co. acquired "substantially all of the properties and assets of Zonolite" under the terms and conditions contained in that agreement.

7.    The employees of the Zonolite Company remained at the mine and processing facilities as employees of W.R. Grace & Co.

8.    W.R. Grace & Co. operated the Libby Mine until on or about 1992.

9.    W.R. Grace & Co. acquired the rights to the name "Zonolite" as part of the transaction with the Zonolite Company and continued to manufacture and sell Zonolite's product line, including vermiculite concentrate, expanded vermiculite, and Zonolite Attic Insulation.

10.   In 1988, W.R. Grace & Co., the same Connecticut corporation that entered into the Zonolite Agreement, changed its name to W.R. Grace & Co. - Conn. as part of a corporate reorganization, and became a subsidiary of a newly-created New York corporation named W.R. Grace & Co. In 1998, W.R. Grace & Co., a

Delaware corporation, was incorporated. W.R. Grace & Co. - Conn., became a wholly owned subsidiary of the Delaware corporation.

11. For the purposes of this Indictment, "W.R. GRACE" refers to W.R. Grace & Co., a Connecticut corporation, both before and after it changed its name to W.R. Grace & Co.-Conn. in 1988.

12. As part of its operations, defendant W.R. GRACE mined and milled vermiculite ore at the Libby Mine. The milled vermiculite ore was known as "vermiculite concentrate."

13. As part of its operations, defendant W.R. GRACE disposed of mining waste and mill tailings (a waste product of the milling process) at the Libby Mine.

14. From on or about 1963 until on or about 1991, defendant W.R. GRACE operated a Screening Plant, a processing plant at which vermiculite concentrate was separated into different sized grades through a mechanical screening process (the "Screening Plant").

15. Prior to the mid-1970s, the Screening Plant was located at the Libby Mine.

16. After the mid-1970s, the Screening Plant was located down Rainy Creek Road from the Libby Mine, at the intersection of Highway 37 and Rainy Creek Road on the bank of the Kootenai River, about four miles from Libby, Montana.

17. Prior to the construction of the new Screening Plant at the intersection of Highway 37 and Rainy Creek Road, defendant W.R. GRACE used this property as a holding point for vermiculite concentrate trucked from the Screening Plant at the Libby Mine.

18.   A facility known as the "Export Plant" was located across the railroad tracks from downtown Libby, Montana near where Highway 37 crosses the Kootenai River.

19.   From on or about 1963 to at least on or about 1992, defendant W.R. GRACE trucked small amounts (relative to the volume shipped to customers from the rail loading station near the Screening Plant) of vermiculite concentrate to the Export Plant from the Screening Plant, where it was stockpiled and then placed in bags for distribution to locations in other states.

20.   Defendant W.R. GRACE shipped the vermiculite concentrate (in hopper railroad cars or, in lesser amounts, in bags) to defendant W.R. GRACE owned and licensed expansion facilities and to customers throughout the United States.

21.   In the operation of the Screening Plant, there were occasionally spills, processing errors, or lack of demand for certain size grades of vermiculite concentrate.

22.   At various times between 1963 and 1992, defendant W.R. GRACE placed the vermiculite concentrate that had spilled, vermiculite concentrate that was affected by processing errors, or vermiculite concentrate of a grade for which there was no immediate demand in various locations on the grounds of the Screening Plant.

23.   At various times between 1963 and 1990, defendant W.R. GRACE allowed employees and residents of Libby, Montana to take vermiculite concentrate for their personal use.

24.   At some unknown time in the 1970s, an employee of defendant W.R. GRACE informed the Libby Public School District that vermiculite materials from the Libby Mine could be used as a surface for the Libby High School running track.

25.  At some unknown time, employees of defendant W.R. GRACE transported vermiculite materials to the Libby High School and the Libby Junior High School where they were laid and served as a surface for the running tracks at both schools for approximately seven years.

26.  On or about 1981, employees of defendant W.R. GRACE transported vermiculite materials to Plummer Elementary School in Libby, Montana where they were laid and served as the foundation for an outdoor ice skating rink.

27.  In 1990, defendant W.R. GRACE ceased vermiculite mining at the Libby Mine. Defendant W.R. GRACE continued vermiculite processing operations at the Libby Mine and the Screening Plant until approximately 1992.

28.  In the mid-1990s, defendant W.R. GRACE sold several of the properties associated with its former vermiculite operations in and near Libby, Montana.

29.  On or about December 17, 1993, defendant W.R. GRACE sold the Screening Plant to Lincoln County residents Mel and Lerah Parker.

30.  From approximately 1993 to on or about June, 2000, Mel and Lerah Parker used the Screening Plant for commercial operations (a commercial nursery and mushroom farm) and their personal residence.

31.  From on or about 1977 to on or about 1994, the defendant W.R. GRACE leased a portion of the Export Plant to various people and entities to use for organized youth baseball games and practices.

32.  From on or about 1987 to sometime before on or about May 12, 1994, defendant W.R. Grace leased a portion of the Export Plant to Jim Regh, Melvin Burnett, and others for use as their place of business.

33.   In separate transactions on or about May 12, 1994 and on or about February 23, 1995, defendant W.R. GRACE transferred portions of the former Export Plant property to the City of Libby.

34.   From on or about 1995 to on or about 1997, the City of Libby leased a portion of the Export Plant to various people and entities to use for organized youth baseball games and practices.

35.   From on or about May 12, 1994 to on or about 2000, the City of Libby leased a portion of the Export Plant to Melvin Burnett, who used the location for a retail lumber yard and related operations.

36.   On or about 1994, defendant W.R. GRACE sold to an entity known as Kootenai Development Corporation ("KDC") approximately 3,600 acres of mountainous land that comprises the Libby Mine, 1,200 acres of which had been actively mined, and an approximately 20-acre parcel now known as the "Flyway," which is located between Highway 37 and the Kootenai River, adjacent to and south of the former Screening Plant.

37.   On or about November 23, 1999, Environmental Protection Agency ("EPA") representatives arrived in Libby, Montana to investigate reports of a potential hazardous waste emergency relating to asbestos contaminated vermiculite.

38.   As a result of its investigation, EPA concluded that the conditions at the site presented an imminent and substantial threat to human health and the environment.  The site was ultimately declared a Superfund Site pursuant to federal law.  As of December 31, 2001, EPA had incurred 55,100,000.00 dollars in cleanup costs.

39.     At various dates alleged in this Indictment, defendant ALAN R. STRINGER held different positions with defendant W.R. GRACE, including: from on or about September 8, 1981 to on or about 1988, he was the Libby Mine Supervisor; from on or about 1988 to on or about 1994, he was the General Manager of Operations at the Libby Mine; and from on or about 1999 to the present, he served as defendant W.R. GRACE's representative relating to EPA's Superfund Cleanup.

40.     At various dates alleged in this Indictment, defendant HENRY "HARRY" A. ESCHENBACH held different positions with defendant W.R. GRACE, including: from on or about 1971 to on or about 1977, he was an Industrial Hygienist in the Industrial Chemicals Group ("ICG"); and from on or about 1977 to on or about December 31, 1996, he was the Director of Health, Safety, and Toxicology for ICG.

41.     At various dates alleged in this Indictment, defendant JACK W. WOLTER held different positions with defendant W.R. GRACE, including: from on or about September 15, 1975 to on or about 1988, he was Vice-President of Mining and Engineering for the Construction Products Division ("CPD"); and from on or about 1988 to on or about 1994, he was Vice-President and General Manager of CPD.

42.     At various dates alleged in this Indictment, defendant WILLIAM J. McCAIG held different positions with defendant W.R. GRACE, including: from on or about January, 1971, he was a Maintenance Engineer at the Libby Mine; from on or about 1976 to on or about 1979, he was Maintenance Superintendent at the Libby Mine; from on or about 1979 to on or about 1988, he was General Manager

of Operations at the Libby Mine; and from on or about 1988 to on or about August 31, 1995, he was Manufacturing Manager of Specialty Vermiculite of CPD Business Unit in Enoree, South Carolina.

43. At various dates alleged in this Indictment, defendant ROBERT J. BETTACCHI held different positions with defendant W.R. GRACE, including: from on or about 1979 to on or about 1986, he was General Manager of CPD; from on or about 1986 to on or about 1989, he was Vice-President of CPD; and from on or about 1989 to the present, he was President of CPD and Senior Vice-President of defendant W.R. GRACE.

44. At various dates alleged in this Indictment, defendant O. MARIO FAVORITO held different positions with defendant W.R. GRACE, including: from on or about 1970 to on or about 1993, he was corporate legal counsel for ICG; and from an unknown time but no earlier than on or about 1993 to the present, he was Assistant Secretary of defendant W.R. GRACE and Chief Group Counsel.

45. At various dates alleged in this Indictment, defendant ROBERT C. WALSH held different positions with defendant W.R. GRACE, including: from on or about 1982 to on or about 1989, he was President of CPD; from on or about 1989 to an unknown time he was Executive Vice President of Grace Specialty Chemicals Co.; and from an unknown time to on or about 1994, he was Senior Vice-President of defendant W.R. GRACE.

46. From 1976 to 1990 the Directors, Officers, and Shareholders of W.R. GRACE enjoyed at least $140 million in after tax profits arising largely from products made with vermiculite contaminated with tremolite asbestos from the Libby Mine.

## B. ASBESTOS RELATED DISEASES

47.   Modern science has not established a safe level for asbestos exposure for which there is no increased risk of disease.

48.   Airborne exposure to tremolite asbestos by breathing into human lungs causes scarring of the lung tissues and can cause the disease known as "asbestosis."

49.   Asbestosis is a progressive disease that destroys the human lung's ability to absorb oxygen, and in severe cases, results in severe disability or death.

50.   The rate of asbestosis mortality of the Libby population is 40 to 80 times higher than expected when compared to rates for Montana and the United States.

51.   Airborne exposure to tremolite asbestos causes lung cancer in humans.

52.   The rate of lung cancer mortality of the Libby population is approximately 30 percent higher than expected when compared to rates for Montana and the United States.

53.   Airborne exposure to tremolite asbestos can cause an aggressive and fatal form of cancer in humans known as "mesothelioma." This form of cancer is extremely rare, resulting in no more than 9 cases per 1 million individuals in the United States general population, and is uniquely associated with exposure to asbestos. This form of cancer is not related to cigarette smoking.

54.   Over twenty cases of mesothelioma have been identified to date among persons who lived or worked in Libby. This is a significant finding for this small population of approximately 8,000 people.

55.   Airborne exposure to tremolite asbestos can cause the disease of pleural fibrosis, which is scarring of the pleural tissues surrounding the lungs. Pleural fibrosis can

result in impaired functioning of the lungs, and in more severe cases, disability and death. The development and progression of pleural fibrosis is not related to cigarette smoking.

56. Pleural fibrosis is associated with a greater risk of developing mesothelioma and lung cancer.

57. To date, approximately 1,200 residents of the Libby, Montana area have been identified as having asbestos related pleural abnormalities as a result of being exposed to tremolite asbestos produced by W.R. GRACE at the Libby Mine. Of this group, 70 percent are not former employees at the Libby Mine. Individuals have been identified with asbestos related disease whose only exposure to asbestos has been through asbestos containing vermiculite from the Libby Mine located throughout the community.

58. Asbestos related diseases have a latency period ranging from 3 to 40 years or more. That is, a person exposed to asbestos by breathing will not manifest symptoms of disease until 3 to 40 or more years after exposure.

59. Airborne exposure to tremolite asbestos can cause bloody pleural effusions. A bloody pleural effusion is a pathological collection of bloody fluid between the pleural lining and the lung. They are considered to be a possible manifestation of early stages of mesothelioma.

## C. STATUTORY BACKGROUND

### I. CLEAN AIR ACT

60. The Clean Air Act ("CAA"), 42 U.S.C. § 7401 *et seq.*, is the United States' comprehensive air pollution control statute. The purpose of the CAA is "to protect

and enhance the quality of the nation's air resources." 42 U.S.C. § 7401(b)(1); *see also* 42 U.S.C. § 7470.

61.    Under the CAA, any person who knowingly releases into the ambient air any hazardous air pollutant or any extremely hazardous substance, and who knows at the time that he thereby places another person in imminent danger of death or serious bodily injury is subject to criminal penalties. 42 U.S.C. § 7413(c)(5)(A).

62.    Asbestos is a hazardous air pollutant. 42 U.S.C. § 7412(b)(1).

63.    A "person" includes a corporation, individual and "any responsible corporate officer." 42 U.S.C. § 7602(e); 42 U.S.C. § 7413(c)(6).

64.    Congress defined "serious bodily injury" as "bodily injury which involves a substantial risk of death, . . . extreme physical pain, . . . or protracted loss or impairment of the function of a bodily member, organ, or mental faculty." 42 U.S.C. § 7413(c)(5)(F).

## II. TOXIC SUBSTANCES CONTROL ACT

65.    The Toxic Substances Control Act, 15 U.S.C. § 2601 et. seq. ("TSCA"), regulates chemical substances and mixtures whose manufacture, processing, distribution in commerce, use, or disposal may present an unreasonable risk of injury to health or the environment.

66.    Section 8(e) of TSCA, 42 U.S.C. § 2607(e) requires that any person who manufactures, processes, or distributes in commerce a chemical substance or mixture and who obtains information that reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment shall immediately inform the Administrator of EPA of such

information, unless the person has actual knowledge that the Administrator has been adequately informed of such information.

67.    At times relevant to this Indictment, EPA interpreted the requirement under TSCA 8(e) that a person "immediately inform" the Administrator to be met if the person submitted the information to EPA within 15 working days after the date the person obtained such information.

## III. COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT (SUPERFUND)

68.    The Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq. ("CERCLA" or "Superfund"), authorizes designated EPA personnel to conduct response actions to address releases or threatened releases of hazardous substances into the environment. 42 U.S.C. § 9604(a)(1). Asbestos is defined as a "hazardous substance" under CERCLA and EPA's implementing regulations. 42 U.S.C. § 9601(14); 40 C.F.R. 302.4.

69.    Under Section 104(e)(2) of CERCLA, 42 U.S.C. § 9604(e)(2), designated EPA personnel "may require any person who has or may have information relevant to any of the following to furnish, upon reasonable notice, information and documents relating to such matter:

(A) The identification, nature, and quantity of materials which have been or are generated, treated, stored, or disposed of at a vessel or facility or transported to a vessel or facility.

(B) The nature or extent of a release or threatened release of a hazardous substance or pollutant or contaminant at or from a vessel or facility.

(C) Information relating to the ability of a person to pay for or perform a cleanup.

## COUNT I
## (Conspiracy)

70. Paragraphs 1 through 69 are incorporated here as if set forth in full.

71. That beginning on or about 1976, and continuing until on or about 2002, at Libby, and other locations within and without the District of Montana, the defendants, W.R. GRACE, ALAN R. STRINGER, HENRY A. ESCHENBACH, JACK W. WOLTER, WILLIAM J. McCAIG, ROBERT J. BETTACCHI, O. MARIO FAVORITO, and ROBERT C. WALSH, and others known and unknown to the grand jury did knowingly combine, conspire and agree among themselves and others:

## OBJECTS OF THE CONSPIRACY

a. To knowingly release and cause to be released into the ambient air a hazardous air pollutant, namely asbestos, and at the time knowingly placed persons, including: families of employees of W.R. GRACE Libby vermiculite mining and processing operations; residents of Libby, Montana and surrounding communities in Lincoln County; and others in imminent danger of death or serious bodily injury in violation of 42 U.S.C. § 7413(c)(5)(A).

b. To defraud the United States and others by impairing, impeding, and frustrating the governmental functions of the United States, including the United States Environmental Protection Agency (EPA) and the Department of Health and Human Services, specifically, the National Institute for Occupational Safety and Health ("NIOSH");

being federal agencies responsible for administering federal laws and regulations designed to protect public health and safety and the environment in violation of 18 U.S.C.§ 371.

72.    It was a purpose of the conspiracy to conceal and misrepresent the hazardous nature of the tremolite asbestos contaminated vermiculite, thereby enriching defendants and others.

73.    It was a purpose of the conspiracy to increase profits and avoid liability by misleading the government and preventing the government from using its authorities to protect against risks to human health and the environment associated with the manufacture, processing, distribution, commerce, use, handling, disposal, and release of tremolite asbestos contaminated vermiculite.

## MANNER AND MEANS OF THE CONSPIRACY

The following manner and means, among others, were used by the defendants to effectuate and perpetuate the conspiracy set forth above:

74.    It was part of the conspiracy that the defendants obtained knowledge of the hazardous nature of the tremolite asbestos contaminated vermiculite through various means, including, but not limited to: scientific testing and analysis, including animal studies; epidemiological studies of employees; employee medical screening and examinations; employee medical record reviews; collection and evaluation of a deceased employee's lung tissue; review of employee death certificates; conducting employee morbidity and mortality studies; employee autopsy reviews; review of medical and scientific literature; reviewing

reports from insurance carriers; and reviewing employee worker's compensation claims.

75.   It was part of the conspiracy that the defendants obtained knowledge of the propensity of tremolite asbestos contaminated vermiculite, when disturbed, to release fibers into the ambient air (also known as "friability") through various means, including, but not limited to: product testing, including attic simulation and vermiculite materials handling tests ("drop tests"); and air and bulk sampling at the Libby Mine and other defendant W.R. GRACE facilities in and around Libby, Montana, at defendant W.R. GRACE owned and licensed expansion plants, at the facilities of customers using vermiculite materials, and at the Libby High School track.

76.   It was part of the conspiracy that the defendants concealed the full extent of their knowledge of the hazardous nature and friability of the tremolite asbestos contaminated vermiculite from employees of defendant W.R. GRACE Libby vermiculite mining and processing operations; families of employees of defendant W.R. GRACE Libby vermiculite mining and processing operations; industrial customers of defendant W.R. GRACE Libby vermiculite products; employees of industrial customers of defendant W.R. GRACE Libby vermiculite products; residents of Libby, Montana and surrounding communities in Lincoln County, Montana; and government authorities.

77.   It was part of the conspiracy that the defendants obstructed, impeded, and frustrated the governmental authorities by withholding information regarding the hazardous nature and friability of the tremolite asbestos contaminated vermiculite

and asserting that the Libby Mine operations and Libby vermiculite posed no risk to public health and safety and the environment.

78.   It was part of the conspiracy that the defendants marketed and sold tremolite asbestos contaminated vermiculite and products containing tremolite asbestos contaminated vermiculite.

79.   It was part of the conspiracy that the defendants sold and leased tremolite asbestos contaminated real property and withheld information about the contamination from the purchasers of the property.

80.   It was part of the conspiracy that defendants provided and distributed tremolite asbestos contaminated vermiculite material to the community, resulting in releases of asbestos into the ambient air in and around Libby, Montana and surrounding communities in Lincoln County, Montana.

81.   It was part of the conspiracy that defendants caused W.R. GRACE employees and their personal effects and clothing to be contaminated with tremolite asbestos and allowed them to leave the Libby mine with these contaminated clothes, resulting in releases of tremolite asbestos into the ambient air in and around Libby, Montana and surrounding communities in Lincoln County, Montana.

82.   It was part of the conspiracy that the defendants falsely described, concealed from, and failed to reveal to the government the hazardous nature and friability of the tremolite asbestos in the Libby vermiculite and the health hazards associated with exposure to tremolite asbestos.

83.    It was part of the conspiracy that the defendants obstructed, impaired, impeded, and misled EPA during the course of EPA's emergency response to the asbestos contamination in and around Libby, Montana.

## OVERT ACTS

In furtherance of the conspiracy and to effect its objectives, defendants, together with each other and with other persons known and unknown to the grand jury committed numerous overt acts in the District of Montana and elsewhere including, but not limited to, the following:

### Eschenbach Study

84.    Sometime prior to August 23, 1976 defendant ESCHENBACH gathered information regarding the lung health of defendant W.R. GRACE employees at the Libby Mine. This information was reported by an employee of defendant W.R. GRACE to defendant WOLTER in a memo dated August 23, 1976:

> Statistics provided by Harry Eschenbach indicated of eighteen (18) age sixty-five (65) normal retirements, three (3) had normal chests, one (1) had no records and fourteen (14) had positive lung disease, i.e. either significant scar tissue on the lung or significant fibrosis; there have been five (5) long term disability claims, three (3) of these were employees with six (6) years of service and two (2) with between fifteen (15) and twenty-five (25) years of service. Sixty-three (63) percent of all Libby employees with over ten (10) years of service test positive.

### Commission of the Fairleigh Dickinson Animal Toxicology Study (Hamster Study)

85.    On or about March 15, 1976, defendants W.R. GRACE and co-conspirators contracted with Dr. William Smith of Fairleigh Dickinson University to conduct animal toxicological studies on Libby Mine tremolite asbestos and vermiculite for

70,000.00 dollars (the "Hamster Study"). The contract between defendant W.R. GRACE and Dr. Smith prohibited Dr. Smith from publishing the results of the study in scientific literature without the permission of defendant W.R. GRACE.

86.    From on or about January 1977 through approximately October 1977, Dr. Smith and an employee of defendant W.R. GRACE provided regular status reports to defendants W.R. GRACE, FAVORITO, ESCHENBACH, and WOLTER on the findings of the Hamster Study showing progressive evidence of asbestos related lung disease, including a significant incidence of mesothelioma.

87.    On or about May 25, 1978, Dr. Smith provided defendant W.R. GRACE a preliminary draft Final Report of the Hamster Study. The draft report concluded that 10 hamsters had died of mesothelioma, and that the findings of tumors were evidence that tremolite asbestos fibers in the sizes tested were carcinogenic (caused cancer).

88.    A consultant hired by defendant W.R. GRACE revised Dr. Smith's preliminary draft Final Report including the removal of the statement that the findings of tumors in response to tremolite asbestos fibers were evidence that tremolite asbestos fibers in the sizes tested were carcinogenic (caused cancer). Defendant W.R. GRACE did not grant Dr. Smith permission to publish the results of the study in scientific literature.

## The Enbionics Review

89.    On or about March 29, 1977, an employee of defendant W.R. GRACE wrote a memo directing another employee of defendant W.R. GRACE to coordinate a meeting to discuss a professional epidemiological study of defendant W.R.

GRACE employees exposed to tremolite asbestos fibers. Defendants ESCHENBACH, WOLTER and FAVORITO were copied on the memo. According to the memo, two of the goals of the epidemiological study were to develop a methodology for tracking improvements in employees' health that may result from improvement in dust controls at the Libby Mine and to determine the risk of developing cancer through analysis of cause of death from selected groups of past employees.

90.    On or about March 30, 1977, defendant ESCHENBACH responded to the March 29, 1977 memo regarding the proposed epidemiological study, warning that such a study would likely become public knowledge and should not be initiated unless "they [defendant W.R. GRACE] are prepared to deal with that situation."

91.    On or about July 1977, defendants W.R. GRACE and ESCHENBACH hired Enbionics, a consulting firm specializing in epidemiological studies, to review employee x-rays from defendant W.R. GRACE vermiculite mines in Libby, Montana and Enoree, South Carolina.

92.    On or about August 25, 1978, defendants W.R. GRACE and ESCHENBACH received Enbionics' report, which stated:

> As you indicated before the project began, there is a substantial difference in the attack rates of asbestos and possible asbestos disease between the South Carolina and Montana facilities. In fact, we had only one case of clear asbestos disease in South Carolina and a few cases of possible asbestos disease. There are numerous cases of asbestos disease in Montana. The incidence of disease is independent of age, since there are a number of quite young individuals with obvious asbestos disease in Montana. Probably the difference lies in total exposure, fiber size, and mineral form.

## The Libby Facility Audit Report

93. In a memo dated May 14, 1981 to defendant WOLTER, a member of defendant W.R. GRACE's Corporate Facility Audit staff confirmed that an internal audit was to be conducted of the Libby Mine operations during June 1981.

94. Defendants WOLTER and McCAIG were responsible for an overall review of the draft audit report.

95. Defendants ESCHENBACH and FAVORITO were responsible for reviewing the portion of the draft audit report relating to health effects at the Libby Mine.

96. In the Facility Audit report dated June 1981, a review of workers' x-rays was conducted. The report stated:

> An analysis was run on the data to determine the impact of the wet process operation over the past five years on lung abnormalities vis-a-vis the period 1968 through 1975 with dry operations. Again the point is conceded that there are data inadequacies insofar as statistical analysis is concerned, but a trend may be perceived. Data shows an incidence of 45.1% abnormalities for five year employees during the dry mill operations (1968 through 1975) as compared to 38.4% for five year employees during the wet mill operations (1976 through 1980).

97. The report also found, based upon 1980 data, that "[e]ach additional year of tremolite exposure for an employee adds a significant 1.5 percent to the incidence of abnormal x-rays."

## O.M. Scott Employees' Bloody Pleural Effusions

98. On or about November 4, 1980, defendant FAVORITO disseminated to defendant W.R. GRACE senior management, including defendant ESCHENBACH, a file produced by NIOSH. That file included information concerning "a bloody pleural effusions problem" among employees of O.M. Scott

at its Marysville, Ohio facility, where vermiculite ore from the Libby Mine was processed.

99.   On or about November 12, 1980, a defendant W.R. GRACE senior manager wrote a memo to other defendant W.R. GRACE senior managers, including defendants FAVORITO and WOLTER, summarizing a meeting he had with O.M. Scott management wherein O.M. Scott expressed its intention to discontinue use of Libby ore due to the asbestos contamination.

100.  On or about December 11, 1981, an employee of defendant W.R. GRACE wrote a memo to defendant W.R. GRACE senior managers, including defendants WOLTER, BETTACCHI, ESCHENBACH, and FAVORITO advising them that two employees of O.M. Scott were suing defendant W.R. GRACE alleging injury from exposure to tremolite asbestos.

101.  On or about May 27, 1983, defendant WOLTER wrote a memo to defendant W.R. GRACE senior management, including defendants ESCHENBACH and WALSH, inviting them to attend a meeting with Dr. James Lockey to hear the results of Lockey's study of O.M. Scott employees. The memo referenced Dr. Lockey's articles summarizing the health effects of vermiculite exposure and the pulmonary hazards of tremolite contaminated vermiculite. The memo also referenced Dr. Lockey's "knowledge of the exposures and health knowledge of the O.M. Scott employees, twelve of which are reported to have bloody pleural effusions, alleged to be caused by tremolite exposure at the O.M. Scott plant in Marysville, Ohio."

102.   On or about June 3, 1983, Dr. Lockey met with W.R. Grace senior management in Cambridge, Massachusetts and advised them of his conclusion that the bloody pleural effusion problem at O.M. Scott Company was caused by employee exposure to defendant W.R. GRACE's tremolite asbestos contaminated vermiculite concentrate from the Libby Mine.

## Monson Mortality Study

103.   On or about April 5, 1982, defendants W.R. GRACE and ESCHENBACH hired Richard R. Monson, M.D., of Harvard University's School of Public Health to conduct a mortality study of persons employed at the Libby Mine from 1950 to 1981.  Dr. Monson collected 66 death certificates and examined the cause of death listed.  Dr. Monson concluded and reported to defendants W.R. GRACE and ESCHENBACH that an excessive number of employees at the Libby Mine had died of cancer of the respiratory system including mesothelioma.

104.   On or about July 28, 1982, defendant ESCHENBACH provided copies of the mortality study done by Dr. Monson on W.R. GRACE employees at the Libby Mine to defendant W.R. GRACE senior management, including defendants FAVORITO, McCAIG and WOLTER.  In his memo, defendant ESCHENBACH stated, "Our major problem is death from respiratory cancer.  This is no surprise."

## The NIOSH Study

105.   On or about November 26, 1980, an employee of defendant W.R. GRACE wrote a memo to defendant FAVORITO, copied to defendant WOLTER, describing a November 24, 1980 meeting with NIOSH representatives, which was attended by defendants ESCHENBACH and FAVORITO.  The purpose of the meeting was to

discuss NIOSH's proposed epidemiological study of Libby, and the memo concluded by listing defendant W.R. GRACE's options for responding to NIOSH's proposed study. The options and recommendations were as follows:

(a) Obstruct and block, possibly even contesting in the courts. As I understand it, we'd lose and this is not exactly the image we try to project.

(b) Be slow, review things extensively and contribute to delay. This might not be bad policy generally and it is possible that the new Administration's policies will make NIOSH more selective in how scarce staff resources are allocated after January 20, 1981.

(c) Publish a "preemptive epidemiological study". This could attenuate the resume-enhancement potential for NIOSH study personnel. This could also be a checkpoint for a subsequent NIOSH study when it is released.

(d) Cooperate fully. This agency and its personnel have not always acted with high levels of professionalism on past studies. This option would save NIOSH time and effort, make their study more comprehensive and possibly rule out some inaccuracies. It would not necessarily make NIOSH's conclusions any more responsible.

(e) Actively go upstream in NIOSH to personally repeat the same arguments, the first time immediately after receipt of protocol.

(f) Actively seek to turn off the sources of the pressure for the study by personally repeating the same arguments. However, the sources may have supplementary reasons not fully shared with NIOSH.

(g) Attempt to apply influence via congressmen, senators, lobbyists or others to get it turned off. However, it is not necessarily successful, can backfire, and to be effective must be developed over long periods of time due to the trust required.

There are other options as well. All should be discussed. At this time I tend to favor a phased combination of (b), (c), (e), and (f).

106.    In a February 11, 1981 letter to Dr. Daniel Banks of NIOSH, defendant FAVORITO questioned the need for NIOSH's proposed study:

During our meeting on November 24th, we indicated to you that the vermiculite ore as mined at Grace's Libby, Montana mine is found along

with asbestiform tremolite contamination. Any study of vermiculite conducted in such environment can only lead to inconclusive results. This fact makes any study at Libby, Montana of questionable use, especially as it relates to NIOSH's avowed purpose of evaluating exposure to "pure vermiculite." We believe that any study at Libby will amount to nothing more than yet another verification of what is already known, viz., that excessive exposure to asbestiform material is dangerous to health. NIOSH must reconsider whether it is in anyone's best interest for it to expend scarce public funds in such redundant pursuits.

107. From on or about November 14, 1980, when NIOSH requested information regarding the Libby Mine to begin its proposed study, to at least on or about June 1981, defendant W.R. GRACE was unwilling to release the data requested.

108. On or about March 23, 1981, defendant FAVORITO informed NIOSH that defendant W.R. GRACE planned to present its position regarding the proposed NIOSH study to a higher government authority.

109. In a June 29, 1981 letter to the Acting Deputy Assistant Secretary for United States Mine Safety and Health, defendant FAVORITO questioned the utility of NIOSH's proposed study, stating that "to mount a study to assess the results of possible exposure to vermiculite appears completely unjustified given the fact that to our knowledge there is no credible evidence that adverse health effects follow from exposure to vermiculite itself," and that "utilization of Libby, Montana as a locus to study exposure to vermiculite would be a wasteful and redundant expenditure of scarce Government manpower, money and effort . . ."

110. On or about July 28, 1982, defendant ESCHENBACH provided copies of the Monson Mortality Study to defendant W.R. GRACE senior management, including defendants FAVORITO, McCAIG, and WOLTER. In his memo, defendant ESCHENBACH stated, "Our major problem is death from respiratory

cancer. This is no surprise." The memo further stated, "NIOSH would possibly not pursue the mortality portion of their study if we provided this information to them."

111.   On or about March 29, 1983, defendants W.R. GRACE, WALSH, WOLTER, and ESCHENBACH began negotiations with Drs. John Corbett McDonald and Alison D. McDonald of the McGill University School of Occupational Health regarding a W.R. GRACE sponsored mortality and morbidity study of its employees at the Libby Mine. Defendant WALSH copied defendants WOLTER, ESCHENBACH and FAVORITO on the initial letter to McDonald.

112.   On or about May 5, 1983, defendant ESCHENBACH disseminated to defendant W.R. GRACE senior managers, including defendants WALSH, FAVORITO and WOLTER a summary of a meeting with the Drs. McDonald regarding the proposed McGill study.

113.   On or about June 15, 1983, defendants W.R. GRACE and ESCHENBACH, in response to an April 25, 1983 EPA request for additional information regarding the health effects of exposure to asbestos for all workers, informed EPA that a thorough evaluation of current employees would be part of the McGill University (McDonald, et. al.) epidemiological study.

114.   On or about October 18, 1983, defendant ESCHENBACH wrote a memo to defendant WALSH, with copies to defendant W.R. GRACE senior management, including defendants McCAIG and WOLTER summarizing the study of "McNair's lung." McNair was a former employee of defendant W.R. GRACE at the Libby Mine. As related by defendant ESCHENBACH, the McGill researcher determined

that "the uncoated fiber size distribution in McNair's lung was remarkably similar to that which is found when analyzing air samples from Libby."

### Drop, Drum Transfer, Attic Simulation Tests, and Survey of Commercial Users of Expanded Vermiculite

115.    Beginning on or about 1977, and continuing through 1982, defendant W.R. GRACE conducted "drop tests" to determine whether tremolite asbestos fibers were released to the air from various W.R. GRACE commercial and consumer products made with tremolite asbestos contaminated vermiculite from the Libby Mine.

116.    These drop tests revealed to defendant W.R. GRACE that its commercial and consumer products made with vermiculite from the Libby Mine released tremolite asbestos fibers into the air.

117.    On or about 1982, defendant W.R. GRACE participated in and conducted "drum transfer" tests to determine tremolite asbestos exposure levels occurring when scooping Libby vermiculite concentrate from one drum to another, and to evaluate whether mixing binders to the vermiculite concentrate would lower airborne asbestos fiber levels.

118.    These drum transfer tests revealed to defendant W.R. GRACE that its vermiculite concentrate from the Libby Mine released asbestos fibers into the air when transferred from one drum to another.

119.    Beginning on or about 1977, and continuing through on or about 1983, defendant W.R. GRACE conducted attic simulation tests to determine whether tremolite asbestos fibers were released to the air from ZONOLITE Attic Insulation.

120. The attic simulation tests revealed to defendant W.R. GRACE that when installed or disturbed, ZONOLITE Attic Insulation released hazardous amounts of tremolite asbestos fibers into the air.

121. From 1978 through 1979, defendant W.R. GRACE conducted a survey of its customers who used expanded vermiculite from the Libby Mine for agricultural and industrial purposes.

122. As part of this survey, defendant W.R. GRACE conducted personnel air monitoring of the employees at its customers' facilities to determine the level of airborne asbestos fiber releases generated during activities such as unloading bags of the vermiculite, emptying the vermiculite into containers, mixing the vermiculite with other materials, and bagging products made with the vermiculite.

123. Defendant W.R. GRACE also analyzed bulk samples taken from the expanded vermiculite from the Libby Mine used by its customers, as well as its customers' products made with the vermiculite.

124. As stated by CPD, the objective of this analysis was to "collect data on tremolite content on vermiculite products used by CPD customers." The purpose was to determine the "correlation between user personnel exposure to Tremolite at job site and % Tremolite in Vermiculite used and/or product produced."

125. The results of the survey revealed to defendant W.R. GRACE that the expanded vermiculite contained small amounts of tremolite asbestos, sometimes as low as 0.01% by weight.

126. The results of the survey also revealed to defendant W.R. GRACE that the expanded vermiculite released high levels of asbestos fibers from routine

occupational activities, even when the tremolite content was minimal. For example, at one fertilizer production facility, the "time weighted average" ("TWA") fiber exposure for two workers emptying bags of vermiculite was 6.83 fibers per cubic centimeter (f/cc) and 7.8 f/cc, which exceeded the regulatory limit of TWA 2.0 f/cc established by the Occupational Safety and Health Administration (OSHA) then in effect. The bulk samples from this facility showed that the tremolite asbestos content was 0.039% by weight.

127. Defendants WOLTER and ESCHENBACH received a copy of the sampling results from the survey.

### Failure to Disclose Under Toxic Substances Control Act Section 8(e)

128. Defendants W.R. GRACE and ESCHENBACH failed to disclose to EPA information required by TSCA 8(e) within 15 days of receiving that information.

129. In response to EPA's request for information pursuant to TSCA 8(e), defendants W.R. GRACE and ESCHENBACH sent EPA a letter on March 24, 1983. In this notification, defendants W.R. GRACE and ESCHENBACH failed to disclose to EPA the Hamster Study, the Enbionics review, and the Monson/Harvard Mortality study, among other information required by TSCA 8(e).

130. In the March 24, 1983 TSCA submittal to EPA, defendants W.R. GRACE and ESCHENBACH falsely stated that the known information demonstrated their products as currently manufactured did not create a substantial risk and that they had "no reason to believe, there is any risk associated with the current uses of Libby vermiculite-containing products."

131.   On or about March 4, 1986, defendants W.R. GRACE and ESCHENBACH

submitted to EPA the documents summarizing the McGill and NIOSH studies and

falsely stated that these documents contained all information requested by EPA.

As in 1983, defendants W.R. GRACE and ESCHENBACH failed to disclose all

information required by TSCA 8(e).

132.   On or about April 1, 1992, defendants W.R. GRACE and ESCHENBACH

submitted to EPA the Hamster study under a TSCA 8(e) "compliance audit

program" (amnesty program).   At that time, defendants W.R. GRACE and

ESCHENBACH again did not submit all information they were required to submit

under TSCA 8(e).

## Exposure to the Libby Community

133.   From on or about 1977 until on or about 1993, defendant W.R. GRACE gave

away vermiculite materials contaminated with tremolite asbestos to the Libby

community without disclosing the hazardous nature of the material.

134.   On or about August 23, 1976, an employee of defendant W.R. GRACE wrote a

memo to defendant WOLTER, that stated:

> Request the ICG Safety and Health Group conduct an intensive
> study to determine the level of tremolite in the environment, that is
> at the mine or work location and in town.  This study should be
> conducted under a variety of temperature, wind, and atmospheric
> conditions to determine precise levels of tremolite fibers in the air
> and in turn the exact magnitude of the problem.  If the threshold limit
> values...exceed the MESA/OSHA standards in town and the
> surrounding area(s) and therefore pose a serious hazard to the
> town's population, we would then be best advised to develop a
> program to improve/eliminate problem areas before taking steps to
> discourage or forbid smoking on mine property.

135.   On or about May 24, 1977, a defendant W.R. GRACE manager wrote, in an appendix to a memo copied to defendant W.R. GRACE senior management and defendant WOLTER, that the health of asbestos workers' families was adversely affected by exposure to asbestos dust carried home by workers and that the level of contamination in the home was not a low level.

136.   On or about February 22, 1978, an employee of defendant W.R. GRACE wrote a memo to defendant WOLTER, copied to defendant W.R. GRACE senior management including defendant FAVORITO, with editorial changes for a pamphlet proposed to be distributed to Libby Mine employees warning of possible asbestos hazards at their workplace, including the hazard that take-home dust posed to family members. In this memo, the employee recommended that existing stocks of the pamphlet be destroyed.

137.   On or about March 19, 1979, local Libby physician Richard Irons wrote a letter to defendant W.R. GRACE expressing concern about the health of Libby Mine workers and their families and the health effects of take-home dust. In the letter, Dr. Irons proposed conducting a health study. On or about April 10, 1979, defendants W.R. GRACE and ESCHENBACH wrote a memo to Libby management, copied to defendant WOLTER regarding Dr. Irons' proposed study. In the memo, defendant ESCHENBACH stated, "Irons is turning the screw. . . We either play the game his way or he is going to blow the whistle." Defendants W.R. GRACE and ESCHENBACH declined Dr. Irons' proposed study.

138.   On or about July 15, 1983, defendant McCAIG wrote a memo informing defendant WOLTER that a local doctor had seen an "asbestos related pattern" in

the chest x-rays of the general Libby public and that another local doctor had observed one or two cases of asbestos related disease that the doctor "suspected might have resulted from exposure carried home by employees." Defendant McCAIG's memo summarized discussions within defendant W.R. GRACE concerning the possible institution of a mandatory uniform and shower policy to eliminate take-home dust.  Defendant McCAIG concluded by saying that "a uniform and shower policy is unwarranted since adverse effects cannot be definitively proven and would only cause unwarranted fear or concern among employees and the Libby community."

139.  On or about 1977, through on or about 1992, defendant W.R. GRACE failed to provide workers with adequate changing and shower facilities that would have minimized take-home dust and exposure to tremolite asbestos to the families of defendant W.R. GRACE's employees.

140.  On or about March 19, 1984, defendant ESCHENBACH wrote a memo informing defendant W.R. GRACE senior management, including defendant FAVORITO, of a study published concerning dogs contracting mesothelioma from asbestos dust brought home on the clothes of asbestos workers.

## Placement of Mill Tailings at Libby Schools

141.  On or about 1981, defendants W.R. GRACE and McCAIG provided mill tailings to the Plummer Elementary School for use as a foundation for an outdoor ice skating rink.

142.  On or about 1981, defendant W.R. GRACE employee Earl Lovick informed the Plummer Elementary School Principal that vermiculite materials should not be

used as a foundation for the ice skating rink. Lovick failed to disclose to the principal that the vermiculite materials contained tremolite asbestos.

143.   From on or about 1981 and continuing through 2000, defendant W.R. GRACE failed to completely remove vermiculite materials contaminated with tremolite asbestos from the Plummer Elementary School ice skating rink.

144.   From on or about 1976 through on or about 1981, defendant W.R. GRACE provided mill tailings to the Libby Public School District for use on the Junior and Senior High School running tracks.

145.   On or about 1981, defendant W.R. GRACE and defendant McCAIG directed an employee of defendant W.R. GRACE to collect and analyze air samples from the Libby High School running track.

146.   On or about July 8, 1981, an employee of defendant W.R. GRACE notified defendant McCAIG in writing that he had collected and analyzed personal air samples while running at the Libby High School running track, the results of which showed "surprisingly high" fiber concentrations, and stated further that "concentrations as high as 1.0 f/cc could result when the track is in a well used condition and is being used by a large number of people."

147.   On or about July 27, 1981, defendant WOLTER informed his supervisor in writing of the situation involving the Libby High School running track and requested authority for the removal and replacement of the "mill coarse tailings" at an estimated cost to defendant W.R. GRACE of 18,000.00 to 20,000.00 dollars.

148.   On or about July 31, 1981, defendants W.R. GRACE, WOLTER and McCAIG authorized 20,000.00 dollars to resurface the Libby Junior and Senior High

School running tracks, which according to the authorization were "surfaced with coarse tails refuse which contains high concentrations of tremolite asbestos."

149.  From on or about 1981 and continuing through 2000, defendants W.R. GRACE, McCAIG, WOLTER, and STRINGER failed to completely remove vermiculite materials contaminated with tremolite asbestos from the Libby Junior and Senior High School tracks.

## Negotiations and Marketing of W.R. GRACE Properties

150.  On or about July 17, 1990, an employee of defendant W.R. GRACE wrote a memo to defendant BETTACCHI, copied to defendant FAVORITO, informing them that 3M Company ("3M") was interested in acquiring the Libby Mine.

151.  On or about April 17, 1991, an employee of defendant W.R. GRACE wrote a memo to defendant BETTACCHI, copied to defendant FAVORITO, describing 3M's renewed interest in purchasing the Libby Mine.  Defendant STRINGER provided a site tour to 3M representatives during the negotiations.

152.  On or about November 11, 1991, an employee of defendant W.R. GRACE wrote a memo to defendants FAVORITO, BETTACCHI and WOLTER transmitting a letter from 3M, which stated that 3M was no longer interested in purchasing the Libby Mine based upon evidence of "potential environmental problems."

153.  In a letter dated April 18, 1991 to defendant STRINGER, the Phelps Dodge Mining Company ("Phelps Dodge") advised defendant STRINGER that "the property is not of interest" to Phelps Dodge, and that "the presence of so much asbestos was the main factor for declining the property."

154. In a memo dated May 13, 1991, copied to defendants BETTACCHI, STRINGER and WOLTER, under the heading "Libby Update," an employee of defendant W.R. GRACE stated, "Libby received a letter from Phelps Dodge indicating 'no interest at this time' in pursuing any exploration of the Rainey Creek intrusive. The concern was excessive asbestos."

155. On or about July 14, 1993, defendant WOLTER wrote a memo to defendant W.R. GRACE senior management, copied to defendant BETTACCHI, describing defendant W.R. GRACE's assets in Libby. Attached to the memo was a July 6, 1993 memo to defendant WOLTER with an analysis of sales options prepared by defendant STRINGER that stated:

> For the same reasons that 3M would not buy the mine, I doubt that any other large corporation will come forward with an offer to buy the entire property. If Grace is going to be able to transfer all of the future responsibilities and liabilities to someone else, they are going to have to be willing to sell to some small organization.

### Export Plant Property (Baseball Fields)

156. From on or about 1977 and continuing until on or about 1994, knowing the Export Plant property was contaminated with tremolite asbestos, defendant W.R. GRACE leased said property to various people and entities to use for organized youth baseball games and practices.

157. On or about March 9, 1993, defendants W.R. GRACE and STRINGER, knowing the Export Plant property was contaminated with tremolite asbestos, stated in a letter to the Mayor of Libby that it was "W.R. GRACE and Co's intent to donate to the city of Libby" the Export Plant property.

158.   On or about February 23, 1995, defendants W.R. GRACE, BETTACCHI and FAVORITO, knowing the Export Plant property was contaminated with tremolite asbestos, signed a deed transferring title of the Export Plant property to the City of Libby without disclosing to the city the health hazard associated with said property.

## Export Plant Property (Commercial Buildings)

159.   On or about 1987, defendants W.R. GRACE and McCAIG, knowing the Export Plant property was contaminated with tremolite asbestos, leased a portion of said property to Mon-Ida, a business owned by James Regh, and failed to disclose the health hazard associated with said property.

160.   On or about October 1, 1989, and continuing until approximately 1994, defendants W.R. GRACE and STRINGER knowing the Export Plant property was contaminated with tremolite asbestos, leased a portion of said property to Millwork West, a business owned by Melvin Burnett, and failed to disclose the health hazard associated with said property.

161.   On or about May 12, 1994, defendants W.R. GRACE, BETTACCHI and FAVORITO, knowing the Export Plant property was contaminated with tremolite asbestos, signed a deed transferring title of the Export Plant property to the City of Libby without disclosing to the city the health hazard associated with said property.

162.   From on or about May 12, 1994, defendants W.R. GRACE, STRINGER, BETTACCHI, and FAVORITO failed to disclose the health hazard associated with

the tremolite asbestos contamination of the property to the City of Libby and the occupants of said property.

## Sale of the Screening Plant Property to Parkers

163. On or about October 1992, defendants W.R. GRACE and STRINGER approached the Parkers and offered the Screening Plant property for sale.

164. On or about December 9, 1992, defendants W.R. GRACE and STRINGER signed an Agreement to Sell and Purchase, effecting the sale of the Screening Plant property to the Parkers.

165. On or about December 17, 1993, defendants W.R. GRACE and BETTACCHI knowing the Screening Plant property was contaminated with tremolite asbestos, signed a deed transferring title of the Screening Plant property to the Parkers and failed to disclose the health hazard associated with said property.

166. Beginning on or about December 17, 1993, defendants W.R. GRACE, BETTACCHI and STRINGER, knowing the Screening Plant property was contaminated with tremolite asbestos and knowing that the Parkers resided on and established a commercial nursery on said property, failed to disclose the health hazard associated with said property.

167. On or about April 19, 2000, subsequent to EPA notifying the Parkers of the potential contamination of their property, defendants W.R. GRACE and STRINGER delivered a check for 40,000.00 dollars to the Parkers.

## Property Transactions with KDC

168. On or about October 17, 1994, defendants W.R. GRACE and BETTACCHI executed a Purchase and Sales Contract with Kootenai Development Company

("KDC") wherein defendant W.R. GRACE sold the properties known as the "Mine Site" and the "Flyway."

169.   Sometime after October 17, 1994 but before July 14, 2000, defendant WOLTER became a shareholder in KDC by investing approximately 600.00 dollars.

170.   On or about July 14, 2000, defendant W.R. GRACE, knowing that EPA was negotiating with KDC to use the mine site to return the contaminated materials removed from the community, signed a Stock Purchase Agreement wherein defendant W.R. GRACE agreed to purchase all the stock shares of KDC, thereby obtaining control over the property known as the "Mine Site," the "Flyway" and the "Bluffs."

171.   On or about July 14, 2000, defendant W.R. GRACE paid approximately 2,323,685.62 dollars to the principals of KDC pursuant to the Stock Purchase Agreement referred to in ¶ 170. As payment for his shares in KDC, defendant WOLTER received approximately 1.3 million dollars from defendant W.R. GRACE.

172.   On or about July 18, 2000, defendant W.R. GRACE denied the EPA Superfund Emergency Response Team access to the property known as the "Mine Site," the "Flyway" and the "Bluffs."

## Obstruction of EPA's Superfund Clean-Up

173.   On or about November 23, 1999, defendants W.R. GRACE and STRINGER told the EPA On-Scene Coordinator that Libby Mine vermiculite concentrate at the Export Plant and at the Screening Plant contained less than one percent tremolite asbestos.

174. On or about November 23, 1999, defendants W.R. GRACE and STRINGER told the EPA On-Scene Coordinator that historical asbestos contamination problems at the Libby Mine had been resolved and provided one page of air monitoring data gathered during closure of the mine site to demonstrate that current conditions were safe.

175. From on or about November 23, 1999 through approximately spring of 2000, defendants W.R. GRACE and STRINGER led EPA employees and contractors associated with EPA's Superfund cleanup, to various locations that were contaminated with tremolite asbestos, including: the "Mine Site," "Rainy Creek Road," the "Screening Plant," the "Flyway" and the "Export Plant," without disclosing the extent and nature of the contamination at these locations.

176. On or about February 22, 2000, defendants W.R. GRACE and STRINGER responded to an EPA CERCLA104(e) Request For Information regarding the "Libby Asbestos Site" and provided the following false and misleading information: that defendant W.R. GRACE did not provide vermiculite contaminated with tremolite asbestos to the general public in Libby.

177. On or about February 22, 2000, defendants W.R. GRACE and STRINGER responded to an EPA CERCLA 104(e) Request For Information regarding the "Libby Asbestos Site" and failed to inform EPA that defendant W.R. GRACE had donated vermiculite mill coarse tailings contaminated with tremolite asbestos to Libby public schools for surfacing the Junior High School running track.

178. On or about February 22, 2000, defendants W.R. GRACE and STRINGER responded to an EPA CERCLA 104(e) Request For Information regarding the

"Libby Asbestos Site" and failed to inform EPA that defendant W.R. GRACE had donated vermiculite mill coarse tailings contaminated with tremolite asbestos to the Libby Public School District for the foundation of the Plummer Elementary School outdoor ice skating rink.

179.    On or about February 22, 2000, defendants W.R. GRACE and STRINGER responded to an EPA CERCLA 104(e) Request For Information regarding the "Libby Asbestos Site" and failed to disclose that defendant W.R. GRACE used waste materials contaminated with tremolite asbestos to "sand" Rainy Creek Road.

180.    On or about February 22, 2000, defendants W.R. GRACE and STRINGER responded to an EPA CERCLA 104(e) Request For Information regarding the "Libby Asbestos Site" and failed to disclose all locations where asbestos contaminated vermiculite materials were located, including: the "Flyway" and the "Bluffs."

181.    On or about February 22, 2000, defendants W.R. GRACE and STRINGER responded to an EPA CERCLA 104(e) Request For Information regarding the "Libby Asbestos Site" and provided the following false and misleading information: that defendant W.R. GRACE employees did not regularly leave the facility with dust contaminated with tremolite asbestos on their clothing.

182.    On or about February 22, 2000, defendants W.R. GRACE and STRINGER responded to an EPA CERCLA 104(e) Request For Information regarding the "Libby Asbestos Site" and failed to disclose all air and environmental media sampling information.

183.   On or about February 22, 2000, defendants W.R. GRACE and STRINGER

responded to an EPA CERCLA 104(e) Request For Information regarding the

"Libby Asbestos Site" and failed to disclose the existence and dispositions of the

following waste streams, among others:  "Stoner Rock" and waste vermiculite

concentrate.

### W.R. Grace Letter to EPA Administrator

184.   On or about April 10, 2002, in response to a proposal by EPA to declare a "public

health emergency" for the City of Libby that would allow EPA to remove asbestos

containing attic insulation from homes in Libby, defendant W.R. GRACE, in a

letter to the Administrator of EPA, stated the following:

(i)  "Grace's expanded vermiculite, which was used in ZAI, poses no risk to

human health or the environment;"

(ii)  ". . . [ZAI] contains biologically insignificant amounts of respirable

asbestos fibers;"

(iii)  ". . . it is reasonable to expect that disturbance of [ZAI] will not result in

hazardous levels of airborne asbestos fibers;" and

(iv)  ". . . there is no credible reason to believe that ZAI has ever caused an

asbestos-related disease in anyone who has used in his/her home."

In violation of 18 U.S.C. § 371.

## COUNT II
### (Clean Air Act - Knowing Endangerment)

185.    Paragraphs 1 through 69 and 84 through 184 are incorporated by reference as if realleged in full.

186.    That beginning on or about November 15, 1990, and continuing until the present, at Libby, within the State and District of Montana, defendant W.R. GRACE did knowingly release and caused to be released into the ambient air a hazardous air pollutant, namely, asbestos, and at the time, knowingly placed another person, namely the residents of the town of Libby and Lincoln County in imminent danger of death or serious bodily injury by providing and distributing asbestos contaminated vermiculite material to the community; and by causing defendant W.R. GRACE employees and their personal effects to be contaminated with asbestos, in violation of 42 U.S.C. § 7413(c)(5)(A), 18 U.S.C. § 2.

## COUNT III
### (Clean Air Act - Knowing Endangerment)

187.    Paragraphs 1 through 69 and 84 through 184 are incorporated by reference as if realleged in full.

188.    That beginning on or about December, 1993, and continuing until on or about June 15, 2000, at Libby within the State and District of Montana, the defendants, W.R. GRACE, ALAN R. STRINGER, JACK W. WOLTER, and ROBERT J. BETTACCHI did knowingly release and caused to be released into the ambient air a hazardous air pollutant, namely, asbestos, and at the time knowingly placed another person in imminent danger of death or serious bodily injury by selling real

property known as the "Screening Plant" to the Parker family, in violation of 42
U.S.C. § 7413(c)(5)(A), 18 U.S.C. § 2.

## COUNT IV
### (Clean Air Act - Knowing Endangerment)

189.  Paragraphs 1 through 69 and 84 through 184 are incorporated by reference as if
realleged in full.

190.  That beginning on or about November 15, 1990, and continuing until on or about
the summer of 2000, at Libby within the State and District of Montana, the
defendants, W.R. GRACE, ALAN R. STRINGER, JACK W. WOLTER, and
ROBERT J. BETTACCHI did knowingly release and caused to be released into
the ambient air a hazardous air pollutant, namely, asbestos, and at the time
knowingly placed another person in imminent danger of death or serious bodily
injury by leasing a property known as the "Export Plant" to the Burnetts and
selling the property known as the "Export Plant" to the City of Libby, in violation of
42 U.S.C. § 7413(c)(5)(A), 18 U.S.C. § 2.

## COUNT V
### (Wire Fraud)

191.  Paragraphs 1 through 69 and 84 through 184 are incorporated by reference as if
realleged in full.

192.  That from on or about November, 1992 and continuing until late April, 2000, at
Libby, within the State and District of Montana, the defendants W.R. GRACE,
ALAN R. STRINGER, JACK W. WOLTER, and ROBERT J. BETTACCHI, having
devised or intending to devise a scheme or artifice to defraud that is to obtain
money from the Parkers and to avoid liability by selling property known as the

—

"Screening Plant" to the Parkers without disclosing the health hazard associated with tremolite asbestos contamination on the property, did for the purpose of executing said scheme, on April 12, 2000 transmit or cause to be transmitted by means of wire, communications in interstate or foreign commerce, namely, a Letter of Intent, describing defendant W.R. GRACE's plan for cleaning the "Screening Plant" and the compensation the Parker's would receive, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2.

## COUNT VI
### (Wire Fraud)

193.    Paragraphs 1 through 69 and 84 through 184 are incorporated by reference as if realleged in full.

194.    That from on or about 1994 and continuing until late July, 2000, at Libby, within the State and District of Montana, defendants W.R. GRACE, JACK W. WOLTER and ALAN R. STRINGER having devised or intending to devise a scheme or artifice to defraud, that is to avoid liability by selling and subsequently purchasing properties known as the "Mine site" and "Flyway" from KDC, Inc., did for the purpose of executing said scheme, on July 12, 2000, transmit or cause to be transmitted by means of wire, communications in interstate or foreign commerce, wiring instructions directing the transmission of payment for the purchase of KDC, Inc. stock, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2.

## COUNT VII
### (Obstruction of Justice)

195. Paragraphs 1 through 69 and 84 through 184 are incorporated by reference as if realleged in full.

196.  On or about November 23, 1999, in the District of Montana, defendants W.R. GRACE and ALAN R. STRINGER, did corruptly obstruct, impede, and endeavor to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had before the United States Environmental Protection Agency, an agency of the United States, by providing the following false and misleading information to the United States Environmental Protection Agency, to wit: that W.R. GRACE's vermiculite concentrate contained less than one percent tremolite asbestos and that historical asbestos contamination problems a the Libby mine had been resolved in violation of 18 U.S.C. §§ 1505 and 1515(b), and 18 U.S.C. § 2.

## COUNT VIII
### (Obstruction of Justice)

197. Paragraphs 1 through 69 and 84 through 184 are incorporated by reference as if realleged in full.

198. On or about February 22, 2000, in the District of Montana, defendants W.R. GRACE and ALAN R. STRINGER, did corruptly obstruct, impede, and endeavor to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had before the United States Environmental Protection Agency, an agency of the United States, by providing to the United States Environmental Protection Agency false and misleading

information in defendant W.R. GRACE's response to an EPA CERCLA 104(e)
Request for Information, to wit:

1.   that W.R. GRACE did not provide vermiculite to the general public;

2.   that W.R. GRACE employees did not regularly leave the mine with
     tremolite dust on their clothing;

3.   that W.R. GRACE only informed EPA that it had provided
     vermiculite mill coarse tailings for use on the Libby High School
     running track, when in truth and in fact, W.R. GRACE had placed
     vermiculite mill coarse tailings at the Libby Junior High School
     running track and at the Plummer Elementary School ice skating
     rink;

4.   that W.R. GRACE took actions to treat the roadway to the mine to
     minimize dust created by vehicular traffic, when in truth and in fact,
     W.R. GRACE used vermiculite mill tailings, to construct, surface and
     sand the roadway; and

5.   that W.R. GRACE failed to inform EPA of air and environmental
     media sampling studies and results.

In violation of 18 U.S.C. §§ 1505 and 1515(b), and 18 U.S.C. § 2.

## COUNT IX
### (Obstruction of Justice)

199.  Paragraphs 1 through 69 and 84 through 184 are incorporated by reference as if realleged in full.

200.  On or about July 18, 2000, in the District of Montana, defendants W.R. GRACE and ALAN R. STRINGER, did corruptly obstruct, impede, and endeavor to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had before the United States Environmental Protection Agency, an agency of the United States, by denying the EPA Superfund Emergency Response Team access to the property known as the "Mine Site," the "Flyway" and the "Bluffs." In violation of 18 U.S.C. §§ 1505 and 1515(b), and 18 U.S.C. § 2.

## COUNT X
### (Obstruction of Justice)

201.  Paragraphs 1 through 69 and 84 through 184 are incorporated by reference as if realleged in full.

202.  On or about April 10, 2002, in the District of Montana, defendant W.R. GRACE did corruptly obstruct, impede, and endeavor to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had before the United States Environmental Protection Agency, an agency of the United States, by providing the following false and misleading information to the United States Environmental Protection Agency, to wit: in a letter to the Administrator of the EPA, stated the following: "Grace's expanded vermiculite, which was used in ZAI, poses no risk to human health or the

environment;" ". . . [ZAI] contains biologically insignificant amounts of respirable asbestos fibers;" ". . . it is reasonable to expect that disturbance of [ZAI] will not result in hazardous levels of airborne asbestos fibers;" and ". . . there is no credible reason to believe that ZAI has ever caused an asbestos-related disease in anyone who has used in his/her home." In violation of 18 U.S.C. §§ 1505 and 1515(b), and 18 U.S.C. § 2.


A TRUE BILL.

_____
FOREPERSON

_____
WILLIAM W. MERCER
United States Attorney

_____
CARL E. ROSTAD
Criminal Chief Assistant U.S. Attorney


WARRANT _____

BAIL _____

CRIMSUM *Returnable 2/22/05 @ 1:30p.m. in M/a., before L.B.E. All Dft's*

N:\crim\04\0395\Grace Indictment 18.2.wpd                    49