# EXHIBIT E

{D0010222:1 }



Not Reported in B.R.  Page 1
2000 WL 290187 (Bankr.E.D.Pa.)
**(Cite as: 2000 WL 290187 (Bankr.E.D.Pa.))**

H

Only the Westlaw citation is currently available.

United States Bankruptcy Court, E.D. Pennsylvania.
In re LEHIGH VALLEY PROFESSIONAL SPORTS
CLUB, INC., Debtor.
**No. 00-11296DWS.**

March 14, 2000.
Stuart M. Brown, Philadelphia, PA, for Debtor.

Kurt F. Gwynne, Klett Lieber Rooney & Schorling, Philadelphia, PA, Robert A. Klein, Conrad, O'Brien, Gellman & Rohn, Philadelphia, PA, for Atlantic League of Professional Baseball & Lehigh Valley Black Diamonds Professional Baseball Club, Inc.

David B. Zabel, Cohen & Wolf, Bridgeport, CT, for Creditors Mary J. Foster & Jack McGregor.

Aris J. Karalis, Philadelphia, PA, for Committee of Unsecured Creditors.

*MEMORANDUM OPINION*

SIGMUND, Bankruptcy J.

**\*1** Before the Court is the Motion of The Atlantic League of Professional Baseball Clubs, Inc. (the "League"), Jack MacGregor and Mary Jane Foster (together with the League, "Movants") for an Order Terminating Exclusivity Pursuant to 11 U.S.C. § 1121(d) (the "Motion"). A hearing was held on an expedited basis on February 29, March 7 and 8, 2000. [FN1] For the reasons stated below, the Motion is denied.

> FN1. At the conclusion of the hearing on March 8, the record was closed but for some minor evidentiary issues. The League moved the admission of portions of the deposition of Thomas X. Flaherty. As the Debtor had not had the opportunity to review the portions of the deposition designated, it was given until the end of the day March 9 to submit a written objection. The League timely responded. The Debtor's objections to those portions of the deposition it has identified as hearsay are sustained. The headings to the designations are not part of the record of this matter nor are the pages that are annexed to the pages on which the relevant testimony appears. Its other objections are overruled. Exhibit M-25 is also excluded as hearsay.

BACKGROUND

In 1997 the Debtor acquired a membership interest in the League [FN2] which was formed in 1995 to field minor league professional baseball teams in the mid-Atlantic states. It formed a team known as the Lehigh Valley Black Diamonds, one of nine teams presently comprising the League. The Movants bring this Motion as creditors of the Debtor. The real focus of this contested matter centers on the League's desire to see Debtor's membership interest acquired by a new entity. They seek to accomplish this by proposing a plan of reorganization. On the other hand, the Debtor seeks the opportunity to rehabilitate its business affairs and propose a plan that will pay its creditors in full and allow it to retain what it perceives as substantial equity in the value of the membership interest.

> FN2. The interest was actually acquired by Value Added Investments Corp. ("VAI"), a corporation owned by Debtor's principal Thomas X. Flaherty ("Flaherty"), Exhibit M-2, and assigned to the Debtor corporation.

Movants elicited the testimony of five witnesses who told the story of the Debtor's acquisition of its membership in the League and the involvement of its principal Flaherty through his company Park Place Builders, Inc. d/b/a Federal Developers ("Federal") in the development of a stadium in Williams Township where the Black Diamonds would hold their home games. To facilitate the receipt of a $5 million grant from the Commonwealth of Pennsylvania through the Northampton Industrial Development Authority ("IDA"), Federal partnered with the not-for profit corporation, Northwestern Human Services ("Northwestern") to build the stadium. Northwestern purchased the land on which the stadium was to be built and funded, with Flaherty, the initial construction costs while Flaherty sought to secure permanent financing to complete the project. [FN3] Construction began in December 1998. However, in July 1999, with the stadium 55-60% completed, construction ceased when funds were exhausted and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R. Page 2
2000 WL 290187 (Bankr.E.D.Pa.)
**(Cite as: 2000 WL 290187 (Bankr.E.D.Pa.))**

permanent financing had not been secured. [FN4] On November 30, 1999, the IDA gave notice of termination of the grant. Finding that Debtor failed to cure during the 60 day period provided in the Cooperation Agreement, Exhibit M-14, at ¶ 9, the grant was allegedly terminated on January 30, 2000.

> FN3. Their relationship was memorialized in a Cooperation Agreement dated September 16, 1998 between the IDA and Federal and Northwestern. Exhibit M-14.

> FN4. At that time it was clear that the IDA grant money could only be used as back-end money.

At present, the stadium lies dormant, an incomplete project that is viewed as an eyesore visible from I-78 to drivers approaching the Lehigh Valley. [FN5] While the Debtor has no role in the development of the stadium, the new stadium is inextricably related to its financial success. The profitability of League baseball is directly connected to the team's ability to derive supplemental revenues from a home stadium such as advertising, concession and sky box income. Moreover, ticket revenue is only available to the home team. Not surprisingly then, it is every member's goal to build a stadium as quickly as possible. Perhaps for that reason, the League had not felt it necessary to make a home stadium a requirement of membership. That condition, however, was added through an amendment to the League by-laws adopted on January 24, 2000. [FN6]

> FN5. The City of Easton, which according to the testimony of Mayor Thomas Goldsmith, had incorporated the stadium into its 1994 revitalization plan, awaits the development of the stadium to aid its economic development. Needless to say, this project has been a big disappointment to everyone who had such high hopes for it.

> FN6. According to Anton Rosenthal ("Rosenthal"), the League's Secretary/Treasurer, in the first season of play, 1998, six out of seven team members actually played. No team was required to have a home stadium and the Newark and Lehigh Valley teams did not. In 1999, six out of seven team members played ball and only Lehigh Valley did not have a permanent stadium. It was not required to have one, and it could have chosen not to play rather than to play on the road as it did.

The Long Island team, in which Rosenthal has an interest, did not play in either year. On January 24, 2000, the League Board, consisting of team representatives, met and made the stadium condition mandatory.

*2 On December 8, 1999, the League sent Flaherty notice that the Black Diamonds were in violation of the League by-laws for failing to provide a ballpark in the Lehigh Valley in which to play home games, failing to pay 1999 dues, failing to reimburse the League for money expended on its behalf and failing to fulfill financial obligations to its staff, vendors and suppliers. [FN7] Exhibit M-9. [FN8] While Flaherty's failure to complete the stadium was not an expressed basis for finding him an unsuitable team owner, it would appear that the League's loss of confidence and patience with him on the stadium project colored their treatment of the Debtor. Response to the League charges was demanded by December 31, 1999. Shortly thereafter, on December 13, 1999, Northwestern's Stadium Committee passed a resolution that it would not enter a lease with Flaherty or any entity controlled by Flaherty for use of the stadium being constructed. Exhibit M-13. [FN9] On January 24, Flaherty attended the League Board meeting with representatives of Delancey Investment Group, Inc. to present a letter of intent for financing the team through the formation of a new entity which would acquire a 75% interest in the Debtor. [FN10] Thereafter, believing that the League members were poised to terminate its membership, Debtor filed for protection under Chapter 11 on February 1, 2000.

> FN7. On cross examination, the League's counsel sought to demonstrate the extent of these unpaid obligations. While acknowledging the debts, Flaherty responded that the League encouraged him to put his resources into the stadium even if it meant letting certain team expenses go unpaid. In any event, since the Black Diamonds were running $750,000 - $1,000,000 in the red annually, a fact of which the League was fully aware, their protestations ring somewhat hollow on this point.

> FN8. While not mentioned in the December 8 notice, at some point in December the League discovered that the Debtor was also in default of the requirement of the League agreement that each team fund its prorata share of a $1,000,000 escrow account

Not Reported in B.R. Page 3
2000 WL 290187 (Bankr.E.D.Pa.)
**(Cite as: 2000 WL 290187 (Bankr.E.D.Pa.))**

necessary to assure municipalities that the League would stand for the unpaid debts of its members. Debtor's share, based on the original six teams, was approximately $170,000. While a pledge of stock was acceptable to fulfill the requirement, the stock pledged by Debtor apparently was always valued less than the required amount and is significantly undervalued today. Exhibit M-18. The League has apparently funded Debtor's share and asserts that as part of its claim. Exhibit M-7. While the League has expanded from six to nine teams, there was no indication that the League will treat this obligation as proportionately reduced.

FN9. While the resolution was never adopted or ratified by the Northwestern Board, its Chairman former Senator Joseph Rocks testified that Northwestern has acted consistent with that resolution. *See also* Exhibit M-17. Since it is Flaherty's plan to sell majority control of Debtor to a third party in conjunction with the bankruptcy reorganization, he does not view this antagonism towards him to be an impediment to the Debtor.

FN10. The League responded on January 27 by sending Flaherty an application for change of ownership which obviously was premature at that point. Rosenthal contends the League is still waiting to get information about that deal. The Debtor contends, and the testimony confirms, that the League will not meet with the Debtor on any issue.

DISCUSSION

Section 1121(b) grants a debtor the exclusive right to file a plan for 120 days after the order for relief. [FN11] However, subsection (d) permits the court, for "cause," to increase or reduce the 120-day and 180-day periods specified. The party seeking change has the burden of establishing that cause exists, *In re Texaco, Inc.,* 81 B.R. 806, 813 (Bankr.S.D.N.Y.1988) and when that change is a reduction in the statutory period, the burden is especially heavy. *Matter of Interco Inc.,* 137 B.R. 999 (Bankr.E.D. Mo.1992). Whether to grant the request is committed to the sound discretion of the bankruptcy judge. *Matter of All Seasons Industries,* 121 B.R. 1002, 1004 (Bankr.N.D.Ind.1990).

FN11. Exclusivity will be lost if a Chapter 11 trustee is appointed. The debtor also has the exclusive right for an additional 60 days to solicit acceptances of a plan filed within the 120 day period. 11 U.S.C. § 1121(c).

The Congressional history of this section provides the following limited guidance on the nature of "cause."

Cause might include an unusually large or unusually small case, delay by the debtor, or recalcitrance among creditors.

H.R.Rep. No. 595, 95th Cong., 1st sess. 402 (1977). The identification of cause is obviously fact sensitive. In the years since Congress promulgated § 1121, there have been legions of cases that have attempted to identify "cause" consistent with the policy underpinnings of this section. Notably, however, these cases arise in the context of requests to extend, not contract, exclusivity. Thus, the factors articulated in these decisions have marginal utility here since many of them assume the initial statutory period has been afforded. *See, e.g., In re Dow Corning Corp.,* 208 B.R. 661, 664 (Bankr.E.D.Mich.1997). However, the following court's discussion on extending exclusivity is insightful in addressing a motion to reduce the period:

*3 In passing upon a request for a change in the debtor's exclusivity period, the court needs to consider more than just the articulated cause presented to it. It must also consider the history and purpose of § 1121 and the competing interests which Congress sought to balance when it enacted these time tables.

The limited exclusivity period, which is a feature of Chapter 11 proceedings under the Bankruptcy Code contrasts with the procedure under Chapter XI of the Bankruptcy Act which gave the debtor the exclusive right, throughout the Chapter XI proceedings, to propose a plan. The House Report accompanying H.R. 8200 noted that '[t]he exclusive right [under old Chapter XI] gives the debtor undue bargaining leverage, because by delay he can force a settlement out of otherwise unwilling creditors'.... Additionally, Sec. 1121 represents a congressional acknowledgment that creditors, whose money is invested in the enterprise no less than the debtor's, have a right to a say in the future of the enterprise ...

[W]e think that any bankruptcy court involved in an assessment of whether 'cause' exists should be mindful of the legislative goal behind Sec. 1121. The bankruptcy court must avoid reinstituting the imbalance between the debtor and its creditors that characterized proceedings under the old Chapter XI. Section 1121 was designed, and should be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors. [citations omitted].

As a result, a request to either extend or reduce the period of exclusivity is a serious matter. Such a motion should "be granted neither routinely nor cavalierly." McLean Industries, Inc., 87 B.R. at 834.

*All Seasons Industries,* 121 B.R. at 1003.

In electing to change the pre-Code scheme of unlimited exclusivity for the debtor, Congress could have allowed any party to file a plan from the inception of the case. It chose not to, rather retaining debtor exclusivity for 120 days. In recognizing the need to balance interests, Congress stated:

Proposed chapter 11 recognizes the need for the debtor to remain in control to some degree, or else debtors will avoid the reorganization provisions of the bill until it would be too late for them to be an effective remedy. At the same time, the bill recognizes the legitimate interests of creditors, whose money is in the enterprise as much as the debtor's, to have a say in the future of the company. The bill gives the debtor an exclusive right to propose a plan for 120 days.

H.R.Rep. No. 595, *supra,* at 231-32. In so doing, Congress signified its intent not to "swing the pendulum of bargaining advantage in the opposite direction." R. Wesson, *The Exclusivity Period in Section 1121: How Exclusive Is It?,* 11 Cardozo L.Rev. 639 (1990). "Exclusivity is intended to promote the environment in which the debtor's business may be rehabilitated and a consensual plan may be negotiated." K. Gross and P. Redmond, *In Defense of Debtor's Exclusivity: Assessing Four of the 1994 Amendments to the Bankruptcy Code,* 69 American Bankruptcy L.J. 287, 308 n.29 (1995). Given bankruptcy's overarching goal of consensual reorganization, it not surprising that Congress would have elected to preclude competing plans in the formative period of the Chapter 11 case. *In re Grand Traverse Development Co. Ltd. Partnership,* 147 B.R. 418, 419 (Bankr.W.D. Mich.1992).

**\*4** In the 22 years since the exclusivity provision was promulgated in the Bankruptcy Reform Act of 1978, there have been only two reported cases that permitted shortening the exclusivity period: *In re Crescent Beach Inn, Inc.,* 22 B.R. 155 (Bankr.D.Me.1982), and *Pickens Industries, Inc. v. Palmer, Palmer & Coffee (In re Texas Extrusion Corp.),* 68 B.R. 712 (N.D.Tex.1986), *aff'd,* 844 F.2d 1142 (5th Cir.1988). In *Crescent Beach,* on a motion, alternatively, for the appointment of a trustee, dismissal or reduction of exclusivity period, the Court found cause to shorten the period, denying the other relief requested. It noted that the debtor had filed its petition on March 15 and the 180 day period would not expire until Labor Day, the final weekend of the summer season for debtor's hotel and restaurant business. Moreover, it appeared to the court that

the major obstacle in the path to a successful reorganization in this case is the principal parties' acrimonious relations. They continue their bitter feuding not only at their own expense, but at the expense of all creditors of the debtor. Shortening the debtor's exclusive period for filing a plan will permit any party in interest, including parties with perhaps a more objective view of the debtor's circumstances, to file a plan. The court believes that the interests of all creditors and the interests of the debtor as well will be best served permitting any party in interest to file a plan.

22 B.R. at 160. In *Texas Extrusion,* the court referred to *Crescent Beach's* finding that "the principal parties' acrimonious relations" was a major obstacle in the path to a successful reorganization, and concluded that "this facet of Crescent Beach is amply matched in the instant case." 68 B.R. at 724. Citing *Crescent Beach* and *Texas Extrusion,* the court in *In re Texaco Inc.,* 81 B.R. 806 (Bankr.S.D.N.Y.1988), identified gross mismanagement by the debtor and acrimonious feuding between the debtor's principals as examples of "major obstacles to a successful reorganization," which may constitute cause, and rejected a motion to terminate or modify exclusivity to file a competing plan that would change the debtor's corporate governance. *Id.* at 812. Likewise in *In re Eagle Pitcher Industries,* 176 B.R. 143 (Bankr.S.D.Ohio 1994), the court found no cause to terminate exclusivity where the grounds asserted were that the creditor was being treated unfairly in negotiations and that an alternative plan would expedite prompt resolution of case. The court noted that there was no evidence of undue delay or that the continuation of exclusivity was being used as a tactical device to put pressure on creditors to accept a plan they think is unsatisfactory.

The hurdles to reorganization which led to shortening of the exclusivity period in *Crescent Beach* and *Texas Extrusion* are not present here. [FN12] There have been no allegations that divisive relationships among the Debtor's principals are an obstacle to its reorganization. [FN13] To the extent there is acrimony in this case, its source appears to be the League rather than some internal rift in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Debtor's management. The League's aggressive litigation posture does not constitute cause. "To hold otherwise would permit litigious creditors to manufacture 'cause' to shorten the exclusivity period through their own unilateral actions." *Grand Traverse Development, supra,* 147 B.R. at 419. Indeed the refusal of creditors to negotiate in good faith supports continuation of exclusivity. *See In re Gibson & Cushman Dredging Corp.,* 101 B.R. 405, 410 (E.D.N.Y.1989) (extension granted in light of recalcitrance of creditors and their intent to liquidate rather than negotiate on an equitable plan of reorganization).

> FN12. The League compares the seasonality factor that the court considered in *Crescent Beach* to the seasonality factor here. However, there is a critical difference between the two cases. In *Crescent Beach,* the internal rift in the debtor's management obviated any possibility of a successful operation during the summer season when presumably the restaurant and hotel earn their greatest revenues. Here the Debtor is prepared to field a team. Moreover, playing baseball will not help creditors since the team's activities admittedly will only generate losses.

> FN13. Indeed the Debtor is controlled by one person, Thomas N. Flaherty, its sole owner.

**\*5** While the scarce decisional law does not offer any cases directly on point, the "major obstacle to successful reorganization" test articulated in *Texaco* is a helpful guidepost for resolving this contested matter. The League argues that no plan of reorganization can be confirmed without its consent and that it will not consent to any plan of reorganization proposed by the Debtor. By reason of its purchase of certain unsecured claims, Exhibit M-1, the League states that it controls a majority in number and amount of the unsecured class, and is therefore able to block the confirmation of a debtor plan. [FN14] The League's confidence is overstated at this early date. The League based its conclusion on the list of unsecured creditors filed with the Petition. Exhibit M-11. Presumably based on that list, the League devised its strategy for purchasing claims that would allow it to block the vote of the class of unsecured claims. Section 1126(c) requires acceptance by at least two-thirds in amount and one-half in number of the allowed claims of a class of a class, and § 1129(a)(8) requires each class to either accept the plan or not be impaired unless the cramdown provisions of § 1129(b) are invoked. To that end, the League secured assignments of fourteen claims aggregating $12,435.78 [FN15] and based thereon, contends that in combination with the Movants' claims of $630,000, Movants control 78% and 57% of claims in number and amount, respectively. Exhibits M-1 and M-10. Without regard to amount, the League has not established, at least at this juncture, [FN16] that it controls a majority in number of the claims. Moreover, even were the League able to control the vote of the class of unsecured claims, the Debtor may be able to propose a plan that garners the support of another impaired class and utilize the cramdown provisions of § 1129(b) to secure confirmation. [FN17] Finally, while the League is adamant today that it will not deal with the Debtor because of Flaherty's failed promises which have left a sour taste in members' mouths, it may conclude otherwise if it recognizes that only through a cooperative approach will baseball be played in the Lehigh Valley this season. Since February 1, the League has refused to meet with the Debtor, opting rather to pursue an aggressive litigation strategy. It may be that the League now has a better prospect in mind for bringing baseball to the Lehigh Valley than Flaherty but so long as the Debtor has a valid ownership interest, barring a major impediment to confirmation, it should be given the opportunity contemplated by Congress to reorganize or to realize the equity in its asset by finding a buyer, acceptable to the League, which will pay fair market value.

> FN14. The League drew this conclusion from comparing the aggregate amount of its claims ($630,000) with the aggregate amount of claims ($814,587.34) listed on a schedule filed with the petition. Exhibit M-11. The Debtor objected on the grounds that the list did not represent the actual amount of unsecured claims. Rather the Schedules, which had as of the first hearing date not yet been filed, would reflect the actual amount of unsecured debt. The Schedules have now been filed, and I take judicial notice of them pursuant to Fed.R. Evid. 201, incorporated in these proceedings by Fed.R.Bankr.P. 9017. *See Maritime Elec. Co., Inc. v. United Jersey Bank,* 959 F.2d 1194, 1200 n.3 (3d Cir.1991); *Levine v. Egidi,* 1993 WL 69146, at \*2 (N.D.Ill.1993); *In re Paolino,* 1991 WL 284107, at \*12 n. 19 (Bankr.E.D.Pa.1991); *see generally In re Indian Palms Associates, Ltd.,* 61 F.3d 197

(3d Cir.1995). It appears that while Schedule F (Unsecured Nonpriority Claims) is, with the exception of Flaherty's claim, not materially different in *amount* to the amount used by the League, it is considerably more in *number* of claims.

FN15. The circumstances of the assignments were not disclosed. Thus, I do not know whether an offer was made to all creditors. This fact may be relevant if the League seeks to vote these claims against a Debtor plan. As the Debtor has argued, the fact that the League has purchased these claims does not mean that their adverse votes will defeat the plan if the Debtor is able to convince the Court to designate under § 1126(e) on the grounds that the rejection of the plan was not in good faith.

FN16. I state "at this juncture" because the League is not precluded from purchasing additional claims now that it has the Debtor's full schedule. Notably, however, § 1126(c) speaks of allowed claims and neither Exhibit M-11 or Schedule F are therefore determinative. At this early stage, a bar date for filing proofs of claim has yet to be set.

FN17. Under the United States Supreme Court's recent decision in *Bank of America Nat'l Trust & Savings Ass'n v. 203 N. LaSalle Street Partnership,* 526 U.S. 434, 119 S.Ct. 1411 (1999), Flaherty will not be able to retain the Debtor's equity without the Debtor "extending an opportunity to anyone else either to compete for that equity or to propose a competing reorganization plan." *Id.* at 1422. A contrary plan provision will run afoul of the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B)(ii).

The plan proposed by the League in concept [FN18] in effect seeks to acquire the Debtor's membership interest for $575,000, a bargain if the Debtor's estimate of its value is anywhere near correct. According to the testimony of Stephen Scherf, the Debtor's business valuation expert, the value of the Debtor's membership in the League could range from $3 million to $8.7 million. [FN19] The League contemplates that the $575,000 plan funding will pay creditors almost in full, and appears to assume that this will assure confirmation. Since the League offered no plan document, it is hard for me to evaluate that assumption. However, as it appears that none of the funds are contemplated to be paid to Flaherty, the road to confirmation is not paved with astroturf. To the extent that Flaherty, who testified that he expended personal resources to fund the team's losses of $750,000 in 1998 and $1,000,000 in 1999, is treated in a separate class and paid less than other unsecured creditors, he undoubtedly will object on the grounds of improper classification or discriminatory treatment. I would also expect, based on Debtor's counsel's statement regarding the purchase of claims, that the Debtor will challenge the use of these votes. Since the League's plan has not been introduced, except in the most general way, there may be other objections asserted by the Debtor, Flaherty or other interested parties.

FN18. The League did not present any written plan of reorganization but merely outlined its intention to fund a plan with $575,000 available for that purpose and subordinate Movants' own claims aggregating $630,000. With this funding, it contends that unsecured creditors would be paid almost in full. Since the League's supposition is based on the unsecured claims listed on Exhibit M-10 ($175,152 exclusive of Movants' claims), it is not clear how the $575,000 is to be allocated. It may be that the balance of the plan funding is earmarked for operating expenses or perhaps for priority claims which approximate $250,000. In any event, it is clear that in representing that unsecured creditors will be paid almost in full, the League has some other and unspecified plan for the treatment of Flaherty's asserted claims estimated at $2.1 million. Because the League has not yet memorialized its concept in any document, these questions are not capable of being answered. Thus, notwithstanding its rush to terminate exclusivity, the League either is not ready to actually file a plan of reorganization or to share its complete plan with the Court and Debtor.

FN19. Admittedly a preliminary analysis, Scherf's opinion is premised on the assumption that a home stadium would be available for play in the 2001 season so as to generate advertising, concession, etc., income to supplement ticket revenues. In reaching his conclusion, he considered various prior letters of intent, including the January 2000 Delancey letter of intent that

fixed a value of $3.6 for the Debtor. It is clearly beyond the scope of this decision to fix a value on the Debtor's membership interest. Rather it is sufficient to note that the League's contribution to a plan of $575,000 plus the subordination of the Movant's claims of $630,000 is substantially less than the minimum value fixed by Scherf.

**\*6** Significantly, Rosenthal, testified that the League was not willing to propose a plan unless it could be assured it would be in a position to field the Black Diamonds play this season. Given the present schedule for spring training, he indicated that a plan would have to be confirmed by April 4, 2000. [FN20] While giving lip service to the notion of competing plans, the League's strategy is to continue to press for expedited treatment consistent with its deadline, thereby foreclosing Debtor from having a competing plan. [FN21] Compare *All Seasons,* 121 B.R. at 1003 (noting that denying extended exclusivity does not sound a "death knell" for debtor's reorganization as there is no negative effect upon the debtor's co-existing right to file its plan). My decision is made easier by the fact that there is no way that the League can confirm a plan in the next three weeks, particularly one that has not even been filed to date. Even were I to accede to the League's request for an expedited schedule, three weeks is simply unrealistic. Given the history in this case where an issue as non-controversial as the extension of time to file schedules has been the subject of litigation, I have no doubt that there will be myriad objections to the disclosure statement and confirmation, some of which are anticipated above, and they will have to be resolved. Even if the League is successful in this Court, there will be appeals which could cloud the ownership of the team. Since the League has not filed its Plan, I do not know whether its condition to performance is a final confirmation order, *i.e.,* one not subject to appeal. Moreover, in balancing the interests of creditors and the Debtor to notice and opportunity to participate in the reorganization process against the League's alleged desire to field a team by opening day, I find insufficient grounds to shorten notice and voting periods to allow the League's ambitious condition to be met. The sincerity of the League's expressed concern that its reputation will be harmed by the failure to field a team in the Lehigh Valley this year [FN22] is mitigated by its refusal to work with the Debtor to get a team ready to play ball. It may be that the Debtor will be unable to do its part and if that is the case, the League will have its remedies under the parties' agreement. However, the League's refusal to meet with the Debtor and to provide the customary notices that it provides to member teams about spring training and other pre-season issues evidences a decision on its part that it places a higher priority on its strategy to acquire the membership than having baseball played in the Lehigh Valley. In short, I am not convinced that the exigent circumstances are not to some extent of the League's making.

>FN20. Rosenthal was called back to the stand by the MacGregors' lawyer who until that moment had acted consistent with his statement at the onset of the hearing that he would defer to the League's lawyer and not participate. Presumably in the adjournment between day one and two and after the League's attorney had completed his direct examination of Rosenthal, the Movants reviewed their record and discovered some further facts sufficiently important to call Rosenthal back to the stand alleging a need of the other lawyer to conduct his own examination. Debtor's counsel objected but I allowed the examination for the reason stated on the record. The April 4 drop dead date was elicited during this brief recall.
>
>FN21. Counsel presaged the League's next step should it be successful in terminating exclusivity when he made reference to wanting expedited hearings on the disclosure statement and confirmation.
>
>FN22. In the past two years of its existence, the League has had only six of its seven teams playing. This year eight teams are on the schedule, Exhibit M-12, including the Black Diamonds, representing an expansion of the League. One team will still not be playing. Presumably if the League could function with six teams, it can function with seven. Since the Black Diamonds have no stadium, the team will incur another $750,000 loss this playing season. Notwithstanding its urgency to confirm its plan by April 4, the League has not stated how a team will be fielded and by whom and with what money. Thus, there is no assurance that a team would be fielded even if the League achieved its present bankruptcy goal.

Having concluded that the League has not established that a reorganization by the Debtor is

foreclosed at this juncture of the case, I am nonetheless mindful of the significant hurdles the Debtor faces. The $5 million IDA grant has been terminated, and while Debtor suggests some legal grounds to fight that termination (and indeed has joined with Federal in seeking to secure or confirm the availability of the grant in the adversary proceeding it recently filed in this Court), the need for financing of the stadium is an obstacle to this reorganization to the extent that a lender may be only interested in investing in the team *and* the stadium. Flaherty posits three possibilities for plan funding: a January 27, 2000 proposal from Delancey Investment Group, Inc., *see* exhibit D-13, an anticipated proposal from New Life Ventures and some combination of the two with both these parties. Flaherty states that he expects to know what shape the transaction will take in about one week at which time the Debtor would be prepared to propose a plan of reorganization. Flaherty also states that Federal need not be the developer so long as the development of the stadium does not result in costs that would impose a higher rent than originally contemplated. A review of the Delancey letter of intent, which is to expire on March 15, however, evidences a condition that the acquiring entity obtain rights to complete development of the stadium. It also requires the continued availability of the Commonwealth grant. Other relevant conditions are the achievement of satisfactory lease terms, the team's good standing in the League and acceptable revenue projections if the Debtor has irrevocably lost its membership rights in a soccer league. [FN23] Clearly the letter of intent will expire before these conditions could, if ever, be met. Whether a new proposal based on today's realities, not those of January 27, can be formulated with Delancey or one finalized with New Life or some combination of the two is uncertain at best. [FN24] Given the amount of time Flaherty has been trying to put together the financing under favorable conditions, his prognosis for a financing transaction including the stadium component in the time it will be necessary to propose a plan is unrealistic. However, I recognize that while an investor may desire to complete the stadium development, it may be possible to interest an investor in the team membership alone, something that has fewer obstacles to accomplish and is doable in a more manageable time period. Severing the stadium piece lessens the significance of the expressed opposition to Flaherty by Northwestern and certain community officials [FN25] based on his failure to complete the stadium as promised.

FN23. The Debtor scheduled its membership in the soccer league as an asset. However, it appears that the soccer league may have given notice of termination before the Chapter 11 case was filed.

FN24. The Debtor introduced a long line of commitments by various lenders and investors dated from July 1997 through November 1999, Exhibit D-1 through D-12. Flaherty's background and expertise is in accessing capital markets to finance large public and private projects. Indeed his relationship with Northwestern predates the stadium project. He has served as a financial consultant assisting them with financing transactions and, up to very recently, was a member of its Board. As recently as September 14, 1999, its President and Chief Executive Officer confirmed Northwestern's willingness to assist in the facilitation of financing of the stadium. Exhibit D-14. Given the number of letters of intent received for the project, there was no shortage of effort on Flaherty's part or interest by third parties. Nonetheless, none of the commitments closed. Flaherty attributed the problem to Northwestern who he said was unable to commit to the length of the terms required by the lender. How that would be any different now was not addressed other than to suggest that Northwestern need not be the project sponsor.

FN25. The League made much of the opposition of Glenn Riebman, the Northampton County Executive, who testified as to his view that Flaherty did not tell the truth about his ability to finance the project. Riebman has been the source of negative media commentary which the League complains has damaged its reputation. Riebman also testified that it was always his opinion that the IDA grant should be used for a different project, an IMAX theatre in the Smart Discovery Center, and he refused to approve the award of the grant to Debtor. However, since his approval was not necessary, Debtor was awarded the grant over his opposition. It is not clear what significance, if any, Riebman's opposition has.

**\*7** More troublesome is what the testimony disclosed concerning the Debtor's ability to operate. At the present time, some four weeks before the

Not Reported in B.R. Page 9
2000 WL 290187 (Bankr.E.D.Pa.)
**(Cite as: 2000 WL 290187 (Bankr.E.D.Pa.))**

commencement of spring training, the Debtor has no management, front office staff, coaches and trainers, and has no ballplayers on contract notwithstanding the imminence of opening day on April 30th. Responsibility for staffing the Debtor to play professional baseball and locating a League appropriate facility has been delegated to Dilip Petagara ("Petagara"), an employee of VAI on contract to Debtor. Petagara, whose background and skill set is business administration and organization, has been designated as the Debtor's CEO, CFO and COO. He admittedly has no baseball experience and acknowledges the need to promptly hire a general manager whom he intends to accompany to spring training on April 15. The potential candidates are last year's manager Russ Vecchio (whose past performance Petagara appears to have reservations about) and Coach Shore who coached the Debtor's former soccer team. [FN26] An offer has been extended to the latter but no compensation terms have been discussed. The Debtor also needs to hire a sales director, a marketing director and a director of sales operations. These employees are needed by mid-April. At present Petagra is either reviewing or soliciting resumes. In addition to the front office staff, the Debtor needs to hire a field manager, a pitching coach, a trainer and most importantly, players. He contemplates asking the former field manager, laid off in January, to return but has not gotten around to contacting him and does not know whether he is available for employment at present. The same situation exists with the pitching coach. Neither has a claim against the estate. In the past, the League had been helpful in assisting the Debtor find appropriate personnel but they have not done so this year. Finally, the protocol for employing players is to invite those that the team is interested in to spring training to see how they perform individually and as a group. Based on these observations, contracts are then extended. Debtor has not invited any players to spring training yet. Additionally because of the two new expansion teams, certain previous season's players have been designated as "protected" from employment by the new teams. Debtor has thirteen protected players but has not yet contacted any of them about employment and yet they are precluded from contracting with other teams. According to Petagara, the status of the human resources of the team is not far different than last year although at least last year Vecchio was on board as general manager. Most players sign contracts in April, some during spring training and some before.

> FN26. Vecchio is listed as a creditor with a claim of $15,276.75 for unreimbursed travel and business expenses for 1999. Shore does not appear on the Schedule.

Debtor also does not yet have a stadium in which to hold its home games. A stadium is necessary to receive ticket revenue. [FN27] Debtor has located several possibilities but the site must be approved by the League which will not meet with it. [FN28] Given the League's stated intention to field a team if it can acquire the Debtor's ownership interest by April 4, it clearly has identified an appropriate stadium. Thus, this condition to being play ready could be easily overcome if the League would communicate with the Debtor.

> FN27. In 1998 debtor played at a stadium located in Newburgh, New York. In 1999, Debtor played all its games on the road, presumably making its costs greater and revenues lesser.
>
> FN28. The two possible venues for home games suggested by Debtor were rejected as not suitable for professional ball. Lancaster's field dimensions and condition are unacceptable. No reason was given for rejecting the Bangor field. While the League was satisfied with Debtor's team playing its games on the road last year, it apparently will not agree to its doing so this year.

**\*8** Petagara is confident that all these loose ends can be pulled together by opening day. This view appears overly optimistic. He states that he has not made more progress because the bankruptcy has impeded his ability to attend to these tasks. I agree but not for the reason he stated. It is not the expenditure of time preparing papers for court filing and attending court sessions that has made him unable to contact any of the prospects for these positions but most likely the uncertain status of the team. It is impossible to hire competent staff when it is common knowledge that the League is taking legal action to take over the team. Moreover, there is absolutely no financial stability to the organization which needs $750,000 to complete the season. Flaherty assures the Court that he expects to be able to present a financing package that will fund the Debtor's operations and that in any event, he has the personal financial resources to enable the Debtor to pay its expenses as they come due. While it is true that Flaherty stepped up to the plate in the prior seasons (as evidenced by a claim of over $2 million from personal loans to the Debtor), he appeared quite reluctant to make any specific commitment now. It was only on inquiry of the Court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R. Page 10
2000 WL 290187 (Bankr.E.D.Pa.)
**(Cite as: 2000 WL 290187 (Bankr.E.D.Pa.))**

that he outlined the extent of his resources [FN29] which appear to be sufficient to allow the Debtor to pay its expenses as they come due provided that he chooses to use his assets for this purpose. Flaherty will not have the luxury of holding out much longer. While the Debtor's financing is not an issue before me now, the Debtor will soon be required to enter a stadium lease and provide a deposit and other assurances to the lessor. Other contracts may require similar deposits given the Debtor's bankruptcy status. According to Flaherty, the Debtor will need $50,000 before the start of the season on April 28 and $100,000 monthly thereafter. I would expect the presentation of a financing motion in very short order as well as motions to authorize the Debtor to enter into the stadium lease and any other significant contractual arrangement. Thus, defeat of the League's present motion only brings the Debtor a brief respite. It has only a short window of opportunity to breathe life into this reorganization case. However, it will have the opportunity to attempt to do this without the antagonistic efforts of the League preventing any chance of success.

> FN29. He testified that he had liquid assets of $175,000 and earns $300,000-$500,000 per quarter from VAI after expenses.

In short, a creditor plan filed at this point removes any incentive for the League or Northwestern to work with the Debtor. It would obviate any opportunity for the Debtor to reorganize its affairs and could result in the forfeiture of a valuable asset. So long as Debtor does not utilize this proceeding to unnecessarily delay creditors and fulfills its post petition obligations to third parties, it should be provided the opportunity to realize the benefit of the bankruptcy relief it sought, the attempt to reorganize. However, that opportunity will only continue so long as it demonstrates good faith and diligence in moving toward a confirmable plan. [FN30] It is too early to form a judgment on those issues although the business challenges of the next 30 days, in light of the amount and tenor of the litigation to date in this case, present a heavy burden. Nonetheless, at this juncture, the Code policy of encouraging consensual reorganizations will be served by leaving exclusivity in place as Congress intended.

> FN30. The Debtor, Flahery and certain businesses owned by Flaherty have filed a massive lawsuit against the League, the IDA, Northwestern and various individuals involved in the development of the stadium project, seeking injunctive relief and damages for alleged tortious interference with contractual relations, defamation and breach of contract. Debtor is going to have to come up with more than a law suit to support continued exclusivity in this case. While I have given Debtor every benefit of the doubt at this stage of the case, the burden shifts to it when it seeks to extend the presumptive 120 days of exclusivity.

**\*9** An Order consistent with the foregoing Memorandum Opinion shall issue.

*ORDER*

AND NOW, this 14th day of March, 2000, upon the consideration of the Motion of The Atlantic League of Professional Baseball Clubs, Inc., Jack MacGregor and Mary Jane Foster (together with the League) for an Order Terminating Exclusivity Pursuant to 11 U.S.C. § 1121(d) (the "Motion"), after notice and hearing and for the reason set forth in the accompanying Memorandum Opinion;

It is hereby ORDERED and DECREED that the Motion is DENIED.

2000 WL 290187 (Bankr.E.D.Pa.)

END OF DOCUMENT