## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | **Chapter 11** |
| | ) | |
| **In re:** | ) | **Case No. 01-01139 (JKF)** |
| | ) | |
| **W. R. GRACE & CO., et al.,** | ) | **(Jointly Administered)** |
| | ) | |
| **Debtors.** | ) | **Re: Docket No.: 8486** |
| | ) | |
| | ) | **Response Deadline:  June 10, 2005** |
| | ) | |
| | | **Hearing Date:  June 27, 2005** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF ASBESTOS
PROPERTY DAMAGE CLAIMANTS TO DEBTORS' EIGHTH
MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. § 1121(d)
EXTENDING DEBTORS' EXCLUSIVE PERIODS IN WHICH TO
FILE A CHAPTER 11 PLAN AND SOLICIT VOTES THEREON**

The Official Committee of Asbestos Property Damage Claimants (the "PD Committee")

of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and

through its undersigned counsel, hereby submits this objection (the "Objection") to the proposed

eighth extension of the Debtors' exclusive periods (the "Exclusive Periods") to file a plan of

reorganization and solicit acceptances thereon.  In support of its Objection, the PD Committee

respectfully represents as follows:

### PRELIMINARY STATEMENT

After enjoying the exclusive right to file a plan of reorganization for nearly four years,

the Debtors rewarded their asbestos creditors with a patently offensive, unconfirmable plan of

reorganization (the "Plan").  Through the Plan, the Debtors seek to cram down a cap on

recoveries by asbestos claimants in blatant contravention of 11 U.S.C. § 524(g).  Adding insult to

injury, the Plan does not allow asbestos creditors to vote for or against the Plan, making a 524(g)

MIAMI 896343.2 7481715554

injunction simply unattainable. Despite vociferous objections to the Plan by (among others) the PD Committee, the asbestos personal injury committee (the "PI Committee") and the Future Claimants' Representative (the "FCR"), the PD Committee is unaware of a single attempt by the Debtors to forge a consensual plan of reorganization since the Plan's filing. The Debtors remain fanatically devoted to a Plan that uses every back-door vehicle to suppress the role of asbestos creditors in these cases. As the Debtors will undoubtedly squander any additional opportunity to propose a consensual plan, the Court should deny the Motion.

The Debtors' disdain for finding common ground is endemic to these proceedings. In addition to the Debtors' outrageous Plan, the Debtors are also creating much discord in the embryonic stages of the estimations (the "Estimations") of property damage claims (the "PD Estimation") and personal injury claims (the "PI Estimation"). For instance, based on statements to the PD Committee and the Court, the Debtors apparently seek to turn the PD Estimation into a farcical science trial. The Debtors view the PD Estimation as their own bully pulpit to promote the absurdity that none of the Debtors' approximately twenty asbestos laden products—installed in thousands of buildings throughout the country during much of the last century—are harmful. With respect to the PI Estimation, the Debtors seek to exclude pursuant to FED. R. EVID. 408 the Debtors' asbestos settlement history from the PI Estimation, notwithstanding that courts customarily admit into evidence, in one form or another, a debtor's asbestos settlement history. In short, the Debtors are utilizing the Estimations as yet another tool to create discord and to squelch any consensual resolution of these cases.

These Debtors in particular should not be allowed to abuse the chapter 11 process or the gift of exclusivity. Recently, disturbing events surfaced with respect to certain members of the Debtors' present and former management. In February 2005, debtor W.R. Grace & Co.

MIAMI 896343.2 7481715554

2

("Grace") and several of its senior employees were indicted on charges of intentionally misleading the Federal Government, industrial customers, workers and the public of the asbestos dangers associated with Grace's Libby, Montana, vermiculate mine.   The federal criminal indictment also charges that, as part of Grace's conspiracy to increase profits and avoid liability by misleading the Federal Government, Grace withheld important information from the Federal Government in respect of asbestos contamination of Zonolite Attic Insulation ("ZAI") and ZAI's capacity to release asbestos when disturbed.   Similarly, on June 1, 2005, the New Jersey Attorney General filed a civil complaint against Grace and two former executives alleging that defendants falsified documents to state environmental authorities about asbestos-contaminated soil.  Such misdeeds do not warrant a further extension of exclusivity.  Rather, they require, at a minimum, the immediate termination of exclusivity.  For each of the foregoing reasons, the Court must not grant an eighth extension of the Exclusive Periods.

## BACKGROUND

1.      On April 2, 2001 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.      On April 12, 2001, the Office of the United States Trustee appointed the PD Committee, the PI Committee and the official committee of unsecured creditors (the "UCC"). On June 18, 2001, the United States Trustee appointed the Official Committee of Equity Security Holders (the "Equity Committee").  On May 24, 2004, the Court appointed Mr. David T. Austern as the FCR.

3

MIAMI 896343.2  7481715554

3.     On or about November 13, 2004, the Debtors filed their initial Plan, which was subsequently amended on or about January 13, 2005, to include, <u>inter alia</u>, the UCC and the Equity Committee as co-proponents of the Plan.

4.     On May 23, 2005, the Debtors filed the Motion, which seeks to extend the exclusive period in which to file a plan by six months (through November 23, 2005) and the exclusive period in which to solicit acceptances thereon by six months (through January 23, 2006).

**OBJECTION**

**THE DEBTORS DO NOT DESERVE AN
EIGHTH EXTENSION OF EXCLUSIVITY**

A.     **The Debtors Have Failed to Establish
"Cause" For An Eighth Extension of Exclusivity**

      1.     **Legal Standard Governing Extension of Exclusive Periods**

5.     Bankruptcy Code Section 1121 provides, in relevant part, as follows:

> (d) On request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may <u>for cause</u> reduce or increase the 120-day period or the 180-day period [Exclusive Periods] referred to in this section.

11 U.S.C. § 1121(d) (emphasis added).[1]

6.     It is axiomatic that a debtor bears the burden of affirmatively establishing "cause" to extend exclusivity.  <u>See In re Washington-St. Tammany Elec. Coop., Inc.</u>, 97 B.R. 852, 854 (E.D. La. 1989)(<u>citing In re Lake in the Woods</u>, 10 B.R. 338 (Bankr. E.D. Mich. 1981)); <u>In re Ravenna Indus., Inc.</u>, 20 B.R. 886 (Bankr. N.D. Ohio 1982); <u>see also In re Curry Corp.</u>, 148 B.R.

---

[1]     As set forth below, pursuant to the recently enacted Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Public Law 109-8, 119 Stat. 23 (the "Reform Act"), Congress eliminated a court's ability to grant indefinite extensions of the exclusive periods to chapter 11 debtors.  Revised section 1121(d) applies to

754, 756 (Bankr. S.D.N.Y. 1992)(finding that a "debtor must make a clear showing of 'cause' to support an extension of the exclusivity period."). Indeed, "[e]xtensions are not to be granted neither routinely nor cavalierly." In re McLean Indus., Inc., 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987)(citing In re Swatara Coal Co., 49 B.R. 898, 899-900 (Bankr. E.D. Pa. 1985)). Moreover, with each successive extension of the exclusive periods, the burden of proof becomes more difficult to satisfy. See In re Dow Corning Corp., 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997)("the Debtor's burden gets heavier with each extension it seeks as well as the longer the period of exclusivity lasts...").

7.     Congress limited exclusivity for good reason. "Congress believed that debtors often delay confirmation of a plan, while creditors want quick confirmation. Therefore, unlimited exclusivity gave a debtor 'undue bargaining leverage,' because it could use the threat of delay to force unfair concessions." Century Glove, Inc. v. First Am. Bank of N.Y., 860 F.2d 94, 102 (3d Cir. 1988)(citing House Report, 1978 U.S.C.C.A.N. at 6191)(emphasis in original). "Congress allowed a limited period of exclusivity, giving the debtor 'adequate time to negotiate a settlement, without unduly delaying creditors.'" Id. (citing same)(emphasis in original). "The Legislative history counsels a narrow reading of the section [1121]." Id.; see also In re Timbers of Inwood Forest Assoc., Ltd., 808 F.2d 363, 372 (5th Cir. 1987)(section 1121 of the Bankruptcy Code "represents a congressional acknowledgment that creditors, whose money is invested in the enterprise no less than the debtor's, have a right to a say in the future of that enterprise.")(citing the legislative history of section 1121), aff'd, 484 U.S. 365 (1988). The Timbers Court added that bankruptcy courts should not only be "mindful of the legislative goal behind [section] 1121," but also "avoid reinstituting the imbalance between the debtor and its creditors that

characterized proceedings under the old Chapter XI." Id. The Timbers court further noted, "Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors." Id. Terminating a debtor's exclusivity "serves to eliminate the potential harm and disadvantages to creditors and democratizes the reorganization process." In re Kun, 15 B.R. 852, 853 (Bankr. D. Ariz. 1981).

8.    If any doubt existed as to Congress's views towards unlimited extensions of exclusivity to debtors, the Reform Act put such questions to rest. Revised section 1121(d) eliminates a court's discretion to extend the exclusive period to file a plan beyond eighteen months from the petition date and to solicit acceptances thereon beyond twenty months from the petition date. See 11 U.S.C. § 1121(d)(2)(A),(B). While revised section 1121(d) does not apply to these cases, the strong public policy behind eliminating indefinite extensions of the exclusive periods very much applies here.

### 2.    The Debtors Have Failed to Demonstrate that Cause Exists to Extend the Exclusive Periods

9.    In the over four years since the Petition Date, the Debtors have astonishingly made little progress towards exiting these chapter 11 cases. There exists only a handful of events that have occurred in these cases worth reporting below:

- **Filing of Plan of Reorganization.** In September 2003, the Court provided marching orders to work out a consensual plan of reorganization. On March 24, 2004, the Court warned the Debtors, *"I'm getting to the point where if I don't lift exclusivity, I'm going to appoint a trustee....But, this has gone on too long, with too little progress."*[2] The Debtors responded by filing a nonconsensual Plan that

---

[2]    See, March 22, 2004 hearing transcript (Docket No. 5374) at 48.

6

MIAMI 896343.2  7481715554

(a) seeks to treat the claims of holders of asbestos property damage claims ("PD Claims") and other asbestos creditors as unimpaired and thus disenfranchising such claimants from the right to vote on the Plan, whether under sections 1126 and 1129(a)(7) or 524(g); (b) seeks to arbitrarily cap the Debtors' liability for PD Claims and other asbestos claims despite the requirements of section 524(g) that the Debtors must fund the 524(g) trust so that it can pay the liquidated values of all asbestos claims in full; and (c) fails to comply with section 524(g)(2)(B)(i)(III), which requires that the 524(g) trust be entitled to own a majority of the voting shares of each of the Debtors, the parent of the Debtors or a subsidiary of each such Debtor that is also a Debtor. The Debtors cannot receive any credit for filing a patently unconfirmable Plan that seeks to disenfranchise its largest creditor constituency—the asbestos creditors—from participating in the plan process. As a result, the Court should not grant an extension of the Exclusive Periods.

- **The Estimations.** With respect to the PD Estimation, to date the Debtors have been unable to provide a proposed case management order to the PD Committee. The Debtors desire, however, to turn the PD Estimation into a farcical science trial by litigating the harmfulness of each of the Debtors' approximately twenty asbestos containing products installed in buildings during much of the last century. The Debtors' efforts to litigate science issues contravene twenty years of decisions by trial and appellate courts around the country (beginning with Greenville City Hall, 827 F.2d 975 (4th Cir. 1987)). Despite repeated motions in limine and numerous trials, the PD Committee is unaware of a single U.S. case in

7

which the Debtors won, as a matter of law, on a science issue. Simply put, court decisions finding the Debtors' products to be harmful have remained undisturbed for twenty years. Indeed, if the Debtors' asbestos products are not harmful, it defies logic why the Debtors spent approximately $700 million to settle PD Claims. Furthermore, after over four years, the Debtors only recently filed their Motion to Approve PI CMO and Questionnaire (the "<u>PI CMO Motion</u>") (Docket No. 8394).[3]  The Debtors propose nearly two years' worth of discovery and motion practice before the Court holds an evidentiary hearing on the PI Estimation in 2007 (over <u>six years</u> after the Petition Date!). The Debtors also seek to exclude pursuant to FED. R. EVID. 408 the Debtors' asbestos settlement history from the PI Estimation, notwithstanding that courts customarily admit into evidence a debtor's asbestos settlement history.[4]  Not surprisingly, the Debtors recently filed a motion to extend the objection deadline to the PI CMO Motion, given the expected lengthy and detailed objections that will be filed in response thereto.[5]  For these reasons as well, the Court should not extend the Exclusive Periods.

---

[3]     The Debtors originally filed a motion for case management order within the first two months of these cases.
[4]     See, e.g., <u>Owens Corning v. Credit Suisse First Boston</u>, 322 B.R. 719, 722 (D. Del. 2005)(court utilized debtors' pre-petition asbestos settlement history to estimate the debtors' current and future asbestos liability). The court in <u>In re Babcock & Wilcox Co.</u>, 274 B.R. 230 (Bankr. E.D. La. 2002), rejected the notion that a debtor's asbestos settlement history is inadmissible under FED. R. EVID. 408 for purposes of estimating a debtor's asbestos liability in the context of a solvency dispute. Significantly, the Debtors are represented by the same lead bankruptcy counsel who represents the Babcock & Wilcox debtors. The PD Committee raises the Debtors' Rule 408 argument here merely to demonstrate the Debtors' intent on raising meritless arguments for purposes of creating discord among the creditor constituencies. The PD Committee is not opining as to the weight the Court should or should not accord to the Debtors' asbestos personal injury settlement history. The PD Committee reserves the right to take any position with respect to the weight accorded to the Debtors' personal injury settlement history in the PI Estimation.
[5]     The PD Committee regards evidence of the Debtors' asbestos property damage settlement history as a critical data point in the PD Estimation. As a result, the PD Committee will be objecting to any attempt by the Debtors to exclude settlement history pursuant to FED. R. EVID. 408.

8

- **Sealed Air Adversary Proceeding**. The Debtors cannot take any credit for the most significant aspect of these cases, the approximately $1.2 billion settlement of the <u>Sealed Air</u> fraudulent conveyance adversary proceeding. Incredulously, during the <u>Sealed Air</u> litigation, the Debtors sided with the defendants thereto and fought <u>against</u> the receipt of substantial recoveries to their own creditors. Ironically, though, under the Plan, virtually all of what might be paid to asbestos creditors results from the <u>Sealed Air</u> recovery! The Debtors' inexplicable tactics caused much delay and cost to the Debtors' estates, providing yet another reason to terminate exclusivity. The Debtors' insistence on denying this substantial source of recovery to the holders of PD Claims typifies the scorched earth tactics that these Debtors have employed from the very beginning of these cases with respect to their asbestos liabilities. The Debtors' scorched earth tactics have not advanced these cases in any material respect.

- **Compensation to Executives**. For the last four years, the Debtors have been fixated on enriching the upper echelons of management. The battles over executive compensation have only served to entrench management against the interests of their asbestos creditors. Soon after the filing of these cases, the Debtors sought and obtained approval of a $4.6 million General Retention Program for the period 2001-2002 to the Debtors' top executives. In 2002, the Debtors sought and obtained approval of a revised $6.7 million General Retention Program for the period 2003-2004. The Debtors also obtained approval of long term incentive compensation programs ("<u>LTIPs</u>") for these executives. Estimated payouts under LTIPs covering the years 2001-2003 and 2002-2004 totaled $23.6

9

million. The Debtors sought and obtained approval of hefty retention bonuses to the Debtors' former Chief Executive Officer, Paul J. Norris, entitling him to well over a million dollars. Upon Mr. Norris's resignation as the Debtors' CEO, the Debtors sought and received approval of an annual salary of $425,000 to Mr. Norris as a part-time consultant. The Debtors also sought and obtained approval of substantial retention and other bonuses for the Debtors' current CEO, Alfred E. Festa. Indeed, in addition to Mr. Festa's entitlement to annual bonuses totaling 100% of his base salary, Mr. Festa is expected to receive $1,690,000 through his participation in the 2005-2007 LTIP and in excess of an additional $1.5 million for remaining as CEO for three years while the Plan is on file. Most recently, the Debtors filed a motion seeking to pay $450,000 to their former General Counsel and Chief Restructuring Officer, David B. Siegel, who, like Mr. Norris, will receive $450,000 as a part-time consultant. If the Debtors devoted as much attention to satisfying their asbestos obligations as they devote to enriching management, these cases would be much further along. The Debtors, however, are simply unwilling to focus on satisfying PD Claims. For this reason as well, the Court should not extend the Exclusive Periods.

- **ZAI Litigation**. The Debtors have expended millions of dollars attempting to convince the Court that ZAI poses no harm to homeowners. All that has been accomplished in this regard is a hearing on competing motions for summary judgment. The Debtors' quixotic quest to likewise convince the Court through the PD Estimation that none of their approximately twenty asbestos containing products pose any harm ensures many years of litigation before this Court. A

10

divide-and-conquer approach is not the answer to a consensual resolution of these cases. To refocus these cases on a consensual track, the Motion must be denied.

- **Indictments/Civil Complaints**. In February 2005, Grace and several of its current and former senior executives, including Robert Bettacchi, president of Grace's construction products division and a senior vice president of Grace; O. Mario Favorito, chief group counsel and assistant secretary for Grace; and Alan R. Stringer, Grace's representative for the Environmental Protection Agency's (the "EPA") Superfund clean-up efforts, were indicted by a federal grand jury for misrepresenting to the Federal Government, industrial customers, workers and the public the asbestos dangers associated with the Debtors' vermiculite mine in Libby, Montana.[6] The federal indictment also related to the withholding of important information from the Federal Government in respect of asbestos contamination of ZAI, as well as Grace's misrepresentations to the EPA regarding ZAI in its efforts to escape public health warnings about ZAI. Additionally, on June 1, 2005, the New Jersey Attorney General filed a civil complaint against Grace and two former executives alleging that defendants falsified documents to state environmental authorities. These events warrant, at a minimum, the termination of exclusivity.

10. As demonstrated by the foregoing, the Debtors possess no incentive to forge a consensual plan of reorganization with exclusivity in hand. Rather, they remain steadfastly wedded to a Plan that was dead on arrival. The Debtors will continue to seek to divide and

---

[6]   Upon information and belief, Messrs. Bettacchi, Favorito and Stringer are on administrative leave pending the outcome of the criminal trial. The Debtors are advancing millions of dollars to the criminal defendants to fund

11

conquer their creditors by denying asbestos claimants any voice in the reorganization process and, as a consequence, these cases will fester indefinitely. Accordingly, now is the time to level the playing field and allow the parties-in-interest, who have waited all this time to move forward and receive payment on their claims, to file their own plan if they deem appropriate to do so. This will assure, at a minimum, fairness to the plan process, and, at best, a consensual resolution to these cases.[7]

## B.    Size And Complexity Alone Do Not Constitute "Cause"

11.    "Size and complexity alone cannot suffice as 'cause'" to extend exclusivity. In re Public Serv. Co. of N.H., 88 B.R. 521, 537 (Bankr. D. N.H. 1988). If that were so, a debtor in a large and complex case would automatically have a right to plan exclusivity throughout the proceedings, contrary to the rationale of section 1121. Id. Surely this is not the result Congress intended, especially as evidenced by revised section 1121(d).

12.    In the legislative history for section 1121, Congress stated, "if an unusually large company were to seek reorganization under Chapter 11, the Court would probably need to extend the time in order to allow the debtor to reach an agreement. If, on the other hand, a debtor delayed in arriving at an agreement, the court could . . . permit creditors to formulate and propose a reorganization plan." H.R. Rep. No. 595, 95th Cong., 1st Sess. 231, 232 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 9191. Legislative history makes it clear that Congress did not intend for all large complex cases to receive automatic extensions of exclusivity. The

---

their legal costs and expenses, subject to the defendants' undertaking to repay the funds in the event the defendants are found not to be entitled to the advanced funds.

[7]    Indeed, an inherent inequity exists in allowing the UCC and Equity Committee to co-propose the Plan with the Debtors while simultaneously denying other parties the ability to propose their own plan of reorganization.

12

Reform Act likewise clarifies Congressional intent on eliminating evergreen extensions of exclusivity.

13.     Size and complexity must be accompanied by other factors pertinent to the particular debtor to justify extension of plan exclusivity. <u>Public Serv. Co. of N.H.</u>, 88 B.R. at 537. The Court may deny an extension of exclusivity where although a company seeking reorganization is unusually large, the debtor has delayed in arriving at an agreement or is attempting to pressure other parties to yield to a position which is necessarily prejudicial. <u>In re Sharon Steel Corp.</u>, 78 B.R. 762, 765 (Bankr. W.D. Pa. 1987). The court in <u>Sharon Steel</u> denied the debtor's first request for an extension of exclusivity even though the case was very large and complex stating:

> The leverage accorded to the debtor by the period of exclusivity must give way to legitimate interests of other parties in interest so that progress toward an effective reorganization of the debtor may be enhanced before it is too late. The proceeding must be opened up to substantial and significant input by the creditors in the event they can propose a means (possibly by proposal of a plan of reorganization) which will rescue the debtor from its precarious posture.

<u>Id.</u> at 766.

14.     The current Plan is a pure leverage play. As stated, it offensively seeks to deny the holders of PD Claims and other asbestos claimants the right to vote on the Plan, while simultaneously seeking to cap recoveries to asbestos claimants based upon an arbitrary ceiling conjured by the Debtors.    The Debtors can no longer hide behind the vagaries of words like "large" and "complex" to receive for the eighth time an extension of the Exclusive Periods.

## C.     The Debtors Are Not Prejudiced If Exclusivity Ends

15.     Moreover, the Debtors will not suffer any prejudice if exclusivity ends. The Debtors may continue on their ill-advised path or propose another plan of reorganization. <u>See In</u>

13

re Mother Hubbard, Inc., 152 B.R. 189, 195 (Bankr. W.D. Mich. 1993). "By denying the extension, the Court does not prejudice the debtors' co-existent right, nor dilute the debtors' duty to file a plan. The other parties are simply allowed to protect their interests by coming forward with alternative plans or motions to dismiss." In re Southwest Oil Co. of Jourdanton, Inc., 84 B.R. 448, 454 (Bankr. W.D. Tex. 1987). The risk that while the Debtors are developing their plan, another party may file a plan, is a risk that Congress intended. Id. The fact that the Debtors may wish to prevent creditors from interfering with the Debtors' reorganization and proposal of a plan is not cause within the meaning of section 1121(d). See In re Parker Street Florist & Garden Ctr., Inc., 31 B.R. 206, 207 (Bankr. D. Mass. 1983)(debtor cannot use exclusivity as tactical weapon to pressure creditors to yield to unsatisfactory plan). There is no negative effect on the Debtors from denial of an extension of exclusivity. Id.

16.     In fact, it is beneficial to the Debtors, their estates and all creditors if others are allowed to propose plans, especially under the circumstances present here where the Debtors seek to deny any vote to holders of PD Claims and other asbestos creditors. "The ability of a creditor to compare the debtor's proposals against other possibilities is a powerful tool by which to judge the reasonableness of the proposals." Century Glove, Inc., 860 F.2d at 102; see also In re Mother Hubbard, Inc., 152 B.R. at 195 (stating that the possibility that other parties in interest may file competing plans may motivate the debtors to more earnestly negotiate an acceptable consensual plan).

17.     Here, if the Exclusive Periods are extended for the eighth time, the holders of PD Claims will continue to be powerless to a plan process specifically engineered to deny any voice to the holders of PD Claims and other asbestos creditors. The Court (and the Debtors' creditors) deserves more. The only possibility of turning the trajectory of these cases away from the

14

MIAMI 896343.2 7481715554

Debtors' scorched earth approach to one of consensus is to terminate exclusivity. In short, the Court must allow for the democratization of the plan process. The only way to democratize the process is by terminating exclusivity. A further extension of the Exclusive Periods will not accomplish this result but would have the contrary effect, as evidenced to date. The relief requested herein is both appropriate and in the best interests of the Debtors' estates and all of its creditors and, therefore, no "cause" exists to extend the Exclusive Periods for the eighth time. Only by eliminating the Exclusive Periods will the holders of PD Claims, and other creditors of the Debtors, be placed on an equal footing in the plan process, a condition precedent to exiting these long-standing cases.

## CONCLUSION

**WHEREFORE**, the PD Committee respectfully requests that this Court: (a) deny the Debtors' request for an eighth extension of the Exclusive Periods; and (b) provide the PD Committee with such other and further relief as is just and proper.

Dated:    Wilmington, Delaware
          June 10, 2005

                          Respectfully submitted,

                          Scott L. Baena (Admitted Pro Hac Vice)
                          Jay M. Sakalo (Admitted Pro Hac Vice)
                          Matthew I. Kramer (Pro Hac Vice Pending)
                          BILZIN SUMBERG BAENA
                          PRICE & AXELROD LLP
                          200 South Biscayne Boulevard
                          Suite 2500
                          Miami, Florida 33131-2336
                          Telephone: (305) 374-7580

                          -and-

15

FERRY, JOSEPH  & PEARCE, P.A.

/s/ Theodore J. Tacconelli
Theodore J. Tacconelli (No. 2678)
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, Delaware  19899
Telephone:  (302) 575-1555

CO-COUNSEL FOR THE OFFICIAL
COMMITTEE OF ASBESTOS PROPERTY
DAMAGE CLAIMANTS

MIAMI 896343.2  7481715554