IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x
In re:                                        :    Chapter 11
                                              :    Case No. 01-01139(JKF)
                                              :
W. R. GRACE & CO., et al.,                    :    Jointly Administered
                                              :
                        Debtors.              :
------------------------------------------------------------- x    Hearing Date: August 17, 2004 at 9:00 a.m.

**RESPONSE OF OFFICIAL COMMITTEE OF EQUITY
SECURITY HOLDERS TO W.R. GRACE & CO.'S MOTION
TO APPROVE PI CMO AND QUESTIONNAIRE (Dkt. No. 8394)**

The Official Committee (the "Equity Committee") of Equity Security Holders of W.R. Grace & Co. ("Grace") submits this response to *W.R. Grace & Co.'s Motion to Approve PI CMO and Questionnaire* dated May 10, 2005 (the "CMO Motion"), to raise a discrete issue relating to the process for valuing asbestos personal injury claims. Specifically, the Equity Committee respectfully submits that the Court must ensure that there are sufficient consequences to those asbestos personal injury claimants who fail or refuse to complete and return the proposed questionnaire so as to avoid the upward sample bias that would result if the tort claimants and their counsel were allowed to "pick and choose" which claimants provided the requested information. For the reasons set forth below, we believe the Court should put claimants on notice now that (i) it will permit the Debtors' (and others') asbestos estimation experts to assign a zero value to claims for which no questionnaire is returned, and (ii) appropriate sanctions may subsequently be imposed on those claimants who fail to complete and return the questionnaire.

KL3:2425132.4

## BACKGROUND

As Grace has explained well in the CMO Motion and associated Memorandum of Points and Authorities, any estimation of the total present and future asbestos personal injury liabilities that is based on extrapolation from pre-petition settlement history would vastly overstate Grace's aggregate liabilities. That is so because Grace, like other asbestos defendants, faced a surge of claims supported neither in law nor fact and, in a futile effort to put its asbestos liabilities behind it, settled thousands of such claims for far more than their legitimate values. Many of the factors that led to these inflated claims and inflated settlements are discussed in Grace's papers and have been widely recognized, including recently by Judge Fullam in the Owens Corning case. *See Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 723-24 (D.Del. 2005)[1].

Pre-petition history is thus an entirely unreliable predicate for estimating Grace's asbestos liabilities. The Equity Committee believes that Grace has proposed the *only* realistic solution to this problem, by seeking to require all asbestos personal injury claimants who have already filed lawsuits to complete and return a questionnaire setting out the basic facts and evidence supporting their claims. The data thereby gathered would enable qualified estimation experts to draw reasoned conclusions about the total number of present and future valid claims against Grace. However, those inferences would *only* be valid if the data is not tainted by sampling bias; in other words, the questionnaire responses must at least roughly representative of the entire universe of

---

[1] The factors noted by Judge Fullam include intensive marketing efforts by plaintiffs' lawyers, venue shopping by plaintiffs' lawyers, mass asbestos screenings by persons with suspect motives, suspect radiography interpretations by "B-readers," and tactics employed by plaintiffs' lawyers to group meritorious and non-meritorious claims for trial. *Id.*

KL3:2425132.4

claimants.[2] If filling out the questionnaire were entirely voluntary, the tort claimants' counsel would undoubtedly "pick and choose," causing only the claimants with actual verifiable impairments to respond, thereby vitiating the integrity of the entire questionnaire process.

The Equity Committee agrees with Grace that the best way to prevent such an outcome would be to impose a bar date for individuals who have already filed lawsuits against Grace but fail to return completed questionnaires. We understand, however, that the Court is disinclined to take that step.[3] In the absence of a bar date, it is essential that the Court establish alternative means of ensuring that claimants comply with the questionnaire process or, at the very least, that appropriate inferences be drawn from their failure to do so.

## ARGUMENT

The development of a database of legally and factually valid claims depends upon compliance by the asbestos personal injury claimants who, prior to the petition, filed lawsuits against Grace. To the extent the information obtained by the questionnaire process is flawed, incomplete, or unrepresentative of the entire universe of claimants, the database will be unreliable.

Presumably, the asbestos personal injury lawyers who filed lawsuits against Grace performed proper due diligence to determine the validity of their clients' claims *before*

---

[2] In fact, it is unavoidable that the questionnaire procedure will suffer from at least some bias towards stronger claims, because the questionnaires are limited to individuals who, prior to the bankruptcy petition, already deemed their claims strong enough to take the affirmative step of initiating lawsuits – knowing that by doing so they were representing to the various courts that their claims were supportable, and knowing that they would be subject to discovery to investigate those claims.

[3] Grace has proposed that such a procedure be used only to establish a database for estimation of asbestos personal injury claims as a whole, and that it not result in the adjudication of any particular claim.

KL3:2425132.4

filing them, which diligence would have included gathering documents, medical records and work histories sufficient to support a colorable claim. Responding to the proposed Grace questionnaire should therefore be a simple matter of transferring the information to the questionnaire form, attaching records and documents, and returning the form to Grace. Indeed, completing the questionnaire would be far less onerous than the discovery that these asbestos claimants must have expected they would be subjecting themselves to -- including depositions and extensive document production – when they filed their complaints. There is therefore no *legitimate* reason why such a claimant would fail to complete the questionnaire.

However, absent sanctions or other appropriate consequences, asbestos claimants with deficient claims have an overwhelming *tactical* incentive not to comply. For such deficient claimants, filling out a questionnaire could only have two potential consequences, both undesirable from the claimant's point of view: (1) the questionnaire could be used as a basis to deny their claim at some later date, in connection with whatever claim procedure is ultimately adopted, and (2) the weakness of the claim would result in a lower estimation of total asbestos liabilities. If failing to fill out a claim has no negative consequences, these individuals will presumably be advised by their counsel to throw their questionnaires in the garbage. At the same time, individuals able to support their claims would have strong incentives to do so.

If these are the incentives, it makes no sense to assume that non-respondents have the same characteristics as the respondent population, and it would make no sense to extrapolate from the universe of responding claimants alone. Any calculation that did so

---

We believe that this limitation of the consequences of the proposed bar order eliminates any due process concerns raised by the asbestos personal injury lawyers.

-4-

would dramatically overstate the number of strong claims and, as a result, the estimation of total asbestos liability. To avoid that result and obtain an accurate estimation, the only sensible inference to draw from a claimant's failure to fill out a questionnaire is that the claimant *cannot* produce evidence of a legally and factually valid claim.

As a very simplified example, suppose that out of approximately 1000 identified claimants, only 200 return the questionnaires. Those 200 presumably would be individuals who believed they had at least potentially viable claims. After testing those 200 in the manner approved by the Court, assume that only 100 are found to have legally and factually valid claims. If the respondents were representative of the entire universe, these results would lead one to conclude that 50% of all asserted claims are legally supportable. But that conclusion would make no sense, because it is obvious that the 800 individuals who failed to respond may have done so because they were unable to produce sufficient evidence to support their claims. Drawing the appropriate inference from their silence, the appropriate conclusion is that only 10% -- not 50% -- of the asserted claims are valid.

Because invalidity is the logical inference from failure to complete a questionnaire, it is in the interests of all concerned – including the asbestos claimants – that measures be implemented to enforce compliance with the questionnaire. As Grace sets out in its CMO Motion, and as this Court recognized during the omnibus hearing on June 27, 2005, the asbestos personal injury plaintiffs to whom questionnaires will be sent have filed lawsuits against Grace and are therefore subject to discovery, whether in the underlying case or in a claims objection filed by Grace or any other party. The questionnaire simply avoids the need to file one thousand separate document requests and

interrogatories, with the associated cost and expense of discovery disputes in each case. Under Fed. R. Bankr. P. 7037, the penalty for failure to respond to discovery can include a dismissal of the action, or, in the context of a claim objection, an order sustaining the objection and expunging the claim. To enforce compliance, the Court could order that the claim of any person who fails to respond will be expunged.

Of course, such a measure would have the same practical consequences as imposing a bar date, which we understand the Court is reluctant to do. If the Court believes a bar date is inappropriate, the Equity Committee submits that it is imperative that the Court at least take appropriate steps to put asbestos claimants on notice now – before the deadline for responding to the questionnaire – of the potential consequences of failure to respond:

a.     Most important, the Court should issue an order making it clear that, *for purposes of asbestos claims estimation only*, non-respondents will be deemed not to possess valid claims. By thus making clear what we believe to be true in any event, the Court will ensure that the asbestos claimants, both individually and as a group, are aware of the natural consequences of failing to cooperate with the questionnaire procedure.

b.     In addition, the Court could further advance the goal of obtaining meaningful questionnaire data by notifying claimants now that sanctions may subsequently be imposed on non-responding claimants. Specifically, the Court could authorize that notice be given now that, as to any claimant who fails to respond to the questionnaire, the Debtors may subsequently seek appropriate sanctions (potentially including dismissal of the claims of non-responding claimants), and the Court may or may not grant such sanctions. By entering such an order, the Court would retain control

over the ultimate determination of what sanctions, if any, are appropriate, while at the same time giving claimants an appropriate incentive to provide full and complete responses to the questionnaire, thereby preserving the integrity of the process.

## CONCLUSION

The Equity Committee submits that the solution suggested above is fair to all constituencies in this case. It does not punish asbestos personal injury claimants who have valid, or even colorable, claims. It also does not punish the non-asbestos constituencies by saddling them with an asbestos claims database skewed by the omission of large numbers of non-respondents without valid claims. For this reason, the Equity Committee requests that the Order approving the PI CMO contain provisions ensuring that claimants are put on notice that (i) non-respondent claims will be treated as having zero value for purposes of asbestos claims estimation, and (ii) sanctions may subsequently be imposed on those claimants who fail to respond.

Dated:  June 30, 2004

                              Respectfully submitted,

                              KLETT ROONEY LIEBER &
                                  SCHORLING

                              By:  /s/ Teresa K.D. Currier
                              Teresa K. D. Currier (ID No. 3080)
                              The Brandywine Building
                              1000 West Street, Suite 1410
                              Wilmington, Delaware  19801
                              Telephone:  (302) 552-4200
                              Facsimile:  (302) 552-4295

                                        - and -

                              KRAMER LEVIN NAFTALIS &
                                  FRANKEL LLP
                                Philip Bentley
                                Gregory Horowitz
                                Gary M. Becker
                              919 Third Avenue
                              New York, New York  10022
                              Telephone:  (212) 715-9100
                              Facsimile:  (212) 715-8000

                              Attorneys for the Official Committee of
                              Equity Security Holders

KL3:2425132.4