IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| | ) Case No. 01-1139 (JKF) |
| **W.R. GRACE & CO., et al.** | ) (Jointly Administered) |
| | ) |
| Debtors. | ) Related Docket Nos. 8394, 8395, 8396 |
| | ) |

## FUTURE CLAIMANTS REPRESENTATIVE'S OBJECTION TO DEBTORS' MOTION TO APPROVE PI CMO AND QUESTIONNAIRE

David T. Austern, the legal representative for future asbestos claimants (the "Future Claimants Representative") appointed by this Court in the above-captioned Chapter 11 cases, by counsel, objects[1] to Debtors' Motion to Approve PI CMO and Questionnaire [Doc No. 8394] (the "CMO and Questionnaire Motion").[2]

### PRELIMINARY STATEMENT

The CMO and Questionnaire Motion was designed to realize Debtors' liability cap strategy by disenfranchising and disallowing Asbestos PI Claims outside of a claims allowance process. By attempting to eliminate or reduce present claims, Debtors are attempting to unfairly limit their liability for future claims because as Debtors know any estimation of future claims would be extrapolated from historical and present claims. This improper solution to Debtors' asbestos liability will largely be borne by the future Asbestos Claimants. This is contrary to the intent, purpose and proper use of a §524 channeling injunction which clearly contemplates that

---

[1] By Order of the Court [Doc. No. 8589], the time for parties to object to Debtors' Motion to Approve PI CMO and Questionnaire was extended until Thursday, June 30, 2005. During the June 27, 2005 hearing, the Court ordered the parties to meet during the week of July 5th to discuss the form of a case management order and questionnaire.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Glossary of Terms Used in Plan Documents, filed by Debtors on January 13, 2005 [Doc. No. 7561].

any Asbestos Trust be sufficiently funded, and that the Plan and Asbestos Trust incorporate adequate protections to preserve the rights of future Asbestos PI Claimants.

As a preliminary matter, the Future Claimants Representative notes that, despite the Court's direction on January 21, 2005, Debtors did not negotiate the proposed case management order (the "CMO") or the proposed questionnaire (the "Questionnaire") with the Asbestos PI Committee and/or the Future Claimants Representative before filing the CMO and Questionnaire Motion. Although there were discussions among the parties, there was no give and take. Instead, Debtors ignored the suggestions of the Future Claimants Representative and the Asbestos PI Committee. If any serious progress is going to be made in this case, Debtors' stonewall tactics must end.

The Future Claimants Representative believes it is in the best interests of all parties to move this case along as expeditiously as possible to preserve the estate. There is no question that the estimation of asbestos personal injury claims against Debtors will be critical to the plan confirmation process in these cases. There also is no question that a case management order and a reasonable mechanism for obtaining discovery from Asbestos PI Claimants would be helpful in managing any estimation proceeding.

Estimation, however, is not the appropriate procedural device for barring Asbestos PI Claimants from ever asserting claims against Debtors. The purpose of estimation should be to approximate Debtors' asbestos liability, which, in turn, should be the basis for a hearing on whether a plan of reorganization is fair and equitable. A determination of whether a plan is fair and equitable requires consideration of several factors, not just the amount of money Debtors propose placing in a trust. For a simplistic example, consider the following scenarios: (1) a debtor places $1.5 billion in a Section 524(g) trust, which will pay asbestos claims at a rate of

50%, and equity holders would retain all of their interests; versus (2) a debtor places $2 billion in a Section 524(g) trust, as well as some portion of the equity interests in the reorganized debtor, which would pay asbestos claims at a rate higher than 50%, and equity holders would retain a smaller percentage (or none) of their interests. Cash contributions and equity in a reorganized debtor are just two of many factors that could be considered in determining whether channeling future asbestos claims to a Section 524(g) trust is fair and equitable "in light of the benefits provided, or to be provided, to such trust." 11 U.S.C. § 524(g)(4)(B)(ii).

The CMO and Questionnaire Motion departs from well-established norms for estimation, including the District Court's recent estimation decision in the Owens Corning case.[3] Debtors improperly propose to estimate Asbestos PI Claims for distribution purposes, without appropriate procedural safeguards and in a manner that caps Debtors' aggregate asbestos liability. If a cap is to be imposed, any estimation should be conservative (on the high side) to protect future claimants. Further, the starting point for any estimation of Debtors' asbestos liability should be Debtors' pre-bankruptcy experience in the tort system.

Although the Court has stated that a questionnaire could be used as a discovery tool in connection with an estimation proceeding, the CMO and Questionnaire Motion is much more than a discovery mechanism. The burdensome Questionnaire is designed to eliminate claims since it would constitute an evidentiary barrier over which Asbestos PI Claimants must climb before their claim can be estimated and capped as part of Debtors' aggregate asbestos liability. Similarly, the CMO creates unnecessary procedural hurdles for Asbestos PI Claimants. The Future Claimants Representative is not opposed to a reasonable questionnaire and case management order, if appropriate procedural safeguards are put in place. But the CMO and

---

[3] Owens Corning v. Credit Suisse First Boston, 322 B.R. 719 (D. Del. 2005).

Questionnaire Motion does not contain any details or protocols regarding the estimation litigation. It is clear that Debtors want the benefits of a claims objection process without any of the procedural safeguards that would protect claimants.

There is a remarkable difference between the <u>Owens Corning</u> model for estimation in an asbestos case, in which experts consider various factors in arriving at an estimation opinion, and Debtors' proposal, which asks the Court to preclude claimants who fail Debtors' tests from *ever* asserting a claim against Debtors. There is an even greater difference between estimating for purposes of determining that a Section 524(g) trust will have sufficient assets to treat present and future claims in a substantially similar manner and that channeling future claims to such a trust would be fair and equitable, and estimating for purposes of capping Debtors' asbestos liability.

Accordingly, the Future Claimants Representative respectfully requests that the Court deny the CMO and Questionnaire Motion. Going forward, this Court should permit the distribution of a "user-friendly" questionnaire that could be used as discovery in any estimation proceeding, but otherwise require an expedited schedule for briefing and expert reports.[4]

## I.    BACKGROUND

On April 2, 2001, each of the Debtors filed a petition for relief under chapter 11 of the Bankruptcy Code.

By Order dated May 24, 2004, the Court appointed the Future Claimants Representative under Section 524(g) of the Bankruptcy Code to serve as the legal representative for future asbestos claimants.

On November 13, 2004, Debtors filed, among other things, a disclosure statement and Debtors' Plan of Reorganization. Debtors also filed the Second CMO Motion, Debtors' Motion

---

[4] If the parties are unable to agree, the Future Claimants Representative expects to file with the Court by the July 13, 2005 deadline a proposed case management order and questionnaire.

for Entry of an Order Seeking the Estimation of Asbestos Claims and Certain Related Relief (the
"Estimation Motion") and Debtors' Motion for the Entry of an Order Approving Solicitation and
Confirmation Procedures and Schedule [Doc. Nos. 6898, 6899, 6900] (collectively, the "Plan
Related Motions").

On December 22, 2004, the Future Claimants Representative filed a consolidated
objection to the disclosure statement and the Plan Related Motions [Doc. No. 7340], arguing,
among other things, that Debtors' Plan of Reorganization is patently unconfirmable.

On January 13, 2005, Debtors filed an amended disclosure statement and an Amended
Joint Plan of Reorganization (the "Plan"), which did nothing to address the Future Claimants
Representative's concerns about the Plan being unconfirmable as a matter of law.[5]

On January 21, 2005, a hearing was held on the Estimation Motion. During the hearing,
the Court indicated that a questionnaire could be used by Debtors as a discovery device. See Jan.
21, 2005 Hr'g Tr., at p. 132 ("It seems to me that if the debtor thinks that it has some value to do
a questionnaire, . . . [as a] form of discovery, I think . . . we could treat it as though it's a series of
interrogatories.").

Also, during the January 21, 2005 hearing, the Court ordered the Asbestos Personal
Injury Committee, the Future Claimants Representative, and Debtors to negotiate a case
management order to govern the estimation of Asbestos PI Claims. Although there were
discussions among Debtors, the Asbestos PI Committee, and the Future Claimants

---

[5] Debtors' current Plan contains a cap of approximately $1.7 billion for Asbestos Claims. Debtors have been trying
for years to find a way to reduce their asbestos liability. By proposing to litigate the merits of Asbestos PI Claims,
the CMO and Questionnaire Motion is just another attempt by Debtors to establish a liability filter. Debtors appear
to have arbitrarily picked $1.7 billion as their cap for asbestos liability.

Representative regarding a case management order, Debtors refused to change their proposed CMO and Questionnaire.[6]

On May 10, 2005, Debtors filed the CMO and Questionnaire Motion [Doc. No. 8394] with an accompanying memorandum in support thereof [Doc. No. 8395] (the "Memorandum"). In the Memorandum, Debtors admit that there was no give and take by Debtors: "after considerable negotiation, the Asbestos PI Committee and the FCR remain unwilling to agree to the Debtors' Questionnaire." Memorandum, Tab 1, at p. 3.

The CMO and Questionnaire Motion seeks the entry of the CMO, which would approve, among other things, the form of a Questionnaire to be mailed to counsel of record for all holders of Asbestos PI Claims for which litigation was commenced prior to the Petition Date. The effect of the CMO and Questionnaire Motion is to estimate Asbestos PI Claims, apparently including future Asbestos PI Claims, for all purposes, including for purposes of distribution.

Although the CMO and Questionnaire Motion and the Memorandum span nearly 80 pages (without exhibits), it is not clear what use Debtors ultimately will make of the Questionnaire. From the CMO and Questionnaire Motion, it is clear that Debtors wish to use the Questionnaire in pre-confirmation estimation litigation. However, the Second CMO Motion and the Plan reference an Asbestos PI Questionnaire to be used in connection with post-confirmation claims allowance litigation. Debtors fail to explain whether the Questionnaire would be used in connection with the Second CMO Motion or whether a second round of questionnaires would be sent to Asbestos Claimants.

Debtors' intent to use the CMO and Questionnaire as a liability filter for present claims, which would affect future claims, only becomes clear upon a review of the proposed CMO. The

---

[6] On June 26th, the Court once again ordered the parties to confer.

proposed CMO states that any Asbestos PI Claimant who fails to complete a Questionnaire would be "forever barred, estopped and enjoined from asserting any such Claims (or filing a subsequent Proof of Claim and/or Questionnaire with respect to such Claims) . . . ." CMO and Questionnaire Motion at Exhibit A, Proposed CMO ¶ 3. Further, the CMO would reserve for Debtors the right to disallow claims in their discretion if any Asbestos PI Claimant "fails to comply with the terms of this Order or the discovery requests . . . made in connection with the Asbestos PI Estimating Hearing." CMO and Questionnaire Motion at Exhibit A, Proposed CMO ¶ 5. Interestingly, there is no mention of the disallowance of claims in the CMO and Questionnaire Motion or the Memorandum. In fact, this Court has said it will not impose a bar date for asbestos claims.

The Future Claimants Representative does not believe an estimation proceeding is the appropriate procedural mechanism for barring Asbestos PI Claimants from asserting claims against Debtors. Estimation is an approximation, not a precise valuation of each claim. Owens Corning, 322 B.R. at 725 ("[S]ince mathematical precision cannot be achieved in the prediction being undertaken, it is important that we not pretend to have achieved mathematical accuracy.").

## II.    ARGUMENT

### A.    Debtors improperly propose to estimate Asbestos PI Claims for all purposes, including distribution, without appropriate procedural safeguards and in a manner that improperly caps Debtors' aggregate asbestos liability.

Debtors continue to seek an estimation of Asbestos PI Claims for distribution purposes, i.e., to cap their asbestos liability. By artificially setting the amount of their asbestos liability at approximately $1.7 billion, Debtors are trying to protect the interests of their shareholders.[7]

---

[7] On April 14, 2005, in connection with discovery on Debtors' Motion for an Order Authorizing the Debtors to Enter Into (A) An Employment Agreement With Its Current Chief Operating Officer Under Which He Would Assume the Position of Chief Executive Officer of the Debtors ("CEO") and (B) A Post-Retirement Agreement with the Current CEO Whereby He Would Provide Consulting Services Related to Debtors' Chapter 11 Cases [Doc. No. 7753], counsel for the Asbestos PD Committee deposed Thomas A. Vanderslice, the Lead Independent Director of

Debtors also are trying to use estimation to back into their aggregate cap and their position that Asbestos PI Claims are unimpaired. But nothing in Section 524(g) requires an aggregate cap on Debtors' asbestos liability. Moreover, Section 502(c) is not a proper vehicle for estimating future Asbestos PI Claims.[8]

Debtors' asbestos liabilities are what they are. The Court may need to approximate Debtors' asbestos liabilities for confirmation purposes, but any estimation should not be binding for all purposes without appropriate procedural safeguards. Debtors' motion improperly contemplates an "evidence-based" proceeding that would fix Debtors' asbestos liability in the aggregate without protecting the rights of present and future claimants. The merits of Asbestos PI Claims should not be litigated outside a normal claims objection/allowance process, which would protect the due process and other rights of claimants. The CMO and Questionnaire Motion seeks to litigate the merits of claims in the aggregate without describing any details or protocols regarding the proposed estimation litigation.

---

Debtors' board. When asked about Debtors' Plan, Mr. Vanderslice stated: "Well, I think in my opinion it's going to be difficult for all the various creditors to get together. You're all trying to screw each other in the process. You know how it goes. So it's going to be difficult. I think in my opinion the company has put together some reasonable proposals. But greed is a tough thing in these negotiations." Vanderslice Depo. Tr. at p. 73, lines 16-22 and p. 74, line 1.

[8] Section 502(c) provides for the estimation of "any contingent or unliquidated claim." 11 U.S.C. § 502(c)(1) (emphasis added). Future Asbestos Claims are not "claims," but are "demands," under the Bankruptcy Code. See 11 U.S.C. §§ 101(5) and 524(g)(5). Neither Section 502(c) nor any other provision in the Bankruptcy Code authorizes the estimation of "demands" for distribution purposes. The Supreme Court has stated that when the language of the Bankruptcy Code is clear and unambiguous, the plain meaning controls issues of statutory interpretation. See Ron Pair Enters., Inc., 489 U.S. at 240-41 ("[A]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute.") (citing Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571 (1982) ("There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes.")).

The only means in the Bankruptcy Code for addressing future asbestos-related liabilities is through Section 524(g). See Findley v. Falise (In re E&S Dist. Asbestos Litig.), 878 F. Supp 473, 571 (E.D.N.Y. and S.D.N.Y. 1995), aff'd in part, vacated in part, 78 F.3d 764 (2d Cir. 1996) (explaining how debtors who seek to resolve future asbestos liability must qualify for an injunction under Section 524(g)). In the context of a proposed confirmable plan, anticipated "demands" would be considered in connection with the "fair and equitable" findings required in order to confirm a plan under Section 524(g). See Section II.B.3. below.

In addition, Debtors do not explain whether they would incorporate into any estimation proceeding the litigation protocols proposed in the Original CMO Motion or the Second CMO Motion, or how, if at all, the CMO and Questionnaire Motion fits with Debtors' prior CMO proposals.  On June 27, 2001, Debtors filed an "Original CMO Motion" [Doc. No. 586, as modified and amended by Doc. Nos. 2275 and 2581].  The Original CMO Motion sought to establish pre-confirmation litigation protocols.  Because the Original CMO Motion languished at the District Court, on November 13, 2004, Debtors filed a "Second CMO Motion" [Doc. No. 6898], which is currently pending before this Court.  The Second CMO Motion, however, is different from the Original CMO Motion, as it seeks to establish post-confirmation litigation protocols.[9]

It is unclear whether the CMO and Questionnaire Motion is essentially a "Third CMO Motion," or whether it is a subset of the Original CMO Motion or the Second CMO Motion.  For example, from the CMO and Questionnaire Motion and the Memorandum, it appears that Debtors would like to use the Questionnaire in pre-confirmation litigation, which would suggest that the matter is a subset of the Original CMO Motion.  However, the Second CMO Motion specifically references the use of an Asbestos PI Questionnaire in connection with the liquidation of Asbestos PI Claims after confirmation, which would suggest the CMO and Questionnaire Motion is a subset of the Second CMO Motion.  Then again, because Debtors do not explain the use of the CMO and the Questionnaire, and the motion does not contain any details regarding litigation protocols or methodology for estimation, the CMO and Questionnaire Motion could also be a "Third CMO Motion."

Regardless, the lack of details concerning Debtors' intended use of the Questionnaire is

---

[9] Given that the Original CMO Motion was filed prior to the appointment of the Future Claimants Representative, he could not object to that motion.  The Future Claimants Representative objected to the Second CMO Motion.

reason alone to deny the CMO and Questionnaire Motion. Respectfully, the Court should not authorize what would be an expensive and one-sided procedure without a detailed explanation from Debtors as to what they intend to do with the information from the Questionnaire. Further, any case management order should limit the use of a questionnaire to estimation purposes, and not for purposes of precluding claims. Approving the CMO and Questionnaire Motion would likely result in further litigation and delay.

1.    **A determination under Section 524(g) in connection with confirmation that the Plan is fair and equitable does not require a cap on Debtors' liability for Asbestos Claims.**

Section 524(g) requires that the Court determine, in connection with a channeling injunction and before entering a confirmation order, that the injunction(s) to be issued to protect parties under a plan with respect to demands is fair and equitable with respect to the persons that might subsequently assert such demands, in light of the benefits provided to the plan trust on behalf of the protected parties. 11 U.S.C. § 524(g)(4)(B)(ii). The Court also must find that pursuit of future Asbestos Claims outside of a Section 524(g) plan is likely to threaten such plan's purpose to deal equitably with claims and future demands. 11 U.S.C. § 524(g)(2)(B)(ii)(III).

There is nothing in Section 524(g) that requires, in connection with such fair and equitable findings, that the Court estimate or cap Debtors' asbestos-related liability. On the contrary, to confirm the Plan the Court must find that the actual amounts, numbers and timing of future demands cannot be determined. 11 U.S.C. § 524(g)(2)(B)(ii)(II). If the Court finds it necessary to estimate future Asbestos Claims to assist in determining whether the Plan is fair and equitable, such an estimation should not be final for distribution purposes. This is particularly so where, as here, equity holders are retaining their interests. See 11 U.S.C. §§ 524(g)(2)(B)(II) (asbestos trust is to be funded by securities of a debtor and obligation of a debtor to make future

payments, including dividends) and 1129(b)(2)(B)(ii) (absolute priority rule precludes equity from retaining their interests unless unsecured claims are paid in full).

Future Asbestos Claimants bear most of the risk of any Section 524(g) trust being underfunded. Thus, it is crucial that any estimation proceeding lead to a fair and equitable plan, with a sufficiently funded trust, and that any trust and related plan incorporate adequate protections to preserve the rights of future Asbestos PI Claimants. Estimating Debtors' liability for Asbestos Claims for all purposes – that is, imposing an aggregate cap to limit Debtors' asbestos liability while permitting equity holders to retain their interests – is improper and prejudices the rights of future Asbestos PI Claimants.

> **2.     Section 502(c) should not be used to estimate present and future Asbestos Claims for distribution purposes without appropriate procedural safeguards.**

Section 502(c), by its express language, authorizes estimation of contingent or unliquidated claims for many purposes, including allowance. 11 U.S.C. § 502(c)(1). The primary application of the claims estimation process, however, is to estimate claims for voting and feasibility purposes when the fixing of contingent or unliquidated claims would otherwise delay administration of the case. 11 U.S.C. § 502(c); See, e.g., O'Neill v. Continental Airlines, Inc. (In re Continental Airlines, Inc.), 981 F.2d 1450, 1461 (5th Cir. 1993) (for estimation to be applicable, "a claim must be contingent or unliquidated and fixing the claim must entail undue delay in the administration of justice"); In re Nova Real Estate Inv. Trust, 23 B.R. 62, 66 (Bankr. E.D. Va. 1982) ("An estimate necessarily implies no certainty; it is not a finding or a fixing of an exact amount. It is merely the court's best estimate for the purpose of permitting the case to go forward and thus not unduly delay the matter."); In re MCorp Fin., Inc., 137 B.R. 219, 226 (Bankr. S.D. Tex. 1992), appeal dismissed and remanded on other grounds, 139 B.R. 820 (S.D. Tex. 1992) (refusing to permit estimation to be a binding cap for purposes of distribution).

Although Section 502(c) is silent as to the manner in which contingent or unliquidated claims are to be estimated, courts have very broad discretion to use "whatever method is best suited to the particular contingencies at issues." Bittner v. Borne Chem. Co., 691 F.2d 134, 135 (3d Cir. 1982). As a result, courts use a variety of procedures for estimating claims for purposes of voting and feasibility. See, e.g., In re Wallace Bookstores, Inc., 317 B.R. 720 (Bankr. E.D. Ky. 2004) (full blown evidentiary hearing); In re Baldwin-United Corp., 55 B.R. 885, 889 (Bankr. S.D. Ohio 1985) (summary jury trial); In re Lane, 68 B.R. 609, 613 (Bankr. D. Haw. 1986) (court reviewed pleadings and briefs and conducted a one-day hearing). The Third Circuit has recognized that, in certain cases, "arbitration or even a jury trial on all or some of the issues may be necessary to obtain a reasonably accurate estimation of claims." Kool, Mann, Coffee & Co. v. Coffey, 300 F.3d 340, 357 (3d Cir. 2002) (quoting Bittner, 691 F.2d at 135).

In certain circumstances, courts have found it necessary to estimate claims for allowance and distribution purposes, but only after ensuring that appropriate procedural safeguards inherent in traditional notions of due process were protected. See, e.g., NLRB v. Greyhound Lines, Inc. (In re Eagle Bus Mfg., Inc.), 158 B.R. 421, 437 (S.D. Tex. 1993) (court estimated claims but permitted parties to present seven hours of evidence and testimony and 165 trial exhibits); In re Poole Funeral Chapel, Inc., 63 B.R. 527, 532 (Bankr. N.D. Ala. 1986) (finding that for "counts sounding in tort, the plaintiffs are entitled to jury trials in some court for purposes of distribution. The bankruptcy court has the right and duty only to estimate these claims for the purposes of confirming a plan under Chapter 11, and that is a core proceeding."). In these instances, courts utilized more detailed procedures than those used to estimate for purposes of voting or feasibility. See, e.g., In re Wallace Bookstores, Inc., 317 B.R. 720 (Bankr. E.D. Ky. 2004) (when estimating for purposes of allowance, court will use a full-blown evidentiary hearing).

No procedural safeguards are proposed in the CMO and Questionnaire Motion. Instead, Debtors argue that the "methodology" of estimation need not be determined at this time. CMO and Questionnaire Motion, at p. 2. In seeking to cap their asbestos liability, however, Debtors intend to litigate the merits of all asbestos claims based on the Questionnaire. *Therefore, now is the time to protect claimants' due process and other procedural rights*.

The essence of a claimant's right to due process is the opportunity to prepare and present its case to the Court. See, e.g., Armstrong v. Manzo, 380 U.S. 545, 550 (1965) (quoting Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950)) ("Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case."). The opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." Armstrong, 380 U.S. at 552. See also OakFabco, Inc. v. Am. Std., Inc. (In re Kewanee Boiler Corp.), 297 B.R. 720, 730 (Bankr. N.D. Ill. 2003) ("The debtor in possession or trustee must ensure that 'parties in interest' must be given adequate notice and opportunity to be heard before their interests may be adversely affected.").

It should go without saying that requiring a claimant to complete a burdensome Questionnaire is not the same as permitting a claimant to present its case to a jury. A reasonable questionnaire could and should be crafted. Such a questionnaire should be used solely for estimating Debtors' aggregate asbestos liability, and not for barring claims.

Further, an estimation procedure should not preclude reconsideration of claims pursuant to Section 502(j). "If a plan proponent could cut off a claimant's right to a § 502(j) reconsideration, Congress' passage of that provision would be meaningless, and the result would

be in contravention of the legislative history on the estimation procedure." MCorp, 137 B.R. at 226 (finding that a plan, which proposed a cap on all contested claims, with estimates on such claims subject to downward revision only, could not be confirmed). "The estimation process may fulfill the allowance requirement for purposes of § 1129(a)(9), but will not set the outer limits of a claimants' right to recover. Rather, the ultimate allowance of the claim will set that right." Id. (citing In re MacDonald, 128 B.R. 161, 167-68 (Bankr. W.D. Tex. 1991)).

The Plan would impose an aggregate cap on Asbestos PI Claims. Thus, on an aggregate basis, the Plan terminates Asbestos PI Claimants' rights to any upward adjustment on reconsideration under Section 502(j). Even if the Plan were to specifically provide that the holder of a contested Asbestos Claim may seek reconsideration of the amount of that claim, no amount would have been placed in reserve to pay any such reconsidered Asbestos Claim at an increased amount. See MCorp, 137 B.R. at 226 (finding that a right of reconsideration would be futile to a claimant because of a cap and lack of a reserve).

In addition to inherent due process requirements, bankruptcy law provides specific procedural protections to creditors when their claims are at issue. For example, a debtor cannot lodge a valid claim objection or create a contested matter without producing specific evidence to rebut a timely-filed proof of claim. See Whitney v. Dresser, 200 U.S. 532, 535 (1906); Lundell v. Anchor Constr. Specialists, Inc. (In re Lundell), 223 F.3d 1035, 1040-41 (9th Cir. 2000); In re TransAmerican Natural Gas Corp., 978 F.2d 1409, 1416 (5th Cir. 1992); In re UNR Indus., Inc., 45 B.R. 322, 325 (N.D. Ill. 1984) (rejecting argument in bankruptcy case involving 17,000 asbestos claims that district courts can conduct "summary hearing" instead of full blown trial).

Moreover, Rule 9014 mandates that "reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought," and that numerous provisions of the Federal

Rules of Bankruptcy Procedure "shall apply" including full discovery under Rules 7026, and 7028-7037. Rule 9014, therefore, makes clear "that the fundamental requisites of due process must be satisfied in a contested matter in the same manner as in an adversary proceeding." In re Zumbrun, 88 B.R. 250, 252 (B.A.P. 9th Cir. 1988); Raleigh v. Illinois Dep't of Revenue, 530 U.S. 15, 24-25 (2000) ("Bankruptcy courts are not authorized in the name of equity to make wholesale substitution of underlying law controlling the validity of creditors' entitlements, but are limited to what the Bankruptcy Code itself provides.").

In addition, personal injury and wrongful death claims must "be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose." 28 U.S.C. §§ 157(b)(5) and 1411. There is no question that a bankruptcy court can estimate asbestos claims for plan confirmation purposes. Owens Corning, 322 B.R. at 719; In re Eagle-Picher Indus., Inc., 189 B.R. 681 (Bankr. S.D. Ohio 1995). However, a bankruptcy court does not have core jurisdiction to liquidate contingent or unliquidated asbestos claims for distribution purposes. See G-I Holdings, 323 B.R. at 600-16 (Bankr. D.N.J. 2005) (citing, inter alia, 28 U.S.C. §§ 157(b)(2)(B) and 157(c)(1)).

Debtors' CMO and Questionnaire fail to satisfy due process requirements. Not only do the CMO and Questionnaire give discretion to Debtors over which claims would be forever barred, but they also appear to unfairly limit Asbestos PI Claimants' rights to conduct discovery and put on evidence. The truncated procedures inherent in, but not explained by, the CMO and Questionnaire Motion should not apply to a determination of the merits of Asbestos PI Claims. The scientific, medical and expert evidence that may be required to prove up a claim is complex, and cannot be adequately presented in an estimation proceeding.

**B.**    **An estimation proceeding is not the appropriate proceeding for litigating the merits of Asbestos PI Claims, or for precluding Asbestos PI Claimants from asserting Asbestos PI Claims against Debtors in the future.**

Typically, an estimation proceeding involves the estimation of individual claims under Section 502(c) of the Bankruptcy Code. Debtors propose an alternative by seeking to estimate asbestos claims in the aggregate and to estimate future claims. The Future Claimants Representative is not opposed to an aggregate estimation as a precursor to a confirmation process for a plan with a Section 524(g) trust, but such an estimation proceeding should not be confused with litigating the merits of each claim with appropriate procedural safeguards.

Even when claims are estimated in the aggregate, the model is for such an estimation to be for confirmation purposes and the merits of individual claims are not litigated. See Owens Corning, 322 B.R. at 719; Eagle-Picher, 189 B.R. at 681. Here, however, the CMO and Questionnaire would create a procedure under which the merits of claims would be litigated. Further, that procedure would preclude Asbestos PI Claimants from asserting claims in the future if, for example, they (a) failed to timely submit a Questionnaire, (b) failed (in Debtors' opinion) to properly complete a Questionnaire, or (c) failed to prove up the merits of their claim via a Questionnaire during the estimation proceeding. Any aggregate estimation of Asbestos PI Claims should not result in the disallowance or preclusion of claims.

Moreover, unlike a traditional claims objection/allowance process and the model for estimating claims in the aggregate, the implication of Debtors' proposal seems to be the establishment of two rounds of claims litigation—one under the CMO and Questionnaire and a second under any TPD or CMO under any confirmed plan. Debtors fail to describe in any meaningful detail how the merits of Asbestos PI Claims would be litigated, or how an expert's opinion as to the merits of such claims could be transformed into a binding determination of the merits of such claims. Debtors also fail to explain how the merits of more than 100,000 claims

16

can be decided en masse during their proposed "evidence-based estimation." In addition, the discovery under the proposed CMO is completely one-sided.

      1.    **Any estimation proceeding should attempt to approximate Debtors' asbestos liability and should not include a determination on the merits of Asbestos PI Claims.**

Estimation enables parties and the Court to evaluate a plan of reorganization without having to wait until each and every contingent or unliquidated claim is litigated to judgment. See 11 U.S.C. § 502(c) (there shall be estimated any contingent or unliquidated claim, the fixing or liquidation of which would unduly delay the administration of the case); see generally Kane v. Johns-Manville Corp., 843 F.2d 636, 646-48 (2d Cir. 1988); A.H. Robins Co. v. Piccinin, 788 F.2d 994, 1013 (4th Cir. 1986); UNR Indus., 45 B.R. at 326. Estimation typically is an alternative to a claims objection process under Section 502 of the Bankruptcy Code. Debtors' proposed estimation, however, is a claim disallowance process that confuses the concepts of claims objection litigation and claims estimation litigation. There is no basis in the Bankruptcy Code for litigating the merits of individual claims (without fixing the amount of each claim) to achieve an aggregate valuation of all claims, as Debtors propose.

Importantly, the objective of estimation is to assess the "probable value" of claims in the tort system. Owens Corning, 322 B.R. at 722 ("[C]laims are to be appraised on the basis of what would have been a fair resolution of the claims in the absence of bankruptcy."). Courts have expressly recognized that Congress' use of the term "estimate" recognizes that the result will not necessarily be precise. In re Baldwin-United Corp., 55 B.R. 885, 898-99 (Bankr. S.D. Ohio 1985); Nova Real Estate Inv. Trust, 23 B.R. at 66. As the District Court in Owens Corning recently explained, experts testifying as to asbestos-related claims valuation were "expressing their opinions, not verifiable facts." Owens Corning, 322 B.R. at 721.

In keeping with the mandate of Section 502(c), therefore, courts have rejected litigation of individual claims in favor of an estimation "in the interests of administering th[e] case efficiently." In re Federal Press Co., 116 B.R. 650, 654 (Bankr. N.D. Ind. 1989). Courts also have rejected the idea of protracted litigation prior to estimation. A.H. Robins, 788 F.2d at 1012 (estimation of the potential and pending claims should precede any trials of the claims); UNR Indus., 45 B.R. at 326 (rejecting contention that trial on liability issues must precede estimation and holding that it is "not necessary to order trials now so that these claims can be valued."). The CMO and Questionnaire Motion is directly contrary to the well-established norms of estimation.

2. **Although evidentiary standards may be relevant in arriving at an approximation of Debtors' asbestos liability, estimation proceedings should not be used to create substantive hurdles to the allowance of claims.**

Debtors' invocation of <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), as a tool for imposing substantive legal standards across thousands of cases is improper. Debtors propose to use <u>Daubert</u> as a means of establishing dispositive legal hurdles that all claimants in all jurisdictions would have to meet to state a cause of action in the relevant state court and, therefore, in bankruptcy. This proposal is unsustainable under the plain language of <u>Daubert</u> and its progeny. In <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999), for example, the Supreme Court held that whether or not the factors identified in <u>Daubert</u> are pertinent for admitting expert testimony depends upon "the particular circumstances of the particular case at issue." <u>Kumho Tire</u>, 526 U.S. at 150 ("the gatekeeping inquiry must be 'tied to the facts' of a particular 'case.'"). <u>See also</u> <u>Meinhardt v. Unisys Corp. (In re Unisys Sav. Plan Litig.)</u>, 173 F.3d 145, 174 & n. 1 (3d Cir. 1999) (opinion denying sur petition for rehearing) (confirming that the <u>Daubert</u> gatekeeping inquiry must be tied to the facts of a particular case).

Besides ignoring the Supreme Court's directive that <u>Daubert</u> be applied in a case-specific manner, Debtors proposal attempts to exclude an expert's testimony on the basis of his conclusions, as opposed to his methodology. <u>Daubert</u>, 509 U.S. at 590 ("The focus, of course, must be solely on principles and methodology, not on the conclusions they generate."); <u>In re Paoli R.R. Yard PCB Litig.</u>, 35 F.3d 717, 746 n. 15 (3d Cir. 1994) (an expert's testimony cannot be excluded merely because his conclusions "are different from those of other experts"). Debtors would have the Court exclude all expert testimony that concludes that exposure or medical criteria below Debtors' thresholds caused a claimant to suffer an asbestos-related illness.

In <u>Daubert</u>, the Supreme Court held that an expert's testimony is admissible, so long as the methodology used in formulating his opinion is relevant and reliable. <u>Daubert</u>, 509 U.S. at 589. Under <u>Daubert's</u> reliability prong, expert opinion need only be based on "good grounds." <u>Daubert</u>, 509 U.S. at 590; <u>Paoli</u>, 35 F.3d at 744 ("The grounds for an expert's opinion merely have to be good, they do not have to be perfect."). This means that the expert's opinion must be based on methods and procedures of science. <u>Daubert</u>, 509 U.S. at 590; <u>Paoli</u>, 35 F.3d at 744. The reliability inquiry is a flexible one, designed merely to serve as a threshold query for admissible evidence. <u>Daubert</u>, 509 U.S. at 594; <u>Paoli</u>, 35 F.3d at 744 ("The reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence.").

Importantly, Debtors provide no details as to how the Questionnaire information will be "quantified and evaluated" by experts, or how an expert can possibly develop meaningful estimates of Debtors' actual liability from the Questionnaire data. Frankly, the Future Claimants Representative doubts whether there is such thing as an expert who can predict the outcome of individual cases under the applicable law of 50 states based on responses to a questionnaire and without considering Debtors' historic claims information. Debtors provide no hints as to how an expert is supposed to accomplish such a prediction.

C.    **Debtors' pre-bankruptcy experience in the tort system, including Debtors' settlement history, is relevant and should be the starting point for any estimation of Debtors' asbestos liabilities.**

The CMO and Questionnaire Motion seeks to change the way in which asbestos liabilities are estimated. The Future Claimants Representative is not aware of any court having excluded a debtor's pre-bankruptcy history, including settlement history, from consideration in an estimation proceeding. Moreover, Debtors fail to cite any case law in support of their argument. There simply is no reason to deviate from the well-established methodologies

20

employed in other cases, such as <u>Eagle-Picher</u>, 189 B.R. at 681, and <u>Owens Corning</u>, 322 B.R. at 719.

Although there is no question that a court has discretion in establishing an appropriate methodology for estimating claims, the appropriate starting point for estimation is a debtor's experience in the tort system prior to filing for bankruptcy protection. <u>Eagle-Picher</u>, 189 B.R. at 681, and <u>Owens Corning</u>, 322 B.R. at 721-22. The various concerns raised by Debtors' bankruptcy counsel regarding Debtors' settlement history and pre-bankruptcy experience in the tort system may be considered in determining what adjustments, if any, should be made as Debtors' asbestos liabilities are extrapolated during the estimation proceeding.[10]  But those considerations, which may go to the weight or credibility the Court gives to an expert's opinion, <u>Owens Corning</u>, 322 B.R. at 725 (discussing the conclusions of competing experts), are not reasons for completely disregarding Debtors' pre-bankruptcy history.

1.    **An estimation proceeding should attempt to approximate Debtors' asbestos liability, which should be extrapolated from what is known, namely, Debtors pre-bankruptcy experience with asbestos claims.**

In an estimation proceeding, the task before a court is to estimate a debtors' liability to present and future claimants as of a certain date. A central issue in establishing an estimation methodology is the nature of Debtors' tort system experience. The Supreme Court has held that the validity and amount of claims against a bankruptcy estate are determined by reference to

---

[10] In their Memorandum, Debtors variously state: "It is undisputed that previous asbestos bankruptcy estimates have been woefully inaccurate and have underestimated the magnitude of future claims. However, the original forecasts in these previous asbestos bankruptcy cases did not inaccurately predict *actual* future disease rates or actual debtor liability." Memorandum, Tab 3, at p. 1; "An estimate based on abusive litigation and past settlement history could render a debtor insolvent, depriving shareholders of property and decreasing the recoveries of other unsecured creditors. Thus, estimating asbestos personal injury claims beyond the amount of actual liability would render a plan unconfirmable because Bankruptcy Code § 1129(b) provides that treatment of a dissenting class of impaired creditors be 'fair and equitable' – no premiums are allowed." Memorandum, Tab 5, at p. 1. Setting aside Debtors stated concerns about protecting Equity Interests, it is ironic that Debtors argue that estimations based on claims resolution history in other cases have been too low, but that any estimation in this case would be too high if Debtors' claims resolution history is considered.

applicable non-bankruptcy law. See Raleigh, 530 U.S. at 20; Grogan v. Garner, 498 U.S. 279, 283-84 and n. 9 (1991); Butner v. United States, 440 U.S. 48, 54 (1979); Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 161 (1946). The principle that claims must be valued according to applicable non-bankruptcy law applies in estimation proceedings. Bittner, 691 F.2d at 135; Brints Cotton, 737 F.2d at 1341; In re Farley, Inc., 146 B.R. 748, 752 and 756 (Bankr. N.D. Ill. 1992); Federal Press, 116 B.R. at 653; Owens Corning, 322 B.R. at 721 ("The claims being valued arise under state law, hence state law determines their validity and value.").

Consistent with Raleigh and Bittner, numerous courts estimating mass tort and asbestos claims have relied on estimates based on the debtor's pre-bankruptcy claims experience in the state court system. See, e.g., Eagle-Picher, 189 B.R. at 686 (estimating claims based upon debtor's pre-petition claims history); In re Babcock & Wilcox Co., No. 00-10992, at 47-49 (E.D. La. Oct. 8, 2004) (estimating claims based upon expert testimony predicated on debtor's claims history); In re A.H. Robins Co., Inc., 88 B.R. 742 (E.D. Va. 1988) aff'd, 880 F.2d 694, 702 (4th Cir. 1989). No court has held that asbestos claims may be estimated based on claims qualification rules manufactured anew in bankruptcy, irrespective of the debtor's tort system experience. See Owens Corning, 322 B.R. at 725 (rejecting opinion of expert because it "cannot be accepted without totally disregarding the historical experience in asbestos litigation"). Thus, any "estimate should be primarily based on the history of this company." Eagle-Picher, 189 B.R. at 690; Owens Corning, 322 B.R. at 721-23 (the question is the extent to which adjustments should be made to that history).

It is logical for estimation, which is valuing the unknown, to be done by reference to what is known. Eagle-Picher, 189 B.R. at 686 ("In valuation, the only sound approach is, if possible, to begin with what is known."). Thus, estimating the value of pending and future claims against

Debtors (the unknown) should be made by reference to some known data set, namely, Debtors' claims resolution history. <u>Owens Corning</u>, 322 B.R. at 721-23.

This common-sense method for valuing pending and future asbestos claims—tailored to the particular facts of each case—has been used in every asbestos-related bankruptcy since 1990. These include Owens Corning, Eagle-Picher, UNR, National Gypsum, Celotex, Fibreboard, Fuller-Austin, and Raytech.

The purpose of estimation is not to determine what is owed to particular claimants (that will be the function of a Section 524(g) trust), or to determine what, in a defendant's perfect world, is the "right" amount claimants should be paid. Rather, estimation should approximate what Debtors' pending and future asbestos liability would be if these claims were litigated or settled under the substantive tort laws of the various states. In other words, estimation should determine what Debtors' liability would have been but for their bankruptcy filing. <u>See</u> <u>Owens Corning</u>, 322 B.R. at 722 ("[C]laims are to be appraised on the basis of what would have been a fair resolution of the claims in the absence of bankruptcy.").

       2.     **In arriving at a determination of Debtors' asbestos liability, certain information might be considered in order to make adjustments to any extrapolation based on Debtors' pre-bankruptcy history, but it would be improper to totally disregard Debtors' pre-bankruptcy claims experience.**

Debtors' claims resolution history reflects their real-world liability. That history represents negotiated and litigated resolutions that take into account all of their defenses to all types of claims, from the strongest set of facts and legal arguments to the weakest. By using Debtors' claims resolution history as the data set for estimation, the Court will not be unfair to Debtors, but will favor them with the presumption that they could have continued to dispose of cases with equivalent efficiency. <u>See</u> <u>Owens Corning</u>, 322 B.R. at 722-23 ("The question to be resolved is the extent to which adjustments should be made to historical values to account for . . .

probable changes."). In addition, Debtors will have the opportunity to show, for example, that non-malignant claims are not compensable in the tort system (in certain states). Thus, there is no reason to ignore Debtors' experience in the tort system.

Debtors, however, ask the Court to completely disregard their claims resolution history and instead estimate by looking only at data from the Questionnaire. To extrapolate Debtors' current and future liability from the Questionnaire, the Court would have to create a surrogate for the tort system to determine claim validity while preserving claimants' due process rights. But Debtors cannot create a new system to replace the substantive tort system. Moreover, federal courts do not have authority to alter the tort system by, for example, establishing mandatory standards for compensability. Owens Corning, 322 B.R. at 724. Even if the Court could alter the tort system, creating a new system could not be done in any reasonable time frame. Debtors CMO contemplates at least a sixteen-month process. The whole purpose behind estimation is to quickly evaluate an unknown quantity by comparison to similar claims with known characteristics and values.

The CMO and Questionnaire Motion is simply another device to disenfranchise Asbestos PI Claims. Debtors assert that they were forced to settle worthless claims because they could not get a fair trial in the tort system. But that assertion is contrary to Debtors' policy of defending against weak claims and settling only those claims that were likely to survive motions to dismiss. "Filing a Chapter 11 petition merely to obtain tactical litigation advantages is not within the legitimate scope of the bankruptcy laws." Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.), 200 F.3d 154, 165 (3d Cir. 1999) (internal quotes omitted).

Further, Debtors incorrectly argue that Federal Rule of Evidence 408 precludes estimation based on past settlement values. Rule 408 renders inadmissible evidence of offers to

settle disputed claims where such evidence is proffered "to prove liability for or invalidity of the claim or its amount." Fed. R. Evid. 408. Thus, Rule 408 only bars the use of evidence of compromise "to prove the validity or invalidity of the claim that was the subject of the compromise." 23 Wright and Graham, Federal Practice and Procedure § 5306, at 215-16 (1980). On the other hand, if "the settlement negotiations and terms explain and are part of another dispute, they must often be admitted if the trier of fact is to understand the case." 2 Weinstein, Federal Evidence § 408.08[5] (2d ed. 1997).

Here, information about the number of Debtors' past tort claims and the cost of its past tort settlements is essential to estimation, and that evidence is admissible under Rule 408. See Broadmount Capital Corp. v. Summa Med. Corp., 972 F.2d 1183, 1194 (10th Cir. 1992) (evidence from prior settlement discussions admissible because "related to an entirely different claim" from the claim that was the subject of the negotiations); Official Asbestos Claimants Comm. v. Babcock & Wilcox Co. (In re Babcock & Wilcox Co.), 274 B.R. 230, 256-57 (Bankr. E.D. La. 2002) (evidence of settlement history is admissible under Rule 408). Thus, the Court may properly consider Debtors' prior settlements because that data would not be used to "prove the validity or invalidity" of any particular claim, but would be used to estimate Debtors' aggregate liability for all present and future claims. Consideration of prior settlements is an accepted component of estimation in bankruptcy cases. Owens Corning, 322 B.R. at 722-24; Eagle-Picher, 189 B.R. at 691.

### D.    The Future Claimants Representative will propose a more reasonable case management order and questionnaire, if the parties cannot reach agreement.

The Future Claimants Representative agrees that estimating Debtors' asbestos liability will be important to the plan confirmation process. The Court has already indicated, and the

Future Claimants Representative agrees, that any estimation litigation must be more expedient than the year and a half schedule suggested in Debtors' CMO.

The Future Claimants Representative is not opposed to the use of a reasonable questionnaire used as a discovery tool related to estimation. However, the proposed Questionnaire is far too onerous and more detailed than what Debtors need for an estimation proceeding. Debtors' lengthy Questionnaire would place a significant burden on claimants and their counsel.

If the parties are unable to agree to a consensual case management order and form of a reasonable questionnaire, the Future Claimants Representative will propose a case management order and form of questionnaire by the July 13, 2005 deadline.

## IV.    CONCLUSION

For the foregoing reasons, the Future Claimants Representative respectfully requests that the Court deny Debtors' Motion to Approve PI CMO and Questionnaire, consider a more reasonable form of questionnaire and a case management order with a more expedited schedule, as one or more of the parties may submit by July 13, 2005, and grant such other and further relief as may be just and proper.

Respectfully submitted,

PHILLIPS, GOLDMAN & SPENCE, P.A.

Dated:  June 30, 2005

_____

JOHN C. PHILLIPS, JR., ESQUIRE (#110)
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
(302) 655-4210 (facsimile)

Roger Frankel, Esquire
Richard H. Wyron, Esquire
Monique D. Almy, Esquire
Matthew W. Cheney, Esquire
Debra L. Felder, Esquire
Swidler Berlin LLP
3000 K Street, N.W., Suite 300
Washington, D.C. 20007
(202) 424-7500
(202) 424-7643 (facsimile)

Counsel for David T. Austern,
Future Claimants Representative

CERTIFICATE OF SERVICE

I, CELESTE A. HARTMAN, Senior Paralegal, hereby certify that on this 30th day of
June, 2005, I caused the foregoing *Future Claimants' Representative's Objection to Debtors'
Motion to Approve PI CMO and Questionnaire* to be served on the following persons via email
(where available via Pacer) and first class mail, postage prepaid:

Janet S. Baer, Esquire
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
Fax: 312-861-2200
*Counsel for the Debtors*

Bennett L. Spiegel, Esquire
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA 90017
Fax: 213-680-8400
*Counsel for the Debtors*

Laura Davis Jones, Esquire
Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C.
919 North Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705
Fax: 302-652-4400
*Counsel for the Debtors*

Lewis Kruger, Esquire
Stroock & Stroock & Levan
180 Maiden Lane
New York, NY 10038-4982
Fax: 212-806-6006
*Counsel for the Official Committee of Unsecured Creditors*

Michael R. Lastowski, Esquire
Duane, Morris & Heckscher, LLP
1100 N. Market Street, Suite 1200
Wilmington, DE 19801-1246
Fax: 302-657-4901
*Counsel to the Official Committee of Unsecured Creditors*

Scott L. Baena, Esquire
Bilzin, Sumberg, Dunn, Baena, Price & Axelrod
First Union Financial Center
200 South Biscayne Blvd., Suite 2500
Miami, FL 33131
Fax: 305-374-7593
*Counsel to the Official Committee of Property Damage Claimants*

Michael B. Joseph, Esquire
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899
Fax: 302-575-1714
*Counsel to the Official Committee of Property Damage Claimants*

Elihu Inselbuch, Esquire
Caplin & Drysdale
399 Park Avenue, 36th Floor
New York, NY 10022
Fax: 212-644-6755
*Counsel to the Official Committee of Personal Injury Claimants*

Marla Eskin, Esquire
Campbell & Levine, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801
Fax: 302-426-9947
*Counsel to the Official Committee of Personal Injury Claimants*

Thomas M. Mayer, Esquire
Kramer Levin Naftalis & Frankel LLP
919 Third Avenue
New York NY 10022
Fax: 212-715-8000
*Counsel to the Official Committee of Equity Holders*

Teresa K.D. Currier, Esquire
Klett Rooney Lieber & Schorling
1000 West Street, Suite 1410
P.O. Box 1397
Wilmington, DE 19899-1397
Fax: 302-552-4220
*Counsel to the Official Committee of Equity Holders*

Office of the United States Trustee
Attn: Frank J. Perch
844 N. King Street
Wilmington, DE 19801
Fax: 302-573-6497

       Under penalty of perjury, I certify the foregoing is true and correct.

_Celeste A. Hartman_

CELESTE A. HARTMAN

9224099v3