# EXHIBIT B

## (Whitehouse Questionnaire Affidavit)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
* * * * * * * * * * * * * * * * * * * * * *
                                          *
In re                                     *
                                          *     Chapter 11
W.R. GRACE & CO., et al.,                 *     Case No. 01-01139 (JFK)
                                          *     Jointly Administered
          Debtor.                         *
                                          *
* * * * * * * * * * * * * * * * * * * * * *
```

## AFFIDAVIT OF DR. ALAN C. WHITEHOUSE
## RE: GRACE QUESTIONNAIRE

STATE OF MONTANA)
                   :ss
County   of   Lincoln   )

DR. ALAN C. WHITEHOUSE, being first duly sworn upon oath, deposes and

states as follows:

1.     I am Dr. Alan C. Whitehouse. My address is 1507 East Eloika Road, Deer

Park, WA 90066.

2.     I am licensed in Washington and Montana. I currently practice chest

medicine at the Center for Asbestos Related Disease in Libby, Montana, where we have

about 1,500 active cases of asbestos disease from exposure to Libby tremolite asbestos.

3.     My curriculum vitae is attached as Exhibit 1 to the General Affidavit of Dr.

Alan C. Whitehouse.

4.     I have reviewed the Grace Questionnaire of May 10, 2005, which defines

"asbestosis" as including "diffuse pleural thickening as defined in the ILO's Guidelines

For the Use of the ILO International Classification of Radiographs of Pneumoconioses

(2000)."

5.    I have reviewed the publication ILO (2000), Guidelines For the Use of the

ILO International Classification of Radiographs of Pneumoconioses, revised edition

2000. It defines "diffuse pleural thickening" as follows:

> Diffuse pleural thickening historically has referred to
> thickening of the visceral pleura. The radiological distinction
> between parietal and visceral pleural thickening is not always
> possible on a postero - anterior radiograph.

> For the purpose of the ILO (2000) Classification, diffuse
> pleural thickening extending up the lateral chest wall is
> recorded only in the presence of, and in continuity with, an
> obliterated costophrenic angle. Diffuse pleural thickening is
> recorded as absent or present along the chest wall. If present,
> it is recorded as in-profile or face-on, and separately for the
> right and left side. Its extent is recorded in the same manner
> as for pleural plaques. A minimum width of about 3mm is
> required for in-profile diffuse pleural thickening to be
> recorded as present.

The definition requires two findings:  (1)  "an obliterated costophrenic angle" (this is

generally described as blunting of the costophrenic angle in the United States), and (2)  a

minimum width of 3mm in the pleural thickening.

6.    The Grace Questionnaire definition of "asbestosis" is not consistent with

standard practice in chest medicine.  It is standard practice to use the American Thoracic

Society (2004) definition.  ATS (2004) "Diagnosis and Initial Management of Non-

Malignant Diseases Related to Asbestos," Am J Respir Crit Care Med, Vol. 170, 691-

715, 2004.  ATS (2004), p. 691, states the criteria for diagnosis of non-malignant

asbestos-related disease as follows:

Dr. Alan C. Whitehouse Affidavit                    2                              6/13/05

- Evidence of structural pathology consistent with asbestos related disease as documented by imaging or histology.
- Evidence of causation by asbestos as documented by the occupational and environmental history, markers of exposure (usually pleural plaques), recovery of asbestos bodies or other means.
- Exclusion of alternative plausible causes for the findings.

ATS (2004), p.700, states "asbestosis is asbestos induced parenchymal fibrosis with or without pleural thickening." Asbestos pleural disease is characterized by pleural plaques or diffuse pleural thickening. No minimum width for pleural thickening, nor blunting of the costophrenic angle is necessary to the ATS definition of "non-malignant asbestos related disease," which includes "asbestosis" and "asbestos pleural disease." *Id.* at 691. By requiring blunting and 3mm pleural thickening, the Grace Questionnaire definition of asbestosis is highly exclusionary upon Libby patients with asbestos disease, and is not consistent with standard practice in chest medicine or the medical literature.

7.      Similarly, the Grace Questionnaire defines "asbestosis" in terms of loss of lung function, as measured on pulmonary function tests. ATS (2004), p.691, states: "Demonstration of functional impairment is not required for the diagnosis of non-malignant asbestos-related disease." Again, the Grace Questionnaire definition of asbestosis is not consistent with standard practice in chest medicine or the medical literature. The definition is highly exclusionary upon the Libby cohort, as the vast majority are diagnosed with asbestos disease, but do not meet the lung function test requirements stated in the definition.

8.      In addition, the Grace definition of "asbestosis" uses only "a chest x-ray reading by a B-reader and replicated by an independent B-reader." Questionnaire, p. iv.

This too is contrary to standard practice in chest medicine and the medical literature. ATS (2004), p.691, does not require the use of a chest x-ray for diagnosis. In fact ATS (2004), p.696 states: "Conventional CT is superior to chest films in identifying parenchymal lesions, rounded at atelectasis and pleural plaques." The publication by Public Citizen "Leading Medical Experts Fault Arbitrary, Outdated Medical Criteria in Asbestos Bill," (May 2005), attached as Exhibit 1 states at p.4, "CT scans are about 33% more sensitive in detecting interstitial disease and over 50% more sensitive in detecting pleural disease."

Use of only chest x-rays to define and diagnose "asbestosis" is highly exclusionary upon the Libby cohort, as many are diagnosed through the use of CT scans as is standard practice in chest medicine. In particular, in the Libby cohort, on CT scan very often we see sub-pleural interstitial fibrosis, which is not seen on plain chest x-ray. It is thought that sub-pleural interstitial fibrosis often plays a major role in Libby pleural disease. In the Libby cohort, CT scans are far more diagnostic than is the plain chest x-ray. This diffuse pleural thickening is frequently seen in Libby patients. It is difficult to see on chest x-ray, and seems to correlate well with severe restrictive lung disease.

9.    The Grace Questionnaire definition of "asbestosis" is also not consistent with standard practice in chest medicine, as it requires a B-reading of the chest x-ray. This is not required in the ATS (2004) statement of standard practice. B readings are not used in clinical practice. It is not standard practice to obtain a B-read. There is no B-reader in Montana. The requirement of a B-reading would be highly exclusionary upon the Libby cohort, as very few have B readings.

10.     With regard to the requirement of blunting of the costophrenic angle, as required in the Grace Questionnaire definition of "diffuse pleural thickening," within the definition of "asbestosis," there is no medical literature supporting the use of blunting of the costophrenic angle as a requirement in the diagnosis of asbestos disease generally, or asbestos pleural disease in particular.  In the medical literature there is no demonstrated correlation between blunting and the presence or severity of asbestos disease.

Libby pleural disease generally does not cause blunting of the costophrenic angle. Inclusion of a requirement of blunting of the costophrenic angle would be highly exclusionary upon the Libby cohort, since only a minority of patients present with this finding.

Attached as Exhibit 2 is a letter dated February 9, 2005 titled "Preliminary Report of 79 Chest X-rays Reviewed Relative to the Asbestos Injury Resolution Act of 2005." This study was done in response to a similar requirement of blunting of the costophrenic angle in a draft of the asbestos bill.  It is my understanding that this requirement was removed from the asbestos bill in the special provisions for Libby, as reported out of the Senate Judiciary Committee on May 26, 2005.  As noted on the Preliminary Report, only 22 of 79 (28%) patients had blunting of the costophrenic angle.  Of the seven dead of asbestos disease, only four had blunting.  Requiring blunting for inclusion in a cohort of those diagnosed with asbestos pleural disease is not consistent with standard practice in chest medicine or the medical literature.

11.     With regard to the requirement of 3mm thickness, as required in the Grace Questionnaire definition of "diffuse pleural thickening," within the definition of

"asbestosis," there is no scientific basis for a requirement of 3mm thickness to define "diffuse pleural thickening." ATS (2004), p.707, notes that pleural thickening "ranges in thickness from less than 1mm up to 1cm or more." No minimum thickness is required for the diagnosis of asbestos disease. As noted in the letter by the President of the American Thoracic Society, "diffuse pleural scarring can be associated with greatly diminished FVC regardless of the extent or thickness of the scarring or its bilaterality." Copy attached as Exhibit 3. I have checked the listed measurements for the Preliminary Study, which is Exhibit 2. Of the 79 patients, 40 had 3mm or more thickness in the right lung and 36 had 3mm or more thickness in the left lung. 49 had 3mm or more thickness in one lung. This is 62% of the 79 patients, meaning that about 38% would be excluded by a requirement of a minimum 3mm thickness. It is important to note that of the patients with severe disease (for example FVC under 60), seven of 18 would be excluded by the 3mm requirement.

12.    A further requirement in the Grace Questionnaire definition of "asbestosis" is that certain pulmonary function test requirements be met. As noted above, "functional impairment is not required for the diagnosis." ATS (2004), p.691. Accordingly, the Questionnaire definition is not consistent with standard practice in chest medicine or the medical literature.

A more medically plausible approach would be to group all patients diagnosed with asbestos disease into (1) the unimpaired (FVC, TLC and DLCO all over 80%), (2) the impaired (one number, FVC, TLC, or DLCO under 80%), and (3) the severe (one number FVC, TLC, or DLCO under 65%). Grace's approach to severity of disease is not

consistent with standard practice in chest medicine as it (1) omits to use DLCO (diffusion capacity) and (2) it imposes a requirement of an $FEV_1$/FVC ratio over 65.

13.    DLCO is a standard measure of severity in asbestos disease.    Diffusion capacity (DLCO) measures the lungs' efficiency in transferring oxygen into the blood stream. DLCO is a key measure of degree of impairment in asbestos related disease. The American Thoracic Society (2004), p.697, states:

> Evaluation of subjects with suspected asbestos-related disease should include spirometry . . . all lung volumes and the carbon monoxide diffusing capacity. In addition to diminished lung volumes, the carbon monoxide diffusing capacity is commonly reduced due to diminished alveolar - capillary gas diffusion, as well as ventilation - profusion mismatching.

Fishman's Pulmonary Diseases and Disorders (3rd Ed. 1998), p.883, states:

> The characteristic pulmonary function changes of asbestosis are a restrictive impairment with a reduction in lung volumes (especially FVC and total lung capacity) decreased diffusion capacity, and arterial hypoxemia.

See also Fraser and Pare, Diseases of the Chest, 4th Ed. (1999), p.2445. Similarly, the AMA Guides to Permanent Impairment (5th Ed.) uses diffusion capacity as a basis for assessment of permanent impairment due to respiratory disorders. Diffusing capacity is available at any lung center, and is standardized. American Thoracic Society, "Single Breath Carbon Monoxide Diffusing Capacity (Transfer Factor). Recommendations for a Standard Technique." Am Rev Resp Dis 1987; 136:1299. The Center for Asbestos Related Disease in Libby applies this standard technique.

14.    DLCO is a particularly important indicator of the severity of restrictive disease in the Libby tremolite asbestos disease patients. I have published a paper titled "Asbestos-Related Pleural Disease Due to Tremolite Associated With Progressive Loss

of Lung Function: Serial Observations in 123 Miners, Family Members, and Residents
of Libby, Montana," Am J Ind Med 46:219-225 (2004). The article at page 221 states:

> In a group of 123 patients, including those with improved FVC, the average yearly
> loss was 2.2% four FVC, 2.3% for TLC, and 3.0% for DLCO as calculated over an
> average of 35 months (Fig.1).

15.     Seventy six percent of the 123 patients in my study had progressive loss of

lung function. In the Libby cohort, DLCO shows progressive decline along with FVC

and TLC. In many individual cases, there is significant asbestos disease on the chest x-

ray, and only the DLCO is reduced, not the FVC or TLC. Some patients with severe

shortness of breath are severe only in the DLCO defect. We find that the DLCO defect is

the leading indicator of severity in the Libby cohort, and has the greatest correlation with

shortness of breath and the timing of the patients' entry to oxygen treatment.

16.     In my recently published study (Whitehouse 2004) I explain:

> Pleural changes alone are unlikely to cause a decrease in DLCO. DLCO decreases
> are likely to be associated with interstitial disease not apparent clinically on either
> plain chest radiographs or HRCT.

17.     The importance of DLCO as an indicator of severity in asbestos pleural

disease is long established. Cookson (1983) "Pleural Thickening and Gas Transfer in

Asbestosis," Thorax 1983; 38:657-661 is also a study of a cohort exposed to amphibole

asbestos. The study presents parallel findings regarding DLCO as the leading indicator

of severity of pleural disease. Cookson states that "the ratio of transfer factor [the British

term for diffusion capacity] to effective alveolar volume correlated directly with the

degree of pleural thickening as alveolar volume fell with increasing severity of pleural

disease."

18.    The Grace Questionnaire improperly defines "asbestosis" as requiring loss of lung function. Then Grace omits to use DLCO as a measure of lung function. This omission is highly exclusionary to the Libby cohort, as many patients otherwise included would be excluded, because DLCO is a proper measure of their impairment. The Grace Questionnaire is not consistent with standard practice in chest medicine or the medical literature.

19.    The Grace Questionnaire definition of "asbestosis" requires an $FEV_1/FVC$ ratio of over 65. The $FEV_1/FVC$ ratio is a measure of obstructive disease. In obstructive disease the exhale is obstructed. Asbestos disease generally is a restrictive disease, restricting the inhale. With asbestos disease in general, and Libby pleural disease in particular, there is an obstructive component. *See* Fraser and Pare's Diagnosis of Diseases of the Chest, 4th Ed. (1999), pp.2445-46 and Fishman, p.884. No requirement of an $FEV_1/FVC$ ratio over 65 is set forth in the ATS (2004) statement of standard practice in diagnosis of asbestos related disease. Imposing a $FEV_1/FVC$ ratio requirement of 65 or higher will tend to exclude many Libby pleural disease patients who have obstructive disease along with their asbestos disease. The obstructive disease may be from asthma, smoking, asbestos disease or other causes. However, the asbestos patients are already independently diagnosed with asbestos disease radiographically and by physical examination. It is improper to exclude a patient from a diagnosis of asbestos disease, simply because the patient has obstructive disease as well. Use of the $FEV_1/FVC$ ratio as a limiting factor in the diagnosis of asbestos disease is not consistent with standard practice in chest medicine or the medical literature. It is also significantly exclusionary

upon the Libby cohort, as many have a ratio under 65. It is also improper to exclude a patient with severe asbestos disease from the category of "clinically severe asbestosis," because of concomitant obstructive disease and an $FEV_1/FVC$ ratio of under 65. The obstructive disease may be due to the asbestos disease. In any event, the obstructive disease does not make the asbestos restrictive disease any less severe.

20.     The Grace Questionnaire defines "asbestosis" as diagnosed by a board certified "pulmonologist or internist." This apparently excludes patients diagnosed by family practice doctors and others. The ATS (2004) statement of standard practice in diagnosis of asbestos disease does not so limit the clinician. In Libby, family practice doctors are familiar with Libby pleural disease and routinely diagnose it. Limiting "asbestosis" to those diagnosed by a "pulmonologist or internist" is unnecessarily exclusionary.

        DATED this ___ day of June, 2005.


                                        _____
                                        Dr. Alan C. Whitehouse

        SUBSCRIBED AND SWORN to before me this _15_ day of June, 2005.

                                        _____
(SEAL)                                  Notary Public for the State of Montana
                                        Candace J Cummings
                                        Residing at: Libby, Montana
                                        My Commission Expires: _Feb 3, 2006_



Buyers Up • Congress Watch • Critical Mass • Global Trade Watch • Health Research Group • Litigation Group
Joan Claybrook, President

# Leading Medical Experts Fault Arbitrary, Outdated Medical Criteria in Asbestos Bill

## Flawed Standards Will Deny Compensation to Many Legitimate Victims of Asbestos Disease

Four of the country's leading experts in the diagnosis and treatment of asbestos diseases are opposing the medical standards that claimants must meet to qualify for coverage under the $140 billion trust fund set up by the asbestos bill, S. 852, to compensate individuals injured by exposure to the toxic mineral. These clinicians and researchers are:

***Michael Harbut, MD, MPH, FCCP***, Chief of the Center for Occupational and Environmental Medicine, Co-Director of the National Center for Vermiculite and Asbestos-Related Cancers at the Karmanos Cancer Institute and past chair of the American College of Chest Physicians. According to Dr. Harbut, who currently treats over 2,000 individuals a year, most of whom suffer from asbestos-related diseases, the bill would exclude over 40 percent of his patients despite the fact that their illnesses are clearly attributable to asbestos exposure. Dr. Harbut contends that one former iron worker he has treated for about eight years, and who recently required a double lung transplant, would not have qualified for relief under the bill until perhaps two years ago, when his condition was already so advanced that there was little hope of saving his lungs.

***Philip J. Landrigan, MD, MSc, DIH***, Chair of the Department of Community and Preventive Medicine at Mount Sinai School of Medicine (the department founded by Dr. Irving J. Selikoff, renowned "Father of Asbestos Research in the United States"), which has been the major provider of diagnostic services to over 12,000 workers at the Ground Zero site of the World Trade Center destruction. According to Dr. Landrigan, a board-certified specialist in occupational medicine (among other specialties) and a member of the National Academy of Sciences' Institute of Medicine, tens of thousands of legitimate lung cancer victims would be shut out of the fund by the bill's medical criteria.

***Alan C. Whitehouse, MD,FCCP***, Senior consulting physician at the Center for Asbestos Related Disease in Libby, Montana, and the pulmonary specialist who first identified asbestos-induced disease among W.R. Grace miners and factory workers in Libby. According to Dr. Whitehouse, whose patients are largely community members with no direct occupational exposure but who nevertheless developed asbestos diseases because of the toxic dust deposited by the W.R. Grace mine and factory into the air and soil, the bill's medical criteria would exclude 90 percent of the individuals he treats, knocking them down to the lowest disease



**EXHIBIT**

*/*

category, "Level 1,"where they are only entitled to x-ray and lung function tests once every three years.

**L. Christine Oliver, MD, MPH, MS, FACPM,** Assistant Clinical Professor of Medicine at Harvard Medical School and Associate Physician of Pulmonary and Critical Medicine at Massachusetts General Hospital. According to Dr. Oliver, who has spent years treating asbestos victims, thousands of exposed individuals who have demonstrated abnormalities on chest x-rays and are therefore at significantly increased risk of developing cancer will be denied vital long-term follow up because of the limitations on medical monitoring in the Level 1 category. These individuals may be prevented from discovering they have cancer until it is too late to stall or reverse the progress of the disease.

And that's not all. The **American Thoracic Society** has published criteria that disagree considerably with the medical criteria in the bill, although they do not take a position for or against the legislation. The **American Public Health Association**, a membership organization consisting of over 50,000 public health professionals, also disagrees with the medical criteria put forth in the bill.

## What is at Stake

The staggering scale of the asbestos epidemic that has already sickened or killed hundreds of thousands of people in the U.S. is underscored by the number of potential victims: some 27.5 million workers exposed to asbestos on the job from 1940-1978, and who in turn contaminated their own families; thousands of residents of Libby, Montana, where asbestos-tainted vermiculite was mined and manufactured into Zonolite insulation for 70 years; hundreds of thousands of people living in the 28 sites nationwide that received 80 percent of the vermiculite mined in Libby from 1964-1980, and those living in the remaining 172 sites where vermiculite was used in factory processing; the residents of over 30 million houses in the U.S. that, according to the EPA, still have vermiculite insulation; the thousands of New Yorkers living and working in proximity to the site of the World Trade Center's destruction.

An analysis conducted in 1982 projected up to 9,700 cancer deaths each year of workers occupationally exposure to asbestos, and an estimated total 500,000 worker mortalities between 1967 and 2030. But this did not include sickness and death from non-malignant asbestos diseases, nor the full range of potential occupational victims (such as demolition and renovation workers), or those exposed to risks after 1979. And, it only covered workers. Some 10,000 people died of asbestos-related diseases in 2003 alone, and because of the 20-50 year latency period between toxic exposure and manifestation of symptoms—and the fact that asbestos was not strictly regulated until 1986—experts now predict that the peak for both malignant and non-malignant forms of asbestos-related diseases will not be reached until 2018.[1] Disease projections vary widely, ranging from 750,000 to 2.6 million future claims of sickness and death associated with asbestos.[2] A 2003 Congressional Budget Office estimated some 1.7 million claims over the next three decades.[3]

---

[1] Nicholson WJ, Perkel G, Selikoff IJ. 1982. *Occupational exposure to asbestos: population at risk and projected mortality -- 1980-2003.* Am J Ind Med 3:259-311.
[2] Testimony of Laura S. Welch, MD, Medical Director, Center to Protect Workers Rights, before the Senate Judiciary Committee, June 2003.
[3] Congressional Budget Office *Cost Estimate: S. 1125 Fairness in Asbestos Injury Resolution Act,* October 2003.

## What the Experts Say

### Summary

The bill's medical standards are designed to exclude hundreds of thousands of otherwise legitimate asbestos-poisoned individuals from compensation. The aforementioned specialists in occupational medicine with particular expertise in the effects of asbestos contamination maintain that S. 852 uses arbitrary, outdated medical criteria to define asbestos-related disease that are not based on or are inconsistent with current medical and scientific knowledge.  The legislation:

- Requires x-ray evidence of disease instead of more technologically accurate, sensitive and readily available methods such as CT scan, defines disease based on pre-1995 thinking that has since been conclusively disproved, sets fixed exposure thresholds contrary to epidemiological evidence, arbitrarily reduces benefits to smokers and fails to recognize injuries to consumers and residents living in proximity to asbestos processing plants.

- Rejects most of the criteria for determining the existence and extent of asbestos-related disease established by the American Medical Association *Guides to the Evaluation of Permanent Impairment*—standards widely accepted by the medical community and used by 42 states and some Canadian provinces as the basis for workers compensation claims.

- Ignores the recommendations of the American Thoracic Society (ATS), which were developed over the course of three years by the preeminent experts in the field of lung disease, as set forth in its *Guidelines for the Diagnosis and Initial Management of Nonmalignant Diseases Related to Asbestos*.

- Relies on the term "substantial" as a determinant in a variety of contexts, a word that has no commonly understood meaning in the medical community, nor definition in medical literature or in the bill itself. This means that an administrator will be left to make a decision tantamount to medical diagnosis, which should be made by a physician.

Those excluded will lose their right to seek compensation in court for the harms inflicted by companies that knowingly exposed them to a powerful human carcinogen.  As diagnosed sufferers of asbestos-related diseases (although not eligible for financial assistance under the bill) they will be unable to obtain health or life insurance. Some will be unable to continue in their current trade or to work at all.  The cost of their continuing medical care—which for someone stricken with asbestosis could be several thousand dollars a month for oxygen alone—will ultimately be borne by taxpayers, if at all.

What follows is a detailed critique of the bill's medical criteria compiled from the testimony, statements and letters to Senate Judiciary Committee members by the aforementioned experts:

3

## Diagnosis based on crude, outdated technology

### 1.    X-rays are a poor substitute for CT scans

The bill almost completely relies on x-rays and a limited set of pulmonary function tests—a more than century-old, forced breathing test—as the basic diagnostic tools and, by extension, determinants of a claimant's compensation level. Studies comparing x-ray with CT scan technology, have conclusively shown that the x-ray is a comparatively crude way of diagnosing asbestosis. CT scans are about 33 percent more sensitive in detecting interstitial disease, and over 50 percent more sensitive in detecting pleural disease.[4]

X-rays fail to diagnose many victims of lung disease caused by inhalation of asbestos fibers. One reason is that asbestosis—a progressive, sometimes fatal disease that leaves its victims dependent on external oxygen supplies for survival—can be present in the lung even though the x-ray is normal using the ILO classification system specified in the bill. The ATS guidelines affirm the use of high resolution CT scanning for diagnosis of asbestosis when the chest x-ray is normal. As described in numerous peer-reviewed publications and in the ATS report, high-resolution computer tomography (HRCT) is now widely accepted as a diagnostic tool for asbestosis and asbestos-related lung scarring. Recent studies show that readers using a scoring index for HRCT were more accurate and reliable in the diagnosis of asbestosis than when using plain chest x-rays. The most notable study concluded that "the examined HRCT scoring method proved to be a simple, reliable, and reproducible method for classifying lung fibrosis and diagnosing asbestosis also in large populations with occupational disease, and it would be possible to use it as a part of an international classification."[5] Expert consensus supports this conclusion.

Nevertheless, there is only limited call in the bill for use of HRCT technology. The cost for HRCT diagnosis compared to x-rays may be a concern, but there is every reason to believe affordable prices for HRCT scans can be achieved, especially as the volume of such scans would grow if the technology were permitted beyond the narrow fashion now contemplated by the bill. Some treating centers have already managed to get the cost down to just a few hundred dollars per CT scan.

### 2.    Mesothelioma diagnosis remains elusive

The bill fails to require the use of sufficiently sophisticated technology to diagnose mesothelioma, cancer of the lining of the abdominal or chest cavity, which is so difficult to detect accurately that a large number of cases go undiagnosed until after death. Mesothelioma cases are the most expensive for industry to compensate. The only documented cause of mesothelioma is asbestos exposure; although it is often referred to as a rare disease, the 2,500-4000 cases of mesothelioma diagnosed annually kill more people in the U.S. than ovarian cancer. PET scans, which can be more sensitive than CT scans, should be incorporated into the diagnostic criteria of the bill. Flexibility to allow for serological diagnosis should also be included in the bill. A blood test field tested in the U.S. and already in use in Australia has

---

[4] *Fraser and Paré's diagnosis of Diseases of the Chest, 4th Ed.*, pp. 2431, 2440.

[5] O. Huuskonen, et al., *High-resolution computed tomography classification of lung fibrosis for patients with asbestos-related disease*, Scandinavian Journal of Work, Environment and Health 27(2):106-12, April 2001.

proven very sensitive in diagnosing the disease. U.S. clinical trials for blood tests for mesothelioma are occurring right now at the Karmanos Cancer Institute in Michigan. Individuals at risk of mesothelioma would be barred from offering the results provided by such emerging technology under the bill.

## Diagnosis based on arbitrary criteria inconsistent with the current state of medical knowledge

### 1.   Barriers to proving asbestos-related lung disease

The bill requires *bilateral* pleural disease—thick scarring on the lining of both lungs—in order to establish that asbestos exposure is the cause of illness. Moreover, the scarring, which resembles an orange rind, must be of a certain width and be associated with specific breathing impairment. The dimension and impairment requirements have no basis in medical literature. And as acknowledged by the ATS in its guidelines, pleural scarring associated with asbestos *almost always* begins unilaterally—in just one lung—and often progresses unevenly. Thus, the bill would exclude from compensation, at the very least, individuals in the early stages of asbestosis.

### 2.   Flawed lung function testing

The bill requires abnormal spirometry—a test of the ability to blow air in and out—for a diagnosis of asbestosis, despite the fact that individuals with asbestos-related disease do not necessarily evidence spirometric abnormalities. For example, a construction worker who suffers from obstructive lung disease caused by dust and welding fumes may also suffer from restrictive lung disease due to asbestos exposure on the construction site. The worker may not exhibit abnormal spirometry, however, because the obstructive-restrictive combination can produce an overall normal spirometric test result.

## Exposure criteria are unreasonably rigid

### 1.   Minimum exposures exclude valid cases

The bill sets minimum durations of exposure to asbestos in order to establish valid claims of asbestos-related disease. For example, there is a minimum 5-weighted-year duration of asbestos exposure to support a diagnosis of asbestosis. There is an 8-12 year requirement of exposure to establish asbestos causation in the case of lung cancer. There is no support for strict exposure thresholds in medical or scientific literature. On the contrary, evidence points to situations where, under some exposure conditions, a one-month occupational exposure to asbestos can markedly heighten the risk of lung cancer and increase the risk of asbestosis-related death.

### 2.   Unreasonable discounting of exposure after 1976 and 1986

The bill discounts exposure based on the years during which it occurred, counting each year of exposure after 1976 as only half a year, and after 1986 as one-tenth of a year. The rationale for this is presumably the reduced opportunities for toxic exposure after these dates due to the implementation of OSHA and EPA regulations. There is, however, no medical or scientific basis for the discount formula used in the bill, nor any other discount formula. Furthermore, the

formula is ludicrous on its face: an individual with colorectal, laryngeal, esophageal, pharyngeal or stomach cancer whose exposure occurred after 1976 would need 105 years to meet the criteria for a valid claim, according to Dr. Philip Landrigan.

## Impairment criteria run counter to AMA guidelines

### 1.    Important medically-accepted tests are left out

How well an individual's lungs are working can be measured accurately and reliably with pulmonary function testing. The diagnosis of asbestosis depends in part on characteristic findings of physical exam, pathology, chest x-ray or CT scan, but impairment must be measured with appropriate pulmonary function testing. The AMA *Guides* states that each worker should undergo spirometry *and* DLCO—a measure of the lungs' efficiency in transferring oxygen into the blood stream—as part of the evaluation of lung impairment, and exercise testing can add additional information if needed. Using a combination of forced vital capacity (FVC), forced expiratory volume in one second (FEV1), DLCO, and oxygen consumption on exercise testing (VO₂max) when needed, the patient is placed into one of four levels.

The asbestos bill refers to the AMA *Guides* and includes spirometry, but omits DLCO and oxygen consumption on exercise testing—both of which are important and readily available tests that the AMA has determined are reliable and essential to determine how badly a person's lungs are impaired. As a result, individuals with asbestosis may have to wait until their disease is advanced before they can qualify for treatment.

## Causative criteria unreasonable and unscientific

### 1.    Outdated reliance on "markers" excludes legitimate cancer victims

Versions of the bill in 2003 and 2004 provided three levels of compensation for victims of asbestos-related lung cancer: Level VII, for lung cancer victims with 15 years of substantial occupational exposure, but whose x-rays showed no "markers" of non-malignant asbestos-related disease; Level VIII, for victims with lung cancer whose x-rays showed pleural disease; and Level IX for lung cancer victims with x-rays showing asbestosis. S. 852 has eliminated compensation under the old Level VII criteria for exposure in the absence of radiographic "markers," a determination that, based on Congressional Budget Office projections will potentially remove more than 40,000 asbestos-related lung cancer victims from coverage.[6] Provisions recently added to the 2005 bill would allow some of the lung cancer victims without radiographic "markers" to use CT scans to show that they have asbestosis, but the bill does not specify that victims with pleural disease can also use this more sensitive and specific diagnostic test to show their disease and exposure. CT scans have been proven in scientific studies to identify pleural disease or asbestosis in approximately half of individuals without such findings on x-rays, and that about half of these identified by CT scans will have asbestosis and half will

---

[6] Testimony of Peg Seminario, Director, AFL-CIO, before the Senate Judiciary Committee, April 2005.

have pleural disease. Thus, the net result of the bill as introduced is that 25,000 – 30,000 asbestos lung cancer victims previously covered may not be eligible for compensation.[7]

Numerous studies show that there is a dose-response relationship between exposure to asbestos and the risk of lung cancer, with increasing exposure leading to increasing risk of disease. There is no know safe level of exposure to asbestos. Workers at U.S. government facilities get an environmental pay differential if their job exposes them to airborne asbestos, regardless of the concentrations or length of time of exposure, so long as protective measures have not been implemented to eliminate the potential for injury.[8] With 15 years of substantial occupational exposure to asbestos, lung cancer can be attributed to that exposure—it should not be necessary to document underlying non-malignant asbestos disease as well. More importantly, while workers with asbestosis have a two-to-four-fold higher risk of lung cancer than asbestos exposed workers without asbestosis, asbestosis is merely a surrogate measure of exposure: significant asbestos exposure is required to cause asbestosis. Since 1995, scientific studies have clearly demonstrated that asbestosis itself is not a necessary intermediary for development of asbestos-related lung cancer. Thus, current medical thinking rejects the threshold requirement of a radiographic "marker" to prove that lung cancer has been caused by asbestos. As a secondary matter, even where there is asbestosis, lung disease may not meet the still further hurdle of being bilateral, as already discussed.

## 2.      Smokers are unfairly punished

The bill reduces the ability of lung cancer patients with a history of asbestos exposure and who smoked to receive the same level of compensation as those who did not smoke, despite the well-documented synergistic effect of these two carcinogens. People exposed to asbestos are five times more likely to develop lung cancer than those not exposed. Smokers run a 10-fold risk of developing lung cancer compared to non-smokers. But a smoker who is also exposed to asbestos has 55 times the risk of developing lung cancer. To exclude a lung cancer sufferer with a history of occupational exposure to asbestos solely because the victim smoked is unreasonable because it implies assumption of a significantly heightened risk that, in fact, could not have been known by the victim: even those who would have been aware that smoking posed a danger would not have had knowledge of the synergistic combination, a fact that remains in the province of medical professionals and is not commonly advertised. It is prejudicial because it singles out smokers but ignores the synergistic interaction of other environmental carcinogens, such as drinking arsenic-contaminated well water, with asbestos exposure. It is unfair because it allows a corporation that concealed the dangers of smoking from consumers to blame a given individual's lung cancer on occupational contact with asbestos, and a corporation that concealed the dangers of asbestos from workers to claim that the same individual, who was an employee, got lung cancer from smoking—thus exempting bad actors from legal liability. Finally, to arbitrarily attribute a smoker's lung cancer to smoking rather than asbestos because there is no radiographic "marker" of exposure, i.e., pleural disease, flies in the face of epidemiological evidence as described above.

---

[7] Ibid.
[8] *U.S. Dep't. of Veterans Affairs Medical Center v. American Federation of Government Employees,* 46 FLRA No. 107, January 1993.

### 3.    Consumers and bystanders are left out

The bill only compensates those who were occupationally exposed to asbestos—and then, only if in contact with asbestos for more than 5 years—and the family members of exposed workers. It does not, for example, compensate the high school kids in factory towns across the country who unloaded boxcars filled with vermiculite ore to earn money over their summer vacations and now, maybe 20 years or more later, have developed lung disease. It makes no provision for individuals harmed by non-occupational exposure, other than the residents of Libby, Montana. The EPA currently has 28 nationwide factory site "hot spots" under priority surveillance to determine the health effects of asbestos exposure. These sites received 80% of the Libby, Montana vermiculite ore sent to a total 200 factories in the U.S. where the toxic material was processed for use in consumer goods. The remaining 172 sites are of secondary interest to the EPA, but are also included in its surveillance plan. None of the community members exposed to asbestos dust from factory exhaust and particles transmitted widely by workers on their clothing and skin in any of these 200 towns will be covered under the trust fund.

Also excluded from qualifying for benefits are consumers who purchased and indifferently used and disposed of some 3,000 commercial products containing asbestos, including people who did their own automotive repairs such as replacing brake linings. Nor does the bill include occupants of 30 million houses nationwide containing asbestos-laden insulation in their attics, the health consequences of which have as yet been unexplored—although it has been established that there is no safe level of exposure to asbestos. It leaves out the hundreds of thousands of New Yorkers who have lived and worked in the vicinity of Ground Zero from the World Trade Center's destruction forward. The bottom line is that because the medical criteria rely on occupational exposure thresholds, they exclude millions of individuals who unwittingly incurred the risk of disabling and potentially fatal disease by purchasing products or living in communities with asbestos-related industries.

### Contacts

***Michael Harbut, MD, MPH, FCCP***, Chief, Center for Occupational and Environmental Medicine; Co-Director, National Center for Vermiculite and Asbestos-Related Cancers, Karmanos Cancer Institute; Clinical Assistant Professor, Internal Medicine, Wayne State University. (248) 547-9100 (w), (248) 506-8871 (c), (248) 367-8265 (beeper), M1har@aol.com.

***Philip J. Landrigan, MD, MSc, DIH***, Chair, Dept. of Community and Preventive Medicine, Mount Sinai School of Medicine. (This is New York's largest clinical facility in occupational medicine and one of the nation's largest research and training programs in occupational health, established by Dr. Irving J. Selikoff, known as the "Father of Asbestos Research in the United States." This department was the major provider of diagnostic services to Ground Zero workers in the aftermath of the World Trade Center destruction, examining over 12,000 workers, many of whom were exposed to asbestos.) (212) 241-4804 (w), phil.landrigan@mssm.edu.

***L. Christine Oliver, MD, MPH, MS, FACPM***, Assistant Clinical Professor of Medicine, Harvard Medical School; Associate Physician, Pulmonary and Critical Medicine, Massachusetts General Hospital. (617) 232-1704 (w), (617) 312-7219 (c),coliver@ohiinc.com.

*Alan C. Whitehouse, MD,FCCP*, Senior consulting physician at the Center for Asbestos Related Disease, Libby, Montana and the pulmonary specialist who first identified asbestos-induced disease among workers in the W.R. Grace mine and manufacturing plant at Libby. (509) 999-5500 (c), (509) 276-1342 (h), (406) 293-9274 (Libby CARD clinic), acw1@sisna.com

###

Public Citizen is a national, nonprofit consumer advocacy organization based in Washington, D.C.

For more information, please visit www.citizen.org



**Alan C. Whitehouse MD**
Board Certified
Internal Medicine & Pulmonary Diseases

1507 E Eloika Rd.
Deer Park,Wa 90006
(509) 999-5500
Fax (509) 276-1343

### PRELIMINARY REPORT ON 79 CHEST XRAYS REVIEWED
### RELATIVE TO THE ASBESTOS INJURY RESOLUTION ACT OF 2005

At the request of Jon Heberling, Dr Black and I reviewed 79 chest xrays to evaluate qualification for compensation under the Asbestos injury Resolution Act of 2005. This was not a controlled study and it was biased toward the more ill patients. This occurred as all patients xrays looked at were from my Spokane practice which incorporated many severely ill patients and ones who had lost 10-15% of their lung function over a period of several or more years. All films were reviewed carefully and measurements taken of pleural thickness, review of any interstitial disease, review for blunting of either costo-phrenic angle, or charts reviewed for prior thoracic surgery that would create blunting of a costo-phrenic angle. I have read many more films on patients from Libby and estimate that overall only 10 - 20 % of all the patients would qualify.

### RESULTS

15 patients were on oxygen with an $FEV_1$/ FVC ratio > 65%; only 4 qualified

8 patients had died- 5 qualified/ 3 did not qualify. All died of respiratory failure from asbestos pleural disease except one.

22 of 27 that qualified had blunting of one costo-phrenic angle.

5 of 27 qualified met the B2 requirement.

17 patients had FVC, TLC, and DLCO all over 80% of predicted (normal) and only 1 qualified

29 patients had FVC, TLC, or DLCO 60- 80% and considered to be in an intermediate range.10 qualified. All were very symptomatic.

33 patients had FVC, TLC, or DLCO under 60% (severe); only 16 qualified, including only 2 of 6 who died.

Of the 71 living patients, only 22 qualified ( 31%). 18 of these had FVC's or DLCO's of less than 70% of predicted. Only 3 of 71 qualified with FVC above 80% of predicted. 2 of those though had DLCO's below 70% of predicted. Another significant consideration is that we use normal values (Knudsen, Miller), that range 5- 10% higher than the Crapo norms used in the AMA Guides to evaluation of Permanent Impairment (5th Ed.).

The average FVC in this group of 79 was 65% of predicted and the DLCO 70% (Knudsen/ Miller). Of the 22 alive qualifying, 2 had had thoracic surgery which may have created the qualifying blunting of the costo-phrenic angle and would exclude them from compensation.

Only 4 of 79 patients had interstitial disease of 1/0 or greater, typical of Libby tremolite disease. Libby asbestos disease is predominantly a pleural disease.

It is clear that the proposed law is inadequate to compensate the approximately 1500 asbestos victims in Libby, Montana who have been identified so far. There is also no scientific basis for the B2 requirement or the angle bunting requirement outlined in the law.

Alan C. Whitehouse MD
Spokane, Wa.

**EXHIBIT**

tabbies

2



Gary Ewart
*Director,*
*Government Relations*

Fran DuMelle
*Consultant.*
*International Health*

**Washington Office**
1150 18th Street, N.W.
Suite 900
Washington, DC 20036-3816
Phone: (202) 785-3355
FAX: (202) 452-1805
Internet: www.thoracic.org

**National Headquarters**
61 Broadway
New York, NY 10006
Phone: (212) 315-8700
Internet: www.thoracic.org

Thomas R. Martin, MD
*President*

Adam Wanner, MD
*Past-President*

Homer Boushey Jr., MD
*President-Elect*

Sharon I. S. Rounds, MD
*Vice President*

Peter D. Wagner, MD
Treasurer

Carl C. Booberg
*Executive Director*

*Official Journals*

American Journal of
Respiratory and Critical
Care Medicine ®

American Journal of
Respiratory Cell and
Molecular Biology®

Internet: www.atsjournals.org

Dennis Archer, JD
President-Elect
American Bar Association
740 15th Street, N.W.
Washington, DC 20005-1019

Dear Mr. Archer:

As president of the American Thoracic Society (ATS) I want to express our extreme concern with the medical criteria used in the <u>American Bar Association policy: Asbestos Litigation Policy</u> adopted in February 2003. The medical criteria used in the document do not reflect the current state of screening and diagnosis for asbestos-related diseases

The ATS is one of the leading organizations in the scientific and medical community regarding the diagnosis and treatment of asbestos related diseases. The American Thoracic Society (ATS) founded in 1905, is an independently incorporated, international professional and scientific society which focuses on respiratory and critical care medicine. Today, the Society has approximately 13,500 members are engaged preventing and treating respiratory disease around the globe, through research, education, patient care and advocacy.

The ATS does not have a position on the need for, merits of or construction of asbestos litigation reform legislation. As physicians who diagnose, treat and research asbestos-related conditions, we are however committed to ensuring that appropriate medical criteria is used and applied in whatever legislative proposals move forward.

The ATS has the following concerns the medical criteria listed in the ABA Asbestos Litigation Report:

**Existence of Asbestosis**
Significant asbestosis can be present with an x-ray profusion less than 1/0 or even with a normal x-ray. Impairment from this asbestosis can be manifest by demonstrated decrease in diffusing capacity (DL) (with or without a decrease in forced vital capacity, FVC) or abnormality in ventilatory and gas exchange parameters on respiratory exercise testing. Diffusing capacity is available at any lung center, is standardized[1] and is known to be abnormal in interstitial lung disease (ILD) even when FVC and x-ray are normal. Perversely, if DL is significantly decreased without a decrease in FVC, the x-ray standard requirement of the ABA standard (2/1) is greater that what is in common medical practice.

---

1)  American Thoracic Society. Single breath carbon monoxide diffusing capacity (transfer factor). Recommendations for a Standard Technique. Am. Rev. Resp. Dis. 1987; 136:1299.

**EXHIBIT**

tabbies

3

Impairment from asbestos can be manifest by the FVC when the x-ray is normal; such impairment is not admissible under the ABA proposal.

Asbestosis can be detected radiographically by CT scan when the x-ray is normal. CT scan is universally available in the U. S. and used by all pulmonolgists in a fuller assessment of ILD.

**Pleural Scarring**
The section on impairment from asbestos-related pleural scarring is vastly insufficient. Diffuse pleural scarring can be associated with greatly diminished FVC regardless of the extent or thickness of the scarring or its bilaterality[2]. It is therefore exclusionary to insist on "bilateral" diffuse pleural thickening of at least B/2.

Analysis of large numbers of patients with asbestos-related pleural scarring has shown that extensive circumscribed pleural scarring is associated with a significant decrement in FVC sufficient to bring about impairment in individual patients.

The ATS will soon be publishing a revised version of: The Diagnosis of Nonmalignant Diseases related to Asbestos. The revised document will provided the most recent data and professional recommendations on the definitions, diagnosis and treatment of nonmalignant asbestos-related diseases. The ATS strongly encourages the American Bar Association and other policy makers to consider this forthcoming document when establishing medical criteria in asbestos-related legislation.

Sincerely,

Thomas R. Martin

Thomas R. Martin, M.D.
President,
American Thoracic Society

Cc:    Members of the House Judiciary Committee
       Members of the Senate Judiciary Committee

---

2)    Lilis R, Miller A, Godbold J et al. Pulmonary function and pleural fibrosis: quantitative relationships with an integrative index of pleural abnormalities. Am J Industr. Med 1991; 20:145.