# EXHIBIT 20

{D0007918:1 }

Page 1

```
1            IN THE UNITED STATES BANKRUPTCY COURT
2                   FOR THE DISTRICT OF DELAWARE
3   IN RE:                        )
                                  )        Chapter 11
4   OWENS-CORNING, ET AL.,        )        Case No. 00-03837 (JFK)
                                  )
5                                 )        Jointly Administered
              Debtors.            )
6                                 )
7
8
9   ***********************************************
              VIDEOTAPED DEPOSITION OF
10                 DR. GARY FRIEDMAN
                  DECEMBER 14, 2004
11                    VOLUME 1
    ***********************************************
12
13
14
15        ORAL DEPOSITION OF DR. GARY FRIEDMAN, produced as
16   a witness at the instance of Credit Suisse First
17   Boston, as Agent for the prepetition institutional
18   lenders to the Debtor, and duly sworn, was taken in
19   the above-styled and numbered cause on the 14th of
20   December, 2004, from 8:40 AM to 5:00 PM, before
21   Cinnamon Boyle, CSR in and for the State of Texas,
22   reported by machine shorthand, at the offices of Weil,
23   Gotshal & Manges, 700 Louisiana, Suite 1600, Houston,
24   Texas, pursuant to the Federal Rules of Civil
25   Procedure.
```

Page 4

```
 1                          INDEX
                                                       PAGE
 2
        Appearances..............................       2
 3
        Stipulations.............................       6
 4
 5
        DR. GARY FRIEDMAN
 6
        Examination by MR. HICKERSON.............       6
 7
        Examination by MR. SWETT.................     234
 8
        Examination by MS. HOGAN.................     252
 9
        Examination by MR. SWETT.................     268
10
11      Signature and Changes....................     270
12      Reporter's Certificate...................     272
13
                              EXHIBITS
14
15      NO.   DESCRIPTION                             PAGE
16      86    Curriculum Vitae Of Dr. Friedman ....     7
17      87    Application For Order Under 11 U.S.C. .  17
18      88    US Bankruptcy Court Request Of Documents
              In Exhibit A To Dr. Friedman...........  18
19
        89    Notice Of Deposition To Dr. Gary Friedman.. 22
20
        90    OCF Consulting Contract With
21            Dr. Gary Friedman .....................  30
22      91    Letter To Anne Little From Dr. Friedman
              Dated October 7, 1999 .................  42
23
        92    Letter To Dr. Friedman From Anne Little
24            Dated October 11, 1999 ................  52
25      93    Letter To Anne Little From Dr. Friedman
              Dated March 01, 2000 ..................  55
```

GARY FRIEDMAN

Page 2

```
 1                A P P E A R A N C E S
 2  FOR CREDIT SUISSE FIRST BOSTON, AS AGENT FOR THE
    PREPETITION INSTITUTIONAL LENDERS TO THE DEBTOR:
 3
         DAVID A. HICKERSON
 4       PETER M. FRIEDMAN
         WEIL, GOTSHAL & MANGES, LLP
 5       1501 K Street, N.W.
         Suite 100
 6       Washingston, D.C. 20005
         (202)682-7195
 7
 8  FOR DEBTORS:
 9       MARY BETH HOGAN
         DEBEVOISE & PLIMPTON, LLP
10       919 Third Avenue
         New York, NY 10022
11       (212)909-6996
12
    FOR OFFICIAL COMMITTEE FOR ASBESTOS CLAIMANTS:
13
         TREVOR W. SWETT
14       MAX C. HEERMAN
         CAPLIN & DRYSDALE
15       One Thomas Circle, NW
         Suite 1100
16       Washingston, D.C. 20005
         (202)862-5000
17
18  FOR FUTURE CLAIMAINTS REPRESENTATIVE:
19       MARIS VEIDEMANIS
         KAYE SCHOLER, LLP
20       425 Park Avenue
         New York, New York 10022-3598
21       (212)836-8623
22
    FOR BONDS AND TRADES:
23
         JONATHAN B. KROMBERG
24       ANDERSON KILL & OLICK, PC
         1251 Avenue of the Americas
25       New York, New York 10020
         (212)278-1261
```

Page 3

1
2
    ALSO PRESENT:  HORACIO X. SANTOS - VIDEOGRAPHER
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1      A.   Okay.  Do you promise?
2           That was my sense.  It was not
3 necessarily a scientific measurement that I could
4 produce you a document for but that was my gestalt,
5 when I say compensable disease, I meant under the
6 strict terms under the NSP agreements.  May not be the
7 tort system or some other setting but in the NSP
8 agreements, I think that that was a fairly accurate
9 overview based on the things you and I visited
10 together.
11     Q.   So it's your view that some two-thirds of the
12 nonmalignant claims submitted under the NSP should not
13 have been paid?
14          MS. HOGAN:  Object to form.
15 Mischaracterizes testimony.
16          MR. SWETT:  Objection to form.
17     Q.   (BY MR. HICKERSON) Would you agree with that
18 statement?
19     A.   The determination whether claims should be
20 paid or not was never in my purview.  It's whether
21 they met medical criteria and should they be paid
22 based on what I viewed as medical criteria.
23     Q.   Taking that qualification, is it your opinion
24 that two-thirds of the nonmalignant claims submitted
25 under the NSP did not meet medical criteria for

GARY FRIEDMAN

Page 216

1  payment under the NSP agreement?
2              MS. HOGAN:  Object to form.
3              MR. SWETT:  Same objection.
4      A.  Again, I think within the context of the
5  cases I reviewed prior to the preparation of this
6  document, that was my view, yes, sir.
7      Q.  (BY MR. HICKERSON) Okay.
8      A.  Based on medical criteria under the NSP
9  agreement.
10     Q.  Yes.  Thank you.  The next sentence it says,
11 80 percent of the nonmalignant claims submitted would
12 not qualify as impaired under the terms of the
13 agreement.  Was this the topic that you later did the
14 report that we just went through in some detail?
15     A.  The 1,691?
16     Q.  Yes.
17     A.  Yes, it is -- it was to focus on those -- on
18 the impaired claims, yes, sir.
19     Q.  And so the first sentence here is not limited
20 to impaired claims; is that right?  Your opinion that
21 at least 66 percent of the nonmalignant claims
22 submitted do not represent compensable disease.
23             MS. HOGAN:  Objection to form.
24             MR. SWETT:  Objection.
25     A.  That --

1           MR. HICKERSON:  I will accept one
2  objection as being applicable to everyone preserving
3  objections for everyone.
4           MS. HOGAN:  We can't talk to each other.
5  I don't know if he's going to object, so.
6           MR. HICKERSON:  Once we've heard one,
7  it's good for everyone in the room.
8           MR. SWETT:  Fair.
9      A.  Again, this is prior to preparation of the
10 large study and the 66 percent would have been all
11 inclusive, impaired, unimpaired, et cetera.  The other
12 number relates only to impaired.  When I say the other
13 number, 80 percent only to impaired.
14     Q.  (BY MR. HICKERSON) Okay.  And since you
15 didn't have -- you hadn't conducted the 1,691 study
16 yet when you wrote this?
17     A.  That's correct.
18     Q.  What was your opinion that 80 percent of the
19 nonmalignant claims submitted would not qualify as
20 impaired under the term of the agreements based upon?
21     A.  It was based upon the three things I listed
22 here.  My own experience as to what percent of
23 patients are impaired who actually have an
24 asbestos-related disease that might fulfill these
25 unique criteria for the NSP.  Number two, litigation

```
 1    They varied based upon the x-ray finding of the
 2    claimant, and they were predicated upon the finding of
 3    abnormal lung function testing.
 4         Q.   Is it fair to say those were criteria
 5    applicable as a matter of contract under the NSP as
 6    distinct in criteria applicable in the tort system as
 7    a matter of law?
 8         A.   It's my understanding that -- again, I'm not
 9    a lawyer so when we talk about contract -- but it's my
10    understanding these were agreements that were reached
11    between the various -- each plaintiff firm and the
12    Owens-Corning within the NSP, so I would assume that
13    would be contractual, and certainly they are different
14    from the criteria that are customarily used when I
15    testify in a court of law, and we are using ATS
16    impairment criteria or American Medical Association
17    guideline to impairment.  These criteria were unique
18    to the NSP.
19         Q.   Were they stricter than the ATS or tort
20    system criteria you experienced in the sense that the
21    NSP impairment criteria excluded more clients?
22              MR. HICKERSON:   Object to the form of the
23    question.
24         A.   They are stricter to the sense that --
25    several things.  Number one is that the AMA guide to
```

GARY FRIEDMAN

Page 237

```
 1   impairment and the American Thoracic Society guide to
 2   impairment, all other impairment guides only address
 3   the issue of impairment, meaning how well do the lungs
 4   function or do they function from -- or properly
 5   stated, is there capacity in functioning capacity
 6   below a certain normal value.
 7              The NSP criteria goes that far and goes a
 8   step farther and addresses the issue of causation
 9   indirectly by disqualifying patients whose lung
10   impairment might be due to other causes such as
11   cigarette smoking because of the fact that an abnormal
12   lung test by itself doesn't make the diagnosis.
13              And within the NSP, the Owens-Corning did
14   not want to be penalized and paying money for people
15   whose lungs were injured from smoking, and so they put
16   certain other parameters that also had to be achieved
17   into the agreement for each of the patients.
18        Q.   And outside of the NSP, in your experience as
19   an expert testifying in litigation, did you often see
20   it happen that a claimant proceeding on the basis of a
21   diagnosis of asbestosis who was a smoker and who could
22   not have met the impairment criteria on the NSP on the
23   account of smoking would nonetheless be eligible in
24   the tort system?
25        A.   I've seen many cases where roughly 70 or 80
```

Page 238

1    percent of insulators were smokers, a lot of blue
2    collar workers were smokers, and they -- that did not
3    preclude them from filing a claim in the tort system,
4    that's correct.
5        Q.  Now, is it fair to say that pages 3 and 4 of
6    your report, which is Exhibit 6, set forth the general
7    summary of the criteria of the NSP as you understood
8    them?  I should say the criteria for determining
9    nonmalignant impaired cases.
10       A.  That's correct in the broadest sense.  The
11   actual criteria would be contained in the Appendix A
12   and Appendix B, which is attached to my report.
13       Q.  Apart from the issue of smoking, can you
14   think of other ways in which the criteria generally
15   applicable under the NSP were more restrictive than
16   the criteria that would apply in the tort system in
17   the sense of ruling out more claims?
18            MR. HICKERSON:  Object to the form of the
19   question.
20       A.  The -- in functional impairment within the
21   NSP also is predicated in part on patient age so there
22   was a sliding scale which would have been unique to
23   the NSP but different from the tort system as far as
24   how lung function had to correlate with age.  Also,
25   the fact that the -- there were certain x-ray criteria

```
 1   that were more stringent such as for pleural disease,
 2   the NSP then would have been applicable in the tort
 3   system.
 4       Q.  (BY MR. SWETT) In the tort system, is a
 5   claimant required to show a PFT revealing reduced lung
 6   function in order to be eligible for compensation?
 7           MR. HICKERSON:  Object to the form of the
 8   question.
 9       A.  Could you repeat that for me, please?
10       Q.  (BY MR. HICKERSON) In your experience in the
11   tort system is it a prerequisite for compensation that
12   a claimant for nonmalignant asbestos-related disease
13   present a pulmonary function test revealing reduced
14   lung function?
15           MR. HICKERSON:  Object to the form of the
16   question.
17       A.  I think I understand your question.
18       Q.  (BY MR. SWETT) Okay.
19       A.  Let me repeat and see if this is what you
20   intend.
21       Q.  Okay.
22       A.  I guess what you're asking is, in the
23   simplest term can a -- in the tort system can a person
24   file a claim for asbestosis or pleural disease either
25   without performing a PFT or without having an abnormal
```

GARY FRIEDMAN

Page 240

1   PFT, would that --
2       Q.  Not only file but receive compensation on
3   such a claim.
4       A.  It could, yes.
5       Q.  As a medical matter, is a pulmonary function
6   test revealing essential to a diagnosis of asbestosis?
7       A.  It is certainly helpful in strengthening the
8   diagnosis.  It is not essential.  The 1986 American
9   Thoracic Society criteria document says that you can
10  have asbestosis without impairment, although certainly
11  it's an important piece of information but it's not
12  required to make the diagnosis.
13      Q.  Doctor, in your experience in the tort
14  system, has it sometimes happened that you've
15  testified in behalf of a claimant alleging
16  nonmalignant asbestos disease, and specifically
17  asbestosis, based on an x-ray with an ILO reading of 1
18  over 0?
19      A.  I have testified in cases that after a
20  thorough evaluation, exclusion of more probable cause
21  that had a 1 over 0, I testified for the plaintiff,
22  that is correct.
23      Q.  And have many of those plaintiffs succeeded
24  in winning compensation?
25      A.  Yes, sir.

Henjum Goucher Reporting Services, LP
888-656-DEPO

GARY FRIEDMAN

Page 241

1    Q.  In many of those cases, did the defense
2  contest the presence of any disease?
3    A.  Yes.
4    Q.  Do you draw a distinction in your own mind,
5  Dr. Friedman, between impairment on the one hand and
6  injury on the other?
7    A.  I think that there is -- using the American
8  Medical Association guide to impairment and in other
9  formats that I've -- where I've worked -- done work
10 Texas workers' Comp or Texas Rehab Commission, I
11 believe there are distinctions between injury and
12 impairment, yes.
13   Q.  How would you describe those distinctions?
14   A.  I believe the definition of injury might be
15 an alteration of a bodily part or alteration in
16 function made by injury.  Whereas impairment indicates
17 the loss of use or loss of function.  So that injury
18 can be an anatomic diagnosis, but impairment is the
19 loss of function.
20   Q.  Do you also draw a distinction between
21 impairment on the one hand and disability on the
22 other?
23   A.  Yes.
24   Q.  What distinction is that?
25   A.  Again, going to the American Medical

1  viewed as significant questions in my mind concerning
2  how their interpretations compare to the peer review
3  literature or to the other B Readers, which to me
4  raises some questions especially when combined with
5  the fact some of these individuals were also
6  identified later in the Gitlin study which at the time
7  was unknown to me.
8      Q.  What was the total number of B Readers
9  involved in the 1,691 claims for which you reviewed
10 records?
11     A.  I believe that the total number of B Readers,
12 pulmonologists, radiologists was approximately 48, so
13 I believe there were 43 doctors in addition to the
14 five who were identified.
15     Q.  With respect to those 43, you did not
16 identify any systemic problem; is that so?
17     A.  Correct.  To the contrary, they as a group --
18 there may be some individual variations.  As a group
19 they seemed far more in keeping with what you expect
20 from the peer review literature and also were a very
21 useful barometer as they also had been hired by
22 plaintiff's counsel to demonstrate the difference
23 between the way their x-rays compared with the
24 literature and with these five of the more prolific
25 readers.  So they were the other 90 percent of the

GARY FRIEDMAN

Page 262

```
 1      A.   These are cases that predominantly have not
 2   been filed.  These are cases that are people who have
 3   had an x-ray, might have had a positive x-ray reading
 4   by somebody but who have not been given a clinical
 5   diagnosis of a disease and our experience is 85
 6   percent of the time we have told plaintiff's law firms
 7   they do not have a case or it may be that we're
 8   looking at the x-ray for the first time and tell them
 9   it's negative.  But we have literally tens of
10   thousands of cases that we have told plaintiff firms
11   do not have a case based on our review of the x-rays,
12   our review of the patient.
13      Q.   Dr. Friedman, do you know -- do you know why
14   Owens-Corning chose to send you certain claims NSP
15   claims for your review?
16      A.   The answer -- the short answer to your
17   question is no, I do not know.  That was their choice.
18   My -- my guess is that the claims they sent me were
19   largely problematic.  They -- as you can see they kept
20   me very busy during the time I was working with them
21   and I know whenever I would come up to Granville, they
22   would ahead of time pull cases that were problematic
23   and the cases that were sent to me were usually the
24   cases they had serious question on.  As to how they
25   chose those or why, you'd have to ask internally.
```

Henjum Goucher Reporting Services, LP
888-656-DEPO

1    Q.  I think you testified earlier that you
2    reviewed around 3,000, maybe somewhat higher NSP
3    claims for medical purposes?
4    A.  That's correct.
5    Q.  Do you have any idea how many total NSP cases
6    there were?
7    A.  I do not know.  I know that the first time I
8    ever talked to anybody about possibly going to become
9    involved with the NSP, the number 200, 215,000 is when
10   I asked them what the magnitude of the problem was.  I
11   remember my response to that.  I think that
12   Owens-Corning owed me for a new pair of underwear
13   because that that was a large number and that was
14   overwhelming.
15   Q.  You didn't look at all 200,000?
16   A.  No, I said I only went up to 3 or 4,000 out
17   of that total.
18   Q.  So which is about little over one percent?
19   A.  That's correct.
20   Q.  So the documents that Mr. Hickerson showed
21   you earlier today that dealt with prepetition
22   prebankruptcy reports on various NSP claims that you
23   reviewed, those reports and the conclusions you
24   reached in those reports apply to about one percent of
25   the total NSP claims?

GARY FRIEDMAN

Page 264

```
 1                MR. HICKERSON:  I'll object to the form
 2   of the question.
 3        Q.  (BY MS. HOGAN)  You can go ahead and answer.
 4        A.  They applied to what I reviewed, whether they
 5   can be extrapolated beyond that, I'm not going to say
 6   yes or no because I have not looked at the universe of
 7   the claims so I don't know.  I think that they are
 8   fair representations of what we looked at.
 9        Q.  Of the one or one and a half percent of the
10   claims you looked at.
11                MR. HICKERSON:  Object to the form of the
12   question.
13        A.  Plus the additional 1,961 claims in the
14   bankruptcy.  I think that they accurately reflect what
15   we found there.  Now, beyond that I would be
16   speculating.
17        Q.  (BY MS. HOGAN)  In Exhibit 101, this was a
18   letter from Jeff -- from you to Jeffrey Martincic at
19   Integrex about Odom and Elliott?
20        A.  Yes.
21        Q.  Do you recall that?  And you were asked a
22   question I believe it was -- had to do with your
23   recommendation.  One of your recommendations was that
24   an audit of the radiographs should be conducted,
25   Dr. Ballard's radiographs should be conducted.  Do you
```