# EXHIBIT 21

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------------------------------

IN RE:

OWENS CORNING, et al.,

Debtors.

CHAPTER 11
Case Nos. 00-3837 to 3854 (JFK)
(Jointly Administered)

----------------------------------------------------------------------------------

WITNESS:
Dr. Joseph Gitlin

DATE:
December 17, 2004

LOCATION:
Washington, DC

TAKEN BY:
Caplin & Drysdale

FINAL COPY
JANE ROSE REPORTING
1-866-rose-NYC  www.janerose.net

Page 1

```
 1     UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF DELAWARE
 2

 3     ------------------------------

       In re:
 4                                   Chapter 11
       OWENS CORNING, et al.,
 5
           Debtors.
 6

 7

 8         Case Nos. 00-3837 to 3854(JPF)

 9     ------------------------------

10

11

12

13

14     DEPOSITION OF:      Dr. Joseph N. Gitlin
15     DATE:               December 17, 2004
16     LOCATION:           Washington, DC
17     LEAD:               Caplin & Drysdale
18     REPORTER:           Susan Ashe, RMR, CRR
19

20

21

22

23

24     FINAL COPY
25     JANE ROSE REPORTING 1-866-rose-NYC
```

Page 2

```
 1    ATTORNEYS FOR ASBESTOS CLAIMANTS COMMITTEE:
 2          Nathan D. Finch, Esquire
 3          CAPLIN & DRYSDALE, CHARTERED
            One Thomas Circle, N.W.
 4          Washington, DC  20005
 5          PHONE:  202-862-5000
 6
 7
 8
 9    ATTORNEYS FOR OWENS CORNING:
10
            Helen Y. Kim, Esquire
11
            DEBEVOISE & PLIMPTON LLP
12          919 Third Avenue
            New York, NY  10022
13
            PHONE:  212-909-6455
14
15
16
17    ATTORNEYS FOR CREDIT SUISSE FIRST BOSTON AS
      AGENT FOR PREPETITION LENDERS:
18
            Adam P. Strochak, Esquire
19
            WEIL, GOTSHAL & MANGES LLP
20          1501 K Street, N.W., Suite 100
            Washington, DC  20005
21
            PHONE:  202-682-7133
22
23
24
25
```

Page 3

```
 1    ATTORNEYS FOR CERTAIN BONDHOLDERS AND THE
      TRADES:
 2
              Mark Weldon, Esquire
 3
              ANDERSON KILL & OLICK, P.C.
 4            1251 Avenue of the Americas
              New York, NY  10020
 5
              PHONE:  212-278-1201
 6
 7
 8
 9    ATTORNEYS FOR THE FUTURE CLAIMANTS
      REPRESENTATIVES (Via Telephone):
10
              Michael A. Lynn, Esquire
11
              KAYE SCHOLER, LLP
12            425 Park Avenue
              New York, NY  60602-4207
13
              PHONE:  312-372-1121
14
15
16
17
              ATTORNEYS FOR CERTAIN BONDHOLDERS (Via
18    Telephone):
19            Heidi Balk, Esquire
20            STROOCK, STROOCK & LAVAN, LLP
              180 Maiden Lane
21            New York, NY  10038
22            PHONE:  212-806-6525
23
24
25    ALSO PRESENT:  David B. Smith, Paralegal
                      Caplin & Drysdale
```

U.S. Bankruptcy Court          **FINAL**          **Dr. Joseph Gitlin**
In Re: Owens Corning                              **December 17, 2004**

Page 65

1      Dr. Henry.

2                      Do you know whether Dr. Henry

3      typically testifies for asbestos defendants?

4           A      I don't know.

5           Q      You're familiar with the concept of

6      "interobserver variability"; correct?

7           A      Yes.

8           Q      And what does that mean?

9           A      That is very common, to find that

10     qualified physicians tend to differ in

11     interpreting -- and I'll use the term "films."

12                     There is whole other science

13     here when we get into digital; but we'll talk

14     about "films."

15                     They tend to differ in their

16     interpretation of abnormalities -- either

17     false-positives or false-negatives, whichever

18     way you want to look at it.

19                     And in general, in science as

20     well as the art of medical imaging

21     interpretation, there is a difference of about

22     20 percent.

23          Q      In your 2002 deposition, you said

24     that radiology is an art, not a science, and

25     there is variation in the view of the reader in

Page 66

```
 1    almost any examination that's looked at.
 2                   Do you still agree with that
 3    statement?
 4         A    Yes.
 5         Q    Are you familiar with the work by
 6    Ducatman, et al. --
 7         A    Yes.
 8         Q    -- that examined the B-reader
 9    intervariability in the context of examinations
10    for the U.S. Navy?
11         A    Yes.
12                   MR. FINCH:  Let's mark this as
13         the next exhibit.
14                   (Whereupon, Gitlin Deposition
15         Exhibit No. 6 was marked for
16         identification.)
17                   THE WITNESS:  It's labeled
18         "August 1988," by the way.
19    BY MR. FINCH:
20         Q    You do have Gitlin Exhibit 6 in
21    front of you, Dr. Gitlin?
22         A    Yes.
23         Q    This is an August 1988 publication
24    by Dr. Alan Ducatman and others, entitled
25    "'B-Readers' and Asbestos Medical Surveillance."
```

U.S. Bankruptcy Court    **FINAL**    **Dr. Joseph Gitlin**
In Re:  Owens Corning           **December 17, 2004**

Page 87

```
 1        form.
 2        A      It's a hypothetical possibility.
 3        Q      Which you have not investigated;
 4   correct?
 5        A      Correct.
 6        Q      Just to sort of break it down in
 7   laymen's terms:  You would agree with me, would
 8   you not, that if you went to a podiatrist's
 9   office you'd likely find a higher percentage of
10   people in the waiting room who are complaining
11   of sore feet than you would of people walking
12   around on the street?
13        A      Logically, yes.
14        Q      And so, would you agree with me that
15   the same sort of phenomenon can occur in
16   asbestos litigation -- meaning that a much
17   greater percentage of persons who file claims
18   actually have asbestos-related disease than what
19   you would expect from the total screened
20   exposure population?
21        A      Logically, yes.
22        Q      Have you done any kind of study to
23   determine whether doctors who often testify for
24   asbestos defendants engage in a systematic
25   underreading of X-rays?
```

**U.S. Bankruptcy Court**        **FINAL**       **Dr. Joseph Gitlin**
**In Re: Owens Corning**       **December 17, 2004**

Page 120

1     that were submitted, the initial B-readers for

2     all of them are -- I mean, the initial readers

3     for all them were done by B-readers?

4     A     Oh, yes.

5     Q     So you're not saying that those

6     roughly 30 B-readers were not qualified or

7     incompetent, are you?

8     A     Oh, no.

9     Q     And of the 30 B-readers, seven of

10    them read more than 35 X-rays; is that right?

11    A     Correct.

12    Q     Do you know if any court has

13    precluded any of the seven from testifying in an

14    asbestos personal injury case, on the ground

15    that they are incompetent or their testimony is

16    unreliable?

17    A     I don't know of any instance.

18    Q     After you had gotten the 551 films,

19    you -- there were some that you couldn't use for

20    some reason; is that right?

21    A     Right.

22    Q     And so, you got down to the 492?

23    A     Right.

24    Q     Of the 492 individual claimants, do

25    you know how many of that 492 at least one of

Page 123

1              And then there were two
2    consultants, 1/0 or greater, in nine cases.  And
3    so on.
4         Q     But --
5         A     Now, in the extreme case, which may
6    make it clearly understood, if you go to the
7    column headed "6" --
8              MR. WELDON:  What page are we
9         on again?
10             THE WITNESS:  On 851 of the
11        published report.
12        A     -- there was one instance where all
13   six consultant readers said that there was 1/0
14   or greater.
15             So in addition to the initial
16   reader that also said 1/0 or greater, all six
17   consultants said yes.
18        Q     I still don't think that answers my
19   question, or maybe I just don't understand the
20   answer.
21             Are you saying that if you sum
22   up the column headed "1" on Table 4b on page
23   851, that will tell you how many of the 492
24   claimants -- at least one of the consultant
25   B-readers believed that they had a 1/0 or

Page 124

1    greater ILO rating?  Or is it some other

2    calculation to do that?

3          A     That calculation will do it, and

4    there is another way of doing it.

5                      From -- no.  I can't do it

6    from this table here.

7          Q     Okay.  So is it correct that 39 out

8    of the 492, one of the consultant B-readers

9    concluded they had a 1/0 or greater?

10         A     Yes.

11         Q     All right.  What is a "kappa

12    statistic"?

13         A     It's a measure of agreement between

14    one or more individuals on determining the value

15    of a parameter in a statistical analysis.

16         Q     Would you agree that a kappa

17    statistic of greater than .75 indicates a high

18    level of agreement?

19         A     Yes.

20         Q     And a kappa statistics of 1.0, for

21    example, would mean an almost perfect agreement;

22    correct?

23         A     Yes.  By definition, 1.0 is perfect.

24         Q     A kappa statistic of .40 to .75

25    would indicate fair agreement?

U.S. Bankruptcy Court                  **FINAL**                  Dr. Joseph Gitlin
In Re: Owens Corning                                       December 17, 2004

Page 129

1    do it this way:

2                    Going back to your article,

3    which is in Gitlin 1, at various places you talk

4    about kappa statistics -- first, the kappa

5    statistic measuring the agreement among the six

6    consultant readings.

7         A    Right.

8         Q    And then the kappa statistic when

9    you add in the initial B-readers; correct?

10        A    Correct.

11        Q    Okay.  For example, on page 849 of

12   the article --

13        A    I've got it.

14        Q    -- in the second column, first full

15   paragraph, you write:  "The kappa statistic

16   assessing agreement among the six consultant

17   readers was .10 with a 95% confidence interval

18   of .07-.12."

19                    This is the kappa statistic

20   for film quality; is that correct?

21        A    This is -- Table 1d -- as usual, I

22   have to go back two pages to find 1d, I think.

23                    1d is "...Chest X-ray Film

24   Quality," yes.

25        Q    So what this shows is that the

Page 130

```
 1    consultant B-readers have pretty poor agreement
 2    among themselves as to film quality; correct?
 3         A    Yes.
 4         Q    And then when you add the initial
 5    B-readers to that, it doesn't really change the
 6    agreement or lack of agreement that much;
 7    correct?
 8         A    Correct.
 9         Q    The next parameter that you measure
10    after the film quality is the question:  Is the
11    X-ray film completely negative?
12         A    Correct.
13         Q    And there the consultant B-readers
14    have a kappa statistic of .43; is that right?
15                   I'm reading on page 850 your
16    article.
17         A    I'm trying to find that, that
18    number.
19                   That's Table 2d; and on kappa
20    statistics -- well, it's .- -- yeah .43.
21         Q    Which, I guess, is on the low end of
22    fair agreement; correct?
23         A    Yes, yes.
24         Q    And then when you add the initial
25    readers to that, the kappa statistic drops to
```

U.S. Bankruptcy Court                FINAL                Dr. Joseph Gitlin
In Re: Owens Corning                              December 17, 2004

Page 134

1        Q     So there was a fair agreement

2    between the initial B-readers and the consultant

3    B-readers on the question of whether there were

4    pleural abnormalities consistent with

5    pneumoconiosis; is that right?

6        A     Right.

7        Q     Okay.  On the last page -- not the

8    last page, it's page 853, under the "Discussion"

9    section --

10       A     Right.

11       Q     -- the second paragraph, the second

12   sentence, you state:

13                  "The authors had no basis for

14   determining how this group of workers

15   represented the universe of asbestos claimants."

16                  Do you see that?

17       A     Yes.

18       Q     Do you still agree with that

19   statement?

20       A     Yes.

21       Q     So you don't know how representative

22   this group of asbestos claimants is, compared to

23   the hundreds of thousands of asbestos claimants

24   as a whole?

25       A     That's correct.

Page 137

1   College of Radiology.  And he feels their

2   responses were quite honest.

3                     And in his recommendation of

4   who to select from the larger list, it was a

5   factor in his saying:  We have people who are

6   thought of or have a reputation for being

7   associated with plaintiff cases.  We have people

8   who are associated with defendants.  We have

9   people who have never been involved at all.

10                     And so, there is a range of

11   association here.

12        Q     Do you know if he asked any of them

13   to provide prior depositions where they were

14   questioned under oath about --

15        A     Yes.

16        Q     -- who they worked for?

17        A     He did not.

18        Q     He did not.

19                     And I take it you didn't do

20   that either; correct?

21        A     Correct.

22        Q     And so, do you know which, if any,

23   of these seven consultant B-readers is a

24   consultant for plaintiffs in asbestos

25   litigation?

U.S. Bankruptcy Court                    **FINAL**                    **Dr. Joseph Gitlin**
In Re:  Owens Corning                                            **December 17, 2004**

Page 138

```
 1        A      I don't know.

 2               I know the one, according to

 3    Otha's conversation said, "I have a reputation

 4    for..."

 5        Q      Was it Dr. Fraser; correct?

 6        A      I honestly don't know, but it could

 7    be.

 8        Q      All right.

 9        A      In fact, that's a very interesting

10    question, which, when I looked at my own table

11    here before -- this Gitlin 9 -- I still can't

12    tell you, because of the codes we gave these

13    people, that "C1" is who and "C2" is who, by

14    name, because of my intent not to know that in

15    doing all this analysis.

16               So for a moment there when you

17    asked that question, I might go look at Fraser

18    and see what his percentage of positives were;

19    but I don't know which one he is.

20        Q      Okay.  So is it fair to say, you

21    relied on Mr. Linton to do the vetting to

22    determine whether or not any of these seven

23    consultant B-readers were people who principally

24    consulted for defendants in asbestos litigation

25    or not?
```

U.S. Bankruptcy Court                 **FINAL**                  **Dr. Joseph Gitlin**
In Re:  Owens Corning                                    **December 17, 2004**

Page 139

1          A        For defendants or for plaintiffs?

2          Q        Yes.

3          A        I relied on his personal

4     information, yes.

5          Q        Okay.  And you know that he did not

6     ask any of them for prior depositions or trial

7     testimony, where they were under oath and

8     responded to questions about who they had worked

9     for in asbestos litigation?

10         A        Yes.  He did not ask -- this was on

11    a very professional and very long-term personal

12    basis.

13                  He was quite confident he got

14    straight answers.  In fact that was part, as I

15    mentioned earlier, of our agreement with the

16    consultants -- that they would be anonymous,

17    insofar as we had the power to keep them

18    anonymous -- and then at some point, we had to

19    respond and put it in writing -- and also, that

20    they agreed to be totally blind to all the key

21    elements of litigation.  They didn't want to

22    know about it, and they didn't.

23         Q        Okay.  In paragraph 6 of your

24    supplement report, you --

25         A        That's Gitlin 2.

Page 142

1    made by Dave Setter; and the way this is

2    written, we did receive, in many cases, boxes

3    directly from the providers of those films.

4                So that is the way I interpret

5    that sentence right now.

6          Q    Okay.  So is it correct that

7    Mr. Setter was the lawyer who arranged for all

8    of the X-rays that were sent to Mr. Linton and

9    you to be sent?

10         A    In these seven groups, yes.

11         Q    Yes.  And these seven groups

12   comprised the 492 cases or X-rays that your six

13   consultant B-readers reviewed; right?

14         A    Well, more than that; but there

15   ended up being 492 suitable for analysis and

16   publication, yes.

17         Q    Okay.  And Mr. Setter was the lawyer

18   responsible for arranging for the X-rays that

19   got to be delivered to you and Mr. Linton; is

20   that right?

21         A    And the reports.

22         Q    And the reports.

23         A    Often separately, but both were

24   essential.

25         Q    Okay.  For the Mississippi Holder

Page 143

```
 1    group, you got 30 plaintiffs' films and B-reads;
 2    right?
 3         A    Right.
 4         Q    This talks about a case called the
 5    "Estate of Charles Holder, et al. v.
 6    Westinghouse Electric Company..." in Jones
 7    County, Mississippi.
 8              Do you know how many X-rays
 9    Mr. Setter or the lawyers that were working with
10    him had access to in addition to the 30 films
11    that they sent to you?
12         A    No; but I've assumed all along
13    that -- and the statement that was made here,
14    that nobody made any cuts -- I'm sorry, I can't
15    find it now in the paragraph -- oh, there it is,
16    the last sentence:  We were informed that the
17    attorneys made no cut of the films produced or
18    the -- "forwarded them, 'as is,' to Mr. Linton"
19    for reading.
20         Q    Well, do you understand one way or
21    the other as to whether Mr. Setter or the other
22    attorneys working with him had the ability to
23    obtain X-rays for more than 30 plaintiffs
24    involved in the Mississippi litigation?
25         A    I have no knowledge of that.
```

U.S. Bankruptcy Court          **FINAL**          **Dr. Joseph Gitlin**
In Re: Owens Corning                              **December 17, 2004**

Page 144

```
 1         Q      So, they could have.  You just don't
 2    know?
 3         A      Right.
 4         Q      And you don't know, if they had
 5    access to more X-rays, what selection criteria
 6    they used to send the 30 films to you?
 7         A      That's correct.
 8                But I do know that Dave Setter
 9    made the statement that's here:  The attorneys
10    made no cuts of the films produced or the
11    B-readers' initial reads, and forwarded them to
12    us "'as is.'"
13                He went to great lengths to be
14    very specific about that.
15         Q      Well, it says here he made no cut of
16    the films produced in the Estate of Charles
17    Holder v. Westinghouse litigation.
18                My question is:  How do you
19    know whether or not there were other X-ray films
20    in other litigation in Mississippi that
21    Mr. Setter had access to?
22         A      I don't know.
23         Q      Okay.  So, he could have selected
24    one case and pulled all of the X-rays available
25    for that case.  And then it would be true that
```

Page 145

1    he made no cut of the films from that case;

2    correct?

3         A     Correct.

4         Q     And then he could have had access to

5    a lot of other X-ray films from other cases,

6    that he didn't send you; right?

7         A     Well, yes, obviously.

8         Q     So you don't know the universe of

9    X-rays which Mr. Setter had access to?

10        A     And that's my favorite word -- I

11   don't know anything about the "universe," and it

12   is driving me up the wall.

13        Q     Would that same statement hold true

14   for all of these groups of cases, "AA" through

15   "AG"?

16              You don't know the universe of

17   cases which the defense lawyers had access to

18   before sending you X-rays?

19        A     That is absolutely correct.

20              However, in every case where I

21   was informed or Otha Linton was informed that no

22   cuts were made, we included that in the

23   paragraph.  And I'm not sure I can find another

24   one now, but I'm sure it's here in a couple of

25   cases.

U.S. Bankruptcy Court                   **FINAL**                   **Dr. Joseph Gitlin**
In Re:  Owens Corning                                          **December 17, 2004**

Page 146

```
 1                            But, you're right.  We have no
 2   knowledge of what the real universe was of
 3   workers exposed to asbestos, who are potential
 4   claimants, as I define the "universe."
 5             Q      You have no knowledge of the
 6   universe of X-rays that the defense lawyers had
 7   access to, above and beyond just the exposed
 8   worker population; correct?
 9             A      No knowledge whatsoever.
10             Q      All right.  And because of that, you
11   can't say how representative the results of this
12   study are of asbestos claimants, generally; is
13   that right?
14             A      Yes.  But I have learned something
15   since the paper was published.
16             Q      We'll get to that in a moment.
17             A      I phrased that, just so you could
18   maybe allow it later.
19             Q      What have you learned since this
20   paper was published that you were referring to
21   in your last answer?
22             A      You mentioned earlier that you noted
23   that seven of our initial readers provided a
24   substantial number of the NIOSH forms in our
25   492.
```

U.S. Bankruptcy Court                **FINAL**                **Dr. Joseph Gitlin**
In Re:  Owens Corning                                         **December 17, 2004**

Page 156

1    defensible estimate.

2          Q      Of the prevalence, the current

3    prevalence of asbestos-related diseases;

4    correct?

5          A      And incidence.

6          Q      The next sentence in paragraph 6,

7    you write:

8                        "We could not and did not make

9    any claim that films and reports in our survey

10   are representative of the claimant universe."

11                       Do you still agree with that

12   statement?

13         A      That's true.

14         Q      You don't have any belief or basis

15   for knowing whether the 492 claimants you

16   examined are representative of the claimant

17   universe as a whole; is that correct?

18         A      Right.  We have no basis for making

19   such a claim.

20         Q      Okay.  Turning to Gitlin 12 --

21         A      Aha.

22         Q      -- what is Gitlin Exhibit 12, sir?

23         A      The first page refers to the

24   "Academic Radiology" publication, December 2004,

25   letters to the editor; and the -- I guess the

U.S. Bankruptcy Court                **FINAL**                Dr. Joseph Gitlin
In Re: Owens Corning                                       December 17, 2004

Page 163

1    forms and films -- to the attorneys who provided
2    the raw material for the study.
3                    And when you start off with
4    something close to 100 percent positive, which
5    is expected in litigation, the claims are --
6    well, they better be based on positive findings,
7    whether they're right or wrong.
8                    Then there's -- that's what
9    you test against, independent readings.
10        Q    At the bottom of the page, Ducatman
11   writes:
12                   "The solution attributed to me
13   by Gitlin and colleagues (1) of multiple
14   readings, is likely to be an improvement; if
15   used alone, however, it will lead to
16   under-reading for several statistical reasons."
17                   Do you agree with
18   Dr. Ducatman's conclusion that use of multiple
19   readings to determine presence of extra changes
20   caused by exposure to asbestos would lead to
21   underreading?
22        A    I question it, and I would subject
23   it to scientific investigation.
24        Q    So you don't have a strong opinion,
25   one way or the other, as you sit here right now;