UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .    Chapter 11
                                    .
W.R. GRACE & CO., <u>et al</u>.,    .    Case No. 01-01139(JKF)
                                    .    Jointly Administered
          Debtors.                  .
                                    .    June 27, 2005 (12:12 p.m.)
                                    .    Wilmington


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.



1    THE COURT:   Okay, W.R. Grace, Bankruptcy No. 01-

2  11396.  Are the parties connected by phone?

3    UNIDENTIFIED SPEAKER:   Yes.

4    THE COURT:   Okay.  I have telephonic appearances

5  listed by March Coleman, Tiffany Cobb, Michael Davis, Bruce

6  Levin, Elizabeth DeCristofaro, Jonathan Brownstein, David

7  Parsons, Jack Cohn, Allyn Danzeisen, Darrell Scott, Sarah

8  Edwards, Gary Becker, Edward Westbrook -- Mr. Bernick, but

9  he's here -- Jonathan Friedland, Lori Sinanyan, Michael Brown

10  -- Pardon me, is there a court call operator on?

11    TELEPHONE OPERATOR:   Yes, there is.

12    THE COURT:   There's some -- I don't know what it

13  is, but it sounds like noise or typing or background

14  something.

15    TELEPHONE OPERATOR:   Okay.

16    THE COURT:   Thank you.  Michael Brown, Stafano

17  Calogero, Barbara Seniawski, and Christopher Candon.   I

18  apologize for not pronouncing all the names properly.  I'll

19  take entries of appearances from those of you in court,

20  please.

21    MR. BERNICK:   David Bernick for Grace and with me

22  is Janet Baer, David Carickhoff, and Jonathan Friedland.

23    MR. PASQUALE:   Kenneth Pasquale from Stroock &

24  Stroock & Lavan for the Creditors Committee.

25    MR. HURFORD:   Mark Hurford of Campbell & Levine on

1  behalf of the Asbestos PI Committee along with Ron Reinsel

2  from Kaplin & Drysdale.

3      MR. BAENA:  May it please the Court.  Good

4  afternoon, Judge.  Scott Baena and Jay Sakalo on behalf of

5  the Property Damage Committee.

6      MR. FRANKEL:  Good afternoon, Your Honor. Roger

7  Frankel for David Austern the Future Claimants

8  Representative.

9      MR. CHEHI:  Good afternoon, Your Honor.  Mark Chehi

10  from Sadden Arps, and I have here my partner, Henry

11  Wasserstein from our New  York office to address the Sealed

12  Air settlement matter.

13      MR. SULLIVAN:  Good afternoon, Your Honor. Bill

14  Sullivan, Delaware counsel for the ZAI claimants.

15      THE COURT:  Mr. Bernstein.  I'm sorry, I don't know

16  where that came from, but --

17      MR. BERNICK:  Well, Donald Bernstein was a

18  classmate of mine in law school, but --

19      THE COURT:  I apologize.

20      MR. BERNICK:  Your Honor, there's a relatively

21  lengthy agenda, but I think many of the matters are

22  uncontested or administrative in nature.  There are two

23  substantial matters:  One is the motion to extend

24  exclusivity, and the second is the matter of the case

25  management order in connection with the property damage

1    claims.  Ms. Baer will be addressing all of the matters up to

2    those last two matters, and I'll address the Court with

3    respect to those last two matters.  So, if we can proceed on

4    that basis?

5           THE COURT:  All right.

6           MR. BERNICK:  Ms. Baer with address the Court.

7           MS. BAER:  Good afternoon, Your Honor.  Your Honor,

8    with respect to agenda item number 1, which was the motion of

9    the Massachusetts Department of Environmental Protection from

10    relief from the stay, as you may recall there was a setoff

11    issue there.  The Massachusetts Department of EPA has filed a

12    notice of withdrawal of their motion, and that can now be

13    taken off the calendar.  It is now moot.

14           THE COURT:  All right, thank you.

15           MS. BAER:  Your Honor, item number 2 is the second

16    supplemental application of David Austern, the Future

17    Claimants Representative to extend the terms of the

18    employment of CIBC World Markets Corp.  A certificate of no

19    objection was filed on that matter.

20           THE COURT:  Yes, I have CNOs on items 2, 3, and 4.

21    I have not had an opportunity to get the orders entered -- I

22    know there are others, but just looking briefly at the

23    agenda, on items 2, 3, and 4, those orders will be entered.

24           MS. BAER:  Your Honor, with respect to items 3 --

25    Item number 3 I do have the order here in court.  If it would

1  be helpful, I can hand it up and we can get it entered right

2  now.   I don't know what that will do to you procedurally.

3       THE COURT:   It's probably easier if I just indicate

4  that they should all be entered electronically, Ms. Baer, but

5  I'll find out and get back to you as soon as Mona lets me

6  know how they prefer it.

7       MS. BAER:   Your Honor, that takes us to item number

8  4, which was the motion of the debtors for authority to

9  retain its former general counsel David Seagel as a

10 consultant.   Your Honor, we submitted a certificate of

11 counsel on that one.   There was one inquiry.   The Asbestos

12 Property Damage Committee asked us if we would supply them

13 with a monthly statement of Mr. Seagel's hours.   We indicated

14 we would do so, in fact, it's a monthly statement that will

15 indicate his hours as well as a little breakdown of the

16 different matters he's working on.   With that, Your Honor, we

17 revised the order to include providing that to all of the

18 committees, not just the PD Committee, as well as the U.S.

19 Trustee and would ask that that order be entered.

20      THE COURT:   Yes, 4 can be entered.   Okay, 2 and 3

21 apparently are already in progress of being entered, and 4

22 will be now, so.   Okay, with respect to 5, if you have the

23 order here, I'll take that one.

24      MS. BAER:   I do.

25      THE COURT:   Thank you.   Okay that's entered.

1    MS. BAER:  Your Honor, item number 6 you already

2    entered that order.  That was on the Lake Charles Union

3    Pension Plan.

4    THE COURT:  All right.

5    MS. BAER:  That takes us to item number 7, Your

6    Honor, which is the quarterly fee applications.  I believe

7    that the Asbestos Property Damage Committee filed a response

8    to the fee examiner's report, and I will turn the podium over

9    to them.

10    THE COURT:  Mr. Baena.

11    MR. BAENA:  May it please the Court.  Scott Baena

12    on behalf of the Property Damage Committee.  Judge, I hate to

13    take up the Court's valuable time on a matter that doesn't

14    entail a lot of money.  And that certainly is the case in

15    respect of this objection, if you will, or recommendation by

16    the fee examiner in respect of our fees.  However, we thought

17    the point was an important one, and from time to time, people

18    have been bringing these kinds of points to the Court, and we

19    thought this was just such an instance where we should talk

20    to the Court again.  Judge, we thought it was very sensible

21    and thoughtful, early in this case, to insure that there was

22    going to be within our firm a consistent number and array of

23    people involved in this matter.  We think that by that

24    consistency, you minimize the expense of the representation

25    by the efficiencies that you create over time, and the

1   familiarity that people have that they gain over time.  And

2   amongst the professionals that that applies to, in the case

3   of our firm, are paraprofessionals who are valued members of

4   our restructuring and insolvency team, who are highly

5   skilled, indeed some of them have even graduated law school,

6   and we have asked them to do a number of things including,

7   which we thought was of paramount importance, avoiding the

8   necessity for every one of the lawyers who's involved in this

9   case to review every pleading.  And we have them parse out

10  the pleadings to the various people based upon subject

11  matter, based upon prior involvement in the type of subject

12  or subject matter that is the matter engendered by the

13  pleadings.  Indeed, if you review the monthly and quarterly

14  bills submitted by my firm, you'll see that I have very

15  little time, personally, that's billed for reviewing

16  pleadings, and it's because of this process that we employ

17  that insures that matter is assigned to the right person for

18  further handling.  We note and commend Kirkland & Ellis for

19  the same process, indeed, we suspect a number of firms

20  involved do.  But for some reason, the Kirkland firm and our

21  firm are the only two firms that were singled out on this

22  particular occasion for these charges, which again, are not a

23  lot of money.  I think in the case of Kirkland it was $6,000

24  on a $2 million quarterly fee app, and in our case it was

25  $4,000 on a $200,000 fee app.  The examiner's position on

1  this is that the function of these paraprofessionals is

2  ministerial.  And nothing could be further from the truth

3  unless we don't understand what he means by ministerial.  We

4  think it makes entirely good sense to create efficiencies

5  wherever we can, and that would include expanding the use of

6  paraprofessionals to insure that we don't duplicate the

7  delivery of legal services by lawyers within the law firm,

8  and that's what this dispute is all about.

9       THE COURT:  Anyone present for the fee examiner?

10       MR. SMITH (TELEPHONIC):  Yes, Your Honor, this is

11  Warren Smith, the fee examiner.

12       THE COURT:  Go ahead, Mr. Smith.

13       MR. SMITH (TELEPHONIC):  I do not dispute anything

14  that was just said.  However, that's not what this dispute is

15  about, Your Honor.  The dispute is not about efficiencies nor

16  is it about having paralegals parse their pleadings and

17  allocate out those pleadings that should be read by certain

18  people.  If you note Exhibit A to our final report regarding

19  Bilzin, Sumberg, it identifies a number of charges, and yes,

20  these were all charges or fees that were incurred by

21  paralegals, but we don't -- we did not categorically deny or

22  recommend disallowance of the fees by these paralegals.  It

23  was just for those services where we felt that these

24  paralegals were going across the line and doing essentially

25  secretarial tasks.  If you look on Exhibit A, Your Honor, to

1   again, our final report regarding Bilzin, Sumberg, on

2   12/17/04 the timekeeper identified as BAB billed for,

3   quote,"create shipping label and send via Fed Ex", and,

4   quote, "create labels for folders and redwell to insert

5   pleadings".  A lot of the other charges on Exhibit A are for

6   printing documents, and so, Your Honor, we have no objection

7   to paralegals performing the tasks for which paralegals are

8   appropriate, and I think it was very eloquently explained how

9   paralegals can be used efficiently.  However, some of these

10  charges we believe that were in this application involve

11  paralegals performing tasks for which secretaries are more

12  appropriate, and those are the charges to which we

13  recommended disallowance, Your Honor.

14          THE COURT:  Okay, Mr. Baena?

15          MR. BAENA:  I'm going to let Mr. Sakalo, if you

16  don't mind, talk about the specific charges.

17          THE COURT:  All right, Mr. Sakalo.

18          MR. SAKALO:  Good afternoon, Your Honor.  Your

19  Honor, with respect to the two particular charges that Mr.

20  Smith just raised, he is correct as to those two, but if you

21  look at the rest of the specific charges listed in his

22  Exhibit A, that is the project that Mr Baena was explaining

23  before.  That is what our paraprofessionals, we call project

24  assistants, do on a daily basis for us in managing the

25  pleadings that come in.  The descriptions of them perhaps

1  aren't as descriptiveness as Mr. Smith might wish, and we did

2  include in our initial response to his initial report a

3  description of what they do in more detail, and he again

4  didn't find that to be persuasive, and Mr. Baena just

5  specified exactly what it is that our paraprofessionals do,

6  and we believe, in accordance with what other firms in this

7  case are doing, other firms in Delaware are doing on these

8  mega cases, that these are compensable activities.

9      THE COURT:  Well, what other firms are doing in

10 Delaware may or may not be the issue.  What you do with your

11 non-bankruptcy clients may be more of an issue.  I mean

12 that's what busy beaver tell me.

13     MR. SAKALO:  This is something that we do -- have

14 instituted in our litigation group for mega cases, as well,

15 Your Honor, this is not something that we --

16     THE COURT:  Well, what other cases?  Do you have

17 mega-non-bankruptcy cases?  I mean where's the comparison

18 that I have to follow?

19     MR. SAKALO:  Yes, yes, Your Honor.  Our litigation

20 matters that are pending where we have electronic filing,

21 this is something that we've instituted throughout our firm

22 for all of our cases, and it's something that's regularly

23 charged to our clients.

24     THE COURT:  What are the nature, for example,

25 subject matter-wise of other mega cases that are not

1    litigation -- or are not bankruptcy cases?

2         MR. SAKALO:  For instance, we're defending a

3    fraudulent transfer action pending in the Southern District

4    of Ohio where there is, you know, on any given day five, six,

5    seven, eight different pleadings that are filed in that

6    action, and our paraprofessionals do the same type of work on

7    those cases.  We have pending actions in New York.  Other

8    actions in Delaware, we do this as well.  Those are on non-

9    bankruptcy matters, Your Honor.

10        THE COURT:  Okay, I will take a look at this after

11   court and decide when I have a chance to review each specific

12   item as to whether I think it's appropriate.  Frankly, the

13   fact that somebody's creating a label, should not be charged

14   the paralegal rates -- at the highest paralegal rates.  It

15   just shouldn't be.

16        MR. SAKALO:  We agree with --

17        THE COURT:  In fact, it shouldn't be charged at

18   all.

19        MR. SAKALO:  We agree.  That particular entry, we

20   overlooked that one, and we agree as to that one, but you'll

21   see on Exhibit A, that's the only entry of that nature.

22        THE COURT:  All right.  I will take a look at

23   Exhibit A later and make a decision.  Okay.

24        MR. SAKALO:  Thank you, Your Honor.

25        MR. SULLIVAN:  Good afternoon, Your Honor.  Bill

1   Sullivan on behalf of the ZAI claimants.  Your Honor, I rise

2   only because in reviewing the certification of counsel this

3   morning with respect to the quarterly fees, I noted that it

4   omitted the new firms of both Darrell Scott and myself.  We

5   both changed firms last fall during this fifteenth quarterly

6   period, and I have not had a chance to raise that issue with

7   Mr. Smith yet because I only caught it this morning.  So,

8   Your Honor, I would like the opportunity to review that with

9   Mr. Smith and find out what happened with respect to the two

10  new firms.

11          THE COURT:  Okay.  That makes sense.  Mr. Smith,

12  did you get the fee applications properly?  Is it just that

13  somehow or other they were deleted from the order?

14          MR. SMITH (TELEPHONIC):  Your Honor, I think we'll

15  have to discuss this off the record, Your Honor.

16          MR. SULLIVAN:  This would be the first quarter that

17  the new firms would have appeared, Your Honor, so, you know,

18  I'll work it out with Mr. Smith, and we can advise the Court.

19          THE COURT:  Well, you need to advise whoever is

20  preparing the order.  The fee applications were properly

21  filed and served and Mr. Smith has reviewed them?  They're

22  just missing from the order?

23          MR. SMITH (TELEPHONIC):  Well, okay.  Your Honor,

24  we've not reviewed them.  The reason that we have not

25  reviewed them, I don't know.

1          THE COURT:  Okay.  I'm sorry, Mr. Sullivan, who are

2    you representing?  ZAI plaintiffs.

3          MR. SULLIVAN:  ZAI, yes.

4          THE COURT:  Okay.  Has there been an order that

5    appoints counsel for ZAI plaintiffs?  Have you been

6    substituted formally on the record?

7          MR. SULLIVAN:  Your Honor, I have been and my prior

8    firm I was billing and was paid, and then when I changed

9    firms, we reviewed that with Grace and his counsel, and

10   everybody agreed that it fell within the prior order, so,

11   that we would continue to be paid at my new firm as Delaware

12   counsel.  So, it is subject to an existing order, Your Honor.

13         THE COURT:  Well, I don't know how I get you paid

14   if you're not on the record anyplace in the new firm.   I

15   mean, I need an order that appoints you in the new firm;

16   don't I?

17         MR. SULLIVAN:  Your Honor, we reviewed this in

18   February, and the initial appointment order for both Mr.

19   Scott and myself identified us personally and therefore --

20         THE COURT:  That's fine, but don't I need a new

21   firm and a new address somewhere on the record in order to

22   know -- I mean, if you haven't made that substitution, our

23   records aren't even going to be sending you pleadings in the

24   correct place.

25         MR. SULLIVAN:  We made those substitutions, Your

1   Honor.   I mean we've been receiving pleadings, we filed the

2   notice --

3           THE COURT:  Okay.   I was trying to get to whether

4   or not the record was correct as to where you are now lodged.

5   So the order that appointed you referred specifically to you

6   and Mr. Scott --

7           MR. SULLIVAN:  Right.

8           THE COURT:  -- not to your firm.

9           MR. SULLIVAN:  Right.

10          THE COURT:  Okay.  So that's not an issue.

11          MR. SULLIVAN:  That's my understanding, Your Honor.

12  We had discussions and worked that out, and in fact the

13  monthlies have been paid, as I understand it, from this

14  quarterly period.  So -- Your Honor, I guess -- counsel

15  suggested, if we just discuss it with Mr. Smith and either

16  submit a new order or a revised order with respect to these

17  two firms.

18          THE COURT:  Yeah, well, he has to review them

19  obviously, so yes, I need to get an order that deals with

20  these two issues, and I'm going to have to make a ruling on

21  Mr. Baena's anyway, so, it's going to take me a little bit of

22  time to figure out what the fees are going to be.  So, who is

23  submitting in this case; is it Mr. Smith or is it the debtor

24  that's preparing these orders?

25          MR. CARICKHOFF:  Your Honor, David Carickhoff on

1  behalf of the debtors.  Mr. Smith has been giving us the

2  attachment to the omnibus order.  I've always drafted the

3  order itself but the Exhibit A which sets forth the requested

4  fees and the examiner's recommendation has always been

5  prepared by the fee auditor.

6        THE COURT:  Okay, well, that portion, Exhibit A,

7  except for Mr. Baena and I guess this issue Mr. Sullivan's

8  raising can be entered.  So, perhaps what I can do is get a

9  partial order entered with respect to everybody who's agreed

10  with his recommendations, and then a supplemental order once

11  you've come to some agreement with respect to those fees.  So

12  --

13        MR. CARICKHOFF:  I guess the order that we have to

14  hand up to Your Honor that was submitted under certification

15  of counsel, Your Honor can strike or put a notation in it

16  that Mr. Baena's firm's fees are under advisement, and I

17  think everybody else can go forward, and Mr. Sullivan can

18  submit a certification of counsel with respect to his fees

19  and Mr. Scott's firm's as well.

20        MR. SULLIVAN:  I would be glad to do that, Your

21  Honor.

22        THE COURT:  Mr. Baena, how about -- if you're

23  telling me that the issue that is contested is $4,000, so

24  that I don't hold up your whole fee, how about if I award all

25  but the $4,000 that's contested, and then we can do a

1    supplemental later.

2         MR. BAENA:  That's fine.

3         THE COURT:  All right.  Can you fix this order

4    before you hand it up.

5         MS. BAER:  That's what's in there.

6         THE COURT:  It is in there now?

7         MR. CARICKHOFF:  The recommended amount does not

8    include the 4,000 that's in dispute.

9         THE COURT:  All right.  So everybody's fees are

10   okay except that Mr. Sullivan's aren't in there, and Mr.

11   Baena's I need to address the $4,000 worth.  Is that correct?

12   Okay.  Let me make a note so I know what I'm doing here.

13        MR. SULLIVAN:  And, Your Honor, with respect to my

14   fees, I'll also do it on behalf of Mr. Scott.

15        THE COURT:  Okay, that's fine.  I'm sorry, what

16   agenda number is this?  I'm sorry.

17        MS. BAER:  It's agenda number 7.

18        THE COURT:  Seven, thank you.

19        MS. BAER:  And I have the order here, Your Honor.

20        THE COURT:  All right.  So, on Sullivan and Scott

21   fees, I'm going to get a certification of counsel after, Mr.

22   Smith, you've had an opportunity to review them.

23        MR. SMITH (TELEPHONIC):  Yes, Your Honor.

24        THE COURT:  All right, so, in this instance, with

25   respect to Sullivan and Smith, I will need an order on a

1  certification of counsel that Mr. Sullivan will prepare.

2  This one won't be coming from the debtor; is that correct?

3      MS. BAER:  That's correct.

4      THE COURT:  All right, and Mr Baena, I'll give you

5  a ruling so there will be some order that will be entered

6  with respect to that.

7      MR. BAENA:  Thank you, Your Honor.

8      THE COURT:  Okay.  I'll take the order now, Ms.

9  Baer.  Thank you.  Okay, that order is entered.

10      MS. BAER:  Your Honor, agenda item number 8 is

11  exclusivity which we'd like to skip for now while we get

12  these other matters taken care of.

13      THE COURT:  That's fine.

14      MS. BAER:  Agenda --

15      MR. SMITH (TELEPHONIC):  Your Honor, this is Warren

16  Smith.  If I could be excused?

17      THE COURT:  Yes, sir, thank you.

18      MR. SMITH (TELEPHONIC):  Thank you, Your Honor.

19      MS. BAER:  Your Honor, agenda item number 9 is the

20  debtor's fourth omnibus objections to claims.  There was one

21  matter left, the contested matter of Spaulding & Slye.  The

22  parties have reached an agreement on that settlement, and I

23  have a stipulation and agreed order here for your execution.

24      THE COURT:  All right, what's the settlement?

25      MS. BAER:  Your Honor, the claim has been settled

1    for $1,250,000 and no interest even if the plan ultimately

2    calls for interest to be paid.  That is a set and firm amount

3    that will not change.

4          THE COURT:  All right.  Has this been circulated?

5    Okay.  For the record, I don't know if they picked you up.

6    You said it was sent to the Unsecured Creditors Committee.

7          MS. BAER:  Yes, we've been in consultation with the

8    Unsecured Creditors Committee on this.  They have seen this

9    order, and they do know the details of the settlement.

10         THE COURT:  All right, that order is entered.

11         MS. BAER:  Your Honor, agenda item number 10, the

12   debtor's fifth omnibus objections to claims.  There are a few

13   contested claims left over on the exhibit, and we're asking

14   that this be continued to next month.

15         THE COURT:  All right.  Okay, that's entered.

16         MS. BAER:  Your Honor, agenda item number 11 is the

17   debtor's eighth omnibus objections to claims.  There are

18   three contested claims left, and we're asking those be

19   continued to next month.

20         THE COURT:  Thank you.  That order's signed.

21         MS. BAER:  Agenda item number 12, the debtor's

22   ninth omnibus objections to claims.  On this matter, Your

23   Honor, there are no responses and the order is adjudicating

24   some of the matters and continuing a couple of them where

25   there were issues.

1    THE COURT: All right. Thank you. That's signed.

2    MS. BAER: Your Honor, agenda item number 13, the

3 debtors' tenth omnibus objections to claims a non-substantive

4 objection, we received no responses and all of the matters on

5 there have been resolved according to the order.

6    THE COURT: Okay. Thank you. Okay, that's signed.

7    MS. BAER: Agenda item number 14, the debtors'

8 eleventh omnibus objections to claims. This was a non-

9 asbestos Gateway objection. We received no responses. We

10 have received some contact. Some of the matters have been

11 resolved. Some of them are being continued, and there's one

12 stipulation that's attached. It does not call for Court

13 signature. It's just a stipulation resolving that claim.

14    THE COURT: All right. Thank you. That's signed.

15    MS. BAER: Your Honor, that takes us to agenda item

16 number 15, which is the joint motion of Sealed Air and the

17 Asbestos Committees for entry of the Sealed Air settlement

18 agreement. Your Honor, I'm sure that Sealed Air would like

19 to present this matter to the Court, but I'm pleased to

20 submit to the Court that we are all in agreement on the order

21 to approve the settlement agreement.

22    THE COURT: Okay.

23    MR. WASSERSTEIN: Good afternoon, Your Honor.

24 Henry Wasserstein from Skadden Arps on behalf of the Sealed

25 Air Corporation defendants in the adversary proceeding. Your

1  Honor has before her the renewed motion that has been made to

2  approve the settlement together with the response that was

3  submitted by the debtors on April 24.  So Your Honor should

4  have everything that has occurred up until April 24.  If Your

5  Honor would care for me to do so, I can briefly summarize the

6  chronology of events that occurred up until that time.

7  They're all in those papers.  There's nothing new there.

8           THE COURT:  They are in the papers, and it's not so

9  much the chronology that I'm confused about, it's who's who

10  in the zoo.  I'm not really sure what the purpose of or the

11  relationship and the affiliation between the parties such

12  that they're going to be entitled to a 524(g) injunction is,

13  under this settlement, nor am I sure how if the debtor, for

14  example, loses exclusivity and/or it doesn't have the plan

15  that's proposed, how this settlement can be effectuated and

16  why we're going through this exercise now.

17           MR. WASSERSTEIN:  Your Honor, as I understand it,

18  the plan that the debtors have submitted, the keystone to

19  that is the settlement agreement between Sealed Air and the

20  two Asbestos Committees.  If the settlement agreement is not

21  ultimately approved, Sealed Air would have the ability to

22  walk away from the settlement agreement and be in whatever

23  position it would otherwise be.  So certainly in connection

24  with that plan, with that proposed plan, the Sealed Air

25  settlement agreement is very significant.  Also, given the

amount that is involved in this, ultimately it is something
that needs to be resolved independent of whatever plan the
Court ultimately approves because we're talking here of an
amount that today approaches a billion dollars based upon the
current value of the Sealed Air stock that is part of the
package.  With regard to the existence of the 524(g) trust
issue, all that is being done here is taking any potential
exposure that Sealed Air would have as a result of debtors'
asbestos liabilities and shielding those.  There are no other
asbestos liabilities that the Sealed Air defendants have.
It's all derivative of their relationship with the debtors
and the acquisition of the Cryovac business spec, I guess, in
1998.  So that's why this is something that we believe needs
to be addressed and now would be an appropriate time to do
it.

          THE COURT:  All right.

          MR. WASSERSTEIN:  Do you need me to go over the --
Well, you said you understand the prior events.  Is there a
reason for me to go over that?

          THE COURT:  I don't think so --

          MR. WASSERSTEIN:  Okay.

          THE COURT:  -- unless there's something that you
think really needs to be brought to my attention.

          MR. WASSERSTEIN:  There really isn't.  I think
really what ought to be done is to go forward from April 24

1   when the Court received the last papers from W.R. Grace and

2   take it to today as to where we are now.  In connection with

3   that, if I might, I would like to hand up a proposed order to

4   the Court.

5           THE COURT:  All right.

6           MR. WASSERSTEIN:  That is an amendment of the prior

7   proposed order that had been handed up.

8           THE COURT:  All right.  Thank you.

9           MR. WASSERSTEIN:  The April 24 submission of W.R.

10  Grace basically stated that they did not object to the

11  approval of the settlement agreement.  They characterize the

12  payment as a -- they characterize it as being a principal

13  part -- a significant part of their proposed plan of

14  reorganization, and that, quote, "This payment is critically

15  important in order to achieve confirmation of the plan,"

16  close quote.  They also noted that even though they were not

17  parties to the settlement agreement, that they intended to

18  comply with the settlement agreement.  The settlement

19  agreement is based upon two things:  (a) -- from the Sealed

20  Air's point of view -- it's based upon (a) the establishment

21  of the 524(g) trust and the appropriate injunction, and (b)

22  an attempt to get the best possible tax situation for Sealed

23  Air for the payments that it is making.  And that requires

24  some cooperation for W.R.Grace.  The settlement agreement

25  required the Asbestos Committees to use their best efforts to

1  have a plan confirmed that provided for these types of
2  things.  The debtors have indicated that they have no problem
3  with that, and they did that in that document.  What the
4  debtors were concerned about was the possibility that they
5  would be required to take some action that would expose them,
6  their officers and directors to potential exposure, either
7  civilly or criminally.  They also indicated in their papers
8  that they understood that the way the settlement agreement
9  currently existed and the way the law currently existed that
10  that was not a problem today.  So, essentially what we did
11  over a period of time, and we've had extensive conversations,
12  communications, we asked for one month extension to try to
13  work out what we did, and we were able to work it out.
14  Everything that is done is set forth in paragraph (4) of the
15  proposed order, and that appears on the fifth page of the
16  document.  And essentially, paragraph (4) does three things:
17  First of all, it reflects debtors' agreement that they're
18  going to comply with the settlement agreement, and indeed, it
19  directs them to comply with that agreement.  Second, it
20  provides that wherever the settlement agreement calls for the
21  Committees to use their best efforts to have Grace take
22  action or refrain from taking action that the debtors will do
23  that, will take that action or refrain from that action.  And
24  finally, it provides a slight modification of the provision
25  that had been proposed in the April 24 memorandum submitted

24

1  by Grace.  What it provides is, is that if there is a change

2  of law as that term is defined in the settlement agreement,

3  that occurs after the date that Your Honor signs an order

4  approving the settlement agreement, then W.R. Grace, the

5  debtors' Sealed Air, the Committees, whoever would be

6  required to take an action or refrain from taking an action

7  as a result of a change of law after the date the order is

8  signed would be absolved from having to take such action or

9  refrain from taking that action.  So in effect, what it does,

10  is it takes the provision that debtors were proposing and

11  just moves it forward to after an order is signed.  Those are

12  the only changes that appear in the proposed order that

13  differ from the order that had previously been presented to

14  the Court, other than a renumbering of paragraphs and some

15  typographical changes.  We circulated this proposed order to

16  the debtors, the Asbestos Committees, the Unsecured Creditors

17  Committee, the Equity Committee, the Futures Representative,

18  and the United States Trustee.  We have received no

19  objections from anyone with regard to the proposed order.

20         THE COURT:  Mr. Baena, did you have something you

21  wanted to say?

22         MR. BAENA:  May it please the Court, I just want to

23  make sure that the Court got the answers to all the questions

24  that the Court had.  I believe that one of the questions you

25  asked was whether the loss of exclusivity by the debtor would

1    impact the settlement agreement, and I think the answer is,

2    not really.  This settlement agreement provides a contour for

3    a reorganization of the debtors by any party in interest

4    offering up such plan of reorganization, so long as everybody

5    abides by the terms of the settlement agreement.  And I can't

6    imagine a constituency in this case that would wish to

7    somehow fail to follow the road map of this settlement

8    agreement and thereby augment this estate's assets for

9    reorganization by, as Mr. Wasserstein said, one billion

10   dollars or more.  It's ironic, Judge, that it was on June

11   14th, that Mr. Lockwood and I -- June 14, 2001, that Mr.

12   Lockwood and I went to Judge Wolin and asked for permission

13   to prosecute this list.  It was November 27, 2003 when we

14   came to a settlement with Sealed Air and Fresenius about that

15   litigation, and here we are, not quite but almost two years

16   later, trying to consummate it.  We urge that the Court

17   approve the settlement here and now so that there's no

18   misgivings or any question about the fact that this is

19   available as a centerpiece of a plan of reorganization.

20        THE COURT:  Okay.  Mona, can you call Rachel and

21   get them to turn some air on in here.  It is really awful.

22   All right, anyone else?  All right, let me take a look at

23   this order, please.  Okay, how long is the Bankruptcy Court

24   supposed to have jurisdiction to make the determination as to

25   whether or not the applicability of paragraph (4) that there

1    has been some change in the circumstances after the date that

2    the settlement's approved will take place?

3            MR. WASSERSTEIN:  I'm not sure that the parties

4    considered that, Your Honor, but I would assume that it would

5    be as long as there's an issue relating to tax returns being

6    submitted.  Does that sound right?  Mr. Chehi points out,

7    Your Honor, that paragraph (11) provides for continued

8    jurisdiction of the Court even after the closing of the

9    Chapter 11 cases.

10           THE COURT:  Well, that's what the old order said

11   too.

12           MR. WASSERSTEIN:  Yes.  It said it in paragraph

13   (10) however.

14           THE COURT:  Okay.  Congratulations.  The estate's

15   $1.2 billion richer.

16           MR. WASSERSTEIN:  Thank you, Your Honor.

17           MR. BAENA:  Thank you, Judge.

18           THE COURT:  Now, is there anything left in these

19   two adversaries?  Can they be closed?  Because if so, I want

20   to put that in this order too.  One is still closed, has

21   never been reopened, I think, even though we're still getting

22   things filed at it.

23           MR. BAENA:  Judge, my confusion is, where the

24   adversaries are right now, actually.

25           THE COURT:  Well, I hope they're here because if

1    they're not this order's not worth much.

2        MR. BAENA:  Because, you know, we were prosecuting

3    this as additional.

4        THE COURT:  No, I believe that they're back here

5    because --

6        MR. BAENA:  And those files have been closed.  I

7    thought we had --

8        THE COURT:  No, the confusion is that one of the

9    adversaries has been closed, but you folks are still filing

10    things at it.  The other adversary has not been closed, but

11    not much is being filed at it.  This one has both adversary

12    dockets on it, docket numbers on it, one of which is closed

13    and has not been reopened including the fact that fee

14    petitions were filed at it.  I raised this with debtors'

15    counsel a number of months ago asking them to get it reopened

16    if necessary.  It's never been reopened.  So right now, I

17    have a closed adversary that I'm entering an order at.

18        MR. HURFORD:  Your Honor, if I may, Mark Hurford of

19    Campbell & Levine.  The other issue that remains open, as

20    Your Honor may or may not be aware, is in relation to the

21    Cybergenics opinion, there were some motions filed to attempt

22    to deal with that situation.  There were appeals taken to the

23    Third Circuit.  Some of those appeal remain pending.  Our

24    office, our Committee has been communicating, with the help

25    of the other parties, to update the Third Circuit on where

1  those are.  So, that case will need to be closed out --

2          THE COURT:  Which adversary?

3          MR. HURFORD:  Well, we appealed from really both.

4  To my knowledge Judge Wolin consolidated both of the

5  adversaries to be dealt with together.

6          THE COURT:  Well, I don't think there's an order

7  that substantively consolidates these.  I know he was

8  tracking them together, but I'm not familiar with all of

9  Judge Wolin's orders, but I'm not aware of one that

10 consolidated the adversaries.

11         MR. HURFORD:  Your Honor may be correct.  There may

12 not be a written order to that effect, but they were all

13 dealt with in a consolidated basis, and my office will take

14 the lead in disposing of the appeal to the Third Circuit.

15 We've indicated to them that once this order was entered, we

16 would communicate with all the parties to dispose of those

17 appeals.

18         THE COURT:  They're moot?

19         MR. HURFORD:  Exactly.

20         THE COURT:  All right, so you're going to be

21 dismissing the appeal.  So that won't be a bar to closing the

22 adversaries.

23         MR. HURFORD:  I'm just noting for the Court that

24 that needs to be done, that's all.

25         MR. CHEHI:  Your Honor, Mark Chehi again.  Just as

a point of information, it may be helpful.  The adversary

proceeding in which the Sealed Air disputes were being

adjudicated and out of which this settlement agreement arises

was referred to this Court, Your Honor, for purposes of the

settlement motion only.  That had been pending for some time,

so, assumably then the adversary proceedings that are at

issue are still pending before Judge Buckwalter in the

District Court, and probably the right thing to do here, as

just a suggestion, is to the extent that there's appellate

practice pending out of the Sealed Air matter and the other,

you know, again, dismissal of the appeals is appropriate, and

then just leave the adversary proceedings open as they might

be before Judge Buckwalter and just have this settlement

order entered there, and then the parties could move before

Judge Buckwalter to close the adversaries if they're still

before him.

THE COURT:  Well, what's left in the adversary?

MR. BAENA:  I don't know that that's exactly right,

with all due respect, because Judge Buckwalter referred the

settlement motion in all related pleadings, as I recall, to

this Court, and we never really understood what that meant.

We assumed it meant everything.  Indeed, you dealt with the

fee aspects.

THE COURT:  Yeah, I thought it meant everything

because I don't know what's not related to the settlement

1   motion.

2   MR. WASSERSTEIN:  There is one thing that is

3   pending before Judge Buckwalter that is a conditional motion

4   that was made by Sealed Air in connection with revisiting

5   Judge Wolin's decision regarding the standards to be applied

6   to determine solvency back in July of 2002.  That motion was

7   filed, admitted, and stated to be a motion that was a

8   conditional motion, a protective motion, in the event that

9   the settlement agreement and the terms of the settlement

10  agreement were not incorporated into a plan of reorganization

11  and that the Sealed Air settlement fell apart.  That is still

12  something since there is not yet a plan of reorganization

13  that's been approved that is still something that has a

14  capability -- I'm not saying a likelihood but a capability of

15  rearing itself again.  And so, therefore, that motion I would

16  not like to have -- I would like to keep that alive.

17  THE COURT:  Why can't that simply be dismissed

18  without prejudice so that in the event that this does fall

19  apart, you can revisit it and reopen the adversary.  I don't

20  see any reason to keep an adversary open when you've got a

21  settlement.  I mean, you've either got a settlement or you

22  don't.

23  MR. WASSERSTEIN:  Your Honor, I don't have a

24  problem if it were withdrawn without prejudice to renewal in

25  the event that the settlement does not go through.  That

1   would not be an issue for us.

2       THE COURT:  Okay, but one second.  Okay, one of the

3   adversaries is closed.  I don't know whether the District

4   Court Clerk closed it or the Bankruptcy Court Clerk closed

5   it, but one of the adversaries is closed.  So, it doesn't

6   exist anywhere anymore, and that's why I'm still confused

7   about where these orders are to be docketed and whether both

8   adversaries are ready for final disposition.

9       MR. BAENA:  Your Honor, the adversary that was

10  closed, we believe, is the Fresenius adversary, which was 02-

11  2211.

12      THE COURT:  Okay.

13      MR. BAENA:  The adversary that remains open is the

14  Sealed Air adversary, which is 02-2210.  This motion,

15  obviously, relates directly to 02-2210.

16      MR. WASSERSTEIN:  Correct.

17      MR. BAENA:  And I would think that's where the

18  order ought to be filed when it's entered.

19      THE COURT:  I'm sorry, the settlement or the Sealed

20  Air --

21      MR. BAENA:  The settlement order in respect to

22  Sealed Air that was presented to you, which you approved,

23  that belongs to 2210.

24      THE COURT:  Okay, but not to 2211?

25      MR. BAENA:  No, no.  2211 was settled by a prior

1   settlement agreement that was approved by Judge Wolin, I

2   believe, a hundred or so years ago.

3           MR. WASSERSTEIN:  Involving Fresenius but not

4   Sealed Air.

5           THE COURT:  All right, one of the -- I think it was

6   this one, though, the Sealed Air adversary, Judge Wolin had

7   actually entered -- had actually signed an order that has

8   never been docketed that approved the settlement in

9   principal.  I thought that actually applied to both.  It was

10  apparently not docketed because there were documents filed

11  under seal so for some reason the order that approved the

12  settlement didn't get filed.

13          MR. WASSERSTEIN:  Now, I understand the confusion.

14  That was signed on Thanksgiving Eve, 2002.

15          MR. BAENA:  November 27, 2003.

16          MR. WASSERSTEIN:  2002.

17          MR. BAENA:  2003?

18          MR. WASSERSTEIN:  2002.  That was when both -- when

19  there were term sheets that were submitted in connection with

20  both cases to Judge Wolin subject to execution of formal

21  settlement agreements.

22          THE COURT:  Right, that's right.

23          MR. WASSERSTEIN:  So, that did apply to both of

24  those cases.  Subsequently, the Fresenius settlement

25  agreement was executed, presented to Judge Wolin, and

33

1    approved by him, but this one, involving Sealed Air was never

2    -- Well, it was presented to him, but it was never approved

3    because of all the problems that developed thereafter.

4         THE COURT:  All right.  Okay, so, this says at the

5    bottom of the caption that this document pertains to

6    Adversary 02-2210, and that is correct.

7         MR. BAENA:  That is correct.

8         THE COURT:  And that's where it should be docketed.

9    Okay, so, Fresenius was closed.  Nothing's pending in it.  So

10   now let me restate the question:  Can this one be closed?

11        MR. WASSERSTEIN:  It can be, Your Honor, so long as

12   it's understood that the motion that we have presently

13   pending before Judge Buckwalter can be renewed.  It would be

14   withdrawn without prejudice to its renewal in the event that

15   ultimately the settlement agreement was not performed.

16        THE COURT:  All right, I will either write that

17   into this order or you folks can submit a separate order that

18   closes the adversary, which may be more appropriate since you

19   want to get the appeals dismissed anyway.

20        MR. WASSERSTEIN:  We will do it with a separate

21   order.

22        THE COURT:  All right, but I want a deadline for

23   doing it so I can not have to track this anymore.

24        MR. CHEHI:  What about July 8th, Your Honor, right

25   after the holiday.

1        THE COURT:  That's fine.

2        MR. BAENA:  This year?

3        MR. CHEHI:  This year, 2005.

4        THE COURT:  All right.  A certification of counsel

5    with an order closing the 02-2210 adversary is to be

6    submitted -- Who's going to submit it?

7        MR. CHEHI:  Sealed Air can submit it, Your Honor.

8        THE COURT:  All right.  So there are no further fee

9    apps, nothing, coming in either of these adversaries; is that

10   correct?  This is it.

11       MR. BAENA:  Judge, the order you've entered has a

12   retention of jurisdiction provision --

13       THE COURT:  Yes, it does.

14       MR. BAENA:  -- in respect to the settlement, and

15   we're content that that's sufficient for us to come back to

16   you if there's any problems between us in regard to the

17   consummation of the settlement.  In regard to the pleadings,

18   the pleadings are concluded.  There are no further pleadings

19   to be had.

20       THE COURT:  All right, okay.  You disagree?

21       MR. TACCONELLI:  No, Your Honor.  Theodore

22   Tacconelli, local counsel for the Property Damage Committee.

23   Your Honor, we were directed to file our fee applications in

24   this adversary proceeding.  Our firm filed a quarterly fee

25   application in the 2210 adversary proceeding.  What we could

1    do is we could withdraw that and file it in the main case.

2    It's a very small fee application.  I certainly don't want

3    that to hold this up.

4         THE COURT:  When is it set for hearing?

5         MR. TACCONELLI:  That would be the next round of

6    quarterly fee applications in this case, whatever the next

7    date would be.

8         THE COURT:  All right, if you don't mind, Mr.

9    Tacconelli, I think that would be helpful.

10        MR. TACCONELLI:  That will be fine, Your Honor.

11        THE COURT:  All right.

12        MR. TACCONELLI:  We will withdraw it and file in

13    the main case.

14        THE COURT:  Thank you.

15        MR. TACCONELLI:  Thank you.

16        THE COURT:  No one has an opposition to that;

17    correct?  Okay, thank you.

18        MR. TACCONELLI:  Thank you, Your Honor.

19        THE COURT:  Thank you.  Ms. Baer?

20        MS. BAER:  Your Honor, agenda item number, I think

21    it's 16, yes, is the motion of The Scotts Company.  That was

22    mistakenly put on the agenda.  That matter was actually

23    resolved a couple of months ago, and you ordered that it be

24    placed back on the agenda for next February.  And with that,

25    Your Honor, we are ready to go back to agenda item number 8,

1    which is exclusivity, and Mr. Bernick will address that.

2         THE COURT: Anyone need a break? No? Let's just

3    keep going then.

4         MR. BERNICK: Your Honor, I want to take us back

5    for just a moment to the end of the hearing that took place

6    on the 21st of January of this year. Your Honor will recall

7    at that time that the debtors had just filed the proposed

8    plan of reorganization which was obviously a significant

9    development in the case, and that plan garnered the support

10   both from equity holders and also from the unsecured

11   creditors. It also attracted objections by other

12   constituencies, and in particular, the other constituencies

13   lodged objections to the ultimate confirm-ability of the

14   plan. We had an extensive argument on the 21st of January, a

15   very detailed argument. And at the conclusion of the

16   argument, Your Honor decided to defer those issues, those

17   confirmation issues until after we had gone through an

18   estimation process, and that's where we were. What was

19   interesting was that there was only one objection to the

20   continuation or extension of exclusivity at that time, and it

21   was kind of, what I'll call, a MEAP (phonetical) objection.

22   There's one objection by the Future Claimants Representative,

23   Mr. Austern, and after all of the debates that took place

24   during that hearing, we took up the issue of exclusivity, and

25   Mr. Frankel very graciously said, Well, we do have an

1  objection but we're prepared to withdraw that objection, and

2  exclusivity was extended, therefore, until this month.  Now,

3  when it comes to this extension of exclusivity, we are

4  walking down the road, indeed trying to move more quickly

5  down the road, following through on exactly the plan and the

6  path that was set out in January, but now we have three

7  objections that have been lodged, the Futures Representative,

8  the Personal Injury Committee, and also the Property Damage

9  Committee.  And they're lodged with fervor in, you know,

10  tension, and the real question is, well, what is it that's

11  happened since January that has so dramatically altered the

12  path of this case that when there was essentially no

13  objection in January, there's now all of a sudden all of

14  these objections to exclusivity being extended, and I would

15  venture to say that there are three ways of looking at this:

16  Two are improper, one is proper, and the answer under the

17  proper consideration is there clearly ought to be an

18  extension of exclusivity.  The first improper suggestion

19  that's made in the papers in support of the objection to

20  exclusivity, is that we're all dealing with a plan that is an

21  un-confirmable plan.  That is nothing more than an effort to

22  reargue the very issue that the Court addressed in January

23  and said was going to be deferred.  We're not going to gain

24  here by continually revisiting the issue, the same identical

25  issue, of whether the plan is confirmable or not.  We

1  obviously believe that it is.  We have support in that in the

2  Equity Committee and the Unsecured Creditors Committee.  They

3  agree that it is.  There's disagreement, and Your Honor

4  decided in January that we were going to defer that issue.

5  Why are we continuing to talk about it?  It's a waste of

6  time.  The second consideration, that I think drives these

7  papers and it's very obvious, is that as we now have gone

8  down the road of the objection process that we believe is

9  critical to estimation, that is the process of obtaining

10  answers to these claim forms, making objections and the like,

11  the pressure is on.  It's on the property damage claimants

12  because we now have their claim forms, and we are now lodging

13  the objections.  It is on the Personal Injury Committee

14  because we now have submitted a proposed claim form that we

15  believe is going to be very effective in connection with the

16  estimation process.  All these things clearly were

17  contemplated in January.  We're now moving down that road,

18  and basically, what we're now seeing is the revival of issues

19  about whether there really ought to be this kind of objection

20  process.  How revived?  Well, if they terminate exclusivity,

21  then presumably they're going to be arguing for a different

22  kind of plan that doesn't turn on any of those things.  Their

23  kind of estimation, which doesn't really consider the merits

24  of any of the claims, is simply an extrapolation from

25  settlements.  You know all these arguments.  We're going to

39

go down the road to a one-way street estimation.  So the sub-text of the request that exclusivity not be extended, the sub-text is quite clear, which is, Your Honor, don't take the time to do an estimation that is an actual litigated estimation, terminate exclusivity so that we can come up with a plan that won't require any of that effort, and we'll be able to cram it down.  Now, obviously that is a false promise.  If exclusivity were terminated and other additional plans were submitted, there's no way that the interest of the equity holders or the interest of the unsecured creditors can simply be blinked away.  We're going to face exactly the same issues, but now in the context of a much messier situation, which is competing plans.  Which then brings us to what the real issue is, and the third issue, and that is very simple.  Since January, when there was the MEAP objection then withdrawn and there were no objections, is there some fundamentally different vision of how this case can be resolved then we were talking about in January or that we've talked about for the last three years?  Is there something new that all of a sudden is now being articulated?  And the answer to that is absolutely not.  There's no new vision for the future, no silver bullet, no magical solution that somebody has conceived of in the six months that now have passed that all of a sudden is going to bring this case to a close without addressing the hard issues that have posed a

1  quandary in all respects, litigation respects, settlement

2  respects, and the like, there is no new path, and the path

3  that we're on, we believe, Your Honor, is the right path.

4  And let me be very specific on what we propose going forward.

5  We had back at the beginning and it is ironic in hearing the

6  complaints about the time that this case has taken when you

7  think about where this case was and when it was filed in

8  2001.  In 2001, the very first day of the case, we laid out a

9  road map that identified each and every one of the issues

10  that had to be addressed, and they could be addressed by

11  settlement or it could be addressed by litigation.  And they

12  haven't changed.  We have ZAI.  We have the traditional

13  property damage claims.  We have personal injury, and we have

14  fraudulent conveyance.  We talked about these on 4/01.

15  Fraudulent conveyance actually was raised because of

16  continuing the effort on part of certain claimants, the AI

17  claimants, to continue litigation outside the context of the

18  bankruptcy.  They were all raised, and I remember still, I

19  think it was November 22nd of 2001, we actually had case

20  management orders that had been submitted.  We had briefs

21  that contested those orders and made other kinds of

22  proposals.  Everything was before Judge Farnan.  Everything

23  was ripe.  Case management, let's go.  And then we learned,

24  literally, as we came into court for a hearing on the case

25  management orders, we learned that the case was going to be

1  reassigned.  And as a result, Judge Wolin took over, and

2  Judge Wolin decided he had a priority scheme.  He wanted the

3  fraudulent conveyance to be number one.  He wanted PI to be

4  held, and PD and ZAI, he said, Well, those can go forward but

5  before Your Honor.  And we now know that as a result of that,

6  during the period of time that then followed, the fraudulent

7  conveyance claim that was litigated in '01 has now been

8  settled.  The ZAI claim was litigated, and it's now under

9  submission.  The PD claims, we got the forms, which were

10  contested and then approved by Your Honor and then the appeal

11  was taken, actually by the Property Damage Committee, and

12  those forms were in place, and they've now been filled out

13  and we're poised to litigate that. That was able to go

14  forward, Your Honor was able to pursue both of the dimensions

15  of the litigation that had been placed before you, and the

16  personal injury folks remained on hold.  We didn't -- I mean,

17  Judge Wolin was very explicit.  He put it very far at the end

18  of the game, and it's only recently that we've now got a

19  proposed form on personal injury.  This now, the settlement

20  of fraudulent conveyance has been approved.  This is

21  submitted for a ruling, that is ZAI and with respect to PD

22  we're now in the process of filing objections.  So, while the

23  timing is not ideal from anybody's point of view, to say

24  nothing of the debtor, the debtor's been here from day one,

25  he could not have been more diligent.  We pressed at every

1    single opportunity.  So, where does this leave us?  First I

2    should say, we should make mention of the legislation.  The

3    legislation is kind of the 600 pound gorilla, actually I

4    think that -- originally that role was accorded to the ZAI

5    claimants by Brother Lockwood.  So, it's the two ton elephant

6    in the room, and it's a factor that's out there, and it's on

7    people's minds, but I think there's probably a lesson from

8    the CE case, the new CE plan, the modified plan was just

9    submitted at the end of last week.  Combustion Engineering

10   maybe had no choice but to go forward with their efforts to

11   reorganize because they couldn't wait for legislation, and

12   now finally, God bless, it looks like that actually is going

13   to get resolved.  I don't know where the legislation is going

14   to go.  I don't think anybody knows where the legislation's

15   going to go, but one thing's for sure, which is that we're

16   not going to make progress in this case simply waiting for

17   the crystal ball on legislation to become clear.  We had to

18   press this case forward.  So there is no silver bullet that

19   we can count on in the context of this Court.  Second path is

20   settlement, and there's a reference in the papers filed by

21   the property damage claimants that they're unaware of

22   settlement discussions, which is kind of a stunning

23   statement.  The company throughout this entire period of time

24   has had numerous contacts with all constituencies, including

25   members of the Property Damage Committee to deal with the

1   prospect of finally trying to settle this case.  There have

2   been all kinds of discussions with all kinds of lawyers, all

3   kinds of representatives.  We have not been idle in that

4   process.  What has emerged?  Well, gee, it's a shocker.  It's

5   not just the debtor who disagrees with the value of the

6   claims that have been lodged.  We're not the only ones that

7   have an issue.  The property damage claimants disagree with

8   the personal injury claimants and what the personal injury

9   claims are worth.  The personal injury claimants disagree

10  with the property damage claimants.  This is not the first

11  case.  They've been fighting with each other since the

12  Celotex case, and they continue to fight with each other in

13  the Celotex case tooth and nail.  They're fighting in other

14  cases.  So, the tort claimants, bodily injury and property,

15  they're at each other's throats.  They don't agree on what

16  the settlement value should be.  What about the ZAI claimants

17  versus the traditional property claimants?  They don't agree

18  either.  What about the relationship between all that and

19  equity, or all that and the unsecured debt?  No one agrees.

20  No one can even figure out what the claims are worth.  And

21  traditionally that's what the court system is all about.  If

22  you can't agree on what the claims are worth, you litigate,

23  and the only way that you make progress in settlement is to

24  litigate because it creates the pressure for settlement.  So,

25  the whole idea that somehow the debtor has been an obstacle

1    in this process is laughable, and then the Future Claims

2    Representative was appointed, and David Austern is one very

3    talented, resourceful, and capable Future Claims

4    Representative, and a good force for mediation and

5    settlement, and that held out some promise.  They haven't

6    come up with a concept either that everybody agrees to.  So,

7    this is not a debtor problem.  This is a problem that is

8    endemic to the subject matter of the case.  Now, the only way

9    the problem can be resolved, is to make further progress on

10   the litigation front, which then brings me to where we are,

11   and where I think that we should go.  We believe that Your

12   Honor should continue to press forward.  When it comes to

13   ZAI, I know we discussed this last time, but we believe it

14   would be critical for Your Honor to devote the time and

15   resources that are necessary to decide that issue.  It's just

16   --

17        THE COURT:  I am doing that.

18        MR. BERNICK:  Good, great, terrific.  With respect

19   to personal injury, on personal injury we now have the forms

20   that have been developed, and there's been a very

21   entertaining if not productive dialogue between the debtor

22   and Mr. Lockwood and the others on the Personal Injury

23   Committee with regard to that form.  We spent a lot of time

24   on it.  They spent a lot of time on it, and it's now going to

25   be before Your Honor for a determination, just like we did

1  property damage personal injury, that group can do personal

2  injury.  Personal injury inevitably will take more time as a

3  track because the form has to be filled out and there are

4  some tough issues.  So, in a sense, that's probably the

5  slowest track.  Fraudulent conveyance we don't have to worry

6  about any more, which leaves us, and I think I'm going to

7  spend a couple of minutes with respect to the property damage

8  claims.  All right, Jen, if you could hand up to the Court

9  and two others these -- Yes, just all of them.  I just want

10  to review very quickly what we think is going to happen with

11  the property damage which is actually, I think, going to

12  occupy the attention of the parties here in the short term.

13  If you could just --

14       MR. BAENA:  Judge, while they're looking for

15  charts, can I just have clarification.  Are we arguing

16  exclusivity now or are we arguing the status conference about

17  PD claims or are we just going off on a tangent to obfuscate

18  the issue before Court?

19       MR. BERNICK:  What we're doing is we're handing up

20  the charts that will then be used for the exclusivity

21  argument.  If you want to look at them, that's probably the

22  best way of expediting them, but we'll get to all those

23  issues in due course.  They have seen fit to object to the

24  extension of exclusivity in the very midst of the process

25  that constitutes the lifeblood of this case.  If they don't

1  want to listen to the reasons why we believe that exclusivity

2  should be extended, that's fine, but they're the ones that

3  have made the objection.  Door is open, we're walking through

4  the door.  What is going on with the traditional property

5  damage claims?  Well, as you can see from the first chart,

6  Mr. Speights, from Speights and Runyan, accounts for 73

7  percent of all the asbestos property damage claims, 73

8  percent.  Mr. Dyes (phonetical) who is also a very -- been

9  involved very deeply in this process for many years, has come

10  in with what is obviously a much more limited universe of

11  claims at about 4 percent.  It's 150.  Now, we have all the

12  information from the claim forms, Your Honor, and we're now

13  putting it on a -- it's basically an analytical structure, a

14  data base that we're using so that we can lodge all

15  objections, based upon the face of the claim form and on the

16  basis of the documentation that's attached, we believe by the

17  middle of September if not sooner.  So, while we're peeling

18  off the issue of the authority to file claims, our goal is to

19  be completely done with that by the middle of September so we

20  can then litigate the success of issues going forward and

21  find out how much this traditional property damage claim is

22  worth.  Remember, at the time that this case was filed, there

23  were only seven property damage cases left in the entire

24  United States.  We now see over 4,000.  That does tend to

25  raise a question about what's going on.  We know what's going

1    on now.  Mr. Speights has been called on this now in several

2    different cases, Federal Mogul; In Re: Owens Corning; In Re:

3    Celotex; In Re: U.S. Mineral Product Company; and also in

4    Armstrong --

5            MR. BAENA:  I'm going to object, Your Honor.  I am

6    going to object.  This is outrageous.  Mr. Speights isn't

7    here.  There's no motion that regards Mr. Speights' claims.

8    There's nothing on this agenda today about the liquidation or

9    the discussion about property damage claims except the status

10   conference in regard to a case management order.  All we're

11   here about is whether or not this debtor should have six more

12   months of exclusivity.  That's what we're here about.

13           MR. BERNICK:  This is a speaking objection, Your

14   Honor.

15           MR. BAENA:  No, I --

16           MR. BERNICK:  Mr. Bernick --

17           THE COURT:  Gentlemen, both of you stop.  Mr.

18   Baena, your objection's overruled for this reason:  The

19   debtor is trying to tell me what it's going to do to keep the

20   case moving and Mr. Speights' objections on the property

21   damage side, if they have to be litigated, are going to take

22   up a lot of the resources.  To the extent that that's all the

23   debtor's trying to tell me, I got the point, Mr. Bernick, you

24   can move onto something else.

25           MR. BERNICK:  That's fine.  We have a process in

1    motion to deal with -- Let me just give you a global number.

2    I think, frankly, it's virtually all of his claims have a

3    fundamental issue which is about whether they've been

4    authorized to be filed to begin with by an actual client, and

5    that's one issue that we're going to frame.

6         THE COURT:  It doesn't matter.  I got the point.

7    You're going to take on the property damage issues based on

8    the forms that have been filed --

9         MR. BERNICK:  Yes.

10        THE COURT:  -- fine.  That's what you ought to do.

11   I'm happy to see that it's coming.  September's a good time

12   frame, okay.

13        MR. BERNICK:  Okay.  So we then have the remainder

14   which would be -- We believe that the property damage claims,

15   we will be able to file our objections in September, and we

16   then have submitted a case management order, which is the

17   second real item, I think, that we're going to take up that

18   deals with that.  Let me touch on that very briefly without

19   getting into the details.  Your Honor directed us in January

20   to develop such a case management order, and I think that the

21   process was a good and cooperative one in terms of the

22   overall flow of events.  An issue has now been raised, which

23   I know we'll talk about when we get to the order of whether

24   the -- whether counsel for the Property Damage Committee is

25   actually prepared to proceed on the basis of the schedule

1  that we had originally contemplated.  So the reason that

2  we're filing what is not an agreed case management order, the

3  reason is that we have a different view on how promptly that

4  should proceed, and the reason that's relevant to exclusivity

5  is we are proposing that certain of the issues relating to

6  the property damage claims, that is authorization be taken up

7  in September, others be taken up beginning in October, and

8  those are two issues: constructive notice, which can be

9  litigated on a generic basis, and the Daubert issue, which is

10  a question of data.  That was the same issue that we

11  litigated before Judge Newsome in the Armstrong case and led

12  him to strike the basis for most of the property damage

13  claims, and of course, those claims later were settled by

14  Armstrong.  We anticipate exactly the same kind of processes,

15  it's a cookie cutter from Armstrong.  It's not specific to

16  any individual claim.  We then have the other issues, which

17  we believe can be litigated on a generic basis, and we would

18  propose that they are kind of the last way, but all ways

19  would be completed by the spring to early summer of next

20  year.  We would have basically three hearings over time, the

21  last one being in June, and that would bring this track to a

22  close.  Of course we hope that at any point during that

23  process that we can reach agreement, but really ZAI and

24  property, now that fraudulent conveyance is out of the

25  picture, it is our assessment that they are today the

1   principal reasons why this case cannot be settled.  That's

2   not to say that we're not going to have a lot of issues with

3   the personal injury folks, but we believe that there's so

4   much swing here and the argued for value of these property

5   claims versus what we believe the reality is, that that is

6   where the principal obstacle to settle them currently lies.

7   Now, there have been objections that have been lodged.  And I

8   just want to make a couple of comments on the objections, and

9   then I note that counsel will speak as vigorously in support

10  of those objections as they have done in their pleadings.

11  First of all, the Future Claims Representative, for the life

12  of me, I can't understand what has changed from the

13  perspective of the Future Claims Representative since they

14  raised their hand alone in January as being the sole

15  objectors and then said, Well, that's okay.  We understand

16  where Your Honor's headed.  We withdraw our objection.  Why

17  are they back turning over the same soil, making the same

18  arguments?  They don't have any magical settlement wand

19  either.  The personal injury folks are objecting.  It's

20  obvious why they're objecting.  They know that if this

21  process of claim form development and completion goes

22  forward, that they will face a real contest on estimation as

23  opposed to their usual plug the settlement numbers in and see

24  what comes out at the end kind of approach, which has never

25  been approved when objected to.  The property damage folks,

1  again, it's very obvious.  They want to avoid the Speights &

2  Runyan issues.  They want to avoid the objections and they

3  want more time.  What is the vision that the Property Damage

4  Committee possibly can have?  They have none, and the reason

5  they have none is very simple.  This Committee now is

6  hopelessly conflicted.  The PI, the traditional property

7  damage claims are competing for a piece of the same pie as

8  the ZAI claims.  There are different traditional property

9  damage claimants with radically different kinds of claims

10  that they've submitted to Mr. Speights and his 2,000 claims

11  are completely different.  Some of them we don't even know

12  who the client is, it's just a building.  He puts a building

13  down on the claim form and says, That's my client.  And some

14  of these people are now calling us saying, This guy doesn't

15  represent us.  So they're conflicted as among the traditional

16  property damage claimants, and then finally the whole

17  Committee has obviously a very different view of the world

18  from PI and the unsecureds.  Mr. Bennett complains that there

19  hasn't been a consensual resolution.  The heart of that

20  complaint ought to be directed at his own committee which

21  can't agree on the approach that they want to take.  And the

22  only answer to that is we're not asking to disband that

23  committee, the only answer is to remove the conflict by

24  resolving the issues that drive it.  So, we would think it's

25  very important to keep this case on track.  Grace is very

1  dedicated to the proposition that being timely before the

2  Court.  I can tell the Court I apologize for having not

3  having been present at some of the hearings in the last nine

4  months.  I was on trial.  God bless, I'm done with that

5  trial, and I'm totally focused on this case, and we would ask

6  for six months' extension.

7        THE COURT:  Mr. Baena?  Oh, I'm sorry.

8        MR. PASQUALE:  Ten seconds, Your Honor, I promise.

9  Ken Pasquale, for Stroock for the Unsecured Creditors

10  Committee.  Your Honor, just for the record, we did not file

11  any papers frankly because we thought it apparent that in our

12  position as co-proponents of this plan, we do in fact support

13  the debtor's request for exclusivity, and we do so for all

14  the reasons that the debtor's put before you, and I just

15  wanted to stand and make that clear.

16        THE COURT:  All right, thank you.

17        MR. PASQUALE:  Thank you.

18        MR. BAENA:  May it please the Court.  Scott Baena

19  on behalf of the Property Damage Committee.  Your Honor, this

20  is the eighth motion for the extension of exclusivity, and

21  indeed, the motion itself is nothing more than another

22  iteration of the same old motion that's been made seven

23  times.  In fact, if you read that motion, it is almost devoid

24  of any grounds for granting the motion.  The only indication

25  of cause that the motion sets forth for the extension of

exclusivity at this late date, is that the debtor needs the
time to, quote, "continue to make progress in their
development of a confirmable Chapter 11 plan."  Likewise, at
paragraph (13) of the motion, the debtor states that the
termination of exclusivity would undermine the debtor's
opportunity to negotiate, file, and confirm a consensual plan
of reorganization.  Now, I don't know what that means other
than what it appears to say, and that is, that the debtor
recognizes that it has a problem.  The problem being the plan
which is on the table.  We've articulated that that plan was
dead on arrival.  We think to some extent the Court shared
our misgivings about the confirm-ability of that plan back in
January.  And deferred may be a charitable way of just saying
putting off to another day dealing with its infirmities.  Our
concern, Judge, is that what the debtor tries to do is
connect the estimation process with the extension of
exclusivity in respect of the plan which is on the table.
And we don't see that connection.  We think that back in
January when the Court said we're going to embark upon an
estimation process, it wasn't in respect of the debtor's plan
per se as opposed to in respect to any plan.  And it didn't
say -- And the Court did not say that the debtor is going to
have exclusivity for the duration of the estimation processes
that it undertakes in respect of both PD and PI, and it
didn't say that nobody could ever complain about the

1 exclusivity that the debtor is enjoying in the meanwhile in

2 respect of this particular plan that's it's filed.   The

3 Court, indeed, left the door wide open for exactly what's

4 happening today.   The debtor recognizes by its motion that it

5 should be doing more to gain consensus for a plan, not the

6 plan that's on the table.   And I must tell you, Judge, I

7 heard Mr. Bernick describe a process that he says is going on

8 in criticism of statements made by Property Damage in its

9 objection.   I'm unaware of the process.   I'm just unaware of

10 any discussions, any substantive discussions that have taken

11 place in earnest since last year.   It's June, Judge.   We have

12 just enjoyed the fourth anniversary of this case.   The

13 estimation process will go forward.   We do not resist it

14 going forward.   We'll talk about the CMO later.   We'll talk

15 about the fact that the CMO they want to present to you

16 today, I got it 5:30 on Saturday when I was out of the

17 country.   We'll talk about that.   But we have not resisted

18 after our initial objections to the process, we have not

19 resisted, indeed, we've done everything we can to make the

20 estimation process in respect to property damage at least a

21 viable process.   But the fact that it goes on is only by

22 recognition of everybody in the case that it has to happen in

23 respect of any plan that comes before the Court.   It doesn't

24 entitle this debtor to hold us hostage while it undertakes a

25 program for estimation that could be two or three years.   We

1    can't leave ourselves with their plan as the only option, and

2    we can't give them the prerogative by keeping their plan on

3    the table, of keeping us out of the discussion about a

4    consensual plan that we can put on the table.   And that's

5    what they're doing.   And, Judge, we've complained as well

6    that you've got to take into account in some context or

7    another and we think it's in this context.   But this isn't

8    the greatest debtor in the world.   Despite all the bravado

9    and all the musings about the things that they've done, this

10   is a debtor that's been indicted during the course of a

11   Chapter 11 proceeding.   This is a debtor that three officers

12   of have been indicted during the course of a Chapter 11

13   proceeding.   This is a debtor that's spending millions of

14   dollars every month to defend those officers and itself in

15   criminal proceeding.

16          THE COURT:   Those actions, as I understand it,

17   happened before the case was filed, as I understand, with the

18   ZAI -- or I'm sorry, the Libbey issues; is that the basically

19   the --

20          MR. BAENA:   Judge, the criminal conduct that

21   they're charged for occurred over an extended period of time

22   including before the occurrence of bankruptcy.   But the

23   indictment occurred, forgive me for putting it so bluntly, on

24   your watch.

25          THE COURT:   I understand that.   Nonetheless, to the

1   extent that that is somehow an accusation that I had

2   something to do with the criminal indictment, I hope you'll

3   withdraw that statement.

4       MR. BAENA:  But there was criminal conduct that

5   occurred post-petition as well, Judge.

6       MR. BERNICK:  Mr. Baena ought to be very careful in

7   making representations to the Court about the connection of

8   that kind of proceeding and clients that he represents are

9   part of his Committee in Libbey, if he opens that door, he

10   ought to be fully cognizant of what the consequence might be.

11   He's now saying that that criminal proceeding has welded up

12   in this Court, and that's a very, very interesting concept

13   for his client to be pursuing here.

14       THE COURT:  Gentlemen, we're going to take a ten-

15   minute recess.  Mr. Baena, cool off.

16       (Whereupon at 1:33 p.m. a recess was taken in the

17   hearing in this matter.)

18       (Whereupon at 1:44 p.m. the hearing in this matter

19   reconvened and the following proceedings were had:)

20       THE CLERK:  All rise.

21       THE COURT:  Please be seated.  Mr. Baena.

22       MR. BAENA:  I apologize to the Court if I made my

23   point too strenuously, Judge.

24       THE COURT:  No, Mr. Baena, if you're accusing me of

25   something improper, I want to see it in writing, and I will

1   stop these hearings right now.

2      MR. BAENA:  I wasn't accusing the Court of

3   anything, Judge, other than the fact that we have a debtor

4   that has misbehaved.

5      THE COURT:  We do.  That's apparent, at least from

6   the prosecution's point of view with criminal indictments,

7   but Mr. Baena, you've been involved in this case.  The other

8   committees have been involved in this case, and quite

9   frankly, the only information I get is by way of pleadings

10   filed from parties, and to the best of my knowledge, I wasn't

11   given any information early on in this case that there were

12   indictments likely of officers, directors, or anyone else in

13   the case, and I resent the accusation, and I don't use that

14   word lightly because there are very few things in my life

15   that make me resent things, and I do resent that remark.  So,

16   if you think I'm doing something improper, I want to hear it

17   right now.  I want it filed in writing, and I will stop these

18   proceedings until it is adjudicated.  This is your chance.

19      MR. BAENA:  Judge, again, I never suggested except

20   perhaps by the use of poor choice of words that the Court did

21   anything untoward.  Nothing was intended to make that

22   accusation.

23      THE COURT:  All right, then let's get on with the

24   argument.

25      MR. BAENA:  Judge, I'd like to make two last points

1    and leave it to our papers, which I think are extensive and

2    set forth adequate reasons why this motion ought to be

3    denied.   The first point I'd like to make is the observation

4    that Mr. Pasquale brings to mind when he speaks on behalf of

5    a co-proponent of the pending plan, and that is the fact that

6    the Equity Committee and the Trade Committee are co-

7    proponents of the plan that is on the table.   And it just

8    strikes us as odd and inexplicable that the only way to be a

9    player four years in this game about the outcome of this case

10   is by agreeing with the debtor to a plan that we can't agree

11   to.   And because we object to it, we're left at the side

12   lines like critics as opposed to proponents.   The unsecureds,

13   equity, and the debtor have had the opportunity to put

14   forward a plan.   Four years later, we have not, the asbestos

15   constituencies have not.   We're sidelined, and we believe

16   that that's inappropriate.   The second point I'd like to

17   make, we do allude to in our papers, and I think it's more

18   than anecdotal.   It's very reflective of a point, and that is

19   the fact that under the Reform Act that was recently passed

20   by Congress, we wouldn't be debating four years into a case

21   whether somebody should have that exclusivity.

22            THE COURT:   That's right, we wouldn't have this

23   case at all.   No one in their right mind will file a

24   bankruptcy case like this under the Reform Act.

25            MR. BAENA:   And there has to be a reason why

1   Congress said, Eighteen months is enough, and other people

2   ought to have a chance.  And four years later, whatever

3   reason there was from eighteen months to four years, just as

4   Mr. Bernick asks, What's changed?  The answer to the question

5   is, Nothing has changed, and that's the problem.  Nothing has

6   changed.  They're still pursuing a plan.  By Mr. Bernick's

7   argument, he suggests that there's more life to that plan

8   which is on the table, then we believe there is, and you've

9   heard all about that.  And yet, he believes that the

10  estimation proceeding is the preliminary event for that ill-

11  founded plan.  We say, That's where he's wrong.  It's a

12  preliminary event for any plan, and we shouldn't get through

13  that event, which could take, as I said before based on their

14  proposed case management orders, more than a year.  In the

15  case of PI, at least two years.  We shouldn't get through two

16  years of this process and say, Okay, now we've got six months

17  to go through their plan.

18          THE COURT:  Well, okay, this is somewhat getting

19  into the case management side of things, but to the extent

20  that it's relevant, let's talk about it for a minute.  How

21  soon do you want to try the cases?

22          MR. BAENA:  That's not -- Judge, in all due

23  respect, that's not the point.  I mean we've got limitations.

24  I've recognized those limitations.  I agree with those

25  limitations.  The question is what are we going to do at the

1   end of that event, and the way they see it, Judge --

2       THE COURT:  At the end of that event, I think, the

3   following:  If the estimation turns out to be more than the

4   $1.7 billion that the debtor says has to be the minimal

5   number, that plan is not confirmable.  So either the debtor

6   has to modify it or exclusivity should be terminated and

7   everybody will have a chance to come up with a plan with the

8   number that's been determined to exist by the Court.

9       MR. BAENA:  So, Judge, by that observation, we're

10  not talking about a six month continuance here of

11  exclusivity.  You're talking about two years or however long

12  that process takes.

13      THE COURT:  So, if you want the process expedited,

14  we can expedite the process.  If that's the issue, if the

15  timing of getting the claims estimated is the issue, then do

16  the discovery quicker and let's get to trial.

17      MR. BAENA:  You see, Judge, this is where I think

18  it's unfair, the process is unfair.  If the tradeoff for

19  being able to file your own plan is that you get less

20  procedurally in the estimation process in terms of time and

21  preparation, that's not fair.

22      THE COURT:  No, actually, Mr. Baena, we wouldn't be

23  going forward to confirmation on any plan until the

24  estimation's done.  So if I --

25      MR. BAENA:  That's correct.

1   THE COURT:  That's right.  So if I terminate

2   exclusivity now, all that's going to do is provide, you know,

3   take a guess, one other plan, five other plans, none of which

4   I'm going to let go forward any way until the estimation's

5   over.  So why don't we get through the estimation process.

6   MR. BAENA:  Because the fact of those plans, Judge,

7   creates the playing field for a negotiation over a consensual

8   plan.

9   THE COURT:  Oh, but, look, the playing field is

10  there.  I mean, I'm a little bit at a loss to understand why

11  there can't be negotiations with or without any plan on the

12  table, but you've heard what the debtor thinks is the

13  debtor's best effort.  Frankly, knowing the way negotiations

14  go in bankruptcy, I'm willing to believe that's there's

15  probably a little wiggle room on behalf of the debtor just

16  like there is on behalf of the Future Rep. and the Committee,

17  because there's always wiggle room or you can't have an

18  negotiation.  So, folks, why you're not talking to each other

19  is beyond me, but this is what I'm going to do, whether

20  exclusivity is terminated or not, I am ordering all of you to

21  have a face-to-face meeting next week.  I don't care whether

22  it's vacation schedules, period, that interfere, I want a

23  face-to-face meeting in which you will see whether or not you

24  can come to any essential agreement about any valuation issue

25  that's in dispute, if there is one, about any estimation

1    issue that's in dispute, both property damage and personally

2    injury-wise.  Now, this can be structured.  In fact, it

3    probably should be, so that there is a meeting first with

4    people interested in the property damage side and secondly

5    with people interested in the personal injury side, but

6    before there is any final agreement, you're all going to have

7    to get together.  You want an opportunity to see if you can

8    do a consensual plan, this is it for everybody.  For

9    everyone.  So, if the numbers work out, in a way that you can

10   all agree, then there will be a consensual plan.  If you

11   can't agree, then we have to go through the estimation

12   process, and until that estimation process if fixed, no

13   plan's going to be confirmed.  So, whether there's

14   exclusivity or not right now, there won't be any movement

15   toward getting a plan out the door unless you have an

16   agreement or we get the estimation process done, otherwise,

17   there can't be a plan.  So, I think, Mr. Baena, you hit the

18   nail on the head when you say, It's too long.  I want it

19   shorter, a shorter time frame.  We need to get the hearings

20   done sooner, and that includes me with the ZAI motion under

21   consideration, I understand that, but all of it needs to be

22   bumped up.

23          MR. BAENA:  I have no further comments, Judge.

24   Thank you.

25          MR. FRANKEL:  Good afternoon, Your Honor.  Roger

1  Frankel for Mr. Austern.  I'm not sure if Your Honor has

2  already decided this motion or not but --

3          THE COURT:  No, I haven't.

4          MR. FRANKEL:  -- I'll speak to it.  First of all, I

5  didn't realize our withdrawing our objection last time would

6  be used against us this time.  I think that what we wanted to

7  see was the progress that would be made over six months, and

8  we can envision a series of six month periods where very

9  little is done.  What I want to discuss is the plan that was

10 filed by the debtor.  It's very favorable to the commercial

11 creditors, very favorable to equity, and it's very hostile to

12 the asbestos claimants.

13         MR. BERNICK:  Your Honor, I'm going to object,

14 because again, it's exactly -- Indeed it goes beyond the

15 confirmation issues that Your Honor determined in January

16 were premature.

17         THE COURT:  Folks, can we get through the argument?

18 Overruled.  Mr. Frankel, please proceed.

19         MR. FRANKEL:  Thank you, Your Honor.  The reason

20 that I raise that, Your Honor, is that we think it is

21 relevant to exclusivity the choices that the debtor makes

22 four years into a case as to what kind of plan they file.

23 This is a case where they could have filed a plan that --

24 okay, perhaps they didn't want to have asbestos claimants

25 voting.  I understand why they wouldn't want to do that.  We

1   think that by itself makes the plan un-confirmable, but

2   that's not for today.  But they provided that the asbestos

3   claims, including the property damage, including the personal

4   injury, including the future personal injury claims cannot

5   exceed $1.7 billion.  Now they could have just as easily

6   filed a plan that provided that if they exceed 1.7 or 2 or 3;

7   what happens?  That would not have been difficult, but they

8   chose to file a plan that caps asbestos liabilities or makes

9   their plan un-confirmable, and it's for that reason, Your

10  Honor, that we believe that a second plan, or for that

11  matter, other plans, but at least a second plan that at least

12  says what happens if it turns out at the end of this long

13  period that asbestos claims are in excess of 1.7 billion,

14  which we think is very likely, what happens?  We shouldn't

15  have to go back to square one, give the debtor a chance at

16  that point to modify their plan, or at that point have a

17  battle over exclusivity.  We think it would be very

18  appropriate at the end of the estimation process, whatever it

19  results in, that there be a confirmable plan on file.  The

20  only other thing I'm going to say, Your Honor, is I

21  appreciate Mr. Bernick's remarks with regard to Mr. Austern.

22  Mr. Austern made the determination to file this opposition

23  because he does believe that a level playing field will

24  result if exclusivity is terminated.  Thank you.

25      MR. HURFORD:  Good afternoon, Your Honor.  Mark

1   Hurford of Campbell & Levine.  Frankly, Your Honor, I

2   prepared a more lengthy argument, but going third and at this

3   point in time in the hearing, I guess it would be best for me

4   to respond to some of the particular issues that have been

5   raised.  And one of the issues I would like to respond to was

6   a comment from debtor's counsel which was raised a couple of

7   times regarding why, and you, I'm sure, have read the PI

8   Committee's papers, the PD Committee's papers, and the Future

9   Rep.'s papers as to why the plan that's currently on file is

10  un-confirmable.  And the reason is, and this is cited in the

11  debtor's own papers, that one of the factors the Court

12  considers in determining whether to extend exclusivity, is

13  whether the debtor has demonstrated reasonable prospects for

14  filing a viable plan.  Obviously, it knows our position.

15  They have not filed a viable plan.  Mr. Frankel just stated a

16  few reasons for that.  Mr. Baena stated a few more reasons

17  for that.  From our point of view, very simply boiled down,

18  the Asbestos Committee has the right because they are

19  impaired to vote on the plan under 1126.  They also have the

20  right, in fact, they're required to vote on the plan under

21  524(g).  We are required to vote.  So, as far as the debtors,

22  whether or not they're taking that position at this hearing,

23  I'm really not sure, but they have demonstrated reasonable

24  prospects for filing a viable plan.  I don't think that

25  exists.  The debtors also comment on negotiations with

1   creditors.  The element cited in the debtors' own papers is

2   that whether the debtor has made progress in negotiating with

3   creditors, there seems to be some disagreement as to whether

4   or not the debtors have been negotiating with the PD

5   Committee.  I can tell you they have not been negotiating

6   with the PI Committee, at least in the last six months.  I'm

7   not sure for the rest of these people.  Regardless, the

8   papers generally referred to, quote/unquote, "capitalized

9   term, asbestos parties."  That capitalized term, as far as I

10  can see, was not defined in the motion.  Regardless, nowhere

11  in their motion do they say that they made progress in

12  negotiating with the creditors.  Not that they're

13  negotiating, but that they've made progress.  And I guess my

14  last bit of comments, I would like to get back to the --

15  somewhat the theme of the PI Committee's objection, and that

16  is that throughout this case any legitimate movement that has

17  been made in moving these cases forward has been done

18  pursuant to comments that Your Honor has made on the record.

19  Your Honor may recall that after the PI Committee objected to

20  the fifth motion to extend exclusivity, that Your Honor

21  instructed the parties to meet and confer.  There was one

22  teleconference that was held after that.  By no means could

23  that be considered a good faith attempt at reaching a

24  resolution of these cases.  Thereafter, this Court raised

25  concerns in connection with an argument on a general

1  unsecured claim with regards to what progress the debtor was

2  making and questioned the need to replace the debtors -- the

3  debtors in possession to see if something can get done.

4  Thereafter, in connection with the PI Committee, and I think

5  there were other objections filed as well, to the debtors' --

6  the Grace debtors' sixth motion to extend exclusivity, this

7  Court raised the question whether or not these debtors would

8  even be seeking a 524(g) injunction.  That question could not

9  be responded to, and your Court ordered them, by the next

10 omnibus hearing, to either file a motion or to come and state

11 on the record, unequivocally, what they were going to do.

12 Because of Your Honor's statements, a Futures Rep. was

13 finally appointed, and because of Your Honor's statements

14 again at that hearing, which if I recall correctly, mentioned

15 specifically the appointment of a trustee despite an

16 acknowledgement of what that might do to the debtors'

17 financial lenders may be necessary.  At that point, the

18 debtors came in and said, We will be filing a plan.  Now, the

19 second round of legitimate negotiations that went on in this

20 case, went on around that time, and to my knowledge, nothing

21 has gone forward since that period of time.  Like I said,

22 Your Honor, the steps that have been made, the actual steps

23 in progressing this case, has been made by Your Honor pushing

24 the debtors to do them.  And what this really comes down to

25 is litigation.  Do we want to litigate for the next several

1  years of these cases or do we want to level the playing

2  field, see if the other creditors can step forward and do

3  what the debtors have failed to do, reach some agreement

4  amongst the creditors.  Now granted, there maybe there will

5  need to be estimation.  Maybe that estimation process can be

6  streamlined as it has in numerous other cases I can think of.

7  Armstrong, which considered the debtor's pre-petition

8  settlement history.  Owens Corning, which considered the

9  debtor's pre-petition settlement history, which, by the way,

10  it certainly was not an uncontested issue in Owens Corning.

11  There were a number of motions filed to establish an asbestos

12  personal injury bar date in Owens Corning that were never

13  granted.  And in that case, it was decided to move forward

14  with estimation.  Judge Wolin said in that case that if he

15  didn't think there was appropriate information that he could

16  rule on estimation, that he wouldn't, and he would consider a

17  personal injury bar date.  He apparently decided he didn't

18  need it because, obviously, as we all know, he ruled.  And

19  more recently in Federal Mogul, the Asbestos PD Committee led

20  by Rod Gotshall in that case, objected, but there was a

21  hearing estimation that was based upon the debtor's pre-

22  petition settlement history.  I guess what we're asking for,

23  Your Honor, is a leveling of the playing field, and I

24  mentioned this in my papers.  We will conceive that there's

25  no alternative plan that's ready to be filed.  But, Your

1   Honor, as we approach others to negotiate, where the general

2   unsecured creditors under the current plan are supposed be

3   getting a hundred cents on the dollar plus post-petition

4   interest, and equity are going to be retaining such a

5   substantial percentage;, where is the level playing field?

6   Now, Your Honor's asked us to go into negotiation next week.

7   We will certainly do that, but, to date the debtors haven't

8   been able to move this case forward on this playing field,

9   and we're asking that the playing field be leveled so that

10  other parties can bring forward plans, and maybe these cases

11  can be resolved much quicker.  The time line that debtors'

12  counsel has just proposed considers a hearing in December of

13  2006 for asbestos personal injury claims.  And, like I said,

14  Your Honor, that's really what this all comes down to.

15  Actually, I believe I said I was only going to respond to one

16  more, two more things, but let me respond to one other issue

17  raised by debtors' counsel and that is the assertion that the

18  Asbestos PI Committee is concerned with the ongoing briefing

19  for the debtors' proof of claim/questionnaire, and that we

20  are suddenly objecting to the debtors' extensions of

21  exclusivity because of the pressure felt by that.  As the

22  debtors' papers point out, they filed on day one a motion for

23  a procedure which I've gone back and studied it, but it's

24  very, very similar to the procedure that they're seeking to

25  undertake now.  That's been pending in these cases.  If we

1  were really that scared and we're objecting to exclusivity

2  because of that, we would have objected to every motion to

3  extend exclusivity. We haven't. We objected to the fifth.

4  We objected to the sixth, and we objected to the eighth. We

5  didn't object to the seventh because there actually were some

6  negotiations that took place during that time period, and we

7  believe that's the relevant time period for Your Honor to

8  consider. But there were some negotiations that took place

9  and the debtor filed a plan. In the next six months, nothing

10  has happened. We're back to square one, and as Your Honor

11  knows, we would ask that you lift exclusivity, level the

12  playing field, and allow the other creditors to see if we can

13  move this forward -- case forward much more expediently.

14  Thank you.

15          THE COURT: All right, Mr. Hurford, you actually

16  raised something that I wanted to inquire about and haven't

17  yet, and that is, if I do terminate exclusivity, what does

18  that do to the debtors on the business side? Because

19  frankly, I'm not seeing much progress, and I think the case

20  needs more. So, I don't know that I'm prepared to terminate

21  exclusivity today, but I think I am prepared to put an end to

22  exclusivity, an end date to exclusivity, and it's not going

23  to be December of 2006.

24          MR. HURFORD: I'm not sure that I'm prepared to

25  answer the question as to what that would do to their

1    business.  I mean, obviously, they have their plan on file.

2    They can continue to push for their plan.  As Mr. Frankel

3    pointed out, when we reach the end of the day, their plan --

4    Well, maybe people can dispute whether or not their asbestos

5    liabilities will exceed 1.7 billion, but assuming it

6    surpasses that, which we certainly believe it will easily,

7    their plan goes nowhere.  If we can file another plan or we

8    can reach some other agreement to litigate this case so that

9    it's not six years old when we're finally getting estimations

10    --

11         THE COURT:  I've heard the argument.  I want an

12    answer from somebody to the issue, the financial issue.

13    That's what I'm concerned about at the moment.  What will the

14    consequence, if there is a termination of exclusivity, be on

15    the debtors' business side of things and the financial

16    issues, not on the rest of this.  That's what I'm concerned

17    with.

18         MR. BERNICK:  I don't know that anyone really here

19    in court today really is sufficiently informed to address

20    that.  I know that I'm not on behalf of the debtor, and know

21    that the debtor does not have representatives here that are

22    capable of doing that.  We would be happy to inform the

23    Court, make a submission to the Court with respect to that

24    particular issue, but I would like, Your Honor, just briefly

25    to address some of the points and then maybe make a proposal

1    about going forward in light of Your Honor's question, if I

2    could, and I'm not going to respond to all the different

3    points that have been made.  The fact of the matter is that

4    there's a lot of discussion about the playing field and

5    whether it's level or not.  The principal obstacles to

6    settlement are not a question of determination or resolve.

7    They're not a question of management approach.  They're not

8    even necessarily a question of the approach of these

9    committees.  The principal obstacles to settlement, I

10   participated in some of the discussions and in a lot of the

11   internal discussions about where it's going, and I've also

12   resolved other cases.  The obstacles are facts.  They're

13   basic facts.  People have a very different sense of what it

14   is that they're entitled to.  Your Honor gets a flavor with

15   respect to the traditional property claims on how different

16   the perspectives are of the debtor versus Mr. Speights.  Your

17   Honor has a perspective from the ZAI claims and how different

18   the perspectives are of the litigants with respect to those

19   claims.  When it comes to personal injury, in a sense that's

20   the most difficult problem because it's the most complex one,

21   and there are also more procedural areas to resolving those

22   claims because they're personal injury claims.  But let me

23   point out a couple basic public facts that ought to give Your

24   Honor a flavor.  Right now, Grace's stock is trading at

25   values that are higher than they've been before.  Grace's

1   stock has equity value.  Why does it have equity value?

2   Well, it has equity value probably in large part because of

3   the legislation.  Beyond the stock, however, you find the

4   creditors, not only in the Grace case, but in other cases,

5   indeed in cases where equity is no longer really at issue,

6   like Owens Corning or like Federal Mogul.  Those are all

7   cases that were cited.  Equity is not at issue in those

8   cases.  Who is it that's mounting the attack on the

9   traditional estimation methodology that the personal

10  injury claimants have used?  It's the other unsecured

11  creditors.  So, it's not a question of equity.  It's a

12  question of, What are those claims really worth?  And the

13  problem is that there is a broad perception that is out there

14  in large part because of the legislation but also as a result

15  of data that's now been produced in these cases, in

16  Congoleum, in this case, and elsewhere, data that shows that

17  there is a major, major problem when it comes to how some of

18  these claims are actually developed and lodged.  The

19  screening trailers, the mass factories of claims that are

20  being used.  You can't ignore that.  That's just a fact

21  that's out there.  That's a problem to wrestle with in these

22  cases, and unfortunately, there's no simple way to say, Well,

23  what is really the impact of that?  Now, Judge Farnan, in the

24  context of the Owens Corning case took an approach that said,

25  Well, here's a high estimate, here's a low estimate.  Boom.

1    I can't tell you the math but here's something that's in

2    between.   I suppose that's one way to go about doing

3    business.   But even he considered the impact of those

4    different issues about whether the claims are really bona

5    fide claims or not.   So, this problem of whether the PI

6    claims really work is an enormous problem, and there has to

7    be a methodology for dealing with it.   That's what creates

8    the barrier.   If you lift exclusivity and other people file

9    plans, we know exactly what it is that's going to happen.

10   People will come in and simply reflect in their plans their

11   particular perspective on what their claims are worth.   And

12   they'll then seek to battle out, now in the context of

13   competing plans, exactly the same issues that are the subject

14   of the estimation.

15            THE COURT:   I agree, which is why we have to do the

16   estimation unless you can come to a settlement.   Look, there

17   are limited ways in which you can estimate anything.   Whether

18   the settlement history is something to be considered seems to

19   be an issue that's dividing this case that hasn't divided all

20   other cases.   That's one reason why the trials have been

21   somewhat different in some of the other cases.

22            MR. BERNICK:   Your Honor, I would disagree a little

23   bit.

24            THE COURT:   Even consensual.

25            MR. BERNICK:   In the Owens Corning case, there was

1   no issue about whether settlement history should be used as

2   the predicate for the estimate.

3          THE COURT:  Well, I agree.

4          MR. BERNICK:  And the reason for that is that no

5   one believes -- everybody knows in the Owens Corning case

6   there is no equity.  So, it's just a question of

7   proportionality between the different claimants -- between

8   the different creditor constituencies.  And that's happened

9   before.  But there is --

10          THE COURT:  But, look -- but this plan, as you

11   currently -- as the debtor currently has it crafted, this

12   plan has to be a one hundred percent plan for all allowed

13   claims.

14          MR. BERNICK:  That's correct.  That is absolutely

15   correct, and people say -- people say, Well, it's not

16   confirmable on it face.  We went through the technical issue

17   of whether there's impairment or not on the face of the plan,

18   but whether it's confirmable or not is inevitably driven by

19   their sense of how the facts will turn out.  If it turns out,

20   and I will tell Your Honor that a lot of people are standing

21   up talking in this Court who don't have a clue about what

22   went into the formulation of the plan.  They didn't even talk

23   to their clients, and they're making representations about

24   what the plan is or is not.  This plan was constructed in

25   large part driven by the very settlement discussions that

1   have taken place.  There are different pots of money that

2   have been set up based upon the debtors' sense of how to

3   accommodate conflicting views among the different creditor

4   constituencies.  So we put money in those pots.  If it turns

5   out that we're right about the estimates, that is that there

6   will be payment in full for the symptomatic claimants, that

7   the asymptomatic claimants will be as unsuccessful as we

8   believe that they are and is the marketplace for the

9   resolution of claims, now says that they are.  Asymptomatic

10  claimants are nowhere in those states and the market for

11  their claims has dropped.  It's almost like what happened at

12  Dow Corning in the disease claims.  It's dropped through the

13  floor.  So if we're right on how much money should be

14  allocated to those claims, and we're right about Mr.

15  Speights' claims, which doesn't take much scrutiny to

16  determine, and we're right about Mr. Dye's claims which are

17  worth far more money than Mr. Speights' claims are, and we're

18  right about CAI which we believe that we are on the facts,

19  this plan was crafted to give money to all constituencies

20  weighing and balancing their radically different views about

21  what the claims are worth.  This is not a situation of being

22  such a debtor friendly plan.  This is a plan that most of all

23  is driven by a process that says, Here's the money that we

24  think belongs here, but let the estimation determine what it

25  is, and those facts will drive any plan.  They come in there

1  with their other plans, we're going to be back at ground

2  zero.  So, the question becomes, Your Honor, I think the

3  question that Your Honor focused on, Your Honor's unhappy

4  with the progress of the settlement negotiations.  We are

5  unhappy.  There was a concerted effort to try to get that

6  plan before it was filed to be supported by everybody, and

7  then when it became clear that we weren't going to get

8  certain constituencies, we didn't give up, and we said, Well,

9  let's see how many more we can get, and we got equity and we

10 got the unsecured.  We were hammering tarns to get property

11 to sign onto this plan.  So, what now would happen if Your

12 Honor were to say, I'll extend exclusivity, but by God, I

13 want to know (a) if there's an impact on the debtor if it's

14 terminated, and (b) it's going to be extended no further than

15 X date.  What does Your Honor suppose is going to happen?  If

16 there had been objections and delays as you're now going to

17 hear there have been objections and delays to our case

18 management orders before, they are now going to be -- Your

19 Honor, it's not working out.

20      THE COURT:  Look, folks, let me explain something.

21 Orders are signed by me.  If you folks can't agree on a case

22 management order, you're going to get one, and it's going to

23 be my dates and my time frames.  I would like your input into

24 that because I would like to know reasonably how much time

25 you need for discovery.  But if it's overly delayed, it's not

1  going to work, I will give you different dates, and that's

2  how it's going to be.  We're simply going to get this done.

3  And I don't see, Mr. Bernick, that we're getting it done.  I

4  really don't.

5          MR. BERNICK:  Your Honor, we have before you the

6  case management order for property damage.  We were prepared

7  to have expert reports exchanged late this summer or early

8  fall.  It was the property damage claimants that said, No,

9  we're not going to be ready.  So, we've accommodated them,

10  and we've extended the schedule some more.

11          THE COURT:  All right.

12          MR. BERNICK:  Your Honor, we're prepared to do this

13  tomorrow.

14          THE COURT:  Mr. Bernick, the property damage and

15  the personal injury can march side by side.  They don't have

16  to, despite Judge Wolin's original game plan, which may have

17  made sense back in whenever he was appointed to the case, it

18  doesn't have to be the way it is now.  So, the isn't any

19  reason why they can't march side by side.  I'm happy with a

20  form if that's what the debtor wants to try to do to see

21  whether or not some vital information on the personal injury

22  side can be adduced so that everybody can make use of it for

23  whatever your position's going to be on the estimation

24  hearing.  But that can be done in a much more rapid fashion

25  than requiring a trial in December of next year.

1          MR. BERNICK:  Well, we're prepared to do that.

2     We're absolutely prepared to do that.  But, Your Honor, you

3     see how even the dialogue starts to effect the substance of

4     the process.  Unless the information is gathered and gathered

5     carefully, the process is no better than the information.  If

6     the process is operating under a time constraint that is

7     imposed because the parties won't settle rather than being

8     imposed because the information can't be gathered, then what

9     you're going to do is end up sacrificing the quality of the

10    information which will sacrifice the quality of the

11    estimation and make it more amendable to attack.  We believe

12    that this schedule can be compressed, we absolutely do.  And

13    we're prepared to do anything that's necessary to expedite

14    this schedule.  All that we want is the information.  We'll

15    propose to the Court -- we have already a CMO that's before

16    the Court on the property side.  We'll propose a CMO to the

17    Court with respect to personal injury that's more

18    accelerated.  We're happy to do that, but, Your Honor, if

19    that process is going to be followed seriously, like any

20    other piece of litigation, (a) you can't give one side or the

21    other or anybody an external point of leverage.  And here the

22    external point of leverage is exclusivity.  If Your Honor is

23    not satisfied with how the litigation is working or Your

24    Honor is not satisfied that the parties are not operating in

25    good faith from a settlement point of view, I would urge that

1    Your Honor be driven by those as factors rather than
2    artificially setting a date at this time because otherwise
3    people will gain the date.   It happens every time.
4         THE COURT:   I've ordered you to get together next
5    week.   I want you to see whether or not next week you can
6    come up with an agreed upon schedule for the property damage
7    on the one side and for the personal injury on the other.
8    That includes a claim form which can be produced.   I will
9    approve a claim form of some sort.   I'm not saying what sort,
10   but I will, folks, approve a claim form because it may be
11   useful to all parties in the estimation, and I will consider
12   it appropriate discovery.   Rather than taking depositions of
13   400,000 personal injury plaintiffs, we're going to do it
14   through claim forms.   So, it will be approved.   Now, you
15   folks can get together and see if you can agree on the
16   information.   I don't expect a 20-page claim form, Mr.
17   Bernick.   That will be outrageous.   It will not be necessary.
18   But some basic information, yes.   I think the debtor and all
19   the other parties will benefit from it.   So your task, next
20   week, all of you, I'm not speaking just to Mr. Bernick,
21   everyone is to get together in a face-to-face meeting for
22   however long it takes.   Take your toothbrushes to see whether
23   or not you can get case management orders that are agreed on
24   for both the property side and the personal injury side.
25   There is no need to piggyback those two orders.   They can be

1  done simultaneously.  That's number one.  Number two, if you

2  can't agree, then before the July 18th hearing, you will

3  submit your separate versions, and I will craft a case

4  management orders in both of them and a personal injury claim

5  form.  You'll have all your appeal rights.  I will not stay

6  the issue pending appeal because we're going to get this

7  done. This case needs to be out of bankruptcy.  There is no

8  benefit to anybody having it here this long.  It should be

9  done.  Mr. Bernick, the plan has what I think is a defect.

10  Whether it's fatal or not, I don't know, but it has no

11  alternative to what happens in the event that the personal

12  injury estimates are greater than what the debtor thinks the

13  cap should be, and since it has to be a hundred percent plan,

14  there has to be some alternative.

15          MR. BERNICK:  It does in fact have --

16          THE COURT:  What does it say?

17          MR. BERNICK:  -- a pressure relief valve on the

18  asymptomatic side.  But, Your Honor, again, I --

19          THE COURT:  The symptomatic side could be higher, I

20  don't  know.

21          MR. BERNICK:  It could be, Your Honor, but again,

22  all the questions are right on but the difficulty is that

23  when you say that that is a defect, there are enormous

24  ramifications for that, and --

25          THE COURT:  Well, I will use the word --

1   MR. BERNICK:  -- I'm not -- What I mean --

2   THE COURT:  -- problem.

3   MR. BERNICK:  -- to say is that you really have to

4   get down to the analysis of, Well, what happens if the

5   estimate turns out to be higher, the same, or lower?  What

6   happens to that alleged defect.  For example, if Your Honor

7   does an estimate of the symptomatic claims and says the

8   estimate is below the amount of money that's there, is there

9   really a defect at that point in time?  If there is not, then

10  Your Honor's question was raised by counsel which is, What

11  if?  What does saying that the what if must be addressed in

12  this plan do to the negotiation process.  Inevitably it

13  means, that one party's going to sit there and they're going

14  to try to bust the cap --

15  THE COURT:  Fine.

16  MR. BERNICK:  -- solely for saying that the plan is

17  non-confirmable.

18  THE COURT:  Look, the number at the moment is not

19  relevant.  What's relevant is what dividend the debtor's

20  going to pay to whoever is entitled to get it.  Let's get

21  down to the fact that that's how bankruptcy plans work.  The

22  number is only symptomatic of what that dividend

23  expectation's gong to be.   I mean, the debtors may have an

24  expert already who's willing to put the number at 1.7

25  billion, maybe that's the case.  The other committees may

1    have -- just to pick numbers out of the air -- estimates who

2    are willing to say the number's $50 billion.

3        MR. BERNICK:  And the key is, Your Honor, that once

4    the claim -- We're all operating -- If it were just a

5    question of that, it would have been done.  Why can't people

6    do it?  It's not just because they have different models.

7    It's not even because they have different approaches.  It's

8    because they don't have the information.  If you got the

9    information, you can do deals.  Let me make one last thing,

10   and I'll -- Your Honor, then I promise I'll shut up.

11       THE COURT:  Well, who has the information?

12       MR. BERNICK:  The plaintiffs' lawyers do because we

13   don't have -- that's the whole idea of the claim form.

14       THE COURT:  So does the debtor on the settlement

15   side.  So --

16       MR. BERNICK:  We've given it on the settlement

17   side.  The problem is that you cannot -- and I'd try if I had

18   time, you can't take the history of settlement and determine

19   from that reliably the impact --

20       THE COURT:  Mr. Bernick, what you can determine

21   reliably from that is how the debtor has settled cases in the

22   past.

23       MR. BERNICK:  Right.

24       THE COURT:  This is a trust that's going to be

25   created.

1          MR. BERNICK:  Right.

2          THE COURT:  There will be a pool of money.

3          MR. BERNICK:  Right.

4          THE COURT:  Against that pool of money, there will

5     be one of several forms one of which may be, in quotes, "a

6     settlement".  Everybody who approves a claim up at a certain

7     level will agree by voting for this plan that their

8     distribution out of that trust will be a settled sum.  Of

9     course, it's relevant.

10          MR. BERNICK:  Sure.  That already is in the plan.

11          THE COURT:  I know it is.

12          MR. BERNICK:  We've already done that.

13          THE COURT:  I understand that.  The problem is that

14    there is no upside in the event that the debtor's wrong on

15    the caps.  If the debtor has overstated the caps, everybody

16    benefits.  Nobody's going to complain in that sense.

17          MR. BERNICK:  Your Honor, I don't mean to argue

18    with you, but at the end of the day -- I mean, I could draw

19    you a picture that says, Okay, you've got that settlement

20    history, and what you're really going to do is if they get

21    their way, they extrapolate off from the top of it, you know.

22    I won't argue.  You already know what that issue is.  The

23    question is, depending upon which issue comes out that is

24    asymptomatic, as an example, or requirements for product

25    identification, as an example, depending on how those issues

1    come out, how much of that prior curve do you strip away?

2            THE COURT:  I agree.

3            MR. BERNICK:  Okay.  Now, that's what the claim

4    forms will tell us.

5            THE COURT:  I've already said --

6            MR. BERNICK:  Okay.

7            THE COURT:  --  I will agree to some form of claim

8    form, not a 20-page claim form.

9            MR. BERNICK:  Well, take a look -- I don't know

10   offhand how long it is.  Whatever it is that Your Honor said

11   before and that we complied with it, it's a shorter form.  It

12   is detailed.  It's going to require work because unless you

13   do it, you end up with the same kind of claim manufacturing

14   that we've had in the past.  But I have a way, Your Honor, I

15   think, and I'll just say it.  It's two propositions:

16   Propositions one, is that rather than setting some date now

17   or a week from now or two weeks from now for termination of

18   exclusivity, we focus on getting the litigation track set,

19   including the part of it that will involved obtaining

20   information.  And Your Honor, we'll meet and confer on that,

21   and if we can't agree, we'll comply with Your Honor's order,

22   we'll submit schedules and Your Honor can enter the order.

23   That really, after all, was where we were back in 2001 with

24   Judge Farnan.  With respect to the settlement side and the

25   need for Your Honor's sense that the debtor is not acting

1    promptly enough, and I won't argue with that --

2         THE COURT:  It's all parties, Mr. Bernick.  I

3    haven't -- I'm hearing that the debtor hasn't made any

4    efforts to get together.  I'm not hearing from the debtor

5    that anybody else's calls have been unanswered.  You're all,

6    as far as I can -- I mean, the debtor's not saying, Gee, the

7    Asbestos Committee called and we said, No, we can't talk to

8    you.  Nobody's negotiating.

9         MR. BERNICK:  To the contrary.  We have pushed it,

10   and that's why it's so frustrating to hear people who don't

11   know.

12        THE COURT:  Stop.

13        MR. BERNICK:  Okay.

14        THE COURT:  I have ordered you to get together.

15   That's where I'm going.  I'm ordering you, and frankly, in

16   five minutes we're terminating this case until next week, so

17   talk fast because that's it.

18        MR. BERNICK:  I've got my second point and I'll

19   shut up because I think it's a good one that will solve a lot

20   of problems.  If Your Honor wants to bring somebody else into

21   this process to be able to report to the Court on whether in

22   fact the parties are being diligent in operating in good

23   faith in the settlement discussions, we've not done that so

24   far, and maybe that's a way of Your Honor developing better

25   assurance that the settlement process is moving forward.  I'm

1    not suggesting some kind of, you know, big deal type of

2    thing.    I want some way of breaking the information gap

3    that's bothering Your Honor.    Your Honor doesn't know what's

4    happening on the settlement side because people are making a

5    bunch of representations and you don't know what's accurate.

6    I think it might make sense to have somebody that's in a

7    position to know what the story is so that Your Honor doesn't

8    have to do something like set a court date or an exclusivity

9    termination that is driven by your sense of the lack of

10   progress but inevitably will have unintended consequences

11   with respect to the negotiation itself, and to my observation

12   also the litigation.    There's a much more focused cure which

13   is to get a source of information to Your Honor on whether in

14   fact the settlement discussions are taking place and are

15   active.    And that's my last proposal.

16           THE COURT:    Did you get into our calendar yet?    See

17   if you can get Connie and get our calendar.    Gentlemen, this

18   is what I'm going to do.    I am going to grant a brief, and I

19   do mean brief, extension of exclusivity until I get this set

20   for an argument date in Pittsburgh, at which we're going to

21   address, however long it takes, bring your toothbrushes, the

22   case management order both for property damage and personal

23   injury, if that's necessary, the claim form, and the

24   extension of exclusivity.    Mr. Bernick, to a certain extent,

25   the consequences in terminating exclusivity would be

1   intended, because if I don't see substantial progress, maybe

2   it's time that somebody else gets a shot.  What I do not want

3   to do is terminate what seems to be a pretty viable business

4   on behalf of the debtor by a termination that may have

5   consequences that I don't intend on the business side.  So,

6   for that hearing, I want to know specifically from the debtor

7   and anybody else, financial advisors, what the consequences

8   will be.  I consider that to be a significant issue in this

9   case, particularly where the debtor is telling me it's

10  solvent.  Now, do I know whether the debtor's solvent?

11  Obviously, no.  That's not an issue that has come before me

12  in a litigated or even a settlement context.  So, I don't

13  know.  I don't know whether or not the debtor's plan is --

14  I'll use the words "rich enough" to satisfy the claims.  I

15  simply don't know.  I haven't heard the evidence, and it's

16  time that I start getting the evidence.  All of you are

17  charged with getting in touch with each other to negotiate a

18  settlement.  All of you, and I don't, from this day forward,

19  want to hear one complaint that somebody hasn't contacted

20  somebody else to move the case to get forward with

21  settlement.  Mr. Bernick, I'm holding you personally

22  responsible for making calls on a weekly basis to start

23  settlement discussions and, folks, you'd better be there to

24  answer them or return those calls promptly.  Because if I

25  hear that you haven't then I will have some other

1    consequences.  Mr. Hurford -- No, I want -- give me like two

2    months' worth, because I'm going to try to schedule some

3    dates.  Mr. Hurford?

4              MR. HURFORD:  Thank you, Your Honor.  Having heard

5    that I'm somewhat hesitant to be standing here, but obviously

6    this motion, the objection to the motion to extend

7    exclusivity has gone far afield and Your Honor seems to have

8    made at least a preliminary ruling that you will be entering

9    an order approving some sort of asbestos personal injury

10   claim form.

11             THE COURT:  I expect to.

12             MR. HURFORD:  Well, I rise to ask Your Honor to at

13   least withhold decision on that issue.  First of all, and as

14   Your Honor knows, Mr. Lockwood typically addresses matters

15   regarding asbestos, personal injury --

16             THE COURT:  Yes, and I've heard his recitation in

17   at least six other cases, and I doubt that it's going to

18   change in this one.  I could probably give it back to you.

19             MR. HURFORD:  Well, it probably won't, Your Honor,

20   but I guess his recitation is somewhat successful because,

21   from what I know, in the Babcock case an asbestos personal

22   injury bar date, proof of claim form was entered and thrown

23   aside.

24             THE COURT:  Why?

25             MR. HURFORD:  And that Court finally said, No --

1      THE COURT:  I said nothing about a bar date.  I

2  said a claim form.  And the reason for the form is that the

3  debtor's view as to how an estimation hearing is going to

4  take place and the rest of the world's view is very

5  different.  I want to see what comes out of the claim forms.

6  The debtor has the right to discovery to know what the

7  current claims are, and that will be a much better basis for

8  estimation of current claims and possibly future claims then

9  anything else.  So, let's get it done.  Let's find out what

10  the claims are, what people say they have by way of claims.

11  That number may turn out to be some astronomical number which

12  is meaningless, but it may also, if counsel does their job

13  right, be a legitimate basis for figuring out what the claims

14  are.

15      MR. HURFORD:  Your Honor, that was the same track

16  that was taken in USG and Judge Wolin decided was not

17  fruitful.

18      THE COURT:  I don't care what the other judges have

19  decided.  This is this case, this is how we're going to do

20  it.  So, go work on a claim form that you can live with,

21  folks, you're going to get one.  If you can't work on one

22  that you can live, I'm going to do it, and you know a whole

23  lot more about it than I do.

24      MR. HURFORD:  I understand, Your Honor, but this

25  exact issue is pending briefing.  The debtors' motion for

1  approval of this case management order and their proof of

2  claim or questionnaire or whatever you want to call it is

3  under consideration.  Our objection is due at the end of the

4  month, which reminds me of an issue that I need to raise with

5  you at the end of the hearing, but the matter hasn't even

6  been briefed, Your Honor, and if Your Honor --

7         THE COURT:  Okay, you can brief it.

8         MR. HURFORD:   -- will give us time.

9         THE COURT:  Yes, you certainly may brief it, and

10  you can brief in light of the fact that in all probability

11  you're going to end up with a claim form, please.  You've

12  argued.  You've heard what I have to say, please, let's get

13  to it.

14         MR. HURFORD:  Thank you.

15         THE COURT:  Mr. Hurford, what other issue did you

16  want to raise?

17         MR. HURFORD:  I'm not sure how much of this history

18  you'll need me to recite, but if Your Honor will recall the

19  debtors had a deadline to file their opening brief.  In

20  connection with filing the opening brief, they filed a motion

21  to exceed the page limitation and asked for an additional day

22  to file their briefs.  Aside from their motion, their

23  memorandum of points and authority is 75 pages long, aside

24  from all the exhibits which number several hundred pages.

25         THE COURT:  Okay.

1          MR. HURFORD:  What I'm getting to is, the parties

2    jointly submitted a motion, and it was all major

3    constituencies, asking that the local rules with regards to

4    page limitations be waived.  Your Honor black-lined that

5    order down to 60 pages.  What we're asking for is an ability

6    to file an answering brief and the equivalent number of pages

7    as the debtors, which is 75 pages.  We don't feel --

8          THE COURT:  Fine, okay, fine.

9          MR. HURFORD:  Thank you.

10          THE COURT:  Seventy-five pages is fine.

11          MR. HURFORD:  We appreciate it.

12          MR. BAENA:  Your Honor, in regard to the property

13    damage CMO, just so that there's no misapprehension, Your

14    Honor will recall that in April I shared with you that it was

15    revealed to us shortly before that hearing that the debtor

16    intended to take on the science, if you will, of all of the

17    products that engender property damage claims.  Your Honor

18    shared our surprise by that revelation.  At the end of that

19    hearing we indicated that we were going to continue to work

20    on a case management order, and we came back before you in

21    May, and at the May hearing apprised you that because of the

22    deliberations and what have you, both sides came to the

23    conclusion that the dates had to be changed.

24          THE COURT:  Yes.

25          MR. BAENA:  Okay, and we were supposed to work on

1    it again.  Ms. Baer indicated that she was going to be

2    talking to her property damage litigation experts within the

3    next week after that hearing.  Just this weekend, on

4    Saturday, we received the very next iteration of a case

5    management order.

6            THE COURT:  Well, if you're ahead of me, I haven't

7    seen it yet.

8            MR. BAENA:  It hasn't --

9            THE COURT:  So, I'm not addressing it today.

10            MR. BAENA:  I'm not addressing it, but I want to

11    make sure you understand, Judge, that the issue isn't just

12    timing.  The issue is what are the issues that are engendered

13    by the estimation process in respect to property damage.  And

14    this new CMO creates a whole new track that I've had about a

15    day to digest at the present time, and it creates this whole

16    new track that has to do literally with two matters that

17    weren't even subject of the prior CMO.  My point, Judge, is

18    that --

19            MR. BERNICK:  Your Honor, we -- I have to object.

20    This --

21            THE COURT:  Mr. Bernick, please.  Let's get

22    finished with this.  I've heard enough.  Mr. Baena, what,

23    what's the point?

24            MR. BAENA:  My point is, Judge, we're not going to

25    just be arguing about time.  We're going to be arguing about

1    scope.

2           THE COURT:  I understand that.

3           MR. BAENA:  Okay.  And I just wanted to make sure

4    that whatever you schedule gives us an opportunity to argue

5    about scope, brief and argue about scope.

6           THE COURT:  I told you to bring your toothbrushes.

7    I meant it.

8           MR. BERNICK:  In preparation for that, it would be

9    helpful if counsel for the Property Damage Committee could go

10   back to the pleadings that were filed in the first day of

11   this case, set out the scientific issues, defenses, including

12   this defense and in the Armstrong decision itself.  The whole

13   idea that this was a surprise last time is completely

14   apocryphal.

15          THE COURT:  Mr. Bernick, I wasn't involved in the

16   case in the first day of the case either, and I'm not going

17   back and take a look at that either.  File something that's

18   current so we all know what's going on in the case and what

19   the debtor's perspective is.  I want to see some movement,

20   and frankly, this little bit of infighting is getting to the

21   point where it's not helpful.  So, if I need new counsel --

22   not new counsel, but a trustee for the debtor, if I need new

23   counsel for the committees, sobeit, folks.  That's the level

24   I'm at.  I'm tired of the infighting.  I expected to see some

25   progress, and I expect to see it by the time we have the next

1   hearing with respect to these case management orders.   And if

2   you can't do it, as I said earlier you'll get the orders from

3   me the way I craft them.   So, take your best shot, because as

4   I said before, you're much more expert at this than I am.

5   I'll do my best.   Yours is probably better.   Mona, dates.

6         Well, actually it looks as though the best date to

7   try to do this may actually be the day after the next omnibus

8   hearing, which is July 19th, the next omnibus is the 18th.   I

9   apparently have half a day on Tuesday, July 5th.   I'm sure

10   none of you will be too thrilled with that, but it's only

11   half a day.   And that's it, until the 19th of July.   That

12   would give you virtually three weeks or almost a month to get

13   together, several times, to negotiate and see what you can

14   resolve and to file whatever briefs you'd like me to see on

15   whatever issues you still find are pending that you've not

16   been able to resolve.   So, how's July 19th for a hearing

17   date?   Which means we will not have any of these issues on

18   the July 18th calendar.   We will have business related

19   issues, not case management, not plan, not exclusivity.   They

20   will all be on July 19th, not issues related to the plan.

21         MR. BAENA:   Is there going to be a briefing

22   schedule, Judge?

23         THE COURT:   Well, we'll have to develop one.   If

24   July 19th is fine, let's pick that and we'll work backwards.

25         MR. BAENA:   If I could be so bold, Judge, I have a

1    trial that starts the following week in Vermont, and that is

2    a little bit of a difficulty for me, but if this is it, I'll

3    just abide by the Court's request.

4            THE COURT:  That's the day that I have in July.

5    Would you prefer to do it in August?  I mean --

6            MR. BAENA:   (Microphone not recording.)

7            THE COURT:  Then we're back to everything slipping

8    again.

9            MR. BAENA:  Well, I'll abide by whatever the Court

10    wishes.

11            THE COURT:  All right, the debtors -- I'm not sure,

12    when does debtors' exclusivity terminate now?

13            MS. BAER:  Your Honor, it would have terminated but

14    we filed the motion so the bridge order gives us until today,

15    and you need to enter an order today.

16            THE COURT:  All right, debtors' exclusivity period

17    is extended to the conclusion of the hearing on July 19.

18    That hearing will be in Pittsburgh.  Actually -- Yeah, it

19    depends on transportation time home.  Let's plan on that

20    being in Pittsburgh but it's possible, because I'm here on

21    the 18th, but not the 19th, so it's possible that we may be

22    able to do it here.  Are you going to have other issues teed

23    up for the 18th?

24            MS. BAER:  Your Honor, there are a couple of

25    motions.  They're not particularly significant.  They're

1    business related type motions.

2        THE COURT:  Are they likely to settle so that

3    there's no hearing that's going to be held?

4        MS. BAER:  They're very likely.  The information on

5    them has been shared.  One of them's a long time incentive

6    plan, we haven't heard back, but it's an extension of last

7    month's, and I can't even remember any other thing that's on

8    right now.  It's minimal.

9        THE COURT:  Right.  What I'm trying to get to is

10   would you prefer to move everything to the 19th in Pittsburgh

11   and not have an omnibus date on the 18th, but that's assuming

12   -- I mean, I want the majority of the day on the issues we've

13   been talking about today, not on the debtors' business

14   issues.

15       MS. BAER:  Yes, they're very minimal.

16       THE COURT:  Does everyone agree to that?  All

17   right.  The omnibus hearing date is continued to July 19 in

18   Pittsburgh beginning at -- Do you want to start at 8:30 or 9

19   o'clock, you pick; 8:30?

20       MR. BERNICK:  I think we'll start at 9 o'clock.

21       THE COURT:  Nine, all right.  Okay.  From the

22   debtor, within two weeks from today, let me give you a date,

23   see if that works.  No, that won't work.  It's going to have

24   to be a little shorter.  By July the 7th, I want a report as

25   to the consequences of termination of exclusivity from the

1  business perspective.  I'm not asking about the bankruptcy

2  consequences.  I understand those.  I think you all know from

3  the questions I was asking earlier, I'm concerned about, for

4  example, the debtors' lines and letters of credit, the

5  debtors' financing facilities, the debtors' business plans,

6  whether there is -- I'm not sure that some termination would

7  affect any of that, but I want to find out for sure.

8  Everybody else may respond to that by July the 12th in the

9  form of another report, if you choose.  All right, Mr. Baena,

10  what issues is it that you want a briefing schedule for?

11        MR. BAENA:  The scope of the PD estimation

12  procedure.

13        THE COURT:  All right, well let me start with this:

14  When next week are you folks getting together to see what you

15  can resolve on the case management issues for both property

16  damage and personal injury?  They can be separate meetings.

17  They don't need to have all of you together unless you want

18  the same schedule, which I doubt.

19        MR. HURFORD:  Your Honor, I apologize.  I'm really

20  not in a position to respond to that question.  As most of

21  the people in this courtroom know, Mr. Inselbuch heads that

22  up for the Asbestos PI Committee.  I have heard some

23  discussion that he has to travel to England in connection

24  with Federal Mogul.

25        THE COURT:  You've got enough of a firm.  He

1    doesn't have to be there personally.  There are lots of other

2    people in the firm.  That's one reason why his firm gets

3    appointed as counsel, that they have enough people to staff

4    it.  So get it staffed.

5         MR. REINSEL:  Your Honor, Rob Reinsel.  I'm from

6    Kaplin, really sitting in for Mr. Lockwood.  Mr. Lockwood is

7    out of the country I know this week and next.  Regardless of

8    Mr. Inselbuch's schedule, we will accommodate the Court.

9         THE COURT:  All right, what day do you want to meet

10   next week or can I just say next week and you folks can work

11   it out, but I don't expect to hear that you didn't meet.

12        MR. REINSEL:  I think the latter would probably be

13   more preferable, Judge.

14        THE COURT:  All right, property damage next week

15   and personal injury next week to work out two case management

16   orders.  All right, so it will be after next, I guess, Mr.

17   Baena, after your meeting that your briefing would be due, so

18   next week is the week of the 3rd of July and the hearing's on

19   the 19th, which is a Tuesday.  So I need briefs, I guess from

20   all sides at one time, with no opportunities for replay.

21   You'll just have to all tell me what you think the issues are

22   and brief them.  Probably you can come up with a list of

23   issues at your meeting, I would think.  You probably will

24   agree on the issues.  How to handle them is probably going to

25   be the difference.

1    MR. BERNICK:  Your Honor, I think that that's

2  probably the best idea.  We ought to be able to reach at

3  least agreement on the areas in which we disagree, and I

4  think that simultaneous briefs probably makes sense.  We have

5  been through this process before.  I think it would be -- I

6  suppose what that means is that we'll end up taking pieces of

7  the brief that we have already submitted in connection with

8  the order.  It will be, of course, about form and a kind of

9  recasting them to fit whatever group of issues we come up

10  with during our meeting next week.  That's probably where all

11  this is headed.  Do you want that briefing to be in a sense

12  all that you have to look at in connection with the hearing

13  on the 19th?  I think you probably just have to have

14  simultaneous briefs and that will become the briefing with

15  respect to CMO and further extension of exclusivity.  Does

16  that make sense?

17    THE COURT:  I'm not sure that there's any more

18  briefing needed on the exclusivity; is --

19    MR. BAENA:  It's just a report that --

20    MR. BERNICK:  That's right.  That's just the CMO

21  and -- right.

22    THE COURT:  All right, so how about by July 12th,

23  all briefs due.

24    MR. BERNICK:  It should be whatever Your Honor

25  needs by way of lead time for the 19th.

1       THE COURT:  Well, I've got a real problem if I

2  don't get the briefs the morning of the 12th, even getting

3  them before the hearing on the 19th.

4       MR. BERNICK:  So we should file them at that time?

5  I mean, I hate to say it, but would it be better if we do it

6  on the 11th?

7       MR. BAENA:  We've previously e-mailed briefs of

8  this sort to you, Judge.

9       THE COURT:  I know, but I think I'm going to be at

10  a place where I'm not going to have access to e-mail, I

11  believe, Mr. Baena, and that's what I'm worried about.

12  Actually, I could get them by e-mail if you can do them in

13  Word, not in Word Perfect.

14       MR. BERNICK:  I really -- I don't know, that kind

15  of leaves out there the question of whether you ultimately

16  get them.  I remember that happening before in an adversary

17  hearing.

18       THE COURT:  Well, all right.  This is what I'll do.

19  I'll give you an address where the briefs can be delivered to

20  me in hard copy.  I'll give it to one person, one person

21  collect all the briefs, and I'll want them by -- I have to

22  have them on the morning of the 13th at the place I'm going

23  to be because I'm only going to be there the 12 and 13th, and

24  I'm leaving again, and they won't catch up with me.  That's

25  the problem.

MR. BERNICK:  We'll undertake -- If it's appropriate,

we'll undertake responsibility for being the collecting point

and then we'll figure out in order to get it to Your Honor by

the morning of the 13th when we need it so that we can put it

on an airplane or whatever to have it get there.

THE COURT:   Or, can we just go off the record a

second with respect to schedules so that I can -- I just don't

want all this on the record.

(Whereupon at 2:46 p.m. the Court went off the record

in the hearing in this matter.)

(Whereupon at 2:49 p.m. the hearing in this matter

went back on the record and the following proceedings were

had:)

THE COURT:   All right, let's go back on the record

then.  All right, the briefs are due by July 12th; is that what

you've decided?   With hard copies sent to Mr. Bernick's New

York office by July 13th, and then they'll be delivered to me

by Mr. Bernick, somebody on his behalf, on July 14th.

MR. BERNICK:  I think that I'm getting the sense from

my brethern's vibrations over here, why don't we make them due

on 13th at noon.

THE COURT:   All right.

MR. BERNICK:  Hard copies to be in our office by 5

o'clock, and we'll get them shipped off to you.

THE COURT:   Okay, that's fine, and if you'll see me

after this over, I'll give you the address where they can be

1   delivered.

2       MR. FRANKEL:  Your Honor, just so we're clear, the

3   business report that we talked about earlier is still due on

4   the 7th but reply by the 12th.

5       THE COURT:  Right, that's correct.  And then the

6   briefs are due the 13th with paper copies to me on the 14th.

7       MR. BAENA:  And what we file on the 12th, we don't

8   have to make any special arrangements to deliver to you, Judge,

9   we just file it with the court?

10      MR. BERNICK:  What are you planning to file?

11      MR. BAENA:  A response.

12      THE COURT:  Any responses to your business report.

13  Would you do the same thing, make sure that Mr. Bernick's New

14  York office has a copy by 5 p.m. on the 13th, and they can be

15  delivered to me too, just in case.  I should have e-mail access

16  on the 12th, but just in case I don't.  That would be  a fail-

17  safe.

18      MR. BAENA:  Okay.

19      THE COURT:  All right, what else for today?  All

20  right, if the debtor wants to submit an order that extends

21  exclusivity through that hearing on July 19th, I'll sign it,

22  otherwise this is the order, it is in effect, and debtor's

23  exclusivity is extended through that time with a corresponding

24  extension to solicit ballots for a month after whenever it

25  currently ends.  Okay.  Oh, the 2019 amendment; have you see

1    the orders that I entered in the Pittsburgh cases?

2           MS. BAER: Yes, Your Honor.

3           THE COURT: Are they agreeable now?

4           MS. BAER: Yes, they are.

5           THE COURT: Will you submit one, please, in this case

6    on a COC.   Link it to the prior 2019 order so I can get it

7    entered, and that can take effect too.

8           MS. BAER: We will.

9           THE COURT: All right, thank you.  All right, **any**

10   other matters?  Okay we're adjourned, thank you.

11          (Whereupon at 2:51 p.m. the hearing in this matter

12   was concluded for this date.)

13

14

15

16          I, Elaine M. Ryan, approved transcriber for the

17   United States Courts, certify that the foregoing is a correct

18   transcript  from  the  electronic  sound  recording  of  the

19   proceedings in the above-entitled matter.

20

21   *Elaine M. Ryan*                          7-01-05
     Elaine M. Ryan
22   2801 Faulkland Road
     Wilmington, DE 19808
23   (302) 683-0221

24

25