IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |

**Related to Docket No. 8486**

## DEBTORS' REPORT ON BUSINESS EFFECTS OF TERMINATING EXCLUSIVITY

### Introduction

Terminating exclusivity in this case will have a negative impact on the Debtors' businesses. While terminating exclusivity will not be a breach of any of the Debtors current contractual arrangements, that is by no means the end of the inquiry. Terminating exclusivity in a case of this size and complexity is rare. In fact, in the approximately 70 significant asbestos

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company. (Collectively referred to as "Grace" or the "Debtors")

related chapter 11 cases that have been filed over the last 20 years, on only **three** occasions have the Debtors confirmed that exclusivity has been terminated. And, as outlined below, those three cases are distinguishable from the present situation. The very fact that exclusivity is essentially never terminated in cases of this sort, will set off alarm bells that are sure to affect the Debtors' businesses. These effects essentially relate to negative perception of Debtors' management both externally and internally.

Externally, such termination is sure to be viewed as a signal that management was wrong in focusing on having the Court determine Grace's actual asbestos liability in these chapter 11 cases. In effect, terminating exclusivity will punish the Debtors for doing just what the Bankruptcy Code was established to do and what the Court has determined it will do - determine the full extent of the Debtors' asbestos liability using scientifically established criteria rather than a flawed tort system. As outlined below, this external reaction is sure to result in, among other things, a tightening of the Debtors ability to obtain credit and other accommodations, loss of customer confidence, and lack of a competitive edge.

Internally, terminating exclusivity is sure to be construed as a sign that management is no longer in control of Grace or the reorganization process. Thus, management will not be viewed as being there for the long run. As a result, among other things, employee relations and the Debtors' ability to recruit and keep young talent is sure to be affected.

These negative perceptions, in turn, are sure to detrimentally affect the Debtors' long term business plans. Since filing chapter 11 in 2001, Grace has grown from a $1.6 billion revenue company to a $2.5 billion revenue company. This growth has occurred through, among other things, increased productivity, good liquidity and certain strategic expansion projects and

acquisitions. The lack of certainly with respect to who will control Grace and the direction reorganized Grace will take, puts this continued growth and the resulting profitability in doubt.

## Specific Report

**Existing Financial Arrangements**

1.  The Debtors have conducted a review of their current lending and other financing agreements and contracts and have determined that terminating exclusivity will not be a breach of any of those agreements. (Festa at para. 3.)[2] However, as outlined below, the Debtors anticipate that terminating exclusivity could have an adverse impact on the Debtors' ability to obtain similar financial and business accommodations in the future.

2.  As outlined above, the Debtors have reviewed the dockets and other materials for approximately 70 asbestos related chapter 11 cases that have been filed in the last 20 years. Based on that review, the Debtors have discovered only three instances where exclusivity has been terminated. Those three cases are <u>Federal Mogal</u>, <u>U.S. Minerals</u> and <u>Babcock and Wilcox</u>. Each of these cases, however, is distinguishable from the Debtors' situation. In <u>Federal Mogal</u>, terminating exclusivity was of little concern to the debtors because the proposed plan on the table was a joint plan and no competing plans were anticipated or filed. In <u>U.S. Minerals</u>, exclusivity terminated at about the same time a chapter 11 trustee was appointed in the case. In <u>Babcock</u>, the Court, in terminating exclusivity did not consider any specific business implications of such termination.

3.  As a result, it is fair to say that terminating exclusivity in a complex asbestos chapter 11 case is extremely rare. Thus, the very act of doing so will send alarm bells throughout

---

[2] "Festa at para. ___" refers to the Affidavit of Fred Festa, President and Chief Executive Officer of the Debtors dated July 7, 2005 and attached hereto.

the marketplace. It is likely to be perceived by the financial marketplace as a loss of control by the Debtors' management in the future direction of the company. This, of course, would translate into a hesitancy in the marketplace to commit to any long term business arrangements with Grace. (Festa at para. 3).

4. Among the most vital financial arrangements of the Debtors, is the Debtor In Possession Financing Agreement ("DIP Agreement"). It has a renewal date of April 1, 2006. The loss of exclusivity could have an adverse impact on the Debtors' ability to obtain a renewal of the DIP Agreement on the current terms and conditions. (Festa at para.4 )

5. Likewise, terminating exclusivity may have an adverse impact on the Debtors' ability to obtain other financing arrangements in the future, especially with respect to discretionary arrangements such as letters of credit, lines of credit, and surety bonds. The Debtors rely on these types of discretionary financial arrangements to operate on a daily basis. However, these type of arrangements have certain risks for the providers. Lenders and sureties are not as likely to want to do business with a company whose financial and strategic direction is believed more uncertain with a loss of exclusivity. Thus, for the Debtors to obtain such arrangements, Grace could be asked to provide more security than it would have been asked to provide in the past. And, if the terms the Debtors are accustomed to receiving are altered due to the concern about the Debtors' future, that will have an adverse effect on the Debtors' business plan which calls for, among other things, additional letters of credit, lines of credit, and surety bonds on terms similar to those currently in place. (Festa at para. 5)

6. Further, in fiscal year 2004, approximately 61% of Grace's consolidated revenues came from its non-debtor subsidiaries, most of which are foreign. The Debtors' business plans call for continued geographic growth and expansion, particularly in developing and emerging

4

markets overseas. However, foreign customers are much more hesitant to do business with a company in bankruptcy. Chapter-11-type reorganizations typically do not exist outside the United States. Initial concerns by foreign customers over Grace's Chapter 11 filing reflected the assumption that a liquidation would result. These concerns have subsided as Grace demonstrated stability post-filing, but could well re-emerge in the wake of a loss of exclusivity, potentially resulting in impairment of Grace's standing as a global supplier and therefore in lost business and profits. (Festa at. para. 6)

7. The Debtors also rely on favorable credit terms from their suppliers. Generally, with some exceptions, Grace has been able to obtain the same pricing and credit terms that it enjoyed prior to its chapter 11 filing. In the event that the Debtors' suppliers alter these terms due to the concern about the Debtors' future, that will have an adverse impact on the Debtors' business plan, where working capital levels assume the continuation of the current terms. (Festa at para. 7)

**Adverse Impact on Debtors' Customer Relationships**

8. The uncertainly in the marketplace that could be caused by terminating exclusivity may also affect Grace's relationships with its existing customers as well as its efforts to secure new customers. This uncertainty could result in a reluctance on the part of its customers to enter into long term sales contacts. Further, Grace can expect that its commitments to new products and technologies, which will require new capital, will be questioned. (Festa at para. 8)

9. For example, sixteen of Grace Performance Chemical's ("GPC's") customers purchased $10 million or more from GPC in 2004, representing about $240 million, or 22% of GPC's total sales. Sales of some of Davison's products are even more concentrated in the hands of large customers. For example, in 2004, sales of fluid cracking catalysts and additives to

DOCS_LA:142078 1

Davison's eight largest customers accounted for sales of approximately $200 million. These customers are global or very large national players who have made Grace a key partner in their business success. Any fear that Grace may be in danger of losing its ability to invest for growth, technological leadership and customer focus could impact Grace's position with these customers and jeopardize the resulting sales and earnings. (Festa at para. 9)

10. Likewise, Grace's business is highly competitive. Any uncertainly with respect Grace's future is sure to be used by Grace's competitors in bidding for new work as well as securing new business from existing customers. (Festa at. para 10)

**Damage to Employee Relations**

11. From day one of these chapter 11 cases, management has worked diligently to maintain Grace's employee base. Key to that maintenance is the message that known management is in control of Grace and the process, has a clear direction and will protect the employee base who management understands is the key to successfully achieving the Companies' business goals. Terminating exclusivity is directly contrary to what the employees expect and will create serious concerns and anxiety among the employees. Such anxiety will ultimately have a negative impact on both employee relations and the productivity of Grace necessary to meet its business projections and plans. (Festa at para. 11).

12. These employee concerns are likely to affect productivity of Grace as a result of: (i) flight risk – especially for younger employees and employees in jobs in high demand in the marketplace; (ii) time wasted as employee speculation persists; (iii) greater difficulty in hiring quality personnel, especially younger employees and employees in demand positions, and (iv) the potential higher costs to attract new employees and retain current key employees. Grace has been advised by PricewaterhouseCoopers, its independent accountants, that loss of key personnel

in the finance department could constitute a material weakness in internal controls under the Sarbanes-Oxley Act. (Festa at para. 12)

**Negative Effect on Debtors' Long Term Business Plans**

13. Since filing chapter 11 in April 2001, Grace has grown from a $1.6 billion company (2000 revenues) to a $2.5 billion company (projected 2005 revenues). This growth has occurred through, among other things, increased productivity, good liquidity, and strategic expansion projects and acquisitions. In fact, since 2000, Grace has made 24 strategic acquisitions which have added $180 million to Grace's sales base. Most of these acquisitions were made by non-debtor foreign subsidiaries. (Festa at para. 13)

14. The future growth of Grace is dependent upon (i) driving penetration of new products and product extensions; (ii) exploiting high growth regions like China and Eastern Europe; and (iii) continuing further expansion projects and acquisitions. (Festa at para. 14)

15. The uncertainty over who will ultimately control Grace has already made this growth much more difficult. In fact, Grace has found that the very need for Bankruptcy Court and creditor approval has continually adversely affected Grace's ability to make acquisitions. Terminating exclusivity will make it that much more difficult to grow the businesses. The profitable growth of Grace's businesses will benefit all stakeholders in Grace's chapter 11 cases. (Festa at para. 15)

16. Grace currently has several joint venture partners in strategic business segments. Among these are Chevron, with whom Grace has formed Advanced Refining Technologies, LLC, which sells hydroprocessing catalysts. Joint venture partners of this caliber are difficult to locate and just as difficult to maintain. Grace's growth with these joint venture partners will be hampered due to the uncertainly that could result from terminating exclusivity. Likewise, of course, locating additional strategic partners of this stature may be hampered. (Festa at para. 16)

DOCS_LA 142078 1

17. GPC has three existing joint ventures in Russia, Turkey and Dubai, all important developing economies where a joint venture represents Grace's best model for success. The Russia joint venture in GPC's sealants and coatings business, relatively small today, could be a jumping off place for entry into the cement and concrete segment in Russia. The confidence of Grace's joint venture partners is critical to the continued success of these joint ventures. (Festa at para. 17)

18. Grace has a number of existing and potential technology partners who are key to the ability to innovate for world class growth and profitability in the future. Grace is also working with customers and suppliers on novel technologies in a number of cases and has existing research contracts with a number of academic institutions. Particularly, the deals that are still under negotiation could be jeopardized by a concern that Grace may not be in a position to meet the spirit and letter of its commitments. (Festa at para. 18)

19. Current acquisition deals are also in progress that could be jeopardized by a loss of confidence in Grace's ability to make and keep commitments. Grace currently is conducting due diligence on approximately 12 acquisition candidates in several product lines. (Festa at para. 19)

**Effect on Joint Plan and Claims Process**

20. The Debtors current Chapter 11 Plan is a Joint Plan filed with the support of Grace's Equity Committee and its Unsecured Creditors' Committee. However, maintaining exclusivity is a condition to continued Unsecured Creditor Committee support. Loss of support is certain to be construed negatively in the marketplace. (Festa at para. 20)

21. Likewise, the current Grace chapter 11 plan calls for payment of essentially 100% to all creditors. The existence of such a Plan has been helpful in negotiations with suppliers, customers, and existing claimants. The fear that a competing plan will be filed that is not as

8

favorable, is sure to adversely affect future negotiations on disputed claims and arrangements with current suppliers. (Festa at para. 21)

22.     Finally, the existence of competing plans will most certainly be a major distraction to Debtors' management which will, in turn, affect productivity and profitability. This distraction will take many forms including, but not limited to, the time and effort management will have to devote to: (i) studying other plans; (ii) addressing such other plans with its board of directors and shareholders (who are expected to be especially focused on plans which further dilute equity); and (iii) communicating with its employees, key customers, suppliers and joint venture partners with respect to such other plans, in an effort to minimize all of the anticipated harm outlined herein. (Festa at para. 22)

DOCS_LA 142078 1

**Conclusion**

Terminating exclusivity in this case is sure to have a negative impact on the Debtors' businesses. These businesses are extremely successful and profitable and hold the key to successfully reorganizing and providing the creditors of these estates with a meaningful recovery. As a result, and for the reasons outlined above and in the Debtors Motion to Extend Exclusivity dated May 23, 2005 and the Debtors Reply to Objections dated June 17, 2005, exclusivity should be extended.

July 7, 2005

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
Jonathan Friedland
200 East Randolph Drive
Chicago, IL 60601

and

PACHULSKI, STANG, ZIEHL, YOUNG,
JONES & WEINTRAUB P.C.

Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
Scotta E. McFarland (Bar No. 4184)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession