IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) Case No. 01-1139 (JKF) |
| W.R. GRACE & CO., et al., | ) (Jointly Administered) |
| | ) |
| Debtors. | ) Related Docket Nos. 8486, 8963 |
| | ) |

## FUTURE CLAIMANTS REPRESENTATIVE'S RESPONSE TO DEBTORS' REPORT ON BUSINESS EFFECTS OF TERMINATING EXCLUSIVITY

David T. Austern, the legal representative for future asbestos claimants (the "Future Claimants Representative") appointed by this Court in the above-captioned chapter 11 cases, by counsel, responds to Debtors' Report on Business Effects of Terminating Exclusivity (the "Debtors' Business Report"), filed by W.R. Grace and its affiliated debtors (collectively, the "Debtors"), and states as follows:

### PRELIMINARY STATEMENT

The Debtors' Business Report is premised on a series of "ifs," "coulds," "mights," and "mays." While anything is possible, the Debtors cannot even state definitely, much less establish as a matter of proof, that the termination of exclusivity will have a detrimental impact on their businesses.

The Debtors have a strong market position, strong cash flow, a significant cash position and low borrowing needs. Such financial strength and substantial growth has occurred despite a series of potentially business-damaging events which the Debtors' management, employees, customers, suppliers and lenders have experienced with no noticeable impact to the business. For example, the Debtors saw no material impact when they announced in 2000 and 2001 that they were unable to file their financial statements on time. Even their filing of chapter 11 bankruptcy protection more than four years ago had little material lasting impact on the Debtors'

business operations. The Debtors' businesses, employees, customers, suppliers and lenders were also not impacted materially when the Debtors' former chief executive agreed to settle Securities and Exchange Commission ("SEC") fraud charges; when two former executives agreed to cease-and-desist orders from the SEC related to fraudulent earnings reporting in the 1990s; when a federal district court in Missoula, Montana ordered the Debtors to repay $54.5 million to the government for the investigation and cleaning of Libby, Montana; when the Debtors and seven executives were indicted by the United States for federal crimes arising out of the Debtors' Libby, Montana operations; or when the New Jersey Attorney General filed suit against the Debtors and two former executives for making false certifications. And even when this Court stated that it was close to considering the appointment of a trustee, the Debtors' business did not appear to suffer at all. In the aftermath of so many events, the Debtors can hardly now demonstrate that termination of exclusivity will sound a death knell, or will have any materially adverse effect, for their businesses or their relationships with their employees, customers, suppliers and lenders.

Because the termination of exclusivity will not end the Debtors' chances for reorganization but rather will facilitate meaningful negotiations among the parties-in-interest and ultimately increase the likelihood of a consensual plan, the Future Claimants Representative respectfully requests that the Debtors' motion to extend their exclusive periods be denied.

## RESPONSE TO DEBTORS' SPECIFIC REPORT

**Debtors' Credit and Liquidity**

1. The Debtors' state that because the termination of exclusivity is rare in complex asbestos chapter 11 cases, "the very act of doing so will send alarm bells throughout the marketplace." Debtors' Business Report ¶ 3. But if the termination of exclusivity was such an alarming and detrimental event in the marketplace, customers and lenders would include it in

2

long term business contracts or DIP facilities as an event of default or a material change, and senior executives would demand clauses in their employment contracts addressing the impact of termination of exclusivity. Under the Debtors' theory, no court could ever terminate exclusivity in a complex chapter 11 asbestos case.

2. Further, while the Debtors' financial statements and other public filings discuss potential business risks, the termination of exclusivity has never specifically been included as a risk factor in such discussions.

3. The Debtors also state that terminating exclusivity "*may* have an adverse impact on the Debtors' ability to obtain other financing arrangements in the future, especially with respect to discretionary arrangements such as letters of credit, lines of credit, and surety bonds." Debtors' Business Report ¶ 5 (emphasis added). But as of May 31, 2005, the Debtors reported that they had nearly $400 million in available cash. See Monthly Operating Report, May 31, 2005, Doc. No. 8941. Further, the Debtors do not currently borrow *any* funds for working capital or other cash needs under their post-petition financing facility (the "DIP Facility"), which provides for up to $250 million in available credit. Radecki Affidavit ¶ 5.[1] As of May 31, 2005, the Debtors have only $29 million reserved for letters of credit. See Monthly Operating Report, May 31, 2005, Doc. No. 8941. The DIP Facility will remain in place for at least another nine months, and the Debtors have stated that there will be no breach of the financing arrangement if exclusivity is terminated. Debtors' Business Report ¶ 1.

4. The Debtors have acknowledged that these sources and amounts of liquidity are sufficient to support their strategic initiatives and chapter 11 proceedings for the foreseeable future. See W.R. Grace & Co. Press Release, Grace Reports First Quarter Financial Results,

---

[1] References to the "Radecki Affidavit" refer to the Affidavit of Joseph J. Radecki, Jr. in Support of Future Claimants Representative's Response to Debtors' Report on Business Effects of Terminating Exclusivity, attached hereto as Exhibit A

3

April 20, 2005. The Debtors further represent that they continue to pay their vendors currently and in a timely fashion.

5. The Debtors' strong market position, strong cash flow, significant cash position and low borrowing needs makes them an attractive candidate for any lender. Radecki Affidavit ¶ 7. It is unrealistic to suggest that terminating exclusivity would deter institutional lenders from entering into attractive DIP financing arrangements with the Debtors. Id.

**Debtors' Business and Customer Relations**

6. While the Debtors have operated under chapter 11 for over four years, their businesses continue to deliver healthy sales and strong cash flow. As shown in Exhibit 1 to the Radecki Affidavit, the Debtors' revenues have progressively increased from approximately $400 million in the first quarter of 2001 (approximately $1.6 billion per year) to over $600 million in the first quarter of 2005 (approximately $2.5 billion per year), an increase of approximately fifty percent (50%). Radecki Affidavit ¶ 8. See also Debtors' Business Report ¶ 13, Festa Affidavit ¶ 13. This substantial growth has occurred despite the filing of these chapter 11 cases, the resulting uncertainty that chapter 11 proceedings inevitably create, and numerous other adverse events as described below.

7. As described more fully in Exhibit 2 to the Radecki Affidavit, the Debtors have proven that they can manage the following adverse events with no material lasting impact on their business:

- November 2000: W.R. Grace announces it will be unable to file its next quarterly financial statements on time
- April 2001: Debtors' file for chapter 11 bankruptcy protection and announce they will be unable to file their 2000 financial statements timely

4

| | | |
|---|---|---|
| ▪ | December 2002: | Partial summary judgment granted in favor of government against Grace for recovery of cleanup costs related to previously operated vermiculite mining and processing sites near Libby, Montana |
| ▪ | March 2003: | Former chief executive J.P. Bolduc agrees to settle Securities and Exchange Commission ("SEC") fraud charges |
| ▪ | August 2003: | Two former executives agree to cease-and-desist orders from the SEC related to fraudulent earnings reporting in the 1990s |
| ▪ | August 2003: | Federal District Court in Missoula, Montana orders repayment to government of $54.5 million for investigation and cleaning of Libby, Montana |
| ▪ | March 2004: | Statement by the Court that the Court is close to considering the appointment of trustee to W.R. Grace cases |
| ▪ | August 2004: | Debtors restate their 2003 financial results |
| ▪ | November 2004: | Debtors announce that CEO Paul Norris is to retire effective May 31, 2005 |
| ▪ | February 2005: | Company and seven executives indicted by the United States for federal crimes arising out of the Debtors' Libby, Montana operations |
| ▪ | June 2005: | New Jersey Attorney General files suit against W.R. Grace and two former company executives for falsely certifying that any hazardous asbestos contamination at the company's Hamilton Township plant had been cleaned up in accordance with state requirements |

Despite these events, the Debtors' businesses continue to flourish and revenues continue to grow.

8. The Debtors manufacture many high quality and unique products which are often specialized for their customers. These high quality and specialized products create an incentive for customers to continue to do business with the Debtors. Radecki Affidavit ¶ 10. Additionally, the Debtors' customers are likely aware of the Debtors' strong financial position and it is unlikely that the termination of exclusivity will jeopardize their willingness to enter into long

5

Case 01-01139-AMC    Doc 8982    Filed 07/12/05    Page 6 of 19

term business contracts. Id. The suggestion that terminating exclusivity *could* cause foreign customers (who are not familiar with the chapter 11 bankruptcy process) to become more hesitant to do business with the Debtors is unsubstantiated. Id. The Debtors' representation that the termination of exclusivity could impact customer relations is simply not credible.

**Debtors' Employee Relations**

9. The Debtors state that the termination of exclusivity "is directly contrary to what the employees expect and will create serious concerns and anxiety among the employees." Debtors' Business Report ¶ 11. But terminating exclusivity is not linked to employee retention. Radecki Affidavit ¶ 11. In fact, since filing for bankruptcy, the Debtors have, generally without objection by the stakeholders, taken numerous actions to ensure employees are fully compensated and assured during the process, including, among other things, making regular contributions to pension plans aggregating over $110 million,[2] implementing four separate long term incentive programs for key employees aggregating over $47 million,[3] and obtaining Court-approval of senior executive employment agreements and consulting agreements. Furthermore, the Debtors recently appointed a new chief executive officer, whose employment and compensation package is not conditioned on the retention of exclusivity. Since the termination of exclusivity will not end the Debtors' chances for reorganization but rather will facilitate real negotiations among the parties-in-interest toward a consensual plan, there is no reasonable basis for employees to have a negative reaction.

10. The Debtors' prediction that terminating exclusivity will have a negative impact on the Debtors' productivity and that the existence of competing plans will "most certainly be a

---

[2] This includes recently approved contributions of approximately $46 million pursuant to the Court's Order dated June 22, 2005 [Orders, Doc. Nos. 3445, 4154, 6503, 8667, and 8666].

[3] This excludes similar bonus payments to the CEOs but includes payments sought under the Debtors' motion to approve the 2005-2007 incentive program, which is scheduled to be heard on July 19, 2005. A certificate of no objection has been filed. [Orders, Doc. Nos. 2615, 3441, and 5759].

6

major distraction to Debtors' management" (Festa Affidavit ¶ 22) cannot be reconciled with the fact that the Debtors have employed two consultants, Mr. Norris and Mr. Siegel (both former senior executives of the Debtors), to focus primarily on, and devote significant time to, the Debtors' reorganization process.[4]

## CONCLUSION

Since the only plan on file is the Debtors' patently unconfirmable plan, real negotiations will not proceed until the playing field is finally made level by the termination of exclusivity. Accordingly, for the foregoing reasons, the Future Claimants Representative respectfully requests that the Court deny the Debtors' motion to extend the exclusive periods.

Dated: July 12, 2005

Respectfully submitted,

PHILLIPS, GOLDMAN & SPENCE, P.A.

_____
John C. Phillips, Jr., Esquire (#110)
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
(302) 655-4210 (facsimile)

Roger Frankel, Esquire
Richard H. Wyron, Esquire
Monique D. Almy, Esquire
Debra L. Felder, Esquire
Swidler Berlin LLP
3000 K Street, N.W., Suite 300
Washington, D.C. 20007
(202) 424-7500
(202) 424-7643 (facsimile)

Counsel for David T. Austern,
Future Claimants Representative

---

[4] The Debtors are paying Messrs. Norris and Siegel approximately $425,000 and $450,000 a year, respectively [Doc. Nos. 7753 and 8340 (Motion and Order approving Norris' post-retirement consulting agreement); Doc. Nos. 8485 and 8716 (Motion and Order approving Siegel's post-retirement consulting agreement)].

# Exhibit A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) <br> ) Chapter 11 <br> ) Case No. 01-1139 (JKF) |
| W.R. GRACE & CO., et al., | ) (Jointly Administered) <br> ) |
| Debtors. | ) <br> ) |

### AFFIDAVIT OF JOSEPH J. RADECKI, JR. IN SUPPORT OF FUTURE CLAIMANTS REPRESENTATIVE'S RESPONSE TO DEBTORS' REPORT ON BUSINESS EFFECTS OF TERMINATING EXCLUSIVITY

Joseph J. Radecki Jr., being first duly sworn, states as follows:

1. I am a Managing Director of CIBC World Markets Corp. ("CIBC"). CIBC is a full service investment bank, which offers a comprehensive set of products and services for its corporate and institutional clients. I have provided a range of financial advisory, investment banking and valuation services to debtors and debtors-in-possession, creditors' committees, acquirers, future claims representatives and other parties-in-interest in connection with bankruptcy cases and financially distressed situations. I have served or am presently serving as a financial advisor to debtors, creditors, trustees, and other parties in numerous chapter 11 proceedings, including currently serving as the financial advisor to future claimants representatives in three other asbestos bankruptcy cases. I am familiar with the matters stated herein and I make this affidavit based on my own personal knowledge, information and belief.

2. On September 27, 2004, the Court authorized the employment of CIBC as the financial advisor to David T. Austern, the Future Claimants Representative in the above-captioned chapter 11 cases of W.R. Grace & Co. and its affiliated debtors (collectively, the "Debtors").[1]

---

[1] Order Authorizing the Retention and Employment of CIBC World Markets Corp. as Financial Advisor to David T. Austern, Future Claimants' Representative, dated Sept. 27, 2004, as extended on March 14, 2005 and June 27, 2005.

3.   I have reviewed the Debtors' Report on Business Effects of Terminating Exclusivity (the "Debtors' Business Report") and the Affidavit of Fred Festa in support thereof (the "Festa Affidavit").

4.   I have reviewed and am familiar with the nature of the Debtors' businesses and their financial position. I am also familiar with the historical events involving the Debtors which have transpired since the last quarter of 2000. As explained more fully herein, it is very unlikely that terminating exclusivity will have a detrimental impact on the Debtors' businesses.

**Debtors' Credit and Liquidity**

5.   As of May 31, 2005, the Debtors reported that they had nearly $400 million in available cash. Monthly Operating Report, May 31, 2005. The Debtors do not currently borrow any funds for working capital or other cash needs under their post-petition financing facility, which provides for up to $250 million in available credit. As of May 31, 2005, the Debtors have only $29 million reserved for letters of credit. Monthly Operating Report, May 31, 2005. The DIP facility will remain in place for at least another nine months, and the Debtors have stated that there will be no breach of the financing arrangement if exclusivity is terminated. Debtors' Business Report ¶ 1.

6.   The Debtors have stated that these sources and amounts of liquidity are sufficient to support their strategic initiatives and chapter 11 proceedings for the foreseeable future. W.R. Grace & Co. Press Release, Grace Reports First Quarter Financial Results, April 20, 2005. The Debtors further state that they continue to pay their vendors currently and in a timely fashion.

7.   The Debtors' strong market position, strong cash flow, significant cash position and low borrowing needs makes them a highly attractive and strong credit to any lender. It is unrealistic to suggest that terminating exclusivity would deter institutional lenders from entering into attractive DIP financing arrangements with the Debtors.

**Debtors' Business and Customer Relations**

8  While the Debtors have operated under chapter 11 for over four years, their businesses continue to deliver healthy sales and strong cash flow. As shown in Exhibit 1, attached hereto, the Debtors' revenues have progressively increased from approximately $400 million in the first quarter of 2001 (approximately $1.6 billion per year) to over $600 million in the first quarter of 2005 (approximately $2.5 billion per year), an increase of approximately fifty percent (50%). Debtors' Business Report ¶ 13, Festa Affidavit ¶ 13. This substantial growth has occurred despite the filing of these chapter 11 cases, the resulting uncertainty that chapter 11 proceedings inevitably create, and numerous other adverse events as described below.

9  As described more fully in Exhibit 2 to the Radecki Affidavit, the Debtors have proven that they can manage the following adverse events with no material lasting impact on their business:

- November 2000: W.R. Grace announces it will be unable to file its next quarterly financial statements on time

- April 2001: Debtors' file for chapter 11 bankruptcy protection and announce they will be unable to file their 2000 financial statements timely

- December 2002: Partial summary judgment granted in favor of government against Grace for recovery of cleanup costs related to previously operated vermiculite mining and processing sites near Libby, Montana

- March 2003: Former chief executive J.P. Bolduc agrees to settle Securities and Exchange Commission ("SEC") fraud charges

- August 2003: Two former executives agree to cease-and-desist orders from the SEC related to fraudulent earnings reporting in the 1990s

- August 2003: Federal District Court in Missoula, Montana orders repayment to government of $54.5 million for investigation and cleaning of Libby, Montana

3

- March 2004: Statement by the Court that the Court is close to considering the appointment of trustee to W.R. Grace cases

- August 2004: Debtors restate their 2003 financial results

- November 2004: Debtors announce that CEO Paul Norris is to retire effective May 31, 2005

- February 2005: Company and seven executives indicted by the United States for federal crimes arising out of the Debtors' Libby, Montana operations

- June 2005: New Jersey Attorney General files suit against W.R. Grace and two former company executives for falsely certifying that any hazardous asbestos contamination at the company's Hamilton Township plant had been cleaned up in accordance with state requirements

Despite these events, the Debtors' businesses continue to flourish and revenues continue to grow.

10. The Debtors manufacture many high quality and unique products which are often specialized for their customers. These high quality and specialized products create an incentive for customers to continue to do business with the Debtors. Additionally, the Debtors' customers are likely aware of the Debtors' strong financial position and it is unlikely that the termination of exclusivity will jeopardize their willingness to enter into long term business contracts. In my experience, to suggest that terminating exclusivity *could* cause foreign customers (who are not familiar with the chapter 11 bankruptcy process) to become more hesitant to do business with the Debtors is unsubstantiated.

**Debtors' Employee Relations**

11. In my experience, it is unrealistic to believe that terminating exclusivity is in any way linked to employee retention. In fact, since filing for bankruptcy, the Debtors have, generally without objection by the stakeholders, taken numerous actions to ensure employees are fully compensated and assured during the process, including, among other things, making regular

4

contributions to pension plans aggregating over $110 million,[2] implementing four separate long term incentive programs for key employees aggregating over $47 million,[3] and obtaining Court-approval of senior executive employment agreements and consulting agreements. Furthermore, the Debtors recently appointed a new chief executive officer, whose employment and compensation package is not conditioned on the retention of exclusivity. Since the termination of exclusivity will not end the Debtors' chances for reorganization but rather will facilitate real negotiations among the parties-in-interest toward a consensual plan, properly managed, there is no reasonable basis for employees to have a negative reaction.

12. The Debtors' prediction that terminating exclusivity will have a negative impact on the Debtors' productivity and that the existence of competing plans will "most certainly be a major distraction to Debtors' management" cannot be reconciled with the fact that the Debtors have employed two consultants (both former senior executives of the Debtors) to focus primarily on, and devote significant time to, the Debtors' reorganization process.[4] Festa Affidavit ¶ 22.

---

[2] This includes recently approved contributions of approximately $46 million pursuant to the Court's Order dated June 22, 2005.

[3] This excludes similar bonus payments to the CEOs but includes payments sought under the Debtors' motion to approve the 2005-2007 incentive program, which is scheduled to be heard on July 19, 2005. A certificate of no objection has been filed.

[4] The Debtors are paying Messrs. Norris and Siegel approximately $425,000 and $450,000 a year, respectively.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on July 12, 2005

_____
Joseph J. Radecki, Jr.

Sworn to before me this
___th day of July, 2005.

_____
NOTARY PUBLIC

JUDITH CHAITOW
Notary Public, State of New York
No. 31-4683789
Qualified in New York County
Commission Expires February 28, 2006

6

# Exhibit 1



# Exhibit 2

**WR Grace and Co.**

Events:

| Date | | Event |
|---|---|---|
| 11/15/2000 | Q4 2000 | Announces it will be unable to file its next 10-Q by the deadline required by the SEC |
| 4/1/2001 | | Interim approval for Key Employee Retention Program |
| 4/2/2001 | Q2 2001 | Announces it will be unable to file its next 10-K by the deadline required by the SEC. |
| 4/3/2001 | | Files for Chapter 11 bankruptcy protection. |
| 8/2/2001 | Q3 2001 | Requests extension of filing of reorganization plan |
| 1/29/2002 | Q1 2002 | Announces Q4 2001 results. Revenues $429.1 million, up 9.5% from the same quarter of the previous year. |
| 4/23/2002 | Q2 2002 | Announces Q1 2002 results. Revenues $413.5 million, up 4.5% from the same quarter of the previous year |
| 10/23/2002 | | Announces Q3 2002 results. Revenues $478.7 million, up 6.8% from the same quarter of the previous year. |
| 12/23/2002 | Q4 2002 | Partial summary judgment granted in favor of government against Grace for recovery of cleanup costs related to previously operated vermiculite mining and processing sites near Libby, Montana |
| 1/20/2003 | | Files motion to authorize contributions to trust funding the Curtis Bay pension plans |
| 1/29/2003 | | Announces Q4 2002 results. Revenues $453.4 million, up 5.7% from the same quarter of the previous year |
| 2/10/2003 | | Files motion to authorize Long Term Incentive Program for Key Employees for 2003-2005 |
| 3/1/2003 | Q1 2003 | Former chief executive J P Bolduc agrees to settle Securities and Exchange Commission fraud charges |
| 3/3/2003 | | Files motion to authorize contributions to pension plans |
| 3/13/2003 | | Receives an Unqualified Going Concern Opinion from its auditor, Pricewaterhousecoopers |
| 4/22/2003 | Q2 2003 | Announces Q1 2003 results. Revenues $444.8, up 7.7% from the same quarter of the previous year. |
| 7/23/2003 | | Announces Q2 2003 results. Revenues $503.4 million, up 6.7% from the same quarter of the previous year |
| 8/13/2003 | Q3 2003 | Two former executives agree to cease-and-desist orders from the Securities and Exchange Commission related to fraudulent earnings reporting in the 1990s |
| 8/29/2003 | | Federal District Court in Missoula orders repayment to government $54.5 million for investigation and cleaning of Libby Montana |
| 10/23/2003 | | Announces Q3 2003 results. Revenues $521.0 million, up 8.5% from the same quarter of the previous year. |
| 11/18/2003 | Q4 2003 | Chairman and CEO Paul Norris steps down as president. Board elects Fred Festa as president and COO. |
| 1/27/2004 | | Announces Q4 2003 results. Revenues $511.3 million, up 12.4% from the same quarter of the previous year |
| 3/5/2004 | Q1 2004 | Restatement of 2003 financials. Q4 2004 net loss restated as $49.5 million, down $24 million from previous year |
| 3/22/2004 | | Statement by Judge Fitzgerald that court is close to considering the appointment of trustee to W R Grace case |
| 3/22/2004 | | Files motion to authorize Long Term Incentive Program for Key Employees for 2004-2006 |

| Date | Quarter | Event |
|---|---|---|
| 4/12/2004 | | 401(k) plan sells substantially all of its shares of Grace at $3.50 to a single buyer. |
| 4/20/2004 | Q2 2004 | Announces Q1 2004 results. Revenues $518.5, up 16.6% from the same quarter of the previous year. |
| 5/23/2004 | | Files motion to authorize contributions to Lake Charles /Chattanooga union pension plans. |
| 6/2/2004 | | The United Steelworkers of America Local 14087 approve new four-year contract for WR Grace hourly employees that includes a 14.2% wage increase over the period. |
| 7/19/2004 | | Files motion to authorize contributions to pension plans |
| 7/21/2004 | | Announces Q2 2004 results. Revenues $572.4 million, up 13.7% from the same quarter of the previous year |
| 8/9/2004 | Q3 2004 | Receives an Unqualified Going Concern Opinion from its auditor, Pricewaterhousecoopers |
| 8/10/2004 | | Announces that a retirement plan has filed a class-action lawsuit against the company's officers and its board members for selling of almost all of its shares of Grace by company's 401(k) |
| 9/8/2004 | | Elects President and Chief Operating Officer Fred Festa to Board of Directors |
| 10/14/2004 | | Files a motion seeking U.S. Bankruptcy Court approval of an extension of the exclusive period during which the company can file a plan of reorganization through and including 11/15/2004. |
| 10/15/2004 | | Files motion to delay filing plan of reorganization citing positive discussions with creditors. The Plan was due to be filed on October 14. |
| 10/20/2004 | | Announces results for Q3 2004. Revenues $578.9 million, up 11.3% from the same quarter of the previous year. |
| 10/26/2004 | Q4 2004 | U.S. Bankruptcy Court for the District of Delaware grants a one-month extension to file a reorganization plan through Nov. 15. |
| 10/29/2004 | | Announces that the company and several senior-level employees are the targets of a federal grand jury investigation into possible environmental violations. |
| 11/4/2004 | | Employees file a class action to recover $40 million in profits lost in their personal retirement accounts |
| 11/13/2004 | | Files a Plan of Reorganization as well as several associated documents, including a Disclosure Statement. |
| 11/19/2004 | | Names President and Chief Operating Officer Fred Festa as chief executive |
| 1/14/2005 | | Files an Amended Plan of Reorganization, Disclosure Statement and related documents with the Delaware Bankruptcy Court with support of equity and trade creditors |
| 1/25/2005 | | Announces Q4 2004 results. Revenues $589.1 million, up 15.2% from the same quarter of the previous year |
| 2/7/2005 | Q1 2005 | Company and seven executives indicted by government |
| 3/7/2005 | | Receives an Unqualified Going Concern Opinion from its auditor, Pricewaterhousecoopers |
| 4/20/2005 | | Announces Q1 2005 results. Revenue $603.2, up 18.2% from the same quarter of the previous year. |
| 5/23/2005 | | Files motion to authorize contributions to pension plans. |
| 6/1/2005 | Q2 2005 | New Jersey Attorney General files suit against W.R. Grace & Co. and two former company executives for falsely certifying that any hazardous asbestos contamination at the company's Hamilton Township plant had been cleaned up in accordance with state requirements. |
| 6/15/2005 | | Files motion to authorize Long Term Incentive Program for Key Employees for 2005-2007 |
| 6/27/2005 | | The U.S. Bankruptcy Court in Delaware approves definitive settlement agreement with Sealed Air Corp. |