IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:

W.R. GRACE & CO., et al.

Debtors.

Chapter 11

Case No. 01-1139 (JKF)

Jointly Administered

**AFFIDAVIT OF ROBERT W. MATHEWS IN RESPONSE TO THE DEBTOR'S REPORT ON BUSINESS EFFECTS OF TERMINATING EXCLUSIVITY**

STATE OF CONNECTICUT
                          ss:
COUNTY OF FAIRFIELD

Robert W. Mathews, being first duly sworn, deposes and says:

1. I am a Managing Director of L. Tersigni Consulting P.C. ("LTC"), a firm providing financial advisory services in bankruptcy proceedings and complex litigation. My expertise is derived from over thirty years of experience in global commercial and investment banking and financial consulting. Attachment to this Affidavit is a description of my professional qualifications.

2. In April 2001, the Asbestos PI Committee retained LTC to provide financial advisory services in connection with the W. R. Grace & Co. bankruptcy cases. LTC is also currently the financial advisor to many other committees of asbestos claimants appointed as official committees in the bankruptcy cases of various companies that have filed for reorganization under Chapter 1 of the Bankruptcy Code.

3. I have conducted a review and analysis of Debtor In Possession Financing Agreements, their extensions and subsequent exit financing for numerous Chapter 1 asbestos companies. Over the past several years I have prepared assessments of the financing associated with at least nine asbestos-related bankruptcies.

4	have also assessed other financing arrangements for non-debtor businesses with extensive asbestos issues. As part of these assessments, my involvement has included monitoring the bank and bond markets and discussing details of prospective commitments of capital and credit with various financial institutions.

5.	I have been asked by counsel for the Asbestos PI Committee to provide my opinion as to whether the loss of exclusivity would have an adverse impact on W.R. Grace's ability to obtain a renewal of its DIP Agreement on terms and conditions substantially similar to its existing Debtor In Possession Financing Agreements ("DIP Agreement").

6	In forming my opinion, I have reviewed the DIP Agreement for W. R. Grace and the Debtor In Possession Financing Agreements for debtors in numerous other asbestos bankruptcy cases. have also considered public information and my personal experience with lenders in the restructuring market concerning general market terms and conditions for obtaining Debtor In Possession Financing Agreements.

7	Based on my analysis and evaluation of the company's financial position, market conditions and my experience with credit practices and financial markets, the loss of exclusivity would not have an adverse impact on W. R. Grace's ability to obtain a renewal of its DIP Agreement on the current terms and conditions for the following reasons:

a)	The present debtor in possession financing market and short-term outlook is comparable if not more favorable for borrowers than in April 2003 (when the existing DIP Agreement terms became effective) The financing market continues to be favorable to borrowers because of a stable economic environment, lack of defaults and excess of potential supply over actual demand for financing. As a result, it is likely that the

principal terms and conditions of a DIP Agreement renewal, such as the rate, amount, security and maturity, would be no worse than the terms of the existing DIP Agreement

b) W. R. Grace's current financial position, liquidity and financial outlook are stronger than it was in April 2003 (when the existing DIP Agreement terms became effective). In terms of liquidity, W. R. Grace's cash balance was $275.0 million, excluding an additional $87.7 million (representing the cash value of life insurance policies which the Debtor characterizes as additional liquidity), at March 31, 2003, the nearest quarter-end prior to obtaining the current DIP Agreement terms. By March 31 2005, W. R. Grace's cash balance increased significantly to $474.8 million, excluding an additional $81.0 million, representing additional liquidity for the cash value of life insurance policies. Cash is projected to decline by year-end 2005 because of non-core and mostly non-recurring cash outflows, but is projected to remain at levels significantly higher than year-end 2003. In terms of financial performance, W. R. Grace's sales, EBIT and operating cash flow improved materially from 2003 to 2004 and are projected to continue to improve in 2005

c) W. R Grace does generally not utilize its $250 million existing credit facility except for limited letter of credit and holdback usage. Letters of credit outstanding were approximately $29 million on May 31, 2005, and have not significantly deviated from that level. During a 5-month period in 2003, W.R. Grace borrowed up to $40 million under its credit facility, even though the Company's consolidated cash balance was roughly $300 million during that period (excluding more than $80 million for the cash value of life insurance policies). Borrowings were only temporary until the Company repatriated cash from its foreign, non-filing entities to repay its loan. Therefore,

the borrowings were used for strategic cash management purposes and were not necessarily because of limited cash balances.

d) The DIP Agreement lenders are protected by financial and other covenants, which have never been violated, and have not required exclusivity as a lending condition. The principal financial covenant is a DIP cash flow covenant requiring certain minimal levels of EBITDAR. In addition, the lenders require the receipt of certain financial projections. In my experience, lenders are primarily concerned with repayment on emergence, which is protected by their priority collateral position and is not impacted by exclusivity. In this instance, the Debtor's DIP lenders do not require interminable exclusivity as a lending condition.

In my opinion, the debtor could obtain commitment proposals for renewal and extension of its existing DIP Agreement under terms and conditions no worse than those currently in place despite the termination of exclusivity. This assessment is based upon a comparison of the details of the existing terms and conditions for the DIP Agreement in amount, price and other conditions with the present market terms and conditions.

*Robert W. Mathews*
Robert W. Mathews

SWORN TO and subscribed before me
this 12th day of July 2005.

_____
Notary Public

**HARRIET A. ROSS**
**NOTARY PUBLIC**
MY COMMISSION EXPIRES JULY 31, 2009