**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-1139 (JKF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket Nos. 8486, 8600, 8963** |

**OFFICIAL COMMITTEE OF ASBESTOS PROPERTY DAMAGE CLAIMANTS'
REPORT ON BUSINESS EFFECTS OF TERMINATING EXCLUSIVITY**

The Official Committee of Asbestos Property Damage Claimants (the "PD Committee"), by and through undersigned counsel, hereby files this Report on the business effects of terminating the above-captioned debtors' (the "Debtors") exclusive right to file a plan of reorganization and respectfully states as follows:

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

**INTRODUCTION**

At the June 27, 2005 omnibus hearing, the Court requested written reports with respect to the potential business effects on the Debtors if the Court denied the Debtors' eighth request for an extension of exclusivity. On July 7, 2005, the Debtors filed their Report in which they attempted to explain the purported "negative impact" on the Debtors' businesses if exclusivity was terminated. In their Report, the Debtors discuss in the vaguest of terms that it is the belief of their newly-appointed Chief Executive Officer, Fred Festa, that termination of exclusivity could or may cause both external and internal negative signals about the Debtors which, in turn, could or may affect the Debtors' long-term business plans.

Conspicuously missing though from the Debtors' Report is any <u>non-speculative</u> discussion about the effects on the Debtors. There is a simple answer for that - - no evidence exists that any harm will come should the Court decline to further extend the Debtors' monopoly on exclusivity. First, the Debtors grudgingly admit that none of their essential business contracts would be affected; second, it is difficult to imagine any negative perception surrounding the loss of exclusivity when federal indictments and a civil lawsuit filed by the State of New Jersey has not materially impacted the Debtors' businesses; third, the Debtors' common stock trades on information readily available in the marketplace and already has considered the possibility of the Debtors losing exclusivity; and fourth, terminating exclusivity will enhance the possibility of a consensual plan of reorganization that will enable the Debtors to exit chapter 11 much earlier than they could ever contemplate under their drawn-out litigation protocols.

**REPORT**

1.      Perhaps the best indication of the business effect of terminating the Debtors' exclusivity is how the marketplace anticipates and incorporates such possibility into its everyday

dealings with the Debtors. According to the Debtors' Report, terminating exclusivity will not be a breach of any of their current lending and other financing agreements and contracts. See Debtors' Report, ¶1. The impact of such determination cannot be overstated. Moreover, the fact that the Debtors cannot point to one significant financing or business contract that would be jeopardized by terminating exclusivity speaks volumes about the marketplace's perception of the Debtors' exclusivity.

2. As this Court is well aware, one of the most common features of a debtor-in-possession financing facility (a "DIP Facility") is the inclusion of a default provision in the event a debtor loses its exclusive right to file a plan of reorganization. These types of provisions are put in place to protect the lender in the event there is a business impact that could affect the DIP Facility. However, in this instance, the Debtors' DIP Facility lender, Bank of America, N.A. (the "DIP Lender"), who is undoubtedly a sophisticated, experienced lender to chapter 11 debtors and who is represented by highly competent bankruptcy counsel, made a business decision not to include an exclusivity "default" in its loan agreement. The only logical conclusion from this omission is that the DIP Lender fully recognized that termination of the Debtors' exclusivity would not result in any serious harm to the Debtors' businesses.

3. Despite the fact that their existing DIP Facility fails to include an exclusivity default, the Debtors posit that "[t]he loss of exclusivity could have an adverse impact on the Debtors' ability to obtain a renewal of the DIP [Facility] on the current terms and conditions." See Debtors' Report, ¶4. The Debtors offer no explanation as to why the DIP Lender, after four years of extending the DIP Facility, would all of a sudden mandate that the Debtors maintain exclusivity in order to maintain the existing terms and conditions. In addition, it is worth noting that as of May 31, 2005, the Debtors held $399.9 million in cash and cash equivalents (per May

31, 2005 Monthly Operating Report), which seriously calls into question the necessity of even continuing the DIP Facility on its current terms and conditions. Over the past twelve months, with the exception of certain letters of credit, the Debtors have had no outstanding borrowings under the DIP Facility at the end of any month. See Boyer Affidavit, ¶7.[2]

4. The Debtors also raise speculative concern about their relationships with existing customers and their ability to attract new customers if the Court were to terminate exclusivity. See Debtors' Report, ¶8. To support their theoretical concern, the Debtors recite the sales by one of their divisions, Davison, of approximately $200 million to eight customers and the unsubstantiated fear that such relationships could be in jeopardy. Id., ¶9. However, the Debtors once again fail to provide the entire picture.

5. As explained in the Boyer Affidavit, the Debtors have frequently represented that Davison's products, in many instances, are unique products that would be difficult for customers to source from other suppliers and, in other instances, are designed specifically to meet the particular customer's needs and could not be sourced through the Debtors' competitors without significant lead time and substantial cost. See Boyer Affidavit, ¶8.

6. Moreover, if recent occurrences outside of the bankruptcy process have not had a significant impact on the Debtors' business relationships, it is hard to fathom how the loss of exclusivity might create any such impact. In February 2005, debtor W.R. Grace & Co. ("Grace") and several of its senior employees were indicted on charges of intentionally misleading the Federal Government, industrial customers, workers and the public of the asbestos dangers associated with Grace's Libby, Montana, vermiculate mine. The federal criminal indictment also charges that, as part of Grace's conspiracy to increase profits and avoid liability by misleading

---

[2] "Boyer Affidavit, ¶__" refers to the Affidavit of Gregory Boyer, a member of Conway DelGenio & Gries & Co., LLC, the financial advisor to the PD Committee, a copy of which is attached hereto as Exhibit A.

the Federal Government, Grace withheld important information from the Federal Government in respect of asbestos contamination of Zonolite Attic Insulation ("ZAI") and ZAI's capacity to release asbestos when disturbed.  Similarly, on June 1, 2005, the New Jersey Attorney General filed a civil complaint against Grace and two former executives alleging that defendants falsified documents to state environmental authorities about asbestos-contaminated soil.

7. Without any compunction, the Debtors actually argue that terminating exclusivity will create serious concerns and anxiety amongst their employees. See Debtors' Report, ¶11. This is quite surprising because in all of the Debtors' efforts to put in place long-term retention and performance bonuses that the Debtors argued were necessary in order to maintain quality employees and keep employee morale high, they never once referred to the need to maintain exclusivity as additional factor affecting employee retention.

8. The Debtors seem to completely misunderstand the impact of the termination of exclusivity.  The Debtors equate the termination of exclusivity with the removal or limitations on management to continue to run their businesses on a day to day basis.  That misses the mark by a mile.  The PD Committee is not suggesting, at this time, that the Debtors' management be relieved of their control of the Debtors.  Termination of exclusivity has no bearing on the day to day management of the Debtors' affairs.

9. In reviewing the performance of the Debtors, it is informative to review how the Debtors' common stock has traded during the course of the bankruptcy proceeding.  From April 2, 2001 through April 30, 2003, the Debtors' stock price fluctuated between $0.99 per share and $3.75 per share.  During this period, fluctuations in the Debtors' stock price appears to have been impacted by various factors, including general market dynamics, speculation on settlement

trends in asbestos companies, events relating to the Sealed Air fraudulent conveyance action and disclosure on various environmental issues related to the Debtors.  See Boyer Affidavit, ¶9.

10.     From May 1, 2003 through June 30, 2005, the Debtors had significant fluctuations in their stock price ranging from $2.34 to $14.95.  Fluctuations in the stock price during this period appear to have been impacted by (a) speculation and market notification of events relating to POR discussions and negotiations; (b) events relating to potential legislative measures that would affect asbestos litigation; and (c) the Federal indictment issued against Grace and certain current and former officers of Grace.  See Boyer Affidavit, ¶10.

11.     There appears to have been limited impact upon the Debtors' stock price as a result of general chapter 11 events, but, rather, the Debtors' stock appears to have been significantly impacted by (a) plan of reorganization discussions; (b) market speculation on such discussions and trends in federal legislation related to a proposed national asbestos trust fund; and (c) issues surrounding the federal indictment.  Such movements likely reflect the market's interpretation of the impact those events would have on the potential recoveries to the Debtors' equity holders under a plan of reorganization.  See Boyer Affidavit, ¶11.

12.     Lastly, the Debtors complain that the existence of competing plans of reorganization will be a distraction to their management.  This too is a curious statement, considering that the Debtors have sought and received authority to pay two of their former executives, Messrs. Norris and Siegel, almost $1 million per year collectively to help shepherd the Debtors through the reorganization process.  Thus, the strain on day to day management should be minimal, as the Debtors have engaged consultants for this exact purpose.

MIAMI 906415.2 7481715537
7/12/05 6:52 PM                                         6

## **CONCLUSION**

As explained above, terminating exclusivity would not have a significant impact on the Debtors' businesses. The only possibility of turning the trajectory of these cases away from the Debtors' scorched earth approach to one of consensus is to terminate exclusivity. In short, the Court must allow for the democratization of the plan process. The only way to democratize the process is by terminating exclusivity. A further extension of the Exclusive Periods will not accomplish this result but would have the contrary effect, as evidenced to date. Terminating exclusivity is both appropriate and in the best interests of the Debtors' estates and all of its creditors and, therefore, no "cause" exists to extend the Exclusive Periods for the eighth time. Only by eliminating exclusivity will the holders of PD claims, and other creditors of the Debtors, be placed on an equal footing in the plan process, a condition precedent to exiting these long-standing cases.

Accordingly, for the reasons set forth herein and in the PD Committee's Objection to the Debtors' motion for an eighth extension of the exclusive periods, exclusivity should be terminated.

Dated:   Wilmington, Delaware
         July 12, 2005

          Respectfully submitted,

          BILZIN SUMBERG BAENA
            PRICE & AXELROD LLP
          200 South Biscayne Boulevard
          Suite 2500
          Miami, Florida  33131-2336
          Telephone:  (305) 374-7580

          Scott L. Baena (Admitted Pro Hac Vice)
          Jay M. Sakalo (Admitted Pro Hac Vice)
          Matthew I. Kramer (Pro Hac Vice Pending)

                -and-

          FERRY, JOSEPH & PEARCE, P.A.
          824 Market Street, Suite 904
          P.O. Box 1351
          Wilmington, Delaware  19899
          Telephone:  (302) 575-1555


          By:/s/ Theodore J. Tacconelli
              Michael B. Joseph
              (Del. Bar No. 392)
              Theodore J. Tacconelli
              (Del. Bar No. 2678)


          CO-COUNSEL FOR THE OFFICIAL
          COMMITTEE OF ASBESTOS PROPERTY
          DAMAGE CLAIMANTS