# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., *et al.*, | ) | Case No. 01-1139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Hearing Date: July 19, 2005 @ 9:00 a.m.** |

## POSITION PAPER OF THE OFFICIAL COMMITTEE
## OF ASBESTOS PERSONAL INJURY CLAIMANTS
## REGARDING PI CMO AND QUESTIONNAIRE

**CAMPBELL & LEVINE, LLC**
Marla R. Eskin (No. 2989)
Mark T. Hurford (No. 3299)
800 N. King Street, Suite 300
Wilmington, DE 19801
Telephone:    (302) 426-1900
Telefax:    (302) 426-9947

- and -

**CAPLIN & DRYSDALE, CHARTERED**
Elihu Inselbuch
399 Park Avenue, 36th Floor
New York, NY 10022
Telephone:    (212) 319-7125
Telefax:    (212) 644-6755

- and -

Peter Van N. Lockwood
Nathan D. Finch
Kimberly N. Brown
One Thomas Circle, N.W., 27th Floor
Washington, D.C. 20005
Telephone:    (202) 862-5088
Telefax:    (202) 429-3301

Counsel for the Official Committee of
Asbestos Personal Injury Claimants

{D0045715:1 }DOC# 244732

## INTRODUCTION

The Official Committee of Asbestos Personal Injury Claimants ("the Committee") hereby submits this Position Paper in response to this Court's directive at the June 27, 2005, hearing, that the parties meet and confer in an attempt to agree on case management order ("CMO") for the estimation of Debtors' liability for asbestos personal injury and wrongful death claims ("PI claims"). At that hearing, the Court — quite unexpectedly — indicated that it is inclined to approve some type of claim form "to see whether or not some vital information on the personal injury side can be adduced so that everybody can make use of it for whatever your position's going to be on the estimation hearing." Tr. 6/27/05 Hr'g, 78. Accordingly, it ordered the parties to determine whether agreement can be reached on the contents of the claim form. *Id.* 80.

The Court admonished that "I don't expect to see a 20-page claim form, Mr. Bernick. That will be outrageous. It will not be necessary. But some basic information, yes." *Ibid.* It directed the parties to submit "separate versions" of a CMO and claim form, as necessary, and scheduled a hearing for July 19. *Id.* 81. Pursuant to the Court's instructions, counsel for the Committee and counsel for Debtors, along with numerous other interested parties, met and conferred on July 8, 2005.[1]

At the June 27 hearing the Court made statements from the bench that it will agree to "some form of claim form, but not a 20-page claim form" (at 85) without the benefit of the Committee's brief in opposition to the Debtors' Motion to Approve PI CMO and Questionnaire ("Opposition").[2] By prior order of the Court, that brief was due on June 30, three days after the

---

[1] The parties also discussed procedures for future settlement discussions.

[2] Cited herein as "Opp. Br." Committee Counsel at the hearing objected to the issue of a claim form being decided before its opposition papers were due.

{D0045715:1 }

hearing. In that brief, the Committee argues at great length that approval of a "discovery" form for PI claims is neither necessary for estimation purposes nor appropriate under governing bankruptcy law. The Committee strenuously urges the Court to allow the Committee to be heard on the threshold decision whether to allow Debtors to conduct some form of discovery of individual claimants, and to read and seriously consider the Committee's June 30 Opposition (attached as **Exhibit A**, without exhibits) in its entirety. Thus, the Committee renews its opposition to the entire concept of individual claimant discovery for purposes of estimation in the aggregate.

Importantly, Debtors demand such discovery *without even bothering to propose how it will be used in an estimation.* In fact, Debtors have expressly declined to propose an estimation method. *See* Debtors' Mem.[3] Tab 3, 2. Before embarking on any element of Debtors' proposal by authorizing *any* individual claimant discovery, the Court should satisfy itself that Debtors could put it to good use, so as to justify the time, expense, and burden that a claimant questionnaire necessarily entails. But Debtors make their request in a vacuum. As the Committee explains in its opposition, truncated discovery of individual claimants would not serve any useful purpose for *estimation* and could not form the lawful basis for individual claim *disallowance*, as Debtors would have it. Because it would only further delay plan confirmation at tremendous cost to the estate — as the *Babcock & Wilcox* bankruptcy plainly demonstrated — the Court should decline to approve a PI questionnaire in this case.

In the event the Court is persuaded by the numerous briefs filed on June 30 in opposition to the Debtors' proposal to use a PI claimant questionnaire, the Committee is confident that this

---

[3] Memorandum of Points and Authorities in Support of W.R. Grace & Co.'s Motion to Approve PI CMO and Questionnaire, May 10, 2005.

matter could be brought to trial on estimation in January 2006. The Committee's proposed PI CMO containing a schedule for the same is attached as **Exhibit B.**

Nonetheless mindful of the Court's statements at the June 27 2005, hearing, the Committee files herewith a proposed Personal Injury Claimant Questionnaire, attached as **Exhibit C**, for use in the alternative. That is, if the Court is determined to order a PI discovery questionnaire, the Committee submits that it should adhere to its statement at the June 27 hearing that such a form demand only "vital information" of PI claimants. To that end, the Committee contends that the only valid use that could be made of a PI questionnaire in an asbestos estimation would be to determine whether the disease mix of the pending present claimants is similar to that of the settled historical claimants. The Committee proposes a streamlined questionnaire for that limited purpose. This Court should continue to reject Debtors' monstrous "trial-by-claim-form" questionnaire as overly burdensome and unnecessary for the detailed reasons set forth in the numerous opposition papers filed in response to Debtors' motion.

**ARGUMENT**

**I.   A DISCOVERY QUESTIONNAIRE IS NOT NECESSARY IN ORDER TO CONDUCT A VALID ESTIMATE OF GRACE'S ASBESTOS LIABILITY**

At the June 27 hearing, the Court indicated that it would not consider imposition of a bar date in this case (at 90), and accordingly suggested that a PI claim form could be used only as "appropriate discovery," *id.* 80.

Debtors, however, have not proposed a discovery questionnaire, but an onerous proof-of-claim ("POC") form designed to cheaply get rid of claims that are perfectly valid under substantive state tort law. The form is so extensive and burdensome — with instructions and medical definitions manufactured out of thin air for the sole purpose of maximizing the number of disallowed claims — that it virtually guarantees that claimants will not be able to comply.

The penalty for filing "incomplete" forms would be the gravest imaginable: total expungement of the claim. *See, e.g.,* Debtors' Proposed PI CMO 3 (stating that any claimant "who fails to complete * * * the Questionnaire * * * will be forever barred, estopped, and enjoined from asserting any such Claims"); Opp. Br. 9-11 (discussing same). For the reasons set forth in the Committee's Opposition, under no circumstances could the Court approve a "claim form" beyond Official Form 10 and permanently disallow claims for failure to include particular information.[4] Claim forms are meant to serve as notice of a claim; a claimant need not present the full evidence he might adduce if the claim were challenged. Under prevailing law, therefore, claimants cannot be punished for omissions on the most basic POC authorized under bankruptcy law, but rather are given the opportunity to amend the form to correct flaws or omissions. Opp. Br. 12-13.[5]

That said, the Committee respectfully submits that even an individual claim form that would operate strictly as a discovery device is not necessary or appropriate for purposes of estimation of Debtors' liability in the aggregate. As described in detail in the Committee's Opposition, Debtors' justification for needing a claim form — and discarding the well-

---

[4] Any imposition of a claim form must comply with governing bankruptcy law, which mandates an elaborate procedure for disputing individual claims. A bare-bones POC is prima facie valid unless the *debtor* brings forth sufficient evidence placing the validity in question. If the debtor does so, a contested matter under Bankruptcy Rule 9014 begins. In such matters the parties are afforded full *reciprocal* discovery and procedural rights, including the right of personal injury and wrongful death claimants to jury trials in district court. Opp. Br. 14-16. It defies reason to afford claimants these procedural rights in the context of filing a proof of claim, but to allow claims to be summarily invalidated because claimants' responses to a discovery request do not meet the exacting formal and substantive standards self-servingly devised by Debtors.

[5] The Committee also objects in toto to Debtors' proposal that the Committee serve as so-called "Liaison Counsel" (whatever that means) for PI claimants. The Committee cannot be ordered to represent tens of thousands of individual claimants — who are entitled to their own lawyers — in connection with individual discovery disputes.

established *Eagle-Picher/Owens Corning* estimation method in the first place — is pure histrionics:

- Debtors point to no evidence to support their suggestion that Grace paid claims for which it thought it had no potential liability. In fact, the evidence shows that Grace pursued a strategy of settling only those claims that were extremely likely to survive a motion to dismiss; it defended and took to trial the rest. Opp. Br. 45-49.

- Grace regularly settled claims based on far less information than it would demand of similar claimants in bankruptcy. Grace's gargantuan asbestos liability was not a product of "lax" evidentiary standards in state court or alleged abuses by trial lawyers; it resulted from the widespread use of asbestos by manufacturers such as Grace, which poisoned countless Americans, and the fact that asbestos poses a risk at any level of exposure. *Id.* 46-49.

- Spikes in the numbers of claims filed are easily explained by the long latency period for asbestos-related disease, the increased public awareness of asbestos litigation, and moratoria on claim filings that Grace negotiated in its 1997 and 1998 settlement agreements; when the moratoria expired in early 2000, a "spike" in claims naturally resulted. *Id.* 49-53.

- The studies Grace cites merely show that B-readers and other doctors may disagree as to proper readings of x-rays and diagnoses. They do not demonstrate or purport to demonstrate widespread fraud among B-readers; if such fraud existed, Grace would certainly have addressed it in its years of litigation prior to bankruptcy. *Id.* 54-63.

Grace's rhetoric and hyperbole does nothing to besmirch the well-tested method of valuing claims by reference to their *actual* value in the absence of bankruptcy. Although Debtors have not proposed an estimation method, one thing is clear: Grace hopes to use bankruptcy as a means of completely escaping asbestos personal injury debt that it would certainly bear outside of bankruptcy. This is improper, and should not be tolerated. *See id.* 28-29.

As a consequence, the procedure followed by every court to have addressed asbestos estimation in the aggregate thus far should be the *starting point* for determining an estimation method in this case — not Debtors' unprecedented disallowance-by-POC scheme. *See* Opp. Br. 29-39. The *Eagle-Picher/Owens Corning* approach, using the defendant's past settlement

{D0045715;1} - 5 -

history as the basis for the estimation, and without requiring any sort of claim-by-claim discovery, has been used to estimate a company's aggregate asbestos liability in the following cases:[6]

- *   Federal Mogul (bankruptcy estimation) (sub judice, hearing held June 2005)
- *   Owens Corning (bankruptcy estimation) (decided in 2005)
- *   Babcock & Wilcox (confirmation hearing) (2003)
- *   Armstrong (confirmation hearing) (2003)[7]
- *   Fuller Austin (insurance coverage dispute) (2003)
- *   Babcock & Wilcox (fraudulent transfer case) (2002)
- *   National Gypsum (bankruptcy cases) (2000, 1993)
- *   Celotex (1996)
- *   Eagle-Picher (bankruptcy estimation) (1995)
- *   Fibreboard (class action fairness hearings) (1995)

Under the *Eagle-Picher/Owens Corning* method, as is required under bankruptcy law, the "validity and value" of claims under state law at or near the petition date drives the estimation. Owens Corning v. Credit Suisse First Boston, 322 B.R. 719, 721 (D. Del. 2005) (citing Raleigh v. Illinois Dep't of Revenue, 530 U.S. 15, 20 (2000)). The history of Debtors' resolution of asbestos claims within the tort system provides the most relevant evidence of the "validity and value" of claims, given their incentive to minimize the cost of their asbestos liability. *See* Opp. Br. 39. In fact, prior to bankruptcy, Grace regularly used its settlement and litigation history to estimate the extent of its asbestos liability. *Id.* 43-45. The parties' experts can and will disagree about the meaning of this history, and about the effects of changes in state tort law on the valuation of claims. Such agreement is properly addressed in estimation. But no party may

---

[6]   This list is based on those cases known to, and recalled by, Committee counsel. There are undoubtedly others.

[7]   The bankruptcy court's order recommending plan confirmation in *Armstrong* was reversed on grounds unrelated to asbestos estimation. *See* In re Armstrong World Indus., Inc., Case No. 00-04471, slip op. 43-44, Docket No. 6255 (Bankr. D. Del. Dec. 19, 2003), *rev'd on other grounds*, No. 00-4471, 2005 U.S. Dist. LEXIS 2810, at *1 (D. Del. Feb. 23, 2005).

legitimately contend that state tort law does not apply and force upon claimants purely fictitious substantive liability standards and values.

Information about individual claims, moreover, is not useful in an estimation in the aggregate. Opp. Br. 15-16, 23-29. The Committee's Opposition sets forth numerous reasons for this, which the Court should consider in crafting a discovery order in this case:

- The pervasive factual disputes underlying asbestos claims are too individualized to be resolved in the aggregate. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-25 (1997). Causation and injury "must be determined as to individuals, not groups." Cimino v. Raymark Indus., Inc., 151 F.3d 297, 313 (5th Cir. 1998). Opp. Br. 5, 25-26.

- Under 11 U.S.C. § 502 and Supreme Court precedent, the validity of claims in bankruptcy is tested by state law. Raleigh, 530 U.S. at 20. The majority of claims that would be disallowed under Debtors' POC/questionnaire (e.g., for failure to demonstrate a certain PFT score or a replicated B-reading) would survive summary judgment under state law. Opp. Br. 27-28.

- The purpose of estimation is to establish in the aggregate the scope of Debtors' present and future asbestos liability; it is not to decide the merits of individual claims. To do the latter in a manner that respects claimants' rights to due process would inevitably involve the adjudication of individual claims and thus defeat the very purpose of estimation. *Id.* 1-2, 4-5.

Accordingly, a similar exercise conducted in the *Babcock & Wilcox* bankruptcy at Mr. Bernick's urging proved wasteful in the extreme. There, after allowing the use of a far simpler, 4-page discovery form, the court realized that the debtors' individualized claims adjudication scenario was unworkable and ordered the parties to submit briefs on claims estimation. The valuation of the debtors' asbestos liability at the confirmation hearing was based entirely on expert estimation of that liability using the same general approach the Committee proposes here. *See* Opp. Br. 68-72.

Even if some form of discovery questionnaire were approved, Debtors' proposed form must be rejected as nothing short of "outrageous." Tr. 80. Much of the information it demands has no grounding in state tort law. Opp. Br. 17. For example:

- State law requires only that Debtors' asbestos be a substantial contributing factor in causing disease, so the extensive information they would demand about exposure to asbestos products of other manufacturers is irrelevant. Opp. Br. 19-20.

- Much of the required medical information is either cumulative, e.g., information about "each doctor * * * that has treated your condition," or irrelevant, e.g., detailed information about every prescription drug the claimant has ever taken. *Id*. 23-24.

- Other medical information Debtors would demand does not relate to any standards under state tort law, but rather to Debtors' self-interested and wishful thinking about what they would like those standards to be. *Id.* 21-23.

- Information, e.g., as to *all* of a claimant's past residences, any asbestos products installed at those residences, and the claimant's history of alcohol use has no bearing on Grace's liability and is included in an apparent attempt to frustrate or scare away people. *Id.* 9, 24.

Debtors' POC/questionnaire is extraordinarily burdensome and complex, requiring an avalanche of information that has no conceivable bearing on the viability of the individual claim, let alone estimation in the aggregate. Opp. Br. 18-20, 21-23, 64-68. Discovery of such extensive evidence would not be permitted in any tort proceeding, since discovery must be limited to matters relevant to the claims or defenses at issue. Most of Debtors' proposed discovery would only be relevant if they could unilaterally define the predicates of and defenses to asbestos personal injury claims to suit their interests.

This Court also made clear at the June 27 hearing that, whatever discovery is conducted prior to the estimation hearing, it "can be done in a much more rapid fashion than requiring a trial in December of next year." Tr. 78. Counsel for the Committee thus proposes a virtually identical CMO to that which Judge Fullam approved in the *Owens-Corning* case. *See* **Exh. B.** Fact witnesses would be identified by August 31, 2005; depositions of fact witnesses and the exchange of expert witness reports would be completed by November 1, 2005; and rebuttal expert witness reports would be due December 1, 2005, with depositions completed by January 13, 2006. Pretrial motions and designations of expert deposition testimony would be due

January 16, with counter-designations and objections, trial witness lists, lists of trial exhibits and pre-hearing memoranda filed by January 23. The hearing would commence January 31, 2006.

It is therefore indisputable that the estimation method and CMO proposed by the Committee would more efficient and more cost-effective then anything that Debtors' scheme could produce. Considering that Debtors have yet to actually propose an estimation method, it is difficult — if not impossible — for the Court to have any assurance that the outcome of claimant discovery would not lead to more infighting over what procedures would follow, more undue expense to the estate in connection with litigating those issues and implementing the outcomes, and more interminable delay, which this Court has made clear it will not sustain much longer.

This Court has simultaneously requested supplemental briefing on the consequences of terminating exclusivity. In its papers, the Committee urges the Court to deny Debtors' eighth exclusivity motion in order to open up the possibility of meaningful settlement negotiations for a consensual resolution of these cases. The way to move this case toward a plan of confirmation is not to entertain Debtors' frolic and detour into individual claims data that — at least at this juncture — has not been shown by Debtors to be usable in *any* estimation method, let alone a valid one. The Committee shares this Court's desire to end the fruitless sidebar disputes that have dragged these proceedings on for four years, to no measurable avail. To think that anything will be left for equity after the various creditors, the State of New Jersey, and the federal government's criminal enforcement sanctions are taken into consideration is folly. Accordingly, the way to stop the logjam is to create incentives for the unsecured creditor constituencies to negotiate a consensual plan with the PI Committee and the other asbestos creditors. While estimation proceeds promptly and efficiently, exclusivity should be terminated.

II. **IN THE EVENT THIS COURT APPROVES A DISCOVERY QUESTIONNAIRE, IT SHOULD APPROVE EXHIBIT C TO THIS BRIEF, AS IT ONLY SEEKS INFORMATION THAT WOULD BE OF JUSTIFIABLE USE IN ESTIMATION**

Although the Committee objects to the use of a PI discovery questionnaire as unnecessary, it has carefully considered the Court's June 27th statements to determine whether a questionnaire seeking "some basic information" could be of use in an *Eagle-Picher/Owens Corning* estimation. Tr. 80. Accordingly, the Committee proposes the attached questionnaire which seeks the following: (1) identifying information; (2) basic medical information, including the diagnosis and year of diagnosis; and (3) basic exposure history, including the first and last years of exposure and the occupations at the time of exposure. *See* **Exh. C.**

Unlike with Debtors' proposed form, this information can be directly linked with a particular estimation method, so its utility is fully justified now. As described in the Committee's Opposition, the *Eagle-Picher/Owens Corning* estimation method takes the total number of pending claims for each disease type, discounts those totals by the rate at which Grace was able to historically resolve their claims for zero dollars, computes the average compensation paid per claim over a certain period for each disease type, and multiplies the claims likely to be settled in each category by the corresponding average settlement value. Values are derived from the average claim-resolution costs as they existed before bankruptcy, but at a time reasonably close to the petition date, adjusted to reflect reasonably foreseeable factors, if any, that would affect future values. Opp. Br. 33-34. Because this process utilizes historical resolution data as well as pending claim data, a brief questionnaire along the lines described above would enable the estimating expert to ascertain whether the mix of diseases and basic exposure history is consistent as between the historical settlement data and the present claimants with pending claims, or whether adjustments need to be taken into account.

Unlike Debtors' form, moreover, the Committee's proposed form could be completed in a relatively short period of time because it would seek only information that is already contained in a claimant file. If the Court requires claimants to fill out and return the Committee's proposed questionnaire, the form could be completed and returned within 60 days of issuance and the information entered into a database within another month or two. Debtors' proposal, by contrast, would demand that claimants and their lawyers hunt down details so excessive that they could eclipse what is required as a basis for top secret security clearances by the federal government — and for no identifiable reason. Were the Court to expand the Committee's form to approach the "life history questionnaire" Debtors would impose, the January 2006 trial date for estimation would be pushed back by at least six to eight months, if not longer, depending on how Debtors later propose to use the information in connection with whatever (currently undisclosed) estimation method they have in mind.

(Remainder of Page Intentionally Left Blank)

**CONCLUSION**

Accordingly, for the foregoing reasons, Debtors' Motion to Approve PI CMO and Questionnaire should be denied in its entirety. This Court should terminate exclusivity and either proceed forthwith with estimation in the aggregate based on Debtors' history of resolving claims in the tort system or, in the alternative, approve the Committee's proposed Questionnaire for the limited purpose described herein.

Date: July 13, 2005

**CAMPBELL & LEVINE, LLC**

 /s/ Mark T. Hurford
Marla R. Eskin (No. 2989)
Mark T. Hurford (No. 3299)
800 N. King Street, Suite 300
Wilmington, DE 19801
Telephone:    (302) 426-1900
Telefax:        (302) 426-9947

- and -

**CAPLIN & DRYSDALE, CHARTERED**
Elihu Inselbuch
399 Park Avenue, 36th Floor
New York, NY 10022
Telephone:    (212) 319-7125
Telefax:        (212) 644-6755

- and -

Peter Van N. Lockwood
Nathan D. Finch
Kimberly N. Brown
One Thomas Circle, N.W., 27th Floor
Washington, D.C. 20005
Telephone:    (202) 862-5088
Telefax:        (202) 429-3301

Counsel for the Official Committee of
Asbestos Personal Injury Claimants