# EXHIBIT A

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 01-1139 (JKF) |
| W.R. GRACE & CO., *et al.*, | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | **Objection Date: June 30, 2005** |
| | ) | **Hearing Date: August 17, 2005 @ 9:00 a.m.** |
| | ) | **Related Docket Nos.: 8394, 8395, 8424** |

## OPPOSITION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS TO DEBTORS' MOTION TO APPROVE PI CMO AND QUESTIONNAIRE

Date: June 30, 2005

**CAMPBELL & LEVINE, LLC**
Marla R. Eskin (No. 2989)
Mark T. Hurford (No. 3299)
800 N. King Street, Suite 300
Wilmington, DE 19801
Telephone:    (302) 426-1900
Telefax:        (302) 426-9947

- and -

**CAPLIN & DRYSDALE, CHARTERED**
Elihu Inselbuch
399 Park Avenue, 36th Floor
New York, NY 10022
Telephone:    (212) 319-7125
Telefax:        (212) 644-6755

- and –

Peter Van N. Lockwood
Nathan D. Finch
Walter B. Slocombe
Kimberly N. Brown
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone:    (202) 862-5088
Telefax:        (202) 429-3301

Counsel for the Official Committee of
Asbestos Personal Injury Claimants

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ...........................................................................................................7

I.      DEBTORS' PROPOSAL TO DISALLOW CLAIMS VIA A
        PROOF-OF-CLAIM FORM MASQUERADING AS A DISCOVERY
        QUESTIONNAIRE IS LEGALLY UNSUSTAINABLE AND AN
        ABUSE OF THE BANKRUPTCY PROCESS ...................................................7

        A.      Debtors Propose an Onerous Proof-of-Claim Form Designed to
                Strip Themselves of Personal Injury Liability by Sheer Process
                of Elimination ....................................................................................7

        B.      This Court Cannot Approve Debtors' Truncated Disallowance Scheme
                Because Individual Personal Injury Claimants Are Entitled to the Full
                Measure of Due Process under the Code before Their Claims Can Be
                Expunged .........................................................................................11

        C.      This Court Cannot Disallow Claims That Are Compensable Under
                State Law Based on Fictitious Medical and Exposure Criteria
                Embedded in Debtors' Proof-of-Claim Form ........................................17

        D.      There Is No Process for Collective Disallowance of Individual
                Personal Injury Cases That Comports With Constitutional and
                Statutory Standards of Due Process......................................................23

II.     THE INFORMATION SOUGHT BY THE QUESTIONNAIRE IS NOT
        NECESSARY OR APPROPRIATE FOR ESTIMATION OF DEBTORS'
        AGGREGATE LIABILITY ..........................................................................29

        A.      The Eagle-Picher/Owens Corning Method of Estimating Asbestos
                Personal Injury Tort and Wrongful Death Claims in the Aggregate Is
                Well-Tested, Workable and Fair...........................................................30

                1.      General Estimation Principles and the Eagle-Picher Case ..............31

                2.      The Owens Corning Case ......................................................35

        B.      Debtors' Claims History Constitutes the Essential Data for Estimation
                Because Grace Has Always Had Every Incentive to Minimize Its Liability
                in Resolving Claims...........................................................................39

1.      Debtors' Suggestion That <u>Daubert</u> Precludes Use of the
        <u>Eagle-Picher/Owens Corning</u> Estimation Methodology in This Case Is
        Frivolous ...............................................................................................40

2.      Grace Has Repeatedly Estimated the Extent of Its Asbestos
        Liabilities Using the Very Claims History It Now Asks This
        Court to Ignore .......................................................................................43

3.      Debtors' Assertion That Grace Was Forced to Pay Meritless
        Claims in the Tort System Is Controverted by Its Own Documented
        Claims Settlement Policy .........................................................................45

4.      Asbestos Disease Incidence and Historical "Spikes" Are Readily
        Explained, and Do Not Justify Debtors' Burdensome Questionnaire .......49

5.      The Studies Grace Cites Have No Bearing on the Compensability of
        Claims Under State Tort Law, and Merely Show That Doctors Can
        Disagree on Medical Diagnoses.................................................................54

        a.      Manville "Penn State" Audit .........................................................55

        b.      Johns Hopkins/Gitlin and Owens Corning Studies........................58

        c.      The Friedman Report ....................................................................62

III.    IT WOULD TAKE YEARS TO GATHER AND "PROCESS" THE IRRELEVANT
        INFORMATION SOUGHT BY GRACE'S PROOF OF CLAIM FORM, AT
        INORDINATE COST TO THE ESTATE.........................................................64

        A.      The Production of Information Debtors Would Demand of Individual
                Claimants Is More Extensive and Intrusive Than Full Discovery in
                a Lawsuit.................................................................................................64

        B.      Counsel's Failed Efforts in the <u>Babcock & Wilcox</u> Case Are
                Instructive ..............................................................................................68

CONCLUSION..............................................................................................................72

# TABLE OF AUTHORITIES

## CASES

**Page**

A.H. Robins Co. v. Piccinin, 788 F.2d 994 (4th Cir. 1986) ...............................16

In re Allegheny International, Inc., 954 F.2d 167 (3d Cir. 1992) ......................14

Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997) .............................5, 26

In re Armstrong, 28 B.R. 864 (Bankr. D. Del. 2002) ........................................40

In re Babcock & Wilcox Co., 274 B.R. 230 (Bankr. E.D. La. 2002) ................31

Bittner v. Borne Chemical Co., Inc., 691 F.2d 134 (3d Cir. 1982)......................17, 31, 36

Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076 (5th Cir. 1973).................19, 48

Bottomly v. Leucadia National, 163 F.R.D. 617 .................................................65

Bridges v. Eastman Kodak Co., 850 F. Supp. 216 (S.D.N.Y. 1994) ................65

In re Brints Cotton Marketing, Inc., 737 F.2d 1338 (5th Cir. 1984)............................33, 36

Broadcort Capital Corp. v. Summa Medical Corp., 972 F.2d 1183
    (10th Cir. 1992)........................................................................................31

Celotex Corp. v.Tate, 797 S.W.2d 197 (Tex. Ct. App. 1990) ...........................20

Cimino v. Raymark Industries, Inc., 151 F.3d 297 (5th Cir. 1998)...............................5, 9,
                                                                                                                    10, 26

Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).........................40, 42

In re Eagle-Picher Industrial, Inc., 189 B.R. 681
    (Bankr. S.D. Ohio 1995).......................................................................32, 33, 50

In re Federal Press, 116 B.R. 650 (Bankr. N.D. Ill. 1989).................................32

In re Fibreboard Corp., 893 F.2d 706 (5th Cir. 1990) ......................................26

Fitzgerald v. Cassil, 216 F.R.D. 632 (N.D. Cal. 2003).......................................65

In re G-1 Holdings, Inc., 323 B.R. 583 (Bankr. D.N.J. 2005)......................62, 63

Georgine v. Amchem Products, Inc., 83 F.3d 610 (3d Cir. 1996), *aff'd sub nom*,
    Amchem Prods., Inc. v. Windsor 521 U.S. 591 (1997) ..............................................26

In re Hooker Investments, Inc., 937 F.2d 833 (2d Cir. 1991) ...........................................13

JB ex rel Palmer v. Asarco, Inc., 225 F.R.D. 258 (N.D. Okla. 2004) ...............................65

In re Joint E. and S. District Asbestos Litigation, 129 B.R. 710
    (E. & S.D.N.Y. 1991), *vacated*, 982 F.2d 721 (2d Cir. 1993) ......................................3

In re Joint E. & S. Districts Asbestos Litigation, 237 F. Supp. 2d 297
    (E. & S.D.N.Y. 2002) ....................................................................................54, 56, 57

Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988) ...........................................16

Kannankeril v. Terminix International, Inc., 128 F.3d 802 (3d Cir. 1997) ......................19

In re Kolstad, 928 F.2d 171 (5th Cir. 1991) .....................................................................13

Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999) .............................................42

Lineaweaver v. Plant Insulation Co., 37 Cal. Rptr. 2d 902
    (Cal. Ct. App. 1995) ....................................................................................................18

Louderback v. Orkin Exterminating Co., Inc., 26 F. Supp. 2d 1298
    (D. Kan. 1998) ............................................................................................................19

In re Lundell, 223 F.3d 1035 (9th Cir. 2000) ...................................................................14

Malcolm v. National Gypsum Co., 995 F.2d 346 (2d Cir. 1993) ....................................26

In re Myrland, 209 B.R. 524 (Bankr. W.D. Wash. 1997) ................................................14

Orleans Parish Sch. Board v. Asbestos Corp. Ltd., 114 F.3d 66
    (5th Cir. 1997) ........................................................................................................19, 48

Owens Corning v. Credit Suisse First Boston, 322 B.R. 719 (D. Del. 2005),
    *appeal docketed*, No. 05-2578 (3d Cir. May 20, 2005)                     1, 17, 21, 28,
                                                                              30, 31, 33, 36,
                                                                              37, 38, 39, 60, 62

In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717 (3d Cir. 1994) ..................................42

Paoli R.R. Yard PCB Litigation v. Monsanto Co., 916 F.2d 829 (3d Cir. 1990) ..............40

Raleigh v. Illinois Department of Revenue, 530 U.S. 15 (2000).......................................17

Raymark Ind., Inc. v. Stemple, No. 88- 1014-K, 1990 WL. 72588
    (D. Kan. May 30, 1990)....................................................................................................54

In re SGL Carbon Corp., 200 F.3d 154 (3d Cir. 1999).....................................................29

Sholits v. American Cyanamid Co., 568 A.2d 1196
    (N.J. Super. App. Div. 1989) .................................................................................21

Sullivan v. Combustion Eng., 590 A.2d 681
    (N.J. Super. Ct. App. Div. 1991) ...........................................................................18

In re Stoecker, 143 B.R. 879, 143 B.R. 879 (Bankr. N.D. Ill. 1992),
    aff'd in part, vacated in part on other grounds, 5 F.3d 1022
    (7th Cir. 1993)....................................................................................................13, 14

Thacker v. UNR Industrial, Inc., 603 N.E.2d 449 (Ill. 1992) ..........................................21

Tragarz v. Keene Corp., 980 F.2d 411 (7th Cir. 1992).........................................17, 18, 20

In re TransAmerican Natural Gas Corp., 978 F.2d 1409 (5th Cir. 1992).........................14

In re UNR Industrial, Inc., 45 B.R. 322 (N.D. Ill. 1984)............................................15, 16

In re USG Corp., 290 B.R. 223 (Bankr. D. Del. 2003)................................................17, 25

In re Unisys Savings Plan Litigation, 173 F.3d 145 (3d Cir. 1999) ................................42

United States v. Llera Plaza, 188 F. Supp. 2d 549 (E.D. Pa. 2002)...........................42, 43

Verbyke v. Owens-Corning Fiberglas Corp., 616 N.E.2d 1162
    (Ohio Ct. App. 1992) .................................................................................................20

Wehmeier v. UNR Industrial, Inc., 572 N.E.2d 320 (Ill. App. Ct. 1992).........................20

Whitney v. Dresser, 200 U.S. 532 (1906)........................................................................14

## FEDERAL STATUTES

11 U.S.C. § 101(5) .............................................................................................................27

11 U.S.C. § 502.................................................................................................12, 26, 27,
                                                                                                                                    33, 40

11 U.S.C. § 524(g) ......................................................................................1, 29

28 U.S.C. § 1411 ............................................................................................40

28 U.S.C. § 157(b)(5) .....................................................................................15

Fed. R. Bankr. P. 3001(a) ..............................................................................12

Fed. R. Civ. P. 26 .....................................................................................15, 65

Fed. R. Civ. P. 28-37......................................................................................15

Fed. R. Civ. P. 42 .....................................................................................70, 71

Fed. R. Evid. 408 ...........................................................................................31

## MISCELLANEOUS

Am. L. Prod. Liab. 3d § 122:9 .......................................................................17

The Use of Court Experts in Asbestos Litigation, 137 F.R.D. 35 (1991)........................63

The Official Committee of Asbestos Personal Injury Claimants ("the Committee") hereby opposes Debtors' Motion to Approve PI CMO and Questionnaire.[1]

## PRELIMINARY STATEMENT

In November of last year, Debtors filed their proposed Plan of Reorganization, which would provide for the creation of a post-confirmation 11 U.S.C. § 524(g) Trust to which all asbestos personal injury ("PI") claims would be channeled for recovery. As all parties now agree, as a prerequisite to the establishment of a § 524(g) Trust, this Court must estimate the value of pending and future asbestos personal injury claims against Debtors. *See* Debtors' Disclosure Statement § 2.4.1. Rather than have the Court proceed promptly to estimate their liability in the way that courts have made estimates in every major asbestos bankruptcy to date, i.e., by taking as the base the debtor's claims resolution history, Debtors would require the 118,000-odd present individual claimants to complete and return a massive and invasive proof-of-claim form/questionnaire or risk disallowance of their claims altogether.

The proper purpose of estimating tort liabilities in the aggregate is to foster plan confirmation by gauging "the total amount which the claimants, as a group, could legitimately have claimed as compensation, as of the petition date." Owens Corning v. Credit Suisse First Boston, 322 B.R. 719, 722 (D. Del. 2005) (Fullam, J.), *appeal docketed*, No. 05-2578 (3d Cir. May 20, 2005) (cited hereafter as "Owens Corning, 322 B.R. at __"). Grace's most recent submission has nothing to do with estimating its asbestos tort liabilities in any legitimate sense. Although Grace has adjusted its rhetoric, its goal remains what it has been since, expressly eschewing estimation, it filed its first claims liquidation proposal in 2001: It has no interest in

---

[1]    Citations to the memorandum in support of Debtors' motion will be to tab and page numbers, that is, "Tab x, x."

valuing the claims for what they were worth in the actual tort system at the petition date, but wants instead to use the bankruptcy process as a way to change the substantive legal rules and procedures by which the merits of asbestos claims are determined, and thereby to defeat and depreciate the claims.

If held to its tort liabilities as valued by the tort system, Grace is insolvent. Hence, the Debtors' agenda from the first day of this bankruptcy has been to *escape* from the tort system as administered by the courts and to *change* the rules under which its tort liabilities are established and valued. Their hidden purpose is to use their proof of claim/questionnaire to fend off asbestos claims and plan confirmation for as long as possible while lobbyists press Congress to federalize and "reform" asbestos tort laws. That failing, Debtors' hope is to impose in their bankruptcy case liability criteria and procedures that would not apply in nonbankruptcy courts — Grace's own private version of tort "reform."

In an effort to prejudice the Court towards its radical reform agenda, Grace devotes the majority of its brief to so-called "Relevant Factual History" — a remarkable collection of incorrect factual assertions, half-truths, citations to articles by its favorite "experts" and other defendants' briefs, and misleading characterizations of asbestos litigation. Incredibly, a company that has been criminally indicted by the United States government and sued by the State of New Jersey for poisoning entire communities with its asbestos operations nonetheless blames the asbestos victims, the court system, and its own litigation strategies for the financial problems caused by the tens of thousands of claims that it paid each year before it resorted to bankruptcy protection.

From the early 1900s to the mid-1970s, Grace and other asbestos defendants knowingly sold asbestos-containing products without adequate warning, exposing tens of millions of

Americans to asbestos fibers which Grace knew could injure and even kill them.  *See* BARRY I.

CASTLEMAN, ASBESTOS: MEDICAL AND LEGAL ASPECTS 498-502 (2d ed. 1986).  As a result, a

steadily increasing number of the persons exposed to the asbestos in Grace's products began to

get sick and die from asbestos related diseases such as mesothelioma, lung cancer and asbestosis.

Due to the long latency periods (up to a full lifetime) between exposure and manifestation of

asbestos-related diseases, the full impact of asbestos exposures caused by Grace's operations in

the 1950s, 60s and 70s did not manifest in detectable ways until decades later.  The injuries and

deaths caused by its products will go on being discovered for many years to come.

By the early 1990's, plaintiffs had achieved a pattern of success on asbestos tort

litigation, such that "most workers exposed to asbestos recover substantial sums through

settlement or jury awards."  In re Joint E. and S. Dist. Asbestos Litig., 129 B.R. 710, 749 (E. &

S.D.N.Y. 1991), *vacated*, 982 F.2d 721 (2d Cir. 1993).  Over the decades, from the 1970s until it

filed for bankruptcy protection, Grace and its lawyers devised litigation strategies and

evidentiary requirements for paying claims which in all instances were designed to — and did —

minimize its liability costs.  Consistent with elementary tort defense tactics, the basic strategy

was to try to settle any case where the plaintiff had sufficient evidence under prevailing law to

survive summary judgment.  For decades, Grace and other defendants took advantage of the

delays in the court system caused by tens of thousands of claims pending at any one time, and

the plaintiffs' consequent inability to obtain a trial date, to settle cases at prices far lower than

plaintiffs could achieve if they were guaranteed a speedy trial in every case.

Now, after it has sought bankruptcy protection from continuing to have to handle the

claims filed against it in the tort system, Grace blames the asbestos victims and the courts for the

financial toll of paying the claims brought by tens of thousands of sick and dying asbestos victims.

Not only does Grace attack the suffering claimants, their lawyers and this country's non-bankruptcy courts as promoting "rampant problems and abuses [in] asbestos litigation" (Tab 2, 1), but it next assails this Court's bankruptcy predecessors, arguing that the same "broken system" (Tab 2, 9) has infected "previous asbestos bankruptcy estimates" conducted by other federal courts sitting in bankruptcy (Tab 3, 1). From these unsupported factual premises, Debtors invite this Court to take "the opportunity" to change the existing system of laws, and thus propose their "solution" to the problem they have manufactured: "to determine, in connection with estimating Grace's current liability, the magnitude of invalid claims *that ultimately may be disallowed*." *Ibid.* (emphasis added). In reality, what Grace seeks to achieve is a repudiation of the tort system in favor of an unprecedented system of its own imagining.

To that end, Grace does not propose a "questionnaire" as a vehicle for discovery related to estimation, but a *proof-of-claim* form (POC) that, contrary to governing bankruptcy law, would operate to disqualify large numbers and categories of claims from being estimated at all so that Debtors will not have to provide for them in an eventual plan of reorganization. The detail demanded is so staggering — with directives to photocopy its 24 pages as to every single medical test or assessment, every residence, every jobsite, and every conceivable exposure to any asbestos-containing product by every possible manufacturer — and the instructions and definitions are so confusing, that Debtors' proof-of-claim form virtually guarantees that no one, much less 118,000 persons and their few hundred lawyers (whose help will necessarily be required), could reasonably complete it in the 90 days allotted, if ever. The penalty for a misstep in completing this coercive "POC" instrument would be total expungement of claims that are

perfectly valid under state tort law.  POC/Questionnaire.  This flagrant violation of the statutory

and constitutional rights of individual claimants would occur without so much as joining the

affected claimants as parties, and without affording them any of the protections they would enjoy

if Debtors were to attempt to disallow their claims using the existing provisions of the

Bankruptcy Code.

Even if construed solely as a discovery aid without preclusive effect, imposing a lesser

version of Grace's POC/questionnaire would add nothing of relevance to the information already

available for estimation through the database pertaining to the hundreds of thousands of claims

resolved by Grace before bankruptcy.  Grace could not lawfully use data from the

POC/questionnaire as a springboard for mass disallowances, as it intends.  The pervasive factual

disputes underlying asbestos claims are too individualized to be litigated in classes.  *See*

Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 624-25 (1997); Cimino v. Raymark Industries,

Inc., 151 F.3d 297, 311-21 (5th Cir. 1998).  In the tort system — which estimation must attempt

to replicate — asbestos claims are rarely amenable to summary judgment.  If it were possible

under the law to dispense with large numbers of asbestos claims by consolidated summary

judgment motions or any other similar process, the Court may rest assured that the resourceful,

well-funded and aggressive community of asbestos defendants would have found and employed

it in the tort system long before now and reported the results to this Court in their motion papers.

But due process, the fact-intensive nature of asbestos claims, the rules of civil procedure, the

Bankruptcy Code, and fundamental fairness to claimants prevent any court from giving short

shrift to their claims in the manner these Debtors propose.  Debtors are asking the Court to put its

trust in a mirage that can never lead to a confirmable plan of reorganization.  *See* Cimino, 151

F.3d 297 (rejecting trial plan that resolved asbestos claims through the trial of issues in representative cases).

Given its fundamental flaws, Debtors' suggested protocol does not warrant serious consideration, and the Court should speedily reject it. After lavishing time and resources on their prior radical and unlawful claims liquidation schemes, Debtors have no just call on the Court's indulgence in order to experiment for years more with their equally radical and unlawful claims disallowance program, which, like their myriad former claims liquidation proposals,[2] is not aimed at using estimation for the statutorily intended purpose of valuing the liabilities for what they would be worth outside of bankruptcy, but instead at *de*-valuing those liabilities and

---

[2]      Rejecting the very concept of estimation, Debtors proposed their first "litigation protocol" in June 2001, which involved a similar — though less onerous — discovery questionnaire/proof-of-claim form. Under that scheme, Debtors would seek to disallow "incomplete" claims, but the merits would be litigated. An appointed "Personal Injury Litigation Committee" would represent claimants in "omnibus" summary judgment hearings on various fact-intensive issues, limited discovery, and Rule 42 "common issue bench trial[s]." Debtors' Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Proof of Claim Forms and Approval of Notice Program (Docket #586) 2, 9-10. *See also* W.R. Grace's Supplemental Brief Regarding Procedures for the Litigation of the Common Personal Injury Liability Issues (Docket # 2275) 39-40 (proposing that the litigation "protocol" instead be implemented twice). In an "Omnibus Reply" to objections to that Motion, Debtors completely changed course, proposing instead: "exemplar objections" and summary judgment motions to categories of disputed claims; individual claimants responses (without reciprocal discovery); "Rule 706 expert work," including <u>Daubert</u> proceedings; exemplar rulings; omnibus objections and summary judgment motions for "similarly situated claims"; and, finally, "show[] cause" responses by individual claimants. Debtors' Consolidated Reply in Support of Their Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Claim Forms and Approval of the Notice Program (Docket # 1666) 41-42. As with Debtors' instant papers, the Committee strenuously opposed each of these proposals as *per se* unlawful, in that they would extinguish thousands of personal injury claims that are valid under applicable state law based on Debtors' manufactured standards of liability. *See* Committee's Opposition to Debtors' Motion for Entry of Case Management Order (Docket # 902); Committee's Opposition to Debtors' Motion for Leave to File Omnibus Reply (Docket # 1388); Committee's Case Management Proposal (Docket # 2421).

salvaging undue equity for Grace's shareholders.  Indeed, Debtors' copious papers *still* contain no hint of how they propose to conduct the actual estimation, or how they would value any surviving claims.

Rather than postponing the estimation hearing while Debtors pursue their latest diversion, the Court should do as other bankruptcy courts have done, most recently in the <u>Owens Corning</u> and <u>Federal Mogul</u> estimation proceedings:  It should refuse to authorize any version of a discovery questionnaire directed to 118,000 claimants or to countenance its inherent delays and costs, and should instead go forward to a hearing on aggregate estimation based on historical data and competent expert testimony.[3]  This course would involve only a six-month period fact and expert discovery tailored closely to the limited issues relevant to aggregate estimation.

## ARGUMENT

**I.      DEBTORS' PROPOSAL TO DISALLOW CLAIMS VIA A PROOF-OF-CLAIM FORM MASQUERADING AS A DISCOVERY QUESTIONNAIRE IS LEGALLY UNSUSTAINABLE AND AN ABUSE OF THE BANKRUPTCY PROCESS**

### A.      Debtors Propose an Onerous Proof-of-Claim Form Designed to Strip Themselves of Personal Injury Liability by Sheer Process of Elimination

To begin with, it is important to emphasize that what Debtors urge is a draconian proof-of-claim form — not a discovery questionnaire.  Instead of proposing a discovery device, Debtors seek to create a monstrous proof-of-claim form that would inevitably function as a machine for perfunctorily disallowing masses of individual claims for procedural and clerical "errors."  No court in the bankruptcy of an asbestos defendant has ever approved a proof-of-claim form as extensive and complicated as that proposed here by Debtors.  The form is so massive — requiring so much information that no plaintiff in the tort system could reasonably

---

[3]      As instructed by the Court at the June 27 hearing, we will meet and confer to see if agreement can be reached on disputed points.

possess or obtain it all — that it would per se prevent claimants from complying.  Debtors have

tailored their dense definitions and instructions to their self-generated version of what a "valid"

claim should look like for one transparent purpose: to maximize the number of claimants who

will fail to complete the form to their satisfaction and thus have their claims perfunctorily

disallowed under Debtors' scheme.

Although ostensibly "only" 24 pages long, the "W.R. Grace Asbestos Personal Injury

**Proof of Claim**/Questionnaire" (emphasis added) is laden with directives to "photocopy" sub-

parts that lengthen it exponentially and to attach additional "supporting" documentation as to

each medical condition; each diagnosis; each doctor (including treating, pathologists, and doctors

performing tests); each test; each consultation; each treatment; each medical assessment; each

job category involving a Grace product; each particular exposure to a Grace asbestos-containing

product; each exposure to an asbestos-containing product "not attributable to Grace"; each job

during the past 20 years other than those involving exposure to a Grace product; each incidence

of tobacco use by particular tobacco product; each use of prescription drugs within the past 20

years; and each lawsuit in which the claimant has ever brought.  To satisfy the scope and

ambiguity of the demand for medical information alone, claimants or their lawyers would have

to review and submit all of the claimants' medical records for any condition over the course of

the claimant's entire lifetime — not simply those which prove the presence of asbestos-related

disease — else risk permanent expungement of the claim altogether.  Considering the number of

consultations, treatments, and so on that a lung cancer patient undergoes, just adding the

duplicates of Part II's questions on "Asbestos-Related Conditions" (3 pages) necessary to

complete the proof-of-claim form as instructed could easily extend the total length into the

hundreds of pages.

In any case, no claimant or law firm has such records.  Claimants will normally have reports from doctors that document the claimed disease; they do not have all of the doctor's records that backed up the report, and certainly do not have complete records of the claimant's entire medical history.  Requiring the claimant to locate, obtain, assemble, copy and send all of this information with the proof-of-claim practically guarantees that the Court will be asked to disallow majority of disallowed claims for "incompleteness."[4]

As explained further below (Parts I.C-D & III.A), much of what Grace demands would be extraordinarily difficult — if not impossible — to obtain, and is irrelevant in any event.  For example, claimants must make photocopies of Part V ("Residential History") (2 pages) for "each of [their] past residences (starting with the earliest)."  POC/Questionnaire 8-10.  Debtors then expect them to list all Grace asbestos products and asbestos products made by others "brought onto [the] residence or surrounding areas" during each residency.  *Id.* 9.  That is, an eighty-year old claimant would be expected to know and remember not only the apartment or house he rented in 1960, but also who manufactured any asbestos shingles or insulations installed or repaired not just in his house, but in "the surrounding area" while he lived there.

Most significantly, all information, tests, diagnoses, and documentation about medical issues must conform to Debtors' definitions of disease or they "will * * * seek to estimate the value of any claim * * * with no further evidence at zero and to value such Claim at zero <u>for purposes of allowance</u> and distribution."  POC/Questionnaire iv.  Indeed, any claimant "who fails to complete and serve the Questionnaire on or before 21 November 28, 2005 at 5:00 P.M. (Eastern Standard Time), shall be forever barred, estopped, and enjoined from asserting any such

---

[4]    In practice, it can safely be assumed claimants will not just quietly let their cases die; this Court will be inundated with tens of thousands of individual motions challenging Debtors' disallowance scheme.

Claims (or filing a subsequent Proof of Claim and/or Questionnaire with respect to such Claims)
against any of the Debtors," and "[i]f any such Claims are so barred, * * * such Claims shall be
estimated at zero."  Proposed PI CMO 3.  The instructions and proof-of-claim form are replete
with similar phrases, threatening dire consequences for failure to follow one direction or another:
"[Y]ou may be forever barred from asserting or receiving payment on account of your claim
unless you complete and submit this questionnaire by [date]" (POC/Questionnaire i); "All
holders of claims * * * are required to file this questionnaire by [date].  Any such holder who
fails to do so **shall be forever barred, estopped and enjoined** from asserting any such claims"
(*id.* iii, emphasis in original); "**If you (and/or your lawyer, if applicable) fail to complete Part
X, your Questionnaire will be considered incomplete, and the Debtors will move the Court
for the permanent expungement and disallowance of your asserted claim**" (*id.* vii, emphasis
in original).  "If a section is left blank, then that section will be interpreted to mean that the
injured party does not have the specified injuries, conditions, or test results addressed in that
section," and no amendments would be permitted for any purpose.  *Id.* iii. The proof of claim
ends with a threat of fine or imprisonment for "presenting a fraudulent questionnaire" and
requires claimants to attest "**under penalty of perjury** * * * that [they] have not omitted any
requested information, the inclusion of which, would have a material effects on [their] right to a
Claim." *Id.* 17 (emphasis in original).  Thus, if a mesothelioma claimant omits reference to a
prescription for amoxicillin taken 10 years ago, and such information is later deemed "material"
(whatever that means), Debtors would apparently take the position that the claimant would not
only have his claim thrown out in its entirety, but would be criminally liable for a felony![5]

---

[5]        In a hearing involving a far more limited POC in In re Babcock & Wilcox, Debtors'
counsel, there representing Babcock, similarly argued — without success — that failure to

Grace's abusive proof-of-claim form is obviously designed to get rid of upwards of 98% of the claims lodged against it pre-petition, simply by mandating virtually impossible procedural and substantive information requirements that have no grounding in the law, and attaching the severest of possible penalties — disallowance for all purposes — to claimants' failure to satisfy them.  Many claimants will find it too costly even to submit a claim.  As explained below, this Court should reject out-of-hand Debtors' misguided scheme to rewrite the Bankruptcy Code's existing procedures — and its myriad due process protections for claimants — for the disallowance of individual claims.  It is patently illegal.

> **B.     This Court Cannot Approve Debtors' Truncated Disallowance Scheme Because Individual Personal Injury Claimants Are Entitled to the Full Measure of Due Process under the Code before Their Claims Can Be Expunged**

Debtors attempt to justify their unprecedented proof-of-claim disallowance procedure on the grounds that "[t]he Bankruptcy Code requires a specific claims objection process to ensure that only valid claims receive compensation."  Tab 3, 2.  In contending that nothing short of "a

---

comply with the form's instructions should invalidate claims: "THE COURT: What do you mean by [facially defective claims]?  MR. BERNICK: Just what it says, they failed to comply with Your Honor's instructions.  THE COURT: I'm suppose [sic] to say, 'Get out of here'?  MR. BERNICK: Absolutely."  In re The Babcock & Wilcox Co., No. 00-0558 ("Babcock & Wilcox"), Tr., at 18 (E.D. La. Jan. 25, 2002) ("Babcock & Wilcox Transcript") (attached as Exhibit 1).  As explained below (Part III.B), the court rejected Mr. Bernick's proposals for reasons that apply with equal force here.  See, e.g., Babcock & Wilcox, Order and Reasons, at 21 (E.D. La. August 25, 2000) (attached as Exhibit 2) (observing that "the time and expense involved in completing the form is prohibitive and will deter claimants from filing claims" and finding that "the proposed claim form is unnecessarily detailed and would amount to an undue burden on parties who wish to assert claims"); Babcock & Wilcox, Order, at 3 (Oct. 6, 2000) (attached as Exhibit 3) (finding that particular language in proposed POC "may in effect, if not by design, discourage the filing of claims, which is not the function of the proof of claim form" and therefore "must be deleted").

specific claims objection process" will suffice in estimation, Debtors misleadingly conflate

estimation with the Code's distinct process for liquidation or disallowance of individual claims.[6]

If Debtors want "a specific claims objection process," they must adhere to the

Bankruptcy Code's existing procedures for adjudicating the merits of individual claims.  Instead,

Debtors have concocted an entirely new *disallowance procedure* for cheaply getting rid of

claims that runs roughshod over governing law and cannot bear even cursory consideration by

this Court.  Debtors cite 11 U.S.C. § 502(a) in support of their argument that they are entitled to

object to individual claims, and go to great lengths to detail the individual claims objection

process embodied in 11 U.S.C. §§ 502(a) and (b).  Tab 3, 2.  Yet somehow, they manage to reach

the tortured conclusion that, despite these statutory requirements for individual claim

determination "estimation is a streamlined adjudication to *determine the merits of asserted*

*claims*" without all the bother of following the statute.  *Id.* 4 (emphasis added).  Debtors cite no

authority for this extraordinary view.  Nor can they.

Debtors' proof of claim cannot be reconciled with the Code's mandated procedures for

adjudicating individual claims.  The vast majority of courts that have presided over previous

asbestos and other mass tort bankruptcies have (to the extent they required PI claimants to file

POCs at all) refused to order the completion of any POC beyond Official Form 10.[7]  Indeed, the

Bankruptcy Rules require that a POC be "a written statement setting forth a creditor's claim" that

"conform[s] substantially to the appropriate Official Form."  Fed. R. Bankr. P. 3001(a).  Official

---

[6]      Indeed, they expressly discourage the Court from "decid[ing] upon an estimation
methodology at this time," and fail to propose one in their lengthy papers.  Motion to Approve PI
CMO and Questionnaire 2.

[7]      A proof of claim is unnecessary for purposes of estimation in the aggregate in any event,
and would serve no useful purpose here.

Form 10 is a single page, with one page of instructions.  Except for identifying data, claim amounts, and signatures, it can be completed entirely by checking boxes.

The "W.R. Grace Asbestos Personal Injury Proof of Claim/Questionnaire," by contrast, would operate as a machine for eliminating large categories of claims for failure to satisfy Debtors' manufactured substantive and procedural hurdles for "validity."  It is completely at odds with core bankruptcy principles.  The POC is a simple notice of the fact that a creditor is making a claim; it is not, as Debtors' proof-of-claim form is designed to be, a detailed (and final) presentation of the evidence that would demonstrate the validity of the claim in the event it is challenged.  *See, e.g.,* In re Hooker Invs., Inc.*,* 937 F.2d 833, 840 (2d Cir. 1991) (stating that the POC "enabl[es] the parties to a bankruptcy case to identify with reasonable promptness the *identity* of those making claims against the bankruptcy estate and the *general amount* of the claims") (emphasis added).  It is no more required that a bankruptcy claimant present the full evidence he would present if his claim is challenged (along with responses to a challenger's discovery demands and defenses) than a litigant filing a complaint must simultaneously, and irrevocably, present his full evidentiary case and rebut every conceivable challenge to it.

Debtors' attempt to impose severe penalties for mistakes or omissions in their proof-of-claim form must be rejected under prevailing law.  "There is *no* authority for the proposition that the failure to attach documents to a proof of claim requires the bankruptcy court to disallow the claim on that basis."  In re Stoecker, 143 B.R. 879, 883 (Bankr. N.D. Ill. 1992) (citation omitted), *aff'd in part, vacated in part on other grounds*, 5 F.3d 1022 (7th Cir. 1993).  Amendments to proofs of claim are "liberally permitted to cure a defect in the claim as originally filed, to describe the claim with greater particularity or to plead a new theory of recovery on the facts set forth in the original claim."  In re Kolstad, 928 F.2d 171, 175 (5th Cir. 1991) (quotation

omitted); *see also* <u>In re Stoecker</u>, 143 B.R. at 883 ("[T]he proper procedure for the bankruptcy

court is not to disallow the claim if the claimant fails to strictly adhere to the rule [Fed. Bankr. R.

3001]; it should merely * * * give the claimant an opportunity to amend or prove its claim.").

There is nothing in the Bankruptcy Code that authorizes a debtor to obtain a once-for-all

presentation of all evidence to support a claim and refute defenses thereto through a POC of its

own creation — let alone pre-emptive disallowance for incomplete responses.

Moreover, there is no authority enabling the Court to disallow a claim for failure to

satisfy all the substantive or evidentiary requirements of a proof-of-claim form.  To the contrary,

as Debtors concede, a proper proof of claim must be considered "'prima facie valid'"; it is *the*

*debtor* that bears "'[t]he burden of going forward * * * to produce evidence sufficient to negate

the prima facie validity of the filed claim.'"  Tab 3, 3 (quoting <u>In re Allegheny Int'l, Inc.</u>, 954

F.2d 167, 173-74 (3d Cir. 1992)).  Indeed, if they were to follow the procedures prescribed in the

Code, Debtors could not make a valid claim objection regarding *a single* personal injury claim in

this case without producing specific evidence to rebut a timely-filed proof of claim.  *See* <u>In re</u>

<u>Lundell</u>, 223 F.3d 1035, 1040-41 (9th Cir. 2000); <u>In re TransAmerican Natural Gas Corp.</u>, 978

F.2d 1409, 1416 (5th Cir. 1992).  Nor could they defeat claims or even require claimants to

provide further evidence by unvarnished objection.  <u>Whitney v. Dresser</u>, 200 U.S. 532, 535

(1906).  If a debtor fails to meet this burden, the debt is allowed.  *See, e.g.,* <u>In re Myrland</u>, 209

B.R. 524, 526 (Bankr. W.D. Wash. 1997).

Moreover, in the event a debtor succeeds in rebutting a POC with evidence, the claim is

not automatically rejected.  Instead, a contested matter governed by Bankruptcy Rule 9014 is

commenced.  That Rule mandates that "reasonable notice and opportunity for hearing shall be

afforded the party against whom relief is sought," and that numerous provisions of the

Bankruptcy Rules of Civil Procedure "shall apply," including *full discovery* under Rule 7026 (the equivalent of Fed. R. Civ. P. 26), and Rules 7028-7037 (the equivalent of Fed. R. Civ. P. 28-37). Most importantly, personal injury and wrongful death claimants are entitled to *jury trials* "in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose." 28 U.S.C. § 157(b)(5); *see also id.* § 1411.

Hence, if Debtors want to challenge the merits of individual claims, they cannot do so without facing the full measure of due process mandated by the Code and Rules, including jury trials on disputed issues of material fact with respect to each disputed claim. *Cf*. In re UNR Indus., Inc., 45 B.R. 322, 325 (N.D. Ill. 1984) (rejecting argument in bankruptcy case involving 17,000 asbestos claims that district courts can conduct "'summary hearing'" in lieu of full-blown trial, as debtor "points to no statute or rule that either authorizes this departure from normal practice or explains what procedures constitute a 'summary hearing'"). Of course, conducting 118,000 jury trials is neither feasible nor appropriate. Congress has provided the solution to this problem in the Code itself, as Debtors fully recognize in their proposed Plan of Reorganization. Section 524(g) provides for the resolution of individual asbestos personal injury claims, not by the individual allowance process in the Bankruptcy Code, but by a trust created for the express purpose of evaluating claims pursuant to established procedures, with both reasonable evidentiary requirements and full procedural protections for claimants, including ultimate resort to a jury. The procedures governing resolution of individual claims by the § 524(g) trust are included in a consensual Plan of Reorganization.

Estimation in the context of a case leading to the creation of a 524(g) trust is, by contrast, most emphatically *not* about determining individual claim validity; this will be the task of the trust. It is about establishing the aggregate scale of the present and future asbestos personal

injury claims under existing tort law that a debtor faced that will be channeled to the trust, thereby enabling the parties and the court to prepare and evaluate a plan of reorganization without having to wait until each and every contingent or unliquidated claim is litigated to judgment.  *See generally* Kane v. Johns-Manville Corp., 843 F.2d 636, 646-48 (2d Cir. 1988); A.H. Robins Co. v. Piccinin, 788 F.2d 994, 1013 (4th Cir. 1986); In re UNR Indus., Inc., 45 B.R. at 326.  For this purpose, courts have developed a process for estimation of mass tort claims in the aggregate, analogous to, but not identical to the § 502(c) provision for estimation of individual claims for allowance purposes.

Debtors, by contrast, propose that this Court somehow approximate Grace's current liability by "determin[ing] the magnitude of invalid claims that ultimately may be disallowed." Tab 3, 1.  This position is hopelessly contradictory.  By insisting that individual claims must be adjudicated on the merits as a part of aggregate estimation, Debtors would convert aggregate estimation into a sort of omnibus objection procedure which would violate claimants' rights under the Bankruptcy Code and Rules and due process.  Certainly, claims estimation cannot be used as an "end run" around the constitutional rights and legal norms that otherwise apply.

Grace is attempting to write its own rules governing how much it must pay deserving claimants in bankruptcy, simply because the claimants against it are numerous.  Debtors seek the "best of both worlds" — the finality of disallowance that individual claims adjudication enables and a "streamlined adjudication" process — that would nullify existing statutory and due process protections for individual claimants.  *See id.* 4.  Of course, governing law cannot be so blithely swept aside.

**C.    This Court Cannot Disallow Claims That Are Compensable Under State Law Based on Fictitious Medical and Exposure Criteria Embedded in Debtors' Proof-of-Claim Form**

Debtors do not conceal that they intend to use the POC/questionnaire as a chance to disallow on the "merits" claims that somehow make it through the proof-of-claim form's massive procedural pitfalls.  To state the obvious, a bankruptcy court is bound to apply existing law to the case pending before it.  In this sense, Debtors' audacious proof-of-claim proposal is from another world.  In addition to ignoring the procedural protections enshrined in the Bankruptcy Code, Rules, and U.S. Constitution, Debtors seek to impose a self-serving set of substantive criteria, unmoored from any legal principles or experience in the tort system, to govern the validity and value of personal injury claims.

It is axiomatic that "[t]he claims being valued arise under state law, hence state law determines their validity and value."  Owens Corning, 322 B.R. at 721.  This principle was established unambiguously by the Supreme Court in Raleigh v. Illinois Dep't of Revenue, 530 U.S. 15, 20 (2000).  *See also* Bittner v. Borne Chem. Co., Inc., 691 F.2d 134, 135 (3d Cir. 1982); In re USG Corp., 290 B.R. 223, 225 (Bankr. D. Del. 2003) ("[S]tate law claims remain governed by state law, even after the debtor invokes federal bankruptcy protection.").  This Court has no authority to ignore Raleigh, or to change state tort law for purposes of estimation.  It therefore cannot even contemplate disallowing claims for failure to satisfy Debtors' fictitious criteria for claim validity.

The basic tort law affecting asbestos personal injury claims is straightforward.  The liability of asbestos manufacturers is based on failure to warn or strict liability.  AM. L. PROD. LIAB. 3D § 122:9.  This liability is joint and several among the manufacturers of the products to which a plaintiff was exposed.  *See, e.g.,* Tragarz v. Keene Corp., 980 F.2d 411, 425-26 (7th Cir.

1992).  Plaintiffs need not prove that a particular defendant's product individually caused the injury, only that the product was a substantial factor contributing to the injury.  *See, e.g., id.* at 420, 424-25.  Provided a claimant can provide evidence of injury and exposure, his or her claim will survive summary judgment.  *See, e.g.,* Lineaweaver v. Plant Insulation Co., 37 Cal. Rptr. 2d 902, 906 (Cal. Ct. App. 1995) ("In the context of asbestos litigation, a plaintiff must demonstrate exposure to a defendant's product and biological processes from the exposure which result in disease.").  Plaintiffs may win damages for injuries that do not cause a loss of function.  Sullivan v. Combustion Eng., 590 A.2d 681, 682 (N.J. Super. Ct. App. Div. 1991) (holding, in case in which plaintiff suffered pleural thickening but no loss of pulmonary function, that "compensatory damages can be awarded for bodily harm, although there is no impairment of a bodily function") (citations omitted).  These norms obtaining in asbestos cases are not surprising. They are wholly consistent with basic tort principles.

By contrast, as with their past proposals, Debtors' proof-of-claim form propounds a slew of questions that reflect not actual evidentiary standards, but the information an asbestos claimant would have to adduce to establish a valid claim *in Debtors' defendant-perfect world.*  It sets forth manufactured standards for disease that vastly exceed those required to prevail at trial in the tort system — let alone survive summary judgment or generally qualify for settlement under Grace's own pre-bankruptcy standards.  Under the substantive criteria required to satisfy the form, many asbestos claims that have value in the tort system would become valueless. Through this sleight-of-hand, Debtors would rid themselves of a significant portion of their asbestos-related debt.

Even a brief examination of Debtors' exposure and medical criteria demonstrates, at best, the shortcomings and, at worst, the bad faith of the proof-of-claim form as a whole.  Grace's

product identification and exposure requirements are totally divorced from state law standards.

Therefore, they cannot form the basis for disallowance of claims in bankruptcy.  Not only would

the POC require excruciatingly detailed information about exposure to Grace asbestos-containing

products, but it would seek the same kinds of information about possible exposure to other

manufacturers' asbestos-containing products, including, *inter alia*, the name and address of the

site; the name of the site's owner; the dates of exposure; the employer during each exposure at

the site; the names of products and materials attributed to Grace and other suppliers; the date and

frequency, in hours per day and days per year, of exposure to each of those products; and the

basis for identification of the product.  POC/Questionnaire 5-8.

But the law is clear that to recover against an asbestos defendant, a claimant need only

show that his exposure to a defendant's asbestos was a "substantial factor" in bringing about his

disease.  Borel v. Fibreboard Paper Prods. Corp., 493 F.2d 1076, 1094 (5th Cir. 1973).  Because

no safe level of asbestos has been established, Orleans Parish Sch. Bd. v. Asbestos Corp. Ltd.,

114 F.3d 66, 68-69 (5th Cir. 1997), detailed evidence about "levels" of exposure is not required

and courts permit experts to testify in toxic tort chemical cases even if they do not know a

plaintiff's exact level of exposure.  *See* Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 808-09

(3d Cir. 1997); Louderback v. Orkin Exterminating Co., Inc., 26 F. Supp. 2d 1298, 1306 (D.

Kan. 1998).  In any event, as a matter of fundamental fairness (as well as Bankruptcy Rule 9014)

no claim could be discarded simply for failure to produce such evidence absent reciprocal

discovery of Grace (*e.g.,* sales records), which Debtors' POC scheme would not allow.

Debtors' requirement that claimants identify each exposure to "asbestos-containing

products *not* attributable to Grace" (POC/Questionnaire 7) is not only impossibly burdensome; it

is irrelevant to Grace's asbestos liability.  State courts have repeatedly held that "[w]here there is

competent evidence that one or a de minimis number of asbestos fibers can cause injury, a jury may conclude the fibers were a substantial factor in causing a plaintiff's injury." <u>Wehmeier v. UNR Indus., Inc.</u>, 572 N.E.2d 320, 337 (Ill. App. Ct. 1992); <u>see also</u> <u>Tragarz</u>, 980 F.2d at 421. Indeed, courts have "specifically reject[ed]" the argument that a plaintiff "may not show substantial causation absent proof that [the defendant's] product was more responsible for [plaintiff's] injury than other manufacturers' products." <u>Verbyke v. Owens-Corning Fiberglas Corp.</u>, 616 N.E.2d 1162, 1168 n.5 (Ohio Ct. App. 1992).  "It is sufficient if it is shown that [a defendant's] products contributed to the injury.  The degree of contribution is left for apportionment of damages." *Ibid.*

Grace makes no attempt to justify its exposure requirements on the basis of state tort law, or reconcile them with the Supreme Court's mandate in <u>Raleigh</u>.  Instead, Debtors boldly proclaim that "[t]he mere fact of exposure to Grace asbestos-containing product * * * is not sufficient to pass the threshold evidentiary criteria *applicable to this estimation proceeding.*" Tab 4, 3 (emphasis added).  Debtors thus directly acknowledge that for purposes of *this proceeding*, they will ask the Court not to apply the applicable non-bankruptcy law, but to manufacture a new standard that conflicts with basic tort law principles, on the grounds that "[p]laintiffs must show that they were exposed to defendant's allegedly hazardous product or material at a level that has been demonstrated, through scientifically reliable evidence, to cause injury" (whatever that means).  *Ibid.*  Unsurprisingly, Debtors cite no case for their standard.  In <u>Celotex Corp. v.Tate</u>, 797 S.W.2d 197, 204 (Tex. Ct. App. 1990), a Texas court held that the plaintiff meets his burden of proof against a particular defendant "[i]f there was sufficient evidence presented by [the plaintiff] showing that [the defendant] supplied *any* of the asbestos to which [the plaintiff] was exposed."  (Emphasis in original.)  Other courts have similarly held that

a defendant can be held liable even if the evidence shows that its asbestos was responsible only

for a tiny fraction of the total asbestos to which the plaintiff was exposed.  *See, e.g.,* Thacker v.

UNR Indus., Inc., 603 N.E.2d 449, 457 (Ill. 1992); Sholits v. American Cyanamid Co., 568 A.2d

1196, 1205 (N.J. Super. App. Div. 1989).

Debtors' medical criteria are yet another exercise in wishful thinking, designed to

eradicate otherwise valid claims.  In order to establish a claim for "Clinically Severe Asbestosis,"

for example, a claimant must have asbestosis that is:

> (1) diagnosed by an independent pulmonologist or internist certified by the
> American Board of Internal Medicine, (2) with either (a) a chest x-ray
> reading by a B-reader and replicated by an independent B-reader, both of
> whom are certified by the National Institute for Occupational Safety and
> Health, of at least 2/1 on the ILO grade scale, or (b) asbestosis determined
> by pathology; (3) with an independent pulmonary function test
> demonstrating either (a) total lung capacity less than 65% or (b) forced vital
> capacity less than 65% and a FEV 1/FVC ratio greater than or equal to
> 65%; and (4) with a supporting independent medical diagnosis and
> supporting documentation establishing exposure to Grace asbestos-
> containing products as a cause of the asbestosis.

POC/Questionnaire iv.[8]  By contrast, a single medical report containing a diagnosis and a

statement that a claimant's asbestosis was caused by exposure to asbestos would be sufficient to

withstand summary judgment as to causation in the tort system.  *See* Owens Corning, 322 B.R. at

724.  Not only would Grace require *two* diagnostic reports, it would refuse to accept "a

physician's finding that an injured person's disease is 'consistent with' or 'compatible with'

asbestos [as] sufficient under the applicable rules of evidence to prove asbestosis."  *Id.*  Taken

to its logical extreme, this caveat suggests that many claimants' existing diagnoses — which may

well include such language —would be useless, even though they comply with authoritative

---

[8]     The information required to establish other asbestos-conditions differs only in detail, not
in scope.

medical standards.  Claimants would instead be required to re-incur the expense of obtaining

another "primary" report as well as a "supporting" diagnosis for these proceedings alone.

In other words, in order to preserve their basic right to participate in this bankruptcy,

claimants would have to scramble to find two "independent" physicians willing to render new

diagnostic reports that contain definitive statements as to causation — with "supporting

documentation."  But no conceivable medical test or examination will be able to show whose

asbestos products caused the diagnosed illness.  Debtors thus appear to be demanding that a

physician examining a patient in 2005 review and evaluate her legal evidence of product

identification for an exposure forty years prior and certify that the asbestosis was caused by

Grace's asbestos products.  Not only does this fail to reflect any state's law, it is beyond a

physician's expertise and practically impossible.

Then there is Grace's requirement for diagnosis by "independent" doctors and B-readers.

Independence is defined as the absence of "social or financial relationship with lawyers

representing asbestos claimants."  POC/Questionnaire iv.  But the POC gives no clue as to what

the term "social or financial relationships" might mean.  Surely a doctor or B-reader cannot be

deemed biased because he or she belongs to the same church as a plaintiffs' lawyer.  Moreover,

even if Debtors were to confine the exclusion to doctors and B-readers who have at one point

been *paid* by a lawyer, claimants can hardly be expected to know or even obtain this

information; nor is the fact that lawyers compensate professionals who help them develop cases

evidence of any impropriety.  While the POC would unfairly require claimants to amass

evidence in the form of confirming medical reports, the requirement that the new diagnosticians

be "independent" from their lawyers apparently means that the claimants themselves would have

to navigate the medical community without the assistance of counsel.  A properly qualified

doctor's or B-reader's social or even financial relationship with plaintiffs' lawyers is at best a matter for cross-examination in a claim-by-claim objection process, not automatic exclusion. Hence, Debtors' demand for "independence" turns out to be just another method of eliminating valid claims.

### D. There Is No Process for Collective Disallowance of Individual Personal Injury Cases That Comports With Constitutional and Statutory Standards of Due Process

The "Definitions and Instructions" for Debtors' proof-of-claim form are critical to divining an understanding of their disallowance scheme.  The section identified as "C. Part II — "Asbestos-Related Medical Condition(s)" contains Debtors' self-invented definitions for six specific disease categories: Mesothelioma, Asbestos-Related Lung Cancer 1, Asbestos-Related Lung Cancer 2, Other Cancer, Clinically Severe Asbestosis, and Asbestosis.  Part II of the proof-of-claim form then requires claimants to "attach medical records that comply with the requirements set forth in the Instructions to Part II."  POC/Questionnaire 2.  Debtors include in their definition section a seventh, catch-all category which they identify as "Other Asbestos Disease" and define as "[a]ny asbestos-related injuries, medical diagnoses, and/or conditions other than those above."  POC/Questionnaire iv.  Presumably, the only claims Debtors would concede are "valid" and worthy of payment are those that satisfied their criteria under the first six disease categories.  So a question arises as to the purpose of requiring claimants to undergo the same extraordinary burden of submitting the same level of detailed information under the "Other Asbestos Disease" category.

There are only two possible explanations.  The first — and most obvious — is to make filing a claim as difficult as possible, so as to intimidate claimants from filing at all.[9]  Indeed, even for claimants suffering from one of Debtors' six recognized medical conditions, much of the information the form otherwise requires is utterly irrelevant.  In addition to mandating that claimants satisfy their standards for disease, for example, Debtors would force them to complete major portions of Part II for "(1) the diagnosing doctor during your first diagnosis and * * * all additional diagnosis [sic], (2) each B-reader that has provided a chest x-ray reading, and (3) each doctor, if any, that has treated your condition."  POC/Questionnaire iv.  If a claimant provided two diagnoses that conformed to Debtors' standards, detailed *additional* information about each and every treating doctor — as well as a chronicle of current and past alcohol use and all prescription drugs used in the past twenty years, required by Part VI — would have no relevance whatsoever.

The second possible explanation is that Debtors are preserving for themselves a "fallback" position in the event the Court properly refuses to authorize the disallowance of claims *en masse* for failure to satisfy Grace's manufactured disease standards.[10]  Because Debtors' medical standards are virtually impossible to satisfy, the vast majority — if not all — of

---

[9]     By way of example, the authorization of disclosure of health information requires claimants to attest to their "understand[ing] that * * * once this information is disclosed it may be subject to re-disclosure and would no longer be protected by federal privacy regulations."  POC/Questionnaire Appendix C.

[10]     Even assuming arguendo that the Court could rule that claims failing to meet Debtors' criteria have no value, the estimated number of viable claims that would remain would be vanishingly small, and it is entirely unclear how Debtors would attach values to those claims.  Some "gold-plated," all-but-indisputable claims (*e.g.,* for mesothelioma with clear exposure evidence) would surely remain, as Debtors concede.  Those claims would have to be valued by jury verdicts in the strongest plaintiff's cases — not by average settlements across the whole range of cases.

the PI claims for which a proof of claim is submitted would fall under the "Other Asbestos Disease" category.  Debtors remain silent as to what they would have the Court do with these claims, but they would no doubt seek to disallow many of them on product identification or medical grounds that are either implicit in the proof-of-claim form itself or completely undisclosed at this juncture.  Presumably, a so-called "expert" will project "valid" claims from the data compiled from any remaining POCs, while treating claims barred for incomplete responses or failure to meet Debtors' exposure and medical standards as "invalid" for purposes of extrapolating the percentage of future claims that would be "valid."  But how this can be accomplished remains a mystery.  Debtors clearly do not intend 118,000 hearings with the full reciprocal discovery and, ultimately, jury trials on disputed questions of fact.  More likely, what can be gleaned from Debtors' less-than-forthcoming papers is that they will proffer "experts" to use individual proof-of-claims to testify that aggregate categories and percentage of claims are "invalid," and to come up with values to attach to any remaining "valid" claims (if any).  This hypothetical scenario is preposterous on its face.

To begin with, the Court can entertain "defenses" to liability in the context of an aggregate estimation "only to the extent that they do not interfere with the claimants' constitutional and legal rights as prescribed by law."  In re USG Corp., 290 B.R. 223, 227 (Bankr. D. Del. 2003).  Like Debtors in this bankruptcy, defendants in the tort system often question whether a plaintiff has been exposed to their specific products, whether his claimed illness is actually caused by asbestos or instead by smoking or other factors, and indeed whether the plaintiff is sick at all.  By their very nature, such defenses almost always turn on disputed facts, preventing summary dispositions.  Considering large numbers of claims in group proceedings cannot obviate the disputes of fact, but would only multiply them.  Thus, in the

Georgine settlement litigation, the Third Circuit concluded that the putative class of future

asbestos claimants could not lawfully be certified for class action treatment under Rule 23 of the

Federal Rules of Civil Procedure, because the individual claims were so disparate on their facts:

> Class members were exposed to different asbestos-containing products, for
> different amounts of time, in different ways, and over different periods.
> Some class members suffer no physical injury or have only asymptomatic
> pleural changes, while others suffer from lung cancer, disabling asbestosis,
> or from mesothelioma — a disease which, despite a latency period of
> approximately fifteen to forty years, generally kills its victims within two
> years after they become symptomatic. Each has a different history of
> cigarette smoking, a factor that complicates the causation inquiry.

Georgine v. Amchem Prods., Inc., 83 F.3d 610, 626 (3d Cir. 1996), aff'd sub nom. Amchem

Prods., Inc. v. Windsor, 521 U.S. 591 (1997).  Under substantive law, "causation of plaintiff's

injury by defendant's product and plaintiff's resultant damages must be determined as to

'individuals, not groups.'"  Cimino v. Raymark Indus., Inc., 151 F.3d 297, 313 (5th Cir. 1998)

(emphasis added) (rejecting a procedure to impose results in asbestos cases based on trials of test

cases of the same general kind and quoting In re Fibreboard Corp., 893 F.2d 706, 711 (5th Cir.

1990)); see also Malcolm v. National Gypsum Co., 995 F.2d 346, 350-54 (2d Cir. 1993)

(disapproving consolidation for trial of forty-eight asbestos cases because too many different

individual exposures, jobs, job sites, and diseases were involved).

If asbestos claims do not lend themselves to collective dispositions on the facts under

existing tort law, neither are they amenable to disallowance under any special bankruptcy

standards.  Of course, any effort to disallow claims in bankruptcy would have to rest on statutory

grounds recognized by the Bankruptcy Code itself.  The statutory grounds for disallowance are

detailed and specific.  See 11 U.S.C. § 502(b).  Only one of those grounds has even theoretical

relevance to an estimation of asbestos claims, i.e., the objection that any "such claim is

unenforceable against the debtor and property of the debtor, under any agreement or applicable

law for a reason other than because such claim is contingent or unmatured." 11 U.S.C.

§ 502(b)(1). But, as relevant here, that ground simply incorporates the rule that claims are tested

in bankruptcy by applicable non-bankruptcy law. For purposes of an aggregate estimation,

therefore, Debtors could place at issue the allowability of any given category of asbestos claims

only if they could frame a legal theory that would render an entire category of claims

"unenforceable against the debtor" as a matter of state tort law regardless of variations in the

facts and circumstances of the individual claims. A claim is not unenforceable under applicable

non-bankruptcy law merely because the debtor disputes the merits of the claim or dislikes

applicable state tort law. The Bankruptcy Code expressly defines "claim" to encompass a right

to payment that is "disputed" 11 U.S.C. § 101(5). No category of claims can be ignored in the

estimation merely because Debtors would have some *chance* of prevailing if the claims were

tried.

 An example drawn from the Debtors' own submissions underscores the difficulty.

Debtors, through their POC/questionnaire, would "value at zero" any claim of asbestos-related

lung cancer, other cancers, or asbestosis unless the claimant supplies a chest x-ray read by *two*

certified B-readers showing evidence of asbestos-related nonmalignant disease of at least 1/0 on

the ILO grade scale.[11]  POC/Questionnaire iii. "Clinically severe asbestosis" would also require

a pulmonary function test ("PFT") showing a 35% decline in lung function, and asbestosis would

require 20% decline. *Id.* iv. Similar criteria were unsuccessfully urged upon the court in the

Owens Corning estimation proceeding. Judge Fullam cut through these proffered medical

criteria in a way that shows the impossibility of imposing them by any sort of "estimation"

---

[11]      *See* International Labour Office, Guidelines for the Use of ILO International
Classification of Radiographs for Pneumoconiosis (1980).

proceedings in this case, even leaving aside the problem of ensuring due process for individual

claimants:

> [T]here is considerable dispute between the parties as to what constitutes a compensable claim for asbestosis. The Banks argue that, although it is generally understood that an X-ray reading of 1/0 or higher supports a diagnosis of asbestosis, the claim should not be compensable unless pulmonary function tests ("PFT") establish at least a 20% reduction in pulmonary function. They further assert that the X-ray findings should be confirmed by at least two independent B-readers, whereas, in the past, single readings by biased B-readers resulted in the payment of many claims which should not have been paid.

> The record makes clear, however, that pulmonary function tests are not very reliable; standards are available only with respect to males, and, in any event, what is "normal" lung capacity varies greatly with size, physical condition, etc. *Moreover, with the possible exception of Ohio, no state has amended its tort law to specify a PFT threshold for compensability of a claim*.

> With respect to X-ray readings, it is clear that, at the margins, equally qualified and impartial B-readers may reach different conclusions (a 1/0 reading means that it is just barely asbestosis; a 0/1 reading means that it is almost asbestosis; and the difference between the two is extremely subtle.) *Here, too, it must be remembered that a claim of asbestosis survives summary judgment if there is a diagnosis supported by a single B-reading*.

Owens Corning, 322 B.R. at 724 (emphasis added).

Because the merits of the personal injury claims — both pending and future — against

Debtors are dictated by state tort law and the majority of claims they seek to disallow on a global

basis would survive summary judgment,[12] Grace's efforts to use the bankruptcy process to

prescribe defendant-friendly rules of liability must fail. The "filing a chapter 11 petition merely

to obtain tactical litigation advantages is not within the legitimate scope of the bankruptcy laws."

---

[12]    Indeed, Grace did not pay all claims simply because they were submitted for payment. The percentage of rejected claims is shown by the historical record, and this would be taken into account in the projections that an expert would undertake under the Eagle-Picher/Owens Corning estimation method.

In re SGL Carbon Corp., 200 F.3d 154, 165 (3d Cir. 1999) (internal quotation and citation

omitted).[13]

## II.   THE INFORMATION SOUGHT BY THE QUESTIONNAIRE IS NOT NECESSARY OR APPROPRIATE FOR ESTIMATION OF DEBTORS' AGGREGATE LIABILITY

Debtors cannot cite a single case actually adopting or even supporting their approach.

Nor can they cite a single case rejecting or even distinguishing the approach urged by the

Committee.  Courts have employed the Eagle-Picher/Owens Corning estimation method time

and time again.  This Court should use it in this case, as well.

At a minimum, precedent should guide the estimation proceedings in this case, and

Debtors bear the burden of proving their allegation that the established Eagle-Picher/Owens

Corning method should be rejected.  The central justification they give for rejecting the standard

Eagle-Picher/Owens Corning method is factual: they claim that Grace did not get a fair shake in

the tort system so its claims resolution history is too tainted to formulate a proper basis for

estimating their liability in bankruptcy.  Debtors should be required to show this *with evidence*

---

[13]      Debtors err in arguing that claim forms in the context of trust distribution procedures
(TDPs) also provide a precedent for their POC.  Tab 4, 10.  There is a profound difference
between what can be put into a consensual plan of reorganization and what can be crammed
down creditors' throats against their will in a debtor's effort to minimize its debt and escape
insolvency with equity intact.  The provisions of a § 524(g) trust, including its trust distribution
process, can be implemented only with affirmative approval of 75% of asbestos claimants
voting.  *See* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).  Through the voting mechanism, the
Bankruptcy Code affords due process to asbestos claimants.  Debtors' POC, in contrast, is
simply a unilateral attempt by Debtors to impose their crabbed view of what constitutes a valid
claim.  In Babcock, the Honorable Sarah S. Vance explicitly rejected the debtor's reliance on the
Manville TDP as a precedent for the pre-bar date POC that the debtor sought. Exhibit 2, at 21
("The 21 page Manville Trust form relied on by debtors is not a proof of claim form required to
meet a bar date but a claim form used by the trust to evaluate each claim individually for the
purposes of liquidation and payment.  The Court is therefore not persuaded that the extensive
information requested in the Manville Trust form is an appropriate model for a proof of claim
that will subject claimants to a bar date.").

before the Court can seriously contemplate burdening 118,000 people — many of whom are very

sick — with Debtors' onerous and one-sided POC/discovery questionnaire.  But even if Debtors

could conceivably prove the facts they allege as justification for tossing aside 15 years of

estimation precedent (which they cannot), their self-serving disallowance plan is unsustainable as

a matter of law.

> **A.    The Eagle-Picher/Owens Corning Method of Estimating Asbestos Personal Injury Tort and Wrongful Death Claims in the Aggregate Is Well-Tested, Workable and Fair**

Experience shows that an aggregate estimation is frequently a helpful and sometimes a

necessary step in the process of formulating and confirming a plan of reorganization in an

asbestos bankruptcy.  It provides the basis for allocating the value of the estate among the

competing stakeholders in the plan confirmation process.  It is thus integral to a determination of

whether Debtors' stockholders will be entitled to share in any distribution from the estate under

the rule of absolute priority.  In such an estimation, the ultimate issue is:  "[W]hat would have

been a fair resolution of the claims in the absence of bankruptcy"?  Owens Corning, 322 B.R. at

722.

Two cases, Eagle Picher and Owens Corning, are on all fours with this case, and should

guide this Court in how to proceed.  In both cases, the courts recognized that the claims history

of the debtors, coupled with analysis of expected future developments, provided ample and

reliable information for the valuation of claims, and that information gathering about specific

individual claims in those cases was unnecessary and would not assist the court in estimation.

Virtually all of the complaints about the tort system that Debtors argue in this case mandates the

use of their proposed POC — including the effects of mass screenings, and supposedly

illegitimate medical evidence generated by plaintiff-paid doctors, among other factors — were

heard and taken into account by Judge Fullam in <u>Owens Corning</u>. *See* 322 B.R. at 722-25.

Judge Fullam adhered to the principle that present and future claims are to be valued based on

their "worth in the tort system as it existed on the petition date," but recognized that there could

be adjustments for "factors which can and should be avoided in the future." *Id.* at 722-23. There

is no good reason for this Court to depart from the well-established approach set forth in these

precedents. Indeed, the traditional method provides the *only* realistic starting point for deriving a

reasonable estimate.[14]

### 1.    General Estimation Principles and the <u>Eagle-Picher</u> Case

While courts may use "whatever [estimation] method is best suited to the particular

contingencies at issue," <u>Bittner v. Borne Chem. Co., Inc.</u>, 691 F.2d 134, 135 (3d Cir. 1982), they

---

[14]    In this connection, Debtors' counsel revives a specious argument it raised — and lost — in the Babcock & Wilcox bankruptcy. There, as here, it was claimed that Rule 408 of the Federal Rules of Evidence prohibits use of Grace's claims resolution history in estimation. In <u>In re Babcock & Wilcox Co.</u>, 274 B.R. 230 (Bankr. E.D. La. 2002), Bankruptcy Judge Jerry A. Brown squarely rejected the proposition that "reliance on B&W's settlement process as a substitute for proof of legal liability is contrary to law, and is in violation of Rule 408 of the Federal Rules of Evidence." *Id.* at 255. As Judge Brown observed, "Rule 408 applies to the use of evidence of compromise to prove the validity or invalidity of the claim *that is the subject of the compromise.*" *Id.* at 256 (emphasis added). Indeed, the text of the Rule itself renders inadmissible at trial evidence of offers to settle disputed claims where such evidence is proffered "to prove liability for or invalidity of *the claim or its amount.*" Fed. R. Evid. 408 (emphasis added). "When settlement negotiations and terms explain and are part of another dispute, however, they are often admitted to allow the trier of fact to 'understand the case.'" 274 B.R. at 256 (quoting 2 Weinstein, Federal Evidence § 408.05[5], at 408-35 (2001)); *see also* <u>Broadcort Capital Corp. v. Summa Med. Corp.</u>, 972 F.2d 1183, 1194 (10th Cir. 1992) (evidence from prior settlement discussions admissible because "related to an entirely different claim" from the claim that was the subject of the negotiations). He continued: "Consequently, the court, in determining whether B&W's future estimation of tort liabilities was reasonable, can consider both settlement by B&W and other case histories against other asbestos defendants as part of the grounds for its decision. To do otherwise would close one's eyes to the realities that existed [when B&W filed for bankruptcy]." 274 B.R at 256. For the same reasons, Debtors' Rule 408 argument should be rejected here.

have recognized that estimating a personal injury claim requires an informed prediction as to

how the case would turn out if it were litigated to conclusion in the forum in which it was

pending before bankruptcy, using the best evidence available.  In In re Farley, Inc., for example,

the court estimated a group of personal injury claims for purposes of voting on the plan and

determining plan feasibility.  146 B.R. 748 (Bankr. N.D. Ill. 1992).  The court valued the claims

by multiplying the potential damages available in the state court action by the court's estimation

of the claimants' likelihood of success at trial.  Id. at 756.  The court made the following

observation, which underscores the propriety of estimating claims based on the legal and

practical realities of litigating in the state tort system:

> The Illinois Circuit Court has denied an earlier summary judgment motion
> filed by Farley [the defendant], based on the same employment issue that it
> raised here.  Barring settlement, the tort case will be going to trial before a
> state court jury. Therefore, the subject claims cannot and do not have a zero
> value in any legal or practical sense. Their more realistic value consists of
> the amount stipulated as damages in [the] event Farley is found liable,
> discounted by the chance that Farley will not be found liable.

Id. at 753.  Similarly, in In re Federal Press, 116 B.R. 650, 653-54 (Bankr. N.D. Ill. 1989), a

court estimated the value of an unresolved personal injury claim for purposes of plan voting.

The court valued the claim by reference to the nationwide average of jury verdicts in similar

cases.

The leading case on estimation of asbestos claims in the aggregate remains In re Eagle-

Picher Indus., Inc., 189 B.R. 681 (Bankr. S.D. Ohio 1995).  Like the instant case, Eagle-Picher

involved an estimate of a debtor's liability for purposes of formulating a plan, and the Eagle-

Picher estimation was based in part on Eagle Picher's prior payment history.  Id. at 684-86.  And

like this case, Eagle-Picher was an asbestos bankruptcy where a § 524(g) trust was contemplated

at the time of estimation.  The precise argument Grace advances here — that its claims resolution

history cannot serve as a basis for estimating its "actual" asbestos liability — was squarely

rejected nearly two decades ago in Eagle-Picher, where the court described the debtor's

pre-petition record on disposal of asbestos claims as "a valuable experiential resource" for

estimating the value of pending and future claims.  *Id*. at 686.  Eagle-Picher established the key

considerations that should enter into a court's estimation of present and future asbestos

liabilities: (1) the history of the Debtor company; (2) the total number of claims expected; (3) the

category of disease and occupation; and (4) *settlement values* for claims close to the bankruptcy

filing date.  *See id.* at 690-91.  The court further established that in an estimation undertaken for

plan formulation and confirmation purposes claims must be valued as of the date on which

Debtors filed their bankruptcy petition.  *See* In re Brints Cotton Mktg., Inc., 737 F.2d 1338, 1342

(5th Cir. 1984); Owens Corning, 322 B.R. at 722; Eagle-Picher, 189 B.R. at 686; *cf.* 11 U.S.C. §

502(b) (noting that, in case of objection to a claim, the court must determine the amount of the

claim in dollars "as of the date of the filing of the petition").  Eagle-Picher remains the most

authoritative precedent on estimation in the aggregate to date.[15]

More specifically, the estimation method established by Eagle-Picher calls for the expert

to (i) take the total number of pending claims for each disease type; (ii) discount those totals by

the rate at which the particular defendant was able historically to dispose of claims for zero

compensation, thus arriving at the total number of claims in each disease category that are likely

to receive compensation; (iii) compute for each disease category the average compensation paid

per claim over a reasonable base period; and (iv) multiply the claims likely to be settled in each

disease category by the corresponding average settlement value, summing the products of these

---

[15]    It is telling that, unlike in prior papers in which Debtors at least attempted to distinguish
Eagle-Picher and its lengthy progeny, they do not even cite that case — let alone try to convince
the Court that it is bad law — in their latest tome.

calculations to arrive at the aggregate liability for pending claims.  A defendant's liability to *future* claimants can reasonably be estimated by (i) forecasting the future incidence of asbestos-related cancers in the population based on well-known epidemiological studies;[16] (ii) computing the "propensity to sue" a given defendant by multiplying the forecasted number of diagnoses by the percentage of those diagnoses that can be expected to give rise to claims against the particular defendant, based on that entity's claims history and observed trends in claiming behavior; (iii) forecasting the number of nonmalignant claims as a function of the number of forecasted cancer claims, based on historical relationships between claims against that defendant for malignant and non-malignant diseases and observed trends; (iv) valuing the forecasted claims within each disease category by dollar amounts derived from average settlement values computed on the basis of a reasonable base period in that defendant's actual claims history; (v) adjusting those dollar amounts to account for monetary inflation over time, thereby arriving at the anticipated stream of settlement payments; and (vi) using a risk-free rate of return to discount that stream of payments to its present value as of the petition date.[17]

In deriving values to ascribe to pending claims, the appropriate metric is the average claim-resolution costs as they existed before bankruptcy, but at a time reasonably close to the petition date, adjusted to reflect reasonably foreseeable factors, if any, that would affect future values.  Computing the average costs over large numbers of claims ensures that all varieties of

---

[16]     Epidemiological studies indicate that asbestos-related malignancies will continue to manifest themselves in the United States until at least the year 2039.  *See* Nicholson, Perkel & Selikoff, *Occupational Exposure to Asbestos*, 3 Am. J. Indust. Med. 259 (1982) ("Nicholson et al.") (attached as Exhibit 4).

[17]     This method does not just mechanically extrapolate.  It does allow, and in fact requires, consideration of ways in which conditions in the future are likely to differ from those in the past in ways that affect the result, such as increasing claiming rates or restrictive legislation.

resolutions (including rejections) are captured and weighted appropriately.  Using broad-based

averages is the logical way to replicate Grace's actual experience when ascribing values to the

backlog of tens of thousands of pending and likely future claims.

## 2.    The Owens Corning Case

The recent Owens Corning case illustrates that the Eagle-Picher method of estimating

aggregate asbestos liability can be manageable, fair, prompt, and efficient, while considering

both sides' contentions on how conditions will change in ways that affect projections.  In Owens

Corning, the debtor, the asbestos claimants committee, and the legal representative of future

claimants are co-proponents of a plan of reorganization, filed on or about January 19, 2003.

Opposition to the plan is led by Credit Suisse First Boston ("Credit Suisse"), as agent for holders

of bank debt.  In August, 2004, the Honorable John P. Fullam, Sr., in entering an order

scheduling a claims estimation hearing, ruled that "the data now available — the Debtor's claim

history, the experience in other cases, etc. — viewed in light of the expert testimony at the

scheduled hearing, should probably suffice for Claims Estimation purposes."  In re Owens

Corning, 00-3837 ("Owens Corning"), Order (Bankr. D. Del. Aug. 19, 2004) (attached at Exhibit

5)

In a subsequent unsuccessful discovery motion, Credit Suisse applied to the court to

establish a procedure "to obtain a random sampling of already-existing Medical Records,

including X-rays, of asbestos personal injury Claimants who have asserted nonmalignant claims

against Owens Corning" that was far more limited than what Debtors seek here.  Owens

Corning, Brief in Support of Motion of CFSB, at 1 (Oct 4, 2004) (attached as Exhibit 6).[18]  The

---

[18]      It would have covered 1,000 claimants, involving only pending nonmalignant claims, and been limited to medical records.  Exhibit 6, at 30.  Credit Suisse conceded that even its relatively

Court found that "no useful purpose would be served by further delaying matters, and running up additional legal bills, to prove what is already reasonably well known." <u>Owens Corning</u>, Memorandum and Order, at 2 (Nov. 22, 2004) (attached as Exhibit 7).  Judge Fullam observed:

> The relevant data have been available for analysis for many years.  The conclusions drawn by experts have long been debated, and will be fully aired at the January hearing.  In the unlikely event that the information now available proves insufficient to enable a reasonably correct estimate of future claims, that issue, too, will be considered at the hearing in January.

*Id.* at 1-2.

After about five months of discovery, a six-day evidentiary hearing took place in January of this year.[19]  Less than three months later, Judge Fullam rendered his decision on the merits and estimated Owens Corning's liability in the aggregate for pending and future asbestos-related personal injury and wrongful death claims.  *See* <u>Owens Corning</u>, 322 B.R. at 721-22.  The court first reiterated that "[t]he claims being valued arise under state law, hence state law determines their *validity* and *value,*" 322 B.R. at 721 (emphasis added) (citing <u>Raleigh v. Illinois Dep't of Revenue</u>, 530 U.S. 15, 20 (2000), and <u>Bittner v. Borne Chem. Co.</u>, 691 F.2d 134, 135 (3d Cir. 1982)), and that "claims are to be valued as of the petition date," *ibid.* (citing <u>In re Brints Cotton Mktg</u>, 737 F.2d 1338 (5th Cir. 1984)).  Judge Fullam recognized that this "necessarily means that the claims are to be appraised on the basis of what would have been a fair resolution of the claims in the absence of bankruptcy."  322 B.R. at 722.  "The values of future claims should be estimated on the same basis — *i.e.*, what their claims would have been worth in the tort system

---

narrow sample would require postponing the estimation hearing by "a period of six months to a year."  Exhibit 6, at 1.

[19]      Four fact witnesses and fewer than a dozen expert witnesses testified for all parties.

as it existed on the petition date," albeit taking into account changes likely to occur and to affect "the number of such future claims." *Ibid*.

The court noted that Owens Corning "had disposed of more than 330,000 asbestos claims pre-bankruptcy, and had compiled a voluminous, and very complete, data-bank of pertinent information." 322 B.R. at 722. "As a result of this litigation history, the information available" to guide the estimation in bankruptcy included:

> (1) how juries evaluated various categories of asbestos claims; (2) the percentage of claims disposed of without payment; (3) how the various asbestos defendants viewed their comparative liability for the universe of asbestos claims throughout the nation (Owens Corning's was about 20%); (4) what experienced asbestos litigators on both sides regarded as the appropriate settlement value of various types of asbestos-related claims; and (5) a rough approximation of the relationship between the number of persons affected by asbestos-related diseases and the number of persons who would make claims against Owens Corning (propensity to sue).

*Ibid.*

With respect to asbestos-related malignancies, the court found that "[t]here is general agreement that the values assigned to valid claims for mesothelioma, lung cancer, and other cancers throughout Owens Corning's litigation history accurately reflect the values such claims will have in the future." 322 B.R. at 724. Regarding nonmalignant claims, the court concluded that, "some of the past results have been skewed by factors which can and should be avoided in the future," presenting a question as to "the extent to which adjustments should be made to historical values to account for these probable changes." *Id*. at 722-23. The court rejected the contention that an asbestosis claim can be compensated only if supported by pulmonary function tests showing at least a 20% reduction in lung function, as well as the claim that, in order to qualify for compensation, an asbestosis claim must be supported by positive x-ray findings by at least two independent B-readers. *Id*. at 724.

Owens Corning's claims history and claims data formed the "mother lode" of information available for evaluation and analysis by the several experts who testified at the estimation hearing.[20]  The range of competing estimates of Owens Corning's liability as testified to by these witnesses was as follows: $2.08 billion (Dr. Dunbar),[21] $6.5 billion to $6.8 billion (Dr. Vazquez), $8.15 billion (Dr. Rabinowitz), and $8.4 billion to $11.1 billion (Dr. Peterson).  After taking account of assumptions and factors likely to require modest adjustments in their estimates, the court opined "that the appropriate figure lies somewhere between Dr. Vazquez's high estimate [$6.8 billion] and Dr. Rabinowitz's low estimate [$8.15 billion]."  *Id*. at 725.  The court therefore estimated Owens Corning's total liability at $7 billion.

Credit Suisse moved for reconsideration, arguing that the court should have made downward adjustments to his estimate to "account for alleged overpayments to unimpaired claimants."  Owens Corning, Motion for Reconsideration, at 1 (attached as Exhibit 8).  In language that bears emphasis for purposes of this case, the court denied the motion:

> I do not adopt the Banks' seeming assumption that to acknowledge that past litigation results were skewed to some extent by litigation irregularities (forum-selection, mass-screenings, runaway juries, etc.) is equivalent to a guarantee that, from now on, no such factors will be present. *This Court does not have the authority to change state law.  All cases which can*

---

[20]     The asbestos claimants committee offered the testimony of Dr. Mark Peterson, who is the retained claims consultant for the corresponding Committee in this case.  The legal representative of future claimants in Owens Corning relied on Dr. Francine Rabinowitz.  Credit Suisse called as a fact witness Dr. Thomas Vazquez, who had created certain estimates in the past as a consultant to Owens Corning, and Credit Suisse's expert was Dr. Frederick Dunbar of NERA.

[21]     The court pointedly rejected Dr. Dunbar's testimony, observing that "[h]is conclusion that, in the current inventory of 128,000 claims, only about 17,000 will prove compensable cannot be accepted without totally disregarding the historical experience in asbestos litigation." 322 B.R. at 725.

> *survive summary disposition under state law have some potential value.*
> *The perfect world assumed by the [Debtors'] argument — a world in which*
> *only persons suffering serious symptoms make claims, symptoms which*
> *could possibly be caused by something other than asbestos are ruled out,*
> *reductions in pulmonary function will be disregarded unless they exceed*
> *20%, and only multiple X-ray readings will suffice — cannot realistically be*
> *predicted with assurance.*
>
> In short, I merely attempted to arrive at an estimate which
> appropriately reflected the differences between what has already occurred,
> and what is likely to happen in the future.

*Id.* at 1-2 (emphasis added).

**B.    Debtors' Claims History Constitutes the Essential Data for Estimation Because Grace Has Always Had Every Incentive to Minimize Its Liability in Resolving Claims**

As explained above, an estimation derived from average claim-resolution costs, computed over a base period close to the petition date, best approximates "the total amount which the claimants, as a group, could legitimately have claimed as compensation, as of the petition date." Owens Corning, 322 B.R. at 722.  This approach rests on the common-sense proposition that the claims actually resolved by Grace close in time to the petition date are closely comparable to the pending and future claims — more comparable, indeed, than anything else of known value — and thus provide the only realistic benchmark for estimating the aggregate value of those pending and future claims.  It presumes, as is appropriate, that at every juncture in Grace's long history as an asbestos defendant, management made rational decisions in the enlightened self-interest of the company with the overall objective of minimizing its outlays and its liability.  The presumption is a sound one, and it is, in any event, confirmed by the testimony of Grace lawyers quoted below (at page 44-45).  The Court therefore ought to be skeptical when asked by Debtors to ignore or deprecate the values that emerged from that process.

**1.**     **Debtors' Suggestion that <u>Daubert</u> Precludes Use of the <u>Eagle-Picher/Owens Corning</u> Estimation Methodology in This Case Is Frivolous**

Debtors mount a curious attack on the <u>Eagle-Picher/Owens Corning</u> estimation methodology by suggesting that <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993), somehow requires the Court to subject would-be expert evidence in support of individual claimants' cases to <u>Daubert</u>-style scrutiny before it can estimate any claims for purposes of formulating and confirming a plan.  *See* Tab 3, 9-13.  This is nonsense.  Nothing in <u>Daubert</u> or its progeny says anything at all about bankruptcy estimation, as Debtors suggest.  *See id.* 13.  Of course, in an individualized allowance/disallowance process under 11 U.S.C. § 502(b) — which, for personal injury and wrongful death claimants must involve jury trials under 28 U.S.C. § 1411 — <u>Daubert</u> could come into play in evaluating the admissibility of specific expert testimony proffered by either side, but estimation does not endeavor to determine the "validity" of individual claims.[22]

As the Court is aware, <u>Daubert</u> provides that a particular expert's testimony is admissible in a particular proceeding so long as the process or technique the expert used in formulating the opinion is relevant and reliable.  <u>Daubert</u>, 509 U.S. at 589.  The reliability inquiry is intended to be a flexible one, designed merely to serve as a threshold query for admissible evidence.  *See id.* at 594.  And the court "must err on the side of admission rather than exclusion."  <u>Paoli R.R. Yard PCB Litig. v. Monsanto Co.</u>, 916 F.2d 829, 857 (3d Cir. 1990).

---

[22]     Debtors' citation to <u>In re Armstrong</u>, 28 B.R. 864 (Bankr. D. Del. 2002), is completely misleading (at Tab 3, 13).  That case involved an objection process — not an estimation — and there is no equivalent situation here.

To the extent Debtors are arguing, for example, that any doctor's diagnosis that is not supported by "two B-reads, one independent, * * * as well as the underlying, supporting X-rays" as well as particularized pulmonary function testing (at Tab 4, 6-9) is inherently unreliable — and therefore "junk science" that is prohibited under <u>Daubert</u> — they are wrong.  The 2004 ATS Statement[23] — which sets out the authoritative guidelines for diagnosing nonmalignant asbestos-related diseases — does not require a pulmonary function test at all, let alone one that meets Debtors' specific criteria.  Rather, all that is required for a diagnosis of asbestosis is a finding of interstitial pulmonary fibrosis, and evidence of exposure to asbestos "that is of sufficient duration, latency and intensity to be causal."  Exhibit 9, at 700.  The ATS Statement specifically recognizes that asbestos can cause real harm without any obvious functional impairment:

> It is understood that [non-malignant asbestos-related] disease may
> be present at a subclinical level and may not be sufficiently
> advanced to be apparent on histology, imaging or functional
> studies. * * * Demonstration of functional impairment is not
> required for diagnosis of non-malignant asbestos-related disease
> * * *.

<u>Id.</u> at 691.  As a consequence, in the 12 years since the Supreme Court handed down <u>Daubert</u>, there has not been a single reported state or federal case in which a doctor was disqualified from testifying in an asbestos personal injury case for failure to consider two B-reads or require a PFT as a prerequisite to diagnosis.

What Debtors really appear to be saying is that no plaintiff could conceivably produce an expert who could legitimately testify as to a medical condition, product identification or other elements in support of his personal injury claim that would satisfy <u>Daubert</u> unless that expert

---

[23]     <i>See</i> 2004 American Thoracic Society Statement, <i>Diagnosis and Initial Management of Nonmalignant Diseases Related to Asbestos</i>, 170 Am. J. Respiratory and Critical Care Med. 691, 696 (2004) ("2004 ATS Statement") (attached as Exhibit 9).

applied Grace's manufactured, Grace-friendly medical criteria.  <u>Daubert</u> specifically prohibits what Debtors are implicitly trying to do here: exclude experts on the basis of their conclusions versus their methodologies.  As the Supreme Court explained in <u>Daubert</u> itself, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."  509 U.S. at 595; *see also* <u>In re Paoli R.R. Yard PCB Litig.</u>, 35 F.3d 717, 746 n.15 (3d Cir. 1994) ("The methodology/conclusion distinction remains of some import * * * to the extent that there will be cases in which a party argues that an expert's testimony is unreliable because the conclusions of an expert's study are different from those of other experts.  In such cases, there is no basis for holding the expert's testimony inadmissible.").

Moreover, <u>Daubert</u> issues are decided on a case-by-case basis.  In <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137 (1999), the Supreme Court held that whether or not the factors identified in <u>Daubert</u> are pertinent for admitting expert testimony depends upon "the particular circumstances of the particular case at issue."  526 U.S. at 150; *see also id.* at 156 ("The trial court had to decide whether this particular expert had sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case.").  *See* <u>In re Unisys Savings Plan Litig.</u>, 173 F.3d 145, 156 (3d Cir. 1999); <u>United States v. Llera Plaza</u>, 188 F. Supp. 2d 549, 564 (E.D. Pa. 2002).  Consequently, the only lawful way to implement Debtors' demand for <u>Daubert</u> scrutiny of individual claimants' evidence would be, at a minimum, 118,000 <u>Daubert</u> hearings — or more, depending on the number of experts each claimant would proffer in support of his claim.  Thus, while Debtors' actual estimation method remains unrevealed, to the extent they intend to eliminate individual claims by means of a <u>Daubert</u> motion seeking to preclude expert testimony based on evidence provided by the POCs, their proposal must fail.

### 2.    Grace Has Repeatedly Estimated the Extent of Its Asbestos Liabilities Using the Very Claims History It Now Asks This Court to Ignore

The entire thrust of Grace's novel disallowance scheme for asbestos estimation amounts to the classic childhood ploy of asking for a "do-over," with the rules changed in its favor.  After more than two decades of experience litigating — sometimes trying, but usually settling — the asbestos personal injury cases filed against it, at all times following litigation strategies which were designed to and did minimize its overall liability to asbestos claimants, Grace now seeks through its "POC/questionnaire" to engage in a "trial by claim form" process from which its "experts" will make assumptions about the compensability and value of claims which have no relation to the substantive state law which governs the claims.  In addition to all the due process and fairness problems caused by Grace's approach, the entire premise behind it, namely that Grace's litigation history does not reflect its "true" liability, is simply wrong — if the standard of "validity" is the law as it is, not as defendants wish it were.

Grace, like most asbestos defendants, has for years publicly admitted in its financial statements that it had large and growing asbestos liabilities, and has estimated the extent of those liabilities using the exact same claims history that it now asks this Court to ignore.  Its December 31, 2000 10-K, for example, is replete with examples of Grace's admitted asbestos liability: Grace reports its "asbestos related liability to be realized after one year" and "asbestos-related liability expected to be satisfied after one year."  December 31, 2000 10-K, at F-14 and F-15 (attached as Exhibit 10).  Grace discusses in detail its "Asbestos-related *liability*" and its "estimated *liability*" for asbestos claims.  *Ibid.* (emphasis added).  The reserve amounts for asbestos personal injury liability were, of course, based on estimates derived from Grace's own claims filing and resolution history, and the defense and disposition costs associated with those claims.  *Id.* at F-15

Robert Beber, Grace's former general counsel, testified at deposition that Grace's asbestos personal injury reserve was based on: (1) the number of pending cases; (2) where cases were pending; (3) Grace's historical settlement history; (4) the percentage of cases settled versus percentage dismissed; (5) the likelihood of taking a case to trial; (6) the average disposition costs per case (*i.e.,* the money Grace paid to plaintiffs); and (7) defense costs.  <u>Official Committee of Asbestos Personal Injury Plaintiffs v. Sealed Air Corp.</u> No. 02-2211 ("<u>Sealed Air</u>"), Beber Deposition, July 31, 2002, at 263-64 (attached as Exhibit 11).  Mr. Beber was asked, "[w]hy did Grace use its historical settlement averages and dismissal rates as part of calculating the reserve?"  He responded:  "It's as good a benchmark as we had to determine for every thousand, if you will, claims, how many we would pay on and how many we would get out of without having to pay any money."  *Id.* at 264.  Similarly, Jay Hughes — Grace's former in-house lawyer in charge of asbestos PI litigation — testified that Grace's estimates of its asbestos liability were calculated using historical settlement averages and dismissal rates because "that's the most logical way to estimate future claims is to look at the history, in terms of the value of future claims."  <u>Sealed Air</u>, Hughes Deposition, July 19, 2002, at 151-52 (attached as Exhibit 12).

Indeed, when Grace attempted to calculate its solvency at the time of the March 1998 Sealed Air transaction,[24] it hired Drs. Dan Rourke and B. Thomas Florence of KPMG to perform an estimate of its asbestos liabilities based on pending claims and those that would be filed

---

[24]    This led to a fraudulent conveyance action whereby the Asbestos Claimants Committee (among others) sought to avoid the 1998 transfer by W.R. Grace & Co.-Conn., a Grace subsidiary and asbestos defendant, of its packaging business to its own subsidiary and the transfer of that subsidiary's stock to Grace.  *See* <u>Official Committee of Asbestos Personal Injury Plaintiffs v. Sealed Air Corp</u>, Adversary Nos. 02-2210, 02-2211, Complaint (Bankr. D. Del. Mar. 18, 2002).  That case was settled in November 2002, and the settlement was recently approved by this Court.  *See id.* Order Approving, Authorizing, and Implementing Settlement Agreement, dated June 27, 2005.

through the year 2039.  When asked at deposition whether he thought "using Grace's prior

claims resolution history, including its acceptance rates and the average claim indemnity

payments, is a valid way to project the future asbestos liabilities of Grace," Dr. Rourke testified:

"The answer is yes, because we are basically extrapolating, again, from the recent past to the

future, so the answer is yes."  <u>Sealed Air</u>, Rourke Deposition, June 20, 2002, at 154 (attached as

Exhibit 13).  Dr. Rourke also testified that "[as] of December 1997, [he] personally believ[ed]

that it was possible to reasonably estimate the number and defense and disposition costs of

personal injury claims that may be brought against Grace after the year 2002."  *Id.* at 190.

Debtors' assertion that the same claims history is fundamentally flawed for purposes of

estimating its liability in bankruptcy is just not credible.

> **3.      Debtors' Assertion That Grace Was Forced to Pay Meritless Claims
> in the Tort System Is Controverted by Its Own Documented Claims
> Settlement Policy**

Because they realize that an estimate based on Grace's claims history in the real world

ruled by the actual tort law will result in a number that Debtors will not like, their bankruptcy

lawyers now ask this Court to ignore Grace's past history with asbestos on the grounds that the

litigation results did not reflect its "true" liability.  Tab 3, 1-2.  Glaringly absent from the papers

filed by Grace's bankruptcy lawyers is a shred of evidence to support the assertion that Grace

paid thousands of claims on which it believed it had no potential liability.  If it were true that

Grace regularly paid money to settle worthless claims, one would expect to see at least an

affidavit from one of the many attorneys who, on Grace's behalf and on behalf of its insurers,

opposed, tried, settled, and paid tens of thousands of the very types of claims Debtors now say

are worthless.

Not surprisingly, Debtors' assertion that Grace was forced to pay meritless claims (as contrasted to claims on which it faced a risk of losing) in the tort system is controverted by its own documented claims settlement policy.  Grace followed a policy of settling only claims that were extremely likely to survive a motion for dismissal; it defended against the rest.  In a 1996 letter to Price Waterhouse regarding an examination of Grace's financial statements, a Grace attorney explains the company's settlement policy:

> The company generally tries to settle those cases where there is evidence of: (a) exposure to a product formerly manufactured by the Company; and (b) the presence of an asbestos-related injury. In cases without such evidence, the Company seeks to be dismissed and, where necessary, on occasion proceeds to trial in such cases.

At 2-3 (attached as Exhibit 14).  Elsewhere, Grace explained its settlement policy as follows: "Grace requires three things to settle a suit: workplace exposure (1) to Grace product (2) and a doctor's diagnosis of an injury caused by exposure to asbestos (3; [sic] the doctor's report must state the injury is due to asbestos exposure) [sic]."  ARPC Report on Grace Asbestos Liability 8 (attached as Exhibit 15).

Grace followed this strategy because it was the *cheapest method* of resolving its asbestos liability.  The record of jury verdicts against asbestos defendants compared to the amounts at which they could settle cases makes clear that it would have been much more expensive if, instead of settling virtually all cases likely to survive dismissal, Grace had litigated them to judgment, *even if it had been successful a substantial share of the time*.  In short, by using Grace's claims resolution history as the data set for estimation, this Court will not be unfair to Debtors, but will favor them with the presumption that they could have continued to dispose of cases with equivalent efficiency.

Similarly, there is no merit to Grace's assertion that it was forced to settle worthless claims because it could not get a fair trial in the tort system.  Tab 2, 38-43.  This assertion is completely unsupported, and it is belied by Grace's own trial record and its stated policy of defending against weak claims and settling only those claims that were likely to survive motions to dismiss.[25]  The notion that Grace could not get a fair trial across the entire American tort system is offensive and absurd.  This Court is well aware of the capabilities of the American tort system to provide all parties with a fair opportunity to present their cases.  Asbestos litigation is not confined to what Debtors call "high verdict" jurisdictions; for example, thousands of claims have been filed against asbestos defendants in the state and federal courts of Pennsylvania, Delaware, and New Jersey — venues familiar to this Court.  Indeed, the only States in which Grace has been 100% unsuccessful at trial are three northern prairie States — Montana, Minnesota, and South Dakota — none of which is reputed to be especially unfair to defendants in tort litigation.  *See* In re USG Corp, No. 01-2094 (Bankr. D. Del), Affidavit of Mark Peterson, July 19, 2002 ("Peterson USG."), at ¶ 37 & Table 4 (attached as Exhibit 16).  In short, the courts competently manage the vast majority of asbestos personal injury cases throughout the country.

Debtors also argue that many claims result from the transporting of existing claims to new or different defendants, regardless of exposure.  Tab 1, 30.  This argument, in addition to being belied by Grace's own documents, ignores the nature of proof of causation for asbestos diseases and the basis for its own settlement history.  The typical asbestos personal injury claimant is an industrial or construction worker who, over the course of his working life, was exposed to, and could prove exposure to, the asbestos-containing products of a substantial

---

[25]    The crucial distinction that Debtors ignore when they argue that they were forced to settle "invalid" claims is that the test of a "valid" claim is whether it presents a significant risk of an unfavorable result at trial, not whether the defendant believes there is no possible defense.

number of different asbestos defendants.  Correspondingly, it was established early on that a

plaintiff did not have to assume the impossible burden of proving that any particular defendant's

product was the unique cause of his injury — only that it was a "contributing factor."  *See* Borel

v. Fibreboard Paper Prods. Co., 493 F.2d 1076, 1094 (5th Cir. 1974).  This resulted in each

claimant having an entirely legitimate basis for naming many different asbestos defendants in a

typical lawsuit.

As indicated above (at 14-15), once a plaintiff comes forward with evidence that he has

an asbestos related disease,[26] whether or not he had a valid claim against a particular defendant

boils down to an individualized facts and circumstances jury question: namely, that exposure to

defendant X's product was a "contributing factor" in causing the disease.  Under the law of most

jurisdictions, this showing was relatively easy to achieve, not because evidentiary standards were

low, but because use of asbestos — dangerous at any level of exposure — was widespread.  Not

surprisingly, given the relative ease by which any given plaintiff could advance evidence

sufficient for a jury to find injury and exposure to a defendant's product, defendants like Grace

quite rationally decided it was far cheaper to settle a case for a few thousand dollars if presented

with an affidavit that the plaintiff was present at a work site at a time when Grace asbestos-

containing products were known to be present than to litigate such a case all the way through

---

[26]    While "no safe level of exposure or 'threshold' level [of exposure] has ever been
established," Orleans Parish Sch. Bd. v. Asbestos Corp. Ltd., 114 F.3d 66, 69 (5th Cir. 1997), the
only known cause of mesothelioma is exposure to asbestos, and the medical literature is replete
with examples that even minimal amounts of exposure to asbestos dust can cause mesothelioma.
Asbestosis, by definition, is caused by asbestos exposure.  Although causation issues arise in
lung cancer cases, if the plaintiff has lung cancer and a documented history of exposure to
asbestos as a practical matter his case will survive summary judgment in almost every
jurisdiction.

trial and face a potential jury verdict in the plaintiff's favor, which could potentially run into the millions of dollars.[27]

### 4.    Asbestos Disease Incidence and Historical "Spikes" Are Readily Explained, and Do Not Justify Debtors' Burdensome Questionnaire

Citing "asbestos regulations [that] * * * in the early 1970s led to dramatic reductions in exposure" Debtors assert that there is "no foundation in science for the large numbers of asbestos claims currently pending against asbestos defendants." Tab 2, 17-18. They accordingly argue that those claims "were invalid or of doubtful validity." Tab 2, 42. These assertions are pure histrionics, from a medical perspective and with respect to litigation issues that are both generally applicable and peculiar to Grace.

The only epidemiologically established cause of mesothelioma is asbestos exposure, and the vast majority of mesothelioma deaths in men can be traced to identified asbestos exposure. The National Cancer Institute's "SEER" data allows one to compute the number of mesothelioma deaths in the United States each year. According to the SEER data (and Dr. Hans Weill, an epidemiologist who testifies only on behalf of asbestos defendants) there are currently about 2,800 new mesothelioma cases in men each year, plus several hundred additional cases in women. H. Weill. et al*., Changing Trends in US Mesothelioma Incidence*, 61 OCCUPATIONAL & ENVTL. MED. 440 ("Weill Article") (attached as Exhibit 17); Owens Corning,. Transcript, Jan., 18, 2005 p.m, at 111-114 (attached as Exhibit 18). The incidence of mesothelioma in the United

---

[27]    This strategy is fundamentally different from what is sometimes claimed — that defendants settled on a "nuisance" basis simply because it was cheaper to pay a little than fund a defense, even if the defense was all but certain to win. The testimony (cited above) of Grace's counsel makes clear that it was not the costs of defense, but the risks of losing, that made settlement the rational choice.

States is either at its peak or very close to it, so any decline in the incidence of mesothelioma is not statistically significant.[28]  Exhibit 17, at 439.

It should come as no surprise to Grace that mesothelioma incidence has reached a peak now, because although there is no upper limit in latency for mesothelioma, the latency period for the disease runs 30-40 years or more from first exposure, and 1973 was the peak year for asbestos consumption in the United States.  Asbestos defendants, including Grace, should have known for years that the rates of asbestos-related disease would increase steadily until the turn of the twenty-first century, as they have, and decline only very gradually thereafter.  In 1982, researchers at Mt. Sinai predicted the future asbestos-caused cancer deaths that would occur through 2030.  *See* Nicholson, et al.*,* Exhibit 4.  This study considered the levels of exposure to asbestos prior to its "regulatory curtailment" in the 1970s, the size of the exposed population, and the long latency period of asbestos-related cancers.  It projected that mesothelioma and lung cancer deaths would rise throughout the 1980s and 1990s, plateauing at the turn of the century.  Real-world mesothelioma deaths as measured by the National Cancer Institute have confirmed the Study's forecast.  *See* Peterson USG, Exhibit 16 at ¶ 47; In re Eagle-Picher Indus., Inc., 189 B.R. 682, 687 (Bankr. S. D. Ohio 1995) (discussing study).

Unlike the SEER data for mesothelioma incidence, there is no national registry of non-malignant disease that sets forth statistics on either the total incidence or the prevalence of

---

[28]     Grace's statement and chart at page 15 claiming that mesothelioma incidence rates have declined by 27% over the past decade is a gross mischaracterization of the SEER data.  A more accurate picture of the mesothelioma disease incidence rate (which has been fairly constant since 1990 is found at Figures 1 and 2 in Dr. Weill's article).  Exhibit 17, at 439.

asbestos-related non-malignancies.[29]  Like mesothelioma, asbestos-related non-malignant

diseases have very long latency periods.  The information we do have, however, suggests that the

incidence and prevalence of asbestosis is still increasing.  According to the most recent

government data, asbestosis deaths and hospital discharge diagnoses of asbestosis have been

consistently rising over the decade 1990-2000, reaching a high of 20,000 asbestosis related

hospitalizations in the year 2000.  CDC/NIOSH Work Related Lung Disease Surveillance

Report, at 3-4, 15 (Attached as Exhibit 19).

Because there is no valid, reliable, peer-reviewed, or published epidemiological study

that projects the incidence or prevalence of non-malignant diseases in the United States as the

Nicholson study does for asbestos-related cancers (and no way to check the accuracy of such

projections even if such a study existed), most medical experts agree that "changes in

mesothelioma incidence are probably the clearest measure of the extent of asbestos related

disease."  Weill Article, Exhibit 17, at 441.  The "spike" in claims prior to Grace's 2001

bankruptcy is thus easily explained by the long latency periods and epidemiology of asbestos

related diseases — the peak period for the asbestos disease burden in the United States was the

late 1990s to early 2000s, approximately 30 years after the peak usage of asbestos in 1973.

In addition to the fact that the peak period for asbestos disease occurred, as expected, in

the late 1990s to early 2000 time period, there are other explanations for the rise in claims some

of which are general and some specific to Grace.  As Grace notes, there has been an increase in

the claiming rate of non-malignant plaintiffs.  But whereas Grace asserts that this increase has

been confined to non-malignant claims, the fact is that the propensity to sue has *also* increased

---

[29]     "Incidence" means the number of new occurrences of disease in a given population;
"prevalence" measures the number of people in the population who have the disease at any one
point in time.

with respect to individuals suffering from asbestos-related *cancers*.  This general increase in the propensity of injured asbestos victims to file a claim has many causes, from the rise of internet related advertising to mass screening operations sponsored by unions or law firms to the general increase in publicity surrounding asbestos litigation.  The bankruptcies of other asbestos defendants also increased the number of claims against those defendants who were not in bankruptcy; until April 2001, this category included Grace.  During the pendency of the Georgine and Fibreboard litigation, claims against numerous defendants were stayed or deferred; when the Supreme Court found these settlements were improper under the class action rules, claims against all asbestos defendants naturally rose.

Finally, events specific to Grace, including its own litigation strategies, caused the supposed "spike" in claims.  Unfavorable publicity surrounding Grace's Libby, Montana asbestos mine, which first came to light in early 2000, was certainly a factor in the increase in claims against Grace (although this by no means suggests that these claims were invalid).  Most importantly, however, Grace itself took steps to *decrease* the number of claims filed against it in 1998 and 1999 with full knowledge that doing so meant that claims against it would rise again in 2000 and 2001.  Because of the large volume of personal injury cases pending against it, Grace often tried to resolve thousands of claims at once in large "mass settlements" with established plaintiffs' law firms.  In such mass settlements several thousands of cases would be resolved for aggregate amounts running into the tens of millions of dollars.  The mass settlement agreements typically required each claimant to submit a release, a diagnosis from a licensed physician, and an affidavit or another evidence of exposure to asbestos-containing products manufactured and sold by Grace.  Mass settlement agreements entered into with some of the largest plaintiffs' firms in 1997 and just prior to March 1998 also contained two to three year "moratoria periods" that

prohibited the plaintiff firms from filing new cases against Grace until the moratoria periods

expired.  When these "moratoria periods" began to expire in early 2000, the established

plaintiffs' firms began to file claims against Grace again, *just as Grace expected*.  As Grace's

former general counsel testified during the Sealed Air litigation:

> Q.   When Grace entered into the mass settlement agreement with
> Baron and Budd that had a moratorium period, what expectations did you
> have as to what Baron and Budd would do in terms of filing claims against
> Grace when the moratorium period expired?
> . . .
> A.   I assume that after the moratorium period expired they would
> again begin filing claims against Grace.
>
> Q.   Did you have the same expectation with respect to the Goldberg
> Persky firm?
>
> A.   Yes . . .  Because it was not an ongoing moratorium.  It had a
> defined period.
>
> Q.   Once a defined period was over, that law firm could begin filing
> new claims against Grace?
>
> A.   Correct.
>
> Q.   Why did Grace as a part of its dealing with these plaintiff law
> firms where it entered into mass settlements asked for moratorium periods?
> . . .
> A.       It was my view, having negotiated the first one, that the
> moratorium provision would reduce the number of claims filed against the
> company.

Beber, Deposition, Exhibit 11, at 258-59.  In the face of this testimony, for Grace to now claim

that the 2000-2001 spike in claims filed against it was "unpredicted" and "unexplainable" is

disingenuous.

5.    **The Studies Grace Cites Have No Bearing on the Compensability of Claims Under State Tort Law, and Merely Show That Doctors Can Disagree on Medical Diagnoses**

Debtors contend that recent studies demonstrate a problem of poor and/or fraudulent medical data in asbestos litigation (Tab 2, 28), and thus justify extensive discovery of the medical and other records of each of the 118,000 claimants.  They point to no actual evidence of fraud among asbestos B-readers, but ask the Court to draw unwarranted inferences from the cited studies, and from a dated and aberrant case involving one screening facility and a group of tire workers.  And they certainly do not support the absurd suggestion that Debtors can demonstrate fraud by examining the records requested by their POC.

The fact that B-readers disagree does not establish fraud.  As Debtors have conceded, the interpretation of x-rays for purposes of diagnosing non-malignant asbestos diseases is a subjective process.  *See* Tab 4, 6-7; *see also* In re Joint E. & S. Dists. Asbestos Litig., 237 F. Supp. 2d 297, 309 (E. & S.D.N.Y. 2002);  Owens Corning, Friedman Deposition, Dec. 14, 2004, at 249-50 ("Friedman") (Attached as Exhibit 20**)**, Owens Corning, Gitlin Deposition, Dec. 17, 2004,. at 65-66 ("Gitlin") (attached as Exhibit 21).  And, as Judge Fullam noted in Owens Corning, it is "virtually impossible" to "prove which of two conflicting readings of lung X-rays is correct," let alone demonstrate that a disputed reading is fraudulent.  Owens Corning, Memorandum and Order, Apr. 28, 2005, at 3 (attached as Exhibit 22).

What is known is that Grace has a long history of vigorously defending and settling asbestos claims, with the assistance of well-funded and aggressive counsel who were alert to every opportunity to gain leverage over plaintiffs.  For Debtors to come before this Court now suggesting that an extensive fraudulent scheme somehow escaped Grace's detection until its bankruptcy defies common sense.  Debtors' reliance on Raymark Ind., Inc. v. Stemple, No. 88-

1014-K, 1990 WL 72588 (D. Kan. May 30, 1990), which they cite at every turn (*e.g.,* at Tab 2, 18; Tab 4, 7), simply underscores the point.  The <u>Stemple</u> case, decided fifteen years ago, was aberrant and notorious.  Grace had ample opportunity in the decade between that decision and its own bankruptcy to root out and deal with any claims generated under similar circumstances.  Owens Corning, for example, was vigilant in resisting claims it considered dubious, even to the point of suing some laboratories for what it claimed were bogus PFTs, but had to settle that suit for an amount that covered only a third of its litigation costs.  *See* Exhibit 22, at 3.  There is no reason to believe that Grace was any less vigilant; had it discovered any fraud, it would have pursued all available remedies.  And, as noted below, Grace, like all other asbestos defendants, will have taken into account the source reliability of medical evidence in determining the settlement value of cases.

### a.    Manville "Penn State" Audit

Grace points to an audit of medical records, conducted in the 1990s, for claims submitted to the Manville Trust, which Grace grossly mischaracterizes as concluding that "41% of claims did not present evidence of asbestos-related diseases."  Tab 1, 4; Tab 2, 27.  The audit was not an attempt to determine whether the audited claimants had any asbestos-related disease based on a review of medical records or physical examinations.  Rather, it merely tested whether B-readers selected by the Trust agreed with the x-ray classifications of claimants' doctors.  The audit showed that the B-readers hired by the Trust agreed with claimants' doctors' x-ray interpretations in 59% of the audited cases, and that, in the remaining 41% of cases, Trust B-readers interpreted the x-rays as evidencing either no disease or a less serious disease than claimed.  *See* A.R. Localio et al., Biostatistics Section, Dept of Health Evaluation Services, Penn. State Univ. College of Medicine & Center for Clinical Epidemiology and Biostatistics, *The*

*Manville Personal Injury Settlement Trust X-Ray Audit: An Assessment of the Identification of the Underlying Disease Process Implications for Medical Review by Certified B-Readers* (1998), at 14 (the "Penn State Study"), Debtors' Brief  Exhibit C.

The Trust's own consultants at Pennsylvania State University drew no conclusions as which B-readers' interpretations were correct, much less any conclusions about whether the claimants were suffering from asbestos-related diseases.  Rather, they concluded only that there was a great degree of inter-reader variability, even among the B-readers hired by the Trust. While the Trust's B-readers disagreed with plaintiffs' B-readers 41% of the time, they also disagreed among themselves, sometimes even more: the disagreement rate among the ten possible pairings of Trust B-readers was as high as 66%.  *Id.* at 26.  The authors of the Penn State Study commented that "[t]he level of agreement among some of the [Manville Trust] B-readers pairs in this study was poor by any clinical or statistical standard."  *Id*. at 27.  Judge Weinstein, who oversees the Manville Trust, summed it up as follows: "[T]he B-Readers' reports of those criticizing plaintiffs' experts were sometimes inconsistent among themselves and furnished no gold standard for diagnoses.  The process is intrinsically subjective at the margins." In re Joint E. & S. Dists. Asbestos Litig., 237 F. Supp. 2d at 309.

Importantly, the intrinsic subjectivity of interpreting x-rays and the large degree of inter-reader variability led the outside consultants to the Manville Trust to conclude that the audit was an *invalid basis for denying individual claims*.  When the Manville trustees attempted to deny claims based on the audit's findings, claimants sued for violation of the Trust's distribution procedures.  After being told by Judge Weinstein that he was going to find for the plaintiffs, the

trustees backed down, and never actually used the audit as a basis for denying a single claim.

Owens Corning, Transcript, Jan. 19, 2005 pm., at 110-12 (Dunbar) (attached as Exhibit 23).[30]

The Manville Trust Distribution Procedures subsequently were amended, but not because, as Debtors incorrectly imply, the audit had uncovered illegitimate claims.  Rather, there was concern that the ratio of compensation payments as between nonmalignancy claims and malignancy claims had become skewed in favor of the less serious injuries.  Judge Weinstein found that it was appropriate for the Trust to respond by

> [i]ncreas[ing] the ratio of payment made to those with more serious diseases, that is, mesothelioma or other malignancies, to payment made to non-malignant or unimpaired claims * * * .  Such a shift in ratios would help remedy the current misallocation of fund resulting in part from the rise in unimpaired claimants.

In re Joint E. & S. Dists. Asbestos Litig., 237 F. Supp. 2d at 319, 325.  Accordingly, the parties agreed to amend the Manville TDP so as to direct more of its limited resources to the victims of asbestos-related malignancies.

The experience of the Manville Trust in no way supports Debtors' request to review all claimants' medical records and have entire categories of claims disallowed at the estimation stage.  The Manville Trust is a limited fund settlement trust that is unable to fully compensate its claimants; thus, the interested parties agreed to channel more of the trust's funds to cancer victims and away from those with less serious illnesses.  No such triage is necessary here, where Debtors claim they can pay all claims their full value, and the issue is not what individuals get paid what from a limited fund, but what is the total liability for all asbestos personal injury claimants.  And there was no determination in the case of the Manville Trust that the nonmalignancy claims were invalid or would have lacked value in the tort system.

---

[30]    Dr. Dunbar testified as an expert witness for Credit Suisse in Owens Corning.

#### b.        Johns Hopkins/Gitlin and Owens Corning Studies

As purported proof of widespread illegitimate claims, Debtors (at Tab 2, 27) point to a

study by Dr. Joseph Gitlin, et al., comparing x-ray interpretations by two groups of B-readers.[31]

Joseph N. Gitlin, et al., *Comparison of 'B' Readers' Interpretations of Chest Radiographs for*

*Asbestos Related Changes,* 11 J. ACAD. RADIOLOGY 843 (2004) (the "Gitlin Study") (Debtors'

Brief Exhibit G).[32]  The Gitlin Study, and the testimony of Dr. Gitlin (who was a consultant to

Owens Corning), were offered into evidence at the <u>Owens Corning</u> hearing.  In the study, which

was commissioned and funded *by attorneys for asbestos defendants*, seven B-readers, hand

picked by Dr. Gitlin and his co-authors, examined chest x-rays of 492 asbestos plaintiffs.  The

claimants considered were not a sample of all claimants; they were chosen and supplied to Dr.

Gitlin by counsel for asbestos defendants.  Gitlin, Exhibit 21, at 142–46.  Not surprisingly, given

that the claimants had chosen to pursue claims based in part on their abnormal x-ray readings,

95.9% of the x-rays had been interpreted previously by qualified B-readers as positive for

parenchymal abnormalities (scored as small opacities profusion category of 1/0 or higher on the

ILO scale.)[33]  The qualifications and competence of the initial B-readers were not disputed.  *Id.* at

---

[31]     B-readers are trained and certified by the National Institute of Occupational Safety and Health (NIOSH) to read chest x-rays for signs of pneumoconiosis, and classify them according to ILO standards, described in n. 15 below.  The designation of B-reader is the highest certification available for physicians trained in the use of the ILO standards.  *See* Penn State Study, Debtors' Brief  Exhibit C, at 3.

[32]     Debtors refer to this study as the "Johns Hopkins Study."  Although Dr. Gitlin is associated with Johns Hopkins, the title is a misnomer, as this was not an independent research study conducted under the auspices of that institution.  Rather, as the authors of the study disclose, it was commissioned and funded by attorneys for asbestos defendants.

[33]     ILO 1980 Classification of radiographs of the pneumoconiosis.  Geneva, Switzerland: Occupational Safety and Health Service, International Labor Office, publication 22, revised.  The ILO has set out a uniform standard for the classification of x-rays showing signs of pneumoconiosis.  As explained by Dr. Alan Ducatman:

120.  In only 9.4% of the cases did one of the B-readers chosen by Gitlin *et al.* agree with the initial B-reader's classification of the x-rays as 1/0 or higher on the ILO scale.  Gitlin Study, Debtors' Brief  Exhibit G, at 851, Table 4(b); Gitlin, Exhibit 21, at 124.  Even among Dr. Gitlin's B-readers there was poor agreement.  *See id.* at 129-30; L. Christine Oliver, et al., Letter to the Editor, 11 J. ACAD. RADIOLOGY 1397, 1398 (2004) (attached as Exhibit 24).[34]  In only one instance did all of Dr. Gitlin's B-readers agree in their classification of an abnormal x-ray.  Debtors' Brief Exhibit G, at 851, Table 4(b); Gitlin**,** Exhibit 21, at 123.

Dr. Gitlin and colleagues had not seen any previous studies that documented a 96% rate of parenchymal abnormality among workers exposed to asbestos, and therefore concluded that Dr. Gitlin's B-readers' findings of lower rates of abnormalities must have been more accurate than those of the initial B-readers.  *See* Gitlin Study at 855.  That conclusion was immediately decried by experts in statistics and public health as "without foundation."  (Alfred Franzblau, et al., Letter to the Editor, 11 J. ACAD. RADIOLOGY 1400, 1401 (2004) (attached as Exhibit 26); *see also* Oliver letter, Exhibit 24, at 1398.)  The 492 x-rays re-examined in the Gitlin Study were not taken from a cross-section of *exposed* workers.  Rather, they were x-rays of workers who, having been presented with abnormal x-ray findings, had *decided to file claims*.  As Dr. Franzblau, et al.,

---

Within the ILO system, roentgenograms [x-rays] were historically classified as follows:  category 0, normal; category 1, abnormal, few opacities; category 2, numerous opacities but lung markings visible; category 3, lung markings obscured.  Each category determination is followed by consideration of a possible alternative so that 1/0 could alternatively be normal but 1/1 and 1/2 are certainly and progressively abnormal.

Alan M. Ducatman, et al., *B-Readers' and Asbestos Medical Surveillance*, 30 J. OCCUPATIONAL MED. 644, 644 (1988) (attached as Exhibit 25).

[34]    The Oliver letter was one of the several critiques of the Gitlin Study submitted to and published by the Journal of Academic Radiology.

point out, and as Dr. Gitlin conceded in his deposition (Exhibit 21, at 87, 163), "the prevalence of radiographic abnormalities among persons who file claims would be expected to be at or near 100%, regardless of the prevalence of such abnormalities in the larger population from which these persons were drawn." Franzblau letter, Exhibit 26, at 1401.  As stated in another of the many critiques of the Gitlin Study, "one cannot really conclude from this [Gitlin's] analysis that the consultant readers were any more accurate than the initial readers." Oliver letter, Exhibit 24, at 1398.  Dr. Franzblau and his co-authors phrased it more starkly: "no valid scientific conclusions can be drawn from Gitlin and colleagues' investigation." Franzblau letter, Exhibit 26, at 1401.  Indeed, the Gitlin Study only shows what was already well known:  Equally qualified and certified B-readers can, and often do, disagree as to the proper interpretation of x-rays.  *See* Owens Corning, 322 B.R. at 724.[35]

The wide variability among B-readers exposed in the Gitlin Study was "expected," as extensive inter-reader variability already had been well documented in prior literature.  (Alan M. Ducatman, Letter to the Editor, 11 J. ACAD. RADIOLOGY 1399, 1399 (2004) (attached as Exhibit 27); *see also* Oliver letter, Exhibit 26, at 1398.  In 1988, Dr. Alan Ducatman and colleagues conducted an independent study in which 23 B-readers evaluated a random, representative sample of more than 100,000 chest radiographs of U.S. Navy employees.  Ducatman Study, Exhibit 25, at 646.  This study is particularly significant because it was not undertaken for litigation purposes.  Although no two B-readers were observing the same films, the large number

_____

[35]    Similarly, the 1990 Reger Study cited by Debtors (Tab 2, 27 n.58) also merely suggests that B-readers have different rates of identifying diseases, and is hardly revelatory.  But these differences in the propensities to identify disease in x-rays cannot be attributed to fraud; they are simply the result of human nature and the difficulties in interpreting x-rays.  Furthermore, the group of claimants in this study — tireworkers whose x-rays were conducted at one facility — was by no means representative of the universe of asbestos claimants and no conclusions can be reached based on the study.

of x-rays reviewed by each, and the method of randomization for distribution, minimized the possibility that the B-readers were observing x-rays of populations with different risks of developing asbestos-related diseases. *Id*. at 646. The Ducatman Study found a 377-fold variability among B-readers in their classifications of the x-rays (more than twice the 159-fold inter-reader variability found in the Gitlin Study), and a 15-fold variability even among NIOSH instructors, who train and certify B-readers nationwide, and are "presumably the most expert," with the greatest degree of calibration among themselves. *Id*. at 645-46.

Classification of chest radiographs for the diagnosis of asbestos-related diseases is a subjective process. While there may be some "over-reading" by some B-readers, there is also "under-reading" by those who are more conservative. *See* Owens Corning, Transcript, Jan. 13, 2005 p.m., at 40, 43 (Leff) (attached as Exhibit 28) (counsel for Owens Corning testified that B-reading is very subjective, and that asbestos defendants tended to use B-readers who were more conservative, and read fewer films as positive); Friedman, Exhibit 20, at 249-50, Gitlin, Exhibit 21, at 65-66. "Over-reading" is a far cry from fraud, indeed. From a medical surveillance perspective, "the failure to find existing disease is generally regarded as the most serious problem." Ducatman Letter, Exhibit 27, at 1399. Although a 1/0 classification on the ILO scale is largely regarded as the cut-off for considering an x-ray "positive" for asbestosis, asbestosis may be present in as many as 15-20 percent of exposed persons with "normal" chest x-rays. 2004 ATS Statement, Exhibit 9,at 696; H.M. Kipen, et al., *Pulmonary fibrosis in asbestos insulation workers with lung cancer: a radiological and histopathological evaluation,* 1987 Brit. J. Indus. Med. 96 ("Kipen Study") (attached as Exhibit 29). Given the dangers and known incidence of under-reading, and the admonition of the American Thoracic Society to give

the "benefit of the doubt" to patients who have been exposed to asbestos,[36] it is not surprising

that some doctors will conclude that markings on an x-ray in an asbestos-exposed person indicate

asbestosis, even though some other doctors will not.

In asking to review the x-rays of all 118,000 claimants against Grace, Debtors seek to

spend time and money on work that can only demonstrate once again what already is well known

— that equally qualified B-readers often reach different conclusions as to the proper

classification of x-rays, and that Debtors dispute the validity of most of the nonmalignancy

claims against Grace.  Disputes as to the proper interpretation of x-rays, however, do not justify

the rejection of a single claim, let alone the categorical rejection of entire classes of claims.  As

Judge Fullam has stated, "a claim * * * survives summary judgment if there is a diagnosis

supported by a single B-reading."  Owens Corning, 322 B.R. at 724.  And in our system of

justice, claimants have a constitutional right to a jury trial on disputed facts.  In re G-1 Holdings,

Inc., 323 B.R. 583, 605 (Bankr. D.N.J. 2005).

### c.        The Friedman Report

The final study cited by the Debtors, a 2002 report by Dr. Gary Friedman, who was a

medical consultant to Owens Corning, is equally inapposite.  *See generally Friedman Study.*  Dr.

Friedman reviewed a small selection of claims submitted pursuant to certain agreements under

Owens Corning's National Settlement Program (NSP).  They were not a representative sample of

asbestos claims; instead, they were mostly claims submitted by a small number of B-readers,[37]

---

[36]      The 1986 American Thoracic Society Statement, *Diagnosis of Nonmalignant Diseases Related to Asbestos* (attached as Exhibit 30) at 367 instructs doctors that "given a clear history of exposure to asbestos, a diffuse interstitial fibrosis can be presumed to be due to the asbestos as other forms of interstitial fibrosis are relatively uncommon."

[37]      While Dr. Friedman found problems with five of the B-readers involved in his claim review, he found no problems with any of the other 43 B-readers.  Friedman, Exhibit 20, at 251.

pulmonary function testing services and law firms, and had been selected by Owens Corning for review because they were "problematic." Friedman, Exhibit 20, at 262. Dr. Friedman testified he would be "speculating" if he were to extrapolate his findings to the entire universe of Owens Corning claimants. *Id*. at 262-64.

In his report, Dr. Friedman concludes that of the Owens Corning claims he reviewed, only 13.3% had adequate documentation to satisfy the medical criteria of Owens Corning's extant National Settlement Program which — unlike the tort law — required pulmonary function test results demonstrating "impairment." Dr. Friedman's findings have no relevance to this estimation proceeding, as a finding of impairment supported by a PFT is not required under state tort law to show compensable injury. Dr. Friedman himself pointed out that the PFT impairment requirement was imposed by the "strict terms" "unique" to the NSP (*id.* at 215-17) that no finding of "impairment" was required for recovery in the tort system, and that he himself had many times seen "unimpaired" plaintiffs recover for their asbestos-related injuries, where defendants had disputed the presence of disease. *Id*. at 236-42.[38]

---

Simply because Dr. Friedman disagreed with some of the plaintiff doctors regarding their diagnoses does not mean that those claims would be found invalid under state substantive law or even that their B-reader's evidence would have been excluded. As Dr. Friedman acknowledged, it was his experience that reasonable doctors often disagree about whether a particular x-ray should be read as 1/0 as opposed to 0/1. *Id.* at 249-50. In fact, Dr. Friedman sometimes testified for an asbestos claimant that had an x-ray reading of 1/0, and the plaintiff succeeded in obtaining a jury verdict in its favor, even though the defendant contested the presence of any disease. *Id.* at 240-41.

[38]    Debtors cite another law review article as demonstrating the problem of fraud in asbestos litigation (at Tab 2, 28), but the only conclusion drawn in that piece was that "[a] Court's expert will be a persuasive witness and will have a significant effect upon a jury." Carl B. Rubin and Laura Ringenbach, *The Use of Court Experts in Asbestos Litigation*, 137 F.R.D. 35, 41 (1991). Judge Rubin described several asbestos cases in which a court-appointed expert witness testified as to the existence of disease, with the jury as the ultimate arbiter of whether the plaintiff was entitled to compensation. In one case, the jury disagreed with the expert, and returned a verdict for plaintiff despite the expert's opinion that there was no disease. In two other cases, the expert

III.    IT WOULD TAKE YEARS TO GATHER AND "PROCESS" THE IRRELEVANT
        INFORMATION SOUGHT BY GRACE'S PROOF OF CLAIM FORM, AT
        INORDINATE COST TO THE ESTATE

Debtors' form attempts to do "double-duty" — functioning as a POC to cheaply disallow

claims that are valid under governing tort law *and* as a one-sided discovery demand that even

claimants who meet Debtors' manufactured criteria for claim validity would have to complete in

order to preserve their right to recovery.  In either case, there is no requirement anywhere in the

Bankruptcy Code that a claimant fill out an onerous pre-estimation questionnaire to establish a

valid claim again a debtor's estate.[39]  But even as a stand-alone discovery device, Debtors'

questionnaire must be rejected for two reasons: no trial court presiding over an asbestos personal

injury case in the tort system would enforce a request for the vast majority of irrelevant

information it demands, and the data it would produce would be unusable in a proper estimation.

A.    The Production of Information Debtors Would Demand of Individual
      Claimants Is More Extensive and Intrusive Than Full Discovery in a Lawsuit

Debtors cynically maintain that the required information related to exposure "already

should be known by the claimants and their lawyers in light of the fact that each had filed

lawsuits."  Tab 4, 5.  They insinuate that if such information is not known to claimants and their

---

testified that there was no asbestosis present, but there were pleural plaques.  Regardless of the
automatic credibility conferred by the court's imprimatur, court-appointed experts cannot be
made the arbiters of the claims; disputed facts still must be left to the jury for determination.

[39]    Presumably, if the POC/questionnaire is allowed under the terms proposed by Debtors —
that is, for use as a basis to "forever bar[], estop[], or enjoin[]" claims — claimants would have
the same right to contest Debtors' rejection of the questionnaires that they would have to contest
the rejection of a POC.  Each rejected claim would therefore result in a round of discovery, a
contested matter, and ultimately jury trials.  Debtors themselves note that reciprocal discovery is
"fundamentally reasonable."  Tab 4, 13.  Debtors' self-righteous pose regarding reciprocal
discovery simply highlights the unworkable nature of their estimation methodology and
questionnaire.  The right to reciprocal discovery would lead to discovery and jury trials for every
individual claim their methodology devalued or eliminated, delaying confirmation proceedings
indefinitely.

lawyers then the lawyers falsely attested that a "proper investigation into the facts underlying the lawsuits had been performed prior to filing." *Ibid*. These statements ignore the realities of asbestos — and all other — litigation, of which Debtors and their lawyers are well aware. In such litigation, notice pleading is the norm and entirely proper. Despite Debtors' suggestions to the contrary, no rule of civil procedure requires claimants to have trial-ready evidence as a pre-requisite to the filing of a complaint. Cases do not get fully worked up until they are being prepared for trial and even well-prepared files will have no reason to contain much of the information called for the by the proof of claim.

If Grace were to seek equivalent discovery in a tort case in state or federal court, much of its demand would be quashed. It is a fundamental tenet of discovery that it be limited to matters relevant to the claims or defenses at hand. *See* Fed. R. Civ. P. 26(b)(1). "[D]efendants may not engage in a fishing expedition by inquiring into matters totally irrelevant to the [underlying tort claim]." Bridges v. Eastman Kodak Co. 850 F. Supp. 216, 223 (S.D.N.Y. 1994). Courts routinely deny irrelevant discovery, including the discovery of medical information only tangentially related to the claims at issue. *See* Fitzgerald v. Cassil, 216 F.R.D. 632, 634, 639 (N.D. Cal. 2003) (granting plaintiffs' motion to quash defendants' subpoena for "[a]ny and all medical [and psychological] records" because the psychological records were privileged the medical records were not relevant to discrimination claim); JB ex rel Palmer v. Asarco, Inc., 225 F.R.D. 258 (N.D. Okla. 2004) (holding that medical records of dismissed plaintiffs used by experts in lead and zinc exposure suit were not relevant to expert opinions on remaining unrelated plaintiffs and denying defendants' motion to compel); Bottomly v. Leucadia Nat'l, 163 F.R.D. 617, 620 (denying defendant/employer access to plaintiff/employee's full psychological record in sexual harassment suit because it was "remote to what an expert may legitimately use

for foundation for an expert opinion"). The information sought by Grace in its POC/questionnaire is similarly remote to the information upon which an expert in this matter can legitimately rely.

Grace entered bankruptcy four years ago. Claimants naturally have had no incentive to gather product identification evidence in the interim as if preparing for trial, so it is not likely to be in individual files — and certainly not in the detail Debtors demand, as individual plaintiffs cannot be expected to have comprehensive knowledge of the specific asbestos product to which they were exposed. Memories of individual plaintiffs are typically supplemented by the testimony of co-workers and by documentary evidence, including that obtained by discovery of the defendant. Given the expense and time it takes assemble this information from numerous sources, it will appear only in cases that have been fully prepared for trial.

Even a "trial ready" file will only have a fraction of the information required by Debtors' POC/questionnaire, much of which has no bearing on Debtors' liability and so would not be gathered by an attorney in preparation for trial or otherwise. Medical records concerning non-asbestos related conditions, information about past residences and asbestos products in the home, information regarding lawsuits other than those against asbestos producers, full employment histories, and the names of owners of particular worksites would not be found in claimants' files and would not be necessary to prove their cases. The requirement that claimants attach all medical documents connected in any way to their asbestos-related disease vastly exceeds the parallel documentary requirements for trial. Incredibly, Debtors would go so far as to expect claimants to produce their original and only copies of x-rays indefinitely, leaving them unable to use them for medical purposes or in connection with cases against other tort defendants. Tab 4, 8.

Moreover, Debtors' proposal would be extraordinarily expensive to implement.  Their proposed PI CMO (at ¶ 3) would give claimants a mere 90 days to complete the POC/questionnaire.  Some law firms represent thousands of clients, as Debtors well know, and the complexity of the form indicates that substantial time of paid professionals would be required to complete a single questionnaire.  As Debtors acknowledge, Dr. Peterson conducted a pretest of the last proof of claim form Debtors proposed in 2001.  Affidavit of Mark Peterson, Sept. 9, 2001 (Docket # 903) (Peterson Grace) (attached as Exhibit 31).  He concluded that in order to complete this far less detailed, 11-page version for an estimated 200,000 claimants, "[it] would require 600,000 person-hours (390 person-years), a cost of over $24 million and well over a year of time."  *See id.* at ¶¶ 29-31.[40]  Dr. Peterson estimated that "[a] law firm with 5,000 claims would have to devote over 10 paralegals for one year (5,000 claims x 3.016 hours divided by 7 hours per day x 220 days per year) to complete the forms."  *Id.* ¶ 30.

As the instant form is substantially longer — and rife with additional ambiguities that could require actual attorney time — the average cost would be much higher.  No law firm has this excess capacity available.  Moreover, as with Debtors' first attempt at a questionnaire, Debtors "have provided no plan for collecting, data-entering and analyzing their proposed proof of claim."  *Id.* ¶ 30.  And "[i]t is important to recognize * * * that there would be a multiplier effect * * * because every party — the Debtors, the Committee, the Legal Representative, the

---

[40]     Debtors' suggestion that Dr. Peterson's September 9, 2001 affidavit demonstrates that pre-petition claims "lack[] basic evidentiary support" is utterly specious.  Tab 2, 41.  As with Debtors' instant POC, that form would have "require[d] claimants to attach medical records that they would not have to submit to defendants in discovery for their asbestos bodily injury law suits."  Peterson Grace, Exhibit 31, at ¶ 18.  Where information sought "dealt with matters that are never an issue in tort litigation," it was "not in the hands of claimants or their attorneys."  *Id.* ¶ 35.  To suggest that this constituted a concession that most claimants "lack basic evidentiary support" for their claims is the ultimate in boot-strapping and improper.

Unsecured Creditors Committee, and the Property Damage Committee — would have the opportunity and obligation to obtain and analyze this data at the expense of the estate." *Id.* To render this information in any way navigable, "the parties would have to retain expensive medical coders and doctors to help analyze the hundreds of thousands of pages of medical records." *Id.* And imposition of Debtors' discovery-by-questionnaire program could not lawfully go forward without allowing full-scale reciprocal discovery of Grace and its subsidiaries by each of the 118,000 claimants expected to complete the questionnaire. Thus, the costs to the estate in terms of time and money that Debtors' POC/questionnaire would necessitate are simply staggering.

### B.    Counsel's Failed Efforts in the <u>Babcock & Wilcox</u> Case Are Instructive

Quite ironically, Debtors hold out the use of a questionnaire for estimation in <u>Babcock</u> as a supporting precedent for their proposal to employ a "discovery" questionnaire in this case. Tab 4, 11-13. But Debtors' assertion that the form "adopted by the court in B&W, was less specific than that requested here" is such an extreme understatement that it borders on falsehood. *Id.* Moreover, the <u>Babcock and Wilcox</u> exercise shows that the utility of an individual questionnaire as a discovery device in estimation is totally illusory.

The difference in degree between the form approved in <u>Babcock</u> and the instant POC/questionnaire is so great that it becomes a difference in kind. The <u>Babcock</u> form was four pages long with six pages of instructions and required photocopying additional pages only if the claimant claimed more than three exposures to B&W asbestos-containing products. The <u>Babcock</u> form included one page for the name and address of claimants and their attorneys. <u>Babcock & Wilcox</u>, POC, Oct. 2000,(attached as Exhibit 32). It had another page for medical information, that *only* required claimants to check boxes indicating their diagnoses, fill in the

year of first diagnosis, and provide the date and result of claimants' most recent  lung function

rests and ILO rating.  The third page asked for the basic information only about claimed

exposure to B&W products and included the signature block.  The last page provided the form to

be filled out by those claims based on a parent's or spouse's asbestos related condition.  (In other

words, the actual PI form was only 3 pages in length.)

The Babcock court rejected more extensive versions of the form.  The original version

was 32 pages long and sought some of the same information that Debtors' POC/questionnaire

seeks, but was still less detailed.  Babcock & Wilcox, Proposed POC, June 1, 2000 (attached as

Exhibit 33).  It had space for multiples entries in each section so it would have required little

photocopying and did not, for example, seek information about every residence at which a

claimant ever lived, every jobsite at which a claimant worked, or every lawsuit they ever filed.

The district court summarily rejected that form.  Babcock & Wilcox, Minute Entry, June 30,

2000.  B&W thus simplified the form greatly, resulting in a five page form, with six pages of

instructions.  Even then, the court found "that the proposed claim form is unnecessarily detailed

and would amount to an undue burden on parties who wish to assert claims.  Babcock & Wilcox,

Order and Reasons, August 25, 2000, Exhibit 2, at 21.  The court again ordered B&W to

"substantially modif[y]" the form, instructed it to "ask questions that go to th[e] prima facie

evidence of liability," namely, "claimant's exposure to asbestos from debtors' products and the

injuries that resulted from that exposure."  Id. at 22.  After an additional subsequent

modification, the final 4-page form was approved by the court.  Babcock & Wilcox, Order

Regarding Debtor's Motion for Entry of an Order Establishing a Bar Date, Approving the Proof

of Claim Form, and Approving the Form and Manner of Notice, Oct. 30, 2000, at 10 (attached as

Exhibit 34).

Even this modest form proved, when completed, to be of no use in estimation.  The analysis conducted by B&W, which Debtors urge this Court to rely on, was never tested, and was not even considered by that court.  The entire exercise proved to be a waste of time and money.  B&W gleaned information from the claim forms and reported it as if it were the results of a contested proceeding, without ever offering the plaintiffs any opportunity to supplement their proof or to do discovery to challenge the conclusions in B&W's "Report to the Court."  At a hearing on the debtors' proposal to the court on how it could resolve these claims, the court expressed skepticism about this plan and, clearly realizing that the debtors' individualized claims adjudication scenario would take decades to accomplish if it could be done at all, the court ordered the parties to submit briefs on claims estimation.  <u>Babcock & Wilcox</u> Transcript, Exhibit 1, at 6-7, 14, 51, 67.  Less than six months later the debtors and asbestos claimants filed a consensual plan of reorganization, which ultimately led to a confirmation hearing at which various insurance companies contested the debtors' overall asbestos liability.  The valuation of the debtors' asbestos liability at the confirmation hearing was based entirely on expert estimation of that liability using the same general approach as that proposed by the Committee here.

Grace is surely familiar with this history — which is a matter of public record — as it is represented by the same attorney that represented B&W.  In a hearing on a proposed case management order, Judge Vance of the Eastern District of Louisiana was highly critical of Mr. Bernick's arguments that the completed forms could be used to eliminate entire categories of claims.  For example, B&W argued that the exposure history on the forms showed that a large number of claimants alleged exposure at locations where there were no B&W boilers, the sole source of exposure at issue in that case.  Judge Vance flatly rejected Mr. Bernick's contention that these claims could be dismissed in the aggregate under Fed. R. Civ. P. 42.  Judge Vance

stated: "But the issues are still individual issues.  If you are going to lump them all together and say, okay, these 160,000 may have an issue involving exposure — each one of those people has an issue as to exposure that has to be determined * * * Now, how can I do that except one at a time?"  Babcock & Wilcox Transcript, Exhibit 1, at 7-8.  Mr. Bernick was unable to answer that question to the court's satisfaction.  *See id.* at 8-11.

The court clearly saw that the process would be time consuming in the extreme: "Suppose there's an issue of fact and you lose that summary judgment motion," Judge Vance told Mr. Bernick, "[t]hat's not the end of it because you have a backup summary judgment motion down the road because you have about 644,000 possible objections that could be made to these claims if I add all this stuff up." *Id.* at 11.  To Mr. Bernick's contention that the court could dispose of 93,000 claims in three months, "depend[ing] on how fast [Judge Vance] read the papers," Judge Vance declared herself "awe-struck." *Id.* at 12-14.  Again and again during her colloquy with Mr. Bernick, Judge Vance returned to the basic point that objections to claims had to be dealt with on a case-by-case basis.  Toward the end of this colloquy, Judge Vance declared: "I think you want to totally undo the bankruptcy process, and I just don't agree with your interpretation of how that works, that you can't have an estimation process that considers past history of how claims were settled, to make an estimation that you have to have an individualized determination of every single claim." *Id.* at 32.  Given Judge Vance's incredulity about Babcock's proposed estimation methodology and the imminent end of exclusivity, Babcock, as mentioned, reached a settlement with its adversaries.

Here too, the data which Debtors propose to collect through their POC/questionnaire will have no value in estimating asbestos personal injury claims.  Given this inevitability, once can only wonder why Debtors continue to decidedly refuse to reveal how they intend to use this

information to estimate their liability.  Because individual personal injury claims cannot be

resolved on a global basis and questions of fact must go to juries under § 1411 of the Bankruptcy

Code, it is difficult to fathom how this extraordinarily expensive data collection effort — even if

framed as a routine request for individual claimant discovery, without Debtors' penalties for non-

or incomplete compliance — could be anything but a futile waste of time and money.  Certainly,

it could not be of meaningful use in a statistical estimation process based on Grace's claims

resolution which, the Committee respectfully submits, is how this Court should proceed.

## CONCLUSION

For the foregoing reasons, Debtors' Motion to Approve PI CMO and Questionnaire

should be denied.

Date:  June 30, 2005

**CAMPBELL & LEVINE, LLC**

 /s/ Mark T. Hurford 
Marla R. Eskin (No. 2989)
Mark T. Hurford (No. 3299)
800 N. King Street, Suite 300
Wilmington, DE 19801

- and –

**CAPLIN & DRYSDALE, CHARTERED**
Elihu Inselbuch
399 Park Avenue, 36th Floor
New York, NY 10022

- and –

Peter Van N. Lockwood
Nathan D. Finch
Walter B. Slocombe
Kimberly N. Brown
One Thomas Circle, N.W.
Washington, D.C. 20005

Counsel for the Official Committee of
Asbestos Personal Injury Claimants