IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
|  | ) | Chapter 11 |
|  | ) |  |
| In re: | ) | Case No. 01-01139 (JKF) |
|  | ) |  |
| W. R. GRACE & CO., et al., | ) | (Jointly Administered) |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |
|  | ) | **Hearing Date:  July 19, 2005** |
| _____ | ) |  |

**PROPOSED CASE MANAGEMENT ORDER OF THE OFFICIAL COMMITTEE OF
ASBESTOS PROPERTY DAMAGE CLAIMANTS AND INCORPORATED
MEMORANDUM OF LAW IN SUPPORT OF PROPOSAL**

Dated:  July 13, 2005

Respectfully submitted,

BILZIN SUMBERG BAENA
  PRICE & AXELROD LLP
200 South Biscayne Boulevard
Suite 2500
Miami, Florida  33131-2336
Telephone:  (305) 374-7580

Scott L. Baena (Admitted <u>Pro</u> <u>Hac</u> <u>Vice</u>)
Jay M. Sakalo (Admitted <u>Pro</u> <u>Hac</u> <u>Vice</u>)
Allyn Danzeisen (Admitted <u>Pro</u> <u>Hac</u> <u>Vice</u>)
Matthew Kramer(Admitted <u>Pro</u> <u>Hac</u> <u>Vice</u>)

and

FERRY JOSEPH & PEARCE, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, Delaware  19899
Telephone:  (302) 575-1555

Theodore J. Tacconelli
(Del. Bar No. 2678)

Co-Counsel for the Official Committee of
Asbestos Property Damage Claimants

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ....................................................................................... 1

DISCUSSION ................................................................................................................... 2

I.    There is No Precedent for the Estimation of Asbestos Property Damage Claims ................................................................................................................... 2

II.   The Debtors' Proposal Is Unworkable as it Fails to Meet the Requirements of a Proper Estimation Process ............................................................................... 5

    A.   Global Determinations Concerning the Harmfulness of the Debtors' Products Would be Improper ...................................................... 7

    B.   The Daubert Ruling Debtors Seek is Not a Threshold Estimation Issue; Plentiful Verdicts and Rulings that the Debtors' Products are Harmful Cannot Be Disregarded for Tactical Advantage......................... 9

    C.   Constructive Notice Is Not a Threshold Estimation Issue ....................... 16

    D.   Debtors' Proposed Estimation Procedure Violates PD Claimants Due Process Rights ................................................................................. 22

    E.   The Debtors' Proposal Provides Illogical Order and Timing for Discovery and Expert Reports ................................................................ 23

III.  The PD Committee's Case Management Proposal is a Sensible Approach to the Estimation of PD Claims ......................................................................... 26

CONCLUSION ............................................................................................................... 28

# TABLE OF AUTHORITIES

## CASES

*Adalman v. Baker Watts & Co.*,
    807 F.2d 359 (4th Cir. 1986) ....................................................................20

*Andaloro v. Armstrong World Indus., Inc.*,
    799 A.2d 71 (Pa. Super. Ct. 2002) ............................................................15

*Baldwin United Corp.*,
    55 B.R. 855 (Bankr. S.D. Ohio 1985) .........................................................7

*Banc One Building Mgmt. Corp. v. W.R. Grace Co.—Conn.*,
    565 N.W.2d 154 ( Wis. Ct. App. 1997) ......................................................18

*Bd. of Educ. of City of Chicago v. AC and S, Inc.*,
    546 N.E.2d 580 (Ill. 1989) ........................................................................14

*Bd. of Educ. of Hilton Cent. School Dist. v. Ambach*,
    474 N.Y.S.2d 244 (N.Y. Sup. Ct. 1984) ....................................................15

*Bellsouth Telecomm., Inc. v. W.R. Grace & Co.*,
    77 F.3d 603 (2d Cir. 1996) ............................................................11, 13, 18

*Bittner v. Borne*,
    691 F.2d 134 (3rd Cir. 1982) ............................................................4, 7, 22

*Blue Cross & Blue Shield of South Carolina v. W. R. Grace & Co.*,
    781 F. Supp. 420 (D.S.C. 1991) ................................................................14

*Bush v. Gore*,
    531 U.S. 98 (2000) .....................................................................................18

*Chew v. Dietrich*,
    143 F.3d 24 (2d Cir. 1998) .........................................................................22

*City of Greenville v. W.R. Grace & Co.*,
    827 F.2d 975 (4th Cir. 1987) ...............................................................10, 14

*City of Philadelphia v. Lead Indus. Ass'n, Inc.*,
    994 F.2d 112 (3d Cir. 1993) .......................................................................18

*Clayton Ctr. Assocs. v. W.R. Grace & Co.*,
    861 S.W.2d 686 (Mo. Ct. App. 1993) ..................................................13, 19

*Daubert v. Merrell Dow Pharms.*,
   509 U.S. 579 (1993)........................................................................................10

*Dayton Independent School District, et al. v. W.R. Grace, et al.*,
   Civil Action No. B-81-277-CA (U.S.D.C. E.D.  Texas, Beaumont
   Div.) ....................................................................................................................7

*District of Columbia Court of Appeals v. Feldman*,
   460 U.S. 462 (1983)........................................................................................16

*Erie R. Co. v. Tompkins*,
   304 U.S. 64 (1938)..........................................................................................18

*Flatt v. Johns Manville Sales Corp.*,
   488 F. Supp. 836 (E.D.Tex. 1980) ...............................................................15

*Georgine v. Amchem Prods., Inc.*,
   83 F.3d 610 (3d Cir. 1996), aff'd, 521 U.S. 591 (1997)..............................18

*Grogan v. Garner*,
   498 U.S. 279 (1991)........................................................................................18

*Hammond v. North American Asbestos Corp.*,
   435 N.E.2d 540 (Ill. Ct. App. 1982) .............................................................15

*Hygh v. Jacobs*,
   961 F.2d 359 (2d Cir. 1992)..........................................................................20

*Ideal World Marketing, Inc. v. Duracell*,
   15 F. Supp. 2d 239 (E.D.N.Y. 1998) ............................................................21

*In re Amoroso*,
   123 Fed.Appx. 43  (3d. Cir. 2004)................................................................22

*In re Argonaut Fin. Servs., Inc.*,
   164 B.R. 107 (N.D.Cal. 1994) .......................................................................23

*In re Armstrong World Indus., Inc.*,
   285 B.R. 864 (Bankr. D. Del. 2002) .............................................................10

*In re Audre*,
   216 B.R. 19 (9th Cir. BAP 1997) ..................................................................16

*In re Combustion Eng'g, Inc.*,
   391 F.3d 190 (3d Cir. 2004)..........................................................................22

iii

*In re Continental Airlines, Inc.*,
   981 F.2d 1450 (5th Cir. 1993) ...................................................................................7

*In re Farmland Indus., Inc.*,
   284 B.R. 111 (Bankr. W.D.Mo. 2002).........................................................................23

*In re Initial Public Offering Secs. Litigation*,
   174 F. Supp. 2d 61 (S.D.N.Y. 2001)...........................................................................20

*In re M. Frenville Co.*,
   744 F.2d 332 (3d Cir. 1984), <u>cert. denied</u>, 469 U.S. 1160 (1985) ...............................18

*In re Mitchell*,
   255 B.R. 345 (Bankr. D. Mass 2000) ..........................................................................16

*In re Nugent*,
   254 B.R. 14 (Bankr. D. N.J. 1998) ..............................................................................16

*In re Owens Corning*,
   322 B.R. 719 (D. Del. 2005).................................................................................3, 20

*In re SGL Carbon Corp*,
   200 F.3d 154 (3d Cir. 1999).......................................................................................15

*In re W.R. Grace & Co. (W.R. Grace & Co., et al. v. Sealed Air Corp. and Cryovac, Inc.)*
   281 B.R. 852 (Bankr. D. Del. 2002) ...........................................................................18

*In re Windsor Plumbing Supply Co.*,
   170 B.R. 503 (E.D. N.Y. 1994) ....................................................................................4

*Jones v. Chemetron Corp.*,
   212 F.3d 199 (3d. Cir. 2000).......................................................................................22

*Kirbyville Independent School District, et al. v. Asbestospray Corp. et al.*,
   Civil Action No. 1:94CV412 (U.S.D.C. E.D. Texas, Beaumont Div.) ........................8

*Logan v. Zimmerman Brush Co.*,
   455 U.S. 422 (1982)....................................................................................................22

*MDU Resources Group v. W.R. Grace & Co.*,
   14 F.3d 1274 (8th Cir. 1994) ...................................................................................6, 18

*Marx & Co. v. Diners' Club, Inc.*,
   550 F.2d 505 (2d Cir. 1977).......................................................................................20

iv

*Motown Productions, Inc. v. CACOMM, Inc.*,
   668 F. Supp. 285 (S.D.N.Y. 1987)............................................................................20

*Music Sales Corp. v. Morris*,
   73 F. Supp. 2d 364 (S.D.N.Y. 1999).......................................................................20

*Northridge Co. v. W.R. Grace & Co.*,
   471 N.W.2d 179 (Wis. 1991)..................................................................................15

*Northridge Co. v. W.R. Grace & Co.*,
   556 N.W.2d 345 (Wis. Ct. App. 1996) ..................................................................13

*Paul v. Davis*,
   424 U.S. 693 (1976)...............................................................................................22

*Port Authority of New York and New Jersey*,
   245 F. Supp. 2d 563 (D.N.J. 2001) ..................................................................10, 11

*Pritchard v. Norton*,
   106 U.S. 124 (1882)...............................................................................................23

*Prudential Insurance Co. of Am. v. United States Gypsum Co.*,
   359 F.3d 226 (3rd Cir. 2004) .................................................................................18

*Raleigh v. Illinois Dept. of Rev.*,
   530 U.S. 15 (2000).................................................................................................18

*Reorganized Church of Jesus Christ v. U.S. Gypsum*,
   882 F.2d 335 (8th Cir. 1989) .................................................................................10

*Rooker v. Fidelity Trust*,
   263 U.S. 413 (1923)...............................................................................................15

*San Francisco Unified School District v. W. R. Grace & Co.*,
   44 Cal. Rptr. 2d 305 (Cal. Ct. App. 1995) ..............................................................8

*Sentinel Mgmt Co. v. Aetna Casualty and Surety Co.*,
   615 N.W.2d 819 (Minn. 2000)...............................................................................10

*Specht v. Jensen*,
   853 F.2d 805 (10th Cir. 1988) ...............................................................................20

*State Farm Mutual Automobile Insurance Co. v. W.R. Grace & Co.*,
   834 F. Supp. 1046 (C.D. Ill. 1992) ........................................................................18

*T.H.S. Northstar Assocs. V. W.R. Grace & Co.*,
    66 F.3d 173 (8th Cir. 1995) ...............................................................14

*T.H.S. Northstar Assocs. v. W.R. Grace & Co.*,
    860 F. Supp. 640 (D. Minn. 1994)....................................................14

*Technical Concepts, L.P. v. Zurn Indus., Inc.*,
    2002 WL. 31027962 (N.D.Ill. Sep. 10, 2002) ...............................22

*Town of Hooksett School Dist. v. W.R. Grace & Co.*,
    617 F. Supp. 126 (D.N.H. 1984)...............................................14, 18

*Tulsa Professional Collection Services, Inc. v. Pope*,
    485 U.S. 478 (1988)............................................................................22

*U.S. Gypsum Co. v. Admiral Insurance Co.*,
    643 N.E.2d 1226 (Ill. App. Ct. 1995) ..............................................10

*U.S. Gypsum Co. v. Mayor and City Council of Baltimore*,
    647 A.2d 405 (Md. Ct. App. 1994)....................................................10

*U.S. v. Leo*,
    941 F.2d 181 (3d Cir. 1991)...............................................................20

*United States v. Zipkin*,
    729 F.2d 384 (6th Cir. 1984) .............................................................20

*University of Vt. v. W.R. Grace & Co.*,
    565 A.2d 1354 (Vt. 1989)...................................................................18

*Vanston Bondholders Protective Committee v. Green*,
    329 U.S. 156 (1946)............................................................................17

*Wasau Tile, Inc. v. County Concrete Corp.*,
    593, N.W.2d 445 (Wis. 1999).............................................................15

## CONSTITUTION AND FEDERAL STATUTES

U.S. CONST. amend. V............................................................................22

U.S. CONST. amend. XIV.......................................................................22

11 U.S.C. § 502..............................................................................3, 4, 7

11 U.S.C. § 524(g) ..........................................................................3, 21

## PRELIMINARY STATEMENT

The Court has determined that it is essential to undertake the estimation of filed asbestos property damage claims ("PD Claims") in anticipation of consideration of *any* proposed plan of reorganization.  In doing so, the Court has made it plain that the objective of the estimation is to determine *the estimated value of all filed PD Claims and not the liquidation of individual PD Claims*, as such determination will enable the Court to conclude whether any plan of reorganization is feasible.  To this end, the Court directed the parties to propose a case management order which will govern the PD Claims estimation process (the "PD CMO").

At the April, 2005 omnibus hearing, the Court was apprised that the PD CMO which the Debtors and the PD Committee had agreed upon and intended to propose to the Court for its approval required further consideration based on the Debtors' revelation that it intended to challenge the harmfulness of their asbestos-containing products.  At the June, 2005 omnibus hearing, the Court was advised that the Debtors and the PD Committee had not yet agreed upon a PD CMO.  As a result, the Court directed those parties to confer in person in an effort to reach agreement on a PD CMO.  The parties have since held two extensive telephonic meetings and an in-person meeting. Unfortunately, however, the parties have not been able to agree upon a PD CMO.

The principal difference that prevents the Debtors and the PD Committee from reaching agreement on a PD CMO is that the Debtors seek to blur any distinctions between the *estimation* of PD Claims and the *liquidation* of individual PD Claims. Taking advantage of the fact that there has never been an estimation of asbestos property damage claims in an asbestos bankruptcy case, the Debtors propose a case management

1

order that (a) attempts to sweep under the rug unfavorable decisions and verdicts against the Debtors over the last twenty years concerning their property damage liabilities; (b) governs a full-blown global liability trial, including the trial of science that ignores (i) individual state laws defining injury, harm, hazard; (ii) when a claim accrues; (iii) the Debtors' pre-bankruptcy position that PD Claims cannot be addressed on a group basis; and (iv) applicable caselaw which mandates individual consideration of PD Claims; (c) strives to determine the ultimate value of individual PD Claims in the context of a group estimation proceeding; and (d) deprives PD Claimants of their constitutional right to due process.

In stark contrast, the PD Committee proposes a PD CMO which merely sets the stage for the estimation process that is in harmony with the Federal Rules of Civil Procedure.[1]  The PD Committee's proposed PD CMO is purely procedural and does not attempt to obtain or evade substantive advantages as is the case with the Debtors' ill-conceived proposal.

## DISCUSSION

## I.    There is No Precedent for the Estimation of Asbestos Property Damage Claims

1.    While the estimation of asbestos personal injury claims ("PI Claims") has been accomplished in numerous asbestos bankruptcies, *this is the first bankruptcy case to address the estimation of PD Claims*.  In fact, only two concluded asbestos bankruptcies[2] have even implicated substantial PD Claims and only one of those cases implicated

---

[1] The PD Committee's proposed case management order is attached hereto as Exhibit A.

[2] The Celotex Corporation and National Gypsum Company.

2

section 524(g) of the Bankruptcy Code.[3]  Both of those cases resulted in confirmed plans of reorganization which were obtained with the consent of the majority of the holders of asbestos property damage and asbestos personal injury claimants.  Thus, it was not necessary in any other asbestos bankruptcy to establish a process for the estimation of PD Claims as a contested matter.   It follows that, unlike in respect of asbestos personal injury claims, *there is no model for the estimation of PD Claims under section 502(c) of the Bankruptcy Code*.

2.      Little is learned from previous experience with estimating PI Claims in establishing an estimation model for PD Claims in this case.  In fact, in the Debtors' Motion to Approve a Personal Injury Case Management Order, the Debtors document the purported need to revisit the estimation methodology previously used to estimate PI Claims by virtue of what they characterize as unfortunate pre-bankruptcy settlement experience and revelations of fraudulent PI Claims.   See Section II of Debtors' Memorandum in Support of Motion for a PI CMO [Docket Nos. 8394-8395]; Section III of Debtors' Motion for Entry of an Order Seeking Estimation [Docket No. 6899]; see also In re Owens Corning, 322 B.R. 719, 723 (D. Del. 2005)(identifying venue-shopping, mass-screenings, erroneous x-ray interpretations by suspect B-readers, over-payment to "unimpaired" claimants, group lawsuits, global settlements and availability of punitive damages as factors that may have skewed the historical data of the asbestos personal injury litigation.  PD Claims do not engender such concerns.  Moreover, in the case of PI Claims, the usual objective is to estimate future claims, as well as current claims, which entails a prediction of the likely incidence and an approximation of the value of personal

---

[3] The Celotex Corporation.

MIAMI 906352.4 7481715537

injury claims yet to accrue or be asserted against a debtor.  Here, however, the Debtors only seek to estimate the value of *filed* PD Claims.[4]

3.     Neither the Bankruptcy Code nor the Federal Rules of Bankruptcy Procedure provide any guidelines for the estimation of PD Claims.  Indeed, literally speaking, section 502(c) of the Bankruptcy Code only applies to the estimation of an individual claim for purposes of allowance of such claim.  Here, however, the Debtors seek to estimate all PD Claims for purposes of determining feasibility of a plan of reorganization.[5]  Thus, we are left with the somewhat nebulous direction of the Third Circuit Court of Appeals that bankruptcy courts should use "whatever method [of estimation] is best suited to the particular contingencies at issue."  See Bittner v. Borne, 691 F.2d 134, 135 (3rd Cir. 1982).

4.     The estimation process is not without limitation, however, as it must (a) conform with the purpose of the Code; (b) provide adequate constitutional protections; (c) consider the relevant legal rules that govern the value of the claim; and (d) ensure the process itself will not delay the conclusion of estimation.  See Bittner, 691 F.2d at 135 (3rd Cir. 1982); In re Windsor Plumbing Supply Co., 170 B.R. 503, 520 (E.D. N.Y. 1994).  Specifically, this Court is "bound by the legal rules which may govern the ultimate value of the claim[s] ... [and] those general principles which should inform all decisions made pursuant to the Code."  Bittner, 691 F.2d at 135-36.

---

[4] The Debtors have apparently concluded that the risk of future PD Claims is small. In its Informational Brief, Grace stated that, with respect to the property damage claims resulting from the installation of Monokote-3 (which was but one of Grace's numerous asbestos containing products which gave rise to PD Claims), it does "not expect any additional claims to be filed," and that "those that are filed will be subject to a statute of limitations defense."  *See Informational Brief* at 6 [Docket No. 6].

[5] While the PD Committee has accepted the Court's direction to undertake an estimation of PD Claims, it nonetheless reserves all objections, rights (including rights on appeal), and claims to and in respect of the use of such process.

MIAMI 906352.4 7481715537

**II.    The Debtors' Proposal Is Unworkable as it Fails to Meet the Requirements of a Proper Estimation Process**

5.    The Debtors' proposed PD Claims estimation methodology cannot be employed as it (a) attempts to sweep under the rug unfavorable decisions and verdicts against the Debtors over the last twenty years concerning their property damage liabilities; (b) seeks a full-blown global liability trial, including the trial of science, ignoring individual state laws defining injury, harm, hazard and when a claim accrues, as well as ignoring the Debtors' pre-bankruptcy position that PD Claims cannot be addressed on a group basis and applicable caselaw which mandates individual consideration of PD Claims; (c) seeks determinations of the ultimate value of individual PD Claims in the context of a group estimation proceeding; and (d) deprives PD Claimants of their constitutional right to due process.  As a consequence, the Debtor's proposal does not engender an acceptable estimation methodology.

6.    The Debtors' PD Claims estimation proposal appears to be a two-step process:[6]  First, the Debtors propose to address what they denominate as "Phase I" to address what the Debtors refer to as "Threshold Issues," consisting of the determination of (a) what methodologies for determining the risks associated with asbestos exposure comply with Rule 702 of the Federal Rules of Evidence; and (b) a determination of when *all* PD Claimants had constructive notice "of potential asbestos property damage claims."

---

[6] On July 11, 2005, the Debtors for the first time provided a draft case management order in respect of objections to PD Claims.  The Debtors have provided no indication of the notice they propose to give to PD Claimants in advance of the hearing on July 19, 2005.  It appears from the text of the draft order that the Debtors do not intent to provide <u>any</u> notice to PD Claimants in advance of such hearing.  The PD Committee obviously objects to any such procedure.

7.    The "Threshold Issues" are further testimony to the Debtors' attempt to obscure the lines between the estimation process and the liquidation of individual PD Claims, as well as the Debtors' effort to use this bankruptcy case to revisit unfavorable property damage liability determinations obtained in the tort system.[7]  Incredibly, the Debtors seek to designate experts and submit expert reports on purported Threshold Issues without even providing the PD Committee an opportunity to present competing experts and expert reports.  Apparently, the Debtors believe it appropriate to muzzle the PD Committee on these issues based solely on the PD Committee's well-reasoned stance that these issues should not be included in the estimation.  See Debtor's proposed PD CMO of July 2005 attached hereto as Exhibit B at ¶ 3.

8.    Second, the Debtors propose an estimation hearing but fail to provide any definition whatsoever for how they propose that proceeding ought to be conducted or how they would value those PD Claims which survive the claims objection process.[8]

---

[7] The Debtors "threshold issues" are actually somewhat inconsistent. Indeed, the Eighth Circuit Court of Appeals observed: "Grace argued at trial not only that the statute of limitations had run, but also that the plaintiff had suffered no injury from the asbestos-containing Monokote. The arguments are inconsistent: if MDU has suffered no injury from the Monokote, then it has no cause of action--until an injury is suffered, the statute of limitations cannot begin to run." MDU Resources Group v. W.R. Grace & Co., 14 F.3d 1274, 1279 n. 9 (8th Cir. 1994)(holding that harm would exist upon contamination of asbestos) cert. denied, 513 U.S. 824 (1994).

[8] At the April 25, 2005 Omnibus Hearing, the Court apparently shared our surprise when informed that the Debtors intended to try science issues in the estimation process. See pp. 109-116 of April 25, 2005 hearing transcript.  At that point, the Court ordered the Debtors to provide more information about the estimation process the Debtors envisioned.

> THE COURT: Well, I think that – a roadmap is exactly what we need I think.  You know, maybe you need some form of decision tree that tells you if discovery shows one thing you're going this way, and if it shows something else, you're going another.  I don't know.  But whatever way you decide to do it, I think before we get into this whole estimation process we need to know what issues both the debtor and the committee are going to raise.

Id. at 113-114.

Despite a two and a half month respite to identify the issues and provide the court-requested decision tree, Debtors continue to refer to a veiled estimation process without listing all the issues they wish to address.

9.      What emerges from the Debtors' proposed PD CMO, especially when viewed in conjunction with the condition of the Debtors' plan of reorganization that the estimated value of the Asbestos PD Fund shall constitute the maximum amount that the Reorganized Debtors shall have to pay on account of all Allowed Asbestos PD Claims, is, in fact, no more than a process for the *liquidation,* as opposed to *estimation*, of PD Claims.  Ironically, however, under section 502(c) of the Bankruptcy Code, estimation is only available if the liquidation of the underlying claim would unduly delay the bankruptcy case.  See Bittner at 136; see also In re Continental Airlines, Inc., 981 F 2d 1450, 1461 (5th Cir. 1993)("In order for the estimation process of §502(c) to apply, a claim must be contingent or unliquidated and fixing the claim must entail undue delay in the administration of justice.").[9]

**A.      Global Determinations Concerning the Harmfulness of the Debtors' Products Would be Improper**

10.      Throughout their pre-petition asbestos litigation experience, the Debtors consistently argued that the issue of the defectiveness of their asbestos containing products had to be determined on a building-by-building basis and that common issue trials were inappropriate.  Indeed, we are unaware of a single pre-bankruptcy litigation involving the Debtors in which group determinations were permitted.  See, e.g., W.R. Grace position paper on common issues determinations in Dayton Independent School District, et al. v. W.R. Grace, et al., Civil Action No. B-81-277-CA (U.S.D.C. E.D. Texas, Beaumont Div.) attached hereto as Exhibit C; W.R. Grace Opposition to Class

_____

[9] While the Bittner court recognized that an ultimate merits determination may, on occasion, be appropriate in an estimation, in each case in which such a determination was made, individual claimants were actual participants in the estimation and could defend the merits of their individual claims.  See, e.g., Bittner, 691 F.2d at 137; see also Baldwin United Corp., 55 B.R. 855 (Bankr. S.D. Ohio 1985).  However, that is not the

Certification in <u>Kirbyville Independent School District, et al. v. Asbestospray Corp. et al.</u>, Civil Action No. 1:94CV412 (U.S.D.C. E.D. Texas, Beaumont Div.) attached hereto as Exhibit D. In the Debtors' own words: "Whether asbestos-containing materials installed in buildings are hazardous cannot be answered in the abstract or in a vacuum. Rather determining whether defendants' products pose any hazard – which is obviously an essential element of the plaintiff's case - requires a site specific, building by building analysis." <u>Id.</u> The Debtors explained:

> The issue of defectiveness will necessarily vary building by building even within each school district. In each building, the issues will be whether the asbestos fibers, if any, found in the air came from a ceiling product (as opposed to ambient air, pipe and boiler insulation, floor tiles, etc.) and whether they pose a detectable and <u>unreasonable</u> danger. The condition of the material in each building is thus essential evidence for each claim of strict liability, just as the Dayton officials believed in 1984….Further, the elements of strict liability include as well injury and comparative causation. Building conditions and maintenance are thus conspicuously relevant. . . . ***It is not practical, in this procedural, legal and factual environment, to carve out artificial, theoretical questions for common resolution as those general questions will not be the basis of any liability adjudication. The creation of such general questions would resolve nothing for the five plaintiffs in the initial trial. . . . The issues for each plaintiff and for each building are simply too fact-specific to admit of resolution in a fashion divorced from the particular facts that establish the adverse legal claims of the parties.***

W.R. Grace Submission in Dayton Ind. Sch. Dist. (emphasis added)(internal citations omitted).

11.    Courts have, in fact, held that building contamination must be tried on an individual basis. <u>See</u>, <u>e.g.</u>, <u>San Francisco Unified School District v. W. R. Grace & Co.</u>, 44 Cal. Rptr.2d 305, 315 n. 6 (Cal. Ct. App. 1995).

---

case here. Indeed, the involvement of some 4,000 PD Claimants in the estimation would defeat the purpose of such a proceeding.

12.     The process of aggregate claims estimation does not supplant the wisdom militating against the determination of hazards or time bar defenses on a global basis in an estimation process.[10]  Unfortunately, however, the Debtors' persist in their attempts to use the PD estimation process as an excuse to obtain global rulings, in diametric opposition to the positions taken and results achieved in pre-bankruptcy litigation, which the Debtors will seek to apply to individual PD Claims.   That stratagem is totally inappropriate.

B.      The *Daubert* Ruling Debtors Seek is Not a Threshold Estimation Issue; Plentiful Verdicts and Rulings that the Debtors' Products are Harmful Cannot Be Disregarded for Tactical Advantage

13.     By the Debtors' Proposed PD CMO, they would have the Court determine as a Threshold Issue what the proper methodology is for determining the risks associated with asbestos exposure.   Said another way, the Debtors apparently seek a global determination that PD Claimants must have air sample analyses showing some unspecified level of contamination in the PD Claimant's building or structure for its PD Claim to be allowable.   The Debtors apparently seek to avail themselves of a determination in the <u>Armstrong World Industries</u> bankruptcy that dust sample analyses

---

[10] In a recent hearing in the USG bankruptcy relating to the estimation of personal injury claims, Judge Conti recognized that global rulings on defenses and causation issues would be inappropriate:

> I don't envision that I could do what the Debtors said – do what the Debtors said I should do, which is take a global issue such as a defense that a particular kind of claim has zero merit.  I mean I think the—each state  may have a different view; and the only way I think I  could deal with what the Debtor has said is if there was – there was agreement among all of the experts that that was the case.

> When you have disputes like that of fact, that's something that may have to go to each individual jury, to see whether they agree or disagree; and eventually you may come to some state-by state resolution.  Because of issue preclusion or whatever, you might be able to use it against the Debtors as the cases proceed.  But I don't think I can make that type of finding globally in this case.

June 13, 2005 USG Hearing Transcript, pp. 34-35 attached hereto as Exhibit E.

MIAMI 906352.4 7481715537

are no substitute for air sample analyses;[11] however, the significance that the Debtors attach to the application of the <u>Armstrong World Industries</u> decision to this case is wrong for at least two reasons. <u>First</u>, pre-petition case law confirms that federal and state courts have concluded that the dust sample test is admissible for the purposes of demonstrating present asbestos contamination. <u>See</u>, <u>e.g.</u>, <u>Reorganized Church of Jesus Christ v. U.S. Gypsum</u>, 882 F.2d 335, 336-39 (8th Cir. 1989); <u>City of Greenville v. W.R. Grace & Co.</u>, 827 F.2d 975 (4th Cir. 1987); <u>Sentinel Mgmt Co. v. Aetna Casualty and Surety Co.</u>, 615 N.W. 2d 819, 824-25 (Minn. 2000); <u>U.S. Gypsum Co. v. Admiral Insurance Co.</u>, 643 N.E.2d 1226, 1240 (Ill. App. Ct. 1995); <u>U.S. Gypsum Co. v. Mayor and City Council of Baltimore</u>, 647 A.2d 405,423-24 (Md. Ct. App. 1994). <u>Second</u>, there can be no legitimate dispute of the fact that the Debtors' asbestos-containing products which gave rise to filed PD Claims were harmful.

### i.    Dust Sampling is an Accepted Methodology

14.    Just over one month after the filing of Debtors' chapter 11 petition, United States District Court Judge Bissell from the District of New Jersey conducted a <u>Daubert</u> analysis[12] of the settled dust sample method in an asbestos property damage insurance matter and found "a strong case for the reliability of dust sampling testing to show current asbestos conditions." <u>Port Authority of New York and New Jersey</u>, 245 F. Supp.2d 563, 570 (D.N.J. 2001).[13] This case confirms the admissibility of the settled dust sample method in this Circuit at the time of the commencement of this bankruptcy.

---

[11] <u>In re Armstrong World Indus., Inc.</u>, 285 B.R. 864 (Bankr. D. Del. 2002).
[12] <u>Daubert v. Merrell Dow Pharms.</u>, 509 U.S. 579 (1993).

[13] Although Judge Bissell determined that the testing method could not be used to extrapolate backwards by using present condition results to show what conditions existed ten to fifteen years earlier for insurance coverage, the court did conclude the method reliable for showing current conditions, which is precisely

15.     Further, the Debtors themselves have relied upon the dust sample method in federal tort litigation after the United States Supreme Court's decision in <u>Daubert</u> when they believed such a position would help their case.    For example, in <u>Bellsouth Telecomm., Inc. v. W.R. Grace & Co.,</u> the Debtors pointed to several tests, including dust samples, taken by the plaintiff to successfully argue that harmful asbestos contamination existed and that plaintiff had not timely filed the action.    <u>See</u>, <u>e.g.</u>, <u>Bellsouth Telecomm., Inc. v. W.R. Grace & Co.</u>, 77 F.3d 603, 605 (2d Cir. 1996)(clearly demonstrating the Debtors considered the method reliable at that time).    The court accepted the Debtors' argument and dismissed the case on statute of limitations grounds.

16.     Moreover, procedures have been established that ensure the reliability of the settled dust sample method.    The American Society for Testing and Materials promulgated Standard D5755-95 delineating a standardized process for the testing of whether asbestos fibers have contaminated a property.    In fact, several governmental agencies including the Environmental Protection Agency and the United States Public Health Service utilize this method to confirm contamination.    The settled dust sample method is not "junk" science, but rather a long-recognized and reliable test to show whether fibers are being released and causing harm.

17.     The Debtors cannot ignore their own litigation experience both on the issue of the hazardous nature of their products and on the acceptance of the settled dust sample method.    Distinct from Armstrong's production of non-friable floor tile products, the Debtors manufactured friable products which juries have regularly found to release fibers and to be unreasonably dangerous.    Importantly, the <u>Armstrong</u> decision arose after

what PD Claimants would use the method to demonstrate—that contamination was shown on the day of the test. <u>Id.</u>  The court also considered the Paoli factors in its ruling. <u>Id.</u> at 567 (citing <u>In re Paoli Railroad PCB</u>

the Debtors' bankruptcy commenced and in the context of a liability trial—not an estimation proceeding—to address whether non-friable floor tile could cause harm. Unlike Armstrong whose asbestos-containing floor tile did not result in extensive asbestos property damage litigation, the track record for the Debtors' asbestos-containing products does not warrant a second look at dust sampling during estimation.

18.     Ultimately, any determination of whether a building has suffered contamination causing a hazard must occur on a claim-by-claim individual basis. The PD Claim estimation process is not the vehicle to revisit the settled dust sample method.

   **ii.      The Debtors' Asbestos-Containing Products Are Harmful**

19.     Throughout the Debtors' twenty year history of asbestos property damage litigation, they routinely raised and lost the contention that their asbestos-containing products were not hazardous. Rulings and verdicts were repeatedly rendered against the Debtors on that very point in state and federal courts at both the trial and appellate levels. For example, in the <u>Northridge</u> decision out of Wisconsin, the appellate court found that:

> "Consistent with the exact phrasing of both the supreme court's decision and the jury question, ***Northridge was required to prove that Monokote contaminated the shopping malls by releasing toxic substances*** prior to April 4, 1988 ***and, as a result, caused a health hazard. Northridge did so. . . . Contrary to Grace's argument, evidence established that such "dislodged" asbestos posed health hazards.*** A brief sampling includes: Grace's own internal documents describing its efforts to locate a substitute for Monokote because "[a]sbestos is a health hazard," and observing that "[a]sbestos is rapidly becoming recognized as a very serious health hazard;" testimony of Dr. Henry Anderson, an epidemiologist, that asbestos can cause disease and is the highest level of carcinogen, and further, that the disturbance of friable asbestos-containing material from sprayed asbestos such as Monokote was hazardous to those who would breathe the air during its disturbance; and testimony of Spielman that the asbestos-containing fireproofing at the Northridge mall was moderately friable and that its debris was present at the remodeling site, and that the fireproofing material at the Southridge mall was moderately to quite

<u>Litigation</u>, 35 F.3d 717 (3d Cir. 1994)).

12

friable and easily dislodged and was periodically disturbed during remodeling. ***The evidence was overwhelming.***

Northridge Co. v. W.R. Grace & Co., 556 N.W.2d 345, 350 (Wis. Ct. App. 1996).

Likewise, after the Clayton Center jury verdict in Missouri awarding compensatory

damages, Grace appealed arguing that there had been insufficient evidence to find that

Monokote was unreasonably dangerous, but the appellate court disagreed:

> Here, defendant's fireproofing product was Mono-Kote. Defendant does not dispute that Mono-Kote contained asbestos. Evidence showed the Mono-Kote applied in the building was friable, or easily crumbled. In some areas, the Mono-Kote had deteriorated to the extent that it had fallen from the beams; dust and debris, which was full of asbestos fibers, was present on the tops of ceiling tiles. Testimony showed these released fibers threatened a risk of harm to occupants of the building, particularly maintenance workers. Further testimony indicated dust samples taken from different areas in the building contained high concentrations of asbestos structures.

> It is not necessary to chronicle all of plaintiffs' evidence that would support submission of the case to the jury. Based on the above, ***a jury could reasonably conclude that Mono-Kote was unreasonably dangerous.*** Point denied.

Clayton Ctr. Assocs. v. W.R. Grace & Co., 861 S.W.2d 686, 689 (Mo. Ct. App. 1993)(emphasis added).

20.    Federal courts similarly found that the Debtors' asbestos-containing

products were harmful. See, e.g., Bellsouth, 77 F.3d at 605 (2d Cir. 1996)("Asbestos

containing material ('ACM') such as Monokote poses a health threat if and when it

becomes 'friable.'"); T.H.S. Northstar Assocs. V. W.R. Grace & Co., 66 F.3d 173 (8th

Cir. 1995)(upholding a jury verdict finding contamination, but remanding for

recalculation of damages); City of Greenville v. W.R. Grace & Co., 827 F.2d 975, 979

(4th Cir. 1987)(upholding jury verdict and concluding "the jury would not have had to

find a great degree of risk resulting from the asbestos to conclude that the Monokote was

13

unreasonably dangerous."); <u>Town of Hooksett School Dist. v. W.R. Grace & Co.</u>, 617 F. Supp. 126, 131 (D.N.H. 1984)(finding "where a defect in Defendant's product—i.e. the asbestos—creates a cognizable safety hazard, the resulting injury to property is as actionable in strict liability and negligence as personal injury from the defect would be.").

21.    Debtors have even admitted that their asbestos-containing products were harmful.  For example, in <u>Blue Cross & Blue Shield of South Carolina v. W. R. Grace & Co.</u>, the Debtors actually acknowledged the harmfulness of Monokote and argued that a party was contributorily negligent because, when the company purchased the product, it knew or should have known that the asbestos was harmful and that Monokote contained asbestos.  <u>Blue Cross & Blue Shield of South Carolina  v. W. R. Grace & Co.</u>, 781 F. Supp 420, 425 (D.S.C. 1991); <u>see</u> <u>also</u>, <u>T.H.S. Northstar Assocs. v. W.R. Grace & Co.</u>, 860 F. Supp 640, 645 (D. Minn. 1994)(Debtors argued that THS Northstar was a sophisticated real estate investor that assumed the risk of the known asbestos hazard).

22.    Further, numerous jurisdictions have concluded that the mere presence of asbestos in a friable material renders the product defective and unreasonably or inherently dangerous.  <u>See</u> <u>Bd. of Educ. of City of Chicago v. AC and S, Inc.</u>, 546 N.E.2d 580, 588 (Ill. 1989)("The nature of the defect in these ACMs is the asbestos fibers, which are toxic and which, it has been determined, may, in certain circumstances, be harmful."); <u>Andaloro v. Armstrong World Indus., Inc.</u>, 799 A.2d 71, 87 (Pa. Super. Ct. 2002) (upholding trial court's jury instruction, in the context of strict liability, in which trial court made an initial determination that asbestos was inherently dangerous and required adequate warnings); <u>Wasau Tile, Inc. v. County Concrete Corp.</u>, 593, N.W.2d 445, 457 (Wis. 1999)(referring to its <u>Northridge Co. v. W.R. Grace & Co.</u>, 471 N.W.2d 179 (Wis.

1991) decision, Wisconsin Supreme Court stated that asbestos is an inherently dangerous material); Bd. of Educ. of Hilton Cent. School Dist. v. Ambach, 474 N.Y.S.2d 244, 246 (N.Y. Sup. Ct. 1984)("It is clear to this court that the legislature recognized the inherent dangers of asbestos material that was friable. That such material when disturbed will put microscopic asbestos fibers in the air."); Hammond v. North American Asbestos Corp., 435 N.E.2d 540, 544 (Ill. Ct. App. 1982)(holding that asbestos products are harmful because of the asbestos they contain); Flatt v. Johns Manville Sales Corp., 488 F.Supp. 836, 841 (E.D.Tex. 1980)(holding as a matter of law that "products containing asbestos are defective and unreasonably dangerous within the meaning of section 402A of the Restatement.")

23.     The aggregate estimation of PD Claims is not an opportunity for the Debtors to revisit an issue that has been tried numerous times with adverse results for the Debtors.  See In re SGL Carbon Corp, 200 F.3d 154, 165 (3d Cir. 1999).  The effort to once again address the hazardous nature of the Debtors' asbestos-containing products in the context of a PD Claims estimation proceeding is thus inappropriate, not only because it is unsuitable for omnibus determination, but also because it is an improper attempt by the Debtors to obtain more favorable rulings than were obtained in the tort system prior to bankruptcy which has long been recognized as improper. See, e.g, Rooker v. Fidelity Trust, 263 U.S. 413 (1923); District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983).  The essence of the Rooker –Feldman doctrine is that lower federal courts do not have jurisdiction to sit in appellate review of decisions of state courts, excepting habeas corpus proceedings. See In re Mitchell, 255 B.R. 345, 360-61 (Bankr. D. Mass 2000); In re Nugent, 254 B.R. 14, 36 (Bankr. D. N.J. 1998); In re Audre, 216 B.R. 19 (9th

Cir. BAP 1997).  Using a "claims estimation process as a mechanism for de novo or appellate review of state court judgments does violence to the roles and relationships of the federal and state judiciaries, and could create an unwarranted friction.  Such a mechanism, if it existed, also might lead to forum shopping in an inappropriate way."  <u>In re Mitchell</u>, 255 B.R. at 361.

### C.    Constructive Notice Is Not a Threshold Estimation Issue

24.    Debtors propose that we embark upon costly and irrelevant expert discovery, motion practice, and evidentiary hearings on the "constructive notice of potential asbestos property damage claims." Para. 3 of the Debtors' Proposed CMO.  The Debtors have suggested in the past that they possess a statute of limitation defense to many PD Claims.  As the Court will recall, on July 19, 2004, it granted the Debtors relief from Del.Bankr.LR 3007-1 to file "gateway objections" to PD Claims.[14]  In support of the gateway objections protocol, the Debtors stated that such a protocol would be "efficient because it allows for the quick disposition of PD Claims that contain the same foundational and dispositive substantive defect(s)."  Gateway Objection Motion at 4.  With much bravado, the Debtors reported to the Court the following:

> Ms. Baer:    Likewise, Your Honor, we've identified over three thousand three hundred statute of limitations and laches-type objections which can be brought.  Very routine, Your Honor, situations where, based on the information in the proof of claim form, clearly the statute of limitations has run – run by many, many years.

Transcript of March 22, 2004 hearing at 6.

---

[14] The additional Gateway Objections include (a) incomplete claim form; (b) materially deficient supporting information; (c) laches; and (d) prior settlement.

25.     With similar bravado, the Debtors now contend that they can eradicate PD Claims even more informally and expeditiously by demonstrating through expert testimony that such claims should be estimated at zero dollars based on claimants' purported constructive knowledge of the potential harms of asbestos, a mythical standard that does not exist under any state law.[15]   The Court must see this "threshold issue" for what it is -- the Debtors' attempt to expunge *en masse* PD Claims without bothering to engage in any claims objection process that would directly involve the claimants and their right to a merits-based adjudication.  Indeed, the Debtors' boasting aside, they have not filed a single objection to a PD Claim based on statute of limitations grounds during the four plus years of these cases![16]

### i.     The Debtors Grossly Misstate Applicable Constructive Notice Standards

26.     The Court cannot accept as part of the estimation process a make-believe constructive notice standard specifically conjured up by the Debtors to eradicate <u>bona fide</u> PD Claims.  Rather, PD claimants, just as any other litigant, are entitled to have the applicable state substantive law applied to their individual tort claims. <u>See</u> <u>Vanston Bondholders Protective Committee v. Green</u>, 329 U.S. 156, 161 (1946)("What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed, is a question which, in the absence of overruling federal law, is to be determined by reference to state law."); <u>Grogan v. Garner</u>, 498 U.S. 279, 283 (1991) ("The validity of a creditor's claim is determined by rules of state law."); <u>Raleigh v.</u>

---

[15] The Debtors did not seek authority to utilize experts in the "routine" gateway objections process.  It is unclear why experts, therefore, are now required to opine on constructive notice.

[16] The Debtors have only filed one gateway objection to date on non-substantive, procedural grounds concerning eight proofs of claim.

Illinois Dept. of Rev., 530 U.S. 15, 20 (2000)("The 'basic federal rule' in bankruptcy is that state law governs the substance of claims."). It has long been accepted in this country, on the basis of comity and federalism, that federal courts should apply state law to tort claimants' state claims and not their own brand of federal common law.[17]

27.    The vast majority of states hold that the statute of limitations accrues on an asbestos property damage claim when a building owner knew or should have known that the building was contaminated by the release of asbestos fibers. Such a determination is based on the facts and circumstances particular to each plaintiff.[18] The

---

[17]    See Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); see also Bush v. Gore, 531 U.S. 98, 112 (2000)("comity and respect for federalism compel us to defer to the decisions of state courts on issues of state law. That practice reflects our understanding that the decisions of state courts are definitive pronouncements of the will of the States as sovereigns."); City of Philadelphia v. Lead Indus. Ass'n, Inc., 994 F.2d 112, 115 (3d Cir. 1993)("we may not significantly expand state law without a clear indication that the [state] Supreme Court would do the same."); Georgine v. Amchem Prods., Inc., 83 F.3d 610, 627 (3d Cir. 1996)(noting requirement to apply "an individualized choice of law analysis to each plaintiff's claims"), aff'd, 521 U.S. 591 (1997); In re M. Frenville Co.,744 F.2d 332 (3d Cir. 1984)(state law controls when right to payment on claim against debtor accrues), cert. denied, 469 U.S. 1160 (1985); In re W.R. Grace & Co (W.R. Grace & Co., et al. v. Sealed Air Corp. and Cryovac, Inc.), 281 B.R. 852, 860 (Bankr. D. Del. 2002)("[W]hile federal law controls which claims are cognizable under the Code, the threshold question of when a right to payment arises, absent overriding federal law, 'is to be determined by reference to state law.'")(quoting Vanston, 329 U.S. 156, 161 (1946)).

[18]    See Banc One Building Mgmt. Corp. v. W.R. Grace Co.—Conn., 565 N.W.2d 154, 159 ( Wis. Ct. App. 1997)(appellate court noted with approval lower court's review of documents relating to asbestos testing of plaintiff's building and correspondence between plaintiff and contractors regarding the remodeling of space contaminated by asbestos); Bellsouth 77 F.3d at 611 (2d Cir. 1996)(for purposes of when the statute of limitation accrues under Connecticut law, "[t]he focus is on the plaintiff's knowledge of facts, rather than on discovery of applicable legal theories.")(internal quotations omitted); State Farm Mutual Automobile Insurance Co. v. W.R. Grace & Co., 834 F.Supp. 1046, 1049 (C.D. Ill. 1992)(court considered Grace's "misleading or incomplete at best" correspondence to State Farm regarding the harmfulness of its product in determining the date in which State Farm possessed knowledge or should have possessed knowledge of asbestos contamination); Town of Hooksett School District v. W.R. Grace & Co, 617 F.Supp. 126, 129 (D.N.H. 1984)("At first glance it would appear that Plaintiff's suit is barred under either [state] statute [of limitation] as suit was not filed until twenty-three years after the allegedly dangerous product was installed in the Plaintiff's school. However, New Hampshire law instructs otherwise."); MDU Resources Group v. W.R. Grace & Co., 14 F.3d 1274, 1279 (8th Cir. 1994)(constructive knowledge of contamination is a fact specific inquiry), cert. denied, 513 U.S. 824 (1994); University of Vt. v. W.R. Grace & Co., 565 A.2d 1354, 1357 (Vt. 1989)("Precisely when plaintiff's cause of action accrued will require factual development at trial. Summary judgment at this stage is inappropriate."); Prudential Insurance Co. of Am. v. United States Gypsum Co., 359 F.3d 226, 234 (3rd Cir. 2004)(with respect to federal civil RICO claim, court reviewed Prudential's extensive real estate enterprise, "evidence pertinent to Prudential's own buildings and employees regarding the hazards of ACMs and related precautions," as well as government regulations, to determine when Prudential knew or should have known of its asbestos-related injuries).

Debtors wholly misstate the statute of limitations issue by framing the issue as one concerning when asbestos claimants possessed constructive notice of "potential" claims. Public information about the dangers of asbestos, standing alone, does not trigger the running of state statutes of limitation.  The Debtors sought to convince at least one state appellate court otherwise and lost on that specific issue.  See Clayton Ctr. Assocs. v. W.R. Grace & Co., 861 S.W.2d 686, 690 ( Mo. Ct. App. 1993) (appellate court affirmed jury verdict against the Debtors, finding, in part, that "public information about asbestos" was insufficient to prove constructive notice).

28.    Moreover, even in a state in which the date of installation or date of discovery of installed material containing asbestos is relevant to accrual of the action, a statue of limitation or statue of repose is ordinarily tolled by a defendant's fraud, fraudulent concealment or industry-wide conspiracy.  To this day, the Debtors claim that their products do not cause injury, but rather are nonfriable and therefore "safe."  Thus, one would have to also take into consideration, when considering constructive notice issues, the effect and validity of statements made by the Debtors pre-petition to each PD Claimant, as well as repeated statements made during these bankruptcy cases, in which the Debtors continue to deny any possible problem from their asbestos products.

**ii.   Constructive Notice Issues Must Be
Adjudicated On a Claim-By-Claim Basis**

29.    It is ludicrous for the Debtors to even suggest that anyone can take

factually unrelated claims and determine that all such claims are barred under different

state statutes of limitation. See Owens Corning v. Credit Suisse First Boston, 322 B.R.

719, 722 (D. Del. 2005)(the purpose of estimation is to determine "what would have been

a fair resolution of the claims in the absence of bankruptcy."). The Court recognized that

claims subject to a gateway objection on statute of limitations grounds would require

individualized adjudication: "I mean, I could compel the debtor to say that if the property

is in Florida or the issue is governed by Florida law, to put all the Florida ones in one

objection.   But, omnibus objections always have each claim examined on their own

merits." March 22, 2004 Hearing Transcript at 11-12 (emphasis added).

**iii.   No "Constructive Notice" Expert Exists as a Matter of Law**

30.    As absurd as the Debtors' mythical constructive notice standard appears,

the Debtors' assertion that an expert exists to opine on such a nonsensical standard

borders on the comical.  The question of whether a statue of limitation has even begun to

run is a subjective inquiry, the determination of which is usually left to the trier of fact.

The PD Committee is unaware of any case where the Debtors or any other asbestos

defendant has sought to qualify anyone as an expert on constructive notice issues.  It is

simply too well established to argue otherwise that "the expert testimony...as to an

ultimate issue of domestic law or as to the legal significance of facts is inadmissible."[19]  It

---

[19] See U.S. v. Leo, 941 F.2d 181, 196 (3d Cir. 1991); Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992); In re Initial Public Offering Secs. Litigation, 174 F.Supp.2d 61, 64 (S.D.N.Y. 2001) ("In fact, every circuit has explicitly held that experts may not invade the court's province by testifying on issues of law."); Music Sales Corp. v. Morris, 73 F.Supp.2d 364, 381 (S.D.N.Y. 1999); Motown Productions, Inc. v. CACOMM, Inc., 668 F.Supp. 285, 288 (S.D.N.Y. 1987), rev'd on other grounds, 849 F.2d 781 (2d Cir. 1988); see also

MIAMI 906352.4 7481715537

matters not whether such testimony is offered at the summary judgment or trial stage.
See Ideal World Marketing, Inc. v. Duracell, 15 F.Supp.2d 239, n.2 (E.D.N.Y. 1998)("such [legal expert] testimony is inadmissible whether offered at trial for the benefit of the jury or submitted with motions for the benefit of the judge").  Yet, by the proposed CMO, that is precisely what the Debtors propose to do.  Since it would be impermissible for an expert to opine as to an ultimate issue of law, the Court must prohibit the Debtors from introducing any expert testimony concerning their fanciful constructive notice standard in the estimation proceeding.

### iv.    Traditional Estimation Methodologies Already Account For Affirmative Defenses Based On A Debtor's Prior Litigation History

31.    The Debtors' proposal that we now embark upon consolidated discovery and hearings on constructive notice defenses are also unnecessary because section 524(g) provides a claims resolution mechanism that will determine whether a particular PD Claimant's proof of claim is barred by any applicable statute of limitation.  Further, as the Debtors are well aware, the estimation process can statistically and empirically accommodate affirmative defense theories.  Indeed, asbestos estimation experts routinely take into consideration a debtor's pre-petition track record in asserting affirmative defenses to adjust estimations accordingly.  The Debtors, however, do not want the Court to look to their vast and telling pre-bankruptcy settlement and litigation history.  Rather, they seek to interject into the estimation process purported affirmative defenses to filed proofs of claim.    As stated, the Court has already approved the gateway objection process by which the Debtors may attempt to dispose of affirmative defenses to proofs of

Specht v. Jensen, 853 F.2d 805, 808-10 (10th Cir. 1988); Adalman v. Baker Watts & Co., 807 F.2d 359, 366 (4th Cir. 1986); United States v. Zipkin, 729 F.2d 384, 387 (6th Cir. 1984); Marx & Co. v. Diners' Club, Inc., 550 F.2d 505 (2d Cir. 1977).

MIAMI 906352.4 7481715537

claim, including on constructive notice grounds.  Any effort to eliminate filed proofs of

claim, however, must occur in the claims objection process to allow each claimant an

opportunity to a merit-based adjudication.

>    **D.    Debtors' Proposed Estimation Procedure Violates PD Claimants Due Process Rights**

32.    The Debtors' proposed estimation procedure would deprive individual PD

Claimants of their due process rights.  Although courts have found that a bankruptcy

court can use "whatever method is best suited to the particular contingencies at issue,"[20]

this does not mean that procedural due process rights can be sacrificed on the altar of

expediency. See In re Combustion Eng'g, Inc., 391 F.3d 190, 245 n. 64 (3d Cir. 2004)

(minimal due process requirements extend to bankruptcy proceedings); In re Amoroso,

123 Fed.Appx. 43, 49-50 (3d. Cir. 2004)(analyzing due process requirements in a

bankruptcy proceeding); Jones v. Chemetron Corp., 212 F.3d 199, 209 (3d. Cir. 2000)

(applying due process considerations to bankruptcy proceeding).

33.    It is beyond legitimate debate that, at a minimum, due process demands

that a PD Claimant be given notice and an opportunity to be heard prior to the deprivation

of a property interest. See Tulsa Professional Collection Services, Inc. v. Pope, 485 U.S.

478, 484-85 (1988).  A PD Claimant's cause of action for property damage caused by any

of the Debtors' numerous toxic asbestos products are just the type of property interests

protected by the Due Process Clause.[21] See Logan v. Zimmerman Brush Co., 455 U.S.

---

[20] Bittner, 691 F.2d at 135.

[21]    While the Due Process Clause of the Fifth Amendment is implicated in this federal bankruptcy
proceeding, for purposes of constitutional analysis, the Court can rely on decisional authority applying the
Due Process Clause of either the Fifth Amendment, which applies to the federal government, or the
Fourteenth Amendment, which applies to the States. See Paul v. Davis, 424 U.S. 693, 702 n. 3
(1976); Chew v. Dietrich, 143 F.3d 24, 29 n. 4 (2d Cir. 1998) (observing that the due process analysis is
basically the same under both the Fifth and Fourteenth Amendments); Technical Concepts, L.P. v. Zurn

422, 428 (1982).  As far back as 1882, the Supreme Court held that a "vested right of action is property in the same sense in which tangible things are property, and is equally protected against arbitrary interference." Pritchard v. Norton, 106 U.S. 124, 132 (1882). "Thus, any government action that substantially and unreasonably interferes with an individual's cause of action or precludes her opportunity to be heard violates procedural due process." In re Argonaut Fin. Servs., Inc., 164 B.R. 107, 111 (N.D.Cal. 1994); see also In re Farmland Indus., Inc., 284 B.R. 111, 116-17 (Bankr. W.D.Mo. 2002)(accord).

34.     The Debtors' proposed estimation procedure would cause just such an interference with individual PD Claimants' causes of action because it would, in effect, fix the amount of specific claims for purposes of distribution, rather than estimate, as proposed by the PD Committee, the outer-limit of the aggregate value of the PD Claims. Accordingly, the PD Committee objects to the Debtors' attempt to deprive individual PD Claimants of their constitutional right to due process.

**E.      The Debtors' Proposal Provides Illogical Order and Timing for Discovery and Expert Reports**

35.     The Debtors would begin the PD estimation process with the exchange of expert reports, first, on the so-called Threshold Issues and then, on the estimation itself, without any prior disclosure of the identities of experts (or even the subjects on which expert testimony will be elicited) or the identities of factual witnesses.  See Paras. 3 & 13 of Debtors' Proposed CMO.  The Debtors' proposal requires the exchange of expert reports prior to any discovery being completed.  Further, the Debtors allow for only a

---

Indus., Inc., 2002 WL 31027962 at *3 n.4 (N.D.Ill. Sep. 10, 2002) (observing that "[t]he Seventh Circuit has held that there is no operative difference between the concept of due process as applied to the states through the Fourteenth Amendment and due process as applied through the Fifth Amendment for federal claims).

minimal period and basis for the experts who previously filed reports on the Threshold Issues or on the other estimation issues to supplement their reports. <u>See</u> Paras. 3, 4 & 13 of Debtors' Proposed CMO.[22]  This Byzantine process, in the face of the Debtors' failure to provide even a hint as to how they propose to conduct the actual estimation, is fraught with the prospect (worse yet perhaps, the intention) of undue surprise, ambush and endless motion practice.  If the PD Committee guesses wrong about what issues are to be tried - - just as we and the Court failed to appreciate the Debtors' intention to challenge science - - it may well be left without experts to rebut those of the Debtors.

36.     The Debtors allot four to six weeks to depose all experts and all previously undisclosed witnesses.  <u>See</u> Paras. 5-7, 14-16 of Debtors' Proposed CMO.  As the Debtors indicate they intend to try science and statutes of limitation issues through a battle of experts, there can easily be ten expert witnesses per side and an unknown number of individual fact witnesses to depose in less than thirty (30) days - - twenty (20) days if depositions *duces tecum* are involved as subpoenas will likely be required for the fact witnesses.  This is obviously insufficient time to complete deposition discovery.

37.     Although the Debtors' proposal intimates that supplemental expert reports will be allowed, the Debtors' proposal also places unreasonable limitations on the right to file supplements to expert reports.  <u>See</u> Paras. 3, 4 & 13 of Debtors' Proposed CMO.  As to Expert Reports in respect of (a) Threshold Issues, <u>only the Debtors</u> are permitted to file supplemental reports; and (b) estimation issues, any supplemental reports are due <u>before</u> fact discovery is closed.  <u>See</u> Paras. 3, 4, 13 & 16 of Debtors' Proposed CMO.

---

[22] And, again, with respect to Phase 1 "Threshold Issues," the Debtors propose that only they be entitled to file expert reports.

38.    In respect of the Threshold Issues, fact witnesses need not be identified until November 14, 2005, and deposition discovery does not close until December 16, 2005, but supplemental expert reports would be due on December 1, 2005.  Paras. 4-6 of Debtors' Proposed CMO.  The estimation discovery schedule has a similar defect.  Paras. 13-15 of Debtors' Proposed CMO.  The Debtors also propose that no written discovery be permitted after the very same day that expert reports are due, approximately one month before the parties are even required to identify their fact witnesses.  Paras. 3, 5, 6, 13-15 of Debtors' Proposed CMO.

39.    Another timing concern is that final fact witness and expert lists on the Threshold Issues are due a mere three days after deposition discovery closes.  Paras. 6 & 8 of Debtors' Proposed CMO.

40.    The significance and urgency of the Threshold Issues is best demonstrated by the fact that under the Debtors' proposal expert reports on estimation are due January 16, 2006, over two weeks before hearing on the Threshold Issues (*i.e.*, under the Debtors' proposal, they seek a February 2006 trial date on the Threshold Issues).  See Paras. 9 & 13 of Debtors' Proposed CMO.  Thus, the estimation experts will not even be able to assess or account for any Court rulings on the Threshold Issues.  Further, the proposed CMO would not allow the experts to supplement their reports if the Court did render rulings on the Threshold Issues that arguably impact estimation values as the deadline for supplements will have passed at least two months before any such rulings could conceivably be made.

41.    It is apparent that the Debtors seek to take advantage of the fact that there is no precedent for the estimation of filed PD Claims on an aggregate basis.  Rather than

using this opportunity to design a responsible process for the estimation of PD Claims, the Debtors seek to game the system and turn this important main event into an improvisational exercise to change the landscape of state law simply because of the fact of bankruptcy.   In short, the sequence and timing of the exchange of lists and reports and of discovery under the Debtors' proposed CMO is illogical and fraught with the potential for confusion, at best, and ambush, at worst, which will inevitably lead to disputes, the need for judicial intervention and delays.   The Court should reject the Debtors' proposal and accept the PD Committee's proposed CMO which follows the familiar contours of Rule 26 of the Federal Rules of Civil Procedure.

### III.    The PD Committee's Case Management Proposal is a Sensible Approach to the Estimation of PD Claims

42.    In stark contrast to the Debtors' proposed CMO, the PD Committee's proposed CMO follows the traditional path utilized in contested matters under the Bankruptcy Code, as well as in civil litigation in the federal court system and is in harmony with the Federal Rules of Civil Procedure.  Where there are differences between the typical path and the processes necessary to allow the PD estimation to proceed efficiently, the PD Committee's proposal adjusts the typical path to allow for such modifications.

43.    The PD Committee's proposal commences with each PD Estimation Participant[23] providing its Expert Disclosures pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure on or before September 1, 2005.  Significantly, this disclosure is not accompanied at this stage by the exchange of expert reports.  It is simply a disclosure

---

[23] For purposes of this Section III, all defined terms used, but not defined herein, shall have the meanings set forth in the PD Committee's proposed Case Management Order, attached hereto as Exhibit A.

of each person who may be used at trial to present evidence under Rules 702, 703 or 705 of the Federal Rules of Evidence, or the type of each expert which each party intends to engage for purposes of providing such testimony.  Each party may supplement its Expert Disclosures within twenty (20) days based on the information it obtains from the Expert Disclosures of the other PD Estimation Participants.  By providing for this sequence, the PD Committee's proposal allows for each PD Estimation Participant to get off on the same foot and avoid trial by confusion and ambush that is characteristic of the Debtors' proposal.

44.     The initial Expert Reports to be exchanged pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure would then be due on November 30, 2005, with supplements thereto due on May 1, 2006, to take into account discovery and reports of experts from other PD Estimation Participants.[24]

45.     Initial disclosures of each individual likely to be called to testify in respect of the PD Estimation would be due on September 1, 2005, with supplements and additions thereto permitted through February 1, 2006.  In addition, all written discovery other than in respect of Expert Reports or expert testimony may commence at any time, but must be concluded by February 15, 2006.  Further, all depositional discovery of non-expert witnesses may commence at any time, but must be concluded by March 15, 2006.

46.     With respect to discovery of experts, written discovery and depositional discovery may commence at any time after the exchange of Expert Reports, but must be concluded by June 1, 2006.

---

[24] The Expert Reports may also be supplemented at any time up to twenty (20) days prior to the Estimation Hearing to take into account the allowance or disallowance of PD Claims pursuant to Gateway Objections or other objections to or determination of PD Claims.

MIAMI 906352.4 7481715537

47.     The remaining provisions of the PD Committee's proposed CMO adopt in large part the structure proposed by the Debtors, with certain dates and deadlines adjusted accordingly to take into account the more rational, straight-forward approach advocated by the PD Committee.

48.     The primary difference between the PD Committee's proposal and the Debtors' proposal is highlighted by the fact that the former proposal is maintained on one-track that focuses upon the task at hand - - the estimation of PD Claims - - as opposed to the Debtors' multi-pronged approach that frequently blurs the distinction between a liquidation of individual PD Claims and the aggregate estimation of all filed PD Claims.  However, the PD Committee's proposal does not ignore the other matters in the bankruptcy case that may implicate the estimation of PD Claims.

## CONCLUSION

49.     At the end of the day, the estimation process will be a battle of experts. We have already been surprised once by the Debtors' "science" revelation.  Who knows what other surprises are out there?  There is far too much at stake to allow the estimation of PD Claims to be conducted in such a manner.  To ameliorate that concern, it is wise to allow each PD Estimation Participant to be informed about which type of expert issues will be implicated.  In addition, it makes infinite sense to allow the expert opinions and reports to (a) take into account other matters that may occur in the bankruptcy case; and (b) evolve as necessary to accommodate any such matters that may arise.  The structure and timing of the PD Committee's proposal amply accomplishes those goals, and concludes at virtually the same termination date as the Debtors' proposal.  Accordingly, in order to obtain the result desired by the Court - - an informed estimation that will be

used as part of determining the feasibility of any plan of reorganization in this case - - the PD Committee urges the Court to deny the Debtors' proposal and adopt the PD Committee's proposal.

WHEREFORE, the PD Committee respectfully urges the Court to reject the case management order proposed by the Debtors and to adopt the case management order proposed by the PD Committee, and to provide such other and further relief as the Court deems just and proper.

Dated:  July13, 2005                          Respectfully submitted,

                                              BILZIN SUMBERG BAENA
                                                PRICE & AXELROD LLP
                                              200 South Biscayne Boulevard
                                              Suite 2500
                                              Miami, Florida  33131-5340
                                              Telephone:  (305) 374-7580

                                              Scott L. Baena (Admitted Pro Hac Vice)
                                              Jay M. Sakalo (Admitted Pro Hac Vice)
                                              Allyn Danzeisen (Admitted Pro Hac Vice)
                                              Matthew Kramer (Admitted Pro Hac Vice)
                                                                and

                                              FERRY JOSEPH & PEARCE, P.A.
                                              824 Market Street, Suite 904
                                              P.O. Box 1351
                                              Wilmington, Delaware  19899
                                              Telephone:  (302) 575-1555

                                              By:  ____/s/ Theodore J. Tacconelli_____
                                                     Theodore J. Tacconelli
                                                     (Del. Bar No. 2678)

                                              CO-COUNSEL FOR THE OFFICIAL
                                              COMMITTEE OF ASBESTOS
                                              PROPERTY DAMAGE CLAIMANTS

MIAMI 906352.4 7481715537