# **EXHIBIT C**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

* * * * * * * * * * * * * * * * * *
                                   *
DAYTON INDEPENDENT SCHOOL          *
DISTRICT, et al.,                  *     CIVIL ACTION
                                   *     NO. B-81-277-CA
        Plaintiffs,                *
                                   *     Consolidated With
    v.                             *
                                   *     CIVIL ACTION
W.R. GRACE & CO., et al.,          *     NO. B-81-293-CA
                                   *
        Defendants.                *
                                   *
* * * * * * * * * * * * * * * * * *

SUBMISSION BY W. R. GRACE & CO. AND UNITED
STATES GYPSUM COMPANY REGARDING COMMON ISSUES

This submission by W. R. Grace & Co. ("Grace") and United States Gypsum Company ("USG") is made in response to the Order of this Court dated November 14, 1986. In that Order the Court directed the parties to submit "a proposal setting out the specific questions of law or fact which are common to all parties and which may be resolved in the initial trial." For the reasons that follow, Grace and USG must respond that no issues of law and fact may be resolved in the initial trial for any claimants other than those engaged in that first trial. The determinations to be made by the jury in that first trial must be based upon the proof put at issue in that trial. The procedural posture of this case, the varying facts relevant to and determinative of judgments of liability, and the law

governing the various claims made by plaintiffs, all compel the conclusion that the initial trial cannot properly address or resolve issues of law or fact for any other claim.

PROCEDURAL HISTORY OF "COMMON QUESTIONS" IN THIS ACTION

This case involves the claims of eighty-three plaintiff school districts against sixteen defendants stated in a multi-count Complaint alleging, among other things, negligence, breach of express and implied warranties, strict liability, nuisance, trespass, fraud, and misrepresentation. The six hundred or so school buildings at issue were constructed from at least as early as 1924 through the 1970's. Some defendants, like Grace and USG, manufactured a number of acoustical plaster or fireproofing materials with asbestos at times from at least the 1940's through the early 1970's. Grace, for example, manufactured, at various times, at least sixteen such building products containing asbestos; USG manufactured many more varieties. Some defendants here manufactured no such products, making instead insulation or floor tiles with asbestos, or in some cases mined raw asbestos. Some companies whose products allegedly exist in some schools, notably National Gypsum Company, are not defendants in this case.

The Court has set the claims of five school districts for trial. Allegations concerning the products in the 116-120 buildings within these districts, identifying the defendant allegedly answerable to suit for each building, have been advanced for about ninety of these buildings. With respect to Grace, one fireproofing product, MonoKote MK-3, is the product

identified./1/ For USG, the allegations in these buildings relate to two products, Audicote and Sabinite./2/ The remaining products made by these companies are not implicated. Most other defendants are not claimed to have products present in these buildings. Evidence concerning such non-implicated products of Grace, USG, or other defendants will not be relevant to any claim to be determined in the first trial.

The history of the claims of "common questions" in this case is worth reviewing. The original Complaints of Dayton Independent School District and Evadale Independent School District, both filed in April, 1981, did not seek to raise common issues. In April, 1984, the United States District Court for the Eastern District of Pennsylvania issued an order certifying a mandatory class for all school district claimants in the United States. This certification was supported by Grace and USG. On April 26, 1984, there was a hearing in this Court (Judge Parker) concerning the effect of that certification on the two cases (Dayton ISD and Evadale ISD) then pending./3/ Testimony was elicited by counsel for plaintiff,

---

/1/ In one other building, a second Grace Product, Econowhite, is named.

/2/ Product identification contentions filed by plaintiffs on December 11, 1986, state that another USG product, HiLite, is alleged to exist in one building. Further, for one building in Grapevine-Colleyville, plaintiffs identify a product by Sprayon Research Corp. that plaintiffs may assert can be attributed to USG.

/3/ A copy of the Transcript of that April 26, 1984 hearing is attached hereto as Exhibit 1.

Mr. Dies, from officials of Dayton ISD and Evadale ISD regarding the likelihood that the claims of those districts could be prosecuted by representative class members in Philadelphia. In pertinent part, the representative of Dayton testified that the students, teachers, administrators and other persons situated in Dayton would have "essential" knowledge pertinent to the facts of the Dayton claim, including condition of the materials in place (Exhibit 1, p. 12). Further, the Dayton official testified that he didn't think "any two buildings [were] constructed exactly alike as far as the structure, and as far as what it would involve as far as removing and replacing..." (Exhibit 1, pp. 15-16). The Evadale representative similarly testified that all school districts are different, and "certainly Evadale differs from all the others." (Exhibit 1, p. 24).

The two cases then existing were permitted to proceed regardless of the Philadelphia class certification order. Thereafter, in November, 1984, a Complaint in Intervention (for seven new districts) was filed which itself sought certification of a class of all Texas school districts. Various defendants, including Grace and USG, opposed class certification. In February, 1985, plaintiffs filed a new Complaint listing sixty-six new school district plaintiffs but omitting any class action allegations. A later Amended Complaint, filed in April, 1986, added twenty-eight more school district plaintiffs, but still declined to assert any class action allega-

tions. No class action allegations now exist and no class is certified.

## DISCUSSION

I. THE CLAIMS AT ISSUE IN THE INITIAL TRIAL WILL NOT ADDRESS OR RESOLVE ISSUES COMMON TO ALL PARTIES.

While this Court has ruled that the claims of all eighty-three plaintiffs are properly joined before this Court, the present scheduling order sets the claims of only five school districts for disposition in the initial trial. A review of the parties to that initial trial, the elements of proof necessary to determine liability in each of those claims, and reference to elementary rules of procedure, will demonstrate that no questions of law or fact can or will be determined for any parties outside that trial. Indeed, only random issues of law or fact common to the claims of the five school districts at trial will arise.

A. Not All Parties Or Products Are Present In The Initial Trial.

No evidence relating to the claims of seventy-eight plaintiffs or their buildings at issue will or can be admitted for any claim of the five school districts to be tried. Those other claimants will seek separate judgments in their own trials and all interrelated issues must be tried to a single jury. The information about these other claims is irrelevant to the trial of the five districts. Confusion and prejudice would necessarily follow admission of such irrelevant evidence.

No evidence relating to the product of any company not alleged to be in the five districts' buildings will or can be admitted. The five districts collectively assert that one Grace product (MonoKote MK-3, a fireproofing product) is present in many schools. One other Grace product (Econowhite, a finish coat) is named in one school. For USG, Sabinite and Audicote, acoustical plaster products which are in fact quite distinct in characteristics one from the other, are alleged to exist. As noted above, two other USG products are now alleged to exist in two schools, leaving the bulk of USG's products not at issue. A few schools allegedly installed products of National Gypsum Company, not a party here, and one school, Grapevine High School in the Grapevine-Colleyville Independent School District, allegedly installed products of Sprayon Research Corp., not a party here, and U.S. Mineral Products. The range on defendants is much less than those named in the current Complaint; certainly defendants not in Court at the initial trial may not be bound by the proceedings. See Hardy v. Johns-Manville Sales Corp., 681 F.2d 334, 337-38 (5th Cir. 1980) (manufacturers who were not parties to prior asbestos-related products liability suit could not be estopped from contesting liability issues). Further, only a few of the products manufactured by Grace or USG will be put to issue; no other products may be adjudged properly in the initial trial in any sense. Cf. Migues v. Fiberboard Corp., 662 F.2d 1183, 1189 (5th Cir. 1981) (all asbestos products cannot be regarded as unreasonably dangerous as a matter of law).

B.  The Theories of Recovery Do Not Permit Adjudication of Issues For Other Claimants.

The judgments of liability that plaintiffs seek in the initial trial will not and cannot determine liability for other claimants.

The multi-count Complaint sets out a number of theories of recovery. Most are clearly limited in their application to facts surrounding the particular purchase (e.g., fraud and misrepresentation must be proved specifically; failure to warn addresses the knowledge of the architect or other agent and the knowledge of the seller at the time of sale; breach of warranty depends upon the warranties actually made for fireproofing material, accoustical plaster, or other products). Other theories, like negligence, or "marketing defect" under strict liability, depend upon the knowledge of the seller and the technological environment at the time of the sale. As the sales in question occurred at varying times (the buildings were constructed over a fifty-year span; Grace, for example, made its products over a thirty-year span) these theories are all fragmented by the dimension of time as well as the facts specific to each purchase and sale.

It may prove true that for some theories, like negligence, a school in Dallas purchased MonoKote MK-3 for its building at the same time that Dayton ISD allegedly purchased that product for its school. This coincidence is now difficult to predict. It is essential to understand, however, that any judgment of

liability for those coincident schools will be based upon the determination of all the elements of negligence (e.g., duty to warn, failure to warn, demonstrated harm, proximate causation of harm, absence of intervening cause, comparative fault calculations, etc.). Thus, what will be adjudicated for the claim of Dallas ISD with respect to its school that purchased MonoKote MK-3 in 1961 will differ as to liability from what will be adjudicated for the claim of Dayton ISD for its 1961 constructed school.

Further, with respect to strict liability, the issue to be adjudicated for liability is equally fragmented over time and by specific facts developed as to each separate building. In Texas, strict liability[4] requires proof of a number of elements. For a design defect claim, plaintiff must prove, most importantly, that the product is defective and unreasonably dangerous and that it was defective when it left the defendant's control. Armstrong Rubber Co. v. Urquidez, 570 S.W.2d 374, 376 (Tex. 1978); Restatement (Second) of Torts §402A, comment g (1965). This formulation makes clear that the inquiry into defect must be specific to each building. The defect cannot be merely that the product contained asbestos

---

[4]  Defendants Grace and USG will file dispositive motions, at the time directed by the Court, as to a number of legal theories advanced by the five school districts including strict liability in tort.

encased in plaster. See Gideon v. Johns-Manville Sales Corp., 761 F.2d 1129, 1145 (5th Cir. 1985) ("all asbestos-containing products cannot be lumped together in determining their dangerousness."). Plaintiffs in their Complaint allege at various points that the products of defendants have released fibers into the air and thereby caused harm or hazard (e.g., Third Amended Complaint, pp. 15, 17, ¶¶V, VII). It is not likely that the plaintiffs will rely solely upon the claim that asbestos present in building products in place, and not released into the building environment, is itself a defect justifying relief. Plaintiffs can be expected to try to counteract the reality that the fireproofing or acoustical plaster products at issue did in fact perform as intended with some attempt to prove that the asbestos encased in those products poses some health hazard because of fiber release.

Thus, the issue of defectiveness will necessarily vary building by building even within each school district. In each building, the issues will be whether the asbestos fibers, if any, found in the air came from a ceiling product (as opposed to ambient air, pipe and boiler insulation, floor tiles, etc.) and whether they pose a detectable and unreasonable danger. The condition of the material in each building is thus essential evidence for each claim of strict liability, just as the Dayton officials believed in 1984 (Exhibit 1, p.12). Further, the elements of strict liability include as well injury and comparative causation. Building conditions and maintenance are thus conspicuously relevant. Moreover, even in a design defect

claim, state of the art evidence is admissible and relevant to the technological environment as of the time of sale. Boatland of Houston, Inc. v. Bailey, 609 S.W.2d 743, 748 (Tex. 1980). But see Carter v. Johns-Manville Sales Corp., 557 F.Supp. 1317, 1320 (E.D. Tex. 1983) (claim of defective design not dependent on foreseeability of danger, "know-how" not "know of" is content of technological environment). The dimension of time therefore joins the splintering of claims by building conditions even under strict liability.

## II. NO ISSUES RELATING TO OTHER CLAIMANTS MAY BE RESOLVED IN THE INITIAL TRIAL.

Plaintiffs put their claims at issue by trial. Defendants as well as plaintiffs have the right under the Seventh Amendment to the United States Constitution to a unitary trial of all interrelated facts to a single jury. Gasoline Products Co. v. Champlin Refining Co., 283 U.S. 494, 500 (1931); Eximco, Inc. v. Trane Co., 748 F.2d 287, 290 (5th Cir. 1984). Claims joined into one action may be tried at once, but claims not tried remain no more than unresolved allegations.

In a class action proceeding, claims of persons not before the court may be resolved by the proxy of representative claimants resolving their own claims, provided certain safeguards are present. Fed. R. Civ. P. 23. This is not a class action. No other provision of the Federal Rules permits resolution of issues by proxy.

Further, the description of the claims put to test by the Third Amended Complaint, the elements of liability, and the

nature of proof to be offered, compel the conclusion that each determination of liability will rest on particular and specific facts. For example, the strict liability -- "design defect" -- claim of Dayton ISD will be resolved by determining whether any levels of asbestos fiber proved to be due to release by Grace's product poses an "unreasonable danger" in the Stephen F. Austin school, whether Dayton was more at comparative fault than Grace due to improper maintenance of the product, and whether Grace at the time of sale operated in a "technological context" that permitted alternative designs. See Boatland, 609 S.W.2d at 748. A jury verdict for Dayton ISD on this school would therefore resolve only that particular claim.

It is not practicable, in this procedural, legal and factual environment, to carve out artificial, theoretical questions for common resolution as those general questions will not be the basis of any liability adjudication. The creation of such general questions would resolve nothing for the five plaintiffs in the initial trial.

Moreover, Article III of the Constitution empowers federal courts to hear and determine "cases" and controversies." "The case or controversy requirement of Article III of the Constitution is fundamental, and dictates that legal issues be presented in the context of actual cases and not in the abstract," National Treasury Employees Union v. Kurtz, 600 F.2d 984, 987-88 (D.C. Cir. 1979). "To satisfy the 'case and controversy' requirement of Article III, a plaintiff must allege a sufficient personal stake in the outcome of a dispute to ensure

that the matter to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." Alschuler v. Department of Housing & Urban Development, 686 F.2d 472, 476 (7th Cir. 1982). "The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting a specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts". Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-241 (1937) (citations omitted).

It is clear, therefore, that the framing and determination of such hypothetical questions for other parties not present, without proof at trial to support those claims, would be improper and is impermissible. The splintering out of abstract questions as to some aspect of a claim would also defeat the Seventh Amendment requirement that interrelated issues be tried to a single jury.

III. COLLATERAL ESTOPPEL OR ISSUE PRECLUSION IN LATER CASES MUST DEPEND UPON THE JUDGMENTS IN THE INITIAL TRIAL.

If plaintiffs prevail in this first trial, they can be expected to propose the use of offensive collateral estoppel. See generally Parklane Hosiery Co. v. Shore, 439 U.S. 322 (1979); Blonder Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313 (1971). The overriding issue in collateral estoppel is fairness to the party to be estopped. The prerequisites include a determination in an

13

earlier trial by judgment of an issue in the later suit, full and fair opportunity to litigate that issue in the earlier cases, and concerns that inconsistent adjudications in still other cases might in fairness prevent the preclusion of litigation in a later case.

Collateral estoppel can only be determined after judgment and by the court charged with deciding that issue in the later suit. It is therefore improper to decide this issue for the seventy-eight remaining claimants before judgments enter after the initial trial. Use of this doctrine will depend inexorably upon what judgments actually enter at that trial, and specifically upon what issues are actually litigated. If the later court concludes that the judgment for Dayton, for example, determined issues peculiar to Dayton, it should rule that the Dayton judgment does not preclude Grace from litigating claims of Houston or Fort Worth on liability. Grace and USG believe strongly that this will be the case. In any event, collateral estoppel is an issue which can only be addressed after the initial trial.

It is also possible for parties to agree that a "test case" be litigated which will be treated by the parties as determinative of particular issues in other cases. This procedural device requires the agreement of the parties who thereby waive their rights to jury trial of other claims. For all the reasons set out above, Grace and USG expressly decline to treat the initial trial as a "test case." The issues for each plaintiff and for each building are simply too fact-specific to

admit of resolution in a fashion divorced from the particular facts that establish the adverse legal claims of the parties.

## CONCLUSION

For all of the foregoing reasons, defendants W.R. Grace & Co. and United States Gypsum Company must respectfully oppose any attempt to resolve issues of fact or law relevant to the claims of any school districts other than Dallas, Birdville, Hurst/Euless/Bedford, Grapevine-Colleyville, and Dayton in the initial trial.

Respectfully submitted,

W.R. GRACE & CO.

By its attorneys,

Patricia S. Greek
ANDREWS & KURTH
4200 Texas Commerce Tower
Houston, TX 77002
(713) 220-4184

James J. Dillon
Richard A. Oetheimer
GOODWIN, PROCTER & HOAR
Exchange Place
Boston, Massachusetts 02109
(617) 570-1000

Charles Dewey Cole, Jr.
NEWMAN SCHLAU FITCH &
  BURNS, P.C.
305 Broadway
New York, New York 10007
(212) 619-4350

UNITED STATES GYPSUM COMPANY

By its attorneys,

Stephen S. Andrews
WOODARD, HALL & PRIMM
4700 Texas Commerce Tower
Houston, TX 77702
(713) 221-3800

Edward H. Green
WEELER, WHEELUS & GREEN
550 Fannin Street
Beaumont, TX 77704
(409) 838-0101

Dated: December 12, 1986

VS-3562/o
12/12/86

14