# EXHIBIT E

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:  USG Corporation,              Chapter 11
a Delaware corporation,
et al.,                               Civil Action No. 01-2094
                    Debtor.


\*   \*   \*   \*   \*


        Transcript of proceedings held on Friday, June 13,
2005, United States District Court, Pittsburgh, Pennsylvania,
before Joy Flowers Conti, District Judge.


IN-COURT APPEARANCES:

For the Debtor:                 DAVID HEIMAN, Esq.
                                STEPHEN C.NEAL, Esq.
                                SCOTT DEVEREAUX, Esq.
For the Unsecured
Creditors Committee:            KEN PASQUALE, Esq.

For the Equity Committee:       DAVID HICKERSON, Esq.
                                RALPH MILLER, Esq.
For the Asbestos Property
Damage Claimants Committee:     ALLYN DANZELSEN, Esq.

For the Future Claimants:       SEAN GREECHER, Esq.


For the Asbestos Claimants
Committee:                      PETER LOCKWOOD, Esq.

For the SAC:                    ELIZABETH MAGNER, Esq.

For Dean Trafelet:              ANDREW KRESS, Esq.
                                JANE PARVER, Esq.

VARIOUS APPEARANCES BY TELEPHONE

Court Reporter:                 Shirley Ann Hall, RDR, CRR
                                1029 U.S. Courthouse
                                Pittsburgh, PA 15219
                                (412) 765-0408


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

2

```
 1                    P R O C E E D I N G S
 2                      *   *   *   *   *
 3             (In open court.)
 4             THE COURT:  This is a hearing on at least two
 5   matters that have been filed in the USG Corporation bankruptcy
 6   case in terms of matters that have been withdrawn to the
 7   District Court, and the numbers here are 041159 and 041560.
 8   The Court has received a listing of the parties present.  Does
 9   this listing also include those who are participating by
10   phone?
11             MR. NEAL:  Your Honor, Stephen Neal.  I don't think
12   it does.
13             THE COURT:  What I would propose to do is to make
14   this an exhibit and attach it as part of our record; and so to
15   make it complete in terms of all of those who are
16   participating today, I'm going to ask those on the telephone
17   line to please identify yourself and the party that you are
18   representing.
19             (Whereupon, various appearances were made known by
20   telephone.)
21             THE COURT:  I just want to proceed with some of the
22   matters that are not contentious, and that may also a affect
23   the need for some of the individuals to stay on the line,
24   particularly those from CCR.
25             First of all, there's been a motion and order for
```

1    admission pro hac vice filed with respect to David Hickerson,

2    and the Court intends to sign that order and admit

3    Mr. Hickerson pro hac vice.

4            MR. HICKERSON:  Thank you, Your Honor.

5            THE COURT:  Okay.

6            The second matter -- and I'll take this up first

7    because it's not as contentious -- and that is the request to

8    refer back to the bankruptcy court the adversary proceeding

9    that was filed by the Plaintiffs, USG Corporation and

10   United States Gypsum Corporation; and that was Adversary

11   Proceeding No. 01-08932.

12           And the Court has reviewed those materials, and it

13   appears that all parties that have an interest in that matter

14   have consented to the reference being referred -- the matter,

15   I should say, being referred back to the bankruptcy court,

16   which would be to Judge Fitzgerald; and CCR had filed

17   something in terms of there is a phase one that has already

18   been determined by Judge Wolin and a phase two that would

19   really be what is at issue, and I think that's helpful for

20   purposes of the record here in this court, but ultimately when

21   it goes back to Judge Fitzgerald she'll be considering what

22   are the open issues that still remain in that adversary

23   proceeding.

24           Does anyone have any issue or wish to be heard with

25   respect to that matter?

```
 1            Hearing none, the Court will sign the order and send
 2   Adversary Proceeding No. 01-08932 back to Judge Fitzgerald.
 3   So the order withdrawing the reference will be terminated and
 4   it will go back to Judge Fitzgerald.
 5            That brings us back to really the main matter for
 6   the Court today, and it has to do with where we proceed from
 7   here with respect to the claims estimation and what's the best
 8   way to get there.  And there are disputes, as I see it, and
 9   I'll just tell you where I think the issues are between the
10   parties; and then I'll hear from each of -- each party that
11   wishes to make a statement on the record.
12            The main question I had asked -- and, by the way, I
13   want to say first I thought this was a very helpful process,
14   at least to the Court, in terms of educating myself about
15   where your issues are and where the concerns are and what some
16   of the major matters that this Court will have to determine --
17   how those will arise.
18            And as I understand it, the debtors feel that there
19   are certain matters which are more in the form of matters of
20   law in terms of the nature of the defenses that they would
21   have available to them in the personal injury litigation, and
22   they wish to have the Court look at those defenses; and there
23   are several of those set forth in a tiered approach that the
24   debtors wish the Court to look at, and they would like to have
25   the Court examine those -- what I view as, essentially,
```

1    defenses to these types of claims to see how those defenses

2    will affect the claims evaluation process.

3         On the other hand, the Future Claimants and the

4    Asbestos Personal Injury Claimants view this as a matter not

5    of looking at defenses, but really looking at the past and

6    looking at the historic treatment of these claims by this

7    particular company to see how they historically settled, how

8    they paid out, and the various factors going back in the past,

9    and trying to look at the past and extrapolate into the future

10   how these claims should be estimated for purposes of the

11   estimation process.

12        So you really have two divergent views there; and as

13   I see it, the Equity Committee comes in and says sort of a pox

14   on both your houses, and let's just have full-blown claims

15   estimation discovery, and we'll resolve everything relating to

16   these respective positions of the parties at one time, and we

17   will ultimately -- should be saving time to get to how we're

18   going to deal with the estimation.

19        So that's the sense that I took away from your

20   filings that you had made with the Court, and I'll be prepared

21   at this time to hear any arguments you wish to make on that.

22        MR. NEAL:  Thank you, Your Honor; I'm Stephen Neal,

23   one of the attorneys on behalf of the Debtors, together with

24   Scott Devereaux and David Heiman; and let me address fairly

25   briefly the issues.

1          But I think Your Honor has correctly identified the

2    two different prospectus that the parties bring to the issue.

3    The Debtor at this point actually is perfectly comfortable

4    with proceeding in the fashion that the Equity Committee is

5    advocating.

6          As we see it, there are really two -- we think two

7    rational routes we might go down here next.  One would be to

8    proceed with the original concept that we had laid out of

9    having a hearing without the benefit of discovery at which

10   Your Honor would determine the kind of estimating methodology

11   that you wished to apply to the task that we all agree is

12   necessary of estimating the asbestos claims.

13          THE COURT:  But I just -- could I stop you right

14   there to just ask you a question.

15          It seems that a number of the other bankruptcy cases

16   where the estimation process is a lot farther ahead than the

17   one that we have here, as well as perhaps in this case earlier

18   on when Judge Wolin had, you know, consolidated a number of

19   the cases, at least for purposes of making some of these

20   procedural decisions, that you had three tiers of claims that

21   you were looking at, you know.  And the latter -- the last one

22   being the Future Claimants, and there was sort of a different

23   process for each one of those.

24          I don't see any of those issues, at least, apparent

25   at this threshold level; and I'm just wondering why that would

1    be.

2              MR. NEAL:  Well, we, on behalf of the Debtor, had

3    originally urged to Judge Wolin that we engage in an

4    estimation process of the sort that he ultimately embraced in

5    his estimation order.  We had urged that it be done with

6    respect to all claims that are pending; and future claims,

7    whether they be cancer, mesotheliomas, are unimpaired.  We had

8    urged that we do a full-bore estimation that dealt with all of

9    those claims at one time.

10             Judge Wolin on his own initiative essentially

11   embraced the Debtor's proposal as to how to go about

12   estimating the claims; roughly said, we'll have discovery,

13   parties can take any discovery they want from each other.

14   We'll then have an estimation hearing in which the Debtors can

15   urge their view of the world as to how estimation should

16   proceed and what evidence should be admitted with respect to

17   it.  The ACC can do the same thing, other parties can do the

18   same thing.

19             The only respect in which he differed from the

20   approach that we had urged on him is that Judge Wolin said but

21   in the first instance I'm going to confine the exercise to

22   cancer victims and not deal with the unimpaireds; and we

23   accepted that.

24             And Judge Wolin's thinking, I believe, was that it

25   would be a way to get pretty far down the line without having

1   to deal with the entire ball of wax at one time.  We had

2   urged, as I say, to do everything at once; and I think as we

3   stand before Your Honor, nobody is urging that we subdivide

4   the exercise into cancer, mesos --

5        THE COURT:  That is the sense I had in reading what

6   was before me.  I just want to make sure that I wasn't missing

7   something there, since a review of many of the other opinions

8   that were attached and some of the others that we examined for

9   purposes of this hearing seem to indicate there was sort of a

10   tiered approach you'd like at the first phase, the second

11   phase, and the third phase.

12        And so my understanding then is correct, that we're

13   looking at everything all together.

14        MR. NEAL:  Correct.  And just so I'm clear as to

15   what we, I think, would urge as our first preference at this

16   point would be to simply go ahead now the way the Equity

17   Committee proposes, let all sides take whatever discovery they

18   think is relevant or may lead to relevant evidence for the

19   estimation proceeding, set a fixed period of time in which to

20   do that -- be that four months or five months or six months --

21   but let anybody take any discovery they want during that

22   period, set a firm date on which you'll commence an estimation

23   hearing, and at that estimation hearing let the parties come

24   in and urge the admission and relevance of whatever evidence

25   they think you should consider, and let you essentially in an

1    integrated proceeding make your own judgment about how you

2    want to estimate; and in light of how you want to go about

3    estimation, make your own determinations as to what evidence

4    that has been gathered during the discovery process is

5    relevant and admissible.  We think at this point that that is

6    actually the most efficient way to proceed.

7           The other --

8           THE COURT:  That would all involve -- just so -- I'm

9    trying to get it clear in my mind.  That would entail a

10   considerable amount of expert discovery during this period.

11          MR. NEAL:  It would entail a significant amount of

12   expert discovery.  I think all the parties recognize there is

13   going to be expert discovery, but it would essentially get

14   everything done at one time; and we think it would, in the

15   end, be the most efficient way to move the whole process

16   forward.

17          It wouldn't force you -- as we think the ACC's

18   position does today -- it wouldn't force you to try to make

19   determinations at this stage about what evidence ultimately

20   might be relevant and admissible at the estimation proceeding.

21   It would -- it would properly, I think, defer those decisions

22   for you to make after discovery has been had and after the

23   parties have briefed and done their pretrial briefing with

24   respect to the estimation issues.  That's what we think is the

25   most efficient way to go forward.

1           Another way to go forward that we have also urged is

2     to simply go ahead now and set a briefing and argument

3     schedule without any discovery, at which time we would then

4     come in, the respective parties, and urge the Court with

5     respect to their views as to how you should conduct the

6     estimation; and then after that hearing, then have essentially

7     open discovery.  That was essentially the approach that

8     Judge Wolin used, and I think it's the approach that

9     Judge Gambardella used.

10          In both of those instances the courts set an

11    estimation methodology without either party or any party

12    having discovery beforehand.  They laid out what the

13    methodology was going to be and then went ahead and had

14    discovery for all parties to commence thereafter.

15          The one approach that we think does not make sense

16    is the approach that's being urged by the ACC.  The ACC is

17    saying what you ought to do at this point is allow the ACC to

18    take discovery from the Debtor concerning the Debtor's

19    proposal as to how to conduct the estimation, then have a

20    hearing at which the Court would determine the estimation

21    methodology, and only thereafter allow sort of open discovery

22    with respect to the estimation itself.

23          Our view is that that is a procedure that is not

24    necessary, and that will inevitably delay the proceeding in a

25    significant and unnecessary way.  It's an idea that was not

1    broached by the ACC when we were in front of Judge Wolin.

2    They never suggested to Judge Wolin that they needed discovery

3    before the estimation proceeding was agreed to or determined

4    by Judge Wolin.

5            It's not an approach, as I say, that was addressed

6    or embraced by Judge Gambardella in the GI case, and it's an

7    approach that really doesn't make sense for a couple of

8    reasons that I would like to take the Court's time on now --

9    but I'll be brief -- and then address it after the ACC has had

10   a further chance to speak themselves.

11           But I'd like to start by looking at the ACC's brief

12   of April 26th of this year; and on Page 6 of that brief the

13   ACC described what they think the challenge is facing the

14   Court.  And right in the middle -- and I'm quoting from their

15   brief on Page 6 -- they said:  Hence, in estimating personal

16   injury claims under Section 502(c), courts have attempted to

17   predict how the case would turn out if it were litigated to

18   conclusion in the forum in which it was pending prior to

19   bankruptcy using the best available evidence.

20           We don't -- we think that is roughly a fair

21   statement of what the task is before the Court.  But having

22   said that the task before the Court is to figure out what

23   would happen in state courts using the best available

24   evidence, what the ACC then suggests, both by their request

25   for discovery before you determine a methodology and by virtue

1   of the methodology they're urging, what they are fundamentally

2   urging on the Court is that where they say the task is for you

3   to determine how the case would turn out if it were litigated

4   to conclusion in the forum in which it was pending, using the

5   best evidence available, having said that's the task, they

6   next urge you to do that task by considering the one kind of

7   evidence that the state courts most surely would not consider,

8   which is settlement evidence from other cases, which would not

9   be admissible in the state courts; and they urge you not only

10   not to consider, but not even to allow discovery into the one

11   kind of evidence that the state courts most assuredly would

12   look at, and that is the medical evidence and the scientific

13   evidence and the other evidence dealing with issues of

14   exposure, causation, and injury.

15          So their entire premise is based on the assumption

16   that you ought to make judgments in estimating our liability

17   by looking at the precise kind of evidence that the state

18   courts themselves would not consider and by ignoring and

19   precluding us from even taking discovery into the very kind of

20   evidence that the state courts would consider, i.e., evidence

21   again of a scientific, medical nature.

22          They say that our approach is unprecedented when

23   they urge you to reject the approach that we've urged, both

24   from estimation and the approach that we've urged as far as

25   discovery here.  They say it's unprecedented; but that

1    statement, no matter how bold or sweeping, is simply wrong.

2    The approach that we're urging for estimation is exactly the

3    approach that Judge Wolin ordered.

4            It's very similar to, if not identical to, the

5    approach that Judge Gambardella ordered, except she did not

6    restrict the exercise to cancer only; she restricted it to a

7    broader group of claims, all present claims.  But it was clear

8    from her order -- is clear from her order that the Debtor is

9    going to be able to take discovery and offer medical and

10   scientific evidence.  She specifically contemplates that.  She

11   specifically contemplates that the Debtor will be able to move

12   for summary judgment based on that kind of evidence in the

13   estimation proceeding.

14           Armstrong World followed a similar approach.  Grace

15   followed a similar approach in the non-asbestos context.  The

16   AH Robbins, Corp. followed a similar approach.  That is, when

17   I say a similar approach, in each of those instances the

18   Debtors have been able to develop evidence and present to the

19   Court in the estimation proceeding evidence, which Your Honor

20   correctly described a few minutes ago as in the nature

21   essentially of defenses, as to why there would not be any

22   liability in the state courts and should not be any liability

23   found or assumed here for purposes of estimation.

24           The only case that really adopted the approach that

25   the ACC is using, contrary to their saying our approach is

1  unprecedented, the only court that really sort of fully

2  embraced that seems to have been Eagle Picher, which is ten

3  years ago.  And Eagle Picher is noteworthy in the sense that

4  in Eagle Picher the Debtor and the Futures Representative and

5  the Asbestos Claimants all had agreed to a settlement before

6  the estimation proceeding began.  They presented a plan that

7  was jointly supported by all of those constituents, which here

8  are at odds with one another.

9       They collectively then urged the court to simply

10  look at historical settlement data, essentially for the

11  purpose of validating the number that they had plugged into an

12  agreed plan for purposes of setting out a fund for asbestos.

13       The ACC says we really need this kind of discovery

14  before the Court considers what estimation methodology to use

15  because we, the ACC, don't understand the Debtor's plan.  And

16  so they've come up with this sort of almost contention

17  interrogatory kind of approach.  We don't really understand

18  what their proposal is from an estimation standpoint.

19       Well, Your Honor, with all due respect to my

20  distinguished colleagues who represent the ACC, that is

21  disingenuous.  We have been dealing with these ladies and

22  gentlemen for over four years on this.  They have heard our

23  plans spelled out ad infinitum in court, in open court;

24  they've seen it in our briefs, they've seen it over and over

25  in various settings.

1          They never, when we were in front of Judge Wolin,

2     said:  We don't understand the plan and need discovery to

3     understand the plan.  I don't believe they ever in GI Holdings

4     said:  We don't understand the plan and need discovery in

5     order to understand the plan of estimation.  The plan of

6     estimation has been laid out in extreme detail over and over

7     and over; and to the extent they think there needs to be final

8     flesh on what we propose in the way of estimation, that is

9     exactly the kind of final flesh that gets put on as we

10    approach and during the course of an estimation trial itself.

11         I mean it is no different than any other trial would

12    be.  There is an issue that the Court has to determine, which

13    is what is the proper amount of money to put into the trust.

14    The two sides have differing views as to how the Court ought

15    to do that.  They are going to develop and -- over competing

16    kinds of evidence; and as the trial -- the estimation trial

17    takes place in this courtroom, Your Honor will make the

18    determination as to what is the appropriate form of estimation

19    and, therefore, what evidence is relevant and admissible.

20         But for them to suggest that they need discovery

21    simply in order to understand what we're saying, as I say, is

22    a tactical and not a real objection or a real justification

23    for taking the discovery they seek.

24         Now, somewhat at odds with their statement that they

25    need discovery in order to understand our proposal is their

1    next argument, which is that our proposal is so complicated,

2    it will be an unnecessary use of time and diversion and the

3    Court should stay away from it because of its complexity.

4    Like I said, it's a little odd to say they don't understand it

5    on the one hand, and then in the next breath say it's too

6    complex and lay out the complexity as they do in multiple

7    pages of their brief.

8          A couple of comments with respect to their argument

9    that our proposal is so complex they need discovery before the

10   Court should even consider it.  No other court has agreed or

11   adopted that.  No other court has found the kind of proposal

12   we're making too complex to deal with it.  It's not nearly as

13   difficult or as time consuming as the ACC would suggest.  It

14   is a series of very specific, concrete issues on which both

15   sides would offer evidence and the Court would make decisions.

16         Shouldn't, in fact, necessarily be a bad thing that

17   it's a little difficult and a little complex for the ACC to

18   proceed here in the context where they're trying to deprive

19   property owners of multiple billions of dollars in assets.  So

20   the notion that we shouldn't be prepared to roll up our

21   sleeves and dig in and do a little hard work before that

22   occurs doesn't make sense.

23         The truth of the matter is if we had devoted in the

24   last two-and-a-half or three years to the task of estimating

25   the asbestos liability the amount of time that the ACC has

1    devoted to saying it's too complicated or it's not the right

2    way to do it, and otherwise delaying it, we'd be done with the

3    process by now.

4            They suggest that our approach creates due process

5    problems because they say that every one of the individual

6    claimants will need to be noticed with respect to the

7    discovery that we want to take and be given an opportunity to

8    participate in the discovery.  That's wrong, and that position

9    is exactly the opposite of what these very lawyers said in GI;

10   and we've laid that out in our brief.

11           But in GI Holdings they took the position that you

12   were not -- as long as you were not liquidating individual

13   claimant's claims, you were not creating any due process

14   issues with respect to those claimants; and we are not in this

15   proceeding or in the estimation proceeding suggesting that any

16   individual claims be liquidated at all.

17           No claimant is going to lose his or her right to a

18   jury trial.  No claimant is going to have his or her claim

19   liquidated by the estimation proceeding.  All that's being

20   done is the Court is making a determination as to how much

21   money should be put in a fund to reasonably anticipate the

22   claims.

23           The only due process issue that's invoked by all of

24   this, Your Honor, is the due process interests of the Debtors,

25   the equity holders, because once the -- once the estimate is

1    made by the Court, --

2              THE COURT:  Can I just stop you right there before

3    you move off that position.

4              I think the problem, at least as I see it, with the

5    due process argument is that if you want to estimate certain

6    groups of claims at zero, that is a death knell for those

7    claimants; and it's one thing if you say I'm going to set

8    aside a fund of X number of dollars, and some claimants may or

9    may not, you know, be able to recover under that; but if you

10   are going to have this so-called, you know, class that's

11   unimpaired because they have no claims, you know, then they --

12   because there's no value to their claims, you're in effect

13   depriving them of that due process.  Where do they go?

14             MR. NEAL:  They can still go -- they can still go

15   and assert the claim and try to prove that despite the

16   estimation of zero --

17             THE COURT:  Where's the money to pay them?

18             MR. NEAL:  The money is in the trust; and if there's

19   ultimately insufficient money in the trust, that is no

20   different than if there's ultimately insufficient money in the

21   coffers of a solvent Defendant in a piece of litigation.  Due

22   process does not guarantee claimants either a solvent

23   Defendant -- doesn't guarantee Plaintiffs that a Defendant

24   will have a certain amount of resources available to respond.

25             The Bittner decision in the Third Circuit

1    specifically said that it's not a problem to estimate a claim

2    at zero, wasn't found to be an abuse of discretion when the

3    court did that and did not invoke due process issues because

4    any individual continues to preserve his or her right to bring

5    the claim, to assert the claim.  Whatever estimation decision

6    this Court has made is not binding with respect to the merits

7    of that claim as a result --

8              THE COURT:  I understand all that.  The problem, I

9    think, is a proportionality issue.  You know, if there's going

10   to be -- if -- if the estimation comes out to be zero, and the

11   number of those potential claimants and the risk that the

12   Court could be wrong on that is overwhelming in proportion to

13   the amount that's available and the number of potential

14   claimants that recognized have a claim against the fund, you

15   know, the realities of that could be quite different.

16             It's one thing to say I think your claim has no

17   merit, but this other claim may have merit up to something,

18   and there is another one on a proportionate basis; maybe it's

19   not -- it doesn't swamp the access to the fund, if you

20   understand the argument there.  So, you know, that's

21   problematic.

22             MR. NEAL:  But that -- but, of course -- a couple of

23   things.  Those same problems, if they are problems, exist even

24   if the Court embraces the ACC's estimation theory because the

25   ACC, when they contemplate the estimation methodology that

1     they're urging, are not contemplating the individual claimants

2     be given notice or that individual claimants participate in

3     depositions or discovery.

4              And although they are confident that their

5     methodology would lead to a higher total number ultimately in

6     the trust, it's no different -- the problem is no different in

7     kind.  So when they're advancing their own estimation

8     methodology, which again has exactly the same risks that

9     Your Honor just outlined, they don't seem to think it creates

10    any due process problem.

11             Bittner didn't think it created a due process

12    problem.  I mean it may be relevant; those are issues that

13    ultimately are going to bear on what, if any claims,

14    Your Honor may estimate at zero.

15             THE COURT:  Might depend on the magnitude.  I think

16    it is more of a proportionality issue because due process --

17    you know, in one context you can have very similar

18    circumstances, but it may come out differently depending on

19    the economics of the issue and that type of thing, in this

20    context.

21             MR. NEAL:  So I agree it's proportionality that

22    Your Honor deals with in the course of estimation, but it

23    doesn't create due process problems.  The only due process

24    problem we have, as I was saying -- and they have already made

25    the point -- but to reiterate briefly, the only due process

1    problems invoked in this stage are the due process rights of

2    the people who irrevocably lose those assets when they are

3    moved into the trust.

4           The one thing that is certain, once those assets are

5    moved from the corporation to the trust, the current owners of

6    those assets lose those assets to the degree they're

7    transferred into the trust.  That is a due process issue.

8    That is one of the reasons why the kind of methodology that

9    we're ultimately urging the Court to embrace is the

10   appropriate one.  That is why it would be a violation of due

11   process to do what the ACC is urging, which is to simply say

12   take less historical data, do a little mathematics, and come

13   up with your number; because the property owners, the people

14   who own those assets, are entitled to hold onto those assets

15   until somebody through due process shows they're not entitled

16   to them.

17          And due process entitles -- entails, among other

18   things, the right of those claimants, those asset holders, to

19   demonstrate that they have meritorious defenses.

20          THE COURT:  Those are the Debtors here.

21          MR. NEAL:  Yes, demonstrates they have meritorious

22   defenses on the claims being urged on them.

23          In the GI context, the ACC took exactly the opposite

24   position than they're taking here on this due process issue,

25   and their position in the --

1          THE COURT:  In that case was there an argument that

2     this whole group of claimants had zero value?

3          MR. NEAL:  No, but there was an explicit argument

4     that because you were not liquidating claims, you didn't run

5     across any due process rights of individual claimants.

6          THE COURT:  You weren't saying that a group like the

7     Future Claimants had zero value.

8          MR. NEAL:  Right.  That issue hadn't been reached.

9     In GI -- the specific statement from the ACC in GI -- and it's

10    quoted in our response brief at Page 17 -- is they wrote,

11    quote:  An estimation designed solely to test the Debtor's

12    solvency, not to determine actual distributions to individual

13    claimants, does not violate anyone's jury trial or due process

14    rights.

15          And similarly, here, we are not in our estimation

16    methodology and will not in the estimation proceeding be

17    asking the Court to determine the actual distributions to any

18    individual claimants.  All we are asking as to the end thing,

19    the outcome, is the same thing the ACC is asking for; and that

20    is that the Court make a reasonably based estimate of how much

21    money should be put in the trust to deal with the claims that

22    will be asserted against the trust; and as long as we're not

23    asking the Court to liquidate individual claims, you don't

24    have the due process issue.

25          The ACC -- the ACC at one point in one of their

1    briefs says the difference between what they are seeking now

2    and what we are seeking, as they say, there is a distinction

3    between discovery that's relevant to the choice of an

4    estimation methodology on the one hand and discovery that is

5    relevant to the application of that methodology on the other.

6        And what they're saying in their papers is that the

7    discovery they seek is relevant to the choice of an estimation

8    methodology that the Court has to make, and that the discovery

9    that we're seeking is relevant only to the application of a

10   methodology; and that, therefore, we should not be entitled to

11   proceed with discovery simultaneously with their discovery.

12       But, Your Honor, that is a distinction that is

13   without a difference because, among other things, we are

14   saying that the methodology approach urged by the ACC -- that

15   is, take the historical settlement data, project the future

16   number of claims that are either pending or will be filed,

17   multiply the two, and voila, that is their choice of

18   methodology.

19       We're saying before Your Honor could even begin to

20   choose that methodology, you need to hear the evidence and we

21   need to be able to take the discovery to demonstrate that that

22   methodology would be severely flawed for various reasons,

23   including the fact that those historical settlements don't

24   really tell you anything about the underlying liability in the

25   case, including the fact that we have this chrysotile defense

1    that the underlying settlements don't tell you anything about,

2    including the fact that there are all sorts of newly

3    developing evidence in support of the proposition that these

4    x-rays that have been relied upon so heavily by the claimants

5    historically are, at best, flawed and, if you share the

6    concerns of another court, perhaps the result of fraudulent

7    activity.

8           But, anyway, there are a whole host of things that

9    we think are relevant both to the ultimate methodology,

10   defenses that we think are relevant to the ultimate

11   methodology, but which also bear on the choice of methodology

12   issue.  So once the ACC acknowledges that discovery and

13   evidence relevant to the choice of methodology ought to be

14   engaged in at this point in time, that effectively opens up

15   the whole can of worms anyway, because they cannot stand here

16   and say you should choose their methodology, look at the

17   historical settlements, and multiply them by claims filed.

18          They cannot with a straight face say you should

19   choose their methodology without our being given an

20   opportunity with evidence to show you why their methodology is

21   deeply flawed, why their methodology in fact would result in

22   the deprivation of property rights and due process rights of

23   our client when there is no evidentiary basis for that

24   deprivation.

25          So once they acknowledge, as they do in their final

1    brief, that discovery about the choice of methodology is

2    relevant now -- and they even say that if we need discovery

3    about the choice of methodology, we ought to be able to --

4    entitled to take it -- once you say we're going to have

5    discovery about the choice of methodology, it invokes all the

6    discovery that we're seeking anyway.

7         And that is one of the reasons why, in the final

8    analysis, and I'll stop -- we now come out with the Equity

9    Committee and say because the evidence, even in the ACC's

10   framework, bears on the choice of methodology, the most

11   efficient thing we could possibly do now is fix a time period

12   in which all parties take whatever discovery they want,

13   develop the evidence, and then come before the Court at a

14   fixed date for an estimation hearing in which we'll argue how

15   you ought to estimate and we'll tell you what evidence we

16   think is relevant to that; and Your Honor can make the

17   determinations that they are now seeking in the form sort of

18   premature in limine rulings.

19        Your Honor can make it the way they should be made,

20   as evidence in the course of a trial, and you can determine

21   the relevance of it now; but we shouldn't be precluded from

22   taking discovery, and the process will be protracted

23   unnecessarily if we're made to sit on the sidelines for some

24   four or five-month period while they take this preliminary

25   discovery which is, A, unnecessary and, B, if it's going to be

1      taken, ought to be two-sided anyway.

2            THE COURT:  Thank you.

3            MR. NEAL:  Thank you, Your Honor.

4            THE COURT:  Who wishes to be heard from the ACC?

5      Since the ACC and the Future Claimants join in the same brief,

6      I assume I only need to hear from one person.  You'll let me

7      know whether that assumption is correct.

8            MR. LOCKWOOD:  I hope so, Your Honor, but I'd like

9      to -- we heard a lot very fast just then from Mr. Neal, and I

10     am not sure I wrote down quite as much of it as I could, and

11     I'd like to ask the Court's indulgence to allow them to

12     interject something if I miss something.

13           THE COURT:  Would you identify yourself for the

14     record, please.

15           MR. LOCKWOOD:  Peter Lockwood from Caplin &

16     Drysdale, representing the Asbestos Claimants Committee.

17           The ground seems to be shifting under our feet here

18     a little bit.  We had originally been asked by the Court to

19     produce decision trees as to how estimation should be

20     conducted.  The parties did.  It was clear that there were two

21     divergent views on how that should happen.  We made the point

22     that we thought that there was some discovery that was

23     necessary to inform the Court as to the appropriateness or

24     legality or feasibility of the two competing methods, and the

25     debtors took issue with that.

1          But now, for the first time today, we -- as a

2    result, apparently, of a late filed contribution by the newly

3    appointed Equity Committee, we learned that the Debtors are

4    actually perfectly willing to punt, essentially, on the issue

5    of methodology --

6          THE COURT:  I think, to be fair to them, they did

7    mention that in their brief as well; so it wasn't --

8          MR. NEAL:  Yes, we did, Your Honor.

9          THE COURT:  I think the primary issue was to have --

10   to go the route that they had suggested; but as a fall-back,

11   they said:  If you're going to open it up to discovery, open

12   it up to everybody.

13         MR. LOCKWOOD:  I understand it's referred to as a

14   fall-back.  As far as I heard it, the principal point that

15   they would urge on the Court would essentially be let's get

16   started and let's have a free-for-all.  And that free-for-all

17   would apparently involve everybody just going out and starting

18   to serve discovery demands on each other without any decision

19   by this Court of exactly how that process is going to work.

20         I would like to focus a little bit on where we

21   started before we get into the back-up proposal that is now

22   the forefront proposal.

23         We came here with the idea in mind that we would try

24   and -- we would need discovery on basically two different

25   topics.  One was how did the Debtors actually think their

1    process that they call substantive estimation works in

2    practice, not just in generalities.  And, two, why they took

3    the position that 30 years of history and the torts system had

4    never been able to produce a record, if you will, of what

5    their liabilities were, whatever trials they had, whatever

6    verdicts they had, whatever settlements they had, why they

7    made settlements, et cetera.

8            The Debtors' response in their papers, which was

9    touched on again by Mr. Neal today, is that they have the

10   right to test the merits of claims; and they had -- their

11   process is that they're going to ask the Court to hold an

12   evidentiary hearing to determine the characteristics of valid

13   claims.

14           As an aside, I might add that I believe they would

15   intend to have the Court do that even under the back-up

16   proposal about estimation.  They would simply -- they would

17   put on their estimation case, and we would put on our

18   estimation case, which might -- we're likely to be ships

19   passing in the night, and the Court would then decide sort of

20   at the end of the day which case the Court thought was better.

21           But part of their case would be this notion that the

22   Court would decide, after hearing undisclosed evidence, the

23   characteristics of valid claims, which would be based on the

24   pending claims, not historical claims experience.  And the

25   Court, as Your Honor pointed out a few minutes ago, would then

1    be asked to estimate at zero those claims -- and I'm quoting

2    here -- which do not satisfy the set of criteria for claims

3    predicted to be valid and payable.

4           And then they would go on and present testimony from

5    economic and statistical experts who will apply the Court's

6    characteristics, rulings to --

7           THE COURT:  I have to say, though, the only thing

8    that bothered me there wasn't that there may be -- there -- as

9    I understand it, the estimation is simply an estimation.

10   You're not picking out an individual claim, saying this claim

11   is worth zero, this claim is worth a hundred thousand, this

12   claim is worth a million.  What you're doing is you're looking

13   at the scheme of claims.

14          That's why I think they phase them in in most of

15   these other cases in terms of cancers down to those that are

16   future and have showed no signs or symptomatology whatsoever,

17   and then they range in trying to figure out how you're going

18   to come up with a value there.

19          And what would trouble me in terms of due process

20   isn't that, you know, in estimating you're going to say some

21   claims are just in the past, you throw out some claims, maybe

22   there should be more, a percentage of the claims; but if

23   you're taking a whole category and saying these, as a

24   category, have nothing to attribute to them, and when you look

25   at that in proportion in terms of the number of claimants and

1   maybe how they have been handled in the past, if that

2   proportionate is going to swamp the class, you might get into

3   the due process issues if indeed this Court is wrong in its

4   determination as to what the actual would be versus the

5   estimate.

6           MR. LOCKWOOD:  Well, the Debtors are extraordinarily

7   fast in the way in which they characterize the estimation

8   that -- in response to Your Honor's questions earlier about

9   this zero assets.  Presumably under that approach, if they got

10  Your Honor to say, for example, that -- make a ruling, despite

11  the fact that no court, anywhere, has ever made that ruling,

12  they can't -- they have not cited one case where a court has

13  held as a matter of law that chrysotile does not cause

14  mesothelioma; they have not cited one state court that says,

15  as a matter of law, chrysotile does not cause mesothelioma;

16  they have spent 30 years in the tort system litigating

17  mesothelioma claims and settling mesothelioma claims.

18          They might have won some -- although they don't tell

19  us.  If they did, it was in front of a particular jury on

20  particular facts of a particular claimant with a particular

21  expert chosen by that Plaintiff and USG.  But they've

22  certainly lost some.  We would like to know -- the discovery

23  we've sought indeed goes to the question of just exactly on

24  your chrysotile defense, using it as an example, what sort of

25  experience do you have?

```
 1          Why should the Court -- why should the parties take
 2   Mr. Neal's word that we've got a chrysotile defense, Judge,
 3   and we want to go through this elaborate process to get
 4   Your Honor to listen to some experts that we're going to drag
 5   in here, and we're going to litigate this with the Asbestos
 6   Claimants Committee and the Future Claimants representative
 7   who, as a matter of bankruptcy law, are not authorized to
 8   litigate individual claims; and they're going to litigate this
 9   blanket objection, and Your Honor is going to decide if --
10   that they're right, and nobody with a mesothelioma claim has a
11   valid claim.
12          Now, what they want to do is play games.  They want
13   to pretend that that declaratory judgment that they're asking
14   you to make is really just an estimation at zero, so it
15   doesn't really count.  So when they come up with their
16   bankruptcy plan, like a 524(g) trust in it, and they've got to
17   put together a trust distribution procedure matrix, where they
18   say how much they're going to pay for various categories of
19   claims and what the medical criteria and what the exposure
20   criteria are -- this is using mesothelioma as an example --
21   they will say:  What about mesothelioma claims?
22          I can't imagine the TDP being approved by this Court
23   or proposed by the Futures Representative of the Asbestos
24   Claimants Committee that said mesothelioma gets $100,000 on
25   scheduled value, which is the normal value; or if you want to
```

1   have individual review, you get up to $400,000, let's say; or

2   if that's not enough, you can go and have arbitration or

3   something.  The TDP would have to have say mesothelioma people

4   get nothing.  Why?  Because the Court has ruled as a matter of

5   law that nobody anywhere -- remember, you're being asked here

6   to do a global asbestos estimation.  You're not being asked,

7   as in Bittner, to estimate in lieu of trying a single creditor

8   claim.

9           THE COURT:  But I also don't think that I'm being

10  asked to make a decision here that -- or rule as a matter of

11  law that any particular defense would absolutely prevail.  I

12  don't think I'm being asked -- I think I'm just asked to

13  examine the potential defenses.

14          Now, this may be not what the Debtors envision, but

15  I think I'm being asked to evaluate the defenses and weigh

16  that evaluation in determining what the value is.  I don't

17  envision that, as a result of the estimation process, I would

18  be making findings as to the state of the particular art today

19  with respect to whether a defense is absolutely meritorious or

20  not.  It's something to be weighed.

21          MR. LOCKWOOD:  Your Honor, this is a yes or no

22  question they're presenting to you.  Either chrysotile can

23  cause mesothelioma or it can't.  There's no intermediate; it

24  can cause -- in this kind of a case or in that kind of case.

25          THE COURT:  I thought I read your brief to say that

1    there are experts on both sides.

2            MR. LOCKWOOD:  There are and they disagree.

3            THE COURT:  So I'm not going to see you folding your

4    tent and saying, you know, we absolutely agree that, you know,

5    the Debtors' experts are right.  What the Court's being asked

6    to do is look at their presentation and your presentation and

7    weigh how meritorious that defense is.  It may be -- there

8    could be a range there, and I don't have to come out and

9    say -- as I envision an estimation decision, I don't have to

10   come out and say X is absolutely right; Y is absolutely wrong.

11           I don't believe Judge Fullam in his decision came

12   out and made any specific fact findings or legal decisions to

13   justify his approach.  I think he discussed in general what

14   his concerns were, where he saw the trends going, and then

15   came up with a number.  But he didn't break down the number

16   and say:  I'm giving this much for this type of claim and this

17   much for that type of claim.  It was a general overview.

18           Now, I could be wrong in my reading of what he did,

19   but that was the sense I had.

20           MR. LOCKWOOD:  That's what Judge Fullam did, but

21   that's not what the Debtors proposed, unless they've changed

22   their proposal here this morning.

23           THE COURT:  I don't envision that I could do what

24   the Debtors said -- do what the Debtors said I should do,

25   which is take on a global issue such as a defense that a

1    particular kind of claim has zero merit.  I mean I think

2    the -- each state may have a different view; and the only way

3    I think I could deal with what the Debtor has said is if there

4    was -- there was agreement among all of the experts that that

5    was the case.

6              When you have disputes like that of fact, that's

7    something that may have to go to each individual jury, to see

8    whether they agree or disagree; and eventually you may come to

9    some state-by-state resolution.  Because of issue preclusion

10   or whatever, you might be able to use it against the Debtors

11   as the cases would proceed.  But I don't think I can make that

12   type of finding globally in this case.

13             I would be interested -- I think that's getting the

14   cart before the horse, so to speak.  Because I don't have any

15   of those expert reports before me, I don't know what the real

16   differences are, and so I can't prejudge what might be

17   presented.

18             MR. LOCKWOOD:  Your Honor, part of the problem is --

19   again, it goes back --

20             THE COURT:  This is something that I may have to

21   weigh, you know.  If they have some good arguments and you

22   have some good arguments, then I have to weigh what.  I have

23   to predict in the future what juries are going to do.  I mean

24   that's the tough part about this estimation.  It's a

25   prediction.  You can't go solely on the past because things

1    change; and I think Judge Fullam recognized that.  Things

2    change, evidence changes, issues; the level of -- maybe

3    treatments will change.  Who knows what could be presented in

4    determining the estimation?

5              But it's a prediction, and the Court has to use the

6    best judgment with the best evidence available to make the

7    prediction.  And there may be some juries that are going to

8    buy what the Defendant -- what the Debtors are setting forth,

9    and there's others that will not.  And the Court has to weigh

10   the quality of the medical evidence that would come in here

11   and make a decision.

12             So, you know, I can't prejudge that because I don't

13   have any of that in front of me.

14             MR. LOCKWOOD:  I agree with Your Honor about the

15   prediction.  I will say that the -- it is -- one of the

16   reasons we're having the methodology debate is that it's our

17   view that the best evidence of what juries are likely to do on

18   that issue is what they've done in the past, and the best

19   evidence of what the Debtors regard the risks of winning or

20   losing those issues in front of juries arise out of the

21   Debtors' past settlement history.  The Debtors have never yet

22   stated, because they can't, that the idea that chrysotile

23   doesn't cause mesothelioma is something that came into the

24   medical literature and science within the last year or two,

25   and that up until then it had never crossed anybody's mind

1    that there was an argument there.

2         This chrysotile defense has been litigated in the

3    torts system by the Debtors and others for twenty or thirty

4    years.  And the reason we asked for discovery is we wanted to

5    prove to Your Honor that that's what they've done.  Rather

6    than listening to Mr. Neal, who has never tried an asbestos

7    tort case in his life --

8         THE COURT:  Just to slow down there, you know, it

9    gets again to the quality of the evidence that would be

10   medical evidence or expert evidence that would be coming in.

11        MR. LOCKWOOD:  I grant you that, Your Honor, but the

12   Debtor has had an opportunity over the past 20 or 30 years --

13        THE COURT:  I'm not disputing that.

14        MR. LOCKWOOD:  -- to find experts.

15        THE COURT:  If you are correct in what you're

16   saying, you'll be able to get that evidence from the Debtor in

17   terms of what they've done in the past; did they have this

18   same kind of expert, you know, opinion and advice available to

19   them; and that will factor into the quality issue that the

20   Court has got to look to in determining how to make a

21   prediction.

22        MR. LOCKWOOD:  That's true if we have an estimation

23   which is essentially a battle of the experts.  But the Debtors

24   want to make this into -- they want to have claimant

25   discovery.  They haven't told us exactly what claimant

1    discovery is yet or how it's going to be applied, but -- for

2    example, let's take the chrysotile defense.  You don't need

3    any discovery from any claimant to know -- to find out what

4    medical experts agree or disagree.  That is a pure question of

5    medical science, and it's based on epidemiology; and I

6    haven't -- the Debtors have certainly not identified and I

7    cannot even begin to imagine what some person who's got

8    mesothelioma today, who has sued the Debtor in a state court

9    system, is going to be able to give to the Debtor that would

10   help the Debtor show to Your Honor what the merits or demerits

11   of the chrysotile defense are.  That's a question of competing

12   expert witnesses.

13        THE COURT:  And you may be right in that; and if you

14   are correct in that, then that becomes during the -- during a

15   discovery phase, a motion to limit that discovery because it's

16   not going to produce anything that is relevant.

17        MR. LOCKWOOD:  Well, let's go through the five

18   defenses, Your Honor, and look at this.  The first one we've

19   been talking about is the chrysotile defense.

20        THE COURT:  But we're not here for that today.

21   You've said you want to take discovery on those five.

22        MR. LOCKWOOD:  I want to take -- not on the merits

23   of them.  What I want to find out is how many cases have you

24   litigated the chrysotile defense before different triers of

25   fact in different courts around the countryside over the last

1     twenty years and what was the results of that?  How many did

2     you win?  How many did you lose?  How many did you settle?

3               If you settled most of your mesothelioma cases, as I

4     believe is probably the case, how much did you settle them

5     for?  If you settled them for a lot of money, why did you

6     settle them for a lot of money?  Since you believe that the

7     chrysotile defense is an iron-clad winner, why didn't you try

8     them and establish all these cases that you could cite to the

9     Court where experts have on your behalf testified that the

10    chrysotile defense is a valid one and courts and juries have

11    agreed with you?

12              That's what I'd like to show them because what I

13    think they're trying to do here, with all due respect,

14    Your Honor, is sell you a bill of goods.  They've come up with

15    this idea --

16              THE COURT:  I trust that you will not let them do

17    that.  I mean that's what this process is going to be about.

18              MR. LOCKWOOD:  I'll do my level best.  But they --

19    they now -- they have up until now, and I'm still -- I still

20    feel like I have to discuss what their -- what the position

21    presented in their papers on this issue are and their decision

22    tree because they haven't abandoned the idea --

23              THE COURT:  No, they haven't abandoned it; but I

24    think they have agreed, I think, with an approach that, yes,

25    you're right, it's fair to give you a certain amount of

1    discovery with respect to those issues.

2         But once you open the discovery door, then the issue

3    becomes should it just be opened and let's get to it and then

4    we get ultimately more quickly to the decision?  Because I

5    don't see it -- you know, to be frank, reading through all

6    these materials, I don't see it as an all-or-nothing approach

7    here.  You know -- particularly, you know, when I read what

8    Judge Fullam had done in his opinion.  He looked at what are

9    the future trends that you're looking at.  And that's -- those

10   are things that you can't just solely look to the past for.

11        So once you're looking into these future trends,

12   which would be the venue shopping, mass screenings, erroneous

13   x-ray interpretations, some overpayments, and I think that

14   picks up some of the defenses that maybe they didn't -- I

15   don't know if there's state-of-the-art in terms of the medical

16   standards and medical capability in terms of review and

17   screening, maybe things have changed over the past twenty

18   years, maybe, you know -- I don't have that information before

19   me today, and I'm sure that you'll bring it out as you go

20   through here.

21        And then also the issue of group lots, group

22   settlements, and how that factored into all of this.  But I

23   think what was compelling about what Judge Fullam -- I don't

24   think you can totally divorce the past from the future, so

25   that's why I don't think just totally saying you're going to

1    absolutely win or lose on these merits, because now we've got

2    new medical testimony that is going to show there is

3    absolutely no merit to these -- and unless everybody agrees

4    that that's the case, you're going to have competing experts;

5    and this Court then has to review that and try to make a

6    prediction as to how that might play out among the various

7    jurisdictions.

8         And there's been some new state statutes passed, so

9    maybe some existing cases are going to get different treatment

10   if they're already pending versus those that would be filed

11   after these statutes are passed; what's the trend, what would

12   people predict as to other states passing similar legislation.

13   You know, when you're looking at the future claimants, you

14   have to factor all of that in; and that would be --

15        MR. LOCKWOOD:  Your Honor, again, I agree with you,

16   but you're talking about an estimation approach that

17   Judge Fullam took which is diametrically opposed to the one

18   that the Debtors and the Equity Committee in this case want to

19   have happen.

20        THE COURT:  And you.

21        MR. LOCKWOOD:  No, we're perfectly happy to use the

22   approach that Judge Fullam took.  Our view of estimation is

23   that you start with the history because that's -- look, if you

24   think about what the past resolution record is, it's the

25   Debtors trying cases in tens or hundreds of jurisdictions,

1    raising all the defenses they have, and getting results.

2    There's -- most of their cases, as Mr. Neal in his papers

3    points out, are settled; but the settlements themselves are

4    the result of the Debtor and the Plaintiffs' lawyers taking

5    into account the risks and hazards, as in the case of any

6    settlement, of winning or losing.

7            If the Debtors or the Plaintiffs were in the tort

8    system, for example, aware of the defenses that the Debtor now

9    wants to put up, then the evidence of how those defenses

10   played out in the past is empirical data that the Court can

11   use to see what the results are, rather than the Court sitting

12   here as the global trier of fact and deciding this defense is

13   either a good defense or a bad defense.

14           If the Court's goal, as I heard the Court express

15   it, is to predict the results of what would have happened if

16   the Debtor weren't in bankruptcy, which is what Judge Fullam

17   says the approach is, we're here to determine --

18           THE COURT:  I think that's what the estimation

19   contemplates.

20           MR. LOCKWOOD:  Exactly, exactly.

21           THE COURT:  I think it's easier for cases that are

22   ripe for trial today.  You have some cases that were pending,

23   I'm sure, at the time the bankruptcy was filed, and probably

24   not much has happened to those cases.  Were any of these cases

25   subject to relief from the automatic stay so that they could

1    proceed?

2            MR. LOCKWOOD:  No, Your Honor, not that I believe.

3            THE COURT:  So everything has been stayed since that

4    date, so you probably have people in there who may have

5    already died, people may -- may have moved from one stage to

6    the other stage of the disease and the illness.  So those

7    people are going to be easier calls in terms of grouping, in

8    terms of what might be the likely outcome.

9            And then you go to the various phases; and as you

10   get to the Future Claimants, it becomes more difficult because

11   somebody may not file a claim for ten years.  Right?  Is

12   that --

13           MR. LOCKWOOD:  I guess I'm not following what you

14   have in mind.  Are you envisioning what Judge Wolin at one

15   point said in response to Mr. Neal's argument, which is:

16   We'll take 25 mesothelioma cases down to Delaware and put them

17   in front of juries and extrapolate the results.

18           THE COURT:  I'm not saying what I'm going to do.  I

19   thought as part of this methodology that's what I would be

20   getting in terms of an approach from all of you in terms of a

21   decision-making tree.  What I got -- and I thought it was very

22   helpful -- was one side saying:  Well, we need -- we just need

23   to choose which methodology, and it's sort of like an all or

24   nothing on the methodology.

25           I, quite frankly, don't think it's as simple as

1    that.  I don't think it's as simple as saying:  We're going to

2    substantive estimation, which is you value our defenses.  The

3    way I see that versus let's just look at the past and go

4    through and make some predictions from the past --

5              MR. LOCKWOOD:  Your Honor, we are not urging -- I

6    cannot -- I'm sorry if I've interrupted you.

7              THE COURT:  Go ahead.

8              MR. LOCKWOOD:  We do not urge that you just look at

9    the past.  I want to make it quite clear.  Our expert concedes

10   that you start with the past, but then you look to see whether

11   there are trends that are developing that are going to result

12   in a divergence of what the curve or the path might be if you

13   simply mechanically extrapolate.

14             The Debtors and the Equity Committee repeatedly

15   assert that that's all we're doing, is mechanically

16   extrapolating from the past.  That's not true.  We're

17   perfectly prepared to go to an estimation in which they put on

18   the expert testimony and attempt to explain, for example, why

19   the chrysotile defense is going to fare better in the future

20   than it did in the past.

21             But, again, as we read their proposals, they don't

22   want to try and have to put on somebody who will convince

23   Your Honor --

24             THE COURT:  I think they've given up on that by

25   coming to me and saying they're ready to go to the full-blown

1    discovery.  I think they're going to argue it perhaps at the

2    hearing, but it's just -- it's one matter that has to be taken

3    into consideration in the global determination of how I'm

4    going to go about doing this estimation.

5              MR. LOCKWOOD:  Well, if that's true, and I'm not

6    sure --

7              THE COURT:  I'm not putting words in their mouth.

8    I'm saying the way I see this going, it's not going to be a

9    simple -- these substantive -- these defenses have substantive

10   merit, and therefore we're going to value certain claims at

11   nothing because no claimant is going to be able to come in

12   there -- you know, we've moved from that to saying, okay,

13   let's just take discovery overall.  Let's take the discovery

14   the ACC and the Future Claimants want.  We'll take our

15   discovery, and then we'll come to a hearing, and it will be

16   for the Court to hear everything and then make a

17   determination.

18             MR. LOCKWOOD:  Your Honor, the problem with that

19   formulation, which may well be in sort of general where the

20   Debtors have now landed, is when they say -- when you say

21   "take discovery," what kind of discovery are we talking about?

22             THE COURT:  Well, I agree, that there's going to be

23   an issue on what discovery is.  This is not going to be a

24   free-for-all.  I mean I think I'm persuaded by what the

25   Debtors have said here today and the Equity Committee and

1    also, quite frankly, by you.  It's not look solely at the

2    past.  You've got to look at the trend.  You've got to see

3    what's happening in the various jurisdictions, et cetera.

4         So we're going to need discovery; and so if we get

5    to this discovery, we have to have a discovery plan.  I can't

6    imagine going free-for-all with people filing papers here and

7    there and trying to take X amount of depositions.  We have to

8    have a process that has some order to it, which means the

9    parties have to sit down and tell each other what discovery in

10   particular they want, agree on a process for that.

11        If you're going to have written discovery, does that

12   come first?  When do the expert reports come in?  How long

13   does it take for a response to an expert report?  You know,

14   and to get to an expert report, you sort of have to have what

15   issue is the expert going to be dealing with.  So, you know,

16   what issues are going to come out in it; and so that was sort

17   of, you know, to be -- you know, to be frank with you, in

18   terms of coming up with a decisional tree, that was, you know,

19   sort of a more -- much more detailed level of analysis that I

20   was envisioning that I would have to decide at the hearing

21   itself.

22        But you all need to know what it is you're going to

23   ask me to decide, and those are the decisions that have to be

24   made and the discovery that has to be taken.  And if they want

25   to have discovery on certain claimants, if it's relevant to

1    their defenses, you know, maybe -- then maybe they should.

2              MR. LOCKWOOD:  I'd like to get to that point because

3    that's another --

4              THE COURT:  I can't decide that today because they

5    haven't sat down with you and told you what they want; and if

6    you have a dispute, just like in any discovery dispute, you

7    come to the Court and you say:  This is overly broad; it's not

8    relevant.  And then you have a discrete fight about that

9    particular problem as opposed to saying no discovery on

10   anything whatsoever, because everything else can be proceeding

11   apace.

12             MR. LOCKWOOD:  Your Honor, one of the two legs of

13   the discovery that we asked for today is exactly what

14   Your Honor just described, which is we're trying to find --

15   the Defendants, the USG Debtors in their papers have used the

16   phrase "claimants' discovery" in a number of places in their

17   decision tree and in their responsive papers.

18             THE COURT:  Yes.

19             MR. LOCKWOOD:  They haven't given us any idea of

20   what kind of claimants' discovery that they have in mind.  And

21   their original plan, which they may or may not have decided to

22   alter, appeared to envisage some form of test case kind of

23   approach, that they would -- they would get some expert who

24   would tell them what size of a sample they needed to -- to do

25   something, and they would then try and get -- they would take

1    this number of claimants that their expert told them they

2    needed to get information about, and they would go out and

3    somehow identify -- they would turn the number into specific

4    claimants somehow.  There would be some selection method which

5    they haven't described, and they would then take discovery

6    from those claimants.

7            Now, they certainly don't need to take discovery

8    about chrysotile versus mesothelioma, or whether you can have

9    a lung cancer without an asbestosis diagnosis, or whether your

10   other cancer could or could not have been caused by exposure

11   to asbestos.  Three of their five defenses involve no

12   discovery at all from claimants.  That leaves you with two

13   remaining kind of --

14           THE COURT:  That might be the subject of expert

15   reports, and that would be part of your discovery there.

16           MR. LOCKWOOD:  Exactly, if they want to try and put

17   on a regular estimation proceeding like the one Judge Fullam

18   conducted.  Let me mention one thing about that, by the way.

19           Prior to the estimation proceeding before

20   Judge Fullam, the banks who were the opponents, the

21   adversaries, in that specifically asked Judge Fullam to set a

22   bar date, require claimants to file claims, answer

23   questionnaires; and it was -- and it was all for the purpose

24   of going through the same kind of testing of the individual

25   claims and then extrapolating from the individual results of

1    that test to the future.

2              And Judge Fullam denied that.  He said no, I think

3    we can do it with the experts, and the experts can come in,

4    and they can tell me whatever they think is going to be

5    different about the new world from the old world.

6              THE COURT:  Sometimes the experts need some of the

7    discovery to get their reports together.  So --

8              MR. LOCKWOOD:  That's -- again, we're trying to find

9    out.  The other two defenses are you shouldn't be able to

10   recover on, quote, unimpaired claims.  Well, now,

11   presumably -- they know what they think an unimpaired claim

12   is.  I don't.  It's not a term of law.  It's not a term you'll

13   find in any of the states.  There are some specific things --

14   like in Pennsylvania you can't recover on a pleural claim

15   unless you can show some form of symptomatic effect of it on

16   you.

17             In the states that they cite in their brief, that in

18   the last four years have changed their law on non-malignancy

19   claims, in Ohio, Texas, Florida and Georgia, there are in

20   those states certain specific tests set for the validity of

21   non-malignant asbestos claims; but with those exceptions,

22   there is no such thing as a law out there that says if you

23   have an -- if you've got a claim for a pleural disease or a

24   form of asbestosis that's what we would say -- let's say is

25   low grade, it's not disabling in some way or another, that you

1    can't recover on that claim because you're unimpaired.

2           And -- but that's their proposal, is that somehow or

3    another some expert is going to come in here and look at, I

4    guess, individual -- they're going to take discovery from

5    claimants, and they're going to try to get x-ray readings, and

6    they're going to try and get pulmonary function tests, and

7    going to try to get doctors' diagnoses, and then they're going

8    to take the results of that, and they're going to give them to

9    some expert, and the expert is going to say, number one, this

10   person is unimpaired and, number two, because he's unimpaired,

11   he doesn't have a claim or his claim should be valued at zero.

12          THE COURT:  With all due regard, that's sort of

13   speculative.  I don't know what they're going to ask for in

14   the way of discovery.  I don't know.  I mean they may or may

15   not be.  If they're doing something that's improper, you know,

16   you'll, I'm sure, bring it right to my attention, you know, so

17   I don't have that before me right now.

18          MR. LOCKWOOD:  Your Honor, that is why we asked for

19   the discovery.  It's not a question of proper or not.  It's a

20   question of -- sensible, feasible and legal.

21          THE COURT:  It's a question -- you're going to get

22   discovery.  The issue is, you know, do we open it up so that

23   we can complete the discovery phase and get to the

24   estimation -- which is, quite frankly, the way that I'm

25   leaning -- in order to avoid a piecemeal approach here to

1    where we're going, because I don't see it as an all or

2    nothing.  You know, they may be partially right or there may

3    be some value in their defenses.  It may not be a hundred

4    percent value because it's just something that is weighed by

5    the Court in trying to look to the future and make a

6    prediction.

7            MR. LOCKWOOD:  Your Honor, one other thing about

8    value which has not yet been discussed really by the Debtors

9    or the Equity Committee or anybody else.  In the estimation

10   that Judge Fullam did, in the estimation handled in Eagle

11   Picher -- and I might add, by the way, that I want to talk

12   about their use of G-1 and Grace and the rest of them because

13   it's very misleading.  None of those cases have yet decided on

14   what methodology is going to be used, none of them.

15           And Judge Wolin never decided on the methodology

16   that was going to be used.  He wrote his opinion; we spent six

17   to nine months trying to figure out how it would be

18   implemented, what form of test cases would we have jury

19   trials, how would they be extrapolated, et cetera.  There was

20   never any agreement, there was never any decision; and then

21   the Debtors decided along with the banks in Owens-Corning that

22   Judge Wolin was partial and biased and had made ex parte

23   contact and got him recused.

24           THE COURT:  I'm not going there.  I can only deal

25   with -- you know, as I said, with all due regard, we're here

1   today to decide what's going to happen here.  I'm not

2   Judge Wolin, I'm not Judge Fullam.  I am looking to see where

3   we're going, and what the dispute that I have before me today

4   is, what kind of discovery to have.  You have asked for a

5   certain kind of discovery on the, quote, substantive

6   estimation issues.  The Debtor is conceding:  Give it to you.

7   Yes, you can have it, but open it up so that when we come in

8   at the next stage, all the discovery is completed.

9           And while I understand that today who knows what

10  that discovery will be, the question is should the parties sit

11  down and discuss what will be the discovery and come up with a

12  discovery plan to get to the next stage.

13          MR. LOCKWOOD:  Your Honor, I would be happy to sit

14  down with the debtors and discuss anything.  I have to tell

15  you right now that one of the reasons that I think that we're

16  here and having this discussion is that the debtors and the

17  Asbestos Claimants and the Futures Rep are going to approach

18  that discussion from poles apart because our view of the world

19  is that the points they want to make about how the law should

20  change and whatever can, to the extent they have any validity,

21  most of which we dispute, be done through experts.

22          They seem to have in mind the idea that they're

23  going to need discovery of claimants.  And, again, the

24  claimants are going to be -- I don't know what we're talking

25  about, a thousand claimants or -- I don't know how they're

1    going to be selected.  They have their personal lawyers; I

2    don't represent the claimants.  The Futures Rep doesn't

3    represent the claimants.  Are they going to hit them with

4    subpoenas?  What happens if they don't respond to the

5    subpoena?  Are they going to have their claim disallowed?

6              THE COURT:  But with all -- like I said, with all

7    due regard, that is for you to sit down and talk about in

8    terms of how you're going to work out the discovery.  I'm

9    not -- this today is not the day for me to say yes, they have

10    it; no, they don't.  What I need you to do is they need --

11    because you don't even know what they want.  Maybe they want

12    what you say; I don't know, you don't know.

13              So what you need to do in -- is to refine what

14    you're going to have in the discovery; and what I am troubled

15    about is -- does -- for me, as the judge, does this have to be

16    staged in a certain way?  You know, because are there

17    different groupings that I'm going to have to put them in?

18    And you may be all at the same time, maybe not.  Those that

19    are already ripe with the disease now, those that are coming

20    into it, and those in the future; they are all going to have

21    different issues.

22              If you're going to be asking me to predict how many

23    in the future are going to come into that, you know, what's

24    the best and -- what's the best way to make that

25    determination.

```
 1          MR. LOCKWOOD:  There's a chicken and egg or cart and
 2   horse problem here.  If we're going to be taking discovery on
 3   individual claimants, in order to support one of these five
 4   defenses or something, we feel we and the Court need to know
 5   exactly what sorts of information they think that they can get
 6   from a claimant that would enable them to substantiate the
 7   defense.
 8          We had originally gone down the decision tree path
 9   and thought it was a sensible thing to do because we thought
10   that if the Court came to the conclusion that the Court could
11   not render categorical rulings about the defenses, that nobody
12   that is, quote, unimpaired, close quote, however the Court is
13   persuaded by the Defendant to define unimpaired, if the Court
14   isn't going to make that ruling, then trying to get discovery
15   to figure out which claimants do or do not meet the
16   requirements of this yet-to-be-decided standard of
17   unimpairment is not --
18          THE COURT:  The problem that I have with what you're
19   suggesting --
20          MR. LOCKWOOD:  -- is a waste of time, frankly.
21          THE COURT:  Not necessarily.  The problem that I
22   have is that each side has to be treated fairly in terms of
23   getting ready for the hearing; and if what the Debtors are
24   saying, they need some discovery to get to their experts in
25   order to get a valid expert report prepared to deal with this
```

1    issue for the Court, then, you know, that's something that

2    they may be entitled to.  I can't prejudge what it is or how

3    it's going to go about.

4           But for you to come in here and say they get none of

5    that, you know --

6           MR. LOCKWOOD:  Your Honor, I didn't -- I didn't come

7    in here to say that this morning.  I came in here to say,

8    Judge, I'd like to get some contention interrogatories to

9    Debtor so they can tell me and you exactly how they propose to

10   go about implementing this plan; and we're sitting here now

11   and I'm speculating and you're speculating and --

12          THE COURT:  I'm not the one that's speculating.

13          MR. LOCKWOOD:  That's all I ask for.

14          THE COURT:  I am asking for the parties -- and this

15   is the way this is going to come out today.  What I'm going to

16   ask -- and, by the way, before I do that, does anybody else

17   wish to be heard on this?

18          MR. LOCKWOOD:  I will take that as a suggestion to

19   sit down, Your Honor.

20          THE COURT:  Unless there is something that I haven't

21   heard from you, that you wanted to make a point.  We just keep

22   going around and around.

23          MR. LOCKWOOD:  Your Honor, there's probably lots;

24   but I think discretion suggests that I should sit down anyway.

25          THE COURT:  Okay.

1              MS. PARVER:  Your Honor, very briefly, Jane Parver

2    from the Kaye Scholer law firm for the Futures Representative.

3              And, Your Honor, I just tried the case before

4    Judge Fullam.  Do I understand -- because we have shifted

5    ground -- at the conclusion of today, what I thought I was

6    hearing, Your Honor -- and that's what I'm seeking

7    clarification on -- is that Your Honor is envisioning an

8    estimation hearing somewhat along the lines that Judge Fullam

9    held, which was primarily expert testimony.

10             He said in his order when he set down the hearing,

11   he said:  It's going to be expert testimony; and if I need

12   something after that, I'll consider it then, if I need

13   anything more.

14             THE COURT:  What I'm envisioning -- I think that

15   case was a lot farther along than this case, as I understand

16   it, no?

17             MS. PARVER:  Your Honor, I can tell you that where

18   we were, we had exchanged claims -- the Futures Rep and the

19   ACC and the banks all had access to the Debtors' claims base,

20   the historical base.  What we then did -- and that was all

21   that had really happened, Your Honor.  And, frankly, shortly

22   after Judge Fullam was appointed in the case, the banks -- the

23   Creditors Committee and then the banks changed their experts,

24   so that delayed things even further; and we had had no

25   discovery or anything else at that time, Your Honor.

1          And Judge Fullam said this is how I'm doing it; and

2     expert reports -- I think his order was August 13th.  He said:

3     Expert reports are going to be due October 15th.  All

4     discovery will be done by December 15th, and we'll have a

5     hearing in January.  I think he set the date even in January.

6     And we then worked out -- but what was different, we then

7     worked out -- and sometimes things had to go to

8     Judge Fullam -- very little went to Judge Fullam -- the nature

9     of the testimony at the hearing; and I think this will answer

10    one question the Court has raised, which is when these -- I

11    guess you'd call them econometricians or these estimation

12    experts testify, what they do in part is they look at the

13    claims database and they divide it by different categories of

14    disease because that's how the database sets it forth.

15          THE COURT:  Right.

16          MS. PARVER:  And they analyze the treatment of those

17    kinds of claims and the values at which those claims have been

18    settled or litigated to verdict, and they look at the

19    historical rejection or dismissal rates as well.  And then

20    they do predictions, if you will, forecasts of -- for future

21    claims, number and value of future claims; but, again, it's

22    predicated on differences in disease, differences in dismissal

23    rates.

24          There were issues in the Owens-Corning case -- I

25    don't know will be issues here -- which were issues of

 1    punitive damages and how relevant they would be in the future.

 2    There was some medical testimony heard from either side, if

 3    you will, and some other experts.

 4            The Debtors here have talked about experts.  Again,

 5    I don't know how that would factor in because they want

 6    experts to testify that unless you were on construction sites,

 7    you never could have gotten -- you know, been exposed to USG

 8    asbestos; or they want experts to testify that unless you were

 9    exposed to X percentage of dust in the air or whatever it is,

10    you couldn't possibly have gotten sick from the Debtors'

11    products.

12            Given that, we're talking about latency periods of

13    diseases here of 30 through 50 years.  I don't know how

14    relevant that kind of expert testimony is going to be in sort

15    of, you know, predicting, if you will, how these claims would

16    be tried in the future.  But, again, I guess that's something

17    we can -- talk about.

18            THE COURT:  Each case is different.  Each case is

19    different.  In terms of the Owens-Corning, I think their

20    product was a lot more hazardous in many respects than what we

21    have here.  Maybe, maybe not, you know; but it was -- the

22    sense that I have is that the nature of what -- Owens-Corning

23    was a prime target because of the way their product, I guess,

24    diffused in the air or whatever.

25            MS. PARVER:  I think it's more where it's sold,

1  Your Honor, and how ubiquitous it is; but in -- then again, a

2  lot of times when these Defendants decided, for generally good

3  business reasons, to go into these defense groups, very often

4  that raised their national profile, and so they then became

5  bigger targets there.

6        THE COURT:  These -- this is what I need you to do.

7  In terms -- it may well turn out to be the way you are

8  suggesting in terms of a battle of the experts, but it may be

9  that there is -- there are other trends that there are not

10  necessarily experts who would be speaking to it, but others

11  that -- because there were factors that -- I don't know where

12  Judge Fullam got these factors from.  I don't know if those

13  were things set forth in the expert reports.  And he talked

14  about the -- that the -- when he said you couldn't -- it's not

15  possible to safely assume that the historical results would be

16  extrapolated into the future, and that's because of changed

17  circumstances.

18        Where do the changed circumstances come in and how

19  does that come into evidence?  Is it solely through experts

20  who will be making predictions?  Or is there maybe some

21  factual basis that needs to be presented to the Court to show

22  that, in fact, not only may they change, but they have changed

23  in many places?

24        For example, when the laws change in the various

25  states -- I saw that in here.

1            MS. PARVER:  There was testimony on that.

2            THE COURT:  What kind of proof is necessary for

3     that?  Probably stipulations, as I would see, coming in.  Had

4     the laws in X state, Y state changed January.

5            MS. PARVER:  Your Honor can take judicial notice of

6     things like that.

7            THE COURT:  Exactly.

8            MS. PARVER:  Then there's an expert testimony, if

9     you will, as to how many cases there will be.

10           THE COURT:  How many cases, the change of venue

11    issues, all of those are changing, as well as some of the

12    medical standards, the medical testing today that may not have

13    been available ten years ago, five years ago; I don't know.

14           But what you need to do is that you will need to

15    have a sit-down, a meet and confer of those who want to

16    participate in the discovery.

17           Is the Equity Committee going to be participating in

18    this discovery?

19           MR. HICKERSON:  We certainly believe we're entitled

20    to, Your Honor.

21           THE COURT:  Okay.

22           UNIDENTIFIED SPEAKER:  Creditors Committee.

23           UNIDENTIFIED SPEAKER:  Asbestos Property Damage

24    Claimants Committee.

25           THE COURT:  We've got the Property Damage Committee,

1    the Creditors Committee, the Equity, we've got the Debtors,

2    we've got the Asbestos Claimants Committee, and we've got the

3    Futures Committee.  There are certain people who will take the

4    lead in this, as they have in the past -- as they have in the

5    past, I assume.  Everybody is going to have an opportunity to

6    participate.

7         You need to prepare a discovery plan which would

8    encompass an appreciation of what each side intends to present

9    as an issue at the claims estimation hearing, okay?  And then

10   the discovery you intend to take with respect to that issue.

11   So I think each side has to determine what issues they want

12   the Court to decide at that -- and it may be for the

13   Creditors -- excuse me, for the Asbestos Claimants, you want

14   to look at the historical -- you know, what trends you want to

15   establish, that they favor you or disfavor you or you think

16   are simply relevant in looking at how you're going to do this.

17        So you need to look at what issues you want to

18   address, and then you need to have a disclosure of the experts

19   or witnesses you would intend to rely upon for proof of what

20   you intend to present with respect to your issues.  So

21   essentially it's like a Rule 26 disclosure is what I'm seeing

22   here, what issues you have, what witnesses you have; but we're

23   looking to layer in there at this stage, to the extent you

24   know it, what experts you are going be relying upon.  We have

25   to include the expert discovery as part of this at the same

1    time.

2            MS. PARVER:  That's going to be primarily,

3    Your Honor, at this stage, I guess, from -- other than our

4    statistical experts, from the Debtors; and we would have to

5    reserve -- obviously we've got to go out and find certain

6    experts.  We would like to know finally, after four years, is

7    it, three years what the name of the Debtors' expert --

8            MR. NEAL:  They keep trying to impose on you to be

9    the intermediary in a discovery conference that hasn't

10   occurred yet, and I think we all hear what Your Honor is

11   saying.  We should go about our business and do it.

12           THE COURT:  I think you need to know what the issues

13   are that you are going to present.  I think we already see

14   where the Debtor is coming out on the five issues that they

15   want to make sure the Court is aware of.  I can see the

16   historical issues that the Asbestos Claimants and the Future

17   Claimants believe would -- should be presented to the Court in

18   your statistical review of those things.

19           There will be other factors that -- I think it would

20   be foolish for any party to ignore those, particularly since

21   you've just been through this with Judge Fullam; and I don't

22   know how they came to be presented to him.

23           MS. PARVER:  Through experts, Your Honor; but,

24   Your Honor, I guess we wanted to take away -- at least from

25   the changing circumstances here today, I guess Your Honor is

1    not at the moment anyway predisposed to sort of give

2    declaratory judgment rulings, if you will.

3            MR. NEAL:  We didn't ask you for any, Your Honor.

4            MS. PARVER:  Mr. Neal, let me finish.

5            MR. NEAL:  You guys have been going for an hour now,

6    and I think we could certainly --

7            THE COURT:  Please sit down, please sit down.

8            Go ahead and finish.

9            MS. PARVER:  Your Honor, because we did intend to

10   brief to you, because we do feel very strongly about the

11   illegality of the Debtors' five questions -- five questions,

12   if you will, the proposals, that the Court rule up or down as

13   to, for example --

14           THE COURT:  I've already given a sense of where I am

15   coming from --

16           MS. PARVER:  Thank you, Your Honor.

17           THE COURT:  -- on that.  I don't think I can go all

18   or nothing unless everybody agrees.  If you have an issue in

19   which there is a legal expert that everybody says is

20   absolutely right on the money, when I get into the competing

21   experts, the best that I can do, because I'm not making an

22   individual decision on a single case, the best that I can do

23   is try to evaluate the quality of that, looking at the various

24   jurisdictions, and come up with an estimation of how I think

25   it might play out.  50 percent right, 50 percent wrong;

1    60 percent right, 40 percent wrong, whatever it may be; and

2    then that's what your job will be in the estimation hearing,

3    is to persuade me as to the quality of that and how it will

4    play out into the future.

5              And that's the toughest thing, I have to make a

6    prediction; but you've got to give me the information to make

7    a prediction, and you can't get away from the merits in that.

8    It's simply not the past, and I think you've conceded that,

9    that that wouldn't be the Asbestos Claimants' view.  They

10   realize things change, and you've got to deal with that in

11   some fashion.

12             What you need to do -- I'm not making declaratory

13   judgments.  I'm not going to make new law in this case; that

14   is, going to say, oh, gee, Judge Conti has now decided for the

15   rest of the world that this defense is absolutely right.  I

16   can't do that unless there's absolute agreement on it because

17   I'm not the judge in every single case.  Everybody has to have

18   a right to a hearing on that in their particular case, perhaps

19   in their jurisdiction with their law, and that's all a moving

20   target to a certain extent; and the medical treatment changes,

21   medical theories change and -- but the Defendant has -- the

22   Debtors have a right to get that to the Court's attention.

23             And if they have two experts, three experts, and you

24   have five experts -- you know, there will be some limitation

25   on the number of experts because we're not going to go on for

1    days and days in this situation.

2            So what you need to do is you need to sit down and

3    say:  What are the issues that the Court has to decide?  We

4    sort of know on the Debtors' side what the issues are.  I have

5    an inkling about your side and how it's going to come out; and

6    then there's these trend issues, you know, that I'm going to

7    have to view and look at.

8            And it may be that just as the thing -- what are the

9    trends?  You set forth what you think the trends are, the

10   other side sets forth what they think the trends are, and who

11   speaks to that, what experts are you going to have; and, you

12   know, maybe it is that the Debtor needs to lead forth with

13   your experts first so that the other side has a fair

14   opportunity to come back.

15           But I envision a disclosure between both sides.  To

16   the extent you don't have an expert yet, you don't have one.

17   I mean that's what the disclosure's all about.  You expect to

18   get one, but you don't have one yet.  If you already have

19   somebody lined up that you absolutely will be relying on,

20   that's what you -- that's what you will do.

21           Or if it's something where you say you need this

22   amount of discovery, then you disclose your experts and then

23   you move on, that's fine with me, too; because sometimes

24   experts need a certain amount of information before they can

25   give an opinion, and it's not fair to one party to say I'm

1    going to use X as my expert.  When you get the information,

2    maybe there's somebody else that is better suited in making

3    that opinion, and you don't -- you know, that's the way it

4    goes in litigation.

5         So what you need to do is you need to say is there

6    going to be some fact discovery in some fashion that has to go

7    forth initially; and it may be on your statistics.  It may be

8    on your trends --

9         MS. PARVER:  The Debtors' history and why they

10   decided to do what they do.

11        THE COURT:  Right.

12        MS. PARVER:  Do we take -- I envision, Your Honor,

13   there will be a lot of issues -- attorney/client privilege

14   issues here because, obviously, we're going to be exploring

15   why didn't the Debtor raise these kind of defenses if they

16   were so good before or anything.  Do we take those issues to

17   you, Your Honor?

18        THE COURT:  I think if you can't agree on them and

19   the Debtors are going to say you can't, it would be typical

20   discovery.

21        MS. PARVER:  Fine, Your Honor.

22        THE COURT:  You come in here and say there is a

23   privilege going to be asserted; is there a way to get around

24   it?  Is there not a way to get around it?  If the Debtor is

25   going to open up the privilege because they are going to say

1   our lawyers were wrong in the past and they're right now,

2   maybe it's a discrete thing that the Court can say it's open

3   for that purpose but that purpose only, and it's not a blanket

4   waiver of the privilege.  You know, there's lots of ways to

5   approach this.

6          But if they're going to rely on something that opens

7   up their attorney/client privilege, it may open it up but

8   albeit for a very limited purpose.

9          MS. PARVER:  Fine, Your Honor.

10          THE COURT:  This is -- while it's complex in the

11   sense of you've got so many claims and it's an estimation,

12   it's not a real resolution of one particular claim.

13          MS. PARVER:  Right.

14          THE COURT:  You know, we have to get started; and I

15   think the way to get started is to have a disclosure from each

16   side as to what you intend to present at the estimation

17   hearing, what your -- what you intend to present as your

18   issues, any witnesses, documents that you believe support your

19   position.

20          So it's like a Rule 26(f) when you go through and

21   make your disclosures.  You make your disclosures, then you

22   sit down and work out your discovery plan in terms of what

23   you're going to do.  And there may be some fact discovery that

24   comes before the disclosure of the experts, and then you give

25   an exchange of the party that's moving, who has the burden on

1   that issue, because they want to raise it.  If they have an

2   expert to do it, they go first.  The other side gets to

3   respond, and it may be a mixed bag here.  It may not be the

4   Debtor going first on all of the experts because if it's

5   something that the -- the Claimants are raising or the Future

6   Claimants are raising, it's something that you want to push

7   forward with, maybe your expert should go first.

8            It's that type of thing that you really need to sit

9   down and come up with your plan; and my question is do you

10  need to have your disclosures before you sit down to map out

11  your discovery?

12           MR. DEVEREAUX:  Scott Devereaux, Your Honor.

13           I think the answer is yes, it's going to inform that

14  decision to exchange something in writing first before we try

15  to sit down and draft a schedule; at least that would be my

16  view of it.

17           THE COURT:  I don't want to have a huge delay here.

18  This is not going to be a mammoth, you know, year-long

19  process.  I think you are familiar enough with, you know, the

20  information that if we could try to move it along more

21  quickly, that would be what I would be envisioning.  And

22  outside of the experts, you know, because sometimes, you know,

23  it does take a little longer to get them on board, I don't

24  think this whole process, all in, should take more than six

25  months; and that includes the experts as well.

1          So that we can be envisioning that we would be

2     having an estimation hearing sometime, you know, shortly after

3     that six-month period.

4          MR. NEAL:  Six months to do the exchanges and

5     conduct the discovery and then do the final reports?

6          THE COURT:  Exactly, exactly.

7          MR. LOCKWOOD:  Your Honor, with respect to the

8     disclosure, just a question.  Are we talking about disclosure

9     of the identity of the expert and a summary of what they're

10    going to do or are we talking about an actual expert exchange

11    of expert reports?

12         THE COURT:  No, no, just -- if you know, if you have

13    an issue like you have your statistician, somebody that's

14    doing your statistics, and you say the issue is going to be

15    statistically, you know, what happens to this claim in ten

16    years or what happens -- or -- whatever you intend to bring to

17    light to the Court, and say to that, we have X, Y and Z

18    documents that we would be relying on, and Z would be the

19    identification of the expert that would be doing it.

20         Then you would say that's all you need to do.  Then

21    you meet and you say, okay, we're going to have ten experts;

22    or you would say an unidentified expert because you don't

23    identify one, you envision you would need it.  So when you sit

24    down and meet, you would say this is the volume of documents

25    we need to look at.

1        Are their witnesses that we need to take?  I don't

2    know if the claimant issue comes up or if you want -- if the

3    Debtors are going to say we want to take some discovery of

4    these particular claimants, who are they, what are they, and

5    if you're going to object to that because it's overly broad,

6    not relevant or whatever.  Then when we meet after your

7    discovery plan is in for me to approve the discovery plan, if

8    you know in advance what some of the issues will be in terms

9    of discovery disputes, we can tee those up for discrete

10   hearings and try to move that along quickly so we can deal

11   with that as quickly as possible.

12       Some things you won't know until you get in, and

13   then, you know, we deal with that as any other matter.  You

14   request a hearing or conference call -- you don't need to all

15   come here if it's a fairly discrete issue.  So -- and then

16   you're going to have to say, okay, this is what we're going to

17   do.  We have ten experts; how will we go about it.  We have

18   five you have five; when's the time.  Pick a day.

19       You know, by September 15th, you know, you're going

20   to have your expert reports here exchanged, respond, discovery

21   of the experts.

22       I usually have -- I usually have the expert report

23   come in for the one side that is going to be relying on it,

24   then there's 30 days generally for the other side to be

25   opposing it to get an expert report, and then there's a five

1    to ten days period for supplementation of any expert report.

2              And that generally envisions that at any point in

3    there there's going to be discovery going on in terms of the

4    expert; and then usually the period for discovery of the

5    expert doesn't last longer than 30 days after you get the

6    supplementation.

7              MR. NEAL:  Does Your Honor typically allow

8    deposition of experts?

9              THE COURT:  That's what I'm saying, it would end 30

10   days after.  It doesn't limit you as to whether you take it.

11   Whoever has an expert report out there, and the other side

12   wants to take it as soon as possible rather than waiting until

13   the end of the period so that their expert can supplement or

14   do whatever, you know, you're free to make those professional

15   decisions and set it up yourselves.  That's usually what I do.

16             MR. NEAL:  It sounds like what we need to do is we

17   need to have the meet and confer and need to work backwards

18   from a six month cut-off period and work backwards --

19             THE COURT:  Right.  See if it's feasible.  If it's

20   not, you need to mutually be saying that will not work, but

21   this is what will work and come back to me.

22             MR. LOCKWOOD:  Just so we're all clear and not

23   accused of lying behind a log or anything, Your Honor, I think

24   we could probably identify some of the people that we would

25   want to get as what we would regard as rebuttal experts, just

1    basically off of reading the Debtors' papers that they have

2    filed today.  I believe there may be a couple of other areas

3    where we aren't really going to know exactly what kind of

4    expert, much less who we're going to need, until after we see

5    what the Debtor proposes for their experts on the issue.

6            THE COURT:  I think the experts I'm asking you to

7    disclose are those that you know that you want to present sort

8    of in your case-in-chief, so to speak.

9            MR. LOCKWOOD:  Oh, okay.

10           THE COURT:  Then the rebuttal experts come along

11   afterwards.

12           MR. NEAL:  We work out a schedule where we identify

13   case-in-chief experts and a time period in which the rebuttal

14   experts will be identified and reports will be coming from

15   them.

16           THE COURT:  Usually -- and I'm not adverse to having

17   the rebuttal expert not known until the report comes in, and

18   then you usually let them know, and then the rebuttal expert

19   report comes in, and then you get 30 days to -- 15 days after

20   that report comes in to file a supplement, if you wish, for

21   yours.

22           MR. NEAL:  To the extent we need fact discovery, we

23   work it out so it's running in parallel or --

24           THE COURT:  Or if you have to have fact discovery

25   before the expert report can be prepared; some experts you may

1    not need any fact discovery, you just know that they're there

2    and you have already teed them up.  But it's -- I can't make

3    those decisions for you.  But you need to exchange your

4    disclosures -- exchange the disclosures; and when can you do

5    that?

6              By the way, this goes for anybody that has a

7    disclosure, if you want to have --

8              MR. LOCKWOOD:  I assume that anybody -- the

9    volunteers that want to jump into this, do their own --

10             THE COURT:  They're subject to the same --

11             MR. NEAL:  Thirty days?

12             THE COURT:  -- thirty days?  I think it really

13   should be fifteen days.  I don't know how you're going to meet

14   the six-month goal if you don't start moving along.

15             MR. LOCKWOOD:  The only reason I'm hesitating is the

16   two partners in my firm that try these cases are presently

17   starting an estimation trial tomorrow.  Fifteen days would

18   really be pushing it, but we'll --

19             THE COURT:  Is a month good enough?

20             MR. LOCKWOOD:  I think 30 days.

21             THE COURT:  So 30 days for the exchange of

22   disclosures, and let's pick the day so there's no confusion on

23   that.  Today is the 13th.  That would take us -- let's say

24   July the 14th.  It gives you a little more than 30 days.

25   Okay?  So July the 14th.  It takes into consideration the fact

1    that we have the fourth of July holiday in there; so July the

2    14th you will exchange your disclosures, and those should be

3    exchanged by 5:00 p.m. that day.

4           And you are all used to communicating with each

5    other.  Don't exchange it with the Court.  I don't need to

6    know.  Okay?  So you'll need to do that by the 14th.  And is a

7    two-week period enough time for you to meet and confer on a

8    discovery plan?

9           MR. NEAL:  Yes.

10           MR. LOCKWOOD:  Meet, confer, and reach agreement?

11           THE COURT:  Yes.  On the discovery plan, that's what

12    I'm asking you.

13           MS. PARVER:  Your Honor, does it make sense to first

14    have maybe a week or ten days after we get the fourteenth --

15    people are going to be reacting and may be saying:  Oh,

16    they're going to be putting in this expert; we know we're

17    going to put in this expert.

18           THE COURT:  I'm asking you what is a realistic time

19    frame to meet and confer and come up with a discovery plan?

20           MR. NEAL:  Two weeks is agreeable to us, Your Honor.

21    It should be enough time.

22           MS. PARVER:  What?

23           MR. NEAL:  Two weeks should be enough time.

24           THE COURT:  Three weeks?

25           MS. PARVER:  Three weeks, Your Honor, thank you.

1          THE COURT:  That will give you two weeks to mull it

2     over and then maybe that third week you -- what you should do

3     is check each others' calendars and set up -- you're used to

4     meeting together.  Set up the time, you know, when you can all

5     get together and meet and confer.  Face-to-face is better with

6     this type of situation; and so you'll have two weeks to mull

7     it over, look at the other's issues, see what it is, and then

8     that will take us to let's say August the 5th.

9          Gives you a little bit more than the three weeks.

10    So August the 5th you should have to -- you should file your

11    discovery plan, on August the 5th.

12         MR. LOCKWOOD:  I assume that includes the

13    possibility of competing discovery plans if we don't agree,

14    Your Honor?

15         MR. NEAL:  I assume the goal really is for us to try

16    to work out a joint plan that we do agree to; and then if

17    there are outlying issues, tee those up separately so we

18    don't --

19         THE COURT:  I would think so.  I think there should

20    be one joint submission; and if you agree or disagree as to a

21    particular thing, put it in there and we can go through.

22    Trying to match perhaps five different discovery plans would

23    not be productive.

24         So I think anybody that wants to be a participant in

25    the discovery plan, if they have divergent views, they should

1   be set forth in that document.  And then let's get together --

2   actually, I'll give you until August the 12th because I'm not

3   going to be able to look at it until the following week.  So

4   you'll have until August the 12th.  That gives you four weeks.

5   That should be ample time to exchange your documents and get

6   all -- get through that.

7           And then we should plan to review the discovery

8   plan, let's say, on the 23rd of August.

9           MR. LOCKWOOD:  This would be a hearing, Your Honor?

10          THE COURT:  It will be a case management conference

11  on the estimation.  It's not a hearing.  It is just a

12  conference.  And we will do that -- what's the best time for

13  you all?  Was two o'clock a good time for you to get in and

14  get out?

15          MS. PARVER:  Yes, Your Honor.

16          THE COURT:  So we'll do that at two o'clock on the

17  23rd.  And then from that we'll see what the outside date is;

18  and if you know that there's already issues that have to be

19  determined in terms of discovery disputes, we'll pick a couple

20  dates and try to set those -- set some times aside for those

21  issues to be resolved as quickly as possible.

22          The object would be that you resolve them yourselves

23  in a consensual way.  For example, on the attorney/client

24  privilege issue, I mean this isn't -- these are issues that

25  lawyers have seen in other instances; and if there's a way

1    that you can disclose some of those items, but yet protect the

2    privilege and others, we'll -- I think you should sit down and

3    talk what the parameters will be.  If you can agree on that

4    and come with a consented to order, that's the best.  That

5    would be in everyone's best interest, including the Court's,

6    for efficiency and moving the case more quickly.  And that

7    would go for everything.

8            The object here would be that there's fairly broad

9    discovery; and you may not think it's absolutely pertinent,

10   but if it has any remote relevancy, I would be inclined to

11   grant it as long as it's, you know, not going to be something

12   that is so humongous that it will take a year to do; then you

13   have to ask is it really worth it?

14           So I think you need to keep those parameters in mind

15   because if you think it's something you would say, oh, it

16   shouldn't come in, maybe that's a decision that is ripe for a

17   motion in limine at some point; but they won't know what they

18   have to know, what they can move against unless they see it.

19           So bearing that approach in mind, please approach

20   the discovery in that vein, and I think it will avoid a lot of

21   fighting; and it's a bankruptcy, so everything is open

22   anyway -- or it should be in terms of access to information.

23   It's not like in many other types of circumstances.

24           So, you know, I think if you can keep in mind each

25   side is entitled to get what they believe that they need, even

1    if you don't think they need it, so if -- unless you're

2    absolutely a hundred percent certain that there is no value

3    whatsoever, you know, I think you strive in the effort of

4    making the discovery doable rather than not doable and try to

5    work it out that way.  Is that clear to everybody?

6            This time frame is going to be so ordered on the

7    record today, and we will come back -- we have just to recap

8    that the disclosures relevant to the estimation hearing will

9    be exchanged no later than July the 14th, I believe is the

10   date I've said.

11           August the 12th will be the date for the -- and on

12   the 14th, that's by 5:00 p.m.  On the 12th you'll have to file

13   with this Court your proposed discovery plan.

14           And we will have a hearing on the -- not a hearing,

15   but a case management conference on the discovery plan on

16   August the 23rd at 2:00 p.m.  And those are the dates that are

17   so ordered on the record.

18           Is there anything further to come before the Court?

19           MR. NEAL:  No, Your Honor.  Thank you very much.

20           THE COURT:  Okay.  This hearing is adjourned.

21           (Whereupon, at 4:10 p.m., court was adjourned.)

22

23

24

25

1                    C E R T I F I C A T E

2                    I, Shirley Ann Hall, certify that the foregoing

3    is a correct transcript from the record of proceedings in the

4    above-titled matter.

5    _____
                        Shirley Ann Hall, RDR, CRR
6                       Official Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

=