IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **W. R. GRACE & CO., et al.** | ) | **Case No. 01-01139 (JKF)** |
| | ) | |
|       **Debtors.** | ) | **(Jointly Administered)** |

**Hearing Date: July 19, 2005, 9:00 a.m.**

## DEBTORS' BRIEF IN SUPPORT OF ENTRY OF CASE MANAGEMENT ORDERS FOR ASBESTOS PROPERTY DAMAGE CLAIMS

When the Debtors filed these cases in April 2001, Grace's asbestos property damage litigation was nearly 20 years old and seemed to have run its course: More than 370 property damage lawsuits had been filed since 1983 and by February 2001, only 7 of those were still pending, including 2 on appeal, 1 on a suspense calendar, and 1 awaiting a dismissal order due to product misidentification. In Grace's Informational Brief, filed April 2, 2001, Grace made clear that after a notice and a bar date process were used to identify any other property damage claims that might still lie against Grace, the merits of all such claims could be adjudicated by this Court in a single bench trial designed to address whether or not the product was hazardous:

> Grace maintains that a wet-sprayed, cementitious product such as [Grace's Monokote 3] incorporated into buildings *does not pose an asbestos hazard.* Throughout the years, tests have demonstrated that *the potential for exposure to asbestos from MK-3 -- either during application or after, in air systems of buildings -- is minimal.*...Consequently, Grace believes that property damage claims arising from the use of such products should be *disallowed.* Should the District Court conclude that summary judgment is unwarranted, however, *Grace will seek adjudication of these claims on a consolidated basis through a bench trial.* (Docket 6 at p. 61-62, emphasis added.)

More than 4 years have passed since these Chapter 11 cases were filed and in response to the notice and bar date, the Debtors received over 4000 traditional asbestos property damage claims ("PD Claims"). The disparity between the 7 claims pending as of 2001 and the 4000+ PD claims filed in response to the notice/bar date system comes into sharp focus when the PD claim

forms are examined. Specifically, the Debtors are learning that, among other limitations, thousands of these PD claims: (1) may have been improperly filed without client authorization; (2) lack any supporting documentation of Grace product identification; (3) were long-ago barred by statutes of limitation; and (4) provide no testing data reflecting any hazard from the product in place.

As set out for years in various filings in these cases, the bankruptcy process is uniquely suited for filtering out bad claims like these efficiently and resolving remaining liability issues consensually. This approach has been used with great success in both the *Babcock & Wilcox* and *Armstrong World Industry* asbestos bankruptcies: In *Babcock's* Chapter 11 case, for example, roughly 47,000 contract claims were grouped and efficiently resolved via an omnibus objection process; similarly, in *Armstrong*, all asbestos property damage claims were resolved en masse after a single *Daubert* hearing. To achieve comparable results in these Chapter 11 cases, the Debtors propose pursuing two parallel paths for handling PD claims: (1) a litigation path culminating in resolution of all outstanding asbestos property damage issues by June 2006, reflected in the accompanying Case Management Orders, Exhibits A-C; and (2) a formalized settlement path. Both are described further below.

## PATH ONE: LITIGATION

The traditional asbestos property damage litigation path proposed by the Debtors has three stages:

- 1: Claims Objection Process (Summer - Fall 2005): By September 1, 2005, the Debtors will make a good faith effort to have on file all objections to all asbestos PD claims, including but not limited to the Gateway Objections permitted by this Court's July 19, 2004 Order. Throughout Fall 2005, the Debtors will then set certain of these PD objections for hearings in batches. This process should lead efficiently to the disallowance of hundreds, if not thousands, of claims which then need not be valued for estimation or confirmation purposes. At the PD Committee's request, the Debtors have set out the schedule for this process in a separate case management order, attached as Exhibit A (the "PD Objection CMO").

- 2: Estimation Phase I (October 2005 - February 2006): Unlike the objection process which addresses *specific* flaws in *individual* PD proof of claim forms, Estimation Phase I addresses two *general* issues that inevitably will have a major impact on estimation of *all* PD claims: (1) the proper date of constructive notice for bringing an asbestos property

2

damage claim, which is a key statute of limitations issue, and (2) the appropriate methodology, under *Daubert*, for determining whether Grace product in a building is hazardous. Exhibit B (the "PD Estimation CMO"). As in *Babcock* and *Armstrong*, the Debtors believe that conducting early hearings on these critical issues could substantially speed consensual resolution of these Chapter 11 cases.

- 3: Estimation Phase II (January - June 2006): In June 2006, the universe of PD claims still remaining at that time will be subject to an estimation trial. *See* Exhibit B (the "PD Estimation CMO").

As described further below in Sections A-C, all three stages are designed to work together to resolve efficiently the Debtors' traditional asbestos PD claims. Importantly, because as a result of the notice and bar date *all* PD claims are now before this Court, the objection/disallowance process (stage 1) and the estimation process (stages 2 and 3) can and must work together hand and glove. To the extent claims are disallowed through objections, these claims need not be estimated or may be estimated at zero; to the extent estimation determines common issues affecting large numbers of claims, those claims may in turn be disallowed. Recognizing this crucial interrelationship between objections and estimation, the Debtors' PD CMOs, Exhibits A and B, are designed to make efficient use of both processes to resolve the universe of PD claims. Specifically, the CMOs propose a system whereby the issues easiest to address are raised first, through objections to batches of claims for which minimal evidentiary fact development is necessary, and then proceeding on through Phase I and Phase II estimations, where increasingly complex matters may be addressed.

In addition, as discussed below in Section D, the Debtors also suggest that it would now be appropriate to enter a CMO for Zonolite Attic Insulation claims, in the form proposed in Exhibit C. Finally, in Section E below, the Debtors attempt to lay out the differences between the parties on these various CMOs based on the parties' recent meet and confer process.

### A. Claims Objection Process (Summer - Fall 2005)

At the PD Committee's request, rooted in counsel's apparent concern that objections to individual PD Claims must be addressed by individual claimants rather than by the PD Committee, the claims objection process has been broken into a separate PD Objection CMO,

3

91100-001\DOCS_DE:109929.1

Exhibit A. As reflected in this PD Objection CMO, with the Court's permission, the Debtors anticipate filing two omnibus objection papers: (1) the "Speights" objections, to be filed in July 2005, addressing the apparent lack of authority of the Speights & Runyan firm to file nearly 75% of the PD claims received by the Debtors, and (2) all other objections to all claims, including the Gateway Objections, to be filed by September 1, 2005. Batches of these objections will then be brought on for hearing throughout Fall 2005.

### 1. The Speights Objections

Thousands of claims filed by the Speights firm appear deeply flawed. With even the most limited discovery, the Debtors have learned that Speights signed and filed PD Claims on behalf of parties Speights does not represent. As a few examples:

- The American Medical Association Building: Counsel for The American Medical Association (the "AMA") testified last week that "I spoke with various representatives of the law firm of Speights & Runyan ("S&R") in late 2002 and early 2003. The subject of discussion was whether S&R would represent the AMA in this bankruptcy proceeding. *I informed S&R that the AMA did not wish S&R to represent it in this proceeding.*" *Compare* (7/6/05 affidavit from AMA counsel, emphasis added) *with* (3/27/03 Claim No. 6661 for American Medical Association Building, submitted by Speights and signed by attorney Amanda Steinmeyer of that firm)

- Harvard Vanguard Medical Associates: A representative for Harvard submitted a letter and affidavit last week confirming Harvard "*did not authorize Speights & Runyan to represent it and file a proof of claim on its behalf* in the Grace bankruptcy." *Compare* (7/7/05 Harvard letter and affidavit) *with* (3/27/05 Claim No. 6726 for Harvard Public Health/Harvard Vanguard Med. Asso., submitted by Speights and signed by Steinmeyer)

- Maryland Casualty Company: Maryland Casualty ("MCC") has written to "confirm that (i) MCC has never retained the law firm of Speights & Runyan to represent MCC in the Grace Bankruptcy Cases; and (ii) *MCC never authorized the law firm of Speights & Runyan to file a proof of claim on MCC's behalf* in the Grace Bankruptcy Cases." *Compare* (7/1/05 MCC letter) *with* (3/27/05 Claim No. 6721 for Maryland Casualty Co., submitted by Speights and signed by Steinmeyer).

Because 2,938, or nearly 75% of the PD claims received by the Debtors, were filed by this firm, the issue of Speights' authority to bring these claims must be addressed. Resolution of the Speights issue is critical to estimation of the Debtors' PD claims.

Investigation continues, but the Debtors believe the extent of Speights' improper filings is broad and deep. Between June 29, 2005 and July 5, 2005, Speights, obviously anticipating the Court's scrutiny, attempted to "withdraw" 180 asbestos property damage claims -- including the claims described above. *See* Docket Nos. 8710-8936 (June 29, 2005 through July 5, 2005). The Debtors have further learned that to date, nearly 2000 Speights-filed proofs of claims have been "withdrawn" en masse in asbestos bankruptcies after challenges were made to their validity, including 1,228 in *Federal Mogul*, 328 in *Owens Corning* and 131 in *U.S. Mineral*.

Although discovery on the Speights issue is currently ongoing, the Debtors anticipate that they will object to *all* of the 2,938 claims signed and filed by Speights on the basis of lack of authority. In addition, based on the Verified 2019 Statement filed by Speights in December 2004, the Debtors will challenge smaller batches of Speights claims as follows (discovery from the Speights firm on all of these categories of claims is still outstanding):

- No 2019 Statement: 208 Claims signed and filed by Speights in 2003 were never listed in Speights' December 2004 Verified 2019 Statement. These should plainly fail on the ground of lack of authority;

- Buildings and Job Sites: 358 Claims were signed and filed by Speights on behalf of "Buildings" and "Job Sites." The Debtors believe not only that "buildings" and "job sites" have no legal standing to file claims, but also that Speights had no authority to bring these claims in the first place;

- Anderson Memorial 1992 Original Complaint: 787 Claims signed and filed by Speights cite to a 1992, superseded complaint in the *Anderson Memorial* case as the basis for Speights' representation. In *Anderson Memorial*, filed in Speights' home state of South Carolina, Speights initially sought certification of a nationwide class of building owners to bring asbestos property damage claims. In 1994, the South Carolina court struck from the original complaint the claims of non-residents on the grounds that claims arising outside of South Carolina were prohibited by South Carolina's door closing statute. A second amended *Anderson Memorial* complaint, limited to South Carolina claims, was filed in 1995 and is currently pending. Nearly 800, non-South Carolina PD claims signed and filed by Speights cite to the 1992, superseded *Anderson Memorial* complaint as the basis for Speights' representation of those claims. The Debtors anticipate demonstrating that this complaint does not provide Speights with authority to file these claims;

- Anderson Memorial 2001 Orders: 59 Claims signed and filed by Speights are brought on behalf of South Carolina entities for which Speights' authority to file is allegedly based on 3 South Carolina pleadings from 2001, including 2 that were entered by the South Carolina court *after* the automatic stay went into effect. Specifically, as the basis for Speights' supposed representation of these claimants, Speights' Verified 2019 Statement

5

cites to (1) a February 9, 2001, ex parte, "emergency" conditional class certification (in a 10 year old case!) of asbestos property damage claims for South Carolina buildings, entered by Speights' South Carolina home state court at Speights' request in response to concerns that Grace might file Chapter 11; and (2) two Orders entered by the same South Carolina state court in June 2001 and July 2001, more than four months after Grace had filed Chapter 11 and provided notification to the South Carolina court of the automatic stay. The Debtors anticipate showing that these South Carolina orders are deeply problematic, null and void, and do not provide Speights with authority to file these claims;

- Building Questionnaires: 15 Claims signed and filed by Speights cite as authority for filing exemplar "building questionnaires" that do not reflect any signature by any client. The Debtors anticipate challenging these claims on the basis of lack of authority;

- Undefined Symbol "E": 22 Claims signed and filed by Speights cite the undefined symbol "E" as the basis for authority to file. The Debtors anticipate challenging these claims on the basis of lack of authority;

- Supply Stores: 31 Claims were signed and filed by Speights on behalf of construction companies, supply stores or contractors. These entities were more likely to have bought Grace product for use on other job sites than to have used any product in a manner giving rise to a proper PD claim in this matter. Further, Speights does not even provide street addresses for some of these purported claimants. The Debtors anticipate challenging all of these claims for lack of authority;

- Exemplar Contracts: 1,690 Claims signed and filed by Speights cite as authority to file one of ten "exemplar" contracts identified on the Verified 2019 Statement as K-1 through K-10. The Debtors believe there are flaws in these 'exemplar' contracts and anticipate challenging Speights' authority to bring these claims.

The Debtors have been collating lists of which Speights claims fall into which category and will file the Speights objections no later than July 18, 2005. Hearings on these objections, in batches or as a whole, could begin by the end of August 2005, so long as Speights is not permitted to delay the Debtors' discovery into those claims.

### 2.     September 1, 2005 Omnibus Objections

By September 1, 2005, the Debtors propose filing an omnibus paper to identify *all* objections (other than the Speights "lack of authority" objections) to all PD claims. This omnibus objection would include the Gateway objections (incomplete Proof of Claim form;

91100-001\DOCS_DE:109929.1

materially insufficient supporting information; no product identification; barred by statutes of limitation or repose; barred by laches; barred by prior settlements), plus any other substantive objections that apply, including the objection that the product at issue is not hazardous. Currently, the Debtors anticipate filing an Omnibus objection paper that (1) identifies the types of objections raised (such as statute of limitations and laches); (2) provides a brief summary of the legal and/or factual argument in support of each such type of objection; and (3) provides attached exhibits identifying specifically which claims fall within each type of objection. The Debtors will, of course, also provide notice to the claimants of which objections apply to their claims.

Throughout Fall 2005, the Debtors anticipate bringing batches of these objections on for hearing. As described above, as part of the global effort to achieve an efficient disallowance and estimation process, the Debtors anticipate that it will likely make sense to have only *some* objections brought on for hearing in Fall 2005, with other issues deferred to be dealt with through the estimation process. For example, the Debtors would expect to seek a hearing in Fall 2005 on the issue of disallowance of all claims barred by prior settlements, a simple issue that can be addressed by the Court on a minimal evidentiary record. In contrast, other objections registered by September 1, 2005 yet requiring the development of a more significant evidentiary record for the Court's review, such as statutes of limitation, may be easier addressed through estimation, as described in the next section.

**B.     Estimation Phase I (October 2005 - February 2006)**

Although the PD Committee disagrees, the Debtors believe that both estimation (and consensual resolution) of these Chapter 11 cases will be sped significantly if critical issues are heard early in the estimation process, much as *Babcock* and *Armstrong* achieved consensual resolutions in part by holding early hearings on specific, focused topics. For these Chapter 11 cases, two contentions by the Debtors are well suited to be heard early and affect enormous numbers of claims: (i) that certain methodologies for determining exposure to asbestos must comply with Rule 702 of the Federal Rules of Evidence; (ii) that all claims asserted on or after a

7

certain date are subject to a statute of limitations defense to the extent triggered by constructive notice. PD Estimation CMO, Exhibit B. The relevance of these issues to the Debtors' Chapter 11 cases are not news to the PD Committee: The Debtors have said literally *for years* that these are the two threshold liability issues that must be addressed in this case. E.g. Debtors' Consolidated Reply In Support Of Their Motion For Entry Of Case Management Order, Establishment Of A Bar Date, Approval Of The Claims Form And Approval Of The Notice Program at 35 (11/9/01).

The Debtors understand that the PD Committee would not have any estimation-related issues heard on an accelerated basis and would address all PD issues in a single step, collapsing the estimation process into what the Debtors have styled "Estimation Phase II," discussed in Section C below. In contrast, the Debtors propose submitting initial expert reports on the two "Estimation Phase I" topics by October 17, 2005, with discovery and *Daubert* briefing leading to a hearing on these "Estimation Phase I" topics in February 2006.

### 1. Methodologies For Determining Exposure To Asbestos

In *Armstrong*, a two day *Daubert* hearing was held on the issue of whether a potential hazard in a building could be established through the use of dust sampling techniques. The Debtors argued that dust sampling could not be used to show hazard. Specifically, the methodology failed both the relevance and reliability tests under *Daubert*: (1) The method is not reliable because, as was shown at the hearing, it is not repeatable, among other things; (2) The method is not relevant, because all epidemiological studies relating to building hazard are tied to *air sampling* tests, not dust sampling tests. Shortly after Judge Newsome ruled that the dust sampling method did not meet *Daubert* standards, all pending Armstrong PD claims settled for pennies on the dollar. *See In re Armstrong World Indus.*, 285 B.R. 864 (Bankr. D. Del. 2002).

The *Daubert* issues addressed in *Armstrong* are directly relevant to this case. The issues have already been briefed and argued in *Armstrong*, and many of these issues were also briefed before this Court in advance of the ZAI hearing in these cases. The same experts that both

8

plaintiffs and defendants have called to testify for years in traditional asbestos property damage cases are intimately familiar with these topics, and neither side would have any trouble producing expert reports on an expedited time frame. With this easily accessible record, the Debtors submit that this *Daubert* issue is appropriately addressed early in Estimation Phase I and will significantly advance the resolution of this Chapter 11.

### 2. Constructive Notice

As indicated above, at the time these Chapter 11 cases were filed, only 7 asbestos property damage cases were still pending against Grace. This was not happenstance. Rather, by the time of Grace's bankruptcy filing in 2001, asbestos property damage litigation was nearly 20 years old and building owners had been on notice for *decades* of asbestos issues. Building owners with conceivably meritorious claims no doubt would have raised them years before 2001, just as building owners tried to do in the 379 lawsuits (covering thousands of buildings) that Grace had faced since 1983.

With this history behind it, the Debtors believe that the issue of constructive notice -- when *should* building owners have known enough to bring a property damage claim -- is well suited to early adjudication in these Chapter 11 cases and could help to resolve thousands of pending PD claims. *See also Prudential Ins. Co. v. National Gypsum*, 359 F.3d 226 (3d Cir. 2004) (summary judgment granted in asbestos property damage case on the basis of constructive notice as of October 1983). While the PD Committee contends there are variations in state law that preclude a global determination of this issue, this concern is overstated. Virtually every state has some type of constructive notice standard in place and these standards are essentially identical from state to state. Further, because the filed PD claims are in hand, it is easy to tell which states' laws apply. Finally, because -- as the Prudential case shows -- asbestos was a well known public health issue as of the early 1980s, it is not as if minor variations from state to state will make a significant difference: This Chapter 11 was filed in 2001, nearly *20 years* after people should have been on constructive notice of potential claims.

9

The determination of the constructive notice issue up front will have an enormous impact on the validity and value of filed claims, key for the estimation process. And, as in the *Prudential* case described above, the parties should already have experts familiar with when building owners knew or should have known of potential asbestos claims. *E.g. Prudential*, 359 F.3d at 229 ("Asbestos had, however, already become a well-known and important public health and safety issue in the United States prior to 1984.")

### C. Estimation Phase II (January to June 2006)

The proposed PD Estimation CMO proposes exchange of estimation expert reports on all remaining topics by January 2006. By this time, the Debtors hope to have achieved disallowance of many PD claims through the objection process which should substantially simplify the estimation. Final hearing on estimation could take place by June 2006. Exhibit B.

The Debtors believe that the PD Committee does not oppose the basic timing of Phase II. What the PD Committee does object to -- in addition to objecting to the notion that any 'common issues' should be heard in Estimation Phase I -- is the overlap of Phase I and Phase II. That is, while not agreeing to phasing at all, the PD Committee complains that if there *were* to be phasing, the Debtors' Phase II does not make sense because expert reports in Phase II are due in January 2006, before the hearing on Phase I in February 2006; as a result, the Phase II estimation experts cannot take account of the results when filing their reports. The Debtors disagree with this analysis, for four major reasons.

*First*, the issues set out above in Phase I will need to be briefed and addressed by experts whether the estimation process is staged or not. If all expert work is collapsed into a single phase, as the PD Committee suggests, then the estimation experts have the same basic problem of which the PD Committee now complains: The estimation experts will need to submit reports at the *same* time as other liability reports are being submitted, and thus the estimators will issue their reports without the benefit of any ruling on liability issues. This may be a problem, but it is *not* a problem with the staging process. Rather, the Debtors submit that the estimation experts

10

for both sides are sophisticated individuals who will be able to take into account probabilistic liability rulings in their analysis. For example, perhaps an expert might opine in a January 2006 report that the total PD liability is X if the constructive notice date is 1983 and Y if there is no legal constructive notice date. Because the experts will have databases containing all available information on existing PD claims, it should be straightforward for them to consider different ways to aggregate potential PD claim amounts.

*Second*, recognizing the dilemma described above, the Debtors' proposal at least has the advantage of simplifying the estimation process for the court and the parties. That is, rather than holding hearing on threshold PD liability issues *and* PD estimation -- and, for that matter, PI estimation issues -- all in June 2006, the phased proposal allows the parties to make shorter, focused evidentiary presentations over time.

*Third*, because Phase II does not anticipate a final hearing on estimation until June 2006, it is conceivable that the estimation experts *will* have a ruling on liability issues before trial. This could simplify and streamline the final estimation for the Court. Using the example from the first paragraph, if the Court were to decide between February and June 2006 that the constructive notice date were 1983, then only 'X' would need to be presented at the June trial, rather than X and Y in the alternative.

*Fourth*, the only alternative to the situation described in the first paragraph above is to establish a CMO that forces this Court to decide liability issues by a date certain, before the parties submit estimation expert reports. It would be highly unusual to establish a CMO that dictates when the rulings of the Court should be issued, as opposed to a CMO like Exhibit B that instead dictates when the parties must complete their work.

### D.     Zonolite Attic Insulation

The Debtors have advocated that this Court decide the ZAI science issue and still believe that is the appropriate approach. To the extent the Court does not rule on pending ZAI science issues before the Estimation process is completed, however, or if the Court rules that some ZAI

11

claims may proceed against the Debtors' estates, then these claims too will need to be estimated. In order to do so, the Court must set a bar date and approve a notice program. If nothing else, the October 2004 ZAI science hearing made it abundantly clear that there will be no way to estimate ZAI claims *without* notice and a bar date. There is simply not enough data otherwise available to make any meaningful determination as to the scope of the number of homes potentially at risk.[1] The Debtors also submit that based on evidence and argument heard in the ZAI science hearing, the Court now has sufficient information to determine whether there would be any danger for claimants to simply look *briefly* in their attics to see whether ZAI is present in order to decide whether to file a ZAI Proof of Claim form. As this Court already recognized at the ZAI science hearing, it is fundamental that the amount of asbestos exposure matters as a threshold.[2]

As a result, based on the evidence and argument already elicited at the ZAI science hearing, the Debtors now renew their request for a ZAI Bar Date, Claims form and Questionnaire. The Debtors' proposed ZAI CMO is attached as Exhibit C.

### E.   **Specific Points On Which The Parties Agree And Disagree**

As this Court ordered, the parties engaged in a meet and confer process before filing the PD CMOs. Specifically, counsel for Debtors and the PD Committee met by telephone on July 1, 2005 and July 6, 2005, and again in person on July 8, 2005. For the Court's convenience, the

---

[1] *Compare* ZAI Tr. 10/18/04 at 114 (Debtors' expert assumed 940,000 homes with ZAI) *with id.* at 116-17 (claimants' attorney argues that "we changed the number of ZAI homes from 940,000 to three million, and that's based, Your Honor, on data which indicates -- and estimates that put the number of ZAI homes as high as ten million or more. So we simply took three million homes, knowing it's not 940,000, 'cause that's only ten years of sales. We have another 50 years of sales. So, we took three million. Again, Your Honor, it's an assumption.") *and id.* at 148 ("The Court: But I don't see any -- the problem is I don't see any basis for the changes, either. I mean, they're still guesses. There's still no evidence that tells me how many homes are still out there with ZAI in them or how many ever existed with ZAI in them in the first place) *and id.* at 138 (Debtors' counsel argues that "[claimants] question the record evidence of 940,000 homes, but the truth of the matter is, and it's just a matter of common sense, their assumption that any home that was ever built that ever utilized ZAI would today still be in existence or today still have ZAI is simply an unreasonable assumption. Homes turn over, homes get remodeled, homes get destroyed for new track development, and so the assumption they use doesn't make any sense.").

[2] ZAI Tr. 10/18/04 at 100 ("The Court: I mean, everybody's exposed to it [asbestos]. That doesn't make it an unreasonably safe exposure.").

Debtors attempt to identify below the parties' respective positions on the 3 proposed PD CMOs based on these discussions:

- Exhibit A: PD Objection CMO. The Debtors believe that as an entity, the PD Committee neither opposes nor endorses the PD Objection CMO. Counsel for the PD Committee believes that objections to PD Claims are an issue between the Debtors and the individual PD claimants, and do not implicate the PD Committee as a whole.

- Exhibit B: PD Estimation CMO. There do not appear to be any issues with respect to the overall *time frame* for PD Estimation outlined in the Debtors' PD Estimation CMO. However, as discussed above, the PD Committee does not agree to the Debtors' proposal to divide Estimation into two *phases*, Phase I and Phase II. The PD Committee further objects that the two issues set out above for Phase I adjudication are neither threshold nor common issues.

- Exhibit C: ZAI CMO: At the in-person meet and confer, the PD Committee indicated that special counsel for the ZAI claimants was on vacation and unavailable to address this issue at the present time. All the PD Committee indicated it could do was to take the issue back to ZAI counsel for discussion.

## PATH TWO: SETTLEMENT

At the July 8, 2005 in-person meet and confer, the Debtors suggested that the parties establish a method for moving forward on potential settlement discussions to try to agree to a consensual chapter 11 plan. The Debtors suggested three specific steps be implemented by agreement of the parties. The parties were largely able to reach agreement on this proposal. The three steps, and the Debtors' understanding of the parties' respective positions, are:

- Step 1: Designated Negotiators: The PD Committee should pick a negotiation representative to meet with the Debtors and that negotiation representative must be present in person or telephonically at hearings to be accountable to respond to the Court's questions, if any, about whether negotiations are proceeding. The PD Committee responded that it has picked such representatives, namely Martin Dies and Darrell Scott, who respectively represent traditional PD claimants and ZAI claimants. The parties have no dispute on this step;

- Step 2: Regular Meetings: The parties should set a schedule of regular meetings for sitting down and discussing potential settlement. The Debtors suggested the parties set up a schedule by which the parties meet at least once every 60 days. The PD Committee had no objection to the suggestion of regular meetings and expressed concerned only about the next two months due to summer vacation plans of many of the relevant parties.

- Step 3: Monitor or Mediator: The Debtors suggested that the parties agree on a monitor or mediator to monitor all settlement discussions. This individual would be available to report back in open court (not *ex parte*) regarding the status (process, not substance) of such discussions. Specifically, the monitor or mediator would report whether meetings are taking place, whether the meetings are worthwhile, whether progress is being made, and the like. The individual would *not* be expected to comment on the substantive position of the parties. The parties have reached agreement on the concept and have agreed to continue a dialogue to try to pick an acceptable individual to undertake this role.

In sum, the parties are in essential agreement on all three proposed settlement path steps, and request additional time to reach agreement on an individual to act as monitor or mediator of this settlement process.

WHEREFORE, for the reasons stated above, the Debtors respectfully request that the Case Management Orders attached as Exhibits A-C be entered.

Dated: July 13, 2005

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Michelle H. Browdy
Janet S. Baer
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB, PC

_____
Laura Davis Jones (Bar #2436)
David W. Carickhoff, Jr. (Bar #3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
(302) 652-4100

Co-Counsel for the Debtors and Debtors in Possession

14