## Jury Verdicts

Predictions of jury trial outcomes shape settlements in ordinary and mass tort litiga-
tion. Parties estimate expected value from previous jury verdicts in similar cases
(Mnookin and Kornhauser, 1979; Galanter, 1993). Because few cases go to trial,
cases that reach verdict are not likely to be representative of the typical lawsuit. How
attorneys adjust settlement values to reflect this selection bias is not well understood.
But it is widely assumed that trends in settlement values of cases reflect trends in jury
awards (perhaps with some lag).

There is no national databank or tracking system for jury verdicts, including as-
bestos cases. To investigate trends in asbestos jury verdicts, we searched *Mealey's Liti-
gation Report: Asbestos* from January 1, 1993, to 2001. As we discussed previously, we
found 526 trials that delivered verdicts on 1,570 plaintiffs' claims, which constitute
the database for our jury verdict analysis.[67] Our analysis generally focused on verdicts
on the 1,570 claims, whether tried singly or together.

### Trends in Numbers and Types of Claims Tried to Verdict

The annual number of claims decided by a jury declined over the period studied,
but, as Figure 3.4 shows, that decline occurred primarily between 1993 and 1994,
when claims tried to verdict fell by more than 50 percent.[68] After that, juries decided
between 50 and 250 claims per year.

The peak number of jury verdicts in 1996 was the result of the consolidated
trial of the claims of 129 shipyard workers in Louisiana, which accounted for more
than half of all jury verdicts in that year.[69] In 1999, the number of asbestos jury ver-
dicts hit their lowest point since 1993 and then began to increase again. The in-
creases from 1999 to 2001 may reflect the destabilization of the litigation that took
place after the U.S. Supreme Court announced its decisions in *Amchem* and *Ortiz*.

Reflecting the composition of the population of asbestos claims generally, most
claims that reached verdict in the period studied were for nonmalignant injuries.

---

[67] We excluded asbestos property damage cases from our analysis and cases in which asbestos exposure was tan-
gential to the claim—for example, tobacco suits.

[68] There is no statistically significant time trend in the number of claims tried to jury verdict from 1994 to 2001
(coeff = −5.94, p = .518). Further investigation revealed that 1993 is not an aberration, but the last of a few years
with high levels of claims presented to juries. A search of the *Mealey's Litigation Report: Asbestos* for 1992 revealed
an even larger number of claims tried to verdict than for 1993. A reviewer of a preliminary draft of this report
suggested that two factors may explain the sharp drop in the number of claims tried to verdict from 1993 to
1994: (1) a number of defendants known for "aggressive" litigation strategies, including Raymark, Celotex and
Keene, filed for Chapter 11 reorganization, effectively ending their role in the litigation; and (2) the stay of litiga-
tion against the Center for Claims Resolution (representing some 20 defendants) that prevailed during the nego-
tiations of the *Georgine* class action settlement and its aftermath.

[69] *Abadie v. Metro. Life Ins. Co.*, 784 So. 2d 46 (La. Ct. App. 2001).

50    Asbestos Litigation

**Figure 3.4**
**Number of Claims Reaching a Jury Verdict**



RAND *MG162-3.4*

Among the claims that reached verdict, asbestosis claims were the most numerous, followed by claims for other nonmalignant conditions, including pleural plaques (see Figure 3.5).

**Figure 3.5**
**Distribution of Claims Tried to Verdict by Injury Type**



RAND *MG162-3.5*

The distribution of claims tried to verdict by injury type did not change much over the period studied (see Figure 3.6).[70] The large fraction of nonmalignant claims among the 1,996 verdicts is attributable to the consolidated trial of 129 claims described above. (Two of the plaintiffs in that trial had mesothelioma, two had other cancers, and two had disabling asbestosis. The remainder claimed other nonmalignant injuries.)

**Trends in Plaintiff Success and Award Sizes**

During the period studied, plaintiffs with mesothelioma were most likely to win at trial, followed by plaintiffs with asbestosis. Plaintiffs with malignancies other than mesothelioma were least likely to win (see Figure 3.7).[71]

**Figure 3.6**
**Distribution of Claims Tried to Verdict by Injury Type over Time**



RAND MG162-3.6

---

[70] None of the changes observed is statistically significant. We rely on the litigation reporter's description of injury type in this analysis.

[71] All pairwise comparisons are statistically significant except for the comparison between other cancers and other nonmalignant injuries (coeff = .042, p = .312). (*Coeff* [coefficient] is a measure of the difference between the proportions, and *p* [probability] is the statistical significance of the difference.) The differences in the probability of a plaintiff award between cancer claims and nonmalignant injury claims are: coeff = .061, p =.017; the differences in the probability of a plaintiff award between mesothelioma claims and other cancer claims are: coeff = .225, p = .000; the differences in the probability of a plaintiff award between asbestosis claims and other nonmalignant injury claims are: coeff = .072, p =.028; and the differences in the probability of a plaintiff award between mesothelioma claims and asbestosis claims are: coeff = .112, p = .001.

52    Asbestos Litigation

**Figure 3.7**
**Probability of Plaintiff Award by Injury Type**



RAND MG162-3.7

During the period studied, there was considerable change in plaintiff success among all injury groups (see Figure 3.8). Over time, the probability of winning generally increased for asbestosis plaintiffs,[72] whereas the probability of winning declined somewhat for mesothelioma plaintiffs, only to rise again toward the end of the study period.[73]

On average, successful mesothelioma plaintiffs received the largest jury awards, and successful asbestosis plaintiffs the next-largest awards (see Figure 3.9).[74] During 1993–2003, the average mesothelioma award topped other award averages in all but one year (see Figure 3.10).[75] The relative size of average awards in other injury categories changed from year to year, often as the result of a few dramatically large jury verdicts in a specific injury category. For example, in 1998, a jury in Texas awarded $5.6 million to each of 18 asbestos plaintiffs whose cases were tried together. Three years later, a jury in Mississippi awarded $25 million to each of six plaintiffs whose

---

[72] coeff = .033, p = .003.

[73] Net decrease over time, coeff = –.017, p = .059. Other observed changes are not statistically significant.

[74] All pairwise comparisons are statistically significant (p < .001).

[75] The observed changes over time within injury categories generally are not statistically significant; in a few instances in which changes over the entire time period are statistically significant that statistical significance is attributable to a sharp change in a single year.

**Figure 3.8**
**Changes in the Probability of Plaintiff Award by Injury Type, 1993–2001**



RAND *MG162-3.8*

**Figure 3.9**
**Average Jury Awards by Injury Type**



RAND *MG162-3.9*

54   Asbestos Litigation

**Figure 3.10**
**Trends in Average Jury Awards by Injury Type**



RAND *MG162-3.10*

claims were consolidated, far more than any asbestosis award ever before delivered. That same year, two Texas juries awarded asbestosis plaintiffs $7.5 million and $18 million.

As a result of the differences in average jury awards by injury type, although plaintiffs with noncancerous diseases accounted for the largest number of plaintiff verdicts, mesothelioma plaintiffs obtained the largest proportion of dollars awarded. As Figure 3.11 illustrates, 60 percent of all dollars awarded by juries went to mesothelioma plaintiffs, who accounted for only 30 percent of all plaintiff verdicts. In contrast, plaintiffs with diseases other than cancer or asbestosis, who accounted for 20 percent of plaintiff verdicts, got 5 percent of the total dollars awarded.

In every year but 1998, the majority of dollars awarded went to mesothelioma plaintiffs. The share of dollars awarded to plaintiffs with other injuries varied over time, but the appearance of trends (e.g., a decline in the share of dollars for mesothelioma plaintiffs and an increase in the share for asbestosis plaintiffs) is attributable to verdicts in just a few years (see Figure 3.12).[76]

---

[76] A statistically significant trend over the entire period for mesothelioma (coeff = –.024, p = .060) becomes statistically not significant when 1998 and 2001 are excluded (coeff = –.018, p = .226); a statistically significant trend for asbestosis (coeff = .031, p = .029) becomes statistically not significant when 1998 and 2001 are excluded (coeff = .017, p = .137).

**Figure 3.11**
**Distribution of Dollars Awarded in Plaintiff Verdicts by Injury Type**



RAND *MG162-3.11*

**Figure 3.12**
**Distribution of Total Dollars Awarded by Juries over Time by Injury Type**



RAND *MG162-3.12*

**Outcomes of Consolidated Trials**

As discussed previously, close to 80 percent of plaintiffs whose cases reached trial during the study period had their claims grouped together with others and tried to a single jury. (Recall that this 80 percent figure does not account fully for plaintiffs whose claims may have been decided in part by a jury who found liability in the first phase of a consolidated trial after having heard evidence for a different set of plaintiffs chosen to represent all of the consolidated claims.) Using our jury verdict database, we were able to investigate whether the outcomes of claims that are grouped are systematically different from the outcomes of claims tried individually. We examined differences between claims tried individually and in smaller (two to five claims) and larger (six or more claims) groups, and between homogeneous and heterogeneous injury groups (for example, all asbestosis claims, compared with groups with a mix of asbestosis and mesothelioma claims). We note where we found statistically significant differences but caution readers that the differences observed may be the result of unobserved differences between claims assigned to different trial treatments, rather than the effect of trial organization itself.

During the study period, there was little difference in the probability of winning for plaintiffs whose claims were tried individually, compared with all those whose claims were tried in groups (see Figure 3.13).[77] But plaintiffs whose claims were tried individually were less likely to win than plaintiffs whose claims were tried in small groups,[78] and plaintiffs whose claims were tried in small groups were more likely to win than plaintiffs whose claims were tried in large groups.[79]

However, mesothelioma victims, on average, received higher awards when their claims were tried individually than when they were tried in groups (see Figure 3.14).[80] Asbestosis plaintiffs received higher awards, on average, when their cases were tried in large groups rather than small groups,[81] but received lower awards, on average, when they were tried in small groups rather than individually.[82] (The difference in average awards for asbestosis plaintiffs in smaller and larger groups results from the two large awards to asbestosis plaintiffs whose cases were tried in Texas in 1998 and in Mississippi in 2001 in groups of six and 18 claims, respectively.)

---

[77] coeff =.026, p = .391.

[78] coeff = –.067, p = .054.

[79] coeff = .142, p = .000.

[80] coeff = 1285244, p = .046.

[81] coeff = –1467458, p = .004.

[82] coeff = –1187478, p = .001.

**Figure 3.13**
**Probability of Plaintiff Success by Injury Type and Trial Organization**



**Figure 3.14**
**Average Jury Awards by Injury Type and Trial Organization**



Early in the period studied, when claims were grouped together for trial, they were likely to include a mix of injuries. In the last three years of the period studied,

when claims were grouped for trial, they were more likely to be homogeneous with regard to injury (see Figure 3.15).

Plaintiffs whose claims were grouped with plaintiffs with similar injuries (i.e., in homogeneous groups) on average had a higher probability of winning than plaintiffs whose claims were grouped with plaintiffs with different injuries (i.e., in heterogeneous groups) (see Figure 3.16).[83] There is no evidence that mesothelioma plaintiffs' chances of winning varied depending on the nature of the claim groupings,[84] but asbestosis plaintiffs whose claims were tried in homogeneous groups had a higher probability of winning.[85]

On average, plaintiffs whose claims were grouped for trial obtained higher awards when the groupings were homogeneous, rather than heterogeneous.[86] But this observed difference appears to be attributable to the effect of grouping on mesothelioma plaintiffs, who received substantially less when their claims were tried in

**Figure 3.15**
**Distribution of Claims by Single Plaintiff Versus Homogeneous and Heterogeneous Injury Groups, 1993–2001**



---

[83] coeff = −.099, p = .001.

[84] coeff = −.068, p = .207.

[85] coeff = −.249, p = 000.

[86] coeff = −1467925, p = .000.

**Figure 3.16**
**Probability of Plaintiff Success by Injury Type and by Single Plaintiff Versus Homogeneous and Heterogeneous Injury Groups**



RAND MG162-3.16

heterogeneous groups.[87] In other injury categories, differences in the average award between homogeneous and heterogeneous groups are not statistically significant (see Figure 3.17).

## Choice of Forum and Venue

"Forum shopping" is a term frequently used to refer to parties' strategic efforts to find the most attractive jurisdiction and venue in which to pursue or defend their cases. Although forum shopping is officially frowned upon (Algero, 1999), the U.S. legal system offers litigants considerable flexibility with regard to forum selection, and lawyers who fail to choose a forum wisely may be susceptible to charges of malpractice. Depending on how they structure the litigation, plaintiffs may be able to choose between federal and state courts, among different state courts, and among different venues within a state. Plaintiffs in civil litigation get to take the first step by

---

[87] coeff = –2208466, p = .000.

**Figure 3.17**
**Average Jury Verdicts by Injury Type and by Single Plaintiff Versus Homogeneous and Heterogeneous Injury Groups**



RAND *MG162-3.17*

filing their suit in a particular jurisdiction and venue within that jurisdiction. Civil defendants may contest the plaintiff's choice and, if successful, may remove the lawsuit to another jurisdiction, or sometimes, another venue.[88]

The federal judiciary seeks to constrain forum shopping by applying the same procedural rules in all federal courts. But in diversity cases (private suits between parties from different states), federal courts apply substantive state law including state doctrine on choice of law in situations in which several different states' laws may be implicated. These state laws differ in ways that can determine outcomes of product liability cases such as asbestos lawsuits, even when brought in federal courts.

As in the federal system, state courts are supposed to apply uniform procedural rules statewide. Most states model their procedural rules upon the federal rules, but there are important differences between federal and state rules and among state rules. Because states' substantive law and procedural rules differ, and because, in reality, informal practices differ across and within state and federal courts, the U.S. system of federalism provides strong incentives for plaintiffs to structure their lawsuits in ways that allow them to file in favorable forums, and for defendants to seek ways of veto-

---

[88] The U.S. Supreme Court has held that "there is ordinarily a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards trial in [an] alternative forum." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981).

ing these choices and moving cases to jurisdictions that they believe will be more fa-
vorable to them.[89]

### Shift from Federal to State Courts

In the early years of asbestos litigation, cases were divided more or less evenly be-
tween federal and state courts and were generally concentrated in locales in which
there were heavy concentrations of workers who had been exposed to asbestos: Cali-
fornia, Pennsylvania, Maryland, New Jersey, and Illinois (Hensler et al., 1985). In
the late 1980s, filings began to move away from federal courts. As shown in Figure
3.18, 41 percent of all claims were filed in federal courts in 1988. But after the
JPMDL transferred all federal asbestos cases to Judge Charles Weiner in the Eastern
District of Pennsylvania for pretrial processing, many plaintiff attorneys became wary
of filing in federal court, knowing that their new cases as well would be transferred to
Judge Weiner,[90] whose rulings many plaintiff attorneys perceived as antithetical to
their clients' interests. By proceeding in state courts, plaintiff attorneys retained con-
trol over their cases and preserved the option of pursuing the litigation in more plain-
tiff-friendly jurisdictions. Ten years later, only about 13 percent of claims were being
filed in federal courts. While the proportion of cases filed in federal courts declined,
filings in state courts soared. Over time, litigation moved to the Gulf States (e.g.,
Texas, Mississippi), where shipyard workers and workers in petrochemical facilities
had a high probability of asbestos exposure.

### Distribution of Claims by Jurisdiction and Venue

Throughout the history of asbestos litigation, a small number of jurisdictions has ac-
counted for the bulk of the litigation, but the areas of concentration have changed
somewhat over time (see Table 3.3).

From 1970 to 1987, four states accounted for 61 percent of asbestos claimants
who filed in state courts: California, Illinois, New Jersey, and Pennsylvania. By the
late 1990s, however, filings of asbestos claims in these states accounted for only
8 percent of the total. Between 1998 and 2000, five other states captured 66 percent
of filings: Texas, Mississippi, New York, Ohio, and West Virginia. These states had
accounted for only 9 percent of the claims filed before 1988. Only two states that
have been important in the litigation, Maryland and Florida, have had a relatively
stable proportion of the filings.

---

[89] In bankruptcy, where defendants (debtors) select the filing jurisdiction, analysts have detected signs of forum
shopping as well (Eisenberg and LoPucki, 1999).

[90] Under 28 U.S.C. §1407, new filings are regarded as "tag along" cases and are automatically transferred to the
transferee judge after filing.

62   Asbestos Litigation

**Figure 3.18**
**Percentage of New Cases Filed in Federal Courts**



RAND MG162-3.18

**Table 3.3**
**Percentage of Claims Filed in State Courts by State**

| | Time Period | | | |
|---|---|---|---|---|
| | **1970–1987** | **1988–1992** | **1993–1997** | **1998–2000** |
| California | 31 | 5 | 2 | 2 |
| Florida | 3 | 4 | 5 | 4 |
| Illinois | 6 | 4 | 1 | 1 |
| Maryland | 8 | 9 | 3 | 7 |
| Mississippi | 1 | 9 | 5 | 18 |
| New Jersey | 7 | 6 | 2 | 1 |
| New York | 2 | 4 | 5 | 12 |
| Ohio | 1 | 5 | 3 | 12 |
| Pennsylvania | 17 | 11 | 3 | 3 |
| Texas | 3 | 15 | 44 | 19 |
| West Virginia | 3 | 12 | 11 | 5 |

NOTE: Includes all states with at least 2 percent of filings during any time period.

Some of the states and venues in which asbestos filings have been concentrated are areas with high levels of civil litigation generally. In 2000, New York and California led the nation in absolute numbers of civil case filings, with New Jersey in

fourth place, and Texas following in eighth position (National Center for State Courts, 2001). Maryland led the nation in per capita civil case filings, with New Jersey and New York following in fifth and sixth places, respectively. But the concentration of asbestos filings across states and among venues within states primarily reflects the character and history of asbestos litigation, as well as the perceived advantages that different venues offer plaintiffs. New York, where many workers were exposed to asbestos in the Brooklyn Navy Yards, barred asbestos latent injury claims until 1988, when it amended its statute of limitations. After 1988, many asbestos claims were filed in New York state courts, explaining the increasing concentration of filings observed in that state. Many firms developed asbestos specialty practices because they were located in regions with high asbestos exposure. Not surprisingly, they tended to file cases in states and venues in these regions. This explains the concentration observed, for example, in Maryland and Texas.

The differences in procedural rules and practices (e.g., joinder, consolidation, inactive dockets, expedited dockets, and discovery rules) and in substantive law (e.g., criteria for legal injury, "two disease" rules) described earlier in this chapter also help to explain forum and venue choice. Whereas formal procedural rules and state substantive doctrine apply to all cases within a state, informal judicial management practices, which vary from court to court, may make some venues more attractive to plaintiffs or defendants. Case management and trial schedules may be viewed as conferring advantages on plaintiffs or defendants. Judges or juries in some jurisdictions are regarded as being more or less friendly to plaintiffs than judges or juries in other jurisdictions.

By the mid-1990s, three counties in Texas (Harris [Houston], Galveston, and Jefferson [Beaumont]) accounted for more than 25 percent of all new filings in all state courts across the country. In the late 1990s, two counties in Mississippi (Jefferson [Natchez] and Claiborne [Vicksburg]) joined the list of venues attracting large numbers of claims. In 1998–2000, close to 20,000 cases, more than 10 percent of the total filed over that period, were filed in these two counties (see Table 3.4).

Sharp changes in filing patterns over time more likely reflect changes in parties' strategies in relationship to changes in the (perceived) attractiveness (or lack thereof) of state substantive legal doctrine or procedural rules, judicial case management practices, and attitudes of judges and juries toward asbestos plaintiffs and defendants, than changes in the epidemiology of asbestos disease.

### Distribution of Jury Trials

The concentration of claims in certain jurisdictions and venues is reflected in the distribution of jury trials by state and county. From 1993 to 2001, 65 percent of trials that resulted in verdicts were held in just five states: Pennsylvania, Texas, California,

**Table 3.4**
**Distribution of State Court Filings by Venue**

| 1970–1987 | | | 1988–1992 | | |
|---|---|---|---|---|---|
| State | Venue | % | State | Venue | % |
| CA | Los Angeles County | 14.3 | MS | 19th Circuit Jackson County | 8.4 |
| CA | San Francisco County | 7.6 | WV | 13th Circuit Kanawha County | 7.8 |
| PA | Philadelphia County | 7.5 | MD | 8th Circuit Baltimore City | 6.7 |
| MD | 8th Circuit Baltimore City | 6.4 | NJ | Middlesex County | 4.5 |
| CA | Alameda County | 5.9 | PA | Philadelphia County | 3.9 |
| NJ | Middlesex County | 4.5 | TX | Orange County | 3.7 |
| IL | 3rd Circuit Madison County | 3.8 | TX | Morris County | 3.6 |
| PA | Cambria County | 2.7 | NY | New York County | 3.5 |
| PA | Allegheny County | 2.4 | CA | Los Angeles County | 2.5 |
| WA | King County | 2.4 | OH | Summit County | 2.5 |
| | | | TX | Harris County | 2.3 |
| | | | IL | 3rd Circuit Madison County | 2.1 |
| | | | FL | 4th Circuit Duval County | 2.0 |

| 1993–1997 | | | 1998–2000 | | |
|---|---|---|---|---|---|
| State | Venue | % | State | Venue | % |
| TX | Harris County | 11.0 | OH | Cuyahoga County | 11.7 |
| TX | Galveston County | 9.9 | MS | 6th Circuit Jefferson City | 8.8 |
| TX | Jefferson County | 6.8 | NY | New York County | 8.0 |
| NY | New York County | 4.7 | MD | 8th Circuit Baltimore City | 6.8 |
| WV | 17th Circuit Monongalia County | 4.3 | MS | 9th Circuit Claiborne County | 3.9 |
| WV | 13th Circuit Kanawha County | 3.5 | NY | Erie County | 3.5 |
| MD | 8th Circuit Baltimore City | 3.0 | WV | 2nd Circuit Marshall County | 2.6 |
| TX | Morris County | 2.5 | TX | Jefferson County | 2.3 |
| WV | 2nd Circuit Marshall County | 2.4 | | | |
| MI | 10th Circuit Saginaw County | 2.3 | | | |
| OH | Cuyahoga County | 2.3 | | | |
| LA | Civil District Orleans Parish | 2.2 | | | |
| TX | Brazoria County | 2.1 | | | |

NOTE: Includes all courts with at least 2 percent of state court filings in any period.

Louisiana, and Maryland (see Figure 3.19). These states also had a slightly higher ratio of plaintiffs to trials: 75 percent of plaintiffs whose claims went to verdict presented their case in one of these five venues.

The distribution of trials has changed over time, mirroring changes in the distribution of filings. Pennsylvania at one time accounted for 50 percent of plaintiffs whose claims reached verdict; more recently, the proportion of plaintiffs whose claims reached verdict in Pennsylvania dropped to less than 20 percent. In the three most-recent years for which we have data, Texas and Maryland together accounted

**Figure 3.19**
**Distribution of Trials and Claims by State**



RAND *MG162-3.19*

**Figure 3.20**
**Distribution of Claims Tried to Verdict by State and Year**



RAND *MG162-3.20*

for the largest share of claims tried to verdict (see Figure 3.20). But the share of ver-
dicts in a single state may be misleading as an indicator of general patterns: Louisiana
is among the top five states for trial verdicts because of the single verdict in a case

brought by 126 plaintiffs in 1996, reflecting the potential for a single consolidated trial to shape the profile of asbestos litigation in any year.

## Bankruptcy Litigation

Since the early 1980s, asbestos litigation in federal and state courts has played out against a background of parallel litigation in the bankruptcy courts, which has influenced the primary litigation against non-bankrupt defendants and, in turn, has been shaped by that litigation. When the Manville Corporation filed for Chapter 11 reorganization in 1982, it temporarily disrupted asbestos litigation patterns, as plaintiffs and non-bankrupt defendants alike sought to prevent the stay of litigation against Manville, which had until then been the lead defendant in the litigation (Hensler et al., 1985). The difficulties attendant on estimating the financial exposure of the Manville Bankruptcy Trust (discussed further in Chapter Six) highlighted for non-bankrupt defendants the difficulties of estimating their own future liabilities. The Manville bankruptcy reorganization at first provided cautionary lessons on the use of bankruptcy to resolve asbestos claims. But after Congress amended the bankruptcy statute to facilitate the creation of post-bankruptcy trusts to resolve asbestos injury claims, many looked to the Manville Trust as a model for aggregating claims and capping corporate liability exposure due to asbestos even for those corporations that were not at the time facing bankruptcy themselves (Glater, 2000, p. C4).

As the early Chapter 11 reorganizations were approved by the courts and the trusts that were established by the reorganizations began to pay claims, the ability to collect compensation through a streamlined administrative process may have been a factor in attracting new plaintiff law firms to asbestos litigation (see Table 3.1) and also may have helped fund ongoing litigation outside the bankruptcy courts. Although the trusts paid only modest sums to each claimant, the total fees available to law firms for representing large numbers of claimants on their trust filings could be substantial.[91] When increasing asbestos claims rates encouraged scores of defendants to file Chapter 11 petitions (discussed in Chapter Six), the resulting stays in litigation against these defendants drove plaintiff attorneys to press peripheral non-bankruptcy defendants to shoulder a larger share of asbestos claims value and to widen their search for other corporations that might be held liable for the costs of asbestos exposure and disease. In addition, the surge of filings for Chapter 11 reorganization in early 2003 may have provided another incentive for some asbestos plaintiff law firms to seek representation of large numbers of asbestos claimants: Under Section 524(g) of the bankruptcy code, a proposed reorganization plan must obtain support from 75 percent of current asbestos claimants to win court approval, meaning that law

---

[91] For a discussion of the economics of mass filings of small-value cases, see McGovern (2002).

firms that represent large numbers of claimants will wield the most power over the reorganization negotiations (Parloff, 2004).

As bankruptcy proceedings have expanded to include most of the original lead defendants in asbestos litigation and scores of other companies besides (see Chapter Six), the dynamics of these proceedings have come increasingly to mirror the dynamics of the primary litigation in federal and state courts. Borrowing from case management practices in trial courts, district courts have consolidated multiple bankruptcy reorganizations and assigned mass tort "specialist" judges to preside over them.[92] Parties have sought to transfer[93] related claims to bankruptcy courts in the hope of achieving an attractive global resolution of those claims.[94] In the USG Corporation bankruptcy, Judge Alfred Wolin ordered that claimants with cancer would have their claims processed before claimants with non-cancer injuries, essentially establishing an expedited docket. Judge Wolin also appointed special masters and mediators to work with bankruptcy parties to achieve consensual reorganization plans, just as Judge Tom Lambros and Judge Robert Parker (among others) had earlier appointed special masters and mediators to work with parties in the trial courts.[95] And seemingly borrowing a page from the controversial "futures" settlements that were rejected by the U.S. Supreme Court in *Amchem* and *Ortiz*, lawyers have sought to fashion resolutions of bankruptcy claims against a number of major corporations that offer attractive settlements of current claims in exchange for support for reorganization plans that will determine payments of other claimants far into the future (Plevin et al., 2003; Parloff, 2004).

---

[92] See "3rd Circuit Judge Orders 5 Bankruptcies . . ." (2001) (announcing the decision of Chief Judge Edward Becker to assign multiple bankruptcies to Judge Alfred Wolin of the District Court of New Jersey). Judge Wolin appointed two bankruptcy court judges to assist in managing the reorganizations. Subsequently, Judge Wolin was removed from three of the cases by the Third Circuit Court of Appeals and then retired from the bench, handing over supervision of the two remaining cases. See Freudenheim (2004).

[93] *In re USG Corp.*, No. 01-2094, Mem. Op. and Order (Bankr. Del. Feb. 19, 2003). Judge Wolin was subsequently removed from this case. See Freudenheim (2004).

[94] See "Consolidated Bankruptcy Judge Transfers . . ." (2001) (reporting motion by General Motors, Ford, and Daimler-Chrysler to transfer asbestos lawsuits against them to bankruptcy court, under the court's authority to handle "related cases"). The "friction defendants," who also included other automobile and automobile product manufacturers, reportedly hoped to achieve a nationwide dismissal of claims against them as a result of hearings (required by the U.S. Supreme Court's decision in *Daubert v. Merrell Dow Pharms.*, 516 U.S. 869 [1995]) at which they planned to challenge the scientific evidence underlying the claims. Ultimately, the claims against the auto manufacturers were remanded to the state courts in which they have been filed. See "Federal Judge Denies Big 3 . . ." (2002); Berke (2002); *In re Federal-Mogul Global, Inc.*, 300 F.3d 368 (2002).

[95] See "Judge Wolin Appoints Consultants . . . " (2002) (reporting appointment of five consultants to serve as special masters). The special masters included David Gross, whose firm defended the Manville Corporation prior to its 1982 filing for Chapter 11 reorganization, and Francis McGovern, who served as special master to Judges Lambros and Parker in their asbestos case management activities described earlier in this chapter. McGovern was also appointed to serve as mediator in the Federal-Mogul, Babcock & Wilcox, and Owens-Corning bankruptcy proceedings. See "Delaware Bankruptcy Judge Appoints Mediator . . ." (2002) and "Owens Corning Files Motion . . ." (2002).

Some have argued that bankruptcy trusts, including those established as the result of "prepackaged" bankruptcies (discussed in Chapter Six), will provide swifter, less expensive, and more certain compensation for asbestos injury victims, while allowing society to realize the value of a defendant corporation's activities. Others contend that reorganization plans that provide payments far into the future to large numbers of functionally unimpaired claimants—in some instances, after substantial assets have been committed to pay current functionally unimpaired claimants—threaten the ability of trusts to conserve resources for seriously injured claimants who will come forward in the future. Others question whether proposed bankruptcy trust plans that rely on insurance assets whose availability is in some instances itself in contention will prove solvent. Whether and to what extent bankruptcy litigation will solve the central issues of asbestos litigation—providing adequate compensation to the seriously injured, achieving efficient and fair resolution of asbestos claims, predicting future claiming patterns, estimating future claim values, and regulating conflicts of interest—is currently unclear.

CHAPTER FOUR
# Claimants and Defendants

In this chapter, we estimate the total number of claimants and defendants involved in asbestos litigation between the mid-1970s, after *Borel v. Fibreboard*, and 2002. We also describe trends in the types of injury claims and the industries represented by defendants named in the litigation. Although we cannot disclose the names of asbestos defendants, we can identify the proportion of defendants from various industries and the changes in that proportion over time.

## Asbestos Claimants

### Approach to Estimating Total Number
It is not easy to answer the most basic questions about asbestos litigation, such as how many claimants and defendants have been involved in the litigation. There is no national registry of asbestos claimants. Some claims are not filed formally in court as lawsuits. Federal courts report the number of asbestos lawsuits filed, but in recent years most lawsuits have been filed in state courts, which do not routinely identify and report annual asbestos lawsuit filings. Privately held information about asbestos litigation is regarded as highly sensitive by those who hold it, because information about historical trends in asbestos litigation may have significance for current and future settlement negotiations and outcomes and for other business and law firm transactions. Hence, most private parties are willing to share data only under confidentiality agreements on a not-for-attribution basis.

The only way to estimate the total number of claimants in these circumstances was to obtain confidential data from many participants in the litigation. In each instance, we specified the data we sought and conducted sufficient investigation (for example, comparing information from multiple sources) to assure ourselves that the data provided to us were reliable. We used only data that we confirmed with other data or with other participants in the litigation.

We compared lists of claimants provided by defendants and personal injury trusts established subsequent to Chapter 11 reorganization and deleted redundant entries to identify the number of unique individuals who had filed asbestos personal

injury claims by the end of 2002. In making these comparisons, we deleted claimants on each list for which we did not have adequate information to determine whether those claimants were also included on any of the other lists. We also recognized that claimants occasionally filed a suit naming several defendants and then, at a later date, added defendants or filed a claim with a trust or against other defendants. We counted each claimant once, in the year in which they initially filed a claim, regardless of whether they subsequently filed additional claims. In all, we identified about 710,000 unique individuals who had brought an asbestos claim by the end of 2002, the end of our main field research study period.

We then examined the observations we had deleted because the information we needed to identify those claimants was missing. We suspect that the large majority of the claimants on any one list for whom we lacked adequate information to determine if they were also on another list did in fact appear on another list. However, some of the claimants we deleted from one list because of inadequate identification information may not have been represented on any of our other lists and therefore are not included in the 710,000-claimants estimate. We assumed that the probability that a claimant with missing information on one list was also on another list equaled the probability that a claimant on the first list for whom we had complete information was also on some other list. Applying these probabilities to the observations left out of the comparisons because of missing information, we estimated that our data included approximately 20,000 additional individuals who had filed asbestos personal injury claims by the end of 2002.

We had intended to examine the distribution of injuries claimed by asbestos claimants. However, we discovered that defendants do not generally agree on a classification scheme for nonmalignant injuries. For example, one defendant who provided information to us classified all nonmalignant claims into five categories. Another defendant divided them into 28 different categories, none of which matched any of the five categories used by the first defendant. Further, several defendants told us that they had changed the systems they used to classify nonmalignant claims over time. In these cases, we cannot even consistently classify nonmalignant claims by categories over time for the same defendant, let alone merge that defendant's claims data with the data provided by other defendants and trusts. Thus, in the subsequent discussion, while we are able to distinguish among mesothelioma claimants, other-cancer claimants, and nonmalignant claimants, we have not been able to break down nonmalignant claimants into finer categories.

**Results**

**Approximately 730,000 People Had Filed an Asbestos Claim Through 2002.**
Table 4.1 shows the number of individuals identified in our data that filed an asbestos personal injury claim, broken out by the year of the filing and the category of the

**Table 4.1**
**Number of Claimants by Claimed Injury**

| Year | Claimed Injury | | | |
|---|---|---|---|---|
| | Mesothelioma | Other Cancer | Nonmalignant | Total |
| Before 1980 | 238 | 467 | 3,431 | 4,136 |
| 1980 | 222 | 528 | 3,415 | 4,165 |
| 1981 | 264 | 587 | 3,881 | 4,732 |
| 1982 | 291 | 604 | 3,984 | 4,879 |
| 1983 | 324 | 657 | 3,579 | 4,560 |
| 1984 | 423 | 879 | 4,822 | 6,124 |
| 1985 | 519 | 1,202 | 7,681 | 9,402 |
| 1986 | 660 | 1,964 | 12,675 | 15,299 |
| 1987 | 972 | 2,997 | 17,087 | 21,056 |
| 1988 | 1,266 | 3,292 | 24,713 | 29,271 |
| 1989 | 2,411 | 6,376 | 45,151 | 53,938 |
| 1990 | 1,275 | 2,386 | 21,357 | 25,018 |
| 1991 | 979 | 2,451 | 19,322 | 22,752 |
| 1992 | 971 | 2,569 | 26,343 | 29,883 |
| 1993 | 817 | 2,151 | 23,005 | 25,973 |
| 1994 | 1,207 | 2,536 | 20,702 | 24,445 |
| 1995 | 1,306 | 3,624 | 43,283 | 48,213 |
| 1996 | 1,312 | 2,887 | 43,824 | 48,023 |
| 1997 | 1,347 | 3,132 | 28,978 | 33,457 |
| 1998 | 1,387 | 2,828 | 38,539 | 42,754 |
| 1999 | 1,520 | 2,863 | 40,815 | 45,198 |
| 2000 | 1,776 | 2,623 | 52,055 | 56,454 |
| 2001 | 1,893 | 3,639 | 89,308 | 94,840 |
| 2002 | 1,856 | 3,148 | 50,112 | 55,116 |

claimed injury. The data presented in Table 4.1 do not include the approximately 20,000 individuals who we estimate had filed asbestos personal injury claims by the end of 2002 but for whom we lacked the information necessary to determine whether they were included on more than one of our lists. We had no way to estimate either the year in which they filed a claim or their claimed injury.

We conclude that approximately 730,000 individuals brought an asbestos-related personal injury claim by 2002, including the 710,000 claimants included in Table 4.1 and the estimated 20,000 claimants we omitted because of missing information. We believe this number is probably an underestimate. It is possible that some individuals brought asbestos claims but did not name any of the defendants from whom we had obtained data and therefore were not included on any of the lists of claimants that defendants made available to us. Because the entities that provided these lists include defendants that have been prominent in asbestos litigation, we be-

lieve there are few claimants who did not name any of those defendants. Nonetheless, there are likely to be some claimants who are not included on any of the various lists of clients provided to us.

The sharp surge in claimants filing asbestos claims in 1988 and 1989 probably reflects the impact of the establishment of the Manville Trust in 1988. Claims against the Johns Manville Corp. were stayed when the corporation filed for Chapter 11 bankruptcy in 1982. It appears that many potential claimants postponed filing claims until the Trust was established.

**The Number of Claims Filed Annually Has Increased Sharply in the Past Few Years.** As shown in Table 4.1, the annual number of individuals filing asbestos injury claims has grown sharply over time, particularly in recent years. The early 1980s typically saw about 5,000 claims per year. In the late 1980s and early 1990s, the annual rate of new claims grew to roughly 25,000 claims per year. By the mid- to late 1990s, roughly 50,000 claims per year were being filed.

This surge in the annual number of filings has been reflected in the filings experienced by individual defendants. Figure 4.1 shows the number of claims filed each year over the 1990s against five major defendants, including a bankruptcy trust, two defendants who have entered bankruptcy, and two non-bankrupt corporations. (We include only five defendants on the chart so as not to obscure the details of each defendant's experience.) Each of these defendants has a particular posture in the litigation, so we would not expect their experiences to be identical. Nor would we expect their experiences to be representative of all defendants. However, in dozens of interviews we conducted with participants on all sides of the litigation, there has been near universal agreement that these defendants' experiences are broadly representative of the patterns of asbestos claim filings over the 1990s.

The sharp year-to-year changes in the annual number of filings against each of these defendants reflect events in the litigation in general or in the circumstances of a particular defendant. The general pattern, however, is the same for all of them: Over the past decade, the number of claims filed annually against each of these defendants has increased substantially. Four of them were each receiving 15,000 to 20,000 claims per year at the beginning of the 1990s. That number grew throughout the decade until, by 2000, it had grown to roughly 50,000 claims per year. The bottom line in Figure 4.1 shows one defendant that appeared to have the litigation under control in the early 1990s, when actually the annual number of claims against it was drifting downward. But even that defendant experienced a sharp increase in claims toward the end of the decade.

Whether these trends will continue into the future is an open question. But it is clear from our interviews with participants in the litigation that recent changes in filing rates have played an important role in shaping the future expectations of attorneys, parties to the litigation, policymakers, and business analysts.

**Figure 4.1**
**Annual Number of Claims Against Five Major Defendants, 1991–2000**



RAND *MG162-4.1*

**Claimants with Nonmalignant Injuries Account for Most of the Growth in Claims.** Claims for nonmalignant injuries grew sharply through the late 1990s and early 2000s. Almost all the growth in the asbestos caseload can be attributed to the growth in the number of these claims, which include claims from people with little or no current functional impairment. Many of the participants we interviewed, including those involved on behalf of both plaintiffs and defendants, cited the rapid growth in the annual number of claims for nonmalignant injuries as the most important recent trend in the litigation.

Figure 4.2 shows the trends in the annual numbers of new claimants alleging each type of injury relative to the number of new claimants who had alleged that type of injury before 1980. It is clear that throughout the 1980s, claims for mesothelioma, other cancers, and nonmalignant injuries grew at approximately the same rate. The lines in Figure 4.2, which show the relative annual numbers of new claimants alleging each type of injury, are almost exactly the same. Even the 1988–1989 spike in new claimants reflects the same relative changes for each injury type.

However, beginning in the early 1990s, the annual number of new claimants alleging a nonmalignant injury has grown much faster than the annual number of

74    Asbestos Litigation

**Figure 4.2**
**Trends in the Number of Claims by Type of Injury**



RAND *MG162-4.2*

new claimants alleging some form of cancer. The growth in the annual number of claims is almost entirely due to increases in the numbers of nonmalignant claims entering the system.

**The Number of Claimants with Mesothelioma Has Been Increasing in Recent Years.** Figure 4.2 also reveals a recent upward trend in the number of mesothelioma claims filed annually. Leaving aside the 1989 spike in claims, through the late 1980s and early 1990s, the number of mesothelioma claims filed each year was about five times the number of such claims filed before 1980. Beginning in 1994, however, the annual number of mesothelioma claims filed grew each year until, by 2002, it had approximately doubled from the corresponding early 1990s numbers.

Although the annual number of mesothelioma claims grew over the decade, the absolute number of these claims is very small compared with the absolute number of nonmalignant claims. Hence, the growth in the annual number of mesothelioma claims accounted for only a very small part of the growth in the total number of claims entering the system each year. Nonetheless, because these are the most serious—and consequently most costly—injuries, some of the attorneys we interviewed cited the growth in the annual number of mesothelioma claims as the most important change in the litigation in the late 1990s and early 2000s.

Claims for other cancers grew during the first half of the 1990s, then gradually declined. The annual number of claims for cancers other than mesothelioma ended the decade at a level roughly 10 percent greater than had been experienced at the outset of the decade.

**Claimants with Nonmalignant Conditions Are a Growing Proportion of All Claimants.** The rapid growth in the annual number of claims filed for nonmalignant conditions has profoundly affected the overall distribution of claims entering the system. As Figure 4.3 shows, nonmalignant claims accounted for roughly 80 percent of all claims entering the system through the mid-1980s. The fraction of claims that asserted nonmalignant conditions grew through the late 1980s and early 1990s, rising to more than 90 percent of annual claims in the late 1990s and early 2000s.

Although the annual number of mesothelioma claims has been increasing in recent years, the number of all claims has been increasing much faster. Therefore, mesothelioma claims are decreasing as a proportion of the whole. They accounted for 6–7 percent of all claims in the 1970s and early 1980s, but fell as a percentage of total claims in the mid-1980s, accounting for roughly 4–5 percent of claims through most of the 1980s. In the late 1980s, the mesothelioma share of the claims entering the system each year fell further, to roughly 3 percent of all claims, and remained at that level through the early 2000s.

Claims for other cancers exhibit a similar pattern. They accounted for 11–14 percent of annual total claims through the 1970s and most of the 1980s. The other-cancer share of claims declined through the 1990s to about 5 percent of the total in the early 2000s.

**Some Evidence Suggests That Most Nonmalignant Claimants Are Currently Unimpaired.** The fraction of claimants with nonmalignant diseases that are functionally unimpaired at the time they file a claim is a source of sharp controversy. It is difficult to determine this fraction or to examine trends in the distribution of claims by injury severity because there is no database in which claimants' medical data are consistently and reliably entered over time. The only information on severity of

**Figure 4.3**
**Annual Distribution of Claims by Type of Injury**



injury, including the existence of impairment, comes from limited studies in which an analyst draws a sample of individual claims from defendants' files and reviews the medical information provided by the claimants to determine whether the information in the file offers evidence that the claimant was impaired.

In 1995, the Manville Trust implemented an audit program in which independent B Readers (physicians who read X-rays with B Readings) reviewed the X-rays from a random sample of claimants.[1] The Trust operates under the supervision of federal district court judge Jack B. Weinstein. The B Readers were selected in consultation with the plaintiffs' bar; none of the B Readers employed in the audit had testified on behalf of an asbestos defendant. The X-ray review process was designed to give the benefit of any doubt to the claimant. Two B Readers reviewed each claim in the sample. A claim was downgraded only if both B Readers independently determined that they saw no indication of even low-level, sub-diagnostic X-ray evidence of interstitial fibrosis. According to an affidavit filed with the court, ". . . of the X-rays the Trust actually received, approximately 50% failed independent B-reader review."[2]

Several more-recent studies have found fractions of unimpaired claimants ranging from two-thirds to up to 90 percent of all current claimants (Edley and Weiler, 1993; Bernick et al., 2001a; Rourke, 2001; Chambers, 2002). Because most of these studies were commissioned by defendants, and because the issue of impairment is central to the asbestos litigation controversy, their findings are hotly contested.

Based on the available data, we conclude that a large and growing proportion of the claims entering the system in recent years was submitted by individuals who had not at the time of the claim filing suffered an injury that had as yet affected their ability to perform the activities of daily living.

**Claims Filed by Workers Exposed to Asbestos in Nontraditional Industries Are Increasing.** Although people have been exposed to asbestos in various ways and, hence, claims arise from various sources, most claims are based on exposure to asbestos in the workplace. In the early years of asbestos litigation following *Borel,* most claimants came from industries in which workers physically manipulated asbestos or products containing asbestos and typically inhaled large amounts of asbestos fibers on an everyday basis. Nicholson et al. (1982) focused on the industries in which occupational exposure to asbestos was substantial: asbestos mining, manufacture, or installation; shipyards; railroad and automobile maintenance; construction; chemicals; and

---

[1] According to the Centers for Disease Control (see http://www.cdc.gov/niosh/pamphlet.html), "NIOSH B-reader approval is granted to physicians who demonstrate proficiency in the classification of chest X-rays for the pneumoconioses using the International Labour Office (ILO) Classification System."

[2] Affidavit of Patricia G. Houser, *In re Manville Personal Injury Settlement Trust Medical Audit Procedures Litigation,* 98 Civ. 5693, March 13, 1999, p. 9.

utilities. Because workers in these industries were so heavily exposed to asbestos and, consequently, accounted for the large majority of claimants in the early days of the litigation, these industries are often termed the "traditional" industries.

More recently, however, there has been rapid growth in the numbers of claims brought by people working outside the traditional industries where they typically did not handle asbestos but asbestos was present in the workplace atmosphere. For example, in the early 2000s, workers in the textile industry brought large numbers of claims (Claims Resolution Management Corporation, 2001). Textile workers sometimes work with machines run by motors with gaskets that contain asbestos or in facilities ventilated by ducts lined with asbestos. Those workers may have inhaled asbestos fibers released into the air, but they are not likely to have inhaled as much as shipyard workers—who worked in enclosed, tight quarters, in an atmosphere thick with asbestos fibers—or asbestos installers.

Table 4.2 compares trends in claiming from individuals who were exposed to asbestos in traditional and nontraditional industries. As the table shows, the rate of increase in claims from workers in nontraditional industries is such that there are now about as many of those claims filed annually as there are claims from workers in traditional industries. The growth in claims from workers in nontraditional industries is an example of how unpredictable asbestos litigation has become. Earlier projections of the magnitude of the litigation, based on Nicholson et al. (1982), did not take into account these claims.

The increasing number of claims filed by workers in nontraditional industries occurred during the same period that we observed an increase in the fraction of claims filed by workers with nondisabling, nonmalignant asbestos injuries.

**Table 4.2**
**Claims from Workers in Nontraditional Versus Traditional Industries**

|  | Number of Claims | | | % Increase | |
|---|---|---|---|---|---|
|  | 1999 | 2000 | 2001 | 1999–2000 | 2000–2001 |
| Traditional | 16,997 | 31,496 | 43,397 | 85 | 54 |
| Nontraditional[a] | 11,420 | 23,582 | 40,453 | 107 | 71 |

SOURCE: Claims Resolution Management Corporation, 2001.
[a]Food and beverage, textiles, paper, glass, iron/steel/nonferrous metals, durable (metal) goods, and other industries.

## Asbestos Defendants

### Approach to Estimating Total Number

Most asbestos claims name dozens of defendants, amplifying the effects of the litigation beyond what is observed in a more ordinary tort lawsuit against one or a few defendants. Moreover, as the litigation has continued and, in particular, as mounting bankruptcies have stayed litigation against defendants who formerly provided a substantial share of the compensation obtained by claimants (see Chapter Three), more defendants have been drawn into the litigation. A number of defendants, insurers, plaintiff and defense attorneys, and courts provided us, usually on a confidential basis, lists of entities that they knew had been named as defendants on asbestos product liability claims. Almost all of these defendants were businesses. Many are large corporations with thousands of employees and billions in annual revenues. Others are firms with as few as 20 employees and just a few million dollars in annual revenues. The lists also included a small number of government agencies and nonprofit entities.

When we merged these lists, the resulting list of defendants totaled 10,463 entities. We observed that some of the entities on the merged list were subsidiaries or branches of defendants rather than independent companies. We also observed some cases in which it appeared that a defendant's name had been misspelled on a list so the same defendant essentially appeared twice on the merged list. To develop a valid list of defendants that included only independent entities, we set out to verify the existence of the defendants on the merged list. At the same time, we identified the two-digit Standard Industrial Classification (SIC) code classification[3] for each of the companies we could verify, using the contemporary (2003) editions of InfoUSA[4] and Dun and Bradstreet's Hoover's Online.

We started the verification process as soon as we received the first lists of defendants. When it became clear that the number of defendants on the merged list was building into the thousands, we realized that it would take more time and resources than were available to us to verify all the entries on the entire merged list. When we stopped looking up every company on the merged list, we had verified almost 2,000 entities on InfoUSA and Hoover's. But we did not know whether the defendants on the lists we had obtained at the beginning of the process, when we began checking every defendant on a list provided to us, were representative of the entire population of defendants. Accordingly, we decided to draw a random sample of 500 defendants

---

[3] The U.S. Department of Commerce uses the SIC system to categorize economic activity for statistical purposes. The system is hierarchical. All types of economic activity are divided into a small number of very broad categories with narrower subdivisions. Every entity engaged in any type of economic activity in the United States is assigned an SIC code according to its primary activity.

[4] InfoUSA is a subscription database sold only to libraries, educational institutions, and government agencies.

from the merged list and to base our estimates of the number and type of defendants primarily on the random sample. We drew this sample from the entire merged list of defendants, including both those we had already looked up and those on the merged list that we had not yet verified.

### Results

At least 8,400 Entities Have Been Named as Asbestos Defendants Through 2002. We were able to identify 401 of the 500 defendants in the random sample. This implies that the number of unique defendants is about 8,391. We calculated the 95 percent confidence interval using the binomial approximation to the normal distribution. The result suggests that we can be 95 percent confident that the number of unique defendants is at least 8,025 and no more than 8,756. Accordingly, we estimated that about 8,400 firms have been named as defendants on asbestos personal injury claims.

This number is probably an underestimate. Because we collected lists of defendants through the end of 2002, our merged list did not include any entities named after 2002 as defendants on an asbestos claim for the first time. The sources we used to verify firms do not list firms that did not exist in 2002, even though they may have existed at some prior date. Thus, we would not have found firms that were named as defendants at some time before 2002 and subsequently ceased doing business under the names they had when they were named as a defendant. It is likely that some firms named as defendants before 2002 had been liquidated, were acquired by or had merged with another firm, or simply changed their name before 2002. Finally, in some cases, the name of the defendant was incomplete, and it was impossible to identify the particular entity against which the claim was brought.[5]

### Approach to Analyzing Distribution of Defendants Across Industries

We estimated the percentage of defendants in each two-digit SIC category based on our random sample. We assumed that the 99 companies we could not identify were randomly distributed among SIC categories. This random distribution is not verifiable, because we do not know whether the companies we could not classify were disproportionately drawn from particular SIC codes. As such, we used a LaPlace estimator of proportion:

---

[5] We had no way to determine the number of asbestos defendants that were not included on any of the lists provided to us. Those defendants would include both defendants that were named for the first time after 2002 and those that had not come to the attention of the individuals who provided us with lists of defendants. Also, our estimate does not include defendants that *did* appear on a list provided to us but that we could not identify. Such defendants would include both those that had liquidated or changed their names prior to 2002 and those whose names were misspelled on the lists provided to us. In sum, our estimate of 8,400 asbestos defendants probably underestimates the true number of entities that have been named as defendants on an asbestos claim.

$$p_i = (n_i + 0.5) / (n+1)$$

where $i$ indexes SIC codes. Without the 0.5 in the numerator and the 1 in the denominator, this would be a proportion. Using the LaPlace correction provides a moderate amount of smoothing. The estimated proportions were then rescaled such that they sum to 100 percent. We constructed 99 percent confidence limits for the estimates using the binomial approximation to the normal distribution based on the random sample.

In the initial stage of this analysis, when we were looking up the defendants on the full merged list, we identified and verified about 2,000 defendants. These defendants included a few whose primary industry was not included in the list of industries for the 401 defendants we identified in the random sample. Because the defendants we identified in the initial stage of the analysis were not drawn from a random sample, we could not simply combine the list of defendants from the random sample and the list of defendants from the initial stage of the analysis. However, if a defendant identified in the initial stage of the analysis fell into industry X, we know that industry X included at least one asbestos defendant even though no defendant among the 401 from the random sample was included in that industry. Rather than discard the information we obtained from the initial stage of the analysis, we used the classifications based on that stage of the analysis as lower limits. For example, if the initial stage of the analysis classified 100 defendants into industry X, then we know that the lower limit for industry X is 100/10,463 = 1 percent. It turned out that the lower limits often fell within the usual confidence intervals rather than below the lower limit. For example, for industry X, the confidence interval might have been [0.6–2.0], but we know that the lower limit had to be at least 1 percent for industry X. We, therefore, reconstructed the confidence intervals to ensure that the lower limit (e.g., 1 percent) is less than or equal to the lower confidence interval limit (e.g., 0.6 percent).

We computed the lower limit as the maximum of the lower limit and the lower confidence limit. In the above example, the minimum is max(0.6 percent, 1 percent) = 1 percent. We then adjusted the upper limit to reflect the change of the lower limit. We treated this as a truncated normal distribution where the truncation occurs at the lower limit. We compute the upper confidence limit to correspond to the 99th percentile of the non-truncated probability mass function. Computationally, this can be accomplished by adjusting the confidence level on the untruncated normal distribution as follows:

New level $= 1 - [(1 - \text{old level}) (1 - \Phi(\text{lower limit}))]$

where $\Phi()$ refers to the cumulative distribution function of the normal distribution, lower limit is the percentage that is already classified to this category based on the

initial stage of the analysis, and old level is the usual confidence level. Here, we use a usual confidence level of 0.99. This new confidence level is used only to adjust the upper confidence limit.

To carry the example further, we need to make more assumptions. We know that the (mean) estimate is the midpoint of the confidence interval (0.6,2.0), thus the estimate is 1.3 percent. Further, assume the standard deviation is 0.35. Then

$$\Phi(\text{lower limit}) = \Phi((1.0 - 1.4)/0.35) = 0.127$$

Accordingly, the new level is 0.9987. Finally, the upper confidence limit needs to be computed based on normal theory in the usual way. Because the new level is higher than the old level (0.99), the upper confidence limit will be larger than before. Since the lower limit is also larger than before, this is exactly the desired effect.

To illustrate these calculations with another value, suppose there is no lower limit (i.e., the lower limit equals minus infinity), then the new level turns out to be the old level (as it should) because $\Phi(-\text{infinity}) = 0$.

In summary, the confidence limits were revised because the lower confidence limit often was lower than the lower limit. After the lower limit was adjusted, the upper limit also needed adjustment.

Throughout, we chose a larger confidence limit than is usually used in analyses such as these (99 percent versus 95 percent), because we construct confidence limits for a large number of categories. The larger the number of categories, the more likely it is that one of the confidence intervals does not contain the true percentage.

**Results**

   **Defendants Are Distributed Across Most Industries.** Asbestos litigation has spread well beyond the asbestos-related manufacturing and installation industries where it first began to touch almost every form of economic activity that takes place in the United States. We found that 75 out of a total of 83 different industries in the SIC system at the two-digit level included at least one firm that had been named as an asbestos litigation defendant.

Table 4.3 presents our estimates of the fraction of asbestos litigation defendants in each two-digit SIC industry. It also presents the confidence intervals for these estimates.

It should be noted that some entities pursue business activities in multiple industries. Hence, a claim against an entity may have been based on activities outside its principal business activity. Therefore, these data indicate the spread of the litigation in terms of the distribution of entities named as defendants across SIC codes and do not necessarily indicate the range of economic activities that have given rise to asbestos claims.