82   Asbestos Litigation

**Table 4.3**
**Distribution of Defendants by SIC Two-Digit Industry Code**

| SIC Code | Industry | Defendants (%) | Confidence Limits (%) Lower 99% | Upper 99% |
|---|---|---|---|---|
| 1 | Agricultural Production Crops | 3.4 | 3.4 | 3.6 |
| 7 | Agricultural Services | 0.3 | 0.1 | 0.9 |
| 9 | Fishing, Hunting, and Trapping | 0.1 | 0.0 | 0.4 |
| 10 | Metal Mining | 0.1 | 0.0 | 0.4 |
| 12 | Coal Mining | 0.1 | 0.1 | 0.5 |
| 13 | Oil and Gas Extraction | 1.7 | 0.4 | 3.0 |
| 14 | Mining and Quarrying of Nonmetallic Minerals, Except Fuels | 1.3 | 0.4 | 2.5 |
| 15 | Building Construction General Contractors and Operative Builders | 4.3 | 2.2 | 6.4 |
| 16 | Heavy Construction Other Than Building Construction Contractors | 1.1 | 1.1 | 1.2 |
| 17 | Construction Special Trade Contractors | 9.9 | 6.8 | 12.9 |
| 20 | Food and Kindred Products | 2.9 | 2.9 | 3.3 |
| 21 | Tobacco Products | 0.4 | 0.4 | 0.6 |
| 22 | Textile Mill Products | 0.3 | 0.0 | 0.9 |
| 23 | Apparel and Other Finished Products Made from Fabrics and Similar Materials | 0.3 | 0.2 | 0.9 |
| 24 | Lumber and Wood Products, Except Furniture | 0.9 | 0.1 | 1.9 |
| 25 | Furniture and Fixtures | 0.5 | 0.2 | 1.3 |
| 26 | Paper and Allied Products | 0.5 | 0.0 | 1.2 |
| 27 | Printing, Publishing, and Allied Industries | 0.3 | 0.2 | 0.9 |
| 28 | Chemicals and Allied Products | 4.3 | 2.2 | 6.4 |
| 29 | Petroleum Refining and Related Industries | 1.3 | 1.3 | 1.9 |
| 30 | Rubber and Miscellaneous Plastics Products | 1.5 | 0.4 | 2.8 |
| 31 | Leather and Leather Products | 0.7 | 0.7 | 0.8 |
| 32 | Stone, Clay, Glass, and Concrete Products | 4.3 | 2.2 | 6.4 |
| 33 | Primary Metal Industries | 1.5 | 1.3 | 2.8 |
| 34 | Fabricated Metal Products, Except Machinery and Transportation Equipment | 4.9 | 2.7 | 7.1 |
| 35 | Industrial and Commercial Machinery and Computer Equipment | 4.3 | 2.2 | 6.4 |
| 36 | Electronic and Other Electrical Equipment and Components, Except Computer Equipment | 1.4 | 1.4 | 2.4 |
| 37 | Transportation Equipment | 1.5 | 0.5 | 2.8 |
| 38 | Measuring, Analyzing, and Controlling Instruments; Photographic, Medical, and Optical Goods; Watches and Clocks | 0.9 | 0.9 | 1.2 |
| 39 | Miscellaneous Manufacturing Industries | 0.3 | 0.3 | 0.9 |
| 40 | Railroad Transportation | 1.1 | 0.1 | 2.2 |
| 41 | Local and Suburban Transit and Interurban Highway Passenger Transportation | 0.3 | 0.3 | 0.9 |
| 42 | Motor Freight Transportation and Warehousing | 0.3 | 0.0 | 0.9 |
| 44 | Water Transportation | 8.9 | 6.0 | 11.8 |
| 45 | Transportation by Air | 1.5 | 1.5 | 1.6 |
| 47 | Transportation Services | 0.1 | 0.1 | 0.5 |
| 48 | Communications | 0.3 | 0.1 | 0.9 |
| 49 | Electric, Gas, and Sanitary Services | 1.3 | 0.1 | 2.5 |
| 50 | Wholesale Trade-Durable Goods | 9.5 | 6.5 | 12.5 |
| 51 | Wholesale Trade-Non-Durable Goods | 3.6 | 3.6 | 4.3 |

**Table 4.3—Continued**

| SIC Code | Industry | Defendants (%) | Confidence Limits (%) Lower 99% | Upper 99% |
|---|---|---|---|---|
| 52 | Building Materials, Hardware, Garden Supply, and Mobile Home Dealers | 1.9 | 0.7 | 3.3 |
| 53 | General Merchandise Stores | 0.4 | 0.4 | 1.0 |
| 54 | Food Stores | 0.3 | 0.1 | 0.9 |
| 55 | Automotive Dealers and Gasoline Service Stations | 0.5 | 0.0 | 1.2 |
| 56 | Apparel and Accessory Stores | 0.5 | 0.3 | 1.3 |
| 57 | Home Furniture, Furnishings, and Equipment Stores | 0.5 | 0.0 | 1.2 |
| 58 | Eating and Drinking Places | 0.1 | 0.1 | 0.5 |
| 59 | Miscellaneous Retail | 0.5 | 0.1 | 1.2 |
| 60 | Depository Institutions | 0.3 | 0.1 | 0.9 |
| 61 | Non-Depository Credit Institutions | 0.1 | 0.1 | 0.5 |
| 62 | Security and Commodity Brokers, Dealers, Exchanges, and Services | 0.3 | 0.0 | 0.9 |
| 63 | Insurance Carriers | 0.5 | 0.0 | 1.2 |
| 64 | Insurance Agents, Brokers, and Service | 0.7 | 0.2 | 1.6 |
| 65 | Real Estate | 1.3 | 0.3 | 2.5 |
| 67 | Holding and Other Investment Offices | 0.9 | 0.5 | 1.9 |
| 70 | Hotels, Rooming Houses, Camps, and Other Lodging Places | 0.5 | 0.4 | 1.3 |
| 72 | Personal Services | 0.3 | 0.2 | 0.9 |
| 73 | Business Services | 1.5 | 0.2 | 2.8 |
| 75 | Automotive Repair, Services, and Parking | 0.3 | 0.3 | 0.9 |
| 76 | Miscellaneous Repair Services | 0.3 | 0.1 | 0.9 |
| 78 | Motion Pictures | 0.2 | 0.2 | 0.5 |
| 79 | Amusement and Recreation Services | 0.3 | 0.0 | 0.9 |
| 80 | Health Services | 0.1 | 0.1 | 0.5 |
| 81 | Legal Services | 0.3 | 0.3 | 0.6 |
| 82 | Educational Services | 0.5 | 0.1 | 1.2 |
| 83 | Social Services | 0.3 | 0.3 | 0.9 |
| 84 | Museums, Art Galleries, and Botanical and Zoological Gardens | 0.1 | 0.0 | 0.5 |
| 86 | Membership Organizations | 0.3 | 0.0 | 0.9 |
| 87 | Engineering, Accounting, Research, Management, and Related Services | 2.1 | 0.6 | 3.6 |
| 89 | Services Not Elsewhere Classified | 0.6 | 0.6 | 0.7 |
| 91 | Executive, Legislative, and General Government, Except Finance | 0.5 | 0.0 | 1.2 |
| 92 | Justice, Public Order, and Safety | 0.1 | 0.1 | 0.5 |
| 94 | Administration of Human Resource Programs | 0.1 | 0.0 | 0.5 |
| 96 | Administration of Economic Programs | 0.3 | 0.0 | 0.9 |
| 99 | Nonclassifiable Establishments | 0.5 | 0.0 | 1.2 |

**Litigation Is Concentrated in Eight Industries.** Although asbestos litigation is widespread throughout the economy, it is spread very unevenly across industries, with only a handful of defendants in some industries and hundreds of defendants in others. Three industries, Construction Special Trade Contractors (SIC code 17), Water Transportation (44), and Wholesale Trade-Durable Goods (50), each contain

about 10 percent of all defendants. Five other industry classifications, Building Construction General Contractors and Operative Builders (15), Chemicals and Allied Products (28), Stone, Clay, Glass, and Concrete Products (32), Fabricated Metal Products, Except Machinery and Transportation Equipment (34), and Industrial and Commercial Machinery and Computer Equipment (35), each represent from 4 to 5 percent of the total. The remaining industries each contain smaller percentages of the defendants.

**It Was Not Possible to Identify How Often a Single Defendant Has Been Named.** Our data were not sufficient to estimate the number of claimants that had named any particular defendant or the defendants in any particular industry group. Most of those who provided lists of defendants to us had not attempted to count the number of times any particular defendant had been named. And, even in those instances in which someone was able to provide data on the number of times that they knew a particular defendant had been named, we had no way to determine the fraction of claims against that defendant included in their data.

Plaintiff attorneys, for example, know the defendants named on the claims they had filed. But the list of defendants they named on claims filed on behalf of claimants who were exposed to asbestos under one set of circumstances (e.g., site, duration, occupation, etc.) would generally differ from the list of defendants they named on claims filed on behalf of claimants exposed to asbestos under a different set of circumstances. While several plaintiff attorneys could provide the names of defendants to us, they generally did not have counts of the number of times they had named any particular defendant readily available. And they generally had no data on how often other plaintiff attorneys had named any of those defendants.

Similarly, defendants or defense attorneys know the names of the co-defendants on claims against them or their clients. But, because the list of co-defendants named on some claims can differ from the list of co-defendants on other claims, defendants generally did not have counts of the number of times any particular co-defendant had been named. Here, too, even if defendants or defense attorneys had maintained counts of the number of times a defendant had been named on claims against them or their clients, they still had no idea of how often that defendant had been named on claims on which they themselves had not been named.

In sum, we can identify those entities that have been named as a defendant on at least one asbestos claim. But we have no data on, or estimates of, how often any of those entities has been named on all claims combined. Consequently, while we can identify the range of industry groups that include at least one entity that has been named as a defendant on an asbestos claim, we cannot distinguish among industry groups that include entities named on large numbers of claims and industry groups that include entities named very infrequently.

The distribution of defendants across industries (see Table 4.3) suggests the groups for which it is likely that entities within those groups have generally experi-

enced substantial numbers of claims. Water Transportation (SIC 44), for example, includes between 6.0 percent and 11.8 percent of all defendants. This means that roughly 500 to 1,000 firms in that industry have been named on at least one asbestos claim. It seems very unlikely that so many different firms in the same industry would have been named on an asbestos claim unless the activities undertaken in that industry had led to substantial asbestos exposures which, in turn, suggests that a substantial number of claims have been filed against firms in that industry. Some of these firms may have seen very few claims, but it seems likely that if that many firms from the same industry have been named, some, or perhaps most, of them would have been named frequently.

Conversely, between 0.1 percent and 0.5 percent of the entities in the Health Services (SIC 80) industry had been named on an asbestos claim. This means that roughly eight to 40 Health Services firms have been named on at least one asbestos claim. It seems very unlikely that so few entities in the same industry would have been named on an asbestos claim unless substantial asbestos exposure is infrequent in that industry and, consequently, few entities in that industry see a substantial number of claims. One, or a few, of these firms may have seen a number of claims. But it seems likely that if that few firms have been named at all, most of them would have been named infrequently.

In sum, asbestos litigation has spread across the U.S. economy in the sense that at least one firm in each of 75 different industries has been named as a defendant on a claim. However, the concentration of the litigation is very uneven, with only a handful of defendants in some industries and hundreds of defendants in others. Three industries each contain about 10 percent of all defendants, five others each include about 4 to 5 percent of defendants, and the remaining industries each contain smaller percentages of the defendants. While we do not have estimates of the numbers of claims that name the defendants in each industry, it seems reasonable that the distribution of claims is roughly similar to the distribution of defendants. That is, it is likely that the entities in eight industries have generally seen substantial numbers of claims while the entities in the other 67 industries have each generally seen comparatively few claims.

There could, of course, be exceptions. There may be entities in the heavily impacted industries that have seen few claims, and there may be entities in the industries that include relatively few defendants that have been the target of large numbers of claims. However, it seems likely that while the litigation has spread across the U.S. economy, the litigation is still highly concentrated in certain industries in the sense that entities in the heavily impacted industries have probably been named relatively often while the entities in the less heavily impacted industries have been named only infrequently.

CHAPTER FIVE
# Costs and Compensation

In this chapter, we estimate the total amount of money spent on asbestos personal injury claims by defendants and insurers. We then estimate how much of the money spent on asbestos litigation was consumed by transactions costs and how much ended up in claimants' pockets. The components of those costs are illustrated in Figure 5.1.

*Total spending* refers to the net amount defendants and insurers combined spent on asbestos litigation. This sum is the amount defendants spent after being reimbursed from insurers and the amount insurers spent after being reimbursed by reinsurers. Total spending is broken down into defense transaction costs and the gross compensation paid to claimants. *Defense transaction costs* include the costs defendants and insurers incurred in all asbestos-related litigation, including litigation with other defendants and insurers. *Gross compensation* consists of claimants' legal fees and expenses and the claimants' net compensation. We discuss each of these components in this chapter, beginning with total spending. For each component, we first describe our approach to estimation and then present our findings. At the end of the chapter, we discuss estimates of future expenditures on asbestos litigation.

## Total Spending

### Approach to Estimation

There are no publicly available data on total spending on asbestos litigation, on the fraction of that amount that goes to transaction costs, or on the net compensation to claimants. We obtained confidential data and the results of proprietary studies from a variety of sources and used these data to estimate total spending on asbestos litigation from the inception of the litigation in the 1960s through 2002.

Our first step in estimating total spending was to estimate the number of claims closed each year through 2002, by type of claim (mesothelioma, other cancer, or nonmalignant injury). We used the methods described in Chapter Four to estimate the number of claimants who initially filed an asbestos claim in each year through 2002. Specifically, we compared the lists of claimants provided to us by defendants

**Figure 5.1**
**Components of Asbestos Litigation Costs and Compensation**



RAND *MG162-5.1*

and personal injury bankruptcy trusts to identify the number of unique individuals who had filed an asbestos personal injury claim in each year through the end of 2002. As we described earlier, in making these comparisons, we deleted the claimants on each list for whom we did not have adequate information to determine whether that claimant was also included on any of the other lists. We also recognized that claimants occasionally filed a claim naming several defendants and then, at a later date, added defendants or filed a separate claim with a personal injury bankruptcy trust or against other defendants. We counted each claimant once, in the year in which claimants initially filed a claim, regardless of whether they subsequently filed additional claims.

We then calculated the distribution of time-to-disposition for all defendants combined for each type of claim. The defendants and personal injury bankruptcy trusts who provided these data to us generally told us they believe they do not systematically settle claims faster, or slower, on average, than other defendants. In our interviews with other participants in the litigation, we asked if they could suggest defendants or personal injury bankruptcy trusts whom they thought were particularly quick, or slow, to settle claims. While a variety of entities were discussed in these conversations, the defendants and trusts in our database were not often mentioned. We assume that the distributions of time-to-disposition for the defendants and trusts that provided information to us are representative of the distribution of average time-to-disposition by type of claim for all defendants and personal injury bankruptcy trusts.

We assume that, on average, the share of the total claim value (assessed at the time of settlement) paid by a defendant is not related to how long, from the time of

filing, it takes for that defendant to settle the claim. Thus, if a defendant would pay, on average, X percent of the value of a particular claim if it settled that claim N years after it was filed, it would, on average, pay X percent of the value of that claim if it happened to settle that claim sooner, or later, than N years after the claim was filed. Then, the average share of the total value of a given claim paid by the defendants who settle that claim in any given year is independent of the year in which those defendants settle the claim. We multiplied the estimated number of claimants who filed each type of claim in each year by the distribution of time-to-disposition for that type of claim. The resulting numbers are estimates of the average percentage of the value of the claims of each type filed in each year that defendants paid in settlements in each subsequent year.

For example, on average, defendants settle about 6 percent of the claims brought against them within one year of when the claims are filed. Thus, we assume that, on average, a claimant will settle with about 6 percent of the defendants the claimant named within one year of when he or she brought the claims. We also assume that defendants' payments to claimants are independent of when they settle any particular claim. So, on average, the payments made to a claimant in any given year are proportional to the fraction of the defendants named by that claimant that settle with that claimant in that year. Under these assumptions, the payments a claimant receives within one year of when he or she files the claim will, on average, add up to about 6 percent of the value of the type of claim he or she alleged in that year. Similarly, defendants settle about 16 percent of the claims brought against them one to two years after the claims are filed. We assume that claimants will, on average, settle with about 16 percent of the defendants they name one to two years after they bring their claims and will receive from those defendants payments that will, on average, add up to about 16 percent of the value of claims for their alleged type of injury in that year. And this pattern of claims payments continues over future years.

The share any particular defendant or group of defendants pays on claims may vary over time in response to changes in the environment (e.g., a defendant's bankruptcy). We are assuming that claimants and their attorneys respond to changes in the environment (e.g., bankruptcy filings) by seeking larger settlements from viable defendants, naming larger numbers of defendants, and bringing new defendants into the litigation. In sum, we assume that, on average, a claimant receives the same share of the total value of his or her type of claim in any given year after filing his or her claim. The specific group of defendants that compensate any particular claimant at any particular time may differ from what the group would have been had the claim been filed at a different time.

We then obtained three independent estimates of what total spending on a claim of each type would have been, on average, in 2000, if all the defendants named on the claim had settled in that year. First, we interviewed defense attorneys, who represented several of the defendants who provided data to us, to obtain their esti-

mates of the share of the total value of each type of claim that the defendants they represented had paid, on average, in 2000. Because we knew what the defendants had paid, on average, in 2000 on claims of each type, we could use the attorneys' estimates of defendants' shares to estimate each attorney's implicit estimate of total spending on each type of claim by his or her defendant. Many of the defense attorneys we interviewed were not able to offer estimates of the shares of total spending their clients had paid. We averaged the estimates from attorneys who could provide them in order to estimate the average total value of each type of claim in 2000.

Second, analysts at Tillinghast-Towers Perrin, a leading actuarial consulting firm, had conducted an analysis similar to ours to estimate the average total amount spent for each type of claim in the year 2000. Tillinghast-Towers Perrin provides actuarial services to a large number of clients regarding their asbestos liabilities. In the course of this work, Tillinghast gained access to extensive data on its clients' spending on each type of claim. Tillinghast reviewed the settlement amounts, by injury type and year, that were paid by the asbestos defendants it represented and estimated the defendants' shares of total claimant awards to develop estimates of the total value of claims by injury type (inclusive of plaintiff attorney fees). Tillinghast interviewed its clients' legal staffs and the defense counsel who represented those clients to verify what those clients paid on claims of various types and their estimates of their share of the total value of each claim that they paid. We then used that information to estimate the total value of each type of claim. Tillinghast shared its results with us on a confidential basis. Its estimates were generally similar to ours.

Third, a research corporation with extensive experience in asbestos analysis had conducted a similar analysis to estimate the average total amount spent for each type of claim in 1998 and 1999. It had worked with a substantial number of defendants to estimate the share of the total value of each type of claim that each of those defendants typically paid and, consequently, the total value of each type of claim. The corporation also shared its results with us on a confidential basis.[1] Its estimates for some types of claims differed from those we had obtained ourselves and that Tillinghast-Towers Perrin had provided to us.

Because of the differences in the estimates we obtained from the two outside sources, we performed the analysis of total spending on asbestos personal injury claims twice, first using the Tillinghast-Towers Perrin estimates and then using the research corporation's estimates. Because our estimates were similar to those obtained by Tillinghast-Towers Perrin, and because Tillinghast had access to a greater amount of data than we did, we did not perform a third analysis using our estimates.

We then estimated what total spending on a claim of each type would have been, on average, in each year, if all the defendants named on the claim had settled in

---

[1] Our confidentiality agreement with this research corporation prohibits our disclosing its identity.

that year. We began with Kakalik et al.'s (1983) estimates of the average amount spent per claim by all defendants and insurers combined in 1981 by type of claim. We then estimated the corresponding average spending per claim by all defendants and insurers combined in either 2000 (when using the Tillinghast estimates) or 1998–1999 (when using the research corporation estimates) by type of claim. We computed the average annual rate of increase in total spending per claim for each type of claim over the 1981–2000 (Tillinghast) or 1998–1999 (research corporation) period. We assumed that the total amount spent per claim, by type of claim, grew at this annual average rate from 1981 through either 2000 or 1998–1999 and computed the resulting average amount spent per claim by type of claim and year. We have no reason to believe that the average total amount spent on each type of claim grew smoothly over that period. Average total spending per claim undoubtedly grew more rapidly in some years than in others. However, the average of the estimates of spending by year we developed by smooth exponential interpolation between 1981 and 2000 or 1998–1999 should be close to the average of the true values over that period.

We extrapolated the 1982–2000, or 1982 through 1998–1999, trends in total spending per claim by type of claim to 2001 and 2002. In doing so, we may have overestimated spending per claim in those years. A substantial number of major defendants filed for bankruptcy between 2000 and the summer of 2002. (See Chapter Six for a discussion of these filings.) Because claims against these defendants are barred pending their reorganization, claimants lost access to several defendants who had until then been substantial sources of compensation. Plaintiff attorneys whom we interviewed told us that they attempt to make up for their inability to obtain compensation from these defendants by demanding larger amounts in compensation from the surviving defendants and by bringing new defendants into the litigation (see Chapter Three). Defense counsel confirmed the reports of these plaintiff attorneys. While these actions may have closed some of the gaps opened by the disappearance of the major defendants who petitioned to file for reorganization under Chapter 11, it is quite possible that compensation by type of claim did not grow as rapidly in 2001 and 2002 than it had in other years. If so, our estimate of the amounts spent per claim in 2001 and 2002 will overstate the true amounts.

We multiplied our estimate of the number of claims, by type of claim, filed in each year over the period 1982–2002 by the corresponding estimates of the distribution of time-to-disposition and each of the estimates of average spending per claim by type and year. The results are estimates of the total amount paid out by defendants and insurers on each type of claim in each year over the period 1983–2002. We added these estimates to the Kakalik et al. (1983) estimate of total spending on asbestos litigation through 1982 to obtain estimates of the total amount spent on asbestos litigation through 2002.

**Results**

Total Spending on Asbestos Claims Through 2002 Was About $70 Billion. Tables 5.1a and 5.1b present alternative estimates of annual total amounts spent on asbestos litigation by all defendants and insurers combined, defense and claimants' transaction costs, and claimants' gross and net compensation through 2002. We used the Tillinghast-Towers Perrin estimates of the average total amount spent on a claim of each type in 2000 in calculating the estimates presented in Table 5.1a. We used the corresponding estimates of the average total amount spent on a claim of each type in 1998–1999 by the research corporation in calculating the estimates presented in Table 5.1b.

The two sets of estimates are remarkably similar. They each imply that approximately $70 billion has been spent on asbestos litigation through 2002. Analysts at Milliman USA, another leading actuarial consulting firm, have independently developed estimates of the total costs of asbestos litigation through 2000. Milliman provides actuarial services to a substantial number of defendants and insurers who are involved in asbestos litigation. In the course of their work, Milliman analysts

**Table 5.1a**
**Estimates of Asbestos Litigation Compensation ($ millions) Through 2002 (Using Tillinghast-Towers Perrin Estimates of Year-2000 Claim Values)**

| Year | Total Spending by All Defendants and Insurers | Defense Transaction Costs | Gross Compensation | Claimants Transaction Costs | Net Compensation |
|------|------|------|------|------|------|
| 1982 and earlier | 549 | 203 | 346 | 135 | 211 |
| 1983 | 306 | 101 | 205 | 80 | 125 |
| 1984 | 376 | 204 | 172 | 67 | 105 |
| 1985 | 479 | 212 | 267 | 104 | 163 |
| 1986 | 658 | 391 | 267 | 104 | 163 |
| 1987 | 950 | 400 | 550 | 215 | 336 |
| 1988 | 1,370 | 540 | 830 | 324 | 506 |
| 1989 | 2,055 | 550 | 1,504 | 587 | 918 |
| 1990 | 2,859 | 1,325 | 1,534 | 598 | 935 |
| 1991 | 3,169 | 1,588 | 1,581 | 616 | 964 |
| 1992 | 3,373 | 1,391 | 1,983 | 773 | 1,209 |
| 1993 | 3,475 | 1,766 | 1,708 | 666 | 1,042 |
| 1994 | 3,560 | 1,020 | 2,540 | 991 | 1,550 |
| 1995 | 3,956 | 1,277 | 2,679 | 1,045 | 1,634 |
| 1996 | 4,511 | 1,510 | 3,001 | 1,171 | 1,831 |
| 1997 | 4,934 | 1,635 | 3,299 | 1,286 | 2,012 |
| 1998 | 5,330 | 1,731 | 3,599 | 1,404 | 2,195 |
| 1999 | 5,775 | 1,141 | 4,635 | 1,808 | 2,827 |
| 2000 | 6,314 | 1,209 | 5,106 | 1,991 | 3,114 |
| 2001 | 7,480 | 1,496 | 5,984 | 2,334 | 3,650 |
| 2002 | 8,907 | 1,781 | 7,126 | 2,779 | 4,347 |

**Table 5.1b**
**Estimates of Asbestos Litigation Compensation ($ millions) Through 2002 (Using an Independent Research Firm's Estimates of Claim Values in 1998–1999)**

| Year | Total Spend-ing by All Defendants and Insurers | Defense Transaction Costs | Gross Compensation | Claimants Transaction Costs | Net Compensation |
|------|------|------|------|------|------|
| 1982 and earlier | 549 | 203 | 346 | 135 | 211 |
| 1983 | 303 | 100 | 203 | 79 | 124 |
| 1984 | 372 | 201 | 170 | 66 | 104 |
| 1985 | 473 | 210 | 264 | 103 | 161 |
| 1986 | 649 | 385 | 263 | 103 | 161 |
| 1987 | 933 | 392 | 541 | 211 | 330 |
| 1988 | 1,341 | 528 | 813 | 317 | 496 |
| 1989 | 2,009 | 538 | 1,471 | 574 | 897 |
| 1990 | 2,804 | 1,300 | 1,504 | 587 | 918 |
| 1991 | 3,123 | 1,565 | 1,558 | 608 | 950 |
| 1992 | 3,330 | 1,373 | 1,957 | 763 | 1,194 |
| 1993 | 3,425 | 1,741 | 1,684 | 657 | 1,027 |
| 1994 | 3,512 | 1,006 | 2,506 | 977 | 1,529 |
| 1995 | 3,917 | 1,264 | 2,653 | 1,035 | 1,618 |
| 1996 | 4,447 | 1,488 | 2,959 | 1,154 | 1,805 |
| 1997 | 4,872 | 1,615 | 3,257 | 1,270 | 1,987 |
| 1998 | 5,300 | 1,721 | 3,579 | 1,396 | 2,183 |
| 1999 | 5,790 | 1,143 | 4,647 | 1,812 | 2,834 |
| 2000 | 6,418 | 1,228 | 5,190 | 2,024 | 3,166 |
| 2001 | 7,597 | 1,519 | 6,078 | 2,370 | 3,707 |
| 2002 | 8,995 | 1,799 | 7,196 | 2,807 | 4,390 |

have access to a large volume of data on asbestos payments to date. Using these data, Milliman estimated that about $50 billion was spent on asbestos claims through 2000 (Bhagavatula, 2002). Each of our sets of estimates of total spending on asbestos claims through 2000 implies that the total spending was about $54 billion. Thus, our estimate is similar to that of a well-respected organization with extensive access to data and substantial experience in analyzing asbestos litigation. We have also discussed our estimate of total spending on asbestos claims with representatives of several major insurance and reinsurance companies. None of those we interviewed expressed strong reservations about our results. Some thought we might be somewhat high; others thought we were somewhat low. But none thought our estimate was very far off.

U.S. insurance companies are required to list their cumulative net paid losses, including loss adjustment expenses, in their annual statements. A. M. Best has collected and collated these data. A. M. Best reported that U.S. insurers had spent about $21.6 billion on asbestos claims through 2000 (Altonji et al., 2001). Thus, through

2000, U.S. insurers accounted for about 40 percent of the total amount spent on asbestos personal injury claims.

Based on conversations with both U.S. and foreign insurance companies, we believe foreign insurers spent $8 billion to $12 billion through 2000, more than half of which has been assumed by the London market. Milliman estimates that foreign insurers have spent $8 billion on asbestos litigation to date (Bhagavatula, 2002). Foreign insurers accounted for 15 to 22 percent of the expenditures on asbestos litigation through 2000.

Subtracting the amounts U.S. and foreign insurers have spent on asbestos litigation from our estimate of $54 billion in total expenditures through 2000 implies that U.S. defendants spent between $20 billion and $24 billion on asbestos litigation through 2000, roughly 40 percent of the total spending. Milliman estimates that U.S. defendants' uninsured losses through 2000 were $20 billion (Bhagavatula, 2002).

Table 5.2 summarizes our estimates of the distribution of total spending on asbestos litigation through 2000.

**Nontraditional Defendants Now Account for More Than Half of Asbestos Expenditures.** As we noted in Chapter Four, asbestos litigation has spread beyond the asbestos-related manufacturing and installation industries where it first began. Nontraditional defendants and their insurers are also paying an increasing share of the costs to resolve asbestos injury claims. A confidential study of asbestos costs that was shared with us reports that in the early 1980s traditional defendants accounted for about three-quarters of expenditures. In contrast, according to this report, by the late 1990s nontraditional defendants accounted for about 60 percent of asbestos expenditures. This study was performed for a private client by a respected analyst who has had extensive experience in the asbestos litigation area and whose work was cited to us by both plaintiff and defense attorneys. We discussed both the study's analysis and the data on which it was based with the analyst and determined that the work was analytically sound.

Given the number of major defendants that have filed for bankruptcy since 1998, it seems likely that the nontraditional defendants' share of total spending on asbestos injury claims has grown into the 2000s and is substantially higher today than it was in the late 1990s.

Table 5.2
Distribution of Total Spending on Asbestos Litigation Through 2000

| Expenditure Source | Amount |
|---|---|
| U.S. insurers | $22 billion |
| Insurers outside the United States | $8–$12 billion |
| Defendants | $20–$24 billion |

## Defense Transaction Costs

### Approach to Estimation

We obtained aggregate annual data on indemnity payments and defense costs for a large number of defendants. These data were available for some defendants from the early 1980s. In other cases, we were able to obtain data only for the past few years. When we sought these data, defendants were generally able to provide these data through 2001. In all, the data include more than 60,000 defendant-year observations. Because the data comprised annual average indemnity payments and defense costs, we had to assume the ratio of defense transaction costs to indemnity did not vary by type of claim. However, the widespread practice of settling claims in blocks, which frequently include different types of claims (see Chapter Three), effectively eliminates differences in the ratio of defense transaction costs to indemnity by type of claim. Accordingly, we used the observations we had for any given year to compute the weighted average ratio of defense transaction costs to total spending for those observations for that year. We then multiplied the ratio for each year and the corresponding estimates of total spending by type of claim to estimate defense transaction costs by year for each type of claim.

We subtracted the estimate of defense transaction costs in each year from the corresponding estimate of total spending per claim, by type of claim, to estimate claimants' gross compensation by claim type and year.

### Results

Defense Transaction Costs Account for About 31 Percent of Total Spending. An earlier RAND study (Kakalik et al., 1983) concluded that, in the 1970s and early 1980s, defendants' and insurers' legal fees and expenses consumed about 37 cents of every dollar spent on asbestos litigation. Table 5.3 presents our estimates of defendants' and insurers' legal fees and expenses as a percentage of total spending each year since 1982 for all defendants combined for whom we had data. It also shows the mean and standard deviations of the observations we had for each year through 2001. We assume that defense transaction costs accounted for the same share of total spending in 2002 as they had in 2001.

We multiplied our estimates of the share of total spending consumed by defense legal fees and expenses in each year by each of our estimates of total spending in each year from Tables 5.1a and 5.1b. Each of our sets of estimates implies that defense legal fees and expenses consumed more than $21 billion, about 31 percent of the funds spent by defendants and insurers on asbestos personal injury claims through 2002.

The defense transaction costs associated with asbestos litigation generally accounted for well over 40 percent of total spending in the 1980s and early 1990s. The

**Table 5.3**
**Defense Costs as a Percentage of Total Spending, 1983–2001**

| Year | Average Defense Costs, All Observations Combined (%) | Average Defendant's Defense Costs (%) | Standard Deviation of Average Defendant's Defense Costs (%) |
|------|------|------|------|
| 1983 | 33 | 86 | 35 |
| 1984 | 54 | 57 | 43 |
| 1985 | 44 | 70 | 44 |
| 1986 | 59 | 56 | 41 |
| 1987 | 42 | 67 | 41 |
| 1988 | 39 | 71 | 38 |
| 1989 | 27 | 67 | 41 |
| 1990 | 46 | 69 | 45 |
| 1991 | 50 | 72 | 37 |
| 1992 | 41 | 72 | 40 |
| 1993 | 51 | 69 | 39 |
| 1994 | 29 | 71 | 41 |
| 1995 | 32 | 74 | 38 |
| 1996 | 33 | 73 | 38 |
| 1997 | 33 | 70 | 43 |
| 1998 | 32 | 65 | 37 |
| 1999 | 20 | 69 | 40 |
| 2000 | 19 | 70 | 39 |
| 2001 | 20 | 74 | 38 |

asbestos litigation environment in the 1980s was highly adversarial: Defendants disputed among themselves regarding responsibility for the asbestos at a site; defendants and insurers disputed over a host of coverage issues; and plaintiffs, defendants, and insurers vigorously disputed issues of causality, illness, and other such matters. Defense transaction costs averaged about 44 percent of total asbestos spending in the 1980s and early 1990s.

Many of these issues were essentially worked out in the late 1980s and early 1990s in the form of formal judicial decisions, agreements among defendants and insurers regarding joint defense efforts and coverage issues, and agreements between some plaintiff attorneys and defendants to settle claims according to a schedule of payments by claim type. These arrangements led to reduced defense litigation costs. Defense transaction costs averaged about 25 percent of total asbestos spending from the mid-1990s through the early 2000s. (See Table 5.3.)

**Defense Transaction Costs Are Likely to Increase in the Future.** Virtually all of our interview respondents discussed what they saw as new instabilities in asbestos litigation after the failure of the *Amchem* settlement (see Chapter Three). Many interviewees noted that the Center for Claims Resolution (CCR), a consortium of about 20 non-bankrupt corporations that were coordinating their defense of asbestos

claims and the leading example of asbestos defendant cooperation, has ceased settling claims against its members. At the same time, interviewees told us, many defendants' agreements with plaintiff law firms were under reconsideration or being renegotiated. In particular, as an increasing number of major defendants have filed for bankruptcy and ceased paying asbestos claims pending their reorganization, plaintiff attorneys are seeking greater compensation from the defendants who remain in the litigation. Many of those defendants, in turn, are reluctant to pay greater compensation for a given type of claim than they had been paying in the past. Also, we have been told that many defendants are moving away from block settlements of large groups of claims and looking in more detail at individual claims. Plaintiff firms were said to be pursuing more-adversarial strategies. And a number of those we interviewed believe that as the litigation expands to defendants who had not been involved in the litigation before, there will be new insurance coverage battles.

No one we interviewed offered us qualitative or quantitative information about changes in transaction costs resulting from these new sources of instability. But all of these factors have significant potential to influence defense transaction costs, and it seems likely that those costs will increase, at least temporarily, as a result. Because some of these issues may take several years to resolve, such a period of higher costs could be relatively long.

**Transaction Costs of a Bankruptcy Trust Are Considerably Lower.** Once a bankrupt corporation is reorganized and a trust is established to assume its liabilities, claims processing procedures are largely administrative rather than adversarial. This should lead to dramatically lower transaction costs, as was the case of the Manville Trust.

From 1994 to 2000, the Manville Trust reported annual average operating expenses (not including special expenses associated with tobacco litigation) of about $10 million, about 5 percent of the total dollars it paid out to asbestos claimants plus expenses during this period. The Manville Trust also requires that attorneys representing claimants who file claims against it charge a fee of no more than 25 percent of the amount paid to the asbestos claimant. Our interviewees reported that attorneys generally adhere to that requirement.

Assuming that these expense ratios are correct, people who file claims against the Manville Trust receive about 70 percent of the total dollars spent by the Trust. However, it must be noted that the funds available to the Trust are limited. The money may be paid much more efficiently in this way, but the amount paid to any particular claimant is much less than would have been paid in litigation, given what other claimants are being paid for the same kinds of claims. Moreover, while some other trusts limit attorneys' fees, others do not.

## Gross Compensation

### Approach to Estimation

To estimate claimants' gross compensation, we multiplied our estimates of total spending on each type of asbestos claim in each year by one minus our estimates of the fraction of total spending that went to defense transaction costs in that year.

### Results

**Gross Compensation Is About 69 Percent of Total Spending.** We estimate that the sum of indemnity payments to claimants through 2002 equaled almost $49 billion, about 69 percent of total spending on asbestos litigation through that date. Gross compensation to claimants accounted for about 56 percent of the funds spent through the 1980s and early 1990s. The drop in defense transaction costs as a share of total spending in the mid- to late 1990s resulted in an increase, to about 75 percent, in the share of total spending going to claimants, gross of their transaction costs.

The confidential analysis mentioned above also provided estimates of the total indemnity paid to asbestos claimants in each of four time periods through 1997. That study's estimates and our corresponding estimates from Tables 5.1a and 5.1b are shown in Table 5.4. Here, too, a well-respected analyst with extensive access to data and substantial experience in the asbestos litigation area arrived at estimates that are very similar to ours.

Table 5.5 shows our estimates of the distribution of claimants, by type of claim, who brought claims in each of the time periods of interest and the gross compensation paid to claimants by type of claim and time period. For purposes of comparison, the table also shows the only available comparative data: the distribution of claims brought against the Manville Trust in 1995–2000, the distribution of gross compensation paid by the Manville Trust over that time period, and Tillinghast Towers-Perrin estimates of the distribution of gross compensation paid, by type of claim, in 1991–2000.

**Table 5.4**
**Gross Compensation Paid on Asbestos Personal Injury Claims**

| Years | Estimates ($ millions) | | |
|---|---|---|---|
| | From Table 5.1a | From Table 5.1b | From Analyst's Confidential Study |
| 1982 and earlier | 346 | 346 | 267 |
| 1983–1987 | 1,461 | 1,441 | 1,447 |
| 1988–1992 | 7,431 | 7,304 | 6,309 |
| 1993–1997 | 13,228 | 13,059 | 14,721 |
| Total | 22,467 | 22,149 | 22,744 |

**Table 5.5**
**Estimated Distribution of Claimants and Gross Compensation by Type of Claim**

| Distribution of Claimants | | |
| --- | --- | --- |
| Type of Claim | | |
| Mesothelioma (%) | Other Cancer (%) | Nonmalignancy (%) |
| RAND Estimates | | |
| 1982 and earlier | 6 | 12 | 82 |
| 1983–1987 | 5 | 14 | 81 |
| 1988–1992 | 4 | 11 | 85 |
| 1993–1997 | 3 | 8 | 89 |
| 1998–2002 | 3 | 5 | 92 |
| Manville Trust, 1995–2000 | 4 | 8 | 88 |

| Distribution of Gross Compensation | | |
| --- | --- | --- |
| Type of Claim | | |
| Mesothelioma (%) | Other Cancer (%) | Nonmalignancy (%) |
| Table 5.1a Estimates | | |
| 1982 and earlier | 18 | 15 | 67 |
| 1983–1987 | 21 | 19 | 60 |
| 1988–1992 | 20 | 21 | 59 |
| 1993–1997 | 20 | 21 | 60 |
| 1998–2002 | 20 | 20 | 61 |
| Table 5.1b Estimates | | |
| 1982 and earlier | 18 | 15 | 67 |
| 1983–1987 | 25 | 18 | 57 |
| 1988–1992 | 28 | 20 | 52 |
| 1993–1997 | 32 | 18 | 49 |
| 1998–2002 | 38 | 16 | 47 |
| Manville Trust, 1995–2000 | 20 | 16 | 64 |
| Tillinghast Towers-Perrin Estimates, 1991–2000 | 17 | 18 | 65 |

We estimate that mesothelioma claimants accounted for about 6 percent of total claims and about 18 percent of the gross compensation paid all claimants combined in the early days of the litigation. The fraction of claimants who filed claims for mesothelioma steadily declined over time until, by the early 2000s, only about 3 percent of claimants were filing mesothelioma claims. However, the amount paid in compensation on the average mesothelioma claim grew more rapidly over time than

did the average amounts paid in compensation for other types of claims. Based on the Table 5.1a estimates, mesothelioma claimants' share of gross compensation has remained at about 20 percent since the early 1980s. The alternative estimates, in Table 5.1b, assume even more rapid growth in the average amounts paid in gross compensation on mesothelioma claims and, consequently, imply that the share of gross compensation that went to mesothelioma claims grew over time, reaching about 38 percent of gross compensation in the late 1990s and early 2000s.

The trends in claims for other cancers are very similar to those for mesothelioma. Other cancer claimants accounted for 12 to 14 percent of all claimants through the 1980s. The share of claimants who brought claims for other cancers steadily declined through the 1990s until, by the early 2000s, other cancer claimants accounted for only about 5 percent of claimants. However, the fraction of gross compensation that went to other cancer claimants remained roughly the same, about 20 percent of total spending, according to the Table 5.1a estimates, and roughly 18 percent of total spending, according to the Table 5.1b estimates, throughout the 1980s and 1990s.

As we discussed earlier, the fraction of claimants who brought nonmalignant injury claims grew steadily throughout the 1980s and 1990s. Nonmalignant injury claimants received about 60 percent of gross compensation over the entire period, according to the Table 5.1a estimates. The Table 5.1b estimates imply that the growth in the share of gross compensation going to malignant injury claimants resulted in a decline in the share of gross compensation going to nonmalignant injury claimants, from about two-thirds in the early 1980s to a little less than half in recent years.

The Claims Resolution Management Corporation recently published the distribution of the Manville Trust's claims payments by type of claim from 1995 through 2001 (Austern, 2002). Manville's experience over those seven years, as shown in Table 5.5, closely resembles the estimates we obtained using the Tillinghast Towers-Perrin estimates of total spending per claim by type of claim. Mesothelioma claims accounted for about 4 percent of the total claims paid by the Trust over that period and about 20 percent of the gross compensation paid by the Trust.

About 8 percent of the Trust's claims over this period were for cancers other than mesothelioma; those claimants received about 16 percent of the Trust's compensation payments. Nonmalignant claims accounted for about 88 percent of claims and 64 percent of the gross compensation.

At a meeting of casualty actuaries in May 2001, analysts from Tillinghast-Towers Perrin presented estimates of the relative average compensation provided to claimants across the country for mesothelioma claims, all other cancer claims, and all nonmalignant injury claims, respectively, combined from 1991 to 2000 (Angelina and Biggs, 2001). Those analysts estimated that, on average, over the 1991–2000 period, mesothelioma claimants recovered about twice as much as did claimants for

lung cancers and other cancers and about seven times as much as did nonmalignant injury claimants.

We used our data to estimate the distribution of claimants by type for the period covered by the Tillinghast-Towers Perrin estimate. We then applied the Tillinghast-Towers Perrin estimates of the relative compensation provided to different types of claimants to the distribution of claimants by type in order to estimate how the total gross compensation provided to asbestos claimants over the 1991–2000 period was divided among the different types of claims. Those results are also presented in Table 5.5. Here, too, the results implied by the independent estimates obtained by experts with a great amount of experience in asbestos litigation are generally similar to ours.

**Average Compensation for Mesothelioma Has Increased Sharply.** The amounts that individual defendants paid claimants for all types of claims declined through the 1980s. Average payments per defendant for other cancer claims and nonmalignant claims bottomed out in the early 1990s and have changed little over the past decade, whereas the average amounts that a defendant paid to mesothelioma claimants grew dramatically through the 1990s.

Figure 5.2 shows the ratio of the average amount that the defendants who provided data to us paid in compensation for each type of claim in each year to what they paid in compensation for that type of claim in 1982. The total amount any claimant received depended on the number of defendants who paid compensation to that claimant.

**Figure 5.2**
**Average Compensation Paid by Major Defendants by Claimed Injury, Relative to 1982**



RAND MG162-5.2

The results illustrated in Figure 5.2 were confirmed in our interviews with participants in the litigation, including both plaintiff and defense attorneys. They told us that the ratio between mesothelioma and other injury claims for non-bankrupt defendants has widened considerably in the past few years. Moreover, some interviewees said that settlement values have increased substantially in certain jurisdictions, and suggested that filing patterns have shifted over time because of this trend. Taken together, these results and comments suggest that the relative shares of total expenditures paid for the different types of claims shown in Table 5.5 could change substantially in the future.

**Bankruptcies Erode Compensation.** Bankruptcy has had a decided effect on compensation patterns. During the bankruptcy process, claimants are not paid. And after a corporation emerges from bankruptcy reorganized and with a trust established, significantly fewer dollars are available for current claims, and thus claimants are paid less. Because illness from asbestos exposure is characterized by long latency periods, it is likely that claimants will continue to come forward years into the future. The trusts are required to provide for future claimants and, consequently, the trusts are generally concerned about being sure there will be money for future claimants. The fact that many of the trusts pay only pennies on the dollar is one of the reasons why asbestos litigation is spreading to greater numbers of defendants. If claimants cannot get adequate compensation from the defendants who have filed for bankruptcy, they must look for greater compensation from other defendants or pursue additional defendants or both.

The costs of bankruptcy for current claimants can be easily inferred from the experience of the bankruptcy trusts over the years. These plans establish the amount due a claimant—termed the "full liquidated value" of a claim—for each type of claim. However, over time, trusts typically pay lower than liquidated value on current claims in order to preserve funds for paying future claims. In the next chapter, we detail the claims payment histories of the early personal injury bankruptcy trusts.

## Claimants' Transaction Costs

### Approach to Estimation

Kakalik et al. (1984) found that claimants' attorney fees and other legal expenses averaged about 39 percent of claimants' gross compensation. Claimants' contingency fees to attorneys averaged 34 percent on claims settled before trial and 39 percent on claims that went to trial. Overall, contingency fees averaged 34 percent of gross compensation. Other expenses averaged approximately 5 percent of gross compensation on settled claims and about 6 percent of gross compensation on tried claims. Overall, claimants' other legal expenses averaged 5 percent of gross compensation. Claimants'

total legal expenses including both their lawyers' fees and other expenses averaged 39 percent of gross compensation.

We interviewed a number of individuals involved in asbestos litigation from a variety of perspectives, including some of the nation's leading asbestos plaintiff attorneys. None of the people we interviewed said they had seen any evidence that claimants' attorney contingent fee rates had been reduced to reflect changes in the litigation. Plaintiff attorneys may have recognized savings from routinization of the litigation (e.g., the widespread use of administrative payment schedules). However, none of those we interviewed suggested that any of these savings have been passed on to claimants. Similarly, the people we interviewed generally said that they had not observed any reduction in claimants' other legal expenses. Therefore, the estimates presented in Tables 5.1a and 5.1b assume that claimants' attorney contingency fee rates and other legal expenses continued to average 39 percent of gross recoveries through 2002. We multiplied the annual estimates of claimants' gross compensation by 39 percent to estimate claimants' transaction costs by type of claim and year.

**Results**

Claimants' Transaction Costs Account for 27 Percent of Total Spending. We estimate that claimants' legal fees and expenses added up to about $19 billion, 27 percent of total spending on asbestos personal injury claims through 2002. The drop in the share of total spending consumed by defense transaction costs and the consequent increase in the share of total spending going to gross compensation have resulted in an increase in the share of total spending going to claimants' transaction costs, from about 22 percent in the 1980s and early 1990s to about 29 percent in the mid- to late 1990s.

Although the people we interviewed generally agreed that claimants' total legal costs—the sum of their attorneys' legal fees and other costs, as a percentage of their recovery—had not, on average, changed over the past two decades, we thought it was still possible that legal costs had declined over time. Attorneys and experts in relevant areas have developed extensive knowledge and information on the issues that generally arise in contesting an asbestos claim and can presumably develop the evidence and expert opinions necessary to support a claim at less expense. To explore the implications of this possibility, we reestimated claimants' transaction costs and net compensation assuming that claimants' other legal costs declined at a constant annual average rate from 5 percent of compensation in 1982 to 0 percent in 2000.

Table 5.6 shows the estimates of claimants' transaction costs and, consequently, their net compensation when we assume that claimants' other legal expenses, as a percentage of gross compensation, steadily declined from 5 percent in 1982 to 0 percent in 2000. Under this assumption, claimants' legal fees and expenses added up to about $17 billion—24 percent of total spending on asbestos personal injury claims—through 2002. The share of total spending going to claimants' transaction

costs increased from about 21 percent in the 1980s and early 1990s to about 26 percent in the mid- to late 1990s.

## Claimants' Net Compensation

### Approach to Estimation

We estimated claimants' net compensation by subtracting the estimates of claimants' transaction costs from the estimates of claimants' gross compensation.

### Results

   **Claimants Net Compensation Is About 42 Percent of Total Spending on Asbestos Litigation.** We estimate that claimants' net compensation through 2002 equaled about $30 billion, about 42 percent of total spending on asbestos litigation through that year.

**Table 5.6**
**Modified Estimates of Claimants' Transaction Costs and Net Compensation ($ millions), Assuming Other Legal Expenses Declined to Zero in 2000**

| Year | Modified Table 5.1a Estimates | | Modified Table 5.1b Estimates | |
| | Claimants' Transaction Costs | Net Compensation | Claimants' Transaction Costs | Net Compensation |
| --- | --- | --- | --- | --- |
| 1982 and earlier | 135 | 211 | 135 | 211 |
| 1983 | 79 | 126 | 79 | 124 |
| 1984 | 66 | 106 | 65 | 105 |
| 1985 | 102 | 165 | 101 | 163 |
| 1986 | 101 | 166 | 100 | 164 |
| 1987 | 207 | 343 | 203 | 337 |
| 1988 | 310 | 520 | 303 | 509 |
| 1989 | 557 | 947 | 545 | 926 |
| 1990 | 564 | 970 | 553 | 951 |
| 1991 | 577 | 1,004 | 569 | 989 |
| 1992 | 718 | 1,264 | 709 | 1,248 |
| 1993 | 614 | 1,094 | 605 | 1,079 |
| 1994 | 906 | 1,634 | 894 | 1,612 |
| 1995 | 948 | 1,731 | 939 | 1,714 |
| 1996 | 1,054 | 1,948 | 1,039 | 1,920 |
| 1997 | 1,149 | 2,150 | 1,135 | 2,123 |
| 1998 | 1,244 | 2,355 | 1,237 | 2,342 |
| 1999 | 1,589 | 3,046 | 1,593 | 3,054 |
| 2000 | 1,736 | 3,370 | 1,765 | 3,425 |
| 2001 | 2,034 | 3,949 | 2,066 | 4,011 |
| 2002 | 2,423 | 4,703 | 2,447 | 4,750 |

On average, in the 1980s and early 1990s, about 34 percent of the total dollars spent on asbestos litigation was recovered by claimants after they paid legal fees and expenses. Claimants' net compensation grew as a fraction of total asbestos litigation expenditures in the mid- and late 1990s and early 2000s, averaging about 46 percent of total asbestos spending. Overall, the estimates presented in Tables 5.1a and 5.1b imply that about 42 percent of the funds expended on asbestos litigation have ended up in claimants' pockets.

Based on the data in Table 5.6, if claimants' other legal expenses, as a percentage of gross compensation, steadily declined from 5 percent in 1982 to 0 percent in 2000, claimants' net compensation through 2002 would have totaled about $32 billion, about 45 percent of total spending on asbestos litigation through that date.

In the future, it seems likely that many asbestos claimants will recover a share of their compensation from personal injury trusts established as a result of Chapter 11 reorganizations (see Chapter Six). If these trusts impose limits on attorney fees (e.g., if they require attorneys to charge no more than 25 percent of compensation received), or if attorneys choose to reduce their contingency fees for compensation obtained from personal injury trusts, the share of total dollars spent on asbestos litigation recovered by claimants may increase.

## Future Compensation and Costs

The history of asbestos litigation has been characterized by failures to forecast its magnitude, scope, and evolution with any accuracy. For example, in 1982, respected analysts were predicting that the future costs of asbestos litigation could reach $38 billion (Kakalik et al., 1983). Among the participants in the litigation whom we have interviewed to date—most of whom have been involved in the litigation for more than a decade—there is no agreement about whether the litigation is approaching its end or will continue to grow or change in character.

Analysts' projections of the numbers of future claims and the claims' likely costs also vary dramatically. Analysts at Tillinghast-Towers Perrin project an ultimate total of one million claims, costing defendants and insurers $200 billion (Angelina and Biggs, 2001). Analysts at Milliman project a total of 1.1 million claims, but they estimate that the total costs of asbestos personal injury claims will reach $265 billion (Bhagavatula at al., 2001).[2]

The Manville Trust commissioned a deliberately high-side estimate designed to set an upper boundary on how many claimants might come forward in the future. The estimate was three million total claimants, which means the process is only

---

[2] The Milliman analysts estimate that the ultimate costs of asbestos litigation will eventually total $275 billion, including $265 billion for personal injury claims and $10 billion for property damage claims.

about one-quarter finished (Austern, June 21, 2001). The Trust did not attempt to estimate what this high number of claimants would imply for the total costs of asbestos litigation.

Analysts' projections of who will ultimately bear these costs are equally disparate. As noted above, Tillinghast-Towers Perrin analysts have estimated that, if current trends continue, by the time the litigation has run its course, defendants and insurers will have spent about $200 billion, of which defendants will have paid about 39 percent (Angelina and Biggs, 2001). Milliman analysts have estimated that current trends imply that asbestos defendants will ultimately pay about 64 percent of the litigation's total costs which, they estimate, will add up to $265 billion. Based on these estimates, defendants' uninsured losses could ultimately range from $78 billion (Tillinghast-Towers Perrin) to $170 billion (Milliman).

The large variation in the projections of future claims and costs reflects recent changes in the litigation: sharp increases both in the numbers of claims filed and in the fraction of new claims submitted for nonmalignant conditions, particularly by unimpaired claimants, and rapid increases in the compensation paid to mesothelioma claimants. There has also been a dramatic increase in the number of firms filing for bankruptcy. Analysts differ in their assumptions about the implications of these changes for the future course of the litigation.

However, the differences among these projections and the question of which is more likely to be accurate is not the important issue. The projections vary, but they do agree that the litigation is far from over. It is possible that hundreds of thousands of claims—or perhaps more than two million—have yet to be made. We estimate that defendants and insurers have spent $70 billion through the end of 2002 to compensate the 730,000 claimants who have come forward. Regardless of the differences among the various projections, they all suggest that, at most, only about 70 percent of the final number of claimants have come forward and, possibly, only a fourth. Based on these projections, the future costs of asbestos litigation could total $130 billion to $195 billion.

CHAPTER SIX
# Bankruptcies

The total costs of asbestos litigation up to the present and the prospect of future costs have led many firms to file for bankruptcy. We examined information from numerous sources to compile a list of firms (provided in Appendix D) that have filed for bankruptcy and that have incurred and/or were expected to incur substantial asbestos-related liabilities.

In this chapter, we first describe our approach to identifying asbestos-related bankruptcies, then present information on trends in bankruptcy filings and describe the trusts that have been established by those firms that have emerged from bankruptcy. We review the available literature on the effects of these bankruptcies on the U.S. economy, including job losses and revenue losses over the lifetime of workers who have been laid off. Finally, we note that the economic effects of asbestos litigation extend beyond the bankruptcies. For asbestos defendants, each dollar paid out in defense costs and damage awards or settlements reduces retained earnings. As a result, these firms have fewer internal dollars available to finance investment and to create new jobs. Of course, the dollars paid out by defendants become income to others, including asbestos plaintiff lawyers as well as asbestos claimants. The economic effects of these wealth transfers have not been studied.

## Approach to Identifying Asbestos-Related Bankruptcies

Several individuals and organizations have compiled lists of asbestos-related bankruptcies. These lists are generally quite similar. However, no two of these lists are identical; each one of them includes or omits firms listed in each of the others. Three factors underlie most of the differences among the lists: First, some lists treat the bankruptcy of a parent company and one or more of its subsidiaries as a single event and list only one of them. Others list both the parent company and any subsidiaries that also filed for bankruptcy. Second, some lists show a company under its original name, even though the company changed its name or was bought by another company before petitioning to file for reorganization under Chapter 11 of the bankruptcy code, while other lists show the company by the name under which it filed for bank-

ruptcy. Finally, those who compiled the lists sometimes arrived at differing conclusions as to whether asbestos played a substantial role in a company's decision to file for bankruptcy.

Rather than rely on any one of these lists, we compiled our own list of asbestos-related bankruptcies through the end of 2003 from a variety of sources, including

- *Mealey's Litigation Report: Asbestos* (Mealey Publications)
- *Mealey's Asbestos Bankruptcy Report* (Mealey Publications)
- *Asbestos Litigation Reporter* (Andrews Litigation Reporter)
- *COLUMMS—Asbestos* (HarrisMartin Publishing)
- a list of asbestos-related bankruptcies maintained by the American Academy of Actuaries
- a list of asbestos-related bankruptcies maintained by the American Insurance Association
- a list of asbestos-related bankruptcies maintained by Porter Novelli Issue Advocacy, a public affairs communications firm
- Plevin and Kalish (2001)
- searches of Lexis-Nexis, Westlaw, and a number of newspapers and magazines that regularly cover business and financial topics.

In addition to the sources listed above, we searched publicly available bankruptcy filings, 10-K forms filed with the SEC, and standard references to business entities (e.g., such as Standard & Poor's and Dun & Bradstreet) to identify related companies, companies that changed their names, and companies for which asbestos liabilities did not appear to be a significant contributor to their bankruptcy. A bankruptcy can involve a parent company and one or more of its subsidiaries. When we observed bankruptcy filings by a parent and one or more of its subsidiaries, or by multiple subsidiaries of the same parent, we treated those filings as a single bankruptcy event even if the filings occurred at substantially different times. Table D.1 in Appendix D lists a parent company and any of its subsidiaries as a single bankruptcy. (Appendix D also discusses some instances in which the bankruptcy of a parent and the bankruptcy of its subsidiaries have been treated as separate events.)

It was sometimes difficult to identify the distinct entities among the many names that appeared in our information sources on asbestos-related bankruptcies. Companies changed names and were bought and sold. In some cases, the company that filed for bankruptcy is not as familiar as its predecessor. For example, Asbestospray is a well-known defendant and others have included it on their lists of asbestos bankruptcies. However, Asbestospray was purchased by H&A Construction in 1972, and it was H&A Construction that filed for bankruptcy in 1983. Accordingly, we do not include Asbestospray on our list, but we do include H&A Construction.

We did not attempt to list every name change, but we do identify common aliases in Appendix D.

The decision to file a Chapter 11 petition is a difficult one for corporations. Often, a variety of factors—e.g., foreign competition, declining market conditions, increased costs of capital, or poor management—enter into that decision. There are asbestos defendant companies that have filed for bankruptcy for reasons unrelated to asbestos litigation. But most asbestos defendants who have filed a Chapter 11 petition claim that they did so primarily, or in large part, because of the direct and indirect effects[1] of their asbestos liability exposure. We examined the information contained in the various sources listed above and included a company that filed for bankruptcy on our list only if several different sources indicated that the firm had incurred and/or was expected to incur substantial asbestos liabilities, and there were no strong indications that the firm filed for bankruptcy for reasons entirely unrelated to asbestos liability. Because we had no independent means for judging whether asbestos litigation actually "caused" a bankruptcy, Table D.1 should be interpreted as a list of "asbestos defendants that have filed for bankruptcy" and not as a list of "companies driven into bankruptcy by asbestos."

## Trends in Bankruptcy Filings

As of summer 2004, we had identified 73 corporate asbestos defendants[2] that had dissolved or filed for reorganization under Chapter 11: one in 1976, 20 in the 1980s, 15 in the 1990s, and at least 37 between January 2000 and summer 2004. Bankruptcy is more common today than in the past, with as many new petitions filed in the 2000s as were filed in the previous two decades combined. Table 6.1 shows the distribution of bankruptcy filings over time.

Several individuals involved in asbestos litigation told us that a number of asbestos defendants that are contemplating filing for bankruptcy have postponed action in

---

[1] The *direct effects* of liability comprise the costs of the litigation, including payments to claimants and their lawyers and payments to defense counsel. The *indirect effects* of liability include loss of share value—as the financial markets assess the cost of continuing asbestos liability exposure—and increasing costs of capital.

[2] We omitted one company, Huxley Development, which appears on many lists of asbestos-related bankruptcies. Huxley Development is an asbestos defendant named in more than 15 published opinions, most of which are at least 20 years old. Apparently Huxley Development was a U.S. broker that bought and sold asbestos (*Irving v. Owens-Corning Fiberglas Corp.*, 864 F.2d 383 [5th Cir. 1989]). However, we were never able to confirm that the company filed for bankruptcy, much less where and when it filed. We reviewed the bankruptcy court dockets available online but found nothing pertaining to Huxley Development.

**Table 6.1**
**Asbestos-Related Bankruptcy**
**Filings, 1976–2004**

| Year | Number of Filings |
|------|-------------------|
| 1976 | 1 |
| 1982 | 3 |
| 1983 | 2 |
| 1984 | 1 |
| 1985 | 1 |
| 1986 | 4 |
| 1987 | 3 |
| 1988 | 3 |
| 1989 | 3 |
| 1990 | 2 |
| 1991 | 2 |
| 1992 | 2 |
| 1993 | 2 |
| 1994 | 0 |
| 1995 | 1 |
| 1996 | 1 |
| 1997 | 0 |
| 1998 | 3 |
| 1999 | 2 |
| 2000 | 7 |
| 2001 | 9 |
| 2002 | 11 |
| 2003 | 6 |
| 2004 | 4 |

the hope that the U.S. Congress will enact asbestos-related legislation that will allevi-
ate their problems.[3] We have no way of knowing whether the reduction in the filing
rate in 2003 and early 2004 reflects such decisions or reflects a shift in the pace of
filings.

## Personal Injury Trusts

When Johns-Manville filed for bankruptcy in 1982, it was the largest producer of
asbestos products. Although Johns-Manville was not the first company to file for
bankruptcy due to the pressure of asbestos litigation,[4] it created the model for re-

_____

[3] Some companies' recent asbestos reorganization plans included provisions nullifying the plans if Congress
passed legislation on asbestos litigation in 2004. See "Halliburton, Equitas Reach $575 Million Deal," 2004.

[4] UNR, also known as Union Asbestos and Rubber, filed for bankruptcy a month earlier and North American
Asbestos had filed six years earlier.

solving asbestos personal injury litigation under the protection of bankruptcy.[5] The model includes a trust funded by a majority of the defendants' stock, plus other corporate assets including insurance coverage.[6] The trust is the only recourse for asbestos claimants, who are barred by injunction from pursuing a reorganized company.[7] The bar is known as a "channeling injunction" and has since been codified in the Bankruptcy Code at 11 U.S.C. §524(g). As noted by the presiding Johns-Manville bankruptcy judge, "All concerned recognized that the impetus for Manville's action was not a present inability to meet debts but rather the anticipation of massive personal injury liability in the future."[8] In light of this concern, the Manville reorganization plan established a trust to provide for an anticipated 50,000 to 100,000 future claims as well as the present claims, for a total estimated liability of about $2 billion. The trust was funded with assets valued at more than $3 billion, including 80 percent of the company's stock.

The Manville bankruptcy became the model for resolving asbestos personal injury claims through reorganization. As of the end of 2002, eight defendants who filed for reorganization under Chapter 11, including Johns-Manville, had confirmed their reorganization plans that arranged for compensation for personal injury through an asbestos personal injury trust funded under their plans. Data on these eight bankruptcies are presented in Table 6.2.

The duration from bankruptcy petition to confirmation of reorganization of these eight companies ranged from 2.5 to ten years. The National Gypsum bankruptcy lasted only 2.5 years, but the trust has been, and remains, troubled. Under the

**Table 6.2**
**Petition and Confirmation Information on Completed Asbestos Bankruptcies**

| Debtor | Court | Petition Date | Date of Reorganization Plan Confirmation | Years in Bankruptcy |
|---|---|---|---|---|
| UNR | N.D. Ill. | 07/19/82 | 06/01/89 | 7 |
| Johns-Manville | S.D.N.Y. | 08/26/82 | 10/28/88 | 6 |
| Amatex | E.D. Penn. | 11/02/82 | 04/26/90 | 8 |
| Forty-Eight Insulations, Inc. | N.D. Ill. | 04/17/85 | 05/16/95 | 10 |
| Celotex | M.D. Fla. | 10/12/90 | 03/04/97 | 6.5 |
| National Gypsum | N.D. Tex. | 10/31/90 | 03/09/93 | 2.5 |
| EaglePicher, Inc. | S.D. Ohio | 01/07/91 | 11/18/96 | 6 |
| H. K. Porter | W.D. Penn. | 06/14/91 | 06/26/98 | 7 |

---

[5] *In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986), decision affirmed in part, reversed in part, 78 B.R. 407 (S.D.N.Y. 1987), order affirmed, 843 F.2d 636 (2d Cir. 1988).

[6] 68 B.R. at 621; Hodara and Stark, 2001.

[7] 68 B.R. at 624.

[8] 68 B.R. at 624.

National Gypsum reorganization plan, a bankruptcy trust was to contribute funds to CCR. The National Gypsum reorganization plan further specified that if the value of the National Gypsum trust fell below $500 million, the trust would take over responsibility from CCR for paying claims against National Gypsum.[9] After the Supreme Court invalidated CCR's class-action settlement of all future claims against it (see Chapter Three),[10] National Gypsum withdrew from CCR and established the Asbestos Claims Management Center (ACMC) to pay claims against National Gypsum. The ACMC was unable to pay the claims presented to it, and the National Gypsum trust sought a declaratory judgment establishing that the reorganized company was not protected from liability that the trust was unable to compensate. The Fifth Circuit Court held that the reorganization did not protect the reorganized National Gypsum after the trust was depleted.[11] New National Gypsum then agreed to contribute an additional $347 million to the trust in April 2002 in order to fund ACMC, but was unable to save ACMC from bankruptcy. ACMC filed for reorganization on August 19, 2002.

The National Gypsum bankruptcy preceded the codification of the channeling injunction (discussed above) and was designed to complement the CCR Class Action Settlement. It is unlikely that another reorganization will be subject to the insolvency of a personal injury trust.

The financial status and liability exposure varied among the eight defendants listed in Table 6.2; subsequently, the size and funding of the eight trusts also varied. Data on each reorganization trust are presented in Tables 6.3 and 6.4. The data were compiled from corporate annual statements, filings with the bankruptcy court, judicial opinions, and other publicly available records. Table 6.3 presents the estimated claim numbers and values, which were submitted by each defendant in support of its petition for a channeling injunction. Table 6.4 shows the initial value of the trust established by each of these defendants and the source of the funds provided to each trust.

## The Trusts' Experience

The Manville Trust did not break new ground easily. Johns-Manville filed a Chapter 11 petition in 1982. Its reorganization plan created a trust that would pay future

---

[9] Nos. 390-37213-SAF-11, 390-37214-SAF-11, N.D. Tex.

[10] *Amchem Products Inc. v. Windsor,* 521 U.S. 591 (1997).

[11] *New National Gypsum Co. v. National Gypsum Settlement Trust,* 219 F.3d 478 (5th Cir. 2000).

**Table 6.3**
**Estimated Numbers and Values of Claims Submitted by Defendant Debtors in Support of a Petition for a Channeling Injunction**

| Debtor | Present Claims | | Future Claims | | Total Claims | |
|---|---|---|---|---|---|---|
| | Number | Value ($ millions) | Number | Value ($millions) | Number | Value ($ millions) |
| UNR | 17,000 | $254 | 120,000 | $1,796 | 137,000 | $2,050 |
| Johns-Manville | 76,000 | $1,352 | 15,500 | NA | 91,500 | NA |
| Amatex | 9,315 | $15 | 60,000 | $65 | 69,315 | $80 |
| Forty-Eight Insu-lations, Inc. | 130,510 | $333 | 40,736 | $104 | 171,246 | $437 |
| Celotex | 105,000 | $1,380 | 814,000 | $5,900 | 919,000 | $7,280 |
| National Gypsum | 62,000 | $127 | 157,500 | $730 | 219,500 | $857 |
| EaglePicher, Inc. | 149,403 | $478 | 333,467 | $2,025 | 482,870 | $2,503 |
| H.K. Porter | 73,118 | $345 | 485,775 | $1,675 | 558,893 | $2,020 |

NOTE: NA = not available.

**Table 6.4**
**Value of Trusts and Sources of Funds**

| Debtor and Trust Value ($ millions) | Sources of Funding and Amounts ($millions) | |
|---|---|---|
| UNR   $150.00 | 63% of company stock | $150.00 |
| Johns-Manville   $3,154.40 | Cash | $155.40 |
| | 80% of company stock | $454.00 |
| | Interest-bearing note | $50.00 |
| | Bonds | $1,800.00 |
| | Insurance proceeds | $695.00 |
| | 20% of company profit (1992 and later) | Unknown |
| Amatex   $15.70 | Insurance | $9.90 |
| | Company deposit | $4.40 |
| | Promissory note | $1.40 |
| Forty-Eight Insulations, Inc.   $56.29 | Liquidated assets of company | $56.29 |
| Celotex   $1,130.84 | 100% of Celotex stock | $600.00 |
| | 100% of Jim Walter Corp. stock | $151.86 |
| | Veil-piercing settlement | $150.48 |
| National Gypsum   $815.00 | Undisputed insurance | $300.00 |
| | Disputed insurance | $390.00 |
| | Austin Company stock | $125.00 |
| EaglePicher, Inc.   $641.76 | Cash | $75.38 |
| | Tax refund | $67.00 |
| | Divestiture notes | $29.55 |
| | Sinking-fund debentures | $250.00 |
| | 97.4% of new stock | $219.83 |
| H.K. Porter   $92.00 | Liquidated assets of company | $92.00 |

claimants the compensation due them from the Johns-Manville Corporation.[12] The amount due a claimant, or the liquidated value of the claim, was determined by an administrative schedule (termed a "matrix") established when the bankruptcy reorganization plan was approved. Under the reorganization plan, the trust was to compensate all future claimants for 100 percent of the liquidated value of their claims against Johns-Manville. The trust began to pay claims in 1988.

Within two years, the trust had paid out so much money that there were serious doubts about its future solvency (Smith, 1990). In 1990, Judge Jack Weinstein ordered the trust to cease payments to all but exigent cases, pending a review of its financial prospects. After extensive expert analyses, a new plan was drawn up under which the trust was to pay all claims against Manville that were expected to arise thereafter, but at the much reduced rate of one-tenth of litigation value.[13]

In 1995, a new reorganization plan was approved by Judge Weinstein.[14] Although appeals were pending, the trust resumed payments to claimants at a rate of 10 percent of the liquidated value of the claims. Payments continued at this rate for six years.

Claims filed with the Manville Trust soared in the last half of 2000 and into the first half of 2001. As a result, demands on the trust exceeded expectations and again threatened its long-term fiscal prospects. The trust commissioned several different projections of likely future claim filings. Various consultants, each of whom had extensive previous experience in the asbestos litigation arena, examined the trends in claims filings and the available epidemiological models on the incidence of asbestos injury and disease. In a letter to Manville Trust claimants, the trust's CEO noted that the consultants now predicted that the trust would receive 1.5 million additional claims and could possibly see as many as 2.5 million additional claims (Austern, June 21, 2001). In July 2001, after analyses of the recent filing trends, the CEO of the trust announced that, pending resolution of any controversy concerning the amount of the pro rata share, the trust would henceforth pay claims at the rate of five cents on the dollar (Austern, July 5, 2001). Analyses of filing trends in late 2001 and 2002 suggested that the funds expected to be available to the trust going forward would not be sufficient to pay all future claims even at the reduced level of 5 cents on the dollar, meaning that the trust would have to further reduce its payments. Although the prior reductions (to 10 percent and then to 5 percent of the liquidated value of

[12] *Matter of Johns-Manville Corp.*, 68 B.R. 618 [(Bankr. S.D.N.Y., 1986)], *aff'd in part, rev'd in part, Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2nd Cir. 1988).

[13] *Findley v. Blinken*, 129 B.R. 710 (E.&S.D.N.Y. 1991) (approving a class action settlement), vacated 928 F.2d 721, modified 993 F.2d 7 (2nd Cir. 1993); *In re Johns-Manville Corporation*, 878 F. Supp. 472 (E.&S.D.N.Y. 1995).

[14] *In re Joint Eastern and Southern Districts Asbestos Litigation*, 878 F. Supp. 473 (E.D.N.Y. 1995), *aff'd in part, vacated in part*, 78 F.3d 764 (1996).

the claims) had reduced the amounts paid to all claimants, including the most seriously injured, the trust this time decided to adopt a sliding scale of reductions to its payment schedule, with the result that payments to less seriously injured claimants were reduced, while payments to more seriously injured claimants were maintained at the levels established in 2001.

The Manville Trust's experience has been replicated in the other trusts that were established to provide asbestos claimants with the compensation due them from a defendant who filed for bankruptcy. National Gypsum, as noted above, has also been relitigated due to an inability to fully compensate asbestos complainants. Facing an unexpected increase in claims, the UNR Asbestos Disease Claims Trust in November 2000 implemented a $100 filing fee for all claimants. It also lowered the cap on additional compensation paid to claimants who filed for independent review, and whose claims past muster, from 12.9 percent to 7.5 percent more than the amount specified in the compensation schedule for their category of claims.[15] (Claimants who simply accepted the amount of compensation specified in the compensation schedule without an additional review were not affected by the decrease in the award, although they were required to pay the filing fee.) In 2001, the EaglePicher and Celotex Trusts reduced payments to claimants to 15.5 percent and 10 percent, respectively, of the liquidated claim value (Claims Resolution Management Corporation, 2001, p. 26).

## Disputed Reorganizations: Raymark Industries and Celotex

The reorganization of two companies that filed for bankruptcy in the wake of asbestos claims was complicated by extensive litigation involving pre-petition transactions with related entities. In both cases, it was alleged that the transactions were intended to shield corporate assets from asbestos litigation.

The first example concerns Raymark Industries and Raytech Corporation. Raymark Industries, the successor of Raybestos-Manhattan, was already in severe financial trouble in the mid-1980s. Raymark created a new subsidiary, Raytech Corporation, in June 1986. After a series of complex transactions, Raytech owned the only two remaining profitable divisions of Raymark and had none of the Raymark Industries' asbestos liability.[16] Raymark was named the debtor in an involuntary Chapter 11 petition filed in Pennsylvania in September 1988.[17] Raytech was held to be Raymark's "successor in liability" in December 1988.[18]

---

[15] "UNR Trust Lowers Payment Percentage . . . ," 2000.

[16] *Schmoll v. AC&S,* 703 F. Supp. 868, 869-873 (1988).

[17] *In re Raymark Industries,* No. 88-21315 (E.D. Pa. 1988).

[18] *Schmoll v. AC&S,* 703 F. Supp. 868, 869 (1988), *affirmed,* 977 F.2d 499 (9th Cir. 1992).