## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **W. R. GRACE & CO.,** *et al.*, | ) | **Case No. 01-1139 (JKF)** |
| | ) | **(Jointly Administered)** |
| Debtors. | ) | |

## DEBTORS' STATUS REPORT REGARDING MOTION TO APPROVE ASBESTOS PI ESTIMATION CMO AND QUESTIONNAIRE[1]

Dated: July 13, 2005

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick
Jonathan Friedland
Salvatore Bianca
200 East Randolph Drive
Chicago, IL 60601
Telephone: (312) 861-2000

KIRKLAND & ELLIS LLP
Barbara Harding
Brian T. Stansbury
655 15th St., NW
Washington, D.C. 20005
Telephone: (202) 879-5000

PACHULSKI, STANG, ZIEHL, YOUNG,
JONES & WEINTRAUB P.C.
Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100

Co-Counsel to Debtors and Debtors in Possession

---

[1] This brief is an amended version of "Debtors' Status Report Regarding Motion To Approve Asbestos PI Estimation CMO and Questionnaire," which was filed on July 14, 2005. This version adds a Table of Authorities and makes corrections to two citations – changing "Fed. R. Evid. 26(b)" to "Fed. R. Civ. P. 26(b)" on page 6 and changing "Rule 702 of the Fed. R. Civ. P." on page 17 to "Fed. R. Evid. 702" on page 18. No other changes have been made to the brief.

## TABLE OF CONTENTS

Page

I.    THE STANDARDS GOVERNING THE SCOPE OF THE QUESTIONNAIRE
      ARE THE SAME AS THE STANDARDS GOVERNING DISCOVERY. ...................... 8

II.   THE COURT SHOULD INITIATE THE ESTIMATION PROCEEDINGS BY
      ADOPTING AND ISSUING THE DEBTORS' QUESTIONNAIRE WHICH
      HAS BEEN REVISED IN AN ATTEMPT TO ADDRESS THE CONCERNS OF
      THE OBJECTORS AND THE COURT.............................................................. 12

III.  THE PROPOSED QUESTIONNAIRE SEEKS EVIDENCE RELEVANT TO
      THE ESTIMATION AND IS DESIGNED TO MINIMIZE THE CLAIMANTS'
      DISCOVERY BURDEN............................................................................... 16

      A.    The Importance of Information and Data Relating to the Reliability of B-
            Reading Evidence............................................................................... 18

      B.    PFT Information Is Necessary to Determine Impairment..................................... 22

      C.    Litigation History is Necessary to a Determination of a Claim's Validity ........... 25

      D.    Evidence of Exposure to Grace and Non-Grace Asbestos-Containing
            Products Is Relevant Evidence in an Estimation Proceeding............................... 26

      E.    The Relevance of a Complete Occupational History ........................................... 27

IV.   THE COMPETING QUESTIONNAIRE DOES NOT PROVIDE MEANINGFUL
      DISCOVERY ....................................................................................... 29

V.    THE DEBTORS' PROPOSED CASE MANAGEMENT ORDER .................................. 29

K&E 10627184.17

# TABLE OF AUTHORITIES

**Page(s)**

*Cases*

*Acuna v. Brown & Root, Inc.*,
    200 F.3d 335 (5th Cir. 2000) ............................................................................................ 12

*Harold's Auto Parts, Inc. v. Mangialardi*,
    889 So.2d 493 (Miss. 2004) ................................................................................... 11, 12, 31

*In re O'Brien*,
    351 F.3d 832 (8th Cir. 2003) ............................................................................................ 31

*In re Silica Prods. Liab. Litig.*, No. 1553, 2005 WL 1593936 (S.D. Tex. June 30, 2005) .... passim

*In re USG Corp.*,
    290 B.R. 223 (Bankr. D. Del. 2003) ................................................................................. 32

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) ........................................................................................................ 17

*Societe National Aerospatiale v. United States Dist. Court*, 482 U.S. 552 (1987) ........................ 8

*Transportes Aereos de Angola v. Ronair, Inc.* 104 F.R.D. 482 (D. Del. 1985) ............................ 30

*Other Authorities*

AMA Guidelines ....................................................................................... 23, 24, 27, 28

ATS, *Standardization of Spirometry*, *1994 Update*,
    Am J Respir Crit Care Med, 152:1107 (1995) ................................................................. 25

Dr. David Weill, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse
    (Feb. 3, 2005) ................................................................................................................. 20

Dr. Paul Epstein, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse
    (Feb. 2, 2005) ................................................................................................................. 20

Dr. Theodore Rodman, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse
    (Feb. 2, 2005) ................................................................................................................. 20

*In re Silica*, Tr. of Hr'g
    (S. D. Tex. Feb. 18, 2005) ............................................................................................... 20

Rand Institute for Civil Justice,
    *Asbestos Litigation* (2005) ........................................................................................... 1, 2

K&E 10627184.17

*Rules*

Fed R. Civ. P. 26(b) ..................................................................................................... 6, 30

Fed. R. Bankr. P. 7026 ..................................................................................................... 8

Fed. R. Bankr. P. 9014 ..................................................................................................... 8

Fed. R. Civ. P. 11(b)(3) ................................................................................................... 12

Fed. R. Civ. P. 26(a)(1)(B) .............................................................................................. 11

Fed. R. Civ. P. 26(b)(1) ..................................................................................................... 9

Fed. R. Civ. P. 26(b)(2) ..................................................................................................... 9

Fed. R. Civ. P. 26(c) .......................................................................................................... 9

Fed. R. Civ. P. 30 .............................................................................................................. 9

Fed. R. Civ. P. 33 .............................................................................................................. 9

Fed. R. Civ. P. 34 .............................................................................................................. 9

Fed. R. Civ. P. 35(a) .......................................................................................................... 9

Fed. R. Civ. P. 36 .............................................................................................................. 9

Fed. R. Civ. P. 37(b)(2) .................................................................................................... 30

Fed. R. Civ. P. 37(b)(2)(C) .............................................................................................. 30

Fed. R. Civ. P. 45 .............................................................................................................. 9

Fed. R. Evid. 702 ............................................................................................................. 18

K&E 10627184.17

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **W. R. GRACE & CO., *et al.*,** | ) | **Case No. 01-1139 (JKF)** |
| | ) | **(Jointly Administered)** |
| Debtors. | ) | |

## DEBTORS' STATUS REPORT REGARDING MOTION TO APPROVE ASBESTOS PI ESTIMATION CMO AND QUESTIONNAIRE

### INTRODUCTION

Debtors file this Status Report in support of their May 10, 2005 Motion to Approve the PI CMO and Questionnaire (the "Motion") which sought an order (i) approving the Debtors' proposed Case Management Order (CMO) regarding the estimation of asbestos personal injury claims; and (ii) requiring each holder of an asbestos personal injury claim who filed a lawsuit against Debtors prior to the Petition Date to complete and return Debtors' proposed "Questionnaire" as a means of discovery in connection with the estimation hearing. Six parties objected to the Debtors' Motion.[2] Two parties, the Equity Committee and the General Unsecured Creditors Committee, filed pleadings in support of the Debtors' Motion. Since the filing of the Debtors' CMO brief, several events have occurred that are relevant and have significance to the issues raised by the Debtors' CMO Motion currently before the Court.

**The Rand Report**

First, on the day that the Debtors filed their CMO brief, the Rand Institute for Civil Justice released its final report on asbestos litigation. Rand Institute for Civil Justice, *Asbestos*

---

[2]    The "Objectors" included the Asbestos PI Committee, the Future Claimants Representative ("FCR"), the Asbestos PD Committee, Libby Claimants, Maryland Casualty Company, and Certain Insurers.

*Litigation* (2005) [hereinafter, "Rand Report, 2005"] (attached as Exhibit 1). The Debtors' brief in support of the PI CMO and Questionnaire cites extensively to the interim Rand Report published in 2002. The final Rand Report further supports the Debtors' positions as follows:

- Claimants with nonmalignant conditions are a growing proportion of all claimants:

    "Nonmalignant claims accounted for roughly 80% of all claims entering the system through the mid-1980s. The fraction of claims that asserted nonmalignant conditions grew through the late 1980s and early 1990s, rising to more than 90 percent of annual claims in the late 1990s and early 2000s." Rand Report, 2005, at xxv.

- Many claimants are unimpaired:

    "Some evidence suggests that most nonmalignant claimants are currently unimpaired." *Id.* at xxv.

- Plaintiff law firms are suing peripheral defendants:

    "At least 8,400 entities have been named as asbestos defendants through 2002." *Id.* at xxv, 78-79. The 2002 Rand Report estimated only 6,000. Similarly, defendants and claims from workers in non-traditional industries are increasing at a greater rate than claims from workers in traditional asbestos-exposed industries. *Id.* at 76-77, 81-83.

### The Silica Decision

Second, on June 30, 2005, United States District Court Judge Janice Graham Jack issued Order No. 29: Addressing Subject-Matter Jurisdiction, Expert Testimony and Sanctions in the matter of *In re Silica Prods. Liab. Litig.*, No. 1553, 2005 WL 1593936, at *1 (S.D. Tex. June 30, 2005) (attached as Exhibit 2). *In re Silica* involves approximately 10,000 plaintiffs in Mississippi, West Virginia, Alabama, California, Illinois, Michigan, Oklahoma, and Texas, and dozens of manufacturing and mining company defendants, including 3M Company, Lockheed Martin, Vulcan Materials, and U.S. Silica. Two of the Court's findings in particular bear relevance to the Grace bankruptcy: (1) thousands of plaintiffs in the Silica Litigation have apparently already separately asserted claims against asbestos defendants for the *same* injury

2

involved in their silica claims; and (2) the plaintiffs' silicosis diagnoses in the Silica Litigation appear to be questionable, if not fraudulent. Judge Jack stated that testimony during *Daubert* hearings that took place February 16-18, 2005 raised "great red flags of fraud" on the part of doctors and plaintiff attorneys involved in the case. Tr. of Hr'g at 24 (Feb. 17, 2005). Notably, many of the *same doctors and plaintiffs' attorneys* are involved in Grace's bankruptcy.

It is almost ironic that for the past three years, the Debtors have contended that the most critical issue to resolving this bankruptcy is the reliability of the scientific and medical data underlying their asbestos claims. At the same time, and in the face of mounting evidence from the medical, legislative, and legal communities suggesting that those data are unreliable, the claimants' committees have resisted any and every attempt of the Debtors and the Court to investigate the medical and scientific foundation of those claims. It is precisely that proposition, namely -- the unreliability of scientific and medical data -- that formed the basis of Judge Jack's opinion in *In re Silica*. Moreover, in its investigation of the reliability of the medical and other scientific data underlying the silica claims, Judge Jack employed precisely the same procedure and standards for dealing with large numbers of claims that the Debtors here have advocated before this Court. Indeed, Judge Jack accomplished the claims review and expert analysis in a relatively short period of time (indeed, during the same time period that the claimants have persistently argued against this process)..

What the Silica court found is not astonishing to those who have seriously investigated the proliferation of asbestos and silica claims in the United States and indeed, in some respects, is merely confirmation of the factual predicate stated in the Debtors' CMO brief. Because the opinion is over 250 pages long, the Debtors recite just a sample of the highly relevant findings of the Court:

3

- Commenting on the fact that of the 6,757 silica plaintiffs screened by one company, 4,031 of those plaintiffs also had filed asbestos claims: "[T]he magnitude of this feat becomes evident when one considers that many pulmonologists, pathologists and B-readers go their entire careers without encountering a single patient with both silicosis and asbestosis." Order at 80. "Stated differently, a golfer is more likely to hit a hole-in-one than an occupational medicine specialist is to find a single case of both silicosis and asbestosis. [The screening company] parked a van in some parking lots and found over 4,000 such cases." *Id.*

- Commenting on the conduct of the lawyers, many of whom have claims against Grace, the Court stated: "In the majority of cases, these diagnoses are more the creation of lawyers than of doctors." Order at 149.

- Regarding Dr. Harron's diagnosis of silicosis for 1,807 silica plaintiffs who had previously filed asbestosis claims based on Dr. Harron's B-reading of the same x-rays]: "the sheer volume of Dr. Harron's asbestosis/silicosis reversals ... can only be explained as a product of bias -- that is, of Dr. Harron finding evidence of the disease he was currently being paid to find." Order at 157. Grace has historically paid thousands of claims supported by Dr. Harron's "diagnosis" and believes that of the current claims, many if not thousands, are supported by his work.

- Highlighting the applicability of her findings to the asbestos litigation, Judge Jack stated: "It is worth noting that this evidence of unreliability of the B-reads performed for this MDL is matched by evidence of unreliability of B-reads in asbestos litigation." Order at 136 (citing *American Radiology* study in which 492 chest x-rays that had been read by plaintiffs' doctors had a 4.5% positive asbestosis rate versus the 95.9% positive rate achieved by the plaintiffs' doctors).

Judge Jack made numerous findings concerning the difference between relevant medical standards and methods, and the actual methods and "standards" employed by the plaintiffs' doctors:

- "[A] thorough, detailed, physician-guided work/exposure history is the kind of history that experts in the field of occupational medicine insist upon when diagnosing silicosis. *It is therefore the type of history required by the Federal Rules for these diagnoses to be admissible.*" Order at 125 (emphasis added) (finding that the doctors did not solicit the critical information).

- "[T]he gulf between the methodology Dr. Levy employed for this litigation and the methodology Dr. Levy advocates in his academic work starkly contravenes the Supreme Court's requirement that an expert ... *employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.*" Order at 159 (internal citations and quotations omitted) (emphasis added).

4

- Additionally, the Court harshly criticized the same doctors in the silica MDL who have diagnosed asbestos claimants (including Dr. Ray Harron who has diagnosed many of the Grace claimants). "[T]he failure of the challenged doctors to observe the same standards for 'legal diagnosis' as they do for a 'medical diagnosis' renders their diagnoses in this litigation *inadmissible under Rule 702*." Order at 147 (emphasis added).

This opinion, along with all the evidence contained in the Debtors' CMO brief, provide the backdrop against which the Debtors seek the Court's approval to serve a discovery questionnaire on the current claimants of record.

**The Parties' Negotiations**

Finally, the remaining events of significance leading up the filing of this Status Report involve the meetings and negotiations among the parties. The parties participated in telephonic conversations following the last hearing on this case, and those conversations culminated in face-to face meetings on July 8, 2005 at the offices of Kirkland & Ellis LLP in Washington, D.C. While some of the issues with respect to the Motion were narrowed as a result of these negotiations, there remain fundamental disagreements. Critically, some of these disagreements need to be resolved before the Debtors can serve the Questionnaire and start the estimation proceedings. Other disagreements, which may be significant as well, have emerged, but can be resolved during the estimation and plan confirmation process. Thus, this Status Report serves as a guide to what issues have or have not been resolved, and to highlight which of the unresolved issues must be addressed in order for the Court to rule on the Motion.

Accordingly, though the following important issues are in dispute among the parties, the Court does not need to decide them prior to approving the CMO and Questionnaire. They are:

- *The Proper Estimation Methodology.* The parties have opposing views concerning the appropriate method for conducting an estimation of current and future personal injury asbestos claims liability. The Court is well aware of the disputes among the parties concerning these issues, as they have been briefed repeatedly by all parties since the beginning of the case, and discussed numerous times during hearings before this Court. At the end of the day, there will be competing estimation models

5

and methods offered by various parties to these bankruptcy proceedings. The Court need not decide what methodology to adopt before hearing from the experts who are the proponents of the respective estimation models and methods.[3]

- *The Use of the Final Estimates in the Plan.* At this time, the Court need not decide what the proper use of the final estimates should or will be in confirming a Chapter 11 Plan. Again, the parties have opposing views concerning the ability to impose an aggregate dollar cap on a class of claims and on whether such a "capped" class can be unimpaired under the Code. Indeed, these issues were the subject of extensive briefing earlier in the case and were specifically reserved by the Court as a matter it would decide *after* the estimation hearing.[4] Moreover, the Debtor may seek to modify and tailor the Plan in light of the issues raised. However important the issue is, it has no bearing on the limited issues raised by Debtors' Motion to Approve the CMO and Questionnaire.

- *Use of Information Obtained in Discovery in Estimation Models.* Contrary to the suggestions of some Objectors, Debtors are not obligated at this time to provide a road map of how their experts will utilize the information from the Questionnaire in an evidence-based estimation. Similarly, the Court need not decide now what the appropriate or inappropriate use of that information will be. Rather, as discussed below, all that Debtors need demonstrate now is how the Questionnaire is likely to lead to the discovery of relevant information. *See* Fed. R. Civ. P. 26(b).

Further, there are additional issues that are germane to the CMO process but that cannot legitimately be contested anymore:

- *Entitlement to Discovery Relating to the Estimation.* This issue already has been decided. The Court has ruled repeatedly that Debtors are entitled to discovery. *See*

---

[3]  *See* Tr. of Hr'g at 12 (Jan. 21, 2005) ("With respect to the case management order, until we get an approved disclosure statement, frankly, I think that's something that can wait. I think we need to see whether or not we can get an approved disclosure statement..."); *id.* at 132 ("But, I do agree with you, that the appropriate way to do this is through a battle of experts."); *id.* at 136 ("All I'm trying to get to is an estimation process. It seems to me that experts may disagree about the appropriate methodology to use. That will be a *Daubert* issue."); *id.* at 139-140 ("But, regardless, the information that the debtor wants, I think, is appropriate for an expert to take a look at. Whether I'm going to consider it, what value I'll place on it, whether it meets *Daubert* or not, I think is an issue down the road.").

[4]  *See id.* at 150. ("So, the confirmation procedures, at this point, I think, can be deferred."); *id.* at 169 ("Well, I don't know where we stand on the issue of the right to vote. I think what we're doing is looking at an estimation hearing, and the outcome of that estimation hearing will probably govern whether there is or is not impairment in the financial sense, that I was getting to earlier."); *id.* at 171 ("I'm happy to have that same issue deferred [voting], if in fact we're going to do an estimation hearing on property damage, or some objection to claim process on property damage."); *id.* at 172 ("Okay. I am not taking that under advisement. I will simply ask the debtor, once we get through the estimation processes, or objection to claim processes, whichever they are, to put that issue [voting] back on the agenda, and I'll deal with it then.")

6

Tr. of Hr'g at 80 (June 27, 2005) ("The debtor has the right to discovery to know what the current claims are, and that will be a much better basis for estimation of current claims and possibly future claims than anything else."); *see also* Tr. of Hr'g at 117-18 (Jan. 21, 2005) ("You folks are going to need discovery whether I go through Mr. Bernick's process or the traditional type estimation hearing that [Mr. Lockwood] is proposing."). Indeed, the Debtors already have produced discovery to the Asbestos PI Committee, including aggregate information relating to claims, settlement history and prediction of future claims; and

- *Use of Questionnaire to Conduct Discovery.* The Court need not entertain argument again on the merits of using a questionnaire in lieu of traditional discovery. The Court already has decided that a questionnaire will be sent to the claimants who filed suit against Debtors before the Petition Date. *See* Tr. of Hr'g at 71-72 (June 27, 2005) ("I will approve a claim form of some sort. I'm not saying what sort, but I will, folks, approve a claim form because it may be useful to all parties in the estimation, and I will consider it appropriate discovery. Rather than taking depositions of 400,000 personal injury plaintiffs, we're going to do it through the claim forms. So it will be approved.")[5]

By contrast, there are only two issues that require the Court's decision before the estimation proceedings can begin. They are: (1) what is the proper scope and content of the questionnaire that will be sent to the current asbestos PI claimants; and (2) what is an appropriate schedule for discovery leading up to the asbestos personal injury claims estimation hearing. Accordingly, the remainder of this Status Report will focus on the facts and legal standards relevant to these two unresolved and pertinent issues. Specifically, the Debtors will address: (i) the standards governing the scope of the Questionnaire; (ii) the current content and scope of the Debtors' proposed Questionnaire, which has been revised as a result of the aforementioned negotiations; (iii) the relevance of the information requested in the Questionnaire; (iv) the Asbestos PI Committee's proposed alternative questionnaire and the reasons why it fails to meet

---

[5]  *See also* Tr. of Hr'g at 80 (June 27, 2005) (Court: "I said a claim form. And the reason for the form is that the debtor's view as to how an estimation hearing is going to take place and the rest of the world's is very different. I want to see what comes out of the claim forms.")

the discovery needs of the Debtors; and (v) the Debtors' proposed CMO, and the remaining disputes (which are minimal) the parties have with respect to it.

## DISCUSSION

### I.   THE STANDARDS GOVERNING THE SCOPE OF THE QUESTIONNAIRE ARE THE SAME AS THE STANDARDS GOVERNING DISCOVERY.

As noted above, the Debtors are entitled to discovery under the Bankruptcy Rules in connection with this Court's estimation of asbestos personal injury liability. *See* Fed. R. Bankr. P. 9014. Indeed, Debtors in a bankruptcy proceeding are entitled to take discovery to the same extent as they would be were the claim proceeding in litigation outside the bankruptcy context. *See* Fed. R. Bankr. P. 7026 (incorporating Fed. R. Civ. P. 26). Moreover, the Debtors' right to this broad discovery has been repeatedly confirmed by this Court which has stated:

> The debtor *has the right* to discovery to know what the current claims are, and that will be a much better basis for estimation of current claims and possibly future claims than anything else. So, let's get it done. Let's find out what the claims are, what people say they have by way of claims. . . . [I]f counsel does their job right, [ ] be a legitimate basis for figuring out what the claims are.

Tr. of Hr'g at 80 (June 27, 2005) (emphasis added); Tr. of Hr'g at 118-19 (Jan. 21, 2005) ("[D]iscovery's a two-way street and the Federal Rules of Evidence apply both ways. I wholly endorse the concept and if there is additional discovery needed, I assure you, [the Debtors are] going to get it."), *see also Societe National Aerospatiale v. United States Dist. Court*, 482 U.S. 552, 540 n.25 (1987) (It is a "fundamental maxim that '[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation.'")

In the same fashion, the breadth of discovery to which Debtors are entitled is defined by the Federal Rules of Civil Procedure which provide that:

> Parties may obtain discovery regarding *any matter*, not privileged, *that is relevant to the claim or defense of any party*, including the

8

> existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.

Fed. R. Civ. P. 26(b)(1) (emphasis added). Moreover, the Federal Rules of also allow parties to obtain this discovery through a panoply of methods including depositions, interrogatories, requests for admissions, requests for the production of documents, requests for inspection, and subpoenas issued to third-parties (including the claimants' physicians), all of which carry burdens—some significant—to the litigant from whom discovery is sought. *See* Fed. R. Civ. P. 30, 33, 34, 36, & 45.[6]

The burdens associated with traditional discovery methods are part and parcel of litigation, and ones that a plaintiff, or, as here, a claimant, freely and willingly chooses to assume when he or she makes the decision to bring a claim. Pursuant to Federal Rule of Civil Procedure 26(b)(1), "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party[.]" Rule 26(b)(1) further advises that 'relevance' is to be liberally construed, in that the information sought need not be admissible at trial, but "reasonably calculated to lead to the discovery of admissible evidence." While the burden of the information sought is indeed a consideration with regard to discoverable information, it does not outweigh the discovery of relevant information, absent a showing of good cause by the opposing party. Fed. R. Civ. P. 26(b)(2) & (c).

---

[6]   Indeed, the Federal Rules even provide that:

"When the ... physical condition ... of a party ... is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner .... The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made."

Fed. R. Civ. P. 35(a).

Instead of pursuing the extensive discovery to which they are entitled, and exposing each claimant who sued Debtors prior to the Petition Date to the burdens associated with complying with such requests, Debtors seek to obtain their discovery through a 14-page questionnaire [8 pages of questions, 6 pages of instructions]. This discovery mechanism will be easier, faster, and less expensive for all parties.[7] Indeed, questionnaires are commonly used in civil litigation and asbestos bankruptcies for these very reasons, and have been used in the estimation of property damages in this very action.[8] In fact, this Court has already expressed its approval o the Questionnaire as an appropriate method of obtaining discovery in this case. *See* Tr. of Hr'g at 140 (Jan. 21, 2005) ("What the debtor intends to do seems to me, in an estimation process, to be calculated to lead to relevant admissible evidence. And for discovery on an estimation process, that's all I need."); *id.* at 132 ("It seems to me that is has some value to do a questionnaire, and you know, the form of discovery, I think, is somewhat within the discretion o the Court and we can treat it as though it's a series of interrogatories.").

Yet, despite this significant concession by Debtors, the claimants still object to the issuance of a questionnaire claiming that the "[p]roduction of information required in [the] Questionnaire is more extensive and intrusive than full discovery in a lawsuit." (Asbestos PI Committee, at 64-68). In addition to being ridiculous on its face, the claimants' objection highlights and underscores its true goal: To deny Debtors *any* information concerning the claims against them, information to which this Court already found Debtors entitled to receive. *See* Tr. of Hr'g at 80 (June 27, 2005); Tr. of Hr'g at 117-18 (Jan. 21, 2005).

---

[7] The Questionnaire provides the additional benefit of a consistent platform for the information, which is necessary in order for statistical analyses which are associated with the estimation to be conducted.

[8] *See* Debtors' CMO Motion, Tab 4, at 10-12 (for further discussion about the use of Questionnaires).

Moreover, the disingenuousness of this objection is clearly revealed when the relevant law is examined. As discussed in Debtors' May 10, 2005 Motion to Approve PI CMO and Questionnaire, those claimants who filed a lawsuit against Grace already should have provided the requested information to their counsel. (CMO Motion, Tab 4, at 5). Indeed, Rule 26(a)(1) requires a party to litigation to provide the very information requested by the Questionnaire prior to being served with any formal discovery request:

> [A] party must, ***without awaiting a discovery request***, provide to other parties: . . . a copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses . . . .

Fed. R. Civ. P. 26(a)(1)(B) (emphasis added).

Courts have recognized that attorneys who fail to gather the very information sought in the Questionnaire have run afoul of Rule 11. In *Harold's Auto Parts, Inc. v. Mangialardi*, 889 So.2d 493 (Miss. 2004), the Mississippi Supreme Court heard an appeal in an asbestos case where the attorneys filed claims on behalf of plaintiffs without verifying whether the individual claimants had been exposed to asbestos in the State of Mississippi:

> The case before us has endured seven amended complaints, and now involves the claims of 264 plaintiffs against 137 named defendants who have identified approximately 600 different employers where asbestos exposure might have taken place. Approximately 220 of the plaintiffs are unable to identify any employment within the state of Mississippi.

889 So. 2d at 494. The court noted that "we are not told which plaintiffs were exposed to which products manufactured by which defendants; nor are we told when any particular plaintiff was exposed during the seventy-five year period. . . ." *Id.* The court called this "basic information" and found that the failure to provide such basic information constituted "an abuse of, and failure to comply with, Rules 8, 9, 10 and 11. What is referred to as 'core information' and 'disclosure'

11

is basic information which should be known to plaintiffs' counsel *prior* to filing the complaint, not information to be developed in discovery or disclosure. The information should have been included in the complaint." *Id.* at 494-95.

The District Court for the Southern District of Texas's recent opinion in *In re Silica* also reinforces the fact that the diagnostic information underlying each plaintiff's claim should have been known to the filing attorney prior to commencing an action against the defendants.

> [B]ecause the lawyers short-circuited the appropriate diagnostic process, [they]-- at a minimum-- recklessly disregarded the fact that there is no reliable basis for believing that every Plaintiff has silicosis. And this basic information regarding the nature of each Plaintiff's injuries is information [the lawyers] should have known *before* filing their claims in this Court.

*In re Silica Products Liability Litigation*, Order at 237 (June 30, 2005) (citing *Acuna v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000); Fed. R. Civ. P. 11(b)(3)) (emphasis in original).

The essence of claimants' position is that completion of the Questionnaire is more burdensome than the discovery they would have faced had their claims come to trial. As demonstrated above, this position has no foundation in law or fact. Rather, as discussed below, the Questionnaire is narrowly tailored to elicit information relevant to an evaluation and estimation of current and future claims liability.

## II. THE COURT SHOULD INITIATE THE ESTIMATION PROCEEDINGS BY ADOPTING AND ISSUING THE DEBTORS' QUESTIONNAIRE WHICH HAS BEEN REVISED IN AN ATTEMPT TO ADDRESS THE CONCERNS OF THE OBJECTORS AND THE COURT.

In June of 2001, the Debtors first proposed the use of a Questionnaire to gain discovery about the PI asbestos claims and submitted a proposed Questionnaire at that time. In November of 2004, in connection with the Debtors' request for an estimation, the Debtors again proposed that a questionnaire be sent to claimants who sued the Debtors before the Petition Date and

offered a revised questionnaire (Docket No. 6899). On May 10, 2005, the Debtors proposed another new draft of the Questionnaire (Docket No. 8394). On several different occasions, the Court has stated that it intends to approve a questionnaire and that the Debtors are entitled to receive discovery concerning the current claimants' claims. Tr. of Hr'g at 71-72, 80 (June 27, 2005) (*supra*). Despite the Court's unequivocal statements that Debtors are entitled to and will get discovery via a questionnaire of some sort, the asbestos claimants' committees have remained unyielding in their position that Debtors are not entitled to the questionnaire. Indeed, until this past Friday, the Asbestos PI Committee and Libby Claimants still had not agreed to the issuance of even one question. And, as Debtors understand, the Asbestos PI Committee and Libby Claimants would still prefer not to have any questionnaire. (*See* PI Comm. Obj. at 12, n.7, Libby Obj. at 5).

The Debtors' fundamental position concerning issuance of the Questionnaire remains the same - they are entitled to the full range of discovery afforded by Fed. R. Civ. Proc. 26, but are willing to forgo that more extensive discovery in favor of an efficient procedure designed to elicit information in a consistent format that will be relevant to an estimation of current and future liability. Accordingly, in an effort to gain consensus on the Questionnaire, the Debtors offer yet another Questionnaire, revised in an effort, as discussed below, to addresses many of the concerns raised by the Objectors. *See* Revised Questionnaire (attached as Exhibit 3).

First, both the Objectors and the Court have expressed concern about the length of the Questionnaire. This Court specifically requested that the Questionnaire be under 20 pages. *See*

13

Tr. of Hr'g at 71-72 (June 27, 2005).[9]  Accordingly, Debtors have reduced the Questionnaire from its original 17 pages (excluding instructions and appendices) to 8 pages (excluding instructions and appendices).[10]

Second, the Objectors challenged and Debtors have removed questions relating to a Claimants' alcohol consumption (Libby Obj. at 23), radon exposure (Libby Obj. at 23), prescription drug use (Libby Obj. at 24), past history of cancer (Libby Obj. at 23); and non-asbestos litigation (PI Comm. Obj. at 66).  These modifications represent significant concessions by Debtors in that Debtors and their experts continue to believe that all of this information is relevant to an estimation of current and future liability.  Additionally, this information clearly would be discoverable under Rule 26.

Third, in response to the Objectors' concerns that requiring claimants to photocopy additional pages is overly burdensome, the revised Questionnaire includes additional copies of sections that require information that may exceed the provided space.  (*See* PI Comm. Obj. at 4, 8).  Similarly, Debtors have attempted to respond to the Objectors' concerns that the Questionnaire is too complicated by simplifying it and making it more user friendly. Questionnaire at 4-6 (streamlining exposure section and providing extra copies for claimants with multiple product exposures).

Fourth, the Objectors also challenge provisions of the Questionnaire's instructions, which list Debtors' views of the medical standards for asbestos-related disease.  (*See* Libby Obj. at 13-

---

[9]  Previously the Court stated that the questionnaire should not be 50 pages and was "probably not going to be ten pages." Tr. of Hr'g at 155-56 (January 21, 2005) (suggesting that a length somewhere in between would be appropriate).

[10]  The original Questionnaire and accompanying instructions have been reduced from a combined total of 25 pages to 14 pages.

14

20; PI Comm. Obj. at 21). However, as with many other "objections" and complaints lodged by the Claimants' representatives, this issue is not relevant to the Court's current decision concerning the appropriate scope and content of the Questionnaire. The Objectors are once again prematurely raising a challenge to the *use* of the information sought by the Questionnaire – an issue that will be resolved by this Court at a later date. (*See* Libby Obj. at 13). Debtors' definitions with respect to medical conditions are not binding at this time, but they are an important form of notice of what the Debtors intend to argue in support of their view of the estimation. Accordingly, although the Court need not rule on the definitions at this time, they should remain in the Questionnaire so that the claimants, and their lawyers, understand (1) the importance of the information sought; and (2) how the Debtors intend to proceed. The parties may disagree about what constitutes reliable medical evidence of disease, indeed, that disagreement will be one of the primary subjects of the *Daubert* aspect of the estimation. If the claimants' lawyers believe that different information or evidence should be used to demonstrate disease, they will have the opportunity to advance their positions during the course of the estimation proceedings.

Finally, the FCR argues that Debtors fail to provide details as to how they will "quantify and evaluate" the data from the Questionnaire. (*See* FCR Obj. at 4, 20). This argument has no merit. The issue is not how Debtors will quantify and evaluate the information, rather, the only issue is how the information sought in the Questionnaire is relevant to the issues that will be in contention during the estimation process. The relevancy of the information sought is the subject of extensive discussion in Debtors' CMO brief and will be discussed further in the following section.

15

In conclusion, Debtors have made every effort to come to agreement with the claimant committees concerning the content of the Questionnaire. However, the parties' views on this issue are wildly divergent and are not likely to be resolved without the Court's intervention.

**III.    THE PROPOSED QUESTIONNAIRE SEEKS EVIDENCE RELEVANT TO THE ESTIMATION AND IS DESIGNED TO MINIMIZE THE CLAIMANTS' DISCOVERY BURDEN.**

As discussed in Debtors' Motion, given the known abuses in asbestos litigation, the known failure of past estimations and trusts, and the current state of legislative reforms concerning asbestos claims, all of the information in the questionnaire is relevant and proper for use by experts in an estimation of current and future claims liability and value. The foundation for the requests in the Questionnaire are contained primarily in Debtors' Motion to Approve the CMO and Questionnaire. Debtors will not repeat the information and arguments presented in support of the content of the Questionnaire in that Motion.

The recent decision by Judge Janice Graham Jack in *In re Silica Products Liability Litigation* underscores the importance of requiring scientifically reliable evidence in this estimation proceeding. The *In re Silica* decision invalidated several hundred silicosis diagnoses and recommended the invalidation of almost 10,000 more:

> The Court has addressed the testimony it has received regarding *all* the diagnoses by *all* of the challenged doctors in this MDL, despite the fact that . . . the Court has ultimately found that the Defendants have failed to meet their burden of establishing that the Court has subject-matter jurisdiction over the vast majority of these cases . . . . In spite of this, the Court has included its findings concerning all of the testimony it received, in hopes that the state courts that ultimately must shepherd these cases to their conclusion will not have to re-hear *Daubert*-type challenges to these doctors and their diagnoses."

*In re Silica Products Liability Litigation*, Order at 154 (emphasis in original). The court determined that the B-readers and doctors who diagnosed the silicosis claimants failed to follow

16

the appropriate medical guidelines for their specialty and based their opinions on unreliable medical evidence.

The opinion is replete with descriptions of doctors and B-readers who literally mass produced positive silicosis diagnoses without any medical basis whatsoever. The court indicated that the same reckless behavior that led to thousands of invalid silicosis claims has corrupted asbestos litigation as well. Order at 136. The court's solution to this problem was to require scientifically reliable evidence to support a silicosis claim and dismiss those claims based on unreliable evidence. *See* Order at 120-21 (finding that a reliable silicosis diagnoses requires "an adequate exposure to silica dust with an appropriate latency period," "radiographic evidence of silicosis," and "the absence of any good reason to believe that the radiographic findings are the result of some other condition (i.e., a differential diagnosis);" *id.* at 147 (""[T]he failure of the challenged doctors to observe the same standards for 'legal diagnosis' as they do for a 'medical diagnosis' renders their diagnoses in this litigation ***inadmissible under Rule 702.***") (emphasis added); *id.* at 155 ("the reliance ... on inadequate and unreliable (exposure) histories renders the entire diagnosis and accompanying testimony inadmissible"); *id.* at 159. ("Indeed, the gulf between the methodology Dr. Levy employed for this litigation and the methodology Dr. Levy advocates in his academic work starkly contravenes the Supreme Court's requirement that 'an expert ... employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'") (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).

Judge Jack's opinion in *In re Silica Products Liability Litigation* highlights the fact that the information requested by the Debtors in the Questionnaire is not "unnecessary" and "burdensome" as suggested by the Claimants. Rather, the information requested is essential to

17

formulating an expert opinion on estimation that meets the requirements of *Daubert* as interpreted in Fed. R. Evid. 702. *In re Silica Products Liability Litigation* Order at 147. ("[T]he failure of the challenged doctors to observe the same standards for 'legal diagnosis' as they do for a 'medical diagnosis' renders their diagnoses in this litigation *inadmissible under Rule 702.*") (emphasis added).[11]

Thus, the following discussion provides new and further support for the relevance of information sought by the Questionnaire, particularly the information relating to (a) diagnosis and B-readings, (b) PFT tests, (c) past litigation history, (d) exposure to Grace and non-Grace asbestos-containing products and (e) a proper medical and occupational history.

### A.    The Importance of Information and Data Relating to the Reliability of B-Reading Evidence

In relevant part, the Debtors' Questionnaire asks the Claimants to provide the X-ray and B-reader report supporting the Claimants' asbestosis claim.    The Objectors contend that a claimant should not have to provide the actual B-read and X-ray, because a single medical report containing a diagnosis is sufficient to withstand summary judgment.    (PI Comm. Obj. at 21). Additionally, the Objectors argue that there is no need for replicated B-reads.    (PI Comm. Obj. at 41).    However, Judge Jack's discussion of the B-reading "evidence" in the silica litigation provides further critical support for the Debtors' Questionnaire requests relating to this issue. The following are just some of the relevant statements and findings concerning the unreliability of B-read evidence:

---

[11]    Moreover, even if this Court were to consider prior settlement history in estimating asbestos liability (as urged by the Objectors), the Questionnaire is relevant to such estimations methodologies because, as discussed in *Owens Corning*, it will elicit information necessary to determine the nature and extent of any "adjustments" that must be made to estimates based on settlement history.  Indeed, the FCR concedes this very point.  (*See* FCR Obj. at 21.)

- "These [silica] diagnoses rest predominantly upon a positive B-read. Indeed, some of the Plaintiffs' lawyers and even the doctors seemed to enter the *Daubert* hearings under the impression that a positive B-read is a talisman that would dispel any doubts about the diagnoses as a whole. As discussed at length in this Order, according to generally-accepted medical principles, a positive B-read simply does not equal a diagnosis." Order at 51.

- "Furthermore, when comparing the names of the approximately 6,757 N&M generated MDL Plaintiffs with the names in the Manville Personal Injury Settlement Trust . . . at least 4,031 N&M-generated Plaintiffs have also made asbestosis claims. The magnitude of this feat becomes evident when one considers that many pulmonologists, pathologists and B-readers go their entire careers without encountering a single patient with both silicosis and asbestosis." Order at 79-80.

- "Moreover, even assuming that the B-read itself is performed in an unbiased and reliable manner (a highly dubious assumption in these cases), the history and purpose of the B-reader program exposes a more fundamental problem in the Plaintiffs' current use of B-reads." Order at 51.

- "However, in the setting of a mass screening and/or mass B-reading for litigation, the B-reader is acutely aware of the precise disease he is supposed to be finding on the x-rays. In these cases, the doctors repeatedly testified that they were told to look for silicosis, and the doctors did as they were told." Order at 52.

- "The unsound nature of the diagnoses is betrayed not only by the opportunistic transformations of asbestosis reads into silicosis reads, but also by the improbable *consistencies* among the silicosis reads." Order at 54 (emphasis in original).

- "Finally, it is worth noting that this evidence of the unreliability of B-reads performed for this MDL is matched by evidence of unreliability of B-reads in asbestos litigation." Order at 136.

Furthermore, there is no doubt that the same unreliable diagnosis and B-reader reports described and uncovered by Judge Jack in the silica claims exist and flourish in the current PI asbestos Grace claims before this Court. Although incomplete as of the time of the filing of this pleading, the following facts are known:

- There were many law firms identified by Judge Jack as participating in the filing of unsubstantiated claims of silicosis. *Id.* at 60. A preliminary search of Grace's files indicates that a substantial number of those law firms are implicated in Grace's claims. The following is merely a *sample* of law firms that submitted asbestos retreads in *In re Silica* who *also* filed Grace claims and the associated number of pending claims, known to date, in Grace's bankruptcy: Alwyn Luckey (418); Baron & Budd (6,495); Barton & Williams (310); Campbell Cherry (2,947); Cascion,

19

Vaughn Law Offices (2,908); Cumbest, Cumbest, Hunter & McCormick (1,415); Ferraro & Associates (2,461); John Arthur Eaves (2,973); Louis S. Robies, P.A. (2,685); Maples & Lomax (434); Morris, Sakalarios & Blackwell (2,487); Motley Rice, LLC (7,017); Pierce, Raimond, Osterhout, Wade, Carlson & Coulter, P.C. (3,952); Provost & Umphrey (1,252); Varas & Morgan (1,784); Williams, Bailey Law Firm LLP (1,385).

- Judge Jack examined and criticized the conduct of these attorneys, including their practice of B-read shopping, finding: "Sometimes, law firms (especially Campbell Cherry) would ask N&M to have another doctor do re-reads of the x-rays which had been read as positive for silicosis. And if the subsequent B-reader (often Dr. Martindale) did not make a positive silicosis finding, then N&M would send the x-ray to a third B-reader for yet another read. Mr. Mason thought it was even possible that if the third reader also did not make a positive silicosis finding, then the x-ray would be sent to a fourth reader. And while some law firms did not want diagnoses made by Dr. Harron, other law firms (for example, the law firm group of Barton & Williams) would accept the initial Dr. Harron positive B-read even after two subsequent B-readers had read the x-rays as negative for silicosis." Order at 75-76 (internal citations omitted).

- With respect to past settled Grace claims, it appears that the law firms implicated in the silica claims scandal accounted for over 100,000 claimants. For current Grace claims – claims before this Court that will serve as the basis of the Court's ultimate estimation – at least 40,000 of the claims were filed by these same law firms.

- Similarly, Judge Jack identified several doctors and screening companies as providing fraudulent and unfounded medical data concerning silicosis. Importantly, she specifically found that the inaccuracies occurring in the diagnosis of silicosis claims also are occurring in the diagnosis of asbestosis claims. *Id.* at 136. As an example, Judge Jack noted that it is a rare occurrence to find both asbestos and silica-related injuries in the same person.[12] Despite this, Judge Jack found that the

---

[12] *See, e.g.,* Dr. David Weill, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 4 (Feb. 3, 2005) ("Because asbestosis and silicosis have such difference appearances on an x-ray, in a clinical setting, "confusion between silicosis and asbestosis does not occur.") ("Even in China, where I saw workers with jobs involving high exposure to asbestos and silica (such as sandblasting off asbestos insulation), I did not see anyone or review chest radiographs of anyone who had both silicosis and asbestosis."); Dr. Paul Epstein, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 2, 3 (Feb. 2, 2005) ("[T]he x-ray appearances of these two dust-related diseases [i.e., silicosis and asbestosis] are vastly different.") ("[I]t is my professional opinion that the dual occurrence of asbestosis and silicosis is a clinical rarity."); Dr. Theodore Rodman, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 2 (Feb. 2, 2005) ("Among the thousands of chest x-rays which I reviewed in asbestos and silica exposed individuals, I cannot remember a single chest x-ray which showed clear-cut findings of both asbestos exposure and silica exposure."); *In re Silica,* Tr. of Hr'g at 89-90 (S. D. Tex. Feb. 18, 2005) ("Dr. John Parker, former administrator of NIOSH's B-read program and current revision of the ILO guidelines testified that he has never seen a clinical case of asbestosis and silicosis in the same individual.").

K&E 10627184.17

following doctors diagnosed asbestos/silica re-treads in *In re Silica Products*: Robert B. Altmeyer, James Wayland Ballard, John W. Evans, Jr., Andrew Harron, Ray A. Harron, Jack H. Hasson, Jeffrey J. Laborde, Richard B. Levine, Phillip Howard Lucas, W. Allen Oaks, Alvin J. Schonfeld, and Paul C. Venizel.

- The *In re Silica* Court levied heavy criticism against the majority of these doctors. For instance, the Court noted that "in *every one* of the approximately 6,350 reports ... purportedly issued by Dr. [Ray] Harron, Dr. Harron failed to write, read or personally sign the actual report." *In re Silica Products* Order at 84 (other failures included "trust[ing] the secretaries/typists to know how to 'translate [the ILO form] into English' ... despite the fact that none of them had any medical training" and allowing "his secretaries, a typing company, N&M, and perhaps others, to 'prepare [his] reports, stamp [his] name on them and send those reports out without [him] editing or reviewing them.'"); *see also id.* at 89-91 (when confronted by his large number of unexplained asbestosis/silicosis diagnosis reversals Dr. Harron "asked for representation ... [and] did not re-take the witness stand.") The Court found that Dr. Harron's son, Dr. Andrew Harron, followed the same deficient procedures as his father. *Id.* at 91-92. Dr. James Ballard, admitted when testifying that he understood that the statement that "there is exposure to history that's consistent with asbestosis ... meant to Dr. Ballard that the lawyers and/ or [screening company who hired him] want[ed] [Dr. Ballard] to look for asbestosis. Dr. Ballard acknowledged that this could sway his reading." Order at 94 (internal quotation marks omitted). Dr. W. Allen Oaks testified that "[w]hen reading x-rays ... if the screening company told him to read for silicosis, that is the only disease he would mention in his report, even if he felt the x-ray was also consistent with asbestosis. Likewise, if the screening company told him to look for asbestosis, that is all he would report." *Id.* at 113.

- Once again, a preliminary review of the limited information on this issue in Grace's current claims demonstrates that those same doctors and B-readers provide the foundation - the medical "evidence" - for a large number of the claims before this Court in this estimation.

- Finally, and most tellingly, it appears that some of the most flagrant fraud concerning claims - the "retreads", *i.e.*, asbestosis claims turned silica claims and vice versa -- exist in Grace claims as well. Again, this analysis is preliminary, but in a comparison of Grace claims with the claims in the silica litigation, Grace has discovered that numerous current Grace claimants also are/were MDL silica claimants.

In light of the overwhelming and undisputed record demonstrating the unreliability of B-reader evidence, Debtors will advocate during the estimation that value should only attach to asbestosis claims where the claimant provides independent, replicated B-reader reports and the actual X-rays themselves to ensure that fraudulent and unreliable evidence, like that associated

with the silica claims filed by the above lawyers and supported by the above doctors does not taint this estimation as it tainted the proceedings before Judge Jack. Importantly though, the Court does not have to decide at this point that it agrees or disagrees with Debtors' position on this. Rather, all the Court has to do is determine whether the Debtors are entitled to try to determine, via questions in the Questionnaire, how many of its claims are based solely on B-reads of the nature and kind described by Judge Jack in the Silica opinion. The record before the court couldn't be clearer on the issue of relevance with respect to this issue. Indeed, if the Questionnaire is not issued in a substantially similar form to that proposed by Debtors, then Debtors will have no choice but to pursue individualized discovery, or some type of sample of individualized discovery, that will give the Debtors the information and data necessary to conduct an estimation that takes into account the fraud and baseless nature of claims based on the type of B-reader "evidence" described by Judge Jack.

### B.      PFT Information Is Necessary to Determine Impairment

The Objectors also take issue with the requirement of submitting pulmonary function test ("PFT") results for claimants with non-malignant asbestos disease. (PI Comm. Obj. at 28). The PFT results, however, are an essential component of determining whether, and to what extent, the Claimant[13] has suffered pulmonary impairment. As discussed in the May 10, 2005 memorandum of law in support of the Motion, only claimants who have sustained pulmonary impairment are entitled to recovery. (*See* CMO Motion, Tab 4, at 4). Again though, the Court does not need to adopt the Debtors' position at this time in order to issue the Questionnaire seeking this information. On the contrary, even if the Court were to adopt the claimants'

---

[13]   Debtors' references throughout this Status Report to "Claimants" mean only those Claimants who actually sued Grace before the Petition Date.

22

position that unimpaired claimants have valid claims (which they don't), the PFT results still must be produced during estimation discovery. The PFT results are the only data available for distinguishing between asbestosis claims with medical impairment and those without medical impairment. These results will allow the defendants' experts (and the Court) to factor into an estimation the proportion of asbestosis claimants with medical impairment and those with no medical impairment - a factor that is highly relevant and necessary to an accurate estimation of the value of current and future claims.

In order to demonstrate pulmonary impairment, a claimant must demonstrate loss of respiratory function.

> Respiratory impairments that produce a decrement of lung function and affect the ability to perform activities of daily living are assigned an impairment rating. For example, an anatomic change such as a circumscribed pleural plague would be an impairment based on abnormality in anatomic structure. However, if there were no abnormality in lung function and no decrease in the ability to perform activities of daily living, the individual would be assigned a 0% impairment rating.

AMA Guidelines at § 5.1.

In order for the PFT to meet the standards articulated by the AMA, it must be replicable. When conducting an impairment examination, the doctor or technician must ensure that the test is reproducible as a subsequent doctor could modify an impairment evaluation.

> Consistency tests are designed to ensure reproducibility and greater accuracy. . . . The physician must use the entire range of clinical skill and judgment when assessing whether or not the measurements or tests results are plausible and consistent with the impairment being evaluated. If, in spite of an observation or test result, the medical evidence appears insufficient to verify that an impairment of a certain magnitude exists, the physician may modify the impairment rating accordingly and then describe and explain the reason for the modification in writing.

*Id.* at § 2.5c.   In order to enable a subsequent doctor or medical professional to verify an impairment evaluation, a claimant must provide all documentation associated with the original impairment evaluation.

> Performing an impairment evaluation requires considerable medical expertise and judgment. Full and complete reporting provides the best opportunity for physicians to explain health status and consequences to patients, other medical professionals, and other interested parties such as claims examiners and attorneys. Thorough documentation of medical findings and their impact will also ensure that reporting is fair and consistent and that individuals have the information needed to pursue any benefits to which they are entitled.

*Id.* at § 2.3.

The medical test for obtaining measurements of pulmonary impairment is spirometry. *Id.* at § 5.4d ("Forced expiratory maneuver measurements are made from at least three acceptable spirometric tracings that demonstrate uniformity pertaining to both the expiratory flow pattern and concordance of at least two of the three results within 5% of each other."). According to the AMA, "Spirometric testing equipment, calibration, and administration techniques must conform to the guidelines of the 1994 ATS Statement on Standardization of Spirometry." *Id.*

The ATS has established extensive and highly technical guidelines for conducting and interpreting spirometric readings. Among the ATS's primary concerns is whether the spirometry equipment is properly calibrated, maintained, and verified as part of a quality control protocol.

> Routine equipment preventive maintenance - cleaning, calibration checks, verification, and quality control - is essential to assure accurate spirometry results. . . . In any quality control program, an important element is a procedures manual containing: calibration procedures, test performance procedures, calculations, criteria, reference value source, and action to be taken when 'panic' values are observed. A notebook should be maintained that documents daily instrument calibration as well as problems encountered with the system, corrective action required, and system hardware and software upgrades.

24

ATS, *Standardization of Spirometry, 1994 Update*, Am J Respir Crit Care Med, 152:1107, 1116 (1995).

Pursuant to these medical standards and criteria, the Debtors' Questionnaire seeks information relating to the aforementioned tests. The Objectors downplay the need for PFT results by pointing to the recent *Owens Corning* decision where the Court acknowledged the unreliability of PFT's. This decision, however, merely underscores the importance of obtaining reliable PFT results that conform to modern medical standards. Verifying that a PFT was performed in accordance with these standards requires a Claimant to submit the documentation underlying the PFT analysis. Again, as with all the other information requested in the Questionnaire, this is proper discovery. The claimants and their lawyers already should have had this information prior to filing a claim and most likely have produced copies of the test results in connection with the settlement or litigation of other asbestos law suits.

### C.   Litigation History is Necessary to a Determination of a Claim's Validity

The claimants' committees also object to the request for prior litigation history as overly burdensome. In response, Debtors have tailored this request to seek only prior or concurrent litigation relating to silica or asbestos. The reasons for these requests are obvious. First, to be successful in any asbestos claim, the claimant must demonstrate that his exposure to the defendant's product played a substantial causal role in the development of the disease. Thus, lawsuits alleging that other asbestos exposures are substantial causes of claimants' diseases are relevant to determining the validity and value of these groups of claims. Furthermore, where it is universally recognized that claimants and screening companies are taught and coached to hide other confounding exposures, *see* Debtors' CMO Motion; *In re Silica* Opinion at 83-84, 125-26, disclosure of prior and concurrent litigation alleging other asbestos exposures serves as a deterrent to that type of fraudulent conduct.

Finally, as described above, the Debtors have dropped their requests for prior non-asbestos-related litigation, with one notable exception –the Debtors continue to seek discovery related to claimants' past or concurrent silica litigation. After a cursory review of Grace claims records, Grace is convinced that some, and probably many, of the claimants in the Texas MDL silica litigation, also have existing claims against Grace for asbestosis. As discussed above, a number of unscrupulous plaintiffs and their lawyers have attempted to recover for both silicosis and asbestosis based on the same B-reads. Judge Jack found that there was no foundation for such claims. Accordingly, the proposed Questionnaire appropriately seeks information designed to identify those claimants so that estimation experts can take that information into account during the estimation process.

### D.    Evidence of Exposure to Grace and Non-Grace Asbestos-Containing Products Is Relevant Evidence in an Estimation Proceeding

The revised Questionnaire retains specific inquiries about the nature of a Claimant's alleged asbestos exposure, and it specifically seeks information about the Claimants' Grace and non-Grace asbestos exposure. The Objectors argue that claimants should not have to provide specific and reliable information about their exposure to the Debtors' product, arguing that all a claimant must show is that asbestos "was a 'substantial factor' in bringing about his disease." (PI Comm. Obj. at 19).

The Objectors' opposition to providing information about the Claimants' exposure to Grace-specific asbestos is flatly contradicted by the Court's opinion in *In re Silica*; *see also* Debtors' CMO Brief at Tab 4, 2-5 (discussing relevance of asbestos exposure evidence). The *In re Silica* opinion identified history of exposure "to potentially toxic, environmental substances including organic dust and inorganic dust. . . ." (Order at 50) as a vital component of assessing the legitimacy of a claim based on exposure to occupational dust. Thus, information about each

26

claimant's exposure is essential to developing a valid opinion as to whether it was in fact Grace asbestos that caused the claimant's alleged disease. As the AMA guidelines indicate:

> Medical or scientifically based causation requires a detailed analysis of whether the factor could have caused the condition, based upon scientific evidence and, specifically, experienced judgment as to whether the alleged factor in the existing environment did cause permanent impairment. Determining medical causation requires a synthesis of medical judgment with scientific analysis.

AMA Guidelines, § 1.6. Accordingly, the Debtors are entitled to seek discovery relating to this critical issue. In the Debtors' estimation, the lack of this information renders a claim worthless.

### E.     The Relevance of a Complete Occupational History

Diagnosis of occupational dust diseases like asbestosis and silicosis requires information about a patients' exposure history in order to be admissible under the Federal Rules of Evidence.

> [A] thorough, detailed, physician-guided work/exposure history is the kind of history that experts in the field of occupational medicine insist upon when diagnosing silicosis. *It is therefore the type of history required by the Federal Rules for these diagnoses to be admissible.*

*In re Silica Products Liability Litigation*, Order at 125 (emphasis added); *see also id* at 56-57 ("[I]t is vitally important for a physician to take a thorough occupational/exposure history and medical history."); and *see also id.* at 102 ("[T]he proper diagnosis of silicosis ... depends critically on a comprehensive and appropriate patient history that adequately explores the relation of the disease to the occupation."). The court in *In re Silica* analyzed one claimant in particular to illustrate the importance of considering work history prior to diagnosing disease based on a B-read:

> The importance of excluding other conditions which might have caused the positive radiographic findings can be illustrated by the case of Plaintiff Donald Connell. Dr. Harron testified that based upon his ILO form for Mr. Connell, Mr. Connell displayed radiographic findings consistent with coal worker's

27

pneumoconiosis, silicosis, asbestosis, and/or berylliosis. According to Dr. Harron's report which diagnosed silicosis, Mr. Connell worked at Peabody Coal Company. Despite the fact that Mr. Connell presumably would have been exposed to coal while working at a coal company, thus making coal worker's pneumoconiosis an obvious explanation for the positive radiographic findings, Dr. Harron diagnosed only silicosis. Dr. Harron supposed this was because N&M had provided him with an A-sheet indicating exposure to silica. However, the N&M A-sheet did not ask about exposure to coal, presumably because the sheet was produced only for silicosis *and asbestosis* litigation.

*Id.* at 83-84 (emphasis added).[14] The AMA agrees:

It is important to obtain a complete occupational history from the individual to evaluate the possible effect of theses exposures. A chief component of the history contains a chronological description of work activities beginning with the first year of employment and includes names of employers, the specific types of work performed, the materials used by the person, and the potentially toxic materials present in the workplace.

AMA Guidelines, § 5.3b.

Thus, what the Objectors have identified as "irrelevant" - a comprehensive work and exposure history - is actually a vital component of a scientifically reliable opinion of whether a Claimant has a dust-related disease like asbestosis and whether it was in fact Grace asbestos that caused the Claimants' disease. Accordingly, in the Questionnaire, each Claimant must provide a detailed occupational history, and information about whether the Claimants' diagnosing doctor solicited such history prior to rendering the diagnosis.

---

[14] Interestingly, a search of Grace's database located a current asbestosis claim for "Donald Connell." At this time, Grace does not know whether or not this is the same Donald Connell referred to by Judge Jack in the Silica opinion.

## IV.    THE COMPETING QUESTIONNAIRE DOES NOT PROVIDE MEANINGFUL DISCOVERY

The Asbestos PI Committee proposes a competing questionnaire which only requests: a) the identity of the injured party, b) the injured party's attorney (if any), (c) the injured party's diagnosis, and (d) whether the injured party was ever exposed to Grace asbestos-containing products.

The Debtors are at a loss as to what to say about the PI Committee proposed "Questionnaire" and quite simply urge the court to review it and to note that Grace could provide the information requested in it for most claims without any assistance from the Claimants. A returned questionnaire of the sort proposed by the Asbestos PI Committee  amounts to nothing more than a restatement of the allegations contained in the Claimants' complaint filed against Grace. The Grace Claimants' civil complaints provide the name of the disease alleged, the name of the claimant, the name of the attorney filing the suit and an allegation that the claimant was exposed to a Grace asbestos-containing product.   In essence, the Asbestos PI Committee questionnaire would provide precisely the same information already in Debtors' possession and as such, it would be a waste of time and resources to issue such a questionnaire.

As discussed above, Debtors have elected to minimize traditional discovery in these proceedings only if the questionnaire issued provides a meaningful substitute. The Asbestos PI Committee's Questionnaire is not, and clearly was not intended to be, a true discovery device. As such, Debtors will not agree to limit their rights to more traditional discovery if it is issued.

## V.    THE DEBTORS' PROPOSED CASE MANAGEMENT ORDER

The parties essentially agree on the stages and timing of the estimation proceeding.  The main disagreement regarding the CMO stems from disagreement on the scope of discovery, and thus, the form of the Questionnaire, which has been addressed herein.  The Debtors revised CMO

29

is attached as Exhibit 4, and reflects the dates agreed upon with all representatives, including the claimants committees, at the meeting on July 8, 2005. The parties agreed to the dates in this CMO, on condition of the Court's adoption of the Debtors' proposed Questionnaire.

The only other remaining disagreement concerns the consequences for failing to timely return the Questionnaire. As discussed in the Response to the Motion filed by the Official Committee of Equity Security Holders, sufficient consequences must be imposed for failure to complete the questionnaire in order to prevent claimants from picking and choosing which claimants will provide completed questionnaires. Although imposing a bar date may be the most effective means of preventing such sampling bias, other options are also available to the court. One alternative to barring claims is to estimate claims not accompanied by a completed Questionnaire at zero. However, valuing such claims at zero, may result in an underfunding of the trust absent disallowance of the claim.

Furthermore, Claimants have a duty to comply with any discovery order as set by this Court. Fed. R. Civ. P. 26(b) (2005). Failure to comply with the discovery order could lead to sanctions, including, but not limited to: contempt of court, monetary sanctions, striking of pleadings and preclusion from introduction of evidence. Fed. R. Civ. P. 37(b)(2) (2005). In fact, Rule 37(b)(2)(C) provides that an appropriate sanction for a party's failure to comply with discovery also includes "dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party." Thus, here, a proper sanction for a claimant's failure to comply could rightly include a dismissal or disallowance of his claim. *See e.g. Transportes Aereos de Angola v. Ronair, Inc.* 104 F.R.D. 482, 506-07 (D. Del. 1985) (dismissing plaintiffs' claims and cross-claims against defendants and granting a default judgment in defendants' favor on their counterclaims for plaintiffs' failure to comply with

discovery orders); *In re O'Brien*, 351 F.3d 832, 839 (8th Cir. 2003) (affirming Bankruptcy Court's Rule 37 dismissal of claim against claimant who failed to comply with discovery despite the availability of a potentially "less onerous sanction").

Another alternative is for the court to *preserve the ability of the Debtors to seek sanctions* (including, but not limited to, dismissal of the claims) for failure to complete the Questionnaire. Indeed, *In re Silica* recognized that a court has the authority to dismiss claims all together should the claimant fail to respond to a discovery request. Order at 213 ("If, in the face of three separate written Orders, these plaintiffs have indeed failed to submit a Fact Sheet, then this Court **would not hesitate to dismiss the claims of those Plaintiffs without-- or with-- prejudice.**") (emphasis added). Similarly in *Harold's Auto Parts, Inc. v. Mangialardi*, 889 So.2d 493 (Miss. 2004), the Mississippi Supreme Court ruled that a trial court *must* dismiss a complaint without prejudice if plaintiffs failed to provide "the name of the defendant or defendants against whom each plaintiff makes a claim, and the time period and location of exposure." *Id.* at 495. Importantly, both of these statements were made in the context of attempts to obtain information about silica and/or asbestos claims from a large group of claimants through the use of a form of some type. This alternative, however, can only be effective where there is a real possibility that the Court will grant such sanctions. Therefore, although alternatives to barring claims do exist, they are, at most, imperfect substitutes for a bar date.

## CONCLUSION

Debtors' Questionnaire seeks information that will permit Debtors and their experts to determine what scientifically reliable foundation exists, if any, for a large portion of the current claims. Debtors' estimation experts will take the position that data and information on the existence or non-existence of scientifically reliable evidence in support of the claims is essential

31

for a scientifically valid estimation of the asbestos PI claims. The Questionnaire proposed by the Debtor will give Debtors' estimation experts the opportunity to make an estimation that avoids problems that skewed past estimations, including: (1) the failure to link the payment of a PI claim to reliable medical and exposure evidence, and (2) the failure to account for the abuse involved in claims filings when such evidence is not required. There simply is no valid argument that Debtors should not be permitted to gather this evidence for use during a contested estimation proceeding. As Judge Wolin stated two years ago in the course of the USG Corp. bankruptcy case:

> [I]f the debtor maintains that its creditors are not legitimate and that, properly analyzed, claims against it do not exceed its assets, the Court must assist as well . . . In an asbestos bankruptcy, the Court will, within the constraints of the law, reject unsubstantiated medical evidence and fanciful theories of causation.

*In re USG Corp.*, 290 B.R. 223, 225 (Bankr. D. Del. 2003 (Wolin, J.)). Debtors seek nothing more than to estimate their legitimate claims and to not pay bogus ones, and the discovery essential to this result.

Dated:    July 13, 2005

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick
Jonathan Friedland
Salvatore Bianca
200 East Randolph Drive
Chicago, IL 60601
Telephone:    (312) 861-2000
Facsimile:    (312) 861-2200

KIRKLAND & ELLIS LLP
Barbara Harding
Brian T. Stansbury
655 15th St., NW
Washington, D.C. 20005
Telephone:    (202) 879-5000
Facsimile:    (202) 879-5200

-and-

PACHULSKI, STANG, ZIEHL, YOUNG, JONES &
WEINTRAUB P.C.

Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400

Co-Counsel to Debtors and Debtors in Possession

K&E 10627184.17