CHAPTER ONE
# Introduction

In 1973, asbestos manufacturers were found strictly liable to workers injured as a result of exposure to their products (*Borel v. Fibreboard*, Fifth Circuit, U.S. Court of Appeals, 1973). Following that decision, increasing numbers of product liability claims against asbestos manufacturers flowed into the courts. By the early 1980s, more than 20,000 claimants had initiated lawsuits alleging injuries from exposure to asbestos. The growing volume of this type of litigation began to attract the attention of public policymakers.

Many of those involved in asbestos litigation devised procedures to streamline the litigation process and reduce the burdens and costs they faced. Courts developed formal and informal approaches to managing asbestos litigation. A series of court decisions resolved most of the coverage disputes between defendants and insurers. Many defendants chose not to aggressively contest liability and instead negotiated settlements of large numbers of cases with leading plaintiff attorney firms. These agreements typically called for settling hundreds or thousands of cases per year at amounts specified in administrative "schedules" that reflected differences in injury severity and other characteristics deemed to affect the value of cases. Asbestos litigation continued to be a critical concern for the firms frequently named as defendants, but at the time there were only a few dozen firms in this position. Most observers tended to view asbestos litigation as "manageable" in the sense that the effects of the litigation were largely limited to those few dozen or so defendants. Asbestos litigation became a lower priority on the national political agenda.

In the past decade, however, and particularly in the past few years, the situation has changed dramatically. Sharp increases in the number of asbestos claims filed annually, the number and types of firms named as defendants, the costs of the litigation to these defendants and their insurers, and the number of firms filing for bankruptcy have reawakened policy concerns. In particular, there are growing concerns that these trends put at risk the compensation of future claimants who suffer from serious injuries. Asbestos litigation poses challenges for asbestos-injury victims seeking compensation, plaintiff attorneys representing those claimants, defendants who must respond to the litigation while protecting shareholders' interests, insurers who must cover the

losses, and financial institutions attempting to accurately assess the magnitude of current losses and future liabilities. Because of the number of people exposed to asbestos in the United States, the injuries those people have incurred, the financial losses attendant to those injuries and the ensuing litigation, and the potential economic impact of that litigation, asbestos litigation also poses unique challenges for the civil justice system.

This RAND Institute for Civil Justice (ICJ) study is intended to provide objective data and analysis to stakeholders and policymakers so that they can address the key policy questions: How well is the current process working? Can it be improved?

## Research Objectives

A clear understanding of the dimensions of asbestos litigation is essential to the design of an effective policy response to the litigation. What do past patterns of asbestos exposure tell us about the number of future claims that can be anticipated? How has the litigation evolved over time? How many claims are being filed? By whom? Against whom? For what injuries? How much are claimants recovering? How many defendants have been charged with responsibility, and what industries do they represent? How many bankruptcies have been attributed to asbestos litigation, and what are the overall economic effects of the litigation? More generally, what does the future hold? This study set out to answer those questions to the extent possible given the limitations in the data available.

## Scope of This Study

As the questions posed in the previous section suggest, this study focuses on how the litigation system is performing in resolving asbestos claims. Within the available time and given the available resources, we could not examine the circumstances of those who were injured by asbestos exposure, nor could we investigate what companies that have been defendants in the litigation did or did not do to protect the health and safety of workers. Tens of millions of Americans were exposed to asbestos in the workplace over the past several decades. Of those, more than 700,000 have brought claims, and just as many, and possibly even more, claimants may come forward with claims in the future. We focus on what happened to those who claimed injury and what happened to the defendants in those cases.

## Research Approach

The critical challenge to conducting research on asbestos litigation is that so little data are publicly available. There is no national registry of asbestos claimants. Some claims are not filed formally in court as lawsuits. Federal courts report the number of asbestos lawsuits filed, but in recent years most lawsuits have been filed in state courts, which do not routinely identify and report annual asbestos lawsuit filings.

The typical asbestos claimant brings a claim against many defendants. In recent years, defendants have typically named several dozen defendants, and each of those defendants generally settles claims separately and keeps its own records. Any one defendant knows about the claims against it and its settlements, but it usually does not know how much other defendants are paying on a claim. Claimants may receive money from settlements over a long period of time. They may settle with some defendants today and other defendants next year and still others later on down the line.

Further, because there are so many conflicting interests, and because so much money is involved, even the limited data possessed by those involved in the litigation are viewed as highly sensitive and confidential. So, answers to simple questions such as how many claims are there? and what does the litigation cost? are not readily available.

We approached this problem in a number of ways. First, we drew on data and knowledge gained in previous RAND Corporation research on asbestos and other mass toxic tort litigation (Kakalik et al., 1983; Kakalik et al., 1984; Hensler et al., 1985; Peterson and Selvin, 1991; Hensler, 1992; Hensler and Peterson, 1993; Hensler, 1995; Hensler et al., 2000). We drew on the knowledge we acquired in these studies to establish historical and interpretative contexts for new information.

Second, we collected publicly available data from a variety of sources, ranging from asbestos litigation reporters to corporations' Securities and Exchange Commission (SEC) filings. Where we found inconsistencies, we either note them or did not make use of the data. When corporations attribute their filing for bankruptcy to asbestos litigation, they often report the number of asbestos claims filed against them in their bankruptcy petitions. We obtained these data as well. Asbestos bankruptcy trusts (entities that are formed to pay asbestos claims after Chapter 11 reorganization) typically report the number of claims filed against them to the court that has jurisdiction over the bankruptcy. All of these records are public, although they are not always easy to locate.

Third, we obtained both public and confidential analyses from many of the financial analysts and insurance analysts who have conducted their own studies of asbestos litigation. If they used proprietary data in their studies, we asked the analysts to review their analytic methods with us. Most of the analysts we interviewed were willing to discuss their approach with us and show us how they arrived at their re-

sults, even if they could not share their data with us. We relied on only those studies that we determined were sound.

Fourth, we obtained confidential data from many participants in the litigation. In each instance, we specified the data we sought and conducted sufficient investigation (for example, comparing information from multiple sources) to assure ourselves that the data provided to us were reliable. We used only data that we confirmed with other data or with other participants in the litigation. In the first phase of the research, we obtained data, on a confidential basis, on each of the claims brought against almost 200 defendants and trusts through 2000. We then updated that dataset with data on claims brought against some of the major defendants and trusts in 2001 and 2002. Because time and resource constraints limited the second round of data collection, we did not attempt to update every data series we collected in the initial effort.

We obtained data on claimants from a number of defendants and insurers. Many defendants that have been prominent in the litigation have received claims from tens of thousands, and in some cases hundreds of thousands, of people. Because, as mentioned earlier, asbestos claimants typically file claims against multiple defendants, many of the claimants on the list for one defendant also appeared on the lists for other defendants. This overlap frequently allowed us to compare the information we obtained for a claimant from one defendant with the information we obtained for that claimant from other defendants to determine the reliability of the data. For our analysis, we included only those data that proved to be reliable in the sense that the data from different defendants agreed.

Some claimants filed two or more claims at different times and, occasionally, in different states. These claimants typically were those who brought a suit against some defendants at one time in one state and filed claims with one or more trusts at other times, possibly in another state. We counted each claimant only once—at the time and in the state in which that claimant first appeared in any of the data available to us. For example, the analysis of trends and patterns in filings by state reported in Chapter Three considers only the initial filing by any particular claimant and does not include any subsequent filings by that claimant. For this reason, the distributions of filings reported in that chapter undercount the total number of claims filed in any state in any time period, to the extent that the state saw filings against some defendants or trusts in that time period by persons who had filed asbestos claims against other defendants or trusts at an earlier date.

We also obtained aggregate annual data on indemnity payments and defense costs from a large number of defendants and insurers. Some defendants and insurers provided data going back to the early 1980s. Others were able to provide data only for the past few years. In all, the data include more than 60,000 defendant-year observations. Almost all the defendants for whom we have data had some insurance coverage, all of which had coverage limits. Because there is always the possibility that

a defendant and insurer can dispute whether a coverage limit has been reached, both defendants and insurers have strong incentives to maintain accurate data on indemnity payments and loss adjustment costs. For that reason, we believe these data are accurate.

Finally, we conducted more than 60 interviews with key participants in the litigation, including plaintiff attorneys, corporate counsel, outside defense counsel, insurance company claims managers, investment analysts, and court-appointed "neutrals." All of these interviews lasted at least one hour, and some took considerably longer. In some instances, we conducted multiple interviews with a single source. The picture of the current state of asbestos litigation that emerged from these interviews was remarkably consistent. Where some interviewees had sharply different views of the litigation than others, they noted that themselves and discussed why their perceptions differed. All the interviews were conducted under the promise of confidentiality to encourage candor, and we explained the purposes of the study and our general approach to all the interviewees.

## Differences Between This Report and an Earlier Interim Report on Asbestos Litigation

This monograph extends the work presented in an earlier RAND documented briefing on asbestos litigation (*Asbestos Litigation Costs and Compensation: An Interim Report*, DB-397-ICJ, 2002) in a number of ways. This report includes

- an expanded review of the epidemiological literature on asbestos-related injuries and a review of the most widely accepted projections of the number of mesothelioma cases that would occur between 1985 and 2009 (see Chapter Two)
- an updated discussion of the evolution of asbestos litigation, including more information on deferred and expedited dockets, consolidated trials and bankruptcy, and some additional details about trends in jury verdicts (see Chapter Three)
- updated estimates of the total number of individuals who had filed asbestos personal injury claims through 2002 and the total number of defendants named on those claims, and new analyses of the distribution of asbestos defendants across industries (see Chapter Four)
- more details about how we carried out the analysis, much of which is provided in the appendices to this report
- updated estimates of the total amount of money spent on asbestos personal injury claims through 2002, how much of that money was consumed by transaction costs, and how much ended up in claimants' pockets (see Chapter Five)

- updated estimates of the number of bankruptcies that have been attributed to asbestos litigation (see Chapter Six)
- discussion of asbestos litigation reform proposals (see Chapter Seven).

The revisions to the estimates published in the interim report are based on several considerations. Some estimates have changed because the analysis was incomplete when the interim report came out. For example, that report estimated that 6,000 defendants had been named in the litigation; this report updates that number to 8,400. The increase does not mean we that we estimated that 2,400 new defendants have been named on asbestos claims since the publication of the interim report. Rather, when we wrote the interim report, we had not completed the task of checking all the lists of defendants we had received from various sources for duplicates and subsidiaries. We estimated that the lists provided to us included well in excess of 6,000 defendants and, so, reported that estimate in the interim report. We have since completed checking those lists and estimate that 8,400 entities have been named as asbestos defendants.

Other estimates changed because we updated them. The interim report, for example, gave estimates of the numbers of claimants and total dollars spent on asbestos litigation through the year 2000. This report updates those estimates through 2002. Similarly, the interim report estimated the number of asbestos-related bankruptcies through spring 2002; we now provide an estimate of the number of asbestos-related bankruptcies through summer 2004. We also updated our discussion of the evolution of the litigation to include significant new developments.

It is important to note, however, that not all our data have been updated to 2002. Many of the estimates in this report still reflect data collected through 2000. We did not have the resources necessary to collect new data and revise the analysis in every case.

## Terminology

We use a number of terms in this report that call for clarification at the outset.

### Defendants

Several leading asbestos defendants filed for bankruptcy and subsequently emerged reorganized. The reorganizations included the formation of a trust funded by the defendant and its insurers. The trust is the only recourse for asbestos claimants, who are barred by injunction from pursing the reorganized company.[1] Rather than repeat the

---

[1] 68 B.R. at 624. The bar is known as a "channeling injunction" and has since been codified in the U.S. Bankruptcy Code at 11 U.S.C. §524(g).

phrase "defendants and trusts" in references to the entities against whom claims are brought or to the entities paying claims, we generally use the word *defendants* with the understanding that that word refers to both defendants and trusts.

## Defense Costs

At various points in this report we refer to the *defense costs* (or *expenses* or *spending*) of defendants and insurers. These terms always refer to the amounts defendants spent on asbestos litigation, net of any reimbursement by insurers and the amounts insurers spent including both their own expenses and amounts they reimbursed defendants under various policies and excluding any contribution by other insurers under a reinsurance policy.

## Claim

The typical asbestos lawsuit includes a number of claimants and names several dozen defendants. Commentaries on asbestos litigation sometimes use the word *claim* to refer to a lawsuit, regardless of the numbers of claimants and defendants included in the lawsuit. The word claim also is sometimes used to refer to a claimant regardless of whether that claimant's lawsuit also includes other claimants. Finally, the word claim is sometimes used to refer to an assertion by an individual claimant against an individual defendant. Most of our analyses focus on individual claimants, whether or not their claim was included in a lawsuit with other claims and independent of the number of defendants named by the claimant. Accordingly, in the subsequent discussion, we generally use the word "claim" to refer to an individual claimant. Thus, when we say a large fraction of the claims was filed by a small number of plaintiff law firms, we mean that a small number of plaintiff law firms filed claims on behalf of a large fraction of the individuals who brought claims against one or more defendants. Similarly, when we say defendants have spent X thousand dollars resolving claims for mesothelioma, we mean that the amounts of money paid to claimants who brought claims for mesothelioma and the legal fees and expenses incurred in the course of paying those claims added up to X thousand dollars.

## Unimpaired

One of the most hotly debated issues in asbestos litigation concerns whether unimpaired asbestos claimants ought to be compensated. The term itself often introduces confusion because impairment can be taken to mean either an injury or a decrease in the ability to function in everyday activities. The American Medical Association's (AMA's) definition of impairment is synonymous with injury: *Impairment* is defined as "a loss, loss of use, or derangement of any body part, organ system, or organ function" (American Medical Association, 2001, p. 2). A scar on the lungs, in this sense, is impairment. *Impairment ratings,* however, as defined by the AMA, measure the functional limitations caused by an injury: Impairment ratings reflect "an individual's

ability to perform common activities of daily living, excluding work" (American Medical Association, 2001, p. 4). "For example, an anatomic change such as a circumscribed pleural plaque would be an impairment based on an abnormality in anatomic structure. However, if there were no abnormality in lung function and no decrease in the ability to perform activities of daily living, the individual would be assigned a 0% impairment rating" (American Medical Association, 2001, p. 88). Under the AMA guidelines,

- a person may be injured, but not functionally impaired, and
- a person may be functionally impaired, while still being able to hold down a job.

In this report, we use the term *unimpaired* to refer to someone who experiences no decrease in the ability to perform the activities of daily life, even if he or she has evidence of an injury. In other words, the individual would be assigned a 0% impairment rating according to the AMA definition. It is important to note that claimants who are unimpaired in this sense when they file a claim may manifest more critical symptoms after an extended latency period. In most jurisdictions, those who are injured but not (yet) impaired by their exposure to asbestos have legally cognizable claims.

### Injury/Disease

The term used to refer to a claimant's asserted condition is also a source of controversy. The word *disease,* as defined in Webster's *Collegiate Dictionary,* is "a condition of the living animal or plant body or of one of its parts that impairs normal functioning." Accordingly, some commentators object to the use of the word "disease" in referring to the entire population of asbestos claimants because it implies, in their view, a judgment that all claimants are impaired. In this report, when discussing all claimants taken together, we usually use the more neutral term: *injury.* Thus, when we say, the next chapter reviews the kinds of injuries associated with asbestos, we do not imply any judgment as to the severity of the various types of injuries and diseases asserted by claimants.

## Organization of This Report

Chapter Two describes the kinds of injuries associated with exposure to asbestos and reviews the epidemiological studies that have estimated how many people are likely to eventually incur asbestos-related injuries. Chapter Three examines important aspects of the evolution of the litigation over the past two decades, including trends in jury verdicts. Chapter Four describes the numbers and types of claimants and defen-

dants and shows how they have changed over time. Chapter Five describes costs of the litigation and compensation to plaintiffs, including distribution of total compensation amounts by type of injury. Chapter Six examines the economic effects of the litigation, focusing on the numbers of bankruptcies, characteristics of bankrupt defendants, and performance of personal injury bankruptcy trusts. Finally, Chapter Seven considers how well the tort system has performed and discusses recent efforts to devise alternatives to the current system for resolving asbestos injury claims.

CHAPTER TWO
# Injuries from Asbestos Exposure

Asbestos litigation stems from widespread use of and exposure to asbestos, which is known to cause a variety of injuries. This chapter describes the nature of asbestos-related injuries and discusses why it has been difficult to estimate their occurrence. It concludes by summarizing the results of epidemiological studies that have estimated numbers of asbestos-related injuries through 2029.

## Asbestos Use in the Workplace

Asbestos is abundant and inexpensive to mine and process. Because asbestos is strong, durable, and has excellent fire-retardant capability, it was widely used in industrial and other work and residential settings through the early 1970s. Asbestos consumption in the United States peaked in 1973 and then dropped dramatically over the next three decades (Alleman and Mossman, 1997).

Millions of American workers have been exposed to asbestos, some for long periods of time and/or at high levels. When the Occupational Safety and Health Act (OSHA) went into effect in 1970, industries imposed increasingly strict safety regulations governing workplace exposure to asbestos. In 1989, nearly 20 years later, the Environmental Protection Agency (EPA) proposed banning all products containing asbestos. That ban, however, was set aside in 1991 with a decision by the Fifth Circuit Court of Appeals (*Corrosion Proof Fittings v. E.P.A*).[1] Although the ban still applied to certain asbestos products and prohibited the use of asbestos in products that had not previously contained it, some uses of asbestos were permitted and remain legal to this day in the United States. The EPA notice on material containing asbestos notes the following: "EPA does NOT track the manufacture, processing, or distribution in commerce of asbestos-containing products" (EPA, 2003). Exposure to naturally occurring asbestos, which may also cause disease, is generally not regulated (Renner, 2000).

---

[1] 947 F.2d 1201 ([5th Cir. Oct. 18, 1991] [No. 89–4596]), *opinion clarified* (Nov. 15, 1991), *rehearing denied* (Nov. 27, 1991).

It is well documented that the dangers of asbestos were known before World War II (Brodeur, 1985; Tweedale, 2000). The managers of some asbestos manufacturing companies did not warn their employees of the risks of asbestos exposure or provide adequate protection for them, even though they were aware of those risks to the health of their workers (Brodeur, 1985; Castleman, 1996). In the 1950s, some manufacturers lobbied against stricter regulation of asbestos exposure in the workplace (Brodeur, 1985). It was these failures of public and private decisionmakers decades ago that precipitated what has been termed "the worst occupational health disaster in U.S. history" (Cauchon, 1999, p. 4) and set the stage for the current litigation.

## Injuries Resulting from Asbestos Exposure

The groundbreaking work on injuries caused by asbestos exposure among U.S. workers was conducted by Dr. Irving Selikoff at the Mount Sinai School of Medicine in New York in the 1960s and 1970s (Selikoff, Churg, and Hammond, 1964 and 1965; Selikoff and Lee, 1978). We draw on that work in the following descriptions of the injuries caused by asbestos exposure, including mesothelioma, other cancers, asbestosis, and pleural thickening or plaques.

### Mesothelioma

Mesothelioma is a cancer of the lining of the chest or abdomen. Asbestos is the only demonstrated cause of mesothelioma, although some mesothelioma cases have not been traceable to an asbestos exposure. Possible causes of mesothelioma other than asbestos have been suggested but have not been established based on epidemiologic evidence (Peterson et al., 1984; Strickler et al., 2003; Price and Ware, 2004). The incidence of mesothelioma among males has increased dramatically over the past several decades and is attributed to the use and production of asbestos in the preceding decades. Mesothelioma rates are much lower among females and have been stable over this period (Price and Ware, 2004). The disease is regarded as inevitably fatal, usually within a year or two of diagnosis. Mesothelioma can occur even with a relatively low level of exposure to certain types of asbestos fibers (EPA, 2003). Prior to 1999, the number of mesothelioma deaths in the United States could not be counted directly from public health reporting systems because mesothelioma was not recorded as a separate cause-of-death category on death certificates (Environmental Working Group, 2004). In the United States, the National Cancer Institute's Surveillance, Epidemiology, and End Results (SEER) Program, as part of the Centers for Disease Control and Prevention, now collects data on mesothelioma cases in certain areas. Mesothelioma is identified as a separate category in the SEER cancer registry data. The SEER data, however, cover only nine reporting areas (either states or metropolitan areas) that may not be representative of the rest of the United States.

## Other Cancers

Other cancers have also been linked to asbestos, although they all have other causes besides asbestos exposure. Aside from mesothelioma, lung cancer is the most frequently claimed malignant disease. There is general agreement that asbestos exposure can cause lung cancer. The risk of lung cancer can be exacerbated by other factors as well, most notably smoking. Between 1940 and 1979, there were high rates of smoking among workers in the blue-collar industries where asbestos exposure was particularly high. In lung cancer cases, defendants often dispute plaintiffs' allegations that their cancer is attributable to asbestos exposure rather than to smoking.

Although an accurate count of lung cancer deaths is available from the Vital Statistics registration system in the United States, estimating the number of *asbestos-related* lung cancer deaths would be difficult. Lung cancer is coded as a separate cause of death on death certificates, but only a small proportion of all lung cancer deaths can be attributed to occupational asbestos exposure. Most lung cancer cases are caused by other factors, including cigarette smoking. Even if detailed smoking histories of lung cancer cases in the original asbestos worker cohorts were available, which they are not, it would be difficult to determine the appropriate proportion of lung cancer to attribute to occupational asbestos exposure. The same is true for lung cancer cases today.

Other cancers asserted by asbestos claimants include leukemia, and cancers of the bladder, breast, colon, esophagus, kidney, larynx, lip, liver, lymphoid, mouth, pancreas, prostate, rectum, stomach, throat, thyroid, and tongue. The relationship of these other cancers to asbestos is a subject of contention; defendants frequently dispute the causality of these cancer claims. No U.S. government agency monitors the incidence of asbestos-related cancers other than mesothelioma.

## Asbestosis

Asbestosis is a chronic lung disease resulting from inhalation of asbestos fibers that can be debilitating and even fatal. However, a person diagnosed with asbestosis might be asymptomatic or only mildly impaired. Although decreased lung volume is a characteristic clinical feature of pulmonary asbestosis, it is not required for a diagnosis to be made (American Thoracic Society, 1996). Severe cases are usually the result of long-term, high-level exposure to asbestos, but "[e]vidence of asbestosis has been found many years after relatively brief but extremely heavy exposure" (American Thoracic Society, 1996).

The National Institute for Occupational Safety and Health (NIOSH) publishes limited data on U.S. deaths due to asbestosis, but no U.S. government agency monitors the prevalence of the disease. The NIOSH data indicate that deaths due to asbestosis have increased substantially over the past three decades, from 77 in 1968 to 1,265 in 1999 (NIOSH, 2004). (See Table A.2 in Appendix A for more details.) Because asbestosis is not always fatal, however, death certificates are not a good measure

of the incidence of asbestosis, and the number of cases probably far exceeds the number of deaths. The only way to measure the number of asbestosis cases accurately would be to conduct a survey of workers exposed to asbestos that included a complete evaluation, documented occupational exposure, and provided X-ray, clinical, and physiologic evidence indicating the presence of physical changes associated with asbestosis.

### Pleural Plaques, Pleural Thickening, and Pleural Effusion

Asbestos can cause other nonmalignant abnormalities of the pleura: pleural plaques and thickening, and pleural effusion (American Thoracic Society, 1996). Pleural plaques and thickening are scarring of the pleura, the membrane that lines the inside of the chest wall and covers the outside of the lungs. Pleural effusion is the presence of liquid in the pleural space. Pleural plaques and thickening can be diagnosed by a chest X-ray and can be accompanied by symptoms and diminished pulmonary function (Kilburn and Warshaw, 1990).

## Controversy over the Unimpaired

One of the most hotly contested issues in asbestos litigation is the extent to which claimants are affected by their exposure: that is, how sick or "impaired" they are. Some commentators say that many claimants are "not sick" and, because the funds available to compensate asbestos claimants are limited, the funds should be allocated only to those who "are sick."

Others strongly disagree with this position, arguing that under the law of all 50 states individuals are entitled to compensation if they have suffered a tortious injury or disease. Under most state laws, workers who can show evidence of asbestos disease as defined above are eligible to claim compensation for injury.

In the United States today, there is no comprehensive database into which claimants' medical data have been consistently and reliably entered over time. The only direct information on the nature and severity of injuries claimed by asbestos plaintiffs, including the existence of impairment, comes from limited studies in which an analyst draws a sample of individual claims from defendants' files and reviews the medical information provided by the claimants to determine whether the information in the files offers evidence that a claimant was impaired. We discuss this evidence in Chapter Four.

## Predicting Asbestos-Related Cancers

Estimating the numbers of asbestos-related deaths and diseases is complicated by the long latency periods associated with asbestos injuries. Typically, 20 to 40 years elapse between the first exposure to asbestos and disease manifestation. The Manville Trust found, for example, that the average year of first exposure to asbestos by claimants who filed a claim with the Trust during the 1980s and 1990s was generally about 40 years earlier (Claims Resolution Management Corporation, 2001, p. 20). Some people who are first diagnosed with a nondisabling condition may develop more serious diseases in the future, but others will not.

Several epidemiological studies aimed at projecting total asbestos-related disease in the United States were conducted in the late 1970s and 1980s (Higginson, 1980; Enterline, 1981; McDonald and McDonald, 1981; Peto et al., 1981; Nicholson et al., 1982; Walker et al., 1983; Lilienfeld et al., 1988). Each of these studies predicted the number of asbestos-related cases or deaths expected to occur in the future among persons occupationally exposed to asbestos over the previous several decades. Litigators still use the study by Nicholson et al. (1982) as the standard reference on occupational exposure to asbestos.

Because the study by Nicholson et al. (1982) is often cited in discussions of past and future asbestos litigation, we present a more detailed summary of their projections of asbestos-related cancer deaths (see Table 2.1). These projections estimated the number of "excess" (i.e., premature) asbestos-related deaths due to three types of cancer (mesothelioma, lung cancer, and gastrointestinal and other cancers), and the sum of these categories of cancer deaths for the years 1965 through 2029. Based on this study, 312,380 asbestos-related excess cancer deaths were projected to occur from 1965 through 2004, of which one-quarter are from mesothelioma (see Table 2.1). Nicholson et al. projected that excess deaths from asbestos-related cancers would peak during the 1990s, and then gradually decline. According to their projections, 120,085 asbestos-related cancer deaths will occur over the next 25 years (2005–2029). Of these future cases, four of five were predicted to occur in the next 15 years (2005–2019). The projections by Nicholson et al. (1982) end in the year 2029, although the number of asbestos-related cancer deaths in the last projection period (2025–2029) is still substantial at 8,695.

Because each of the early projection studies employed different methods, they generated vastly different estimates. Nicholson et al. (1982) examined asbestos-related diseases in industries and occupations judged to be "high-risk": that is, in industries and occupations in which workers incurred extensive exposure to asbestos. They estimated that 228,795 excess deaths due to asbestos-related cancers would occur from 1985 through 2009 as a result of exposure of workers to asbestos from 1940 through 1979 (see Table 2.2). Importantly, this number does not include deaths

**Table 2.1**
**Projected Excess Deaths from All Asbestos-Related Cancers in Selected Occupations and Industries, United States, 1965–2029, Based on Study by Nicholson et al. (1982)**

| Years | Mesothelioma | Lung Cancer | Gastrointestinal and Other Cancers | All Cancers |
|---|---|---|---|---|
| 1965–1969 | 4,505 | 11,720 | 4,280 | 20,505 |
| 1970–1974 | 5,410 | 16,430 | 5,170 | 27,010 |
| 1975–1979 | 7,125 | 21,840 | 5,950 | 34,915 |
| 1980–1984 | 8,875 | 25,275 | 6,880 | 41,030 |
| 1985–1989 | 11,990 | 27,360 | 7,475 | 46,825 |
| 1990–1994 | 13,740 | 27,485 | 7,470 | 48,695 |
| 1995–1999 | 14,845 | 26,295 | 7,125 | 48,265 |
| 2000–2004 | 15,300 | 23,465 | 6,370 | 45,135 |
| 2005–2009 | 14,995 | 19,605 | 5,275 | 39,875 |
| 2010–2014 | 13,305 | 14,935 | 4,060 | 32,300 |
| 2015–2019 | 10,410 | 10,540 | 2,820 | 23,770 |
| 2020–2024 | 7,475 | 6,270 | 1,700 | 15,445 |
| 2025–2029 | 4,585 | 3,230 | 880 | 8,695 |
| 1965–2004 | 81,790 | 179,870 | 50,720 | 312,380 |
| 2005–2029 | 50,770 | 54,580 | 14,735 | 120,085 |
| 1965–2029 | 132,560 | 234,450 | 65,455 | 432,465 |

NOTE: Estimates are based on annual projections in Table XXII (lung cancer), Table XXIII (mesothelioma), Table XXIV (gastrointestinal and other cancers), and Table XXV (all cancers) of Nicholson et al. (1982).

resulting from severe asbestosis, or from exposure to asbestos in other occupations and industries, or from post-1979 exposure to asbestos. Although estimates by Nicholson et al. (1982) are widely cited, they were disputed by some epidemiologists at the time of their publication. The Nicholson et al. estimates were derived from a study conducted by Irving Selikoff at the Mount Sinai School of Medicine under a contract with the United States Department of Labor.

Other studies conducted around the same time predicted far fewer excess cancer cases for 1985–2009 due to asbestos exposure. The lowest of these estimates, from a study by Walker et al. (1983), was 39,385 cases of mesothelioma and lung cancer among asbestos workers. The Walker study was conducted at the Harvard School of Public Health and the Epidemiology Resources Institute in Brookline, Massachusetts, under contract with the Johns-Manville Corporation and was itself subject to criticism. The Nicholson and Walker studies provide upper and lower bounds, respectively, for the credible projections of disease attributable to occupational asbestos exposure published during this time period (see Table 2.2).[2]

---

[2] An unpublished study by Bridbord et al. that was cited by Manton (1983) and by Lilienfeld et al. (1988) generated much higher estimates of cancer deaths from occupational exposure to asbestos. According to Manton, Bridbord et al. estimated that between 13 and 18 percent of all cancer mortality in the United States might be caused by occupational exposure to asbestos. Lilienfeld et al. reported that the Bridbord et al. study estimated that

**Table 2.2**
**Projections of Asbestos-Related Cancers Among Asbestos Workers, 1985–2009**

| Study | Mesothelioma | Lung Cancer | Gastrointestinal and Other Cancers | Total[a] |
|---|---|---|---|---|
| Higginson (1980) | 25,000 | 37,500 | æ | 62,500 |
| Enterline (1981) | 16,650 | 63,525 | æ | 80,175 |
| Peto et al. (1981) | 20,925 | 79,515 | æ | 100,440 |
| McDonald and McDonald (1981) | 22,870 | 123,750 | æ | 146,620 |
| Nicholson et al. (1982) | 70,870 | 124,210 | 33,715 | 228,795 |
| Walker et al. (1983) | 15,500–18,100 | 23,885[b] | æ | 39,385–41,985 |
| Lilienfeld et al. (1988) | 21,500 | 76,700 | 33,000 | 131,200 |

SOURCE: Lilienfeld et al. (1988), Table 2 (with minor corrections).

NOTE: æ = Not reported.

[a] "Total" includes only the types of cancer reported in the projections.

[b] From Table 8 in Manton (1983).

Several other studies of trends in asbestos-related injuries have been conducted since these early studies, but most of those other studies focused on asbestos-related injuries outside the United States (e.g., Banaei et al. [2000] in France; Kjaergaard and Andersson [2000] in Denmark; Magnani et al. [2000] in Italy, Spain, and Switzerland; and Peto et al. [1999] in Western Europe). Litigation experts have also used the Nicholson et al. (1982) estimates, more recent studies, and other data to project the number of future asbestos claims (Manville Personal Injury Settlement Trust, 2001; Stallard, 2001).

Another recent study (Price and Ware, 2004) has updated predictions of mesothelioma for the coming decades in the United States. In Table 2.3, we present these projections of mesothelioma cases from 1990 through 2049 in the United States, including males and females. The basis for these predictions is the best available population-based rates from the SEER Program. This study predicts 89,305 cases of mesothelioma will occur in the United States between 2005 and 2049, with more than half of the cases occurring in the next 20 years. The decreasing number of mesothelioma cases among males beginning in the year 2005 reflects the decreased production and use of asbestos in the United States since 1976.

---

1.6 million cancer deaths, including 1.44 million lung cancer deaths, would occur among asbestos workers between 1980 and 2010. Also according to Lilienfeld et al., the Bridbord study estimated that 10,000 mesothelioma deaths would occur each year as a result of occupational asbestos exposure.

Table 2.3
Projected Cases of Mesothelioma, United States, 1990–2049, Based on a
Study by Price and Ware (2004)

| Years | Males | Females | Total |
|---|---|---|---|
| 1990–1994 | 8,874 | 2,310 | 11,184 |
| 1995–1999 | 9,640 | 2,385 | 12,025 |
| 2000–2004 | 10,040 | 2,460 | 12,500 |
| 2005–2009 | 9,960 | 2,535 | 12,495 |
| 2010–2014 | 9,472 | 2,610 | 12,082 |
| 2015–2019 | 9,018 | 2,685 | 11,703 |
| 2020–2024 | 8,274 | 2,760 | 11,034 |
| 2025–2029 | 7,242 | 2,835 | 10,077 |
| 2030–2034 | 6,212 | 2,910 | 9,122 |
| 2035–2039 | 5,286 | 2,985 | 8,271 |
| 2040–2044 | 4,508 | 3,060 | 7,568 |
| 2045–2049 | 3,818 | 3,135 | 6,953 |
| 1990–2004 | 28,554 | 7,155 | 35,709 |
| 2005–2049 | 63,790 | 25,515 | 89,305 |
| 1990–2049 | 92,344 | 32,670 | 125,014 |

NOTE: Numbers of mesothelioma were estimated from Figure 2 of Price and
Ware (2004).

## Evaluating the Predictions

Although 20 years of the projection period in the earlier studies have elapsed, the projections from these studies are still difficult to validate using actual data. No projection studies have been published that update the estimates of Nicholson et al. or Walker et al. with actual data substituted for the early time periods of their projections or that independently project the number of asbestos-related health outcomes. The Nicholson and Walker projection studies used complicated models and required detailed and voluminous input (e.g., labor data to estimate the number of asbestos workers). These factors would make replication of those studies both time-consuming and expensive.

We conducted a limited test of Nicholson's projections in the case of mesothelioma alone by applying actual incidence rates for 1977–1997 from the SEER Program to the population of the United States. Our comparison between the two sources is limited to the five years shown in Table 2.4 for which data from the Nicholson study and mesothelioma rates for the SEER areas are available. Based on the number of mesothelioma cases shown in Table 2.4, we conclude that Nicholson's

projections are similar to those based on actual SEER incidence rates, with the Nicholson estimates ranging from 20 percent higher to 10 percent lower than those based on the SEER rates. In these calculations, we assumed that Nicholson's estimates of the total number of workers exposed to asbestos (27.5 million) accurately represent all people exposed to asbestos, and that all cases of mesothelioma in the United States would occur within that group.

A more detailed discussion of the comparison of early projections of asbestos-related diseases is provided in Appendix A, and an explanation of the estimating procedures we used to test Nicholson et al.'s mesothelioma projections is provided in Appendix B.

**Table 2.4**
**Estimated Cases of Mesothelioma in the United States, 1977–1997, Based on the Nicholson et al. (1982) Study and SEER Incidence Rates**

| Year | Number of Asbestos-Related Mesothelioma Deaths from Nicholson et al. | Number of Cases of Mesothelioma Estimated from SEER Incidence Rates |
|------|------|------|
| 1977 | 1,425 | 1,200 |
| 1982 | 1,775 | 1,764 |
| 1987 | 2,398 | 2,157 |
| 1992 | 2,748 | 2,991 |
| 1997 | 2,969 | 2,604 |

CHAPTER THREE

# Asbestos Litigation Dynamics

## Background

Asbestos litigation is the longest-running mass tort litigation in the United States. It arose out of the exposure of millions of workers to a useful but injurious product and out of product manufacturers' failure to warn of the risks of exposure. Asbestos litigation over time has been shaped by changes in substantive and procedural law, the rise of a sophisticated and well-capitalized plaintiff bar, heightened media attention to litigation generally and toxic tort litigation in particular, and wider use of computer technology. In turn, asbestos litigation has made a significant contribution to the evolution of mass civil litigation, providing a model for some to emulate and others to avoid.

Most mass toxic tort litigation arises relatively soon after information related to litigation first appears, suggesting a link between product use or exposure and injury or disease. Within a few years, the litigation is either extinguished—as a result of new information disputing earlier claims of injury causation or court rulings in favor of defendants—or resolved in one or a few large-scale settlements. Because the history of these cases is relatively short, the substantive and procedural law and social and technological practices that prevail at the beginning of the litigation are likely to determine the litigation's progress and ultimate outcomes.

The long latency period of asbestos-related diseases, along with widespread exposure to asbestos over many decades, has created a dramatically different profile for asbestos litigation, which has been ongoing for more than three decades and is expected to continue long into the future. The distinguishing feature of asbestos litigation has been its tendency to reshape itself over time. The focus of the litigation has shifted from federal to state courts, and now, increasingly, to bankruptcy courts. Trial judges who developed innovative procedures to manage large asbestos caseloads have moved on to the appellate bench or private practice, leaving different judges to rediscover those procedures or substitute different procedures of their own. Law firms that played leading roles in asbestos litigation in the 1980s have left the field and been replaced by new firms with new litigation strategies and business models. Corporations that were perceived to have little or no exposure to asbestos-related liability

have found themselves at the center of the litigation. As in the case of generals whose strategies seem to be based on fighting the last war, those engaged in asbestos litigation often find themselves primed to deal with a litigation whose character has dramatically evolved since they last reviewed their strategic options. This chapter describes that evolution, highlighting the features of the litigation that public policymakers most need to understand when considering how to respond to calls for asbestos litigation reform.[1]

## The Early Years

Although Irving Selikoff's landmark studies of asbestos disease among insulation workers were widely publicized in the 1960s, it was not until the 1970s that lawyers representing asbestos workers scored significant victories against asbestos manufacturers. In *Borel v. Fibreboard*,[2] the Fifth Circuit Court of Appeals upheld the application of strict liability to latent injury torts and found defendants jointly and severally liable for injury to an asbestos insulation worker. In the following years, plaintiff lawyers in several states successfully challenged the exclusivity of workers' compensation for asbestos manufacturers' employees, freeing these workers to seek damages in tort (Hensler et al., 1985).

In the first successful cases against asbestos manufacturers, plaintiff attorneys introduced evidence that several major manufacturers had known about the dangers of asbestos exposure as early as the 1930s but had concealed this information from their employees. When defendants challenged the relevance of this evidence to claims from workers installing asbestos insulation, plaintiff attorneys sought to uncover evidence that asbestos manufacturers were aware that asbestos exposure was causing disease among insulators as well as asbestos factory workers (Hensler et al., 1985).

With the application of substantive legal doctrines to latent injuries still uncertain, pursuing individual claims against asbestos manufacturers in those early years was risky for plaintiff law firms. Moreover, each claim required the presentation of scientific evidence on the causal link between asbestos exposure and disease, plus extensive factual investigation to demonstrate a causal link between the specific plaintiff's injury and the defendant's products, meaning that asbestos claims were far more expensive to prosecute than ordinary personal injury claims. The defendants were large corporations that could afford to invest in protracted litigation and to adopt aggressive litigation strategies in response to plaintiffs' suits. As a result, few plaintiff

---

[1] Previous studies have detailed the evolution of asbestos litigation over time—e.g., Brodeur (1985); Hensler et al., (1985); Castleman (1996); and Hensler (2002). Although we provide some historical context in this chapter, our purpose is to highlight features of the litigation that pose challenges for lawyers, judges, and policymakers.

[2] 493 F.2d 1076 (5th Cir. 1973).

lawyers were willing to take on asbestos workers' claims, and those that did faced significant challenges and sometimes assumed substantial personal financial risks. It was these lawyers who laid the groundwork for the plaintiff successes that followed (Brodeur, 1985).

## Growth of Mass Litigation

Initially, asbestos manufacturers vigorously defended themselves against workers' claims, raising a host of issues, including the risks of exposure to asbestos, whether the plaintiffs had been exposed to the defendant's products, and whether the statutory period for filing had passed (Hensler et al., 1985). By the mid-1980s, however, plaintiff law firms in parts of the country where people were heavily exposed to asbestos, such as jurisdictions with shipyards or petrochemical facilities, had learned that they could succeed against asbestos defendants by filing large numbers of claims, grouping them together, and negotiating with defendants on behalf of the entire group. Often, defendants would agree to settle all of the claims that were so grouped, including weaker as well as stronger claims, to reduce their overall costs of litigation. By agreeing to pay weaker smaller-value claims in exchange for settling stronger and larger-value claims, defendants could also contain their financial risk. Some plaintiffs might receive lower values for claims that were settled as part of a group rather than litigated individually, but litigating claims en masse lowered the cost and risk per claim for plaintiff law firms (Hensler, 2002; McGovern, 2002). At the same time, some defendants reportedly agreed to pay a few hundred dollars per claim for virtually all claims filed against them, without much attention to the facts of individual claims, in order to avert litigation costs.

To identify more potential claimants, plaintiff law firms began to promote mass screenings of asbestos workers at or near their places of employment (Hensler et al., 1985). Plaintiff law firms would bring suit on behalf of all the workers who showed signs of exposure, sometimes filing hundreds of cases under a single docket number (Hensler et al., 1985). Given the profile of asbestos disease, these groups of claimants had injuries of varying severity, ranging from fatal mesothelioma and other malignant diseases to disabling asbestosis to milder asbestosis to pleural plaques and scarring not accompanied by functional impairment.

## Concentration of Plaintiff Representation

As asbestos litigation geared up in the 1970s, the risks and expense of representing asbestos workers and the development of mass filing strategies for litigating against corporate defendants with substantial resources led to the development of a small but sophisticated plaintiffs' asbestos bar, which represented a large fraction of all asbestos claimants. By 1985, ten firms represented one-quarter of the annual filings against major defendants. By 1992—about 20 years after the landmark *Borel* decision—just ten firms represented half of the annual filings against major defendants. Three years

later, ten firms (many, but not all, of the same firms that had been in the 1992 "top ten") represented three-quarters of the annual filings against asbestos defendants, even though the filings themselves had increased by a third. The concentration of claims in a small number of firms facilitated mass litigation strategies, which in turn facilitated control of the litigation by these firms. More recently, the degree of concentration of asbestos cases has diminished somewhat, as new law firms—some of them spin-offs of older well-established firms—have entered the asbestos litigation market (see Table 3.1). But asbestos litigation has remained highly concentrated, with ten firms representing nearly half of all filings in 2000.

## Adapting Legal Doctrine to Long-Latency Torts

Legal doctrines that determine whether and when injury victims can sue to obtain compensation were developed for victims of traumatic injury, not disease. The long latency period associated with asbestos disease posed challenges for the civil justice system to which courts in many jurisdictions were slow to respond.

Table 3.1
Data on Law Firms with Large Asbestos Caseloads

| | Percentage of Cases Filed by Law Firms in Top 10 for Annual Asbestos Filings | Number of Law Firms with 100 or More New Filings | |
|---|---|---|---|
| | | New Firms | Existing Firms |
| 1985 | 24 | 0 | 102 |
| 1986 | 32 | 6 | 58 |
| 1987 | 40 | 14 | 61 |
| 1988 | 40 | 11 | 60 |
| 1989 | 38 | 15 | 67 |
| 1990 | 37 | 13 | 68 |
| 1991 | 35 | 12 | 64 |
| 1992 | 51 | 14 | 66 |
| 1993 | 51 | 11 | 64 |
| 1994 | 53 | 12 | 65 |
| 1995 | 76 | 7 | 63 |
| 1996 | 76 | 9 | 69 |
| 1997 | 59 | 12 | 77 |
| 1998 | 50 | 28 | 93 |
| 1999 | 51 | 17 | 82 |
| 2000 | 48 | 23 | 75 |

**Statutes of Limitation and Definitions of Compensable Injury**

Significant obstacles for asbestos plaintiffs during the early years of the litigation were statutes of limitation, which generally require injury victims to file legal claims within a year or two after injury. Initially, many state courts held that asbestos plaintiffs' injuries had occurred many years earlier when the workers were first exposed, and therefore the allowable time for filing claims had expired. Later, many legislatures adjusted their statutes of limitation so as to require that latent-injury victims file suit within one or two years of when they know or should have known that they were injured (Hensler et al., 1985), rather than within a few years of the time of first exposure, thereby significantly increasing the number of claimants who had been exposed to asbestos many years ago who were eligible to bring suit

The application of statutes of limitation to asbestos cases has important consequences for asbestos victims. If a worker learns that he or she has been exposed to asbestos, seeks a medical examination to determine whether there has been a serious health consequence (e.g., cancer), and discovers that he or she has pleural plaques or scarring but no other symptoms of injury or impairment, in most jurisdictions a legal claim must be filed within a short time in order to protect the worker's chance of seeking compensation, as these physiological changes have been held to trigger a cause of action. Under traditional tort doctrine, only a single claim can be filed for any tort, even if that tort causes multiple injuries to a person. Therefore, in jurisdictions that follow this traditional rule, a worker who files a claim for pleural plaques or nondisabling asbestosis cannot file another claim if he or she develops more serious disease, such as cancer, in the future. However, in some jurisdictions, the worker may be able to recover compensation for fear of developing a later disease or for medical monitoring of his or her health (Behrens, 2002).

Over time, many jurisdictions have adopted special doctrines and rules to adjust the application of these traditional tort doctrines to long-latency asbestos disease claims. Most jurisdictions now follow the rule that the statute of limitations begins to run when workers discover that they have been injured, rather than at the time of first exposure. In California, the statutory period for filing an asbestos claim does not begin until a plaintiff's ability to work at his or her ordinary occupation is impaired (CA Civ Proc §340.2). Some courts have held that asymptomatic pleural thickening is not a compensable injury; hence, the statute of limitations in asbestos cases does not begin to run when a worker discovers such thickening.[3] Many states have adopted a "two-disease" rule that allows asbestos plaintiffs who have filed claims for

---

[3] See, e.g., *In re Hawaii Fed. Asbestos Cases,* 734 F. Supp. 1563 (1990); *Owens-Illinois v. Armstrong,* 87 Md. App. 699 (1991); and *Simmons v. Pacor, Inc.,* 543 Pa. 664 (1996).

nonmalignant diseases to bring a second lawsuit if and when a malignancy is diagnosed.[4]

**Inactive and Expedited Dockets**

Some jurisdictions have established inactive dockets (sometimes called "pleural registries") that enable asbestos plaintiffs who show signs of exposure but are not functionally impaired to satisfy statutes of limitation by filing their lawsuits but delay processing and resolving those lawsuits until the plaintiffs' injuries have progressed further (Schuck, 1992; Rothstein, 2001; Behrens, 2002). Nonmalignant claims are removable from the inactive docket only if they meet prespecified clinical criteria (e.g., diagnosis of malignancy, certain radiological exam results, and pulmonary function test ratings) or if a claimant's lawyer is otherwise able to persuade the court that a claim should be activated. State courts in Massachusetts (Commonwealth of Massachusetts, 1986), Cook County, Illinois,[5] and Baltimore, Maryland,[6] established inactive dockets in the late 1980s and early 1990s. In a variation on this policy, some courts have established "expedited dockets" that give priority to cancer claims, placing the claims of those without functional impairment at the back of the queue.[7]

Although registries preserve plaintiffs' rights to pursue compensation in the future, they do not provide compensation for whatever losses a plaintiff might already have suffered or for monitoring his or her health going forward. In courts such as Cook County, where discovery does not begin until a case is transferred from the inactive to the regular (active) docket, attorneys who have agreed to represent plaintiffs who are not currently functionally impaired do not have to invest time and money to investigate the case ("Inactive Asbestos Dockets . . . ," 2002). But the plaintiff lawyers who represent non-impaired plaintiffs also cannot secure fees immediately, making it harder for them to spread the risks of litigating more serious cases and perhaps making it less financially attractive for them to represent asbestos plaintiffs generally. Not surprisingly, some plaintiff attorneys have been unenthusiastic about pleural registries, and in some jurisdictions (e.g., Baltimore), plaintiff attorneys have vigorously contested their establishment or requirements.

---

[4] See, e.g., *Eagle-Picher Industries, Inc. v. Cox*, 481 So. 2d 517 (1985); *Devlin v. Johns-Manville Corp.*, 202 N.J. Super. 556 (1985); *Marinari v. Asbestos Corp.*, 417 Pa. Super. 440 (1992); and *Sopha v. Owens-Corning Fiberglas Corp.*, 230 Wis. 2d 212 (1999).

[5] *In re Asbestos Cases*, Order to Establish Registry for Certain Asbestos Matters (Cir. Ct. Cook Cty., Ill., May 26, 1991).

[6] *In re Asbestos Pers. Injury and Wrongful Death Asbestos Cases*, Order Establishing an Inactive Docket for Asbestos Pers. Injury Cases, No. 92344501 (Cir. Ct. Baltimore City, Md., Dec. 9, 1992).

[7] See, e.g., *In re Cuyahoga Cty. Asbestos Cases*, Gen. Pers. Injury Asbestos Case Mgmt. Order No. 1 (as amended Jan. 4, 2002) (Cleveland, Ohio); and *In re New York City Asbestos Litig.*, Order Amending Prior Case Mgmt. Order (S. Ct. N.Y. City, N.Y., Dec. 19, 2002).

From the perspective of defendants, pleural registries are attractive because they reduce the number of claims paid out annually by eliminating payments for those who are not functionally impaired, who in recent years have constituted the majority of all claimants (see Chapter Four). And, in jurisdictions where placement on pleural registries is mandated, if nondisabled plaintiffs never develop injuries that meet the criteria necessary to be removed from the registry, defendants will pay fewer claims in total over time and likely less in total compensation to all those who have been exposed to asbestos.

Although only a small number of jurisdictions had established inactive dockets up until 2000, inactive dockets have attracted renewed attention over the past few years. Courts that have established inactive dockets in recent years include New York City,[8] Seattle, Washington,[9] and Madison County, Illinois,[10] all of which now have substantial numbers of asbestos cases on their inactive dockets. Some judges have issued case management orders dismissing claims filed by certain law firms on behalf of nonfunctionally impaired plaintiffs with nonmalignant claims, while also tolling the statute of limitations for these claims.[11] On several occasions, federal judge Charles Weiner, to whom all asbestos lawsuits filed in federal courts have been transferred for pretrial management since 1991, has ordered the administrative dismissal of claims of plaintiffs without malignancies or current functional impairments.[12] Orders issued by state court trial judges usually apply to their courts only, but in states in which all asbestos cases are transferred to a single court for coordination the scope of a case management order may be effectively statewide. In January 2004, the Michigan State Supreme Court heard arguments on a petition filed by 60 corporate defendants asking the court to establish a statewide inactive docket for asbestos plaintiffs without malignancies or current functional impairments ("Michigan High Court Hears Docket Arguments," 2004). In June 2004, Ohio enacted legislation requiring that all

---

[8] *In re Asbestos Litigation,* Order Amending Prior Case Management Orders (S. Ct. N.Y. City, N.Y., Dec. 19, 2002).

[9] Letter from Judge Sharon Armstrong, King County, Washington, to Counsel of Record, December 3, 2002.

[10] *In re All Asbestos Litigation Filed in Madison County,* Order Establishing Asbestos Deferred Registry (Cir. Ct. Madison County, Ill., Jan. 23, 2004).

[11] See, e.g., *In re Wallace & Graham Asbestos-Related Cases,* Case Management Order (Greeneville County, S.C., 2002; *In re All Asbestos Cases,* Order Establishing an Inactive Docket for Cases Filed by the Law Offices of Peter T. Nicholl Involving Asbestos-Related Claims, No. CL99-399 (Portsmouth City Circuit Court, 2004).

[12] *In re Asbestos Prod. Liab. Litig. (No. VI),* MDL 875, Civil Action No. 2 (Maritime Actions), Order at 9, 13, 15 (E.D. Pa. May 1, 1996); *In re Asbestos Prod. Liab. Litig. (No. VI),* MDL 875, Order (E.D. Pa. Oct. 16, 1997); and *In re Asbestos Prod. Liab. Litig. (No. VI),* MDL 875, Admin. Order No. 8 (E.D. Pa. Jan. 14, 2002). The statute of limitations is tolled and plaintiffs may re-file when they can show "manifest injury" due to asbestos exposure.

asbestos plaintiffs meet specified injury criteria; in the absence of malignancy, the law requires proof of functional impairment.[13]

## Judicial Case Management

As asbestos cases flooded courts in areas of the country where there had been heavy exposure to asbestos, federal and state courts struggled to manage asbestos caseloads more efficiently in order to reduce private and public transaction costs (Hensler et al., 1985; Hensler, 1995; McGovern, 1986, 1989a, 1997; Peterson and Selvin, 1991; and Willging, 1985). The initiatives taken in the 1980s by innovative judges to improve efficiency were widely admired and imitated by fellow judges as the litigation progressed (McGovern, 1995).

A key feature of judicial management in asbestos litigation—and now, in mass torts generally—is the aggregation of cases for pretrial processing. Judges issue case management orders that apply to all asbestos cases filed in their courts, not just the single case that might be before them at a particular time. Often, judges will schedule hundreds or more cases filed by a single law firm for pretrial settlement discussion, hoping that having the entire set of cases before them for evaluation will facilitate settlement negotiations between plaintiff and defense counsel. Sometimes the cases will be grouped by plaintiffs' place of employment, but in other instances they may include claims from diverse sites and occupations. Typically, these large groups of cases include claims of varying injury severity.

### Aggregation Across Jurisdictions

In 1991, by order of the Judicial Panel on Multidistrict Litigation (JPMDL), under authority granted by 28 U.S.C. §1407, all asbestos cases filed in the federal courts were transferred to Judge Charles Weiner of the Eastern District of Pennsylvania for pretrial management.[14] Under the statute, when Judge Weiner deems the cases ready for trial, he is required to remand them to the jurisdictions in which they were originally filed.[15] By September 2004, 100,412 asbestos suits had been transferred to Judge Weiner. (In addition, 7,468 cases have been filed in the Eastern District of Pennsylvania and assigned to Judge Weiner.) Of these, 74,152 have been dismissed and 366 have been remanded to their filing district for trial ("Statistical Analysis of Multidistrict Litigation," 2004). Most of these cases were closed administratively without liability being decided or compensation being paid.

---

[13] OH LEGIS 88 (2004), 2004 Ohio Laws File 88 (Am. Sub. H.B. 292). The Ohio statute also sets other conditions for filing asbestos lawsuits.

[14] *In re Asbestos Prods. Liab. Litig. (No. VI),* 771 F.Supp. 415 (J.P.M.L. 1991).

[15] *Lexecon v. Milberg, Weiss, Bershad, Hines & Lerach,* 523 U.S. 26 (1998).

In some states, courts have adopted rules that call for transferring all asbestos cases filed in courts within the state to a single court (Hensler et al., 1985; McGovern, 1986). These rules frequently provide for trial as well as case management in the transferee court. In 1991, cases filed in four West Virginia counties were consolidated for trial in Monongalia County ("Cases in Four West Virginia Counties Consolidated," 1991).[16] In 1999, West Virginia promulgated TCR 26.01, which provides for transfer of mass tort cases filed in any county in the state to a single judge for case management and trial.[17]

Aggregation may also be accomplished by certification of a class under F.R.C.P. 23 or its state law counterparts. Class actions may include claims filed in many different state and federal courts (as well as claims that have not yet been filed in court). However, the requirements for class certification are more precise and arguably more difficult to satisfy than the requirements for consolidation, and class actions have been few—albeit significant—in shaping asbestos litigation.

In Mississippi, until September 2004, plaintiffs from outside the state who wished to join litigation in Mississippi could do so under the provisions of a unique mass joinder rule (M.R.C.P. 20) that required only that a single plaintiff meet state venue requirements.[18] The rule drafters' comments to Mississippi's joinder rule indicated that their intention was to allow "virtually unlimited joinder at the pleading stage" and give the judge wide latitude to "shape the trial to the necessities of the particular case."[19] However, the Mississippi State Supreme Court recently handed down an opinion restricting the application of joinder under Rule 20.[20] Prior to 2003, under the Mississippi rule, thousands of plaintiffs—including many from outside the state—filed asbestos claims in Mississippi courts.

---

[16] When the consolidation order was announced, plaintiff attorneys said they did not know how many cases it covered. See *State of West Virginia Ex Rel. Mobil Corp. v. Gaughan,* Judge, Supreme Court of Appeals of West Virginia, April 2002, No. 30314.

[17] On the adoption of TCR 26.01, see *State ex rel. Mobil Corp. v. Gaughan,* 211 W. Va. 106 (2002). The West Virginia Supreme Court has held that case law setting requirements for Rule 42(a) trial consolidations (discussed in the next section) does not apply to cases consolidated under TCR 26.01 (*State ex rel. Mobil Corp.,* 2002). Other states also have rules for transferring similar cases to a single jurisdiction. See, e.g., Maryland Rule 2-327(d); New Jersey Rule 4.38-1(b); and Kansas State Acts 60-242.

[18] Mississippi Code, Section 11-11-3. The amended statute requires each plaintiff to meet venue requirements. It applies only to cases filed after September 2004. Mississippi law does not provide for class actions.

[19] Challenges to joinder are reviewed under an abuse of discretion standard. *Illinois Central Railroad v. Travis,* 808 So. 2d 928 (Miss. 2002); *Am. Bankers Ins. Co. of Florida v. Alexander,* 825 So. 2d 8 (Miss. 2002).

[20] *Janssen Pharmaceutica, Inc. v. Armond,* 866 So. 2d 1092 (Miss. 2004) (rejecting joinder of 56 plaintiffs alleging injury from the prescription drug Propulsid). The court noted that although the rule drafters asserted that the "general philosophy" behind Rule 20 was to permit "virtually unlimited joinder," the comments to Rule 20 also state that "joinder of parties . . . is not unlimited" and set two conditions for joinder. *Janssen Pharmaceutica* (2004) at 1097.

## Consolidation

Within jurisdictions, rather than simply relying on scheduling orders to aggregate cases for settlement discussions, some judges have formally consolidated cases for pre-trial, and sometimes for trial as well. Consolidation within a single court jurisdiction is provided for by Rule 42(a) of the Federal Rules of Civil Procedure. Many states have adopted Rule 42(a) in its entirety, although a handful of states have not. Under Rule 42(a), trial judges have broad discretion to consolidate cases that share common legal or factual issues,[21] but they are required to balance the potential savings of time and cost resulting from consolidation against the possibility of prejudice against the parties.[22] A judge may consolidate cases completely or for limited proceedings without the consent of the parties. For example, in 1983, Judge Tom Lambros consolidated all asbestos cases then pending in his court for case management and settlement.[23]

In the early 1980s, a few judges experimented with consolidating cases for *trial*, hoping to minimize duplicative testimony on crosscutting issues such as disease causation. Ordinarily, in a unitary consolidated trial, the jury hears crosscutting evidence once, and then hears evidence specific to each of the cases; after deliberating, the jury issues verdicts in each of the cases, based on all the evidence it has heard. Sometimes, consolidated trials are bifurcated: The jury hears liability and other cross-cutting evidence (e.g., causation, punitive damages) first and decides those issues, and then, if the jury decides against the defendant(s), the jury hears and decides the individual issues in each case, which it may also hear and decide in a single sitting.[24] Occasionally, cases may be "reverse bifurcated" meaning that the jury first hears damages evidence and issues a compensatory award and then hears liability evidence. (The supposition is that knowing the value a jury places on damages may facilitate settlement, thus obviating the need for a potentially complex trial of liability evidence.)

Unitary consolidated trials are most practical when the number of cases consolidated is relatively small. If a large number of cases is consolidated for trial, unitary trials become unwieldy. Some judges address this problem by consolidating large numbers of cases for trial, and then dividing the consolidated cases into smaller groups (called "panels" or "flights") and trying the grouped claims together. Often,

---

[21] *Malcolm v. National Gypsum Co.*, 995 F.2d 346 (2d Cir. 1993); *Saudi Basic Industries Corp. v. Exxon Mobil Corp.*, 194 F. Supp. 2d. 378 (D.N.J. 2002).

[22] *Arnold v. Eastern Airlines, Inc.*, 681 F.2d 186, 193 (4th Cir. 1982), *cert. denied,* 460 U.S. 1102; *Daniels v. Loizzo*, 178 F.R.D. 46 (S.D.N.Y. 1998).

[23] *In re Ohio Asbestos Litig.*, N. 83-OAL (N.D. Ohio, June 1, 1983) (General Order No. 67, OAL Order No. 1). Judge Lambros informally coordinated his docket for case management purposes with the state court in Cuyahoga County.

[24] Authority to bifurcate cases is provided by F.R.C.P. 42(b). Individual trials may also be bifurcated. Experimental research suggests that bifurcating issues for trial may change outcomes, in comparison with trying all issues at once in a unitary trial (Horowitz and Bordens, 1990).

the judges hope that the verdicts in the first few trials will lead parties to settle the remainder of the consolidated cases, as (under the doctrine of *collateral offensive estoppel*)[25] liability verdicts against the defendants might preclude these same defendants from contesting liability in future trials.

To increase trial efficiency (and parties' motivation to settle) in large-scale consolidations, some judges select a few representative cases for trial of liability and other crosscutting issues. The jury decides those issues and then decides damages (if necessary) in the representative cases. The jury's decisions on the crosscutting issues are applied to *all* cases in the consolidation, and other juries then hear damages issues in the other cases that are part of the consolidation. In practice, these large-scale consolidations resemble trials of class actions, in which class-wide issues are usually tried to a single jury and followed, if necessary, by trials of individual class members' claims. But whereas a jury's decision on group-wide issues in a consolidated trial binds only the named parties that are before the court, in a Rule 23 class action the jury's decision on class-wide issues binds all members of the class, including absent parties.[26] While there is case law regarding the selection of representative parties in class actions, there is little or no case law regarding the selection of representative parties for non–class action consolidated trials, and judges appear to make the selection—often with the advice of the attorneys—on an ad hoc basis.[27]

The organization of trials in Rule 42(a) and other consolidations and Rule 23 class actions is specified by judicial case management orders, which, in asbestos litigation, have produced considerable variation on the trial models described in this section. In the early 1980s, in the Philadelphia Court of Common Pleas and the federal court in East Texas, several juries were seated to hear testimony common to several cases at the same time and then separated to hear testimony specific to each case and to decide those cases' outcomes. When, after hearing the same evidence, the different juries returned conflicting verdicts on the common questions, this experiment was abandoned (Hensler et al., 1985). Thereafter, when judges consolidated cases for trial, they generally put together a few cases, and tried those cases together to a single jury, which delivered individual verdicts for each case. In 1984, federal judge Robert Parker consolidated 30 cases for trial in East Texas and selected four cases from the larger consolidated group for trial to a single jury. As the judge anticipated, the verdicts in the tried cases provided benchmarks for settling all of the remaining cases; however, had settlement not ensued, each of the cases that had been aggregated

---

[25] *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979).

[26] When a class is certified under F.R.C.P. 23(b) (3), class members who do not wish to be bound by the case's outcome may opt out of the class litigation.

[27] But, see *In re Ethyl Corp.*, 975 S.W.2d 606, 620 (Tex. 1998) (reviewing case law on the criteria for consolidation and discussing in passing the selection of representative cases).

would have been tried (several at a time) to a jury (Selvin and Picus, 1987). At the time, it was the largest nonclass consolidation of asbestos cases for trial ever.[28]

Although most consolidated trials in the early years involved relatively small numbers of plaintiffs, a few judges in jurisdictions with large asbestos caseloads consolidated thousands of cases for trial. In 1985, Judge Parker certified the first class action of asbestos workers' injury claims in East Texas, and scheduled a trial of four class-wide questions, including punitive damages.[29] The class comprised about 800 asbestos claims then pending in federal court in Texas. Judge Parker's certification decision specified that if liability were found against the defendants, plaintiffs' damages claims would be decided in "mini-trials" of four to ten claims. The class action settled for $137 million five weeks into trial (McGovern, 1989). Judge Parker later certified another class action comprising some 3,000 claims, which were tried in 1990 in a novel format that applied the jury's liability verdict to the entire class and extrapolated the damages verdicts in sample cases to similar class members (Saks and Blanck, 1992; Bordens and Horowitz, 1998).[30] In 1989, the state court in Kanawha County, West Virginia, tried several hundred cases together, ordering a single jury to decide six common issues, including the award of punitive damages.[31] Three years later, asbestos cases filed in four West Virginia counties were consolidated for trial in the Monongalia County, West Virginia, state court ("Cases in Four West Virginia Counties Consolidated," 1991).[32] In 1991, New York State Court judge Helen Freedman consolidated 850 cases arising out of asbestos exposure to powerhouse workers.[33] About the same time, Judge Freedman and federal judge Jack Weinstein (sitting in the Eastern and Southern Districts of New York) consolidated for trial approximately 600 cases arising out of asbestos exposure to workers in the Brooklyn

---

[28] *Newman v. Johns-Manville*, Civil No. M-79-124-CA (E.D. Tex.). *Newman* was filed against multiple defendants, including Johns-Manville. The litigation against Manville was stayed after its 1982 filing for Chapter 11 reorganization, but the case moved forward against the other defendants. At the time of the trial, ten defendants remained.

[29] *Jenkins v. Raymark Industries, Inc.*, 109 F.R.D. 269 (E.D. Tex. 1985), *aff'd*, 782 F.2d 468 (5th Cir. 1986).

[30] *Cimino v. Raymark Indus.*, 751 F. Supp. 649 (D. Tex. 1990). Subsequently, the 5th Circuit held that the trial consolidation violated defendants' due process rights, and the verdicts were vacated. *Cimino v. Raymark Indus.*, 151 F.3d 297 (5th Cir. 1998).

[31] *Turley v. Owens-Corning Fiberglass In re Asbestos Case*, Nos. 84-C-3321 (Cir. Ct., Kanawha Co., W. Va., Feb. 15, 1989). The order consolidated all cases on which the firm of Ness, Motley, Loadholt, Richardson & Poole, a leading South Carolina asbestos law firm, was associated. The cases were consolidated under Rule 42 of the West Virginia Rules of Civil Procedure. See *State of West Virginia Ex. Rel. Mobil Corporation v. Gaughan*, West Virginia Supreme Court of Appeals, slip op. No. 30314 (April 2002). It is unclear how many cases initially were covered by the trial consolidation order, but 315 cases were actually tried in the first phase. See "Trials: Damages Awarded in West Virginia Second Phase," 1990.

[32] When the consolidation order was announced, plaintiff attorneys said they did not know how many cases it covered ("Cases in Four West Virginia Counties Consolidated," 1991).

[33] *In re New York City Asbestos Litigation*, Re: All Powerhouse Cases, N.Y. Sup. Ct., N.Y. Co. (1991).

Navy Yard. Most of the Navy Yard cases settled before trial,[34] but 79 cases were tried in a multiphase trial before a single jury.[35]

By the beginning of the 1990s, both the frequency and scale of consolidation seemed to be increasing. In 1990, 8,555 claims against more than 100 defendants were consolidated for trial in state court in Baltimore, Maryland. The judge's order called for two trials of different groups of defendants. Under the trial plan, if the jury found liability for any of the defendants, damages trials (with different juries) would be held subsequently for small groups of plaintiffs, until all plaintiffs' cases had been either tried or settled. The first jury to hear cases would also be asked to set a punitive damage multiplier for all defendants against whom it decided punitive damages were merited. By the time of the first trial, in 1992, claims against all but 15 of the defendants had been dismissed or settled, and during the trial nine of these defendants settled. The jury found some but not all of the remaining defendants liable and set a punitive damage multiplier for some of the latter defendants; it awarded compensatory damages to some but not all of the representative plaintiffs.[36] In 1993, the largest consolidated trial to date was heard in a Jackson County, Mississippi, state court. The trial was held in a courtroom at the county fairgrounds constructed just for this trial and lasted four and a half months (Abbott and Mallette, 1994). Six of nine sample plaintiffs were awarded $9.26 million in compensatory damages, while defense verdicts were delivered in the remaining three cases. A punitive damages multiplier was set at ten cents for every dollar of compensatory damages, which was applicable for the remaining plaintiffs in the 9,600-plaintiff trial.[37]

Trying thousands of cases together raises due process questions for plaintiffs and defendants alike (Trangsrud, 1989). If, as is common, the liability phase is tried first with representative plaintiffs, and the jury decides in favor of the defendant, all of the plaintiffs, not just those whose cases were presented to the jury, lose—as indeed happened in a trial of 800 cases alleging birth defects arising out of the use of Bendectin

---

[34] *In re New York City Asbestos Litigation*, 142 F.R.D. 60 (E.D.N.Y. & S.D.N.Y. 1992).

[35] *In re Eastern & Southern Dists. Asbestos Litig.*, 772 F. Supp. 1380 (E.D.N.Y. & S.D.N.Y. 1991), *aff'd in part, rev'd in part* 971 F.2d 831 (2nd Cir. 1992).

[36] See *ACandS, Inc. v. Godwin et al.*, 340 Md. 334 (1995). Two other defendants who had settled with the plaintiffs who brought suit against them elected to have their cross-claims heard in the common issues trial, so that the jury actually decided claims against eight defendants. The Maryland appellate court upheld the consolidation on appeal but reversed the jury's punitive damages awards, with the result that in the subsequent trials plaintiffs could obtain only compensatory damages. (See *ACandS, Inc.*, 1995). The mass consolidation followed a period in which the court had attempted to manage its asbestos cases by consolidating first six, and later ten, cases for trial (*ACandS, Inc.*, 1995). The first consolidation, known as Abate I, was followed by a second consolidated trial of other defendants and cross-claims, known as Abate II. See *ACandS, Inc. v. Abate*, 121 Md. App. 590 (1998).

[37] *In re Asbestos Personal Injury Cases, Abrams et al.*, (Jackson Co. Cir. Ct., 19th Jud. Dist. Miss. 1993). This was apparently the second phase of a multiphase trial in which the different phases involved different sets of defendants. When the case was first scheduled for a consolidated trial, it was estimated to comprise some 6,000 claims. (See "Judge Hopes to Resolve 6,000 Cases in Consolidated Trial," 1991).

(Green, 1996). In a class action trial, the risk is magnified, as the outcomes of a class-wide trial apply to all class members including absent unnamed parties. Moreover, experimental social-psychological research suggests that consolidating cases for trial may change jurors' assessments of liability and damages. Horowitz and Bordens (1988) found mock juries in simulated trials with representative plaintiffs were more likely to find the defendant liable when the juries were aware that a large number of plaintiffs were represented by the case in front of them.

Defendants believe that large-scale consolidation, especially when accompanied by the risk of huge punitive damage awards, tilts the playing field against them. As a result, when faced with a consolidated or class-wide trial of thousands of cases, they are very likely to settle. For example, just before the 1991 first phase of the large-scale consolidated trial in Jackson County, Mississippi, several defendants settled with 5,500 plaintiffs ("5,500 Mississippi Plaintiffs Settle . . . ," 1991). In recent years, defendants have challenged large-scale consolidations on due process grounds. In 1998, the Fifth Circuit Court of Appeals vacated the results of the East Texas class action trial in which verdicts for 160 plaintiffs were extrapolated to a class of more than 3,000 plaintiffs.[38] The court held that the trial plan violated the Seventh Amendment right to trial. However, the West Virginia Supreme Court has supported mass consolidations in that state.[39] To date, the U.S. Supreme Court has not agreed to hear appeals of mass consolidations. Consolidated trials of small numbers of cases may also raise due process concerns for plaintiffs and defendants, as information about one plaintiff's injuries or damages may skew the awards for other plaintiffs upward or downward in a process known as "anchoring" (Sunstein et al., 1998). In experimental research using mock juries and simulated trials, Horowitz and Bordens (1988) found that in a group trial the presence of an "outlier" plaintiff with more-severe injuries led to higher awards for the other plaintiffs in the group. Trying small numbers of claims together does not seem to have engendered the same level of controversy as mass consolidations, but outcomes of consolidated trials are often appealed, in part, on the grounds that consolidation was inappropriate.[40]

To determine the proportion of asbestos claims tried singly and in groups in recent years, we searched *Mealey's Litigation Report: Asbestos* from January 1, 1993, to

---

[38] *Cimino v. Raymark Indus.*, 151 F.3d 297 (5th Cir. 1998).

[39] *State of West Virginia ex. rel. Mobil Corp. v. Gaughan*, West Virginia Supreme Court of Appeals, slip op. No. 30314 (April 2002).

[40] See, e.g., *Malcolm v. National Gypsum Co.*, 995 F.2d 346 (2d Cir. 1993) (holding judge erred in consolidating 48 New York State cases of powerhouse workers who were employed at different sites); *Cain v. Armstrong World Industries*, 785 F. Supp. 1448 (S.D. Ala., 1992) (holding trial court erred in consolidating 13 diverse actions, including personal injury and wrongful death actions); *In re Ethyl* 975 S.W.2d 606 (1998) (reviewing prior appellate opinions on trial consolidation and suggesting consolidating small numbers of claims may be acceptable, where large-scale consolidations would not).

2001.[41] We found 526 trials that reached verdicts on 1,570 plaintiffs' claims. About 60 percent of the trials involved a single claim; most of the remainder involved fewer than ten claims (see Figure 3.1). But the proportion of all *claims* that were tried individually was only about one-quarter; about half were tried in groups of six claims or more (see Figure 3.2).

The distribution of claims by number of claims tried together remained roughly the same over the time period, although a somewhat larger proportion of claims was tried individually in the last few years studied (see Figure 3.3).

Some claims are filed in groups (i.e., under a single docket number)[42] and then tried together as if they were a single case, without a case management order consolidating claims for trial. Most large-scale consolidations either are settled or are resolved by group-wide trials on liability issues (and sometimes punitive damages),

**Figure 3.1**
**Distribution of Trials by Number of Claims Tried Together (Claims Tried to Verdict, 1993–2001)**



RAND MG162-3.1

---

[41] There is no national database of civil jury outcomes. *Mealey's* is a subscription service for litigators that is now available online (www.mealeysonline.com). *Mealey's* has been following asbestos litigation closely for many years and is often used as a reference for the field. For further details on our selection and processing of data from *Mealey's*, including data limitations, see Appendix C.

[42] For example, an Illinois decision references a complaint filed in Cook County in 1987 on behalf of 134 plaintiffs against 20 or more defendants. See *In re Asbestos Cases*, 224 Ill. App. 3d 292, 293 (Ill. App. Ct. 1991). But see *Abdullah v. Acands, Inc.*, 30 F.3d 264 (1st Cir. 1994) ("The Massachusetts Mass Joinder Cases") (upholding Massachusetts federal court's dismissal of a single complaint filed on behalf of 1,000 plaintiffs on grounds that the complaint did not meet joinder requirements).

36   Asbestos Litigation

**Figure 3.2**
**Distribution of Claims by Number Tried Together (Claims Tried to Verdict, 1993–2001)**

Claims



NOTE: The 31+ category is accounted for entirely by a consolidated trial of 129 claims.

**Figure 3.3**
**Percentage of Claims Tried Singly and in Groups over Time (Claims Tried to Verdict, 1993–2001)**



followed by damages trials of small groups of claims. Jury verdict reporters do not always distinguish among these situations. Therefore, one cannot determine the frequency of trial consolidation or the magnitude of large-scale consolidations by simply counting the number of group trials or the number of claims tried together, as reported by *Mealey's* or other litigation subscription services. To further explore the frequency and magnitude of large-scale consolidations, we closely read descriptions of all cases identified as "consolidated" in *Mealey's Litigation Report: Asbestos* from 1993 to 2003, including cases in which few claims reached trial.

Excluding consolidations for pretrial purposes only—such as the consolidation of federal cases under 28 U.S.C. §1407 and a consolidation of cases in Kansas under a rule modeled after the federal multidistrict statute—we found 15 consolidations each of which comprised 100 claims or more, which proceeded in seven states (see Table 3.2). All but one of these large-scale consolidations resulted in trials, including trials of subgroups of cases as well as trials with representative plaintiffs. In some instances, a consolidation led to multiple trials of representative plaintiffs against different subgroups of defendants.

Table 3.2 includes only consolidations that were either tried or scheduled for trial but settled during the ten-year period (1993–2003) we studied. Some of the cases listed in Table 3.2 were first consolidated before 1993, and in one case, an initial trial phase took place before 1993, and then a second phase occurred during the period under study. As discussed previously, some large-scale trial consolidations, including trials of class actions and (in Mississippi) mass joinders, were completed before 1993 and therefore are not included in Table 3.2.[43] In the final phase of preparing this report, we identified an additional large-scale consolidation, comprising about 5,000 cases, which went to trial in 2004 and therefore is also not included in Table 3.2. On the other side of the ledger, some of the consolidations listed in Table 3.2 might not sustain appeal today: In 2004, the Mississippi Supreme Court articulated stricter requirements for Rule 20 joinders;[44] subsequently, the Mississippi state

---

[43] Many claims have been filed in Mississippi under its permissive joinder rule (Rule 20). Table 3.2 includes only mass joinder cases that were scheduled during the study period for a consolidated trial (typically under Rule 42). Mass joinders of 100 claims or more that we identified in our legal research, but for which we did not find reports of consolidated trials, include *Abercrombie v. Pittsburgh Corning Corp.* (214 plaintiffs); *Abner v. Westinghouse Elec. Corp.* (1,123 plaintiffs); *Barksdale v. Pittsburgh Corning Corp.* (130 plaintiffs); *Bell v. Combustion Engineering* (1,123 plaintiffs); *Hedrick v. Metropolitan Life Ins. Co.* (2,856) plaintiffs; *Noble v. E.H. O'Neill* (4,667 plaintiffs); and *Stephens v. Combustion Engineering* (2,500 plaintiffs). See *Prepared Statement of Steven Kazan, Hearing on Asbestos Litigation Before the Committee on the Judiciary, U.S. Senate,* September 25, 2002 (citing data reported in an amicus brief of the Mississippi Manufacturers Association in *American Bankers Ins. Co. of Fla v. Alexander,* filed July 14, 1999). On the number joined in *Stephens,* see Clark (2001, pp. 371–372). After filing the mass joinder, the plaintiff attorneys in Stephens amended the complaint to remove most of plaintiffs, leaving only some 300 (Clark, 2001, footnote 60).

[44] *Janssen Pharmaceutica, Inc. v. Armond,* 866 So. 2d 1092 (Miss. 2004).

**Table 3.2**
**Large-Scale Trial Consolidations, 1993–2003**

| State | Case Title | Year[a] | Number of Claims | Was There a Trial? What Form? | Outcome(s) to Date |
|---|---|---|---|---|---|
| Illinois | *In re Asbestos*[b] | 1996 | 220 | No | Settled |
| Louisiana | *In re Asbestos Plaintiffs v. Bordelon*[c] | 1994 | 2,995 | Yes, some cases tried in groups of ten or fewer claims. | Mix of plaintiff and defense verdicts, dismissals and settlements. |
| Louisiana | *Abadie v. Metropolitan Life*[d] | 1995 | 1,000+ | Yes, some cases tried in small and large groups. | Mix of plaintiff and defense verdicts, judgments notwithstanding the verdict (JNOVs) and settlements. |
| Louisiana | *Bickham v. Metropolitan Life*[e] | 1999 | 1,400 | Yes, some cases tried in small groups. | Defense verdicts; outcomes of other consolidated claims unknown. |
| Maryland | *Abate v. AC&S* ("Abate II")[f] | 1994 | 1,300 | Yes, single multiphase trial with five representative plaintiffs, followed by mini-trials of damage claims. Trial also resolved some claims pertaining to 8,555 plaintiffs whose claims were tried in prior consolidated trial ("Abate I"). | Liability found and compensatory and punitive damages awarded; JNOV granted to some defendants re punitive damages; liability of some defendants reversed by appellate court; liability of other defendants vacated and remanded for retrial; 6,800 claims ultimately resolved by settlement prior to mini-trials. |
| Mississippi | *In re Asbestos Personal Injury Cases (Abrams)*[g] | 1993 | 9,600 | Yes, multiphase trial with nine representative plaintiffs. Claims against different defendants were tried in separate phases. | Mix of plaintiff and defense verdicts; punitive damage multiplier specified for all plaintiff verdicts. |

**Table 3.2—Continued**

| State | Case Title | Year[a] | Number of Claims | Was There a Trial? What Form? | Outcome(s) to Date |
|-------|-----------|---------|------------------|------------------------------|---------------------|
| Mississippi | *Cosey v. Bullard*[h] | 1998 | 3,464 | Yes, 12 plaintiff cases tried together; judge reportedly planned to try additional cases to same jury. | Plaintiff verdicts in all cases against some or all defendants. All defendants found liable for punitive damages. All cases settled before amount of punitive damages was decided. Remaining cases in mass joinder settled with most defendants, along with another mass joinder case, *Rankin v. A-Bex Corp.* |
| Mississippi | *Curry v. ACandS*[i] | 2001 | 154 | Yes, ten cases set for trial; two were dismissed and two settled before trial. Additional trials planned for groups of ten cases. | Plaintiff verdicts against all non-settling defendants. No punitive damages awarded.[j] |
| Texas | *In re Ethyl Corp.*[k] | 1998 | 459 | 348 settled. Of the remaining 111, 25 were selected for trial (later reduced to 22). | Consolidation of 25 claims appealed but upheld. Final outcomes unknown. |
| Virginia | *In re Asbestos Cases*[l] | 2002 | 1,296 | Yes, bifurcated trial against eight defendants. One defendant dismissed, four settled. | One of three remaining defendants found liable; no punitive damages. Case may have settled; damages phase not reported. |

40   Asbestos Litigation

**Table 3.2—Continued**

| State | Case Title | Year[a] | Number of Claims | Was There a Trial? What Form? | Outcome(s) to Date |
|---|---|---|---|---|---|
| West Virginia | *Mobil Corp. v. Gaughan*[m] | 2002 | 7,715[n] | Multiple trial plans proposed by judge. At one time, five trial phases, each of one or more groups of 25 claims, except for one group of 20 cancer claims. All trials in unitary format, to resolve only the claims before the jury.[o] Plaintiffs to decide trial groupings.[p] At another time, three judges and juries to hear and to decide common issues, followed by mini-trials on causation and damages with other juries, apparently of groups of claims.[q] As held, Phase I group-wide trial on liability, with Phase II mini-trials on damages, including punitive damages, to follow. | Trial began against "a few defendants"; case was dismissed against one, others settled, leaving one defendant to proceed, which the jury found liable.[r] |
| West Virginia | *Mon-Mass II*[s] | 1998 | 7,000 | At time of consolidation, more than 140 defendants; reduced to 80 defendants as trial approached; only three remaining by verdict. Phase I trial of liability and punitive damages. Mini-trials on damages to follow. | Liability found against three defendants and punitive multiplier specified. |
| West Virginia | *In re Asbestos Cases* (Kanawha III)[t] | 1994 | 9,000–10,000 | Reported to be tried to two juries and two judges, "perhaps coming together," with one trial with sample plaintiffs but the other not. | Mix of defense and plaintiff verdicts; punitive damages assessed against one defendant; most defendants settled before verdict.[u] |
| West Virginia | *In re Asbestos Cases* (IV)[v] | 1995 | "Up to" 1,000 | Phase I trial on product defect against six manufacturers of welding rods, wires, and cables; no punitive damages claims. | Mix of liability ("defective") and no-liability; outcomes of damages claims not reported. |

**Table 3.2—Continued**

| State | Case Title | Year[a] | Number of Claims | Was There a Trial? What Form? | Outcome(s) to Date |
|-------|-----------|---------|------------------|------------------------------|--------------------|
| West Virginia | *In re Asbestos Cases* (Ka-nawha IV)[w] | 1996 | 1,000+ | Multiphase trial plan, Phase I on liability, organized by 33 prem-ises and 17 owners. Phase II individual claims against defen-dants held liable in first phase.[x] | Liability found against defendants. Verdict said to apply to "all current and future plaintiffs" claiming exposure to products manufac-tured by these de-fendants. Outcomes of damages claims not reported. |

[a] Generally, this is the year of trial. In some instances, cases were ordered to be consolidated some years earlier. In some instances of multi-phase trials, earlier trial phases occurred before the period under study.

[b] *In re Asbestos Litigation,* Master File Asbestos Litigation No. 95 L 00000 (Ill. Cir., Cook Co.).

[c] *Asbestos v. Bordelon, Inc.,* 726 So. 2d 926, 978 (La. Ct. App. 1998).

[d] *Abadie v. Metro. Life Ins. Co.,* 784 So. 2d 46 (La. Ct. App. 2001).

[e] *Bickham v. Metropolitan Life Ins. Co.,* 764 So. 2d 345 (La. Ct. App. 2000).

[f] Details of the trial plan in Abate II are reported at *ACandS, Inc. v. Abate,* 121 Md. App. 590 (1998). This second consolidated trial in the long-running Baltimore City asbestos litigation included both third-party and cross-claims pertaining to the original 8,555 plaintiffs whose cases were tried in 1992 and the liability and compensation claims of an additional 1,300 plaintiffs whose claims were filed after the claims of the 8,555 whose cases were tried in Abate I. The 1998 appellate court opinion notes that there is uncertainty about how many plaintiffs' and defendants' cases were decided in the 1994 trial.

[g] *In re Asbestos Personal Injury Cases: Abrams et al.,* Jackson Co. Cir. Ct. Miss. About 5,500 plaintiffs set-tled with some defendants prior to trial. See *"5500 Mississippi Plaintiffs Settle . . . "* (1991).

[h] *Cosey v. Bullard Co. et al.* (No. 95-0069, Miss. Cir. Jefferson Co.). On the number of cases joined in *Cosey,* see "Trade Association Asks Mississippi High Court . . ." (1999). On the trial outcomes, see "Mississippi Jury Awards $48.5 Million . . ." (1998). On the settlement of *Cosey* and *Rankin,* said to include "nearly 4,000 plaintiffs," see "Plaintiffs Question Allocation . . ." (2000). Later reports describe the post-*Cosey* settle-ment as covering more than 6,100 plaintiffs. See "Tobacco Lawyers Want New Asbestos Trial Site" (2001, p. 10A). We also found references to other mass joinder cases in Mississippi: *Noble v. O'Neil* (4,667 plain-tiffs); *Bell v. Combustion Engineering* (987 plaintiffs); and *Stephens v. Combustion Engineering* (2,500 plaintiffs). None of these appears to have reached trial in consolidated form. On the number of cases joined in *Noble* and *Bell,* see "Trade Association Asks Mississippi High Court . . ." (1999). On the number joined in *Stephens,* see Clark (2001, pp. 371–372). After filing the mass joinder, the plaintiff attorneys in *Stephens* amended the complaint to remove most of the plaintiffs, leaving only some 300 (Clark, 2001, footnote 60).

[i] *James Curry et al. v. ACandS Inc. et al.* (No. CV 00-181, Miss. Cir. Holmes Co.). For a description of trial and outcomes, see "Miss. Jury Returns $150 Verdict . . ." (2001). In some reports, this case is cited as *John-son v. ACandS.*

[j] 3M has appealed the verdicts against it. *3M Co. v. Johnson,* 2004 Miss. LEXIS 1102 (Miss. 2004).

[k] *In re Ethyl Corp.,* 975 S.W.2d 606, 620 (Tex. 1998) (upholding consolidation).

[l] *In re Asbestos Cases,* No. CL-99-20000-00, Va. Cir. Newport News (petition for writ of mandamus against judge ordering consolidation denied). *In re Hopeman Bros., Inc.* 569 S.E.2d 409 (Va. 2002). Cert. denied. *Hopeman Brothers Inc. v. Clarence L. Acker et al.,* No. 02-520, U.S. Sup. For a description of the trial, see "Jury Returns Mixed Verdict . . ." (2003).

[m] *Adkins v. Mobil Oil Corp.,* No. 01-50987, Kanawha Co. Cir. Ct., W. Va. This was the first case consoli-dated under West Virginia TCR 26.01.

[n] Originally reported to include more than 8,000 plaintiffs and more than 250 defendants; by the time of trial, about 5,000 plaintiffs and "a few" defendants remained.

[o] *State ex rel. Allman v. MacQueen,* 209 W. Va. 726, 729 (2001).

[p] *State ex rel. Allman* (2001, at 732).

q *State ex rel. Mobil Corp. v. Gaughan*, 211 W. Va. 106, at 109 (2002). The trial judge noted that he was also considering applying a "damage matrix" to assess damages for the individual claims (*State ex rel. Mobil*, 2002, at 110).

r "Union Carbide Liable . . ." (2002).

s *In Re: Mon-Mass II*, C.A. No. 93-C-362, et al. W. Va. Cir., Monongalia Co.

t No. 92-C-8888, Kanawha Co. Ct., W. Va.

u See "OCF Admits to Liability . . ." (1994); "MetLife Settles 35,000 Cases . . ." (1994); "Rapid American Hit with . . ." (1994).

v No. 92-C-8888, Kanawha Co. Ct. W. Va. For a description of the trial and outcomes, see "Welding Rod, Wire, and Cable Defendants . . ." (1995).

w No. 92-C-8888, Kanawha Co. Ct., W. Va. In all, there were six consolidated trials in Monongalia and Kanawha counties prior to the adoption of TCR 26.01, which were said to have resolved more than 20,000 cases. See *State ex rel. Allman v. MacQueen*, 209 W. Va. 726 (2001), Note 6. The first consolidated case in Kanawha County was tried in 1990 ("Damages Awarded in West Virginia Second Phase," 1990).

x *State ex rel. Appalachian Power Co. v. MacQueen*, 198 W. Va. 1 (1996). At the time of the Supreme Court's ruling upholding the trial consolidation, the plans for Phase II had not yet been announced (*State ex rel. Appalachian Power Co.*, 1996, at 6).

legislature amended state venue rules to limit joinders to plaintiffs who would satisfy state venue requirements,[45] effectively eliminating mass joinders of out-of-state plaintiffs. The Texas Supreme Court, while upholding consolidation in *In re Ethyl,* articulated consolidation guidelines that arguably restrict future mass consolidations in that state.[46]

Although we supplemented our reading of litigation reporters with traditional legal research, determining whether trials took place and what form they took proved to be extraordinarily difficult.[47] As a result, we regard the information shown in Table 3.2 as being suggestive of the frequency and scale of large-scale consolidations during the period studied; some large-scale consolidations may not be included, and the numbers of claims reported may be approximate.

All of the consolidated trials listed in Table 3.2 were complex. Of the 14 large-scale consolidations we identified where some trials took place, eight used representa-

---

[45] Mississippi Code, Section 11-11-3.

[46] *In re Ethyl Corp.*, 975 S.W. 2d 606 (1998) (setting requirements for consolidation under Tex. R. Civ. P. (a) but denying mandamus on grounds that the trial court record was silent regarding relevant factors and trial court order is reviewed for abuse of discretion).

[47] The numbers of cases consolidated change as the litigation progresses, and some cases settle with some or all defendants while others are apparently added to the original consolidation order. Decisions sometimes refer to general titles for the consolidated litigation ("In re asbestos"), sometimes refer to lead plaintiffs, and sometimes rely on colloquial descriptions ("the mass consolidations in Monongalia county"), making it easy to undercount or over-count cases. Court decisions often are either silent or vague about the number of cases affected by the decisions; indeed, sometimes courts comment that they are unsure about the number themselves. See, e.g., *ACandS, Inc. v. Abate*, 121 Md. App. 590 (1998); *State ex rel. Mobil Corp. v. Gaughan*, 211 W. Va. 106 (2002), note 3; and *State ex rel. Allman v. MacQueen*, 209 W. Va. 726 (2001), note 1. We even found one instance in which the parties themselves argued about how many cases had been decided by a consolidated trial. Although we tried to identify cases that were consolidated for trial but settled entirely before a trial took place, it seems likely that litigation reporters would be more prone to miss such cases than to miss cases in which trial commenced. We believe Table 3.2 presents the most accurate count of large-scale consolidations possible without extensive interview-based research with attorneys involved in these consolidations, which was beyond the scope of this study.

tive plaintiffs to try liability (and sometimes punitive damages) against defendants. In the remaining six trials, plaintiffs were grouped for unitary ("all issues") trials, including one trial in which a single jury heard all 129 claims in full and was instructed to fill out a special verdict form for each.[48] Although only half of the consolidated trials were structured so that the jury's verdict in the liability phase would bind all of the consolidated claims, descriptions of the unitary trials of small groups of claims suggest that judges anticipated that the initial trials would lead to settlement of all the remaining consolidated claims.

Some of the trials listed in Table 3.2 were extraordinarily complex. For example, the 1994 Baltimore City trial known as "Abate II" (which was the second stage of the 1992 trial, "Abate I," described above), the jury was asked to decide liability and punitive damages against defendants sued by some 1,300 plaintiffs whose cases were filed after 1992, and *also* some claims against these defendants brought by the original set of 8,555 plaintiffs whose claims were tried in 1992 to a different jury. In its decision on the trial appeal brought by some defendants, the appellate court noted that it was uncertain how many plaintiffs' and defendants' cases were decided in the 1994 trial.[49]

The challenge of trying thousands of sometimes quite disparate claims against scores of defendants is illustrated by the succession of different trial plans that were announced in some cases. For example, in *Adkins v. Mobil Oil Corp.*,[50] a 2002 consolidation of 7,715 claims in West Virginia, the judge at one time indicated that there would be five trial phases, each involving one or more groups of 25 claims each, except for one group of 20 cancer claims, with the plaintiff attorneys to decide on how cases would be grouped. All claims would be tried in unitary format, meaning the outcomes would apply only to this specific group of claims.[51] Later, it was reported that three judges and juries would be assigned to hear and decide common issues among the consolidated claims, perhaps with mini-trials of damage claims to follow, but perhaps with some procedure aimed at applying a "damage matrix."[52] Ultimately, there was a single bifurcated trial, with phase I deciding group-wide liability issues. The judge intended that phase to be followed by mini-trials to decide com-

---

[48] *Abadie v. Metro. Life Ins. Co.*, 784 So. 2d 46 (La. Ct. App., 2001).

[49] *ACand S, Inc. v. Abate,* 121 Md. App. 590 (1998). The Maryland court was not the only court to express uncertainty about how many cases were involved in consolidations. See, e.g., *State ex rel. Mobil Corp. v. Gaughan,* 211 W. Va. 106 (2002), note 3, and *State ex rel. Allman v. MacQueen,* 209 W. Va. 726 (2001), note 1.

[50] No. 01-50987, Kanawha Co. Cir. Ct., W. Va.

[51] *State ex rel. Allman v. MacQueen,* 209 W. Va. 726, 729, 732 (2001).

[52] *State ex rel. Mobil Corp. v. Gaughan,* 211 W. Va. 106, 109–110 (2002).

pensatory and punitive damages, but the one defendant who remained at the time of the liability verdict apparently settled thereafter.[53]

In some instances, how the consolidated litigation would be organized for trial was still unclear at the time that the trial began. For example, at the time that some defendants appealed a trial consolidation plan for some 1,000 premises liability claims brought in Kanawha County, West Virginia, the West Virginia Supreme Court—upholding the plan—noted that while the judge had organized the liability phase of the trial, "the precise formula for the presentation of phase two of the trial has not been announced."[54] We could find no record of the judge's plan for trying successive waves of cases in the large-scale consolidation of *Cosey v. Bullard,*[55] a Mississippi mass joinder of 3,464 claims. In answer to our inquiry, one of the lawyers who tried the case told us that when the case settled—after the first 12 plaintiffs' claims reached verdicts and all defendants were found liable for punitive damages—the lawyers were still not certain how the trial would proceed.

Both defendants and plaintiffs sometimes appealed these trial consolidation plans (although defense appeals were more common). For example, when the West Virginia trial judge presiding over *Adkins* announced his plan for consolidating groups of claims and holding "all issues" unitary trials, defendants argued against any consolidated trial, and one group of plaintiffs argued against unitary trials, asking instead that the trial begin with a single liability phase that would apply to all of the consolidated claims.[56] More frequent than appeals, however, were the large-scale settlements that many defendants agreed to before trials commenced or before the juries reached verdicts.

The parties were not the only ones who opposed massive consolidations; some judges expressed doubts as to the fairness of proposed consolidations, especially in light of the U.S. Supreme Court's decision in *Amchem Products v. Windsor,*[57] reversing that large-scale consolidation of the claims of future plaintiffs. "Frankly, this case leaves me with a profound disquiet," wrote one of the West Virginia Supreme Court justices who ruled on the *Adkins* consolidation plan. "Mobil argues very persuasively and convincingly that the defendants have been denied due process in our courts. . . . I am deeply concerned that Mobil is probably correct and some federal court will eventually tell us so." Justice Maynard nevertheless concurred with colleagues on the bench in rejecting Mobil's challenge as untimely, because the trial plan for *Adkins*

[53] See "Union Carbide Liable for Thousands of Asbestos Claims . . . " (2002); "Union Carbide Left as Remaining Defendant . . . " (2002).

[54] *State ex rel. Appalachian Power Co. v. MacQueen,* 198 W. Va. 1 (1996), note 9.

[55] No. 95-0069, Miss. Cir. Jefferson Co.

[56] *State ex rel. Allman v. MacQueen,* 209 W. Va. 726 (2001).

[57] 521 U.S. 591 (1997).

had not yet been completed. Moreover, Judge Maynard concluded, "Notwithstanding the foregoing, there is another side to this issue which is equally thorny and troubling. If this mass litigation is simply halted, clearly all the plaintiffs would be denied their due process rights and their day in court. There should be a simple answer that would guarantee everyone's due process rights, but I cannot conceive or fashion one."[58]

Notwithstanding defendants' fears that consolidated trials will inevitably result in plaintiff awards, the cases for which we were able to determine trial outcomes displayed a mix of outcomes. Of the 13 consolidations for which we were able to determine at least some trial outcomes, six resulted in a mix of plaintiff and defense verdicts, six resulted in plaintiff verdicts in all cases against some or all defendants, and one resulted in defense verdicts. Punitive damages were not always claimed and not always awarded against all defendants when claimed. In two instances, trial judges dismissed claims against one or more defendants, and in two instances they reversed one or more jury verdicts. In one instance, an appeals court vacated some decisions and remanded the case for retrial. Interpreting this mix of outcomes is complicated by the fact that only those who are most certain of the strength of their cases (correctly or incorrectly) generally proceed to trial.

## Settlement

In asbestos litigation, as in all other civil litigation in the United States, most cases settle. Some settlements are the result of judicial case management practices, including large-scale consolidations such as those described above. However, over time, many defendants have chosen to adopt independent settlement programs, negotiating settlements of thousands of cases outside the courts.

### The "Futures" Problem

When a single plaintiff settles a torts case, the plaintiff generally is reasonably certain of the extent of his or her injuries, and the defendant offers an amount intended to cover future medical costs and work losses associated with the injury, as well as the costs incurred to date. In many mass tort cases, however, the plaintiffs include some people with little or no current injury who claim that they have a higher risk of injury in the future, because they have used or have been exposed to a defendant's product. Whether and under what circumstances these plaintiffs should be able to

---

[58] *State ex rel. Mobil Corp. v. Gaughan*, 211 W. Va. 330, 331, 333 (2002) (J. Maynard, concurring). On October 7, 2002, the U.S. Supreme Court rejected the defendants' appeal. *Mobil Corp. v. Adkins*, 537 U.S. 944 (2002), *cert. den'd*. By October 18, all but one defendant had settled the claims against them ("Union Carbide Left as Remaining Defendant . . . ," 2002).

collect damages from defendants has been a source of sharp controversy, and state laws regarding future injuries vary. However, as a practical matter, in order to achieve a comprehensive settlement of all claims associated with alleged product defects, defendants often offer payments to plaintiffs who are mainly seeking protection against future injury-related losses.[59]

In asbestos litigation, the problem of future injury costs is compounded by the long latency period of asbestos-related disease. Defendants who have been the targets of large numbers of claims in the past anticipate that claims will be brought against them for many years to come. Likewise, plaintiff attorneys who specialize in representing asbestos plaintiffs anticipate that they will represent similar plaintiffs, as they become ill, far into the future. Uncertainty about the extent of previous asbestos exposure and changing claiming rates and patterns—reflecting in large part the litigation strategies we have discussed in this chapter—have made it extremely difficult to predict the number and cost of future asbestos claims. But the certainty that future claims will emerge has encouraged settlement agreements that incorporate future claimants. How to make certain that these agreements will, in fact, provide for all future claimants who come forward, so that all who are eligible for compensation are properly compensated and all who are required to pay compensation have taken into account this responsibility in their business planning, has come to be called "the futures problem."

Some corporations that face mass asbestos filings have entered into standing settlement agreements with leading plaintiff attorneys' firms.[60] These agreements typically call for settling hundreds or thousands of cases per year at amounts specified in administrative schedules. The amounts reflect differences in injury severity and other claim characteristics, including the plaintiff lawyer's trial skills and willingness to go to trial, that affect the trial value of cases. Defendants' decisions to pay the negotiated sums are based on cost-benefit calculations that include the value of avoiding the risk and costs of trial, including the untoward effects on stock prices of large jury awards, and also a desire to smooth cash-flow demands to settle cases (Hensler, 2002). Settlement amounts may be renegotiated over time to reflect perceived changes in the values of asbestos claims.

---

[59] For example, plaintiffs who feared rupture of defective implanted Shiley Heart Valves obtained a settlement that offered medical monitoring and payment to remove the valves if they ruptured in the future. *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141 (S.D. Ohio 1992), *appeal dismissed*, 14 F.3d 600 (6th Cir. 1993). Many of these plaintiffs' claims would not have survived motions to dismiss because they arose in jurisdictions that did not recognize claims for emotional distress arising from fear of future injury *(Bowling,* 1992). Plaintiffs who feared future heart-valve injury as a result of taking the diet pill popularly known as "fen-phen" were included in a class action settlement that offered, inter alia, medical monitoring. *Brown v. Am. Home Prods. Corp. (In re Diet Drugs Prods. Liab. Litig.),* 2000 U.S. Dist. LEXIS 12275 (D. Pa. 2000).

[60] See, e.g., "4th Circuit Rules That Ohio Plaintiffs Are Necessary . . ." (1999) (reporting settlement agreements between Owens Illinois and three West Virginia attorneys).

For plaintiff law firms, standing agreements offer a means of reducing transaction costs of litigation and also regularizing their firms' revenue stream over time. The agreements also expand the number of claimants on whose behalf the firms are able to obtain compensation. By "packaging" plaintiff claims, the lawyers are able to obtain compensation for claimants with weak claims who would have difficulty collecting damages if they were to proceed individually.

Plaintiff law firms that enter into these agreements demand that each defendant with whom they negotiate an agreement pay a share of the estimated total value of the plaintiff's claim that, in the plaintiff lawyer's view, reflects the share of liability attributable to that defendant. For many years, under the terms of such agreements, lead defendants—mainly asbestos product manufacturers—have paid substantial amounts, while peripheral defendants, whose connection with asbestos products was attenuated, paid more modest amounts.

### The Search for Global Settlement

When federal asbestos cases were transferred to Judge Charles Weiner by the Judicial Panel on Multidistrict Litigation in 1991, many asbestos lawyers anticipated that Judge Weiner would help parties negotiate a global settlement of all federal cases against all defendants that would in turn provide a model for resolving state cases (Hensler, 2002). However, fashioning such a broad settlement among a large number of defendants and plaintiff attorneys who had diverse and opposing interests proved enormously difficult. Moreover, if defendants were to achieve their goal of "global peace"—resolving all claims, present and future, at a known price—the parties needed to craft a mechanism for dealing with claimants who had not yet come forward.[61]

Ultimately, the search for a single overarching settlement failed. Instead, a consortium of about 20 major asbestos defendants negotiated two settlements with leading asbestos plaintiff attorneys under the aegis of the multidistrict litigation transferree court, one a "private" (not judicially supervised) settlement of all claims those attorneys then had pending against the defense consortium, and the second, a class action settlement of *all claims that might be brought in the future by any plaintiff (and plaintiff attorney)* against the consortium.[62] The class action settlement provoked sharp attack from lawyers who were not part of the negotiated agreements, from public interest attorneys, and from legal ethicists (Baron, 1993; Hensler, 2002; Symposium, 1995), and was appealed first to the Third Circuit[63] and then to the

---

[61] While challenging, this requirement was not unique to asbestos litigation. For example, at the time of the Agent Orange settlement (resolving claims of Vietnam veterans who alleged injury due to dioxin exposure), the total size of the class was unknown (Schuck, 1987).

[62] *Georgine v. Amchem Products, Inc.*, 157 F.R.D. 246 (E.D. Pa. 1994).

[63] *Georgine v. Amchem Prods.*, 83 F.3d 610 (3d Cir. 1996).

U.S. Supreme Court. When the settlement was rejected by the U.S. Supreme Court in *Amchem Products v. Windsor*,[64] and when the Court, in *Ortiz v. Fibreboard*,[65] subsequently rejected a similar class settlement of asbestos claims against another major defendant in 1999,[66] efforts to achieve a global resolution of asbestos litigation through class action litigation collapsed (Cabraser, 1998).

### Asbestos Litigation After *Amchem* and *Ortiz*

After the failure of the *Amchem* and *Ortiz* class action settlements in 1997 and 1999, the landscape of asbestos litigation began to change. Filings surged, perhaps in part as a result of the publicity engendered by the class action notices required by *Amchem* and *Ortiz* and the ensuing controversy, which was widely reported in the legal media. From 1998 on, the number of law firms filing more than 100 cases annually increased dramatically, and the number of firms that were new to such large-scale filings also shot up (See Table 3.1).

In an effort to achieve a comprehensive settlement of all present and future claims against it, Owens-Corning Fiberglass, a leading asbestos manufacturer defendant, announced a national settlement program comprising standing settlement agreements with multiple plaintiff law firms. In short order, that settlement program collapsed under the weight of an unanticipated flood of claims, and the company petitioned for bankruptcy reorganization. The consortium of defendants that had hoped to contain their asbestos litigation exposure through the *Amchem* settlement suspended operations, and many of their members also filed for Chapter 11 reorganization (Hensler, 2002).

As filings surged, many of the asbestos product manufacturers that plaintiff attorneys had traditionally targeted as lead defendants filed for bankruptcy. Plaintiff attorneys sought out new defendants and pressed defendants whom they had heretofore treated as peripheral to the litigation for more money. With new firms engaged in litigating on the plaintiffs' behalf, and new corporations drawn into the litigation or assuming a more central role, the old settlement agreements began to unravel.

---

[64] 521 U.S. 591 (1997). The Supreme Court had granted certiorari on the question of whether it is permissible for judges to certify a settlement class action in circumstances where it would (arguably) be impermissible to certify a litigation class. The Court did not reject the legitimacy of settlement classes generally but vacated approval of the settlement before it on the grounds that the diverse interests of class members were not properly represented by class representatives and class counsel (Hensler, 2002).

[65] 527 U.S. 815 (1999).

[66] *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).