# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| In Re: | § | |
| SILICA PRODUCTS LIABILITY | § | MDL Docket No. 1553 |
| LITIGATION | § | |
| | § | |

## ORDER NO. 29: ADDRESSING SUBJECT-MATTER JURISDICTION, EXPERT TESTIMONY AND SANCTIONS

Twenty months of pre-trial proceedings and coordinated discovery in the above-styled multidistrict litigation ("MDL") have culminated in three issues becoming ripe for decision: (1) whether federal subject-matter jurisdiction exists in this MDL's 111 cases (totaling over 10,000 individual Plaintiffs); (2) whether the doctors who diagnosed Plaintiffs with silicosis employed a sufficiently reliable methodology for their testimony to be admissible; and, (3) whether Plaintiffs' counsel should be sanctioned for submitting unreliable diagnoses and failing to fully comply with discovery orders.

The rulings contained herein are summarized as follows.

The claims of every Plaintiff in each of the 90 cases listed in "Appendix A" (attached hereto) will be REMANDED for lack of subject-matter jurisdiction. In order to allow the parties an opportunity to petition the Mississippi Supreme Court for consideration of how Mississippi's judicial system can best absorb the return of these cases, the Motion to Stay the effective date of remand will be GRANTED. The Court will STAY the effective date of the remand of the cases listed in "Appendix A" for a period of 30

days from the date of this Order, after which time remand will issue.

Kirkland v. 3M Co., S.D. Tex. Cause No. 04-639, will be sent to the Judicial Panel on Multidistrict Litigation ("Panel") with a recommendation that, for the convenience of the parties and to promote the just and efficient conduct of the case, Kirkland be remanded to the United States District Court for the Northern District of Georgia.

After the implementation of the above-stated rulings, only the 19 recently-transferred cases listed in "Appendix B," as well as Alexander v. Air Liquide America Corp., S.D. Tex. Cause No. 03-533 (originally filed in this Court), will remain in this MDL. An in-person status conference will be conducted on August 22, 2005 at 9:00 a.m., concerning the appropriate procedure for expediting jurisdictional discovery in the cases listed in "Appendix B," as well as in any later-transferred cases. As to the "Appendix B" cases, the stay of discovery entered on February 22, 2005 (see Order No. 26) will be lifted. As set out in Order No. 4, all Plaintiffs in recently-transferred actions must submit sworn Fact Sheets within 60 days from the date of transfer by the Panel (excluding the period during which discovery was stayed). (Order No. 4, ¶ 20.)

In Alexander, Plaintiffs have 30 days from the date of this Order to cure the jurisdictional allegation concerning American Optical's principal place of business. Should Plaintiffs fail to

cure the allegation within 30 days, American Optical will be dismissed without prejudice.

As to <u>Alexander</u>, Defendants' Motion to Exclude will be GRANTED: the testimony of Dr. Harron and the testimony of Dr. Levy (as well as their accompanying diagnoses) are inadmissible. Immediately following the August 22, 2005 status conference addressing the "Appendix B" cases, the Court will conduct an in-person status conference in <u>Alexander</u>, to address whether (and, if so, under what conditions) the Plaintiffs' claims may proceed.

Defendants' Motions for Sanctions will be GRANTED as to <u>Alexander</u>. The law firm of O'Quinn, Laminack & Pirtle ("O'Quinn") has multiplied the proceedings unreasonably and vexatiously, and will be required to satisfy personally <u>Alexander</u>'s proportionate share (i.e., one percent) of Defendants' reasonably incurred costs, expenses and attorneys' fees for the <u>Daubert</u> hearings conducted on February 16-18, 2005. The Court does not yet fix the amount of this sanction. Instead, within seven days from the date of this Order, O'Quinn must file a statement with the Court either admitting or denying the Court's estimate of $825,000 as the total amount of fees, costs and expenses Defendants reasonably incurred due to the three-day <u>Daubert</u> hearings. Should O'Quinn deny the $825,000 figure, the Court first will allow Defendants to prove their actual fees, expenses and costs for the <u>Daubert</u> hearings, and then will allow O'Quinn to challenge those amounts and their reasonableness; finally, the Court will sanction O'Quinn for

-3-

<u>Alexander</u>'s proportionate share of the actual fees, expenses and costs Defendants reasonably incurred.  Regardless of whether O'Quinn admits or denies the $825,000 figure, the amount of the sanction will be set in a later order.

As to all MDL cases transferred by the Panel <u>before</u> December 5, 2004 (i.e., the "Appendix A" cases, over which the Court has no subject-matter jurisdiction), the Motion to Exclude Expert Testimony, the Motions for Sanctions, and all other pending motions not otherwise addressed in this Order are reserved for consideration by the appropriate state court after remand.

As to those MDL cases transferred by the Panel <u>after</u> December 5, 2004 (i.e., the "Appendix B" cases), the Motion to Exclude Expert Testimony, the Motions for Sanctions, and all other pending motions not otherwise addressed in this Order are STAYED pending this Court's ruling on subject-matter jurisdiction.

### Table of Contents

I.   Background . . . . . . . . . . . . . . . . . . . . . . 7
     A.   Silica and Silicosis  . . . . . . . . . . . . . . 7
     B.   MDL 1553 . . . . . . . . . . . . . . . . . . . . 15
II.  Daubert Hearings/Court Depositions . . . . . . . . . . 30
     A.   Need for the Daubert Hearings . . . . . . . . . . 30
          1.   Dr. Martindale's Deposition  . . . . . . . . 32
          2.   December Hearings  . . . . . . . . . . . . . 38
               a.   December 2 Telephonic Conference . . . . 38
               b.   December 17 Status Conference . . . . . 39
          3.   Dr. Hilbun's & Dr. Cooper's Depositions  . . . 45
     B.   Medically-Accepted Method for Diagnosing
          Silicosis . . . . . . . . . . . . . . . . . . . . 49
     C.   Comparison to Asbestosis  . . . . . . . . . . . . 60
     D.   Screening Companies . . . . . . . . . . . . . . . 63
     E.   Dr. Ray Harron  . . . . . . . . . . . . . . . . . 80
     F.   Dr. Andrew Harron . . . . . . . . . . . . . . . . 91
     G.   Dr. Ballard . . . . . . . . . . . . . . . . . . . 92
     H.   Dr. Levy  . . . . . . . . . . . . . . . . . . . . 96
     I.   Dr. Coulter . . . . . . . . . . . . . . . . . . 107
     J.   Dr. Oaks  . . . . . . . . . . . . . . . . . . . 113
     K.   Daubert Analysis  . . . . . . . . . . . . . . . 116
          1.   Legal Standard . . . . . . . . . . . . . . 117
          2.   Criterion 1: Sufficient Exposure . . . . . . 121
          3.   Criterion 2: Radiographic Findings . . . . . 128
          4.   Criterion 3: Differential Diagnosis  . . . . 137
          5.   Lawyers Practicing Medicine and
               Doctors Practicing Law . . . . . . . . . . 143
          6.   Effects of Mass Over-Diagnosing  . . . . . . 151
          7.   Alexander Ruling . . . . . . . . . . . . . 153
     L.   Independent Medical Advisors/Technical
          Advisory Panel . . . . . . . . . . . . . . . . 161
     M.   Kirkland Deposition . . . . . . . . . . . . . . 164
III. Subject-Matter Jurisdiction  . . . . . . . . . . . . 169
     A.   Priority of Subject-Matter Jurisdiction . . . . . 169
     B.   Removal . . . . . . . . . . . . . . . . . . . . 171
     C.   Diversity Jurisdiction  . . . . . . . . . . . . 171
          1.   Amount in Controversy  . . . . . . . . . . 172
          2.   Complete Diversity . . . . . . . . . . . . 175
               a.   Improper Joinder . . . . . . . . . . . 177
                    i.   Joinder of Plaintiffs  . . . . . . 184
                    ii.  Joinder of Defendants by Each
                         Individual Plaintiff . . . . . . . 193
               b.   Procedural Issues . . . . . . . . . . 197
               c.   Analysis . . . . . . . . . . . . . . . 200

D.    Motion to Stay the Effective Date of Remand . . . . 215
E.    Cases Transferred After December 5, 2004  . . . . . 217
F.    <u>Kirkland</u>  . . . . . . . . . . . . . . . . . . . 218
G.    <u>Alexander</u> . . . . . . . . . . . . . . . . . . . 222
IV.   Sanctions  . . . . . . . . . . . . . . . . . . . . . 225
A.    In the Absence of Subject-Matter Jurisdiction . . . 227
B.    <u>Alexander</u> . . . . . . . . . . . . . . . . . . . 232
V.    Conclusion . . . . . . . . . . . . . . . . . . . . . 246

## I.    Background

### A.    Silica and Silicosis[1]

The mineral that lies at the heart of this litigation--silica--appears benign at first glance.   Silica, also known as silicon dioxide, is the second most common mineral in the earth's crust and is the primary ingredient of sand and 95 percent of the earth's rocks.   But if sand or rocks are chipped, cut, drilled or ground, respirable-sized particles of silica may be produced, and the mineral becomes potentially dangerous.   Inhaled silica particles may be trapped in the lungs, causing areas of swelling and scarring.   Over time, these swollen areas can grow larger, breathing can become increasingly difficult, and eventually, the lungs may fail completely, resulting in death.   This disease is called "silicosis."

Silicosis is classified into three types: chronic/classic, accelerated and acute.   Chronic or classic silicosis, the most common form, typically requires at least 15-20 years of moderate to low exposure of respirable silica.   Accelerated silicosis can occur after 5-10 years of high exposure.   Acute silicosis occurs after a few months or as long as two years of exposure to extremely high concentrations of respirable silica.   The symptoms associated with

---

[1]   Unless otherwise noted, the background information on silica and silicosis contained herein was gathered from the websites of the Centers for Disease Control (www.cdc.gov & www.cdc.gov/niosh/) and the World Health Organization (www.who.int).

silicosis include shortness of breath, fatigue, chest pain, weight loss, fever and/or respiratory failure.

The only effective treatment for silicosis is a lung transplant. (Feb. 18, 2005 Trans. at 308.) Otherwise, the disease is incurable, progressive, and irreversible. Because people with silicosis have a high risk of developing tuberculosis ("TB"), they should undergo frequent TB tests and in some cases may be prescribed a TB medication as a prophylactic measure. (Feb. 18, 2005 Trans. at 308-09.) Silicosis also can lead to cancer and autoimmune disease, so silicotics should be frequently tested for those associated diseases. In addition, a silicotic who has difficulty breathing may be treated with drug therapy to keep the airways open and free of mucus. A silicotic should also receive any available pneumonia vaccines and should be encouraged to cease smoking. (Feb. 18, 2005 Trans. at 308.) And, of course, anyone with silicosis should avoid further exposure to respirable silica, to prevent the disease from worsening.

Silicosis is one of the oldest recognized occupational diseases, with cases recorded as far back as the 16th century. In the early 1930's, the Tennessee Valley Authority built the "Hawk's Nest Tunnel" through Gauley Mountain in West Virginia to build a hydroelectric facility. In order to accomplish this, the workers drilled though one mile of almost pure silica. Five thousand people worked on this project; no safety precautions were taken to prevent respirable-silica exposure. Approximately 1,200 workers

developed silicosis, and approximately 400-600 of these workers perished from the disease. This is known as the "Hawk's Nest incident," and it is considered America's worst industrial disaster.[2]

But despite the fact that the dangers of respirable silica have been known for many years, more than a million U.S. workers continue to be exposed to respirable silica. Exposure is most prevalent in occupations such as abrasive blasting (i.e., "sandblasting"), mining, quarrying, and rock drilling.

This continued exposure is tragic, because while silicosis is incurable, it is also 100 percent preventable. There are well-known steps employers, workers, and/or government regulators could take to drastically reduce worker exposure to respirable silica. Indeed, the use of crystalline silica was banned in abrasive blasting operations in Great Britain in 1950 and in other European nations in 1966. In the United States, in 1974, NIOSH recommended that silica sand be prohibited for use as an abrasive blasting material in favor of less hazardous substances.[3]  While this

---

[2]  See generally Martin Cherniak, THE HAWK'S NEST INCIDENT: AMERICA'S WORST INDUSTRIAL DISASTER (Yale Univ. Press 1986).

[3]  NIOSH has studied several abrasive agents that might be used as substitutes for silica sand during sandblasting.  Some of the abrasives studied are steel grit, specular hematite, nickel slag, copper slag, crushed glass, garnet, staurolite, olivine, and coal slag.  Most of these abrasives work as well as silica sand and cost about the same or even less. However, the use of a substitute may have other adverse effects.  See generally http://www.cdc.gov/elcosh/docs/d0100/d000048/d000048.html.

recommendation was not adopted, beginning in the 1970's, OSHA implemented regulations requiring the use of respirators, as well as other measures designed to reduce workers' exposure to respirable silica. In 2001, OSHA reported:

> Although OSHA currently has a permissible exposure limit for crystalline silica ..., more than 30 percent of OSHA-collected silica samples from 1982 through 1991 exceeded this limit. Additionally recent studies suggest that the current OSHA standard is insufficient to protect against silicosis.

66 Fed. Reg. 25724, 25727 (May 14, 2001). Steps employers and workers can take to prevent exposure include engineering controls, such as ventilation systems, automated equipment operated from an enclosed booth, and "wet methods" (e.g., while cutting masonry or concrete, using water to prevent silica dust clouds), as well as the proper use of appropriate respirators.

Yet, while even a single silicosis death is one death too many, progress is being made. The Centers for Disease Control ("CDC") has found that the number of U.S. workers exposed to silica dust has declined steadily from 1970 to 2002. Correspondingly, silicosis deaths have also steadily declined.[4] The National Institute for Occupational Safety and Health ("NIOSH"), in its most recent estimates, reports that deaths attributable to silicosis in the United States have declined steadily each year from 1,157

---

[4] The CDC estimates that this decline in silicosis mortality is due to (1) the loss of jobs in heavy industry, and (2) dust limits in the U.S., which have been increased steadily for approximately thirty years. (Feb. 18, 2005 Trans. at 226.)

deaths in 1968 to 187 deaths in 1999.  According to NIOSH, the state with the highest silicosis mortality rate is West Virginia, with an age-adjusted mortality rate of 4.74 deaths per million population over the 10-year period from 1990-1999.[5]  Mississippi ranks 43rd in the United States, with an age-adjusted silicosis mortality rate of 0.64 deaths per million, equating to 1.3 silicosis deaths per year.[6]

A recent peer-reviewed study of the incidence of silicosis in Michigan found that from 1987 to 1996, the ratio of the number of living to deceased silicosis cases was 6.44.[7]  Applying this ratio to NIOSH's silicosis mortality statistics between 1990 and 1999 (during which time Mississippi had 13 silicosis deaths), one would anticipate approximately eight new silicosis cases per year in

---

[5] See www.cdc.gov/niosh/docs/2003-111/pdfs/2003-111d.pdf.

[6] See id.; Feb. 18, 2005 Trans. at 228.  Alabama ranks 19th, with an age-adjusted mortality rate of 1.20 deaths per million, and Texas ranks 33rd, with an age-adjusted mortality rate of 0.83 deaths per million.  See www.cdc.gov/niosh/docs/2003-111/pdfs/2003-111d.pdf.

[7] (Feb. 18, 2005 Trans. at 229.)  The researchers compared the number of silicosis deaths on death certificates with the number of silicosis cases reported by doctors, hospitals and worker's compensation agencies in Michigan.  (Feb. 18, 2005 Trans. at 231.)  In Michigan, silicosis is "reportable", meaning that any diagnosis must be reported to the appropriate agency by law.  (By contrast, silicosis is not a reportable disease in Mississippi.)

According to occupational medicine expert Dr. Gary Friedman, some experts feel the 6.44 multiplier is too high.  (Feb. 18, 2005 Trans. at 231.)  The issue is whether the multiplier accurately compensates for the likelihood that silicosis cases are sometimes missed or misdiagnosed by physicians.  (Feb. 18, 2005 Trans. at 118.)

Mississippi.    Applying   the   6.44   multiplier   to   the   1999   U.S.
mortality   rate,   one   would   anticipate   approximately   1,204   new
silicosis cases per year throughout the entire United States.

This   information   provides   the   backdrop   for   the   issue   of
immediate   concern   to   this   Court:   silicosis   lawsuits,   especially   in
Mississippi.   In 2000, approximately 40 Plaintiffs filed silicosis
claims in Mississippi courts.   In 2001, approximately 76 Plaintiffs
filed silicosis claims in Mississippi courts.   These numbers are
considerably higher than what one might expect given the Michigan
study, but they are not outside the realm of what an epidemiologist
would say is possible in Mississippi.[8]

However, in 2002, the number of new Mississippi silicosis
claims skyrocketed to approximately 10,642.   In 2003 and 2004, the
number of new silicosis claims in Mississippi continued to be
shockingly high, at 7,228 claims in 2003 and 2,609 claims in 2004.
By way of comparison, in 2002, on average, more silicosis claims
were filed per day in Mississippi courts than had been filed for
the entire year only two years earlier.   And during 2002-2004, the
20,479 new silicosis claims in Mississippi are over five times

---

[8]   Dr. Howard William Ory, an epidemiologist who worked for
the CDC for 23 years, estimated that based on data from NIOSH's
silicosis surveillance system (which actively solicits case
reports from pulmonary and occupational medicine physicians and
"B-readers" (discussed infra)) and from the Michigan study
(referenced supra), there would be between 36 and 73 cases of
silicosis diagnosed in Mississippi per year.   (Ory Aff. at 3
(attached to MDL 03-1553 Docket Entry 1145).)

greater than the total number of silicosis cases one would expect over the same period in the entire United States.

This explosion in the number of silicosis claims in Mississippi suggests a silicosis epidemic 20 times worse than the Hawk's Nest incident. Indeed, these claims suggest perhaps the worst industrial disaster in recorded world history.

And yet, these claims do not look anything like what one would expect from an industrial disaster. One would expect an industrial disaster to look like the Hawk's Nest incident: presenting cases of acute silicosis (with relatively brief incubation periods), emanating from a single worksite or geographic area with an extremely high concentration of silica. To the contrary, virtually all of these silicosis claims are for chronic or classic silicosis (with incubation periods in excess of 15 years). The claims do not involve a single worksite or area, but instead represent hundreds of worksites scattered throughout the state of Mississippi, a state whose silicosis mortality rate is among the lowest in the nation.[9]

---

[9] According to the CDC, Mississippi's silicosis mortality rate ranks 43rd out of the 50 states. See www.cdc.gov/niosh/docs/2003-111/pdfs/2003-111d.pdf. Outside of Mississippi, the majority of the remainder of Plaintiffs in this MDL reside in Alabama (which ranks 19th in silicosis mortality), Texas (which ranks 33rd), and Kentucky (which ranks 14th). The states with the highest silicosis mortality rates (West Virginia, Vermont, Colorado, Pennsylvania and New Mexico being the top five) are not represented. According to the most recent statistics from the CDC's Morbidity and Mortality Weekly Report, during the years of 1968-2002, "[b]y county, the greatest age-adjusted [silicosis] mortality rates were clustered in western states, northeastern states, and north Atlantic states." http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5416a2.htm.

Moreover, given the sheer volume of claims--each supported by a silicosis diagnosis from a physician--one would expect the CDC or NIOSH to be involved, examining and responding to this enormous epidemic.  One would expect local health departments and physician groups to be mobilized.  One would expect a flurry of articles and attention from the media, such as what occurred in 2003 with SARS.[10]

But none of these things have happened.  There has been no response from OSHA, the CDC, NIOSH or the American Medical Association to this sudden, unprecedented onslaught of silicosis cases.  By contrast, the CDC and NIOSH issued an outbreak alert in 1988 for 10 cases of silicosis in Ector County, Texas, and for a single death from acute silicosis in Ohio in 1992.  (Feb. 18, 2005 Trans. at 234.)  The OSHA field office in Jackson, Mississippi has had no reports of any silica problems in recent years and has had no requests for any silica-related investigations.  (Feb. 18, 2005 Trans. at 237.)  Officials from the Mississippi State Department of Health, the Mississippi Medical Association, the Mississippi Board of Licensure, and the University of Mississippi Medical School all were unaware of any increase in silicosis cases in Mississippi.  (Feb. 18, 2005 Trans. at 237-41.)  Likewise, Mississippi's apparent silicosis epidemic has been greeted with silence by the media, the public, Congress and the scientific communities.

---

[10]  There has been 27 SARS cases in the United States, 251 in Canada, and approximately 8,000 worldwide, mostly in Asia. (Feb. 18, 2005 Trans. at 235.)

In short, this appears to be a phantom epidemic, unnoticed by everyone other than those enmeshed in the legal system: the defendants, who have already spent millions of dollars defending these suits; the plaintiffs, who have been told that they are suffering from an incurable, irreversible and potentially fatal disease; and the courts, who must determine whether they are being faced with the effects of an industrial disaster of unprecedented proportion--or something else entirely.

**B.    MDL**

Over 10,000 of the silicosis claims recently filed in Mississippi (as well as claims filed in Kentucky, Texas and Missouri) are now pending in the above-styled MDL.  The MDL began on September 4, 2003, when the Judicial Panel on Multidistrict Litigation centralized 22 actions into this Court pursuant to 28 U.S.C. § 1407, for coordinated or consolidated pretrial proceedings.[11]  See In re Silica Prods. Liab. Litig., 280 F. Supp.

---

[11] Title 28 U.S.C. § 1407, the MDL statute, provides in relevant part:

> When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings.  Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions.  Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated....

2d 1381 (J.P.M.L. 2003). Since that time, 85 additional actions have been conditionally transferred to this MDL.[12] Cumulatively, these cases involve over 10,000 individual Plaintiffs, each alleging injuries from silica exposure caused by over 250 corporate Defendants.[13]

The majority of Plaintiffs are individuals who were at one point employed as sandblasters, foundry workers, or in other trades which required them to work in an environment that exposed them to silica dust. Plaintiffs have sued Defendants who made a product which contains silica, made a product used to protect workers from exposure to silica, and/or made a product used to work with silica. Plaintiffs assert the following causes of action under state law: negligence, gross negligence, breach of warranty, products liability, premises liability, civil conspiracy, and fraud. Plaintiffs seek compensatory and punitive damages.

---

28 U.S.C. § 1407(a).

[12] An additional action in this MDL was originally filed in this Court, <u>Alexander v. Air Liquide America Corp.</u>, S.D. Tex. Cause No. 03-533.

[13] The exact numbers of Plaintiffs and Defendants change on an almost daily basis. This is because claims are either subtracted from this MDL (usually via unopposed motions to dismiss occasioned by settlement or agreement of the parties) or added to this MDL (via conditional transfer orders from the Judicial Panel on Multidistrict Litigation).

One-hundred-seven of the 111 cases in this MDL were originally filed in Mississippi state court.[14]  The vast majority of Plaintiffs in the MDL cases are citizens of Mississippi, Alabama and Texas, although the Plaintiffs also include a scattering of residents of other states (Arkansas, California, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Michigan, Missouri, North Carolina, Ohio, Tennessee, and West Virginia).  The number of Plaintiffs in the cases range from 1 to 4,280.  The number of Defendants in the cases range from 6 to 134, all corporations, some of which are incorporated in, or have their principal place of business in, Mississippi.[15]

---

[14]  The four current MDL cases filed outside of Mississippi are: Alexander v. Air Liquide America Corp., S.D. Tex. Cause No. 03-533 (filed originally in this Court on the basis of diversity jurisdiction); Kirkland v. 3M, S.D. Tex. Cause No. 04-639 (filed originally in Georgia state court and subsequently removed to the Northern District of Georgia, where it was assigned cause number 1:04-2152); Covey v. Union Pacific R.R., S.D. Tex. Cause No. 05-93 (filed originally in Missouri state court and removed to the Eastern District of Missouri, where it was assigned cause number 4:03-1686); and, Adams v. Pulmosan Safety Equip. Corp., S.D. Tex. Cause No. 05-183 (filed originally in Kentucky state court and removed to the Western District of Kentucky, where it was assigned cause number 5:04-123).

[15]  In many cases, the number of Defendants bear no apparent relationship to the number of Plaintiffs.  Instead, the number of Defendants (and the identity of the Defendants) seem to be contingent on the identity of the Plaintiffs' law firms rather than the identity of the Plaintiffs.  For instance, O'Quinn, Laminack & Pirtle is Plaintiffs' counsel in 18 MDL cases, 16 of which are brought against the same 73 Defendants, despite the fact that the Plaintiffs in those 16 cases range in number from 9 to 410.  Likewise, Campbell, Cherry, Harrison, Davis & Dove is Plaintiffs' counsel in two MDL cases, one with 247 Plaintiffs and one with 4,280 Plaintiffs, but both against the same 134 Defendants.

Defendants removed each of the 104 Mississippi cases to federal court, alleging diversity jurisdiction.[16] The removing Defendants asserted that while complete diversity did not exist on the face of the Complaints, in each case, the Plaintiffs had been improperly joined because no two Plaintiffs had similar exposure histories to silica. Defendants argued that in deciding jurisdiction, the Court should sever each Plaintiff's claim and focus solely on the citizenship of the specific Defendants who allegedly caused that Plaintiff's specific injury. Defendants argued that once this is done, some Plaintiffs' claims would be remanded to state court, but the vast majority of severed claims would be within the diversity jurisdiction of federal court. At the time of removal, Defendants provided no proof for its assertions; they merely asserted "[o]n information and belief, few, if any, plaintiffs were exposed to the Mississippi Defendants' products. Therefore, the Mississippi Defendants were fraudulently

---

[16] At the time of removal, Defendants also argued that federal bankruptcy jurisdiction existed due to the fact that some Plaintiffs had filed bankruptcy. Defendants asserted that "[s]ome or all of the claims in this action are core proceedings or are related to the above-referenced bankruptcy cases, and are within the Court's original jurisdiction." (See, e.g., Notice of Removal, Sullivan v. Aearo, 03-369, ¶ 12.) Defendants did not specify which Plaintiffs had filed for bankruptcy protection or when, instead stating in the removal notices that "defendants cannot without remand-related discovery identify every plaintiff with a bankruptcy case." (Id. ¶ 10.) However, this argument was quickly abandoned by Defendants and has not been reasserted. Since the removing party bears the burden of showing that removal was proper, see Manguno v. Prudential Prop. & Cas. Ins. Co., 276 F.3d 720, 723 (5th Cir. 2002), and since Defendants have failed to even attempt to make this showing, the Court will not dwell on the issue of bankruptcy jurisdiction.

joined as to [the] overwhelming majority of plaintiffs." (<u>See, e.g.</u>, Notice of Removal, <u>Sullivan v. Aearo</u>, S.D. Tex. Cause No. 03-369, ¶ 6.) The notices of removal also alleged that, "[a]lthough the complaint is silent, it is facially apparent that the amount in controversy exceeds $75,000, exclusive of costs." (<u>Id.</u> ¶ 8.)

When the cases were initially transferred to this Court, a number of remand motions filed by Plaintiffs were pending. More remand motions followed.

On December 12, 2003, at the outset of the first in-person conference in this MDL, the Court raised the issue of its subject-matter jurisdiction. The Court stated its opinion that, based upon the relevant law and the submissions of the parties up to that point, it did not appear that the Court had jurisdiction over the MDL cases. (Dec. 12, 2003 Hearing Trans. at 12-13, 18 ("I'm not closing down your jurisdictional issue. But if I have to [decide] it right now, ... I would remand all the cases to State Court.").) The Court proposed giving the Defendants "all the discovery [they] want on fraudulent misjoinder."[17] (<u>Id.</u> at 13.) However, the Defendants asked if, prior to any discovery, they could further brief the jurisdictional issue. (<u>Id.</u> at 14-15.) The Court agreed, but also noted the benefit of coordinated discovery: "[I]f I end up remanding ... all [the cases] to State Court a year from now, you

---

[17] As discussed <u>infra</u>, fraudulent misjoinder is a doctrine relevant to a federal court's subject-matter jurisdiction-- specifically, diversity jurisdiction.

will at least have had the opportunity to have one forum to do discovery, one forum to prepare your case." (Id. at 15.)

In mid-January 2004, at the direction of the Court, the parties submitted briefs on the issue of the Court's subject matter jurisdiction.  Defendants proposed a process whereby the Court would apply the doctrines of "fraudulent joinder" and "fraudulent misjoinder" to scrutinize the claims of each Plaintiff in order to determine precisely against whom that Plaintiff has a legitimate claim.  Only after parsing the pleadings in this way did the Defendants propose the Court look to the citizenship of the "legitimate 'plaintiff vs. defendant' groupings" in order to determine whether complete diversity exists.  (Martin Materials' Separate Mem. Opposing Remand, MDL docket entry 83, at 7.) Defendants' proposed process entailed conducting "remand-related discovery" (designed to pierce the generalized complaints and determine the precise nature of each Plaintiff's claim).

Plaintiffs maintained their position that the Court lacked subject-matter jurisdiction.  They further argued that if discovery was permitted, it should not be limited to jurisdictional issues.

On January 23, 2004, after the second status conference, the Court denied all pending motions to remand without prejudice to re-urge at a later date.  (Order No. 4 ¶ 1.)  At the request of the parties, the Court issued Paragraph 19 of Order No. 4, designed to aid the Court in determining its subject-matter jurisdiction by "develop[ing] the factual basis for the claims of each Plaintiff."

-20-

(Order   No.   4,   ¶   19.)[18]         In   compliance   with   this

---

[18]  Order No. 4 provides, in relevant part:
19.  The Parties have two weeks to create an affidavit
that can be used to develop the factual basis for the
claims of each Plaintiff.  At a minimum, the Plaintiffs
must disclose where they believe they were exposed to
silica including the date and location, state their
particularized claims against each Defendant, provide
medical release authorization, and provide IRS release
authorization.  The Parties have two weeks to agree on
a definition of "silica-related products" that will
govern the products claims in this litigation.  If an
agreement can not be reached on these matters, the
Parties are instructed to contact the Court's case
manager and a hearing will be held on Thursday,
February 5, 2004 at 8:30 a.m.
20.  Initial Disclosures must be made by April 5, 2004.
Plaintiffs must provide completed affidavits of the
factual basis of their claims.  In all later
transferred cases, Plaintiffs' affidavits must be
disclosed within 60 days from the date of transfer by
the Judicial Panel on Multidistrict Litigation.
Defendants must disclose all silica-related products
they manufactured or distributed from the year 1930
forward and include the relevant time frame of
production/distribution for each product, pursuant to
the agreed definition of "silica-related products."
(Order No. 4, ¶¶ 19-20.)

This Court entered these Orders, as well as those discussed
infra, as an exercise of its "wide discretion" over the
management of pretrial discovery, especially when "handl[ing] the
complex issues and potential burdens on defendants and the court
in mass tort litigation."  Acuna v. Brown & Root Inc., 200 F.3d
335, 340 (5th Cir. 2000) ("[T]here are approximately one thousand
six hundred plaintiffs suing over one hundred defendants for a
range of injuries occurring over a span of up to forty years.
Neither the defendants nor the court was on notice from
plaintiffs' pleadings as to how many instances of which diseases
were being claimed as injuries or which facilities were alleged
to have caused those injuries.  It was within the court's
discretion to take steps to manage the complex and potentially
very burdensome discovery that the cases would require.") (citing
Landry v. Air Line Pilots Ass'n Int'l AFL-CIO, 901 F.2d 404, 436
(5th Cir. 1990); Fournier v. Textron, Inc., 776 F.2d 532, 534 (5th
Cir. 1985) (noting district court's authority to manage and
develop complex litigation discovery)).  In Acuna, the Fifth
Circuit affirmed the district court's dismissal of plaintiffs'
claims prior to the commencement of discovery when plaintiffs

Order, the parties agreed to the form of sworn "Fact Sheets" to be submitted by each Plaintiff and each Defendant.  The Plaintiff's Fact Sheet required each Plaintiff to submit specific information about when, where and how each Plaintiff alleged he or she was exposed to silica dust.  The Plaintiff's Fact Sheet also required detailed medical information concerning each Plaintiff's silica-related injury.  Defendant's Fact Sheet required each Defendant to provide information (including photographs) of each silica-related product that the Defendant designed, manufactured, marketed, sold, and/or distributed from 1930 to the present.  (According to Plaintiffs, this information was necessary for them to determine precisely against which Defendants each Plaintiff had a claim.) Blank examples of each Fact Sheet are attached to Order No. 6, issued February 5, 2004; six examples of completed Plaintiff's Fact Sheets are attached hereto as Exhibits 32-37.[19]

The Court did not limit discovery to the completion of the Fact Sheets, but instead allowed discovery to proceed at the discretion of the parties.  In addition, the Court established a

---

failed to obey district court's order requiring plaintiffs to submit expert affidavits that "had to specify, for each plaintiff, the injuries or illnesses suffered by the plaintiff that were caused by the alleged uranium exposure, the materials or substances causing the injury and the facility thought to be their source, the dates or circumstances and means of exposure to the injurious materials, and the scientific and medical bases for the expert's opinions."  Acuna, 200 F.3d at 338, 340.

[19]  Certain portions of the Fact Sheets have been omitted from these Exhibits.  Specifically, the signed authorizations to release medical and financial records have been omitted, as well as all Social Security earnings statements.

method for handling discovery disputes quickly and efficiently. (Order No. 4, ¶ 21 ("Each party is ordered to bring any discovery issue to the Court's attention immediately.  At first sign of a discovery problem, all parties shall make a joint telephone call to the case manager who will schedule a joint conference call with the Court that same day.").)  At the same time, the Court directed the establishment of a document depository for all documents produced in these cases, as well as a website, www.mdl1553.com, to serve as the electronic bulletin board for this litigation.  (Order No. 4 ¶ 17; Order No. 5A.)

Over the course of the next year, the Court conducted in-person status conferences approximately every 5-8 weeks.  At these conferences, the Court addressed scores of pending motions, discovery disputes and administrative matters.  The Court also repeatedly returned to the issue of its subject-matter jurisdiction.  Invariably, this issue boiled down to Defendants' objections that Plaintiffs' Fact Sheets were too generalized to allow the Defendants to identify precisely which Defendant(s) each Plaintiff was alleging caused his or her injury.  These objections would typically be followed by counter-objections from Plaintiffs that Defendants' deficient disclosures were hampering their efforts to develop the factual bases for their claims.[20]

---

[20]  More specifically, Plaintiffs have repeatedly argued that in order to aid Plaintiffs in narrowing their claims, they need (1) photos of each silica-related product manufactured, sold or distributed by each Defendant, and (2) sales receipts showing the ultimate destinations of each Defendant's silica-related

For example, after the May 17, 2004 status conference, the Court issued Order No. 10, which states, in part:

> 5. The Court notes that Plaintiffs' disclosures in their Fact Sheets appear deficient. Additionally, Plaintiffs challenge the adequacy of Defendants' disclosures. The Parties have until the next hearing to cure any deficiencies. The Court will address the adequacy of the disclosures by both sides at the next hearing.
>
> 6. Defendants are ordered to disclose any machines or products that they manufacture that produce respirable crystalline silica dust as previously explained in Order No. 6, as well as products and applications that are included in the list identified by National Institute for Occupational Safety and Health ("NIOSH") as containing respirable crystalline silica dust. Defendants are also ordered to disclose as "silica related products" any product that contains a Material Safety Data Sheet ("MSDS"), or other warning, that warns of silicosis or silica exposure from using the product.

(Order No. 10 ¶¶ 5-6.) After the June 28, 2004 status conference, the Court issued Order No. 12, which provides in part:

> 12. Plaintiffs have two weeks to supplement their fact sheets with regards to the types of products used and any identifying product information. The Court finds that products listed on Plaintiffs' fact sheets represent regular use only by Plaintiffs. If a specific product name or identifying information is not included on the fact sheets then the Court finds that neither the product name nor identifying information is known by Plaintiffs at this time.
>
> 13. Plaintiffs have two weeks to supplement their fact sheets to include the names, dates, and locations of specific work sites where Plaintiffs allege exposure to silica. Once a particular work site is identified by relevant dates of employment, location, and types of products, Defendants have 30 days to produce any sales records for that work site encompassing the products described by Plaintiff.

---

products.

(Order No. 12 ¶¶ 12-13.)    After the August 22, 2004 status conference, the Court issued Order No. 13, which addressed a number of deficiencies in the Defendants' disclosures of sales records and distributor lists.   (Order No. 13 ¶¶ 2-4, 8-9.)

The objections about each side's disclosures continued.  After the October 14, 2004 status conference, the Court issued Amended Order No. 14, which provides in part:

> 1.   Within 90 days after receiving Defendants' sales receipts (as ordered by the Court to be due on October 15, 2004) Plaintiffs are required to dismiss without prejudice all Defendants not identified by name in said receipts unless a Defendant's product has been specifically identified in a Plaintiff's previously filed affidavit.
> 2.   To the extent not already done, Plaintiffs  are ordered thirty days from today to supplement their initial affidavits with the identity of worksites, including address and employer name, at which injuries occurred, and the date range of said exposure.
> ....
> 8.  At least 30 days prior to any Plaintiff's deposition, Plaintiffs will notify all Defendants against whom that Plaintiff has a cause of action.  All other Defendants will be dismissed without prejudice as to that Plaintiff. Failure to adequately notify the Defendants may result in sanctions against the Plaintiff of up to five hundred dollars for each Defendant who appears unnecessarily.

(Am. Order No. 14 ¶¶ 1-2, 8.)

Between each status conference, the Court ruled on a multitude of motions, conducted a number of phone conferences to resolve discovery disputes, entered protective orders, and otherwise implemented a number of administrative measures designed to move these cases forward.

However, one thing that the Court did not do was enter a case management plan. The Court urged the parties to jointly construct and agree to a plan governing the discovery process. But the parties proved unwilling to agree. Instead, Plaintiffs and Defendants submitted competing proposed case management plans. Plaintiffs' proposed plan would establish four "representative worksite tracks for case-specific pretrial preparation." Each track (representing four of the larger worksites at issue) would consist of 60 Plaintiffs (20 selected by Plaintiffs, 20 selected by Defendants and 20 randomly selected by the Court). Under this plan, discovery on the 240 representative Plaintiffs would be concluded by the beginning of 2006, with the entire MDL set to conclude January 31, 2006. The Defendants objected that this provision would allow them to depose only 2.4 percent of the Plaintiffs (while Plaintiffs would have been free to depose all of the Defendants), leaving the vast majority of the discovery and pre-trial motions against Plaintiffs to be handled after the cases were returned to the transferor courts. The Defendants also objected that allowing Plaintiffs to select one-third of the representatives would create an unrepresentative sample of Plaintiffs, since the initial disclosures showed that 93 percent of Plaintiffs had minimal radiographic findings.

By contrast, the Defendants' proposed case management plan had much grander aspirations--it provided for discovery on every one of the 10,000 Plaintiffs' claims. It would accomplish this by

"staging" the discovery of the claims: a schedule would be established for discovery of each claim once a Plaintiff is selected to a monthly grouping of claims. Forty Plaintiffs would be randomly chosen for each monthly grouping, and eleven groupings would be selected each year, with no monthly grouping for December. For the first grouping of forty Plaintiffs, discovery would be completed and dispositive motions would be fully briefed on October 15, 2005. Defendants envisioned that this process would continue at a rate of 440 Plaintiffs per year until all Plaintiffs' claims had been exhausted. Thus, Defendants envisioned that discovery in this MDL would continue for over twenty years (and possibly much longer, judging by the rate at which new cases have been transferred to the MDL). While such interminable discovery might guarantee lifetime employment for defense counsel, it also calls to mind the saying that "justice delayed is justice denied."[21]

After hearing arguments on the issue, the Court declined to order that either plan be implemented. Instead, the Court made clear at the October 14 status conference that there were no orders (other than agreed protective orders) limiting discovery at all. (Am. Order No. 14 ¶ 5.) However, for the second time (the first being in May 2004), the Court ordered that the Plaintiffs who are most ill be deposed first. (Am. Order No. 14 ¶¶ 6-7; Order No. 10 ¶ 7.) To this end, Plaintiffs were ordered "to identify and

---

[21]  The saying is attributed to William Gladstone.  See http://bartleby.school.aol.com/73/954.html.

provide to Defendants a list of grouped Plaintiffs arranged seriatim with the highest number b-read to the lowest. Plaintiffs will identify in this list those Plaintiffs who do not have a high number b-read but whom they believe to be seriously ill with silica related disease." (Am. Order No. 14 ¶ 6.)

Finally, by the December 2004 status conference, it was clear that a decision on the issue of subject-matter jurisdiction could no longer be delayed. In Order No. 19, issued after the December 17, 2004 status conference (wherein Plaintiffs represented that all Fact Sheets had been filed), the Court ordered "[b]riefing (and any designation of evidence) on the issue of this Court's subject matter jurisdiction (as affected by recent Mississippi Supreme Court caselaw and the inability to determine what cause of action each Plaintiff has against each Defendant)." (Order No. 19 ¶ 2.) Also in Order No. 19, the Court noted that an agreement had been reached between a number of Plaintiffs and Defendants whereby the Plaintiffs who failed to specifically identify a particular Defendant's product on a Fact Sheet or product identification chart would dismiss that Defendant without prejudice, subject to the parties entering into a tolling agreement. (Order No. 19 ¶ 12.)

As directed by Order No. 19, Defendants filed their final submissions on the issue of federal jurisdiction on February 4, 2005. Two groupings of Defendants submitted briefs arguing that the Court should sever each Plaintiff's claims, then require each Plaintiff contesting jurisdiction to refile motions for remand

accompanied by complaints plead with specificity (as well as jurisdictional evidence in some cases) to support the assertion that the Court lacks jurisdiction. Another Defendant, 3M Company ("3M"), filed a motion to remand, arguing that virtually all Plaintiffs still assert claims against non-diverse Defendants, and therefore the cases should be remanded to state court. Of these submissions, only 3M supported it with evidence, submitting Plaintiffs' Fact Sheets and medical submissions. At the same time, 3M, as well as other Defendants, moved for sanctions against Plaintiffs on the grounds that the diagnoses on which these cases are based were made fraudulently.

Before addressing the remand motions, the Court conducted Daubert[22] hearings/Court depositions of the Plaintiffs' diagnosing experts and the "screening companies" that hired them. (Order No. 19 ¶ 4.) As discussed below, the Court conducted these hearings prior to deciding the issue of subject-matter jurisdiction for two reasons: (1) because they were potentially relevant to the issue of the Court's subject-matter jurisdiction, and (2) because they were warranted by Defendants' motion for sanctions, which is a matter a court without subject-matter jurisdiction may consider, see Willy

---

[22] See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). Under Daubert and its progeny, the trial court makes a "preliminary assessment of whether the reasoning or methodology underlying the [expert] testimony is scientifically valid and of whether that reasoning or methodology can be applied to the facts at issue." Id. at 592-93.

v. Coastal Corp., 503 U.S. 131 (1992).  These hearings spanned
three days, from February 16, 2005 to February 18, 2005.

## II.  **Daubert Hearings/Court Depositions**

### A.    **The Need for the Hearings**

Prior to turning to the evidence adduced at the hearings, it
is helpful first to summarize the facts that warranted them.  As
the Plaintiffs' Fact Sheets came pouring into the document
depository, something remarkable became apparent.  As required by
this Court's orders, the Fact Sheets list all of the Plaintiffs'
physicians--not just the physicians who diagnosed the Plaintiffs
with silicosis.  In total, the more than 9,000 Plaintiffs who
submitted Fact Sheets[23] listed the names of approximately 8,000
different doctors.  And yet, when it came to isolating the doctors
who diagnosed Plaintiffs with silicosis, the same handful of names
kept repeating.  All told, the over 9,000 Plaintiffs who submitted
Fact Sheets were diagnosed with silicosis by only 12 doctors.[24]  In

_____

[23]  Many of the Plaintiffs simply failed to obey the Court's
repeated orders to submit Fact Sheets.  These Plaintiffs will be
addressed, infra.

[24]  The twelve doctors are: Dr. Robert Altmeyer, Dr. James
Ballard, Dr. Kevin Cooper, Dr. Todd Coulter, Dr. Andrew Harron,
Dr. Ray Harron, Dr. Glynn Hilbun, Dr. Richard Levine, Dr. Barry
Levy, Dr. George Martindale, Dr. W. Allen Oaks, and Dr. Jay
Segarra.  The diagnoses and underlying methodology of Dr.
Altmeyer and Dr. Levine are not discussed in this Order.  By
agreement of the parties (because of the relatively small number
of diagnoses Dr. Altmeyer and Dr. Levine issued), neither doctor
testified at the Daubert hearings/Court depositions.
    Throughout this Order, the Court refers to these physicians
as the "diagnosing doctors."  This is not meant to imply that any
of the physicians are fact witnesses.  Plaintiffs have made no

virtually every case, these doctors were not the Plaintiffs' treating physicians,[25] did not work in the same city or even state as the Plaintiffs, and did not otherwise have any obvious connection to the Plaintiffs.  Rather than being connected to the Plaintiffs, these doctors instead were affiliated with a handful of law firms and mobile x-ray screening companies.

Defendants sought discovery from nine of these diagnosing doctors, as well as three screening companies.[26]  Two of the screening companies (N&M and RTS) fought the Defendants' document subpoenas in the United States District Court for the Southern District of Mississippi.  In this Court, Plaintiffs filed motions to quash the document subpoenas issued to the other screening company and all nine doctors.  With respect to each doctor, Plaintiffs asserted that they had standing to object to the discovery because each doctor "is a Plaintiffs' expert."  (MDL 03-1553, Docket Entries 1077, 1079, 1081, 1083, 1084-87, 1188.)

---

such claim; instead, Plaintiffs have consistently maintained that the "diagnosing doctors" are "experts" (although, as discussed <u>infra</u>, they have intimated that some of the doctors may be non-testifying experts).

[25]  Approximately 85 percent of the Plaintiffs who submitted Fact Sheets reported having a treating physician.  (Feb. 18, 2005 Trans. at 243.)  As a general matter, these Plaintiffs do not appear to be indigent individuals who do not otherwise have access to health care.

[26]  The nine doctors are: Dr. Robert Altmeyer, Dr. James Ballard, Dr. Kevin Cooper, Dr. Todd Coulter, Dr. Glynn Hilbun, Dr. Richard Levine, Dr. Barry Levy, Dr. George Martindale and Dr. Jay Segarra.  The three screening companies are: N&M Inc., RTS Inc., and Innervisions Inc.

Plaintiffs objected, among other reasons, on the grounds that asking the doctors to search their records and produce documents for 10,000 individuals would subject the doctors to an undue burden and expense. Nine of the ten motions to quash were filed on October 25, 2004. Four days later--and before the Defendants responded or the Court ruled--the Defendants deposed one of these diagnosing doctors.

### 1.    Dr. Martindale's Deposition

On October 29, 2004, Defendants deposed Dr. George H. Martindale, a radiologist in private practice in Mobile, Alabama. Contrary to Plaintiffs' assertion in their motion to quash the subpoena issued to Dr. Martindale (filed four days earlier), Dr. Martindale testified that he was not Plaintiffs' expert and had specifically refused Plaintiffs' lawyers' requests to serve as their expert. (Martindale Dep. at 13, 141, 152-53.)

Notwithstanding this, Dr. Martindale is listed on the Fact Sheets as diagnosing 3,617 Plaintiffs with silicosis. _Each_ of Dr. Martindale's reports for _each_ of these 3,617 Plaintiffs contain the following sentence:

> On the basis of the medical history review, which is inclusive of a significant occupational exposure to silica dust, physical exam and the chest radiograph, the diagnosis of silicosis is established within a reasonable degree of medical certainty.

(Martindale Dep. Ex. D-2.)  An example of one of these reports is attached as Exhibit 1.[27]

Despite this language in his reports, during his deposition Dr. Martindale admitted that he did <u>not</u> diagnose <u>any</u> Plaintiff with silicosis.  He admitted that he did not speak to a single Plaintiff; he only prepared "B-readings" of Plaintiffs' chest x-rays.[28]  (Martindale Dep. at 73.)  Indeed, he testified that he did not even know the criteria for making a diagnosis of silicosis. (Martindale Dep. at 70.)

Specifically, Dr. Martindale testified as follows:

> Q.  The impression states ... that on the basis of the medical history review, which is inclusive of a significant occupational exposure to silica dust, physical exam and the chest radiograph, the diagnosis of silicosis is established within a reasonable degree of medical certainty.  Now, Doctor, that's simply inaccurate, isn't it?

---

[27] The Court selected this Plaintiff's report at random from a large number of similar choices.  The selection of this Plaintiff, or of any other Plaintiff specifically named in this Order or named in an exhibit attached to this Order, should not be interpreted as a finding that the named Plaintiff does not have silicosis or is a malingerer.

The social security number which originally appeared on Exhibit 1 has been redacted.  Likewise, all social security numbers on all other Exhibits attached to this Order have been redacted.

[28] A "B-reading" is a physician's report of findings from a patient's chest radiograph (i.e., an "x-ray").  This report is entered on a standardized form using a classification system devised by the International Labour Office ("ILO").  NIOSH issues "B-reader" certifications for physicians in the United States. There are approximately 500-700 certified B-readers currently practicing in the United States.  (Feb. 18, 2005 Trans. at 76-77.)

A.   I can't - yes, sir - I can't diagnose silicosis on
the basis of the chest x-ray and ILO [i.e., International
Labour Office B-read form], and I didn't intend to....
[N]otwithstanding whatever is said here, I did not intend
to make a diagnosis of silicosis or asbestosis based on
the ILO, chest x-ray that I had, and/or the information
that I was sent.  I assumed that the physician who did
the physical, did the history, took the occupational
exposure would be making the diagnosis.

Q.   Okay, let's break this up into a couple of pieces.
Would it be fair to say that in your opinion this
impression that's listed on [Dr. Martindale's report] is
an overstatement of what you did?

A.   I think - yes, I think it's an overstatement.

Q.   Would it be fair to say that this appears to state
a clinical diagnosis of silicosis when, in fact, that's
not what you did?

A.   Correct.

(Martindale Dep. at 101-03.)  Dr. Martindale further testified:

Q.   Doctor, as you sit here today, will you withdraw
from all of your reports that have the [diagnosing]
language under 'impression' ... as incorrect and
overstated?

A.   I would say that if there wasn't an established – if
another physician hadn't established a diagnosis of
silicosis slash asbestosis, I would withdraw that.  I
would - I would say that I am personally not making a
diagnosis of asbestosis or silicosis on any report that -
whose ILO I filled out and whose chest x-ray I looked at,
that it was not my diagnosis of asbestosis or silicosis,
notwithstanding how I worded that paragraph.

....

Q.   [W]e can pull out all thirty-five hundred of these
if we need to, but it would be fair to say that the
impression paragraph such as the one listed in [Dr.
Martindale's report] - that anywhere that occurs in your
thirty-five hundred diagnoses, that that's overstated?

A.   As far as I'm concerned, yes.... I'm not diagnosing
silicosis myself, correct.

(Martindale Dep. at 120, 132.)

In early 2001, Dr. Martindale decided to get a B-reader
certification in order to supplement his income.  (Martindale Dep.

-34-

at 51-52 ("I'd heard there was a physician here in Mobile named Jim Ballard who had read a number of B-read films and ... I thought that ... it would be something that could supplement my income.")) All of Dr. Martindale's reports and B-reads were works hired by N&M, Inc., the screening company that orchestrated the majority of silicosis diagnoses for Plaintiffs in this MDL. (Martindale Dep. at 52.)

Between March 2001 and June 2002, Dr. Martindale read approximately 4,000 B-reads for N&M, for both silicosis and asbestosis litigation. (Martindale Dep. at 16-17, 20, 113.) As noted above, 3,617 of these came to be labeled "diagnoses" by Dr. Martindale for Plaintiffs in this MDL. These 3,617 diagnoses were issued on only 48 days, at an average rate of 75 diagnoses per day.

According to his testimony, the reason Dr. Martindale moved so quickly is that he did not believe he was diagnosing silicosis; he believed he was simply providing a "second check" of another physician's thorough diagnosis:

> A.    [I]t was my understanding that another physician had done a physical and history -- occupational history, medical history -- had supervised some PFTs [i.e., pulmonary function tests] and had evaluated the chest x-rays, and only those patients that they had deemed had positive chest x-rays were sent to me to evaluate.
> ....
> Q.    And do you have an understanding of why N&M wanted you to do a second read of these x-rays?
> A.    The only explanation that I was given was that for case -- for settlement of cases, the second reading was being required.  I guess as a second check, you know.
> Q.    And who gave you that explanation?

A.   Heath Mason, who I guess is one of the owners of N&M.

(Dr. Martindale Dep. at 21-24, 60.)[29]

The process operated as follows: for each person, N&M mailed Dr. Martindale a chest x-ray in a jacket, a single sheet of paper that contained an abbreviated history and physical, and an ILO form (i.e., a B-read form) with the person's and Dr. Martindale's identifying information already filled in.[30] (Dr. Martindale Dep. at 19, 34-36, 91-92.) Dr. Martindale was told by Heath Mason, co-owner of N&M, that the abbreviated history and physical had been performed by a radiologist named Dr. Ray Harron. (Id. at 16, 36-37.) Dr. Martindale testified that he did not rely on this form in any way in performing his B-read. (Id. at 106.) But in making his B-reads, Dr. Martindale was "influenced" by the B-read notation written on each x-ray jacket, which Dr. Martindale understood (based on what Mr. Mason told him) had been written by Dr. Harron. (Id. at 36-37, 45-46.) Dr. Martindale was a novice--"I had read no

---

[29]   See also Martindale Dep. at 65-66 ("[M]y interpretation of the whole process was that a physician was taking a good occupational history, a medical history, performing a physical exam, and either he or someone else was overseeing the pulmonary function tests, and there was an interpretation of the chest x-ray at the time all of this was done, and these patients were screened for people who appeared as if they had clinical diagnoses of asbestosis or silicosis and the chest x-ray supported that diagnosis."); 102 ("I assumed that the physician who did the physical, did the history, took the occupational exposure would be making the diagnosis.").

[30]   A copy of this abbreviated "physical and history" is attached as Exhibit 2. A copy of a pre-printed ILO form is attached as Exhibit 3.

films other than my [B-reader certification] test"--and Dr. Martindale "was under the impression ... Dr. Harron has read thousands and thousands of films." (Id. at 46.)  Thus, Dr. Martindale was "probably affected by [Dr. Harron's B-read notation] to some extent." (Id. at 45.)  After noting Dr. Harron's B-read, Dr. Martindale would look at the x-ray, complete the ILO form and dictate a report for each file sent to him by N&M.  Dr. Martindale completed as many as 159 B-reads a day, often in the evenings, after returning home from a normal workday.  (Id. at 126.)

Dr. Martindale then mailed the completed ILO forms and dictation tapes, along with everything he had received from N&M, to a transcriptionist who had been referred to Dr. Martindale by N&M. (Id. at 24-25, 29-31.)  The transcriptionist typed the written reports which have been used in this litigation and which included the "diagnosis of silicosis" language.  (Martindale Dep. Ex. D-2; see Exhibit 1, attached.)  Mr. Mason asked Dr. Martindale to allow this language to be inserted in the reports, and, despite the fact that Dr. Martindale knew the language to be false, Dr. Martindale acquiesced.  (Martindale Dep. at 31-32, 101-03.)  After the transcriptionist typed the reports, she sent them to N&M, who stamped them with Dr. Martindale's signature.  (Id. at 24-25, 29-30.)  Under this process, Dr. Martindale did not sign, review or even see his reports after they were transcribed.  (Id. at 29-31, 106.)  Indeed, Dr. Martindale was not even sure that he had ever

seen one of his diagnosing reports prior to the date of his
deposition. (Id. at 102.) Specifically, he testified:

> Q. [Y]ou've never seen this form [i.e., Dr.
> Martindale's report with the "Impression" of a diagnosis
> of silicosis, see Exhibit 1] before today; right?
> A. I haven't seen this form. I don't know whether I
> ever saw the impression -- I feel like I did probably see
> the impression and approved it probably or acquiesced to
> it, whatever, but I don't know exactly how -- when he
> [i.e., Mr. Mason] wanted to include 'within a reasonable
> degree of medical certainty,' I don't -- I don't remember
> the exact wording of what it said, whether it said it's
> -- you know the diagnosis is established within a
> reasonable degree of medical certainty or whether it said
> within a reasonable degree of medical certainty the
> patient has silicosis or asbestosis or -- but
> notwithstanding whatever is said here, I did not intend
> to make a diagnosis of silicosis or asbestosis based on
> the ILO, chest x-ray that I had, and/or the information
> that I was sent. I assumed that the physician who did
> the physical, did the history, took the occupational
> exposure would be making the diagnosis.
> ....
> Q. And if you had it to do over again, you wouldn't
>    use that [diagnosing] language?
> A. I wouldn't use that language, no, sir.

(Martindale Dep. at 101-02, 103-04.)

N&M paid Dr. Martindale $35 for each of his 3,617 reports
which purport to diagnose a Plaintiff with silicosis. (Id. at 20.)

### 2. December Hearings

#### a. December 2 Telephonic Hearing

On December 2, 2004, the Court conducted a telephonic hearing
on Plaintiffs' motions to quash the document subpoenas for their
diagnosing doctors. By this time, five of the doctors (including
Dr. Martindale) had indicated that they had no responsive

documents, making the motions moot as to them.  With respect to the remainder of the doctors, the Court rejected Plaintiffs' argument that discovery should be quashed because the doctors might be non-testifying experts.[31]  The Plaintiffs refused to affirmatively state that any particular doctor was, in fact, a non-testifying expert for any Plaintiff.[32]  Moreover, the Court ruled that "so long as Plaintiffs are proffering the doctors and their diagnoses to fulfill this Court's requirement under Order No. 6 that Plaintiffs produce diagnoses of silica-related disease, Plaintiffs cannot claim the doctors are non-testifying."  (Order No. 17 at 3.)

### b.    December 17 Status Conference

At the next in-person status conference after Dr. Martindale's deposition, on December 17, 2004, the Court expressed concern about Dr. Martindale's withdrawal of his diagnoses, and thereafter proposed <u>Daubert</u> hearings/Court depositions for all of the remaining diagnosing doctors, as well as the screening companies (such as N&M) that hired most of them.  (Dec. 17, 2004 Status Conf.

---

[31]  Most discovery against non-testifying experts is prohibited by Federal Rule of Civil Procedure 26(b)(4)(B).

[32]  Instead of affirmatively stating that the doctors have been retained as <u>non-testifying</u> experts, Plaintiffs only vaguely asserted: "Plaintiffs ... object <u>to the extent</u> that Dr. Cooper is a consulting-only expert for any of the 10,000 [Plaintiffs]." (Mot. Quash Cooper Subpoena, MDL 03-1553 Docket Entry 1084, at 3 (emphasis added) (each of the motions to quash contained the same language).)  But as set out above, Plaintiffs did affirmatively state in each motion to quash that each doctor was a "Plaintiffs' expert."  (<u>See, e.g.</u>, Mot. Quash Cooper Subpoena, MDL 03-1553 Docket Entry 1084, at 1.)

Trans. at 17-18, 24.)    When the Court proposed these hearings, Plaintiffs' liaison counsel readily agreed.    Plaintiffs' liaison counsel emphasized that the Plaintiffs' lawyers were "caught ... by great surprise" by Dr. Martindale's testimony, and he indicated that the testimony of the other diagnosing doctors would be different.    For example, the following exchanges occurred at the December 17 status conference:

> COURT: I'm not blaming anybody about Martindale.... But
> Martindale, if he's a symptom of a bigger problem, I need
> to know about it now and everybody else does too.
> PLAINTIFFS' LIAISON COUNSEL: I certainly agree with your
> Honor.... [W]ith respect to the Martindale issue, it came
> as a great surprise to the member of our team that used
> him.... It caught us by great surprise. We don't think
> it is indicative of what you're going to see with respect
> to the other [diagnosing physicians].... We are willing,
> ready, and able to bring the rest of these guys here to
> show -- to show their stripes.
> ....
> COURT: Now, we all know, ... that silicosis is a very bad
> disease, and you get it from a workplace in admitted
> instances. It's very bad. And you get it from certain
> products, from long-term exposure, and there are people
> that are very sick with that. But what happens is, as we
> all know, is that sometimes the good is thrown in with
> the bad and it prevents people who really need to go
> forward with their case from being heard and getting
> their discovery. And that's why something like this is
> so crucial ... to lay to rest.
> PLAINTIFFS' LIAISON COUNSEL: I'm not disagreeing with
> you.... [A]ll I am saying is ... that the Martindale
> deal caught everybody by surprise on our side.

(Dec. 17, 2004 Status Conf. Trans. at 18, 19, 21, 23-24, 35.) Plaintiffs' liaison counsel also spoke repeatedly of the Plaintiffs' lawyers' "grave concerns as to how [Dr. Martindale] got flipped." (Id. at 45; see also id. at 18-20, 39.) In light of

these concerns, Plaintiffs' liaison counsel asked for an order that defense counsel would not be allowed to contact any of Plaintiffs' experts without first obtaining permission of Plaintiffs' counsel. (Id. at 41, 45-46.)

The Court's orders related to the Daubert hearings/Court depositions were memorialized in Order No. 19, the same order which established the final briefing schedule on the issue of subject-matter jurisdiction.  The Court ordered that on February 16-18, 2005, "[e]very physician who has diagnosed silicosis in any of the Plaintiffs, regardless of whether any Plaintiff relied on the diagnosis on a fact sheet, shall attend in person and testify." (Order No. 19 at 2.)   In addition, the Court ordered representatives of the two primary screening companies, RTS and N&M, to attend and testify.  (Id.)  The Court granted Plaintiffs' request to prohibit Defendants from having any further contact with Plaintiffs' diagnosing physicians, other than to conduct the previously-scheduled depositions of Dr. Glynn Hilbun (on December 20, 2004) and Dr. Kevin Cooper (on January 4, 2005).  (Id.)  The Court also ordered Defendants to pay the reasonable fees and travel expenses for the attendance of the Plaintiffs' diagnosing physicians.  (Id. at 3.)  Finally, the Court denied Defendants' motion for a stay of all discovery except discovery into Plaintiffs' doctors and screeners; instead, all discovery was allowed to continue.  (Id. at 5.)

It is worth remarking why the Court conceived of the--for lack of a better phrase--"Daubert hearings/Court depositions."[33] These were the most efficient and effective way to allow the Defendants to depose the doctors (as is their right under the Federal Rules of Civil Procedure), while providing direct Court supervision over the proceedings--which seemed advisable in light of the allegations (or at least, intimations) of misconduct made by both sides.[34] The Court's direct supervision also was advisable in light of a quartet of motions filed by Defendants in the wake of Dr. Martindale's deposition: Defendants' Motion to Exclude Plaintiffs' Experts (based upon Daubert considerations); Defendants' Motion to Appoint Independent Expert Medical Advisors/Technical Advisory Panel (pursuant to Federal Rule of Evidence 706);[35] Defendants' Motion for Physical Examinations; and Defendants' Motion for Partial Summary Judgment and/or Dismissal (regarding Cause Nos. 03-387 and 03-392, arguing that those Plaintiffs relying on Dr. Martindale for their

---

[33]   For ease of reference, hereinafter the Court will refer to the "Daubert hearings/Court depositions" as simply, "Daubert hearings."

[34]   Specifically, the Defendants had charged that all of Dr. Martindale's diagnoses were "fraudulent", while Plaintiffs intimated that the Defendants exerted some type of improper influence in order to "flip" Dr. Martindale.

[35]   Rule 706 provides, in part:
The court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations.  The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses of its own selection.
Fed. R. Evid. 706(a).

silicosis diagnoses no longer had competent diagnoses on which to base their claims, in violation of Mississippi law[36] and this Court's Order No. 6). The Court deferred ruling upon these motions until after the <u>Daubert</u> hearings. However, in Order No. 19, the Court did state, "[t]he parties are urged to agree on a panel of four experts for the purpose of excluding, if possible, any plaintiff that does not presently have silicosis or is not in fear

---

[36] In this motion, and at other times during the MDL proceedings, Defendants have argued that Mississippi law does not recognize a cause of action for fear of contracting a disease or illness in the future, no matter how reasonable the fear.

However, it is worth noting that the pronouncements from the Mississippi Supreme Court have not been so clear. Most recently, the Court stated:

> We have before found that emotional distress inflicted either negligently or intentionally is compensable. However, emotional distress based on the fear of a future illness must await a manifestation of that illness <u>or</u> be supported by substantial exposure to the danger, and be supported by medical or scientific evidence so that there is a rational basis for the emotional fear. We do not harm and, in fact, preserve a recovery for emotional distress when the same is based on such a foundation.

<u>S. Cent. Reg'l Med. Ctr. v. Pickering</u>, 749 So.2d 95, 99 (Miss. 1999) (emphasis added) (quoting <u>Leaf River Forest Prods., Inc. v. Ferguson</u>, 662 So.2d 648, 650 (Miss. 1995)); <u>see also</u> <u>Jackson v. Johns-Manville Sales Corp.</u>, 781 So.2d 394, 414 (5th Cir. 1986) ("Jackson's claim is not merely that he <u>might</u> get cancer, or that there is a remote possibility that he will. Jackson has established that there is a greater than fifty percent chance that he <u>will</u> get cancer. Who can gainsay that this knowledge causes him anguish, or that this anguish is reasonable? Certainly not this court and, in our view, not the Mississippi Supreme Court.") (emphasis in original) (citation omitted). Thus, it appears that a claim for fear of a future illness may be compensable in the absence of manifestation of that illness, so long as the claim is "supported by substantial exposure to the danger, and ... supported by medical or scientific evidence so that there is a rational basis for the emotional fear." <u>S. Cent. Reg'l Med. Ctr.</u>, 749 So.2d at 99.

of future illness as related to silicosis, and to prioritize the degree of severity of silicosis in any other plaintiff." (Order No. 19 ¶ 5.)

Finally, it bears repeating that the Court conducted these hearings prior to deciding the issue of subject-matter jurisdiction for two reasons. First, the hearings were warranted by Defendants' motion for sanctions, which is a matter a court without subject-matter jurisdiction may consider, see Willy v. Coastal Corp., 503 U.S. 131 (1992). Second, the hearings were potentially relevant to the issue of the Court's subject-matter jurisdiction. As discussed below, one method of establishing subject-matter jurisdiction is through the doctrine of improper joinder, which can be shown with evidence of "actual fraud in the pleading of jurisdictional facts." Smallwood v. Ill. Cent. R.R. Co., 385 F.3d 568, 573 (5th Cir. 2004) (en banc), cert. denied, 125 S. Ct. 1825 (2005); see also Travis v. Irby, 326 F.3d 644, 646-47 (5th Cir. 2003). In light of Dr. Martindale's deposition, Defendants alleged actual fraud in the pleading of Plaintiffs' claims of silica-related injuries.[37]

Finally, as a more practical matter, the parties were in agreement as to the advisability of the hearings: the Defendants

---

[37] In addition, at least according to Defendant 3M, whether the Plaintiffs have sustained an injury is relevant to the issue of whether the jurisdictional amount-in-controversy requirement has been met. As alleged in the Complaint and the Fact Sheets, Plaintiffs' claims of injuries largely hinge on the experts' diagnoses of silica-related disease. In light of Dr. Martindale's deposition, the validity of at least 3,617 Plaintiffs' diagnoses was in question.

were eager to have this forum to depose the doctors, and the Plaintiffs, in the words of Plaintiffs' liaison counsel, were "willing, ready, and able to bring the rest of these [diagnosing doctors] here ... to show their stripes." (Dec. 17, 2004 Status Conf. Trans. at 23.)

### 3.    Dr. Hilbun's and Dr. Cooper's Depositions

As noted above, despite the impending February <u>Daubert</u> hearings, the Court allowed Defendants to conduct their previously-scheduled depositions of Dr. Hilbun and Dr. Cooper on December 20, 2004 and January 4, 2005, respectively. Dr. Hilbun (a general surgeon) and Dr. Cooper (a general practitioner) each performed abbreviated physical examinations on individuals who attended screening events held by N&M for the law firm of Campbell, Cherry, Harrison, Davis & Dove ("Campbell Cherry"). (Hilbun Dep. at 28-29, 32-34, 38; Cooper Dep. at 22-23.) Dr. Hilbun was paid $5,000 per day for performing abbreviated exams for five days of screenings in Columbus, Mississippi, on April 22-26, 2002. (Hilbun Dep. at 28-29, 32-34, 38.) Lured by what he considered to be "easy money," Dr. Cooper performed abbreviated exams in Pascagoula, Mississippi on April 15-16 and May 15, 2002. (Cooper Dep. at 22-23, 83.)

The exams consisted of asking two questions (whether the person has (1) shortness of breath and/or (2) connective tissue disease), listening to each person's lungs, and checking them for cyanosis, clubbing, and ankle edema. Pursuant to N&M's instructions, Dr. Hilbun or Dr. Cooper completed a simple, single-

-45-

page form for each of the Plaintiffs, signed the handwritten form, and left it in N&M's custody at the conclusion of the screening. (Hilbun Dep. at 34, 37-38, 53, 78; Cooper Dep. at 23-25, 28-31.) An example of this form, which was so simple, "any first grader could read [it]" (Hilbun Dep. at 34), is attached hereto as Exhibit 4.  The shaded portion of the form was filled out by Dr. Hilbun or Dr. Cooper; the remainder of the form was completed by others. (Hilbun Dep. at 41-43.)   N&M provided Dr. Hilbun and Dr. Cooper with this form--the doctors had no input in drafting it or the prepared questions they asked during the exams.  (Hilbun Dep. at 35; Cooper Dep. at 23-25, 28-31.)  Dr. Cooper testified that it was "easy work" because his role was exceedingly limited "compared to what I do in my normal practice."  (Cooper Dep. at 83.)  He stated: "not having to make a call about anything whatsoever, not having to make a diagnosis, write a prescription, do anything like that, that's easy work."  (Cooper Dep. at 83.)

Both doctors emphasized that they did not diagnose any of the Plaintiffs with silicosis.  (Hilbun Dep. at 19; Cooper Dep. at 20.) Indeed, both doctors testified that they had never diagnosed anyone with silicosis.  (Hilbun Dep. at 19; Cooper Dep. at 114.)

Sometime after the screenings, N&M presented both doctors with typed forms for their signature.  Both doctors testified that they believed these forms were typed versions of their physical examination reports.  A sample of these N&M-prepared typed forms is

attached as Exhibit 5 (Dr. Hilbun) and Exhibit 6 (Dr. Cooper). All of the forms contained the following language:

> On the basis of this client's history of occupational exposure to silica and a B reading of the clients chest x-ray, then within a reasonable degree of medical certainty, [Plaintiff] has silicosis.
> Exposure to silica is associated with an increased incidence of lung cancer, connective tissue diseases and autoimmune diseases. Therefore, this client should consult with his or her physician.

(Exs. 5 & 6.) Both doctors testified that, contrary to the language in the typed forms, they did not see any x-rays, x-ray reports or pulmonary function tests, and they did not diagnose any Plaintiff with silicosis. (Hilbun Dep. at 19-22, 52, 56-62, 84, 89-90, 94; Cooper Dep. at 19-21, 40, 47-51.) Despite the false information on the forms, Dr. Cooper personally signed and dated 249 typed forms. (Cooper Dep. at 60.) Dr. Cooper testified that he failed to read any of the forms as he signed them, because he was "very, very busy." (Cooper Dep. at 20, 60, 66.) Dr. Hilbun testified that he never reviewed the typed forms, but simply instructed his assistant to stamp his name on the forms. (Hilbun Dep. at 22, 61-62.) N&M then presented the signed forms to Campbell Cherry, who placed them in the document depository pursuant to this Court's Order No. 6.[38]

---

[38] These reports are not mentioned on Plaintiffs' Fact Sheets. Instead, according to the Fact Sheets, all of the Plaintiffs who were examined by Dr. Hilbun or Dr. Cooper were diagnosed with silicosis by Dr. Martindale.

Despite Plaintiffs' assertions to the contrary in the motions to quash, Dr. Hilbun and Dr. Cooper each testified that they had not agreed to be a Plaintiffs' expert in this matter. (Hilbun Dep. at 23; Cooper Dep. at 15.)

Also, Dr. Hilbun testified that he first learned of the diagnosis language in his reports in December 2004. (Hilbun Dep. at 85-88.) He testified that he informed Billy Davis, an attorney with Campbell Cherry, of the false language five days prior to the December 17, 2004 status conference (and eight days prior to Dr. Hilbun's December 20 deposition). (Hilbun Dep. at 85, 88; see also Feb. 17, 2005 Trans. at 204.) Thus, Mr. Davis knew that Dr. Hilbun's diagnosing reports were false--but apparently did not know Dr. Cooper's diagnoses were false--when he argued before the Court that Dr. Hilbun and Dr. Cooper should not be required to testify because they did not diagnose any Plaintiffs with silicosis. Specifically, the following exchange occurred:

> DAVIS: A couple of doctors that [Defendants] mentioned are doctors that have not been identified on fact sheets as diagnosing physicians; they have not been relied upon as diagnosing physicians...
> COURT: Who are those?
> DAVIS: Dr. Kevin Cooper and Dr. Glen Hilbun. They performed physical exams on approximately 600 of our clients.
> COURT: Did they diagnose them?
> DAVIS: They are -- they --
> COURT: Are they diagnosing physicians?
> DAVIS: No, sir, we have not identified them as diagnosing physicians.
> COURT: Well, who made the diagnosis on those 600?
> DAVIS: Dr. Martindale. They are part of the Dr. Martindale group. We have relied on those doctors'

-48-

reports as it relates to taking a physical exam and a
medical history.
COURT: Were you going to -- who are you going to now want
to substitute in for Martindale for those 600?
...
DAVIS: Your Honor, we have ... gotten substitute
diagnoses on a large number of those --
COURT: By whom?
DAVIS: By Dr. Harron....
COURT: I want every single doctor who has diagnosed
silicosis in any of the ... Plaintiffs to show up for
that [Daubert hearings/Court] deposition.
....
DAVIS: If it's a diagnosis that we have relied on, your
Honor, or that we've submitted under our fact sheet.
COURT: No, anybody that's diagnosed silicosis in any of
these people needs to show up.  You're supposed to have
disclosed those names.  It doesn't matter what you're
relying on.  That was not what was back in the affidavit
months ago.  You were supposed to have disclosed the
diagnosing physician.  If you've got them and you haven't
disclosed them, ... there are going to be sanctions. ...
This is not a hide the ball with the silicosis.  These
are people who need --
DAVIS: Your Honor, we're not trying to hide the ball.

(Dec. 17, 2004 Status Conf. Trans. at 41-44.)  It was then that

Plaintiffs' liaison counsel interjected, for the third time, his

"grave concerns as to how [Dr. Martindale] got flipped." (Id. at

45.)

## B.   Medically-Accepted Method for Diagnosing Silicosis

At this point, it would be helpful to summarize the generally-

accepted standards in the medical community for diagnosing

silicosis.  As the Plaintiffs wrote in a brief filed prior to the

Daubert hearings:

> The basic mechanism for diagnosing silicosis is not
> controversial.   A diagnosis requires a history of

-49-

exposure to silica dust, radiographic evidence of silicosis, and 'the absence of any good reason to believe that the radiographic findings are the result of some other condition.'  It is also important that the time between exposure and the onset of disease is consistent with the latency period typical of silicosis.

(Pls.' Informational Br. Regarding Diagnosis Silicosis at 2 (citing Hans Weill, et al., Silicosis and Related Diseases, in OCCUPATIONAL LUNG DISORDERS 286 (3rd ed. 1994); Daniel E. Banks, Silicosis, in TEXTBOOK OF OCCUPATIONAL AND ENVIRONMENTAL MEDICINE 380-81 (2nd ed. 2005).)  The testimony of the diagnosing doctors was in accord with the above summary.  For instance, one of the Plaintiffs' diagnosing doctors, Dr. Jay Segarra, a pulmonologist and NIOSH-certified B-reader practicing in Biloxi, Mississippi, elaborated as follows about the generally-accepted methodology for diagnosing silicosis:

[T]he diagnosis of [silicosis] rests on, basically, three factors.  One is an appropriate chest X-ray and I'll tell you what that means in a minute.  An adequate exposure history which I'll explain in a minute.  And finally, the absence of any other disease that would be more likely to explain the radiographic findings or clinical symptoms or whatever than Silicosis.

An appropriate chest X-ray for a B-reader means, at least, primarily small, rounded opacities.  They don't all have to be rounded but they should, at least, be primarily rounded.  And involving, at least, one of the upper lung zones of an alveoli profusion of 1/0 or greater. This is in the absence of some superior medical data that you generally don't have such as a high resolution chest CT scan or a tissue sample where you can look under the microscope.  Most of the time, you don't have that available.  So, that's the chest X-ray.

What an adequate exposure history means is that the physician or an agent of the physician has just got taken from the patient a history of exposure to potentially toxic, environmental substances including organic dust and inorganic dust.  And determine that the level of exposure -- the intensity and duration was sufficient to

explain the abnormalities on the chest X-ray, or at least
potentially.

　And then ruling out the other diseases that can often
be done by [past medical] history.  The physical exam
plays usually a small role in that regard.  The history
is more important.

(Feb. 16, 2005 Trans. at 353-54; <u>see also</u> Feb. 16, 2005 Trans. at

22 (Dr. Levy); Feb. 17, 2005 Trans. at 42 (Dr. Coulter); Feb. 18,

2005 Trans. at 146 (Dr. Andrew Harron); Feb. 18, 2005 Trans. at 107

(Dr. Parker).)[39]  Dr. Segarra further testified that generally it

is not appropriate for anyone other than the physician or an agent

of the physician to take the exposure and past medical history.

The exception to this would be if the patient is unavailable, in

which case a doctor could rely on "an extensive medical

questionnaire" for the medical history, or, in the case of a work

history, if the doctor has "not just a couple of words or a couple

of sentences but [the doctor] ha[s] the entire deposition of the

---

　　[39]  Dr. Levy stated that a physical examination is not
necessary to diagnose silicosis.  (Feb. 16, 2005 Trans. at 23.)
However, Dr. Levy has previously testified in another silicosis
case that the taking of a physical, as well as a history, are
"standard methodologies" in diagnosing silicosis.  Specifically,
he testified:

　　The methodologies I've used [in diagnosing plaintiff
　　with silicosis], including differential diagnosis,
　　including reviewing the soundness of the X-rays and the
　　literature, as well as the body of the literature as a
　　whole, including use of Bradford Hill principles, all
　　of those methodologies, the methodologies I've used in
　　reviewing his past medical history, taking a history
　　from him, performing a physical examination, all of
　　those are standard methodologies used by physicians and
　　by epidemiologists.

(Feb. 16, 2005 Trans. at 155.)

patient who explained what he did for work." (Feb. 16, 2005 Trans. at 355.)

Dr. Segarra testified that he will also have Pulmonary Function Tests ("PFTs") performed on the patient, in order to further aid in the diagnosis.[40] (Feb. 16, 2005 Trans. at 361.) And with respect to reading the chest x-ray, Dr. Segarra testified that "99.9 percent of the time," he does the B-reading himself, rather than relying on another doctor's B-read.[41] (Feb. 16, 2005 Trans. at 360.)

In evaluating pneumoconioses,[42] including silicosis, chest x-rays are normally interpreted using the ILO radiograph classification system. An example of the ILO's standardized form, on which B-readers record the results of their reads, is attached as Exhibit 7. For the purpose of the following discussion, box "2B. Small Opacities" is of primary concern.

---

[40] PFTs, which will be discussed _infra_, are a broad range of physiological tests that measure how well the lungs take in and exhale air and how efficiently they transfer oxygen into the blood.

[41] Moreover, Dr. Segarra testified that on the rare times he has relied upon another doctor's B-read, he refuses to make a final diagnosis until he sees the patient's x-ray himself. (Feb. 16, 2005 Trans. at 360-61.) And on one of those occasions, when he looked at the film, he changed his diagnosis. (_Id._)

[42] "Pneumoconiosis" is the general term for a disease of the lungs, such as asbestosis or silicosis, caused by long-continued inhalation of dusts or fibers or other extrinsic materials.

The ILO system standardizes the interpretation of chest x-rays using descriptions of the size, shape, and profusion (i.e., degree or severity) of radiographic abnormalities (i.e., visible lung markings or scarring).[43]  The system is used to describe shape (either regular/rounded or irregular/linear) and size (regular/rounded: "P", "Q", "R"; irregular/linear: "S", "T", "U") characteristics of radiographic abnormalities.[44]  <u>See</u> ILO Form, attached as Exhibit 7, at box "2B a."  The extent of radiographic abnormalities (i.e., "profusion", located on the ILO form at box "2B c.") is characterized by a number between 0 and 3, and a second number, separated from the first by "/".  The first number, preceding the "/", is the final score assigned to that film by the reader.  The second number, following the "/", is a qualifier.  The numbers 0, 1, 2, and 3 are the main categories, ranging from normal (or 0) to increasingly abnormal (1, 2, and 3).  An x-ray read as a category 1 film might be described as 1/0, 1/1, or 1/2.  When the reader uses the descriptor "1/1", she is rating the film as a "1",

---

[43]  The discussion of the ILO classification system contained herein, <u>see</u> <u>infra</u>, is based on the ILO Guidelines (1980 and 2000 Editions), from testimony during the <u>Daubert</u> hearing, <u>see</u> Feb. 16, 2005 Trans. at 333, 340 & Feb. 18, 2005 Trans. at 44, and from the testimony of Dr. Laura Welch and Dr. David Weill before the Senate Judiciary Committee on February 2-3, 2005, <u>see</u> 2005 WLNR 2777131.

[44]  "P", "Q" and "R" mean that rounded opacities are present, with "P" representing diameters up to 1.5 mm, "Q" diameters from 1.5 mm to 3 mm, and "R" diameters from 3 mm to 10 mm.  (Opacities over 10 mm are described as large opacities in box "2C." of the ILO form.)  Small irregular/linear opacities in the same size ranges are classified as "S", "T" and "U".

and only considered it as a "1" film.  If she uses "1/0", she is saying she rated the film as a "1", but considered calling it a "0" (or normal) film before deciding it was category 1.  Finally, when the reader uses "1/2", she is saying she is rating the film as a "1", but considered calling it a "2" film.

The ILO classification scheme also addresses which of the six lung zones are involved (upper, middle, and lower, in either the right or left lung), located on the ILO form at "2B b."

The ILO guidelines direct the reader to include all the abnormalities that exist.[45]

Chronic or classic silicosis (i.e. the type of silicosis at issue in virtually all of the MDL cases) is characterized by tiny round nodules, primarily in the upper lobes of both lungs.  On an x-ray, these round nodules show up as small, rounded opacities, which would be rated on the ILO form as "P", "Q", or "R".  A diagram of these opacities, which are consistent with silicosis, is attached as Exhibit 8.  By way of contrast, asbestosis, which is caused by inhaling asbestos, is characterized by linear scarring, which shows up on an x-ray as small irregular opacities ("S", "T", or "U"), primarily in the lower lobes of both lungs.  A diagram of these opacities, which are consistent with asbestosis, is attached as Exhibit 9.

---

[45]   See International Labour Office, Guidelines for the Use of the ILO International Classification of Radiographs of Pneumoconioses at 2 (2000).

If a reader were to read 1,000 x-rays, and then read the same x-rays a year later, there can be expected to be some variation in the findings. (Feb. 18, 2005 Trans. at 21-22.) This phenomenon of the same reader classifying a radiograph differently on different occasions is known as "intra-reader variability." If two different readers read the same x-rays and disagree amongst themselves on a classification, this is known as "inter-reader variability."[46] Concern over reader variability prompted the ILO to develop its classification scheme for the pneumoconioses. Obviously, the goal should be for variability to be as close to zero as possible. Dr. John Parker, who formerly administered NIOSH's B-reader program, testified: "[T]he statistical strength of the ILO classification system is in numbers. And if there are multiple examples of [variability], then it begins to exceed what is plausible an experienced reader might do." (Feb. 18, 2005 Trans. at 141.)

Returning to the process of diagnosing silicosis, the final criterion for a diagnosis is ruling out the other potential causes of the radiographic findings. Radiographic findings consistent with silicosis may be caused by a host of other diseases, including: other pneumoconioses, such as coal worker's pneumoconiosis, berylliosis and byssinosis; infectious diseases, such as tuberculosis; collagen vascular diseases, such as rheumatoid arthritis and lupus; fungal diseases, such as

---

[46] Reader variability is most likely to occur on profusions (i.e., "1/0" versus "0/1") rather than in zones or opacity sizes and shapes. (Feb. 18, 2005 Trans. at 137-38.)

histoplasmosis and coccidioidomycosis; as well as sarcoidosis. (Feb. 16, 2005 Trans. at 101-05, 328; Feb. 18, 2005 Trans. at 91-93, 229.) Radiographic findings consistent with silicosis also may be caused by certain infections, drugs, pharmaceutical preparations, congestive heart failure, obesity, or simply inferior quality x-ray equipment or film. (Feb. 18, 2005 Trans. at 91-93, 229.)[47]

In order to rule out the multitude of other causes of the radiographic findings, it is vitally important for a physician to

---

[47]    Dr. Parker explained:
To reach a medical diagnosis certainly requires more than just shadows on a chest x-ray. Because those shadows can be caused by any number of disease processes. You would be quite interested whether the individual, if the shadows were consistent with silicosis, you would be quite interested in their workplace exposures over their lifetime. ... [In making t]he differential diagnosis, you're interested in their [occupational and exposure] history, their review of systems, their past medical history. There are drugs that can cause shadows on x-rays, or pharmaceutical preparations that can injure lung and cause shadows on the x-ray. There are organic dust exposures and inorganic dust exposures that can cause shadows on the x-ray. There are collagen vascular diseases such as rheumatoid arthritis, lupus, that can cause shadows on the x-ray. There's this unusual disorder, sarcoidosis, that can cause shadows on the x-ray, and congestive heart failure can cause shadows on the x-ray. Obese patients, as well as patients who take a shallow breath or other technical quality abnormalities with the film may lead to shadows on the x-ray that may be misleading and thought to be abnormal. But if the film is repeated with better technique, may appear more normal.
(Feb. 18, 2005 Trans. at 91-93.) Similarly, Dr. Friedman testified about the "infections and [the] host of different diseases" that can look like silicosis on an x-ray, again highlighting the need for a differential diagnosis. (Feb. 18, 2005 Trans. at 229.)

take a thorough occupational/exposure history and medical history. (Feb. 16, 2005 Trans. at 101-06; Feb. 18, 2005 Trans. at 91-93, 229, 353-54.)   Indeed, even a travel history may be relevant: certain diseases which mimic silicosis on an x-ray are primarily found in particular geographic regions of the country or the world. (Feb. 16, 2005 Trans. at 101-06; Feb. 17, 2005 Trans. at 43-44.) If the patient has traveled to that region, then those diseases become more likely explanations for the radiographic abnormalities.[48] And, of course, given the wide variety of possible causes for x-ray findings consistent with silicosis, the occupational, medical and travel histories must be directed by someone with sufficient medical training and knowledge to guide the questioning through all of the areas necessary to exclude each of the other possible causes for the findings.[49]   This is why it is

---

[48]   For example, if the patient had traveled in, or previously lived in, certain areas of California and Arizona, then coccidioidomycosis would need to be ruled out as a cause of the x-ray findings prior to making a diagnosis of silicosis. (Feb. 16, 2005 Trans. at 101-02.)

[49]   As Dr. Todd Coulter, one of Plaintiffs' diagnosing physicians, testified:
A:  [T]here's more to this than meets the eye.  The history has to be expansive but it also has to be guided, if you will, by what the patient tells you. ... We ask about social history.  We ask about family history.  I ask about smoking history.  Where I live on the Gulf Coast of Mississippi I want to know about their military history.  We've got a lot of people who have traveled all over the world.  I want to know about their -- their public health history, such as, inoculations and immunizations. ...
Q:  So in reviewing the ... information that the patient has given you, you then sit down with a patient and flush that out for more information that you

imperative that the diagnosing physician take at least some portion of the histories. (Feb. 16, 2005 Trans. at 355, 366; Feb. 17, 2005 Trans. at 43-45; Feb. 18, 2005 Trans. at 92, 134, 244-45, 255.)

Finally, at the conclusion of a patient's visit, Dr. Segarra tells the patient "the results of all of what [he] did in trying to come up with whether this person has silicosis or not." (Feb. 16, 2005 Trans. at 362.)  If Dr. Segarra diagnoses a patient with silicosis, he will "sit down and explain the diagnosis to [the patient]. And [he] recommend[s] to that patient or plaintiff that he get a follow up examination with his treating doctors no later than six months after [the] diagnosis." (Feb. 16, 2005 Trans. at 362-63.)  Dr. Segarra also tells the patient or plaintiff that although the risk of getting lung cancer or other pulmonary diseases is increased with silicosis, it is nonetheless unlikely that they will contract those associated diseases:

> I want them to understand that they have a progressive disease. But, that the other diseases for which they're at an increased risk, doesn't mean that they will get these other diseases. And, in fact, they probably won't. It's simply that they're at greater risk than the average person. And I try to quantify that risk and put that in perspective for them.

(Feb. 16, 2005 Trans. at 363.)

After Dr. Segarra finishes discussing his findings with the patient, he dictates his report, has it typed, reviews it, signs

---

consider important?
    A:  History, history, history, yes, sir.
(Feb. 17, 2005 Trans. at 43-47.)

it, and then, in the litigation context, he sends it to the lawyer. (Feb. 16, 2005 Trans. at 362.)  Dr. Segarra does not use form letters or signature stamps in his practice.  (Feb. 16, 2005 Trans. at 371.)  In addition to mailing the report to counsel, he will also either mail the report directly to the patient or insist that the plaintiff's counsel mail the report to the patient.  (Feb. 16, 2005 Trans. at 362.)  The reason for this is that "[p]eople need reinforcement of what you tell them.  Studies have shown that you talk to patients and tell them something, but you really need to repeat it several times in different ways for it to sink in completely."  (Feb. 16, 2005 Trans. at 362.)

According to Dr. Segarra, the entire process of determining whether an individual has silicosis takes between 60-90 minutes.[50] (Feb. 16, 2005 Trans. at 366.)  Thirty minutes of this time is devoted to taking the person's occupational, medical and smoking histories, and performing the physical examination.  (Id.)

Although Dr. Segarra has diagnosed plaintiffs in a number of lawsuits, he has only diagnosed a single Plaintiff in this MDL, Roosevelt Sykes.[51]  (Feb. 16, 2005 Trans. at 357-58.)  A copy of his

_____

[50]  Similarly, Dr. Gary Friedman, whose testimony will be discussed infra, testified that he usually spends between an hour and an hour and a half with the patient.  (Feb. 18, 2005 Trans. at 253.)  He continued: "And then after that, I read the x-rays, go over pulmonary function tests, review the medical records, frequently contact the treating doctor.  So the total time [to diagnose] is longer."  (Feb. 18, 2005 Trans. at 253.)

[51]  It is worth noting that because Dr. Segarra only diagnosed a single Plaintiff in this MDL, the Defendants

report for Mr. Sykes is attached as Exhibit 10.  Regardless of whether he sees the patient in a clinical setting or in a medical-legal setting, Dr. Segarra's methodology is the same.  (Feb. 16, 2005 Trans. at 371-72.)

Based upon the testimony presented at the <u>Daubert</u> hearings, as well as the medical literature and other materials submitted by the parties, the Court finds that the process described above is the standard medical practice for diagnosing silicosis, in both the clinical and the medical-legal context.  (<u>See, e.g.</u>, Feb. 16, 2005 Trans. at 367, 371-72.)

### C.    Comparison to Asbestosis

As will become apparent below, it is helpful to briefly contrast the method for diagnosing silicosis with the method for diagnosing asbestosis.[52]  Both diseases are chronic lung diseases caused by the inhalation of dusts found in a variety of workplaces. The diagnostic criteria for both diseases include the examination of chest x-rays.  As noted above, on a chest x-ray, silicosis presents with small, rounded opacities, in the upper or mid zones of the lungs.  <u>See</u> Exhibit 8.  By contrast, on a chest x-ray,

---

suggested that he not be required to testify at the hearing. However, the Plaintiffs insisted that Dr. Segarra be permitted to testify, and the Court granted Plaintiffs' request.  (Feb. 16, 2005 Trans. at 357-58.)  Defendants have not challenged Dr. Segarra's testimony under <u>Daubert</u>.

[52]  The information presented in this section comparing silicosis and asbestosis was derived from "Asbestosis and Silicosis," 349 The Lancet 1311, 1997 WL 9330702 (May 3, 1997).

asbestosis presents with irregular linear opacities, primarily at the bases and periphery of the lungs. See Exhibit 9. Also, unlike with silicosis, in cases of asbestosis, "pleural thickening" (denoted on boxes "3A" through "3D" on the ILO form) is common. (Feb. 18, 2005 Trans. at 45-46; compare Exhibit 9 with Exhibit 8.)

Because asbestosis and silicosis have such different appearances on an x-ray, in a clinical setting, "confusion between silicosis and asbestosis does not occur." Dr. David Weill, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 4 (Feb. 3, 2005). As Dr. Weill, a pulmonologist with the University of Colorado Respiratory Center, recently stated before the Senate Judiciary Committee:

> Distinguishing among diseases that fall into the same radiographic categories requires the clinician to consider other factors, most notably a careful history and pulmonary function test. There should not, however, be confusion between diseases that fall into different categories, such as asbestosis and silicosis.

Id. at 5; see also Dr. Paul Epstein, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 2 (Feb. 2, 2005) ("[T]he x-ray appearances of these two dust-related diseases [i.e., silicosis and asbestosis] are vastly different.").

While it is theoretically possible for one person to have both silicosis and asbestosis, it would be a clinical rarity. As Dr. Weill testified:

> Although asbestosis and silicosis are different diseases that look different on x-ray films, it is theoretically possible for one person to have both diseases. A person

-61-

could be exposed to both silica and asbestos in
sufficient quantities to cause either disease, but it
would be extremely unusual for one person in a working
lifetime to have sufficient exposure to both types of
dust to cause both diseases.  In my clinical experience
in the United States, I have never seen a case like this
and colleagues who saw patients in periods where exposure
levels were much higher have difficulty recalling an
individual worker who had both asbestosis and silicosis.
Even in China, where I saw workers with jobs involving
high exposure to asbestos and silica (such as
sandblasting off asbestos insulation), I did not see
anyone or review chest radiographs of anyone who had both
silicosis and asbestosis.

Dr. David Weill, Senate Judiciary Committee Testimony, Fed. Doc't

Clearinghouse at 4 (Feb. 3, 2005); see also Dr. Paul Epstein,

Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at

3 (Feb. 2, 2005) ("[I]t is my professional opinion that the dual

occurrence of asbestosis and silicosis is a clinical rarity."); Dr.

Theodore Rodman, Senate Judiciary Committee Testimony, Fed. Doc't

Clearinghouse at 2 (Feb. 2, 2005) ("Among the thousands of chest x-

rays which I reviewed in asbestos and silica exposed individuals,

I cannot remember a single chest x-ray which showed clear-cut

findings of both asbestos exposure and silica exposure.").

Likewise, Dr. John Parker, former administrator of NIOSH's B-reader

program and current revisor of the ILO guidelines, testified before

this Court that he has never seen a clinical case of asbestosis and

silicosis in the same individual.  (Feb. 18, 2005 Trans. at 89-

90.)[53]  Similarly, Dr. Samuel Hammar, a pathologist who has written

_____

[53]  Dr. Parker did testify that he has seen pathologic
evidence (i.e., after an autopsy or biopsy) of both diseases
being present.  (Feb. 18, 2005 Trans. at 89.)  But he called such
pathologic findings "distinctly unusual."  (Feb. 18, 2005 Trans.

the leading pathology textbook on lung disease (and who is frequently a plaintiff's expert in asbestosis cases), has written the following:

> I have seen the diagnosis [of asbestosis and silicosis in the same patient] several times, and in the cases that I've had pathology to evaluate [i.e., where he has actually looked at the lung tissue], I have never seen cases in which there was both silicosis and asbestosis in the same patient.  This does not necessarily mean that this couldn't happen, but in my experience, I have never seen it.  Silicosis has a fairly distinct morphology, and at this point in time is a rare disease.  I think I have seen about five cases over the last ten years that I thought pathologically represented silicosis.

(Feb. 18, 2005 Trans. at 263-64; Friedman Ex. 2.)

### D.    Screening Companies

The majority of claims in this MDL rely upon diagnoses given by doctors associated with screening companies.  A representative of two such screening companies, N&M and RTS, testified at the Daubert hearings.  N&M (short for "Netherland & Mason," the co-owners of the company) helped generate approximately 6,757 claims in this MDL, while RTS (short for "Respiratory Testing Services") helped generate at least 1,444 claims.  (Feb. 18, 2005 Trans. at 29-31, 177; Feb. 17, 2005 Trans. at 267; N&M Ex. 38.)  Because N&M produced such a large percentage of the claims in this MDL, the Court will focus its discussion on N&M, with occasional references to RTS when appropriate.  Also, a third screening company, Occupational Diagnostics, which generated 237 diagnoses, did not

---

at 90.)

testify at the hearings.  (Feb. 17, 2005 Trans. at 30, 53-54, 67-68.)  This third testing company, which, curiously, shares its office and phone line with a Century 21 real estate business (Feb. 17, 2005 Trans. at 80-81), will be discussed _infra_, in conjunction with the testimony of Dr. Todd Coulter.

In 1994, Heath Mason and Molly Netherland, the co-owners of N&M, and Charles Foster, the owner of RTS, were all employees of another Alabama screening company called "Pulmonary Testing Service."  Mr. Foster left Pulmonary Testing Service at that time to form RTS, and Mr. Mason and Ms. Netherland formed their company two years later, after Pulmonary Testing Service went out of business.  (Feb. 17, 2005 Trans. at 269; Feb. 18, 2005 Trans. at 169.)

At the time he formed N&M, Mr. Mason was 21 years old; he had dropped out of junior college after only a year and had worked at Pulmonary Testing Service for less than two years.  (Feb. 17, 2005 Trans. at 268.)  Neither Mr. Mason nor Ms. Netherland had (or currently have) any medical training and N&M has never had a medical director.[54]  (Feb. 17, 2005 Trans. at 271-72, 276.)  What Mr. Mason did possess was contacts with paralegals at law firms.  (Feb. 17, 2005 Trans. at 274.)  Ms. Netherland had the seed money

---

[54]  Mr. Mason has attended a three-day course in administering Pulmonary Function Tests.  (Feb. 17, 2005 Trans. at 272, 300.)

for the business and access to x-ray equipment from her husband's chiropractic office.  (Feb. 17, 2005 Trans. at 271, 275.)

At the outset, N&M simply provided x-rays to law firms.  But the law firms quickly began asking N&M to also provide doctors to read the x-rays, perform physical examinations and provide finalized diagnostic reports, ready for litigation. (Feb. 17, 2005 Trans. at 272.)  In late 1996 or early 1997, N&M hired Dr. Ray Harron, a radiologist and certified B-reader, to read chest x-rays as well as make diagnoses.  (Feb. 17, 2005 Trans. at 270.)  N&M paid Dr. Harron $125 per person for the process which included some combination of the following three steps: (1) reading the x-ray, (2) conducting an abbreviated physical exam, and (3) making a diagnosis.[55]  (Feb. 17, 2005 Trans. at 280.)  At first, Dr. Harron stipulated that he would receive a minimum payment of $10,000 per day, but Dr. Harron did not insist on this if less than 80 people attended a screening.  (Feb. 17, 2005 Trans. at 280.)  Over time, N&M sent x-rays to--in Mr. Mason's words--"multitudes of B-readers," including Dr. Harron, Dr. Andrew Harron (Dr. Harron's son),[56] Dr. James Ballard, and Dr. Allen Oaks, all of whom testified at the Daubert hearing.  (Feb. 17, 2005 Trans. at 284.)

---

[55]  For instance, sometimes another B-reader would read the x-ray, while Dr. Harron would perform the physical examination and make the diagnosis.  (Feb. 17, 2005 Trans. at 283.)

[56]  Throughout this Order, Dr. Ray Harron will be referred to either as "Dr. Harron" or "Dr. Ray Harron," while his son will always be referred to as "Dr. Andrew Harron."

The screening companies were established initially to meet law firm demand for asbestos cases. But sometime around 2001, law firms began asking the companies to screen people for silicosis. (Feb. 17, 2005 Trans. at 287.) The initial lists of people to be screened were the law firms' "existing inventory" of asbestos plaintiffs. (Feb. 17, 2005 Trans. at 281, 286.) Law firms also placed advertisements in the media asking people to attend screenings. One such law firm advertisement is attached as Exhibit 11. Screening companies, in turn, advertised for law firm business, as well as for members of the public to attend the screenings. An N&M marketing brochure is attached as Exhibit 12, and an RTS brochure is attached as Exhibit 13. The public advertisements appealed to a broad range of individuals--for instance, one law firm advertisement begins:

> **Attention all contract, union, non-union, and retired** plant and factory workers, painters, sandblasters, glaziers/glassworkers, construction workers, quarrymen, boilermakers, bricklayers, plasterers, carpenters, welders, cement finishers, laborers, electricians, insulators, machinists, maintenance, operators, pipefitters, paperworkers, sheetmetal workers, steelworkers, sheetrock hangers, drywallers, and other trades: You may have been exposed to asbestos or silica sand for a period of time, and be eligbile to be screened for **ASBESTOSIS, MESOTHELIOMA CANCER, LUNG CANCER, OR SILICOSIS.**

(Exhibit 11 (emphasis in original).) The RTS brochure features an even longer list of trades, as well as details as minor as, "[t]he mobile units are not only functional but very appealing to the

eye."[57]  (Exhibit 13.)  N&M produced a television commercial listing many job titles and inviting viewers to call a toll-free number to make an appointment to be screened.  (Feb. 17, 2005 Trans. at 366-67.)  When N&M received responses to its public advertising, N&M then would solicit this client list to law firms.  (Feb. 17, 2005 Trans. at 367-68.)

Generally, the first stages of the screening process operated as follows: (a) the law firm provided the screening company with a list of people (for instance, existing asbestos plaintiffs or workers at industrial sites); (b) either the law firm or the screening company sent out a mass mailing asking the recipient to call the screening company's toll-free phone number; (c) the staff answering the phone would ask if the caller had been exposed to silica; and, (d) for those who "showed some form of being exposed to silica," the caller would be encouraged to attend a mass screening.  (Feb. 17, 2005 Trans. at 281-82, 286, 289.)

The screening company would tailor this process to the wishes of the law firm.  In the words of Mr. Mason, "basically, [the screening company is] a service; whatever [the law firm] asked us to do is what we did."  (Feb. 17, 2005 Trans. at 281.)  Some law firms would simply ask the screening company to x-ray a group of people and send the x-rays to the firm, who would then pass the x-rays on to a B-reader hired directly by the firm.  (Feb. 17, 2005

---

[57]  A photo of a screening truck used by RTS is attached as Exhibit 14.

Trans. at 283.)  Then the law firm might ask the screening company to set up physical examinations and PFTs on those with positive B-reads.  (Feb. 17, 2005 Trans. at 283.)  Also, rather than using the screening company's receptionists, some law firms would hire a "temp service" to take "a brief work history" and decide if the person "had adequate exposure" to silica to justify the cost of the x-ray.  (Feb. 17, 2005 Trans. at 284.)

In either case, there is no evidence that anyone answering the phones, whether employed by a screening company or a law firm, had any medical training or had been instructed by any medical professional what questions would be appropriate in taking an occupational history.  (Feb. 17, 2005 Trans. at 293-94; Feb. 18, 2005 Trans. at 180.)  Indeed, it is clear that the law firms, rather than any medical professionals, established the criteria for the screening company to use when taking the occupational history.  (Feb. 18, 2005 Trans. at 194-95.)  For example, Mr. Foster of RTS testified that the Barton & Williams law firm asked for a client to have at least five years exposure history to silica to qualify for a screening.  (Feb. 18, 2005 Trans. at 195.)  Mr. Foster said that other law firms required "a lot less" exposure.  (Feb. 18, 2005 Trans. at 195.)  Perhaps most telling was when the Court asked Mr. Foster, "What is your training on this, on [diagnosing] silicosis?", to which Mr. Foster replied: "Whatever the criteria the law firm sets."  (Feb. 18, 2005 Trans. at 183.)

On the day of a screening, the screening company parked its van or truck (carrying a mobile x-ray machine) in the parking lot of a hotel or a retail establishment, such as a K-Mart or a Sizzler restaurant.[58] (Feb. 17, 2005 Trans. at 54.)  As each client arrived in front of the van or trailer, a receptionist greeted the client, and using a standard form prepared by the screening company or law firm, verified that the client had an appointment and the information previously given by the client over the telephone.[59] (Feb. 17, 2005 Trans. at 306.)  The client then underwent a chest x-ray.  (Feb. 17, 2005 Trans. at 307.)

N&M's x-ray equipment was operated by a technician and was periodically inspected by the appropriate state certification board.  Inspectors in both Mississippi and Texas have issued violations to N&M for failing to comply with state standards. (Feb. 17, 2005 Trans. at 308-09, 312, 316-17.)  In addition, N&M did not have a policy of having a medical professional supervise the x-rays and the equipment during the screens.  (Feb. 17, 2005 Trans. at 308-09.)  Moreover, no medical professional actually ordered the x-rays; Mr. Foster testified that he viewed the client as "requesting" the x-ray for him- or herself.  (Feb. 18, 2005

---

[58] A photo of a screening van used by N&M is attached as Exhibit 15, and a photo of a screening truck used by RTS is attached as Exhibit 14.

[59] An example of a form used in an N&M screening is attached as Exhibit 16.  (Feb. 17, 2005 Trans. at 291-92, 306-07.)  The client did not fill out the form between "Doctor Comments:" and "Pulmonary Function Test Results:".

Trans. at 42, 176; RTS Ex. 1.)  This is despite the fact that, according to Dr. Ballard (an RTS B-reader), in normal medical practice, a doctor orders an x-ray before it is performed on a patient.  (Feb. 18, 2005 Trans. at 42-43.)

At this point, it is worth noting that there is nothing inherently wrong about performing x-rays in a van or trailer.  For instance, NIOSH uses a mobile x-ray unit.  (Feb. 18, 2005 Trans. at 100.)  However, mobile units must have rigorous medical oversight, to ensure that proper safety standards are observed.  Moreover, mobile x-ray units often are not as heavy as ones in offices and do not always have a consistent power source, which can lead to inferior quality films.  (Feb. 18, 2005 Trans. at 292-93, 305-06.)  With respect to the units used by the screening companies at issue here, there is no evidence of medical oversight (rigorous or otherwise), sufficiently heavy x-ray units, or a consistent power source.  (See, e.g., Feb. 17, 2005 Trans. at 87-88.)  Indeed, there is no evidence any medical professional supervised the extent to which the Plaintiffs were irradiated.  (See, e.g., Feb. 17, 2005 Trans. at 88.)

Returning to the screening process in these cases, the Court will focus on, by way of example, the Campbell Cherry cases.[60]  In those cases, after the x-ray was taken, Dr. Harron (on behalf of

---

[60]  Campbell Cherry represents approximately 4,256 Plaintiffs in this MDL.

N&M) read the film using a view box, and decided whether the patient should have PFTs.  (Feb. 17, 2005 Trans. at 317-21.)

As noted above, PFTs are a broad range of tests that measure how well the lungs take in and exhale air and how efficiently they transfer oxygen into the blood.[61]  While PFTs by themselves cannot determine the cause of any abnormality, they can be used in combination with a chest x-ray and other tests to help determine what type of lung disease a person has.  Mr. Mason, after attending a three-day training course, performed the most common PFT, spirometry.[62]  (Feb. 17, 2005 Trans. at 271-72.)  Despite the fact that he is not a respiratory therapist and, in his words, "I don't really have any medical qualifications" (Feb. 17, 2005 Trans. at 271-72), he moved beyond spirometry and performed other, more complicated types of PFTs.  (Feb. 17, 2005 Trans. at 278, 299-301; Feb. 18, 2005 Trans. at 269-70.)

An example of an N&M PFT report belonging to Plaintiff Robert Morgan is attached hereto as Exhibit 17.  Listed on pages 1, 4, 5

---

[61]  The most common PFTs are spirometry (often repeated after the administration of a bronchodilator such as albuterol), flow-volume loops, single breathing diffusing capacity (known as "DLCO"), helium dilution lung volumes, arterial blood gas analysis, pulse oximetry and sputum induction.  See generally http://www.hopkinsmedicine.org/pftlab/pftests.html.

[62]  Spirometry is a measurement of forced expiration.  The patient inhales maximally, filling his or her lungs to "Total Lung Capacity," and then exhales forcefully into a device called a spirometer.  The spirometer measures the volume and time of expiration, which allows the calculation of a number of parameters of lung functioning.  See http://www.hopkinsmedicine.org/pftlab/pftests.html.

and 6 of the PFT report are "Error Codes" for the equipment used to perform a particular PFT (page 1 is the spirometry report; page 4 is the single breath diffusing capacity report; page 5 is the flow volume loop report; page 6 is the lung volume report).  These Error Codes, listed on the reports as "ECodes", contain between 3 and 6 different categories, each representing a performance requirement established by the American Thoracic Society.  (Feb. 18, 2005 Trans. at 271.)  If the equipment meets the American Thoracic Society requirement for each category, then each number will be "0".  (Feb. 18, 2005 Trans. at 271.)  But if the equipment fails a requirement, then the number for that category will be "1".  (Feb. 18, 2005 Trans. at 271.)  In reviewing "Ecodes" on pages 1, 4, 5 and 6 of Exhibit 17, it is clear that more often than not, the equipment failed to function according to American Thoracic Society requirements.

Dr. Friedman looked at page 1 of Mr. Morgan's PFT report and was immediately struck by the spirometry result which indicates that Mr. Morgan had a 43 percent ratio of the volume of air he could exhale in one second to the total volume of air he could exhale with a single breath.  (Feb. 18, 2005 Trans. at 272; see Attached Exhibit 17 at 1 (listed as "FEV1/FVC%").)  Given Mr. Morgan's age, the ratio should normally be approximately 75 percent.  (Feb. 18, 2005 Trans. at 272.)  According to Dr. Friedman,

> What that means is that if you have this [FEV1/FVC%]
> number reduced, that means there's airway obstruction,
> and you should use something like albuterol or nebulizer
> to see if this person has reversible airway disease like
> asthma.  And you customarily would give the treatment,
> wait 15 minutes, and then repeat the study.

(Feb. 18, 2005 Trans. at 272.)  However, as indicated by the

report, no such treatment was given to Mr. Morgan (i.e., there is

nothing listed under "Post Rx"), perhaps because N&M did not have

a doctor to prescribe the drug, or perhaps because N&M did not want

to slow the stream of clients in the screening process by waiting

15 minutes, or perhaps because the person administering the test

simply did not know the proper procedure.  (Feb. 18, 2005 Trans. at

273.)  In any event, according to Dr. Friedman, the "test [report]

doesn't tell us anything."  (Feb. 18, 2005 Trans. at 273.)

Returning to the screening process, after the PFTs were

performed, Dr. Harron performed an abbreviated physical examination

(taking about two minutes per client) and completed the ILO form

and an "A-sheet" in front of the patient.[63]  (Feb. 17, 2005 Trans.

at 317-18, 321, 323.)  During Dr. Harron's sole meeting with the

client, Dr. Harron did not ask the client about his or her work

---

[63] A copy of an ILO form is attached as Exhibit 18.  A copy
of the "A-sheet" is attached as Exhibit 16.  (Feb. 17, 2005
Trans. at 319.)  As is apparent by the "Doctor Comments" section
of the A-sheet, the physical examination was very circumscribed
and very brief.  (Feb. 17, 2005 Trans. at 323.)  For instance,
the patient did not change into a gown or lie down.  (Feb. 17,
2005 Trans. at 321-22.)
     The notation "⊕ 1/0" at the bottom of Exhibit 16 indicates
Dr. Harron's profusion level reading.  (Feb. 17, 2005 Trans. at
319-20.)

history; instead he simply relied upon the information gathered by the screening company, as written on the A-sheet. (Feb. 17, 2005 Trans. at 328.) After completing the paperwork, Dr. Harron informed the client of his diagnosis. (Feb. 17, 2005 Trans. at 321.) Later, Dr. Harron dictated a narrative from the ILO form, which sometimes would be typed immediately onsite and sometimes would be typed later offsite. (Feb. 17, 2005 Trans. at 318-19.)

At some point, Dr. Harron's relationship with N&M grew so close that N&M had a stack of blank ILO forms that had been signed by Dr. Harron. (Feb. 17, 2005 Trans. at 370-71.) A copy of a pre-signed blank ILO form is attached as Exhibit 18. Mr. Mason testified that while N&M would fill in the name and social security number of the patient and the date of the x-ray on the pre-signed ILO form, Dr. Harron himself completed the remainder of the form. (Feb. 17, 2005 Trans. at 371.) He did not explain, however, why the forms were pre-signed if Dr. Harron himself later completed them.

In the case of the Campbell Cherry screens, if the patient received a diagnosis of silicosis, a receptionist informed the patient that they could choose any lawyer they wanted, but that a Campbell Cherry lawyer was waiting for them at a nearby offsite location. (Feb. 17, 2005 Trans. at 324-25.)

If the patient who was diagnosed with silicosis signed-up with Campbell Cherry to be a plaintiff, then Campbell Cherry paid N&M $750 for screening that patient. (Feb. 17, 2005 Trans. at 301-03,

-74-

325.)  If the patient was not diagnosed with silicosis or did not
sign-up with Campbell Cherry, N&M was paid nothing. (Feb. 17, 2005
Trans. at 301-03, 325.)  Campbell Cherry represents approximately
4,256 Plaintiffs in this MDL, meaning N&M likely was paid
$3,192,000 for its Campbell Cherry work. (Feb. 17, 2005 Trans. at
363.)  For each of the approximately 2,000 Plaintiffs represented
by O'Quinn, Laminack & Pirtle, N&M was paid $335 per positive
diagnosis. (Feb. 17, 2005 Trans. at 363-64.)  Because of this fee
structure, Mr. Mason testified that the emphasis was on attracting
as many people as possible to the screenings and creating as many
positive diagnoses as possible; as he stated, "[F]rom a business
standpoint of mine, you had to do large numbers." (Feb. 17, 2005
Trans. at 282.)

Sometimes, law firms (especially Campbell Cherry) would ask
N&M to have another doctor do re-reads of the x-rays which had been
read as positive for silicosis.[64]  (Feb. 17, 2005 Trans. at 331-33,
342, N&M Ex. 17.)   And if the subsequent B-reader (often Dr.
Martindale) did not make a positive silicosis finding, then N&M
would send the x-ray to a third B-reader for yet another read.
(Feb. 17, 2005 Trans. at 335-37, 375-76, 405.)  Mr. Mason thought
it was even possible that if the third reader also did not make a
positive silicosis finding, then the x-ray would be sent to a

_____

[64]  In some of these cases, the initial silicosis B-reader
also had read that Plaintiff's x-ray as consistent with
asbestosis for asbestos litigation. (Feb. 17, 2005 Trans. at
331-33, N&M Ex. 17.)

fourth reader.  (Feb. 17, 2005 Trans. at 337-38.)  And while some law firms did not want diagnoses made by Dr. Harron, other law firms (for example, the law firm group of Barton & Williams) would accept the initial Dr. Harron positive B-read even after two subsequent B-readers had read the x-rays as negative for silicosis. (Feb. 17, 2005 Trans. at 338-39, 407-09.)  As Mr. Mason stated:

> You would have different law firms that needed different bases at different times.  You may have in your inventory where Dr. Harron read them positive.  The people want a lawyer.  The people want to be represented.  So it's your job that if a [person] calls you and they have a B reader who has said they were positive, it's our job to help them find a lawyer.  That's what they want us to do. That's what we told them we were going to do.

(Feb. 17, 2005 Trans. at 339.)

Meanwhile, if a client was tested and told that he or she did not have silicosis, the client was told to return for retesting at a later date.  (Feb. 18, 2005 Trans. at 186-87, 201.)  However, Mr. Foster testified that he did not keep track of how often a client returned to be retested (Feb. 18, 2005 Trans. at 188, 201), meaning clients, who sometimes were eager to be retested (Feb. 18, 2005 Trans. at 186), could be exposed to multiple chest x-rays in a brief period of time.

Mr. Mason testified that in April 2002, the Campbell Cherry firm asked N&M to find a doctor other than Dr. Harron to do the physical examinations during the screenings.  (Feb. 17, 2005 Trans. at 377-78.)  N&M recruited Dr. Hilbun and Dr. Cooper for this purpose.  (Feb. 17, 2005 Trans. at 378.)  N&M passed on the extra

charges for these doctors to Campbell Cherry. (Feb. 17, 2005 Trans. at 380.) Mr. Mason testified that he believed the erroneous diagnosing language in Dr. Hilbun's and Dr. Cooper's reports (discussed supra) originated from Dr. Harron's office, where the reports were transcribed. (Feb. 17, 2005 Trans. at 380-81, 391.) In any event, Mr. Mason denied that N&M inserted the improper diagnosing language into the reports. (Feb. 17, 2005 Trans. at 380-81.)

While Mr. Mason did not seem distressed about Dr. Hilbun's and Dr. Cooper's false "diagnoses", he seemed quite distressed about Dr. Martindale's retraction of all of his diagnoses. Mr. Mason testified that "[Dr. Martindale] cashed every check that I ever gave to him for this particular purpose [i.e., diagnosing silicosis].... [H]e agreed to the [diagnosing] language...." (Feb. 17, 2005 Trans. at 382.) Mr. Mason explained:

> [T]he same [diagnosing] language is basically used on all the reports. I mean, Dr. Harron's reports are the same. At the time, Campbell Cherry ... faxed me this particular paragraph and I met with Dr. Martindale to discuss this paragraph. [Dr. Martindale] asked me what I thought it was about and I said, 'Basically all I know about it is, is that this is the same paragraph that we have on Ray Harron reports when he diagnoses people and they [i.e. Campbell Cherry] need a diagnosing paragraph.'
> And he said, 'Well, what do I have to have for that?'
> And I said, 'Well, you've got to have the stuff that I'm going to send to you,' which is their history, their latency, their time of exposure, which was all provided to him on the 'A' sheet.

(Feb. 17, 2005 Trans. at 383-84.) Mr. Mason, while looking at an exhibit which is attached hereto as Exhibit 19, further explained:

> A:  [W]hat [Campbell Cherry] wanted ... was that [diagnosing] language ... because ... [Dr. Martindale] was giving them a normal ILO form -- I mean, a normal X-ray narrative, basically without the [diagnosing] paragraph.
>
> Q:  Yeah, which would have just been 'consistent with,' as opposed to this ... 'reasonable degree of medical certainty' language, right?
>
> A:  Right.  And what I explained to [Campbell Cherry] when they showed it to me was, I said [Dr. Martindale] can't do that unless we provide to him their history, exposure, and all the things he needs to do a diagnosing paragraph, which we had not done in the past, but what we did do when we started to insert the paragraph.
>
> Q:  So this 'reasonable degree of medical certainty' language is coming from the lawyers?
>
> A:  This particular one, but I mean, I would say that it came from most likely Dr. Harron's report because it reads exactly the same.

(Feb. 17, 2005 Trans. at 384.)

Indeed, in reviewing the reports of the diagnosing doctors who participated in the mass screenings, the diagnosing language is remarkably similar.  Not only was Dr. Hilbun's and Dr. Cooper's diagnosing language identical to Dr. Ray Harron's, but Dr. Andrew Harron's diagnosing language was likewise identical.  (Exhibit 19, attached.)  When Dr. Oaks worked for N&M, his diagnosing language was identical to the language in Dr. Martindale's reports. (Exhibit 19, attached.)

For example, Exhibit 20 (attached hereto) contains two reports from Dr. Harron, wherein Dr. Harron diagnosed the same individual, Clarence Odem, on one date with silicosis and on another date with asbestosis (and neither report references the other).  On the asbestosis report, Mr. Odem's work history states that he worked

for the U.S. Army as a laborer from 1957-1994, during which time he was exposed to asbestos; on the silicosis report, Mr. Odem's work history states only that he worked for Ingalls as a painter from 1965-1968 (i.e., during the same period he claimed to be working for the Army), during which time he was exposed to silica.[65]  Most remarkable is that Dr. Harron based these two divergent diagnoses on the same chest x-ray--meaning the diagnoses and the inconsistent work histories originated from the same mass screening.  Two additional examples of Dr. Harron making divergent diagnoses (one asbestosis and one silicosis) for the same individual arising out of the same mass screening are attached as Exhibit 21.[66]

Overall, N&M--a small Mississippi company operated without medical oversight--managed to generate the diagnoses for approximately 6,757 MDL Plaintiffs.  To place this accomplishment in perspective, in just over two years, N&M found 400 times more silicosis cases than the Mayo Clinic (which sees 250,000 patients a year) treated during the same period.  (Feb. 18, 2005 Trans. at 230.)  Furthermore, when comparing the names of the approximately

[65]  These reports were produced for the O'Quinn firm, which, in most instances, took the work histories of the clients.  N&M, according to Mr. Mason, "would just verify that information with the client."  (Feb. 17, 2005 Trans. at 400.)

[66]  All of the silicosis reports were addressed to the O'Quinn firm at 440 Louisiana Ave. in Houston, while all of the asbestosis reports were addressed to Foster & Harssema, also at 440 Louisiana Ave. in Houston.  Mr. Mason explained that the same law firm "had two sets of lawyers ... for this particular thing--one to handle their silica exposure, one to handle their asbestos exposure."  (Feb. 17, 2005 Trans. at 400.)

6,757 N&M-generated MDL Plaintiffs with the names in the Manville Personal Injury Settlement Trust (a trust established for asbestos claims after the Johns-Manville Corporation bankruptcy[67]), at least 4,031 N&M-generated Plaintiffs have also made asbestosis claims. (N&M Ex. 38.)  The magnitude of this feat becomes evident when one considers that many pulmonologists, pathologists and B-readers go their entire careers without encountering a single patient with both silicosis and asbestosis.  See Feb. 18, 2005 Trans. at 89-90, 263-64; Friedman Ex. 2; see also Dr. David Weill, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 4 (Feb. 3, 2005); Dr. Theodore Rodman, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 2 (Feb. 2, 2005).  Stated differently, a golfer is more likely to hit a hole-in-one than an occupational medicine specialist is to find a single case of both silicosis and asbestosis.  N&M parked a van in some parking lots and found over 4,000 such cases.

### E.   Dr. Ray Harron

In 1995, at the age of 63, Dr. Harron "kind of gave up real medicine and [he has] just been doing this pneumoconiosis work." (Feb. 16, 2005 Trans. at 259-60.)  From 1995 until the present, Dr. Harron has worked exclusively for plaintiffs' lawyers, reading x-rays and diagnosing asbestosis and silicosis for use in litigation. (Feb. 16, 2005 Trans. at 258-60.)  Specifically, all of Dr.

---

[67]   See generally http://www.mantrust.org.

Harron's "pneumoconiosis work" has been for N&M. (Feb. 16, 2005 Trans. at 277.) From 1995 through approximately 2000, Dr. Harron's work for N&M focused on asbestosis cases. (Feb. 16, 2005 Trans. at 279.) Beginning in 2001, his focus shifted to silicosis cases. (Feb. 16, 2005 Trans. at 279-80.)

Dr. Harron testified as follows about his diagnosing process:

> [I]f there's a history of exposure with some latency and then I've got an x-ray, then I can tie it together and say 'within a reasonable degree of medical certainty' this individual has whatever pneumoconiosis I think it is. And 'within a reasonable degree of medical certainty,' it is my understanding that all the lawyers on both sides of this room agree means better than a 50 percent chance that this is what the diagnosis is. It's not a diagnosis the way a treating physician would have to make a diagnosis....

(Feb. 16, 2005 Trans. at 267-68.) Dr. Harron explained that based upon diagnoses "to a reasonable degree of medical certainty," he would not "put [the clients] on drugs, do radiation therapy, put radium in them, [or] refer them to a surgeon for some kind of invasive work." (Feb. 16, 2005 Trans. at 308.) Stated differently, Dr. Harron believes "it's a legal standard and not a real diagnosis."[68] (Feb. 16, 2005 Trans. at 268.)

_____

[68] Dr. Harron is correct that it is a legal standard. The Mississippi Supreme Court has stated that "[a] medical expert need not testify with absolute certainty." Stratton v. Webb, 513 So.2d 587, 590 (Miss. 1987). In Stratton, the defendants argued that the plaintiff had not provided the appropriate medical expert testimony to satisfy causation requirements because the medical expert had testified that he could not positively state the cause of the plaintiff's medical condition. See id. at 589. However, the expert testified that the plaintiff had back problems following her accident and felt the injury was related to the accident. See id. at 590. In finding that there was

Dr. Harron testified that he did not agree with the language in his reports about him relying upon the results of a physical examination in making his diagnosis; but N&M asked him to place that language in his reports and he "capitulated". (Feb. 16, 2005 Trans. at 281-82.)

Dr. Harron also testified that, "I don't take the history; it's given to me...." (Feb. 16, 2005 Trans. at 267, 282.) Instead, Dr. Harron believed that the law firms or N&M took the client's history, or at least he understood that "a medical person is not taking the history." (Feb. 16, 2005 Trans. at 282, 295.) He testified that all he needs to make a diagnosis, in terms of exposure history, is a simple statement, such as, "I was exposed 20 years ago to silica." (Feb. 16, 2005 Trans. at 304-05.) However, he did testify that, "[i]f [the history is] not reliable ... then I have to retract the diagnosis." (Feb. 16, 2005 Trans. at 282-83.)

Dr. Harron also testified that he did not agree that one of the criteria for the diagnosis of silicosis is the absence of any good reason to believe that the positive radiographic findings are the result of some other condition. (Feb. 16, 2005 Trans. at 324-25.) This opinion is contradicted by all of the major textbooks in

---

sufficient causation evidence to sustain the verdict, the court stated that the expert's "testimony, taken as a whole, sufficiently established a reasonable medical certainty that the accident caused the injuries." Id.; see also Blake v. Clein, — So.2d ——-, 2005 WL 774905, *17 (Miss., April 7, 2005) (same).

the field, as well as by the testimony of the other physicians at the hearing. (See, e.g., Hans Weill, et al., Silicosis and Related Diseases, in OCCUPATIONAL LUNG DISORDERS 286 (3rd ed. 1994); Daniel E. Banks, Silicosis, in TEXTBOOK OF OCCUPATIONAL AND ENVIRONMENTAL MEDICINE 380-81 (2nd ed. 2005); Feb. 16, 2005 Trans. at 353-54 (Dr. Segarra).) Indeed, even the Plaintiffs' briefing contradicts Dr. Harron's opinion. (Pls.' Informational Br. Regarding Diagnosis Silicosis at 2.)

The importance of excluding other conditions which might have caused the positive radiographic findings can be illustrated by the case of Plaintiff Donald Connell. Dr. Harron testified that based upon his ILO form for Mr. Connell, Mr. Connell displayed radiographic findings consistent with coal worker's pneumoconiosis, silicosis, asbestosis and/or berylliosis. (Feb. 16, 2005 Trans. at 328.) According to Dr. Harron's report which diagnosed silicosis, Mr. Connell worked at Peabody Coal Company. (Feb. 16, 2005 Trans. at 328.) Despite the fact that Mr. Connell presumably would have been exposed to coal while working at a coal company, thus making coal worker's pneumoconiosis an obvious explanation for the positive radiographic findings, Dr. Harron diagnosed only silicosis. Dr. Harron supposed this was because N&M had provided him with an A-sheet indicating exposure to silica. (Feb. 16, 2005 Trans. at 329-30.) However, the N&M A-sheet did not ask about exposure to coal, presumably because the sheet was produced only

for silicosis and asbestosis litigation.  (Feb. 16, 2005 Trans. at 330.)  An example of an A-sheet is attached as Exhibit 16.[69]

Dr. Harron testified that his only involvement in these cases was to complete the ILO forms.  He trusted his secretaries, a typing company, N&M, and perhaps others, to "prepare [his] reports, stamp [his] name on them and send those reports out without [him] editing or reviewing them."  (Feb. 16, 2005 Trans. at 285-87.)  Dr. Harron also testified that he did not dictate his reports, but he instead trusted the secretaries/typists to know how to "translate [the ILO form] into English."  (Feb. 16, 2005 Trans. at 289-90.)  He did this despite the fact that none of them had any medical training, with the exception of one typist who had been an x-ray technician.  (Feb. 16, 2005 Trans. at 290.)  In other words, in every one of the approximately 6,350 reports (2,600 of which were diagnosing reports and the remainder were B-read reports) purportedly issued by Dr. Harron, Dr. Harron failed to write, read, or personally sign the actual report.  (Feb. 16, 2005 Trans. at 285-90, 300, 317.)

Dr. Harron testified about the case of Plaintiff Barry Barrett.  On August 18, 2001, Dr. Harron read Mr. Barrett's x-ray

---

[69]  Unfortunately, Mr. Connell's A-sheet was missing.  Dr. Harron repeatedly was constrained in answering questions about his diagnoses because he kept no records for his litigation work. All of the materials he used and produced were sent to N&M. (Feb. 16, 2005 Trans. at 299, 318.)  N&M and/or the Plaintiffs' lawyers involved only produced a handful of the A-sheets for the 6,350 Plaintiffs that Dr. Harron diagnosed in this MDL.  (Feb. 16, 2005 Trans. at 300.)

and completed an ILO form, attached hereto as Exhibit 22.  Through some manner that Dr. Harron did not explain, this single ILO form became the basis of two separate diagnosing reports for Mr. Barrett.  One of the reports, attached as Exhibit 22, states that "I feel within a reasonable degree of medical certainty, Barry Barrett has asbestosis."  The other report, also attached as Exhibit 22, states that "I feel within a reasonable degree of medical certainty, Barry Barrett has silicosis."  Neither report references the other report or the other report's diagnosis.  Dr. Harron explained that the typist[70] would have seen the "S" primary opacity box checked and would have interpreted this as consistent with asbestosis.  (Feb. 16, 2005 Trans. at 292.)  This would have prompted the typist to produce the report diagnosing asbestosis. (Feb. 16, 2005 Trans. at 294.)  Dr. Harron further explained that the typist would have seen the "P" secondary opacity box checked and interpreted that as consistent with silicosis, prompting the report diagnosing silicosis.  (Feb. 16, 2005 Trans. at 292-94.) Dr. Harron testified that other diseases also could have been consistent with these opacities, but the typist selected asbestosis and silicosis, respectively.  (Feb. 16, 2005 Trans. at 293-94.) This situation was not confined to the case of Mr. Barrett.  (Feb.

---

[70]  Based upon the initials at the bottom of the diagnosing reports, the typist was not Dr. Harron's long-time secretary or the former x-ray technician on his staff, but he supposed it was "translate[d]" by an unidentified member of "a stable of ... secretarial help [on the second floor of his office building] ... that is always looking for extra work."  (Feb. 16, 2005 Trans. at 289-90, 322.)

16, 2005 Trans. at 320-22 (detailing the identical situation with respect to Plaintiff James Curtis).)

Dr. Gary Friedman,[71] an occupational medicine specialist and professor at the University of Texas, testified about Dr. Harron's practice of allowing a secretary to transform the markings on the ILO form into a diagnosing report and then stamp his signature without review.  Dr. Friedman said that this does not remotely resemble reasonable medical practice.  (Feb. 18, 2005 Trans. at 249.)  He continued: "I've been a B-reader.  I've taught B-reading. I don't know of anything that implies that the B-reading system can be used by--interpreted by people other than physicians."  (Feb. 18, 2005 Trans. at 249.)  Later, Dr. Friedman called the practice "disgraceful"; Dr. Segarra called it "distressing".  (Feb. 16, 2005 Trans. at 365; Feb. 18, 2005 Trans. at 265.)

Dr. Harron was involved in the diagnosis of approximately 6,350 Plaintiffs in this MDL (by performing B-reads and/or producing diagnosing reports), and he is listed as the diagnosing physician for approximately 2,600 Plaintiffs.[72]  (Feb. 16, 2005

---

[71]  Dr. Friedman was hired by the Defendants to testify at the Daubert hearings.  However, it is worth noting that in the 23 years Dr. Friedman has consulted in medical/legal matters, 90-95 percent of his work has been for plaintiffs' lawyers.  (Feb. 18, 2005 Trans. at 216-17.)  Indeed, Dr. Friedman is currently employed in other cases by many of the Plaintiffs' lawyers in this MDL.  (Feb. 18, 2005 Trans. at 216-17.)

[72]  After Dr. Martindale withdrew his 3,617 diagnoses, Plaintiffs proposed to substitute each of Dr. Martindale's diagnoses with one from Dr. Harron.  (Feb. 16, 2005 Trans. at 317.)  Whether these were cases where Dr. Harron had already

Trans. at 300, 317.)  Of all the MDL Plaintiffs who submitted diagnoses, Dr. Harron performed approximately 78 percent of the B-reads.  (Defs.' Ray Harron Ex. 19.)

When the Defendants cross-referenced the documents produced in this MDL with the documents in the Manville Trust (a trust established for asbestos claims), they discovered instances where Dr. Harron performed a B-read for someone in connection with an asbestosis claim, and then later read the same person in connection with a silicosis claim in this MDL.  For example, in 1994, Dr. Harron completed an ILO form for Clarence Kimble in connection with asbestos litigation.  On that ILO form, attached as Exhibit 23, Dr. Harron found "S" and "T" opacities or scars on all zones of Mr. Kimble's lungs, consistent with asbestosis.[73]  (Feb. 16, 2005 Trans. at 333.)  These scars are permanent; according to Dr. Harron, people "with those fibers and scars in their lungs were going to their grave with them."  (Feb. 16, 2005 Trans. at 333-34.)

In 2002, Mr. Kimble was x-rayed again, this time in connection with the current silicosis litigation.  Dr. Harron again read Mr. Kimble's x-ray and completed an ILO form, attached as Exhibit 23. This time, Dr. Harron determined that Mr. Kimble's lungs had uniform "P" opacities or scars, consistent with silicosis.  As

---

produced diagnosing reports which just had not been used, or whether Plaintiffs were proposing that Dr. Harron would perform the diagnoses anew, was not made clear.

[73] As discussed _supra_, "S" and "T" opacities are linear or irregular opacities.  _See generally_ Exhibit 9, attached hereto.

discussed above, such opacities are rounded, and are unlikely to be confused with the "S" and "T" opacities that Dr. Harron previously reported in Mr. Kimble.  When asked about Mr. Kimble's case, Dr. Harron ascribed it to "intra-reader variability."[74]  (Feb. 16, 2005 Trans. at 334.)

When confronted with another example of a complete reversal on his part, this time in the case of Plaintiff Cora Lee Rodgers (whose 1995 asbestosis ILO form and 2002 silicosis ILO form are attached as Exhibit 24), Dr. Harron again invoked intra-reader variability, and also speculated that the x-ray film could have been shot lighter in the case of the silicosis screens (which apparently might have brought out the opacities in the upper lungs, where silicosis generally is present).[75]  (Feb. 16, 2005 Trans. at 337-40.)

When presented with his own prior testimony that inter-reader variability (i.e., the variability between two different readers, rather than between the same reader) should be approaching zero, Dr. Harron agreed that his switch in the cases of Ms. Rodgers and Mr. Kimble is "about as wide[] [a] variance as you can get."  (Feb. 16, 2005 Trans. at 343.)  He then stated that the reversals are: "a

---

[74]  As discussed _supra_, "intra-reader variability" is the phenomenon of the same reader reading the same film differently on different occasions.  (Feb. 16, 2005 Trans. at 334.)

[75]  Dr. Harron testified that he does not supervise the protocol for shooting the x-rays, so he does not know how any of the x-rays were shot.  (Feb. 16, 2005 Trans. at 341.)

real problem and I'd like to see the film.  Whether I could explain it or not, I don't know."[76]  (Feb. 16, 2005 Trans. at 343.)

Just as the Defendants prepared to introduce a packet of eight more identical asbestosis/silicosis reversals by Dr. Harron, Dr. Harron stated to the Defendants' attorney, "if you're accusing me of fabricating these things, I think that's a serious charge." (Feb. 16, 2005 Trans. at 344.)  When the Court responded that the Defendants seemed to be making that accusation--and defense counsel agreed--Dr. Harron asked for representation.  (Feb. 16, 2005 Trans. at 344-45.)  The Court ended his testimony at that point in order to allow Dr. Harron to hire an attorney.  (Feb. 16, 2005 Trans. at 344-46.)  The eight additional sets of ILO forms showing the same reversals by Dr. Harron were admitted.  (Defs.' Ray Harron Exs. 11-18.)

Finally, the Defendants offered, and Plaintiffs have not disputed, a chart showing all of the Plaintiffs in this MDL who were read by Dr. Harron for silicosis, and who also have an asbestosis claim in the Manville Trust based upon a prior B-read by Dr. Harron.  This chart, attached as Exhibit 25, shows that after December 31, 2000 (when N&M changed its focus from asbestos to silica litigation), Dr. Harron found "P", "Q" and "R" opacities (consistent with silicosis) in 99.69% of the 6,350 B-reads he

---

[76] Unfortunately, since the x-rays had not been produced, the x-rays could not be examined.

performed for MDL Plaintiffs.[77]  But prior to December 31, 2000 (when N&M was focused on asbestos litigation), Dr. Harron performed B-reads on 1,807 of the same MDL Plaintiffs for asbestos litigation, and he found some combination of only "S", "T" and/or "U" opacities (consistent with asbestosis but not silicosis) 99.11% of the time.  In short, when Dr. Harron first examined 1,807 Plaintiffs' x-rays for asbestos litigation (virtually all done prior to 2000, when mass silica litigation was just a gleam in a lawyer's eye), he found them all to be consistent only with asbestosis and not with silicosis.  But upon re-examining these 1,807 MDL Plaintiffs' x-rays for silica litigation, Dr. Harron found evidence of silicosis in every case.[78]  This volume of reversals, according to Dr. Segarra (another Plaintiffs' expert) and Dr. Friedman, simply cannot be explained as intra-reader

---

[77]  Most of Dr. Harron's "consistent with silicocis" B-reads (i.e., finding "P", "Q" or "R" as the primary and/or secondary opacity), contain a primary or secondary opacity reading which may also be consistent with asbestosis (i.e., an "S", "T" or "U" reading).  However, none of his silicosis reports mention asbestosis.

[78]  Most of Dr. Harron's "consistent with silicocis" B-reads (i.e., finding "P", "Q" or "R" as the primary and/or secondary opacity), contain a primary or secondary opacity reading which may also be consistent with asbestosis (i.e., an "S", "T" or "U" reading).  Therefore, because it is possible that some of Dr. Harron's B-reads for this silicosis litigation may have been consistent with both silicosis and asbestosis, some of these B-reads may have not been complete reversals, or, "about as wide[] [a] variance as you can get" (Feb. 16, 2005 Trans. at 343), but they are nonetheless major reversals; this is because, in the words of Dr. Segarra, "you're crossing over on the ... small opacity from an irregular to a rounded one."  (Feb. 17, 2005 Trans. at 13.)  Moreover, none of his silicosis reports mention asbestosis.

variability.[79]  (Feb. 17, 2005 Trans. at 15; Feb. 18, 2005 Trans. at 298.)

As discussed above, Dr. Harron's testimony during the first day of the <u>Daubert</u> hearings abruptly ended when the Court granted his request for time to obtain counsel.  Although the parties said they expected to re-call Dr. Harron the following day, Dr. Harron, now represented by an attorney, did not re-take the witness stand.

**F.    Dr. Andrew Harron**

Dr. Andrew Harron is a radiologist and certified B-reader who diagnosed approximately 505 MDL Plaintiffs for N&M.  (Feb. 18, 2005 Trans. at 146-47, 163-64; A. Harron Ex. 35.)  He attended the N&M screenings and acted as the diagnosing doctor on the days when his father, Dr. Ray Harron, was unavailable.  (Feb. 18, 2005 Trans. at 147-48.)  Dr. Andrew Harron testified that his diagnosing process at the screenings was the same as his father's.  (Feb. 18, 2005 Trans. at 148-51.)  Like his father, he received his work and exposure history from N&M, then he took an abbreviated medical

---

[79]  Specifically, Dr. Segarra testified that acceptable intra-reader variability is having the same reader read the same film identically 75-80 percent of the time.  (Feb. 17, 2005 Trans. at 14.)  And "of the 20 to 25 percent that are different most of the changes should be minor.  You can have a couple that are totally different, that happens because medicine is not an exact science and people are human, but they shouldn't all be complete changes from irregular to rounded or rounded to irregular."  (Feb. 17, 2005 Trans. at 14.)  Meanwhile, Dr. Friedman testified that a 10 percent intra-reader variability rate can be expected.  (Feb. 18, 2005 Trans. at 298.)

history and he performed an abbreviated physical examination. (Feb. 18, 2005 Trans. at 151.)

Dr. Andrew Harron also followed the same "transcription" process employed by his father--whereby secretaries interpreted his marks on the ILO form and drafted diagnosing reports and stamped his signature. (Feb. 18, 2005 Trans. at 154-55.) Like his father, he never saw or read any of the reports purportedly written and signed by him. (Feb. 18, 2005 Trans. at 155-57.)

## G.    Dr. Ballard

Dr. James Ballard, a radiologist and certified B-reader practicing in Alabama, performed 1,444 B-reads on Plaintiffs in this MDL, in conjunction with RTS screenings.[80] (Feb. 18, 2005 Trans. at 15, 29-31; Ex. 4.) He actually issued the diagnoses for approximately 120 Plaintiffs. (Feb. 18, 2005 Trans. at 17.) However, he did not perform physical examinations, or take medical or exposure histories, for any of the Plaintiffs. (Feb. 18, 2005

---

[80]  Although Dr. Ballard was not licensed to practice medicine in Mississippi, he traveled with RTS to Mississippi and read x-rays in the course of screens. (Feb. 18, 2005 Trans. at 37-38.)  The issue of whether Dr. Ballard's or RTS's activities constituted the unauthorized practice of medicine for the purpose of the State of Mississippi is not before this Court.  However, upon remand, if Plaintiffs persist in basing their silicosis claims on diagnoses founded on Dr. Ballard's B-reads, then this issue may be relevant.  (See generally Feb. 18, 2005 Trans. at 37-43.)

Trans. at 31-32.)  Dr. Ballard charged RTS $45 per B-read, and $60 per B-read when he traveled.[81]  (Feb. 18, 2005 Trans. at 32.)

The Defendants asked Dr. Ballard about the case of Plaintiff Angelean Ball.  Dr. Ballard read the same chest x-ray of Ms. Ball on two separate occasions, once in the context of asbestos litigation and once in the context of silica litigation.  When he reviewed the x-ray for asbestos litigation, he found the presence of irregular "S" and "T" opacities in the lower lung zones, as well as extensive pleural thickening,[82] all consistent with asbestosis. See ILO form and Report, attached as Exhibit 26.  When he reviewed the same x-ray for the present silica litigation, Dr. Ballard found rounded "P" and "Q" opacities in all zones and found no pleural thickening at all.  See ILO form and Report, attached as Exhibit 27.  When presented with this complete reversal, Dr. Ballard posited that "the films could be mixed up," meaning that he in reality was not reading the same film.  (Feb. 18, 2005 Trans. at 49-52.)  He further stated that "it would be difficult for [him] to stand by the diagnosis for either one right now."  (Feb. 18, 2005 Trans. at 49.)

---

[81]  Thus, for the B-reads Dr. Ballard performed for cases in this MDL, he was paid approximately $66,000.  He testified that in 2002 and 2001, he was paid approximately $1 million for performing B-reads in asbestos litigation.  (Feb. 18, 2005 Trans. at 33.)

[82]  Dr. Ballard found her pleural thickening to be the most extensive category on the ILO form--a category "3", meaning the pleural plaques were visible on more than half of the length of the chest.  (Feb. 18, 2005 Trans. at 45-46.)

The Defendants then presented twelve additional examples of Dr. Ballard making a similar complete asbestosis/silicosis reversal. (Ballard Exs. 21-44.) The Defendants also presented additional examples of complete asbestosis/silicosis reversals when Dr. Ballard read the film for the silica litigation and another B-reader (usually Dr. Harron) read the film in the asbestos litigation. (Ballard Exs. 45-54.)

Dr. Ballard testified that "either ... the testing service or the law firm" provided him with the work history for the clients. (Feb. 18, 2005 Trans. at 56.) This "work history" amounted to a simple statement from the lawyers or RTS that there "is exposure history that's consistent with asbestosis." (Feb. 18, 2005 Trans. at 56.) This meant to Dr. Ballard that the lawyers and/or RTS "want[ed] [Dr. Ballard] to look for asbestosis." (Feb. 18, 2005 Trans. at 56.) Dr. Ballard acknowledged that this "could sway" his reading. (Feb. 18, 2005 Trans. at 58.) Specifically, he explained:

> [I]f you've got somebody that you have history of exposure to asbestos, or if they say read for asbestosis, and you see S and T size opacities in the lower lung zone, then you would be more prone to see those. And if later you heard that they had silica exposure and you were reading for that, you would look closer for those P size opacities, because they, in the lower profusion, would be more difficult to see than the S/T's.

(Feb. 18, 2005 Trans. at 57.) Later, he again tried to explain:

> [T]hey might send me these films and say these are asbestos cases. And ... when I get the ... same film that might have been sent earlier for asbestosis, and

-94-

> they say this individual has silicosis, or silica exposure, then you might look in those upper lung zones more carefully, because those small -- P size opacities are much more difficult to see than the S/T size opacities. And you have to specifically be looking for them, particularly in the lower profusions....

(Feb. 18, 2005 Trans. at 64-65.)

Moreover, in viewing all of Dr. Ballard's 1,444 positive B-reads in this MDL, one would expect a fairly wide range of profusions between "1" (being the least severe) and "3" (being the most severe). As noted above, and as written on the ILO form, positive profusion findings are written from "1/0" (i.e., the B-reader believes it is a "1" but considered classifying it as a "0", meaning normal) to "3/+" or "3/4" (i.e., the B-reader believes it is a "3" and considered the profusion more severe than a normal "3"). In this MDL, Dr. Ballard classified 1,153 Plaintiffs, or 80% of his positive B-reads, as the least severe reading of "1/0". Additionally, Dr. Ballard classified 273 Plaintiffs, or 19% of his positive B-reads, as the next least severe reading of "1/1". Dr. Ballard classified only 1% of his positive B-reads as more severe than "1/1" (13 Plaintiffs were "1/2", 3 Plaintiffs were "2/2", 1 Plaintiff was "2/3", and no Plaintiffs were "3/2", "3/3" or "3/4").

Dr. Ballard's consistency is especially remarkable because it is in the area of profusion, which normally is the area where reader variability is most likely to occur (as opposed to in opacity sizes and shapes). (Feb. 18, 2005 Trans. at 137-38.) Dr.

Parker, the former administrator of NIOSH's B-reader program had this to say on the subject of this consistency of profusion:

> What I find most stunning about the information I've seen in the last, yesterday afternoon and this morning, is the lack of reader variability, because the consistency with which these films are read as 1/0 defies all statistical logic and all medical and scientific evidence of what happens to the lung when it's exposed to workplace dust. What again is stunning to me is the lack of variability. This lack of variability suggests to me that readers are not being intellectually and scientifically honest in their classifications.

(Feb. 18, 2005 Trans. at 81-82.)  Dr. Parker elaborated:

> If I have a population in which there's general agreement that they have silicosis, I would be stunned to find almost all of the readings to be 1/0.  I would expect there to be a range of distributions of profusion.  The system would not expect a reader to be that consistent.  In fact, that very consistency suggests that people are not being intellectually and scientifically honest.

(Feb. 18, 2005 Trans. at 83-84.)

### H.   Dr. Levy

Dr. Barry Levy diagnosed approximately 1,389 Plaintiffs in this MDL.[83]  (Defs.' Resp. PTO 27, MDL 03-1553 Docket Entry 1826, Ex. C.2.)  In making these diagnoses, Dr. Levy exhibited an extraordinary amount of faith: he did not take the occupational or

---

[83]  For the past 18 years, Dr. Levy has not been a treating physician, but instead earns his income through consulting in litigation on behalf of plaintiffs.  (Feb. 16, 2005 Trans. at 37, 41-42, 52.)  His standard billing rate is $600 per hour, and he has the option of charging $900 per hour for weekend and after-hours work.  (Feb. 16, 2005 Trans. at 42-43.)  For example, excluding his travel time, Dr. Levy billed approximately $34,000 simply to prepare for his testimony at the Daubert hearings. (Feb. 16, 2005 Trans. at 49-51.)

medical histories of any of the Plaintiffs; he did not perform the B-reads on any of the Plaintiffs; he did not perform the physical examination of any of the Plaintiffs; and he did not speak to any of the Plaintiffs or their primary care physicians. (Feb. 16, 2005 Trans. at 24, 69, 72, 111.)    Instead, he relied on other physicians' B-reads (primarily Dr. Ballard)[84] and on the work of other "physicians" whom he believed followed "the protocol that I developed for the history and physical." (Feb. 16, 2005 Trans. at 24.)  He testified that "the protocol I set up for other physicians to do physicals in this case" should take "[a]bout an hour and a half." (Feb. 16, 2005 Trans. at 72.)  Later, Dr. Levy amended this answer by stating that "some of this conceivably could have been done by a nurse or assistant asking some of the history questions in advance, but I would guess the total professional time would be in the range of about an hour, maybe an hour and [a] half." (Feb. 16, 2005 Trans. at 76.)

Despite establishing this protocol, Dr. Levy testified that he does not know if the protocol was followed.  Indeed, all of Dr. Levy's work in diagnosing the Plaintiffs occurred in his office in

---

[84]  Dr. Levy is not a B-reader and did not see any of the Plaintiffs' x-rays.  (Feb. 16, 2005 Trans. at 38, 71.)  Of Dr. Levy's approximately 1,389 diagnoses, Dr. Ballard performed the B-read on 950 and Dr. Allen Oaks (whose testimony is discussed infra) performed the B-read on 145, and numerous other physicians performed the remainder of B-reads.  (Feb. 16, 2005 Trans. at 176.)

Massachusetts--without seeing or examining any Plaintiff.[85]  (Feb. 16, 2005 Trans. at 56.)  Dr. Levy testified: "I don't know anything about the screening that the plaintiffs had.  I recognize that people had the B-readings and so forth.  I'm not familiar with what actually took place."  (Feb. 16, 2005 Trans. at 148.)

Dr. Levy testified that for the "vast majority" of Plaintiffs "[he] did a preliminary report and then a supplemental report." (Feb. 16, 2005 Trans. at 23.)  This supplemental report was done after the history and physical were performed.  (Feb. 16, 2005 Trans. at 25.)  In these cases (as in virtually all of the rest), there is no evidence that any of the Plaintiff's histories were taken by a physician or other medically-trained individual, as supposed by Dr. Levy's protocol.

Moreover, the claimed thoroughness of Dr. Levy's evaluations is belied by the speed at which he worked.  All told, Dr. Levy performed 1,239 diagnostic evaluations in 72 hours.  (Feb. 16, 2005 Trans. at 68.)  On average, Dr. Levy devoted less than four minutes to each of his diagnostic evaluations in this litigation.[86]  (Feb.

---

[85]  As was the case with Dr. Ballard, the Court need not delve into the issue of whether Dr. Levy's diagnosing of Plaintiffs who were examined in Mississippi, Texas and Alabama constitutes the unlicensed practice of medicine in those states. It is worth noting that Dr. Levy has considered the issue, and his "conclusion was that I was not practicing medicine, that I was providing diagnostic information in the context of medical/legal consultation."  (Feb. 16, 2005 Trans. at 56-57.)

[86]  Dr. Levy testified that excluding the 379 people who did not have a sufficient exposure to silica (and therefore could be evaluated quickly), he spent an average of about five minutes on

16, 2005 Trans. at 68.)  Of this time, he spent approximately one minute per report reviewing the report for accuracy.  (Feb. 16, 2005 Trans. at 84-85.)  The brevity of his mass diagnoses is in stark contrast to Dr. Levy's work in the single-plaintiff state-court case of <u>McBride v. Clark Sand Company</u>, when Dr. Levy devoted 17.6 hours and his assistant spent 46 hours diagnosing the plaintiff with silicosis.  (Feb. 16, 2005 Trans. at 70-71.)

An example of a report prepared by Dr. Levy is attached as Exhibit 28.[87]  The report concerns Plaintiff Samuel Fontaine, who apparently claimed he "was exposed to free crystalline silica from 1967 to 1995 as a teacher who worked around sandblasting for Rosedale Elementary Jr. High in Rosedale, Mississippi."  As indicated above, Dr. Levy did not speak to the Plaintiff or supervise the taking of the exposure history, but merely trusted that whomever took the history was a physician who followed his "protocol."  This protocol included an explicit instruction that anyone who "worked around sandblasting," as Mr. Fontaine purportedly did for 27 years while teaching elementary school, must have "worked in the immediate proximity of sandblasting."  (Feb. 16, 2005 Trans. at 94.)

------

his diagnostic evaluations.  (Feb. 16, 2005 Trans. at 67-69.)  By comparison, Dr. Segarra and Dr. Friedman each testified that they spend in excess of an hour to diagnose a patient with silicosis. (Feb. 16, 2005 Trans. at 366; Feb. 18, 2005 Trans. at 253.)

[87]  The information contained in Exhibit 28 represents all of the information Dr. Levy had when he made his diagnosis. (Feb. 16, 2005 Trans. at 111.)

Dr. Levy testified that in the case of Mr. Fontaine, he was able to satisfy the third diagnostic criteria for silicosis (i.e., the absence of any good reason to believe that the radiologic findings are due to some other disease) because:

> [t]here's no indication on the reading of the B-reading which is shown here or in the -- there was no plural thickenings, no plural plaques. The B-reader, Dr. Ballard, didn't indicate anything about asbestosis. There's no indication of asbestosis exposure or coal dust or beryllium, for that matter. I excluded those to any reasonable probability; that is, it satisfied the criterion of the absence of any information to conclude that it was a different dust disease of the lung.

(Feb. 16, 2005 Trans. at 101; see also Feb. 16, 2005 Trans. at 111 (emphasizing the "B-reading that did not show any evidence of Asbestosis disease").) Unfortunately, Dr. Levy testified prior to Dr. Ballard, and thus could not respond to Dr. Ballard's testimony that he ignored evidence of asbestosis when he was asked to read x-rays for silica litigation. Indeed, Dr. Levy was not aware that any of the Plaintiffs he diagnosed, including the 950 which were based on Dr. Ballard's B-reads, had ever also been diagnosed with asbestosis. (Feb. 16, 2005 Trans. at 180.)

In the case of Mr. Fontaine, Dr. Levy testified that he excluded other diseases which might have produced Mr. Fontaine's radiographic findings by looking to statistics about the geographic distribution of different diseases:

> The next category is infectious diseases and the ones to consider there are Miliary Tuberculosis, as well as fungal diseases, such as histoplasmosis and coccidioidomycosis. It turns out that coccidioidomycosis

-100-

in this country is a disease primarily in California and
Arizona....   And there's just a handful in the most
recent year from CDC of 2002 in which they reported 3900
cases nationwide, 3800 of those were from California and
Arizona with a scattering of cases elsewhere.  No cases
were reported from Mississippi....  If he was seen by his
treating     physician--and    I'm    not    a    treating
physician--that     physician    might    have    reported
[coccidioidomycosis] ... to the public health authorities
in    the    State    where    the    person    is    resident....
Tuberculosis, Histaplasmosis are unlikely.  I considered
those diagnoses.  Tuberculosis, for example, occurs at
the rate of five per 100,000; Mississippi, only one to
three  percent  of  Tuberculosis  cases  are  Malarial
Tuberculosis....  [As  for  the  rate  of  occurrence  of
Histaplasmosis in the Mississippi Delta,] I don't [know]
the exact number.  I know it's a part of the country
where   Histaplasmosis   does,   indeed,   occur.     So,
Histaplasmosis is a possibility but again, weighing the
likelihood of; is Silicosis more likely in a person with
20  plus  years  exposure  --  at  least,  intermittent
sandblasting without evidence of respiratory protection
who has a positive B reading versus the possibility of
undiagnosed Histaplasmosis; I think -- and it was my
judgment in this case -- that Silicosis is a much more
likely probability.

(Feb. 16, 2005 Trans. at 101-05.)

Dr. Levy may be correct that it is customary medical practice

to exclude certain diseases and conditions based on official

statistics about the geographic distribution of a disease.

However, as alluded to by the nationwide silicosis statistics set

out supra, the same principle virtually mandates the conclusion

that the vast majority of silicosis diagnoses in this MDL are

erroneous.

One obvious problem with these diagnoses (which certainly is

not confined to, or even best exemplified by, Dr. Levy's diagnoses)

is repeatedly referenced in Dr. Levy's academic writings on the

-101-

diagnosis of silicosis.    Dr. Levy has written that "the proper

diagnosis of silicosis ... depends critically on a comprehensive

and appropriate patient history that adequately explores the

relation of the disease to the occupation."  (Feb. 16, 2005 Trans.

at 129-30.)[88]  Dr. Levy has also written a series of examples of

physicians who misdiagnosed "a work-related illness caused by a

hazardous substance" despite "a reasonable and considerable

_____

[88]  According to Dr. Levy's writings:
    The occupational history has five key parts: (A)
    description of all the patient's pertinent jobs, both
    past and present; (B) a review of exposures based by
    the patient in these jobs; (C) information on the
    timing of symptoms in relation to work; (D) data on
    similar problems among coal workers; and (E)
    information on non-work factors such as smoking and
    hobbies that may cause or contribute to disease or
    injury.
(Feb. 16, 2005 Trans. at 134-35.)  Dr. Levy has also explained
that in taking an occupational history, "[t]he number of hours
per day and days per year [of exposure to silica] is an important
piece of information."  (Feb. 16, 2005 Trans. at 144.)
    Moreover, an occupational history is important not only to
determine the exposure of an individual to silica, but also to
attempt to determine the dose.  "Exposure" means to be in close
proximity or contact with a hazardous substance, whereas "dose"
means the amount of that hazardous substance--in this case,
silica--that gets into the body.  (Feb. 16, 2005 Trans. at 146.)
If a worker is exposed to silica, but does not get any silica
into his or her body, then it is not a hazardous situation.
(Feb. 16, 2005 Trans. at 146.)  Hence, questions about dosage are
also important.  As Dr. Levy has written:
    Equally pertinent, when asking about exposures ..., the
    physician should ask questions such as:  Does the
    ventilation system always work adequately?  Is it
    usually turned off, especially in the winter?  Do
    workers follow instructions when performing certain
    work tasks or when using personal protective equipment?
    Some physicians might be surprised at how aware workers
    are of such matters.
(Feb. 16, 2005 Trans. at 145-46.)

evaluation and diagnosis." (Feb. 16, 2005 Trans. at 131-32.) Dr. Levy's text continues:

> The facts fit together and resulted in a coherent story leading each physician to recommend a specific therapeutic and preventive regimen. In each of these cases, however, the physician made an incorrect diagnosis because of a common oversight; failure to take an occupational history.

(Feb. 16, 2005 Trans. at 132.)[89]

In virtually all of the cases presented to the Court,[90] the occupational history, to the extent one was taken at all, falls far below the standards set by Dr. Levy's writings. None of the histories Dr. Levy relied upon were taken by a physician or other medically-trained individual--instead, they were taken by the law firms or screening companies. The histories fail to include any information about dosage, or the length and intensity of exposure to silica. For example, it would be natural to inquire with Mr. Fontaine the precise circumstances under which he was exposed to airborne crystalline silica for 27 years while working in an elementary school, and, for example, with what frequency and duration "blast equipment" was used in the "immediate proximity" of

---

[89] In response to these and other quotations from his writings about the importance of taking a history, Dr. Levy responded that "[i]t is impossible to obtain a detailed occupational history on every patient seen." (Feb. 16, 2005 Trans. at 130.) While that statement may be true, that does not mean it is reasonable medical practice to not even <u>attempt</u> to take a detailed history from a patient who is available and willing to give one.

[90] One notable exception is Roosevelt Sykes, the Plaintiff diagnosed by Dr. Segarra.

his classroom.  (Ex. 28 at 5, attached.)  As another example, it might be natural to inquire with Plaintiff Robert Hart how, at the age of fifteen, he was self-employed, "hanging & finishing sheetrock" and using jack hammers and sanders.  (Levy Ex. 6 at 9.) Or a physician might ask Plaintiff Sammie Williams how, and on how many days, he was exposed to crystalline silica while working for 30 years as a piano repairman.  (Levy Ex. 7 at 5.)

When questioned about three specific cases, Dr. Levy withdrew his diagnoses for each of the cases.  In the case of Plaintiff James Hyatt, Dr. Ballard had read the x-ray as consistent with asbestosis and mixed dust disease (finding "S" and "T" opacities in the lower lungs with pleural abnormalities), yet Dr. Levy diagnosed silicosis, erroneously calling the opacities "rounded."  (Feb. 16, 2005 Trans. at 188; Dr. Levy's report is attached as Exhibit 29.) When presented with a 2001 report prepared by Dr. Segarra diagnosing Mr. Hyatt with asbestosis (attached as Exhibit 30), Dr. Levy withdrew his diagnosis.  (Feb. 16, 2005 Trans. at 199-200.) Likewise, Dr. Levy withdrew his diagnosis of Plaintiff Donny Weaver when he realized he relied upon an erroneous report by the B-reader, Dr. Oaks, which listed the B-read as an "S/P" ("P" being consistent with silicosis), when it was in fact an "S/S".  (Feb. 16, 2005 Trans. at 199; Levy Ex. 13.)  Dr. Levy also withdrew his diagnosis of Plaintiff Zettie Shields, which was based on a Dr. Ballard B-read consistent with silicosis, when he was presented with another B-read by Dr. Ballard of the same x-ray, this time

-104-

consistent with asbestosis. (Feb. 16, 2005 Trans. at 200-02; Levy Exs. 14 & 17.)    For the same reason (i.e., a Dr. Ballard asbestosis/silicosis reversal), Dr. Levy withdrew his diagnoses of Plaintiffs Effie Coleman and Monroe Lenoir. (Feb. 16, 2005 Trans. at 204-05; Levy Exs. 15 & 18-19.)

In summary, the following is clear: the reliability of Dr. Levy's diagnoses are dependant upon the reliability of the B-readers (primarily Dr. Ballard); Dr. Levy worked at a break-neck pace which apparently led to some errors; and his exposure and medical histories were not taken by medically-trained people and were below the standard set by his writings and his "protocol." Finally, it is clear that Dr. Levy had an agenda: diagnose silicosis and nothing else. For instance, the following exchange occurred regarding Plaintiff Sammie Orr, whom Dr. Levy diagnosed with silicosis and nothing else:

> DR. LEVY: Here's a gentleman like many other people who have both silicosis and asbestosis. ...
> Q: If he had both, why didn't you diagnose him with both?
> DR. LEVY: My job was not to make diagnoses of asbestosis.
> ....
> Q: Okay.
> THE COURT: [Your] job is not to make diagnosis of anything other than silicosis.
> DR. LEVY: Well, yes.

(Feb. 16, 2005 Trans. at 213.)

It is clear that Dr. Levy saw his role with respect to these cases as beginning and ending with litigation. In one of his

published articles, Dr. Levy advises a diagnosing physician to inform appropriate entities of the diagnosis for the good of other workers and of society:

> If a work-related illness is diagnosed, the physician can play a critical role in developing and implementing preventative measures such as educating or advising the patient, reporting the case with the patient's permission to the employer and/or the union if one exists, contacting an appropriate governmental agency if the situation dictates the need, instituting substitutions for or measures to engineer out of work place hazard and conducting further research on the problem.

(Feb. 16, 2005 Trans. at 221.)  Dr. Levy made this recommendation to physicians who diagnose a <u>single</u> work-related illness.  In this MDL, Dr. Levy diagnosed <u>1,389</u> cases of silicosis.  (Defs.' Resp. PTO 27, MDL 03-1553 Docket Entry 1826, Ex. C.2.)  Yet despite the fact that Dr. Levy has provided consulting services to NIOSH, OSHA, the CDC, the Environmental Protection Agency, and the World Health Organization--and therefore would know the proper people to call if he felt it was appropriate--he chose to notify no one but the lawyers who paid his bills:

> DR. LEVY:  My duty in this context was to assess [whether] people had silicosis and report that information to the attorneys. ...
> Q:  You have not called any agencies, Mississippi State Department of Health, OSHA in Mississippi, the Mississippi -- University of Mississippi Medical School, you've not made contact with any of those people to let them know that you have diagnosed 1200-some-odd cases of silicosis?
> DR. LEVY:  That's correct.

(Feb. 16, 2005 Trans. at 222.)

Two of Plaintiffs' other diagnosing doctors, Dr. Segarra and Dr. Coulter, testified that they would not employ the methodology employed by Dr. Levy in these cases. (Feb. 16, 2005 Trans. at 365; Feb. 17, 2005 Trans. at 64.) Dr. Friedman testified most cogently about Dr. Levy's diagnoses:

> Dr. Levy made his diagnoses in about three-and-a-half minutes, never talked to a patient, never looked at an x-ray, never ... talked to a treating physician, [and] may have only looked at a few medical records in cases that he linked. And in 72 hours, reviewed something in the range of 1200 cases, and [in] 800 ... diagnosed life-threatening illness. ... Dr. Levy ... relied on the product identification part of the work history. I don't even think it was a full work history. I mean, ... it came nowhere near meeting what his own methodology was that he spelled out. And I have both the Third and Fourth Edition of his textbooks. And in no way does it relate to that methodology.

(Feb. 18, 2005 Trans. at 250-51.)

## I.   Dr. Coulter

Dr. Todd Coulter, a general internist practicing in Mississippi, diagnosed 237 MDL Plaintiffs with silicosis. (Feb. 17, 2005 Trans. at 30, 67-68.) Dr. Coulter diagnosed these Plaintiffs as part of a contract with a screening company called Occupational Diagnostics. (Feb. 17, 2005 Trans. at 53-54.) As noted above, this company is run from a Century 21 realty office, even sharing its phone number with the real estate business. (Feb. 17, 2005 Trans. at 80-81.) On weekends, the company parked its trailer in the parking lots of restaurants and hotels. (Feb. 17,

2005 Trans. at 54, 73.)  The trailer had a portable x-ray machine and a "physician's suite."  (Feb. 17, 2005 Trans. at 55.)

Dr. Coulter became involved in the mass screens after being recruited by the owner/operator of Occupational Diagnostics.  Dr. Coulter described the recruitment process as follows:

> So [the owner of the screening company] made an appointment with me and talked to me about would I be willing to do some occupational reports for him.  Or more importantly, would I be willing to evaluate some patients?  And he explained the scope of it as that "Well, we're going to be taking chest x-rays and we're going to be looking for silicosis or something like that or whatever it was and you'll need to evaluate the patients."
>
> And I said to him, "Well, let me spend some time researching and reviewing this and then I'll decide if that's something I can do."  So I looked up something in the textbook of Internal Medicine on silicosis and found some basic information and said, well, it doesn't seem like it would be that difficult and that's why I consented.

(Feb. 17, 2005 Trans. at 72.)

All told, during eleven days of screenings, Dr. Coulter saw approximately 600 people, approximately half of whom he diagnosed with silicosis.[91]  (Feb. 17, 2005 Trans. at 75.)  By contrast, after ten years of operating his own high-volume clinic,[92] Dr. Coulter has diagnosed approximately six people with silicosis.  (Feb. 17, 2005 Trans. at 69.)  Dr. Coulter testified that he spent up to 15

---

[91]  Some of the people Dr. Coulter diagnosed are not Plaintiffs in this MDL, but are plaintiffs in cases pending in state court.

[92]  He currently averages 40-45 patients a day in his clinic.  (Feb. 17, 2005 Trans. at 69.)

minutes with each of the clients--although it is difficult to believe this was common, since given the volume of people he saw (between 50 and 60 a day), he would have had to work 15-hour days with no breaks.  (Feb. 17, 2005 Trans. at 98.)

Dr. Coulter testified that he took thorough histories from the Plaintiffs, although thorough histories are not reflected on his reports.  (An example of one of Dr. Coulter's reports is attached as Exhibit 31.)  He stated that the exposure histories and occupational histories were written on forms provided by, and then returned to, the screening company.[93]  (Feb. 17, 2005 Trans. at 104-08.)  Although Dr. Coulter is not a B-reader, he testified that he reads x-rays as a part of his normal practice and he does not feel that he needs to use an ILO form to render a diagnosis.  (Feb. 17, 2005 Trans. at 34, 55.)

Dr. Coulter does not consider the Plaintiffs his patients. (Feb. 17, 2005 Trans. at 53, 105.)  As with all of the other doctors, he diagnosed Plaintiffs "to a reasonable degree of medical certainty," which is a term he would not use for diagnoses in his practice, but instead is a term he uses for litigation.  (Feb. 17, 2005 Trans. at 91.)  He testified as follows:

> A: When I utilize the term 'reasonable degree of medical certainty,' that reflects for me and only for me -- at the moment in time based upon the information that I

---

[93] These purportedly thorough histories have never been produced, despite the Court's admonition to Plaintiffs' counsel that if Plaintiffs wished to rely on those histories, they needed to be produced.  (Feb. 17, 2005 Trans. at 107-09, 117-19.)

-109-

have, this is what I come up with. ... Not excluding and not considering other potential limitations or conditions.

COURT:  Why?  Why wouldn't you be?

A:  Perhaps -- and again, I think your Honor is correct. That is an example where I am trying to think as a lawyer instead of ... consistently thinking as a doctor.

COURT:  Well, if you were thinking as a doctor, what would you be doing with this [report]?  With this information?

A:  I would confirm the diagnosis of silicosis.

COURT:  How would you be able to do that?

A:  Chest x-ray findings and certainly the exposure history.  And then considering alterative and ruling out competing other diagnoses.

(Feb. 17, 2005 Trans. at 92.)

Dr. Coulter's testimony contained a number of examples of how he relaxed his standards for the screening "clients" when compared to his clinic "patients".  In contrast to his practice at his clinic, while at the screenings, Dr. Coulter did not supervise the selection of the x-ray equipment, the selection of the x-ray operators, the setting up and operation of the equipment, or the amount of radiation to which the Plaintiffs were exposed.  (Feb. 17, 2005 Trans. at 87-88, 125.)

Moreover, after working with the screening company for "a couple of months," Dr. Coulter sought out advice from two pulmonologists to give him a "tutorial" on how to read x-rays.  (Feb. 17, 2005 Trans. at 100-01.)  Notably, he only sought out this training when he was confronted with two patients from his clinic whom he suspected had silicosis.  (Feb. 17, 2005 Trans. at 102-03.)

Finally, according to Dr. Coulter, in the context of his clinic:

> [N]o one leaves without at least a tentative diagnosis.... [W]hat people crave in the active practice of medicine, ... they crave the -- you know what we don't want is we don't want to say, 'Gosh, I spent this time with the doctor and I don't know what's going on.' People want feedback. They want communication. I think that's what's important. That's what I do.

(Feb. 17, 2005 Trans. at 49.)  By contrast, in the context of his work in the mass screenings for this litigation, he testified that unless he was specifically asked by the client, "I was not going to give people the diagnosis." (Feb. 17, 2005 Trans. at 128.)  But, "[i]f patients asked, I said: it looks like, it may be Silicosis. It looks like Silicosis. But, your lawyers will be in contact with you or whoever sent them to the testing center." (Feb. 17, 2005 Trans. at 128.)  However, when it came time to dictate the diagnosing letter to the lawyers, Dr. Coulter expressed a certainty he apparently could not muster when looking the patient in the eye. (See Exhibit 31, attached.)

Perhaps most disconcerting about Dr. Coulter's diagnoses is that every one of his 237 reports for Plaintiffs in this MDL contain the identical sentence: "There is increased prepondurance [sic] of interstitial lung tracings in lower lobes bilaterally."[94] (See, e.g., Exhibit 31, attached.)  (Not only does every report contain this sentence, but every report contains the identical

---

[94] Dr. Coulter is not a B-reader, and did not complete an ILO form for any of the Plaintiffs.

misspelling of the word, "preprondurance.")    As Dr. Coulter
conceded, "interstitial lung tracings in lower lobes" is
characteristic of <u>asbestosis</u> rather than silicosis. (Feb. 17, 2005
Trans. at 134.)  Also, in every one of Dr. Coulter's reports, two
other sentences always appeared: "On closer examination of the
bilateral lobar markings, there are multiple enhanced lucent
circular opacities.  These are disparate, and are prominent in both
PA and lateral films."  (<u>See, e.g.</u>, Exhibit 31, attached.)

In addition, 221 out of Dr. Coulter's 237 reports mention a
physical examination.  (Dr. Coulter testified that the remaining 16
reports are "incomplete in that there is no documentation of the
physical exam, but the physical exam was performed.  I performed
the physical exam on all of the patients."  (Feb. 17, 2005 Trans.
at 96.))  In every one of the 221 reports, this sentence appears:
"The physical examination is hallmarked by audible but coarse
rhonci with minimum to moderate rales on auscultation."[95]  (<u>See,
e.g.</u>, Exhibit 31, attached.)  However, Dr. Coulter could not point
to any medical text or article where it states that it is common
for silicotics to have rales or rhonci.  (Feb. 17, 2005 Trans. at
138.)

_____

[95]  According to Dr. Coulter, in laymen's terms, this means
that "[t]he lungs sounded rather junky."  (Feb. 17, 2005 Trans.
at 136.)  More specifically, "[r]honchi are sounds that resemble
snoring.  They are produced when air movement through the large
airways is obstructed or turbulent."  <u>See</u>
www.nlm.nih.gov/medlineplus/ ency/article/003323.htm.  By
contrast, "[r]ales (crackles or crepitations) are small clicking,
bubbling, or rattling sounds in the lung.  They are believed to
occur when air opens closed alveoli (air spaces)."  <u>Id.</u>

Finally, at this point, it is hardly surprising that even prior to searching through the records at the Manville Trust, out of Dr. Coulter's 237 silicosis diagnoses, at least 150 of these individuals had previously been diagnosed with asbestosis. (Feb. 17, 2005 Trans. at 148.)

### J.    Dr. Oaks

Dr. W. Allen Oaks, a radiologist and NIOSH-certified B-reader practicing part-time in Mobile, Alabama, performed B-reads on 447 Plaintiffs and diagnosed approximately 200 Plaintiffs. (Feb. 17, 2005 Trans. at 162-65, 175, 220; Oaks Ex. 4.) Despite the fact that Dr. Oaks issued 200 diagnoses, he declined to label himself as an "expert in the area of diagnosing silicosis," instead preferring only to say he was "an expert in reading x-rays." (Feb. 17, 2005 Trans. at 190.)

When reading x-rays, Dr. Oaks testified if the screening company told him to read for silicosis, that is the only disease he would mention in the report, even if he felt the x-ray was also consistent with asbestosis. (Feb. 17, 2005 Trans. at 235, 246.) Likewise, if the screening company told him to look for asbestosis, that is all he would report. (Feb. 17, 2005 Trans. at 235, 246.)

For his diagnosing work, N&M gave Dr. Oaks an x-ray and an exposure history and instructed him, "on the basis of the exposure history and the B-reading, render an opinion as to whether or not

-113-

these clients -- these patients had silicosis."[96]  (Feb. 17, 2005 Trans. at 168, 190-91.)  He was not aware of who took the exposure history or their qualifications, other than that it was provided to him by N&M.  The "history" Dr. Oaks relied upon consisted of a bare statement that the person was exposed to silica.  The "history" said nothing about the duration of the exposure, the intensity of the exposure, the nature of the exposure or whether the individual was protected (such as by wearing a mask) during that exposure. (Feb. 17, 2005 Trans. at 251.)  However, Dr. Oaks testified that "[i]t's my assumption that the doctor who does the history and physical has questioned this patient and then has summarized it [with] this statement [i.e., that the client has been exposed to silica]."  (Feb. 17, 2005 Trans. at 254.)  He further testified that his "diagnosis of silicosis is based on the assumption that there's an exposure history that meets the basic criteria."  (Feb. 17, 2005 Trans. at 256-57.)

Dr. Oaks testified that he would expect "some spread" of profusion levels among the 447 Plaintiffs whom he either diagnosed or identified as having x-rays consistent with silicosis.  (Feb. 17, 2005 Trans. at 220.)  He also testified that among a large group of people with silicosis, one would expect the disease to have progressed further (i.e., have a greater profusion) among the older people.  (Feb. 17, 2005 Trans. at 220.)  Moreover, Dr. Oaks

---

[96]  As was the case with most of the other diagnosing doctors, Dr. Oaks did not consider the Plaintiffs his patients. (Feb. 17, 2005 Trans. at 186-87.)

testified that silicosis usually begins in the upper- to mid-lung zones, although when the disease has progressed, findings can be seen in the lower zones as well.[97]  (Feb. 17, 2005 Trans. at 221.)

However, when looking at Dr. Oaks' 447 B-reads, his findings do not conform to what he (and generally-accepted medical knowledge of silicosis) would have predicted.  In the population of 447 people, Dr. Oaks reported no cases where only the upper-lung zones, or only the upper- and mid-lung zones, showed abnormalities consistent with silicosis.  (Feb. 17, 2005 Trans. at 224; Oaks Ex. 4.)  And among the 447 people, Dr. Oaks found a "1/0" profusion (the most minimal finding) 408 times and a "1/1" (the second-most minimal finding) 39 times.  (Feb. 17, 2005 Trans. at 229; Oaks Ex. 4.)  He did not find a single person to have a profusion greater than "1/1".  And he made these remarkably uniform findings despite the fact that he examined x-rays from a fairly even distribution of people between 50 and 80 years of age.  (Oaks Ex. 4.)

As recounted above with respect to Dr. Ballard, Dr. Parker (the former administrator of NIOSH's B-reader program) called this consistency of profusion "stunning", "def[ying] all statistical logic and all medical and scientific evidence of what happens to the lung when it's exposed to workplace dust."  (Feb. 18, 2005 Trans. at 81-82.)  According to Dr. Parker, "[t]his lack of variability suggests to me that readers are not being

---

[97]  If the disease advances to the lower lobes, it will also remain evident in the upper- and mid- lobes.

intellectually and scientifically honest in their classifications."
(Feb. 18, 2005 Trans. at 82.)

### K.   __Daubert__ Analysis

As discussed above, on a number of different levels, the
claims in this MDL defy all medical knowledge and logic.   The
United States has enjoyed a steady 30-year decline in silicosis
rates and mortality.   And yet Mississippi, a State ranked only 43rd
in the U.S. in silicosis mortality, recently experienced a crush of
new silicosis lawsuits, many of which are now before this Court.
As Dr. Friedman testified, there simply is no rational medical
explanation for the number of alleged diagnoses of silicosis in
this MDL.   (Feb. 18, 2005 Trans. at 221.)   That, however, does not
mean there is no explanation at all for the cases.

If searching for an explanation in the legal field, one might
focus on the fact that most of the cases were filed just prior to
the effective dates of a series of recent legislative "tort reform"
measures in Mississippi.   One might also focus on the decline in
asbestosis lawsuits, leaving a network of plaintiffs' lawyers and
screening companies scouting for a new means of support.

But the motions and concerns which prompted the __Daubert__
hearings ask the Court to focus on the _medical_ explanation for the
cases.   Two separate motions[98] ask the Court to examine the

---

[98]   __See__ Defendants' Motion to Exclude Plaintiffs' Experts,
MDL 03-1553 Docket Entry 1149; and, Defendant 3M Co.'s Mot. for
Appointment of a Technical Advisory Panel and Joinder in Defs.'

reliability of the diagnoses pursuant to Federal Rule of Evidence 702 and the analytical framework established by <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) and its progeny. Specifically, Defendants challenge the admissibility of the testimony of the following diagnosing physicians: Dr. Ballard, Dr. Cooper, Dr. Coulter, Dr. Andrew Harron, Dr. Ray Harron, Dr. Hilbun, Dr. Levy, Dr. Martindale, and Dr. Oaks.  These nine physicians issued 99 percent of the diagnoses submitted in this MDL.  (Defs.' Steering Committee's Resp. PTO 27, MDL 03-1553 Docket Entry 1826, Ex. C.2.)

### 1.    Legal Standard

"[U]nder the Rules [of Evidence] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  <u>Moore v. Ashland Chem. Inc.</u>, 151 F.3d 269, 275 (5th Cir. 1998) (en banc); <u>see also</u> Fed. R. Evid. 104(a)  ("Preliminary questions concerning ... the admissibility of evidence shall be determined by the court....").  "The primary locus of this obligation is Rule 702, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify."  <u>Id.</u>  Rule 702 provides:

> If scientific, technical, or other specialized knowledge
> will assist the trier of fact to understand the evidence
> or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion

---

Mot. to Exclude Pls.' Experts' Testimony, MDL 03-1553 Docket Entry 1145.

or otherwise, if (1) the testimony is based upon
sufficient facts or data, (2) the testimony is the
product of reliable principles and methods, and (3) the
witness has applied the principles and methods reliably
to the facts of the case.

Fed. R. Evid. 702.

Daubert provides the analytical framework for determining
whether expert testimony is admissible under Rule 702 of the
Federal Rules of Evidence. See Burleson v. Texas Dep't of Criminal
Justice, 393 F.3d 577, 583 (5th Cir. 2004). "Under Daubert, trial
courts act as gate-keepers overseeing the admission of scientific
and non-scientific expert testimony." Id. (citing Kumho Tire Co.
v. Carmichael, 526 U.S. 137, 147 (1999)). The "Daubert analysis
governs expert medical testimony." Black v. Food Lion, Inc., 171
F.3d 308, 310 (5th Cir. 1999) (citing Moore, 151 F.3d at 275 n.6);
see also Skidmore v. Precision Printing & Pkg., Inc., 188 F.3d 606,
617-18 (5th Cir. 1999) ("This so-called 'gate-keeping' obligation
applies to all types of expert testimony, not just 'scientific'
testimony.") (citing Kumho Tire Co., 526 U.S. at 147). For
example, in Skidmore, the Fifth Circuit affirmed the admitting of
a psychiatrist's testimony that the plaintiff suffered from post-
traumatic stress disorder because the doctor satisfactorily
"testified to his experience, to the criteria by which he diagnosed
[plaintiff], and to standard methods of diagnosis in his field."
Skidmore, 188 F.3d at 618.

Under Daubert, trial courts must make "a preliminary
assessment of whether the reasoning or methodology underlying the

testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93. Stated differently, "the trial judge must determine whether the expert testimony is both reliable and relevant." Burleson, 393 F.3d at 584 (citing Daubert, 509 U.S. at 589). In this MDL, there is no dispute that, as a general matter, silicosis diagnoses are relevant to Plaintiffs' claims; the issue is whether the actual proffered diagnoses are reliable.

Many factors bear on the inquiry into the reliability of expert testimony, including, but not limited to:

> (1) whether the technique in question has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the error rate of the technique; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has been generally accepted in the scientific community.

U.S. v. Hicks, 389 F.3d 514, 525 (5th Cir. 2004) (citing Daubert, 509 U.S. at 593-94). These "factors identified in Daubert form the starting point of the inquiry into the admissibility of expert testimony. However, 'the factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" Burleson, 393 F.3d at 584 (quoting Kumho, 526 U.S. at 150). In addition, "whether an expert's testimony is reliable is a fact-specific inquiry." Burleson, 393 F.3d at 584 (citing Skidmore, 188 F.3d at 618). "The inquiry authorized by Rule 702 is a flexible one; however, a scientific opinion, to have

evidentiary relevance and reliability, must be based on scientifically valid principles." Moore v. Ashland Chem. Inc., 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

The party proffering the expert testimony has the burden of "demonstrat[ing] that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable." Id. The issue under Daubert is not whether the expert's opinion is correct; the issue is only whether it is reliable. See id. ("The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable.") (citations omitted). This reliability inquiry "requires some objective, independent validation of the expert's methodology. The expert's assurances that he has utilized generally accepted scientific methodology is insufficient." Id. (citation omitted). And in making the reliability inquiry, it is the district court's responsibility "to make certain that an expert ... employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho, 526 U.S. at 152; see also Burleson, 393 F.3d at 584 (same).

In applying these standards to the diagnoses in this MDL, the Court will first focus on each of the three accepted criteria for diagnosing silicosis. A diagnosis requires (1) an adequate exposure to silica dust with an appropriate latency period, (2) radiographic evidence of silicosis, and (3) the absence of any good

reason to believe that the radiographic findings are the result of some other condition (i.e., a differential diagnosis).[99]   (See, e.g., Pls.' Informational Br. Regarding Diagnosis Silicosis at 2 (citing Hans Weill, et al., Silicosis and Related Diseases, in OCCUPATIONAL LUNG DISORDERS 286 (3rd ed. 1994); Daniel E. Banks, Silicosis, in TEXTBOOK OF OCCUPATIONAL AND ENVIRONMENTAL MEDICINE 380-81 (2nd ed. 2005)); Feb. 16, 2005 Trans. at 353-54.)   As discussed above, these three criteria are universally accepted, as demonstrated by learned treatises and experts in the field.  It is the implementation of these criteria in these cases which ranged from questionable to abysmal.

## 2.   Criterion 1: Sufficient Exposure

The "exposure histories" (or "work histories") were virtually always taken by people with no medical training, who had significant financial incentives to find someone positive for exposure to silica (or asbestos, depending upon which type of suit the employing law firm was seeking to file).   See Allen v. Pennsylvania Eng'g Corp. 102 F.3d 194, 197 n.3 (5th Cir. 1996) (citing with approval a case affirming the exclusion of an expert in part because "the expert's testimony 'was influenced by litigation-driven financial incentive'") (quoting Lust v. Merrell Dow Pharm., 89 F.3d 594, 597-98 (9th Cir. 1996)); see also Allison

---

[99]   All three of these steps may be bypassed with a biopsy of the patient's lung tissue which shows silicosis.  Except for Plaintiff Clark Kirkland, discussed infra, no Plaintiff alleges a biopsy diagnosis.

v. McGhan Med. Corp., 184 F.3d 1300, 1321 (11th Cir. 1999) (same).
These "histories" were devoid of meaningful details, such as the
duration and intensity of exposure, which are critical to
determining whether someone has sufficient exposure, dosage and
latency to support a reliable diagnosis.  Dr. Friedman specifically
referenced Dr. Levy and said, "I'm not sure I would consider [what
Dr. Levy relied upon] any occupational history at all."[100]  (Feb.
18, 2005 Trans. at 261.)

Mr. Mason of N&M testified that the doctors who worked for his
screening company simply relied upon the abbreviated work histories
that N&M supplied them.    These histories were taken by
receptionists with no medical training.  (An example of an N&M
"history" is attached as Exhibit 16.)   The reason for this,
according to Mr. Mason, is that "to ask the doctor to take a work
history in our field would be like asking Mr. Setter [the defense
attorney questioning him] to wash my car.  I mean it's ... very
beneath him."  (Feb. 17, 2005 Trans. at 328.)

With all due respect to Mr. Mason (who has no medical
training), experts in the field of occupational medicine do not

---

[100]  Although Dr. Levy is not the worst offender among these
screening company doctors, because of his sterling credentials
and voluminous scholarly works, his participation in this
enterprise is perhaps the most disappointing.

consider taking an occupational history to be beneath a physician.

Dr. Friedman[101] testified:

> [E]very patient that I see in our office, I take a
> history from. Now, they may have the initial history
> taken by my office nurse, who's been with me 12 or 13
> years, but I personally review the history with the
> patient and add to it and make any corrections and go
> over it and take that history myself.

(Feb. 18, 2005 Trans. at 255.) Dr. Friedman further testified that

a "detailed" occupational history is necessary for diagnosing

silicosis and it should "come from somebody trained medically to

take that kind of history." (Feb. 18, 2005 Trans. at 244-45.)

Similarly, Dr. Segarra testified that it is not appropriate

for anyone other than the physician or an agent of the physician to

take the exposure and past medical history. (Feb. 16, 2005 Trans.

at 355.) When seeing a suspected silicotic, Dr. Segarra devotes

approximately thirty minutes to taking the person's occupational

and medical histories, smoking history and physical examination.

(Feb. 16, 2005 Trans. at 366.)

Likewise, Dr. Parker testified:

> A. As a pulmonologist, to diagnose silicosis, in
> addition to the radiographic information, I would, of
> course, want to examine the patient, understand more
> about their work exposure history and more about their

---

[101] As noted supra, while Dr. Friedman was hired by the
Defendants to testify at the Daubert hearings, in the 23 years
Dr. Friedman has consulted in medical/legal matters, 90-95
percent of his work has been for plaintiffs' lawyers. (Feb. 18,
2005 Trans. at 216-17.) Indeed, Dr. Friedman is currently
employed in other cases by many of the Plaintiffs' lawyers in
this MDL. (Feb. 18, 2005 Trans. at 216-17.)

social and past medical history and current symptoms.
....
Q. And what would you want to know about their workplace
exposures?
A.    You would be interested in what was being
manufactured, what was being used, what were the
potential intensities of exposure, what were the duration
of exposure, what types of respiratory protection may
have been worn by the individual, as well as what type of
engineering controls may have been in place by the
company, corporation, employer, manufacturer, to reduce
the burden of the dust exposure in employees. You would
also be interested in their entire work history, because
it's possible that they may have had exposures even
before their current job, which may have resulted in
exposures that might explain the shadows on the
radiograph.
Q. And might explain that those shadows indeed represent
something other than silicosis. Correct?
A. That's correct.

(Feb. 18, 2005 Trans. at 92, 134.)

Correspondingly, Dr. Coulter testified about the different

lines of questioning a physician might follow when taking an

occupational history. (Feb. 17, 2005 Trans. at 43-45.) For

instance, he testified:

A: You ask more questions.... Exactly, where was it
located? What exactly is going on? You've got to be
very, very specific. The who, the what, the why, the
when, the where, the how. Were they wearing a mask?
Were they not wearing a mask? Exactly what were they
doing? .... [T]here's more to this than meets the eye.
The history has to be expansive but it also has to be
guided, if you will, by what the patient tells you. ...
We ask about social history. We ask about family
history. I ask about smoking history. Where I live on
the Gulf Coast of Mississippi I want to know about their
military history. We've got a lot of people who have
traveled all over the world. I want to know about their
-- their public health history, such as, inoculations and
immunizations. ...
Q: So in reviewing the ... information that the patient
has given you, you then sit down with a patient and flush

-124-

> that out for more information that you consider
> important?
> A:  History, history, history, yes, sir.

(Feb. 17, 2005 Trans. at 43-44.)

Finally, Dr. Levy has written that "the proper diagnosis of silicosis ... depends critically on a comprehensive and appropriate patient history that adequately explores the relation of the disease to the occupation." (Feb. 16, 2005 Trans. at 129-30.)

This type of thorough, detailed, physician-guided work/exposure history is the kind of history that experts in the field of occupational medicine insist upon when diagnosing silicosis.  It is therefore the type of history required by the Federal Rules for these diagnoses to be admissible.  Cf. Allen v. Pennsylvania Eng'g Corp., 102 F.3d 194, 198 (5th Cir. 1996) ("An additional ground for excluding the opinions lies in Federal Rule of Evidence 703, which requires that the facts on which the expert relies must be reasonably relied on by other experts in the field.").

And yet, in these cases, the "histories" are so deficient as to not even merit the label.  Some doctors pretended that this was not true, pointing to the cursory "A-sheet" and treating it as an appropriate history--in essence, refusing to acknowledge that the emperor has no clothes.  Other doctors pretended that the A-sheet was merely a distilled version of an unseen, appropriately-thorough history.  For instance, Dr. Levy and Dr. Oaks each testified that

they operated on the assumption that some other, unnamed physician conducted an appropriate history.  In Dr. Levy's case, he claimed to believe that an unknown physician was following his "protocol", which included spending 90 minutes with each patient taking a history.  In reality, no appropriate histories have been produced, and there is no reliable evidence that they ever existed.  <u>Cf. Guillory v. Domtar Indus. Inc.</u>, 95 F.3d 1320, 1331 (5th Cir. 1996) ("Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all.  Both analyses result in pure speculation.").

Instead, the evidence shows that none of the challenged experts took an occupational or exposure history.  They all relied upon a history taken by lawyers and clerks with no medical training or supervision.  The questions asked were not drafted by physicians, testifying or otherwise; indeed, the challenged physicians were not even aware of what questions were asked.

In the absence of an appropriate work/exposure history, there is no way for the diagnosing doctors to have known the potential intensities of respirable silica exposure, the duration of the exposure, information as to dosage (i.e., the types respiratory protection worn by the individual, and/or any engineering controls that were in place by the employer to reduce the amount of exposure), as well as information as to possible alternative causes of the radiographic findings (as discussed in more detail, <u>infra</u>).  The following discussion from the Fifth Circuit's opinion in <u>Allen</u>

v. Pennsylvania Engineering Corp., 102 F.3d 194 (5th Cir. 1996) is equally applicable here:

> Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case. Not only was the scientific knowledge absent, but the experts' background information concerning [plaintiff]'s exposure to [the toxic substance at issue] is so sadly lacking as to be mere guesswork. The experts did not rely on data concerning [plaintiff]'s exposure that suffices to sustain their opinions under R[ule] 703.

Id. at 199 (citing, inter alia, Christophersen v. Allied-Signal Corp., 939 F.2d 1106, 1114-15 (5th Cir. 1991) (en banc) (holding that the district court did not abuse its discretion in excluding an expert's opinion that was based on insufficient data regarding the dosage of a harmful substance and the duration of exposure to that substance); Viterbo v. Dow Chem. Co., 826 F.2d 420, 423 (5th Cir. 1987) (concluding that evidence from animal studies is insufficient based in part on the lack of evidence that the plaintiff was exposed to comparable amounts)).

Looking no further than the first criterion, virtually all of the diagnoses fail to satisfy the minimum, medically-acceptable criteria for the diagnosis of silicosis, and therefore, the testimony of the challenged doctors[102] cannot be admissible under the standards set by Rule 702 and Daubert. See Curtis v. M&S Petroleum, Inc., 174 F.3d 661, 670-71 (5th Cir. 1999) ("Under

---

[102] The challenged doctors are: Dr. Ballard, Dr. Cooper, Dr. Coulter, Dr. Andrew Harron, Dr. Ray Harron, Dr. Hilbun, Dr. Levy, Dr. Martindale, and Dr. Oaks.

<u>Daubert</u>, 'any step that renders the analysis unreliable ... renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.'") (quoting <u>In re Paoli R.R. Yard PCB Litig.</u>, 35 F.3d 717, 745 (3d Cir. 1994); citing <u>Moore</u>, 151 F.3d at 279 n.10).

### 3.   Criterion 2: Radiographic Findings

These diagnoses rest predominantly upon a positive B-read. Indeed, some of the Plaintiffs' lawyers and even the doctors seemed to enter the <u>Daubert</u> hearings under the impression that a positive B-read is a talisman that would dispel any doubts about the diagnoses as a whole. As discussed at length in this Order, according to generally-accepted medical principles, a positive B-read simply does not equal a diagnosis. As Dr. Parker stated: "To reach a medical diagnosis certainly requires more than just shadows on a chest x-ray. Because those shadows can be caused by any number of disease processes." (Feb. 18, 2005 Trans. at 91.)

Moreover, even assuming that the B-read itself is performed in an unbiased and reliable manner (a highly dubious assumption in these cases), the history and purpose of the B-reader program exposes a more fundamental problem in the Plaintiffs' current use of B-reads.

Dr. Parker, who formerly administered NIOSH's B-reader program, explained the origin of the B-reader system:

> The B reader system was developed by NIOSH, under federal mandate, to apply to the coal workers' x-ray surveillance

-128-

program. All people who mine underground coal were given
the opportunity for a radiograph approximately every four
years, to see if they had evidence of disease, which
would then give them transfer rights to a low dust
exposure. In the early years, recognition of wide
variability in both the quality of the film and the
quality of the interpretation, NIOSH devised a scheme to
certify facilities as qualified to take the x-rays, and
then certified readers as qualified to classify the
x-ray. ... When NIOSH has a film classified as part of
their coal workers x-ray surveillance program, they have
an initial reader, followed by a second reader. When
there's agreement between those two readers, they may
stop their reading and accept the concurrence between
those two readers. If there's disagreement among the two
initial readers, then another reader classifies the film
until there's concurrence. Sometimes even two or three
readers may not agree, and then they may submit the film
to a panel reading.

(Feb. 18, 2005 Trans. at 79.) The B-reader system was not

established for use in litigation, but as part of a coal workers'

surveillance program to determine whether a worker should be

transferred to a low-dust environment.[103] And under this

surveillance program, the worker is not transferred until at least

two B-readers agree on a positive read. But in most of these MDL

cases, a single positive B-read was deemed sufficient to establish

a diagnosis of silicosis.

Moreover, B-readers rely upon the ILO classification system,

which "was devised primarily to lead to international harmony and

consistency to allow research done in different nations to be

compared to epidemiologic research done in other nations." (Feb.

18, 2005 Trans. at 78; 131.) According to Dr. Parker (one of only

---

[103] Coal workers' pneumoconiosis and silicosis are different
diseases.

15 doctors worldwide who is currently revising the ILO's classification guidelines), the ILO guidelines were never intended to be used in the legal setting: the guidelines, by their express terms, are "not supposed to be used for designation of disease or determining compensation."[104]  (Feb. 18, 2005 Trans. at 73-75, 80-81, 131.)  Furthermore, the American College of Occupational and Environmental Medicine recently issued a report to NIOSH stating that it no longer supports the use of a B-read for the diagnosis of pneumoconiosis.[105]  (Feb. 18, 2005 Trans. at 299.)

Furthermore, the methodology followed by these B-readers does not correspond to the ILO's recommended methodology for applying the ILO classification system.  According to the ILO guidelines:

> When classifying radiographs for epidemiological purposes it's essential that the reader does not consider any information about the individuals concerned other than the radiographs themselves.  Awareness of supplementary details specific to the individuals can introduce bias into the results.

(Feb. 17, 2005 Trans. at 196.)  A B-reader is supposed to read the film without any knowledge of the patient or the suspected disease-

---

[104]  The latest version of the Guidelines state that the ILO Classification System "does not imply legal definitions of pneumoconioses for compensation purposes and does not set or imply a level at which compensation is payable."  International Labour Office, <u>Guidelines for the Use of the ILO International Classification of Radiographs of Pneumoconioses</u> at 1 (2000).

[105]  The American College of Occupational and Environmental Medicine did state that it would support the use of a B-read for the diagnosis of pneumoconiosis in epidemiological studies, an application which is not relevant to this MDL.  (Feb. 18, 2005 Trans. at 299.)

-to be, in Dr. Parker's words, "totally unaware of the suspected occupational or environmental exposure of the person whose film you're classifying."[106]    (Feb. 18, 2005 Trans. at 82.)    As Dr. Harron testified: "That's one of the rules, that the B-reader is supposed to read the film with no knowledge at all about the film, why it's being taken, where the person worked or what the exposure [was]."  (Feb. 16, 2005 Trans. at 263-64.)

However, in the setting of a mass screening and/or mass B-reading for litigation, the B-reader is acutely aware of the precise disease he is supposed to be finding on the x-rays.    In these cases, the doctors repeatedly testified that they were told to look for silicosis, and the doctors did as they were told.

It is worth noting at this point that there is nothing inherently wrong with a mass screening, which can be "a mechanism to identify disease in a population at risk for disease."  (Feb. 18, 2005 Trans. at 132.)[107]  But, as Dr. Parker testified:

_____

[106]  NIOSH calls this "blinding readers"--i.e., hiding the work history of the person who was x-rayed.  According to NIOSH's website:
> [o]verall bias can occur when readers know the nature of the workplace exposure of the radiographs being classified.  Knowledge of exposures can bias readers to recording more or fewer abnormalities or preferentially selecting certain types of abnormality (e.g., rounded opacities for silica-exposed workers versus irregular for asbestos-exposed workers).

See http://www.cdc.gov/niosh/topics/chestradiography/interpretation.html.

[107]  Dr. Friedman gave an example of how screenings can be helpful:
> [U]nder OSHA, the requirement for asbestos is a yearly

[T]he screening needs to include readers who are also given films that are known to be, by multiple readers, by multiple readings, as negative, and films that are known by multiple readings to be abnormal, and then allow those readers to recognize the normal and abnormal films that have been read by many other readers as a quality control effort in the reading exercise.

(Feb. 18, 2005 Trans. at 132.)[108]

No such quality control measures were taken by the challenged experts in the cases before this Court.  Cf. U.S. v. Hicks, 389

---

chest x-ray over age 40, with exposure ten years prior. And if you have contractors who go from employer to employer, none of the employers want to perform the yearly chest x-ray, because ... the employee ... may only be there for a limited number of months.  And so they kind of fall through the cracks, and so they get the screening through their union.  And it is those trades, like boilermakers, pipe fitters, insulators, that have recognizable levels of exposure, I think it's appropriate for their unions to provide the screening. If that's done with the aid of lawyers and that's the way it's done, I see no problem with that.  Personally, I have more of a problem with the mass media advertising to the general public, where you're not targeting known exposed trades.
(Feb. 18, 2005 Trans. at 303.)
Even the mass screenings conducted in this litigation had some tangential benefits.  Dr. Harron and Dr. Coulter each testified that one benefit of these mass screenings was that on a couple of occasions, the doctor examining the x-ray found evidence of cancer or an enlarged heart.  (Feb. 16, 2005 Trans. at 264; Feb. 17, 2005 Trans. at 58.)  Also, two of the people Dr. Coulter first saw during a screening became patients at his clinic, although not for treatment related to silicosis.  (Feb. 17, 2005 Trans. at 56, 61.)

[108]  Dr. Parker elaborated:
So to give someone a batch of 100 films, it's ideal to spike that set with some known positives and some known negatives as a quality control on your readers, to see how successful they are at identifying the absence of abnormality or the presence of abnormality on those films.
(Feb. 18, 2005 Trans. at 132.)

F.3d 514, 525 (5th Cir. 2004) (one of the <u>Daubert</u> reliability factors is "the existence and maintenance of standards controlling the technique's operation") (citing <u>Daubert</u>, 509 U.S. at 593-94). The reason for this is obvious. Quality control measures would have reduced the number of positive diagnoses. And in the business of mass screenings, a diagnosis, whether accurate or not, is money in the bank. This was quite literally true with the Campbell Cherry firm, who only paid N&M when the firm received a positive diagnosis and a client willing to sign-up to be a plaintiff. (Feb. 17, 2005 Trans. at 301-03, 325.)[109] But even with respect to the other law firms, the screening business was competitive, and without large numbers of positive diagnoses, the screening company would lose money or would lose the law firm account to a competitor. When testifying, the screening company representatives made no pretense that they were helping people or serving the greater good--they are businesses, and as Mr. Mason testified, "from a business standpoint of mine, you had to do large numbers." (Feb. 17, 2005 Trans. at 282.)

And it is clear that at least some of this pressure to produce positives was transferred to the B-readers/diagnosing doctors--despite their testimony to the contrary. Working for mass screeners is "easy work" (according to Dr. Cooper and Dr.

---

[109]   More specifically, Campbell Cherry paid N&M $750 for each of the firm's 4,256 Plaintiffs in this MDL, and nothing for anyone who did have a positive diagnosis or did not engage the firm. (Feb. 17, 2005 Trans. at 301-03, 325, 363.)

Coulter[110]), and reading x-rays for mass screeners is a desirable way for a doctor to supplement his income (according to Dr. Martindale (Feb. 17, 2005 Trans. at 304), Dr. Ballard and Dr. Oaks (Feb. 17, 2005 Trans. at 175)), something to do while living out one's "Golden Years" (according to Dr. Harron, Feb. 16, 2005 Trans. at 259). As demonstrated by Dr. Martindale's overtures to N&M and Occupational Diagnostics' recruitment of Dr. Coulter, this was a buyer's market. While a B-reader/diagnosing doctor is essential to the screening process, the doctor is fungible, and if the screening company or law firm was unhappy with one doctor's rate of positive reads and/or diagnoses, then future business will go to another, more compliant doctor.

With respect to the staggering number of silica MDL Plaintiffs who also have made asbestosis claims, the implausibility of this was discussed supra with respect to N&M, who generated in excess of 4,000 silicosis diagnoses on individuals who previously made asbestosis claims. Looking beyond just N&M cases, at least 6,000 MDL Plaintiffs previously made asbestosis claims. It bears repeating that outside of the small cadre of doctors who diagnose for screening companies, even a single case of a dual diagnosis of silicosis and asbestosis is extremely rare. See Feb. 18, 2005 Trans. at 89-90, 263-64 (Dr. Parker testifying that he has never

---

[110] Specifically, Dr. Coulter testified that "I looked up something in the textbook of Internal Medicine on silicosis and found some basic information and said, well, it doesn't seem like it would be that difficult and that's why I consented [to perform the screenings]." (Feb. 17, 2005 Trans. at 72.)

seen a clinical case of asbestosis and silicosis in the same individual); Friedman Ex. 2 (letter from Dr. Hammar: "[I]n the cases that I've had pathology to evaluate, I have never seen cases in which there was both silicosis and asbestosis in the same patient."); see also Dr. David Weill, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 4 (Feb. 3, 2005) ("Even in China, where I saw workers with jobs involving high exposure to asbestos and silica (such as sandblasting off asbestos insulation), I did not see anyone or review chest radiographs of anyone who had both silicosis and asbestosis."); Dr. Paul Epstein, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 3 (Feb. 2, 2005) ("[I]t is my professional opinion that the dual occurrence of asbestosis and silicosis is a clinical rarity."); Dr. Theodore Rodman, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 2 (Feb. 2, 2005) ("Among the thousands of chest x-rays which I reviewed in asbestos and silica exposed individuals, I cannot remember a single chest x-ray which showed clear-cut findings of both asbestos exposure and silica exposure.").  When informed that 6,000 silicosis Plaintiffs had previous asbestosis diagnoses, Dr. Parker testified: "I find it stunning and not scientifically plausible."  (Feb. 18, 2005 Trans. at 90.)  Based upon the evidence presented, the Court agrees.

The unsound nature of the diagnoses is betrayed not only by the opportunistic transformations of asbestosis reads into silicosis reads, but also by the improbable consistencies among the

silicosis reads.  Reader variability is most likely to occur on profusions (Feb. 18, 2005 Trans. at 137-38), and yet this is the one area where the B-readers were implausibly consistent.  In reviewing the 6,510 B-reads produced during Plaintiffs' initial disclosures, over 92 percent of the profusions were 1/0 or 1/1, while less than 2 percent were 2/1 or greater (i.e., 2/1, 2/2, 2/3, 3/2, 3/3, or 3/+).  (Defendants' Motion to Exclude Plaintiffs' Experts, MDL 03-1553 Docket Entry 1149, at 13.)  As recounted above with respect to Dr. Ballard and Dr. Oaks, the consistencies in profusion "defies all statistical logic and all medical and scientific evidence of what happens to the lung when it's exposed to workplace dust." (Feb. 18, 2005 Trans. at 81-82.)  Similarly, Dr. Coulter's findings in 237 out of 237 cases that the Plaintiffs' silicotic opacities were found in the lower lobes is "so unlikely as to not be possible." (Feb. 18, 2005 Trans. at 90.)

Finally, it is worth noting that this evidence of the unreliability of the B-reads performed for this MDL is matched by evidence of the unreliability of B-reads in asbestos litigation. In a study published in Academic Radiology, the authors set up a blinded panel of B-readers to interpret 492 chest x-rays previously read by physicians employed by plaintiffs' lawyers in asbestos litigation.  The plaintiffs' doctors had found that 95.9 percent of the x-rays were positive for changes consistent with asbestos.  The blinded panel, however, found that only 4.5 percent of the x-rays

had changes consistent with asbestosis.[111]  <u>See also</u> Carl B. Rubin & Laura Ringenbach, The Use of Court Experts in Asbestos Litigation, 137 F.R.D. 35, 39, 45 (1991) (recounting that in 65 asbestos cases before U.S. District Judge Carl C. Rubin, court-appointed medical experts found no radiographic evidence of any asbestos-related condition in 42 cases).

### 4.    Criterion 3: Differential Diagnosis

In almost all of the MDL cases, the challenged diagnosing doctors simply ignored this final criterion (i.e., the absence of any good reason to believe that the positive radiographic findings are the result of some other condition) altogether.  Dr. Harron went so far as to deny that it even is one of the criteria for diagnosing silicosis.  (Feb. 16, 2005 Trans. at 324-25.)  As set out above, Dr. Harron's opinion is directly contradicted by all of the major textbooks in the field, as well as by the testimony of the other physicians at the hearing and even the briefing of the Plaintiffs in this litigation.  <u>See, e.g.,</u> Daniel E. Banks, Silicosis, in TEXTBOOK OF OCCUPATIONAL AND ENVIRONMENTAL MEDICINE

---

[111]  <u>See</u> Gitlin, et al., Comparison of "B" Readers' Interpretations of Chest Radiographs for Asbestos Related Changes, 11 Acad. Radiol. 843 (Aug. 2004).

Prior to the <u>Daubert</u> Hearing, the Court granted a motion to quash the deposition subpoenas that Plaintiffs had issued to the authors of this study.  Among the reasons the Court quashed the subpoenas was that all parties stipulated that this asbestosis study was irrelevant to this MDL.  After the <u>Daubert</u> hearings, while the Court finds the results of this study to be unsurprising, the Court will not rely upon the study in making any <u>Daubert</u> rulings.

380-81 (2nd ed. 2005); Hans Weill, et al., Silicosis and Related Diseases, in OCCUPATIONAL LUNG DISORDERS 286 (3rd ed. 1994); Feb. 16, 2005 Trans. at 353-54 (Dr. Segarra); Pls.' Informational Br. Regarding Diagnosis Silicosis at 2.  One of the reliability factors specifically enunciated in Daubert is whether the expert's technique is generally accepted in the relevant scientific community.  See Daubert, 509 U.S. at 593-94; see also Burleson, 393 F.3d at 584.  For example, in Pipitone v. Biomatrix, Inc., 288 F.3d 239 (5th Cir. 2002), the Fifth Circuit expressly held in the context of a Daubert ruling that a physician's "elimination of various alternative causes ... were based on generally accepted diagnostic principles related to these conditions." Id. at 246.  In these MDL cases, by contrast, the doctors' failure to exclude other alternative causes of the radiographic findings clearly is not generally accepted in the field of occupational medicine.  Cf. Raymark Indus., Inc. v. Stemple, 1990 WL 72588, *8 (D. Kan. 1990) (finding that physicians' asbestosis diagnoses did not "pass muster" because: "It appears that the [physicians] placed much weight on x-ray results in making a diagnosis that a tire worker had an asbestos-related disease.  However, they also admitted that the x-rays detect fibrosis [i.e., lung scars] and that there are as many as 150 causes of fibrosis, only one of which is asbestos.  In addition, it appears that many of these 150 causes of fibrosis are indistinguishable from asbestosis on x-rays.").

Indeed, as Dr. Harron implicitly acknowledged in his testimony, someone did make a _de facto_ differential diagnosis for each of the Plaintiffs he diagnosed with silicosis. Dr. Harron testified that while numerous other diseases could have been consistent with the opacities he noted on the ILO forms, in each case, his typist selected either asbestosis or silicosis. (Feb. 16, 2005 Trans. at 293-94.) Thus, for every Plaintiff purportedly diagnosed by Dr. Ray Harron and Dr. Andrew Harron, an unnamed and untrained member of "a stable of secretarial help" (many of whom are employed by N&M) quite literally made the differential diagnosis. A typist decided that a check of a box on the ILO form translated into a diagnosis of silicosis, implicitly excluding all of the other possible causes of the radiographic findings.

By contrast, Dr. Parker explained the appropriate process for making a differential diagnosis:

> To reach a medical diagnosis certainly requires more than just shadows on a chest x-ray. Because those shadows can be caused by any number of disease processes. You would be quite interested whether the individual, if the shadows were consistent with silicosis, you would be quite interested in their workplace exposures over their lifetime. ... [In making t]he differential diagnosis, you're interested in their [occupational and exposure] history, their review of systems, their past medical history. There are drugs that can cause shadows on x-rays, or pharmaceutical preparations that can injure lung and cause shadows on the x-ray. There are organic dust exposures and inorganic dust exposures that can cause shadows on the x-ray. There are collagen vascular diseases such as rheumatoid arthritis, lupus, that can cause shadows on the x-ray. There's this unusual disorder, sarcoidosis, that can cause shadows on the x-ray, and congestive heart failure can cause shadows on the x-ray. Obese patients, as well as patients who take

> a shallow breath or other technical quality abnormalities
> with the film may lead to shadows on the x-ray that may
> be misleading and thought to be abnormal.  But if the
> film is repeated with better technique, may appear more
> normal.

(Feb. 18, 2005 Trans. at 91-93.)  Similarly, Dr. Friedman testified about the "infections and [the] host of different diseases" that can look like silicosis on an x-ray, again highlighting the need for a differential diagnosis.  (Feb. 18, 2005 Trans. at 229.) Radiographic findings consistent with silicosis may be caused by the following diseases: other pneumoconioses, such as coal worker's pneumoconiosis, berylliosis and byssinosis; infectious diseases, such as tuberculosis; collagen vascular diseases, such as rheumatoid arthritis and lupus; fungal diseases, such as histoplasmosis and coccidioidomycosis; as well as sarcoidosis. (Feb. 16, 2005 Trans. at 101-05, 328; Feb. 18, 2005 Trans. at 91-93, 229.)  Radiographic findings consistent with silicosis also may be caused by certain infections, drugs and pharmaceutical preparations, congestive heart failure, obesity or simply inferior quality x-ray equipment or film.  (Feb. 18, 2005 Trans. at 91-93, 229.)

In order to rule out the multitude of other causes of the radiographic findings, it is vitally important for a physician to take a thorough occupational/exposure history and medical history. (Feb. 16, 2005 Trans. at 101-06; Feb. 18, 2005 Trans. at 91-93,

229, 353-54.)[112]   As noted <u>infra</u>, even a travel history may be relevant: certain diseases which mimic silicosis on an x-ray are primarily found in particular geographic regions of the country or the world.  (Feb. 16, 2005 Trans. at 101-06; Feb. 17, 2005 Trans. at 43-44.)

Given the wide variety of possible causes for x-ray findings consistent with silicosis, the occupational, medical and travel histories must be directed by someone with sufficient medical training and knowledge to guide the questioning through all of the areas necessary to exclude each of the other possible causes for the findings.[113]  This is why experts in the field of occupational medicine opine that it is imperative for the diagnosing physician take at least some portion of the histories in order to make a

---

[112]  For instance, Dr. Segarra testified that "ruling out the other diseases ... can often be done by history.  The physical exam plays usually a small role in that regard.  The history is more important."  (Feb. 16, 2005 Trans. at 353-54.)

[113]  As Dr. Todd Coulter, one of Plaintiffs' diagnosing doctors, testified:
A:  [T]here's more to this than meets the eye.  The history has to be expansive but it also has to be guided, if you will, by what the patient tells you. ... We ask about social history.  We ask about family history.  I ask about smoking history.  Where I live on the Gulf Coast of Mississippi I want to know about their military history.  We've got a lot of people who have traveled all over the world.  I want to know about their -- their public health history, such as, inoculations and immunizations. ...
Q:  So in reviewing the ... information that the patient has given you, you then sit down with a patient and flush that out for more information that you consider important?
A:  History, history, history, yes, sir.
(Feb. 17, 2005 Trans. at 43-44.)

competent differential diagnosis.  (Feb. 16, 2005 Trans. at 355, 366; Feb. 17, 2005 Trans. at 43-45; Feb. 18, 2005 Trans. at 92, 134, 244-45, 255.)

By contrast, in all of the cases diagnosed by the challenged physicians, the medical histories, physical examinations and other tests were either nonexistent or cursory.  The histories that did exist were taken by  people without sufficient training (or incentive) to know what questions to ask in order to rule out other possible causes of the radiographic findings.

The attitude of the challenged diagnosing doctors toward this final criterion mirrored their overall attitude toward these diagnoses: meeting this criterion correctly simply involved more work than they were willing to devote to the task.  Implicit in the doctors' testimony were the questions: Can't you see how many people we had to diagnose?  How can you possibly expect us to be any more thorough than we were?  These are the same pleas the Court has heard repeatedly from the lawyers throughout this MDL.  But these doctors and Plaintiffs' lawyers are not innocent victims of overwhelming numbers.  Hordes of Plaintiffs have not been thrust upon them against their will.  The doctors undertook the burden of diagnosing each of these Plaintiffs--just as the attorneys undertook the burden of representing each one of them--and the sheer volume of Plaintiffs does not mean that these professionals' obligations toward each Plaintiff has been lessened.

5.    **Lawyers Practicing Medicine and Doctors Practicing Law**

Dr. Friedman posited that the diagnoses were iatrogenic in nature. (Feb. 18, 2005 Trans. at 245.) "Iatrogenic" is defined as "[i]nduced in a patient by a physician's activity, manner, or therapy."[114] Whether this is true, the Court cannot say, but the Court is confident that Dr. Friedman was correct when he testified that the "epidemic" of some 10,000 cases of silicosis "is largely the result of misdiagnosis." (Feb. 18, 2005 Trans. at 246.)

Dr. Parker agreed with the following summary of the flaws in the diagnoses:

> Q: In your opinion, Doctor, is it proper methodology to, for the diagnosis of silicosis, for a B-reader to know, going in, the reason he's looking at the x-ray, he knows he's looking for silicosis, for that doctor to rely on simply a statement of the years someone worked at a job, with a job description, and no other information, to then go ahead and diagnose silicosis?
> A:  I would think that would fall outside the bounds of acceptable medical practice.
> Q:  Would it be proper then for, if that doctor, that B reader, doesn't do the diagnosis, but then sends his read on to someone else, another doctor, a pulmonologist like yourself, who has nothing more than the information I've described, the years that someone worked somewhere, where they worked, what their job was, and now a reading, a B-reading that's been read for the purpose of looking for silicosis, would it be proper methodology for that doctor to then conclude, to diagnose silicosis in that patient?
> A:  I don't believe that's scientifically acceptable.

(Feb. 18, 2005 Trans. at 94.) Similarly, Dr. Friedman summarized the problems as follows:

---

[114]  See http://dictionary.reference.com/search?q=iatrogenic.

-143-

> I don't think the diagnoses are reliable. ... [I]n Texas,
> we have a saying, all hat and no horse. And I think that
> they said they used certain diagnoses, but they didn't go
> beyond the three criteria to really provide the data for
> the occupational history. I don't know that they fully
> excluded other more probable causes, from what I've seen.
> And I don't even want to talk about the x-rays....

(Feb. 18, 2005 Trans. at 260-61; see also Feb. 18, 2005 Trans. at 264.) Dr. Friedman further testified: "[T]he tragedy is that I don't know that the diagnoses are reliable ... because of the methodology." (Feb. 18, 2005 Trans. at 313.) The Court has been left with no choice but to agree.

A review of all of the submitted Fact Sheets is telling. In the approximately 9,083 Fact Sheets submitted in this MDL as of the date of the Daubert hearings, approximately 8,000 treating doctors are named. (Feb. 18, 2005 Trans. at 257.) But when it comes to the doctors who diagnosed these Plaintiffs with silicosis, 12 names appear. (Feb. 18, 2005 Trans. at 259.) Twelve doctors diagnosed all 9,083 Plaintiffs. This small cadre of non-treating physicians, financially beholden to lawyers and screening companies rather than to patients, managed to notice a disease missed by approximately 8,000 other physicians--most of whom had the significant advantage of speaking to, examining, and treating the Plaintiffs.

One possible explanation is the fact that in every case involving a screening company, the diagnoses were essentially manufactured on an assembly line. The steps in the diagnosing process were divided among a number of different people, not all of whom were qualified and none of whom assumed overall responsibility

and oversight for the entire process. Thus, in many cases, a different person performed each of the following steps: taking the occupational history, performing the physical exam, reading the x-ray, analyzing the pulmonary function tests, taking the medical history, and finally, making a diagnosis. The people performing the steps were so compartmentalized that often they did not know the others' identities, let alone whether they were qualified and were performing their assigned tasks correctly. Hence, for example, Dr. Levy issued 1,389 diagnoses for Plaintiffs he had never met, by relying totally on cursory work and exposure "histories" taken by untrained receptionists he had never met (and whom he was deluded into believing were physicians who spent 90 minutes with each Plaintiff), B-read reports by doctors he had never met (and without even glancing at the x-rays), and cursory "physicals" and "medical histories" performed by other doctors he had never met. Most stunningly, this assembly line structure allowed Dr. Martindale to reconcile his acquiescence in false diagnosing language. Dr. Martindale testified:

> [M]y interpretation of the whole process was that a physician was taking a good occupational history, a medical history, performing a physical exam, and either he or someone else was overseeing the pulmonary function tests, and there was an interpretation of the chest x-ray at the time all of this was done, and these patients were screened for people who appeared as if they had clinical diagnoses of asbestosis or silicosis and the chest x-ray supported that diagnosis.

(Martindale Dep. at 65-66; see also id. at 102 ("I assumed that the physician who did the physical, did the history, took the

-145-

occupational exposure would be making the diagnosis.").)  Because he believed some other physician had taken all of the proper diagnosing steps, he apparently felt he would cause no harm if he failed to do so himself.  Repeatedly, the diagnosing doctors testified as to their blind (and, as it happens, unfounded) faith that other physicians had taken the necessary steps to legitimize their diagnoses.  By dividing the diagnosing process among multiple people, most of whom had no medical training and none of whom had full knowledge of the entire process, no one was able to take full responsibility over the accuracy of the process.  This is assembly line diagnosing.  And it is an ingenious method of grossly inflating the number of positive diagnoses.

It is important to emphasize that this discussion and this Order should not be taken as a criticism of the right of impaired individuals to seek redress through the courts.  This process not only benefits the impaired individual, but also benefits those who otherwise would have been impaired in the future had the defendant's alleged wrongful behavior gone unchecked.  What the Court is criticizing is the idea that when doctors step into a courtroom, they can abandon the methodology they practice in the clinic.  Dr. Friedman, who devotes a substantial amount of time consulting and testifying for plaintiffs, testified that there should be no distinction between a medical diagnosis and a "legal diagnosis." (Feb. 18, 2005 Trans. at 283.)  He testified:

Q.   [W]hen you're hired by a law firm to render an opinion, do you consider yourself to be the treating physician of that patient?
A.   I do.  I consider myself to have the same level of responsibility as -- no matter how the patient is sent to me.  If I can give you one or two quick examples. There's a patient who's here in the MDL, Mr. Gatlin, has acute silicosis.  I personally not only talked to his doctor but attempted to arrange for his lung transplant. So I've gotten involved.  And there are many, I'd say a couple of times, at least a couple of times a month, we'll pick up cardiac arrhythmias, PVC's, we'll do an EKG for free, call their family doctor.  I had a fellow two weeks ago that I would not let go back home to, up to north Texas.  I made him stop at Scott & White clinic in Bryan/College Station on the way because he had cardiac arrhythmias and he wanted to at least go there because I think his family lived there.  So I do not consider myself their treating doctor, to the extent that I don't look to them for payment.  I treat them as though they were any other patient on whom I was doing a consultation.

(Feb. 18, 2005 Trans. at 283-84.)

By contrast, most of the diagnosing doctors emphasized that they did not consider the people being screened to be patients.  As stated by Dr. Harron: "These people are not patients; it's a different situation."  (Feb. 16, 2005 Trans. at 264.)  Of course, the doctors need not have been so explicit--it is readily apparent from their actions that they did not consider the Plaintiffs to be their patients.

It is also readily apparent that the failure of the challenged doctors to observe the same standards for a "legal diagnosis" as they do for a "medical diagnosis" renders their diagnoses in this litigation inadmissible under Rule 702.  As both the Supreme Court and the Fifth Circuit have directed: "The district court's

-147-

responsibility 'is to make certain that an expert ... employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Skidmore v. Precision Printing & Pkg., Inc., 188 F.3d 606, 618 (5th Cir. 1999) (quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999)).

If nothing else, this MDL illustrates the mess that results when lawyers practice medicine and doctors practice law. In almost all of these cases, one vital requirement for the diagnosis of silicosis—the taking of occupational histories—was performed absent medical oversight by the lawyers or their agents or contractors. More generally, the lawyers determined first what disease they would search for and then what criteria would be used for diagnosing that disease. The lawyers controlled what information reached the diagnosing physicians, stymying the physician's normal ability to ask targeted follow-up questions and perform follow-up exams.[115] The lawyers also controlled what information reached the patients, stymying the patient's normal ability to learn from a medical professional details about their diagnosis, their prognosis, and what, if any, follow-up care they should receive. Indeed, a lawyer from the Plaintiffs' firm of Barton & Williams summarized the problem most succinctly when he argued that the doctors' B-reads of his clients are attorney work

---

[115] This is not to say that the challenged physicians did not willingly abdicate their role in the usual physician-patient relationship.

product.[116]    (Feb. 18, 2005 Trans. at 9-11.)    In the majority of cases, these diagnoses are more the creation of lawyers than of doctors.

Conversely, virtually all of the challenged diagnosing doctors seemed to be under the impression they were practicing law rather than medicine.  They referred to the Plaintiffs as "clients" rather than "patients", and they utilized shockingly relaxed standards of diagnosing that they would never have employed on themselves, their families or their patients in their clinical practices.  Almost uniformly, they phrased their diagnoses with the legal incantation "reasonable degree of medical certainty" or "reasonable degree of medical probability."  Dr. Harron summarized it best: "[I]t's a legal standard and not a real diagnosis."[117]  (Feb. 16, 2005 Trans. at 268.)  And, finally, despite diagnosing a serious and completely preventable disease at unprecedented rates, not a single doctor even bothered to lift a telephone and notify any governmental agency, union, employer, hospital or even media outlet, all of whom conceivably could have taken steps to ensure recognition of

---

[116]    The attorney was arguing that he should not be required to place in the MDL document depository the silicosis B-reads of his non-MDL state-court clients.  (Feb. 18, 2005 Trans. at 9-11.)

[117]    The Court is mindful of the following advice, stated in a different context by the court in Holbrook v. Lykes Bros. S.S. Co., Inc., 80 F.3d 777, 785 (3d Cir. 1996):  "We have not required that when medical experts give their opinion, they recite the talismanic phrase that their opinion is given to 'a reasonable degree of medical certainty,' because care must be taken to see that the incantation does not become a semantic trap...."

currently-undiagnosed silicosis cases and to prevent future cases from developing.  One can imagine the outcry that would have resulted had these doctors kept silent after diagnosing thousands of new cases of avian flu or mad-cow disease.  Had these doctors been acting as doctors--and had they genuinely believed their diagnoses were legitimate--they would have taken this simple and humane step.

Instead, these diagnoses were about litigation rather than health care.  And yet this statement, while true, overestimates the motives of the people who engineered them.  The word "litigation" implies (or should imply) the search for truth and the quest for justice.  But it is apparent that truth and justice had very little to do with these diagnoses--otherwise more effort would have been devoted to ensuring they were accurate.  Instead, these diagnoses were driven by neither health nor justice: they were manufactured for money.  The record does not reveal who originally devised this scheme, but it is clear that the lawyers, doctors and screening companies were all willing participants.  And if the lawyers turned a blind eye to the mechanics of the scheme, each lawyer had to know that Mississippi was not experiencing the worst outbreak of silicosis in recorded history.  Each lawyer had to know that he or she was filing at least some claims that falsely alleged silicosis. The fact that some claims are likely legitimate, and the fact that the lawyers could not precisely identify which claims were false,

cannot absolve them of responsibility for these mass misdiagnoses which they have dumped into the judicial system.

### 6.    Effects of Mass Over-Diagnosing

Many of the effects of the mass misdiagnoses are obvious, but they nonetheless should be noted.  Limited judicial resources are consumed weeding out meritless claims, costing the judiciary, costing other litigants whose suits are delayed, and ultimately costing the public, who pays for a judicial system that is supposed to move with some degree of speed and efficiency.

Defendant companies pay significant costs litigating meritless claims.  And what harms these companies also harms the companies' shareholders, current employees, and ability to create jobs in the future.

And, potentially, every meritless claim that is settled takes money away from Plaintiffs whose claims have merit.  And not only are those with meritorious claims denied just compensation, they are potentially denied full and meaningful access to the courts. As is apparent simply by a reading of this Order, it is difficult for a court to devote attention to a single case when it is part of a wave of 10,000 other cases--many of which are meritless.

Then there is the toll taken on the misdiagnosed Plaintiffs. If these Plaintiffs truly have abnormal x-rays, then the radiographic findings may be caused by a number of conditions other than silicosis.  And when the diagnosing doctors fail to exclude

-151-

these other conditions, it leaves the Plaintiffs at risk of having treatable conditions go undiagnosed and untreated.

In the case of the Plaintiffs who are healthy, at least some of them can be expected to have taken their diagnoses seriously. They can be expected to have reported the diagnoses when applying for health insurance and life insurance--potentially resulting in higher premiums or even the denial of coverage altogether. They can be expected to report the diagnoses to their employers and to the Social Security Administration. And they can be expected to report the diagnoses of this incurable disease to their families and friends.

These people have been told that they have a life-threatening condition: but they are not told by a doctor; they are told by a lawyer--apparently in most cases through the mail. In most cases, they never saw the doctor who diagnosed them. And in most cases, they never had the opportunity to ask the diagnosing doctor questions about the diagnosis and what it means. When dealing with this MDL and its 10,000 Plaintiffs, it is easy to forget that "statistics are human beings with the tears wiped off." (Feb. 18, 2005 Trans. at 252 (quoting Dr. Irving Selikoff).) But it should not be forgotten that a misdiagnosis potentially imposes an emotional cost on the Plaintiff and the Plaintiff's family that no court can calculate.

These misdiagnoses also risk exacting an equally unquantifiable yet equally real cost to society. Dr. Parker testified:

> I feel passionately about the recognition and prevention of occupational lung disease. I mean, I have committed most of my professional life to that, as well as looking for therapies for pulmonary diseases. But to be looking for disease in people who may have no symptoms is not doing the individual any good, nor is it doing society any good.

(Feb. 18, 2005 Trans. at 86.) He further testified, "[a] purported diagnosis in someone who doesn't have this disease ... detract[s] from the person who has the serious and life-threatening disease." (Feb. 18, 2005 Trans. at 87.) Not only does a false diagnosis detract from the person who has silicosis, but it potentially harms future silicosis prevention. There is a risk that governmental entities, employers and the public will learn of this bevy of misdiagnoses and fail to take the steps that need to be taken to further prevent worker exposure to respirable silica. It is evident from the testimony before this Court, as well as studies by NIOSH and others, that silicosis is a continuing tragedy in our country. Those suffering the effects of the disease do not need an inflated number of claims to lend gravitas to their situation. Their tragedy stands on its own.

### 7. **Alexander** Ruling

The Court has addressed the testimony it has received regarding <u>all</u> of the diagnoses by <u>all</u> of the challenged doctors in

-153-

this MDL,[118] despite the fact that--as discussed _infra_--the Court has ultimately found that the Defendants have failed to meet their burden of establishing that the Court has subject-matter jurisdiction over the vast majority of these cases.  Hence, the Court cannot issue a ruling on the admissibility of the testimony related to a majority of these diagnoses pursuant to Rule 702 and _Daubert_.  See _Dahiya v. Talmidge Int'l, Ltd._, 371 F.3d 207, 210 (5th Cir. 2004) ("Unless a federal court possesses subject matter jurisdiction over a dispute, ... any order it makes (other than an order of dismissal or remand) is void.") (citations omitted); _Howery v. Allstate Ins. Co._, 243 F.3d 912, 916 n.6 (5th Cir. 2001) (citing _Kokkonen v. Guardian Life Ins. Co. of Am._, 511 U.S. 375, 377 (1994)).  In spite of this, the Court has included its findings concerning all of the testimony it received, in hopes that the state courts that ultimately must shepherd these cases to their conclusion will not have to re-hear _Daubert_-type challenges to these doctors and their diagnoses.[119]

---

[118]  The challenged doctors are: Dr. Ballard, Dr. Cooper, Dr. Coulter, Dr. Andrew Harron, Dr. Ray Harron, Dr. Hilbun, Dr. Levy, Dr. Martindale, and Dr. Oaks.

[119]  The Mississippi Supreme Court has adopted the Federal Rule 702/_Daubert_ standard for determining the admissibility of expert testimony.  See _Mississippi Transp. Comm'n v. McLemore_, 863 So. 2d 31, 39 (Miss. 2003) ("[T]his Court today adopts the federal standards and applies our amended Rule 702 for assessing the reliability and admissibility of expert testimony.").  Hence, the legal standards discussed herein should be applicable in Mississippi state courts.

As discussed <u>infra</u>, the Court does possess subject-matter jurisdiction over one MDL case, <u>Alexander v. Air Liquide Corp.</u>, Cause No. 03-533.  Therefore, the Court has the authority to rule on Defendants' motions to exclude Plaintiffs' diagnosing experts in that case.

<u>Alexander</u>, which was originally filed in this Court, has 100 Plaintiffs.  All but one of the Plaintiffs submitted a silicosis diagnosis from Dr. Ray Harron, while seven Plaintiffs submitted a silicosis diagnosis from Dr. Levy.[120]

As discussed above, both doctors relied upon occupational/exposure histories and medical histories which fail to even merit the title, "history", let alone meet the generally-accepted scientific methodology for diagnosing silicosis.  (<u>See, e.g.</u>, Feb. 18, 2005 Trans. at 261 (Dr. Friedman: "I'm not sure I would consider [what Dr. Levy relied upon] any occupational history at all.").)  And, as even Dr. Harron conceded, "[i]f [the history is] not reliable ... then I have to retract the diagnosis."  (Feb. 16, 2005 Trans. at 282-83.)  As discussed above, the reliance of both doctors on inadequate and unreliable histories renders the entire diagnosis and accompanying testimony inadmissible.  <u>See Curtis v. M&S Petroleum, Inc.</u>, 174 F.3d 661, 670-71 (5th Cir. 1999) ("Under <u>Daubert</u>, any step that renders the analysis unreliable ... renders the expert's testimony inadmissible.  This is true whether

---

[120] Six of the Plaintiffs submitted diagnoses from both Dr. Harron and Dr. Levy.

the step completely changes a reliable methodology or merely misapplies that methodology.") (quotation omitted).

With respect to Dr. Harron, he simply ignored the third criterion for diagnosing silicosis (i.e., the absence of any good reason to believe that the positive radiographic findings are the result of some other condition). (Feb. 16, 2005 Trans. at 324-25.) As set out above, this "technique" of diagnosing silicosis without even attempting to rule out the myriad of other causes of radiographic findings consistent with silicosis is not generally accepted in the relevant scientific community. Cf. Pipitone v. Biomatrix, Inc., 288 F.3d 239, 246 (5th Cir. 2002) (noting in the context of a Daubert ruling that a physician's "elimination of various alternative causes ... were based on generally accepted diagnostic principles related to these conditions").

Perhaps even more stunning was Dr. Harron's reliance on largely untrained secretarial staff to "translate [the ILO form he completed] into English" (Feb. 16, 2005 Trans. at 289-90), "prepare [his] reports, stamp [his] name on them and send those reports out without [him] editing or reviewing them" (Feb. 16, 2005 Trans. at 285-87). Dr. Harron did not read, review or even see any of the 99 diagnosing reports in Alexander bearing his name. This "distressing" and "disgraceful" procedure does not remotely resemble reasonable medical practice. (Feb. 16, 2005 Trans. at 365; Feb. 18, 2005 Trans. at 249, 265.) Not only is this "technique" not generally accepted in the scientific community, but

it is utterly lacking in any "standards controlling the technique's operation." <u>U.S. v. Hicks</u>, 389 F.3d 514, 525 (5th Cir. 2004) (among the reliability factors are "the existence and maintenance of standards controlling the technique's operation; and ... whether the technique has been generally accepted in the scientific community") (citing <u>Daubert</u>, 509 U.S. at 593-94).

Moreover, as recounted above, the sheer volume of Dr. Harron's asbestosis/silicosis reversals (i.e., reading an x-ray as consistent with asbestosis for asbestos litigation and then reading the same individual's x-ray as consistent with silicosis for silica litigation), simply cannot be explained as intra-reader variability. (Feb. 17, 2005 Trans. at 15.)  Instead, it can only be explained as a product of bias--that is, of Dr. Harron finding evidence of the disease he was currently being paid to find.

And with respect to Dr. Levy, based on his average rate of diagnosing in this MDL, Dr. Levy performed all of his work on all the seven diagnoses he issued in <u>Alexander</u> in less than 30 minutes--which is less than half the time a normal expert in the field of occupational medicine would spend issuing a single diagnosis. (Feb. 16, 2005 Trans. at 366; Feb. 18, 2005 Trans. at 253.)  Dr. Levy based his diagnoses entirely upon the cursory "histories" in Plaintiffs' Fact Sheets (taken by lawyers or untrained clerks) and upon the unreliable B-reads performed by Dr. Harron or Dr. Ballard.  He never examined the Plaintiffs or took a

history from them.[121]  And given the extremely limited and biased information he had available to him, he had no reliable way to rule out alternative causes for the radiographic findings.  From the Plaintiffs' lawyers' point-of-view, it appears Dr. Levy's primary purpose was to provide a veneer of glossy credentials over a patently unreliable collection of materials (i.e., cursory histories and biased B-reads).

The flaws in Dr. Levy's diagnoses here are similar to those noted by the court in Castellow v. Chevron USA, 97 F. Supp. 2d 780 (S.D. Tex. 2000).  In Castellow, the court granted a motion to exclude Dr. Levy's testimony on Daubert grounds because his opinion on the medical cause of plaintiff's illness was founded almost entirely upon the flawed report of another doctor.  See id. at 794, 798 ("Dr. Levy stressed that Dr. Rose's calculations were very important to him in forming his opinion about the quantitative exposure to which the deceased had been subject.... Dr. Levy acknowledged that if Dr. Rose's calculations were inaccurate, so that Mr. Castellow was never, in fact, exposed to benzene at the levels calculated, then he could not offer an opinion as to causation.") (excluding Dr. Levy's opinion along with other experts because, inter alia, "the result driven methodology ... is rife with error and speculation").

---

[121]  Dr. Levy explained: "I don't know anything about the screening that the plaintiffs had.  I recognize that people had the B-readings and so forth.  I'm not familiar with what actually took place."  (Feb. 16, 2005 Trans. at 148.)

As set out above, two of Plaintiffs' diagnosing doctors in other MDL cases, Dr. Segarra and Dr. Coulter, testified that they would not employ the methodology employed by Dr. Levy in these cases. (Feb. 16, 2005 Trans. at 365; Feb. 17, 2005 Trans. at 64.) And Dr. Friedman testified as follows:

> Dr. Levy made his diagnoses in about three-and-a-half minutes, never talked to a patient, never looked at an x-ray, never ... talked to a treating physician, [and] may have only looked at a few medical records in cases that he linked.  And in 72 hours, reviewed something in the range of 1200 cases, and [in] 800 ... diagnosed life-threatening illness. ... Dr. Levy ... relied on the product identification part of the work history.  I don't even think it was a full work history.  I mean, ... it came nowhere near meeting what his own methodology was that he spelled out.  And I have both the Third and Fourth Edition of his textbooks.  And in no way does it relate to that methodology.

(Feb. 18, 2005 Trans. at 250-51.)  Indeed, the gulf between the methodology Dr. Levy employed for this litigation and the methodology Dr. Levy advocates in his academic work starkly contravenes the Supreme Court's requirement that "an expert ... employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999).[122]

---

[122]  Another area where Dr. Levy fails to "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," Kumho Tire, 526 U.S. at 152, is illustrated by the following exchange:
DR. LEVY:  Here's a gentleman like many other people who have both silicosis and asbestosis. ...
Q:  If he had both, why didn't you diagnose him with both?
DR. LEVY:  My job was not to make diagnoses of asbestosis.

Similarly, Dr. Harron's testimony that he was applying "a legal standard and not a real diagnosis" (Feb. 16, 2005 Trans. at 268), along with Dr. Levy's testimony that "I was not practicing medicine, ... I was providing diagnostic information in the context of medical/legal consultation" (Feb. 16, 2005 Trans. at 56-57), echo the following passage from <u>Allen v. Pennsylvania Engineering Corp.</u>, 102 F.3d 194 (5th Cir. 1996):

> Dr. LaMontagne, in fact, inadvertently described exactly the problem this court faced in evaluating his and appellants' other expert testimony: 'This is not a scientific study.  This is a legal opinion.'
> <u>Pace</u> Dr. LaMontagne, the goal of <u>Daubert</u> and this court's previous cases has been to bring more rigorous scientific study into the expression of legal opinions offered in court by scientific and medical professionals.  In the absence of scientifically valid reasoning, methodology and evidence supporting these experts' opinions, the district court properly excluded them.

<u>Id.</u> at 198.

In short, Plaintiffs have failed to sustain their burden of showing that Dr. Harron's and Dr. Levy's testimony related to any of the diagnoses proffered in <u>Alexander</u> is sufficiently reliable to be admissible.  Therefore, as to <u>Alexander</u>, Defendants' Motion to Exclude is GRANTED: the testimony of Dr. Harron and Dr. Levy (as

---

....
Q:  Okay.
THE COURT: [Your] job is not to make diagnosis of anything other than silicosis.
DR. LEVY:  Well, yes.
(Feb. 16, 2005 Trans. at 213.)  In contrast to Dr. Levy's litigation reports, "[a] treating physician, of course, would have noted all potential abnormalities on the first report."  Dr. David Weill, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 8 (Feb. 3, 2005).

well as their accompanying diagnoses) are inadmissible. As discussed _infra_, the Court will schedule a status conference in the _Alexander_ case, to address whether (and, if so, under what conditions) the Plaintiffs' claims will proceed.[123]

### L.   Independent Medical Advisors/Technical Advisory Panel

During a phone conference with liaison counsel in October 2004, the Court raised the issue of appointing independent medical advisors to determine which of the Plaintiffs has a competent diagnosis. The Plaintiffs were not amenable to this proposal, and the Court was not prepared to order it in the absence of an agreement between the parties.

A month later, on November 11, 2004, a number of Defendants moved the Court to appoint a panel of B-readers under the auspices of the American College of Radiology Committee on Pneumoconiosis to review the x-rays of the Plaintiffs and the reports used to diagnose the Plaintiffs with silicosis. Under Defendants' proposal, the Court would dismiss any Plaintiff whose x-ray the panel determines is not consistent with silicosis. (See MDL 03-1553 Docket Entry 1145, 1149.)

On December 14, 2004, Plaintiffs filed their objection to this motion, arguing that their diagnosing doctors utilized "the appropriate scientific methodology for determining whether an injury exists." (MDL 03-1553 Docket Entry 1295 at 7.) The

---

[123]   The deadline for the designation of experts has past.

doctors, according to Plaintiffs, simply "[c]onduct[ed] such methodology on a large scale." (MDL 03-1553 Docket Entry 1295 at 7.) Therefore, Plaintiffs argued, even if an expert panel disagreed with the conclusions reached by the diagnosing doctors, this would be a difference of opinion and not a Daubert issue. (MDL 03-1553 Docket Entry 1295 at 12.)

In Order No. 19, the Court carried forward Defendants' motion pending the upcoming Daubert hearings. Notwithstanding this, in Order No. 19, the Court stated: "The parties are urged to agree on a panel of four experts for the purpose of excluding, if possible, any plaintiff that does not presently have silicosis or is not in fear of future illness as related to silicosis, and to prioritize the degree of severity of silicosis in any other plaintiff." (Order No. 19 ¶ 5.) The parties once again declined the Court's suggestion to agree on a panel.

After the ensuing depositions of Dr. Hilbun and Dr. Cooper, and after nearly two days of testimony at the February 2005 Daubert hearings, Mr. Davis, of Campbell Cherry (the firm representing approximately 4,256 Plaintiffs), addressed the Court:

> DAVIS: Every single plaintiff with exception of a few that people have tried to get out of this case on some basis, have a diagnosis by doctors, all of whom we believe were capable of making the diagnosis and follow the proper methodology.
> Again, I'm going to speak to my firm, but I think I can speak for everybody on the plaintiff's side. We have not committed any improper acts. I and my firm makes no apology for representing these people and for filing the cases on their behalf; however, as I said a moment ago,

as facts in a case develop, we determined it is time to
do something new or different to help our cases along.

    And your Honor, what we are willing to propose or
what we are going to do -- and I think this is true for
most of the plaintiff lawyers, we are going to establish
an independent medical panel to review every one of these
X-rays to determine if this independent panel believes
that the radiographic findings support the diagnosis for
silicosis.

THE COURT:   I told you this months ago after the
Martindale fiasco that you had to come up with something
to help your clients stay in this litigation. ...
Because it's your clients that are going to suffer.

MR. DAVIS: Yes, ma'am. As you mentioned earlier today,
there are sick people in this litigation and these people
--

THE COURT:   They're not being well served by this
testimony.

MR. DAVIS: And we acknowledge that, your Honor, and what
we're saying is, with your help we'll create an
independent panel. We'll be glad to work jointly with
Defendants, but if none of that works out, we as a group
are going to do that and we are going to be in a position
to determine which of these plaintiffs, based on this
independent medical panel deserve to have their cases
remain in this court and those that do not, deserve to be
dismissed without prejudice and without any running of
their statute of limitations so that if they subsequently
develop this disease, they are not barred by anything
that has gone on here.

    These people don't need to be victims by having good
cases thrown out or by having cases that don't have the
appropriate radiographic readings at this time, but do at
a later date from being able to come back into the
system.  It is fair to our clients.  We are content and
heartfelt --

THE COURT:  How far -- what are we?  Three years into
this litigation now?  Three years into this litigation
and now you say you're going to come up with a doctor
that can actually diagnose whether they've got this or
not. ...  And I can understand if the Defendants don't
jump up and say, "We join you in this process."

MR. DAVIS:  And your Honor, quite frankly, if they don't
join with us, we're going to do it anyway because we have
got to protect the ability of these clients –

....

THE COURT: I can't help but over this last day and half
think, 'Is there one member of the plaintiff's bar that

would have gone to one of these screening companies for their own pulmonary problems and relied on this kind of diagnosis from anyone other than Dr. Segarra.' I have to ask you this. I don't want an answer, but I have to posit that in my mind.

(Feb. 17, 2005 Trans. at 206-09.)

On February 17, 2005, Mr. Davis made this declaration of the Plaintiffs' intent to establish--unilaterally, if necessary--"an independent medical panel to review every one of these X-rays to determine if this independent panel believes that the radiographic findings support the diagnosis for silicosis." (Feb. 17, 2005 Trans. at 206.) Over four months later, Plaintiffs have not informed the Court of any steps they have taken toward establishing this medical review panel.

## M. Kirkland Deposition

Other than the single Plaintiff diagnosed by Dr. Segarra, there is only one of the 10,000 Plaintiffs whom the Court can say with confidence is genuinely injured.[124] His name is Clark C. Kirkland, and just prior to undergoing a lung transplant, he testified at the February Court depositions.[125] Yet, despite his being genuinely sick, despite his having two attorneys of record,

---

[124] The Court makes no finding as to the extent of Mr. Kirkland's injury, or whether it was caused in whole or in part by the inhalation of silica.

[125] Mr. Kirkland and his wife are the only Plaintiffs in Kirkland v. 3M Company, cause number 04-639.

and despite his being in a courtroom full of lawyers, he had no one to represent his interests.

On December 22, 2004, Mr. Kirkland sent a letter to this Court (as well as to a United States District Judge in Atlanta, Georgia and the United States Attorney's Office in Atlanta), alleging that one of his two attorneys of record, Michael Martin, committed certain acts of misconduct.  Among other things, Mr. Kirkland alleged that his attorney failed to file suit on his behalf within the statute of limitations.[126]

January 14, 2005, Defendant 3M reported to the Court that it had received a letter from Mr. Kirkland making similar allegations against Mr. Martin.  In light of this, 3M argued that Mr. Kirkland had waived his attorney-client privilege, and 3M asked the Court for permission to serve discovery on Mr. Kirkland directly.  3M also asked for permission to take Mr. Kirkland's deposition at a time when the Court would be available to rule on objections.

On January 24, 2005, Mr. Kirkland's attorneys, Mr. Martin and Scott C. Monge, filed motions to withdraw as counsel for Mr. Kirkland.  On January 31, 2005, the Court denied these motions, and

---

[126]  Mr. Kirkland was a plaintiff in a suit filed in Georgia state court on April 11, 2003, and then voluntarily dismissed on April 17. 2003.  On January 28, 2004, the same case was refiled in a different Georgia state court by Scott C. Monge as lead counsel.  This subsequent action was removed to federal court and, on November 24, 2004, the case was conditionally transferred to this MDL.  Mr. Kirkland alleges that he has developed silicosis as a result of exposure to silica dust while a rock driller for the U.S. Army in the 1970's.  (Kirkland Dep. at 18.)

instead ordered both attorneys to appear in person for a Court-monitored deposition of Mr. Kirkland conducted by 3M on February 16, 2005.  3M was granted permission to contact Mr. Kirkland only to the extent necessary to arrange for the payment of his travel expenses to the deposition.  Also, the Court noted that Mr. Kirkland may retain additional counsel.  These rulings were made in Order No. 23, a copy of which was sent directly to Mr. Kirkland, as well as all counsel.

On February 10, 2005 (six days before Mr. Kirkland's scheduled deposition with 3M), Mr. Martin filed, purportedly on behalf of Mr. Kirkland, a motion to dismiss 3M with prejudice.  Mr. Kirkland had sued 3M for producing an allegedly-deficient dust-protection mask.  According to the motion, in 2001 and 2002, Mr. Kirkland had made statements indicating that he did not wear a respirator or mask when he was exposed to silica.  Therefore, according to the motion, 3M, and another Defendant who manufactured dust-protection masks, should be dismissed with prejudice.  Since these 2001 and 2002 statements presumably were known to Mr. Martin long before February 10, 2005, the timing of the motion seemed suspect.  (And as became apparent at Mr. Kirkland's deposition, the motion was filed without Mr. Kirkland's knowledge or consent.)

On February 16, 2005 (the first day of the Daubert hearings), at the scheduled time of Mr. Kirkland's deposition, Mr. Martin appeared (with counsel of his own) while Mr. Monge did not.  (On the same date, the Court issued a written order requiring Mr. Monge

to appear on February 17, 2005 and show cause as to why he should not be held in contempt for failing to comply with the Court's order to appear for his client's deposition.)  Mr. Martin's attorney first addressed the Court and asked that 3M's deposition not be permitted to go forward in light of the motion to dismiss that Mr. Martin filed on behalf of Mr. Kirkland.  (Kirkland Dep. at 10.)  The Court reminded counsel that the motion to dismiss had not yet been ruled upon and indicated it would allow the deposition to proceed.  (Kirkland Dep. at 10.)

Then the Court explained to Mr. Kirkland about the meaning and consequences of waiving attorney-client privilege, and asked Mr. Kirkland if he waived the privilege with respect to Mr. Martin. (Kirkland Dep. at 11, 14.)  Mr. Kirkland stated under oath that he wished to waive his attorney-client privilege with respect to Mr. Martin.  (Kirkland Dep. at 11, 14.)  The Court also explained that because Mr. Kirkland indicated that he has been unable to locate another attorney, the Court would not release Mr. Martin and Mr. Monge from their representation of him until at least after 3M's deposition.  (Kirkland Dep. at 12.)  The Court also noted that: "[Y]ou do have an attorney here that you may consult with and you may visit with your attorney as long as you need to."  (Kirkland Dep. at 12.)

During the direct examination, 3M questioned Mr. Kirkland about the statements he made in 2001 and 2002 which were referenced in the motion to dismiss.  (Kirkland Dep. at 28-30.)  3M also

questioned Mr. Kirkland about the date on which Mr. Kirkland believed his illness was caused by silica exposure.  Finally, 3M questioned Mr. Kirkland about his allegations against Mr. Martin, and the materials Mr. Kirkland produced at the deposition (including correspondence and taped recordings of conversations between Mr. Kirkland and Mr. Martin).[127]

After 3M finished its questioning, Mr. Martin rose to question his client.  Of course it is understandable why Mr. Martin no longer wished to represent Mr. Kirkland.  However, Mr. Kirkland's case was under attack by 3M, and if at all possible, Mr. Kirkland needed representation, so Mr. Martin was not permitted to withdraw. Despite this, Mr. Martin succumbed to the urge to torpedo his client's case.  In a contentious examination, Mr. Martin and his client argued about whether Mr. Kirkland's statements in 2001 and 2002 precluded a suit against 3M.  Then Mr. Martin attempted to show that his client's cause of action accrued for statute of limitations purposes in 1999--meaning that Mr. Kirkland's suit would have been time-barred prior to Mr. Martin's engagement in 2002 and therefore any delays and/or errors Mr. Martin might have made in filing the 2003 suit would not have caused damage.  At this point, the Court told Mr. Martin that "[u]nless you have something that would be helpful to your client, then the deposition is

---

[127]   The specifics of Mr. Kirkland's allegations are matters for another forum.

concluded." (Kirkland Dep. at 56.) Hearing nothing that would aid Mr. Kirkland's case, the Court ended the deposition.

After the <u>Daubert</u> hearings, the Court granted Mr. Martin's motion to withdraw from the case.

## III.    Subject-Matter Jurisdiction[128]

### A.    Priority of Subject-Matter Jurisdiction

A federal court's "first inquiry" must be whether it has subject-matter jurisdiction. <u>Smallwood v. Ill. Cent. R.R. Co.</u>, 385 F.3d 568, 576 (5th Cir. 2004) (en banc), <u>cert. denied</u>, 125 S. Ct. 1825 (2005); <u>see also</u> <u>Union Planters Bank Nat'l Ass'n v. Salih</u>, 369 F.3d 457, 460 (5th Cir. 2004) ("[F]ederal courts are duty-bound to

---

[128] When considering the issue of federal subject-matter jurisdiction, the Court will apply the law of the Fifth Circuit. <u>See</u> <u>In re Temporomandibular Joint Implants Prods. Liab. Litig.</u>, 97 F.3d 1050, 1055 (8th Cir. 1996) ("When analyzing questions of federal law, the [MDL] transferee court should apply the law of the circuit in which it is located.") (citing <u>In re Korean Air Lines Disaster</u>, 829 F.2d 1171, 1176 (D.C. Cir. 1987), <u>aff'd</u>, 490 U.S. 122 (1989)); <u>see also</u> <u>Murphy v. F.D.I.C.</u>, 208 F.3d 959, 965-66 (11th Cir. 2000) (same); <u>Menowitz v. Brown</u>, 991 F. 2d 36, 40 (2d Cir. 1993) (same). Jurisdiction is "arguably the area where the need for uniformity in federal law is most compelling." <u>In re StarLink Corn Prods. Liab. Litig.</u>, 211 F. Supp. 2d 1060, 1063-64 (D.C. Ill. 2002). "The diversity jurisdiction law of the [MDL] transferee court should be applied because 'applying the law of the transferor circuit could yield a situation where we would find federal jurisdiction exists over claims from some parts of the country, but not from others. This is an untenable result.'" <u>In re Mastercard Int'l, Inc. Internet Gambling Litig.</u> 2004 WL 287344, *2 (E.D. La. Feb. 12, 2004) (quoting <u>In re StarLink Corn Prods. Liab. Litig.</u>, 211 F. Supp. 2d at 1063-64); <u>see also</u> <u>In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.</u>, 256 F. Supp. 2d 884, 888 (S.D. Ind. 2003) (same); <u>In re Diet Drugs Prods. Liab. Litig.</u>, 220 F. Supp. 2d 414, 423 (E.D. Pa. 2002) ("As an MDL Court sitting within the Third Circuit, we must apply our Court of Appeals' fraudulent joinder standard.").

examine the basis of subject matter jurisdiction <u>sua sponte</u>."); 28 U.S.C. § 1447(c). This is because "[f]ederal courts are courts of limited jurisdiction." <u>Howery v. Allstate Ins. Co.</u>, 243 F.3d 912, 916 (5th Cir. 2001) (citing <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 377 (1994)). Federal courts "must presume that a suit lies outside this limited jurisdiction, and the burden of establishing federal jurisdiction rests on the party seeking the federal forum." <u>Howery</u>, 243 F.3d at 916 (citations omitted).

The reason a federal court's first inquiry must be whether the case falls within its limited jurisdiction is that "[u]nless a federal court possesses subject matter jurisdiction over a dispute, ... any order it makes (other than an order of dismissal or remand) is void." <u>Dahiya v. Talmidge Int'l, Ltd.</u>, 371 F.3d 207, 210 (5th Cir. 2004) (citing <u>John G. & Marie Stella Kenedy Mem'l Found. v. Mauro</u>, 21 F.3d 667, 674 (5th Cir. 1994); <u>Shirley v. Maxicare Tex. Inc.</u>, 921 F.2d 565, 568 (5th Cir. 1991)). The Fifth Circuit has explained:

> Where a federal court proceeds in a matter without first establishing that the dispute is within the province of controversies assigned to it by the Constitution and statute, the federal tribunal poaches upon the territory of a coordinate judicial system, and its decisions, opinions, and orders are of no effect.

<u>Howery</u>, 243 F.3d at 916 n.6 (quotation omitted).

The fact that these actions are collected in an MDL does not alter the normal jurisdictional rules. "While [28 U.S.C.] § 1407 provides a procedure for transferring cases filed in different

districts to a single district court for pretrial proceedings, nowhere does it expand the jurisdiction of either the transferor or the transferee court." <u>In re Showa Denko K.K. L-Tryptophan Prod. Liab. Litig.-II</u>, 953 F.2d 162, 165 (4th Cir. 1992) ("The authority for consolidating cases on the order of the judicial panel on multi-district litigation ... is merely procedural and does not expand the jurisdiction of the district court to which the cases are transferred.").

### B.    Removal[129]

A party may remove an action from state court to federal court if the action is one over which the federal court possesses subject-matter jurisdiction.    <u>See</u> 28 U.S.C. § 1441(a).    The removing party--as the party seeking the federal forum--bears the burden of showing that federal jurisdiction exists and that removal was proper.    <u>See</u> <u>Manguno v. Prudential Prop. & Cas. Ins. Co.</u>, 276 F.3d 720, 723 (5th Cir. 2002).    "Any ambiguities are construed against removal because the removal statute should be strictly construed in favor of remand." <u>Id.</u> (citing <u>Acuna v. Brown & Root, Inc.</u>, 200 F.3d 335, 339 (5th Cir. 2000) ("[D]oubts regarding whether removal jurisdiction is proper should be resolved against federal jurisdiction.")).

### C.    Diversity Jurisdiction

---

[129]    Unless specifically referenced <u>infra</u>, the following discussion of the Court's subject-matter jurisdiction applies to the removed cases listed in "Appendix A," attached hereto.

Defendants removed these cases pursuant to 28 U.S.C. § 1441,[130] asserting diversity subject-matter jurisdiction under 28 U.S.C. § 1332.[131]    Therefore, whether this Court has subject-matter jurisdiction depends upon whether the Plaintiffs' claims satisfy the two requirements for diversity jurisdiction: (1) the $75,000 amount-in-controversy requirement, and (2) the complete diversity of citizenship requirement.   See 28 U.S.C. § 1332(a).

### 1.    Amount in Controversy

"Where ... the petition does not include a specific monetary demand, [the defendant] must establish by a preponderance of the evidence that the amount in controversy exceeds $75,000." Manguno, 276 F.3d at 723 (citation omitted).   The complaints in this MDL do not include a specific monetary demand.   In such an instance, "[t]he district court must first examine the complaint to determine whether it is 'facially apparent' that the claims exceed the jurisdictional amount." St. Paul Reinsurance Co. v. Greenberg, 134 F.3d 1250, 1253 (5th Cir. 1998) (citing Allen v. R & H Oil & Gas Co., 63 F.3d 1326, 1335 (5th Cir. 1995)).   "If it is not thus apparent, the court may rely on 'summary judgment-type' evidence to

---

[130]    The federal removal statute, 28 U.S.C. § 1441(a), allows for the removal of "any civil action brought in a State court of which the district courts of the United States have original jurisdiction."

[131]    As previously discussed, at the time of removal, Defendants also argued that the Court possessed bankruptcy jurisdiction due to the fact that some Plaintiffs had filed bankruptcy.   However, this argument has been abandoned.   See footnote 16, supra.

ascertain the amount in controversy."  St. Paul Reinsurance Co.,
134 F.3d at 1253 (citing Allen, 63 F.3d at 1336).

As alleged in the Complaints, it is facially apparent that
each of the claims exceed the jurisdictional amount of $75,000.[132]
For example, the following allegations from Nichols v. Aearo, S.D.
Tex. Cause No. 03-391 (one of the cases transferred in this MDL's
initial transfer order), are typical:

> As a direct and proximate cause of the conduct of
> Defendants, Plaintiffs were injured.  The damages
> Plaintiffs have suffered include, but are not limited to,
> the following:
> A.   Severe impairment to their lungs and respiratory
>      system;
> B.   Medical Expenses, past and future;
> C.   Pain and Suffering, past and future;
> D.   Mental Anguish, Anxiety, and Discomfort, past and
>      future;
> E.   Lost wages and income, past and future;
> F.   Physical Impairment;
> G.   Physical Disfigurement;
> H.   Loss of Enjoyment;
> I.   Loss of Consortium;
> J.   Pre and post judgment interest;
> K.   Exemplary and Punitive Damages;
> L.   Treble damages;
> M.   Reasonable and necessary attorneys fees; and
> N.   Such other relief to which Plaintiffs may be justly
>      entitled.

---

[132] "The Supreme Court has long interpreted § 1332's phrase
'matter in controversy' not to allow multiple plaintiffs to add
together separate and distinct demands, united for convenience
and economy in a single suit, to meet the requisite
jurisdictional level." Allen, 63 F.3d at 1330 ("The general rule
is that each plaintiff who invokes diversity of citizenship
jurisdiction must allege damages that meet the dollar requirement
of § 1332.") (quotation and citations omitted).

(Pls.' Orig. Compl. at 64; see also Alexander v. Air Liquide Am. Corp., S.D. Tex. Cause No. 03-533, Pls.' Orig. Compl. at 35 (same).[133])  These are the types of injuries that the Fifth Circuit has held satisfies the "facially apparent" standard.  See Gebbia v. Wal-Mart Stores, Inc., 233 F.3d 880, 883 (5th Cir. 2000).[134]

Therefore, the Plaintiffs' Complaints satisfy the amount-in-controversy requirement.[135]

_____

[133] As discussed infra, Alexander was originally filed in this Court.

[134] In Gebbia, the Fifth Circuit held that it was "facially apparent" that the following allegations made a claim for damages in excess of $75,000:

> Plaintiff alleged in her original state court petition that she sustained injuries to her right wrist, left knee and patella, and upper and lower back.  Plaintiff alleged damages for medical expenses, physical pain and suffering, mental anguish and suffering, loss of enjoyment of life, loss of wages and earning capacity, and permanent disability and disfigurement.

Gebbia, 233 F.3d at 883.

[135] In its Motion to Remand, 3M argues that the evidence presented during the Daubert hearings constitutes "summary judgment-type evidence" showing that most Plaintiffs do not satisfy the amount-in-controversy requirement.  However, in the Fifth Circuit, a court looks to "summary judgment-type evidence" only if it is not "facially apparent" that the claims exceed the jurisdictional minimum.  See St. Paul Reinsurance Co., Ltd. v. Greenberg, 134 F.3d 1250, 1253-54 (5th Cir. 1998) ("The district court must first examine the complaint to determine whether it is 'facially apparent' that the claims exceed the jurisdictional amount.  If it is not thus apparent, the court may rely on 'summary judgment-type' evidence to ascertain the amount in controversy.") (emphasis added); cf. H&D Tire and Automotive-Hardware, Inc. v. Pitney Bowes Inc., 227 F.3d 326, 329 (5th Cir. 2000) ("Because it is not facially apparent from the complaint that the jurisdictional amount is satisfied, we will look elsewhere in the record to determine the amount in controversy.") (emphasis added); Allen v. R & H Oil & Gas Co., 63 F.3d 1326, 1336 (5th Cir. 1995) ("In situations where the facially apparent test is not met, the district court can then

## 2.    Complete Diversity

With respect to the diversity-of-citizenship requirement, "[i]t is well-established that the diversity statute requires 'complete diversity' of citizenship: A district court cannot exercise diversity jurisdiction if one of the plaintiffs shares the same state citizenship as any one of the defendants." Corfield v. Dallas Glen Hills LP, 355 F.3d 853, 857 (5th Cir. 2003) (citations omitted).

In the case of corporate parties, a corporation is a citizen of both its state of incorporation and the state of its principal place of business for purposes of diversity jurisdiction. See Teal Energy USA, Inc. v. GT, Inc., 369 F.3d 873, 875 (5th Cir. 2004); Stafford v. Mobil Oil Corp., 945 F.2d 803, 806 (5th Cir. 1991) ("For diversity jurisdiction purposes, a corporation is a citizen of the state in which it was incorporated and the state in which it has its principal place of business.") (quoting Getty Oil Corp. v. Ins. Co. N. Am., 841 F.2d 1254, 1258 (5th Cir. 1988); see also 28 U.S.C. § 1332(a).  In these MDL cases, many of the Complaints allege the

_____

require parties to submit summary-judgment-type evidence, relevant to the amount in controversy at the time of removal.") (emphasis added).  In a footnote, the Allen court continued: "The efficient procedure is to not require such 'summary judgement' proof until after the initial consideration of the face of the complaint." Allen 63 F.3d at 1336 n.16.
     Therefore, in these MDL cases, because it is "facially apparent" from the Complaints that the amount-in-controversy requirement is satisfied, the evidence adduced at the Daubert Hearings may not be used to subsequently show that the amount-in-controversy requirement is not satisfied.

Defendants' states of incorporation, but none of the Complaints allege any Defendant's principal place of business.

However, it is not Plaintiffs' burden to make such allegations. "For diversity jurisdiction, the party asserting federal jurisdiction must 'distinctly and affirmatively allege' the citizenship of the parties." Howery v. Allstate Ins. Co., 243 F.3d 912, 919 (5th Cir. 2001) (quoting Stafford, 945 F.2d at 806). Here, the Defendants are asserting federal jurisdiction via removal: hence, they "bear[] the burden of establishing diversity; if [they] fail[] to meet that burden, [the court] cannot presume the existence of federal jurisdiction." Howery, 243 F.3d at 919. Therefore, the Defendants must "distinctly and affirmatively allege" the principal place of business of all properly joined Defendants.[136]

But even as the Complaints are currently pleaded (i.e., without any allegations concerning the Defendants' principal places of business), all of the removed actions in this MDL lack complete diversity of citizenship--that is, at least one Plaintiff is of the same citizenship as at least one Defendant. This, however, does not end the inquiry. Defendants removed these cases alleging that the Plaintiffs had improperly (or, "fraudulently") joined the parties. Defendants argued that in deciding jurisdiction, the Court should sever each Plaintiff's claim and focus solely on the

---

[136] The requirement that a Defendant be "properly joined" is discussed infra.

citizenship of the specific Defendants who allegedly caused that Plaintiff's specific injury.  Defendants argued that once this is done, some Plaintiffs' claims will need to be remanded to state court for lack of federal jurisdiction, but the vast majority of severed claims will be within the diversity jurisdiction of federal court.  At the time of removal, Defendants provided no proof for its assertions; they merely asserted "[o]n information and belief, few, if any, plaintiffs were exposed to the Mississippi Defendants' products.  Therefore, the Mississippi Defendants were fraudulently joined as to [the] overwhelming majority of plaintiffs."  (See, e.g., Notice of Removal, Sullivan v. Aearo, S.D. Tex. Cause No. 03-369, ¶ 6.)[137]

### a.    Improper Joinder

The removal statute, 28 U.S.C. § 1441, specifies that suits arising under federal law are removable without regard to the citizenship of the parties, while all other suits are removable "only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought."  28 U.S.C. § 1441(b) (emphasis added).  In other words, a court is to disregard the citizenship of parties which have been improperly joined.  See Smallwood v. Ill. Cent. R.R. Co., 385 F.3d 568, 572-73 (5th Cir. 2004) (en banc) ("The doctrine of improper joinder rests on ... statutory underpinnings, which entitle a

---

[137]  The pertinent allegations in all of the Notices of Removal are identical.

defendant to remove to a federal forum unless an in-state defendant has been 'properly joined.'"). <u>Smallwood</u> explains:

> The Federal courts should not sanction devices intended to prevent the removal to a Federal court where one has that right, and should be equally vigilant to protect the right to proceed in the Federal court as to permit the state courts, in proper cases, to retain their own jurisdiction.

<u>Id.</u> at 573 (quotation omitted).

The Fifth Circuit has recognized that "improper joinder" (also known as "fraudulent joinder")[138] may be established in one of two ways: "(1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court." <u>Id.</u> at 573 (citation omitted).

Defendants do not rely on either of these forms of improper joinder here. Although they alleged during the <u>Daubert</u> Hearings that Plaintiffs' diagnoses are "fraudulent", they have pointedly asserted that this "fraud" is irrelevant to jurisdictional issues. (Certain Defs.' Reply in Support of Jurisdiction, MDL 03-1553 Docket Entry 1755 at 5 ("That plaintiffs' 'diagnoses' have now been shown to be a sham has nothing to do with the jurisdictional issues

---

[138]   The term, "improper joinder," was recently adopted by the Fifth Circuit. <u>See</u> <u>Smallwood</u>, 385 F.3d at 571 n.1 ("We adopt the term 'improper joinder' as being more consistent with the statutory language than the term 'fraudulent joinder,' which has been used in the past. Although there is no substantive difference between the two terms, 'improper joinder' is preferred.").

now presented to this Court.").)   Similarly, while a handful of Defendants have argued that Plaintiffs cannot establish a cause of action against them under state law,[139] they have not contended that this somehow relates to jurisdiction (such as that the dismissal of those particular Defendants would result in the existence of diversity of citizenship between the remaining Plaintiffs and Defendants).

Instead, the Defendants here rely upon a third type of improper joinder which is known as "fraudulent <u>mis</u>joinder," and which exists "where a diverse defendant is joined with a nondiverse defendant as to whom there is no joint, several or alternative liability and where the claim against the diverse defendant has no real connection to the claim against the nondiverse defendant." <u>Triggs v. John Crump Toyota, Inc.</u>, 154 F.3d 1284, 1287 (11th Cir. 1998) (citing <u>Tapscott v. MS Dealer Serv. Corp.</u>, 77 F.3d 1353, 1360 (11th Cir. 1996), abrogated on other grounds by <u>Cohen v. Office Depot, Inc.</u>, 204 F.3d 1069 (11th Cir. 2000)).  The Fifth Circuit has not explicitly adopted this rule, but it has spoken in dicta of "the <u>Tapscott</u> principle that fraudulent misjoinder of plaintiffs is no more permissible than fraudulent misjoinder of defendants to circumvent diversity jurisdiction."  <u>In re Benjamin Moore & Co.</u>,

---

[139] For example, in all but one of the MDL cases, the Defendants who manufacture air compressors have argued that, as a matter of law, they had no duty to warn Plaintiffs of the health hazards associated with respirable silica and abrasive blasting. (<u>See</u> MDL 03-1553 Docket Entries 1107 & 1108; <u>see also</u> <u>Barnes v. Alabama Carbonates LP</u>, S.D. Tex. Cause No. 03-511, Docket Entry 86.)

318 F.3d 626, 630-31 (5th Cir. 2002) (holding that the Court of Appeals lacked jurisdiction to review the district court's rejection of defendants' fraudulent misjoinder claim); see also In re Benjamin Moore & Co., 309 F.3d 296, 298 (5th Cir. 2002) ("[I]t might be concluded that misjoinder of plaintiffs should not be allowed to defeat diversity jurisdiction.") (citing Tapscott). The Court will assume for the sake of argument that the Fifth Circuit would explicitly adopt the Tapscott principle in an appropriate case.

Tapscott involved an interpretation of Federal Rule of Civil Procedure 20(a) to determine whether the joinder of certain claims in a class action was proper. Rule 20(a) governs the "permissive joinder of parties," and it provides, in pertinent part:

> All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action. All persons ... may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.

Fed. R. Civ. P. 20(a). The first sentence of Rule 20 sets out the criteria as to when plaintiffs may be joined together in one action. The second sentence of Rule 20 sets out the criteria as to when defendants may be joined in one action. Plaintiffs may join together if they allege a claim "arising out of the same

transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action." Fed. R. Civ. P. 20(a); <u>see also</u> <u>Applewhite v. Reichhold Chems., Inc.</u>, 67 F.3d 571, 574 n.11 (5th Cir. 1995). <u>Defendants</u> may be joined together only if there is an alleged claim against the defendants "arising out of the same transaction, occurrence, or series of transactions or occurrences, and if any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a).

"Under the [Federal] Rules [of Civil Procedure], the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 724 (1966) (citing, <u>inter alia</u>, Fed. R. Civ. P. 20); <u>see also</u> <u>Alexander v. Fulton County, Ga.</u>, 207 F.3d 1303, 1323 (11th Cir. 2000) ("Plainly, the central purpose of Rule 20 is to promote trial convenience and expedite the resolution of disputes, thereby eliminating unnecessary lawsuits.") (citation omitted). As used in the Federal Rules:

> 'Transaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship. Accordingly, all 'logically related' events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence.

<u>Alexander</u>, 207 F.3d at 1323 (quoting <u>Moore v. New York Cotton Exch.</u>, 270 U.S. 593, 610 (1926); <u>Mosley v. Gen. Motors Corp.</u>, 497

F.2d 1330, 1333 (8ᵗʰ Cir. 1974)); cf. H.L. Peterson Co. v. Applewhite, 383 F.2d 430, 433 n.4 (5ᵗʰ Cir. 1967) (noting that the "same transaction or occurrence" language in Federal Rule of Civil Procedure 13(a) (governing compulsory counterclaims) "has been broadly interpreted not to require absolute identity of factual backgrounds for the two claims but only a logical relationship between them") (citation omitted).  As stated by a commentator:

> [L]anguage in a number of decisions suggests that the courts are inclined to find that claims arise out of the same transaction or occurrence when the likelihood of overlapping proof and duplication in testimony indicates that separate trials would result in delay, inconvenience, and added expense to the parties and to the court.

7 Wright, Miller & Kane, Federal Practice and Procedure § 1653 (citations omitted).

In Tapscott, one group of plaintiffs sued a set of defendants in state court for fraud arising from the sale of automobile service contracts.  See Tapscott, 77 F.3d at 1355.  In the same lawsuit, another group of plaintiffs sued an entirely separate set of defendants for fraud arising from the sale of service contracts covering retail products, as opposed to automobiles.  See id.  The retail products defendants were of diverse citizenship from the plaintiffs, while the automobile defendants were non-diverse.  See id. at 1359-60.  After removal to federal court, the Eleventh Circuit affirmed the district court's denial of the plaintiffs' motion to remand, stating that because the two sets of defendants were unrelated, the plaintiffs' "attempt to join these parties

-182-

[was] so egregious as to constitute fraudulent joinder." Id. at 1360. In so holding, the court expressly "d[id] not hold that mere misjoinder is fraudulent joinder," but rather held that "egregious" misjoinder was necessary to constitute fraudulent joinder. See id. As another MDL court has summarized: "[U]nder Tapscott, something more than 'mere misjoinder' of parties may be required to find fraudulent misjoinder. Precisely what the 'something more' is was not clearly established in Tapscott and has not been established since." In re Bridgestone/Firestone, Inc., 260 F. Supp. 2d 722, 728 (S.D. Ind. 2003); see also In re Rezulin Prods. Liab. Litig., 168 F. Supp. 2d 136, 146-47 (S.D.N.Y. 2001) (same); In re Diet Drugs, No. 98-20478, 1999 WL 554584, *3 (E.D. Pa., July 16, 1999) ("[A] finding of mere misjoinder does not itself warrant a finding of fraudulent misjoinder.") (citing Tapscott, 77 F.3d at 1360).[140]

---

[140]   In the Rezulin Products MDL, the court stated: Although misjoinder is a ground for dismissal or severance of an improperly joined party, the vast majority of courts confronting the issue on remand motions have found that misjoinder of a party with a unique claim against a non-diverse adversary is not alone a basis for remand. One treatise suggests that this is because improper joinder does not defeat the possibility of a claim against the misjoined party, as is required to satisfy the traditional standard for fraudulent joinder in discounting the citizenship of non-diverse parties. Thus, courts considering the issue generally have looked for the additional element of a bad faith attempt to defeat diversity, defining misjoinder of this type as a third species of fraudulent joinder.
In re Rezulin Prods. Liab. Litig., 168 F. Supp. 2d at 146-47 (citing inter alia, Tapscott, 77 F.3d at 1360).

-183-

Here, it is not necessary for the Court to precisely define the parameters of "mere misjoinder" versus "egregious misjoinder." Instead, it is sufficient to explain why, for jurisdictional purposes, the joinder of the disparate Plaintiffs' claims constitutes egregious misjoinder, while each Plaintiffs' joinder of his or her claims against multiple Defendants does not constitute egregious misjoinder.

### i.    Joinder of Plaintiffs

The MDL Plaintiffs are alleging individual damages resulting from exposure to respirable silica over the course of each particular Plaintiff's work life.  These exposures—and any resulting illnesses—will vary depending upon where each Plaintiff worked, for how long, and with what equipment.  In reviewing the Plaintiffs' Fact Sheets, it is clear that the Plaintiffs who have been joined together have no relevant connection to each other, outside of the fact that all are alleged to have been exposed to respirable silica.  The majority of the joined Plaintiffs worked in different locations, for different lengths of time, at different occupations, using different products.

It is worth noting that the joinder of the Plaintiffs in each case is not entirely haphazard.  Instead, it appears that the true reason for the joinders is that the collection of Plaintiffs in each case were all part of a certain law firm's existing asbestos "inventory" and/or they were screened within the same time-period by the same screening company.  Of course, while these reasons

might explain the joinders, they do not make the joinders proper under Rule 20.

Instead, joinder among plaintiffs is only proper if they allege a claim "arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action."  Fed. R. Civ. P. 20(a).[141]  Here, it is evident from the Plaintiffs' Fact Sheets that this test for joinder has not been met.  This point can be illustrated by a random selection of the Fact Sheets of two out of the 4,280 Plaintiffs joined in <u>Prince v. Pearl River Sand & Gravel Co.</u>, S.D. Tex. Cause No. 03-392.  The two Fact Sheets are attached hereto as Exhibits 32 & 33.

Plaintiff Raymond Eugene Goodwin alleges silica exposure while working during the following years at the following jobs: from 1958-59 as a grinder at U.S. Steel Company in Gary, Indiana; from 1969-1970 as a truck driver at Ingall Iron in Birmingham, Alabama;

---

[141]  As discussed more fully <u>infra</u>, following the lead of the Eleventh Circuit in <u>Tapscott</u>, this Court will apply Federal Rule of Civil Procedure 20, rather than an analogous state-law joinder rule, in determining the jurisdictional issue of "egregious misjoinder."  <u>See</u> <u>Tapscott</u>, 77 F.3d at 1360; <u>see also</u> <u>Edwards v. E.I. Du Pont De Nemours & Co.</u>, 183 F.2d 165, 168 (5th Cir. 1950) ("[I]n procedural matters we are controlled by the Federal Rules of Civil Procedure, 28 U.S.C.A. ...  [W]e look to the federal statutes as construed by ... federal decisions to determine whether the case is removable in whole or in part, all questions of joinder, non-joinder, and misjoinder being for the federal court.") (citations omitted).  Moreover, as discussed <u>infra</u>, in these cases, the result would be no different if the Court analyzed the "egregious misjoinder" issue using Mississippi Rule of Civil Procedure 20.

and from 1994-1995 as a mechanic at United Gunite in Florence, Alabama. (Exhibit 32 at 3.) Plaintiff James Earl King alleges silica exposure while working as a mechanic at Tractor & Equipment Company in Anniston, Alabama from 1971-1990. (Exhibit 33 at 3.) The only "transaction, occurrence, or series of transactions or occurrences" that links these two Plaintiffs is that they were each "diagnosed" with silicosis by Dr. Martindale, they are each represented by the Campbell Cherry firm (located in Waco, Texas), and they each sued the same collection of 134 Defendants in Mississippi state court. However, these are not the types of transactions or occurrences which are relevant under Rule 20. See Fed. R. Civ. P. 20(a) ("All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences ....") (emphasis added). By way of further illustration (and to illustrate the variations--or lack thereof--in the Fact Sheet submissions), two Fact Sheets also have been randomly selected from both Clark v. Air Liquide America Corp., S.D. Tex. Cause No. 03-376 (a case purporting to join 1,566 Plaintiffs), and Woods v. Pulmosan Safety Equipment Corp., S.D. Tex. Cause No. 04-025 (a case purporting to join 25 Plaintiffs).[142] See Exhibits 34 & 35 and 36

---

[142] Prince, with 4,280 Plaintiffs, and Clark, with 1,566 Plaintiffs, are the largest cases in this MDL. Because of this, the egregiousness of the misjoinder of the Plaintiffs in those cases seems especially pronounced. But even as to the other cases which purport to join lesser numbers of Plaintiffs, each

& 37, attached hereto.[143]  These Fact Sheets show what is apparent from all of the Fact Sheets--that these Plaintiffs have no relevant connection to each other.

As stated by another MDL court:

> The joinder of several plaintiffs who have no connection to each other in no way promotes trial convenience or expedites the adjudication of the asserted claims. Rather, the joinder of such unconnected, geographically diverse plaintiffs that present individual circumstances material to the final outcome of their respective claims would obstruct and delay the adjudication process. Given Plaintiffs' vast geographic diversity and lack of reasonable connection to each other, the court finds that the attempted joinder of the nonresident Plaintiffs wrongfully deprives Defendants of their right of removal.

In re Diet Drugs, No. 98-20478, 1999 WL 554584, at *3 (E.D. Pa., July 16, 1999) (applying Tapscott and finding egregious misjoinder where plaintiffs attempted to join persons from seven different states who had no connection with one another except that each ingested diet drugs); see also Coleman v. Conseco, Inc., 238 F.

---

with disparate work and exposure histories, this "egregious misjoinder" discussion is applicable.  The are, however, two notable exceptions: Kirkland v. 3M Co., S.D. Tex. Cause No. 04-639 and Gatlin v. Ash Grove Cement Co., S.D. Tex. Cause No. 04-638.  Kirkland (a case with only two Plaintiffs, husband and wife) will be addressed separately, infra.  Gatlin is a single-Plaintiff case with 6 Defendants.  The portion of this Order addressing the joinder of Plaintiffs is not applicable to Gatlin. The case nonetheless has been included with the other cases listed on "Appendix A" because the discussion related to the "Appendix A" cases in the other jurisdictional portions of this Order are applicable to Gatlin.

[143]  Certain portions of the Fact Sheets have been omitted from these Exhibits.  Specifically, the signed authorizations to release medical and financial records have been omitted, as well as all Social Security earnings statements.

Supp. 2d 804, 818 (S.D. Miss. 2002) (finding egregious misjoinder
and dismissing 45 out-of-state plaintiffs because "the out-of-state
Plaintiffs' claims ... 'occurred in complete factual, temporal and
geographic isolation' from the claims of the three Mississippi
Plaintiffs") (quoting Rudder v. Kmart Corp., No. 97-0272, 1997 WL
907916 at *6 (S.D. Ala., Oct. 15, 1997));[144] cf. Abdullah v. Acands,
Inc., 30 F.3d 264, 269 n.5 (1st Cir. 1994) ("Appellants' Complaint

---

[144] Rudder was initially filed in Alabama state court by
three plaintiffs, two of which were Alabama residents, and one of
which was a resident of Michigan. The sole defendant was Kmart
Corporation, a resident of Michigan. The suit was based on the
alleged fraudulent sale by Kmart of used auto batteries as new
batteries. The Michigan plaintiff purchased batteries at Kmart
stores in Michigan and Alabama. However, the Alabama purchase
occurred after he initiated suit against Kmart. The Alabama
plaintiffs purchased their batteries at Kmart stores in Alabama.
Kmart removed the case to Alabama federal court on the
jurisdictional basis of diversity of citizenship. Kmart alleged
that the Michigan plaintiff was fraudulently misjoined to destroy
diversity of citizenship jurisdiction. Finding that the Michigan
plaintiff was fraudulently misjoined under Rule 20, the Rudder
court held:

> Clearly, McGuire [the Michigan Plaintiff] and the other
> plaintiffs do not 'assert a right to relief arising out
> of the same transaction or occurrence, or series of
> transactions or occurrences.' McGuire's Alabama
> purchase--assuming arguendo that it could possibly form
> the predicate for a valid cause of action--occurred in
> complete factual, temporal and geographic isolation
> from Rudder's and Soleman's [the Alabama plaintiffs].
> The record contains no evidence of any connection
> whatsoever between the plaintiffs or their respective
> transactions. Indeed, McGuire testifies in essence that
> he has never spoken to either William Rudder or Cissy
> Soleman. The record reflects no reason why the joinder
> of McGuire, a Michigan resident, to the other two
> plaintiffs, Alabama residents, would serve any
> legitimate purpose of fairness or judicial efficiency.
> In short, the claims of McGuire, and Rudder and
> Soleman, are not claims that a reasonable person would
> normally expect to be tried together.

Rudder, 1997 WL 907916 at *5 (citations and footnotes omitted).

fails to satisfy the threshold requirement of Fed. R. Civ. P. 20 that the plaintiffs' claim for relief arise out of 'the same transaction, occurrence, or series of transactions or occurrences.' The Complaint is bereft of factual allegations indicating why 1000 plaintiffs and 93 defendants belong in the same action.  It gives no indication of whether plaintiffs were injured while serving on the same vessels or during the same time periods; no indication of whether they were injured by exposure to the same asbestos-containing products or equipment, nor any specification of the products or equipment to which they were exposed.") (citing Aaberg v. Acands, Inc., 152 F.R.D. 498, 500 (D. Md. 1994) (same)); In re Asbestos II Consol. Pretrial, No. 86-C-1739, 1989 WL 56181, at *1 (N.D. Ill., May 10, 1989) (same).

Therefore, while the Fifth Circuit has not expressly adopted the Tapscott theory of improper joinder, the Court assumes, arguendo, that the misjoinder of the Plaintiffs' claims so fails to meet the requirements of Federal Rule of Civil Procedure 20(a) as to constitute "egregious misjoinder" under Tapscott.  Thus, when considering the issue of diversity of citizenship, the Court will view each Plaintiff's claim in isolation, as if all Plaintiffs' claims were severed from each other.

Prior to addressing the issue of each Plaintiff's joinder of Defendants, two issues related to the joinder of Plaintiffs should noted.

First, at the time the Complaints were filed in state court, Plaintiffs had at least a colorable basis to believe the joinders of these disparate Plaintiffs were proper under Mississippi Rule 20--despite the fact that the text of Mississippi Rule 20 is, in essence, the same as Federal Rule 20.  For example, in 2002, the Mississippi Supreme Court stated: "The general philosophy of the joinder provisions of these Rules is to allow <u>virtually unlimited joinder</u> at the pleading stage, but to give the Court discretion to shape the trial to the necessities of the particular case."  <u>Ill. Cent. R.R. v. Travis</u>, 808 So.2d 928, 931 (Miss. 2002) (emphasis added).

But more recently, the Mississippi Supreme Court has clarified that Mississippi Rule 20 would not permit joinder in situations such as those presented by the cases in this MDL.  In <u>Janssen Pharmaceutica, Inc. v. Armond</u>, 866 So.2d 1092 (Miss. 2004), the court held that Mississippi Rule 20 did not allow the joinder of 56 different plaintiffs who were prescribed an allegedly defective drug (Propulsid) by 42 different doctors.  The court explained:

> [E]ach plaintiff/doctor combination has its own set of facts and evidence surrounding the prescribing of Propulsid, the transaction or occurrence which is the basis for each claim.  Thus, there is no single transaction or occurrence or series of transactions or occurrences connecting all 56 plaintiffs and 42 physician defendants.

Janssen, 866 So.2d at 1102.[145]    The Mississippi Supreme Court reaffirmed this holding in the context of an asbestos case which attempted to join over 150 plaintiffs:

> [T]he plaintiffs ... were improperly joined ..., as the only similar trait shared by the plaintiffs is the alleged exposure to asbestos at some point in their work history. The plaintiffs worked in different occupations, for different employers, at different times, were exposed to different products and used different respiratory protection equipment or no respiratory protection equipment at all.

3M Co. v. Johnson, 895 So.2d 151, 158 (Miss. 2005).    Thus, the Court assumes, arguendo, that in these MDL cases, the Plaintiffs' attempted joinders would fare no better under Mississippi Rule 20 than they do under Federal Rule 20.

The second issue the Court notes is why it has refrained from considering Plaintiffs' civil conspiracy allegations.    The Plaintiffs rely upon these allegations to link their disparate claims together.    However, as originally plead, the conspiracy

---

[145] After holding that the joinder of the plaintiffs' claims were improper, the court remanded the case for severance of all plaintiffs' claims and "also instruct[ed] the trial court to transfer the severed cases to those jurisdictions in which each plaintiff could have brought his or her claims without reliance on another of the improperly joined plaintiffs." Janssen, 866 So.2d at 1102; see also Dillard's, Inc. v. Scott, --- So.2d ----, 2005 WL 1039141, at *5 (Miss., May 5, 2005) ("[T]he out-of-state plaintiffs with no connection to Mississippi and whose causes of action accrued out of state shall be dismissed without prejudice and all remaining cases without an independent basis for venue in Hinds County shall be severed and transferred to the appropriate jurisdiction where each plaintiff could have brought his or her claim without reliance on an improperly joined plaintiff."). Although this Court makes no finding on this issue of state-court procedure, the holdings of Janssen and Dillard's appear to be applicable to these MDL cases.

allegations were too conclusory to state a claim for civil conspiracy.  See, e.g., S. Christian Leadership Conference v. Supreme Court of State of La., 252 F.3d 781, 786 (5th Cir. 2001) ("'[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent [a] motion to dismiss.'") (quoting Fernandez-Montes v. Allied Pilots Ass'n, 987 F.2d 278, 284 (5th Cir. 1993)).

At the December 17, 2004 Status Conference, the Court asked Plaintiffs' liaison counsel to select the date by which Plaintiffs could replead the conspiracy claims with particularity.  He selected January 3, 2005, and then stated, "And we will stand by that."  (Dec. 17, 2004 Status Conf. Trans. at 72.)  The Court memorialized the January 3 deadline in Order No. 19.  (Order No. 19 ¶ 3.)  On January 3, Plaintiffs moved for a three-week extension of time to replead the conspiracy claims.  The Court denied the motion for extension of time.  (MDL 1553 Docket Entry 1485.)

On January 18, 2005, Plaintiffs filed a motion to reconsider the denial of the extension of time, and attached their proposed repleaded conspiracy claims.  As repleaded, the claims allege that 28 Defendants were members of two organizations (the Air Industrial Hygiene Foundation and the Silica Safety Association) that conspired to misrepresent to the public the dangers of silica exposure and to prevent the strengthening of OSHA's regulations on silica exposure, including a proposed ban on the use of silica in abrasive blasting.  (MDL 1553 Docket Entry 1514, Ex. A at 1-9.)

This Court denied Plaintiffs' motion to reconsider (see Order No. 23), and leaves the decision of whether to accept the belated allegations, as well as whether the new conspiracy allegations state a cognizable claim under applicable state law, to the state courts to decide in the first instance. As discussed below, these decisions are not necessary to the resolution of federal jurisdiction; remand is required even without considering the conspiracy claims.

### ii. Joinder of Defendants by Each Individual Plaintiff

Defendants also invite the Court to consider separately (i.e., sever) the claims of <u>each</u> individual plaintiff against <u>each</u> individual defendant for purposes of determining jurisdiction. Apparently--it is never spelled out--Defendants propose that each Plaintiff's claims against multiple Defendants will proceed simultaneously in two separate venues: all claims against diverse Defendants will proceed in federal court, while all claims against non-diverse Defendants will proceed in state court.[146]  In their brief, "Defendants recognize that severing down to the level of claims against individual defendants is not the conventional

---

[146]  The alternative, apparently, is for one plaintiff to be forced to maintain separate actions against each defendant he claims caused his alleged illness.  Hence, under this alternative, if a plaintiff claims 20 defendants' products combined to cause his silicosis, he would be forced to prosecute 20 separate actions (some in state court and some in federal court), which ultimately could culminate in 20 separate jury trials.

response." (Certain Defs.' Br. on Jurisdiction, MDL 03-1553 Docket Entry 1583 at 24.)  Indeed, Defendants fail to cite a single case where a federal court took such a step in determining its jurisdiction after removal.[147]

Returning to the requirements of Rule 20, it is easy to see why Defendants' suggestion is so unconventional.  According to the Rule, defendants may be joined together if there is an alleged claim against the defendants "arising out of the same transaction, occurrence, or series of transactions or occurrences, and if any question of law or fact common to all defendants will arise in the action."  Fed. R. Civ. P. 20(a).  When viewing each Plaintiff's case in isolation, whether each Plaintiff is injured (e.g., has silicosis) is a question of fact common to all Defendants being sued by that Plaintiff.  The various silica exposures which allegedly caused that Plaintiff's injury is a series of occurrences, as well as a mixed question of law and fact, common to all Defendants.  See Jones v. Nastech Pharm., 319 F. Supp. 2d 720, 727-28 (S.D. Miss. 2004) ("Plaintiff['s] claim against her treating physician and the pharmaceutical Defendants have a common transaction or occurrence, that is the injury which she allegedly sustained as a result of ingesting Stadol.  There are common issues

---

[147]  To be fair, the impetus for Defendants' unorthodox suggestion was a comment made by this Court during the December 17, 2005 Status Conference: "Well it could be that I don't have to sever each Plaintiff from each case, but that I can just look at it as each Plaintiff having a separate cause of action against each Defendant for diversity purposes."  (Dec. 17, 2004 Status Conf. Trans. at 16.)

of law and fact relating to the cause of these injuries and the extent of these injuries."). As the Judicial Panel on Multidistrict Litigation found (at the urging of Defendants) at the outset of this MDL:

> On the basis of the papers filed and hearing session held, the Panel finds that the actions in this litigation involve common questions of fact.... These actions share questions of fact arising from alleged injuries and/or exposure to respirable silica and plaintiffs' similar allegations that defendants knew or should have known of the danger to persons exposed to silica products and failed to warn, or inadequately warned, of this danger.

In re Silica Prods. Liab. Litig., 280 F. Supp. 2d 1381, 1382-83 (J.P.M.L. 2003); see also In re Norplant Contraceptive Prods. Liab. Litig., 168 F.R.D. 579, 581 (E.D. Tex. 1996) ("[T]he Defendants' liability under theories of negligence, misrepresentation, and fraud arises out of the same series of occurrences wherein Defendants failed to adequately warn Plaintiffs, thus satisfying Rule 20(a). Further, Plaintiffs satisfy the 'common question' prong of Rule 20(a) given that common questions of law or fact exist in Plaintiffs' allegations of negligence, misrepresentation, and fraud arising out of the alleged series of acts and omissions committed by Defendants.").

It is worth noting that in this jurisdictional analysis, the Court need not--and does not--find that the joinder of all Defendants who allegedly caused a Plaintiff's silicosis is proper

pursuant to Rule 20.[148]   Instead, as discussed above, it is sufficient under the <u>Tapscott</u> analysis for the Court to find that the joinder does not constitute an "egregious" misjoinder.   <u>Cf.</u> <u>Tapscott</u>, 77 F.3d at 1360 ("We do not hold that mere misjoinder is fraudulent joinder, but we do agree with the district court that Appellants' attempt to join these parties is so egregious as to constitute fraudulent joinder.").

Of course, those Defendants who have no connection to a particular Plaintiff (i.e., where the Plaintiff did not use or was not exposed to the Defendant's product or worksite) should be disregarded during the jurisdictional analysis.   Thus, in determining whether complete diversity exists, the Court will focus upon each Plaintiff's sworn Fact Sheets, wherein each Plaintiff clarified the factual basis for his or her individual claim, including listing the precise Defendants against whom that

---

[148]   While the Court has (at Defendants' urging) applied <u>Federal</u> Rule 20 in the improper joinder analysis, it is worth noting that the Mississippi Supreme Court's latest decision on the issue indicates that under <u>Mississippi</u> Rule 20, each Plaintiff's joinder of the Defendants (or at least different classes of Defendants) was improper:

> [T]he plaintiffs sued multiple defendants based on multiple theories of causation.   These defendants were required to defend themselves alongside unrelated defendants.   From 3M's perspective, it was the only defendant in the suit which did not manufacture or distribute a product containing asbestos.   Therefore, not only were the plaintiffs' claims lacking in a similar transaction or occurrence, but the defendants were improperly joined as well pursuant to Miss. R. Civ. P. 20(a).

<u>3M Co. v. Johnson</u>, 895 So.2d 151, 158-59 (Miss. 2005).
    But even if this Court were applying Mississippi Rule 20, the Court would not find "egregious" misjoinder.

Plaintiff alleges caused his or her alleged injury.  But prior to looking at the Fact Sheets to determine if the Defendants have met their burden of showing that complete diversity exists, the Court takes a detour to consider two procedural issues which--potentially--complicate this analysis.

### b.    Procedural Issues

The removal statute, 28 U.S.C. § 1446, in conjunction with relevant caselaw, establish a number of procedural hurdles that a defendant must clear in order to remove an action to federal court.  While these requirements may be waived, <u>see, e.g.</u>, <u>Ragas v. Tennessee Gas Pipeline Co.</u>, 136 F.3d 455, 457 (5th Cir. 1998), in the majority of these cases, Plaintiffs filed a motion to remand (complaining of, <u>inter alia</u>, procedural defects in the removal) within 30 days of the notice of removal.  <u>See</u> 28 U.S.C. § 1447(c) ("A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal....").  Therefore, in those cases, Defendants were required to obey the proper removal procedure.  For the purposes of those cases, there are two relevant procedural hurdles.

First, "in order to comply with the requirements of § 1446, all served defendants must join in the removal petition filed prior to the expiration of the removal period." <u>Gillis v. Louisiana</u>, 294 F.3d 755, 759 (5th Cir. 2002) (citing <u>Getty Oil Corp. v. Ins. Co. of N. Am.</u>, 841 F.2d 1254, 1262 n.9 (5th Cir. 1988)).  This is known

as the "rule of unanimity." See Tedford v. Warner-Lambert Co., 327 F.3d 423, 428 n.15 (5th Cir. 2003).

The "removal period" is thirty days after receipt of the complaint by the first-served defendant.[149] "[A]ll served defendants must join in the [removal] petition no later than thirty days from the day on which the first defendant was served." Getty Oil Corp., 841 F.2d at 1263. An attempt to join in the removal petition outside of this thirty-day window is ineffective. See id. at 1262-63.

In order to "join" in the removal petition, "there [must] be 'some timely filed written indication from each served defendant, or from some person or entity purporting to formally act on its behalf in this respect and to have the authority to do so, that it has actually consented to such action.'" Gillis, 294 F.3d at 759 (quoting Getty Oil, 841 F.2d at 1262 n.11). A blanket statement by the removing defendant(s) that other defendants join (or consent) in the removal is insufficient to meet this requirement. See Getty Oil, 841 F.2d at 1262 n.11. In looking at the removals in this MDL, it is clear that many Defendants in almost every case failed to timely join in the removal.

_____

[149] Section 1446(b) of the removal statute states, in relevant part:
> The petition for removal of a civil action ... shall be filed within thirty days after the receipt by the defendant ... of a copy of the initial pleading setting forth the claim for relief upon which such action ... is based.

28 U.S.C. § 1446(b).

One exception to the rule of unanimity is that there is no requirement that an improperly-joined party consent to the removal. See Jernigan v. Ashland Oil Co., 989 F.2d 812, 815 (5th Cir. 1993) (consent of defendants who have been "fraudulently joined" not needed for removal); Farias v. Bexar County Mental Health Mental Retardation Servs., 925 F.2d 866, 871 (5th Cir. 1991) ("All defendants who are properly joined and served must join in the removal petition and ... failure to do so renders the petition defective.") (emphasis added).[150]

The second requirement at issue is that "[u]nder 28 U.S.C. § 1441(b), even where an action could have been originally brought in federal court, the defendant may not remove the state action to federal court if the defendant is a citizen of the state in which the action was filed." Hartford Accident & Indem. Co. v. Costa Lines Cargo Servs., Inc., 903 F.2d 352, 358 n.6 (5th Cir. 1990); see also Caterpillar, Inc. v. Lewis, 519 U.S. 61, 68 (1996) (same).[151] In other words, if a Plaintiff is asserting a claim against a

---

[150]    The Fifth Circuit in Jernigan explained:
[A]s a general rule, removal requires the consent of all co-defendants.  In cases involving alleged improper or fraudulent joinder of parties, however, application of this requirement to improperly or fraudulently joined parties would be nonsensical, as removal in those cases is based on the contention that no other proper defendant exists.
Jernigan, 989 F.2d at 815.

[151]    The removal statute provides: "Any [diversity] action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought."  28 U.S.C. § 1441(b).

properly joined citizen of the state in which the action was originally brought (in most of these cases, Mississippi), then removal was procedurally improper.

Therefore, in order to conduct a complete analysis of the motions to remand, the Court must look not only at whether complete diversity exists (i.e., the jurisdictional inquiry), but <u>also</u> must grant any motions to remand timely filed by Plaintiffs who: (1) are suing a properly-joined Defendant that did not timely join in the removal petition, and/or (2) are suing a properly-joined Defendant that is a citizen of the state where the action was originally filed.

### c.  Analysis

The issue of this Court's subject-matter jurisdiction was raised within five minutes of the first conference in this MDL and it has been raised at every subsequent status conference.  As set out above, Defendants bear the burden of showing that removal was proper.  <u>See</u> <u>Manguno v. Prudential Prop. & Cas. Ins. Co.</u>, 276 F.3d 720, 723 (5th Cir. 2002).  When the removing party alleges improper joinder, this burden is "heavy".  <u>See</u> <u>Smallwood v. Ill. Cent. R.R. Co.</u>, 385 F.3d 568, 574 (5th Cir. 2004) (en banc) ("The party seeking removal bears a heavy burden of proving that the joinder of the in-state party was improper."); <u>see also</u> <u>Hart v. Bayer Corp.</u>, 199 F.3d 239, 246 (5th Cir. 2000) ("The burden of persuasion placed upon those who cry 'fraudulent joinder' is indeed a heavy one.") (quotation omitted).

In order to allow the removing Defendants an opportunity to discharge this heavy burden, the Court granted the Defendants' request "to pierce the pleadings" and "consider summary judgment-type evidence." Ross v. Citifinancial, Inc., 344 F.3d 458, 462-63 (5th Cir. 2003) ("For fraudulent joinder vel non, it is well established that the district court may 'pierce the pleadings' and consider summary judgment-type evidence.") (citing, inter alia, Travis v. Irby, 326 F.3d 644, 648-49 (5th Cir. 2003)). Jurisdictional discovery (in the form of Plaintiffs' and Defendants' Fact Sheets) commenced in January 2004. (Order No. 4.) Unfettered discovery has been available to Defendants (and Plaintiffs) for many months.[152] When the Court set the schedule for

---

[152] In September 2004, after this MDL had been pending for a year, the Fifth Circuit issued its en banc Smallwood decision. Among other things, the decision states: "We emphasize that any piercing of the pleadings should not entail substantial hearings. Discovery by the parties should not be allowed except on a tight judicial tether, sharply tailored to the question at hand, and only after a showing of its necessity." Smallwood, 385 F.3d at 574. At the time the opinion was issued, discovery had been permitted for approximately five months, and continued to be available during and after the briefing process on subject-matter jurisdiction. Indeed, on June 1, 2005, the Court conducted a phone conference on a discovery dispute in this MDL.

Although Smallwood and a host of other cases establish without equivocation that a court's initial inquiry must be determining its own subject-matter jurisdiction, see id. at 576, this Court was also mindful of its role as an MDL transferee court, a role designed "to avoid duplication of discovery, prevent inconsistent or repetitive pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary." In re Silica Prods. Liab. Litig., 280 F. Supp. 2d 1381, 1383 (J.P.M.L. 2003). From the outset, the Court ordered the Plaintiffs' and Defendants' Fact Sheets, which were directly related to jurisdiction. But in simultaneously allowing other discovery, the Court almost certainly moved beyond the "sharply tailored" discovery envisioned by Smallwood.

the parties to present their final submissions on the issue of subject-matter jurisdiction, the Court stated that the schedule applied to "[b]riefing (and <u>any designation of evidence</u>)." (Order No. 19 ¶ 2 (emphasis added).) It should have been clear that if Defendants were seeking to pierce the pleadings and support its removal with evidence, this was the time to do it.

Despite all of the above, the removing Defendants failed to designate <u>any</u> evidence in support of their position that federal subject-matter jurisdiction exists over these cases. Defendants failed to show that complete diversity exists in any of the MDL cases. Defendants failed to pierce the pleadings and show that any Defendant was fraudulently joined. Defendants failed to show that all properly-joined Defendants had timely consented to the removal. Defendants failed to show that no properly-joined Defendant is a citizen of the state where the action was originally filed. In short, Defendants failed to take any of the steps necessary to meet their burden of showing that federal jurisdiction exists over these cases.

Instead, the sole Defendant that designated evidence with its jurisdictional submission is 3M, who joined the Plaintiffs (and two other Defendants)[153] in moving for remand. 3M attached CD-ROMs

---

[153] Other than 3M, Defendant ITW Vortec moved for remand on the basis of lack of subject-matter jurisdiction. (<u>See</u> <u>Clark v.</u> <u>Air Liquide Am. Corp.</u>, S.D. Tex. Cause No. 03-376, Docket Entry 293.) Also, Defendant Bacou-Dalloz Safety, Inc. joined in and adopted 3M's Motion to Remand. (<u>See</u> MDL 03-1553, Docket Entry 1631.) In addition, a large number of Defendants did not join in

containing each of the Plaintiffs' Fact Sheets submitted as of November 20, 2004 (the last date given by the Court for Plaintiffs to supplement their Fact Sheets under Amended Order No. 14).

As discussed above, on January 26, 2004, at the urging of the parties, the Court ordered both Plaintiffs and Defendants to submit Fact Sheets "that can be used to develop the factual basis for the claims of each Plaintiff." (Order No. 4, ¶ 19; Order No. 6.) The Court ordered that "[a]t a minimum, the Plaintiffs must disclose where they believe they were exposed to silica including the date and location, state their particularized claims against each Defendant, provide medical release authorization, and provide IRS release authorization."[154]   (Order No. 4, ¶ 19.)   The Defendants agreed to the form of these Fact Sheets. (Order No. 6 ¶ 3 ("The parties have agreed to a sworn declaration form that shall by used by Plaintiffs to identify the factual basis of their claims as contemplated by Order 4 Paragraphs 19-20.").)   Subsequently, the Plaintiffs have been ordered to cure deficiencies and refine their

---

the removals and have not filed anything in support of or in opposition to federal jurisdiction.  Throughout the discussion of subject-matter jurisdiction contained herein, general references to "Defendants" or "the removing Defendants" refers only to those Defendants who actively advocated federal jurisdiction during the final briefing in February and March 2005.

[154]   In addition, the Defendants were required, inter alia, to list (and include photos if possible) of "all silica-related products they manufactured or distributed from the year 1930 forward and include the relevant time frame of production/distribution for each product." (Order No. 4, ¶ 19.) Plaintiffs argued that this information was necessary for them to determine precisely against which Defendants each Plaintiff had a claim.

Fact Sheets and provide additional information.  (Order No. 10 ¶ 5; Order No. 12 ¶¶ 12-14; Order No. 14 ¶ 2.)  The primary motivating purpose behind these orders was to clarify the particular Defendants against whom each Plaintiff asserts a claim.

After all of these orders, virtually every Plaintiff's verified Fact Sheet states that he or she asserts a claim against at least one Defendant who is a citizen of that Plaintiff's state of residence.  Thus, based upon the Fact Sheets, even when deeming every Plaintiff severed from the other Plaintiffs, complete diversity does not exist in most of the thousands of individual Plaintiff's cases.

According to 3M (the only Defendant who reports having thoroughly reviewed every Plaintiff's Fact Sheet), only 71 Plaintiffs <u>might</u> have complete diversity based upon the Fact Sheets: "[I]t appears that there could be 71 Plaintiffs in a total of 5 lawsuits [who are not asserting a claim against a non-diverse Defendant].  Even this number may be too high because it does not account for a Defendant's citizenship based on its principal place of business."  (3M Co.'s Br. Regarding Subject Matter Juris., MDL 03-1553 Docket Entry 1585 at 15.)  The reason 3M "does not account for a Defendant's citizenship based on its principal place of business," is that in the Plaintiffs' Complaints (which were all filed in state court), only the place of incorporation is alleged. As permitted under state court rules of procedure, <u>see, e.g.,</u> Miss.

-204-

R. Civ. P. 10, the Plaintiffs did not allege the state in which any Defendant has its principal place of business.

By contrast, in federal court, "[f]or diversity jurisdiction, the party asserting federal jurisdiction must 'distinctly and affirmatively allege' the citizenship of the parties." Howery v. Allstate Ins. Co., 243 F.3d 912, 919 (5th Cir. 2001); see also Stafford v. Mobil Oil Corp., 945 F.2d 803, 804 (5th Cir. 1991). "For diversity jurisdiction purposes, a corporation is a citizen of the state in which it was incorporated and the state in which it has its principal place of business." Stafford, 945 F.2d at 805 (quoting Getty Oil Corp. v. Ins. Co. N. Am., 841 F.2d 1254, 1258 (5th Cir. 1988) (citing 28 U.S.C. § 1332(c)). As in Stafford, "[p]laintiffs have stated facts alleging only one of these two possible states of corporate citizenship with respect to each defendant, which is not enough to establish diversity jurisdiction." Stafford, 945 F.2d at 805. Therefore, the removing Defendants, as the parties asserting federal jurisdiction, had the burden of "distinctly and affirmatively" alleging the principal places of business of each Defendant. And yet the Defendants did not even attempt to meet this seemingly minor burden. So even as to the 71 Plaintiffs whose Fact Sheets might point to the existence of complete diversity, because Defendants have failed to meet their burden, the Court cannot assume that jurisdiction exists. See Manguno v. Prudential Prop. & Cas. Ins. Co., 276 F.3d 720, 723 (5th Cir. 2002) ("Any ambiguities are construed against removal because

-205-

the removal statute should be strictly construed in favor of remand.") (citing <u>Acuna v. Brown & Root, Inc.</u>, 200 F.3d 335, 339 (5th Cir. 2000) ("[D]oubts regarding whether removal jurisdiction is proper should be resolved against federal jurisdiction.")); <u>Howery</u>, 243 F.3d at 916, 921 ("[Federal courts] must presume that a suit lies outside [their] limited jurisdiction...."); <u>Stafford</u>, 945 F.2d at 806 (same).[155]

Tellingly, the removing Defendants fail to acknowledge in their briefs that they bear the burden of establishing federal jurisdiction. Instead, they propose: "Motions for remand would only be possible for those plaintiffs that previously complied with the Court's orders (by properly describing claims against non-diverse defendants) and can meet the additional requirements discussed below in connection with a remand motion." (Certain Defs.' Br. on Jurisdiction, MDL 03-1553 Docket Entry 1583 at 9.) Among the additional requirements that Defendants seek to impose is

---

[155] Under certain circumstances, when the party bearing the burden of establishing jurisdiction initially fails to adequately allege complete diversity, a court may allow that party to amend its allegations. Specifically, "a party shall be allowed to amend its complaint in order to make a complete statement of the basis for federal diversity jurisdiction <u>where diversity jurisdiction was not questioned by the parties and there is no suggestion in the record that it does not in fact exist</u>." <u>Stafford</u>, 945 F.2d at 806 (citing <u>Leigh v. Nat'l Aeronautics & Space Admin.</u>, 860 F.2d 652, 653 (5th Cir. 1988); 28 U.S.C. § 1653). However, in these cases, jurisdiction has been questioned and there is a suggestion in the record that diversity does not exist. Moreover, Defendants have failed to even request the opportunity to amend any of their jurisdictional submissions (ranging from the notices of removal, which began in 2002, to their final jurisdictional submission in 2005).

allowing each Defendant the option of "tak[ing] the deposition of the plaintiff [seeking remand], any affiant supporting the motion [to remand], or any other party with knowledge." (Certain Defs.' Br. on Jurisdiction, MDL 03-1553 Docket Entry 1583 at 33.)

As discussed above, virtually all (if not all) of the over 9,000 Plaintiffs who submitted Fact Sheets still assert claims against non-diverse Defendants. And since Defendants are of the opinion that the majority of these Plaintiffs were not truthful in those sworn Fact Sheets, it can be assumed that Defendants would seek to depose those Plaintiffs in an effort to prove that their claims against the non-diverse Defendants are not bona fide. Thus, using the Defendants' process, it could take two decades to finally settle the matter of federal subject-matter jurisdiction.[156]

There are two fatal flaws in the Defendants' proposed process for determining the Court's subject-matter jurisdiction. First, Defendants' plan envisions the Plaintiffs bearing a burden in order to "obtain remand." (Certain Defs.' Br. on Jurisdiction, MDL 03-1553 Docket Entry 1583 at 25 ("To <u>obtain</u> remand ... a plaintiff would have to <u>demonstrate</u> that he or she had asserted a bona fide claim against a non-diverse defendant (or a properly joined Mississippi defendant) at the time of removal."). (emphasis added)) However, the law is clear that "[i]t is to be presumed that a cause

---

[156]  As was the case with their proposed case management plan, Defendants do not posit a timetable for completing the deposition process. Instead, it is a process with no apparent end.

lies outside [a federal court's] limited jurisdiction ..., and the burden of establishing the contrary rests upon the party asserting jurisdiction." <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 377 (1994) (citations omitted); <u>see also</u> <u>Manguno</u>, 276 F.3d at 723 ("The removing party bears the burden of showing that federal jurisdiction exists and that removal was proper. ... Any ambiguities are construed against removal because the removal statute should be strictly construed in favor of remand.") (citing <u>Acuna</u>, 200 F.3d at 339).

Implicit in Defendants' briefing is the idea that the normal burden of proof should be reversed (i.e., that Plaintiffs should be required to affirmatively prove the absence of federal jurisdiction) because Plaintiffs lack credibility due to their submission of "wholly unreliable" diagnoses. For instance, Defendants state:

> There is absolutely no reason to presumptively credit any plaintiff's assertions in a 'fact sheet' of a claim against a jurisdiction-defeating defendant--non-diverse, Mississippi-resident, or non-consenting--in this case: Plaintiffs have themselves shown (in connection with the diagnosis issue) that their factual assertions in this case are wholly unreliable--indeed fanciful.

(Certain Defs.' Reply Supp. Jurisdiction, MDL 03-1553 Docket Entry 1755 at 2-3.) Regardless of how understandable the Defendants' suspicions might be, Defendants have pointed to no legal authority indicating that the usual burden of proof in removals can be shifted as a sanction for other improper litigation tactics/assertions.

Instead, the proper course of action is for the Defendants to ask a court of competent jurisdiction--here the state courts--to issue sanctions for "wholly unreliable" factual assertions. The Mississippi Supreme Court recently indicated that a complaint similar to the ones in these MDL cases "is sanctionable." Harold's Auto Parts, Inc. v. Mangialardi, 889 So.2d 493 (Miss. 2004). Mangialardi arrived to Mississippi's highest court via an interlocutory appeal of a denial of defendants' motion to sever 264 plaintiffs' claims in an asbestos case. The following discussion from the Mangialardi court's opinion is especially relevant to these MDL cases:

> In essence, we are told that 264 plaintiffs were exposed over a 75-year period of time to asbestos products associated with 137 manufacturers in approximately 600 workplaces. We are not told which plaintiff was exposed to which product manufactured by which defendant in which workplace at any particular time. We do not suggest that this lack of basic information is the result of recalcitrance on the part of plaintiffs' counsel; perhaps plaintiffs' counsel has not [been] furnished the information.
>
> Defendants have strenuously objected to the failure and/or refusal of plaintiffs[] to provide the information. They point out that it is impossible to argue to the trial court that joinder was improper, because they aren't provided basic information about each of the plaintiffs. Curiously, rather than filing a motion for more definite statement, or to dismiss, defendants[] simply seek the information 'as soon as practicable.' The defendants further argue that [Mississippi] Rule [of Civil Procedure] 20 requires the disclosure to be made. The position stated by plaintiffs is that defendant[]s do not need the information right now, since there apparently is a plan to try the cases[] one at a time.
>
> We find that all have missed the mark. This matter should not be before us because of a failure to comply with Rule 20, but rather because of an abuse of, and failure to comply with, [Mississippi] Rules [of Civil Procedure] 8, 9, 10 and 11. What is referred to as 'core information' and 'disclosure' is basic information which should be known to plaintiffs' counsel

<u>prior</u> to filing the complaint, not information to be developed
in discovery or disclosure.  The information should have been
included in the complaint.

Complaints should not be filed in matters where plaintiffs
intend to find out in discovery whether or not, and against
whom, they have a cause of action.  Absent exigent
circumstances, plaintiffs' counsel should not file a complaint
until sufficient information is obtained, and plaintiffs'
counsel believes in good faith that <u>each plaintiff</u> has an
appropriate cause of action to assert against a defendant in
the jurisdiction where the complaint is to be filed.  To do
otherwise is an abuse of the system, and is sanctionable.

<u>Mangialardi</u>, 889 So.2d at 494 (emphasis in original) (citing Miss.

R. Civ. P. 11);[157] <u>cf.</u> <u>Hale v. Harney</u>, 786 F.2d 688, 692 (5th Cir.

---

[157] Mississippi Rules of Civil Procedure 8, 9, and 10 govern
the rules and form of pleading.  Mississippi Rule of Civil
Procedure 11 provides in part:
(a) Signature Required.  Every pleading or motion of a
party represented by an attorney shall be signed by at
least one attorney of record....  The signature of an
attorney constitutes a certificate that the attorney
has read the pleading or motion; that to the best of
the attorney's knowledge, information, and belief there
is good ground to support it; and that it is not
interposed for delay. ...
(b) Sanctions.  If a pleading or motion is not signed
or is signed with intent to defeat the purpose of this
rule, it may be stricken as sham and false and the
action may proceed as though the pleading or motion had
not been served.  For wilful violation of this rule an
attorney may be subjected to appropriate disciplinary
action. ...  If any party files a motion or pleading
which, in the opinion of the court, is frivolous or is
filed for the purpose of harassment or delay, the court
may order such a party, or his attorney, or both, to
pay to the opposing party or parties the reasonable
expenses incurred by such other parties and by their
attorneys, including reasonable attorneys' fees.
Miss. R. Civ. P. 11.
In addition to referencing Rule 11 sanctions, the
<u>Mangialardi</u> court decried the plaintiffs' failure to meet the
requirements of Mississippi's joinder rule (Mississippi Rule 20),
and then stated:
[Plaintiffs] don't appear to know when they were
exposed [to asbestos], where they were exposed, by whom

1986) ("The day is past when our notice pleading practice--
circumscribed only by a requirement of subjective good faith on the
pleader's part--plus liberal discovery rules invited the federal
practitioner to file suit first and find out later whether he had
a case or not.") (affirming imposition of federal Rule 11
sanctions).   In short, it is clear that Mississippi trial courts
have the authority to adequately address abuses of the pleading
rules.   See Mangialardi, 889 So.2d at 494-96; see also 3M v.
Hinton, --- So.2d ----, 2005 WL 374460, at *1-*2 (Miss. Feb. 17,
2005) (same).

A second flaw in the Defendants' jurisdictional proposal is
that it seems to envision a never-ending process for determining
jurisdiction.   Defendants may believe that over time, Plaintiffs
will crumble and admit that they do not have claims against any
non-diverse Defendants, but this would be pure speculation.   The
Defendants exhibited the same belief in the effect of the Fact
Sheets (the form and content of which was agreed to by the
parties).   Defendants now are unhappy that the jurisdictional
discovery failed to unveil the situation that they continue to
believe exists.   But if further substantive discovery and
ultimately trial proves that Plaintiffs lied in the sworn Fact

----

they were exposed, or even if they were exposed.
Presumably, when they learn this information,
plaintiffs' counsel intends to dismiss those who should
not have been joined.  This is a perversion of the
judicial system unknown prior to the filing of mass-
tort cases.
Mangialardi, 889 So.2d at 495.

Sheets, and/or violated state pleading rules or court orders, then that behavior would be sanctionable by a court of competent jurisdiction. Regardless of whether Defendants' suspicions are correct, it should be in all litigants' best interests to have these cases in a court with jurisdiction as soon as possible, so that substantive discovery may be completed, potentially dispositive motions may be considered, and the truth might emerge.

In _Smallwood_, the Fifth Circuit "emphasize[d] that any piercing of the pleadings should not entail substantial hearings." _Smallwood_, 385 F.3d at 574. The court continued: "Indeed, the inability to make the requisite decision [as to jurisdiction] in a summary manner itself points to an inability of the removing party to carry its burden." _Id._ Presumably the term, "summary manner," is a relative one: what would be considered "summary" in a 10,000-plaintiff, 100-case MDL should be different than what would be considered "summary" in a single-plaintiff, two-defendant case such as _Smallwood_. But by any definition, a year and a half of proceedings must test the outer limits of the term, "summary manner." And for these proceedings to be considered merely the beginning of a significantly more substantial process stretches the term well beyond its breaking point. Moreover, as a practical matter, there now are pending motions to dismiss and motions for summary judgment, in addition to the _Daubert_ motions and sanctions motions discussed elsewhere in this Order. If any of these motions have merit, then the Defendants deserve to have them considered

sooner rather than later by a court confident in its jurisdiction. Likewise, if any of the Plaintiffs' claims have merit, then the Plaintiffs deserve to have their claims adjudicated sooner rather than later.   In short, the Court rejects the Defendants' proposal to allow these proceedings to spiral toward infinity.

For the reasons discussed above, the claims of every Plaintiff who submitted a Fact Sheet in the "Appendix A" cases must be remanded for lack of subject-matter jurisdiction.   But there remains the issue of those Plaintiffs who did <u>not</u> submit a Fact Sheet in the "Appendix A" cases.   Defendants have listed more than 1,000 Plaintiffs who, Defendants contend, failed to submit any Fact Sheets whatsoever.   If, in the face of three separate written Orders, these Plaintiffs have indeed failed to submit a Fact Sheet, then this Court would not hesitate to dismiss the claims of those Plaintiffs without--or with--prejudice.[158]  <u>See</u> <u>Bluitt v. Arco Chem. Co.</u>, 777 F.2d 188, 190-91 (5th Cir. 1985) ("[W]e do not find that the district court abused its discretion in dismissing plaintiff's case.   Three times the court ordered plaintiff to more fully answer defendant's interrogatories.   Neither plaintiff nor plaintiff's attorney argued that they were confused by the court's orders or that they were unable, for whatever reason, to comply fully with

---

[158] Although this issue has not been fully briefed, the parties have noted in passing that, in the absence of a tolling agreement, the dismissal of these claims <u>without</u> prejudice would have the effect of a dismissal <u>with</u> prejudice due to the running of the statute of limitations.   The Court makes no findings as to this issue.

the court's requests."); see also Larson v. Scott, 157 F.3d 1030 (5th Cir. 1998) (upholding district court's dismissal without prejudice for failure to prosecute where magistrate explicitly warned plaintiff that failure to comply with court order might so result and plaintiff was given four months to comply); Truck Treads, Inc. v. Armstrong Rubber Co., 818 F.2d 427 (5th Cir. 1987) (upholding dismissal with prejudice where counsel acted with bad faith and contumacious conduct in failing to respond to court's order to comply with discovery requests); Kabbe v. Rotan Mosle, Inc., 752 F.2d 1083 (5th Cir. 1985) (upholding dismissal with prejudice where plaintiff received notice of deposition on three occasions and failed to appear).  However, in the absence of subject-matter jurisdiction, this arrow is not in the Court's quiver.[159]  See U.S. Catholic Conference v. Abortion Rights Mobilization, Inc., 487 U.S. 72, 80 (1988) (holding that civil contempt sanction for failure to comply with district court order must fail if district court lacks subject-matter jurisdiction); Hernandez v. Conriv Realty Assoc., 182 F.3d 121, 123 (2d Cir. 1999) ("[W]here a court lacks subject matter jurisdiction, it also lacks the power to dismiss with prejudice.  It is true that such an order, if imposed as a procedural sanction, does not involve an assessment of the merits of the case.  Nevertheless, we believe

---

[159]  This result might be different if the absence of the Plaintiffs who failed to submit a Fact Sheet would result in the Court having subject-matter jurisdiction over any of the other Plaintiffs' claims.  However, there is no suggestion that this is the case.

that Article III's limits on federal jurisdiction are designed not only to prevent federal courts from assessing the merits of certain disputes, but also to prevent federal courts from interfering-- through such assessments <u>or otherwise</u>--with the jurisdiction of state courts over certain cases, such as this one, that do not implicate federal interests.") (emphasis in original); <u>In re Orthopedic 'Bone Screw' Prods. Liab. Litig.</u>, 132 F.3d 152, 157 (3d Cir. 1997) ("Where ... the district court lacked subject matter jurisdiction, it could not impose a sanction that has the effect of adjudicating the merits of the case."); <u>but see</u> <u>In re Exxon Valdez</u>, 102 F.3d 429 (9th Cir. 1996) (court later determined to be without subject-matter jurisdiction may dismiss claims pursuant to Rule 37 for a plaintiff's repeated failure to respond to any discovery request).  Instead, the final disposition of these Plaintiffs' claims must await a court of competent jurisdiction.[160]

Therefore, the claims of every Plaintiff in each of the cases listed in "Appendix A" (attached hereto) must be remanded for lack of subject-matter jurisdiction.[161]  All pending motions in those cases are stayed pending consideration by the appropriate state court.

### D.    Motion to Stay the Effective Date of Remand

---

[160]  Because of this, the Court refrains from finding as a fact that any particular Plaintiff failed to submit a Fact Sheet.

[161]  The MDL cases not listed in "Appendix A" will be discussed <u>infra</u>.

On March 29, 2005, during a telephonic conference, the Court solicited the parties' proposals for the best procedure for implementing the remand of the MDL cases, in the event the Court determined remand was required. (See Order No. 27 at 5.)  In response, certain Defendants filed a motion for the Court to stay the effective date of any remand order for 30 days following its entry. (MDL 03-1553 Docket Entry 1882, filed May 26, 2005.) Defendants seek this stay in order to petition the Mississippi Supreme Court for an order consolidating the remanded cases before a single judge.  According to Defendants, this consolidation would not only prolong the beneficial aspects of the federal MDL—efficiency, convenience and consistency—but would actually enhance those aspects because the state judge would be unhampered by jurisdictional concerns.

The Court finds this motion to be well-taken.  This Court's Order remanding the "Appendix A" cases will result in 90 cases, totaling nearly 10,000 Plaintiffs, being returned en masse to state courts in approximately 19 Mississippi counties.  It is quite possible that at least 19 more cases will follow. (See discussion of "Appendix B" cases, infra.)  The parties should have the opportunity to petition the state's highest court for consideration of how Mississippi's judicial system can best absorb the influx of cases.  Therefore, the Court will stay the effective date of the remand of the cases listed in "Appendix A" for a period of 30 days from the date of this Order, after which time remand will issue.

### E.    Cases Transferred After December 5, 2004

An MDL such as this is not a stagnant creature.  Since the initial Conditional Transfer Order on September 4, 2003 (which sent 22 cases), the Judicial Panel on Multidistrict Litigation has issued 14 subsequent Conditional Transfer Orders, sending 95 additional cases to this Court for coordinated or consolidated pretrial proceedings.  The most recent Conditional Transfer Order was filed on June 13, 2005, transferring 6 cases.

The Defendants are entitled to have an opportunity to meet their burden of proving that jurisdiction exists in the newly-transferred cases.  Therefore, this Order does not remand those cases transferred so recently that the Plaintiffs were not yet required to submit Fact Sheets at the time of the February 4, 2005 deadline for Defendants to submit evidence supporting jurisdiction.[162]  All actions transferred after December 5, 2004 (60 days prior to the February 4, 2005 deadline) will remain in this Court and a part of this MDL.

Therefore, after the implementation of this Order remanding the 90 cases listed in "Appendix A," only the 19 recently-transferred cases listed in "Appendix B,"[163] as well as <u>Alexander v.</u>

---

[162]  All Plaintiffs in actions transferred after January 26, 2004 were required to submit their sworn Fact Sheets within 60 days from the date of transfer by the Judicial Panel on Multidistrict Litigation.  (Order No. 4, ¶ 20.)

[163]  Three additional cases were scheduled to be transferred via Conditional Transfer Order 13, but transfer in those cases was opposed.  Therefore, those cases likely will be set for a

<u>Air Liquide America Corp.</u>, S.D. Tex. Cause No. 03-533 (originally filed in this Court), will remain in this MDL.[164]    The Court's paramount concern with respect to the "Appendix B" cases will be determining whether federal subject-matter jurisdiction exists.  An in-person status conference will be conducted on August 22, 2005 at 9:00 a.m., concerning the appropriate procedure for expediting jurisdictional discovery in the cases listed in "Appendix B," as well as in any later-transferred cases.  As to the "Appendix B" cases, the stay of discovery entered on February 22, 2005 (<u>see</u> Order No. 26) is hereby lifted.  As set out in Order No. 4, all Plaintiffs in recently-transferred actions must submit sworn Fact Sheets within 60 days from the date of transfer by the Panel (excluding the period during which discovery was stayed).  (Order No. 4, ¶ 20.)

### F.    <u>Kirkland</u>

<u>Kirkland v. 3M Co.</u>, S.D. Tex. Cause No. 04-639, was originally filed on January 29, 2004 in the State Court of Fulton County, Georgia.   On July 23, 2004, 3M removed the case to the United States District Court for the Northern District of Georgia, where it was assigned Cause No. 1:04-cv-2152.  3M's Notice of Removal, in

---

hearing before the Panel.  <u>See</u> R. Proc. Jud. Panel Multidistrict Litig. 7.4(c)-(d).

[164]    As discussed <u>infra</u>, another MDL case, <u>Kirkland v. 3M Co.</u>, S.D. Tex. Cause No. 04-639, will be sent to the Judicial Panel on Multidistrict Litigation with a recommendation that it be returned to the transferor court.

contrast to the notices of removal filed in the cases listed in "Appendix A," distinctly and affirmatively alleges both the place of incorporation and principal places of business each of the Defendants. <u>Cf.</u> <u>Howery v. Allstate Ins. Co.</u>, 243 F.3d 912, 919 (5th Cir. 2001) ("For diversity jurisdiction, the party asserting federal jurisdiction must 'distinctly and affirmatively allege' the citizenship of the parties.") (quoting <u>Stafford v. Mobil Oil Corp.</u>, 945 F.2d 803, 804 (5th Cir. 1991)).  Based upon these allegations and the allegations in the Complaint, the two Plaintiffs, Clark C. Kirkland and Sharon S. Kirkland (husband and wife), have a different citizenship than each of the seven Defendants. Furthermore, it is facially apparent from the Complaint that Plaintiffs claim damages in excess of $75,000.  Therefore, diversity jurisdiction exists.  <u>See</u> 28 U.S.C. § 1332(a).[165]

---

[165] The Notice of Removal also alleges that federal subject-matter jurisdiction exists independent of diversity by virtue of federal enclave jurisdiction, <u>see</u> <u>Lord v. Local Union No. 2088</u>, 646 F.2d 1057, 1059 (5th Cir. 1981), because Mr. Kirkland claims injury from silica exposure at Fort Benning, Georgia.  Since diversity jurisdiction exists, the Court need not address this issue.

Also, it is worth noting that the removal was not timely because it was filed more than 30 days after service of the Complaint.  <u>See</u> 28 U.S.C. § 1446(b).  However, during the over three months the case was pending in the transferor court, no motion to remand was filed.  (<u>Kirkland</u> was removed to federal court on July 23, 2004, and was transferred to this MDL via Conditional Transfer Order 10, filed November 5, 2004.) Therefore, any objection to a procedural defect in the removal has been waived.  <u>See</u> 28 U.S.C. § 1447(c) ("A motion to remand the case on the basis of any defect in removal procedure must be made within 30 days after the filing of the notice of removal under section 1446(a)."); <u>see also</u> <u>Ragas v. Tennessee Gas Pipeline Co.</u>, 136 F.3d 455, 457-58 (5th Cir. 1998).

Having found that subject-matter jurisdiction exists, the next issue is whether, in light of the remand of the majority of cases in this MDL, the Court should retain Kirkland or recommend that it be remanded to the transferor court (i.e., the U.S. District Court for the Northern District of Georgia).

The power to remand a case to the transferor court lies solely with the Judicial Panel on Multidistrict Litigation. See 28 U.S.C. § 1407(a) ("Each action ... transferred [by the Panel] shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred....") (emphasis added); In re Roberts, 178 F.3d 181, 183 (3d Cir. 1999). In determining whether to issue a suggestion for remand to the Panel, a transferor court should be guided by the standards for remand employed by the Panel. See In re Bridgestone/Firestone, Inc., 128 F. Supp. 2d 1196, 1197 (S.D. Ind. 2001). "The exercise of that discretion [to remand] generally turns on the question of whether the case will benefit from further coordinated proceedings as part of the MDL." Id. (citing In re Air Crash Disaster, 461 F. Supp. 671, 672-73 (J.P.M.L. 1978)). Remand is inappropriate, for example, when continued consolidation will "eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary." In re Heritage Bonds Litig., 217 F. Supp. 2d 1369, 1370 (J.P.M.L. 2002) (citing 28 U.S.C. § 1407). By contrast, the Panel has discretion to remand when everything that remains to be done is case-specific.

See In re Patenaude, 210 F.3d 135, 145 (3d Cir. 2000); In re Bridgestone/Firestone, Inc., 128 F. Supp. 2d at 1197.

In Kirkland, the remaining issues are different than those in every other case remaining in this MDL.  All of the cases listed in "Appendix B" are at a stage in which subject-matter jurisdiction has yet to be determined--and is in significant doubt.  The Court's "first inquiry" in those cases must be the issue of jurisdiction.  Smallwood, 385 F.3d at 576.  The only other case associated with this MDL, Alexander (discussed infra), involves 100 Plaintiffs whose experts have been struck on Daubert grounds.  In Kirkland, by contrast, there is no issue concerning federal jurisdiction, or whether Mr. Kirkland is injured (he is scheduled to have a lung transplant).  Instead, the issues in Kirkland involve whether Plaintiffs' sole remaining attorney may withdraw, whether Plaintiffs' claims are barred on statute-of-limitations grounds, and whether certain prior statements by Mr. Kirkland bar his claim against 3M.[166]  Also, Plaintiffs' sole remaining attorney, Scott Monge (a Georgia lawyer who seeks to withdraw from the case), has complained of the imposition of prosecuting the case in Texas.  Should Mr. Monge be permitted to withdraw, Plaintiffs, both Georgia residents, would be left to proceed pro se.  Requiring pro se litigants to prosecute a case in a court over a thousand miles from

---

[166]  No Defendant has yet filed a motion addressing the statute-of-limitations issue or the issue of the whether 3M should be dismissed.  As noted supra, Plaintiffs' previous attorney, Mr. Martin, filed a motion to dismiss 3M, apparently against the wishes of Mr. Kirkland.

their residence would be a significant imposition, and seemingly a needless one considering how case-specific the remaining issues are.

Therefore, because the Court believes remand will serve the convenience of the parties and will promote the just and efficient conduct of the case, the Court will recommend to the Judicial Panel on Multidistrict Litigation that <u>Kirkland</u> be remanded to the United States District Court for the Northern District of Georgia, where it was assigned Cause No. 1:04-cv-2152.  The Court refrains from ruling on the pending motions, reserving them for consideration by the transferor court, should the case be remanded.

G.    **Alexander**

<u>Alexander v. Air Liquide America Corp.</u>, S.D. Tex. Cause No. 03-533, was originally filed in this Court.  The 100 Plaintiffs allege--and the 41 Defendants do not dispute--that this Court has diversity jurisdiction over this action.

However, in conducting its own review of federal subject-matter jurisdiction,[167] the Court found that the jurisdictional allegations in the Complaint were deficient.  Specifically, the principal places of business of most of the corporate Defendants had not been alleged.

---

[167]  "[F]ederal courts are duty-bound to examine the basis of subject matter jurisdiction <u>sua sponte</u>."  <u>Union Planters Bank Nat'l Ass'n v. Salih</u>, 369 F.3d 457, 460 (5th Cir. 2004); <u>see also</u> Fed. R. Civ. P. 12(h)(3).

As set out below, "[w]hen jurisdiction depends on citizenship, citizenship should be distinctly and affirmatively alleged." Stafford v. Mobil Oil Corp., 945 F.2d 803, 804 (5th Cir. 1991) (quotation omitted); see also Howery v. Allstate Ins. Co., 243 F.3d 912, 919 (5th Cir. 2001) (same). "For diversity jurisdiction purposes, a corporation is a citizen of the state in which it was incorporated and the state in which it has its principal place of business." Stafford, 945 F.2d at 805 (quoting Getty Oil Corp. v. Ins. Co. N. Am., 841 F.2d 1254, 1258 (5th Cir. 1988) (citing 28 U.S.C. § 1332(c)). As in Stafford, the Alexander "Plaintiffs have stated facts alleging only one of these two possible states of corporate citizenship with respect to each defendant, which is not enough to establish diversity jurisdiction." Stafford, 945 F.2d at 805.

In contrast to the "Appendix A" cases, because the parties have not questioned the subject-matter jurisdiction of this Court in this case, the defective jurisdictional allegations could be cured pursuant to 28 U.S.C. § 1653.[168] See Stafford, 945 F.2d at 806 ("[A] party shall be allowed to amend its complaint in order to make a complete statement of the basis for federal diversity jurisdiction where diversity jurisdiction was not questioned by the parties and there is no suggestion in the record that it does not

---

[168] Section 1653 states that "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." 28 U.S.C. § 1653.

-223-

in fact exist.") (citing <u>Leigh v. Nat'l Aeronautics & Space Admin.</u>, 860 F.2d 652, 653 (5th Cir. 1988)).

Therefore, on May 16, 2005, the Court ordered Plaintiffs, as the parties seeking to invoke the federal jurisdiction in this case,[169] to amend their jurisdictional allegations.  On May 24, 2005, Plaintiffs filed their First Amended Complaint, distinctly and affirmatively alleging both the place of incorporation and the principal places of business of 40 of the 41 Defendants.  With respect to the 41st Defendant, American Optical Corporation ("American Optical"), Plaintiffs state: "Plaintiff has been unable to locate this Defendant['s] principal place of business at the time of this filing."  (Pls.' First Am. Compl., Docket Entry 119, at 11.)

Once again, since the parties have not questioned federal subject-matter jurisdiction in this case, this jurisdictional allegation concerning American Optical's principal place of business may be cured pursuant to 28 U.S.C. § 1653.  Plaintiffs have 30 days from the date of this Order to learn through discovery or otherwise the principal place of business of American Optical and again amend the Complaint to adequately allege jurisdiction.[170]

---

[169]  "The burden of proving that complete diversity exists rests upon the party who seeks to invoke the court's diversity jurisdiction."  <u>Stafford</u>, 945 F.2d at 804 (quoting <u>Getty Oil</u>, 841 F.2d at 1259).

[170]  It is worth noting that in the Notice of Removal in <u>Kirkland</u>, 3M alleges that American Optical's principal place of business is in Connecticut.  (<u>See</u> <u>Kirkland v. 3M</u>, S.D. Tex. Cause

Should Plaintiffs again fail to adequately allege jurisdiction within 30 days, American Optical will be dismissed without prejudice.

As discussed above, the Motion to Exclude the expert testimony of Dr. Harron and Dr. Levy on Daubert grounds has been granted. Immediately following the August 22, 2005 status conference addressing the "Appendix B" cases, the Court will conduct an in-person status conference in Alexander, to address whether (and, if so, under what conditions) the Plaintiffs' claims may proceed.

## IV.  Sanctions

On February 4, 2005, Defendants accompanied their submissions on subject-matter jurisdiction with requests for sanctions, arguing that "Plaintiffs affirmatively, and repeatedly, misled Defendants and the Court with respect to whether they had diagnoses in hand to support their claims." (Certain Defs.' Br. on Juris., MDL 03-1553 Docket Entry 1583, at 35; see also 3M Co.'s Br. Regarding Subject Matter Juris., MDL 03-1553 Docket Entry 1585, at 17.) Defendants explained that they expected "the record being developed in connection with the 'Daubert' hearings will provide further proof that plaintiffs engaged in conduct amounting to fraud." (Certain Defs.' Br. on Juris., MDL 03-1553 Docket Entry 1583, at 35.)

At the conclusion of the Daubert hearings, the Court allowed Defendants until February 23, 2005 to supplement their request for

---

No. 04-639, Notice of Removal, Docket Entry 1, ¶ 15.)

sanctions, allowed Plaintiffs until March 10, 2005 to respond, and set a sanctions hearing for March 14, 2005.  (Order No. 26 ¶ 2.)

In their supplemental briefing, Defendants specified that they seek monetary sanctions pursuant to Federal Rules of Civil Procedure 11, 16, 26 and 37, 28 U.S.C. § 1927, and the Court's inherent authority.[171]  They argued that "[t]he Court should sanction plaintiffs for knowingly submitting and advocating bogus diagnoses." (Supplemental Mot. Sanctions, MDL 03-1553 Docket Entry 1678 at 4.)  They further argued that Plaintiffs had violated a number of the Court's orders, including those requiring the submission of fully completed Fact Sheets and those requiring disclosure of Plaintiffs' previous asbestosis claims/diagnoses.

At the March 14 sanctions hearing, Defendants reiterated their arguments, while Plaintiffs argued that: (1) the Court did not have subject-matter jurisdiction and thus did not have the authority to award sanctions; and, (2) Plaintiffs attempted in good faith to fully comply with the Court's orders.

Because the Defendants' briefing was long on argument and short on evidence, the Court ordered Defendants to supplement their motions with additional evidence, and provided for Plaintiffs to

---

[171]  Specifically, 39 Defendants moved for sanctions pursuant to Rules 16 and 37, § 1927 and the Court's inherent authority, while 3M moved for sanctions pursuant to Rules 11 and 37, § 1927 and the Court's inherent authority.  (Supplemental Mot. Sanctions, MDL 03-1553 Docket Entry 1678; Mot. 3M Co. Sanctions, MDL 03-1553 Docket Entry 1679.)  Numerous additional Defendants joined in each motion.

have an opportunity to respond.  (Order No. 27 ¶¶ 1-2.)  On March 29, 2005, the Court conducted a telephone conference with the parties, during which the Defendants stated that the Plaintiffs had recently produced a large volume of additional documents responsive to the Court's previous discovery orders.  In order to allow the Defendants time to process these documents, the parties jointly requested that any order on jurisdiction, Daubert, and/or sanctions not be issued until late-May or June.

## A.    In the Absence of Subject-Matter Jurisdiction

As discussed above, Defendants have not met their burden of establishing that the Court possesses subject-matter jurisdiction over any of the cases listed in "Appendix A."  Therefore, prior to addressing whether sanctions are warranted, the Court must consider whether it has the ability to levy sanctions at all.

Many times, the Fifth Circuit has stated flatly, "[u]nless a federal court possesses subject matter jurisdiction over a dispute, ... any order it makes (other than an order of dismissal or remand) is void."  Dahiya v. Talmidge Int'l, Ltd., 371 F.3d 207, 210 (5th Cir. 2004); see also, e.g., John G. & Marie Stella Kennedy Mem'l Found. v. Mauro, 21 F.3d 667, 674 (5th Cir. 1994) (same); Shirley v. Maxicare Tex. Inc., 921 F.2d 565, 568 (5th Cir. 1991) (same); see also Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause.") (quoting Ex parte McCardle, 7 Wall. 506, 514, 19 L. Ed. 264 (1868)); Howery v. Allstate Ins. Co., 243 F.3d 912, 916 n.6

-227-

(5th Cir. 2001) ("Where a federal court proceeds in a matter without first establishing that the dispute is within the province of controversies assigned to it by the Constitution and statute, the federal tribunal poaches upon the territory of a coordinate judicial system, and its decisions, opinions, and orders are of no effect.") (quotation omitted).  However, the situation is not as straightforward as these quotes might indicate.

In Willy v. Coastal Corp., 503 U.S. 131 (1992), the Supreme Court held that a district court may impose Rule 11 sanctions in a case in which the court is later determined to be without subject-matter jurisdiction.  Specifically, the district court awarded Rule 11 sanctions in the form of $19,000 in attorney's fees for the plaintiffs' counsel's filing of "a 1,200-page, unindexed, unnumbered pile of materials" with the district court and "reliance on a non-existent Federal Rule of Evidence."  Id. at 133.  In so holding, the Willy Court distinguished another case wherein the Supreme Court held that a district court's civil contempt order cannot stand if the court did not have subject-matter jurisdiction. See id. at 138 (distinguishing U.S. Catholic Conference v. Abortion Rights Mobilization, Inc., 487 U.S. 72 (1988) (reversing a district court's award of fees for two nonparty witnesses' failure to comply with a district court subpoena)).  The Court explained the difference between the situation in Catholic Conference and that in Willy:

Given that civil contempt is designed to coerce
compliance with the court's decree, it is logical that
the order itself should fall with a showing that the
court was without authority to enter the decree.  The
interest in having rules of procedure obeyed, by
contrast, does not disappear upon a subsequent
determination that the court was without subject-matter
jurisdiction.  Courts do make mistakes; in cases such as
<u>Catholic Conference</u> it may be possible immediately to
seek relief in an appellate tribunal.  But where such an
immediate appeal is not authorized, there is no
constitutional infirmity under Article III in requiring
those practicing before the courts to conduct themselves
in compliance with the applicable procedural rules in the
interim, and to allow the courts to impose Rule 11
sanctions in the event of their failure to do so.

<u>Id.</u> at 139.  The Court further explained that permitting a court to

impose Rule 11 sanctions in the absence of subject-matter

jurisdiction "implicates no constitutional concern because it does

not signify a district court's assessment of the legal merits of

the complaint."  <u>Id.</u> at 138 (quotation omitted).  The lesson from

<u>Willy</u> is that a district court which is later determined to be

without subject-matter jurisdiction may sanction a party for

violating Rule 11, but may not sanction a party to coerce

compliance with a court order.

However, there are two characteristics of these MDL cases

which distinguish them from <u>Willy</u>.  First, in <u>Willy</u>, the court

issuing sanctions did so under the belief--later determined to be

mistaken--that it had subject-matter jurisdiction over the action.

<u>See id.</u> at 137 ("A final determination of lack of subject-matter

jurisdiction of a case in a federal court ... does not

automatically wipe out all proceedings had in the district court at

a time when the district court operated under the misapprehension that it had jurisdiction."); see also In re Exxon Valdez, 102 F.3d 429, 431 (9th Cir. 1996) (same). Here, by contrast, this Court has determined that it lacks subject-matter jurisdiction over all of the MDL cases transferred by the Panel prior to December 5, 2004. This Court is under no misapprehension that it has jurisdiction.

Also, Willy dealt only with a district court's ability to levy Rule 11 sanctions. In these MDL cases, by contrast, Rule 11 sanctions are not available because 3M[172] failed to comply with Rule 11's procedural "safe harbor" requirements.[173] And even had 3M complied with the procedural requirements, the basis for the motion--filing claims based on fraudulent diagnoses--cannot be the

---

[172] Only 3M moves for sanctions pursuant to Rule 11. The other Defendants move for sanctions on other grounds.

[173] Rule 11 provides, in relevant part:
A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected.
Fed. R. Civ. P. 11(c)(1)(A). This is known as the "safe harbor" provision, and it contemplates service of the Rule 11 motion at least 21 days prior to filing the motion with the court in order to give the parties at whom the motion is directed an opportunity to withdraw or correct the offending contention. See Elliott v. Tilton, 64 F.3d 213, 216 (5th Cir. 1995). "The plain language of the rule indicates that this notice and opportunity prior to filing is mandatory." Id. In Elliott, the Fifth Circuit held that when the moving party fails to comply with this "safe harbor" provision, a Rule 11 sanction cannot be upheld. See id.

subject of Federal Rule 11 sanctions because the claims were filed in state court.[174]    Therefore, with Rule 11 unavailable to the "Appendix A" cases, Defendants are only left with their alternate grounds for the sanctions motions.  But Defendants have pointed to no Supreme Court or Fifth Circuit authority indicating that any of these alternate grounds may support sanctions in the absence of subject-matter jurisdiction.  And here, as noted above, there is the added fact that the Court would be attempting to issue sanctions knowing it has no subject-matter jurisdiction.

In short, in the absence of specific authority to the contrary, the Court will not deviate from the admonition that "[u]nless a federal court possesses subject matter jurisdiction over a dispute, ... any order it makes (other than an order of dismissal or remand) is void."  Dahiya, 371 F.3d at 210.

Therefore, as to all MDL cases transferred by the Panel before December 5, 2004 (i.e., the "Appendix A" cases), the motions for sanctions are reserved for consideration by the appropriate state

---

[174]    "Rule 11 does not apply to conduct in state court prior to removal."  Foval v. First Nat'l Bank of Commerce, 841 F.2d 126, 130 (5th Cir. 1988).  Hence, Rule 11 sanctions "cannot apply to the petition [a plaintiff] filed in state court that thereafter was removed."  Edwards v. Gen. Motors Corp., 153 F.3d 242, 245 (5th Cir. 1998).  "Moreover, rule 11 does not impart a continuing duty, but requires only that each filing comply with its terms as of the time the paper is signed.  Consequently, [a plaintiff] cannot be sanctioned simply for her failure to withdraw pleadings filed in state court that would have violated rule 11 had they been filed in federal court."  Id. (citing Thomas v. Capital Sec. Servs., Inc., 836 F.2d 866, 874 (5th Cir. 1988) (en banc)).

court after remand.  As to those MDL cases transferred by the Panel <u>after</u> December 5, 2004 (i.e., the "Appendix B" cases), the motions for sanctions are STAYED pending this Court's ruling on subject-matter jurisdiction.

**B.  <u>Alexander</u>**

As discussed above, the Court is not constrained by a lack of subject-matter jurisdiction in <u>Alexander v. Air Liquide America Corp.</u>, S.D. Tex. Cause No. 03-533.  Yet, even with jurisdiction, Rule 11 sanctions are inappropriate because Rule 11's procedural prerequisites have not been satisfied in this case.[175]  This does not mean, however, that sanctions are not warranted.  In addition to Rule 11, Defendants have moved for sanctions pursuant to 28 U.S.C. § 1927.

Section 1927 provides that "[a]ny attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  28 U.S.C. § 1927.  "[S]anctions under § 1927 must

---

[175]  As noted above, Defendants failed to comply with the "safe harbor" requirement of Rule 11(c)(1)(A).  Rule 11 also provides for the imposition of sanctions <u>sua sponte</u> by a court. This provision contains no "safe harbor" requirement, but it requires, prior to the imposition of sanctions, the court to "enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney, law firm, or party to show cause why it has not violated subdivision (b) with respect thereto."  Fed. R. Civ. P. 11(c)(1)(B); <u>see also</u> <u>Elliott v. Tilton</u>, 64 F.3d 213, 216 (5th Cir. 1995).  The Court has entered no such show cause order in this case.

be predicated on actions that are both "unreasonable" and "vexatious." Edwards v. Gen. Motors Corp., 153 F.3d 242, 246 (5th Cir. 1998) (emphasis in original) (citing Travelers Ins. Co. v. St. Jude Hosp., Inc., 38 F.3d 1414, 1416-17 (5th Cir. 1994)). "This requires that there be evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court." Id. (citing Travelers Ins. Co., 38 F.3d at 1416-17; Baulch v. Johns, 70 F.3d 813, 817 (5th Cir. 1995)); see also Mercury Air Group, Inc. v. Mansour, 237 F.3d 542, 549 (5th Cir. 2001) (same). Under § 1927, "attorneys have been held accountable for decisions that reflect a reckless indifference to the merits of a claim." Coghlan v. Starkey, 852 F.2d 806, 814 (5th Cir. 1988) (quoting Reliance Ins. Co. v. Sweeney Corp., 792 F.2d 1137, 1139 (D.C. Cir. 1986)). "Because of the punitive nature of § 1927 sanctions, and in order not to chill legitimate advocacy, the provision must be strictly construed." Edwards, 153 F.3d at 246 (citing Travelers Ins. Co., 38 F.3d at 1416-17). However, the decision whether to impose § 1927 sanctions is discretionary with this Court. See id.

Alexander was filed by the law firm of O'Quinn, Laminack & Pirtle, L.L.P. ("O'Quinn"), a firm based in Houston, Texas.[176] O'Quinn represents over 2,000 Plaintiffs in this MDL. As discussed

---

[176] The Watts Law Firm also signed the Alexander Complaint, but Defendants do not seek sanctions against that firm because it has acted only as local, or "liaison", counsel. (Supplemental Mot. Sanctions, MDL 03-1553 Docket Entry 1678, at 1; see also Mar. 14, 2005 Sanctions Hearing Trans. at 16.) Therefore, the Court only considers whether O'Quinn's conduct warrants sanctions.

above in reference to the <u>Daubert</u> ruling, 99 of the 100 Plaintiffs in <u>Alexander</u> submitted a silicosis diagnosis from Dr. Ray Harron, while seven <u>Alexander</u> Plaintiffs submitted a silicosis diagnosis from Dr. Levy.[177]

As an initial matter, it should have been apparent to O'Quinn in late-2003, as it was preparing to file a case with 100 Plaintiffs, all Mississippi or Alabama residents, that it was medically implausible for the Plaintiffs' silicosis diagnoses to have been accurate.  Using the statistics from the CDC cited at the outset of this Order, one would expect a total of approximately 33 new silicosis cases per year in Alabama and Mississippi combined. When considering the fact that O'Quinn not only filed the 100-Plaintiff <u>Alexander</u> case, but also was in the process of filing silicosis cases for over 1,900 other Plaintiffs (almost all of whom were Mississippi or Alabama residents), then the implausibility should have been even more starkly apparent.  Of course, O'Quinn also knew about the existence of the MDL (hence the reason <u>Alexander</u> was filed originally in this Court), which eventually grew to over 10,000 Plaintiffs, the majority of whom are Mississippi or Alabama residents.   At this point, medical implausibility had become a virtual impossibility.[178]  Thus, even at

---

[177]  Six of the Plaintiffs submitted diagnoses from both Dr. Harron and Dr. Levy.

[178]  Adding to the facially-implausible nature of these diagnoses is that fact that by mid-2004, O'Quinn knew about the large number of MDL Plaintiffs who had previously been diagnosed with asbestosis.  (Order No. 12 ¶ 14; O'Quinn's Resp. Opp'n

the time of <u>Alexander</u>'s filing, O'Quinn exhibited a "reckless disregard of the duty owed to the court." <u>Edwards</u>, 153 F.3d at 246 (citation omitted); <u>see also</u> <u>Coghlan</u>, 852 F.2d at 814 (under § 1927, "attorneys have been held accountable for decisions that reflect a reckless indifference to the merits of a claim") (quotation omitted).

Even if O'Quinn cannot be charged with knowledge of silicosis statistics at the time of the filing of their claims, they certainly can be charged with such knowledge when Defendants raised the issue in their briefing in this MDL.  For instance, on November 11, 2004, 3M presented evidence showing that it is "scientifically virtually impossible" for all of the MDL Plaintiffs to have silicosis.  (Mot. Appointment Technical Advisory Panel, MDL 03-1553 Docket Entry 1145, at 6 & Ex. C.)

As detailed above, on October 29, 2004, Defendants deposed Dr. Martindale, which revealed that his 3,617 "diagnoses" were not diagnoses at all.  It also revealed that Dr. Martindale had been told by N&M that "another physician had done a physical and history -- occupational history, medical history -- had supervised some PFTs and had evaluated the chest x-rays."  (Dr. Martindale Dep. at 23-24.)  As detailed above, this was false.

---

Defs.' Mots. Sanctions, MDL 03-1553 Docket Entry 1775, at 13-14.) All told, over half of O'Quinn's 2,000 MDL Plaintiffs previously filed asbestosis claims.  (Defs.' Steering Committee's Resp. PTO 27, MDL 03-1553 Docket Entry 1826, Ex. B.2.)

Despite this testimony (and despite the additional testimony of Dr. Hilbun and Dr. Cooper, described above), which Defendants trumpeted to the Court (so O'Quinn cannot claim to be ignorant of it), Plaintiffs opposed the motion to exclude their experts, opposed the use of independent experts to test the diagnoses, and instead insinuated (apparently with no factual basis) that Defendants had illicitly "flipped" Dr. Martindale and stated that they were "willing, ready, and able to bring the rest of these [diagnosing doctors] here ... to show their stripes." (Dec. 17, 2004 Status Conference Trans. at 18-20, 23, 39, 45.)

At this point--at the latest--O'Quinn's continued prosecution of its claims, and continued insistence that the N&M-produced diagnoses would be proven legitimate at the Daubert hearings, crossed the rubicon established by § 1927. Stated differently, Plaintiffs' (including O'Quinn's) insistence upon the Daubert hearings multiplied the proceedings unreasonably and vexatiously.

This conclusion is supported by the active role O'Quinn played in making its Plaintiffs' diagnoses. As discussed above, the first essential step in diagnosing silicosis involves the taking of a thorough and appropriate occupational and exposure history. Unlike many of the other Plaintiffs' firms, O'Quinn did not ask the screening company (here, N&M) to take the histories; instead, O'Quinn (or a "temp service" hired by O'Quinn) took the occupational and exposure histories. (Feb. 17, 2005 Trans. at 284, 342, 400.) O'Quinn only used N&M to take x-rays and perform PFTs;

O'Quinn took responsibility for the histories and for coordinating the diagnostic process. (Feb. 17, 2005 Trans. at 342, 374.) As detailed above, both Dr. Harron and Dr. Levy relied totally upon the exposure histories provided to them by the lawyers. Dr. Levy was told that a physician had spent 90 minutes with each Plaintiff performing a detailed history and physical. (Feb. 16, 2005 Trans. at 24, 72, 76.) This was shown to be false at the Daubert hearings, and O'Quinn, at least, should have known it was false from the outset, since the lawyers or their employees had taken the histories themselves.

Of course, saying that the Plaintiffs do not have diagnoses is not to say that none of the Alexander Plaintiffs have silicosis. Perhaps a handful of them do. The point is that because the lawyers short-circuited the appropriate diagnostic process, O'Quinn--at minimum--recklessly disregarded the fact that there is no reliable basis for believing that every Plaintiff has silicosis. And this basic information regarding the nature of each Plaintiff's injuries is information O'Quinn should have known before filing their claims in this Court. See Acuna v. Brown & Root, Inc., 200 F.3d 335, 340 (5th Cir. 2000) (citing Fed. R. Civ. P. 11(b)(3)).

It is important to emphasize that this is not a normal circumstance where a plaintiff's expert is disqualified after a Daubert hearing. Simply proffering an expert who fails Daubert is not enough to warrant sanctions. But requiring a court and the defendants to undergo a Daubert hearing when the plaintiff has no

-237-

reasonable basis to believe that the expert can pass muster under
Daubert can result in plaintiff's counsel being liable for the
defendant's Daubert hearing fees and expenses. Cf. Edwards v. Gen.
Motors Corp., 153 F.3d 242, 246-47 (5th Cir. 1998) (affirming § 1927
award for defendant's fees incurred after the date on which
plaintiff's attorney knew her case was unwinnable but refused to
disclose that fact to the court and to the defendant in hopes of
extorting a nuisance-value settlement).

Here, O'Quinn should have realized its diagnoses were fatally
unreliable based upon the statistics referenced above, as well as
the Martindale, Hilbun and Cooper depositions. This is especially
true because O'Quinn itself provided the inadequate occupational
and exposure histories underlying the purported diagnoses. Once
O'Quinn donned a lab coat and injected itself into the diagnostic
process, it is reasonable to charge them with knowledge both of
what is required for a medically-acceptable diagnosis,[179] and of how
far their diagnoses strayed from that standard.

Moreover, the clear motivation for O'Quinn's micro-management
of the diagnostic process was to inflate the number of Plaintiffs
and claims in order to overwhelm the Defendants and the judicial

---

[179] Regardless, O'Quinn can be charged with knowing the
accepted method for diagnosing silicosis since, prior to the
Daubert hearings, Dr. Friedman testified on the subject (see
generally May 17, 2004 Status Conference Transcript at 19-109),
and Plaintiffs themselves cited textbooks and other materials
containing that information in "Plaintiffs' Informational Brief
Regarding the Diagnosis of Silicosis" (MDL 03-1553 Docket Entry
1618).

system.   This is apparently done in hopes of extracting mass nuisance-value settlements because the Defendants and the judicial system are financially incapable of examining the merits of each individual claim in the usual manner.

The Court finds that filing and then persisting in the prosecution of silicosis claims while recklessly disregarding the fact that there is no reliable basis for believing that every Plaintiff has silicosis constitutes an unreasonable multiplication of the proceedings.   When factoring in the obvious motivation-- overwhelming the system to prevent examination of each individual claim and to extract mass settlements--the behavior becomes vexatious as well.   Therefore, the Court finds that in <u>Alexander</u>,[180] O'Quinn has "multiplie[d] the proceedings ... unreasonably and vexatiously," and the firm will be required "to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."   28 U.S.C. § 1927.[181]

_____

[180]   The conduct that forms the basis of O'Quinn's § 1927 liability is not confined to <u>Alexander</u> or to O'Quinn.  However, O'Quinn will not be insulated from liability simply because the Court does not have jurisdiction to sanction Plaintiffs' counsel in the other cases.  Instead, as discussed <u>infra</u>, O'Quinn will only be sanctioned for <u>Alexander</u>'s proportionate share of "the excess costs, expenses, and attorneys' fees reasonably incurred because of [the sanctionable] conduct."  28 U.S.C. § 1927.  It will be left to the respective state courts after remand to address counsel's conduct in the remanded cases.

[181]   In making this finding, the Court--as it must--strictly construes § 1927.  <u>See</u> <u>Edwards</u>, 153 F.3d at 246.  Strictly construing the statute, the Court finds that the § 1927 liability arose at the time of the <u>Daubert</u> hearings.  Absent strict construction, the Court likely would find that liability arose with the filing of the Complaint.

Prior to turning to the amount of O'Quinn's sanction, the Court notes that Defendants also moved for sanctions pursuant to Federal Rules of Civil Procedure 16, 26 and 37, which allow the Court to sanction a party who fails to comply with scheduling orders, improperly certifies discovery responses, or fails to cooperate with discovery. The factual bases for sanctions grounded in those Rules have been documented and debated at length in the parties' filings in response to Order No. 27. Defendants have noted numerous instances in which Plaintiffs have failed to comply with the Court's discovery orders, some of which Plaintiffs dispute. In general, Plaintiffs' counsel, including O'Quinn, argue that they, "in good faith, made every attempt to comply with the Court's discovery orders." (O'Quinn's Resp. Opp'n Defs.' Mots. Sanctions, MDL 03-1553 Docket Entry 1775, at 12.) Implicit (and sometimes explicit) in their "good faith" arguments is that Plaintiffs' counsel did the best it could considering the large volume of Plaintiffs. For example, in the introductory section of O'Quinn's brief in opposition to the sanctions motions, O'Quinn offers a brief tutorial in the differences between "mass torts" and "traditional personal injury lawsuits":

> As with most mass torts, there are thousands of [silica] cases filed nationwide. Unlike traditional personal injury lawsuits, these [mass tort] cases are unique and prosecuted in a non-traditional--yet judicially efficient--manner. The unique nature of mass torts is especially relevant in this instance due to the fact that silica litigation has been ongoing for many years and, therefore, [has] taken on certain characteristics all its own. The fact is counsel for Plaintiffs and Defendants have been dealing with the issues currently before the

-240-

> Court for many years.  Although the 'diagnoses' issues
> that the Court is now grappling with are relatively new
> in this arena, they are issues that have successfully
> been dealt with before.

(O'Quinn's Resp. Opp'n Defs.' Mots. Sanctions, MDL 03-1553 Docket Entry 1775, at 2.)  Although O'Quinn does not support its statement with any examples of the "'diagnoses' issues" being "successfully ... dealt with," O'Quinn does explain the "dynamics and functioning of [O'Quinn]'s silica docket," which includes over 2,000 claims in this MDL.  (O'Quinn's Resp. Opp'n Defs.' Mots. Sanctions, MDL 03-1553 Docket Entry 1775, at 13.)  O'Quinn then describes the "painstaking procedures" the firm implemented to attempt to comply with the Court's order to disclose which of its 2,000 Plaintiffs had previously been diagnosed with asbestosis.  (O'Quinn's Resp. Opp'n Defs.' Mots. Sanctions, MDL 03-1553 Docket Entry 1775, at 13-15.)

The Court does not doubt that complying with discovery orders related to thousands of Plaintiffs can be an overwhelming undertaking.  But the reason it is overwhelming is that Plaintiffs' counsel, and the screening companies and physicians they employ, have taken steps to inflate the number of silicosis claims beyond the true number of people with silicosis.  In other words, at the root of the unwieldy nature of this MDL, including the difficulty in responding fully to discovery, is the fact that Plaintiffs' counsel such as O'Quinn filed scores of claims without a reliable basis for believing that their clients had a compensable injury,

-241-

thereby "multipl[ying] the proceedings ... unreasonably and vexatiously." 28 U.S.C. § 1927. Thus, even though the Alexander Plaintiffs may have failed to fully comply with all of the Court's discovery orders, the underlying cause of this is addressed by § 1927, and that is why § 1927 forms the basis of the Court's sanction.

In determining the amount of the § 1927 sanction, the Court considers three factors: (1) whether there is a connection between the amount of monetary sanctions imposed and the sanctionable conduct by the violating party; (2) whether the costs or expenses claimed by the aggrieved party are "reasonable," as opposed to self-imposed, mitigable, or the result of delay in seeking court intervention; and, (3) whether the sanction is the least severe sanction adequate to achieve the purpose of § 1927. See Topalian v. Ehrman, 3 F.3d 931, 936-37 (5th Cir. 1993) (citations omitted).[182] Applying these factors to this situation, the Court finds that O'Quinn should be required to pay Alexander's proportionate share of Defendants' "reasonably incurred" costs, expenses and attorneys' fees for the three-day Daubert hearings.

As discussed above, by the date of Daubert hearings, the patent unreliability of the diagnoses underlying each of the claims in Alexander (as well as most of the other cases) should have been

_____

[182] The fourth factor discussed in Topalian, "that the [district] court must announce the sanctionable conduct giving rise to its [sanctions] order," Topalian, 3 F.3d at 937, has already been addressed.

readily apparent to O'Quinn (as well as the other Plaintiffs' counsel). Yet neither O'Quinn, nor any of the other Plaintiffs' counsel, attempted to stop the hearings or withdraw their claims or acknowledge that they did not have legitimate diagnoses; instead, Plaintiffs (after implying that Dr. Martindale's retractions were caused by Defendants' malfeasance) told the Court that they welcomed the opportunity to allow their diagnosing doctors and screening companies "to show their stripes." (Dec. 17, 2004 Status Conference Trans. at 23.) This forced Defendants to marshal evidence, question Plaintiffs' doctors and screeners, and present two experts of their own (Dr. Friedman and Dr. Parker), all requiring Defendants to incur fees, costs and expenses.[183] Furthermore, the Court finds that Defendants' efforts, as displayed during the three-day hearings, were reasonably necessary to place Plaintiffs' diagnoses in their proper light.

Defendants have not proffered an accounting of the fees, costs and expenses they expended during the three-day <u>Daubert</u> hearings. However, a large group of Defendants have stated that for the purposes of the sanctions motions, they "will accept the Court's estimate [made during the <u>Daubert</u> hearings] that the attorney costs (including fees) of such [<u>Daubert</u>] proceedings amounted to approximately $275,000 per day."[184] (Supplemental Mot. Sanctions,

---

[183] Indeed, assuming any of the <u>Alexander</u> Plaintiffs procure alternate diagnoses, the <u>Daubert</u> process may have to be repeated.

[184] The Court's estimate of $275,000 per day was based on the number of defense attorneys present at the hearings

-243-

MDL 03-1553 Docket Entry 1678, at 8.)    Thus, for the three-day Daubert hearings,[185] the Court will begin with the assumption that the total amount of fees, costs and expenses Defendants incurred was $825,000.  The Court also operates under the assumption that the proportionate share of the total fees, costs and expenses attributable to Alexander--a case with 100 Plaintiffs in a 10,000-Plaintiff MDL--is one percent (i.e., 100 divided by 10,000). Hence, at this stage, the Court assumes that Alexander's proportionate share of the total amount is $8,250.

However, prior to the Court issuing an order requiring O'Quinn to pay $8,250 to Defendants pursuant to § 1927, O'Quinn should have the opportunity to require Defendants to prove their fees, costs and expenses, as well as challenge whether they were reasonable (as opposed to being "self-imposed, mitigable, or the result of delay in seeking court intervention," Topalian, 3 F.3d at 937).

---

multiplied by a "low count" of the number of hours of in-court time at an average rate of $200 per hour.  (See Feb. 16, 2005 Trans. at 235; see also Mar. 14, 2005 Sanctions Hearing Trans. at 27-28.)
    Defendants indicate that if so ordered, they will prepare evidence of their actual fees and expenses, "which defendants expect will far exceed the Court's $275,000 per day estimate." (Supplemental Mot. Sanctions, MDL 03-1553 Docket Entry 1678, at 8 n.7.)

[185]  The Daubert hearings spanned February 16-18, 2005. Defendants also ask for reimbursement for the fees they expended for the in-person hearing on February 15, 2005.  (Supplemental Mot. Sanctions, MDL 03-1553 Docket Entry 1678, at 8.)  However, the February 15 hearing was a status conference which would have occurred even had the Daubert hearings been cancelled. Therefore, Defendants' fees for the February 15 hearing cannot be recovered via § 1927.

Therefore, while the Court determines herein that O'Quinn should be liable for Alexander's proportionate share of Defendants' reasonable fees, expenses and costs for the Daubert hearings, the Court does not yet fix the amount of the sanction in this Order. See Travelers Ins. Co. v. St. Jude Hosp., Inc., 38 F.3d 1414, 1416 (5th Cir. 1994) (noting that a district court may award sanctions in one order, and set the amount of the award in a later order; also noting that the sanctions award only becomes appealable when "the award is reduced to a sum certain") (citing S. Travel Club, Inc. v. Carnival Air Lines, Inc., 986 F.2d 125, 131 (5th Cir. 1993)).  Instead, within seven days from the date of this Order, O'Quinn must file a statement with the Court either admitting or denying the Court's estimate of $825,000 as the total amount of fees, costs and expenses Defendants reasonably incurred due to the three-day Daubert hearings.[186]  Should O'Quinn deny the $825,000 figure, the Court first will allow Defendants to prove their actual fees, expenses and costs for the Daubert hearings, and then will allow O'Quinn to challenge those amounts and their reasonableness; finally, the Court will sanction O'Quinn for Alexander's proportionate share of the actual fees, expenses and costs Defendants reasonably incurred.  Regardless of whether O'Quinn admits or denies the $825,000 figure, the Court will set the amount of the sanction in a later order.

---

[186]  O'Quinn's admitting of this figure will not be construed as admitting any other finding in this Order, including whether O'Quinn should be liable for sanctions pursuant to § 1927.

It is worth noting that the amount of the sanction this Court ultimately orders (whether $8,250 or a percentage of an amount to be proven by Defendants), while not insignificant, will be substantially less than the total amount of damages--some calculable and some not--Plaintiffs' counsel have caused by their filing of thousands of claims without a reliable basis for believing that every Plaintiff has been injured.  However, the Court must confine itself to "the least severe sanction adequate to achieve the purpose of the rule under which it was imposed."  <u>See</u> <u>Topalian v. Ehrman</u>, 3 F.3d 931, 937 (5th Cir. 1993).  The Court trusts that this relatively minor sanction will nonetheless be sufficient to serve notice to counsel that truth matters in a courtroom no less than in a doctor's office.

## V.  Conclusion

The claims of every Plaintiff in each of the 90 cases listed in "Appendix A" (attached hereto) will be REMANDED for lack of subject-matter jurisdiction.  In order to allow the parties an opportunity to petition the Mississippi Supreme Court for consideration of how Mississippi's judicial system can best absorb the return of these cases, the Motion to Stay the effective date of remand is GRANTED.  The Court hereby STAYS the effective date of the remand of the cases listed in "Appendix A" for a period of 30 days from the date of this Order, after which time remand will issue.

Kirkland v. 3M Co., S.D. Tex. Cause No. 04-639, will be sent to the Judicial Panel on Multidistrict Litigation ("Panel") with a recommendation that, for the convenience of the parties and to promote the just and efficient conduct of the case, Kirkland be remanded to the United States District Court for the Northern District of Georgia.

After the implementation of the above-stated rulings, only the 19 recently-transferred cases listed in "Appendix B," as well as Alexander v. Air Liquide America Corp., S.D. Tex. Cause No. 03-533 (originally filed in this Court), will remain in this MDL. An in-person status conference will be conducted on August 22, 2005 at 9:00 a.m., concerning the appropriate procedure for expediting jurisdictional discovery in the cases listed in "Appendix B," as well as in any later-transferred cases. As to the "Appendix B" cases, the stay of discovery entered on February 22, 2005 (see Order No. 26) is hereby lifted. As set out in Order No. 4, all Plaintiffs in recently-transferred actions must submit sworn Fact Sheets within 60 days from the date of transfer by the Panel (excluding the period during which discovery was stayed). (Order No. 4, ¶ 20.)

In Alexander, Plaintiffs have 30 days from the date of this Order to cure the jurisdictional allegation concerning American Optical's principal place of business. Should Plaintiffs fail to cure the allegation within 30 days, American Optical will be dismissed without prejudice.

-247-

As to <u>Alexander</u>, Defendants' Motion to Exclude is GRANTED: the testimony of Dr. Harron and the testimony of Dr. Levy (as well as their accompanying diagnoses) are inadmissible. Immediately following the August 22, 2005 status conference addressing the "Appendix B" cases, the Court will conduct an in-person status conference in <u>Alexander</u>, to address whether (and, if so, under what conditions) the Plaintiffs' claims may proceed.

Defendants' Motions for Sanctions will be GRANTED as to <u>Alexander</u>. The law firm of O'Quinn, Laminack & Pirtle ("O'Quinn") has multiplied the proceedings unreasonably and vexatiously, and will be required to satisfy personally <u>Alexander</u>'s proportionate share (i.e., one percent) of Defendants' reasonably incurred costs, expenses and attorneys' fees for the <u>Daubert</u> hearings conducted on February 16-18, 2005. The Court does not yet fix the amount of this sanction. Instead, within seven days from the date of this Order, O'Quinn must file a statement with the Court either admitting or denying the Court's estimate of $825,000 as the total amount of fees, costs and expenses Defendants reasonably incurred due to the three-day <u>Daubert</u> hearings. Should O'Quinn deny the $825,000 figure, the Court first will allow Defendants to prove their actual fees, expenses and costs for the <u>Daubert</u> hearings, and then will allow O'Quinn to challenge those amounts and their reasonableness; finally, the Court will sanction O'Quinn for <u>Alexander</u>'s proportionate share of the actual fees, expenses and costs Defendants reasonably incurred. Regardless of whether

O'Quinn admits or denies the $825,000 figure, the amount of the sanction will be set in a later order.

As to all MDL cases transferred by the Panel _before_ December 5, 2004 (i.e., the "Appendix A" cases, over which the Court has no subject-matter jurisdiction), the Motion to Exclude Expert Testimony, the Motions for Sanctions, and all other pending motions not otherwise addressed in this Order are reserved for consideration by the appropriate state court after remand.

As to those MDL cases transferred by the Panel _after_ December 5, 2004 (i.e., the "Appendix B" cases), the Motion to Exclude Expert Testimony, the Motions for Sanctions, and all other pending motions not otherwise addressed in this Order are STAYED pending this Court's ruling on subject-matter jurisdiction.

SIGNED and ENTERED this 30th day of June, 2005.

_____
Janis Graham Jack
United States District Judge