UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case No.  01-1139 (JFK)
                                .
                                .
  W.R. GRACE & CO.,             . Courtroom A, 54th Floor
                                . U.S. Steel Tower
                                . Pittsburgh, PA
                  Debtor.       .
                                . July 19, 2005
. . . . . . . . . . . . . . . . 8:42 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:            Pachulski, Stang, Ziehl, Jones &
                            Weintraub, P.C.
                            By:  DAVID CARICKHOFF, ESQ.
                            919 North Market Street, 16th Fl.
                            Wilmington, Delaware  19899

                            Kirkland & Ellis LLP
                            By:  DAVID BERNICK, ESQ.
                                 MICHELLE H. BROWDY, ESQ.
                                 JANET BAER, ESQ.
                                 BARBARA HARDING, ESQ.
                            200 East Randolph Drive
                            Chicago, Illinois  60601


Audio Operator:             Cathy Younker


 Proceedings recorded by electronic sound recording, transcript
             produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

APPEARANCES (CONT'D):

For Century:                      White and Williams LLP
                                  By:  LINDA M. CARMICHAEL, ESQ.
                                  824 North Market Street
                                  Suite 902
                                  Wilmington, DE  19899-0709

For the FCR:                      Swidler Berlin LLP
                                  By:  ROGER FRANKEL, ESQ.
                                       RICHARD WYRON, ESQ.
                                  The Washington Harbour
                                  3000 K Street, N.W., Suite 300
                                  Washington, D.C.  20007-5116

For W.R. Grace:                   W.R. Grace
                                  By:  WILLIAM SPARKS, ESQ.
                                       MARK SHELNITZ, ESQ.
                                       JAY HUGHES, ESQ.
                                  7500 Grace Drive
                                  Columbia, MD  21044

For Allstate Insurance Co.:       Cuyler Burk, LLP
                                  By:  ANDREW CRAIG, ESQ.
                                  Parsippany Corporate Center
                                  Four Century Drive
                                  Parsippany, NJ  07054

For ZAI:                          Scott Law Group
                                  By:  DARRELL SCOTT, ESQ.

For Zurich:                       Connelly Bove lodge & Hutz, LLP
                                  By:  JEFFREY WISLER, ESQ.
                                  The Nemours Building
                                  1007 North Orange Street
                                  Wilmington, DE  19801

For Maryland Casualty:            Eckert Seamans Cherin & Mellot,
                                  LLC
                                  By:  EDWARD LONGOLZ, ESQ.
                                  600 Grant Street, 44th Floor
                                  Pittsburgh, PA  15219

For Continental Casualty,         Ford Marrin Esposito Witmeyer &
et al.:                           Gleser, L.L.P.
                                  By:  ELIZABETH DECRISTOFARO, ESQ.
                                  Wall Street Plaza
                                  New York, NY  10005-1875

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONTINUED):

For the ACC:                    Caplin & Drysdale, Chartered
                                By:  PETER LOCKWOOD, ESQ.
                                     NATHAN FINCH, ESQ.
                                One Thomas Circle, N.W.
                                Washington, D.C.  20005

For London Market Insurers:     Linklaters
                                By:  BRENDA D. DILUIGI, ESQ.
                                1345 Avenue of the Americas
                                19th Floor
                                New York, NY  10105

For the Asbestos Claimants'     Campbell & Levine, LLC
Committee:                      By:  MARK HURFORD, ESQ.
                                800 N. King Street, Suite 300
                                Wilmington, DE  19801

For CNA Insurance:              Goodwin Procter LLP
                                By:  DANIEL GLOSBAND, ESQ.
                                Exchange Place
                                Boston, MA  02109

For Travelers:                  Simpson Thacher & Bartlett LLP
                                By:  ELISA ALCABES, ESQ.
                                425 Lexington Avenue
                                New York, NY  10017-3954

For the Equity Committee:       Kramer Levin Naftalis & Frankel,
                                LLP
                                By:  GARY M. BECKER, ESQ.
                                919 Third Avenue
                                New York, New York  10022

For the P.D. Committee:         Bilzin Sumberg Baena Price &
                                Axelrod LLP
                                By:  JAY SAKALO, ESQ.
                                     SCOTT BAENA, ESQ.
                                     ALLYN DANZEISEN, ESQ.
                                200 South Biscayne Boulevard
                                Suite 2500
                                Miami, Florida  33131

For the P.D. Committee:         Ferry, Joseph & Pearce, P.A.
                                By:  THEODORE TACCONELLI, ESQ.
                                824 Market Street, Suite 904
                                Wilmington, Delaware  19899
                                (Telephonic appearance)

**J&J COURT TRANSCRIBERS, INC.**

4

APPEARANCES (CONTINUED):

For the Unsecured Committee:   Stroock & Stroock & Lavan
                              By:  LEWIS KRUGER, ESQ.
                                   ARLENE KRIEGER, ESQ.
                              1809 Maiden Lane
                              New York, New York  10038-4982

For the Trade Committee:       Duane Morris
                              By: MICHAEL LASTOWSKI, ESQ.
                              1100 North Market Street
                              Suite 1200
                              Wilmington, Delaware  19801-1241
                              (Telephonic appearance)

For Reaud Morgan & Quinn:      Stutzman, Bromberg, Esserman &
                              Plifka, P.C.
                              By:  DAVID PARSONS, ESQ.
                                   SANDER ESSERMAN, ESQ.
                              2323 Bryan Street, Suite 2200
                              Dallas, Texas  75201
                              (Telephonic appearance)

For ZAI Claimants:             Richardson, Patrick, Westbrook &
                              Brickman, LLC
                              By:  ED WESTBROOK, ESQ.
                              174 East Bay Street
                              Charleston, South Carolina 29401
                              (Telephonic appearance)

                              Bilzin Sumberg Baena Price &
                              Axelrod LLP
                              By: MATTHEW KRAMER, ESQ.
                              200 South Biscayne Boulevard
                              Suite 2500
                              Miami, Florida  33131
                              (Telephonic appearance)

                              Zuckerman Spaeder LLP
                              By:  ELIZABETH POWER, ESQ.
                              919 Market Street, Suite 1705
                              Wilmington, DE  19899
                              (Telephonic appearance)

                              Drinker, Biddle & Reath
                              By:  ANDREA D'AMBRA, ESQ.
                              One Logan Square
                              18th and Cherry Streets
                              Philadelphia, PA  19103
                              (Telephonic appearance)

APPEARANCES (CONTINUED):

                              Klehr, Harrison, Harvey,
                              Branzburg & Ellers, LLP
                              By:  JENNIFER SCOLIARD, ESQ.
                              919 Market Street, Suite 1000
                              Wilmington, DE  198091
                              (Telephonic appearance)

                              Cohn, Whitesell & Goldberg, LLP
                              By:  DANIEL COHN, ESQ.
                                   CHRISTOPHER CANDON, ESQ.
                              101 Arch Street
                              Boston, MA  02110
                              (Telephonic appearance)

                              Monzack & Monaco, P.A.
                              By:  FRANCIS MONACO, ESQ.
                              1201 N. Orange Street, Suite 400
                              Wilmington, DE  19899
                              (Telephonic appearance)

                              Landis, Rath & Cobb, LLP
                              By:  KERRI KING MUMFORD, ESQ.
                              919 Market Street
                              Suite 600
                              Wilmington, DE  19801
                              (Telephonic appearance)

ALSO APPEARING BY TELEPHONE:

                              By:  JOHN O'CONNELL

                              By:  JACK COHN

                              Steptoe & Johnson, LLP
                              By:  MARCH COLEMAN, ESQ.
                              Washington, D.C.

                              By:  LAURIE SINAYAN

                              By:  SHAUN WALSH

                              By:  THOMAS WHELAN

                              By:  TIFFANY COBB

                              By:  PAUL NORRIS

                              By:  JASON PACORNEY

TELEPHONIC APPEARANCES (CONTINUED):

By:  JONATHAN BROWNSTEIN

By:  DAVID CLAUDER

By:  SARAH EDWARDS

1           THE CLERK:  All rise.

2           THE COURT:  Are you ready?

3           UNIDENTIFIED SPEAKER:  Ready.

4           THE COURT:  Okay.  Please be seated.  This is the

5  matter of W.R. Grace, Bankruptcy Number 01-1139.  It's pending

6  in the District of Delaware.  The participants I have listed by

7  phone are:  Edward Westbrook, Theodore Taconelli, John

8  O'Connell, Jack Cohn, March Coleman, Laurie Sinayin, Matthew

9  Kramer, Elizabeth Power, Shaun Walsh, Thomas Whelan, Tiffany

10 Cobb, Michael Lastowski, Michael Davis, Elisa Alcabes, Andrea

11 D'Ambra, Paul Norris, Dan Cohn, Christopher Candon, Elizabeth

12 DiChristopher, Jennifer Scoliard, Jason Pacorney, Francis

13 Monaco, Jonathan Brownstein, Carrie Mumford, David Klauder,

14 Sarah Edwards, Sander Esserman, and David Parsons.  Please,

15 folks, put your mute buttons on until you're speaking, and when

16 you do speak identify yourself for the record.  I'll take

17 entries of those of you in Court who wish to enter appearances,

18 please.

19          MR. BERNICK:  Good morning, Your Honor.  David

20 Bernick for Grace.

21          MS. BROWDY:  Your Honor, Michelle Browdy, for Grace.

22          MS. BAER:  Janet Baer for Grace.

23          MR. CARICKHOFF:  David Carickhoff for Grace.

24          MS. KRIEGER:  Arlene Krieger for the unsecured

25 creditors committee.

1          THE COURT:  Just a second, please.

2          MR. KRUGER:  Lewis Kruger for the unsecured

3  creditors' committee.

4          MR. LOCKWOOD:  Peter Lockwood for the asbestos

5  claimants' committee, Your Honor.

6          MR. FINCH:  Nathan Finch for the asbestos claimants'

7  committee, Your Honor.

8          MR. HURFORD:  Mark Hurford for the asbestos

9  claimants' committee.

10          MR. BAENA:  Your Honor, Scott Baena on behalf of the

11  P.D. Committee.

12          MR. SAKALO:  Good morning, Your Honor.  Jay Sakalo on

13  behalf of the P.D. Committee.

14          MR. FRANKEL:  Good morning, Your Honor.  Roger

15  Frankel, Swidler Berlin, for the  futures representative.

16          MR. WYRON:  Good morning, Your Honor.  Richard Wyron

17  --

18          THE CLERK:  We don't pick you up.  You need a mike.

19          MR. WYRON:  Richard Wyron of Swidler Berlin for the

20  futures representative.

21          MR. BECKER:  Good morning, Your Honor.  Gary Becker

22  from Kramer Levin for the equity committee.

23          MS. DILUIGI:  Good morning, Your Honor.  Brenda

24  DiLuigi of Linklaters for London Market Insurers.

25          MR. CRAIG:  Good morning, Your Honor.  Andrew Craig

1   from Cuyler Burke for Allstate Insurance Company.

2          MR. LONGOLZ:  Good morning, Your Honor.  Edward

3   Longolz from Eckert Seamens for Maryland Casualty.

4          MS. CARMICHAEL:  Good morning, Your Honor.  Linda

5   Carmichael, White and Williams, for Century Indemnity Company.

6          MS. ALCABES:  Good morning, Your Honor.  Elisa

7   Alcabes, Simpson, Thacher and Bartlett.

8          THE COURT:  I'm sorry?

9          MS. ALCABES:  Elisa Alcabes, Simpson, Thacher and

10  Bartlett, for Travelers.

11         MS. DECRISTOFARO:  Good morning, Your Honor.

12  Elizabeth DeCristofaro for Continental Casualty Company.

13         THE COURT:  Ms. DeCristofaro, I couldn't hear you.  I

14  couldn't pick it up, what you were saying.

15         MS. DECRISTOFARO:  Okay.  Elizabeth DeCristofaro for

16  Continental Casualty Company.

17         THE COURT:  Thank you.

18         MR. GLOSBAND:  Good morning.  Dan Glosband from

19  Goodwin Proctor, also for Continental Casualty.

20         MR. WISLER:  Good morning, Your Honor.  Jeffrey

21  Wisler of Connelly Bove on behalf of Zurich Insurance Company,

22  Zurich International, and Maryland Casualty.

23         THE COURT:  Okay.  Mr. Bernick?

24         MR. BERNICK:  Your Honor, I think we're going to

25  proceed with some of the administrative matters to get them out

1  of the way, and I think that there are really two principal

2  orders of business today.  One is the CMO for property damage,

3  and the other is the CMO for personal injury.  And I'll be

4  addressing those, but Ms. Baer will talk about the orders that

5  should be entered on that --

6          THE COURT:  All right.

7          MR. BERNICK:  -- what are essentially the two

8  matters.

9          MS. BAER:  Good morning, Your Honor.  Janet Baer on

10  behalf of W.R. Grace.  Your Honor, Agenda Items Number 1 and 2

11  you've already entered orders on.  Agenda Items 3 and 4 are the

12  CMO matters which we'll be taking up momentarily.

13          Agenda Item Number 5 was the motion of the State of

14  Montana for relief from the automatic stay.  The State of

15  Montana asked that we adjourn this matter until the August 29th

16  meeting for status.

17          THE COURT:  That's fine.

18          MS. BAER:  Your Honor, Agenda Items Number 6, 7, 9,

19  and 10 are omnibus objections that have been continued from

20  time to time.  All of those matters are being continued, and

21  I'll hand up all four orders at one time.

22          THE COURT:  All right.

23                  (Pause)

24          THE COURT:  Okay.  They're all signed.

25          MS. BAER:  Your Honor, that then leaves Agenda Items

1  3, 4, and 11, which Mr. Bernick will address.

2          THE COURT:  Mr. Bernick?

3          MR. BERNICK:  Your Honor, would it be all right if I

4  took off my jacket?

5          THE COURT:  No, you have to suffer all day, Mr.

6  Bernick.

7                        (Laughter)

8          MR. BERNICK:  Well, any way I can get sympathy.

9          THE COURT:  I should explain, gentlemen.  It gets so

10 hot in this courtroom.  Any time you want to take your jacket

11 off it's fine.  You don't need a broken arm to do it.

12                        (Laughter)

13         THE COURT:  And ladies, too.  That applies to you, if

14 you have jackets you wish to take off.

15         MR. BERNICK:  Your Honor, I'm going to try to speak

16 from over here because I have a variety of materials to display

17 to the Court.  But essentially what I think would be a workable

18 format today is just begin with the property damage, take that

19 all the way through, and then proceed with personal injury.

20         THE COURT:  That's fine.

21         MR. BERNICK:  And what I then am going to do, as I

22 was actually walking over, back to the office, or actually back

23 to the hotel last night, I happened to pass by the Smithfield

24 Church I think it's called, and they had a sermon with an

25 interesting title.  Its title was "Indecision produces

1 flexibility." "Indecision produces flexibility."  And I kind

2 of thought about all the resonances that had with respect to

3 this case.  I kind of wondered, well, gee, if we're inflexible,

4 does that mean that we'll get the right kind of decisions from

5 them?  And I said, well, no, that's not going to work either,

6 but I did decide that inevitably, while we all want to draw

7 lines today and focus on certain things, we should just have

8 people stand up and essentially cover all the issues that

9 they've raised, because I know Your Honor's style, you want to

10 listen to all of those different issues.

11         At the end of the day, we believe that the business

12 that has to be accomplished today is to get these orders in

13 place and on the P.I. side to get the questionnaire in place.

14 But I know that inevitably the argument will turn to broader

15 matters, so I'm just going to take on -- be flexible and take

16 on all the different matters that I think have been raised,

17 both with respect to property and also with respect to personal

18 injury.  At the end of the day they'll focus on the concrete

19 pieces of paper that we believe need to be entered here.

20         Essentially the CMO that we've proposed with respect

21 to property damage is --

22         THE COURT:  Mr. Bernick, I'm sorry, but somebody is

23 going to have to move that board.  It's covering about the

24 lower third of your --

25         MR. BERNICK:  I'll just --

J&J COURT TRANSCRIBERS, INC.

1            THE COURT:  Thank you.

2            MR. BERNICK:  We've proposed a case management order

3  that proceeds in a stage-wise form.  Essentially what we're

4  trying to do is to marry the objection process which has been

5  designed to handle a very large number of claims that can be,

6  we believe, disposed of very readily without a lot of labor-

7  intensive adjudications, to handle that up front, but to marry

8  it to the estimation stage.  There would be little point served

9  if we actually had to value theoretically the cost of removing

10 asbestos from a building where there's not even been the

11 authority to prosecute the claim, so we have got this staged

12 approach.  And pursuant to Your Honor's suggestion, I think it

13 was in the April hearing, Your Honor said I want to see the

14 road map of what issues get set out, and when they get set out,

15 and when they get resolved.  And essentially, in this first

16 phase we would take on the question of is there an authority to

17 prosecute the claim, and this Your Honor will hear affects a

18 huge number of claims, and then what are called the gateway

19 objections, where you have an incomplete proof of claim,

20 insufficient documentation, no product I.D. where there has

21 been a prior settlement so that the claim actually has been

22 disposed of.

23            Now, do we have to get decisions on all of those

24 matters before we get to the next phase?  It would be nice.  It

25 would be nice to do that, and therefore we have said that there

1  should be hearings scheduled when Your Honor is available to

2  take up these threshold matters.  Inevitably there will be some

3  overlap, and we don't want the schedule to be contingent upon

4  Your Honor issuing orders by certain dates because that puts

5  all the pressure on Your Honor and is better borne by the

6  parties.  So, to the extent that we don't resolve all of these

7  matters, we hope to resolve many of them, and we then can

8  proceed to the next phase.  The next phase identifies two

9  principle issues that we believe carry through a huge number of

10 claims, if not really all of the claims, there will be some

11 exceptions, and can be addressed up front.  One is the issue

12 about how does -- what kind of data, what kind of methodology

13 for gathering data satisfies the Daubert standard which

14 requires reliability, and can be considered by the Court for

15 purposes of determining whether the asbestos in a given

16 building needs to be removed.  That is, whether there's a risk

17 that warrants its being removed.  And as I'll get back to in a

18 minute, that is a general question.  That's the very question

19 that we asked Judge Newsome to resolve in the Armstrong case,

20 which he did resolve spanning hundreds of claims.  Secondly,

21 constructive notice.  Constructive notice is based on a

22 reasonableness standard.  The P.D. Committee has taken issue

23 with how we articulate that principle of law.  It would be our

24 position that if we're wrong about that principle of law, and

25 that means that you have to have every single building owner

1   come in, Your Honor, can decide that.  We don't think that

2   that's what the law says at all.  We think the whole purpose of

3   constructive notice is really to enable the Court to short

4   circuit questions of, well, yes I did know, or no I didn't

5   know, or something like that.  If the market knows the

6   individual building owner or claimant is deemed to know as a

7   matter of law.  So, that is issue is tee'd up.  Again, no

8   ruling is required.  Your Honor would have to consider all of

9   this evidence in any event if everything were postponed until

10  the end.  But the idea is not to postpone it.

11          We then come to all remaining issues in the

12  determination of what dollar figure should attach to these

13  various claims.  The rationale for proceeding in this step-wise

14  fashion is very clear and well-known to Your Honor, and, if

15  only to, in a good-natured way, annoy Mr. Baena, I promised him

16  that I would show this chart today.  He said, you've got to

17  show the chart today, so I'm going to show the chart.  Here's

18  the chart that shows, as Your Honor is well aware, that as of

19  the time that this case was filed, essentially the property

20  damage litigation was on its last steps.  We're down to a total

21  of, I think, that seven cases were pending as of 2001, when the

22  case was filed.  By contrast, however, even though the

23  marketplace has been operative -- I mean, this litigation goes

24  back decades.  I think the last Grace Monokote or fireproofing

25  product that contained asbestos was sold in 1973, so we're

1 talking about a product that was taken off the market decades

2 ago.  Well, the marketplace of litigation was sensitive to the

3 fact that these claims were old claims.  You were in fear of

4 them brought not because people got fired.  God knows there was

5 huge amounts of money to be made in this litigation.  Grace

6 paid out hundreds of millions of dollars in this litigation.

7 So, there was no lack of economic incentive.  And the

8 litigation wore down because basically the marketplace was

9 concluding that the statute of limitations had run, that this

10 was a piece of litigation whose time had come and gone.  We

11 then see, by contrast, that once the bar date was set in this

12 case, we got 4,000 claims that are lodged, and that cannot be

13 real.  We all know it can't be real, and the question therefore

14 is how to get to the bottom of which of these claims really is

15 a viable claim given the applicable law.

16          What then becomes the rationale for why the CMO

17 proceeds in the fashion that it does?  It's essentially this,

18 and these are kind of rough orders of magnitude of how we think

19 it's actually going to occur.  We think that the objections,

20 particularly to Mr. Speights's claims, he's got 75 percent of

21 all the claims that have been filed, will be threshold

22 objections.  They'll be effective.  And they'll take the total

23 number of claims way, way, down.  Other objections, which we'll

24 talk about, will reduce them further.  In the estimation phase

25 one, this maybe is actually optimistic.  We think that there

1  are going to be even fewer cases that are left.  But certainly

2  an order on magnitude or better than what we've got with 4,000

3  cases, which then leaves us only with a small number of cases,

4  we hope and believe, that actually have to be valued.  That is,

5  actually have to be estimated in all respects.  So, that is the

6  step-wise approach that we're pursuing.

7          Now, we did have a productive dialogue.  We had Mr.

8  Baena, on behalf of his committee, was very diligent in pushing

9  to have several discussions, both oral and in person, so we

10 hashed out all aspects of this.  I frankly thought that we came

11 an awful lot closer than what the papers seem to reflect, but

12 it is what it is.  We don't have an agreement so we're here

13 today.  And essentially, as I read the papers and I see the

14 alterative that's been proposed, the committee doesn't like any

15 one of the phases that we've got, and doesn't even like the

16 fact that we've got phases,  don't see the need to have the

17 gateway and authority objections addressed first and promptly.

18 Why don't they just simply go on their merry way?  On

19 estimation, don't believe that that's a common issue.  It can't

20 be adjudicated as a common issue.  And with respect to phase

21 two, that is the final step, they even take issue with what I,

22 I believe, a fundamental precept of the Code, which is that

23 estimation can, in fact, be used to set the value of each and

24 every claim if that's where this thing goes.

25          Now, obviously the number one priority it to set the

1  overall aggregate value, because that is what is called out in

2  the plan.  But given estimation, and the fact that there's no

3  personal injury claim, 502(c) is loud and clear, we can use

4  estimation, following the appropriate rules of evidence, to

5  value out each and every one of these claims.  We think at the

6  end of the day that's going to be very feasible to accomplish.

7  They take issue with that, as well.  It is perplexing why.  I

8  am sure that Mr. Baena will explain that here this morning.

9          So, we have to respond to these various points that

10 have been made, and I will try to do so briefly.  With regard

11 to the objection process, the objection process already, even

12 at this stage, has borne very significant proof.  There were

13 early flags, and we started to look at the claim forms that

14 were turned in with respect to these property damage claims,

15 there were early flags that there were fundamental problems,

16 that the 4,000 claims really were not real.  What kinds of

17 flags?  Well, in some cases, in many cases, indeed, in scores

18 if not hundreds of cases, we had a claim that said the claimant

19 is a building.  Now, I guess in an in rem action the action is

20 all about a thing.  But generally plaintiffs are people,

21 persons, corporate persons, or individual persons.  They're not

22 buildings.  Why is a claim being filed on behalf of a building?

23 We had another early flag, which was, it turns out, that not

24 only were the claimants structures instead of people, but the

25 claimants, I guess a building can't sign a claim form, so the

1  lawyer has signed all the claim forms -- 2,938 Speights and

2  Runyan claims were signed by one of two lawyers, either Mr.

3  Speights or Ms. Steinmeyer.  And we can see this very easily.

4  It's right on the claim form itself.  Speights and Runyan.

5         THE COURT:  Well, I mean, with respect to that

6  objection, why don't you just file it?

7         MR. BERNICK:  I'm sorry?

8         THE COURT:  With respect to that objection, why don't

9  you just file it?  Let's just get to that issue.

10         MR. BERNICK:  We have.  We --

11         THE COURT:  Oh, it has been filed?

12         MR. BERNICK:  We're going to -- we have filed -- we

13  are filing, I believe today, all of the objections based upon

14  personal authority with respect to all the Speights and Runyan

15  claims.

16         THE COURT:  Okay.  I'm not sure why that's going to

17  tie up anything else.

18         MR. BERNICK:  It's not -- it shouldn't.  That's the

19  whole point, is to get rid of this stuff early on.

20         THE COURT:  Well --

21         MR. BERNICK:  And you'll see that there are some

22  issues that do have to be adjudicated.  But what we found out

23  was that, take this particular claim on behalf of the AMA, we

24  started to test this.  We subpoenaed ten different buildings,

25  and this is going to get back to the question of timing, which

1  is very deep.  We subpoenaed ten actual claimants that were

2  listed to have them talk about, tell us where is the authority

3  that they gave to Mr. Speights.  And what we found out is that

4  it was represented that in the case -- this one right here,

5  actually, signed by Ms. Steinmeyer, that the AMA actually had

6  authorized them to proofs of the claim.  But we have now

7  obtained an affidavit that actually says that the people from

8  the AMA actually spoke with the Speights and Runyan firm on

9  discussions whether S&R would represent the AMA in this

10 proceeding.  I informed S&R that the AMA did not wish S&R to

11 represent them in this proceeding.

12        THE COURT:  Well, I mean, this is going to be a major

13 litigation issue, because frankly, if that law firm, in fact,

14 filed a claim after getting notice that they were not to file

15 it, that's cause for disbarment.  I mean, that's not just a

16 proof of claim issue.  There's a real problem.  So, why don't

17 we just file it and get to it.  If it's not true, then it's not

18 true.  If it is, then --

19        MR. BERNICK:  That's exactly right.  We then turn out

20 -- I won't bore the Court, but we've got other communications

21 from other people saying that it's not been authorized.  So, in

22 pursuing this with Mr. Speights, one of his answers was, and

23 this is, again, a remarkable answer, it's what I call the road

24 class.  And there's no other way to refer to it.  There was an

25 effort called the <u>Anderson Memorial</u> class action, and this was

1 prosecuted as a purported class action on behalf of property

2 damage claimants as a class. There's only one problem. It was

3 -- certification was denied. Flatly denied. So, time passed,

4 and rumors started to fly around that Grace was going to go

5 into bankruptcy. So, all of a sudden a new class action is

6 filed, and the idea -- in the action, this was explicit with

7 the Court, is that Judge, you've got to certify this class and

8 certify it now, because Grace is going to file for bankruptcy,

9 essentially let's get our foot in the door. Well, that was not

10 acted on until after the bankruptcy case was filed and the stay

11 was put in place. So, we now have a class that apparently was

12 certified after this case was filed, and they now say, well,

13 that class action is there. Now, they could have been candid

14 with the Court. They could have come in and sough permission

15 to proceed in that class in terms of filing the claim forms.

16 They could have sought permission to file a class action claim

17 form. But what they decided to do instead was different. They

18 rounded up all of the different people that have now been

19 prosecuting -- on whose behalf they purport to prosecute, a

20 total of about 1,600 claimants that they say, well, we didn't

21 have express authority for all of them, but they're all part of

22 this class. So, what we really have in the <u>Anderson</u> case, and

23 the reason that I go through this, is that it's -- a lot of

24 this stuff is very straightforward, but in other areas it's

25 taking a little bit of time to unpack what actually has driven

1  this enormous volume of claims.  And the <u>Anderson</u> case is

2  outrageous.  There are actual rules -- and to say, oh, well,

3  because of that class I don't have to tell anybody, and I can

4  presume to represent people even where I've called them up and

5  they've told me no.

6          So, what have we done, and why is timing so critical?

7  We've pursued this very actively in the last several weeks in

8  order to get this process underway and to get this case down to

9  a manageable size.  This was taking place.  We objected to ten

10 of the claims and we noticed depositions of those people.

11 Immediately there was a request to have a meet and confer to

12 stop the depositions, so we said, well, here is the discovery

13 we're going to seek from your firm, and in the meet and confer

14 we also proposed a stipulation to moot the depositions.  Just

15 tell us that you never have represented -- never have been

16 authorized by these people.  Mr. Speights told us, in no

17 uncertain terms, that stipulation was dead on arrival, wasn't

18 even going to consider it.  So, we had no choice but to proceed

19 with the depositions.  We then -- they then filed a motion for

20 protective order and we actually, on an emergency basis, we're

21 going to tee it up for decision today.

22          Now, all of a sudden what happens?  There's another

23 request for a meet and confer.  A meet and confer now takes

24 place, and now we get a signed stipulation.  It's a little bit

25 more detailed.  It lays out more facts.  It contains some self-

1  serving language.  But in essence it says exactly the same

2  thing, which is in virtually all the cases there's absolutely

3  no authority for them to proceed.  So, that mooted the issue,

4  which means we can't actually get on track to resolve the

5  question of what discovery we're going to get from Mr. Stipes's

6  firm.  All we want is the documentation with respect to all

7  these claims.  So, it's now being pushed off, pushed off,

8  pushed off.  And it's this lesson that makes us very, very

9  focused on the idea of the CMO calling out for dates so that

10  all of these matters can get resolved.  We don't have to have

11  kind of a little separate case management process with Mr.

12  Speights.  It's got to get done soon.  And that's end of

13  speech, but that's why I'm pursuing this --

14          THE COURT:  Well, I got lost somewhere in this

15  process because I'm still not sure where we're going.  If this

16  all relates to the objection that you're filing with respect to

17  Speights' authority, I don't need to hear any more about it

18  today.  I have to adjudicate it in the context of that

19  proceeding.  As far as the property damages, the committee is

20  concerned that somehow this process is going to tie up the rest

21  of the process.  I don't think that they have to be intangent.

22  I think they can be in tandem while these processes are going

23  on.

24          MR. BERNICK:  That's not -- that's not -- it seems to

25  me --

24

1          MR. BAENA:  Your Honor, if I may?  Your Honor, we --

2          MR. BERNICK:  Just -- just a moment.

3          THE CLERK:  State your name?

4          MR. BAENA:  My name is Scott Baena on behalf of --

5          THE COURT:  Mr. Baena?

6          MR. BAENA:  Your Honor, we haven't even alluded to

7 them, the Speights and Runyan claims in our papers in response

8 to the CMO.  It's background noise, Judge, and it's just like

9 their process.  They want to infect the Court by giving you a

10 little bit of a preview of what they intend to do, what they

11 haven't done for three years, four years.  And it's irrelevant

12 to the estimation process.

13          THE COURT:  Well, look.  Everybody -- let's start

14 with one ground rule.  I don't care what nobody has done up

15 until now.  What I care about is what happens from today going

16 forward.  So, the fact that it hasn't been done so far is a

17 total irrelevancy.  I don't care.  The reason we're here and

18 the reason I sent you out for the meet and confer was so that

19 we could set a process going forward.  So, the fact that it

20 hasn't been done to date, I don't care about -- it's not any

21 basis for any rulings that you're going to get from me today.

22 What I care about is how we're going to get these things

23 adjudicated in a logical and hopefully expeditious manner going

24 forward, starting today.  End of story.  So, I don't want to

25 hear any more from anybody else about it hasn't been done for

1 three or four years.  It's irrelevant.  It's going to be done

2 now, and the question is how.

3        MR. BAENA:  Correct, Your Honor.  And I thought the

4 issue we were here on is how are we going to estimate property

5 damage claims generally, not how are we going to deal with Mr.

6 Speights's proofs of claims.

7        THE COURT:  Well, and I think -- well, we have to

8 deal with all of the objections that any party intends to bring

9 --

10        MR. BAENA:  Clearly.

11        THE COURT:  -- with the debtor in the lead, so --

12 I've already said, if the debtor is filing the Speights

13 objections, let's figure out a track to put the Speights

14 objections on and let's go with them.  But I don't see why that

15 has to go first.  I don't see why the rest of the process can't

16 go on while Speights is going on separately.

17        MR. BERNICK:  It will.

18        THE COURT:  Okay.

19        MR. BERNICK:  It absolutely will.  But the purpose of

20 the CMO being staged in the way in which it is is that, for

21 example, if we wanted to go right to constructive notice and

22 the Daubert issue, that takes time for people to file their

23 reports.  So, the CMO calls out all of that.  But in the

24 meantime, we want to make sure that these threshold issues get

25 addressed in a timely fashion.  We originally wanted to include

1   them in the same CMO, so it would be clear that this kind of

2   messing around with dates and the like, and not getting prompt

3   adjudications isn't going to take place.  Mr. Baena objected to

4   having it in the CMOI because he said, well, this relates to

5   Mr. Speights, who although he says is background noise, is 75

6   percent of Mr. Baena's current constituency.  So, we put in a

7   separate case management order, and there is now a separate

8   case management order before Your Honor, and that's the only

9   reason I'm talking about it, is that we would like to get that

10  order entered so that --

11          THE COURT:  Is anybody objecting to the separate case

12  management order with respect to dealing with the Speights

13  claims?

14          MR. BAENA:  I don't believe they've even served it on

15  Mr. Speights.  Judge, I'm not here to represent an individual

16  claimant.  I'm not here to represent Mr. Speights, except to

17  the extent that his claims are implicated in the P.D.

18  estimation proceeding.  I'm not in a position to sit here and

19  talk about what the case management order ought to be in

20  respect of the objection to any particular P.D. claim.

21          THE COURT:  All right.  Let me interrupt.  Have you

22  served this proposal on Mr. Speights?

23          MR. BERNICK:  I believe that -- well, first of all,

24  Mr. Speights is a member of the P.D. committee.

25          THE COURT:  Yes.

1            MR. BERNICK:  So, whether he was personally served, I

2    don't know.  I can certainly find out.  But with all due

3    respect, Your Honor -- Mr. Baena, we have gone through an

4    exhaustive process of setting out dates for gateway objections.

5    Gateway objections all relate to individual claims.  The

6    distinction that he's attempting to draw, which is I can't

7    handle all these objections --

8            THE COURT:  Well -- it's irrelevant.  I mean, we have

9    a property damage committee.  To the extent they want to be

10   involved they'll be involved.  To the extent they don't, they

11   won't, and then they'll waive any effort to get involved later.

12   That's the way it's going to be.  The property damage committee

13   is there for the purpose of representing, in the global sense,

14   all the property damage claims.  So, to the extent they want to

15   be involved, they will.  If they don't want to be involved,

16   they will have waived any opportunity to get involved.  The

17   case management orders are going to be entered, and they're

18   binding on everybody, period, end of story.

19           MR. BERNICK:  That's fine.

20           THE COURT:  Now, with respect to Mr. Speights, if Mr.

21   Speights is a member of the committee surely he must have

22   knowledge of all this.

23           MR. BAENA:  Judge, may I just make this point?  The

24   Court entered a case management order at the beginning of this

25   case --

1          THE COURT:  Yes.

2          MR. BAENA:  -- about how matters would be brought on.

3          THE COURT:  Yes.

4          MR. BAENA:  This matter was not brought on until they

5  filed a brief last week in respect of the P.D. estimation.

6  That's the entire notice of this matter, which got it --

7  because they control the agenda on today's calendar.

8          THE COURT:  They don't control the agenda.  Anybody

9  who wants to put anything on the agenda can be put on the

10 agenda.  And if, in fact --

11         MR. BAENA:  Not on --

12         THE COURT:  -- somebody is asking for something to be

13 put on that isn't put on, please let me know --

14         MR. BAENA:  No, no --

15         THE COURT:  -- because I will withdraw all of the

16 agendas and we'll do something different.

17         MR. BAENA:  My point is your case management order

18 doesn't permit a matter to be put on here, for hearing, on --

19 seven day's notice.

20         THE COURT:  That's right.

21         MR. BAENA:  And that's what's happened here.

22         THE COURT:  Well, then, if we're not ready for it,

23 we'll put this on to August.  Mr. Speights can get notice.  We

24 are going to deal with Mr. Speights' claims.

25         MR. BAENA:  That's fine.

1           THE COURT:  These are serious issues.

2           MR. BAENA:  I'm not telling --

3           THE COURT:  And they ought to be litigated one way or

4    another.

5           MR. BERNICK:  Your Honor, really, this is -- this is

6    so -- this is so disingenuous.  Mr. Speights clearly knows,

7    he's clearly a member of the committee.

8           THE COURT:  Look --

9           MR. BERNICK:  This whole -- I'm --

10          THE COURT:  No, wait.  I'm going to resolve this.

11   I've heard enough.  I'm going to enter a CMO that deals with

12   Mr. Speights' claims.  If, in fact, Mr. Speights, who

13   apparently is the entity who will be most interested in this,

14   has some objection and hasn't been appropriately notified,

15   he'll let me know and then we'll put it on the August agenda.

16   So, my suggestion, Mr. Bernick, to the extent that the CMO is

17   an issue is simply that we enter the order but we make the

18   dates start one day after next month.  And then if Mr. Speights

19   wants to be here, he better be here next month, because that's

20   when this issue is getting put to bed.

21          MR. BERNICK:  So we can then pursue with others,

22   because I don't want to hear the same objection with respect to

23   others.  How -- does Your Honor want us to serve every single

24   P.D. claimant with that same -- with that same case --

25          THE COURT:  No.  I don't know that that's necessary.

1  But when you're dealing with 75 percent of the objections and

2  the whole issue seems to be focused, in many of them, if not

3  most of -- if not all of them, on the authority of the person

4  who signed the claim on behalf of the claimant.  That person

5  ought to be notified.

6          MR. BERNICK:  That's fair enough.  But then let's

7  build on, because what we have said is that by September 1

8  we're going to file omnibus objections that kick off what used

9  to be called all the gateway objections, substantially

10  incomplete form, insufficient supporting -- no product I.D.  We

11  have a lot of them that weren't identified what the building

12  is, barred by the statute of limitations.  I want to come back

13  to the statute of repose prior settlements.  These are all

14  threshold matters that pertain to actual specific individual

15  claimants.  And --

16          THE COURT:  Well, you'll need to notify those

17  specific claimants when you file the objection.

18          MR. BERNICK:  Okay.  Well, the -- well, that's fine.

19  We will certainly go ahead and do that.  But all that I'm

20  underscoring to Your Honor is that at some point we've got to

21  be able to manage this case.  And --

22          THE COURT:  Yes, you do.  But --

23          MR. BERNICK:  And if Mr. Baena can't communicate with

24  his own clients, or his own -- his own constituency --

25          THE COURT:  Now stop, folks, please.  We're not going

1  there.  Please.  To the extent that there is an individual

2  claim as to which the debtor is going to file an objection, the

3  property damage committee, in fact, all of the committees,

4  because they're part of the service list in the case, so they

5  should get notified, the lawyer representing that entity, to

6  the extent that there is a lawyer who is representing that

7  entity, and the claimant should be notified.  If the claimant

8  is a building, then frankly I don't know how you serve a

9  building unless you have to go post it.  I -- it would seem

10 that if Mr. Speights's firm filed those objections on behalf of

11 the building, notifying Mr. Speights ought to be sufficient

12 because I don't think posting a notice on the building is

13 really going to give that building any better notice than

14 giving it to Mr. Speights.

15        MR. BERNICK:  That's fine, Your Honor.  We'll proceed

16 in accordance with that.  And, Your Honor, we will ask for the

17 CMO to be entered.  We'll modify it so that it's effective the

18 day after.  Whatever it is, we just want to get the ball

19 rolling because we think it will save a lot of time.

20        Let me pursue estimation phase one, which is the next

21 one.  And this, again, will be -- I'll attempt to be brief

22 here.  There are two issues.  One is the proper methodology for

23 determining whether a product is a hazard necessitating

24 removal.  The essential position, and it's been litigated again

25 and again, and with mixed results.  They talk about, and we'll

1  show here in a moment, that there are some cases that have

2  decided this against us.  There are cases that have decided

3  this in our favor.  There's a Judge who wrote a 180 bench

4  opinion going through and finding that this product was not a

5  hazardous product.  So, there's a very hotly contested issue

6  about whether, once the product is in place, and it's not

7  disturbed, whether there -- whether it's really a hazard

8  necessitating removal.  Of course, these days maintenance

9  people know the kinds of cautions to take.  You don't have to

10  spend tens of millions of dollars renovating a building just

11  because there's asbestos there.

12        Well, the first issue has really got two parts to it.

13  The first part is methodology, that is what kind of data can be

14  considered in determining whether there is a risk necessitating

15  removal.  The second issue is if the data has been properly

16  obtained, what does that data show?  Does it show that this

17  asbestos-containing product in place actually gives rise to a

18  risk sufficient to warrant removal?  So, there are really two

19  parts to it, and we have constructive notice.

20        Now, there's some complaint here that in some fashion

21  this is a big surprise.  It's not a big surprise.  November 9

22  of 2001, we -- our consolidated reply in support of our motion

23  for a case management order, and we specifically addressed the

24  question of what would actually take place.  And we

25  specifically identified this whole area of risk as a major

1  issue.  Why?  Because it was a major issue in the underlying

2  litigation.  So, there's absolutely no surprise here.  In fact,

3  the day that the case -- we learned the case was going to be

4  transferred, I was prepared to come in and argue this very

5  point, including some of the very graphics that we have here,

6  before Judge Farnan.  So, this is not new.  It's been out there

7  absolutely forever.  Now, in the case -- the Daubert issue, is

8  a threshold issue.  If a building does not have the proper data

9  following scientific methodology, that claim is history.  They

10 cannot meet their burden of establishing that there is any

11 risk.  So, the data -- the question of data is a threshold

12 issue.  We're now in Federal Court, Daubert most plainly

13 applies.  There's some issue that the P.I. Committee has raised

14 with respect to that, but the Bankruptcy Rules spell out, in a

15 contested proceeding the Federal Rules of Evidence govern.

16 This Court is bound to follow Daubert.

17        THE COURT:  If we need expert opinion testimony in

18 this issue, and frankly I don't see how we can do it without

19 it, yes, Daubert applies, as do the several cases that follow

20 Daubert, Kumho Tire, for example, and the others, in the

21 Supreme Court.  So, yes, it applies.

22        MR. BERNICK:  And basically Judge --

23        THE COURT:  The only question is when to do the

24 hearing.

25        MR. BERNICK:  That's right.  And this -- we

1    reasonably put this one up front.  It's the basic question of

2    whether an indirect measure, like dust, can get you up to the

3    risk models that take you to the legal standard which requires

4    risk.  It's a very simple, straightforward issue in the sense

5    that it took about a day or two of evidence to present.  And

6    the reason that we moved it up front is A, it's generic.  We

7    know from the claim form submissions, Your Honor, we know

8    exactly which buildings have air data.  You need air data to be

9    able to measure risk in accordance with -- measure risk in

10   accordance with the existing risk models.  If you don't have

11   air concentration data, you're not on the map to establish risk

12   scientifically.  And that was the issue that was presented.

13   So, we know already exactly which claims, out of the thousands

14   of claims, actually have gone to the trouble of gathering this

15   very simple air data.  And we know that very few of them have.

16   There are probably a couple, three, four hundred buildings

17   where this kind of air data even exists.  So, it's a threshold

18   issue.  And once this issue was resolved in the Armstrong case,

19   the property damage claims disappeared en masse.  They were all

20   settled.  I won't get into the amounts.  But the whole issue

21   was resolved on the strength of having proceeded to get the

22   determination that Judge Newsome made.  That determination was

23   very plain.  He applied it across the board.

24           THE COURT:  It was, but frankly I think I'm dealing

25   with a different product under a different circumstance, and I

1  don't know whether dust -- because I haven't heard any expert

2  testimony.  I don't know whether using a dust standard in this

3  case, dealing with different products than Judge Newsome

4  addressed in <u>Armstrong</u>, is a viable standard.  So, fine.  If we

5  need to figure out whether it's a viable standard then let's

6  tee that issue up, because if it is then I'm going to hear the

7  dust evidence.  And if it isn't, then you're right, it ought to

8  be stricken and we should move on.

9           MR. BERNICK:  Right.

10           THE COURT:  Frankly, I don't know why we can't do

11  this trial with using both the dust data and using the air

12  concentration data so that we can get it all in at one time.

13  And if I determine that the dust data doesn't meet the

14  applicable <u>Daubert</u> standards, then I can throw it out.

15           MR. BERNICK:  I think that, Your Honor, that could be

16  done.  That's the approach that says --

17           THE COURT:  Because the approaches are not the same,

18  are they?

19           MR. BERNICK:  Well, no, because -- but here's the

20  price that we're going to pay for that.  It goes right back to

21  the same basic flow of claims.  Number one, the dust data, once

22  you get into the analysis of the dust data, you're not talking

23  about a small amount of evidence for the Court to consider.

24  You're talking about a significant amount of evidence.  It is

25  -- it's gathered in each and every -- in many of these

1 buildings in different locations, and the expert is going to

2 struggle with well, what does it all mean?  So, you're not

3 talking about chewing off a small amount of evidence, but more

4 critically, you're not talking about dramatically preserving a

5 population of claims where if you wait until the end, we're not

6 only going to analyze the dust data for all those buildings,

7 we're going to analyze the statute of limitations.  We're going

8 to analyze state of the art, we're going to analyze the dollar

9 value of removal.  That's the whole idea of the phrased

10 approach.

11        THE COURT:  But you're talking about doing the

12 statute of limitations first.  So if, in fact, the statute of

13 limitations has barred the claim, you're never going to get

14 into any kind of data, let alone dust data for those buildings.

15        MR. BERNICK:  Well, this is how it works.  We get the

16 expert reports, under our proposal here, on October the 17th.

17 We have the phase one hearing here.  Now, we have to still

18 proceed with the phase two expert reports, that's correct, but

19 the phase two expert reports will analyze the claims, and you

20 won't have to hear -- you won't have to have discovery on any

21 of this stuff if we get this phase one hearing in place.  What

22 are the issues?  There are two.  One is constructive notice,

23 and the other is this methodological issue.  You're right, Your

24 Honor.  If you were to decide, based upon constructive notice

25 at this early stage, that these claims are barred by the

1  statute of limitations, then we wouldn't even have to resolve

2  that issue.

3          THE COURT:  Right.

4          MR. BERNICK:  But I don't want to force that -- I

5  don't want to force that.  I want to -- I thought we would

6  group these two issues together, constructive notice, not

7  actual notice.  It's the generic issue, not the case-specific

8  issue, so that Your Honor could rule either way up front.  Now,

9  we could always advance this and do the statute of limitations

10 first.  We're happy to do that, too.

11         THE COURT:  Wasn't the statute of limitations issue,

12 at least the way you framed it in the papers, it seems that

13 it's going to be a question of law.  I know the committee has

14 some concern, and every state statute and the method by which

15 constructive notice might apply may be different, but isn't

16 that still going to be a legal -- a threshold legal issue?

17         MR. BERNICK:  Well, we believe that it absolutely is.

18 This is -- let me just pursue that for just a moment so it's

19 all faced to us all on the table.  On the statute of

20 limitations, as I've indicated, we think that the market

21 recognized de facto the running of the statute long ago.  But

22 the Prudential decision, Prudential v. Gypsum, really

23 established, in a sense, the de jure principle that was really

24 driving the marketplace.  And it is a generic issue.  The

25 question is, well, as of 1981, what did the marketplace

1  actually know?  And the marketplace, we believe, is quite

2  clear, and the factors that were picked out in the _Prudential_

3  case are all of them very well -- very easy to establish.  So,

4  we believe that these facts that drive constructive notice,

5  even under their standard of constructive notice, are all

6  generic, can all be determined exactly as they were in the

7  _Prudential_ case.  And constructive notice, Your Honor -- and

8  incidentally, the _Prudential_ case was affirmed by the Third

9  Circuit.  Constructive notice is a principle that is adopted in

10 key states here.  60 percent of the 3,500 claims come from

11 states that recognize constructive notice.  So, we now come

12 back.  In phase one the whole idea is before we litigate every

13 single building, you wash out the ones that you could object

14 to, as we've talked about.  We then tee up two issues.  One is

15 the scientific methodological issue, and the other is

16 constructive notice.  Constructive notice can be presented to

17 the Court in a very, very short fashion.  There's probably some

18 expert testimony that would be required, but basically Your

19 Honor is construing the facts about what was available publicly

20 in asking the same question that was asked in the _Prudential_

21 case, which is would this have put a reasonable -- would this

22 have put a building owner on reasonable notice, inquiry notice

23 of the fact that there was a claim?  But we put both of those

24 things before Your Honor.  We have a couple day hearing on the

25 _Daubert_ issue.  We have probably briefs with respect to

1 constructive notice.  You've got it all there.  And rather than

2 holding off on those decisions until we analyze and then

3 litigate all of the claims, if Your Honor would then determine

4 those two issues, we will have this case down to what it really

5 should be, which is the continuation of the pre-bankruptcy

6 litigation flow, which was very, very small.

7          Now, we don't -- obviously, as we go forward we could

8 present all this and then hold it all off until the end.  And

9 that's essentially what the property damage committee

10 advocates.  They say, well, why do all of this now.  Let's just

11 do it later.  And the answer is so clear, because you're

12 talking about a relatively small collection of evidence.  It's

13 already been litigated before in these cases, with decisive

14 results, and it gets presented early on.  And then if Your

15 Honor gives us some guidance, we're in a position to then do

16 the more labor intensive work on specific collections of

17 buildings in a very, very efficient fashion as the last phase

18 of the case.  So, it really, in our view, is -- I mean, it's

19 the way that you would proceed if you had Rule 16 really

20 meaning something, which is how do you deal with 4,000?  Well,

21 you don't wait until the end to litigate all 4,000 claims if

22 there are simple ways in which to chop down the population and

23 focus on what's real.  We'd feel differently about it if there

24 had been -- if a different -- if there had been a different

25 pre-bankruptcy history.  If there were 4,000 cases out there

1  before the bankruptcy was filed and they call carried through,

2  well, we could understand that.  At least these are people who

3  decided to file and prosecute their claims.  Here we have seven

4  cases turning into 4,000.  There's obviously a problem that has

5  to be resolved.

6          Let me touch a little bit on phase three, and then I

7  want to talk about ZAI, and then I'll sit down so tat Mr. Baena

8  can speak his piece as well.

9          The phase three estimation is relatively

10  straightforward.  First we take on the second prong of the

11  hazard issue, which is, well, if there is air data, does it

12  show that there's a problem?  There are then a whole series of

13  other issues.  If there are -- if Your Honor rules against us

14  on constructive notice, then we'll have to get into an actual

15  notice standard.  Now, we have evidence form the files already

16  that bears upon actual notice.  For example, we could tell you

17  the State of California, which was responsible for several

18  hundred claims in this case, actually litigated against Grace

19  on asbestos in Alabama in 1990.  They tried, together with

20  other states, to get original jurisdiction for some kind of

21  fancy case, all-in case against Grace, and it got thrown out.

22  Here they are, in 1990, suing Grace.  Well, if they were suing

23  Grace in 1990, how in the world can their claims not be barred?

24  So, we will have some case-specific statute of limitations

25  issues.  And then we get, obviously, to the question of

1  dollars.  Now, on hazard the only thing that I will show beyond

2  what we've talked about so far is that when you actually get to

3  the air data, we now have got summaries that have been done,

4  really with air data taken from buildings all over the country.

5  And you can see here there's an OSHA action level of .1 fibers

6  per milliliter of air.  These are fibers greater than five

7  microns.  And you can see, if you aggregate the data from

8  schools, public buildings, universities, commercial properties

9  and residential, this is what your air data shows.  It shows,

10  you know, vanishing fractions of that action level.  So, the

11  question about whether this asbestos in place needs to be

12  removed is very much a live issue, and we're here under

13  Daubert.  And if that constitutes an unreasonable risk under

14  methodologies that are available to the scientific community in

15  the risk models, then we lose.  But if, under the methodologies

16  that are in those models, these are -- these are background

17  levels of risk, asbestos is everywhere, these are background

18  levels of risk, then we win.  And it's not a question of

19  displacing state law at all, it's a question of applying state

20  law at the federal standards of evidence.

21          So, we come back to the P.D.'s three principal

22  objections.  First, they say, well, there's no real need to do

23  the gateway objections.  Your Honor has already heard this.

24  We're very focused on timing there.  We've got to get it out of

25  the way.  Estimation, phase one.  They say constructive notice

42

1   has been adopted in key -- we say adopted in key jurisdictions,

2   and everybody includes common evidence, this issue needs to be

3   addressed in any event, regardless of variations in state law.

4   That remains true.  Your Honor has raised the question can you

5   wait?  We've pointed out the tremendous efficiencies that

6   accrue from not waiting.  And then, with respect to the

7   methodological issue, they say, again, that's not generic.

8   Armstrong says that they're flat wrong about that.  And then

9   finally, with respect to phase two, they again say, well, gee,

10  you know, we shouldn't be litigating the merits of these

11  claims.  That's exactly what estimation was supposed to

12  accomplish in bankruptcy.

13         Now, on ZAI, we -- and this is something that I am

14  proposing today.  I've mentioned it to Mr. Baena before.  But

15  because this has been so heavily litigated already, we think

16  it's very important to get on the table.  And the question is

17  this.  Your Honor will recall that back in 2001 we get a notice

18  program, we had a claim form, and we had a proposal for a bar

19  date.  We then -- they had a series of very vigorous

20  discussions before the Court, and I remember them well.  Should

21  there be a class action for ZAI, or should there be a bar date?

22  And, Your Honor, in a very practical fashion, said at that

23  point in time, said, well, geez, don't I really have to know

24  more about the nature of this product and what it's risks are

25  before I can resolve that issue?  If there really isn't a risk,

1  this product, why do I want to send out a nationwide notice?

2  And why do I want to go to the trouble of having a bar date?

3  Why have all these people file their claims to no purpose?  So,

4  we went down the road of doing te science trial, and the

5  science litigation proceeded, very ably presented and

6  litigated.  And the matter is now under submission to Your

7  Honor.  Now, we would obviously like, if Your Honor were to

8  rule, and dispense with the entire litigation.  And that is,

9  obviously, an alternative that's available.  But given the time

10 pressure that we're facing of the estimation process in the

11 case as a whole, we think it's appropriate that we at least

12 establish a track for ZAI in the event that Your Honor doesn't

13 rule.  Or, in the event that Your Honor rules and says that

14 these claims in some part can continue.

15       We then get back to the question of, well, how do we

16 deal with the people who are out there?  Number one, we

17 desperately need to know who it is that's going to file a

18 claim, because if we don't know who those people actually are,

19 folks will get in here and take the stand, and they'll engage

20 in massive speculation about how many people there really are

21 out there.  There will be ranges from millions down to hundreds

22 of thousands of people, and in order to do the estimation folks

23 will take the assumed number of homes and simply multiply it by

24 costs of removal, will have theoretically speculatively

25 billions of dollars worth of claims.  Mr. Lockwood ably put it

1  at the very beginning of the litigation, when he was -- he was

2  very taken with these claims, not because they are meritorious.

3  I think he would tell you that they're not.  But with the

4  problem that it's created is this is a 600 pound gorilla in the

5  courtroom.  We go back to the question, then, how do we find

6  out who is out there?  And I think where -- the Court probably

7  has come to something like this.  Before there was a missing

8  piece of the equation.  You know, is this so hazardous that

9  people can't even go up to their attics and poke around, and

10 look to see if they have it in response to a bar date notice.

11 I think Your Honor knows, based upon the submissions that have

12 taken place, that the prospect that people are going to be at

13 risk if they poke around in their attics and see if they've got

14 the stuff is completely without any kind of foundation.  It is

15 extreme and it's wrong.  So, we do -- we have successfully, by

16 presenting the science evidence on both sides, we believe,

17 addressed the question about whether there is a barrier to

18 their being a bar date.  We think that there is no barrier to

19 there being a bar date.

20        We then have before Your Honor the notice program,

21 and they presented absolutely no alternative notice program.

22 We have the claim form.  And the only differences they had on

23 the claim form were how do you describe, you know, the nature

24 of this material and whether it's risky or not.  So, we have,

25 basically, a notice program that can proceed.  We have a claim

1  form that can be used.  All we need to do is set the bar date.

2  And what we've proposed in very simple terms is that we simply

3  do that on a time table that we've set out and we can actually

4  have this same matter heard on exactly the same time table, and

5  indeed in the same hearing.  That is to say that if we send the

6  -- if we send the notice out now we can get all these materials

7  back.  We can find out who the claiming population is.  Your

8  Honor already has seen most of the scientific evidence, if not

9  all of the scientific evidence.  And Your Honor can determine

10  if this is real, and if so, what provision should be made for

11  it in the context of exactly the same estimation hearing.  So,

12  we're prepared to proceed either way.  We'd be happy if Your

13  Honor would rule.  At the same time we recognize the burdens

14  that are on the Court, and we think that it's important to find

15  out, once and for all, who these folks really are.

16        Now, I have some comments with respect to the

17  property damage committee's proposed CMO.  The biggest problem

18  we have is that most of it we had never seen before.  We had

19  extensive meet and confers and they didn't tell us about a lot

20  of this stuff.  Rather than my anticipating that, maybe it

21  would be appropriate to hear from Mr. Baena, and then I can

22  comment on the CMO that he is proposing in the context of any

23  response.

24        THE COURT:  All right.

25                    (Pause)

1              THE COURT:  You can pull that tray out, Mr. Baena.

2              MR. BAENA:  Oh.  I think you tell me that every time.

3    Thank you.  May it please the Court, Your Honor, Scott Baena on

4    behalf of the property damage committee.  First, although it's

5    been alluded to, I did want to assure the Court that there have

6    been meetings in earnest in a good faith effort to come to an

7    agreement about how to proceed.  And I want to emphasize the

8    fact that we met three times, two times telephonically, one

9    time in person.  And I do want to emphasize the fact that the

10   issue that was discussed in the course of all of those meetings

11   was not whether we were going to have a P.D. estimation, it was

12   how we were going to have it.  And we did, indeed, work with

13   the concepts that were first promoted by the debtor as their

14   vision of how to proceed.  And what their process entails is a

15   fundamental difference between the P.D. committee's view of

16   what should occur here and their own.  And it's on several

17   different levels.

18             First and foremost, Judge, we see a very big

19   difference between the process of claims administration and the

20   process of determining, by estimation, the value of property

21   damage claims.  There have been at least one occasion where

22   this Court entered an order which dealt with the issue of how

23   are we going to expedite, to some extent, truncate to another

24   extent, the determination of property damage claims.  And that

25   was the gateway objection motion that the debtor brought before

1  you.  They sought an opportunity to tee up five different types

2  of issues which they perceived from the proof of claim form

3  that was approved by the Court as being issues which, if

4  addressed by the Court initially, might avert the necessity for

5  the substantive determination of each and every one of those

6  claims.  And the Court acceded to that process.  Unfortunately,

7  the debtor hasn't undertaken any gateway objections as of this

8  moment, and so we don't know how well the process is going to

9  work.  But you will recall that that gateway process, amongst

10  other things, included the determination of statute of

11  limitations issues.  If the debtor failed to convince the Court

12  that any of those gateway issues should result in the

13  disallowance of a particular claim, then they were forced to

14  either abandon the objections or bring a substantive objection.

15  And that was the gateway process.  And we recognized that the

16  gateway process was something separate and apart from the

17  estimation of claims.  And in the perfect world, Judge, the

18  estimation process would be a process that put a value on all

19  the claims that survive an objection process.

20      You cautioned everybody not to talk about what didn't

21  occur here.  I'm going to resist a little bit just to make the

22  one point that this would be an entirely different process

23  today, it would be an entirely simpler process today if there

24  was any claims administration that had gone on in respect to

25  P.D. claims in the last four years.  But because there wasn't

1 doesn't mean that there's now an invitation to just blur the

2 process of the determination of individual property damage

3 claims and the estimation of property damage claims in the

4 aggregate.  And that is fundamentally our problem with the

5 proposed CMO.  It blurs the distinction between that which we

6 think needs to be addressed in respect to specific P.D. claims

7 with the process of an aggregate estimation of all P.d. claims.

8         We don't have to determine why we're at this point,

9 but we do know, from our bankruptcy experience outside of the

10 asbestos bankruptcy cases that estimation works best when the

11 universe of claims to be estimated is at a minimum.  Indeed,

12 Your Honor, the real problem with the whole process that we've

13 been disturbed by is the fact that it's become the law of the

14 asbestos bankruptcy cases that we're going to estimate claims,

15 and we're going to do so under 502(c).  But what we have built

16 up is an entire repertoire of experience in that regard in

17 respect to personal injury but none in respect to property

18 damage, making this job even more difficult.

19         And it's important to note that the code doesn't

20 provide us any guidelines whatsoever under 502(c).  Indeed, it

21 addresses, when literally -- when we read it literally, the

22 estimation of a single claim for purposes of allowance.  And

23 that's not what we're doing here.  We're not doing a single

24 claim, and we're not estimating the claim for purposes of

25 allowance.  That was your ruling in January.  So, we're really

1  painting on a clean canvas, as I've said over and over again.

2  And what the debtor is doing is taking advantage of that fact

3  and just blurring the distinctions, once again, between 502(c)

4  and the ordinary process under 502(a) of allowing or

5  disallowing claims.  And so --

6        THE COURT:  We need to ask -- if we need to look at

7  each individual property damage claim on its own, why do I need

8  a committee?  What does a committee do?

9        MR. BAENA:  I'm not saying you do, Judge.  I'm not

10  saying that at all.  Indeed, I'm saying entirely the opposite.

11  One of the reasons why all of this is sort of unusual and

12  difficult to accommodate is because we -- we promote the notion

13  that all asbestos claims, at the end of the day, won't even be

14  determined by the Court.  It will be determined by a trust of

15  some sort, a mechanism of the 524(g) for determining those

16  claims, which is yet another reason why 502(c) really probably

17  wasn't even contemplated in the context of 524(g).  But I'm not

18  saying, Judge, you have to do all 4,000 claims.  To the

19  contrary.  Those claims will be determined elsewhere.  Ideally

20  it would have been determined before, but it wasn't.

21        The debtors, by the way, don't give up the prospect,

22  as you've heard over and over again, of bringing claims to you

23  in large numbers to determine.  That's not the process that

24  we've been suggesting should take place.  And it's these

25  overarching differences between us that really suggest the

1  differences in the approach.  They view, as an example, the

2  Speights and Runyan situation as a stage in the estimation.

3  That, to me, in the best case, is just another way of saying

4  the more we reduce the number of claims the easier the

5  estimation process will be.  But that's not to suggest that

6  dealing with the Speights and Runyan claims is part and parcel

7  of an estimation process.  And we've got to keep that in mind.

8  When they raise the so-called threshold issues, the phase one

9  portion of their process, they seem to suggest, once again,

10 that that's all part and parcel of an estimation process.

11 That's where we disagree with them, and I'll get into that a

12 little bit more.

13        So, Your Honor, we see this as parallel paths.  You

14 talked about it operating in tandem.  I'll accept that

15 characterization.  But they are two different processes.  And

16 what's particularly important to keep in mind is that not only

17 are the processes different, but the parties are different.

18 That's an entirely different setting that we find ourselves in

19 because in the case of individual claims obviously the

20 claimants are implicated in that process.  Obviously the

21 claimants will come forward with evidence specific to their own

22 claims.  Obviously we're not in a position, as a committee,

23 even if lots of those claimants are on our committee, we're not

24 vested with the authority.  We don't have the ability to

25 represent individual claimants in the promotion of their

1  claims.  On the other hand, on the estimation side of this

2  equation, we are very much in the hunt.  We have been

3  designated by the Court as lead counsel in the case of my firm

4  to prosecute, or defend, or whatever it is we're doing in the

5  context of the property damage claims estimation process, and

6  so, we've got to be very cautious in this process not only to

7  avoid the blurring of the distinctions between claims

8  administration and claims estimation, but to also remember

9  burdens of proof and who is best able to manage the dispute

10  that they wish to put before you.  And when we get to our

11  proposal you'll see, Judge, it's just what they would call

12  phase three.  It's an estimation process.  It's a process,

13  however, that's intended to provide different entry points for

14  data that is obtained on the other side of the fence from the

15  claims allowance process.  The claims allowance process must

16  inform the estimation process.  We recognize that, and that's

17  what our process does that theirs doesn't.  Indeed, and I'll

18  talk again about this in greater detail, their process doesn't

19  even contemplate that you'll hear the threshold issues before

20  experts have to provide their opinions about the value of

21  property damage claims.  There's no better dramatic testimony

22  to the fact that their process can't work.  Their process is

23  just a lot of work to create a lot of confusion.  And Mr.

24  Bernick has explained why.  He said it subtly and not to subtly

25  repeatedly.  It's because they want to create a delta for a

1 settlement.  Well, hopefully that prospect does exist.

2 Hopefully that event will occur.  But we don't build the

3 estimation process, in all due respect, Your Honor, to find

4 that delta.  We're still undertaking, if we accept their view

5 of it, we're undertaking a Bankruptcy Code process.  The

6 process doesn't talk about creating deltas for settlements.  It

7 talks about estimating the value of the remaining claims.  And

8 so, that's what our process is intended to do.

9          The requirement that we --I'm sorry -- the

10 requirement that we build into all of this flexibility can't be

11 overstated.  And I think there are current examples that are,

12 again, dramatic proof of why that's the case.  Judge, just as

13 it is the case that none of us have ever done this before,

14 every other instance where there is a price tag put on property

15 damage, it was done by consent.  It was done by agreement to

16 the parties.  It was done in the context of a consensual plan

17 of reorganization.  So, this has never been done.  And as a

18 result, I couldn't begin to describe to you today, Judge, and

19 assure you that I wouldn't have to change my position later,

20 how exactly estimators are going to go about putting a number

21 on, and how we're going to present that evidence to you, and

22 what rules of determination you need to abide by in making an

23 estimation, because to a large extent we're going to be

24 creating that process as we go along.  We heard, several months

25 ago, and you'll recall what derailed the approval of a case

1 management order was a couple of revelations that came along

2 the way in the course of mere conversation in meet and confers

3 with the debtor. We heard that now science was on the table

4 again. There was no real definition to what kind of science we

5 were dealing with. Indeed, you'll recall Ms. Baer asked the

6 Court for time out so she could meet with their property damage

7 experts. We cannot construct the process, Judge, in the void

8 of experience that we have that doesn't permit them to say,

9 gee, we may need to bring up science, and for us to be able to

10 react to it. If we didn't fortuitously find out about that, we

11 could have been in a very serious and embarrassing situation,

12 causing a do over at the end of the day. And their proposal

13 provides no opportunity for either side to present a vision,

14 and for the other side to accommodate it or oppose it, and for

15 Your Honor to decide whether it should be incorporated in the

16 process or not. Ours does.

17         The most telling part of their position is in their

18 papers, because, Judge, everything I say is borne out by their

19 moving papers. They are looking to use this process to filter

20 out claims. And we've just got to stop for a second, Judge,

21 and say to ourselves, is that what an estimation is supposed to

22 do?

23         THE COURT: Look, I mean, if the issue is

24 wordsmithing, that for example, just to pick a group of claims,

25 that the debtors' objection to the Speights claim is really a

1  substantive objection on allowance issues because of the theory

2  that the debtor had expressed here today and in its papers that

3  there was no authority for the filing of the claim at the

4  outset, that's fine.  I mean, it's not really estimating the

5  claim.  It's either allowing or disallowing the claim.  If it's

6  disallowed there's no need to estimate.  If it's allowed, then

7  it goes into the estimation pool.

8            MR. BAENA:  Correct.

9            THE COURT:  Okay?

10           MR. BAENA:  Correct.

11           THE COURT:  So, we're not saying anything -- I don't

12 think you're saying anything any different, you're just using

13 different words for that part of this.

14           MR. BAENA:  Well, I don't think so, Judge.  I think,

15 in all due respect, I appreciate the fact that that's how you

16 hear it, and I don't want to discourage you from hearing it

17 that way, but that's not what they're saying.  That's not what

18 they're saying.  They're saying we can get rid of lots of

19 claims in the course of this process.

20           THE COURT:  Well, maybe they can.  I don't know, at

21 this point.  Maybe they are --

22           MR. BAENA:  Not when you're doing an estimation for

23 purposes of feasibility.  And, Judge, this is a very important

24 point, very important point.

25           THE COURT:  But taking a look at the -- again, just

1  to use this as an example, at the Speights claim, in the manner

2  in which the debtor says it's going to pursue the Speights

3  claim isn't estimating it.  It's determining whether it's a

4  properly-filed proof of claim that can be allowed or not

5  allowed.

6          MR. BAENA:  Right.  I agree with that.  I agree.

7          THE COURT:  All right.

8          MR. BAENA:  I agree with that example, but if we use

9  the constructive notice example --

10          THE COURT:  Okay.

11          MR. BAENA:  -- I don't agree that that's a

12  determination that's appropriately made in the context of this

13  proceeding, of the estimation proceeding.

14          THE COURT:  Okay.

15          MR. BAENA:  I don't believe that _Prudential_ tells us

16  that it should be.  I don't believe state law supports that

17  theory.  And we're all in agreement, because now their papers

18  even agree with us that state law is the determining factor as

19  to whether or not these claims would have been allowed in the

20  tort system.  And so, we look to state law for guidance as to

21  issues like statute of limitation, an issue which they

22  previously characterized as a gateway objection, an issue

23  which, because it is a gateway objection would be asserted

24  against a claimant not in the context of an estimation.

25          THE COURT:  And I agree with that.  I believe that

Case 01-01139-AMC   Doc 9105   Filed 07/28/05   Page 56 of 295

56

1  the issue with respect to the way the debtor has structured the

2  gateway objection process, their pre-phase one, or phase one

3  process, is that there are requests for determinations of

4  whether or not the claim is allowable, period.  And if it's not

5  allowable it goes away.  It's disallowed and there is no

6  estimation with respect to that claim.  But if it is allowed,

7  or allowable, then the value of that claim has to be estimated

8  so that the debtor knows -- you folks all seem to think there's

9  going to be a property damage trust, how much money is going to

10  -- or something, is going to be required to fund that trust for

11  purposes of distribution.

12         MR. BAENA:  That's the point, Judge.

13         THE COURT:  Okay.

14         MR. BAENA:  How much money is going to be necessary

15  to fund the trust?  How much money has got to be allowed to

16  asbestos claimants --

17         THE COURT:  Right.

18         MR. BAENA:  -- as opposed to equity?  That's the

19  issue here.

20         THE COURT:  Well, as opposed to anybody else.

21         MR. BAENA:  And, Judge, you see, it's just really a

22  matter of perspective.  Our perspective is that because this is

23  a feasibility issue, not an allowance issue, which is what

24  502(c) talks about, and because we are trying to determine what

25  would the contour be for the treatment, you know, dollar-wise

1  for the treatment of property damage claims, our position is

2  that you want to know how bad it could get.  They're trying to

3  prove to you, through the estimation process, how good they

4  might do.

5              THE COURT:  Yes.  And you'll try to prove how bad

6  they can do, and hopefully I'll come to a decision, and that's

7  how the estimation will go.  That's what estimations always do.

8              MR. BAENA:  But Judge, what is the purpose?  The

9  purpose is to find out how much money could conceivably need to

10 be set aside because of --

11             THE COURT:  Right.

12             MR. BAENA:  -- the allowance and disallowance of

13 claims.

14             THE COURT:  Right.

15             MR. BAENA:  Which is not happening here.

16             THE COURT:  Why not?

17             MR. BAENA:  Why not?  Because the estimation

18 proceeding doesn't deal with the allowance and disallowance of

19 claims.  The estimation proceeding doesn't.

20             THE COURT:  Well, but it will.

21             MR. BAENA:  They may bring objections to claims.

22 That's a different proceeding.  They may allow some claims to

23 go to a trust to be allowed or disallowed.  That's not

24 implicating the estimation proceeding.  What we need to

25 determine is, at the end of the day, after they've finished

1  their objections, after the trust gets finished scrubbing the

2  claims, how bad could it be, because we want to make sure that

3  there's enough money to pay all the claims that could be

4  allowed.

5         THE COURT:  In -- at whatever distribution percentage

6  the plan is going to -- or the trust is going to set, yes.

7         MR. BAENA:  And the reason they're approaching it

8  differently, Judge, goes back, once again, to the fact that

9  they've done two very nasty things to us in the plan, their

10 plan.  The first is they put a cap on all asbestos liabilities.

11 And the second is they've said nobody that holds an asbestos

12 claim can vote.  You see.  And this process is to promote their

13 plan.

14        THE COURT:  Well, this process has to go forward

15 regardless of whose plan is --

16        MR. BAENA:  That is correct.

17        THE COURT:  -- ever on the table.  And the concept

18 that the asbestos claimants are not going to get to vote is one

19 I haven't yet been required to address.  I will, I'm sure, be

20 required to address that issue.

21        MR. BAENA:  Well, Judge, it is because of that

22 difference that we think that allowing the intrusion into the

23 estimation process of matter which State Courts reserve for the

24 determination of individual tort claims is inappropriate.

25        THE COURT:  But how else do I estimate whether there

1 is an allowable claim that may be subject to payment through

2 the trust?  Because if I adopt your view and don't look at the

3 constructive notice issues, then there is no estimation and

4 I'll allow those claims at zero for purposes of estimation

5 because I'll have no evidence that indicates that they are

6 anything other than stale, because they're old.  You know --

7           MR. BAENA:  But you can't come to that conclusion,

8 though, in the course of this.

9           THE COURT:  I can't, unless I hear the evidence.

10 Exactly.

11           MR. BAENA:  But the evidence will show you that these

12 claims were filed.

13           THE COURT:  Yes.

14           MR. BAENA:  That's what it will show you.

15           THE COURT:  They were filed.

16           MR. BAENA:  There's an objection process that's going

17 along in tandem.

18           THE COURT:  Right.

19           MR. BAENA:  It's claims are getting allowed or

20 disallowed in the course of that process.

21           THE COURT:  Right.

22           MR. BAENA:  That will inform us about the number of

23 claims.

24           THE COURT:  Right.

25           MR. BAENA:  Okay.  And so, that's the place where we

1 determine whether or not the claim is time barred or not, not

2 here.  You can't judge, you shouldn't judge, in all due

3 respect, you shouldn't end up, at the end of the day, saying

4 just what you just said.  I think these claims are old, I'm

5 going to put a zero value on these claims.  It's not a binary

6 decision.  That's the problem here.  It's not a binary

7 decision.

8              THE COURT:  Which is why --

9              MR. BAENA:  Indeed, the problem -- the stark

10 difference between estimating personal injury claims and

11 property damage claims is I don't think Mr. Lockwood would tell

12 you that statute of limitations is a big deal in that whole

13 process.

14              THE COURT:  That's because in every instance in which

15 I've been involved so far the debtors have wanted to put even

16 stale claims into the plan so that they don't have an issue

17 about something coming back to haunt them later.  They've never

18 raised it, that's why it's not an issue.

19              MR. BAENA:  Well --

20              THE COURT:  In fact, I specifically raised it in one

21 of the cases, in one of the Pittsburgh cases, and they said no,

22 we don't want to go there, we want to put all the claims in,

23 whether they're old or not old.

24              MR. BAENA:  No, Judge, I -- respectfully --

25              THE COURT:  The only entities who have been raising

1  it --

2          MR. BAENA:  -- I think historically --

3          THE COURT:  -- have been the insurance companies as

4  to whether or not they're going to have liability in the event

5  that the debtor pays the claims through the trust, which isn't

6  something, fortunately, I've had to deal with.

7          MR. BAENA:  Judge, I think historically it's just

8  become the case that there isn't much attention paid to statute

9  of limitations on the universe of claims that are being

10 estimated for personal injury purposes.

11         THE COURT:  Which is what I just said.

12         MR. BAENA:  I agree with you.  But it's an evolution

13 that brings them to that point.  Here, again, we have no prior

14 experience, and here there is this appearance of old claims.

15 And so, we're focused on it.  And so, because of this need to

16 get this process done, and again, forgive me, and because we

17 haven't done any claims allowance --

18         THE COURT:  But there's a big difference between the

19 --

20         MR. BAENA:  -- and disallowance before, we're --

21         THE COURT:  No, Mr. Baena --

22         MR. BAENA:  -- sort of now going to use the process

23 of estimation --

24         THE COURT:  No.

25         MR. BAENA:  -- to --

1            THE COURT:  I can't agree with that.  Number one,

2    there's a fundamental difference between the property damage

3    and personal injury.  The personal injury latency period might

4    still be out there.  The property damage is done.  Nobody is

5    putting asbestos into a building anymore.  If it's been put

6    into a building in 1973 and it's been there since 1973, we know

7    that it's been there since 1973, and somebody is going to prove

8    whether or not it's hazardous or not, and that can be

9    estimated.  The amount of the damage either to remove it or the

10   likelihood that the building is going to have to be torn down

11   at some point in the future, or whatever, can be known.  It's

12   much different than the personal injury side of things.  And

13   there is no reason why this estimation process can't work.

14   This is just a claim, like everybody else's claim.  It doesn't

15   involve a personal injury with a latency period.

16            MR. BAENA:  Judge, a couple of points in response.

17   First of all, while it's not totally settled yet, my

18   understanding was that in this particular case the estimation

19   that the debtor has asked for is first in respect to filed

20   claims.  So, it's -- it's not the futures that you talk about

21   people who may get sick in 40 years.  Additionally, in regard

22   to property damage claims, I think I've made this point before,

23   but it appears to be worth making again.  And that is the

24   statute of limitations doesn't apply to all of these claims.

25            THE COURT:  Why not?

1          MR. BAENA:  Because of nolens tempus.

2          THE COURT:  Well, okay.  So, fine, that's going to be

3  the defense to the objection to claim on constructive notice.

4          MR. BAENA:  1,600 claims that were filed --

5          THE COURT:  Okay.

6          MR. BAENA:  -- related to nolens tempus claims.

7          THE COURT:  Oh.  All right.

8          MR. BAENA:  All right.  So, I mean --

9          THE COURT:  1,600 claims is a drop in the bucket in

10  these cases.

11          MR. BAENA:  Well, Judge, you know, that's an

12  interesting observation because if we were to believe

13  everything that Mr. Bernick says, giving him just a little bit

14  of time, he'll vet these claims down to a minuscule amount.

15          THE COURT:  Well, he may or may not.

16          MR. BAENA:  Which would make estimation a lot easier.

17          THE COURT:  Yes, it will.

18          MR. BAENA:  It would make it a lot easier --

19          THE COURT:  I agree.

20          MR. BAENA:  -- if he could do that first.

21          THE COURT:  Yes, it will.

22          MR. BERNICK:  That's what we're trying to do.

23          THE COURT:  If the claims are not allowed, they can't

24  be estimated -- there's no need to estimate them.  They're not

25  allowed, there's no claim anymore.  So, of course what we want

64

1  to estimate is the universe of claims, not the universe of

2  disallowed claims.

3           MR. BAENA:  Correct.  Correct.

4           THE COURT:  Okay.

5           MR. BAENA:  And it's the claims allowance process

6  that gets us to that point.

7           THE COURT:  I agree.

8           MR. BAENA:  Judge, I was hoping I could use this

9  thing, but I see it's not -- is it working.  I just wanted to

10 --

11          MR. BERNICK:  Scott, if you really want to, I think

12 we can help make that happen.  Do you want to use it?

13          MR. BAENA:  This thing?

14          THE COURT:  Is it plugged in.  I --

15          MR. BERNICK:  It's the ELMO.

16          THE COURT:  I have never tried to use it myself, so I

17 apologize.  I don't know.  But it's -- if it's plugged in it

18 should be working.

19          MR. BERNICK:  No.  The screens are already in place.

20          MR. BAENA:  I just want to put a piece of paper on

21 it.  It's regular paper.

22                        (Pause)

23          MR. BAENA:  I'm not sure where it shows.  Oh.

24          THE COURT:  Oh.  Wait -- okay.  Wait until I get my

25 screen adjusted.  I'm sorry.

1        MR. BAENA:  I'm sure there's something I have to do

2  to adjust this.

3        MR. BERNICK:  Now you know why I didn't want to use

4  it.

5        MR. BAENA:  Yes.  You can't hardly see it.  Judge,

6  may I approach and hand you a copy of what I'm projecting?

7        THE COURT:  Sure.  Thank you.  If you have an extra,

8  Mr. Baena, would you give one to my law clerk, too, please?

9  Thank you.

10        MR. BAENA:  Judge, what we have, and maybe it will

11  just be easier to work with what I've handed out instead of --

12        THE COURT:  This is the chart that's in the book.

13        MR. BAENA:  No, Judge.  This is our chart.

14        THE COURT:  No, it's different?

15        MR. BAENA:  I haven't compared it to theirs because I

16  just got theirs.  And what we tried to portray here is the P.D.

17  committee's proposal on the top, and the debtor's proposal on

18  the bottom.  And as I indicated before, Judge, our proposal

19  really attempts to deal with what they call phase three, which

20  is an estimation hearing.  And we start with the proposition

21  that to the extent that we can conform this process to

22  something we're all familiar with, like a contested matter

23  conducted when Rule 26 applies, it will be easier for the

24  parties to pursue this process.  And so, again, our process

25  starts not dissimilarly from theirs, or excuse me, dissimilarly

1 from theirs, by having parties sort of like apprize one

2 another, as we do in litigations, about the nature of their

3 case.

4          THE COURT:  That's fine.  I don't have any problem

5 with the structure the way you want to do it with respect to

6 the -- what is the equivalent to the debtor's phase three.

7          MR. BAENA:  And -- okay.  So --

8          THE COURT:  So, I don't have any problem with it.

9          MR. BAENA:  Okay.

10          THE COURT:  But that doesn't mean that I'm not going

11 to permit the debtor to do the gateway type objections that it

12 wants to go forward with.

13          MR. BAENA:  I'm not stopping them, Judge.  I --

14          THE COURT:  Because I think it needs to.

15          MR. BAENA:  Judge, I have obviously not articulated

16 the committee's position will, and I --

17          THE COURT:  Oh, yes you have.

18          MR. BAENA:  -- want to take another shot at it,

19 Judge.  We have no problem with the gateway objection process.

20 When Mr. Bernick and I met, I told them go object to claims.

21 When he raised this new phase two, or phase one -- they call it

22 phase one, their threshold issues, I said, do them.  We're not

23 trying to stop them from doing it, Judge.  But we don't want to

24 create this process that's compressed the way they do.

25          THE COURT:  Okay.

1          MR. BAENA:  And if they wish to bring that up along

2  the way, they may do so, and we may object to it again.  We may

3  try to discourage the Court from pursuing it.  And that's

4  context in which it ought to come up.

5          THE COURT:  Fine.  The only issue --

6          MR. BAENA:  In terms of the gateway objections, we

7  have nothing on this paper about gateway objections.  We have

8  --

9          THE COURT:  The only problem that I see, Mr. Baena,

10  and frankly I see it in both of your proposals, is I'm not sure

11  about the discovery -- the contours of the discovery with

12  respect to the claims that the debtor may actually be filing

13  what I will call a substantive objection to, something other

14  than the estimation, more akin to the allowance or

15  disallowance.

16          MR. BAENA:  Judge, I would -- I'm not weighing in on

17  that because it doesn't involve anybody but the claimant and

18  them, and I would imagine that if that becomes a problem

19  between them and the claimant they'll get a case management

20  order.

21          THE COURT:  Oh, no.  I misled you with what I said.

22  I'm sorry.  I meant with respect to the phase three estimation,

23  you're going to be doing discovery --

24          MR. BAENA:  Correct.

25          THE COURT:  -- while the debtor is going to be going

68

through the gateway objections.  I am not certain, for example,
you may want to take discovery of the Speights claims while the
debtor is saying there aren't any Speights claims.  And
frankly, it would seem to make some sense, if the debtor has
even a colorable objection that makes sense, that the discovery
on those claims as to which the debtor has a substantive
objection probably doesn't go forward until there's either an
allowance or disallowance, because otherwise you may be
spinning wheels.  Having said that, however, if you don't go
forward with it then, then you're going to delay discovery if,
in fact, those claims are allowed.  So, that's what I'm asking
about.  How do you want to resolve that issue?

            MR. BAENA:  I understand your point.  And, Judge, all
that I could figure out in that regard was to at least permit
the process to accommodate a result in respect of those
objections.  And that's why we permit, under our proposal, the
right for experts --

            THE COURT:  The supplementals.

            MR. BAENA:  -- to supplement their reports.

            THE COURT:  Okay.  Fine.

            MR. BAENA:  I don't know how else to do it, Judge.

            THE COURT:  That's fine.

            MR. BAENA:  A few months ago, January 21, when I was
complaining about, Judge, we don't know all about each of these
claims, and those claimants aren't here, you did two things.

You said P.D. claimants can participate if they want.  It's not
mandatory.  And then you said and you'll have the right to take
discovery.  And I accept that.  I'm not sure, today, what
discovery I'll wish to take.  But that is an opportunity that
we have.  I think that the process, I think that the approach,
firstly, that each side will take in respect to the process,
which will be reflected in their initial designations, to a
large extent, I believe, will, to a large extent, shape the
contours of discovery.  And we're just not at a point right now
to tell you precisely what that would be.  But I do believe our
process accommodates it.

        THE COURT:  Okay.  I don't see any problem with due
process.

        MR. BAENA:  Okay.  Would you like to sign our order,
Judge, or --

        THE COURT:  Well, actually I think I want a
combination of several orders.  I mean, I think what I need, or
if you're going to break down this CMO process with respect to
what I'm calling the substantive objections as opposed to the
phase three, then if you want it in one order I need a combined
order.

        MR. BAENA:  I would prefer separate orders, Judge.

        THE COURT:  Well, let me hear from Mr. Bernick about
-- I've just said I don't have a problem with your order.  Let
me find out what problems he has.

1          MR. BERNICK:  Your Honor, if I could --

2          MR. BAENA:  My stuff --

3          MR. BERNICK:  Yes.  Go ahead.

4                    (Pause)

5          MR. BERNICK:  Let me come back to a point that really

6  goes to the extent to which these orders can be combined, and

7  if you'll just bear with me for a second I want to wrap in what

8  I think is the central point that Mr. Baena made, because it's

9  still lurking out there, and I believe that unless it's

10  squarely addressed it's going to be very difficult to even get

11  down to the level of the orders, because it even potentially

12  undercuts the orders.  And that is if you think about a claim

13  being filed called claim one, that claim is going to have

14  different constituents.  It's going to have a bankruptcy

15  constituent in the sense that it has to be filed as a

16  bankruptcy claim in accordance with the Bankruptcy Rules.  It

17  will have an evidentiary constituent.  And we all know that

18  under the Bankruptcy Code, the evidence that is followed, rules

19  of evidence that are followed are the Federal Rules of

20  Evidence.  And then, finally, you have a legal component.  And

21  it's never been disputed, we know that the legal component is

22  state law with respect to these tort claims.  That's what a

23  claim is, whether there are a 1,000, a 100,000, or there's only

24  one, those are the constituent's claim.  Now, the Code does set

25  out, and as I see Mr. Lockwood with this kind of Cheshire grin,

1  remembering that all of these things all have been gone over in

2  connection with P.I., and he's just to fascinated to see how

3  are we going to maintain our position on P.I. and P.D. at the

4  same time, but he also knows that it's there, and what it is.

5  We do know that there is an objection process that can be

6  pursued for that claim.  That is a procedure that is available

7  under the Code.  And if we were to object to any one of the

8  claims we could object on any one of these grounds.  They would

9  all be substantive objections.  We can say that there was no

10 authority, so we say under the Bankruptcy Rules you've got to

11 have authority to file a claim, you have to do it in later

12 litigation, too, but we can say that there's no authority, and

13 that would be a substantive objection.  We can say that there's

14 no product I.D.  That's another gateway objection.  They just

15 don't identify our product.  That is actually a requirement of

16 state substantive law.  But it's also a substantive -- they say

17 there's no product I.D.  We could also object on grounds of

18 statute of limitations.  Indeed, the gateway objections also

19 include the statute of limitations.  We could also object on

20 grounds of <u>Daubert</u>.  In fact, in the <u>Dow Corning</u> case there

21 were objections that were filed on <u>Daubert</u> grounds.  Any

22 bankruptcy law driven, evidentiary driven, or substantive

23 legally driven objection can be made to any claim that is done

24 on an individual basis, you will then get to the question of

25 whether claims should be allowed or disallowed.

1              THE COURT:  Right.

2              MR. BERNICK:  The rules, then, are spelled out for

3    that process.  And basically it's a litigation process.  There

4    are some rules that don't apply, but basically the Court spells

5    out which rules of civil procedure apply.  We can go through

6    each and every one of the claims on exactly this basis.  And in

7    fact, we will, in this case, be filing objections to each and

8    every one of the property damage claims on each and every one

9    of these grounds.  It's not simply going to be limited to the

10   Speights problem of authority.  We're going to be making

11   substantive objections to all these claims.  So, issue will be

12   joined on every single claim.  And we could go down the road of

13   doing the objection process.  That's what we originally

14   proposed for doing for the personal injury claims.  It's what

15   we've always said that we were going to do with respect to the

16   property damage claims.  So, there's no real distinction

17   between an objection that's filed with respect to a claim in

18   terms of what the grounds for objection can be, and anything

19   else that you might -- all these objections are all substantive

20   objections.

21             We also have the opportunity, though, under the Code,

22   to go with estimation under 502(c).  This is another procedure.

23   Now, does the evidence change under 502(c)?  No, the evidence

24   doesn't change.  502(c) is an estimation.  If it's contested,

25   it's a contested matter.  If it's a contested matter, exactly

1  the same rules apply.  There's no difference.  So, the

2  objections that can be made to the allowance of a claim are

3  substantively identical to the defenses that could be lodged in

4  connection with an estimation.  And the outcome of the

5  estimation, Mr. Baena is hesitant to say that there is a --

6  it's not a question of binary.  If the claim is no good, the

7  value of that claim is zero.  Now, there is no way to value

8  that claim.  It isn't driven by Bankruptcy Rules, the Rules of

9  Evidence, or state substantive law.  It's exactly the same.

10 But what the Code contemplates is the 502(c), that is

11 estimation is available, where to go through claim by claim.

12 Or even a single claim.  You could do 502(c) for a single

13 claim.  Where going through the single claim, following each

14 and every one of the available procedures would be time

15 consuming.  So, for example, if there were one claim, and it

16 were a horrifically complex property damage claim, Your Honor

17 might decide, you know, this thing is so complicated, but you

18 know what?  It's only worth $10,000.  If we went down the road

19 of doing full-scale litigation for this claim we'd eat up all

20 the costs -- we'd eat up the value of the claim in litigation.

21 Let's just do an estimate.  What would the estimate be?  It's

22 the same evidence, the same defenses.  It's a streamlined form

23 of it.  You don't have to have witnesses take the stand under

24 oath and follow through every single issue down to the last

25 detail.  You consider the basic issues.  You save money, and

1  you save time.  The only variance between estimation and full-

2  scale litigation under the rules is that you have the option of

3  not following through on all of the different rules of civil

4  procedure that might otherwise apply to the allowance or

5  disallowance of the claim.  It is a streamlined process.  If

6  you take a look at the case law, the case law in estimation

7  doesn't rise or fall with mass tort.  They're all cases where a

8  Judge says, well, we're going to estimate this.  You all come

9  in.  We're going to have a mini trial.  That's basically what

10 is all involved.  Okay.  So, the outcome is driven by the same

11 defenses, the same evidence.  Mr. Baena is anxious to avoid

12 having all the same issues arise like messy statute of

13 limitations, and messy <u>Daubert</u>.  They're here no matter what

14 happens.  So, we have preserved our option of following through

15 on the objections, but in order to save time we have said this

16 is a 502(c) case.  Let's have an estimation in order to save

17 time.  And if we meet that standard, the claims are actually

18 estimated for purposes of distribution.  This is not personal

19 injury, so they are bound by the result claimant, by claimant,

20 by claimant.

21        Now, we have C-2 through C-4000 here.  Does this

22 change the equation?  You could say no, it doesn't change the

23 equation if you want to go through claim, by claim, by claim.

24 If you want to go through estimation, does the fact of their

25 being all these claims change the equation?  Yes.  Because it

1   says there's a good reason to estimate.  We've got so many

2   claims.  So, yes, the numerosity of the claims means that we're

3   going to estimate.  What then happens to the estimation?  Does

4   the evidentiary requirements change?  No.  Did the legal

5   requirements change?  No.  Did the bankruptcy requirements

6   change?  No.  It's the same thing.  It's just that we're going

7   to have to be very streamlined about it.  So, that's exactly

8   what we've done.  We've tried to isolate, through the objection

9   process, objections that will cut across hundreds of claims.

10  We have tried to isolate, through the estimation process,

11  issues like constructive notice, and <u>Daubert</u>, and statute of

12  limitations that are going to cut across hundreds of claims.

13  That is what estimation is all about.  So, here's he problem.

14          THE COURT:  Okay.

15          MR. BERNICK:  You go through all of that and you say

16  we've got a case management order that calls out the

17  prosecution of these threshold objections first.  It doesn't

18  sound like there's any real disagreement with that.  We then

19  say the second part of the CMO should be estimation, step one.

20  And that becomes critical.  If we're going to have an

21  estimation, we have got to pick out those issues and see what

22  kind of impact they have, because our order is very different

23  from theirs because it allows for the possibility that Your

24  Honor will determine threshold issues that cut across all of

25  these claims in estimation.  So, their order and ours are

1  radically different.

2         And with respect to stage three, at that point

3  they're much more the same.  The problem with their stage

4  three, with their version of stage three is really one of time.

5         THE COURT:  Right.

6         MR. BERNICK:  And time, in a very critical sense.  If

7  you go through and -- I'll go over to his screen here, if you

8  go through and you see their committee, you're going to have

9  these initial expert reports, and they take place on November

10  1.  Now, under our schedule all of this on phase three would be

11  compressed into a much shorter time period.

12         THE COURT:  Well, look, you know, I -- it sounds

13  great to say that it's going to be compressed, but look how

14  many of you are out there, plus me.  We all have to be in Court

15  at the same time to get this done, and frankly, gentlemen, that

16  has been a very difficult thing to accomplish.  So, I don't

17  have any problem with their time line, because I think it's

18  probably a realistic time line.

19         MR. BERNICK:  Well, let's make the comparison, but I

20  then want to get back to this issue that I -- we've got to deal

21  with.  Our time line contemplates that we will have a hearing

22  in July.  Their time line contemplates that we'll have a

23  hearing in August.  So, the overall time lines are not

24  substantially different.

25         THE COURT:  Right.

1          MR. BERNICK:  But here's the big difference.  They

2    want to have these initial reports on all issues on November 1.

3    That's a waste of time.  It's a waste of time because we know

4    that the supplemental reports will be the only thing that you

5    can count on.  The supplemental reports will be done with the

6    benefit, now, of the claims -- we're going to go through with

7    claims objection.  We want to go with phase one hearing.  The

8    initial report that then says we're going to give you the

9    values of all 4,000 claims by November, considering -- it's

10   just never going to happen.

11         THE COURT:  Well, that's what I just asked earlier,

12   about the discovery with respect to the claims process.

13         MR. BERNICK:  Yes.  That's what I want to address, is

14   that from our point of view, what you do is you go forward with

15   the -- with the objections first, that's already on its track.

16   That gets done.  You then have, under our order, and this is

17   not really quite our order, you have phase one expert reports

18   in October, because they ought to be in -- and then the hearing

19   takes place in February.  Now --

20         THE COURT:  Well, I think the problem with the

21   debtor's suggestion with respect to the method by which the

22   expert reports are coming in is that it doesn't allow for back

23   and forth.  And frankly, I think you need a little bit of back

24   and forth.

25         MR. BERNICK:  Well, after you have a back --

1              THE COURT:  Which is why I like the property damage

2  committee's --

3              MR. BERNICK:  We're happy to have the back and forth

4  of the experts, when the supplement -- but what we think is

5  critical is that there's no point in having the initial reports

6  take place in November and the supplementals, then --

7              THE COURT:  Okay --

8              MR. BERNICK:  -- six months, seven months later --

9              THE COURT:  So now you're saying you don't want them

10  in tandem, you want to do your gateways first.

11             MR. BERNICK:  No.  What I want is what we've

12  proposed, is that we have the phase one reports on constructive

13  notice, and on methodology, to have those exchanged early.  So,

14  I say phase one expert reports in October.  We're happy to have

15  a supplement to that 30 days later, or 45 days later.  But we

16  want phase one isolated so that we can have the hearing in

17  February.  That's all that I'm saying.  And with respect to

18  phase two, we have phase two expert reports, the estimation

19  expert reports due in January.  I'm happy to have a

20  supplementation 30 or 45 days later on that.  But if you don't

21  separate out those first issues, you really were losing the

22  opportunity to trim the case so that the estimation reports are

23  really focused on the buildings that ultimately are going to

24  count.

25             THE COURT:  All right.  So, the disagreement seems to

1 be, at this point, not so much on your -- I'll just call them

2 omnibus objections, the gateway objections.  It seems to be on

3 whether or not to bifurcate the estimation process so that some

4 issues that the debtor wants to identify, like constructive

5 notice and the Daubert issues are done before the whole

6 estimation process.

7         MR. BERNICK:  We've presented to Your Honor, if Your

8 Honor wants to decide them, you can.  If Your Honor wants to

9 delay them, you can.

10         THE COURT:  Well, if they're presented I have to

11 decide them.  Of course I'm going to decide them.

12         MR. BERNICK:  Well, that's correct.  But let me get

13 to the last thing before Mr. Baena I know is going to have a

14 response.  And this comes back to this, so that everything is

15 on the table.  The real difference, the real complaint that he

16 has is he's going to still -- we're still going to be having

17 out here this problem that if I'm right and the defenses that

18 we would lodge by way of objection are equally relevant to

19 estimation and equally binding under the rules, he is going to

20 tell Your Honor that what's the real difference between these

21 two things.

22         THE COURT:  The burden of proof.

23         MR. BERNICK:  I don't believe it's even that.  But --

24 I don't think so.  But here's what the real problem is.  He

25 says this is not my job.  It's somebody else's job.

1              THE COURT:  Well, okay.

2              MR. BERNICK:  And I want to be clear, we can't go

3 down the road and have the position taken that somehow we're

4 going to go through this whole process, but we're not really

5 going to resolve these merits based issues on any basis that's

6 binding with respect to the claimants.

7              THE COURT:  Of course we are.

8              MR. BERNICK:  Yes.  And so, if that's going to be

9 true, then we've got to be clear, is Mr. Baena going to be

10 speaking for this people?  Are they going to be speaking for

11 themselves.  If they're going to be speaking for themselves I

12 want to get them here.  Let's just get them here.  We don't

13 have to worry about --

14              THE COURT:  That's why I said give notice to

15 everyone.  If the property damage committee chooses to take a

16 position, it will.  If it doesn't, it waives it.  It's still

17 going to be bound by the results, as are the claimants.  So,

18 give everybody notice and we'll see who shows up.  Mr. Baena?

19              MR. BAENA:  Judge, I just feel constrained to reply.

20 First, the notion that all that the debtor is doing is

21 streamlining the process by its CMO is, to borrow a word from

22 Mr. Lockwood, poppycock.  And the reason it's poppycock is

23 because the notion of numerosity, which Mr. Bernick suggests is

24 the driving force for this estimation isn't a concept under

25 502(c).  There's only one reason for the allowance of an

1  estimation proceeding under 502(c), and that is that the

2  determination of a claim would unduly dely confirmation.

3          THE COURT:  I am not aware -- I am sure they are out

4  there, but I'm not aware of a case in which a claim -- well, I

5  can't say that.  I actually had a case where there was only

6  really one claim in the case, and it was estimated.  But in

7  every case that I've seen it has been groups of claims that are

8  estimated, not a claim.  502(c), in the cases I've -- I

9  personally am familiar with has been used to estimate groups of

10 claims.

11         MR. BAENA:  May I ask, Judge, who were the parties

12 before you in that proceeding?

13         THE COURT:  I don't think there was a committee in

14 the proceeding.

15         MR. BAENA:  It was the claimants.

16         THE COURT:  The claimants were there.

17         MR. BAENA:  That's the big difference here.

18         THE COURT:  Well, we're going to notify the --

19         MR. BAENA:  That's the difference.

20         THE COURT:  -- claimants, and they'll show up if they

21 choose.  If they don't choose, they'll lose.  I mean, you know,

22 the default orders will be there.  I can't protect everybody --

23         MR. BAENA:  I just -- I just don't think we ought to

24 pretend that we're doing anything other than creating a script

25 for the process at a whole --

1        THE COURT:  Creating a --

2        MR. BAENA:  We're creating the script --

3        THE COURT:  Okay.

4        MR. BAENA:  -- for this process out of whole cloth.

5   It doesn't exist.  Numerosity is not in 502(c).  There's

6   nothing about streamlining the process in the Bankruptcy Code.

7   It's not about any of that.  We're trying to find a way to do

8   this sensibly, and I don't think their plan is sensible.

9        THE COURT:  Well, I have a -- I have a good way to do

10  it sensibly.  Don't have a trust for property damage, end of

11  story.  We'll litigate all the claims if that's what you want

12  to do.  There won't be a trust, and I don't need a committee.

13  So --

14       MR. BAENA:  Judge, fine.  I mean -- what can I say in

15  response to that -- that statement, Judge?  I'm not here

16  preserving my position.  I'm here preserving the system, the

17  process.

18       THE COURT:  But are you?  I mean, that's the

19  question.  Because I don't --

20       MR. BAENA:  Well, Judge --

21       THE COURT:  -- listening to your argument, Mr. Baena,

22  I don't know what role you envision the committee having.  If

23  every property damage claim has to be litigated on its merits,

24  there is no need for a committee.

25       MR. BAENA:  No, Judge.  We're putting a value on the

83

1  claims.

2         THE COURT:  Right.  That's what the estimation does.

3         MR. BAENA:  I can do that, Judge.  I can do that.

4         THE COURT:  Okay.

5         MR. BAENA:  I can help you put a value on the claims.

6         THE COURT:  Good.

7         MR. BAENA:  But when it comes to whether or not

8  somebody had notice of a particular thing, I'm really not in

9  the position that a claimant would be to give you the entire

10 set of facts.  And so, Judge --

11        THE COURT:  You're not in any better position to

12 value the claims.

13        MR. BAENA:  But, Judge, you see, what they would like

14 you to do is treat that as binary.  Oh, you can't do that, then

15 the claim is worth zero.  My point is, in an estimation we put

16 a range of values on claims.

17        THE COURT:  Sure.  There may be a range.  I don't

18 know what the outcome will be.  I haven't heard the evidence

19 yet.

20        MR. BERNICK:  But it's based on the evidence in the

21 law.  It's not based on anything else.  Your Honor, your idea

22 of not having -- we put that plan out there as a way of

23 creating a pot of money to continue where we were in the

24 settlement process.  They are the ones who say no.  We're happy

25 to have this be the litigation process.  We'll be done with it

1 by June.  We'll know what these claims are worth, and that will
2 be it.

3           THE COURT:  Okay.  Let's go to it.  I believe that
4 the sensible conclusion to this is the following.  Number one,
5 the debtor ought to pursue what we have collectively kind of
6 referred to as the gateway objections.  They ought to be
7 pursued.

8           MR. BAENA:  And regular objections, too.

9           THE COURT:  The regular objections.

10           MR. BAENA:  Substantive and gateway objections.

11           THE COURT:  Substantive and gateway objections ought
12 to be pursued, period, end of story.  Let's go to them.  With
13 respect to the estimation, I believe it's appropriate, once
14 those gateway objections are determined, in fact, probably even
15 while they're being determined, to go forward with discovery as
16 to whatever the debtor isn't going to object to on a
17 substantive matter, and to get supplemental reports after you
18 get some rulings with respect to what is or isn't going to be
19 allowed, because if the claims are not allowed they are not
20 going to be estimated.  They are already valued at zero.  If
21 they are allowed we still have to figure out what their worth
22 is for purposes of a distribution coming out of this estate.
23 So, they have to be estimated.

24           MR. BAENA:  Agreed.

25           THE COURT:  Okay.  So, I think, although you're still

1  using different words, and there's still an issue about whether

2  there should be, I guess, the phase two process in here,

3  because phase one is the substantive portion of this --

4         MR. BAENA:  Correct.

5         THE COURT:  And phase three is the ultimate trial --

6         MR. BAENA:  Correct.

7         THE COURT:  -- the only question is whether or not to

8  do a separate <u>Daubert</u> proceeding.  And I think that's

9  appropriate if the debtor wants to bring those motions, or the

10  committee does.  I mean, it can also be done as part of the

11  substantive.  It doesn't really matter much.  It has to be

12  done.  If the debtor's view is correct that it will, because of

13  the science that -- the standard, whether it's going to be

14  dust, or air, or both, that can then be used at the main trial,

15  is determined as a result of that hearing, makes sense.  If the

16  debtor is correct about that it might make sense to hear some

17  of that evidence first so I can determine what I'm going to

18  hear at the trial.  But if you have to get geared up for it,

19  whether it's a preliminary or whether it's part of the trial, I

20  don't care where it's done.  It has to be done.  I need to know

21  whether using dust samples is an appropriate methodology to get

22  me to the estimation of these claims.  I need to know that.

23  So, it has to be done somewhere.  I don't know that <u>Armstrong</u>

24  is the means all and end all in this case.  It's a different

25  product, a different application.  I don't know whether the

1 standards are the same.  That's why I need some experts to give

2 me some guidance.

3         MR. BERNICK:  Your Honor --

4         MR. BAENA:  That would speak in favor, Judge, of our

5 process, I think.

6         THE COURT:  I don't care whether it's done first or

7 second.  I mean, it has to be done.  So, whether it's

8 incorporated into one process or not -- Mr. Bernick, you folks

9 have a great deal more knowledge about this process than I

10 have.  You're talking to each other on a different level.  And

11 I only see the tip of the iceberg, so I may have a different

12 spin than is appropriate on this because I don't know what's

13 under the water line.  Okay.  If, in fact, Mr. Bernick is

14 correct that what's under the water line, in order to do the

15 Daubert dust process as part of a final hearing, is the 600

16 pound gorilla, in and of itself, then it probably makes sense

17 to weed that out first so that we can determine whether it's

18 appropriate evidentiary standard before everybody goes out and

19 tries to get dust samples in 4,003 buildings, or however many

20 there are buildings.  I mean, that may make some sense.  It may

21 save the cost.  It may save a lot of expert work.  And it may,

22 in fact, streamline this process.  If he's not correct on that

23 estimation it doesn't matter.  But I don't have any way of

24 knowing.

25         MR. BAENA:  Judge, can I ask for a five-minute break

1 at this point --

2        THE COURT:  Yes.

3        MR. BAENA:  -- so I can speak with my clients?

4        THE COURT:  We'll take a recess until ten after 11.

5        MR. BAENA:  Thank you, Judge.

6                    (Recess)

7        THE COURT:  Mr. Baena?

8        MR. BAENA:  Your Honor, I guess that -- I hear the

9 Court say that you appreciate the fact that our proposal does

10 provide the flexibility that we're advertising.  I hear you

11 say, as well, that there may be threshold issues, or issues

12 that are overarching issues that need to be heard.  And I take

13 those two comments and conclude that even as to the second

14 point, our proposal can accommodate that process.  Our proposal

15 permits issues to be raised as they would be raised in any

16 contested matter.  Our proposal permits discovery in respect to

17 those issues.  It permits expert reports in respect to those

18 issues.  It even permits people to become better informed in

19 the process of discovery and supplement their reports.  And we

20 believe that their position, on the other hand, unnecessarily

21 advances those issues in the queue of things that have to be

22 done.  To some extent -- entirely, in fact, it truncates

23 discovery for no particular reason at all, making it an

24 inefficient process.  And indeed, the proof is in the pudding

25 that their proposal doesn't even anticipate you'll hear those

1  matters before we present expert reports on the value of P.D.

2  claims, which makes the whole thing a waste of time, in my

3  judgment.

4         THE COURT:  So, let me see if I understand what

5  you're saying.  You're suggesting that if the debtor wants to

6  file, for example, an objection to the Speights claim, fine,

7  file it, but use your time line for discovery just related to

8  the Speights objections.  And then if --

9         MR. BAENA:  No -- no, ma'am.  Ma'am, my proposal has

10 nothing to do with objections to claims, be they substantive

11 objection to claims.

12        THE COURT:  Oh.  I'm sorry.

13        MR. BAENA:  Or gateway objections to claims.

14        THE COURT:  Okay.  Then --

15        MR. BAENA:  That process has already been defined.

16        THE COURT:  Okay.

17        MR. BAENA:  Do as they wish.

18        THE COURT:  Oh.  See, you're back to the difference

19 between phase two and phase three.

20        MR. BAENA:  I'm just on an estimation proceeding --

21        THE COURT:  All right.

22        MR. BAENA:  And what I'm saying is even if the Court

23 wished to accede to the view that some of those phase two

24 matters should be heard in the context of estimation, without

25 precluding us, obviously, from arguing about that some other

1  time, our proposal accommodates that.

2         THE COURT:  All right.  So, you're saying essentially

3  that the phase two and phase three issues should go through the

4  discovery process together.  If they're bifurcated for hearing

5  they're bifurcated for hearing, but the discovery process

6  should be open on all those issues?

7         MR. BAENA:  Correct.  Correct.

8         THE COURT:  Okay.  Mr. Bernick?

9         MR. BERNICK:  We talked about this.  I think we're

10 pretty set on that.  We've talked about this.  In here, I think

11 the only issue is is there any point in submitting the reports

12 for ultimate estimation way over here in November.  Our feeling

13 is no.

14         THE COURT:  Okay.  So then let's change the time line

15 and push the ultimate reports back.  But let's get the

16 discovery process going on all issues.

17         MR. BERNICK:  The discovery process.  That's fine.

18 We can have the discovery process take place on all issues.  We

19 will have the discovery process take place on all issues

20 commencing on September 1.

21         THE COURT:  When I say all issues, I'm talking not

22 about the gateway issues, I'm talking about your phase two and

23 phase three.  The --

24         MR. BERNICK:  I understand that.

25         THE COURT:  Okay.  Fine.

1           MR. BERNICK:  We will have that.  And so, we'll call

2 for discovery to commence on September 1.  We will then say

3 let's have the expert reports on October 17th for phase one.

4 We'll have the expert reports for the hearing as we've

5 indicated in our order.  So, we'll have discovery starting --

6           THE COURT:  No, wait.  I think the proposal is

7 discovery starts -- the initial expert reports are due on all

8 phases at the same time.  Then your non-expert list, your

9 written discovery, and so forth I think we need - -maybe we

10 need to talk about that.  But the initial expert reports should

11 be on all issues.

12           MR. BAENA:  Twofold, Judge, if I may?  First -- what

13 we proposed is first, let each party be required to make

14 initial disclosures as to the type of experts that they're --

15           THE COURT:  That's fine.

16           MR. BAENA:  -- going to call.

17           THE COURT:  I agree.  That's fine.

18           MR. BAENA:  And then the initial reports.

19           THE COURT:  That's fine.

20           MR. BAENA:  As to all matters.

21           MR. BERNICK:  That's fine.  So, discovery starts on

22 September 1.  We will have a disclosure, say, September --

23 let's say October 1.  We will have disclosure of all experts in

24 terms of what the subject matters are.

25           THE COURT:  Right.

1           MR. BAENA:  You said September 1?

2           THE COURT:  That's fine.  I know.  But, you know, if

3  you need time it's fine.  I'd rather build a schedule that

4  works so that we don't have slippage later on.

5           MR. BERNICK:  What we're talking about is description

6  of subject matters.  And I think it's going to be useless, but

7  I'm happy to say fine, let's go forward with it.

8           THE COURT:  That's fine.

9           MR. BERNICK:  We then get to the critical point of

10 are there going to be real expert reports on these threshold

11 issues?  We believe very strongly that there should be for all

12 the reasons that we've indicated.  We're even prepared, if it's

13 necessary.  I would have thought we could just do this under

14 Rule 16 of the case management order, and we'll file motions on

15 October the 17th dealing with these two issues.  And then if

16 Mr. Baena wants to say we can't respond to these, I don't think

17 that that's really appropriate.  At that point we set up a

18 motion -- I think this could become case management -- all you

19 have to, Your Honor, is say the initial reports for phase one

20 will be October 17th, and, because Your Honor wants this

21 dialogue process, any supplemental reports will be 30 days

22 later.  That way everybody can see each other's reports and

23 decide okay, they want to supplement it.  And then -- but then

24 we are going to want that hearing.  We're prepared to move

25 forward, do whatever for it, but there is no reason why Your

1  Honor shouldn't ave the opportunity to further simplify this

2  case.

3        THE COURT:  Well, as I said, I really don't have a

4  dog in the fight about when the hearing takes place, because I

5  have to hear it, so whether it's first, or consolidated, from

6  my point of view makes very little difference.  What makes a

7  difference to me is if the discovery can be streamlined, less

8  costly, and so forth, as the result of doing the <u>Daubert</u>

9  hearing first, then I'd like to do it first.  But that's the

10  reason for it, not as a -- not for any other reason.

11        MR. BERNICK:  Well, that's exactly where I'm going,

12  because -- because we don't want to have to go ahead and

13  litigate the ultimate dollar value for all of these different

14  building if they don't have the data to support their

15  scientific case.

16        THE COURT:  All right.  So, what about the debtor

17  submitting its expert report, whatever date you choose --

18        MR. BERNICK:  October --

19        THE COURT:  Have the committees submit their expert

20  reports at a date after that, so they can see yours first, and

21  then both of you can submit supplemental reports, or you, I

22  guess, the debtor could submit a supplemental report shortly

23  after that.  That ought to take care of the committee's

24  concern, at least as to the initial phase that they're being

25  required to put in an expert report without really

1 understanding what the issues are going to be.

2          MR. BERNICK:  Fine.

3          THE COURT:  And it seems to me the debtor ought to

4 take the lead in defining the issue that you want to litigate,

5 and submit the expert report, give them a chance to file their

6 own -- or the individual claimants, for that matter.  I need to

7 get back to -- somebody please don't let me lose track of that

8 issue, because I want to get back to the coordination of the

9 individual claimants and the property damage committee.

10          MR. BERNICK:  And I'll make a further suggestion in

11 order to, again, help focus this.  We'll still call for the

12 phase one hearing and then with respect to phase two expert

13 reports, their schedule contemplated that we would be done I

14 think in August.  Ours is a little faster.  Let's take the

15 extra time, we'll have the phase one hearing on those two

16 issues, and then have the phase two expert reports follow the

17 phase one hearing by, say, 30 days.

18          THE COURT:  Well, those will be supplemental expert

19 reports to take account of whatever the rulings are.  And --

20          MR. BERNICK:  Well, no, but see, again, Your Honor,

21 the key thing here is do we have, in the first expert reports,

22 all issues?  Or do we have, first of all, these two issues?  If

23 we have all issues there's no way it can be -- we can even

24 start to submit them by October the 17th.  Why?  Because then

25 we're talking about, you know, thousands of buildings.  That's

1  the whole reason for phasing it in this fashion.  So, our

2  proposal would be that the first -- the expert report we would

3  submit on October the 17th would cover these two issues, and

4  we'd have the back and forth, and the hearing.  We would then

5  have the phase three expert reports, and we will go -- we'll go

6  first, although I don't think it's really our burden, we're

7  happy to go first.  We'll do our phase three expert reports 30

8  days after the hearing.  And then, again, they can respond and

9  we'll supplement --

10         THE COURT:  Okay.  The concept of phases is -- I'm

11  having difficulty in the -- on this record talking about

12  phases.  Can we define issues?  It would make it easier for me

13  if we could just talk about issues.  It seems to me that this

14  is the structure that you're both somewhat agreeing on, but not

15  totally.  Number one, the debtor is going to file whatever

16  substantive issues you're going to file, and that track is

17  going to go forward.  While that track is going forward you're

18  going to start discovery.  The discovery that the debtor wants

19  to start at the outset deals with the methodology and

20  constructive notice.  You don't want to go beyond that.  The

21  committee wants to go beyond that.

22         MR. BERNICK:  We're happy to have discovery, if

23  there's some type of fact discovery, or something like that.

24  What we don't want to do is have our experts basically go

25  through not only those two issues, but any and all other issues

1 that relate to all these -- all these buildings, including a

2 dollar valuation for each building.

3        THE COURT:  Because you don't know what buildings

4 will still be left.

5        MR. BERNICK:  Not only that, but it -- it's an

6 enormous amount of work.  I mean, you're talking about hundreds

7 and hundreds of buildings.  So, yes.  But for both of those

8 reasons, we want to defer submitting expert reports with

9 respect to the remaining issues until we have a better sense of

10 where Your Honor is coming out under those first two, and

11 frankly, more time.  So, that's the only difference.  In other

12 words, if we put this one up front --

13        THE COURT:  Okay.

14        MR. BERNICK:  -- and we litigate it up front, the

15 only burden that that imposes is that at the phase one hearing

16 we then have the last phase.  It may mean that the hearing --

17 the final hearing slips some, but we're much smarter about what

18 we're doing.

19        THE COURT:  All right.  Mr. Baena, I don't -- again,

20 in theory, I don't have a problem with that structure, provided

21 that the claimants are given actual notice of the fact that

22 these objections are pending, and have an opportunity to

23 participate if they choose.  To the extent that they don't

24 choose, and the property damage committee is concerned about

25 the outcome of those issues for the eventual estimation of the

1  remaining issues, then I think the property damage committee

2  does have a stake in this and should appear.  But if you choose

3  not to, if you disagree, whatever the outcome is, you'll be

4  bound by.  Everybody will be bound.

5         MR. BAENA:  Judge, can I ask you to do just what you

6  asked us to do, and describe the issues you're now referring

7  to?

8         THE COURT:  I am referring to the methodology and the

9  constructive notice issues.

10        MR. BAENA:  As you just said it, Judge, are you

11  envisioning those to be raised by the debtor in the context of

12  the estimation or in respect of all the claims?

13        THE COURT:  I don't know the difference.

14        MR. BERNICK:  We'll do both.  I mean, again, to be

15  very clear, and somebody pointed out in the break that I wasn't

16  as clear on this as I should be.  On September the 1st we will

17  lodge formal objections to each and every claim, period.  So,

18  on all grounds -- so, it will be there.  We will be seeking to

19  disallow those claims.  The methodology, the procedure that

20  we're adopting for purposes of resolving some of the objections

21  is a claim by claim objection process.  The methodology that

22  we're seeking to adopt under the rules for the liquidation of

23  all of the remaining claims is estimation under 502(c).

24        THE COURT:  Okay.  But we still need to get to the

25  allowance issue first, before you want to liquidate the rest.

1          MR. BERNICK:  That's right.  We want -- but the only

2    stuff that we're going to seek to disallow under a claim-by-

3    claim basis without estimation are these early threshold

4    matters --

5          THE COURT:  Right.  So --

6          MR. BERNICK:  -- like authority --

7          THE COURT:  Right.  So, why are they not done first?

8          MR. BERNICK:  We're asking that they be done first.

9          THE COURT:  Okay.

10          MR. BERNICK:  That comes first.

11          THE COURT:  All right.

12          MR. BERNICK:  Then, while that is underway, we then

13    start discovery.  Well, the discovery process with respect to

14    anything else --

15          THE COURT:  Is open.

16          MR. BERNICK:  -- will be opened up.  We'll have the

17    disclosure on October the 1st of all of the experts.  No

18    problem with that.  We will then take up, in the first expert

19    reports, these two threshold issues of constructive notice and

20    the Daubert methodology.  We will seek to have all claimants

21    individually bound by the outcome of that proceeding, but it

22    will be in estimation.  We won't move for summary judgment.  We

23    could.  We can move for summary judgment.  Judge, if you want

24    us to move, we'll move for summary judgment.  But you don't

25    really have to.  You can take it under 502(c).  You can take it

1  -- I don't really care.  It makes no difference.

2          THE COURT:  Well, as to the methodology issue, it

3  seems to me that the 502(c) process works because if the main

4  issue for the methodology is whether or not dust evidence will

5  be permitted in the hazard phase of the trial, that's an issue

6  that will effect the product in all buildings.

7          MR. BERNICK:  That's correct.

8          THE COURT:  So, that seems to be appropriate whether

9  you call it a 502(c), or a common issues trial.  Whatever you

10 want to phrase it, that seems appropriate.  With respect to

11 constructive notice, however --

12         MR. BERNICK:  Yes?

13         THE COURT:  -- it seems to me that that notice is

14 going to be driven by each individual state law, and so you at

15 least have to group together --

16         MR. BERNICK:  We will group the state law.  But, see

17 -- and again, you can call either way.  You can say we can move

18 for summary judgment, or we can call an estimation.  We will

19 break out the states in which the claims are lodged by groups,

20 and then we will present the evidence which we believe is

21 generic across the state we believe is dispositive across the

22 states.  And then we will argue to Your Honor what the effect

23 of that evidence is.

24         THE COURT:  I think that would be more appropriate by

25 way of summary judgment on those legal issues.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Then we'll file a motion for summary

2    judgment.

3          THE COURT:  Okay.

4          MR. BERNICK:  But bear in mind that summary judgment

5    can be denied on the grounds that there's a material issue of

6    fact.

7          THE COURT:  Yes.

8          MR. BERNICK:  And if that's so, this is the advantage

9    of estimation.  In estimation you can resolve that issue of

10   fact right up front.  In other words, you can say I would have

11   to sit on that matter as a trier of fact.  It's not really

12   summary judgment where something becomes a strict standards.

13   With estimation you can decide that --

14         THE COURT:  But what I'm confused about, and maybe

15   it's just my confusion, but it seems that we're going back to

16   mixing apples and oranges.  If you're talking about an

17   allowance process, then I think you need to prove that the

18   claim is either allowed or not.  If you're talking about

19   estimation for both allowance and for distribution, then you

20   can use estimation.  But nobody is going to be bound by it.  It

21   will still go into the trust.  I will not estimate, for

22   ultimate allowance purposes, without giving the claim holders

23   notice and finding out whether I've litigated.  I will not, in

24   this context, do it.

25         MR. BERNICK:  That's exactly what we want -- we'll

1  give them notice.

2          THE COURT:  Okay.

3          MR. BERNICK:  That's the whole idea, is that we'll

4  give them notice.  We're all kind of, again, it's a complicated

5  thing because I guess it doesn't often get discussed.  But

6  we're all taking about the same group of chickens here.

7          THE COURT:  We are.  That's the thing.

8          MR. BERNICK:  I mean, we have a certain set of facts.

9  The facts are going to be -- what we say everybody knew in the

10  marketplace.  They're going to argue whether that constitutes

11  reasonable notice or not.

12          THE COURT:  Right.

13          MR. BERNICK:  Constructive notice or not.  So, that's

14  a canned brief.  Now, you then say, well, do you do it by

15  summary judgment?  If we do it by summary judgment we still

16  have to notify the individuals.

17          THE COURT:  Yes.

18          MR. BERNICK:  And it's going to be binding on the

19  individuals.  And the standard is going to be what's

20  reasonable.  And they're going to say, oh, well, gee, what's

21  reasonable is for the trier of fact.  It's not a matter of law.

22  If we go estimation, we have to provide notice to all the

23  individuals, because ultimately it is binding on them.  But

24  then you can resolve the mapper, as the trier of fact in

25  estimation, and it is binding.  That's the whole idea of

1  502(c).

2         THE COURT:  Well, I am going to reserve until I see

3  the expert reports and how the -- I'm going to ask you to set

4  this up for a further status conference before the close of

5  discovery so that I can see, at that point, where this issue is

6  coming out, because here is the problem.  At this stage,

7  without knowing even what the state laws provide, I don't know

8  whether I want testimony on what any particular building owner

9  knew, should have known, and whether it was reasonable or not.

10 I really don't know whether I think it's appropriate for

11 estimation, or whether I think it should be done on an

12 individual basis.  And I would prefer to err on the side of

13 making sure that everybody has appropriate due process rights

14 to be able to be involved in that issue.  I agree with you, Mr.

15 Bernick, if it can be done by estimation I think 502(c) is a

16 vehicle in which -- or Rule 42, however you want to use it, is

17 a vehicle that could be used for that purpose.  But whether

18 it's appropriately used, right now I'm just not sure.  So, I

19 want to reserve decision on whether it's going to be by summary

20 judgment and an evidentiary process geared toward summary

21 judgment, or whether it will be geared toward estimation.

22        MR. BERNICK:  So, what we'll do in the case

23 management order is specifically provide for that.  But the

24 expert -- the expert reports will be submitted in the sequence

25 that we've talked about.  We go first.  They go second.

1           THE COURT:  Right.

2           MR. BERNICK:  We then supplement.  And then, I

3  suppose what will happen is on the basis of that, we will then

4  -- both sides will make a submission to the Court on how to

5  dispose of this issue, whether there ought to be a

6  Daubert hearing -- whether there ought to be a Daubert hearing

7  slash summary judgment, or slash estimation, we'll submit

8  briefs.

9           THE COURT:  There will be a Daubert hearing on the

10  methodology issue.

11           MR. BERNICK:  Right.

12           THE COURT:  There has to be.  I don't know that I

13  need -- I don't know that I need a Daubert hearing on the

14  constructive notice issue.

15           MR. BERNICK:  I misspoke.  We will submit briefs in

16  advance of that hearing date with regard to whether -- what is

17  going -- what should happen on the hearing date.  Should there

18  be evidence for purposes of Your Honor making a determination

19  about the estimate?

20           THE COURT:  Right.

21           MR. BERNICK:  Or should it be handled as summary

22  judgment?  And then I'm sure that we'll take that matter off

23  during this period of time.

24           THE COURT:  That's fine.

25           MR. BERNICK:  But we'll go forward with the expert

1 reports.  We'll contemplate the hearing.  And we'll reserve and

2 submit the appropriate briefing to Your Honor on what the

3 appropriate procedural vehicle is for the disposition of the

4 issues.

5         THE COURT:  Yes.  That's fine.  Meanwhile, I believe

6 the Daubert issue, it may not be as easy to grapple with as a

7 matter of evidence, but it certainly will be easier to prepare

8 for as a matter of trial.  So, that track, I think, can go

9 marching forward while I'm deciding what to do with the

10 constructive notice issue.

11         MR. BERNICK:  And then with respect to phase three, I

12 still believe that the right idea is that, again, anything can

13 be happening in this period of time for people to take

14 discovery, do whatever they want.  But then at a point in time

15 after the Daubert hearing we will then have the initial

16 reports, the same process, initial responsive reports going to

17 the ultimate estimation.  And then the estimation hearing

18 itself will probably be bumped back 30 or 45 days from what we

19 proposed because it's just going to take -- it's going to take

20 more time.

21         THE COURT:  That's fine.  I'm comfortable with the

22 bifurcation of the expert reports so that the first expert

23 reports will address only the methodology concerning the dust

24 versus air.  Whether you want to do them together, or not at

25 all, whatever the experts will say, and the constructive notice

104

1  issue.  Then there will be supplemental reports to address

2  anything left after the <u>Daubert</u> hearing and the constructive

3  notice issue is either tried or addressed by way of summary

4  judgment, however it's going to be done.

5          MR. BERNICK:  What if we tried to prepare something

6  and confer with Mr. Baena to see if we can just communicate

7  with the Court in some fashion, on an appropriate order, we'll

8  take the transcript --

9          THE COURT:  That's fine.  And the debtor will take

10  the initial, or, with respect to all expert reports the

11  committees, and anybody else who chooses, will have a chance to

12  file a response.  And then the debtor will have a chance to

13  reply.

14          MR. BERNICK:  If -- we have one last issue, I think,

15  on this, which is ZAI.

16          THE COURT:  Well, wait.  I don't want to go there

17  yet.

18          MR. BAENA:  I just want to make sure, though, Judge,

19  that you put off to the side the constructive notice issue for

20  the time being in terms of --

21          THE COURT:  How to decide it.

22          MR. BAENA:  Exactly.

23          THE COURT:  Yes.

24          MR. BAENA:  And that will be a matter presumably

25  we'll brief, and argue along the way, as the Court instructs

1  us.

2          THE COURT:  Well, I think what you should do is

3  whatever discovery you choose to do, at the end of the

4  discovery period but before that issue is tee'd up for trial,

5  put it on the agenda for a status conference, give me briefs

6  that will support your position.  Please, don't give me huge

7  briefs.  I am inundated with paper in this case.  I literally

8  am having trouble getting through it all with everything else.

9  So, please, keep them short.  You know, I don't need 30 cites.

10 Give me a good case.  I really would prefer having one good

11 case than 25 that really don't say much anyway.  Please, tell

12 your clerks and your associates, look for the case, and give me

13 the case.  And if there isn't the case, then give me two or

14 three.  But don't give me 35.  I really don't want to have to

15 look at all that.  I just can't imagine that it's going to be

16 even that well researched in this context, frankly.  So, yes.

17         MR. BAENA:  Okay.  Now, on the methodology issue, the

18 Daubert issue, the Court is not saying that we still can't -- I

19 don't want to use too many double negatives -- the Court didn't

20 instruct us against arguing that the process is inappropriate.

21 We can still do that.

22         THE COURT:  You can still argue that.

23         MR. BAENA:  And we can even argue at what point the

24 process should be employed.

25         THE COURT:  And you can put that on the same agenda

1 for the discussion right at the close of the discovery.

2          MR. BAENA:  Right.  Correct.  Okay.

3          THE COURT:  All right?  But -- so, I'm inclined to

4 think, right now, Mr. Baena, but it's without hearing any of

5 the experts, and I may change my mind, that if Mr. Bernick is

6 correct, I'm probably going to be inclined to say the <u>Daubert</u>

7 hearing should go forth first.

8          MR. BAENA:  I understand.  But you haven't foreclosed

9 our opportunity.

10          THE COURT:  I have not foreclosed it.

11          MR. BAENA:  I appreciate that.

12          MR. BERNICK:  We should provide for that -- we should

13 provide --

14          THE COURT:  Yes.

15          MR. BERNICK:  We'll --

16          THE COURT:  Yes.  You should provide for putting that

17 on the agenda and for briefs on that issue.  But truly, folks,

18 please, you know, give me ten good pages.  Don't give me 120

19 that repeat themselves ad infinitum.  I don't always get it the

20 first time, but I am comfortable enough admitting that on the

21 record and asking for guidance.  So, please, just say it once.

22          MR. BERNICK:  ZAI.

23          THE COURT:  No, I'm not ready yet.

24          MR. BERNICK:  Okay.

25          THE COURT:  With respect to the individual claimants,

1  I still want a coordination function because it may be that the

2  individual claimants are looking to the committee for some

3  guidance, or help, or filing, or whatever.  And Mr. Baena, I

4  really think before an individual claimant has to incur legal

5  expenses to hire a lawyer to come here to take a position that

6  the committee is going to take anyway, they ought to know that

7  so that if they choose to have the committee essentially act as

8  its surrogate in that sense, that the committee goes forward on

9  that issue.  If they have a different position, then they ought

10 to know that they have to show up here and litigate it on their

11 own.  But to the extent that it's going to be what the

12 committee is doing anyway and they don't choose to have

13 separate counsel, it seems to me that that is an appropriate

14 committee function.  So, I would like you still to be the

15 coordinator, and I don't expect to hear from any individual

16 claimant's counsel unless they first checked with you to find

17 out what the committee's position is, and then either get on

18 board or don't get on board as they choose.

19       MR. BAENA:  We might be well advised, Judge, to

20 cobble together some better recitals in the orders that we

21 propose to you --

22       THE COURT:  I think that would be helpful.

23       MR. BAENA:  -- to ensure that P.D. claimants are

24 aware of your feeling on that subject.

25       THE COURT:  Yes.  I think that's a good idea, and I

think this order should make it clear that when I get to the

ultimate resolution, whether it's by way of summary judgment,

or estimation, or litigation, everybody is going to be bound.

MR. BAENA:  Judge, I'm glad you brought that up.  We

keep saying that, and frankly I'm not even sure what that means

at this juncture.

THE COURT:  It means if they don't like the opinion

they'd better appeal, because they're not going to get a second

bite at the apple in the plan process.

MR. BAENA:  Okay.

THE COURT:  This is, in my view, preliminary to the

plan process.  It is fixing the claims, the property damage

claims, figuring out how the trust has to be funded --

MR. BAENA:  Right.

THE COURT:  -- and it may not provide for the

percentage of distribution, but it is going to be the whole

universe of what will be available for distribution.

MR. BAENA:  That's fine, Judge.  I understood it that

way.  I just wanted to make sure it wasn't something broader,

because when Mr. Bernick says it, it sounds like it's a little

bit more significant than that.  Not that that's not

significant --

THE COURT:  Because he has a deeper voice than I

have.

MR. BAENA:  Well -- okay.

109

1           MR. BERNICK:  I should hope so.

2                         (Laughter)

3           THE COURT:  All right.  Are you two able, now, to get

4  together and do an order?

5           MR. BAENA:  Yes.

6           MR. BERNICK:  Absolutely, Your Honor.

7           MR. BAENA:  We enjoy -- they never serve lunch on

8  time.  I think we can do this by phone, though.  Okay.

9           THE COURT:  Okay.  Does anybody else want to be heard

10 on the issue of the structure we've just been talking about

11 now, before I send these two out to craft an order?  All right.

12 You're it, folks.  No one else wants to be heard.  Yes?  Mr.

13 Baena?

14           MR. BAENA:  Do I need to address Zonolite, Judge?  I

15 must say that if I did I would tell you the following.  First,

16 this whole notion of Zonolite is an afterthought.  It was

17 raised for the very first time like a stroke of lightening at

18 our meet and confer in Washington two weeks ago Friday.  Mr.

19 Bernick realized that in addition to Mr. Speights he needed to

20 confront Zonolite, and now he was going to propose a Zonolite

21 case management order, estimation process, something we've

22 never, ever discussed before, briefed before, or spoke with the

23 Court before.  And then we get his proposal and you'll recall,

24 Judge, you directed the parties, if we couldn't reach

25 agreement, that we would each submit our orders, our proposed

1  orders at the same time.  No rebuttals.  Well, Mr. Bernick took

2  that once step further.  He submitted three orders.  And one of

3  which was Zonolite.  We haven't had a opportunity to comment on

4  it.  We have very strong feelings.  We think it's premature.

5  As we continued to say, the issue that's already before you,

6  Judge, still needs to be resolved before we can --

7          THE COURT:  It does, Mr. Baena, because -- it does

8  need to be resolved, and I truly am working on it.  But you're

9  not going to be getting an opinion from me for at least a

10 month, and probably longer.  But nonetheless, I am working on

11 it.  It's just going to take that -- given everything else I'm

12 working on at the moment, it's just going to take me that long

13 to get through it.  Plus, I'm going on vacation, and I'm not

14 working on this case while I'm on vacation.  Don't have any

15 emergencies for the next two weeks, please, because I'm not

16 going to hear them in the next two weeks.  I'm telling you now.

17 So, keep your emergencies for three weeks from now.

18          MR. BAENA:  Actually, Judge, I don't think we've ever

19 brought an emergency before Your Honor in this case.

20          THE COURT:  I'm not sure, actually, that you have.

21 This one is actually pretty good.

22          MR. BERNICK:  The Court is looking at me.

23                      (Laughter)

24          MR. BERNICK:  No emergencies.

25          MR. BAENA:  I was looking at Jan Baer, because she's

1  the historian of this case.

2          THE COURT:  Okay.

3          MR. BAENA:  I don't think we ever have, Judge.

4          THE COURT:  All right.  Well, don't for the next two

5  weeks.  Okay?  So, in any event I am working on it, I do think

6  you need a ruling before we go out with a bar date order with

7  respect to Zonolite because I think the structure -- well,

8  whether you need an order at all will depend on the outcome.

9  But the structure of the order will clearly depend on the

10 outcome.  So, I really think that should be deferred.

11         MR. BERNICK:  We have no problem with it.  We just

12 wanted to -- in -- the bolt of lightening is exactly as Mr.

13 Baena characterized it, it came out of absolutely nowhere.

14 There was no warning.  But when Your Honor -- when I shoed up

15 at the last hearing and I heard all of the clamoring to

16 terminate exclusivity, to bring an end to this case, we went

17 back and said how can we do that?  We've got to cover all of

18 the bases, including Zonolite.  So, I'm not saying that somehow

19 it should all get resolved today.  Obviously Your Honor -- if

20 Your Honor is working on an opinion that would be extremely

21 helpful.  But at some point in time we've just got to make sure

22 that we don't have this be carrying off at the end.  That's --

23         THE COURT:  When is the -- when are the September and

24 the October omnibus hearings?

25         MR. BERNICK:  I don't even --

1          UNIDENTIFIED SPEAKER:  September 22nd -- 26th.

2          MR. BERNICK:  September 26th.

3          THE COURT:  Okay.  The end of the month.  And then

4  October's is at the end, too?  Put the issue of the Zonolite

5  case management order on the October agenda.  I'll do my best

6  to have an opinion out by then.  I'm not going to promise, but

7  I'll try.

8          MR. BERNICK:  That's fine.

9          MR. BAENA:  Would it drop off the agenda if you don't

10  issue your opinion by then?

11          THE COURT:  No.  Let's put it on for status

12  conference, because at least I can -- by then I can -- if I

13  don't have the opinion out I can probably give you a better

14  estimate of when I'm likely to get it done.

15          MR. BERNICK:  Your Honor, if there's nothing else on

16  P.D., we would then move to personal injury.  Mr. Lockwood and

17  Mr. --

18          MR. BAENA:  Thank you, Your Honor.

19          MR. BERNICK:  -- have been waiting so patiently for

20  this event.  But I guess I thought I would inquire of the Court

21  what Your Honor's schedule is, and --

22          THE COURT:  Well, I need to give my staff at least a

23  short recess for lunch, and I'm -- maybe those of you who want

24  to get some lunch, too.  To get down -- if you stay in this

25  building, and then back up, it normally takes about 45 minutes

1  to get there, get something to eat, eat, and get back.  So, I

2  would propose maybe we recess until 12:30.

3          MR. BERNICK:  That's fine.

4          THE COURT:  Okay.  And then I have a conference call

5  that I think I told you about earlier.  At the moment I don't

6  recall what time it is this afternoon.  It's either at four or

7  at five.

8          MR. BERNICK:  Yes.  Well, I would hope that we can

9  restrain ourselves at least to the point that we don't

10  jeopardize that conference call.  That's no commitment --

11          THE COURT:  Okay.  Well, we're going to be taking a

12  recess for the conference call, anyway, so --

13          MR. LOCKWOOD:  Well, we could certainly shorten

14  things in the matter if Mr. Bernick would rely on his July 13th

15  filing instead of spending an hour or so walking through it

16  before I get to respond.

17          MR. BERNICK:  Well, I'll do my best to restrain

18  myself, but will you promise to go no longer than I do?

19          MR. LOCKWOOD:  No.

20                      (Laughter)

21          THE COURT:  Okay.  We'll be in recess until 12:30.

22  We'll start with the personal injury order, then.

23                      (Recess)

24          THE COURT:  Please be seated.  All right.  After a

25  delicious lunch in the cafeteria area downstairs, I'm sure

1  you've got everything resolved on personal injury.

2          MR. BERNICK:  Absolutely.

3          THE COURT:  Okay.

4          MR. BERNICK:  In fact, I solicited -- there was such

5  a feeling of, you know, good will, and good atmosphere in the

6  room, just now I said to my brethren, I said, exclusivity,

7  well, come on, let's just reach agreement.  And I'll tell you

8  what the result of that poll was, I guess, before we break at

9  the end of the day.  I'm mindful of the time, Your Honor, and I

10 think people are also mindful of their flights, so I'll try to

11 move through this quickly.

12          As I indicated at the outset, our goal is very

13 concrete, which is to get the questionnaire approved and to get

14 the CMO approved.  But inevitably a lot of issues have been

15 raised, and I'll venture to say that at the end of the day the

16 reason -- these are all old issues -- not old issues in the

17 sense they're irrelevant, but they've been raised before.  And

18 the chorus that we keep on hearing on these issues that, just

19 like the chorus we keep hearing on exclusivity, does serve a

20 purpose.  And the purpose is they're essentially negotiating

21 with the Court.  Why are they negotiating with the Court?

22 Because at the end of the day, if they can chop down the case

23 management order, chop down on the questionnaire, that

24 ultimately helps their goal.  Our own reaction to that, and our

25 response is very simple.  The right kind of forms should go

1  out.  The questionnaire should go out.  The right kind of CMO

2  should go out.  Those are the drivers, and as long as we're

3  proceeding in an expeditious fashion, which I believe that we

4  will, and the parties will, they are birds of a different

5  feather in terms of what happens with exclusivity, or what

6  happens with some of the broader plan issues that have been

7  raised.  Let me put that particular position in context, and

8  let me go through this pretty quickly.

9          As you've seen from the personal injury committee's

10 brief, my brethren across the isle are very active all over the

11 country in dealing with these kinds of issues.  We hear about

12 Federal Mogul, we hear about G-1 Holdings.  And they're all

13 there, and you can see that when it comes to this case they're

14 very careful.  They're fighting this kind of land war in China,

15 and they want to make sure they don't give up on a position.

16 So, in fact, they have not.  They are very scrupulous, and

17 their briefs articulate all of their positions, so that nobody

18 can accuse them of having waived any of them.  But to do that

19 here they have to set up what are essentially a bunch of straw

20 men, because we're not doing many of the things that they

21 insist we cannot do.  We're not asking the Court for the kinds

22 of things that they insist are totally inappropriate.  They

23 have so cowed us over all these years of litigation we don't

24 have the temerity to ask for some of the things that they are

25 now suggesting that we're asking for.  We're buckled at our

1  knees, and it's still not enough, I've got to say I want to

2  surrender, so here's the surrender.

3             THE COURT:  Do I get to judge credibility in this --

4                            (Laughter)

5             UNIDENTIFIED SPEAKER:  You just did, Judge.  You just

6  did.

7                            (Laughter)

8             THE COURT:  Thank you.

9             MR. BERNICK:  I'll state it here in black and white

10 and red.  We are not seeking, in contrast to what we're doing

11 with property damage, where the rules are different, we're not

12 seeking to disallow claims when it comes to the estimation that

13 applies to the personal injury claims.  We're not asking for

14 approval of a proof of claim form.  We're not seeking that.

15 We're not seeking a bar date.  We're not asking for the

16 displacement of one tick or iota of state tort law not on the

17 agenda.  And we are not fighting the tide of prior decisions,

18 which we'll see in a minute this notion that, oh, this is all

19 accepted wisdom, and it's done this way, and only Mr. Bernick

20 and W.R. Grace want to do it this way, that's illusory.  The

21 fact of the matter is there are a broad spectrum of different

22 issues that are confronted in these cases.  There are a broad

23 spectrum of results that have been achieved.  What is it that

24 we are asking for?  We go back to this basic chart.  This is

25 the chart of claim filings over time, and basically we say,

1 well, we've got a history.  The history shows the tremendous

2 fluctuations.  We can actually have a doubling in one year of

3 the number of claims that are being filed.  We say to

4 ourselves, well, what guidance does history actually bring us

5 in talking about what the real liability is?  And our answer

6 is, if you take this history at face value, it tells you almost

7 absolutely nothing, because it's driven by a system that's not

8 driven by science.

9      In connection with the Babcock and Wilcox case, which

10 is a case that the -- our personal injury committee is fond of

11 quoting and citing to, I am -- lead counsel, until the

12 settlement was reached in the Babcock and Wilcox case, and was

13 involved in all of the different decisions that they now are

14 talking about.  And in the Babcock and Wilcox case, we went in

15 with this -- with a history that also had fluctuations to it.

16 And I had the opportunity, in that case, to take the deposition

17 of the person that they bring around the country to testify as

18 an expert, Dr. Peterson.  And the question I put to Dr.

19 Peterson that was, are you telling me that these filings and

20 the future filings are driven by actual disease caused by

21 Babcock and Wilcox?  No.  Can you identify for me any one

22 claim, Dr. Peterson, that was filed, or that will be filed that

23 actually is disease caused by Babcock and Wilcox?  A

24 nonsensical question.  And the answer ultimately was no.  Are

25 you telling us that your model is epidemiologically driven?

1 This is all spelled out by science?  No.  It's a social

2 behavior model, social behavior being how cases get filed

3 against companies.  The social behavior of claimants, the

4 social behavior of lawyers.  It's not epidemiology.  It's not

5 medicine.  So, we know what the history is, and will not be

6 contested in this case, a history that reflects many, many

7 different dynamics.  The question is what we have to focus on

8 here is what is the liability, the legal liability?

9        So, what are the implications?  Well, you can see

10 that if we try to extrapolate, as we ultimately will have to,

11 we try to extrapolate to the future, based upon that history,

12 you can see, right on the face of it, that there are a variety

13 of different results that can be achieved.  Is there a real

14 disease curve that follows through under here, because many of

15 the claims really don't involve disease?  By contrast, is the

16 disease curve one that actually peaks in 1995?  Is it one that

17 really peaks in 2000?  Where do you draw?  What do you do?  How

18 do you actually know that there's any science that says that

19 the liability of the disease is real.  And depending upon where

20 you draw that curve, you get vastly different results in the

21 future because all the value is largely future-oriented value.

22 So, to try to solve that problem, what we essentially are doing

23 here is it's fairly straightforward.  We take a look at the

24 claims that were pending as of the time this case was filed.

25 So, we go to 2001, and it's a little bit apples and oranges,

1  because these are all numbers of claims filed.  We're going to

2  take, in 2001, all claims -- the claims that were then pending

3  against the company, in other words, we take a snapshot of a

4  real point in time.  We don't seek to alter it in any way.  We

5  take all of the claims that were pending then, which will

6  include many claims that were filed historically, and we

7  analyze these claims to see -- to inform the Court one of the

8  different categories and types of claims, and what kinds of

9  issues are they with respect to different groups of claims for

10 purposes of ultimate estimation.  That's where it is that we're

11 going.

12      Now, the question will be raised, well, what kinds of

13 filters, what kinds of categories are you going to draw, and

14 aren't you really altering the law that would otherwise be

15 applicable to those claims in the process of thus categorizing

16 them?  Well, the answer is, again, I've got to give you a bunch

17 of nots.  We are not seeking to impose a different state law

18 standard.  We are not seeking to create a new standard for

19 diagnosing disease.  They say, well, you know, you're using

20 this standard for asbestosis, but the real standard is a

21 different standard.  We're not seeking to do that.  The focus,

22 from beginning -- the time that we filed this case all the way

23 forward to today, is not the standard for diagnosis.  It is not

24 the state law standard.  It's the process of making the

25 diagnosis.  It is the methodology for gathering medical and

exposure data.  It is the methodology that is applied in the

process of reaching the diagnosis.  And reliability of data and

reliability of methodology are straight Daubert issues.  It's

the process, the process, the process.  What are the drivers of

what we're talking about here?

(Pause)

MR. BERNICK:  The transparency -- just didn't work

out right.  But the drivers for our estimation under the Code

rules which incorporate Daubert are reliability drivers.  It's

process is is the right method being followed?  And it really

falls into three major categories.  One is reliability of

medical evidence.  The second is reliability of exposure

evidence.  And last is the reliability of diagnosis.  Now, the

predicates for going down this road are very, very clear.  You

begin with the medical evidence.  We know that, as early as the

1990's, it turns out that an audit was done of the claims for

asbestosis that were being filed in the Johns Manville Trust.

And that audit showed an absolutely enormous failure rate.

That is that the readings that were being reached by these

doctors simply were not replicable readings.  46 percent of all

claims submitted were submitted by only ten doctors.  They are

cranking out hundreds and thousands of claims.  The failure

rate of those ten doctors was 63 percent, over one-third on

audit showed no disease whatsoever.  It was -- say it was a

fraud, it wouldn't be far fetched.  Now, the claimants point

1  out in the briefs, say, well, you know, that was all raised

2  before Judge Weinstein, and he rejected the whole idea.  That's

3  just a flat misrepresentation.  A case was filed called the

4  Adams case.  The Adams case was actually filed by people who

5  wanted to compel the trust to stop doing the audit.  It was the

6  trust, itself, that conducted the audit.  What Judge Weinstein

7  has done in open Court, and I actually litigated this in the

8  context of the Manville Trust case against the tobacco

9  industry, it's all -- totally is a matter of record what Judge

10 Weinstein said was, look, this plan got put together.  The

11 class action settlement got settled.  And basically a deal is a

12 deal.  You can't go back on the deal.  The deal didn't call for

13 the trust doing an audit.  It was not that Judge Weinstein in

14 any way, shape, or form said that the audit was invalid, or

15 that it was wrong.  In fact, Judge Weinstein, on his own motion

16 in 2002, or 2001, raised exactly the same questions all over

17 again.  Why?  Because the trust was running out of money.  And

18 all of these trusts, on their own motion now, have clamped down

19 on the kinds of claims that will be accepted because there is

20 this big problem.

21        But this is not all.  Literally, over time, a whole

22 series of studies have been done.  We have supplied a booklet

23 to Your Honor of all these slides, and we've also given copies

24 to the other side.  The Kumho Tire studies in 1990, to Owens

25 Corning in 1996 and 1997, the Penn State audit, which I just

1 showed Your Honor, to our own audit in Babcock and Wilcox, the

2 claim forms went out.  These were claim forms made into

3 questionnaires, and they were answered.  And a road map was put

4 together.  And it turns out that 74 percent of the claims did

5 not allege diagnostic results consistent with one impairment or

6 asbestosis.  Something like 30 percent of the claims didn't

7 even have any medical evidence.  There's no product I.D. in

8 vast numbers of these claims.  They say Babcock and Wilcox,

9 this approach was rejected.  That is flat out a

10 misrepresentation to this Court.  The road map was put out

11 before the Court and it languished.  Why?  Because the Judge

12 probably wanted the case to settle.  She reached no

13 determination on the summary judgment motions that had been

14 filed.  She reached no determination on the results of the

15 claim process.  She reached no determination that the process

16 that she had set down was somehow contrary to law, or was not

17 the right way to proceed if it could be done in an expeditious

18 fashion.  So, the idea that Babcock and Wilcox supports their

19 position is absolutely contrary to the facts.

20          Then we have other reports that have been done more

21 recently in connection with the Owens Corning case, and of

22 course with the Johns Hopkins study, itself, which show that 95

23 percent of the x-ray films did not have abnormalities, whereas

24 the original plaintiff's B readers diagnosed 96 percent as

25 showing the abnormalities.  What is it that the P.I. committee

1  says?  Oh, I guess people could disagree.  We're supposed to

2  pay money for that?  We're supposed to pay money to the estate

3  when it produces exactly the opposite result when reviewed by

4  people who are independent?

5        Now, at the end of the day we then come from the

6  medical evidence to the exposure data.  And Grace is vulnerable

7  on the exposure data, as well.  Why?  What do I mean?  There

8  are two prongs.  A claimant comes into a doctor for purposes of

9  diagnosis to see whether they're sick or not.  That's one

10 prong.  That's the medical evidence -- the medical evidence

11 that's considered.  The second prong is sick from what?  Whose

12 product?  And that is equally, if not more important an issue

13 is the medical evidence itself.  Why?  Because the question is

14 who pays?  And we all know that most of the companies that

15 actually were responsible for asbestos-related real illness has

16 long ago been in Chapter 11.  And as they moved into Chapter

17 11, the claims have shifted as a result of what Dr. Peterson

18 would call social behavior, the claims have shifted to more

19 solvent entities who may or may not actually have been

20 responsible.  This is what we've seen, is there's been a

21 dramatic increase, traditional types of increase, non-

22 traditional defendants, that is not the mainstream defendants

23 have received more and more claims, and it became extreme,

24 literally extreme, just before Grace filed.  What happened?

25 This is a compilation taken from the Rand Report, the 2005 Rand

1 Report, and it shows that in industries that had never seen

2 significant claims, like the textile industry, like the

3 automotive industry, in 1999 and in particular in 2000, whoom,

4 claims go through the roof.  Now, was that driven by the fact

5 that all of a sudden a lot of people got sick from working with

6 brakes?  It got -- it happened not because of any medical or

7 biological process, that happened as a result of the social

8 behavior of litigants.  That's the problem if you don't have

9 reliable evidence of exposure being required.  And what

10 happened to Grace during that same period of time, Grace's

11 claims also skyrocketed.  So, there was a concerted effort, in

12 2000, to shift, both increase claims and to shift claims more

13 broadly to solvent parties, something that can only happen if

14 there's not reliable exposure data required.  Is Grace

15 vulnerable to this problem?  You bet.  Our own sampling of the

16 Grace claims, and there's one that we've shown repeatedly, and

17 it has never been gain say by any comparable study that they

18 have ever done through the committee shows that in the one area

19 where the use of Grace products was most pervasive, which was

20 construction, this is the fireproofing area, where the stuff

21 gets put on all the girders, only 12 percent of Grace's claims

22 are being made by people who had an occupation within that

23 construction area, whereas we see we go from iron and steel

24 production, ship building, railroad, auto maintenance, tire and

25 rubber manufacturing.  We've got all kinds of people who are

1  saying, from all kinds of industries, pay my claim.  So, we've

2  got a real problem with the reliability of exposure data.

3         Now, there's a way to get -- exposure data to.  You

4  get very specific about what was the occupation for what period

5  of time, and as a result what was the dose?  And in fact, in

6  the Chimino case that was litigated many years ago, they

7  actually did dose calculations based upon the location of the

8  particular workers.  You can do it.  And in fact, the case law

9  in many instances requires it.  They purport to say that the

10  case law doesn't believe that dose is relevant?  I don't know

11  where these people have been.  Dose has been used repeatedly,

12  repeatedly, as a benchmark for determining under

13  Daubert standards whether, in fact, there's sufficient reliable

14  science to implicate a product.  Just recently, in the PPA

15  litigation Judge Rothman looked for the doses that were

16  involved and the studies that implicated the different disease

17  end points for different forms of PPA.  Does is absolutely a

18  key determinant.  And it's determinant here because it drives

19  risk.

20         So they say, well, you can't do that, though.  You

21  can't produce all of this reliability scrutiny.  You can't do

22  it if you're dealing with thousands of claims.  And that really

23  is the pitch that they've made all across the country is,

24  Judge, you can't do it with respect to thousands of claims.

25  And, of course, the pitch that we're been trying to make is

1  yes, you can.  You can actually do it through claims allowance

2  or disallowance, but you certainly can do it in estimation.

3  And the best evidence of how doable it is comes from what Judge

4  Jack just did in the silica litigation.  Basically Judge Jack

5  took a look at exactly the same machinery that has produced all

6  of these claims, the machinery of people, of high volume B

7  readers, of doctors processing claims and issuing diagnoses, of

8  lawyers helping to set up trailers at factories and the like to

9  get people to come in.  She took that exact same machinery, and

10  the exact same kind of diagnostic data which is B reads and

11  PFTs, and the same doctors, and the same lawyers, and she

12  looked at it real hard as part of her MDL.  And she didn't even

13  have estimation available as a tool.  She did it as part of the

14  MDL under good old -- under the good old rules of federal

15  procedure.  So, what is it that she found with respect to the

16  -- this machinery?  We quoted it to Your Honor in the brief,

17  and it could not be clearer, she called it as it was.  The

18  diagnoses are more a creation of lawyers than of doctors.  The

19  diagnoses were manufactured for the money.  This was a scheme,

20  willingly devised by lawyers, doctors, and screening companies.

21  Every meritless claim that is settled takes away money from

22  people whose claims have merit.  The allegation here is clear

23  fraud, and you can't sugar coat it.  And she saw the testimony

24  of the doctors as providing great red flags of fraud.  This

25  went through the fact that occupational histories were taken --

1  were not taken, that basically a B read was designed to stand

2  in place of this.  She took issue with and found that the

3  diagnosing reports were deficient, basically the same language

4  is being used everywhere, and we'll show you some of that

5  language.  She also took issue with bias, the doctors were all

6  biased.  Guess who the doctors were.  It's the same doctors who

7  were involved in the <u>Manville</u> case.  It's the ten high volume

8  doctors that all of their clients lawyers go off and retain and

9  do this -- it's the same people turning out silicosis

10 diagnosis, turning out asbestosis diagnosis, turning out

11 claims.

12          How does all this impact Grace?  Thousands of Grace

13 claims involve the same lawyers.  We've just gone through and

14 taken a list of the different law firms who are involved in

15 that case, in sponsoring that machinery, and we've got

16 literally thousands and thousands of Grace claims that come

17 from exactly the same law firms.  What about the doctors?

18 Thousands of Grace claims involve the same doctors.  And these

19 are the doctors -- the famous Dr. Harron.  Dr. Harron has

20 supported claims of the -- has supported claims that are now

21 pending against Grace.  In fact, I think we actually brought a

22 claim.  You can see what kind of medicine is being done here.

23 This is a claim currently pending against Grace.  It is signed

24 by Dr. Harron.  There he is.  And we've blocked off the name of

25 the claimant.  And look at all he has filled in about the

1  patient history.  There is none.  The examination.  There is no

2  examination.  Nothing.  It's just -- it's just -- it's just a

3  film.  And yet he says, okay, here's the film.  There's plaque

4  on the left half of the diaphragm impression.  And this is what

5  now supports the fact of an asbestosis claim in this

6  litigation, which is all hunky-dory, if you believe the

7  personal injury committee.  It says consistent with asbestos-

8  related disease.  That's the diagnosis.  Consistent with.  They

9  didn't say it's asbestos-related.  It doesn't say it's

10 asbestosis.  It's consistent with asbestos-related disease

11 because I squinted and looked at the B reading, and everybody

12 else will read it a different way, and that's what I can say.

13 And this would be used to support a claim for mild asbestosis,

14 or some kind of pleural disease.

15         So, the problem is real.  The problem identified by

16 Judge Jack is here in this Court, represented in this Court,

17 being pursued in this Court.  Something has got to be done

18 about it.  We have tried to craft a way of doing something

19 about it.  We did so, in fact, before Judge Jack ruled, and

20 it's been our approach all along.  And this is a flow chart

21 that then carries directly to the questionnaire.  What do we

22 do?  We take the three basic problems, unreliability or

23 fraudulent medical data, unreliable exposure data, unreliable

24 diagnosis.  Under unreliable medical data we get B reads and

25 PFTs.  What did Judge Jack do?  She said, with respect to this

1  data, there has to be scientific reliability.  There has to be

2  a <u>Daubert</u> analysis.  What do we say?  <u>Daubert</u> applies.

3         With respect to the B reads, she says, B reads

4  conducted in mass screenings do not follow ILO guidelines and

5  -- as many positive diagnoses as possible.  They must be

6  performed in an unbiased and reliable manner.  What do we do?

7  And I'm going to dissolve all of the -- you know, this kind of

8  hand wringing about the science, and how complex it is.  We

9  don't have to get very complicated at all.  We've got two

10  things.  Two things.  One is that the ILO methodology, that is

11  how you read these x-rays, is published.  There are standards,

12  and standardized publications that are in black and white.  And

13  to solve the problem of bias and the machinery that's been

14  created, get them read independently.  That's what our approach

15  is.  We say get -- follow the standards and get them read

16  independently, and then the data is fine.  It's fine.  What

17  does the published methodology call for?  It calls for multiple

18  B reads for independent readers, people who don't have a

19  financial stake or connection with the claimants' firms.  How

20  important is it to get multiple B reads?  I don't want to take

21  up too much time, but basically we quoted the ILO guidelines

22  themselves.  They have to be repeated readings, at least two,

23  but preferably more readers, each classified all radiographs

24  independently.

25         What about the PFTs, the pulmonary function tests?

130

1  This is also very easy because, again, there are standards that

2  spell out exactly how the test should be administered.  You

3  already know that you go into the doctor and you blow into the

4  tube.  You've got to get it all out.  They make you go huhh,

5  get it all out.  That gives you a profile.  The profile looks

6  something like this, where you're expiring all that air.  But

7  you have to do it three times.  They make you do it thee times,

8  even though you don't want to.  And the fact of the matter is

9  the machine then generates the curve.  And these curves can be

10 read.  They can be superimposed to find out if there really is

11 a reliable test being done.  And the standards spell it all

12 out.  So, we say there should be -- there should, in fact, be

13 these PFTs.

14          We also say that to deal with the problem of

15 unreliable exposure data there has to be a complete work

16 history.  And to deal with the problem of unreliable diagnosis

17 there has to be an independent diagnosis made on reliable data.

18 Now, if a claimant chooses to do something differently, that is

19 they want to submit good old Dr. Harron's B reads, they want to

20 submit the good old-fashioned stuff.  They want to argue the

21 good old-fashioned standards, and they don't want to comply

22 with any of this, that's fine, and our form says you can submit

23 anything it is that you want.  All we're saying is that from

24 our point of view these are the arguments that we're going to

25 make.  And if you want to comply with what we believe to be the

1  required standards, this is what you should do.  But nobody is

2  prevented from submitting anything that they want in response

3  to the form.

4         So, where does that all bring us at the end of the

5  day?  It brings us to the questionnaire which tracks exactly

6  the same flow.  And I've got listed here B reads, that's

7  handled in part two and seven.  PFTs, part two and seven,

8  exposure data, part three, sections A and B, and then the

9  diagnostic information, as well.  We have trimmed down this

10  claim form, not claim form, this questionnaire, to be directly

11  tailored to exactly the diagnostic and exposure evidence that's

12  going to be critical in evaluating the value of these claims.

13  We have followed -- followed Judge Jack's opinion.  It's almost

14  identical to Judge Jack's opinion.  We've had it out there for

15  three years now.  It's the same stuff, because it's driven by

16  exactly the same problem.

17         How will that, then, translate into an estimate?  It

18  will translate into an estimate because once we take a look at

19  the claims here, in 2001, draw a line through what we believe

20  to be the claims that do cast these basic standards, that will

21  give us a benchmark against which we can then back pass to find

22  out what the exposed population is following the traditional

23  epidemiological models, and then forecast on the same basis.

24  At that point your forecast is driven not by the fact of a

25  claim, or filing a piece of paper that comes out of this gin

1  mill of paper, it will actually be based upon scientific and

2  medical data.  That's what you then estimate on the going

3  forward basis being the value of the claims.  And we reduce the

4  uncertainty, and we know how much money there is out there to

5  be paid.

6          I want to touch on one issue, which is the law, and

7  then go to the CMO, because the CMO, I think, is a little bit

8  simpler than the CMO issues that we faced in connection with

9  the property damage claims.  One issue is impairment.  They

10 say, well, you know, it may be.  They don't say this, but even

11 if you were to assume that all of the data has to be done in

12 accordance with the methodologies.  What good is it going to do

13 you if one of the uses of the data is to show absence of

14 impairment?  But, in fact, even plaintiffs who aren't impaired

15 still can recover under state law.  In other words, they'll say

16 even if all the data is reliable, people who are not impaired

17 still are entitled to recover under state law, and we can't

18 change substantive state law.  And the answer, and this is the

19 point they make here with respect to the PFT, a finding of

20 impairment supported by a PFT -- you know, gold-plated PFT is

21 not required under state law to show compensable injury.  And

22 the fact of the matter is that that's a claim that's been out

23 there for a while, but time has caught up with it.  There are

24 several states that have now enacted legislation requiring

25 asbestos claimants to establish, to demonstrate physical

1  impairment.  Florida, Ohio, Georgia, and Texas all have changed

2  their law so the state substantive law is now no longer

3  supportive of their position.  In addition, you have Courts

4  that have adopted inactive dockets, or similar processes for

5  unimpaired claimants.  And that, effectively, accomplishes the

6  same thing.  You can't pursue the claim until you're impaired.

7  So effectively, you don't have a claim for an unimpaired

8  injury.  What is the potential impact?  And we can find for

9  every claimant we know where they reside.  We can determine

10 what state's law is going to apply.  What is the impact of just

11 this issue of impairment, where we know -- because we can read

12 out their PFT scores, who is impaired and who is not impaired,

13 just right off the bat.  Just in the four states that have

14 asbestos tort reform, for all pending pre-petition P.I. claims,

15 and then for pending and closed, 40 percent of our sample comes

16 from states which have not enacted this tort reform.  It's a

17 huge impact.  What if you include not just states that have

18 enacted tort reform, but states that have adopted inactive

19 dockets and the like.  60 -- almost 60 percent of the claims

20 will be affected such that we believe that absent a PFT

21 properly done, showing impairment, they have no right of

22 recovery in those states to date.  Again, an enormous impact.

23         Then we come to the point -- another legal point that

24 they make, saying, gee, this decision, or what the -- what

25 Grace wants you to do is contrary to the law.  It's not been

134

1  adopted in all these other cases.  And I think that the answer

2  is actually exactly the reverse.  The first thing that Grace

3  has done is to follow the Code.  What does the Code say?  It

4  says estimation is a contested matter.  Because it's a

5  contested matter the Rules of Evidence apply.  They assert that

6  there is nothing about estimation that has anything to do with

7  Daubert, again, a farcical position.  The Federal Rules of

8  Evidence incorporate Daubert.  Estimation as a contested matter

9  must comply with the Rules of Evidence, including Daubert.

10 Daubert is all over this case.  They say -- we also say -- the

11 Courts must apply federal procedural law, as well, again

12 spelled out by the Code, and state substantive laws.  So, we've

13 got an approach that is absolutely and completely consistent

14 with, indeed follows the mandate of the Code.  We've been very

15 careful about that.  We have not sought to argue state law has

16 to be trumped.  We have not sought criteria for how to define

17 diseases.  All that we've said is that the Daubert standards

18 have to be followed, and the data has to be reliable.

19        Now, against this backdrop, what about all of this

20 conventional wisdom?  I've got a conventional wisdom chart

21 here.  I just want to put it up on there.

22                   (Pause)

23        MR. BERNICK:  So you can see you didn't see that, or

24 this.  What's actually happened in the cases, and going back to

25 the cases, the big problem is that they all are kind of coming

135

1  at related issues from slightly different perspectives.  And

2  it's very easy to pick out one part of the array and say, oh,

3  gee, this is what the law is.  I think if you isolate the

4  variables in these cases, number one, the Courts are looking to

5  different benchmarks in determining what the advocate liability

6  is.  On one extreme you have Courts that have looked to see,

7  well, was the pre-Chapter 11 reserve taken by the company for

8  the liability?  Was it a reasonable reserve?  At that point you

9  look to historically what the company did, and ask whether it's

10 reasonable.  That becomes very relevant in the fraudulent

11 conveyance case.

12        The next step up says, well, let's take a look at the

13 pre-Chapter 11 settlement values.  They may or may not be the

14 same thing as the reserve.  Let's take a look at pre-Chapter 11

15 liability, which is sort of the same thing as settlement

16 values.  What's the legal liability that arises from a pre-

17 Chapter 11 litigation process?  Then, differently, what about

18 the litigation value in Federal Court, such as in a Bankruptcy

19 Court?  If we were to liquidate all of these claims, if this

20 were to case were to go on for years, and we liquidated all of

21 these claims in this Court, they would have a litigation value

22 in Federal Court.  We wouldn't send all these cases back to be

23 determined in State Court.  We would litigate them here, there

24 would be Federal litigation Court values.  And finally, you

25 could also look down the road, say, well, the real issue is how

1  much is it going to cost to get rid of them, to liquidate them?

2  How much will it cost for the trust to liquidate them, down the

3  road, recognizing that many of them will be settled?  And there

4  you can look down the road to how much it's going to cost to

5  settle and litigate the cases.  These are all different

6  benchmarks.  And then there are a variety of different

7  procedures that are available.  Again, they cover a spectrum.

8  You can have an estimation that's done where the estimation is

9  essentially uncontested because everybody agrees to the plan,

10  whatever the estimate is, they're all signing on to it.  That's

11  happened in many, many cases, that is, we've had uncontested

12  estimations where pre-Chapter 11 settlement values by agreement

13  have been used as the estimate.  It says many -- and there are

14  many cases that are like that.  There's no real issue, and as

15  part of the plan process nobody contests it.  One step over it

16  says we're going to have estimation but it's either -- it's not

17  agreed to in terms of the final result, but the -- how it's

18  going to be done is agreed to, or the Court says here is how

19  you are going to do it.  So, it is partly contested, but partly

20  not contested.

21         Then you have a fully contested estimation where

22  nobody agrees about anything.  And the Court says, I am going

23  to hear from you down the road at the trial, but in the

24  meantime you get your experts, the other side gets their

25  experts.  You have discovery, competing estimates are

1 presented, including competing methodologies for estimation,

2 and you have an estimation down the road.  And then, finally,

3 you have the approach that says we're going to litigate the

4 question of what the overall value, or viability of the claims

5 is through aggregative litigation.  Now, obviously there are a

6 variety of different cases.  If we go to, let's say, estimation

7 by agreed or Court-ordered procedure, in the A.H. Robins case,

8 the alcon shield, the company's pre-Chapter 11 liability was

9 determined through estimation, but there was agreement on the

10 data that would be used for that estimation process, exactly

11 how it would be gathered.  And ultimately people came in with

12 competing estimates.  And, Judge, it's kind of very reminiscent

13 of what happened just with Judge Fullam.  One -- one estimate

14 was, like, seven billion, another estimate was at 700 million,

15 and then there was an estimate that was hanging around, 2.5

16 billion, which just happened to be the value that everybody

17 expected to accrue to the sale of the A.H. Robins Company, and

18 therefore, the value that would be available.  And guess which

19 value the Court decided to pick?  It picked $2.5 billion.  Were

20 there a series of findings and determinations?  No, because

21 basically much of the process had already been agreed to.  The

22 question was what was the final ticket?  The final irony of

23 that was that that estimate was submitted by Francine

24 Rabinovitz, who happens to have submitted exactly the same, or

25 submitted an estimate in the Owens Corning case, which again

1   was picked because it was somewhere between the high and the

2   low, without any explanation of why.  But that was estimation

3   where much was agreed to, pre-Chapter 11 liability.

4          By contrast, you have Owens Corning, Eagle Pitcher,

5   and Federal Mogul.  These are all situations where there was a

6   contest about the estimate but much of how the estimate was to

7   be done was not disputed.  For example, in Federal Mogul they

8   basically stipulated that pre-bankruptcy settlement values were

9   going to be used for the estimation process.  In Eagle Pitcher

10  a database for pre-bankruptcy settlement values was used.

11  There was an effort to expand the database, or to argue that

12  somehow the more recent claims were more probative than the

13  older claims.  But everybody agreed that there was going to be

14  the use of pre-bankruptcy settlement values, and Owens Corning,

15  I am told, although I do not know, I am told that, in fact, in

16  this case the Judge determined in advance that the estimation

17  was going to be done using pre-bankruptcy settlement values on

18  the theory that what had to be measured was not pre-Chapter 11

19  liability, and we say here he made just a flat mistake, he said

20  it's got to be pre-Chapter 11 settlement values.  And the error

21  here is really fairly simple.  Judge Fullam said that because

22  state substantive law governs.  You use the values that come

23  out of the state system.  Whereas, in fact, state substantive

24  law doesn't necessarily mean the settlement values that come

25  out of the very unique, and we would say broken State Court

1  process.  Very different from Judge Fullam's decision is Judge

2  Gambardella's decision recently in the G-1 case, where she flat

3  out rejected the idea that these settlement values should be

4  dispositive.  She said she was going to rule finally on the

5  issue down the road, but her footnote explains why these values

6  are not really very useful.  So, when they say it's all being

7  done the same way, even where there's agreement, they're just

8  wrong.  What about fully contested estimations?  Dow Corning

9  II, which was the confirmation of the Dow Corning plan, was a

10 contested confirmation proceeding, there was a contested

11 estimation as part of it.  And in that process the Dow Corning,

12 and I put on this case in connection with the confirmation

13 hearing, put on the estimate of the cost to liquidate claims

14 post-confirmation.  And it was adopted by the Court, and

15 affirmed by the 6th Circuit.

16       What about litigation value in Federal Court?  This

17 is what we're arguing for here under the current CMO.  It's

18 also what USG is arguing for.  No decision finally has been

19 reached in that case.  What about G-1, Judge Gambardella's

20 decision?  Well, she has yet to decide whether she is going to

21 go this way, that is, Federal Court value, or pre-Chapter 11

22 value.  She has yet to decide.  But she has clearly -- that A,

23 there's going to be discovery, B, both methodologies can be

24 presented down the road, and that C, to the extent that we're

25 talking about pre-Chapter 11 liability, she's already served

1  notice that she's not buying the idea of pre-bankruptcy

2  settlement values.  They actually quote the <u>G-1 Holdings</u>

3  decision.  Your Honor should read the <u>G-1 Holdings</u> decision.

4  Judge Gambardella is basically setting up a situation where

5  there will be a fully-contested estimation down the road, both

6  sides presenting their evidence and their methodologies, and

7  you know, it's a very thoroughly written opinion.

8          What about full litigation.  Full litigation takes

9  place in two contexts.  One, you have full litigation where you

10 have a fraudulent conveyance action brought challenging pre-

11 Chapter 11 reserves.  That's what happened in <u>Hillsborough</u>

12 <u>Holdings</u>.  It's what happened in the <u>Sealed Air</u> case in

13 connection with Grace.  And also, this is what they said on

14 <u>Babcock and Wilcox</u>, even though they lost the <u>Babcock and</u>

15 <u>Wilcox</u> case.  What was the issue in the <u>Babcock and Wilcox</u>

16 fraudulent transfer and conveyance case?  It was the adequacy

17 of the pre-11 reserves.  To determine the adequacy of the

18 reserves, we didn't go back and say let's now figure out after

19 the fact what the real liability was.  We had to say, as we

20 did, that our -- our estimation methodology back at the time

21 the reserve was set was a reasonable -- was a reasonable

22 methodology.  In fact, Judge Brown specifically disclaimed the

23 idea that the rules that would apply to the fraudulent

24 conveyance case would be the same rules that would apply to the

25 estimation for plan purposes.  Exactly the same distinction was

1  made by Judge Roland in the <u>Sealed Air</u> case.  Because we were

2  talking about the adequacy of a prior reserve, Judge Wolin was

3  clear that the methodologies and the rulings that applied in

4  that case and in that context were not necessarily the same

5  thing as would be applied in connection with estimation as part

6  of a plan processing.  So, these cases had very little

7  relevance to our process here.

8          What about full litigation?  We have seen full

9  litigation procedures apply to determine litigation value in

10  the bankruptcy case in <u>Armstrong</u>, Rule 42 and <u>Daubert</u> were used

11  on the property damages cases.  We also applied exactly the

12  same principles for our road map in Babcock and Wilcox,

13  ultimately not ruled upon.  This was also the proposal that we

14  made, initially in this case, and in order to expedite the

15  resolution of the issue here we've gone to estimation instead.

16  This was also the proposal that was made in the first stage of

17  <u>Dow Corning</u>.  In the first stage of <u>Dow Corning</u> there were

18  competing estimation plans.  Judge Spector decided you could

19  not actually estimate a disputed personal injury mass tort.

20  So, what he said is that you've got to go to full litigation.

21  let's bring on Rule 42.  Let's bring on Daubert.  That's

22  exactly what we did before the District Judge.  And as soon as

23  that process got underway, guess what happened?  The case

24  settled.  So, the idea of using full litigation to determine

25  the aggregate litigation value in Federal Court on disputed

1 claims clearly has precedent.  The silica MDL is full

2 litigation techniques being applied to determine whether the

3 claims do, in fact, have value in Federal Court?

4          What's the bottom line?  The bottom line is that

5 there is no such thing as a monolithic set of decisions, or a

6 conventional wisdom, or a carved in stone standard for how to

7 do this estimation.  Each one of these cases is complex.  Each

8 one of the Courts has gone about things in somewhat the

9 different way.  We have argued for a process that we think will

10 be expeditious, will follow the rules, and all that we're

11 saying at this stage of the game is let them argue if they want

12 that it ought to be differently.  Let them if they want that it

13 should be prior settlement values.  They can make that pitch

14 when we have the estimation hearing.  But we are entitled to

15 discovery.  We're entitled to discovery in accordance with the

16 Federal Rules.  It is actually spelled out in the Code.  And

17 they can't rig the ultimate estimation by saying you don't get

18 any discovery rights, or you don't get the questionnaire to be

19 filled out.  It just doesn't comport with the Code, and

20 shouldn't carry us very long, which then brings me to the case

21 management order.

22          The case management order that we propose is fairly

23 straightforward.  We say that the questionnaires basically can

24 be competed in a 12-month period of time, the questionnaires

25 that we propose to the Court.  Now, what's very interesting is

143

1 they say in their brief, oh, my God, it's going to take years.

2 Well, when I sat down with Mr. Inselbuch and Mr. Finch during

3 the meet and confer, we asked how long will it take to get our

4 questionnaire filled out, asked that question specifically, and

5 the answer was four months.  Four months.  And remember, this

6 is not a bar date, so in contrast to <u>Babcock and Wilcox</u>, we're

7 not in a situation where people had to fill this out even to

8 prosecute a claim.  It's just a questionnaire for litigation

9 purposes.  They said four months.  How long to do the database?

10 Another three months.  How long for the expert discovery?

11 Basically from early October until May 15th.  These are all the

12 time periods that came absolutely, completely, and literally

13 out of the meet and confer.  Their own mouths.  We said, okay

14 -- where there was a doubt, I said, well, we'll use your time.

15 You tell me the time.  Now, they didn't agree to the

16 questionnaires.  They didn't agree to any questionnaires.  But

17 they surely agreed to these time periods, and we simply

18 incorporated them into our CMO, which produces a hearing date

19 of August.

20      What have they now done?  Well, they said they got a

21 different questionnaire, but they actually -- well, here's what

22 they've done.  They actually have proposed a CMO that looks

23 something like this.  That the order issues, there are expert

24 reports, fact depositions, expert depositions, and the hearing

25 takes place lickety-split on the first of February.  Where's

144

1   the questionnaire?  There's no questionnaire.  There's not our

2   questionnaire, there's not their questionnaire.  There's no

3   questionnaire.  Where is our discovery?  Where is our discovery

4   of all of these different claimants in any way, shape, or form?

5   It's not there.  There's just nothing for it.  So, we've now

6   got a one-way street.  They say we can run down our one-way

7   street by February 1.  That's what they say.  Well, that's

8   great.  They can go run down that street, but that's their part

9   of the case, it's not our part of the case.  So, we actually

10  talk about something else that they don't tell the Court, which

11  is, well, what if their questionnaires were used?  Now, we have

12  said in our briefs their questionnaires don't do anything other

13  than to repeat the same stuff that's gone into claim

14  historically that has nothing to do with our discovery.  Again,

15  it's maybe their discovery that they would want us to do, but

16  it's not our discovery that we need.  So, we then said, well,

17  okay, if we use your questionnaires does it really affect the

18  end date?  So, we then took how long it would take to get those

19  questionnaires filled out.  It wouldn't be done overnight.

20  They basically said it will take about 45 -- what is that --

21  about 45, 60 days, whatever it is.  It would take this period

22  of time to get the questionnaires filled out.  The database

23  would then be compiled.  It would be shorter.  There would then

24  be expert discovery, etcetera, etcetera.  When would the

25  hearing be?  It wouldn't be August 1, as on our schedule.  It

1  would be June 1.  So, what's the real difference in these CMOs?

2  60 days.  That is whether you use our questionnaire or their

3  questionnaire, you're basically talking about an estimation

4  process that convenes in the summer of next year.  Now, that's

5  real.  That is, these were what we discussed at the meet and

6  confer.  And the bottom line is that there's -- there's

7  disagreement about the questionnaires, but there's really not

8  too much disagreement on what the sequence should be for the

9  CMO, and how long the process should take.  And yet they come

10 in here and basically talk about something that was never

11 discussed.  It was discussed, it was mentioned, never agreed

12 to.  And they ignore the fact that they are themselves saying

13 if there's a questionnaire it's going to take time.  What are

14 doing?  So, we would argue to the Court that at the end of the

15 day this is discovery.  It is our questionnaire that drives our

16 discovery, not them telling us what discovery we should get.

17 It's going to take some time.  It's not going to take

18 materially more time than it would have taken for their

19 questionnaire.  So, we would ask the Court to order the serving

20 and the filing of the questionnaires, and entry of the CMO, and

21 I'm prepared -- if you'd like, Your Honor, to go through the

22 questionnaire in whatever detail you feel is appropriate.

23 I suspected that would be the answer, so I'll turn it over to

24 Mr. Lockwood, unless you have questions.

25          THE COURT:  I actually did have one question about

146

1  it.  I may have left it in my office.  I noticed -- I may have

2  left it in my office.  I may have to go back and get it before

3  we adjourn.  I noticed something on one of the pages, but I

4  apologize.  Without my notes in front of me I just read so much

5  this past weekend that I can't recall chapter and verse as to

6  where it was.  I thought that there was a time frame, I think,

7  that seemed not to make sense to me, somewhere around page ten

8  or 12, but offhand what it is I don't know, so --

9          MR. BERNICK:  We have a copy here we can hand up --

10          THE COURT:  All right.  Thank you.  Mr. Lockwood?

11                       (Pause)

12          THE COURT:  Thanks.  I think what I -- somewhere or

13  other I thought that some block was left off that needed an I

14  don't know kind of answer.  I believe that's what -- oh, you

15  know, I think maybe, now that I look at this, it was in the

16  property damage committee -- property damage form.  I think it

17  had something to do with has the building ever been inspected?

18  Have there been reports of something?  And there was a yes/no,

19  but there wasn't an I don't know.  And based on the fact that

20  the building ages were so long, I thought maybe it needed an I

21  don't know block.  So -- I'm sorry.

22          MR. BERNICK:  We'll check it out.

23          THE COURT:  Okay.  Mr. Lockwood?

24          MR. LOCKWOOD:  Your Honor, I guess I should

25  congratulate Mr. Bernick on the expedition of his presentation,

1 although he talked so fast I was having trouble keeping up with

2 what he was saying in terms of being able to respond to it, but

3 I'll --

4        THE COURT:  There's that credibility factor again,

5 Mr. Lockwood.

6        MR. LOCKWOOD:  I'll do my best.  I'd like to focus

7 the Court initially on two things, actually, a comparison with

8 Mr. Bernick's first slide about what he says Grace is not

9 seeking to do with the P.I. claims, and the handwritten chart

10 that he prepared in connection with Mr. Baena's dispute over

11 the P.D. CMO, and the questionnaire.  To start with the

12 handwritten schedule on the board here, Mr. Bernick listed

13 three categories of, in effect, legal rules that he stated, and

14 I believe correctly have to do with the allowance and

15 disallowance of claims in bankruptcy case, bankruptcy rules and

16 procedures, the Rules of Evidence that applies to the

17 determination of facts related to the claims, and the legal

18 standards relating to the validity of the claims.  And he first

19 goes through how that would work out if you objected to the

20 claims individually.  And he listed some things that were

21 specific to P.D. claims, but in terms of if you translate this

22 into issues of personal injury claims, you would have a

23 different set of issues as we heard in machine gun style

24 fashion from Mr. Bernick earlier, there would be issues of

25 diagnoses, and B readers, and pulmonary function tests, and

1 there would be <u>Daubert</u> issues with respect to those testing

2 requirements of whether or not the plaintiff had or hadn't

3 produced an expert, etcetera.  And there would be whatever

4 other issues relating to what Mr. Bernick's second slide

5 referred to as the, quote, real, closed quote, liability.  And

6 what I take the word real to mean in that context is a Court-

7 determined liability.  And Courts determine allowance

8 proceedings using the Federal Rules of Evidence, and the

9 Bankruptcy Rules, and the -- and legal principles, and we've

10 spelled that out in our brief, about how you initiate an

11 objection to a claim, and that kicks off a contested matter,

12 and who has what rights, and how you wind up ultimately under

13 the Bankruptcy Code with a jury trial, if it's a personal

14 injury claim, in front of the District Court.

15          Now, he says his second point is we can also do

16 estimation of individual claims if, under Section 502(c) the

17 actual litigation, objection allowance process would unduly

18 delay the administration of the case.  And again, that's true,

19 you could.  And indeed, as Mr. Baena pointed out, 502(c), by

20 its terms, applies to the allowance of a claim by estimation.

21 And while Mr. Bernick didn't get into it, it's perfectly clear

22 that putting aside the Court's discretion to limit the amount

23 of evidence and the extent to which you get into the merits of

24 claims in an individual claim estimation, the basic principles

25 of -- under the bankruptcy process of a right of an individual

1  claimant to contest the estimation of his individual claim,

2  which would again be precipitated by an objection to the claim,

3  would be essentially the same as it would be in an objection

4  process.  If you want to estimate my claim at zero, or $10, or

5  whatever, you've got to give me notice.  You've got to object

6  to the claim.  And then you've got to have a hearing of the

7  contested matter, and proceed forward.  And the only real

8  difference between that and the objection process is that the

9  Bankruptcy Judge can truncate to some extent, consistent with

10 due process, and sort of reasonableness, the extent to which

11 you ultimately get down and dirty into the absolute bottom line

12 merits of that claim.

13        And then we get to category three, which is down here

14 in the corner, which shows what happens when you deal with

15 4,000 P.D. claims, and all it says is estimation.  But as

16 explicated by Mr. Bernick, we're talking about a form of

17 aggregate estimation, and he says, oh, that's the same thing as

18 individual claim estimation, it's just streamlined.  Well, to

19 describe -- that description as facile hardly begins to do

20 justice to it, particularly in the context of what we're here

21 on today, which is this questionnaire.

22        First, of course, instead of 4,000 claims, which Mr.

23 Bernick believes will be winnowed down to a couple of hundred

24 through his objection process in the P.D. format, we have a

25 118,000 claims on the personal injury side.  Secondly, instead

1 of a series of claims objections, where those claims'

2 individual merits would be ruled on by the Court through the

3 P-1 objection process, we don't have any of that here.

4 Similarly, allegedly, at least, we don't have any P-2 process

5 for estimating the individual claims.  And indeed, slide one

6 specifically says that Grace is -- what Grace is not seeking to

7 do with P.I. claims is not asking for -- not disallowing

8 claims, and while they profess to say that they're estimating

9 claims, with all due respect, estimating a claim at zero, as

10 opposed to estimating it at some fraction of a disputed value

11 between the claimant and the debtor is the functional

12 equivalent of disallowing it, because 502(c) specifically talks

13 about the estimation being the allowance of the claim.  So, if

14 you estimate it at zero, that's what you get for that claim.

15 And you're out here identifying, through a questionnaire,

16 individual claims, named plaintiffs, asserted claim, valuing it

17 at zero and asserting your authority for doing that in Section

18 502(c), that by hypothesis, by the rules, that claimant is

19 entitled to be in Court, litigate with you, and if you litigate

20 his claim at zero you've functionally disallowed it.  But

21 again, supposedly Grace is not going to do that here.  They're

22 going to estimate them in the aggregate.  And they're going to

23 streamline them.  Okay.  How do they propose to streamline

24 them?  Well, they propose to streamline them by sending out a

25 questionnaire and then having experts.  Beyond that, they don't

1  tell us how their experts are going to get from 118,000

2  questionnaires to their estimation other than to say, in the

3  instructions to their questionnaires and in some of the

4  argument that we've heard here today, that they expect the

5  Court to make rulings that effectively say to people if you

6  don't -- if your questionnaire demonstrates that your claims

7  don't satisfy certain criteria that we, the debtor, propose, we

8  will get the Bankruptcy Court, you, Judge Fitzgerald, to

9  estimate that claim at zero, and we will -- presumably, since

10 we don't propose to do -- have the Judge make 118,000

11 individual claim determinations, their experts, in some

12 undisclosed fashion, are going to be able to group all of these

13 claims and have you rule on, you know, grounds of 500, or

14 1,000, or 10,000, or whatever, at a pop.  And a lot of that we

15 heard about, you know, what Mr. Bernick's asserted results of

16 his audits in Grace demonstrate, and Mr. Bernick's analysis of

17 his audits in B&W demonstrate, which is all very nice, except

18 that nobody ever had the opportunity to test any of that.  No

19 Judge ever passed on any of that.  And that's just Mr. Bernick

20 telling the Court, to use the Court's comment about credibility

21 earlier, trust me, I've got a bunch of people.  I reviewed all

22 this stuff.  This is my conclusions.  And you should take my

23 word for it and enter decisions in this case based on what I'm

24 telling you my analysis was in those cases, which I think is,

25 among other things, grossly inappropriate.

1          I want to divert a little minute here to Judge Jack's

2  opinion, because both in their papers and in their argument the

3  debtors have made a great deal of that.  I want to start out by

4  saying that I certainly have no brief as to defending or

5  disputing Judge Jack's results in that case as it related to

6  the silica claims and the -- and her analysis of the defects in

7  those claims.  I don't know whether the record was or wasn't

8  complete.  I don't know anything about it.  But I'm not here to

9  argue with what she did, and indeed, much of what she said I

10 would agree with.  But there's certain key differences about

11 what happened in that case and where we are here that it's very

12 important for this Court to focus on in connection with this

13 questionnaire.

14         Judge Jack was assigned by the Federal Panel on

15 Multi-District Litigation to pre-try -- pre-try 10,000

16 individual lawsuits.  There was an initial objection to her

17 subject matter jurisdiction from the plaintiffs because most of

18 those cases had been removed from State Courts, and transferred

19 to Federal Courts, and then transferred to Judge Jack's Court.

20 Judge Jack decided to pass on the subject matter jurisdiction

21 pending discovery, which she thought might bear on the subject

22 matter jurisdiction issue, and also the basic pre-trial of the

23 case.  So, what you had, then, was approximately two years of

24 case specific, plaintiff specific discovery in a pre-trial

25 context of a bunch of cases which if she had ultimately had

1 subject matter jurisdiction she would have taken up to the edge

2 of trial and then sent back to the transfer of Courts for trial

3 under the applicable multi-district procedures.  In the course

4 of that pre-trial, as her opinion makes clear, Judge Jack sent

5 -- allowed discovery from the defendants to the plaintiffs

6 consisting of certain fact sheets, which are not in the record,

7 but which the -- are not in this record, at least, but which

8 the debtor analogizes to the questionnaire they are proposing.

9 And among other things, in those fact sheets required the

10 plaintiffs to identify their testifying experts, who they were

11 going to put on at trial to demonstrate that they met the

12 applicable burden of proof with respect to the demonstration

13 that they had a silica-related disease.  And it was in the

14 context of evaluating those -- let me back up one second.

15       The plaintiffs, in answer to that, sent in

16 documentation that identified the doctors in question as their

17 experts.  There's a footnote which indicates there was a

18 certain amount of waffling on the plaintiff's part about

19 exactly what kind of experts they were, but Judge Jack

20 ultimately decided that they were testifying experts.  Why does

21 that matter?  It matters because what Daubert does is it says

22 that a defendant can exclude, under the Rules of Evidence and

23 the principles of Daubert, proposed expert testimony at the

24 trial of a case, if it doesn't satisfy the recognized

25 principles of the discipline in which the testimony is being

1  offered.  And it was under those circumstances that Judge Jack

2  said wait a minute.  To have a diagnosis in a trial of a

3  disease you've got to have occupational history from the doctor

4  who is going to testify.  She made the further point, which is

5  correct, that B reader reports are not, by themselves, a

6  diagnoses.  The literature is quite clear that all a B reader

7  report is a report from somebody who has read a chest x-ray

8  that has the purported expertise to be able to interpret that

9  x-ray, which in many instances involves B readers because they

10 are certified by NIOSH as having a particular level of

11 expertise, but the much quoted American Thoracic Society

12 guidelines, for example, that Mr. Bernick refers to don't even

13 require that you have a B reader involved in a diagnosis.  All

14 it requires is that somebody who is competent, who could be a

15 doctor who had sufficient training and experience in reading

16 chest x-rays can read the x-ray report.  And whether or not the

17 fact that the doctor wasn't a B reader would go, in part, I

18 guess, to the credibility of the doctor's evaluation, which the

19 trier of fact would have to determine.  But it's not a

20 requirement, per se, to have a B reader, A, and B, a B read by

21 itself isn't a diagnosis.

22        Now, what the silica people attempted to do, in

23 effect, was to say either the B read was a diagnosis, or that

24 the B reader had, in fact, made a diagnosis without ever

25 interviewing the plaintiff, which she expressed extreme

1 disagreement with.

2        Now, let's talk about, before we get into particulars

3 of all of the issues in the questionnaire, let's talk about

4 where we -- what Mr. Bernick wants to do here.  We've got

5 118,000 people that filed lawsuits that -- that named Grace up

6 to four-plus years ago, these are the pre-petition cases that

7 were filed.  Since that time, all activity in those cases as

8 relates to Grace has been stayed by operation of the automatic

9 stay.  So, we have no idea what the status of any of those

10 cases is today.  Some of them may have gone to trial.  Many of

11 them may have been settled.  Some of them might have been

12 voluntarily dismissed.  We don't know.  But we're going to send

13 a questionnaire out to those people, and the questionnaire on

14 its face in the medical procedure section asks them, you know,

15 whether they were diagnosed, when they were diagnosed, who

16 diagnosed them, and a lot questions about relationships between

17 the diagnosing doctor and lawyers, and what have you, and

18 similar questions about B readers, and similar questions about

19 anybody that may or may not have had a pulmonary function test,

20 and similar questions about anybody that may have had

21 pathology.  But absent from all of this -- well -- again, let

22 me back up a second.  Presumably, somehow or another, Mr.

23 Bernick and his client, and his firm, and the experts are going

24 to take these answers to these questionnaires, 118,000 of them,

25 and they're going to go through and they're going to say these

1  people don't have any claims that are valid because of various

2  defects.  Some of -- they were from Dr. Harron.  Or they were

3  from some other bad doctor.  Or whatever.  But -- and they're

4  going to say the Court should do that under <u>Daubert</u>.  But until

5  and unless those plaintiffs have identified any of those people

6  as their testifying expert in a trial of their individual

7  claim, this Court doesn't have any authority to apply <u>Daubert</u>

8  because <u>Daubert</u> only addresses the qualifications of an expert

9  that testified at the trial of the merits of a case.  There's

10 nothing in -- Judge Jack, among other things, didn't even

11 decide, with respect to the claims that she castigated the

12 plaintiff's lawyers and their doctors for having presented, she

13 didn't even rule the claims were invalid.  She reserved for

14 another day the question of whether or not those plaintiffs,

15 for example, might decide to go out and say, gee, she's

16 disqualified Dr. Harron here, and Dr. Ballard, and she said a

17 lot of bad things about how these screening operations were

18 done, so, Judge, we'd like to go back, get my personal

19 physician to take my medical history, get some B reader that,

20 like Dr. Friedman, or Dr. Sigara, who Judge Jack seemed to

21 think highly of, have them do a B read, and resubmit the claim.

22 Maybe Judge Jack will permit that.  Maybe she'll prohibit it on

23 the ground, as she mentioned, a time for filing expert reports

24 had passed.  That's -- but that would be a matter of trial

25 procedure.  It's not a matter of the merits.  But in fact, what

1 Mr. Bernick's proposal suggests is that in light of what Judge

2 Jack said about all these doctors, and the screening operations

3 that generated the claims, and the absence of personal

4 diagnoses, etcetera, that all the existing plaintiffs and their

5 lawyers, if put to their proof, as Mr. Bernick claims he has an

6 absolute statutory right to do in this case under the

7 Bankruptcy Code, if put to the proof of their claims in this

8 case on a one-by-one basis, they would nevertheless tender Dr.

9 Harron and a B read with no diagnosis from any doctor, and in

10 circumstances where they would be able to prove, on a claim-by-

11 claim basis that those claims suffered from the exact same

12 deficiencies as the claims that were attacked successfully in

13 the silica case.  Now, I don't know, maybe the plaintiff's bar

14 is as stupid as Mr. Bernick thinks it is.  But I don't know how

15 this Court could possibly assume that whoever might have been

16 the initial B reader that the plaintiff used in him and his

17 lawyer deciding that they had enough information to file a

18 lawsuit, not to go to trial in the lawsuit, but simply to file

19 a lawsuit in a State Court, he wants to, in effect, lock that

20 information in as though it was trial ready.  And the plaintiff

21 is going to have to live with whatever bad choices his lawyer

22 and he may have made five years ago in determining whether or

23 not there was enough evidence of a disease to go ahead and file

24 the lawsuit.  I suggest to you that that is grossly

25 inappropriate.  I mean, if you're going to apply <u>Daubert</u>

1  standards to people, they should have the opportunity to

2  prepare their case for trial and have the Court rule on the

3  admissibility of their proposed experts at a time when the case

4  is ready for trial.  This isn't some process under which the

5  Court is somehow or another making rulings which Judge Jack

6  didn't even make as to what is the minimum amount of diagnostic

7  quality that's required for somebody to file a complaint in the

8  State Court in Mississippi, for example, where presumably there

9  may very well be a very large number of the Grace cases that

10  might have been filed in Mississippi because it's been

11  identified as a jurisdiction where there is a lot of claims.

12  In other words, this isn't a Rule 11 exercise to determine

13  whether or not the plaintiffs in the cases filed against Grace

14  had enough basis for filing their case at the time they filed

15  it, which is really the only type of information that Mr.

16  Bernick's questionnaire would elicit.  Who was the guy that

17  diagnosed you at the time you filed your case, unless the case

18  has some or another gone to trial, and unless they expand --

19  they have asked, in the questionnaire, for every diagnosis you

20  ever got, every pulmonary function test you ever had, every B

21  read that you ever got, and every pathology test you ever got.

22  So, for the cases that went to trial, however few of those

23  there may have been, and the Court is well aware that

24  relatively few asbestos cases actually ever get to trial.

25  They're mostly settled or dismissed voluntarily, or -- some few

1    cases you might very well get the plaintiff's testifying

2    expert.  And I would suspect, since Judge Jack's view of what

3    is required to have a diagnosis for purposes of a <u>Daubert</u>

4    hearing at a trial is not something uniquely created by Judge

5    Jack out of whole cloth for the silica litigation, and if you

6    actually looked at the cases that went to trial you would find

7    vanishingly few of them, if any, where the plaintiff only had a

8    Ray Harron B read and a notation at the bottom, a la Mr.

9    Bernick's exhibit that he showed you on the screen that said

10   that the B read was, quote, consistent with asbestosis.  I

11   don't think anybody has ever contended that that level of

12   information would get you to a jury in a trial at the end of

13   the day.  It might get you past, indeed, the -- from the

14   absence of any cited authority by Mr. Bernick on the subject.

15   One can assume that it would get you past a motion for summary

16   judgment as to whether or not there were material facts in

17   dispute, because generally speaking motions for summary

18   judgment are made prior to the time that you designate experts

19   and put your whole trial case ready to go.  So, at the end of

20   the -- no matter how bad -- what went on in Judge Jack's Court

21   was, both from the perspective of the medicine and the

22   lawyering, it doesn't really tell you anything about how this

23   questionnaire is going to help this Court estimate a bunch of

24   claims at zero by using <u>Daubert</u>, because, again, these are not

25   -- you're not generating testifying experts on an individual

1  claim-by claim basis.

2       I don't know if the Court wants me to go through the

3  questionnaire line by line, but I think, as an overview, it's

4  absolutely crystal clear that the vast majority of the

5  questions in that questionnaire involve the eliciting of facts

6  which are relevant only to the individual claimants' claims.

7  So, at the end of the day, putting aside all of the other

8  issues that the claim form presents, what you've got is an

9  extremely burdensome, extremely long, and the debtor's

10 protestations about having reduced the burden of the claim form

11 by the pages, a lot of it had to do with consisting of things

12 like converting boxes to lines, to filling out answers, and to

13 saying in four different sections of medical, and in several

14 different sections of exposure, if you have more than one

15 report, copy the page and fill it out for each report you got.

16 If you had more than one job, and more than one job side, copy

17 the page and fill that out.  So, what purports to be an eight-

18 page form for any of these workers, many of whom had multiple

19 jobs in multiple job sites over the years, the actual form,

20 when filled out with all of these xeroxed pages filled out,

21 could very well run to 50 or 100 pages.

22       THE COURT:  If they had that many jobs they're

23 probably too old, and gone by now.

24       MR. LOCKWOOD:  Well, Your Honor, a lot of these --

25 people like insulators and construction workers, I mean, Mr.

1  Bernick spent a lot of time trying to tell the Court that the

2  only kind of people with a legitimate claim against Grace are

3  construction workers.  I'm sure the Court is familiar with the

4  notion that construction workers work on a lot different jobs.

5  And you could have been exposed to Grace products in dozens if

6  not hundreds of different job sites.

7              THE COURT:  Well, I guess --

8              MR. LOCKWOOD:  And as for -- and moreover, they want

9  information about your exposure to every other defendant's

10  asbestos products, so either the job sites that you worked on

11  where you didn't have exposure to a Grace product, you had to

12  fill them out for exposure for Johns Manville products, or

13  whatever.  So, essentially, your looking at a filling out of a

14  form that would have just a phenomenal number of pages,

15  assuming -- assuming that the plaintiff had the ability to

16  remember or otherwise produce that information.  And as we

17  pointed out in our brief, this exposure stuff is what Mr.

18  Bernick and the plaintiff's bar, and the rest of us refer to by

19  the shorthand a product I.D.  And how -- how does the plaintiff

20  prove 20 or 30 years later where he was exposed to somebody's

21  product, and what the quantum of exposure was?  And this also

22  goes to this issue about, oh, well, dose.  They claim dose

23  doesn't matter.  Dose, of course, matters.

1          Well, first, the plaintiff is a worker.  He's not

2 going to carry around -- he doesn't have a eidetic memory that

3 enables him to remember every sack of construction material and

4 the label that was on it, and or, if there weren't any labels

5 floating around, he didn't have access to the invoices from the

6 contractor to show -- that would show, in discovery, where the

7 -- whose product it was and how it was purchased.  In the real

8 world, as we point out in our papers, product I.D. is proven

9 through a variety of mechanisms, only one of which is the

10 recollection of the plaintiff.  Many of them involve co-worker

11 testimony.  They involve invoices.  They involve records of the

12 defendant itself as to where it shipped things.  They involved

13 customers.  And they required the trier of fact to draw

14 inferences about circumstantial evidence where there isn't

15 direct evidence.  Mr. Bernick's questionnaire and his arguments

16 all sort of proceed on the assumption that, oh, product I.D.,

17 everybody knows all about that.  The minute the plaintiff

18 lawsuit is filed he's worked up the case.  He's got all the

19 stuff, so it will be a piece of cake for him to put in, quote,

20 all documents that relate to his case.  And, moreover, the

21 questionnaire goes on to say that if you don't have all the

22 documents you've got an obligation under a penalty of perjury

23 clause that says I've found everything that's material to the

24 claim to go out and look for the documents so that you can

25 attach them to his questionnaire.

1          And again, to what end?  At the end of the day, each
2    plaintiff will have a questionnaire that will have anywhere
3    from, you know, the eight pages simpliciter, to 50 or 100
4    pages, depending on how many of these forms they have to xerox
5    to put the information in, and it will describe what?  Only the
6    particulars of his or her individual claim.  And what are we
7    going to do with that at that point?  Not only is the case not
8    trial ready, so you're going to get a lot of claims that says I
9    don't know, or I don't remember, etcetera, but how do you get
10   from the questionnaire to whether or not Grace is a, quote,
11   real liability, closed quote, to that claimant.  Your Honor
12   said, in discussing with Mr. Bernick and Mr. Baena earlier,
13   that you agreed that making categorical rulings about claim
14   validity such as whether constructive notice was barred --
15   claims under statute of limitations sort of across the board on
16   some global basis because everybody should have known per Mr.
17   Bernick in 1984 that they should have started looking for
18   asbestos in their buildings, that the categorical rulings of
19   that sort would require -- would be an allowance issue for the
20   individual claimants, and they'd have to have the right to come
21   in and respond to that.  Well, if you're making categorical
22   rulings, for example, if you're being asked to, which I might
23   add Mr. Bernick has cited no legal authority in support of.  I
24   mean, we've heard a lot of charts being flipped over about PFT
25   standards, and American Thoracic standards, and ILO standards.

1  He hasn't cited any cases from any of the State Courts that

2  tell you that, at the discovery stage in the case you have to

3  have various types of results.  He has cited four states that

4  have changed their laws, and presumably experts could, without

5  going through individual claims, using Grace's claims history,

6  make some kind of identification of the percentage of cases

7  that historically came from those states, and extrapolate the

8  extent to which that would continue, or whether the plaintiffs,

9  as they have done demonstrably, and as Mr. Bernick has pointed

10  out in other presentations to the Court, when the law in the

11  state gets bad, the claims migrate from that state and start

12  showing up in other states under the state's venue provisions

13  that permit that, to avoid the bad states.  Why -- take

14  Mississippi, for example.  Why are all these cases coming from

15  Mississippi in the first place?  Now they are going to get

16  knocked out because out of state plaintiffs will no longer be

17  able to bring suits in Mississippi in car load lots by the

18  device of adding one Mississippi plaintiff to the group.  But

19  why were they brought there in the first place?  Well, they

20  were brought there in the first place presumably, I don't know,

21  Mr. Bernick doesn't know, but I -- I think that it's a fair

22  presumption they were brought there for at least two reasons.

23  One, there were -- the claims were from jurisdictions that had

24  problems for the type of claim.  I mean, Pennsylvania, for

25  example, you can't recover for an unimpaired pleural case, so

165

1  maybe a bunch of Pennsylvania claims found their way to

2  Mississippi to get around that.  Another one is Mississippi is

3  notorious for having very good verdicts in cases that went to

4  trial.  I mean, Mr. Bernick has cited, and others have cited

5  that there were cases a couple years ago, some unimpaired cases

6  went to trial in Mississippi got $50 million.  So, that would

7  be another case.  Well, if Mississippi cuts off all those

8  cases, does that mean that the cases which, after all,

9  originated outside of Mississippi in the first place, just

10 vanish?  Or does it mean they're going to get brought somewhere

11 else?  And if they're brought somewhere else does -- are they

12 going to be brought in states where they don't stay the cause

13 of action by some incompetent plaintiff's lawyer?  Are they

14 going to be brought somewhere else where, you know, maybe they

15 might have to work a little harder.  Maybe they might get a

16 little let favorable jury, might get less money.  Whatever.

17         THE COURT:  You're making a great argument for a bar

18 date.

19         MR. LOCKWOOD:  Your Honor, if you want to have

20 118,000 claims and have a contested 118,000 individual

21 contested matters, you can do it, but I would come back to the

22 notion where we started in all of this case, which is

23 estimation.  Why -- if this isn't a 502(c) estimation, and I

24 agree with Mr. Baena, frankly, that technically I don't think

25 this is, because we're not estimating the claims here for

166

1    allowance.  If you read 502(c), it says, "We are estimating

2    claims for purposes of allowance."  Most of this estimation --

3    80 percent of it -- is going to involve future claims.  We're

4    certainly not allowing the future claims, and the fact is that

5    even with respect to the present claims where you could have

6    some notional idea that you're talking about allowance, the

7    fact is all of those claims are going to get sent to a trust

8    unsupervised by the Bankruptcy Court, and the Trust is going to

9    resolve them not allow them.  An allowance is something that

10   happens under the supervision of a bankruptcy judge pursuant to

11   provisions in the bankruptcy rules and the Code.  What the

12   Trust is going to do with them isn't going to have a judge and

13   bankruptcy rules and the Bankruptcy Code.  It's going to have a

14   TDP, a trust distribution process.

15           THE COURT:  Well, of course, but the issue still is

16   what is the predicted I suppose estimate of what those claims

17   will be, at what disease levels, so that whatever plan is

18   proposed make sure that it is appropriately funded.  I mean you

19   can put it in terms of feasibility if you want, but it's still

20   a confirmation standard --

21           MR. LOCKWOOD:  I agree.

22           THE COURT:  -- and we still have to go through the

23   process if you folks can't agree.

24           MR. LOCKWOOD:  I agree.  The question is whether you

25   do that by simply, as Mr. Bernick derisively described, through

1  the use of experts without getting into a lot of the individual

2  claimant discovery.  Mr. Bernick has stated --

3         THE COURT:  Well, I think there are lots of ways you

4  can do it.  I mean the settlement mystery model, everybody has

5  -- not everybody.  Some cases have used the settlement mystery

6  model.  It's readily accessible data within the debtor's

7  organization, so it's out there.  But does it really predict

8  what future claims will be filed and how they will be allowed

9  and at what levels?  I don't know.  I mean it's an evidentiary

10 matter in every instance.  Isn't it?

11        MR. LOCKWOOD:  Well, again, we start out with one of

12 the reasons that we're here in the first place on an aggregate

13 estimation whether or not 502(c) is directly applicable is the

14 proposition that everybody agrees -- unless Mr. Bernick wants

15 to try and make good on his threat that he's actually going to

16 try and go back and ask for a bar date and go through them one

17 by one -- that trying to go through allowance of 118,000 claims

18 would unduly delay the administration of this case, because you

19 have to give 118,000 notices, and you have to have 118,000

20 contested matters, and --

21        THE COURT:  I'm retiring in ten years.

22        MR. LOCKWOOD:  Yes, well, I think I could safely

23 predict at the time of your retirement in ten years you'll

24 still have a pretty good docket of cases, particularly --

25        THE COURT:  Employment for bankruptcy judges.

1           MR. LOCKWOOD:  Judge, in fact, you should be able to

2    send a lot of them to the District Court, because under 157

3    they're entitled to a jury trial.

4           THE COURT:  Happiness.

5           MR. FRANKEL:  Peter, we won't have the benefit of

6    your counsel by then.  Will we?

7           MR. LOCKWOOD:  Well, I don't know.  It's an

8    interesting question.  I'm getting a little long in the tooth.

9           THE COURT:  But the purpose is not to figure out

10   whether the current claims are allowable or not.  The purpose

11   is to figure out within whatever model you want to use or is

12   determined to be used, that is a good predictive analysis to

13   figure out how the claims are likely to be resolved through the

14   trust when they're filed in the future.

15          MR. LOCKWOOD:  I agree.

16          THE COURT:  Okay.

17          MR. LOCKWOOD:  And but lets think about that for a

18   moment.  Mr. Bernick's presented all kinds of statistics that

19   he says this Court should accept for purposes of this

20   questionnaire and CMO debate.  I mean indeed he put in a whole

21   lot of argument about the estimation.  I mean he says 90

22   percent of the cases are now non-malignancy cases.  If that's

23   true, and it probably is true, you can look at the Manville

24   database.  You can look at the Grace settlement history.  There

25   is no reason to believe that all of a sudden the case mix in

1   terms of diseases is going to change a lot, so why do you need

2   a bunch of questionnaires to prove that's something Mr. Bernick

3   already knows.  That 90 percent of the cases are non-malignancy

4   cases.

5           With respect to the issue of individual PFT results

6   and individual B reader results and that kind of stuff, Judge

7   Fullam managed -- I want to say something, by the way, about

8   Judge Fullam and what Mr. Bernick said about him.  He mis-

9   described what Judge Fullam did.  The Creditors Committee in

10  Owens-Corning asked for a bar date, and they wanted to get

11  information about every individual claimant for precisely the

12  same reasons Mr. Bernick was.  They were in there arguing about

13  bad B readers.  And, by the way, Dr. Harron and Dr. Ballard and

14  some of the doctors identified in Judge Jack's opinion, they

15  were in the Manville audit that he talked about.  That's ten

16  years ago.  Grace it -- he said -- he admitted in his pleadings

17  Grace has precisely settled cases with B reads from Dr. Harron.

18  The fact that -- I don't -- we haven't yet had the opportunity

19  to take depositions from the Grace lawyers, but I expect that

20  we'll hear the same kind of thing we've heard from Owens-

21  Corning's defense counsel, Federal Mogul's defense counsel,

22  which -- and, for that matter, in Babcock and Wilcox from the

23  Worldwide Services Claims Handling Facility for Babcock that,

24  hey, we knew about these questionable documents, and we knew

25  about screenings.  I mean screenings -- people have been

1 complaining about screenings for years.  The original <u>Stemple</u>

2 case he cites, and the tire workers case from 1990, that

3 involved mobile vans running around screening tire workers.

4          The fact that the plaintiffs' bar has been ginning up

5 cases by going out aggressively and finding people that they

6 claim are injured is not something that has just come to light,

7 no matter what Mr. Bernick wants to say about it.  It's been

8 known for years, and the testimony generally is, look, when we

9 get these crappy cases, a big inventory, we conclude it's

10 easier to settle a bunch of them for $200 a pop than it is to

11 litigate all of them where, well, we might get rid of 90

12 percent or however many percent of them.  We're going to lose a

13 number of them, whatever percentage it is, and when we lose, we

14 lose big, and it's going to at the end of the day cost us a lot

15 more money.  What Bernick --

16          THE COURT:  But how is that relevant to what's going

17 to happen in the future?  You know, the concept that somebody

18 is going to take a case in Mississippi because the juries are

19 apparently more sympathetic, whether or not there is really

20 liability of this specific defendant, you know, it's -- I guess

21 -- or Missouri, whatever -- Mississippi, Missouri.  Well, I

22 guess under that law they have the opportunity to do it, but in

23 the bankruptcy context what they may have is a contingent,

24 disputed, unliquidated claim that needs to be litigated

25 somewhere.  And, yes, you can take a look the state law with

1  respect to whether or not they have a claim, but it still has

2  to be liquidated.  Now, it's going to be liquidated under the

3  bankruptcy processes or trust processes, however, that's going

4  to work out.  Hopefully, people who are not impaired are not

5  getting paid large dollars to come into the Trust and trial

6  claims.  And, you know, 118,000 --

7        MR. LOCKWOOD:  Well, that's true.  I mean that's why

8  settlement values are used.  We could in every one of these

9  cases, Your Honor, say, look, settlement value -- we could say

10 we adopt your crazy rule 408 position, and that settlements

11 aren't admissible, and so what have we got to do look?  Well,

12 jury verdicts.  Well, what's the -- well, there's only about,

13 you know, 20 or 80 or 100 or whatever of them, and they're all

14 over the lot, but if you average them out, sure, Grace will

15 have won 50 or 60 or 70 percent of the cases.  I don't know, a

16 good -- much more than the voluntary dismissals in the

17 settlement process.  But the average price for both the cases

18 that they win and they lose that arises from the verdicts they

19 got and the ones that they lost is way higher and --

20        THE COURT:  But, look, all you're arguing for, from

21 what I can see, is this.  If the debtor wants to produce its

22 evidence based on one model, and you want to produce your

23 evidence based on another, do it.  I'll figure out which model

24 has better credibility and makes more sense and doing

25 adjudication.  I mean that's what my job is.  Yours is to

1  produce the evidence, the way you think it should come in, and

2  my job is to make rulings based on the evidence you produce,

3  and that's how we'll go.

4           MR. LOCKWOOD:  We accept that, Your Honor --

5           THE COURT:  Okay.

6           MR. LOCKWOOD:  -- but this all goes back to the

7  questionnaire, and what information they're entitled to seek

8  and why they're entitled to seek it.  They are asking for an

9  incredibly burdensome questionnaire that can by definition --

10 the vast bulk of the information contained in it relates to the

11 individual claim.  If what we're doing here is an aggregate

12 estimation, and we're not, as they profess, disallowing claims,

13 and we're not asking for approval of a proof of claim -- I'll

14 tell you their questionnaire is a heck of a lot more detailed

15 than the Manville proof of claim form.  I mean Manville didn't

16 ask about who else's products you were exposed to or -- I mean

17 it doesn't ask for any of this kind of stuff.

18          THE COURT:  Well, we haven't gotten into that detail

19 yet.  I'm not sure that some of that stuff is really relevant.

20 You know, it may be in that if a specific individual plaintiff

21 knows that he or she was exposed to, for example, a Manville

22 product and knows that for a fact for whatever reason, doesn't

23 know whether they were really exposed to a Grace product, but

24 has a reason to surmise that they were, yes, I think it's

25 relevant to say yes, I was exposed to a Manville product.  I

1  mean the debtor -- that may give the debtor some other

2  discovery.  It may give the other -- the plaintiffs other

3  discovery.

4        MR. LOCKWOOD:  Actually, the debtor hasn't explained

5  why that -- what that discovery would lead to.  I mean part of

6  the problem is that when you read through their July 13th

7  filing, and they discuss the rationale for various of their

8  requests in the questionnaire that we've objected to, they say

9  the Court doesn't need to address why we need this information.

10 Just take it on faith that we want it, and we'll use it, and

11 the Court will -- and everybody else will find out some time

12 down the road whether it's helpful.

13       THE COURT:  No, it has to be calculated to lead to

14 relevant and admissible evidence.  That's the standard, you

15 know, and if it's not calculated to do that, it's not going to

16 be discoverable.  So, you know --

17       MR. LOCKWOOD:  We agree with that.  The problem,

18 which Mr. Bernick has conflated in much of his argument when he

19 talks about us saying they're not entitled to Daubert hearings,

20 and they're not entitled to discovery, is what kind of --

21 what's relevant in the proceeding depends on what are the

22 issues being litigated in the proceeding.

23       THE COURT:  He's just being --

24       MR. LOCKWOOD:  We would concede if they're litigating

25 individual claims allowance.  That a lot more of the

174

information that they're asking for in the questionnaire would

be relevant.  But if what they're litigating is what they're

aggregate present and future liability and the future liability

is likely to consist of, you know --

THE COURT:  But at this --

MR. LOCKWOOD:  -- 75 or 80 percent of the total,

getting detailed specific plaintiff-only information from the

plaintiffs --

THE COURT:  But it may be relevant.  It may, and I'm

-- I'll give you one scenario at the moment.  Let's say that in

a particular -- at a particular job site -- that is a large job

site, just for hypothesis purposes.  Obviously, this has

nothing to do with any specific case.  Let's assume that there

are 5,000 workers from a particular job site who file claims

against Grace, and somehow all 5,000 of those people know that

they were exposed at a particular time in a particular place to

a Manville product, but none of them know that they were

exposed at a particular time or a particular time or a

particular place to a Grace product, I mean I think you can

extrapolate from that that there will be a percentage of people

in the future who will file claims that will not identify a

Grace product but will identify somebody else's product, and

that may be relevant evidence as to whether those future claims

will, in fact, be allowed by a trust, which then tells you that

there are numbers of claims that will come in that will be

**J&J COURT TRANSCRIBERS, INC.**

1  disallowed -- again, in my, you know, perfect analysis, and,

2  therefore, the Trust funding doesn't have to include those

3  claims.  That's the whole purpose.  It's just to get to a

4  bottom line.

5        MR. BERNICK:  If I can raise just a point of process,

6  we're now past the amount of time that I took, and I know that

7  Mr. Lockwood was very cautious and said that he wouldn't take

8  anymore time.  He couldn't say that he wouldn't take more time

9  than I do.  I know that Mr. Frankel is also anxious to address

10 the Court.  I know that folks are interested in talking about

11 exclusivity, and if we run into your 4:00 call --

12        THE COURT:  It's five I believe.

13        MR. BERNICK:  Okay.  In any event, I really think

14 that it would be good to know what it is that Your Honor really

15 intends to cover today and maybe hear from other people,

16 because all this is is just a rehash of what's in the briefs.

17        THE COURT:  Yes.  Look, my --

18        MR. LOCKWOOD:  Your Honor, I --

19        THE COURT:  My bottom line position is I think a

20 questionnaire, to the extent that the debtor or the other

21 parties want to do discovery is fine.  I've said that before.

22 You could do it by interrogatories.  You can do it by

23 questionnaires.  There is really not much difference.  Exactly

24 what use this information will be to extrapolating the evidence

25 to predict the numbers of future claims and at what disease

1 levels and what the compensation will be, right now I'm not --

2 I simply don't know enough about what that process will

3 generate to know, but I'm not the expert witness who's going to

4 have to look at that information and make that extrapolation.

5 So it seems to me if that's the information the experts say

6 they want and need in order to do whatever predictive analysis

7 they're going to do so that they can testify and I can try to

8 give you some rulings as to what those parameters will be, then

9 we should do it.  I think these questionnaires go a little far.

10 I think it at some point we should sit down and do just what

11 you said, go through them line by line and figure out what's

12 appropriate and what isn't.  You're not that far apart with

13 some of the basic information.  To the extent -- I understand

14 you don't agree with the questionnaire, but to the extent that

15 there has been a draft of a questionnaire, some of it's not

16 that far apart.  It's just that the debtor's goes significantly

17 further than the Committee's.

18          MR. BERNICK:  Your Honor, if I can address that just

19 for a moment, so we can start to focus this thing, as I

20 predicted, this is all about a negotiation that ultimately

21 converges on the content of the questionnaire.  They're saying

22 it's not relevant, and it's not relevant.  It's not relevant,

23 and that then leads to and it's too burdensome, so we've got to

24 cut back on it, and we're really now into an area where --

25          THE COURT:  Well, but what they'll say, Mr. Bernick,

1  in answer to the question is I object, it's not relevant, and

2  it's burdensome, and then I'm going to be right here making

3  rulings on it anyway, so why don't we just do it and get it

4  done?

5       MR. BERNICK:  But that's exactly what it is that

6  we've been trying to do.  We have sat down for months on this

7  thing.  We've cut back for a very significant period of time,

8  and I would just -- what I would be prepared to do is to have

9  Your Honor actually go through the questionnaire, assume that

10  they object to everything on the basis of relevance and burden

11  -- assume that for a fact.  They will -- they've already done

12  that.  They've already said that, but Your Honor has

13  articulated the standard which is the discovery standard.  If

14  we had one of those claimants here as an individual claimant in

15  an individual case, and we were to sit down and put that

16  questionnaire in front of them and say we want to know all of

17  the B reads, all of the doctors who did the B reads, all the

18  PFTs, all the doctors who did the PFTs, and we want to know

19  your entire exposure history -- we ordinarily do that by way of

20  a deposition, I can assure you every single one of those

21  questions would be asked.  If you asked what -- you know, 50

22  lawyers sitting around a table wasting time.  There is nothing

23  that is in that questionnaire that is not absolutely

24  mainstream, solid core discovery.  It's apparent on the face of

25  the questionnaire.

1          MR. LOCKWOOD:  On an individual --

2          MR. BERNICK:  No, excuse me.

3          MR. LOCKWOOD:  Look, you interrupted me to begin

4  with, Mr. Bernick.

5          THE COURT:  Pardon me.  Gentlemen.  Gentlemen, I'm

6  sorry.

7          MR. LOCKWOOD:  Your Honor, I have --

8          THE COURT:  Please speak to me not to each other.

9          MR. LOCKWOOD:  Your Honor, please, I had the floor.

10 Mr. Bernick is now launched into a rebuttal in the middle of my

11 argument.

12         THE COURT:  I'll hear you, Mr. Bernick, after I hear

13 Mr. Rockwood.  But, Mr. Rockwood, let's sum up.  I understand

14 your position.  We're going to have a questionnaire so --

15         MR. LOCKWOOD:  Okay.  Let me make this observation,

16 Your Honor.  A couple observations.  First, the question --

17 Your Honor made the comment, just before Mr. Bernick

18 interjected, about what the expert wants to do with it.  We've

19 never had any showing from the debtor about what their experts

20 want and why they want individual claim specific data for the

21 purpose of rendering a report about the present and future

22 aggregate liabilities of his client.  We're being asked to take

23 on faith the proposition that Mr. Burnick's client experts

24 undesignated, un-affidavited, un-everything need this

25 information to do this.

1          THE COURT:  Well, if it turns out they didn't, then

2   I'm sure that there will be some issues that you will be

3   raising about credibility at trial.

4          MR. LOCKWOOD:  Your Honor, one of the things that we

5   haven't talked about here today, which is a big problem, is

6   what happens to people that either don't or can't answer the

7   questionnaire completely.  The questionnaire instructions

8   remain -- one part of them says the Court may disallow and bar

9   the claim.  Another instruction says it shall disallow the

10  claim.  I personally am of the view that Mr. Bernick validly

11  hopes that half of the people or two thirds of the people

12  either won't answer the questionnaires or will answer I don't

13  know to a bunch of questions, and he will then come in here and

14  argue that their claim should be valued at zero, because they

15  didn't have --

16         THE COURT:  Well, Mr. Lockwood, that's --

17         MR. LOCKWOOD:   -- the information in their

18  possession.

19         THE COURT:  That's really in the future.  I mean I

20  don't know who -- what people are going to say.  If they --

21  there may be reasons why people don't have any ability to

22  answer the question.  You know, somebody may have Alzheimer's

23  and not even know that they have an asbestos-related disease.

24  Those counsel or those people will surely have someone who will

25  write down we don't know, and this is why we don't know, but

1  here's what we do know.  They'll supply what they know, and

2  they'll explain their reasons for why they don't.  That I can't

3  deal with at this stage.

4       MR. LOCKWOOD:  Well, okay.  Let's go to the next

5  question, which is specifics of the questionnaire itself.  Mr.

6  Bernick has said that we don't agree on anything, and that's

7  true in one sense that we don't agree that there should be a

8  questionnaire.  On the other hand, we have sat down repeatedly

9  with him and pointed out the reasons why particular questions

10  are objectionable, and he has essentially said you're entitled

11  to your opinion, and I'm entitled to mine.

12       The question of how we are going to get to an actual

13  questionnaire -- if the Court has, in fact, determined that,

14  you know, (a) there will be some kind of questionnaire, the

15  question of what kind of questionnaire is still a problem.  We

16  agreed in the CMO to a four-month period, because we were hoped

17  that our constituency, even if confronted with 10,000 clients

18  that had to fill this claim out -- this form out would do the

19  best they could.  But at the end of the day it's the claimant's

20  responsibility to answer the questionnaire and the claimant's

21  lawyer is going to have to deal with that.  I hate to sound

22  like Mr. Baena in this, but certainly, my committee isn't going

23  to go out and answer questionnaires for people.  They don't

24  have the information even if they had the authority, which they

25  don't.  And you're talking about 118,000 people and the

1 potential for a whole lot of disputes and what have you, and at

2 a minimum it seems to me we ought to go through the

3 questionnaire with the Court at some point, so that the Court

4 could have some idea of --

5          THE COURT:  I already said that ten minutes ago.

6          MR. LOCKWOOD:  Okay.  Well, the question is is today

7 the day you -- the Court wants to do that?

8          THE COURT:  I don't know.  I need to hear from

9 everybody else first so --

10          MR. LOCKWOOD:  Okay.  Well, I'll sit down then.

11          THE COURT:  I mean I'd like to get it done, but, you

12 know, at this point whether it's going to be today or not I

13 don't know.  Mr. Frankel.

14          MR. FRANKEL:  Good afternoon, Your Honor.  Roger

15 Frankel for David Ostern.  Your Honor, I actually will be

16 brief.  The issues that are of concern to us are that the

17 estimation trial we assume is an estimation of not just the

18 claims of those that are getting questionnaires, but that we're

19 going to extrapolate from that for the present unsettled

20 claims, for the claims that have been filed or that are

21 asserted after the petition date, and then, of course, the

22 future claims.  And our concern is, is that to the extent that

23 the questionnaire is either too burdensome or imposes unfair

24 penalties and results in a zero claim, for instance, that zero

25 claim may be multiplied by five future zero claims that are

1 unfair, and so we think the process of how the questionnaire is

2 sent out, what the questionnaire contains should be such that

3 it is for an estimation of claims and not for a claims process

4 itself or an objection to claim.

5          We have submitted with our brief on July 13th a

6 proposed questionnaire.  It is, as you might expect, simpler

7 than the one that the debtor proposed.  It is more pages than

8 what the PI folks would want, but we think it's a fair

9 questionnaire, so that experts can then do a study as to what

10 present and future claims are, and we think that's really all

11 that this is about.  There are two suggestions that we have

12 with respect to the sanctions or the incentives for not filling

13 out a questionnaire or for filling out a questionnaire.

14          One of the, frankly, I don't think has ever been used

15 before.  At least folks here haven't heard of it, and that is

16 if you fill out your questionnaire and you return it timely,

17 then you go to the head of the FIFO queue, and while we don't

18 have a confirmation order that could demand that, we certainly

19 could put in the CMO that the parties will use their best

20 efforts to cause that result.  And it just seems like an easy

21 incentive, so that people that throw the questionnaire back

22 know that they're going to get something for that.

23          THE COURT:  Well, that would have to be something

24 that would then be incorporated into the TDPs.  Is that

25 possible?

1           MR. FRANKEL:  Your Honor, I think if this Court

2  orders the parties to use their efforts to do that, it is

3  absolutely possible.

4           THE COURT:  All right.  I don't have any problem with

5  that.

6           MR. FRANKEL:  Because there is a FIFO queue that's

7  going to be established anyway.

8           MR. BERNICK:  What that's basically saying -- what

9  actually turns out to be in most cases a pretty important item

10 for discussion --

11          THE COURT:  Yes.

12          MR. BERNICK:  -- which is the FIFO queue we're now

13 determining is going to be part of a plan kind of

14 unconditionally no matter what else the plan calls for.  Again,

15 we'd be happy to entertain that type of idea, but the idea that

16 somehow we can guarantee that at this point with respect to

17 anybody seems to be a little bit farfetched.  I'm not aware of

18 any rule that enables the Court -- and I say this -- I'd be

19 happy to do it, but I say this not understanding how the Court

20 could have the power to define in advance as a matter of court

21 order without soliciting the approval of all the different

22 claimants that this particular provision is, in fact, going to

23 survive no matter what else the plan says.

24          THE COURT:  Well, I think you can say that the

25 parties will make their best efforts to develop a TDP that will

184

1  put the people who have timely filled this questionnaire out at

2  the front of the FIFO queue, and if there are classifications

3  within which the Trust is going to take a look at claims, that

4  they'll be put at the head of that classification.  For

5  example, if the Trust decides that it's going to deal with

6  mesothelioma claims first because of whatever reason, then the

7  mesotheliomas who fill out this questionnaire will go to the

8  head of that queue.  I think the parties can be ordered to use

9  their best efforts.  I don't know that I can guarantee it, Mr.

10  Frankel, but using best effort seems fine.

11         MR. FRANKEL:  Your Honor, I was not suggesting a

12  guarantee.  I think it's just an incentive that perhaps would

13  help people get over the hurdle.

14         The other side of it is the stick, and there, Your

15  Honor, we think that the most that should occur is that there

16  would be the same kind of sanctions that would occur in a

17  discovery dispute.  In other words, if somebody -- if it turns

18  out, for instance, that we have 90 percent or 80 percent of

19  these questionnaires back, then that seems to me to be enough

20  of a sampling for people to do their future study.  To penalize

21  the other 20 percent makes no sense at all, and I don't

22  understand why -- although Mr. Bernick says there's no bar date

23  -- the questionnaire says if you don't fill your claim out and

24  return it on time, your claim is barred.

25         THE COURT:  Yes, I thought I just heard Mr. Bernick

**J&J COURT TRANSCRIBERS, INC.**

1 saying this wasn't to be an allowance process anyway.

2          MR. BERNICK:  Well, I'd like to address that, and I

3 appreciate --

4          MR. FRANKEL:  Can I finish though?

5          MR. BERNICK:  Yes.  Well, I was going to agree with

6 you, but that's okay.

7          MR. FRANKEL:  I'll note he's agreed with me on that

8 point.  Your Honor, the other comments that I have really deal

9 with the CMO itself, and it's the debtor's CMO, and I just want

10 to be brief on it, but it's important, because these are issues

11 that we talked about at the meet and confer, but it doesn't

12 seem to have made its way into the final CMO that the debtor

13 filed.  Again, there is the forever barred issue with respect

14 to the claims questionnaire.  There is in Section 2B that the

15 questionnaire is served on the official committees.  I assume

16 the FCR was left out inadvertently on that.

17          There is this concept of liaison counsel where they

18 have the PI Committee and the FCR picking one or the other law

19 firm to act as counsel in this, and I thought we had agreed

20 that wasn't going to be the case, but it still is in the CMO,

21 and I think we -- and I think I can speak for Mr. Lockwood --

22 object to speaking on behalf of each other's clients.

23          Your Honor, I do think the time frame that we are

24 looking at is very similar, both with our CMO and the debtor's,

25 and the real issue on the CMO and the time frame I think

1  depends on what questionnaire ultimately is sent out, and I

2  will defer to Mr. Lockwood on how much time the plaintiffs

3  would need once we decide on what questionnaire there is.

4  Thank you, Your Honor.

5          THE COURT:  Okay.  With respect to the service issue,

6  we hadn't really focused on specific portions of either the

7  questionnaire or the CMO, but I agree that the forever barred

8  issue should be taken out of the CMO if it's coming out of the

9  questionnaire.  It should be served on the Future Claims Rep,

10  obviously.

11         With respect to liaison counsel, frankly, I think

12  that to the extent that the current asbestos plaintiffs want to

13  participate on their own, I should impose on Mr. Lockwood the

14  same liaison function I've imposed on Mr. Baena.  I don't see

15  what that does to the Future Rep.  You don't represent current

16  claimants in any context, not a fiduciary capacity whatsoever.

17  So I agree that the Future Claims Rep should be in this

18  proceeding period, and I will talk to Mr. Lockwood about the

19  other -- the liaison issue.

20         MR. FRANKEL:  And, Your Honor, the only thing I was

21  suggesting was the CMO process generally to get to the

22  estimation hearing, we should be a party of that separate and

23  apart.

24         THE COURT:  Oh, yes, surely.

25         MR. FRANKEL:  And with regard to present claimants,

1  we have no role in that.

2          THE COURT:  All right.

3          MR. LOCKWOOD:  Your Honor, with respect to your

4  question about the liaison counsel, the Committee is perfectly

5  happy to be liaison counsel in terms of actual participation by

6  plaintiffs' counsel in the estimation sort of hearing process.

7  The concern we have is being designated as liaison counsel for

8  discovery disputes that might arise with respect to a

9  questionnaire.  I mean you're talking hundreds of plaintiffs'

10 law firms.  Each one of them could be getting questionnaires.

11 Each one of them could be having disputes with the debtor about

12 whatever --

13         THE COURT:  Frankly, Mr. Lockwood, let me stop you.

14         MR. LOCKWOOD:  -- and my firm really couldn't handle

15 that level of --

16         THE COURT:  Let me stop you.  I think an independent

17 person ought to be appointed for that purpose, and I think I

18 have somebody in mind.  So --

19         MR. LOCKWOOD:  Okay.  Thank you, Your Honor.

20         THE COURT:  -- I think there should be a discovery

21 focus that should not come to the Court first, and there should

22 be someone who can attempt to fix that problem if it's fixable,

23 and if it isn't, then you can come to the Court, and I've got

24 somebody in mind, and I think that's an appropriate way of

25 frankly both for you -- I don't know whether that's something

1  Mr. Baena cares so much about.  There are not likely I think to

2  be as many problems in the property damage side.  No?

3        MR. BAENA:  We've excluded -- we've accepted the

4  designation, Your Honor --

5        THE COURT:  All right.

6        MR. BAENA:  -- for discovery purposes.

7        THE COURT:  Okay.  Thank you.

8        MR. BERNICK:  Your Honor, I'll be very brief and

9  focus I think on the remaining matter which is really how to

10 reach closure on the content of the questionnaire and what the

11 standard should be for that.

12        First just a couple small things.  Mr. Lockwood has

13 been at pains again to remind the Court that we're asking you

14 to do something kind of on a wing and a prayer for one -- Your

15 Honor has fairly said we'll see, and we'll judge the

16 credibility when the evidence comes in.  But what Mr. Lockwood

17 hasn't addressed is how it can be that it's not just a question

18 of what our experts have found in litigation, but Johns Hopkins

19 University, which did the 19 -- did the 2004 study, the one

20 that found 95 percent said abnormality, 95 percent of ours say

21 no abnormality -- that's not me.

22        THE COURT:  It doesn't matter, Mr. Bernick.  I'm

23 going to let you ask some of those things.  If you're unhappy

24 with the B reader, and you want to do further discovery, you

25 can do further discovery.

1          MR. BERNICK:  But the reason I say this is again this

2  is -- basically gets down to the kind of a negotiation  process

3  with the Court over the content of that questionnaire, and

4  every single question makes a difference.  This is our

5  discovery.  It's not their discovery.  Concretely though, what

6  does the burden really mean, because this now has come down to

7  a question of what standard should govern both relevance and

8  burden in terms of the questionnaire?  Remember this

9  questionnaire, as Your Honor is well aware, is not just being

10 served upon unsuspecting members of the general population.

11 It's being served only those people who already decided to

12 initiate litigation and all of the burdens that are entailed by

13 the litigation.  So the standard governing burden is the

14 standard set forth under the discovery rules, and I have to

15 say, Your Honor, I'm not aware of any case that I have ever

16 litigated or somehow in any case it has not been -- it has been

17 too burdensome to ask a plaintiff for their medical records and

18 their occupational history.  It is just absolutely basis stuff.

19          Not only that, but the fact that these lawsuits are

20 old lawsuits is very important.  They've now been pursued, some

21 of them, for four, five, six, seven, eight years.

22          THE COURT:  Well, let me suggest something that may

23 make this a little less onerous and may add to Mr. Frankel's

24 carrot.  Why don't we add something that to the extent that

25 these questionnaires are filled out timely and submitted,

1 they'll be used by the Trust for purposes of looking at the

2 distribution when there is a plan that's confirmed?

3          MR. BERNICK:  I have no problem with that whatsoever.

4          THE COURT:  And so then, folks, if there's additional

5 information, you all -- you know, you're all part of trusts in

6 many other cases.  You know what information trusts are

7 generally going to want.  Let's just make it possible, so that

8 we don't -- they don't have to do it again.

9          MR. BERNICK:  They do it right this time, I would say

10 that they don't have to do it again.  It is more -- we were

11 talking about again when they're saying it's too burdensome,

12 what does that mean.  These forms are not going to be filled

13 out by claimants.  They're going to be filled out by their

14 lawyers.

15          THE COURT:  Well, maybe, but they're going to have to

16 be --

17          MR. BERNICK:  Your Honor, they will be filled -- it

18 is absolutely a mortal certainty that they will be filled out

19 by the lawyers as to what --

20          THE COURT:  Yes, but the information is going to have

21 to come from the plaintiff.  My lawyer wouldn't know where I

22 worked 25 years ago.

23          MR. BERNICK:  No, in part, that's true, but

24 overwhelmingly it's not -- that's not how these cases are

25 pursued.  And in an ordinary litigation if a plaintiff didn't

1 remember, the interrogatory imposes and obligation on the

2 lawyer to make reasonable inquiry.  That's what the rules say,

3 so you can't --

4          THE COURT:  But you're not --

5          MR. BERNICK:  You can't --

6          THE COURT:  But this isn't litigation of the

7 individual claim.  It is not a total parallel.

8          MR. BERNICK:  Well, but here's where I'm going, Your

9 Honor.  Is that when it comes to burden, we are not talking

10 about burden on an individual claimant.  We're talking about

11 burden on the lawyers who represent them and have the

12 obligation to satisfy any and all discovery requests.

13          THE COURT:  Well, Mr. Bernick, if the lawyer already

14 has that information in file, then I agree with you.  If the

15 lawyer doesn't have it, then the lawyer's going to have to get

16 in touch with the claimant.

17          MR. BERNICK:  Yes.

18          THE COURT:  And it will be a burden on the asbestos

19 plaintiff, but so would filing a proof of claim and attaching

20 any documentation that would be necessary --

21          MR. BERNICK:  All that I want to avoid, Your Honor,

22 is somehow that this is really an extraordinary imposition on

23 the claimant.  It's not.  It's an imposition on the law firm.

24 And number two, the law firms are not going to sit there and

25 hide behind the claimant say, well, gee, my claimant doesn't

1  personally know, and, therefore, I don't have to tell you the

2  answer to the question, and whether lawsuits are pursued is

3  they're pursued by law firms that aggregate information for

4  purposes of prosecuting the claims so --

5          THE COURT:  But you're not looking at this for

6  allowance purposes.

7          MR. BERNICK:  Your Honor, this goes back, and it's

8  exactly the same proposition.  The only way to value -- we're

9  not seeking to penalize the plaintiffs.  From our point of

10 view, if they don't fill out the form, Mr. Frankel is exactly

11 right, we don't care.  It doesn't make any difference from our

12 point of view.  We're not going to seek to disallow the claim.

13 Notwithstanding all the suggestions, we're not going to seek to

14 limit the claim.  We just want to know the information for

15 purposes of the estimate, and the estimate -- the basis for the

16 estimate is the merit of the claim, period, end of statement.

17         Now they may say no, we're going to violate all the

18 rules and use settlement values.  Our position is that's not

19 right, so in the same fashion as for PD this estimate will be

20 driven by merits information, and our only way to get that

21 information is this questionnaire.  So you're talking about the

22 lifeblood of the evidence, and the evidence is all that can be

23 considered.

24         So, Your Honor, I would say -- and let me add one

25 more thing to the mix here, because I'm going to come to a

1 proposal here in just a moment.  We're talking about claim

2 forms or a questionnaire is being filled out by counsel.

3 They've already told us -- they represented to us, and they

4 didn't deny it today, they can do it in four months.  Their

5 questionnaire takes a month and a half.  Our questionnaire

6 takes four months in a case that may be worth hundreds of

7 millions or billions of dollars, and they are pursuing -- we're

8 only talking about people that they already represent to take

9 that extra --

10        THE COURT:  Mr. Bernick, I've already said we're

11 going to do a questionnaire.  We just need to get down to the

12 specifics.

13        MR. BERNICK:  The last -- last thing.  Last thing.

14 Your Honor, has, as we have now here, a fraud problem in this

15 case.  There's a fraud problem in this case.  We can't get

16 around it.  For them to say that somehow this is too

17 burdensome, and we can't conduct a discovery that we need with

18 respect to that fraud is absolutely outrageous, so here's my

19 proposal.

20        We have spent weeks and months -- the whole purpose

21 of being here today was not to have this whole discussion about

22 whether there should be a questionnaire.  It was a talk about

23 the questionnaire and the CMO.  They've had the opportunity.

24 They've had the opportunity to go line by line.  They've

25 submitted briefs that virtually go through line by line even

1  though they want to preserve -- pristine their position that

2  there should not be a questionnaire.  I would like -- I would

3  propose that Your Honor take a look at these -- at the

4  questionnaire, and based upon the standard that applies, which

5  is the Federal Rule Standard of Discovery, even considering the

6  fact that this is an estimation, which, therefore, means it's

7  streamlined, not different but streamlined, and considering

8  what are the burdens associated with this balanced against the

9  fact that we have a fraud issue that we have to ferret out.

10  Your Honor, take a look at that questionnaire and give us your

11  reaction to what it is that you think about that questionnaire.

12  To invite another round of briefs --

13          THE COURT:  I'm not doing anymore briefs, Mr.

14  Bernick.  My goodness.

15          MR. BERNICK:  Okay.  So if it's appropriate to come

16  back here like next week or another day, I'd be happy to do it,

17  but really I would submit, Your Honor, that this really is

18  something that can be judged at this point with all Your Honor

19  knows on the face of the questionnaire.  We worked very hard to

20  keep it focused on just these issues, and the only reason that

21  I drew this little chart is that there's all this atmosphere of

22  mystery.  If they don't have B reads, they cannot establish --

23  they will not be able to establish fibrosis for purposes of

24  saying that they really have an asbestotic condition, and they

25  won't be able to establish that they have an asbestos-related

1  lung cancer.  You can't have an asbestos-related lung cancer,

2  unless you have some significant element of fibrosis.  So they

3  lose out on this just like <u>Daubert</u> on the dust sampling and the

4  air sampling.  If they don't have this -- and we're not saying

5  they're locked into what it is they had four years ago.  We say

6  go get it now.  We invite them to get it now.  If they don't

7  have this, these claims disappear.  You press a button.

8  They're not disallowed, but for estimation purposes you're

9  doing a projection of what ultimately would be allowed or

10  disallowed.  You press a button.  They disappear.  That's not

11  very complicated.

12         With the PFT, if they don't have PFTs properly

13  administered showing four vital capacities of the appropriate

14  levels, they can't get, in our view, compensation for

15  asbestosis in the key states that matter.  So this is not a

16  question of a lot of judgment and a lot of speculation.  The

17  whole idea of the questionnaire was to ask for the hard data.

18  The hard data can be put on -- in a spreadsheet.  We can see

19  what it is.  You can say that 75 percent, 60 percent -- if you

20  believe Mr. Lockwood's representations to the Court, 90 percent

21  of these claimants are not going to have malignant disease, and

22  we're talking about 90 percent of the claims.  In our view,

23  it's unlikely that 10 or 15 percent of them will have properly

24  read B reads.  Indeed their papers concede that.  We will get

25  this all sliced and diced and hard data that we don't even have

1 to argue about, and it's so simple, but you --

2           THE COURT:  But the problem with the futures claims

3 with respect to prior -- let me just say wrongdoing.  I'm not

4 making findings.  Let's assume that there was prior wrongdoing

5 with the past B reads.

6           MR. BERNICK:  Right.

7           THE COURT:  Certainly, that's not going to be

8 happening in the future with respect to people filing claims

9 against the Trust.  Is it?  I mean as somebody pointed out --

10          MR. BERNICK:  But that's the whole point is that if

11 until the -- that is exactly why we propose using this

12 questionnaire.  They now have an opportunity -- they can go out

13 to anybody that they want to go out to --

14          THE COURT:  Fine.

15          MR. BERNICK:  -- and get the B reads properly done,

16 and if they did it and, boy, they've got bigger percentages

17 that we think, you know, we're hung by our own petard.  No one

18 is being locked into the past, but the past cannot be relied

19 upon to tell us what the future is going to bring.  That's the

20 whole point of the questionnaire.  And so, Your Honor, I -- you

21 know, there's nothing more really for me to say in terms of the

22 sanction that they don't fill out the forms.  Whoever fills out

23 the forms fills out the forms.

24          We're not seeking to allow or disallow, but the idea

25 that somehow people don't fill out the forms, that we should

1  kind of back fill in and say, well, maybe their claims are

2  really valid after all, come on.  They're litigants.  They have

3  the opportunity to provide us with the information.  That's why

4  we did not work with a sample.  We took the whole nine yards.

5  We said everybody.  So we're now going to see how many of these

6  people if after years of litigating against other companies

7  have the wherewithal to pursue just the basic elements of their

8  claim.  So we're very, very hypersensitive, Your Honor, I

9  suppose you can rightly observe about negotiating on this

10 questionnaire.  It is so stripped down that as soon as you

11 start to tinker with it on -- especially on grounds of burden

12 -- there hasn't been a burden issue associated with medical

13 records.  When you start to tinker on grounds of burden, we are

14 giving up -- they're giving up our case.  Their case is easy.

15 They pressed a button.  You settled.  You pay.

16        THE COURT:  Well, I'm not concerned about the medical

17 records.  I mean surely they must have some medical records in

18 order to have filed the case or at least gotten them into a

19 litigation posture, and if they don't, they're not going to be

20 able to prove their claim against the Trust without them

21 anyway.  I'm not concerned about medical records.

22        I'm more concerned about tell me every place you've

23 worked in the past 25 or 35 or 45 years.  I mean some people

24 may not remember that.  Every time you think you've been

25 exposed to asbestos, okay, I mean people may have had jobs that

1  they don't think created a claim.

2        MR. BERNICK:  If they don't know -- if they don't

3  know, and their lawyers don't know, that's fine.  They can

4  state that.  No one can make you know something that you don't

5  know.  On the other hand, if the lawyers had prosecuted claims

6  against other companies at exactly the same sites for exactly

7  the same occupations --

8        THE COURT:  Yes, that should be stated.

9        MR. BERNICK:  -- that should be stated.

10        THE COURT:  I agree.

11        MR. BERNICK:  And that's why we asked for the

12  litigation history, because if they've been out there for four

13  years, they likely have pursued claims against everybody they

14  can possibly imagine.

15        THE COURT:  All right.  Well, maybe I misread the

16  questionnaire.  I didn't think you were asking who you have

17  litigated against.  I thought you were asking for other

18  exposures by other products, and that's a different issue.

19        MR. BERNICK:  But for asbestos -- when it comes to

20  other products that could have caused the same type of ailment,

21  like cigarettes, we do ask for cigarettes.

22        THE COURT:  That's fine.

23        MR. BERNICK:  But our principal focus on occupational

24  history is if what they have got is just fibrotic condition,

25  there are certain industries where it's very clearly

1  established that there are fibrotic exposures.  We should at

2  least know about that.  But where we're most focused is on the

3  detailed history of the asbestos exposures to other asbestos

4  products, and that's why we asked for the litigation history,

5  because by and large these people have been litigating for the

6  last four or five years.  They'll probably have made claims

7  against every trust and every product that they can possibly

8  think of, so their lawyers to fill out this form is again not

9  like it's rocket science.  They should already have in their

10  database all of the different job histories for their own

11  clients, and all we want to do is we want to know what that

12  history is.

13          THE COURT:  All right.  I think we need to go through

14  one -- you know, start with the base of the questionnaire.

15  This -- we're not getting anywhere from this.  I've heard these

16  arguments.  I've already said we'll do a questionnaire, and

17  it's been another hour, and we're not any closer to developing

18  what that questionnaire should be.

19          MR. BERNICK:  Well, I'm happy to do it, but I'm also

20  happy to make -- I don't know what other counsel think -- make

21  the suggestion that Your Honor -- that it really be -- Your

22  Honor has got the briefs, has got the questionnaires, and do we

23  make a date to come back in the next few days and talk about it

24  further?  But --

25          THE COURT:  Three weeks.

1          MR. BERNICK:  What?

2          THE COURT:  Three weeks.  Remember?  No emergencies.

3          MR. BERNICK:  Oh, then we should -- then I hate to

4  say it, but we should probably just do it today.

5          THE COURT:  All right.  Does anybody else have

6  anything new to add with respect to these questionnaires or the

7  CMO?

8          MS. DiLUIGI:  Good afternoon, Your Honor.  Brenda

9  DiLuigi for the London Market Insurers.  Your Honor, certain of

10  Grace's insurers have submitted briefing on the PI estimation

11  issues, and really we've done so just to clarify our position

12  in that regard.  As Your Honor is aware, we are -- chief among

13  the insurers' concerns is the potential that any order that

14  Your Honor may enter in connection with estimation may be

15  despite whatever purposes for which it is being requested now

16  may be misused in the future and in a way that impacts

17  insurers' rights.

18          When we last appeared before Your Honor in January,

19  you advised the insurers that although you did not want to and,

20  in fact, would not be deciding insurance coverage issues, you

21  were nevertheless not prepared to enter any order with respect

22  to insurance neutrality in terms of imposing neutrality on a

23  plan that you weren't sure was intended to be insurance

24  neutral.

25          THE COURT:  I hadn't seen a plan.

1        MS. DiLUIGI:  And, well, Your Honor, I would just

2   like to clarify that what we're asking for in terms of

3   neutrality language or language to be inserted into the

4   estimation and case management order is not insurance

5   neutrality for all purposes.  We are not seeking in any way a

6   decree as to the plans treatment of insurance, and that, as

7   Your Honor has stated previously, is an issue for another day,

8   and we'll take it up at the appropriate time.

9        What we are proposing is that the case management

10  order relating to personal injury claims for purposes of

11  estimation include language that defines the scope of the

12  proceedings and protects against later abuse in a way that

13  would impact insurers' rights.  And what we're proposing I

14  believe is pretty simple.  It's the language that has already

15  been adopted by the Third Circuit in connection with <u>Combustion</u>

16  <u>Engineering</u>, but it's --

17        THE COURT:  That was a plan.

18        MS. DiLUIGI:  But --

19        THE COURT:  That was insurance neutral.

20        MS. DiLUIGI:  Yes, Your Honor, and what we're

21  proposing is not the CE language as it's drafted in the

22  opinion, but rather the language tailored to relate to

23  estimation proceedings only, so that it doesn't say anything

24  about what the plan does and doesn't do and what the plan

25  documents.

1          THE COURT:  Look, everybody is going to be bound by

2   these estimations, period, end of story.  To the extent that

3   the insurers have some creditor status, which I'm not aware of,

4   then if you want to participate, participate, because you're

5   going to be bound by the estimation findings.  They will be

6   binding.  They're going to be incorporated into a plan, and

7   everybody's going to have to live with those findings.  So if

8   you want to participate, participate.  To the extent that the

9   insurance companies are only trying to say that you're not

10  bound, because this is just an estimation for Trust

11  distribution purposes, and you'll figure out what your

12  respective liabilities are after the Trust is formed and makes

13  distributions, that's fine.  I think you -- I think this

14  process preserves that.  But to say that the estimation numbers

15  that I find are not binding on you is not correct.  They will

16  be.  So if you've got an interest, show up.

17          MS. DiLUIGI:  Your Honor, our concern is not that

18  estimation occur in general, and that you'll issue an order,

19  but rather that despite what the debtor is saying is now -- and

20  the debtor has made various representations in the various

21  briefings and court appearances about what estimation is

22  intended to do on the one hand and what is not intended to do

23  on the other hand -- and from our perspective we believe it

24  would be appropriate to incorporate those representations into

25  the order and have them find their way into the case management

1  order, so that everybody's on the same page.

2          THE COURT:  Look, I'm in a procedural order, which is

3  what a case management order is.  I'm not making substantive

4  findings.  All I'm doing is setting up a process.  I'm not

5  going to give anybody releases or indemnities or assignments or

6  anything else in a case management order.  It's just a process.

7          MS. DiLUIGI:  We understand, Your Honor, and so long

8  as estimation is only being used, as Your Honor says, to

9  determine the adequacy of the funding of the plan, that's --

10          THE COURT:  And the likely claims that will be filed.

11          MS. DiLUIGI:  Yes, Your Honor.

12          THE COURT:  That's the purpose.  Yes.

13          MS. DiLUIGI:  Our concern is that the debtors may

14  take Your Honor's comments and in the future attempt to argue

15  for a UNR result against the insurers, and, you know, so long

16  as --

17          THE COURT:  That's a plan issue.

18          MS. DiLUIGI:  Yes, Your Honor.

19          THE COURT:  A UNR is definitely a plan issue.  I've

20  already said the estimation findings will be binding on anybody

21  who is a party in interest.  I'm not convinced that the

22  insurance companies are parties in interest, but if you think

23  you are, show up.  They will be binding.

24          MS. DiLUIGI:  Thank you, Your Honor.

25          THE COURT:  Anybody else?

1           MR. BERNICK:  I presume if they show up, Judge, we

2  could explain to you why we think they should go back to where

3  they came from.

4           THE COURT:  Sure.

5                    (Laughter)

6           THE COURT:  Okay.  Anyone else?  Let's take a ten-

7  minute recess, and then we'll come back and start.

8                    (Recess)

9           THE CLERK:  All rise.

10          THE COURT:  Please be seated.  Mr. Bernick.

11          MR. BERNICK:  Yes.  We've had -- we took the

12  opportunity to recess to have a short conference.  I think that

13  Mr. Lockwood wants to address the Court on one matter.

14          THE COURT:  All right.

15          MR. BERNICK:  And then I have a proposal that I think

16  we're all agreed to.  It's a question of whether Your Honor

17  would find it appropriate.

18          THE COURT:  All right.

19          MR. LOCKWOOD:  Yes, Your Honor.  It's just a response

20  to one item that Mr. Bernick said before the break, and then he

21  will report on a proposal that we have jointly that deal with

22  the questionnaire.  One of the things he said in response to

23  many of your questions about people who didn't have the

24  information when they got the questionnaire was their lawyers

25  could go out and get it for them.  The point I would simply

1  make is that he's been spending a lot of time talking about the

2  rules relating to discovery.  What this questionnaire is is the

3  functional equivalent of a set of written interrogatories

4  coupled with the document production demand.

5          In the real world of Federal Rules of Civil

6  Procedure, etcetera, when you get interrogatories and a

7  document production demand, what you are required to do is give

8  them the documents that you have and give them the answers to

9  information that you have, and you're not required to complete

10 the rest of your trial preparation in order to respond to the

11 interrogatories.  You may have to supplement the

12 interrogatories, depending upon how they're worded, etcetera,

13 and all I'm saying is that when you consider the proposal that

14 we're about to make, that you keep in mind the issue about this

15 proposal that you lawyers should be told that they can go out

16 and get it.  Thank you.

17         THE COURT:  Okay.  Mr. Bernick.

18         MR. BERNICK:  I guess by way of response to that just

19 in half a heartbeat, we're not saying that they have to go out

20 and do anything.  I mean if they want to continue to submit the

21 kinds of information that have been the subject of a lot of

22 discussion today based upon the Dr. Harrons of the world, no

23 one's saying they can't do it, and that's always been the

24 substance of the questionnaire.

25         The proposal that we have, Your Honor, is that one of

1  us think it would be overwhelmingly productive.  Of course, we

2  all enjoy it immensely, but overwhelmingly productive to

3  prolong your days further by going through the questionnaire

4  question by question.  Our proposal is that -- if Your Honor is

5  willing, that you would take the questionnaire back, read

6  through it, and then through order I would suppose let the

7  parties know how you're coming out with respect to what should

8  be in the questionnaire.  We would then ask for a week or ten

9  days to submit any brief comments that we have where Your

10 Honor's coming out, and then there would be a hearing.  We

11 would propose -- that is the debtors would propose that it be

12 telephonic, so that we don't then simply -- I mean if it's in

13 person, our own view is that we won't really accomplish an

14 awful lot.

15         THE COURT:  Mr. Bernick, I have you here.  If I keep

16 you here, we'll get it done today.  I don't need anymore ten

17 days.  I've read through every single piece of paper that was

18 delivered to me while I was at another seminar.  We're going to

19 do it today and get it done.

20         MR. BERNICK:  That's fine.

21         THE COURT:  So, folks, if you need another recess to

22 go postpone your plane reservations, tell me now.  I'll give

23 you that recess.  We're going to stay until it's done.

24         MR. BERNICK:  Okay.  There's only one other matter I

25 think that's on the agenda which is exclusivity.

1          THE COURT:  My view about exclusivity, unless you

2  folks have a different view, is I'll continue it until the next

3  omnibus, and I'll hear the arguments at that time.

4          MR. BERNICK:  That's fine, Judge.

5          THE COURT:  Anybody have an objection to that

6  process, so we can get to this issue of the questionnaire?

7          MR. FRANKEL:  That's fine, Your Honor.

8          MR. LOCKWOOD:  No objection, Your Honor.

9          THE COURT:  All right, then it's continued until the

10  conclusion of the next omnibus hearing, and I'll your arguments

11  then.  Please put that like as the first contested matter, so

12  we can get to it early if it has not been resolved by that

13  time.  Okay.  Where do you want to start?

14          MR. BERNICK:  I guess probably the best idea is --

15  I'm working with a current copy of the questionnaire -- is on

16  page one and just go through it page by page, and I guess we

17  should just give Your Honor a chance to look through it.

18          THE COURT:  Tell me where the first objectionable

19  phrase is, folks, and let's focus on that.

20          MR. LOCKWOOD:  Your Honor, should we do this from our

21  seats?

22          THE COURT:  Yes, please.

23          MR. LOCKWOOD:  If you compare, starting on page one

24  of the instructions, the language on -- in the paragraph

25  starting "The questionnaire is the official document," second

1  to the last, where it talks about, "failure to do so may have

2  significant consequences including your being forever barred

3  from asserting your -- receiving payment on account of your

4  claim."

5        THE COURT:  Yes, that should be stricken, and instead

6  I think we should take Mr. Frankel's language that says, you

7  know, we are soliciting this information now for purposes of

8  estimating future liability.  Your assistance would be greatly

9  appreciated, and, in fact, if you fill out this questionnaire

10 timely and as completely as possible, (a) we will do our best

11 to get you into the queue in the TDP process wherever

12 appropriate first in line, at the top of the list, however you

13 want to state that, and (b) to the extent that you attach all

14 of the documents that the Trust will need, you won't have to do

15 it again.  This information will be provided to the Trust, so

16 you will have satisfied your burden.  Something to that effect.

17 You folks can wordsmith.  Any objection to that?

18                  (No verbal response)

19        THE COURT:  Okay.  Next, Mr. Lockwood.

20        MR. BERNICK:  The only caveat -- well, I think we

21 just have to work on it from a language point of view, but we

22 can't leave them with the inference that, in fact, they will

23 get paid.  That is we can't do anything that sounds like if

24 they fill this out, they are in some fashion assured of getting

25 a payment.

1           THE COURT:  That's fine.  I think you can say that

2  your claim will, you know, be evaluated for a payment under

3  Trust distribution procedures which have not yet been approved.

4  So this is not a guarantee of payment, but, you know, you will

5  have to submit something to the Trust.  If you submit it now,

6  you won't have to fill it out again.  Something along those

7  lines.

8           MR. LOCKWOOD:  We'll work on that.  The same comment

9  at little Roman at three of page -- of the instruction.  I'm

10 going through the instructions, because they're --

11          THE COURT:  Mr. Lockwood, I can't hear you.  I'm

12 sorry.  You need to --

13          MR. LOCKWOOD:  I'm sorry.  The same comment with

14 respect to the language at the top of little Roman page three

15 appears that any such holder -- the very first paragraph -- who

16 fails to do so, boldface, shall be forever barred, estopped,

17 and enjoined from asserting any such claims.  That one isn't

18 even a may.  That's a shall.

19          THE COURT:  I'm sorry.  That one I'm not finding.

20          MR. LOCKWOOD:  Page three of the instructions.

21          THE COURT:  Yes, I'm on that.

22          MR. LOCKWOOD:  The top of the page.

23          MR. BERNICK:  It's on my page two at the bottom.

24          THE COURT:  Okay.

25          MR. LOCKWOOD:  Oh.  Our printers must format

**J&J COURT TRANSCRIBERS, INC.**

1  differently, Your Honor.

2          THE COURT:  Yes.  Okay.  It's paragraph number

3  five --

4          MR. LOCKWOOD:  Yes.

5          THE COURT:  -- in the instructions?

6          MR. BERNICK:  Yes.  We can conform that.

7          THE COURT:  That's fine.

8          MR. BERNICK:  Next.

9          MR. LOCKWOOD:  Your Honor, on part two there's a --

10 beginning after the second paragraph there's a series of

11 definitions of diseases, and then there's something at the end

12 of it.  The last one is called Other Asbestos Disease, and it

13 says, "Any asbestos-related injuries, medical diagnoses, and/or

14 conditions other than those above."  Essentially what the

15 debtors are doing here, as they justify in their papers, is

16 creating their own definitions of not only what is a disease

17 but what is a qualifying disease by building in both exposure

18 requirements and diagnosis requirements into it, the result of

19 which we believe is that something like 95 percent or more of

20 all of the answers to the questionnaires will wind up

21 describing other asbestos disease, because we don't believe,

22 and certainly the debtors haven't -- I don't think the debtors

23 would assert that most of the claimants would have two

24 independent pathologists diagnosing mesothelioma or replicating

25 B meters for their various asbestosis diseases.

1        I mean they might go out and get them if they were

2   told that they had to get them, but I mean to some extent by

3   allowing the debtor to put these diseases in there as though --

4   it puts a sort of a court imprimatur on the notion that somehow

5   or another this is what is, in fact, going to be required in

6   order for you to have a claim that's capable of being

7   estimated, and we don't understand why you just can't have a

8   more neutral description of the diseases.  And then they've

9   asked questions about whether they have these various reports

10  and multiple pathology reports replicating B readers.  And if

11  they want to argue that for the people that don't have them,

12  they don't qualify, they can do that without building in the

13  requirement of having them into their definition of the disease

14  in the first place.

15        THE COURT:  Well, that seems fair.  I wonder whether

16  we can simply say something in this questionnaire like, you

17  know, here are the diseases that are customarily diagnosed.  Do

18  you have one of these, and if so, what evidence do you have

19  that supports it?  Why not just do it as a fact, and then the

20  debtor can categorize them however the debtor chooses if the

21  evidence doesn't rise to the level the debtor thinks is

22  appropriate?

23        MR. BERNICK:  It's not -- it's really -- if we start

24  to identify how -- what diseases often are diagnosed, that's

25  the whole problem, is that what's often diagnosed are things

1  that we don't believe constitute any disease whatsoever.  So --

2        THE COURT:  But you are -- I mean you have listed

3  them.

4        MR. BERNICK:  No, because Mr. Lockwood made reference

5  to it, but he didn't really I don't think refer the Court to it

6  directly.  If you take a look at F, the definitions are done.

7  It says explicitly we can move this up front to make it

8  explicit up front.  These are the definitions that Grace will

9  use in determining its own position regarding its liability.

10        And then it goes on to say, "All information, test

11  diagnoses, and documentation should conform to the

12  definitions," da, da, da, da.  Then critically -- and we can

13  underscore this, do whatever.  "Information, tests, diagnoses,

14  and documentation that do not conform to the definitions may be

15  submitted," and we can beef that up, but we will assert in

16  court that it should be given little or no weight.  What we're

17  really saying is we're being completely transparent.  These are

18  the criteria that we believe are required under the standards

19  and Daubert.  You don't have to meet them if you don't want to,

20  but this is what you will be, in our view judged, by.  We can,

21  you know, your lawyers may disagree, in which case you can

22  submit whatever you want, but the Court is not providing

23  imprimatur for anything by putting this in the form --

24        THE COURT:  All right.  I think the sentence --

25        MR. LOCKWOOD:  Your Honor, this was justified as

1 being a discovery questionnaire, i.e., asking questions.  It's

2 not intended to be a notice of Grace's litigating position to

3 bar as a whole.  If Grace wants to send out a separate notice

4 to the plaintiff's bar telling them what their view of -- what

5 you need to do to qualify to have asbestos-related lung cancer

6 or asbestosis as a matter of law, they certainly can come to

7 the Court and ask for permission to do that.  Or, for that

8 matter, they could probably do it without Court permission.

9          But this is supposed to be instructions on how to

10 answer a questionnaire.  Every proof of claim that I've ever

11 seen in every bankruptcy case or trust procedure says do you

12 claim that you have malignant mesothelioma, or do you claim you

13 have asbestos-related lung cancer?  It doesn't say do you claim

14 that you have asbestosis or lung cancer with -- diagnosed on

15 the basis of X and evidence of asbestosis on the basis of Y.

16 And the questionnaire itself purports to ask whether you have

17 those conditions, so it's a matter of the debtor putting one

18 and one together and arguing the claim doesn't qualify.

19          THE COURT:  Okay.  I think that the debtor should

20 amend the questions so that the questions simply ask for the

21 facts not state the debtor's position.  If what you would like

22 to do is attach to the end of the questionnaire a position

23 paper that you are going to advocate and have this information

24 in it and say this is what you're going to advocate, but your

25 advocacy hasn't been approved by the Court, the questionnaire

1  has, you may do so.  I think the big problem is the sentence

2  that says, "All information, tests, diagnoses, and

3  documentation should conform with the definitions," because --

4          MR. BERNICK:  We can change that.  All this does is

5  to short -- we could ask factually do you have a one, two,

6  three, four, five?

7          THE COURT:  Right.

8          MR. BERNICK:  Do you have a one, two, three, four,

9  five?  We can do that.  All it does is to make this thing

10 longer.

11         THE COURT:  It may make it longer, but if there's an

12 objection in that respect, it's still supposed to be fact

13 discovery.

14         MR. BERNICK:  We'll then turn those -- all of these

15 -- we'll turn them all into questions.

16         MR. FINCH:  Your Honor, this is Nate Finch from

17 Caplin and Drysdale.  Just may I make a suggestion?  The

18 definitions in the Future Claimants Committee's questionnaire

19 and the Asbestos Claimants Committee's questionnaire of the

20 various diseases are neutral and taken basically from the same

21 definitions that the Manville Trust uses.

22         THE COURT:  All right.  Does --

23         MR. BERNICK:  They're not neutral.  The Manville

24 Trust is something that the plaintiffs' bar all agrees to.

25 This is our discovery.  It's not theirs.

1          THE COURT:  This is the debtor's discovery.  If the

2    debtor turns these into questions related to -- eliciting the

3    facts or the contentions to the extent that there's a

4    contention issue, although this seems to be factually oriented,

5    that seems to me to be appropriate.  As I said, if you want to

6    attach your own contentions to the end so that people know what

7    it is that you intend to do with this information, just so you

8    say that this is your proposal, it is not what's been approved

9    by the Court, you may do so.  Okay, so you will change into

10   facts and circulate it to make sure that the questions are not

11   objectionable.  Next.

12          MR. LOCKWOOD:  Under the heading Supporting Documents

13   for Diagnosis --

14          THE COURT:  Yes.

15          MR. LOCKWOOD:  -- they -- the second paragraph

16   purports not merely to ask for the document but to prescribe

17   what the diagnosis must be.

18          MR. BERNICK:  We will change that in line with what

19   the Court has said.  We will include the second sentence which

20   defines what we will -- what we believe to be independent

21   means.  We will put -- to the extent that we ask questions, we

22   will say to the extent the questions below ask you for whether

23   the doctor is independent, these are the criteria.  Now, I

24   think that in point of fact, because we spell it out, that is

25   we break out in the questions boxes that have them say did you

1  pay for the services, were you required to retain counsel,

2  maybe we can just dispense with the whole thing.  So --

3          THE COURT:  Okay.  Either --

4          MR. BERNICK:  -- what I would say, Your Honor, is

5  let's just take out --

6          THE COURT:  The second paragraph.

7          MR. BERNICK:  -- the second paragraph.  I would also

8  agree from the same point of view to take out the bolded

9  language under x-rays and B reads.  That bolded language we

10 will work into a definition for purposes of asking the

11 questions.  Same thing with respect to pulmonary function

12 tests.

13         THE COURT:  All right.  Fine.

14         MR. LOCKWOOD:  The first sentence of the paragraph

15 about x-rays and B reads purports to tell the plaintiff that if

16 his chest x-ray reading is provided with a replicated reading,

17 the chest x-rays themselves do not need to be attached at this

18 time.  The implication is if there is no replicating reading by

19 the B reader, you have to supply the chest x-ray.  Typically

20 speaking, if plaintiff only has one actual chest x-ray picture,

21 the plaintiff by hypothesis in this case has sued Grace but

22 also may well sue a lot of other people.  The chest x-ray may

23 well be and frequently is necessary to bring the case against

24 other people --

25         THE COURT:  All right, then it can be --

1          MR. LOCKWOOD:  -- and they in effect want them to

2  turn it over to Grace and --

3          THE COURT:  All right.  It can be stated that the

4  debtor has been permitted to ask for access to show it to a B

5  reader or a doctor of the debtor's choosing.

6          MR. LOCKWOOD:  Okay.  I would just note the

7  implication again that in effect what we're going to have is

8  the debtors are going to take -- have their own B readers read

9  118,000 x-rays potentially and argue about them.  I mean --

10          THE COURT:  They may or may not.  I don't know.  I

11  doubt that.

12          MR. BERNICK:  There's a lot of different ways to

13  slice it.  This was an effort on our part to eliminate a

14  cumbersome process.  If they don't want to go through the

15  process of getting an independent certification, then we

16  obviously have to be given the right of access.  I don't think

17  we're going to be stupid in how we use that right.

18          THE COURT:  Okay.  I think you have the right of

19  access, but having the chest x-ray copies attached might be too

20  burdensome under those circumstances.  So provide that you can

21  have the access upon request, but the copies do not need to be

22  attached.  All right.  Next.

23          MR. COHN:  Your Honor, by telephone, this is Daniel

24  Cohn on behalf of the <u>Libby</u> plaintiffs.

25          THE COURT:  Yes.

1          MR. COHN:  I don't -- I want to defer to Mr.

2    Lockwood, but if he's done with the supporting documents

3    section, I did have a couple of other comments on that.

4          THE COURT:  All right.  Go ahead.

5          MR. COHN:  The first is -- and this really keys off

6    of what you've just decided -- is that when there are original

7    documents versus copies, that it should be made clear that the

8    original need not be supplied, but in general that only copies

9    need to be --

10          THE COURT:  All right.  It can say the questionnaire

11    must be accompanied by copies of any and all documents.  That's

12    fine.

13          MR. BERNICK:  Well, but with access to the originals.

14          THE COURT:  With access to the originals.  Fine.

15          MR. COHN:  And then under -- on pulmonary function

16    tests there is an issue even as to copies, which I understand

17    the cost of that raw data that Mr. Bernick has requested -- and

18    I'm referring specifically, Your Honor, to where it says in the

19    first line actual raw data including all spirometric tracings.

20          THE COURT:  Okay.

21          MR. COHN:  My understanding, first of all, is that

22    many, many clinics will not have even saved that.  So that's --

23    but obviously, if it doesn't exist, then they can't be

24    produced.  But even as to those clinics that actually still

25    have those underlying data, they will charge for it to be

1 supplied, and this leads to a broader question, which is that

2 what is to be produced here I take it is that, as in any

3 document production, is what is in the possession or control of

4 the claimant, and that no one is being asked to go out and get

5 something that they do not now have.

6        MR. BERNICK:  It's the claimant and their counsel.  I

7 mean if we're going to play the game where we've got to go out

8 and get medical releases and request medical documentation from

9 doctors all over the country, that will effectively turn this

10 process into individual claim litigation, and it will founder.

11 Lawyers, to the extent that lawyers have the ability to access

12 this information, they have an obligation to make reasonable

13 inquiry under the rules, and they should obtain it.  And

14 particularly with regard to the Libby claimants, where they're

15 basically all seeing the same guy in the same clinic, this

16 ought to be a very efficient process.

17        MR. LOCKWOOD:  Your Honor, I can't believe that we're

18 being told that if Grace asks for documentation which is not in

19 the plaintiffs' possession or the plaintiffs' lawyers'

20 possession but in some of these third parties' possession, and

21 they have to pay out of pocket in order to get it for the

22 purpose of Grace using it and having their experts use it, this

23 questionnaire could legitimately do that.  I mean, again, Mr.

24 Bernick tries to distinguish between its individual claim

25 litigation if Grace has to out and do medical records review.

1  Apparently, it's not individual claims litigation if the

2  plaintiff is forced to go out and get the same information at

3  the plaintiffs' expense.

4          MR. BERNICK:  To the contrary, I think in any

5  individual case a court would require a plaintiff to produce

6  their own medical information.

7          MR. LOCKWOOD:  But this isn't an individual case as

8  the Court has repeatedly stated.

9          MR. BERNICK:  But the question is whether -- this is

10  a shell game now.  We want to know the basis of their claim.

11  We want to know the medical data, and now they say, oh, well,

12  gosh, don't get it from us.  Go conduct discovery.  And we say,

13  okay, we'll go ahead and do that.  In this case we'll bog down.

14  The whole point of this matter is that these lawyers have

15  access to their doctors.  These doctors -- day in/day out they

16  do business with them.  In half a heartbeat they can get this

17  information.

18          THE COURT:  I can't see the --

19          MR. LOCKWOOD:  Your Honor, there's nothing in the

20  record to support these kinds of broad assertions by Mr. --

21          MR. BERNICK:  Take a look at Judge Jack's opinion.

22          THE COURT:  Pardon me.

23          MR. LOCKWOOD:  Judge Jack was talking about a limited

24  number of silica claims.

25          THE COURT:  Folks, I am not Judge Jack, and this

1  isn't a silica case.  Could we please concentrate, or you're

2  going to be here all right.  I, however, am leaving at five,

3  and you are not leaving until I come back from my conference

4  call in the event that we're not done.  So can we please get to

5  it?  Mr. Cohn, it doesn't seem to me that this is an

6  unreasonable request.  If somebody is filing a claim or

7  pursuing a claim against Grace based on the fact that there is

8  a pulmonary function test that shows a disease, it seems to me

9  that they have an obligation to produce either the results or

10  the raw data.  To the extent that they want to go to the

11  doctor's office and copy the raw data, that's fine.  But to the

12  extent that there is an actual document, and they want to

13  attach it, that's okay, too.  They have their choice.  They can

14  either --

15          MR. LOCKWOOD:  Either or --

16          THE COURT:  They can go get it, or they can hand

17  write it out or whatever they need to do, Xerox it, however it

18  can be done.  It's to be attached if it exists.

19          MR. BERNICK:  Right, the tracings in particular.

20  Those are the curves that are the --

21          THE COURT:  I understand the tracings are necessary.

22  That's probably the thing you want the most --

23          MR. BERNICK:  That's right.

24          THE COURT:  -- and it doesn't seem to me to be

25  unreasonable as a request to get it when you're trying to

1 | evaluate what the readings are and whether they're supporting

2 | for purposes of figuring out how many claims in the future are

3 | going to have those readings.  So that's allowed.

4 |         MR. FINCH:  Your Honor, should the debtor be ordered

5 | to pay the cost of getting that?

6 |         THE COURT:  No, I don't think so.  It seems to me if

7 | the claimant is filing a claim against Grace in a State Court

8 | suit, which is what most of these things are, based on a

9 | pulmonary function test, they're going to have to produce it at

10 | some point.  They can produce it now.  They won't have to

11 | produce it again for the Trust.  They're going to have to

12 | produce it then anyway, and it will be their responsibility to

13 | produce it for the Trust not the Trust's.

14 |         MR. LOCKWOOD:  I mean supposing the plaintiffs'

15 | position is that they don't have to have a pulmonary function

16 | test in order --

17 |         THE COURT:  Then they won't have one.

18 |         MR. LOCKWOOD:  -- to prove the validity of their

19 | claim?  Shouldn't they at least have the option not to pay a

20 | clinic to --

21 |         THE COURT:  If they have had a pulmonary function

22 | test, and their answer to the question is yes, I did, then I

23 | want a copy of the document attached.  They're going to have to

24 | attach it for the Trust.  It would be their expense anyway, and

25 | I've already said we're going to not make them redo this for

1  the trust.  It's not an unreasonable burden.  They're to attach

2  it.  Next.

3         MR. LOCKWOOD:  In my copy it's at the top of page

4  five.  It may be at the bottom of page four on yours, Your

5  Honor.  It's the last paragraph under Asbestosis.  There's

6  another recitation of what the position that the debtors --

7         MR. BERNICK:  Yes, we'll take that out.

8         MR. LOCKWOOD:  -- will pay.

9         THE COURT:  All right.  The debtor -- as a general

10  rule, the debtor is to take all of its positions out of it, so

11  you can point them out.

12         MR. BERNICK:  Right.  If we're asking a question that

13  assumes a definition, we have to provide the definition --

14         THE COURT:  Exactly.  Yes.

15         MR. BERNICK:  -- but our position will not be in

16  here.

17         THE COURT:  All right.  Next.

18         MR. LOCKWOOD:  Now, under Asbestos Disease, the next

19  paragraph where they talk about the documentation, "It says it

20  includes supporting documentation exposing -- establishing

21  exposure to Grace asbestos-containing products as a cause of

22  the disease."  I'm totally unclear as -- I mean in a trial

23  where you have circumstances --

24         THE COURT:  Well, that's coming out anyway.

25         MR. LOCKWOOD:  Here.  No.

1          THE COURT:  That's a definition.  Right?

2          MR. LOCKWOOD:  No, it's under the definition of other

3  asbestos-related disease.

4          THE COURT:  Right.

5          MR. BERNICK:  I'll rephrase it.  "Any person

6  asserting any other asbestos disease should include any -- any

7  chest x-ray, pulmonary function tests, and supporting medical

8  diagnoses and supporting documentation establishing that

9  exposure to Grace asbestos-containing product had a causal role

10 in the development of the disease."

11         THE COURT:  Well, I think the issue is that the x-ray

12 may not support that Grace's product had any role in it.  It's

13 just an asbestos disease.  That's the problem.

14         MR. BERNICK:  Well, but then they've got a big

15 problem, because the point of this whole thing is that whatever

16 you have got on Grace --

17         THE COURT:  Right, so --

18         MR. BERNICK:  -- come up with it.

19         THE COURT:  So what it should say is it should stop

20 after documentation, and then you should have a separate

21 section that says, "Attach whatever documents you have that

22 establish that exposure to Grace asbestos-containing products

23 had a role in the development of the disease."  It should be a

24 separate question not part of -- necessarily part of the

25 medical question.

1          MR. LOCKWOOD:  Your Honor, if this question is

2  directed to lawyers, that documentation could conceivably

3  include the entire -- an entire case file -- deposition

4  testimony.  If you went to trial --

5          THE COURT:  This directed to plaintiffs.

6          MR. LOCKWOOD:  What?

7          THE COURT:  It's directed to plaintiffs.  The lawyers

8  may have some of the documents in their file.

9          MR. LOCKWOOD:  Well, I understand, but this -- the

10  way -- if you go back and look at who this is told, and these

11  questionnaires -- the lawyers for the plaintiffs are instructed

12  to produce every document that they have that relates to their

13  clients' case.  So that if hypothetically -- Mr. Bernick made

14  much of the fact that these cases have been pending for years

15  against other defendants, so you could've had -- you could have

16  deposition transcripts.  You could have a ton -- you could have

17  trial testimony for that matter in which --

18          THE COURT:  All right, then make it --

19          MR. LOCKWOOD:  -- exposure to Grace products --

20          THE COURT:  Okay.  Make it that any documentation or

21  an identification of where that documentation can be obtained

22  -- what it is and where it can be obtained.

23          MR. BERNICK:  Yes, I mean we've run into this also

24  with Mr. Speights who says, well, it's Grace, and then I've got

25  25,000 documents at my office.  Come look at them.  And I think

226

1  that where we are talking about law firms, the law firms still

2  have an obligation to provide the information that relates to

3  the claimant.

4         THE COURT:  I agree, and so it should say related to

5  Grace.  You can put instructions in that say do not identify

6  anything other -- that is not related to Grace.

7         MR. BERNICK:  To the claimant and to Grace.

8         THE COURT:  To the claimant's claim against Grace.

9         MR. BERNICK:  Right.  That's fine.

10         THE COURT:  Fine.

11         MR. BERNICK:  We will put that in there.

12         MR. LOCKWOOD:  I'm not sure where that leaves us on

13  -- I mean if you've got trial testimony that some coworker

14  says, you know, this job site had a Grace product, is the

15  lawyer whose work product that is required to produce it in

16  response to the questionnaire?

17         THE COURT:  That's their problem to figure out.

18         MR. LOCKWOOD:  What?

19         THE COURT:  That's their problems to figure out.  Let

20  them figure it out whether they're going to attach it or not.

21         MR. BERNICK:  That's pretty easy.  Where are we now?

22                    (Pause)

23         MR. LOCKWOOD:  Oh, I don't know whether Your Honor

24  has already ruled on this in the course of our prior

25  discussions, but in the industry code -- in D part three

1  immediately following the industry codes --

2            THE COURT:  Yes.

3            MR. LOCKWOOD:   -- there's a paragraph that says,

4  "Please provide the requested information for the each --" I

5  assume the is a typo "-- each side at which the you --" I

6  assume the is a typo "-- were exposed to asbestos-containing

7  products other than Grace products."  We continue to object to

8  the relevance of, in an estimation, Grace's liability of what

9  individual claimants might have been exposed to other peoples'

10  products.  Your Honor gave me a hypothetical in which the

11  claimant was exposed to Manville products but wasn't exposed to

12  Grace products.  If he wasn't exposed to Grace products, that's

13  enough of a basis for Grace saying he doesn't have a claim

14  against Grace.  Establishing that he was also exposed to

15  Manville products is surplusage at that point.  On the other

16  hand, if he was exposed to both, a Manville product and Grace

17  product, under the outstanding law, that doesn't negate in any

18  way, shape, or form Grace's liability.

19            THE COURT:  I thought the question was being limited

20  to litigation, if you've commenced litigation or engaged in

21  litigation against --

22            MR. LOCKWOOD:  No, that's the --

23            THE COURT:   -- someone other than Grace.

24            MR. LOCKWOOD:  Not in 3B, Your Honor.

25            MR. BERNICK:  I think with respect to this group of

228

1  claimants, it will end up being the same thing.  That's why we

2  asked for the litigation.  But Mr. Lockwood's hypothetical is

3  just wrong.  The test is it has to be a substantial

4  contributing factor.  If they worked at a Manville site for 35

5  years and then were exposed to Grace cement for a period of

6  three months, that's not a substantial contributing factor.

7  All we want to know is the occupational exposure history just

8  as if the person were sitting there at the table.

9        MR. LOCKWOOD:  Your Honor, Mr. Bernick is just

10  misstating the law.  I mean --

11        THE COURT:  Look, folks.  The answer is this.  You

12  may ask it with respect to litigation.  If they have commenced

13  an action against another asbestos producer, manufacturer,

14  deliverer, or whatever, you may ask that question.  If they

15  have never -- if they have filed a claim against another

16  producer other than Grace, you may ask that question.

17        MR. BERNICK:  That's fine.

18        THE COURT:  But with respect to providing all these

19  information codes, I think that's going a bit far.

20        MR. BERNICK:  Well, with respect to where they have

21  initiated a claim or been paid a claim or initiated litigation,

22  we absolutely do need -- we do need the codes there, because,

23  otherwise, you can't tell that the nature of the exposure was.

24  So all they have to do is if they worked let's say at five

25  sites where they have made claims against different folks, they

1  just have to give us what was their job and what was --

2  ultimately what was the product to which they were exposed at

3  those five sites.

4        THE COURT:  That's fine.  That's fair enough.  It'll

5  be limited to that, having filed -- pursued a claim or

6  commenced an action.

7        MR. BERNICK:  Yes, so that will define what we can

8  ask for by way of sites --

9        THE COURT:  Yes.

10       MR. BERNICK:  -- and we have follow up questions that

11  ask for the exposure.

12       MR. LOCKWOOD:  Well, again we're -- at the moment

13  we're just on the instructions, Your Honor.  Paragraph H, part

14  seven --

15       THE COURT:  All right.

16       MR. LOCKWOOD:  -- Supporting Documentation, this

17  again talks about any and all documents that you and your

18  counsel have or reasonably can obtain that support or otherwise

19  relate to your diagnosis.

20       THE COURT:  All right.  We can --

21       MR. LOCKWOOD:  That's incredibly -- and your

22  exposure.  That's incredibly broad and vague, both.  The

23  reasonably can obtain implies -- imposes the burden that we

24  discussed earlier about going out and generating new

25  information.

1          THE COURT:  No, I don't think people have to go out

2  to generate something that they don't already have.  But again,

3  as I said, if they attach it now, they don't have to attach it

4  later.  If it's something they're going to need to prove their

5  claim later, it would be better for them to do it now, so they

6  don't have to do it through this process later.

7          MR. LOCKWOOD:  That may be, Your Honor, but the word

8  must doesn't give them any discretion.

9          MR. BERNICK:  It's you or your counsel.  All we want

10  is what they would have to do in an ordinary case if they were

11  prosecuting a claim.  They would be obliged to get the medical

12  information.  I believe Your Honor had already ruled on this

13  about --

14          THE COURT:  Well, you've already said on the medical

15  information, but this is going beyond the medical.  It seems to

16  me, Mr. Bernick, that it would be fair to simply say that you

17  or your counsel have, take out the reasonably can obtain, and

18  make this a continuing duty.  If something else comes up, then

19  they have to produce it.

20          MR. BERNICK:  Every one of these people is going to

21  tell us, oh, we don't have it at our office.  It's at the

22  doctor's office, and we can't possibly get it.  That's exactly

23  what they're going to say.

24          THE COURT:  Well, it seems to me that if it's the

25  doctor's office, the doctor is the agent of the patient in this

**J&J COURT TRANSCRIBERS, INC.**

1  instance just like the attorney is.  That's clearly within the

2  patient's custody or control if not custody.

3         MR. BERNICK:  We'll make this easier.  We'll focus it

4  on the diagnosis and on exposure to Grace products.  This is

5  broader.  It's goes exposure to asbestos-containing products.

6         THE COURT:  All right.

7         MR. BERNICK:  And I think --

8         MR. LOCKWOOD:  Your Honor, this --

9         MR. BERNICK:  -- it's very reasonable.

10        MR. LOCKWOOD:  This or otherwise relate to, I mean

11 it's one thing to ask for the document that the plaintiff wants

12 to tender as supporting his claim --

13        MR. BERNICK:  The rest.

14        MR. LOCKWOOD:  -- the or otherwise relate to, I don't

15 even know what that means.  I mean that's incredibly broad.

16        MR. BERNICK:  That's what it means in any discovery

17 case.  This is -- the relate to operative term is standard in

18 any discovery process, so that we're not simply talking about

19 what the claimant would like to refer to, but we're talking

20 about the other things that relate to the --

21        MR. LOCKWOOD:  Again, we're talking about this is as

22 though it was an individual claims allowance.  I mean this is

23 an estimation.  It's supposed to be streamlined.

24        THE COURT:  It is.

25        MR. LOCKWOOD:  What's streamlined about asking for

232

1  anything that might relate?  I mean the word --

2           THE COURT:  Folks, I've made a ruling.

3           MR. LOCKWOOD:  -- relate is unbelievably.  Everything

4  relates to everything else, Your Honor.  I object.  When I get

5  those kind of discovery requests, I always object to the term

6  relate to.

7           THE COURT:  Well, then they can object to it if

8  that's what they want to do.

9           MR. LOCKWOOD:  I get sustained regularly, because

10 it's too broad and vague and undefined.

11          THE COURT:  But the standard is going to be whatever

12 they need to get through the Trust process that they can put in

13 this now they don't have to do again.  That should be a big

14 incentive, and on top of that they'll get their claim treated

15 first.  That should be a big incentive for them to go out and

16 get whatever documents that support this claim, so they don't

17 have to --

18          MR. LOCKWOOD:  I agree with that, Your Honor, but

19 again --

20          THE COURT:  -- do it again.

21          MR. LOCKWOOD:  -- this uses the word must.

22          THE COURT:  It says --

23          MR. LOCKWOOD:  It says the questionnaire must be

24 accompanied by it.  It doesn't say the questionnaire may be

25 accompanied by it.

1              MR. BERNICK:  The Court has heard from  Mr. Rockwood.

2    This is the fifth time or sixth time he has made the argument.

3    This is basic discovery rules.  Your Honor has ruled on this

4    repeatedly, and all he's doing is seizing upon the unfortunate

5    opportunity that the same language has recurred again to

6    reargue exactly the same point.  Your Honor has ruled on this.

7              THE COURT:  All right.  I think this could be

8    amended --

9              MR. LOCKWOOD:  Your Honor, you haven't ruled on this.

10             THE COURT:  It could be something like this.

11   Documents that you, your counsel, or your doctors have, period.

12   Take out the reasonably can obtain and make it a continuing

13   duty.

14             MR. LOCKWOOD:  Can we limit it to that support your

15   diagnosis rather than or otherwise relate to?  I mean, because

16   again -- or find some debtor term than otherwise relate to.

17   Your Honor, do you know what otherwise relate to means in the

18   context of exposure?

19             THE COURT:  Sure.

20             MR. LOCKWOOD:  I don't.

21             THE COURT:  Well, I know this.  I know that if

22   there's an x-ray that doesn't support the diagnosis, because

23   it's negative, and it should be positive, that that relates to

24   the diagnosis.

25             MR. LOCKWOOD:  Well, okay.  If they want to rephrase

1  that support or contradict or negative, but otherwise relates

2  to -- I mean something relate --

3         MR. BERNICK:  I'll be happy to do support or

4  contradict.

5         THE COURT:  Fine.

6         MR. LOCKWOOD:  That's acceptable.

7         MR. BERNICK:  And conflict with.  Support or conflict

8  with.

9         THE COURT:  Fine.

10        MR. COHN:  Your Honor, once again, this is Dan Cohn

11 on the telephone.

12        THE COURT:  Yes.

13        MR. COHN:  I think that the addition of the word or

14 doctor does not reflect the reality of the type of relationship

15 that people have with doctors.  They're not like lawyers where

16 it is reasonable to expect that whatever the lawyer has in his

17 file is owned by the patient, and the patient has the ability

18 to produce.

19        THE COURT:  Mr. Cohn, I've never seen a doctor yet

20 who upon reasonable request and the copying fee doesn't produce

21 a copy of the medical documents.  So the plaintiff can get it,

22 period, end of story.  It's the plaintiff's information that's

23 significant.

24        MR. FINCH:  Your Honor, on the exposure documents,

25 any time I see a request it says any and all documents.  Some

1  of -- I mean Grace has been litigating and trying asbestos

2  personal injury cases for 20 years.  It's produced --

3          MR. BERNICK:  Your Honor, I object.  This is the

4  exact -- first of all, it's other counsel speaking for the same

5  committee.  Second of all, it's exactly the same objection --

6          THE COURT:  Please.  Please.

7          MR. BERNICK:  -- that was just ruled upon.

8          THE COURT:  Folks, can we please just get through it?

9  Go ahead.  Finish your statement, so I can hear it.

10          MR. FINCH:  There could be a warehouse of documents

11  that Grace produced in prior litigation relating to exposures

12  at job sites all over the country.  You're expecting the

13  plaintiff's lawyer to produce that, or can they just say tell

14  Grace go look in your own document depository?

15          THE COURT:  You can tell Grace to go look in its

16  document depository if you identify for Grace where in the

17  document depository it is.  So it was filed in, you know, XYZ

18  case pending in the Southern District of New York in document

19  discovery production YZ.  You can do that.

20          MR. BERNICK:  Your Honor, what I agreed to do in the

21  way of modifying this language relating to your diagnosis and

22  your exposure to Grace asbestos-containing products, it's your

23  exposure.  So if they're going to refer to documents in our

24  warehouse that deal specifically with this plaintiff's

25  exposure, that's fine.  I venture to say all that that will do

1  is be completely abused.  If they really have documents that

2  are that specific, the plaintiffs' lawyers have them.  They

3  have them in their possession.

4          THE COURT:  They probably have, but if they've

5  already produced them once, they don't need to produce them

6  again.  So if they can prove that they've already produced

7  them, you can go back into your files and get them.

8          MR. BERNICK:  Well, I think it's so simple.  They've

9  got the claim files for these people.

10          THE COURT:  They do.  Do you want to pay for the cost

11  of it then?  But if they've produced it before, they can send

12  it again, but Grace will reimburse the costs -- the copying and

13  mailing costs?

14          MR. BERNICK:  That's fine.

15          THE COURT:  Fine.

16          MR. LOCKWOOD:  Your Honor, what this discussion

17  demonstrates, in part at least, is that the plaintiffs --

18  individual plaintiffs that are trying claims against Grace

19  based on exposure theoretically would have to get discovery

20  from Grace about documents relating to their exposure, because

21  Grace would have invoices.  It would have customer lists.  It

22  would have information its files either in depositories or

23  elsewhere that would show where Grace products went

24  potentially.  And one of the things that's totally unclear to

25  me about how this process is supposed to work is that what

1  we've got is Mr. Bernick here describing all the information he

2  needs, so that his experts can attack the plaintiffs' claims,

3  but are the plaintiffs whose individual claims are being

4  attacked here under the guise of an aggregate estimation going

5  to be forced in order to rebut that to get discovery against

6  Grace to try and find out what documentation Grace has that

7  would help them prove up product I.D., which is also what goes

8  on the typical case, as Mr. Bernick is fine with saying?

9          MR. BERNICK:  That's pretty easy, because this is

10 precisely the same argument that Mr. Lockwood's partner made to

11 Judge Vance down in the Eastern District saying, well, we can't

12 really tell what the product -- you know, whether there really

13 was product I.D. until you tell us where all your boilers were.

14 Tell us where all your boilers were, so then we can tell you

15 who was exposed to them, and she said, no, these are people who

16 all filed claims against Grace already.  If they've got the

17 information, they've got it.  If they don't have it, they don't

18 have it.

19         MR. LOCKWOOD:  Your Honor, that was --

20         THE COURT:  This is not an allowance process for the

21 individuals.

22         MR. LOCKWOOD:  But in front of Judge Vance it was.

23         THE COURT:  Well, it isn't here.

24         MR. LOCKWOOD:  She -- I understand, and that's why --

25         THE COURT:  So they don't need to --

1          MR. LOCKWOOD:  -- that vassal response about what

2   Judge Vance said is not applicable in this case.

3          THE COURT:  They don't have to defend against

4   anything here if they don't want to come in.  If Grace presents

5   evidence through its experts and the committees evidence that

6   is contrary through their experts with respect to the

7   significance of the information that's being presented, that's

8   what this is all about.  It's not about adjudging whether a

9   specific claim is allowed or not.  Folks, come on.  We've been

10  doing this all day.

11         MR. LOCKWOOD:  But, Your Honor, but bear with me a

12  second.

13         THE COURT:  I don't want to bear with you.  I want to

14  get through this, Mr. Rockwood.

15         MR. LOCKWOOD:  I understand, but this is important.

16  I mean it --

17         THE COURT:  I know it's important.  I've overruled it

18  five times.

19         MR. LOCKWOOD:  I don't know what you've overruled.

20  We're talking about a questionnaire.  We haven't even discussed

21  that.  I mean --

22         MR. BERNICK:  Technically, Your Honor --

23         THE COURT:  Mr. Bernick, stop, please.  Go ahead, Mr.

24  Rockwood.

25         MR. LOCKWOOD:  Mr. Bernick is trying to put us in a

J&J COURT TRANSCRIBERS, INC.

1  position in which through some combination of the committee and

2  the plaintiffs they're going to wind up having to litigate

3  against his experts who are going to say there's no product

4  I.D. here, because the plaintiff didn't produce product I.D. --

5          THE COURT:  The Committee has discovery rights.

6          MR. LOCKWOOD:  -- and in a regular case the response

7  to that is that the plaintiff would not only be able to produce

8  their -- whatever evidence he already had, but he also would be

9  able to get evidence from the defendant.

10         THE COURT:  You have discovery rights.  If you want

11  evidence from the defendants, take them.

12         MR. LOCKWOOD:  So that means -- and the question is

13  how do we do that?  Does that mean that the Committee --

14         THE COURT:  Not through this questionnaire.  This is

15  the debtor's.

16         MR. LOCKWOOD:  I understand, but I'm trying --

17         THE COURT:  Okay.

18         MR. LOCKWOOD:  Does the Committee have to act on

19  behalf of the individual claimants who don't have product I.D.

20  to seek discovery from the debtor that could substantiate the

21  plaintiff's claims, or did the plaintiffs' lawyers individually

22  have --

23         THE COURT:  Mr. Lockwood, you're positing things

24  we've spent the whole day talking about.  You've already said

25  you don't want to be the liaison for discovery matters.

1          MR. LOCKWOOD:  Correct.

2          THE COURT:  I've said I'm going to appoint a mediator

3  for that purpose.  That's what I'm going to do, so don't worry

4  about it.  If you want discovery, you know how to take it.

5          MR. LOCKWOOD:  Okay, well, just let me then state for

6  the record I object to a questionnaire that is going to be used

7  by the debtor for the -- under the guise of estimation for

8  having experts disallow claims based on the plaintiffs'

9  inadequate evidence when the plaintiffs are not being afforded

10 under any rules the opportunity --

11         THE COURT:  Nobody is disallowing claims.

12         MR. LOCKWOOD:  -- to get --

13         THE COURT:  Your objection is overruled.  This is not

14 an allowance process.  It's an estimation process.  You have no

15 standing to raise that objection, because, as you've told me

16 repetitiously today, you don't represent the individual

17 plaintiffs.

18         MR. LOCKWOOD:  No, but I do represent them in the

19 estimation, Your Honor, and that's what -- what I'm concerned

20 about is that we're going to wind up with a very one-sided

21 record here, and we're going to have a lot of information that

22 the debtors are going to have gotten from the plaintiffs' via

23 the questionnaire.

24         THE COURT:  This is the debtor's questionnaire, Mr.

25 Lockwood.  It's not being used to for discovery by the other

241

1  side.  You can do your own questionnaire.  If you want to come

2  up with one, or you want to go through yours, the one you've

3  submitted in lieu of the debtors, if that's what you want by

4  way of evidence, we'll go through it.  If there's a different

5  one you want, propose a different one.  This is the debtor's

6  discovery.  Overruled.  Please, let's go.

7          MR. LOCKWOOD:  In the attestation instruction, part

8  five, paragraph I --

9          THE COURT:  I'm sorry.  Part five?

10         MR. LOCKWOOD:  Excuse me.  Part eight.  I miss --

11         THE COURT:  Okay.

12         MR. LOCKWOOD:  It's the second sentence.  It says,

13  "You are further attesting and swearing that you have not

14  omitted any requested information, the inclusion of which would

15  have a material effect on any right to assert a claim against

16  the debtor's estates."  I'm not aware of any provision of law

17  that enables the debtor to have that sort of a jurat on a claim

18  form or anything else.

19         THE COURT:  I'm not either, Mr. Bernick.  I think

20  that needs to be stricken.  If you want to put in a --

21         MR. BERNICK:  I am striking it out as we speak.

22         THE COURT:  All right.

23         MR. BERNICK:  True and accurate is good enough.

24         MR. LOCKWOOD:  Item J, part nine, second sentence.

25         THE COURT:  Actually, I don't think that the claimant

1  has to fill this out by -- through their lawyer.  Do they?

2          MR. BERNICK:  Well, the lawyer -- the claimant has

3  got to fill it out, and but then the lawyer also signs off, and

4  that is absolutely critical.

5          MR. LOCKWOOD:  I would note that in the normal

6  interrogatory responses in the Federal Rules of Civil

7  Procedure, Your Honor, there's no provision for having a lawyer

8  sign his client's interrogatory answers.

9          MR. BERNICK:  It absolutely blinds the realities of

10 this litigation, and it's absolutely critical that we obtain

11 the information.  If you want to put your clients to the task

12 of learning all that will be mounted in support of their

13 claims, so that they personally can attest to it, that's fine.

14 But generally speaking, we know exactly how this is going to

15 take place.  The clients will know relatively little.  It's the

16 lawyers that know everything, and it's the lawyers from whom we

17 need the information.

18         MR. LOCKWOOD:  So basically, Your Honor, we're in a

19 situation in which every time Mr. Bernick wants some

20 information he says it's required by the Federal Rules of Civil

21 Procedure, but when he wants some information that isn't

22 required by the Federal Rules of Civil Procedure, he says he

23 wants it because he has to have it, because otherwise bad

24 things will happen to him.  I don't think that's quite fair.

25         MR. BERNICK:  It's required by the Federal Rules of

243

1  Civil Procedure that when discovery responses are made, there

2  has to be a reasonable inquiry.  We've been through this a

3  thousand times.

4         MR. LOCKWOOD:  I repeat, if you look at the rules on

5  interrogatories, Your Honor, you will not see any requirement

6  they be signed by a counsel or attested to by a counsel.  It

7  just doesn't exist.

8         THE COURT:  Actually, I don't see in part nine a

9  place where the lawyer is -- oh, it says, "To be completed by

10 the legal representative.  I swear that the information is true

11 and accurate."

12        MR. BERNICK:  I would say I would modify that and

13 delete the next sentence.  I'd say, "True, accurate, and

14 complete to the best of my knowledge."  That's what it says, to

15 the best of my knowledge.  All of the information is true,

16 accurate, and complete.  That would delete the next sentence.

17        THE COURT:  Okay.  It seems to me that Part J in the

18 instructions can simply be directed to the legal representative

19 and say to the legal representation if you are the legal

20 representative of the injured person, you must sign part nine,

21 and strike all the rest of it.

22        MR. BERNICK:  Fine.

23        MR. LOCKWOOD:  I'm sorry.  Excuse me, Your Honor.

24 I'm -- oh, okay.

25        THE COURT:  And then part nine should be amended as

244

1 you stated.

2          MR. BERNICK:  Yes.

3          MR. LOCKWOOD:  Moving  to the questions themselves,

4 Your Honor?

5          THE COURT:  Yes.

6          MR. LOCKWOOD:  And keeping in mind that in general we

7 still believe that at a minimum Mr. Frankel's form of

8 questionnaire is better than this, there is a requirement in

9 Part 2A, Diagnosed Conditions, that the -- "You have to have a

10 separate part two for each such diagnosis, test, consultation,

11 treatment, or medical assessment.  For your convenience

12 additional copies of part two are attached as Appendix C."  I

13 mean that is essentially -- allows the debtor to get I guess --

14 I'm not sure what it is -- impeachment material or something

15 like that.  In other words, it's -- you've talked earlier about

16 the claimants are putting in the stuff that they say supports

17 their claim.  But this is an effort to generate a multiplicity

18 of things, so that the debtor can have their experts or whoever

19 look among them and try and determine whether there's

20 inconsistencies between prior or subsequent or whatever, and

21 then --

22          THE COURT:  Oh, I didn't see it that way, Mr.

23 Lockwood.  What I thought the debtor was asking was, for

24 example, whether there is a disinterested -- I'll use that word

25 -- doctor and maybe a quote/unquote interested doctor, and that

1  -- I thought that was the reason for the information.  Maybe it

2  duplicates too much.

3         MR. LOCKWOOD:  Well, if you -- I'm focusing on the

4  language that says, "Please complete a separate part two for

5  each such diagnosis, test, consultation."  The stuff about the

6  relationships are separate questions under the -- under each

7  form in part two.

8         THE COURT:  Well, yes.  So what it's saying, for

9  example --

10         MR. LOCKWOOD:  I mean for a cancer claimant, for

11  example, every time you went to the doctor, it would produce

12  potentially a diagnosis, test, consultation, treatment, and if

13  you've been -- had cancer for five or ten years, I mean you

14  might have to produce a ton of part twos, each one of which

15  describes each visit to the doctor.

16         THE COURT:  Yes, that's --

17         MR. LOCKWOOD:  I just don't understand why this is --

18  why --

19         THE COURT:  I think that's -- in that sense I agree

20  with you.  That's asking too much.  It seems to me that there

21  may be certain parts of these, for example, the cancers, once

22  diagnosed, that's probably what you need, unless there's a

23  contrary diagnosis at some point.

24         MR. BERNICK:  Let me --

25         MR. LOCKWOOD:  Well, even in the case of severe --

1           MR. BERNICK:  Let me look at this.  See, the problem

2  -- obviously, you know where we're going, which is the -- we

3  want to know about all the diagnoses of this asbestos --

4  alleged asbestos-related condition.  That's what we want to

5  know.  Different doctors, different times, different

6  conditions, that's what we want to know.  We don't want all of

7  the treatment, history, and all the rest of that stuff.  So I

8  think what we probably should do, "If you have been diagnosed

9  with multiple and/or if you received diagnoses, consultations

10 relating to the same condition by multiple doctors, please

11 complete part two for each such --" I think I would probably be

12 inclined to take out the word treatments in both situations,

13 because I think that that's --

14          THE COURT:  Well, in consultations and medical

15 assessments maybe -- if you're really looking at diagnoses --

16          MR. BERNICK:  You're really looking for diagnoses.

17          THE COURT:  -- then why don't you limit it to

18 diagnoses --

19          MR. BERNICK:  Yes, I would say, "Consultation --

20          THE COURT:  -- except perhaps for the pulmonary

21 function test?  I don't know whether you need -- or maybe you

22 can define it --

23          MR. BERNICK:  Or say, "And/or receive diagnoses,

24 comma, diagnostic tests."  So it's not all tests.  It's

25 diagnostic tests relating to the same condition for each such

1 diagnosis and diagnostic test.  So we will eliminate,

2 "consultations, treatments, and medical assessments," from both

3 sentences.  We will still include diagnosis, and we will

4 include tests, but they will be only diagnostic tests.

5          THE COURT:  Mr. Lockwood.  Okay.  Next.

6          MR. COHN:  Excuse me, Your Honor.  Once again, this

7 is Daniel Cohn for the Libby plaintiffs.

8          THE COURT:  Yes.

9          MR. COHN:  I do want to clarify since every time a

10 patient goes to the doctor in effect they are re-diagnosed.  I

11 take it that what is being referred to is the first diagnosis

12 by a particular doctor.

13          THE COURT:  Maybe it would make sense, Mr. Bernick,

14 to say the initial diagnosis, and then any diagnosis that

15 changes the original diagnosis.

16          MR. BERNICK:  That's fine.  We will include language

17 to that effect.

18          THE COURT:  Okay.  Mr. Cohn, I think that would make

19 more sense.

20          MR. COHN:  It would certainly limit the amount of

21 burden here, Your Honor.

22          THE COURT:  All right.  Okay.

23          MR. BERNICK:  Mr. Lockwood is now flying through the

24 balance of these questions, because they're so pure and clean.

25 Right?

1            MR. LOCKWOOD:  My objection to the extent of them has

2    already been noted.  In -- continuing on, there's a paragraph

3    starting, "With respect to your relationship to the diagnosing

4    doctor," when -- the second question is, "Did you pay the

5    doctor for the services performed?"  I'm not exactly -- for the

6    diagnosis or for treatment?  I mean I'm not quite sure.  I mean

7    I'm not sure what the services are here.  My assumption is that

8    what is being sought -- and again I -- just this seems to me to

9    be an effort to show bias, which is an individual issue for

10   between a plaintiff and his doctor, but it --

11           MR. BERNICK:  I'll amend it to say, "diagnostic

12   services."

13           MR. LOCKWOOD:  I take it the word counsel in the next

14   sentence should be s-e-l not c-i-l.

15           MR. BERNICK:  We're working with an old version.

16   Yes.

17           MR. LOCKWOOD:  Oh, okay.

18           THE COURT:  I'm not sure that the words, "were you

19   required," are appropriate.  Maybe it's did you retain counsel.

20           MR. BERNICK:  Yes.  Right.  We wouldn't want to imply

21   any -- did you retain counsel in order to receive --

22           THE COURT:  I'm not clear about what you're trying to

23   get out with respect to the did you pay for services of the

24   diagnosing doctor.  Are you trying to find out whether the

25   lawyer paid, or no one paid, or --

1              MR. BERNICK:  Well, the lawyer paid.  Yes.

2              THE COURT:  Okay.  Maybe it should just say who paid.

3  "If the doctor was paid for the diagnosis, who paid him?"

4              MR. BERNICK:  Well, as much as possible, you're

5  trying to get check in the box type of thing.

6              THE COURT:  All right.  Well, because here's the

7  thing.  If, in fact, there is a recovery for this plaintiff,

8  won't the lawyer have been reimbursed for that payment by the

9  plaintiff anyway?

10             MR. BERNICK:  Okay, so --

11             MR. LOCKWOOD:  I believe this is --

12             MR. BERNICK:  That's fine.  We'll do fill in the

13  blank.  "Who paid?"

14             THE COURT:  Okay.  Next.

15             MR. LOCKWOOD:  The final question, "Did the doctor

16  have a financial or social relationship direct or indirect with

17  your legal counsel," as written would appear to be -- require

18  the plaintiff, who's the one who is supposed to fill this out,

19  to determine from either his doctor or his lawyer whether they

20  belong to the same gym, among other things.

21             THE COURT:  Yes, I agree.  That's --

22             MR. LOCKWOOD:  I mean this is just ridiculous.

23             THE COURT:  I agree.  I understand what you're trying

24  to get to, but, frankly, I'm not sure that that's a proper

25  statement.

1           MR. BERNICK:  Well, what -- here's what -- what we

2   are trying to get to is does the doctor have a financial or

3   social relationship with the lawyer.  That's what we want.

4           THE COURT:  But the plaintiff may not know, so the

5   question may be are you aware of a financial or social

6   relationship with the -- between the doctor and your legal

7   counsel, and if so, what is it.

8           MR. BERNICK:  Fine.

9           MR. LOCKWOOD:  Your Honor, I mean what is the point

10  in asking whether or not a lawyer has -- you know, plays bridge

11  with a doctor or something?  I mean --

12          THE COURT:  Actually, I --

13          MR. LOCKWOOD:  -- the social relationship part of

14  this, I -- it's one thing to talk about raising questions that

15  somehow or another these doctors are on the lawyers payrolls in

16  some way, but this social relationship --

17          MR. BERNICK:  Very soft hypothetical.  Extremely.

18          THE COURT:  Well, I don't need a hypothetical.  Why

19  doesn't the question before it address it?  "Was the diagnosing

20  doctor referred to you by counsel?"  Why isn't that enough?

21          MR. BERNICK:  Because there are -- there's a vast web

22  of relationships between the lawyers and the doctors, and this

23  is an opportunity to get the claimant also to say what he knows

24  or she knows.

25          MR. LOCKWOOD:  And then the --

1           MR. BERNICK:  Excuse me.  So whether or not there was

2  payment or retention, that's ultimately not going to answer the

3  question.  The question is, for example, if the Motley Rice

4  firm has an ongoing financial relationship with a certain

5  doctor who then sees a claimant who is represented by Perry

6  Weitz.

7           THE COURT:  Exactly, but how are the plaintiffs going

8  to know that?

9           MR. BERNICK:  Well, but see you don't -- we don't

10 know but --

11          THE COURT:  Well, fine, then ask are you aware of,

12 you know, a relationship between your legal -- don't say

13 financial or social, just a relationship between your doctor

14 and counsel, and if so, what is it.

15          MR. BERNICK:  Fine.

16          MR. LOCKWOOD:  Again, Your Honor, I would just note

17 that -- I mean what --

18          MR. BERNICK:  This is a filibuster.  He --

19          MR. LOCKWOOD:  The answer to that is the doctor and

20 my lawyer are friends.

21          THE COURT:  Fine.

22          MR. LOCKWOOD:  What expert is Mr. Bernick going to

23 find who's going to say that has any bearing on an estimation

24 issue as to the validity of this guy's claim?  I mean this is

25 so -- this is just outrageous.  The extent to which he is going

252

1  afield here looking for -- this is sort of impeachment material

2  or bias.  If you were trying an individual case, it might

3  conceivably have some relevance, but I mean --

4          THE COURT:  Mr. Bernick, you're going to get the

5  names of the doctors and the names of the lawyers, and, quite

6  frankly, from your own experience, aren't you going to know who

7  has relationships?

8          MR. BERNICK:  Well, the amazing thing, Your Honor, is

9  that Judge Jack kind of got into it.  Other people have gotten

10 into it in part, but there really is -- I hate -- it sounds

11 like, you know, there's a crusade.  There's no crusade.  Nobody

12 really knows all of these relationships, unless --

13         THE COURT:  Well --

14         MR. BERNICK:  -- unless you conduct discovery, and

15 the fact of the matter is that this now is a very, very key

16 issue.  I'm prepared to take social --

17         THE COURT:  Wait.  Let me ask a question.  Do the

18 Trust distribution procedures require a diagnosis by or a read

19 by any specific entities?

20         MR. BERNICK:  No.

21         MR. LOCKWOOD:  No.

22         THE COURT:  No.

23         MR. BERNICK:  No.

24         THE COURT:  So you can still use the pre-petition

25 entities for that purpose.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Yes.  See, I would take this, Your

2 Honor, and I would say --

3          MR. LOCKWOOD:  Yes --

4          MR. BERNICK:  Excuse me.  Your Honor, we are never

5 going to -- we really -- I think what's going on now --

6          THE COURT:  It's your time.

7          MR. BERNICK:  -- is that we're running against the

8 clock, and we can see exactly what's happening.  The clock is

9 going to run out before 5:00.

10          THE COURT:  Well, then you're going to stay, folks.

11          MR. LOCKWOOD:  Your Honor, I mean this is just gross.

12 Mr. Bernick and I have spent days arguing about this kind of

13 stuff.  He's told me to pound sand every time.  Now I have an

14 opportunity to argue to a neutral observer, and he claims that

15 I'm trying to run out the clock for reasons -- why would I want

16 to run out the clock?

17          THE COURT:  Would you both like to stop attacking

18 each other and get to the merits, or do you really want to come

19 back after 5:00?  I mean it's your colleagues who are going to

20 suffer not me.

21          MR. LOCKWOOD:  In any -- I think --

22          MR. BERNICK:  I would offer to amend this --

23          MR. LOCKWOOD:  -- this question is grossly

24 inappropriate.

25          MR. BERNICK:  -- to say, "Did the doctor have a

254

1  financial or professional relationship with your legal

2  counsel?"  Now, I would also be -- I think I want to ask the

3  claimant this.  If I can get the -- if we can get the lawyers

4  to attest to that, that's also fine.

5       THE COURT:  It's not a questionnaire for the lawyers.

6  I mean they're --

7       MR. BERNICK:  Well, I've only got a couple

8  opportunities to find out this very important issue of bias.

9  There's a network out there.  I want to know what the network

10  is.

11       THE COURT:  I think it's fine if you say, "Are you

12  aware of a relationship between your counsel and your doctor,

13  and if so, what is it?"

14       MR. BERNICK:  That's fine.

15       THE COURT:  And if what you get is that they're

16  friends, then --

17       MR. BERNICK:  It's -- done deal.

18       THE COURT:  -- it's an irrelevancy.

19       MR. BERNICK:  Done.  Done.

20       THE COURT:  All right.  Next.

21       MR. LOCKWOOD:  I don't know why they need all the

22  specificity about tobacco products, Your Honor.  I mean it's

23  one thing to say do you use them or have you ever used them.

24  It's another thing to start trying to get your tobacco history.

25  I mean --

1          THE COURT:  Yes, I'm not really clear about that

2  either.

3          MR. BERNICK:  Because it translates directly into

4  risk.  On the basis of numbers of pack years you can get

5  directly to risk of lung cancer.  It's a question of arithmetic

6  calculation based upon published tables.  If you don't have

7  pack years, you don't get risk.  If we're talking about

8  somebody who's a 35-pack year smoker and is exposed to Grace

9  asbestos for a period of three months, and the question is did

10  Grace asbestos substantially contribute to their lung cancer,

11  we can calculate in half a heartbeat probability of causation

12  on the basis of the number of cigarettes they smoked.  It's

13  that simple.

14          MR. LOCKWOOD:  And we will then knock out one of

15  118,000 claims we think on the basis of this Court making an

16  estimation not a --

17          THE CLERK:  Speak into the mike, please.

18          MR. LOCKWOOD:  -- an estimation not an adjudication

19  of that issue.  Right?

20          MR. BERNICK:  No, to the contrary the evidence is

21  overwhelming.  The people who had significant exposure to

22  asbestos also were heavy smokers.  Everybody knows that.

23          MR. LOCKWOOD:  And the evidence is also overwhelming

24  of the synergy between asbestos and smoking, and you have a 55

25  times greater risk of getting lung cancer if you had asbestos

1  exposure as well as --

2           THE COURT:  All right.

3           MR. LOCKWOOD:  -- as well as --

4           THE COURT:  I don't -- it's calculated to lead to

5  relevant admissible evidence, so it's fine.  I don't know how

6  it will be used, but it's calculated that way.  It's fine.

7  Next.

8           MR. LOCKWOOD:  On the B reader form, the same

9  question about financial or social relationship with counsel

10 or --

11          THE COURT:  Fine.  It should be -- all of them will

12 be amended the same way.

13          MR. FINCH:  Your Honor, what if a chest x-ray was

14 read by a doctor that was not a B reader, or what if the

15 asbestosis was diagnosed through a high resolution CAT scan?

16          MR. BERNICK:  Well, then that's pretty simple,

17 because then you'll be able to provide the documentation.

18 Along with the required documentation it says give us what you

19 got.

20          THE COURT:  Do you want something else added under

21 four that says if it wasn't provided by a B reader, who did it,

22 and what was the method?

23          MR. FINCH:  Sure.

24          MR. BERNICK:  Okay.  We'll stick that in.

25          THE COURT:  Fine.

1          MR. LOCKWOOD:  On the pulmonary function test, why do

2    we need the height and weight?

3          MR. BERNICK:  Because that --

4          THE COURT:  That definitely affects -- even I with a

5    child with -- not asbestos -- with asthma know that's a very

6    relevant standard to the readings.

7          MR. LOCKWOOD:  Well, but I mean it's a very

8    individualized standard as well.

9          THE COURT:  Yes.  Well, okay.  I don't know whether

10   there will be evidence about the population and whether or not

11   they will be the same height and weight.

12         MR. BERNICK:  It all goes into the interpretation of

13   the --

14         THE COURT:  But it does go to that, so, all right.

15   That's approved.  I don't know what the experts will do with

16   it, but it's calculated to lead to appropriate evidence, so

17   let's go.

18         MR. LOCKWOOD:  Same function -- question about

19   financial and socialization.

20         MR. BERNICK:  We will conform -- just to save time,

21   we will conform all questions relating to the relationship to

22   comply with what we have undertaken and the Court has ordered

23   as that -- those questions first were posed to the questioner.

24         THE COURT:  All right.

25         MR. LOCKWOOD:  Okay, then move to Part 3, "Exposure

1  to Asbestos Products."

2          THE COURT:  All right.

3          MR. LOCKWOOD:  The first one -- the very first text

4  under that talks about completing a separate Part 3 for each

5  applicable site.  If you look at Part 3, it is three pages, and

6  so as we were discussing earlier this morning, Your Honor, if

7  you're a construction worker that's worked at 50 or 100 sites

8  in their life -- and this says asbestos-containing products.

9  It doesn't say Grace asbestos-containing products.  So you get

10 to do multiple forms for not only all your Grace exposures but

11 all of your non-Grace exposures.  I mean this is --

12         THE COURT:  Yes, I think the ruling that I made with

13 respect to the litigation should -- and the claim having been

14 filed should be sufficient for that purpose.  If somebody has

15 filed a claim, you're going to know it, so why do you need that

16 additional information now?

17         MR. BERNICK:  I don't -- what we said was that if

18 they have filed a claim, they should know the information, and

19 they then should provide it.  If they have not filed a claim,

20 then we're saying that -- you've just already told us you've

21 ruled that we can't get -- we're not going to get the

22 information.

23         THE COURT:  Right.

24         MR. BERNICK:  So where they filed a claim we want all

25 of this information --

1              MR. LOCKWOOD:  Well, if they --

2              MR. BERNICK:  -- for each of the sites.

3              MR. LOCKWOOD:  If they filed a claim, they get to

4  fill out 50 or 100 three-page forms --

5              THE COURT:  Possibly.  If they've sued --

6              MR. LOCKWOOD:  -- in part of this non-burdensome

7  questionnaire.

8              MR. BERNICK:  If they've sued all those people.

9              THE COURT:  If they've sued 50 people, yes, that's

10  right.

11             MR. LOCKWOOD:  No.  No.  No.  It has nothing to do

12  with the number of people they've sued.  It has number of

13  exposures.

14             MR. BERNICK:  No, we --

15             MR. LOCKWOOD:  Let's assume they've sued Grace --

16             MR. BERNICK:  Peter, listen.  Listen.

17             MR. LOCKWOOD:  -- and Johns Manville, Your Honor.

18             MR. BERNICK:  No, Peter, listen.  At least listen.

19  The Court has said if we have got a -- if there's a claim or a

20  lawsuit, so that's the world.  We're not -- we are agreeing --

21  we're complying with what the Court has said.  This will not

22  extend to other exposures where a claim or a lawsuit has not

23  been made.

24             THE COURT:  All right, so the definition --

25             MR. LOCKWOOD:  I understand that, but, Your Honor --

1          THE COURT:  -- the introduction section has to be

2    changed.

3          MR. LOCKWOOD:  But my -- the point I'm trying to

4    make, Your Honor, if I can make it without interruption, let's

5    assume you've sued two, Grace and Johns Manville.

6          THE COURT:  Yes.

7          MR. LOCKWOOD:  Actually, let's say it's not Johns

8    Manville, because they're -- Owens-Illinois let's say, and in

9    the course of your working career you worked on 100 job sites

10   in which you were exposed to the products of Grace, Owens-

11   Illinois, and a bunch of other asbestos manufacturers.  Even if

12   you limit this requirement to people who file claims, it still

13   says you've got to fill out a separate form for each job site

14   that you worked at even though you've only sued two defendants,

15   and even though the job sites may not even relate to exposures

16   from either of those two defendants.

17         THE COURT:  All right.  What about this?  In lieu of

18   filling it out -- filling out a questionnaire for non-Grace

19   exposure, for anybody who has filed a claim or instituted a

20   lawsuit, they can attach a copy of the lawsuit --

21         MR. BERNICK:  No.

22         THE COURT:  -- as opposed to filling this out.  Mr.

23   Bernick, this is could be very cumbersome.

24         MR. BERNICK:  Your Honor, he's --

25         THE COURT:  It's too much.  I'm not going to approve

1 it.

2          MR. BERNICK:  He is negotiating.

3          THE COURT:  Mr. Bernick, I'm not going to approve it.

4 It's too much, so figure out how to make it less.

5          MR. BERNICK:  Well, if Your Honor doesn't approve --

6 that's fine.  This is exactly the problems as why --

7          THE COURT:  This is why you're here, to negotiate

8 this order.

9          MR. BERNICK:  I understand.  Well --

10          THE COURT:  It's either negotiate or get my rulings.

11          MR. BERNICK:  Right, but see this is the problem, is

12 that if it's only in the lawsuit -- what the lawsuits say, Your

13 Honor, they say John Doe was exposed to Grace products.  John

14 Doe -- in fact, they don't even say that.  John Doe was a

15 worker, and they say he was exposed to the defendant's

16 products, and there's --

17          THE COURT:  All right.

18          MR. BERNICK:  There's an Exhibit A.

19          THE COURT:  Okay.

20          MR. BERNICK:  There's 40 different defendants.

21          THE COURT:  That's fine.  If that's the case and it's

22 not relevant, then have one separate page for every non-Grace

23 entity that you have either sued or filed a claim against, and

24 on that one page list the exposures and the occupation code

25 without all of this other identification, because that way you

1  can get the fact that there was a suit filed against another

2  manufacturer or whatever -- distributor or whatever it's going

3  to be in the occupation code and the dates.

4          MR. BERNICK:  Well, Your Honor, with due respect, and

5  I know it's late, but this is absolutely of the essence.  Let's

6  assume you've got an individual who was exposed to asbestos for

7  ten years, and they're exposed to Grace asbestos in the last

8  year, we get very detailed information on the exposure, and it

9  turns out it's a job where his exposure was minimal.

10          THE COURT:  How is that going to translate to future

11 claims, which is the purpose?

12          MR. BERNICK:  Because the -- and he has got any kind

13 of particularly asbestos.  In the prior nine years he was

14 working directly with and manipulating Owens-Corning asbestos,

15 Owens-Illinois asbestos.  You have to know the nature of the

16 exposure, otherwise, they -- all exposures will be treated the

17 same, and there's no sense of whether the Grace exposure

18 actually was causal.  They want to be able to argue at the end

19 of the day that no matter what the Grace exposure was, it was

20 enough and not have the Court know about how intense the other

21 exposures are.

22          THE COURT:  I still think this is too much for

23 everybody for every exposure.

24          MR. BERNICK:  But every site --

25          THE COURT:  Now, if somebody has ten --

                    **J&J COURT TRANSCRIBERS, INC.**

263

1          MR. BERNICK:  It's every site.  All your --

2          THE COURT:  If somebody has ten exposures over the

3    course of a lifetime, that's one thing.  But if you're a

4    construction worker and working on ten sites a year for 25

5    years, it's too much.

6          MR. BERNICK:  But, Your Honor, those -- they have

7    brought claims against all of those different people.  If they

8    brought claims, it's not too much trouble for them to specify

9    what's on a piece of paper.

10         THE COURT:  That's what I said.  Put it on one piece

11   of paper what the occupation code --

12         MR. BERNICK:  We'll put it on one piece of paper per

13   site.

14         THE COURT:  -- is, what the site was, whatever

15   information you want without all of this.

16         MR. BERNICK:  Got it.

17         THE COURT:  During each exposure what, if any, of the

18   following were you, a worker who removed, a worker who mixed --

19         MR. BERNICK:  Yes, one page per site.

20         THE COURT:  No, one page per claim or per suit per

21   defendant.  One page.

22         MR. BERNICK:  One page per claim?

23         THE COURT:  If you file -- if I'm the asbestos

24   plaintiff --

25         MR. BERNICK:  Right.

1              THE COURT:  -- and I have sued Grace and Owens-

2  Corning and Pittsburgh Corning --

3              MR. BERNICK:  Right.  I get three -- there are three

4  pages.

5              THE COURT:  There are -- well, you can have exposure

6  to Grace at every place they ever worked.  This is fine for

7  Grace.

8              MR. BERNICK:  Okay.

9              THE COURT:  I'm not objecting to it for Grace.  I'm

10  objecting to it for not Grace.

11             MR. BERNICK:  Okay, so it's for each non-Grace claim

12  defendant or sued defendant we get one page on exposure.

13             THE COURT:  One page on exposure that tells the

14  person to list the place where they were exposed, the dates

15  where they were exposed, the product, whatever you want on one

16  page.

17             MR. BERNICK:  Fine.

18             THE COURT:  Just a minute.

19                          (Pause)

20             THE COURT:  I'm sorry.  Next.

21             MR. BERNICK:  I think that that would take us up to

22  part four, the employment history.

23             MR. LOCKWOOD:  Well, wait a minute.  Excuse me, Your

24  Honor.  So if they were exposed to Grace products in, you know,

25  X number of job sites, they have to fill out a three-page copy

1  of this form for each one of those X job sites?  Again, I mean

2  this is intensely individual fact oriented.  I mean I just

3  cannot understand how we --

4          THE COURT:  They have to fill out a one and a half

5  page --

6          MR. LOCKWOOD:  We're going to have experts that are

7  going to --

8          THE COURT:  The part that related to Grace starts on

9  my page four and ends on my -- at the top of my page five.

10  It's 14 questions, and, yes, they have to fill that out for

11  every Grace exposure that they're claiming against the debtor.

12  That's --

13          MR. LOCKWOOD:  So it's two pages.

14          THE COURT:  Well, I have it as one and a half.

15          MR. LOCKWOOD:  Well, okay.

16          THE COURT:  The other says exposure to other

17  asbestos-containing products, and it's non-Grace asbestos-

18  containing products.  So it's 14 questions, and, yes, that's

19  appropriate for the debtor to figure out whether this was a

20  major or not major or any cause of the liability.

21          MR. LOCKWOOD:  Well, just for the record, Your Honor,

22  the law on what is a contributing factor sufficient to give

23  liability varies from state to state among the 50 states, and

24  in most states it's minimal.

25          THE COURT:  I understand, Mr. Lockwood, but I also

1  know that some of these plants have been closed for several

2  years, and if the people were exposed at a place that's been

3  closed for 25 years, the likelihood that 25 years from now I'm

4  going to have the same claims based on the same exposure to

5  that product and that work site is probably going to be less.

6  So it's relevant to proving whether or not there will or will

7  not be a likelihood that the types of claims that have been

8  filed against Grace in the past will be likely to be filed

9  against Grace in the future based on job site and type of

10  employment and work exposure.

11          MR. LOCKWOOD:  I don't think that's the use that

12  Grace proposes to put this to, Your Honor.

13          THE COURT:  Well, all right.  In any event --

14          MR. LOCKWOOD:  But I guess we'll find out.

15          THE COURT:  Okay.  Next.

16          MR. COHN:  Your Honor, this is Daniel Cohn again --

17          THE COURT:  Yes.

18          MR. COHN:  -- for the Libby claimants.  One small

19  matter which is in question number six under -- down at the

20  bottom of the page.

21          THE COURT:  All right.

22          MR. COHN:  There's a request for social security

23  number, and I think just because of the security implications

24  of that, that should be stricken.

25          MR. BERNICK:  What?

1          THE COURT:  The social security number I believe --

2  well, this is not going to be filed on the record.  This is

3  just going to Grace, Mr. Cohn.

4          MR. COHN:  Well, so long as -- I mean if you want to

5  instruct them to keep -- themselves to keep it confidential,

6  then I suppose that might work.  But it's probably just safer

7  to not have it be out there in the stream of commerce to begin

8  with.

9          MR. BERNICK:  Well, it's not going to be in the

10  stream of commerce.  Your Honor, there's all kinds of

11  confidential information that gets handled in the course of

12  litigation, and this is no different.

13          THE COURT:  Why don't we build into the case

14  management order or this order that it will be kept

15  confidential.  It's for use in this litigation period, and then

16  it's not to be disclosed to parties outside the litigation

17  without order of Court.  It's not going to be filed anyway, so

18  I think a confidentiality agreement will resolve that.  Can you

19  live with the last four digits of the social security number?

20          MR. BERNICK:  No.

21          THE COURT:  Why not?

22          MR. BERNICK:  Because there's a -- it's a question of

23  being able to verify the person's identity.  I mean there's

24  no --

25          THE COURT:  That's what we do in bankruptcy, identify

1 people by the last four digits.

2        MR. BERNICK:  We match these claims with silica

3 claims.  We match these claims with other claims that are made

4 against other entities, so we can verify --

5        THE COURT:  Yes, but how many John Smiths have the

6 last four digits 0-5-5-5?

7        MR. BERNICK:  A lot.

8        THE COURT:  You know, if there is somebody who has a

9 duplicate name and a duplicate number, then you can ask for

10 more.

11       MR. BERNICK:  We'll inquire to find out.  There's no

12 interest that we have beyond the ability to get other

13 information, and we'll find out if we can live with that.

14       THE COURT:  All right.

15       MR. BERNICK:  If we can, we can.  If we can't, we

16 can't.  We'll let you know.

17       THE COURT:  Well, because even the 2019 statements

18 are limited to four digits, so I don't see why that should be a

19 problem.

20       MR. BERNICK:  There's a question of matching these

21 other databases, Your Honor, and I just don't know.

22       THE COURT:  All right.

23       MR. COHN:  And, Your Honor, one more brief request,

24 if I may.  Might local counsel be excused from the call?

25       THE COURT:  Yes.

1          MR. COHN:  Thank you, Your Honor.  I appreciate it.

2          MR. LOCKWOOD:  One point I would note, Your Honor,

3 just for the record.  Four C on this thing implies an ability

4 to produce information which I think is fanciful.  It says,

5 "Dates and frequency, hours slash day, day slash year, of each

6 exposure to products attributed to Grace."  I mean plaintiffs

7 are going to be doing this from memory for things that happened

8 20/30 years ago, and Grace is going to --

9          THE COURT:  That's probably right, and they can say I

10 don't know.

11          MR. LOCKWOOD:  -- try to have its experts take the

12 position essentially that if the plaintiff doesn't remember how

13 much his exposure was, that they haven't satisfied their burden

14 of proof --

15          THE COURT:  Mr. Lockwood, that will be my call --

16          MR. LOCKWOOD:  -- to prove their dosage.

17          THE COURT:  -- and if it's something that happened 25

18 years ago and they say I don't remember, I'm going to believe

19 that they don't remember.  So I will caution Grace in advance

20 not to try that type of attack if Grace had any intention of

21 doing that.  Next.

22          MR. LOCKWOOD:  Paragraph -- number -- questions

23 number, on the same topic, nine in particular, I don't

24 understand why they need the dates that the other injured

25 person was exposed to each Grace asbestos-containing product.

270

The claim is not being pursued here on behalf of the other

injured person.  It's being pursued on behalf of the person who

has a contact with that.  The issue is whether the person with

the contact had sufficient proximity, and most of these cases

involve mesothelioma claims.  I'm not sure I've heard of any

sort of derivative asbestosis or pleural claims.

MR. BERNICK:  Then they don't have it.  Your Honor,

this -- frankly, this is -- I will personally run out of time,

because I have got to catch a plane, and all we're doing is

repeating things, and this is a frivolous point.  Obviously, if

they don't have a derivative claim for some other disease, they

don't have it, and it's completely irrelevant.  With respect to

mesothelioma, if the claim is for derivative exposure,

everything depends upon the person who was principally exposed,

but it --

MR. LOCKWOOD:  But it --

MR. BERNICK:  Excuse me.

MR. LOCKWOOD:  But there's no minimum dose

requirement for mesothelioma, Your Honor, so --

MR. BERNICK:  Excuse me.  This is absolutely standard

information.  Did your husband bring asbestos fibers home on

his clothes, and did you wash them?  That's really what we're

talking about.  That's the classic exposure situation.  If you

don't know what the injured person's exposure was, you have no

way of gauging whether there's any basis for the derivative

1 claim to say that there was exposure.

2        THE COURT:  Yes, but I don't know how somebody could

3 say the date that each person was exposed to -- you know, every

4 time your husband comes home and you wash clothes, is that

5 supposed to be listed separately as a date of exposure?

6        MR. BERNICK:  It's very simple.  My husband worked at

7 X plant from 1965 to 1966.  He came home with asbestos on his

8 clothes, and I washed them.

9        MR. LOCKWOOD:  Right, and so then let's assume the

10 husband is dead.  The wife comes down with mesothelioma, and

11 now she's got to fill out a form saying my husband was exposed

12 to Grace products on the following days for each asbestos

13 product.

14        MR. BERNICK:  She's got mesothelioma --

15        MR. LOCKWOOD:   How is she possibly going to be able

16 to do that?

17        MR. BERNICK:  Let me venture to say if she has

18 mesothelioma, all of your law firm clients I'm sure have

19 already investigated every possible exposure and every possible

20 claim that could ever be brought on behalf of that woman,

21 because there's a very valuable place --

22        THE COURT:  I think the problem is the underlying

23 each.  If it simply says the nature of the other person's

24 exposure to Grace's products, that's one thing.  And then if it

25 says approximate dates other person was exposed to Grace as per

1  asbestos products, that's probably fine.  But asking for each

2  date as to each product, nobody's going to be able to remember

3  that.

4         MR. BERNICK:  If they can't remember it, John, they

5  can't remember.

6         THE COURT:  Mr. Bernick, you're asking for something

7  that's not possible.  Amend it.  Okay.  Next.

8         MR. LOCKWOOD:  Where do we stand -- I take it on sub-

9  paragraph B as exposure to other asbestos-containing products,

10 we've been through that.  That's the one page --

11        THE COURT:  That's right.

12        MR. LOCKWOOD:  -- against the other defendant?

13        THE COURT:  Correct.

14        MR. LOCKWOOD:  Okay.  Part four, "Employment

15 History."  "Other than jobs listed --" at the beginning of it

16 it says, "Other than jobs listed in part three, these being the

17 jobs that you claim your exposure is based on, please complete

18 a separate part four for all of your prior work experience

19 during the past 20 years up to and including your date of your

20 current employment."

21        THE COURT:  I don't have -- that's not what mine

22 says.  It says, "Other than jobs listed in part three, please

23 complete a part four for all of your prior work experience up

24 to and including your current employment."

25        MR. LOCKWOOD:  Did they --

1          THE COURT:  For each job --

2          MR. LOCKWOOD:  Mine says separate, but even if they

3 deleted the word separate, if it says, "Please complete a part

4 four," aren't they saying that you have to complete a separate

5 one?

6          MR. BERNICK:  "Other than jobs listed, please

7 complete this part four for all of your prior work experience

8 including," blah, blah, blah, blah.  We just want to know where

9 else they worked.

10          THE COURT:  Okay.  I --

11          MR. LOCKWOOD:  What's the relevance if it's not a

12 place where they claim exposure to asbestos, Your Honor?

13          THE COURT:  Yes, I agree.

14          MR. BERNICK:  For obvious reasons.  If somebody was

15 working in a textile mill, and they don't claim exposure to

16 asbestos products, there are a lot of different ways in which

17 textile fibers can cause exactly the same conditions.  This is

18 well established.  Judge Jack's opinion specifically dealt with

19 saying B reads pick up all kinds of exposures to all kinds of

20 other materials.  All we're asking them for is their jobs.

21          MR. LOCKWOOD:  Your Honor, Judge Jack dealt with the

22 other diseases that would present on an x-ray the same as

23 silicosis.  She didn't address at all what other diseases would

24 present on an x-ray or diagnostic similar to asbestos.

25          MR. BERNICK:  That's false.

1        THE COURT:  All right.  Well, the question is --

2        MR. LOCKWOOD:  It is not false.

3        THE COURT:  This says for every job you ever had.

4  Some of these folks are probably 75.  I mean do you really need

5  to go back to the time that they were ten?

6        MR. BERNICK:  Your Honor, it is a minimally invasive

7  question that produces important information.  This again is a

8  question of if it's all burden, if they can't remember it, they

9  can't remember it.  What do you want me to say, industrial jobs

10 that you've held?

11       THE COURT:  All right.  It's -- yes, that might --

12 that might be satisfactory.

13       MR. BERNICK:  Okay.  Industrial jobs that you've

14 held.  That's fine.

15       THE COURT:  All right.

16                    (Pause)

17       THE COURT:  Okay.  With respect -- I have -- this is

18 one that I noted on my own, Mr. Bernick.  With respect to part

19 five, Litigation, A, question seven, "Were you deposed, and if

20 so, attach a copy of the deposition."  They may not have a

21 copy.  The lawyer may or may not have a copy.  I don't know,

22 and I'm not going to require them to get one.  So if you want

23 permission to find out where it is and get one and pay for it,

24 fine, but I don't -- I really don't know that I see the need

25 for deposition transcripts.  If Grace was party to the suit,

1 Grace can get it.

2          MR. BERNICK:  Well, but that's -- the point is we're

3 really talking about people where Grace was not a party to the

4 suit.

5          THE COURT:  Well --

6          MR. BERNICK:  So A we will --

7          THE COURT:  It says, "Was Grace a defendant in the

8 lawsuit?"

9          MR. BERNICK:  Yes, well, that's yes or no.

10          THE COURT:  Okay.

11          MR. BERNICK:  "Have you ever been a plaintiff?"

12          THE COURT:  So if it says, "Were you deposed?  If

13 Grace was not a party, attach a copy," what do you need a copy

14 for?  And it'll have to be at Grace's expense.

15          MR. BERNICK:  That's fine.  Grace's expense.  But we

16 need a copy, because it's precisely in depositions against

17 other defendants --

18          THE COURT:  All right.

19          MR. BERNICK:  -- that they're going to make out the

20 position that they had other exposures.

21          THE COURT:  Okay.  That's fine.

22          MR. LOCKWOOD:  Your Honor, question six requests

23 information that is not generally available in discovery and

24 the State Court system --

25          MR. BERNICK:  Or the federal system.

1          MR. LOCKWOOD:  -- and it is -- or the federal system

2 and is -- I don't understand the relevance of it, but

3 whatever --

4          THE COURT:  Well, actually --

5          MR. LOCKWOOD:  -- Owens-Illinois may or may not have

6 paid somebody to settle a claim --

7          THE COURT:  The recent cases actually are saying that

8 it is discoverable even if it's not admissible under the

9 Federal Rules of Evidence.

10          MR. LOCKWOOD:  That may be.  I'm not arguing

11 necessarily the whole thing on -- a lot of -- the question is

12 what's the relevance.  I mean if you got paid money from Owens-

13 Illinois on a claim against Owens-Illinois, and you've

14 disclosed that you filed a lawsuit against Owens-Illinois, and

15 you --

16          THE COURT:  Well, it could be a significant issue.

17          MR. LOCKWOOD:  -- said that a settlement agreement

18 was reached against it, what -- are we going to be having

19 contribution and indemnification cross claims in this --

20          THE COURT:  No, but it could --

21          THE CLERK:  Use the mike.

22          THE COURT:  It could be an issue, Mr. Lockwood, with

23 respect to whether or not -- if it was a huge settlement, then

24 that seems to indicate that maybe the claim against Grace,

25 which has been filed after this case was filed not before, for

1 example, or something that was filed right before the

2 bankruptcy was filed, has less significance in terms of Grace's

3 product.  It may.  I'm not prejudging that it does, but it may.

4         MR. LOCKWOOD:  Well, yes, I mean that's just

5 speculation.  I mean --

6         THE COURT:  Of course.

7         MR. LOCKWOOD:  -- what kind of an expert are you

8 going to have in here that come in and say, well, somebody got

9 two million dollars from Owens-Illinois in a settlement, and

10 that, therefore, means that Grace's liability is X?  I mean

11 what --

12         THE COURT:  I don't know, but it may be enough for

13 other appropriate inquiry.  The terms of the settlement,

14 however, I'm not sure I understand why you need the terms.

15         MR. BERNICK:  Very simple.  First of all, they're the

16 one's who are asking for all settlement information as being an

17 indicator of where the marketplace stands with respect to

18 claims.  These are all people who have received settlement for

19 their claims in the last four or five years.

20         THE COURT:  But not from Grace.

21         MR. BERNICK:  Not from Grace, but the settle -- if

22 they got settlement -- the terms of the settlement paid them

23 for one disease, and that is it was settled for a certain

24 disease, and they're looking for another disease from Grace, or

25 they alleged the same exposure and take, you know, no money for

1 it from another company.

2          THE COURT:  But you keep going back to something

3 that's like a disallowance of this claim, and it's not being

4 used --

5          MR. BERNICK:  No, it's a question of pricing the

6 claim.  What's been the marketplace price for these claims --

7          THE COURT:  And you're going to have an expert that

8 will tell me that, because a particular person settled a

9 particular claim --

10          MR. BERNICK:  No.  No.  It'll be --

11          THE COURT:  -- for a specific amount, that that's

12 going to have predictive value in the future.

13          MR. BERNICK:  No, it's they are the ones who are

14 going to take the position that settlements -- settlement

15 dollars are predictive future trends.  All that we --

16          THE COURT:  Grace -- I thought it was Grace's

17 settlement dollars.

18          MR. BERNICK:  No.  No.  No, it -- that's the point is

19 that they'll say Grace's prior settlement are, but then they'll

20 fill in the gap between the time of bankruptcy and the time of

21 the estimate with their own statements about what has happened

22 to market prices since.  And all I'm saying is let's find out

23 what happened to the market prices --

24          THE COURT:  All right.

25          MR. BERNICK:  -- for these particular claims.

1          THE COURT:  Is that what your theory is going to be?

2          MR. LOCKWOOD:  I have absolutely no idea what our

3  theory is going to be, and, moreover, I have absolutely -- to

4  the extent that you're looking for -- Mark Peterson would be

5  looking to somehow or another extrapolate increases in Grace's

6  settlement values, which typically I don't think he does do --

7  if Grace has a settlement history of its own, that's what he

8  looks at.  He doesn't need to use data from other claims, and

9  in any event, even if that were true and you got -- and you're

10  determined to let him have the settlement amount --

11          MR. BERNICK:  The settlement amount -- we would agree

12  to this, (a) we want the settlement, because we need to know

13  what the settlement was for, (b) we would agree not to consider

14  or not even to ask for information relating to the price of the

15  settlement if you all will agree that you're not going to

16  characterize what happened to market prices for other claimants

17  or other defendants similarly situated to Grace from 1990 --

18  from 2001 going forward to the present time.  But if you are

19  going to place that at issue, we certainly want discovery of

20  what's happened with respect to these people.

21          MR. FINCH:  Your Honor, the way he's -- I mean I've

22  tried more of these estimation cases probably than anybody in

23  the country, and the way they typically are done is you

24  estimate based on the several share of the liability of the

25  company, and you're not valuing the whole case.  The claimant

1  from a mesothelioma case might get five million dollars all in

2  from all the defendants.  Grace's average settlement for

3  mesothelioma might be $150,000.  I mean I haven't looked at the

4  data closely recently, but that's -- and so what Dr. Peterson

5  and others like him, including Tom Florence, who was an expert

6  hired by Grace at the time of the Sealed Air litigation to

7  project what its liabilities were then, they look at the past

8  several share of the liability.  Grace has been paying $150,000

9  per case to resolve its mesothelioma cases, and the costs per

10  case has been rising steadily across the decade of the '90s.

11  In the early '90s they were paying $20,000 a case.

12          MR. BERNICK:  Your Honor, I don't --

13          MR. FINCH:  By 2001 they're paying -- let me finish,

14  Mr. Bernick.  By 2001 they were pay $150,000.  And so he might

15  extrapolate those trends forward, but he doesn't go out and say

16  I'm trying to price what the aggregate settlement amount for a

17  mesothelioma case across all defendants would be.  No one has

18  the data to do that.

19          MR. BERNICK:  That's not the purpose of the proffer.

20  It's completely beside the point.  You may think that we're

21  trying to find out how much a meso claim got as a whole.

22  That's not the purpose of this exercise.  The purpose of the

23  exercise is to anticipate that Mark Peterson will not do what

24  you're saying, that he is going to count the period of time

25  from 2001 to the present, and we want to have the data that

1 bears upon it.  And for us to sit there and listen, well, this

2 is what Dr. Peterson's going to do or not, I don't know what

3 he's going to do.  But if he's going to get into this period of

4 time, we want the data.

5 　　　　　THE COURT:  Well, okay.  First of all, then let's

6 limit the question to the time frame rather than any

7 settlement, because these settlements can go back I don't know

8 how many years.  If you're really concerned with 2002 to the

9 present or two thousand, whatever the year is, limit it to that

10 time.

11 　　　　　MR. BERNICK:  That's fine.

12 　　　　　THE COURT:  That's number one.  Number two, I still

13 have some concern about the terms of the settlement.

14 　　　　　MR. LOCKWOOD:  Could we just limit it -- if I

15 understood Mr. Bernick, what he really wanted to know was how

16 the aggregate settlement amount was spread among the individual

17 defendants as opposed to what non-monetary terms might have

18 been like the scope of a release or -- I mean the terms of the

19 settlement, to know them you'd have to have the entire

20 settlement agreement and give him a copy of it.

21 　　　　　MR. BERNICK:  It's not -- that's not true.  I said

22 it, and I'll say it again.  Your Honor, I apologize.  I'm going

23 to have -- I have to leave in about three minutes, and Ms.

24 Harding can take over, but, frankly, this has been a process

25 that's been far prolonged by repetitive arguments, and I think

1  we're kind of towards the end here.  The purpose is exactly as

2  I said.  We want to know for what claim -- that is what disease

3  -- if so and so claimant got a settlement, did he say he was

4  getting settlement for asbestos, for pleural disease?  He may

5  have made a claim for severe asbestosis, but then --

6           THE COURT:  Well, then ask that.

7           MR. BERNICK:  Well, that's what we're going to get

8  from the settlement -- from the settlement documents.

9           THE COURT:  But I'm not sure you're entitled to the

10 entire settlement document.

11          MR. BERNICK:  Well, I don't know how else --

12          THE COURT:  It seems to me that you can get -- you

13 can say, you know, identify the defendants with whom you

14 settled, the amounts, and for what disease.

15          MR. BERNICK:  Fine.

16          MR. FINCH:  Your Honor, that's -- almost all of these

17 settlement agreements with defendants are going to have

18 confidentiality provisions.  The defendant Owens-Illinois is

19 going to have in every release and every settlement is going to

20 have this is confidential, and you can't disclose it unless and

21 until --

22          THE COURT:  I'm ordering it.  Next.

23          MR. FINCH:  Owens-Illinois isn't before Your Honor.

24          THE COURT:  Then they can come in and contest it if

25 somebody violates their agreements.  I don't know what the

1  scopes of these agreements are.  To the extent that the debtor

2  is making a claim here that may be duplicative claim that it

3  alleged against somebody else and for which it recovered, the

4  debtor's entitled to know that.

5         MR. LOCKWOOD:  Well, Your Honor, if the concern is

6  about different diseases, there's an entire subsection (b) of

7  this thing which is aimed specifically at determining whether

8  or not you got a different --

9         MR. BERNICK:  That's not in the settlement papers.

10 It happens every day of the week that a claim is settled for a

11 lesser disease, because they know they can't make out the claim

12 for the more severe disease.  We just want to know --

13        THE COURT:  I don't have any problem with --

14        MR. LOCKWOOD:  Claims get settled for a variety of

15 reasons.  I mean --

16        THE COURT:  You can identify the defendant, get the

17 amount, and the disease.  It seems to me that's appropriate.

18 If somebody who's not here has an objection to it and the

19 document says that the debtor has to give notice, the debtor

20 will give notice.  Then if the debtor can't answer or somebody

21 has an objection, I'll deal with it.  Next.

22        MR. LOCKWOOD:  Part seven, supporting documentation

23 requires the person answering this questionnaire to give a

24 medical release to Grace and attach it.  That's not -- I mean

25 if this was an individual litigation of an individual claim,

1 they might be able to get a court to order a plaintiff to give

2 up their privacy rights to that extent.  But essentially --

3      THE COURT:  Yes, you're getting all the information

4 in the claim form as it is.

5      MR. BERNICK:  Well, if they -- but the point is this.

6 They can't have it both ways.  That is they can't be providing

7 this information that is filling out the claim for but then

8 saying I'm not going to authorize the release of any records in

9 order to -- that might be -- that might bear upon the veracity

10 of what I'm saying.

11      THE COURT:  You've already told them they have to

12 attach them.

13      MR. BERNICK:  Yes, that's what I'm -- well, then if

14 they have to attach them or have their lawyers provide them, we

15 just want to make sure that -- well, fine.  We don't need it.

16      THE COURT:  All right.  It's out.  Next.

17      MR. LOCKWOOD:  Have we discussed the part eight,

18 plaintiff thing that he says he's swearing I haven't omitted

19 any material information?

20      THE COURT:  It's going to be changed to put in accord

21 with the instructions.

22      MR. BERNICK:  Yes, to be true and accurate.

23      MR. LOCKWOOD:  Okay.  Part nine --

24      THE COURT:  We discussed.

25      MR. LOCKWOOD:  And we -- that's directed to the

1 lawyers.  Has that been eliminated?

2          MR. BERNICK:  No, it's just been -- I modified 9(b).

3          THE COURT:  Well, I don't think (a) is an appropriate

4 question.  This is not -- (a) is -- this form is not to be

5 filled out by the legal representative as a legal rep.  It's to

6 be filled out as the legal rep for the agent of the claimant.

7 So when you're asking about the social and financial

8 relationships between the lawyers and the doctors, I don't

9 think that's appropriate here.

10          MR. BERNICK:  Well, you can't -- I mean we have to

11 have it one way or the other.  If the claimant is not being

12 asked of this or doesn't know --

13          THE COURT:  You are asking.

14          MR. BERNICK:  But the claimant in all likelihood is

15 not going to know, and this information bears one thousand

16 percent on the very issue that we've been discussing here,

17 which are who are these doctors.  If we can't --

18          THE COURT:  The fact that the claimant isn't going to

19 know is what I tried to argue to you earlier, is the reason why

20 it didn't belong there.

21          MR. BERNICK:  Then I would be happy to have that out

22 and have this in.  This is the only way we're going to find

23 out.

24          MR. LOCKWOOD:  Your Honor, there's no provision in

25 the Federal Rules for allowing discovery demands on a lawyer

1  for a plaintiff.

2           MR. BERNICK:  That's absolutely --

3           MR. LOCKWOOD:  You get discovery against plaintiffs.

4           MR. BERNICK:  That's absolutely false.

5           THE COURT:  That's not so.  I think you can get

6  discovery --

7           MR. LOCKWOOD:  Well, you could take his deposition,

8  but there's interrogatories and document production requests,

9  which is what this is, are directed at parties.

10          MR. BERNICK:  We'll take the depositions of all of

11 the plaintiffs' firms to find out their relationship with the

12 doctors.  I'm happy to do that.

13          MR. LOCKWOOD:  You can try.

14          MR. BERNICK:  Well, we're going to -- if the Court

15 will say that we are entitled to pursue this by way of other

16 discovery, we will not include it in the questionnaire, and

17 we'll simply proceed against the law firms and take the

18 depositions.

19          THE COURT:  I'm not making rulings about what's

20 appropriate or what's not in terms of other discovery.  What I

21 don't think is appropriate is this question in this form.  So I

22 think (a) should be deleted.  You can -- I've already ruled

23 with respect to the claimants.  I don't think you're going to

24 get any valuable information there, but you want it in.  You

25 can have it in.  Take (a) out and modify (b) as we talked about

1 earlier.

2          MR. BERNICK:  What would you suggest, Your Honor,

3 because this -- at this point if we don't get this information,

4 you have eliminated our ability to deal with the whole problem

5 of fraud and the submission of these claims in this case.  We

6 have got to have the ability to conduct the discovery.  We

7 thought this is the least painful way in which to do it.

8 Absolutely the least painful way in which to do it.  We're

9 happy to take the depositions, but we can't sit there and

10 accept a pig in a poke.  That is get all this data and not have

11 any idea about what the relationships are with --

12          MR. LOCKWOOD:  Your Honor, if they're --

13          THE COURT:  Well, there's a giant leap --

14          MR. LOCKWOOD:  -- interested in determining fraud in

15 the submission of claims, I would note the following.  Number

16 one, no plaintiffs have submitted any claims yet in this

17 bankruptcy case, because there's no bar date.  There's some

18 pre-petition lawsuits pending, but this bankruptcy proceeding

19 and estimation is not an effort to determine whether pre-

20 petition lawsuits were or were not fraudulent.  Secondly, it's

21 -- again it gets to the individual claims, and it's an effort

22 to -- it assume that if the claimants and the future claimants

23 in particular and their lawyers who are on notice from Judge

24 Jack that you couldn't use these B readers and you couldn't

25 engage in these practices, that they continue to do so.

1          THE COURT:  It's a giant leap to say that because a

2  doctor and a lawyer play bridge together that there's fraud.

3          MR. BERNICK:  I said I'll change that -- financial or

4  professional relationship.

5          MR. LOCKWOOD:  And what is a professional

6  relationship, Your Honor?

7          MR. BERNICK:  Well, it's very simple.  They do

8  business with one another.

9          THE COURT:  Well, they obviously do business --

10          MR. LOCKWOOD:  But they don't pay money, so it's not

11  a financial relationship?

12          THE COURT:  -- with one another.  If there's an

13  expert witness who's testifying, they obviously have a

14  professional relationship.

15          MR. BERNICK:  No.  No.  This is with respect to the

16  doctors that are doing the diagnoses that are in the form.

17          THE COURT:  Right.

18          MR. LOCKWOOD:  Your Honor, I respectfully submit that

19  the time to argue what discovery they can get against lawyers

20  is when they make a motion for that purpose.  This

21  questionnaire should be directed at claimants.

22          THE COURT:  (a) is too broad.  I agree.  (a) is too

23  broad.  It has to be deleted, and modify (b) as we talked

24  before.

25          MR. BERNICK:  Your Honor, now we're at the 11th hour

1  in this last question, Your Honor.

2          THE COURT:  Mr. Bernick, you asked me for rulings.

3  I'm giving you rulings.

4          MR. BERNICK:  I suggested that we actually defer

5  this, and I suggest that we defer that, because we're now

6  talking about whether we're going to -- they will fight us

7  tooth and nail to avoid learning --

8          THE COURT:  They may.

9          MR. BERNICK:  -- those facts, and we need --

10         THE COURT:  Well, they may.

11         MR. BERNICK:  And we need to learn those facts.  It's

12  just that simple.

13         THE COURT:  Well, you may, but it's --

14         MR. LOCKWOOD:  Your Honor, Mr. --

15         THE COURT:  -- not appropriate in this questionnaire

16  which is directed to the claimant.

17         MR. BERNICK:  Okay.  Could we then set on for the

18  next omnibus hearing -- we will bring on a motion --

19         THE COURT:  Fine.

20         MR. BERNICK:  -- for the next omnibus hearing to

21  conduct discovery against the law firms to find out about these

22  relationships --

23         THE COURT:  That's fine.

24         MR. BERNICK:  -- and the alternative against the

25  doctors.

1          THE COURT:  Bring that motion on.  Take (a) out and

2     amend (b) --

3          MR. BERNICK:  Fine.

4          THE COURT:  -- as we've talked about earlier.  All

5     right.  Is that it?

6          MR. LOCKWOOD:  Subject to the fact, Your Honor, that

7     for the reasons previously stated, and I think exemplified by

8     the discussion that we've had going through the questionnaire,

9     which is that this -- almost every question here has -- goes to

10    the merits of individual cases, and, therefore, we continue to

11    object to the overwhelming majority of the questions, we're

12    through.

13         THE COURT:  Okay, then with respect to the case

14    management order, it needs to be modified I think once you get

15    the -- your questionnaire straight.  Are you going to be able,

16    based on what we talked about earlier, to come to some

17    agreement about the time frames to be put in the CMO?

18         MR. LOCKWOOD:  I believe we already agreed that the

19    debtors got -- essentially have gotten their questionnaire, and

20    we agreed on a case management order with the debtors, as Mr.

21    Bernick recited, as to what would happen if the debtors got

22    their questionnaire.

23         THE COURT:  All right.

24         MR. LOCKWOOD:  So I don't --

25         THE COURT:  So then I will expect to get from you on

1  a certification of counsel the case management order with the

2  revised questionnaire.

3        MR. LOCKWOOD:  There are some questions that Mr.

4  Frankel raised earlier about specific provisions in that, and I

5  think my partner, Nate Finch, may have one or two additional

6  ones that are separate from the time table.

7        THE COURT:  All right.  Mr. Bernick, if you need to

8  leave --

9        MR. BERNICK:  Yes, I'm sorry really.  I apologize,

10 Your Honor, but I --

11        MR. FINCH:  So what I would suggest is that Mr.

12 Bernick and Mr. Frankel and I discuss the -- there are a few

13 wiggles with the CMO that I don't agree to in terms of the

14 timing.  I mean not so much the brought out ones, but there are

15 a couple of dates in there that I want to discuss with him.

16        THE COURT:  All right.  That's fine.

17        MR. FINCH:  And also there's one other issue, Your

18 Honor, which I want to flag, and I don't know what the debtor's

19 position will be on this.  There was a fair number of fact

20 witness depositions taken in the context of the Sealed Air

21 litigation concerning the standards by which Grace would

22 resolve claims and how it set its reserves and what evidence it

23 would require before it would pay a claim.  I deposed the

24 former General Counsel of the company, the former Associate

25 General Counsel of the company.  I would like all those

1  depositions to be useable in this proceeding to the same extent

2  as if they were taken in this case, so I don't have to go out

3  and re-depose all those people.

4           THE COURT:  Well, that makes sense.

5           MS. HARDING:  Your Honor, there was one --

6           THE COURT:  You need to use the microphone.

7           MS. HARDING:  I'm sorry.  It's Barbara Harding for

8  Kirkland, Your Honor.  Thank you.  During our negotiation on

9  the CMO, I think we should talk about that, because at the

10  negotiation there was discussion about how those depositions

11  would be used, and apparently, there were some rulings or

12  discussion by the Court at that time, and we wanted an

13  opportunity to go back and look at the record --

14           THE COURT:  All right.

15           MS. HARDING:  -- before we agreed.

16           THE COURT:  Okay.  If there -- are they under seal?

17           MR. FINCH:  There's a confidentiality order as part

18  of this Sealed Air case, and I don't think there's anything

19  that was really said in that deposition -- in any of those

20  depositions that is confidential.  What I don't want to do is

21  -- and I think depositions are admissions as against Grace and

22  as against the Equity Committee.  I don't want the Commercial

23  Creditors Committee or some other committee to come in here and

24  say, oh, I wasn't present at that deposition.  I'm going to

25  make you go back and re-ask Mr. Beeber or Mr. Hughes, who was

**J&J COURT TRANSCRIBERS, INC.**

1  sitting in the courtroom -- still is sitting in the courtroom

2  back there, all the same questions you asked him in the summer

3  of 2002.  That's what I'm trying to avoid.

4         THE COURT:  Well, if some other entity has additional

5  discovery they want to take, perhaps they can take it.  If your

6  discovery is done, it seems to me your discovery is done.  They

7  can get copies of the transcript, unless there's some

8  prohibition against it, and I don't know why there would.  And

9  if they've got additional questions to ask, they can do it.

10        MR. FINCH:  Well, they could -- sure, they could go

11 ask additional questions.  What I don't want -- I want to make

12 clear is that the questions that I asked and the answers that I

13 got don't have to -- I don't have to go back and ask the same

14 three hours of questions of the guy.  That --

15        THE COURT:  You don't need to re-ask the same

16 questions provided that there is no bar that Judge Wolin

17 imposed of which I'm not aware, but I don't know all the ins

18 and outs of that litigation.  I didn't follow it that closely.

19 So why don't you talk about it as part of the case management

20 order?  It makes good sense that you don't redo things.

21        MS. HARDING:  We will, Your Honor.

22        THE COURT:  All right.  Anyone else?

23        MR. CARICKHOFF:  Your Honor, David Carickhoff for the

24 debtors.

25        THE COURT:  Yes.

1          MR. CARICKHOFF:  I think you had set aside August

2   17th to deal with the issues that we've addressed today.  I

3   just want to -- didn't you set a -- I thought you set a

4   separate August 17th date to deal with it.  I just want to

5   be --

6          MR. LOCKWOOD:  That's my recollection, Your Honor.

7          THE COURT:  Well, then --

8          MR. LOCKWOOD:  I had arranged my vacation schedule

9   around that, which was why --

10         THE COURT:  Then good work gentlemen getting it done

11  early I guess.  So we don't need that hearing?

12         MR. CARICKHOFF:  I just want to clarify that that's

13  off.

14         THE COURT:  There's no -- no one has any issues that

15  have to be addressed then?

16                    (No verbal response)

17         THE COURT:  Okay.  It's canceled.

18         MR. CARICKHOFF:  Thank you.

19         THE COURT:  Anybody else?

20                    (No verbal response)

21         THE COURT:  All right.  We're adjourned.  Thank you.

22         ALL:  Thank you, Your Honor.

23                    *  *  *  *  *

24

25

## CERTIFICATION

We, TAMMY DeRISI and PATRICIA C. REPKO, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter to the best of our ability.


/s/ Tammy DeRisi                Date:  July 28, 2005
TAMMY DeRISI


/s/ Patricia C. Repko
PATRICIA C. REPKO

J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**