# EXHIBIT 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., <u>et al</u>. | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

Hearing Date:
Objection Deadline:

## DEBTORS' THIRTEENTH OMNIBUS OBJECTION TO 2,938 UNAUTHORIZED CLAIMS FILED BY THE LAW FIRM SPEIGHTS & RUNYAN

With even the most limited discovery to date, the Debtors have uncovered disturbing evidence that the Speights & Runyan firm ("Speights") has filed numerous unauthorized proofs of claim in these cases on behalf of claimants Speights does not represent. As just a few examples:

- <u>The American Medical Association Building</u>:  Counsel for The American Medical Association (the "AMA") has testified that "I spoke with various representatives of the law firm of Speights & Runyan ("S&R") in late 2002 and early 2003. The subject of discussion was whether S&R would represent the AMA in this bankruptcy proceeding. *I informed S&R that the AMA did not wish S&R to represent it in this proceeding.*" *Compare* Exhibit A (7/6/05 affidavit from AMA counsel, emphasis added) *with* Exhibit B (3/27/03 Claim No. 6661 for American Medical Association Building, submitted by Speights and signed by attorney Amanda Steinmeyer of that firm)

- <u>Harvard Vanguard Medical Associates</u>:  A representative for Harvard sent a letter and affidavit confirming Harvard *"did not authorize Speights & Runyan to represent it and file a proof of claim on its behalf* in the Grace bankruptcy." *Compare* Exhibit C (7/7/05 Harvard letter and affidavit) *with* Exhibit D (3/27/05 Claim No. 6726 for Harvard Public Health/Harvard Vanguard Med. Asso., submitted by Speights and signed by Steinmeyer)

- <u>Maryland Casualty Company</u>:  Maryland Casualty ("MCC") has written to "confirm that (i) MCC has never retained the law firm of Speights & Runyan to represent MCC in the Grace Bankruptcy Cases; and (ii) *MCC never authorized the law firm of Speights & Runyan to file a proof of claim on MCC's behalf* in the Grace Bankruptcy Cases." *Compare* Exhibit E (7/1/05 MCC letter) *with* Exhibit F (3/27/05 Claim No. 6721 for Maryland Casualty Co., submitted by Speights and signed by Steinmeyer).

The extent of Speights' improper filings runs both broad and deep. From June 29, 2005 through July 5, 2005, for example, obviously anticipating this Court's scrutiny, Speights "withdrew" 180 asbestos property damage claims -- including the claims described above -- in a transparent effort to avoid judicial review of Speights' claims-filing practices. *See* Docket Nos. 8710-8936. Oddly, more than 45 of those purportedly "withdrawn" claims were for buildings *for which Speights had never filed a claim in the first place*. *See* Exhibit G (identifying 46 docket entries of "withdrawal" of claims for which the Debtors have no evidence a claim was on file). The Debtors have further learned that to date, nearly 2000 Speights-filed claims have been withdrawn en masse in other asbestos bankruptcies after challenges were made to their validity, including 1,228 in *Federal Mogul*, 328 in *Owens Corning* and 131 in *U.S. Mineral*. There can be no explanation for such practices *except* that those claims were improper from the start.

The impact of Speights' improper claims filing on the Debtors' reorganization efforts cannot be overstated. At the time these Chapter 11 cases were filed, fewer than 10 traditional asbestos property damage cases were pending against Grace. In response to the March 2003 bar date, the Debtors were inundated by over 4000 claims -- and *nearly 75% of those claims were filed by Speights*. It appears that *every single one* of the 2,938 traditional asbestos property damage claims filed by Speights was signed by either attorney Daniel Speights or attorney Amanda Steinmeyer of the Speights firm; not a single Speights proof of claim was signed by an individual claimant.

By this Omnibus Objection and for the reasons stated more fully below, the Debtors request that each and every claim filed by the Speights & Runyan firm -- a total of 2,938 claims -- be disallowed on the grounds that Speights lacked proper authority to file those claims.[1]  For the Court's ease of reference, the Debtors first here identify the categories of unauthorized Speights claims to which they object. Some claims fall into multiple categories:

---

[1]    Consistent with the Debtors' proposed PD Objections CMO, filed with this Court on July 13, 2005, the Debtors reserve all other objections on these Speights claims.  As set out in the PD Objections CMO, the Debtors expect to make all other substantive objections to all claims, including the Speights claims, by September 1, 2005.

- No 2019 Statement: 208 Claims signed and filed by Speights in 2003 were never listed in Speights' December 2004 Verified 2019 Statement. These claims plainly fail on the ground of lack of authority. A list of these claims is attached as Exhibit H;

- Buildings and Job Sites: 358 Claims were signed and filed by Speights on behalf of "Buildings" and "Job Sites." "Buildings" and "job sites" have no legal standing to file claims and Speights had no authority to bring claims on their behalf. A list of these claims is attached as Exhibit I;

- Anderson Memorial 1992 Original Complaint: 787 Claims signed and filed by Speights cite to a 1992, superseded complaint in the *Anderson Memorial* case as the basis for Speights' representation. As described in more detail below, in *Anderson Memorial*, filed in Speights' home state of South Carolina, Speights initially sought certification of a nationwide class of building owners to bring asbestos property damage claims. In 1994, the South Carolina court struck from the original complaint the claims of non-residents on the grounds that claims arising outside of South Carolina were prohibited by South Carolina's door closing statute; in 1996, the same court denied reconsideration and adopted in full the 1994 order striking non-resident claims. A second amended *Anderson Memorial* complaint, limited to South Carolina claims, was filed in 1996 and is currently pending. Nearly 800, non-South Carolina PD claims signed and filed by Speights cite to the 1992 rejected and superseded *Anderson Memorial* complaint as the basis for Speights' representation of those claims. This outdated complaint does not provide Speights with authority to file these claims. A list of these claims is attached as Exhibit J;

- Anderson Memorial 2001 Orders: 59 Claims signed and filed by Speights are brought on behalf of South Carolina entities for which Speights' authority to file is allegedly based on 3 South Carolina pleadings from 2001, including 2 that were entered by the South Carolina court *after* the automatic stay went into effect. As described further below, as the basis for Speights' supposed representation of these claimants, Speights' Verified 2019 Statement cites to (1) a February 9, 2001, ex parte, "emergency" conditional class certification (in a 10 year old case!) of asbestos property damage claims for South Carolina buildings, entered by Speights' South Carolina home state court at Speights' request in response to concerns that Grace might file Chapter 11; and (2) Orders entered by the same South Carolina state court in June and July 2001, more than four months after Grace had filed Chapter 11 and provided notification to the South Carolina court of the automatic stay. These South Carolina orders are null and void, have no legal effect, and do not provide Speights with authority to file these claims. A list of these claims is attached as Exhibit K;

- Building Questionnaires: 15 Claims signed and filed by Speights cite as authority for filing exemplar "building questionnaires" that do not reflect any signature by any client. Speights has shown no authority to bring these claims. A list of these claims is attached as Exhibit L;

- Undefined Symbol "E": 22 Claims signed and filed by Speights cite the undefined symbol "E" as the basis for authority to file. Speights' Verified 2019 Statement supports

3

no finding that Speights has authority to bring these claims. A list of these claims is attached as Exhibit M;

- Supply Stores: 31 Claims were signed and filed by Speights on behalf of construction companies, supply stores or contractors. These entities were more likely to have bought Grace product for use on other job sites than to have used any product in a manner giving rise to a proper PD claim in this matter. Further, Speights does not even provide street addresses for some of these purported claimants. The Debtors object to all of these claims on the ground that Speights did not have authority to file them. A list of these claims is attached as Exhibit N;

- Exemplar Contracts: 1,690 Claims signed and filed by Speights cite as authority to file one of ten "exemplar" contracts identified on the Verified 2019 Statement as K-1 through K-10. These 'exemplar' contracts appear deeply flawed; the Debtors object to Speights' authority to bring these claims. A list of these claims is attached as Exhibit O.

- All 2,938 Claims Signed By Attorneys Daniel Speights and Amanda Steinmeyer: All 2,938 claims submitted by Speights were signed by one of two attorneys from that firm. While under Bankruptcy Rule 9010(c) there is a presumption of authority when an attorney signs a proof of claim on behalf of a client, this presumption must fail for claims signed by these two attorneys given the factual record of these attorneys' claims-filing practices. A list of these claims is attached as Exhibit P.

In further support of these Omnibus Objections, the Debtors state as follows:

## JURISDICTION

1.      This Court has jurisdiction over this matter under 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § § 157(b)(2)(A) and (O).

2.      The statutory bases for relief requested herein are 11 U.S.C. § § 105(a), 502 and 506 and Rules 3001 and 3007 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules").

## OBJECTION AND REQUEST FOR RELIEF

3.      By this Objection and for the reasons stated within, the Debtors seek disallowance and expungement of all 2,938 claims filed by Speights & Runyan, listed in Exhibits H-P attached hereto.

4

I.      **FACTS:   SPEIGHTS HAS NOT ESTABLISHED IT HAD PROPER AUTHORITY TO FILE 2,938 CLAIMS IN THIS CASE**

A.      **Speights Signed And Filed Nearly 75% Of The Debtors' 4000+ Asbestos Property Damage Proofs of Claim**

4.      When the Debtors filed these cases in April 2001, Grace's asbestos property damage litigation was nearly 20 years old and seemed to have run its course.  Beginning in 1983, Grace faced a total of 379 property damage lawsuits covering thousands of buildings; 300 of those lawsuits were filed before 1990, many by the Speights firm.  By February 1, 2001, only 7 property damage lawsuits remained pending against Grace, including 2 on appeal, 1 on a suspense calendar, and 1 awaiting a dismissal order due to product misidentification.

5.      In stark contrast to Grace's pre-2001 property damage claims history, particularly its claims history from 1995 on, after the Debtors filed for Chapter 11 and the notice and bar date process went forward for traditional asbestos property damage claims, the Debtors received a whopping 4200 PD claims, of which 4003 remain pending.  Nearly 3000 of those claims were filed by Speights.  Specifically, Speights filed 2,938 proofs of claim, or almost 75% of the pending traditional asbestos property damage claims received by the Debtors.

6.      Of the Speights-filed claims, 1,862 were signed by Daniel Speights of the Speights firm and 1,076 were signed by Amanda Steinmeyer of the Speights firm.  It appears that not a single Speights-filed claim was personally signed by an actual claimant.

B.      **Even the Face Of The Speights-Filed Claims Reflect Enormous Problems**

7.      As reflected in the sample Speights proofs of claim attached as Exhibits B, D and F, an enormous number of the Speights claims contain no identification of Grace product,

5

state that no supporting documentation is available and plainly reflect that *no* factual investigation was undertaken before the claim was filed.[2]  For example:

(a)    In response to question 13, "for what alleged asbestos-containing product(s) are you making a claim?", these claims state simply "Surface Treatment," with no indication that a Grace-manufactured surface treatment was used.

(b)    In response to requests for basic information these forms uniformly -- and repeatedly -- provide generic non-answers such as "multiple renovations over various years" and "various years, numerous projects." (*See, e.g.* response to questions 10 and 11.)

(c)    In response to requests to supply or describe testing and sampling information, these forms provide no documentation and state generically "various years, numerous samples." (*See, e.g.*, response to question 29)

(d)    When asked in question 31 to specify the manner in which Grace products were modified and/or disturbed, all of these responses state "affected by numerous custodial and maintenance activities and renovations."

(e)    As supporting documentation, more than 1000 of the Speights claims attach only the single, typewritten lawyer document contained as the last page of each of Exhibits B, D and F with nothing more, stating that there is *no* supporting information.  This additional "documentation" provides yet more non-information, such as: " As indicated in its response, the Claimant does not know of any such specific documents at this time."

---

[2]    The information described in this Subsection is offered as supporting evidence that Speights did not have *authority* to file these 2,938 claims.  Merits objections to the flaws in Speights' claims, such as lack of product identification, will be addressed separately in the Debtors' proposed September 2005 Omnibus Objection.

C.    **In December 2004, More Oddities Began To Emerge In The Speights-Filed Claims**

8.    After Speights' "Verified Statement of Multiple Representation Pursuant to Fed. R. Bankr. P. 2019" was filed in December 2004, more apparent improprieties and inconsistencies seemed to arise with respect to Speights-filed claims. As a few examples:

(a)    Speights' 2019 Verified Statement contained no entries corresponding to more than 200 of the claims that Speights had signed and filed by the March 2003 Bar Date.

(b)    Hundreds of entries on Speights' December 2004 Verified 2019 Statement seemed to reflect filings on behalf of "buildings" and "job sites" with no indication that any underlying client either exists or authorized the claim. As "Claimant Name," these entries contain only building names or street addresses.

(c)    Numerous entries on Speights' December 2004 Verified 2019 Statement identified as "Claimants" supply stores such as paint stores, building supply companies, insulating companies, construction companies and the like -- entities more likely to have purchased Grace product for use in other job sites than to have used any product in a manner giving rise to a proper PD claim in this case. Particularly odd for a *property damage* claim, no street address was provided on Speights' Verified 2019 Statement for many of these companies.

9.    Another indication of potential problems in Speights-filed claims arose shortly after the Debtors filed a Notice of Intent to Object in December 2004. In response to this Notice, the Debtors received a letter sent on behalf of Building Laborers Local 310 in Cleveland, Ohio, attached as Exhibit Q. Counsel for Local 310 wrote that Speights-filed Claim No. 11591 "had been *filed on behalf of my client without authorization.*" Exhibit Q, emphasis added.

10.    Counsel for Local 310 complained that he had filed a proper PD claim, No. 2785, on the Local's behalf and that Speights' competing claim No. 11591 for same building was unauthorized. Id.

7

11.     Under the column indicating "First Name and Middle Initial of Creditor/Equity Security Holder," Speights' Verified 2019 Statement for Claim No. 11591 identified no apparently authorizing client, but only a building name, "Laborer's Local #310 f.k.a. Laborer's 310 Union Office Building," located at 3250 Euclid Avenue, Cleveland, Ohio.

12.     In an issue addressed below at Section II.C, under the column "form of agreement/instrument empowering entity to act on behalf of creditors or equity security" Speights' Verified 2019 Statement for Claim No. 11591 identified only the original Speights-filed complaint in the purported nationwide class action *Anderson Memorial* filed in Speights' home state of South Carolina in 1992.  What Speights' Verified 2019 Statement failed to note was that this original complaint had been superseded:  In 1994, the *Anderson Memorial* court struck from the original complaint the claims of non-residents on the grounds that claims arising outside of South Carolina were prohibited by South Carolina's door closing statute; a second amended *Anderson Memorial* complaint, limited to South Carolina claims, was filed in 1996 and is currently pending.  Nearly 800 non-South Carolina claims listed in Speights' Verified 2019 Statement similarly rely on this *Anderson Memorial* complaint as the basis for representation.

**D.     From February Through May 2005, The Debtors Unsuccessfully Attempted To Resolve Problematic Speights Claims Directly And Informally, Without The Need For Court Intervention**

13.     As the problems described above became apparent, the Debtors attempted unsuccessfully to address them directly with Daniel Speights of the Speights firm, including through telephone calls, in-person meeting, and e-mail correspondence.  As some examples:

(a)     On February 24, 2005, as a follow up to a February 16, 2005 Boca Raton meeting with Daniel Speights, the Debtors sent Mr. Speights an e-mail identifying 168 PD claims filed by Speights that were not on Speights' Verified 2019 Statement.  The Debtors asked that Speights either withdraw those claims "to the extent they were not authorized by the

8

claimants named therein," or supplement Speights' Verified 2019 Statement "to the extent one or more claimants was erroneously omitted from that statement." In response, Speights did neither.

(b)    On March 7, 2005, as follow up to another discussion with Mr. Speights, the Debtors sent Mr. Speights a list of 374 claims, this time identifying facially invalid claims that appeared to be (a) filed on behalf of buildings or jobs rather than persons or legal entities, (b) filed on behalf of construction or supply stores, or (c) lacking even basic street addresses and, in a few cases, city addresses. Once again, Speights ignored the Debtors' request to withdraw.

14.    In yet another effort to resolve the handling of problematic Speights claims informally, on May 27, 2005 outside counsel for the Debtors sent to Daniel Speights and Amanda Steinmeyer another list of apparently unauthorized claims, noting:

> "[m]any of the claims are filed on behalf of buildings or projects, not actual claimants. The fact that the forms were signed by a lawyer from your firm, not the claimants as required, further suggests that your firm may not actually represent these claimants. To avoid the effort of investigating thousands of claims, *we would appreciate if you could send us documentation that your firm actually represents these clients.*"

Once again, Speights neither withdrew the questionable claims nor provided proof that the firm actually represented the "clients" on whose behalf Speights had signed and filed PD claims.

15.    Despite repeated efforts by the parties to resolve the Speights claims on their own without court intervention, the Debtors and Speights were not able to reach a stipulation for the handling of these claims.

**E.    In June 2005, The Debtors Served Narrow Discovery To Determine Whether Speights Actually Represented The Claimants On Whose Behalf Speights Signed and Filed Proofs Of Claim**

16.    When it became clear that informal resolution of the Speights claims was not working, the Debtors drafted narrow discovery designed to help uncover whether Speights actually represented the clients on whose behalf Speights had signed and filed PD claims.

9

17.    *First*, on June 17, 2005, the Debtors filed objections to 10 Speights claims. Docket 8640.  The Debtors selected this small and admittedly unscientific random sampling simply as an initial means of getting a handle on the nature of the pending 2,938 Speights-filed claims. The 10 claims fell into the following categories:

(a)    <u>Claims For Which No 2019 Statement Was Provided</u>:  7 of the claims to which the Debtors objected were not listed on Speights' December 2004 Verified 2019 Statement.[3]  As indicated above, before filing this objection the Debtors had repeatedly asked Speights to either withdraw or provide the basis for representation for the numerous claims Speights had filed and signed that were not on Speights' Verified 2019 Statement.

(b)    <u>Claims for Which No Street Address Was Provided</u>:  1 claim was listed on Speights' Verified 2019 Statement with no accompanying street address provided for the building supposedly at issue.[4]  As the supposed "form of agreement/instrument empowering entity to act on behalf of creditors or equity security" for filing this South Carolina claim, Speights' 2019 cites to 3 pleadings from the *Anderson Memorial* case dated 2001: As discussed further below at Section II.D, the first pleading, dated February 9, 2001, is an ex parte, "emergency" conditional class certification of asbestos property damage claims for South Carolina buildings -- in the then-nearly 10 year old case -- entered by the South Carolina state court at Speights' request in response to concerns that Grace might file Chapter 11; the second two pleadings are orders filed by the same South Carolina state court in June 2001 and July

---

[3]    Those claims are:  No. 6701 (Pilot Life Insurance Company, North Carolina); No. 6721 (Maryland Casualty Co., Maryland); No. 6726 (Harvard Public Health, Massachusetts); No. 6734 (Northwest Community Hospital, Illinois); No. 6736 (McCormick Place, Illinois); No. 6661 (American Medical Association Building, Illinois); and No. 6672 (Employer's Mutual Job, Wisconsin).

[4]    No. 10873, Byars Machine Co., Lauren, South Carolina.

10

2001, more than three months *after* Grace had filed Chapter 11 and provided notification to the South Carolina court of the automatic stay.

      (c)    Claims For Which The Basis of Speights' Authorization To File Was Supposedly A "Building Questionnaire": 1 objection was to a claim for which Speights' Verified 2019 Statement identifies a "bankruptcy claim form questionnaire," B-4, as the basis for representation of this building.[5]

      (d)    Claims For Which Duplicative Claims Were Filed: 1 objection was to Laborer's 310 Union Office Building, described in detail above, Claim No. 11591 which was also the subject of non-Speights filed claim No. 2785.

      18.    *Second*, after filing the objection to these initial 10 Speights claims, the Debtors served subpoenas on 8 of the 10 supposed Speights "clients" and noticed those "client" depositions to take place between June 30, 2005 and July 11, 2005. (*See, e.g.,* Docket 8645.) Specifically, these subpoenas and deposition notices requested the 30(b)(6) deposition of the person most knowledgeable as to (i) whether the client had retained Speights to represent it in the Debtors' bankruptcy case and (ii) whether the client had authorized Speights to file a proof of claim on its behalf in the Debtors' bankruptcy case.

      19.    *Third*, in July, the Debtors served discovery on Daniel Speights and the Speights law firm.[6] The Speights subpoena sought documents by July 15, 2005 and deposition on July 25, 2005. Mr. Speights' deposition has been noticed for July 27, 2005. (Docket Nos. 8907-09) The Rider to the Speights firm subpoena, attached as Exhibit R, makes clear that all of this discovery is designed to collect documentary evidence and testimony to determine whether

---

[5]   Claim No. 6630, the Greater Fort Wayne Chamber of Commerce Building.

[6]   The subpoenas were issued in early July but the Debtors have learned that service was not effected in Hampton, South Carolina immediately. Debtors also attempted to serve Amanda Steinmeyer at the Speights firm but were informed she no longer works there.

Speights had the authority to file PD claims against the Debtor in each of the categories addressed by this Omnibus Objection.

**F.      Since Late June 2005, Speights Has Attempted To Prevent All Discovery Of Its Questionable Claims From Going Forward**

20.     On June 28, 2005, Daniel Speights contacted the Debtors' counsel by e-mail about the 8 Speights "client" 30(b)(6) depositions that had been noticed to take place June 30, 2005 through July 11, 2005. Mr. Speights' letter made clear that he was prepared to file a "Motion for Protective Order, which under the local rules will *automatically stay these depositions*," but preferred an opportunity to try to resolve the matter informally first.

21.     In response, the parties conducted a telephonic meet and confer on June 29, 2005. In advance of that phone call, the Debtors sent to Mr. Speights a near-final draft version of the Rider, Exhibit R described above, identifying the discovery the Debtors were about to serve on the Speights law firm and bringing into question the basis of Speights' claimed representation for *all* 2,938 claims signed and filed by Speights.

22.     During the meet and confer, counsel for the Debtors made clear that the Debtors would withdraw the 8 subpoenas of the Speights "clients," but only if Mr. Speights would sign a stipulation confirming that Speights did not represent those clients and did not have authorization to bring their claims in the first place. In the meantime, the Debtors agreed to suspend the June 30-July 11, 2005 depositions for a period of 7 days to give Mr. Speights an opportunity to review and sign such a stipulation. A draft stipulation was sent to Mr. Speights but no signed version was returned in the 7 day period.

23.     In addition, during the June 29, 2005 session the parties agreed to hold an in-person meet and confer the week of July 11, 2005.

24.     In the interim, to prevent the Debtors' discovery from going forward, on July 6, 2005 Speights filed a Motion for Protective Order purportedly on behalf of Anderson

Memorial Hospital as class representative to prevent all 8 client depositions from going forward. Docket No. 8947. In the cover e-mail accompanying the Motion, Speights indicated again "[a]s discussed, this Motion *stays the subject discovery from going forward*. I regret that you chose this route." (emphasis added). This issue is discussed below in Section II.

25.    A second meet and confer took place on Wednesday, July 13, 2005 in the Washington, D.C. offices of Kirkland & Ellis LLP. The July 13 meet and confer resolved the issues pending as of that time with respect to the initial "client" depositions. *See* Stipulation signed by Daniel Speights, attached as Exhibit S. The client depositions will not go forward.

26.    The Debtors anticipated additional meet and confers on the discovery served on Mr. Speights and the Speights firm as the parties attempt to resolve this discovery informally. On July 15, 2005, however, Speights filed a Motion to Quash the subpoena.

**G.    In A Disturbing Turn Of Events, In Early July, While The "Client" Depositions Were Suspended, Numerous "Clients" Wrote To Confirm That Speights Had No Authority To File Claims On Their Behalf**

27.    When the parties agreed to suspend the Speights "client" depositions for 7 days to give Mr. Speights an opportunity to provide a form of stipulation as to the basis for his authority to have filed those claims, Kirkland & Ellis contacted the deponents in letters copied to Mr. Speights, informing them of the short delay. Debtors' counsel noted in those letters that "[m]any of you have already contacted us in response to the subpoena to indicate that your organization did not authorize Speights & Runyan to represent it and file a proof of claim on its behalf in the Grace bankruptcy. If this is the case, in lieu of appearing for a deposition, you may provide us with a letter, affidavit, or other documentation memorializing that your organization did not authorize Speights & Runyan to file a proof of claim."

28.    Many of the Speights "claimants" then proceeded to provide written confirmation denying Speights ever had authority to represent them. As some examples:

13

(a)    The American Medical Association (the "AMA") submitted an affidavit stating "I spoke with various representatives of the law firm of Speights & Runyan ("S&R") in late 2002 and early 2003. The subject of discussion was whether S&R would represent the AMA in this bankruptcy proceeding. I informed S&R that the AMA did not wish S&R to represent it in this proceeding." Compare Exhibit A (7/6/05 AMA affidavit, emphasis added) with Exhibit B (Speights Claim No. 6661 for the American Medical Association Building).

(b)    Harvard Vanguard Medical Associates submitted a letter and affidavit confirming that Harvard "*did not authorize Speights & Runyan to represent it and file a proof of claim on its behalf in the Grace bankruptcy.*" *Compare* Exhibit C (7/7/05 Harvard letter and affidavit, emphasis added) *with* Exhibit D (Speights Claim No. 6726).

(c)    Maryland Casualty Company ("MCC") submitted a letter to "confirm that (i) MCC has never retained the law firm of Speights & Runyan to represent MCC in the Grace Bankruptcy Cases; and (ii) *MCC never authorized the law firm of Speights & Runyan to file a proof of claim on MCC's behalf in the Grace Bankruptcy Cases.*" *Compare* Exhibit E (7/1/05 Maryland Casualty letter, emphasis added) *with* Exhibit F (Speights Claim No. 6721).

29.    Notably, without taking even a *single* deposition, the Debtors now have written confirmation from 6 of the original 10 random objected-to claims that Speights did not have authority to file those claims.[7]

30.    Speights has also signed a statement of facts confirming Speights had no oral or written authority from these "clients" before filing claims in March 2003. *See* Exhibit S.

---

[7]    These are: Harvard (Claim No. 6726), the AMA (Claim No. 6661), Maryland Casualty (Claim No. 6721), Laborer's 310 (Claim No. 11591), Jefferson Pilot (Claim No. 6701) and the Employers Insurance Company of Wausau (Claim No. 6672). Jefferson Pilot and Employers of Wausau letters are attached as Exhibits T and U.

H.    **In Yet Another Bizarre Turn Of Events, From June 30 through July 5, 2005, While The "Client" Depositions Were Suspended, Speights Began Jettisoning Dozens Of Claims**

31.    During the same time frame that Speights' purported "clients" were confirming that Speights had no authority to represent them, Speights began "withdrawing" dozens of apparently bogus claims.

32.    Between June 29 and July 5, 2005, Speights withdrew 180 claims:  On June 29, 2005, Speights "withdrew" 55 claims, including 6 of the 8 claims that had been noticed for deposition, among them Harvard, Maryland Casualty and the AMA; on June 30, 2005, Speights "withdrew" 53 more claims; on July 1, 2005, Speights "withdrew" 46 claims; and on July 5, 2005, Speights "withdrew" 26 claims.  *See generally* Docket Nos. 8710 through 8936.

33.    The Debtors have been attempting to pin down the nature and scope of the 180 claims "dropped" by Speights -- none of which the Debtors believe Speights had authority to file in the first place.  To date, it appears that the dropped claims include: 89 of the 208 Speights claims for which no accompanying Verified 2019 Statement was provided; 33 of the 787 non-South Carolina claims supposedly filed based on the authority of the defunct 1992 *Anderson Memorial* complaint; and 4 of 59 South Carolina claims supposedly filed based on the authority of the ex parte and post-bankruptcy filing Orders Speights obtained from its home state court.

34.    For at least 46 of these claims -- a full quarter of those purportedly "withdrawn" -- Speights' withdrawal papers identified no corresponding claim number and instead indicated that the claim number for the building was "unknown."  After a painstaking review process and comparison of these claims with the existing PD claims database, the Debtors believe they may now understand this problem:  These 46 docket entries appear to be

15

withdrawing "claims" that *were never filed in the Debtors' Chapter 11 cases*. A list of these 46

apparently phony "withdrawals" is attached as Exhibit G.[8]

     35.     Speights has continued "withdrawing" a small trickle of claims post-July 5

as well.

    I.     **Speights Appears To Have A Pattern And Practice Of Filing Bogus Asbestos Property Damage Bankruptcy Proofs Of Claim And Withdrawing Them When Challenged**

     36.     The Debtors are now in the process of attempting to grapple with the

breadth of Speights' potentially *fraudulent* claims filing practices in these Chapter 11 cases. The

Debtors believe that far more than the 180 Speights claims "withdrawn" from June 30 through

July 5, 2005 (46 of which were apparently never filed as claims in this case in the first place) are

deeply flawed.

     37.     While investigation continues, the Debtors are beginning to learn that

Speights has similarly filed -- and withdrawn when challenged -- massive volumes of asbestos

property damage claims in other pending asbestos bankruptcies. Based on the simple volume

alone, one can only assume that those claims never had merit when filed in the first place.

Notably, as in this case, Speights' practice has apparently been to try to negotiate and withdraw

those c laims b efore d iscovery c an p roceed o r h is p ractices s ubjected t o judicial s crutiny. A s

examples:

     (a)     In *Federal Mogul,* Speights filed 2,915 asbestos property-damage claims

constituting 78.5% of all such claims that were filed. Through two omnibus objections, *Federal*

*Mogul* objected to all Speights claims; many of the deficiencies cited appear to be identical to

---

[8]    The remaining 134 claims are still included on the lists of Speights claims that the Debtors seeks to have disallowed and expunged, attached as Exhibits H-P, for one reason: If Speights had no authority to file these claims, then it is not clear that Speights had any authority to "withdraw" them either.

flaws in the claims Speights filed in this case.  Apparently through negotiation, the parties in *Federal Mogul* eventually entered into a stipulation by which Speights agreed to withdraw, with prejudice, 1,228 of those claims.  *See, e.g.* Order Approving Stipulation Withdrawing (i) Certain Claims Filed by the Law Firm of Speights & Runyan and (ii) the Debtors' Procedural Objections to Other Claims, In re Federal-Mogul Global Inc., et al., Case No. 01-10578 (AMW) (Bankr. D. Del., March 8, 2005) (Docket No. 7097).

   (b)    In *Armstrong World Industries*, Speights filed 415 asbestos property damage claims on behalf of 330 claimants, constituting 71% of the total asbestos property damage claims received by the Debtor.  Apparently, each of the Speights claims in that case was similarly signed by Amanda Steinmeyer of the Speights firm, with no accompanying power of attorney provided. *Armstrong* filed a Motion of the Debtors to Compel Compliance by Speights & Runyan and Bilzen Sumberg Dunn Baena Price & Axelrod LLP with Bankruptcy Rule 2019, or, Alternatively, to Strike their Appearance on Behalf of Certain Creditors, In re Armstrong World Indus., Case No. 00-04471 (RJN) (Bankr. D. Del. Aug. 2, 2002) (Docket No. 2920). Once again, the parties ultimately seem to have negotiated these claims privately, eventually settling all of them for $2 million in cash payments. *See* Agreed Motion of Armstrong World Industries, Inc. for Order Approving and Authorizing Settlement and Compromise, In re Armstrong (April 4, 2003) (Docket Nos. 4033, 4429).

   (c)    In *Owens Corning*, the record reflects that once again the Debtors objected to 366 Speights claims and, two months later, by agreed stipulation of the parties Speights voluntarily withdrew 328 of those claims and agreed to mediate the rest. *See* Thirteen Omnibus (Substantive) Objection to Certain Asbestos-Related Property Damage Claims, In re Owens Corning, et al., Case No. 00-3837 (JKF) (Bankr. D. Del. Sept. 10, 2003) (Docket No. 9441); Stipulation and Order Regarding Thirteenth Omnibus (Substantive) Objection to Asbestos-

17

Related Property Damage Claims Filed by Speights & Runyan, <u>In re Owens Corning</u> (Nov. 18, 2003) (Docket No. 10314).

       (d)    In *U.S. Mineral*, on April 7, 2005, the Futures' Representative filed two omnibus objections to 300 asbestos property damage claims filed by Speights. Apparently, within two weeks, Speights withdrew 132 of those claims and, in turn, the omnibus objections were withdrawn. *See* (First) Omnibus Objection to Claims Filed Against the Debtor (Substantive) Filed by Walter J. Taggart; (Second) Omnibus Objection to Claims Filed Against the Debtor (Substantive) Filed by Walter J. Taggart; *see generally* <u>In re United States Mineral</u> <u>Prod.</u>, Case No. 01-2471 (JKF) (Bankr. D. Del. Apr. 7, 2005) (Docket Nos. 2612, 2613, 2615 - 2746, 2897 -98).

       38.    The Debtors have not yet determined what, if any, discovery went forward in these other bankruptcy matters into the issue of Speights' authority to file in the first place the nearly 2000 claims he later agreed to withdraw by stipulation.[9]

       39.    The Debtors, too, remain prepared to negotiate with Mr. Speights. Until the issue of Speights' authority to file 2,938 claims in this case is addressed, however, no meaningful progress can be made. Until this issue is determined, the Debtors do not have the information needed to understand what exactly it is they are supposedly negotiating.

---

[9] The Debtors are now aware that on May 3, 2002, well before the above record had been developed, Daniel Speights testified in open court as to why Speights had filed 415 Proofs of Claim late in the <u>Armstrong</u> case. It does not appear from the transcript that the parties had taken discovery on this issue before Mr. Speights took the stand. In light of the development of recent facts, Mr. Speights' responses to the Court's questions are quite curious. E.g. <u>In re Armstrong</u>, 5/3/02 Tr. at 50 (Court: "Let me rephrase the question. For the purposes of filing a proof of claim or otherwise representing these particular clients in this bankruptcy, what was the most recent date on which you were contacted, or retained, or hired? A: And the answer is I don't know, but an amount -- a matter of years. Q: A matter of years? A: Yes.").

## II.    LEGAL ARGUMENT:  ALL 2,938 SPEIGHTS CLAIMS SHOULD BE DISALLOWED

40.    For the reasons stated herein, the Debtors respectfully request that *all* 2,938 claims filed by Speights be disallowed and expunged on the grounds that Speights did not have authority to sign and file them.[10]  For the convenience of this Court, the Debtors below identify the categories of claims to which they object on the basis that Speights lacked authority and provide a short explanation of each.  Attached as accompanying Exhibits H-P are the lists of which unauthorized Speights claims fall into each category.  Some claims appear in multiple categories.

### A.    208 Claims:  No Verified 2019 Statement

41.    208 claims signed and filed by Speights contain no corresponding entry in Speights' Verified 2019 Statement of Multiple Representation filed in December 2004.

42.    A list of these claims is attached as Exhibit H.

43.    Because none of these 208 claims was identified in Speights' Verified 2019 Statement, no authority to file these claims has been established by Speights.

44.    Further, a small random sampling[11] of these 208 claims conducted by the Debtors in June and July 2005, described above in Sections I.E-G, established that *none* of these claimants provided authority to Speights to file PD claims.[12]  In fact, the American Medical Association went so far as to testify that Speights had asked for permission to represent it in

---

[10]  Consistent with the Debtors' proposed property damage CMOs filed with this Court on July 13, 2005 the Debtors reserve all other objections to the Speights claims and anticipate making all remaining objections to all claims, including Speights claims, by September 1, 2005.

[11]  Those claims are:  No. 6701 (Pilot Life Insurance Company, North Carolina); No. 6721 (Maryland Casualty Co., Maryland); No. 6726 (Harvard Public Health, Massachusetts); No. 6734 (Northwest Community Hospital, Illinois); No. 6736 (McCormick Place, Illinois); No. 6661 (American Medical Association Building, Illinois); and No. 6672 (Employer's Mutual Job, Wisconsin).

[12]  *See, e.g.* Exhibits A (AMA affidavit), C (Harvard letter and affidavit), E (Maryland Casualty letter), S (Speights stipulation), T (Jefferson Pilot letter) and U (Employers Insurance Company of Wasau letter).

DOCS_DE:110109.1

these bankruptcy cases and the AMA *said no.*  *Compare* Exhibit A (AMA affidavit) *with* Exhibit B (Claim No. 6661, AMA claim signed and filed by Speights).

45.     For some of these claims, Speights has also now stipulated it had no written or oral authority to file these claims in the Debtors' Chapter 11.[13]  Exhibit S.

46.     All of the claims on Exhibit H should be disallowed and expunged.

**B.      358 Claims:  Filed On Behalf Of "Buildings" Or "Job Sites"**

47.     358 claims made by Speights are filed on behalf of buildings or job sites.

48.     A list of these claims, each of which was signed and filed by Speights, is attached as Exhibit I.

49.     "Buildings" and "jobs" are not legal entities and, therefore, are not capable of being creditors that can file claims against the Debtors' estates.

50.     Bankruptcy Rule 3001 provides that a proof of claim, "shall be executed by the creditor or the creditor's authorized agent."  Therefore, a "building" or a "job" could only file a proof of claim if it was capable of being a "creditor."  "Buildings" and "jobs," however, are not capable of being creditors.  The Bankruptcy Code defines "creditor" as "an entity that has a claim against the debtor."  11 U.S.C. § 101(10).  "Entity," in turn, is defined by the Bankruptcy Code to include any "person, estate, trust, governmental unit, and United States Trustee"  11 U.S.C. § 101(15).  The definition of "person" "includes [an] individual, partnership, and corporation..." 11 U.S.C. (41).  There is nothing in these definitions that allows for a building or a job to be a "creditor."

51.     In addition, the random sampling conducted by the Debtors in June and July 2005 demonstrated that the random claims selected from the "buildings" and "job site"

---

[13]  Speights' Stipulation claims Speights believed it had authority to file based on *Anderson Memorial.*  This issue is addressed below at Sections II.C and II.D.

category, Exhibit I, had not given Speights permission to file claims. *Compare, e.g.* Exhibit A (authority to file a claim for the American Medical Association building was not given) *and* Exhibit U (authority was not provided to file a claim for the Employers Mutual Job, Claim No. 6672) *with* Exhibit I (incorporating Speights' Claim Nos. 6661 for the AMA building and 6672 for the Employers Mutual Job).

52.     As another example, counsel for Building Laborers Local 310 in Cleveland, Ohio has written that Speights-filed Claim No. 11591 "had been *filed on behalf of my client without authorization.*" *Compare* Exhibit Q (emphasis added) *with* Exhibit I (Speights' entry for Claim No. 11591, Laborer's 310 Union Office Building).

53.     All of the claims on Exhibit I should be disallowed and expunged on the grounds Speights had no authority to bring them.

**C.     787 Claims: *Anderson Memorial* 1992 Original Complaint**

54.     787 claims on Speights' Verified 2019 Statement cite to a 1992 original complaint filed by Speights in *Anderson Memorial Hospital v. W.R. Grace*, No. 92-CP-25-279 (South Carolina Ct. Common Pleas, Dec. 23, 1992) as the basis for Speights' authority to file these PD claims. The 1992 *Anderson Memorial* original complaint, filed in Speights' home state of South Carolina, sought certification of a nationwide class of building owners to bring asbestos property damage claims in South Carolina state court.

55.     A list of these claims, each of which was signed and filed by Speights, is attached as Exhibit J. All of these claims are for buildings located outside of South Carolina.

56.     The notion that the *Anderson Memorial* 1992 original complaint provided Speights with authority to file these 787 claims in this Chapter 11 on behalf of buildings located outside of South Carolina is demonstrably false.

21

57.    *First,* Speights' Verified 2019 Statement omits the crucial fact that in 1994, nationwide class certification *was denied* in that case and out of state claims were *stricken.* The *Anderson Memorial* court wrote that the *out-of-state claims of non-residents were prohibited* by South Carolina's door closing statute.   Therefore "this court grants the defendants' motion and *strikes from plaintiff's First Amended Complaint claims of non-residents where the claims do not rise in South Carolina or whose property at issue is not situated in South Carolina.*" Exhibit V, Memorandum Order, *Anderson Memorial* (Aug. 8, 1994, emphasis added).

58.    *Second,* in 1996, the *Anderson Memorial* Court denied reconsideration of the August 1994 order and adopted it again in full.   Exhibit W, Order, *Anderson Memorial* (May 28, 1996).

59.    *Third,* in a decision squarely on point, the South Carolina Supreme Court confirmed that South Carolina's door-closing statute prohibits nonresidents from participating in a class action against a foreign corporation.   *Farmer v. Monsanto Corp.,* 579 S.E.2d 325 (South Carolina 2003).   Daniel Speights and the Speights firm plainly knew of that decision; they were counsel of record for respondents in that case.   *Id.* at 326.

60.    *Fourth,* in 1996, Speights filed a second amended complaint in *Anderson Memorial* limited to buildings in South Carolina.   It is the *second amended complaint* -- limited to South Carolina buildings -- that is operative in the *Anderson Memorial* case, not the outdated 1992 original complaint attached to Speights' Verified 2019 Statement.

61.    *Fifth,* the evidence now establishes that Speights at some point contacted out-of-state building owners and expressly sought permission to file claims on their behalf in these Chapter 11 cases.   The AMA, for example, testified that Speights asked for permission to represent it in these bankruptcy cases and the AMA *said no.*   Exhibit A.   Speights' attempt to solicit permission constitutes an admission that Speights knew it did *not* have authority to

22

represent non-South Carolina building owners based on the *Anderson Memorial* original complaint.[14] How many others has Speights tried to solicit?

62.    *Sixth*, the Laborer's 310 Office Building serves as one of the randomly tested entries on Speights' Verified 2019 Statement for which authority to file was supposedly based on the *Anderson Memorial* original complaint. As set out above, Laborer's 310 has its own counsel, filed its own PD claim in this case, and views Speights' Claim No. 11591 as unauthorized. Exhibit Q.

63.    *Seventh*, if *Anderson Memorial* provides the legal basis for Speights' representation of non-South Carolina building owners, how in the six day period from June 29, 2005 to July 5, 2005 could Speights properly withdraw more than 30 claims identified in Speights' Verified 2019 Statement as filed on the authority of the *Anderson Memorial* complaint -- and at the same time *not* withdraw the other 757 claims in this category? *See* Exhibit X (listing Anderson Memorial original complaint claims "withdrawn" from June 29 through July 5, 2005). Similarly, how on July 6, 2005 could Speights have filed a Motion for Protective Order on behalf of Anderson Memorial as Class Representative for the Debtors' randomly selected claims, while at the same time withdrawing those claims on June 29, 2005?[15]

64.    Plainly, the *Anderson Memorial* original complaint provided no authority for Speights to sign and file the 787 claims identified at Exhibit J. All should be disallowed and expunged.

---

[14]   *Cf.* Docket No. 8947 (Speights' July 6, 2006 Motion for Protective Order on behalf of claimants *including the AMA*, filed on behalf of Anderson Memorial as "Class Representative").

[15]   *Compare* Docket No. 8947 ("Anderson Memorial As Class Representative") *with* Docket Nos. 8710 through 8715 and 8778 (June 29, 2005), withdrawing Claim No. 6661 (the AMA building), Claim No. 6672 (Employer's Mutual Job), Claim No. 6726 (Harvard), Claim No. 6721 (Maryland Casualty), Claim No. 6734 (Northwest Community Hospital), Claim No. 6701 (Pilot Life Ins.) and Claim No. 11591 (Laborer's 310 Union Office Building).

D.    **59 Claims:** *Anderson Memorial* **2001 Orders**

65.    As the authority for filing claims on behalf of 59 South Carolina claimants, Speights' Verified 2019 Statement cites to three 2001 *Anderson Memorial* orders (February 2001, June 2001 and July 2001) purporting to certify a class of South Carolina property owners to pursue asbestos property damage claims in state court.

66.    A list of the 59 claims, each of which was signed and filed by Speights, is attached as Exhibit K. The three 2001 orders are attached to Speights' Verified 2019 Statement.

67.    As explained below, these 2001 *Anderson Memorial* orders are void and provide no authority for Speights to file bankruptcy claims on behalf of non-existent "class" members. Further, Speights' own actions in this case belie the notion that Speights has authority to represent the South Carolina buildings based on these orders.

68.    *First,* as explained below, the February 2001 emergency, *ex parte* conditional class certification order was entered in an improper attempt to avoid an anticipated automatic stay from the Bankruptcy Court.

69.    After nationwide class certification was denied in *Anderson Memorial,* a second amended complaint was filed in 1996 limited to South Carolina state claims. That is the pending complaint in *Anderson Memorial.* By early 2001, however, nearly 10 years after the *Anderson Memorial* action was initially filed and shortly before the Debtors filed these Chapter 11 cases, still no class was certified, even of the more narrow class of South Carolina building owners.

70.    On February 8, 2001 -- in this ten year old case -- Speights filed an "Emergency Petition For A Rule To Show Cause Why A Conditional Class Should Not Be Certified Against W.R. Grace & Co. And W.R. Grace & Co.-Conn." As the basis for this emergency action, Speights wrote that Grace disclosed "last week" that it was considering filing

24

for bankruptcy protection, and that "[o]nce Grace files for bankruptcy, this Court may be deprived of jurisdiction to do anything against Grace -- including issuing a certification order on the merits." Exhibit Y, Emergency Petition at 1-2, Anderson Memorial (Feb. 8, 2001).

71.     In the accompanying Verification to the February 8, 2001 Emergency Petition to Show Cause, Daniel Speights testified: "The South Carolina building owners in Anderson's class will be severely prejudiced if Grace files for bankruptcy before the Court can rule on the merits of certification....Absent conditional certification prior to bankruptcy filing, a bankruptcy court may not grant the South Carolina building owners the preferential class treatment this Court may determine they deserve." Id. at Ex. A, p. 3.

72.     The next day, on February 9, 2001, two months before these Chapter 11 cases were filed, the South Carolina court granted Speights' petition for emergency relief ex parte, conditionally certifying the Anderson Memorial South Carolina class. Order, Anderson Memorial (Feb. 9, 2001).

73.     This Court should not accede to Speights' attempted February 2001 manipulation o f t he S outh C arolina c ourt a nd t his C ourt b y h olding t he c onditional F ebruary 2001 Order provided authority to Speights to file these claims.

74.     Second, the conditional February 2001 Order cited as Speights' basis of authority in Speights' Verified 2019 Statement has been superseded by two other 2001 orders attached to the 2019 Statement -- which in turn violate the automatic stay and are void.

75.     After the Debtors' Chapter 11 cases were filed, t he Anderson Memorial court was provided notice of the automatic stay.  In violation of that stay, on June 18, 2001 and July 5, 2001, the South Carolina court entered final orders certifying Anderson Memorial as a class of South Carolina building owners.

25

76.     Orders entered in violation of a debtor's automatic stay are void *ab initio* and have no legal effect. *Raymark Indus. v. Lai*, 973 F.2d 1125 (3d Cir. 1992); *Maritime Elec. v. United Jersey Bank*, 959 F.2d 1194, 1206 (3d Cir. 1991); *In re Ward*, 837 F.2d 124, 126 (3d Cir. 1988). These orders can give Speights no authority to file claims for supposed "class" members.

77.     *Third*, even the void July 2001 order itself recognizes that the *Anderson Memorial* class would be an opt-out class, and *no notice or opportunity to opt out has ever been provided* to supposed class members. *Cf.* July 2001 Order at 6 and n.8 ("Plaintiff seeks to certify an *opt-out class action* on behalf of itself and a class of other South Carolina property owners whose buildings contain or previously contained [asbestos containing surfacing materials]. *Opt-out means that class members will have a reasonable opportunity to exclude themselves from the class after Court-approved notice has been provided.*"); *id.* at 20 ("Pursuant to Rule 23(d)(2), SCRCP, within thirty (30) days of the entry of this Order the Parties shall submit their proposals regarding the timing and content of class notice.").

78.     As an example, for Byars Machinery, the one claim in this category randomly selected by the Debtors as described above in Section I.E, Speights' recent statement of facts *concedes* "Speights & Runyan had no communication with this claimant before filing this claim in Grace's Chapter 11." Exhibit S at ¶ 5.[16]

79.     Further, it is well established that "consent to being a member of a class in one piece of litigation is not tantamount to a blanket consent to any litigation the class counsel may wish to pursue," including filing bankruptcy proofs of claim in a Chapter 11 case. *E.g. In re Baldwin-United Corp.*, 52 B.R. 146, 148-49 (Bankr. Ohio 1985) ("We have not found, however,

---

[16]  This statement of facts goes on to state: "After Grace issued a subpoena for the deposition of this claimant in June 2005, Speights & Runyan had communications with this claimant. In communications with Speights & Runyan, this claimant stated it *was not previously aware of the Anderson Memorial class* but had it been informed of *Anderson Memorial* would have wanted to participate in it." Exhibit S at ¶ ¶ 6-8 (emphasis added).

26

any persuasive authority that would allow, under the guise of 'class claims' those claims filed on behalf of individuals who failed to file their own claims. The weight of authority, in fact, is to the contrary"); *Reid v. White Motor*, 886 F.2d 1462, 1471-72 (6th Cir. 1989) (bankruptcy court "well within its discretion to dismiss Reid's class proof of claim since he has failed to elucidate his authority as agent for the [White Motor Corp.] former employees"); *In re Ross* 37 B.R. 656, 658 (9th Cir. 1984). And here, because no notice or opt-out opportunity was provided, there was never *consent* for participation in the *Anderson Memorial* "class" by any "class member" in the first instance -- as Speights well knew when its attorneys signed and filed these 59 bankruptcy proofs of claim.

80.     If for no other reason, reliance on the *Anderson Memorial* order as authority to file these 59 claims fails because notice to an opt-out class was not provided.[17]

81.     *Fourth*, if *Anderson Memorial* truly provided authority for Speights to file proofs of claim on behalf of the 59 South Carolina buildings identified on Exhibit K, by what authority did Speights withdraw 4 of those claims on June 29, 2005 -- and *not* withdraw the remaining 55? Compare Exhibit K with Dockets 8722, 8725, 8729 and 8732 (withdrawing claims that had purportedly been filed on the authority of the *Anderson Memorial* orders).

82.     Speights had no authority to sign or file the 59 claims identified on Exhibit K. All should be disallowed and expunged.

**E.     15 Claims:  Unsigned Building Questionnaires**

83.     For roughly 17 of the entries on Speights' Verified 2019 Statement, Speights identifies one of four exemplar building questionnaires, B-1 through B-4, as the basis

---

[17]   *Cf. In re Sacred Heart Hospital*, 177 B.R. 16 (Bankr. E.D. Penn. 1995) ("it can be convincingly argued that it would be wasteful for the bankruptcy court, in its claims process, to either *replicate* any notice procedures already utilized in the nonbankruptcy court class-action process, or for the bankruptcy court to undertake to *provide for different notices* which could very well confuse unnamed class members to their unfair prejudice.")

DOCS_DE:110109.1

for the firm's authority to file those claims.  Among the discovery served on Speights (that Speights now seeks to quash) is a request that further information on these claims be provided. *E.g.* Exhibit R at p. 6-7, ¶ 5(a)-(b).

84.    For exemplar building questionnaires B-1 through B-3 attached to Speights' Verified 2019 Statement, however, the face of the exemplar alone demonstrates that these questionnaires do not establish Speights had authority to sign and file claims in these Chapter 11 cases.  Specifically, none of exemplar questionnaires B-1 through B-3 provide for any indication of *who* the building owner is, let alone a date, signature line or any other proof that an owner gave Speights permission to file a bankruptcy claim on its behalf.

85.    A list of the 15 claims signed and filed by Speights that rely on building questionnaires B-1, B-2 or B-3 as proof of Speights' authority to file is attached as Exhibit L. All 15 claims should be disallowed and expunged.

F.    **22 Claims:  Unidentified Symbol "E"**

86.    For 22 of the claims signed and filed by Speights, Speights' Verified 2019 Statement identifies only the unexplained symbol "E" as the basis for Speights' authority to file.

87.    Among the discovery Speights now seeks to quash is the Debtors' request that information on these "E" claims be provided.  *E.g.* Exhibit R at p. 6.

88.    By providing no information whatsoever on these "E" claims, Speights has established no authority to sign and file these claims in the Debtors' Chapter 11.  A list of these claims is attached as Exhibit M.  All should be disallowed and expunged.

G.    **31 Claims:  Supply Stores**

89.    As described above in Section I.C, numerous entries on Speights' Verified 2019 Statement identified as "Claimants" supply stores such as paint stores, building supply companies, insulating companies, construction companies and the like -- entities more likely to

28

have purchased Grace product for use in other job sites than to have used any product in a manner giving rise to a proper PD claim in this case.

90.    A list of the 31 claims signed and filed by Speights falling into this category is attached as Exhibit N.

91.    Particularly odd for *property damage* claims, no street address was provided on Speights' Verified 2019 Statement for many of these companies.

92.    Among the discovery to Speights' firm that Speights seeks to quash is a request for backup documentation that Speights had authority to file claims on behalf of these stores. *E.g.* Exhibit R at 8.

93.    In the meantime, Speights has admitted that for the one randomly selected entry in this category for which the Debtors served discovery in June 2005, Byars Machinery, Speights had no communication with the claimant before filing the PD claim at issue. Exhibit S.

94.    Because to date Speights has not established authority for signing and filing the 31 claims identified at Exhibit N, all should be disallowed and expunged.

**H.     1690 Claims: Exemplar Contracts**

95.    For 1690 claims, the corresponding Verified 2019 Statement entry cites to one of ten "exemplar contracts," K-1 through K-10, that supposedly provide Speights with authority to file these claims. As part of the discovery Speights seeks to quash, the Debtors asked Speights to provide the *actual* contracts for each of these 1690 entries. *E.g.* Exhibit R at 8.

96.    A list of these claims, each of which was signed and filed by Speights, is attached as Exhibit O.

97.    These claims and their accompanying exemplar contracts are overwhelmingly problematic. The Debtors have no choice but to object to these claims as a

29

whole and require Speights to provide further proof that the filing of *each* of these 1690 claims has been authorized in these Chapter 11 cases. Some examples are described below.

98.    *California Universities*: 1281 of the 1690 claims listed in Exhibit O cite as authority for filing one of two exemplar contracts: K-4, signed by The Regents of the University of California in December 2002, and K-10, signed for the California State University on March 31, 2003. These contracts do not give Speights authority to file any claims, no matter how baseless, against the Debtors at will. The contractual language expressly limits authority to, for example, pursue claims against manufacturers "against whom an action is presently viable." K-10. Yet by all indications, Speights has done nothing more than execute two signed contracts and then dump in claims for more than 1200 buildings with apparently no investigation whatsoever. As examples:

(a)    Nearly 1200 of these 1281 claims, when filed, contained *no supporting documentation* whatsoever.[18] *Cf. supra* Section I.B and Exhibits B, D and F.

(b)    Like the Speights claims attached as Exhibits B, D and F, the claim forms filed in 2003 for nearly 1200 of these buildings provided no information other than generic non-

---

[18]    In summer 2005, in response to the Debtors' Notice of Intent to Object, Speights purported to "supplement" some of these facially barren claims. The supplement is a mess. As examples: The initial 1600+ page supplement is only a paper index; no documents were supplied and no searchable electronic index was provided. Speights has since supplemented his initial supplement with at least two more enormous paper indices even longer than the first, indicating these various supplements may or may not overlap, with no explanation as to how they fit together. The Debtors were given an "invitation" to come to Hampton, South Carolina to inspect and copy the underlying documents, but Speights has ignored the Debtors' request to supply dates for this review. A random analysis of the paper indices thus far suggests that more than *60%* of the entries on this "supplement" may be of documents that Speights *already provided* as attachments to the small subset of claims for which he submitted putative supporting documentation. Other items listed on the index do little more than increase volume and create confusion, such as breaking a 15 chapter document into 15 separate entries on the index by logging each chapter individually. Other documents identified correspond to claims that Speights supposedly withdrew in June and July 2005. The *only* clear thing that emerges from the murk of Speights' supplementation is that if the Debtors are forced to go to South Carolina to review the actual back up documents, it should be at Speights' cost, not the estates'.

statements such as "multiple renovations over various years," "various years, numerous projects" and "various years, numerous samples";

      (c)     Like the claims attached as Exhibits B, D and F, when filed nearly 1200 of these claims expressly contained an attachment stating "the Claimant does not know of any such specific documents at this time." *See also supra* Section I.B.

      (d)     The claim forms for the California universities seem to indicate that these claims have been long barred by statute of limitations[19], yet the purported authorization to file these claims is expressly limited to "buildings against whom an action is presently viable." E.g. Exemplar K-10, attached to Speights' Verified 2019 Statement.

      99.     *Canadian Claims*:  More than 400 of the claims listed on Exhibit O are Canadian claims for which authority to file is supposedly rooted in one of two exemplar contracts, K-5 or K-9.  The 341 entries corresponding to K-9 are particularly problematic.  In light of Speights' disturbing claims filing practices, the Debtors suggest these flaws indicate Speights did not have authority to file these claims.  As examples:

      (a)     Speights' Verified 2019 Statement attached *no* signed version of K-9 for *any* of the 341 entries, only a blank form (in contrast to the majority of the other 10 exemplars provided by Speights, which were signed);

      (b)     The Canadian claims corresponding to these entries contained *no* backup documentation whatsoever when they were filed in 2003;[20]

---

[19]  In response to the request for information about related property damage lawsuits previously filed for the buildings at issue, these claims identify *Alabama v. W.R.Grace*, a U.S. Supreme Court case.  In May 1990 the Supreme Court declined to take original jurisdiction over this matter, and at the time of Grace's Chapter 11 filing in 2001 -- more than ten years later -- the California universities had still filed no action against Grace.

[20]  Speights' summer 2005 supplementation of massive paper indices of documents supposedly available for review and inspection in Hampton, South Carolina apparently supplements a number of Canadian claims. Significant problems with that supplement are addressed above.

(c)     Like the Speights claims attached as Exhibits B, D and F, the claim forms filed in 2003 for these buildings provided no information other than generic non-statements such as "multiple renovations over various years," "various years, numerous projects" and "various years, numerous samples";

(d)     Like the claims attached as Exhibits B, D and F, when filed these Canadian claims expressly contained an attachment stating "the Claimant does not know of any such specific documents at this time." *See also supra* Section I.B.

(e)     Oddly, while all of these claims were supposedly authorized by a single exemplar contract, K-9, these claims originate in provinces across Canada and implicate a wide range of types of owners including schools, government entities and private buildings. *See* Exhibit O.

(f)     Even before filing, Speights must have known that many of these claims were no good, including claims in British Columbia. *E.g. Privest Properties Ltd. v. Foundation Co. of Canada* (1995), 11 B.C.L.R. (3d) 1 (S.C.), *aff'd* (1997), 31 B.C.L.R. (3d) 114 (C.A.), *leave to appeal to the Supreme Court of Canada refused*, [1997] S.C.C.A. No. 216. In *Privest*, the British Columbia Court of Appeals affirmed a supreme court decision which had held, after 182 trial days, that Monokote 3 fireproofing product was not inherently dangerous.

100.    *Other claims*:  Only 6 of the 1690 claims on Exhibit O correspond to anything other than a California university claim or a Canadian claim.  Particularly in light of the Speights track record discussed above, however, even these claims appear problematic.  For example:

(a)     Exemplar K-1, corresponding to 2 Speights claims, appears to be an e-mail from an Arkansas local counsel telling Speights there is authority to file claims on behalf of

32

two buildings for KARK-TV. K-1 contains no signature or other direct proof of authorization by the building *owner* however.

(b)     Exemplars K-2 and K-3, corresponding to 1 claim each, are letters from the early 1990s that appear to permit Speights to pursue settlement negotiations, arbitration and/or litigation for two building owners. These letters predate the Chapter 11 filing by ten years, however, and obviously contain no express authority to file a bankruptcy proof of claim on the building owners' behalf.

(c)     Exemplar K-6, purportedly corresponding to one claim, is unsigned and blank, and identifies no client.

(d)     Exemplar K-8, corresponding to one claim, is signed and expressly references the fact that Chapter 11 proceedings are ongoing in Wilmington, Delaware. But this signed contract is dated December 2003 -- 9 months after the March 2003 PD Bar Date.

**I.     2,938 Claims: All Claims Signed By Attorneys Daniel Speights Or Amanda Steinmeyer**

101.     As set out above, *every single one* of the 2,938 claims submitted by Speights was signed by one of two attorneys from that firm, Daniel Speights or Amanda Steinmeyer. A list of all of these claims is attached as Exhibit P.

102.     While under Bankruptcy Rule 9010(c) there is a presumption of authority when an attorney signs a proof of claim on behalf of a client, this presumption must fail for claims signed by these two attorneys given the overwhelming factual record as to these attorneys' claims-filing practices set out above.

103.     As described above in Fact Section I, for example, even the most minimal discovery of a handful of randomly selected claims demonstrates that Speights signed and filed claims for which Speights *had no authority* to do so. In fact, the affidavit from the American Medical Association, Exhibit A, reflects that Speights *sought* authority to file a claim for the

AMA and was told no, yet filed a claim anyway. *Compare* Exhibit A (AMA affidavit) *with* Exhibit B (Speights-filed claim for the AMA building); *see also* Exhibits C, E, Q, S, T and U.

104.     The Debtors submit that these discrepancies are particularly troubling in light of the express language contained on each of the 2,938 claims forms signed by Daniel Speights and Amanda Steinmeyer, just above the signature line:   "I have reviewed the information submitted on this proof of claim form and all documents submitted in support of my claim.  I declare, under penalty of perjury, that the above statements are true, correct, and not misleading." *E.g.* Ex. B, D and F.  Beneath the signature line, the claim form further states expressly "The penalty for presenting a fraudulent claim is a fine of up to $500,000.00 or imprisonment up to 5 years, or both. 18 U.S.C. § § 152 & 3571" *Id.*

105.     As further described above in Fact Section I, Speights' pattern and practice in this and other cases of withdrawing *thousands* of claims en masse when challenged in order to avoid judicial scrutiny can have no other explanation than that Speights had no authority to bring these claims in the first instance.

106.     The Debtors respectfully request that every one of the 2,938 claims signed by Daniel Speights or Amanda Steinmeyer, identified at Exhibit P, be disallowed and expunged.

### RESPONSES TO THIS OMNIBUS OBJECTION

107.     To contest an objection, a claimant must file and serve a written response to this Objection ("Response") so that it is received no later than 4:00 p.m. (Eastern Time) on [_____,2005.]  Every Response must be filed with the Office of the Clerk of the United States Bankruptcy Court for the District of Delaware:  Marine Midland Plaza, 824 Market Street, Wilmington, Delaware 19801, and served upon the following entities, so that the response is received no later than 4:00 p.m. (Eastern Time) on [_____], at the following addresses:

34

Co-Counsel for the Debtors:

Kirkland & Ellis LLP
200 E. Randolph Drive
Chicago, Illinois 60601
Attn: Andrea L. Johnson

    -and-

Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C.
919 North Market Street, 16th Floor
Wilmington, Delaware 19801
Attn: David Carickhoff, Jr.

108.   If a claimant fails to file and serve a timely Response, the Debtors may present to the Court an appropriate order reclassifying, reducing, or disallowing and expunging the claim, as applicable, without further notice to the claimant or a hearing.

## REPLIES TO RESPONSES

109.   The Debtors may, at their option, file and serve a reply to a claimant's Response.

## RESERVATION

110.   The Debtors hereby reserve the right to object in the future to any of the claims listed in this Objection or on the exhibits attached hereto on any ground, and to amend, modify and/or supplement this Objection, including, without limitation, to object to amended claims and newly-filed claims and to file all other objections relating to these claims. Separate notice and hearing will be scheduled for any such objection.

111.   Notwithstanding anything contained in this Objection or the attached exhibits, nothing herein shall be construed as a waiver of any rights that the Debtors may have (a) to bring avoidance actions under the applicable sections of the Bankruptcy Code, including, but not limited to, 11 U.S.C. § 547, against the holders of claims subject to this Objection; or

35

(b) to exercise its rights of setoff against the holders of such claims relating to such avoidance actions.

## NOTICE

112.   The Debtors will serve copies of this Objection on (1) the Office of the United States Trustee (with exhibits); (2) the Speights firm, which signed every single one of the claims at issue, (with exhibits); (3) counsel to each of the official committees appointed by the UST (with exhibits); (4) counsel for the Future Claimants' Representative (with exhibits), (5) counsel to the debtor in possession lender (with exhibits), and (6) on all parties that have requested that they be served with all pleadings filed in these cases pursuant to Federal Rule of Bankruptcy Procedure 2002 (the "2002 List") (exhibits available upon request).

113.   The Debtors submit that notice of this Objection as outlined above is sufficient under Bankruptcy Rule 3007 and that no further notice is necessary.

114.   Based on the factual record set out above, if the Court determines that notice of individual claimants is required, the Debtors' respectfully request that Speights be ordered to provide that notice at Speights' cost, rather than burdening the Debtors with this expense of Speights' making.

## NO PREVIOUS REQUEST

115.   No previous request for the specific relief set forth herein has been made to this or any other court.

## NON-APPLICABILITY OF LOCAL RULE 3007-1

116.   The Debtors believe this Objection, and related exhibits attached hereto, complies with Rule 3007-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware. The Debtors submit that Local Rules 3007-1(f)(i) and (iii) should not apply to this Objection because such rules are limited to omnibus objections on substantive

36

grounds.  The objections herein are essentially non-substantive because they relate primarily to the failure of S&R to have appropriate authorization to file the claims.    However, in an abundance of caution, this Objection has been filed in conjunction with a motion for limited waiver of Local Rule 3007-1 for the purpose of filing this Objection.  Specifically, the Debtors have requested the Court waive: (i) Local Rule 3007-1's limitations concerning the number of claims that may be subject to a substantive omnibus objection and (ii) the requirement in Local Rule 3007-1 that the Debtors file all substantive objections to a particular Claim in a single objection.  The Debtors believe waiver of the Local Rule to file this Objection is in the best interest of the estate as it will streamline the objection process and potentially eliminate hundreds, if not thousands, of claims without the need for an adjudication on the merits of the claims.

DOCS_DE:110109.1

## CONCLUSION

For the reasons stated above, the Debtors respectfully request that all 2,938 claims filed by the Speights firm be disallowed and expunged.  Further, as set out above in the section on Notice, if this Court determines that notice of this Objection must be given to the individual claimants at issue, the Debtors respectfully request this Court order that notice be given by Speights at Speights' expense.

Wilmington, Delaware

> KIRKLAND & ELLIS LLP
> David M. Bernick, P.C.
> Michelle H. Browdy
> Janet S. Baer
> Michael Dierkes
> Samuel Blatnick
> 200 East Randolph Drive
> Chicago, Illinois 60601
> (312) 861-2000
>
> and
>
> PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB, PC
>
> _____
> Laura Davis Jones (#2436)
> David W. Carickoff, Jr. (Bar #3715)
> 919 North Market Street, 16th Floor
> P.O. Box 8705
> Wilmington, DE 19899-8705
> (302) 652-4100
>
> Co-Counsel for the Debtors and Debtors in Possession

38