# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | Case No. 01-1139 (JKF) |
| W.R. GRACE & CO., *et al.*, ) | Jointly Administered |
| ) | |
| Debtors. ) | **Hearing Date: August 29, 2005 @ 12:00 p.m.** |
| ) | **August 29, 2005 Agenda Item No. 18** |
| ) | **Re: Docket Nos. 8394, 8395, 8396, 8781, 8816, 8817,** |
| ) | **8818, 8827, 8829, 8846, 8847, 8910, 8983, 8989, 8992** |
| ) | |

**OPPOSITION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS TO THE REVISED QUESTIONNAIRE PROPOSED BY DEBTORS AND RESPONSE TO THE DEBTORS' PROPOSED CASE MANAGEMENT ORDER FOR THE ESTIMATION OF ASBESTOS PERSONAL INJURY LIABILITIES**

The Official Committee of Asbestos Personal Injury Claimants ("Committee"), by counsel, hereby submits this opposition to the revised "W.R. Grace Asbestos Personal Injury Questionnaire," and a response to the proposed Case Management Order ("CMO") which the Debtors have stated they will file with the Court on or about August 26, 2005. In support of this opposition, the Committee states as follows:

**Opposition to Revised Questionnaire**[1]

1.      The Committee continues to object the entire concept of serving the proposed Questionnaire and its associated document requests on 118,000 asbestos personal-injury claimants. The Debtors' whole purpose for using the Questionnaire has always been to disallow or have the Court estimate at zero value whole categories of asbestos personal-injury claims, without affording the claimants the procedural protections of the Fifth Amendment's due process clause, which include the resolution of factual issues by jury trial.

---

[1]    Copies of the version of the Questionnaire and CMO circulated by the Debtors to the Committee on August 25, 2005 are attached as Exhibits 1 and 2 respectively.

{D0048079:1 }DOC# 247224

2.      Even as supposed "discovery devices," the Questionnaire and its parallel document requests are incredibly overbroad, unduly burdensome, and unlikely to lead to evidence that is admissible in an asbestos estimation hearing.  Discovery under the Federal Rules is broad, but not limitless.  And it certainly does not justify such a far-reaching fishing expedition, in which over 118,000 claimants are being asked to produce, among other things, medical records that they probably do not have in their possession, custody, or control, and to disclose painstakingly detailed information of every job site they worked, even if it has been decades since they worked there.  The cost and burden associated with this discovery is staggering.  Completing such a searching Questionnaire, which is by definition tailored to individual claims discovery, defeats the very purpose of estimation, which is to prevent undue delay in the administration of the estate.  See 11 U.S.C. § 502(c)(1).

3.      Given these fundamental flaws, it is probably not surprising that U.S. District Judge Joseph H. Rodriguez, in the Federal-Mogul case, recently rejected individual claimant discovery as an appropriate way to estimate aggregate asbestos liability, and opted instead for the method that the Committee has urged in this case all along, which is estimating present and future claims based on data from the Debtors' past claims resolution history.  See Official Comm. of Asbestos Claimants v. Asbestos Property Damage Comm., 1:05-cv-00059, slip op. at 44 (D. Del. August 19, 2005) (a copy of the decision is attached as Exhibit 3).  In his decision (in which he found the aggregate asbestos liability in the United States of Turner & Newall, a Federal-Mogul subsidiary, to be $9 billion), Judge Rodriguez explained:

> Here, the focus is on [the debtors'] aggregate personal injury liability for the creation of a trust, **not the merits of individual or class of individual claims**.  To do the latter[] would require that each claimant be afforded the procedural protections of the due process clause of the Fifth Amendment, thereby requiring cases that presented disputed issues of fact a trial by jury.

Judge Rodriguez continued:

> Thus, the Court finds persuasive the recent Owens Corning v. Credit Suisse First Boston, (In re Owens Corning), 322 B.R. 719 (D. Del. 2005) case, and likewise determines that an estimation of asbestos liability for the limited purposes of plan formulation is a fruitful endeavor because it promotes the speed and efficiency goals of the Bankruptcy Code, while not implicating the procedural rights of the individual claimants.  Also similar to Owens-Corning is the fact that ***this estimation did not involve the discovery of individual claims***, but rather an inquiry focused on [the debtors'] historical claims-handling practices …. ***To do otherwise would eviscerate the purposes of the estimation process and place additional financial burdens on the very trust which the Court is trying to create***.

Opinion at 44 (emphasis added); see also In re Eagle Picher, 189 B.R. 681, 686 (Bankr. S.D. Ohio 1995).[2]

4. Judge Rodriguez's recent decision in Federal-Mogul joins the list of established precedents that provide for an estimation based on prior claims settlement history and not based on invasive questionnaires served on individual claimants.  See In re Owens Corning, 322 B.R. 719 (D. Del. 2005); Eagle Picher, 189 B.R. 681.  By contrast, the proposed Questionnaire, even in its revised form, is simply unprecedented.  It is calculated to be nothing less than unduly burdensome and unfair to individual claimants.  For all of these reasons, the Committee respectfully urges the Court to follow the Owens-Corning, Eagle-Picher, and Federal-Mogul precedents and reject the Debtors' proposed Questionnaire in its entirety.

---

[2]   Contrary to the Debtors' assertions on July 19 that the Federal-Mogul case did not involve a dispute as to the methodology by which to estimate asbestos liabilities, in fact the Federal Mogul Asbestos Property Damage Committee, which was the party opposing the Asbestos Personal Injury Claimants' Committee and Future Claimants' Representatives' estimate of the liabilities, sought entry of a bar date in October 2004, which was rejected by the Bankruptcy Court.  A copy of the hearing transcript at which the Bankruptcy Court denied the bar date motion is attached as Exhibit 4.  The PD Committee also filed a motion after the close of the hearing to re-open the trial and take discovery of individual claimants, much as Grace seeks to do here.  The District Court denied the PD Committee's application in an order dated July 19, 2005 (a copy of this order is attached as Exhibit 5).

5.      The proposed Questionnaire, in its revised form, is also defective in that it does not comply with the Court's oral rulings from the bench on July 19, 2005.  After the July 19 hearing, the Debtors revised their Questionnaire, ostensibly to heed the Court's rulings, and sent the revised version to the Committee on August 11, 2005.  At two subsequent "meet and confer" sessions, the Committee highlighted the areas where the revised Questionnaire did not follow the letter or spirit of the Court's decisions, and it proposed alternative language to the Debtors in an effort to remedy the Questionnaire's non-compliant facets.  The Debtor accepted some of the Committee's proposed changes, but rejected most of the others.  The Committee participated in these sessions and proposed remedial language to the Debtors in a good-faith attempt through negotiation to resolve some of the more problematic areas of the revised Questionnaire.  The fact that the Committee did participate in these meet-and-confer sessions should not be construed in any way as signifying the Committee's acceptance of the entire Questionnaire process or an admission of the Committee that the proposed Questionnaire is somehow proper.

6.      Notwithstanding its continuing objections to the entire Questionnaire process, the Committee does wish to apprise the Court of where the revised Questionnaire fails to comply with its bench rulings of July 19.  At the outset, the Committee believes that the first page of the Questionnaire should state two important facts:  (1) that the Questionnaire is the Debtors' discovery as authorized by the Court and <u>not</u> the Court's own device for valuing and evaluating the merits of claims or groups of claims; and (2) that the claimants and their attorneys are only obligated to complete the Questionnaire based on what they know now or have in their possession, and that they have no duty to gather information from third parties or do additional discovery to complete the Questionnaire.  <u>See</u> Transcript of July 19, 2005 Hearing, at 230, 233

{D0048079:1 } 4

[hereinafter, "Tr."]. Accordingly, the Committee proposes that the following language be inserted into page one of the Questionnaire:

> While authorized by the Court, this Questionnaire is solely a means for W.R. Grace to seek information. The Court's authority extends only to permitting Grace to seek it in this manner. The Court will not directly use the completed Questionnaire to estimate liability. Rather, this information will be analyzed by the parties and experts to the Grace bankruptcy proceedings and these analyses will be presented to the Court as part of an adversary process as each party deems fit. The form is unrelated to individual claims allowance and any sanction for failure to complete the form will <u>not</u> include disallowance or result in any other prejudice to your claim.
>
> Although you are required by the Court to complete this Questionnaire to the best of your ability, you are not required to provide any information that you do not know or remember or that is not in your or your agent's custody and control. You are not required to gather information not already in your or your agent's custody or control, nor should you make guesses or estimates in answering any question. You are not required to gather information from outside sources in order to complete the Questionnaire.

7. This Court also ruled that medical diagnosis questions should be open-ended and that it was not proper for the Debtors to advocate their positions in the guise of a Questionnaire. <u>See</u> Tr. 211, 223. To comply with this ruling, two additional boxes for each disease category should be added to pages 1, 2, and 3 of the form (<u>i.e.</u>, parts II.1.a through II.1.f):

> ___ diagnosis and documentation supporting exposure to asbestos or asbestos containing products as having a causal role in the development of the disease or condition.
>
> ___ other (please specify) _____

8. The Committee also believes that, with respect to exposure to other defendants' asbestos and asbestos-containing products, the Court did not authorize the Debtors to seek information about exposure at multiple job sites. <u>See</u> Tr. 263, 264. On page 9 (Part V) of the Questionnaire, under the heading "Exposure to Other Defendants' Products," the Committee believes the Court only authorized discovery into other defendant exposures from one site. To

that end, page 9 should be modified so that it seeks information only about "primary site of exposure to other defendant product."

**Response to Proposed CMO**

9.      The Committee is in substantial agreement with most aspects of the Debtors' proposed CMO. However, as counsel for the Committee indicated at the July 19 hearing (Tr. 291), there are a few aspects of the proposed CMO with which the Committee does not agree.

10.      After further consideration and review of additional information the Committee believes that four months may well prove insufficient for asbestos personal injury claimants (and the plaintiff law firms representing them) to provide the information sought by the Questionnaires. The discovery status of claims (all of which have been stayed as to the Debtors since April 2001) will span a continuum of case preparation, as will the technological and professional resources of the plaintiff law firms that are being asked to provide information in response to the Questionnaire process. For example, providing the information requested by the Questionnaire will be less time consuming for claims that have already gone through the paper discovery process in litigation against other defendants (interrogatories answered, medical records gathered, etc.) than for claims that have been placed on an inactive docket or which have been resolved with all other non-bankrupt defendants before discovery was completed. Likewise, law firms having computerized record-keeping and document retrieval processes will be able to provide the information sought by the Questionnaires more quickly than firms that are not as technologically advanced. Similarly, a firm representing only 10 or 50 claimants will be able to respond more quickly than a firm representing 10,000 claimants. Thus while four months may be sufficient time to furnish the information sought by the Questionnaire for claimants whose cases have gone through discovery and who are represented by law firms that have substantial paralegal and technological resources, it will likely be insufficient for other claimants whose cases have been inactive for four years or whose lawyers have large caseloads and less

than modern technology.  In summary the Committee and counsel for the Committee do not know the particular circumstances of every law firm representing Grace claimants, and if after the Questionnaires are sent out it becomes apparent that a significant number of claimants need additional time to respond, the Committee or other parties may seek an extension of the deadlines in the CMO that relate to Questionnaire completion.

11.    The Committee is likewise dubious that Rust Consulting (the Debtors' claims handling agent) will be able to review the 118,000 Questionnaires with all of their supporting documentation and compile the pertinent information into a usable database within two months. Many Questionnaire submissions will likely contain (in addition to the Questionnaire itself) interrogatory responses, pertinent medical records, social security printouts and perhaps one or two deposition transcripts.  Even if one assumes that the Debtors' claims reviewers will need only one hour per claim to review the Questionnaire and records submitted by each claimant and type the relevant information into a database (which strikes us as unrealistically speedy, particularly since Rust's claims agents are unlikely to be lawyers or paralegals experienced in reviewing asbestos personal-injury claims), inputting and verifying the relevant data for 118,000 claims would likely take 100 claims agents over six months simply to process the data (i.e. 118,000 claims divided by 100 agents equals 1,180 claim files per claims agent, and assuming an hour per claim and 40 hour work weeks, it would take 29.5 weeks for each claims agent to review and process his or her 1,180 claims).

12.    The Debtors have assured the Committee and the other interested parties herein that Rust is up to completing this task within two months as per the Debtors' proposed CMO. However, due to the high potential for error when processing this enormous amount of data within two months, the Committee and the Future Claimants Representative believe it critically

important that its experts and lawyers are provided upon request with access to (or copies of) all documents submitted by each claimant to Rust.

13. The Committee also does not agree to two other aspects of the proposed CMO. Paragraph 12 of the CMO provides that depositions of experts may commence at any time. Since many experts will be submitting both an initial expert witness report and a supplemental/rebuttal report, this provision theoretically would authorize parties to depose experts twice, once after the submission of each report. The Committee believes that two depositions of any witness is wasteful and that the CMO should provide either that expert witnesses may be deposed only after the date by which supplemental reports are due or that expert witnesses may be deposed only one time.

14. Paragraph 14 of the CMO also provides that parties who file a <u>Daubert</u> or other motion in limine may file a reply brief seven days after the party opposing such motion files its opposition brief. We believe reply briefs in the context of <u>Daubert</u> or similar pretrial motions are unnecessary and thus should not be permitted.

(Remainder of page intentionally left blank)

WHEREFORE, for the reasons stated above, the Committee respectfully requests (1) that the Court disapprove the proposed Questionnaire and any similar discovery of individual claimants; <u>or</u> in the alternative (2) to the extent the Court authorizes the Debtors to proceed with their proposed Questionnaire, that the language and modifications proposed by the Committee herein be adopted and incorporated into the Questionnaire and the CMO; <u>and</u> in all events (3) that the Committee be granted such other and further relief as the Court deems just and appropriate.

Respectfully submitted,

**CAMPBELL & LEVINE, LLC**


<u>/S/ Mark Hurford</u>
Marla R. Eskin (No. 2989)
Mark T. Hurford (No. 3299)
800 N. King Street, Suite 300
Wilmington, DE 19801
Telephone:  (302) 426-1900
Telefax:     (302) 426-9947

**CAPLIN & DRYSDALE, CHARTERED**
Elihu Inselbuch
399 Park Avenue, 36th Floor
New York, NY 10022
Telephone:  (212) 319-7125
Telefax:     (212) 644-6755

Peter Van N. Lockwood
Nathan D. Finch
Jeffrey A. Liesemer
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone:  (202) 862-5000
Telefax:     (202) 429-3301

Counsel for the Official Committee of
Asbestos Personal Injury Claimants