UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| W.R. GRACE & CO., *et al.*, | . | Case No. 01-01139(JKF) |
| | . | Jointly Administered |
| Debtors. | . | |
| | . | Aug. 29, 2005 (12 noon) |
| | . | (Wilmington) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE COURT: The participants I have listed by phone

2     are:  David Witkin, Sara Gooch, Thomas Whalen, Lori Sinanyan

3     -

4          MR. WHALEN: Thomas Whalen.

5          UNIDENTIFIED SPEAKER: What's going on?

6          UNIDENTIFIED SPEAKER: Hello?

7          THE COURT: Pardon me.  Who's on the phone with

8     somebody crying and things in the background?  Please put

9     your mute buttons on.  Sam Blatnick, Jonathan Friedland,

10    Michael Dierkes, Christopher Candon, Barbara Harding, Dan

11    Cohn, Sandy Esserman, David Parsons, Barbara Seniawski,

12    Jaclyn DiLasico, David Siegel, March Coleman, Tiffany Cobb,

13    Michael Davis, John O'Connell, Elizabeth DeCristofaro, Edward

14    Westbrook, Jonathan Brownstein, John Phillips, David Austern,

15    Darrell Scott, Martin Dies, Elizabeth Cabraser, Sean Walsh,

16    Allyn Danziesen.  Please put your mute bottons on, folks.

17    I'll take entries of appearances of those of you in court,

18    please.

19         MR. BERNICK: David Bernick for Grace.

20         MS. HARDING: Barbara Harding for Grace, Your Honor.

21         MS. BRAWDY: Michelle Brawdy for Grace.

22         MS. BAER: Janet Baer for Grace.

23         MR. PASQUALE: Ken Pasquale for the Unsecured

24    Creditors Committee.

25         MR. BECKER: Gary Becker for the Equity Committee.

1          MR. BAENA: May it please the Court, Scott Baena for

2     the PD Committee.

3          MR. FRANKEL: Roger Frankel, Swiver Berlin

4     (phonetical) on behalf of David Austern, the Future Claimants

5     Representative.

6          MR. LOCKWOOD: Peter Lockwood for the Asbestos

7     Claimants Committee, Your Honor, and with me today is Mr.

8     Jeffrey Glesmer of my firm.

9          MR. GLESMER: Good afternoon, Your Honor.

10         THE COURT: Good afternoon.

11         MS. WARREN: Mary Warren for London Market Insurers,

12     Your Honor.

13         MR. COHN: Jacob Cohn for Federal Insurance Company.

14         MR. HURFORD: Mark Hurford, Campbell & Levine on

15     behalf of the PI Committee.

16         MS. DeCHRISTOFARO: Elizabeth DeChristofaro for

17     Continental Casualty Company.

18         MS. D'AMBRA: Adrea D'Ambra for One Beacon & Seatan.

19         MR. CARICKHOFF: David Carickhoff for W.R. Grace.

20         MR. GLOSBAND: Dan Glosband also for Continental

21     Casualty.

22         MS. THOMPSON: Christina Thompson for Maryland

23     Casualty and Zurich American.

24         MS. EDWARDS: Sara Edwards for Royal Insurance

25     Company.

1          MR. MONACO: Frank Monaco for the State of Montana.

2          MR. BRANDY (phonetical): Good morning, Your Honor.

3     Thomas Brandy for the regents to the University of

4     California, the trustees of the State University Systems, and

5     for Pacific Freeholds.

6          MR. WESTBROOK (TELEPHONIC): Edward Westbrook, ZAI

7     claimants.

8          THE COURT: Mr. Speights?

9          MR. SPEIGHTS: Dan Speights on behalf of the

10    Speights & Runyan claimants, and my law partner, Alan Runyan

11    is also here today.

12         THE COURT: Mr. Speights, I'm sorry, I can't hear

13    you.

14         MR. SPEIGHTS: Excuse me, Your Honor.  I'm Dan

15    Speights on behalf of Speights & Runyan property damage

16    claimants and my law partner, Alan Runyan is also here and

17    another lawyer in our firm, Bud Fairey is also here and may

18    be addressing the Court.

19         THE COURT: All right, thank you.

20         MR. LOIZIDES: Good afternoon, Your Honor.  Chris

21    Loizides, Delaware counsel with Speights & Runyan.

22         THE COURT: Mr. Bernick?

23         MR. BERNICK: Thank you, Your Honor.  I think we

24    have a fairly full agenda here today.  Just to preview I

25    think the basic topics that we're going to be going through

1    and who's going to be covering them, at least on behalf of

2    the debtors.  Items 1 through 11 will be covered by Ms. Baer

3    and that relates to a series of matters, different subjects.

4    There will be significant time on items 12 through 15, which

5    relate to the Speights & Runyan claims, and Ms. Brawdy from

6    my firm will be addressing those.  We then get to a status

7    conference with respect to the PD claims generally and there

8    are two case management orders that relate to that.  Then we

9    have a status conference with respect to personal injury.

10   That's item 18.  Then finally, exclusivity, item 19.  So if

11   we can begin with items 1 through 11, and Ms. Baer will

12   address the Court with respect to those.

13          THE COURT: Ms. Baer.

14          MS. BAER: Good afternoon, Your Honor.  Item number

15   1 is the debtor's motion with respect to certain tax

16   settlements.  A certificate of no objection was filed on that

17   matter, Your Honor.

18          THE COURT: Yes, actually, I have certificates of no

19   objection, just from looking at my initial notes, on items 2,

20   3, and 6, and a COC what was filed on item 4.  Those orders

21   will be entered.  I just haven't had a chance to do them yet.

22          MS. BAER: Thank you, Your Honor, and item 1, I

23   think, a COC was also filed on that one.  There was a slight

24   revision in that order too.

25          THE COURT: Okay, I don't think I've seen that one.

1           MS. BAER: I do have it if it would be more

2    convenient I'll just present it right now.

3           THE COURT: All right.  Thank you.

4           MS. BAER: There were some slight revisions in that

5    order to take care of the claims that were actually filed and

6    having them not resolved.

7           THE COURT: All right, that order is entered.

8           MS. BAER: Your Honor, would you like me to just

9    present the orders where there were certificates of no

10   objection or COCs to get them taken care of now?  I can

11   certainly do that.

12          THE COURT: Mona, do you want them on the docket or

13   here?  I'll just take them now, then, Ms. Baer, if you have

14   them.  That will be easier if I just do them here.

15          MS. BAER: I do, Your Honor.  Item number 2 was the

16   debtor's motion with respect to the settlement fund with

17   Marsh and McLennan.

18          THE COURT: Thanks.  If you want to give them to me

19   all at once, that's fine too.  All right, I've signed item 2.

20          MS. BAER: Item number 3, Your Honor, is the motion

21   to acquire certain assets of the Single-Site Catalysts'

22   business.

23          THE COURT: Okay.  All right, I've signed 3.

24          MS. BAER: Item number 4 is the debtor's motion to

25   assume and assign a lease and sublease.  A certificate of

1   counsel was filed with that one.  A revised order, which I've

2   handed to you, handled a couple of miscellaneous matters that

3   the Unsecured Creditors Committee had wanted revised.

4           THE COURT: All right.  I've signed that.

5           MS. BAER: Item number 5, Your Honor, is the motion

6   and order for approval of a settlement agreement with

7   Intercat.  The Unsecured Creditors objected to that order,

8   Your Honor, because the final agreement was not yet done.

9   What we would like to do is enter and continue this matter

10  for the September hearing.  We're hoping the final agreement

11  will be done in time for the creditors to review it and

12  comment on it and then object if need be.  If there is not

13  enough time, we will then enter and continue from September

14  to October, but we'll take it one hearing at a time and hope

15  that we can achieve it by next month.

16          THE COURT: All right, it's continued.

17          MS. BAER: Item number 6, Your Honor, was a

18  certificate of no objection filed on the Pitney Hardin

19  application to expand their role to include another matter,

20  and you should have that order in front of you.

21          THE COURT: I have it signed.

22          MS. BAER: Your Honor, item number 7 is the debtor's

23  fifth omnibus objection to claims.  The order before you

24  resolves certain claims and continues the rest to the

25  September hearing.

1          THE COURT: Okay, that order is signed.

2          MS. BAER: Thank you.  Item number 8, the debtor's

3   eighth omnibus objection to claims.  There are three claims

4   left.  Two are being expunged under that order, and one is

5   being continued to the September hearing.

6          THE COURT: All right, that's signed too.

7          MS. BAER: Item number 9, debtor's ninth omnibus

8   objections to claims.  There are three total claims left.

9   This order takes care of all of those claims including some

10  defaults where parties were served and never responded.

11         THE COURT: All right, just one second.  That's

12  signed too but give me just a minute, please.  All right.

13         MS. BAER: Agenda item number 10, debtor's eleventh

14  omnibus objections to claims.  There are ten total claims

15  left on this matter.  Four are being continued to the

16  September hearing.  The rest have been resolved including

17  some defaults where no one responded.

18         THE COURT: Okay, that's signed.

19         MS. BAER: Your Honor, that moves us to agenda item

20  number 11, which is the motion of the State of Montana for

21  relief from the automatic stay.  This matter is just before

22  you today on a status.  Your Honor, earlier last week, the

23  debtors filed a motion to expand the preliminary injunction

24  in this Chapter 11 case to include these matters against the

25  State of Montana.  That motion is set for hearing in

1   September.  If that motion is granted, the State of Montana's

2   motion to modify the stay will essentially become moot.

3   Under these circumstances, we would like agenda item number

4   11 to just continue to the September hearing at which point

5   we'll take up our motion to enjoin those matters.

6          THE COURT: Mr. Monaco?

7          MR. MONACO: Good afternoon, Your Honor.  Frank

8   Monaco for the State of Montana.  What Ms. Baer reported to

9   the Court is essentially correct.  The preliminary injunction

10  motion filed by the debtors will certainly obviate the need

11  to have motion relief heard if it is granted.  I don't know

12  that I entirely agree that it moots all the issues in our

13  motion, but certainly, we would probably withdraw the motion

14  without prejudice because it doesn't resolve issues regarding

15  contribution indemnification ultimately, but it certainly

16  would obviate the need to have, and I would request that this

17  matter be put over in the interest of judicial economy.

18         THE COURT: All right, it's continued till

19  September, thank you.

20         MR. MONACO: Thank you, Your Honor.

21         MS. BAER: Your Honor, agenda item number 12 has to

22  do with the Speights & Runyan matters, and I will turn the

23  podium over to Michelle Brawdy from our office.

24         THE COURT: All right, Ms. Brawdy.

25         MS. BRAWDY: Thank you, Your Honor.  Michelle Brawdy

1   on behalf of the debtors.  The next several items on the

2   agenda all deal with one single substantive issue which is

3   whether or not the Speights & Runyan firm from South Carolina

4   had authority to file nearly 3,000 proofs of claim in this

5   case.  Now the easy answer to that, Your Honor, is no.  The

6   Speights firm didn't have that authority.  We served very

7   limited discovery on a handful of these claimants in June and

8   got overwhelming responses that the Speights firm had filed

9   claims on behalf of parties Speights did not represent, and

10  in fact, as you would have seen in our reply paper, Your

11  Honor, the August 12th pleading from the Speights firm

12  conceded that for at least a thousand of the nearly 3,000

13  proofs of claims filed there was no authorization received

14  from the underlying party.  What I'd like to do, Your Honor,

15  to move these next several items along on the agenda is

16  basically to take a step back and spend about ten minutes or

17  so visiting on the facts as we've come to learn them, and I

18  think if we take the time to do that, you'll see how all

19  these motions and various pieces of paper fit together and

20  why the course of relief that we're seeking makes sense.

21          THE COURT: All right.

22          MS. BRAWDY: Thank you, Your Honor, and again, I've

23  set this up as a power point presentation, but for the ease

24  of reference of the Court and opposing counsel, I've made a

25  couple hard copies which I'd like to hand out.

1            THE COURT: All right.  Thank you.

2            MS. BRAWDY: And, Your Honor, with the Court's

3    permission, the power point actually sets up at counsel

4    table, if I may speak from counsel table?

5            THE COURT: Sure.

6            MS. BRAWDY: Thank you.  So, Your Honor, if we take

7    the step back and figure out what do we know about the

8    Speights & Runyan claims.  Well, we know that historically,

9    Grace has a long history of property damage litigation -

10           THE COURT: Ma'am, I'm sorry.  I'm having trouble

11   hearing you.  Is it possible - yes, to get that a little

12   closer.

13           MS. BRAWDY: Is this better?

14           THE COURT: Yes, much, thank you.

15           MS. BRAWDY: Thank you, Your Honor.  There's a long

16   history of property damage litigation, and a lot of these

17   cases were actually against the Speights & Runyan firm.  So

18   in March of 2003, when the proofs of claims came in, as we

19   told Your Honor before, the numbers were overwhelmingly high,

20   far higher than you would expect given the history of Grace's

21   property damage litigation, but the mere fact that the

22   Speights firm was the most represented firm in this pool of

23   claims was not really unexpected.  In fact, if it had been

24   almost any other firm, it would have raised a lot of

25   questions and concerns, but again, the debtor had a long

1   history with Speights.  And similarly, Your Honor, the fact

2   that all of these claims were signed by one of two attorneys

3   from the Speights firm didn't really raise any concerns

4   either.  One of the instruction forms that accompanied the

5   proofs of claim indicated that counsel could sign the claim

6   forms.  So all we knew, again, as of March of 2003, was that

7   we had more claims then we expected, but the characters

8   weren't unusual.  It wasn't until, Your Honor, we got the

9   verified 2019 statement in December of 2004 that was ordered

10  by this Court that very, very real problems began to become

11  apparent in the Speights filings.

12          I don't know if the Court can see this . . .

13  (microphone not recording).

14          THE COURT: Not at all.

15          MS. BRAWDY: Not at all, okay . . . (microphone not

16  recording).

17          THE COURT: Would it fit on - oh, there's no ledge.

18  But can anyone else see it?  No.

19          MS. BRAWDY: Your Honor, it's actually the same as

20  slide 5, I believe in the package.

21          THE COURT: Oh, well, that's fine.  I'll just put

22  the slide up then, thanks.

23          MS. BRAWDY: Okay.

24          THE COURT: I have a monitor that has your slides.

25          MS. BRAWDY: Okay.  But the reason I wanted to pull

1    this out into a board, Your Honor, is because these

2    categories you're going to see consistently through all of

3    our papers.  On the 13th omnibus objection, we've attached

4    Exhibits H through P, which are spelled out on this slide,

5    which are all the categories of claims we pulled out from the

6    Speights verified 2019 statement that struck us a

7    problematic, that we needed to bring to the attention of the

8    Court.  So, again, that's the explanation for the slide H

9    through P.  But, by the same token, Your Honor, when we get

10   to the motion to quash what Speights there is seeking to

11   quash is our document discovery where we sought documents in

12   each of these very same categories saying, Hey, what's your

13   basis, what's your authorization for filing these claims.

14   Similarly, the supplemental motion to quash is aimed at

15   preventing our deposition discovery where we've asked for

16   testimony from the Speights firm, from Mr. Speights, and from

17   his colleague, Ms. Steinmeyer (phonetical).  We've asked for

18   testimony in each of these categories asking what the basis

19   for your authority to file these claims were, and then

20   finally, Your Honor, for the 12th omnibus objection, what we

21   did, it is hard to get your arms around such a large volume

22   of claims, we pulled a handful out of these categories,

23   objected and served discovery on them.  So, the 12th omnibus,

24   also, deals with claims in these categories.  And as I

25   penciled in on the chart up there, we chose seven from

1    category H to object to.  One from category I.  One from

2    category L, and one from category M.  So those are the

3    subject of a 12th omnibus, and because there's overlap in

4    these categories, Your Honor, several of the claims that we

5    picked to object to initially also fall into the Anderson

6    Memorial category.  So we're going to see these categories

7    throughout not only today but when we come back here to argue

8    the merits, hopefully, next month.  I thought it would be

9    worth visiting just for a few minutes on these categories,

10   what they were, and why they seemed to us to raise concerns,

11   and the first obvious one is this category H, where we got no

12   verified 2019 statement reflecting that Speights represents

13   claimants here.  And that was obviously a real problem, Your

14   Honor, because as we pointed out, every single one of the

15   Speights & Runyan claims was signed by an attorney at the

16   Speights firm.  Our only contact information on any of those

17   claims is the Speights firm.  How could Speights both file

18   those claims and not have corresponding authority reflected

19   in the 2019 statement?  So we knew immediately, again, as of

20   December of 2004, that there were problems.  Again, at least

21   200 claims did not seem to be authorized.  The next item that

22   jumped out at us in December was when you looked at the 2019

23   statement, the first column says who the creditors is, who

24   are you supposedly representing, and instead of being

25   companies or individuals, they seem to be buildings and job

1  sites.  We'll come back later to argue the merits, but

2  obviously, it seemed odd to us that a building supposedly

3  authorized Seights to file these claims, and that concern was

4  confirmed about two weeks later, Your Honor, when we got the

5  letter that was attached as Exhibit Q to the 13th omnibus when

6  we got a letter from a lawyer representing Laborers 310, the

7  310 union, that actually had their own claim on file for the

8  Laborers 310 Union Office Building, and said, Hey, someone

9  else has tried to file a claim on our behalf.  And that was,

10  again, very consistent with our concern that are there real

11  claimants under here who have authorized Speights to file

12  these claims?  The next categories, the Anderson Memorial

13  complaints and order, when we come back to argue the merits,

14  we'll be spending quite a bit of time on this, but Exhibit J,

15  the Anderson Memorial complaint examples were for buildings

16  outside the State of South Carolina that Speights attached

17  the original complaint from 1992 saying, This is my authority

18  to file claims on behalf of building owners outside South

19  Carolina.  Of course the problem with that, Your Honor, as

20  you've seen in our papers, that complaint was rejected ten

21  years ago.  The Court in South Carolina rejected a nationwide

22  class, struck all the building owners outside of the state

23  from that class, and in fact, there's now a second amended

24  complaint in the Anderson Memorial case that's the operative

25  complaint.  It's limited to South Carolina building owners.

1    So, when we see that almost a thousand of the claims

2    indicated in the 2019 say they're filed on the authority of

3    an outdated objected complaint that raised concerns for us.

4    Similarly, Exhibit K are claims supposedly filed under the

5    authority of the Anderson Memorial orders that were issued in

6    violation of the automatic stay from this Court, Your Honor.

7    These were orders issued in 2001, supposedly certifying a

8    class of South Carolina building owners.  No notice was ever

9    given on that, and again, we knew we would be coming back to

10   the Court to deal with those issues.  Exhibits L through O, I

11   won't go into in any detail this morning.  We'll, again, come

12   back to argue the merits, but let's suffice it to say,

13   they're issues with just the documentation we have so far

14   from the 2019 statement was not sufficient for us to confirm,

15   yes, Speights in fact had authority to bring those claims.

16   We since had some correspondence with Mr. Brandy who in fact

17   are going to withdraw our objection to one of those claims

18   under Exhibit O, the Pacific Freehold's case, but for, again,

19   well over a thousand claims.  We still have this concern, did

20   Speights have authority to file, and then Exhibit P is our

21   catchall because in light of all the problems that we've seen

22   so far, we really just had some problem with the

23   trustworthiness of these claims, and whether or not there was

24   authority to bring them, and I think it's important to note,

25   Your Honor, that despite these concerns that we had going

1    back to December, we didn't run into Court and say, there's

2    fraud, and there's abuse, and the claim should be disallowed,

3    and they are all kinds of problems.  As I said, the debtor

4    had a long history with Mr. Speights.  We tried to meet with

5    him.  You'll see reflected in slide 21, it's a summary of

6    things in our 13th omnibus, there were meetings.  There were

7    phone calls.  There were e-mails.  We identified claims.  We

8    identified hundreds of claims where we were concerned, is

9    there any authorization to file that, and we never got the

10   response back saying, Here's our authorization; or else,

11   Here's our withdrawal of those claims.  Again, we worked for

12   months trying to resolve this without Court intervention, and

13   it just became impossible.  So in June of this year, Your

14   Honor, we did three things that I think really changed the

15   landscape of the facts that are before the Court today.

16   First, as I mentioned, we chose ten claims, essentially

17   randomly, from this pool of twenty-nine hundred plus to try

18   to get a handle on what's in there.  What's the basis of the

19   authority.  So we filed the 12th omnibus objecting to ten

20   claims.  Then we chose eight of those claims, Your Honor, and

21   we served subpoenas, and we said, We want to take the

22   deposition of the person most knowledgeable of whether or not

23   Speights had authority to file the claim.  These weren't

24   merits depositions, we just wanted to know what was the basis

25   for the authority to file, because, again, given the history

1   that we've talked about, we knew there were questions and

2   concerns about whether there was in fact authorization.  And

3   then the third thing we did, Your Honor, was we prepared

4   discovery of the Speights firm, the document discovery and

5   the deposition discovery that are the subjects to the motions

6   to quash.  We gave a copy of those discovery requests

7   informally to Mr. Speights in June, and we served them

8   formally in July, and for slide 23, I don't want to get into

9   this in any detail, but suffice it to say, that everywhere we

10   turn, ever time we try to take any discovery, Speights did

11   everything he could to prevent the discovery from going

12   forward.  There was motions for protective order, motions to

13   quash, supplemental motion for quash, everything to keep us

14   from investigating those claims.  And there's a very

15   interesting offshoot of that, Your Honor, is that we had a

16   meet and confer, and we agreed to stay the depositions of the

17   randomly selected claimants for seven days while we tried to

18   work things out informally.  We were hoping if we could just

19   get a stipulation that says, you know, tell us you didn't

20   have authorization to file those claims, we wouldn't need to

21   do the discovery and there would be no need to go forward

22   with the depositions.  So we put everything on hold for seven

23   days at the end of June, beginning of July of this year, and

24   because of that, it was rather interesting, we had to contact

25   the potential deponents because you have to tell them they're

1    not going to be deposed.  So we sent a letter.  We copied it

2    to Dan Speights because supposedly he was their counsel.  We

3    didn't want to contact claimants without informing their

4    counsel, and we told them in the copy of the letters attached

5    here, we told the claimants, We're going to defer these

6    depositions for seven days, but in the meantime, as you might

7    expect, a number of these claimants had contacted us and

8    said, Who's Speights?  What proof of claim are you talking

9    about?  Can you send me a copy.  I never heard of this law

10   firm.  I've never heard of any of these people, and what we

11   told them in this letter was, If you want to just send us a

12   letter or an affidavit telling us about this authorization

13   issue, we don't have to go forward and take your deposition,

14   and the response, Your Honor, was overwhelming.  For eight of

15   the ten claims that we had listed, again, chosen randomly for

16   the 12th omnibus, we got letters or affidavits back.  They've

17   all been attached to the papers we've submitted to the Court.

18   I've chosen a couple examples here.  Maryland Casualty, we

19   never authorized Speights & Runyan to file a proof of claim.

20   Harbard sent both a letter and an affidavit.  We never

21   authorized Speights & Runyan to file a proof of claim.  I

22   think probably the most striking example we got back was from

23   the American Medical Association.  The American Medical

24   Association, we're not talking about a fly-by-night

25   organization here.  They got back to us and said, Not only

 1    did AMA not authorize Speights to file a proof of claim on

 2    its behalf, but that Speights and Runyan had come to the AMA,

 3    asked for permission to file a proof of claim, and was told

 4    by the AMA, No, we don't authorize it.  That's paragraph (3)

 5    of the Exhibit A attached to our 13th omnibus objection.  Yet,

 6    despite again, all these letters and affidavits, we have

 7    claim after claim that was filed by the Speights firm.

 8    Here's the example, Exhibit B attached to the 13th omnibus.

 9    Speights & Runyan submitting a claim on behalf of the

10    American Medical Association, signed under the penalty of

11    perjury, saying the above statements are true, correct, and

12    not misleading.  How are these statements in any way true,

13    correct, and not misleading, Your Honor?  Again, example

14    after example we got back responses from claimants saying,

15    These people don't represent us.  Yet at the same time we

16    have proofs of claims filed on their behalf, and this is just

17    the first sampling of nearly 3,000 proofs of claim filed by

18    this one law firm.  And then another unusual thing then

19    started to happen with these claims, Your Honor.  At the same

20    time we were waiting, remember we had the seven day stay, at

21    the end of June, beginning of July, while we figure out

22    what's going to happen, we're waiting for responses from some

23    of these claimants who said that they were going to send

24    letters, and we start to get feedback from the Pacer System

25    that all of a sudden dozens of claims are disappearing.

1   Speights is withdrawing claims.  Again, the very claims that

2   we are seeking to take depositions on.  The very claims that

3   are subject to the 12th omnibus objection are being withdrawn,

4   and the withdrawals, Your Honor, really raised their own

5   problems.  For one thing, and here's just one example I took,

6   here's the withdraw filed by Speights on June 29th,

7   withdrawing a proof of claim for Laborers 310 Union Office

8   Building.  Well, we're very glad not to have to deal with

9   that claim, Your Honor, but we know for a fact that Speights

10  doesn't represent Laborers 310, the union.  So how do you

11  withdraw a claim on behalf of someone you don't represent

12  anymore than you file a proof of claim on behalf of someone

13  you don't represent?  For the handful of claims that were the

14  subject of the 12th omnibus objection, Your Honor, obviously

15  the attempt to withdraw those claims violated Bankruptcy Rule

16  3006 where you can't withdraw a claim except on order of the

17  Court after a hearing.  Other things that came up, the

18  problems with these withdrawals, not only did Speights try to

19  withdraw the handful of claims that had been subject to the

20  12th omnibus objection, but we saw withdrawals of dozens of

21  cases that were supposedly filed under the authority of the

22  Anderson Memorial case.  Now, we've told Your Honor, and

23  we'll come back and argue the merits, there never was an

24  Anderson Memorial class.  Certainly not for out of state

25  buildings and, that is, outside of South Carolina buildings,

1   and again, we believe the order for the South Carolina

2   buildings was ultra vires.  But if Speights has supposedly

3   filed those claims under that authority, how do you withdraw

4   some claims and not others?  I mean, presumably, you either

5   have that authority or you don't.  And the mere fact that

6   some of them were withdrawn and others weren't is further

7   proof that Speights knew that there was no authority under

8   Anderson Memorial to file those claims.  Another problem we

9   discovered in these withdrawals, Your Honor, was that of

10  these 180 claims suddenly withdrawn, 46 of them were not even

11  for claims that had been filed in this case.  They were,

12  again, and it took us thousands of dollars and man-hours to

13  figure this out, but we got withdrawals like the example here

14  on slide 39 where, you know, again, here's a claim supposedly

15  being withdrawn for the 69th Street Terminal Restaurant in

16  Philadelphia, claim number unknown.  Well, this location may

17  exist.  But again, we have no record that this was actually a

18  claim in this case.  That's why presumably the claim number

19  was unknown.  And again, it took tremendous resources and

20  effort to find this out, but we believe again, that 46 of the

21  180 claims that were suddenly withdrawn at the end of June,

22  beginning of July, weren't even claims in this case.  And

23  with a little further digging, Your Honor, we discovered that

24  Speights has withdrawn nearly 2,000 proofs of claims

25  suddenly, without explanation, in various bankruptcies

1    including Federal-Mogul, Owens Corning, U.S. Minerals, and

2    now this case.  And, Your Honor, these are property damage

3    claims.  This is not the kind of volume business that you see

4    on the personal injury side where there's hundreds of

5    thousands of claims out there.  Two thousand claims is an

6    inordinate number of property damage claims, and this is just

7    what Speights has withdrawn.  I mean, I doubt that there's

8    another firm out there that has ever filed 2,000 let alone

9    have the chance to have so many out there that these were

10   withdrawn.  So we essentially got to the point, Your Honor,

11   you'll see at slide 42 where we were when we filed the 13th

12   omnibus objection, was that we knew Speights had filed and

13   withdrawn again, nearly 2,000 proofs of claims in other

14   cases.  In our bankruptcy case now, we're dealing with just

15   over 4,000 claims, almost 3,000 of them were filed by

16   Speights.  We felt we have no choice but to say, We have to

17   presume these are all unauthorized, and again, that's why

18   we're seeking permission to file the 13th omnibus objection to

19   object to those.  But then, Your Honor, I felt that

20   Speights's response about a week or two ago was even more

21   striking.  This is Docket No. 9186 where he responded to the

22   motion for the waiver where we're seeking to file the 13th

23   omnibus.  And Speights admits that for more than a thousand

24   claims, he doesn't have authorization.  In fact, for nearly

25   400 he couldn't even locate the person or entity who owns the

1    building.  How do you sign and file a proof of claim for a

2    building owner you can't even find?  So, now we're in the

3    situation, Your Honor, that we know that more than a thousand

4    of the claims were definitely unauthorized, and the question

5    now is how do we craft relief to go forward to dig through

6    the rest, get rid of the unauthorized claims that don't

7    belong here, and then go forward to go on, to value and deal

8    with the property damage claims so you can go ahead and get

9    out of Chapter 11.  So with that background, Your Honor, it

10   takes me to the first motion up on the agenda which is the

11   motion for the limited waiver to file the 13th omnibus

12   objection by which we're seeking to disallow all Speights

13   claims, and as I said, we've reached agreement now on one of

14   the claims, and I think if you see the Speights response

15   papers, there's no dispute that this waiver should be

16   granted, and that we should be permitted to go ahead and file

17   the 13th omnibus.  The only question now is, what do we do to

18   implement it?  And I've put together a little slide here, 47,

19   which just mirrors what we put in our reply papers on the

20   13th.  What we're asking Your Honor today is we ask that our

21   motion for waiver be granted, and that we'll immediately file

22   the 13th omnibus objection by which we're going to seek to

23   disallow claims in all these categories H through P.  We also

24   think though, now, Your Honor, in light of the admission in

25   Speights' response papers, that we should go ahead now and

1    immediately disallow and expunge the thousand and fifty-three

2    claims that Speights already admits there was no

3    authorization for.  Why should we waste the Court's time and

4    the estate's money digging through claims where there's an

5    admission that there's no authorization.  We also ask

6    clarification, Your Honor, that all those claims that were

7    supposedly withdrawn by Speights, in late June and early

8    July, to confirm those are disallowed and expunged.  We

9    haven't been quite sure what to do with them, because again,

10   he's purporting to withdraw on behalf of claimants he doesn't

11   represent.  We want to make sure that those withdrawals are

12   valid, that those claims get out of the system.  At the same

13   time, and you'll hear in a few minutes, we've been going

14   through and digging through the merits of the Speights claims

15   as well as all the other claims, and I think that you'll find

16   even if there are Speights claims for which there was

17   authorization, there's just a number of problems on the

18   merits.  We don't want to slow down the process of the

19   objections for the estimation, so we think we have to proceed

20   with this parallel path of identifying and getting rid of

21   claims on the merits.  We think that the motions to quash,

22   that's both the motion and the supplemental motion to quash,

23   need to be denied so that we can go ahead and take discovery,

24   get documents and testimony, trying to establish whether or

25   not there was authorization to file which claims in this

1    case.  We also think, Your Honor, that Speights should be

2    reimbursing the estate for the thousands of dollars it's been

3    costing us to review claims that Speights admits there was no

4    authorization to file in the first place, and then, Your

5    Honor, what we would ask to do is, we'll re-run categories H

6    through P after taking out the claims that the Court,

7    hopefully, will disallow today.  We think if we do an

8    expedited discovery in the next couple of weeks, we can have

9    a hearing on the merits, whether or not there was

10   authorization in each of these categories at the next omnibus

11   on September 26th.  So that's basically my argument with

12   respect to the motion for waiver.  Before moving on to the

13   next perhaps it makes more sense to get a response from the

14   other side, before moving to the next agenda items?

15             THE COURT: Mr. Speights?

16             MR. SPEIGHTS: I'm going to need to do a little

17   housecleaning just a minute to get over here, Your Honor.

18             THE COURT: All right.  Do you have hard copies of

19   the - if you're using Power Point do you have hard copies to?

20             MR. SPEIGHTS: No.

21             THE COURT: Okay, somebody's going to have to make

22   one for the record.

23             MR. SPEIGHTS: Absolutely.  May it please the Court,

24   and good afternoon, again, Your Honor.  Speights & Runyan

25   embraces the debtor's request for a waiver of Rule 3007, so

1   the authority issue can be dealt with first.  I say that

2   unequivocally, Your Honor.  And that is really all that's

3   before you today despite the 45 minutes of argument here and

4   despite extensive argument at some hearings in which I was

5   not present.  We also agree that more than 150 claims at a

6   time could be quickly resolved in some logical way.  For

7   purposes of my response, Your Honor, and I must admit it's

8   kind of tough figuring out where to jump in on this, for

9   purposes of my response, I'm going to round off the number at

10  3,000 just because we all can do the math easier.  We have

11  many disputes with Grace.  Many, many disputes with Grace

12  about these claims, one of which is, we think we filed claims

13  that they haven't given us credit for in their system, and

14  that's an issue that can be resolved hopefully by two lawyers

15  sitting in a room for an hour.  But in any event, I'm going

16  to refer to them as 3,000 claims.  Your Honor, we also think

17  it's important to have some background of what we have tried

18  to do and what the claims really are.  The first I want to

19  show you is, the product ID versus non-product ID.  I will

20  talk to you later about my meeting with Bob Beaver and

21  Richard Fin - Mr. Fink is in the courtroom today - in Boca

22  Raton, Florida.  Counsel says there's this great surprise

23  that all this has happened.  I've been talking to W.R. Grace

24  about my claims since November 1993, Your Honor, and I will

25  address that, but one of the things, just to put in front of

1    Your Honor so that she recognizes is that 61 percent of our

2    claims have no product ID and will never have product ID,

3    give or take one or two mistakes.  We discussed this earlier

4    today during the Owens Corning bankruptcy.  And Mr. Beaver

5    and Mr. Fink and I when we met, and now Mr. Beaver, let me

6    just identify for the record, I assume you know who he is.

7    He was Mr. Sigel's predecessor.  He was general counsel to

8    Grace.  He was in charge of all their asbestos defense, both

9    bodily injury and property damage.  He had a group of lawyers

10    working under him, Mr. Fink and Mr. Sparks are in the

11    courtroom today.  Mr. Fink was my shadow since the 1980s or

12    sometime, and we dealt with Mr. Fink and Mr. Beaver and Mr.

13    Sparks and other people in the Grace group, oh, sometime in

14    the late eighties and their predecessors before that.  It was

15    perfectly natural for me to be talking to the W.R. Grace

16    people I've been talking to for 23 years in all counting

17    their predecessors.  But in any event, very early on in our

18    discussions before K&E decided to launch this attack on me

19    and my law firm, I pointed out to Mr. Fink and to Mr. Beaver

20    that 61 percent of these claims were non-product ID claims.

21    And Mr. Beaver said, and I think he suggested it, maybe I

22    suggested it, Why don't we just put those claims on the

23    shelf, and at the appropriate time, we can file the motion to

24    decide whether conspiracy, et cetera, is a cause of action

25    here, and deal with the real claims that we're concerned

1   about, the product identification claims.  And we agreed to

2   that, and a stipulation was prepared to that, and I'll go

3   into what happened to that stipulation in a few minutes.

4   But, just to give you an overall view of what the claims are,

5   61 percent versus 39 percent.  More importantly, Your Honor -

6        MR. BERNICK: Your Honor -

7        MR. SPEIGHTS:  - going to the authority -

8        MR. BERNICK: Excuse me, I have an objection for the

9   record.  Mr. Speights is now going into settlement

10  discussions.  If he wants to go into those settlement

11  discussions, that's fine, but he is opening the door to take

12  discovery with respect to what's in his files that he's been

13  making representations about in the Court.

14       MR. SPEIGHTS: If I could turn, Your Honor, to the

15  specific objections or actually the breakdown of our claims,

16  but probably it would - I didn't know I was going to have a

17  monitor, Your Honor.  If I could have just a minute to get a

18  hard copy of that.

19       UNIDENTIFIED SPEAKER: (Microphone not recording.)

20       THE COURT: Sure.  It should also be over here.  If

21  anybody needs to get closer to the monitors, you know, you're

22  free to do so.  I know they're - it's a kind of big courtroom

23  for those monitors.

24       MR. SPEIGHTS: I've got my copy now, Your Honor.

25       THE COURT: All right.

1          MR. SPEIGHTS: I think that we need to start on this

2     issue of authority with a breakdown of what we're really

3     dealing with here, and you will note that the largest

4     category, and this includes both product ID and non-product

5     ID because apparently Grace has now decided it wants to treat

6     them all as a group and not to divide them.  That's fine.  I

7     have no problem with that.  But, if we look at the total

8     number of claims, roughly 3,000 claims, 56 percent we have

9     written authority, 9 percent expressed authority.  We've got

10    2 percent of the Anderson state class claims.  So what we

11    have, Your Honor, are written authority for basically two-

12    thirds of the claims, two-thirds of the claims.  The written

13    authority includes, I was interested to watch how Grace

14    deftly dealt with the one Pacific Freeholds case.  That was

15    one they objected to too.  They came before you in several

16    hearings talking about objecting to all our claims, and this

17    is just an example and many others will fall by the wayside.

18    Pacific Freeholds is a case which Mr. Brandy and my law

19    partner, Mr. Runyan have litigated for years against W.R.

20    Grace.  It's a member of the PD Committee.  Back in the early

21    1990s, Mr. Runyan negotiated a tolling agreement with Bob

22    Beaver, the general counsel of W.R. Grace for that building.

23    The lawsuit was then filed.  Twenty or thirty depositions are

24    taken.  Depositions which reveal $30-something million in

25    abatement costs for that building in downtown San Francisco.

1   We object to their putting it in our response.  We object to

2   their including that and their authority objections.  Grace

3   writes a letter and says, We still are sticking by our

4   authority objections.  Finally, Mr. Brandy writes Grace a

5   letter, a Rule 11 letter, and points out to them that it's

6   listed in category F of the petition for reorganization, and

7   only then does Grace agree to withdraw its authority

8   objection to this claim over a month after they told us it

9   was going to proceed on it.  I say that, if we're going to

10  proceed one at a time it obviously is going to take a lot of

11  time because even in that extraordinary circumstance, and

12  there are other here too, where we have negotiated and dealt

13  with Grace for years on claims, they are still pursuing this.

14  But leaving aside the one Pacific freeholds, the written

15  contracts include, Your Honor, hundreds of claims filed by

16  Mr. Brandy and me on behalf of the Board of Regents, the

17  University of California System, and on behalf of the Cal

18  State System.  Hundreds and hundreds of claims.  What is our

19  authority?  We have a written contract executed by those two

20  entities to represent them in this Grace bankruptcy.  A

21  written contract and they have had the written contract for a

22  long time, at least when we had to file the responses to

23  2019.  They know that we have a contract of representation,

24  and they want to include it in all this Group 2 because of

25  questions we have about Anderson, and I'm going to get to

1   Anderson in a minute.  That's where all of this is headed, to

2   Anderson.  But they make that argument that even California

3   claims should be dismissed because of lack of authority

4   because in the contract it says we represent them with

5   respect to viable claims, and they take the position that at

6   some point their going to make an affirmative defense, which

7   the statute of limitations is, affirmative defense of statute

8   of limitations and get that claim kicked out substantively.

9   So, therefore, their argument is, we have no authority.

10  That's a silly argument, Your Honor.  We've got some

11  arguments to make, and I really want to go into some detail

12  with you today, however, hundreds of these claims involve the

13  California colleges and universities.  All of this boils down

14  to two slivers of this pie.  The putative class claimant

15  unknown, 12 percent; the putative class claimant known, 20

16  percent, 32 percent.  That's what this dispute is about, and

17  that's where we need to keep our focus.

18          THE COURT: Could you put the prior slide on.  I

19  don't know, you said 12 percent putative class unknown, but I

20  couldn't follow it.  Could I see the slide?

21          MR. SPEIGHTS: Yes, Your Honor.

22          THE COURT: Whichever, yes, thank you.  If you just

23  wait one second, I can give it right back to you, Mr.

24  Speights.  All right, okay, thank you.  All right so it's

25  putative class claimant unknown -

1          MR. SPEIGHTS: And putative class claimant known.

2          THE COURT: Okay.

3          MR. SPEIGHTS: Thirty-two percent, and I'm going to

4    round off there and say roughly a third, roughly a thousand.

5    It's the same number as counsel used a minute ago.  Roughly a

6    thousand claims the authority is based upon the Anderson

7    putative class, and there is no, none, surprise about that.

8    It's a position we have been taking for years, Your Honor.

9    It's a legal issue that Your Honor, now that we've agreed to

10   waive the rule, will have to resolve at some point.

11   Hopefully, sooner rather than later, although, Your Honor,

12   frankly I don't know how you resolve a matter today when the

13   objection has not even been filed yet.  But in any event,

14   that is what this dispute is about.  The Anderson putative

15   class actions, and I'm going to discuss the Anderson putative

16   class action in a few minutes, but I want to say just at the

17   outset, just as a broad brush, Anderson was filed not really

18   as a nationwide.  It was filed as a class action beyond the

19   borders, including Canada, against W.R. Grace essentially a

20   commercial building class.  Not technically correct, but

21   essentially a commercial building class in December 1992,

22   December 1992, and it has a long history.  In 1993, in this

23   courthouse, Anderson participated in the USG Corp. prepack,

24   represented by Mr. Walsh, now Judge Walsh, to make sure its

25   positions were protected because Anderson tried to take the

1    individual litigation that had been going on and bring them

2    together in one lawsuit for all asbestos property damage

3    cases and move forward, and there's a long history of that,

4    but I tell you, Your Honor, two things, just to preview where

5    I'm going.  Number one, in Celetex, 1996, after the so-called

6    door closing ruling, which we will discuss, Judge Baines gave

7    Anderson the maximum amount of votes of any property damage

8    claimant in that bankruptcy, the Anderson putative class.  He

9    gave them the same number of votes as the schools class

10   action, the same number of votes as the colleges class

11   action, both of which had been certified and upheld by courts

12   of appeals.  Nobody had more votes, and later, the claims

13   administrator in Celetex allowed claims for Anderson of

14   several hundred millions of dollars of which they got 12 cent

15   - or will get 12 cent or 11 cents on the dollar.  We don't

16   get hundreds of millions of dollars, but that's what the

17   claim was allowed for.  And finally, Your Honor, we will show

18   you, when we get to it in a few minutes, that this entire

19   issue about the Anderson putative class action, about whether

20   we have the right to file claims on behalf of it was

21   litigated in South Carolina in 2000.  Grace raised the issue

22   in South Carolina saying that we were inadequate counsel

23   because we had filed claims on behalf of Anderson on behalf

24   of the putative class.  Putative is not a new word.  Putative

25   has been around since 1992 in that case.  That issue was

1    litigated when Grace said that we had no authority to be

2    representing people in the Celetex case even though our

3    claims were recognized by Judge Baines in his voting order

4    and even though we were later allowed those claims.  Grace

5    teed that up in South Carolina, and we had an evidentiary

6    hearing, a two-day evidentiary hearing, when Bob Beaver,

7    general counsel of Grace, Mr. Fink, and Mr. Sparks sat in the

8    courtroom.  Witnesses were called.  One of our witnesses, the

9    leading ethics professor in South Carolina testified and told

10   us before, even then, that we had not only the right to file

11   those claims, but we had the obligation to file claims on

12   behalf of the putative class.  Grace cross-examined that

13   witness.  Grace cross-examined our other witnesses.  Grace

14   called witnesses.   We cross-examined them.  And ultimately,

15   the Judge in South Carolina to whom statewide jurisdiction

16   has been given pursuant to all asbestos cases, bodily injury

17   and property damage, ultimately the Judge decided that there

18   was no merit in Grace's position.  Now, that's just a preview,

19   and I had to jump in there early, and I got out of sequence

20   of my argument, but there is a lot of meat on this bone, Your

21   Honor, and if we're going to argue the merits today, as Ms.

22   Brawdy insisted on doing, then I need to be heard a little

23   bit in response.  Now, Your Honor, under normal

24   circumstances, I probably should sit down in about five

25   minutes.  I probably should sit down and say to Your Honor,

1    Grace has now vented at the hearing.  It's raised the issue

2    of authority.  We agree authority should be decided first.

3    Let's tee it up and decide it, and now we will go to the next

4    step as we did in Owens Corning and in other bankruptcies.

5    Let's decide on the CMO and decide how we're going to tackle

6    this case.  Are we going to tackle it first by dealing with

7    all the sections of the pie at once?  Are we going to focus

8    on the one-third Anderson claims and the authority?  Are we

9    going to focus on the University of California and its

10   hundreds of claims and authority?  All at once?  Not all at

11   once?  Are we going to have discovery?  If they're going to

12   have discovery, we certainly have a lot of discovery we're

13   going to conduct.  All of that would be what we would

14   normally do.  In fact, under normal conditions, Your Honor, I

15   suspect that you would say, Mr. Speights, Ms. Brawdy, get out

16   of here and go meet and work out for me a case management

17   order and come back so we can resolve these issues in a

18   logical, professional way.  Unfortunately, Your Honor, it's

19   gone beyond that.  It's gone beyond that because Grace has

20   chosen in my absence and in two instances without notice and

21   one instance a notice arrives, sort of arrives, the day

22   before in my office.  Grace has chosen to try this issue in

23   my absence, and they have said a lot of things.  My name is

24   mentioned - fortunately with computers we can now count - my

25   name is mentioned 77 times in three hearings this year in

1    which I nor anyone else from my firm attended.  And during

2    those hearings, they did not just tell you certain things to

3    try to get an advantage over me in regard to the authority

4    issue, but W.R. Grace made certain demonstrably false

5    statements to you that I walk into this courtroom having to

6    face knowing that they were said in my absence.  I want to

7    start off, if I can, Your Honor, with the last hearing.  July

8    19, 2005, that was a hearing in Pittsburgh.  Now this is not

9    one of those demonstrably false statements.  This is one of

10   those statements that maybe it's just me, maybe it's just

11   because I'm a little old fashioned, but it struck me when I

12   read that transcript after being told about it by other

13   people: "The Court: All right, let me interrupt.  Have you

14   served this proposal on Mr. Speights?"  This is after Grace

15   had spent, I don't know how much time, Your Honor recalls,

16   you were there, lambasting me all over the courtroom in

17   Pittsburgh.  "Mr. Bernick: I believe, well, first of all, Mr.

18   Speights is a member of the PD Committee.  The Court: Yes.

19   So whether he was personally served, I don't know.  I

20   certainly can find out.  The Court: (After interruption) Now,

21   with respect to Mr. Speights, if Mr. Speights is a member of

22   the Committee surely he must have knowledge of all of this."

23   And I understand Your Honor's feeling on that.  I mean it was

24   - given what was before you there, it was a natural

25   assumption on your part to think that I had knowledge of all

1    that.  But let me tell you what I did have knowledge of, Your

2    Honor.  First of all, I had been operating under the perhaps

3    misguided assumption that Mr. Baena would handle these

4    Committee matters, and I would not normally participate

5    anymore than Mr. Rice and Mr. Kaizen (phonetical) participate

6    when Mr. Lockwood is up here arguing on behalf of his

7    Committee, et cetera, et cetera.  Obviously if an attack is

8    launched on me, that might change the dynamics.  And

9    obviously, now, I'm probably ready to say to Your Honor, I

10   plan to attend a lot more hearings than I used to.  The funny

11   thing about it is, Your Honor, I've attended more Owens

12   Corning hearings than all the others put together, and my

13   claim against Owens Corning is this compared to all the

14   others, but we don't have a Committee in Owens Corning.  So I

15   have to come talk to you in Owens Corning.  So, you know,

16   there's a little issue about what I have notice just because

17   I'm on the Committee.  Our Committee doesn't agree on

18   everything, but we're represented by competent counsel who

19   puts forth a collective judgment.  But, Your Honor, the other

20   thing was, the second thing, not the most important thing,

21   but the second thing is, the papers which he did on the CMO

22   papers which attack me, actually arrived in my office on

23   Monday before that Tuesday hearing.  I've now checked that.

24   They were mailed by regular mail.  But there's something more

25   important here, Your Honor, and I think it puts context on

1  it.  That hearing was July 19th.  On July 13th, the Wednesday

2  before, before the papers were prepared on the CMO, those

3  papers were filed either late in the night of the 13th or the

4  early morning of the 14th.  Before those papers were filed

5  attacking me, I was in Kirkland & Ellis' office in

6  Washington, D.C., along with my law partner, along with

7  another lawyer from my office, dealing with the discussion on

8  the ten deposition notices.  I went there hoping we could

9  resolve all of this.  Frankly, for my benefit, but also for

10  the Court's benefit, at least we could have narrowed our

11  differences.  But we early on learned that we could not do

12  that.  In my opinion it's because Grace had a larger agenda,

13  but that will have to await another day to decide.   But when

14  we couldn't do that, we dealt with the ten notices of

15  deposition, and I stipulated there what I would have

16  stipulated to for the thousand.  I'll stipulate what my

17  alleged authority is there, and I think it's solid authority.

18  But during that, when we resolved the ten, during that

19  process, and again Mr. Beaver was there, and Mr. Fink was

20  there, and Ms. Brawdy was there, and Mr. Bernick was there.

21  I told Mr. Bernick that I was not going to be at the hearing

22  next week, that I was going to California for my sixtieth

23  birthday that I had planned for a long time, and I don't know

24  that Your Honor's a golfer, but I was going to play Olympic

25  Golf Course, the hardest golf club in the nation to get on,

1    and Mr. Beaver and I had a chat about it because Mr. Beaver

2    likes golf a lot more than I do.  I told them I wasn't going

3    to be at this hearing.  And what did they do about it?  Well,

4    on Monday, I left actually for Tampa where I had to argue on

5    Tuesday morning before Judge Glynn, and then flew to

6    California mid-day on Tuesday.  Here's Grace, taking me all

7    across this courtroom in front of Your Honor, in front of my

8    counsel, in front of my friends with medias reporting it,

9    everything, knowing that I was not going to be there.  And I

10   think it was highly disingenuous to say it most respectfully,

11   when you inquired, has Mr. Speights been served?  Does he

12   know about this?  Not to tell you that.  Now, maybe I'm old

13   fashioned, that is not my response on the merits, but I think

14   it gives you a little context of what's happening here.  Now,

15   Your Honor, let me turn, if I could, to how we got here to

16   begin with, because we need a history to respond to Ms.

17   Brawdy's statement, We tried to work with Mr. Speights.  We

18   tried to deal with Ms. Speights, et cetera, et cetera.  Three

19   hearings.  The first hearing was on January 24, 2005.  The PD

20   Committee, Mr. Baena had had the temerity to file a motion to

21   strike Grace's notice of intent to object to PD claims.  The

22   Court heard it that day.  I was not present.  I had checked.

23   I don't believe I was served with any response from Grace,

24   although Committee counsel was, and I'm on the Committee.

25   That's the hearing, Your Honor will recall, where you adopted

1    the Speights exception.  The Speights exception to getting

2    re-notice, and again, I understand why Your Honor did that

3    based upon what was before you that day.  Now, Grace, during

4    that hearing, however, made some statements that I take issue

5    with.  The first statement was this: But rather than get a

6    telephone call for example from the Speights & Runyan firm,

7    what we got was this objection or this motion to strike our

8    notice filed by the Asbestos Property Damage Committee of

9    which Speights & Runyan is a party.  With respect to other

10   individuals we have gotten telephone calls.  We have gotten

11   letters which is, Here's the additional information, or,

12   Please, can you supply me my proof of claim so that I can

13   figure out what's going on.  The picture was painted to you

14   of that South Carolina lawyer, he just won't talk to us, Your

15   Honor.  He's just out there on his own doing all these bad

16   things.  They didn't tell you, Your Honor, that five days

17   before that hearing I spoke with Bob Beaver, former general

18   counsel, and agreed to meet with Grace again about my

19   property damage claims in Boca Raton, Florida with Mr. Beaver

20   and with Mr. Fink.  I was in the process of trying to resolve

21   these claims with them.  In fact, Your Honor, when we filed

22   the 2019 in December, there are claims that were left off

23   because in doing that work and Your Honor's order produced a

24   lot of work by a lot of asbestos firms to try to clean up,

25   you know, and a lot of asbestos firms have been supplementing

1    2019s, and that's good.  Clean up.  Get it straight.  As a

2    part of that, a lot of claims are not listed because they

3    were on a list to be withdrawn and cleaned up, including, I

4    think, the AMA claim, which I'll address in a few minutes,

5    and others which were on the withdrawal list.  So, number

6    one, Grace didn't tell you that five days before I was being

7    this bad guy and not talking to them, I arranged a meeting to

8    discuss my claims in Florida.  Number two, Grace didn't tell

9    you, that I had already talked to Grace about my claims.  I

10   went to New Orleans and met with David Segal, who then was

11   general counsel of Grace, Bob Beaver, and Richard Fink, and

12   Mr. Fink gave a full presentation of my claims and told me

13   what all the problems were, and I took positions, positions

14   consistent with what I'm taking today, without going into who

15   said what and when, we had that meeting, and as a result of

16   that meeting, we also decided to do something else to try to

17   work this bankruptcy toward a consensual plan of

18   reorganization, which I might also deal with in a few

19   minutes.  Bottom line is, we talked.  We had talked.  We

20   continue to talk.  So, Your Honor, the next thing at that

21   hearing, the Speights exception hearing is, Grace says this -

22   and this was really the basis of Your Honor's ruling, I

23   believe, as I discern it: "With respect to documentation,

24   here's the problem with the Speights firm, of Speights'

25   firms' documents as well as many of the others, which is why

1    we filed the objection."  They attached a one-page appendix,

2    and the one-page appendix essentially says, Gee, golly-wiz,

3    you've asked for a lot of information, and that would really

4    be a lot of work for us, so we're not going to give it to you

5    now.  Maybe we'll give it to you later.  Well, I can

6    understand if Your Honor was upset about that.  I mean, you

7    issued a bar order.  You wanted documents, and we were not

8    perfect in responding to your bar order.  There was some

9    claims, especially the conspiracy claims, that needed

10   documentation.  But the representation which I made to you

11   actually when the hearing went on and the exchange continues

12   was, the clear suggestion is we'd only filed documentation

13   for something less that 80 claims.  If we'll go over, you

14   asked the question: "How many notices will the debtor have to

15   re-do?" After saying, "You don't have re-do Mr. Speights if

16   he didn't attach anything."  A reasonable position, and I

17   understand, Your Honor.  Grace said, "So the maximum would be

18   sending would essentially be 320 plus whatever Speights'

19   claims attach appropriate, you know, some documentation.  And

20   then down here, All right, so it can't be more than three or

21   four hundred notices that you'll be re-sending?  That's the

22   ones who did have attachments?  That's correct, and it's

23   probably less than that.  So you've got 320 non-Speights and

24   a maximum of 400 that you'll have to be re-sending, so, the

25   clear implication is that there will be about 80."  In any

1    event, they served us with between a thousand and two

2    thousand.  In other words, we had attached documentation, and

3    they wanted more.  And more importantly, just in the last

4    couple of weeks, in Grace's paper of this court, I'm going to

5    tell you it again, I'll tell you again, I keep telling you

6    what I'm going to tell you because it's so voluminous here,

7    but we went back and after that hearing and went to work on

8    getting more documents.  We could read the transcript even

9    though we weren't there.  You wanted documents, and we later

10   supplied them with a sixteen hundred page index of supporting

11   documents, and we later supplemented that index.  We later

12   got to the point, more than a week ago, of being some

13   approximately, maybe not quite, thirty thousand documents in

14   support of our claims.  And we have calculated that to be

15   three or four hundred, five hundred thousand pages in support

16   of our claims rather than, gee, golly-wiz, they didn't attach

17   anything.  And then Grace files this, this in a brief, makes

18   this statement, When we say, come look at all our documents

19   now.  We've got them ready for you.  A random analysis of the

20   paper indices thus far suggests that more than 60 percent of

21   entries on this supplement, that's that sixteen hundred page

22   supplement and maybe added to, maybe of documents that

23   Speights already provided us as attachments to the small sub-

24   set of claims for which he submitted putative supporting

25   documentation.  So, they can't have it both ways.  They

1    appear before you in January and said, Mr. Speights won't

2    talk to us, and by the way, Mr Speights didn't attach any

3    documents and now they say, he attached 60 percent of thirty

4    thousand already.  We attached a lot of documents.  We could

5    have done a lot better, and we're trying to do better, but

6    that was the framework of how we got set up.  Maybe it had

7    something to do with our motion, the Committee's motion

8    attacking the notice.  Maybe it was raised just doing their

9    good work.  But we got set up in a way that attacked us

10   without any prior notice.  In any event, we went to Boca

11   Raton, I did.  I met with Mr. Beaver, and I met with Mr.

12   Fink, and as I told you earlier, and as Mr. Bernick objected

13   to, and if we need discovery, we can probably open a lot of

14   doors.  I'm going to suggest to you in awhile that most of

15   this can be resolved on legal issues.  But we went down

16   there, and there are a series of e-mails verifying this, to

17   try and work out a reasonable way to deal with this

18   controversy about the number of PD claims.  One way to deal

19   with it was put the 61 percent on the shelf.  Let's

20   concentrate first on the others.  Certainly, at that time, it

21   wasn't all of a sudden in June we became suspicious, we

22   already had meetings with Grace.  We have taken the position

23   in the courtroom in South Carolina in 2000 before and since

24   that the putative class required us to file claims on behalf

25   of these class members.  But in any event, we had a full

1   discussion.  You know, Mr. Beaver and Mr. Fink, they've been

2   on the opposite side for a number of years.  They don't give

3   an inch when it comes to Grace, but we can talk to each

4   other.  We can deal with each other in a professional way.

5   And we worked that out, a stipulation, which will be the

6   subject of some exchanges.  In addition, Mr. Fink raised the

7   question of withdrawals.  I was sitting over there today, and

8   I hope my French doesn't insult the Court, I wrote down on

9   this piece of paper, "Damned if you do and damned if you

10  don't."  Mr. Fink wanted me to withdraw claims.  I agreed

11  quickly to withdraw a couple.  I later - we had this exchange

12  about withdrawing claims, meeting in Miami, going through

13  this process, et cetera, and now I'm told today that I did

14  something wrong by withdrawing claims.  So I think Grace is

15  very inconsistent.  I think it's in the interest of everyone

16  for us to go through these claims and make sure we agree on

17  the statistics.  But in any event, Your Honor, we're at Boca

18  Raton, had a good meeting, we put those on the shelf, we

19  exchange e-mails, and I thought we were on the road of at

20  least narrowing our differences of how to deal with claims or

21  perhaps resolving these issues so that at least we could tee

22  up a couple of issues for Your Honor to decide.  There are,

23  Your Honor, a summary, I've attached up front for you, a

24  summary of e-mails back and forth between me and Mr. Fink,

25  and if I can just kind of gloss over them and say this, Mr.

1   Fink and I exchanged the stipulation.  I sent the stipulation

2   back to Mr. Fink.  I think I changed about one thing from

3   thirty to sixty days.  That's putting them on the shelf.  Mr.

4   Fink comes back to me and says, you may recall, at one point

5   he says, You may recall that I wanted you to withdraw some of

6   the claims.  I said, I'll withdraw those claims, in fact they

7   were on my list.  In another exchange, he talks to me about a

8   list of 374 claims.  I told him I was working on my list.  I

9   told him that there was some I wanted to argue with him about

10  on his list, but his list didn't include all those I was

11  prepared to withdraw.  And ultimately, Your Honor, we got

12  down to an agreement that we'd deal with the stipulation

13  first.  We're going to work on supplementing the ones on the

14  product ID claims, and ultimately, I told Mr. Fink, I'm

15  waiting on the stipulation.  The ball is in your court.  Now,

16  something happened, Your Honor.  That was in early April.  I

17  don't know what happened to this process.  Grace didn't write

18  a letter and say, We need this.  We've changed our idea.  We

19  no longer want to put claims on the shelf.  We want to go

20  after authority, et cetera, et cetera.  We're working on

21  supplementing our claims and for some reason, I don't know if

22  it had anything to do with the change in management or the

23  change in lawyers or whatever, war broke out later.  Now,

24  Your Honor, the war really broke out, I think, around July -

25  excuse me, around June 10.  The PD Committee at that time

1    filed an opposition to the debtor's motion for exclusivity.

2    I don't know that I read that, frankly, Your Honor.  I hope

3    I'm not speaking out of school.  Certainly the Committee told

4    Mr. Baena or gave him authority to file that.  I think Mr

5    Baena probably made some strong arguments in favor of Your

6    Honor terminating exclusivity.  Apparently Grace did not like

7    that, but I gather that Grace was already loading its guns

8    even before that got in.  But on June 27, Your Honor, you had

9    another hearing.  Another hearing in which I did not attend.

10   Grace did not serve us with anything.  I'm not even sure

11   Grace served the PD Committee with anything about the

12   Speights & Runyan claims, and again, Grace chose that

13   opportunity to go after me in my absence.  Among other

14   things, and, Your Honor, I really have narrowed this down.  I

15   know it seems like I'm probably dragging it out, but I have

16   narrowed it down to just several quotes.  "Mr. Bernick: Mr.

17   Speights has been called on this now in several different

18   cases, Federal-Mogul, In Re: Owens Corning, In Re: Celetex,

19   In Re: U.S. Mineral Products Company, and also in Armstrong.

20   I've been called on this.  That's what Grace told you.  I've

21   been called on this, Your Honor.  You've got three of those

22   bankruptcies.  You don't have Mogul.  I love these numbers

23   how you throw them out.  We filed five claims per claimant in

24   Mogul.  If there were two thousand claims we're dealing with

25   400 claims of which we withdrew some Mogul claims through a

1  process working with the debtor's counsel that didn't result

2  in having to go to court and arguing any of this that kind of

3  stuff.  And we now have substantial claims against Mogul and

4  we had substantial claims and we filed them and we have

5  putative class claims in Mogul.  We have Anderson claims in

6  Mogul, et cetera, et cetera.  We worked it out.  That wasn't

7  your case.  Armstrong, Your Honor, where the same counsel

8  were involved, we settled all our property damage claims.

9  What's interesting to me in Armstrong - well, I'll wait to

10  Owens Corning.  In Owens Corning, which Your Honor knows more

11  about than the others because I've been before you

12  repeatedly, we did go through a withdrawal process.  There

13  are no putative class claims in the Owens Corning bankruptcy

14  at all.  They are clients of mine for many years.  There is

15  no authority issue raised in Owens Corning.  Ms. Hogan has

16  never uttered the word "lack of authority" to me in all of

17  our discussions.  What we have done was to go through a

18  process that Your Honor set up by which we have to meet

19  certain standards, and many of my school districts or other

20  clients there decided not to proceed.  So what?  That's what

21  the process is supposed to do.  But more importantly, Your

22  Honor, I thought about this the other day, why Grace was

23  attacking me, trying to suggest that I have been whatever the

24  term was, called to task for Owens Corning being one of them.

25  I have a list of the withdrawals in Owens Corning, and what

1    is striking is the fact that the approximate majority of

2    those claims that I went through in Owens Corning are claims

3    where I also represented the claimant in litigation against

4    W.R. Grace.  I have releases for a large number of claimants

5    that I withdrew in Owens Corning, a large number of those

6    places from W.R. Grace.  I have judgments against W.R. Grace

7    for a number of those claims.  Grace is saying I didn't have

8    authority.  It settled those cases with me.  This is an old

9    inventory of clients I have represented, and, of course, I

10   make the argument in Owens Corning that their products had

11   not contaminated until much later on and I filed claims

12   there.  U.S. Mineral is another one, Your Honor.  That's your

13   bankruptcy too.  There is not one allegation that I did not

14   have authority to file claims in U.S. Mineral.  There was an

15   objection by Walt Taggert, the Future Claimants

16   Representative, he wanted to attack statute of limitations

17   and several other grounds.  Mr. Taggert is an honorable

18   person who has been a Trustee of the National Gypsum

19   bankruptcy in which I have claims since 1993.  He didn't

20   attack me personally.  He didn't attack the authority issue.

21   He knows that that's not a real issue here.  He's got

22   legitimate statute of limitations questions.  Fortunately, we

23   worked out a consensual plan in a matter of days.  The

24   withdrawal of claims there had nothing to do with authority.

25   Finally, Your Honor, I get to the last here.  Finally, Your

1  Honor, I get to the merits a little bit.  This is a hearing

2  again, when I'm on the plane going to California to hopefully

3  have a pleasant day when somebody sends me an e-mail to my

4  Blackberry that sort of ruined my day.  Mr. Bernick stands up

5  and tells you a number of things, but this, among other

6  things is what he told Your Honor: "So in pursuing this with

7  Mr. Speights, one of the answers was, and this is again a

8  remarkable answer, it's what I call the rogue class, and

9  there's no other way to refer to it.  There was an effort

10  called the Anderson Memorial class action, and this was

11  prosecuted as a purported class action on behalf of property

12  damage claimants as a class.  There's only one problem.  It

13  was, certification was denied.  Flatly denied."  That is

14  absolutely incorrect.  Then he continues: "So time passed and

15  rumors started to fly around that Grace was going to go into

16  bankruptcy.  So all of a sudden, a new class action is

17  filed."  That is absolutely untrue, Your Honor.  "And the

18  idea and the action that was" – this was explicit with the

19  Court is that – "Judge, you've got to certify this class and

20  certify it now because Grace is going to file for bankruptcy,

21  essentially let's get our foot in the door."  Well, that was

22  not acted on until after the bankruptcy case was filed and

23  the stay was put in place.  Absolutely untrue.  The Court

24  certified as to Grace, and Grace got a hearing on that after

25  he did.  Grace's national counsel, Mr. Castel from New York

1   and local counsel attended a hearing, and the Judge kept a

2   certification in place as to Grace.  And then it says, "Now

3   they could have been candid with the Court."  Now, of course,

4   that class which was certified was the state class action.  I

5   don't mean to suggest to Your Honor that he certified the

6   class for the rest of the nation.  I want to go there now,

7   but there was a certification for it.  So, Your Honor, we get

8   to the merits, and I suggest to you that all we're dealing

9   with here is Anderson and the Anderson putative claims, that

10  one-third of those claims where they want to say I had no

11  authority to file.  This is a history of Anderson.  On

12  December 1992, Speights & Runyan filed this putative class

13  action.  The next year, the United States Court of Appeals

14  for the Fourth Circuit held that the South Carolina door

15  closing statute does not bar a nationwide class action in

16  South Carolina.  Now, I have to divert myself to a subject

17  I've argued in many courts which is the door closing statute.

18  Essentially it says, according to – essentially is says that

19  the South Carolina courts will not entertain lawsuits which

20  don't arise in South Carolina and are not on behalf of South

21  Carolina citizens.  And the issue is whether it applies to

22  class actions or not because the class action representative,

23  like Anderson, is a resident of South Carolina.  In the

24  Central Wesleyan (phonetical) case, that's the National

25  Colleges and Universities class action, the Fourth Circuit

1      says, Yes, you can do that.  That's not a bar.  It does not
2      apply to class actions.  So, we're feeling pretty good.  Then
3      in July, 1993, Anderson filed - there's no motion for
4      certification yet, Anderson filed class and root claims in
5      the Celetex bankruptcy.  That was pending before Judge Baines
6      down in Tampa, Florida.  It was a 1990 bankruptcy that is
7      still going on today.  And we did the same thing in that
8      bankruptcy which we have done here in this bankruptcy.  We
9      filed claims on behalf of members of the putative class
10     before Judge Baines.  In August 1994, Judge Howard, Judge
11     Howard was Judge Hayes' predecessor, Judge Howard had the
12     issue of whether to strike allegations from our complaint.
13     There was no motion to certify filed to strike allegations
14     for buildings outside of South Carolina.  And Judge Howard
15     did strike.  He disagreed with the Fourth Circuit, and the
16     Fourth Circuit was not binding on him, in fairness to Judge
17     Howard, he disagreed with the Fourth Circuit, and struck him
18     from our complaint.  No motion to certify.  Grace took the
19     position that we could not appeal that ruling.  It was an
20     interlocutory ruling.  So what's the bottom line of that?  We
21     still have a putative class that we needed to protect because
22     we intended to appeal that ruling at the appropriate time on
23     the door closing issue and say the Fourth Circuit was right
24     and Judge Howard was wrong.  Then in May 1996, Judge, Judge
25     Baines was proceeding toward a plan confirmation, and Judge

1    Baines had to decide how many votes are people going to get,

2    and Judge Baines issued an order.  We call it the voting

3    order in which as I mentioned to your earlier, he ruled that

4    Anderson had twenty thousand votes.  The same number of votes

5    as the certified schools class action and the certified

6    colleges and universities class action, more votes than a

7    large number of other PD claims.  Then in December 1996,

8    Judge Baines confirmed a plan of reorganization.  Now I had a

9    choice then in Celetex, Judge, and it's the same choice I

10   have here.  I could have filed a motion to certify the

11   Anderson class.  If they had objected to the Anderson class

12   in Celetex, I could have turned around and filed a motion to

13   certify.  The door closing ruling of Judge Howard, without

14   question, had no applicability to a federal court or a

15   federal bankruptcy court in Florida to entertain a class

16   action.  As we all now know, by subsequent decisions, the

17   door closing statute only affects the Circuit Court in South

18   Carolina.  So I could have in Celetex filed a motion for

19   class certification if they had objected.  In fact, Your

20   Honor, we will probably file, if they file these objections,

21   and I have every reason to believe they're going to file the

22   objections.  They're not filed yet.  We're here on limited

23   labor.  If they file these objections, I believe that we will

24   file promptly a motion to certify the Anderson putative class

25   before Your Honor, and then Your Honor can decide not only in

1    this proceeding which we don't object to whether Anderson had

2    the authority of whether Anderson can represent this putative

3    class or what would then be a certified class in this

4    bankruptcy.  We didn't file one there in Celetex because the

5    plan took care of us as a plan could do here.  The plan had a

6    specific definition to cover Anderson, and it dealt with

7    Anderson had the right to file as a group claimant there,

8    just a putative class, we filed as a group class.   We could

9    be considered a group claimant, and therefore, Your Honor, we

10   filed claims later on as a group claimant.  Now, Your Honor,

11   we've got this great plan to representing Anderson putative

12   class, what do we do?  Well, we go to work filing claims.

13   Despite what Grace says about me and my law firm, I think

14   we're pretty prudent when it comes to issues concerning our

15   reputation.  Despite the plan, despite the voting order,

16   despite everything, we consulted with the leading ethics

17   professor in South Carolina.  Professor John Freeman, who

18   teaches at all the ethic seminars, who tells lawyers what to

19   do, and we go to him and say, Professor Freeman, we've got

20   this plan, okay?  Do we now file claims for the claims

21   administrator on behalf of Anderson?  Do we run into any

22   problems?  Do we have authority to do so?  Professor Freeman,

23   and we'll show this when we give the merits, tells us, Not

24   only do you have the authority, man, you've got a fiduciary

25   duty, a fiduciary duty to file claims on behalf of the

1    putative class.  If you don't do it, those absent class

2    members could come after you as well.  So, based upon that

3    advice, based upon the plan, based upon the voting order, we

4    filed all those claims.  And there's a long history down in

5    Celetex, which I'm not getting into today, unless they try to

6    raise it in rebuttal.  So, now we have this going on and

7    Grace comes along again.   Grace comes along, and we file a

8    motion to certify the class.  Grace says, we're going to

9    attack your authority.  I'm sorry, Your Honor.  We're going

10   to attack your adequacy.  We're going to attack the adequacy

11   of Speights & Runyan to represent a class in South Carolina,

12   our home, despite settling hundreds of cases with you,

13   despite huge judgments and verdicts all over the country, not

14   only by Mr. Speights, by Mr. Runyan, Mr. Runyan likes say

15   he's never lost a case against Grace.  He's got cases

16   affirmed on appeal in several jurisdictions in this State and

17   this nation of millions of dollars.  Despite all this, we're

18   going to attack your adequacy to represent this class.  And

19   they hire their experts, and we have a little - I guess if

20   this is World War II that was World War I down in South

21   Carolina as we head to certification.  Despite that, Grace

22   wanted to settle with me, and this is a part of the record.

23   Grace tried to settle the Anderson state class with me, and I

24   had to take the position, I can't settle the state class with

25   you.  They never said I didn't have authority, couldn't

1   settle the state class with you because you're attacking my

2   adequacy.  It would be inappropriate for me to do so even

3   though I could have gotten presumably a lot of money from

4   them.  I would not do so.  So we went to a full evidentiary

5   hearing over two days in South Carolina.  Now, many experts

6   testified.  Grace argued many grounds, but the only ground

7   that's relevant here is Grace argued that we were inadequate

8   because we had filed claims for the putative class in

9   Celetex.  Professor Freeman testifies.  Other people testify.

10  They cross-examine all the witnesses, and we get to the end

11  of the hearing.  Grace asks for an extension of time to file

12  a brief.  The Judge was ready to rule right then on all

13  issues.  Grace asked for an extension of time so he could

14  file a brief after the transcript was prepared.  That was the

15  first or second day of September.  And so we waited on the

16  transcript.  We waited on the transcript for months and

17  months and months even though the Court had said it was ready

18  to rule.  Because the noise was being made about Grace filing

19  bankruptcy, we asked the Court to go ahead and rule as to

20  Grace, which it did and certified as to South Carolina

21  buildings.  That's a two percent on my time chart that I

22  handed Your Honor.  We have a certified class as to Grace.

23  Then on April 2, Grace declared bankruptcy.  What happens in

24  South Carolina?  The minute they declared bankruptcy, all of

25  the other defendants abandoned this attack.  This attack on

1    me and adequacy in Celetex and claims.  They immediately

2    write the Court that they withdraw those.  Then in June we

3    get a letter from Judge Hayes, not Grace, because by then, it

4    was in this Court.  Now, I know it might sound strange, Your

5    Honor, that the Judge writes a lawyer a letter telling him to

6    prepare an order.  That's the way it is done down in South

7    Carolina.  He sends it to all parties.  He sets forth his

8    views. He asks for an order.  He takes the order that every

9    side comments.  After he does that, he writes his own order

10   and he publishes his own opinion.  But I think this letter of

11   Judge Hayes, again, who lives 200 and something miles from

12   where I live, who has statewide jurisdiction of all asbestos

13   VI PD cases.  I think this letter is instructive as to what

14   Grace's position was there and what Judge Hayes thought about

15   it.  Is this mike on, Your Honor?

16            THE COURT: Yes.

17            MR. SPEIGHTS: Okay, I'm sorry.  I just can't read

18   from that distance.  At the beginning of the - Well, at the

19   beginning of the order - Do you want to put that up first.

20   "I find absolutely no merit to the argument that Speights &

21   Runyan would not be adequate class counsel for the plaintiff

22   class in this action.  I could easily address and with

23   specificity dismiss the grounds raised on this issue, as I

24   had reached my conclusion on this issue prior to the Grace

25   state.  My concerns in elaborating on this issue at this time

1   are: One, it is moot as to the remaining defendants, all of

2   whom had abandoned the attack.  Second, since it would solely

3   be an issue viable as to Grace but for the stay, I am not

4   sure that my Court may run afoul of the stay if I make a

5   finding and ruling pertaining solely to a Grace-related

6   issue."  And then, near the end of the letter, Your Honor:

7   "As to Speights & Runyan, the order is to reflect that the

8   Court is fully convinced of the firm's adequacy to prosecute

9   Anderson's and the class's claims against the defendants

10  herein.  As noted above, the Court is reluctant to" - I

11  assume - "go into detail address the specific issues raised

12  and pursued prior to Grace's bankruptcy.  In brief, I find

13  the overwhelming evidence of eminent members of the South

14  Carolina bar alone persuasive."  And then in the last

15  sentence: "Defense adequacy" - excuse me.  "The Court puts no

16  pretus (phonetical) on the assessments and opinions of the

17  defense adequacy of witnesses and finds them ill-equipped to

18  help the Court to any degree on any issue they address.  The

19  record controverts all of those witnesses' attacks on

20  Speights & Runyan.  The order should as to counsel's adequacy

21  follow in general it's language addressing this issue as set

22  forth herein at page 87-88 of Anderson's reply."  So, Your

23  Honor, they fired all their missals in South Carolina.  We

24  had a two-day hearing, and Judge Hayes, to say the least, was

25  not impressed.  Now, Your Honor, where does that leave us?

1   First of all, I hope it leaves Your Honor, and I trust and

2   believe it does, with the realization that there are two

3   sides to every story.  We're prepared, we want to decide this

4   authority issue, and we want to tee it up in a way hopefully

5   that it could be done professionally.  Hopefully people could

6   sit down and narrow the issues for Your Honor, but at least

7   to tee it up in a way that can be dealt with early and not in

8   manic discovery procedures and everything else.  A CMO, a

9   scheduling order, a stipulation, et cetera.  I told Grace -

10  I've told Grace forever, I'll continue to tell them.  They

11  expressed shock that Mr. Speights said in his response to

12  their brief, that he didn't have written authority from a

13  thousand clients.  Well, I've said that forever.  They're

14  members of the putative class.  I believe I not only had the

15  authority, I was told I had a fiduciary obligation to file

16  claims on behalf of that fiduciary class.  Your Honor can

17  decide that.  Essentially it's a legal issue.  They may want

18  discovery, and if they do, we'll discuss that, and we'll move

19  for that along with everything else or by itself, but we need

20  to tee this up in a professional way so that - and I would

21  ask Your Honor to direct us to see if we can at least

22  stipulate to some facts.  Mr. Ferry's going to argue the

23  discovery motions, just stipulate to some facts or at least

24  to decide what we can argue as a matter of law.  Having said

25  that, Your Honor, I wanted to say one other thing, and maybe

1    it's out of - maybe it's out of turn, but I believe this is

2    where we've gotten.  I was particularly offended by the

3    suggestion in the January transcript that I wouldn't talk to

4    anybody.  I told you that I had met with Mr. Segal and Mr.

5    Beaver and Mr. Fink in New Orleans to discuss my claims in

6    2003, and I heard the full presentation, and I made all the

7    arguments that I could muster at that time of why I had

8    authority and why the statute of limitations didn't apply, et

9    cetera, et cetera.  Not as full as today, but I made my

10   points.  But I suggested then that, you know, the reality is,

11   we're not getting anywhere.  There ought to be discussions

12   leading to a consensual plan of reorganization.  I think my

13   brief cites that from my experience, Mr. Dies experience on

14   working on these things.  I'm not trying to get out of this

15   war.  I know this war is going to be here.  I know we're

16   going to litigate this.  I'm not saying anything now to try

17   to persuade you not to decide the authority issue on my

18   claims.  Fine, they've teed it up, we want the air cleared as

19   well.  But, Your Honor, from that point on, until the fall of

20   2004, I devoted a lot of time and Martin Dies has devoted a

21   lot of time trying to bring the parties together on a

22   consensual plan of reorganization.  I think I have some ideas

23   that would bear fruit.  Finally, in absolute frustration, I

24   went to the Future Claimants representative, David Austern,

25   and said, Help us here.  They've got a billion dollars from

1    Sealed Air that they didn't have when this bankruptcy

2    started.  What are we doing?  If you find our claims 90

3    percent invalid, I mean, we've got a Federal-Mogul order here

4    in the last few days that said, 9 billion, Mr. Lockwood, $9

5    billion in Federal-Mogul.  We got Judge Fullam's order in

6    Owens Corning, $7, $8, and $9 million.  They don't have PD

7    claims like we've got here, and they don't have Zololite.

8    What are we doing if we cut the claims in half.  What do if

9    they cut the claims by 80 percent?  Let's talk about a

10   consensual plan, and to his everlasting credit, the Future

11   Claimants representative got us together and he did something

12   very smart.  Okay?  We kept the lawyers out of the room.  The

13   lawyers went out the room.  When you got a call in October of

14   2004 saying, Please hold up a little bit on exclusivity,

15   because we are that close to a deal.  The lawyers were not in

16   the room.  And then it broke down.  I don't know why it broke

17   down.  I don't believe Grace knows why it broke down.  Okay?

18   Nobody knows. We were that close, but once that happened,

19   that's when all the litigation, and it disturbs me because,

20   Mr. Bernick also said on a quote I won't put back up there,

21   the only way to get people talking settlement, is litigation.

22   Put the pressure on them.  Well, that might be true in a lot

23   of cases, but Mr. Lockwood and his firm were involved in

24   Manville in the eighties.  They probably were involved in

25   fifty to a hundred bankruptcies.  I've tried a Manville case

1   in the eighties.  We got some new kids on the block.  If you

2   file a motion and all of a sudden, we're going to capitulate.

3   They give you money.  They have substantial asbestos claims

4   here.  We don't need that.  We've never needed that to talk.

5   I suggest to Your Honor that while we're having this war,

6   let's not lose sight of the ball that is not going anywhere,

7   as resolving the bankruptcy, and I would ask Your Honor to

8   consider appointing a mediator or some process and maybe keep

9   the lawyers out of the room again, and let's see why we can't

10   resolve this issue once and for all.  Thank you, Your Honor.

11       MR. BERNICK: Your Honor, I will be very brief,

12   because I know we still have to get to two other Speights

13   items, and I know that there are many other matters to be

14   handled today.  But, I want to cover a couple of things, and

15   then get to a concrete proposal for how to move forward here

16   because ultimately, I guess, what we have to do is figure out

17   what the next step should be.  Obviously, it's Grace's

18   viewpoint in this case that Mr. Speights and his firm have

19   flaunted the rules and they flaunted the rules repeatedly.

20   And very interesting today, even - and I don't want to delve

21   too much more into the detail of the merits because we will

22   have an opportunity to do that, but it's now been

23   acknowledged that all these different forms were signed by

24   his firm.  That literally hundreds if not thousands of them

25   were based upon the Anderson Memorial case, and yet, in those

1   very claim form responses, he never specifically identified

2   that his only authority for submitting those claims, even

3   those claims of people who specifically told him he did not

4   have the authority, was this purported Anderson Memorial

5   class.  He never even disclosed it.  Simply filed the claims.

6   Never sought permission of the Court.  Simply filed the

7   claims.  Never told us.  Simply filed the claims.  Again,

8   completely flaunting the rules -

9         THE COURT: But, Mr. Bernick, I really - I mean,

10  truly, I've heard all that.  I really think what we need to

11  do is get a case management order because I've heard your

12  position and I understand it.  I've heard Mr. Speights

13  position, and I understand it.  I think you folks need some

14  discovery, and if I have to make a ruling, I need a ruling,

15  but there's no point in continuing with this process.  I get

16  the picture.

17        MR. BERNICK: Okay, then that's really - Let me get

18  to the specific proposal that we wanted to put before the

19  Court.  First, there's the question of what should happen

20  with respect to the claims that Mr. Speights himself

21  recognizes should be withdrawn.  There's a whole bunch of

22  those claims.

23        THE COURT: They should be disallowed or at least,

24  you know, and marked as discontinued.  If there was no

25  authority to file them, I understand the problem with not

1    having the authority to file and also not having the

2    authority to withdraw, but nonetheless, I think they're going

3    to have to be marked as discontinued, because there was no

4    authority to file them, and if those creditors feel that

5    they're somehow prejudiced, I'll hear from them.

6            MR. BERNICK: And that would be our number one

7    proposal is that he do that.  Maybe he should be submitting a

8    form of order to seek the permission to do that formally.

9    He's made reference to a list that he has of things that he

10   was going to clean up, that is presuming the claims get filed

11   and later it gets clean up.  Whatever's on that list, all of

12   them ought to be withdrawn, and he ought to submit an order

13   to that effect, and he should do so within the next 7 days so

14   that we don't have to burden the Court further with any of

15   this.  Secondly, with respect to those matters that are being

16   withdrawn, we will take up later the question of what should

17   be done with the expenses the estate has experienced in

18   connection with those claims, but I don't want that to be an

19   obstacle against going forward.  Can I have the slide, the

20   pie chart slide that was displayed to the Court?  The one

21   that had the breakout of what claims were being filed under

22   what theory of authority that -

23           THE COURT: I have the copy that Mr. Speights gave

24   me.

25           MR. BERNICK: Yeah, that one there.  This brings us

1    to the second basic problem.  The second basic problem is

2    that, and again, I don't want to revisit the whole history,

3    but I personally asked Mr. Speights, and we did informal

4    correspondence to give us precisely that kind of breakdown,

5    that is with respect to all the different claims that he has

6    filed, exactly what is the authority for proceeding with

7    those claims.  He now comes into court and says, Gee, I never

8    knew that all these things were going to be said about me in

9    my absence, which again is totally false, including the

10   discussion about his golf trip in California.  I specifically

11   told him that we were going to raise these matters.  It was

12   his choice not to be here.  It was his choice to wait until

13   he had the opportunity to come in and present the pie chart.

14   But having presented the pie chart, talk is cheap.  We have

15   got to have the ability to pin down what that pie chart means

16   on a claim-by-claim basis.  He says that here are all the

17   different percentages.  Well, where is the filing?  Where is

18   the withdrawal?  Where's the filing?  Where's the attestation

19   that that's all correct?  Which brings me to the subject of

20   the settlement discussions in Pacific Freehold.  The only one

21   claim out of all of the claims that he has filed, and we have

22   taken issue with, there's only one claim he has actually come

23   forward with and demonstrated that in fact he has the

24   authority to pursue.  So we have a major, major gap here

25   between his willingness to appear and make a bunch of self-

1    serving statements to this Court on the basis of charts that

2    he's had weeks to prepare while he stymied our ability to get

3    discovery.  So we need the discovery.

4          THE COURT: Okay.  Can we do away with the

5    vituperative conduct.  I'd like to get to the next issue.

6    You need a case management order to deal with this.  Can you

7    folks get together and do one?  Mr. Speights -

8          MR. BERNICK: But, Your Honor -

9          THE COURT:  - has no objection to the one you're

10    proposing, apparently.

11          MR. BERNICK: Well, Your Honor, there is only one

12    way to do that because, he says that.  We asked him for

13    precisely that time table a month ago.

14          THE COURT: Well -

15          MR. BERNICK: He says, I want more meetings.  We

16    have met with him.  We've called him up.  We've pestered him,

17    but the only way it's going to happen, Your Honor, is for

18    Your Honor to say, Mr. Speights, I want your firm to show up

19    through a witness most knowledgeable about the authority

20    issue, probably Mr. Speights himself, and the woman who

21    signed those forms, show up in ten days at your offices,

22    disclose in advance the documentation that you have to

23    support the authority for every single one of the claims.

24    It's the only way it's going to happen.

25          THE COURT: Look, if the 2019 statements weren't

1    filed or as filed didn't indicate that there was authority,

2    then I have to assume first of all that there was no

3    authority.  So, as to any creditor that's not on the 2019

4    statement I assume there is no authority.  Otherwise there is

5    an amendment process in place for the 2019 statements.  It

6    should have been followed.  End of story.  If there's no

7    authority because it's not on a 2019 statement, then file

8    your objection, and we'll deal with it.

9         MR. BERNICK: We'll go ahead and do that.  We'll

10   take care of those.  But we then still have the overwhelming

11   bulk of the claims that we're talking about here, and the

12   clock is running against us, and Your Honor, I have to say

13   it, he's here because he wanted to buy the time to show up at

14   his convenience and make these arguments and now we're under

15   the time pressure.  I'm sorry, we're under tremendous time

16   pressure in this case.  We've been actively pursuing it on

17   all fronts.  Mr. Speights wants to talk about settlement for

18   hundreds or millions or billions of dollars worth of claims.

19   He doesn't want to pay the piper in discovery.  So, I would

20   ask the Court to order Mr. Speights and the other person who

21   signed the claim forms to make themselves available.  We'll

22   do it in their offices and their city, in whatever period of

23   time that I would say, Let's give them more time.  Give them

24   21 days, 21 days with the documentation being produced in

25   advance by claimant establishing what the documentation is to

1   support their authority to prosecute the claim.  That's

2   exactly the kind of thing that we asked for before, and

3   they've been delaying and delaying and delaying so they can

4   come and do their pictures.  It is the least that can be done

5   here given this history.

6         THE COURT: I have no problem ordering any attorney,

7   any attorney, to show up with proof of what the documentation

8   is to represent somebody when that authority is at issue, and

9   apparently as to at least all of the claims that Mr. Speights

10  - all but one, I guess, the claims that Mr. Speights has not

11  yet withdrawn or indicating an intention to withdraw there is

12  an issue.  He either has some documentation or he doesn't.

13  With respect to the Anderson Memorial claims, my

14  understanding is he's indicated he doesn't have written

15  authority.  He has articulated on the record the reason why

16  he filed those claims.  The issue is, is that sufficient?  I

17  don't know.  Give me a brief.

18        MR. BERNICK: Well, Your Honor, the issue there is

19  that, the issue there is what particular claims is he saying

20  that his sole authority -

21        THE COURT: Fine.

22        MR. BERNICK: - is the Anderson Memorial Hospital.

23        THE COURT: They should be identified.

24        MR. BERNICK: And we specifically asked them to give

25  us the list that tell us that.   That's exactly why we

1    subpoenaed them.

2            THE COURT: Mr. Bernick, you're entitled to that.

3    He'll give you the list, and he'll tell you that.

4            MR. BERNICK:  I'm sorry, what?

5            THE COURT: I said, you're entitled to that.  He'll

6    give you that list and he'll tell you that.  There isn't any

7    way that anybody but Mr. Speights can say, you know, claimant

8    A is on that list and claimant B isn't.  So, he needs to

9    produce it.

10            MR. BERNICK: Okay.  Well, then, this is why again,

11    Your Honor, it seems to me that if Your Honor were to set a

12    date for the appearance of him and other people in his firm,

13    and that's why I say 21 days, and they should have the list

14    of the claims that they're withdrawing.  They should have the

15    list of the claims for which they're only authority is

16    Anderson Memorial Hospital.  They should have with respect to

17    these claims where they say that there's no product ID at

18    all, they're simply a conspiracy claim which doesn't even

19    exist in California.  We should know what that is.  I mean if

20    that's the only basis for it, all he has got to do is come in

21    and under oath say it's so with respect to an identified

22    number of claims.  With respect to the issue of the other

23    categories that Ms. Riley had, we also want to have the list

24    of claims that he says already exists, that are the cleanup

25    claims.  What he said in these quote, "settlement

1  discussions", was, Oh, yeah, there are a bunch of claims I'm

2  going to withdraw, but let me make a deal first before I

3  withdraw them.  That's not the way this works.  If he's got

4  what he called lousy claims, that shouldn't even be part of

5  this list even if he has the authority to prosecute a lousy

6  claim, we shouldn't have to defend a lousy claim.

7       THE COURT: Well, I don't know qualitatively, I

8  don't know what a lousy claim is in this context.  This is an

9  issue about whether or not he has the authority or doesn't.

10  He either does or he doesn't.  If he doesn't then he has an

11  obligation on behalf of those entities for whom he filed a

12  claim without authority to notify them that he did so,

13  because they may have an issue as to whether or not, if

14  checking a docket, if you see that somebody's filed a claim

15  for you, maybe you've decided that you don't know enough

16  about the bankruptcy and maybe that's how it works.  It's his

17  obligation to get it straightened out for those people for

18  whom he filed claims when he didn't have authority.  And if

19  they have some problem with the process, then we'll hear from

20  them, and if they don't then we won't hear from them, and

21  we'll set a date by which we have to hear from them.

22       MR. BERNICK: And the last category will be all the

23  documents that he has with regard to discussions that he's

24  had with any of these claimants regarding the authority to

25  file the claim.  We now actually have documents - Well, Your

1    Honor -

2           THE COURT: I don't know what you're asking.

3           MR. BERNICK: Well, what I'm asking for is that he's

4    got files.  He's got files presumably with respect to

5    individual claimants or some kind of correspondence that

6    relates to them where he's had a contact.  All we want to

7    know is, who else has he had a contact with or either got or

8    didn't get the authority.  And we have to take him through

9    every single one of those because he's created this problem.

10   I don't know what else to do, Your Honor.  He's in control of

11   all of the information.  We don't have time to play cat and

12   mouse -

13          THE COURT: Wait, wait -

14          MR. BERNICK:  - with what he's got.

15          THE COURT: To the extent that there is no proof of

16   claim of record, the authority or lack of authority is

17   irrelevant. There's no proof of claim, and the bar date has

18   passed.  So, it's not an issue.  To the extent that Mr.

19   Speights has filed a claim on behalf of someone with whom he

20   has had correspondence saying, No, you don't represent me,

21   don't file a claim. You're entitled to that, yes.

22          MR. BERNICK: Yes.

23          THE COURT: He can produce it, but I'm not going to

24   ask him to go through his files and tell you everybody he's

25   ever consulted with for whom he hasn't filed a proof of

1    claim.

2         MR. BERNICK: No, I'm not suggesting that.  I'm

3    suggesting with respect to the population of claims that he

4    has filed, we want all of the documentation surrounding

5    communications that he's had with those clients or those

6    claimants with respect to the issue of authority.

7         THE COURT: It seems to me if he produces a written

8    document that says that he has the authority, that's the end

9    of the issue.  The issue only arises if he doesn't have

10   documentation that shows that he has authority.  So, for

11   those entities for whom Mr. Speights does not have a written

12   documentation saying, Yes, you represent me in connection

13   with the Grace bankruptcy, whatever the words are.  I'm not

14   attempting to define the words in whatever the document is,

15   but something that indicates that he has the authority to

16   file a proof of claim in this case for someone.  That's it.

17   That's the end of it.  If he can produce that written

18   documentation, that's what I'm ordering him to produce.  If

19   he doesn't have that documentation, then you're entitled to

20   know whether he has had discussions with someone in which the

21   answer to him was, No, do not file a proof of claim, and he

22   did it anyway.  You're entitled to that.  And you're also

23   entitled to know whether there were other - I guess other

24   indicia of authority under Mr. Speights' view which is for

25   example the Anderson Memorial litigation in which he claims

1   that he has the duty to file.  You're entitled to know which

2   of those entities on the proof of claim list are in that

3   category in his view.

4         MR. BERNICK: That's fine.  But, let me just ask a

5   question.  He says a state court judge told him in that case

6   that he had some obligation to pursue claims.

7         THE COURT: He said the ethics professor, from what

8   I understand.

9         MR. BERNICK: Whatever ethics professor it was,

10  we're talking now about a piece of litigation that was

11  prosecuted specifically in contemplation of Grace's filing of

12  this bankruptcy case, and he never came to Your Honor to

13  either ask for the authorization, never made a disclosure to

14  us, never asked for class certification here.  He says that

15  somehow, some professor he's got of ethics trumps this

16  Court's authority, and his obligation under the rules to

17  demonstrate his authority to prosecute claims.

18        THE COURT: You're arguing the merits.  Right now

19  you're asking for discovery, and I'm ordering discovery.

20  That's all I'm doing right now.  I want a case management

21  order that will set out an orderly process.  I want Mr.

22  Speights to disclose either his basis for the authority or

23  his basis for not having had the authority, whichever it's

24  going to be.  Either affirmative or negative.  By list,

25  you're entitled to know which claimant falls into which

1  category.  That's what you're asking for.  You're entitled to

2  have that information.

3         MR. BERNICK: Okay.  We propose that the documents

4  be produced, make it slip even a little bit more, documents

5  produced within 21 days -

6         THE COURT: Mr. Speights, can you produce the

7  documents in 21 days?

8         MR. SPEIGHTS: . . . (microphone not recording) let

9  me have a moment, Your Honor.

10         THE COURT: Go ahead.

11         MR. SPEIGHTS: I think - Your Honor, we will

12  certainly give him lists within 21 days that you have

13  described.

14         MR. BERNICK: One -

15         MR. SPEIGHTS: May I finish, please.

16         MR. BERNICK: Sure.

17         MR. SPEIGHTS: We certainly can do what you've

18  asked, and I believe we can do it in 21 days, and we will

19  give him what you've asked in 21 days.  Will it be perfectly

20  proof of 3,000, and we don't have to write him a week later

21  and say, move claim number 361 to the x-category rather than

22  y-category, you know, if I was doing it perfectly it might be

23  that situation.  But I'll do my best effort, and I believe we

24  can do it in 21 days, Your Honor.

25         MR. BERNICK: Well, to be clear, I would rather he

1    take 28 days and get it done right and produce what we talked

2    about with Your Honor which is not just some list that he

3    compiles. The list would be great, but we want the underlying

4    documentation that establishes what his authority is to the

5    extent that he has it.

6            THE COURT: You need more time?

7            MR. SPEIGHTS: Well, I would - May I.  I would

8    suggest 30 days, Your Honor.

9            THE COURT: All right.

10           MR. SPEIGHTS: And I might say, with the underlying

11   documentation, we may or may not get into attorney/client

12   issues, but if we do, we will certainly make them available

13   to you to look at, and you can decide whether they have to be

14   disclosed.  I just say that because I don't know.  They have

15   the contracts for all the universities.  They've got a whole

16   lot of stuff already, but I'm not getting back into all of

17   that, okay?  Thirty days is reasonable.  We'll get him what

18   you said.

19           THE COURT: To the extent that there is an

20   attorney/client privilege issue, it seems to me that what you

21   should do is produce a redacted version that indicates the

22   authority for -

23           MR. BERNICK: Right.

24           THE COURT: - portion identifying the client, the

25   dates, the authority and take the rest off, and then if there

1    is an issue as to what's in the redacted version, I'll look

2    at it, but I don't think I need to see the whole document

3    when you can redact it, just showing you spoke with

4    authority, Mr. Speights.  So, try it that way.

5         MR. BERNICK: And then we would like 14 days after

6    that to take Mr. Speights' deposition and the deposition of -

7    what is it?  Amanda Steinmeyer.

8         THE COURT: For what purpose?

9         MR. BERNICK: For purposes of going through those

10   documents and getting a verified, that is an answer under

11   oath that deals with these issues.  Your Honor, we have a

12   fundamental problem with the credibility of this effort.

13   We've seen that they've signed all kinds of documents

14   presumably under oath that were not right, and we believe

15   that it's the only way to get a real assessment of what's

16   going on.  Otherwise, Your Honor, let me just tell one

17   comment with respect to the importance of this.  Mr. Speights

18   talked about how he just loves to talk and he wants to get

19   this case mediated, and he's opened the door, and the fact of

20   the matter is, that, yes, a lot of people have talked and the

21   number one reason we can't make progress in resolving this

22   case consensually, is Mr. Speights.  Every single

23   constituency has told us that, and Mr. Speights is in this

24   position because he's got all of these claims, and we can't

25   even get to the bottom of.  This is a matter of vital

1    importance and the clock is ticking against us.  Nobody is

2    standing to defend him.  Mr. Austern isn't standing up

3    through his representing him and saying, Yeah, Dan Speights

4    is a great guy and he's got a lot of great clients.

5         THE COURT: Okay, enough.  With respect to discovery

6    as to the list that I've ordered, and let me rehash what I

7    think is the scope, the universe in the list.  I'm giving you

8    until September 23rd, Mr. Speights.  It's not an entire month,

9    but the reason is because I'm putting this back on next

10    month's agenda to see whether depositions are still

11    necessary.  So the sooner you can supply this information,

12    even if it's in chunks, the better, because on September 26th,

13    if what I hear is we haven't had sufficient time to digest

14    it, and we need to take Mr. Speights' deposition, I'm

15    probably going to say, Okay, go do it.  I don't know for

16    sure.  But my view is open discovery is better generally

17    speaking than not, so I'll just tell you that.  That's my

18    general approach in most contexts.  All right.  A list of the

19    claims that are going to be withdrawn.  The list that are the

20    Anderson claims.  The list that are the no product ID claims,

21    and if they are no product ID claims, what the theory is with

22    respect to that claim.  The list that is product ID claims,

23    the list of whatever the cleanup claims are if they're not

24    otherwise covered.  I'm not totally sure what those are, and

25    as to claims for which you do have written authority, the

1    documents that verify that written authority.  As to claims

2    that were filed despite not having authority, that list is

3    also to be provided.  Did I cover everything?

4         MR. BERNICK: I think that's fine, Your Honor.

5    Michelle, is there anything else that needs to be taken up?

6    We need to have - I'm sorry.  Just bear with me for half a

7    moment.  We need to have the authority to file the - What

8    omnibus is it?

9         THE COURT: Oh, yes.  You have the authority to file

10   that omnibus objection.  You know, that probably is the best

11   way actually to get this started.  So, I think the objection

12   should be filed promptly so that Mr. Speights can then

13   respond to it in an appropriate fashion, but meanwhile,

14   neither filing the objection nor the response should hold up

15   this process of getting these lists together.

16        MR. BERNICK: That's fine.

17        THE COURT: You both know at this point you're going

18   to need them.

19        MR. BERNICK: And with respect to the last item,

20   which is their motion to quash the subpoena, what I would

21   suggest is that the subpoena and the motion to quash simply

22   be held in abeyance pending Your Honor's determination about

23   whether and to what extent it's going to be necessary to get

24   any further discovery.

25        THE COURT: Well, with respect to the document

1    production, isn't this the scope of what you're asking for?

2         MR. BERNICK: Well, I haven't gone back to actually

3    parse it out, but the subpoena obviously contemplates the

4    appearance of people to testify about it, and that's why -

5         THE COURT: All right, I'll just carry those till

6    September, they may be moot.

7         MR. BERNICK:  - I think it's fair whether - I don't

8    want to take up more time this afternoon in arguing with the

9    scope about subpoenas.

10        THE COURT: All right, and they may be - the

11   subpoenas may be mooted out by this process in any event.

12   So, the motions with respect to quashing the subpoenas are

13   carried till September 26th, and I guess I need an order from

14   the debtor that will grant the authority to file the claim

15   and the responses with this form of discovery built in. So

16   run it by Mr. Speights, please.  Yes, sir.

17        MR. BRANDY: Excuse me, Your Honor.  Thomas Brandy

18   and I'd like a point of clarification.  I'm here on behalf of

19   the Regents to the University of California and on behalf of

20   the trustees of the State University California System.  I'm

21   also counsel or Pacific Freeholds.  We have provided Grace

22   with our fee agreements authorizing my firm and the Speights

23   & Runyan firm to go forward in filing claims.  The word

24   "bankruptcy" per se is not in there, in the fee agreement.

25   It says to file claims.  Do we have to file something in

1   addition to our fee agreement, which obviously authorizes us

2   to act on behalf of our client.

3        THE COURT: Well, have you filed the 2019

4   statements?

5        MR. BRANDY: Yes, Your Honor, and the fee agreements

6   are attached to the 2019.

7        MR. BERNICK: His firm has not filed a 2019.

8        MR. BRANDY: Your Honor, our relationship was such

9   as that Speights & Runyan was handling the bankruptcy aspect

10  and I'm going to try the matter should the matter be tried,

11  and so the filing of forms, et cetera, they did.  My question

12  is, is they've attacked the authority with respect to these

13  two claims.  They abandoned the Pacific Freehold's claim of

14  which I was present and took over twenty depositions, argued

15  summary judgment, et cetera.  They know who I am.  They have

16  my tax ID number.  They've paid me in other cases, and I just

17  want to make sure, do I need to get a declaration from

18  someone from the University of California?  I actually have a

19  declaration with me from the person from the University of

20  California who signed our fee agreement.  I'd like to present

21  it to the Court, it shows we have authority -

22       THE COURT: I think you need to file a 2019

23  statement.  I mean that's the way you get authority to do

24  things in this bankruptcy, and we've, you know, I -

25       MR. BRANDY: I apologize -

1        THE COURT:  - really wasn't sure I understood the

2   purpose for them before, but I guess -

3        MR. BRANDY: I apologize, Your Honor.

4        THE COURT:  - I see the purpose now.

5        MR. BRANDY: The question was does the client - does

6   the client give authority?

7        THE COURT: Right.

8        MR. BRANDY: And I've got - the fee agreement says

9   authority to file a claim.  I have a specific declaration on

10  behalf of the University of California saying that there was

11  authority on their behalf and my behalf to file it, and my

12  point was what more does the Court need or is that

13  sufficient, and if so, I'd like to file it today.

14       THE COURT: Right now -

15       MR. BERNICK: Your Honor, they are basically asking

16  for an advisory opinion of what constitutes sufficient

17  authority.  This gets into the merits.  This is completely

18  coextensive with what Mr. Speights is - I'm sorry.

19       THE COURT: I agree.  You're asking me to give you

20  advice on the merits of a claim, and I can't go there.  What

21  I can tell you is, to the extent that you need to show that

22  you've got some authority in this bankruptcy, please file the

23  2019 statement.  If your view is that Mr. Speights has

24  already done it, and that is the scope of the authority, then

25  that's the scope of the authority.  If Mr. Speights needs

1   some additional paperwork, then you've got to give it to him,

2   and he'll produce it.

3          MR. BRANDY: Thank you, Your Honor.

4          THE COURT: Okay.  So on item number 12, that's

5   where I'm going to get the order from the debtor that will

6   grant the authority to file the 13th omnibus, waive the local

7   rule, and then set out the - I'll call it discovery, document

8   production, the way I've outlined it, and continue the other

9   related matters till September.  All right?  Okay.  Mr.

10  Speights, is there anything before I terminate this matter

11  that you need in this process?

12         MR. SPEIGHTS: No, Your Honor, thank you very much.

13  I could say a lot more, but I won't.

14         THE COURT: Okay.

15         MR. BERNICK: That's fine, Your Honor.

16         THE COURT: All right.

17         MR. BERNICK: If we go on to the other items on the

18  agenda, I think we're now at number - the status report on

19  the PD, other PD matters or PD matters generally, which is

20  item 17.  I don't know if it would be appropriate now, Your

21  Honor, to take a break if the Court believes it's

22  appropriate.

23         THE COURT: I think we should take a ten-minute

24  recess and then we'll reconvene on item 17.

25         (Whereupon at 2:02 p.m. a recess was taken in the

1    hearing in this matter.)

2           (Whereupon at 2:17 p.m. the hearing in this matter

3    reconvened and the following proceedings were had:)

4           THE COURT: Please be seated.  We're back on the

5    record in Grace.  Mr. Bernick.

6           MR. BERNICK: Yeah, with respect to the property

7    damage status report, there are really two items that we want

8    to bring the Court up to speed on and get determinations on.

9    They both have to do with case management orders.  Your Honor

10   will recall that we segregated out the case management order

11   for the adjudication of objections from the case management

12   order for the estimation of asbestos property damage

13   liabilities.  The case management order for the adjudication

14   of the asbestos property damage objections, we don't believe

15   that there's any objection to that.  There are a couple of

16   objections to the estimation CMO so we ask that the Court

17   enter the CMO with respect to the claims objections.  We

18   would also note for Your Honor that paragraph (2) of that

19   order says that no later than September 1, debtor shall make

20   a good faith effort to have on file all of their other

21   objections to asbestos PD claims, the PD objections.  If we

22   had had more time this afternoon, I was going to ask that Ms.

23   Riley take you through where we are on that, but enough said

24   that those will be filed on September 1, and they are

25   comprehensive, that is we go through each – all of the claims

1    and with respect to the claims, lodge objections based upon

2    our analysis of the claims so that which claims match up with

3    which objections is all set out on an omnibus basis, and that

4    is - so that's going to be done.  So we're moving forward on

5    that, but we ask that the Court enter that order.  With

6    respect to the - maybe I ought to pause on that -

7         THE COURT: Yes.  Does anyone have any objection.

8    I'm not aware of any to the objection process itself.  Okay,

9    then just one second.  Which - I'm sorry, which item?

10   Seventeen?

11        MR. BERNICK: That's part of 17.  I think it was 17,

12   Exhibit - the proposed PD objection CMO is Docket 9234.  It's

13   Exhibit C of that, and it's at item 17.  With respect to item

14   17 there's also the CMO on estimation.  We've had a fairly

15   extensive dialogue with Mr. Baena, and I think that we have

16   agreement on everything except for two matters, and we've

17   submitted a redline version that also reflects the

18   suggestions or the proposals that have been made by the

19   Committee versus the Exhibit A to item 17 which is the order

20   that we would ask the Court enter.  I know Mr. Baena is going

21   to speak to this, but we think that the language that the PD

22   Committee wants to add back in raises a matter that we've now

23   been over like three different times.  And that is the

24   question of whether this process is going to be binding on

25   individual claimants, and I can take Your Honor back to the

1   transcript last time when this was specifically dealt with.

2   We believe that it absolutely should be binding with respect

3   to individual claimants.  Your Honor said the last time that

4   notice should be given to everybody.  We have given notice to

5   everybody, and we're prepared to proceed.  But this is not

6   solely for purposes of plan feasibility.  This is for all

7   purposes.  So we're providing notice, and we're going to

8   resolve what's going to happen with these claims on a basis

9   that's binding with respect to individual claimants.  The

10  second matter that Mr. Baena is going to address is what is

11  the impact of the phase one rulings.  Your Honor will recall

12  the phase one, phase two.  Phase one is going to be

13  constructive notice and the question of Dalbert (phonetical).

14  Phase two is essentially everything else that has to do with

15  estimating these claims.  They're raising the question about

16  whether phase one is binding with respect to claimants, and

17  again, from our point of view, it absolutely is binding.

18  That's the whole purpose of phase one, is to take up two

19  threshold matters that we think will be enormously impactful

20  on the scope of claims.  But I'll let Mr Baena speak to those

21  matters and respond as appropriate.

22          THE COURT: Mr. Baena?

23          MR. BAENA: Thank you.  Respectfully, Mr. Bernick

24  did not exactly correctly characterize what we have

25  complained about.  So, if I can do that, Your Honor, I'd

1    appreciate it.  First of all, Scott Baena on behalf of the

2    Property Damage Committee.  Judge, when we concluded

3    agreement on the time lines and deadlines and the organic

4    structure of the process, we went back and looked at the

5    proposed order to make sure that it did a couple of things.

6    First of all faithfully recollected what we agreed upon, and

7    secondly, that it also was descriptive enough because as the

8    Court will recall at the last hearing that we discussed this

9    at, there was a discussion between myself and the Court about

10   insuring that property damage claimants are fully apprised of

11   what this process is about so that they can knowingly and

12   intentionally make a decision about whether or not to

13   participate.  And you and I even talked about clearing up

14   some of the recital clauses of the proposed order, and what

15   was conspicuously missing and continues to be conspicuously

16   missing from the proposal by the debtor is really any real

17   description of what phase two of this process is all about

18   except to say it's everything other than phase one, which

19   doesn't in any way, shape, or form apprise anybody of

20   anything and more importantly, perhaps, provides continued

21   discomfort to us that the contours of this whole process

22   remain to be defined as it becomes convenient for the debtor

23   to do so, as we've seen already happen in the course of all

24   of this.  And so we said, Well, we need to put a recital in.

25   And if you look at the redlined version, what we've done is

1    said, that phase one shall consist of those initial

2    determinations about methodology and about constructive

3    notice, and that phase two is the estimation of the amount of

4    the allowed PD - excuse me, of the asbestos property damage

5    claims for purposes of feasibility of any plan of

6    reorganization, which is exactly what the Court said in the

7    course of that colloquy that I had with the Court at page 56

8    of the last hearing's transcript.  That's what we're doing in

9    phase two.  We're putting a number on it, on the asbestos

10   property damage claims, as you put it, to determine what is

11   required to fund a trust for purposes of distribution under a

12   plan.  And so, we wanted to just apprise property damage

13   claimants of that minor fact, of what this whole thing was

14   about.  And the response to that was that, No, we're not

15   estimating claims for purposes of feasibility.  We're doing

16   something else here.  And you just heard it again from Mr.

17   Bernick.  Again, no definition.  That's exactly what we're

18   doing here, and we think the definition that we provided by

19   way of recital is perfectly appropriate and consistent with

20   exactly what the Court said at the last hearing as well as

21   the hearing back in January, on January 21st.  The second

22   problem we had was that in paragraph (2) of the proposal

23   provided for the debtor, somebody brought to my attention

24   after the fact that in talking about the phase two estimation

25   of what the amount of the asbestos liabilities were, there is

1   no dispute, Judge, on our part, no matter what Mr. Bernick

2   just said, that we understand that when you put an estimate

3   on the amount of asbestos property damage claims through this

4   proceeding, that's it.  That's the estimate, and it's not

5   just property damage claimants that have to live with that

6   estimate, it indeed is the debtors and other claimants who

7   may be vying for a larger piece of the pie.  They're going to

8   have to respect the fact that the contours of a plan have to

9   provide for that estimate in some manner.  We understand

10   that.  We've never disputed that.  I've said it repeatedly to

11   the Court that we understand that.  And so, we understood

12   that that ruling will be binding just not on us but on

13   everybody, as I've just said.  In paragraph (2), however,

14   when they refer to the estimation ruling, they refer to it as

15   "rulings" plural, which was, we thought, maybe just a typo or

16   something.  And so we went back and we corrected that and

17   made it a little crisper, and what we said, regardless, the

18   Court's ultimate resolution of the phase two issue, which is

19   defined as the aggregate amount of the estimated value of the

20   claims shall be binding irrespective to any plan of

21   reorganization, which we think is totally consistent with

22   what the Court said.  The remainder of the revisions that are

23   proposed in the redline, are just to accommodate these

24   defined terms, but conceptually, those are the only two

25   issues that result from these two proposed CMOs that are

1    before you.  We think ours is entirely consistent with what

2    the Court said, and entirely consistent with the process

3    that's been defined.  I should anticipate as well, a matter

4    that was brought to my attention at exactly ten minutes to 12

5    here.  And Ms. Baer advised me at that time that there had

6    been communications with your chambers about what date we can

7    have a hearing to determine whether or not the phase one

8    issues are in fact going to be heard and what the scope of

9    them will be.  And she indicated that the date that the

10   parties had agreed to, which was the November 14th hearing

11   that the Court has already scheduled, was unsatisfactory

12   because Mr. Bernick has a scheduling difficulty that day.  I

13   wish somebody would have called me before this hearing so I

14   could make some calls to find out about other people's

15   availability as well.  I cannot agree to the compromise which

16   is being offered today of November 22 without the opportunity

17   to at least look at my calendar and consult with others who

18   are going to be meaningfully involved in this matter to tell

19   you whether or not that date works for us.  It does strike me

20   that that's Thanksgiving week.

21          THE COURT: It is.  It's a Tuesday.  I told - I

22   didn't but someone on my behalf indicated that if it wasn't

23   going to be the 14th, that's the day I have until sometime in

24   December.

25          MR. BAENA: So, there's no misapprehension, Judge.

1   We readily agreed to the 14th.  I accept that Mr. Bernick has

2   got a problem, and as a professional courtesy, I'd like to

3   accommodate it as long as it doesn't create problems for my

4   side.

5        THE COURT: Well, I understand, and I never expected

6   that it was going to be a unilateral decision.  I thought

7   that it would be discussed among the parties.  As far as I

8   know, I mean, I set the 14th originally and -

9        MR. BAENA: And I would ask the Court, enter the

10  order as the 14th, allow us to get back to you with a change

11  of date, and we could deal with it that way.  I don't think

12  we should leave here without an order unless the Court is

13  receptive to the notion of changing deadlines in this order

14  because, you know, every day we don't have an order, we have

15  no basis for doing anything, and we're just getting behind

16  the eight-ball, which is, I suspect, a tactical advantage to

17  the debtor, and that's unfair.

18       THE COURT: I think the problem with the 14th was, I

19  wasn't sure whether on an omnibus hearing date you're going

20  to have time to do all this.  I mean, that's the real

21  question. I think - and I wasn't involved personally in the

22  discussions, Mr. BAENA, so if I've misinterpreted something,

23  I apologize, but I think my staff said that the parties felt

24  they needed two hours for this hearing.

25       MR. BAENA: It could conceivably be two hours.

1          THE COURT: And if it's going to be two hours,

2   that's not going to happen on an omnibus hearing date.  I

3   mean it will take up your whole time.

4          MR. BERNICK: I could address that, Your Honor, if -

5          THE COURT: Okay.

6          MR. BAENA: We've used two and a half hours already

7   today, Judge.

8          THE COURT: Well, that's what I mean.  So, but

9   that's only because several of the other cases fell off the

10  list, and I was able to convince U.S. Minerals to move to

11  Wednesday, or else you wouldn't have had this time today.

12         MR. BAENA: Judge, I'm just saying, when I walked

13  into this courtroom, like all others I suspect, my Blackberry

14  was taken from me.  I don't have my calendar.  I don't know

15  my client's calendars.  I don't know my colleagues'

16  calendars, and I don't even have a means of communicating

17  with them while I'm here.  So I ask for the same courtesy

18  before we all jump through hoops to accommodate one counsel

19  that other counsel be allowed to consult their schedules as

20  well.

21         THE COURT: Okay.  Well, I do believe the issue

22  though is, if it's not going to be the 14th, unless you're

23  going to make this the only issue on the 14th, I don't think

24  that except for a status report it's going to be much of an

25  argument if that's what you need.  That's the problem with

1    the 14th, since it's an omnibus calendar.

2         MR. BAENA: I have no way of anticipating what the

3    debtor will wish - what else the debtor will have or wish to

4    bring up on the 14th of November.

5         THE COURT: I mean, most of the business issues are

6    going through with CNOs or COCs of one sort or another, so

7    that doesn't seem to be a problem right now, but I can't

8    anticipate what's coming up in November either.  So, that's

9    the problem, and if you want to do it in November, that's

10   your choice, November 22nd, because, you know, that's it.

11   That's the only day I have after the 14th to do it.  If you

12   want to move it to December, I can do that, but I'm -

13        MR. BAENA: That affects other dates.

14        THE COURT: It does.

15        MR. BAENA: And I just need a moment to just find

16   out.

17        THE COURT: All right.

18        MR. BAENA: That's all I'm asking.

19        THE COURT: Okay, well, do you want to recess so

20   that everyone can call and find out about that date or -

21        MR. BAENA: I couldn't possibly contact all the

22   people I need to contact in a recess, Judge.

23        THE COURT: All right.

24        MR. BERNICK: Mr. Baena is very carefully preserving

25   his arguments with respect to the balance of the dates and

1    the CMO, and I can appreciate that.  I think that for present

2    purposes, Your Honor, we probably ought to stick with the

3    14th.  I don't think it's going to take two hours to deal with

4    this issue.  It's really all to be briefed in advanced.

5            THE COURT: Well, the other thing is -

6            MR. BERNICK: And if we have to change it, we have

7    to change it.  It's not simply, although, it's said as a

8    professional curtsey, I'm not going off to golf someplace for

9    my 60th birthday.  I'm going to be on trial in Denver,

10   Colorado in front of a jury.

11           THE COURT: Having more fun than golf.

12           MR. BERNICK: Yeah, having even more fun and Ms.

13   Brawdy, unfortunately, is going to be on trial before a jury

14   in Eastern Washington State.  That is the problem that we

15   have with the 14th.  Now, I can - We can try to figure out

16   some way to perhaps free one of us up to come in that day,

17   but that is the matter that provides the conflict.

18           MR. BAENA: Judge, I haven't said no.  I just said,

19   please let me -

20           THE COURT: I understand.  Look, we're wasting a lot

21   of time on this.  Why don't we just - right now it's going to

22   be either the 14th or the 22nd.  You folks can figure out what.

23   If we need to move the omnibus day to accommodate the 14th, we

24   could do that too, but we still need somebody for the debtor

25   here - or not here, but at least available by phone or video.

1          MR. BERNICK: That might be another solution.

2          THE COURT: Yes.  All right.  So, you two will work

3     that out.

4          MR. BERNICK: Right.

5          THE COURT:  With respect to the changes that the

6     Property Damage Committee's asking for, frankly, when I read

7     the redline version, I wasn't convinced that there was a

8     terrible difference in what the debtor was proposing and

9     frankly, I'm not sure I still understand where there's a

10    significant difference.  To the extent -

11         MR. BERNICK: That's because Mr. Baena is so smooth

12    and so charming and it just goes down real easy, but this is

13    actually an extremely significant matter and there's a very

14    pronounced difference.  Let me begin with paragraph (2).

15         THE COURT: Well, can somebody show me a redline

16    version.  I'm sorry, because once again -

17         MR. BERNICK: I'm sorry, I -

18         MR. BAENA: (Microphone not recording.)

19         THE COURT: Yes, please.  Thank you.  Okay.

20         MR. BERNICK: Paragraph (2), we can see it used to

21    read "regardless" or under our proposed version, "regardless

22    of the Court's PD estimation, rulings shall be binding on all

23    PD claimants".  He says, Well, not totally clear what rulings

24    are we talking about?  And he says, We've got a crisper

25    formulation, but it's different and it's wrong.  The rulings

1    we were talking about are the estimation rulings, and

2    obviously we have two sets of rulings.  We have the phase one

3    rulings and the phase two rulings.

4           THE COURT: Well, let's make it easy and say the

5    Court's findings of facts and conclusions of law will be

6    binding, period.

7           MR. BERNICK: That's fine.

8           THE COURT: I mean -

9           MR. BERNICK: With regard to estimation.

10          THE COURT: Yes, as that - but that's what I'm

11   trying.  So, of course it would be with respect to

12   estimation.  Mr. Baena?

13          MR. BAENA: Judge, my problem is, that we're all

14   sitting here trying to anticipate all of the rulings that the

15   Court may enter.  It would be far less offensive when I - let

16   me back up and say -

17          THE COURT: Well, doesn't everybody know that my

18   rulings are going to be binding anyway?  Why do we need to

19   even put this in an order.

20          MR. BAENA: Well, it depends on the ruling.

21          MR. BERNICK: I don't know, but I - first of all,

22   let me just finish what I was going to say because it's

23   picking up on what the Court said.  The purported

24   justification for clarity here is notice.  Notice is being

25   provided to absolutely everybody about what's taking place.

1    We are also submitting these objections, and everyone's going

2    to get notice of the objections as well, and obviously

3    there's also - most people who are major players in this are

4    also counsel for members of the Committee.  So if the issue

5    is notice, there's tons and tons of notice.  The question is,

6    whether this language should be amenable to what Mr. Baena is

7    actually advocating to the Court, which is that somehow the

8    rulings coming out of phase one are not binding with respect

9    to claimants, and that is the part of this that's wrong.

10   He's got this as being phase two.  No, no, no.  Phase one is

11   also of critical importance.  We're going to be arguing about

12   how it should be used, but we don't want to foreclose as

13   being binding, indeed this is exactly what we went through

14   before.

15           MR. BAENA: But, Judge, here's -

16           THE COURT: Maybe I'm not focusing on the right

17   paragraph.  I'm looking at page 2 that says, "Whereas, the PD

18   estimation shall consist of" -

19           MR. BERNICK: no.

20           MR. BAENA: No.

21           THE COURT: Okay.  What's -

22           MR. BAENA: It's paragraph (2), Your Honor.

23           MR. BERNICK: It's paragraph (2), it's not -

24           THE COURT: Oh, number (2).

25           MR. BAENA: Number (2).

1          THE COURT: Okay.

2          MR. BAENA: Judge, we are - We were just debating

3    when we're going to come in front of you to argue the scope

4    of phase one.  I think it's extremely presumptuous for us to

5    now say we don't know what the contours of phase one are, but

6    whatever it is, it's going to be binding.

7          MR. BERNICK: Didn't say that.  It's just the other

8    way around.

9          MR. BAENA: Shall be binding.

10         MR. BERNICK: No, no, no. It's just the other way

11   around.  You're the one who suggested it should only be phase

12   two issues.  We said, the Court's PD estimation rulings shall

13   be binding, and this is exactly what we through last time.

14   Everyone's going to get notice and issue the -

15         THE COURT: Folks, I'm sorry, but I am truly lost.

16   Whatever findings I make, they're going to be binding whether

17   it's in phase one or phase two.

18         MR. BERNICK: Right.

19         MR. BAENA: Judge -

20         THE COURT: Okay.

21         MR. BAENA: Judge, if I can approach this.

22         THE COURT: Unless I'm reversed on appeal.

23         MR. BAENA: The issue isn't whether the bindings

24   within the findings and rulings within the context of this

25   estimation proceeding are binding upon the parties to that

1  proceeding.  The question is beyond this proceeding how will

2  rulings made by the Court affect individual property damage

3  claimants and their individual property damage claims.  The

4  mischief that they seek to ply by this language is to

5  suggest, indeed to mandate, that any ruling you make will

6  also be applicable to an individual claim, and the allowance

7  or disallowance of that money.  Judge, in all due respect,

8  until you know what it is you're ruling on, until we know

9  what the ruling is, it is wrong, and it's presumptuous to

10  suggest now that it shall be binding on property damage

11  clients.

12        THE COURT: But the phase one -

13        MR. BAENA: At best, Judge, at best you should say

14  "may".

15        THE COURT: No, wait.  The phase one litigation, as

16  I understand it, is to determine two things. Number one, the

17  Dalbert issues as to what form of evidence the Court will

18  accept during the phase two hearing, and that issue is going

19  to be binding.  I mean, I'm only going to give you an interim

20  order, but what it will do is have you raise an objection at

21  the hearing if somebody's position is overruled, because

22  that's the only time it's relevant.  If it's all admissible

23  then it's not an issue, so if I limit the scope of the

24  evidence, then somebody is going to stand up at the hearing,

25  make a proffer.  I'm going to deny it based on the hearing

1  that I previously held and life's going to go on, and that

2  will be binding.

3         MR. BAENA: Respectfully, Judge, I disagree.

4         THE COURT: Well, I'm not going to reverse my -

5         MR. BAENA: If I could just have a word without

6  having a response or -

7         THE COURT: All right.

8         MR. BERNICK: The difficulty, Your Honor, is that

9  this is now the third hearing that we -

10        THE COURT: Mr. Bernick, I've been here three times

11  too, please.

12        MR. BAENA: Judge, I've been through numerous

13  conversations with their firm on this.  So I've been involved

14  in this even more than Mr. Bernick has.  Your Honor, on

15  November 14, we are not having a Dalbert hearing.

16        THE COURT: No.

17        MR. BAENA: We're not having a hearing on

18  constructive notice.  We're having a hearing for you to

19  decide whether or not you're going to.

20        THE COURT: That's right.

21        MR. BAENA: Have those matters as part of the

22  estimation process.

23        THE COURT: Right.

24        MR. BAENA: Okay.  So, and totally decide that, and

25  then totally decide to what extent they'll be implicated by

1   the estimation process.  It's impossible to say that it's

2   binding on an individual claimant in respective of an

3   individual claimant's claim.  That's all we're saying.

4            THE COURT: If the individual claimants want to

5   participate in the estimation process, they have to show up

6   and participate, and if they don't, they're going to be bound

7   by the consequences.

8            MR. BAENA: But the consequences of what, Judge?

9            THE COURT: Of whatever the outcome is.

10           MR. BAENA: I admit as to phase two, they're bound.

11  That's the total amount of the PD claims.

12           THE COURT: Right.

13           MR. BAENA: As to everything else, we don't even

14  know what rulings you're going to rule.  We don't have a clue

15  as yet.

16           THE COURT: Well, I don't know, I'm sorry, but I

17  truly am lost.  From my perspective as the trial judge,

18  assuming that I'm not reversed on appeal, let's forget the

19  appeal issues, for the process by which the trial will take

20  place, if I determine a procedural issue, everybody's bound

21  by it.  If I determine a substantive issue, everybody's bound

22  by it.  If I get reversed on appeal, we do it again the way

23  some other court says to do it.  But until then, it's

24  binding.  I'm lost.  I truly -

25           MR. BAENA: You're not lost.  What you said is fine,

1   Judge.  The question is though, are you talking about in the

2   context of an estimation?

3          THE COURT: Yes.

4          MR. BAENA: We agree that in the context of an

5   estimation it's binding.  It's whether it's binding outside

6   of the estimation that concerns us.

7          THE COURT: I'm not doing anything outside the

8   estimation.

9          MR. BERNICK: May I have a turn.  Is it all right?

10         MR. BAENA: Oh, okay.

11         MR. BERNICK: Thank you.  You can even move away a

12  little bit, it will be all right.

13         MR. BAENA: Amos never left Andy.

14         MR. BERNICK: Well, I'm not going to bite on that

15  one.  Your Honor, maybe this is because I'm a - I only do

16  bankruptcy litigation.  Sometimes I'm questioned about this,

17  but I don't do it as a principal occupation.  But, this is

18  just such basic stuff.  We're going to have an estimation

19  trial.  Under the rules, the result of that estimation trial

20  is plainly binding on each and every claimant.

21         THE COURT: Right.

22         MR. BERNICK: If there's a notice issue, we solve a

23  notice issue by giving them notice.  Under the rules, the

24  estimation can be used for any purpose including allowance or

25  disallowance, and you don't need a jury trial, because they

1   have the right to jury trials.  It's tried to the Court.  So

2   we know that at the end of this estimation process, both in

3   the aggregate and if Your Honor believes it's appropriate,

4   down to an individual level, because we're making objections

5   now at an individual level, the result is completely and

6   totally binding.  The rules so provide.  Due process so

7   provides.  So the only question is, (A) are we providing

8   notice.  The answer to that now is yes.  (B), what is the

9   process that we're going to use to get to that final

10   estimation, and we suggested to Your Honor last time and the

11   time before, when all these same matters were gone over in

12   detail, that there were certain threshold matters that were

13   of such importance and made sense to have them teed up front.

14   And Your Honor said, Okay, I will hear that.  I need to know

15   more.  I can't rule in the abstract.  So, we said, We will

16   submit the matter to Your Honor on briefs.  If they want to

17   argue that these shouldn't be resolved up front, they only

18   should be resolved at the end of the day, they can make that

19   argument, but Your Honor may reject that position, and if

20   they reject that position - if Your Honor rejects that

21   position, then matters can be decided up front, and they are

22   to be binding with respect to the final outcome.  What

23   counsel seems to be suggesting is that this is purely an

24   academic exercise, this phase one, and it's not an academic

25   exercise.  And precisely, in order to show there aren't

1   notice problems, everybody is now being told exactly what's

2   taking place so that they can come in and participate or not.

3   What he seems to be suggesting to Your Honor is that you

4   don't have the latitude to do what any trial judge can do,

5   which is to make certain matters, find them in a certain

6   order in order to save time down the road.  Now, lest be any

7   doubt, in point of fact, Mr. Baena suggests there was this

8   colloquy with the Court that reached a different conclusion.

9   What happens was there was a colloquy with the Court on July

10  the 19th that reached precisely the conclusion that I've

11  articulated.  Mr. Baena said at page 57, "The estimation

12  proceeding doesn't deal with the allowance and disallowance

13  of claims.  The estimation proceeding doesn't."  Your Honor's

14  answer on the very next line, "Well, but it will."  The Court

15  then further said at page 99, "If we're talking about

16  estimation for both loss and distribution, then you can use

17  estimation, which of course you can under the rules.  I never

18  said, because there's all this discussion about, Well, we may

19  not want to participate.  People may not - I said, I want to

20  be clear.  We can't go down the road and have the position

21  taken that somehow we're going through this whole process,

22  but we're really not going to resolve these merits-based

23  issues on any basis that's binding with respect to the

24  claimants.  Your Honor then responded, you said, "That's why

25  -" this is page 80, line 14 - "That's why I said give notice

1    to everyone.  If the Property Damage Committee chooses to

2    take the position that, Well, if it doesn't, it waives it,

3    it's still going to be bound by the results as are the

4    claimants.  So, give everybody notice and we'll see who shows

5    up."  That's exactly what we're doing.  And at page 107,

6    again, the Court says, "I think this order should make it

7    clear that when I get to the ultimate resolution, whether

8    it's by way of summary judgment or estimation or litigation,

9    everybody is going to be bound."  And what the Property

10   Damage Committee wants to do is to revisit this all over

11   again in order to suggest that somehow we're going to go

12   through this process and some parts of it aren't going to be

13   binding, and some parts that are going to be binding.  You're

14   a trial judge, Your Honor, you can decide these issues in

15   whatever order you choose, and if it's appropriate and we

16   convinced Your Honor that there are certain threshold matters

17   that should be decided first, we've given notice.  People can

18   show up and participate if they want, but we shouldn't be

19   saying up front, Oh, don't worry.  You only have to show up

20   for phase two.  That's not the way this proceeding is

21   organized, and that's why the language that we said said the

22   Court's PD estimation rulings shall be binding.  If Your

23   Honor wants -

24          THE COURT: All right.  Maybe the issue is that it

25   should say, Regardless, the Court's determination of the

1    process by which the hearing will take place and the ultimate

2    resolution of the phase two issues shall be binding on all PD

3    claimants - well, binding on everybody - shall be binding.

4         MR. BERNICK: That's fine.

5         MR. BAENA: That's consistent with what we're

6    arguing.

7         THE COURT: All right, fine.  Then let's change it

8    to say, May elect to participate in the PD estimation

9    regardless - whatever I said before - the Court's

10   determination of the process by which the hearings will take

11   place and the ultimate resolution.  That should give them

12   notice that if they want to have an argument about how the

13   process should take place, they'd better show up because I'm

14   only going to base it based on what I hear.

15        MR. BERNICK: I thought you said process and

16   substance?

17        THE COURT: Right.

18        MR. BERNICK: Then with respect to the whereas

19   clause, the whereas clause is a - Shall consist of phase one

20   during which the Court shall determine whether and to what

21   extent the phase one issues are to be addressed as part of

22   the PD estimation.  Again, that's not really correct at all.

23   Constructive notice has to be part of the PD estimation  as a

24   defense to the claim.  Dalbert has to be part of the PD

25   estimation.

1          THE COURT: I don't know where you're looking again.

2    I'm sorry.

3          MR. BERNICK: Here's the redline whereas clause.

4          THE COURT: What page?

5          MR. BERNICK: It's page 2 of the redline version in

6    the middle.  It's in bold.

7          THE COURT: All right.

8          MR. BERNICK: It says, "Consists of phase one during

9    which the Court shall determine whether and to what extent

10   the phase one issues as defined are to be addressed as part

11   of the PD estimation."  The phase one issues are issues that

12   have to be part of PD estimation.  They go to the merits of

13   the claims.  <u>Dalbert</u> controls in this process.  That's what

14   one of the issues is constructive notice is a defense.  The

15   only issue is whether they will be resolved as a threshold

16   matter as opposed to being resolved in phase two.  So, that

17   first statement is wrong.  And then it goes on to say, "In

18   phase two, during which the Court will estimate the amount of

19   the PD claims for purposes of the feasibility."  That again

20   seeks to limit the thrust and focus of the estimation

21   process.  That's what they want to argue.  They want to argue

22   it's not binding for any other purpose.  Sorry, that's not

23   what the rules say.

24          THE COURT: All right.  Well, with respect to the

25   language at the outset that the PD estimation consists of

1   phase one during which I'll determine whether and to what

2   extent the phase one issues which are later defined as the

3   methodology issues and the constructive notice issues -

4        MR. BAENA: I don't think there's a disagreement,

5   Judge, about what the definition of the phase one issue -

6        MR. BERNICK: There's no disagreement with the

7   definition is.  The question is, what will be taken up.  What

8   will be taken up, Your Honor will decide on November 14th.

9   That is, whether those issues will be resolved as threshold

10  matters -

11       THE COURT: Why don't we redo this to simply say

12  that the Court has determined to proceed in two phases.  One

13  - and the argument to determine how phase one will proceed

14  will be heard on either November 14th or November 22nd,

15  whenever it's going to be, and at that time, I am going to

16  hear the concern about what methodologies can be used at the

17  ultimate trial and the issues of constructive notice.  And so

18  phase one will be bifurcated from phase two so that phase one

19  will determine those two limited issues, the <u>Dalbert</u>

20  standards and the constructive notice standards.  After phase

21  one is determined, we'll move to phase two and do the trial

22  on the merits.

23       MR. BERNICK: That's fine.

24       THE COURT: And I think that we can then say,

25  Everybody's notified.  You can show up or not show up as you

1  choose, but you're going to be bound by every decision I make

2  until I issue a final ruling, which is then, you know, taken

3  on appeal if the parties choose to appeal.  But, my concern

4  about giving notice is to let everybody know that this is it,

5  folks, if you've got a property damage claim out there and

6  you want me to hear something about it, you've got to show up

7  and tell me about it now because otherwise, you're not going

8  to have a chance.  That's what I'm worried about.

9         MR. BERNICK: We will get the transcript and we will

10  - What I would suggest is that we want to get this thing

11  done.

12         THE COURT: Yes.

13         MR. BERNICK: Okay, maybe we can - let us work on

14  marking it up.

15         THE COURT: Fine.

16         MR. BERNICK: And then we'll - While Mr. Baena is

17  still here, we'll give it to him and then maybe we can go on

18  with the next item on the agenda.

19         THE COURT: All right, Mr. Baena, here's your copy

20  back.  Thank you.  So, you're going to see if you can

21  actually hand up a written order today.

22         MR. BERNICK: Yes.

23         THE COURT: All right.

24         MR. BERNICK: That's the idea.

25         MR. BAENA: There's one other item that came up; do

1    you want to - Judge, in the course of the discussions between

2    ourselves and debtor's counsel, one of the issues that we

3    raised that we need a little guidance from the Court about,

4    is the anomaly that presently exists in regard to the fees of

5    testifying experts.  As we understand the Court's most recent

6    orders in regard to experts, whether or not they're

7    consulting or testifying experts, we've been required to

8    separately apply for their fees.  And the applications

9    include the usual recitations about the activities performed

10   which creates a bit of a difficulty when it's a testifying

11   expert.

12           THE COURT: Yes, it does.

13           MR. BAENA: And we asked debtor's counsel if they

14   had any objections to us changing that process to level the

15   playing field a bit, whereby we would do what we formerly

16   would have done on the order that existed at the beginning of

17   the case, which is include testifying expert's fees in our

18   fee app.  Is that something that we can bring back before the

19   Court?  Do we need to bring it back before the Court?

20           THE COURT: Well, I think if the application order

21   needs to be amended, yes.  It ought to be amended to make it

22   clear how this process is going to work, but I don't have a

23   strong view about including it in the attorney's fee

24   application provided that it's broken out in a separate

25   fashion so I can review it and so the fee expert can review

1    it - fee auditor, pardon me, can review it.  I thought the

2    reason it was broken out separately, really, was that matter

3    of convenience more than anything else, but I'm -

4          MR. BAENA: We formerly just provided a line item

5    without the detail of what the expert was doing.  That's what

6    I think engendered the change in program, and we had no

7    testifying ahead of us.  We now have a real live matter, a

8    contested matter.  It's going to involve testifying experts,

9    same experts who have been consulting with us up until now,

10   and we'd like to just make it a line item again.

11         THE COURT: Well, have you consulted the auditor?

12         MR. BAENA: My experience with the auditor is he

13   abides by whatever the Court wishes.  You know, I don't want

14   to disclose what my expert is doing.

15         THE COURT: I'm wondering from his point of view

16   whether it's necessary to the extent that he is reviewing the

17   fees at the outset to have - let me call them some categories

18   for lack of a better word at the moment.  So, for example,

19   maybe the expert consulted with counsel for five hours and

20   the fee was X.  Maybe the witness was prepped for testimony

21   for ten hours and the fee was X, without defining

22   specifically what the preparation is.  Would that be

23   satisfactory or is even that a problem?

24         MR. BAENA: In federal practice, I wouldn't even

25   have to do that, and I think the rationale is not that we not

1   have to give a trail of the strategies and impressions and -

2        THE COURT: Oh, I agree.  You don't need to do that,

3   but I'm not sure that saying that he's consulted or that

4   he's, you know, read three books or without identifying what

5   they are really discloses the strategy.  Obviously your

6   expert's going to be out doing what experts do or else he's

7   not going to be an expert.  So, you know, in terms of his own

8   gathering of information, I'm not sure that that reveals the

9   strategy.  I don't think you should go to the level to say,

10  you know, we asked the expert to go look up whether friable

11  asbestos exists in this kind of category.  I mean that could

12  reveal your strategy.  I guess I'm asking, can there be

13  something that would lump categories for the fee auditor's

14  review without compromising any person's strategy with their

15  expert?  This isn't just a committee, you know, your

16  Committee issue, it's for everybody's sake.

17       MR. BAENA: I suppose we can reflect further on that

18  point, Judge, and so there's no misapprehension, to the

19  extent that this, you know, these particular experts are

20  still consulting experts on other matters, we're not asking

21  for any relief from the filing of fee applications in respect

22  to that.

23       THE COURT: Oh, okay.  It's only for the -

24       MR. BAENA: Just for their testimonial involvement

25  in this case.

 1          THE COURT: Having been in that position, Mr. Baena,

 2     I'm kind of hard pressed to think that that's not an

 3     appropriate thing to do.  I just want to make sure that the

 4     fee auditor has sufficient information, and he can

 5     comfortably give me an initial opinion that says, Yes, it's

 6     appropriate or no, it's not.  Now the problem is with respect

 7     to testimonial preparation, I don't know that anybody is

 8     really much in a position to be able to opine about that.  If

 9     the bills get too high you're going to hear from me about it.

10          MR. BERNICK: Your Honor, this is something that we

11     really haven't had a matter to take up in detail.

12          THE COURT: Yeah.

13          MR. BERNICK: Mr Baena wanted to make a report to

14     the Court.  There's no objection to that, but I think that

15     we, at least, would like a little bit more time to think

16     about this further and talk -

17          MR. BAENA: I've raised this on two occasions.

18          THE COURT: Yes, you have.

19          MR. BAENA: And I appreciate he needs to be involved

20     in that discussion.

21          THE COURT: Well, I think you all do, so why don't

22     you figure out what works for the case and let me know and

23     I'm amenable to changing the order in some fashion that

24     protects the attorney/client issues and the strategy issues

25     that you're dealing with, Mr. Baena.  Exactly how that's to

1    work, I don't know right now, but I am amenable to that.

2            MR. BAENA: Thank you, Your Honor.

3            MR. BERNICK: All right, Your Honor, if we could

4    move on.  We're working on some language here to put in the

5    CMO, if we can move on to deal with the personal injury

6    status report.  I know that Mr. Lockwood has been sitting in

7    his usual kind of bemused but anticipatory posture over

8    there.  This is item 18, and Ms. Harding is going to be

9    speaking to these matters.  There's only one thing that I

10   wanted to take up as a preliminary matter, and I don't know

11   that it really warrants any further discussion with the Court

12   beyond to simply respond to what they said in their brief,

13   then Ms. Harding is going to take up the matters that are

14   before the Court for decision today, and I want to make a

15   brief report to the Court on where we stand with respect to

16   discovery of the law firms, which is something that was kind

17   of a carryover issue.  Remember we talked about in connection

18   with the questionnaires, and Your Honor decided not to have

19   it take place in connection with the claimant questionnaires.

20   We're not asking for a decision today on anything, but we do

21   want to let the Court know where it is that we're heading.

22           THE COURT: All right.  I need to ask a question

23   first, Mr. Bernick, and that is, how much longer is this

24   going to take, because USG is not going to take very long.

25   It's scheduled to start at 3 o'clock, and if you're going to

1    be another couple of hours, that's fine, but I want USG done

2    on time because there's no point to continuing that hearing

3    when it's not going to be long.  Are we looking at the

4    exclusivity issue today too?

5         MR. BERNICK: Yeah, we're going to be talking about

6    - although, I don't know that that's going to take - Your

7    Honor's heard ad nauseam on that, I think that we have a

8    proposal to make, and I'm not sure how long that's really

9    going to take.

10        THE COURT: I don't - I think - I mean, my

11   estimation of USG is not more than 20 minutes to half an

12   hour.  Do you think it's going to be longer than that, folks?

13        UNIDENTIFIED SPEAKER: No, we're fine with that,

14   Your Honor.

15        THE COURT: All right, okay.  Why don't you folks do

16   one thing, go out, see if you can work on the terms of this

17   order that really I would like to get entered today on the

18   phase one/phase two issues.  Let me take USG and then we'll

19   finish with Grace.  Maybe that will short-circuit some of the

20   other matters that you need to address today.

21        MR. BERNICK: Could I leave our -

22        THE COURT: Yes, you can leave anything you'd like.

23   The parties on the phone, we're going to terminate this call.

24   We'll reconnect as soon as the USG hearing is over.  I would

25   suggest you call back in in fifteen minutes or else put

1    someone on hold.

2             UNIDENTIFIED SPEAKER (TELEPHONIC): Your Honor, is

3    the USG hearing about to go forward now?

4             THE COURT: Yes.

5             UNIDENTIFIED SPEAKER (TELEPHONIC): If that's what

6    we're calling in for, should we remain on?

7             THE COURT: I'm sorry, I couldn't hear you.

8             UNIDENTIFIED SPEAKER (TELEPHONIC): I'm sorry.  If

9    the USG hearing is about to go forward, shall I remain on for

10   that since I'm calling in for that hearing?

11            THE COURT: Is it a different dial in number?

12            UNIDENTIFIED SPEAKER: No, it's the same number.

13            THE COURT: Yes, you certainly may remain on the

14   line if you're participating in USG, in fact, you can all

15   stay on the line.  That may make it easier, but, you know,

16   run out of your offices for a few minutes.

17                 (Whereupon at 3 p.m. a recess was taken in the

18   hearing in this matter.)

19                 (Whereupon at 5:08 p.m. the hearing in this matter

20   reconvened and the following proceedings were had:)

21            THE COURT: Let me get back here on my notes, Mr.

22   Bernick.  All right, did you folks negotiate, before I get

23   any further, the order on item 17?

24            MR. BERNICK: Yes, we were so inspired by the fervor

25   that we observed by the counsel for the Equity Committee on

1   behalf of Houlihan Lokey and the high fives during the break,

2   that it was an educational experience both for Mr. Baena and

3   I, but we decided that that ought to put in perspective our

4   advocacy, so we did agree, and I will bring up to the Court -

5        THE COURT: Thank you.  Mr. Baena, does this satisfy

6   your concerns?

7        MR. BAENA: Yes, Your Honor.

8        THE COURT: All right.  There are only two minor

9   changes, but I think it clarifies what both of you are

10  attempting to accomplish so, I will sign the form of order as

11  it's been handed up.

12       MR. BERNICK: Thank you, Your Honor.  With respect

13  to personal injury, which is the next item on the agenda, I

14  guess a couple of things I would suggest in the interest of

15  time.  First, I had planned on addressing from our point of

16  view the decision in the Federal-Mogul case, which was raised

17  by the Personal Injury Committee, and in light of the late

18  hour, I won't do so. Suffice it to say, that we had a very

19  different perspective on what the Court there did and the

20  circumstances under which they did it.  In that particular

21  case, the PD Committee had proposed the imposition of a bar

22  date, late, late, late in the day, and the Court specifically

23  declined to get the kind of information that we've been very

24  diligent in seeking here.  And that and many aspects of the

25  case would be worthy of some other discussion, but we don't

1    think it really changes the picture as it was painted to the

2    Court last time.  So, what we'd like to do is just focus on

3    two things that actually have to be decided by the Court: One

4    is the case management order, and our proposal there would be

5    to simply have Mr. Lockwood address the Court with any

6    further remarks that he has with respect to the particular

7    amendments that they want on the questionnaire.  And then Ms.

8    Harding will respond to that and then take up the case

9    management order as well.  So those are the two real items of

10   business.  I had planned on talking about discovery of the

11   attorneys, and I'll just simply report, very briefly, to the

12   Court, the last time obviously that got discussed in

13   connection with the claimant questionnaire, Your Honor said

14   that's not really an appropriate item to be taken up there.

15   We've devoted some thought to how we can conduct that

16   discovery on the least invasive basis, and what we're going

17   to be doing is simply proposing to the other side for their

18   consideration a very simple questionnaire that literally asks

19   about three or four questions of the law firms, and then we

20   would follow up with very focused, more traditional

21   discovery, and I felt it would be important to tell the Court

22   that this afternoon, so that at least, if that issue stays in

23   play and we can carry it over to the next hearing, and at

24   that time we can make a more concrete proposal, but I wanted

25   to make sure Your Honor understood that that was still in

1    play.  So, I think the only two things that we were to have

2    then so far is PI, specifically its concern are number one,

3    the questionnaire, and number two the CMO, and with that,

4    I'll ask Mr. Lockwood to go first and then I think Ms.

5    Harding will be in a position to respond.

6            THE COURT: Mr. Lockwood.

7            MR. LOCKWOOD: Your Honor, one housekeeping matter

8    really before we address the questionnaire and the CMO having

9    to do with the certification that was submitted by the

10   debtors concerning the mediator.  The certification - the

11   description of the certification talked about the - and maybe

12   it's not in the certification itself - Anyway, there was a

13   reference to the mediation of discovery relating to

14   estimation and to the objection to claims, and we understood

15   that the Court had previously ruled - yeah, it's actually in

16   the motion paper itself.  That's where it was.  Settlement of

17   any discovery disputes that may arise in the asbestos

18   personal injury estimation objection to claims process.  This

19   is at page 1, Roman I of their paper.  We had understood the

20   Court had previously acknowledged, as had the debtor, that

21   this estimation was going to be an aggregate estimation, and

22   that we were, in fact, not going to be having objections to

23   claims allowances or dis-allowances, and I just wanted to

24   make sure that there was no misunderstanding among anybody

25   that might be reflected in this paper that either that or

1    that something's going on here that hasn't been brought to my

2    attention before that there was going to be some objection to

3    the claims process here.

4          THE COURT: No, I understood this to be an

5    aggregation process.

6          MS. HARDING: Your Honor, I don't have the order in

7    front of me, but I don't think I'm mistaken that the language

8    in the certification of counsel, it comes directly from the

9    Court's order on the mediator, which is why it was written

10   exactly as it was written.  So, I don't have it in front of

11   me, and I - maybe we can find it, but that was directly from

12   the Court's order and that's why it's in there.

13         MR. LOCKWOOD: Well, if it was in the Court's order,

14   I - that might have been before the Court focused on the

15   discussion we had in July on this.  I would assume that the

16   Court didn't intend to change what the Court just referenced,

17   which was -

18         THE COURT: No, I didn't.

19         MR. LOCKWOOD:  - this is an aggregate estimation.

20   Okay, Your Honor.  With respect to Mr. Bernick's comments

21   about the discovery of attorneys beyond this questionnaire, I

22   just wanted to reiterate that we think that the questionnaire

23   even without the particular details, which my collogues, Mr.

24   Leesman's going to address in a minute here, is for reasons

25   we stated in enumerable times, and I'm not going to repeat

1    here, is just way, way beyond anything that any court has

2    ever permitted to any debtor in a mass tort or any other case

3    to do to 120,000 people.  It's incredibly burdensome.  It's

4    incredibly time consuming and incredibly - and frankly, in my

5    opinion, is not authorized by any applicable bankruptcy rules

6    of the Code.  Having said that, Your Honor has already told

7    us we're going to have a questionnaire, so that's where we're

8    going to be.  But the idea that we're then going to pile on

9    on top of that this minor questionnaire that we're going to

10   address to law firms who aren't by any stretch of the

11   imagination claimants in the case, and then we're going to

12   follow up the questionnaire to the law firms with

13   individualized discovery.  I'm just, you know, putting in a

14   marker here that we're going to vehemently oppose that, and

15   frankly, this whole enterprise is in our opinion so unlikely

16   to produce anything useable at the end of the day for

17   estimation purposes - or let me at least say, add the word

18   "possibly useable", that coupled with the debtor's assiduous

19   refusal to ever tell us how they're going to use this

20   information, but essentially keep saying, Trust us, Your

21   Honor, we'll have some experts that will come in here and

22   explain it all to you.  Just to pile on this additional

23   discovery makes it clear, if it wasn't already clear before,

24   that this is an exercise in, Let's hang in here as long as we

25   can until the United States Congress bails us out of our

1    difficulties.  We understand that's the game that's being

2    played here.  Okay, you know, we're going to have to live

3    through it, but I don't want anybody to think that we're not

4    aware of what's going on, and we don't think that the Court

5    should be unaware of it either.  With respect to the case

6    management order, which I'm going to jump ahead of a bit

7    here, our primary concern there as is reflected in the filing

8    that we made, very short filing on that subject is, really

9    not so much to object to the terms but to bring to the

10   Court's attention under the heading of a certain amount of

11   mea culpa, on the part of myself and Mr. Finch who were here

12   at the July hearing and into the meet and confer negotiations

13   that preceded that, that after having had more time, and

14   you'll remember the July hearing was originally set to take

15   place in mid-August, and it kind of got moved up a month, and

16   frankly, we really didn't do our homework completely in terms

17   of discussing things with the Committee members and other law

18   firms.  We have grave concerns about whether or not at least

19   for firms with large numbers of clients, I mean, five, ten,

20   twenty thousand clients, that the time frame set for getting

21   all the information required by the questionnaire is going to

22   be possible.  The questionnaire is going to set the thing,

23   and we're just saying that we may find ourselves in a

24   situation in which there's significant number of people who

25   come in, who we don't represent except in a sort of global

1    fashion in these proceedings who say, I don't care what the

2    Committee lawyer agreed with Mr. Bernick, I can't get this

3    stuff done in this time.

4         THE COURT: How much time is provided?

5         MR. LOCKWOOD: Four months.  But if you think - if

6    you look at the debtor's questionnaire and think about what

7    it requires and remember, Judge, these are not trial-ready

8    cases.  Some of them may be, but most of these cases have

9    been sitting at least for four years, dead in the water, as

10   far as Grace is concerned.  They might have progressed

11   against other defendants that may or may not produce

12   information that allows them to do certain things with

13   respect to Grace, it may not.  Product ID in particular where

14   you're not getting the product ID from the recollection of

15   the claimant itself, but you're using discovery in the case

16   to get co-worker testimony or Grace purchasing sales records

17   as to whether there are invoices to show delivery of Grace

18   products, et cetera.  None of that is necessarily for all

19   people going to be available, and if it's not, just the act

20   of determining whether they possess it is going to require

21   many things, a lot of routing around in numerous plaintiff

22   files, and we don't really know yet how bad that's going to

23   be, frankly.  And we're just putting a bookmark here really.

24   I'm not asking the Court to reconsider the four-month date.

25   I just don't want anybody, if it turns out that we've got a

1   lot of plaintiff's lawyers coming in here and, you know, to

2   the mediator and everything else saying I can't do it in this

3   time, I just don't want the record to reflect that the

4   Committee basically sold them all down the river by agreeing

5   initially to the four-month period.  I have a similar comment

6   with respect to the Rust Consulting, which only has two

7   months to take these 120,000 files, individual files of data,

8   assuming you get a 100 percent return on this, and go through

9   it, not only just to see what was checked on the boxes and

10   code that in, but also there's all the supporting

11   documentation that's going to be accompanying it, and they're

12   presumably, since they've asked for the documentation, I

13   assume they propose to have somebody look at the

14   documentation because if they didn't, or if they don't, then

15   it's just harassment, and for a consulting firm to wade

16   through 120,000 boxes of documents to glean whatever is

17   gleanable that the debtor thought might be in there, such

18   that the debtor wanted them produced in the first place, all

19   in sixty days, which is what the schedule provides seems to

20   us, upon reflection, to border on the preposterous.  But

21   again, I mean, it's the debtor's firm that hired Rust.  Rust

22   told them what they can do.  The debtors presumably told Rust

23   what they wanted the debtors to do, so, it's in the schedule,

24   but we are highly dubious that it's going to work.  With

25   respect to the two actual pieces of the CMO that there was

1    some specific objections to, the first one had to do with the

2    depositions of experts.  We, frankly, thought - I mean, this

3    is not a big deal to us.   We just thought it would save time

4    and money to the estate to wait until after the supplemental

5    reports were in and then just do the expert all at once as

6    opposed to the debtors doing a deposition first after you get

7    the initial expert report and then a second one after you get

8    the supplemental report.  The debtor's response to that would

9    be to say that well, first, I'm going to do them in the order

10   - not the order they presented, but in my - one thing they

11   suggested is we need additional 15 to 30 days to complete the

12   depositions of the estimation experts.  That's okay with us.

13   We don't really care about that.  The second one is that a

14   party may receive additional time to depose an expert on good

15   cause shown.  I mean, that, it seems to me any case

16   management order is always subject to having somebody come to

17   the Court and saying, Judge, I need a waiver of some

18   provision in the case management order for good cause.

19   Here's what the good cause is.  I don't know other than to

20   invite people to, you know, lie behind the law or whatever on

21   what they're doing with experts.  I don't know why you would

22   need that specifically in the CMO but on the other hand, you

23   know, I guess if you want to put it in there, that's okay.

24   However, the first condition that they want to impose is that

25   the Committee proposes that its experts and the experts of

1    the Futures Rep will be deposed first is totally unreasonable

2    and unacceptable.  The debtors are the ones that have

3    requested this estimation.  They have told the Court that

4    they need it in order to propose a plan.  Indeed, they have

5    made their plan conditioned upon the estimation producing a

6    certain result.  Telling us as they did in the meet and

7    confer that, Oh, well, we're the plaintiffs and we have the

8    burden of proof, i.e., the claimants, is totally unresponsive

9    to that.  In any case where you have a plaintiff and a

10   defendant, either the plaintiff or the defendant can make a

11   motion.  When they make a motion, they're a movant.  When

12   they're a movant, they go first.  This is the debtor's

13   motion.  This is not a claim-by-claim adjudication of the

14   plaintiff's claims either which the plaintiff has asserted a

15   claim against the debtor and even then, it wouldn't prove

16   that if the debtor as objector to the claim made a motion,

17   for example, through an omnibus objection to have a

18   scheduling matter set up through threshold objections as we

19   heard with Mr. Baena and everything, that all of a sudden

20   that means that the plaintiff has still got to go first on

21   whatever that is because they're the plaintiff even though

22   the debtor's the movant.  So, if it comes down to the idea

23   that the tradeoff here is that we have to go first on our

24   experts in order to have one deposition rather than two

25   depositions, we'll take the two depositions.  This was just

1    intended to try and, you know, make things a little bit less

2    burdensome on all parties.  It was not intended to somehow or

3    another give us a tactical advantage, and it certainly isn't

4    intended by us to create an opportunity for the debtor to get

5    a tactical advantage.  The second issue is, if anything, even

6    more trivial than that.  It has to do with reply briefs on

7    Dalbert motions and motions in limine and things of that

8    sort.  If the Court feels that you want to hear reply briefs

9    on every motion of that sort -

10        THE COURT: No, I don't.

11        MR. LOCKWOOD:  - that comes down, that's fine with

12   us.  We thought, again, it would be - save some time.

13        THE COURT: No.  I do not want reply briefs on

14   everything.  My experience with reply briefs is that they're

15   not saying anything that the initial brief didn't say for the

16   most part.  Every once in awhile, there's something

17   additional that's been added or an argument that wasn't

18   anticipated, but they're pretty much doing a summary of what

19   the initial brief is.  So, no, I do not want reply briefs.

20        MR. LOCKWOOD: In any event -

21        THE COURT: And I also don't want motions to allow

22   them.  I don't want them.

23        MR. LOCKWOOD: In any event, that's the totality of

24   our comments on the case management order, Your Honor.  I

25   would like to present my colleague Mr. Jeffrey Leesman who is

1   new to our firm, or relatively new, and who needs to be

2   admitted *pro hac*, which hope Mr. Hurford will take care of.

3   Thank you, Your Honor.

4            MR. HURFORD: Good afternoon, Your Honor.  Mark

5   Hurford from Campbell Levine.  Unfortunately, Your Honor, we

6   did not file a motion for *pro hac* for Mr. Leesman's admission

7   to practice in front of Your Honor or to speak in front of

8   Your Honor this afternoon.  If we could do that - If I could

9   do that verbally right now we'll get something on file by the

10  end of the week.

11           THE COURT: All right, that's fine.

12           MR. HURFORD: Do you need to hear anything on Mr.

13  Leesman or should we just -

14           THE COURT: I need to know where he's admitted.

15           MR. HURFORD: Okay.  He's admitted in Virginia and

16  the District of Columbia.

17           THE COURT: All right.  Anybody have an objection to

18  Mr. Leesman representing today?  All right you're admitted

19  for today, Mr. Leesman.

20           MR. LEESMAN: Thank you very much, Your Honor.  Your

21  Honor, perhaps the better way to get to the questionnaire is

22  to let me invite your attention to our objection and in

23  particular page 5 of the objection which is a carryover of

24  paragraph (6).

25           THE COURT: I'm sorry.  I don't have any of those

1   documents here.  I think I did - or can you tell me in what

2   binder they are and what agenda number and I can look it up

3   because -

4           MR. LEESMAN: I believe Mr. Hurford is going to -

5           MR. HURFORD: Your Honor, Mark Hurford again.  These

6   were the documents - I think there were three filings on

7   Friday afternoon.

8           THE COURT: Oh, then I don't have them at all.

9   The only place I got them was at home and I read them at home

10  and left them there.  So, I don't have these documents.

11          MR. HURFORD: Okay.  Your Honor, I have an extra

12  copy.  This is docket 9261.  It was filed by myself on Friday

13  afternoon at 3 o'clock.

14          THE COURT: Fine, I'll -

15          MR. HURFORD: May I approach?

16          THE COURT: Yes.

17          MR. BERNICK: Your Honor, it might be easier.  We

18  have the language that they're suggesting on slides.  It

19  would be easier just to see it on the slide?

20          THE COURT: It doesn't really matter.  Whatever,

21  thank you. Where are you looking now?

22          MR. LEESMAN: Page 5 of the document, Your Honor,

23  and this is the carryover to paragraph (6).

24          THE COURT: All right.

25          MR. LEESMAN: You'll see two paragraphs that look

1    like block quotes.

2          THE COURT: Yes.

3          MR. LEESMAN: And the first one really goes to

4    something we'd like to introduce on the cover page.  Because

5    we think it's important, this is almost a truth in

6    advertising type of provision.  Our concern was with the

7    cover page as drafted is it says, This is an official court

8    document approved by the Court.  You are obligated to respond

9    to this pursuant to court order.  We thought that that had a

10   little too much of a color of authority with respect to what

11   was really going on here.  So, without reading the language

12   specifically, the essence of what we were trying to get to

13   was we were basically saying this is the method that the

14   debtors are employing to seek discovery, and this is the way

15   that they want to gather evidence or information so that they

16   would use it at an estimation hearing.  There's been no

17   decision as to what actual method that the Court is going to

18   adopt in order to achieve an estimation.  This is only one

19   aspect of that.  And basically, as I said, the concern was,

20   is this is going out to claimants and attorneys who might not

21   be sophisticated in the bankruptcy process, and might have a

22   different impression of the source of the document, for

23   example, this might be, for example, they might perceive this

24   as a court investigation rather than ordinary discovery.

25          THE COURT: I take back what I said, Mr. Bernick, if

1    you've got a redline version on the slides, let's do it

2    please.

3           MR. BAENA: Your Honor, may I?  While the estimation

4    of personal injury claims is vital to this case, I admit, I

5    don't have the same level of interest in each and every of

6    the questions in the questionnaire.  I missed the 6:15

7    flight.  There's one last flight, and I was wondering if I

8    could take leave of court?

9           THE COURT: As long as you don't mind the fact that

10   you're absenting yourself from this joyous discussion, Mr.

11   Baena, you're free to leave.

12          MR. BAENA: I have no way to improve upon this

13   questionnaire I would ask though, Judge, if you even have any

14   strength after this to get into exclusivity again, or that we

15   could roll that to the next hearing.

16          THE COURT: Frankly, I think at this point what we

17   ought to do with exclusivity is put it on an agenda for

18   sometime in December and see where we stand, truthfully.  I

19   mean, you know, I think the issue at this point - It does

20   need to be addressed, but it appears until we get through

21   some of these technical issues, that the debtors probably

22   should just have their exclusivity period.  Without making

23   any judgments as to whether or not exclusivity should be

24   terminated, maybe it should just be put down a couple months

25   until we can actually get the process started.

1          MR. BERNICK: That's fine, but apart from that body

2    language is that a . . . (microphone not recording).

3          THE COURT: Mr. Frankel.

4          MR. FRANKEL: We're happy to argue it today, but -

5          MR. LOCKWOOD: Alternatively, Your Honor, will live

6    with the questionnaire, with all due respect to Mr. Leesman

7    and do the exclusivity now if Mr. Baena wants to get it out -

8    I don't -

9          THE COURT: Well -

10         MR. LOCKWOOD: - anticipate it's going to be real

11   long.

12         THE COURT: I don't think it will be a long

13   argument, either, but truthfully, I really don't see that

14   there's prejudice to the estate at this point by keeping the

15   debtor in possession.  I think we need to get to some of the

16   issues.  I think these issues need to be addressed before

17   anybody can file a plan that's going to make sense, and I

18   just don't see that there is prejudice at this point.  So, I

19   do think the issue needs to be addressed, but I'm just not

20   convinced that it needs to be addressed today.

21         MR. FRANKEL: Your Honor, if I could just say.  We

22   just think exclusivity is a very serious issue.  The fact is

23   whether it's this month or next month isn't going to make the

24   difference, but we don't want it to be the idea that the

25   estimation goes first which is a year and a half down the

1    road, and then we take up exclusivity seriously.

2         THE COURT: No, I think it is a serious issue, but I

3    believe we need to get the processes set in place first

4    because that is obviously more important.  We need to get the

5    case moving before anybody can file a plan.  My suggestion,

6    truly, is not even to put it on next month.  Put it on the

7    month after.  Let's get these little technical issues

8    hopefully finished and then have a serious discussion about

9    exclusivity.  That's what I would proposed.

10        MR. FRANKEL: That's fine, Your Honor.

11        MR. BERNICK: I would say, though, I mean - I don't

12   want to push this issue today for a whole bunch of reasons,

13   although I'm happy to do it, but I will be on trial and that

14   trial will likely extend through November.

15        THE COURT: Oh, in November.

16        MR. BERNICK: So when Your Honor said December,

17   that's fine with me.  I am happy - what I don't like is to

18   hear all these comments made that are basically arguments

19   about exclusivity and then can, Oh, well, if you beat me to

20   death, I guess I'll agree to defer it, but I don't want - If

21   we want argument today, I'll be happy to do it today.  If

22   it's going to be in December, that's fine too.

23        THE COURT: I did say November, but I had forgotten

24   that Mr. Bernick had that conflict, gentleman.  Would you

25   agree to the December 19th hearing date, and at that point in

1   time, it seems to me, that the motion could be amended to add

2   whatever information if there is something new that you want

3   to add to -

4           MR. FRANKEL: Your Honor, that would be fine with

5   the Future Claims Representative.  We would ask that as it

6   has been in virtually every hearing it not be set last on the

7   agenda so that actually it has time to be heard.

8           THE COURT: Yeah, we'll put it first, and I'll ask

9   the debtor to put it first on the contested list so that we

10  can get through the uncontested matters first, but then the

11  contested matter will start with exclusivity on the December

12  hearing date, and, folks, if you have anything to supplement

13  the motion or the responses please file it so that it's filed

14  in conjunction with that December hearing date, and the

15  debtor's exclusivity will be extended until the conclusion of

16  that hearing.

17          MR. FRANKEL: Thank you, Your Honor.

18          MR. BAENA: Thank you, Judge, and I apologize to

19  counsel that it was this first hearing that I was rude to him

20  in.

21          MR. LOCKWOOD: Just for the record, that's fine with

22  the ACC as well, Your Honor.

23          THE COURT: All right, thank you.  Okay.

24          MR. LEESMAN: Your Honor, turning back to the

25  questionnaire.  There is one sentence in the language that's

1    been put on the screen that I'd like to highlight, and that's

2    the last sentence at the end that says, "The form is

3    unrelated to individual claims allowance and any sanction for

4    failure to complete the form will not include disallowance or

5    result in any other prejudice to your claim."  Your Honor, we

6    felt that this was important clarifying language since the

7    Court has indicated before that this is not a claims

8    allowance and disallowance process.  We think disallowance of

9    a claim for failure to meet the debtor's expectations as to

10   what the questionnaire would look like -

11        THE COURT: I'm going to stop you.  It may result in

12   some prejudice because to the extent that the debtor doesn't

13   get discovery and somebody wants to testify or do discovery,

14   I may bar that claim from doing it for not participating in

15   discovery.  So there may be prejudice.  There may be

16   consequences, and it is incorrect to say that there will be

17   no consequences.  It I not incorrect to say that in and of

18   itself may not result in disallowance, but there may be

19   consequences.  So, I will not approve that language.

20        MS. HARDING: Your Honor, if I may, just interrupt.

21   With respect to the questionnaire as it's already formulated

22   and revised with respect to the instructions, we already have

23   the section in it that says that the claim will not - that

24   the - excuse me - "Completion of this questionnaire does not

25   mean that your claim will be either allowed or paid."  And

1    then the PI Committee didn't have any objection to our

2    revision to that language.  It was pursuant to the Court's

3    instructions, so that issue is already dealt with in the

4    questionnaire.

5        THE COURT: Yeah, I think that is a better way to do

6    it because that is a more correct statement.  There may be

7    consequences for not complying with discovery.

8        MR. LEESMAN: Very well, Your Honor.  Has the Court

9    had an opportunity to read what's on the screen?

10       THE COURT: Yes.

11       MR. LEESMAN: Okay.  Let me proceed to the next

12   language at issue, which I believe is the paragraph that

13   begins with "Although".  Right.  Your Honor, we proposed this

14   - this was basically coming from a colloquy from the July 19th

15   hearing.  Our impression from where the Court was coming from

16   was that the questionnaires would go out to the attorneys and

17   also to the claimants, and it would ask for medical

18   information from the claimant's doctors, and if that

19   information was there, it ought to be produced, and the

20   language that we have submitted basically clarifies that.

21   What we're also trying to get at too, is if they don't have

22   the information or they have to go out to certain separate

23   sources that are beyond their possession, custody, or

24   control, that seems to us to be beyond what's necessary in

25   discovery, but certainly, we were addressing -

1          THE COURT: Wait, how can we do this affirmatively

2    and simply say, You must produce information that is within

3    your custody, control, or those of your agents - care,

4    custody, or control or those of your agents and take this

5    other language out.  This sentence, "You are not required to

6    gather information not already in your or your agent's custody

7    or control, nor should you make guesses or estimates in

8    answering any question", has so many nots in it that nobody's

9    going to understand what they have to do.  So, let's put it

10   affirmatively.  What you have to do is produce what you have

11   or what your agent has.

12          MR. LEESMAN: Very well, Your Honor.

13          THE COURT: All right.

14          MR. LEESMAN:  The next item that we have deals with

15   - I think it's part two of the questionnaire.  It's the

16   language regarding in which we want to put those two options

17   at the end.  It is part two, okay.  Your Honor, this would be

18   on - again, it's on page 5 of our objection, and it's also on

19   the table that's on page 5 of the debtor's report.

20          THE COURT: What specifically, the diagnosis and

21   documentation issues?

22          MR. LEESMAN: Well, what we're getting at is, as Your

23   Honor recall, for each of the asbestos-related diseases in the

24   prior version of the questionnaire, there was rather lengthy

25   and involved definitions that involved, you know, that defined

1  the term based on a certain kind of diagnoses, et cetera, et

2  cetera.  The debtors agreed to amend that for this version of

3  the questionnaire, and what they've done is they basically

4  said, Do you have this certain kind of disease, such as

5  mesothelioma or whatever cancer, and then the claimant

6  responded as expected to check various boxes as to what that

7  claimant has in support of that disease, which could read you

8  know, a certain B reading or second certain B reading, so on

9  and so forth.  What we thought was important and this is the

10  language that we want to add was to add more open-ended bases,

11  because -

12          THE COURT: Like what though?  Just tell me what you

13  want to add, please.

14          MR. LEESMAN: We want to add two boxes at the end of

15  each of the diseases.

16          THE COURT: That say what?

17          MR. LEESMAN: And the first box would read, quote,

18  "Diagnosis and documentation supporting exposure to asbestos

19  or asbestos-containing products as having a causal role in the

20  development of the disease or condition."  And then the last

21  box would be "other".

22          THE COURT: Well, I think the other should be in

23  there.

24          MR. LEESMAN: Please specify.

25          MS. HARDING: Your Honor, may I be heard on this?

1        THE COURT: I think the other should be in there.

2   I'm not sure what the diagnosis one does.  What are you

3   intending to accomplish by that?

4        MR. LEESMAN: Well, what it means is that there's a

5   diagnosis that's other than what's specifically mentioned in

6   the debtor's boxes, and what it also suggests is that there's

7   diagnosis and documentation supporting evidence of exposures

8   having a causal role in the development of the disease.  We

9   thought that was -

10       THE COURT: But we only care about exposure to Grace

11  products.  Why ask them about exposure to other products?  The

12  question about Grace products is already there.

13       MR. LEESMAN: This is - I think we might be talking

14  about two different parts, Your Honor.

15       THE COURT: Well, I'm looking at paragraph (7) on

16  page 5.  What you want to do is add to pages 1, 2, and 3 of

17  the form.  So I'm looking at, for example, paragraph (1(a)) of

18  the form which deals with mesothelioma.  And you would want to

19  add under the three existing boxes, the two boxes that are

20  already there or that - I'm sorry.  Under the three existing

21  boxes, the two boxes you propose.  The box that's already

22  there says, Diagnosis and documentation supporting exposure to

23  Grace asbestos-containing products having a substantial causal

24  role in the development of the condition.  You want to add,

25  Diagnosis and documentation supporting apparently any exposure

1    to asbestos or asbestos-containing products as having a

2    causal, not substantial, role in the development of the

3    disease or condition.  So, I'm not sure how that gets you the

4    fact that it was Grace's liability.

5           MR. LEESMAN: We think - Well, it's - Grace's

6    liability I believe, is part three, which deals with direct

7    exposure to Grace asbestos-containing products.  Part two, or

8    at least what I understand part two to deal with, is to

9    basically look at what kind of medical evidence do you have

10   supporting the disease rather than anything that's Grace

11   specific.  You know, what kind of B-reads do you have, so on

12   and so forth.  We find that the language that you led to me,

13   Your Honor, which ends with, a substantial causal role, is

14   really too limiting, and we -

15          THE COURT: Okay, well, here's the problem.  If you

16   put that sentence in, and that's what's checked, then there's

17   no connection to Grace products.  You're just going to get an

18   objection to it.  So, what benefit has it, sir?

19          MR. LEESMAN: Well, they establish that they do have

20   some kind of evidence that they're going to have to show of a

21   disease and exposure, and if I understand the form correctly,

22   then they have to go to part three to establish the product

23   identification, the certain job sites that they were working,

24   so on and so forth.  I think part two is looking for the type

25   of medical evidence is there, and part three is looking for

1   the Grace exposure, and our proposed language goes to part

2   two.

3           THE COURT: All right.  So your concern is that the

4   last of the existing box that specifically identifies Grace's

5   products as too narrow because somebody may have exposure and

6   then the next step is to connect the exposure to Grace's

7   product in part three.  Frankly, I think it's overkill.  I

8   mean I think you're going to generate more confusion rather

9   than less, but if - they're your constituents, if you want it

10   in, I'm not necessarily opposed to putting it in.  I think the

11   other box should go in.

12           MR. LEESMAN: We agree with Your Honor on the other

13   box, yes, yes, certainly, but we think that the debtor's

14   formulation, this last box, for example, on the mesothelioma

15   is too strong because it refers to a substantial causal role.

16   You know, right now, we think we need to give the claimants

17   the option to, if they have other medical evidence, to be able

18   to check the box and come forward with it.

19           THE COURT: All right.  How about adding then the

20   first box that you want with respect to diagnosis and

21   documentation, but then to add a sentence that says, If you

22   check this box, you must complete part three.

23           MS. HARDING: May I respond, Your Honor?  First of

24   all I'd like to just alert the Court to one thing, and I've

25   got it on the slide next here.  The Court may recall, this

1    issue came up because in the debtor's - in the instructions to

2    the questionnaire that the Court considered on July 19th, we

3    added several positions that the debtors believe are

4    important, and the Court ruled that those were not - that was

5    not proper to have position statements in the instructions,

6    and the Court asked the debtors to amend the -

7         THE COURT: Yes I did.

8         MS. HARDING:  - questionnaire and turn them into

9    questions soliciting facts about our positions.  All right?

10   And then the Court, and I've got the language here, this issue

11   was specifically talked about, that the PI Committee asked for

12   language that they wanted in.  They asked for questions that

13   they wanted in, our discovery request, and the Court ruled on

14   two different occasions that this is the debtors' discovery

15   and they don't get to put questions about their positions, and

16   elicit facts about their position -

17        THE COURT: I understand, but I also understand that

18   in asking a question the way it's raised that you may end up

19   limiting people who actually do have some evidence of a Grace

20   product, and I don't think you want to do that either.

21        MS. HARDING: Your Honor, I don't agree, Your Honor.

22   I think that the way that the question is asked, we're simply

23   trying to find out if - it's a medical question.  It's a

24   question about whether the claimant has a medical diagnosis

25   that's supported by exposure to Grace products.

1          THE COURT: No, you're asking for a substantial

2    causal role, and that has an awful lot of value added

3    components to it.  I'm going to permit this to be added, but

4    only with the extension to this clause that says, If you

5    complete the diagnosis section the way you've asked that it be

6    added or the other section that you must complete part three

7    because they must connect the debtor to this evidence somehow.

8          MR. BERNICK: Your Honor, if I could speak here

9    briefly.  This is not simply a question of exposure or having

10   evidence of exposure.

11         THE COURT: I understand that.

12         MR. BERNICK: That's what part three is all about.

13   Part two is about something else.  Part two is about a doctor

14   being able to say, based upon medical evidence, that the

15   requirement of causation, which they themselves have

16   articulated consistently, substantial contributing factor,

17   substantial cause, whether that requirement is being met.

18   That's not a question of whether there was Grace asbestos

19   there.  That is a question of whether a doctor has exercised

20   judgment and determined that there's medical evidence that

21   exposure to Grace's product actually played a role.  We can

22   have people who will be at a job site, exposed to all kinds of

23   asbestos.  The plaintiffs would like to have the burden be on

24   us to prove the negative.

25         THE COURT: You don't have to prove the negative, but

1    I don't see at this point if people have some evidence but

2    don't have a specific diagnosis by a doctor that says, Yes it

3    was Grace's product that caused your asbestos.  I mean how

4    does a doctor know whether it's Grace's product or somebody

5    else's product.

6         MR. BERNICK: To the contrary.  That is exactly -

7    That's the only way that the case can be prosecuted.  If they

8    don't have medical evidence that says that our exposure was

9    causal, they're out of luck, and what typically happens in

10   these cases, Your Honor, this is the way the law - This is

11   discovery.  Our taking the deposition of a treating physician

12   who had rendered a diagnosis every day of the week, I'd say,

13   Well, did you reach a diagnosis that said that exposure to

14   this product was a substantial contributing factor of so and

15   so's illness.  I'd ask the treating physician that question

16   every day of the week.  That's the whole point of part two is

17   to find out if there's ever been a doctor that has said that.

18   They don't like that.  They would like to have Your Honor draw

19   the inference that somehow evidence of exposure at a job site

20   is sufficient for the Court to reach a conclusion about

21   causation.  That's not what part two asks.  Part two asks -

22        MR. LOCKWOOD:  Your Honor -

23        MR. BERNICK: Excuse me.  Part two asks whether the

24   doctor has been able to say that.  And this is a re-argument.

25   We went through all of these things before.  The purpose of

1   today is to go through and to execute on what Your Honor

2   determined before.  This was our question.  If they want to

3   ask their own question or they want to argue to the Court -

4           THE COURT: Well -

5           MR. BERNICK:  - later on, they can always go ahead

6   and do that.

7           THE COURT: Yeah, that is true.  This is the debtor's

8   discovery, but I do want another category added because there

9   may still be something that is other and that is appropriate

10  and that the claimant should have an opportunity to submit.

11          MR. LOCKWOOD:  Your Honor, if we're going to tag

12  team this, I'll just make the observation that - Mr. Bernick's

13  right.  It's their questionnaire.  It's their discovery.  We

14  made the suggestion on the thought that ultimately the results

15  of this questionnaire are composed in some unspecified manner

16  to be presented to experts and then presented to the Court.

17  We thought that we should alert the Court - not Mr. Bernick,

18  that his view of what he asks in deposition questions is not

19  necessarily what the trier of fact is going to conclude is the

20  evidence.

21          THE COURT: I agree and that may not be what the

22  evidence -

23          MR. LOCKWOOD:  But if a question like this is not in

24  the questionnaire, there may wind up being a gigantic hole -

25          THE COURT: There may be -

1           MR. LOCKWOOD:  - in their proof.  But if Mr. Bernick

2    wants to leave the -

3           MR. BERNICK: They can always fill that hole.

4           MR. LOCKWOOD:  Excuse me.

5           THE COURT: Gentlemen.

6           MR. LOCKWOOD:  I didn't interrupt you, please don't

7    interrupt.  If Mr. Bernick and his client want to craft this

8    case so there's a gigantic hole in the middle of the case,

9    fine.  They can do that. We're not going to force them, we're

10   not going to ask the Court to force it.  We thought this would

11   be helpful, useful.  It's not our discovery.  We don't intend

12   to conduct discovery of our clients, and that was the purpose

13   for which Mr. Leesman was explaining.

14          THE COURT: Okay, fine.

15          MR. LOCKWOOD:  If he doesn't want it in there, fine.

16   We made the point.  We made the record.  Your Honor now

17   understands it.  We'll live with the consequences.

18          THE COURT: I do understand it.  I understand that it

19   may cause a gap in the expert's analysis.  I understand that

20   it may cause a gap in the trial evidence that's coming in.

21   It's the debtor's discovery.  If they don't want it, they

22   don't have to have it, but I do want an other category added

23   because it appears to me that there may be something else that

24   isn't covered that a person ought to be able to say to the

25   debtor, I have this evidence that connects Grace to my

1    product.  All right, what's next.

2        MR. LEESMAN: The next portion of our comments goes

3    to part five of the revised questionnaire, and part five deals

4    with exposure to non-Grace asbestos-containing products.  Does

5    Your Honor have a copy of part five before the Court?

6        THE COURT: I don't know.  Is it attached in here?

7    You mean to the questionnaire?

8        MR. LOCKWOOD:  It's Exhibit B to the debtor's report

9    to the Court, Your Honor.

10        MR. LEESMAN: Your Honor, I have an extra copy.

11        THE COURT: All right.  Okay.

12        MR. LEESMAN: Your Honor, the Court's instruction at

13    the July 19 hearing was to have any investigation regarding

14    exposure to a non-Grace asbestos product to be limited to one

15    page.  And we thought that the way this page was crafted

16    almost asks for a little much in terms of what the respondents

17    have reply to, and our suggestion, in order to make the

18    discovery less burdensome, is to have the claimant or the

19    respondent identify the primary site or the site that the

20    exposure from the non-Grace asbestos product took place rather

21    than being forced to identify all these sites of exposure.

22        THE COURT: Well, I mean, there may not be more than

23    one site.  I think all this is doing is giving the claimant

24    the opportunity to say, you know, I was exposed at multiple

25    sites and here they are.  If there was only one, this serves

1    that purpose.

2           MR. LEESMAN:  It's non-Grace, so, we thought that -

3    that's right.  The debtor wants to investigate and take

4    discovery as to what the Grace exposures are -

5           THE COURT: Of course.

6           MR. LEESMAN:  - if there's any evidence of that, but

7    it seems rather burdensome to do it with respect to the non-

8    Grace.

9           THE COURT: Well, I don't see why.  I mean if the

10   claimant - especially if the claimants been filing claims in

11   other cases, they ought to know that they filed claims in

12   other cases and it shouldn't be that burdensome.  They should

13   have already figured that out.  I can't see that this is

14   overly burdensome.

15          MR. LEESMAN:  Your Honor, one of the things that -

16   in reliance of our suggestion here was page 264 of the July 19

17   transcript in which the Court did instruct the debtor to say

18   with respect to the non-Grace exposures, and I'm looking at

19   page 264 according to the transcript between lines 13 and 16,

20   it says, "The Court: One page on exposure that tells the

21   person to list the place where they were exposed, the dates

22   they were exposed, the product, whatever you want on one

23   page."

24          THE COURT: Yes.  That's what this form does.  I

25   didn't ever intend to limit discovery to one place of

1    exposure.  The problem was that before this, the questionnaire

2    with respect to each place of exposure was - I don't remember

3    exactly, two and a half pages, and I thought it was too much.

4    I expect that if they were exposed in more than one place,

5    they're going to fill this form out for each place they're

6    exposed.  That's what's being asked.  All I was trying to do

7    was say, put it on one page so that for each place of

8    exposure, you only have one page to fill out.  The debtor's

9    done even better and given you three places in one.

10           MR. LEESMAN:  Thank you, Your Honor.  The last point

11   actually appears on the debtor's report.  I'm looking at page

12   5 of the report that talks about - and it's itemized as .2,

13   pulmonary function test tracings and the box says, The

14   instructions for part two of the questionnaire include the

15   following language, quote: "Pulmonary Function Tests: Please

16   attach all pulmonary function test results including actual

17   raw data and all spiral metric tracings on which the results

18   are base" - it says base right here, I think it should have a

19   "d" on the end for more past tense.  Your Honor, I think we

20   suggested this because we were looking for clarification

21   because there was some uncertainty as to whether the claimants

22   with respect to the actual data, the actual raw data for

23   supporting a pulmonary function test would be required to

24   produce the originals or copies.

25           THE COURT: Oh, copies are fine.  I don't - unless

1    there is some x-ray that has to be produced in an original

2    form.  Do you need original test results?

3            MS. HARDING: No, I believe, Your Honor, that the

4    questionnaire allows for copies to be filed and originals to

5    be requested if needed, but it allows for copies.

6            THE COURT: Yeah, copies are fine unless, you know,

7    something happens and it's not legible, then I think the

8    debtor could go back and ask for something else.

9            MR. LEESMAN: Very well, Your Honor, that's a

10   clarification that we were seeking.

11           THE COURT: Okay.

12           MR. LEESMAN: That concludes my portion of the

13   presentation.

14           THE COURT: All right.

15           MS. HARDING: Your Honor, could I get a clarification

16   with respect to the first - I'm going to go backward - with

17   respect to the first paragraph that was requested.  I think

18   it's before the Court now, Your Honor.

19           THE COURT: Yes.

20           MS. HARDING: As I understand it, the Court is not

21   allowing this language because of the reasons the Court stated

22   and also because we have covered the fact about the allowance

23   or disallowance in the questionnaire already; is that correct?

24           THE COURT: Well, I was focused on the last portion

25   of this when I said I wouldn't permit it, because I think

1    there could be prejudice by not responding to discovery

2    requests.  So, I hadn't really addressed the rest.

3         MS. HARDING: Okay, and I - that's what I wanted to

4    talk to the Court about if I may.  Your Honor, with respect to

5    the entire - The first thing I'd like to say, Your Honor, is

6    with respect to the instructions.  At the July 19th hearing we

7    went line by line by line on the instructions, and the issues

8    that are attempted to be covered in here are covered in the

9    questionnaire now, and there's been no objection from the PI

10   Committee that we have somehow or another not implemented the

11   Court's instructions at that hearing correctly.  So that's the

12   first point I'd like to make.  The second point, Your Honor,

13   is that the language that they attempt to insert into the

14   questionnaire now is contrary to the Court's prior rulings in

15   many respect, and I have a couple of examples.  With respect

16   to the Court's authority extends only to permitting Grace to

17   seek it in this manner.  That simply is not what the Court has

18   ruled.  The Court has ruled and said on many occasions this is

19   discovery.  The debtors can seek it how they see fit.  The

20   Court's made reference to interrogatories.  The Court has

21   suggested we can follow up with respect to discovery if it

22   need be, and so I think that's an impermissible statement

23   about the Court's authority and the Court's authority is

24   governed by the discovery rules -

25         THE COURT: Well, I don't think this language is

1   helpful.  Let me just cut this off.  I don't think this

2   language is helpful.  If you need something that indicates

3   that the purpose of this questionnaire is for discovery rather

4   than for an evidentiary, I guess, submission, that's okay, but

5   the rules permit the debtor in the event that somebody signs

6   this under oath to use it in direct evidence if it's relevant.

7   So, I don't think it's true to say that - It may be true to

8   say the Court won't directly use it to estimate liability, but

9   the parties will, and if it's admitted into evidence I will

10  consider it.  So, I don't think those two sentences are

11  correct.

12         MR. LEESMAN: We understand that, Your Honor.  I

13  think the larger point that we're trying to get to is this is

14  only one method that's being used by one party to pursue

15  discovery.  And we thought that as a truth in advertising that

16  it was important to make that point.

17         THE COURT: Well, I guess what you could say is this

18  questionnaire's being used by Grace to seek information

19  concerning your asbestos claim.

20         MS. HARDING: Your Honor, may I speak to that, Your

21  Honor.  If the Court may recall this as well, in the debtors'

22  instructions in the July 19th hearing, the debtors had

23  statements about how it would be used.

24         THE COURT: And I told you to take it out.

25         MS. HARDING: And the PI Committee, they objected and

1    the Court struck the language.  It's just not permissible to

2    allow them now to put questions and statements in the

3    instructions talking about how it's going to be used.

4         THE COURT: Well, okay, with respect to this - Is the

5    offensive sentence the fact that this form of - that this

6    questionnaire itself is authorized by the Court?  Is that the

7    problem, and you simply want it to say, This questionnaire is

8    being used by W.R. Grace to seek information concerning your

9    claim of asbestos?

10        MR. LEESMAN: That's the essence of it, yes, Your

11   Honor.

12        THE COURT: Well then I don't see any problem with

13   that.  How about just changing the language and say, This

14   questionnaire is being used by W.R. Grace to seek information

15   concerning your asbestos claim.

16        MS. HARDING: Your Honor, I'd like to add pursuant to

17   the discovery rules under the Federal Rules of Civil

18   Procedure.

19        THE COURT: Oh, sure, that's fine.  I mean, if that's

20   what you're doing, if you're considering it to be discovery,

21   and I think that's been the context that it's been proffered

22   in before for your experts.  A problem, Mr. Lockwood?

23        MR. LOCKWOOD: Well, Your Honor, that's ambiguous.

24   It goes back to this issue of allowance or disallowance.

25   Discovery, yeah, but estimation discovery in the aggregate.

1    If you start saying -

2            THE COURT: Oh.

3            MR. LOCKWOOD:  - under the discovery rules, people

4    are going to start thinking that there's going to be taking

5    discovery of my individual -

6            THE COURT: All right.

7            MR. LOCKWOOD:  - claim which I'm going to try and -

8            THE COURT: Let me stop you.  They're not going to

9    understand the Federal Rules of Civil Procedure anyway.  These

10   are asbestos claimants.  Just say that Grace is going to use

11   this questionnaire as a means to seek information about your

12   asbestos claim, and that's enough.

13           MS. HARDING: That's fine, Your Honor.

14           THE COURT: Okay.

15           MR. LEESMAN: Thank you, Your Honor.

16           MS. HARDING: And I'll take care of this paragraph

17   then completely with that language.

18           THE COURT: All right.  So the first sentence will be

19   changed to say that Grace is seeking this information about

20   your asbestos claim.  The second two sentences in red will not

21   be included.  The debtor wants to put in the next sentence

22   that the information's going to be analyzed by the parties and

23   the experts?

24           MS. HARDING: We prefer not to put it in, Your Honor,

25   but I don't think we have a huge objection to that part of it.

1          THE COURT: I mean, I don't see that you need it.  I

2   think telling them that you're trying to get information about

3   their asbestos claim's enough, but if, you know, if the

4   Committee wants it in, it may be more confusing rather than

5   less, but I don't know that it matters.  And then the last two

6   sentences should come out - or last sentence.

7          MR. LEESMAN: The last sentence, that's right, Your

8   Honor.

9          THE COURT: You want that sentence in or no?

10          MR. LOCKWOOD: Your Honor -

11          THE COURT: Pardon me just a minute.  I'm sorry, who

12   was - Mr. Lockwood?

13          MR. LOCKWOOD: I don't think that the fourth

14   sentence, but rather this is it makes any sense if you believe

15   the third sentence.  If Your Honor has ruled that the two

16   sentences in red, the second and the third, are not going to

17   be in -

18          THE COURT: Right.

19          MR. LOCKWOOD: Then the sentence after that lacks

20   context.

21          THE COURT: All right.  So all it should say then is

22   Grace is going to use this questionnaire to seek information

23   about your claim, period.  Okay.  All right, anything else on

24   the case management order?

25          MS. HARDING: Your Honor - With respect to the

1  questionnaire, the other half of the language that they

2  propose, I think that you ruled about you are required to

3  produce information in your custody and in the custody of your

4  agent's control and custody.   You gave a line at what should

5  go in there.

6          THE COURT: Right.

7          MS. HARDING: And my question to the Court is, is

8  that the line that should replace the language that the PI

9  Committee is seeking or should we discuss the rest of the

10 language that's there as well.

11         THE COURT: It should say something like, you're

12 required to complete this questionnaire to the best of you're

13 ability and to provide information as requested that is within

14 your care, custody, or control or that of your agent.

15         MR. BERNICK: Your Honor, again at the risk of

16 prolonging this, but literally this concept, that is, what

17 gets produced and what doesn't get produced, we went through

18 in the specific context of each and every question.  That's

19 what we spent all our time doing last time.  So they have a

20 general statement that this point can only be designed for one

21 purpose, which is in some fashion to create a touchstone that

22 the Committee believes is in some sense more advantageous or

23 different from the rest of the form.

24         THE COURT: Oh, so you don't want any language.

25         MR. BERNICK: I don't want - Whatever it is that

1    they're required to do, they're required to do.

2         MS. HARDING: And, Your Honor, we - There's been no

3    objection, Your Honor, from the PI Committee, and I asked it

4    specifically last week about it.  They do not object to the

5    way that we've incorporated the Court's instructions on this

6    very issue in three or four different places in the

7    questionnaire.

8         THE COURT: I don't see that you need this language.

9    I thought the debtor wanted some instruction in.  I don't see

10   that the instruction's necessary.  It may be more confusing

11   rather than not.  Why do you want this instruction in?

12        MR. LEESMAN: Because we want to clarify that when

13   they're going to be responding to this, that they have to get

14   whatever is in the attorney file that's non-privileged.  They

15   have to produce the medical records from their doctor, but to

16   ask them to go out and, you know, do new tests or try to find

17   old records that are just not within their possession,

18   custody, and control, we think that that's a little much

19   especially when at the same time you have this kind of sort of

20   Damocles being held over the claimants in terms of, well, if

21   it's not complete and accurate, then bad things can happen to

22   their claim.

23        THE COURT: But I addressed this at the last hearing.

24   They have to do this for the trust distribution process

25   anyway.  They still have to prove their claim, somewhere.  So,

1    now they're doing it a little sooner than they would if the

2    plan were confirmed.  You know, it's not that - I can't see

3    that they're prejudiced.

4         MR. LEESMAN: I guess what we're looking for, Your

5    Honor, is just a clarification and confirmation that the

6    discovery rules saying that the party has to produce whatever

7    is in his or her possession, custody, and control, that's

8    consistent with this process that's happening here.

9         MR. BERNICK: Your Honor, the discovery rules say an

10   awful lot more than that, but rather than have an abstract

11   discussion about language that tries to define for purposes of

12   the entire questionnaire what they're supposed to do and what

13   they're not supposed to do, we should go back to, as Ms.

14   Harding indicated, we hashed this out, line by line, question

15   by question the last time.

16        THE COURT: Yeah.  Let me stop it, Mr. Bernick.  I do

17   not think that this sentence - that this paragraph is

18   necessary.  To the extent that the people have lawyers, their

19   lawyers are going to advise them about what they need to do if

20   they don't have the documentation at hand, and to the extent

21   that they don't probably the Committee is going to get a call,

22   and you'll advise them about what they need to do if anything

23   with documentation at hand.  Obviously they don't need to go

24   create anything.  By the same token, if they don't have

25   current x-rays, for example, but think they have an asbestos

1    disease and want to get a current x-ray, this language

2    essentially is telling them not to do it, whereas, they may

3    want to do it.  So, I'm not sure that they should be

4    prohibited from doing that if in fact they can prove a claim

5    against Grace.

6            MR. BERNICK: We didn't see our language as

7    prohibiting.  We understand what Your Honor is saying, but we

8    think just to make it consistent with the discovery rules and

9    the discovery process, that's important language to have.

10           THE COURT: I think they can - if they want

11   information about the discovery rules and process, they can

12   look up the Rules of Civil Procedure and that will inform them

13   about what they have to do.  All right, this won't go in.

14           MR. BERNICK: Okay.  Your Honor, we'll tender up in

15   just a moment here a conforming copy of the questionnaire

16   reflecting - We'll obviously give it to counsel.  I'd just

17   like to address the CMO very briefly so Mr. Lockwood can - I

18   want to make sure that you have an opportunity to respond

19   fully.  First, on the reply, the question of a reply brief,

20   we're not seeking a blanket rule that says we get to have a

21   reply brief for everything.  The specific reference in the CMO

22   in this case is for a reply brief on the Dalbert issue, and

23   that's a brief that we think would be very important here.  We

24   will obviously follow Your Honor's guidance that we shouldn't

25   simply be rearguing things that are in the initial brief, but

1   that's likely to be a very significant issue and reply briefs

2   have been filed maybe to frequently, but they certainly have

3   been filed frequently in this case to somehow to rule in

4   advance says there can't be a reply brief in context of the

5   Dalbert issue, we think unfairly singles that out.

6        THE COURT: All right, that's fine.  I'll take a

7   reply brief on that issue, and a sur-reply brief on that issue

8   without further order but limited to five pages each.

9        MR. BERNICK: Fine.  With respect to two depositions

10  versus sequencing, I don't want to prolong the day by having a

11  long discussion about what the sequencing rules really should

12  be and who carries the burden of proof on what issue.  We'll

13  just take out a reference to a single deposition so that - I

14  mean, that was something the claimants wanted, was only one

15  deposition and at that point we didn't want sequencing.  If

16  Mr. Lockwood says that he would rather have more than one

17  deposition, rather than arguing about sequencing, we're happy

18  to go that way too.

19       THE COURT: Okay, but why don't we just start with

20  the debtors?  I mean, if the debtors' experts in fact have a

21  position that everybody else supports, and which, you know,

22  isn't totally out of the question, it may happen, then we

23  don't need to go through the rest of this.  Why don't we start

24  with the debtors' expert.

25       MR. BERNICK: I don't have a problem with that, but

1    what typically happens though in these cases, and we've been

2    through this many, many times before.  It's not just these

3    cases.  It's litigation generally, is the first expert to go,

4    particularly if you've had all reports done before you have

5    the depositions, the first expert says something in his

6    deposition, and then lo and behold, shock of shocks, the

7    expert who was responsive comes back and says, Why, I've done

8    a little bit more work to see if what you said in your first

9    deposition is accurate or not, and here's what I have to say.

10   So if you mix that together with the sequencing, the net

11   effect is that their guy gets to do more work after our guy,

12   and then we can't come back and respond.

13          THE COURT: Kind of like filing a reply brief?

14          MR. BERNICK: Yes, it's kind of like filing a reply

15   brief.

16          THE COURT: So do a supplemental deposition of the

17   debtor.  Start with the debtors.  Do everybody else's and then

18   do a supplemental of the debtors.

19          MR. BERNICK: That's fine.  Then with respect to the

20   question of timing, and I know - I think that takes care of

21   the CMO itself, but I think that it's important to focus a

22   little bit on the statements that were made concerning timing.

23   We have to able to rely upon dealing with the bodily injury or

24   Personal Injury Committee in this case, and we sat down very

25   specifically, we made proposals for how long it should take,

1    and then we had a meeting, and in that meeting, as Mr.

2    Lockwood, Im sure, will confirm, each one of us went through

3    and said, Okay, if the Committee has its way on what the

4    questionnaire should be or what the form should be, how long

5    will it take for the debtor to kind of go through the

6    schedule, and we said, Okay, here's what it is.  You know, I

7    turned around and said the same thing, I said, Well, gee -

8    maybe it was Mr. Inselbuch, I said, how long will it take -

9    and Mr. Finch was there, if we get our way, and he said, Well,

10   gee, that's a fair question, and we both agreed that neither

11   one of us would question what the other one said.  That is,

12   how long it would take if their agenda actually were worked

13   out by the Court.  And it was at that time that they told us

14   it would take four months.  And they had the opportunity the

15   last time we were here, which was after those meetings had

16   taken place, to call that into question and they did not.  It

17   suited their purposes at that time.  Now, if in fact it's

18   going to take - now I'll say, Oh, it's going to take longer

19   and I want to put in a mark here and it may be extended.  I'll

20   give them five months, but what we should not have is the

21   uncertainty that says that people are already laying down

22   markers that the deadlines that we're setting today are not

23   meaningful deadlines.  Whatever they are, they should be set,

24   and we shouldn't have to go back and forth and say, Well, now,

25   maybe individual claimants - because I know what's going to

1   happen.  They'll show up with, you know, x-law firm or y-law

2   firm saying these things are absurd.  We can't complete them,

3   et cetera, et cetera.  We got a deal which relied upon the

4   Committee.  If they want the five months, give them five

5   months.  We'll switch the schedule back a month, but they

6   ought to produce these materials on time.  They then said,

7   Well, gee, we're kind of skeptical that Rust can really

8   accomplish analyzing all this information.  There's going to

9   be 125,000 boxes of information.  I'm sorry.  We can't do

10  business in that way.  We don't want a situation where we get

11  the invitation to go into the depository and find out all that

12  the Weitz & Luxumberg (phonetical) firm knows about W.R.

13  Grace.  The whole point here is to get questionnaires that are

14  filled out and the information provided in support of claims.

15  And it's not enough to simply say, go take a look at my

16  depository.  They've got to give us the documents according to

17  the claims.  And this is not burdensome.  Why is it not

18  burdensome?  It's exactly the same burden that's contemplated

19  by the rules and they've been at this, Your Honor, for four

20  years.  They've been litigating these cases down to the nines.

21  Presumably most of them have already been paid out.  So they

22  should already have this information.  Let's get the schedule

23  put in place.  If they want an extra month, that's fine, but

24  what bothers me a little bit, is that we really see - what we

25  really kind of hear is the marker's being laid out that, Well,

1   all this is going to really become delayed and it's going to

2   take an awful lot longer, et cetera, et cetera, and that

3   brings me, I have to respond to the comment about how Grace is

4   waiting for Congress.  Grace is not waiting for Congress.  We

5   have been actively pressing this case for the better part of

6   four years.  There is not one period of time when we haven't

7   been in often fruitlessly asking to get these very issues

8   pressed.  And what happened was that Judge Wolin decided that

9   the personal injury issues would be put to the end.  Why?  It

10  was very simple.  USG and Grace were the two companies that

11  stood by the idea that these claims should be questioned, that

12  there was equity left to be had.  So what Judge Wolin did is

13  he prioritized the cases where there wasn't equity at issue,

14  and where people weren't questioning the scope of the

15  liability.  He specifically did that.  But he did contemplate

16  that there would finally come a time when the other cases were

17  done and Grace and USG would have the opportunity to find out

18  what the liabilities were.  What the claimants seem to be

19  doing in this case is saying, No, no, no.  We're going to keep

20  on pushing this off so that we can get the Owens Corning

21  decision, the Federal Mogul decision, this decision, and that

22  decision, in context where liability is really not being gone

23  into in the same way, so we can come back and tell Your Honor,

24  look at all these other cases where this is not being done.

25  Not even Judge Wolin contemplated that.  The time has come to

1   get this information to get it promptly.  We're being put

2   under pressure of exclusivity.  There ought to be a parallel

3   pressure that says, Get this work done with.

4           THE COURT: All right.

5           MR. BERNICK:  So, we're not waiting for Congress, we

6   just want the information.

7           THE COURT: I have a suggestion and on the

8   instruction form, because I agree that there should not be

9   slippage in this order, but maybe we'd better advise people

10  that there won't be slippage in the discovery orders.  So

11  perhaps it should say something like, you know, If you have

12  any questions about your obligations consult the lawyer,

13  because the Court has fixed deadlines by which this

14  information must be submitted.  Something along those lines to

15  make it clear that I'm not going to extend discovery for

16  claimants who decide at the last minute that they're not going

17  to take an action and then get counsel.  Although I don't

18  really think that's the issue.  I think the issue is wether or

19  not the firms who have lots of clients will be able to get

20  substantial compliance, but for the most part, they're

21  probably big boys and they know how to file a motion to extend

22  time if they need it.

23          UNIDENTIFIED SPEAKER:  Your Honor -

24          MR. BERNICK: And they also know - I'm sorry - They

25  also know how to file claims. They filed claims on behalf of

1    these people against the trusts all the time.

2         MR. LOCKWOOD: If Mr. Bernick is finished testifying,

3    could I speak, Your Honor.  First I move to strike virtually

4    everything he said on grounds of he's incompetent to testify,

5    but he has no more knowledge of how many of these cases have

6    been brought to trial by other lawyers against other

7    defendants, how often the plaintiffs do -

8         THE COURT: Mr. Lockwood, frankly -

9         MR. LOCKWOOD:  - and he sits there and he spouts

10   stuff off because it sounds good.

11        THE COURT: Mr. Lockwood, please.  It's very late.

12   I'm very tired.  I really don't want the vituperative

13   comments.  I'm just going to leave if that's what we're taking

14   up.  So, let me assure you, I'm not taking any of those

15   comments to heart.  I understand the spirit in which they're

16   said.  Let's get to the end of this.

17        MR. LOCKWOOD: Okay, then the reason for the

18   bookmarks, Your Honor, is because - We're a statutory

19   committee, okay?  We don't represent a single individual

20   claimant.

21        THE COURT: I know you don't, but I -

22        MR. LOCKWOOD: These questions -

23        THE COURT: But I control the scope of discovery in

24   issues that are going to be before me.  I want a reasonable

25   period of time.  I don't expect to be extending discovery

1    willy nilly.  If somebody gives me a good reason, I've done it

2    in the past.  I'll probably do it in the future.

3              MR. LOCKWOOD: That's all we're saying, Your Honor,

4    is we don't know.  Mr. Bernick says, Oh, well, let's make it

5    five months.  As far as I know, they will get it all in in

6    four months.  I'm just saying, that there's a lot of different

7    fact patterns out there with different law firms with

8    different client loads and different stages of trial

9    preparation.

10             THE COURT: You won.

11             MR. LOCKWOOD: And -

12             THE COURT: Okay, you won.

13             MR. LOCKWOOD: The second thing is about the Rust,

14   the two-month period for Rust.  That's their guy.

15             THE COURT: Yes.

16             MR. LOCKWOOD: He's not my guy.

17             THE COURT: I understand.

18             MR. LOCKWOOD: I'm saying I don't think their guy can

19   do it in two months.  If they're right, they can, but this

20   business about don't send me to a depository or something like

21   that, Mr. Bernick has asked for the documents.  He's going to

22   get documents for each one of a 125,000 claimants.  Some of

23   the documents may - he wants deposition transcripts.  You

24   don't have to produce.  If you've got 2,000 claimants and

25   you're relying on one co-worker deposition to identify stuff

1    at a product ID at a site where fifty claimants worked, you

2    don't have to put in fifty deposition transcripts. You can

3    say, See the deposition transcript attached to claimant number

4    1.  That's okay by the rules that he's fond of -

5        THE COURT: Mr. Lockwood, I understand.  I don't need

6    a lecture on how the rules -

7        MR. LOCKWOOD: Okay, well, I just wanted - He seemed

8    to feel that when I put down the practical problems and

9    described them that somehow or another I was proposing to

10   change the way the rules worked in litigation which he is so

11   fond of describing himself as an expert in, and all I'm trying

12   to say is, I'm just telling you we don't know these things.

13   We're doubtful that a lot of stuff can be done, but we

14   understand.  You play by the rules.  But again, the rules as

15   they apply in a bankruptcy case to an aggregate estimation not

16   the rules that would necessarily apply if Your Honor was

17   setting a case management order that says, We're going to try

18   your individual asbestos case on the 14th of December, 2006.

19       THE COURT: Yes, you won that issue an hour ago.

20   Good afternoon.

21       MR. COHN: Good evening, Your Honor.  Jacob Cohn for

22   Federal Insurance Company.  I don't want to make this any

23   longer than it already is.  We, the insurers have been working

24   as part of the CMO.  We addressed some of our issues with the

25   debtor.  There are two issues that involve access to highly

1    relevant information that I hope are basically housekeeping

2    issues.  Number one, is access of the insurers or other

3    parties that don't already have access to Sealed Air materials

4    that people have been alluding to discovery from Sealed Air,

5    an adversary proceeding that bears upon the estimation

6    proceeding that's taking place now, and number two, at this

7    point is access to the exhibits to the 2019 statements of the

8    PI claimants' attorneys that have a body of information that

9    is relevant to this proceeding.

10           THE COURT: Well, with respect to Sealed Air, I

11   haven't heard anybody asking for those, so I don't know what

12   that's about.  With respect to the 2019 statements I thought I

13   put them under seal subject to motions to be released when

14   parties show case for getting that access.

15           MR. COHN: Well, I was wondering then if we can't get

16   that ruled upon on oral motion.  May we have leave, please, to

17   file on shorter notice to get it on the September omnibus?

18           THE COURT: Sure.  You can put it on the September

19   omnibus.  And if it's not contested that's one thing.  If it

20   is contested then - and I don't know.  Have you talked to

21   people?

22           MR. COHN: We have raised it with all the

23   constituencies.  I didn't hear any push-back and I've had some

24   further discussion with debtor's counsel.  I understand don't

25   have a problem with our having access to this information.

1         THE COURT: Well, file a motion -

2         MR. BERNICK: Which information though. Is this the

3    2019 or the Sealed Air.

4         MR. COHN: 2019.

5         THE COURT: On the 2019, I think you should file a

6    motion because individual attorneys who filed those statements

7    may have some objection whether or not the parties do.  So

8    you're going to have to make service.

9         MR. COHN: Okay.  And the Sealed Air there are

10   depositions of people who have had referred to having to do

11   with the historic practices of Grace and other things.  I just

12   don't know what they are, but they have been alluded to, and I

13   don't have access to and I asked some of the official

14   committees that didn't have any -

15        MR. BERNICK: I would suggest that this be put over

16   to the next time.  The Sealed Air discovery went into some

17   factual materials, but also went into a lot of material as to

18   which the debtor claimed were product, and we lost those

19   determinations but we lost them in connection with the

20   fraudulent conveyance case, and we would want to probably

21   visit on some specific categories that we believe are

22   privileged and not be a subject of discovery from other

23   parties, and we, therefore, would want to have this taken up

24   next time.

25        THE COURT: All right, with respect to Sealed Air,

1    why don't you meet and confer with the parties and see if you

2    can't do it by some agreement, you know, subject to a

3    confidentiality order, and if you can't then file an

4    appropriate motion, but you may be able to resolve that.  On

5    the 2019 statement, though, you've got to make notice on the

6    entities whose statements you want to see.

7         MR. COHN: Okay.  All right, thank you, Your Honor.

8    We'll will try to get something on file this week.

9         THE COURT: All right.

10        MS. WARREN: Your Honor, Mary Warren for London

11   Market Insurers.  I assure you I'm the caboose speaker of the

12   day, and I think maybe Mr. Bernick was a little premature in

13   saying the CMO is done with.  We did file a limited objection

14   to it and over the course of the day in discussions, almost

15   all of our issues have been resolved.  So there's really one

16   thing I want to bring up other than what Your Honor's heard

17   before which is our reservation of rights.  It's a subject

18   matter jurisdiction in insurance neutrality.  The one issue

19   with the case management order that we think would be helpful

20   for everyone is to insert provisions that provide for

21   rebuttal.  There's nothing in this case management order right

22   now that provides for rebuttal expert reports.  The Federal

23   Rules of Bankruptcy Procedures specifically 7026, provide for

24   rebuttal.  We think that this would impose some order and

25   efficiency on the CMO.  We did raise this with debtor's

1    counsel.  I believe they're not opposed to it in principle, it

2    was just a matter of adding some extra time onto the schedule.

3    We think that you could put a rebuttal period for discovery at

4    the end of the supplemental period in the CMO, and they have

5    maybe a few weeks at the most.  The way this is drafted now,

6    there's a provision for initial expert reports and

7    supplementation of expert reports, and the waste this will

8    lead to, we think is a serious concern.  Say we, the London

9    Market, don't know all the expert reports that the debtor's

10   going to put in.  There's a provision in the CMO for

11   identifying categories of expert reports, but that could be

12   extremely vague.  Someone could say, I'm going to submit X -

13   Joe Blow is going to submit a report on medical causation -

14         THE COURT: I don't have any problem with rebuttal

15   reports, if that's how you want to do it.  I actually thought

16   that was the purpose of the supplementals.  Maybe it isn't,

17   but that's what I thought the purpose of the supplemental was.

18         MS. WARREN: I asked about that, Your Honor, and the

19   answer was no.

20         THE COURT: All right, well -

21         MS. WARREN: But like I said, I don't think that

22   there's any -

23         MR. LOCKWOOD: The ACC was under the impression that

24   supplementals were the equivalent of rebuttal.  If that's a

25   problem then maybe we ought to have a further discussion of it

1    in front of the Court.

2        MS. WARREN: Well, let's put the word "rebuttal" in

3    here and bring it up for the next time.

4        MR. BERNICK: The difficulty with rebuttal is that if

5    you call it rebuttal then everyone ends up debating whether

6    it's proper rebuttal or not.  Inevitably, there's going to be

7    a back and forth, and I agree with Mr. Lockwood.  That was the

8    whole purpose of having supplemental depositions, is to pick

9    up anything whether you want to call it rebuttal or you want

10   to call it, you know, something that - somebody thought of

11   that after the fact.  You have an opportunity to -

12       THE COURT: That's fine.

13       MR. BERNICK: It's like cleanup.

14       THE COURT: If that's - as long as supplemental

15   includes rebuttal reports, I think it's broad enough.  You can

16   use that, you know, in your own analysis use the term

17   "rebuttal", but it seems to me that that was the purpose for

18   the supplementals in the first place.

19       MS. WARREN: Well, then, Your Honor, that's fine.

20   We'll just make it explicit.  Instead of supplemental say

21   supplemental or rebuttal reports.

22       THE COURT: All right.

23       MS. WARREN: Put that language in the report.

24       THE COURT: That's fine.

25       MS. WARREN: Thank you very much.

1        MR. BERNICK: If I could just add then, what is it

2   being - are the insurers contemplating having experts in

3   rebuttal?  Because if the insurers have specific expert

4   rebuttal that's intended here, it would certainly expedite the

5   process to know about that.  If they're saying that, Gee, as a

6   matter of good housekeeping, we should have rebuttal, I'll

7   understand that too, but I'm a little bit curious.

8        MS. WARREN: Your Honor, that's a fascinating

9   question considering that we were just sort of dragged into

10  this party a couple of months ago.  We've never seen any

11  claims history information from the debtor.  We've never seen

12  any claims settlement information.  We're not going to get the

13  navigable data base with questionnaire results until next

14  March.  Your Honor, we are not in a position to answer that

15  question.  I think it's rather remarkable that Mr. Bernick is

16  even asking that.

17       THE COURT: Well, I mean, to have a rebuttal report

18  that generally means that you have to have a witness because

19  otherwise you don't have a rebuttal report, so I guess you'll

20  find out whether you're having -

21       MS. WARREN: Right.  I mean, we'll see what their

22  witnesses are.  We'll see if we need to rebut.

23       THE COURT: All right.

24       MS. WARREN: Thank you.

25       THE COURT: Okay, what else?

1      MR. BERNICK: I don't believe that there is anything

2   else.  We're trying to mark up the CMO right here, Your Honor.

3   Could you give us maybe five minutes, Your Honor, maybe we can

4   tender up the questionnaire and the CMO.

5      THE COURT: Are you going to get this agreed upon?

6      MR. BERNICK: That's the idea.

7      THE COURT: Okay, then, let's close the record.

8   Frankly, folks, I would like to leave.  I have an appointment

9   with my daughter who just started college that I'm already

10   late for, so I would sort of like to be out of here.  Can you

11   just leave it, and I will get it signed and docketed tomorrow.

12      MR. BERNICK: That's fine.  We appreciate your

13   patience this afternoon, Your Honor.

14      THE COURT: All right, thank you.  We're adjourned.

15      ALL: Thank you, Your Honor.

16      (Whereupon at 6:28 p.m. the hearing in this matter

17   was concluded for this date.)

18

19      I, Elaine M. Ryan, approved transcriber for the

20   United States Courts, certify that the foregoing is a correct

21   transcript from the electronic sound recording of the

22   proceedings in the above-entitled matter.

23

24   /s/ Elaine M. Ryan                    9/6/05
     Elaine M. Ryan
     2801 Faulkland Road
     Wilmington, DE 19808
     (302) 683-0221