## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **W. R. GRACE & CO.,** *et al.,* | ) | **Case No. 01-1139 (JKF)** |
| | ) | **(Jointly Administered)** |
| **Debtors.** | ) | |

## DEBTORS' EMERGENCY MOTION FOR LEAVE
## TO TAKE DISCOVERY OF CLAIMANTS' ATTORNEYS

KIRKLAND & ELLIS LLP

David M. Bernick
Jonathan Friedland
Salvatore Bianca
200 East Randolph Drive
Chicago, IL 60601
Telephone:    (312) 861-2000
Facsimile:    (312) 861-2200

KIRKLAND & ELLIS LLP

Barbara Harding
Brian T. Stansbury
Amanda C. Basta (admission *pro hac vice* pending)
655 Fifteenth Street, NW
Washington, D.C. 20005
Telephone:    (202) 879-5000
Facsimile:    (202) 879-5200

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.

Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Fl.
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400

Dated: September 9, 2005

Co-Counsel for the Debtors and
Debtors in Possession

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................. 1

FACTUAL BACKGROUND .................................................................................................. 2

I.    The Court Is Well Aware of the Factual Predicate That Forms the Basis for this
      Motion for Discovery from the Claimants' Lawyers ............................................................ 2

II.   New Evidence of Suspicious Practices Continues to Emerge ............................................. 4

      A.    Grand Jury Investigation of Possible Criminal Conduct and Congressional
            Investigation ........................................................................................................... 4

      B.    Grace's Preliminary Investigation of Its Claims Continues to Uncover
            Further Evidence of an Overlap with the Doctors and Lawyers and
            Unprofessional Practices Responsible for the Baseless Silica Claims .................. 6

            1.    Silica/Asbestos Retread Claims Are Unreliable or Fraudulent on
                  Their Face and Are Present in Grace Claims. ............................................... 6

            2.    Grace Continues to Uncover Inadequate Occupational and
                  Exposure Histories for Claimants -- Precisely Like Those
                  Criticized by Judge Jack .............................................................................. 10

DISCUSSION ..................................................................................................................... 13

I.    The Evidence Sought By Debtors Is Critical to the Estimation Process ........................... 13

II.   The Debtors Are Entitled to Take Discovery of the Claimants' Attorneys. ..................... 17

III.  The Discovery Sought by the Debtors Is Minimally Invasive. .......................................... 19

CONCLUSION ................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) .................................................................................................. 14

*In re Arthur Treacher's Franchisee Lit.*,
    92 F.R.D. 429 (E.D. Pa. 1981) .............................................................................. 18

*In re Federal-Mogul Global, Inc.*,
    Bankr. No. 01-10578(RTL) (D. Del. Aug. 19, 2005) ......................................... 14

*In re O'Dowd*,
    233 F.3d 197 (3d Cir. 2000) .................................................................................... 16

*In re Silica Prods. Liab. Lit.*,
    No. 1553 (S.D. Tex. Jun. 30, 2005) ............................................................. passim

*Integrated Solutions, Inc. v. Serv. Support Specialties, Inc.*,
    124 F.3d 487 (3d Cir. 1997) .................................................................................... 16

*Kaiser v. Mutual Life Ins. Co. of New York*,
    161 F.R.D. 378 (S.D. Ind. 1994) ............................................................................ 18

*U.S. v. Whiting Pools, Inc.*,
    462 U.S. 198 (1983) .................................................................................................. 16

*United Phosphorous, Ltd. v. Midland Fumigant, Inc.*,
    164 F.R.D. 245 (D. Kan. 1995) .............................................................................. 18

## Rules

Fed. R. Bankr. P. 7026 ......................................................................................................... 17

Fed. R. Bankr. P. 9014 ......................................................................................................... 17

Fed. R. Civ. P. 26(b)(1) ........................................................................................................ 17

Fed. R. Civ. P. 26(b)(3) ........................................................................................................ 18

Fed. R. Evid. 104(a) .............................................................................................................. 14

Fed. R. Evid. 702 ........................................................................................................... 10, 14

Fed. R. Evid. 703 ................................................................................................................... 14

K&E 10681910.10

**Other Authorities**

Dr. Paul Epstein, Senate Judiciary Committee Testimony,
Fed. Doc't Clearinghouse (Feb. 2, 2005) ........................................................................ 7

Glater, Jonathan D., *Lawyers Challenged on Asbestos*,
THE NEW YORK TIMES, Jul. 20, 2005 .............................................................................. 5

*In re Silica Prods. Liab. Lit.*
Tr. of Status Conference ..................................................................................................... 8

*In re Silica Prods. Liab. Lit.*
Tr. of Telephone Conference ............................................................................................. 5

Press Release, United States Chamber of Commerce,
Institute for Legal Reform (July 20, 2005) ...................................................................... 5

K&E 10681910.10

## INTRODUCTION

It is now virtually indisputable that the quality of the medical evidence submitted in support of large numbers of asbestos claims around the country is substandard and, in some cases, may be fraudulent. Front and center of this controversy are the relationships between and among the lawyers that file the claims, and the screening companies and doctors who provide "medical" evidence in support of those claims. Information about those relationships and the claims manufacturing process, however important, remains largely unknown. Although law firms and doctors currently are under investigation in courts and by at least one federal grand jury, no one has yet unraveled the web of relationships, transactions and incentives that have fueled the filing of junk asbestos claims. As recognized by this Court, that information typically will not be known by the claimants themselves and cannot be gleaned from the claims, but rather must be learned directly from the lawyers and the doctors involved in the filing of the claims. Such information has yet to be exposed to the light of day.

Against this backdrop, the Debtors file this emergency motion for leave to seek discovery of the attorneys who represent the claimants with personal injury asbestos claims against Grace. The Debtors intend to pursue two distinct avenues of discovery designed to ensure, at the bare minimum, disclosure of matters and evidence that are necessary to the Court's estimation of the personal injury ("PI") asbestos claims. First, the Debtors seek, with the Court's permission, to propound a short, two-page questionnaire (attached as Exhibit A) to all asbestos personal injury claimants' counsel in order to obtain basic information about the relationships between and among the attorneys, the doctors, screening companies and other persons who generated the data that provides the foundation for the nearly 118,000 current asbestos personal injury claims against Grace. Second, the Debtors intend to take immediate discovery via traditional means (depositions, and/or subpoenas duces tecum) from law firms that meet one of the following

criteria: (a) firms that have filed silica "retreads" against Grace as confirmed by a social security

number match; (b) firms that have filed silica "retreads" against Grace as confirmed by last

name, first name, and middle initial match; and (c) firms which were criticized by Judge Jack in

the Silica Opinion for having brought large numbers of "retread" silica/asbestos claims and who

now are before this Court with thousands of claims against Grace.[1]

## FACTUAL BACKGROUND

The factual predicate for the discovery sought is now well known to the Court.

Accordingly, the Debtors provide only a short summary of the relevant facts that previously have

been briefed. Additionally, new information about the extent and nature of the practices that

have resulted in the filing of baseless asbestos claims continues to emerge, as described below.

**I.     The Court Is Well Aware of the Factual Predicate That Forms the Basis for this Motion for Discovery from the Claimants' Lawyers**

It is universally recognized that the suspect practices recently detailed in the silica mass

tort litigation have infected asbestos litigation for over a decade. Indeed, Grace maintains that

the medically suspect and potentially fraudulent diagnosis and filing of asbestosis claims is the

very reason Grace has been forced to file for bankruptcy.[2] The pertinent facts surrounding the

asbestos claims debacle have been established in prior briefs by the Debtors and are as follows:

---

[1]    In total 18 law firms fit the above criteria. Those firms are: Alwyn Luckey; Baron and Budd; Campbell Cherry Harrison Davis Dove; Christopher M. Parks; Foster & Sear; Grenfell, Sledge & Stevens; Lanier Parker & Sullivan P.C.; Lanier & Wilson; Law Office of Joseph F. Bruegger; Morris & Sakalarios; Neegan & Bickham; Nix Law Firm; O'Quinn, Laminack, & Pirtle; Parker & Parks LLP; Reaud, Morgan & Quinn; Robins, Cloud, Greenwood & Lubel; Silber Pearlman; and The Eaves Law Firm.

[2]    Grace does not dispute that there are legitimate asbestos claims for which it is responsible. Rather, Grace maintains that it was forced into bankruptcy by the filing of massive numbers of baseless claims. The filing of the baseless claims eventually caused Grace to be unable to effectively manage claims. Prior to bankruptcy, although Grace maintained efforts to do so, the sheer number of claims made it virtually impossible to distinguish adequately between valid and invalid claims.

2

- It is known that mass x-ray screenings sponsored by a small number of law firms and screening companies lead to unreliable, invalid or fraudulent B-reading reports that form the basis of thousands of asbestosis claims.[3]

- It is known that pulmonary function tests ("PFTs") when not performed according to the proper standards are easily manipulated and unreliable.[4]

- It is known that the claim rates that are being experienced in asbestos litigation bear no rational relationship to either the actual incidence of asbestos-related diseases or the actual rate of past asbestos consumption.[5]

- It is known that previous audits of asbestos related claims have revealed the existence of massive problems.[6]

---

[3]  *See* W.R. Grace & Company's Informational Brief at 19, 21 (Docket No. 6) (Apr. 2, 2001); Debtors' Consolidated Reply in Support of Their Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Claim Forms with Respect to Asbestos Personal Injury Claims and Approval of Debtors' Combined Notice Program at 36 (Docket No. 1666) (Feb. 12, 2002); Memorandum of Points and Authorities in Support of W.R. Grace & Co.'s Motion to Approve PI CMO and Questionnaire at 7, 22 (Docket No. 8395) (May 10, 2005). *See* Exhibit B (attached).

Relevant portions of the cited briefings here and below have been attached for the Court's convenience.

[4]  *See* Debtors' Consolidated Reply in Support of Their Motion For Entry of Case Management Order, Establishment of a Bar Date, Approval of the Claim Forms, and Approval of the Notice Program at 53 (Docket No. 1106) (Nov. 9, 2001); Debtors' Consolidated Reply in Support of Their Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Claim Forms with Respect to Asbestos Personal Injury Claims and Approval of Debtors' Combined Notice Program at 36, 39 (Docket No. 1666); Debtors' Motion for Entry of a Case Management Order Establishing Protocols for Litigating Asbestos-Related Claims Following Plan Confirmation at 18, 22 and 25 (Docket No. 6898) (Nov. 13, 2004); Memorandum of Points and Authorities in Support of W.R. Grace & Co.'s Motion to Approve PI CMO and Questionnaire at 24-26 (Docket No. 8395) (May 10, 2005); Debtors' Status Report Regarding Motion to Approve Asbestos PI Estimation CMO and Questionnaire at 25 (Docket No. 8994) (Jul. 13, 2005). *See* Exhibit C (attached).

[5]  *See* W.R. Grace & Company's Informational Brief at 2, 37 (Docket No. 6) (Apr. 2, 2001); Debtors' Memorandum in Support of Motion for Entry of Case Management Order, Motion to Establish Bar Date, Motion to Approve Claim Forms, and Motion to Approve Notice Program at 13-15 (Docket No. 537) (Jun. 27, 2001). Debtors' Consolidated Reply in Support of Their Motion For Entry of Case Management Order, Establishment of a Bar Date, Approval of the Claim Forms, and Approval of the Notice Program at 7-10 (Docket No. 1106) (Nov. 9, 2001); Debtors' Consolidated Reply in Support of Their Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Claim Forms with Respect to Asbestos Personal Injury Claims and Approval of Debtors' Combined Notice Program at 8, 12 (Docket No. 1666); Debtors' Motion for Entry of an Order Seeking the Estimation of Asbestos Claims and Certain Related Relief at 15-17 (Docket No. 6899) (Nov. 13, 2004); Memorandum of Points and Authorities in Support of W.R. Grace & Co.'s Motion to Approve PI CMO and Questionnaire at 9-10, 13-15, 17-18, 32, 37-39 (Docket No. 8395) (May 10, 2005). *See* Exhibit D (attached).

[6]  *See* Debtors' Consolidated Reply in Support of Their Motion For Entry of Case Management Order, Establishment of a Bar Date, Approval of the Claim Forms, and Approval of the Notice Program at 11 (Docket No. 1106) (Nov. 9, 2001); Debtors' Motion for Entry of an Order Seeking the Estimation of Asbestos Claims and Certain Related Relief at 18-21 (Docket No. 6899) (Nov. 13, 2004); Memorandum of Points and Authorities in (Continued...)

3

- It is known that in the *In re Silica Products Liability Litigation*, federal District Court Judge Janice Graham Jack investigated the foundation for 10,000 silicosis diagnoses and found "great red flags of fraud" perpetrated by the lawyers, doctors and screening companies who generated those diagnoses, as well as related asbestosis diagnoses.[7]

- And, it is now known that a large portion of the asbestos claims brought against Grace, the very claims that will form the basis for this Court's estimation, are founded upon the same unreliable medical and exposure data.[8] Indeed, the same doctors that supported the baseless silica claims are the same doctors who support thousands of Grace claims. And the same lawyers who filed the bogus silica claims are the same lawyers who have filed asbestos claims against Grace.

## II.    New Evidence of Suspicious Practices Continues to Emerge

Evidence continues to mount revealing the unreliable diagnostic methods employed by doctors and screening companies in asbestos and silica cases, either at the behest of or with the complicity of the plaintiffs' bar.

### A.    Grand Jury Investigation of Possible Criminal Conduct and Congressional Investigation

On July 20, 2005, *The New York Times* reported that federal prosecutors in Manhattan are investigating three plaintiffs' law firms in connection with various asbestos claims pending in the *G-1 Holdings* bankruptcy. Jonathan D. Glater, *Lawyers Challenged on Asbestos*, THE NEW

---

*(Continued)*
Support of W.R. Grace & Co.'s Motion to Approve PI CMO and Questionnaire at 4-5, 26-28, 43 (Docket No. 8395) (May 10, 2005). *See* Exhibit E (attached).

[7]    *See* Debtors' Status Report Regarding Motion to Approve Asbestos PI Estimation CMO and Questionnaire at 2-4, 16, 18-21 (Docket No. 8994) (Jul. 13, 2005). *See* Exhibit F (attached).

[8]    *See* Debtors' Consolidated Reply in Support of Their Motion For Entry of Case Management Order, Establishment of a Bar Date, Approval of the Claim Forms and Approval of the Notice Program at 41-54 (Docket No. 1106) (Nov. 9, 2001); Debtors' Consolidated Reply in Support of Their Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Claim Forms with Respect to Asbestos Personal Injury Claims and Approval of Debtors' Combined Notice Program at 25-41 (Docket No. 1666) (Feb. 12, 2002); Debtors' Motion for Entry of a Case Management Order Establishing Protocols for Litigating Asbestos-Related Claims Following Plan Confirmation at 5, 18-25, 26-29 (Docket No. 6898) (Nov. 13, 2004); Debtors' Motion for Entry of an Order Seeking the Estimation of Asbestos Claims and Certain Related Relief at 21-24 (Docket No. 6899) (Nov. 13, 2004); Memorandum of Points and Authorities in Support of W.R. Grace & Co.'s Motion to Approve PI CMO and Questionnaire at Tab 2, 38-43 (Docket No. 8395) (May 10, 2005). *See* Exhibit G (attached).

4

YORK TIMES, Jul. 20, 2005.  Notably, one of the three firms under investigation is a firm with known asbestos/silica "retreads" against Grace.  *See* Social Security Number Matched CMS Plaintiffs (attached as Exhibit H) (showing claimants from silica litigation with same social security number as a current Grace claimant).  Key to these investigations are interviews with former firm employees in which the employees "described coaching potential claimants and noted efforts *to influence doctors' diagnoses*."  Glater, *Lawyers Challenged on Asbestos*, THE NEW YORK TIMES, Jul. 20, 2005 (emphasis added).  Upon information and belief, a significant number of the litigants with claims against Grace are the same litigants with claims against G-1 Holdings.

The same prosecutors investigating G-1 Holdings' claims also are investigating the plaintiffs' lawyers' conduct during the Texas silica litigation, including the fact that "[s]ome of the same law firms that brought [silica] claims also brought asbestos claims, some of the doctors who diagnosed silica injury in claimants also diagnosed asbestos injury in claimants - and many of the same people claiming they were hurt by silica previously claimed they were harmed by asbestos."  *Id.*[9]  As described in previous briefs, many law firms with known "retreads" in the silica litigation currently represent litigants who have filed claims against Grace.[10]

---

[9]    Upon issuing her ruling, Judge Jack informed counsel that she had received an inquiry from "the head of the U.S. Attorney's Office in Corpus Christi," who asked "how he could get discovery in the [silica] case." *See In re Silica Prods. Liab. Lit.* Tr. of Telephone Conference at 3-4 (June 30, 2005) (attached as Exhibit I). Judge Jack explained that the U.S. Attorney in Corpus Christi was relaying a request his office had received from "the [U.S. Attorney for the] Southern District of Manhattan." *Id.*

[10]    *See* Exhibit F (Debtors' previous briefing).

Moreover, on July 20, 2005, the United States Chamber of Commerce Institute for Legal Reform ("ILR") issued a press release criticizing "the 'assembly line' processes used by plaintiffs' attorneys to screen plaintiffs for massive lawsuits targeting U.S. businesses." Press Release, United States Chamber of Commerce, Institute for Legal Reform (July 20, 2005) on file with author. The ILR criticized "[t]he model ... perfected in asbestos litigation" in which "plaintiffs' attorneys, working with a handful of doctors and screening companies, have created a business model for *manufacturing* mass tort claims." *Id.* (emphasis added). In response to the problem "ILR
(Continued...)

5

Moreover, on August 2, 2005, Congress, through the Energy and Commerce Committee and Oversight and Investigations Subcommittee, sent letters to the screening companies and doctors involved in the silica litigation requesting information relating to their specific roles in the silica litigation (including what law firms each has performed work for in silicosis cases, and whether the doctors and screening companies had retread asbestosis/silicosis diagnoses).[11]  The congressional investigation was sparked by Congress's concern "that individuals entrusted with the health care of patients may have corrupted basic principles or medical standards and practice in the service of litigation."  Exhibit J at 2; Exhibit K at 1.

## B.   Grace's Preliminary Investigation of Its Claims Continues to Uncover Further Evidence of an Overlap with the Doctors and Lawyers and Unprofessional Practices Responsible for the Baseless Silica Claims

Grace continues to uncover evidence of confirmed silica/asbestos retreads and lawyer-driven, as opposed to doctor-driven, occupational and exposure histories.

### 1.   Silica/Asbestos Retread Claims Are Unreliable or Fraudulent on Their Face and Are Present in Grace Claims

At the heart of the silica claims controversy before Judge Jack was the existence of thousands of known silica/asbestos "retread" claims. *See In re Silica Prods. Liab. Lit.*, No. 1553 (S.D. Tex. Jun. 30, 2005) ("Silica Order") at 135 (finding that presence of retreads rendered silicosis diagnoses "unsound"). A "retread" is a case in which a single claimant has brought both a claim for asbestosis and a claim for silicosis, often based on the same x-ray. *See, e.g.,* Silica

---

*(Continued)*
announced the creation of a medical database to help detect fraudulent screening practices, and analyze the relationship between the lawyers, doctors, and screeners involved in these cases." *Id.* In short, ILR is focusing on precisely the same types of information that Debtors seek here. The database, however, is not yet available.

[11]  See letters from Reps. Joe Barton and Ed Whitfield, Aug. 2, 2005, *available at* http://energycommerce.house.gov/108/News.08022005_1618print.htm and http://energycommerce.house.gov/108/News.08022005_1619print.htm (attached as Exhibits J and K).

Order at 85 (describing one retread plaintiff). Out of the approximately 10,000 silica plaintiffs in the Texas Silica MDL, *some 6,000 had previously brought claims for asbestosis. Id.* at 134. Judge Jack ultimately described the practice as the "opportunistic transformations of asbestosis reads into silicosis reads." *Id.* at 135.

As vast testimony both before Judge Jack and Congress has established, "in a clinical setting, 'confusion between silicosis and asbestosis *does not occur*.'" Silica Order at 61 (quoting Dr. David Weill, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 4 (Feb. 3, 2005)) (emphasis added); *see also* Dr. Paul Epstein, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 2 (Feb. 2, 2005) ("[T]he x-ray appearances of these two dust-related diseases [*i.e.*, silicosis and asbestosis] are vastly different."). Indeed, "the dual occurrence of asbestosis and silicosis is a clinical rarity." *Id.* at 62 (quoting Dr. Paul Epstein, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 3 (Feb. 2, 2005)). Despite this clinical rarity, it was established in the silica MDL that 6,000 of the MDL Plaintiffs previously had been diagnosed with asbestosis. *Id.* at 135. Dr. John Parker, the former head of NIOSH's B-reader program, called this occurrence "stunning and not scientifically plausible." *Id.* As a result, Judge Jack ultimately found that the existence of so many retreads "can only be explained as the product of bias -- that is, of [the doctors] finding evidence of the disease [they were] currently being paid (by lawyers) to find." *Id.* at 157 (parenthetics added).[12]

Moreover, the law firms representing the silicosis claimants are openly acknowledging what the doctors before Judge Jack attested to -- the retread claimants do not in fact have *both*

---

[12] Once confronted with a number of his thousands of silica/asbestos retread diagnoses, and the admonishment of the judge that he was indeed being accused of fraud, Dr. Ray Harron (one of the physicians who has "diagnosed" thousands of Grace claimants) was permitted leave to seek the guidance of counsel and ultimately did not retake the witness stand during the *Daubert* hearing in the Texas silica MDL. Silica Order at 89.

7

silicosis and asbestosis. *See In re Silica Prods. Liab. Lit.* Tr. of Status Conference at 62-64 (Aug. 22, 2005) ("Silica Tr.") (attached as Exhibit L). More importantly, in the cases where there are retreads, it is the asbestosis diagnoses that are coming under increasing fire. Indeed, as one attorney succinctly described the problem: "I think the explanation on a lot of the cases is *the asbestosis diagnosis* is wrong." *Id.* at 62-63 (emphasis added).

The following exchange, which took place in the Silica MDL, brings the problem into even sharper focus:

| | |
|---|---|
| Mr. Laminack: | All I know is at this point 87 of these *Alexander* plaintiffs have good, solid *Daubert*-proof diagnoses of silicosis. They've got it. |
| The Court: | And 70-some percent of those also had apparently solid *Daubert*-proof asbestosis diagnoses .... |
| Mr. Laminack: | I doubt that's true. |
| The Court: | About the asbestosis? |
| Mr. Laminack: | Yes .... As I say, your Honor, I doubt that. I doubt the numbers, and I doubt the diagnosis. |
| The Court: | You doubt that they had claims or *you doubt that they actually had asbestosis.* |
| Mr. Laminack: | *Both.* |

*Id.* at 64 (emphasis added). The impact of this admission is obvious. As Judge Jack pointed out, when claimants "made fraudulent claims in asbestosis and now those same people who made fraudulent claims are trying to make another pneumoconiosis claim ... that impacts their credulity tremendously." *Id.* at 63.

The prevalence of so many asbestos/silica retreads is easy to understand when one examines the conduct of the law firms bringing the retread claims. In 2001, law firms began to ask screening companies, who already had been conducting asbestos screenings for the firms, to screen people for silicosis. Silica Order at 66. Law firms provided the screening companies with "initial lists of people to be screened." *Id.* Those lists consisted of "the law firms' 'existing

8

inventory' of asbestos plaintiffs." *Id.*  Law firms also placed media advertisements seeking workers in various industries "to be screened for ASBESTOSIS, MESOTHELIOMA CANCER, LUNG CANCER, OR SILICOSIS." *Id.* (caps original).  Moreover, the evidence suggests that the law firms were so intent on generating claims that they influenced the diagnostic process itself. *Id.* at 74-76, 133-34.[13]

Grace recently has confirmed that retread claims, which were the subject of Judge Jack's scorching criticism, and which now appear to be the subject of federal grand jury and congressional investigation, are present in the Grace claims.  To date, Grace has been able to confirm, based upon very limited Social Security number information available to it at this time, that at least 76 current and past claims, brought by 18 different law firms, are retreads from claims brought in the Silica MDL.  However, based upon name comparisons of just 3,500 of the 10,000 silica plaintiffs, Grace has preliminarily confirmed 1,300-1,400 retread plaintiffs thus far. Remarkably, Grace's preliminary investigation has revealed that at least 5 of the silica plaintiffs, Donald Connell, Cora Lee Rogers, James Hyatt, Zettie Shields, and Effie Coleman, whose cases *were singled out by name in Judge Jack's opinion as invalid retread claims*, appear to have current claims against Grace.  *See* Silica Order at 83-84, 87-88, 104-05; *see also* Spreadsheets

---

[13]    For instance, Judge Jack criticized law firms for shopping x-rays to as many as four B-readers in order to obtain a positive diagnosis of silicosis. Silica Order. at 75-76. Judge Jack also noted that "without large numbers of positive diagnoses, the screening company would lose money or would lose the law firm account to a competitor." *Id.* at 133; *see also id.* at 134 ("While a B-reader/diagnosing doctor is essential to the screening process, the doctor is fungible, and if the ... law firm was unhappy with one doctor's rate of positive reads and/or diagnoses, then future business will go to another, more compliant doctor."). As Grace previously has noted, this practice has been suspected in asbestos claims as well. *See* Memorandum of Points and Authorities in Support of W.R. Grace & Co.'s Motion to Approve PI CMO and Questionnaire at 21 (Docket No. 8395) (May 10, 2005).

9

(attached as Exhibits M and N). The presence of these confirmed retreads alone suggests, at a bare minimum, that the original diagnoses of asbestosis are suspect.[14]

> **2.    Grace Continues to Uncover Inadequate Occupational and Exposure Histories for Claimants -- Precisely Like Those Criticized by Judge Jack**

Perhaps even more serious among the problems that Judge Jack recognized in the Texas Silica MDL is the absence of adequate occupational and exposure histories to support the diagnoses. Occupational and exposure histories are vital because, as Dr. Gary Friedman testified in the silica case, "infections and [a] host of different diseases" can look like pneumoconiosis (including silicosis and asbestosis) on an x-ray. Silica Order at 140. Therefore, a differential diagnosis is necessary to "rul[e] out the other potential causes of the radiographic findings." *Id.* at 55. As Dr. Jay Segarra, a doctor who diagnosed the single silica plaintiff whose diagnosis Judge Jack found satisfied the requirements of *Daubert* and Fed. R. Evid. 702, testified: "[G]enerally it is not appropriate for anyone other than the physician or an agent of the physician to take the exposure and past medical history." *Id.* at 51.

However, rather than the physician-directed and driven taking of occupational and work histories that is necessary for a diagnosis to satisfy the requirements of Fed. R. Evid. 702, "it is clear that the law firms, rather than any medical professionals, established the criteria for the screening company to use when taking the occupational history." *Id.* at 68. Indeed, "[t]he questions were not drafted by physicians, testifying or otherwise." *Id.* at 126. This failure to develop a proper occupational or exposure history clearly influenced the "diagnoses" that were ultimately rendered. In *In re Silica*, Dr. James Ballard (a doctor who has diagnosed a number of

---

[14]    Obviously, Grace reasonably suspects that it would be able to confirm hundreds if not thousands more retreads if the remaining silica plaintiffs' information were available to it.

the Grace claimants), testified that "either . . . the testing service *or the law firm* provided him

with the work history for the clients." *Id.* at 94 (emphasis added). Moreover, Dr. Ballard

testified that the work histories consisted of "a simple statement . . . that there is exposure history

that is consistent with asbestosis" and signaled to Dr. Ballard "that the lawyers and/or [screening

company] want[ed] [Dr. Ballard] to look for asbestosis." *Id.*[15]

The Silica Opinion makes clear the disastrous consequences caused by this inappropriate

intervention by the law firms:

> In almost all these cases, one vital requirement for the diagnosis ...
> the taking of occupational histories -- was performed, absent
> medical oversight, by the lawyers or their agents or contractors.
> More generally, the lawyers determined first what disease they
> would search for and then what criteria would be used for
> diagnosing that disease. The lawyers controlled what information
> reached the diagnosing physicians, [stymieing] the physician's
> normal ability to ask targeted follow-up questions and perform
> follow-up exams. The lawyers also controlled what information
> reached the patients, [stymieing] the patient's normal ability to
> learn from a medical professional details about their diagnosis,
> their prognosis, and what, if any, follow-up care they should
> receive.

Silica Order at 148.

---

[15] In the silica cases, law firms went so far as to provide the precise language that doctors used in rendering their diagnoses. Silica Order at 77. There is evidence suggesting that the same practice occurred in the diagnosis of the Grace claims. Dr. W. Allen Oaks and Dr. James W. Ballard, two of the physicians who testified in the Silica MDL, use identical diagnosing language in their diagnostic reports for Grace claimants despite the fact that their diagnoses were made some four years apart. The identical diagnostic language reads: "The above parenchymal changes are consistent with asbestosis provided the subject's exposure history and latency are appropriate." *See* Exhibit O (Oaks Diagnostic Reports) and Exhibit P (Ballard Diagnostic Reports).

Moreover, Dr. Ray Harron, who diagnosed thousands (if not tens of thousands) of Grace claimants made his diagnoses "to a reasonable degree of medical certainty." *See, e.g.,* Exhibit Q (Harron Diagnostic Reports). Such "diagnostic" language was heavily criticized by Judge Jack as being the result of "the mess that results when lawyers practice medicine and doctors practice law." Silica Order at 148. Indeed, the doctors themselves conceded that the language they chose reflected the fact that the phraseology was "a legal standard and not a real diagnosis." *Id.* at 149.

K&E 10681910.10

The Grace claims contain similar evidence of inadequate, non-physician conducted occupational and exposure histories. Dr. Ray Harron's diagnostic reports, a limited number of which are available to Grace, only include the most cursory mention of the claimants' occupational history. *See* Exhibit Q. In some cases, despite the diagnosis form having spaces for "Patient History" and "Examination," those spaces are completely blank. *Id.* at 1a-1b. Neither do Dr. Oaks' and Dr. Ballard's reports for Grace claimants make any reference to the claimants' occupational or exposure histories at all, merely stating that the claimants' chest x-ray is consistent with asbestosis *"**provided** that the subject's exposure history and latency are appropriate." See* Exhibits O and P (emphasis added). At the very least, it suggests that an exposure/occupational history, if taken at all, was taken by someone other than the diagnosing physicians and not provided to the diagnosing doctors. This lack of adequate exposure and occupational histories is critical in determining the validity and value of the claims because, as Judge Jack explained, "it is vitally important for a ***physician*** to take a thorough occupational/exposure history and medical history." Silica Order at 56-57 (emphasis added). Without those histories, the x-ray readings and corresponding asbestosis "diagnoses" are unreliable and the claims that are supported by them should receive little, if any, value in an estimation, if any, particularly when the suspect practices now are more thoroughly understood.

The presence of the same inadequate exposure histories, the same doctors and the same law firms is powerful evidence that the same malfeasance that occurred in the "diagnosis" of silica injuries also occurred during the "diagnosis" of asbestos-related disease. Indeed, the presence of so many of the same "great red flags of fraud" that were present in the silica litigation, in combination with all the previous evidence concerning the baseless nature of the underlying medical and exposure data in asbestos cases, makes it clear that further discovery is

12

necessary in this proceeding to determine how many of the asbestos personal injury claims filed against Grace are based on suspect practices that produce unreliable medical and exposure data. At the July 19, 2005, hearing, counsel for the PI Committee conceded that "95 percent or more" of the personal injury Grace claims could not be supported by the kind of independent and replicable evidence the Debtors argue is required by the Federal Rules of Evidence. Tr. of Hr'g at 210 (Jul. 19, 2005). As discussed below, the discovery sought is intended to lead to evidence that will demonstrate whether this forecast indeed is true, for if it is, that certainly is relevant evidence that should be considered in an estimation.

## DISCUSSION

As the Debtors will demonstrate below, discovery of the individual claimants' attorneys is necessary to the estimation proceedings in order to allow the Debtors to determine the extent to which asbestos personal injury claims are based on unreliable medical evidence or potentially fraudulent diagnoses. Moreover, such discovery is permissible under the Federal Rules of Bankruptcy Procedure and the Federal Rules of Civil Procedure. Finally, the Debtors have attempted to narrowly-tailor the proposed discovery in order to impose the fewest burdens on the claimants' counsel as possible.

**I.      The Evidence Sought By Debtors Is Critical to the Estimation Process**

Evidence of suspect practices and potential fraud is relevant to the estimation proceeding because the quality of the estimation performed by the Court will only be as good as the quality of information presented to the Court as to the value of the underlying claims. Claims that are based on unreliable and potentially fraudulent practices are entitled to little or no value in the estimation, particularly if it becomes apparent that entire blocks or categories of claims are wholly unsupportable by reliable medical evidence. Moreover, to the extent that the estimation

13

of current claims impacts the estimation of future claims, unsupported or fraudulent claims should be entitled to little to no weight in the estimation of those future claims. This is particularly true now when it finally appears that those practices are being investigated by courts and grand juries and, thus, are not likely to continue unabated as they have for the past decade. Allowing this discovery will enable Debtors to identify these little or no value claims and ensure that they are properly accounted for in any estimation.

As thoroughly discussed in prior pleadings, scientific and medical evidence is only admissible under the Federal Rules of Evidence and *Daubert* if it is based upon reliable scientific data and methods. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) (establishing that a federal judge "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable"). Because an estimation proceeding is governed by the Federal Rules of Evidence, the assessment of whether proffered scientific evidence is admissible under Fed. R. Evid. 702 and 703 in such a proceeding must include an analysis of the reliability standards established in *Daubert*. *See* Fed. R. Evid. 104(a); *Daubert*, 509 U.S. at 592-93; Tr. of Hr'g at 139 (Jan. 21, 2005). Information sought in the questionnaire is designed to lead to the discovery of information that will be central to determining the reliability, and thus the admissibility, of the medical evidence on which these claims are based -- claims that ultimately will form the basis of the Court's estimation.

The recent *In re Federal-Mogul Global, Inc.* (*"Federal-Mogul"*) decision highlights the absolute necessity of having the sort of information that the Debtors are seeking here available to experts who will be opining on current and future asbestos liability. In that case, the court recognized the existence of problems related to personal injury asbestos claims and indeed listed the factors cited by the Owens-Corning Court, including mass screenings and erroneous x-ray

14

readings. *In re Federal-Mogul Global, Inc.*, Bankr. No. 01-10578(RTL) (D. Del. Aug. 19, 2005) ("*Federal-Mogul Opinion*") at 58. However, the Court did not require an adjustment to the estimation, based on these factors, because, at least in part, "the record before [the Court] does not supply the factual support necessary to intelligently quantify their effect." *Id.*

The Debtors here are attempting to avoid that precise problem. They are seeking discovery intended to provide an ample factual record that will allow its experts and the Court to "quantify the effects" of the known problems in current asbestos claims. In so doing, the Debtors seek to ensure that the ultimate estimate of its present and future asbestos liability is based upon claims for real asbestos disease caused substantially by exposure to Grace products.

Because this information is critical to the Debtors' experts' ability to quantify the effect of the existence of unreliable and potential fraudulent medical and exposure data, the Debtors requested that the W.R. Grace Asbestos Personal Injury Questionnaire ("PI Questionnaire") include certain questions designed to elicit information about the "financial and social relationships" between the claimants' attorneys and the doctors and screening companies supporting asbestos personal injury claims. At that time the Court recognized that this was not information the claimants, who would be providing the information in the PI Questionnaire, were likely to possess. Tr. of Hr'g at 251 (Jul. 19, 2005). The Court, however, also appeared to recognize the interest the Debtors have in obtaining the information, and the potential relevance of such information to the estimation of the personal injury claims. Tr. of Hr'g at 191 (Jul. 19, 2005). And, importantly, the Court noted during the July 19 omnibus hearing that the claimants' attorneys are the entities best situated to provide the requested information. Tr. of Hr'g at 251 (Jul. 19, 2005).

15

Thus, because the Debtors were precluded from seeking the relevant information in the claimant questionnaire, the Debtors now request leave to serve a short, two-page questionnaire on all law firms who represent claimants with personal injury asbestos claims against Grace. The questionnaire is specifically directed at ferreting out patterns of questionable diagnostic practices by seeking information relating to direct or indirect financial relationships between the lawyers, screening companies, doctors or other law firms. The Debtors intend this questionnaire to serve as a precursor to traditional discovery -- but only if evidence suggestive of unreliable methodologies, possible fraud, or bias is uncovered. In addition to the questionnaire, the Debtors intend to seek immediate direct discovery of those eighteen firms who: (a) have filed silica "retreads" against Grace as confirmed by a Social Security number match; (b) have filed silica "retreads" against Grace as confirmed by last name, first name, and middle initial match; and (c) were criticized by Judge Jack in the Silica Opinion for having brought large numbers of retread silica/asbestos claims and who now are before this Court with thousands of claims against Grace. These firms all have documented retread claims. Because such claims, and the practices that lead to them, are suspect on their face, Grace will move forward expeditiously with this discovery of these specific firms. And as described above, the Debtors' experts will use the information gathered during this discovery, and the discovery provided by the Claimant Questionnaire, to aid in the quantification of the effect of unreliable medical data, exposure data, and, potentially, fraud, on the estimation of Grace's current and future liability.[16]

---

[16] The Debtors also are entitled to take this discovery pursuant to Federal Rule of Bankruptcy Procedure 2004 as any claim for civil fraud arising out of the filing of claims against Grace prior to Grace's bankruptcy petition would be an asset of the estate. *See In re O'Dowd*, 233 F.3d 197, 201 n.6 (3d Cir. 2000) (finding that malpractice claim that arose pre-petition was an asset of the estate); *Integrated Solutions, Inc. v. Serv. Support Specialties, Inc.*, 124 F.3d 487, 490 (3d Cir. 1997) ("The Bankruptcy Code defines a bankrupt's estate broadly to encompass all kinds of property, including intangibles and causes of action."); *see also U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n. 9 (1983).

16

## II.    The Debtors Are Entitled to Take Discovery of the Claimants' Attorneys

Under the Federal Rules of Bankruptcy Procedure and Federal Rules of Civil Procedure, and as explained in its Status Report Regarding Motion to Approve Asbestos PI Estimation CMO and Questionnaire, Debtors have a right to take discovery that is co-extensive with their right to take discovery had the same claims been brought in the typical litigation posture. *See* Fed. R. Civ. P. 26(b)(1); Fed. R. Bankr. P. 7026 and 9014. Indeed, the Court has recognized that discovery will provide "a much better basis for estimation of current claims and possibly future claims than anything else." Tr. of Hr'g. at 80 (Jun. 27, 2005). The only requirement that must be met is that the discovery be "relevant to the claim or defense of any party." Fed. R. Civ. P. 26(b)(1); Fed. R. Bankr. P. 7026. The information sought "need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1); *see also* Tr. of Hr'g at 173 (Jul. 19, 2005).

Here, discovery of attorneys is essential because, in this situation, the attorneys are the entities that are uniquely in possession of the relevant information. *See* Tr. of Hr'g at 191, 250-52 (Jul. 19, 2005). The claimants themselves are unlikely to possess the information concerning the financial relationships that exist between and among law firms, doctors and screening companies. Even the doctors and screening companies themselves would have no way to know if, or the extent to which, a law firm with which it was associated had established a network of relationships with other law firms, doctors, or screening companies. *Id.* at 251. Indeed, common sense dictates that the ***only*** sufficient source capable of providing information as to the full extent of the attorneys' pre-existing network of relationships with doctors, screening companies and even other law firms is the attorneys themselves. *Id.* at 250-52. As Judge Jack recognized, and the Debtors contend, it is these financial relationships, and not medicine or science, that

17

appear to drive the diagnoses of massive numbers of asbestos and silica claims. *See* Silica Order at 144, 148-150, 237.

Given these unique circumstances, the type of discovery requested is fully permissible under the Federal Rules of Civil Procedure. Critically, "[t]he [Federal] Rules do not grant a special privilege or immunity from discovery to parties' counsel." *Kaiser v. Mutual Life Ins. Co. of New York*, 161 F.R.D. 378, 381 (S.D. Ind. 1994). Indeed, "Federal Rule 26(b)(3) clearly contemplates discovery from attorneys as well as from the parties themselves or their agents." *United Phosphorous, Ltd. v. Midland Fumigant, Inc.*, 164 F.R.D. 245, 248 (D. Kan. 1995); *In re Arthur Treacher's Franchisee Lit.*, 92 F.R.D. 429, 437 (E.D. Pa. 1981) (the language of Rule 30 allows the deposition of "any person . . . includes an attorney for a party to the action"). Moreover, at least one court has characterized the idea that counsel might be exempt from discovery, including from the taking of depositions, as "inconceivable." *United Phosphorus*, 164 F.R.D. at 248. Thus, "[a]ttorneys with discoverable facts not protected by attorney-client privilege or work product are not exempt from being a source of discovery by virtue of their license to practice law or their employment by a party to represent them in litigation." *Id.*; *see also In re Arthur Treacher's Franchisee Lit.*, 92 F.R.D. at 437 ("The fact that the proposed deponent is an attorney for one of the parties in the case is *clearly not enough*, by itself, to justify granting in full the motion for a protective order [preventing the deposition.]") (emphasis added). Indeed, this Court has already corrected the PI Committee's misstatement of the law on this point at the July 19, 2005 hearing. *See* Tr. of Hr'g at 285-86 (Jul. 19, 2005) (Mr. Lockwood: "Your Honor, there's no provision in the Federal Rules for allowing discovery demands on a lawyer for a plaintiff."; The Court: "That's not so. I think you can get discovery."). Thus, although it may

18

be somewhat uncommon, discovery of lawyers is appropriate when the lawyers have information

that is relevant or calculated to lead to the discovery of admissible information -- as it is here.

**III.    The Discovery Sought by the Debtors Is Minimally Invasive**

In an effort to minimize the burdens placed on the parties and their attorneys by virtue of

this discovery, the present motion seeks permission only to serve the claimants' attorneys with a

two-page questionnaire that seeks basic information about potentially relevant financial

relationships.   The Debtors only intend to seek further discovery from attorneys under two

conditions: (i) if the law firm is one of eighteen law firms whose known practice of bringing

retread claims place the claims brought in this case at the highest risk of being substandard or

fraudulent, or (ii) if the law firm's answers to the questionnaire reveal the same patterns and

practices that call into question the veracity and reliability of the underlying medical and

exposure data supporting the claims. Thus, the overall burdens will be less than if Debtors seek

the full discovery to which they are entitled immediately.

Moreover, any burden imposed by the questionnaire is one that, as Judge Jack explained,

the claimants' counsel willingly accepted when bringing the cases:

> The attitude of the challenged diagnosing doctors towards [taking
> sufficient occupational and exposure histories] mirrored their
> overall attitude toward these diagnoses:   meeting this criterion
> correctly simply involved more work than they were willing to
> devote to the task . . . . *These are the same pleas the Court has
> heard repeatedly from the (plaintiffs') lawyers throughout this
> MDL.* But these doctors and Plaintiffs' lawyers are not innocent
> victims of overwhelming numbers. Hordes of Plaintiffs have not
> been thrust upon them against their will  .  .  . the attorneys
> undertook the burden of representing each one of them -- and the
> sheer volume of Plaintiffs does not mean that these professionals'
> obligations toward each Plaintiff has been lessened.

Silica Order at 142 (parenthetics and emphasis added).  Similarly, this Court should not permit

claimants' counsel to hide behind the sheer volume of cases that they willingly brought to avoid

19

their obligations under the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure in an attempt to: (i) conceal the suspect practices and relationships that appear to have generated thousands of unreliable and potentially baseless claims against the Debtors and (ii) prevent the Debtors from building a factual record that will permit the quantification of the impact of those claims on the estimation.

## CONCLUSION

The Debtors previously have documented the serious problems with the exposure and medical evidence underlying a large number of Grace asbestos personal injury claims. Now, preliminary evidence strongly suggests that the questionable attorney and doctor behavior identified by Judge Jack in the Silica MDL is also present in the claims before this Court. Grace is entitled to discovery of facts and information relating to these practices and behavior so that it can consider them in the estimation model it ultimately proposes. Such unreliable and potentially fraudulent practices are clearly relevant to, and indeed undermine, this Court's ability to estimate the Debtors' *actual* current asbestos personal injury liability. And, their presence in current Grace claims also is relevant to the estimation of future claims. The Debtors' requested discovery would allow suspect practices and potential fraud to be properly accounted for before it is permitted to infect and irreparably harm the estimation process. Whatever minimal burden these requests may generate is far outweighed by the Debtors', and the Court's, need for the information in this estimation proceeding.

20

For the foregoing reasons, the Debtors request that the Court grant this Motion and allow discovery of the claimants' attorneys to proceed in accordance with the procedures outlined in this motion.

Dated: September 9, 2005

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick
Jonathan Friedland
Salvatore Bianca
200 East Randolph Drive
Chicago, IL 60601
Telephone:    (312) 861-2000
Facsimile:    (312) 861-2200

KIRKLAND & ELLIS LLP
Barbara Harding
Brian T. Stansbury
Amanda C. Basta (admission *pro hac vice* pending)
655 Fifteenth Street, NW
Washington, D.C. 20005
Telephone:    (202) 879-5000
Facsimile:    (202) 879-5200

-and-

PACHULSKI, STANG, ZIEHL, YOUNG,
JONES & WEINTRAUB P.C.

Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession

21