# EXHIBIT "B"

Bench Filed
on 4/2/01

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (   ) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

## W.R. GRACE & COMPANY'S
## INFORMATIONAL BRIEF

KIRKLAND & ELLIS
David M. Bernick
James H.M. Sprayregen
Andrew R. Running
Christopher B. Sullivan
Douglas G. Smith
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000
(312) 861-2200 (fax)

PACHULSKI, STANG, ZIEHL,
YOUNG& JONES P.C.
Laura Davis Jones
919 North Market Street, 16th Floor
Wilmington, Delaware 19801
(302) 652-4100
(302) 652-4400 (fax)

– Co-Counsel for the Debtors and Debtors in Possession –

Dated: April 2, 2001

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

No. 6

Consequently, many current claimants are not and will never be sick.[40]

Nonetheless, such unimpaired claimants often receive compensation, depleting resources that would otherwise be available to compensate legitimate claims. As Justice Breyer recently summed up, "up to one-half of asbestos claims are now being filed by people who have little or no physical impairment. Many of these claims produce substantial payments (and substantial costs) even though the individual litigants will never become impaired."[41]

Mass screening programs have facilitated the filing of huge numbers of claims by those who are unimpaired.[42] As Judge Weinstein observed when presiding over the Johns-Manville bankruptcy, some plaintiffs' attorneys "have filed all of their cases without regard to

---

[40] See Christopher F. Edley, Jr. & Paul M. Weiler, *Asbestos: A Multi-Billion-Dollar Crisis*, 30 HARV. J. LEGIS. 383, 384 (1993) ("Tens of thousands of [the asbestos] claims have been made, many successfully, by individuals who are understandably worried about their exposure to asbestos but who are not now and never will be afflicted with disease."). *See also Asbestos Litigation Crisis in Federal and State Courts: Hearings Before the Subcommittee on Intellectual Property and Judicial Administration of the House Committee on the Judiciary*, 102d Cong., 1st & 2d Sess. 77, 94 (Oct. 24, 1991) (testimony of Professor Lester Brickman) (observing that in the *Cimino* case, of 2300 claimants who were re-examined by doctors for the defense, 50% showed no signs of asbestos exposure).

[41] *Amchem*, 521 U.S. at 629 (Breyer, J., concurring in part and dissenting in part) (quoting Christopher F. Edley, Jr. & Paul C. Weiler, *Asbestos: A Multi-Billion Dollar Crisis*, 30 HARV. J. LEGIS. 383, 384, 393 (1993)).

[42] *Asbestos Litigation Crisis in Federal and State Courts: Hearings Before the Subcommittee on Intellectual Property and Judicial Administration of the House Committee on the Judiciary*, 102d Cong., 1st & 2d Sess. 77, 100 (Oct. 24, 1991) (testimony of Professor Lester Brickman) ("[P]leural plaque claims account for approximately 80% of new asbestos claim filings and represent a substantial percentage of previously filed claims. The existence of tens of thousands of such claims is accounted for by mass screenings of industrial workers financed by plaintiffs' lawyers and usually done with the active assistance of local union officials. Often, mobile x-ray vans brought to plant sites are used for the screenings."); Peter H. Schuck, *The Worst Should Go First: Deferral Registries in Asbestos Litigation*, 15 HARV. J.L. & PUB. POL'Y 541, 564 (1992) ("Another probable reason for the large number of unimpaired claims relates to the practice of some labor unions and plaintiffs' lawyers who engage in aggressive claim-solicitation campaigns on a mass basis designed to multiply the number of filed cases, thereby increasing the pressure on defendants to settle cases wholesale.").

In another example, a federal district judge in Kansas found that medical screeners departed from accepted medical standards by diagnosing asbestos-related "injuries" that failed to meet minimum American Thoracic Society diagnostic criteria. As a result, the court concluded that "many, if not most" of the cases were "without merit."[47] *See also In re Hawaii Fed. Asbestos Cases*, 734 F. Supp. 1563, 1566 (D. Haw. 1990) (cases are often diagnosed based on "subjective declarations of shortness of breath, tiredness and general lassitude," rather than objectively observable clinical findings).

**B.    Litigating asbestos cases today: Litigation of claims no longer is a real alternative.**

The avalanche of claims precludes litigation on a case-by-case basis, and litigation of claims has imposed costs so high they make such litigation prohibitive. Even when claims are litigated, the outcomes are arbitrary, inconsistent, and driven by systemic weaknesses such as rampant forum shopping.

**1.    The backlog within the tort system precludes litigation on a case-by-case basis.**

As the Judicial Conference Report observed, "[i]t is unrealistic to believe that individual trials can provide relief."[48] This is because "[t]he local trial of an individual asbestos claim takes so long that trying each claim separately would require all the civil trial time for the

---

[47] *See Raymark Indus. v. Stemple*, 1990 WL 72588, at *2, *8, *22 (D. Kan. 1990). The court found that, despite the fact that the American Thoracic Society criteria for diagnosing asbestosis indicate "that a doctor should consider only fibrosis with a profusion of 1/1 or greater," the medical screeners reported that workers had asbestos-related "injuries" with only a 1/0 reading – a reading that has no clinical significance – on the International Labour Organization (ILO) scale. Overall, the court concluded that the screening program produced a "steady flow of faulty claims" and a "fraud on the court."

[48] REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 19 (Mar. 1991).

THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE CO., *et al.*, | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**DEBTORS' CONSOLIDATED REPLY IN SUPPORT OF THEIR
MOTION FOR ENTRY OF CASE MANAGEMENT ORDER,
ESTABLISHMENT OF A BAR DATE, APPROVAL OF THE CLAIM
FORMS WITH RESPECT TO ASBESTOS PERSONAL INJURY
CLAIMS AND APPROVAL OF DEBTORS' COMBINED NOTICE PROGRAM**

Dated: February 12, 2002

KIRKLAND & ELLIS
David M. Bernick
James H.M. Sprayregen
Andrew R. Running
Janet S. Baer
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000
(312) 861-2200 (fax)

PACHULSKI, STANG, ZIEHL, YOUNG
& JONES P.C.
Laura Davis Jones
David W. Carickhoff, Jr.
Hamid Rafatjoo
919 North Market Street, 16th Floor
Wilmington, Delaware 19801
(302) 652-4100
(302) 652-4400 (fax)

Co-Counsel for the Debtors and
Debtors in Possession

No. 1666

subjective speculation. *Daubert*, 509 U.S. at 590. The methodology must be real and it must produce consistent results, meaning, it must be reproducible. *See id.* at 590, n. 9. Even if a test is *generally* reliable, testing is inadmissible if performed in an unreliable manner. *See, e.g., Metropolitan St. Louis Equal Housing Opp'y Council v. Gordon Gundaker Real Estate Co.*, 130 F.Supp.2d 1074, 1082-83 (E.D. Mo. 2001) (excluding expert testimony based on flawed testing protocols).

In the asbestos context, data from two types of test results, while widely used to support mass claim filings, can be unreliable, manipulable and not reproducible: (1) ILO scores — which are based on subjective interpretations of lung x-rays — have been shown to be highly unreliable unless independent doctors make multiple corroborative readings, and (2) lung function testing, known as a pulmonary function test ("PFT"), is highly manipulable and must be reproduced in accordance with defined procedures before a claimant can be deemed to have a real impairment. While these tests can be scientifically valid when performed in accordance with recognized procedures and standards, they are invalid if those procedures and standards are not followed. In the latter case, such test data will lack sufficient reliability, reproducibility and scientific validity to be admissible under *Daubert*.

This is not merely an academic concern for Grace. As discussed in Part I above, the recent surge in claims against Grace has come after mass screenings were performed by a small number of plaintiff firms. ILO and PFT tests have yielded massive numbers of claims for nonmalignant conditions. The task of determining whether these claims are supported will be difficult (but necessary) to ensure that only claims that are based upon reliable science are permitted to proceed. Again, appointment of a Rule 706 panel may be appropriate to assist the Court in performing its role as a "gatekeeper" under *Daubert*. Independent experts also could be enlisted to

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | **Chapter 11** |
|  | ) |  |
| **W. R. GRACE & CO.,** *et al.,* | ) | **Case No. 01-1139 (JKF)** |
|  | ) | **(Jointly Administered)** |
| Debtors. | ) |  |
|  | ) |  |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF W.R. GRACE & CO.'S MOTION TO
## APPROVE PI CMO AND QUESTIONNAIRE

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet Baer
Jonathan P. Friedland
Salvatore F. Bianca
Joseph Nacca
Andrea L. Johnson
200 East Randolph Drive
Chicago, IL 60601
Telephone:    (312) 861-2000
Facsimile:    (312) 861-2200

KIRKLAND & ELLIS LLP
Barbara M. Harding
Brian T. Stansbury
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:    (202) 879-5000
Facsimile:    (202) 879-5200

Dated:  May 10, 2005

PACHULSKI, STANG, ZIEHL, YOUNG, JONES &
WEINTRAUB P.C.
Laura Davis Jones (Bar No. 2436)
David Carickhoff (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession

No. 8395

The Manville Trust's payment standards were changed again in 2002. *See* 237 F. Supp.

2d at 324. The new "TDP" adds a provision mandating that all diagnoses be based on physical

examinations. In addition, the Trust must be satisfied that all medical evidence submitted is:

> [c]redible and consistent with recognized medical standards and may direct the submission of such documentation as it requires to support this determination. These provisions will allow the Trust to ensure that claims meet adequate standards of proof (that is, standards of proof that would entitle them to compensation in the tort system). These requirements will likely require most facilities currently conducting asbestos screening to change their processing of potential claimants.

*Id.* Critics have asserted that these evidentiary requirements are still "inadequate to ensure that

'medical evidence provided in support of . . . claim[s] is credible and consistent with recognized

medical standards'" and do "not adequately address the root of the problems facing the Trust,

mass screenings." *Id.* at 328 (citations omitted).

>    **B.    Inventory Settlements Not Tied to Valid Medical and Exposure Evidence Caused Claims to Soar In the Tort System.**

The Manville trends were also reflected in claiming trends against asbestos defendants as

a whole. In order to avoid the same fate as Manville, many companies chose to pursue a

privatized claims resolution process in which they agreed to settle claims on a mass basis in lieu

of traditional tort system litigation.[14]    These inventory settlements, however, repeated the

mistakes of the Manville Trust because they were not adequately anchored to traditional proof of

liability. Instead, they focused on settling claims -- regardless of real validity -- simply to stave

---

[14]   *See In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1298 (7th Cir. 1995) (observing that aggregation exposes the defendant to "intense pressure to settle"); *id.* at 1304 ("The number of asbestos cases was so great as to exert a well-nigh irresistible pressure to bend the normal rules."); Francis E. McGovern, *Rethinking Cooperation Among Judges in Mass Tort Litigation*, 44 U.C.L.A. L. Rev. 1851, 1858 (1997) ("Plaintiffs' attorneys rush to their favorite judges and demand draconian procedures to pressure defendants to make block settlements.); Jack B. Weinstein, *Ethical Dilemmas in Mass Tort Litigation*, 88 Nw. U. L. Rev. 469, 521 (1994) ('Often the pressure for block settlements comes from plaintiffs' attorneys who hope to get something for a large mass of questionable cases. Some attorneys ... will take almost any case without regard to its merit, hoping for a global settlement.") (footnote omitted).

*Committee on the Judiciary*, 108th Cong. (Mar. 5, 2003) (statement of Mr. Steven Kazan).

In perhaps the most telling indication of the skepticism associated with mass screenings, Judge Weiner of the Eastern District of Pennsylvania, overseeing all asbestos cases in federal courts, *dismissed* all non-malignant asbestos-related lawsuits that were based only on lung X-rays obtained from mass screenings. *In re Asbestos Prods. Liab. Litig.*, No. MDL 875, 2002 WL 32151574, at *1 (E.D. Pa. Jan. 16, 2002). In doing so, Judge Weiner found that "the filing of mass screening cases is tantamount to a race to the courthouse and has the effect of depleting funds, some already stretched to the limit, which would otherwise be available for compensation to deserving plaintiffs." *Id.*

Another reported recurring problem with mass screenings is that the B-readers often are unqualified and highly motivated to find "positive" results. Certain doctors are known for "over-reading" X-rays. Other doctors are not educated in diagnosing asbestos-related conditions. *Eagle-Picher Indus.*, 718 F.Supp. at 1057 ("Moreover, many diagnoses are made by physicians not well schooled in the American Thoracic Society's criteria for the diagnosis of asbestosis and the medical literature does not provide standards for judging the diagnosability of asbestos-related disease."). In some cases, they are not even board certified or licensed to practice medicine. *Raymark Indus.*, 1990 WL 72588, at *5.[43] These accommodating pro-plaintiff B

---

[43] "[T]he medical defendant possessed, at best, the most limited of credentials - Bharadwaja was not licensed in the United States, Rao was a radiologist and not qualified to diagnose asbestos disease, and Gelbard had been previously sued for misrepresenting her qualifications and for submitting incompetent medical reports." *Raymark Indus.*, 1990 WL 72588, at *5. Dr. Bharadwaja testified that he "considered pleural plaques and pleural thickening to be the same thing" and did not know the latency period for asbestosis. *Id.* at *6 The court indicated that "the attorneys' certifications and the physicians' diagnoses are somehow intended to 'pass muster.' Not with this court!" *Id.* at *7; *Abadie v. Metro. Life Ins. Co.*, 784 So.2d 46, 72 (La. Ct. App. 2001) (the court noted that the doctor who examined most of the plaintiffs and whose reports were relied on by diagnosing doctors was *not* a board certified lung specialist).

22