# EXHIBIT "D"

Bench Filed
on 4/2/01

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 ( ___ ) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

## W.R. GRACE & COMPANY'S
## INFORMATIONAL BRIEF

KIRKLAND & ELLIS
David M. Bernick
James H.M. Sprayregen
Andrew R. Running
Christopher B. Sullivan
Douglas G. Smith
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000
(312) 861-2200 (fax)

PACHULSKI, STANG, ZIEHL,
YOUNG & JONES P.C.
Laura Davis Jones
919 North Market Street, 16th Floor
Wilmington, Delaware 19801
(302) 652-4100
(302) 652-4400 (fax)

– Co-Counsel for the Debtors and Debtors in Possession –

Dated: April 2, 2001

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

No. 6

coercive and exorbitantly costly) means for companies who are not major players in the asbestos world to attempt to manage their asbestos litigation.

Second, and much more recently, the privatized claims process itself was turned against surviving asbestos defendants, dramatically increasing their exposure to asbestos claims and thereby destroying their already attenuated programs for managing claims. As other companies involved in asbestos litigation have gone bankrupt, the claims against Grace in particular have skyrocketed -- without apparent connection to any new principle of liability or accepted principle of science. In 2000 alone, asbestos claims against Grace increased 81% over the prior year, reaching a total of nearly 49,000 claims for 2000. Year to date trends for 2001 are even worse. The asbestos litigation no longer merely siphons off Grace's profits -- it threatens Grace's financial health and its core businesses.

Chapter 11 now affords the only solution for Grace. Other paths to resolution have been foreclosed. The Supreme Court has restricted class action settlements under Rule 23. Congress has failed to enact legislation to address the problem.

And Chapter 11 procedures can be tailored in this case to produce a fair and efficient resolution of legitimate claims while screening out meritless ones. Chapter 11 should not merely be a process for distributing available funds to claimants regardless of claim merit. Rather, the threshold task in Chapter 11 is to determine the validity of asserted claims. While that task is daunting in mass-tort bankruptcies, the courts have developed procedures that can be used to define and resolve mass-tort liability within the bankruptcy system. These include:

2

The string of companies seeking resolution of their asbestos-related liability through Chapter 11, coupled with the increasing pressures placed upon those companies remaining outside the system, have led many observers to predict that there is "no end in sight."[85]

>    2.    **There was no practical check on the accelerated claims filings and increased demands against non-bankrupt companies.**

Many of the companies recently entering the bankruptcy system have cited dramatic increases or "spikes" in the claims filed against them and in settlement demands.[86] These increases bear no apparent relation to changes in liability or trends in disease. Yet, there is no mechanism in place to stem the new filings and escalating settlement demands against the companies that remained outside of bankruptcy.

For all the reasons catalogued above, defendants have no effective recourse in the courts. Indeed, the threat of high volume litigation in unfavorable jurisdictions is precisely what

---

[85] *See* Credit Suisse First Boston, Asbestos: The Dust Assassin Cries Out for Tort Reform 8, Nov. 11, 2000 ("According to our industry sources, without legislative action many more companies will also be forced to file for bankruptcy within the next two years owing to rising costs per claim."); Jeff St. Onge, *Owens Corning Bankruptcy Shows Scope of Asbestos Issue*, DAILY BANKRUPTCY REV., Oct. 9, 2000 ("A flood of asbestos lawsuits since the mid-1960s have produced specialty law firms that are fleshing out new clients and cases at an awesome rate. With an ever-increasing tide of lawsuits, growing by 50,000 a year by one estimate, the asbestos issue seems destined to throw several more companies into bankruptcy.").

[86] *See, e.g., Owens Corning Files Voluntary Chapter 11 Petition to Resolve Asbestos Liability*, PR NEWSWIRE, Oct. 5, 2000 ("[T]he cost of resolving current and future claims, together with a flurry of recent new filings from plaintiff lawyers not participated in the NSP, led us to the conclusion that a Chapter 11 reorganization was prudent and necessary."); *Asbestos Woe Leads Burns & Roe to File for Bankruptcy Relief*, ENG. NEWS-RECORD, Dec. 18, 2000, at 22 (noting that "'the number of cases brought against the company increased markedly'"); Queena Sook Kim, *G-I Holdings' Bankruptcy Filing Cites Exposure in Asbestos Cases*, WALL ST. J., Jan. 8, 2001, at B12 ("G-I's chief executive officer and general counsel, Richard A. Weinberg, said there was a 'dramatic increase in the number of claims.'"); *G-I Holdings Implements Strategy to Seek Bankruptcy Protection*, ASBESTOS & LEAD ABATEMENT REP., Feb. 1, 2001 (citing "nearly double the number [of claims] filed in 1996" as reason for bankruptcy).

**ORIGINAL**

THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE CO., *et al.*, | ) | Case No. 01-01139 (JJF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

## DEBTORS' MEMORANDUM IN SUPPORT OF
## MOTION FOR ENTRY OF CASE MANAGEMENT ORDER,
## MOTION TO ESTABLISH BAR DATE,
## MOTION TO APPROVE CLAIM FORMS,
## AND MOTION TO APPROVE NOTICE PROGRAM

KIRKLAND & ELLIS
David M. Bernick
James H.M. Sprayregen
Andrew R. Running
Janet Baer
Christopher B. Sullivan
Douglas G. Smith
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000
(312) 861-2200 (fax)

PACHULSKI, STANG, ZIEHL, YOUNG &
JONES P.C.
Laura Davis Jones
David Carickhoff
Hamid Rafatjoo
919 North Market Street, 16th Floor
Wilmington, Delaware 19801
(302) 652-4100
(302) 652-4400 (fax)

Co-Counsel for the Debtors and Debtors in
Possession

FILED
2001 JUN 27 PM 7: 24
CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

No. 537





As set forth in the Informational Brief, the reason Debtors were forced to seek Chapter 11 protection is that they have experienced since 1999 a spike in personal injury claims that is unsupported by any principle of science or law:

This claims spike bears no relation to the actual trend of disease. For example, data from the National Cancer Institute's Surveillance, Epidemiology and End Results ("SEER")



**National Mesothelioma Death Rate**

program shows that, far from trending upward, mesothelioma deaths have declined since 1992.

Despite these trends, since 1999 Grace's mesothelioma claims have increased sharply.   A similar spike occurred in the proportion of reported lung cancer cases resulting in claims against Grace during 1999.

14

The absence of any correlation between the recent spike in claims and the actual number of mesothelioma and lung cancer cases is important to understanding the trends in other claims. Mesothelioma and lung cancer have the longest latency periods between initial exposure and the onset of disease. Thus, the incidence of all other diseases should be declining, not increasing. But since at least the mid-1990s, and especially in the last few years, the relative proportion of non-malignant disease claims to mesothelioma and lung cancer claims against Grace and other asbestos defendants has dramatically increased.

Put simply, the actual rates of disease are going down, but the number of claims against Grace are skyrocketing. While some of the claims being asserted against Grace may be valid, three issues need to be addressed before potentially valid claims can be identified.

**1.    There must be proof of exposure to Grace's products.**

State law uniformly requires that no claim should proceed without credible evidence of exposure to Grace's asbestos products. Plaintiffs bear the burden of identifying a Grace product as the source of their exposure. *See, e.g., Harris v. Owens-Corning Fiberglass Corp.*, 102 F.3d 1429, 1432 (7th Cir. 1996) ("a plaintiff must produce evidence sufficient to support an inference that he inhaled asbestos dust from the defendant's product."); *Thompson v. Johns-Manville Sales Corp.*, 714 F.2d 581 (5th Cir. 1983) (affirming summary judgment in asbestos case as to defendants whose products plaintiff could not recall using), *cert. denied*, 465 U.S. 1102 (1984); *Aymond v. Texaco, Inc.*, 554 F.2d 206, 210-11 (5th Cir. 1977) (affirming directed verdict for manufacturer where plaintiff did not establish that manufacturer's product caused the injuries); *Cawein v. Flintkote Co.*, 610 N.Y.S.2d 487, 488 (N.Y. App. 1994) ("It is not

15

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JJF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**DEBTORS' MOTION FOR LEAVE TO FILE OMNIBUS REPLY TO VARIOUS OBJECTIONS TO THE DEBTORS' MOTION FOR ENTRY OF CASE MANAGEMENT ORDER, ESTABLISHMENT OF A BAR DATE, APPROVAL OF THE PROOF OF CLAIM FORMS AND APPROVAL OF THE NOTICE PROGRAM (RE: DOCKET NO. 545)**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), hereby request authority to file an omnibus reply (the "Omnibus Reply") pursuant to Del.Bankr.LR 9006-1(d) and D.Del.LR. 7.1.3(a)(D) in further support of the *Motion For Entry of a Case Management Order, Establishment of a Bar Date, Approval of the Proof of Claim Forms and Approval of the Notice Program* (the "Motion"), which Motion is currently pending before the Court and set for hearing on November 21, 2001 at 12:00 p.m.

Various creditors and official committees appointed in these chapter 11 cases have filed objections and responses to the Motion. The Debtors seek to file the Omnibus Reply for the purpose

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## ARGUMENT

### I.   THERE IS NO SERIOUS DISPUTE THAT THE ASBESTOS CLAIMS AGAINST GRACE SPUN OUT OF CONTROL BEFORE THIS CASE WAS FILED.

As we have previously advised the Court, Grace's bankruptcy[2] was necessitated by a dramatic reversal in the trend of asbestos claim filings against the company. Claims that had been declining for years suddenly skyrocketed in 2000, overwhelming Grace's ability to resolve them through the tort system:



This surge in claims starkly demonstrated the irrationality of the privatized claims process that evolved over the years, and it left Grace with no choice but to break the pattern of history and file bankruptcy. In their sole attempt to explain away the recent claims spike, the Property Damage (PD) and Personal Injury (PI) Committees offer no theory that has anything to do with Grace's actual liability. And the explanation that *is* proffered is contradicted by both the recent surge in claims against other companies and analysis of Grace's own unique claims history.

---

[2] "Grace" and "Debtors" are used interchangeably herein. "Debtors" is defined at footnote 1 of Debtors' Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Proof of Claim Forms and Approval of the Notice Program.

**A.    There Is No Explanation — Grounded Either In Medicine Or In Grace's Liability — For The Recent Spike In Claims Against Grace.**

As detailed in Grace's initial memorandum, actual asbestos-related malignant disease rates are declining in response to the regulatory curtailment of significant asbestos exposures in the early 1970s.[3] The death rates for mesothelioma, the disease with the longest latency period, have been declining since 1992.[4] Leading medical researchers similarly have described asbestosis as a "disappearing disease."[5] A published study of asbestos-exposed workers reported that "we have not seen a single case of significant asbestosis with first exposure during the past 30 yr."[6] Perhaps for these reasons, the PI Committee does not even attempt to justify the recent spike in claims against Grace based on an actual increase in disease caused by Grace's products.

Moreover, only a small number of plaintiffs' law firms were responsible for the surge in claims against Grace in 1999-2000, belying the notion that disease rates drive the increase. Seventeen law firms filed 22,550 more claims in 2000 than they had filed in 1999, and were therefore responsible for almost the entire 22,726 increase in total claims filed against Grace:

---

[3] *See generally* Neoplastic Asbestos-Induced Disease, Pathology of Occupational Lung Disease (A. Churg & F. Green, ed., 2nd, 1998) at 339 ("progressive lowering of standards for permitted occupational exposure to asbestos has markedly decreased the incidence and severity of asbestosis"). *See also* R. Doll & J. Peto, *Asbestos: Effects on Health of Exposure to Asbestos* at 2 ("With reduction in the amount of exposure, the development of incapacitating fibrosis slows down and the reaction becomes so slight and its spread so slow that no person with otherwise healthy lungs would develop significant disability before reaching an age when he was likely to die of other causes.").

[4] SEER data from the National Cancer Institute available at www-seer.ims.nci.nih.gov.

[5] K. Browne, *Asbestos-Related Disorders*, Occupational Lung Disorders, 3rd, 411-504, 420 (1994).

[6] Gaensler, Jederlinic & Churg, *Idiopathic Pulmonary Fibrosis in Asbestos-exposed Workers,* American Review of Respiratory Disease 144(3):  689-696, 695 (1991) (emph. added).

-8-

| Law Firm | 1999 Claims | 2000 Claims | Increase |
|---|---|---|---|
| Peirce Raymond Osterhout | 143 | 3,579 | 3,436 |
| Kelley & Ferraro L.L.P. | 563 | 3,755 | 3,192 |
| David Lipman, P.A. | 511 | 2,908 | 2,397 |
| Larry Norris | 44 | 2,346 | 2,302 |
| Tayllor & Cire | 3 | 2,132 | 2,129 |
| Law Firm of Crymes Pittman | 0 | 1,169 | 1,169 |
| Barrett Law Offices | 0 | 1,054 | 1,054 |
| Hissey Kientz & Herron | 26 | 962 | 936 |
| Wallace & Graham P.A. | 317 | 1,150 | 833 |
| Law Offices of Peter Nicholl | 0 | 813 | 813 |
| Duke Law Firm | 42 | 820 | 778 |
| LeBlanc & Waddell | 0 | 707 | 707 |
| Odom & Elliott | 180 | 810 | 630 |
| Climaco Climaco Lefkowitz | 353 | 977 | 624 |
| Varas & Morgan | 435 | 1,018 | 583 |
| Cascino Vaughan Law Offices | 252 | 808 | 556 |
| Robins Cloud Greenwood & Lubel | 156 | 567 | 411 |
| **17 FIRM TOTALS:** | **3,025** | **25,575** | |
| **TOTALS FOR ALL FIRMS:** | **25,466** | **48,192** | **22,726** |

| | |
|---|---|
| **TOTAL 2000  INCREASE FOR 17 FIRMS:** | **22,550** |

Thus, while the rest of the plaintiffs' bar was filing claims against Grace in 2000 at about the same rate as in 1999, these 17 firms somehow generated 22,550 more claims than they had in 1999, raising their collective annual share of the claims against Grace from 11.8% to more than 53%. The committees offer no explanation for how such a small number of firms were able to generate such a significant surge of claims.

-9-

Instead, the PI Committee's expert Mark Peterson (a lawyer and psychologist) attributes Grace's claims spike to unfavorable publicity last year about Grace's Libby, Montana mine. (Peterson Aff. ¶ 23) Even if it were true that Libby publicity had a nationwide impact on the filing of claims against Grace, this would illustrate the problem Grace faces. The issues concerning asbestos exposure at Libby pertain to only a small group of claimants. Libby is a small town, with a population of 2,500. The cumulative total of Libby personal injury claims is 232, a small fraction (.07 %) of the 328,000 claims asserted nationally. If Libby publicity is causing a surge of claims nationally, those claims are being filed for the wrong reasons.

Further, the "Libby" theory for the broad upsurge in claims is unsupported by citation to any evidence and is contrary to the facts.

*First*, the plaintiff law firms that are responsible for bringing these cases already had filed over 260,000 personal injury claims against Grace before 2000. They did not need to be inspired by "adverse publicity" before filing additional claims.

*Second*, attributing the recent claims spike to adverse Libby publicity would blink away the glaring fact that other asbestos defendants experienced similar surges in claims in 2000. For example, the rate at which new claims have been filed against the Manville Trust has nearly doubled in each of the last two years. The following chart, included in the First Quarter 2001 Manville Trust Report, shows this dramatic surge in new claims filings through May of this year:[7]

---

[7] *See also* First Quarter 2001 Manville Trust Financial Report, available at www.mantrust.org. and *Mealey's Litigation Report: Asbestos*, August 3, 2001, at 13-14.

THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE CO., *et al.*, | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

## DEBTORS' CONSOLIDATED REPLY IN SUPPORT OF THEIR MOTION FOR ENTRY OF CASE MANAGEMENT ORDER, ESTABLISHMENT OF A BAR DATE, APPROVAL OF THE CLAIM FORMS WITH RESPECT TO ASBESTOS PERSONAL INJURY <u>CLAIMS AND APPROVAL OF DEBTORS' COMBINED NOTICE PROGRAM</u>

Dated: February 12, 2002

KIRKLAND & ELLIS
David M. Bernick
James H.M. Sprayregen
Andrew R. Running
Janet S. Baer
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000
(312) 861-2200 (fax)

PACHULSKI, STANG, ZIEHL, YOUNG
    & JONES P.C.
Laura Davis Jones
David W. Carickhoff, Jr.
Hamid Rafatjoo
919 North Market Street, 16th Floor
Wilmington, Delaware 19801
(302) 652-4100
(302) 652-4400 (fax)

Co-Counsel for the Debtors and
Debtors in Possession

No. 1666

**A.      There Is No Explanation — Grounded Either In Medicine Or In Grace's Liability — For The Recent Spike In Claims Against Grace.**

As detailed in Grace's initial memorandum, actual asbestos-related malignant disease rates are declining in response to the regulatory curtailment of significant asbestos exposures in the early 1970s.[3] The death rates for mesothelioma, the disease with the longest latency period, have been declining since 1992.[4] Leading medical researchers similarly have described asbestosis as a "disappearing disease."[5] A published study of asbestos-exposed workers reported that "we have not seen a single case of significant asbestosis with first exposure during the past 30 yr."[6] Perhaps for these reasons, the PI Committee does not even attempt to justify the recent spike in claims against Grace based on an actual increase in disease caused by Grace's products.

Moreover, only a small number of plaintiffs' law firms was responsible for the surge in claims against Grace in 1999-2000, belying the notion that disease rates drive the increase. Seventeen law firms filed 22,550 more claims in 2000 than they had filed in 1999, and were therefore responsible for almost the entire 22,726 increase in total claims filed against Grace:

---

[3] *See generally* Neoplastic Asbestos-Induced Disease, Pathology of Occupational Lung Disease (A. Churg & F. Green, ed., 2nd, 1998) at 339 ("progressive lowering of standards for permitted occupational exposure to asbestos has markedly decreased the incidence and severity of asbestosis"). *See also* R. Doll & J. Peto, *Asbestos: Effects on Health of Exposure to Asbestos* at 2 ("With reduction in the amount of exposure, the development of incapacitating fibrosis slows down and the reaction becomes so slight and its spread so slow that no person with otherwise healthy lungs would develop significant disability before reaching an age when he was likely to die of other causes.").

[4] SEER data from the National Cancer Institute available at www-seer.ims.nci.nih.gov.

[5] K. Browne, *Asbestos-Related Disorders*, Occupational Lung Disorders, 3rd, 411-504, 420 (1994).

[6] Gaensler, Jederlinic & Churg, *Idiopathic Pulmonary Fibrosis in Asbestos-exposed Workers,* American Review of Respiratory Disease 144(3): 689-696, 695 (1991) (emph. added).

and the Center for Claims Resolution. *See* attached Claims Report, Exhibit K. The combined data from that survey confirms that the vast majority of the 1997 claims were invalid or of doubtful validity, and that valid year 2000 claims are even more scarce.

1.    **The Vast Majority Of The Claims Provide No Evidence Of Impairment.**

The recent surge in claims against Grace is *not* due to an increase in the most serious and best documented claims, *i.e.*, cancer claims, but overwhelmingly is due to non-malignant claims. Based upon Grace's statistical survey, less than 7% of the 1997 claims were for mesothelioma, lung cancer, or other cancers. Seventeen percent of the claims included so little information that the type of disease could not even be determined. And the remaining 76% were for non-malignant conditions.

The percentage of malignant claims declined even further in 2000. Less than 6% of the claims were for cancer. More than 30% of the year 2000 claims presented so little information that no disease could be identified. The remaining 64% were for non-malignant conditions.

Analysis of diagnostic data relating to the sampled claims shows the same picture: no new wave of disease is responsible for the new wave of claims. Two diagnostic tests are widely used in combination to diagnose non-malignant injury: "ILO" readings of chest x-rays and Pulmonary Function Tests. X-rays are used to identify asbestosis within the lungs or pleural thickening in the outer lining of the lungs. The physician grades the x-ray on a scale of 0/0 (no abnormality) through 3/3 (most severe) based upon criteria developed by the International Labour Organization ("ILO"). The American Thoracic Society has set an ILO rating of 1/1 as the minimum

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

Objection Deadline: December 3, 2004
Hearing Date: December 20, 2004 at Noon (Pittsburgh, PA)

## DEBTORS' MOTION FOR ENTRY OF AN ORDER SEEKING THE ESTIMATION OF ASBESTOS CLAIMS AND CERTAIN RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Grace") file this motion (the "Estimation Motion") seeking (a) entry of an order determining estimates of the aggregate amounts needed to fund[2] the Asbestos Trust to enable the Asbestos Trust to pay in full all Allowed Asbestos Claims and Asbestos Trust Expenses, as and when they

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2] It is contemplated that the Asbestos Trust will be funded 31 days following the Effective Date.

No. 6899

before detailing those procedures, we will briefly summarize the unexplained surge in Claims that drove the Debtors into bankruptcy, because the Debtors' dispute with the Asbestos PI Committee over the validity of those Claims will be one of the principal subjects of the estimation hearing we are proposing.

**A.      The Debtors' 2001 bankruptcy filings were the result of a surge of claims that overwhelmed the tort system.**

43.      The Debtors' bankruptcies were necessitated by a sudden and scientifically unexplainable surge of asbestos Claim filings against the company.  As reflected in the chart below, Claims that had been declining for years suddenly skyrocketed in 2000, overwhelming the Debtors' ability to resolve them through the tort system.



44.      This surge in Claims starkly demonstrated the irrationality of the privatized Claims process that evolved over the years, and left the Debtors with no choice but to break the pattern of history and file bankruptcy.

**B.      There is no explanation - grounded either in medicine or in the Debtors' liability - for the 2000 spike in claims against the Debtors.**

45.      The Asbestos PI Committee has never attempted to justify the spike in Claims against the Debtors based on an actual increase in disease caused by the Debtors' products.   Actual asbestos-related malignant disease rates are declining in response to the

regulatory curtailment of significant asbestos exposures in the early 1970s.[11] The death rates for mesothelioma, the disease with the longest latency period, have been declining since 1992.[12] Leading medical researchers similarly have described asbestosis as a "disappearing disease."[13] A published study of asbestos-exposed workers reported that "we have not seen a single case of significant asbestosis with first exposure during the past 30 years."[14]

46.     Moreover, as detailed in the Debtors' 2002 CMO Reply Brief, only a small number of plaintiffs' law firms was responsible for the surge in Claims against Grace in 1999-2000, belying the notion that disease rates drive the increase. Seventeen law firms filed 22,550 more Claims in 2000 than they had filed in 1999, and were therefore responsible for 99.2% of the increase in total Claims filed against the Debtors. The Asbestos PI Committee has never explained how such a small number of firms was able to generate such a surge of Claims.

47.     Instead, the Asbestos PI Committee's expert Mark Peterson attributed the Debtors' Claims spike to unfavorable publicity in 2000 about the Debtors' Libby, Montana mine. (Peterson Aff. 23). Even if it were true that Libby publicity had a nationwide impact on the filing of Claims against the Debtors, this would only illustrate the problem the Debtors face. The issues concerning asbestos exposure at Libby pertain to only a small group of Claimants. Libby is a small town, with a population of 2,500. The cumulative total of Libby personal injury Claims is 232, a small fraction (.07%) of the 328,000 Claims asserted nationally. If Libby

---

[11]   *See generally* Neoplastic Asbestos-Induced Disease, Pathology of Occupational Lung Disease (Churg, A. & F. Green, ed., 2nd, 1998) at 339 ("progressive lowering of standards for permitted occupational exposure to asbestos has markedly decreased the incidence and severity of asbestosis"). *See also* R. Doll & J. Peto, *Asbestos: Effects on Health of Exposure to Asbestos* ("With reduction in the amount of exposure, the development of incapacitating fibrosis slows down and the reaction becomes so slight and its spread so slow that no person with otherwise healthy lungs would develop significant disability before reaching an age when he was likely to die of other causes.").

[12]   SEER data from the National Cancer Institute available at http://seer.cancer.gov/faststats/html/inc_mesoth.html.

[13]   K. Browne, *Asbestos-Related Disorders*, Occupational Lung Disorders, 3rd, 411-504 (1994).

[14]   Gaensler, Jederlinic & Churg, *Idiopathic Pulmonary Fibrosis in Asbestos-exposed Workers*, American Review of Respiratory Disease 144(3):  689-696 (1991) (emph. added).

16

publicity is causing a surge of Claims nationally, those Claims are being filed for the wrong reasons.

48.    Further, the "Libby" theory for the broad upsurge in Claims is unsupported by citation to any evidence and is contrary to the facts. *First*, the plaintiff law firms that are responsible for bringing these cases already had filed over 260,000 personal injury Claims against the Debtors before 2000. They did not need to be inspired by "adverse publicity" before filing additional Claims. *Second*, attributing the 2000 Claims spike to adverse Libby publicity would blink away the glaring fact that other asbestos defendants experienced similar surges in Claims in 2000. The following chart, included in the First Quarter 2001 Manville Trust Report, shows this same dramatic surge in new claims filings through May 2001:



49.    Asbestos claims against other defendants increased as well during the same time period. Equitas' March, 2001 Annual Report confirms that "[m]ost other defendants [in addition to the Manville Trust] also reported significant increases in the number of claims filed in 2001. The majority of these new claims have been filed on behalf of unimpaired persons." Likewise, a May 30, 2001 Tillinghast report estimates that average annual non-Center for Claims Resolution asbestos claims nearly doubled from 30,000 in 1998-99 to almost 60,000 in 2000.

17

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO.**, *et al.*, | ) | **Case No. 01-1139 (JKF)** |
| | ) | **(Jointly Administered)** |
| **Debtors.** | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF W.R. GRACE & CO.'S MOTION TO
APPROVE PI CMO AND QUESTIONNAIRE**

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet Baer
Jonathan P. Friedland
Salvatore F. Bianca
Joseph Nacca
Andrea L. Johnson
200 East Randolph Drive
Chicago, IL 60601
Telephone:    (312) 861-2000
Facsimile:    (312) 861-2200

KIRKLAND & ELLIS LLP
Barbara M. Harding
Brian T. Stansbury
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:    (202) 879-5000
Facsimile:    (202) 879-5200

Dated: May 10, 2005

PACHULSKI, STANG, ZIEHL, YOUNG, JONES &
WEINTRAUB P.C.
Laura Davis Jones (Bar No. 2436)
David Carickhoff (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession

No. 8395

experts also found that the top 10 highest-volume doctors from the Manville Trust Audit were also responsible for more than 50% of the asbestosis claims against B&W. *Id.* at 27.

In sum, rather than bringing about closure, these inventory settlements encouraged more filings because they made it easier for claimants to be paid even though they lacked scientifically reliable medical and exposure evidence.[16]

### C.    By 2000, the Real Cost of the Broken System Emerged

Beginning in late 1999 and early 2000, dramatic increases occurred in claims presented both to traditional asbestos defendants and even to those defendants and companies who had very little asbestos litigation exposure in the past and whose products contained only trace amounts of asbestos. The massive increase in claims, however, was not supported, and indeed was contradicted by, trends in asbestos exposure and actual disease incidence. Thus, defendants and courts found themselves flooded with asbestos claims that lacked proper foundation either in law or in science.

#### 1.    Asbestos Claims Soar, Again

In 2000, defendants, debtors and the courts began observing "a dramatic increase in the total and rate of filing of asbestos lawsuits and claims." *In re Joint E&S Dists. Asbestos Litig.*, 237 F. Supp. 2d at 300. Companies already in bankruptcy experienced this surge, and many of the companies entering the bankruptcy system around that time cited these increases, or "spikes," in the claims filed against them and in settlement demands as precipitating their bankruptcy petitions:

---

[16] *See* Equitas Limited Reports and Accounts for the Year Ended 31 March 2001, 22-23 ("[I]nventory settlements have failed to reduce defendants' asbestos liabilities and now appear to have made the situation worse. Many defendants have reported an increase in the number of pending asbestos claims . . . Inventory settlements have encouraged the filing of new claims because they have made it *increasingly easy for claimants' attorneys to recover money for unimpaired claimants.*") (emphasis added).

9

- **Manville:**  As seen in the chart below, claim filings against Manville nearly doubled in 2000 as compared to 1999 and "[a]bout July of 2000, the Manville Trust began to experience a dramatic and unanticipated rise in the number of claims being filed and expansion in scope of the industries and occupations which generated those claims."[17]



- **Owens Corning:**  "[T]he cost of resolving current and future claims, together with a flurry of recent new filings from plaintiff lawyers not participating in the NSP, led us to the conclusion that a Chapter 11 reorganization was prudent and necessary."[18]

- **Eagle-Picher:**  In October 2000, the Eagle-Picher Trust saw "a significant increase in claim filings over and above what our expert consultants had predicted two years ago."[19]

- **UNR:**  The UNR Trust also experienced a sharp and unexpected jump in claim filings.  In 2000, the UNR Trust cited a 33% rise in asbestos claims from the year

---

[17]  *See In re Joint E&S Dists. Asbestos Litig.*, 237 F. Supp. 2d at 313.  In 2001, the claim filing rate was more than double the rate in 2000 (which itself represented nearly a doubling from 1999).  In the first quarter of 2001, the Manville Trust received 24,500 new claims, in contrast to 10,400 new claims received in the first quarter of 2000 and 5,700 received during the first quarter of 1999.  Mealey's Litig. Rep.: Asbestos ( May 4, 2001) at 7.

[18]  *Owens Corning Files Voluntary Chapter 11 Petition to Resolve Asbestos Liability,* PR Newswire, Oct. 5, 2000.

[19]  Letter from William B. Nurre, Executive Director, EPI Trust, to Claimants' Counsel (Oct. 9, 2000).

91100-001\DOCS_DE:107964.1

nonmalignant claims shot up steeply beginning around 1999, and the trend departed suddenly and substantially from the filings of malignant disease claims. *Id.*



This increase in claims is not and *cannot* possibly be attributable to actual exposure or disease trends for several reasons. *See In re E.&S Dists. Asbestos Litig.*, 237 F. Supp. 2d at 305 (attributing increase in claims to: electronic filing permitting plaintiffs' lawyers to file duplicative claims at little cost, plaintiffs' firms advertising and mass screenings, and suing peripheral defendants).

It has been almost 40 years since Dr. Irving Selikoff began publishing his medical studies describing the dangers of asbestos dust to asbestos workers.[29]   The enactment of strict government regulations followed, and the use of new asbestos essentially ceased in the United

---

[29]   I.J. Selikoff, J. Churg & E.C. Hammond, *The Occurrence of Asbestosis Among Insulation Workers in the United States*, 132 Annals of the N.Y. Academy of Sciences 139 (1965)

91100-001\DOCS_DE:107964.1

States.[30]  As the following timeline shows, use of asbestos – and consequently, worker exposures started to fall around 1950 and then fell off dramatically after OSHA set low exposure limits in 1971.



As exposures decreased dramatically, medical experts, including Drs. Doll & Peto, universally predicted a downward trend in both malignant and non-malignant diseases.  *See* R. Doll & J. Peto, *Asbestos: Effects on Health of Exposure to Asbestos*, HMS, (1988)*; In re Joint E&S Dists. Asbestos Litig.*, 237 F. Supp. 2d at 311 ("Mesothelioma and asbestos-related lung cancers are expected to result primarily from the sort of direct occupational exposure that was phased out as a result of increasingly stringent federal regulation.")

---

[30]  *In re Joint E&S Dists. Asbestos Litig.*, 129 B.R. at 737 (noting that with "the increased awareness of dangers and new government regulations, use of new asbestos essentially ceased in the United States in the early 1970's") (citations omitted).  *See also* Brickman 2003, *supra*, at 35-36; *Asbestos Litigation, Hearing Before the Senate Comm. on the Judiciary*, 107th Cong. 3 (2002) (statement of Steven Kazan) (quoting Rand Report, 2002, *supra*, at 12 ("drastic reduction in asbestos usage")); Alex Berenson, *Panel Urges Complete Ban on Product With Asbestos*, N.Y. Times, May 10, 2003, at C4 (noting that the "use of asbestos . . .  has fallen drastically since the early 1970s").

14

In keeping with the predictions of the scientific community, the actual incidence of asbestos-related disease has been declining in the U.S. since at least the early 1990s.[31]  Asbestos-related malignant disease (mesothelioma and lung cancer) rates are declining and have been for at least the past 12 years.[32]  National Cancer Institute data indicate that death rates for mesothelioma, the disease that requires the least amount of asbestos exposure and has a long latency period, *have been declining since 1992*.[33]  As shown below, data on the incidence of mesothelioma among U.S. males confirms that there has been less and less asbestos disease in the U.S. population over the past decade.[34]



---

[31]  Surveillance, Epidemiology and End Results (SEER) data from the National Cancer Institute available at http://seer.cancer.gov/faststats/html/inc_mesoth.html.

[32]  *Id.*

[33]  *Id.*

[34]  *Id.*

analysis of the incidence of asbestos-related disease, that U.S. asbestos disease has peaked, because "[a]sbestos regulations promulgated by the U.S. Occupational Safety and Health Administration (OSHA) in the early 1970s have led to dramatic reductions in exposure."[36]

Despite the overwhelming consensus that asbestosis as a real *disease* has been in decline *for decades* in this country -- asbestosis *claims* have been increasing dramatically both in total numbers, and as a proportion of all claims, as depicted in the chart below.[37]



The scientific facts thus belie the growth in claims. Despite the clear medical and scientific evidence demonstrating that there has been less and less actual asbestos-related *disease* in the U.S. population, *claims* for asbestos-related diseases have been growing astronomically, and, what's more, the claims have been growing fastest in the disease category in which the

---

[36]   Dr. Bertram Price, *Mesothelioma Trends in the United States: An Update Based on Surveillance, Epidemiology, and End Results Program Data for 1973 through 2003*, AM. J. EPIDEMIOLOGY, 159:107, 112 (2004).

[37]   Rand Report, 2002, *supra*, at 46.

91100-001\DOCS_DE:107964.1

scientific and medical evidence most clearly indicates that claim numbers should be falling. *See In re Joint E&S Distrs. Asbestos Litig.*, 237 F. Supp. 2d at 305 (recognizing disconnect between decrease in incidence of exposure and disease and increase in asbestos claims). There simply is no foundation in science for the large numbers of asbestos claims currently pending against asbestos defendants in and out of bankruptcy. As Senator Orrin Hatch recently stated: "This defies common sense."[38]

### III.    LAX EVIDENTIARY REQUIREMENTS IN MASS SETTLEMENTS HAVE RESULTED IN ABUSES IN THE CLAIMS PROCESS

There is virtually universal agreement that the recent dramatic increases in asbestos claims are the result of lax evidentiary requirements, giving rise to abuse in claims filings. The courts, Congress, the medical community and even plaintiff lawyers now agree that such abuse exists.

Long ago, in *Raymark Indus., Inc. v. Stemple*, No. 88-1014-K, 1990 WL 72588 (D. Kan. May 30, 1990), the court found the process in which the attorneys "recklessly acquiesce[d to] the filing of a constant, steady flow of faulty claims" to be a "professional farce," noting that it "makes a mockery of the practices of law and medicine." *Id.* at *2. The court stated that if it chose to acquiesce to the faulty claims "it would make a 'laughingstock' of the court!" *Id.* Matters have only deteriorated since.

---

[38] *Asbestos Litigation Crisis Continues: It is Time for Congress to Act, Hearing Before the Senate Committee on the Judiciary*, 108th Cong. (Mar. 5, 2003) (statement of Sen. Orrin Hatch); Brickman 2003, *supra*, at 36 ("Proving impervious to the predictions of medical science, the litigation has not only continued to grow, but has been reinvigorated by a huge influx of newly recruited claimants, most of whom share a common characteristic: they have no discernable illness.").

18



The automotive industry in particular was singled out as part of a broad initiative by plaintiffs to find a new, solvent target. From 1999 to 2000, as depicted in the chart below, claims by the auto maintenance industry against the Manville Trust increased by a staggering 631.9%.[65] This was the largest one-year increase for any of the recorded industries, and claims continued to increase.[66]

---

[65]  Table, "Number of Claims by Year Received and Industry," *in* D. Austern Mealey's Presentation (July 2, 2001) (reporting 631.9% increase from 1999 to 2000 for "auto maintenance" claims).

[66]  *Id.*

payment than the rest of the non-malignant claims. *Id.*   Other recent trusts, such as the Pittsburgh Corning Trust and the DII Trust (a Halliburton subsidiary) contain similar criteria.

Defendants and debtors, their stockholders, creditors and employees are not the only entities impacted by the problems in asbestos litigation.   The impact on U.S. state and federal courts has been extensively documented.   *See generally* Rand Report, 2002, *supra*.   But also, those with true asbestos-related injuries suffer the results of massive numbers of baseless claims. As discussed previously, the massive increase in new claims at the turn of the century came largely from non-malignant claims.   For most of these claims, there exists no medical foundation.   As the chart below illustrates, though, a substantial portion of the money available to pay claims goes to these nonmalignant claimants and their lawyers.   Rand Report, 2002, *supra,* at 64.



Consequently, the Manville Trust, Eagle-Picher Trust and UNR Trust have all been forced to significantly reduce their payouts for *all* claims, including payouts for claims relating to persons with mesothelioma, a fatal cancer.[70]  Judge Helen E. Freedman noted the problem:

> Recoveries by unimpaired or minimally impaired plaintiffs deplete the funds needed to compensate present and future claimants with serious illnesses, and resources are dwindling as the "elephantine mass of asbestos cases" nationwide drives large numbers of potentially culpable parties into bankruptcy.

*In re New York City Asbestos Litig.*, No. 40000/88, 2002 WL 32151568, at *1-2 (Sup. Ct. N.Y. Dec. 19, 2002).

### IV.    GRACE HAS THE SAME PROBLEMS:  MASSIVE NUMBERS OF CLAIMS WITH NO RELIABLE MEDICAL DATA AND EXPOSURE EVIDENCE

Grace finds itself in the same position as other bankrupt defendants -- it is faced with thousands of claims that have no basis in medicine or law and the potential for unlimited filings of such claims in the future.   The same lawyers are implicated, the same B-readers are implicated, and the same abusive claims practices are implicated.

### A.    Grace Experienced the Same Unpredicted and Unexplainable Increase in Claims as Other Asbestos Manufacturers.

The Debtors' bankruptcies were necessitated by a sudden and scientifically unexplainable surge of asbestos claim filings against the company. *See* W.R. Grace 4/2/01 Informational Br. at

---

[70]    *See* Mealey's Litig. Rep.: Asbestos (Aug. 3, 2001) at 14;  *Findley v. Trs. of the Manville Pers. Injury Settlement Trust (In re Joint E.&S Dists. Asbestos Litig.)*, 2001 WL 1464362, at *1 (E.&S.D.N.Y. 2001) ("The courts note that there is a continuing rise in the number of claims and that the amount payed [sic] pro rata on claims has been reduced from 10 percent to 5 percent of the original value."); Letter from William B. Nurre, Executive Director, EPI Trust, to claimants' counsel (Oct. 9, 2000)  (In October 2000, the Eagle-Picher Trust had to reduce its payout from 31.9 percent to 25.7 percent.); UNR Asbestos Trust Letter, Mealey's Litig. Rep. 21 (Dec. 1, 2000) at D-1 (In fall of 2000, claims against the UNR Trust had jumped so quickly that it was forced to lower its payout from 12.9 percent to 7.8 percent.).

91100-001\DOCS_DE:107964.1

38.[71]  Asbestos claims against Grace peaked in 1996 and showed a pronounced downward trend. *Id.*  The downward trend continued for two more years with no sign of abating. *Id.*  But the trend reversed with a 28 % increase in 1999 and an 81% increase in 2000. *Id.*  In January 2001, claims were served on Grace at a rate 374% higher than the year before, and in February 2001 at a rate 207% higher than the year before. *Id.*  In April 2001, Grace was forced to file Chapter 11. *Id.*



As reflected in the chart above, claims that had been declining suddenly skyrocketed in 2000, overwhelming the Debtors' ability to resolve them through the tort system.

---

[71]    See also Andrews Asbestos Litig. Rep. 23(7) (April 12, 2001); WALL ST. J. B8 (4/3/01).

91100-001\DOCS_DE:107964.1