# EXHIBIT "E"

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JJF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**DEBTORS' MOTION FOR LEAVE TO FILE OMNIBUS REPLY TO VARIOUS OBJECTIONS TO THE DEBTORS' MOTION FOR ENTRY OF CASE MANAGEMENT ORDER, ESTABLISHMENT OF A BAR DATE, APPROVAL OF THE PROOF OF CLAIM FORMS AND APPROVAL OF THE NOTICE PROGRAM (RE: DOCKET NO. 545)**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), hereby request authority to file an omnibus reply (the "Omnibus Reply") pursuant to Del.Bankr.LR 9006-1(d) and D.Del.LR. 7.1.3(a)(D) in further support of the *Motion For Entry of a Case Management Order, Establishment of a Bar Date, Approval of the Proof of Claim Forms and Approval of the Notice Program* (the "Motion"), which Motion is currently pending before the Court and set for hearing on November 21, 2001 at 12:00 p.m.

Various creditors and official committees appointed in these chapter 11 cases have filed objections and responses to the Motion. The Debtors seek to file the Omnibus Reply for the purpose

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.



Asbestos claims against other defendants have increased as well. Equitas' March, 2001 Annual Report confirms that "[m]ost other defendants [in addition to the Manville Trust] also reported significant increases in the number of claims filed in 2001. The majority of these new claims have been filed on behalf of unimpaired persons." Likewise, a May 30, 2001 Tillinghast report estimates that average annual non-Center for Claims Resolution asbestos claims nearly doubled from 30,000 in 1998-99 to almost 60,000 in 2000.

**B.     Grace's Analysis Of The 1997 And 2000 Claims Further Confirms The Need For Litigation To Define Grace's Liability.**

Grace recently has completed an analysis of 500 randomly-selected claim files from its 1997 and 2000 filings. Grace augmented the medical data and occupational exposure information in these claims files by obtaining information that the same claimants filed with the Manville Trust

-11-

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

Objection Deadline: December 3, 2004
Hearing Date: December 20, 2004 at Noon (Pittsburgh, PA)

### DEBTORS' MOTION FOR ENTRY OF AN ORDER SEEKING THE ESTIMATION OF ASBESTOS CLAIMS AND CERTAIN RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Grace") file this motion (the "Estimation Motion") seeking (a) entry of an order determining estimates of the aggregate amounts needed to fund[2] the Asbestos Trust to enable the Asbestos Trust to pay in full all Allowed Asbestos Claims and Asbestos Trust Expenses, as and when they

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2] It is contemplated that the Asbestos Trust will be funded 31 days following the Effective Date.

C.  Since Grace's 2001 chapter 11 filing, numerous courts, academics and other observers have confirmed widespread, national abuse of the asbestos claims process.

50. As of the filing of their Informational Brief on the first day of these Chapter 11 Cases, the Debtors made clear that the inability of the U.S. tort system to handle asbestos claims was the cause of their Chapter 11 filings. As noted at the time, courts, scholars and journalists were already describing asbestos litigation as an "avalanche,"[15] a "serious problem,"[16] a "dilemma,"[17] and a "disaster."[18] Impossibly high volumes of claims filings were forcing defendants to settle tens of thousands of claims, with no ability to weed out non-meritorious claims or cases for which no liability could ever be established.

51. Perhaps not surprisingly, since the time of the Debtors' filing in April 2001, the nationwide situation has only deteriorated. Indeed, the crisis is "worsening at a much more rapid pace than even the most pessimistic projections."[19] Since Grace's 2001 filing, more than 20 additional U.S. manufacturers have sought bankruptcy protection from asbestos claims.[20] As set out in this section, numerous studies, court decisions and articles not available at the time of the Debtors' initial filing have confirmed Grace's experience of the widespread abuse of the asbestos system across the country. For example:

---

[15] *Jenkins v. Raymark Indus.*, 782 F.2d 468, 470 (5th Cir. 1986).

[16] *In re Asbestos Litig.*, 829 F.2d 1233, 1235 (3d Cir. 1987), *cert. denied*, 485 U.S. 1029 (1988).

[17] *Jenkins*, 782 F.2d at 470.

[18] REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 2 (Mar. 1991); *The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283*, 106th Cong. at 14 (1999) (statement of Professor William N. Eskridge, Jr., Yale Law School).

[19] Victor E. Schwartz, et al., Addressing the "Elephantine Mass" of Asbestos Cases: Consolidation Versus Inactive Dockets (Pleural Registries) and Case Management Plans that Defer Claims Filed by the Non-Sick, 31 PEPP. L. REV. 271 (2004).

[20] *See* Deborah R. Hensler et al., *Asbestos Litigation Costs and Compensation: An Interim Report* 71 (Rand Inst. 2002) (at least 22 asbestos bankruptcies between 2000 and July 2002); Letter from the American Academy of Actuaries to Senator Frist (March 24, 2004) at Exhibit 2a (identifying more than 70 asbestos bankruptcy filings, 34 of which were filed in 2000 or later).

91100-001\DOCS_DE:102549.1

(i) As the American Bar Association recognized in 2003, "by virtually all accounts, contemporary asbestos litigation is no longer driven solely, or even primarily, by the occurrence of disabling asbestos-related diseases."[21]

(ii) In another ongoing asbestos bankruptcy case, it was recently disclosed that an expert retained by Owens Corning, Dr. Friedman, concluded that only 13.3% of claims met the minimal medical standards that had been agreed to by Owens Corning and asbestos plaintiffs' law firms to establish compensable claims under Owens Corning's National Settlement Program (NSP). The starkness of Dr. Friedman's finding that 87.3% of a random sample of settled nonmalignant claims lacked supporting medical evidence is stunning. However, even this number is apparently too low, as Dr. Friedman wrote that "a review of the radiographic reports and ILO forms raises serious questions concerning their reliability. These factors are likely to place downward pressure on the 13.3%."[22]

(iii) As part of recent Senate hearings, a leading medical expert in asbestos-related diseases wrote claimants are being compensated "for illnesses that, according to the clear weight of medical evidence, either are not caused by asbestos or do not result in a significant impairment - i.e., are not generally regarded by the medical profession as an illness." *Id.* at 79 (citing Letter from Dr. James Crapo to Senator John Kyl, dated June 23, 2003).

(iv) In 2002, another plaintiffs' expert witness wrote about medical screenings sponsored by plaintiffs' lawyers that: "Over the past 2 years, I have noted that many of these individuals [worker-plaintiffs] could not (due to inadequate latency or exposure) and did not manifest any evidence of asbestos-related disease... I was amazed to discover, that in some of the screenings, the worker's X-ray had been "shopped around" to as many as six radiologists until a slightly positive reading was reported by the last one of them. The "shopping around" of X-rays is not sound or proper medical practice and may, in fact, result in harm to some of the screened individuals. Some workers end up being unnecessarily and incorrectly advised that they have a potentially or invariably fatal disease. A number, no doubt, suffer anxiety and stress as a result. Others may change their life plans for no valid reason.... Finally, with respect to public policy, compensation dollars are now unnecessarily diverted from real victims of

---

[21] Report of Am. Bar Ass'n Comm'n on Asbestos Litig. at 7 (Feb. 2003) ("ABA Report").

[22] Brief in Support of Motion of CSFB, as Agent, to Establish Procedures to Obtain a Sample of Medical Records, Including X-rays, From Asbestos Personal Injury Claimants Asserting Nonmalignant Claims Against the Debtors and to Modify the Court's August 19, 2004 Scheduling Order, *In re Owens Corning*, Case No. 00-3837 to 3854 (JKF) (October 4, 2004) at Ex. C.

19

asbestos exposure and their families to transaction costs and compensation of the uninjured and unimpaired."[23]

(v) Another expert has noted that "A select few handfuls of B-readers and doctors cooperate with the enterprises by 'diagnosing' massive numbers of those screened as having asbestosis or 'consistent with asbestosis."[24]

(vi) According to a July 23, 2002 letter from Steven Kazan, a well-known plaintiffs' lawyer, to Judge Weinstein, 90% of the Manville Trust's last 200,000 claims originated from attorney-sponsored x-ray screening programs; 91% of all claims against that Trust allege only non-malignant asbestos "disease," and those claimants currently receive 76% of all Manville Trust payouts.

(vii) Commenting on the resulting dilution of payouts to truly injured claimants, Judge Weinstein stated at a 2002 hearing that: "It is absolutely essential to cut unnecessary claims, invalid claims, improper claims to improve payments to those who are most seriously injured and to cut the costs of distribution."[25] As explained by one Senior Judge, "these suits are brought on behalf of individuals who are asymptomatic as to an asbestos-related illness and may not suffer in the future. Substantial transaction costs are expended, and therefore unavailable for compensation to truly ascertained asbestos victims."[26]

(viii) The RAND organization, which for years has analyzed the asbestos litigation crisis, issued a 2002 report with blunt observations: "In asbestos litigation, however, mass litigation strategies have effectively opened the courts to everyone who alleges that they were exposed to asbestos and incurred some injury, without regard to whether and to what degree they are functionally impaired and sometimes without much attention to the strength of their evidence of exposure."[27]

---

23  David Egilman, Letter to the Editor, *Asbestos Screenings*, AM. J. OF INDUSTRIAL MED. 42:163 (2002).

24  Written Statement of Professor Lester Brickman, Subcommittee on Commercial and Administrative Law of the United States House of Representatives Committee on the Judiciary at 10 (July 21, 2004).

25  *Findley v. Falise*, No. 90-3973, hearing transcript at p. 34 (E.D.N.Y. Sept. 4, 2002).

26  *In re Asbestos Prod. Liab. Litig.* (No. VI), MDL 875, Admin. Order No. 8, at 1-2 (E.D. Pa. Jan. 14, 2002).

27  Deborah R. Hensler et al., Asbestos Litigation Costs and Compensation: An Interim Report 85 (Rand Inst. 2002).

20

(ix) Former United States Court of Appeals Judge and United States Attorney General Griffin Bell has written that "asbestos litigation now stands as the only part of our tort system in which people who can show no real physical injury are routinely allowed to recover."[28]

52. It is precisely this widespread, historical abuse of the tort system that makes these proposed estimation procedures so critical. Put simply, it is impossible to extrapolate from Grace's past, forced payment of these garbage claims to determine what its *true* liability is.

D. **The Debtors' analysis of the 1997 and 2000 Claims further confirms the need for additional Claims information to define the Debtors' liability.**

53. In connection with the Original CMO Motion briefing, the Debtors completed an analysis of 500 randomly selected Claim files from its 1997 and 2000 filings. The Debtors augmented the meager medical data and occupational exposure information in its own inventory settlement files by obtaining information that the same Claimants filed with the Manville Trust and the Center for Claims Resolution. *See* Claims Report, Exhibit K to the 2001 CMO Reply Brief. The combined data from that survey confirms that the vast majority of the 1997 Claims were invalid or of doubtful validity, and that valid year 2000 Claims are even more scarce.

E. **The vast majority of the Claims provide no evidence of impairment.**

54. The surge in Claims against the Debtors is not due to an increase in the most serious and best-documented Claims, i.e., cancer Claims, but overwhelmingly is due to non-malignant Claims. Less than 7% of the 1997 Claims were for mesothelioma, lung cancer, or other cancers. Seventeen percent of the Claims included so little information that the type of disease could not even be determined. And the remaining 76% were for non-malignant conditions.

---

[28] Griffin B. Bell, Asbestos Litigation & Tort Law: Trends, Ethics & Solutions: Asbestos & the Sleeping Constitution, 31 PEPP. L.REV. 1 (2003) ("The Sleeping Constitution").

21

No. 8395

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| W. R. GRACE & CO., *et al.*, | ) Case No. 01-1139 (JKF) |
| Debtors. | ) (Jointly Administered) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF W.R. GRACE & CO.'S MOTION TO APPROVE PI CMO AND QUESTIONNAIRE

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet Baer
Jonathan P. Friedland
Salvatore F. Bianca
Joseph Nacca
Andrea L. Johnson
200 East Randolph Drive
Chicago, IL 60601
Telephone:    (312) 861-2000
Facsimile:    (312) 861-2200

KIRKLAND & ELLIS LLP
Barbara M. Harding
Brian T. Stansbury
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:    (202) 879-5000
Facsimile:    (202) 879-5200

Dated: May 10, 2005

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
Laura Davis Jones (Bar No. 2436)
David Carickhoff (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession

91100-001\DOCS_DE:107964.1

No. 8395

In response to the flood of claims, the Manville Trust conducted an outside claims audit. This audit revealed massive abuse: 41% of claims presented *no* evidence of asbestos-related disease. *See* A.R. Localio *et al.*, Biostatics Section, Dept. of Health Evaluation Serv., Penn. State Univ. College of Medicine & Center for Clinical Epidemiology and Biostatics, *The Manville Personal Injury Settlement Trust X-ray Audit: An Assessment of the Identification of the Underlying Disease Process Implications for Medical Review by Certified B-Readers* at 14 (1998) (Appendix Exhibit C) (hereinafter, the "Penn. State Audit"). [9] For a substantial percentage of the remaining claims, independent doctors could not replicate the diagnosis of an asbestos-related disease. *Id.*



---

[9] For a further discussion of the audit and the circumstances surrounding it, *see* Lester Brickman, *On the Theory Class's Theories of Asbestos Litigation: The Disconnect Between Scholarship and Reality*, 31 PEPP. L. REV. 34, 132 n. 344 (2003) (hereinafter "Brickman 2003") (Appendix Exhibit D); and Rand Report, 2002, *supra*.

4

Failure rates for replication were highest among a small group of doctors, as seen in the above chart. *Id.* Indeed, 63% of the asbestosis claims supported by this handful of doctors could not be replicated by independent experts and over 1/3 of these claims showed *no evidence* of asbestos-related disease. *Id.* The audit also discovered a statistically significant correlation between the failure rate of a doctor and the law firm by whom the doctor was retained. *Id.*[10] But the most startling fact of all was the revelation that this handful of doctors accounted for almost ½ of the *total claims* against the Manville Trust. *Id.*



As the chart above demonstrates -- for the single most active doctor, 49% of his claims showed *no evidence of disease* whatsoever. *Id.* Not surprisingly, referrals to this doctor

---

[10] *The Fairness in Asbestos Injury Resolution Act of 2003*, S. Rep. No. 108-118, at 98 (2003) (statement by Sen. Jon Kyl, Member, Sen. Comm. on the Judiciary). The biostatisticians conducting the audit concluded, in a written report submitted to the trust in February 1998, that the particular law firm that submitted any given claim was "a strikingly significant predictor" of whether that claim would fail the audit, and that those findings exhibited "huge levels of statistical significance."

experts found that *over 95%* of 1,900 "positive" PFT cases did not meet ATS standards in the first case[56] and *over 98%* of 3,486 "positive" PFT cases did not meet ATS standards in the second case.[57]



## B.   Hard Data Now Confirms the Magnitude of the Problem.

While the problems with the medical data and tests, including their abuse, have long been known by defendants, judges, and politicians, hard data now confirms the severity and pervasiveness of these problems throughout the tort and bankruptcy systems. As shown in the

---

*also,* Tr. of Hr'g at 29-33, *Owens Corning v. Credit Suisse First Boston,* No. 04-CV-905 (Bankr. D. Del. Jan. 13, 2005) (Clyde M. Leff) (settled RICO claims against certain mass screening enterprises with false "positive" PFTs for "just under $3 million dollars").

[56]   Brickman 2003, *supra,* at 119-20 (citing Compl. at 60-67, *Owens Corning v. Pitts,* No. 96-CV-2095 (E.D. La. June 19, 1996)).

[57]   Brickman 2003, *supra,* at 126-27 n. 326 (citing Compl. at 60-62, *Owens Corning v. McNeese,* Civil Act 3:97CV29WS (S.D. La. 1997)).

chart below, the following scientific studies and expert analyses confirm the consistent and prevalent over-diagnosis of asbestos-related conditions:[58]

### Studies Showing Poor Medical Data

| Study | Result |
|---|---|
| Tire Workers Study | 96.4% of 439 tire workers allegedly suffering from asbestos-related disease did not have conditions consistent with asbestos exposure. |
| Penn. State Audit | 41% of claims did not present evidence of asbestos-related disease. |
| Babcock & Wilcox Claims Analyses | 74% of claims did not allege diagnostic results consistent with lung impairment or asbestosis. |
| Friedman Expert Report in Owens Corning | 86.7% of claims did not meet minimal standards set by NSP. |
| Johns Hopkins Study | 95% of films did not have abnormalities. (Original plaintiff B-readers diagnosed 96% as showing abnormalities.) |

These studies demonstrate the abuse associated with a large percentage of asbestos-related claims. Indeed, in the most recent study, over 95% of the claims *failed* to meet minimal diagnostic criteria.[59]

---

[58] R.B. Reger, W.S. Cole, E.N. Sargent & P.S. Wheeler, *Cases of Alleged Asbestos-Related Disease: A Radiologic Re-Evaluation*, Vol. 32, No. 11, Journal of Occupational Medicine 1088 (Nov. 1990) (Appendix Exhibit E) (hereinafter "Tire Workers Study"); Penn State Audit, *supra*; Babcock & Wilcox Claims Analyses, *In re The Babcock & Wilcox Co.*, B&W's Supplemental Brief in Further Support of its Proposed Litigation Protocol & Report to the Court Regarding Asbestos Developments Generally and the Proofs of Claim Filed Here, Case Nos. 00-0558, 00-10992 at 45, (Oct. 18, 2001 & Jan. 7, 2002) (hereinafter "Babcock & Wilcox Claims Analyses"); Expert Report of Dr. Gary K. Friedman, *In re Owens-Corning*, Case Nos. 00-3837 to 3854 at 4 (Bankr. D. Del. 2002) (Appendix Exhibit F) (hereinafter "Friedman Expert Report in *Owens Corning*"); and Joseph N. Gitlin, Leroy L. Cook, Otha W. Linton & Elizabeth Garrett-Mayer, *Comparison of "B" Readers' Interpretations of Chest Radiographs for Asbestos Related Changes*, Acad. Radiol. 2004; 11:843-856 (Appendix Exhibit G) (hereinafter "Johns Hopkins Study").

[59] *See* Johns Hopkins Study, *supra*, at 855.

In addition to the scientific studies, independent studies by courts demonstrate the problem of poor and/or fraudulent medical data in asbestos litigation. In the late 1980s, the United States District Court for the Southern District of Ohio appointed a standing panel of ten neutral experts to review the medical records of 65 pending asbestos bodily injury cases. Hon. Carl Rubin & Laura Ringenbach, *The Use of Court Experts in Asbestos Litigation*, 137 F.R.D. 35, 37, 39 (1991). Although all the plaintiffs claimed some asbestos-related condition, the court-appointed experts found that 65% *had no asbestos-related condition whatsoever. Id.*[60]

In another example, Raymark Industries sued certain attorneys and medical screeners alleging they had defrauded the company in connection with a class action settlement with tire workers allegedly injured from exposure to asbestos products. *See Raymark Indus.*, 1990 WL 72588 at *2, *8, *22. The court overseeing the case found that the medical screeners departed from accepted medical standards by diagnosing asbestos-related "injuries" that failed to meet minimum American Thoracic Society diagnostic criteria. *Id.* As a result, the court concluded that "many, if not most" of the cases were "without merit" and denied the attorneys' and medical screeners' motion for summary judgment on the fraud and RICO charges. *Id.* (Overall, the court concluded that the screening program produced a "steady flow of faulty claims" and a "fraud on the court.").

---

[60] In approximately 80% of the cases, the court-appointed experts found no asbestos disease, and in thirteen of sixteen cases in which the expert testified, the jury agreed with the expert. *Id.* at 41 ("The conclusion is inescapable: A Court's expert will be a persuasive witness and will have a significant effect upon a jury."). Judge Rubin concluded that Federal Rule of Evidence 706 which allows a federal court to appoint experts "on its own motion" was essential to guard against a "Battle of the Experts" and resolved to use Rule 706 in future asbestos cases where appropriate.

91100-001\DOCS_DE:107964.1

- appeared to be the result of mass screenings.[75]



Thus, Grace now stands in shoes similar to past asbestos debtors, but seeks not to repeat the mistakes of those bankruptcy cases. Grace is not asking the court to fix the whole system of asbestos litigation -- but merely to employ a legally *available* and scientifically *valid* process to reduce the likelihood that fraudulent and invalid claims will be considered in estimating Grace's aggregate legal liability.

---

"Zonolite Spra-Tex," a *decorative* ceiling product that never would be used in a steel works. Others at the same plant listed "Zonolite Monokote," the fireproofing product used in *commercial* high-rise buildings.)

[75] *Id.* (Many of these new claims appear to be the result of recent mass screenings and claim recruiting efforts at large industrial plants. For example, during the Fall of 2000, a single plaintiffs' law firm submitted 1,672 claims to Grace, nearly all of which were for steelworkers in Pennsylvania, West Virginia and Ohio. In the winter of 2001, that same law firm submitted another 400 claims from a single plant in Gary, Indiana.)