# EXHIBIT "F"

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., *et al.*, | ) | Case No. 01-1139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

## DEBTORS' STATUS REPORT REGARDING MOTION TO APPROVE ASBESTOS PI ESTIMATION CMO AND QUESTIONNAIRE

Dated: July 13, 2005

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick
Jonathan Friedland
Salvatore Bianca
200 East Randolph Drive
Chicago, IL 60601
Telephone: (312) 861-2000

KIRKLAND & ELLIS LLP
Barbara Harding
Brian T. Stansbury
655 15th St., NW
Washington, D.C. 20005
Telephone: (202) 879-5000

PACHULSKI, STANG, ZIEHL, YOUNG,
JONES & WEINTRAUB P.C.
Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100

Co-Counsel to Debtors and Debtors in Possession

K&E 10627184.14

No. 8994

in support of the PI CMO and Questionnaire cites extensively to the interim Rand Report published in 2002. The final Rand Report further supports the Debtors' positions as follows:

- Claimants with nonmalignant conditions are a growing proportion of all claimants:

    "Nonmalignant claims accounted for roughly 80% of all claims entering the system through the mid-1980s. The fraction of claims that asserted nonmalignant conditions grew through the late 1980s and early 1990s, rising to more than 90 percent of annual claims in the late 1990s and early 2000s." Rand Report, 2005, at xxv.

- Many claimants are unimpaired:

    "Some evidence suggests that most nonmalignant claimants are currently unimpaired." *Id.* at xxv.

- Plaintiff law firms are suing peripheral defendants:

    "At least 8,400 entities have been named as asbestos defendants through 2002." *Id.* at xxv, 78-79. The 2002 Rand Report estimated only 6,000. Similarly, defendants and claims from workers in non-traditional industries are increasing at a greater rate than claims from workers in traditional asbestos-exposed industries. *Id.* at 76-77, 81-83.

**The Silica Decision**

Second, on June 30, 2005, United States District Court Judge Janice Graham Jack issued Order No. 29: Addressing Subject-Matter Jurisdiction, Expert Testimony and Sanctions in the matter of *In re Silica Prods. Liab. Litig.*, No. 1553, 2005 WL 1593936, at *1 (S.D. Tex. June 30, 2005) (attached as Exhibit 2). *In re Silica* involves approximately 10,000 plaintiffs in Mississippi, West Virginia, Alabama, California, Illinois, Michigan, Oklahoma, and Texas, and dozens of manufacturing and mining company defendants, including 3M Company, Lockheed Martin, Vulcan Materials, and U.S. Silica. Two of the Court's findings in particular bear relevance to the Grace bankruptcy: (1) thousands of plaintiffs in the Silica Litigation have apparently already separately asserted claims against asbestos defendants for the *same* injury involved in their silica claims; and (2) the plaintiffs' silicosis diagnoses in the Silica Litigation

appear to be questionable, if not fraudulent. Judge Jack stated that testimony during *Daubert* hearings that took place February 16-18, 2005 raised "great red flags of fraud" on the part of doctors and plaintiff attorneys involved in the case. Tr. of Hr'g at 24 (Feb. 17, 2005). Notably, many of the *same doctors and plaintiffs' attorneys* are involved in Grace's bankruptcy.

It is almost ironic that for the past three years, the Debtors have contended that the most critical issue to resolving this bankruptcy is the reliability of the scientific and medical data underlying their asbestos claims. At the same time, and in the face of mounting evidence from the medical, legislative, and legal communities suggesting that those data are unreliable, the claimants' committees have resisted any and every attempt of the Debtors and the Court to investigate the medical and scientific foundation of those claims. It is precisely that proposition, namely -- the unreliability of scientific and medical data -- that formed the basis of Judge Jack's opinion in *In re Silica*. Moreover, in its investigation of the reliability of the medical and other scientific data underlying the silica claims, Judge Jack employed precisely the same procedure and standards for dealing with large numbers of claims that the Debtors here have advocated before this Court. Indeed, Judge Jack accomplished the claims review and expert analysis in a relatively short period of time (indeed, during the same time period that the claimants have persistently argued against this process)..

What the Silica court found is not astonishing to those who have seriously investigated the proliferation of asbestos and silica claims in the United States and indeed, in some respects, is merely confirmation of the factual predicate stated in the Debtors' CMO brief. Because the opinion is over 250 pages long, the Debtors recite just a sample of the highly relevant findings of the Court:

- Commenting on the fact that of the 6,757 silica plaintiffs screened by one company, 4,031 of those plaintiffs also had filed asbestos claims: "[T]he magnitude of this feat

3

becomes evident when one considers that many pulmonologists, pathologists and B-readers go their entire careers without encountering a single patient with both silicosis and asbestosis." Order at 80. "Stated differently, a golfer is more likely to hit a hole-in-one than an occupational medicine specialist is to find a single case of both silicosis and asbestosis. [The screening company] parked a van in some parking lots and found over 4,000 such cases." *Id.*

- Commenting on the conduct of the lawyers, many of whom have claims against Grace, the Court stated: "In the majority of cases, these diagnoses are more the creation of lawyers than of doctors." Order at 149.

- Regarding Dr. Harron's diagnosis of silicosis for 1,807 silica plaintiffs who had previously filed asbestosis claims based on Dr. Harron's B-reading of the same x-rays]: "the sheer volume of Dr. Harron's asbestosis/silicosis reversals ... can only be explained as a product of bias -- that is, of Dr. Harron finding evidence of the disease he was currently being paid to find." Order at 157. Grace has historically paid thousands of claims supported by Dr. Harron's "diagnosis" and believes that of the current claims, many if not thousands, are supported by his work.

- Highlighting the applicability of her findings to the asbestos litigation, Judge Jack stated: "It is worth noting that this evidence of unreliability of the B-reads performed for this MDL is matched by evidence of unreliability of B-reads in asbestos litigation." Order at 136 (citing *American Radiology* study in which 492 chest x-rays that had been read by plaintiffs' doctors had a 4.5% positive asbestosis rate versus the 95.9% positive rate achieved by the plaintiffs' doctors).

Judge Jack made numerous findings concerning the difference between relevant medical standards and methods, and the actual methods and "standards" employed by the plaintiffs' doctors:

- "[A] thorough, detailed, physician-guided work/exposure history is the kind of history that experts in the field of occupational medicine insist upon when diagnosing silicosis. *It is therefore the type of history required by the Federal Rules for these diagnoses to be admissible.*" Order at 125 (emphasis added) (finding that the doctors did not solicit the critical information).

- "[T]he gulf between the methodology Dr. Levy employed for this litigation and the methodology Dr. Levy advocates in his academic work starkly contravenes the Supreme Court's requirement that an expert ... *employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.*" Order at 159 (internal citations and quotations omitted) (emphasis added).

- Additionally, the Court harshly criticized the same doctors in the silica MDL who have diagnosed asbestos claimants (including Dr. Ray Harron who has diagnosed

4

## III. THE PROPOSED QUESTIONNAIRE SEEKS EVIDENCE RELEVANT TO THE ESTIMATION AND IS DESIGNED TO MINIMIZE THE CLAIMANTS' DISCOVERY BURDEN.

As discussed in Debtors' Motion, given the known abuses in asbestos litigation, the known failure of past estimations and trusts, and the current state of legislative reforms concerning asbestos claims, all of the information in the questionnaire is relevant and proper for use by experts in an estimation of current and future claims liability and value. The foundation for the requests in the Questionnaire are contained primarily in Debtors' Motion to Approve the CMO and Questionnaire. Debtors will not repeat the information and arguments presented in support of the content of the Questionnaire in that Motion.

The recent decision by Judge Janice Graham Jack in *In re Silica Products Liability Litigation* underscores the importance of requiring scientifically reliable evidence in this estimation proceeding. The *In re Silica* decision invalidated several hundred silicosis diagnoses and recommended the invalidation of almost 10,000 more:

> The Court has addressed the testimony it has received regarding *all* the diagnoses by *all* of the challenged doctors in this MDL, despite the fact that . . . the Court has ultimately found that the Defendants have failed to meet their burden of establishing that the Court has subject-matter jurisdiction over the vast majority of these cases . . . . In spite of this, the Court has included its findings concerning all of the testimony it received, in hopes that the state courts that ultimately must shepherd these cases to their conclusion will not have to re-hear *Daubert*-type challenges to these doctors and their diagnoses."

*In re Silica Products Liability Litigation*, Order at 154 (emphasis in original). The court determined that the B-readers and doctors who diagnosed the silicosis claimants failed to follow the appropriate medical guidelines for their specialty and based their opinions on unreliable medical evidence.

16

147. ("[T]he failure of the challenged doctors to observe the same standards for 'legal diagnosis' as they do for a 'medical diagnosis' renders their diagnoses in this litigation *inadmissible under Rule 702*.") (emphasis added).[10]

Thus, the following discussion provides new and further support for the relevance of information sought by the Questionnaire, particularly the information relating to (a) diagnosis and B-readings, (b) PFT tests, (c) past litigation history, (d) exposure to Grace and non-Grace asbestos-containing products and (e) a proper medical and occupational history.

### A. The Importance of Information and Data Relating to the Reliability of B-Reading Evidence

In relevant part, the Debtors' Questionnaire asks the Claimants to provide the X-ray and B-reader report supporting the Claimants' asbestosis claim. The Objectors contend that a claimant should not have to provide the actual B-read and X-ray, because a single medical report containing a diagnosis is sufficient to withstand summary judgment. (PI Comm. Obj. at 21). Additionally, the Objectors argue that there is no need for replicated B-reads. (PI Comm. Obj. at 41). However, Judge Jack's discussion of the B-reading "evidence" in the silica litigation provides further critical support for the Debtors' Questionnaire requests relating to this issue. The following are just some of the relevant statements and findings concerning the unreliability of B-read evidence:

- "These [silica] diagnoses rest predominantly upon a positive B-read. Indeed, some of the Plaintiffs' lawyers and even the doctors seemed to enter the *Daubert* hearings under the impression that a positive B-read is a talisman that would dispel any doubts about the diagnoses as a whole. As discussed at length in this Order,

---

[10] Moreover, even if this Court were to consider prior settlement history in estimating asbestos liability (as urged by the Objectors), the Questionnaire is relevant to such estimations methodologies because, as discussed in *Owens Corning*, it will elicit information necessary to determine the nature and extent of any "adjustments" that must be made to estimates based on settlement history. Indeed, the FCR concedes this very point. (*See* FCR Obj. at 21.)

18

according to generally-accepted medical principles, a positive B-read simply does not equal a diagnosis." Order at 51.

- "Furthermore, when comparing the names of the approximately 6,757 N&M generated MDL Plaintiffs with the names in the Manville Personal Injury Settlement Trust . . . at least 4,031 N&M-generated Plaintiffs have also made asbestosis claims. The magnitude of this feat becomes evident when one considers that many pulmonologists, pathologists and B-readers go their entire careers without encountering a single patient with both silicosis and asbestosis." Order at 79-80.

- "Moreover, even assuming that the B-read itself is performed in an unbiased and reliable manner (a highly dubious assumption in these cases), the history and purpose of the B-reader program exposes a more fundamental problem in the Plaintiffs' current use of B-reads." Order at 51.

- "However, in the setting of a mass screening and/or mass B-reading for litigation, the B-reader is acutely aware of the precise disease he is supposed to be finding on the x-rays. In these cases, the doctors repeatedly testified that they were told to look for silicosis, and the doctors did as they were told." Order at 52.

- "The unsound nature of the diagnoses is betrayed not only by the opportunistic transformations of asbestosis reads into silicosis reads, but also by the improbable *consistencies* among the silicosis reads." Order at 54 (emphasis in original).

- "Finally, it is worth noting that this evidence of the unreliability of B-reads performed for this MDL is matched by evidence of unreliability of B-reads in asbestos litigation." Order at 136.

Furthermore, there is no doubt that the same unreliable diagnosis and B-reader reports described and uncovered by Judge Jack in the silica claims exist and flourish in the current PI asbestos Grace claims before this Court. Although incomplete as of the time of the filing of this pleading, the following facts are known:

- There were many law firms identified by Judge Jack as participating in the filing of unsubstantiated claims of silicosis. *Id.* at 60. A preliminary search of Grace's files indicates that a substantial number of those law firms are implicated in Grace's claims. The following is merely a *sample* of law firms that submitted asbestos retreads in *In re Silica* who *also* filed Grace claims and the associated number of pending claims, known to date, in Grace's bankruptcy: Alwyn Luckey (418); Baron & Budd (6,495); Barton & Williams (310); Campbell Cherry (2,947); Cascion, Vaughn Law Offices (2,908); Cumbest, Cumbest, Hunter & McCormick (1,415); Ferraro & Associates (2,461); John Arthur Eaves (2,973); Louis S. Robies, P.A. (2,685); Maples & Lomax (434); Morris, Sakalarios & Blackwell (2,487); Motley Rice, LLC (7,017); Pierce, Raimond, Osterhout, Wade, Carlson & Coulter, P.C.

19

(3,952); Provost & Umphrey (1,252); Varas & Morgan (1,784); Williams, Bailey Law Firm LLP (1,385).

- Judge Jack examined and criticized the conduct of these attorneys, including their practice of B-read shopping, finding: "Sometimes, law firms (especially Campbell Cherry) would ask N&M to have another doctor do re-reads of the x-rays which had been read as positive for silicosis. And if the subsequent B-reader (often Dr. Martindale) did not make a positive silicosis finding, then N&M would send the x-ray to a third B-reader for yet another read. Mr. Mason thought it was even possible that if the third reader also did not make a positive silicosis finding, then the x-ray would be sent to a fourth reader. And while some law firms did not want diagnoses made by Dr. Harron, other law firms (for example, the law firm group of Barton & Williams) would accept the initial Dr. Harron positive B-read even after two subsequent B-readers had read the x-rays as negative for silicosis." Order at 75-76 (internal citations omitted).

- With respect to past settled Grace claims, it appears that the law firms implicated in the silica claims scandal accounted for over 100,000 claimants. For current Grace claims – claims before this Court that will serve as the basis of the Court's ultimate estimation – at least 40,000 of the claims were filed by these same law firms.

- Similarly, Judge Jack identified several doctors and screening companies as providing fraudulent and unfounded medical data concerning silicosis. Importantly, she specifically found that the inaccuracies occurring in the diagnosis of silicosis claims also are occurring in the diagnosis of asbestosis claims. *Id.* at 136. As an example, Judge Jack noted that it is a rare occurrence to find both asbestos and silica-related injuries in the same person.[11] Despite this, Judge Jack found that the following doctors diagnosed asbestos/silica re-treads in *In re Silica Products*: Robert B. Altmeyer, James Wayland Ballard, John W. Evans, Jr., Andrew Harron, Ray A. Harron, Jack H. Hasson, Jeffrey J. Laborde, Richard B. Levine, Phillip Howard Lucas, W. Allen Oaks, Alvin J. Schonfeld, and Paul C. Venizel.

---

[11] *See, e.g.*, Dr. David Weill, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 4 (Feb. 3, 2005) ("Because asbestosis and silicosis have such difference appearances on an x-ray, in a clinical setting, "confusion between silicosis and asbestosis does not occur.") ("Even in China, where I saw workers with jobs involving high exposure to asbestos and silica (such as sandblasting off asbestos insulation), I did not see anyone or review chest radiographs of anyone who had both silicosis and asbestosis."); Dr. Paul Epstein, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 2, 3 (Feb. 2, 2005) ("[T]he x-ray appearances of these two dust-related diseases [i.e., silicosis and asbestosis] are vastly different.") ("[I]t is my professional opinion that the dual occurrence of asbestosis and silicosis is a clinical rarity."); Dr. Theodore Rodman, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 2 (Feb. 2, 2005) ("Among the thousands of chest x-rays which I reviewed in asbestos and silica exposed individuals, I cannot remember a single chest x-ray which showed clear-cut findings of both asbestos exposure and silica exposure."); *In re Silica*, Tr. of Hr'g at 89-90 (S. D. Tex. Feb. 18, 2005) ("Dr. John Parker, former administrator of NIOSH's B-read program and current revision of the ILO guidelines testified that he has never seen a clinical case of asbestosis and silicosis in the same individual.").

- The *In re Silica* Court levied heavy criticism against the majority of these doctors. For instance, the Court noted that "in *every one* of the approximately 6,350 reports ... purportedly issued by Dr. [Ray] Harron, Dr. Harron failed to write, read or personally sign the actual report." *In re Silica Products* Order at 84 (other failures included "trust[ing] the secretaries/typists to know how to 'translate [the ILO form] into English' ... despite the fact that none of them had any medical training" and allowing "his secretaries, a typing company, N&M, and perhaps others, to 'prepare [his] reports, stamp [his] name on them and send those reports out without [him] editing or reviewing them.'"); *see also id.* at 89-91 (when confronted by his large number of unexplained asbestosis/silicosis diagnosis reversals Dr. Harron "asked for representation ... [and] did not re-take the witness stand.") The Court found that Dr. Harron's son, Dr. Andrew Harron, followed the same deficient procedures as his father. *Id.* at 91-92. Dr. James Ballard, admitted when testifying that he understood that the statement that "there is exposure to history that's consistent with asbestosis ... meant to Dr. Ballard that the lawyers and/ or [screening company who hired him] want[ed] [Dr. Ballard] to look for asbestosis. Dr. Ballard acknowledged that this could sway his reading." Order at 94 (internal quotation marks omitted). Dr. W. Allen Oaks testified that "[w]hen reading x-rays ... if the screening company told him to read for silicosis, that is the only disease he would mention in his report, even if he felt the x-ray was also consistent with asbestosis. Likewise, if the screening company told him to look for asbestosis, that is all he would report." *Id.* at 113.

- Once again, a preliminary review of the limited information on this issue in Grace's current claims demonstrates that those same doctors and B-readers provide the foundation - the medical "evidence" - for a large number of the claims before this Court in this estimation.

- Finally, and most tellingly, it appears that some of the most flagrant fraud concerning claims - the "retreads", *i.e.*, asbestosis claims turned silica claims and vice versa -- exist in Grace claims as well. Again, this analysis is preliminary, but in a comparison of Grace claims with the claims in the silica litigation, Grace has discovered that numerous current Grace claimants also are/were MDL silica claimants.

In light of the overwhelming and undisputed record demonstrating the unreliability of B-reader evidence, Debtors will advocate during the estimation that value should only attach to asbestosis claims where the claimant provides independent, replicated B-reader reports and the actual X-rays themselves to ensure that fraudulent and unreliable evidence, like that associated with the silica claims filed by the above lawyers and supported by the above doctors does not taint this estimation as it tainted the proceedings before Judge Jack. Importantly though, the Court does not have to decide at this point that it agrees or disagrees with Debtors' position on