# EXHIBIT "G"

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JJF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**DEBTORS' MOTION FOR LEAVE TO FILE OMNIBUS REPLY TO VARIOUS OBJECTIONS TO THE DEBTORS' MOTION FOR ENTRY OF CASE MANAGEMENT ORDER, ESTABLISHMENT OF A BAR DATE, APPROVAL OF THE PROOF OF CLAIM FORMS AND APPROVAL OF THE NOTICE PROGRAM (RE: DOCKET NO. 545)**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), hereby request authority to file an omnibus reply (the "Omnibus Reply") pursuant to Del.Bankr.LR 9006-1(d) and D.Del.LR. 7.1.3(a)(D) in further support of the *Motion For Entry of a Case Management Order, Establishment of a Bar Date, Approval of the Proof of Claim Forms and Approval of the Notice Program* (the "Motion"), which Motion is currently pending before the Court and set for hearing on November 21, 2001 at 12:00 p.m.

Various creditors and official committees appointed in these chapter 11 cases have filed objections and responses to the Motion. The Debtors seek to file the Omnibus Reply for the purpose

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

### b.    Exposure Sufficient To Cause Disease

A second significant problem, arising both in prior litigation and in the sample claims noted above, is the lack of evidence of dose and exposure sufficient to cause harm. In toxic tort cases, merely working at a site where an asbestos product was present does not give rise to a cause that is sustainable under the Federal Rules of Evidence. The plaintiff must show that he or she was exposed to defendant's allegedly hazardous product or material and that such exposure proximately caused injury.

It is a fundamental tenet of science that "the dose makes the poison."[23] Any substance can be harmful in a large enough dose. Conversely, many substances that are known to be harmful at high doses – such as aspirin – are harmless at lower doses. This is true with asbestos as with all other chemicals. Virtually every person in North America has been exposed to asbestos. Indeed, pathology data show that individuals in the general population have thousands, even millions, of asbestos fibers in their lungs with no adverse effect.[24] According to Dr. Andrew Churg, a leading pathologist of asbestos diseases, "one may find as many as 40 million fibers of chrysotile, 40 million fibers of tremolite, and 400,000 fibers of amosite or crocidolite in the lungs of the general population of Vancouver, along with 40,000 asbestos bodies." Even so, "there is no evidence that this fiber burden produces asbestos-related disease in the general population."

---

[23]  This principle, first articulated by Paracelsus in the sixteenth century, is one of the foundations of modern toxicology. In the words of Paracelsus: "What is there that is not poison? All things are poison and nothing [is] without poison. Solely the dose determines that a thing is not a poison." *See* Casarett and Doull's *Principles of Toxicology:* THE BASIC SCIENCE OF POISONS at 14 (Klaasen ed., 5th ed., 1996); REFERENCE GUIDE ON TOXICOLOGY, in Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 403 (2000).

[24]  "The first conclusion to be drawn is that everyone in the population carries a fairly substantial burden of asbestos fibers in their lungs." A. Churg, *Nonneoplastic Disease Caused by Asbestos,* in PATHOLOGY OF OCCUPATIONAL LUNG DISEASE (Churg & Green, ed. 2nd 1998) at 293.

Hence, not every person who worked near a Grace asbestos product can demonstrate causation of injury. Here again, threshold determinations must be made under *Daubert*. The whole concept that "the dose makes the poison" is incorporated into the court's gatekeeping function under *Daubert*. A claimant thus has the burden of proving – by reliable and reproducible evidence – that (1) there is an established level of exposure to asbestos that causes disease in humans (*i.e.,* general causation) and (2) the claimant himself was in fact exposed to the requisite dose (*i.e.,* specific causation).[25] "[A] plaintiff in a toxic tort case must prove the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover." *Wright v. Willamette Indus., Inc.,* 91 F.3d 1105, 1106 (8th Cir. 1996). Absent "accurate information on the level of [plaintiff's] exposure," a plaintiff's causation testimony must be excluded and summary judgment granted. *Moore v. Ashland Chemical Co.,* 151 F.3d 269, 278 (5th Cir. 1998) *(en banc), cert. denied*, 526 U.S. 1064 (1999). Unless and until the claimant establishes the existence of a harmful dose – and further establishes actual exposure to an amount in excess of that dose – the trier of fact is left to *guess* whether that particular claimant's exposure was sufficient to cause disease. Guesswork is insufficient under *Daubert* or any other rule of evidence. In *Mitchell v. Gencorp.,* 165 F.3d 778 (10th Cir. 1999), the Tenth Circuit affirmed summary judgment because the plaintiff had not shown sufficient reliable scientific information of "levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance." As the court explained: "Absent supporting

---

[25] *See Reference Guide on Epidemiology,* in Federal Judicial Center REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 382 (2000) ("The plaintiff must establish not only that the defendant's agent is capable of causing disease, but also that it did not cause the plaintiff's disease.")

scientific data, . . . estimates and . . . conclusions are little more than guesswork. Guesses, even if

educated, are insufficient to prove the level of exposure in a toxic tort case." *Id.* at 781.

It will be the claimants' burden to demonstrate through reliable scientific evidence the

levels of exposure sufficient to cause both malignant and non-malignant asbestos-related disease.

It will be their burden also to prove the occupational activities where the claimants' exposures to a

Grace product reached such levels.

Following *Daubert* proceedings, Grace expects to move for summary judgment on

all claims where the occupational activity that involved exposure to Grace products has not been

proven (through evidence meeting *Daubert* standards) sufficient to cause the claimed disease.

### c.    Lack Of Compensable Injury

Grace also intends to move for summary judgment against those claims which do not

provide evidence of a legally cognizable injury. Courts universally require the plaintiff to

demonstrate "that the defendant had a duty of care which [was] breached, and that the breach

proximately caused *legally cognizable injury*." *See, e.g., Faya v. Almaraz*, 329 Md. 435, 448, 620

A.2d 327 (1993) (emph. added)." The mere prospect of future harm, without any actual current

harm, is not a legally cognizable personal injury. "Actual loss or damage resulting to the interests

of another" is a necessary element of a negligence cause of action. "The threat of future harm, not

yet realized, is not enough." PROSSER & KEETON ON TORTS § 30, at 165 (5th ed. 1984).[26] A "mere

change or alteration in some physical person, object or thing" does *not* constitute a legally

compensable harm. "Physical changes or alterations may be either beneficial, detrimental or of no

---

[26] This law also bars claims for medical monitoring costs. Medical monitoring claims present no present injury, only the risk of future injury. By definition, a risk of future injury is not compensable.

consequence to a person." A person suffers harm only "[i]n so far as physical changes have a

detrimental effect" on that person. *Id.* § 7 cmt. b.

As is clear from the claims submitted to Grace historically, many claimants complain

of "injury" from mere exposure to Grace products, but without any health problems or symptoms.

Others complain of harmless pleural plaques or asymptomatic pleural thickening. Such conditions,

however, are not compensable.

### *Pleural Plaques*

Pleural plaques are opaque, rounded lesions of the pleura, which is a filmy, plastic

wrap-like tissue membrane that surrounds certain inner surfaces as well as the exterior of the lungs.[27]

Pleural plaques are clinically harmless and do not cause injury or impair lung function. They have

been described in the medical literature as nothing more than "spots" that can be observed on a lung

x-ray, since "by themselves, plaques do not cause loss of function or symptoms."[28] Specifically,

pleural plaques do *not* cause shortness of breath, impair lung function, cause chest pain, cause any

---

[27]  *See generally* American Thoracic Society (ATS), *The Diagnosis of Nonmalignant Diseases Related to Asbestos*, AM. REV. RESPIR. DIS. 134: 363-68, 364 (1996). Pleural plaques typically are seen in the *parietal* pleura, which lines the inner chest wall, inner surface of the rib cage and diaphragm, as opposed to the *visceral* pleura, which surrounds the entire lung. Pleural plaques should generally be bilateral, that is, observed in both lungs.

[28]  According to Dr. Murphy, who headed the ATS committee that established criteria for diagnosing asbestosis, pleural plaques have been referred to as "beauty spots on the roentgenogram" or "markers of exposure" because "by themselves, plaques do not cause loss of function or symptoms." AM. REV. RESP. DIS. 136: 1516-17 (1987) (citations omitted). *See also* L. Brickman, *The Asbestos Litigation Crisis*, 13 CARDOZO L. REV. 1819, 1848 (1992), *citing* Gaensler, *Asbestos-Related Pleural Plaques:  Much Ado About Very Little*, DRI Seminar 10/16-18/91 ("The investigators who initially described the connection between exposure to asbestos and pleural plaques called such lesions 'harmless scurrilous beauty marks on the chest film' because they found them neither associated with loss of function or symptoms nor precancerous. An extensive review of the literature 35 years later has revealed nothing to contradict these original impressions.")

abnormal physical symptoms, decrease life expectancy, or cause any known complications.[29]  In

short, there is a medical consensus that pleural plaques are "an isolated radiographic finding" that

"do not by themselves produce clinically significant reductions in pulmonary function."[30]

    Although some pleural plaques can become calcified and enlarged, "[e]ven strikingly

large and bulky plaques do not cause measurable functional impairment, and when these patients

complain of dyspnea the usual cause is asbestosis or chronic obstructive lung disease."[31]  As Dr.

Browne has written in a leading text, "[w]hether calcified or not, pleural plaques alone are

symptomless; dyspnea [shortness of breath], chest pain, abnormal physical signs and impairment

of lung function are absent."[32]  Nor do pleural plaques increase the risk that the patient may contract

an actual disease associated with asbestos.  Pleural plaques are not precursors of lung cancer,

mesothelioma or asbestosis.[33]

---

[29] *See* K. Browne, *Asbestos-Related Disorders*, in OCCUPATIONAL LUNG DISORDERS (Parkes, ed. 3rd 1994) at 458 ("Plaques themselves have no effect on life expectancy and are not known to give rise to any complications.")

[30] *See* Jones, et al., *The radiographic pleural abnormalities in asbestos exposure: Relationship to physiologic abnormalities*, J. THORACIC IMG. 3: 57-65 (1988). *See also* A. Churg, *Neoplastic Asbestos-Induced Disease,* in PATHOLOGY OF OCCUPATIONAL LUNG DISEASE (Churg & Green, ed. 2nd 1998) at 339 (pleural disease "is still seen with considerable frequency, but it generally has little or no functional import"); Matters of Health and Safety Arising from the Use of Asbestos in Ontario, Toronto, Ontario Ministry of the Attorney General 1984 (hereinafter *"Ontario Royal Commission"*) at 103.  (Plaques are "not associated with clinical and functional abnormalities").

[31] Gaensler et al., *Thoracic Surgical Problems in Asbestos-Related Disorders*, ANN. THORACIC SURG. 40:82-96, 93 (1985).

[32] K. Browne, *Asbestos-Related Disorders*, in OCCUPATIONAL LUNG DISORDERS (Parkes, ed. 3rd 1994) at 455.

[33] *Id.* at 451, 458-59. *See also* A. Churg, *Nonneoplastic Disease Caused by Asbestos*, in PATHOLOGY OF OCCUPATIONAL LUNG DISEASE, at 310 (Churg & Green, ed. 2d 1998) ("There is no evidence that plaques or diffuse pleural fibrosis are in any way precursors of mesothelioma"); W. Weiss, *Asbestos-related Pleural Plaques and Lung Cancer*, CHEST 103: 185-59 (1993) ("[T]he weight of the evidence favors the conclusion that persons with asbestosis-related pleural plaques do not have an increased risk of lung cancer in the absence of parenchymal asbestosis").

### *Pleural Thickening*

Pleural thickening is less common than pleural plaques. It typically affects the visceral pleura, the membrane surrounding the lungs. It can range from a thin, milky discoloration to a thicker fibrosis easily seen on x-ray. Pleural thickening is usually asymptomatic, although extensive diffuse thickening may have an adverse effect on lung function.

### *Courts Have Found That Pleural Plaques, Pleural Thickening And Asymptomatic Asbestosis Are Not Legal Injuries*

The majority of courts that have considered the issue have found that pleural plaques and asymptomatic pleural thickening do not cause injury, harm, loss or detriment. They merely reflect a subclinical change in lung tissue, which is not actionable. "A mere change in the lining of the lung does not constitute an impairment or worsening of a bodily function, nor does it prevent the exercise of a bodily function." *In re Asbestos Litigation*, No. 87-09-24, 1994 WL 721763, at *3 (Del. Super. June 14, 1994), *rev'd on other grounds*, 670 A.2d 1339 (Del. Super. Ct. 1995). *See also*, *Owens-Corning v. Bauman*, 726 A.2d 745, 757 (Md. App.), *cert. denied*, 731 A.2d 970 (1999) ("[m]ere exposure to asbestos and cellular changes resulting from asbestos exposure, such as pleural plaques and thickening, alone *is not a functional impairment or harm,* and therefore, *do not constitute a legally compensable injury.*"); *Owens-Corning v. Bauman*, 726 A.2d 745, 757 (Md. App.), *cert. denied*, 731 A.2d 970 (1999) (cause of action for asbestos-related personal injury "does not arise until the asbestos fibers inhaled into the lungs cause functional impairment"), *citing ACandS, Inc. v. Abate*, 710 A.2d 944, 981-982 (Md. Ct. Spec. 1998), *cert. denied*, 713 A.2d 979 (1998) ("the condition known as pleural plaques, or even generalized pleural thickening, *unaccompanied by disabling consequences or physical impairment*, is not a compensable injury as a matter of law"); *Simmons v. Pacor, Inc.*, 674 A.2d 232, 236-37 (Pa. 1996) (Because scarring of

lung tissue is a "mere physical change that was unaccompanied by any detrimental effect," plaintiffs suffered no harm and could not recover for asymptomatic pleural thickening.); *In re Hawaii Federal Asbestos Cases*, 734 F.Supp. 1563, 1567 (D. Haw. 1990) ("A claimant's subjective testimony as to shortness of breath and fatigue without more is not sufficient ....Plaintiff must show a compensable harm by adducing objective testimony of a *functional impairment* due to asbestos exposure."); *Wright v. Eagle-Picher Indus., Inc.*, 565 A.2d 377 (Md. 1989) (pleural plaques are non-compensable injury when unaccompanied by any symptoms or functional impairment) (all emph. added)

Likewise, in *Bernier v. Raymark Industries, Inc.*, 516 A.2d 534 (Me. 1986), the Maine Supreme Court concluded that subclinical injury is not actionable. "Even assuming that any inhalation of asbestos dust immediately causes microscopic injury to lung tissues, we conclude that the subclinical injury resulting from such inhalation is 'insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law.'" *Id.* at 543. The *Bernier* court was quoting from a FELA case, *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 942 (3d Cir. 1985), *cert. denied*, 474 U.S. 864, 106 St. 183 (1985). As the U.S. Supreme Court has recognized in FELA cases, "the words 'physical impact' do not encompass every form of 'physical contact'. And, in particular, they do not include a contact that amounts to no more than an exposure." *Metro-North Commuter Railroad Co. v. Buckley*, 521 U.S. 424, 432 (1997); *see also Amendola v. Kansas City Southern Railway Co.*, 699 F.Supp. 1401 (W.D. Mo. 1988) (inhalation of asbestos fibers alone did not represent physical injury sufficient to support a claim).

Courts also have found that asymptomatic asbestosis is not a legally cognizable injury. For example, in *Burns v. Jaquays Mining Corp.*, 752 P.2d 28 (Ariz. App. 1987), the court granted summary judgment to an asbestos mill owner with regard to subclinical asbestosis claims

because subclinical injuries do not amount to physical harm. "[U]ntil the asbestosis manifests itself one can only speculate as to the debilitating effects the plaintiff will suffer. Not all asbestosis is one hundred percent debilitating." Consequently, the court stated, "[w]e see no reason to depart from traditional tort concepts and allow recovery for injuries before any disease becomes manifest." *Id.* at 31. The court reasoned that a contrary rule would give rise to a cause of action for countless plaintiffs who are healthy and might never manifest injury. Furthermore,

> proof of damages in such cases would be highly speculative, likely resulting in windfalls for those who never take ill and insufficient compensation for those who do. Requiring manifest injury as a necessary element of an asbestos-related tort action avoids these problems and best serves the underlying purposes of tort law: the compensation of victims who have suffered.

*Id.* at 30, (quoting *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 942 (3d Cir. 1985)).

Similarly, in *Taylor v. Owens-Corning Fiberglas Corp.*, 666 A.2d 681, 687 (Pa. Super. Ct. 1995) the Pennsylvania Superior Court found that "a plaintiff . . . must suffer discernible physical symptoms to have a compensable injury." Several of the plaintiffs whose cases had been consolidated in *Taylor* had been diagnosed with asbestosis but had no symptoms attributable to asbestos exposure. The court found that none of the plaintiffs had an injury sufficient to sustain a legal cause of action. "[I]f a plaintiff is able to 'lead active, normal [life], with no pain or suffering, no loss of an organ function . . . ,' he does not have a compensable injury." *Id.* (quoting *Giffear v. Johns Manville Corp.*, 632 A.2d 880, 887 (Pa. Super. 1993)).

Given this precedent, Grace will ask the Court to decide that claims of "injury" predicated on pleural plaques, asymptomatic asbestosis or any other subclinical condition are not compensable.

### d.    Claims Supported By Unreliable Diagnostic Data Cannot Survive *Daubert* Scrutiny

A further problem with asbestosis claims is that they turn on diagnostic assessments that are neither reproducible nor reliable unless they meet specific standards and are appropriately verified.  A claimant must demonstrate that the test method performed in his or her case is reliable and admissible.  *See In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 742, 745 (3d Cir.1994), *cert. denied sub nom General Elec. Co. v. Ingram*, 513 U.S. 1190 (1995) (sponsoring party must demonstrate expert's findings are based on the scientific method and are reliable; any failure to do so renders testimony inadmissible).  The scientific method relied upon may not be based on subjective speculation.  *Daubert*, 509 U.S. at 590.  The methodology must be real and it must produce consistent results, meaning, it must be reproducible.  *See id.* at 590, n. 9.  Even if a test is *generally* reliable, testing is inadmissible if performed in an unreliable manner.  *See, e.g., Metropolitan St. Louis Equal Housing Opp'y Council v. Gordon Gundaker Real Estate Co.*, 130 F.Supp.2d 1074, 1082-83 (E.D. Mo. 2001) (excluding expert testimony based on flawed testing protocols).

In the asbestos context, data from two types of test results, while widely used to support mass claim filings, can be unreliable, manipulable and not reproducible:  (1) ILO scores — which are based on subjective interpretations of lung x-rays  —  have been shown to be highly unreliable unless independent doctors make multiple corroborative readings, and (2) lung function testing, known as a pulmonary function test ("PFT"), is highly manipulable and must be reproduced in accordance with defined procedures before a claimant can be deemed to have a real impairment.  While these tests can be scientifically valid when performed in accordance with recognized procedures and standards, they are invalid if those procedures and standards are not

followed. In the latter case, such test data will lack sufficient reliability, reproducibility and scientific validity to be admissible under *Daubert*.

This is not merely an academic concern for Grace. As discussed in Part I above, the recent surge in claims against Grace has come after mass screenings were performed by a small number of plaintiff firms. ILO and PFT tests have yielded massive numbers of claims for nonmalignant conditions. The task of determining whether these claims are supported will be difficult (but necessary) to ensure that only claims that are based upon reliable science are permitted to proceed. Again, appointment of a Rule 706 panel may be appropriate to assist the Court in performing its role as a "gatekeeper" under *Daubert*. Independent experts also could be enlisted to advise the Court in screening procedures necessary to assure that only claims supported by reliable diagnostic data *per se* are allowed to go forward.

### ILO Tests

There are two major and interconnected problems with ILO scores -- variability and subjectivity. Numerous studies have shown that lung x-rays are interpreted with tremendous variability by different readers (inter-observer variability) and even by the same reader at different times (intra-observer variability). The ILO itself acknowledges that "there is significant variation in repeated readings of the same radiograph, not only from reader to reader, but also between readings by the same reader."[34]

---

[34] *ILO 1980 International Classification of Radiographs of the Pneumoconioses* International Labour Organization, Geneva 1980 at 20. NIOSH has further acknowledged that "[r]ecently, the [B-reader] program has been criticized, the main concern being that variability among readers is excessive despite the training and certification. ("1980 ILO Report") There is also the perception some B-readers systematically bias readings in legal proceedings." M. Attfield & D. Wagner, *A Report on a Workshop on the National Institute for Occupational Safety and Health B Reader Certification Program*, JOM 34: 875-78 (1992)

-50-

The variability problem is particularly pronounced when an ILO reading is at the lower end of the classification scale. As Dr. Hans Weill, a leading pulmonologist and asbestos researcher, has written: "It is in the lower categories (0/1 to 1/1) that the greatest degree of interobserver variability (disagreement) occurs."[35]

In the face of these problems, two things must be shown for ILO readings to be admissible under *Daubert*: (1) a minimum reading of 1/1; and (2) multiple readings of each radiograph to ensure consistency and reproducibility.

While the requirements on reliability and reproducibility under *Daubert* can only be satisfied in this way, these threshold showings also are fully consistent with the diagnostic criteria for asbestosis. The fact that a 1/0 reading represents only "suspect" disease, combined with the variable nature of a 1/0 reading, has led physicians and scientists to conclude that a 1/1 classification is the minimum level at which asbestosis reliably can be diagnosed in a clinical setting. The "authoritative consensus view" enunciated by the American Thoracic Society is that an ILO reading of 1/1 or higher should be used to diagnose asbestosis.[36] Thus, to make a scientifically reliable showing that a claimant has asbestosis, a chest radiograph must demonstrate that the claimant has a score of 1/1 or higher.

ILO classifications below 1/1 further fail to meet *Daubert* requirements of reliability and reproducibility because they are wholly subjective and dependent on the impressions, bias and experience of the interpreter. *Daubert* forbids analyses based on "subjective speculation" and on

---

[35] H. Weill, *Diagnosis of Asbestos-Related Disease*, CHEST 91:802-03 (1987).

[36] *The Diagnosis of Nonmalignant Diseases Related to Asbestos*, AM. REV. RESP. DIS., 134:363-68 (1986).

data where the results have such an enormous known rate of error. *Daubert*, 509 U.S. at 590, 594.[37] Indeed, courts have considered an ILO reading of 1/0 to be too uncertain for reliable diagnostic use. *See, e.g., Eagle Picher Indus. v. Liberty Mutual Ins. Co.*, 829 F.2d 227, 236 n. 14 (1st Cir. 1987) ("a reading of 1/0 is too uncertain to be used to diagnose a particular case."); *Raymark Indus., Inc. v. Stempel*, No. 88-1014-K, 1990 WL 72588, at * 7 (D. Kan. May 30, 1990) ("On the ILO scale, a reading of 1/0 is only a 'suspect' finding of fibrosis, and is not sufficient to diagnose asbestosis.").

As for readings of 1/1 or higher, the variability problem may be reduced but still remains. Each B-reader brings an individual level experience and bias to what indisputably is a subjective process of interpretation. Consequently, the only way to ensure that a radiographic reading is reliable and reproducible is to have it examined by more than one certified B-reader. The ILO itself "strongly recommend[s] that at least two, and preferably three independent readings are made for each radiograph."[38] Other experts agree. As Dr. Ducatman has stated, "[a]t present, individual diagnoses, *legal decisions* and population assessments ought to rely on multiple readings."[39]

Accordingly, Grace proposes the use of independent, court-appointed scientific experts under Rule 706 to assist in ensuring the accuracy of ILO readings of asbestos personal injury claimants. An outside panel could be recommended by the National Academy of Sciences (or a similar impartial authoritative organization) and approved by the Court for this purpose.

---

[37] Some doctors believe a 1/0 reading may be used to diagnose asbestosis for clinical and research purposes, but that cannot satisfy *Daubert*'s reliability standard. The unreliability of low ILO readings was one factor in the ATS's determination that the threshold should be 1/1 or higher. *The Diagnosis of Nonmalignant Diseases Related to Asbestos*, AM. REV. RESP. DIS. 136: 1516-17 (1987).

[38] 1980 ILO Report at 20.

[39] Ducatman et al., *B-Readers and Asbestos Medical Survelillance*, JOM 30:644-47, 646 (1988) (emph. added).

### Pulmonary Function Tests

PFTs are the best tool to determine whether an asbestos claimant has a physical impairment. Put simply, PFTs measure a subject's lung capacity to determine levels of breathing obstruction. But such tests are reliable only if performed accurately, and they are particularly subject to manipulation. For this reason, the ATS has issued comprehensive standards governing PFTs.[40] Inaccurate or poorly performed tests can result in improper diagnoses. Where the quality of a test is suspect, any dysfunction shown on the test "should only indicate the need for more definitive testing," and the physician should "avoid specific diagnostic statements."[41]

Pulmonary function tests need to be scrutinized even more closely in the litigation context because proper performance of the tests require full patient cooperation and effort. "Variability is greater in pulmonary function tests than in most other laboratory tests because of the need for consistent patient effort. Therefore, proper testing and valid results require an expert technician, as well as the patient's full cooperation and ability to understand and perform the test correctly.[42] Because the test is so dependent on the cooperation of the patient, the ATS cautions that "[t]he effort-dependent spirogram must be carefully scrutinized for quality."[43]

In order to survive a *Daubert* challenge, claimants relying on pulmonary function tests must demonstrate that those tests were conducted in a reliable and accurate fashion, in conformance with the well-accepted standards established by the ATS. Qualified experts, with knowledge of the

---

[40] ATS, *Lung Function Testing: Selection of Reference Values and Interpretative Strategies,* AM. REV. RESP. DIS. 144:1202-18, 1211 (1991).

[41] *Id.*

[42] Fitzgerald *et al.*, *Office Evaluation of pulmonary Function: Beyond the Numbers*, AM. FAMILY PHYSICIAN 54: 525-34, 527 (1996).

[43] ATS *Standardization of Spirometry–1987 Update*, AM. REV. RESP. DIS. 136: 1285-98 (1987).

ATS standards and experience in performing and interpreting PFT tests, can review existing tests to determine whether they were conducted properly. For example, reproducibility of the tests, as described in the ATS standards, is an essential check of whether Forced Vital Capacity (FVC) test was properly conducted. A minimum of three curves (spirometric tracings) must be generated if an FVC test is performed properly, and those curves should be virtually identical to each other. If not, the test by definition is not reproducible for that patient, and serious questions exist about the quality of the test and the patient's cooperation.

Another important check is whether the spirometer was set to record for the full length of time recommended by the ATS. Improperly truncating the recording time will cause a test falsely to appear as if a restrictive lung abnormality is present. Appropriate predictive values must also be used to identify what constitutes abnormality and normality.

With respect to FVC curves and other spirometric tracings, an independent facility already exists at Tulane University Health Sciences Center, School of Medicine that could analyze and determine the validity of existing pulmonary function tests.

### 2. Grace Has Proposed A Straightforward Litigation Protocol For Personal Injury Claims.

Grace's litigation protocol for personal injury claims streamlines the process of adjudicating claims while preserving legitimate personal injury claimants' right to a jury trial. Grace intends to file exemplar objections and summary judgment motions to each category of disputed claims — e.g., claims alleging exposure at a site not served by Grace, claims alleging mere site exposure, instead of direct work with a Grace product, and so forth. These objections and summary judgment motions will present Grace's factual and legal arguments as to product identification, dose, and compensable injury. Each exemplar objection will be served by first-class mail to the holders

-54-

THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE CO., *et al.*, | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

**DEBTORS' CONSOLIDATED REPLY IN SUPPORT OF THEIR
MOTION FOR ENTRY OF CASE MANAGEMENT ORDER,
ESTABLISHMENT OF A BAR DATE, APPROVAL OF THE CLAIM
FORMS WITH RESPECT TO ASBESTOS PERSONAL INJURY
CLAIMS AND APPROVAL OF DEBTORS' COMBINED NOTICE PROGRAM**

Dated: February 12, 2002

KIRKLAND & ELLIS
David M. Bernick
James H.M. Sprayregen
Andrew R. Running
Janet S. Baer
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000
(312) 861-2200 (fax)

PACHULSKI, STANG, ZIEHL, YOUNG
& JONES P.C.
Laura Davis Jones
David W. Carickhoff, Jr.
Hamid Rafatjoo
919 North Market Street, 16th Floor
Wilmington, Delaware 19801
(302) 652-4100
(302) 652-4400 (fax)

Co-Counsel for the Debtors and
Debtors in Possession

No. 1666

Debtors, and litigation regarding how best to estimate would ensue. In addition, estimation based on settlement history is impossible for certain of the Debtors' potential claims such as Zonolite claims for which no such data exists. There is no Zonolite claims settlement history and no prior liability determinations concerning the product — this is simply a new type of claim asserted against Grace. *See* Debtors' Case Management Motion at 1-2.

## III. THE ASBESTOS PERSONAL INJURY LITIGATION PROTOCOL PROPOSED BY GRACE IS FOCUSED, LEGALLY SOUND AND MANAGEABLE.

As amplified below, Grace has identified very specific issues appropriate for common resolution and very specific procedures for addressing those issues. Far from being "unprecedented," the approach taken by Grace was used in the *Dow Corning* case, and the procedures proposed in the pending motion currently are being used in the *Babcock* bankruptcy. Moreover, these procedures come right out of the rules and are grounded in well-established, non-Chapter 11 precedent. Although earlier asbestos bankruptcies did not employ these procedures, this was by agreement of the parties. Recent events have demonstrated that the liability problems that were set aside by agreement in those cases did not disappear, and they now threaten the viability of the post-confirmation trusts.

This Section describes in more detail the asbestos personal injury issues to be litigated and the Debtors' proposed litigation plan. Section IV then addresses the PI Committee's objections to that plan.

### A. Personal Injury Claims: Many Claims Fail To Meet Basic Legal Requirements.

The task of any personal injury litigation protocol must be to separate valid claims from those brought by the uninjured or those whose injuries were not caused by Grace's products.

-25-

Based upon Grace's litigation history and sample claims it already has analyzed, many claimants will be unable to meet the basic requirements of a cause of action for personal injury.

Claimants bear the burden of proving personal injury and causation by a preponderance of the evidence. *See, e.g., Vigiolto v. Johns-Manville Corp.*, 643 F. Supp. 1454 (W.D. Penn. 1986), *aff'd,* 826 F.2d 1058 (3d Cir. 1987); *See also Thompson v. Johns-Manville Sales Corp.*, 714 F.2d 581 (5th Cir. 1983); *Marshall v. Celotex Corp.*, 651 F. Supp. 389, 394-95 (E.D. Mich. 1987); *Gaulding v. Celotex Corp.*, 772 S.W.2d 66 (Tex. 1989). Grace submits that summary judgment proceedings on the common issues of (a) product identification and exposure, (b) dose sufficient to cause disease, (c) compensable injury and (d) lack of reliable diagnostic evidence will demonstrate that many claimants are unable to establish these basic elements of a personal injury claim.

### 1.    Product Identification And Product Exposure

As set forth in Part I of this brief, product identification is a massive problem with regard to the personal injury claims against Grace. The recent sampling of 1997 and 2000 claims shows that few claimants worked in industries and occupations in which they even could have been exposed to Grace asbestos products. Under the law, the inability to demonstrate actionable exposure to Grace product dooms any such claim.

There can be no personal injury claim unless the plaintiff establishes exposure to defendant's product or material. *See generally* PROSSER & KEETON ON TORTS § 103, at 713 (5th ed. 1984) (an essential element of a plaintiff's case is "the identification of the named defendant as the manufacturer or supplier of the defective product"). In asbestos cases, the claimant must establish first that he or she worked at a job site where the defendant's asbestos was present. "It is axiomatic that, if the defendant never sold asbestos to any of the locations where [the claimant] was allegedly

-26-

employed, no cause of action lies against defendant." *Outlaw v. Keene Corp.*, No. 88-9490 1990, U.S. Dist. LEXIS 1245, at *3-4 (E.D. Pa. Feb. 5, 1990).

Product identification has been highly controversial in asbestos cases in the tort system, as reflected by widely reported incidents of witness coaching[13] and of testimony "abruptly shift[ing]" in response to bankruptcy filings.[14] Grace intends to move for summary judgment against any claimant who cannot produce any identification of a Grace product as his or her work site.

### 2.    Exposure Sufficient To Cause Disease

A second significant problem, arising both in prior litigation and in the sample claims noted above, is the lack of evidence of dose and exposure sufficient to cause harm.  In toxic tort cases, merely working at a site where an asbestos product was present does not give rise to a cause that is sustainable under the Federal Rules of Evidence.  The plaintiff must show that he or she was exposed to defendant's allegedly hazardous product or material and that such exposure proximately caused injury.

---

[13] *See, e.g.*, L. Brickman & R. Rotunda, *When Witnesses Are Told What to Say*, WASH. POST, Jan. 13, 1998, at A15; Rogers, *Witness Preparation Memos Raise Questions About Ethical Limits*, 14 ABA/BNA LAWYERS MANUAL ON PROF. CONDUCT 48, 48-50 (1998) (20-page document from one asbestos plaintiffs' law firm "provides detailed information about asbestos products and packaging; instructs witnesses how to deal with questions and issues at the deposition; gives a list of health symptoms that could enhance damages; and provides general information and advice about being deposed.  The document does not mention a witness's obligation to tell the truth."); *Accidental Exposure*, HARPER'S, 296 (1772) (1/1/98) (containing text of the memo); 30 TEX. TECH. L. REV. 1471, 1476 (1999) (former Texas Supreme Court justice terming the memorandum a "cancer on the legal system").

[14] Notably, when major asbestos producers such as Johns-Manville sought Chapter 11 protection years ago, claims — and testimony — shifted away from the primary manufacturers to more peripheral defendants who remained outside Chapter 11.  Whereas "prebankruptcy testimony in Philadelphia Naval Yard Cases put Manville's share of product use as high as 80 percent, postbankruptcy testimony had Manville exposure accounting for a quarter or less of the volume of asbestos-containing materials encountered by plaintiffs." L. Brickman, *The Asbestos Claim Management Act of 1991*, 13 CARDOZO L. REV. 1891, 1917 n.13 (1992); *see also id.* at 1894 n.13 (noting that after the Johns-Manville filing, "plaintiffs' testimony (and that of their witnesses) abruptly shifted from a predominantly Manville exposure frame to a predominantly 'other defendants' exposure").

It is a fundamental tenet of science that "the dose makes the poison."[15] Any substance can be harmful in a large enough dose. Conversely, many substances that are known to be harmful at high doses – such as aspirin – are harmless at lower doses. This is true with asbestos as with all other chemicals. Virtually every person in North America has been exposed to asbestos. Indeed, pathology data show that individuals in the general population have thousands, even millions, of asbestos fibers in their lungs with no adverse effect.[16] According to Dr. Andrew Churg, a leading pathologist of asbestos diseases, "one may find as many as 40 million fibers of chrysotile, 40 million fibers of tremolite, and 400,000 fibers of amosite or crocidolite in the lungs of the general population of Vancouver, along with 40,000 asbestos bodies." Even so, "there is no evidence that this fiber burden produces asbestos-related disease in the general population."

Hence, not every person who worked near a Grace asbestos product can demonstrate causation of injury. Here again, threshold determinations must be made under *Daubert*. The whole concept that "the dose makes the poison" is incorporated into the court's gatekeeping function under *Daubert*. A claimant thus has the burden of proving – by reliable and reproducible evidence – that (1) there is an established level of exposure to asbestos that causes disease in humans (*i.e.,* general causation) and (2) the claimant himself was in fact exposed to the requisite dose (*i.e.,* specific

---

[15] This principle, first articulated by Paracelsus in the 16th century, is one of the foundations of modern toxicology. In the words of Paracelsus: "What is there that is not poison? All things are poison and nothing [is] without poison. Solely the dose determines that a thing is not a poison." *See* Casarett and Doull's *Principles of Toxicology:* THE BASIC SCIENCE OF POISONS at 14 (Klaasen ed., 5th ed., 1996); REFERENCE GUIDE ON TOXICOLOGY, in Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 403 (2000).

[16] "The first conclusion to be drawn is that everyone in the population carries a fairly substantial burden of asbestos fibers in their lungs." A. Churg, *Nonneoplastic Disease Caused by Asbestos,* in PATHOLOGY OF OCCUPATIONAL LUNG DISEASE (Churg & Green, ed. 2nd 1998) at 293.

-28-

causation).[17]  "[A] plaintiff in a toxic tort case must prove the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover." *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1106 (8th Cir. 1996). Absent "accurate information on the level of [plaintiff's] exposure," a plaintiff's causation testimony must be excluded and summary judgment granted. *Moore v. Ashland Chemical Co.*, 151 F.3d 269, 278 (5th Cir. 1998) *(en banc), cert. denied*, 526 U.S. 1064 (1999). Unless and until the claimant establishes the existence of a harmful dose – and further establishes actual exposure to an amount in excess of that dose – the trier of fact is left to *guess* whether that particular claimant's exposure was sufficient to cause disease. Guesswork is insufficient under *Daubert* or any other rule of evidence. In *Mitchell v. Gencorp.*, 165 F.3d 778 (10th Cir. 1999), the Tenth Circuit affirmed summary judgment because the plaintiff had not shown sufficient reliable scientific information of "levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance." As the court explained: "Absent supporting scientific data, . . . estimates and . . . conclusions are little more than guesswork. Guesses, even if educated, are insufficient to prove the level of exposure in a toxic tort case." *Id.* at 781.

It will be the claimants' burden to demonstrate through reliable scientific evidence the levels of exposure sufficient to cause both malignant and non-malignant asbestos-related disease. It will be their burden also to prove the occupational activities where the claimants' exposures to a Grace product reached such levels.

---

[17] *See Reference Guide on Epidemiology*, in Federal Judicial Center REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 382 (2000) ("The plaintiff must establish not only that the defendant's agent is capable of causing disease, but also that it did not cause the plaintiff's disease.")

Following *Daubert* proceedings, Grace expects to move for summary judgment on all claims where the occupational activity that involved exposure to Grace products has not been proven (through evidence meeting *Daubert* standards) sufficient to cause the claimed disease.

### 3.    Lack Of Compensable Injury

Grace also intends to move for summary judgment against those claims which do not provide evidence of a legally cognizable injury.   Courts universally require the plaintiff to demonstrate "that the defendant had a duty of care which [was] breached, and that the breach proximately caused *legally cognizable injury*." *See, e.g., Faya v. Almaraz*, 329 Md. 435, 448, 620 A.2d 327 (1993) (emph. added)."  The mere prospect of future harm, without any actual current harm, is not a legally cognizable personal injury.  "Actual loss or damage resulting to the interests of another" is a necessary element of a negligence cause of action.  "The threat of future harm, not yet realized, is not enough." PROSSER & KEETON ON TORTS § 30, at 165 (5th ed. 1984).[18]  A "mere change or alteration in some physical person, object or thing" does *not* constitute a legally compensable harm.  "Physical changes or alterations may be either beneficial, detrimental or of no consequence to a person."  A person suffers harm only "[i]n so far as physical changes have a detrimental effect" on that person.  *Id.* § 7 cmt. b.

As is clear from the claims submitted to Grace historically, many claimants complain of "injury" from mere exposure to Grace products, but without any health problems or symptoms. Others complain of harmless pleural plaques or asymptomatic pleural thickening.  Such conditions, however, are not compensable.

---

[18] This law also bars claims for medical monitoring costs.  Medical monitoring claims present no present injury, only the risk of future injury.  By definition, a risk of future injury is not compensable.

### Pleural Plaques

Pleural plaques are opaque, rounded lesions of the pleura, which is a filmy, plastic wrap-like tissue membrane that surrounds certain inner surfaces as well as the exterior of the lungs.[19] Pleural plaques are clinically harmless and do not cause injury or impair lung function. They have been described in the medical literature as nothing more than "spots" that can be observed on a lung x-ray, since "by themselves, plaques do not cause loss of function or symptoms."[20] Specifically, pleural plaques do *not* cause shortness of breath, impair lung function, cause chest pain, cause any abnormal physical symptoms, decrease life expectancy, or cause any known complications.[21] In short, there is a medical consensus that pleural plaques are "an isolated radiographic finding" that "do not by themselves produce clinically significant reductions in pulmonary function."[22]

---

[19] *See generally* American Thoracic Society (ATS), *The Diagnosis of Nonmalignant Diseases Related to Asbestos*, AM. REV. RESPIR. DIS. 134: 363-68, 364 (1996). Pleural plaques typically are seen in the *parietal* pleura, which lines the inner chest wall, inner surface of the rib cage and diaphragm, as opposed to the *visceral* pleura, which surrounds the entire lung. Pleural plaques should generally be bilateral, that is, observed in both lungs.

[20] According to Dr. Murphy, who headed the ATS committee that established criteria for diagnosing asbestosis, pleural plaques have been referred to as "beauty spots on the roentgenogram" or "markers of exposure" because "by themselves, plaques do not cause loss of function or symptoms." AM. REV. RESP. DIS. 136: 1516-17 (1987) (citations omitted). *See also* L. Brickman, *The Asbestos Litigation Crisis*, 13 CARDOZO L. REV. 1819, 1848 (1992), *citing* Gaensler, *Asbestos-Related Pleural Plaques: Much Ado About Very Little*, DRI Seminar 10/16-18/91 ("The investigators who initially described the connection between exposure to asbestos and pleural plaques called such lesions 'harmless scurrilous beauty marks on the chest film' because they found them neither associated with loss of function or symptoms nor precancerous. An extensive review of the literature 35 years later has revealed nothing to contradict these original impressions.")

[21] *See* K. Browne, *Asbestos-Related Disorders*, in OCCUPATIONAL LUNG DISORDERS (Parkes, ed. 3rd 1994) at 458 ("Plaques themselves have no effect on life expectancy and are not known to give rise to any complications.")

[22] *See* Jones, et al., *The radiographic pleural abnormalities in asbestos exposure: Relationship to physiologic abnormalities*, J. THORACIC IMG. 3: 57-65 (1988). *See also* A. Churg, *Neoplastic Asbestos-Induced Disease*, in PATHOLOGY OF OCCUPATIONAL LUNG DISEASE (Churg & Green, ed. 2nd 1998) at 339 (pleural disease "is still seen with considerable frequency, but it generally has little or no functional import"); Matters of Health and Safety Arising from the Use of Asbestos in Ontario, Toronto, Ontario Ministry of the Attorney General 1984 (hereinafter "*Ontario Royal Commission*") at 103. (Plaques are "not associated with (continued...)

Although some pleural plaques can become calcified and enlarged, "[e]ven strikingly large and bulky plaques do not cause measurable functional impairment, and when these patients complain of dyspnea the usual cause is asbestosis or chronic obstructive lung disease."[23] As Dr. Browne has written in a leading text, "[w]hether calcified or not, pleural plaques alone are symptomless; dyspnea [shortness of breath], chest pain, abnormal physical signs and impairment of lung function are absent."[24] Nor do pleural plaques increase the risk that the patient may contract an actual disease associated with asbestos. Pleural plaques are not precursors of lung cancer, mesothelioma or asbestosis.[25]

### *Pleural Thickening*

Pleural thickening is less common than pleural plaques. It typically affects the visceral pleura, the membrane surrounding the lungs. It can range from a thin, milky discoloration to a thicker fibrosis easily seen on x-ray. Pleural thickening is usually asymptomatic, although extensive diffuse thickening may have an adverse effect on lung function.

### *Courts Have Found That Pleural Plaques, Pleural Thickening And Asymptomatic Asbestosis Are Not Legal Injuries*

---

[22] (...continued)
clinical and functional abnormalities").

[23] Gaensler et al., *Thoracic Surgical Problems in Asbestos-Related Disorders*, ANN. THORACIC SURG. 40:82-96, 93 (1985).

[24] K. Browne, *Asbestos-Related Disorders*, in OCCUPATIONAL LUNG DISORDERS (Parkes, ed. 3rd 1994) at 455.

[25] *Id.* at 451, 458-59. *See also* A. Churg, *Nonneoplastic Disease Caused by Asbestos*, in PATHOLOGY OF OCCUPATIONAL LUNG DISEASE, at 310 (Churg & Green, ed. 2d 1998) ("There is no evidence that plaques or diffuse pleural fibrosis are in any way precursors of mesothelioma"); W. Weiss, *Asbestos-related Pleural Plaques and Lung Cancer*, CHEST 103: 185-59 (1993) ("[T]he weight of the evidence favors the conclusion that persons with asbestosis-related pleural plaques do not have an increased risk of lung cancer in the absence of parenchymal asbestosis").

The majority of courts that have considered the issue have found that pleural plaques and asymptomatic pleural thickening do not cause injury, harm, loss or detriment. They merely reflect a subclinical change in lung tissue, which is not actionable. "A mere change in the lining of the lung does not constitute an impairment or worsening of a bodily function, nor does it prevent the exercise of a bodily function." *In re Asbestos Litigation*, No. 87-09-24, 1994 WL 721763, at *3 (Del. Super. June 14, 1994), *rev'd on other grounds*, 670 A.2d 1339 (Del. Super. Ct. 1995). *See also, Owens-Corning v. Bauman*, 726 A.2d 745, 757 (Md. App.), *cert. denied*, 731 A.2d 970 (1999) ("[m]ere exposure to asbestos and cellular changes resulting from asbestos exposure, such as pleural plaques and thickening, alone *is not a functional impairment or harm,* and therefore, *do not constitute a legally compensable injury.*"); *Owens-Corning v. Bauman*, 726 A.2d 745, 757 (Md. App.), *cert. denied*, 731 A.2d 970 (1999) (cause of action for asbestos-related personal injury "does not arise until the asbestos fibers inhaled into the lungs cause functional impairment"), *citing ACandS, Inc. v. Abate*, 710 A.2d 944, 981-982 (Md. Ct. Spec. 1998), *cert. denied*, 713 A.2d 979 (1998) ("the condition known as pleural plaques, or even generalized pleural thickening, *unaccompanied by disabling consequences or physical impairment*, is not a compensable injury as a matter of law"); *Simmons v. Pacor, Inc.*, 674 A.2d 232, 236-37 (Pa. 1996) (Because scarring of lung tissue is a "mere physical change that was unaccompanied by any detrimental effect," plaintiffs suffered no harm and could not recover for asymptomatic pleural thickening.); *In re Hawaii Federal Asbestos Cases*, 734 F.Supp. 1563, 1567 (D. Haw. 1990) ("A claimant's subjective testimony as to shortness of breath and fatigue without more is not sufficient ....Plaintiff must show a compensable harm by adducing objective testimony of a *functional impairment* due to asbestos exposure."); *Wright v. Eagle-Picher Indus., Inc.*, 565 A.2d 377 (Md. 1989) (pleural plaques are non-compensable injury when unaccompanied by any symptoms or functional impairment) (all emph. added)

-33-

Likewise, in *Bernier v. Raymark Industries, Inc.*, 516 A.2d 534 (Me. 1986), the Maine Supreme Court concluded that subclinical injury is not actionable. "Even assuming that any inhalation of asbestos dust immediately causes microscopic injury to lung tissues, we conclude that the subclinical injury resulting from such inhalation is 'insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law.'" *Id.* at 543. The *Bernier* court was quoting from a FELA case, *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 942 (3d Cir. 1985), *cert. denied,* 474 U.S. 864, 106 St. 183 (1985). As the U.S. Supreme Court has recognized in FELA cases, "the words 'physical impact' do not encompass every form of 'physical contact'. And, in particular, they do not include a contact that amounts to no more than an exposure." *Metro-North Commuter Railroad Co. v. Buckley*, 521 U.S. 424, 432 (1997); *see also Amendola v. Kansas City Southern Railway Co.*, 699 F.Supp. 1401 (W.D. Mo. 1988) (inhalation of asbestos fibers alone did not represent physical injury sufficient to support a claim).

Courts also have found that asymptomatic asbestosis is not a legally cognizable injury. For example, in *Burns v. Jaquays Mining Corp.*, 752 P.2d 28 (Ariz. App. 1987), the court granted summary judgment to an asbestos mill owner with regard to subclinical asbestosis claims because subclinical injuries do not amount to physical harm. "[U]ntil the asbestosis manifests itself one can only speculate as to the debilitating effects the plaintiff will suffer. Not all asbestosis is one hundred percent debilitating." Consequently, the court stated, "[w]e see no reason to depart from traditional tort concepts and allow recovery for injuries before any disease becomes manifest." *Id.* at 31. The court reasoned that a contrary rule would give rise to a cause of action for countless plaintiffs who are healthy and might never manifest injury. Furthermore,

> proof of damages in such cases would be highly speculative, likely resulting in windfalls for those who never take ill and insufficient compensation for

> those who do.  Requiring manifest injury as a necessary element of an
> asbestos-related tort action avoids these problems and best serves the
> underlying purposes of tort law: the compensation of victims who have
> suffered.

*Id.* at 30, (quoting *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 942 (3d Cir. 1985)).

Similarly, in *Taylor v. Owens-Corning Fiberglas Corp.*, 666 A.2d 681, 687 (Pa. Super. Ct. 1995) the Pennsylvania Superior Court found that "a plaintiff . . . must suffer discernible physical symptoms to have a compensable injury." Several of the plaintiffs whose cases had been consolidated in *Taylor* had been diagnosed with asbestosis but had no symptoms attributable to asbestos exposure.  The court found that none of the plaintiffs had an injury sufficient to sustain a legal cause of action. "[I]f a plaintiff is able to 'lead active, normal [life], with no pain or suffering, no loss of an organ function . . . ,' he does not have a compensable injury." *Id.* (quoting *Giffear v. Johns Manville Corp.*, 632 A.2d 880, 887 (Pa. Super. 1993)).

Given this precedent, Grace will ask the Court to decide that claims of "injury" predicated on pleural plaques, asymptomatic asbestosis or any other subclinical condition are not compensable.

### 4.    Claims Supported By Unreliable Diagnostic Data Cannot Survive *Daubert* Scrutiny

A further problem with asbestosis claims is that they turn on diagnostic assessments that are neither reproducible nor reliable unless they meet specific standards and are appropriately verified.  A claimant must demonstrate that the test method performed in his or her case is reliable and admissible. *See In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 742, 745 (3d Cir. 1994), *cert. denied sub nom General Elec. Co. v. Ingram*, 513 U.S. 1190 (1995) (sponsoring party must demonstrate expert's findings are based on the scientific method and are reliable; any failure to do so renders testimony inadmissible).  The scientific method relied upon may not be based on

subjective speculation. *Daubert*, 509 U.S. at 590. The methodology must be real and it must produce consistent results, meaning, it must be reproducible. *See id.* at 590, n. 9. Even if a test is *generally* reliable, testing is inadmissible if performed in an unreliable manner. *See, e.g., Metropolitan St. Louis Equal Housing Opp'y Council v. Gordon Gundaker Real Estate Co.*, 130 F.Supp.2d 1074, 1082-83 (E.D. Mo. 2001) (excluding expert testimony based on flawed testing protocols).

In the asbestos context, data from two types of test results, while widely used to support mass claim filings, can be unreliable, manipulable and not reproducible:   (1) ILO scores — which are based on subjective interpretations of lung x-rays — have been shown to be highly unreliable unless independent doctors make multiple corroborative readings, and (2) lung function testing, known as a pulmonary function test ("PFT"), is highly manipulable and must be reproduced in accordance with defined procedures before a claimant can be deemed to have a real impairment.   While these tests can be scientifically valid when performed in accordance with recognized procedures and standards, they are invalid if those procedures and standards are not followed.   In the latter case, such test data will lack sufficient reliability, reproducibility and scientific validity to be admissible under *Daubert*.

This is not merely an academic concern for Grace. As discussed in Part I above, the recent surge in claims against Grace has come after mass screenings were performed by a small number of plaintiff firms.   ILO and PFT tests have yielded massive numbers of claims for nonmalignant conditions.   The task of determining whether these claims are supported will be difficult (but necessary) to ensure that only claims that are based upon reliable science are permitted to proceed.   Again, appointment of a Rule 706 panel may be appropriate to assist the Court in performing its role as a "gatekeeper" under *Daubert*.   Independent experts also could be enlisted to

advise the Court in screening procedures necessary to assure that only claims supported by reliable

diagnostic data *per se* are allowed to go forward.

### *ILO Tests*

There are two major and interconnected problems with ILO scores -- variability and

subjectivity. Numerous studies have shown that lung x-rays are interpreted with tremendous

variability by different readers (inter-observer variability) and even by the same reader at different

times (intra-observer variability). The ILO itself acknowledges that "there is significant variation

in repeated readings of the same radiograph, not only from reader to reader, but also between

readings by the same reader."[26]

The variability problem is particularly pronounced when an ILO reading is at the

lower end of the classification scale. As Dr. Hans Weill, a leading pulmonologist and asbestos

researcher, has written: "It is in the lower categories (0/1 to 1/1) that the greatest degree of

interobserver variability (disagreement) occurs."[27]

In the face of these problems, two things must be shown for ILO readings to be

admissible under *Daubert*: (1) a minimum reading of 1/1; and (2) multiple readings of each

radiograph to ensure consistency and reproducibility.

While the requirements on reliability and reproducibility under *Daubert* can only be

satisfied in this way, these threshold showings also are fully consistent with the diagnostic criteria

for asbestosis. The fact that a 1/0 reading represents only "suspect" disease, combined with the

---

[26] *ILO 1980 International Classification of Radiographs of the Pneumoconioses* International Labour Organization, Geneva 1980 at 20. NIOSH has further acknowledged that "[r]ecently, the [B-reader] program has been criticized, the main concern being that variability among readers is excessive despite the training and certification. ("1980 ILO Report") There is also the perception some B-readers systematically bias readings in legal proceedings." M. Attfield & D. Wagner, *A Report on a Workshop on the National Institute for Occupational Safety and Health B Reader Certification Program*, JOM 34: 875-78 (1992)

[27] H. Weill, *Diagnosis of Asbestos-Related Disease*, CHEST 91:802-03 (1987).

variable nature of a 1/0 reading, has led physicians and scientists to conclude that a 1/1 classification

is the minimum level at which asbestosis reliably can be diagnosed in a clinical setting.  The

"authoritative consensus view" enunciated by the American Thoracic Society is that an ILO reading

of 1/1 or higher should be used to diagnose asbestosis.[28]  Thus, to make a scientifically reliable

showing that a claimant has asbestosis, a chest radiograph must demonstrate that the claimant has

a score of 1/1 or higher.

  ILO classifications below 1/1 further fail to meet *Daubert* requirements of reliability

and reproducibility because they are wholly subjective and dependent on the impressions, bias and

experience of the interpreter.  *Daubert* forbids analyses based on "subjective speculation" and on

data where the results have such an enormous known rate of error.  *Daubert*, 509 U.S. at 590, 594.[29]

Indeed, courts have considered an ILO reading of 1/0 to be too uncertain for reliable diagnostic use.

*See, e.g., Eagle Picher Indus. v. Liberty Mutual Ins. Co.*, 829 F.2d 227, 236 n. 14 (1st Cir. 1987) ("a

reading of 1/0 is too uncertain to be used to diagnose a particular case."); *Raymark Indus., Inc. v.*

*Stempel*, No. 88-1014-K, 1990 WL 72588, at * 7 (D. Kan. May 30, 1990) ("On the ILO scale, a

reading of 1/0 is only a 'suspect' finding of fibrosis, and is not sufficient to diagnose asbestosis.").

  As for readings of 1/1 or higher, the variability problem may be reduced but still

remains.  Each B-reader brings an individual level of experience and bias to what indisputably is a

subjective process of interpretation.  Consequently, the only way to ensure that a radiographic

reading is reliable and reproducible is to have it examined by more than one certified B-reader.  The

ILO itself "strongly recommend[s] that at least two, and preferably three independent readings are

---

[28] *The Diagnosis of Nonmalignant Diseases Related to Asbestos*, AM. REV. RESP. DIS., 134:363-68 (1986).

[29] Some doctors believe a 1/0 reading may be used to diagnose asbestosis for clinical and research purposes, but that cannot satisfy *Daubert*'s reliability standard.  The unreliability of low ILO readings was one factor in the ATS's determination that the threshold should be 1/1 or higher.  *The Diagnosis of Nonmalignant Diseases Related to Asbestos*, AM. REV. RESP. DIS. 136: 1516-17 (1987).

made for each radiograph."[30]   Other experts agree.   As Dr. Ducatman has stated, "[a]t present, individual diagnoses, *legal decisions* and population assessments ought to rely on multiple readings."[31]

Accordingly, Grace proposes the use of independent, court-appointed scientific experts under Rule 706 to assist in ensuring the accuracy of ILO readings of asbestos personal injury claimants.   An outside panel could be recommended by the National Academy of Sciences (or a similar impartial authoritative organization) and approved by the Court for this purpose.

### Pulmonary Function Tests

PFTs are the best tool to determine whether an asbestos claimant has a physical impairment.   Put simply, PFTs measure a subject's lung capacity to determine levels of breathing obstruction.   But such tests are reliable only if performed accurately, and they are particularly subject to manipulation.   For this reason, the ATS has issued comprehensive standards governing PFTs.[32] Inaccurate or poorly performed tests can result in improper diagnoses.   Where the quality of a test is suspect, any dysfunction shown on the test "should only indicate the need for more definitive testing," and the physician should "avoid specific diagnostic statements."[33]

Pulmonary function tests need to be scrutinized even more closely in the litigation context because proper performance of the tests requires full patient cooperation and effort. "Variability is greater in pulmonary function tests than in most other laboratory tests because of the

---

[30]   1980 ILO Report at 20.

[31]   Ducatman et al., *B-Readers and Asbestos Medical Surveillance*, JOM 30:644-47, 646 (1988) (emph. added).

[32]   ATS, *Lung Function Testing: Selection of Reference Values and Interpretative Strategies*, AM. REV. RESP. DIS. 144:1202-18, 1211 (1991).

[33]   *Id.*

need for consistent patient effort. Therefore, proper testing and valid results require an expert technician, as well as the patient's full cooperation and ability to understand and perform the test correctly.[34] Because the test is so dependent on the cooperation of the patient, the ATS cautions that "[t]he effort-dependent spirogram must be carefully scrutinized for quality."[35]

In order to survive a *Daubert* challenge, claimants relying on pulmonary function tests must demonstrate that those tests were conducted in a reliable and accurate fashion, in conformance with the well-accepted standards established by the ATS. Qualified experts, with knowledge of the ATS standards and experience in performing and interpreting PFT tests, can review existing tests to determine whether they were conducted properly. For example, reproducibility of the tests, as described in the ATS standards, is an essential check of whether a Forced Vital Capacity (FVC) test was properly conducted. A minimum of three curves (spirometric tracings) must be generated if an FVC test is performed properly, and those curves should be virtually identical to each other. If not, the test by definition is not reproducible for that patient, and serious questions exist about the quality of the test and the patient's cooperation.

Another important check is whether the spirometer was set to record for the full length of time recommended by the ATS. Improperly truncating the recording time will cause a test falsely to appear as if a restrictive lung abnormality is present. Appropriate predictive values must also be used to identify what constitutes abnormality and normality.

---

[34] Fitzgerald *et al.*, *Office Evaluation of Pulmonary Function: Beyond the Numbers*, AM. FAMILY PHYSICIAN 54: 525-34, 527 (1996).

[35] ATS *Standardization of Spirometry–1987 Update*, AM. REV. RESP. DIS. 136: 1285-98 (1987).

With respect to FVC curves and other spirometric tracings, an independent facility already exists at Tulane University Health Sciences Center, School of Medicine that could analyze and determine the validity of existing pulmonary function tests.

**B.      Grace Has Proposed A Straightforward Litigation Protocol For Personal Injury Claims.**

Grace's litigation protocol for personal injury claims streamlines the process of adjudicating claims while preserving legitimate personal injury claimants' right to a jury trial. Grace intends to file exemplar objections and summary judgment motions to each category of disputed claims — e.g., claims alleging exposure at a site not served by Grace, claims alleging mere site exposure, instead of direct work with a Grace product, and so forth. These objections and summary judgment motions will present Grace's factual and legal arguments as to product identification, dose, and compensable injury. Each exemplar objection will be served by first-class mail to the holders of the disputed claims, who will have 30 days to file a response. Because the Proof of Claim form requires provision of most of the information needed, wide-scale discovery should not be necessary. Any Rule 706 expert work then can proceed. Incorporated in the resolution of these summary judgment issues may be the submission of expert reports on disease diagnosis, extent of injury, and causation, allowing the parties to engage in *Daubert* proceedings regarding the reliability of scientific evidence to support personal injury claims.

Once the Court rules on the exemplar objections/motions in a particular category, Grace will file omnibus objections and summary judgment motions for all similarly situated claims, which will be served by first-class mail on the holders of the disputed claims at the address provided on the Proof of Claim form. To the extent that claimants elect to contest the Debtors' objection, such claimants will have 30 days to file a response showing cause why the Court's exemplar rulings do not govern their situation. In *Babcock & Wilcox*, the court approved the use of similar omnibus

-41-

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

Objection Deadline: December 3, 2004
Hearing Date: To be determined

## DEBTORS' MOTION FOR ENTRY OF A CASE MANAGEMENT ORDER ESTABLISHING PROTOCOLS FOR LITIGATING ASBESTOS-RELATED CLAIMS FOLLOWING PLAN CONFIRMATION

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by their undersigned counsel, file this motion (the "New CMO Motion"), seeking entry of a case management order (the "New CMO"), establishing protocols for litigating asbestos-related claims (the "Asbestos Claims") following plan confirmation.[2]

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed thereto in the Glossary, which is Exhibit 2 to the Exhibit Book, filed on November 13, 2004.

No. 6898

any other defendant) from resolving them through the tort system based on their individual merits.

11.     As detailed in the Debtors' Original CMO Motion briefing, and further explained in Part III.C. and Part III.D. of the accompanying Estimation Motion (discussed below), an analysis of the claims asserted against Grace showed that the vast majority lacked any reliable evidence of medical impairment or injury, and also lacked evidence of any actual exposure to Grace's asbestos products.   Part III.C of the Estimation Motion provides examples of the numerous studies, court decisions and articles that have further confirmed Grace's experience of the widespread abuse of the tort system through the filing of unsubstantiated claims.

12.     As the Debtors detailed in the Original CMO Motion briefing, the unexplained and unprecedented surge of claims filed in 2000 made it impossible for the Debtors to continue these inventory settlements.   Rather than addressing this problem, the Asbestos PI Committee's estimation proposals would perpetuate it.   The Asbestos PI Committee's approach would extrapolate the Debtors' liability for pending and future claims by assuming the claims filed in 2000 were valid, despite the overwhelming evidence to the contrary.

13.     While the Debtors' and the Asbestos PI Committee's proposals were extensively briefed in 2001 and 2002, neither this Court nor the Bankruptcy Court has ever addressed these issues.

14.     While the Debtors are prepared to commence pre-confirmation litigation pursuant to the Original CMO Motion, given the passage of three and one-half years since these Chapter 11 Cases were filed, this New CMO Motion provides an alternative path for litigating the common asbestos liability issues following the confirmation of the Plan.   Toward that end, the Debtors propose to set aside the Asbestos Trust for Asbestos Claimants satisfying recognized

5

necessary to establish a valid Asbestos Claim, the Asbestos Claim should be expunged and disallowed.

### 2.   Asbestos Claims Based On Unreliable Scientific Evidence

49.   In order to maintain a valid claim, a plaintiff must demonstrate that tests were conducted using reliable and admissible methods. See In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742, 745 (3d Cir. 1994), cert. denied, 513 U.S. 1190 (1990) (sponsoring party must demonstrate expert's findings are based on the scientific method and are reliable; any failure to do so renders testimony inadmissible).  The scientific method relied upon may not be based on subjective speculation. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) at 590. The methodology must be real, and it must produce consistent, reproducible results. See id. at 590 n.9.  Even if a test is *generally* reliable, testing is inadmissible if performed in an unreliable manner. See, *e.g.,* Metropolitan St. Louis Equal Housing Opp'y Council v. Gundaker Real Estate Co., 130 F. Supp. 2d 1074, 1082-83 (E.D. Mo. 2001) (excluding expert testimony based on flawed testing protocols).

50.   For Asbestos PI Claims, the two tests needed to establish asbestosis - the ILO Rating Test and Pulmonary Function Tests (PFT) - are (as described below) unfortunately subject to manipulation and can produce unreliable and non-reproducible results.  While these tests can be scientifically valid when performed in accordance with recognized procedures and standards, they are invalid if those procedures and standards are not followed.  In the latter case, such test data will lack sufficient reliability, reproducibility and scientific validity to be admissible under Daubert.

51.   Accordingly, the Debtors intend to file a summary judgment motion seeking dismissal of claims based upon ILO and PFT readings that have not been obtained in compliance with accepted standards.   Once again, the information submitted with the Asbestos PI

18

Questionnaire will be essential to determining the reliability of the submitted diagnostic evidence. For example, the Asbestos PI Questionnaire requires (for non-malignant claims) submission of the results of any medical tests in which a medical doctor measured the Asbestos PI Claimant's lung function or capacity, and copies of those reports and tests. Asbestos PI Claimants must also submit copies of any X-rays or CT scans performed in the last two years and reports of their interpretation, including the Asbestos PI Claimant's ILO Report form along with information concerning the medical professionals that performed such tests. As detailed below, if such tests were not performed or evaluated in conformance with recognized standards, then the claim should be invalidated. See, e.g., Eagle Picher Indus. v. Liberty Mut. Ins. Co., 829 F.2d 227, 236 n.14 (1st Cir. 1987).

52.     The following two sections address some of the inherent uncertainties associated with the ILO Rating and PFT Tests for purposes of supporting Asbestos PI Claims.

### (1)   ILO Tests

53.     The International Labour Organization (ILO) developed criteria for grading chest X-rays used to identify asbestosis within the lungs or pleural thickening in the outer lining of the lungs. In practice, a physician will grade the X-ray on an "ILO Rating" scale of 0/0 (no abnormality) through 3/3 (most severe). The American Thoracic Society (ATS) has set an ILO Rating of 1/1 as the minimum needed to support a diagnosis of asbestosis.[15] The fact that an ILO reading of 1/0 represents only "suspect" disease, combined with the variable nature of a 1/0 reading, has led physicians and scientists to conclude that a 1/1 classification is the minimum level at which asbestosis reliably can be diagnosed in a clinical setting. The "authoritative

---

[15]  American Thoracic Society, *The Diagnosis of Non-Malignant Disease Related to Asbestos*, AM. REV. RESPIR. DIS. 363-367 (1986).

19

consensus view" enunciated by the American Thoracic Society is that an ILO reading of 1/1 or higher should be used to diagnose asbestosis.[16]

54.    There are two major and interconnected problems with ILO scores – variability and subjectivity.   Numerous studies have shown that lung X-rays are interpreted with tremendous variability by different readers (inter-observer variability) and even by the same reader at different times (intra-observer variability).   The ILO itself acknowledges that "there is significant variation in repeated readings of the same radiograph, not only from reader to reader, but also between readings by the same reader."[17]   The variability problem is particularly pronounced when an ILO reading is at the lower end of the classification scale.   As Dr. Hans Weill, a leading pulmonologist and asbestos researcher, has written:   "It is in the lower categories (0/1 to 1/1) that the greatest degree of interobserver variability (disagreement) occurs."[18]

55.    In the face of these problems, ILO readings must be confirmed by two independent and qualified readers to be admissible under Daubert.  All ILO readings must satisfy this requirement.  The ILO itself "strongly recommend[s] that at least two, and preferably three independent readings are made for each radiograph."[19]  Other experts agree.  As Dr. Ducatman

---

[16]  Id., at 363-68.

[17]  ILO 1980 INTERNATIONAL CLASSIFICATION OF RADIOGRAPHS OF THE PNEUMOCONIOSES INTERNATIONAL LABOUR ORGANIZATION, GENEVA 1980, at 20.   NIOSH has further acknowledged that "[r]ecently, the [B-reader] program has been criticized, the main concern being that variability among readers is excessive despite the training and certification. ("1980 ILO Report")  There is also the perception some B-readers systematically bias readings  in legal proceedings."  M. Attfield & D. Wagner, *A Report on a Workshop on the National Institute for Occupational Safety and Health B Reader Certification Program*, JOM 34: 875-78 (1992).

[18]  H. Weill, *Diagnosis of Asbestos-Related Disease*, CHEST 91:802-03 (1987).

[19]  1980 ILO REPORT at 20.

has stated, "[a]t present, individual diagnoses, legal decisions and population assessments ought to rely on multiple readings."[20]  The ILO classification of 1/0 suffers from an additional defect, because by definition it recognizes that a second reader could find no evidence of fibrosis.  ILO classifications below 1/1 further fail to meet Daubert requirements of reliability and reproducibility because they are wholly subjective and dependent on the impressions, bias and experience of the interpreter.

56.    Daubert forbids analyses based on "subjective speculation" and on data where the results have such an enormous known rate of error.  Daubert, 509 U.S. at 590, 594.[21]  Indeed, courts have considered an ILO reading of 1/0 to be too uncertain for reliable diagnostic use.  See, e.g., Eagle Picher Indus. v. Liberty Mutual Ins. Co., 829 F.2d 227, 236 n.14 (1st Cir. 1987) ("a reading of 1/0 is too uncertain to be used to diagnose a particular case."); Raymark Indus., Inc. v. Stempel, Case No. 88-1014-K, 1990 WL 72588, at * 7 (D. Kan. May 30, 1990) ("On the ILO scale, a reading of 1/0 is only a 'suspect' finding of fibrosis, and is not sufficient to diagnose asbestosis.").

57.    As for ILO readings of 1/1 or higher, the variability problem may be reduced but still remains.  Each B-reader brings an individual level of experience and bias to what indisputably is a subjective process of interpretation.  Consequently, the only way to ensure that a radiographic reading is reliable and reproducible is to have it examined by more than one certified B-reader.

---

[20]  Ducatman et al., *B-Readers and Asbestos Medical Surveillance*, JOM 30:644-47, 646 (1988) (emphasis added).

[21]  Some doctors believe a 1/0 reading may be used to diagnose asbestosis for clinical and research purposes, but that cannot satisfy *Daubert*'s reliability standard.  The unreliability of low ILO readings was one factor in the ATS's determination that the threshold should be 1/1 or higher.  *The Diagnosis of Nonmalignant Diseases Related to Asbestos*, AM. REV. RESP. DIS. 136:1516-17 (1987).

91100-001\DOCS_DE:101267.3

### (2)    Pulmonary Function Tests (PFTs)

58.    PFTs are the best tool to determine whether an Asbestos PI Claimant has a physical impairment due to asbestos.  Put simply, PFTs measure a subject's lung capacity to determine levels of breathing obstruction.  But such tests are reliable only if performed accurately, and they are particularly subject to manipulation.  For this reason, the ATS has issued comprehensive standards governing PFTs.[22]  Inaccurate or poorly performed tests can result in improper diagnoses.  Where the quality of a test is suspect, any dysfunction shown on the test "should only indicate the need for more definitive testing," and the physician should "avoid specific diagnostic statements."[23]

59.    Pulmonary function tests need to be scrutinized even more closely in the litigation context because proper performance of the tests requires full patient cooperation and effort.  "Variability is greater in pulmonary function tests than in most other laboratory tests because of the need for consistent patient effort.  Therefore, proper testing and valid results require an expert technician, as well as the patient's full cooperation and ability to understand and perform the test correctly."[24]  Because the test is so dependent on the cooperation of the patient, the ATS cautions that "[t]he effort-dependent spirogram must be carefully scrutinized for quality."[25]

60.    Therefore, in order to survive a <u>Daubert</u> challenge, Asbestos PI Claimants relying on pulmonary function tests must demonstrate that those tests were conducted in a reliable and

---

[22]  ATS, *Lung Function Testing: Selection of Reference Values and Interpretative Strategies*, AM. REV. RESP. DIS. 144:1202-18, 1211 (1991).

[23]  <u>Id</u>.

[24]  Fitzgerald <u>et al</u>., *Office Evaluation of Pulmonary Function:  Beyond the Numbers*, AM. FAMILY PHYSICIAN 54: 525-34, 527 (1996).

[25]  *ATS Standardization of Spirometry–1987 Update*, AM. REV. RESP. DIS. 136:1285-98 (1987).

22

accurate fashion, in conformance with the well-accepted standards established by the ATS. Qualified experts, with knowledge of the ATS standards and experience in performing and interpreting PFTs, can review existing tests to determine whether they were conducted properly.[26]  If not, the test by definition is not reproducible for that patient, and serious questions exist about the quality of the test and the patient's cooperation.

61.    Another important check is whether the spirometer (i.e., the instrument used to determine lung capacity for PFTs) was set to record for the full length of time recommended by the ATS.  Improperly truncating the recording time will cause a test falsely to appear as if a restrictive lung abnormality is present.  Appropriate predictive values must also be used to identify what constitutes abnormality and normality.[27]

### 3.    Asbestos Claims Lacking Reliable Evidence of Restrictive Impairment or Injury

62.    Courts universally require the plaintiff to demonstrate "that the defendant had a duty of care which [was] breached, and that the breach proximately caused legally cognizable injury." See, e.g., Faya v. Almaraz, 329 Md. 435, 448, 620 A.2d 327 (1993) (emphasis added). The mere prospect of future harm, without any actual current harm, is not a legally cognizable personal injury."  Actual loss or damage resulting to the interests of another "is a necessary element of a negligence cause of action."  "The threat of future harm, not yet realized, is not enough." PROSSER & KEETON ON TORTS § 30, at 165 (5th ed. 1984).[28]  A "mere change or

---

[26]  For example, reproducibility of the tests, as described in the ATS standards, is an essential check of whether a Forced Vital Capacity (FVC) test was properly conducted.  A minimum of three curves (spirometric tracings) must be generated if an FVC test is performed properly, and those curves should be virtually identical to each other.

[27]  An independent facility already exists at Tulane University Health Sciences Center, School of Medicine that could analyze and determine the validity of existing pulmonary function tests.

23

alteration in some physical person, object or thing" does not constitute a legally compensable harm. "Physical changes or alterations may be either beneficial, detrimental or of no consequence to a person." A person suffers harm only "[i]n so far as physical changes have a detrimental effect" on that person. Id. § 7 cmt. B.

63.     For example, in the asbestos context, the Maine Supreme Court concluded in Bernier v. Raymark Industries, Inc., 516 A.2d 534 (Me. 1986), that subclinical injury is not actionable. "Even assuming that any inhalation of asbestos dust immediately causes microscopic injury to lung tissues, we conclude that the subclinical injury resulting from such inhalation is 'insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law.'" Id. at 543. The Bernier court was quoting from a Federal Employers' Liability Act (FELA) case, Schweitzer v. Consolidated Rail Corp., 758 F.2d 936, 942 (3d Cir. 1985), cert. denied, 474 U.S. 864 (1985).

64.     As the U.S. Supreme Court has recognized in FELA cases, "the words 'physical impact' do not encompass every form of 'physical contact'. And, in particular, they do not include a contact that amounts to no more than an exposure." Metro-North Commuter Railroad Co. v. Buckley, 521 U.S. 424, 432 (1997); see also Amendola v. Kansas City Southern Ry. Co., 699 F. Supp. 1401 (W.D. Mo. 1988) (inhalation of asbestos fibers alone did not represent physical injury sufficient to support a claim).

65.     Courts have therefore repeatedly found that asymptomatic asbestosis is not a legally cognizable injury. For example, in Burns v. Jaquays Mining Corp., 752 P.2d 28 (Ariz. App. 1987), the court granted summary judgment to an asbestos mill owner with regard to

---

28  This law also bars claims for medical monitoring costs. Medical monitoring claims present no present injury, only the risk of future injury. By definition, a risk of future injury is not compensable.

subclinical asbestosis claims because subclinical injuries do not amount to physical harm. "[U]ntil the asbestosis manifests itself one can only speculate as to the debilitating effects the plaintiff will suffer. Not all asbestosis is one hundred percent debilitating." Id. Consequently, the court stated, "[w]e see no reason to depart from traditional tort concepts and allow recovery for injuries before any disease becomes manifest." Id. at 31. The court reasoned that a contrary rule would give rise to a cause of action for countless plaintiffs who are healthy and might never manifest injury. Id. Furthermore,

> proof of damages in such cases would be highly speculative, likely resulting in windfalls for those who never take ill and insufficient compensation for those who do. Requiring manifest injury as a necessary element of an asbestos-related tort action avoids these problems and best serves the underlying purposes of tort law: the compensation of victims who have suffered.

Id. at 30.

66.     Similarly, in Taylor v. Owens-Corning Fiberglas Corp., 666 A.2d 681, 687 (Pa. Super. Ct. 1995) the Pennsylvania Superior Court found that "a plaintiff . . . must suffer discernible physical symptoms to have a compensable injury." Several of the plaintiffs whose cases had been consolidated in Taylor had been diagnosed with asbestosis but had no symptoms attributable to asbestos exposure. The court found that none of the plaintiffs had an injury sufficient to sustain a legal cause of action. Id. "[I]f a plaintiff is able to 'lead active, normal [life], with no pain or suffering, no loss of an organ function ...,' he does not have a compensable injury." Id. (quoting Giffear v. Johns Manville Corp., 632 A.2d 880, 887 (Pa. Super. 1993)).

67.     For these reasons, any "asbestosis" that does not result in at least "mild impairment" under the AMA's standards for evaluating PFT results cannot support a claim of medical impairment.

25

4.   **Asbestos Claims Lacking An Occupational History Entailing Work with the Debtors' Products**

68.   The Debtors also intend to file summary judgment motions based on certain Asbestos PI Claimants' failure to identify any occupational history involving actual work with the Debtors' products. In order to bring a valid personal injury claim, "a plaintiff must produce evidence sufficient to support an inference that he inhaled asbestos dust from the defendant's product." Harris v. Owens Corning Fiberglas Corp., 102 F.3d 1429, 1432 (7th Cir. 1996). There can be no personal injury claim unless the plaintiff establishes exposure to defendant's product. See generally PROSSER & KEETON ON TORTS § 103, at 713 (5th ed. 1984) (an essential element of a plaintiff's case is "the identification of the named defendant as the manufacturer of the defective product"). Thus, "[i]t is axiomatic that, if the defendant never sold asbestos to any of the locations where [the claimant] was allegedly employed, no cause of action lies against defendant." Outlaw v. Keene Corp., No. 88-9490, U.S. Dist. LEXIS 1245, at *3-4 (E.D. Pa. Feb. 5, 1990). Here, again, the information on the face of the Asbestos PI Questionnaire will determine the validity of the asserted Asbestos PI Claims. The Asbestos PI Questionnaire requires a description of each occupational position and job location in which exposure to the Debtors' products occurred, the specific Grace products that the Asbestos PI Claimant was exposed to, the specific job performed by the worker while he was exposed to Grace's product, and the proximity and duration of exposure to Grace's product at each location.

5.   **Asbestos Claims Lacking Reliable Evidence that the Debtors' Products Caused the Claimed Disease or Property Damage**

69.   Under Daubert, claimants must provide reliable, reproducible scientific evidence demonstrating that the disease they claim could be *caused* at the level of exposure to which they were exposed. Thus, for each disease claimed -- at the least, mesothelioma, lung cancer and asbestosis -- this Court may be asked to determine, as a threshold legal matter, the level of

26

exposure to asbestos that science establishes is capable of causing a two-fold excess of risk above the background risk for the general population.[29]  The Debtors will seek to disallow all claims with exposure levels below that threshold.

70.    It is a fundamental tenet of science that "the dose makes the poison."[30]  This is true with asbestos as with all other chemicals.  Virtually every person in North America has been exposed to asbestos.   Indeed, pathology data reports show that individuals in the general population have thousands, even millions, of asbestos fibers in their lungs with no adverse effect.[31]   According to Dr. Andrew Churg, a leading pathologist of asbestos diseases, "one may find as many as 40 million fibers of chrysotile, 40 million fibers of tremolite, and 400,000 fibers of amosite or crocidolite in the lungs of the general population of Vancouver, along with 40,000 asbestos bodies."  Even so, "there is no evidence that this fiber burden produces asbestos-related disease in the general population."

71.    Hence, not every person who worked near a Grace asbestos product can demonstrate that product substantially contributed to his claimed injury.  Here again, threshold

---

29   Daubert v. Merrell Dow Pharm., 43 F.3d 1311, 1320-22 (9th Cir. 1995) ("Daubert II") (plaintiffs' experts must establish at least a doubling of risk from exposure, or else their opinions would "tend[] to disprove legal causation" under a "more probable than not standard."); see also Hall v. Baxter Healthcare, 947 F. Supp. 1387, 1403 (D. Ore. 1996) (the fit prong of Daubert required plaintiffs to demonstrate on the basis of epidemiological evidence that "exposure to implants more than doubled the risk of their alleged injuries.").

30   This principle, first articulated by Paracelsus in the 16th century, is one of the foundations of modern toxicology. In the words of Paracelsus: "What is there that is not poison? All things are poison and nothing [is] without poison. Solely the dose determines that a thing is not a poison." See CASARETT AND DOULL'S PRINCIPLES OF TOXICOLOGY: THE BASIC SCIENCE OF POISONS (Klaasen ed., 5th ed., 1996); REFERENCE GUIDE ON TOXICOLOGY, IN FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 403 (2000).

31   "The first conclusion to be drawn is that everyone in the population carries a fairly substantial burden of asbestos fibers in their lungs." CHURG, A., NONNEOPLASTIC DISEASE CAUSED BY ASBESTOS, IN PATHOLOGY OF OCCUPATIONAL LUNG DISEASE 293 (Churg & Green, ed. 2nd 1998).

27

determinations must be made under <u>Daubert</u>.  The whole concept that "the dose makes the poison" is incorporated into the Court's gatekeeping function under <u>Daubert</u>.  A Holder of an Asbestos PI Claim thus has the burden of proving – by reliable and reproducible evidence – that (1) there is an established level of exposure to asbestos that causes disease in humans (i.e., general causation) and (2) the Asbestos PI Claimant himself was in fact exposed to the requisite dose (i.e., specific causation).[32]  "[A] plaintiff in a toxic tort case must prove the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover."  <u>Wright v. Willamette Indus., Inc.</u>, 91 F.3d 1105, 1106 (8th Cir. 1996).  Absent "accurate information on the level of [plaintiff's] exposure," a plaintiff's causation testimony must be excluded and summary judgment granted.  <u>Moore v. Ashland Chem. Co.</u>, 151 F.3d 269, 278 (5th Cir. 1998) (en banc), <u>cert</u>. <u>denied</u>, 526 U.S. 1064 (1999).  Unless and until the Asbestos PI Claimant establishes the existence of a dose sufficient to establish a doubling of the normal, "background" risk – and further establishes actual exposure to an amount in excess of that dose – the trier of fact is left to guess whether that particular Asbestos PI Claimant's exposure was sufficient to cause disease.  Guesswork is insufficient under <u>Daubert</u> or any other rule of evidence.  In <u>Mitchell v. Gencorp.</u>, 165 F.3d 778 (10th Cir. 1999), the Tenth Circuit affirmed summary judgment because the plaintiff had not shown sufficient reliable scientific information of "levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance."  As the Tenth Circuit explained:  "Absent supporting scientific data, . . . estimates and . . . conclusions are little more than guesswork.

---

[32]  <u>See</u> *Reference Guide on Epidemiology, in* FEDERAL JUDICIAL CENTER REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 382 (2000) ("The plaintiff must establish not only that the defendant's agent is capable of causing disease, but also that it did cause the plaintiff's disease.").

Guesses, even if educated, are insufficient to prove the level of exposure in a toxic tort case." <u>Id.</u> at 781.

72.    It will be the Asbestos PI Claimants' burden to demonstrate through reliable scientific evidence the levels of exposure sufficient to contribute substantially to both malignant and non-malignant asbestos-related disease.  It will also be their burden, in certain cases, to prove the occupational activities where the Asbestos PI Claimants' exposures to a Grace product reached such levels.  Accordingly, following <u>Daubert</u> proceedings, the Debtors expect to move for summary judgment on certain Asbestos PI Claims where the occupational activity that involved exposure to Grace products has not been proven (through evidence meeting <u>Daubert</u> standards) sufficient to contribute substantially to the causation of the claimed disease.

## Conclusion

73.    The Debtors therefore submit that the post-confirmation resolution of their Asbestos Claims pursuant to the proposed New CMO will serve the collective best interests of the Debtors' estates and creditors by providing a fair and efficient means by which the Debtors and Holders of Asbestos Claims may resolve issues regarding the Debtors' liability and ultimately determine the amounts to be distributed by the Asbestos Trust to individual Holders of Allowed Asbestos Claims.  In the alternative, the Debtors request that this Court enter an order granting the Original CMO Motion, establishing litigation protocols by which Asbestos Claims can be effectively resolved pre-confirmation.

## Notice

74.    Notice of this New CMO Motion has been given to: (i) the Office of the United States Trustee, (ii) counsel to the debtor-in-possession lenders, (iii) counsel to the agent for the Debtors' pre-petition lenders, (iv) counsel to all official committees appointed by the United States Trustee and (v) all those parties that requested service and notice of papers in accordance

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

**Objection Deadline: December 3, 2004**
**Hearing Date: December 20, 2004 at Noon (Pittsburgh, PA)**

## DEBTORS' MOTION FOR ENTRY OF AN ORDER SEEKING THE ESTIMATION OF ASBESTOS CLAIMS AND CERTAIN RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Grace") file this motion (the "Estimation Motion") seeking (a) entry of an order determining estimates of the aggregate amounts needed to fund[2] the Asbestos Trust to enable the Asbestos Trust to pay in full all Allowed Asbestos Claims and Asbestos Trust Expenses, as and when they

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2] It is contemplated that the Asbestos Trust will be funded 31 days following the Effective Date.

---

No. 6899

(ix)    Former United States Court of Appeals Judge and United States Attorney General Griffin Bell has written that "asbestos litigation now stands as the only part of our tort system in which people who can show no real physical injury are routinely allowed to recover."[28]

52.    It is precisely this widespread, historical abuse of the tort system that makes these proposed estimation procedures so critical. Put simply, it is impossible to extrapolate from Grace's past, forced payment of these garbage claims to determine what its *true* liability is.

**D.    The Debtors' analysis of the 1997 and 2000 Claims further confirms the need for additional Claims information to define the Debtors' liability.**

53.    In connection with the Original CMO Motion briefing, the Debtors completed an analysis of 500 randomly selected Claim files from its 1997 and 2000 filings. The Debtors augmented the meager medical data and occupational exposure information in its own inventory settlement files by obtaining information that the same Claimants filed with the Manville Trust and the Center for Claims Resolution. *See* Claims Report, Exhibit K to the 2001 CMO Reply Brief. The combined data from that survey confirms that the vast majority of the 1997 Claims were invalid or of doubtful validity, and that valid year 2000 Claims are even more scarce.

**E.    The vast majority of the Claims provide no evidence of impairment.**

54.    The surge in Claims against the Debtors is not due to an increase in the most serious and best-documented Claims, i.e., cancer Claims, but overwhelmingly is due to non-malignant Claims. Less than 7% of the 1997 Claims were for mesothelioma, lung cancer, or other cancers. Seventeen percent of the Claims included so little information that the type of disease could not even be determined. And the remaining 76% were for non-malignant conditions.

---

[28]  Griffin B. Bell, Asbestos Litigation & Tort Law: Trends, Ethics & Solutions: Asbestos & the Sleeping Constitution, 31 PEPP. L.REV. 1 (2003) ("The Sleeping Constitution").

21

55.     The percentage of malignant Claims declined even further in 2000.  Less than 6% of the Claims were for cancer.  More than 30% of the Claims presented so little information that no disease could be identified.  The remaining 64% were for non-malignant conditions.

56.     Analysis of diagnostic data relating to the sampled Claims shows the same picture:  no new wave of disease is responsible for the new wave of Claims.  Two diagnostic tests are widely used in combination to diagnose non-malignant injury:  "ILO" readings of chest x-rays and Pulmonary Function Tests.  X-rays are used to identify asbestosis within the lungs or pleural thickening in the outer lining of the lungs.  The physician grades the x-ray on a scale of 0/0 (no abnormality) through 3/3 (most severe) based upon criteria developed by the International Labour Organization ("ILO").  The American Thoracic Society has set an ILO rating of 1/1 as the minimum needed to support a diagnosis of asbestosis.[29]

57.     Even an ILO rating of 1/1 does not establish any actual impairment in lung function.  According to the American Medical Association, a second set of tests, Pulmonary Function Testing ("PFT"), is "the quantitative basis on which the evaluation of respiratory system impairment rests."[30]  Two measurements of expiration function are taken:  forced vital capacity (FVC) and forced expiratory volume in the first second ($FEV_1$).  A third test, measuring the diffusing capacity of carbon monoxide in a single breath ($D_{co}$), is also performed.  These results then are compared to normal predicted values calculated based on the gender, race, height and weight of the patient.  For a diagnosis of "mild impairment," the AMA requires an FVC or $FEV_1$ result of 79% or less, or a $D_{co}$ result of 69% or less.[31]

58.     Applying these diagnostic criteria to the Debtors' 1997 and 2000 Claims, the Claims are found to be grossly wanting.  Excluding the 33 cancer Claims in the 1997 sample,

---

[29]  American Thoracic Society ("ATS"), *The Diagnosis of Non-Malignant Diseases Related to Asbestos*, AM. REV. RESPIR DIS. (1986) 134: 363-367.

[30]  *AMA Guides to the Evaluation of Permanent Impairment*, § 5.2, p. 159 (4th ed. 1998).

[31]  *Id.* at Table 8, p. 162.

22

less than 2.8% of the Claims presented ILO ratings of 1/1 or higher and PFT results meeting the AMA criteria for "mild impairment." Only 3.3% of the 2000 sample Claims satisfied both standards.

59.    Beyond the failure to submit evidence meeting recognized medical standards of impairment, the unreliability of the data that is submitted shows that most of the claims will not be able to withstand scrutiny. For example, a 2004 published study showed that doctors acting as plaintiff expert witnesses in suits found asbestos-related injury in 95.9% of the chest X-rays submitted, while independent readers reviewing the *same* X-rays found possible damage in only 4.5%.[32] To establish liability, it is critical that the Claimants be required to submit diagnostic findings that can be replicated by independent, impartial medical reviewers.

### F.    Most Claims fail to establish actual occupational exposure to the Debtors' products.

60.    The recent sampling of the Debtors' 1997 and 2000 Claims also shows that very few Claimants can establish any actual exposure to the Debtors' asbestos products, either because they provide no exposure information or because they worked in industries and occupations in which exposure to the Debtors' products would have been unlikely or impossible.

61.    Half of the Claims provide no exposure information whatsoever. Of the 1997 sample Claims, 236 (47%) provide no information about the location where the alleged exposure occurred, the worker's employer or industry, or the Debtors' product to which he was exposed. Fifty-two percent of the 2000 sample Claims fail to provide any of that critical information. Even when the Debtors attempted to fill in these gaps by cross-referencing the Claimant's social security number to the Manville Trust and CCR databases, the Debtors were unable to identify the industry involved for 20% of the 1997 sample Claims, and 29% of the 2000 Claims. And, of course, the Manville Trust and CCR data provide no information about any exposures to the Debtors' products.

---

32  Joseph N. Gitlin, et al., Comparison of "B" Readers' Interpretations of Chest Radiographs for Asbestos Related Changes,  11 ACAD. RADIOL. 843, 855 (2004).

23

62.     For the other half of the Claims, the meager exposure information that is provided rarely implicates the Debtors.  For example, the Debtors' Monokote-3 fireproofing product was applied by plasterers primarily at high-rise steel construction sites.  Yet, only two of the 500 sample 1997 Claims and only one of the 2000 Claims were filed by plasterers.  Indeed, only 8% of the 1997 Grace sample Claimants and 3% of the 2000 Claimants identified themselves as construction workers.  Even after the Manville and CCR data was used to identify as many of the "unknown" Claimants as possible, only 16% of the 1997 sample Claims, and 12% of the 2000 Claims, were found to be filed by construction workers.

63.     All of the evidence points to one conclusion:  the pre-bankruptcy surge in Claims against the Debtors is due to the indiscriminate filing of Asbestos Claims against an ever-increasing number of defendants nationwide.  Even the Asbestos PI Committee's expert Mark Peterson conceded in his affidavit that "few plaintiffs" recall the specific products to which they were exposed, and that no product identification information was available in 79% of the sample Grace Claim files the Asbestos PI Committee reviewed *at the Claimants' own law firms*. (Peterson Aff. 34)

**IV.     The Debtors' Five-Step Estimation Procedure.**

64.     To address these obvious concerns over the validity of the surge in Asbestos PI Claims filed against the Debtors, while at the same time expediting the confirmation of the Debtors' Plan, we propose the following five-step estimation procedure.  **First,** this Court would approve a bar date (Asbestos PI Pre-petition Litigation Bar Date) by which all persons or Entities holding Asbestos PI Pre-petition Litigation Claims would be required to file their completed Asbestos PI Proof of Claim Form.[33]  This Court would also approve a Questionnaire Return Date by which all Holders of Asbestos PI Pre-petition Litigation Claims who filed Asbestos PI Proof of Claim Forms would be required to file their completed Asbestos PI

---

[33]   Persons who had not commenced litigation before the Petition Date would not be subject to this bar date, minimizing the costs of the bar date notice and restricting the obligation of completing a Claim form at this time to those who had already retained counsel and had already filed a complaint against the Debtors.

24

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | )    Chapter 11 |
| | ) |
| W. R. GRACE & CO., *et al.*, | )    Case No. 01-1139 (JKF) |
| | )    (Jointly Administered) |
| Debtors. | ) |
| | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF W.R. GRACE & CO.'S MOTION TO
## APPROVE PI CMO AND QUESTIONNAIRE

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet Baer
Jonathan P. Friedland
Salvatore F. Bianca
Joseph Nacca
Andrea L. Johnson
200 East Randolph Drive
Chicago, IL 60601
Telephone:    (312) 861-2000
Facsimile:    (312) 861-2200

KIRKLAND & ELLIS LLP
Barbara M. Harding
Brian T. Stansbury
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:    (202) 879-5000
Facsimile:    (202) 879-5200

Dated:  May 10, 2005

PACHULSKI, STANG, ZIEHL, YOUNG, JONES &
WEINTRAUB P.C.
Laura Davis Jones (Bar No. 2436)
David Carickhoff (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession

No. 8395

Consequently, the Manville Trust, Eagle-Picher Trust and UNR Trust have all been forced to significantly reduce their payouts for *all* claims, including payouts for claims relating to persons with mesothelioma, a fatal cancer.[70]  Judge Helen E. Freedman noted the problem:

> Recoveries by unimpaired or minimally impaired plaintiffs deplete the funds needed to compensate present and future claimants with serious illnesses, and resources are dwindling as the "elephantine mass of asbestos cases" nationwide drives large numbers of potentially culpable parties into bankruptcy.

*In re New York City Asbestos Litig.*, No. 40000/88, 2002 WL 32151568, at *1-2 (Sup. Ct. N.Y. Dec. 19, 2002).

### IV.    GRACE HAS THE SAME PROBLEMS:  MASSIVE NUMBERS OF CLAIMS WITH NO RELIABLE MEDICAL DATA AND EXPOSURE EVIDENCE

Grace finds itself in the same position as other bankrupt defendants -- it is faced with thousands of claims that have no basis in medicine or law and the potential for unlimited filings of such claims in the future.    The same lawyers are implicated, the same B-readers are implicated, and the same abusive claims practices are implicated.

#### A.    Grace Experienced the Same Unpredicted and Unexplainable Increase in Claims as Other Asbestos Manufacturers.

The Debtors' bankruptcies were necessitated by a sudden and scientifically unexplainable surge of asbestos claim filings against the company. *See* W.R. Grace 4/2/01 Informational Br. at

---

[70]  *See* Mealey's Litig. Rep.: Asbestos (Aug. 3, 2001) at 14; *Findley v. Trs. of the Manville Pers. Injury Settlement Trust (In re Joint E.&S Dists. Asbestos Litig.)*, 2001 WL 1464362, at *1 (E.&S.D.N.Y. 2001) ("The courts note that there is a continuing rise in the number of claims and that the amount payed [sic] pro rata on claims has been reduced from 10 percent to 5 percent of the original value."); Letter from William B. Nurre, Executive Director, EPI Trust, to claimants' counsel (Oct. 9, 2000)  (In October 2000, the Eagle-Picher Trust had to reduce its payout from 31.9 percent to 25.7 percent.); UNR Asbestos Trust Letter, Mealey's Litig. Rep. 21 (Dec. 1, 2000) at D-1 (In fall of 2000, claims against the UNR Trust had jumped so quickly that it was forced to lower its payout from 12.9 percent to 7.8 percent.).

38

38.[71]  Asbestos claims against Grace peaked in 1996 and showed a pronounced downward trend.

*Id.*  The downward trend continued for two more years with no sign of abating. *Id.*  But the trend

reversed with a 28 % increase in 1999 and an 81% increase in 2000.  *Id.*  In January 2001, claims

were served on Grace at a rate 374% higher than the year before, and in February 2001 at a rate

207% higher than the year before. *Id.*  In April 2001, Grace was forced to file Chapter 11.  *Id.*



As reflected in the chart above, claims that had been declining suddenly skyrocketed in 2000,

overwhelming the Debtors' ability to resolve them through the tort system.

---

[71]    See also Andrews Asbestos Litig. Rep. 23(7) (April 12, 2001); WALL ST. J. B8 (4/3/01).

91100-001\DOCS_DE:107964.1



In addition, the recent surge in claims against Grace was *not* due to an increase in the most serious and best documented claims, *i.e.*, cancer claims, but overwhelmingly was due to non-malignant, unimpaired claims. As depicted in the chart above, based upon Grace's statistical survey, *less than 7%* of the 1997 claims were for mesothelioma, lung cancer, or other cancers. Seventeen percent of the claims included so little information that the type of disease could not even be determined. And the remaining 76% were for non-malignant conditions. The percentage of malignant claims declined even further in 2000. *Less than 6%* of the claims were for cancer. More than 30% of the year 2000 claims presented so little information that no disease could be identified. The remaining 64% were for non-malignant conditions. As discussed earlier, there's no valid medical or scientific foundation for these dramatic increases in claims.

**B.    Many Claims Filed Against Grace Lack Foundation and are Based on Unreliable Medical and Exposure Data.**

Asbestos claims filed against Grace suffer all of the problems identified throughout this brief. In a July 19, 2002 deposition taken by the Asbestos PI Committee's counsel, Grace's

senior counsel responsible for asbestos personal injury claims testified that the sheer volume of

the claims against Grace in the mid- to later-1990s forced the company to settle the claims on a

mass scale even though it knew most were of doubtful validity:

> Leaving aside the quality, the sheer volume of the cases and the resources available in the courts and the resources available to the company to defend the cases made an individual trial of the cases impossible. . . . In a situation where there's hundreds of thousands of cases being filed . . . . even though we knew and were well aware that there were significant problems with the credibility of most of this evidence and, but for the problems associated with the volumes of the cases, the money associated with the cases, that these cases probably were not legitimate claims against Grace, we were forced to pay them.

J. Hughes Dep. at 48-49 (July 19, 2002) (emphasis added).   Moreover, as Dr. Mark Peterson

outlined in his affidavit of September 9, 2001, plaintiffs' lawyers have routinely sued first, and

asked questions about the merits of their claims against Grace later – if at all.   Dr. Peterson

arranged for a sample survey to be conducted of the information *in the plaintiff attorneys' own*

*files* relating to the pre-petition claims against Grace and found that the claims lacked basic

evidentiary support:

- Information indicating the claimant had actually been exposed to Grace's products was found in only 5 of the 24 sample claims.   *"Overall, no [product identification] information was available for 79 percent of claims."*   Peterson Aff. ¶ 34 (Sept. 9, 2001) (emphasis added)

- Peterson confirmed that *information showing an actual asbestos-related injury* (much less an injury attributable to Grace's products) *was even more lacking*:  The survey found that only one-third of the files contained the information about diagnosing physicians, less than half had all of the requested medical reports, only half had X-rays, and "only half [of the plaintiff attorneys] thought they could provide information about whether any doctors had identified alternative or non-asbestos causes." *Id.* at 36.

In light of those findings, and as detailed in the Debtors' February 12, 2002 CMO reply

brief to this Court, Grace retained Dr. Daniel Rourke to perform a statistical study of 1,000

randomly selected pre-petition claims (500 each filed in 1997 and 2000).   *See* Rourke Decl.

41

(Nov. 12, 2001).  For each of the sample claims, Dr. Rourke used the Grace claims files as well

as the CCR and Manville Trust claims database to compile as much information as possible

about the occupational and medical histories of each claimant.[72]  The combined data from that

survey confirms that the vast majority of the 1997 claims were invalid or of doubtful validity,

and that valid claims in the year 2000 are even more scarce.  The analysis showed that the vast

majority of the claims:

- provided no evidence of impairment (as demonstrated in the chart below),[73]

- failed to establish exposure to Grace's products, (See chart below)[74] and

---

[72]  *See* Claims Report, Exhibit K to Grace's Consolidated Reply in Support of CMO, Bar Date, Claim Form and Notice Program.

[73]  *Id.* (Analysis of diagnostic data relating to the sampled claims demonstrates that no new wave of disease is responsible for the new wave of claims.  When diagnostic criteria are applied to Grace's 1997 and 2000 sample claims, the claims are found to be grossly wanting.  Even if the 33 cancer claims in the 1997 sample are excluded, *less than 21.6%* of the remaining claims presented ILO ratings of 1/0 or higher and PFT results meeting the AMA criteria of "mild impairment."  Similarly, *only 11.4%* of the 2000 sample claims satisfied both standards.  In sum, the majority of the non-malignant claimants in both years failed to present the minimum medical evidence needed to substantiate *any* injury at all.)

[74]  *Id.* (The recent sampling of Grace's 1997 and 2000 claims also shows that very few claimants can establish any actionable exposure to Grace's asbestos products, either because they provide no exposure information or because the claimants worked in industries and occupations in which exposure to Grace's products would have been unlikely or impossible.  Half of all the claims provide no exposure information whatsoever.  Of the 1997 sample claims, 47% provide no information about the site or location where the alleged exposure occurred, the worker's employer or industry, or the Grace product to which he was exposed.  Fifty-two percent of the 2000 sample claims fail to provide any of that critical information.  Even when Grace attempted to fill in these gaps by cross-referencing the claimant's Social Security number to the Manville Trust and CCR databases, it was unable to identify the industry involved for 20% of the 1997 sample claims, and 29% of the 2000 claims.  And, of course, the Manville Trust and CCR data provide no information about any exposures to Grace products.  For the other half of the claims, the meager exposure information that is provided rarely implicates Grace.  For example, Grace's Monokote-3 fireproofing product was applied by plasterers primarily at high rise steel construction sites.  Yet, only two of the 500 sample 1997 claims and only one of the year 2000 claims were filed by plasterers.  Indeed, only 8% of the 1997 Grace sample claimants and 3% of the 2000 claimants identified themselves as construction workers.  Even after the Manville and CCR data was used to identify as many of the "unknown" claimants as possible, only 16% of the 1997 sample claims, and 12% of the 2000 claims, were found to be filed by construction workers.  The majority of the sample claims in which the claimant's industry can be identified (using the combined information from the Grace claim file as well as the Manville and CCR databases) were filed by workers who should *not* have been exposed to any Grace products.  Not surprisingly, most of these claimants submit no information about exposure to any Grace product.  When an attempt is made to implicate a Grace product, the product identification often makes no sense.  For example, seven sample claimants from the Kaiser Steel plant in Chicago claimed to have been exposed at that plant to

(Continued...)

42

•     appeared to be the result of mass screenings.[75]



Thus, Grace now stands in shoes similar to past asbestos debtors, but seeks not to repeat the mistakes of those bankruptcy cases. Grace is not asking the court to fix the whole system of asbestos litigation -- but merely to employ a legally *available* and scientifically *valid* process to reduce the likelihood that fraudulent and invalid claims will be considered in estimating Grace's aggregate legal liability.

---

"Zonolite Spra-Tex," a *decorative* ceiling product that never would be used in a steel works. Others at the same plant listed "Zonolite Monokote," the fireproofing product used in *commercial* high-rise buildings.)

[75]   *Id.* (Many of these new claims appear to be the result of recent mass screenings and claim recruiting efforts at large industrial plants. For example, during the Fall of 2000, a single plaintiffs' law firm submitted 1,672 claims to Grace, nearly all of which were for steelworkers in Pennsylvania, West Virginia and Ohio. In the winter of 2001, that same law firm submitted another 400 claims from a single plant in Gary, Indiana.)