# EXHIBIT "J"

## Barton, Whitfield Query Physicians Regarding Silicosis

**WASHINGTON** – U.S. Rep. Joe Barton, R-Texas, chairman of the House Energy and Commerce Committee, and Oversight and Investigations Subcommittee Chairman Ed Whitfield, R-Ky., sent a letter today seeking records and information regarding public health concerns arising from various medical practices conducted to support personal injury litigation relating to silicosis. Silicosis is a lung disease developed from exposure to silica particles that are typically encountered through certain types of mining and sand-blasting work. Modern industrial practices, however, have led to a steady decline of this disease in the U.S. over the past decades.

The letter was sent to the following physicians:

Dr. Robert Altmeyer, Wheeling, W.Va., Dr. James Ballard, Birmingham, Ala., Dr. Barry S. Levy, Sherborn, Mass., Dr. George Martindale, Mobile, Ala., Dr. Glynn Hilbun, Moss Point, Miss., Dr. Kevin Cooper, Pascagoula, Miss., Dr. Richard B. Levine, Elkins Park, Pa., Dr. Jay T. Segarra, Ocean Springs, Miss., Dr. Todd Coulter, Ocean Springs, Miss., Dr. Andrew W. Harron, Kenosha, Wis., Dr. W. Allen Oaks, Mobile, Ala., Dr. Ray A. Harron, Bridgeport, W.Va.

*August 2, 2005*

*We write to you seeking records and information relating to public health concerns arising from certain medical practices allegedly conducted to support personal injury litigation relating to silicosis. In a recent opinion, In Re: Silica Products Liability Litigation, MDL Docket No. 1553 (S.D. Tex., June 30, 2005), U.S. District Judge Janis Graham Jack detailed how physicians and medical screening companies generated a diagnosis of silicosis, a largely incurable and often fatal disease, for thousands of patients in a class action lawsuit. She concluded, however, that, "these diagnoses were about litigation rather than health care" and "were driven by neither health nor justice [but] were manufactured for money." We are deeply troubled that thousands of men and women, in this lawsuit alone, may have sought medical care but instead may have been treated to perfunctory diagnoses so some medical providers could profit from the litigation process. We are examining the relationships, standards, and practices that could encourage or permit such conduct.*

*Silicosis is a lung disease developed from exposure to silica particles that are typically encountered through certain types of mining and sand-blasting work. Modern industrial practices, however, have led to a steady decline of this disease in the U.S. over the past decades. According to the National Institute for Occupational Safety and Health, silicosis-related deaths in the U.S. declined from 1,157 in 1968 to 187 in 1999. In Mississippi, where most of the In Re: Silica silicosis claims arose, Judge Jack referenced epidemiological and mortality data that would project an estimated eight new silicosis cases each year in that state with approximately 1.3 deaths. Nevertheless, from 2001 to 2002, new silicosis lawsuits in Mississippi courts skyrocketed from 76 to 10,642. Judge Jack observed that courts "must determine whether they are being faced with the effects of an industrial disaster of unprecedented proportion – or something else entirely."*

*Our concern, underscored by Judge Jack's opinion, focuses on the conduct of members of the medical community in this matter. First, Judge Jack asked why doctors and lawyers would not alert public health officials when an apparent silicosis epidemic seized the State of Mississippi. Indeed, the Occupational Safety and Health Administration field office in Jackson, Mississippi, received no reports of silica problems and no requests for any silica-related investigations. Judge Jack contrasted the reaction to the over 10,000 new silicosis claims appearing in the State of Mississippi alone with the government and public response to the 27 cases of SARS found throughout the entire U.S. Judge Jack, surmising that the situation is really, "a phantom epidemic, unnoticed by everyone other than those enmeshed in the legal system," also asks what the cost is of this possibly fraudulent public health scare to courts, the public, and, most importantly, those individuals legitimately suffering from silicosis.*

*The most salient and troubling picture to emerge from the In Re: Silica opinion, however, is that individuals entrusted with the health care of patients may have corrupted basic principles of medical standards and practice in the service of litigation. Here there were two main actors involved in developing the medical information and diagnoses necessary to support the lawsuits: medical screening companies and physicians.*

<u>Screening Companies</u>

*Screening companies located and secured the diagnoses of many of the Plaintiffs in the In Re: Silica litigation. Screeners made their money by then referring these patients, packaged with a diagnosis, to an attorney. According to Judge Jack's opinion, the companies would advertise for or solicit individuals who may have worked or come in contact with silica. When such individuals contacted the screening company, employees, typically with no medical training, would perform cursory intake histories to identify those people who "showed some form of being exposed to silica." The screeners would then encourage these identified individuals to attend a mass diagnostic screening – sometimes held in the back of a truck carrying mobile diagnostic equipment and located in the parking lot of a restaurant or hotel. Of particular concern is that in some instances, as noted by Judge Jack, one screener performed x-rays without them being ordered by a medical professional. The information and testing collected at these screenings would often serve as the sole basis for a later diagnosis of silicosis.*

*By way of example, N&M Testing, Inc., of Pascagoula, Mississippi, generated approximately 6,757 of the diagnoses in In Re: Silica yet never employed a medical director. Heath Mason, a co-owner of N&M, had performed a number of Pulmonary Function Tests ("PFT") on patients, although, as he admitted in testimony to the Court, "I don't really have any medical qualifications." Indeed, Judge Jack found that the PFT equipment used by N&M displayed error codes showing that it was, "clear that more often than not . . . [the PFT equipment] failed to function according to the American Thoracic Society requirements." With respect to the x-ray equipment as well, Judge Jack observed that Texas and Mississippi certification boards, after inspections, issued violations to N&M for failing to comply with state standards.*

*Perhaps the issue which goes most to the heart of our concerns about the conduct of these screening companies is the possible undermining of the medical standards upon which thousands of men and women were told they suffered from silicosis. For example, Charles Foster, owner of a screening company RTS, Inc., testified before the In Re: Silica Court:*

> *Court: "What is your training on this, on [diagnosing] silicosis?"*
> *Mr. Foster: "Whatever the criteria the law firm sets."*

*Judge Jack's opinion paints a disturbing picture of individuals perhaps holding themselves out as medical professionals and basing their work not on medical science but the criteria of a lawyer.*

<u>Physicians</u>

*While the conduct of screening companies in this matter is troubling, perhaps the greater scrutiny should be reserved for the handful of doctors who facilitated this conduct. For the more than 9,000 Plaintiffs involved in the In Re: Silica matter, only 12 doctors were responsible for all of the silicosis diagnoses. In almost every case, each of these doctors neither treated, met, or physically examined the patients. Principally, the only connection these 12 doctors had to these more than 9,000 men and women was a small group of screening companies and lawyers.*

*We are specifically concerned about the medical standards and practices these physicians apparently employed in reaching their diagnoses. For example, Dr. George H. Martindale of Mobile, Alabama, who the Plaintiffs' attorneys said had diagnosed 3,617 of the Plaintiffs with silicosis, repeated in each of his reports this exact same sentence:*

*"On the basis of the medical history review, which is inclusive of a significant occupational exposure to silica dust, physical exam and the chest radiograph, the diagnosis of silicosis is established within a reasonable degree of medical certainty."* Nevertheless, Judge Jack observed:

> *"Despite this language in his reports, during his deposition Dr. Martindale admitted that he did not diagnose any Plaintiff with silicosis. . . . Indeed, he testified that he did not even know the criteria for making a diagnosis of silicosis."* (Emphasis in original).

When asked why the language was included in his reports, Dr. Martindale testified to the Court that Mr. Mason, co-owner of the N&M screening company, requested for it to be in the report. Dr. Martindale said that, although he knew the language was false, he nevertheless *"acquiesced."* Additionally, Judge Jack noted that Dr. Martindale had conducted all 3,617 of his reviews in 48 days, averaging 75 reports per day.

Judge Jack's account also reveals that Dr. Martindale's conduct was not unique among the physicians involved in this lawsuit. For example, Dr. Barry Levy diagnosed with silicosis 1,389 patients in Mississippi, Alabama and Texas, all from his office in Massachusetts. He did so without taking a medical or occupational history, performing any physical examination or, for that matter, ever speaking with the patient or the treating physician. He relied only on information supplied to him by attorneys, including the opinions of other doctors paid for by the screening companies. In sum, Judge Jack noted that Dr. Levy's reliance on this second-hand information, *"exhibited an extraordinary amount of faith."* Dr. Levy made 1,239 of these diagnoses in a 72-hour period, a rate of less than four minutes per patient. Judge Jack puts these four-minute diagnoses into context by observing that Dr. Levy's prior silicosis diagnosis, in a different, single-plaintiff lawsuit, took him 17.6 hours and his assistant 46 hours.

Another troubling concern raised in the findings of Judge Jack is the connection suggested between these silica lawsuits and the separate field of asbestos litigation. According to Judge Jack, these screening companies were originally established to service the asbestos lawsuit industry but around 2001 started turning their attention to identifying silicosis cases. Sometimes the screening companies would begin their silicosis work with a law firm's *"existing inventory"* of asbestosis claimants. This led to some interesting results – particularly given recent testimony in a Senate hearing, referenced by Judge Jack, that described both the distinctive clinical nature of silicosis, in contrast to asbestosis, and the fact that it is improbable that a patient could suffer from both at the same time. For example, one doctor, Ray Harron, who was involved in the diagnosis of approximately 6,350 Plaintiffs in <u>In Re: Silica</u>, diagnosed more than 1,800 patients with silicosis whom he had previously diagnosed with asbestosis. In all of the secondary findings of silicosis, Dr. Harron failed to mention any previous diagnosis of asbestosis. Dr. James Ballard diagnosed people with silicosis who he had previously determined to be suffering from asbestosis – based on a review of the exact same x-rays.

Judge Jack does observe that while a mere 12 doctors made all 9,083 silicosis diagnoses involved in the case, there were some 8,000 treating doctors involved in the actual treatment of the patients who did not see this disease. Judge Jack wrote, *"[t]his small cadre of non-treating physicians, financially beholden to lawyers and screening companies rather than to patients, managed to notice a disease missed by approximately 8,000 other physicians, most of whom had the significant advantage of speaking to, examining, and treating the Plaintiffs."* At least three of the physicians involved in the <u>In Re: Silica</u> litigation eventually withdrew or backed off from their reported diagnoses upon cross-examination on their methods and findings.

As described by Judge Jack, this conduct on the part of medical screeners and physicians suggests a serious corruption of medical practices and standards. We seek additional information on the conduct detailed in the <u>In Re: Silica</u> matter to establish whether there is a problem and, if so, if it represents a larger public health concern.

<u>Record and Information Requests</u>

*Accordingly, pursuant to Rules X and XI of the U.S. House of Representatives, please provide us with the following records and information by September 2, 2005. Please note that Requests Nos. 2 - 10 ask for narrative responses or a statement of specific data. With respect to these specific Requests, answers by way of simple reference to produced documents will be insufficient and incomplete. The breadth and timeliness of this review requires each respondent to prepare and submit complete written responses to these Requests, as appropriate.*

*Also, for the purposes of these Requests, please do not provide any patient names or patient specific or individually identifiable health information or produce any records, such as x-rays, occupational or medical histories, opinions, that are specific only to an individual patient's medical condition. Finally, please also respond to these Requests in accordance with the definitions attached to this letter.*

<u>Requests</u>

*1. Please produce all records related to any communications, services, analyses, reviews, or diagnoses you have made on behalf of any patient, attorney, or screening company involving, in any way, the issue of silicosis.*

*2. Please state all medical licensure and credentials you have held in your career including all relevant dates and States. (For the purposes of this Request, you may submit, in place of a written answer, a current curriculum vitae.)*

*3. Please state (in terms of a percentage of income per year, or other such measure) how much of your medical practice, since 2000, has been work as a consultant or expert witness in any legal matters or for any screening company. Please also indicate whether this work was on behalf of plaintiffs or defendants.*

*4. Please identify all state and federal cases in which you have been identified, designated, consulted, or offered as an expert witness. For each case, state the following information:*

   *a. Case caption, including case number;*
   *b. Court in which case was filed;*
   *c. Name of the attorney who retained you;*
   *d. Type of disease alleged in case;*
   *e. Whether the Court designated you as an expert; and*
   *f. Whether the Court denied your designation as an expert.*

*5. Please state what steps must be taken to diagnose a person with silicosis.*

*6. Please state what experience, training, or credentials a person must have to diagnose a person with silicosis.*

*7. Please state your experience, training, and credentials in diagnosing and treating silicosis.*

*8. Please identify all medical screening companies and lawyers, including all relevant names, addresses, and telephone numbers, for whom you have provided any services, or been requested to provide any services, related to the review, analysis, or diagnosis of silicosis-related matters, and for each such entity, please provide the following:*

   *a. Dates of service for each entity;*
   *b. The compensation arrangements with each entity;*
   *c. The total compensation, on a yearly basis, received from each such entity;*
   *d. The total number of patient matters received from each such entity for your review, analysis or diagnosis, including:*

    *i. The total number of such patient matters involving your opinion either making, concurring with, or supporting a diagnosis of silicosis;*
    *ii. The total number of such patient matters involving your opinion either making, concurring with, or supporting a diagnosis of asbestosis;*
    *iii. The total number of such patient matters involving your opinion either making, concurring with, or supporting a diagnosis of any other pulmonary diseases; or*
    *iv. The total number of such patient matters involving your opinion rejecting or disagreeing with a diagnosis of silicosis.*

*9. With respect to your relationships with any entities identified above in your response to Request No. 8, please state whether the level of your compensation from any such entity was based on, in any manner, the diagnosis rendered?*

*10. With respect to your relationships with any entities identified above in your response to Request No. 8, please state whether, prior to conducting your review, analysis, or diagnosis of any patient matters, you had discussion or received any information, understanding, or direction from the entity relating to the fact that silicosis or silica exposure was the condition at issue.*

*11. Please identify all diagnoses of silicosis you have ever made apart from those identified above in response to Request No. 8.*

*12. Have you ever diagnosed or concurred with the diagnosis of any single person suffering both from asbestosis and silicosis? If so, please identify such diagnoses.*

*If you have any questions, please contact Anthony M. Cooke, Majority Counsel for Oversight and Investigations, at (202) 226-2424.*

*Sincerely,*

*Joe Barton*
*Chairman*

*Ed Whitfield*
 *Chairman*
*Subcommittee on Oversight and Investigations*

                    ####