# EXHIBIT 2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al. | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Hearing Date: October 24, 2005, 12:00 p.m. |
| | ) | Objection Deadline: October 7, 2005 |

DEBTORS' FIFTEENTH OMNIBUS OBJECTION (SUBSTANTIVE)
TO ASBESTOS PROPERTY DAMAGE CLAIMS

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................1

    A.      Summary of Objection Categories...........................................................1

    B.      Proposed Hearing Schedule ....................................................................5

JURISDICTION .................................................................................................................9

I.     FACTUAL BACKGROUND.................................................................................10

    A.      History of Grace Products and Uses ......................................................10

           1.       Category I Claims:  MK-3 and Acoustical Plaster.....................11

           2.       Category II Claims:  Grace Mining, Milling and Processing Operations ...................................................................................12

    B.      Grace's Property Damage Litigation History, 1983-2001 ......................13

    C.      Grace's March 2003 PD Claims Filings .................................................13

    D.      The Debtors' PD Claims Objections And Estimation Process...............15

II.    LEGAL ARGUMENT:  OBJECTIONS TO ALL CLAIMS IDENTIFIED IN EXHIBITS A-1 THROUGH H-1 .........................................................................16

    A.      Improperly Submitted PD Claims...........................................................16

    B.      Previously Settled Or Adjudicated PD Claims .......................................18

           1.       Previously Adjudicated Claims..................................................18

           2.       Previously Settled Claims..........................................................20

    C.      PD Claims Providing Insufficient Information.......................................21

           1.       Facially Incomplete Proofs Of Claim ........................................22

           2.       Claims With Insufficient Documentation ..................................24

           3.       Claims Failing To Identify A Grace Product...............................27

           4.       Claims Failing To Rule Out Non-Grace Products......................30

i

Page

D.      PD Claims Brought Too Late ....................................................................31

   1.      Claims For Buildings Built Too Late To Contain Grace
           Asbestos-Containing Products ................................................31

   2.      Claims Barred By The Statute of Limitations Based Upon
           Constructive Notice ................................................................32

   3.      Claims Barred By Assumption of Risk......................................34

   4.      Claims Barred By The Statute Of Limitations Pursuant to Actual
           Notice......................................................................................35

   5.      Claims Barred By The Statute Of Repose. ...............................36

   6.      Claims Barred By Laches .........................................................38

E.      PD Claims Providing No Proof Of Hazard.............................................39

   1.      Claims Providing no Measurement of Relevant Asbestos Levels. ...........39

   2.      Claims Relying Exclusively On Dust Sampling Results That Are
           Irrelevant And Scientifically Unreliable.................................40

   3.      Claims Relying On Air Sampling Results That Are Inapplicable. ...........41

   4.      Claims Attaching Air Sampling Results That Do Not Support The
           Existence Of A Health Hazard.................................................42

F.      Flawed Categories Of Speights Claims ..................................................42

   1.      Speights' California Claims......................................................43

   2.      Speights Claims Contending Building Owners First Learned Of
           Asbestos On The Property In 2003 ..........................................49

   3.      Speights Mt. Sinai Claims........................................................51

   4.      Speights Sonoma State College Claims.....................................51

   5.      Canadian Claims .....................................................................52

G.      Category II Claims Relating To Mining, Milling and Processing
        Operations ..............................................................................................57

   1.      Minneapolis, Minnesota Claims ...............................................58

ii

Page

2.  Claims for Properties in Libby, Montana .................................................59

3.  Other Category II Claims.............................................................................61

4.  Burlington Northern and Santa Fe Railway Claims ...................................62

5.  Failure to Demonstrate Injury....................................................................62

H.  Contribution and Indemnification Claims ............................................................63

I.  Potentially Fraudulent Or Otherwise Factually Incorrect Property Damage
Claims ....................................................................................................................63

RESPONSES TO THIS FIFTEENTH OMNIBUS OBJECTION................................................64

REPLIES TO RESPONSES ...................................................................................................64

WAIVER OF LOCAL RULE 3007-1 AND RESERVATION.....................................................64

NOTICE..................................................................................................................................66

NO PREVIOUS REQUEST ....................................................................................................67

CONCLUSION........................................................................................................................67

iii

## INTRODUCTION

As set out in the *Case Management Order for the Estimation of Asbestos Property Damage Liabilities* (the "PD Estimation CMO" which was approved by this Court during the Debtors' August 29, 2005 omnibus hearing, the Debtors hereby object as follows to Asbestos Property Damage Claims[1] (the "PD Claims").

### A.    Summary of Objection Categories

By this Fifteenth Omnibus Objection, and for the reasons stated more fully below, the Debtors request that each and every PD Claim listed on Exhibits A-1 through H-1 and discussed below in Sections II.A-H be disallowed and expunged, except as expressly noted otherwise. Some PD Claims fall into multiple categories:

- **Section II.A:  Improperly submitted PD Claims, Exhibits A-1, A-2 and A-3:**

  - The PD Claims identified on Exhibit A-1 and A-2 are Asbestos Personal Injury Claims, Medical Monitoring Claims, or ZAI Claims (as defined in the Bar Date Order), that were improperly submitted on PD Claim Forms.  As explained further within, Asbestos Personal Injury Claims and ZAI Claims should be dismissed without prejudice to the claimant to refile;  Medical Monitoring Claims submitted on PD Claim Forms should be disallowed.

  - The PD Claims on Exhibit A-3 are purported PD Claims that *were not* submitted on the PD Claim Form and thus have not provided any of the relevant information this Court held was required in order for a claimant to make a cognizable PD Claim. These claims should be disallowed and expunged.

- **Section II.B:  Previously settled or satisfied PD Claims, Exhibits B-1 and B-2:**

  - The PD Claims identified in Exhibits B-1 and B-2 were either *previously settled* by Grace or otherwise *previously adjudicated*.  The Debtors should not be forced to pay for or address the same claims multiple times.  All of these claims should be disallowed and expunged.

---

[1] For purposes of this Omnibus Objection, the term Asbestos Property Damage Claim has the meaning given in the *Order as to All Non-Asbestos Claims, Asbestos Property Damage Claims, and Medical Monitoring Claims: (I) Establishing Bar Date, (II) Approving Proof of Claim Forms and (III) Approving Notice Program* (April 22, 2002) (the "Bar Date Order"), which established March 31, 2003 as the last date for filing any Asbestos Property Damage Claims against Grace (the "Bar Date"), approved the *Claims Bar Date Notice* (the "Bar Date Notice"), and approved the W. R. Grace & Co. Asbestos Property Damage Proof of Claim Form (the "PD Claim Form").

- **Section II.C:   PD Claims providing insufficient or inconsistent information, Exhibits C-1 through C-4:**

  - The PD Claims identified in Exhibit C-1 are *incomplete on their face,* missing information as basic as state, street address, name of client or signature and/or purport to assert *claims for multiple properties on a single PD Claim Form.* These claims should be disallowed and expunged.

  - The PD Claims identified in Exhibit C-2 provide *insufficient documentation* in support of their claims, including (i) claims that did not attach requested documentation and (ii) Speights & Runyan claims supported only by document indices. Pursuant to this Court's Gateway Objection Order, dated July 19, 2004, the Debtors have already served each of these claimants (or their attorneys, where applicable) with a notice of intent to object. These claims should be disallowed and expunged.

  - The PD Claims identified in Exhibit C-3 contain *no proof of Grace product identification* and should be disallowed and expunged.

  - The PD Claims identified in Exhibit C-4 appear to be attempting to recover for alleged property damage from a *product other than a Grace product,* based on the *product identification documentation* submitted by the claimant. The Debtors object to these claims to the extent the claimant is seeking to force the Debtors to pay for alleged property damage caused by any other entity's product.

- **Section II.D:  PD Claims brought too late.  All of the PD Claims on Exhibits D-1 through D-6 should be disallowed and expunged because they were brought too late:**

  - The PD Claims identified in Exhibit D-1 are attempting to recover for asbestos property damage in *buildings built too late* to incorporate an asbestos-containing Grace product.

  - The PD Claims identified in Exhibit D-2 are barred under the statute of limitations by *constructive notice.*

  - The PD Claims identified in Exhibit D-3 are barred by *assumption of the risk,* since they were brought on behalf of building owners who bought the property at issue after constructive notice had begun to run.

  - The PD Claims identified in Exhibit D-4 are barred by *statutes of limitations* pursuant to actual notice.

  - The PD Claims identified in Exhibit D-5 are barred by *statutes of repose.*

  - The PD Claims identified in Exhibit D-6 are barred by *laches.*

2

- **Section II.E:  PD Claims providing no proof of hazard:**  All of the PD Claims identified in Exhibits E-1 through E-4 should be disallowed and expunged because claimants do not provide any relevant or reliable scientific evidence that shows that the asbestos in the property at issue presents any hazard.

    - The PD Claims identified in Exhibit E-1 contain no *documentation reflecting the building or properties' respective asbestos levels*;

    - The PD Claims identified in Exhibits E-2 provide only *unscientific and unreliable dust sampling* information, but no air sampling data;

    - The PD Claims identified in Exhibits E-3 provide only *air sampling data collected during, or in connection with, an asbestos abatement project and/or other situations that are irrelevant* to show risk during normal operations in a building;

    - The PD Claims identified in Exhibit E-4 provide *air sampling data that fail to show that airborne asbestos levels inside the building are higher than those in typical outdoor air.*

- **Section II.F:  Flawed categories of Speights & Runyan claims, Exhibits F-1 through F-5:**  The claims review process has uncovered several categories of large numbers of claims filed by the law firm Speights & Runyan ("Speights") which, while falling into the other categories listed above, also contain their own unique flaws.  If this Court sustains the Debtors Thirteenth Omnibus Objection which seeks to disallow all Speights claims on the ground Speights lacked authority to file those claims, then there will be no need to address the claims on Exhibits F-1 through F-5.  Otherwise, the Court may elect to deal with the merits of these categories of claims separately, all of which the Debtors seek to have disallowed and expunged.

    - The Speights PD Claims identified in Exhibit F-1 are claims for *California universities* submitted by the Speights & Runyan firm.  As discussed herein, there are numerous fatal flaws in these claims, including many that provide no meaningful supporting documentation whatsoever.[2]

    - The Speights PD Claims identified in Exhibit F-2 contend that the property owner first became aware of asbestos in the building at issue in the year 2003.  Based on other Speights filings in this case, as well as documents attached to certain of these

---

[2] By and through this substantive Omnibus Objection, the Debtors raise only substantive objections to the PD Claims.  Under Delaware Local Rule 3007-1(d)(vi) an objection to a claim "without any supporting documents attached thereto" is considered non-substantive, provided, however, that "if a claim has attached to it *any supporting documents* regardless of content, then the Objection shall be deemed substantive."  *Id* (emphasis added).  Accordingly, under local rule 3007-1, to the extent a PD Claim has any document(s) attached to it - regardless of whether such document is relevant or meaningful - Grace's objection to such PD Claim is considered substantive.  Accordingly, by and through this substantive Omnibus Objection, Grace raises its substantive objections to those PD Claims that have supporting documentation, but such documentation is not meaningful (i.e. one page lawyer-drafted attachments) or relevant.  By and through its 14th Omnibus Objection, Grace has raised its non-substantive objections to those PD Claims that fail to include *any* supporting documentation.

15th omnibus objection to property damage claims_(LEGAL_10694164_13)

claims, the Debtors believe that the entry "2003" identified in all but 29 of Speights' 2,938 claims is pure fabrication. Because of the significance of the initial date of property owners' knowledge to critical defenses such as statute of limitations, the Debtors believe that *all claims relying on the fabricated knowledge date of 2003* should be disallowed and expunged.

- The Speights PD Claims identified in Exhibit F-3 are claims for 40 buildings at *Mt. Sinai Hospital in New York*, all submitted on the basis of a single invoice indicating that a small amount of Grace product was shipped to one building at Mt. Sinai in 1970.

- The Speights PD Claims identified in Exhibit F-4 are claims for buildings at *Sonoma State College*, all submitted on the basis of a single handwritten bid sheet that does not indicate any Grace product was ever used at those sites.

- The Speights PD Claims identified in Exhibit F-5 are brought on behalf of buildings in *Canada*, 415 of which were filed by Speights. There are numerous fatal flaws in these claims, including the following: (i) Canada does not allow recovery for strict liability; (ii) a Canadian appeals court has specifically held that MK-3 does not pose an unreasonable risk of harm, and (iii) Canadian courts have found that the dangers of asbestos were widely known in the late 1960's and early 1970's, which serves to bar these claims under the applicable statutes of limitation.

- **Section II.G:   PD Claims relating to milling, mining or processing operations**: Roughly 250 PD Claims submitted by claimants are "Category II" asbestos PD Claims expressly related to Grace milling, mining or processing operations. These include 50+ claims from Minneapolis, Minnesota, 50+ claims from Libby, Montana, claims from the Burlington Northern and Santa Fe Railway, plus a handful of other claims. Category II claims are addressed separately in Section G below.

- **Section II.H: Contribution and Indemnification Claims:** The PD Claims identified on Exhibit H-1 were filed by other companies with asbestos related liability or trusts seeking indemnification or contribution for personal injury or property damage claims. All of these claims should be disallowed and expunged.

In addition, the Debtors note that the claim objections identified within have necessarily assumed that the information supplied by claimants, while potentially incomplete, was at least true and accurate as supplied. As reflected below in Section II.I, the Debtors reserve their right

4

to make further objections if and when it is determined that information provided by claimants is not true and accurate.[3]

As set out in the July 13, 2005 *Debtors' Brief in Support of Entry of Case Management Orders for Asbestos Property Damage Claims*, Docket No. 8993 (the "Debtors' CMO Brief"), and discussed further within, the Debtors are making these objections as the first step of a multistage, combined objection and estimation process for dealing with PD Claims. Some of these objections, such as objections to previously settled claims, may be addressed on a minimal evidentiary record and can be heard by the Court during omnibus hearings scheduled for Fall 2005; other objections, in particular claims failing due to the building owners' 1980s-era constructive notice of potential PD Claims or PD Claims relying on dust sampling data that fail *Daubert* standards, are best dealt with as part of the Phase I estimation process; still other objections requiring yet further development of an evidentiary record will be addressed during Estimation Phase II.

### B.    Proposed Hearing Schedule

The Debtors propose the following schedule for hearing on objections which are contested as set out below:

**Omnibus hearing, October 24, 2005**

- Section II.A Objections, *improperly submitted PD claims*, identified on Exhibits A-1 through A-3.

- Section II.B Objections, *previously settled or satisfied PD Claims*, identified on Exhibits B-1 and B-2.

---

[3] As one example: The Debtors previously entered into a settlement which bars any claims against Grace on behalf of any building in which a federal lease exists (as, for example, in a building that leases space for a federal post office or other federal facility). To the extent any of the pending claims fall within that settlement agreement yet the owners did not indicate on the proof of claim form that this prior settlement applies, the Debtors reserve the right to later seek to disallow the claim.

5

- Section II.C.1-3 Objections, *PD Claims providing insufficient information*, identified on Exhibits C-1 through C-3.

- Section II.D.1 Objections, *PD* Claims for *buildings built too late* to contain Grace asbestos-containing product.

- Section II.F.1-4 Objections, *Speights PD Claims* for California universities, buildings claiming 2003 as the initial year of owner knowledge regarding asbestos, Mt. Sinai Hospital, Sonoma State College and Buildings/Job Sites.[4]

**Omnibus hearing, November 14, 2005**

- As set out in the PD Estimation CMO, the Debtors and the Asbestos Property Damage Committee (the "PD Committee") have agreed that this hearing should be used to address the *procedural issue of how Estimation Phase I should proceed.*

**Omnibus hearing, December 19, 2005**

- Section II.G Objections, *Category II* claims relating to Grace mining, milling or processing operations.

- Section II.H Objections, claims seeking *contribution or indemnification.*

**Estimation Phase I hearing (March 2006)**

- Section II.D.2 Objections, PD Claims barred by the doctrine of *constructive notice.* As set out in the Debtors' papers in support of a PD Estimation CMO, constructive notice should be dealt with as part of Estimation Phase I. The rulings from Estimation Phase I may later be applied to the claims identified in Section II.D.2.

- Section II.E.2 Objections, PD Claims purportedly supported by *dust sampling* results. As set out in the Debtors' papers in support of a PD Estimation CMO, the question of whether dust sampling as a methodology comports with *Daubert* standards should be dealt with as part of Estimation Phase I. The rulings from Phase I may later be applied to the claims identified in Section II.E.2.

**Estimation Phase II hearing (September 2006)**

- Section II.C.4 Objections, for PD Claims seeking *overbroad recovery* to include alleged property damage caused by non-Grace products. These objections affect the

---

[4] While the Debtors identify substantive objections to Speights' Canadian claims at Section II.F.5, the merits of Canadian claims are to be adjudicated in Canada under the terms of the Plan; thus, the Debtors do not anticipate seeking a merits hearing in this Court for the Canadian claims. Under the Plan, this Court only addresses *procedural* objections to those claims (which includes the procedural issue of Speights' authority to bring those claims, addressed in the Thirteenth Omnibus Objection). The potential value of the Canadian claims will need to be taken into account in Estimation Phase II, however. The Debtors believe valuation of these claims will not be difficult, as they should all be valued at $0 for the reasons stated within.

6

potential scope of recovery, and go to the issue of potential damages rather than liability.

- Section II.D.3-6 Objections, PD Claims *brought too late under statutes of limitation, statute of repose, assumption of risk and laches*. The merits of these arguments will need to be addressed as part of Phase II estimation. After Estimation concludes, individual claims identified on Exhibits D-3 through D-6 may be addressed either pre- or post-confirmation.

- Section II.E.1,3-4 Objections, PD Claims *failing to establish hazard*. After this Court addresses the dust versus air methodology in Estimation Phase I, the Court will be in a position to address in Estimation Phase II whether the claims identified on Exhibits E-1, E-3 and E-4 contain sufficient supporting evidence to establish a hazard. The individual claims identified on Exhibits E-1, E-3 and E-4 may later be addressed either pre- or post-confirmation.

- *Any other objection not yet ruled on* by the time of the Phase II hearing.

For the Court's ease of reference, the Debtors provide below a simple chart indicating the substantive objections raised in this Fifteenth Omnibus Objection as well as the proposed hearing date for addressing those objections which are contested:

### Section II.A:  Improperly Submitted PD Claims

| A-1 | Medical Monitoring Claims | 10/24/05 |
| A-2 | ZAI Claims and Asbestos Personal Injury Claims | 10/24/05 |
| A-3 | Claims not submitted on PD Claim Forms | 10/24/05 |

### Section II.B:  Previously Settled or Satisfied Claims

| B-1 | Previously adjudicated claims | 10/24/05 |
| B-2 | Previously settled claims | 10/24/05 |

7

### Section II.C:  Claims Providing Insufficient and/or Inconsistent Information

| C-1(a) through (e) | Claim forms incomplete on their face or purport to assert claims for multiple properties | 10/24/05 |
|---|---|---|
| C-2 | Claims providing insufficient documentation | 10/24/05 |
| C-3(a) through (f) | Claims failing to provide proof of product identification | 10/24/05 |
| C-4 | Claims seeking recovery for product in addition to Grace product | Phase II hrg |

### Section II.D:  Claims Brought Too Late

| D-1(a) through (d) | Buildings built too late to contain Grace product | 10/24/05 |
|---|---|---|
| D-2 | Claims barred by constructive notice | Phase I hrg |
| D-3 | Claims barred by assumption of risk | Phase II hrg |
| D-4 | Claims barred by statutes of limitation | Phase II hrg |
| D-5 | Claims barred by statutes of repose | Phase II hrg |
| D-6 | Claims barred by laches | Phase II hrg |

### Section II.E:  Claims Providing No Proof of Hazard

| E-1 | Claims providing no documentation reflecting the properties' asbestos levels | Phase II hrg |
|---|---|---|
| E-2 | Claims providing dust sampling, but no air sampling | Phase I hrg |
| E-3 | Claims providing irrelevant air sampling data | Phase II hrg |
| E-4 | Claims providing air sampling data reflecting asbestos levels lower than or comparable to typical outdoor air | Phase II hrg |

8

### Section II.F:  Flawed Speights & Runyan Claims

| F-1 | California University Claims | 10/24/05 |
| F-2 | Claims asserting owner first learned of asbestos in 2003 | 10/24/05 |
| F-3 | Mt. Sinai hospital claims | 10/24/05 |
| F-4 | Sonoma State College claims | 10/24/05 |
| F-5 | Canadian claims | Phase II hrg |

### Section II.G:  "Category II" Claims Relating to Grace Milling, Mining or Processing

| G-1 | Minneapolis claims | 12/19/05 |
| G-2 | Libby, Montana claims | 12/19/05 |
| G-3 | Other Category II Claims | 12/19/05 |
| G-4 | Burlington Northern and Santa Fe Railway claims | 12/19/05 |

### Section II.H:  Claims Providing No Proof of Hazard

| H-1 | Contribution and indemnification claims | 12/19/05 |

In further support of this Fifteenth Omnibus Objection, the Debtors state as follows:

### JURISDICTION

1.      This Court has jurisdiction over this matter under 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § § 157(b)(2)(A) and (O).

2.      The statutory bases for relief requested herein are 11 U.S.C. § § 105(a), 502 and 506 and Rules 3001 and 3007 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules").

9

## OBJECTION AND REQUEST FOR RELIEF

3.      By this Objection and for the reasons stated within, the Debtors seek disallowance
and expungement of all PD Claims listed in Exhibits A-1 through H-1 attached hereto, except as
otherwise expressly noted within.

### I.      FACTUAL BACKGROUND

#### A.      History of Grace Products and Uses

4.      Grace's involvement with asbestos began in 1963, when its construction products
unit, now part of Grace Performance Chemicals, purchased the assets of the Zonolite Company
("Zonolite").  Zonolite purchased asbestos from commercial suppliers and incorporated it in
certain building products.  Zonolite also mined and processed vermiculite[5] from its mines in
South Carolina and near Libby, Montana.

5.      Grace permanently ended all U.S. manufacture of asbestos-added products in
1973 and closed the Libby facility in 1990.  From 1963 through 1973, however, Grace
manufactured and sold certain asbestos-containing construction products that were installed in
buildings.  These products serve as the basis for the traditional asbestos PD Claims in these
Chapter 11 Cases.

6.      Specifically, PD Claimants seeking recovery for property damage allegedly
caused by Grace asbestos-containing products incorporated into their buildings have made
"Category I" claims for property damage; PD Claimants seeking recovery for contamination to
property allegedly caused as a result of Grace's mining, milling or processing operations have
submitted "Category II" claims.

---

[5] Vermiculite is a mineral that expands into popcorn-like, low-density pieces when heated.  This exfoliated or
expanded vermiculite is lightweight and fire-resistant, and thus can be used for insulation, fireproofing, potting soil
and other applications.  Vermiculite is itself an inert mineral that is not a form of asbestos and has no known toxic
properties.

15th omnibus objection to property damage claims_(LEGAL_10694164_13)

### 1.    Category I Claims: MK-3 and Acoustical Plaster

7.    The two principal asbestos-added products produced by Grace for which the Debtors have received PD Claims in these Chapter 11 Cases are (i) spray-on fireproofing (Monokote-3 or "MK-3"), and (ii) acoustical plasters (defined in the Bar Date Notice and referred to herein as "Category I Claims"). These products contained binders (gypsum, cement, clay), insulating materials (vermiculite) and added chrysotile asbestos purchased from asbestos producers.

8.    *Monokote-3*: Grace's fireproofing product, MK-3  was marketed to provide fire protection for the enclosed steel beams of large commercial structures, predominantly high-rise buildings. MK-3 provided such protection in two ways. First, MK-3 insulation prevented steel from heat-softening, thereby protecting high-rise structures from collapse during fires. Second, MK-3 prevented the spread of fire, affording occupants the chance to escape to safety and firefighters the opportunity to control the fire.

9.    MK-3 was a wet-sprayed, cementitious type of fireproofing. MK-3 was mixed in a mixer with a prescribed amount of water. The mixing of water with gypsum created a thick, adhesive cementitious mix. The mix was sprayed onto steel beams, where it would begin to harden and affix to the beams immediately.

10.    Due to federal regulations that banned the spraying of asbestos-containing materials, Grace ceased selling MK-3 in the United States on July 4, 1973 and in Canada after 1975. Prior to that, the following cities had already banned the spraying of asbestos-containing products: (i) New York, NY (1970), (ii) Philadelphia, PA (1971), (iii) Boston, MA (1971), and (iv) Chicago, IL (1972). In some instances, these ordinances not only banned the spraying of asbestos-containing products, but also called for criminal penalties for parties that violated the ordinances. *See e.g. Affiliated FM Ins. Co. v. Board of Educ. of City of Chicago*, 1992 WL

11

409442 (N.D. Ill. 1992) ("The 1971 Chicago ordinance ... call[ed] for up to six-month jail terms").

11.    *Acoustical plasters* containing asbestos were also sold by Grace for a short period of time.    Acoustical plaster was sold under such names as "Zonocoustic," "Spra-White," "Zonolite Acoustical Plastic", "Econo-White" and Zonolite textured finish products.

12.    Acoustical plaster products were clay and vermiculite-based plaster for ceiling application, and were designed to reduce noise levels in large, open spaces.    These products were similar to MK-3 in that they were cementitious products, but unlike MK-3 (which was affixed to steel beams), these products were affixed to ceilings.

13.    Acoustical plaster fell out of favor when cheaper construction methods, such as noise-reducing ceiling tiles, became readily available.    By 1969 or so, Grace had permanently stopped selling asbestos-containing acoustical plaster altogether, except on very rare occasions in response to specific customer request.

14.    *Other products*:   Over the years, Grace occasionally manufactured other products containing asbestos or vermiculite that are potentially the subject of a very small number of PD Claims.    These products were manufactured for limited periods of time and, due to lack of demand, were not widely sold.    The products included, for example, Zonolite High-Temperature Cement, essentially an insulating concrete-style version of MK-3.

### 2.    Category II Claims:  Grace Mining, Milling and Processing Operations

15.    The Debtors also received roughly 250 PD Claims seeking recovery for alleged property damage contamination caused by Grace mining, milling or processing operations (defined in the Bar Date Notice and referred to herein as "Category II Claims").

12

16.     By definition, Category II Claims cluster around particular geographic sites. The largest number of those claims are from Minneapolis, Minnesota and Libby, Montana, plus claims filed by the Burlington Northern and Santa Fe Railway. There are only a handful of claims filed for any other location.

### B.     Grace's Property Damage Litigation History, 1983-2001

17.     Between 1983 and early 2001, Grace faced a total of 379 property damage lawsuits covering thousands of buildings. 300 of those lawsuits were filed before 1990.

18.     Grace's property damage lawsuits typically sought recovery for property damage allegedly resulting from asbestos-containing Monokote-3 fireproofing product used in high rise commercial construction.

19.     Some lawsuits were asserted for property damage allegedly caused by asbestos-containing Grace acoustical plaster. Many of the acoustical plaster claims were brought by schools, where acoustical plaster may have been used in the 1950s and early 1960s to reduce noise in large rooms such as cafeterias or gymnasia.

20.     By February 1, 2001, two months before the Debtors filed these Chapter 11 cases, only 7 property damage lawsuits remained pending against Grace, including 2 on appeal, 1 on a suspense calendar, and 1 awaiting a dismissal order due to product misidentification.

21.     In nearly 20 years of litigating traditional property damage cases, Grace's success rate included:  140 cases resulting in dismissals or summary judgment victories for Grace; in cases tried to verdict, after all appeals had run, defense wins in 9 cases and losses in 7 cases; and 207 cases resulting in settlements, including several large settlements with school districts.

### C.     Grace's March 2003 PD Claims Filings

22.     In stark contrast to Grace's pre-2001 property damage claims history, particularly its claims history from 1995 on, after the Debtors filed their Chapter 11 cases and the notice and

13

bar date process went forward for PD Claims, the Debtors received a whopping 4200 PD Claims, approximately 3,950 of which remain pending.[6]

23.     Nearly 3000 of Grace's pending PD Claims were filed by the Speights & Runyan law firm ("Speights"). With the exception of a handful of Speights claims that do not appear to have been signed by anyone, all of the Speights claim were signed by Daniel Speights or Amanda Steinmeyer (both attorneys with Speights).

24.     Of the approximately 3,950 pending PD Claims, roughly 438 are Canadian and the rest are from the United States. Of the Canadian claims, approximately 415 were filed by Speights. For the U.S. claims, roughly 1,519 originate in California, 222 in New York, 147 in Louisiana, 114 in Minnesota (including 50+ Category II Claims) and 102 in Virginia. These 5 states plus Pennsylvania account for nearly 2/3 of all PD Claims. No other state accounts for more than 100 claims. Of the California claims, more than 1,200 are claims filed by Speights purportedly on behalf of the Regents of the University of California or California State University; of these, the overwhelming majority contain no supporting documentation whatsoever or proof of product identification of any kind.

25.     Additionally, of the approximately 3,950 pending PD Claims, roughly 3,700 are Category I Claims for traditional asbestos property damage while roughly 250 are Category II Claims for property damage based on Grace milling, mining and processing operations.

26.     Of the approximately 250 Category II Claims, 50+ are from Minneapolis, Minnesota, 50+ are from Libby, Montana, and 115 were filed by the Burlington Northern and Santa Fe Railway; no other Grace sites account for more than 10 Category II Claims.

---

[6] Until recently, it appeared that 4003 PD Claims were pending. As part of this Objection process, however, the Debtors determined that several of those claims were general unsecured claims rather than true PD Claims.

15th omnibus objection to property damage claims_(LEGAL_10694164_13)

### D.    The Debtors' PD Claims Objections And Estimation Process

27.    As set out in the Debtors' CMO Brief, and reflected in the PD Estimation CMO,
dated August 29, 2005, the Debtors are adopting a three-stage path for dealing with PD Claims.
Although the dates have changed slightly since the July 13, 2005 submission to incorporate
comments from the PD Committee, the structure remains the same:

- 1:  Claims Objection Process (Summer - Fall 2005):  By September 1, 2005, the Debtors
  will make a good faith effort to have on file all objections to all asbestos PD Claims,
  including but not limited to the Gateway Objections permitted by this Court's July 19,
  2004 Order.  Throughout Fall 2005, the Debtors will then set certain of these PD
  objections for hearings in batches.  This process should lead efficiently to the
  disallowance of hundreds, if not thousands, of claims which then need not be valued for
  estimation or confirmation purposes.

- 2:  Estimation Phase I (October 2005 - March 2006):  Unlike the objection process which
  addresses *specific* flaws in *individual* PD Claims, Estimation Phase I addresses two
  *general* issues that inevitably will have a major impact on estimation of *all* PD Claims:
  (1) the proper date of constructive notice for bringing a PD Claim, which is a key statute
  of limitations issue, and (2) the appropriate methodology, under *Daubert,* for determining
  whether Grace product in a building is hazardous.

- 3:  Estimation Phase II (May - September 2006):  In September 2006, the universe of PD
  Claims still remaining at that time will be subject to an estimation trial.

28.    As a result of the Bar Date Order and Bar Date Notice, all PD Claims are now
before this Court.  Thus, the objection/disallowance process (stage 1) and the estimation process
(stages 2 and 3) can and must work together hand and glove.  To the extent claims are disallowed
through objections, these claims need not be estimated or may be estimated at zero.  To the
extent estimation determines common issues affecting large numbers of claims, those claims
may in turn be disallowed.

29.    Recognizing the crucial interrelationship between *objections* and *estimation*, the
Debtors are seeking to make efficient use of both processes to resolve the universe of PD Claims.
Specifically, the Debtors intend to first raise at hearing the issues that are easiest to address
through objections to batches of PD Claims for which minimal evidentiary fact development is

15

necessary. Over time, the parties will proceed on to Phase I and Phase II Estimations, where increasingly complex matters may be addressed.

30.    As the Debtors have previously described, all three stages are designed to work together to resolve efficiently the Debtors' PD Claims.

31.    This Fifteenth Omnibus Objection (substantive) represents the first stage of this process. The following Section II, with accompanying exhibits, identifies the categories of PD Claims to which the Debtors object. The Debtors will seek to have certain of these contested objections, such as objections to previously settled or adjudicated claims, set for hearings throughout Fall 2005. Other contested objections, such as constructive notice or lack of proof of hazard, will be best dealt with through the estimation process. As appropriate, rulings made during Estimation Phase I and II may later be applied to the corresponding categories of objected-to claims.

32.    The Debtors' proposed schedule for hearing on these objections is set out in the Introductory Section above.

## II.    LEGAL ARGUMENT: OBJECTIONS TO ALL CLAIMS IDENTIFIED IN EXHIBITS A-1 THROUGH H-1

33.    For the reasons stated below, the Debtors respectfully request that all PD Claims identified in the attached Exhibits A-1 through H-1 be disallowed and expunged, unless otherwise expressly noted. For the convenience of this Court, the Debtors below identify the specific categories of claims to which they object and provide a brief summary of the basis for each objection. Some claims appear in multiple categories.

### A.    Improperly Submitted PD Claims

34.    The Debtors object to each of the improperly submitted PD Claims listed on Exhibits A-1 through A-3. All of these claims either: (1) while submitted on the Court-approved

16

PD Claim Form, do not assert PD Claims, or (2) purport to be PD Claims but were not submitted on the approved PD Claim Form, as required by the Bar Date Order and Bar Date Notice, and thus contain none of the information the Court has held must be submitted in order to address the validity of the claims (collectively, the "Improperly Submitted PD Claims"). Specifically:

35. <u>Medical Monitoring Claims</u>: Exhibit A-1 identifies claims submitted using the PD Claim Form that actually are attempting to make Medical Monitoring Claims. The Bar Date Notice required claimants to file their Medical Monitoring Claims using the appropriate Court-approved Medical Monitoring Claim form, however, and it stated that improperly filed Medical Monitoring Claims would be "BARRED AND DISALLOWED." *Bar Date Notice*, pg. 2. The Court should disallow and expunge each and every one of the Medical Monitoring Claims identified on Exhibit A-1 that were improperly submitted as PD Claims.

36. <u>Asbestos Personal Injury Claims or ZAI Claims</u>: The claims identified on Exhibit A-2 are Asbestos Personal Injury claims or ZAI Claims that were improperly submitted on PD Claim Forms. The Bar Date Order did not apply to Asbestos Personal Injury Claims or ZAI Claims, and to date there has not been a bar date for these types of claims. The Court should disallow, without prejudice, each of the claims identified on Exhibit A-2.

37. <u>Claims filed on Non-Asbestos Proof of Claim Forms, Medical Monitoring Proof of Claim Forms, or Official Form 10</u>: The Debtors object to each of the claims listed on Exhibit A-3 because, while they appear to assert PD Claims, they were not submitted on the Court-approved PD Claim Form.[7] Instead, they were filed on Non-Asbestos Proof of Claim Forms, Medical Monitoring Proof of Claim Forms, or Official Form 10.

---

[7] In Section II.A, the Debtors have not objected to contribution and indemnification claims that were not filed on a PD Claim Form. Instead, the Debtors separately object to these claims on Exhibit H and also lodge other objections to these claims throughout this Omnibus Objection, to the extent that any such objections are applicable to any of these claims.

17

38.     The Bar Date Notice specifically required claimants to file their PD Claims using the appropriate Court-approved PD Claim Form, and it stated that improperly filed PD Claims would be disallowed:

> IN THE EVENT THAT PRIOR TO THE BAR DATE YOU FILED A PROOF OF CLAIM FOR AN ASBESTOS PROPERTY DAMAGE CLAIM OR MEDICAL MONITORING CLAIM USING OFFICIAL FORM 10 OR ANY OTHER PROOF OF CLAIM FORM, YOU MUST REFILE YOUR CLAIM ON THE APPROPRIATE SPECIALIZED COURT-APPROVED PROOF OF CLAIM FORM ON OR BEFORE THE BAR DATE OR YOUR CLAIM SHALL BE BARRED AND DISALLOWED.

*Bar Date Notice*, pg. 2.  Further, the Court-approved PD Claim Form was carefully crafted to elicit the pertinent information to allow the Debtors, the Court, and other interested parties to ascertain the substantive merits of the respective claim.  The Improperly Filed PD Claims do not provide this information and, as a result, fail to afford interested parties with a reasonable opportunity to evaluate the claims.  All claims on Exhibit A-3 should be disallowed and expunged.

### B.      Previously Settled Or Adjudicated PD Claims

39.     The Debtors object to the PD Claims listed on Exhibits B-1 and B-2 because each of these claims has been previously resolved either through a settlement or a fully adjudicated lawsuit.  Previously adjudicated claims are barred by the doctrine of *res judicata*; previously settled claims are barred by basic principles of contract law.  All of the PD Claims identified on Exhibits B-1 and B-2 should be disallowed and expunged.

### 1.      Previously Adjudicated Claims

40.     Each of the PD Claims listed on Exhibit B-1 asserts a claim that has already been fully litigated against the Debtors, is barred by the doctrine of *res judicata,* and should be disallowed and expunged.

18

41.     Grace investigated the resolution of each of its pre-petition asbestos property damage lawsuits and identified those lawsuits that resulted in (i) a final judgment exonerating Grace from liability, (ii) a judgment against Grace that has been fully satisfied, or (iii) a court-approved settlement that Grace has fully satisfied.  From the corresponding decisions, pleadings, and settlement agreements, Grace generated a comprehensive listing of the properties covered under those fully litigated lawsuits.  Grace then compared each of the PD Claims against the properties covered under those lawsuits.  The results of this endeavor demonstrate that each of the claims listed on Exhibit B-1 relates to a fully litigated pre-petition lawsuit against Grace.

42.     The doctrine of *res judicata* precludes a claimant from asserting claims that have been (or should have been) fully-litigated against a defendant in a prior action.  *See Brown v. Felsen*, 442 U.S. 127, 131 (1979); *see also Labelle Processing Co. v. Swarrow*, 72 F.3d 308, 313 (3d Cir. 1995) (*Res judicata* is a rule that "a subsequent suit based on the same cause of action as a prior suit that involved the same parties or their privies is barred where there has been a final judgment on the merits in the prior suit.").  The doctrine of *res judicata* is applicable in the bankruptcy context to bar claims that have been previously litigated against a debtor.  *See generally In re Am. MetroComm Corp.*, 303 B.R. 32 (Bankr. D. Del. 2003).

43.     The Third Circuit Court of Appeals has held that *res judicata* should be applied when the following criteria are present:

- A final judgment on the merits in a prior action;
- involving the same parties or their privies; and
- a subsequent claim based on the same cause of action.

*See, e.g., Lui v. Comm'n on Adult Entm't Establishments of the State of Del.*, 369 F.3d 319, 328 n.11 (3d Cir. 2004).

19

44.     In addition, "final judgment on the merits" includes not only rulings in lawsuits but also court-approved settlement agreements. *See Weber v. Henderson*, 33 Fed.Appx. 610, 611-13 (3d Cir. 2002) (unpublished opinion) ("For purposes of *res judicata*, final judgment on the merits occurred when the District Court approved settlement and dismissed the case."); *In re Am. MetroComm Corp.*, 303 B.R. 32, 34 (Bankr. D.Del. 2003) ("Applying the *res judicata* elements to the matter before me, it is clear that the proof of claim filed by the Claimant is barred by the settlement agreement which was approved by the Louisiana state court."); *Schlaeppi v. Del. Trust Co.*, 525 A.2d 562, 565 (Del. Ch. 1986) ('A settlement which is approved by a court has the same *res judicata* effect as a final judgment on the merits.").

45.     In light of the already large size of this Fifteenth Omnibus Objection, the Debtors are not attaching as Exhibits the backup documentation confirming prior adjudication of these claims. This supporting evidence will be provided if this Court or the claimant so requests.

## 2.     Previously Settled Claims

46.     The PD Claims listed on Exhibit B-2 assert claims that have been already settled and satisfied by the Debtors pursuant to prior settlement agreements. Each of these claims is barred by the explicit terms of an applicable settlement agreement and should be disallowed and expunged.

47.     While out-of-court settlement agreements do not bar subsequent actions on *res judicata* grounds, a court "can enforce a settlement agreement summarily." *Samra v. Shaheen Bus. & Inv. Group, Inc.*, 355 F. Supp. 2d 483, 493 (D. D.C. 2005). Courts will dismiss a settled claim as long as there is no material issue of fact relating to the scope or validity of the settlement contract. *See Tiernan v. Devoe*, 923 F.2d 1024 (3d Cir. 1991); *see also Thomas v. State of Louisiana*, 534 F.d 613, 615 (5th Cir. 1976).

20

48.     The Debtors reviewed each of their pre-petition asbestos property damage settlement agreements to ascertain the properties covered under such agreements. The Debtors then compared each of the PD Claims to that listing. Each of the PD Claims listed on Exhibit B-2 is barred by the unambiguous terms of a previous settlement agreement.

49.     The results of this endeavor demonstrate that each of the claims listed on Exhibit B-2 relates to a pre-petition matter where (i) Grace entered into a settlement agreement with the claimant on account of the subject property, (ii) the settlement agreement provides that the settlement is in full satisfaction of the claim, and (iii) Grace has fully satisfied its obligations under the settlement agreement. Therefore, each of the claims on Exhibit B-2 is barred by the basic principles of contract law applicable in every state.

50.     In light of the already large size of the Fifteenth Omnibus Objection, the Debtors are not attaching as Exhibits the backup documentation confirming prior settlement of these claims. This supporting evidence will be provided if this Court or the claimant so requests.

### C.     PD Claims Providing Insufficient Information

51.     The PD Claims identified on Exhibits C-1 through C-3 fail to provide even the most basic information needed to support an asbestos PD Claim and should be disallowed and expunged. Specifically, the claims listed on Exhibit C-1 are invalid because their proofs of claim are *facially incomplete*; claims on Exhibit C-2 are invalid because the claimant provided *insufficient supporting documentation*; and claims on Exhibit C-3 are invalid because the claimant *failed to establish Grace product identification* for the building at issue.

52.     In addition, for the claims listed on Exhibit C-4, the claimant provides some identification of a Grace product at issue in the building but has also provided express evidence of asbestos-containing products *not* manufactured by Grace. The Debtors object to the claims listed on Exhibit C-4 to the extent the claimants are seeking to recover for alleged property

21

damage not caused by Grace -- an issue to be addressed during Estimation Phase II. The Debtors do not seek disallowance or expungement of claims lists on Exhibit C-4 at this point, except to the extent these PD Claims may also be captured in a different category of objection for which the Debtors do seek that relief.

### 1. Facially Incomplete Proofs Of Claim

53.    The Debtors object to the PD Claims listed on Exhibit C-1 because the corresponding claim forms are incomplete. The Court-approved PD Claim Form is designed to elicit the most basic information about a claim. All of the form's questions are important, but several are critical. When a claimant fails to answer certain combinations of these critical questions -- particularly where, as here, notice has already been given of the claim's failings and the claimant has still failed to respond adequately -- the Debtors cannot evaluate the claim and the claim should be disallowed and expunged. Solely for this Court's ease of reference, the Debtors have divided facially incomplete proofs of claims into a few distinct subcategories. Some claims may fall into multiple subcategories:

54.    *Missing basic address information:* Exhibit C-1(a) lists PD Claims for which the PD Claim Form does not provide either the street address, city, or state where the property at issue is located. Without this information, the Debtors cannot determine which state's law applies or evaluate potential legal defenses. Nor can they conduct an adequate factual investigation of the claim. At this point, more than two years after the proofs of claims were due, it is absurd to permit PD Claims to continue to go forward when the claimant cannot even identify where the alleged property is located.

55.    *No claimant signature:* Exhibit C-1(b) lists claims where the claim was not signed by either the claimant or its attorney, a requirement of the court-approved claim form.

22

56.    _Missing basic information about the property at issue_:  Exhibit C-1(c) lists PD Claims for which the PD Claim Form omits basic information about the *property* at issue.  These are claims for which the proof of claim does not disclose one or more of the following: (1) the property's use, (2) the approximate date that the property was built, (3) the property's square footage, or (4) the number of floors that it has.  Among other things, this information is needed to assess the likelihood that Grace asbestos containing materials were used at the property and to investigate the need for and costs of remediation, critical for the Debtors' estimation process.

57.    _Missing basic information about the claimant's knowledge_:  Exhibit C-1(d) lists PD Claims for which the PD Claim Form fails to provide information relating to the claimant's *knowledge*.  In particular, these are claims for which the proof of claim does not provide one or more of the following: (1) information regarding prior asbestos-related property damage lawsuits or claims for the property, (2) the date that the product at issue was installed at the property; (3) the date that the claimant learned that the product at issue contained asbestos; or (4) the date the claimant learned of the presence of asbestos on the property.  Without this information, the Debtors cannot adequately assess the applicability of defenses such as statutes of limitations and repose.

58.    _Asserting claims for multiple properties on a single PD Claim Form_: Exhibit C-1(e) lists PD Claims for which a single PD Claim Form purports to assert claims for multiple properties.  The instructions to the PD Claim Form specifically state if a claimant wished to "alleg[e] [a] current claim against Grace with respect to asbestos in more than one (1) real property, [the claiming party] should complete an Asbestos Property Damage Proof of Claim Form for each property."  Since the PD Claim Form was specifically tailored to elicit

23

information for a <u>single</u> property, the claims on Exhibit C-1(e) do not afford Grace a meaningful opportunity to respond, and Grace would be severely prejudiced if it was forced to do so.

### 2.    Claims With Insufficient Documentation

59.    On Exhibit C-2, the Debtors list PD Claims providing insufficient supporting documentation and seek disallowance and expungement of all of these claims. Pursuant to this Court's Gateway Objection Order, dated July 19, 2004, the Debtors have already served each of these claimants (or their attorneys, where applicable) with at least one notice of intent to object and, therefore, the respective PD Claimants have already had an opportunity to supplement their documentation.

60.    The Debtors object to the PD Claims listed on Exhibit C-2 because the claimants failed to provide sufficient documentation in response to certain questions on the PD of Claim Form.

61.    The Court-approved PD Claim Form requests that claimants attach documentation or a summary of documentation supporting their answers to certain questions. At the March 18, 2002 hearing - where this Court considered the Debtors' motion for the Bar Date Order - this Court emphasized that if claimants do not attach their supporting documentation they must at least attach a summary: "[T]hey need to provide a summary. I'm not waiving the requirement of the summary." (March 18, 2002 Hearing Transcript at 185)

62.    Despite this admonition, numerous claimants failed to attach sufficient documentation or a summary of documentation to support their claims. Through Exhibit C-2, the Debtors object to claims with at least one of the following deficiencies:

- the claimant indicates that it has documentation "relating to the purchase and/or installation of the product on the property" but did not attach these documents or a summary of them;

24

- the claimant indicates that it "made an effort to remove, contain and/or abate the Grace product for which you are making this claim" but did not attach documents or a summary of documents relating or referring to such efforts; or

- the claimant did not attach documents or a summary of documents "relating to the purchase and/or installation of the product in the property" and did not attach documents or a summary of documents "relating or referring to the presence of asbestos in the property for which you are making this claim."

63.    Similarly, many of the Speights PD Claims listed on Exhibit C-2 lack sufficient supporting documentation. More than 1,000 of these claims were submitted in March 2003 with a single, identical typewritten page attached asserting that the claimant has no supporting documentation. This single lawyer-driven "documentation" provides no meaningful information and, particularly in combination with the facts set out in the Debtors' Thirteenth Omnibus Objection regarding Speights' pattern of filing claims without authority to do so, confirms that these claims should be disallowed as baseless.

64.    In a transparent and belated attempt to give the *appearance* that its claims have substantial documentary support, Speights has generated multiple, massive document indices. Many of the remaining Speights PD Claims on Exhibit C-2 are supported by nothing more than these document indices. For these PD Claims, Speights responded to the Debtors' two Notices of Intent to Object (the first of which was served in December 2004) by dumping on the Debtors thousands of pages of worthless paper indices rather than any real supporting documentation. Speights "offered" to permit the Debtors to travel to Hampton, South Carolina to review those documents at Speights' convenience, but then, in response to the Debtors' request to review those documents, refused to provide any date or time for such a review.

65.    The Speights indices are virtually useless: Speights' initial supplement consisted of more than 1,600 pages of a paper index; no documents were supplied and no searchable electronic index was provided. Speights next provided second and third supplements consisting

25

of enormous paper indices even larger than the first, along with an indication stating that all of these various supplemental indices *may or may not* overlap, and with no accompanying explanation of how the various pieces fit together. Later, Speights provided yet a fourth supplement.

66.     Without access to the underlying documents or an electronic index, Grace could do little more than attempt to review these massive paper indices by hand to try to gain insight as to what is contained in these "supplements." The Debtors' initial review of samples from these indices indicated that more than 60% of the entries on these indices were nothing more than a resubmission of documents Speights previously produced with the small subset of claims for which Speights initially supplied supporting documentation. Other items on the index plainly did nothing more than increase volume and create confusion, such as breaking a 15 chapter document into 15 separate entries on the index by logging each chapter as an individual document. Other entries corresponded to claims that Speights supposedly withdrew in June and July 2005.

67.     Given the obvious problems with the Speights index, along with the numerous other problems with Speights claims set out in the Debtors' Thirteenth Omnibus Objection, the Debtors repeatedly asked that Speights provide the Debtors with either a single, non-duplicative set of any actual *new documents* implicated by these supplemental indices, organized by claim number, or else provide dates for the Debtors to attempt to review the documents in South Carolina at Speights' expense. Speights utterly ignored all of these requests, despite repeated letter exchanges on this very topic initiated by attorney Bud Fairey of the Speights firm.

68.     Further, on August 26-27, 2005, with knowledge that the Debtors would be filing this Omnibus Objection in a few days, Speights served the Claims Agent with 62 boxes of

26

documents which the Claims Agent has indicated purport to be NESHAP documents related to certain buildings. The Debtors have not received copies of these documents to date. The Debtors understand that no index was provided with these documents and that some but not all of the documents identify related claim numbers. The Claims Agent is still reviewing the documents to ascertain what they are and to which claims they relate.

69.    Permitting Speights to file these documents over six months after Speights was required to respond to the Notice of Intent to Object, in direct violation of both the Bar Date Order and the Notice of Intent to Object, will severely prejudice the Debtors as it will further hold up the claims objection process which has already been overburdened, in large part, by Speights' unauthorized and unsupported claims.    Speights should not be permitted to continuously ignore Court orders and deadlines at the great prejudice of the Debtors. The supplements and new documents, to the extent they even relate to the Speights claims in any meaningful way, should be stricken.

70.    In light of Speights' repeated failings to provide the supporting documentation requested with Court-approved PD Claim Form in a timely manner, it is finally time to disallow and expunge the Speights PD Claims that are only supported by document indices.

### 3.    Claims Failing To Identify A Grace Product

71.    The Debtors seek to disallow and expunge all PD Claims listed on Exhibits C-3 (a) through C-3 (f) because they fail to establish Grace product identification. "It is well established that product identification is an essential element of every products liability action." *In re Dow Corning Corp.*, 250 B.R. 298, 353-54 (Bankr. E.D. Mich. 2000). The Debtors' product identification objections fall into three broad categories: *First*, the Debtors identify claims for which the proof of claim form on its face is insufficient to identify a Grace product *and* no backup documentation of product identification is provided. *Second*, the Debtors identify

27

claims for which some backup documentation has been provided, but that documentation is *not sufficient* to establish Grace product was used in the building at issue. *Third,* the Debtors identify claims for which some backup documentation was provided but that documentation is inconsistent with Grace product. Some of these categories are further broken into subcategories.

72.    *No Product Identification On Proof Of Claim Form And No Supporting Documentation.*    The PD Claims listed in Exhibits C-3(a), C-3(b), and C-3(c) lack any supporting documentation related to product identification *and* do not identify a Grace product on the proof of claim form. Question 13 of the PD Claim Form reads: "For what alleged asbestos-containing product(s) are you making a claim?" The Debtors objections here can be arranged by how the claimant responded to this question:

73.    Exhibit C-3(a) lists PD Claims that are invalid because they lack any product identification documentation *and* either do not answer Question 13 at all or else provide a non-responsive answer to that question.

74.    Exhibit C-3(b) lists PD Claims that are invalid because they lack any product identification documentation and in response to Question 13, name a product that was not manufactured by Grace, such as "floor tiles" or "roof shingles."

75.    Exhibit C-3(c) lists PD Claims that are invalid because they lack any product identification documentation and, in response to Question 13, name a generic type of product or product line (such as "acoustical plaster" or "surface treatment") that was manufactured by Grace *and* other companies besides Grace. For these claims, it is impossible to tell whether the property at issue has a product that was manufactured by Grace, which is the claimant's burden to establish.

28

76.    *Insufficient Product Identification.*  The PD Claims listed in Exhibit C-3(d) do supply documentation relating to product identification, but that documentation is *insufficient* to establish use of a Grace asbestos-containing product.[8]

77.    For example, rather than attaching an invoice indicating that a Grace asbestos-containing product was purchased and shipped to the building at issue, the claim might instead attach a prospective job list or "bid sheet." Such documents indicate that Grace may (or may not) have *bid* on the construction job at issue, but it does not prove that Grace won the job or supplied asbestos-containing material to it.

78.    Similarly, a "specification" form may be attached that indicates a Grace product was *specified* for use at the building at issue. However, specifications themselves, along with common construction practice, typically dictated that contractors were free to use substantial equivalents to the products identified.  Thus, a specification alone does not provide sufficient evidence that Grace product was used at the site.

79.    *Failure to Attach Documentation of Product Identification.*  The PD Claims listed on Exhibit C-3(e) fail to provide any supporting documentation demonstrating that the subject property does, in fact, have a Grace asbestos-containing product.   Without such documentation, the respective claimants have failed to sustain their burden of showing that they have been injured by Grace and, therefore, the PD Claims on Exhibit C-3(e) should be disallowed and expunged.

---

[8] 239 of the claims on Exhibit C-3(d) fail to identify any Grace product; 14 claims identify a Grace product that did not contain asbestos. There are likely additional claims that identify a Grace product that does not contain asbestos, but, due to the information (or lack thereof) supplied in these claims, it is difficult to determine those claims that identify a Grace product that does not contain asbestos. Therefore, investigation continues, and the Debtors reserve their right to amend this Omnibus Objection with respect to claims of the type listed on Exhibit C-3(d).

15th omnibus objection to property damage claims_(LEGAL_10694164_13)

80.   *Inconsistent Product Identification.*  The PD Claims listed on Exhibit C-3(f) provide supporting product identification that is inconsistent with a Grace product:

81.   Specifically, Exhibit C-3(f) lists PD Claims that are invalid because they are accompanied by bulk sampling data that is inconsistent with a Grace product.

82.   Bulk sample analysis involves the testing of the chemical composition of a sample of product pulled from the building at issue.

83.   The bulk sample results attached to the PD Claims identified on Exhibit C-3(f) either (i) indicate that the product found at the building was *missing* a key ingredient that would have been there if the product at issue was manufactured by Grace; (ii) contain ingredients that are not found in Grace product; (iii) contain key ingredients but in the wrong proportionality of those used by Grace; or (iv) provide data insufficient to determine consistency with a Grace product.  Any of these findings demonstrates that the claimant has failed to establish that the product in the claimant's respective building was manufactured by Grace.

84.   Because of the size of this Fifteenth Omnibus Objection, the Debtors' analysis of bulk sampling results attached to the claimants' PD Claims is not attached as an Exhibit.  This evidence will be made available to the Court or the claimant upon request.

### 4.    Claims Failing To Rule Out Non-Grace Products

85.   Finally, the Debtors object to the PD Claims listed in Exhibit C-4.  These claims are accompanied by some bulk sampling data that is consistent with a Grace product *and* either bulk sampling data that is inconsistent with a Grace product or bulk sampling data insufficient to determine the presence of a non-Grace product in addition to a Grace product.  These bulk samples thus indicate that the building at issue potentially contains both Grace asbestos-containing product *and* asbestos-containing product manufactured by another company.

30

15th omnibus objection to property damage claims_(LEGAL_10694164_13)

*43 of 112*

86.    Out of an abundance of caution, the Debtors object to these PD Claims to the extent that the claimants appear to be seeking to hold the Debtors liable for asbestos property damage caused by another entity's products.

87.    The Debtors are not seeking at this point to disallow or expunge the PD Claims identified on Exhibit C-4, unless those claims also happen to fall into another category for which this remedy is sought.

### D.    PD Claims Brought Too Late

88.    The PD Claims identified in Exhibits D-1 through D-6 should be disallowed and expunged because they were brought too late for claimants to recover. These include claims for buildings built too late to contain a Grace asbestos-containing product, Exhibit D-1; claims barred by applicable statutes of limitation based on constructive notice, Exhibit D-2; claims barred by the owner's assumption of any risk, Exhibit D-3; claims barred by applicable statutes of limitations due to the claimants' actual notice, Exhibit D-4; claims barred by applicable statutes of repose, Exhibit D-5; and claims barred by laches, Exhibit D-6.

### 1.    Claims For Buildings Built Too Late To Contain Grace Asbestos-Containing Products

89.    Exhibit D-1 identifies PD Claims that should be disallowed and expunged because they arise in buildings built too late to contain Grace asbestos-containing products. The claim form expressly anticipates this category of claims will arise and includes a multiple choice question directly on point asking, "when was the property built." Multiple choice answers "pre-1969," "1969-1973," and "after 1973" are provided as the claimant's possible responses. Part 3, Question A-8. Specifically, D-1 identifies the following subcategories of objectionable claims.

31

90.    *First*, as set out in above in Section I.A, Grace stopped selling Monokote-3 in the U.S. as of July 4, 1973. At D-1(a), the Debtors thus object to all PD Claims for MK-3 for U.S. buildings built after 1973.

91.    Grace stopped selling Monokote-3 in Canada after 1975. Accordingly, it is highly unlikely that MK-3 is in Canadian buildings that were built after 1973 and would not be in buildings built after 1975. The Debtors thus object at D-1(a) to any claims from Canadian buildings arising after 1973, shifting the burden of proof back to the claimant to prove the building at issue contains MK-3.

92.    *Second*, as indicated in Section I.A, with rare exception Grace stopped selling acoustical plaster containing asbestos by 1969. Thus, at D-1(b) the Debtors object to any claim for property damage caused by acoustical plaster after 1969.

93.    *Third*, as indicated in Section I.A, Grace's acoustical plaster fell out of favor quickly when by the 1960s cheaper building materials became available to achieve the same effects. Respectfully, Grace challenges whether any buildings built before 1969 still contain Grace's acoustical plaster. More likely, Grace anticipates that these nearly 40-year-old buildings would have replaced Grace product years ago. Thus, at D-1(c) Grace also asserts objections to any acoustical plaster claim from buildings before 1969 as well.

## 2.    Claims Barred By The Statute of Limitations Based Upon Constructive Notice

94.    Each of the PD Claims on Exhibit D-2 should be disallowed and expunged under the applicable statutes of limitations, based upon the doctrine of constructive notice. Under this doctrine, a claimant is deemed to be on notice of its claim -- and the statute of limitations begins running with respect that claim -- on the date that the claimant *should have* learned of its claim through the exercise of reasonable diligence, regardless of when (or whether) the claimant had

32

*actual* knowledge of its claim. *See Prudential Insurance Company of America v. United States Gypsum Company*, 359 F.3d 226 (3d Cir. 2004); *see also Warren Consolidated Schools v. W.R. Grace & Co.*, 518 N.W.2d 508 (Mich. App. 1994).

95. Critically, courts have held that any *potential* dangers from asbestos containing materials in buildings were widely known *at least* as early as October 20, 1983. *Id.* For example, various EPA and Congressional actions throughout the 1970s and early 1980s dealt explicitly with the issue of the potential hazards of asbestos and the responsibilities of owners and operators of buildings with respect to such potential hazards.[9] Further, asbestos' potential dangers were also widely publicized in a myriad of building and trade journals, as well as in the general press.[10]

96. As set out in the Debtors' CMO Brief, constructive notice is a common issue affecting thousands of claims in these Chapter 11 Cases. While state law applies to individual claims, virtually every state has some type of constructive notice standard in place and these standards are essentially identical from state to state.

---

[9] *See, e.g.*, 38 F.R. 8820-8830 (1973 EPA standard regulating the emission of asbestos during the demolition of certain structures with asbestos containing materials); 40 F.R. 48299-300 (1975 amendment to the EPA's 1973 regulation, which expanded the applicability of the 1973 regulation to renovations, as well as demolitions); 43 F.R. 26372 (1978 EPA regulation further expanding the scope of the 1973 regulation); 44 F.R. 17790 (1979 EPA regulation that initiated a "nationwide information and technical assistance program to encourage States and school districts to identify and control exposure problems caused by asbestos-containing materials in school buildings"); *The Asbestos School Hazard Detection and Control Act* (1980), 1 P.L. 96-270, 94 Stat. 487 (federal statute that directed the establishment of a task force to assist States and local educational agencies to ascertain the extent of the danger to the health of school children and employees from asbestos materials in schools); *The Asbestos Exposure Assessment in Buildings* (1982) (EPA inspection manual, which stated that "[o]nce friable asbestos-containing material has been identified in a building, the *potential* that the material will release asbestos fibers and contaminate the building should be evaluated."); *Guidance for Controlling Friable Asbestos-Containing Materials in Buildings* (1983) (EPA manual that provided a then-current summary of data on exposure to airborne asbestos and established specific procedures from remediation).

[10] *See, e.g.*, Harold S. Westover, *Asbestos-Related Health Problems: Building Owners Can be Held Accountable*, Properties, June 1984, at 56-57 ("If a building owner knows there is a friable (loose or flaking) asbestos in his structure and does not rectify the matter, it could be a criminal offense. If the owner is unaware of the asbestos problem, he can still be sued for a civil offense.").

15th omnibus objection to property damage claims_(LEGAL_10694164_13)

97.     Pursuant to the PD Estimation CMO, the Debtors will shortly submit expert reports to address the issue of Constructive Notice as part of Estimation Phase I, as well as a brief discussing the best procedural approach through which to address these claims. After this Court decides the issue of constructive notice in Phase I, its findings may be applied to the claims identified on Exhibit D-2.

98.     The Debtors note that none of the PD Claims on Exhibit D-2 are for properties where the claimant identified the property as an owner occupied residence. Instead, the claims are limited to those properties where the claimant would almost certainly have known (i.e., commercial high-rise buildings) of the potential dangers of asbestos at least as early as October 20, 1983.

### 3.     Claims Barred By Assumption of Risk

99.     The court should expunge and disallow each of the PD Claims on Exhibit D-3 under the doctrine of assumption of the risk, a common legal theory that varies little from state to state.

100.    "Assumption of risk" is defined as "an intentional and voluntary exposure to a known danger and, therefore, consent on the part of the plaintiff to relieve the defendant of an obligation of conduct toward him and to take his chances from harm from a particular risk." *Lankford v. Schachter*, 168 F.3d 482, 1 (4th Cir. 1999). The doctrine of "assumption of risk" acts as an affirmative defense that absolves the defendant of any liability relating to the risk that the plaintiff knowingly assumed. *See id.*

101.    As discussed above in Subsection D.2 on constructive notice, the potential dangers relating to asbestos were widely known in United States at least as early as 1983. As a result, anyone purchasing a building after that date was on constructive notice that asbestos may be in the building and, if present, may pose a potential hazard.

34

102.    Each of the claimants on Exhibit D-3 purchased their properties after 1983 and, therefore, took their respective properties with knowledge of the potential risk of an asbestos hazard. Since the claimants on Exhibit D-3 possessed such knowledge, they knowingly assumed any such risk and relieved Grace from any potential liability.

### 4.    Claims Barred By The Statute Of Limitations Pursuant to Actual Notice

103.    Exhibit D-4 lists PD Claims that should be disallowed and expunged because they are barred by the statutes of limitations based upon the claimants' actual knowledge of their claims.[11] Statutes of limitations limit the time in which a plaintiff can bring suit after a cause of action has accrued. After the time period has run, no legal action can be brought. The policy behind statutes of limitations is to prevent stale claims. *See, e.g., Traer v. Clews*, 115 U.S. 528, 542 (1885) (noting that the underlying policy is "to suppress fraudulent and stale claims").

104.    Limitations periods vary from state to state. For this reason, the Debtors conducted a comprehensive review of potentially applicable state and federal statutes of limitations.

105.    Specifically, in an abundance of caution and without conceding that any or all of these theories either has merit factually or is applicable legally, the Debtors assumed based on past experience that claimants might attempt to argue a wide variety of legal theories in every

---

[11] By and through this Fifteenth Omnibus Objection, the Debtors have objected separately to PD Claims barred by the applicable statutes of limitation under constructive notice (Section D.2) and actual notice (Section D.4). In Section D.4 (Statute of Limitations), the Debtors have applied the longest applicable statute of limitation to the date indicated on the applicable PD Claim as the date the respective claimant admits it had knowledge of its claim. In Section D-2 (Constructive Notice), the Debtors applied the longest applicable statute of limitations to 1983, the date that U.S. courts have determined the potential hazards from asbestos were widely known by building owners throughout the United States. For the reasons stated below in Section II.F.2, the Debtors believe that many claimants have failed to admit their true date of actual notice, which means that D-2 identifies far too few claims. The Debtors preserve their right to amend this Objection as set out below in Section II.I.

35

state, including such potentially diverse claims as strict liability, negligence, nuisance, breach of warranty, conspiracy, product liability, CERCLA, RICO and the like.

106.    After identifying the length of the statute of limitation period for each legal theory for each state, the Debtors employed a five-step algorithm to determine whether a particular claim was barred by a statute of limitations:

- *First*, based on the location of the property in question, the Debtors determined which state's law applies.

- *Second*, the Debtors reviewed that state's law, as well as federal law, and determined the longest potentially applicable limitations period.

- *Third*, the Debtors determined the date on which a cause of action accrued from information reflected on the proof of claim form.

- *Fourth*, the Debtors determined the date on which an action was commenced. If a prior lawsuit was filed, the Debtors used this date. If no prior lawsuit was filed, the Debtors used 2001, when Grace filed its Chapter 11 petition.

- *Fifth*, the Debtors checked whether the time period from the date of accrual to the date of commencement exceeded the longest limitations period. If so, the Debtors objected.

107.    Exhibit D-4 identifies the list of PD Claims barred by statutes of limitation, organized by state, compiled using this conservative algorithm.

### 5.    Claims Barred By The Statute Of Repose.

108.    Exhibit D-5 lists PD Claims that should be disallowed and expunged because they are barred by a statute of repose. Statutes of repose limit potential liability by extinguishing a cause of action after a fixed period of time following a certain event, regardless of whether the cause of action has accrued.

109.    There are two types of statutes of repose potentially applicable to PD Claims: (1) improvement to real property statutes of repose, and (2) product liability statutes of repose. The first type of statute of repose bars claims a certain number of years following the substantial

36

completion of an improvement to real property, while a product liability statute of repose bars claims a certain number of years after the product is delivered, sold, or used (depending on the state's statute).

110. Not all states have adopted both types of statutes. When courts have been presented with the potential applicability of both statutes of repose in asbestos property damage cases, they generally have applied the improvement to real property statute over the product liability statute. *See, e.g, School Dist. No. 1J, Multnomah County, Or. v. AC and S, Inc.*, 5 F.3d 1255 (9th Cir. 1993); *see also Trust Co. v. U.S. Gypsum Co.*, 950 F.2d 1144, 1152 (5th Cir. 1992) (noting that "[t]hese fireproofing materials constitute an improvement to real property within the customary meaning of the term").

111. Improvement to real property statutes of repose apply to certain identified classes of defendants and differ from state to state with respect to whom they protect. Some states protect only architects, contractors, and certain others involved in the design, construction, or supervision of improvements to real property. Other states protect manufacturers.

112. The Debtors' analysis accounted for these variations in state law. To determine whether a particular claim was barred by a statute of repose, the Debtors employed a four-part process:

- *First*, based on the location of the property in question, the Debtors determined which state's law applies.

- *Second*, the Debtors checked whether that state has a statute of repose and, if so, whether the statute applies here.

- *Third*, the Debtors determined the date when the statute of repose time period started to run.

- *Fourth*, using this date, the Debtors calculated whether the deadline for filing a claim expired before the claim was filed. If so, the Debtors objected.

37

113.    If more than one type of statute of repose could arguably apply, the Debtors applied the statute of repose for real property.  And to determine when the statute of repose started running, the Debtors used the date of installation as a proxy for the date of substantial completion (for improvement to real property statutes) or the date the product was delivered, sold, or used (for product liability statutes).

### 6.    Claims Barred By Laches

114.    As noted in Sections D-1 through D-5 above, the claimants listed on Exhibits D-1 through D-5 have delayed in asserting their claims against Grace, often for decades.  Grace has been unreasonably prejudiced by such delay and, as a result, the PD Claims on Exhibit D-6, which represents all of the claims listed on Exhibits D-1 through D-5, are also barred by the doctrine of laches.

115.    Laches is an affirmative defense, varying little from state to state, that allows the Court to "den[y] relief to a claimant who has unreasonably delayed or been negligent in asserting the claim, when that delay or negligence has prejudiced the party against whom relief is sought." BLACKS LAW DICTIONARY, 879 (7th ed. 1999); *see e.g. Sinell v. Town of Sharon*, 289 N.W. 44, 45 (Minn. 1939) ("Laches is unreasonable delay in enforcing a known right.  It is a strictly equitable defense as distinguished from the absolute defense of the statute of limitations.").

116.    Given that Grace has not sold asbestos-containing construction products for more than 30 years, and the courts have recognized that property owners have been on constructive notice of potential PD Claims for more than 20 years, it is difficult to see how Grace has not been prejudiced by the claimants' delay.  Among other things, witnesses are no longer available; building ownership has changed hands; building-specific documentary evidence is more difficult, if not impossible to find; and no doubt improvements and changes have often been made to the buildings at hand, including demolition.

38

117.    Therefore, in addition to the reasons articulated in D1 through D5, the Court could also disallow and expunge each of the Claims on Exhibit D-6 under the doctrine of laches to the extent applicable in each state at issue.

### E.    PD Claims Providing No Proof Of Hazard

118.    The PD Claims identified on Exhibits E-1 through E-4 have not established that Grace's products created an unreasonable risk of harm causing property damage or necessitating abatement -- claimants have provided no proof of hazard in the properties at issue.  In this section, the Debtors thus object to the claims listed in Exhibits E-1 through E-4 and ask that they be disallowed and expunged for the reasons set forth below:

#### 1.    Claims Providing no Measurement of Relevant Asbestos Levels.

119.    Exhibit E-1 lists claims that should be disallowed and expunged because they are not accompanied by *any* documentation reflecting airborne asbestos levels inside the buildings or proving that Libby vermiculite on the properties is dangerous.  The mere presence of asbestos-containing material in a building or on a property does not create a health hazard. Instead, asbestos fibers must be in the air to pose a health risk and the fibers represent a hazard to human beings only if they are breathed into the lungs in sufficient quantities over a sufficiently long period of time to cause disease.

120.    For many years, scientists have used widely accepted methods of air sampling to analyze and report the concentration of respirable asbestos in the air that people breathe.  The claims listed in Exhibit E-1 are not accompanied by such air sampling test results.  They are not even accompanied by dust sampling test results (which would be irrelevant and unreliable for the reasons discussed in Section E.2 below).  Without *any* documentation purporting to quantify asbestos levels, the claimant has not established that any health hazard exists.

39

### 2.    Claims Relying Exclusively On Dust Sampling Results That Are Irrelevant And Scientifically Unreliable.

121.    Exhibit E-2 identifies PD Claims that should be disallowed and expunged because the only testing data upon which they rely to establish building asbestos levels are dust sampling results, and dust sampling is irrelevant and scientifically unreliable.

122.    As set out in the Debtors' CMO Brief, during Estimation Phase I, this Court will have the opportunity to test the relevance and reliability of dust sampling under *Daubert* standards. This Court will have the benefit of directly on-point precedent: *In re Armstrong v. World Industries, Inc.*, the United States Bankruptcy Court for the District of Delaware evaluated dust sampling and concluded that "[a]ny attempt to estimate airborne asbestos levels from measurements of surface dust would be based on nothing more than subjective belief and sheer speculation." 285 B.R. 864, 871 (Bankr. D. Del. 2002).

123.    Dust sampling employs an "indirect preparation method." A dust sample is collected from a surface area, typically using a special microvacuum connected to a filter. After collection, the material on the filter is washed, put into an acidic solution, shaken, sonicated, diluted, and then distributed on a new filter for reading under a microscope. This "indirect" sample is then analyzed using transmission electron microscopy (TEM) and the number of asbestos particles is counted.

124.    Dust sampling is unreliable. For example, the steps of the "indirect preparation method" -- washing the filter, adding acid, shaking the sample, and sonicating the sample -- disaggregate the structures collected on the filter and thus artificially increase the asbestos structure count. The *Armstrong* court found that the dust sampling method contains bias and variability that preclude it from being an admissible scientific method. *Armstrong*, 285 B.R. at 869. The court found that data from the "indirect" dust sampling method "may also suffer from

40

significant variability in the size and number of structures reported by different laboratories preparing and analyzing identical samples." *Id.*

125. Dust sampling is also irrelevant. It measures the wrong endpoint -- dust rather than air -- and therefore should be excluded. In *Armstrong*, the court noted that "it is generally agreed that the risk of harm from asbestos stems from inhaling fibers, not from how much asbestos is on the surfaces of a room." *Id.* at 867-68. The court concluded: "[B]ecause there is no statistical correlation between surface dust and airborne dust, and because airborne dust is what poses the risk of harm, the indirect method has no valid scientific connection to the pertinent inquiry." *Id.* at 871.[12]

126. After this Court addresses dust sampling methodology in Estimation Phase I, its findings may be applied to the claims identified on Exhibit E-2.

### 3. Claims Relying On Air Sampling Results That Are Inapplicable.

127. Exhibit E-3 lists PD Claims for which the only evidence of airborne asbestos levels is air sampling data related to abatement and/or other situations irrelevant to show risk during normal operations in a building. Since abatement involves active disturbance of the asbestos-containing materials, usually for the purpose of removing them, such air sampling data are not indicative of exposures during periods of normal building use and conditions. All of these claims should be disallowed and expunged.

---

[12] Pursuant to the PD Estimation CMO, the Debtors' will fully brief the issue of "air v. dust sampling" in Estimation Phase I.

41

### 4. Claims Attaching Air Sampling Results That Do Not Support The Existence Of A Health Hazard.

128.    Finally, Exhibit E-4 lists PD Claims that should be disallowed and expunged because they provide air sampling data that fail to show that airborne asbestos levels inside the building are higher than those in typical outdoor air.

129.    Whether a person is at an increased risk of disease from exposure to asbestos depends on, among other things, the frequency, duration, and level of exposure to airborne asbestos fibers, the type of asbestos fibers, and the size of the fibers. During the Estimation Phase II proceedings, the Court will receive expert scientific evidence on asbestos levels in buildings and whether those levels have been shown to be hazardous under applicable epidemiological standards.

130.    The Debtors submit that the epidemiological evidence to be addressed in Estimation Phase II will establish that claimants have not established proof of property damage for any of the claims listed in Exhibit E-4.

### F. Flawed Categories Of Speights Claims

131.    As set out in the introduction above, the claims review process has uncovered several categories of large numbers of PD Claims filed by Speights that, while falling into other categories as well, also contain their own unique and fatal flaws.[13] These include claims for California universities, identified at Exhibit F-1; claims contending that building owners first learned of asbestos in buildings in 2003, identified at Exhibit F-2; claims for buildings at

---

[13] During the Debtors' August 29, 2005 omnibus hearing, the Court granted Speights' request to withdraw certain Speights' PD claims. Those claims, however, have not yet been completely identified. Therefore, the Debtors have not removed any Speights' claims from this Fifteenth Omnibus Objection. The Debtors anticipate submitting a separate order permitting withdrawal of those claims.

42

Mt. Sinai Hospital in New York, identified at Exhibit F-3; claims for buildings at Sonoma State College, identified at Exhibit F-4; and claims for Canadian buildings, identified at Exhibit F-5.

132.    The Speights PD Claims are also the subject of a separate objection, the Thirteenth Omnibus Objection, which is seeking to disallow 2,937 Speights-filed PD Claims on the grounds that Speights did not have proper *authority* to sign and file those claims. In contrast, this Fifteenth Omnibus Objection addresses the *merits* of these claims.

133.    Investigation continues:  To the extent it will make sense to separate out and seek a hearing on additional subcategories of Speights PD Claims (all of which are already the subject of substantive objections in other Exhibits to this Fifteenth Omnibus Objection), the Debtors will bring those claims to the attention of this Court.  For now, the Debtors suggest that the merits of the following batches of claims may be addressed based on their own unique problems, in addition to their other flaws:

### 1.    Speights' California Claims

134.    Speights filed more than 1,200 PD Claims   (collectively, the "California University Claims") supposedly for contaminated buildings in California owned by California State University or The University of California (collectively, the "California Universities"). These PD Claims are identified on Exhibit F-1 and all should be disallowed and expunged.

135.    As preliminarily flagged in the Debtors' Thirteenth Omnibus Objection and discussed further below, this Court should disallow and expunge each of the California University Claims for the following four reasons in addition to those addressed elsewhere in this Fifteenth Omnibus Objection: (i) all of the claims are barred by the statute of limitations and laches.  Specifically, the face of *each* of these California University Claims specifically identify a prior disallowed 1990 case against Grace as related to the claim, which means that by their own admission, these claimants were on notice for more than a decade before filing proofs of claim in

43

this bankruptcy. Other California-specific documentation will further establish that this state generally, and these universities specifically, were well aware of asbestos-related property issues decades ago; (ii)many of these claims have not established product identification and thus should also be disallowed and expunged on that ground; (iii) similarly, for others, under California law, the claimants have not established that there has been any compensable property damage, and thus claims should also be barred for this reason; and (iv) finally, as indicated in the Thirteenth Omnibus Objection, Speights has not established it had proper authorization to file these time-barred, meritless claims. Nothing in the "exemplar contracts" attached to Speights' Verified 2019 Statement indicates that Speights had a broad contractual right to dump in hundreds or thousands of unsupported claims on the California Universities' behalf; to the contrary, by express contractual terms Speights could only bring claims that were "presently viable."

136. *First*, all of these claims are barred by the statute of limitations and laches. The California Universities have admitted they had actual knowledge of any claims sufficient to bring a lawsuit at least as early as January 1, 1990.

137. Part 4 of the PD Claim Form asked claimants to identify any prior lawsuits that had been filed for the subject property. In response to this question, the California University Claims (i) identified "Alabama, et al. v. W.R. Grace, et al, US SUPREME CT, Docket No. 116" and (ii) stated that this lawsuit was filed on January 1, 1990.

138. In *Alabama v. W.R. Grace & Co.*, 29 states (including California) sued various corporate defendants including Grace to recoup the States' respective costs for abating asbestos in public buildings. Accordingly, this lawsuit dealt with the same alleged injury that is asserted in the California University Claims. Plaintiffs in the case asked the United States Supreme Court

15th omnibus objection to property damage claims_(LEGAL_10694164_13)

to take original jurisdiction over this action, which the plaintiffs contended the Supreme Court had the prerogative to do. In May 1990, the Supreme Court declined to take original jurisdiction over the action, yet the California universities did nothing for more than a decade before filing claims in the Chapter 11 Cases. Plainly, these 15 year old claims are barred by California's statute of limitations. *E.g. Jolly v. Eli Lilly*, 44 Cal.3d 1103 (Cal. 1988).

139.    The Debtors also submit that California Universities' internal documents will show knowledge of the potential hazard of asbestos in buildings at least as early, if not earlier, than the constructive knowledge date of 1983 discussed above in Section II.D.2.

140.    No doubt, the California Universities will argue that the statute of limitations does not apply to their claims because the doctrine of *nullum tempus occurit regi* ("nullum tempus") precludes the application of any statute of limitations to their claims. This argument, however, is meritless.    Under California law, nullum tempus does not apply to independent entities or subdivisions of the state of California.  Further, since both of the California Universities are independent corporations, neither of them can rely upon nullum tempus to avoid the applicable statute of limitations.

141.    Nullum tempus does not apply to California's subdivisions, including school districts and government agencies, such as the California Universities. *See Marin Healthcare District v. Sutter Health, et al.*, 127 Cal. Rptr. 2d 113 (Cal. App. 3d Dist. 2002) (holding that nullum tempus did not apply to political subdivision of California); San Francisco *Unified School Dist. v. W.R. Grace & Co.- Connecticut*, 44 Cal.Rptr.2d 305 (Cal. App. 1 Dist. 1995) (holding began to run in an asbestos-in-building case when the contamination occurred).  Indeed, in California, statutes of limitations also tend to run against the state generally.  *E.g.* Ca. Code Civ. Pro. §§ 315, 345; *People v. Osgood*, 104 Cal. App. 133, 135 (1930) ("The general

45

legislative policy of California [has been] that the state shall be bound by its statute of limitations with respect to the bringing of actions for the enforcement of any and all such rights as may accrue to the state.").

142.    Further, nullum tempus does not apply to the California University Claims because the California Universities are both independent subdivisions of the State of California. The Regents of the University of California is an independent corporation, which was established for the purpose of administering the University of California. *See* Bylaws for the Regents of the University of the California, Bylaws 1 and 5.  Similarly, the California State University was established by the California state legislature in 1960.  *See* Donahoe Higher Education Act (1960) (the "Donahoe Act").   The Donahoe Act established the California State Colleges (designated "The California State University" on Jan. 1, 1982) and established an independent board of trustees and executive structure to manage the university system.  Accordingly, both of the California State University Claimants are legally separate from the State, and they are both managed independently from the State.  Therefore, neither the Regents of the University of California nor The California State University can be considered the "State" for purposes of nullum tempus, and nullum tempus is not applicable to any of the California University Claims.

143.    *Second*, many of the California University Claims also fail because they do not provide product identification.   In fact, these claims provide *no* meaningful supporting documentation whatsoever.[14]

---

[14] By this argument, the Debtors do not concede that the handful of California university claims that *do* provide documentation have established all or any of the elements of cognizable injury.  For this Court's convenience, however, this particular sub-part of the Debtors' argument is aimed only at claims providing *no* supporting documentation.  California claims with some documentation, no matter how inadequate, are addressed elsewhere in the Fifteenth Omnibus Objection.

46

144.    The identical one page, lawyer-generated document attached to each of these claims states that no supporting documents exist and further suggests that product identification is unnecessary because these claims are founded on an alleged conspiracy amongst asbestos manufacturers. Under a conspiracy theory, this lawyer document argues, the claimants do not need to establish that a Grace product was installed in the subject properties. This argument, however, is unavailable to the California Universities.

145.    California does not recognize conspiracy as an independent tort. *See Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454 (Cal. 1994) ("[c]onspiracy is not an independent tort; it cannot create a duty or abrogate an immunity. It allows tort recovery only against a party who already owes the duty and is not immune from liability based on applicable substantive tort law principles."). Instead, California requires the claimant to prove that it was exposed to the defendant's product.

146.    In the wake of *Applied Equipment*, the California State appellate court has expressly held that an asbestos claimant cannot recover from an asbestos manufacturer *unless and until* that claimant has demonstrated exposure to the specific defendant's product. *Chavers v. Gatke Corp.*, 132 Cal.Rptr.2d 198 (Cal. App. 2003). In *Gatke*, a former automobile and truck mechanic and his spouse filed a suit against various manufacturers of friction brake products that allegedly contained asbestos. The plaintiffs in *Gatke* could not establish actual exposure to any of the named defendant's products. The California appeals court held:

> [i]n cases where the plaintiff alleges the existence of a civil conspiracy among the defendants to commit tortious acts, the source of the substantive liability arises out of a preexisting legal duty and its breach; liability cannot arise out of participation in the conspiracy alone ... *A duty, independent of the conspiracy itself, must exist in order for substantive liability to attach.* That proposition, we conclude, applies in this case and is dispositive of the point. For on this record, *it is clear respondent was under no duty to Mr. Chavers for the simple reason that*

47

*plaintiff could not show he was exposed to any of Gatke's products. Id.* at 203 (emphasis added).

147.   *Third*, the same California University Claims that fail to provide product identification also fail to establish any cognizable property damage.[15]  To recover in tort under California law, claimant must demonstrate that there has been an actual injury to the subject property.   Therefore, the California University Claims listed on Exhibit F-1 that contain no documentation establishing any *actual* injury to property are invalid under California law, and they must be disallowed and expunged.

148.   *Fourth*, dumping in more than one thousand time-barred, meritless claims with no research or supporting documentation is wholly inconsistent with the express terms of Speights' purported contracts with the California universities, one of which was actually signed the *last* day of the bar date period (and, therefore, presumably signed after Speights had already submitted the associated claims).

149.   Speights relies upon two contracts to support its authorization to file the California University Claims.   Specifically, Speights' Verified 2019 Statement attaches (i) an agreement, dated March 31, 2003, between Speights and The Regents for The California State University (the "Cal State agreement"), contract "K-10" and (ii) a similar agreement, dated December 13, 2002, between Speights and the Regents of the University of California, contract "K-4" (the "University of California agreement").

---

[15] By this argument, as for the previous one, the Debtors do not concede that the handful of California university claims that *do* provide documentation have established all or any of the elements of cognizable injury.  For this Court's convenience, however, this particular sub-part of the Debtors' argument is aimed only at claims providing *no* supporting documentation of any cognizable property damage.  California claims with some documentation, no matter how inadequate, are addressed elsewhere in the Fifteenth Omnibus Objection.

48

150. Speights' Verified 2019 Statement states that the Cal State agreement provided authority to file roughly 1,000 California University Claims and the University of California agreement provided authority for the remaining California University Claims.

151. The Cal State Agreement, however, did not give Speights the authority to dump into this bankruptcy any and all claims, no matter how meritless. To the contrary, the agreement makes clear it only purports to authorize Speights to represent its interests "as a result of asbestos-containing surface treatment material placed in its buildings *against whom an action is presently viable.*" As demonstrated above, the California University Claims are not valid, and they were not valid when Speights filed those claims on March 31, 2003. Similarly, the existence of a University of California contract cannot extend Speights' authority to file claims to include those that have no merit.

## 2. Speights Claims Contending Building Owners First Learned Of Asbestos On The Property In 2003

152. All but 29 of the 2,938 PD Claims filed by Speights indicate that the building owner first learned of asbestos in the property at issue in the year 2003. Based on other Speights filings in this case, as well as documents attached to certain of these claims, however, the Debtors believe that the entry "2003" identified in these claims is pure fabrication. Because of the significance of the initial date of property owners' knowledge to critical defenses such as statute of limitations, the Debtors believe that *all claims relying on the fabricated knowledge date of 2003* should be disallowed and expunged. These claims are identified on Exhibit F-2.

153. As just one example addressed in the Debtors' Thirteenth Omnibus Objection, the Debtors have established that Speights never had authority to represent the owners of the American Medical Association Building, claim # 6661. Further, the AMA building was built in 1990, nearly 20 years after Grace stopped selling asbestos-containing product. Yet Speights'

49

claim for that building -- like that for more than 2,900 other buildings -- indicated the owner first became aware of asbestos in the building in 2003.

154.   Similarly, Speights admitted in a pleading filed August 12, 2005 that the firm did not receive authorization to file claims from more than 1,000 building owners on whose behalf Speights went ahead and signed filed PD Claims -- including nearly 400 building owners Speights could not even locate. Docket No. 9186. Yet all of those claim forms identify "2003" as the year the building owner became aware of asbestos in the property. How could Speights possibly have a legitimate basis for providing that date?

155.   The California claims identified above at Exhibit F-1 demonstrate the same problem. How could the claim form indicate that a related lawsuit was filed for the building in 1990 and at the same time contend that the owner at issue was unaware of asbestos property damage until 2003?

156.   For yet other Speights claims, the supporting documentation attached to the PD Claim Form indicates knowledge of asbestos going back decades, while the face of the claim form *still* indicates 2003 as the year the owner first learned of asbestos in the building.

157.   Moreover, Speights' contention that more than 2,900 of 2,938 sophisticated building owners first became aware of asbestos in the properties at issue in 2003 is, simply, not credible. *Cf. Prudential Insurance Company of America v. United States Gypsum Company*, 359 F.3d 226 (3d Cir. 2004) (owner constructive knowledge dates to 1983).

158.   The date the building owner had knowledge of asbestos in a property is crucial to the Debtors' defense, as Speights well knew when these claims were submitted. All claims identified on Exhibit F-2, falsely asserting that the building owner first learned of asbestos in 2003, should be disallowed and expunged.

50

### 3.    Speights Mt. Sinai Claims

159.    The claims identified at Exhibit F-3 were filed by Speights for 40 buildings at Mt. Sinai Hospital in New York. In support of each of these claims, Speights attaches the exact same "invoice" that indicates 70 bags of Monokote-3 product were shipped to *one* building at Mt. Sinai in 1970.

160.    It is physically impossible for this one supposed shipment of a tiny amount of Grace product to have contaminated the 40 buildings for which Speights has submitted claims. Indeed, it is unlikely that even a single building at Mt. Sinai could have cognizable asbestos property damage based on this volume of product. In fact, 1 bag of MK-3 would cover only approximately 50 square feet at 1/2 inch thickness (1/2 inch thickness provides a 2-hour fire rating) - equivalent to a 5 foot by 10 foot room, if laid out flat. Therefore, it is highly unlikely that 1 shipment of 70 bags somehow contaminated 40 Mt. Sinai buildings.

161.    Therefore, all of the Speights PD Claims listed on Exhibit F-3 should be disallowed and expunged.

### 4.    Speights Sonoma State College Claims

162.    In support of more than 20 PD Claims submitted for various buildings at Sonoma State College in California, identified at Exhibit F-4, Speights attaches the same, single page, hand written document indicating a potential *bid* for work at a job site.

163.    As discussed above in Section II.C.3, the existence of a bid sheet does not indicate that Grace either won the bid to provide material for a construction site or provided any asbestos-containing product to the building at issue. And in the case of the Sonoma bid sheet, the handwritten document does not even establish that Grace *submitted* a bid, let alone won it.

164.    Speights has failed to establish product identification, among other things, for all claims identified at Exhibit F-4. All of these claims should be disallowed and expunged.

51

### 5.    Canadian Claims

165.    Each of the PD Claims listed on Exhibit F-5 relates to property located in Canada. Of these Canadian PD Claims, roughly 415 were filed by Speights. Consistent with the terms of the Debtors' Plan, the merits of these claims will ultimately be adjudicated in Canada but this Court will still need to address these claims as part of Estimation Phase II. In an abundance of caution, and without prejudice to their rights to raise additional arguments when these issues are litigated in Canada, the Debtors hereby register their objections to the claims identified on Exhibit F-5 as follows:

166.    The PD Claims identified on Exhibit F-5 are meritless, and should be dismissed as a matter of law, for each of the following three reasons.[16]  *First*, Canadian fault-based liability law does not allow for recovery under strict liability and, since the Canadian claims reveal no basis for a judicial determination that Grace breached any duty to the respective claimants, they appear to assert strict liability claims. *Second*, the persuasive effect of *Privest Properties Ltd. v. Foundation Co. of Canada* means that all Canadian PD Claims involving MK-3 would likely fail in a Canadian court. *Third*, all of the Canadian PD Claims are precluded by applicable statutes of limitation.

167.    *First*, the Debtors object to each of the Canadian PD Claims because they fail to provide evidence that Grace was negligent or otherwise culpable with respect to any of the claimants. Since Canada does not allow recovery under strict liability, this failure precludes the Canadian claimants from recovery.

168.    Canada has rejected the concept of strict liability for tort-based claims for product liability. *See Privest Properties Ltd. v. Foundation Co. of Canada* (1995), 11 B.C.L.R. (3d) 1

---

[16] In addition to any other applicable objections raised elsewhere in the Debtors Thirteenth Omnibus and Fifteenth Omnibus Objections.

15th omnibus objection to property damage claims_(LEGAL_10694164_13)

(S.C.), *aff'd* (1997), 31 B.C.L.R. (3d) 114 (C.A.), *leave to appeal to the Supreme Court of Canada refused*, [1997] S.C.C.A. No. 216; *Park v. B&B Electronics Ltd.* (2003), A.J. No. 873 (QL); *Ragoonanan Estate v. Imperial Tobacco Canada Ltd.* (2000), 52 O.R. (3d), (S.C.J.). Instead, Canadian Courts have always "insisted on some degree of fault in product liability cases." *Id.* The Ontario Court of Appeal gave a clear statement of the Canadian position (with respect to strict liability for product liability cases) when it stated as follows:

> [O]ur courts do not, in product liability cases, impose upon manufacturers, distributors or repairers, as is done in some of the States of the American union, what is virtually strict liability. The standard of care exacted of them under our law is the duty to use reasonable care in the circumstance and nothing more.

*Phillips v. Ford Motor Co. of Canada Ltd.* (1971), 2 O.R. 637, 653 (C.A.).

169.    In Anderson v. St. Jude Medical Inc., (2002) O.J. No. 260, (S.C.J.), the court struck allegations of strict liability in tort in a products case, stating:

> Although many American states have imposed strict liability, provincial legislatures may not see this to be appropriate or necessary in the Canadian context, where there is much greater social assistance available for those who are hurt.

170.    Thus, Canadian product liability cases are decided using negligence principles, including whether the defendant failed to satisfy its requisite standard of care to the claimant. In determining whether a manufacturer has satisfied its standard of care, Canadian courts consider the applicable industry and regulatory standards that existed at the time the product was manufactured and sold. Any such existing standards are considered *"prima faci* proof of a standard of reasonable care." *Piche v Lecours Lumber Co.*, O.J. (1993), No. 1686 (Gen. Div.). If a defendant manufacturer complied with those standards, then the manufacturer can rarely, if ever, be held liable under Canadian law.

171.    Grace's asbestos-containing products have already been shown in Canada to have met the appropriate industry and regulatory standards that existed when Grace manufactured its

53

products. For example, in *Privest*, the court found that in the early to mid 1970's, it was entirely reasonable in Canada for a manufacturer to produce asbestos-containing fireproofing. Moreover, the evidence at that trial indicated that Grace's MK-3 product was a superior product with an impressive track record, including excellent performance in "real-life" fire conditions.

172.   Because the Canadian claims do not reveal any basis for a determination that Grace breached a duty to respective claimants and Canada does not allow recovery for strict liability, the Debtors object to all of these claims, which should in turn be dismissed in Canada.

173.   *Second*, all of the Canadian PD Claims listed on Exhibit F-5 that assert claims for MK-3 in buildings would likely fail because of the decision in *Privest Properties Ltd. v. Foundation Co. of Canada* (1995), 11 B.C.L.R. (3d) 1 (S.C.), *aff'd* (1997), 31 B.C.L.R. (3d) 114 (C.A.), *leave to appeal to the Supreme Court of Canada refused*, [1997] S.C.C.A. No. 216.

174.   The *Privest* bench trial took a total of 182 days; its proceedings filled 13,564 pages of transcript; and the written argument exceeded 6,000 pages. Further, *Privest* addressed hundreds of Exhibits and 21 expert reports were tendered, some of which were updated during the course of proceedings. Put simply, the *Privest* trial was extraordinarily lengthy and every nuance of the case was fully litigated.

175.   In *Privest*, the British Columbia Supreme Court held as follows:

- Grace's MK-3 fireproofing product is *not* an inherently dangerous product; and

- The asbestos contained in the MK-3 does not contaminate buildings or otherwise pose a health hazard to its occupants necessitating removal of the MK-3 materials.

176.   The decision at trial was affirmed by the British Columbia Court of Appeals, which held that the trial judge "did not err in finding, on the evidence before him, that MK-3 was not an inherently dangerous product."

54

177.    In his 309-page decision, trial Judge Drost acknowledged that certain courts in the United States had found MK-3 to be dangerous, but "after consideration of the testimonial and documentary evidence presented in this case, [the court] do[es] not agree with those American courts that have found Monokote MK-3 to be a dangerous product and thus awarded judgment against Grace-Conn." *Privest* at pp. 1-2. Specifically, the court stated as follows:

> I have no hesitation in concluding that the asbestos fibres contained in the MK-3 did not "contaminate" the Building, nor did they expose its occupants and workers to an increased risk of contracting any of the asbestos-related diseases. Nor did any asbestos fibres that were released into the atmosphere of the Building by that product cause damage to property.

> From these conclusions, it follows that there has been no negligence, no breach of duty of care to warn, and no misrepresentation.

178.    Numerous characteristics of the *Privest* decision demonstrate that the case will serve as strong persuasive authority throughout Canada. Further, in the province of British Columbia, *Privest*, which was affirmed by the British Columbia Court of Appeal, would in the normal course be followed on the legal issues it decided by the courts of British Columbia (or by any Canadian court applying B.C. law) on the basis of the doctrine of *stare decisis*.

179.    As described above, *Privest* was a bench trial that took place over more than 180 days, addressed hundreds of documents as well as testimony from more than 20 experts, gave rise to an opinion that was over 300 pages long, and was affirmed on appeal (leave to the Supreme Court of Canada was subsequently denied).

180.    As a result, *Privest*'s precedential value cannot be overstated. Given the enormous amounts of time, money and judicial resources that were devoted to the case, the Debtors submit that other Canadian courts should and will be reluctant to depart from the factual and legal conclusions reached by *Privest*. Indeed, from a practical standpoint, *Privest* already

55

serves as the law throughout Canada, as it has essentially brought such litigation to an end in

Canada for a decade.

181.    Indeed, in awarding Grace costs at the highest tariff level, the trial judge expressly

acknowledged *Privest*'s precedential power:

> Appendix B of the Rules [Canadian rules] states that, in order to attract scale 5
> costs, the matter must be of "unusual difficulty or importance." The import of the
> action must apply to the public at large, or at least to other litigation of a similar
> nature. *As noted, this was the first asbestos case in Canada and many other
> interested parties were following its progress. Had the plaintiffs' action been
> successful, it is likely that many others would have pressed similar claims,
> mirroring the plethora of litigation in the United States concerning the use of
> asbestos and asbestos-containing products* . . . It is true that the Grace Defendants
> defended this case with a view to avoiding a precedent-setting decision which,
> had they lost, would have probably cost them many more millions of dollars in
> similar law suits.

*Id.* at 46 (emphasis added).

182.    Finally, no other Canadian appeals courts has issued an opinion on the issue of

whether Grace products are unreasonably dangerous or pose a health risk to building inhabitants.

*Privest* stands alone as the highest Canadian authority with respect to this issue.

183.    *Third*, while each Canadian province has its own rules governing the statute of

limitations with respect to claims for asbestos property damage, the time for filing a claim has

passed in each of the provinces at issue in the claims identified on Exhibit F-5.[17]  Thus, the

Debtors object to all Canadian claims as being barred by statutes of limitations.

---

[17] For example, in British Columbia, the deadline for asserting a property damage claim is six (6) years from the
date that the asbestos-containing product was installed in the building, and "a cause of action accrues when all of the
constituent elements exist, whether or not the plaintiff is aware of them." *Privest, quoting Wittman v. Emmott*
(1991), 53 B.C.L.R. (2d) 228 (C.A.), *leave to appeal refused by the Supreme Court of Canada* (1991) 58 B.C.L.R.
(2d) (S.C.C.); *The Limitation Act*, R.S.B.C. 1996, c.266. Six year statutes of limitation also apply in Saskatchewan,
Manitoba, Ontario and Nova Scotia. *The Limitation of Actions Act*, R.S.S. 1978, c. L-15 (Saskatchwan); *The
Limitation of Actions Act*, R.S.M. 1987, c. L150 (Manitoba); *Limitations Act*, R.S.O. 1990, c. L. 15 (Ontario;
although this act was repealed as of January 1, 2004, it applies to the Ontario claims because it was effective at the
time of the Bar Date); *The Statute of Limitations*, R.S.N.S. 1989, c. 258 (Nova Scotia). Two year statutes of
limitations apply in Alberta, Newfoundland and Labrador. *The Limitations Act*, R.S.A. 2000, c. L-15.1 (Alberta);
*Limitations Act*, S.N.L. 1995, c. L-16.1 (Newfoundland and Labrador). In Quebec, the limitations period is three
years. *The Civil Code of Quebec*, S.Q. 1991, c. 64. While generally in applying limitations statutes Canadian courts

56

184.    Among other things, the *Privest* case and decision each received such extensive press coverage in both the legal and building management communities, it would be impossible for a building owner to contend it was unaware of its potential claim during or after the *Privest* case which was decided by the trial court in 1995 - eight years before the Bar Date.

185.    Further, Canadian courts have specifically held that "the health hazards of asbestos were of 'public character and notoriety in the late sixties and early seventies.'" *Canadian Indemnity Co. v. Johns-Manville Co., Ltd.*, (1990), 72 D.L.R. (4th) 478 (S.C.C.).

### G.    Category II Claims Relating To Mining, Milling and Processing Operations

186.    As discussed above in Section I.A, the PD Claim Form asked claimants whether they were asserting Category I Claims (claims for Grace product used in a building) and/or Category II Claims (claims related to one of Grace's vermiculite mining, milling or processing operations).    Approximately 250 of the PD Claims received either were or should have been characterized as Category II Claims and are addressed below.

187.    The Debtors hereby raise the following objections to these claims, organized as follows:    (i) objections to claims signed and filed on behalf of claimants in Minneapolis, Minnesota, identified on Exhibit G-1; (ii) objections to claims submitted for property located in Libby, Montana, identified on Exhibit G-2; (iii) other Category II Claims, Exhibit G-3; (iv) claims filed by Burlington Northern and Santa Fe Railway, Exhibit G-4; and (v) objections to all claims on the basis that Libby vermiculite presents no hazard.

---

take into account discoverability consideration, the notoriety of health concerns associated with asbestos reflected in the *Privest* decision, coupled with the high profile of asbestos-related property damage litigation during and after Privest was decided, make it very difficult, if not impossible, for Canadian PD Claimants to overcome arguments that they knew all they needed to know to bring their claims as of 1995 at the latest.

### 1.    Minneapolis, Minnesota Claims

188.    Of the Category II Claims identified on Exhibit G-1, 53 were filed by the law firm of Biersdorf & Associates PA ("Biersdorf"). All of these claims were signed and filed by one attorney and assert claims for properties located in northeast Minneapolis. Six other Minneapolis Category II Claims were also received by the Debtors, four of which are the subject of an objection here. The Debtors object to the 58 Minneapolis claims identified on Exhibit G-1 as follows:

189.    *First*, the Debtors object to all of the 53 Biersdorf-filed Minneapolis claims to the extent that these claims are purporting to seek damages on account of "stigma" associated with the neighborhood where the properties are located. All of these claim forms indicate that these claims are related to the litigation captioned *Chase v. W.R. Grace & Co. - Conn.* (Case No. PI0014792), which sought damages for alleged "stigma" in a Minneapolis neighborhood. Indeed, a third of these claim forms expressly state that the claimant is not aware of any asbestos on the property, yet the claimant is seeking to recover for alleged "stigma." Minnesota courts do not recognize an injury for "stigma" or "perception" of injury. Actual injury to the property is required. *See Sentinel Mgmt. Co.*, 563 N.W.2d 296, 300 (Minn. App. 1997).

190.    *Second*, the Debtors object to all 58 Minneapolis claims (the 53 Biersdorf claims and the five additional claims for properties located in Minneapolis) identified on Exhibit G-1 because they fail to demonstrate asbestos property damage. Some of these claims concede that the EPA has already cleaned up the site at issue; other claims admit that testing was done by the EPA and no contamination was found; other claims state that testing was done but neither attach nor summarize results establishing contamination, including some forms that state that the Debtors could try to obtain the information from the EPA or other agencies; still other claims admit that *no* testing for contamination has been done. Any and all of these shortcomings are

58

fatal to the Minneapolis PD Claims.  By failing to provide proof of contamination, all of these claims fail to demonstrate the elements needed to recover for asbestos property damage.  Indeed, claim # 5143, filed by an individual property owner, expressly states "My property was evaluated and cleaned up by the EPA.  I do not wish to make a claim or file a lawsuit at this time."

191.    *Third*, the Debtors object to Biersdorf-filed claims # 11345 and 11346 because they are duplicative of claims # 5581 and 3337 filed by individual property owners.

192.    *Fourth*, to the extent that any Minneapolis claimant is asserting a PD Claim for a property that has already been remediated by the EPA, the Debtors object that the claimant cannot establish a cognizable PD Claim in this bankruptcy and that all such claims should be disallowed and expunged.  As indicated on Exhibit G-1, the properties identified on the following eight claims have already been remediated by the EPA: claims # 3337, 5143, 11348, 11358, 11371, 11375, 11380, and 12826, and investigation continues as to whether others have been remediated as well.

## 2.    Claims for Properties in Libby, Montana

193.    Roughly 58 PD Claims identified on Exhibit G-2 and addressed in this subsection were asserted for properties located in Libby, Montana (the "Libby Claims").  Two of those claims were filed by claimants not represented by counsel; four claims were filed by McGarvey Heberling Sullivan & McGarvey PC; and 51 claims were filed by the law firm of Lewis, Huppert & Slovak PC (the "Lewis Firm").

194.    Of the 51 Libby Claims filed by the Lewis Firm, four were properly identified as Category II Claims.  Five claims were identified as both Category I and II Claims, but should have been marked only as Category II Claims.  For the 42 remaining claims identified by the Lewis Firm as Category I Claims, the Debtors believe that 31 are actually Category II Claims,

59

two are properly considered ZAI Claims, two are remarkably incomplete yet are likely ZAI Claims, one claim was filed with no category noted, although the Debtors believe it should be a Category II Claim, and six claims appear to be claims for both ZAI and Category II yard-contamination.

195.    The Debtors object to the 58 Libby Claims as outlined below:

196.    *First*, to the extent that any Libby Claims state that they are (i) asserting both Category I and II Claims; (ii) failed to identify a category, but appear to assert a Category II Claim; or (iii) asserting only a Category I Claim, but the PD Claim Forms actually assert only Category II Claims, the Debtors believe that these claims should be reclassified only as Category II Claims. As indicated on Exhibit G-2, some 38 fall into this grouping. The Debtors ask that these claims be reclassified only as Category II Claims.

197.    *Second*, to the extent that any Libby Claims assert claims for contamination from attic insulation, the Debtors believe that these claims should be classified as ZAI Claims rather than as PD Claims. As indicated on Exhibit G-2, claims # 6086, 6085, 6083, 5563, 5560, 5555, 4713, 4712, 9673, and 9671 appear to assert ZAI Claims. Consistent with Section II.A above, the Debtors ask that these claims be disallowed and expunged without prejudice.

198.    *Third*, to the extent that any Libby Claimant is asserting a PD Claim for a property that has already been remediated by the EPA, the Debtors assert that the claimant cannot establish a cognizable PD Claim in these Chapter 11 Cases and that all such claims should be disallowed and expunged.   As indicated on Exhibit G-2, the properties identified on the following six claims have already been remediated by the EPA: 9658, 7045, 5567, 13909, 6096, and 5554, and investigation continues as to whether others have been remediated as well.

60

199.    *Fourth*, the Debtors object to any claim on Exhibit G-2 that fails to establish the presence of vermiculite or asbestos on the property.

### 3.    Other Category II Claims

200.    Exhibit G-3 lists 29 Category II Claims filed by various claimants on account of properties that are not located in Libby, Montana or Minneapolis (collectively, the "Other Category II Claims"), all of which the Debtors seek to have disallowed and expunged.

201.    *First,* as indicated on Exhibit G-3, 17 of the Other Category II Claims fail to include adequate documentation to support their assertions that the subject properties are contaminated by Grace product. These PD Claims have failed to establish injury or causation, and the Court should disallow and expunge each of them.

202.    *Second,* as indicated on Exhibit G-3, claims #10559, 10557, and 4697 indicate that they assert Category II Claims, but the claim forms and supporting documentation are collectively so extremely deficient that the Debtors cannot even ascertain whether the forms do, in fact, assert Category II Claims (or even the general nature of the claim). Therefore, the Debtors ask the Court to disallow and expunge these three claims as materially incomplete.

203.    *Third*, listed on Exhibit G-3, claim #1915 was filed by a residential tenant, who is attempting to assert a claim on account of asbestos that is allegedly being blown out of her ducts by "illegal aliens." This claim purports to assert a Category II Claim, but it does not fit the requirements of a Category II Claim or any other type of claim that was covered by the Bar Date. Therefore, the Debtors ask the court to disallow and expunge this claim.

204.    *Fourth,* as indicated on Exhibit G-3, claims #7089, 4717, 12741, and 12786 indicate that they assert Category II Claims, but the claim forms appear to actually assert Category I Claims. The Debtors ask the Court to reclassify these claims as Category I Claims. Listed on Exhibit G-3, claim #2838 indicates that it asserts a Category II Claim, but the PD

61

Claim Form actually asserts a ZAI Claim. There has not been a bar date for ZAI Claims and, therefore, the Debtors ask the Court to disallow and expunge this claim, without prejudice to the claimant's rights to assert its ZAI Claim at the appropriate stage in Grace's bankruptcy cases. And claim #1793 indicates that it asserts a Category II Claim, but the claim forms actually asserts Category I and ZAI Claims. There has not been a bar date for ZAI Claims and, therefore, the Debtors ask the Court to disallow and expunge the ZAI portion of this claim, without prejudice to the claimant's rights to assert its ZAI Claim at the appropriate stage in Grace's bankruptcy cases. The Debtors also ask the Court to reclassify this claim as a Category I Claim.

### 4.    Burlington Northern and Santa Fe Railway Claims

205.    Claims identified on exhibit G-4 were all filed by The Burlington Northern and Santa Fe Railway (the "Burlington Northern Railway Claims").

206.    The Burlington Northern Railway Claims typically refer to alleged vermiculite contamination of buildings or sites used for railway operations.

207.    The Debtors object and seek to disallow and expunge all Burlington Northern Railway Claims identified on Exhibit G-4 to the extent they fail to establish site contamination or hazard from a Grace product with supporting documentation.

208.    Further, to the extent the Burlington Railway Claims are in reality seeking to recover for alleged contamination from loose-fill vermiculite, the Debtors object and state that these claims are ZAI claims that were improperly submitted on PD Claim Forms. As set out above in Section 11. A, the Bar Date Order did not apply to ZAI Claims. The Court should disallow, without prejudice, the claims on Exhibit G-4 to the extent that any are ZAI Claims.

### 5.    Failure to Demonstrate Hazard

209.    The Debtors object to all of the Category II Claims listed on Exhibits G-1 through G-4 because the presence of Libby vermiculite on the property does not present a hazard

to human health.  Since the PD Claims on Exhibits G-1 through G-4 assert claims for Libby vermiculite that is allegedly on the subject properties, the claimants have not (and could not possibly) prove that they have been injured.

### H.    Contribution and Indemnification Claims

210.    The Claims identified on Exhibit H-1 were filed by companies with asbestos related liability or trusts, seeking contribution and/or indemnification for the payment of asbestos personal injury and/or asbestos property damage claims.

211.    The claims listed on Exhibit H-1 have not and cannot provide either a factual or legal basis that would entitle claimants to recover from the Debtors for asbestos property damage under any contribution or indemnification theory.  As a result, the Debtors seek to disallow and expunge all of these claims.

### I.    Potentially Fraudulent Or Otherwise Factually Incorrect Property Damage Claims

212.    The Debtors note that all PD Claim objections identified above have necessarily assumed that the information supplied by claimants, while potentially incomplete, was at least true and accurate as supplied.

213.    In light of the overwhelming problems identified to date in the Speights claims, however, the Debtors expect the assumption about the veracity of statements made in the 4,000+ PD Claim Forms received is, to say the least, optimistic.  *See, e.g.,* Debtors' Thirteenth Omnibus Objection to 2,938 Claims Filed By Speights & Runyan *and supra* Section II.F.2.  The Debtors reserve their right to make additional objections if and when it is determined that information provided by any claimant is factually incorrect.

63

## RESPONSES TO THIS FIFTEENTH OMNIBUS OBJECTION

214.    To contest an objection, a claimant must file and serve a written response to this

Objection (a "Response") so that it is received no later than 4:00 p.m. (Eastern Time) on October

7, 2005.    Every Response must be filed with the Office of the Clerk of the United States

Bankruptcy Court for the District of Delaware:    Marine Midland Plaza, 824 Market Street,

Wilmington, Delaware 19801, and served upon the following entities, so that the response is

received no later than 4:00 p.m. (Eastern Time) on October 7, 2005, at the following addresses:

> Co-Counsel for the Debtors:
>
> Kirkland & Ellis LLP
> 200 E. Randolph Drive
> Chicago, Illinois 60601
> Katherine Phillips
>
> -and-
>
> Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C.
> 919 North Market Street, 16th Floor
> Wilmington, Delaware 19801
> Attn:  David Carickhoff, Jr.

215.    If a claimant fails to file and serve a timely Response, the Debtors may present to

the Court an appropriate order reclassifying, reducing, or disallowing and expunging the claim,

as applicable, without further notice to the claimant or a hearing.

## REPLIES TO RESPONSES

216.    The Debtors may, at their option, file and serve a reply to a claimant's Response.

## WAIVER OF LOCAL RULE 3007-1 AND RESERVATION

217.    Pursuant to the Case Management Order for the Adjudication of Asbestos

Property Damage Claims Objections dated August 29, 2005 and the Gateway Objection Order

dated July 19, 2004, the Debtors have received permission to file all of these substantive

64

objections at one time in one Omnibus Objection. The Gateway Objection Order also permits the Debtors to file one further substantive objection to each of these claims.

218.   To the extent still applicable, however, the Debtors request waiver from Delaware Bankruptcy Local Rule 3007-1, which requires all "substantive objections" (as defined therein) to a particular proof of claim be asserted in a single omnibus objection and that any substantive objection not so asserted is waived.

219.   As recognized by the Court in the Gateway Objection Order, requiring the Debtors to bring all substantive objections in one fell swoop, is not the most effective way to address these claims. In addition, it could, among other things, prejudice, for example, the Debtors' ability to object to the dollar amount of claims, since the proofs of claim at issue contain no asserted dollar amounts. Moreover, this Objection *assumes* the information supplied by claimants is true and accurate. The Debtors should have the opportunity to make further objections if and when it is determined that this information is untrue and inaccurate. Finally, the vast majority of PD Claims in these cases are being prosecuted by a small, well-organized, and very sophisticated group of law firms. These are not the sort of claimants the Rule is intended to protect nor are the claims typical, run of the mill, contract claims. They are heavily contested, highly fact specific disputes.[18]

---

[18] Two additional grounds weigh in favor of this request: first, Delaware Local Rule 3007-1(f) provides that objections can be amended pursuant to Bankruptcy Rule 7015, which incorporates Rule 15 of the Federal Rules of Civil Procedure ("F.R.C.P.") 15 provides:

> A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served . . . Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

F.R.C.P. 15(a).

However, claims objections are contested matters and Rule 7015 only applies to adversary proceedings. Moreover, Rule 7015 is not included in the rules applicable to contested matters. *See* Fed.R.Bankr.P. 9014(c). Despite the

65

220.    Further, notwithstanding anything contained in this Objection or the attached exhibits, nothing herein shall be construed as a waiver of any rights that the Debtors may have (a) to bring avoidance actions under the applicable sections of the Bankruptcy Code, including, but not limited to, 11 U.S.C. § 547, against the holders of claims subject to this Objection; or (b) to exercise its rights of setoff against the holders of such claims relating to such avoidance actions.

## NOTICE

221.    The Debtors will serve copies of this Objection (with all Exhibits) on (1) the Office of the United States Trustee; (2) each of the official committees in these Chapter 11 Cases; and (3) any attorney that purports to represent the claimants on 100 or more PD Claims in these Chapter 11 Cases.

---

inapplicability of Rule 7015 to claims objections, Delaware Local Rule 3007-1 appears to have been drafted under the assumption (and with the intent) that claims objections can be amended pursuant to Rule 7015.

Bankruptcy Code § 558 provides an additional basis on which the Court may grant this request. It states, "[t]he estate shall have the benefit of any defense available to the debtor as against any entity other than the estate, including statutes of limitation, statutes of frauds, usury, and other personal defenses. A waiver of any such defense by the debtor after the commencement of the case does not bind the estate." The Debtors therefore request, in the alternative, that the Court determine § 558 preserves this right of the estate (or an entity standing in its shoes) and thus trumps Local Rule 3007-1(f).

This Court, in *In re Papercraft Corp.*, noted that § 558 provides that if a debtor attempts to waive a defense subsequent to filing for bankruptcy, the estate nevertheless enjoys the ability to assert the defense. *In re Papercraft Corp.*, 126 B.R. 926, 931 (Bankr. W.D. Pa. 1991) (JKF) (post-filing waiver of defense by debtor does not limit ability of debtor's estate to assert either setoff or recoupment defense). *See also E.Spire Communications, Inc. v. Morris Plumbing and Electric Co. (In re E.Spire Communications, Inc.)*, 293 B.R. 639, 648 (Bankr. D. Del. 2003) ("Courts have held that § 558 preserves to the Debtor defenses it would have had prepetition."); *In re PSA, Inc.*, 277 B.R. 51 (Bankr. D. Del. 2002) (holding that debtor, under § 558, was entitled to exercise state law right of setoff); *In re Ruthrauff, Inc.*, 2005 WL 1420765, at *7 (Bankr. W.D.Pa. 2005) ("Section 558 frequently comes into play when a debtor in bankruptcy objects to a claim filed in the case by a creditor. It applies to any pre-petition defenses a debtor in bankruptcy may have to a cause of action or a claim against it. Recoupment and set-off are included among such defenses. If successful, they effectively 'net out' what debtor and the creditor owe to one another."). This Court further noted:

> [T]he very purpose of § 558 is to preserve for the estate the benefit of any defense "available to the debtor as against an entity other than the estate····" 11 U.S.C. § 558. The estate has the benefit of such a defense even if Debtor, after the commencement of the case, waives it. The waiver is not binding upon the estate.

*In re Papercraft Corp.*, 126 B.R. at 931.

222.    The Debtors will serve copies of this Objection (along with a customized notice that (i) notifies the claimants of the Exhibit(s) where their PD Claim(s) appear(s) and (ii) instructs the claimants on how they can obtain copies of any (or all) of the Exhibits) on (1) any claimant that is not represented by counsel and (2) any counsel that purports to represent claimants on 99 or fewer PD Claims.

223.    The Debtors will serve copies of this Objection (without any of the Exhibits, but with instructions on how to obtain such exhibits) on all parties that have requested that they be served with all pleadings filed in these cases pursuant to Federal Rule of Bankruptcy Procedure 2002 (commonly known as the "2002 List").

## NO PREVIOUS REQUEST

224.    No previous request for the specific relief set forth herein has been made to this or any other court.

## CONCLUSION

For the reasons stated above, the Debtors respectfully request that the claims identified in Exhibits A-1 through H-1 be disallowed and expunged, except as otherwise expressly noted above.

67

Wilmington, Delaware
Dated: September 1, 2005

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Michelle H. Browdy
Janet S. Baer
Jonathan Friedland
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

*and*

PACHULSKI, STANG, ZIEHL, YOUNG, JONES
& WEINTRAUB, PC

Laura Davis Jones (#2436)
David W. Carickoff, Jr. (Bar #3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
(302) 652-4100

Co-Counsel for the Debtors and Debtors in Possession

68