IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **W. R. GRACE & CO., et al.** | ) | **Case No. 01-01139 (JKF)** |
| | ) | |
| Debtors. | ) | **(Jointly Administered)** |
| | ) | |
| | ) | **Re: Docket No. 9311** |
| | ) | **Hearing Date: October 31, 2005, 9:00 a.m.** |
| | ) | **Response Deadline: October 21, 2005** |

## DEBTORS' BRIEF IN SUPPORT OF THE DISALLOWANCE AND EXPUNGEMENT OF 1,900 IMPROPER CLAIMS FILED BY THE LAW FIRM SPEIGHTS & RUNYAN

Speights & Runyan ("Speights") signed and filed nearly 3,000 asbestos PD claims in this Chapter 11 case, *20 times* as many PD claims as were filed by any other law firm. The Speights claims account for nearly 75% of the roughly 4,000 PD claims filed in this bankruptcy and 85% of the 3,400 or so pending traditional PD claims. As set out at length in the Debtors' Thirteenth Omnibus Objection, Docket No. 9311, even the most limited discovery conducted by the Debtors over the summer turned up uncontroverted evidence establishing that Speights signed and filed numerous unauthorized proofs of claim in these cases on behalf of claimants Speights does not represent. *See, e.g.,* Exhibit 4 hereto. Since the Speights authority issues began to come to light in this matter, Speights has withdrawn more than 200 PD claims in this case and the Debtors learned that Speights has similarly withdrawn nearly 2,000 PD claims in other asbestos bankruptcies including 1,228 in *Federal Mogul*, 328 in *Owens Corning* and 131 in *U.S. Mineral*. *See* Thirteenth Omnibus, Dkt No. 9311, § I.I, p. 16-18; Dkt. No. 9517. There can be no explanation for such practices *except* that those claims were improper from the start.

As explained in more detail below, further examination into the Speights claims shows at every turn that these claims are ridden with problems, half-truths and misrepresentations. The

pending Thirteenth Omnibus Objection thus seeks disallowance and expungement of 2,937

claims filed by Speights. As ordered by this Court at the September 26, 2005 omnibus hearing,

the Debtors hereby file this brief in support of the disallowance and expungement of the first

batch of approximately 1,900 of those Speights claims which fall into one of three categories:

- (1) *Anderson Memorial out-of-state claims*:  Claims covering more than 650 buildings located outside of South Carolina for which Speights claims its sole authority for filing was a 1992, superceded putative class action complaint in the *Anderson Memorial Hospital* case; that pleading was rejected more than ten years ago when the *Anderson Memorial* court struck all out-of-state claims from the complaint;

- (2) *Anderson Memorial in-state claims*:  Approximately 50 buildings located within South Carolina for which Speights claims its authority for filing bankruptcy proofs of claim were 2001-era orders entered by the state court at Speights' request in direct violation of this Court's automatic stay, purporting to certify an opt-out class of South Carolina building owners to whom notice and an opportunity to opt out were never given;

- (3) *California conspiracy claims*:  Nearly 1,200 California claims for which Speights admits it has no Grace product identification, filed under a theory of "Conspiracy/ Concert of Action" in contravention of California law which expressly states that plaintiffs cannot recover under these theories in asbestos cases without product identification. *Chavers v. Gatke Corp.*, 132 Cal.Rptr.2d 198 (Cal. App. 2003).

The lists of potentially affected claims are attached hereto as Exhibits 1, 2 and 3 respectively.[1]

## ARGUMENT

### I.   Speights Had No Authority To File *Anderson Memorial* Out-Of-State Claims

For the claims identified on Exhibit 1, Speights identifies the original complaint filed by

Speights in *Anderson Memorial Hospital v. W.R. Grace*, No. 92-CP-25-279 (South Carolina Ct.

Common Pleas, Dec. 23, 1992) as the sole basis for Speights' authority to sign and file hundreds

---

[1] Speights and the Debtors largely agree as to which of the 1900 claims fall into which of the 3 categories, but there are some disputes based on discrepancies between Speights' December 2004 Verified 2019 Statement and Speights' September 2005 lists of the firms' claimed authority for filing claims.  For this Court's ease of reference, the Debtors have attached the September 2005 lists of claims that Speights contends fall into the 3 categories at issue.  Between now and the October 31, 2005 hearing, the Debtors will attempt to work out disputes as to claim categories with the Speights firm.  To the extent disputes remain, the Debtors will identify them by October 31 as among the remaining Speights issues which need to be addressed in future hearings.

of claims for buildings located outside of South Carolina. Ex. 1; *see also* Speights' Verified

2019 Statement. The 1992 *Anderson Memorial* original complaint, filed in Speights' home state

of South Carolina, sought certification of a nationwide class of building owners to bring asbestos

property damage claims in state court. Ex. 6, Complaint, *Anderson Memorial* (December 23,

1992). Speights has admitted it had no express authority from any of the out-of-state claimants

identified on Exhibit 1 to file claims in this bankruptcy, and indeed confesses that it could not

even locate building owners for hundreds of these claims. *See* Ex. 1; Docket No. 9186 at p. 8.

Speights *never sought authority* from this Court to file the *Anderson Memorial* out-of-

state claims on a class-wide basis or as a class representative; Speights simply submitted

hundreds of individual claim forms in this case on behalf of building owners Speights had never

met. These Speights claims were signed and filed by Daniel Speights or another Speights

attorney under the penalties of perjury, yet contained responses that necessarily were fabricated

by the Speights firm. *Compare, e.g.*, Ex. 4 (AMA affidavit) *with* Ex. 5 (AMA claim form

submitted by Speights); *see also* Thirteenth Omnibus Objection, § I.B at p. 5 (describing the

generic non-answers replete throughout thousands of Speights claims, such as "multiple

renovations over various years," "various years, numerous projects," "various years, numerous

samples"); Fifteenth Omnibus Objection, Docket No. 9315, § II.F.2 at p. 49 (all but a few

Speights-filed claims identify "2003" as the year building owners supposedly learned of asbestos

on their property, a date contradicted by, among other things, Speights' contention that hundreds

of these cases are part of a 1992 *Anderson Memorial* class).

It was only through Speights' Verified 2019 statement filed in December 2004 that the

Debtors first learned that Speights was purporting to represent hundreds of individual building

owners on the basis of an outdated class action complaint that had been rejected more than a

3

decade earlier. The notion that the *Anderson Memorial* 1992 original complaint provided

Speights with authority to sign and file these individual claims is demonstrably false.

**A.     Speights Failed To Disclose That The *Anderson Memorial* Court Struck All Out-Of State Claims From That Case More Than 10 Years Ago**

Speights' Verified 2019 Statement omits the crucial fact that in 1994, nationwide class

certification *was denied* in *Anderson Memorial* and out of state claims were *stricken.*

Specifically, the *Anderson Memorial* court held that the out-of-state claims of non-residents were

prohibited by South Carolina's door closing statute, holding "this court grants the defendants'

motion and *strikes from plaintiff's First Amended Complaint claims of non-residents where the*

*claims do not arise in South Carolina or whose property at issue is not situated in South*

*Carolina."* Ex. 7, Order, *Anderson Memorial* (Aug. 8, 1994) (emphasis added).

Speights' 2019 Statement also ignores the fact that in 1996 the *Anderson Memorial* court

denied reconsideration and adopted the August 1994 Order again in full. Ex. 8, Order, *Anderson*

*Memorial* (May 28, 1996).

**B.     Speights Failed To Disclose That The *Anderson Memorial* Complaint Cited In Its Verified 2019 Statement Is No Longer Operative**

Furthermore, in 1996 Speights filed a second amended complaint in *Anderson Memorial*

limited to buildings in South Carolina. It is this *second amended complaint* -- limited to South

Carolina buildings -- that is operative in the *Anderson Memorial* case, not the outdated, rejected

1992 original complaint attached to Speights' Verified 2019 Statement. Ex. 9, Second Amended

Complaint, *Anderson Memorial* (Sept. 6, 1996).

**C.     Speights Failed To Disclose That The South Carolina Supreme Court Has Confirmed That South Carolina's Door-Closing Statute Bars These Claims**

In addition, in a 2003 decision squarely on point, the South Carolina Supreme Court

confirmed that South Carolina's door-closing statute prohibits nonresidents from participating in

4

a class action against a foreign corporation. *Farmer v. Monsanto Corp.*, 579 S.E.2d 325, 328 (South Carolina 2003), attached as Exhibit 14. The Speights firm plainly knows of that decision, since Speights served as counsel of record for respondents in that case. *Id* at 326.

**D.    Speights' Own Conduct Confirms The Firm Knew That The *Anderson Memorial* Complaint Did Not Provide Authority To File Claims**

The Debtors' limited discovery in this case established that Speights did contact certain out-of-state building owners to seek permission to file claims on their behalf in these Chapter 11 cases. The American Medical Association, for example, testified that Speights asked for permission to represent it in these bankruptcy cases in 2002 or 2003 and the AMA said no.[2] Ex. 4. A recent Speights pleading also confirms that the firm at some point attempted to contact the supposed *Anderson* claimants to request authority to file those claims. *E.g.* Docket No. 9186 at p. 8 (category f, identifying claimants who "have not responded to requests for express authorization"). Speights' attempt to solicit permission constitutes an admission that Speights knew it did *not* have authority to file claims for non-South Carolina building owners based solely on the rejected *Anderson Memorial* original complaint.

Speights' withdrawal of purported *Anderson Memorial* claims in this bankruptcy further belies any contention that *Anderson Memorial* gave it authority to file claims as a class representative. For example, since June 2005, Speights has withdrawn 46 out-of-state claims identified as having been filed on the basis of *Anderson Memorial*. Ex. 15. How can Speights claim both to have a fiduciary obligation to pursue claims for the *Anderson Memorial* putative class and at the same time withdraw claims supposedly filed on behalf of those class members?

---

[2] Although Speights has since withdrawn the improper AMA claim, through at least July 2005 Speights was still representing to this Court that it represented the AMA based on *Anderson Memorial. E.g.* Docket No. 8947.

Plainly, Speights had no authority from a ten-year-old rejected putative class action complaint to sign and file hundreds of claims on behalf of individual claimants. All of the claims identified on Exhibit 1 should be disallowed and expunged.

## II.    Speights Had No Authority To File *Anderson Memorial* In-State Claims

As supposed authority for filing the claims for the South Carolina buildings identified on Exhibit 2, Speights' Verified 2019 Statement cites to three 2001 *Anderson Memorial* orders (February 2001, June 2001 and July 2001) purporting to certify a class of South Carolina property owners to pursue asbestos property damage claims in state court. As explained below, these 2001 *Anderson Memorial* orders, attached as Exhibits 11, 12, and 13, are void and provide no authority for Speights to file bankruptcy claims on behalf of an *ultra vires* "class." To the contrary, these Orders, and the facts surrounding their entry, reflect repeated attempts by Speights to manipulate the South Carolina Court and this Court expressly for the purpose of avoiding this Court's automatic stay.

### A.    The February 2001 Class Certification Order Was A Conditional, Ex Parte Order Entered At Speights' Request To Try To Avoid An Automatic Stay

As explained below, the February 2001 "emergency" *ex parte* conditional class certification order entered by the state court at Speights' request on the eve of Grace's bankruptcy filing was an improper attempt to avoid an anticipated automatic stay from the Bankruptcy Court. After nationwide class certification was denied in *Anderson Memorial*, Speights filed a second amended complaint in 1996, limiting the purported class to South Carolina buildings. Ex. 9. By early 2001, however, nearly 10 years after the *Anderson Memorial* action was initially filed and shortly before the Debtors filed these Chapter 11 cases, no class had been certified, not even of the narrower class of South Carolina building owners.

6

On February 8, 2001, Speights filed an "Emergency Petition For A Rule To Show Cause Why A Conditional Class Should Not Be Certified Against W.R. Grace & Co. And W.R. Grace & Co.-Conn." As the basis for this "emergency" action in a ten year old case, Speights wrote that Grace disclosed last week that it was considering filing for bankruptcy protection, and that "[o]nce Grace files for bankruptcy, this Court may be deprived of jurisdiction to do anything against Grace -- including issuing a certification order on the merits." Ex. 10, Emergency Petition at 1-2, *Anderson Memorial* (Feb. 8, 2001).

In the accompanying Verification to the February 8, 2001 Emergency Petition to Show Cause, Daniel Speights testified: "The South Carolina building owners in Anderson's class will be severely prejudiced if Grace files for bankruptcy before the Court can rule on the merits of certification....*Absent conditional certification prior to bankruptcy filing, a bankruptcy court may not grant the South Carolina building owners the preferential class treatment this Court may determine they deserve.*" *Id.* at Ex. A, p. 3.

The next day, on February 9, 2001, less than two months before these Chapter 11 cases were filed, the South Carolina court granted Speights' petition for emergency relief *ex parte*, conditionally certifying the *Anderson Memorial* South Carolina class. Exhibit 11, Order, *Anderson Memorial* (Feb. 9, 2001).

This Court should not accede to Speights' attempted February 2001 manipulation of the South Carolina court *and this Court* by holding that the conditional February 2001 Order provided authority to Speights to file these claims. As Speights testified in his Verification to the February 8, 2001 Emergency Petition to Show Cause, the express purpose of his motion was to give preferential treatment to the prospective members of his purported class. This aim directly

7

contradicts two fundamental goals of the bankruptcy code, equality amongst creditors and discouraging races to the courthouse. *See, e.g., Union Bank v. Wolas*, 502 U.S. 151, 161 (1991).

### B.    The Summer 2001 Class Certification Orders Violate The Automatic Stay As To Grace And Create No Cognizable Class

And it gets worse. The *conditional* February 2001 Order cited as Speights' basis of authority in Speights' Verified 2019 Statement has been *superseded* by the two other 2001 orders attached to the 2019 Statement, *both* of which *violate Grace's automatic stay*. Ex. 12 and 13. After the Debtors' Chapter 11 cases were filed in April 2001, the *Anderson Memorial* court was provided notice of the automatic stay. The South Carolina court did not enter the final order certifying *Anderson Memorial* as a class of South Carolina building owners until summer 2001, however. Ex. 13, Order, *Anderson Memorial* (July 5, 2001); *see also* Ex. 12 (June 2001 Order).

Orders entered in violation of a debtor's automatic stay are void *ab initio* and have no legal effect. *Raymark Indus. v. Lai*, 973 F.2d 1125 (3d Cir. 1992); *Maritime Elec. v. United Jersey Bank*, 959 F.2d 1194, 1206 (3d Cir. 1991); *In re Ward*, 837 F.2d 124, 126 (3d Cir. 1988). Because the final class certification orders were not entered until summer 2001, they are void as to Grace and cannot give Speights any authority to file claims for supposed "class" members in this bankruptcy.

### C.    Speights Has Now Admitted Violating This Court's Automatic Stay By Drafting the July 2001 Order

Even more disturbing, Daniel Speights admitted in open court on August 29, 2005 that it was he who personally prepared the final July 2001 order at the South Carolina court's request, in violation of the automatic stay. *See, e.g.* 8/29/05 Tr. at 58; May 7, 2001 letter to Speights, Ex. 18. As a counsel who has repeatedly touted his experience in asbestos bankruptcy cases to both this Court and the *Anderson Memorial* court, Mr. Speights certainly knew this action violated the law as to Grace. Actions by counsel in knowing violation of the automatic stay constitute

8

contempt of court. *See, e.g., In re Grosse*, 84 B.R. 377 (E.D. Pa. 1988); *see also* 11 U.S.C. § 362(h) ("An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."); *In re Atlantic Business*, 901 F.2d 325 (3d Cir. 1990). In point of fact, Speights had previously been the subject of contempt proceedings for attempting to pursue relief in the *Anderson Memorial* court in violation of a federal court order, putting him on heightened notice of the potential impact of taking actions in that case in contravention to the law. *See, e.g., Dana v. Fireman's Fund Ins.*, 1997 WL 135595 (N.D. Ohio Mar. 11, 1997).

Moreover, the May 7, 2001 letter from the Court cited by Speights expressly states that "The Order should specifically state that the Order affects only the three remaining Defendants, due to the stay as to W.R. Grace." Ex. 18 at 1. In fact, that May 2001 letter is replete with references to the importance of not violating the automatic stay as to Grace. *E.g.* Ex. 18 at 1 ("I am not sure but that my Order may run afoul of the stay if I make a finding and ruling pertaining solely to a Grace-raised issue"); *id.* at 2 ("the Court is reluctant to in detail address the specific issues raised and pursued prior to Grace's bankruptcy."). And the July 2001 Order itself recognizes that "On March 30, 2001, Grace filed for bankruptcy which automatically stayed all further proceedings in this case against Grace." Ex. 13 at 5.

Thus, it is only the Speights firm, arguing here and in its Verified 2019 Statement, that the 2001 Orders apply to claims against Grace in violation of the automatic stay; the South Carolina court has itself acknowledged that they do *not*. This leaves two possibilities: Either Mr. Speights violated this Court's automatic stay in summer 2001 by drafting the *Anderson Memorial* class certification Order to apply to Grace in violation of the stay, or else Speights has

9

been misleading the Debtors and this Court by asserting that Speights had authority to file claims against the Debtors under the 2001 Order when the firm knew the Order did not apply to Grace.

D.    **Speights Also Tried To Prevent This Court From Addressing The *Anderson Memorial* Class Certification Issue**

In addition, rather than asking this Court to decide whether or not a cognizable class of South Carolina building owners could pursue property damage claims in this bankruptcy under *Anderson Memorial*, the Speights firm simply took it upon itself to file numerous individual claims by the Debtors' bar date. It was only through the December 2004 Verified 2019 Statement that Speights even disclosed that these individual claims were supposedly filed on the basis of the ultra vires 2001-era orders from the South Carolina court. Certainly Speights knew from the experience of the ZAI claimants in this bankruptcy that there were procedures that could be followed to ask this Court's permission to pursue class relief. *Cf. In re: American Reserve Corp.*, 840 F.2d 487 (7th Cir. 1988).

Had this Court been asked to consider whether the South Carolina *Anderson* claimants could seek class relief, it would certainly have had the opportunity to weigh, among other things, the fact that the July 2001 order itself recognizes that the *Anderson Memorial* class would be an opt-out class, but *no notice or opportunity to opt out was ever provided* to supposed class members. *Cf.* Ex. 13 at 6, n.8 ("Plaintiff seeks to certify an *opt-out class action* on behalf of itself and a class of other South Carolina property owners whose buildings contain or previously contained [asbestos containing surfacing materials]. *Opt-out means that class members will have a reasonable opportunity to exclude themselves from the class after Court-approved notice has been provided.*"); *Id* at 20 ("Pursuant to Rule 23(d)(2), SCRCP, within thirty (30) days of the entry of this Order the Parties shall submit their proposals regarding the timing and content of

10

class notice."). Because no notice or opt-out opportunity was provided, there was never consent

for participation in the *Anderson Memorial* "class" by any "class member."[3]

**E.      Speights' Withdrawal Of *Anderson Memorial* Claims Is An Admission That The Firm Had No Authority To File Claims On A Class Basis**

Finally, Speights' withdrawal since June 2005 of individual claims purportedly filed

based on *Anderson Memorial* contradicts Speights' contention that the 2001 Orders gave the firm

authority to file those claims in the first place. *See, e.g.*, Ex. 16 (withdrawn South Carolina

claims purportedly filed on the authority of *Anderson Memorial*).

In short, all claims identified on Exhibit 2, signed and filed by the Speights firm, were

unauthorized and should be disallowed and expunged.

**III.    California Does Not Permit Recovery For Conspiracy Claims Absent Product Identification**

Speights has admitted that for the nearly 1,200 California claims identified on Exhibit 3,

Speights has no Grace product identification in support of those claims and is instead attempting

to pursue those claims under theories of "Conspiracy/Concert of Action."  Contrary to Speights'

contention, California law expressly holds that plaintiffs cannot recover under these theories in

asbestos cases without product identification. *Chavers v. Gatke Corp.*, 132 Cal.Rptr.2d 198 (Cal.

App. 2003), attached as Exhibit 17.

---

[3]  *Cf. In re Sacred Heart Hospital*, 177 B.R. 16 (Bankr. E.D. Penn. 1995) ("it can be convincingly argued that it would be wasteful for the bankruptcy court, in its claims process, to either *replicate* any notice procedures already utilized in the nonbankruptcy court class-action process, or for the bankruptcy court to undertake to *provide for different notices* which could very well confuse unnamed class members to their unfair prejudice."). Further, it is well established that "consent to being a member of a class in one piece of litigation is not tantamount to a blanket consent to any litigation the class counsel may wish to pursue," including filing bankruptcy proofs of claim in a Chapter 11 case. *E.g. In re Baldwin-United Corp.*, 52 B.R. 146, 148-49 (Bankr. Ohio 1985) ("We have not found, however, any persuasive authority that would allow, under the guise of 'class claims' those claims filed on behalf of individuals who failed to file their own claims.  The weight of authority, in fact, is to the contrary"); *Reid v. White Motor*, 886 F.2d 1462, 1471-72 (6th Cir. 1989) (bankruptcy court "well within its discretion to dismiss Reid's class proof of claim since he has failed to elucidate his authority as agent for the [White Motor Corp.] former employees"); *In re Ross* 37 B.R. 656, 658 (9th Cir. 1984).

DOCS_DE:111953.1

*First*, California law requires that a plaintiff alleging an asbestos-related injury must demonstrate exposure to a defendant's asbestos-containing product. *Rutherford v. Owens Illinois*, 16 Cal.4[th] 953 (1997). In *Rutherford*, the California Supreme Court rejected jury instructions that shifted the burden of proof on causation to a defendant. In doing so, the Court affirmed that asbestos claims are governed by "basic tort principles" which require a plaintiff to prove that its alleged injury was caused by a defendant's asbestos-containing product. 16 Cal.4[th] at 968. *Rutherford* thus establishes product identification as a threshold for asserting an asbestos-related claim in California.

*Second*, California does not recognize conspiracy as an independent tort. *See Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 459 (Cal. 1994) ("[c]onspiracy is not an independent tort; it cannot create a duty or abrogate an immunity. It allows tort recovery only against a party who already owes the duty and is not immune from liability based on applicable substantive tort law principles."). Instead, California requires the claimant to prove that it was actually harmed by the defendant's product.

In the wake of *Applied Equipment*, the California Court of Appeal expressly held that an asbestos claimant cannot recover from an asbestos manufacturer *unless and until* that claimant has demonstrated exposure to the specific defendant's product. Ex. 17, *Chavers v. Gatke Corp.*, 132 Cal.Rptr.2d 198 (Cal. App. 2003). In *Gatke*, a former automobile and truck mechanic and his spouse sued various manufacturers of friction brake products that allegedly contained asbestos. The plaintiffs in *Gatke* could not establish actual exposure to any of the named defendants' products. The California Court held:

> [I]n California a civil conspiracy to commit tortuous acts can, as a matter
> of law, *only* be formed by parties who are already under a duty to the
> plaintiff, the breach of which will support a cause of action against them --
> individually and not as conspirators -- in tort. Restated, in cases where the

12

> plaintiff alleges the existence of a civil conspiracy among the defendants
> to commit tortious acts, the source of the substantive liability arises out of
> a preexisting legal duty and its breach; *liability cannot arise out of*
> *participation in the conspiracy alone . . . A duty, however, independent of*
> *the conspiracy itself, must exist in order for substantive liability to attach.*
> That proposition, we conclude, applies in this case and is dispositive of the
> point. For on this record, *it is clear respondent was under no duty to*
> *Mr. Chavers for the simple reason that plaintiff could not show he was*
> *exposed to any of Gatke's products.*

*Id* at 203 (emphasis added; internal citations omitted).

The Court of Appeal explained its reasoning as follows:

> Resolution of this issue, we decide, is straightforward. The following
> statement appears in our high court's *Applied Equipment* opinion:
> "Conspiracy is not an independent tort; it cannot create a duty or abrogate
> an immunity. It allows tort recovery only against a party who already
> owes the duty and is not immune from liability based on applicable
> substantive tort law principles." The unstated premise for this conclusion,
> or perhaps a consequence of it, is that an allegation of conspiracy itself
> does not lay a predicate for substantive civil liability. The Supreme
> Court's *Applied Equipment* opinion plainly holds that before one can be
> held liable for civil conspiracy, he must be capable of being *individually*
> *liable for the underlying wrong as a matter of substantive tort law.* And
> that requirement, of course, means he must have owed a legal duty of care
> to the plaintiff, one that was breached to the latter's injury.

*Id* at 201 (emphasis in original; internal citations omitted).

Since the California conspiracy claims fail to provide Grace product identification, they

fail to establish that Grace owed any of the claimants any legal duty and, therefore, the claims on

Exhibit 3 should be disallowed and expunged as a matter of law.

*Third*, *Gatke* and numerous other cases have similarly held that a defendant's alleged

involvement in the asbestos industry does not give rise to liability for "concert of action." *E.g.*

*id.* at 205-06. In upholding the trial court's refusal to give a jury instruction concerning "concert

of action," the California Court of Appeal stated as follows:

> Applying a concert of action theory of collective liability in such industry-
> wide circumstances 'would expand the [concert of action] doctrine far
> beyond its intended scope and would render virtually any manufacturer

13

> liable for the defective products of an entire industry, even if it could be
> demonstrated that the product which caused the injury was not made by
> the defendant.'

*Id., quoting Sindell v. Abbott Laboratories*, 163 Cal.Rptr. 132 (Cal. 1980); *see also In re*

*Asbestos Schools Litigation*, 46 F.3d 1284, 1286-1288 (3d. Cir. 1994).

The decision in *Gatke* is by no means novel. That decision reflects well-settled law in

California and can be traced back to the California Supreme Court's seminal decision in *Sindell*

*v. Abbott Laboratories*, 163 Cal.Rptr. 132 (Cal. 1980). In *Sindell*, the plaintiffs - a class of

individuals claiming they were harmed as fetuses because their respective mothers took DES (a

drug administered to pregnant women) - sued various DES manufacturers. The plaintiffs could

not determine which defendant made the specific DES that was administered to their respective

mothers and, instead, alleged various joint liability causes of action, including "concert of

action." With respect to "concert of action," the plaintiffs alleged that the defendants relied upon

one another's product testing and promotion methods and had acted in concert to market a

defective product without warnings. The Supreme Court held that the plaintiffs' allegations did

not state a claim for concert of action because "such conduct describes a common practice in

industry" and cannot, as a matter of law, give rise to an action for concert of action. *Id.* at 140-

41.

In the wake of *Sindell*, California courts have consistently held that parallel industry

actions cannot give rise to liability for "concert of action." *See, e.g. Sheffield v. Eli Lilly and*

*Co.*, 192 Cal.Rptr. 870, 888 (Cal. App. 1983); *Cadlo v. Owens-Illinois, Inc.*, 23 Cal.Rptr.3d 1, 6-

8 (Cal. App. 2004) (sustaining demurrer to concert of action count and affirming the requirement

of product identification in a claim for asbestos-related injuries); *Mullen v. Armstrong World*

*Industries, Inc.*, 246 Cal.Rptr. 32 (Cal. App. Dist. 1 1988) (affirming dismissal of complaint

alleging negligence, strict liability, nuisance, breach of implied warranty, civil conspiracy,

14

"failure to warn," and "concert of action" brought by the owners of homes allegedly containing asbestos, because the plaintiffs could not identify which defendant made particular asbestos-containing products.)

In sum, all claims identified on Exhibit 3, signed and filed by the Speights firm, are not recoverable under California law.

## CONCLUSION

For the reasons stated above, the Debtors respectfully request that all Speights claims identified in Exhibits 1, 2, and 3 be disallowed and expunged.

Wilmington, Delaware
Dated: September 30, 2005

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Michelle H. Browdy
Janet S. Baer
Samuel L. Blatnick
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

*And*

PACHULSKI, STANG, ZIEHL, YOUNG, JONES
& WEINTRAUB, PC

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
(302) 652-4100

Co-Counsel for the Debtors and Debtors in Possession

15