Exhibit "C"

U.S. Bankruptcy Court                FINAL                  Dr. Joseph Gitlin
In Re: Owens Corning                                        December 17, 2004

Page 3

1    ATTORNEYS FOR CERTAIN BONDHOLDERS AND THE
     TRADES:
2
             Mark Weldon, Esquire
3
             ANDERSON KILL & OLICK, P.C.
4            1251 Avenue of the Americas
             New York, NY   10020
5
             PHONE:   212-278-1201
6
7
8
9    ATTORNEYS FOR THE FUTURE CLAIMANTS
     REPRESENTATIVES (Via Telephone):
10
             Michael A. Lynn, Esquire
11
             KAYE SCHOLER, LLP
12           425 Park Avenue
             New York, NY   60602-4207
13
             PHONE:   312-372-1121
14
15
16
17
     ATTORNEYS FOR CERTAIN BONDHOLDERS (Via
18   Telephone):
19           Heidi Balk, Esquire
20           STROOCK, STROOCK & LAVAN, LLP
             180 Maiden Lane
21           New York, NY   10038
22           PHONE:   212-806-6525
23
24
25   ALSO PRESENT:   David B. Smith, Paralegal
                     Caplin & Drysdale

U.S. Bankruptcy Court               FINAL                Dr. Joseph Gitlin
In Re: Owens Corning                                     December 17, 2004

Page 9

1    looks like -- one, two, three, four, five,

2    six -- seven documents; is that correct,

3    Dr. Gitlin?

4         A    Let me say yes.  I didn't count

5    them, but...

6         Q    Let me just go through these.

7         A    Right.

8         Q    One of these is the article that was

9    published in the "Journal of Academic

10   Radiology"; correct?

11        A    Right.  That's what I call "the

12   paper," yes.

13        Q    I'll call this "the Gitlin article,"

14   if that's all right with you.

15        A    That's fine.

16        Q    Then you have a bound document,

17   which has a table of contents and five tabs; is

18   that correct?

19        A    Yes.

20        Q    And behind Tab 1 is your expert

21   report in the Owens Corning case; is that right?

22        A    Yes.

23        Q    Tab 2 is your supplemental report in

24   the Owens Corning case; is that right?

25        A    Yes.

U.S. Bankruptcy Court                  FINAL                  Dr. Joseph Gitlin
In Re: Owens Corning                                         December 17, 2004

Page 10

1        Q        Tab 3 is an excerpt from an expert

2    witness report of Dr. Mark Peterson, pages 52 to

3    54 from his expert witness report; is that

4    correct?

5        A        Correct.

6        Q        Tab 4 is a report from a Dr. Laura

7    Welch November 2004 with some attachments; is

8    that correct?

9        A        Right.

10       Q        And Exhibit 5 is your December 1998

11   expert witness report that you prepared when you

12   were working as an expert for Owens Corning; is

13   that correct?

14       A        I don't think I was working for

15   Owens Corning.

16       Q        Okay.  You submitted an expert

17   report in December 1998 in some litigation;

18   correct?

19       A        Yes.

20       Q        Do you know what the litigation was

21   about?

22       A        No.  The principal contact was an

23   attorney named "Dwight Tarwater," and I was --

24   since you used the term -- "blinded" to all of

25   the legal aspects of the case.

U.S. Bankruptcy Court    FINAL    Dr. Joseph Gitlin
In Re: Owens Corning         December 17, 2004

Page 11

1  Q  So you don't know, one way or the

2 other, what party requested you to prepare this

3 report; is that right?

4  A  Correct.  I do not know.

5      Well, for the first time --

6 it's surprising that it -- you would say it is

7 Owens Corning.

8  Q  Other than what I might have said

9 two minutes ago, have you come to learn which

10 party requested that you prepare this report in

11 1998?

12  A  No.  Only the contact with the

13 attorney, Dwight Tarwater.

14  Q  Okay.  Now, you have bound these

15 five things together into one little booklet;

16 and I ask first:

17      Did you select these materials

18 and put them into a booklet?

19      Is that something you did, or

20 did somebody do that for you?

21  A  Somebody did it for me, and I

22 thought these would be the pertinent matters for

23 today's deposition.

24  Q  They certainly will.  I'll use

25 different copies of them, so you can keep that.

U.S. Bankruptcy Court                    FINAL                    Dr. Joseph Gitlin
In Re: Owens Corning                                              December 17, 2004

Page 30

```
 1        A      Yes.

 2        Q      And have you heard, also, that it

 3  had to do -- and that the Pitts litigation that

 4  this report was submitted in had to do with

 5  claims where asbestos defendants were suing a

 6  medical testing company?

 7        A      Yes.  I was told that by the

 8  attorney that had been coordinating the most

 9  recent effort, not the original '98 effort.

10        Q      Was that Dwight Setter that told you

11  that?

12        A      "Dave Setter."

13        Q      "Dave Setter," excuse me.

14        A      "Dwight Tarwater" --

15        Q      And "Dave Setter"?

16        A      -- was the first group, the '98

17  group.

18                    And "Dave Setter" has been the

19  coordinator of our activities since 2000.

20        Q      Okay.  And Mr. Setter has told you

21  that the 1998 report was submitted as part of

22  litigation by asbestos defendants against a

23  medical testing facility called the "Pitts

24  litigation"; is that right?

25        A      Yes.
```

Page 31

1        Q      And you understood that your expert

2     report in the Pitts litigation -- or you now

3     understand that your expert report in the Pitts

4     litigation was submitted by the plaintiff in the

5     Pitts litigation, which is one of the asbestos

6     defendants; is that right?

7        A      I'm a little confused about --

8        Q      Well, there are two sides to the

9     Pitts litigation:

10                     There is the asbestos

11    defendant company, and there is the medical

12    testing company --

13       A      Yes.

14       Q      -- that the asbestos defendant

15    company is suing.

16                     Do you understand that?

17       A      Okay.  Yes.

18       Q      Do you understand which side

19    submitted your expert report on its behalf?

20       A      I did not go into that level of

21    detail with Dave Setter when he said my expert

22    report was extremely valuable in that case, and

23    I honestly don't know who was on which side.

24       Q      So you don't know if Mr. Setter

25    represented the defendant asbestos company or

Page 32

1    the medical testing company that was getting

2    sued?

3         A      Correct.

4         Q      Have you since come to learn which

5    side he represented in that litigation?

6         A      No.

7         Q      Okay.  And then I'll have some

8    questions for you about your 1998 study, but let

9    me follow up with the chronology.

10                    Then in 2000 you were asked to

11   conduct a second series of studies; is that

12   right?

13        A      Yes.

14        Q      Okay.  And is it correct that the

15   2000 study is what you ultimately wrote up and

16   published in the Gitlin article?

17        A      Yes.

18                    I would like to make a

19   distinction for the record:

20                    After having gone through the

21   '98 exercise and becoming aware of the scope of

22   the problem, without knowing who the players

23   were -- when Dave Setter approached both

24   Mr. Linton and myself to do a similar study in

25   2000, I suggested that from the beginning it be

U.S. Bankruptcy Court        **FINAL**        **Dr. Joseph Gitlin**
In Re:  Owens Corning                                 **December 17, 2004**

Page 33

1   understood that I strongly recommended that we

2   be given access to the data for an academic

3   publication, which I thought would be very

4   important to the state of the art, and that it

5   not be in any way associated with the legal case

6   nor any of the funds associated with support for

7   the work done on the legal side -- that I wanted

8   to do this as a researcher in a scientific

9   investigation.

10                 So I want to be sure you

11   separate that activity, as is phrased here, the

12   studies and the design and gathering of the

13   data, which was supported, and then the work to

14   put it all together after gaining permission to

15   use the data anonymously to produce tables and

16   analyses for publication.

17       Q     Now, your deposition was taken in

18   2002 as part of West Virginia asbestos

19   litigation; is that right?

20       A     The deposition on the '98?  No.

21       Q     Not on the '98.

22       A     Okay.

23       Q     You refer in Exhibit B to cases in

24   which you've testified previously.  Do you see

25   that?

Page 37

1   chest X-rays from separate individuals; is that

2   right?

3          A      Right.

4          Q      Were any of the 319 X-rays that were

5   part of the work in your 1998 study used in any

6   way in either the work that you did in 2000 or

7   as part of the basis for your 2004 journal

8   article?

9          A      I don't know.

10                We anonymized both the films

11  and the reports.  So in terms of the computer

12  processing, I didn't even think of checking it;

13  and even if I had thought of it, we wouldn't

14  have been able to tell.

15         Q      Okay.  Let me see if I understand

16  this:

17                The 2004 journal article

18  involves a group of 492 individual claimants for

19  whom you and your consultants had X-rays; is

20  that right?

21         A      Right.

22         Q      And we'll get to how those claimants

23  and the X-rays were selected in a minute.

24                Do you know one way or the

25  other whether -- of the 492 claimants that were

Page 141

1                         "AD" is also known as the

2    Michigan group.

3                         "AE," "AF," "AG" were West

4    Virginia -- almost entirely, I guess.

5         Q    Okay.  Let's go --

6         A    Yes.

7         Q    -- through this group by group.

8    It's probably going to be simpler and quicker.

9         A    Okay.

10        Q    "Group AA" is known as the

11   "Mississippi Holder group"; right?

12        A    Let me catch up with you.

13                    (Witness perusing.)

14        A    Yes.

15        Q    All right.  "This group contained 30

16   plaintiffs' films and B-reads"; is that right?

17        A    Yes.

18        Q    You write in the next sentence:

19                    "Initially, the films and

20   B-reads were sent by local Mississippi counsel."

21                    Who were you referring to in

22   the phrase "local Mississippi counsel"?

23        A    I don't know.

24        Q    Okay.

25        A    The arrangements in this case were

Page 142

1    made by Dave Setter; and the way this is

2    written, we did receive, in many cases, boxes

3    directly from the providers of those films.

4                    So that is the way I interpret

5    that sentence right now.

6        Q      Okay.  So is it correct that

7    Mr. Setter was the lawyer who arranged for all

8    of the X-rays that were sent to Mr. Linton and

9    you to be sent?

10       A      In these seven groups, yes.

11       Q      Yes.  And these seven groups

12   comprised the 492 cases or X-rays that your six

13   consultant B-readers reviewed; right?

14       A      Well, more than that; but there

15   ended up being 492 suitable for analysis and

16   publication, yes.

17       Q      Okay.  And Mr. Setter was the lawyer

18   responsible for arranging for the X-rays that

19   got to be delivered to you and Mr. Linton; is

20   that right?

21       A      And the reports.

22       Q      And the reports.

23       A      Often separately, but both were

24   essential.

25       Q      Okay.  For the Mississippi Holder

U.S. Bankruptcy Court        FINAL        Dr. Joseph Gitlin
In Re: Owens Corning                              December 17, 2004

Page 143

1   group, you got 30 plaintiffs' films and B-reads;

2   right?

3        A     Right.

4        Q     This talks about a case called the

5   "Estate of Charles Holder, et al. v.

6   Westinghouse Electric Company..." in Jones

7   County, Mississippi.

8                Do you know how many X-rays

9   Mr. Setter or the lawyers that were working with

10  him had access to in addition to the 30 films

11  that they sent to you?

12       A     No; but I've assumed all along

13  that -- and the statement that was made here,

14  that nobody made any cuts -- I'm sorry, I can't

15  find it now in the paragraph -- oh, there it is,

16  the last sentence: We were informed that the

17  attorneys made no cut of the films produced or

18  the -- "forwarded them, 'as is,' to Mr. Linton"

19  for reading.

20       Q     Well, do you understand one way or

21  the other as to whether Mr. Setter or the other

22  attorneys working with him had the ability to

23  obtain X-rays for more than 30 plaintiffs

24  involved in the Mississippi litigation?

25       A     I have no knowledge of that.

Page 144

1          Q     So, they could have.  You just don't

2    know?

3          A     Right.

4          Q     And you don't know, if they had

5    access to more X-rays, what selection criteria

6    they used to send the 30 films to you?

7          A     That's correct.

8                     But I do know that Dave Setter

9    made the statement that's here:  The attorneys

10   made no cuts of the films produced or the

11   B-readers' initial reads, and forwarded them to

12   us "'as is.'"

13                     He went to great lengths to be

14   very specific about that.

15         Q     Well, it says here he made no cut of

16   the films produced in the Estate of Charles

17   Holder v. Westinghouse litigation.

18                     My question is:  How do you

19   know whether or not there were other X-ray films

20   in other litigation in Mississippi that

21   Mr. Setter had access to?

22         A     I don't know.

23         Q     Okay.  So, he could have selected

24   one case and pulled all of the X-rays available

25   for that case.  And then it would be true that

Page 145

1    he made no cut of the films from that case;

2    correct?

3          A       Correct.

4          Q       And then he could have had access to

5    a lot of other X-ray films from other cases,

6    that he didn't send you; right?

7          A       Well, yes, obviously.

8          Q       So you don't know the universe of

9    X-rays which Mr. Setter had access to?

10         A       And that's my favorite word -- I

11   don't know anything about the "universe," and it

12   is driving me up the wall.

13         Q       Would that same statement hold true

14   for all of these groups of cases, "AA" through

15   "AG"?

16                 You don't know the universe of

17   cases which the defense lawyers had access to

18   before sending you X-rays?

19         A       That is absolutely correct.

20                 However, in every case where I

21   was informed or Otha Linton was informed that no

22   cuts were made, we included that in the

23   paragraph.  And I'm not sure I can find another

24   one now, but I'm sure it's here in a couple of

25   cases.

U.S. Bankruptcy Court                    FINAL                    Dr. Joseph Gitlin
In Re: Owens Corning                                        December 17, 2004

Page 146

1                    But, you're right.  We have no

2    knowledge of what the real universe was of

3    workers exposed to asbestos, who are potential

4    claimants, as I define the "universe."

5          Q      You have no knowledge of the

6    universe of X-rays that the defense lawyers had

7    access to, above and beyond just the exposed

8    worker population; correct?

9          A      No knowledge whatsoever.

10         Q      All right.  And because of that, you

11   can't say how representative the results of this

12   study are of asbestos claimants, generally; is

13   that right?

14         A      Yes.  But I have learned something

15   since the paper was published.

16         Q      We'll get to that in a moment.

17         A      I phrased that, just so you could

18   maybe allow it later.

19         Q      What have you learned since this

20   paper was published that you were referring to

21   in your last answer?

22         A      You mentioned earlier that you noted

23   that seven of our initial readers provided a

24   substantial number of the NIOSH forms in our

25   492.

**U.S. Bankruptcy Court**          **FINAL**          **Dr. Joseph Gitlin**
**In Re: Owens Corning**                        **December 17, 2004**

Page 147

1                          And I had an opportunity to

2    learn about a group called "NERA," which I had

3    never heard before, and asked if they might do a

4    few statistical tabulations.  And it's

5    interesting that our seven readers, initial

6    readers, each of whom provided 35 or more cases

7    in our publication, appear in almost every one

8    of these very large databases.

9                          Now, that coincidence is too

10   coincidental to be due to chance alone; and it

11   may be that their involvement is an indication

12   that some of our conclusions in the 492 study,

13   which scientifically is not representative of a

14   known universe, may, in fact, have some

15   application to informed guesses about other

16   databases.

17       Q     But without investigation, you

18   can't --

19       A     Correct.

20       Q     -- tell that for sure; is that

21   correct?

22       A     Absolutely true.

23       Q     Okay.

24                          MR. WELDON:  Nathan, do you

25   think we could take a break for a second?

U.S. Bankruptcy Court                FINAL                Dr. Joseph Gitlin
In Re: Owens Corning                                      December 17, 2004

```
                                                          Page 188
 1                 CERTIFICATE OF NOTARY PUBLIC

 2

 3              I, Susan Ashe, the officer before

 4    whom the foregoing deposition was taken, do

 5    hereby certify that the witness whose testimony

 6    appears in the foregoing deposition was duly

 7    sworn by me; that the testimony of said witness

 8    was taken by me in stenotype and thereafter

 9    reduced to typewriting under my direction; that

10    said deposition is a true record of the

11    testimony given by said witness; that I am

12    neither counsel for, related to, nor employed by

13    any of the parties of the action in which this

14    deposition was taken; and further, that I am not

15    a relative or employee of any attorney or

16    counsel employed by the parties hereto, nor

17    financially or otherwise interested in the

18    outcome of the action.

19

20

21                        Notary Public in and for the

22                              District of Columbia

23

24    My commission expires April 14, 2007.

25
```

Jane Rose Reporting - New York, New York
1-866-rose-NYC   www.janerose.net