## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: | Chapter 11 |
| W.R. GRACE & CO., *et al.*,[1] | Case No. 01-01139 (JKF) |
| Debtors. | Jointly Administered |
|  | [Related to Docket No. 9382] |

## RESPONSE AND OBJECTION OF REAUD, MORGAN & QUINN, INC. IN OPPOSITION TO DEBTORS' EMERGENCY MOTION FOR LEAVE TO TAKE DISCOVERY OF CLAIMANTS' ATTORNEYS

Reaud, Morgan & Quinn, Inc., ("RMQ") by and through their undersigned attorneys, hereby respond in opposition to Grace's Emergency Motion for Leave to Take Discovery of Claimants' Attorneys (the "Motion") (Docket No. 9382). The Motion should be denied for the following reasons:

### PRELIMINARY STATEMENT

1.      Grace's Motion is a pretext. Grace asserts that this far-reaching discovery is necessary for estimation, but the fact is, with regard to RMQ's clients, there is nothing to estimate. Moreover, RMQ does not file so-called silica "re-tread" cases. RMQ was not involved in the Texas Silica MDL and is not mentioned in Judge Jack's opinion. There is simply no basis whatsoever on which RMQ is named in the Motion.

2.      RMQ's clients (a) settled their cases with Grace well before bankruptcy, (b) submitted detailed proof of exposure and disease diagnoses to Grace pursuant to the parties' written settlement agreement, and (c) were ***approved*** by Grace for payment. Grace does not

---

[1] Debtors are referred to herein collectively as the "Debtor" or "Grace."

{10007420.DOC}

contend, and in fact can not contend, that there exists even a shred of evidence that the settled asbestos claims of RMQ's clients were based on anything other than the medical diagnoses and other evidence submitted to Grace.  Indeed, if Grace had even bothered to look at the medical information that was submitted and approved for the two clients of RMQ that are mentioned in the Motion, it would have seen that the diagnoses of those plaintiffs were based on examinations by Dr. Gary Friedman (and his clinic) – the defense expert who Judge Jack praised and relied upon throughout her opinion.

3.      Moreover, responding to the so-called "minimally invasive" questionnaire – acknowledged by Grace as just the first round of this discovery – could potentially require thousands of hours of effort by lawyers and paralegals.  Taking discovery from opposing attorneys raises numerous ethical questions and issues of privilege, and should only be undertaken in extremely limited circumstances not present here.

4.      At its core, Grace's Motion is a slanderous package of underhanded slurs and innuendo, designed to grab the headlines of the national press.  In the guise of a simple discovery request, the Motion is essentially a vilifying attack against the asbestos plaintiffs' bar as a whole. The Motion is premised almost entirely on supposition and seriously flawed factual assumptions, and but for the privilege afforded judicial pleadings, the libelous statements made by Grace in the Motion would likely be actionable by RMQ.

5.      The Motion is nothing more than an attempt to use Judge Jack's opinion as an opportunistic means to negatively influence this Court's view of all of the claimants' lawyers in this case.  Because it lacks foundation in general, and because it does not (and can not) allege any evidence as to RMQ specifically, the Motion should be denied.

## FACTUAL BACKGROUND

6.      RMQ represents almost 2,000 individuals (the "Settled Plaintiffs" and each

individually, a "Settled Plaintiff") who, prior to August 2000, had filed lawsuits against Grace to

recover damages for asbestos-related disease and injury caused by Grace products.  On or about

August 25, 2000, the Settled Plaintiffs and Grace entered into the Confidential Settlement

Agreement for Texas Cases (the "Settlement Agreement"). [2]  A true and correct copy of the

Settlement Agreement (without exhibits, which are voluminous) is attached hereto as Exhibit

"A". [3]

7.      Pursuant to the Settlement Agreement, each of the Settled Plaintiffs were required

to, and did, submit to Grace detailed information and documentation concerning each Settled

Plaintiff's work history, their exposure to Grace asbestos-containing products, and their medical

condition (hereinafter "Qualifying Materials").  The required medical condition information

included, among other things, a report from a board certified pathologist or a diagnosis from a

competent physician finding an asbestos-related disease or cancer and a report from a competent

physician linking the disease or cancer to asbestos exposure.[4]  With regard to work history and

---

[2] RMQ also represents some other asbestos claimants who have not settled their claims against Grace.

[3] This Court is aware of the terms and provisions of the Settlement Agreement, which is the subject of an adversary proceeding in this Court that has been heavily briefed and litigated through the summary judgment stage.  *See W.R. Grace & Co.-Conn. v. National Union Fire Insurance Company of Pittsburgh, PA v. Reaud, Morgan & Quinn, Inc. and Environmental Litigation Group*, Adversary No. 02-01657 (Bankr. D. Del. 2002).  RMQ requests that the Court take judicial notice of the evidence presented by the parties in the adversary proceeding, which includes full copies of the Settlement Agreements, declarations of the parties, and excerpts from the deposition of Jay Hughes, Senior Litigation Counsel for the Debtor.

[4] The Settlement Agreement required submission of the following "Qualifying Materials" by the Settled Plaintiffs:

"Qualifying Materials" consist of the following:  (i) competent medical evidence that the Settling Plaintiff (or, for wrongful-death claims, the Settling Plaintiff's decedent) has or had an asbestos-related injury of the type set forth in paragraph 4 of this Agreement ("Medical Evidence"); and (ii) a standard release prepared by RMQ and executed by the Settling Plaintiff in the form

{10007420.DOC}

exposure, the parties even agreed upon the specific worksite locations that qualify as exposure sites. Each Settling Claimant also delivered to Grace a release of that person's asbestos claims.

8.      The Settlement Agreement required Grace to notify RMQ within sixty (60) days after receipt of Qualifying Materials if Grace objected to the sufficiency of the submission. Grace reviewed and accepted most Qualifying Materials without question. Grace did raise issues as to some of the Qualifying Materials submitted, but all issues were resolved to Grace's satisfaction, or Qualifying Materials were re-submitted for that particular Settled Plaintiff and ultimately accepted by Grace. [5]    In fact, Jay Hughes, Senior Litigation Counsel for Grace, acknowledged this procedure under the Settlement Agreements.[6]

---

attached hereto as Exhibit B or Exhibit C.  Additionally, RMQ shall provide "Exposure Evidence" in the form of (a) a work history sheet for each Settling Plaintiff showing that such plaintiff worked for some period of time at an Agreed-Exposure Plant; and (b) a list of plants at which W.R. Grace agrees that its asbestos-containing products were used (the "Agreed-Exposure Plants").  The parties to this Agreement have agreed on the worksites that qualify as exposure sites for Settling Plaintiffs for this settlement only and no others, and a list of agreed exposure sites is attached as Exhibit D.  Medical Evidence will be sufficient if it demonstrates that:  (i) for Settling Plaintiffs alleging non-malignant asbestos related disease, either there exists a diagnosis of such condition by a pathologist or a B-reader confirming such condition; (ii) for Settling Plaintiffs alleging asbestos-related cancer, other than lung cancer or mesothelioma, either there exists (a) a report from a board-certified pathologist that links the cancer to asbestos exposure, or (b) a diagnosis by a competent physician of one of the following cancers – Colon Cancer, Esophageal Cancer, Pharyngeal Cancer, Stomach Cancer, Kidney Cancer, Laryngeal Cancer, together with radiological evidence of some asbestos-related lung abnormality; (iii) for Settling Plaintiffs alleging asbestos-related lung cancer, there exists a diagnosis of lung cancer by a competent physician and a report of a physician that links the lung cancer to asbestos; (iv) for Settling Plaintiffs alleging asbestos-related mesothelioma, there exists a diagnosis of mesothelioma by a competent pathologist.

Settlement Agreements ¶ 6.

[5] *See* Declarations of J. William Lewis and Glen W. Morgan ¶ 16.  Appendix to Reaud, Morgan & Quinn, Inc. and Environmental Litigation Group, P.C.'s Opening Brief in Support of Their Motion for Summary Judgment, etc. *W.R. Grace & Co.-Conn. v. National Union Fire Insurance Company of Pittsburgh, PA v. Reaud, Morgan & Quinn, Inc. and Environmental Litigation Group*, Adversary No. 02-01657 (Bankr. D. Del. 2002) (Docket No. 40).

[6] Deposition of Jay Hughes, pp. 21-31.  Debtor's Response in Support of National Union's Summary Judgment Motion, etc.  *W.R. Grace & Co.-Conn. v. National Union Fire Insurance Company of Pittsburgh, PA v. Reaud, Morgan & Quinn, Inc. and Environmental Litigation Group*, Adversary No. 02-01657 (Bankr. D. Del. 2002) (Docket No. 48).

{10007420.DOC}

9.     As a result of Grace's acceptance of the Qualifying Materials, Grace commenced making the installment payments required under the Settlement Agreements, and a substantial amount of the total was paid.  Payments ceased after Grace filed bankruptcy.

10.     RMQ does not file re-tread silica cases.[7]  RMQ has never been involved in the Texas silica multidistrict litigation (*In re Silica Products Liability Litigation;* MDL No. 1553, S.D. Tex.) ("Texas Silica MDL"), and RMQ is not mentioned in Judge Jack's opinion in the Texas Silica MDL.  2005 WL 1593936 (S.D. Tex.).  RMQ (the "Judge Jack Opinion").

11.     Out of the approximately 2,000 Settled Plaintiffs represented by RMQ, Grace has identified two persons that Grace believes may have also filed a lawsuit for silica damages: Robert Hart and Jesus Conales.  Interestingly, the Motion contains no evidence to support this allegation and no way for RMQ to determine if this is true.  In any event, if either Mr. Hart or Mr. Conales has in fact filed a lawsuit against Grace for recovery of silica damages, it was through a different law firm and it was not filed by RMQ.

**ARGUMENT AND AUTHORITIES**

**A.     Grace's Motion is bereft of evidence, relying instead on indiscriminate supposition.**

12.     Grace is asking this Court to authorize incredibly burdensome, across-the-board discovery, to every lawyer for every asbestos creditor in this case, on what amounts to nothing more than a "hunch."  Grace estimates that there are approximately 118,000 asbestos claims in this case.  Grace asserts (without proof) that it has found 76 persons – approximately .06% (six

---

[7] The word "re-tread" is a term fabricated by Grace to describe silica claims filed by persons who also filed prior asbestos claims.  RMQ has not in the past, and does not currently, file such claims on behalf of clients.

{10007420.DOC}

one-hundredths of one percent) – who have also filed silica cases somewhere.[8]  Grace posits that

because Judge Jack found a number of the silica claims in the Texas Silica MDL were based on

incompetent diagnoses, it stands to reason that any silica claim anywhere is fraudulent, any

lawyer who has filed a silica claim is a crook who buys off doctors, and therefore all asbestos

claims made in this case by any lawyer who has also ever filed a silica claim must be bogus.  On

this hypothesis, Grace wants this Court to authorize discovery that is more far-reaching than

anything ever authorized in a case like this.

13.    Grace's Motion is in essence a fraud pleading without the specificity required by

FED R. CIV. P. 9(b).  The Motion is peppered with the words "fraudulent medical evidence",

"junk asbestos claims", "bogus claims," "questionable attorney practices", etc.; but it provides

absolutely no factual specificity with regard to any asbestos claim made in this case.  The

Motion uses the word "retread" as if it is some statutory definition, and even attributes the word

"retread" over and over to Judge Jack, although Judge Jack never used the word once in her

opinion.[9]  Under Rule 9(b), the Motion is appropriate for summary denial.[10]  The Debtor's

---

[8] Grace's only support for this allegation is two unverified spreadsheets – created by Grace – that raise more questions than they answer.  There is no information about where the alleged silica claims were filed, who filed them and whether any of the medical professionals criticized in Judge Jack's opinion made the silicosis diagnoses.  In short, there is nothing to suggest that the claims are in anyway suspect other than they are simply silica claims.

[9] One glaring example is on page 2 of the Motion, where Grace states that it wants to immediately begin traditional discovery from "firms which were criticized by Judge Jack in the Silica Opinion for having brought large numbers of *'retread'* silica/asbestos claims," suggesting by the use of quotation marks around the word that it had been used by Judge Jack in her opinion.

[10] Rule 9(b)'s requirement of particularity in pleading fraud is applicable to all bankruptcy matters, whether adversary proceedings, by virtue of Fed. R. Bankr. P. 7009(b) or contested matters, by virtue of Fed. R. Bankr. 9014.  Bankruptcy courts, like all federal courts, take the purport of the rule seriously and will dismiss a claim of "fraud" when it does not detail the facts giving rise to the claim.  For example, in *Doctors Hospital of Hyde Park*, 308 B.R. 311 (Bankr. N. D. Ill. 2004), the bankruptcy court dismissed a fraud allegation for a failure to state the specifics of the fraud:

> Lasalle's fraud claims will nonetheless be dismissed because they were not pled with sufficient particularity.  Federal Rule of Civil Procedure 9(b) requires that "in all averments of fraud or

{10007420.DOC}

unparticularized charges of "fraud" cannot be used as a ground for seeking additional discovery. In fact, Rule 9(b) is designed "to prevent the filing of suits that simply hope to uncover relevant information." *Doyle v. Hasbro, Inc.,* 103 F.3d 186, 194 (1ˢᵗ Cir. 1994). Grace's wholesale evasion of detail is the very abuse that Rule 9(b) attempts to deter.

14.    Grace's hyperbole becomes even more condemnable when considered against the very tenuous link between the Texas Silica MDL and this case. Although Judge Jack's opinion does strongly condemn the unreliability of the silicosis diagnoses made in that case, and suggests that many asbestosis diagnoses may have been simply transformed into silicosis diagnoses, nowhere does it suggest that the opposite has ever happened – i.e., that silicosis diagnoses have been transformed into asbestosis diagnoses. In fact, Judge Jack describes the small number of silicosis cases filed before 2002 and the "explosion" of silicosis cases thereafter. Texas Silica MDL Opinion at p. 5. She does not draw a correlation between incompetent silicosis diagnoses and the competency of the asbestosis diagnoses that preceded them. In fact, Judge Jack specifically noted that prior studies of asbestos diagnoses were irrelevant to the issues in the Texas Silica MDL and that she would not rely upon them in deciding the issues before her. Texas Silica MDL Opinion at p. 46. Nothing in her opinion raises any specific issue regarding

---

mistake, the circumstances constituting the fraud or mistake shall be pleaded with particularity." *A fraud pleading must include the "identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff."* GE Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1078 (7ᵗʰ Cir. 1997)(citations omitted).

\*\*\*

*Fraud is a serious charge, easy to allege and hard to prove. The rules therefore require pleading with particularity. It must be clear from the beginning the plaintiff has specific details of what happened, when, where, and to whom. No such details are alleged.* Count IV will therefore be dismissed. Id. at. 322 (emphasis supplied).

*Doctors Hospital of Hyde Park*, 308 B.R. at 322.
{10007420.DOC}

asbestos claims in this case.   It is Grace that makes the bounding leap backwards, alleging

essentially that Judge Jack's opinion throws the entire tort system in the United States into

suspicion, and that every attorney in this case must undergo an extensive investigation of his/her

practices on the off chance that some possible connection to the events in the Texas Silica MDL

might be found.

**B.**     **The Motion demonstrates an obvious lack of factual investigation.**

15.     The Motion divides all attorneys into two classes: (i) those attorneys to whom

Grace will first send the questionnaire before beginning "traditional discovery", and (ii) those

attorneys to whom Grace will not wait for a questionnaire response, but who will immediately

get the traditional discovery.   (This "traditional discovery," while not fully explained in the

Motion, will likely seek both the information sought in the questionnaire and much more, such as

document requests, interrogatories, depositions of lawyers and other law firm personnel, etc.).

Grace plans to impose the "traditional discovery" treatment on law firms that satisfy one of three

criteria conceived by Grace: (a) firms that have filed silica claims against Grace as determined by

social security number matches, (b) firms that have filed silica claims against Grace as

determined by name matches, and (c) firms that were criticized by Judge Jack for having brought

large numbers of "retreads" (again, a word she did not use).   The Motion identifies 18 law firms

that Grace contends satisfies one or more of these criteria, but does not provide any kind of

specific evidence against those 18 firms.   In addition to the current group of 18, Grace proposes

to move on to the traditional discovery phase as to any other firm if, in Grace's view, the firm's

response to the questionnaire uncovers evidence suggestive of unreliable methodologies, possible

fraud or bias.  Motion at p. 16. [11]  RMQ was included in the group of 18 firms, but the Motion contains absolutely no support for doing so.

16.     RMQ does not file so-called "re-tread" silica lawsuits.  Indeed, in its 20 year history, out of the many thousands of lawsuits it has filed, RMQ can find only two lawsuits that is has filed on behalf of only two individuals seeking to recover for a silica dust injury.  Neither of the individuals are the persons identified by Grace in the Motion – Messrs. Hart and Conales – as supposedly filing a silica case against Grace.  If either Mr. Hart or Mr. Conales used another law firm to file a silica case against Grace, the pleadings in that case, which are in Grace's possession, would easily reveal the identity of such law firm.  Thus, if Grace had looked into its own records it would have discovered that RMQ does not, and has not, represented either Mr. Hart or Mr. Conales in a silica lawsuit against Grace.  Any contention that either Mr. Hart's or Mr. Conales' silica case, brought by another law firm, somehow satisfies Grace's first two criteria as to RMQ, is simply untruthful.  In addition, RMQ does not satisfy the third criteria because it is not one of the firms criticized in Judge Jack's opinion.  There is simply no indication that Grace conducted any investigation before it decided to make the very serious charges contained in the Motion.  Unfettered by the particular facts of individual situations, Grace simply tossed malfeasance accusations like rice at a wedding – it's not important where they fell.

---

[11] The Court should not be taken in here.  Judging from the meager evidence on which Grace brought this Motion in the first place, it will take very little for Grace to feel that it has found something "suggestive" of "unreliable methodologies, potential fraud or bias," in order to inflict the unspecified "traditional discovery" on firms other than the original group of 18.  Grace will be back to feed at the trough over and over again, subjecting as many plaintiffs' lawyers as possible to the burden and expense of as much discovery as it can get away with.

{10007420.DOC}

17.    Grace's reason for RMQ's inclusion in the group of 18 law firms, which were singled out by Grace as deserving of the immediate "traditional discovery" due to "evidence suggestive of unreliable methodologies, possible fraud or bias," (see Motion at 16) is a reckless and slanderous allegation that is violative of Rule 11. There is a reason Rule 9(b) requires fraud to be pled with specificity – to avoid claims of fraud without true evidence. Grace is fortunate that it leveled these slurs in a legal pleading, because, without the immunity the legal process affords, these unsupported accusations would invite a libel suit by RMQ. [12]

18.    The conduct of Grace is even more egregious when it is remembered that Grace has already approved the medical evidence submitted by RMQ for the Settled Plaintiffs. In the Settlement Agreement, Grace stipulated as to what proof it would accept to substantiate an asbestos claim. The Settled Plaintiffs then submitted that proof and it was accepted by Grace. Grace then began payments based on its approvals of the submissions, but ceased payments on bankruptcy. Thus the situation of the Settled Plaintiffs is markedly different than that of most asbestos claimants in this case. Grace already possesses in its own records the exposure and medical information for the Settled Plaintiffs. Further investigation would be duplicative and unnecessary and would lead to no useable information in this case. More importantly, Grace, if it had even bothered to look in its records at the submissions of the Settled Plaintiffs, it would have been able to determine that the claims that were settled were asbestos claims. Perhaps with just a

---

[12] There is little doubt that the false statements made by Grace would be actionable libel if uttered in a non-judicial forum. While precise formulations differ from jurisdiction to jurisdiction, as a general matter, "a communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." REST 2d TORTS § 559. Accusing an attorney of fraud is without question a defamatory communication.

little diligence on its part Grace could have avoided the defamation is has so casually inflicted upon RMQ.

19.     And if Grace had only taken a few minutes to look at its records before listing Messrs. Hart and Conales as potential suspects, it would have learned that their asbestos diagnoses were conducted by highly respected medical professionals.    Attached hereto as Exhibits "B" and "C" are excerpts of the medical evidence submitted to Grace for Mr. Hart and Mr. Conales under the Settlement Agreement.  Even a cursory review of these documents reveals that the individuals received very thorough and detailed personal examinations by several doctors.  Mr. Hart was diagnosed with pulmonary asbestosis in 1988 by Dr. Gary Friedman of the Texas Lung Institute.  He was later diagnosed with lung cancer.  Because Grace's Motion relies almost entirely on Judge Jack's opinion, Grace would have known that Dr. Friedman was the defense expert in the Texas Silica MDL and that Judge Jack relied upon Dr. Friedman's testimony regarding proper medical methodologies throughout the opinion.[13]   In addition, Mr. Conales was diagnosed with asbestos-related pleural disease in 1991 by Dr. Friedman's colleague, Dr. Glenn Gomes, also of the Texas Lung Institute.  Neither Conales nor Hart were diagnosed by any of the twelve doctors criticized in Judge Jack's opinion.  Both gentlemen were personally inspected by their physicians.  This is not new information – Grace knows or should have known these facts.  If Mr. Hart or Conales have recently used another law firm to file a

---

[13] Dr. Friedman is known as the "gold standard" of pulmonologists. He has practiced for over 31 years and is past president of the Texas Medical Society, past chief of staff of Memorial Hospital in Houston, and past director of Occupational Medicine in Pulmonary Division, University of Texas Medical School. He is board certified in Internal Medicine, Preventive Medicine and Occupational Medicine. He is the Director of Pulmonary Function Laboratories at four Houston hospitals. He is a former B-reader. He has testified as an expert in asbestos litigation for both the plaintiff and the defense for over 20 years. Within the last year he has worked on authoring a chapter in a major textbook on all clinical aspects of asbestos. (See faculty biographies -- Asbestos Medicine seminar, San Diego, CA; Nov. 11-12, 2004, attached hereto as Exhibit "D").  Grace cannot question Dr. Friedman's credentials.

silica case, that in no way suggests any lack of reliability in their original diagnoses of asbestos injury submitted by RMQ (and accepted and approved by Grace).

**C.     The discovery would not be relevant to the estimation proceeding.**

20.     Grace's stated purpose of pursuing this discovery is to obtain information relevant to the claims estimation process.  As to RMQ, however, the information would be useless. RMQ's clients settled and liquidated their claims against Grace pre-petition, thereby converting their tort causes of action into contract claims.  The amount that Grace still owes on the settlement is the unpaid amount of the liquidated settlement. Obviously a claim that has been settled, released and assigned a liquidated value in a settlement agreement is not a claim that needs to be estimated.  This is true even if there remains some portion of the settlement amount unpaid.  The estimation process is intended to estimate the number and dollar value of claims that will be asserted against the estate.  The value of a claim that is already settled is known. Grace has already agreed to the claim's validity and amount.

21.     In addition, in this settlement, Grace not only agreed to a liquidated value for all the claims, it has already received and reviewed the information, including medical diagnoses, submitted to substantiate the claims.  Unlike all of the asbestos claims in this case that will be submitted to the plan trust after confirmation, the Settled Plaintiffs' claims are concluded.  They agreed to a settlement, and they all delivered written releases of their tort claims.  The values of the Settled Plaintiffs' contract claims are not in dispute and they will not be required to prove their claims again.  There is nothing to estimate here, and there will be nothing to evaluate as far as exposure evidence, medical diagnoses, etc. after confirmation.  Any discovery concerning the underlying claims of the Settled Plaintiffs is irrelevant to the issues before the Court.

22.    Estimation of claims is to be undertaken only with regard to "any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c)(1). The claims of the Settled Plaintiffs are not contingent or unliquidated. Further examination of the claims would not be for the purposes of estimation as contemplated by the Code, but would only serve some other, ulterior, purpose of Grace. Moreover, it is the intrusive discovery that is sought by Grace that would "unduly delay the administration of the case," having the converse effect of what estimation is intended to accomplish.

23.    Moreover, the investigation of the merits of individual claims has been held in several similar cases to be unnecessary and irrelevant for estimation purposes. In the very recent estimation opinion of Judge Rodriquez in *In re Federal Mogul Global, Inc..*, Civ. No. 05-59 (D. Del. August 19, 2005) (JHR), the District Court refused to allow comprehensive discovery of a "sample" of individual claimants for purposes of claims estimation. The Court emphasized that the proper inquiry for estimation is not the merits of individual claims, but instead the historical claims settlement values of the Debtor :

> "the focus is on [the Debtor's] aggregate personal injury liability for the creation of a trust, *not the merits of individual or class of individuals claims.* To do the latter would require that each claimant be afforded the procedural protections of the due process clause of the Fifth Amendment, thereby requiring that cases that presented disputed issues of fact a trial by jury. . . . [T]his estimation did not involve the discovery of individual claims, but rather an inquiry focused on [the Debtor's] historical claims-handling practices, and expert testimony on trends and developments in the asbestos tort system. *To do otherwise would eviscerate the purposes of the estimation process and place additional financial burdens on the very trust which the Court is trying to create.*

*Federal Mogul* at 44 (emphasis added). The issues presented by Judge Jack's opinion in the Texas Silica MDL were presented to Judge Rodriquez, but he found that they did not serve as a

basis for a different estimation methodology and rejected the claim that the opinion had brought

to light any new information regarding illegitimate claims or incompetent medical diagnoses.

*See Federal Mogul* at 50.

24.     It is acknowledged that this Court has elected to allow discovery from individual

claimants regarding the specifics of their claims, but the Federal Mogul decision is highly

instructive in its reasoning in the Court's consideration of the current Motion.  To take discovery

of the merits of individual claims is one thing, but it is another entirely to authorize what will

amount to nothing more than a "witch hunt" into the inner workings of every law firm

representing a claimant.  This is not discovery for claims estimation.  Whether one agrees or

disagrees with Judge Rodriquez' conclusion (although as a District Court judge in this district his

opinion cannot be disregarded), one cannot ignore that the current Motion seeks relief way

beyond the investigation of individual claims.[14]

**D.     Taking discovery from opposing counsel should be granted only in exceptional circumstances.**

25.     Although the Federal Rules provide for broad and liberal discovery, *Pacitti v.*

*Macy's*, 193 F.2d 766, 777 (3rd Cir. 1998), the scope of permissible discovery is not unlimited.

*Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 191 (3rd Cir. 1999) ("Although the scope of discovery

under the Federal Rules is unquestionably broad, this right is not unlimited and may be

circumscribed.").  Importantly, under Rule 26(b)(1), the discovery sought must be "relevant to

the claims or defense of any party."

---

[14] The Motion is remindful of the adage, "give someone an inch and they will take a mile." This Court has given much more than an "inch" to Grace on the issue of discovery of individual claims, authorizing the extensive questionnaire that was sent to all asbestos claimants. Not content, Grace now wants to take many, many "miles" of even more discovery and expand the individual claims investigation way beyond anything remotely appropriate.

{10007420.DOC}

26.    And while it is true that the Federal Rules of Civil Procedure do not expressly

prohibit taking discovery of opposing counsel, federal courts have evinced an unambiguous

disfavor for the taking of the deposition of a party's attorney, except in limited circumstances.

*See e.g.*, *Theriot v. Parish of Jefferson*, 185 F.3d 477, 491 (5th Cir. 1999), *cert. denied*, 529 U.S.

1129. The Eighth Circuit has even called the practice a "negative development in the area of

litigation" and pointed out that "[c]ounsel should be free to devote his or her time and efforts to

preparing the client's case without fear of being interrogated by his or her opponent". *Shelton v.*

*Amer. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1987).

27.    The inherent dangers in allowing the depositions of counsel are well-recognized

by the courts. It has been noted that such a deposition "provides a unique opportunity for

harassment; it disrupts the opposing attorney's preparation for trial, and could ultimately lead to

disqualification of opposing counsel if the attorney is called as a trial witness." *Prevue Pet*

*Products, Inc. v. Avian Adventures, Inc.*, 200 F.R.D. 413, 418 (N.D. Ill. 2001), quoting *Marco*

*Island Partners v. Oak Dev. Corp.*, 117 F.R.D. 418, 420 (N.D. Ill. 1987). In addition, courts

have expressed the concern that depositions of opposing counsel could lead to collateral

litigation over peripheral issues, such as privilege, immunity, and harassment claims, and place

additional burdens on both the court and the parties. *Kaiser v. Mutual Life Ins. Co. of New York*,

161 F.R.D. 378, 381 (S.D. Ind. 1994).

28.    In this District, whether a party is permitted to take discovery of opposing counsel

is determined by examining whether "(1) no other means exist to obtain the information; (2) the

information sought is relevant and nonprivileged; and (3) the information is crucial to the

preparation of the case." *Smith v. U.S.*, 193 F.R.D. 201, 215 (D. Del. 2000) (Thynge J.), quoting

*Shelton v. Amer. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1987); *see also, Allergan, Inc. v. Pharmacia Corp.*, No. Civ.A.01-141, 2002 WL 1268047 at *1 (D. Del. May 17, 2002). [15] Grace has not even attempted to satisfy these criteria in this case.

29.     Grace cannot say that no other means exists to obtain information about the claims of the Settled Plaintiffs.  It already has thousands of files in its possession concerning these claims, complete with the information provided by each claimant that includes evidence of the claimants' work history, exposure to Grace products, and medical evidence.  Thus in order to investigate these claims (if such an investigation were even relevant), Grace needs look no further than its own records.  Concerning relevancy, it is undisputed that these claims are not unliquidated tort claims.  They will not be asserted against the estate as unliquidated tort claims and are therefore irrelevant to estimating unliquidated tort claims.  Finally, the information is not crucial to Grace's preparation of its estimation case.  Grace can prepare its case and make its arguments on the proper estimate of asbestos claims in this case without this information, and regardless of any protestations to the contrary, the highly questionable relevance of the information sought is insufficient to warrant the highly invasive and incredibly burdensome discovery proposed of these lawyers.

30.     Moreover, it is an absolute certainty that this discovery will create untold collateral litigation over work product[16] and attorney-client[17] privileges.  The massive discovery

---

[15] Although not yet considered by the Third Circuit, the *Shelton* test has been adopted in several other circuits. *See e.g., Nguyen v. Excel Corp*, 197 F.3d 200, 208 (5th Cir. 1999); *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1112 (10th Cir. 2001); *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 278 F.3d 621, 628 (6th Cir. 2002).

[16] The federal work product doctrine protects the confidentiality of matters prepared by or on behalf of attorneys in anticipation of litigation. FED. R.. CIV. P. 26(b)(3).  The doctrine is designed to eliminate "unwarranted inquiries into the files and mental impressions of an attorney" while recognizing that it is "essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel". *Rail Intermodal*

{10007420.DOC}

to be taken of every opposing counsel in this case – representing approximately 118,000 clients – will predictably result in numerous assertions of privilege that will need to be decided by the Court on a case by case basis.   This estimation proceeding will be swamped by discovery disputes that are unnecessary for a determination of the true issues in contention.  The aggregate cost in time and money to (i) the parties, (ii) the law firms, who will have to themselves retain counsel (both in their home state and in Delaware) to litigate the privilege issues, and (iii) the Court, will be vast.   These costs will greatly outweigh any possible benefit to the discovery, requiring denial of the Motion.

E.     **The Questionnaire is an improper set of interrogatories directed to non-parties.**

31.     The proposed questionnaire is in essence, a set of interrogatories that will be directed to non-parties to this action.   There is no rule of procedure, however, that allows utilizing interrogatories as a discovery device with regard to non-parties.  Federal Rule of Civil Procedure 33 states that "any party may serve upon any other *party* written interrogatories." FED. R. CIV. P. 33(a) (emphasis added).   Other discovery rules expressly permit the taking of depositions and service of document requests on non-parties, but a similar provision is not included in Rule 33.  Moreover, discovery of non-parties is required to be taken pursuant to a subpoena issued under Rule 45, which contains substantial protections against undue burden and

---

*Specialists, Inc. v. Gen. Elec. Capital Corp.*, 154 F.R.D. 218, 221 (N.D. Iowa 1994), quoting *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947).  Protecting attorney work product allows attorneys to work without the unnecessary fear that their work may one day be used against either them or their clients. *Westinghouse Elec. Corp. v. Rep. of the Philippines*, 951 F.2d 1414, 1428 (3rd Cir. 1991) ("Protecting attorneys' work product promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against their clients.").

[17] The attorney-client privilege makes confidential certain communications between a lawyer and his or her client. "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests I the observance of law and administration of justice.  The privilege recognizes that sound

expense and venue requirements for resolution of discovery disputes.[18]  Grace apparently hopes

to have this Court just disregard all procedural rules and authorize this discovery without any of

the protections afforded non-parties under Rule 45.

**F.**     **The Questionnaire is anything but "minimally invasive."**

32.     Demonstrating yet another remarkable economy with truth, Grace describes the

questionnaire it proposes to propound to attorneys as "minimally invasive" and implies that the

associated burden upon responding law firms will be slight.  Motion at 19.  Although the

proposed questionnaire is two pages long – a point Grace highlights – an affirmative answer to

any of the eight inquiries in subpart II.a. could easily entail a response that would comprise a

substantial number of pages.  Affirmative answers would also trigger a demand for the

production of documents, which could be widely dispersed among client files and other records,

invasive of the attorney-client and work product privileges, extremely time consuming and costly

to assemble, and voluminous in the aggregate.

33.     The objectionable nature of the questionnaire starts immediately in Part I, entitled

"Identify of Law Firms and Claimants." Subpart I.a. inquires whether the respondent shares

office space with other law firms or professional entities and, if so, asks that such third parties be

identified.   This inquiry is plainly irrelevant to the estimation of asbestos claims in this

---

legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn Co. v. U.S.*, 449 U.S. 383, 389 (1981).

[18]For instance, Rule 45 requires the party responsible for the discovery to "take reasonable steps to avoid imposing undue burden or expense" on the responding party.  FED R. CIV. P. 45(c)(1).  Such duty is enforced by the local court that issues the subpoena.  *Id.*  The rule also specifies a mechanism for discovery motion practice in the court that issues the subpoena, if there is an objection to the discovery on various grounds.  FED R. CIV. P. 45(c)(2)(B) and (c)(3)(A).  By the Motion, Grace wants to skip over Rule 45 entirely and eviscerate the protections afforded therein.

{10007420.DOC}

bankruptcy case or any other issue properly considered in the administration of those cases. Then Subpart I.b. directs the respondent to attach a list of all clients represented by the lawyer (or his or her firm) who received one of Grace's other questionnaires – the variant directed to asbestos personal injury claimants. This, too, is totally unnecessary. Grace knows the asbestos claimants to whom it disseminated such questionnaires. Moreover, this inquiry is duplicative of information already in Grace's possession by virtue of the Court's Revised Order Requiring Filing of Statements Pursuant to Fed. R. Bankr. P. 2019 (the "2019 Order"; Dkt. No. 6715). Pursuant to the 2019 Order, Grace was provided with exhibits to all 2019 Statements on compact disks by law firms filing 2019 Statements. These exhibits include, among other matters, the names of all the claimants represented by respondent firms that filed 2019 Statements.

34.    It is in Part II, entitled "Firm's Relationships", where the mischief radically escalates. Subpart II.A. instructs the respondent law firm to answer whether or not "your firm, a member of your firm, or any employee of your firm have a (past or current) direct or indirect financial relationship with any of the following (check all that apply)":

- Other law firms that represent asbestos claimants.
- Doctors who diagnose asbestos-related disease.
- Doctors or Technicians who perform chest x-rays.
- B-readers.
- Doctors or Technicians who perform PFT's.
- Doctors who interpret PFT results.
- Pathologists who diagnose asbestos-related disease.
- Screening companies that perform x-rays, B-reads, or PFT's.

Respondents are also instructed that they must also complete subpart II.b. to provide additional, comprehensive details of **each** "relationship" that might fall within subpart II.a..[19]   The specific implications of these inquiries will be discussed below.

35.    A threshold concern, however, is the obvious breadth and imprecision of the words "indirect or direct financial relationship." If a respondent law firm did nothing more than pay a doctor's invoice for a chest x-ray, Grace would almost assuredly maintain that an "indirect or direct financial relationship" had been established, necessitating the burdensome disclosure called for by subpart II.b.  The information sought is not limited to physicians whose diagnoses are the basis for asbestos claims in this case.  It covers everyone, from testifying experts, to undisclosed consulting experts, to in-house employees that may also be licensed physicians.

36.    Another grave concern is the absence of any temporal limitations.  Any "past or current" financial relationship would have to be not only disclosed but detailed.  In the example used above, it would not matter if the law firm had paid the doctor's invoice twenty years ago for a patient that had died ten years ago and had never made a claim against Grace; the absurdly fine sieve of Debtors' questionnaire "catches" all financial relationships without regard to timing.

37.    Nor would the chest x-ray performed by the physician necessarily have had to relate to an asbestos related malady.  As worded, the questionnaire calls for the disclosure of the respondent's "relationship" with all medical professionals and would even apply with respect to clients complaining of such unrelated matters as automobile accidents.

38.    Answering the proposed questionnaire would require responding firms to expend hundreds – quite possibly *thousands or even tens of thousands* – of hours examining client files,

---

[19] The emphasis on the word "each" is not added – it is used by Grace in the questionnaire.
{10007420.DOC}

accounting records and other historical documentation to ferret out all "indirect or direct financial

relationships" under penalty of perjury (as required by Part III of the questionnaire).

39.    Regarding the individual inquiries under subpart II.a., the first question – whether

the respondent has (or had) a direct or indirect financial relationship with "[o]ther law firms that

represent asbestos claimants" – is not only improper but is also a matter that has already been

ruled on by this Court.  Co-counsel or referral relationships with other law firms cannot lead to

the discovery of admissible evidence concerning the estimation of claims.  More significantly,

the Court elected *not* to include such matters in the disclosure required pursuant to Rule 2019 in

this case.  The Court's 2019 Order was not appealed, and has been final for many months.

(Functionally identical 2019 orders were appealed in other cases from this Court, and all were

affirmed.)

40.    The other seven inquiries in subpart II.a. ask if the respondent has ever had a

"direct or indirect financial relationship" with diagnostic physicians, takers of x-rays, B-readers,

PFT performers or interpreters, pathologists, and screening companies – essentially all medically-

related consultants routinely engaged by law firms in an asbestos mass tort practice.  Grace

clearly intends to compel massive disclosure, since these consultants assuredly do not work for

free.  The arms'-length payment of their bills in the ordinary course through a respondent law

firm – *de rigeur* in a mass tort law practice – implicates "indirect or direct financial

relationships" triggering massive additional disclosure under subpart II.b.  By its terms, the

questionnaire would cover relationships with medical professionals (practicing and non-

practicing) who are employed on staff at the law firms.  It would even require the disclosure of

non-testifying consulting experts, implicating the issues of privilege described in the preceding

section and causing the inevitable, and substantial, litigation over such privilege issues

{10007420.DOC}

41.    Subpart II.b. then seeks to elicit a comprehensive explanation of all "indirect or direct financial relationships." The explanation would require a listing of (i) the identity and contact information of the third party, (ii) the third party's employer (if the third party is an individual), (iii) the person(s) at the respondent firm with the past or current relationship, (iv) the "nature" of the relationship, including terms, fees, documentation, etc., (v) the duration of the relationship, (vi) other individuals or entities "involved" or who "were involved" in the relationship, (vii) the person(s) at the respondent firm most knowledgeable about the "financial component" of the relationship, and (viii) a directive that the respondent firm "[i]dentify and produce all documents describing the relationship."

42.    The breadth of this disclosure is astonishingly broad and correspondingly burdensome. A respondent firm would arguably be called upon to comb through all client files and other records (a costly, time consuming and absurd undertaking), identify responsive information while segregating responsive materials from privileged matters, and pull documents that are responsive, which are likely to be quite voluminous in the aggregate. The vacuous sanctimony of Debtors' lip service to "minimiz[ing] the burdens placed on the parties and their attorneys by virtue of this discovery" is laid bare.

43.    Grace professes to seek, via the questionnaire, "basic information about potentially relevant financial relationships." Motion at 19. Grace thus concedes that the financial relationships they are inquiring about are, at best, only potentially relevant. Seldom, if ever, have litigants in any forum sought to impose such onerous and costly discovery burdens on adverse litigants' legal counsel where the relevance of that materials sought is conceded, at the outset, to be doubtful and a matter of speculation.

## CONCLUSION

44.    Grace has already achieved one of its primary purposes in bringing the Motion –
to slander the asbestos plaintiffs' bar.  The Motion does that well, accusing 18 law firms directly,
including RMQ, and every other law firm indirectly, of fraudulent practices.  The accusations are
grounded in conjecture however, and should not be countenanced by this Court.  The indictments
made in the Motion are not supported by evidence and rely almost entirely on Judge Jack's
opinion in the Texas Silica MDL, which is misquoted and misinterpreted.

45.    As to RMQ the Motion lacks legitimacy entirely.  Grace had, and still has, the
pertinent information regarding the Settled Plaintiffs and has intentionally ignored it.  RMQ's
inclusion in the Motion by name was reckless; the statements made are simply false.  The Court
should consider the imposition of appropriate sanctions against Debtor for the defamatory
statements concerning RMQ in the Motion.

WHEREFORE, RMQ prays that the Court enter its order denying Grace's Motion, and
for such other and further relief to which Movants are entitled.

Dated: October 7, 2005

Sander L. Esserman
Robert T. Brousseau
Van J. Hooker
**STUTZMAN, BROMBERG, ESSERMAN &
PLIFKA,
A Professional Corporation**
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Telephone:  (214) 969-4900
Facsimile:  (214) 969-4999
E-mail:  esserman@stutzman-bromberg.com

-AND-

Kathleen M. Miller (ID no. 2898)
**SMITH, KATZENSTEIN &
FURLOW, LLP**
The Corporate Plaza
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, Delaware 19899 (Courier 19801)
Telephone:  (302) 652-8400
Facsimile:  (302) 654-8405
E-mail:  KMM@skfdelaware.com

**ATTORNEYS FOR REAUD, MORGAN &
QUINN, INC. AND ENVIRONMENTAL
LITIGATION GROUP, P.C.**

{10007420.DOC}