## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., *et al.*,[1] | ) | Case No. 01-01139 (JKF) |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | [Related to Docket No. 9382] |
| | ) | |

### RESPONSE OF SILBER PEARLMAN, LLP
### IN OPPOSITION TO DEBTORS' EMERGENCY MOTION FOR LEAVE TO
### TAKE DISCOVERY OF CLAIMANTS' ATTORNEYS

Silber Pearlman, LLP. ("Silber Pearlman") by and through its undersigned attorneys, hereby responds in opposition to Grace's Emergency Motion for Leave to Take Discovery of Claimants' Attorneys (the "Motion") (Docket No. 9382). The Motion should be denied for the following reasons:

### PRELIMINARY STATEMENT

1.    Grace's Motion fails at the threshold. Grace premises its Motion upon the pretext of "estimation" of personal injury tort claims. But one single fact shows that this stated reason is nothing more than a subterfuge. The fact that gives the lie to Grace's ruse is this: the thirty Silber Pearlman clients who appear on Grace's Exhibit H are not tort claimants at all. Twenty-three of them were reviewed, settled and paid in full by Grace long ago. They are not creditors. They have nothing to do with this bankruptcy case. The remaining seven were also reviewed and settled by Grace but have not yet been paid, giving rise to claims for breach of contract. These contract claims are in the

---

[1] Debtors are referred to herein collectively as the "Debtor" or "Grace."

dollar amount of their negotiated settlement.  Grace itself executed these settlement agreements and knows exactly how much money is owing to each of the seven claimants on their settlement contracts.  The Silber Pearlman clients cited by Grace are not tort claimants and their claims do not need to be "estimated."  The "discovery" that Grace seeks premised on these closed cases is illogical—in truth, it is unnecessary.

2.      The Debtor moved for an estimation of personal injury claims.  Debtor proposes confirmation of a plan of reorganization with a §524(g) trust.  In order to determine whether the plan should be confirmed, this Court will need to determine the feasibility of the proposed 524(g) trust.  In order to do this, the Court will have to hear testimony as to the aggregate liability of the Debtors for the asbestos liabilities channeled to the trust.  The Debtor already has all the information that it needs to present its view of aggregate liability to the Court.  It has a huge trove of data accumulated over years of trying and settling asbestos claims.  It has its litigation and settlement histories.  By the time of the estimation hearing, Grace will have more than enough information to allow this Court to perform its duties under §502(c) of the Bankruptcy Code.  Specifically, this Court will be able to determine whether the §524(g) plan proposed by the Debtor is feasible taking into account the asbestos claims now asserted against Grace and its historical claims experience.  This was in fact one of Judge Rodriquez' principal points in *In re Federal Mogul Global, Inc..*, Civ. No. 05-59 (D. Del. August 19, 2005) (JHR).  Grace's Motion is unnecessary and improper discovery.  This Court will have before it all that it needs to estimate feasibility

3.      Grace's Motion is actually a transparent package of innuendo having nothing to do with estimation, with §524(g) or with plan confirmation.  It is a litigation

tactic designed to grab the headlines of the national press.   In the guise of a simple discovery request, the Motion at its core is a vilifying attack against the asbestos plaintiffs' bar as a whole, and Silber Pearlman in particular.   The Motion is premised almost entirely on supposition and seriously flawed factual assumptions, and but for the privilege afforded judicial pleadings, Grace's publication of the Motion would likely be actionable by Silber Pearlman and other law firms named in the Motion.

4.   With regard to Silber Pearlman specifically, there is simply no factual basis for it to be the target of this ill-conceived Motion.   The Silber Pearlman clients cited by Grace assert no tort claims in this case.   Silber Pearlman did not appear in the Texas Silica MDL and is not mentioned in Judge Jack's opinion.   Moreover, with regard to Silber Pearlman's asbestos cases against Grace, Grace attempts to rewrite history.   Of the thousands of cases that Silber Pearlman has handled against Grace over the years, Grace has included only thirty cases—all of which have previously been individually examined and settled by Grace—as a springboard for, hurling opprobrium (indeed, mud) at Silber Pearlman.   Federal courts have consistently noted that fraud is easy to allege but hard to prove. *see, e.g., Doctors Hospital of Hyde Park*, 308 B.R. 311 at 322 (Bankr.N.D. Ill. 2004) and they have Federal Rule of Civil Procedure 9(b) in place to prevent the abusive and unfounded use of a charge of "fraud."   With this guidance in mind, it is shocking that Grace's elephantine Motion gives not a singular particular of how this non-existent "fraud" is alleged to have occurred.   Who, when, and where, all these particulars of "fraud" are stunningly missing. *See In re Rockefeller Center Properties, Inc. Securities Litigation*, 311 F.3d 198 (3d Cir. 2002) (affirming summary judgment of a securities fraud suit where allegations were not supported "with all of the essential factual

background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." Id. at 216).

5.      Other than a footnote reference to Silber Pearlman and a cryptic listing of thirty (out of thousands) of its settled clients on an exhibit, there is nothing whatsoever that says why this respected law firm is accused of "fraud." This silence in laying out the particulars of the alleged "fraud" is strong evidence that there is no fraud, and of the lack of good faith on the part of Grace and its lawyers in suggesting it.

6.      The reason that Grace does not include specifics is that any specific information about its clients and their dealings with Grace over the years would *disprove* the possibility of fraud.  The tort litigation between Silber Pearlman's clients and Grace was conducted in a public forum, and as to the thirty clients with whom Grace settled that are referenced in the Motion, in the open air of negotiations which a sophisticated Grace ultimately chose to resolve through an arm's length settlement.  By definition, the settlement was at a mutually agreeable market-determined value that incorporated both sides' assessment of the merits (or lack thereof) of the opposition's case.  This was one of the essential points made by District Judge Rodriguez' opinion  in *Federal Mogul Global Inc*., Civ. No. 05-59 (JHR) (D.Del. 2005):

> It would be impracticable, if not impossible, to weigh all of the factors that have influenced personal injury litigation in the United States, make adjustments, and then reach a well-reasoned conclusion that differs from what the market has told us a claim is worth.  The market is just that, a market; as such it would not be prudent to second-guess the historic resolutions that were driven by factors by *both* plaintiffs and defendants, and relied upon here by competent experts in formulating an estimate."
> *Id*., slip at 59.

7.      Grace's allegations intentionally omit the particulars required by Fed. Rule Bankr. Proc. 7009(b).  Grace's Motion intentionally omits the fact that Grace negotiated a

prepetition settlement agreement pursuant to which Grace itself reviewed medical criteria information, including such information for every single one of the Silber Pearlman clients who now inexplicably appear on Grace's Exhibit H.  It willfully omits the fact that these settled claimants submitted detailed proof of exposure and disease diagnoses to Grace and were ***approved*** by Grace for payment.  Grace does not contend, and in fact can not contend, that there exists even a shred of evidence that these settled asbestos claims of Silber Pearlman clients were based on anything other than competent medical diagnoses.   *In fact, each of the Silber Pearlman claims meets the objective medical critera for compensation for asbestos disease historically used by Grace itself.*  There is not a fact pleaded to the contrary.

8.      One wonders if Debtors and their counsel even read their Motion before filing it.  In footnote, they airily slander a well-esteemed law firm with the following reference:  "In total, 18 law firms fit the above [self-created] criteria. Those firms are: [naming] Silber Pearlman [and seventeen others]."  Motion at p.2 n.1.  And what were these self-created "criteria" that justified Grace in accusing Silber Pearlman of "fraud"? —the same Grace that had agreed to a process to review and settle claims, and that had in fact signed off on every single claim of a Silber Pearlman client shown on Exhibit H?

9.      Here is Grace's self-imposed and self-created Criterion One:  "(a) firms that have filed silica "retreads" against Grace as confirmed by a social security number match".  Motion at. p. 2. Silber Pearlman has filed no silica claims against Grace.  Then follows Grace's self-imposed and self-created Criterion Two:  "(b) firms that have filed silica "retreads" against Grace as confirmed by last name, first name, and middle initial match."  Motion at. p. 2.  Again:  Silber Pearlman has filed no silica claims against

Grace.  Finally Grace sets forth self-created and self-imposed Criterion Three:  "firms which were criticized by Judge Jack in the Silica Opinion for having brought large numbers of "retread" silica/asbestos claims and who are now before this Court with thousands of claims against Grace."  Motion at. p. 2.   As Grace and its counsel well know (and as they have known at all relevant times), Judge Jack did not mention Silber Pearlman, much less criticize it, and Silber Pearlman did not appear in the Multidistrict Litigation over which Judge Jack presided.  By Grace's own criteria, Silber Pearlman has no place in this witch hunt.

10.    Moreover, responding to the so-called "minimally invasive" questionnaire – acknowledged by Grace as just the first round of this discovery – could potentially require thousands upon thousands of hours of effort by lawyers and paralegals.  Taking discovery from opposing attorneys, while not completely prohibited, raises numerous ethical questions and issues of privilege, and should only be undertaken in very limited circumstances.

11.    The Motion is nothing more than an attempt to use Judge Jack's opinion as an opportunistic means to negatively influence this Court's view of all of the claimants' lawyers in this case.  Because it lacks foundation in general, because it does not (and can not) allege any evidence as to Silber Pearlman specifically, the Motion should be denied.

### FACTUAL BACKGROUND

12.    No Silber Pearlman client has brought a silica claim against Grace.

13.    Silber Pearlman took no part in the Texas silica multidistrict litigation (In re Silica Products Liability Litigation; MDL No. 1553, S.D. Tex.) ("Texas Silica MDL"),

and Silber Pearlman is not mentioned by Judge Jack in her opinion regarding issues with certain silicosis diagnoses in that case.  2005 WL 1593936 (S.D. Tex.).  (the "Judge Jack Opinion").

14.    Grace entered into a binding contractual settlement with each and every Silber Pearlman client named in Exhibit H to its Motion prior to the Petition Date.  It fully funded twenty-three of them.

15.    Grace does not allege a single "particular" with respect to Silber Pearlman that would meet the requirements of Fed. Rule Bankr. Proc. 7009(b) made applicable to this contested matter by Fed. Rule Bankr. Proc. 9014.

### ARGUMENT AND AUTHORITIES

**A.    Grace's Motion is bereft of evidence, relying instead on indiscriminate supposition that is not permitted under Bankruptcy Rule 7009(b)**

16.    Grace is asking this Court to authorize incredibly burdensome, across-the-board discovery, to every lawyer for every asbestos creditor in this case, on what amounts to nothing more than a "hunch."  Grace estimates that there are approximately 118,000 asbestos claims in this case.  Grace asserts (without proof) that it has found 76 persons – approximately .06% (six one-hundredths of one percent)--who have also filed silica cases somewhere.[2]  No Silber Pearlman client, however, has ever filed a silica claim against Grace.  This fact alone should provide grounds for denying Grace's Motion.

---

[2] Grace's only support for this allegation is two unverified spreadsheets – created by Grace – that raise more questions than they answer.  There is no information about where the alleged silica claims were filed, who filed them and whether any of the medical professionals criticized in Judge Jack's opinion made the silicosis diagnoses.  In short, there is nothing to suggest that the claims are in any way suspect other than they are simply silica claims.

17.     Grace's Motion is in essence a fraud pleading without the specificity required by FED. R. CIV. P. 9(b), made applicable in bankruptcy by Fed. R. Bankr. P. 7009 and 9014.  The Motion is peppered with the words "fraudulent medical evidence," "junk asbestos claims," "bogus claims," "questionable attorney practices," etc.; but it provides absolutely no factual specificity with regard to any asbestos claim made in this case.  The Motion uses the word "retread" as if it is some statutory definition, and even attributes the word "retread" over and over to Judge Jack, although Judge Jack never used the word once in her opinion.  One glaring example is on page 2 of the Motion, where Grace states that it wants to immediately begin traditional discovery from "firms which were criticized by Judge Jack in the Silica Opinion for having brought large numbers of *'retread'* silica/asbestos claims," suggesting by the use of quotation marks around the word that it had been used by Judge Jack in her opinion.

18.     Fed. R. Civ. P. 9(b) is a fundamental rule of pleading in federal courts.  It is a specific exception to the otherwise liberal "notice" pleading rules.  As the Court of Appeals for the First Circuit has written:

> Rule 9 imposes a heightened pleading requirement for allegations of fraud in order to give notice to defendants of the plaintiffs' claim, to protect defendants whose reputation may be harmed by meritless claims of fraud, to discourage "strike suits," and to prevent the filing of suits that simply hope to uncover relevant information. [citing earlier case]

*Doyle v. Hasbro, Inc.,* 103 F.3d 186, 194 (1st Cir. 1996)(emphasis supplied).  This is the uniform federal law, *see, e*.g., *United States v. Costner*, 317 F.3d 883 (8th Cir. 2003) as well as the law of this circuit. *see In re Rockefeller Center Properties, Inc. Securities Litigation*, 311 F.3d 198 (3d Cir. 2002).

19.     This requirement of particularity in pleading fraud is applicable to all bankruptcy matters, whether adversary proceedings, by virtue of Fed. R. Bankr. P. 7009(b) or contested matters, by virtue of Fed. R. Bankr. P. 9014.  Bankruptcy courts, like all federal courts, take the purport of the rule seriously and will dismiss a claim of "fraud" when it does not detail the facts giving rise to the claim.  For example, in *Doctors Hospital of Hyde Park*, 308 B.R. 311 at 322 (Bankr.N.D. Ill. 2004), the bankruptcy court dismissed a fraud allegation for a failure to state the specifics of the fraud:

> Lasalle's fraud claims will nonetheless be dismissed because they were not pled with sufficient particularity.  Federal Rule of Civil Procedure 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be pleaded with particularity."  ***A fraud pleading must include the "identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff."***  GE Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1078 (7th Cir. 1997)(citations omitted).
>
> ***
>
> ***Fraud is a serious charge, easy to allege and hard to prove.  The rules therefore require pleading with particularity.  It must be clear from the beginning the plaintiff has specific details of what happened, when, where, and to whom.  No such details are alleged.***  Count IV will therefore be dismissed. *Id.* at. 322 (emphasis supplied).

The Debtor's unparticularized charges of "fraud" cannot be used as a ground for seeking additional discovery.  In fact, Rule 9(b) is designed "to prevent the filing of suits that simply hope to uncover relevant information." *Doyle v. Hasbro, Inc.,* 103 F.3d 186 at 194.  Grace's wholesale evasion of detail is the very abuse that Rule 9(b) attempts to deter.

20.     Grace's hyperbolic inattention to the requirements of the rules becomes even more condemnable when considered against the very tenuous link between the

Texas Silica MDL and this case.  Although Judge Jack's opinion (which is being contested by the parties in that case and is not yet final) does strongly condemn the unreliability of certain silicosis diagnoses made in that case, and suggests that some asbestosis diagnoses may have been simply transformed into silicosis diagnoses, nowhere does it suggest that the opposite has ever happened – i.e., that silicosis diagnoses have been transformed into asbestosis diagnoses.  Judge Jack specifically noted that prior studies of asbestos diagnoses were irrelevant to the issues in the Texas Silica MDL and that she would not rely upon them in deciding the issues before her.  Texas Silica MDL Opinion at p. 46.  Nothing in her opinion raises any specific issue regarding asbestos claims in this case.  It is Grace that makes the bounding leap backwards, alleging essentially that Judge Jack's opinion throws the entire tort system in the United States into suspicion, and that every attorney in this case must undergo an extensive investigation of his/her practices on the off chance that some possible connection to the events in the Texas Silica MDL might be found.

**B.**      **The Motion demonstrates an obvious lack of factual investigation.**

21.      The Motion divides all attorneys into two classes: (i) those attorneys to whom Grace will first send the questionnaire before beginning "traditional discovery," and (ii) those attorneys to whom Grace will not wait for a questionnaire response, but who will immediately get the traditional discovery.  (This "traditional discovery," while not fully explained in the Motion, will likely seek both the information sought in the questionnaire and much more, such as document requests, interrogatories, depositions of lawyers and other law firm personnel, etc.).  Grace plans to impose the "traditional discovery" treatment on law firms that satisfy one of three criteria conceived by Grace:

(a) firms that have filed silica claims against Grace as determined by social security number matches, (b) firms that have filed silica claims against Grace as determined by name matches, and (c) firms that were criticized by Judge Jack for having brought large numbers of "retreads" (again, a word she did not use).  The Motion identifies 18 law firms that Grace contends satisfies one or more of these criteria, but does not provide any kind of specific evidence against those 18 firms.  In addition to the current group of 18, Grace proposes to move on to the traditional discovery phase as to any other firm if, in Grace's view, the firm's response to the questionnaire uncovers evidence suggestive of unreliable methodologies, possible fraud or bias.  Motion at p. 16. [3]  Silber Pearlman was included in the group of 18 firms, but does not satisfy any of Grace's criteria.   In considering Silber Pearlman's erroneous inclusion in the group of 18, it becomes clear that Grace did not conduct even the most basic investigation before it named the 18 firms.

22.    The Motion is simply untruthful.[4]  No Silber Pearlman client ever brought a silica claim against Grace.  Grace knows this.  Silber Pearlman did not appear in the MDL.  Grace knows this, too.  There is simply no indication that Grace conducted any investigation before it decided to make the very serious charges contained in the Motion. Unfettered by the particular facts of individual situations, Grace simply tossed malfeasance accusations like rice at a wedding – it's not important where they fell.

---

[3] The Court should not be taken in here.  Judging from the meager evidence on which Grace brought this Motion in the first place, it will take very little for Grace to feel that it has found something "suggestive" of "unreliable methodologies, potential fraud or bias," in order to inflict the unspecified "traditional discovery" on firms other than the original group of 18.  Grace will be back to feed at the trough over and over again, subjecting as many plaintiffs' lawyers as possible to the burden and expense of as much discovery as it can get away with.

[4] As noted above, Silber Pearlman does not satisfy the third criteria because it is not one of the firms criticized in Judge Jack's opinion.  Grace knows this because *presumably* Grace's counsel read the opinion.

23.    Silber Pearlman's inclusion in the group of 18 law firms, which were singled out by Grace as deserving of the immediate "traditional discovery" due to "evidence suggestive of unreliable methodologies, possible fraud or bias," (see Motion at 16) is a reckless and slanderous allegation that is violative of Rule 11.  There is a reason that Rule 9(b) requires fraud to be pled with specificity – to avoid claims of fraud without true evidence.  Grace is fortunate that it leveled these slurs in a legal pleading, because, without the immunity the legal process affords, these unsupported accusations would invite a libel suit by Silber Pearlman and perhaps others of the law firms wrongfully named. [5]

24.    The conduct of Grace is even more egregious when it is remembered that Grace has already reviewed and approved for settlement the medical evidence submitted by Silber Pearlman in each and every of the thirty  cases that it puzzlingly places on Exhibit H.  Grace paid twenty-three of them, and the remaining seven are due to be paid the agreed-upon settlement amount.  Thus the situation of Silber Pearlman's claimants is different than that of many asbestos claimants in this case.  Grace already possesses in its own records the exposure and medical information for each of them, and in fact, has exposure and medical information of countless other clients of Silber Pearlman that it has accumulated over the years, from discovery, in litigation, and most importantly, in settlement.  Further investigation would be duplicative and unnecessary and would lead to no useable information in this case.

---

[5] There is little doubt that the false statements made by Grace would be actionable libel if uttered in a non-judicial forum.  While precise formulations differ from jurisdiction to jurisdiction, as a general matter, "a communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."  RESTATEMENT (SECOND) TORTS § 559.  Accusing an attorney of fraud is without question a defamatory communication.

C.    **The discovery would not be relevant to the estimation proceeding.**

25.    Grace's stated purpose of pursuing this discovery is to obtain information relevant to the claims estimation process.    As to Silber Pearlman, however, the contemplated discovery would be a spectacular example of disproportionality:    only seven of the Silber Pearlman clients mentioned in Grace's Motion have open claims against Grace, and even those few unfunded claims were reviewed prepetition and approved for payment by Grace.    These are contract claims that do not need estimating. The estimation process is intended to estimate the number and dollar value of claims that will be asserted against the estate.    Here the number of Silber Pearlman's open claims shown on Exhibit H is exactly seven, and the value of those seven is already known from Grace's own settlement of those very claims.

26.    Estimation of claims is to be undertaken only with regard to "any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case."    11 U.S.C. § 502(c)(1).    "However, in cases where a claim is neither contingent nor unliquidated, estimation is simply inappropriate."    *In re Continental Airlines*, 981 F.2d 1450, 1461 (5th Cir. 1993); *In re Southern Cinemas, Inc*., 256 B.R. 520, 533 (Bankr. M.D. Fla. 2000).    This is precisely the case here, where the claims Grace cites as justifying discovery are neither contingent nor unliquidated.    Thus, the "estimation" that Grace seeks would clearly not be for the purposes of estimation as contemplated by the Code, but would only serve some other, ulterior, purpose of Grace.    In fact, it is the intrusive discovery that is sought by Grace that would "unduly delay the administration of the case," having the converse effect of what estimation is intended to accomplish.

27.     Moreover, the investigation of the merits of individual claims has been
held in several similar cases to be unnecessary and irrelevant for estimation purposes.  In
the very recent estimation opinion of Judge Rodriquez in *In re Federal Mogul Global,
Inc.*, Civ. No. 05-59 (D. Del. August 19, 2005) (JHR), the District Court refused to allow
comprehensive discovery of a "sample" of individual claimants for purposes of claims
estimation.  The Court emphasized that the proper inquiry for estimation is not the merits
of individual claims, but instead the historical claims settlement values of the Debtor :

> the focus is on [the Debtor's] aggregate personal injury liability for the
> creation of a trust, *not the merits of individual or class of individuals
> claims.*  To do the latter would require that each claimant be afforded the
> procedural protections of the due process clause of the Fifth Amendment,
> thereby requiring that cases that presented disputed issues of fact a trial by
> jury. . . . [T]his estimation did not involve the discovery of individual
> claims, but rather an inquiry focused on [the Debtor's] historical claims-
> handling practices, and expert testimony on trends and developments in
> the asbestos tort system.  *To do otherwise would eviscerate the purposes
> of the estimation process and place additional financial burdens on the
> very trust which the Court is trying to create.*

*Federal Mogul* at 44 (emphasis added).

28.     The issues presented by Judge Jack's opinion in the Texas Silica MDL
were presented to Judge Rodriquez, but he found that they did not serve as a basis for a
different estimation methodology and rejected the claim that the opinion had brought to
light any new information regarding illegitimate claims or incompetent medical
diagnoses.  *See Federal Mogul* at 50.

29.     It is acknowledged that this Court has elected to allow discovery from
individual claimants regarding the specifics of their claims, but the reasoning of the
*Federal Mogul* decision is highly instructive for this Court's consideration of this current
Motion that purports to find a necessity for unprecedented discovery for the purposes of

estimation.   The Motion calls to mind the adage, "give someone an inch and he will take a mile."   This Court has given much more than an "inch" to Grace on the issue of discovery of individual claims, authorizing the extensive questionnaire that was sent to all asbestos claimants.   Not content, Grace now wants to take many, many "miles" of even more discovery and expand the individual claims investigation way beyond anything remotely appropriate.

30.     To take discovery of the merits of individual claims is one thing, but it is another to authorize what will amount to nothing more than a "witch hunt" into the inner workings of every law firm representing any claimant.   This is obviously not discovery for claims estimation.     Whether one agrees or disagrees with Judge Rodriquez' conclusion (although as a District Court judge in this district his opinion cannot be disregarded), one cannot ignore that the current Motion seeks relief far beyond the investigation of individual claims.

**D.**     **Taking discovery from opposing counsel should be granted only in exceptional circumstances.**

31.     Although the Federal Rules provide for broad and liberal discovery, *Pacitti v. Macy's*, 193 F.2d 766, 777 (3d Cir. 1998), the scope of permissible discovery is not unlimited.   *Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 191 (3d Cir. 1999) ("Although the scope of discovery under the Federal Rules is unquestionably broad, this right is not unlimited and may be circumscribed.").   Importantly, under Rule 26(b)(1), the discovery sought must be "relevant to the claims or defense of any party."

32.     And while it is true that the Federal Rules of Civil Procedure do not expressly prohibit taking discovery of opposing counsel, federal courts have evinced an

unambiguous disfavor for the taking of the deposition of a party's attorney, except in limited circumstances. *See e.g.*, *Theriot v. Parish of Jefferson*, 185 F.3d 477, 491 (5th Cir. 1999), *cert. denied*, 529 U.S. 1129. The Eighth Circuit has even called the practice a "negative development in the area of litigation" and pointed out that "[c]ounsel should be free to devote his or her time and efforts to preparing the client's case without fear of being interrogated by his or her opponent." *Shelton v. Amer. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1987).

33.    The inherent dangers in allowing the depositions of counsel are well-recognized by the courts. It has been noted that such a deposition "provides a unique opportunity for harassment; it disrupts the opposing attorney's preparation for trial, and could ultimately lead to disqualification of opposing counsel if the attorney is called as a trial witness." *Prevue Pet Products, Inc. v. Avian Adventures, Inc.*, 200 F.R.D. 413, 418 (N.D. Ill. 2001), quoting *Marco Island Partners v. Oak Dev. Corp.*, 117 F.R.D. 418, 420 (N.D. Ill. 1987). In addition, courts have expressed the concern that depositions of opposing counsel could lead to collateral litigation over peripheral issues, such as privilege, immunity, and harassment claims, and place additional burdens on both the court and the parties. *Kaiser v. Mutual Life Ins. Co. of New York*, 161 F.R.D. 378, 381 (S.D. Ind. 1994).

34.    Courts in this District have set a high bar to discovery of a litigant's opposing counsel, requiring that the information be not only relevant, but crucial, nonprivileged and otherwise unavailable. *Smith v. U.S.*, 193 F.R.D. 201, 215 (D. Del. 2000) (Thynge J.), quoting *Shelton v. Amer. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1987); *see also*, *Allergan, Inc. v. Pharmacia Corp.*, No. Civ.A.01-141, 2002 WL

1268047 at *1 (D. Del. May 17, 2002). [6]  Grace has not even attempted to satisfy these criteria in this case.

35.     Twenty-three of the "claims" that Grace uses as a basis for the unconscionable foray into a law firm's files *are not claims in this bankruptcy at all*.  The individuals listed were paid long ago.  They are not creditors.  They are shown on no Rule 2019 Statement.  They are not in this case.  As to the remaining seven, they are settled claimants holding contract claims against Grace for their unpaid settlement amounts.  Grace reviewed each of these claims in detail, reached at arm's length a decision to settle them, and then entered into an agreement to settle their claims for a dollar amount.  None of this requires any delving into an opposing attorney's file.  Nothing more from them is needed; nothing is relevant; nothing is crucial.  See *Smith v. U.S.*, 193 F.R.D. 201, 215 (D. Del. 2000).   The seven  Silber Pearlman claim listed on Exhibit H—seven claims already tested in the tort system with the full range of civil discovery available to Grace and then settled and subjected to the approval process agreed to by Grace—cannot possibly create the springboard into a "fraud" investigation into an opposing attorney's files under the law of this District.  Grace used the tort system.  That process is over.  Silber Pearlman's clients have simple contract claims requiring no discovery.

36.     Moreover, it is an absolute certainty that Grace's proposed discovery will create untold collateral litigation over work product[7] and attorney-client[8] privileges.  The

---

[6] Although not yet considered by the Third Circuit, the *Shelton* test has been adopted in several other circuits.  *See e.g.*, *Nguyen v. Excel Corp*, 197 F.3d 200, 208 (5th Cir. 1999); *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1112 (10th Cir. 2001); *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 278 F.3d 621, 628 (6th Cir. 2002).
[7] The federal work product doctrine protects the confidentiality of matters prepared by or on behalf of attorneys in anticipation of litigation.  FED. R.. CIV. P. 26(b)(3).  The doctrine is designed to eliminate "unwarranted inquiries into the files and mental impressions of an attorney" while recognizing that it is

massive discovery to be taken of every opposing counsel in this case – representing approximately 118,000 clients – will predictably result in numerous assertions of privilege that will need to be decided by the Court on a case by case basis.    This estimation proceeding will be swamped by discovery disputes that are unnecessary for a determination of the true issues in contention.    The aggregate cost in time and money to (i) the parties, (ii) the law firms who will have to retain counsel (both in their home state and in Delaware) to litigate the privilege issues, and (iii) the Court, will be vast.    These costs will greatly outweigh any possible benefit to the discovery, requiring denial of the Motion.

**E.**    **The Questionnaire is an improper set of interrogatories directed to non-parties.**

37.    The proposed questionnaire is in essence, a set of interrogatories that will be directed to non-parties to this action.    There is no rule of procedure, however, that allows utilizing interrogatories as a discovery device with regard to non-parties.    Federal Rule of Civil Procedure 33 states that "any party may serve upon any other ***party*** written interrogatories."    FED. R. CIV. P. 33(a) (emphasis added).    Other discovery rules expressly permit the taking of depositions and service of document requests on non-parties, but a

---

"essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel".    *Rail Intermodal Specialists, Inc. v. Gen. Elec. Capital Corp.*, 154 F.R.D. 218, 221 (N.D. Iowa 1994), quoting *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947).    Protecting attorney work product allows attorneys to work without the unnecessary fear that their work may one day be used against either them or their clients.    *Westinghouse Elec. Corp. v. Rep. of the Philippines*, 951 F.2d 1414, 1428 (3rd Cir. 1991) ("Protecting attorneys' work product promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against their clients.").

[8] The attorney-client privilege makes confidential certain communications between a lawyer and his or her client.    "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.    The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client."    *Upjohn Co. v. U.S.*, 449 U.S. 383, 389 (1981).

similar provision is not included in Rule 33.   Moreover, discovery of non-parties is required to be taken pursuant to a subpoena issued under Rule 45, which contains substantial protections against undue burden and expense and venue requirements for resolution of discovery disputes.[9]   Grace apparently hopes to have this Court simply disregard all procedural rules and authorize this discovery without any of the protections afforded non-parties under Rule 45.   With deference, Silber Pearlman believes the Court should decline any such invitation.

**F.     The Questionnaire is anything but "minimally invasive."**

38.     Demonstrating yet another remarkable economy with truth, Grace describes the questionnaire it proposes to propound to attorneys as "minimally invasive" and implies that the associated burden upon responding law firms will be slight.   Motion at 19.   Although the proposed questionnaire is two pages long – a point Grace highlights – an affirmative answer to any of the eight inquiries in subpart II.a. could easily entail a response that comprises many pages.   Affirmative answers would also trigger a demand for the production of documents, which could be widely dispersed among client files and other records, invasive of the attorney-client and work product privileges, extremely time consuming to assemble, and voluminous in the aggregate.

39.     The objectionable nature of the proposed law firm questionnaire starts immediately in Part I, entitled "Identity of Law Firms and Claimants."   Subpart I.a. inquires whether the respondent shares office space with other law firms or professional

---

[9]For instance, Rule 45 requires the party responsible for the discovery to "take reasonable steps to avoid imposing undue burden or expense" on the responding party.   Fed R. Civ. P. 45(c)(1).   Such duty is enforced by the local court that issues the subpoena.   *Id.*   The rule also specifies a mechanism for discovery motion practice in the court that issues the subpoena, if there is an objection to the discovery on various grounds.   Fed R. Civ. P. 45(c)(2)(B) and (c)(3)(A).   By the Motion, Grace wants to skip over Rule 45 entirely and eviscerate the protections afforded therein.

entities and, if so, asks that such third parties be identified.  This inquiry is plainly irrelevant to the estimation of asbestos claims in this bankruptcy case or any other issue properly considered in the administration of those cases.  Then Subpart I.b. directs the respondent to attach a list of all clients represented by the lawyer (or his or her firm) who received one of Grace's other questionnaires – the variant directed to asbestos personal injury claimants.  This, too, is totally unnecessary. Grace knows the asbestos claimants to whom it disseminated such questionnaires.  Moreover, this inquiry is duplicative of information already in Grace's possession by virtue of the Court's Revised Order Requiring Filing of Statements Pursuant to Fed. R. Bankr. P. 2019 (the "2019 Order"; Dkt. No. 6715).  Pursuant to the 2019 Order, Grace was provided with exhibits to all 2019 Statements on compact disks by law firms filing 2019 Statements.  These exhibits include, among other matters, the names of all the claimants represented by respondent firms that filed 2019 Statements.

40.    It is in Part II, entitled "Firm's Relationships," where the mischief radically escalates.  Subpart II.A. instructs the respondent law firm to answer whether or not "your firm, a member of your firm, or any employee of your firm have a (past or current) direct or indirect financial relationship with any of the following (check all that apply)":

- Other law firms that represent asbestos claimants.
- Doctors who diagnose asbestos-related disease.
- Doctors or Technicians who perform chest x-rays.
- B-readers.
- Doctors or Technicians who perform PFT's.
- Doctors who interpret PFT results.
- Pathologists who diagnose asbestos-related disease.
- Screening companies that perform x-rays, B-reads, or PFT's.

41.    Respondents are also instructed that they must also complete subpart II.b. to provide additional, comprehensive details of **each** "relationship" that might fall within subpart II.a..[10]    The specific implications of these inquiries will be discussed in paragraphs 46 through 48, below.

42.    A threshold concern, however, is the obvious breadth and imprecision of the words "indirect or direct financial relationship."  If a respondent law firm did nothing more than pay a doctor's invoice for a chest x-ray, Grace would almost assuredly maintain that an "indirect or direct financial relationship" had been established, necessitating the burdensome disclosure called for by subpart II.b.

43.    Another grave concern is the absence of any temporal limitations.  Any "past or current" financial relationship would have to be not only disclosed but detailed. In the example used above, it would not matter if the law firm had paid the doctor's invoice twenty years ago for a patient that had died ten years ago and had never made a claim against Grace; the absurdly fine sieve of Debtor's questionnaire "catches" all financial relationships without regard to timing.

44.    Nor would the chest x-ray performed by the physician necessarily have had to relate to an asbestos related malady.  As worded, the questionnaire calls for the disclosure of the respondent's "relationship" with all medical professionals and would even apply with respect to clients complaining of such unrelated matters as automobile accidents.

45.    Answering the proposed questionnaire would require responding firms to expend thousands—quite possibly *even tens of thousands*—of hours examining client files, accounting records and other historical documentation to ferret out all "indirect or

---

[10] The emphasis on the word "each" is not added – it is used by Grace in the questionnaire.

direct financial relationships" under penalty of perjury (as required by Part III of the questionnaire).

46.    Regarding the individual inquiries under subpart II.a., the first question – whether the respondent has (or had) a direct or indirect financial relationship with "[o]ther law firms that represent asbestos claimants" – is not only improper but is also a matter that has already been ruled on by this Court.  Co-counsel or referral relationships with other law firms cannot lead to the discovery of admissible evidence concerning the estimation of claims.  More significantly, the Court elected *not* to include such matters in the disclosure required pursuant to Rule 2019 in this case.  The Court's 2019 Order was not appealed, and has been final for many months.

47.    The other seven inquiries in subpart II.a. ask if the respondent has ever had a "direct or indirect financial relationship" with diagnostic physicians, takers of x-rays, B-readers, PFT performers or interpreters, pathologists, and screening companies – essentially all medically-related consultants routinely engaged by law firms in an asbestos mass tort practice.  Grace clearly intends to compel massive disclosure, since these consultants assuredly do not work for free.  The arms'-length payment of their bills in the ordinary course through a respondent law firm – standard practice in a mass tort law practice – implicates "indirect or direct financial relationships" triggering massive additional disclosure under subpart II.b.

48.    Subpart II.b. then seeks to elicit a comprehensive explanation of all "indirect or direct financial relationships."  The explanation would require a listing of (i) the identity and contact information of the third party, (ii) the third party's employer (if the third party is an individual), (iii) the person(s) at the respondent firm with the past or

current relationship, (iv) the "nature" of the relationship, including terms, fees, documentation, etc., (v) the duration of the relationship, (vi) other individuals or entities "involved" or who "were involved" in the relationship, (vii) the person(s) at the respondent firm most knowledgeable about the "financial component" of the relationship, and (viii) a directive that the respondent firm "[i]dentify and produce all documents describing the relationship."

49.    The breadth of the requested disclosure is astonishingly broad and correspondingly burdensome.  A respondent firm would arguably be called upon to comb minutely through all client files and other records (an absurd and costly undertaking), identify responsive information while segregating responsive materials from privileged matters, and pull documents that are responsive, which are likely to be quite voluminous in the aggregate.  The vacuous sanctimony of Debtor's lip service to "minimiz[ing] the burdens placed on the parties and their attorneys by virtue of this discovery" is laid bare.

50.    Grace professes to seek, via the questionnaire, "basic information about potentially relevant financial relationships."  Motion at 19.  Grace thus concedes that the financial relationships they are inquiring about are, at best, only potentially relevant. Seldom, if ever, have litigants in any forum sought to impose such onerous and costly discovery burdens on adverse litigants' legal counsel where the relevance of that material sought is conceded, at the outset, to be doubtful and a matter of speculation.

## CONCLUSION

51.    Grace has already achieved one of its primary purposes in bringing the Motion—to slander the asbestos plaintiffs' bar.  The Motion does that well, accusing 18 law firms directly, and every other law firm indirectly, of fraudulent practices.  The

accusations are improper under Bankruptcy Rule 7009 and are the rankest conjecture. They should not be countenanced by this Court. The indictments made in the Motion are not supported by factual particulars and rely almost entirely on Judge Jack's opinion in the Texas Silica MDL, which is misquoted and misinterpreted, in a case in which Silber Pearlman did not even appear.

52.     As to Silber Pearlman, the Motion lacks any legitimacy whatsoever. The Silber Pearlman clients that Grace cites to support its Motion have all settled. Grace itself used the tort system and then chose to settle every one of them. It paid all but a handful before filing these cases. In each instance, Grace itself vetted the medical criteria for the Silber Pearlman asbestos claimants that Grace cites. Silber Pearlman's inclusion in the Motion by name was reckless; the statements made are simply false. There is not even a suggestion that Grace or its attorneys took seriously their obligations under Fed. R. Civ. P. 11, made applicable to these cases by Fed. R. Bankr. Proc. 9011, or their duties under the fundamental and well-known Fed. R. Civ. P. 9(b). The Motion should be denied in its entirety, but in any event as to Silber Pearlman. Moreover, the Court should consider the imposition of appropriate sanctions against Debtor for the defamatory statements concerning Silber Pearlman in the Motion.

WHEREFORE, Silber Pearlman prays that the Court enter its order denying Grace's Motion, and for such other and further relief to which it is entitled.

Dated: October 7, 2005

Sander L. Esserman
Robert T. Brousseau
Van J. Hooker
**STUTZMAN, BROMBERG,**
**ESSERMAN & PLIFKA,**
**A Professional Corporation**
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Telephone:  (214) 969-4900
Facsimile:   (214) 969-4999
E-mail:  esserman@stutzman-bromberg.com

-AND-

s/ Daniel. K. Hogan
Daniel K. Hogan (DE #2814)
**THE HOGAN FIRM**
1311 Delaware Avenue
Wilmington, DE  19806
Telephone:  (302) 656-7540

**ATTORNEYS FOR**
**SILBER PEARLMAN, LLP**

25