IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| W.R. GRACE & CO., et al., | : | Case No. 01-1139 (JKF) |
| | : | Jointly Administered |
| Debtors-in-possession. | : | |
| | : | |

## OPPOSITION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS TO DEBTORS' EMERGENCY MOTION FOR LEAVE TO TAKE DISCOVERY OF CLAIMANTS' ATTORNEYS

**CAMPBELL & LEVINE, LLC**

Marla R. Eskin (No. 2989)
Kathleen Campbell Davis (No. 4229)
Mark T. Hurford (No. 3299)
800 N. King Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 426-1900
Telefax: (302) 426-9947

**CAPLIN & DRYSDALE, CHARTERED**

Elihu Inselbuch
399 Park Avenue, 27th Floor
New York, NY 10022
Telephone: (212) 319-7125
Telefax: (212) 644-6755

Peter Van N. Lockwood
Nathan D. Finch
Jeffrey A. Liesemer
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone: (202) 862-5000
Telefax: (202) 429-3301

Counsel for the Official Committee
of Asbestos Personal Injury Claimants

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ii

INTRODUCTION AND OVERVIEW ...................................................................................1

ARGUMENT ..........................................................................................................................4

      I.     Silica And Asbestos Are Not The Same; What Occurred
            In The Silica MDL Does Not Create A "Crisis" In Asbestos
            Bankruptcy Estimation Proceedings ................................................................4

            A.    The Daubert and Jurisdictional Rulings in the Silica
                   MDL Have No Bearing on Bankruptcy Estimation............................................5

            B.    Unlike Silica, Tens of Millions of Americans Were
                   Exposed to Asbestos Over Many Years, so the Debtors
                   Cannot Allege Surprise or Outrage at the Multitude of
                   Asbestos-Related Claims Being Asserted Against Them ...................................9

      II.    The Debtors' Allegation Of "Fraud" In The Asbestos Tort
            System Is Not Supported By Specific, Credible Evidence ...........................................13

      III.   In Addition To Being Unnecessary, The Debtors' Proposed
            Discovery Is Improper, Burdensome, And Inappropriate............................................16

            A.    The Federal Rules Do Not Support Serving a Questionnaire
                   on Non-Party Lawyers ..........................................................................................17

            B.    The Debtors Have Not Met Their Burden of Proving That
                   Their Attorney-Directed Discovery Is Proper.....................................................18

            C.    The Proposed Questionnaire to Attorneys Is Overbroad
                   and Burdensome.....................................................................................................23

CONCLUSION....................................................................................................................24

## TABLE OF AUTHORITIES

## CASES

Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993)...................................................... *passim*

G-I Holdings, Inc. v. Baron & Budd, 2005 WL 1653623 *1-5
(S.D.N.Y. July 13, 2005) ..............................................................................................14, 20

In re Arthur Treacher's Franchisee Litigation, 92 F.R.D. 429 (E.D. Pa. 1981) ......................... 22

In re Drexel Burnham Lambert Group, 138 B.R. 717 (Bankr. S.D.N.Y. 1992).............................4

In re Eagle Picher, 189 B.R. 681 (Bankr. S.D. Ohio 1995)..........................................................21

In re Federal Mogul Global, No. 05-00059, 2005 WL 2218360
(D. Del. Sept. 13, 2005) ................................................................................5, 9, 12, 21

In re G-I Holdings, Nos. 01-30135 (RG), 01-389790 (RG) (Bankr. D. N.J.)...............................11

In re Kensington Int'l, Ltd., 368 F.3d 289, 315 (3d Cir. 2004) ......................................................4

In re Levy, 54 B.R. 805, 807 (Bankr. S.D.N.Y. 1985) ..................................................................4

In re Owens Corning, 322 B.R. 719, 722 (D. Del. 2005) ......................................................5, 8, 9

In re Silica Prods. Liab. Litig., 2005 WL 1593936 (S.D. Tex. Jun. 30, 2005) ..................... *passim*

In re W.R. Grace & Co., No. 01-1139 (Bankr. D. Del.).................................................................3

Kaiser v. Mutual Life Ins. Co., 161 F.R.D. 378 (S.D. Ind. 1994) ................................................23

Marco Island Partners v. Oak Dev. Corp., 117 F.R.D. 418, 420 (N.D. Ill. 1987) ........................19

Nationwide Mut. Ins. Co. v. Home Ins. Co., 278 F.3d 621 (6th Cir. 2002) ..................................20

Owens Corning v. Credit Suisse First Boston, 322 B.R. 719, 722 (D. Del. 2005)........................21

Pamida, Inc. v. E.S. Originals, Inc., F.3d 726 (8th Cir. 2002)................................................20, 21

Shelton v. American Motors Corporation, 805 F.2d 1323 (8th Cir. 1986)........................... *passim*

Slater v. Liberty Mut. Ins. Co., No. 98-1711, 1999 WL 46580, *1
(E.D. Pa. Jan. 14, 1999) ...............................................................................................19

Smith v. United States, 193 F.R.D. 201 (D. Del. 2000) ...............................................................20

Thiessen v. General Electric Cap. Corp., 267 F.3d 1095 (10th Cir. 2001)...................................20

United Phosphorous, Ltd. v. Midland Fumigant, Inc., 164 F.R.D. 245
(D. Kan. 1995) ...................................................................................................22

## RULES AND STATUTES

11 U.S.C. § 524(g) (2000) ................................................................................3

11 U.S.C. § 362 (2000) .....................................................................................7

Federal Rule of Bankruptcy 7033 .....................................................................3

Federal Rule of Civil Procedure 33 ...............................................................3, 17

Federal Rule of Civil Procedure 34 ................................................................17

Federal Rule of Civil Procedure 45 .............................................................17, 18

Federal Rule of Evidence 702 ..........................................................................6

Federal Rule of Evidence 703 ..........................................................................6

## OTHER AUTHORITIES

1986 American Thoracic Society Statement, The Diagnosis of Nonmalignant Disease
Related to Asbestos ........................................................................................10

David M. Dreisen, Distributing the Costs of Environment, Health and Safety
Protection: The Feasibility Principle, Cost-Benefit Analysis, and Regulatory
Reform, 32 B.C. Envtl. Aff. L. Rev. 1, 89 ......................................................10

Ducatman et al., "B-readers" and Asbestos Medical Surveillance, 644-7 J.
Occup. Med. 30 (1988) ..................................................................................11

Gitlin et al., Comparison of "B" Readers' Interpretations of Chest Radiographs
for Asbestos Related Changes, 11 Acad. Radiol. 843 (Aug. 2004)................11

Jonathan D. Glater, Lawyers Challenged on Asbestos, The New York Times,
July 20, 2005 ..................................................................................................13

Correction, The New York Times, July 25, 2005 ............................................14

Mark A. Peterson, Report on Opinions and Support for Opinions of Mark A.
Peterson Re: Asbestos Liabilities of W. R. Grace on March 30, 1998, at 26
(July 22, 2002) ...............................................................................................16

Nicholson, Perkel & Selikoff, Occupational Exposure to Asbestos, 3 Am. J.
Indust. Med. 259 (1982)..................................................................................10

U.S. Department of Health and Human Services, Public Health Service, Centers

for Disease Control and Prevention, Division of Respiratory Disease Studies, National Institute for Occupational Safety and Health, <u>Work-Related Lung Disease Surveillance Report</u> 2002....................................................................................................................................10

**OPPOSITION OF THE OFFICIAL COMMITTEE OF ASBESTOS
PERSONAL INJURY CLAIMANTS TO DEBTORS' EMERGENCY
MOTION FOR LEAVE TO TAKE DISCOVERY OF CLAIMANTS' ATTORNEYS**

The Official Committee of Asbestos Personal Injury Claimants ("Committee"), by and through their undersigned counsel, hereby opposes the Debtors' Emergency Motion for Leave to Take Discovery of Claimants' Attorneys ("Motion"), which was filed by the debtors and debtors-in-possession herein (collectively, "Debtors" or "Grace") on or about September 9, 2005.  The grounds supporting the Committee's opposition are as follows.

**INTRODUCTION AND OVERVIEW**

By way of their Motion, the Debtors seek, inter alia, to serve a discovery questionnaire on lawyers who represent individual asbestos claimants.  This is not proper.  The targeted lawyers are not parties to this bankruptcy case.  Moreover, the discovery being directed at these lawyers is not even remotely relevant to the task of estimating the aggregate value of asbestos personal-injury claims.  The Debtors are already attempting to test the merits of individual claims by serving questionnaires directly on asbestos claimants.  As noted before, the Committee continues to take exception to the practice of individual claims discovery in an estimation proceeding because, among other reasons, such discovery jeopardizes individual claimants' due process rights, including their right to a trial by jury on the merits of their claim.  The Debtors' attempt to pursue discovery of claimants' lawyers is simply an effort to grandstand, to "pile on" their previous set of questionnaires with more unnecessary questionnaires, and to harass lawyers at a time when these same lawyers are supposed to be helping their own clients answer the previously-served claimant questionnaires.[1]

---

[1] At the most recent omnibus hearing on September 26, 2005, the Debtors circulated a two-page handout summarizing what they described as a more "streamlined" version of their attorney-directed discovery proposal.  The Committee had no notice prior to September 26 that the

The Debtors' Motion primarily consists of broad generalizations, innuendo, and liberal citation to their previously-filed briefs as "evidence."  The Debtors attempt to justify the extraordinary discovery they seek by asking this Court to believe that there is some kind of "crisis" or "emergency" in asbestos claims litigation.  But the Debtors' cry has been heard before and says nothing new.  For example, the Debtors characterize a number of doctors in their motion as suspect, but asbestos defendants have known about these doctors and their reputations for at least the past 10 years.  Those same asbestos defendants dealt with such questionable doctors and their diagnoses either by refusing to pay claims in which those doctors were involved or by heavily discounting such claims.  The low quality of evidence provided by the criticized doctors is therefore <u>already reflected in the historical claims data</u>.  Thus, the criticized doctors and their evidence are not the kind of "new developments" that can justify serving discovery on non-party attorneys.

Further, the Debtors' continued sensationalizing of Judge Janis Graham Jack's decision in the <u>Silica Products</u> proceeding ("Silica MDL") also fails to justify the unprecedented discovery sought in the Debtors' Motion.  <u>See</u> <u>In re Silica Prods. Liab. Litig.</u>, 2005 WL 1593936 (S.D. Tex. Jun. 30, 2005) [hereinafter, "Silica Ruling"].  As this Court rightly noted at a previous hearing:  "Folks, I am not Judge Jack, and this isn't a silica case."  Hr'g Tr. of July 19, 2005 at

---

Debtors were going to propose a modified version of their discovery plan.  It is not clear whether the Debtors intend to amend their Motion to incorporate the apparent modifications they proposed on September 26.  In any event, it is not necessary for the Committee to address the Debtors' proposed modifications directly, since the Committee's objections are directed to the fundamental validity of the Debtors' overall proposal, regardless of the proposal's size or scope.  In other words, for purposes of this Opposition, it does not matter, for example, whether the Debtors intend to serve questionnaires on all claimants' attorneys or on a particular class of claimants' attorneys that is still large but less comprehensive than their original proposal.  For the reasons addressed herein, the Debtors' whole concept of serving discovery on claimants' attorneys, no matter how large the group, is fundamentally flawed and improper, and the Court should not permit it.

200-21, In re W.R. Grace & Co., No. 01-1139 (JKF) (Bankr. D. Del.) (attached as Exhibit A).

Despite the Court's correct and proper observation, the Debtors continue to holler about silica by

devoting a large share of their brief in support of the Motion to the Silica MDL.  But there are

real and important differences between the Silica MDL and this bankruptcy estimation

proceeding.  Among other things, Judge Jack's opinion addressed a Daubert dispute in

consolidated pre-trial proceedings that are wholly unrelated to bankruptcy estimation.  Yet,

through unfounded accusations, the Debtors try to gloss over the different procedural posture and

the substantive issues that Judge Jack was addressing.  This Court should continue to reject all

unremitting attempts of the Debtors to freely (and incorrectly) associate this bankruptcy case

with the Silica MDL.

The Debtors cannot serve the questionnaire on claimants' attorneys because those

attorneys are not parties to this bankruptcy case.  The Debtors themselves have analogized their

questionnaires to interrogatories, and as the Court well knows, interrogatories may be served

only on "parties" to a case.  See Fed. R. Civ. P. 33; Fed. R. Bankr. 7033.  Moreover, the Debtors

bear the burden of proving the need for attorney-directed discovery, and it is a burden they

cannot meet.  This Committee has every interest in ensuring that at the end of the day only

claims compensable under state law are allowed and paid in this case.  But the time and place for

testing the merits of each individual claim is the time of distribution from a section 524(g) trust,

in accordance with court-approved trust distribution procedures.  See 11 U.S.C. § 524(g) (2000).

The Debtors are already trying to test the merits of individual asbestos claims through their

questionnaire to claimants.  No useful purpose would be served by granting them leave to serve

additional questionnaires on claimants' lawyers and to pursue other attorney-directed discovery

as well.  For the reasons explained more fully below, the Court should deny the Motion.[2]

## ARGUMENT

I.    **SILICA AND ASBESTOS ARE NOT THE SAME; WHAT OCCURRED IN THE SILICA MDL DOES NOT CREATE A "CRISIS" IN ASBESTOS BANKRUPTCY ESTIMATION PROCEEDINGS**

The Debtors' Motion is premised almost entirely on the Silica MDL and the recent ruling

of Judge Janis Graham Jack in that proceeding.  See generally Silica Ruling.  In their Motion, the

Debtors speculate that some doctors, lawyers, or screening companies involved in the Silica

MDL may have also acted on behalf of certain asbestos claimants, and that certain claimants who

have asserted asbestos-related claims against the Debtors may have also asserted silica-related

claims in the Silica MDL – the so-called "retread claims."  The Debtors then use such

speculation to conclude that the doctors, lawyers, and screening companies who provided

evidence of the claimant's asbestos injuries "may have" committed fraud in their asbestos

diagnoses.  This chain of free association, the Debtors conclude, justifies the additional, attorney-

directed discovery in this estimation proceeding.  Yet, as explained below, the Silica Ruling

---

[2] The Committee represents, and owes a fiduciary duty to, the constituency of asbestos personal-injury claimants as a whole, and not to any individual claimant or claimant's attorney.  See In re Kensington Int'l, Ltd., 368 F.3d 289, 315 (3d Cir. 2004) ("[I]t is established that a Creditors Committee owes a fiduciary duty to the unsecured creditors as a whole, not to the individual members."); see also In re Drexel Burnham Lambert Group, 138 B.R. 717, 722 (Bankr. S.D.N.Y. 1992) ("The duty [of the committee and its counsel] extends to the class as a whole, not to its individual members."); In re Levy, 54 B.R. 805, 807 (Bankr. S.D.N.Y. 1985) ("Counsel for the creditors' committee do not represent any individual creditor's interest in this case; they [are] retained to represent the entire unsecured creditor class.").  Nevertheless, the Committee has decided to oppose the Motion, even though the Motion is ostensibly directed to claimants' attorneys, and not to the broader constituency of asbestos claimants.  Specifically, the Committee is concerned of (a) the potential disruption that attorney-directed discovery would create to an otherwise orderly estimation process, (b) claimants' attorneys being distracted from adequately representing their clients as a result of a questionnaire and other discovery being directed to those attorneys, and (c) the sheer waste of money and possibly other assets of the bankruptcy estate, which the Debtors' proposed discovery would potentially cause.

addressed issues quite separate and distinct from the issues to be addressed by this Court in the

estimation proceeding.  This Court should continue to reject the Debtors' tenacious attempts to

link the two proceedings and to use that alleged link as a basis for the extraordinary (and

unwarranted) discovery they seek.  Unlike in the Silica MDL, there is no "crisis" in asbestos

litigation.  Because the Debtors have chosen to so highlight the Silica MDL and the events that

took place therein, it is important first to put the Silica Ruling in its proper perspective.

A.    **The Daubert and Jurisdictional Rulings in the Silica**
      **MDL Have No Bearing on Bankruptcy Estimation**

The Silica MDL involved consolidated pretrial proceedings for 111 cases, comprising of

approximately 10,000 individual tort claims, most of which had been removed from various state

courts.  See Silica Ruling at *6.  Although from the outset it appeared that the court lacked

jurisdiction over the removed cases, id. at *7, the parties spent twenty months on pre-trial

proceedings and discovery in anticipation of adjudicating the merits of the individual claims.

As part of this lengthy pretrial process, claimants designated certain doctors as their

testifying experts for trial.  During his deposition, one of those doctors admitted to following

practices that did not comport with medical standards for diagnosing silicosis, and then

disavowed having made any diagnoses.  See Silica Ruling at *12-14.  The diagnoses and

testimony of the plaintiffs' doctors were then challenged by a battery of motions, and Judge Jack

held a Daubert hearing in the form of in-court depositions of six doctors and representatives of

two screening companies.[3]  This hearing took three court days to complete – almost as much

time as the complete estimation hearings in the Owens Corning and Federal-Mogul cases.  See

Silica Ruling at *2.  While Judge Jack found the methods employed by certain doctors

unreliable, her findings are largely dicta, as she determined that she lacked subject-matter

---

[3] Two additional doctors were deposed out of court before the hearing.  See Silica Ruling at *17.

jurisdiction over all but one case in the MDL.  See id. at *98.  Two of the challenged doctors were involved in that case, and their diagnoses and testimony were held to be inadmissible under Daubert.  See Silica Ruling at *98.

Judge Jack's opinion, which concerns admittedly disturbing practices in silica litigation, simply has no bearing on asbestos litigation and can be of no assistance to this Court in this asbestos bankruptcy estimation proceeding.  The Silica MDL involved consolidated pretrial proceedings, with a view to adjudicating the merits of individual claims.  The challenged doctors' testimony was at issue only because the individual tort plaintiffs had designated those doctors as trial experts.  Without such a designation by the individuals whose claims were to be adjudicated, the expert evidence would not have been in issue and no Daubert challenge would have been presented.  See generally Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).  But since the individual claims were moving to trial and the MDL court was charged with conducting all pretrial proceedings in those matters on a consolidated basis, the claimants were under an obligation to designate their testifying experts, and the admissibility of such experts' opinions thus became relevant.

Because this proceeding properly concerns only the aggregate estimation of Grace's total asbestos liability, rather than the allowance of individual claims, Daubert motions to exclude testimony of individual claimants' B-readers or doctors would be entirely out of order, and discovery calculated to support such motions would be pointless.  The Debtors contend that:

> Because an estimation proceeding is governed by the Federal Rules of Evidence, the assessment of whether proffered scientific evidence is admissible under Fed. R. Evid. 702 and 703 in such a proceeding must include an analysis of the reliability standards established in Daubert.  Information sought in the questionnaire is designed to lead to the discovery of information that will be central to determining the reliability, and thus the admissibility, of the medical evidence on which these claims are based . . . .

Motion 14 (citations omitted).  This argument thoroughly confuses the issues and evidence relevant to estimation.  The Committee is not attempting to proffer as experts the individuals diagnosing the underlying claims.  Rather, the Committee has consistently proposed to estimate Debtors' aggregate asbestos liability by reference to Grace's experience in the tort system prior to bankruptcy.  If the aggregate estimation proceeds in a manner consistent with all other asbestos bankruptcy estimations conducted to date, the physical condition of particular claimants will not be at issue and no party will have any occasion to designate a doctor to testify about any claimant's diagnosis or B-reading, because such testimony has no relevance to determining the aggregate asbestos liability.  Without such a designation, of course, there can be no <u>Daubert</u> challenge to the admissibility of a diagnosis, because no diagnosis will be proffered for introduction into evidence.  All of the Debtors' arguments about the "inadequate occupational and exposure histories for claimants," <u>see</u> Motion 10-13, assume that claimants must have all of their medical and exposure evidence available now to withstand a <u>Daubert</u> challenge.  Of course, such an assumption is flawed.  Claimants have been barred by the automatic stay from developing their case files and from pursuing the type of discovery they would need to establish the elements of their claims under state law.  Claimants have no responsibility and (because of the Bankruptcy Code section 362 stay) are probably unable to bring forward such medical and exposure evidence at this time.  That being the case, the analogies to the Silica MDL are completely inapposite.

Even assuming <u>arguendo</u>, without conceding, that the Debtors could apply <u>Daubert</u> standards to challenge the admissibility of B-readings and diagnoses by particular doctors, no claims could be disallowed on that basis.  Any deficiencies in the initial diagnoses likely would be cured in trial preparation, and no competent plaintiffs' counsel would tender as experts the

doctors whom Judge Jack criticized, using the same diagnostic procedures.  On this point, it is instructive that even as she excluded the doctors' testimony in the Silica MDL, Judge Jack did not dismiss that small number of claims over which she had subject-matter jurisdiction.  See Silica Ruling at *65, 98.  Rather, she noted that "[o]f course, saying that the Plaintiffs do not have diagnoses is not to say that none of the [Plaintiffs] have silicosis." Id. at *94.  In other words, even if Debtors found, through their proposed discovery, that a portion of the asbestos claimants were diagnosed by doctors or B-readers that the Debtors considered biased, the Debtors would not have demonstrated that the underlying claims are themselves invalid and could be disregarded for the purposes of aggregate estimation.

Yet, this is precisely what the Debtors plan to do.  The Debtors intend to collect information from claimants and their lawyers, search for self-defined indicia of "unreliable and potentially fraudulent practices," and then conclude from the presence of such indicia that "entire blocks or categories of claims are wholly unsupportable by reliable medical evidence."  Motion 13.  Nevertheless, as the Court emphasized in Owens Corning, the task at hand here is to determine "the total amount which the claimants, as a group, could legitimately have claimed as compensation" – not to determine the legitimacy of individual claims.  See In re Owens Corning, 322 B.R. 719, 722 (D. Del. 2005) (Fullam, J.).  As a practical matter, over one hundred-thousand present asbestos claims cannot be adjudicated in bankruptcy, so any effort to decide their merits under the guise of estimation would trigger the claimants' due process rights, including the right to have the merits of their claims tried before a jury.

This is not to say that meritless claims will be compensated.  Once this Court has estimated Grace's aggregate asbestos liability, it will be necessary to "structure a program of payment which, to the extent possible, recognizes only legitimate claims."  Memorandum and

Order, dated Nov. 22, 2004, at 2, In re Owens Corning, Nos. 00-3837-54 (JPF) (Bankr. D. Del.)

(attached as Exhibit B).  As a fiduciary for asbestos victims, the Committee has every interest in

ensuring that only those claimants who present claims that would be viable under state law

ultimately receive payment.  The Committee will propose trust distribution procedures in this

case, as in other cases, to ensure that result.  But the point at which the evidence underlying each

individual claim should be subjected to scrutiny is distribution, not estimation.  U.S. District

Judge John P. Fullam emphasized this fundamental point in Owens Corning, cited above.  More

recently, District Judge Joseph H. Rodriguez made the same point in the Federal-Mogul

estimation, when he denied the effort of the property damage committee to reopen discovery in

light of the Silica Ruling, asking almost rhetorically: "Wouldn't it be at some point [after] an

estimation hearing, as completed here, when applicants try to get payment from the fund, there

[would] be some analysis of the legitimacy of their claims?"  Hr'g Tr. of July 14, 2005, at 1373,

In re Federal-Mogul Global, No. 05-00059 (JHR) (D. Del.) (attached as Exhibit C).

> **B.      Unlike Silica, Tens of Millions of Americans Were Exposed to Asbestos
> Over Many Years, so the Debtors Cannot Allege Surprise or Outrage at
> the Multitude of Asbestos-Related Claims Being Asserted Against Them**

Judge Jack found that silicosis is on the decline and that the sudden surge of silicosis

claims cannot be explained epidemiologically, but is "largely the result of misdiagnosis."  See

Silica Ruling at *56.  The Debtors seize on these findings in a hyperbolic way, urging this Court

to make a leap of logic and infer that the vast majority of asbestos claims must also be the result

of misdiagnosis, simply because some of the doctors whose diagnoses were found unreliable by

Judge Jack are also the diagnosing doctors for a portion of the pending claims against the

Debtors.

It cannot seriously be contended that the epidemic of asbestos-related disease is "largely the result of misdiagnosis." Indeed, the fallout from the asbestos exposure is widely acknowledged as one of the worst public health disasters in the history of this country.[4] It is well-documented that more than 27 million American workers were occupationally exposed to this toxic substance between 1940 and 1979.[5] The latency period between exposure and manifestation of illness is long, ranging from 15 years to 40 years or more. And because asbestos remains in the lungs, asbestos disease is often progressive, worsening even after exposure has ceased. Consistent with these well-known facts about asbestos-related conditions, medical surveillance conducted by the United States government has recently confirmed that the incidence of deaths and hospitalizations due to asbestosis is on the rise, "with no apparent leveling off of this trend."[6] "Asbestosis deaths … have increased from fewer than 100 in 1968 to more than 1,250 annually in 1999, the most recent year for which data are available . . . . For 1998 and 1999, asbestosis deaths . . . displac[ed] [coal workers' pneumoconiosis] as the most frequent type of pneumoconiosis death . . . . Hospital discharges associated with asbestosis have been rising rapidly between 1995 and 2000." Id. Generally accepted epidemiology indicates that asbestos-related malignancies will continue to occur in substantial numbers until at least the year 2050. See Nicholson, Perkel & Selikoff, Occupational Exposure to Asbestos, 3 Am. J.

---

[4] See e.g., David M. Dreisen, Distributing the Costs of Environmental, Health and Safety Protection:  The Feasibility Principle, Cost-Benefit Analysis, and Regulatory Reform, 32 B.C. Envtl. Aff. L. Rev. 1, 89 (Asbestos is "one of the most obvious public health disasters we have ever faced.").

[5] See 1986 American Thoracic Society Statement, The Diagnosis of Nonmalignant Diseases Related to Asbestos 363.

[6] See U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention, Division of Respiratory Disease Studies, National Institute for Occupational Safety and Health, Work-Related Lung Disease Surveillance Report 2002, at xxiii (attached as Exhibit D).

Indust. Med. 259 (1982). The number of asbestos-related claims pending against the Debtors is entirely consistent with these well-documented patterns.

Concededly, Judge Jack did state that the unreliability of the silica B-readings "is matched by the evidence of the unreliability of B-reads in asbestos litigation." Silica Ruling at *54. She cited the comparison study by Gitlin in support, apparently uninformed that the subject x-rays in that study were handpicked by defendants' counsel, and unaware of the degree to which that study has been discredited. See Memorandum of the Official Committee of Asbestos Claimants in Opposition to Debtor's Motion to Establish Aggregate Estimation Protocol and for Entry of Scheduling Order, dated June 15, 2005, In re G-I Holdings, No. 01-30135 (RG), 01-389790 (RG) at 13-18 (Bankr. D. N.J.) (attached as Exhibit E); see also Silica Ruling at *54 n.111 (citing Gitlin et al., Comparison of "B" Readers' Interpretations of Chest Radiographs for Asbestos Related Changes, 11 Acad. Radiol. 843 (Aug.2004) [hereinafter Gitlin Study]). Indeed, prior to the Daubert hearings, Judge Jack quashed subpoenas issued by plaintiffs to the authors of the Gitlin Study, holding that it was not relevant to the Silica MDL, and she expressly disavowed reliance on the study in her Daubert ruling. See Silica Ruling at *54, n.111. This Court already has before it much more information than Judge Jack did regarding the Gitlin Study and the well-documented phenomenon of inter-reader variability in B-readings pertaining to nonmalignant asbestos-related conditions. This includes the U.S. Navy's authoritative study by Alan Ducatman, which pointed to a very high degree of inter-reader variability in a non-litigation setting, the "under-reading" of x-rays for asbestos diseases as a factor tending to offset "over-reading," and the conclusion of the independent consultants to the Manville Trust that disagreement of B-readings could not legitimately be used as a basis for disallowing any claim. See Ducatman et al., "B-readers" and Asbestos Medical Surveillance, 644-7 J. Occup. Med. 30

(1988).  Under these circumstances, it would be inappropriate for this Court to give weight to

Judge Jack's incautious remarks regarding the Gitlin Study.

Furthermore, Judge Jack's opinion addressed 10,000 silica claims, all of which had been

filed by a handful of law firms.  By contrast, the approximately 118,000 pending claims against

the Debtors were filed by hundreds of different law firms.  A relatively small portion of those

claims are supported by B-readings or diagnoses by some of the doctors who were criticized by

Judge Jack.  The Debtors and other asbestos defendants were for years well aware of those and

other doctors whose x-ray readings and diagnoses they considered suspect; asbestos defendants

historically refused to pay, or heavily discounted, claims in which those doctors were involved.

See Exhibit E at 22-23 (quoting testimony by Special Counsel to the CCR and by defense

counsel to Owens Corning).  In other words, the low quality of the evidence provided by the

criticized doctors is already reflected in the historical settlement data, a point that Judge

Rodriguez made in refusing to reopen claims estimation discovery in Federal-Mogul based on

the Silica Ruling.[7]   The extent, if any, to which the Debtors' total estimated asbestos liability

should be reduced to account for pending claims with B-readings or diagnoses by suspect doctors

is a matter for debate among the estimation experts based on the ample data already available.

The proposed discovery directed to plaintiffs' lawyers will not shed further light on that issue.

_____

[7] Judge Rodriguez stated:  "[T]he issues have been in the public forum for quite some time now.
The question of Dr. Herron [] even was addressed specifically within the contours of our
[Federal-Mogul] case."  Exhibit C at 1429.  See also In re Federal-Mogul Global, Inc., No. 05-
00059, 2005 WL 2218360, at *27 (D. Del. Sept. 13, 2005) ("The uncontroverted evidence at trial
demonstrated that the market factors that allegedly drove up historic claim resolutions were
counterbalanced by other factors, which Hanly testified, were considered by T & N in its
settlements values. These included the strength of exposure evidence, strength of medical
evidence, identity of plaintiff's doctor supplying the diagnosis, identity of plaintiff's counsel,
jurisdiction where case was pending, plaintiff's ability to get a trial date; plaintiff's economic
damages, and the history of asbestos defendants in the jurisdiction.").

II.     **THE DEBTORS' ALLEGATION OF "FRAUD" IN THE ASBESTOS TORT SYSTEM IS NOT SUPPORTED BY SPECIFIC, CREDIBLE EVIDENCE**

The Debtors adduce almost no credible evidence to show that the problems brought to light in the Silica MDL also characterize resolution of asbestos claims in the state courts. The Debtors' near-exclusive reliance on their own briefs as "evidence" underscores the vacuity of their claims. See, e.g., Motion 3-4, nn.3-8. The Committee's own previous brief demonstrated the flimsiness of the Debtors' factual allegations about the state of the tort system, and there is no need to reiterate them here. See generally Opposition of the Official Committee of Asbestos Personal Injury Claimants to Debtors Motion to Approve PI CMO and Questionnaire, June 30, 2005 (attached as Exhibit F).[8]

In addition to their legal briefs, the Debtors try to support their empty assertions of "fraud" by citing an article that appeared in The New York Times, while simultaneously neglecting to mention that the Times subsequently printed a correction on the very point they emphasize. The article discussed the efforts by asbestos debtor G-I to convince the United States attorney's office to investigate alleged fraud in the resolution of asbestos claims in the tort system. See Jonathan D. Glater, Lawyers Challenged on Asbestos, The New York Times, July 20, 2005. G-I provided the United States attorney with materials that it generated in its floundering civil suit against three plaintiffs' firms. In citing the article, the Debtors attempt to blur the line between the United States attorney's investigation and the investigation conducted by G-I in its effort to support its allegations in the civil lawsuit. According to the Debtors, "The New York Times reported that federal prosecutors in Manhattan are investigating three

---

[8] The Debtors quote a plaintiffs' lawyer's expression of doubt in the Silica MDL about the asbestosis claims of claimants who later made silicosis claims. See Motion 8. This quote is certainly sensational, but, coming from a lawyer who would be admitting fraud to the court if he said the silicosis claims were invalid, it is hardly persuasive evidence of the truth of the assertion.

plaintiffs' law firms . . . .  Key to these investigations are interviews with former firm employees

in which the employees 'described coaching potential claimants and noted efforts to <u>influence</u>

<u>doctors' diagnoses</u>.'"  Motion 4-5 (citing Glater article and adding emphasis).  The interviews

mentioned by the Debtors, however, were not conducted by the United States attorney's office,

but rather by private investigators hired by G-I, who in turn provided the investigative records to

the United States attorney.  What is more, on July 25, 2005, the <u>Times</u> printed a correction

noting that with respect to two of the plaintiffs' firms identified in the article, G-I's investigative

records "did not implicate employees of [two of the] firms in the coaching of potential claimants

or efforts to influence doctors' diagnoses."  <u>Correction</u>, The New York Times, July 25, 2005; <u>see</u>

<u>also</u> <u>G-I Holdings, Inc. v. Baron & Budd</u>, 2005 WL 1653623 *3-5 (S.D.N.Y. July 13, 2005).

   Debtors also baldly misconstrue a comment made by Committee counsel at the July 19

hearing in this case.  Objecting to the overly restricted way in which the Debtors defined

asbestos-related medical conditions, Committee counsel stated:

> [T]he result of [this way of defining asbestos-related illness] we believe is that
> something like 95 percent or more of all of the answers to the questionnaires will
> wind up describing other asbestos disease, because we don't believe, and certainly
> the debtors haven't – I don't think the debtors would assert that most of the
> claimants would have two independent pathologists diagnosing mesothelioma or
> replicating B meters for their various asbestosis diseases.  I mean they might go
> out and get them if they were told that they had to get them ….

Exhibit A at 210-11.  In their Motion, the Debtors paraphrase the above-quoted statement this

way: "[C]ounsel for the PI Committee conceded that '95 percent or more' of the personal injury

Grace claims could not be supported by the kind of independent and replicable evidence the

Debtors" think is necessary.  Motion 13.  Committee counsel obviously did not say or mean that

95% or more "could not" be supported by such evidence.  If this were the case, claimants

obviously would not be able to "go out and get them [<u>i.e.</u>, supporting evidence of disease]" if

they were instructed to do so.  While this mischaracterization of Committee counsel's position is

of no moment by itself, it does show how the Debtors are simply reaching for straws to support

their exaggerated contentions of "fraud" in asbestos litigation.

The Debtors' Motion is predicated in part on an asserted "identity" between certain

claimants involved in the Silica MDL and certain claimants who appear to be asserting asbestos-

related claims in this bankruptcy case – the so-called "retread" claims.  Despite the Debtors'

efforts to concoct such a broad identity, it is evident, using Debtor's highest possible estimate,

that <u>less than 3.5% of the claims against the Debtors were made by claimants who also filed

claims at issue in the Silica MDL</u>.  Out of 3,500 silica claimants, the Debtors have tentatively

identified "1300-1400" who have claims pending against Grace.  <u>See</u> Motion 9.  If 1,400 of

3,500 claimants overlap, and assuming the same ratio among the 10,000 total silica claimants,

there would be 4,000 overlapping claims or approximately 3.4% of the total 118,000 asbestos

claims pending against Grace.  Thus, using the Debtors' own numbers and estimates, the asserted

"identity" between the Silica MDL and this bankruptcy case is tenuous at best.

Moreover, the kind of alleged "fraud" that the Debtors purportedly wish to investigate

bears little, if any, relevance to bankruptcy estimation.  A few of the alleged "retread" claimants

are identified in exhibits H and M to the Motion, and the majority of those claims listed therein

are flagged with the symbols "SET" or "LIQ" or "DIS," which presumably mean that such

claims were settled, liquidated, or otherwise disposed of, respectively.  Yet, as the Court well

knows, in a claims estimation proceeding, the Court assigns an estimated, aggregate value to the

<u>unliquidated</u> asbestos-related claims.  In other words, many of the very "retread" claims from

which the Debtors are insinuating "fraud" <u>are not even the subject of estimation</u>.

While the Debtors might contend that such "retreads" are relevant to "impeach" their own historical claims data, the Court cannot treat such an argument as credible. During the years 1981 through 2001 (the year Grace filed for bankruptcy), approximately 203,195 asbestos personal-injury claims against Grace were resolved through settlement, trial verdict, or otherwise.[9] If most of the 4,000 overlapping or "retread" claims are resolved claims, as exhibits H and N to the Debtors' Motion suggest they are, then these overlapping or "retread" claims constitute a miniscule percentage – less than 2% – of the total number of claims resolved prepetition. Such a small percentage cannot drive a conclusion that "widespread fraud" exists in asbestos litigation. Nor can it support the kind of widespread and indiscriminate discovery of claimants' attorneys that the Debtors wish to pursue. On these grounds alone, the Court should reject the Debtors' exaggerations and hyperbole, and deny the Motion.

III.    **IN ADDITION TO BEING UNNECESSARY, THE DEBTORS' PROPOSED DISCOVERY IS IMPROPER, BURDENSOME, AND INAPPROPRIATE**

As demonstrated above, the Silica MDL dealt with a unique situation that cannot be analogized to asbestos litigation. In the Silica Ruling, Judge Jack addressed the relevance and reliability of certain proffered medical testimony under Daubert. No experts or medical evidence have been offered at this stage of the estimation proceeding. Citing their own briefs and incorrectly characterizing news articles and hearing transcripts, the Debtors persist in asserting "fraud" and repeat their tired mantra of how the state-law tort system is "unfair" and "broken." But such assertions by Grace still ring hollow. There are no "new evidence," no "new developments," and no "new crisis" that can justify such far-reaching discovery of attorneys who

---

[9] See Mark A. Peterson, Report on Opinions and Support for Opinions of Mark A. Peterson Re: Asbestos Liabilities of W. R. Grace on March 30, 1998, at 26 (July 22, 2002) (drawing on Grace's June 24, 2002 database as the source) (attached as Exhibit G).

are not themselves claimants or parties to this bankruptcy case.  In addition to being wholly

unnecessary, the Debtors' proposed discovery is flawed in other respects, described below.

A.    **The Federal Rules Do Not Support Serving a Questionnaire
on Non-Party Lawyers**

The Debtors have consistently likened their questionnaires to interrogatories or document

requests.  <u>See, e.g.</u>, Memorandum of Points and Authorities in Support of W.R. Grace & Co.'s

Motion to Approve PI CMO and Questionnaire, May 10, 2005, Tab 1 (Docket Entry No. 8395).

If the questionnaires are akin to such traditional methods of discovery, then the Debtors have no

basis under the Federal Rules to serve the questionnaires on non-party attorneys.  Federal Rule of

Civil Procedure 33 provides that a party may serve upon "any other <u>party</u>" written interrogatories

"to be answered by the <u>party</u> served."  Fed. R. Civ. P. 33(a) (emphasis added).  The Debtors are

essentially asking this Court to create a new "rule" from scratch that authorizes them to serve

"interrogatories" on non-parties, contrary to the express language of Rule 33(a).  There is no

basis under the Federal Rules for making such a request, and the Court should promptly reject it.

So too, Federal Rule of Civil Procedure 34, governing requests for production of

documents and tangible things, provides that a party may serve such requests "on any other

<u>party</u> . . . ."  Fed. R. Civ. P. 34(a) (emphasis added).  The Debtors seek to pursue discovery of

claimants' attorneys, who by all accounts are not parties to this bankruptcy case, let alone the

estimation proceeding.    Based on the plain language of the Federal Rules, the Debtors have no

proper basis for serving their questionnaire on non-party lawyers.

While Federal Rule of Civil Procedure 34(c) does authorize a party to serve document

requests on non-parties, pursuant to a subpoena issued under Fed. R. Civ. P. 45, that does not

entitle the Debtors to serve questionnaires on non-party lawyers, who in many cases will likely

be outside the subpoena jurisdiction of this Court.  The Debtors' questionnaire gambit seems

nothing more than an "end-run" around the rules requiring a party to obtain a subpoena from a court having jurisdiction over a non-party witness. See Fed. R. Civ. P. 45. To the extent the Debtors seek to employ "traditional discovery" devices, such as obtaining a subpoena issued from a court with personal jurisdiction over the non-party witness, the Court should deny the Debtors request to do so under the rule adopted in Shelton v. American Motors Corp., 805 F.2d 1323 (8th Cir. 1986), and its progeny, which are addressed below.

B.    **The Debtors Have Not Met Their Burden of Proving That Their Attorney-Directed Discovery Is Proper**

Assuming arguendo, without conceding, that the proposed questionnaire is permissible under the Federal Rules, or to the extent the Debtors seek to employ "traditional discovery" of claimants' attorneys, the Debtors should be subject to the holding of Shelton, which places the burden on them to establish the propriety of their attorney-directed discovery. In Shelton, the Court of Appeals for the Eighth Circuit barred the plaintiff from deposing the in-house counsel of the defendant regarding certain matters pertinent to the case. Among other things, the court in Shelton observed "the increasing practice of taking opposing counsel's deposition," which the court viewed as "a negative development in the area of litigation, and one that should be employed only in limited circumstances." Id. at 1327 (emphasis added). The court further opined:

> Taking the deposition of opposing counsel not only disrupts the adversarial system and lowers the standards of the profession, but it also adds to the already burdensome time and costs of litigation. It is not hard to imagine additional pretrial delays to resolve work-product and attorney-client objections, as well as delays to resolve collateral issues raised by the attorney's testimony. Finally, the practice of deposing opposing counsel detracts from the quality of client representation. Counsel should be free to devote his or her time and efforts to preparing the client's case without fear of being interrogated by his or her opponent. Moreover, the "chilling effect" that such practice will have on the truthful communications from the client to the attorney is obvious.

Id.  The court continued:

> The harassing practice of deposing opposing counsel (unless that counsel's
> testimony is crucial and unique) appears to be an adversary trial tactic that does
> nothing for the administration of justice but rather prolongs and increases the
> costs of litigation, demeans the profession, and constitutes an abuse of the
> discovery process.

Id. at 1330.

The concerns articulated by the court in Shelton apply with equal force here.  While it is
too early to tell whether the attorney-client privilege or attorney work product doctrine will be
implicated here, it stands to reason generally that any discovery crafted to explore a "financial
relationship" between an attorney and existing or potential experts will likely trigger an objection
based on that privilege or doctrine.  Addressing those objections will likely prolong and increase
the costs of litigating estimation.  Moreover, pursuing discovery of attorneys will likely distract
them from "devot[ing] his or her time and efforts to preparing the client's case" – which includes
helping their own clients respond to the claimants' questionnaire.  So too, the Debtors' proposed
discovery might ultimately compel attorneys to be witnesses in the estimation or in a claims
allowance proceeding, which in turn might disqualify them from further representing their client.
See, e.g., Slater v. Liberty Mut. Ins. Co., No. 98-1711, 1999 WL 46580, *1 (E.D. Pa. Jan. 14,
1999) ("[A] deposition of one's attorney by an opposing party is inherently annoying,
oppressive, disruptive and burdensome. 'Such a deposition provides a unique opportunity for
harassment, it disrupts the opposing attorney's preparation for trial, and could ultimately lead to
disqualification of opposing counsel if the attorney is called as a trial witness.'") (quoting Marco
Island Partners v. Oak Dev. Corp., 117 F.R.D. 418, 420 (N.D. Ill. 1987)).  In these respects, the
proposed discovery of attorneys appears to be nothing more than "an adversary tactic that does

nothing for the administration of justice …, demeans the profession, and constitutes an abuse of the discovery process."

Because of these unique concerns, the court in <u>Shelton</u> held that discovery of a party's attorney "should be limited to where the party seeking to take the deposition has shown that (1) no other means exist to obtain the information than to depose opposing counsel; (2) the information sought is relevant and nonprivileged; <u>and</u> (3) the information is crucial to the preparation of the case." <u>Id</u>. at 1327 (emphasis added & citation omitted).  Other courts, including the U.S. District Court for the District of Delaware, have adopted the <u>Shelton</u> test (or a similar standard), and have denied attempts by parties to depose the opposing party's lawyer. <u>See, e.g.</u>, <u>Nationwide Mut. Ins. Co. v. Home Ins. Co.</u>, 278 F.3d 621 (6th Cir. 2002) (denying deposition of Nationwide's attorney to discover possible bias of the arbitrator); <u>Thiessen v. General Electric Cap. Corp.</u>, 267 F.3d 1095 (10th Cir. 2001) (affirming trial court's rejection of efforts to depose an attorney accused of destroying relevant documents to "cover up" an allegedly discriminatory policy); <u>Smith v. United States</u>, 193 F.R.D. 201 (D. Del. 2000) (adopting <u>Shelton</u> and disallowing depositions of two JAG attorneys); <u>G-I Holdings, Inc. v. Baron & Budd</u>, 2005 WL 1653623 *5 (S.D.N.Y. July 13, 2005) (holding that the Party seeking attorney testimony "made no showing that (1) defendants' clients committed any act that would justify invading their privilege or (2) that the nature of the relationship between defendants' clients and Holdings is such that invasion is warranted.").[10]

---

[10] A more recent decision of the Eighth Circuit, <u>Pamida, Inc. v. E.S. Originals, Inc.</u>, 281 F.3d 726 (8th Cir. 2002), did not reject or abandon the <u>Shelton</u> test, even though the Eighth Circuit in <u>Pamida</u> permitted attorney discovery.  In the <u>Pamida</u> case, a retailer was named a defendant in a patent infringement case.  After the patent infringement case settled, the retailer filed an action against a manufacturer seeking indemnification for the attorneys fees and costs that the retailer incurred in the concluded patent suit.  The Eighth Circuit permitted discovery of the retailer's attorney because, <u>inter alia</u>, the retailer was seeking indemnification for attorneys' fees, which in

The Court should similarly reject the Debtors' request to pursue discovery of claimants' counsel.  The Debtors have not established that "no other means exist to obtain the information than" the proposed discovery.  Indeed, the Debtors have failed to demonstrate how the discovery they seek from attorneys is even relevant to the aggregate estimation of present and future asbestos claims.

In addition, the Debtors have not proven how the requested discovery is "crucial to the preparation of [their] case."  The Debtors have already served questionnaires on claimants to test the merits of their claims, so there is no reason to "pile on" with discovery directed to the claimants' lawyers.  The Committee has asserted all along that the proper way to estimate aggregate asbestos claims is to start with the debtors' historical claims data.  Between such data and their questionnaires to claimants, the Debtors will likely have a wealth of information on which to draw to make their arguments.  The information they seek regarding "direct or indirect financial relationships" is not crucial to estimating the aggregate value of present and future asbestos claims.  Other courts have estimated such claims based on the historical claims data alone, without having to rely on any questionnaires to claimants, let alone attorneys.  See In re Eagle-Picher Indus., Inc., 189 B.R. 681, 690-91 (Bankr. S.D. Ohio 1995); Owens Corning v. Credit Suisse First Boston, 322 B.R. 719, 722 (D. Del. 2005); In re Federal-Mogul Global, Inc., No. 05-00059, 2005 WL 2218360, at *27 (D. Del. Sept. 13, 2005).  Because the Debtors have not satisfied the first and third parts of the Shelton test, the Court should deny the Motion.[11]

---

turn put "the work of [the retailer's] attorneys directly at issue in the case."  Id. at 731.  Unlike Pamida, this claims estimation proceeding does not involve the indemnity or recovery of attorneys' fees that were incurred in concluded litigation.  The facts of Pamida are therefore distinguishable from the situation here.

[11] Because the Debtors have not met their burden regarding the first and third elements of the Shelton test, the Committee need not address the second part of that test in detail, which requires the Debtors to prove that the information they seek is "relevant and nonprivileged."  As

The cases cited by the Debtors in support of the Motion do not follow <u>Shelton</u> and its progeny, and are otherwise distinguishable on their facts. Motion 18. In the first case cited by the Debtors, <u>In re Arthur Treacher's Franchisee Litig.</u>, 92 F.R.D. 429 (E.D. Pa. 1981), the district court rendered its decision several years before the Eighth Circuit decided <u>Shelton</u>, and thus did not have the benefit of the Eighth Circuit's reasoning. The court in <u>Arthur Treacher's</u> probably did not perceive the corrosive effect that deposing attorneys was having on the civil justice system, which the Eighth Circuit perceived several years later in <u>Shelton</u>. In any case, in <u>Arthur Treacher's</u>, the deposition of only one attorney was sought. By contrast, here, the Debtors seek discovery from <u>many</u> attorneys, and the greater number of attorneys subject to discovery intensifies the concerns identified in <u>Shelton</u>, such as the likelihood of increased litigation costs stemming from more privilege-based objections, which in turn justifies the more exacting legal standard announced by the Eighth Circuit in <u>Shelton</u>.

In the second case cited by the Debtors, <u>United Phosphorous, Ltd. v. Midland Fumigant, Inc.</u>, 164 F.R.D. 245 (D. Kan. 1995), there was no dispute over whether the attorney in question could be deposed; the dispute instead turned on the scope of the examination. Here, by contrast, the Committee <u>does</u> dispute whether the Debtors can just willy-nilly pursue discovery of claimants' attorneys, when the Debtors have not shown how such discovery is relevant, necessary, or even appropriately tailored to assist the Court in reaching an estimated value of aggregate asbestos claims.

---

discussed above, however, the Debtors have not shown that the information they seek through their attorney questionnaire is relevant in any respect to an aggregate estimation proceeding. Moreover, the Debtors' proposal to conduct a full-blown fishing expedition of attorneys' "financial relationships" certainly raises the specter that at least some of the information would be privileged or otherwise protected under the attorney work product doctrine.

The final case cited by the Debtors, <u>Kaiser v. Mutual Life Ins. Co.</u>, 161 F.R.D. 378 (S.D. Ind. 1994), is not helpful to their position either.  In <u>Kaiser</u>, the attorney to be deposed participated in the transactions or occurrences underlying the causes of action being asserted in that case.  <u>See</u> <u>id</u>. at 379.  For example, as to a breach-of-contract claim asserted in that case, the attorney in question was the defendants' representative, who informed the plaintiffs that the defendants would not honor an oral agreement between them.  <u>See</u> <u>id</u>.  Here, the Debtors do not seek attorney discovery because they were involved in the particular facts that gave rise to an asbestos cause of action; instead the Debtors are seeking collateral evidence from attorneys, which they apparently hope to use to impeach their own claims resolution history.  The Debtors are seeking to cast a vastly wider net of discovery than what was sought in <u>Kaiser</u>.  Accordingly, <u>Kaiser</u> cannot be used to support their position.

C.     **The Proposed Questionnaire to Attorneys Is Overbroad and Burdensome**

The proposed questionnaire would require non-party attorneys "under penalty of perjury" to disclose "each direct or indirect financial relationship" they have or had with certain "other law firms," "doctors," "technicians," "B-readers," "pathologists," and "screening companies." The term "direct or indirect financial relationship" is so imprecise and elastic that it makes the questionnaire overbroad and burdensome for attorneys to answer.  Read literally, the targeted attorneys would have to disclose every medical-related expert in the asbestos field that they ever worked with in the course of their legal careers, including any medical experts whom their offices wrote a check to.  Even worse, the responding attorneys would presumably have to complete an entire page 2 of the questionnaire in any one of the following situations: (a) if a law firm employee is married to a doctor or technician who performs any type of chest x-rays; (b) if an attorney shares any private investments with a doctor or technician who works with x-rays,

such as in an investment club; or (c) if an attorney or employee helps to prepare tax documents

for any doctor or technician who is involved with chest x-rays. These hypotheticals are just a

few examples of how overbroad the Debtors' proposed discovery can reach. Thus, aside from its

improper place in this estimation proceeding generally, the questionnaire attempts to uncover too

many "relationships" that simply are not relevant to estimation and beyond the scope of any

reasonable discovery.

Moreover, contrary to the Debtors' assertions, the proposed discovery is <u>not</u> "minimally

invasive." The Debtors attempt to highlight the fact that their questionnaire is "short" and "only

two pages," without ever explaining that an attorney will have to answer the eight questions on

page 2 <u>for each and every "direct or indirect financial relationship" that they are required to</u>

<u>disclose</u>. What makes this questionnaire even more unfair is that the claimants' attorneys will be

required to invest energy and resources answering it precisely at the time they will be expected to

help their own clients respond to the claimants' questionnaire. There is no proper basis to permit

the Debtors to "pile on" even more questionnaires and discovery, which in substance is a cynical

scheme by the Debtors to exert leverage over asbestos claimants and their lawyers.

<u>**CONCLUSION**</u>

In sum, the Debtors have established no basis for pursuing the type of discovery sought in

the Motion. What occurred in the Silica MDL does not automatically translate into a "crisis" in

asbestos litigation. The Debtors' efforts to create a "crisis" through a chain of free association

with the Silica MDL should be seen for what it really is – a cynical ploy to gain tactical

courtroom leverage over claimants and their lawyers through countless questionnaires and other,

burdensome discovery. Furthermore, the Debtors have not demonstrated a basis under the

Federal Rules to pursue the discovery they seek, nor have they satisfied the test articulated in

Shelton to justify pursuing even "traditional discovery" of certain attorneys. For the reasons set forth above, the Committee respectfully requests that the Court deny the Motion in its entirety and grant to the Committee such other and further relief as this Court deems just and appropriate.

Dated: October 7, 2005

Respectfully submitted,

**CAMPBELL & LEVINE, LLC**

/S/ Kathleen Campbell Davis
Marla R. Eskin (No. 2989)
Kathleen Campbell Davis (No. 4229)
Mark T. Hurford (No. 3299)
800 N. King Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 426-1900
Telefax: (302) 426-9947

**CAPLIN & DRYSDALE, CHARTERED**

Elihu Inselbuch
399 Park Avenue, 27th Floor
New York, NY 10022
Telephone: (212) 319-7125
Telefax: (212) 644-6755

Peter Van N. Lockwood
Nathan D. Finch
Jeffrey A. Liesemer
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone: (202) 862-5000
Telefax: (202) 429-3301

Counsel for the Official Committee
of Asbestos Personal Injury Claimants