# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              . Case No.  01-1139 (JFK)
                                    .
                                    .
  W.R. GRACE & CO.,                 . Courtroom A, 54th Floor
                                    . U.S. Steel Tower
                                    . Pittsburgh, PA
                    Debtor.         .
                                    . July 19, 2005
. . . . . . . . . . . . . . . . . . 8:42 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:            Pachulski, Stang, Ziehl, Jones &
                            Weintraub, P.C.
                            By:  DAVID CARICKHOFF, ESQ.
                            919 North Market Street, 16th Fl.
                            Wilmington, Delaware  19899

                            Kirkland & Ellis LLP
                            By:  DAVID BERNICK, ESQ.
                                 MICHELLE H. BROWDY, ESQ.
                                 JANET BAER, ESQ.
                                 BARBARA HARDING, ESQ.
                            200 East Randolph Drive
                            Chicago, Illinois  60601


Audio Operator:             Cathy Younker

Proceedings recorded by electronic sound recording, transcript
        produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

1        MR. BERNICK:  What?

2        THE COURT:  Three weeks.  Remember?  No emergencies.

3        MR. BERNICK:  Oh, then we should -- then I hate to

4  say it, but we should probably just do it today.

5        THE COURT:  All right.  Does anybody else have

6  anything new to add with respect to these questionnaires or the

7  CMO?

8        MS. DiLUIGI:  Good afternoon, Your Honor.  Brenda

9  DiLuigi for the London Market Insurers.  Your Honor, certain of

10  Grace's insurers have submitted briefing on the PI estimation

11  issues, and really we've done so just to clarify our position

12  in that regard.  As Your Honor is aware, we are -- chief among

13  the insurers' concerns is the potential that any order that

14  Your Honor may enter in connection with estimation may be

15  despite whatever purposes for which it is being requested now

16  may be misused in the future and in a way that impacts

17  insurers' rights.

18        When we last appeared before Your Honor in January,

19  you advised the insurers that although you did not want to and,

20  in fact, would not be deciding insurance coverage issues, you

21  were nevertheless not prepared to enter any order with respect

22  to insurance neutrality in terms of imposing neutrality on a

23  plan that you weren't sure was intended to be insurance

24  neutral.

25        THE COURT:  I hadn't seen a plan.

**J&J COURT TRANSCRIBERS, INC.**

1        MS. DiLUIGI:  And, well, Your Honor, I would just

2   like to clarify that what we're asking for in terms of

3   neutrality language or language to be inserted into the

4   estimation and case management order is not insurance

5   neutrality for all purposes.  We are not seeking in any way a

6   decree as to the plans treatment of insurance, and that, as

7   Your Honor has stated previously, is an issue for another day,

8   and we'll take it up at the appropriate time.

9        What we are proposing is that the case management

10  order relating to personal injury claims for purposes of

11  estimation include language that defines the scope of the

12  proceedings and protects against later abuse in a way that

13  would impact insurers' rights.  And what we're proposing I

14  believe is pretty simple.  It's the language that has already

15  been adopted by the Third Circuit in connection with Combustion

16  Engineering, but it's --

17       THE COURT:  That was a plan.

18       MS. DiLUIGI:  But --

19       THE COURT:  That was insurance neutral.

20       MS. DiLUIGI:  Yes, Your Honor, and what we're

21  proposing is not the CE language as it's drafted in the

22  opinion, but rather the language tailored to relate to

23  estimation proceedings only, so that it doesn't say anything

24  about what the plan does and doesn't do and what the plan

25  documents.

1          THE COURT:  Look, everybody is going to be bound by

2     these estimations, period, end of story.  To the extent that

3     the insurers have some creditor status, which I'm not aware of,

4     then if you want to participate, participate, because you're

5     going to be bound by the estimation findings.  They will be

6     binding.  They're going to be incorporated into a plan, and

7     everybody's going to have to live with those findings.  So if

8     you want to participate, participate.  To the extent that the

9     insurance companies are only trying to say that you're not

10    bound, because this is just an estimation for Trust

11    distribution purposes, and you'll figure out what your

12    respective liabilities are after the Trust is formed and makes

13    distributions, that's fine.  I think you -- I think this

14    process preserves that.  But to say that the estimation numbers

15    that I find are not binding on you is not correct.  They will

16    be.  So if you've got an interest, show up.

17         MS. DiLUIGI:  Your Honor, our concern is not that

18    estimation occur in general, and that you'll issue an order,

19    but rather that despite what the debtor is saying is now -- and

20    the debtor has made various representations in the various

21    briefings and court appearances about what estimation is

22    intended to do on the one hand and what is not intended to do

23    on the other hand -- and from our perspective we believe it

24    would be appropriate to incorporate those representations into

25    the order and have them find their way into the case management

1  order, so that everybody's on the same page.

2          THE COURT:  Look, I'm in a procedural order, which is

3  what a case management order is.  I'm not making substantive

4  findings.  All I'm doing is setting up a process.  I'm not

5  going to give anybody releases or indemnities or assignments or

6  anything else in a case management order.  It's just a process.

7          MS. DiLUIGI:  We understand, Your Honor, and so long

8  as estimation is only being used, as Your Honor says, to

9  determine the adequacy of the funding of the plan, that's --

10          THE COURT:  And the likely claims that will be filed.

11          MS. DiLUIGI:  Yes, Your Honor.

12          THE COURT:  That's the purpose.  Yes.

13          MS. DiLUIGI:  Our concern is that the debtors may

14  take Your Honor's comments and in the future attempt to argue

15  for a UNR result against the insurers, and, you know, so long

16  as --

17          THE COURT:  That's a plan issue.

18          MS. DiLUIGI:  Yes, Your Honor.

19          THE COURT:  A UNR is definitely a plan issue.  I've

20  already said the estimation findings will be binding on anybody

21  who is a party in interest.  I'm not convinced that the

22  insurance companies are parties in interest, but if you think

23  you are, show up.  They will be binding.

24          MS. DiLUIGI:  Thank you, Your Honor.

25          THE COURT:  Anybody else?

1          MR. BERNICK:  I presume if they show up, Judge, we

2     could explain to you why we think they should go back to where

3     they came from.

4          THE COURT:  Sure.

5                    (Laughter)

6          THE COURT:  Okay.  Anyone else?  Let's take a ten-

7     minute recess, and then we'll come back and start.

8                    (Recess)

9          THE CLERK:  All rise.

10         THE COURT:  Please be seated.  Mr. Bernick.

11         MR. BERNICK:  Yes.  We've had -- we took the

12    opportunity to recess to have a short conference.  I think that

13    Mr. Lockwood wants to address the Court on one matter.

14         THE COURT:  All right.

15         MR. BERNICK:  And then I have a proposal that I think

16    we're all agreed to.  It's a question of whether Your Honor

17    would find it appropriate.

18         THE COURT:  All right.

19         MR. LOCKWOOD:  Yes, Your Honor.  It's just a response

20    to one item that Mr. Bernick said before the break, and then he

21    will report on a proposal that we have jointly that deal with

22    the questionnaire.  One of the things he said in response to

23    many of your questions about people who didn't have the

24    information when they got the questionnaire was their lawyers

25    could go out and get it for them.  The point I would simply

**J&J COURT TRANSCRIBERS, INC.**

1  make is that he's been spending a lot of time talking about the

2  rules relating to discovery.  What this questionnaire is is the

3  functional equivalent of a set of written interrogatories

4  coupled with the document production demand.

5       In the real world of Federal Rules of Civil

6  Procedure, etcetera, when you get interrogatories and a

7  document production demand, what you are required to do is give

8  them the documents that you have and give them the answers to

9  information that you have, and you're not required to complete

10  the rest of your trial preparation in order to respond to the

11  interrogatories.  You may have to supplement the

12  interrogatories, depending upon how they're worded, etcetera,

13  and all I'm saying is that when you consider the proposal that

14  we're about to make, that you keep in mind the issue about this

15  proposal that you lawyers should be told that they can go out

16  and get it.  Thank you.

17       THE COURT:  Okay.  Mr. Bernick.

18       MR. BERNICK:  I guess by way of response to that just

19  in half a heartbeat, we're not saying that they have to go out

20  and do anything.  I mean if they want to continue to submit the

21  kinds of information that have been the subject of a lot of

22  discussion today based upon the Dr. Harrons of the world, no

23  one's saying they can't do it, and that's always been the

24  substance of the questionnaire.

25       The proposal that we have, Your Honor, is that one of

**J&J COURT TRANSCRIBERS, INC.**

1   us think it would be overwhelmingly productive.  Of course, we

2   all enjoy it immensely, but overwhelmingly productive to

3   prolong your days further by going through the questionnaire

4   question by question.  Our proposal is that -- if Your Honor is

5   willing, that you would take the questionnaire back, read

6   through it, and then through order I would suppose let the

7   parties know how you're coming out with respect to what should

8   be in the questionnaire.  We would then ask for a week or ten

9   days to submit any brief comments that we have where Your

10  Honor's coming out, and then there would be a hearing.  We

11  would propose -- that is the debtors would propose that it be

12  telephonic, so that we don't then simply -- I mean if it's in

13  person, our own view is that we won't really accomplish an

14  awful lot.

15          THE COURT:  Mr. Bernick, I have you here.  If I keep

16  you here, we'll get it done today.  I don't need anymore ten

17  days.  I've read through every single piece of paper that was

18  delivered to me while I was at another seminar.  We're going to

19  do it today and get it done.

20          MR. BERNICK:  That's fine.

21          THE COURT:  So, folks, if you need another recess to

22  go postpone your plane reservations, tell me now.  I'll give

23  you that recess.  We're going to stay until it's done.

24          MR. BERNICK:  Okay.  There's only one other matter I

25  think that's on the agenda which is exclusivity.

**J&J COURT TRANSCRIBERS, INC.**

1        THE COURT:  My view about exclusivity, unless you

2  folks have a different view, is I'll continue it until the next

3  omnibus, and I'll hear the arguments at that time.

4        MR. BERNICK:  That's fine, Judge.

5        THE COURT:  Anybody have an objection to that

6  process, so we can get to this issue of the questionnaire?

7        MR. FRANKEL:  That's fine, Your Honor.

8        MR. LOCKWOOD:  No objection, Your Honor.

9        THE COURT:  All right, then it's continued until the

10  conclusion of the next omnibus hearing, and I'll your arguments

11  then.  Please put that like as the first contested matter, so

12  we can get to it early if it has not been resolved by that

13  time.  Okay.  Where do you want to start?

14        MR. BERNICK:  I guess probably the best idea is --

15  I'm working with a current copy of the questionnaire -- is on

16  page one and just go through it page by page, and I guess we

17  should just give Your Honor a chance to look through it.

18        THE COURT:  Tell me where the first objectionable

19  phrase is, folks, and let's focus on that.

20        MR. LOCKWOOD:  Your Honor, should we do this from our

21  seats?

22        THE COURT:  Yes, please.

23        MR. LOCKWOOD:  If you compare, starting on page one

24  of the instructions, the language on -- in the paragraph

25  starting "The questionnaire is the official document," second

**J&J COURT TRANSCRIBERS, INC.**

1  to the last, where it talks about, "failure to do so may have

2  significant consequences including your being forever barred

3  from asserting your -- receiving payment on account of your

4  claim."

5            THE COURT:  Yes, that should be stricken, and instead

6  I think we should take Mr. Frankel's language that says, you

7  know, we are soliciting this information now for purposes of

8  estimating future liability.  Your assistance would be greatly

9  appreciated, and, in fact, if you fill out this questionnaire

10 timely and as completely as possible, (a) we will do our best

11 to get you into the queue in the TDP process wherever

12 appropriate first in line, at the top of the list, however you

13 want to state that, and (b) to the extent that you attach all

14 of the documents that the Trust will need, you won't have to do

15 it again.  This information will be provided to the Trust, so

16 you will have satisfied your burden.  Something to that effect.

17 You folks can wordsmith.  Any objection to that?

18                      (No verbal response)

19            THE COURT:  Okay.  Next, Mr. Lockwood.

20            MR. BERNICK:  The only caveat -- well, I think we

21 just have to work on it from a language point of view, but we

22 can't leave them with the inference that, in fact, they will

23 get paid.  That is we can't do anything that sounds like if

24 they fill this out, they are in some fashion assured of getting

25 a payment.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  That's fine.  I think you can say that

2   your claim will, you know, be evaluated for a payment under

3   Trust distribution procedures which have not yet been approved.

4   So this is not a guarantee of payment, but, you know, you will

5   have to submit something to the Trust.  If you submit it now,

6   you won't have to fill it out again.  Something along those

7   lines.

8          MR. LOCKWOOD:  We'll work on that.  The same comment

9   at little Roman at three of page -- of the instruction.  I'm

10  going through the instructions, because they're --

11         THE COURT:  Mr. Lockwood, I can't hear you.  I'm

12  sorry.  You need to --

13         MR. LOCKWOOD:  I'm sorry.  The same comment with

14  respect to the language at the top of little Roman page three

15  appears that any such holder -- the very first paragraph -- who

16  fails to do so, boldface, shall be forever barred, estopped,

17  and enjoined from asserting any such claims.  That one isn't

18  even a may.  That's a shall.

19         THE COURT:  I'm sorry.  That one I'm not finding.

20         MR. LOCKWOOD:  Page three of the instructions.

21         THE COURT:  Yes, I'm on that.

22         MR. LOCKWOOD:  The top of the page.

23         MR. BERNICK:  It's on my page two at the bottom.

24         THE COURT:  Okay.

25         MR. LOCKWOOD:  Oh.  Our printers must format

1 differently, Your Honor.

2          THE COURT:  Yes.  Okay.  It's paragraph number

3 five --

4          MR. LOCKWOOD:  Yes.

5          THE COURT:  -- in the instructions?

6          MR. BERNICK:  Yes.  We can conform that.

7          THE COURT:  That's fine.

8          MR. BERNICK:  Next.

9          MR. LOCKWOOD:  Your Honor, on part two there's a --

10 beginning after the second paragraph there's a series of

11 definitions of diseases, and then there's something at the end

12 of it.  The last one is called Other Asbestos Disease, and it

13 says, "Any asbestos-related injuries, medical diagnoses, and/or

14 conditions other than those above."  Essentially what the

15 debtors are doing here, as they justify in their papers, is

16 creating their own definitions of not only what is a disease

17 but what is a qualifying disease by building in both exposure

18 requirements and diagnosis requirements into it, the result of

19 which we believe is that something like 95 percent or more of

20 all of the answers to the questionnaires will wind up

21 describing other asbestos disease, because we don't believe,

22 and certainly the debtors haven't -- I don't think the debtors

23 would assert that most of the claimants would have two

24 independent pathologists diagnosing mesothelioma or replicating

25 B meters for their various asbestosis diseases.

                    **J&J COURT TRANSCRIBERS, INC.**

1          I mean they might go out and get them if they were

2   told that they had to get them, but I mean to some extent by

3   allowing the debtor to put these diseases in there as though --

4   it puts a sort of a court imprimatur on the notion that somehow

5   or another this is what is, in fact, going to be required in

6   order for you to have a claim that's capable of being

7   estimated, and we don't understand why you just can't have a

8   more neutral description of the diseases.  And then they've

9   asked questions about whether they have these various reports

10  and multiple pathology reports replicating B readers.  And if

11  they want to argue that for the people that don't have them,

12  they don't qualify, they can do that without building in the

13  requirement of having them into their definition of the disease

14  in the first place.

15          THE COURT:  Well, that seems fair.  I wonder whether

16  we can simply say something in this questionnaire like, you

17  know, here are the diseases that are customarily diagnosed.  Do

18  you have one of these, and if so, what evidence do you have

19  that supports it?  Why not just do it as a fact, and then the

20  debtor can categorize them however the debtor chooses if the

21  evidence doesn't rise to the level the debtor thinks is

22  appropriate?

23          MR. BERNICK:  It's not -- it's really -- if we start

24  to identify how -- what diseases often are diagnosed, that's

25  the whole problem, is that what's often diagnosed are things

**J&J COURT TRANSCRIBERS, INC.**

1  that we don't believe constitute any disease whatsoever.  So --

2          THE COURT:  But you are -- I mean you have listed

3  them.

4          MR. BERNICK:  No, because Mr. Lockwood made reference

5  to it, but he didn't really I don't think refer the Court to it

6  directly.  If you take a look at F, the definitions are done.

7  It says explicitly we can move this up front to make it

8  explicit up front.  These are the definitions that Grace will

9  use in determining its own position regarding its liability.

10          And then it goes on to say, "All information, test

11  diagnoses, and documentation should conform to the

12  definitions," da, da, da, da.  Then critically -- and we can

13  underscore this, do whatever.  "Information, tests, diagnoses,

14  and documentation that do not conform to the definitions may be

15  submitted," and we can beef that up, but we will assert in

16  court that it should be given little or no weight.  What we're

17  really saying is we're being completely transparent.  These are

18  the criteria that we believe are required under the standards

19  and Daubert.  You don't have to meet them if you don't want to,

20  but this is what you will be, in our view judged, by.  We can,

21  you know, your lawyers may disagree, in which case you can

22  submit whatever you want, but the Court is not providing

23  imprimatur for anything by putting this in the form --

24          THE COURT:  All right.  I think the sentence --

25          MR. LOCKWOOD:  Your Honor, this was justified as

1  being a discovery questionnaire, i.e., asking questions.  It's

2  not intended to be a notice of Grace's litigating position to

3  bar as a whole.  If Grace wants to send out a separate notice

4  to the plaintiff's bar telling them what their view of -- what

5  you need to do to qualify to have asbestos-related lung cancer

6  or asbestosis as a matter of law, they certainly can come to

7  the Court and ask for permission to do that.  Or, for that

8  matter, they could probably do it without Court permission.

9          But this is supposed to be instructions on how to

10  answer a questionnaire.  Every proof of claim that I've ever

11  seen in every bankruptcy case or trust procedure says do you

12  claim that you have malignant mesothelioma, or do you claim you

13  have asbestos-related lung cancer?  It doesn't say do you claim

14  that you have asbestosis or lung cancer with -- diagnosed on

15  the basis of X and evidence of asbestosis on the basis of Y.

16  And the questionnaire itself purports to ask whether you have

17  those conditions, so it's a matter of the debtor putting one

18  and one together and arguing the claim doesn't qualify.

19          THE COURT:  Okay.  I think that the debtor should

20  amend the questions so that the questions simply ask for the

21  facts not state the debtor's position.  If what you would like

22  to do is attach to the end of the questionnaire a position

23  paper that you are going to advocate and have this information

24  in it and say this is what you're going to advocate, but your

25  advocacy hasn't been approved by the Court, the questionnaire

**J&J COURT TRANSCRIBERS, INC.**

1   has, you may do so.  I think the big problem is the sentence

2   that says, "All information, tests, diagnoses, and

3   documentation should conform with the definitions," because --

4            MR. BERNICK:  We can change that.  All this does is

5   to short -- we could ask factually do you have a one, two,

6   three, four, five?

7            THE COURT:  Right.

8            MR. BERNICK:  Do you have a one, two, three, four,

9   five?  We can do that.  All it does is to make this thing

10  longer.

11           THE COURT:  It may make it longer, but if there's an

12  objection in that respect, it's still supposed to be fact

13  discovery.

14           MR. BERNICK:  We'll then turn those -- all of these

15  -- we'll turn them all into questions.

16           MR. FINCH:  Your Honor, this is Nate Finch from

17  Caplin and Drysdale.  Just may I make a suggestion?  The

18  definitions in the Future Claimants Committee's questionnaire

19  and the Asbestos Claimants Committee's questionnaire of the

20  various diseases are neutral and taken basically from the same

21  definitions that the Manville Trust uses.

22           THE COURT:  All right.  Does --

23           MR. BERNICK:  They're not neutral.  The Manville

24  Trust is something that the plaintiffs' bar all agrees to.

25  This is our discovery.  It's not theirs.

1        THE COURT:  This is the debtor's discovery.  If the

2    debtor turns these into questions related to -- eliciting the

3    facts or the contentions to the extent that there's a

4    contention issue, although this seems to be factually oriented,

5    that seems to me to be appropriate.  As I said, if you want to

6    attach your own contentions to the end so that people know what

7    it is that you intend to do with this information, just so you

8    say that this is your proposal, it is not what's been approved

9    by the Court, you may do so.  Okay, so you will change into

10   facts and circulate it to make sure that the questions are not

11   objectionable.  Next.

12       MR. LOCKWOOD:  Under the heading Supporting Documents

13   for Diagnosis --

14       THE COURT:  Yes.

15       MR. LOCKWOOD:  -- they -- the second paragraph

16   purports not merely to ask for the document but to prescribe

17   what the diagnosis must be.

18       MR. BERNICK:  We will change that in line with what

19   the Court has said.  We will include the second sentence which

20   defines what we will -- what we believe to be independent

21   means.  We will put -- to the extent that we ask questions, we

22   will say to the extent the questions below ask you for whether

23   the doctor is independent, these are the criteria.  Now, I

24   think that in point of fact, because we spell it out, that is

25   we break out in the questions boxes that have them say did you

1  pay for the services, were you required to retain counsel,

2  maybe we can just dispense with the whole thing.  So --

3          THE COURT:  Okay.  Either --

4          MR. BERNICK:  -- what I would say, Your Honor, is

5  let's just take out --

6          THE COURT:  The second paragraph.

7          MR. BERNICK:  -- the second paragraph.  I would also

8  agree from the same point of view to take out the bolded

9  language under x-rays and B reads.  That bolded language we

10 will work into a definition for purposes of asking the

11 questions.  Same thing with respect to pulmonary function

12 tests.

13         THE COURT:  All right.  Fine.

14         MR. LOCKWOOD:  The first sentence of the paragraph

15 about x-rays and B reads purports to tell the plaintiff that if

16 his chest x-ray reading is provided with a replicated reading,

17 the chest x-rays themselves do not need to be attached at this

18 time.  The implication is if there is no replicating reading by

19 the B reader, you have to supply the chest x-ray.  Typically

20 speaking, if plaintiff only has one actual chest x-ray picture,

21 the plaintiff by hypothesis in this case has sued Grace but

22 also may well sue a lot of other people.  The chest x-ray may

23 well be and frequently is necessary to bring the case against

24 other people --

25         THE COURT:  All right, then it can be --

**J&J COURT TRANSCRIBERS, INC.**

1        MR. LOCKWOOD:  -- and they in effect want them to

2   turn it over to Grace and --

3        THE COURT:  All right.  It can be stated that the

4   debtor has been permitted to ask for access to show it to a B

5   reader or a doctor of the debtor's choosing.

6        MR. LOCKWOOD:  Okay.  I would just note the

7   implication again that in effect what we're going to have is

8   the debtors are going to take -- have their own B readers read

9   118,000 x-rays potentially and argue about them.  I mean --

10       THE COURT:  They may or may not.  I don't know.  I

11  doubt that.

12       MR. BERNICK:  There's a lot of different ways to

13  slice it.  This was an effort on our part to eliminate a

14  cumbersome process.  If they don't want to go through the

15  process of getting an independent certification, then we

16  obviously have to be given the right of access.  I don't think

17  we're going to be stupid in how we use that right.

18       THE COURT:  Okay.  I think you have the right of

19  access, but having the chest x-ray copies attached might be too

20  burdensome under those circumstances.  So provide that you can

21  have the access upon request, but the copies do not need to be

22  attached.  All right.  Next.

23       MR. COHN:  Your Honor, by telephone, this is Daniel

24  Cohn on behalf of the Libby plaintiffs.

25       THE COURT:  Yes.

1          MR. COHN:  I don't -- I want to defer to Mr.

2    Lockwood, but if he's done with the supporting documents

3    section, I did have a couple of other comments on that.

4          THE COURT:  All right.  Go ahead.

5          MR. COHN:  The first is -- and this really keys off

6    of what you've just decided -- is that when there are original

7    documents versus copies, that it should be made clear that the

8    original need not be supplied, but in general that only copies

9    need to be --

10          THE COURT:  All right.  It can say the questionnaire

11    must be accompanied by copies of any and all documents.  That's

12    fine.

13          MR. BERNICK:  Well, but with access to the originals.

14          THE COURT:  With access to the originals.  Fine.

15          MR. COHN:  And then under -- on pulmonary function

16    tests there is an issue even as to copies, which I understand

17    the cost of that raw data that Mr. Bernick has requested -- and

18    I'm referring specifically, Your Honor, to where it says in the

19    first line actual raw data including all spirometric tracings.

20          THE COURT:  Okay.

21          MR. COHN:  My understanding, first of all, is that

22    many, many clinics will not have even saved that.  So that's --

23    but obviously, if it doesn't exist, then they can't be

24    produced.  But even as to those clinics that actually still

25    have those underlying data, they will charge for it to be

**J&J COURT TRANSCRIBERS, INC.**

1 supplied, and this leads to a broader question, which is that

2 what is to be produced here I take it is that, as in any

3 document production, is what is in the possession or control of

4 the claimant, and that no one is being asked to go out and get

5 something that they do not now have.

6           MR. BERNICK:  It's the claimant and their counsel.  I

7 mean if we're going to play the game where we've got to go out

8 and get medical releases and request medical documentation from

9 doctors all over the country, that will effectively turn this

10 process into individual claim litigation, and it will founder.

11 Lawyers, to the extent that lawyers have the ability to access

12 this information, they have an obligation to make reasonable

13 inquiry under the rules, and they should obtain it.  And

14 particularly with regard to the Libby claimants, where they're

15 basically all seeing the same guy in the same clinic, this

16 ought to be a very efficient process.

17           MR. LOCKWOOD:  Your Honor, I can't believe that we're

18 being told that if Grace asks for documentation which is not in

19 the plaintiffs' possession or the plaintiffs' lawyers'

20 possession but in some of these third parties' possession, and

21 they have to pay out of pocket in order to get it for the

22 purpose of Grace using it and having their experts use it, this

23 questionnaire could legitimately do that.  I mean, again, Mr.

24 Bernick tries to distinguish between its individual claim

25 litigation if Grace has to out and do medical records review.

1  Apparently, it's not individual claims litigation if the

2  plaintiff is forced to go out and get the same information at

3  the plaintiffs' expense.

4           MR. BERNICK:  To the contrary, I think in any

5  individual case a court would require a plaintiff to produce

6  their own medical information.

7           MR. LOCKWOOD:  But this isn't an individual case as

8  the Court has repeatedly stated.

9           MR. BERNICK:  But the question is whether -- this is

10  a shell game now.  We want to know the basis of their claim.

11  We want to know the medical data, and now they say, oh, well,

12  gosh, don't get it from us.  Go conduct discovery.  And we say,

13  okay, we'll go ahead and do that.  In this case we'll bog down.

14  The whole point of this matter is that these lawyers have

15  access to their doctors.  These doctors -- day in/day out they

16  do business with them.  In half a heartbeat they can get this

17  information.

18           THE COURT:  I can't see the --

19           MR. LOCKWOOD:  Your Honor, there's nothing in the

20  record to support these kinds of broad assertions by Mr. --

21           MR. BERNICK:  Take a look at Judge Jack's opinion.

22           THE COURT:  Pardon me.

23           MR. LOCKWOOD:  Judge Jack was talking about a limited

24  number of silica claims.

25           THE COURT:  Folks, I am not Judge Jack, and this

1  isn't a silica case.  Could we please concentrate, or you're

2  going to be here all right.  I, however, am leaving at five,

3  and you are not leaving until I come back from my conference

4  call in the event that we're not done.  So can we please get to

5  it?  Mr. Cohn, it doesn't seem to me that this is an

6  unreasonable request.  If somebody is filing a claim or

7  pursuing a claim against Grace based on the fact that there is

8  a pulmonary function test that shows a disease, it seems to me

9  that they have an obligation to produce either the results or

10 the raw data.  To the extent that they want to go to the

11 doctor's office and copy the raw data, that's fine.  But to the

12 extent that there is an actual document, and they want to

13 attach it, that's okay, too.  They have their choice.  They can

14 either --

15          MR. LOCKWOOD:  Either or --

16          THE COURT:  They can go get it, or they can hand

17 write it out or whatever they need to do, Xerox it, however it

18 can be done.  It's to be attached if it exists.

19          MR. BERNICK:  Right, the tracings in particular.

20 Those are the curves that are the --

21          THE COURT:  I understand the tracings are necessary.

22 That's probably the thing you want the most --

23          MR. BERNICK:  That's right.

24          THE COURT:  -- and it doesn't seem to me to be

25 unreasonable as a request to get it when you're trying to

**J&J COURT TRANSCRIBERS, INC.**