# EXHIBIT E

Kenneth A. Rosen (KR4963)
Jeffrey D. Prol (JP7454)
**LOWENSTEIN SANDLER, PC**
65 Livingston Avenue
Roseland, New Jersey 07068
973.597.2500

Elihu Inselbuch (EI2843)
**CAPLIN & DRYSDALE, CHARTERED**
399 Park Avenue, 27th Floor
New York, New York 10022
212.319.7125

Trevor W. Swett (TS8962)
Peter Van N. Lockwood (PL8843)
**CAPLIN & DRYSDALE, CHARTERED**
One Thomas Circle, N.W.
Washington, DC  20005
202.862.5000

*Co-Counsel to Official Committee*
*of Asbestos Claimants of G-I Holdings, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>G-I HOLDINGS, INC., et al.,<br><br><br>Debtors. | In Proceedings for Reorganization Under Chapter 11<br><br>Hon. Rosemary Gambardella, C.U.S.B.J.<br><br>Case Nos. 01-30135 (RG) and 01-389790 (RG) (Jointly Administered) |

**MEMORANDUM OF THE OFFICIAL COMMITTEE OF
ASBESTOS CLAIMANTS IN OPPOSITION TO DEBTOR'S
MOTION TO ESTABLISH AGGREGATE ESTIMATION
<u>PROTOCOL AND FOR ENTRY OF SCHEDULING ORDER</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

I.  THE MANVILLE AUDIT HAS NO BEARING ON MESOTHELIOMA
    OR LUNG CANCER CLAIMS AGAINST THIS DEBTOR, AND THE
    DEBTOR'S ONLY APPARENT PURPOSE FOR INCLUDING THEM
    IN ITS REQUESTED SAMPLE IS DELAY ...................................................................8

II. THERE IS NO GOOD REASON TO ALLOW DEBTOR TO CONDUCT
    AN UNPRECEDENTED "SAMPLE" OF 2,500 INDIVIDUAL CLAIMS ....................11

    A.  The Claims History Provides All the Data Necessary to Estimate
        Debtor's Aggregate Liability ..............................................................................11

    B.  The Debtor's Vague Charges of "Fraudulent" B-Readings Do Not
        Justify Its Onerous Discovery Proposal ..............................................................12

    C.  The Studies Cited by Debtor Demonstrate Only that Medical
        Diagnosis Is Subjective and Often Disputed ........................................................13

        1.  The Gitlin Study Proves Nothing More than Wide
            Inter-Reader Variability in the Classification of X-Rays .........................13

        2.  The Manville Audit Also Proves Inter-Reader Variability
            and Nothing More ....................................................................................18

        3.  The Friedman Report Is Inapposite, as It Concerned the
            Strict Medical Criteria of the Owens Corning National
            Settlement Program ..................................................................................20

    D.  Disputes as to the Classification of X-rays Do Not Indicate Fraud,
        And Do Not Justify the Proposed Discovery ......................................................21

    E.  The Silica MDL Case Has No Bearing on the Issues Before This Court ............23

    F.  G-I Generally Required Medical Evidence of Asbestos Disease for
        Settlements in the Tort System ...........................................................................25

    G.  There Is No Reason to Test for Product Identification by Undertaking
        the "Sample" ......................................................................................................28

III.    G-I'S PROPOSAL VIOLATES CLAIMANTS' RIGHTS UNDER THE
CONSTITUTION AND THE BANKRUPTCY CODE....................................................30

    A.    G-I's Proposal Would Strip Claimants of Their Jury Trial and Due
Process Rights.....................................................................................................30

    B.    There Is No Reasonable Prospect That Categories of Claims Can Be
Disallowed by Omnibus Summary Judgment Motions.........................................32

        1.    Mass Screening Provides No Basis for Summary Dismissal....................35

        2.    The Absence of a Pulmonary Function Test Demonstrating
"Impairment" Would Not Justify Summary Dismissal ...........................37

        3.    Recently Enacted Medical Criteria Statutes in Four States Will
Have No Material Impact on G-I, While Prospects for Federal
Tort "Reform" Remain Speculative .......................................................39

    C.    The Debtor's Proposed "Panel of Medical Professionals" Would Serve
No Proper Purpose and Could Not Resolve Any Disputes .................................40

IV.    THE DEBTOR'S PROPOSED "ESTIMATION DISCOVERY PLAN AND
ORDER" IS PROCEDURALLY OUT OF ORDER AND ITS PARTICULARS
ARE HIGHLY OBJECTIONABLE...............................................................................42

    A.    G-I's Suggested Deadlines Are Illusory; Its Project Would Take Years..............43

    B.    The Requested Sample Would Be Unreasonably Burdensome...........................44

    C.    This Court Cannot Properly Adjudicate the Rights of Absent Claimants
in the Posture of G-I's Motion ..........................................................................46

    D.    The Debtor's Proposed Discovery Plan Exceeds the Scope of Relevance
for Aggregate Estimation and Is Otherwise Improper ........................................47

CONCLUSION..................................................................................................................50

# TABLE OF AUTHORITIES

## CASES

In re Asbestos Products Liability Lit. (No. VI), 2002 WL 32151574 (E.D. Pa. 2002) ...............36

Cimino v. Raymark Industries, Inc., 151F.3d 297 (5th Cir. 199B)………………………………….7

In re G-I Holdings, Inc., No. 01-30135, 2005 WL 758193 (Bankr. D. N.J. Feb. 1, 2005).............8

Georgine v. Amchem Prods., Inc., 83 F.3d 610 (3d Cir. 1996), *aff'd sub nom.* Amchem
Products, Inc. v. Windsor, 521 U.S. 591 (1997)...........................................................................7

Hall v. Baxter Healthcare Corp., 947 F. Supp. 1387 (D. Or. 1996) ............................................42

In re Joint E.& S. Districts Asbestos Litigation, 237 F. Supp. 2d 297
    (E. & S.D.N.Y. 2002)...................................................................................... 12, 16, 19, 35

In re Joint E. & S. Districts Asbestos Litigation, 129 B.R. 710
    (E. & S.D.N.Y. 1991), *vacated*, 982 F.2d 721 (2d Cir. 1992), *modified*,
    993 F.2d 7 (2d Cir. 1993) ......................................................................................................42

In re Owens Corning, et al., Nos. 00-3837 to 3854 (JPF) (Bankr. D. Del. Nov. 22, 2004)..........12

Owens Corning v. Credit Suisse First Boston, 322 B.R. 719
    (D. Del. 2005) ...........................................................................................1, 5, 16, 18, 22, 41

Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322 (1979) ..........................................................47

Raymark Ind., Inc. v. Stemple, 1990 WL 72588 (D. Kan. 1990).................................................13

Renaud v. Martin Marietta Corp., 749 F. Supp. 1545 (D. Colo. 1990), *aff'd* 972 F.2d 304
    (10th Cir. 1992).....................................................................................................................42

In re Silica Products Liability Lit., 280 F. Supp. 2d 1381 (Jud. Pan. Mult. Lit. 2003)................24

In re Silicone Gel Breast Implant Prods. Liab. Litig., Order 31 (N.D. Ala. 1996)
    avail at 4 Mealey's Litig. Rep.: Breast Implants F-1 (June 23, 1996) ...................................42

In re USG Corp., 290 B.R. 223 (Bankr. D. Del. 2003) ................................................... 8, 32, 46

In re W.R. Grace & Co., 281 B.R. 852 (D. Del. 2002) ...............................................................39

## FEDERAL STATUTES AND RULES

11 U.S.C. § 502(b), (c) ..................................................................................................... 31, 32

Federal Rules of Bankruptcy Procedure  9016 .........................................................................47

Federal Rules of Bankruptcy Procedure  9031 .........................................................................40

Federal Rules of Civil Procedure 42 .................................................................................. 33, 34

Federal Rules of Civil Procedure 45 .........................................................................................47

Federal Rules of Civil Procedure 56(c) .....................................................................................32

## STATE STATUTES AND RULES

Fl. H.B. 1019, 2005 Reg. Sess. (Fla.) .......................................................................................39

Ga. H.B. 416, 2005-06 Leg. Sess. (Ga. 2003) ..........................................................................39

Ohio Rev. Code. Ann §  2307.91 *et. seq*., (2004) ....................................................................39

Tex. Civ. Prac. & Rem. § . 90.011, S.B. 15, 79th Reg. Sess. (Tex. 2005) ................................39

## OTHER AUTHORITIES

Carl B. Rubin and Laura Ringenbach, *The Use of Court Experts in Asbestos Litigation*,
137 F.R.D. 35 (1991) ...............................................................................................................41

## PRELIMINARY STATEMENT

The proper purpose of estimating tort liabilities in the aggregate is to foster plan confirmation by gauging "the total amount which the claimants, as a group, could legitimately have claimed as compensation, as of the petition date." Owens Corning v. Credit Suisse First Boston, 322 B.R. 719, 722 (D. Del. 2005) (Fullam, J.).[1]  Although styled as a mere request to establish an "aggregate estimation protocol" and a scheduling order,[2] G-I's most recent submission really has nothing to do with estimating its asbestos tort liabilities in any legitimate sense.  G-I has adjusted its rhetoric in light of the Court's determination to conduct an aggregate estimation, but its goal remains just what it was in its rejected claims liquidation proposal:  It has no interest in valuing the claims for what they would be worth at the petition date if there were no bankruptcy, but wants instead to use the bankruptcy process as a way to change the rules and procedures by which the merits of asbestos claims are determined, and thereby to defeat and depreciate the claims.

As it happens, evidence obtained from a third party sheds a clear light on G-I's strategy. In October 2000, when the Debtor was preparing for bankruptcy, a bond analyst named Raymond Kennedy from PIMCO, one of the world's leading bond fund management companies, had "a long call with the CFO [of Building Materials Corporation of America] about operations

---

[1]    See Position Paper of the Official Committee of Asbestos Claimants with Respect to Estimation of the Debtor's Aggregate Asbestos Liability and Related Discovery and Scheduling Matters ("C.P.P.") at 20-21.   Judge Fullam's estimation decision in Owens Corning is reproduced as C.P.P., Exh. 3.

[2]    The Debtor's Motion to Establish Aggregate Estimation Protocol and for Entry of Scheduling Order is cited herein as "D. Motion," the brief in support thereof as "D. Br.," and the accompanying exhibits as "D. Exh._."

and the GAF asbestos liability."[3]   In an email that Mr. Kennedy wrote to his colleagues summarizing that discussion, he reported:

> GAF has stated that it does not have enough assets to settle the claims unless there is tort reform.   Thus, GAF will become insolvent.

**Exh. 1** at 1.

This simple statement captures the essence of the Debtor's situation and its goal:  If held to its tort liabilities as established and valued by the tort system, G-I is insolvent.  It cannot meet the claims in the absence of "reform."   Hence, the Debtor's agenda from the first day of this bankruptcy has been to *escape* from the tort system as administered by courts of general jurisdiction and to *change* the rules under which its tort liabilities are established and valued.   It wants to fend off asbestos claims for as long as possible while lobbyists press Congress to federalize and "reform" asbestos tort laws.   That failing, its hope is to impose in the bankruptcy case liability criteria and procedures that would not apply in the nonbankruptcy courts − its own private version of tort "reform."

Certainly, the thrust of its first "liquidation by matrix" proposal for claims estimation, which this Court correctly rejected, was a repudiation of the tort system in favor of an unprecedented system of the Debtor's own imagining.   Now, the Debtor is striving to reinvent aggregate estimation as just another vehicle for *contesting* the claims − a sort of litigation at "wholesale" − that would effectively rule out most of the claims as "invalid" without actually having to confront the claimants whose rights are at stake.   If the Debtor has its way, the shareholder will keep equity worth hundreds of millions of dollars, and the tort victims will be

---

[3]     *See* October 23, 2000 email from Raymond Kennedy to High Yield Portfolio Managers at 1 (**Exh. 1**).  The citation form "**Exh. ___** refers to the exhibits to this memorandum.

left to claim against a grossly underfunded settlement trust, receiving only a fraction of what their claims would be worth had there been no bankruptcy.

The Debtor's "new" approach to estimation has, at its core, the same fundamental flaws that doomed its matrix scheme. It focuses almost entirely on nonmalignancy claims and represents the latest chapter in the Debtor's quest to impose drastic restrictions on asbestos claims for nonmalignancy conditions, despite the repudiation of the same or similar restrictions in the <u>Georgine</u> case and the failure of the United States Congress and all but four state legislatures to enact such restrictions into law. It ignores that disputed claims can and must be taken into account in a bankruptcy estimation and attempts to turn "estimation" into a process for disqualifying large categories of claims from being estimated at all so that the Debtor will not have to provide for them in an eventual plan of reorganization. The Debtor's "protocol" would violate the procedural rights of individual claimants even more flagrantly and cynically than its repudiated matrix scheme would have done. Without so much as joining the affected claimants as parties, it would afford them none of the protections they would enjoy if the Debtor attempted to disallow their claims directly rather than indirectly by "estimation" of "categories." Remarkably, even G-I's unlawful "Claims Liquidation Committee" resurfaces as part of the machinery of G-I's latest program, albeit in the form of a panel of court-appointed experts who are apparently meant to obviate the constitutional function of the jury by somehow resolving without trial the pervasive disputes characteristic of asbestos personal injury litigation.

This time, rather than requiring all claimants to submit elaborate proof of claim forms for estimation purposes, the Debtor seeks comprehensive discovery from a "sample" of 2,500 claimants. It urges the Court to "extrapolate" from this group and issue broad rulings disallowing as "invalid" whole categories of claims through consolidated summary judgment

motions.  The real target is claims for nonmalignant diseases caused by asbestos; indeed, the Debtor says almost nothing at all to justify including cancer and mesothelioma claims in the sample, even though the Court has determined that phase 1 of the estimation proceeding will focus on those claims, with the estimation of nonmalignancy claims to follow.  Its real purpose in folding cancer and mesothelioma claims into its sampling proposal is to *delay* the hearing on the estimation of those claims until it has completed its hoped-for review of thousands of claim files of nonmalignancy claimants.  That attacking the latter is the true purpose of the sample is made clear by the arguments the Debtor offers up in its effort justify this unprecedented, costly, and time-consuming sampling exercise, which rest on several studies involving nonmalignancy claims and on inconclusive developments in silica litigation in which questions have been raised (but not yet answered) about x-ray readings involving silica claimants, some of whom are also asbestos claimants.  Those matters lend no genuine support to the proposal, but at bottom show nothing more than what has long been known − that qualified doctors often disagree about the interpretation of the x-rays in nonmalignancy cases and that the defendants almost always dispute the presence of asbestos-related disease in such cases.  The medical criteria statutes passed recently in four states regarding nonmalignancy claims provide no legitimate impetus for the Debtor's requested sample, especially considering that three of those four statutes expressly provide that they *do not apply* to parties in existing bankruptcy cases.

The requested sample of 2,500 claims would add nothing of substance to the information already available through the database pertaining to the 300,000 claims resolved by G-I before bankruptcy and the more than 150,000 claims pending as of the petition date.  It would tell us nothing about the value of pending and future claims in the tort system.  And it would not contribute in the slightest to resolving the pervasive factual disputes surrounding nonmalignancy

claims.  "[A] claim of asbestosis survives summary judgment if there is a diagnosis supported by a single B-reading," as Judge Fullam noted in his estimation decision in the Owens Corning case,[4] and no opinions by "neutral" experts who disagree with a claimant's B-reader could prevent such a claim from proceeding to trial or, more to the present point, from commanding value in an estimation proceeding.

Since the sample cannot serve the purposes of estimation, it would be inappropriate quite apart from the inordinate burdens it places on claimants and the undue delay it would cause.  As far as the claimants to be sampled are concerned, the proposed sampling exercise would be just as burdensome as the claim form previously propounded by G-I.  The costs are not to be measured solely in the millions of dollars the estate would inevitably incur in discovering 2,500 cases, nor in the value of the time that the claimants or their tort counsel would be asked to devote to such discovery.  They must also be measured in *delay*, especially considering that we are mid-way through the fifth year of this chapter 11 case with no plan of reorganization discernible on the horizon.

The Debtor is well aware that a decision to permit its sample would open this case up to lengthy and indeterminate delays.  Its response is to propose a schedule that is nothing short of ludicrous both in the apparent deadlines it proposes and in what, upon closer inspection, turns out to be its totally open-ended nature.  Thus, the Debtor's proposed order first provides that "[f]act discovery shall be completed on or before August 5, 2005 * * * *" (Proposed Order ¶ IV.1) − and this pursuant to a motion that will not even be *heard* by the Court until July 14, 2005!  It then adds that the discovery period shall not end "in any event * * * before all responses and responsive materials have been produced for the Debtor's sampling program."

---

[4]      Owens Corning, 322 B.R. at 724. (C.P.P. Exh. 3)

When such complete responses have not been received by its August 5, 2005 cutoff date (as the Debtor knows is inevitable), all subsequent dates in the proposed order "shall be modified and moved ninety (90) days once the production of materials for the sampling program is completed." *Id.* With that addition, the Debtor's proposed schedule becomes illusory and misleading, for as Debtor's counsel essentially conceded at the last status conference, they cannot really say how long the sample would take.[5] After all, in the forty or so asbestos bankruptcies that have taken place thus far, no one has ever undertaken such a sample before.

Even more significant than the cost in time and money is the prejudice to the claimant constituency. The Debtor's idea is to disqualify their claims *in absentia* and by broad categories. The program is designed to lure this Court into ruling on basis of a 2,500-claim sample that thousands upon thousands of pending claims can be disregarded as a matter of law and that the Debtor can be discharged of those claims (and most of the tens of thousands of claims that will be filed in the future) without making any provision for them in a plan of reorganization.

Like the "liquidation by matrix" scheme, the Debtor's effort to turn estimation into a mass disallowance proceeding cannot be squared with the commands of due process. And it has not the least chance of succeeding in practice. G-I itself has admitted that asbestos suits almost always turn on disputed facts,[6] and the Third Circuit has made clear that the facts underlying asbestos claims are too individualized to be litigated in classes, even when class members are

---

[5]    *See* D. Exh. C at 35-36 (remarks of Mr. Miller); *see also id.* at 36, lines 12-14 ("the part of the completion I think we all believe is going to be difficult is this collection of data").

[6]    *See* Position Paper of Official Committee of Asbestos Claimants with Respect to Estimation of the Debtor's Aggregate Asbestos Liability and Related Discovery and Scheduling Matters ("C.P.P.") at 38 (citing G-I's formal admission in response to allegation of Committee's counterclaim in declaratory judgment action now pending in District Court).

afforded the right to opt out of the class.[7]  In the tort system - which estimation must attempt to replicate – asbestos claims are rarely amenable to summary judgment and can never be resolved against the claimants through mass consolidations intended to serve as the functional equivalent of a non-opt-out class actions.  If it were possible under the law to dispense with large numbers of asbestos claims by consolidated summary judgment motions or any other similar process, the Court may rest assured that the resourceful, well-funded and aggressive community of asbestos defendants would have found and employed it in the tort system long before now.  But due process, the fact-intensive nature of asbestos claims, the rules of civil procedure, and fundamental fairness to claimants prevent any court from giving short shrift to their claims in the manner this Debtor proposes.  The Debtor is asking the Court to put its trust in a mirage that can never lead to a confirmable plan of reorganization.  *See* Cimino v Raymark Industries, Inc., 151 F.3d 297 (5th Cir. 1998).

Given its fundamental flaws, the Debtor's suggested protocol does not warrant serious consideration, and the Court should speedily reject it.  After lavishing time and resources on its radical and unlawful "liquidation by matrix" scheme, the Debtor has no just call on the Court's indulgence in order to experiment for years more with its equally radical and unlawful "disallowance by extrapolation" program, which, like the former proposal, is not aimed at using estimation for the statutorily intended purpose of valuing the liabilities for what they would be worth outside of bankruptcy, but instead at *de*-valuing those liabilities and salvaging undue equity for the shareholder.  Rather than postponing the estimation hearing while the Debtor pursues its unprecedented sampling, the Court should benefit from the example set by the District Court in the Owens Corning estimation proceeding:  It should refuse to authorize the

---

[7]     Georgine v. Amchem Prods., Inc., 83 F.3d 610, 626 (3d Cir. 1996), *aff'd sub nom.* Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997).  *See* C.P.P. at 39.

sampling request or to countenance its inherent delays and costs and should instead go forward

to a hearing on aggregate estimation a based on historical data and competent expert testimony.

This course will involve only a six-month period fact and expert discovery tailored closely to the

limited issues relevant to aggregate estimation.  *See* C.P.P. at 52-54.

I.      **THE MANVILLE AUDIT HAS NO BEARING ON MESOTHELIOMA OR LUNG CANCER CLAIMS AGAINST THIS DEBTOR, AND THE DEBTOR'S ONLY APPARENT PURPOSE FOR INCLUDING THEM IN ITS REQUESTED SAMPLE IS DELAY**

This Court has determined that estimation should proceed in phases and that

mesothelioma and cancer claims should be addressed in the first hearing.  The Court has divided

the estimation proceedings into phases, with malignancy claims to be addressed before

nonmalignancies, because it recognizes the possibility that the former claims alone may render

the Debtor insolvent, in which event the Debtor will have no stake in the determination of the

allocation of value as between malignancy and nonmalignancy claims in a reorganization and the

"'troubled and occasionally metaphysical controversy of the so-called unimpaired class of

claimants'" may become much easier and less costly to resolve.  In re G-I Holdings, Inc., No. 01-

30135, 2005 WL 758193 * 35 (Bankr. D. N.J. Feb. 1, 2005) (cited below as "Op.") (quoting In re

USG Corp., 290 B.R. 223, 226-27 (Bankr. D. Del. 2003)).  Insolvency based on a "cancers only"

estimation is indeed a likely prospect if the Court accepts the Committee's suggestion that

pending and future lung cancer and mesothelioma claims should be estimated in the same phase

of the proceeding.[8]

---

[8]      Of course, the Debtor also bears liability for other cancers that have resulted in settlements and judgments in the tort system.  Such claims are not uncommon but do not account for a major portion of the aggregate liability.  To simplify the issues and save time, therefore, the Committee offered to exclude other cancers from an estimation aimed at determining whether the Debtor is solvent.

It is therefore striking that almost all of the Debtor's arguments in favor of its proposed protocol relate to issues surrounding nonmalignancy claims. Tellingly, the original sample that the Debtor proposed last fall when it began to issue subpoenas to law firms (which subpoenas have been stayed by the Court) included *only nonmalignancy* claims. Extending the sample to cancer and mesothelioma claims was an afterthought calculated to delay. Justifiably fearing that a "cancers only" estimation will lay bare its insolvency, the Debtor wants at all costs to prevent the proceeding from arriving at that point until it can brandish the files pertaining to nonmalignancy claims as evidence of supposed "fraud,"[9] and thereby, it hopes, prejudice the Court, the press, and the legislatures.

There is no good reason to delay the estimation hearing on mesothelioma and lung cancer claims, even assuming for the sake of argument that the sample would be justified as regards nonmalignancy claims (an assumption that, as shown below, is contrary to fact). In a half-hearted effort to justify including malignancies in its requested sample, the Debtor points to an audit of medical records submitted by claimants to the Manville Personal Injury Settlement Trust ("Manville Trust"). But the Manville Trust's audit in no way suggests that there is anything to be gained by sampling malignancy claims asserted against the Debtor.

According to a letter sent by the Manville Trust to Caplin & Drysdale as attorneys for Selected Counsel for the Beneficiaries, from early 1995 to early 1998, the Trust subjected the x-rays of many thousands of claims to several levels of review designed to "audit" the disease classification of claims submitted to it for payment under the criteria governing distributions by the trust. *See* D. Exh. F. Around 94% of the x-rays reviewed pertained to nonmalignancy

---

[9]    As shown below, the Debtor's habitual cries of "fraud" are based on wide variances in the interpretation of x-rays of nonmalignancy claimants, but it is well documented that such variances are inherent in the subjectivity of x-ray readings and provide no just cause to suspect fraud.

claims, and claims were counted as having "passed" the audit if a B-reader engaged by the Manville Trust confirmed the pre-audit classification of the claim in that trust's system of disease categories. *Id*. at 1. As to nonmalignancy claims, there was considerable disagreement between the B-readers acting for the Manville Trust and those who interpreted the x-rays on behalf of the claimants,[10] yet with respect to malignancy claims the correspondence cited by the Debtor states: "Only about 11% of alleged malignancies have been downgraded in Category," usually because the trust came to doubt the presence of underlying disease. *Id*. at Bates CRMC 0168906.

In the context of a claims database as large as that of the Manville Trust, it is not surprising that claims may be reclassified, that the entity receiving the claims will sometimes dispute the presence of the claimed disease, and indeed that in some small fraction of the claims the alleged disease will ultimately be found to be absent. But the abundant data available in the Debtor's own database is more than sufficient to allow experts to discern the patterns of such reclassifications *in G-I's own claims history* and to draw appropriate inferences for purposes of estimation. The Committee has already informed the Court that G-I's database indicates that, during its last few years outside of bankruptcy, this Debtor resolved about 28% of all claims with zero payment. In valuing pending and future claims, the Committee's claim consultant gives full effect to that "zero pay" rate by averaging a tort defendant's payments for indemnity across *all* resolved claims, including those that were dismissed with no payment at all. There is no reason to fear that G-I's database is not sufficiently detailed to allow the experts to avoid overstatement of its liability for mesothelioma and cancer claims. Moreover, in a truly random sample of 2,500 claims, only a small number of mesothelioma and lung cancer claims would be captured, and

---

[10]    This is hardly surprising, given the well-documented subjectivity of x-ray interpretation and the well-documented and long-recognized phenomenon of inter-reader variability. This problem as well as the Manville audit itself are discussed further below.

whatever slight amount of additional data might be gained (at great expense) would be essentially worthless when compared to the deep fund of claims data already on hand. The Debtor's proposal to sample malignancy claims is a red herring designed not to improve the estimation of such claims but to postpone it for the Debtor's self-serving tactical purposes.

## II.    THERE IS NO GOOD REASON TO ALLOW DEBTOR TO CONDUCT AN UNPRECEDENTED "SAMPLE" OF 2,500 INDIVIDUAL CLAIMS

### A.    The Claims History Provides All the Data Necessary to Estimate Debtor's Aggregate Liability

The purpose of this estimation proceeding is to determine what G-I's aggregate liability for asbestos claims would be had those claims been resolved in the tort system as of the petition date. G-I litigated and settled more than 300,000 claims over a period of thirty years and recorded more than another 150,000 still-pending claims in its database by the time it filed for bankruptcy. That extensive claims history is the most complete, broadest and most representative "sample" possible. Taking comprehensive discovery of 2,500 of those claims, as the Debtor prepares to do, will not enhance the informational basis for estimation in any meaningful way.

G-I's main rationale for the extensive discovery it seeks is that recent studies and audits have supposedly disclosed "a pervasive problem of illegitimate and unsubstantiated asbestos claims", and "underscore the necessity for a critical evaluation of the medical validity of claims." D. Br. at 2-3. That same rationale, and the same studies – including the Gitlin Study of B-readings and a medical records audit carried out by the Manville Trust in the mid-1990's – were presented to the Owens Corning court by Credit Suisse in support of its request to examine medical records of a similar, though less extensive, "sample" of claims. Judge Fullam firmly rejected the more modest sampling proposal in Owens Corning, noting that "no useful purpose

-11-

would be served by further delaying matters, and running up additional legal bills, to prove what is already reasonably well known."   Memorandum and Order at 2, In re Owens Corning, et al., Nos. 00-3837 to 3854 (JPF) (Bankr. D. Del., Nov. 22, 2004) (reproduced as C.P.P., Exh. 2).  *See* C.P.P. at 9-10.

Rather than allowing the Debtor to embark upon another unprecedented experiment in the wake of its failed "liquidation by matrix" scheme, this Court should follow the lead of the Owens Corning court and the many other courts that have grappled with asbestos bankruptcies by proceeding to a hearing on aggregate estimation based on the Debtor's rich trove of existing data. In the unlikely event that such a hearing reveals any critical gaps in information, the Court can at that time tailor supplemental discovery for any specific need.  But it would be neither prudent nor efficient for the Court to authorize wholesale discovery of 2,500 individual claims almost five years into the case when no court has ever thought it appropriate to do so during the entire twenty-five year history of asbestos bankruptcies.  *See* C.P.P. at 48-52.

**B.    The Debtor's Vague Charges of "Fraudulent" B-Readings Do Not Justify Its Onerous Discovery Proposal**

Debtor contends that recent studies of asbestos claims have uncovered misdiagnosed and fraudulent asbestos claims (D. Br. at 3-4), and thus justify extensive review of the medical and other records of some 2,500 asbestos claimants.  G-I points to no actual evidence of fraud among asbestos B-readers, but asks the Court to draw unwarranted inferences from the cited studies, and from dated and inapposite cases.  Nor could any fraud be demonstrated by examining the records requested.  The interpretation of x-rays for purposes of diagnosing non-malignant asbestos diseases is a subjective process.  *See* In re Joint E. & S. Dists. Asbestos Litig., 237 F. Supp. 2d 292, 309 (E. & S.D.N.Y. 2002).  *See also* Owens Corning, Friedman Depo. Tr. at 249-50

(**Exh. 2**), <u>Owens Corning</u>, Gitlin Depo. Tr. at 65-66 (**Exh. 3**).[11]  As Judge Fullam noted, it is "virtually impossible" to "prove which of two conflicting readings of lung X-rays is correct," (C.P.P., Exh. 5 at 3), let alone demonstrate that a disputed reading is fraudulent.

G-I has a long history of vigorously defending and settling asbestos claims, with the assistance of well-funded and aggressive counsel who were alert to every opportunity to gain leverage over plaintiffs.  For G-I to come before this Court now suggesting that an extensive fraudulent scheme somehow escaped detection until its bankruptcy defies common sense.[12]

### C.    The Studies Cited by Debtor Demonstrate Only that Medical Diagnosis Is Subjective and Often Disputed

#### 1.    The Gitlin Study Proves Nothing More than Wide Inter-Reader Variability in the Classification of X-Rays

As purported proof of widespread illegitimate claims, Debtor points to a study by Dr. Joseph Gitlin, et al., comparing x-ray interpretations by two groups of B-readers[13].  Joseph N. Gitlin, et al., *Comparison of 'B' Readers' Interpretations of Chest Radiographs for Asbestos*

---

[11]    Dr. Gary Friedman and Dr. Joseph Gitlin were medical consultants to Owens Corning. Their deposition testimony was offered into evidence at the Owens Corning hearing.

[12]    Debtor's reliance on <u>Raymark Ind., Inc. v. Stemple</u>, 1990 WL 72588 (D. Kan. 1990) underscores the point.  The <u>Stemple</u> case was aberrant and notorious, and Debtor had ample opportunity in the 15 years between that decision and its own bankruptcy to root out and deal with any claims generated under similar circumstances.  Owens Corning, for example, was vigilant in resisting claims it considered dubious, even to the point of suing some laboratories for what it claimed were bogus PFT's, but had to settle that suit for an amount that covered only a third of its litigation costs.  *See* C.P.P., Exh. 5 at 3.  There is no reason to believe that G-1 was any less vigilant; had it discovered any fraud, it would have pursued all available remedies.

[13]    B-readers are trained and certified by the National Institute of Occupational Safety and Health (NIOSH) to read chest x-rays for signs of pneumoconiosis, and classify them according to ILO standards, described in n. 15 below.  The designation of B-reader is the highest certification available for physicians trained in the use of the ILO standards.  *See* **Exh. 10 (**Penn State Study), *infra* at 3.

*Related Changes,* 11 J. Acad. Radiol. 843 (2004)(the "Gitlin Study") (D. Br. Ex. E)[14]. The Gitlin

Study, and the testimony of Dr. Gitlin, who was a consultant to Owens Corning, were offered

into evidence at the Owens Corning hearing.  In the study, which was commissioned and funded

by attorneys for asbestos defendants, seven B-readers, hand picked by Dr. Gitlin and his co-

authors, examined chest x-rays of 492 asbestos plaintiffs, which were chosen and supplied by

counsel for asbestos defendants.  **Exh. 3** (Gitlin) at 142–46.  Not surprisingly – given that the

claimants had chosen to pursue claims based in part on their abnormal x-ray readings – 95.9% of

the x-rays had been interpreted previously by qualified B-readers as positive for parenchymal

abnormalities (scored as small opacities profusion category of 1/0 or higher on the ILO scale.)[15]

The qualifications and competence of the initial B-readers were not disputed.  **Exh. 3** (Gitlin) at

120.  In only 9.4% of the cases did one of the B-readers chosen by Gitlin et al. agree with the

initial B-reader's classification of the x-rays as 1/0 or higher on the ILO scale.  D. Exh. E at 851,

Table 4(b); **Exh. 3** (Gitlin) at 124.  Even among Dr. Gitlin's B-readers there was poor agreement.

---

[14]      Debtor refers to this study as the "Johns Hopkins Study."  Although Dr. Gitlin is associated with Johns Hopkins, the title is a misnomer, as this was not an independent research study conducted under the auspices of that institution.  Rather, as the authors of the study disclose, it was commissioned and funded by attorneys for asbestos defendants.

[15]      *ILO 1980 Classification of radiographs of the pneumoconiosis.*  Geneva, Switzerland: Occupational Safety and Health Service, International Labor Office, publication 22, revised.  The ILO has set out a uniform standard for the classification of x-rays showing signs of pneumoconiosis.  As explained by Dr. Alan Ducatman:

> Within the ILO system, roentgenograms [x-rays] were historically classified as follows:  category 0, normal;  category 1, abnormal, few opacities; category 2, numerous opacities but lung markings visible; category 3, lung markings obscured.  Each category determination is followed by consideration of a possible alternative so that 1/0 could alternatively be normal but 1/1 and 1/2 are certainly and progressively abnormal.

Alan M. Ducatman, et al., *'B-Readers' and Asbestos Medical Surveillance*, 30 J. Occup. Med. 644, 644 (1988) (**Exh. 4**).

*See* **Exh. 3** (Gitlin) at 129-30; L. Christine Oliver, et al., Letter to the Editor, 11 J. Acad. Radiol. 1397, 1398 (2004) (**Exh. 5**).[16]   In only one instance did all of Dr. Gitlin's B-readers agree in their classification of an abnormal x-ray.  D. Exh. E at 851, Table 4(b); **Exh. 3** (Gitlin) at 123.

　　　Dr. Gitlin and colleagues had not seen any previous studies that documented a 96% rate of parenchymal abnormality among workers exposed to asbestos, and therefore concluded that Dr. Gitlin's B-readers' findings of lower rates of abnormalities must have been more accurate than those of the initial B-readers.  *See* D. Exh. E at 855.  That conclusion was immediately decried by experts in statistics and public health as "without foundation".  **Exh. 5** (Alfred Franzblau, et al., Letter to the Editor, 11 J. Acad. Radiol. 1400, 1401 (2004)); *see also* **Exh. 5** at 1398 (Oliver letter).  The 492 x-rays re-examined in the Gitlin Study were not taken from a cross-section of exposed workers.  Rather, they were x-rays of workers who, having been presented with abnormal x-ray findings, had decided to file claims.  As Dr. Franzblau, et al., point out, and as Dr. Gitlin conceded in his deposition (**Exh. 3** at 87, 163), "the prevalence of radiographic abnormalities among persons who file claims would be expected to be at or near 100%, regardless of the prevalence of such abnormalities in the larger population from which these persons were drawn."  **Exh. 5** (Franzblau letter) at 1401.  As stated in another of the many critiques of the Gitlin Study, "one cannot really conclude from this [Gitlin's] analysis that the consultant readers were any more accurate than the initial readers."  **Exh. 5** (Oliver letter) at 1398.  Dr. Franzblau and his co-authors phrased it more starkly: "no valid scientific conclusions can be drawn from Gitlin and colleagues' investigation."  **Exh. 5** (Franzblau letter) at 1401.  Indeed, the Gitlin Study only shows what was already well known:  Equally qualified and

---

[16]     The Oliver letter was one of the several critiques of the Gitlin Study submitted to and published by the Journal of Academic Radiology.

certified B-readers can, and often do, disagree as to the proper interpretation of x-rays.  *See* Owens Corning, 322 B.R. at 724 (C.P.P. Exh. 3).

The wide variability among B-readers exposed in the Gitlin Study was "expected," as extensive inter-reader variability already had been well documented in prior literature.  **Exh. 5** (Alan M. Ducatman, Letter to the Editor, 11 J. Acad. Radiol. 1399, 1399 (2004)); *see also* **Exh. 5** (Oliver letter) at 1398.  In 1988, Dr. Alan Ducatman and colleagues conducted an independent study in which 23 B-readers evaluated a random, representative sample of more than 100,000 chest radiographs of US Navy employees.  Alan M. Ducatman, et al., *'B-Readers' and Asbestos Medical Surveillance*, 30 J. Occup. Med. 644, 646 (1988) (the "Ducatman Study") (**Exh. 4**).  This study is particularly significant because it was not undertaken for litigation purposes.  Although no two B-readers were observing the same films, the large number of x-rays reviewed by each, and the method of randomization for distribution, minimized the possibility that the B-readers were observing x-rays of populations with different risks of developing asbestos-related diseases.  *Id*. at 646.  The Ducatman Study found a 377-fold variability among B-readers in their classifications of the x-rays (more than twice the 159-fold inter-reader variability found in the Gitlin Study), and a 15-fold variability even among NIOSH instructors, who train and certify B-readers nationwide, and are "presumably the most expert", with the greatest degree of calibration among themselves.  *Id*. at 645-46.

Classification of chest radiographs for the diagnosis of asbestos-related diseases is a notoriously subjective process.  *See* In re Joint E. & S. Dists. Asbestos Litig., 237 F. Supp. 2d at 309.  *See also* **Exh. 2** (Friedman) at 249-50, **Exh. 3** (Gitlin) at 65-66.  While there may be some "over-reading" by some B-readers, there is also "under-reading" by those who are more conservative.  *See* Owens Corning, 1/13/05 pm Tr. 40, 43 (Leff) (**Exh. 6**) (counsel for Owens

Corning testified that B-reading is very subjective, and that asbestos defendants tended to use B-readers who were more conservative, and read fewer films as positive.)   From a medical surveillance perspective, "the failure to find existing disease is generally regarded as the most serious problem…" **Exh. 5** (Ducatman Letter) at 1399.  Although a 1/0 classification on the ILO scale is generally regarded as the cut-off for considering an x-ray "positive" for asbestosis,[17] asbestosis may be present in as many as 15-20 percent of exposed persons with "normal" chest x-rays.  **Exh. 7** (2004 ATS Statement) at 696; H.M. Kipen, et al., *Pulmonary fibrosis in asbestos insulation workers with lung cancer:  a radiological and histopathological evaluation,* 1987 Brit. J. Ind. Med. 96 ("Kipen Study") (**Exh. 8**).  Given the dangers and known incidence of under-reading, and the admonition of the American Thoracic Society to give the "benefit of the doubt" to patients who have been exposed to asbestos,[18] it is not surprising that some doctors will conclude that markings on an x-ray in an asbestos-exposed person indicate asbestosis, even though some other doctors will not.

In asking to sample the x-rays of 2,500 claimants, G-I seeks to replicate the Gitlin Study on a larger scale.  But there is no need to spend time and money on work that can only demonstrate once again what already is well known – that equally qualified B-readers often reach different conclusions as to the proper classification of x-rays, and that G-I disputes the validity of most of the nonmalignancy claims against it.  Disputes as to the proper interpretation of x-rays, however, do not justify the rejection of a single claim, let alone the categorical

---

[17]      *See* 2004 American Thoracic Society Statement, *Diagnosis and Initial Management of Nonmalignant Diseases Related to Asbestos*, 170 Am. J. Resp. and Crit. Care Med. 691, 696 (2004) ("2004 ATS Statement") (**Exh. 7**).

[18]      The 1986 American Thoracic Society Statement, *Diagnosis of Nonmalignant Diseases Related to Asbestos* (**Exh. 9**) at 367 instructs doctors that "given a clear history of exposure to asbestos, a diffuse interstitial fibrosis can be presumed to be due to the asbestos as other forms of interstitial fibrosis are relatively uncommon."

rejection of entire classes of claims.  As Judge Fullam has stated, "a claim survives summary judgment if there is a diagnosis supported by a single B-reading."  <u>Owens Corning</u>, 322 B.R. at 724 (C.P.P. Exh. 3).  And as this Court already has recognized, in our system of justice, claimants have a constitutional right to a jury trial on disputed facts.  Op. at *16-18.

### 2. The Manville Audit Also Proves Inter-Reader Variability and Nothing More

G-I also points to an audit of medical records, conducted in the 1990's, for claims submitted to the Manville Trust, which G-I grossly mischaracterizes as concluding that plaintiffs' B-readers' interpretations of x-rays were inaccurate.  (D. Br. at 10.)  In fact, the audit showed only that B-readers hired by the Trust had no dispute with claimants' doctors' x-ray interpretations in 51% of the audited cases, and, in the remaining 41% of cases, Trust B-readers interpreted the x-rays as evidencing either no disease or a less serious disease than claimed.  *See* A.R. Localio et al., Biostatitstcs Section, Dept of Health Evaluation Services, Penn. State Univ. College of Medicine & Center for Clinical Epidemiology and Biostatistics, *The Manville Personal Injury Settlement Trust X-Ray Audit:  An Assessment of the Identification of the Underlying Disease Process Implications for Medical Review by Certified B-Readers* (1998) (the "Penn State Study") (**Exh. 10**) at 14.  The Trust's own consultants at Pennsylvania State University drew no conclusions as which B-readers' interpretations were correct.  Instead, they concluded that there was a great degree of inter-reader variability, even among the B-readers hired by the Trust.  While the Trust's B-readers disagreed with plaintiffs' B-readers 40% of the time, they also disagreed among themselves, sometimes even more: the disagreement rate among the ten possible pairings of Trust B-readers was as high as 66%.  *Id.* at 26.  The authors of the Penn State Study commented that "[t]he level of agreement among some of the [Manville Trust] B-readers pairs in this study was poor by any clinical or statistical standard."  *Id.* at 27.  Judge

-18-

Weinstein, who oversees the Manville Trust, summed it up as follows: "[T]he B-Readers' reports of those criticizing plaintiffs' experts were sometimes inconsistent among themselves and furnished no gold standard for diagnoses.  The process is intrinsically subjective at the margins." In re Joint E. & S. Dists. Asbestos Litig., 237 F. Supp. 2d at 309.

Importantly, the intrinsic subjectivity of interpreting x-rays and the large degree of inter-reader variability led the outside consultants to the Manville Trust to conclude that the audit was an *invalid basis for denying individual claims*.  When the Manville trustees attempted to deny claims based on the audit's findings, claimants sued for violation of the Trust's distribution procedures.  After being told by Judge Weinstein that he was going to find for the plaintiffs, the trustees backed down, and never actually used the audit as a basis for denying a single claim. Owens Corning, 1/19/05 pm Tr. at 110-12 (**Exh. 11**) (Dunbar).[19]

The Manville Trust Distribution Procedures subsequently were amended, but not because, as the Debtor incorrectly implies, the audit had uncovered illegitimate claims.  Rather, there was concern that the ratio of compensation payments as between nonmalignancy claims and malignancy claims had become skewed in favor of the less serious injuries.  Judge Weinstein found that it was appropriate for the Trust to respond by

> Increas[ing] the ratio of payment made to those with more serious diseases, that is, mesothelioma or other malignancies, to payment made to non-malignant or unimpaired claims….  Such a shift in ratios would help remedy the misallocation of fund resulting in part from the rise in unimpaired claimants.

In re Joint E. & S. Dists. Asbestos Litig., 237 F. Supp. 2d at 319; *see also id.* at 325. Accordingly, the parties *agreed* to amend the Manville TDP so as to direct more of its limited resources to the victims of asbestos-related malignancies.

---

[19]    Dr. Dunbar testified as an expert witness for The Bank Group in Owens Corning.

The experience of the Manville Trust in no way supports G-I's request to sample individual claimants' medical records and have entire categories of claims disallowed by extrapolation at the estimation stage. The Manville Trust is a limited fund settlement trust that is unable to fully compensate its claimants; thus, the interested parties agreed to channel more of the trust's funds to cancer victims and away from those with less serious illnesses. But there was no determination that the nonmalignancy claims were invalid or would have lacked value in the tort system. No such triage is necessary here, where G-I claims that it is solvent and can pay all claims.

### 3.   The Friedman Report Is Inapposite, as It Concerned the Strict Medical Criteria of the Owens Corning National Settlement Program

The final study cited by the Debtor, a 2002 report by Dr. Gary Friedman, who was a medical consultant to Owens Corning, is equally inapposite. *See* D. Exh. L. In his report, Dr. Friedman concludes that of the Owens Corning claims he reviewed, only 13.3% had adequate documentation to satisfy the medical criteria of Owens Corning's extant National Settlement Program, which, *inter alia* – unlike the tort law – required pulmonary function test ("PFT") results demonstrating "impairment." Dr. Friedman's findings have no relevance to this estimation proceeding. The claims reviewed were not a representative sample of asbestos claims; instead, Dr. Friedman believed, they were "problematic" claims that Owens Corning selected for review for that very reason. **Exh. 2** (Friedman) at 262. Dr. Friedman testified he would be "speculating" if he were to extrapolate his findings to the entire universe of Owens Corning claimants. *Id*. at 262-64. Regardless, a finding of impairment supported by a PFT is not required under state tort law to show compensable injury.[20] Dr. Friedman himself pointed out

---

[20]   As discussed below, the medical criteria statutes recently enacted in four states will have little or no impact on this estimation process. *See* below at 39.

that the PFT impairment requirement was imposed by the "strict terms" "unique" to the NSP, *id.* at 215-217, that no such finding of "impairment" was required for recovery in the tort system, and that he himself had many times seen "unimpaired" plaintiffs recover for their asbestos-related injuries, where defendants had disputed the presence of disease.  *Id.* at  236-42.

### D.   Disputes as to the Classification of X-rays Do Not Indicate Fraud, And Do Not Justify the Proposed Discovery

It is not surprising – and certainly not evidence of fraud – that in a world where equally qualified B-readers reach different conclusions, asbestos plaintiff lawyers often hired B-readers who had a tendency to read more films as positive for asbestosis, while asbestos defendants often used B-readers who tended to read fewer films as positive.  In the <u>Owens Corning</u> case, one of the debtor's lawyers testified as follows:

> Q.    In the asbestos litigation, did Owens Corning settle x-ray readings that it believed to have been over read?
>
> A.    Yes.
>
> Q.    Why did you do that?
>
> A.    It is the nature of contested litigation that it's very common that plaintiff's expert says one thing and defendant's expert says another thing.  Our trial — and, as I said a minute ago, we had — these people were certified B-readers by NIOSH, who were current in their certifications, we had no evidence at all of fraud or that kind of impropriety and, in front of a jury, it simply became a credibility contest.
>
> And what we found was that, although we could win a significant percentage of cases, we also lost a significant percentage.  And when we lost, we lost very significant amount of jury awards.

**Exh. 6** (Leff) at 41-42.

This and other evidence of the subjective nature of B-reading was presented to the <u>Owens Corning</u> court, which concluded that "[w]ith respect to X-ray readings, it is clear that, at the

margins, equally qualified and impartial B-readers may reach different conclusions." 322 B.R. at 724.  It follows, as Judge Fullam held, that summary judgment for supposed lack of an asbestos-related disease is not a realistic possibility when a claim is supported by a single positive B-reading.  *See* <u>Owens Corning</u>, 322 B.R. at 724.

In the settlement process involving G-I, the CCR's lawyers took into account the quality of medical evidence and the identity of the plaintiff's doctor reading the x-rays.  Indeed, the CCR's special counsel has testified in the <u>Federal Mogul</u> case that CCR claims analysts "certainly" took into consideration the identity of the plaintiff's doctor when assessing a claim, that there were "certain [settlement] agreements that provided that the reports of certain doctors would not qualify for compensation," that "certain diagnoses by certain doctors were not worth very much" and "that [this] would be one of the factors argued about in negotiating appropriate compensation."  <u>Federal Mogul</u>, Hanlon Depo. Tr. at 145-46 (**Exh. 12)**.  Similar evidence was presented in the <u>Owens Corning</u> case, where one of the debtor's lawyers testified as follows:

> Q.    Did you – in negotiating settlements * * * did you attempt to ascertain the identity of the plaintiffs' doctors who were making the diagnoses?
>
> A.    Of course.
>
> Q.    Did you take the reputation of the plaintiffs' diagnosing physician into account into negotiating settlement values?
>
> A.    Yes.
>
> Q.    In what way?
>
> A.    Well, over time where certain plaintiffs' witnesses were used repeatedly, we knew whether they tended to over-read, be objective readers.  In other words, we had a good feel for the inter-reader variability of particular readers.  And some we could –
>
> THE COURT:    And also presumably with the weight to be given to their testimony by the trier of fact if it

> even got to trial.  Let's not waste time with the
> obvious.  Come on, let's move.
>
> Q.    Were you successful in negotiating lower values with
>       plaintiffs' counsel where the plaintiffs' diagnosing
>       physician had a reputation for being an over-reader?
>
> A.    Yes.  For exactly the same reasons the Judge just indicated.

Owens Corning 1/14/05 am Tr. 14-15 (Tucker) (**Exh. 13**).

Claims supported by what the CCR viewed as weaker or questionable x-ray evidence received lower settlement amounts and were paid less frequently than claims supported by better proof.  Thus, to the extent the quality of x-ray readings is an issue, it is already reflected in G-I's settlement history through the lower settlement amounts and higher dismissal rates for claims supported by "questionable" x-ray evidence, and will be accounted for in the estimation calculation.  There is no reason to allow G-I to reopen the business judgments that it and its authorized claims agent made before bankruptcy, when they had all of the investigative tools of litigation at their disposal, the negotiating power of the block of twenty defendants who were the members of CCR, and every incentive to drive the hardest bargains they could achieve.

### E.    The Silica MDL Case Has No Bearing on the Issues Before This Court

Not only does the Debtor inflate variances in B-reading results into "fraud," it also implies that B-readings in *asbestos* cases must be fraudulent, because fraud has been *alleged* by the defendants in a group of *silica* cases. D. Br. at 3-4.  Not only is that proceeding inconclusive, it is also remote from any legitimate issue in this case.[21]

---

[21]    Debtor's assertion that Dr. Harron, whose B-readings are challenged in the Silica case, has provided the B-readings for a number of claimants against G-I does not justify the discovery sought.  That defendants already have enough data to determine how many B-readings were made by Dr. Harron undercuts their argument.  Regardless, as explained above, G-I's settlement history already reflects the identity of x-ray readers, with lower settlement amounts and higher dismissal rates for claims supported by "questionable" evidence.  See above, at 23-24.

By way of background, in 2003, the Judicial Panel on Multidistrict Litigation centralized various actions alleging injuries and exposure to respirable silica for consolidated pretrial proceedings, transferring them to Judge Janis Jack's court in the United States District Court for the Southern District of Texas.  *See* In re Silica Prods. Liability Lit., 280 F. Supp.2d 1381 (Jud. Pan. Mult. Lit. 2003).  About 9,800 plaintiffs were involved in those proceedings, most of which had originated in Mississippi state courts.

In February 2005, Judge Jack held a three-day Daubert hearing to look into the validity of diagnoses of silicosis by several of the plaintiffs' experts.  The Daubert hearing was the subject of press reports, which have been brought to the Court's attention by the Debtor (D. Exh. A), because Judge Jack halted the examination of Dr. Ray Harron when he requested an attorney upon being accused of falsifying certain silicosis diagnoses.  Before making that accusation, defendants had presented evidence that Dr. Harron diagnosed certain individuals with both asbestosis and silicosis, based upon different films taken on different dates, and that Dr. Harron did not disclose the asbestosis diagnoses when he made the silicosis diagnoses.  Daubert Hearing, Feb. 16, 2005, at 321 (Silica MDL) (**Exh. 14**).  In the press reports, little attention was given to the defendants' criticisms of other silicosis B-readers at the Daubert hearing, which did not rise to the level of fraud allegations.  Also receiving little attention was the testimony of Dr. Jay Segarra, a well-known B-reader who received *praise* from the court after the defendants announced that they would not challenge his silicosis diagnosis.  **Exh. 14** at 371-73. Interestingly, Dr. Segarra is one of the B-readers whose work has been questioned by Dr. Gitlin. **Exh. 3** (Gitlin) at 152.

After the Daubert hearing, in a series of motions, the defendants moved for sanctions and to exclude the medical testimony of certain B-readers as to their diagnoses of silica-related

diseases.   Plaintiffs have opposed these motions, maintaining that the B-readers are fully certified by the federal government to read radiographs and that the defendants have misapplied <u>Daubert</u>.  Plaintiffs' Response to Defendants' Motion to Strike Plaintiffs' Experts, Dec. 14, 2004 (<u>Silica MDL</u>) (**Exh. 15**).   The court has not decided the motions.   Judge Jack has indicated, preliminarily, that the court lacks jurisdiction over the silicosis cases, and she expects to remand them.   Motions Hearing, Mar. 14, 2005, at 61 (<u>Silica MDL</u>) (**Exh. 16**).   Of course, we do not deal in this case with silicosis, and whatever Judge Jack ultimately determines, her decision will not be relevant to this bankruptcy.

 F. **G-I Generally Required Medical Evidence of Asbestos Disease for Settlements  in the Tort System**

  G-I's stated purpose in requesting comprehensive discovery of 2,500 cases through the sample is to test the extent to which claims asserted against it (including claims that G-I has already settled) lack medical evidence of illness.   But as G-I's claims consultant, Dr. Letitia Chambers, has attested in an affidavit submitted to this Court, and as former employees of the Center for Claims Resolution ("CCR"), G-I's former claims processing agent, have testified, the CCR did not settle claims on G-I's behalf without first screening those claims for evidence of asbestos-related disease.[22]

  Although it made certain exceptions, as a general matter the CCR settled claims on G-I's behalf either (1) pursuant to certain processing agreements with plaintiffs' law firms, which the Debtor has sometimes referred to as Futures Agreements; or (2) because the cases had been "trial listed" by a court.   In her affidavit in support of G-I's "liquidation by matrix" proposal, Dr. Chambers described the Futures Agreements and reported that the strict screening criteria which G-I asked the Court to adopt as part of its claims liquidation methodology were modeled,

---

[22] G-I was a member of CCR from 1988 until January 2000.

in part, on the Futures Agreements.  *See* Chambers Aff. ¶¶ 17-18, 25, 38 (**Exh. 17**).  Chambers

gave specific examples:

- "Similar pulmonary function criteria, along with very specific testing standards, are also used in the Futures Agreements to divide between 'Non-Malignant I' (impaired) and 'Non-Malignant II' (unimpaired) with the latter group receiving substantially less compensation." *Id.* ¶ 40.

- "Many of the Futures Agreements require a 12-year latency for nonmalignant conditions as well." *Id.* ¶ 41.

- "Indeed, three of the Futures Agreements require a Board-certified physician for diagnosis of all disease categories other than Non-Malignant II (which requires a certified B-reader); others require it for one or more categories.  Four of the Futures Agreements require that the diagnosing physician, if not Board certified, be a licensed physician acceptable to the CCR." *Id.* ¶ 44.

Outside of the Futures Agreements, CCR settled claims on the trial list.  That is, it

litigated the cases in the normal way, testing the plaintiff's evidence in discovery, and decided

whether or not to settle the case once the court fixed a trial date.  The Committee's investigation

indicates that it was common practice in such cases for CCR to insist upon having claimants

examined by defense doctors.  Those doctors frequently controverted the plaintiffs' diagnoses

and opined that the claimants were not sick.  But the claimants' contrary evidence exposed G-I to

a high risk of adverse verdicts, and so G-I generally settled the cases rather than risking trials.

Deposition testimony taken in <u>G-I Holdings, Inc. v. Baron & Budd</u>, 01-Civ-0216 (RWS)

(S.D.N.Y.), confirms that claims settled by the CCR after having been "trial listed" went through

medical screening.  The CCR's former director of claims for Texas and other western regions of

the United States, Richard C. Bargon, testified at his deposition in the <u>Baron & Budd</u> case that,

in deciding which cases to settle "[t]he disease process would be the most important factor * * *"

<u>Baron & Budd</u>, Bargon Depo. Tr. at 36 (**Exh. 18**).  In nonmalignant cases, the CCR would look

at "whether that nonmalignant process related – created any type of measurable impairment." *Id.* Mr. Bargon also testified that he spoke frequently with outside defense counsel "in terms of status of cases, cases that were coming up for trial, their workup of the case in terms of the injury that's being claimed by a particular plaintiff, the extent that their injury may or may not be related to asbestos, the product identification that had come out through discovery on that case, where they worked, when they worked." *Id.* at 31.

Furthermore, George Jacobi, a former CCR employee who worked for Mr. Bargon, testified at his deposition in Baron & Budd that he evaluated law suits by "look[ing] at factors" such as "the severity of the medicals," and reviewing "[m]edical records, interrogatory answers, [and] deposition testimony." Baron & Budd, Jacobi Depo Tr. at 18-19 (**Exh. 19**).  And Daniel Myer, the CCR's former director of claims for states on the east and west coasts, testified at his deposition that in evaluating claims, the CCR would "look at the relevant medical information concerning that case." Baron & Budd, Myer Depo. Tr. at 23 (**Exh. 20**).

At a recent deposition in the asbestos bankruptcy case of In re Federal Mogul Global, Inc., Case No. 01-10578 (RTL) (D. Del.), former CCR special counsel William Hanlon agreed with Bargon, Jacobi, and Myer, testifying that the CCR required evidence of asbestos-related disease before settling cases:

> Q:  Were those two requirements – namely, evidence of exposure to the asbestos-containing products of one or more CCR members and evidence of an asbestos-related disease – requirements in virtually all settlement agreements with asbestos personal injury plaintiffs, between the CCR member companies and the plaintiffs?
>
> A:  Yes, I believe so.
>
> * * *
>
> [W]hat it [the CCR] was attempting to do with these settlements was to enter into settlements that would compensate individuals for

asbestos-related injury; and it was trying to get some evidence of that injury as a condition of the settlement.

It was not intending to compensate people who were not injured by asbestos.

**Exh. 12** (Hanlon) at 109-10.[23]

The key stated reason for G-I's sampling request is a charade.  G-I has no need of additional medical evidence regarding individual claims in order to estimate its asbestos liability in the aggregate.  It accumulated such evidence for years in the tort system – and settled the claims accordingly.

G.    **There Is No Reason to Test for Product Identification by Undertaking the "Sample"**

G-I also asserts that its sample is necessary to test product identification, attacking the Committee for "assum[ing] that all claims G-I paid in the past were supported by evidence of such exposure [to GAF asbestos] despite G-I's membership in the Center for Claims Resolution."  D. Motion at 14.  In fact, as Committee counsel stated at length at the April 13 hearing, the Committee is well-aware that under the CCR members' cross-subsidization arrangement, CCR members named in an asbestos suit contributed to settlements if the claimant could show that he was exposed to at least one of these members' asbestos products.  Because of the cross-subsidization rule, the Debtor expects that, by "sampling" claims, it will be able to

---

[23]    Contrary to G-I's submission, there is no need for an elaborate sample in order to deal with the fact that some claims are not linked in its database to any specific disease category. This problem appears in the databases maintained by all asbestos defendants.  Historical patterns whereby claims are first recorded in the "unknown" disease category and are later assigned to the fields for mesothelioma, cancer, or pleural disease enable experts to allocate the "unknown" claims to specific disease categories in accordance with the subject defendant's actual experience.  *See* C.P.P. at 24 n. 15.  The proposed 2,500-claim sample would represent a tiny population in comparison to the many thousands of claims whose historical reallocation can be observed in G-I's actual database and so would greatly narrow, not expand, the statistical basis for reassigning claims from unknown to known disease categories.

show that comparably few numbers of claimants can establish product identification implicating G-I.

Even if G-I's assumption were true, it would tell the Court nothing about how to value these claims that are supported by evidence of exposure to G-I products.  What G-I fails to discuss is that it and the other producer members agreed to the CCR's cross-subsidization arrangement precisely because that arrangement served their enlightened economic self-interest. G-I determined that it would be cheaper to follow that model than to pay much larger amounts per claim to a smaller universe of claimants who had product identification evidence implicating G-I.

Indeed, Samuel Heyman said at a 1997 deposition that his company did not withdraw from the CCR, even though it was a "continuing thought," for the simple reason that management had to consider "how well prepared we were to go out in the tort system on our own…."  See GAF Corp. Heyman Depo. Tr. at 103 (**Exh. 21**).  The testimony of the CCR's special counsel, William Hanlon, in the Federal Mogul asbestos bankruptcy case is similar.  He stated that the CCR's cross-subsidization arrangement "was a process that the members agreed to.  And it left them with the option of leaving the center if they, at some point in time, became of the view that they didn't want to remain a member * * * ."  **Exh. 12** (Hanlon) at 129.  For each member, withdrawing from the CCR would have meant returning to the tort system:

> And I think for each company the decision was whether they were better off handling their litigation in the CCR or out of the CCR on their own.
>
> And for the companies that participated in the CCR for as long as they did participate in the CCR, I think that they thought that the CCR was handling those cases for them in a way that was better for their companies than if they were handling them on their own.

*Id.*, at 132.   Consistent with Hanlon's testimony, the Committee's expert, Dr. Peterson, will demonstrate why it was in G-I's self-interest to remain in the CCR because it would suffer higher, not lower, liability in the tort system without the benefit of the CCR's cross-subsidization rule.

### III.    G-I'S PROPOSAL VIOLATES CLAIMANTS' RIGHTS UNDER THE CONSTITUTION AND THE BANKRUPTCY CODE

#### A.    G-I's Proposal Would Strip Claimants of Their Jury Trial and Due Process Rights

Correctly conceived, estimation in the aggregate is a method of valuing G-I's overall liability for the limited purposes of plan confirmation without expending the time and money that would be necessary to litigate the claims individually.   When the merits of individual claims are at issue, the claimants enjoy the due process protections and jury trial rights that were discussed in the Committee's last submission.   *See* C.P.P. at 34-38.   In mass asbestos tort bankruptcies, however, the volume of claims dictates that the allowance or disallowance of individual claims must come at a later stage and typically takes the form of post-confirmation claims processing by a settlement trust, applying criteria and values agreed to by the claimants and approved by the bankruptcy court as part of the plan of reorganization.

What the Debtor has in mind is something altogether different.   It is not interested in estimating its liability, but in *reducing* it. G-I has been determined from the outset to deny claimants their rights as litigants because it fears, correctly, that it cannot prevail if those rights are respected.   Its matrix proposal was designed to impose arbitrary claim eligibility criteria, deprive claimants of any meaningful voice in the categorization of their claims, and saddle those few that met the criteria with wholly unrealistic claim values.   Its new approach accords no greater respect to the rights of individual claimants, but even less.   Simply put, G-I seizes on the notion that estimation does not adjudicate particular claims in order to deny individual claimants

any rights at all, but then attempts to transform estimation into a process for *invalidating* claims, not individually but on a *categorical* basis. It wants to extrapolate from a sample of 2,500 claims to a set of determinations that would eviscerate the pending and future claims of hundreds of thousands of absent persons and thereby to serve as the functional equivalent of adjudicating their claims *in absentia*.

The process the Debtor has in mind would represent the ultimate triumph of form over substance, of glib labels over legal rights. G-I cannot properly evade the requirements of due process or the Constitutional right to jury trial by the mere expedient of calling a process "estimation" when its intent in that process is not to value the claims for what they would be worth outside of bankruptcy, but to make it impossible for most of the claimants to recover on their claims in bankruptcy. If the Court permits the Debtor to turn claims estimation into an aggregative vehicle for claim objections, then, for all the reasons previously discussed, the process will trigger the full panoply of rights that individual claimants would enjoy if the Debtor were objecting to their claims directly under section 502(b) of the Bankruptcy Code rather than indirectly under section 502(c). *See* C.P.P. at 34-38. This would sacrifice the efficiencies true estimation in the aggregate is meant to provide and turn the process into an unmanageable accumulation of individual disputes. It is not a viable path for moving this case from its present logjam to a confirmable plan.

Estimation can be the key to reorganizing this Debtor in a reasonable period of time, but only if the Court focuses the proceeding, including discovery, on the *aggregate* liability and not on 2,500 individual claims as a surrogate for the rest of the claim population. The Debtor's proposed sample has no proper role in the matter, and would either turn the estimation

proceeding into an illegitimate end-run around individual claimants' rights or else stimulate the litigation of massive numbers of claims that section 502(c) was meant to avoid.

### B. There Is No Reasonable Prospect That Categories of Claims Can Be Disallowed by Omnibus Summary Judgment Motions

Needless to say, it would be impossible for G-I to try 2,500 claims in bankruptcy, much less the more than 150,000 pending claims, and the more than 200,000 that have accrued since the petition date. Yet, G-I intends to file Daubert motions, and to move this Court for omnibus summary judgments excluding entire "categories of cases" based on G-I's review of the sample claims. D. Motion at 25; D. Br. at 26. There is no precedent in an estimation proceeding in an asbestos bankruptcy for proceeding by way of such omnibus summary judgment motions or Daubert challenges.[24] Summary judgment, moreover, is not available where there is any "genuine issue as to any material fact", Fed. R. Civ. P. 56(c), and most asbestos claims turn on disputed facts, including disputed medical evidence, as the Committee already has shown. The Committee already has explained why consolidated summary judgment motions would have no reasonable prospect of success and why, therefore, the Court would be wise to require a pre-motion conference to explore the supposed utility of any such motions before allowing them to be filed. See C.P.P. at 38-43.

---

[24]    In his preliminary ruling on claims estimation in USG, Judge Wolin suggested that the debtors *might* be permitted to file summary judgment motions on a claims-wide basis, but made clear that "the Court will entertain such applications only to the extent that they do not interfere with the claimants' constitutional and legal rights as prescribed by law." In re USG Corp., 290 B.R., at 227 (Bankr. D. Del. 2003). Having established a bar date and claim form for malignancy claims, moreover, Judge Wolin was poised in USG to litigate estimation, not in the aggregate, but on the basis of individual claims, albeit by consolidating the claims in a way that he never actually defined. To this date, no court has ever actually conducted an estimation in that fashion in an asbestos bankruptcy (nor, to the Committee's knowledge, in any other kind of bankruptcy). See C.P.P. at 37.

While that discussion need not be repeated here, the Court may benefit from the example of another asbestos bankruptcy, the <u>Babcock & Wilcox</u> case, in which the debtor proposed to bring on consolidated summary judgment motions as a way of disallowing claims in broad swathes, much as G-I is urging here, though on the basis of detailed proof of claim forms rather than a sample.  After the bar date order was entered in <u>Babcock & Wilcox</u> case, almost a quarter of a million asbestos personal injury claims were filed.[25]  The debtor then urged the court to entertain consolidated summary judgment motions under Rule 42 of the Federal Rules of Civil Procedure and predicted that this would lead to disallowance in broad categories of about 90% of the  claims, just as G-I supposes here.  District Judge Sarah Vance never accepted that overture, and she correctly recognized that consolidating asbestos claims for decision could not obviate the ultimately individualized nature of the disputes.  The following illuminating colloquy took place between Judge Vance and the debtor's lead counsel:

> THE COURT:  If what you are saying is true, that still would mean that before we got to the 22,000 [claims] that are arguably viable I would have to make 200,000 discrete determinations that these claims were not sufficient to proceed, is that right?
>
> MR. BERNICK [Debtors' Counsel]:  You would have to make a determination with regard to those claims.  The word "discrete" suggests it would be individualized.
>
> THE COURT:  How else?
>
> MR. BERNICK:  That's the whole purpose of Rule 42.  It enables the Court to aggregate claims for purposes of addressing a common issue.
>
> THE COURT:  But the issues are still individual issues.  If you are going to lump them all together and say, okay, these 160,000 may

---

[25]    The Committee estimates that approximately 350,000 claims have accrued by now against G-I, taking into consideration the more than 150,000 that were already pending at the petition date and the 200,000 or so additional claims that historical patterns suggest have come into being during the four and a half years that this chapter 11 case has been in litigation.

have an issue involving exposure − each one of those people has an issue as to exposure that has to be determined. Simply putting them together for Rule 42 doesn't make the individual issue go away.

* * *

THE COURT: If the plaintiff came in and said, "I saw something different," you would be content not to cross-examine the plaintiff?

MR. BERNICK: It might be interesting to take a few depositions and develop some feel for the Court on what kind of testimony is offered, but we are not going to sit there and take 95,000 depositions.

THE COURT: Tell me how long this first 95,000 [claims] is going to take to dispose of.

MR. BERNICK: That, I think, could be done in three months. Again, because −

THE COURT: Who is doing what? Your part or my part?

MR. BERNICK: It depends on how fast you read the papers. Your Honor I think is justifiably and understandably − I'll use the word I think it's −

THE COURT: Try awe-struck.

In re Babcock & Wilcox Co., Tr. of Proceedings held 1/25/02 at 6-7, 14 (**Exh. 22**).

Realizing that the debtor's scenario for disallowing claims by categories under Rule 42 would take decades to accomplish if it could be done at all, Judge Vance ordered the parties to submit briefs on claims estimation as an alternative. *Id.* at 51, 67. Less than six months later the debtor and the Asbestos Claimants Committee filed a consensual plan of reorganization, which ultimately led to a confirmation hearing at which various insurance companies contested the debtors' overall asbestos liability. The valuation of the debtors' asbestos liability at the confirmation hearing was based entirely on expert estimation of that liability using the same general approach as that proposed by the Committee here.

## 1.    Mass Screening Provides No Basis for Summary Dismissal

The Debtor has not specifically stated which categories of claims it would seek to exclude by its proposed omnibus summary judgment motions, but it suggests that claims resulting from "mass screenings" should be disallowed.  Any motion to exclude such claims by summary judgment would be doomed to fail.  As Dr. Laura Welch[26] testified at the <u>Owens Corning</u> estimation hearing, there is nothing inherently wrong with screenings to detect the presence of disease in an asbestos-exposed population.  <u>Owens Corning</u>, 1/14/05 p.m. Tr. (Welch) at 67-68 (**Exh. 23**).  Mesothelioma that is detected through mass screening is not on that account any less of an injury than one discovered in a visit to a treating physician, and the same is equally true of nonmalignancy claims.  The methods by which lawyers identify potential new cases are irrelevant to the question of whether the claims have value.  What matters is whether in the tort system the claim exposes the defendant to the risk of a verdict and damages award.  Throughout G-I's litigation history, its claims agent, the CCR, paid settlements only to those claimants who supported their claims with sufficient medical evidence to make out an asbestos-related injury and thereby expose G-I to potential damages.  *See supra*, Section II, F.

As part of its contention that cases developed through "mass screenings" are illegitimate and subject to dismissal, G-I relies upon certain administrative rules adopted Judge Weiner of the Eastern District of Pennsylvania in the federal multi-district litigation ("MDL").  D. Br. at 3-4.  Contrary to G-I's assertions, Judge Weiner has never held or even implied that these claims are invalid.  Indeed, Judge Weinstein has noted that one result of the procedures has been to divert the cases to state courts and existing trusts.  *See* <u>In re Joint E. and S. Districts Asbestos Litigation</u>, 237 F. Supp. 2d  at 318. (E. & S.D.N.Y. 2002).

---

[26]    Dr. Welch was called as an expert witness in <u>Owens Corning</u> by the Asbestos Claimants' Committee.

When administratively dismissing "mass screening" cases without prejudice, Judge Weiner's orders state: "Once a case is administratively dismissed, the case will remain active for the Court to continue to entertain settlement motions and orders, motions for amendments to the pleadings, substitutions, and other routine matters not requiring a formal hearing." In re Asbestos Products Liability Lit. (No. VI), 2002 WL 32151574, at *2 (E.D. Pa. 2002). Judge Weiner goes on to say, "The Court encourages the parties to work informally upon discovery and settlement of these cases during any period of administrative dismissal and will entertain necessary discovery motions to facilitate the process." Id. His administrative dismissals are subject by their express terms to a plaintiff's right to return the case to active status by "show[ing] some evidence of asbestos exposure and evidence of an asbestos related disease." Id.

In short, the MDL's administrative orders deal with matters of priority on the court's calendar for scheduling and pretrial matters and case management. They ration the time and resources of the lone judge who has been given the Sisyphean task of overseeing pretrial matters in all asbestos cases in the federal courts. They are not substantive rulings that nonmalignancy cases initiated by "mass screening" are non-compensable or fraudulent, as demonstrated by the fact that Judge Weiner explicitly encourages settlement of those cases.

Judge Weiner's treatment of mass screening reflects the practical imperative of allocating his attention on some fair basis among overwhelming numbers of claimants and his choice to let the most seriously injured claimants go to the head of the queue. But this "worst should go first" approach to case management says nothing at all about whether the claims forced to wait for judicial attention are legally viable, and in no way suggests that those claims could be disposed of by some sort of global summary judgment motion.

## 2. The Absence of a Pulmonary Function Test Demonstrating "Impairment" Would  Not Justify Summary Dismissal

Much of the discovery Debtors seek is intended to demonstrate that certain classes of claimants cannot show impairment by PFT results, with the ultimate goal of disallowing claims on that ground.  There is, however, no medical or legal basis for requiring such a showing in order to demonstrate compensable harm from an asbestos-related disease.

Judge Fullam in <u>Owens Corning</u> correctly rejected the contention that an asbestos claim could not be compensable without a PFT showing at least a 20% reduction in pulmonary function, and underscored that a bankruptcy court cannot "alter state law, and therefore cannot establish mandatory standards of compensability."  322 B.R. at 724.  Judge Fullam also noted that PFT tests "are not very reliable:  standards are available only with respect to males, and in any event, what is 'normal' lung capacity varies greatly with size, physical condition, etc."  *Id.* Indeed, many persons with asbestos-related diseases suffer actual and significant declines in their lung function, even when PFT results fall within the "normal" range.  For example, an individual who began with lung function at 110% of normal, and has his lung function reduced to 95% of normal by asbestosis, will have suffered a large decline in lung function, while still scoring within the normal range on a PFT.  **Exh. 13** (Welch) at 101-03; 1/18/05 p.m. Tr. 122 (Weill) (**Exh. 24**).[27]

The 2004 ATS Statement, which sets out the authoritative guidelines for diagnosing nonmalignant asbestos-related diseases, does not require a pulmonary function test.  Rather, all that is required for a diagnosis of asbestosis is a finding of interstitial pulmonary fibrosis, and evidence of exposure to asbestos "that is of sufficient duration, latency and intensity to be

---

[27]    Dr. Weill testified as witness for the Bank Group in <u>Owens Corning</u>.

causal." **Exh. 7** at 700. The ATS Statement specifically recognizes that asbestos can cause real

harm without any obvious functional impairment:

> It is understood that [non-malignant asbestos-related] disease may
> be present at a subclinical level and may not be sufficiently
> advanced to be apparent on histology, imaging or functional
> studies…. Demonstration of functional impairment is not required
> for diagnosis of non-malignant asbestos-related disease ….

*Id.* at 691.

Asbestosis is the result of the body's efforts to rid itself of asbestos fibers, which causes

scarring of the alveoli resulting in the degradation of the lung's ability to expand and contract.

The damage to and scarring of the lung is the disease; it is not necessary to find functional

impairment measured by any particular standard to diagnose asbestosis or any other

nonmalignant asbestos-related disease. **Exh. 24** (Weill) at 101; **Exh. 2** (Friedman) at 240, 244;

**Exh. 7** (2004 ATS Statement) at 691.

Asbestosis, regardless of decline in lung function, causes real harm to its victims. A

person with asbestosis is four times as likely to die from lung cancer as someone who does not

have the disease. **Exh. 24** (Weill) at 102. It often is a progressive disease, there is no cure, and it

exacerbates other respiratory problems. Thus, doctors recommend that persons with asbestosis

undergo annual medical exams, including x-rays and pulmonary function tests, as well as annual

flu and pneumococcal disease vaccinations, because of the increased risk of contracting such

illnesses caused by the effect of scarring on the clearance mechanisms of the lungs. **Exh. 7**

(2004 ATS Statement) at 711, **Exh. 13** (Welch) at 114-15, **Exh. 23** (Welch) at 7. These tests can

cost $1,000 each year. **Exh. 23** (Welch) at 7.[28]

---

[28]    Asbestos-induced pleural plaque and thickening, which is scarring of the pleura, also
causes real harm. Such scarring can decrease lung function, and its presence indicates an
increased risk of cancer, **Exh. 7** (2004 ATS Statement) at 691, 705, as well as an increased risk

**3.    Recently Enacted Medical Criteria Statutes in Four States Will Have No Material Impact on G-I, While Prospects for Federal Tort "Reform" Remain Speculative**

Four states have recently enacted legislation requiring PFT's for nonmalignant claims. *See* Fl. H.B. 1019, 2005 Reg. Sess. (Fla.) (awaiting Governor's signature); Ga. H.B. 416, 2005-06 Leg. Sess. (Ga. 2005); Ohio Rev. Code. Ann. Sec 2307.91 *et. seq*., (2004); Tex. Civ. Prac. & Rem. Sec. 90.011, S.B. 15, 79th Reg. Sess. (Tex. 2005).    Importantly, however, the Florida, Ohio, and Texas legislatures have specifically provided that nothing in the statutes is intended to, or should be interpreted to

> (a)  Affect the rights of any party in bankruptcy proceedings; or
>
> (b)  Affect the ability of any person who is able to make a showing that the person satisfies the claim criteria for compensable claims or demands under a trust established under a plan of reorganization under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. Chapter 11, to make a claim or demand against that trust.

Fl. H.B. 1019 § 9(2)(a), 2005 Reg. Sess. (Fla.).  *See also* Ohio Rev. Code. Ann. § 2307.95 (2004) (same); Tex. Civ. Prac. & Rem. § 90.011, S.B. 15, 79th Reg. Sess. (Tex. 2005) (same). Accordingly, these statutes will have no material affect on estimation in G-I's bankruptcy.[29]

The Debtor treats federal tort "reform" as embodied in the FAIR Act[30] as though it were the law of the land (*see* D. Br. at 15), when in fact it is merely a bill that Congress is considering

---

of asbestosis.  *Id.* at 707.   Thus, the ATS recommends that patients with pleural plaque be monitored regularly for interstitial fibrosis.  *Id.*

[29]     It should also be noted that claimants from these "reform" states remain free to file their claims in other jurisdictions so long as they can establish venue over G-I, and the law of their home states will not necessarily govern in such actions.  Anyone can lay venue in New Jersey in a case against this Debtor.  *See* N.J. Rules of Court 4:3-2(a) (providing for venue "in the county in which * * * *any party* to the action resides at the time of its commencement") (emphasis added).  And New Jersey's substantive law happens to be favorable to asbestos claimants, as Judge Wolin has observed.  *See* In re W.R. Grace & Co., 281 B.R. 852, 861-2 (D. Del. 2002).

but has not passed.  No one can predict whether the asbestos defendants' long effort to procure a legislative rescue will ever succeed, and any suggestion that the asbestos claims against G-I should be estimated on the assumption that the FAIR Act may someday pass would invite the Court to engage in impermissible speculation, as Judge Newsome sternly held when Letitia Chambers attempted to testify to such an assumption in the asbestos estimation proceeding relating to Armstrong World Industries.  *See* In re Armstrong World Ind. Inc., et al., 11/18/2003 Tr. (**Exh. 25**) at 16, 25 ("I don't think there is such a thing as a sear (phonetic) (sic) as far as legislation goes….  It would be bad enough if she were testifying as to what the law contains. That everybody knows you can't do.  But this is even worse.  She is now going to tell me what a proposed piece of legislation contains which is not even a law yet….  I think this is totally beyond the pale.").

### C.   The Debtor's Proposed "Panel of Medical Professionals" Would Serve No Proper Purpose and Could Not Resolve Any Disputes

The Debtor suggests that a "Panel of Medical Professionals" should be appointed, and given authority not only to advise the court as to medical and scientific matters, but to determine the compensability of claims based on medical and product identification evidence.[31]  The Court has seen this before, in the form of the "Claims Liquidation Committee" that would have determined the validity of claims under the Debtor's "liquidation by matrix" scheme.  This Court correctly determined that it lacked the authority to appoint such a Committee under the Bankruptcy Rules.  Op., *27, n. 35.  *See* Fed. Bankr. R. 9031 (Special Masters are not permitted

---

[30]   Fairness in Asbestos Injury Resolution Act of 2005, S. 852, 109th Cong. § 2 (2005).
[31]   The Debtor does not comment as to why its Panel of Medical Professionals would be competent to resolve disputes as to product identification.

in bankruptcy).  By the same token, the decision-making powers that the Debtor now seeks for its renamed panel of experts would violate the law.

If, on the other hand, the panel were to function only as "neutral" expert witnesses, there would be no proper place for them in estimation.  No polling of experts could possibly resolve disputes over the interpretation of claimants' medical evidence.  With respect to x-rays, for example, the well-documented phenomenon of inter-reader variability would ensure that a panel of experts would agree on very few cases; multiple readings of x-rays simply would "lead to under-reading, for several statistical reasons", and be "punitive" to claimants.  **Exh. 5** (Ducatman Letter) at 1400.  In any event, the findings of such an expert panel would not justify the wholesale disallowance of entire categories of claims in estimation.  "[I]t must be remembered that a claim of asbestosis survives summary judgment if there is a diagnosis supported by a *single B-reading*."  Owens Corning, 322 B.R. at 724 (C.P.P. Exh. 3).  That remains true no matter how many doctors – or panels of doctors – disagree with a plaintiff's B-reader's analysis.

The role of court-appointed experts is to assist the finder of fact, not to substitute for claimants' constitutional right to a jury trial, much less disallow classes of claims in a bankruptcy estimation proceeding.  None of the authorities cited by the Debtor suggests otherwise.  For example, Judge Rubin describes several asbestos cases in which court-appointed expert witnesses testified as to the existence of disease.  They were all trials, with the findings of fact left to the jury.  The only conclusion Judge Rubin drew was that "[a] Court's expert will be a persuasive witness and will have a significant effect upon a jury."  Carl B. Rubin and Laura Ringenbach, *The Use of Court Experts in Asbestos Litigation*, 137 F.R.D. 35, 41 (1991).  Regardless of the automatic credibility conferred by the court's imprimatur, court-appointed

experts cannot be made the arbiters of the claims; disputed facts still must be left to the jury for determination.

The three reported cases cited by G-I also are inapposite.  In <u>Renaud v. Martin Marietta Corp.</u>, 749 F. Supp. 1545 (D. Colo. 1990), aff'd 972 F.2d 304 (10th Cir. 1992), a pre-<u>Daubert</u> case, the court considered an expert technical advisor's report stating that it was unsound scientific practice to select one sample of water from a single location and extrapolate from it to describe continuous release of contaminants over 11-year period.  In <u>Hall v. Baxter Healthcare Corp.</u>, 947 F. Supp. 1387, 1404-05 (D. Or. 1996), the court appointed a panel of technical advisers to assist the court with assessing evidence as to whether silicone breast implants are capable of causing connective tissue disease.  *See also* <u>In re Silicone Gel Breast Implant Prods. Liab. Litig.</u>, Order 31 (N.D. Ala 1996), avail. at 4 Mealey's Litig. Rep.: Breast Implants F-1 (June 23, 1996).  None of these cases were bankruptcy estimation proceedings.  And, as Judge Weinstein noted almost fifteen years ago, "[t]he capacity of asbestos fibers to cause serious injuries is no longer disputed."  <u>In re Joint E. & S. District Asbestos Litigation</u>, 129 B.R. 710 (E. & S.D.N.Y. 1991) (Weinstein, J.), *vacated*, 982 F.2d 721 (2d Cir. 1992), *modified*, 993 F.2d 7 (2d Cir. 1993).

## IV.   THE DEBTOR'S PROPOSED "ESTIMATION DISCOVERY PLAN AND ORDER" IS PROCEDURALLY OUT OF ORDER AND ITS PARTICULARS ARE HIGHLY OBJECTIONABLE

The Court should reject the Debtor's proposed order, which is deeply flawed in multiple respects.  The proposed order purports to determine the Debtor's discovery rights against claimants who are not before the Court.  It presents a schedule that is simply illusory and, on its face, bears no resemblance to what the schedule would actually turn out to be if the Debtor were given leave to pursue its quixotic sample.  The sample would be unreasonably burdensome to the

targeted claimants and to the estate, and the information the Debtor aspires to obtain from those targets exceeds the reasonable scope of discovery by any measure.

### A.      G-I's Suggested Deadlines Are Illusory; Its Project Would Take Years

In its papers, the Debtor frequently depicts its proposal as calling for a "first stage estimation hearing in March 2006." D. Br. 7. That representation proceeds, however, from an assumption that is patently false, namely, that fact discovery will be "completed on or before August 5, 2005" (Proposed Order ("P. Ord.") § IV.2 at 5), when in fact discovery pursuant to estimation in the aggregate has not even begun. It then quickly adds that fact discovery shall not end "in any event * * * before all responses and all responsive materials produced for Sample 1 and Sample 2." *Ibid.* In a footnote, the Debtor confesses that "the time it will take to collect this discovery is unpredictable" because "the records G-I seeks are possibly in the hands of claimants, their law firms, testing facilities, and/or medical providers, none of whom the Committee and the Legal Representative can bind to cooperate." D. Br. at 1 n. 2. And its form of order therefore provides that, "If all responses and responsive materials for Debtors' sampling program have not been produced by August 5, 2005, then all other dates set forth herein shall be modified accordingly." (P. Ord. § IV.2 at 6).

What the Debtor is requesting, in other words, is a blank check − the right to pursue its sample targets until it declares their responses "complete," while being wholly unable, by its own admission, to tell the Court how long its unprecedented experiment is likely to take. Only one thing is certain: the sample the Debtor has in mind would take a very long time indeed. In Owens Corning, the same lawyers who represent the Debtor here asked for up to a year to carry out a survey that included 1,000 claimants, fewer than half the number from whom G-I desires comprehensive discovery.

-43-

If the sample goes forward, it would be prudent to count on the sampling process remaining open at least until this time next year.  Taking account of the other intervals set out in the Debtor's schedule, this would mean that the first estimation hearing would not begin until March 2007 at the earliest.  And even that is unrealistic, given that, under the Debtor's approach, the hearing would be preceded by summary judgment motions, which in turn would come after a wave of <u>Daubert</u> motions.

The history of this case teaches nothing if not that complex issues take far longer to brief and decide than the Debtor has taken any account of in its proposal.  And the motions practice the Debtor plans to undertake would require a very large investment of the Court's time and efforts.  And all of this would be in the service of a project that provides no reason for confidence that it can lead to a successful reorganization, considering that it rests on no precedent and is freighted with the many legal deficiencies the Committee has explained above. The proposed order maps a long and expensive journey in uncharted waters with no known destination.

**B.     The Requested Sample Would Be Unreasonably Burdensome**

The burdens placed on claimants targeted by G-I's sample would be great.  G-I's contention that there is no burden on plaintiffs because their attorneys will comply with the discovery demands is disingenuous; the investment of time and effort required would be very real, regardless of who shoulders it.

It must be expected that many claims falling within the sample were still fairly new when G-I filed for bankruptcy and had not been "worked up" through document discovery, depositions, consultations with experts, or the like when the automatic stay came into effect. Since then, claimants and their attorneys have had only limited means and no incentive for

developing their claims against G-I, since the stay has barred their prosecution.  Holders of such claims will face a real dilemma if required to respond to the sample.  Ordinarily, of course, discovery does not require a respondent to generate new information, but simply to provide relevant materials and information already on hand.  If, however, sampled claimants rest on that rule and produce files in existing condition, the Debtor will treat the undeveloped claims as having no merit and will ask the Court to disallow not only those claims themselves, but also some extrapolated percentage of pending claims outside the sample and an extrapolated percentage of future claims not yet on file.  The alternative, of course, is for sample respondents to do all the work necessary to fully develop their files, a process that normally takes a year or more and that is inherently costly.  In litigation, that cost is justified by the prospect of a large judgment or settlement.  Yet the Debtor is not offering to *pay* their claims; on the contrary, it wants the discovery so that it can *attack* them, but only in a process affording the claimants none of the rights and protections they would have in a normal litigation.  And if the claims survive the attack, Debtor seeks not to ascribe to them the high judgment value that reflects their demonstrated strength, but a much lower settlement value.  To ask claimants to undergo the burdens of the sample for the Debtor's unilateral and self-serving advantage would be unreasonable to the point of abuse.

The Debtor's proposal is even more unjust in the burdens and unfairness it would inflict on claimants who have already settled their claims.  G-I has made clear that its sample would sweep in settled claims as well as open ones.  In its last few years before bankruptcy (the heart of the sample's temporal scope), G-I was notorious for repudiating settlements made on its behalf by CCR and forcing the claimants to sue it to collect G-I's share of the agreed settlement consideration.  Having incurred the costs in time and money of the underlying tort suit and the

additional burdens of the collection suit, such claimants would now be asked to make yet another investment in their already-settled claims by being subject to discovery yet again. For them, this exercise would be all cost and no benefit. G-I wants to reopen discovery as to the settled claims, but it is not offering to renegotiate the settlements and pay the claimants more money.

Embedded in the sampling proposal is a requirement that would impose grave hardship on claimants who have open claims against other defendants besides G-I. The Debtor would require claimants to turn over the *originals* of their x-rays, to be held in some sort of central depository. A claimant who is going to trial needs his or her original x-rays for use in evidence. To require them to give up possession of these records would seriously hamper the claimants' ability to litigate their claims against other defendants. It is also unfair to require the claimants to run the risk, for G-I's benefit, that the original x-rays would be lost or damaged in the hands of a third-party depository. Given that, as shown above, the inspection of x-rays has no relevance to aggregate estimation, there is simply no reason to grapple with this sensitive issue of document management at this time.

### C.   This Court Cannot Properly Adjudicate the Rights of Absent Claimants in the Posture of G-I's Motion

It should go without saying that, as individual claimants are not parties to this proceeding, the Debtor's instant motion cannot properly affect their rights to object and be heard if they are subjected to discovery. Indeed, since the Debtor's undisguised purpose is to thwart their claims, the Court should exercise special caution to ensure that whatever is done at this juncture is without prejudice to the absent claimants. The assurance given in by the District Judge in regard to estimation in the USG bankruptcy serves as a healthy reminder that the court should entertain no applications that would "interfere with the claimants' constitutional and legal rights as prescribed by law." In re USG Corp., 290 B.R. 223, 227 (Bankr. D. Del. 2003). The Committee

does not represent individual claimants, but rather the constituency of present claim holders as a whole, and particular claimants will not be collaterally estopped by rulings made without their participation as litigants.  *See* Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 327 n.7 (1979) ("It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard.")

Considering the Debtor's hostile intentions, it cannot be expected that claimants would respond without objection if the Debtor were to subpoena them to compel their participation in the proposed sample.  The proliferation of discovery disputes that the Debtor's proposed course of action would surely trigger must be taken into consideration in judging the wisdom of the proposal.[32]

D.     **The Debtor's Proposed Discovery Plan Exceeds the Scope of Relevance for Aggregate Estimation and Is Otherwise Improper**

For all the reasons given above, the Debtor's proposed sample is not reasonably calculated to serve the purposes of estimation and is therefore beyond the scope of relevance in this proceeding.  It should also be noted that the requested sample would reach beyond the basis for claims made against G-I itself and would encompass "claims, causes of action, and proofs of claim" submitted against other defendants or bankrupts.  *See* P. Ord. § 1.A.6 & 7.  The Debtor also hopes to launch discovery into such attenuated subjects as "[i]nformation regarding the guidelines, criteria, and practices that asbestos plaintiffs' lawyers followed in obtaining * * *

---

[32]     Rule 45 requires that every subpoena "for production or inspection shall issue from the court for the district in which the production or inspection is to be made."  Fed.R.Civ.P. 45(a)(1)(A) and 45(a)(2), made applicable by Fed. R. Bankr. P. 9016.  If the Debtor were to renew its effort to carry out its proposed sample, respondents would be entitled to make objections and "the court by which the subpoena was issued" would have the authority to "quash or modify it" upon timely motion.  Fed.R.Civ.P. 45(c)(2)(B) & 45(c)(3)(A).  The inevitable task of presiding over such disputes would place significant demands on those courts or, if motions to transfer were made and granted, on this Court.

personal injury cases," and the financial arrangements under which diagnosticians are paid. *Id*. § I.A.8 & 11. Such matters have nothing to do with the extent of the defendant's exposure to liability or the value of the claims, and therefore nothing to do with estimation.

The Debtor's form of order also purports to prescribe the scope of discovery available to the Committee and the Legal Representative. *Id*. § I.B. Of course, the Court should let these parties speak for themselves as to the discovery they will request. The Committee has described elsewhere its view of the principal subject matters of discovery tailored to aggregate estimation. *See* C.P.P. at 46-48.

In certain respects, the Debtor's plan asks the Court to impose by fiat undertakings by the Committee, the Legal Representative, and claimants or their tort lawyers that could not properly be required of them without their consent. For example, the form of order purports to decree that these parties must enter into a non-waiver agreement with respect to privileges that might otherwise be asserted. P. Ord. §§ I.A.8 & B.1. Whether or not such agreements will be made must of course be left to the discretion of the privilege-holders. The Debtor would also have the Court determine, as to expert discovery, that "drafts, mark-ups, work papers, notes, and correspondence" are not discoverable (*id*. § III.8), even though nothing in the rules puts such materials out of bounds for discovery. It is true that the parties have agreed to such limitations in the BMCA litigation; whether such an agreement will be made in the estimation proceeding remains to be seen, but it is not a proper subject for an order.

Remarkably, the proposed order would require the Committee and Legal Representative (defined in section I.A.10 of the form as the "Creditor Constituency") to undertake affirmative efforts to "cooperate and assist" in obtaining the Debtor's sample and other discovery from third parties. *Id*. § III.1. Indeed, G-I would have the Court direct experts for the Committee and the

-48-

Legal Representative to "consult and attempt to agree regarding the composition" of its requested sample. *Id.* § III.4 & 5. But the Committee and Legal Representative do not believe in the legitimacy of the Debtor's sampling proposal. They cannot properly be forced to take steps to support it or lend their assistance to third-party discovery that they oppose. And the Debtor certainly has no right to commandeer the services of its adversaries' experts for its own purposes.

The Debtor is once again overreaching, as has been its wont in regard to estimation from the outset. Its proposed order should be rejected. The Court should resolve the pending Motion by denying the Debtor's request to undertake the sample and by setting out a schedule for the narrower (and shorter) discovery that an aggregate estimation reasonably requires. The Committee's suggestions would provide for fact discovery and expert discovery, with a cutoff of January 31, 2006. *See* C.P.P. at 53-54.

## CONCLUSION

The Debtor's Motion should be denied, and the estimation of the G-I's asbestos liability in the aggregate should proceed along the lines described in the Committee's Position Paper.

Dated: June 15, 2005                     Respectfully submitted,


By:    /s/ Jeffrey D. Prol
Kenneth A. Rosen (KR4963)
Jeffrey D. Prol (JP7454)
**LOWENSTEIN SANDLER, PC**
65 Livingston Avenue
Roseland, New Jersey 07068
973.597.2500

Elihu Inselbuch
**CAPLIN & DRYSDALE, CHARTERED**
399 Park Avenue, 27th Floor
New York, New York 10022
212.319.7125

Trevor W. Swett (TS8962)
Peter Van N. Lockwood (PL8843)
**CAPLIN & DRYSDALE, CHARTERED**
One Thomas Circle, N.W.
Washington, DC  20005
202.862.5000

*Co-Counsel to Official Committee of*
*Asbestos Claimants of G-I Holdings, Inc.*