IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**Objection Deadline: October 28, 2005 at 4:00 p.m.**
**Hearing Date: November 14, 2005 at 12:00 p.m.**

## DEBTORS' MOTION FOR AUTHORITY TO ENTER INTO A LEASE FOR WOBURN, MASSACHUSETTS PROPERTY

The Debtors[2] seek approval from this Court to enter into a Lease with Decathlon

for the use of the Debtors' excess vacant property located in Woburn, Massachusetts. The Lease

of the Property will generate an estimated $9.3 million of net cash (on a present value basis) to

the Debtors over the life of the Lease or the Property may be sold to Decathlon for a lump sum.

The alternative is for the Debtors to keep the Property at an estimated $200,000 per year in

carrying costs plus anticipated demolition or maintenance costs of between $0.5 - $1.0 million.

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2] See Background section herein for definition of capitalized terms.

The re-use of this site is a win for all parties -- the Debtors, the City of Woburn, the EPA and the Massachusetts DEP. Instead of an eyesore and visible reminder of the Debtors' past problems with this site, the Property will house Decathlon's prototype store in the U.S. along with its U.S. headquarters. In support of this Motion, the Debtors respectfully state as follows:

**Jurisdiction**

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Motion is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory basis for the relief requested herein is § 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure.

**Background**

*The Property*

3.      The above-captioned debtors and debtors-in-possession (the "Debtors") own a 12.3 acre property in Woburn, Massachusetts (the "Property").  The Property houses two buildings -- an 88,000 square foot warehouse/office space and a 10,000 square foot metal storage space -- that served as the Debtors' former Cryovac equipment assembly operation.  The Debtors have ceased all operations at this location and the Property remains idle at this time.[3]

4.      Pursuant to a 1990 Consent Decree with the EPA and the Massachusetts Department of Environmental Protection (DEP), the Debtors have been remediating this site

---

[3]  The Property is the subject of a book and movie entitled "A Civil Action."

2

since 1992 to remove volatile organic compounds in the groundwater. Such remediation is projected to continue for an additional 10-15 years.

5.      Excluding remediation costs, the current costs of carrying the vacant Property are approximately $200,000 per year. In addition, over the next several years, the Debtors must either spend an additional approximately $1.0 million for deferred building maintenance or demolish the buildings (excluding building slabs and parking lots) at a cost of approximately $0.5 million.

6.      The Property is subject to the lien of the Debtor's debtor in possession (DIP) lenders.

*Marketing and Sale Efforts*

7.      From 1995 until late 2003, the Debtors engaged Spaulding & Slye, the largest real estate developer/broker in the Boston area, to market the Property. The active marketing campaigns resulted in five separate deals to sell and re-develop the site for various uses -- big box home improvement, strip shopping center, warehouse/distribution center, self-storage, restaurant park, and offices. However, after extensive negotiations in each case, including one fully executed sales agreement to build a 110,000 square foot strip center, the deals did not go forward for various reasons.

8.      In late 2003, the Debtors engaged The Stubblebine Company, a regional broker, to market the Property. This most recent aggressive marketing campaign resulted in the Debtors receiving 18 offers and letters of interest, including the offer by Decathlon.

3

*The Lease*

      9.     Of those interested in the Property, MVP Sports Stores Inc. dba Decathlon

USA ("Decathlon") provided the best and most viable offer for leasing the Property. Decathlon

is the U.S. subsidiary of Decathlon S.A. which has $4.2 billion in sales and operates 350 sporting

goods stores in 13 countries, including four in the United States, and manufactures 10 lines of

sporting goods equipment in 18 countries. Decathlon S.A. is part of the Mulliez Family

Association, a family-owned private company from Lille, France, with sales of $45 billion

annually.

      10.    Following intensive arms-length negotiations that took place over the past

11 months,[4] the Debtors agreed to enter into a ground lease with Decathlon, subject to Court

approval (the "Lease"). The Lease is attached hereto as Exhibit A.

      11.    Decathlon plans to spend approximately $7 million to build an 83,500

square foot sporting goods store and a 15,000 square foot office space on the Property to serve as

its U.S. flagship store and headquarters, respectively. Decathlon is willing to invest the time,

effort and funds to change the zoning to retail, its highest and best use, including spending an

estimated $800,000 for traffic improvements to Washington Street (on which the Property is

located).

      12.    The following is a summary of the material terms of the Lease. The

summary below is not intended to set forth all terms of the Lease, and, in the event of a

discrepancy between this summary and the Lease, the terms of the Lease shall govern:

---

[4]  Decathlon submitted their offer letter to the Debtors on October 27, 2004. The basic terms were then negotiated and a mutual letter of intent was signed on December 30, 2004. The Lease was then fully negotiated and signed on September 20, 2005.

4

(i)     <u>Term</u>: Decathlon will lease the land for 20 years with eight 5-year extension options.

(ii)    <u>Option to Purchase/Right of First Offer</u>: During the first five years, Decathlon will have an option to purchase the property for $9,411,765. It will also have a Right of First Offer throughout the lease term with 20 days to accept an offer after notification.

(iii)   <u>Rent and Other Costs</u>: The net rent starts at $800,000 per annum for the first 5 years with 5% increases every 5-year period. Decathlon must pay for all operating costs including property taxes and insurance.

(iv)    <u>Letter of Credit</u>: In lieu of a foreign parent company guaranty, Decathlon will post a $1.6 million letter of credit, which will remain in place throughout the Lease term, and increase along with the rent.

(v)     <u>Project Approvals</u>: Decathlon must obtain a zoning change to retail, and all local use variances and approvals, by September 2007. Decathlon must also obtain a building permit and construct the buildings and other site/offsite improvements, including traffic mitigation, by June 2009. These dates can be extended up to three years in the event of third-party challenges which are being appealed.

(vi)    <u>Debtors' Responsibilities</u>: The Debtors are responsible for (A) ongoing remediation and any necessary sub-slab remediation, (B) demolishing the buildings (including slabs and parking lots) on the Property at an estimated cost of $1.3 million of which Decathlon is obligated to reimburse the Debtors for their actual costs capped at $750,000, (C) environmental testing under the slabs at an estimated cost of $450,000, and (D) obtaining approval from the EPA to reconfigure monitoring and recovery wells at Decathlon's expense.

(vii)   <u>Failsafe Condition</u>: The Debtors may terminate the deal if environmental clean-up costs from any contamination discovered under the slabs will exceed $8.0 million, in which case they will have to reimburse Decathlon for its reasonable out-of-pocket costs.

(viii)  <u>Consents</u>: By January 20, 2006, the Debtors must obtain bankruptcy court approval and a release of the lien on the Property from the Debtors' DIP lenders.

13.     The Debtors anticipate that the pre-tax net present value of the Lease is

$9.3 million.[5]

---

[5] This assumes a 7.5% discount rate, $1.3 million to demolish the buildings on the Property (including slabs and parking lots), $450,000 for environmental testing under the slabs, and that such testing reveals no sub-slab contamination.

14.    The DIP lenders have agreed to release their lien on the Property (as one of the conditions in the Lease) provided that they keep their lien on the payments due to the Debtors from Decathlon under the Lease.

## Relief Requested

15.    By this Motion, the Debtors seek (i) an order pursuant to § 363 of the Bankruptcy Code authorizing the Debtors to enter into the Lease with Decathlon and (ii) a release of the lien of the DIP lenders on the Property on the condition that the lien attaches to the payments due to the Debtors from Decathlon under the Lease.

## Statutory Authority

16.    This Court has statutory authority to authorize and approve the Debtors' entry into the Lease pursuant to § 363(b)(1) of the Bankruptcy Code.    Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or *lease*, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1) (emphasis added).

17.    To approve the use, sale or lease of property outside of the ordinary course of business, this Court need only determine that the Debtors' decision to enter into the Lease is supported by an articulated business justification.    See Dai-ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1998) (citing Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983)); In re Delaware & Hudson R.R. Co., 124 B.R. 169, 175-76 (D. Del. 1991).  Courts have found that a transaction under § 363(b) has an articulated business justification when certain factors are met:

6

(i)     There is a sound business reason for the transaction;

(ii)    The interested parties received adequate notice, including full disclosure of the terms of the deal;

(iii)   The property is sold at a fair and reasonable price; and

(iv)    The proposed buyer is proceeding in good faith.

See In re Taylor, 198 B.R. 142, 157 (Bankr. D. S.C. 1996) citing In re Delaware & Hudson R.R. Co., 124 B.R. at 176; see also Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991).

18.     The circumstances in the present case weigh heavily in favor of this Court finding that the Debtors have a sound business justification for entering into the Lease.

*There is a sound business reason for the transaction.*

19.     The Property is currently vacant and serves as a visible reminder of the Debtors' past problems with this site. Holding the vacant Property has been costing the Debtors an estimated $200,000 per year, and would cost the Debtors anticipated demolition and/or deferred maintenance costs of between $0.5 - $1.0 million within the next two years. Despite the Debtors' best efforts to market the Property over the last decade or more, the Debtors have not been able to lease or sell the Property. Now, they finally have entered into a long-term lease for the Property, with an option to buy, with a viable entity who the Debtors believe have an excellent chance of being able to obtain the necessary development approvals. What is more, the Debtors anticipate that the pre-tax net present value of the Lease is $9.3 million. The Debtors submit that the foregoing strongly evidences a sound business reason for their entry into the Lease.

7

*The interested parties received adequate notice, including full disclosure of the terms of the deal.*

20.    The Debtors submit that the circumstances surrounding their efforts to lease or sell the Property warrant approval of the Lease to Decathlon without requiring an additional hearing or a separate auction process. The Debtors believe it unlikely that there would be another interested party who would pay more and assume the liabilities and responsibilities as provided for in the Lease. Moreover, Decathlon is actively looking to acquire a facility for its headquarters and flagship store, and any delay in completing the proposed transaction may cause Decathlon to go elsewhere to lease a similar asset. The Debtors believe that under the circumstances, notice is adequate.

*The property is sold at a fair and reasonable price.*

21.    After having marketed the Property for over a decade, the Debtors have determined that this Lease represents the highest and best offer from a viable company for use of the Property. No better offer has been received despite aggressive marketing efforts. Decathlon has agreed to enter into a 20-year lease for the land (with an option to purchase) at a net rent of $800,000 per annum for the first 5 years with periodic increases thereafter. Decathlon must also pay for all operating costs including property taxes and insurance. Additionally, under the terms of the Lease, Decathlon is obligated to obtain (a) a zoning change to retail, (b) all local use variances and approvals, and (c) a building permit. Finally, Decathlon has agreed to pay for a large part of the demolition costs and to construct the buildings within a specified period of time. The Debtors believe that under the circumstances, the Lease represents a fair and reasonable price for the Property.

8

*The proposed buyer is proceeding in good faith.*

      22.    The Lease is the product of good faith, arms-length negotiations between the Debtors and Decathlon. This is evidenced by the premium consideration to be received by the Debtors. This is also further evidenced by the sheer length of the deliberate negotiations between the parties. The Debtors therefore request that the Court find that the entry into the Lease is in good faith. Further, the Debtors request that this Court find that if Decathlon exercises its option to purchase under the Lease, Decathlon is a good faith purchaser under § 363(m) of the Bankruptcy Code.

      23.    Once a debtor has articulated a valid business justification, the business judgment rule arises as a presumption to protect the debtor's decision. The business judgment rule is "a presumption that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest." In re Tower Air, Inc., 416 F.3d 229, 234 (3d Cir. 2005); see also Fruehauf Trailer Corp., 250 B.R. 168, 196 (Del. 2000); In re S.N.A. Nut Co., 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) (citing Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions. See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); In re Girard Med. Ctr., 1990 WL 56486, at *2 (Bankr. E.D. Pa. 1990); In re Wheeling-Pittsburgh Steel Corp., 72 B.R. 845, 849 (Bankr. W.D. Pa. 1987). As discussed above, the Debtors have articulated a valid business justification for entering into the Lease. Therefore, under Delaware law, there is a presumption that entry into the Lease is indeed in the best interests of the Debtors and their estates.

24.    Additionally, courts have recognized that a lease that does not harm the value of the premises should be approved. See, e.g., Matter of St. Petersburg Hotel Assoc., Ltd., 37 B.R. 341, 344 (Bankr. M.D. Fla. 1983) (stating "it is recognized that when a lease will not harm the value of the premises and is in the best interest and business judgment of the Debtor, it should be approved at any stage of the proceeding.") In fact, not only does this Lease "not harm the value of the premises," but it enhances the value. Locating the flagship store and headquarters of a multi-national company on what was formerly a superfund site benefits all parties -- the Debtors, the City of Woburn, the EPA and the Massachusetts DEP.

25.    For the foregoing reasons, the Debtors respectfully submit that they have exercised sound business judgment in entering into the Lease.

### Notice

26.    Notice of this Motion has been given to (i) the Office of the United States Trustee, (ii) counsel to the debtor in possession lenders, (iii) counsel to each official committee appointed by the United States Trustee and (iv) those parties that requested papers under Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

10

WHEREFORE, the Debtors respectfully request that this Court enter an order, substantially in the form attached hereto as <u>Exhibit B</u>, (i) authorizing the Debtors to enter into the Lease; (ii) releasing the lien of the DIP lenders on the Property on the condition that the lien attaches to the payments due to the Debtors from Decathlon under the Lease; and (iii) granting such other and further relief as the Court deems just and proper.

Dated:  October 10, 2005

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
Lori Sinanyan
200 East Randolph Drive
Chicago, Illinois 60601
Telephone:  (312) 861-2000
Facsimile: (312) 861-2200

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession

11