# EXHIBIT A

GROUND LEASE

by and between

W.R. GRACE & CO. – CONN.

as Landlord

and

MVP SPORTS STORES, INC.

as Tenant

Dated as of September __, 2005

ARTICLE 1 DEFINITIONS ..................................................................................................... 1

ARTICLE 2 PREMISES; CONDITION OF PREMISES; DELIVERY ...................................... 7

    2.1       Lease of Premises. ............................................................................................... 7

    2.2       Condition of the Premises ................................................................................... 8

    2.3       Demolition of Existing Improvements. ................................................................ 8

    2.4       Delivery of Possession. ..................................................................................... 10

ARTICLE 3 LEASE TERM; TENANT'S RIGHT TO TERMINATE; NOTICE OF LEASE;
              EXTENSION TERMS ....................................................................................... 11

    3.1       Lease Term. ....................................................................................................... 11

    3.2       Contingencies ................................................................................................... 11

           3.2.1    Permitting. ............................................................................................ 11

           3.2.2    Environmental Approvals. ................................................................... 17

           3.2.3    Tenant's Environmental Agreements. ................................................... 18

           3.2.4    Non-Disturbance Agreement ................................................................ 19

           3.2.5    Bankruptcy Court Approval ................................................................. 19

           3.2.6    Termination Pursuant to Sections 3.2.1 through 3.2.5. ........................ 20

    3.3       Notice of Lease; Basic Rent Commencement Date Agreement ........................ 20

    3.4       Extension Terms ................................................................................................ 21

ARTICLE 4 RENT ................................................................................................................. 22

    4.1       Basic Rent ......................................................................................................... 22

    4.2       Interim Rent ....................................................................................................... 23

    4.3       Net Lease. .......................................................................................................... 23

    4.4       Late Payments ................................................................................................... 23

    4.5       Payment of Additional Rent. ............................................................................. 24

ARTICLE 5 REAL ESTATE TAXES ..................................................................................... 24

    5.1       Tenant's Obligation to Pay Taxes. .................................................................... 24

    5.2       Tax Bills and Information. ................................................................................. 24

    5.3       Installment Payments. ....................................................................................... 25

    5.4       Abatements; Contests by Tenant. ...................................................................... 25

ARTICLE 6 CONSTRUCTION OF IMPROVEMENTS ......................................................... 25

    6.1       Improvements Generally. .................................................................................. 25

    6.2       Construction of the Initial Improvements. ........................................................ 26

6.3     Construction Period Insurance. ...........................................................26

6.4     Ownership of Improvements ..............................................................27

ARTICLE 7 REPAIRS, MAINTENANCE AND ALTERATIONS ...........................................27

7.1     Repair and Maintenance. ...................................................................27

7.2     Alterations. ..........................................................................................28

ARTICLE 8 INSURANCE AND INDEMNITY .........................................................................28

8.1     Casualty Insurance. ...........................................................................28

        8.1.1    All Risk. ................................................................................28

        8.1.2    Builder's Risk. .....................................................................28

8.2     Liability Insurance. ............................................................................28

8.3     Worker's Compensation; Employer's Liability Insurance. ...............29

8.4     Other Insurance. ................................................................................29

8.5     Insurance Carriers, Policies. .............................................................29

8.6     Adjustment. ........................................................................................30

8.7     Non-cancellation. ..............................................................................30

8.8     Waiver of Subrogation. .....................................................................30

8.9     Tenant's Indemnification. ..................................................................30

8.10    Landlord's Indemnification. ..............................................................31

8.11    Tenant's Right to Self-Insure. ...........................................................32

ARTICLE 9 LIENS ....................................................................................................................33

9.1     Construction Liens. ............................................................................33

9.2     Contesting Liens. ...............................................................................33

9.3     No Consent. ........................................................................................34

9.4     All Other Liens. ..................................................................................34

ARTICLE 10 USE OF PREMISES ...........................................................................................34

10.1    Permitted Uses. ..................................................................................34

10.2    Legal Requirements and Insurance Requirements. ...........................35

10.3    Contests. .............................................................................................35

ARTICLE 11 ENVIRONMENTAL ...........................................................................................35

11.1    Additional Definitions. ......................................................................35

11.2    Existing Materials. .............................................................................36

11.3    Other Materials; Tenant's Activities. ................................................39

11.4    Conditions of Indemnification. .........................................................40

11.5    Performance of Remediation Work.....................................................................41

11.6    Tenant's Additional Obligations. .........................................................................42

11.7    Landlord's Additional Obligations.......................................................................42

11.8    Tenant's AUL.......................................................................................................43

11.9    Release ................................................................................................................43

11.10   Consent Decree. ..................................................................................................44

11.11   Monitoring Wells and Recovery System. ............................................................44

11.12   Sewer Service to the Treatment Plant. ................................................................45

ARTICLE 12 TRANSFERS OF TENANT'S INTEREST.........................................................46

12.1    No Transfer Other than in Accordance with this Article ......................................46

12.2    Transfers Permitted without Landlord's Consent. ...............................................46

12.3    Transfers Requiring Landlord's Consent. ............................................................48

12.4    Assignment of Lease. ..........................................................................................48

12.5    Nondisturbance and Attornment Agreements. .....................................................49

12.6    General Provisions. .............................................................................................51

ARTICLE 13 LEASEHOLD MORTGAGEES ........................................................................51

13.1    Leasehold Mortgages Generally..........................................................................51

13.2    Definitions. .........................................................................................................52

13.3    Other Provisions Regarding Permitted Leasehold Mortgages. ............................53

13.4    Rights of Permitted Leasehold Mortgagees. .......................................................54

13.5    Further Assurances..............................................................................................57

ARTICLE 14 DAMAGE OR DESTRUCTION ......................................................................57

14.1    Tenant's Election.................................................................................................57

14.2    Restoration Procedures........................................................................................57

14.3    No Surrender or Abatement. ................................................................................58

14.4    Casualty During the Last Lease Year...................................................................58

14.5    Damage to or Destruction of the Existing Improvements.....................................58

ARTICLE 15 TAKING...........................................................................................................59

15.1    Award...................................................................................................................59

15.2    Termination. ........................................................................................................59

15.3    Restoration. .........................................................................................................59

15.4    Temporary Taking................................................................................................60

15.5    Generally. ............................................................................................................60

ARTICLE 16 DEFAULT AND REMEDIES .................................................................... 61

16.1    Events of Default ............................................................................................... 61

16.2    Termination. ...................................................................................................... 62

16.3    Reletting. ........................................................................................................... 62

16.4    Remedies. .......................................................................................................... 62

16.5    Landlord's Right To Perform Tenant's Obligations. ........................................ 63

16.6    Injunctive Relief. .............................................................................................. 63

16.7    Remedies Cumulative. ...................................................................................... 63

16.8    Landlord's Default. ........................................................................................... 63

ARTICLE 17 SURRENDER ........................................................................................... 64

17.1    Surrender. .......................................................................................................... 64

17.2    Holdover. ........................................................................................................... 65

ARTICLE 18 SIGNS ....................................................................................................... 65

18.1    Tenant's Signs. .................................................................................................. 65

ARTICLE 19 OPTION TO PURCHASE ........................................................................ 66

19.1    Tenant's Option to Purchase ............................................................................. 66

19.2    Terms and Conditions of Sale. ......................................................................... 66

19.3    Other Provisions Applicable to Tenant's Option to Purchase ........................... 66

ARTICLE 20 RIGHT OF FIRST OFFER ...................................................................... 67

20.1    Right of First Offer ............................................................................................ 67

20.2    Terms and Conditions of Sale. ......................................................................... 68

20.3    Other Provisions Applicable to Tenant's Right of First Offer. .......................... 68

ARTICLE 21 SECURITY ............................................................................................... 69

21.1    Security Deposit. ............................................................................................... 69

21.2    Letter of Credit. ................................................................................................ 69

21.3    Landlord's Election to Proceed. ........................................................................ 71

ARTICLE 22 MISCELLANEOUS .................................................................................. 71

22.1    Landlord's Covenant ......................................................................................... 71

22.2    Entry on Premises by Landlord ......................................................................... 71

22.3    Utilities and Services ......................................................................................... 71

22.4    Notices ............................................................................................................... 72

22.5    Release. .............................................................................................................. 73

22.6    Personal Property Taxes ..................................................................................... 73

22.7    Enforcement Expenses. ..........................................................................................73

22.8    Severability. ..........................................................................................................73

22.9    No Waiver. ............................................................................................................73

22.10   Estoppel Certificates. ...........................................................................................73

22.11   Waiver of Jury Trial. ...........................................................................................74

22.12   Brokers. ................................................................................................................74

22.13   Integration ...........................................................................................................74

22.14   Bind and Inure. ....................................................................................................74

22.15   No Merger. ...........................................................................................................75

22.16   Enforcement of Landlord's or Tenant's Liability. .............................................75

22.17   Landlord Financing. ............................................................................................75

22.18   Consents. ..............................................................................................................75

22.19   Captions; Table of Contents. ..............................................................................75

22.20   Exhibits. ...............................................................................................................75

22.21   Massachusetts Law Governs. ..............................................................................75

22.22   Time of the Essence. ...........................................................................................75

22.23   No Partnership or Joint Venture. .........................................................................76

22.24   Force Majeure. .....................................................................................................76

22.25   When Lease is Binding. .......................................................................................76

22.26   Counterparts. ........................................................................................................76

EXHIBITS

Exhibit A      Plan of Premises

Exhibit A-1    Legal Description of the Land

Exhibit B      Rights Appurtenant to, and Encumbrances upon, the Premises

Exhibit C      Plan Showing Existing Location of Monitoring Wells and Recovery System

Exhibit D      Development Plan

Exhibit E      Environmental Reports

Exhibit F      Method of Determining Allocation of Taking Awards/Amount of Basic Rent
               Abatement

Exhibit G      Provisions Applicable to Option to Purchase and Right of First Offer

Exhibit H      Form of Nondisturbance and Attornment Agreement

Exhibit I      Form of Letter of Credit

## GROUND LEASE

This Ground Lease (this "Lease") is entered into as of the _____ day of September, 2005, by and between W.R. GRACE & CO. – CONN., a Connecticut corporation  (hereinafter with its successors and assigns, "Landlord"), with a principal place of business at 7500 Grace Drive, Columbia, Maryland 21044 and MVP SPORTS STORES, INC. a Massachusetts corporation (hereinafter with its successors and assigns, "Tenant"), with a principal place of business at 326 Ballardvale Street, Wilmington, Massachusetts 01887.

### RECITALS

A.    Landlord is the owner of a certain parcel of land, together with the buildings and other improvements thereon, located at 369 Washington Street, Woburn, Massachusetts.

B.    Tenant desires to lease such parcel of land, together with the buildings and other improvements thereon, for use as the site of a retail store and office to be constructed by Tenant, and for such other uses as are permitted by the terms of this Lease.

C.    Landlord is willing to lease to Tenant on the terms herein contained, and Tenant is willing to lease from Landlord on the terms herein contained, such parcel of land, together with the buildings and other improvements thereon.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements contained herein, Landlord and Tenant agree as follows:

### ARTICLE 1

### DEFINITIONS

As used in this Lease, the following words and terms shall be defined as follows:

1.1    "Additional Rent" means, collectively, all Real Estate Taxes, costs, expenses, and other amounts required to be paid by Tenant to Landlord or otherwise with respect to the Premises (whether or not expressly denoted as Additional Rent in this Lease) on account of any period of time included within the Lease Term, including amounts due by reason of any default by Tenant hereunder, but excluding Interim Rent and Basic Rent.

1.2    "Affiliate" means, with respect to a specified person or entity, any person, firm, limited or general partnership, association, corporation, trust, or other legal entity (regardless of tier) that controls or is controlled by such specified person or entity, or that is also controlled by the legal entity that controls such specified person or entity. For the purposes of this definition, a person or an entity will be deemed to "control" another entity if it has the power to direct the

1

management and policies of such entity, directly or indirectly, through the exercise of voting rights, by contract, or otherwise.

1.3   "AUL" means an Activity and Use Limitation as described in and provided for in the MCP, and also includes any comparable institutional control required under the Consent Decree.

1.4   "Basic Rent" – as defined in Section 4.1.

1.5   "Basic Rent Commencement Date" means the first day of the Original Lease Term.

1.6   "Building" means, collectively, the building or buildings to be constructed by Tenant on the Land, initially to contain at least 83,500 but not more than 100,000 square feet of gross leasable area for retail use and ancillary corporate office use, in compliance with all applicable Legal Requirements.

1.7   "Building Award" – as defined in Section 15.2.

1.8   "Building Permit Contingency Period" means the period commencing on the day after the expiration of the Permitting Contingency Period and ending on the earlier of (i) six (6) months from such date, or (ii) the date on which a building permit is first issued for all or any portion of the Initial Improvements.

1.9   "Business Day" means any day other than a Saturday, a Sunday, or a legal holiday in the City of Woburn as provided by the laws of The Commonwealth of Massachusetts.

1.10   "Consent Decree" means the EPA Administrative Order by Consent filed at U.S. EPA Docket No. CERCLA I 901035, effective April 27, 1990, and the Consent Decree entered in *United States v. Wildwood Conservation Corporation,* United States District Court for the District of Massachusetts, Civil Action No. 91-11807-MA, effective October 10, 1991.

1.11   "Construction Commencement Date" means the earliest of (i) the day that is six (6) months after all of the Initial Approvals have been "obtained" (as described in Section 3.2.1 below), (ii) the day that is three (3) months after the date on which a building permit is first issued for all or any portion of the Initial Improvements, (iii) the day that is nine (9) months after the last day of the Permitting Contingency Period (unless this Lease has been terminated in accordance with its terms prior to the date described in this clause (iii)), or (iv) the date on which Tenant actually commences construction of the Initial Improvements or any portion thereof. Tenant shall have no obligation to commence or to complete construction of any improvements on the Land except as provided in this Lease.

1.12   "Construction Period" means a period commencing on the Construction Commencement Date, and ending on the earlier of (a) the date on which Tenant obtains a certificate of occupancy (whether temporary or permanent) for the Building or any portion thereof, or (b) nine (9) months after the Construction Commencement Date; *provided, however,* that Tenant shall have no obligation to commence or to complete construction of any improvements on the Land except as provided in this Lease.

2

1.13    "Default Rate" means an interest rate equal to the lesser of (i) the prime rate of interest charged from time to time by Bank of America or its successor, plus three percent (3%) per annum, or (ii) the maximum rate of interest permitted by applicable law.

1.14    "Demolition Completion Date" means the date on which Landlord shall have substantially completed Landlord's Demolition Work, as hereinafter defined, and shall have so notified Tenant in writing.

1.15    "Development Plan" means (i) the conceptual plan attached hereto as Exhibit D showing the general size and location of the Initial Improvements, and (ii) the proposed appearance of the exterior of the Initial Improvements (including signage) as shown on elevation drawings or renderings previously delivered to Landlord on July 8, 2005.  The Development Plan shall be subject to change by Tenant during the Permitting Contingency Period and the Building Permit Contingency Period, provided that (x) any such change from the Development Plan as previously approved by Landlord that would require the relocation or the closure of any portion of the then-existing Monitoring Wells and Recovery System will be subject to the prior written approval of Landlord and of EPA and MADEP as provided in Section 11.11 below, and (y) any such change to the exterior appearance of the Initial Improvements shall be subject to the prior written approval of Landlord (such approval not to be unreasonably withheld, delayed or conditioned) prior to the commencement of construction.  Any such submission for Landlord's approval shall be accompanied by a transmittal letter bearing the following legend on top: **"THIS SUBMISSION IS MADE PURSUANT TO SECTION 1.15 OF THE GROUND LEASE BETWEEN W.R. GRACE & CO.-CONN. AND THE UNDERSIGNED RELATING TO PROPERTY AT 369 WASHINGTON STREET, WOBURN, MASSACHUSETTS - IMPORTANT RIGHTS MAY BE LOST IF YOU DO NOT RESPOND TO THE SENDER WITHIN THIRTY DAYS."**  Landlord shall have thirty (30) days from its receipt of Tenant's request to review the same and to give notice to Tenant that Landlord either approves or disapproves the changes to the Development Plan (and in the case of disapproval, Landlord shall set forth the reasons for such disapproval).  If Landlord fails to give such notice to Tenant within such 30-day period, Landlord shall be deemed to have approved the changes to the Development Plan as so submitted *except* the impact (if any) of the buildings, structures and improvements shown thereon upon the Monitoring Wells and Recovery System, as to which Landlord's express approval shall always be required.  Tenant shall have no obligation to commence or to complete the construction of any of the Initial Improvements shown on the Development Plan except as provided in this Lease.

1.16    "Environmental Approvals" – as defined in Section 3.2.2.

1.17    "Environmental Laws" means, collectively, all applicable federal, state or local statutes, laws, regulations, directives, orders or decrees (whether now existing or hereafter enacted or promulgated), respecting assessment, remediation, removal or disposal of Hazardous Materials including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9601, et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. Section 9601, et seq.; the Toxic Substances Control Act, 15 U.S.C. Section 2601, et seq.; and the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, Massachusetts General Laws, Chapter 21E, each as amended from time to time, and the regulations promulgated under each of such statutes.

3

1.18 "EPA" means the United States Environmental Protection Agency, and any and all agencies, authorities, boards, commissions, departments, or divisions of the federal government which succeed to all or any portion of the powers or jurisdiction currently exercised by the Environmental Protection Agency, or which have authority to assess and seek recovery of damages associated with the release of Hazardous Materials.

1.19 "Events of Default" – as defined in Section 16.1.

1.20 "Existing Improvements" means, collectively, the buildings, structures, paved areas and other improvements existing on the Land as of the date of this Lease, but specifically excluding the Monitoring Wells and Recovery System.

1.21 "Extension Term" means one of the five (5) year periods identified in Section 3.4.

1.22 "Fee Mortgage" means the mortgage on the Premises granted pursuant to a certain Post-Petition Loan and Security Agreement dated April 1, 2001 (as amended) by and between various lenders, Bank of America, N.A., as agent for the lenders, and W. R. Grace & Co. and related entities (including, without limitation, Landlord).

1.23 "First Permitted Leasehold Mortgage" – as defined in Section 13.2.

1.24 "First Permitted Leasehold Mortgagee" – as defined in Section 13.2.

1.25 "Force Majeure" – as defined in Section 22.23.

1.26 "Governmental Approvals" means, collectively, all licenses, permits, approvals, consents, determinations, findings, and other permissions required by applicable Legal Requirements to be issued by any governmental or quasi-governmental authority in connection with the demolition, construction, use, occupancy, maintenance, repair, alteration or modification of the Land or any building, structure or other improvements now or hereafter situated on the Land (or any part or parts thereof), including, without limitation, the Initial Approvals.

1.27 "Hazardous Materials" means any oil, petroleum product, hazardous or toxic waste or substance, and any substance which because of its quantitative concentration, chemical, radioactive, flammable, explosive, infectious or other characteristics, constitutes or may reasonably be expected to constitute or contribute to a danger or hazard to public health, safety or welfare or to the environment, including without limitation lead paint, waste oils, solvents and chlorinated oils, polychlorinated biphenyls (PCBs), toxic metals, explosives, reactive metals and compounds, pesticides, herbicides, radon gas, asbestos and asbestos-containing materials, urea formaldehyde foam insulation and chemical, biological and radioactive wastes, or any other similar materials which are included under or regulated by any Environmental Law.

1.28 "Improvements" means, collectively, the Initial Improvements (as the same may be modified in accordance with the provisions of this Lease after the initial construction thereof), and all other buildings, structures, and other improvements constructed from time to time on the Land pursuant to this Lease.

1.29 "Incurable Lease Defaults" – as defined in Section 13.4.

4

1.30    "Initial Approvals" – as defined in Section 3.2.1.

1.31    "Initial Improvements" means, collectively, the Building, all other buildings and structures, and the associated site improvements, initially to be constructed on the Land pursuant to this Lease. Tenant shall have no obligation to commence or to complete the construction of any of the Initial Improvements except as provided in this Lease.

1.32    "Insurance Requirements" means, collectively, all terms and provisions of any policy of insurance maintained by Landlord or Tenant and applicable to all or any part of the Land, the Building, or the Premises, and all requirements of the issuer of any such policy and all orders, rules, regulations, and other requirements of the National Board of Fire Underwriters (and any other body exercising similar functions) applicable to or affecting the demolition, construction, use, occupancy, maintenance, repair, alteration or modification of the Land or any building, structure or other improvements now or hereafter situated on the Land (or any part or parts thereof).

1.33    "Interim Lease Term" means the period of time commencing on the Term Commencement Date and expiring on the last day of the Construction Period, which period shall in no event exceed a total of seventy-eight (78) months.

1.34    "Land" – as defined in Section 2.1.

1.35    "Land Award" – as defined in Section 15.2.

1.36    "Landlord's Demolition Work" means, collectively, (i) the demolition of the existing buildings and structures on the Land (including all floor slabs, subsurface footings and foundations), (ii) the removal from the Land of the demolition debris and disposal of the same, and (iii) the removal (or other remediation) of all soil from beneath the floor slabs of the existing buildings and structures which is identified as being contaminated with Hazardous Materials and whose removal or remediation is required by applicable Legal Requirements or by the Environmental Approvals.

1.37    "Lease Term" means, collectively, (i) the Interim Lease Term, (ii) the Original Lease Term, and (iii) each Extension Term with respect to which the term of this Lease is validly extended in accordance with the provisions of Section 3.4 below.

1.38    "Lease Year" – as defined in Section 4.1.

1.39    "Legal Requirements" means, collectively, all present and future laws, ordinances, orders, rules, regulations and requirements of all federal, state and municipal governments, departments, commissions, boards and officers, including, without limitation, Environmental Laws and the provisions of all Governmental Approvals, which are applicable (as the context indicates) to the use and occupancy of the Premises, or to the demolition, construction, use, occupancy, maintenance, repair, alteration, enlargement or modification of any buildings or improvements now or hereafter on the Land, or to any part thereof.

1.40    "Letter of Credit" – as defined in Section 21.2.

00050211.DOC / 10

1.41    "MADEP" means the Massachusetts Department of Environmental Protection, and any and all agencies, authorities, boards, commissions, departments, or divisions of The Commonwealth of Massachusetts which succeed to all or any portion of the powers or jurisdiction currently exercised by the Massachusetts Department of Environmental Protection, or which have the authority to assess and seek recovery of damages associated with the release of Hazardous Materials.

1.42    "MCP" means the Massachusetts Contingency Plan, 310 C.M.R. §§40.0000 et seq., as the same may be amended from time to time.

1.43    "Monitoring Wells and Recovery System" means, collectively, (i) the ground water monitoring wells on the Premises, and (ii) the ground water recovery and treatment system and related structures on the Premises incident to the remediation work being carried out by Landlord pursuant to the Consent Decree, in each case as the same currently exists or may hereafter be modified in accordance with the provisions of this Lease.

1.44    "National Retail Tenant" means a nationally recognized retail tenant which is then leasing and operating on a national basis across the United States at least seventy-five (75) retail stores of a size and nature comparable to that which it proposes to operate on the Premises.

1.45    "Original Lease Term" means the period commencing on the day immediately following the last day of the Interim Lease Term and ending on the last day of January following the twentieth (20th) anniversary of such date. By way of example only, if the last day of the Interim Lease Term is June 15, 2007, then the Original Lease Term would commence on June 16, 2007 and would expire on January 31, 2028.

1.46    "Original Permitting Contingency Period" means the period commencing on the Term Commencement Date and ending on the earlier of (i) the date on which Tenant has "obtained" (as that term is defined in Section 3.2.1 below) all of the Initial Approvals and Landlord has obtained all of the Environmental Approvals in accordance with Section 3.2.2 below, or (ii) the later of (a) twelve (12) months after the Term Commencement Date, or (b) if Tenant extends the Original Permitting Contingency Period in accordance with the provisions of Section 3.2.1(h) below, the last day of the Original Permitting Contingency Period as so extended. The Original Permitting Contingency Period is subject to tolling as provided in Section 3.2.1(i) below.

1.47    "Permitted Leasehold Mortgage" – as defined in Section 13.2.

1.48    "Permitted Leasehold Mortgagee" – as defined in Section 13.2.

1.49    "Permitting Contingency Period" means the Original Permitting Contingency Period, as the same may be tolled as provided in Section 3.2.1(i) below.

1.50    "Permitting Contingency Tolling Period" means, collectively, the periods designated by Tenant to Landlord by written notice in the manner provided in Section 3.2.1(i) during which the running of the Original Permitting Contingency Period shall be tolled; provided, however, that in no event shall the Permitting Contingency Tolling Period exceed in total three (3) years in duration. The Permitting Contingency Tolling Period shall not apply with

6

respect to any appeal filed after the expiration of the Original Permitting Contingency Period (as the same may have been extended by Tenant in accordance with the provisions of Section 3.2.1(h) below).

    1.51    "Premises" – as defined in Section 2.1.

    1.52    "Real Estate Taxes" means all taxes, assessments, sewer rents, water rents, charges, duties, impositions, ordinary or extraordinary, foreseen or unforeseen, general or special, which shall, pursuant to present or future law or otherwise, during the Lease Term, be levied or assessed upon the Premises or any portion thereof. The term "Real Estate Taxes" shall not in any case include any income, intangible, franchise, capital stock, inheritance or succession taxes imposed upon or assessed against Landlord. If the present system of taxation is changed, with the result that the whole or a determinable part of Real Estate Taxes is substituted for, or increased by, a tax imposed on owners of real property with respect to that property in a form other than that of the original Real Estate Taxes, or shall be levied or assessed upon the rents received by Landlord from the Premises, then each tax imposed in substitution of, or replacement for, the whole or for a determinable part of the original Real Estate Taxes shall be considered part of "Real Estate Taxes" for the purposes of this Lease.

    1.53    "Regional Retail Tenant" means a retail tenant which then leases and operates in New York State and the New England states at least twenty-five (25) retail stores of a size and nature comparable to that which it proposes to operate on the Premises.

    1.54    "Rent" means, collectively, all Interim Rent, Basic Rent and Additional Rent.

    1.55    "Taking" – as defined in Section 15.1.

    1.56    "Tenant's Environmental Agreements" means, collectively, a Prospective Purchaser Agreement and a Covenant Not to Sue, which Tenant desires to obtain from MADEP in connection with its development of the Land.

    1.57    "Term Commencement Date" means the date of this Lease as appearing on Page 1 hereof.

    1.58    "Transfer" means, collectively, any transfer, mortgage, alienation, or pledge by Tenant of this Lease or any interest therein, whether as part of a financing arrangement or a transfer of ownership, or otherwise, or any sublease, tenancy-at-will, license, concession, or other occupancy arrangement for all or any part of the Premises.

    Additional definitions are contained in Sections 11.1, 12.4, 12.5 and 20.1 below.

## ARTICLE 2

## PREMISES; CONDITION OF PREMISES; DELIVERY

    2.1    Lease of Premises.  Landlord hereby leases to Tenant, and Tenant hereby leases

7

from Landlord, for the Lease Term and upon the terms and conditions set forth herein, the following described premises owned by Landlord and located in Woburn, Middlesex County, Massachusetts (hereinafter collectively called the "Premises"):

    (i)    that certain parcel of land containing approximately 12.37 acres shown on the plan attached hereto as **Exhibit A** and more particularly described on **Exhibit A-1** attached hereto (the "Land"), and

    (ii)    all buildings and improvements, now existing or hereafter constructed on the Land, if any (excluding the Monitoring Wells and Recovery System).

The Premises are leased to Tenant subject to and with the benefit of the easements, rights, restrictions, agreements and encumbrances set forth on **Exhibit B** attached hereto.

Tenant hereby represents and warrants to Landlord that the named Tenant, MVP Sports Stores, Inc., is the entity that currently owns or leases and operates all four of the "Decathlon Sports" stores located in the United States.

    2.2    Condition of the Premises.  Subject to the provisions of Section 2.3, Tenant accepts the Premises in their "as is" condition existing as of the Term Commencement Date and, except as otherwise expressly provided in Article 11 below, Tenant agrees that Landlord is not liable in any respect for the condition of the Premises or any defects in the Premises. Tenant acknowledges that it has leased the Premises after a full and complete examination and investigation of the Premises and related matters, including, without limitation, the title to the Premises, subsurface conditions, existing structures on the Premises, the presence of any Hazardous Materials located on, in or under the Premises or within such structures as of the Term Commencement Date, the current uses of the Premises, and Legal Requirements affecting the Premises or the use thereof. Subject to the provisions of Section 2.3, Tenant hereby accepts the Premises in the same condition in which they now are, and assumes all risks in connection therewith, without any representation or warranty, express or implied, in fact or by law, on the part of Landlord (including, without limitation, representation or warranty as to title, condition, construction, development (including the status of any permits or approvals), income, compliance with Legal Requirements, habitability, merchantability or fitness for any purpose, all of which are hereby disclaimed), and without recourse to Landlord. Notwithstanding the preceding provisions of this Section, Landlord shall be responsible (i) with respect to Hazardous Materials existing on the Premises as of the date of this Lease as provided in Article 11 below, and (ii) for such representations and covenants of Landlord as are set forth in this Lease.

    2.3    Demolition of Existing Improvements. (a) Provided that (i) the Environmental Approvals are obtained in accordance with the provisions of Section 3.2.2 prior to the expiration of the Permitting Contingency Period (as the same may be extended as provided in Section 3.2.1), and (ii) this Lease has not otherwise been terminated in accordance with its terms, Landlord shall, promptly after receipt of the Environmental Approvals, perform Landlord's Demolition Work, all of which shall be performed in accordance with applicable Legal Requirements and the Environmental Approvals. Landlord shall cause Landlord's Demolition Work to occur with reasonable diligence and shall pay the costs and expenses thereof (subject to reimbursement by Tenant as provided

8

in Section 2.3(c)). Landlord shall be solely responsible for obtaining all licenses, permits, approvals, consents, authorizations and the like required by applicable Legal Requirements for the performance of Landlord's Demolition Work.

(b)    In the event that despite the use of reasonable diligence, Landlord has not completed Landlord's Demolition Work by the date on which Tenant obtains a building permit for the Initial Improvements, then notwithstanding anything to the contrary contained in this Lease, (i) Tenant's obligation to pay Interim Rent pursuant to Section 4.2 below shall be suspended for the period commencing on the date on which Tenant obtains such a building permit and ending on the Demolition Completion Date, and (ii) the Construction Commencement Date shall be deferred by the number of days occurring between the day on which Tenant obtains such a building permit and the Demolition Completion Date. In the event that the Demolition Completion Date does not occur within six (6) months after the date on which Tenant obtains a building permit for the Initial Improvements, Tenant shall have the right to terminate this Lease upon thirty (30) days' prior written notice; *provided, however,* that such termination notice shall be deemed rescinded and of no force and effect if Landlord completes Landlord's Demolition Work within thirty (30) days after Tenant gives such notice. Provided that Landlord has used reasonable diligence to perform Landlord's Demolition Work, the remedy provided in this subsection shall be Tenant's sole remedy for Landlord's failure to complete Landlord's Demolition Work within the time provided in this Section 2.3.

(c)    Unless this Lease is sooner terminated in accordance with its terms, Tenant shall reimburse Landlord for the costs and expenses incurred by Landlord as described in Section 2.3(a) in the manner set forth in this subsection, *except* for the portion of such costs and expenses (if any) as are indicated on the documentation provided by Landlord to Tenant as having been incurred solely because of the presence of Hazardous Materials in the existing building materials or in the soil beneath the existing floor slabs, but the maximum amount of Tenant's reimbursement obligation under this Section shall be Seven Hundred Fifty Thousand ($750,000.00) Dollars. Tenant shall pay such reimbursement to Landlord, as Additional Rent, by the first to occur of (i) thirty (30) days after Tenant commences construction of the Initial Improvements or any portion thereof, or (ii) unless this Lease has previously been terminated in accordance with its terms (other than on account of the occurrence of an Event of Default), thirty (30) days after the Construction Commencement Date. Landlord shall have the same remedies with respect to Tenant's failure to pay such reimbursement amount as are available to Landlord with respect to Tenant's failure to pay Rent when due hereunder. Tenant's obligation under this subsection 2.3(c) shall not be affected by the termination of this Lease by Landlord by reason of the occurrence of an Event of Default hereunder, and shall survive any such termination (in which event payment shall be due from Tenant hereunder upon demand by Landlord following such termination); *provided, however,* that no reimbursement shall be due from Tenant if Tenant has terminated this Lease pursuant to Sections 2.3(b), 3.2, 3.3, 3.4, 3.5, or on account of a default by Landlord under this Lease.

(d)    If prior to the date which is twelve (12) months after the date of this Lease, Landlord determines that the cost of removing and/or remediating "Sub-Slab Existing

9

Materials" (as defined in Section 11.1 below) will exceed $8,000,000.00, then Landlord shall have the right to terminate this Lease by giving written notice to Tenant prior to such date, accompanied by reasonable written materials supporting such estimated costs, and Landlord shall within thirty (30) days of receipt of Tenant's request together with reasonable supporting documentation, reimburse Tenant for Tenant's reasonable out-of-pocket costs relating to this Lease and the Premises incurred prior to the date of the Landlord's notice, including, without limitation, architects', engineers' or attorneys' fees and permitting, design and engineering costs; *provided, however,* that Landlord shall have the option, within such 30-day period, by written notice to Tenant, to rescind its termination notice pursuant to this Section 2.3, in which event Landlord shall be deemed to have waived its right to terminate this Lease pursuant to this Section 2.3 and the Lease shall remain in full force and effect as if Landlord had never given such notice of termination.  The parties acknowledge that, pursuant to Section 2.4, Tenant will be occupying portions of the existing buildings prior to the demolition thereof by Landlord, and Tenant agrees to vacate (including the removal of all of its property) the Premises within ninety (90) days after Landlord gives Tenant notice of its intention to commence Landlord's Demolition Work.  If Tenant fails so to vacate the Premises within such 90-day period, the 12-month period provided in the first sentence of this subsection (d) shall be extended by the number of days elapsing between the expiration of such 90-day period and the date on which Tenant so vacates the Premises (including the removal of all of its property).

(e)    All amounts paid by Tenant to Landlord pursuant to Section 2.3(c) in excess of Six Hundred Thousand ($600,000.00) Dollars shall be credited against the first installments of Basic Rent otherwise due and payable hereunder.

2.4    <u>Delivery of Possession</u>. (a)    Landlord shall deliver possession of the Premises to Tenant on the Term Commencement Date, free and clear of all encumbrances, and free and clear of all prior tenants and occupants except as specified on **Exhibit B** attached hereto, but subject to Landlord's right to enter upon the Premises for the purposes of performing its obligations hereunder (including, without limitation, its obligations under Section 2.3 above), and with the Monitoring Wells and Recovery System in place and operating.  Notwithstanding the preceding provisions of this Section to the contrary, Tenant shall not be deemed to have taken full possession of the Premises until the Demolition Completion Date.  It is the intent of the parties that Tenant shall not be deemed an operator of the Premises for purposes of any Environmental Laws until that date, and that Tenant shall be deemed an "eligible tenant" within the meaning of M.G.L. c. 21E, §2, with respect to the Existing Materials.

(b)    Between the Term Commencement Date and the Demolition Completion Date:

(i)    Tenant shall have the right to enter upon the Premises for the following limited purposes only and for no other use or purpose whatsoever:  (A) performing surveys, inspections, and other measurements and evaluations of the Premises, (B) displaying to the public sporting equipment of the type that

10

Tenant proposes to sell at the Premises, and (C) holding meetings relating to the development of the Premises;

(ii)    Tenant's rights of access to and use and occupancy of the Premises shall be subject to Landlord's rights with respect to the performance of Landlord's Demolition Work. No entry upon, or use or occupancy of the premises or any portion thereof by Tenant, shall interfere with the performance by Landlord of Landlord's Demolition Work;

(iii)    Tenant shall not make any alterations, additions, modifications, or improvements to the Premises, nor shall it demolish or remove any portion of the buildings or any other improvement existing on the Land as of the Term Commencement Date;

(iv)    Tenant shall not enter into any Transfer, except for Transfers to Affiliates of Tenant; and

(v)    Except to the extent inconsistent with the provisions of this Section 2.4, all other provisions of this Lease shall apply.

## ARTICLE 3

## LEASE TERM; TENANT'S RIGHT TO TERMINATE; NOTICE OF LEASE; EXTENSION TERMS

3.1    Lease Term. The Lease Term shall commence on the Term Commencement Date, shall continue for the Interim Lease Term, and shall continue thereafter following the expiration of the Interim Lease Term for the Original Lease Term, subject to extension as provided in Section 3.4 below, unless sooner terminated as hereinafter provided.

3.2    Contingencies.

3.2.1    Permitting.

(a)    Promptly after the Term Commencement Date, Tenant shall proceed diligently, at its sole cost and expense, to obtain all licenses, permits, approvals, consents, authorizations and the like, including without limitation, site plan approval, special permits, zoning changes or variances, curb cut permits, environmental approvals and permits of whatever nature required by applicable Legal Requirements for the issuance of a building permit for the Initial Improvements (collectively the "Initial Approvals"), including, without limitation, approvals for all necessary parking facilities, pylon signs, access rights, parking lot lighting, utility poles and related appurtenances relating to the operation of the Building and approvals to permit the relocation of or tapping into or connection to electrical, sewer and water mains and other utility lines, pipes and conduits necessary for the construction and operation of the Building, but expressly excluding (i) a building permit for all or any portion of the Initial Improvements, (ii) the Environmental

11

Approvals, and (iii) Tenant's Environmental Agreements. Whenever the word "obtained" is used in connection with Initial Approvals, no Initial Approval shall be deemed to have been obtained unless it has been granted without qualifications or with conditions or qualifications reasonably acceptable to Tenant, in form and substance, and with the expiration of all applicable appeal periods, without appeal from the issuance therefrom or granting thereof, or the affirmance on appeal of the granting of the Initial Approval without further appeal and without right of appeal, or the settling of any such appeal, and subject to no conditions or terms, which, in the reasonable judgment of Tenant, are not acceptable.

(b)    Intentionally omitted.

(c)    Tenant shall be solely responsible, at its sole cost and expense, for all costs and expenses (including, without limitation, attorneys', engineers' and consultants' fees and expenses) associated with (i) the preparation of all applications for the Initial Approvals and all accompanying materials, (ii) applying for and obtaining the Initial Approvals, and (iii) the performance of all conditions, mitigation or obligations imposed by any of the Initial Approvals; *provided, however,* that if any Initial Approval shall require a continuation of the operation of the Monitoring Wells and Recovery System in place and operating as of the date of this Lease, as the same may be modified in accordance with the provisions of this Lease, Landlord shall remain obligated to operate the Monitoring Wells and Recovery System at its sole cost and expense. Landlord shall, at Tenant's request and direction, provide reasonable cooperation to Tenant in connection with Tenant's obtaining the Initial Approvals. Tenant shall reimburse Landlord as Additional Rent, promptly upon request therefor, for all costs and expenses (including, without limitation, the reasonable fees and expenses of Landlord's consultant and reasonable attorneys' fees and expenses) reasonably incurred by Landlord in connection with its review of any application for an Initial Approval or otherwise reasonably incurred by Landlord in connection with the obtaining of an Initial Approval by Tenant. Tenant shall be solely responsible for applying for and obtaining all Initial Approvals. Landlord and Tenant hereby agree that Landlord shall have no obligation in connection with (1) the application for, or obtaining of, any of the Initial Approvals, except as expressly provided in this Section 3.2.1, (2) the performance or satisfaction of any condition, mitigation, or obligation imposed by or in connection with the issuance of any of the Initial Approvals *provided, however,* that if any Initial Approval shall require a continuation of the operation of the Monitoring Wells and Recovery System in place and operating as of the date of this Lease, as the same may be modified in accordance with the provisions of this Lease, Landlord shall remain obligated to operate the Monitoring Wells and Recovery System at its sole cost and expense, or (3) the design or construction of any building, parking area, road, driveway, utility system, or other improvement constituting part of the Initial Improvements or serving the Initial Improvements or otherwise described in any of the materials submitted in connection with an application for any of the Initial Approvals, and all of the matters described in the preceding clauses (1)-(3) shall be the sole responsibility of Tenant except as otherwise expressly provided in the preceding clause (2).

12

(d)    Tenant shall provide to Landlord copies of all applications for Initial Approvals (including all required studies, plans and other materials) concurrently with the submission of the same to the appropriate governmental authority. Promptly after receipt of any of the Initial Approvals, Tenant shall furnish to Landlord a complete copy of the same.

(e)    Tenant shall give Landlord reasonable advance notice of all public hearings and all meetings with any representatives of, or consultants to, any and all governmental authorities which may be scheduled in connection with any application for an Initial Approval. Tenant shall keep Landlord informed on a monthly basis in writing as to the status of all pending applications for Initial Approvals, including, without limitation, all requests or suggestions for modifications to any such application made by the governmental authority having jurisdiction over such application.

(f)    Prior to the first day of the Original Lease Term, Tenant shall not, without the prior written consent of Landlord in each instance (which consent may be withheld by Landlord in its sole discretion, not to be exercised in an arbitrary or capricious manner), (i) enter into any covenant or agreement with any governmental authority relating to the Premises that will remain applicable to or binding upon Landlord or the Premises in the event that this Lease is terminated, or (ii) unless required by an applicable Legal Requirement, record any Initial Approval (or any plan relating thereto) or notice thereof; *provided, however,* that if Tenant is required by applicable Legal Requirements to record an Initial Approval or a plan or notice relating thereto prior to the first day of the Original Lease Term, Tenant may do so provided that such Initial Approval states on its face that it shall apply to and be binding upon the Premises and/or the owner thereof only in the event that Tenant commences construction of the Initial Improvements or any portion thereof. Without the prior written approval of Landlord in each instance, (which approval may be withheld by Landlord in its sole discretion, not to be exercised in an arbitrary or capricious manner), Tenant shall not have the authority to agree to, and shall not agree to (x) any restriction or obligation proposed to be imposed upon the Premises, or proposed to be imposed upon the development or use of the Premises that will remain binding upon Landlord or the Premises in the event that this Lease is terminated prior to the Basic Rent Commencement Date, or (y) any exaction, mitigation measure, off-site improvement obligation, linkage payment, or other condition to the issuance of any Initial Approval which would require either (A) the conveyance of title to or any interest in any portion of the Land, or (B) unless paid by Tenant and not by Landlord, an out-of-pocket expenditure by the owner of the Land. Notwithstanding the preceding provisions of this subsection, no prior written consent of Landlord shall be required with respect to (i) any covenant or agreement with any governmental authority relating to the Premises, or (ii) any Initial Approval, or (iii) any restriction or obligation proposed to be imposed upon the Premises, or proposed to be imposed upon the development or use of the Premises, or (iv) any exaction, mitigation measure, off-site improvement obligation, linkage payment, or other condition to the issuance of any Initial Approval, in each instance (if any) in which the document(s) constituting and/or evidencing the same expressly state(s) that no obligation therein contained shall be binding upon the Premises or upon Landlord or any successor owner of the Premises unless and until Tenant commences construction of the Initial Improvements or any portion thereof. Landlord hereby consents to the donation to

13

the City of Woburn or other appropriate governmental authority of a strip of land along the Premises' frontage on Washington Street to be used for traffic improvements required as a condition to one or more of the Initial Approvals, *provided* that (i) Landlord shall not be required to perform any work or to incur any cost in connection with such a donation, (ii) any Initial Approval requiring such a donation shall expressly state that no obligation therein contained shall be binding upon the Premises or upon Landlord or any successor owner of the Premises unless and until Tenant commences construction of the Initial Improvements or any portion thereof, and (iii) Landlord shall not be required to execute or deliver any deed or other instrument conveying title to such a strip of land unless and until Tenant commences construction of the Initial Improvements or any portion thereof.

(g)    Tenant shall not, without the prior written consent of Landlord, which consent shall not be unreasonably withheld, delayed or conditioned except as hereinafter provided: (i) voluntarily waive or relinquish at any time any "legally non-conforming," "zoning freeze," or other grandfathered status of all or any portion of the Premises with respect to any Legal Requirements; (ii) take any action that might in any way modify or otherwise affect the continued validity of any existing special permits, variances, or other zoning relief relating to the Premises; or (iii) seek or consent to any change in the zoning classification of the Land or any portion thereof or any amendment to the zoning ordinances of the City of Woburn as applicable to the Premises. If Landlord so consents to any such action by Tenant, the provisions of this Section 3.2.1 shall apply to the submission and prosecution of an application for such change or amendment. Tenant shall submit to Landlord within ninety (90) days after the date of this Lease, for review and approval by Landlord, the proposed language of an amendment to the Woburn zoning ordinance which would permit Tenant's desired retail use at the Premises (whether by map amendment, text amendment, or both), which submission shall be accompanied by a transmittal letter bearing the following legend on top: **"THIS SUBMISSION IS MADE PURSUANT TO SECTION 3.2(g) OF THE GROUND LEASE BETWEEN W.R. GRACE & CO.-CONN. AND THE UNDERSIGNED RELATING TO PROPERTY AT 369 WASHINGTON STREET, WOBURN, MASSACHUSETTS - IMPORTANT RIGHTS MAY BE LOST IF YOU DO NOT RESPOND TO THE SENDER WITHIN THIRTY DAYS."** Landlord shall have thirty (30) days from its receipt of Tenant's submission to review the same and to give notice to Tenant that Landlord either approves or disapproves the proposed zoning amendment (and in the case of disapproval, Landlord shall set forth the reasons for such disapproval). If Landlord fails to give such notice to Tenant within such 30-day period, Landlord shall be deemed to have approved the proposed zoning amendment as submitted to Landlord. Notwithstanding the foregoing provisions of this subsection 3.2.1(g) to the contrary, Landlord shall have the right to withhold its consent, in its sole and absolute discretion, to any proposal by Tenant to change the zoning classification of the Land or any portion thereof, or to amend the zoning ordinance of the City of Woburn as applicable to the Premises, which proposal would restrict the use of the Land for retail purposes as then otherwise permitted under such zoning ordinance.

(h)    In the event that despite the use of diligent efforts by Tenant, one or more of the Initial Approvals has not been issued by the appropriate governmental authority (with only such conditions or qualifications as are reasonably acceptable to Tenant)

14

within twelve (12) months after the Term Commencement Date, then provided that no Event of Default has occurred and is then continuing, Tenant shall have the right, by written notice given to Landlord not later than the last day of such 12-month period, either (i) to terminate this Lease, or (ii) to extend the Original Permitting Contingency Period for up to an additional six (6) months (i.e., so as to expire not later than eighteen (18) months after the Term Commencement Date) so as to enable Tenant to continue its efforts to obtain all of the Initial Approvals.  Further, in the event that despite the use of diligent efforts by Tenant, one or more of the Initial Approvals has not been issued by the appropriate governmental authority by the last day of the Original Permitting Contingency Period as extended by Tenant pursuant to the immediately preceding sentence, then provided that no Event of Default has occurred and is then continuing, Tenant shall have the right, by written notice given to Landlord not later than the last day of the Original Permitting Contingency Period as so previously extended by Tenant, either (i) to terminate this Lease, or (ii) to extend the Original Permitting Contingency Period for up to an additional six (6) months (i.e., so as to expire not later than twenty-four (24) months after the Term Commencement Date) so as to enable Tenant to continue its efforts to obtain all of the Initial Approvals.  During any extension of the Original Permitting Contingency Period pursuant to this subsection, Tenant shall continue to use diligent efforts to obtain all of the Initial Approvals.

(i)     In the event that Tenant has exercised its rights in accordance with each of the first two sentences of subsection 3.2.1(h) to extend the Original Permitting Contingency Period, but despite the use of diligent efforts, Tenant has not obtained all of the Initial Approvals by the last day of the Original Permitting Contingency Period as so extended by Tenant, then Tenant shall have the right, by written notice given to Landlord not later than the last day of the Original Permitting Contingency Period as so extended by Tenant, to terminate this Lease; *provided, however,* that if all of the Initial Approvals have been issued prior to the expiration of the Original Permitting Contingency Period as so extended by Tenant but one or more appeals from the issuance thereof have been timely filed by third parties prior to the expiration of the Original Permitting Contingency Period as so extended, then provided that Tenant is diligently defending such Initial Approval(s) against such appeal, Tenant shall have the right to toll the running of the Original Permitting Contingency Period on one or more occasions for the Permit Contingency Tolling Period (but in no event shall the aggregate amount of all such tolling periods exceed three (3) years) by giving written notice of such tolling to Landlord prior to the expiration of the Original Permit Contingency Period as so extended by Tenant (or the expiration of the tolling period as previously designated in writing by Tenant to Landlord, as the case may be) designating the duration of the Permit Contingency Tolling Period.  During the Permit Contingency Tolling Period Tenant shall, at its sole cost and expense, use diligent efforts in good faith to resolve such appeal, whether by litigation or by settlement.  In the event that, despite Tenant's use of diligent efforts in good faith, all appeals of Initial Approvals have not been dismissed or otherwise disposed of within the Permit Contingency Tolling Period, then Tenant shall have the right, by written notice to Landlord given not later than the last day of the Permitting Contingency Tolling Period, to terminate this Lease.  Tenant shall not have the right to give a notice tolling the running of the Original Permitting Contingency Period (as the same may have been extended by Tenant) with respect to any appeal of an Initial Approval which is first filed

15

after the expiration of the Original Permitting Contingency Period (as so extended). In the event that Tenant does not give a written notice of termination to Landlord within either of the periods provided in this subsection (i) (i.e., prior to the expiration of the Original Permitting Contingency Period as extended by Tenant or prior to the expiration of the Permitting Contingency Tolling Period), then Tenant shall be deemed to have irrevocably waived all rights to terminate this Lease pursuant to this subsection (i) and, if the running of the Original Permitting Contingency Period was previously tolled by Tenant in accordance with the provisions of this subsection (i), the Original Permitting Contingency Period shall re-commence running upon the expiration of the Permitting Contingency Tolling Period.

(j)    In the event that despite the use of diligent efforts, Tenant determines in good faith at any time during the Permitting Contingency Period that there is not a reasonable likelihood that Tenant will be able to obtain all of the Initial Approvals during the Permitting Contingency Period, Tenant shall have the right to terminate this Lease by giving written notice of termination to Landlord prior to the expiration of the Permitting Contingency Period (as so extended). In addition, in the event that despite the use of diligent efforts, Tenant determines in good faith at any time during the Permitting Contingency Period that there is not a reasonable likelihood that Tenant will be able to successfully defend an Initial Approval against a timely-filed appeal, Tenant shall have the right to terminate this Lease by giving written notice of termination to Landlord prior to the expiration of the Permitting Contingency Period (as so extended). If Tenant does not give such a written notice of termination to Landlord within the applicable time period described in the preceding provisions of this subsection (j), then Tenant shall be deemed to have irrevocably waived all rights to terminate this Lease pursuant to this subsection (j).

(k)    In the event that any application for an Initial Approval submitted and diligently prosecuted by Tenant is denied by the applicable governmental authority, Landlord and Tenant shall consult in good faith as to whether to appeal such denial. If the parties agree to appeal such denial, Tenant shall prosecute such appeal diligently, at Tenant's sole cost and expense. If the parties in good faith cannot reach agreement as to whether to appeal such a denial of an Initial Approval, then neither party shall be required to take any further action in connection therewith but either may do so in its discretion and at its sole cost and expense. Landlord's election to prosecute or to continue the prosecution of such an appeal shall not affect Tenant's right to terminate this Lease in accordance with the provisions of this Section 3.2.1.

(l)    Promptly after Tenant has obtained the Initial Approvals, Tenant shall cause the necessary plans and specifications for the Initial Improvements to be prepared and an application filed with the City of Woburn for a building permit therefor, and Tenant shall thereafter diligently prosecute such building permit application. The provisions of subsections 3.2.1(c) through 3.2.1(f) above shall apply to Tenant's obtaining the building permit for the Initial Improvements. Tenant shall provide notice to Landlord of the issuance of such building permit promptly after its issuance. In the event that despite the use of diligent efforts, Tenant has not obtained the building permit for the Initial Improvements by the last day of the Building Permit Contingency Period, then

16

Tenant shall have the right, by written notice given to Landlord not later than the last day of the Building Permit Contingency Period, to terminate this Lease. In the event that Tenant does not so give a written notice of termination to Landlord within that time period, then Tenant shall be deemed to have irrevocably waived all rights to terminate this Lease pursuant to this subsection (l).

(m)    In the event that Tenant terminates this Lease pursuant to this Section 3.2.1, the provisions of Section 3.2.6 below shall apply.

3.2.2    Environmental Approvals.

(a)    Promptly after the Term Commencement Date, Tenant and Landlord shall proceed diligently and in good faith to obtain the approval by EPA and MADEP (to the extent to which such approval is required by applicable Environmental Laws by reason of the presence of Hazardous Materials in components of the existing buildings or structures or in the soil beneath the locations of existing building or structures) of (i) the work plan for the demolition and removal by Landlord of the existing buildings and structures (including floor slabs) on the Land; (ii) an AUL to be imposed upon the Land and recorded with the appropriate Registry of Deeds; and (iii) all changes (if any) to the Monitoring Well and Recovery System required to be made in order to accommodate the location and construction of the Initial Improvements as shown on the Development Plan as approved by Landlord (collectively, the "Environmental Approvals"), each in a form and content acceptable to Landlord, Tenant and the appropriate governmental authorities. The parties shall cooperate in good faith in order to obtain the Environmental Approvals, including providing copies to each other of all correspondence to or from EPA and/or MADEP with respect to the Environmental Approvals and attending all meetings with representatives of EPA and/or MADEP. Each of Landlord and Tenant shall pay its own costs and expenses incurred in connection with obtaining the Environmental Approvals, including, without limitation, attorneys', engineers' and consultants' fees and expenses.

(b)    In the event that, despite the use of diligent efforts in good faith, Landlord and Tenant have not obtained all of the Environmental Approvals in form and content acceptable to both Landlord (in its sole discretion, not to be exercised in an arbitrary or capricious manner) and Tenant by the last day of the Original Permitting Contingency Period (as the same may have been extended by Tenant in accordance with the provisions of Section 3.2.1(h) or tolled by Tenant in accordance with the provisions of Section 3.2.1(i) above), then Landlord and Tenant shall each have the right to terminate this Lease, by written notice given to the other party within fifteen (15) days after the expiration of the Original Permitting Contingency Period (as the same may have been so extended or tolled). If neither Landlord nor Tenant gives such a written notice of termination to the other party within such time period, then both Landlord and Tenant shall be deemed to have irrevocably waived all rights to terminate this Lease pursuant to this subsection (b).

(c)    In the event that Landlord or Tenant terminates this Lease pursuant to this Section 3.2.2, the provisions of Section 3.2.6 below shall apply.

17

### 3.2.3   Tenant's Environmental Agreements.

(a)   Promptly after the Term Commencement Date, Tenant shall proceed diligently and in good faith, at its sole cost and expense, to obtain Tenant's Environmental Agreements from EPA and MADEP in a form and content acceptable to Tenant. Tenant shall be solely responsible, at its sole cost and expense, for all costs and expenses (including, without limitation, attorneys', engineers' and consultants' fees and expenses) associated with obtaining Tenant's Environmental Agreements and the performance of all conditions, mitigation or obligations imposed by any of Tenant's Environmental Agreements. Landlord shall, at Tenant's request and direction, provide reasonable cooperation to Tenant in connection with Tenant's obtaining Tenant's Environmental Agreements. Tenant shall reimburse Landlord as Additional Rent, promptly upon request therefor, for all costs and expenses (including, without limitation, the reasonable fees and expenses of Landlord's consultant and reasonable attorneys' fees and expenses) reasonably incurred by Landlord in connection with Tenant's obtaining any of Tenant's Environmental Agreements. Tenant shall be solely responsible for obtaining all of Tenant's Environmental Agreements, and Landlord and Tenant hereby agree that Landlord shall have no obligation in connection with (i) the application for, or obtaining of, any of Tenant's Environmental Agreements, except as expressly provided in this Section 3.2.3, or (ii) the performance or satisfaction of any condition, mitigation, or obligation imposed by or in connection with the issuance of any of Tenant's Environmental Agreements, and all of the matters described in the preceding clauses (i)-(ii) shall be the sole responsibility of Tenant.

(b)   Tenant shall provide to Landlord copies of all materials submitted to EPA or MADEP in connection with Tenant's efforts to obtain Tenant's Environmental Agreements (including all required studies, plans and other materials) promptly after Tenant submits the same to EPA or MADEP. Any of Tenant's Environmental Agreements required by applicable Legal Requirements to be executed by Tenant prior to the first day of the Original Lease Term shall expressly provide that it shall not be in force or effective unless and until Tenant commences construction of the Initial Improvements or any portion thereof. Without the prior written approval of Landlord in each instance, (which approval may be withheld by Landlord in its sole discretion, not to be exercised in an arbitrary or capricious manner), Tenant shall not have the authority to agree to, and shall not agree to (x) any restriction or obligation proposed to be imposed upon the Premises, or proposed to be imposed upon the development or use of the Premises that will remain binding upon Landlord or the Premises in the event that this Lease is terminated, or (y) any exaction, mitigation measure, off-site improvement obligation, linkage payment, or other condition to the issuance of any of Tenant's Environmental Agreements which would require either (A) the conveyance of title to or any interest in any portion of the Land, or (B) unless paid by Tenant, an out-of-pocket expenditure by the owner of the Land. Notwithstanding the preceding provisions of this subsection, no prior written consent of Landlord shall be required with respect to (i) any restriction or obligation proposed to be imposed upon the Premises, or proposed to be imposed upon the development or use of the Premises, or (ii) any exaction, mitigation

18

measure, off-site improvement obligation, linkage payment, or other condition to the issuance of any of Tenant's Environmental Agreements in each instance in which the document(s) constituting and/or evidencing the same expressly state(s) that no obligation therein contained shall be binding upon the Premises or upon Landlord or any successor owner of the Premises unless and until the Initial Improvements are constructed and opened for business.

(c)      Tenant shall give Landlord reasonable advance notice of all public hearings and all meetings with any representatives of, or consultants to, any and all governmental authorities which may be scheduled in connection with any application for any of Tenant's Environmental Agreements. Tenant shall keep Landlord informed on a monthly basis in writing as to the status of all pending applications for Tenant's Environmental Agreements, including, without limitation, all requests or suggestions for modifications to any such application made by EPA or MADEP.

(d)      In the event that despite the use of diligent efforts in good faith, Tenant has not obtained all of Tenant's Environmental Agreements in form and content acceptable to Tenant within twelve (12) months after the Term Commencement Date, then Tenant shall have the right, by written notice to Landlord given within fifteen (15) days after the expiration of such 12-month period, to terminate this Lease. In the event that Tenant terminates this Lease pursuant to this Section 3.2.3, the provisions of Section 3.2.6 below shall apply. In the event that Tenant does not give such written notice of termination to Landlord within the period provided in this subsection (d), then Tenant shall be deemed to have irrevocably waived all rights to terminate this Lease pursuant to this subsection (d).

3.2.4  <u>Non-Disturbance Agreement</u>.   Promptly after the full execution and delivery of this Lease, Landlord shall endeavor in good faith to cause the holder of the Fee Mortgage to enter into a non-disturbance agreement with Tenant on terms customary for leaseholds of this size and nature and otherwise on commercially reasonable terms, pursuant to which such holder agrees to recognize all of Tenant's rights under this Lease provided that Tenant is not in default hereunder beyond applicable notice and cure periods. In lieu of obtaining the non-disturbance agreement described in the preceding sentence, Landlord shall have the right to obtain a partial release of the Fee Mortgage with respect to the Premises. In the event that Landlord is not able to cause such holder to enter into such a non-disturbance agreement with Tenant or to issue such a partial release within four (4) months after the date of this Lease, then Tenant shall have the right, by written notice to Landlord given within fifteen (15) days after the expiration of such 4-month period, to terminate this Lease. If Tenant so terminates this Lease, then this Lease shall terminate ten (10) days after such notice is given and the provisions of Section 3.2.6 below shall apply. In the event that Tenant does not give such written notice of termination to Landlord within the period provided in this Section 3.2.4, then Tenant shall be deemed to have irrevocably waived all rights to terminate this Lease pursuant to this Section 3.2.4 regardless of whether or not Landlord is able to obtain such a non-disturbance agreement or partial release of the Fee Mortgage for Tenant.

3.2.5  <u>Bankruptcy Court Approval</u>.   Tenant acknowledges that Landlord is

19

currently a debtor in possession pursuant to a voluntary bankruptcy petition filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and that the effectiveness of this Lease is conditioned upon obtaining the approval of the Bankruptcy Court. Promptly after the full execution and delivery of this Lease, Landlord shall apply to the Bankruptcy Court for its approval of this Lease. In the event that Landlord is not able to obtain a final and non-appealable order of the Bankruptcy Court approving this Lease within four (4) months after the date of this Lease, then either Landlord or Tenant may, by written notice to the other party given within fifteen (15) days after the expiration of such 4-month period, terminate this Lease. If either party so terminates this Lease, then this Lease shall terminate ten (10) days after such notice is given and the provisions of Section 3.2.6 below shall apply.

3.2.6   Termination Pursuant to Sections 3.2.1 through 3.2.5.

Notwithstanding anything to the contrary contained in the Lease, in the event that this Lease is terminated pursuant to any of Sections 3.2.1 through 3.2.5 above, this Lease shall terminate with the same force and effect as if the effective date of such termination was the last day of the Lease Term, and Tenant shall, upon written request by Landlord and at no cost to Landlord, (A) execute, acknowledge and deliver to Landlord an assignment of all of Tenant's right, title and interest in and to all of the Initial Approvals and Tenant's Environmental Agreements, and all pending applications therefor (or only such of the Initial Approvals and/or Tenant's Environmental Agreements and/or pending applications as are specified by Landlord in such request), such assignment to be non-recourse and otherwise in customary form, without representation or warranty by Tenant to Landlord, (B) deliver to Landlord copies of all materials, including, without limitation, plans, applications, studies, reports and correspondence, submitted by Tenant to or received by Tenant from governmental authorities or their attorneys or consultants in connection with such Initial Approvals and/or Tenant's Environmental Agreements and/or applications therefor (exclusive of privileged materials or correspondence prepared by Tenant's attorneys), provided that any such delivery shall be made without express or implied representation or warranty by Tenant as to the accuracy of the contents thereof, (C) provide to Landlord copies of all analyses, reports, studies and assessments performed by or on behalf of Tenant relating to the Land and the existing buildings and other improvements thereon or to the potential development of additional buildings or other improvements on the Land, including, without limitation, environmental reports, soil tests, hydrological or hydrogeological studies, traffic studies, and Building inspection reports, provided that any such delivery shall be made without express or implied representation by Tenant as to the accuracy of the contents thereof, and (D) provide reasonable cooperation to Landlord, at no cost to Tenant, in connection with such transfer of materials and information.

3.3   Notice of Lease; Basic Rent Commencement Date Agreement. If a recordable notice (or "memorandum" or "short form") of this Lease is not executed and acknowledged at the time this Lease is fully executed and delivered, Landlord shall do so at a later time, upon Tenant's request. The notice shall be in the form prescribed by applicable statute and shall

20

contain such information as either party may reasonably request, except the Rent payable by Tenant. Landlord shall not be required to execute and deliver any notice of this Lease unless and until Tenant executes, acknowledges and delivers to Landlord counterpart copies of a recordable notice of termination of this Lease pursuant to Section 3.2 above, which documents shall be held in escrow by a title insurance company acceptable to Landlord and Tenant pursuant to a written escrow agreement between the parties, to be released only in the event that this Lease is terminated pursuant to Section 3.2. After the Basic Rent Commencement Date, Tenant shall execute and deliver to Landlord counterpart copies of a recordable instrument setting forth the Basic Rent Commencement Date, and Landlord, not more than twenty (20) days following receipt of those copies from Tenant, shall execute and deliver to Tenant at least two such counterpart copies. Tenant shall be responsible for recording, at its sole cost and expense, any notice of this Lease or Basic Rent Commencement Date agreement executed by the parties pursuant to this Section, and shall promptly thereafter provide the recording information to Landlord.

3.4    Extension Terms. Provided that both (i) Tenant is not in default hereunder beyond the expiration of applicable notice and cure periods, and (ii) this Lease is in full force and effect as of each of (a) the day on which Tenant exercises an extension option pursuant to this Section, and (b) the first day of the corresponding Extension Term, Tenant shall have the right to extend the Lease Term for up to a total of eight (8) additional periods of five (5) years each (each an "Extension Term"), by giving written notice of extension to Landlord not earlier than eighteen (18) months nor later than nine (9) months prior to the then-expiration date of the Lease Term. If, however, for any Extension Term, Tenant shall not so give notice of such election to Landlord by the date which is nine (9) months prior to the then-expiration date of the Lease Term, then Landlord shall give notice to Tenant that Tenant has failed to give such notice of such election and Tenant's time to give such notice of such election shall be extended until that date which is thirty (30) days after the date Tenant receives such notice from Landlord that Tenant has so failed to give notice of such election. If Landlord shall not have given its notice to Tenant on or before that date which is thirty (30) days before the expiration date of the then-existing Lease Term, the Lease Term shall be automatically extended past the expiration date to that date which is thirty (30) days after the date such notice is so given to Tenant by Landlord. Notwithstanding the foregoing, with respect to each Extension Term, respectively, Tenant shall not be entitled to a notice of failure to exercise its extension rights, nor shall Tenant be entitled to any extension of the time to give notice of such exercise, if Landlord shall have given Tenant a notice reminding Tenant (by specific reference to this Section 3.4) of the last date for exercise of its extension rights hereunder, which notice may be given not more than twelve (12) months prior to the last day of the Original Term Lease or the then-current Extension Term, as the case may be. Tenant shall not have the right to exercise its rights hereunder with respect to any Extension Term unless such right has been exercised with respect to each preceding Extension Term.

In the event that Tenant fails to extend the Lease Term in accordance with the provisions of this Section, then Tenant shall be deemed to have irrevocably waived all rights under this Section and the Lease Term shall expire on the last day of the Original Lease Term or the Extension Term then in effect (as the case may be). All Extension Terms shall be upon the same terms and conditions set forth in this Lease (except for the change in Basic Rent as stated in Section 4.1 below) but the Lease Term shall not be extended in the aggregate for more than eight (8) Extension Terms. The first Extension Term shall commence on the day after the last day of

the Original Lease Term, and each successive Extension Term shall commence on the day after the expiration of the preceding Extension Term.

## ARTICLE 4

## RENT

4.1     Basic Rent.  Commencing on the Basic Rent Commencement Date, Tenant shall pay to Landlord at Landlord's address for notices (or to such other person or at such other address as Landlord may direct from time to time by written notice received by Tenant at least thirty (30) days in advance of such change) basic rent for the Lease Term in accordance with the schedule below ("Basic Rent").  Basic Rent shall be paid in equal monthly installments in advance, on the first day of each month, without previous notice or demand and without any abatement, setoff or deduction except as may be expressly provided in this Lease.  Basic Rent shall be pro-rated for the fraction of any month included in the Lease Term.

|  | ANNUAL RENT | MONTHLY RENT |
|---|---|---|
| Lease Years 1 through 5 | $800,000.00 | $66,666.67 |
| Lease Years 6 through 10 | $840,000.00 | $70,000.00 |
| Lease Years 11 through 15 | $880,000.00 | $73,333.33 |
| Lease Years 16 through 20 | $920,000.00 | $76,666.67 |
| First Extension Term, if any | $960,000.00 | $80,000.00 |
| Second Extension Term, if any | $1,000,000.00 | $83,333.33 |
| Third Extension Term, if any | $1,040,000.00 | $86,666.67 |
| Fourth Extension Term, if any | $1,080,000.00 | $90,000.00 |
| Fifth Extension Term if any | $1,120,000.00 | $93,333.33 |
| Sixth Extension Term, if any | $1,160,000.00 | $96,666.67 |
| Seventh Extension Term, if any | $1,200,000.00 | $100,000.00 |
| Eighth Extension Term, if any | $1,240,000.00 | $103,333.33 |

As used in this Lease, the term "Lease Year" shall mean each successive period of twelve (12) months within the Lease Term, commencing on the first day of February and ending on the last day of the next succeeding January; provided, however, that "Lease Year 1" shall mean and refer to the period commencing on the day immediately following the last day of the Interim Lease

22

Term and ending on the last day of the January first following the last day of the Interim Lease Term.

Provided that (i) this Lease has not been terminated in accordance with its terms prior to the Basic Rent Commencement Date, and (ii) no Event of Default then exists hereunder, there shall be applied as a credit against the first installments of Basic Rent otherwise due and payable hereunder an amount equal to one-half of the amount of Interim Rent actually received by Landlord on account of the portion of the Interim Lease Term that commences twenty-seven (27) months after the Term Commencement Date and ends on the last day of the Interim Lease Term. In the event that this Lease is terminated in accordance with its terms prior to the Basic Rent Commencement Date, or an Event of Default exists hereunder as of the Basic Rent Commencement Date, Tenant shall not be entitled to the aforementioned credit against the Basic Rent otherwise due and payable hereunder and all Interim Rent shall be and remain the sole property of Landlord.

4.2    Interim Rent.  Commencing on the day that is three (3) months after the Term Commencement Date, Tenant shall pay to Landlord at Landlord's address for notices (or to such other person or at such other address as Landlord may direct from time to time by written notice) interim rent ("Interim Rent"), to help defray Landlord's Real Estate Taxes and other expenses associated with the ownership of the Premises for the period prior to the Basic Rent Commencement Date, at the rate of (i) Ten Thousand ($10,000.00) Dollars per month for the twenty-four (24) months of the Interim Lease Term commencing three (3) months after the Term Commencement Date, and (ii) Twenty-Thousand ($20,000.00) Dollars per month for the remainder of the Interim Lease Term.  Interim Rent shall be paid in monthly installments in advance, on the first day of each month, without previous notice or demand and without any abatement, setoff or deduction except as may be expressly provided in this Lease.  Interim Rent shall be pro-rated for the fraction of any month included in the Interim Lease Term.

4.3    Net Lease.  It is the purpose and intent of Landlord and Tenant that this is a net lease and that, except as herein explicitly otherwise provided, Landlord shall incur no cost or expense of any kind in connection with this Lease or the Premises or the development, construction, use, occupancy, operation, maintenance or repair thereof, other than Landlord's obligations pursuant to Article 11 below.  Tenant agrees that, except as herein otherwise expressly provided, Tenant shall pay all costs, charges and expenses of every kind and nature whatsoever against or in connection with the development, construction, use, occupancy, operation, maintenance or repair of the Premises which may arise or become due during the Lease Term (excluding the Interim Lease Term), including all of those which, except for the execution and delivery hereof, would or could have been payable by Landlord, other than Landlord's obligations pursuant to Article 11 below.

4.4    Late Payments.  Tenant's default in the due and punctual payment of Interim Rent, Basic Rent, or any Additional Rent under this Lease, within five (5) days after the same shall become due and payable, shall obligate Tenant, upon Landlord's demand, to pay as Additional Rent interest on such amounts at the Default Rate, applied on a daily basis from the date such payment was due and payable until the date on which payment in full (including interest due hereunder) is received by Landlord.  Landlord's rights under this Section shall be in addition to, and not in limitation of, all other rights and remedies available to Landlord on account of Tenant's failure to make timely payment to Landlord.

23

4.5    Payment of Additional Rent. Unless otherwise expressly provided in this Lease, payments of Additional Rent shall be due within fifteen (15) days after written request or demand therefor by Landlord, provided that such request or demand is accompanied by such supporting documentation (if any) as is required by the applicable provision of this Lease.

## ARTICLE 5

## REAL ESTATE TAXES

5.1    Tenant's Obligation to Pay Taxes.    Commencing on the Basic Rent Commencement Date, Tenant shall pay or cause to be paid directly to the appropriate taxing authority having jurisdiction (with a copy to Landlord), prior to the date on which the same must be paid without becoming delinquent, the Real Estate Taxes assessed against the Premises for any tax year. All Real Estate Taxes for tax years or other periods in which the Lease Term (excluding the Interim Lease Term) shall begin and end shall be apportioned so that Tenant shall pay only those portions thereof which correspond with the portions of such tax years or other periods as fall within the Lease Term (excluding the Interim Lease Term). Tenant shall pay all interest and penalties imposed upon the late payment of any Real Estate Taxes which it is obligated to pay hereunder. Tenant shall furnish to Landlord official receipts of the appropriate taxing authority, or other evidence reasonably satisfactory to Landlord evidencing the payment of all Real Estate Taxes, within thirty (30) days after the date on which any such Real Estate Taxes would become delinquent. Tenant shall take no action, nor omit to take any action, which would allow a lien for unpaid Real Estate Taxes to attach to the Premises or any portion thereof. If Tenant fails to pay Real Estate Taxes within the time required hereunder, Landlord shall have the right, but not the obligation, to make such payment, and Tenant shall then pay to Landlord upon demand, as Additional Rent, the amount so paid by Landlord. At any time after the occurrence of a default by Tenant of its obligation under this Section 5.1 (without regard to whether or not such default is timely cured by Tenant), Landlord may, upon written notice to Tenant, require Tenant to make monthly payments in the amount of one-twelfth of Real Estate Taxes payable for the Premises, which amounts shall be paid to Landlord at the same time and in the same manner as payments of Basic Rent hereunder and which amounts shall be paid by Landlord to the taxing authority on account of Real Estate Taxes when such payment is due and payable (and Tenant shall pay to Landlord as Additional Rent, within five (5) Business Days after demand by Landlord, any shortfall in such amount required then to be paid to the taxing authority). Landlord shall not be required to hold any amounts so paid to it by Tenant in escrow or in a separate account, and may commingle the same with other funds of Landlord.

5.2    Tax Bills and Information. Tenant shall make reasonable efforts to cause each taxing authority to send bills for Real Estate Taxes directly to Tenant from and after the Basic Rent Commencement Date (and upon written request by Tenant, Landlord shall request in writing each taxing authority to do so). If the taxing authority shall elect to send the bill for Real Estate Taxes to Landlord (rather than to Tenant), then Landlord shall promptly furnish a copy thereof to Tenant. Landlord and Tenant shall each promptly furnish to the other party copies of all tax notices and assessments received by such party with respect to the Premises.

24

5.3    Installment Payments.    If any Real Estate Tax imposed on the Premises may be paid in installments in accordance with applicable law, Tenant shall be entitled to make payments on account thereof based on the assumption that Landlord has elected to pay that Real Estate Tax in equal installments over the longest time permitted by law (whether or not Landlord has in fact made such an election), and only those installments (or partial installments) attributable to installment periods (or partial periods) falling within the Lease Term (excluding the Interim Lease Term) shall be the obligation of Tenant hereunder.

5.4    Abatements; Contests by Tenant.    Tenant may seek a reduction in the valuation of the Premises (including, without limitation, the Improvements) assessed for tax purposes, and may contest in good faith by appropriate proceedings, at Tenant's expense, the amount or validity in whole or in part of any Real Estate Taxes, and may defer payment thereof if allowed by law, provided that:

(a)    if such payment is deferred, Tenant shall provide Landlord with security reasonably satisfactory to Landlord to assure payment of contested items;

(b)    Tenant shall immediately pay such contested item or items if the protection of the Premises or Landlord's interest in this Lease from any lien or claim shall, in the reasonable judgment of Landlord, require such payment, or if deferring such payment shall subject Landlord to possible criminal prosecution; and

(c)    Landlord shall not be required to join in any proceedings referred to herein unless the provisions of any Legal Requirement at the time in effect shall require that such proceedings be brought by or in the name of Landlord.  Landlord shall not be subjected to any liability for the payment of any costs or expenses in connection with any such proceedings, and Tenant shall indemnify and save harmless Landlord from any such costs and expenses.

Subject to the foregoing, and without cost to it, Landlord shall execute and deliver any appropriate papers which may be necessary to permit Tenant so to contest any valuation or Real Estate Tax and shall further reasonably cooperate with Tenant in such contest, as Tenant may from time to time reasonably request.  Notwithstanding the foregoing, in the event that Landlord incurs any costs or expenses in connection with any such abatement or contest, Tenant shall reimburse the same to Landlord as Additional Rent.


ARTICLE 6

CONSTRUCTION OF IMPROVEMENTS

6.1    Improvements Generally.    All Improvements to be constructed by or on behalf of Tenant on the Land (i) shall not interfere with Landlord's access to, or the operation and maintenance of, the Monitoring Wells and Recovery System, as the same may be modified in accordance with the provisions of this Lease; and (ii) shall not violate the Consent Decree.  All demolition work on the Land, and all construction of the Improvements, shall be performed in a good and workerlike manner, and in accordance with all applicable Legal Requirements and

25

Insurance Requirements. Construction (including staging and laydown areas) shall be performed in such a manner so as not to interfere with the operation of the Monitoring Wells and Recovery System or Landlord's access thereto at all times, as the same may be modified in accordance with the provisions of this Lease. Landlord shall have reasonable access to and the right to inspect the construction of the Improvements, upon reasonable prior notice to Tenant, for the purpose of confirming that such construction is proceeding in accordance with the provisions of this Lease.

6.2    Construction of the Initial Improvements. (a)    Notwithstanding any other provision of this Lease to the contrary, Tenant shall not be obligated to commence construction of the Initial Improvements; *provided, however,* that if Tenant has not commenced construction of the Initial Improvements within ninety (90) days after the Construction Commencement Date, Landlord shall have the right (but not the obligation) to terminate this Lease by giving written notice of termination to Tenant within one hundred twenty (120) days after the Construction Commencement Date. Such notice when given by Landlord shall be effective to terminate this Lease ninety (90) days after the same is given unless, within sixty (60) days after such notice is given, Tenant commences construction of the Initial Improvements and thereafter diligently prosecutes the same to completion in accordance with the provisions of this Lease. If Landlord's notice of termination is not so negated by Tenant, then upon the 90th day after such notice is given this Lease shall terminate with the same force and effect as if the date of such termination was the last day of the Lease Term, and the provisions of Section 3.2.6 above shall apply.

(b)    If Tenant commences construction of the Initial Improvements Tenant shall, subject to delays caused by Force Majeure, thereafter diligently and continuously prosecute construction thereof so as to achieve completion thereof (including fixturing and stocking the building(s) with inventory) by the last day of the Construction Period; *provided, however,* that the office portion of the Initial Improvements need not be finished beyond so-called "shell and core" condition. The Initial Improvements shall be constructed in accordance with the Development Plan as approved by Landlord and the Initial Approvals, and the provisions of Section 6.1 shall apply to such construction. Before the commencement of construction of the Initial Improvements on the Premises, Tenant shall have (i) obtained from the City of Woburn a building permit for the construction of the Initial Improvements; and (ii) delivered to Landlord fully-executed originals of a payment bond and a performance bond, each in an amount equal to 100% of the cost of construction (as evidenced by a fully-executed fixed price or guaranteed maximum price construction contract), naming Landlord as an obligee, in form reasonably satisfactory to Landlord and issued by a surety reasonably satisfactory to Landlord.

6.3    Construction Period Insurance.    During the period of construction of any Improvements, in addition to the insurance required to be maintained by Tenant pursuant Article 8 below, Tenant shall require each of its contractors and subcontractors to carry general liability, workers' compensation, automobile, and umbrella insurance coverage as specified by Landlord from time to time, with at least the following limits: (i) $2,000,000 general liability, including Premises liability and products and completed operations (except that in the case of

26

subcontractors, a $1,000,000 limit will be sufficient); (ii) workers' compensation insurance as required by law; (iii) $500,000/$500,000/$500,000 employers' liability insurance; (iv) $1,000,000 automobile liability insurance; and (v) $3,000,000 umbrella liability insurance (except that in the case of subcontractors, a $1,000,000 limit will be sufficient).

6.4     Ownership of Improvements.  During the Lease Term, title to the Improvements (if any are constructed) shall be vested in Tenant, subject to this Lease, but Landlord shall retain title to the Existing Improvements and to the Monitoring Wells and Recovery System as modified from time to time in accordance with the provisions of this Lease.  Tenant shall be entitled to any depreciation deductions and investment tax credits on the Improvements (if any are constructed) for income tax purposes.  Upon the expiration or earlier termination of this Lease, at Landlord's election, title to the Improvements (if any are constructed) shall immediately and automatically vest in Landlord and shall be surrendered at that time in accordance with Section 17.1.  No further deed or instrument shall be required to confirm such vesting in Landlord, but upon the request of Landlord, Tenant shall execute, acknowledge and deliver to Landlord a deed confirming that all of Tenant's right, title and interest in the Premises has expired and that title to the Improvements has vested in Landlord.

## ARTICLE 7

## REPAIRS, MAINTENANCE AND ALTERATIONS

7.1     Repair and Maintenance.  Throughout the Lease Term, Tenant, at its sole cost and expense, shall keep the Building and all other Improvements erected on the Premises (including, without limitation, all elevators, electrical systems, sanitary facilities, plumbing, and other building systems and other equipment and appurtenances, and all parking areas, drainage systems, exterior lighting systems, driveways, sidewalks, and curbs, but excluding the Monitoring Wells and Recovery System), in compliance with all Legal Requirements.  Tenant shall make all necessary repairs thereto, interior and exterior, structural and non-structural, ordinary and extraordinary, and foreseen and unforeseen.  As used in this Lease, the term "repair" shall include replacement.  Except as provided in Section 11.11 hereof with respect to the Monitoring Wells and Recovery System, Landlord shall not be obligated to make any repairs, or replacements of any kind, nature, or description, whatsoever, to the Premises or any Building or Improvements thereon unless such repair or replacement is made necessary solely by Landlord's act, omission or negligence. Tenant shall maintain all exterior portions of the Improvements free of dirt, rubbish, snow and ice and shall properly dispose of such dirt, rubbish, snow and ice. Except as provided in Section 11.11 below with respect to the Monitoring Wells and Recovery System, Tenant shall also comply with and abide by all Legal Requirements and Insurance Requirements affecting the Premises, the Improvements thereon, or any activity or condition on or in the Premises, including, without limitation, the making of any repairs, alterations, or installations that may be necessary in order to comply with the same. Until such time as Landlord commences the demolition of the Existing Improvements in accordance with the terms of this Lease, the provisions of this Section shall apply to the Existing Improvements.

27

7.2     Alterations.  After the construction of the Initial Improvements is completed, Tenant shall have the right at any time and from time to time to make alterations, changes, replacements, improvements or additions to the Improvements, whether structural or non-structural, including, without limitation, the demolition and removal of the Improvements, without Landlord's permission but subject to compliance with the provisions of this Lease, as well as all Environmental Approvals and all applicable Legal Requirements and Insurance Requirements.

## ARTICLE 8

## INSURANCE AND INDEMNITY

8.1     Casualty Insurance.

8.1.1  *All Risk.*  Tenant, at its sole cost and expense, shall keep in full force and effect casualty insurance on the Improvements located on the Premises in amounts not less than 100% of the full replacement cost thereof (except with respect to flood and earthquake coverages, for which there may be a sub-limit of $50,000.00), without deduction for depreciation and with deductible amounts as approved by Landlord, insuring against all risks of direct physical loss or damage as may from time to time be included within the definition of an "All Risk" or "Broad Form" insurance policy and extended to include coverage against earthquake, earth movement, collapse, flood (including back-up of sewers and drains), sprinkler leakage, breakdown of boilers, machinery and electrical equipment, lightning, wind storm, hail, explosion, vandalism and malicious mischief, riot, civil commotion, aircraft, vehicles, smoke, and such other risks (to the extent obtainable on commercially reasonable terms) as an institutional lender would customarily require on a property comparable in size, use, nature and condition to the Improvements.  The insurance also shall cover increased cost of construction, demolition and debris removal coverage, and contingent liability arising out of the enforcement of building laws and ordinances governing repair and reconstruction and shall include an agreed-amount provision.  The replacement cost of the Building and the other Improvements shall be determined at least once every thirty-six (36) months by an experienced insurance adjuster mutually acceptable to Landlord and Tenant.  Until such time as Landlord commences the demolition of the Existing Improvements in accordance with the terms of this Lease, Landlord shall maintain insurance on the Existing Improvements in coverages and with limits as determined by Landlord.

8.1.2  *Builder's Risk.*  During construction of the Initial Improvements, and during any subsequent construction or alteration of the Building or other Improvements, Tenant shall also keep in full force and effect (or require its contractors to keep in full force and effect), at its sole cost and expense, such endorsements to its "All Risk" policies or such additional policies as are necessary to maintain broad form "builder's risk" insurance coverage against loss or damage to the Improvements on a completed value non-reporting basis.

8.2     Liability Insurance.  Tenant shall maintain, for the mutual benefit of Landlord and Tenant, and naming each of Landlord and the holder of mortgage on Landlord's fee interest as an

28

additional insured, (i) commercial general liability insurance (including contractual liability coverage and a broad form endorsement) against claims for personal injury, death and property damage occurring upon, in or about the Premises, and on, in or about the adjoining sidewalks and access ways or other areas appurtenant to the Premises (including, without limitation, personal injury, death, and property damage resulting directly or indirectly from any change, alteration, improvement or repair thereof) with a combined single limit as of the Term Commencement Date in the amount of $5,000,000.00 for bodily injury and death and for property damage, and with deductible amounts not to exceed $100,000 or as otherwise approved in writing by Landlord; and (ii) umbrella liability insurance with a combined single limit as of the Term Commencement Date of not less than $5,000,000.00 for bodily injury and death and for property damage. Tenant shall at all times maintain underlying liability insurance with limits sufficient to satisfy the underlying insurance limits required by the umbrella liability insurance policy. The liability limits set forth above (as adjusted) shall be reviewed after every fifth year of the Lease Term by Landlord and Tenant and shall be increased at such intervals if such increases are reasonably necessary to reflect inflation or changes in the nature or degree of risks insured.

8.3 <u>Worker's Compensation; Employer's Liability Insurance</u>. Tenant shall maintain (a) worker's compensation insurance, with coverage at least equal to statutory limits, and (b) employer's liability insurance with a limit not less than $1,000,000 each accident.

8.4    <u>Other Insurance</u>. Tenant shall also maintain such other insurance in such coverages and amounts as may from time to time be reasonably required by Landlord insuring Landlord, Tenant and the holder of a mortgage on Landlord's fee interest against other insurable hazards which at the time are ordinarily and customarily insured against in the case of commercial buildings in the greater Boston area of comparable size, use, and location. Notwithstanding the provisions of the preceding sentence, Landlord shall not change the required insurance coverages or amounts during the first five (5) years after the date of this Lease.

8.5    <u>Insurance Carriers, Policies</u>. All insurance provided for in this Article 8 shall be effected under valid and enforceable policies, issued by insurers licensed and doing business in Massachusetts and having a so-called Best's Rating of "A:X" or better, or, if such rating is no longer issued, an equal or better rating by a successor insurance carrier rating service reasonably acceptable to Landlord. Upon the execution of this Lease, and thereafter not less than thirty (30) days prior to the expiration dates from time to time of the policies required pursuant to this Article 8, certificates of such insurance and evidence reasonably satisfactory to Landlord of the payment of premiums therefor shall be delivered by Tenant to Landlord.

Nothing in this Article 8 shall prevent Tenant from taking out insurance of the kind and in the amounts required by this Article under a blanket insurance policy or policies covering other properties as well as the Premises, *provided, however,* that any such policy or policies of blanket insurance (i) shall specify therein, or in a written statement from the insurers under such policy or policies, the amount of the total insurance allocated to the Premises, which amounts shall not be less than the amounts required by Sections 8.1, 8.2, 8.3 and 8.4 hereof, and (ii) such amounts so specified shall be sufficient to prevent any of the insureds from becoming a co-insurer within the terms of the applicable policy or policies, and provided further, however,

29

that any such policy or policies of blanket insurance shall otherwise comply as to endorsements and coverage with the provisions of this Article 8.

8.6    Adjustment.  All policies of insurance provided for in Section 8.1 hereof shall name Landlord, Tenant, the holder of a mortgage on Landlord's fee interest, and any Permitted Leasehold Mortgagee as the insureds as their respective interests may appear, and shall be primary to any policies of insurance maintained by Landlord.  Every loss insured under a policy of insurance maintained by Tenant shall be adjusted and settled promptly by Tenant (including, without limitation, any Permitted Leasehold Mortgagee if named as an insured on any such insurance policy as permitted by this Lease) and the insurer.  Each such policy shall, to the extent obtainable on commercially reasonable terms, contain a provision that no act or omission of Tenant or any sublessee, guest, licensee, operator, or other occupant shall affect or limit the obligation of the insurance company so to pay the amount of any loss sustained.

8.7    Non-cancellation.  Each policy or certificate issued by an insurer shall contain an agreement by the insurer that such policy shall not be canceled, non-renewed or materially modified without at least thirty (30) days' prior written notice to Landlord and to any mortgagee named therein.

8.8    Waiver of Subrogation.  Landlord and Tenant hereby each waive all rights of recovery against the other or against the officers, employees, agents and representatives of the other, on account of loss or damage occasioned to such waiving party or its property or the property of others under its control to the extent that such loss or damage is insured against under any property (casualty) insurance policies which either may have in force at the time of such loss or damage. Each party shall, upon obtaining policies of insurance relating to the Premises which permit the aforesaid waiver, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Lease, and each party shall endeavor to cause each such insurance policy obtained by it to provide that the insurance company waives all right of recovery by way of subrogation against either Landlord or Tenant in connection with any damage covered by any such policy, at the sole cost of the party for whose benefit such waiver is sought.

8.9    Tenant's Indemnification.  Subject to the provisions of Section 8.8 above, Tenant shall indemnify and save Landlord harmless against and from all liabilities, obligations, damages, penalties, claims, costs, charges and expenses, including architects', engineers' and attorneys' fees, court costs and other costs of defense, settlement and judgments (all of which shall be reasonable in amount or as otherwise established in a final non-appealable judgment entered by a court of competent jurisdiction), which may be imposed upon or incurred by or asserted against Landlord arising out of or by reason of any of the following occurrences during the Lease Term:

(a)    any work or thing done in, on or about the Premises or any part thereof by Tenant or any of its subtenants or licensees, or any employees, contractors, agents, servants, guests, operators or invitees of any of the foregoing;

(b)    any use, non-use, possession, occupation, condition, operation, maintenance or management of the Premises or any part thereof including any sidewalk,

30

curb or other area appurtenant to the Premises which, if outside the Premises, is under the control of Tenant, by Tenant or any of its subtenants or licensees, or any employees, contractors, agents, servants, guests, operators or invitees of any of the foregoing;

(c)    any negligence on the part of Tenant or any of its subtenants or licensees, or any employees, contractors, agents, servants, guests, operators, or invitees of any of the foregoing; and

(d)    any loss, theft, accident, injury or damage to any person or property occurring in, on or about the Premises or any part thereof, including any sidewalk, curb or other area appurtenant to the Premises which, if outside the Premises, is under the control of Tenant or any of its subtenants or licensees, or any employees, contractors, agents, servants, guests, operators or invitees of any of the foregoing.

Nothing herein contained shall require Tenant to indemnify and save harmless Landlord with respect to any liabilities, obligations, damages, penalties, claims, costs charges and expenses which may be imposed upon or incurred by or asserted against Landlord arising out of the negligence or willful act or omission of Landlord or its employees, contractors, agents, servants, guests, licensees, operators or invitees.

In case any action or proceeding is brought against Landlord by reason of any claim arising out of any of the occurrences which Tenant is required, pursuant to the terms of this Section, to indemnify and save Landlord harmless against and from, Tenant upon written notice from Landlord shall at Tenant's expense defend such action or proceeding using legal counsel reasonably satisfactory to Landlord.

The foregoing express obligation of indemnification shall not be construed to negate or abridge any other obligation of indemnification running to Landlord which would exist at common law or under any other provision of this Lease, and the extent of the obligation of indemnification shall not be limited by any provision of insurance undertaken in accordance with this Article 8. The provisions of this Section 8.9 shall survive the termination or expiration of this Lease but only with respect to claims which both (i) arose prior to the effective date of such termination or expiration and (ii) of which Tenant has received written notice not later than three (3) years after such termination or expiration.

8.10    Landlord's Indemnification.

Subject to the provisions of Section 8.8, above, Landlord shall indemnify and save Tenant harmless against and from all liabilities, obligations, damages, penalties, claims, costs, charges and expenses, including architects', engineers' and attorneys' fees, court costs and other costs of defense, settlement and judgments (all of which shall be reasonable in amount or as otherwise established in a final non-appealable judgment entered by a court of competent jurisdiction), which may be imposed upon or incurred by or asserted against Tenant:

(a)    arising out of or by reason of any work or thing done in, on or about the Premises or any part thereof during the Lease Term by Landlord or any of its employees, contractors, agents, servants or operators; and

31

(b)    to the extent caused by negligence during the Lease Term on the part of Landlord or any of its employees, contractors, agents, servants or operators.

Nothing herein contained shall require Landlord to indemnify and save harmless Tenant with respect to any liabilities, obligations, damages, penalties, claims, costs charges and expenses which may be imposed upon or incurred by or asserted against Tenant arising out of the negligence or willful act or omission of Tenant or its employees, contractors, agents, servants, guests, licensees, operators or invitees.

In case any action or proceeding is brought against Tenant by reason of any claim arising out of any of the occurrences which Landlord is required, pursuant to the terms of this Section, to indemnify and save Tenant harmless against and from, Landlord upon written notice from Tenant shall at Landlord's expense defend such action or proceeding using legal counsel reasonably satisfactory to Tenant.

The foregoing express obligation of indemnification shall not be construed to negate or abridge any other obligation of indemnification running to Tenant which would exist at common law or under any other provision of this Lease, and the extent of the obligation of indemnification shall not be limited by any provision of insurance undertaken in accordance with this Article 8. The provisions of this Section 8.10 shall survive the termination or expiration of this Lease but only with respect to claims which both (i) arose prior to the effective date of such termination or expiration and (ii) of which Landlord has received written notice not later than three (3) years after such termination or expiration.

8.11    Tenant's Right to Self-Insure.Anything contained in this Article 8 to the contrary notwithstanding, the liability insurance which Tenant is obligated to carry pursuant to Section 8.2 above may be carried pursuant to a prudent self-insurance program; provided that Tenant gives prior written notice to Landlord of its intent to self-insure, together with (i) evidence in form and content reasonably acceptable to Landlord that Tenant or any of its Affiliates has a net worth of at least $100,000,000 in the equivalent of year 2005 dollars (the "Threshold Net Worth") (which evidence may be in the form of a certification letter addressed to Landlord from a duly authorized officer of such Affiliate possessing the Threshold Net Worth), and (ii) a written undertaking in form and content reasonably acceptable to Landlord addressed to Landlord and signed by a duly authorized officer of such Affiliate of Tenant setting forth such entity's agreement to provide such coverage in accordance with this Article 8. So long as Tenant continues to self-insure, Tenant shall provide to Landlord the written materials described in the preceding sentence not later than January 1 of each year during the Term. Landlord shall execute such reasonable confidentiality agreements with respect to the financial information so provided to Landlord as are reasonably requested by Tenant. Any self-insurance arrangements by Tenant shall be primary to any policies of insurance maintained by Landlord. If Tenant shall have properly elected to so self-insure and thereafter at any time during the Term the net worth of Tenant and such of its Affiliates as previously delivered the written materials described in the first sentence of this Section shall drop below the Threshold Net Worth, then Tenant shall, within fifteen (15) days thereafter, deliver to Landlord evidence of the insurance policies required under this Lease. If Tenant shall have properly elected to so self-insure and at any time during the Term thereafter Tenant decides to cease self-insuring, then Tenant shall promptly notify Landlord of such decision and shall further, not less than fifteen (15) days prior to the expiration

32

or termination of such self-insurance program, deliver to Landlord evidence of the insurance policies required under this Lease. If at any time during which Tenant has properly elected to so self-insure, Tenant fails to deliver the written materials described in the first sentence of this Section by January 1 of any calendar year, then the provisions of Section 16.1(b) shall apply. If Tenant shall elect to self-insure, in whole or in part, Tenant hereby recognizes and agrees to abide by the provisions of this Article 8 as if Tenant were carrying the insurance required by this Lease, to the extent of any such self-insurance or deductible maintained by Tenant.

## ARTICLE 9

### LIENS

9.1    <u>Construction Liens</u>. Tenant covenants that the construction of all Improvements, and all other work performed on the Premises, shall be at Tenant's sole cost and expense, and that it will permit no liens to be filed against the Premises. If any notice of contract or mechanic's, laborer's or materialman's lien shall at any time be filed that affects or purports to affect the Premises or any part thereof, with respect to the performance of any labor or the furnishing of any materials to, by or for Tenant or anyone claiming by, for or under Tenant, Tenant, within thirty (30) days after receiving notice of the filing thereof, shall cause the same to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction or otherwise. If Tenant shall fail to cause such lien to be discharged within the period aforesaid, then, in addition to any other right or remedy, Landlord may, but shall not be obligated to, discharge the same either by paying the amount claimed to be due or by procuring the discharge of such lien by deposit or by bond. Any amount so paid by Landlord and all costs and expenses actually incurred by Landlord in connection therewith, together with interest at the Default Rate from the respective date(s) of Landlord's making of the payment or incurring of the cost and expense, shall constitute Additional Rent payable by Tenant under this Lease.

9.2    <u>Contesting Liens</u>. Notwithstanding the foregoing, Tenant may contest, in good faith by appropriate proceedings, at Tenant's sole expense, the amount or validity in whole or in part of any mechanic's, laborer's or materialman's lien, and may defer the discharge of record thereof, provided that:

(a)    Tenant shall provide Landlord and/or the holder of a mortgage on Landlord's fee interest and/or Permitted Leasehold Mortgagees with reasonably satisfactory security to assure payment of contested items, which security shall be in the form of a bond or cash deposit in the maximum amount of such lien, fees, costs, and interest claimed to be owed;

(b)    Tenant shall immediately pay such contested item or items if the existence of such a lien constitutes a default under a mortgage on Landlord's fee interest or any Permitted Leasehold Mortgage;

(c)    Landlord shall not be required to join in any proceedings referred to herein unless the provisions of any applicable Legal Requirement shall require that such

33

proceedings be brought by or in the name of Landlord. Landlord shall not be subjected to any liability for the payment of any costs or expenses in connection with any such proceedings, and Tenant shall indemnify and save harmless Landlord from any such costs and expenses.

9.3    No Consent. The parties hereby acknowledge that, in performing any demolition or construction work on the Premises, Tenant is acting for its own benefit and account, and the parties expressly agree that Tenant will not be acting as Landlord's agent in performing any such work. The fact that Tenant may, in certain circumstances, be required to obtain Landlord's consent prior to commencing any such work is solely for the benefit of Landlord in determining whether such work will comply with the requirements of this Lease, and the granting of any such consent by Landlord shall not be construed to give rights to any other parties. Tenant shall require any contractor who performs any demolition or construction on the Premises to expressly acknowledge and agree to the provisions of this Section. Nothing in this Lease contained shall be deemed or construed in any way as constituting the consent or request of Landlord, express or implied, by inference or otherwise, to any contractor, subcontractor, laborer or materialman for the performance of any labor or the furnishing of any materials for any specific improvement, alteration to, or repair of the Premises or any part thereof.

9.4    All Other Liens. In addition to the foregoing, Tenant shall not directly or indirectly create or permit to be created or to remain, and shall discharge, any lien or encumbrance with respect to the Improvements, the Land, or Landlord's interest under the Lease, other than (a) this Lease, (b) liens for Real Estate Taxes not yet payable, or being contested as permitted by Section 5.4, (c) Permitted Leasehold Mortgages, (d) easements for utilities and services to the Premises which either (i) have been consented to by Landlord, or (ii) by their express terms expire upon the expiration or earlier termination of the Lease Term, or (e) the matters listed on **Exhibit B** attached hereto.


ARTICLE 10

USE OF PREMISES

10.1    Permitted Uses. Without hereby imposing any obligation on Tenant to commence construction of the Initial Improvements on the Land, once Tenant commences construction of the Initial Improvements, the provisions of Article 6 above shall apply and, in addition, within six (6) months following the completion of construction of the Initial Improvements, Tenant shall open and operate the Initial Improvements as a fully stocked and staffed retail store for not less than one week. Provided that Tenant has satisfied such obligation, Tenant shall thereafter have the right to use and permit the use of the Premises for any lawful purpose or for no purpose, *provided* that (i) no such use shall interfere at any time with Landlord's access to, or the operation, maintenance, repair or replacement of, the Monitoring Wells and Recovery System, as the same may be modified in accordance with the provisions of this Lease, and (ii) neither the Premises nor any portion thereof shall be used for any so-called "adult use", such as adult entertainment, massage parlor, or the sale or rental of any so-called "adult" material such as pornographic magazines, books, movies, photographs, or paraphernalia. Tenant shall not use nor

34

permit any portion of the Premises to be used or occupied in violation of the AUL or any Legal Requirement or Insurance Requirement, and shall not permit any condition to exist within the Premises which may be dangerous or which may constitute a nuisance (public or private).

10.2    Legal Requirements and Insurance Requirements.  Throughout the Lease Term, Tenant, at its expense, shall promptly comply with all applicable Legal Requirements and Insurance Requirements.  Any costs incurred by Landlord as a result of the failure by Tenant to comply with Legal Requirements or Insurance Requirements shall be reimbursed by Tenant to Landlord as Additional Rent.

10.3    Contests.  Tenant shall have the right, after ten (10) days' prior written notice to Landlord, to contest by appropriate legal proceedings diligently conducted in good faith, in the name of Tenant, without cost or expense to Landlord, the validity or application of any Legal Requirement, subject to the following:

(a)    if, by the terms of any such Legal Requirement, compliance therewith pending the prosecution of any such proceeding may legally be delayed without the incurring of any lien, charge or liability of any kind against the Premises or any part thereof and without subjecting Tenant or Landlord to any liability, civil or criminal, for failure so to comply therewith, Tenant may delay compliance therewith until the final determination of such proceeding;

(b)    if any lien, charge or civil liability would be incurred by reason of any such delay, Tenant nevertheless may contest as aforesaid and delay as aforesaid, provided that such delay would not subject Landlord to criminal liability or fine, and provided that Tenant (i) furnishes to Landlord security, reasonably satisfactory to Landlord, against any loss or injury by reason of such contest or delay, and (ii) prosecutes the contest with due diligence; and

(c)    Tenant shall not delay such compliance if such delay would constitute a default under a mortgage on Landlord's fee interest or under any Permitted Leasehold Mortgage.

Subject to the foregoing, and without cost to it, Landlord shall execute and deliver appropriate papers which are reasonably necessary to permit Tenant to contest any such Legal Requirement and shall further reasonably cooperate with Tenant in such contest, as Tenant may from time to time reasonably request.


ARTICLE 11

ENVIRONMENTAL


11.1    Additional Definitions.  As used in this Lease, the following terms shall have the meanings set forth below:

00050211.DOC / 10

(a)    "Claims" means, collectively, all claims, acts, debts, demands, actions, causes of action, suits, damages, losses, obligations, costs, expenses, penalties, fines, response actions, fees (including, without limitation, attorneys', consultants', contractors' and experts' fees and expenses) and liabilities of every name and nature whatsoever, both at law and in equity, known or unknown, existing and future, contingent or otherwise, including any action or proceeding, brought or threatened, or ordered by governmental authorities, in each case on account of damage to persons or property or natural resources, but excluding claims for economic losses, consequential damages and damages for loss of use or lost profits.

(b)    "Environmental Reports" means, collectively, the materials set forth on **Exhibit E** attached hereto.

(c)    "Existing Materials" shall mean all Hazardous Materials existing in the soil or in the groundwater in or under the Land as of the date of this Lease including, without limitation, the Known Existing Materials and the Sub-Slab Existing Materials, *but specifically excluding* (i) any Hazardous Materials which were placed there or became present there prior to the date of this Lease by the act or omission of Tenant, or any of its employees, agents, tenants, invitees, or contractors of any tier working on behalf of Tenant, or (ii) any Hazardous Materials which first become present there after the date of this Lease.

(d)    "Known Existing Materials" shall mean those Existing Materials which are identified in the Environmental Reports.

(e)    "Other Materials" shall mean Hazardous Materials in the soil or in the groundwater under the Land which either (i) were first placed there or first became present there either on or prior to the date of this Lease by the act or omission of Tenant, or its employees, agents, tenants, invitees, or contractors of any tier working on behalf of Tenant, or (ii) are first placed there or first become present there after the date of this Lease by any means or cause other than the act or omission of Landlord or any of its employees, agents, invitees or contractors of any tier working on behalf of Landlord.

(f)    "Sub-Slab Existing Materials" shall mean all Hazardous Materials existing as of the date of this Lease in the soil or in the groundwater beneath the slab of any one or more of the existing buildings on the Land.

(g)    "Unknown Existing Materials" shall mean all Existing Materials not identified in the Environmental Reports.

11.2    Existing Materials.

(a)    Tenant acknowledges that the Land contains (or at one time contained) the Known Existing Materials and may contain Unknown Existing Materials, and agrees to accept possession of the Premises in accordance with the provisions of this Lease subject to the presence of such Existing Materials. Without limiting the generality of the foregoing, Tenant acknowledges and agrees that Tenant is not entitled to rely on any information in the Environmental Reports as any form of representation, warranty or

36

covenant, express or implied or statutory, by Landlord or any of Landlord's agents, attorneys, contractors or employees.

(b)    Promptly following Landlord's removal of the slabs of the existing buildings on the Land or any portion thereof, Landlord shall commence and thereafter conduct, at its sole cost and expense, testing of soil beneath the slab location(s) for the presence of Hazardous Materials. In the event that such testing demonstrates that Sub-Slab Existing Materials are present in such concentrations as to require remediation pursuant to applicable Environmental Laws to the level required by Environmental Laws for Tenant's intended use of the Premises for retail and office use with surface parking, Landlord shall proceed to perform the same at its sole cost and expense in accordance with the provisions of subsection (c) below.

(c)    Landlord is responsible, at its sole cost and expense, for all investigation and monitoring required by applicable Environmental Laws to be performed on the Land by reason of the Existing Materials, as well as for the remediation of all Existing Materials to the level required by Environmental Laws for Tenant's intended use of the Premises for retail and office use with surface parking. All investigations and remediation activities on the Land for which Landlord shall be responsible hereunder shall be under the exclusive control of Landlord. Tenant shall cooperate to the extent reasonably requested (at no expense to Tenant) with Landlord, EPA, MADEP, and other governmental authorities having jurisdiction and their consultants, contractors and subcontractors, successors and assigns in the implementation of remediation, if any may be required, and shall provide access to the Land within two (2) Business Days after request (however, no notice shall be required in the event of an emergency or when such access is required on an immediate basis by any governmental authority having jurisdiction thereof or in order for Landlord to comply with Environmental Laws). Subject to the requirements of governmental authorities having jurisdiction thereof or of Environmental Laws, Landlord shall conduct its investigations and remediation activities on the Land so as not to unreasonably interfere with Tenant's development or use of the Land or access to the Land.

(d)    Subject to the provisions of this Lease, Landlord shall indemnify, defend and hold harmless Tenant (including its directors, officers, managers, members, partners, beneficial owners, shareholders, employees and agents), and Permitted Leasehold Mortgagees, and its and their successors and assigns, from and against any and all Claims resulting from, related to or arising out of (i) the migration from the Land of Existing Materials occurring either prior or subsequent to the date of this Lease; or (ii) Landlord's violation of the terms and provisions of the Consent Decree; or (iii) the presence in, on or under the Land of the Unknown Existing Materials, including, without limitation, Claims by any subtenant, licensee or other occupant of the Premises, or any of their respective employees, agents, invitees, or contractors; *provided, however,* that Landlord's obligations under this clause (iii) shall not apply to the extent to which such Claims result from, relate to or arise out of the failure by Tenant, or any subtenant, licensee or other occupant of the Premises, or any of their respective employees, agents, invitees, or contractors, to comply with the provisions of any AUL imposed upon the Land by Landlord in accordance with the provisions of this Lease (without hereby imposing any obligation on Landlord to impose an AUL on the Land or any portion thereof).

37

(e)     Tenant assumes all risks, liabilities and costs resulting from, related to or arising out of contact with or exposure to the Existing Materials by Tenant, or its employees, agents, invitees or contractors, occurring on the Land in connection with the investigations of the Land performed by Tenant prior to the date of this Lease.

(f)     Subject to the provisions of this Lease, Tenant shall indemnify, defend and hold harmless Landlord (including its directors, officers, managers, members, partners, beneficial owners, shareholders, employees and agents), and the holder of a mortgage on Landlord's fee interest, and its and their successors and assigns, from and against any and all Claims resulting from, related to or arising out of:

(i)     the presence in, on, or under the Land as of the date of this Lease of the Known Existing Materials where such Claims are brought by Tenant or anyone claiming by, through or under Tenant, or any employees, contractors, agents, servants, guests, operators or invitees of any of the foregoing (collectively, the "Tenant Claimants"), or any other third parties, *but excluding:* (1) Claims resulting from, related to, or arising out of exposure to Known Existing Materials occurring prior to (and not after) the Demolition Completion Date (but this exclusion (1) shall not apply to Claims brought by any of the Tenant Claimants), (2) Claims brought by Landlord or anyone claiming by, through or under Landlord (other than Tenant Claimants), or any employees, contractors, agents, servants, guests or operators of any of the foregoing, and (3) Claims for remediation or removal of Known Existing Materials; or

(ii)     the failure by any Tenant Claimant to comply with the provisions of the Environmental Approvals, Tenant's Environmental Agreements, and any AUL imposed upon the Land by Landlord in accordance with the provisions of this Lease (without hereby imposing any obligation on Landlord to impose an AUL on the Land or any portion thereof);

*provided, however,* that Tenant's indemnity, defense and hold harmless obligations under this subsection (f) shall not apply to Claims arising out of Landlord's violation of the terms and provisions of the Consent Decree.

(g)     Landlord shall have the right, but not the obligation, as part of its remediation efforts with respect to the Existing Materials, to impose an AUL on the Land or such portions thereof as Landlord deems appropriate, in accordance with the provisions of the MCP; *provided, however,* that any such AUL shall be subject to the approval of Tenant (which approval shall not be unreasonably withheld, delayed or conditioned), be consistent with the Development Plan, and shall not restrict the use of the Land and the Building for retail and office use with surface parking. All costs associated with preparing and recording any AUL pursuant to this subsection (g) and all associated plans shall be borne solely by Landlord. The provisions of this subsection (g) shall not apply to any AUL that is included in the Environmental Approvals.

38

11.3    Other Materials; Tenant's Activities.

(a)    Except as otherwise provided in subsections (b) and (c) below, Tenant shall bear all risks, liabilities and costs resulting from, related to or arising out of the presence of Other Materials, and shall be responsible, at its sole expense, for all investigation and monitoring required by applicable Environmental Laws to be performed on the Land by reason of the presence of the Other Materials, as well as for the remediation of all Other Materials to the level required by Environmental Laws for Tenant's intended use of the Premises. All remediation activities on the Land for which Tenant shall be responsible shall be coordinated with, and shall be subject to the prior written approval of, Landlord, which approval shall not be unreasonably withheld, delayed or conditioned, but which approval shall not be required to be given unless and until MADEP and EPA have given their approval, if required.    Landlord and Tenant shall cooperate to the extent reasonably requested (at no expense to each other) with each other and with EPA, MADEP and other governmental authorities having jurisdiction and their consultants, contractors and subcontractors, successors and assigns in the implementation of remediation, if any may be required, and shall provide access to the Land within two (2) Business Days after request (however, no notice shall be required in the event of an emergency or when such access is required on an immediate basis by any governmental authority having jurisdiction thereof).

(b)    Subject to the provisions of this Lease, Tenant shall indemnify, defend and hold harmless Landlord (including its directors, officers, managers, members, partners, beneficial owners, shareholders, employees and agents), and the holder of a mortgage on Landlord's fee interest, and their respective successors and assigns, from and against any and all liability for Claims resulting from, related to or arising out of (i) the presence in, on or under the Land as of the date of this Lease of any Other Materials which were placed there or first become present there by the act or omission of Tenant, or its employees, agents, tenants, invitees, or contractors of any tier working on behalf of Tenant, (ii) the presence in, on or under the Land after the date of this Lease of any Other Materials, (iii) the migration from the Land of Other Materials occurring subsequent to the date of this Lease, (iv) contact with or exposure to the Known Existing Materials by Tenant, or its employees, agents, invitees or contractors, occurring on the Land in connection with investigations of the Land performed by Tenant prior to the date of this Lease, or (v) Tenant's failure to perform the obligations on its part to be performed or observed under this Lease; *provided, however,* that Tenant's obligations under this subsection (b) shall not apply to the extent to which such Claims result from, relate to or arise out of the release of Other Materials by the act or omission of Landlord, its employees, agents, invitees, or contractors.

(c)    Subject to the provisions of this Lease, Landlord shall indemnify, defend and hold harmless Tenant (including its directors, officers, managers, members, partners, beneficial owners, shareholders, employees and agents), and Permitted Leasehold Mortgagees, and their respective successors and assigns, from and against any and all Claims resulting from, related to or arising out of the presence in, on or under the Land after the date of this Lease of any Other Materials, or the migration from the Land of Other Materials occurring subsequent to the date of this Lease, in each case to the extent to which such Claims result from, relate to or arise out of the release of Other Materials by the act or omission of Landlord, its employees, agents, invitees, or contractors.

39

(d)    Notwithstanding anything to the contrary contained herein:

(i)    if Tenant excavates soil from the Land after the date of this Lease in connection with the installation, construction, repair, maintenance, replacement, addition to, improvement of, or expansion of, the Improvements, and in doing so incurs any additional costs of construction, installation, environmental analysis, or soil disposal (if required) because of the presence of Unknown Existing Materials, Landlord shall promptly reimburse Tenant for such additional costs upon presentation of reasonable supporting documentation of the additional costs so incurred by Tenant, provided that (1) Tenant shall notify the Landlord as soon as practicable (but in no event later than twenty-four (24) hours) after Tenant determines that any such additional costs will be or are likely to be incurred by Tenant, and (2) all such construction activities are performed in accordance with all Environmental Laws, the Environmental Approvals, Tenant's Environmental Agreements, and all restrictions imposed upon the Land pursuant thereto (including, without limitation, soil management plans); and

(ii)    with respect to any other excavation by Tenant, Tenant shall be solely responsible for all costs thereof (including, without limitation, any additional costs of construction, installation, environmental analysis, or soil disposal (if required)) required by reason of the presence of the Existing Materials or the Other Materials.

11.4    Conditions of Indemnification.

(a)    Promptly upon obtaining knowledge thereof, the indemnified party shall notify the indemnifying party of any claim or demand which gives rise to a right of indemnification under this Lease. All claims for indemnification submitted under this Article shall be submitted in writing, stating with reasonable specificity (to the submitting party's actual knowledge, to the extent known) the nature of the claim, the Hazardous Material in question, the location, whether such Hazardous Material was placed or first became present in the location identified in such claim before or after the date of this Lease (and the basis for such determination), the facts giving rise to the claim and the alleged basis for the claim, and the amount (to the extent then determinable) of liability for which indemnity is claimed.

(b)    The indemnifying party shall have the exclusive right and obligation to defend against any claim for which indemnity is being sought under this Lease, with counsel reasonably acceptable to the indemnified party. The indemnified party shall have the right to be represented by advisory counsel at such party's expense in any such action, suit or proceeding. The parties hereto agree to make available to each other, their counsel and consultants all information and documents reasonably available to them which relate to any proceedings or litigation which is the subject of any right of indemnity and the parties agree to render to each other such assistance as they may reasonably require of each other in order to ensure the proper and adequate defense of any such action, suit or proceeding.

40

(c)    The indemnification obligations of the parties under this Article shall survive the expiration or earlier termination of this Lease; *provided, however,* that any claim for indemnity that is not made in writing within five (5) years after the expiration or earlier termination of the Lease Term shall be deemed waived.

11.5    Performance of Remediation Work.

(a)    Each party shall, in the performance of all remediation work required to be performed by such party by the provisions of this Article, comply with all requirements of applicable Environmental Laws, the Environmental Approvals, and Tenant's Environmental Agreements, and cause such work to be performed in a good and workerlike manner. The party responsible for the performance of such remediation work hereunder shall be solely responsible for all costs and expenses incurred in connection therewith, shall obtain all necessary Governmental Approvals and give all applicable notices required by applicable Legal Requirements for such work, and shall provide copies of the same to the other party.  All remediation work shall be performed in accordance with schedules therefor provided by applicable Environmental Laws or by governmental authorities having jurisdiction thereof.

(b)    In addition to and not in any way in limitation of any other provision of this Lease concerning insurance, the party responsible for the performance of remediation work hereunder shall maintain or shall cause its consultants and/or contractors to maintain insurance for such work written through a financially sound and responsible insurance company authorized to do business in the Commonwealth of Massachusetts for the following types of insurance: Professional Liability/Errors and Omissions Insurance and Contractors Pollution Legal Liability Insurance, including coverage for environmental contamination, response costs, bodily injury, and property damage arising out of the acts, errors or omissions of the party responsible for performing such work and/or its contractors, agents or employees in the performance of such work. The limits of liability of such insurance shall be $2,000,000.00 combined single limit, and Tenant and Landlord shall be additional insureds.  Certificates concerning such insurance shall be provided by the party responsible for the performance of remediation work hereunder to the other party prior to the commencement of such remediation work.

(c)    Upon request of the other party, the party responsible for the performance of remediation work hereunder shall cause its consultants and contractors to provide reliance letters or the reasonable equivalent of the same to the other party with respect to any and all documentation prepared for such party's reliance and concerning any Hazardous Materials that may be present at, in, on, under, or near the Premises

(d)    Each party shall provide reasonable cooperation to the other so as to permit the other party to perform remediation work required hereunder, including, without limitation, reasonably cooperating with respect to the preparation and submission of filings or reports required pursuant to the MCP or the Consent Decree, provided that such cooperating party shall not incur any out-of-pocket costs in connection with such cooperation.

41

11.6    Tenant's Additional Obligations.

(a)    Tenant shall observe, obey and cause its subtenants, licensees, and other occupants of the Premises, and the employees, agents, invitees, or contractors of each of the foregoing, to observe and obey all Environmental Laws applicable to the Premises or their operations therein, to comply with the Environmental Approvals and Tenant's Environmental Agreements, and to immediately remediate any spill or other release relating to their operations therein.

(b)    Tenant shall promptly notify Landlord in writing should Tenant become aware of (i) any release or threat of release of Hazardous Materials for which any Environmental Law requires notification to be given to any governmental authority, or any violation of Environmental Laws, with respect to the Premises or any real property adjoining or in the vicinity of the Premises; (ii) any violation of the Environmental Approvals or Tenant's Environmental Agreements; (iii) any notice given to Tenant from any occupant of the Premises or any notice from any governmental authority with respect to any release or threat of release of Hazardous Materials on the Premises; or (iv) the commencement of any litigation or any information relating to any threat of litigation relating to any alleged unauthorized release of any Hazardous Materials or other environmental contamination, liability or problem with respect to or arising out of or in connection with the Premises.

(c)    Tenant shall provide Landlord with copies of any notices of releases of Hazardous Materials which are given by or on behalf of Tenant to any federal, state or local agencies or authorities with respect to the Premises.  Tenant also shall provide Landlord with copies of any notices of responsibility or any other notices received by or on behalf of Tenant from any such agencies or authorities concerning any non-compliance with Environmental Laws, the Environmental Approvals, or Tenant's Environmental Agreements, on or about the Premises, including but not limited to notices regarding Hazardous Materials or substances located on or about the Premises.  In addition, in connection with any litigation or threat of litigation affecting the Premises, Tenant shall deliver to Landlord any documentation or records as Landlord may reasonably request and which are susceptible of being obtained by Tenant without undue cost or expense and without necessity of initiating legal proceedings to obtain the same, other than any documentation or records that, in the sole judgment of Tenant, are subject to the attorney-client privilege, the attorney work-product doctrine, or other applicable privilege or protection, and shall give written notice to Landlord of any subsequent developments.

11.7    Landlord's Additional Obligations.

(a)    Landlord shall observe, obey and cause its employees, agents, contractors, and subcontractors to observe and obey all Environmental Laws applicable to the Premises or their operations therein and the provisions of all Environmental Approvals and all of Tenant's Environmental Agreements.

(b)     Landlord shall promptly notify Tenant in writing should Landlord become aware of (i) any release or threat of release of Hazardous Materials for which any Environmental Law requires notification to be given to any governmental authority, or any violation of Environmental Laws, with respect to the Premises or any real property adjoining or in the vicinity of the Premises; (ii) any violation of the Environmental Approvals or Tenant's Environmental Agreements; (iii) any notice given to Landlord from any occupant of the Premises or any notice from any governmental authority with respect to any release or threat of release of Hazardous Materials on the Premises; or (iv) the commencement of any litigation or any information relating to any threat of litigation relating to any alleged unauthorized release of any Hazardous Materials or other environmental contamination, liability or problem with respect to or arising out of or in connection with the Premises.

(c)     Landlord shall provide Tenant with copies of any notices of releases of Hazardous Materials which are given by or on behalf of Landlord to any federal, state or local agencies or authorities with respect to the Premises. Landlord also shall provide Tenant with copies of any notices of responsibility or any other notices received by or on behalf of Landlord from any such agencies or authorities concerning any non-compliance with Environmental Laws, the Environmental Approvals, or Tenant's Environmental Agreements on or about the Premises, including but not limited to notices regarding Hazardous Materials or substances located on or about the Premises. In addition, in connection with any litigation or threat of litigation affecting the Premises, Landlord shall deliver to Tenant any documentation or records as Tenant may reasonably request and which are susceptible of being obtained by Landlord without undue cost or expense and without necessity of initiating legal proceedings to obtain the same, other than any documentation or records that, in the sole judgment of Landlord, are subject to the attorney-client privilege, the attorney work-product doctrine, or other applicable privilege or protection, and shall give written notice to Tenant of any subsequent developments.

11.8    Tenant's AUL.   Tenant shall not impose any AUL on the Premises or any portion thereof without the prior written approval of Landlord (which approval may be withheld in Landlord's sole and absolute discretion, except to the extent the AUL is consistent with Landlord's obligations under the Consent Decree and with the Environmental Approvals, in which case such approval shall not be unreasonably withheld), and no such AUL shall be recorded or filed unless and until the same shall have been executed by Landlord. Tenant shall be solely responsible for all costs and expenses of any AUL that Tenant wishes to impose on the Premises or any portion thereof, including the reasonable fees of Landlord's attorneys and consultants' in connection therewith.

11.9    Release. (a)    Tenant shall release, remise and forever discharge Landlord (including its directors, officers, managers, members, partners, beneficial owners, shareholders, employees and agents) from and against any and all Claims resulting from, related to or arising out of the presence in, on or under the Land as of the date of this Lease of the Known Existing Materials, which Tenant or anyone claiming by, through or under Tenant, or any employees, contractors, agents, servants, or operators of the foregoing may now have, ever had or ever will have at any time; *provided, however,* that this subsection (a) shall not apply to any Claim brought by Tenant resulting from, related

43

to or arising out of any effort by Tenant to enforce any provision of this Lease, including, without limitation, the indemnity provisions contained in this Article 11.

(b)    Landlord shall release, remise and forever discharge Tenant (including its directors, officers, managers, members, partners, beneficial owners, shareholders, employees and agents) from and against any and all Claims resulting from, related to or arising out of (i) the migration from the Land of Existing Materials occurring either prior or subsequent to the date of this Lease; or (ii) Landlord's violation of the terms and provisions of the Consent Decree; or (iii) Claims resulting from, related to or arising out of any action taken by EPA or MADEP or other governmental authorities with jurisdiction with respect to the Consent Decree, which Landlord may now have, ever had or ever will have at any time; *provided, however*, that this subsection (b) shall not apply to any Claim brought by Landlord resulting from, related to or arising out of any effort by Landlord to enforce any provision of this Lease, including, without limitation, the indemnity provisions contained in this Article 11.

11.10    <u>Consent Decree</u>.    Tenant acknowledges that the Premises are subject to the Consent Decree and that Tenant has reviewed a copy of the Consent Decree and is familiar with its contents. Notwithstanding anything to the contrary contained in this Lease, Tenant agrees that, except with respect to the use and operation of the Monitoring Wells and Recovery System, which shall remain the responsibility of Landlord, Tenant shall comply with all requirements of the Consent Decree insofar as the same affect the development, use and occupancy of the Premises, except to the extent (if any) to which Tenant is hereafter relieved of such compliance obligation by the terms of Tenant's Environmental Agreements (but notwithstanding any such relief provided to Tenant in Tenant's Environmental Agreements, Tenant shall not take any action which would cause Landlord to be in violation of any of the requirements of the Consent Decree). Landlord shall not amend or consent to the amendment of the Consent Decree so as to materially affect Tenant's development of the Premises or its operations thereon, without the prior written consent of Tenant, which consent shall not be unreasonably withheld, delayed or conditioned.

11.11    <u>Monitoring Wells and Recovery System</u>.    Tenant acknowledges that Landlord, among its other obligations under the Consent Decree, is required to operate the Monitoring Wells and Recovery System on the Premises, including without limitation making weekly inspections of the treatment system and monthly inspections of the other portions thereof. Notwithstanding any other provision of this Lease to the contrary, Landlord reserves the right of access to the Premises to the extent reasonably required in order for Landlord to operate, maintain, repair, and replace as necessary the Monitoring Wells and Recovery System. Landlord agrees to exercise such right at times and in a manner so as not unreasonably to interfere with Tenant's development, use and occupancy of the Premises. Landlord further agrees that, for so long as the Premises are used as a retail store for sales to the general public, then except as may be required by emergency conditions or as directed by EPA, MADEP or any other governmental authority having jurisdiction over the Monitoring Wells and Recovery System, Landlord shall not schedule any routine maintenance or repair work on the Monitoring Wells and Recovery System (other than the inspections referenced in the first sentence of this Section) during Tenant's "back to school" selling season in August-September or between November 15 and December 31 except for such repairs and maintenance as may be required to maintain the Monitoring Wells and Recovery

44

System in good operating condition and in compliance with all applicable Legal Requirements. Landlord shall be solely responsible for the cost of operation, maintenance, repair, and replacement of or to the Monitoring Wells and Recovery System *except* that the cost to Landlord of any repairs or replacements required by reason of damage to the Monitoring Wells and Recovery System caused by the act or omission of Tenant, or any subtenant, licensee or other occupant of the Premises, or any of their respective employees, agents, invitees, or contractors, shall be paid by Tenant to Landlord as Additional Rent. After issuance of the Environmental Approvals, Tenant shall have the right, subject to the prior written approval of Landlord (which approval may be withheld by Landlord in its sole and absolute discretion except as provided below) and EPA, MADEP and all other governmental authorities having jurisdiction over the Monitoring Wells and Recovery System, to relocate portions of the Monitoring Wells and Recovery System; *provided, however,* that with respect to the relocation by Tenant of those portions of the Monitoring Wells and Recovery System shown as "Monitoring Wells Which Could Be Relocated (Subject to EPA Approval)" on the plan attached hereto as **Exhibit C**, Landlord shall not unreasonably withhold, delay or condition its approval of such relocation provided that EPA, MADEP and all other governmental authorities having jurisdiction over the Monitoring Wells and Recovery System have previously approved such relocation in writing. Tenant shall be solely responsible, at its sole cost and expense, for obtaining all Governmental Approvals required for any such relocation. All relocations of portions of the Monitoring Wells and Recovery System pursuant to this Section shall be performed by Tenant at Tenant's sole cost and expense and shall not materially increase Landlord's cost of maintaining and operating the Monitoring Wells and Recovery System.

11.12 <u>Sewer Service to the Treatment Plant</u>. The parties acknowledge that a bathroom is part of the operation of the treatment plant that is part of the Monitoring Wells and Recovery System. As a result of past decisions of municipal officials, the treatment plant bathroom is connected to the sanitary sewer line serving the Existing Improvements (which is then connected to the municipal sewer system in Washington Street) rather than by means of a direct connection of the treatment plant bathroom to the municipal sewer system. The parties further acknowledge that either the treatment plant bathroom must be connected to the municipal sewer system at all times in order to remain operational or a temporary alternative must be made available during Landlord's Demolition Work and the construction of the Initial Improvements. Accordingly, Tenant hereby agrees that (i) its design of the Initial Improvements shall include a connection on the Land of the sanitary sewer line from the treatment plant bathroom to the sanitary sewer line serving the Initial Improvements from Washington Street, (ii) the construction of the Initial Improvements shall include the work required to connect the treatment plant bathroom to the sanitary sewer line to the Initial Improvements from Washington Street (and during such construction, Tenant shall provide a temporary portable bathroom), (iii) during such times over the Lease Term as construction is being performed on the Land which affects the then-existing sanitary sewer line serving the treatment plant bathroom, Tenant shall make provision for continued and uninterrupted sewer service to the treatment plant or a temporary, portable bathroom serving the treatment plant, and (iv) Tenant shall not at any time take any action on the Land which has the effect of interrupting, disrupting, or otherwise adversely affecting the continuous provision of sewer service to the treatment plant bathroom from the municipal sewer system in Washington Street without first providing a temporary, portable bathroom serving the treatment plant. All costs associated with operation, maintenance, and repair (as opposed to construction, re-construction, replacement, or relocation) of the sewer line from the treatment plant bathroom to the connection of that line with the sewer line serving the Improvements, shall

45

be paid by Landlord except to the extent that such costs are incurred as a result of the act or omission of Tenant or any of its subtenants or licensees, or any employees, contractors, agents, or servants of any of the foregoing (in which event Tenant shall pay the same to Landlord as Additional Rent). The cost of a temporary, portable bathroom serving the treatment plant during the construction of the Initial Improvements or when required pursuant to this Section shall be borne by Tenant.

## ARTICLE 12

### TRANSFERS OF TENANT'S INTEREST

12.1    <u>No Transfer Other than in Accordance with this Article</u>. Except with respect to Permitted Leasehold Mortgages pursuant to Article 13 below, Tenant shall not engage in, negotiate, or permit any Transfer, nor suffer any Transfer to occur, except in accordance with the provisions of this Article 12. If at any time while this Lease is in effect, Tenant is a corporation (excluding a corporation the outstanding voting stock of which is listed on a recognized securities exchange), a trust (whether or not having shares of beneficial interest), a partnership or association, or otherwise not a natural person, and there shall occur any transfer (by one or more transfers) of a controlling portion of or controlling interest in the stock, partnership, membership, or beneficial interest, or other evidences of equity interests or voting interest of Tenant, such transfer shall also constitute a Transfer for the purposes of this Section. A transfer of a controlling interest in Tenant shall not be deemed a "Transfer" if Tenant is a publicly-traded company. As used in this Lease, the term "Transfer" shall also include a sale of all or substantially all of the assets of Tenant, voluntary and involuntary Transfers, and Transfers by operation of law, including corporate mergers or consolidations.

12.2    <u>Transfers Permitted without Landlord's Consent</u>. (a)    Tenant shall have the right, without the necessity of obtaining Landlord's consent, to sell or assign this Lease, or to sublease the Premises in their entirety (but not less than the entire Premises) to (i) a National Retail Tenant, or (ii) a Regional Retail Tenant. Tenant shall provide written notice to Landlord not less than ten (10) days prior to the effective date of any Transfer permitted by this Section 12.2(a), which notice shall (x) contain the name and home office address of the transferee, and the name and address of the contact person at the transferee for matters relating to the Premises, and (y) be accompanied by (1) a copy of the proposed instrument of Transfer (and Tenant shall deliver a fully-executed copy of such instrument of Transfer, including all exhibits thereto, to Landlord within ten (10) days after the effective date of such Transfer), (2) any financial information concerning the proposed transferee received by Tenant in connection with such proposed Transfer, and (3) evidence of such proposed transferee's other store operations, demonstrating compliance with the requirements contained in the definition of "National Retail Tenant" or "Regional Retail Tenant" (as the case may be) set forth in Article 1 above.

(b)    Tenant shall have the right, without the necessity of obtaining Landlord's consent, to sell or assign this Lease, or to sublease the Premises in their entirety (but not less than the entire Premises) to (i) an Affiliate of Tenant, (ii) the purchaser of all or

46

substantially all of the assets of Tenant, and (iii) the successor to Tenant by merger or consolidation. Tenant shall provide written notice to Landlord not less than ten (10) days after the effective date of any Transfer permitted by this Section 12.2(b), which notice shall (x) contain the name and home office address of the transferee, and the name and address of the contact person at the transferee for matters relating to the Premises, and (y) be accompanied by a fully-executed copy of such instrument of Transfer, including all exhibits thereto, and, to the extent readily available to Tenant, a copy of the most recent audited financial statement of such transferee (or if audited financial statements are not available, then the most recent financial statement of such transferee certified to Landlord by the Chief Financial Officer of the Chief Executive Officer of such transferee).

(c)    After the construction of the Building has been completed and a Certificate of Occupancy issued therefor, Tenant shall have the following rights, without the necessity of obtaining Landlord's consent:

(i)    to sublease pursuant to one or more written subleases portions of the Building to a National Retail Tenant or a Regional Retail Tenant; *provided, however,* that Tenant shall not enter into more than three (3) such subleases which are effective at any one time;

(ii)    to sublease (in the aggregate) up to twenty-five percent (25%) of the leasable area in the retail portion of the Building pursuant to one or more written subleases, *provided* that at the time of entering into each such sublease Tenant is then actively operating a retail store open to the public in the remainder of the leasable area in the retail portion of the Building;

(iii)    during such time as Tenant is actively operating a retail store open to the public in at least seventy-five percent (75%) of the leasable area in the retail portion of the Building, to enter into written concession    agreements    and    license    agreements    with concessionaires or licensee providing similar services to other stores operated by Tenant, providing for the use and occupancy of not more than (in the aggregate) twenty-five percent (25%) of the leasable area in the retail portion of the Building for retail purposes related to the retail business then being conducted by Tenant within the Building, *provided* that no single concessionaire or licensee shall use or occupy more than 5,000 square feet of leasable area in the retail portion of the Building.

Tenant shall provide written notice to Landlord not less than ten (10) days prior to the effective date of any sublease, concession, or license agreement permitted by this Section 12.2(c), which notice shall (w) contain (i) the name and home office address of the subtenant, concessionaire, or licensee, (ii) a plan showing the portion of the Building proposed to be subject to such sublease, concession, or license agreement, together with the leasable area thereof, (iii) the name and address of the contact person at the subtenant, concessionaire, or licensee for matters relating to the Premises, and (x) be accompanied

47

by a copy of the proposed sublease, concession agreement, or license agreement (and Tenant shall deliver a fully-executed copy of such sublease, concession agreement, or license agreement, including all exhibits thereto, to Landlord within ten (10) days after the effective date of such instrument) and (y) any financial information concerning the proposed subtenant, concessionaire, or licensee received by Tenant in connection with such transaction, and (z) in the case of a sublease to a National Retail Tenant or a regional Retail Tenant, evidence of such proposed transferee's other store operations, demonstrating compliance with the requirements contained in the definition of "National Retail Tenant" or "Regional Retail Tenant" (as the case may be) set forth in Article 1 above.

12.3    Transfers Requiring Landlord's Consent.  All Transfers other than those expressly provided for in Section 12.2 above shall require the prior written consent of Landlord, which consent shall not be unreasonably withheld, delayed or conditioned.  Notwithstanding anything to the contrary contained in this Lease, at no time shall there be in force more than three (3) subleases, concessions, license agreements, or other occupancy agreements with respect to the Building (exclusive of subleases entered into by Tenant pursuant to Section 12.2(c)(ii) above and concessions or license agreements entered into by Tenant pursuant to Section 12.2(c)(iii) above).  If Tenant desires to enter into a Transfer for which Landlord's prior written consent is required hereunder, Tenant shall request such consent in writing, including in such request (a) a summary of the business terms of the proposed Transfer, (b) the name, address, business and financial condition of the prospective transferee (including the most recent audited and unaudited financial statements of the prospective transferee (all unaudited financial statements to be certified to Landlord by the Chief Financial Officer or the Chief Executive Officer of such transferee)); (c) a true and complete copy of the proposed instrument containing all of the terms and conditions of such Transfer; (d) a written agreement of the proposed transferee, in recordable form reasonably approved by Landlord, agreeing with Landlord to perform and observe all the terms, covenants and conditions of this Lease; and (e) any other information reasonably requested by Landlord.  If Landlord elects to consent to such a proposed Transfer, Tenant shall promptly deposit with Landlord a full and complete executed original of the instrument(s) evidencing such Transfer.

12.4    Assignment of Lease.

(a)    If Tenant assigns this Lease in accordance with the provisions of this Article 12, Landlord, when giving notice to said assignee or any future assignee in respect of any default under this Lease for which notice and a cure period are herein provided, shall also give a copy of such notice to the original tenant or any successor thereto (collectively, the "Original Tenant") at the address last provided by the Original Tenant to Landlord, and no notice of default with respect to a monetary default hereunder shall be effective unless a copy thereof is so given to the Original Tenant (but actual receipt by the Original Tenant of such notice shall not be a condition precedent to the effectiveness of

48

such notice of default). The Original Tenant shall have the right to cure such monetary default within the same period as Tenant hereunder.

(b)    If Tenant assigns this Lease in accordance with the provisions of this Article 12 and, after the effective date of such assignment, there shall occur a termination of this Lease by reason of rejection in bankruptcy and/or the default of such assignee or any future assignee hereunder, Landlord shall, subject to the satisfaction of the conditions provided below, enter into a new lease with the Original Tenant for the remainder of the Lease Term effective as of the date of such termination of this Lease, at the Rent and upon the covenants, agreements, terms, provisions and limitations herein contained, provided (a) the Original Tenant makes written request for such new lease within thirty (30) days after Landlord gives notice to the Original Tenant of such termination, which notice Landlord shall give promptly after such termination thereof together with a statement of any and all sums which at the time of such notice would be due under the Lease but for such termination and of all other defaults, if any, under the Lease then known to Landlord (the "Landlord's Notice"); (b) the Original Tenant executes such new lease within thirty (30) days after receipt of Landlord's Notice and delivers to Landlord within such time period a security deposit and Letter of Credit in the amount then required pursuant to Article 21 below; (c) concurrently with the full execution and delivery of such new lease, the Original Tenant pays to Landlord all sums due Landlord under this Lease as set forth in the Landlord's Notice (*i.e.*, as though no termination had occurred) through the date of such execution; and (d) such new lease shall require the Original Tenant to cure, not later than three (3) months after the effective date of such new lease, any and all other defaults under this Lease of which Landlord gave notice to the Original Tenant as provided in Section 12.4(a) above (but nothing contained herein shall affect the right of Landlord to require the cure of any other defaults under this Lease that may have existed as of the time of such previous notice but which were not specified in such previous notice), except for the Incurable Lease Defaults (if any).  Any such new lease for the Original Tenant shall be effective as of the date of termination of this Lease, and, except as provided below, shall be upon all the same terms and conditions of this Lease which would have been in effect had the Original Tenant taken an assignment of the leasehold estate under this Lease from such assignee or any future assignee hereunder, including any extension rights. The initial term of any such lease shall be the remainder of the then current Lease Term.  Notwithstanding the foregoing, if Landlord delivers to the Original Tenant, together with Landlord's Notice, a release of Original Tenant and all subsequent holders of the tenant's interest in this Lease except for the then-Tenant as to all liability under this Lease, and a release of the Letter of Credit, the Original Tenant shall not have the foregoing option.

12.5    Nondisturbance and Attornment Agreements.

For the purpose of providing that the termination of this Lease as a result of a default by Tenant hereunder shall not affect any sublease which conforms to certain requirements, and that, notwithstanding the early termination of this Lease as a result of the default of Tenant, such sublease shall continue in full force and effect, Landlord agrees, from time to time, to execute and deliver, within twenty (20) days of the written request therefor by Tenant, a nondisturbance and attornment agreement in the form of **Exhibit H** (a "Nondisturbance Agreement") between Landlord and any such sublessee, subject to and upon the following terms and conditions:

49

(i)     At the time of such request no default of Tenant under this Lease shall exist under this Lease beyond any applicable notice and cure period;

(ii)    Tenant shall have entered into such sublease (the "Sublease") in accordance with all applicable provisions of this Lease;

(iii)   The sublessee under such Sublease is either (a) a National Retail Tenant, or (b) a Regional Retail Tenant;

(iv)    At the time of such request, Tenant shall furnish to Landlord four (4) copies of the nondisturbance and attornment agreement in the form of **Exhibit I**, executed by Tenant and such sublessee, and properly notarized;

(v)     The premises subleased under the Sublease (the "Subleased Premises") shall contain a minimum of 25,000 square feet of leasable area and shall be served by mechanical, HVAC and utility systems which are separated from the mechanical, HVAC and utility systems serving the remainder of the Building, and the remainder of the Building shall have such mechanical, HVAC and utility systems which are separated from such systems serving the Subleased Premises, shall have frontage which is not less than the frontage that is allocable to it on a per square foot pro rata basis, shall have appropriate loading areas, and shall have regular dimensions (*e.g.*, generally rectangular in shape);

(vi)    The Sublease requires such sublessee to open and operate a retail store in the Subleased Premises and such sublessee is then actually operating a retail store in not less than 25,000 square feet of ground floor space in the Subleased Premises in accordance with the terms of the Sublease;

(vii)   The term of the Sublease (including extension rights) is not less than five (5) years nor longer than the period then remaining in the Original Lease Term or the then-current Extension Term, as the case may be;

(viii)  The minimum rent payable per square foot under the Sublease is not less than the Basic Rent then payable under this Lease allocated over the number of square feet of ground floor space in the Building, and in addition thereto, the sublessee shall pay its pro rata share of all additional charges under this Lease;

(ix)    No rent has been prepaid under the Sublease more than one month in advance;

(x)     If there is any security deposit under the Sublease, the Sublease provides that the Landlord is not responsible therefor unless, and then only to the extent that, it actually receives the same;

(xi)    The Sublease does not impose any obligations, liabilities, or expenses on Landlord which are in excess of, or in addition to, the obligations, liabilities, or expenses of Landlord set forth in this Lease;

50

(xii)    The Sublease permits only such uses to be made of the Premises as are permitted under this Lease; and

(xii)    The Sublease provides that it is, in all respects, subordinate and subject to the terms and provisions of this Lease.

Notwithstanding anything to the contrary contained in this Lease, Landlord shall have no obligation to enter into Nondisturbance Agreements such that there are more than three (3) Nondisturbance Agreements in effect at any one time.

12.6    General Provisions.Tenant shall not enter into, nor have the right to request Landlord's consent to, a Transfer at such time as Tenant is in default under this Lease beyond any applicable notice and cure period.    Any attempted Transfer in violation of any of the provisions of this Lease shall be void.    No Transfer shall in any way impair the continuing primary liability of Tenant hereunder (which after any such Transfer shall be joint and several with the persons claiming under the Transfer). All Transfers shall be subject to the terms of this Lease, and shall not confer upon the transferee thereunder any rights to further transfer possession of the Premises or any portion thereof except with the further express written consent of Landlord, which consent may be withheld by Landlord in its sole and absolute discretion. Tenant shall pay to Landlord, as Additional Rent, Landlord's reasonable attorneys' fees (but not the fees of Landlord's in-house counsel) in reviewing any proposed Transfer, whether or not Landlord consents to the same, up to a maximum amount of $2,500.00 per proposed Transfer.

ARTICLE 13

LEASEHOLD MORTGAGEES

13.1    Leasehold Mortgages Generally.    Subject to the provisions of this Section and Section 13.2, Tenant shall have the right to mortgage and finance and refinance its leasehold interest hereunder, or any part or parts thereof, from time to time without limitation as to amount and without limitation as to what the mortgage secures (excluding the fee interest of Landlord), under one or more "Permitted Leasehold Mortgages" (as defined in Section 13.2) and the right to assign unconditionally, collaterally or otherwise, this Lease as collateral security for such Permitted Leasehold Mortgage, and in connection therewith, to grant and convey Tenant's interest in the Premises in such form as the holder of the Permitted Leasehold Mortgage (a "Permitted Leasehold Mortgagee") determines. All proceeds of any Permitted Leasehold Mortgage shall belong to Tenant. For the purposes of this Article, the term "mortgage" shall include mortgages, deeds of trust and all similar instruments as well as security interests, including security interests in personal property, and pledges and assignments of Tenant's interest in this Lease, and modifications, replacements and consolidations of any of the foregoing. Notwithstanding the foregoing, in no event shall there be more than two (2) Permitted Leasehold Mortgages outstanding at any time.    Under no circumstances shall Landlord be required to subordinate its fee interest in the Premises, or any part thereof, to any Permitted

51

Leasehold Mortgage.

The making of a Permitted Leasehold Mortgage in accordance with the provisions of this Article 13 shall not be deemed to constitute a Transfer for purposes of Article 12 above, nor shall any Permitted Leasehold Mortgagee under such a Permitted Leasehold Mortgage who is not in possession of the Premises be deemed an assignee of the leasehold estate created hereby so as to require such Permitted Leasehold Mortgagee to assume the obligations of Tenant hereunder, but a Permitted Leasehold Mortgagee in possession of the Premises and the purchaser at any sale of the leasehold estate created hereby upon foreclosure of a Permitted Leasehold Mortgage, or the assignee of Tenant's interest under this Lease pursuant to an assignment in lieu of such foreclosure, shall be deemed to be an assignee of Tenant (but no consent by Landlord to such assignment or transfer shall be required) and shall be deemed to have assumed the obligations of Tenant hereunder from and after the date of taking possession or of such purchase or assignment. (For the purposes of this Article 13, an entity that is a wholly-owned subsidiary of a Permitted Leasehold Mortgagee formed for the purpose of taking title to the Premises in the event of a foreclosure of the Permitted Leasehold Mortgage or a transfer in lieu thereof shall, so long as such entity remains such a wholly-owned subsidiary, constitute a Permitted Leasehold Mortgagee.) A conditional assignment of Tenant's interest in this Lease to a Permitted Leasehold Mortgagee as security for a Permitted Leasehold Mortgage shall not constitute an assumption of liability by the Permitted Leasehold Mortgagee for Tenant's obligations hereunder until the date of such Permitted Leasehold Mortgagee's taking of possession of the Premises pursuant to the exercise of its rights under such conditional assignment. For purposes of this Section 13.1, the filing of a certificate of entry with the Middlesex South District Registry of Deeds solely for the purpose of foreclosing a Permitted Leasehold Mortgage shall not be construed as taking possession of the Premises by a Permitted Leasehold Mortgagee.

All costs incurred in connection with a Permitted Leasehold Mortgage shall be paid by Tenant. In addition, Tenant shall pay to Landlord, as Additional Rent, all reasonable expenses incurred by Landlord, including reasonable attorneys' fees, in connection with any consents, estoppels, or other instruments that Landlord may be requested to enter into in connection with any Permitted Leasehold Mortgage.

13.2    Definitions.  For the purposes of this Lease, the following terms shall have the following meanings:

(a)    "Permitted Leasehold Mortgage" means the mortgage or mortgages on the leasehold interest of Tenant created hereby and meeting all of the following requirements:

(i)    All rights acquired under such leasehold mortgage shall be subject and subordinate to all of the terms and provisions of this Lease and to all rights of Landlord under this Lease;

(ii)    A copy of such leasehold mortgage has been delivered to Landlord, accompanied by appropriate recording data and the name and address of the holder thereof;

52