(iii)    Such leasehold mortgage becomes due prior to the expiration of the Lease Term;

(iv)    At the time of the execution of the leasehold mortgage, Tenant is not in default hereunder beyond the expiration of any applicable grace or cure periods;

(v)    No personal liability is imposed upon Landlord for repayment of the loan secured by the leasehold mortgage, nor shall Landlord be required to incur any other liability in connection with the leasehold mortgage or otherwise in connection with the loan;

(vi)    The proposed leasehold mortgagee is an institutional lender such as a bank, savings and loan association, insurance company, REIT or pension fund, so-called conduit lender, or other regionally-recognized institutional mortgage lender;

(vii)    The leasehold mortgage permits Landlord or a nominee acting for and selected by Landlord, if Landlord or such nominee so chooses and succeeds to Tenant's interest under this Lease, to continue as mortgagor under the leasehold mortgage, and on the same terms and conditions as those applicable to Tenant;

(viii)    The leasehold mortgage provides that the leasehold mortgagee, upon serving Tenant with any notice of default under the leasehold mortgage, shall simultaneously serve a copy of such notice of default upon Landlord and shall further provide that Landlord shall have the right (but not the obligation) to cure any default by Tenant under the leasehold mortgage within any grace or cure period provided for in such leasehold mortgage; and

(ix)    The leasehold mortgage permits the disbursement of casualty insurance proceeds and payments made in connection with partial eminent domain takings, or conveyances under threat thereof, to be used for the repair and restoration of the Improvements on the terms and conditions set forth in this Lease.

(b)    "First Permitted Leasehold Mortgage" means a Permitted Leasehold Mortgage which, at the time in question, is a first lien on Tenant's interest under this Lease.

(c)    "First Permitted Leasehold Mortgagee" means a Permitted Leasehold Mortgagee holding a First Permitted Leasehold Mortgage.

13.3    Other Provisions Regarding Permitted Leasehold Mortgages.    The following provisions shall apply in connection with Permitted Leasehold Mortgages:

(a)    Each of Landlord and Tenant shall, upon request by the other party, execute, acknowledge and deliver to the requesting party and the Permitted Leasehold

53

Mortgagee an agreement among Landlord, Tenant and the Permitted Leasehold Mortgagee, in form reasonably satisfactory to the Permitted Leasehold Mortgagee, Tenant and Landlord, agreeing to all of the provisions of this Article;

(b)    There shall be no cancellation, surrender or modification of this Lease by joint action of Landlord and Tenant without the prior consent in writing of the First Permitted Leasehold Mortgagee;

(c)    Landlord agrees that the name of each Permitted Leasehold Mortgagee may be added to the "Loss Payable Endorsement" of any and all insurance policies required to be carried by Tenant hereunder, and Tenant agrees that it shall cause such addition to be made; and

(d)    No Permitted Leasehold Mortgage now or hereafter a lien upon Tenant's leasehold interest hereunder shall extend to or affect the reversionary interest and estate of Landlord in and to the Premises or in any manner attach to or affect the Premises from and after any expiration or termination of this Lease (except as expressly provided in Section 13.4(e) with respect to the First Permitted Leasehold Mortgagee's right to obtain a new lease). There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee simple estate in the Premises or any part thereof by reason of the fact that the same person, firm, corporation or other entity may acquire or own or hold, directly or indirectly: (i) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in any such leasehold estate, and (ii) the fee simple estate in the Premises or any part thereof or any interest in any fee estate; and no such merger shall occur unless and until all persons, corporations, firms and other entities having (A) any interest in this Lease or the leasehold estate created by this Lease (excluding subtenants but including any Permitted Leasehold Mortgagee), and (B) any fee simple interest in the Premises or any part thereof shall join in a written instrument effecting such merger and shall duly record the same.

13.4    Rights of Permitted Leasehold Mortgagees.

(a)    Notices.    Provided that Landlord shall have been apprised in writing of the name and address of the First Permitted Leasehold Mortgagee, simultaneously with the giving to Tenant of any process in any action or proceeding brought to terminate or otherwise in any way affect this Lease, or any notice of (i) default, (ii) a termination hereof, or (iii) a condition which if continued may lead to a termination hereof, Landlord will give duplicate copies thereof to the First Permitted Leasehold Mortgagee by registered or certified mail, return receipt requested, and no such notice to Tenant or process shall be effective unless a copy of the notice or process is so sent to the First Permitted Leasehold Mortgagee.

(b)    Right to Cure.    The First Permitted Leasehold Mortgagee shall have the same period after the sending of a notice to it for remedying the default as is given Tenant after notice to it under this Lease, plus an additional thirty (30) days for a default referred to in Section 16.1(a) below, and an additional sixty (60) days for defaults referred to in Section 16.1(d) below, and Landlord agrees to accept performance on the

54

part of the First Permitted Leasehold Mortgagee as though it had been done or performed by Tenant. No payment made to Landlord by a Permitted Leasehold Mortgagee shall constitute agreement that such payment was, in fact, due under the terms of this Lease. The provisions of this subsection (b) and the following subsection (c) shall not apply to any Permitted Leasehold Mortgagee that, directly or indirectly, through any number of intermediary levels of ownership, owns, is owned by, or is under common ownership with Tenant or any of its principals.

(c)    Time to Obtain Possession.    Landlord agrees that, in the event of a non-monetary default which cannot be cured by the First Permitted Leasehold Mortgagee pursuant to paragraph (b) above without obtaining possession of the Premises, Landlord will not terminate this Lease pursuant to Section 16.2 without first giving to the First Permitted Leasehold Mortgagee a reasonable time within which to obtain possession of the Premises, including possession by a receiver, or to institute and complete foreclosure proceedings or otherwise acquire Tenant's interest under this Lease with diligence and without unreasonable delay, provided that such First Permitted Leasehold Mortgagee throughout such time causes to be performed all monetary obligations under this Lease and all non-monetary obligations that can be performed by such First Permitted Leasehold Mortgagee without such First Permitted Leasehold Mortgagee obtaining possession of the Premises. A reasonable time shall mean not in excess of one (1) month as to obtaining possession or instituting foreclosure proceedings, and not in excess of such reasonable time as with due diligence is required to prosecute and complete foreclosure proceedings, not to exceed six (6) months in the aggregate; *provided, however,* that such one-month and six-month periods, as the case may be, shall be tolled during any period that the First Permitted Leasehold Mortgagee is prevented from proceeding by reason of a bankruptcy stay, injunction, or court order provided that such First Permitted Leasehold Mortgagee continues to make diligent efforts during this time to obtain relief from the stay, injunction or order for purposes of obtaining possession of the Premises and foreclosing its Permitted Leasehold Mortgage. Landlord agrees that upon acquisition of Tenant's interest under this Lease by a First Permitted Leasehold Mortgagee and performance by the First Permitted Leasehold Mortgagee of all covenants and agreements of Tenant, except those which by their nature cannot be performed or cured by any person other than the then-Tenant which has defaulted ("Incurable Lease Defaults"), Landlord's right to terminate this Lease shall be waived with respect to the matters which have been cured by the First Permitted Leasehold Mortgagee and with respect to the Incurable Lease Defaults. Nothing herein shall preclude Landlord from exercising any rights or remedies under this Lease, other than a right to terminate this Lease, with respect to any default by Tenant hereunder, prior to or during the pendency of such foreclosure proceedings subject, however, to Landlord's compliance with the provisions of this Section 13.4 with respect to each such default.

(d)    Amendment.    Except as may be expressly otherwise provided herein, this Lease shall not be modified or surrendered to Landlord or canceled by Tenant, nor, except as provided below, shall Landlord accept a surrender of this Lease without the prior written consent of each Permitted Leasehold Mortgagee.

55

(e)   New Lease.   In the event of the termination of this Lease by reason of rejection in bankruptcy and/or the default of Tenant, Landlord shall, subject to the satisfaction of the conditions provided below, enter into a new lease with the First Permitted Leasehold Mortgagee or its nominee for the remainder of the Term of this Lease effective as of the date of such termination of this Lease, at the Rent and upon the covenants, agreements, terms, provisions and limitations herein contained, provided (a) such First Permitted Leasehold Mortgagee makes written request for such new lease within thirty (30) days after Landlord gives notice to such First Permitted Leasehold Mortgagee of such termination; (b) such First Permitted Leasehold Mortgagee executes such new Lease within thirty (30) days after Landlord delivers same to such First Permitted Leasehold Mortgagee; (c) concurrently with the full execution and delivery of such new lease, such Leasehold Mortgagee pays to Landlord all sums due Landlord under this Lease (i.e., as though no termination had occurred) through the date of such execution; and (d) such new lease shall require the new tenant to cure, not later than three (3) months after the effective date of such new lease, any and all other defaults under this Lease of which Landlord gave notice to such First Permitted Leasehold Mortgagee as provided in Subsection (a) above (but nothing contained herein shall affect the right of Landlord to require the cure of any other defaults under this Lease that may have existed as of the time of such previous notice), except for the Incurable Lease Defaults (if any). Any such new lease for such a First Permitted Leasehold Mortgagee shall be effective as of the date of termination of this Lease, and, except as provided below, shall be upon all the same terms and conditions of this Lease which would have been in effect had such First Permitted Leasehold Mortgagee taken an assignment of the leasehold estate under this Lease from Tenant, including any extension rights.  The initial term of any such lease shall be the remainder of the then current Lease Term.  Landlord shall have no obligation to deliver physical possession of the Premises to such First Permitted Leasehold Mortgagee at the time of entering into such new lease unless Landlord, at the time of execution and delivery of such new lease, shall have obtained physical possession of the Premises.

Any new lease granted to such First Permitted Leasehold Mortgagee pursuant to this Section 13.4(e) shall be and remain an encumbrance on the Premises having the same priority thereon as this Lease and shall, without limitation, be and remain prior to any lien, charge or encumbrance of the fee of the Premises created by Landlord subsequent to the original lien of this Lease, and references herein to this Lease shall refer to this Lease as originally executed and to any such new Lease. The First Permitted Leasehold Mortgagee, as tenant under such new lease, shall have the same rights, title and interest in and to the building(s) and improvements on the Premises as Tenant had under this Lease. If the First Permitted Leasehold Mortgagee becomes the holder of Tenant's leasehold interest, and if such First Permitted Leasehold Mortgage shall thereafter assign its interest in this Lease, then so long as the assignee shall agree in writing to assume and perform all obligations of Tenant under this Lease, such First Permitted Leasehold Mortgagee shall be released of all liability that accrues from and after the date of any assignment of such lessee interest. Landlord shall be under no obligation to remove Tenant or anyone holding under Tenant or any other occupant from the Premises, and the new tenant shall take subject to the possessory rights, if any, of such tenants or occupants, including, without limitation, all subtenants of Tenant (to the extent to which their respective subleases

56

survive the termination of this Lease). It is specifically acknowledged and agreed that all covenants, duties and obligations of Tenant hereunder shall survive the execution of any new lease between Landlord and such First Permitted Leasehold Mortgagee or its designee pursuant to this Section 13.4(e) and that such execution shall not release or be deemed to release Tenant from any liability for failure to perform any such covenant, duty or obligation. The provisions of this Section 13.4(e) shall survive the termination of this Lease.

(f)     Transfer by First Permitted Leasehold Mortgagee.  The right of the First Permitted Leasehold Mortgagee to foreclose its First Permitted Leasehold Mortgage and to sell or assign the lessee interest in this Lease is expressly recognized and shall never be deemed a violation of any provision of this Lease (but shall be subject to all of the terms and provisions of this Lease).

13.5     Further Assurances.  Landlord will, upon the request of Tenant, execute, acknowledge, seal and deliver such instruments as may be reasonably necessary or required to effectuate the provisions of this Article 13 (provided that the same are in form and content reasonably acceptable to Landlord), but nothing herein contained shall require Landlord to be or become liable on any promissory note or other document evidencing the indebtedness secured by any Permitted Leasehold Mortgage, or to modify any of the terms or conditions of this Lease, or to provide any indemnification or undertaking in addition to those contained in this Lease.

ARTICLE 14

DAMAGE OR DESTRUCTION

14.1     Tenant's Election.   In case of damage to or destruction of the Existing Improvements or the Improvements or any part thereof by fire or other casualty, Tenant shall promptly give written notice thereof to Landlord.  Subject to the provisions of Sections 14.4 and 14.5 below, Tenant shall, at Tenant's sole option and sole cost and expense, and without regard to the coverage, amount or availability of proceeds of any insurance, either (a) restore, repair, replace, rebuild or reconstruct the same as nearly as possible to its condition immediately prior to such damage or destruction (including Tenant's fixtures, furnishings and equipment), or (b) if a portion of the Improvements could be restored as a commercially viable unit, demolish the affected portion of the Improvements, including all slabs and subsurface footings and foundations, (including the removal from the Land of all demolition materials and the disposal thereof in accordance with all applicable Legal Requirements), regrade the surface of the affected portion of the Land to a reasonably level surface and either pave or landscape the affected portion of the Land, and restore, repair, replace, rebuild, or reconstruct the balance of the Improvements.  Tenant shall notify Landlord of which option Tenant so elects within sixty (60) days after the occurrence of such damage or destruction.  Such restorations, repairs, replacements, rebuilding, reconstruction or removal shall be commenced as soon as practicable thereafter and shall be prosecuted continuously to completion with diligence.

14.2     Restoration Procedures.  Subject to the provisions of Section 14.5 below, in the

57

event of damage to or destruction of the Improvements or any part thereof, then unless this Lease is terminated pursuant to Section 14.4 below, all proceeds of insurance policies maintained by Tenant that are payable on account of such damage or destruction, less the reasonable cost incurred in connection with adjustment of the loss and the collection thereof, shall be paid to Tenant and shall be applied to the cost of the work to be performed by Tenant pursuant to Section 14.1 above. Any insurance proceeds remaining after the completion of such work and the payment of all costs thereof shall be the property of Tenant. All work performed pursuant to this Article 14 shall be performed in accordance with the provisions of Sections 6.1 and 6.3 above.

14.3     No Surrender or Abatement.  Except as set forth in Section 14.4 below, no destruction of or damage to the Improvements, or any portion thereof, by fire or other casualty, whether or not insured, shall entitle Tenant to terminate this Lease or to surrender its interest hereunder, nor shall it relieve Tenant of its liability to pay all Rent payable under this Lease, and Tenant waives any and all rights now or hereafter conferred upon it by statute or otherwise to quit or surrender this Lease or the Premises, or any part thereof, or to any suspension, diminution, abatement, or reduction of Rent, on account of any such destruction or damage.

14.4     Casualty During the Last Lease Year.  Notwithstanding the provisions of Section 14.1 above, if, during the last Lease Year (as determined without giving effect to any Extension Terms with respect to which Tenant has not exercised its option to extend the Lease Term as of the date of the fire or other casualty), the Improvements are so damaged by fire or other casualty that the cost of restoration shall exceed fifty (50%) percent of the replacement cost of the Improvements as last determined pursuant to Section 8.1.1 above, then Tenant may, with the consent of the Permitted Leasehold Mortgagees, elect to terminate this Lease on at least sixty (60) days' written notice to Landlord, which notice shall be given within one hundred twenty (120) days after the occurrence of such fire or other casualty.  If Tenant so terminates this Lease, then (a) this Lease shall expire on the date set forth in Tenant's notice with the same effect as if such date were the last day of the Lease Term; and (b) Tenant shall not be obligated to perform any restoration but Tenant shall, at Landlord's election and at Tenant's sole cost and expense, remove what remains of the Improvements (or so much thereof as Landlord may direct), including all slabs and subsurface footings and foundations, remove from the Land all demolition materials and dispose of the same in accordance with all applicable Legal Requirements), regrade the surface of the Land to a reasonably level surface and either pave or landscape the affected portion of the Land, and install a fence at the perimeter of the Land to prevent trespassing by unauthorized personnel.  Proceeds of insurance shall be applied first to costs of removal, grading and fencing, and all remaining proceeds shall be paid over to the Permitted Leasehold Mortgagee(s) in order of priority of lien.  No such termination shall release Tenant from any obligation hereunder (including without limitation the obligation to pay Rent) accrued or payable for any period prior to the effective date of such termination except to the extent that such obligation has been satisfied, and any prepaid Rent for any period after the effective date of such termination shall be adjusted by the parties.

14.5     Damage to or Destruction of the Existing Improvements.  Notwithstanding the preceding provisions of this Article 14 to the contrary, in the event that the Existing Improvements are damaged or destroyed by fire or other casualty, this Lease shall remain in full force, Tenant's obligations hereunder shall not be affected by such damage or destruction, and

58

Landlord shall complete the demolition and removal thereof as provided in Section 2.3 above. All insurance proceeds payable on account of such damage or destruction shall be paid to, and shall be the sole property of, Landlord, and shall not be subject to any claims by or on behalf of Tenant or any Permitted Leasehold Mortgagee.

## ARTICLE 15

## TAKING

15.1    Award. In the event that the Premises or any part thereof shall be taken in condemnation proceedings or by exercise of any right of eminent domain or by agreement between Landlord, Tenant and those authorized to exercise such right (any such matters being herein referred to as a "Taking"), Landlord, Tenant, the holder of a mortgage on Landlord's fee interest, and any Permitted Leasehold Mortgagee shall have the right to participate in any Taking proceedings or agreement for the purpose of protecting their interests hereunder. Each party so participating shall pay its own expenses.

15.2    Termination. If at any time during the Lease Term there shall occur a Taking of all or substantially all of the Premises, this Lease shall terminate and expire on the date possession is taken by the Taking authority, and the Rent hereunder shall be paid to such date. For the purpose of this Article, "substantially all of the Premises" shall be deemed to have been taken if, in Tenant's reasonable business judgment, the untaken part of the Premises shall be insufficient for the restoration of the Building such as to allow the economic and feasible operation thereof by Tenant. If there is a Taking resulting in the termination of the Lease as above provided, the rights of Landlord and Tenant with respect to the award shall be as follows:

(a)    First, to the payment of the costs, fees and expenses incurred by Landlord and Tenant in connection with the collection of such award;

(b)    Second, Landlord shall receive an amount (the "Land Award") determined by dividing the annual Basic Rent due and payable hereunder for the Lease Year in which the Taking occurs by eight and one-half (8.5%) percent;

(c)    Third, Tenant shall receive an amount (the "Building Award") equal to the out-of-pocket cost to Tenant of the Improvements as of the date of the Taking; and

(d)    Fourth, all remaining proceeds shall be divided between Landlord and Tenant in the same ratio as that between the Land Award and the Building Award.

15.3    Restoration. In the event of a Taking which does not result in the termination of this Lease pursuant to Section 15.2:

(a)    Tenant shall, promptly after such Taking and at its expense (subject to reimbursement as provided below in this Section), restore the Improvements to a complete architectural unit, and shall be entitled to use the proceeds of such Taking to pay the cost of such work, which amounts shall be disbursed by Landlord to Tenant in

59

progress payments as the work progresses; *provided, however,* that if the amount of such Taking proceeds is not sufficient to pay the full cost of restoration, Tenant shall pay any deficiency;

      (b)    Landlord shall be entitled to the Land Award, pro-rated on a per square foot basis to reflect the portion of the Land taken;

      (c)    Tenant shall be entitled to the Building Award less amounts disbursed to Tenant pursuant to subsection 15.3(a), pro-rated on a per square foot basis to reflect the portion of the Building taken;

      (d)    after restoration is complete and all expenses thereof paid, the remaining proceeds shall be divided between Landlord and Tenant in the ratio described in Section 15.2(d) above; and

      (e)    if such Taking reduces the size of the Building or reduces the number of parking spaces that can be made available on the Land below the number required by applicable Legal Requirements to service the Building as it is restored following such Taking, then Basic Rent shall be equitably abated for the remainder of the Lease Term in proportion to the reduction in square footage of the Building or to the reduction in the number of parking spaces below the number so required.

    15.4   <u>Temporary Taking</u>. If the whole or any part of the Premises shall be the subject of a temporary Taking, this Lease shall remain in full force and Tenant shall continue to pay in full the Rent payable by Tenant hereunder without reduction or abatement. Tenant shall be entitled to receive any award so made for the period of the temporary Taking which is within the Lease Term, and the balance shall be paid to Landlord. If such temporary Taking shall extend beyond the expiration or earlier termination of this Lease, Tenant shall pay to Landlord at the time of such expiration or earlier termination a sum equal to the cost of performing any obligations required to be performed by Tenant hereunder in connection with the surrender of the Premises.

    15.5   <u>Generally</u>. If Landlord and Tenant are not able to agree within a reasonable time upon the allocation of a *pro tanto* award or a final Taking award pursuant to Section 15.2 or Section 15.3, or upon the amount by which Basic Rent shall be abated pursuant to Section 15.3, such allocation or abatement amount shall be determined by arbitrators appointed and acting pursuant to the provisions of **Exhibit F** attached hereto. Nothing contained in the preceding sections of this Article shall be construed to require Landlord to make any payment to Tenant in addition to the award made by the taking authority.

In the event that the *pro tanto* award made in connection with a Taking is not acceptable to both Landlord and Tenant, the dissatisfied party may commence and prosecute, at its sole cost and expense (but subject to reimbursement as provided below), such further proceedings as are necessary to obtain a larger award, which proceedings (or the settlement thereof) shall be conducted by counsel selected by the party commencing such proceedings (and be reasonably acceptable to the other party) in accordance with determinations made by the party commencing such proceeding and reasonably acceptable to the other party; *provided, however,* that if Tenant

is the dissatisfied party and applicable law requires such proceeding to be brought in the name of Landlord, Landlord shall, upon request by Tenant, commence and prosecute, at Tenant's sole cost and expense (but subject to reimbursement as provided below), such further proceedings, which proceedings (or the settlement thereof) shall be conducted by counsel selected by Tenant (and reasonably acceptable to Landlord) in accordance with determinations made by Tenant and reasonably acceptable to Landlord. All costs and expenses incurred by Landlord or Tenant pursuant to this Section shall be reimbursed from any award so recovered.

## ARTICLE 16

## DEFAULT AND REMEDIES

16.1    <u>Events of Default</u>.  The following events shall constitute "<u>Events of Default</u>" by Tenant:

(a)    the failure by Tenant to pay any amount of Interim Rent, Basic Rent or Additional Rent when due and payable hereunder, which failure continues for a period of ten (10) days after written notice from Landlord to Tenant specifying the item in default; or

(b)    the failure by Tenant to maintain insurance as required by Article 8, which insurance continues for a period of ten (10) days after written notice from Landlord to Tenant specifying the item in default; or

(c)    the failure by Tenant to perform or comply with any of the agreements, terms, covenants or conditions in this Lease, other than those referred to in paragraphs (a) or (b) of this Section, for a period of thirty (30) days after written notice from Landlord to Tenant specifying the items in default, or in the case of a default which cannot with due diligence be cured within the 30-day period, the failure on the part of Tenant to commence such cure within such 30-day period and thereafter to prosecute the curing of such default to completion continuously with diligence (it being intended in connection with a default not susceptible of being cured with diligence within such 30-day period that the time within which Tenant shall cure the same shall be extended for such period as may be necessary to complete the same with diligence); or

(d)    any of the following: (i) if a receiver, guardian, conservator, or other similar officer is appointed to take possession of all or any portion of the Premises or Tenant's leasehold estate for whatever reason, and such appointment is not vacated within sixty (60) days, or (ii) if the estate hereby created shall be taken on execution or by other process of law, or (iii) if Tenant shall make an assignment for the benefit of creditors, or (iv) if Tenant shall initiate voluntary proceedings under any bankruptcy or insolvency law or law for the relief of debtors, or (v) if there shall be initiated against Tenant any such proceedings which are not dismissed within one hundred twenty (120) days; or

(e)    an Event of Default as described in Section 21.2 below.

16.2    Termination. If an Event of Default should occur, then so long as the same shall be continuing Landlord at any time may give written notice to Tenant specifying such Event or Events of Default and stating that this Lease shall terminate on the date specified in such notice (which date may be as early as the date of such notice), and upon the date specified in such notice this Lease and the Lease Term and all rights of Tenant under this Lease shall expire and terminate, and Tenant shall remain liable as hereinafter provided. Upon such termination, ownership of the Improvements shall pass to Landlord as provided in Section 6.4.

16.3    Reletting. At any time or from time to time after the termination of this Lease as provided in Section 16.2, Landlord may relet the Premises or any part thereof for such term or terms (which may be greater or less than the period which would otherwise have constituted the balance of the Lease Term) and on such conditions (which may include concessions or free rent and alterations of the Premises) as Landlord, in its good faith discretion, may determine, and may collect and receive the rents therefor. Landlord shall in no way be responsible or liable for any failure to relet the Premises or any part thereof, or for any failure to collect any rent due upon such reletting. Landlord shall have no duty to make reasonable efforts to relet the Premises or any portion thereof except to the extent (if any) to which such duty is imposed on Landlord by the laws (including decisional law) of The Commonwealth of Massachusetts.

16.4    Remedies.

(a)    No such termination shall relieve Tenant of its liabilities and obligations under this Lease, and such liabilities and obligations shall survive any such termination. In the event of any such termination, whether or not the Premises or any part thereof has been relet, Tenant shall pay to Landlord the Rent and all other charges required to be paid by Tenant up to the effective date of such termination, in addition to any amounts otherwise recoverable by Landlord pursuant to this Section 16.4.

(b)    At the election of Landlord at any time after any such termination, Tenant shall pay to Landlord, until what would have been the end of the Lease Term in the absence of such termination, as and for liquidated and agreed current damages for Tenant's default, the equivalent of the amount of Rent and other charges that would have been payable under this Lease by Tenant if this Lease was still in effect, less the net proceeds of any reletting after deducting all of Landlord's expenses incurred in connection with such reletting, including, without limitation, all repossession costs, brokerage and management fees, operating expenses, reasonable attorneys' fees and expenses, alteration costs, and expense of preparation for such reletting. Tenant shall pay such current damages (hereinafter called a "deficiency") to Landlord on the dates on which the Basic Rent would have been payable under this Lease if this Lease were still in effect, and Landlord shall be entitled to recover from Tenant each deficiency as the same shall arise.

(c)    At the election of Landlord at any time after such termination, as an alternative to further obligations of Tenant to Landlord pursuant to the preceding subsection (b), Tenant shall pay to Landlord on demand, as and for liquidated and agreed current damages for Tenant's default, an amount equal to two (2) years' Basic Rent at the rate that would have been in effect at the time Landlord makes such demand if this Lease was still in effect. Tenant shall remain liable for all amounts due under subsections (a)

and (b) above with respect to periods prior to Landlord's demand pursuant to this subsection (c).

(d)    For the purposes of subsection (b) of this Section 16.4, the phrase "what would have been the end of the Lease Term" shall be deemed to mean the remainder of the Lease Term as of the day immediately preceding the effective date of the termination of this Lease, taking into account any Extension Terms as to which Tenant had exercised an extension option in accordance with the provisions of Section 3.4 above prior to such termination.

16.5    Landlord's Right To Perform Tenant's Obligations.    If at any time an Event of Default shall occur and be continuing, Landlord, at its option and without waiving any claims related to the occurrence of such Event of Default, may cure the default on the part of Tenant. In addition, in the event of the occurrence of a default by Tenant that creates a significant threat of injury to persons or damage to property (including the Premises), Landlord shall be entitled (but shall not be obligated) to cure the same prior to the expiration of the cure period therefor stated in Section 16.1 after such notice (if any) to Tenant as may be practicable under the circumstances. All amounts expended by Landlord in curing defaults pursuant to this Section, together with interest thereon at the Default Rate from the date such sums were expended, shall be paid by Tenant to Landlord as Additional Rent.

16.6    Injunctive Relief.    In the event of any breach or threatened breach by Tenant of any of the agreements, terms, covenants or conditions contained in this Lease, Landlord shall be entitled to enjoin such breach or threatened breach and shall have the right to invoke any right and remedy allowed at law or in equity or by statute or otherwise as though re-entry, summary proceedings, and other remedies were not provided for in this Lease.

16.7    Remedies Cumulative.    Except as otherwise expressly provided in this Lease, each right and remedy provided for in this Lease to Landlord or Tenant shall be cumulative and shall be in addition to every other right or remedy provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by Landlord or Tenant of any one or more of the rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by the party in question of any or all other rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise.

16.8    Landlord's Default.    Landlord shall not be deemed to be in default in the performance of any of its obligations hereunder unless it shall fail to perform such obligations and such failure shall continue for a period of thirty (30) days after written notice has been given by Tenant to Landlord specifying the nature of Landlord's default or, if such default cannot reasonably be cured within said thirty (30) day period, shall not have commenced within said thirty (30) day period and thereafter be continuing to make diligent efforts to perform such obligations. Tenant's obligation to pay Rent hereunder is an independent covenant and Tenant shall have no right to withhold or abate any payment of Rent, or to deduct from Rent any amount, or to offset or interpose any counterclaim for any amount in any action or proceeding commenced by Landlord with respect to this Lease or the tenancy created hereunder, or to terminate this Lease, because of any default or alleged default on the part of Landlord under this

63

Lease, but Tenant shall have the right to commence and prosecute an independent action against Landlord to seek either damages or injunctive relief with respect to such Landlord default. Tenant hereby acknowledges that Tenant has been represented by counsel of its choice and has participated fully in the negotiation of this Lease, that Tenant understands that the remedies available to Tenant for a Landlord default may be more limited than those that would otherwise be available to Tenant under the common law in the absence of certain provisions of this Lease, and that the so-called "dependent covenants" rule as developed under the common law (including the statement of such rule as set forth in the Restatement (Second) of Property, Section 7.1) shall not apply to this Lease or to the relationship of landlord and tenant created hereunder. In the event of any such default by Landlord, and provided that such default has a material, adverse effect on Tenant's business operations, or threatens the health or safety of Tenant's employees, agents, contractors or invitees, Tenant shall have the right to cure any such default, the cost of such cure to be deductible from Minimum Rent and other monies from time to time due and payable hereunder to Landlord by Tenant; provided that before Tenant exercises the right of self-help, Tenant shall have given Landlord a second notice stating in bold-face type that the Landlord has ten (10) days to cure the default before Tenant has the right to exercise self-help, and Landlord shall not have cured such default within ten (10) days of receipt of Tenant's reminder notice. Any such cure by Tenant shall be performed in accordance with any applicable Legal Requirements, the Environmental Approvals, and the Environmental Agreements, and if consent of EPA or MADEP is required then Tenant shall have first obtained the same.

## ARTICLE 17

## SURRENDER

17.1    <u>Surrender</u>. Tenant shall on the last day of the Lease Term, or upon any earlier termination of this Lease, quit and peacefully surrender and deliver up the Premises, including the Existing Improvements (to the extent still then extant) and the Improvements, to the possession and use of Landlord without delay, free of all occupants, the same to be in compliance with all applicable Legal Requirements and otherwise in their then as-is condition; *provided, however,* that (i) if such surrender is made pursuant to Articles 14 or 15 above, then (unless Tenant elects to demolish the Improvements pursuant to Section 14.4) Tenant shall, at its sole cost and expense, secure the Improvements against unauthorized entry and damage by the elements; and (ii) notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right, in its sole election and at its sole cost and expense, to demolish the Improvements in their entirety, including all slabs and subsurface footings and foundations, (including the removal from the Land of all demolition materials and the disposal thereof in accordance with all applicable Legal Requirements), in which case Tenant shall deliver up the Premises on the last day of the Lease Term (or upon any earlier termination of this Lease) with the surface of the Land regraded to a reasonably level surface (and the affected portion of the Land either paved or landscaped) and a fence installed at the perimeter of the Land to prevent trespassing by unauthorized personnel. The Premises shall be surrendered free and clear of all liens and encumbrances other than (i) those existing at the commencement of the Lease Term, and (ii)

64

those created by Tenant thereafter with Landlord's prior written approval, and shall be surrendered without any payment by Landlord on account of the Improvements. If Tenant elects to deliver the Premises with the Improvements in place, Tenant shall (i) assign to Landlord all guaranties and warranties (if any) relating to any component of any building or structure then extant on the Land, together with all plans, specifications, as-built plans, operating manuals, and the like relating to such Improvements then in Tenant's possession, and (ii) remove all personal property from the Premises and repair all damage resulting from such removal and leave the building broom clean and free of trash or debris. Any property not so removed upon the expiration or earlier termination of the Lease Term shall become the property of Landlord and Landlord shall not have any obligation to account to Tenant therefor. Heating, plumbing, electrical and air conditioning, duct work, and equipment shall be deemed structural portions of the building and shall not be removed. Upon or at any time after the expiration or earlier termination of this Lease, Landlord may, without further notice, enter upon and re-enter the Premises and possess and repossess itself thereof, in accordance with applicable law, and may dispossess Tenant and remove Tenant and all other persons and property from the Premises, and may have, hold and enjoy the Premises and the right to receive all income from the same.

17.2    Holdover.    If Tenant continues in occupancy of the Premises after the expiration or earlier termination of the Lease Term, such occupancy (even with Landlord's consent or acquiescence) shall not be deemed to extend or renew the term of this Lease. Such occupancy shall be deemed a tenancy at will only, on a month-to-month basis, upon the terms herein contained, at a rent equal to one and one-half (1.5) times the Rent payable under Section 4.1 above for the last Lease Year prior to the end of the Lease Term, prorated and payable on a per diem basis for the period of such occupancy. Tenant's obligations under this Article 17 shall survive the expiration of the Lease Term or the earlier termination of this Lease.

ARTICLE 18

SIGNS

18.1    Tenant's Signs.    Tenant shall have the right, at its sole cost and expense, and in conformity with applicable Legal Requirements and Insurance Requirements, to erect and thereafter replace and relocate from time to time signs on the exterior of the Building and one or more pylon or tower signs. Tenant shall have the right, in its own name or in Landlord's name as required, to seek any Governmental Approvals required for its signs, and Landlord shall reasonably cooperate with Tenant in its application therefor (at no cost to Landlord). Tenant shall at its sole cost and expense, not later than the day on which the Lease Term expires or is earlier terminated, remove all signs from the Building and elsewhere on the Premises which were installed by Tenant, and repair to Landlord's reasonable satisfaction any damage to the Building and the Premises caused by such removal and, at Landlord's request, remove Tenant's sign panels from all pylon or tower signs (but leave the pylon or tower in place and functional). Tenant shall indemnify, defend and hold harmless Landlord from and against all costs, expenses, and liabilities resulting from, arising out of, or related to Tenant's obtaining any Governmental Approvals for signs or Tenant's erection, maintenance or removal of such signs.

65

ARTICLE 19

OPTION TO PURCHASE

19.1    Tenant's Option to Purchase.  Provided that this Lease is then in full force and effect and that no Event of Default exists, Tenant shall have an option to purchase the Premises by giving written notice of exercise of such option not earlier than the first day of the sixth (6th) month after the Term Commencement Date, and not later than the last day of the fifth (5th) Lease Year.  If Tenant so exercises its option to purchase, (i) the purchase price for the Premises shall be $9,411,765.00 (based on an 8.5% capitalization rate of the Basic Rent then in effect), and (ii) Landlord and Tenant shall, within forty-five (45) days after Tenant gives such notice of exercise, enter into a purchase and sale agreement at the price set forth above and on the terms and conditions set forth in Section 19.2 below and in **Exhibit G** attached hereto.  The closing shall be held on the first Business Day that is at least thirty (30) days following the execution of the purchase and sale agreement.

19.2    Terms and Conditions of Sale.  If Tenant duly exercises the purchase option described in Section 19.1, the purchase and sale agreement to be executed by the parties pursuant thereto shall provide for (in addition to the terms set forth on **Exhibit G** attached hereto) a deposit due upon execution of the purchase and sale agreement in the amount of $250,000.00.

19.3    Other Provisions Applicable to Tenant's Option to Purchase.

(a)    In the event that Tenant duly exercises the purchase option described in Section 19.1 and thereafter defaults in the performance of its obligation so to purchase the Premises, (i) Tenant shall be deemed to have irrevocably waived all rights to purchase the Premises pursuant to Section 19.1 or Article 20, (ii) Landlord shall be entitled to retain as liquidated damages all deposits paid by Tenant pursuant to this Article 19 or the purchase and sale agreement (if one is executed by the parties), and (iii) Tenant's rights under the remaining provisions of this Lease shall remain in full force and effect and such default shall not constitute a default under this Lease.

(b)    Time is of the essence of this Article 19.

(c)    All notices given hereunder shall be given in the manner and shall be effective as provided in Section 22.4 of this Lease.  Tenant may not assign all or any portion of its rights under this Article 19 except in connection with and to the assignee of an assignment of Tenant's entire interest under this Lease in accordance with the provisions of Article 12 of this Lease.  The option to purchase set forth in this Article 19 shall terminate upon the expiration or earlier termination of this Lease, unless, prior to such expiration or earlier termination of this Lease, (i) Tenant has duly exercised the option to purchase in accordance with the provisions of Section 19.1 above, and (ii) the parties have fully executed and delivered a purchase and sale agreement in accordance with the provisions of this Article 19.

66

ARTICLE 20

RIGHT OF FIRST OFFER

20.1    <u>Right of First Offer</u>.  In consideration of the execution by Tenant of this Lease, Landlord hereby grants to Tenant a right of first offer with respect to the purchase of the Premises, on the following terms and conditions:

(a)    Landlord shall not, at any time during the Lease Term, convey or transfer title to the Premises, or any part thereof (other than to an entity which controls Landlord, is controlled by Landlord, or is under common control with Landlord), or advertise or list the Premises, or any portion thereof, as available for purchase by any third party, except in accordance with the provisions of this Article.

(b)    Provided that this Lease is then in full force and effect and that no Event of Default exists, if, during the Lease Term, Landlord desires to make the Premises available for purchase, Landlord shall give a written notice to Tenant (the "<u>First Offer Notice</u>"), which notice shall contain the purchase price that Landlord is willing to accept for the Premises (the "<u>Offer Price</u>"), and an offer to sell the Premises to Tenant at the Offer Price and on the other terms and conditions set forth below in this Article 20 and in **Exhibit G** attached hereto.

(c)    Tenant shall have twenty (20) days from the date the First Offer Notice is given within which to give written notice to Landlord (an "<u>Acceptance Notice</u>") that it accepts the offer to purchase set forth in the First Offer Notice.  If Tenant so gives an Acceptance Notice to Landlord, then Landlord and Tenant shall, within forty-five (45) days after Tenant gives such Acceptance Notice, enter into a purchase and sale agreement at the Offer Price and on the terms and conditions set forth in Section 20.2 below and in **Exhibit G** attached hereto.  The closing shall be held on the first Business Day that is at least thirty (30) days following the execution of the purchase and sale agreement.

(d)    If Tenant does not give an Acceptance Notice to Landlord within said 20-day period (or if Tenant by notice to Landlord earlier waives its right to purchase), Landlord shall be free, for a period of one (1) year after the end of such 20-day period, to enter into a purchase and sale agreement providing for the sale of the Premises on terms and conditions not materially less favorable to Landlord than those set forth in the First Offer Notice, and provided that Landlord enters into such a purchase and sale agreement within such 1-year period and thereafter conveys the Premises pursuant thereto within six (6) months after executing such purchase and sale agreement, then this Article 20 shall be of no further force and effect; *provided that* if at the time Landlord gives the First Offer Notice Tenant is not then operating a retail store open to the public in at least fifty percent (50%) of the leasable area of the retail portion of the Premises (other than temporary cessations due to casualties, takings, remodeling or Force Majeure), then the foregoing one-year period shall be five (5) years.  If Landlord does not so convey the Premises within the applicable one or five year period (as the case may be) provided in this Section 20.1(d), the Premises shall remain

67

subject to this Article 20 and may not thereafter be conveyed without first being offered to Tenant in the manner provided in subsection (b) above. The parties hereby agree that a reduction in the purchase price of not more than five percent (5%) of the purchase price as set forth in the First Offer Notice shall not be deemed a material modification of the terms set forth in the First Offer Notice for purposes of this Section.

20.2    <u>Terms and Conditions of Sale</u>. If Tenant duly exercises the right of first offer described in Section 20.1, the purchase and sale agreement to be executed by the parties pursuant thereto shall provide for (in addition to the terms set forth on **Exhibit G** attached hereto) a deposit due upon execution of the purchase and sale agreement in the amount of $250,000.00.

20.3    <u>Other Provisions Applicable to Tenant's Right of First Offer</u>. (a)    The provisions of this Article 20 shall also apply to individual parts of the Premises. If a part or parts of the Premises have been transferred in accordance with the provisions of this Article 20, the parts of the Premises not so transferred shall remain subject to this right of first offer.

(b)    The right of first offer set forth herein shall not apply to a foreclosure sale pursuant to any mortgage on Landlord's fee interest in the Premises or to any conveyance in lieu of the foreclosure thereof; *provided, however,* that any mortgage which is subject and subordinate to this Lease shall be subject hereto, as shall title in the hands of a successor to the title to the Premises taking upon foreclosure, or in lieu of foreclosure, throughout the Lease Term. The provisions of this Article 20 shall not apply to any transfer of title by operation of law, but the title of those taking thereby shall remain subject to the provisions of this Article throughout the Lease Term.

(c)    In the event that Tenant gives an Acceptance Notice in accordance with the provisions of this Article 20 but thereafter defaults in the performance of its obligation so to purchase the Property, (i) the provisions of Article 19 and of this Article 20 shall be of no further force and effect, (ii) Landlord shall be entitled to retain as liquidated damages all deposits paid by Tenant pursuant to this Article 20 or the purchase and sale agreement (if one is executed by the parties), and (iii) Tenant's rights under the remaining provisions of this Lease shall remain in full force and effect and such default shall not constitute a default under this Lease.

(d)    Time is of the essence of this Article 20.

(e)    All notices given hereunder shall be given in the manner and shall be effective as provided in Section 22.4 of this Lease. Tenant may not assign this right of first offer, except in connection with an assignment of Tenant's entire interest under this Lease in accordance with the provisions of Article 12 of this Lease. The right of first offer set forth in this Article 20 shall terminate upon the expiration or earlier termination of this Lease, unless Tenant shall have given an Acceptance Notice prior to such expiration or earlier termination of this Lease, in which event this right of first offer shall continue in full force and effect on the terms of this Article 20.

68

ARTICLE 21

SECURITY

21.1    Security Deposit. Upon the execution of this Lease, Tenant shall pay to Landlord the sum of $66,667.00, which shall be held by Landlord without interest and which may be commingled with funds of Landlord, as security for Tenant's performance as herein provided. The security deposit shall be returned to Tenant within thirty (30) days after the expiration or earlier termination of this Lease provided that Tenant is not then in default hereunder. Landlord shall have the absolute right, at any time, to apply or use all or any part of the security deposit to cure any Event of Default by Tenant hereunder and/or to reimburse Landlord for payments made or liabilities incurred to effect any such cure. If all or any part of the security deposit is so used or applied, Tenant shall (notwithstanding the provisions of Section 4.5 above) immediately upon request by Landlord, pay to Landlord as Additional Rent the amount necessary to restore the security deposit to its then required amount. Tenant shall not have the right to call upon Landlord to apply all or any part of the security deposit to cure any default or fulfill any obligation of Tenant; such use shall be solely in the discretion of Landlord. Upon any conveyance by Landlord of its interest under this Lease, Landlord shall deliver the security deposit to its transferee. Upon any such delivery Tenant hereby releases Landlord herein named of and from any and all liability with respect to the security deposit, its application and return, and Tenant agrees to look solely to transferee. It is further understood that this provision shall also apply to subsequent transferees of the landlord interest hereunder.

21.2    Letter of Credit. (a) Within thirty (30) days after the earlier of (i) the Demolition Completion Date, or (ii) the expiration (or earlier waiver in writing by Landlord) of Landlord's right to terminate this Lease pursuant to Section 2.3(d) above, Tenant shall deliver to Landlord an irrevocable standby letter of credit (the "Letter of Credit"), in the form attached hereto as **Exhibit I** (or in form and content otherwise approved in writing in advance by Landlord, which approval shall not be unreasonably withheld, delayed or conditioned *except* that the conditions to draw set forth in the Letter of Credit must be acceptable to Landlord in its sole and absolute discretion) and shall be issued by a commercial bank reasonably acceptable to Landlord. The Letter of Credit shall provide that it may be drawn upon in Boston, Massachusetts (i) in part or in whole, upon the presentation of a sight draft accompanied by a certificate signed by a representative of Landlord, setting forth either (a) the amount due to Landlord by reason of the occurrence of an Event of Default by Tenant hereunder, or (b) if the Lease has expired in accordance with its terms, the amount of damages Landlord actually has incurred in accordance with the terms of this Lease by reason of a default on the part of Tenant existing on such expiration date, or (c) if Landlord has terminated this Lease by reason of the occurrence of an Event of Default hereunder, the amount of damages to which Landlord is entitled under this Lease by reason of such termination, and (ii) in whole, upon the presentation of a sight draft accompanied by a certificate signed by a representative of Landlord, stating that (a) the Lease Term has more than thirty (30) days remaining, (b) such Letter of Credit will expire within not more than thirty (30) days of such certificate, and (c) Tenant has not deposited a substitute Letter of Credit in the form, amount and issued by a bank as required by this Section. Tenant shall deposit the original Letter of Credit with Landlord and shall will keep the Letter of Credit in full force

69

and in compliance with the provisions of this Lease throughout the Lease Term *except* as otherwise expressly provided in Section 21.2(e) below.

(b)     Landlord may use the Letter of Credit to cure any Event of Default by Tenant. In the event that Landlord draws upon and applies or retains any portion or all of the proceeds of the Letter of Credit towards the cure of an Event of Default hereunder, Tenant shall deliver an amendment to the Letter of Credit increasing the amount of the Letter of Credit by the amount so drawn by Landlord within ten (10) days of notice given by Landlord to Tenant, so that at all times (subject to the 10-day grace period herein referenced) Landlord shall be entitled to draw down upon the full aggregate amount of the Letter of Credit. Any failure of Tenant to restore any amount drawn under the Letter of Credit within the time and manner specified in this Section shall immediately constitute an Event of Default hereunder and entitle Landlord to immediately draw down the Letter of Credit then in force or effect and hold the proceeds of such draw as a cash security deposit pursuant to the provisions of this Section. Tenant shall be solely responsible for the payment of all costs associated with obtaining, replacing (as necessary), transferring, extending and maintaining the Letter of Credit in accordance with the terms of this Section 21.2.

(c)     Tenant shall not have the right to call upon Landlord to make any draw upon the Letter of Credit to cure any default or fulfill any obligation of Tenant; such use shall be solely in the discretion of Landlord.

(d)     Landlord shall assign and deliver the original Letter of Credit to its successor or assign, and Tenant agrees to look solely to such successor or assign and thereafter Landlord shall have no further responsibility therefor. It is further understood that this provision shall also apply to subsequent transferees of the landlord interest hereunder. Upon the expiration or earlier termination of the Lease Term, Landlord shall be entitled to draw upon the Letter of Credit as may be required to cure any defaults by Tenant then existing hereunder, and, if Tenant is not then in default hereunder, Landlord shall return the original Letter of Credit to Tenant.

(e)     The Letter of Credit shall be in the following amount from time to time:

(i)     when initially delivered to Landlord, the Letter of Credit shall be in the amount of $1,600,000.00; and

(ii)     thereafter, the amount of the Letter of Credit shall be increased (by amendment or by delivery of an additional or substitute Letter of Credit in the form required by this Section) not later than thirty (30) days prior to the effective date of any increase in Basic Rent as set forth in Section 4.1 above to an amount equal to two (2) years' Basic Rent at such increased rate.

The Letter of Credit (as the same may be renewed, replaced, or amended) shall remain in full force and effect for the entire Lease Term plus a period of thirty (30) days after the expiration of the Lease Term. Tenant shall be responsible, at its sole cost and

70

expense, for maintaining the Letter of Credit in the correct amount at all times in accordance with the provisions of this Section 21.2. Any failure on the part of Tenant to do so shall constitute an immediate Event of Default without the necessity of any notice or the expiration of any cure period.

21.3    Landlord's Election to Proceed.  In the event of a default by Tenant hereunder, Landlord shall have the sole discretion as to whether to proceed against Tenant, the security deposit, the Letter of Credit, or any combination thereof, and Tenant shall have no right or power to direct Landlord in such matters.  Landlord may proceed against the security deposit or the Letter of Credit in any order and from time to time, without thereby waiving any rights with respect to each of them.

ARTICLE 22

MISCELLANEOUS

22.1    Landlord's Covenant.  Landlord hereby covenants and agrees that Tenant, upon paying all Rent as herein provided and observing and keeping all covenants, agreements and conditions of this Lease on its part to be kept, shall have and enjoy the Premises (including, without limitation, the Existing Improvements and the Improvements) during the Lease Term without hindrance by anyone claiming by, through or under Landlord, subject, however, to the matters described on **Exhibit B** attached hereto and the terms of this Lease.

22.2    Entry on Premises by Landlord.  Landlord and its authorized representatives shall have the right to enter the Premises at all reasonable times (i) for the purpose of inspecting the same for compliance with the covenants and obligations of this Lease, and (ii) for all other lawful purposes, in all cases subject to the following provisions: (a) except in case of emergency threatening personal injury or property damage or requiring emergency repairs to the Monitoring Wells and Recovery System, Landlord shall provide reasonable advance notice to Tenant of any such entry; (b) such entry shall be made during normal business hours to the maximum extent practicable, (c) such entry shall be subject to the rights of subtenants and licensees of Tenant as set forth in their respective leases or occupancy agreements, and (d) such entry shall not unreasonably interfere with the normal business operations of any occupants of any portion of the Improvements; *provided, however,* that the foregoing restrictions on Landlord's right to enter upon the Premises shall not apply when such entry is required by EPA, MADEP, or any other governmental authority having jurisdiction over the Premises, nor when such entry is made for the purpose of responding to a release or threatened release of Hazardous Materials on or from the Premises.  Landlord's rights under this Section shall be in addition to Landlord's right of access pursuant to Section 11.11 above.

22.3    Utilities and Services.    Tenant shall pay all expenses associated with the ownership of the Improvements and the operation, management, maintenance, repair, use and occupancy of the Premises, including, without limitation, all charges for gas, water, sewer, electricity, light, heat, power, steam, telephone or other communication service, or other utilities or services used, rendered or supplied to, upon or in connection with the Premises throughout the

71

Lease Term, and Tenant shall indemnify and save Landlord harmless against and from all liabilities, obligations, damages, penalties, claims, costs, charges and expenses on such account. Tenant shall be solely responsible for making all arrangements for the provision to the Premises of all services and utilities desired by Tenant, and Landlord shall have no obligation to provide any services or utilities to Tenant or to the Premises.

22.4    Notices.    Any and all notices, demands, requests, submissions, approvals, consents, disapprovals, objections, offers or other communications or documents required to be given, delivered or served, or which may be given, delivered or served, under or by the terms and provisions of this Lease or pursuant to law or otherwise, shall be in writing and shall be delivered by hand or sent by registered or certified mail, return receipt requested, or by nationally-recognized overnight courier service with written confirmation of delivery,

    addressed if to Tenant to:

        MVP Sports Stores, Inc.
        326 Ballardvale Street
        Wilmington, Massachusetts 01887
        Attention:  Head of Real Estate & Site Development
            – Decathlon USA

        with a copy to:

        Kaitz + Associates, LLP
        38 Glen Avenue
        Newton, Massachusetts 02459
        Attention:  Richard J. Kaitz, Esq.

or to such other address as Tenant may from time to time designate by written notice to Landlord, or if to Landlord, addressed to:

        W.R. Grace & Co. – Conn.
        7500 Grace Drive
        Columbia, Maryland 21044
        Attention:  Director of Real Estate

        with a copy to:

        W.R. Grace & Co. – Conn.
        7500 Grace Drive
        Columbia, Maryland 21044
        Attention:  Real Estate Counsel

or to such other address as Landlord may from time to time designate by written notice to Tenant, or to such other agent or agents as may be designated in writing by either party. Each such notice or submission shall be deemed to be given on the earlier of (i) the date of delivery by

72

hand, or (ii) the date of delivery or upon which delivery was first refused as indicated on the registered or certified mail return receipt or overnight courier receipt.

22.5    Release.  Except only as otherwise expressly provided in Article 11, Tenant agrees that Landlord shall not be liable for any injury or damage to any property or to any person happening on, in or about the Premises, or for any injury or damage to the Premises, or to any property by reason of any defect in the Premises, or which may result from steam, gas, electricity, water, rain or sewer, or any defect in any engines, boilers, elevators, escalators, machinery, electric wiring or fixtures, or for any failure or defect of water, heat, electric light or power supply or for any kind of injury or damage which may arise from any other cause whatsoever on the Premises, including defects in construction, latent or otherwise.

22.6    Personal Property Taxes.  Tenant shall cause to be paid when due without the accrual of interest or penalties, any personal property tax levied on any personal property on the Premises regardless of the ownership of same, and shall indemnify Landlord against any claim, expense, or liability arising from Tenant's failure to cause all such personal property taxes to be timely paid.

22.7    Enforcement Expenses.    Should Landlord or Tenant institute any legal proceedings against the other for breach of any provisions herein contained, the prevailing party in such action shall in addition be entitled to recover its reasonable costs and expenses from the losing party including its reasonable attorneys' fees.

22.8    Severability.  If any term or provision of this Lease or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

22.9    No Waiver.  No failure by either Landlord or Tenant to insist upon the strict performance of any agreement, term, covenant or condition hereof or to exercise any right or remedy consequent upon a breach thereof, and no acceptance of full or partial payment of any Rent during the continuance of any such breach, shall constitute a waiver of any such breach or of such agreement, term, covenant or condition.  No agreement, term, covenant or condition hereof to be performed or complied with by either Landlord or Tenant, and no breach thereof, shall be waived, altered or modified except by a written instrument executed by the other party. No waiver by Landlord or Tenant of any breach shall affect or alter this Lease, but each and every agreement, term, covenant and condition hereof shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

22.10    Estoppel Certificates.  Landlord and Tenant shall, without charge, at any time and from time to time, within twenty (20) days after request by the other, certify by written instrument, duly executed, acknowledged and delivered to the party making such request, or any other person, firm or corporation specified by such party:

73

(a)     that this Lease is unmodified and in full force and effect, or, if there have been any modifications, that the same is in full force and effect as modified and stating the modifications;

(b)     whether or not, to the best knowledge of the person executing the certificate on behalf of Landlord or Tenant, there are then existing any disputes concerning, or any claimed set-offs or defenses against the enforcement of, any of the agreements, terms, covenants or conditions hereof and any modifications hereof upon the part of the other party hereto to be performed or complied with, and, if so, specifying the same;

(c)     the date to which Rent has been paid;

(d)     the date of expiration of the Lease Term; and

(e)     any other information, reasonably and customarily included in any such certificate.

Any such certificate may be relied upon by the party requesting it and any other person, firm or corporation to whom the same is addressed.

22.11   Waiver of Jury Trial.  The parties hereto waive a trial by jury of any and all issues arising in any action or proceeding between them or their successors or assigns under or connected with this Lease or any of its provisions, any negotiations in connection therewith, or Tenant's use or occupation of the Premises.

22.12   Brokers.  The parties hereto acknowledge and agree that in connection with the leasing of the Premises hereunder, they have used the services of The Stubblebine Company and Summit Realty Partners.  Landlord shall pay to such parties any and all commissions due to them for such services in accordance with the provisions of a brokerage agreement dated December 18, 2003 between Landlord and the Stubblebine Company.  Subject to the foregoing, Landlord and Tenant mutually represent that they have dealt with no broker in connection with this Lease. Landlord and Tenant agree to indemnify and save the other harmless from any and all loss, cost, damage or expense incurred arising from their respective dealing with a broker.

22.13   Integration.  All prior understandings and agreements between the parties are merged within this Lease, which fully and completely sets forth the understanding of the parties. This Lease may not be changed or terminated orally or in any manner other than by an agreement in writing and signed by the party against whom enforcement of the change or termination is sought.

22.14   Bind and Inure.  The covenants and agreements herein contained shall bind and inure to the benefit of Landlord, its successors and assigns, and Tenant, its successors and assigns.  All covenants, obligations or agreements of Landlord contained in this Lease shall be binding upon Landlord and Landlord's successors only with respect to breaches occurring during Landlord's and Landlord's successors' respective ownership of the Landlord's interest hereunder.

74

22.15  <u>No Merger</u>.  There shall be no merger of this Lease or of the leasehold created hereby with the fee estate in the Premises by reason of the fact that Landlord may acquire or hold, directly or indirectly, the leasehold estate hereby created or an interest herein or in such leasehold estate, unless Landlord executes and records an instrument affirmatively electing otherwise.

22.16  <u>Enforcement of Landlord's or Tenant's Liability</u>.  Anything contained in this Lease to the contrary notwithstanding, but without limitation of Tenant's equitable rights and remedies, Tenant specifically agrees to look solely to Landlord's interest in the Premises for recovery of any judgment from Landlord (other than for recovery against Landlord for a default by Landlord under Article 11 of this Lease); it being specifically agreed that neither Landlord nor anyone claiming under Landlord (including without limitation any trustees, partners, beneficiaries, officers, directors, shareholders, members, managers or employees of Landlord) shall ever be personally liable for any such judgment.  In no event shall Landlord or Tenant ever be liable to the other for any indirect or consequential damages.  It is further understood and agreed that no trustee, partner, beneficiary, officer, director, shareholder, member, manager or employee of Tenant shall ever be personally liable for the performance of any covenant or obligation on the part of Tenant to be performed under this Lease nor for the payment of any sums payable by Tenant under this Lease.

22.17  <u>Landlord Financing</u>.  This Lease shall be subordinate and subject to the lien of any mortgage hereafter granted by Landlord on its fee interest in the Premises provided that the holder thereof enters into a subordination, non-disturbance and attornment agreement with Tenant in form and content reasonably acceptable to Tenant.  As used in this Section, the term "mortgage" includes mortgages, deeds of trust and all similar instruments, all modifications, extensions, renewals and replacements thereof, and any and all assignments of Landlord's interest in this Lease given as collateral security for any obligation of Landlord.

22.18  <u>Consents</u>.  Notwithstanding anything contained elsewhere in this Lease, Tenant shall have no claim, and hereby waives the right to any claim, against Landlord for money damages by reason of any refusal, withholding or delaying by Landlord of any consent or approval, and in such event Tenant's only remedies therefor shall be an action for specific performance or injunction to enforce any such requirement for Landlord's consent or approval.

22.19  <u>Captions; Table of Contents</u>.  The captions of this Lease and the Table of Contents preceding this Lease are for convenience and reference only and in no way define, limit or describe the scope or intent of this Lease nor in any way affect the meaning or construction of this Lease.

22.20  <u>Exhibits</u>.  The Exhibits attached to this Lease shall be deemed a part of this instrument.

22.21  <u>Massachusetts Law Governs</u>.  This Lease shall be governed exclusively by, and construed in accordance with, the laws of the Commonwealth of Massachusetts.

22.22  <u>Time of the Essence</u>.  Time shall be of the essence hereof and of all dates and time periods set forth herein.

22.23  <u>No Partnership or Joint Venture</u>.  Nothing contained in this Lease shall be construed to create a partnership or joint venture between Landlord and Tenant or to make Landlord an associate in any way of Tenant in the conduct of Tenant's business.  Landlord shall not be liable for any debts incurred by Tenant in the conduct of Tenant's business, nor (except as otherwise explicitly provided herein) shall Tenant be liable for any debts incurred by Landlord in the conduct of Landlord's business, and it is understood by the parties hereto that this relationship is and at all times shall remain that of landlord and tenant.

22.24  <u>Force Majeure</u>.  In the event that Landlord or Tenant is delayed in performing any act because of any of the following (each a "<u>Force Majeure</u>"): the occurrence of any act of God; strikes, lockouts or labor troubles; failure of power; riots, insurrection, acts of the public enemy and wars; order of any government, court or regulatory body; fires, explosions, earthquakes, hurricanes and other natural disasters; any act, failure to act or default of the other party to this Lease; or any other cause beyond the control of Landlord or Tenant, as the case may be, *provided, however,* that lack of money shall not be deemed such a cause, then such performance shall be excused for the period of the delay and the period for the performance of any such act shall be extended for an equivalent period.

22.25  <u>When Lease is Binding</u>.  Neither the submission of this Lease by one party to the other, nor one party's execution and delivery thereof to the other party, nor any communications to date between Landlord and Tenant, whether oral or written, shall constitute, or evidence, any agreement on the part of Landlord or Tenant or confer any rights on Landlord or Tenant. Landlord and Tenant are to be bound with respect to this Lease and the Premises only if and when (a) this Lease has been fully executed by Landlord and Tenant, (b) the security deposit has been delivered to Landlord pursuant to Article 21, and (c) Landlord delivers to Tenant a copy of this Lease executed by Landlord.

22.26  <u>Counterparts</u>.  This Lease may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

(Remainder of page intentionally left blank)

EXECUTED under seal as of the date first set forth above.

LANDLORD:

W.R. GRACE & CO.-CONN.

By: _____
    Name:
    Title:

TENANT:

MVP SPORTS STORES, INC.

By: _____
    Name:
    Title:

# EXHIBIT A

## PLAN SHOWING THE PREMISES

**[See attached plan]**

**EXHIBIT A-1**

**LEGAL DESCRIPTION OF THE LAND**

A certain parcel of land situated in Woburn, in the County of Middlesex, Commonwealth of Massachusetts, being shown on plan entitled "Plan of Land, Woburn, Mass.", dated May 11, 1957, by Harry R. Feldman Inc., Engineers, recorded with Middlesex South District Registry of Deeds, Book 8957, Page 65, and being further bounded and described as shown on said plan as follows:

| | |
|---|---|
| WESTERLY | by said Washington Street, by three bounds totaling five hundred sixty-eight and 36/100 (568.36) feet; |
| NORTHERLY | by land now or formerly of Carlson, one thousand forty-six and 75/100 (1046.75) feet; |
| NORTHEASTERLY | by land of owners unknown, two hundred thirty-two (232) feet; |
| SOUTHEASTERLY | by land of owners unknown, two hundred eight-six and 97/100 (286.97) feet; |
| NORTHEASTERLY | again, by land of owners unknown, one hundred two (102) feet, said line being through the center line of a brook; and |
| SOUTHERLY | by land now or formerly of Anderson, by two bounds totaling nine hundred and eighty-three and 10/100 (983.10) feet; |

Excepting therefrom the following parcel conveyed by W.R. Grace & Co. to William S. Cummings by Deed dated October 18, 1971, recorded in Book 12113, Page 232:

A triangular parcel of land in Woburn, Middlesex County, Massachusetts bounded and described as follows:

| | |
|---|---|
| EASTERLY | by land of William S. Cummings and Joyce M. Cummings, one hundred two (102.00) feet, N 23° 35'33" W; |
| SOUTHWESTERLY | one hundred twenty-eight and 32/100 (128.32) feet, S 87° 37'58" E; |
| SOUTHWESTERLY | eight and 24/100 (8.24) feet, S 87° 59'29" E; and |
| NORTHWESTERLY | one hundred twenty-nine and 88/100 (129.88) feet, by land of W. R. Grace & Co. |

79

## EXHIBIT B

## RIGHTS APPURTENANT TO, AND ENCUMBRANCES UPON, THE PREMISES

1.  Order of Taking by the Commonwealth of Massachusetts Department of Public Works, dated December 16, 1986 (Layout No. 6709), recorded with Middlesex South District Registry of Deeds ("Deeds") in Book 17762, Page 391.

2.  Order of Taking by the Commonwealth of Massachusetts Department of Public Works, dated December 16, 1986 (Layout No. 6613, recorded with said Deeds in Book 17762, Page 401.

3.  Order of Taking by the Commonwealth of Massachusetts Department of Public Works, dated May 24, 1989 (Layout No. 6842), recorded with said Deeds in Book 19879, Page 356.

4.  Order of Taking by the Commonwealth of Massachusetts Department of Public Works, dated May 24, 1989 (Layout No. 6904), recorded with said Deeds in Book 19879, Page 480.

5.  Notice of Federal Lien under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. Sec. 9601 et. seq., dated May 5, 1989, recorded with said Deeds in Book 20088, Page 251, as affected by Notice and Certification of Release of Federal Lien, dated February 10, 1993, recorded with said Deeds in Book 22906, Page 448.

6.  Order of Conditions under Massachusetts Wetlands Protection Act (DEP File No. 348-261) recorded with said Deeds in Book 21966, Page 509, as affected by Certificate of Compliance dated May 23, 1996, recorded with said Deeds in Book 29411, Page 190.

7.  Joint Easement Agreement between W.R. Grace Company and Anderson Estates, Inc. and New England Telephone and Telegraph Company and Boston Edison Company, dated June 4, 1992, recorded with said Deeds in Book 22105, Page 493.

8.  Civil Action No. 91-11807MA recorded with said Deeds in Book 23429, Page 356.

**EXHIBIT C**

## <u>PLAN SHOWING LOCATION OF MONITORING WELLS</u>
## <u>AND RECOVERY SYSTEM</u>

**[See attached plan]**

81

**EXHIBIT D**

**DEVELOPMENT PLAN**

**[See attached plan]**

82

**EXHIBIT E**

**ENVIRONMENTAL REPORTS**

**[See attached list]**

83

**EXHIBIT F**

**METHOD OF DETERMINING ALLOCATION OF TAKING AWARDS/AMOUNT OF BASIC RENT ABATEMENT**

**(REFERENCE SECTION 15.5)**

If the parties are otherwise unable to agree upon the allocation of a *pro tanto* award or a final Taking award, or the amount by which Basic Rent is to be abated following a Taking of a portion of the Premises, said allocation or abatement shall be determined by arbitration in the following manner:

1. Either Landlord or Tenant may commence such arbitration by giving written notice to the other party of the appointment of an arbitrator to make such determination, which arbitrator shall have the qualifications set forth in this Paragraph. Within fifteen (15) days after its receipt of such notice, the other party shall give written notice to the first party of the appointment of a second arbitrator having the qualifications set forth in this Paragraph. Each arbitrator appointed pursuant to this Exhibit shall be an M.A.I. real estate appraiser and shall have been active over the ten (10) year period ending on the date of such appointment in the appraisal of retail and office properties in the Woburn, Massachusetts area.

2. The two arbitrators so appointed shall each, within forty-five (45) days of the notice appointing the first arbitrator, submit to the party which retained it (and shall deliver a copy to the other party) a written report setting forth his or her determination of the allocation of the *pro tanto* award or the final Taking award or the amount of such Basic Rent abatement, as the case may be, between Landlord and Tenant.

3. If the difference between the two determinations is not more than five (5%) percent, then the average of the two determinations shall be deemed to be the allocation or the abatement amount (as the case may be), which shall be final and binding upon Landlord and Tenant for the purposes of Article 15 of this Lease. If the difference between the two determinations is more than five (5%) percent, then the two arbitrators so appointed shall, within ten (10) Business Days after the delivery of the last written report by one of the first two arbitrators, agree upon and appoint a third arbitrator who shall have the qualifications set forth in Paragraph 1 above. If the first two arbitrators cannot agree upon the appointment of the third arbitrator within such 10-Business Day period, either Landlord or Tenant may apply to the American Arbitration Association, the Greater Boston Real Estate Board, or any successor thereto for the designation of a third arbitrator possessing the qualifications set forth above

4. The third arbitrator chosen shall, within thirty (30) days of his or her appointment, submit to Landlord and Tenant a written report setting forth his or her determination of the allocation of the *pro tanto* award or the final Taking award or the amount of such Basic Rent abatement, as the case may be, between Landlord and Tenant. The determination of the third arbitrator shall be final and binding upon Landlord and Tenant for the purposes of Article 15 of this Lease.

84

5.      If the second party fails to appoint an arbitrator and give written notice of such appointment to the first party within the 15-day period specified in Paragraph 1 above, the arbitrator appointed by the other party shall make his or her determination of such allocation or Basic Rent abatement (as the case may be) and shall deliver a written report in the manner described in Paragraph 2 above within forty-five (45) days of his or her appointment. The determination of such allocation or Basic Rent abatement (as the case may be) made by such arbitrator shall be final and binding upon Landlord and Tenant for the purposes of Article 15 of this Lease.

6.      If one of the arbitrators selected by the parties pursuant to Paragraph 2 above delivers a written report setting forth his or her determination of such allocation within the 45-day period described in Paragraph 2 above but the other arbitrator does not, then the determination so delivered by such arbitrator within such 45-day period shall be final and binding upon Landlord and Tenant for the purposes of Article 15 of this Lease.

7.      Each party shall pay the fees and expenses of the arbitrator which it appoints in connection with any proceeding under this Exhibit, and the parties shall share equally the fees and expenses of the third arbitrator.

85

**EXHIBIT G**

**PROVISIONS APPLICABLE TO OPTION TO PURCHASE AND RIGHT OF FIRST OFFER**
**(REFERENCE ARTICLE 19 AND ARTICLE 20)**

     1.    The purchase price shall be paid at the time of delivery of the deed by certified or bank check or by federal wire transfer.

     2.    At the closing, Landlord shall convey the Premises by a good and sufficient quitclaim deed running to Tenant or to such grantee as Tenant may designate by written notice to Landlord at least seven (7) days before the designated closing date, and the deed shall convey a good and clear record and marketable title thereto, free from encumbrances except:

         (a)    such taxes for the then current tax period as are not due and payable on the closing date;

         (b)    those matters identified on **Exhibit B** attached to this Lease (exclusive of the Fee Mortgage);

         (c)    all encumbrances arising after the date of this Lease (i) to which Tenant has consented in writing, which consent shall not be unreasonably withheld, delayed or conditioned, or (ii) which have been created by (or suffered to arise by) Tenant, whether or not in accordance with the provisions of this Lease ;

         (d)    any subleases or other occupancy arrangements entered into by Tenant;

         (e)    the Consent Decree;

         (f)    this Lease;

         (g)    a certain Notice of Obligations, Covenants and Easements to be prepared and recorded by Landlord prior to closing in compliance with Section 7a of the Consent Decree, granting the United States Environmental Protection Agency and the Commonwealth of Massachusetts, and their respective employees, agents, authorized representatives and contractors, access over and the right to conduct activities and to require limitations on residential use on, under, and over the Premises incident to the remediation being carried out by Landlord pursuant to the Consent Decree;

         (h)    an Access Easement and Agreement to be prepared and recorded by Landlord and reasonably acceptable to Tenant, granting Landlord and its employees, agents, authorized representatives, contractors, successors and assigns, access over and the right to conduct activities on, under, and over the Premises, excluding the interior of buildings on the Premises (unless there is one or more recovery wells in the interior of any such building) for the purposes of operating, maintaining, repairing and replacing as necessary the

86

Monitoring Wells and Recovery System and otherwise effectuating the terms of the Consent Decree;

(i)     a lease for the operation and maintenance by Landlord of the Recovery System, to be prepared by Landlord and reasonably acceptable to Tenant;

(j)     an AUL imposed by Landlord in accordance with the provisions of Section 11.2(g) (if Landlord elects to impose an AUL on the Premises) and/or an AUL imposed by Tenant in accordance with the provisions of Section 11.8;

(k)     deed restrictions imposing upon the Premises, for the benefit of Landlord, the limitations on use and activities set forth in any AUL recorded by Landlord prior to the delivery of the deed; and

(l)     any other matters specifically described in the First Offer Notice (applicable to Article 20 only).

3.     On the closing date, Tenant shall accept the Premises in their "as is" condition.

4.     If Landlord is unable to convey title as required on the closing date, then Landlord shall have the option (but not the obligation) to extend the closing date by not more than thirty (30) days to enable Landlord to cure the same. If Landlord does not so elect to extend the closing date, or if at the expiration of the extended time Landlord shall have failed so to remove any defects in title, then Tenant shall have the election either to close and accept the Premises and title thereto in its then-condition, or to terminate the sale transaction (which shall not affect the continued rights and obligations of Landlord and Tenant under all provisions of this Lease).

5.     At the closing, Landlord may use the purchase money or any portion thereof to clear the title of any and all encumbrances or interests, provided that all instruments necessary for this purpose are recorded simultaneously with the deed, except for mortgage discharges from institutional lenders holding mortgages on Landlord's fee ownership interest in the Premises, which may be recorded when received provided that satisfactory arrangements are agreed upon by the parties prior to the Closing for the payment of all indebtedness secured by such mortgages.

6.     At the closing, Landlord shall deliver to Tenant: (a) the deed, (b) such affidavits and indemnities as Tenant's title insurance company may reasonably require relating to mechanics' liens and parties in possession, (c) an assignment, in form and content reasonably satisfactory to Tenant, of all of Landlord's right, title, and interest in and to all guaranties and warranties relating to the building, and (d) a certificate of non-foreign status. Landlord and Tenant shall execute at the closing an agreement, in form and content reasonably satisfactory to each party, pursuant to which the obligations of each of the parties with respect to the environmental matters set forth in Article 11 of this Lease or in the Environmental Approvals shall survive the delivery of such deed and the closing of the purchase and sale transaction.

7.     The receipt by Landlord of the purchase price and the acceptance of the deed by Tenant or the grantee designated by Tenant, as the case may be, shall be deemed to be a full performance and discharge of every agreement and obligation contained or expressed in Article 19 or Article 20 (as the case may be) and this Exhibit G.

87

8.      Landlord shall pay all deed stamps and other closing costs as are customarily paid by a seller of real estate in the Commonwealth of Massachusetts, and Tenant shall pay such closing costs as are customarily paid by a buyer of real estate in the Commonwealth of Massachusetts.

88

## EXHIBIT H

## FORM OF NONDISTURBANCE AND ATTORNMENT AGREEMENT

### RECOGNITION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS RECOGNITION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (the "Agreement") is made as of the _____ day of _____, 20__ between _____ ("Owner") and _____, _____, having its principal place of business and office at _____ ("Subtenant").

### WITNESSETH:

WHEREAS, Owner is landlord under a certain Lease, dated as of _____, 2005, (the "Overlease") demising certain real property (the "Real Property") located in the City of Woburn, County of Middlesex, Commonwealth of Massachusetts (the "Real Property"), which Real Property is more particularly described on Exhibit A attached hereto, wherein Owner, as landlord, leased to _____ ("Landlord"), as tenant, the Real Property;

WHEREAS, Subtenant is the tenant under that certain lease dated as of _____, 20__ between Landlord and Subtenant (the "Sublease") covering a certain portion of the Real Property, as more particularly described in the Sublease (the "Subleased Premises");

WHEREAS, Subtenant has requested that Owner agree not to terminate the Sublease nor disturb Subtenant's occupancy under the Sublease in the event of the termination of the Overlease due to Landlord's default thereunder past all applicable notice and grace periods; and

WHEREAS, Owner is willing to enter into such an agreement on the terms and conditions contained therein;

NOW, THEREFORE, in consideration of the mutual agreements set forth herein and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Owner and Subtenant agree as follows:

1.      Subordination. Subtenant agrees that the Sublease and all of the terms, covenants and provisions thereof and all rights, remedies and options of Subtenant thereunder are and shall at all times continue to be fully subject and subordinate in all respects to the Overlease as the same may be renewed, amended, supplemented, extended or replaced. This provision shall be self-operative and no further instrument shall be required to confirm or perfect such subordination. However, at the request of Owner, Subtenant shall execute and deliver such other documents and take such other action as Owner reasonably requests to perfect, confirm or effectuate such subordination.

2.    Non-Disturbance.  Owner agrees that so long as Subtenant is not in default in its obligations for the payment of rent, additional rent, or other charges due under the Sublease, or in the performance or observance of any of the other terms, covenants and conditions on its part to be performed or observed under the Sublease, in each case beyond the expiration of any applicable notice, grace and/or cure period:

(a)    neither the rights, possession or enjoyment of Subtenant under the Sublease shall be terminated or disturbed by Owner, its successors or assigns, subject however to the terms and the provisions of Paragraph 3 hereof; and

(b)    Subtenant shall not be named as a party in any summary proceeding or other action or proceeding instituted by reason of a default under the Overlease by Landlord, as tenant, nor shall such action or proceeding result in a cancellation, modification or termination of the Sublease.

3.    Non-Liability.  If Owner becomes the successor in interest to Landlord under the Sublease, the Sublease shall, notwithstanding any provision to the contrary therein contained, continue in full force and effect as a direct sublease between Owner and Subtenant, and Owner shall be subject to the provisions of the Sublease, provided that in no event shall Owner or its successors or assigns be:

(a)    liable for any previous act, omission, or negligence of Landlord as sublandlord or any prior sublandlord or the failure or default of any prior sublandlord (including, without limitation, Landlord) to comply with any of its obligations under such Sublease;

(b)    subject to any counterclaims, defenses or offsets which Subtenant may have against Landlord or any prior sublandlord under the Sublease;

(c)    bound by any renewal, extension, amendment, cancellation, assignment, modification or surrender of such Sublease not previously approved in writing by Owner or not expressly permitted under the terms of the Sublease without Landlord's consent, or by any previous prepayment of more than (1) month's fixed rent and one billing period of additional charges which shall be payable as provided in the Sublease unless Owner shall have given its prior written consent thereto;

(d)    bound by any obligation to perform any work or to make improvements to the Subleased Premises;

(e)    obligated to perform or pay for any work in the Subleased Premises, or to undertake to complete any construction of any portion of the Subleased Premises or any capital improvements therein or thereon;

(f)    liable to Subtenant beyond Owner's interest in the Real Property and the rents, income, receipts, revenues, insurance proceeds, issues and profits arising from the Real Property;

(g)    liable for any monies owing by or on deposit with Landlord to the credit of Subtenant except to the extent unconditionally turned over to Owner;

90

(h)    obligated to provide any services to Subtenant or to repair or maintain the Subleased Premises, the Premises, or any part thereof, or to perform any restoration, rebuilding, reconstruction or repair in the event of damage due to casualty or condemnation or other taking by a public authority, except as otherwise expressly provided in the Overlease;

(i)    obligated to pay any tenant improvement allowance or work contribution;

(j)    bound by any free rent concession provisions of the Sublease (i.e., periods during which Subtenant is entitled to occupy the Subleased Premises without payment of rent or with only partial payments of rent other than rent abatements due to a casualty or condemnation); and

(k)    liable for any brokerage commissions or costs, expenses or liabilities in connection therewith.

4.    No Changes to Sublease.  The Sublease constitutes an inducement to Owner to enter into this Agreement.  Consequently, Subtenant shall not, without obtaining the prior written consent of Owner (a) enter into any agreement amending or modifying the Sublease, or (b) prepay any of the fixed rent and one billing period of additional rent and charges due under the Sublease for more than one (1) month in advance of the due dates thereof.  Any such amendment, modification, or prepayment made without Owner's prior written consent shall not be binding on Owner.  Landlord shall promptly give written notice to Owner of any termination of the Sublease (in whole or in part) or any voluntary surrender of the Subleased Premises or any portion thereof by Subtenant.

5.    Attornment.  If the interest of Landlord under the Sublease is transferred (or surrendered or terminated) to Owner by reason of a default under the Overlease by Landlord, as tenant, or by reason of assignment of the Overlease (or any similar device) in lieu of transfer (or surrender or termination) following such default, Subtenant will, at the request of Owner, be bound to Owner under all of the terms, covenants and conditions of the Sublease (except as set forth in Paragraph 3 hereof) for the balance of the term thereof and of any extensions or renewals thereof that are effected in accordance with the Sublease, with the same effect as if Owner were the sublandlord under the express terms of the Sublease, such attornment to be effective as of the date (the "Attornment Date") on which Owner succeeds to the interest of Landlord under the Sublease, without the execution of any further agreement.  However, Subtenant agrees to execute and deliver, at any time and from time to time upon request of Owner, any agreement that may reasonably be necessary or appropriate to evidence such attornment.  Failure of Subtenant to so execute any such an agreement shall not vitiate such attornment.

6.    Notice of Default.  Subtenant will notify Owner of any default of Landlord or any other circumstance that would entitle Subtenant to cancel the Sublease or to abate the rent or additional rent or any other amounts payable thereunder, and agrees that notwithstanding any provision of the Sublease to the contrary, no cancellation thereof or abatement shall be effective unless Subtenant shall have sent Owner a notice in the manner herein provided and unless Owner has failed to cure the default giving rise to such right to abatement or cancellation within the greater of (a) time period as Landlord may be entitled to under the Sublease and (b) thirty (30) days or, if such default (which shall be a non-monetary default) cannot be cured within such time

91

period, unless Owner has failed promptly to commence such cure within such time period or thereafter diligently to prosecute such cure to completion. No cure of Landlord's default by Owner shall be deemed an assumption of Landlord's other obligations under the Sublease and no right of Owner hereunder to receive any notice or to cure any default shall be deemed to impose any obligation on Owner to cure (or attempt to cure) any such default.

7.    Notices. All notices, consents, approvals, demands and other communications ("notices") hereunder shall be in writing and shall be deemed to have been sufficiently given or served for all purposes when delivered in person, sent by Federal Express or other nationally-recognized overnight courier, or sent by registered or certified mail, postage prepaid, return receipt requested, to any party hereto at its address above stated or at such other address and to such other persons of which it shall have notified the party giving such notice in writing. Notices to Owner shall be addressed to Owner at the address above given Attention: _____, and a copy of all notices given to Owner shall simultaneously be sent to _____. Notices to Subtenant shall be addressed to Subtenant at its address above stated, Attention: _____, with a copy to _____. Any notice sent by registered or certified mail shall be deemed to have been served three (3) business days after the date it is mailed in accordance with the foregoing provisions. Any notice sent by Federal Express or overnight courier shall be deemed to have been served the next business day. Any notice sent by personal delivery shall be deemed to have been served on the date of such delivery. Any notice shall be deemed effective and deemed given by Owner or Subtenant, as the case may be, if signed and sent by its respective counsel.

8.    Satisfaction. Subtenant agrees that this Agreement satisfies any condition or requirement in the Sublease relating to the granting of a recognition agreement by Owner.

9.    Confirmation of Facts. In order to induce Owner to enter into this Agreement, Subtenant represents and warrants to Owner as follows:

(a)    A true, correct and complete copy of the Sublease and all amendments and modifications thereto are attached hereto as Exhibit B. The Sublease is in full force and effect, has not been modified, and constitutes the entire agreement between Landlord and Subtenant relating to the Subleased Premises. Subtenant has no interest in the Subleased Premises except pursuant to the Sublease. No unfulfilled conditions exist to Subtenant's obligations under the Sublease.

(b)    To the best of Subtenant's knowledge, no breach or default by Landlord under the Sublease exists and no event has occurred that, with the giving of notice, the passage of time or both, would constitute such a breach or default.

(c)    Subtenant is not in default under the Sublease and has not received any uncured notice of any default by Subtenant under the Sublease.

(d)    Subtenant has not commenced any action or sent or received any notice to terminate the Sublease. Subtenant has no presently exercisable (i) right to cancel or terminate the Sublease or to claim a partial or total eviction arising (whether under the Sublease or under

92

applicable law) from Landlord's breach or default under the Sublease or (ii) right or alleged right to any offset, defense (other than one arising from actual payment and performance, which payment and performance would bind Owner pursuant to this Agreement), claim, counterclaim, reduction, deduction, or abatement against Subtenant's payment of rent or performance of Subtenant's other obligations under the Sublease, arising (whether under the Sublease or under applicable law) from Landlord's breach or default under the Sublease.

      (e)    The term of the Sublease shall expire on _____, 20\_\_, subject to extension by Subtenant in accordance with the provisions of the Sublease to _____, 20\_\_.

      (f)    Subtenant has not transferred, encumbered, mortgaged, assigned, conveyed or otherwise disposed of the Sublease or any interest therein.

      (g)    Subtenant is currently a National Retail Tenant/Regional Retail Tenant *[delete one as inapplicable]* as defined in the Overlease. If Subtenant is a National Retail Tenant, Subtenant currently operates in the United States not less than seventy-five (75) stores of a size and nature comparable to the store to be operated at the Real Property pursuant to the Sublease. If Subtenant is a Regional Retail Tenant, Subtenant currently operates in the New England States and New York not less than twenty-five (25) stores of a size and nature comparable to the store to be operated at the Real Property pursuant to the Sublease.

      (h)    The Subleased Premises contains at least twenty-five thousand (25,000) square feet of ground floor space and otherwise satisfies the requirements of Section 12.5 of the Overlease.

    10.    <u>Authority</u>. Subtenant hereby represents and warrants to Owner that Subtenant has all requisite power to enter into this Agreement and to perform its obligations hereunder, that the execution and delivery of this Agreement by Subtenant has been duly authorized by all requisite actions, that Subtenant has obtained all consents and approvals with respect to this Agreement that are required by the terms of any agreement to which Subtenant is a party, and that the person executing this Agreement on behalf of Subtenant has been duly authorized to do so on behalf of Subtenant. Owner hereby represents and warrants to Subtenant that Owner has all requisite power to enter into this Agreement and to perform its obligations hereunder, that the execution and delivery of this Agreement by Owner has been duly authorized by all requisite actions, that Owner has obtained all consents and approvals with respect to this Agreement that are required by the terms of any agreement to which Owner is a party, and that the person executing this Agreement on behalf of Owner has been duly authorized to do so on behalf of Owner.

    11.    <u>Miscellaneous</u>. This Agreement sets forth the entire agreement between the parties and cannot be modified or terminated orally but may only be modified or terminated by a written instrument signed by both parties. This Agreement shall be governed by, and construed in accordance with, the laws of The Commonwealth of Massachusetts, without regard to conflicts of laws principles. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns. No delay or omission on the part of a party in exercising any right hereunder shall operate as a waiver of such right or remedy, or any other right or remedy. A waiver on any one occasion shall not be construed as a bar to or a waiver of such right or remedy on any

other occasion. If any provision of this Agreement or the application thereof to any person or circumstance shall to any extent be held void, unenforceable or invalid, then the remainder of this Agreement or the application of such provision to persons or circumstances other than those as to which it is held void, unenforceable or invalid shall not be affected thereby and each provision of this Agreement shall be valid and enforced to the fullest extent permitted by law. Notwithstanding anything to the contrary contained herein or in the Sublease, in no event shall Owner or Subtenant be liable hereunder or under the Sublease for consequential damages. In the event of the assignment or transfer of the interest of Owner, all obligations and liabilities of Owner under this Agreement shall terminate, and thereupon all such obligations and liability shall be the responsibility of the party to whom Owner's interest is assigned or transferred, provided such party assumes such obligations. This Agreement may be signed in counterparts. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

**(the next page is the signature page)**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

OWNER:

By:_____
    Name:
    Title:


SUBTENANT:

By:_____
    Name:
    Title:

95

State of _____        )

                     ) ss.

County of _____        )

On the ____ day of _____, 20__ before me, the undersigned, a Notary Public in and for said state, personally appeared _____, personally known to me or proved to me through satisfactory evidence of identification, which were _____, to be the person whose name is signed on the preceding or attached document in my presence, and acknowledged to me that (he) (she) signed it voluntarily for its stated purpose in (his) (her) capacity as _____ of _____.

_____
Signature of Notary Public

State of _____        )

                     ) ss.

County of _____        )

On the ____ day of _____, 20__ before me, the undersigned, a Notary Public in and for said state, personally appeared _____, personally known to me or proved to me through satisfactory evidence of identification, which were _____, to be the person whose name is signed on the preceding or attached document in my presence, and acknowledged to me that (he) (she) signed it voluntarily for its stated purpose in (his) (her) capacity as _____ of _____.

_____
Signature of Notary Public

96

EXHIBIT A TO SUBTENANT

RECOGNITION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

Legal Description

A certain parcel of land situated in Woburn, in the County of Middlesex, Commonwealth of Massachusetts, being shown on plan entitled "Plan of Land, Woburn, Mass.", dated May 11, 1957, by Harry R. Feldman Inc., Engineers, recorded with Middlesex South District Registry of Deeds, Book 8957, Page 65, and being further bounded and described as shown on said plan as follows:

| | |
|---|---|
| WESTERLY | by said Washington Street, by three bounds totaling five hundred sixty-eight and 36/100 (568.36) feet; |
| NORTHERLY | by land now or formerly of Carlson, one thousand forty-six and 75/100 (1046.75) feet; |
| NORTHEASTERLY | by land of owners unknown, two hundred thirty-two (232) feet; |
| SOUTHEASTERLY | by land of owners unknown, two hundred eight-six and 97/100 (286.97) feet; |
| NORTHEASTERLY | again, by land of owners unknown, one hundred two (102) feet, said line being through the center line of a brook; and |
| SOUTHERLY | by land now or formerly of Anderson, by two bounds totaling nine hundred and eighty-three and 10/100 (983.10) feet; |

Excepting therefrom the following parcel conveyed by W.R. Grace & Co. to William S. Cummings by Deed dated October 18, 1971, recorded in Book 12113, Page 232:

A triangular parcel of land in Woburn, Middlesex County, Massachusetts bounded and described as follows:

| | |
|---|---|
| EASTERLY | by land of William S. Cummings and Joyce M. Cummings, one hundred two (102.00) feet, N 23° 35'33" W; |
| SOUTHWESTERLY | one hundred twenty-eight and 32/100 (128.32) feet, S 87° 37'58" E; |
| SOUTHWESTERLY | eight and 24/100 (8.24) feet, S 87° 59'29" E; and |
| NORTHWESTERLY | one hundred twenty-nine and 88/100 (129.88) feet, by land of W. R. Grace & Co. |

97

## EXHIBIT B TO SUBTENANT

## RECOGNITION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

### Sublease

(see attached)

98

**EXHIBIT I**

**FORM OF LETTER OF CREDIT**

[Date]

[Name and Address of Issuing Bank]

IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

BENEFICIARY:
W.R. Grace & Co.-Conn.
[Address]

LADIES AND GENTLEMEN:

At the request of and for the account of _____ ("Customer"), we hereby establish in your favor an Irrevocable Standby Letter of Credit in the sum of USD One Million Six Hundred Thousand and No/100 Dollars (US$1,600,000.00), available by your drafts at sight at our office at _____, Boston, Massachusetts, effective immediately and expiring on _____.

Drafts must be accompanied by:

　　　　1.　　The original of this Letter of Credit and any amendment(s) thereto; and

　　　　2.　　Your signed statement purportedly signed by a duly authorized representative of the Beneficiary reading as follows:

　　　　　　"The amount of this draft represents the amount due the undersigned pursuant to a Ground Lease dated as of August __, 2005 (as the same may have been amended) between the undersigned, as Landlord, and [Customer], as Tenant."

Drafts drawn hereunder must be marked "Drawn under [issuing bank] Letter of Credit No. _____, dated _____. Partial draws are permitted under this Letter of Credit, but the face amount hereof shall be reduced by the amount of any and all partial draws honored hereunder.

Reference in this Letter of Credit to a lease is for identification purposes only and such lease is neither incorporated into nor made an integral part of this Letter of Credit.

Drafts which are accompanied by the statement required by this Letter of Credit (when required under this Letter of Credit), when presented hereunder by 1:00 p.m. Eastern Time on a

99

business day, shall be paid to the Beneficiary in immediately available U.S. Dollars in the amount set forth in such draft, not later than 5:00 p.m. Eastern Time on the same day. Drafts which are accompanied by the statement required by this Letter of Credit (when required under this Letter of Credit) which are presented hereunder after 1:00 p.m. Eastern Time on a business day, shall be paid to the Beneficiary in immediately available U.S. Dollars in the amount set forth in such draft, not later than 3:00 p.m. Eastern Time on the next business day thereafter. If requested by the Beneficiary, payment(s) under this Letter of Credit will be made by deposit of immediately available U.S. Dollars into a designated account of which the Beneficiary notifies [the issuing bank] at the time of presentation of a draft hereunder. [The issuing bank] hereby agrees with the Beneficiary that all drawings made under and in compliance with the terms of this Letter of Credit will be honored by [the issuing bank] upon presentation, provided that such drawings are made and drafts are presented on or before [initial expiration date of Letter of Credit] or any subsequent expiration date as hereinbelow provided.

Except as otherwise expressly stated herein, this Letter of Credit is subject to the "Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500."

This Letter of Credit is transferable in its entirety (but not in part) to any successor beneficiary, and such transferred rights may be successively transferred. Transfers of this Letter of Credit shall be effected upon presentation to [issuing bank] of the original of this Letter of Credit and all amendments (if any), accompanied by the completed transfer form attached hereto as Annex A [attach issuing bank's form of transfer form] and payment by the Customer of our transfer fee [state amount]. In the event that this Letter of Credit is transferred, the sight draft and signed statement required herein must be executed by the transferee as beneficiary.

This Letter of Credit shall be deemed to be automatically extended without amendment for an additional one (1) year term from the present or any future expiration date hereof, unless at least thirty (30) days prior to the present or any future expiration date hereof we notify the Beneficiary in writing by overnight courier service, with receipted delivery, that we elect not to consider this Letter of Credit renewed for any such additional period. Such notice shall be given to the Beneficiary at the address set forth above, or if this Letter of Credit has been transferred in accordance with the provisions hereof, to such address as is set forth in the amendment to this Letter of Credit reflecting such new beneficiary. If we give to the Beneficiary such notice of our election not to renew this Letter of Credit, the Beneficiary shall be entitled to draw hereunder in full or in part upon presentation of your draft, accompanied by a copy of such notice (in which event the Beneficiary need not provide the statement set forth above in the second paragraph of this Letter of Credit).

100

This Letter of Credit will not be automatically renewed after [final expiration date].

Very truly yours,

[issuing bank]

_____

Authorized signature

101



NOTE:  This plan is attached to this Lease as an Exhibit for the sole purpose of showing the boundaries of the Land, and no representation or warranty is made as to any matters shown on this plan.



EXHIBIT C



EXHIBIT D

PROPOSED DECATHLON
100,477 SQF

TOTAL PARKING SPACES = 498

TOWER PARK ROAD

WASHINGTON STREET

Woburn -Proposed Site Plan

Sheet1

| Document Title or Description | |
|---|---|
| | |
| Wells G & H Site ROD | |
| Draft AOC re: Combined Pilot Test | |
| Wells G & H Site Consent Decree | |
| Wells G & H Site SOW | |
| Communication & Coordination Plan | |
| EPA Comments, Central Area RI/FS Work Plan | |
| EPA Comments, Central Area Phase 1A Report | |
| USGS Topographic Maps | |
| Flood Insurance Maps | |
| Aerial Photographs | |
| Miscellaneous Site Photographs | |
| RW22 Installation, Area 2 & 3 Well Installation & Development Photographs | |
| Photos: Spill on RW5 April 1991 | |
| Climatological Data | |
| Daily Precipitation 3/93-10/20/93 | |
| Seismic Refraction Survey Data | |
| USGS 1985 Geophysical Survey Data | |
| Northeast Quadrant Geophysical Surveys, Hager-Richter 1990 | |
| Surveys on Grace Property, Weston Geophysical 1985 | |
| Wells G1 & G3 Borehole Geophysics | |
| 1990 Photogrametric Wells G & H Site Base Map AutoCAD Files | |
| 1992 Grace Property Base Map AutoCAD Files | |
| Grace Site Survey Data | |
| EPA Site Survey Data | |
| Marklinger/Medford/Weston Geophysical Site Survey Data | |
| BSC 12/90 & 4/91 Site Survey Data | |
| WR Grace Recovery & Monitoring Wells Survey Data, Martinage 10/92 | |
| April 2004 GeoTrans Survey of G36DBR, Snyder Creek stream gauge, GO1D, and UG1 | |
| Grace Building Plans (flat file) | |
| Survey Data Supplied to EPA | |
| Grace property boring logs and well information | |
| E+E-Field Investigations of Uncontrolled Hazardous Waste Sites FIT Project | |
| E+E-Chlorinated Solvent Contamination of the GW East Central Woburn, MA | |
| | |
| E+E-Evaluation of the Hydrogeology & GW Quality of East & North Woburn, MA - vol. I & II Final Report | |
| NUS-'Scope of Work for a Remedial Investigation at Wells G&H Site-Woburn, MA | |
| NUS-Wells G&H Site Status Report Memorandum | |
| NUS-Wells G&H Site RI Report, Part 1 - Woburn, MA (4 volumes) | |
| PRC-Wells G&H Remedial Investigation Part II, Final Report | |
| PRC-Wells G&H Wetlands Assessment, Final Report | |
| PRC- Wells G&H Title Searches-Woburn, MA Final Site Report | |
| Ebasco/Enserch/Foster Wheeler - Work Plan Final Supplemental Remedial Investigation/Feasibility Study | |
| 12/88 Final Supplemental Remedial Investigation/Feasibility Study | |
| Ebasco/Enserch/Foster Wheeler-Endangerment Assessment for the Wells G&H Site-Woburn, MA (2 volumes) | |
| Ebasco/Enserch/Foster Wheeler-DRAFT Final Feasibility Study Report Wells G&H Site-Woburn, MA (2 volumes) | |
| July 1995 Final Field Operation Plan Wells G&H RI/FS Operable Unit III Aberjona River Study | |
| GeoTrans | |
| GeoTrans-Review of EPA Report Titled, "Wells G&H Site Remedial Investigation Report, Part I, Woburn, MA" (8 volumes) | |
| GeoTrans-Review Comments re: US EPA Final Work Plan Supplemental Remedial Investigation/Feasibility Study, Wells G&H Site-Woburn, MA | |

Sheet1

| | |
|---|---|
| GeoTrans-Review Comments re: US EPA Jan 1989 Draft Final Feasibility Study Report, Wells G&H Site-Woburn, MA | |
| Technical Memorandum Multi-level Well Installation Evaluation Wells G&H Site-Woburn, MA 11/91 | |
| GeoTrans-Technical Memorandum Installation of Bedrock Wells G2DB & G2DB2 Wells G&H Site-Woburn, MA | |
| Grace Site RD/RA Progress Reports (1992-2004) | |
| GeoTrans-Proposed Revisions to Long-term Monitoring Plan | |
| GeoTrans-Proposal for Passive Diffusive Bag Sampling | |
| GeoTrans-Long-term Monitoring Plan | |
| GeoTrans-Hazard Assessment for Long-term Monitoring Plan | |
| H&S Plan Acceptance Forms for WRG & UniFirst Sites | |
| GeoTrans-Health & Safety Plan Update | |
| GeoTrans-Evaluation of RW22 Pumping Cycle WRG Woburn | |
| Evaluation of Snyder Creek Sampling Results 1993-2003 | |
| June 2004 Vapor Intrusion Modeling | |
| Screening Level Vapor Intrusion Model & Risk Assessment LtrRpt | |
| GeoEnvironmental Consultants | |
| GeoEnvironmental Consultants-Field Investigation & Remedial Measure, Interim Report | |
| GeoEnvironmental Consultants-Field Investigations & Remedial Measures, Phase I-III | |
| GeoEnvironmental Consultants-Field Investigations & Remedial Measures, Phase V-Field Descriptions | |
| Coffin & Richardson-Sewer & Drainage System Evaluations | |
| Hydro-Group-Phase II Work Plan for CRYOVAC Site in Woburn, MA | |
| LEC-Wetlands Resource Analysis & Monitoring Report | |
| CDM-Draft Remedial Action Master Plan for East Woburn, Wobum, MA | |
| GCA Soil Sampling Reports | |
| EPA Proposed Cleanup Plan for Wells G&H Site | |
| EPA-Residential Indoor Air Sampling Results Wells G&H-Woburn, MA June 1989 | |
| EPA-Second Five-Year Review Report for G&H Superfund Site | |
| Canonie 1/92, 3/92, 4/1/92, Draft GW Treatment System Bidding Documents | |
| Canonie Design Consistency Review | |
| Canonie-Draft GW Treatment Facility O&M Manual Phase II | |
| Canonie-Draft Long-term Monitoring Plan Wells G&H | |
| Canonie-Draft Long-term Monitoring Plan Wells G&H | |
| Canonie-Draft Long-term Monitoring Plan Wells G&H | |
| Canonie-Construction Drawings Source Area Remedial Action,A10/10/91 Draft,B10/28/91 Draft,C-Undated Revision 3 (all flat file) & C | |
| Canonie-Project Work Plan(3 volumes), (A)Sampling & Analysis Plan,(B)H&S Plan,[C]Quality Assurance Project Plan | |
| Canonie-Quality Assurance Project Plan | |
| Canonie-H&S Plan Hydraulic Characterization | |
| Canonie-Source Area Remedial Action Construction Report (13 volumes) | |
| Canonie-GW Treatment Facility O&M Phase III | |
| Water Level Data from 1988 UniFirst Pumping Test | |
| Water Level Change & Potentiometric Maps | |
| Cyclic Water Level Fluctuations | |
| Snyder Creek Water Quality, 1992 | |
| Snyder CreekWater Quality, 1990 | |
| Soil quality - East End Used by Cummings | |
| Soil quality - Summary of Grace Site Data | |
| Tighe & Bond 1985 Sediment & Soil Analyses | |
| ETC Soil Quality Reports | |
| Field Data Sheets-Grace/UniFirst Pilot Test | |
| Slug Test Results-Grace/UniFirst Pilot Test | |
| Short Duration Pump Tests-Grace/Unifirst Pilot Test | |

Sheet1

| | |
|---|---|
| Calc. - Mass Removal-Grace/UniFirst Pilot Test | |
| Calc. - Off-site Migration-Grace/UniFirst Pilot Test | |
| Particle Size Distribution-Grace/UniFirst Pilot Test | |
| Hydrographs-Grace/UniFirst Pilot Test | |
| Absorption Experiment-Grace/UniFirst Pilot Test | |
| Water Level Data for Individual Wells-Grace/UniFirst Pilot Test | |
| Well Integrity Test Forms-Grace/Unifirst Pilot Test | |
| RW-8 Pumping Test Analyses | |
| IDW Analyses & Invoices | |
| Treatment System Bid Specs | |
| Recovery Well Materials | |
| Recovery Well Drillings & Cuttings | |
| Off-site Dataloggers & Transducers | |
| ICS/Data Logger | |
| Recovery Well Totalizer Readings | |
| Flow Rate Tables-WRG Treatment System | |
| Blank Monthly RW Totalizer & WL Field Forms (sent) | |
| Completed Monthly Totalizer & WL Field Forms (received) | |
| Recovery Well Pumping Problems | |
| Standing Water & Leaks in Manholes | |
| 10/28/98 Handex ltr. re: RW 20 Replacements | |
| 1/99 Recovery Well Flow Rate Graphs | |
| Revised Long-term Monitoring Plan, 1997 | |
| WRG Treatment System-O&M Plan 9/92 | |
| WRG Treatment System Sampling Results (Oct 92-1998) | |
| Metals - WRG Treatment System | |
| Water Level Measurements | |
| 1992 Water Level Measurements | |
| 1993 Water Level Measurements | |
| 1994 Water Level Measurements | |
| 1995 Water Level Measurements | |
| 1996 Water Level Measurements | |
| 1997 Water Level Measurements | |
| 1998 Water Level Measurements | |
| 1999 Water Level Measurements | |
| Monthly Recovery Well Water Levels | |
| 1991-1996 Original Water Level Data Collection Files | |
| 2000 Water Level Measurements | |
| 2001 Water Level Measurements | |
| 2002 Water Level Measurements | |
| 2003 Water Level Measurements | |
| 2004 Water Level Measurements | |
| 2005 Water Level Measurements | |
| Barograph Data 1/92-9/92 | |
| Vinyl Chloride Validation | |
| Lab Audit | |
| NET Split Sample Results 12/92 | |
| May 1993 - Four Samples Validated | |
| April 1994 Data Validation Request | |
| April 1994 Lab P.E. | |
| October 1997 Lab P.E. | |
| 1/96 Data Validation Request | |
| October 1995 Data Validation | |
| Effluent Data Validation | |
| Effluent Data Validation | |
| Effluent Data Validation | |

Sheet1

| Treatment System Operation | |
|---|---|
| Operation Logs | |
| Peroxide & Flow Graphs | |
| Area Flow Rates | |
| Recovery Well Evaluation | |
| Treatment System Health & Safety | |
| Field Safety Briefing | |
| Long-term Monitoring Data, Forms, Tables, Instructions | |
| Mass Removal 1992-3 | |
| Mass Removal 1993-4 | |
| Mass Removal 1994-5 | |
| Mass Removal 1995-6 | |
| Mass Removal 1996-7 | |
| Area 1 Shut Down Evaluation | |
| 7/15/04 Letter re: MADEP Groundwater Use and Value Determination | |
| List of Site Contaminants provided for Property Sale (prepared by HIS GeoTrans 8/29/97) | |
| Draft Regulated Building Materials Inspection Report, Project Mary, Woburn, Massachusetts; dated May 10, 2005. | |
| Confidential Phase I Environmental Assessment Report, 365 Washington Street, Woburn, Massachusetts; dated July 5, 2005. | |
| Confidential Phase II Environmental Site Assessment, 365 Washington Street, Woburn, Massachusetts; will be dated August 26, 2005. | |