UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                              .
IN RE:                        .        Chapter 11
                              .
W.R. Grace & Co., et al.,     .
                              .
         Debtor(s).           .        Bankruptcy #01-01139 (JKF)
.......................................................
```

Wilmington, DE
September 26, 2005
12:00 p.m.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For The Debtor(s): | David M. Bernick, Esq.<br>Kirkland & Ellis, LLP<br>200 E. Randolph Drive<br>Chicago, IL 60601 |
| | Michelle H. Browdy, Esq.<br>Kirkland & Ellis, LLP<br>200 E. Randolph Drive<br>Chicago, IL 60601 |
| | Janet S. Baer, Esq.<br>Kirkland & Ellis, LLP<br>200 E. Randolph Drive<br>Chicago, IL 60601 |
| (Via telephone) | Samuel Blatnick, Esq.<br>Kirkland & Ellis, LLP<br>200 E. Randolph Drive<br>Chicago, IL 60601 |
| (Via telephone) | Michael Dierkes, Esq.<br>Kirkland & Ellis, LLP<br>200 E. Randolph Drive<br>Chicago, IL 60601 |

(Via telephone)              Jonathan Friedland, Esq.
                             Kirkland & Ellis, LLP
                             200 E. Randolph Drive
                             Chicago, IL 60601

(Via telephone)              Andrea Johnson, Esq.
                             Kirkland & Ellis
                             200 E. Randolph Drive
                             Chicago, IL 60601

                             Amanda C. Basta, Esq.
                             Kirkland & Ellis, LLP
                             655 Fifteenth Street, N.W.
                             Washington, DC 20005

                             Barbara H. Harding, Esq.
                             Kirkland & Ellis, LLP
                             655 Fifteenth Street, N.W.
                             Washington, DC 20005

(Via telephone)              Brian T. Stansbury, Esq.
                             Kirkland & Ellis
                             655 Fifteenth St., NW-Ste. 1200
                             Washington, DC 20005

(Via telephone)              Lori Sinanyan, Esq.
                             Kirkland & Ellis
                             777 S. Figueroa Street
                             Los Angeles, CA 90017

                             James O'Neill, Esq.
                             Pachulski, Stang, Ziehl,
                             Young, Jones & Weintraub
                             919 North Market Street
                             Wilmington, DE 19801

                             Paul J. Norris, Esq.
                             In-House counsel
                             W.R. Grace & Company

For UCC:                     Kenneth Pasquale, Esq.
                             Stroock Stroock & Lavan, LLP
                             180 Maiden Lane
                             New York, NY 10038

For Asbestos PI Committee:   Marla Eskin, Esq.
                             Campbell & Levine, LLC
                             800 North King Street-Ste. 300
                             Wilmington, DE 19801

Mark Hurford, Esq.
Campbell & Levine, LLC
800 North King St.-Ste. 300
Wilmington, DE 19801

For Official Committee of:
Asbestos Property Damage
Claimants

Theodore J. Tacconelli, Esq.
Ferry, Joseph & Pearce, PA
824 Market Street
Wilmington, DE 19899

Jay M. Sakalo, Esq.
Bilzin Sumberg Baena Price
& Axelrod, LLP
200 S. Biscayne Blvd. -Ste. 2500
Miami, FL 33131

Matthew I. Kramer, Esq.
Bilzin Sumberg Baena Price
& Axelrod, LLP
200 S. Biscayne Blvd. -Ste. 2500
Miami, FL 33131

(Via telephone)

Scott L. Baena, Esq.
Bilzin Sumberg Baena Price
& Axelrod, LLP
200 S. Biscayne Blvd. -Ste. 2500
Miami, FL 33131

(Via telephone)

Allyn Danzeisen, Esq.
Bilzin Sumberg Baena Price
& Axelrod, LLP
200 S. Biscayne Blvd. -Ste. 2500
Miami, FL 33131

Daniel Speights, Esq.
Speights & Runyan
200 Jackson Ave. E.
Hampton, SC 29924

Alan Runyan, Esq.
Speights & Runyan
200 Jackson Ave. E.
Hampton, SC 29924

(Via telephone)

Martin Dies, Esq.
Dies Henderson & Carona
1009 West Green
Orange, TX 77630

4

|  |  |
|---|---|
| (Via telephone) | Joseph J. Schwartz, Esq.<br>Riker Danzig Scherer Hyland<br>& Perret, LLP<br>Headquarters Plaza<br>One Speedwell Ave.<br>Morristown, NJ 07962 |
| For Equity Security Holders:<br>Committee | Gary M. Becker, Esq.<br>Kramer Levin Naftalis<br>& Frankel, LLP<br>919 Third Ave.<br>New York, NY 10022 |
| For D.K. Acquisition: | Jennifer L. Scoliard, Esq.<br>Klehr Harrison Harvey<br>Branzburg & Ellers, LLP<br>Mellon Bank Center<br>919 Market St.-Ste. 1000<br>Wilmington, DE 19801 |
| For Maryland Casualty:<br>Company | Jeffrey C. Wisler, Esq.<br>Connolly, Bove, Lodge<br>& Hutz, LLP<br>1220 Market Street-10th Fl.<br>Wilmington, DE 19899 |
| For Campbell Cherry Harrison:<br>Davis Dove, PC | Adam Landis, Esq.<br>Landis Rath & Cobb, LLP<br>919 Market st.-Ste. 600<br>Wilmington, DE 19801 |
|  | Joseph Frank, Esq.<br>Gecker & Frank<br>325 N. LaSalle Street-Ste. 625<br>Chicago, IL 60610 |
| For Certain Asbestos:<br>Claimants | Jeffrey Liesemer, Esq.<br>Caplin & Drysdale, Chartered<br>One Thomas Circle, N.W.<br>Washington, DC 20005 |
| For Baron & Budd, Reaud:<br>Morgan & Quinn | Sander L. Esserman, Esq.<br>Stutzman Bromberg Esserman<br>& Pfilka, PC<br>2323 Bryan St.-Ste. 2200<br>Dallas, TX 75201 |

<pre>
                                  Van J. Hooker, Esq.
                                  Stutzman Bromberg Esserman
                                  & Pfilka, PC
                                  2323 Bryan St.-Ste. 2200
                                  Dallas, TX 75201

                                  Robert T. Brousfeau, Esq.
(Via telephone)                   Stutzman Bromberg Esserman
                                  & Pfilka, PC
                                  2323 Bryan St.-Ste. 2200
                                  Dallas, TX 75201

                                  Etta R. Wolfe, Esq.
(Via telephone)                   Smith Katzenstein & Furlow, LLP
                                  The Corporate Plaza
                                  800 Delaware Ave.
                                  Wilmington, DE 19899

                                  Daniel K. Hogan, Esq.
                                  The Hogan Firm
                                  1311 Delaware Ave.
                                  Wilmington, DE 19806

For State of Montana:             Francis A. Monaco, Jr., Esq.
                                  Monzack & Monaco, PA
                                  Ste. 400
                                  1201 North Orange Street
                                  Wilmington, DE 19801

For Fireman's Fund Ins.:          Leonard P. Goldberger, Esq.
                                  Stevens & Lee
                                  1818 Market Street-29th Fl.
                                  Philadelphia, PA 19103

For ACE Insurers:                 Marc S. Casarino, Esq.
                                  White & Williams, LLP
                                  824 N. Market St.-Ste. 902
                                  Wilmington, DE 19899

                                  Linda Carmichael, Esq.
                                  White & Williams, LLP
                                  824 N. Market St.-Ste. 902
                                  Wilmington, DE 19899

For Hissey Kientz & Herron:       Steven M. Ziolkowski, Esq.
                                  Lowenstein Sandler, PC
                                  65 Livington Ave.
                                  Roseland, NJ 07068
</pre>

For Certain Canler:               Noel C. Burnham, Esq.
Claimants                         Montgomery McCracken Walker
                                  & Rhoads, LLP
                                  300 Delaware ave.-Ste. 750
                                  Wilmington, DE 19801

For One Beacon/Seaton:            Michael Brown, Esq.
                                  Drinker Biddle & Reath, LLP
                                  One Logan Square
                                  18th & Cherry Street
                                  Philadelphia, PA 19103

For London Market:                Mary K. Warren, Esq.
                                  Linklaters
                                  1345 Ave. of the Americas
                                  New York, NY 10105

                                  Elizabeth Power, Esq.
                                  Zuckerman Spaeder, LLP
                                  919 Market St.-Ste. 990
                                  Wilmington, DE 19801

For Continental Casualty:         Daniel M. Glosband, Esq.
Ins.                              Goodwin Procter, LLP
                                  Exchange Place
                                  53 State Street
                                  Boston, MA 02109

                                  Elizabeth M. DiCristofaro, Esq.
                                  Ford Marrin Esposito Witmeyer
                                  & Gleser, LLP
                                  Wall Street Plaza
                                  New York, NY 10005

For AIG Member Companies:         Michael S. Davis, Esq.
                                  Zeichner Ellman & Krause, LLP
                                  575 Lexington Ave.
                                  New York, NY 10022

For Everest Reinsurance:          Brian L. Kasprzak, Esq.
Company                           Marks O'Neill O'Brien
(Via telephone)                   & Courtney, PC
                                  1880 JFK Pkwy.-Ste. 1200
                                  Philadelphia, PA 19103

For Federal Insurance:            Jacob C. Cohn, Esq.
Company                           Cozen O'Connor
                                  1900 Market Street
                                  Philadelphia, Pa 19103

| For The Futures: Representative | Jack Phillips, Esq.<br>Phillips, Goldman & Spence<br>1200 North Broom Street<br>Wilmington, DE 19806 |
|---|---|
| | Richard H. Wyron, Esq.<br>Swidler Berlin, LLP<br>The Washington Harbour<br>3000 K. street, N.W.-Ste. 300<br>Washington, DC 20007 |
| (Via telephone) | Monique Almy, Esq.<br>Swidler Berlin, LLP<br>The Washington Harbour<br>3000 K. Street, N.W.-Ste. 300<br>Washington, DC 20007 |
| (Via telephone) | Joseph Radecki, Esq.<br>Swidler Berlin, LLP<br>The Chrysler Building<br>405 Lexington Ave.<br>New York, NY 10174 |
| (Via telephone) | Jonathan Brownstein, Esq.<br>Swidler Berlin, LLP<br>The Chrysler Building<br>405 Lexington Ave.<br>New York, NY 10174 |
| For U.S. Fire Insurance: Company | March D. Coleman, Esq.<br>Steptoe & Johnson, LLP<br>1330 Connecticut Ave.-N.W.<br>Washington, DC 20036 |
| For Heard Robins Cloud: & Lubel, LLP | Ian P. Cloud, Esq.<br>Heard Robins Cloud<br>& Lubel, LLP<br>500 Dallas-Ste. 3100<br>Houston, TX 77002 |
| For Acting U.S. Trustee: (Roberta A. DeAngelis) | Richard L. Shepacarter, Esq.<br>U.S. Trustee's Office<br>844 King Street-Ste. 2313<br>Lock Box 35<br>Wilmington, DE 19801 |
| Audio Operator: | Jason Smith |

8

Transcribing Firm:                    Writer's Cramp, Inc.
                                      6 Norton Rd.
                                      Monmouth Jct., NJ 08852
                                      732-329-0191

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1         THE COURT:  Okay, this is the matter of <u>W.R. Grace</u>,

2    01-1139.  The participants I have listed by phone are Daniel

3    Scott, Van Hooker, Robert Brousfeau, Monica Almy, Barbara

4    Seniawski, Sandy Esserman, Warren Smith, Curtis Plaza, Sam

5    Blatnick, Ian Cloud, Joseph Schwartz, Christopher Candon, Brian

6    Kasprzak, Michael Dierkes, Jonathan Friedland, Leslie Epley,

7    Lori Sinanyan, Andrea Johnson, Brian Stansbury, Edward

8    Westbrook, Michael Davis, John O'Connell, Scott Baena, Joseph

9    Radecki, Jonathan Brownstein, Paul Norris, March Coleman, Sara

10   Edwards, Martin Dies, Allyn Danzeisen, Shawn Walsh, Tiffany

11   Cobb and William Spark.

12       (The Court and Clerk confer)

13         THE COURT:  Folks on the phone, please put your mute

14   buttons on.  There's some noise that sounds like typing going

15   on in the background, and I apologize, you probably get that

16   from me too, but unfortunately that's one thing I can't stop

17   because of the microphones here.  I'll take entries of people

18   in Court, please.

19         MR. BERNICK:  David Bernick for Grace.

20         MS. BROWDY:  Michelle Browdy for Grace.

21         MS. HARDING:  Barbara Harding for Grace.

22         MS. BAER:  Janet Baer for Grace.

23         MR. O'NEILL:  James O'Neill for Grace.

24         MR. BECKER:  Gary Becker for the Equity Committee.

25         MR. SAKALO:  Jay Sakalo on behalf of the Property

1   Damage Committee.

2          MR. TACCONELLI:  Theodore Tacconelli on behalf of the

3   Property Damage Committee.

4          MR. KRAMER:  Matt Kramer on behalf of the Property

5   Damage Committee.

6          MS. ESKIN:  Marla Eskin, Campbell & Levine, on behalf

7   of the Asbestos Personal Injury Committee and Marc Herford from

8   Campbell & Levine and Jeff Liesemer from Caplin & Drysdale.

9          THE COURT:  Jeff?

10         MS. ESKIN:  Jeff Liesemer from Caplin & Drysdale will

11  be coming through in a moment.

12         THE COURT:  All right.

13         MR. PASQUALE:  Hello, Your Honor.

14         THE COURT:  Hi.

15         MR. PASQUALE:  Ken Pasquale from Stroock for the

16  Unsecured Creditor's Committee.

17         THE COURT:  Okay, Ms. Baer?

18         MS. BAER:  Good afternoon, Your Honor.  Your Honor,

19  the first three matters on your agenda for this afternoon

20  relate to the State of Montana actions.  Those matters, at the

21  request of the Montana Plaintiffs, are all being continued for

22  hearing at the October 24th hearing.  The regular response

23  deadline for October will apply to the Montana Plaintiffs

24  response.

25         THE COURT:  All right.

1          MS. BAER:  Your Honor, agenda item #4 is the Debtor's

2     second amended application to employee Nelson Mullins.  This is

3     an existing special counsel.  They were employed for certain

4     articulated litigation matters.  We're adding a new one, it's a

5     new collection action of fairly great significance, and we're

6     asking that the Court enter an order permitting their

7     application.  We did file a Certification of Counsel.  The only

8     change, Your Honor -- there are no objections, the change on

9     the order was to make it clear that this is not an

10    environmental matter, it's a collection matter.  There was a

11    mistake in the original motion in that regard.

12         THE COURT:  Okay, the agenda did indicate that a COC

13    had been filed, but as of the time that we were preparing for

14    this case, it was not yet docketed.  Would you just double

15    check to be sure that in fact it has been docketed?

16         MS. BAER:  We can, Your Honor, I know I have a copy of

17    it and we show --

18         THE COURT:  You do?

19         MS. BAER:  -- a docket number.

20         THE COURT:  What's the docket number, please?

21         UNIDENTIFIED SPEAKER:  9431.

22         MS. BAER:  9431.

23         THE COURT:  All right.

24         MS. BAER:  And Your Honor, I have the order here if I

25    can hand it up?

1        THE COURT:  No, I've already instructed my staff to

2   stamp -- I should have started with this, I guess -- items 4, 5

3   and 7B.  I told them to stamp 7A too, but apparently there's no

4   order, so I need an order on 7A.

5        MS. BAER:  We do have that order, Your Honor.

6        THE COURT:  All right, I'll take that then.  Thank

7   you.

8      (Pause in proceedings)

9        THE COURT:  All right, that's signed.

10        MS. BAER:  Your Honor, that takes us to agenda item

11   #6, which is Certain Insurer's Motion for Access to exhibits to

12   the 2019 statement.  Your Honor, the Debtor has no objection to

13   that motion and we'll turn it over to the insurers.

14        THE COURT:  All right.

15        MR. PASQUALE:  Your Honor, I did see them coming into

16   the building a minute or two ago.

17        THE COURT:  Okay, can we defer it and do something

18   else?  Okay, we'll return to this.

19        MS. BAER:  Well, skip to another matter.  Your Honor,

20   agenda item #8, the Settlement with Innercat, Inc.  We are

21   still working on drafting those documents so that matter will

22   be continued to the October 24th hearing.

23        THE COURT:  All right.

24        MS. BAER:  That takes us, Your Honor, to agenda item

25   #9, which is the Debtor's Fifth Omnibus Objections to Claims.

1  Your Honor, there are a number of claim objections remaining on

2  this one, one of which we'd ask for you to adjudicate today,

3  Your Honor.  I'm sorry, wrong one.  On this one, Your Honor, we

4  have an order for you to enter which sets a briefing schedule

5  on one of the contested matters, the Peter Pierson claim.  And

6  pursuant to that briefing schedule, Your Honor, we will be

7  filing a response to his Motion for Summary Judgment and a

8  Cross Motion for Summary Judgment.  He will have time to

9  respond, and we're continuing the matter for hearing on the

10  merits on the December 19th Omnibus Hearing.

11        THE COURT:  Okay, is that the last one with respect to

12  --

13        MS. BAER:  No, Your Honor, I believe there are a few

14  others on that one yet.

15        THE COURT:  Okay.

16        MS. BAER:  They're all contested and we're working

17  through some of those.

18     (Pause in proceedings)

19        THE COURT:  Okay, that order is entered.

20        MS. BAER:  Agenda item #10, Your Honor, is the

21  Debtor's Eighth Omnibus Objections to Claims.  There's only one

22  left on that, it's National Union.  I know Michael Davis is on

23  the phone today.  We have been talking and we'll hope that we

24  can put together a stipulation and present it at the hearing in

25  October.

1          THE COURT:  Actually he didn't enter an appearance.

2  Mr. Davis, are you on the phone?

3          UNIDENTIFIED SPEAKER:  Your Honor, I think he's out in

4  the hall.

5          THE COURT:  Oh.

6          MS. BAER:  Oh.

7          UNIDENTIFIED SPEAKER:  He went through Security.

8          THE COURT:  All right, well, I guess we'll wait for

9  this one too, because he -- I know he did not enter an

10  appearance on the phone, although he was on the list.

11          MS. BAER:  What we're doing, Your Honor, is just

12  continuing this one, which is by agreement.  We can skip it if

13  you'd like, but we're not gonna be arguing anything on this one

14  today.

15          THE COURT:  It's just continued until October?

16          MS. BAER:  Yes, it is.

17          THE COURT:  All right, that's fine.

18          MS. BAER:  And I have an order.

19          THE COURT:  Okay, thank you.  There he is.

20          UNIDENTIFIED SPEAKER:  He missed his chance.

21          MS. BAER:  Mr. Davis, I just indicated that the

22  omnibus objection with respect to your claim is being continued

23  to October.

24          MR. DAVIS:  Thank you.

25          MS. BAER:  Your Honor, that takes us to agenda item

1  #11, the Debtor's Eleventh Omnibus Objections to Claims.  On

2  that one, Your Honor, there's one contested matter we'd ask you

3  to adjudicate today, and that's the claim of Mark Barnett.

4  Your Honor, this is a $4,600 unsecured claim filed by Mr.

5  Barnett.  No back-up was supplied, he claims it's for some

6  unpaid wages.  We sent him a Notice of Intent to Object if he

7  did not supply information; he did not respond.  We then filed

8  this objection, and on the notice of the objection he wrote

9  back in hand written letters that, "Grace has unsubstantiated

10  firing policies."  He provided no documentation.  We do not

11  have any information other than that.  It looks like there was

12  a Mark Barnett who worked for Grace for one month in 1995.  He

13  earned $1,800.  Our records don't show if he was fired or if he

14  resigned.  We then sold the CryoVak Division to Sealed Air.  We

15  no longer have any other books and records.  We've contacted

16  Mr. Barnett.  We filed a reply here, we've sent him the reply,

17  and have not heard anything from him.  Your Honor, he supplied

18  no information substantiating his claim and we'd ask that you

19  deny and expunge his claim.

20       THE COURT:  Is anybody representing Mr. Mark Barnett?

21       ALL:  (No verbal response).

22       THE COURT:  No one's -- Mr. Barnett, are you here?

23  Mr. Barnett's not here, he has no counsel, so I'll take your

24  order.

25       MS. BAER:  Thank you, Your Honor.

1        THE COURT:  Is that the last one in this?

2     (Pause in proceedings)

3        THE COURT:  Okay, that order is entered.

4        MS. BAER:  Your Honor, I believe the Insurers are now

5  here, so I would go back to agenda item #6, which is the

6  Insurer's Motion for Obtaining the 2019 exhibits.

7        THE COURT:  All right.  Have you had a chance to get

8  your breath?

9        MR. COHEN:  Thank you, Your Honor, Jacob Cohen for

10 Federal Insurance Company.  I had a little bit of a line at the

11 metal detector.  We --

12        THE COURT:  Is there still a line?  Are parties who

13 are going to be interested in this still coming in?

14        MR. COHEN:  I think there might be a couple, but we --

15 there were maybe seven or eight behind me and that was a few

16 moments ago.

17        THE COURT:  Ms. Baer, why don't we just pursue

18 something else until everybody's in.  I want to make sure we

19 have everybody who wants to be heard on this matter.

20        MR. COHEN:  Well, Mr. Esserman was behind me, I don't

21 know if he's in yet.

22        MS. BAER:  He's right there.

23        MR. COHEN:  Okay, that's -- sure.  Mr. Esserman who

24 represents certain objecting law firms is here.

25        THE COURT:  All right.

1    MR. COHEN:  I understand that the ACC is here.  They

2  filed a notice based objection.  We're asking for essentially

3  the same access that you granted to Credit Suisse First Boston

4  and Ace in the OCF proceedings, which is essentially access to

5  the 2019 exhibit disks, subject to our not publically

6  disclosing any personal information about any individual

7  claimant without further order of the Court.

8    THE COURT:  Well, there's a difference between the

9  cases where I don't think there's parity.  I mean, the Debtor

10  is obviously not objecting, but number one, on the notice

11  issue, I'm concerned.  Were the attorneys for the parties whose

12  information you're trying to access served?

13    MR. COHEN:  Well, let me address that, Your Honor.  We

14  served everyone on the 2002 list to begin with on the

15  assumption, which evidently was consistent with Your Honor's

16  assumption in Kaiser, where you approved my providing notice to

17  the people on the 2002 list the people that want to have notice

18  in a case enter their appearance and sign up for 2002 service.

19  Nevertheless, out of an abundance of caution, several days

20  before any objection was entered, I had our staff here go

21  through everybody who filed a 2019 statement from October of

22  2004, which was the month where the 20 -- I'm sorry, the 2019

23  order was entered that provided -- that did not provide for

24  immediate public access, through September 14th or whatever the

25  day was that we filed that.  We served all of those people,

1   many of them again.  Since then -- and we filed a Certificate

2   of Service.  Since then I had my staff do a reconciliation and

3   with I think about 15 exceptions, every firm that filed a 2019

4   statement was served, either they or their local counsel was

5   served by virtue of being either on the 2002 list or

6   effectively received notice by virtue of being on the ECF email

7   service list.  But anyway, as of approximately 2 weeks ago,

8   actual service was mailed to everybody that filed a 2019

9   statement from October of last year forward.

10          THE COURT:  Okay, so the attorneys who have filed the

11  2019 statements have all had notice of the fact that you're

12  attempting to have access to those 2019 statements?

13          MR. COHEN:  That is correct, Your Honor.

14          THE COURT:  Okay, go ahead then with your argument.

15          MR. COHEN:  Okay.

16          THE COURT:  Why do you need this information?

17          MR. COHEN:  Well, the information is, as set forth in

18  the motion, the names of the people and the personal

19  information about them and their claimed disease categories.

20  Among other things, the information that's gonna come out in

21  the questionnaire is going to go up to the petition date, April

22  2nd, 2001.  There is going to be a body of information about

23  post-petition claimants and what their disease mix is that's

24  gonna be able to be gleaned from this, number one.  Number two,

25  it's a body of information that can be checked against the

1  information that's gonna come out of the database that we'll

2  get access to in March so that we can see if there's

3  inconsistencies there.  Number three, it's a baseline body of

4  information.  The Debtor already has this information, has had

5  it for quite some time, that can be used in advance of the

6  March database preparation and production by the Insurers and

7  their experts, potentially to get started towards participating

8  in the estimation proceeding, Your Honor.

9          THE COURT:  Okay, well, what participation at this

10  point are the Insurers expecting to have in this case because

11  I'm a little unclear.  Some of the responses indicate that the

12  Insurers are denying coverage, or I guess intended to raise the

13  issue that if there is a transfer or some assignment of rights

14  that there will be an allegation -- or an effort to deny

15  coverage.

16          MR. COHEN:  Well, I'm glad you asked that, Your Honor,

17  because that response is entirely off base.  One can tell from

18  reading the 10K's of the Debtor that with respect to all of the

19  coverage that they anticipated ever getting to prior to filing

20  for bankruptcy, they have settlements.  They have settlements

21  with London.  They have -- in my case, Federal Insurance

22  Company, is high level excess has never been approached and is

23  what -- the one case that has been approached, they paid their

24  policy limits and they're resolved.  There is no suggestion

25  here that anybody is going to seek to avoid honoring their

1   coverage obligations.  I mean, there are many, many situations.

2   CNA is both high level and settled and I believe resolved.

3   Allstate, I believe, is --

4           THE COURT:  But then -- well, if --

5           MR. COHEN:  -- settled or resolved.

6           THE COURT:  If that's the case, what do you need the

7   access to the 2019 statements for?  If all of your coverage

8   issues are resolved, you don't have anything left to litigate.

9           MR. COHEN:  Well, our coverage issues aren't resolved,

10  and the reason that we're here is because the Debtor has

11  indicated that they insist on retaining the option of trying to

12  affect a UNR or Fuller Austin result, not only with respect to

13  the high level, unsettled carriers, but with respect to

14  carriers that are settled.  I don't represent settled carriers,

15  but there are settled carriers here in this room that I would

16  assume would be very happy not to be here if the neutrality

17  that we keep on coming here and asking for with respect to the

18  estimation proceeding were entered.  But as it stands, there

19  are people that are gonna seek, or at least reserving their

20  rights to seek, to bind us in a coverage context to the outcome

21  of an estimation that should be purely for plan confirmation

22  issues having to do with the feasibility of the plan and voting

23  rights.  That's all we've asked for is to be cut out of that.

24  Nobody seems to want to permit us to stand down and sit down,

25  so we need to prepare as if we're going to have to proceed, and

1  we may have to proceed to be a full participant in the

2  estimation proceeding that frankly we want no part of.

3        THE COURT:  Because in this instance, the Debtor's

4  proposal is to have the estimation binding for both allowance

5  and distribution purposes, is that --

6        MR. COHEN:  No, I don't think that that is correct.

7        THE COURT:  Okay.

8        MR. COHEN:  But the problem becomes with the existence

9  of the precedence of UNR and Fuller Austin, albeit it is on

10 appeal and UNR is in a different Circuit and Amatex is to the

11 contrary in this Circuit at the District Court level.  We are

12 in a situation where no one is saying we're not gonna try to do

13 this to you.  And in fact, the implication is to the contrary

14 that somebody is going to try to take the outcome of whatever

15 this estimation is and take that, together with plan

16 Confirmation, and say, "Insurers, you have to pay your entire

17 policy limits into the Trust tomorrow."  We don't want to be

18 here.

19        THE COURT:  Is that what the Debtor intends, because

20 if -- I'm a little confused --

21        MR. BERNICK:  Yeah, I --

22        THE COURT:  -- frankly.

23        MR. BERNICK:  I'd -- Mr. Esserman is here, and he can

24 respond to this particular request, but this sounds like the

25 same record being played that we've seen in other cases, which

1  is that the insurance companies want to come in and say we have

2  standing to deal with all -- every and all aspects of this case

3  because we don't know what our treatment down the road is going

4  to be.  Now, a bunch of characterizations were made about what

5  the Debtor's future intent might be, and they can always

6  surmise and they can become concerned, but I don't believe that

7  we've made any kind of representation to that effect.  I think

8  this is a replay of, you know, just a few days ago, well --

9         THE COURT:  Well, tell me what the Debtor's --

10        MR. BERNICK:  We --

11        THE COURT:  -- intent is with respect --

12        MR. BERNICK:  The Debtors have attached --

13        THE COURT:  -- to the insurance.

14        MR. BERNICK:  The Debtor's stated intent with respect

15  to the estimation is the estimation should be binding with

16  respect to the sizing of the Trust, that is the total amount of

17  money that should be set aside with respect to certain kinds of

18  claims.  What implications that might have for coverage down

19  the road, we have not addressed.  We have not made a

20  representation to the effect that we expect to be binding for

21  UNR purposes.  We have not made any such representation to any

22  effect.  So what's happening is the carriers are anticipating

23  that ultimately there will be some kind of UNR argument made,

24  and exactly how that UNR argument might be made, and none of

25  those bridges have been crossed.  So if he's saying here's

1  what's inevitably going to happen, that is at this point his

2  speculation.  That is not something that the Debtors have said

3  in fact they're going to do.  So we don't have a problem with

4  his having the information.  We've got the information.  The

5  Asbestos Claimants presumably have the information.  I frankly

6  question whether a lot of it has the kind of value that he

7  believes that it does have.  I think some of it has got value

8  for estimation purposes.  I question whether all of it does.

9  But to say that as a basis for requesting this information now,

10 this inevitably will be used for some purpose concerning UNR in

11 the certain way I think is highly speculative.  I -- you know,

12 it's certainly not accurate to say that the Debtor has set out

13 those plans and has those plans today.

14      THE COURT:  I'm sorry, but I'm really confused as to

15 what purpose giving you -- I'll call it line by line data, you

16 know, each individual claimant's data serves in terms of

17 getting ready for an estimation hearing.  If -- the purpose of

18 Rule 2019 is to make sure that a party who is going to

19 participate in the Plan of Reorganization is appropriately

20 represented and isn't represented by more than one entity.  So

21 in terms of having a ballot agent look at the 2019 statements

22 and say, "Yes, this person who filed a ballot is the same --

23 has the same identifying information as somebody on the 2019

24 statement and there's no inconsistency," or to the contrary,

25 there is some inconsistency and pointing out what it is or to

1  make sure that that person's not represented by two firms, that

2  I can understand.  But what more is it that the insurance

3  companies need for purposes of an estimation hearing?  I agree

4  that you need global numbers, but why do you need --

5       MR. COHEN:  Well, Your Honor, if I may, the entire

6  concept -- Debtor's concept here is that -- with which we agree

7  is that one should not be estimating blindly simply upon

8  aggregate numbers without taking a principled look at

9  underlying claims.

10       THE COURT:  Yes, but I haven't figured out why the

11  insurance companies have any interest in the estimation.  Are -

12  - because if you participate in the estimation, if I open up

13  these 2019 statements and you participate in the information,

14  and if I open them up I'm going to consider that participation

15  in the estimation, you are going to be bound.

16       MR. COHEN:  Well, Your Honor, again, bound for what?

17  Bound for --

18       THE COURT:  For all purposes.  I'm going to make any

19  and all findings with respect to what claims are going to be

20  treated, how much they're going to be paid, how the Trust

21  funding is going to work and if there is a -- some concern

22  about whether or not insurance, either the policies, the

23  proceeds or the contract rights are assignable and that's

24  necessary to adjudicate plan funding, I'm going to make those

25  findings too.  I mean, you can't participate willy-nilly.

1    You're either in or you're out.

2         MR. COHEN:  But, Your Honor, all we have asked is that

3    we have assurance that a plan estimation -- an estimation for

4    plan feasibility purposes, for voting purposes -- not for

5    distribution, can't be for distribution.  This Court doesn't

6    have jurisdiction to allow claims for distribution or to

7    estimate claims for distribution.

8         THE COURT:  Certainly I do.

9         MR. COHEN:  Not personal injury claims, Your Honor.

10        THE COURT:  I do as long as they don't have to be

11   tried.  The only thing I can't do is try a personal injury

12   action.  But for estimation purposes to figure out whether a

13   claim -- what value a specific claim has to fund a Trust,

14   absolutely I have jurisdiction.  It's non-core, but it's there.

15        MR. BERNICK:  See, Your Honor, I really think that you

16   just heard what is probably the most revealing statement, which

17   is that when you finally confront the carriers with the

18   opportunity to participate and then be bound, that's really not

19   what they want.  What they want is to have a threat of

20   participation and a threat of holding the plan up so that they

21   can achieve what they really want, which is to have neutrality.

22   And we've seen this in every single case.  What they really

23   want at the end of the day is neutrality.  And that is an issue

24   that we can take at an appropriate point in time, but the idea

25   of their making the threat to participate but then saying they

1  don't want to be bound by the result can only be explained as

2  an effort to get leverage so they can say, "Well, we don't have

3  to be here anymore."  And that really is improper.  If they

4  want to be part of the estimation process they should be bound,

5  and then I guess they can participate.  But if they're not

6  gonna be -- if they don't want to be bound by the estimation

7  process, then for them to insist that well, do something else

8  for us in the plan and then we won't participate in the

9  estimation process, is -- it's just a negotiation game.

10          MR. COHEN:  Your Honor, we --

11          MR. BERNICK:  And I guess --

12          MR. COHEN:  We were here in January and we didn't

13  threat.  We said, "Just confirm for us that by not

14  participating we're not gonna end up with a UNR or Fuller

15  Austin result.

16          MR. BERNICK:  We don't have --

17          MR. COHEN:  Your Honor said --

18          MR. BERNICK:  We don't have to make --

19          MR. COHEN:  If I may --

20          MR. BERNICK:  -- any such undertaking --

21          MR. COHEN:  Mr. Bernick, may I --

22          MR. BERNICK:  Sure.

23          MR. COHEN:  -- address the Court, please?  At that

24  point in time, Your Honor said that's a confirmation issue.  If

25  you think that your rights might be impacted and you think that

1  you need to do something, participate.

2          THE COURT:  Right.

3          MR. COHEN:  We came in back July, Your Honor.  We

4  said, "Really, at this point they're saying this is for

5  feasibility purposes.  This is for setting up a Trust."  We

6  don't want to get involved in all of that if Your Honor will

7  please make it clear that by doing that we're not gonna have a

8  situation where at the end of the day they come to us and say

9  pay all your money up front.  Your Honor, if the plan on the

10  table were confirmed tomorrow and Mr. Bernick's client came to

11  us and said, "Look, as these claims get liquidated and as we

12  run through the coverage, when we get to your claims, if we get

13  to your claims that are gonna be covered by your policy above

14  $150 million in many of these years, we expect you to agree to

15  pay," I don't anticipate there would be a whole lot of problem

16  for Insurers in that situation from going forward, assuming

17  they were appropriate TDP's and appropriate protections against

18  fraudulent claims.  I've never -- my client has never denied a

19  claim to this insured.  My client has paid when they got to

20  them.  My client sits above $100 million, 150 million.  They

21  are tens and tens of millions of dollars below that in their

22  consumption of an insurance as of the time they went into

23  bankruptcy.  So I think it's rather unfair to characterize the

24  Insurers as wanting to wield anything here.  We just want to

25  make sure that somebody doesn't come to us and say, "The Court

1  estimated the liability to be X billions of dollars, write your

2  check to the Trust."  When the X billions of dollars -- if they

3  were honored and according to appropriate TDP's liquidated,

4  these Claimants with respect to almost certainly the layers of

5  coverage you're talking about for my clients are gonna be

6  reached years in the future.

7       MR. BERNICK:  Your Honor, you heard it again.  What

8  they're really concerned about is UNR, and they want Your Honor

9  to decide now that they don't have to worry about UNR.  Whether

10  they're going to be bound by UNR, whether the Debtor is going

11  to seek or the Trust is gonna seek UNR treatment based upon

12  whatever happens in this case, is an issue that is not before

13  the Court, it's a down the road issue.  They have to make the

14  same kind of decision that litigants make every day of the week

15  - do I want to participate or do I not want to participate?

16  That's a decision that they have to make.  We don't have to

17  provide them with an assurance that down the road we're not

18  gonna seek a certain of a treatment, and neither does the

19  Court.  If they want to participate now, that's fine.

20       THE COURT:  Well, yes, it is if they want to

21  participate now and they will be bound.  The only question I'm

22  trying to get to is does this make any sense?  And if, in fact,

23  the Debtor is not going to be pursuing the request to have

24  estimation findings for purposes of plan confirmation bind in

25  some other context, then they don't need to participate and

1  they certainly don't need access to these statements.  But if

2  the Debtor isn't going to do that and they're going to

3  participate in estimation, then they may need at least some, if

4  not all, of the information that's in the 2019 statement.

5         MR. BERNICK:  The -- what I'm saying is that the

6  Debtor is unlikely to decide that issue any time prior to

7  confirmation.  Generally speaking, the way that this works is

8  that the confirmation takes place and then an argument will

9  take place down the road, presumably probably made by whoever

10  is running the Trust, about whether to say that on the basis of

11  what happened in the bankruptcy case, UNR, which operates as a

12  principle of law, is applicable and is triggered and the

13  policies then become due according to the principles of UNR.

14  UNR does not require -- it's a principle of law, it says by

15  operation of the bankruptcy result here are the consequences of

16  it.  UNR does not require that the carriers participate or not

17  participate in the process during the bankruptcy case.  And

18  it's not gonna be up to the Debtor to make that decision.  It's

19  a question that really is left up to the people who are running

20  the Trust down the road about what they want to contend on the

21  basis of what happened in the bankruptcy case.  So all that

22  they're doing is to say, "We don't want that issue to be

23  resolved by people who are running the Trust down the road.  We

24  want to be resolved by the Debtor now."  And all that I can say

25  on behalf of the Debtor is that decision is not gonna be up to

1  us, it's not gonna be up to us, and if they want to have access

2  to the information, fine, they can have access to the

3  information.

4        THE COURT:  Well, then maybe I need to hear from the

5  Tort Claims and whoever is going to be running the Trust with

6  respect to this issue because it seems to me that whether or

7  not access to the 2019 statements is required, I suppose is the

8  right word, to the insurance companies depends on whether or

9  not they're going to participate in the estimation hearing.

10        MR. BERNICK:  Well --

11        THE COURT:  And if they're going to participate

12  because somebody is going to allege that the estimation process

13  is binding for something other than plan confirmation purposes,

14  then I want to know it now.  There's a plan on the table,

15  that's the only Plan with which at the moment we're doing

16  discovery and going forward to confirmation, so what's the

17  intent?

18        MR. BERNICK:  Well, but the -- that's what I'm saying

19  to Your Honor is that as I understand UNR, and I'm not a UNR

20  expert by any stretch of the imagination, it doesn't depend on

21  the intendment of the Debtor or the plan proponents or what the

22  plan says.  What it depends upon is a principle of law that

23  says that once the confirmation takes place, the confirmation

24  order or judgment is a judgment that by operation of law is

25  then binding with respect to the policies.  In other words, it

1  really -- it flows from the nature of the judgment that's being

2  entered --

3          THE COURT:  Well, I think we can do away with that

4  issue by indicating that the judgment is a judgment that

5  confirms the negotiated plan, which is a contract.

6          MR. BERNICK:  That's correct, that doesn't --

7          THE COURT:  And it's --

8          MR. BERNICK:  Again, as I understand UNR, that is not

9  -- even if you have, for example, what we're doing in the CE

10 case, which is that I believe we're gonna have, you know, a

11 neutrality provision that says neutral, neutral, neutral.  That

12 still doesn't confront the question of whether a Court in the

13 context of a coverage case will decide that the fact of a

14 judgment in bankruptcy constitutes a judgment against -- the

15 judgment of liability for purposes of these policies.

16         MR. COHEN:  That's Fuller Austin, Your Honor.

17         MR. BERNICK:  That's -- well -

18         MR. COHEN:  That's the step beyond UNR --

19         MR. BERNICK:  Well, what --

20         MR. COHEN:  -- but UNR, Your Honor, is --

21         MR. BERNICK:  I'm sorry, let me -- I'm sorry, I gave

22 you the opportunity, although reluctantly, to finish, that is

23 the issue that's being posed.  It's an issue of law.  It's not

24 a question of the intendment to the parties.  And what we're

25 doing in these plans, at their insistence, is to have

1    neutrality.  Now, that's not true in all the plans.  There are

2    other plans in which there is not neutrality because people say

3    -- I believe this was what happened at Babcock & Wilcox --

4    people say that, "No, it is proper for a plan, in fact, to have

5    a preclusive effect with respect to coverage issues because

6    that's part of the purpose of the bankruptcy law."  That's not

7    been done in CE.  That may be done in other cases.  But

8    whatever is gonna happen, Your Honor, you know, I think that

9    while I understand Your Honor's practical concern with whether

10   this is a real issue or not, what I'm really saying is that I

11   don't know that that concern really is one that can be A)

12   resolved, because I don't know that anybody in this Courtroom

13   can speak in a way that binds the future Trust.  And I don't

14   know B) that these people, of all the people in this case, are

15   some how entitled to know before a decision actually has to be

16   taken how they should conduct their litigation strategy --

17        THE COURT:  Well, if that's the case, then they need

18   to be involved because --

19        MR. BERNICK:  I kind of think so -- I, you know -- but

20   that's why we are not objecting.

21        MR. COHEN:  Your Honor, if I may say three, perhaps

22   four things.  Number one, UNR is not the law of this Circuit

23   and should not be.  Number two, one of the problems with what

24   Mr. Bernick is saying about UNR being purely legal is one of

25   the things that the 7th Circuit said of the CNA companies in

1  holding them to this UNR result was, "Where were you during the

2  bankruptcy?  I didn't hear you complaining during the

3  bankruptcy."  So part of the reason we need to be here, absent

4  being carved out as people did, for example, in OCF.  My

5  understanding is the ACC would be happy if we had a similar

6  stipulation as to the one you -- the Court approved in OCF that

7  allowed us to stand down, but you need to understand that we're

8  not here because we want to threaten.  We're not here because

9  we want to do anything other than make sure that we don't end

10  up with UNR or Fuller Austin happening to us, especially

11  because we didn't say anything.

12      And the other thing I would add is the -- I understand the

13  main purposes of 2019 statements.  2019 statements, however,

14  are judicial records as to which a strong presumption of public

15  access to anyone in the public, to the New York Times, to

16  somebody walking down the street applies.  Now, I understand

17  the personal identity theft sorts of issues that pervaded the

18  Court's decision to effectively seal these things in the first

19  instance.  We're not asking for anything other than access to

20  the exhibits for internal consumption, not to have any

21  individual information publically disseminated or further

22  disseminated without our coming back to the Court and

23  explaining why that should be.  So why can't be, for today, the

24  end of the discussion?

25          THE COURT:  All right, well, then assure me as to how

1  you're A) not going to share the information I release to you

2  with any other insurance company --

3          MR. COHEN:  Well, I didn't have it --

4          THE COURT:  -- B) --

5          MR. COHEN:  Your Honor, I didn't have in mind that we

6  wouldn't use it as a joint group --

7          THE COURT:  No, you're saying you want it for purposes

8  of estimation in this proceeding, and I may disclose it to you

9  for purposes of estimation in this proceeding and only that.

10 So assure me how internally this information is not going to be

11 compared with other data in the insurance company files for use

12 in some other matter, like subsequent coverage litigation or a

13 position that you may take when the same insurance company is

14 defending against insurance claims in another asbestos case.

15 Assure me how you're going to use it for estimation in this

16 case.

17         MR. COHEN:  Your Honor, I don't think, respectfully,

18 that that is a legitimate basis to deny the Insurers access

19 because that has nothing to do with the reason why it's not

20 publically available.  Let me give you a for instance.

21         THE COURT:  Sure it does.  It has a lot to do with it.

22         MR. COHEN:  But let me give you a for instance, Your

23 Honor.  LaBlanc & Wydell filed a 2019 statement in this case

24 that they've amended several times.  They filed almost all of

25 the silica claims in Kaiser.  As you know, my company is

1  involved in both of these cases.  I can't and my client can't

2  erase from the institutional mind --

3          THE COURT:  Sure you can.

4          MR. COHEN:  -- the fact --

5          THE COURT:  We --

6          MR. COHEN:  -- the fact, for example --

7          THE COURT:  We build ethical --

8          MR. COHEN:  -- that there are 4,000 -- that these are

9  all mixed dust claims, to put it euphemistically.

10          THE COURT:  Mr. Cohen, this is not a mixed dust case,

11  this one.  This is an asbestos case, number one.  And number

12  two, we build ethical walls in law firms all the time.  We

13  require all kinds of parties to note their files that they

14  can't take certain action because a bankruptcy has been filed.

15  We can certainly build another database that is for use only in

16  this case and no other case.  If you can assure me that that's

17  what you're going to do for purposes of estimation and show me

18  how it's going to be accomplished, I think you're entitled to

19  access.  And then when this case is over those records could be

20  destroyed.

21          MR. COHEN:  Well, Your Honor, if Your Honor is willing

22  to order access only on that basis, we will make it so, as we

23  have in other bankruptcy cases, for example Congoleum, where

24  there is databases of information that we can't use beyond

25  that.

1        MR. BERNICK:  Well, then if that's so, then why is

2   counsel representing to the Court that it's an improper basis

3   for conditioning access?  I don't understand it.  You have -- 4

4   minutes ago he said that's not possible, and then all the

5   sudden he turns --

6        MR. COHEN:  I didn't say it wasn't possible, Your

7   Honor, I was saying that I think there is a perfectly

8   legitimate basis that -- for having this information, for

9   comparing it to see whether the 4,000 silica claims in Kaiser

10  are 4,000 asbestos claims in this case and therefore, are

11  presumptively dubious in both cases.  And I'm saying I don't

12  need -- I can protect the confidentiality of individual

13  information, and I shouldn't be limited in the use that I make

14  of that information so long as I keep it confidential and so

15  long as there is no harm to the personal information

16  confidentiality interests of individual claimants.

17       THE COURT:  Well, but if you're using the data from

18  one case in another case without notifying that entity in both

19  cases that that's what you're going to use it for, for the

20  purpose of eventually potentially denying coverage, which

21  hasn't even gotten up to your level yet, that's not for

22  purposes of plan estimation.  And that's what I'm saying.  I

23  don't think the 2019 statements are out there for purposes of

24  coverage litigation.  It's there for purposes of making sure

25  that the entities who participate in the plan process are in

1   fact appropriately represented and are given the authority to

2   the person who is going to file a ballot on their behalf to do

3   so, that's the purpose.  And the steps that you're now

4   attempting to take it to are not the purpose for which it's

5   been filed.

6           MR. COHEN:  Well, Your Honor, if you're not gonna let

7   us have it without those restrictions, we'll take it with

8   restrictions Your Honor is willing to allow us to have them

9   with.

10          THE COURT:  All right.

11          MR. COHEN:  Tell us what they are and we'll prepare

12  and appropriate order.

13          THE COURT:  All right, then let me hear from the other

14  side, because if there is a violation, I will deem it a civil

15  contempt and clients and attorneys and whoever else looks at it

16  may be spending quite some time in jail trying to figure out

17  how to cure the contempt.  I am very serious about this.  Let

18  me hear from the other side.  Good afternoon.

19          MR. ESSERMAN:  Good afternoon, Your Honor, Sandy

20  Esserman on behalf of Baron & Budd, Reaud, Morgan & Silver

21  Pearlman.  I'm not gonna go over many of the issues that have

22  been discussed today, but I think one thing we need to address

23  right off the bat is are the Insurers going to be bound?  If

24  they're going to be bound by this proceeding for all respects,

25  that's one thing.  I think we need something -- if they're

1  going to get access, I think we need something in the order to

2  that effect that they're going to be bound for all purposes.

3  They're participating in these proceedings, and whatever

4  happens, happens.

5      I still think that there's some major issues on standing

6  as to whether or not the Insurers do have standing.  I found

7  the case of <u>Kaiser and Flintcoat</u> by Judge Farnan last month,

8  which I'm sure Your Honor's familiar with.

9          THE COURT:  Actually, I just saw it after you cited

10  it.  I -- nobody had told me that it had been decided, so yes,

11  I've read it now.

12          MR. ESSERMAN:  Okay, and in which the District Court

13  affirmed your 2019 orders.  The insurance companies had

14  appealed that.  We basically mounted -- put on the defense of

15  Your Honor's order and was sustained by the Court in that

16  opinion, in which the first issue that the Court addressed was

17  a standing issue.  And it had a couple instructive statements

18  on standing.

19      I think the Court -- the District Court was not convinced

20  the Insurers had any standing to get involved in the 2019's at

21  all and they said as appellees point out that Rule 2019 orders

22  have no effect unless one, a Plan of Reorganization is first

23  conceived, approved by Creditors and confirmed, and two,

24  payment is sought from the Appellants under the respective

25  insurance policies they issue to the Debtors.  And they talked

1  a little bit also about insurance neutrality and if in fact

2  there's an insurance neutrality and they truly have no

3  standing.

4      The Court went on to hold, of course as Your Honor's

5  familiar, that not withstanding the standing issue, Your

6  Honor's sensitivities about the information is right on point

7  and should be preserved.  So I think the first thing we need to

8  say here is for what purpose and are the Insurers bound?  And

9  Mr. Cohen was speaking for Federal, which he said was up, but

10  the pleading was not a Federal pleading.  This pleading was

11  signed by many insurers, many other insurers joined in and I

12  think the restrictions, if in fact they're gonna agree to be

13  bound, I still think there's a standing issue, don't get me

14  wrong.  And I think they should be denied for that reason

15  alone.  But if Your Honor is going to give them the

16  information, there's various ways that the information can be

17  given to them, including by the Debtor without even having the

18  claimant's name and the address and their form of agreement

19  with counsel or their Social Security number, the Debtor can

20  prepare lists and charts of numbers of claimants and what

21  disease they assert and -- without getting into some of the

22  details.

23      I think Your Honor has smelled out here the fact that this

24  really doesn't have anything to do with estimation, that

25  there's clearly some other agendas here.  But if Your Honor is

1    inclined to give them the statements and inclined to grant them

2    at least standing for these purposes to look at the 2019's, I

3    think there's several -- there's very many detailed levels of

4    confidentiality that Your Honor's outlined that need to be

5    cranked into the order.  And furthermore, I think that there is

6    even a question as to whether or not the Debtor can just supply

7    them under the confidentiality with various information

8    gathered from the 2019's that would lead to an estimation

9    issue.

10           MR. BERNICK:  Can I make a proposal?  And one that is

11   designed not to have us inherit the burden of something that we

12   don't -- we're not fighting.  It seems to me that if Your Honor

13   is going to decide today or whenever that in fact access can be

14   granted for -- to this information under certain circumstances,

15   and Mr. Esserman correctly points out that a variety of

16   carriers have an interest in this, and they're probably a

17   couple, three different layers of sensitivity to the

18   information, why -- I would suggest that Your Honor make that

19   determination today or whenever, and then Mr. Esserman can sit

20   down with whoever it is that's gonna act as a liaison with the

21   insurance carriers and figure out what an appropriate, you

22   know, methodology for access is.  And then if there are issues,

23   then bring it back to the Court.  But to try to hash that out

24   today and to try to deal with all of the different carriers who

25   I know are not reluctant to speak to themselves today, I don't

1  think is a terrific use of the Court's time.  We have a lot of

2  other matters today.

3       MR. ESSERMAN:  I agree with Mr. Bernick.  I still

4  think there's a threshold issue of standing here and whether or

5  not -- I think the Insurers need to commit as a group saying,

6  "You know what, we want these -- we want the information here.

7  We're gonna agree to keep it just for estimation purposes here

8  only and no other purposes internally with each insurance

9  company."  And that yeah, we're willing to be bound by these

10 proceedings.  If they say that, well, they got a good argument.

11 I still think standing's an issue.  Thank you, Your Honor.

12      THE COURT:  All right.

13      MR. HURFORD:  Good afternoon, Mark Hurford for

14 Campbell & Levine.  I'm gonna back up and address the service

15 issue.  As Your Honor's recognized previously in connection

16 with the numerous 2019 hearings and today, this is confidential

17 information and it's disclosure is very important.  Our

18 Committee's concern is the notice, or more appropriately the

19 lack thereof, with regards to this motion.  The original motion

20 was served on September 6th, okay.  It appears that the

21 Insurers served a 2002 list.  Now, we went back and compared it

22 was about 2 months worth of 2019 statements that were filed

23 shortly before that motion against the service list for that

24 motion, and only one firm out of the nine firms who had filed

25 2019 statements were included on the Certificate of Service for

1  the motion as originally filed.  And as Your Honor may recall,

2  that motion was filed on short notice, so we filed the

3  objection that we filed which basically said the motion doesn't

4  comply with due process.

5      Now, the same afternoon we filed our objection, the

6  Insurers filed their supplemental Certificate of Service.  They

7  did that supplemental service on September 14th.  Assuming 3

8  business days for service of that -- if I remember correctly is

9  a Wednesday.  Assuming 3 business days for the mailing to allow

10 people to get in and see, they would have received the motion

11 on the objection deadline, which was one week ago.  So for the

12 Insurers to seek to request the information that they are

13 seeking on such short notice with the majority of the law firms

14 who Your Honor instructed them to serve back at the end of

15 August in the case of Grace, or on September 1st at the

16 disclosure statement hearing in <u>Kaiser</u> is just not appropriate

17 --

18         THE COURT:  Well, no, it's not.  I mean, I have a Case

19 Management Order out there.  If it's -- if the service wasn't

20 pursuant to the Case Management Order, I shouldn't even be

21 hearing this today.

22         MR. COHEN:  Your Honor?

23         MR. HURFORD:  Thank you, Your Honor, that's our

24 position.

25         MR. COHEN:  It was pursuant to the Case Management

1  Order, Your Honor.

2       THE COURT:  Not if they got the service of the motion

3  on the day the responses are due.

4       MR. COHEN:  Your Honor, it's because your Case

5  Management Order says serve the 2002 list, and it proceeds on

6  the assumption which I think is --

7       THE COURT:  Yes, and I ordered in Court last month

8  that all of the relevant Parties-In-Interest be served and the

9  20 -- and the Case Management Order limited to the 2002 list is

10  based on the fact that for general business matters, that's

11  who's interested.  You always have to serve the Parties-In-

12  Interest.  And clearly the law firms whose information you're

13  trying to get at are Parties-In-Interest.  They just are.  I

14  mean, if you'd filed a 2019 statement and somebody wanted you -

15  - to get your information and you got served with the motion on

16  the objection date, you know --

17       MR. COHEN:  Your Honor, the very first thing I did

18  when I got involved in this case was enter my appearance, seek

19  leave to appear Pro Hac Vice and get on the 2002 list so I

20  could get notices --

21       THE COURT:  Yes.

22       MR. COHEN:  -- and requests for notices.  And Your

23  Honor, the fact of the matter is -- and I can demonstrate this

24  -- is that all but a handful of filing firms was in -- were in

25  fact served either via themselves or their local counsel by

1  being on the 2002 list or via themselves or their local counsel

2  being on the ECF notice list.  They received actual notice and

3  I believe there are --

4         THE COURT:  As of when though?

5         MR. COHEN:  As of the date of the actual filing of the

6  motion on September 6th.  There were a handful that were picked

7  up because we did the additional exercise of going through.  So

8  I don't think it's a valid point.  Let me just -- while I'm up

9  here.  The Kaiser opinion, one of the things Judge Farnan wrote

10 was -- this was London's appeal there and that -- one of the

11 things Judge Farnan wrote was, "You didn't ask.  Why are you

12 coming to me before you asked Judge Fitzgerald for access?"

13 That was --

14        THE COURT:  No, actually he said that that was not a

15 relevant factor because the issue was whether or not the

16 process should be employed at all.

17        MR. COHEN:  He took -- they took on the process, but

18 he dropped the footnote that said, effectively, "Why didn't you

19 go ask first?"

20        THE COURT:  Well, I think what he was saying is he's

21 not at all clear that you have standing, number one.  But he's

22 going to take that issue on because if the process wasn't

23 appropriate then there -- then he needed to address that first.

24 So he looked at the process and thought it was all right --

25        MR. COHEN:  If --

1          THE COURT:  I don't think that his opinion precludes

2     people from coming in now and asking for access.  I think it

3     confirms that that's what you should do.  So I'm not arguing

4     that you're not appropriately here, I'm arguing as to having

5     filed that motion A) whether service was appropriate, because

6     if not, it has to be continued until next month to give people

7     time to answer.  B) if -- I want to know what standing you

8     have, and C) I want to know the purpose for which you're going

9     to make use of this information because the 2019 statements

10    have a limited purpose.  I required more information on those

11    statements than 2019 requires because I want to make sure that

12    when we get to voting on the plan issues that we have the

13    database with respect to what attorneys are there authorized to

14    cast master ballots, if that's how the process is going to be,

15    or what attorney represents one claimant, making sure that we

16    don't have duplicate ballots coming in from different lawyers.

17    And that is all something that the ballot agent can do.

18          MR. COHEN:  Right, but the standing, by the way, we've

19    been through in a couple of these things the Party-In-Interest

20    discussion, but just for the record, CNA, which is one of the -

21    - the CNA companies, which are among the moving parties here,

22    were listed in the schedules of the Debtor as one of the top 20

23    Creditors of the Debtor.  So I mean, there -- if that's going

24    to make the difference, I just point that out.

25          THE COURT:  No, it's going to make a difference only

1  in that.  They're obviously going to have a vote on the plan,

2  which Insurers, who are not Creditors, are not going to have in

3  that category because they're not Creditors.  And to the extent

4  that they're one of the 20 largest Creditors, they're obviously

5  in terms of their Unsecured Creditor status represented by the

6  Creditor's Committee.  So they don't necessarily need

7  independent access anyway.

8          MR. COHEN:  Now, the information itself, while it is

9  for 2019 purposes gathered, if for estimation purposes, I see

10  500 names and addresses that are the same 500 names and

11  addresses on two different firms; I know that there are 500

12  duplicate claims.

13          THE COURT:  Which is exactly what I'm going to require

14  the ballot agent to do.  That was --

15          MR. COHEN:  I'm -- I understand that's for voting,

16  Your Honor, but here we're talking about a principled

17  examination of claims for estimation purposes.  And anybody

18  that's participating is entitled to know --

19          THE COURT:  You're not going to see ballots before the

20  estimation process.

21          MR. COHEN:  Not ballots, Your Honor, but if firm A has

22  3,000 people that they represent as being claimants with, you

23  know, various degrees --

24          THE COURT:  I see --

25          MR. COHEN:  -- categories --

1          THE COURT:  You're saying two people are listed on two

2   different attorney's 2019 statements, they should be scrubbed.

3          MR. COHEN:  They -- that's an important thing to know

4   in terms of estimation.

5          THE COURT:  And I think that's still something that

6   one of the experts ought to be designated to do.

7          MR. BERNICK:  With all these issues, it's not like the

8   insurance companies are the only one's who are -- we're all

9   focused on --

10         THE COURT:  Yes.

11         MR. BERNICK:  -- issues.  But again, particularly if

12  not all of the law firms -- well, I -- there's an issue about

13  whether this motion is properly up for today, and given all the

14  other issues -- I'm just looking back at the folks that I know

15  are gonna want to speak, and we're 45 minutes into the hearing

16  --

17         THE COURT:  We knew this would happen, Mr. Bernick,

18  just save us some time and let me hear them.

19         MR. COHEN:  Your Honor, I go -- a couple of things.

20  First of all, there's reference to Social Security numbers.

21  Those were carved out from Your Honor's order.  There's a blank

22  field in case Your Honor ever directs Social Security numbers.

23         THE COURT:  No, there should be the last four digits,

24  I think, not the entire Social Security number --

25         MR. COHEN:  No, I don't --

1          THE COURT:  -- I thought, no?

2          MR. COHEN:  I think --

3          THE COURT:  It's a blank unless there's a duplicate

4    name.

5          MR. COHEN:  I think you reserved, Your Honor.

6          THE COURT:  Okay.

7          MR. COHEN:  You reserved, so what we have that is of

8    interest to us are names and addresses so we could take a

9    person that has a common name and know where this person is and

10   a claimed disease category.  That's the information.  And P.S.,

11   with respect to pre-petition claims that they filed a lawsuit,

12   presumably they put in their name, their address and what

13   they're suffering from.  I mean, it's -- there's a generalized

14   waiver when you go and assert claims and put things into suit -

15   -

16         THE COURT:  This isn't an assertion of --

17         MR. COHEN:  -- as to this --

18         THE COURT:  -- a claim.  All this statement is as a

19   representation by in -- I'll just pick on instance, Baron &

20   Budd.  Baron & Budd's representation that it has -- I'm making

21   up numbers -- 1,017 Claimants in this case --

22         MR. COHEN:  And here's who they are --

23         THE COURT:  -- and here's who they are.

24         MR. COHEN:  -- and here's what they claim they're

25   suffering from.

1        THE COURT:  And the who -- here's what they claim

2    they're suffering from is not required in 2019.

3        MR. COHEN:  Yes, Your Honor, but it's there and it's

4    relevant to the estimation proceeding.

5        THE COURT:  Well, it is in a global sense.  It seems

6    to me that if what I just -- what required disclosed was

7    something like person A, just to use a letter, who lives at

8    address #1 claims category 3 disease claim.  And person B who

9    lives at address #2 claims category 5 disease claim, that that

10   gives everybody everything they need for estimation.  You don't

11   need to know the specific name, you do need to know the numbers

12   of claims that are apparently going to come in based on the

13   2019 statements in certain categories.  But you don't need the

14   specifics as to who the person is and where they live and what

15   their Social Security numbers are.

16       MR. COHEN:  But Your Honor, let me give you a for

17   example.  I have here Braton Percell's 2019 statement from the

18   Skinner bankruptcy.  Thousands of names here, Richard Collins,

19   Social Security number and tax -- disease claim non-malignant,

20   where does he live, what's the date he first filed suit, March

21   20, 1997, okay.  And they go back into the 80's.  For example,

22   I mean, if -- and I know that I have the name of somebody that

23   I have from Braton Percell from this case -- I have this

24   information that it had no problem publically filing along with

25   the full Social Security numbers across the hall in Pittsburgh

1  in Skinner Engines.  I could figure out that they're claiming

2  something in this case, they're claiming non-malignant, they're

3  claiming meso in that case, they're claiming a different thing

4  here.  I could find out they filed suit in 1990, and therefore,

5  any claim would clearly be time barred if it was not asserted

6  in the appropriate time.  Again, I could find out that 50, 60,

7  70% of the claims that Mr. Bernick claims, that high

8  percentages of these claims are non-compensable or are

9  inappropriate.  And if I have this information I could go and

10  cross check information against other things.  I can go to the

11  Manville Trust database.  If I want to do these things I have a

12  source of information that permits me to do this.

13       THE COURT:  Which is what I just heard you say you

14  were willing not to do.

15       MR. COHEN:  No, I said I was willing not to it for

16  purposes beyond this estimation --

17       THE COURT:  Right.

18       MR. COHEN:  -- proceeding, but I have a list of -- if

19  I have Richard Collins --

20       THE COURT:  You could compare somebody else's data to

21  this case.

22       MR. COHEN:  I could take the publically available

23  information and show that Richard Collins -- or Richard Collins

24  is making claims in -- against Oglebay Norton, which makes

25  steel mill products, and these people, they made -- building --

1    this wasn't -- guy wasn't a construction worker, one of these

2    claims is no good.

3            THE COURT:  Well, you -- that's a leap, but I mean --

4            MR COHEN:  But these are the sorts of manipulations of

5    data in connection with this information in this estimation

6    proceeding that I might wish to engage in, which is why it is

7    appropriate, I submit, that we have access subject to no

8    further dissemination without coming back to you of individual

9    information, which is precisely what Your Honor ordered in OCF.

10   As for the notice issue, in OCF Your Honor said, "I'm gonna do

11   this here and now, there's no harm because nothing's being

12   publically disseminated," so in this order --

13           THE COURT:  I had --

14           MR. COHEN:  -- I'm providing you -- you give notice.

15           THE COURT:  I have the major Creditor withstanding

16   coming out the kazoo in OCF.  I have Insurers here whose

17   standing is at least tenuous --

18           MR. COHEN:  Well, CNA is a top 20 Creditor here, Your

19   Honor.

20           THE COURT:  Well, you're not --

21           MR. COHEN:  CNA is a moving party.

22           THE COURT:  Well, CNA, as I said earlier, can probably

23   get access through Creditor's Committee information.  I mean,

24   it doesn't necessarily need independent access because the

25   Creditor's Committee is looking at Unsecured Creditor claims.

1 You're not here, as I understand it, claiming Creditor status.

2       MR. COHEN:  Not for my clients.

3       THE COURT:  You're saying you're an insurer whose

4 level is somewhere up in the heights, and at some point in time

5 the Debtor may get there, but they're not there yet.  And even

6 if they do get there, you may deny coverage, you may not, you

7 need to wait and see.  So how does that give you standing to

8 get what you want to do here?

9       MR. COHEN:  Your Honor, we came here in January, we

10 came here in July --

11       THE COURT:  That doesn't matter, coming back --

12       MR. COHEN:  We're back to --

13       THE COURT:  -- to the bucket 18 times --

14       MR. COHEN:  We don't want to.

15       THE COURT:  -- if the well is empty doesn't give you

16 standing.

17       MS. WARREN:  Your Honor, there are other Insurers here

18 who would like to speak.  Can we have a turn?

19       THE COURT:  As soon as I find out how he has standing,

20 please.  I'm --

21       MS. WARREN:  Well, I'd like to address that issue.

22       THE COURT:  All right, fine.  Good afternoon.

23       MS. WARREN:  Good afternoon, Your Honor, Mary Warren

24 of Linklaters for the London Market.  I would like to address

25 standing in particular.  First of all, Judge Farnan used the

1  person aggrieved standard for evaluating insurer's standing.

2  That is not what is at issue here.  As Your Honor knows, the

3  combustion engineering Court made a very stark distinction

4  between standing for purposes of trial in the Bankruptcy Court

5  and standing for purposes of appeal.  Standing at the Trial

6  Court level is extremely broad.  That is what the 3rd Circuit

7  said.

8       THE COURT:  But it's not unlimited.

9       MS. WARREN:  It is not unlimited, Your Honor, and no

10  one says it is, but it is extremely broad.  And it certainly

11  encompasses claims for which insurer money might be expected to

12  pay.

13       THE COURT:  Why?  That's a whole coverage issue.

14  Look, that's what I said earlier.  If you want to get into the

15  coverage issues, if you want findings made about the fact that

16  the Debtor has the right under the Bankruptcy Code to transfer

17  the contract rights or the proceeds or whatever and here's how

18  much they're going to be and this is what the value of the

19  claims is, fine, then I think you're entitled to all this

20  information for everything but you will be bound, there will be

21  Fuller Austin and UNR consequences.  In fact, there will be res

22  judicata and collateral estoppel consequences.

23       MS. WARREN:  Your Honor, I'm glad you raised that, but

24  that -- you've put your finger on exactly the problem here.

25  Litigants are entitled to notice of what is being claimed

1   against them.  The Debtors, the ACC, by leaving this ambiguity

2   about what exactly they want to use estimation for are leaving

3   insurers in an untenable position.  If they want to assert a

4   UNR result, then they should specify exactly what they think

5   Your Honor is doing for purposes of estimation rather than six

6   paragraphs of verbiage, which I don't understand what the

7   conclusion was.  And Your Honor, if no one's willing to give us

8   any comfort, any notice of what exactly they're trying to do

9   here, then we should be entitled to insurance neutrality

10  language that makes it clear that our rights are not adversely

11  affected by the estimation.  That language would also preserve

12  the Debtor's rights as well.  As Your Honor notes from

13  combustion engineering, the language goes both ways.  But come

14  on, rather than leave the Court, the Insurers, everyone in the

15  dark about what's really going here and saying, "That can't be

16  decided until the Trust comes into effect."  Well, that's

17  nonsense, Your Honor, because we're having this estimation

18  proceeding now.  And the Debtors, if they can't come clean

19  about what they're trying to do or what their strategy is, if

20  the ACC is going to fight our participation at every turn, then

21  give us what was given to the insurers in CE.  And then it's

22  very clear what that language should be and what the 3rd

23  Circuit will make of it.  Right now this is just a nonsensical

24  situation.  And, Your Honor, respectfully, if Your Honor has

25  further concerns about standing, about notice, about any of

1   these other issues, we do think it's a good idea to roll this

2   over rather than decide it now on this, frankly,

3   incomprehensible record.

4           THE COURT:  Well, I am concerned about the standing

5   issue, but I also agree that at some point the rubber has to

6   hit the road, and the plan proponents have to decide what it is

7   that they intend the estimation procedure for -- to be.  So

8   yes, I think you're entitled and I think the Court's entitled

9   to know for what purposes I'm being asked to estimate claims.

10  And if it's for clearly only for figuring out whether the Trust

11  is likely to have a certain number of claims at certain disease

12  levels, and therefore the funding into that Trust has to X

13  dollars in order to comport with the plan, then I think

14  everybody is entitled to know that.  And if it's for something

15  more, then I think everybody should know what it is.

16          MR. BERNICK:  Your Honor, I think we've already said

17  that, and we have not made a statement that the estimation is

18  to be used for any other purpose.  What the Insurers want is

19  for us to give a commitment, not just to what this estimation

20  would be used for in this case, but what the ramifications

21  might be of that into the future.  And that is --

22          THE COURT:  Well --

23          MR. BERNICK:  -- the representation that we can't

24  make.  I can't --

25          THE COURT:  Maybe that's a representation that I can

1    agree to attempt -- to cover in an order.

2         MS. WARREN:  And Your Honor, may I address that just

3    for a moment.  There seems to be a sort of lopsided presumption

4    here that the Insurers are trying to bring so-called coverage

5    issues into this bankruptcy proceeding when it is exactly the

6    opposite.  What the -- the reason why we have these -- this

7    vague verbiage and this back and forth about we're not making

8    representations to this and we are as to that, it is because

9    the Debtors are trying to preserve the ability to say that this

10   proceeding was all about coverage.  And we think that's

11   incorrect and that's what we are trying to avoid.  We want to

12   get clarity that this is a bankruptcy proceeding, that what's

13   being done here is for plan confirmation purposes.  We want

14   insurance neutrality language, and leave the coverage stuff out

15   of here.

16        THE COURT:  Well, with respect to neutrality language,

17   I don't know that you're there.  With respect to what the

18   purpose for the estimation hearing is, I think we can get that

19   piece of this firmed up, and then you can decide whether or not

20   to participate because, you know, there is a plan on the table

21   and obviously we have to do the estimation in connection with

22   that plan.  But once that process is over, in all probability,

23   it's going to take plan amendments, it almost always does.  And

24   so, what the final plan's going to look like, I don't know that

25   anybody can say right now.  So whether there will be insurance

1  neutrality in a plan or not, I don't know.  But for purposes of

2  determining the scope of the estimation hearing, I think I can

3  control the docket with respect to what I am willing to hear

4  and how far I am willing to go by way of making findings.  I

5  don't want to do insurance coverage litigation unless we're

6  going to do it all.  So that's the question.  If the Insurers

7  want to do the scope of insurance coverage, not necessarily

8  whether a specific claim is entitled to be paid, I don't mean

9  that, but whether or not a policy can go into the Trust,

10  whether by proceeds or contract rights or whatever, whether the

11  plan findings constitute a judgment such that the insurers are

12  required to put their contribution into the plan now as opposed

13  to under some structured basis on a settlement, if you want all

14  those findings and want to participate in the estimation

15  hearing, fine.  Let's go to it.

16          MS. WARREN:  Your Honor, again, we are not asking for

17  those findings.  And what the Debtor's seeking here is to

18  import coverage litigation over which respectfully this Court

19  does not have jurisdiction, and it's not a proper forum.  And

20  they're trying to conflate what are bankruptcy and plan

21  confirmation issues with what are insurance coverage issues and

22  they are trying to use this proceeding to deny Insurers a fair

23  chance at litigating any and all, whether they are bankruptcy

24  issues, whether they are coverage issues.

25          THE COURT:  All right, well, let me hear from all --

1    at this point in time, maybe what I need to do is address this

2    to all plan proponents in general, okay.  My understanding of

3    the scope of the estimation hearing would be to do what I've

4    attempted to articulate earlier; figure out whether based on

5    the estimates of claims that will be likely filed against the

6    Trust, as the experts will tell me, the plan is appropriately

7    funded from whatever source the plan proponents are going to

8    come up with the funding.  And when I say plan, I include the

9    Trust because that would be, in this respect, part of the plan

10   funding.  Now, is there something more that any plan proponent

11   expects to get out of the estimation process?

12            ALL:  (No verbal response).

13            THE COURT:  All right, is there anything that anybody

14   who may at this point in time be objecting to the plan

15   estimation process expecting to get out of it?

16            MR. BERNICK:  Just to be clear, Your Honor, before we

17   go to those folks, we've made a distinction between the

18   treatment of claims; asbestos claims that are property damage

19   claims and the treatment of claims that are personal injury

20   claims.  With respect to the property damage claims, as I think

21   we've said repeatedly, we are seeking to use the estimation to

22   determine the actual value of those claims for distribution

23   purposes.

24            THE COURT:  For property damage?

25            MR. BERNICK:  For property damage.

1          THE COURT:  Right.

2          MR. BERNICK:  And property damage would include not

3   just traditional property damage, but also the Zonalite claims.

4   And then there are a variety of other non-personal injury

5   claims that we may seek to determine on exactly the same basis.

6   If we focus just on personal injury, which I think is what was

7   driving Your Honor's question --

8          THE COURT:  Yes.

9          MR. BERNICK:  Okay, well, if you just focus on

10   personal injury, the purpose of the estimation process is to

11   determine what level of funding -- whether the levels of

12   funding that are actually set forth in the plan are in fact

13   sufficient in the aggregate to pay for the personal injury

14   claims now and into the future.  We are not seeking, we have

15   not sought to determine coverage issues in -- when -- and now

16   hear two things being said.  On the one hand, counsel says,

17   "Well, under Farnan's decision or whatever, UNR -- where were

18   you?"  So, now we're here and then other counsel says, "Well,

19   we don't want to be here."  All that I can say is that we

20   haven't invited them to be here, we haven't required them to be

21   here, and we are not seeking to determine coverage issues in

22   the estimation case.  The estimation is for purposes of sizing

23   the Trust.  I, however, cannot speak to what the legal

24   implications of that might be with respect to doctrines like

25   UNR.  That's not an issue that we are raising, and the plan

1  does not make an assumption with respect to that issue.

2          THE COURT:  Did that help?

3          MS. WARREN:  I wish I could say it resolved the issue,

4  Your Honor, believe me.  I will certainly take Mr. Bernick's

5  representation that this proceeding is not intended to address

6  insurance coverage.  I think that it would be helpful if that

7  went into any estimation order.  But maybe -- you know, maybe

8  we have the basis for something in the order that the parties

9  could agree on that we could work with.

10          MR. BERNICK:  Yeah --

11          THE COURT:  I have absolutely no problem putting

12  something about the scope being limited -- of the estimation

13  hearing being limited to figuring out how to fund the Trust and

14  the size of the Trust funding.

15          MR. BERNICK:  Right, and that'd be fine.  That is what

16  we have said and we will stand by it.  But having been through

17  this now in other cases, it turns into this battle of, well, is

18  it enough language to give them protection in an argument that

19  may be down the road.  And I can't bind the people who will

20  address those issues down the road, and I object to the process

21  of the Insurers coming in worried about what the implications

22  for coverage down the road might be.  I'm not in a position to

23  address that.  And there are also funding issues that do

24  implicate coverage, although they don't implicate the coverage

25  issues they're talking, so it gets a little tricky.  For

1  example, if it turns out that you're -- you've got policies

2  that have been settled and they are gonna be drawn down over

3  time, you get into the question of how to model the draw down

4  of those policies.  What are those policies really gonna end up

5  being worth at the end of the day?  And then you -- you have to

6  do the modeling requires that you marry the estimation -- the

7  estimation and the estimated flow of claims on the one hand

8  with the policies on the other.

9        THE COURT:  Well, that's a different issue.  If the --

10        MR. BERNICK:  I understand that.

11        THE COURT:  That's an economic issue.  If they're

12  concerned about it they can certainly take a look at the

13  economics.  I don't --

14        MR. BERNICK:  Yes, I understand that, but this all

15  gets very tricky when you're trying to craft the language of an

16  order that's designed to satisfy Your Honor's desire to have am

17  I doing coverage or not?

18        MS. WARREN:  Your Honor, we do a lot of tricky things

19  in bankruptcy and we are happy to negotiate the language.

20        MR. BERNICK:  Excuse me, I'm not happy to negotiate

21  any language because this is being done at the Insurer's

22  instance to satisfy their own concerns about coverage, rather

23  than the Insurers telling Your Honor whether they want to

24  litigate coverage issues.

25        THE COURT:  Well, I --

1        MR. BERNICK:  If they don't want to litigate coverage

2   issues, they're not gonna be litigated.

3        THE COURT:  Mr. Bernick, they've been saying -- I

4   don't think there is a single Insurer, with the possible

5   exception of Century, that wants to litigate coverage issues.

6   Does -- there are numerous Insurers.  There are at least 100

7   people -- close to 100 people in this Courtroom and another 25

8   on the phone.  Is there any insurance company represented that

9   wants to litigate coverage issues in connection with the

10  estimation hearing?  If so, speak now.

11       ALL:  (No verbal response).

12       THE COURT:  There is a silent that is astounding.  No

13  one wants to litigate coverage issues in connection with the

14  estimation hearing, neither do I, so I am happy to say that we

15  will not litigate coverage issues in connection with the

16  estimation process.  So although I guess I tend to say period,

17  end of story often since Mr. Lockwood likes to tell me about it

18  these days, nonetheless, that's kind of how I feel, period, end

19  of story.  We'll put something to that effect in an order.

20       MS. WARREN:  Thank you, Your Honor.  Shall we start

21  talking with the Debtors before the next hearing about coming

22  to some agreed language?

23       THE COURT:  Yes, I -- you know, I think you can work

24  this out and if you can't, then, you know, I'll pick the

25  language.  It's going to be my order.

1          MS. WARREN:  Thank you very much.

2          THE COURT:  All right.

3          MS. WARREN:  Thank you, Your Honor.

4          THE COURT:  Mr. Davis?

5          MR. DAVIS:  Thank you, Your Honor, I rise for what

6    probably is a very obvious matter.  My client is a settled

7    carrier, but in this case that doesn't mean we're done because

8    you got to rise to the level of being resolved.  And some of

9    our policies are resolved, but we are not fully resolved.  We

10   have not joined this motion because being settled as we are, we

11   don't have a great deal of jeopardy here, and we don't wish to

12   be bound, we don't wish to participate.  And I was concerned

13   when Mr. Esserman said something has to be done about the

14   Insurers together collectively.  I just want to make it clear

15   that however the Insurers are dealt with, it's not all

16   together, but by virtue of their separate status.

17       That being said, I would share with everyone present that

18   we did enter into an order that did exactly what's being

19   discussed here in Owens Corning.  And there are a few people in

20   the room who joined me in that order.  And I just offer that

21   fact.

22          MR. LIESEMER:  Your Honor, Jeffrey Liesemer appearing

23   on behalf of the Asbestos Claimants Personal Injury Committee.

24   If I could clarify what Your Honor intends with respect to an

25   order in which there's gonna be dialogue back and forth.  From

1  what I understand the Court has ruled that the Insurers' Motion

2  for Access is denied, provided that the coverage litigation is

3  not made a subject of the estimation proceedings.

4         THE COURT:  Well, I think that's where I'm getting.  I

5  don't know what I've ruled that yet.  I'm not sure I've heard

6  from everybody, but I think that that's going to be a logical

7  outcome.  But I need to hear from anybody else.

8         MR. LIESEMER:  Thank you, Your Honor, and needless to

9  say, we would like to be a participant in any dialogue since we

10 are a party to the estimation proceeding --

11        THE COURT:  Well, not only you, but the Futures Rep.

12 and everyone else ought to be involved.

13        MR. BERNICK:  I don't if the Futures Representative

14 has counsel on the phone.

15        THE COURT:  I think so.  Is the Futures Rep. counsel

16 in Court or on the phone?

17        MR. WYRON:  Your Honor, Richard Wyron for the Futures.

18        THE COURT:  Mr. Wyron, okay.  Yes?

19        MS. DECRISTOFARO:  Good afternoon, Your Honor,

20 Elizabeth DeCristofaro from Continental Casualty Company.  I

21 think that Ms. Warren pretty much addressed everything and

22 we'll try to work this out.  I just want to -- this

23 conversation was going so far field about so many things that

24 are not teed up on the Discovery Motion for the 2019

25 statements.  I just want the record to be clear because there

1  are a lot of insurance companies who may have issues, they may

2  want to be heard about some of these issues that we might want

3  to brief, so I just want to make sure that none of these things

4  are deemed addressed or covered in the context of a 2019

5  motion.

6          THE COURT:  What issues?

7          MS. DECRISTOFARO:  Beyond the scope of whether or not

8  we have access to the 2019 statements.

9          THE COURT:  All I would be doing today -- attempting

10 to do today is deny the request of the Insurers for access to

11 the 2019 statement because they will not have standing based on

12 the representation of the plan proponents that there will be no

13 coverage issues litigated in connection with the estimation

14 process, and that the estimation hearing will be for the

15 purpose and the sole purpose of determining -- I'll call it

16 again -- plan funding.

17         MS. DECRISTOFARO:  And that matter, we're now putting

18 on until next time until we try to resolve the language.

19         THE COURT:  Yes.

20         MR. DECRISTOFARO:  Thank you, Your Honor.

21         MR. COHEN:  I hope I'm a very brief last word, but

22 number one, I would suggest that the motion be denied without

23 prejudice to be raised again in case we find ourselves back in

24 this situation.  And number two, just to note my understanding

25 the {quote}{unquote} "coverage issues" is designed to include a

1  appropriate stipulated language or ordered language that

2  addresses the Insurers' concerns about a {quote}{unquote} "UNR"

3  or a {quote}{unquote} "Fuller Austin" result.

4          THE COURT:  Well, look, here's the problem with

5  respect to that.  I really think that goes to the question of

6  the neutrality issue that has to be part of the plan

7  Confirmation process.  Obviously estimation's part of the plan

8  process too, but I'm kind of bifurcating that out in this

9  discussion right now, okay.  The actual confirmation -- because

10 I don't yet know whether the plan proponents or the plan that

11 is actually subject to confirmation is going to have an

12 insurance neutrality provision in it.  If it does, then I think

13 I will do my very best to give you findings that will at least

14 assure some other Court looking at the issue that I, as the

15 person having heard the testimony and making a finding, have

16 had -- had no intent to have some other consequence other than

17 what I am determining in the plan findings apply.  But no one,

18 not me, not a District Court Judge, can assure you that on

19 appeal somewhere a Circuit or an Appellate Court isn't going to

20 make a different spin on things.  I mean, you know, I'd like to

21 be able to give you that assurance, but as we know from

22 Combustion, I'm not always deemed to be right by the Circuit.

23         MR. COHEN:  I understand, Your Honor.

24         MR. BERNICK:  And all that we're talking about today

25 and that we can talk about is the plan that's on the table.

1  And that's why I've been so reluctant to make future

2  prognostications.  We know that plans get modified.  We know

3  that in other cases plans have called for the assignment of

4  assurance.  That is not the case here.  But we don't know

5  exactly what the future could bring.  All that I can say is

6  that we're operating within the confines of the plan that's on

7  the table today.

8          THE COURT:  I think for purposes of estimation, you

9  have requested the ability to get access to the information so

10  that you can participate in the estimation process.  I am

11  denying that request so that there will not be a collateral

12  consequence to the insurance companies so that no one can say

13  on appeal, "Where were you?"  You are here, you're asking for

14  the right to participate.  I'm saying A) you don't have

15  standing because the purpose of the estimation hearing is not

16  to address coverage issues and whether or not the Insurers will

17  have to fund or not fund any portion of any claim or any

18  portion of the Trust.  Now, I think I can make that kind of a

19  finding.  That's the, off hand, the best I know to try to

20  protect you from the UNR, Fuller Austin results.

21          MR. COHEN:  We appreciate that, Your Honor.

22          THE COURT:  All right, so if somebody wants to put

23  that into the order --

24          MR. BERNICK:  Your Honor, I am very reluctant -- and

25  this is exactly why I don't -- I didn't want to have the

1  negotiation today, and I don't want to have the negotiation

2  tomorrow because if we get into UNR and we get into Fuller

3  Austin it can be a very, very different proposition.  We're

4  talking about not necessarily what the plan itself contemplates

5  and not necessarily whether they were here or not, you're

6  talking about what the operation of law is from a judgment and

7  the bankruptcy --

8       THE COURT:  Yes, and I'm -- no, I'm making a

9  determination they based on the Insurers' request to

10  participate in the estimation process because they feel they

11  have to to avoid a UNR/Fuller Austin result, that I am denying

12  their request.  They will not participate in that process.

13  Therefore, if a Circuit or a District Court says where were

14  you, their answer is going to be we were there and Judge

15  Fitzgerald told us to take our hats and go home.

16       MR. BERNICK:  That's -- that is fine, subject to where

17  we are today and the context of this plan.

18       THE COURT:  Well, yes, it's in the context of this

19  plan, that's what we're doing the estimation for.

20       MR. BERNICK:  Right.

21       MS. WARREN:  Your Honor, I think I understand where

22  the Court is going with this and what we need to do before the

23  next hearing, so I think that's fine.  I will say in response

24  to Mr. Bernick's comment that to the extent there might be

25  another plan later that's different, that is something that

1    would potentially confer Insurer standing, even to the extent -

2    - I mean, I think we have it now.  Your Honor might disagree.

3    I don't mean to resolve that today --

4              THE COURT:  Yes.

5              MR. WARREN:  -- but to the extent that their future

6    plans -- you know, the whole standing issue is wide open and

7    we're not resolving that today.

8              THE COURT:  I'm not really attempting to resolve the

9    standing issue.  What I'm attempting to do is -- I'm hearing

10   from all of you that you're only here because you think you

11   have to be here, but you don't really want to be here.  I'm

12   attempting to get you out of here in a way that hopefully

13   eliminates the problem that you're trying to solve, which is

14   Fuller Austin says, "Where were you?"  You were here.  The

15   Bankruptcy Court in Fuller Austin didn't have the opportunity

16   to say, "Fine, you're here, but I'm not going to permit you to

17   participate because of the limited scope of the estimation

18   hearing."  I have that opportunity, I'm taking advantage of

19   that opportunity.  I'm denying any requests to participate

20   because the scope of the estimation hearing will be limited to

21   figuring out the Trust funding.

22             MS. WARREN:  Thank you, Your Honor, we'll work on

23   language to that effect.

24             THE COURT:  All right, and it's without prejudice to

25   standing, it's without prejudice to raising the issue of access

1  to 2019 statements in the event that the world changes.  Again,

2  it's without prejudice, but it's to get us past this step.

3  Now, having said that, is anybody uncomfortable with what I'm

4  proposing?

5       ALL:  (No verbal response).

6       THE COURT:  All right, then it will -- then this

7  Motion for 2019 Access will be denied without prejudice as I've

8  stated on the record.  You folks can try to work out the order

9  on a COC and I think it would be a good idea just to put it

10  back on the agenda for next month to make sure that everybody

11  has been appropriately served and anybody who does have -- who

12  does want to make comments has a chance to do so.  All right,

13  thank you.

14       (Pause in proceedings)

15       THE COURT:  Okay.

16       MS. BROWDY:  Your Honor, may it please the Court,

17  Michelle Browdy on behalf of the Debtors.  We're now up to

18  agenda item #12, and I believe all the remaining items on the

19  agenda relate either to property damage or to personal injury.

20  I'm gonna be addressing the property damage issues first, and

21  then I'll turn this over to one of my colleagues to address

22  personal injury.

23       THE COURT:  All right.

24       MS. BROWDY:  On the property damage side of things,

25  Your Honor, there are two types of issues on the agenda for

1  today.  The first are issues specific to the Speights filed

2  claims, and that's agenda item 12A, which is a status report on

3  the Speights claims, and then items 13, 14 and 15 which were

4  put over from the last hearing.  The second types of issues are

5  those that relate to the remainder of the property damage

6  claims, that's agenda item 12B and items 19, 20 and 21, most of

7  which, Your Honor, are now moot.  What I would propose to do,

8  Your Honor, is first to give you a brief status report on the

9  Speights filed claims, and then the two sides have submitted

10 competing Case Management Orders on the Speights claims.  I

11 believe we're very close.  If we could get some guidance from

12 the Court to get that order --

13         THE COURT:  Actually, I've received four copies of the

14 Debtors, but none of Mr. Speights.

15         MS. BROWDY:  I actually believe I have a copy of his.

16 It --

17         MR. SPEIGHTS:  I have a copy, Your Honor.

18         MS. BROWDY:  They're very similar, Your Honor.  And

19 if, again, we could then end up with a Case Management Order to

20 address the Speights filed claims, issues 13, 14 and 15 can get

21 put over.  And then after we deal with the Speights issues, if

22 we could move on to the other property damage claims.

23         THE COURT:  Okay, yes, sir?

24         MR. SPEIGHTS:  It was filed on Friday, maybe --

25         THE COURT:  Thank you.

1          MR. SPEIGHTS:  -- (indiscern.).

2          THE COURT:  Was it put into Ms. Bellow's email box

3   because that's how I get the information submitted to me?

4       (The Court and Clerk confer)

5          THE COURT:  Well, for whatever reason, Mr. Speights --

6   Ms. -- I just didn't get, I'm sorry.

7          MR. SPEIGHTS:  I'm sorry, Your Honor.

8          MS. BROWDY:  And Your Honor, to give you a brief

9   status on the Speights filed claims, I've prepared a graphic.

10  I'd like to hand up a copy to the Court, please.

11         THE COURT:  All right.

12         MS. BROWDY:  Thank you, Your Honor.

13         THE COURT:  Thank you.

14      (Pause in proceedings)

15         MS. BROWDY:  Your Honor, at the last two hearings

16  you've been presented with a graphic that looks very similar to

17  the first one that I've handed up, which is as of last month we

18  were of the view that the Speights firm had filed 75% of the

19  pending property damage claims in this case, more than 2,900

20  out of 4,000 property damages cases.  But if you flip over to

21  the next slide what's -- what we have since learned is in fact

22  that a number of the 4,003 property damage claims we thought we

23  were dealing with, they're not all traditional asbestos

24  property damage claims.  Among the 4,003 are some general

25  unsecured claims that got mixed in there.  There are some

1   medical monitoring cases and the like.  There are what we call

2   category two claims for dealing with milling, mining and

3   processing operations.  So the bottom line is when you clean

4   out all these other issues, which still are gonna have to be

5   addressed, but we're really at the point that there's only

6   about 3,400 traditional property damage claims.  And of those,

7   the Speights firm filed more than 2,900 of those.

8       If we turn to the next slide, Your Honor, we've learned

9   some additional information based on the lists that Mr.

10  Speights and his firm gave us over the last week and that

11  specifically then, out of the 2,900 Speights filed claims more

12  than 1,000 of those Speights admits he had no written authority

13  for.  He has since withdrawn more than 200 of those claims

14  based on lists that were submitted in this past week.  And for

15  more than 700 of those claims he concedes he had no written

16  authority to do it.  That leaves us with 1,900 claims for which

17  the Speights firm contends they have written authority.  Of

18  those 1,900 claims, more than 300 of them are Canadian claims

19  which will eventually be adjudicated up in Canada, but what we

20  think for the estimation purposes, it's gonna become very clear

21  that those claims are worth zero dollars.  That leaves of his

22  1,900 for which he contends he had written authority, more than

23  1,400 of those are United States claims that have no product ID

24  information based on the list that Mr. Speights has given us.

25  So out of all these nearly 3,000 claims that the Speights firm

1   has filed, there are only 200 claims for United States

2   buildings for which the Speights firm contends it has both

3   product identification information and express written

4   authority to file the claims.

5        So the question, Your Honor, is in light of the Thirteenth

6   Omnibus Objection we filed challenging Speights' authorization

7   to file these claims, as well as the additional objections that

8   we have since gotten on file on the property damage claims.

9   How do we get through all this junk in the Speights claims to

10  get it down to these 200 that may actually raise substantive

11  issues?  And that gets us to the last slide, which is our

12  proposal for going forward on dealing with the Speights claims.

13  Our proposal, Your Honor, and it's reflected in the Debtor's

14  proposed Case Management Order on the Speights claims, and I

15  believe there's also reference to it in the Speights version of

16  the CMO, is the Debtors believe that if we can tee up three

17  legal issues for hearing at the October 24th Omnibus, those

18  could address 1,900 of the pending claims.  We think we need no

19  discovery to do those.  They're easy legal issues.  Issues have

20  already been raised, for example, in our Thirteenth Omnibus

21  Objection, and we believe if we can tee up, again, three

22  issues; first, the issue of whether the Speights firm had

23  authority to file claims on behalf of out-of-state buildings

24  based on an outdated class action complaint filed in South

25  Carolina where the South Carolina complaint -- Court already

1  found there was no class action appropriate there.  We believe

2  that again, the Anderson Memorial out-of-state claims could

3  help address 650 of the pending cases.  For the Anderson

4  Memorial in-state, that is the South Carolina claims for which

5  Speights firm claims authority based on (indiscern.) orders

6  issued in 2001 in violation of the Court's automatic stay.  We

7  think that that will get rid of another 50-plus claims.  And

8  then the third legal issue, Your Honor, is that more than 1,200

9  of the claims for which Mr. Speights contends he has authority

10  were California claims that have no product identification

11  information.  We think California law is absolutely clear that

12  those claims cannot go forward on a conspiracy basis, so we

13  would ask Your Honor that again, first we set for hearing these

14  three issues for October 24th.  The Debtors would be prepared

15  to file briefs by this Friday, not to exceed 15 pages on these

16  three issues.  Mr. Speights can respond by October 7th.  And if

17  there's any reply we could put him on by the 14th.

18        THE COURT:  Well, what else are you going to put on

19  that Omnibus, because if it's going to be a typical Omnibus,

20  you're not going to have time to argue those three legal issues

21  and do anything else that day.

22        MS. BROWDY:  Your Honor, if the Court has additional

23  time that week I'd be happy to take another date the week of

24  the October 24th hearing.  I don't know that there's much of

25  anything else.

1        MR. BERNICK:  Well, I think that the only other

2   substantive matter is -- Ms. Baer is telling me about, there

3   are the -- what?

4        (Counsel confer)

5        MR. BERNICK:  Is that we have the Motions for Stay

6   with respect to the State of Montana -- it's based against the

7   State of Montana.  And also a Motion of the Stay with respect

8   to New Jersey.  And those are issues -- those are kinds of

9   issues are very familiar to the Court because we've been

10   through that many, many times.  And then I think we're probably

11   gonna have a carry over on the issue of the attorney -- the law

12   firm questionnaire.  But I would think that given the three

13   issues that have been identified -- if Your Honor has other

14   time available, that's great.

15        MS. BROWDY:  Yeah.

16        MR. BERNICK:  But I think we can still probably get it

17   done.

18        MS. BROWDY:  Right, the only other thing on the

19   property damage side is the Fourteenth Omnibus Objection, which

20   are non-substantive objections, things filed post the bar date.

21   So there's really nothing substantial there.  So our proposal

22   would be to do that for the October 24th hearing.  Then I think

23   both sides are in agreement that the Debtors will try to

24   identify additional categories of Speights filed claims that we

25   think we can go forward at Omnibus Hearings without any need

1  for discovery.  We're happy to continue to do that on a fast

2  pace.  I think the only disagreement the parties have on this

3  Case Management Order, although certainly Mr. Speights will

4  correct me if this is incorrect, but the only disagreement is

5  what to do about the discovery that we need because I think

6  it's becoming very plain, Your Honor, from the materials we've

7  gotten from the Speights firm that we are gonna need some

8  additional discovery.  Our proposal would be, again, we're

9  happy to tee up for argument first things that require no

10  discovery, but our hands shouldn't be tied in the meantime to

11  get into the rest of the claims so we can tee those up for

12  hearing promptly, ideally as soon as December.  The Speights

13  proposed CMO says let's deal first on the merits and have the

14  litigation and the hearing on everything that requires no

15  discovery before we even address a schedule for discovery and

16  hearing.  And Your Honor, that's gonna serve only to further

17  delay this process.

18         THE COURT:  Well, what's the nature of the discovery

19  that you're looking for?

20         MS. BROWDY:  Well, Your Honor, it's again, to get into

21  the nature of whether or not Speights had the authority to file

22  these claims in the first place.  So again, I think we can tee

23  up a lot of these issues, potentially the one's, the 1,000 or

24  so that he admits he has no written authority for.  But some of

25  them, for example, he claims he does.  And we need to get into

1  the basis of those.  For example, we're getting

2  {quote}{unquote} "written authority claims" that the materials

3  he has were signed in 2004 and 2005.  What was going on there?

4  I'm trying to understand on the Anderson Memorial side, the

5  2019 statements said that there are hundreds -- close to a

6  thousand claims that were filed solely on the basis of Anderson

7  Memorial.  Well, now from the list that Mr. Speights has given

8  us, we know he's withdrawn some of those.  He is maintaining

9  some of those, and for others of those, now he's contending,

10  well, I have this written authority or that written authority.

11  Well, what's the true story?  I mean, if -- I believe that

12  withdrawing claims that initially you purported to file based

13  on Anderson Memorial shows that you know that you didn't have

14  authority to do it based on Anderson Memorial.  But again, the

15  paper trail that we're getting on these written authorizations

16  or lack of written authorizations or withdrawal will help us to

17  piece that together and I can't tie all the answers together

18  without a witness.

19       Another example, Your Honor, there are about 50 claims for

20  which we've given -- been given a list from the other side and

21  Mr. Speights says, "Well, I had no express written authority in

22  this case, but I historically represent these claimants in

23  other matters."  Well, we start to dig into the backup

24  material, and, Your Honor, we only got the backup material on

25  Thursday or Friday of this past week, but you look it and as

1  examples, you have claims forms that Mr. Speights submitted

2  apparently in the <u>Cilatex</u> case, along with a letter from the

3  Speights firm to the claimant saying, "Hey, we put these in

4  based on Anderson Memorial," but the Cilatex Trust isn't paying

5  Anderson Memorial claims like that.  So what -- I mean, what's

6  his basis for claiming that he had authority to do those?

7       As other examples, again, he says perhaps there's 200

8  claims in the U.S. for which he as this written authority.  You

9  know, one of the examples of course is the classic <u>Anderson</u>

10  <u>Memorial</u> case itself.  We get into that file, that supposed

11  written authority he gave to us, is another copy of the

12  Anderson Memorial complaint.  I don't even know that Anderson

13  Memorial authorized him to file, let alone as -- on behalf of a

14  class representative.  So as we dig into these papers that are

15  supposedly giving Mr. Speights authority to file those claims,

16  they're raising as many questions as they're solving.

17       Again, it's really just getting into the basic level of

18  does he authority to bring these claims?  And that's what we've

19  been asking for since July.

20       THE COURT:  As to those claims for which no written

21  authority has been submitted, is that what you're asking?

22       MS. BROWDY:  No, again, I think we're now finding more

23  of the problems where he claims to have written authority.  As

24  I said, it's a bit difficult to argue this completely, Your

25  Honor, given that we just got the materials from him on

1   Thursday and Friday.  But my hope is that we can tee up close

2   to 1,000 of these claims for which he admits he has no

3   authority based on the legal issue of Anderson Memorial, but

4   there are still other ones within the category where he says he

5   has no express written authority, where, for example, he says

6   but these guys have always been my clients.  And I need to

7   understand the basis of that.  Again, then there's the other

8   batch, the 1,900 or so, for which he contends he has written

9   authority that we're digging into those and finding there's

10   real problems.  Why is he getting -- I'll give an example, the

11   Fort Wayne case, which is one of the claims teed up initially

12   in our Twelfth Omnibus.  If you look at his 2019 statement, he

13   says, "Well, I filed that on the basis of a written building

14   questionnaire."  And then it got teed up in the Twelfth Omnibus

15   Objection.  And what he gave us in a stipulation was, "Well, we

16   had oral authority from them, now we have written authority and

17   we'll give it to you."  And then when we briefed, Your Honor,

18   for the Court the issue of the Twelfth Omnibus, then he

19   submitted papers saying, "Well, I have written authority from

20   Fort Wayne, but I'm gonna have to redact it and I'll give it to

21   the Court in Chambers.  I'm not gonna give it to the other

22   side."

23       Now, we get this supposed written authority that he claims

24   now gives him the basis and I have a piece of paper that's

25   almost completely redacted, it has a fax line that tells me it

1  was from, I believe, June of 2005.  Well, what was the basis

2  for the 2019 statement in December of 2004 saying I have

3  written authority in the form of building questionnaire?  I

4  don't even have a building questionnaire for the <u>Fort Wayne</u>

5  case.  So again, as we start to dig into these materials they

6  are gonna be replete with problems; we're already seeing that.

7  And the notion that that's not even gonna start to get visited

8  through discovery until after we litigate the rest of the

9  issues, that's gonna push it off into next year.  And Your

10  Honor, as you can see from these bar charts, it's the Speights

11  claims that are gonna hold back the entire estimation because

12  there's so much garbage in there that we need to get rid of

13  before we can even start to estimate what the real claims are.

14          THE COURT:  Okay, Mr. Speights?

15          MR. SPEIGHTS:  Good afternoon, Your Honor.

16          THE COURT:  Good afternoon.

17          MR. SPEIGHTS:  Your Honor, I came here today to

18  discuss a CMO with Your Honor, and I believe that's what Your

19  Honor wanted us to do, it's what you put in your last order.

20  And I'm going to resist, although the trial lawyer's blood runs

21  a little bit hotter, I'm trying to resist commenting on the

22  chart that was just handed to you that I hadn't seen before and

23  various arguments which were made on the merits of the

24  authority issue.  And I was prepared to say something very

25  positive, which would be refreshing in this contest between

1   Speights and Runyan and WR Grace.  And I will still say it

2   because I think it was the truth when I walked in, although I'm

3   not quite sure we have the agreement I thought we had, and that

4   is that we agree on one big thing, and that is that Your Honor

5   ought to decide the authority objections that can be decided

6   without discovery first.

7        Now, how many of those are there?  In my opinion, Your

8   Honor, and I think I've said this in various papers, I believe

9   all of 'em could be decided without discovery.  Counsel for

10  Grace takes a different position and I respect that position,

11  but at least we both came in here today with saying let's

12  resolve those which require no discovery.  Now having said

13  that, I want to make the record very clear, having said that I

14  believe all of 'em could be resolved without discovery, I am

15  not sure what's behind door number three.  I can't sign a

16  stipulation saying all maybe resolved without discovery because

17  Grace may in it's papers, now or hereafter filed or in it's

18  arguments heretofore or hereafter made, make certain statements

19  which lead me to say to Your Honor, "Wait a minute, Your Honor,

20  that's an issue of fact and we need discovery."

21       But I'm not here trying to argue for discovery, I'm here

22  arguing for let's get rid of it -- of these objections and one

23  way or the other as to the most claims that we can in a

24  reasonable fashion with -- before we undertake discovery.  When

25  discovery breaks out, it's going to go both ways and we're

1  gonna both be up before you a lot of times saying, "Your Honor,

2  this is wrong, this evades attorney/client," et cetera, et

3  cetera.

4       So in dealing with Kirkland & Ellis about the Case

5  Management Order I agree that the language is fairly close, but

6  there are a couple of things in there that are quite different.

7  My proposal was simply this.  You tee up whatever you want to

8  tee up in accordance with whatever Case Management Order there

9  is, you put it in your proposed agenda -- that's very important

10 to me because I don't want to learn about it a day or two

11 before the hearing -- put it in you proposed agenda which of

12 these objections you want to go forward with at the next

13 Omnibus Hearing and I will go there and we will argue those.

14 And if you want to put 1,000 for that hearing, fine and if you

15 want to put three, fine.  WR Grace controls that list.  And I

16 thought that was a reasonable approach to let Your Honor know

17 that we're ready to tee up those that can be decided on a legal

18 basis.  We may agree all of 'em can at that point.  When they

19 come here and object and they may make arguments of fact and we

20 may say to 'em, "Your Honor, that's an argument of fact.  We

21 need discovery on that."  I don't think that's going to happen.

22      We may argue some of 'em like California, the issue of

23 whether conspiracy is a cause of action in California.  I told

24 Mr. Fink back in February that I thought that was a good issue

25 to tee up at an appropriate time because it involves a large

1  number of claims, although I tell you quite candidly I'm not

2  sure it's an authority objection.  We have contracts with the

3  California claimants.  But in any event, that's just a process.

4  Let's get rid of those that don't require discovery and see

5  what's left.

6       The fundamental difference in these two are -- these two

7  proposals, the one I'll get down on the floor and scream and

8  shout about is they put in their proposal the right -- they've

9  had this objection since July.  They didn't file it 'til

10 September 1 because they needed permission to waive the local

11 rule, but the proposed objection was attached to whatever

12 pleading that was filed when I was on the plane to California

13 in July.  And they've had their objections ready to go, and now

14 in this proposed Case Management Order they want to say, "Well,

15 we gonna file a brief on October 1 and you respond on October

16 7."  Your Honor, they want to file a brief on 1,000 or more

17 claims and give me 7 days to respond?  I don't care if they

18 want to file a lengthy brief, but the Case Management Order

19 must govern that.  I can't be put in the position of responding

20 to all of the objections in a brief in 7 days.

21          THE COURT:  That's fine, that's -- I agree, that's not

22 reasonable.  Why don't you just tee up it up for the November

23 hearing list?

24          MR. SPEIGHTS:  If they want to file a brief, fine.  If

25 they don't want to file a brief, we go in October.  I will say

1  the only other thing, Your Honor, is that -- the list that Ms.

2  Browdy referred to as we just got the list, we filed the list

3  in compliance with the Court's order.  Mr. Fairey who's here

4  today and my staff spent an enormous amount of time trying to

5  get the information, but we are in compliance with the Court's

6  order by providing them what you've told us to provide at the

7  last hearing.  Thank you, Your Honor.

8          THE COURT:  All right, well, with respect to the

9  discovery issues, though, are you -- I'm -- are you in

10 agreement, Mr. Speights, that the way that the Debtor has

11 articulated the groups -- the category groups is an acceptable

12 way to go about this process?

13         MR. SPEIGHTS:  The way they -- and I'm glad you did

14 mention discovery because I intended to come back to that.  The

15 way they have articulated teeing up the groups to be heard

16 based upon their assertion and my hope that they do not require

17 discovery is fine with me.

18         THE COURT:  All right.

19         MR. SPEIGHTS:  I'm sort of like a Defendant and

20 they're sort of like a Plaintiff; they get to file the first

21 pleading and if they want to file them in this order, that's

22 fine.  I'm gonna argue and file briefs and do all those sorts

23 of things that I always do, but I -- as far as a case

24 management standpoint, I even gave 'em broader authority of

25 that in mind.  I said, "Tee 'em up like you want to tee 'em up,

1  vis-a-vis the one's where no discovery is required."  But I do

2  feel strongly -- besides the southern day, I probably feel

3  almost as strongly about -- if you open up discovery now,

4  especially between now and the first hearing, we're gonna have

5  an all out war, Judge.  I mean, they wanted to take my

6  deposition.  I understand it, and they may eventually be able

7  to do it, may not.  I'm gonna work to take some of their

8  depositions, I'm gonna notice Mr. Fink's deposition, and if we

9  can rid of a huge chunk, and maybe all of these objections, by

10  briefing before Your Honor -- and I'm not holding it back at

11  all, I think it makes sense for me and my firm, I hope it makes

12  sense to Kirkland & Ellis, and I would bet everything I own it

13  makes sense to the Court.  I mean, the Court is going to be

14  faced with all sorts of discovery problems that we can

15  hopefully avoid and get this down to a list of claims left and

16  resolve 'em maybe as early as December.

17        THE COURT:  Well, let me give you piece of advice with

18  respect to how I treat discovery matters.  My general rule is

19  if it's not privileged and it's relevant to something, disclose

20  it and that will be true on both sides.  I do not have

21  arguments on discovery motions.  I expect you to show me what

22  the request is, what the response is, what's inadequate about

23  it, and that's all I want to know, what the relevance is.

24        MR. SPEIGHTS:  I understand it, Your Honor, but the

25  problem is -- there's several problems, but the one that jumps

1    to my mind first is if we have 3,000 claims as I round 'em off,

2    it would make a whole lot more sense to get it down to those

3    where there are factual issues --

4            THE COURT:  Sure.

5            MR. SPEIGHTS:  -- in dispute --

6            THE COURT:  Yes.

7            MR. SPEIGHTS:  -- before having that argument, because

8    now we gonna be in that never-never land where nobody agrees

9    what the issues are in dispute.  And I think we should narrow

10   those issues by the legal motions and arguing those objections

11   that can be argued without discovery.  I'm very anxious, Your

12   Honor, to know what they put down, you know, in the future as

13   well on what they believe can be argued without the requirement

14   of additional discovery.

15           THE COURT:  Okay.

16           MR. SPEIGHTS:  And maybe even on those I can say --

17   maybe even say to 'em, "You want discovery for this piece of

18   paper?  Here is the piece of paper.  You want to see the

19   building list?  What's the problem?  Here's the building list."

20   I mean, I'm not sure, but you can do that if you're down to a

21   few hundred, you can't do that with 3,000.

22           THE COURT:  All right.

23           MS. BROWDY:  But Your Honor, a few things, first let's

24   clarify when we're gonna tee up these three legal issues.

25   There are real problems with November, not the least of which

1   I'm gonna be on a jury trial in another matter, plus there are

2   a number of substantive issues already set for the November

3   14th hearing.  The issue of the <u>Anderson Memorial</u> case and why

4   that does not give Speights authority was spelled out in detail

5   in our Thirteenth Omnibus Objection.  Mr. Speights knows what

6   our legal arguments are.  We have the attachments, they've

7   already been submitted up to the Court and there should be no

8   delay.  And if it means teeing it up without writing a separate

9   brief, that's absolutely fine.

10      On the issue of conspiracy, we suggested it in our

11  Thirteenth Omnibus, we haven't really briefed it at length.  It

12  just comes down to one or two cases in California, but I'd be

13  prepared not to have opening papers if Mr. Speights wants to

14  start out on October 7th saying why he thinks he does have

15  authority and --

16      THE COURT:  Well, I -- that's nice that you folks

17  think that, but I don't live in California, so I need the

18  briefs.

19      MS. BROWDY:  And again, then, Your Honor, there's no

20  surprise.  I mean, Mr. Speights has just represented to the

21  Court he's been discussing this with the Debtor since February,

22  so there should be no issue.  Again, we'll limit our papers

23  then to 15 pages or less to deal with these three issues.  I

24  can put them on file by Friday.  I'll get them on file this

25  Thursday if I can.  Again, these issues are no surprise to Mr.

1  Speights.

2           THE COURT:  I understand, but that's still -- to ask,

3  I think, at this point, to have that many claims dealt with in

4  that kind of an expedited briefing schedule when the Debtor is

5  still teeing up estimation, I'm still working on ZAI, you've

6  got all kinds of plan issues going forward, there's simply not

7  an emergency that requires this.  Yes, it needs to be done, but

8  it doesn't have to be done in October as opposed to November.

9           MS. BROWDY:  But -- and I understand your -- the

10  Court's statement, Your Honor, but just again to make clear,

11  the reason estimation had become such a big problem is because

12  there are 4,000 claims on file instead of about 500 which is --

13           THE COURT:  Well, that's on the property damage side.

14           MS. BROWDY:  Yeah --

15           THE COURT:  Yes.

16           MS. BROWDY:  This is the property damage side.

17           THE COURT:  Yes.

18           MS. BROWDY:  The problem with the estimation is these

19  3,000 bogus claims that the Speights firm has filed.  This is a

20  chance to get rid of 2,000 of them.

21           THE COURT:  Can you get into our calendar in

22  Pittsburgh?  Thank you.

23        (The Court and Clerk confer)

24           THE COURT:  Well, apparently the only date --

25        (The Court and Clerk confer)

1            THE COURT:  Fine, how about October 31st in

2    Pittsburgh?

3            MS. BROWDY:  That's fine with the Debtors, Your Honor.

4            THE COURT:  So the Debtor is going to tee up the three

5    legal issues.  I think you two can agree on dates by which you

6    can file briefs.  I'd like to get the last brief, the reply

7    brief, filed at least -- that's a Monday.  Maybe you can submit

8    everything to me by the Wednesday before-hand?

9            MR. SPEIGHTS:  Your Honor, I hadn't responded yet on

10   the 31st, but --

11           THE COURT:  I'm sorry?

12           MR. SPEIGHTS:  I hadn't responded yet on the 31st.

13           THE COURT:  Yes, you haven't.

14           MR. SPEIGHTS:  Okay, I have no conflict that day,

15   that's fine on the 31st.  And I understand where Your Honor's

16   heading, and I appreciate your recognizing the 7 day problem.

17   When -- before we start talking about these dates -- see,

18   normally I would have 30 days under the Case Management Order

19   or whatever it is, and you say why not a shorter period of

20   time?  Well, I haven't seen their brief yet, I don't know what

21   they're going to file.  On California claims I have California

22   co-counsel, I have the inside lawyer for the Board of Regents

23   of California, I have the inside lawyer for the California

24   State University system.  They may want -- it's a little --

25   sometimes a little bureaucratic to get involved in it.  I'm

1  gonna do everything I can if you tell me the 31st to get a

2  brief back in a normal period of time, but it's not just well,

3  he knows about these issues.  I've got other lawyers and many

4  other dealings, of course we haven't even talked about the next

5  group of objections and substantive objections.  So if the 31st

6  is it, I'm gonna say thank you, Your Honor.  Give me as much

7  time as you can.  If it's November the 15th, I'm gonna say

8  thank you very much, Your Honor, and give me as much time.  And

9  if it's whenever the --

10         THE COURT:  All right.

11         MR. SPEIGHTS:  -- next hearing is, thank you very,

12  very much.

13         THE COURT:  Well --

14         MS. BROWDY:  And Your Honor, to clarify, in the -- in

15  Speights' proposed CMO, docket #9503, in paragraph one, under

16  the Speights proposal it says provided without in anyway

17  conceding any other question, including the question of whether

18  discovery is required, Speights and Runyan acknowledges that

19  the Debtors may inform it by September 30th if they wish at the

20  October 24th, 2005 Omnibus Hearing.

21         THE COURT:  Well, he's already explained that.

22         MS. BROWDY:  Yeah.

23         THE COURT:  Yes, let's -- can -- let's just move on

24  and get this done.  Okay, by Friday, September 30th the Debtor

25  is to file it's brief on these three separate issues; one is

1  the authority under Anderson Memorial, one is the California

2  conspiracy theory and what's the other?

3      MS. BROWDY:  There are two under Anderson Memorial,

4  Your Honor.  One is Anderson Memorial as authority for South

5  Carolina claims, one is the authority to Anderson Memorial for

6  out of state non-South Carolina claims.

7      THE COURT:  All right.

8      MS. BROWDY:  And then the third is California

9  conspiracy.

10      THE COURT:  Each brief -- the briefs are to be 15

11  pages, no more, correct?

12      MS. BROWDY:  Yes, Your Honor.

13      THE COURT:  That's due September 30.  Mona, I want to

14  be make sure that we can print these before we get the -- any

15  sort of a binder in.  How -- do you just want notice to Rachel

16  as usual and then we'll get it from her?

17      (The Court and Clerk confer)

18      THE COURT:  All right, for this issue and this issue

19  only, the thing that's coming up on October 30th, when you file

20  your brief please email it both to Ms. Bellow and to my box

21  that's on my internet website, it's JKF@pawb.uscourts.gov.  She

22  will also send that to me at that box, so I don't normally want

23  duplicates, but in this instance I just want to make sure that

24  I can get them and read them timely.

25      MS. BROWDY:  Thank you, Your Honor.

1          THE COURT:  All right, and Mr. Speights' response will

2   be due by -- October 14th is 2 weeks, Mr. Speights, is that

3   workable?

4          MR. SPEIGHTS:  That would be very difficult, Your

5   Honor.  I mean, I'm gonna do what you tell me to do.  I really

6   want as much as I can --

7          THE COURT:  Well, I need to get at least the responses

8   in by --

9          MR. SPEIGHTS:  Are you allowing a reply --

10         MS. BROWDY:  Your Honor?

11         MR. SPEIGHTS:  -- Your Honor?  I know that's normally

12  not in your Case Management Order and it's not in my Case

13  Management Order I passed up.

14         MS. BROWDY:  Your Honor, I know the Court permits

15  replies on motion of five pages or less -- or often does.  So

16  certainly if we were to do a reply we would try to stick -- we

17  would make it within a five page limit.

18         THE COURT:  Well, let me do this then, Mr. Speights,

19  I'll give you until October 21st, that's 3 weeks --

20         MR. SPEIGHTS:  Fine.

21         THE COURT:  That's three Fridays.

22         MR. SPEIGHTS:  Thank you.

23         THE COURT:  And I'll build in that the Debtor may have

24  a reply limited to five pages only on this issue --

25         MS. BROWDY:  Right.

1        THE COURT:  -- I mean, these three issues.  That will

2   be due Wednesday the 26th, which doesn't give you much time but

3   if I'm going to read it I need it by then.

4        MS. BROWDY:  Yeah, no, that's not a problem at all,

5   Your Honor.  And then, again -- okay, then that addresses,

6   again, we think that has a chance of eliminating about 1,900

7   claims.

8        THE COURT:  All right, wait, I need to give you a

9   time, I believe.  You're -- where are you folks coming in from?

10       MS. BROWDY:  Chicago, Your Honor.

11       THE COURT:  South Carolina?

12       MR. SPEIGHTS:  South Carolina, Your Honor.

13       THE COURT:  Do you --

14       MR. SPEIGHTS:  I'm going to have to come in the night

15   before.  It's no way I can get there --

16       MS. BROWDY:  That's fine if you want to -- if Your

17   Honor want to do it first thing in the morning.

18       THE COURT:  Want to start at 9 then, 9 o'clock?  All

19   right.  Okay, yes, now?

20       MS. BROWDY:  Okay, so that -- again, hopefully will

21   get 1,900 claims out of the system, or at least that's our

22   goal.

23       THE COURT:  Yes, and we will address that day the

24   request for how to handle any discovery issues because I want

25   to see what we're dealing with in terms of the global --

1   hopefully getting the 1,900 out of the system.

2        MS. BROWDY:  And Your Honor, the only question I would

3   have on that is in the interim if we want to try to tee up

4   additional matters for the November hearing -- 'cause remember,

5   we agree we have this big chunk and I don't think any other --

6        THE COURT:  Of legal issues?

7        MS. BROWDY:  Of legal issues.

8        THE COURT:  I thought you just told me November was

9   already jammed?

10       MS. BROWDY:  Well, it is for -- it is for me, but my

11  hope was -- for example, if we can adjudicate on October 31st

12  that there's no conspiracy claims that can go forward in

13  California, now that we have the list from Mr. Speights, we may

14  in the interim be able to say, "Oh, you know what, Texas,

15  Louisiana and Delaware have 100 more cases in there."  We could

16  tee that up and one of my colleagues could argue it.  Now, if

17  you'd rather we could just push that all over 'til December,

18  that's fine.

19       MR. BERNICK:  But Your Honor, maybe you could pick up

20  on both things.  Obviously, you know, time is of the essence

21  for us.  And I'll say it because Mr. Speights has been very

22  free with the idea of talking about, you know, kind of what's

23  happening in the broader scope of things.  The word on the

24  street is that this process with Mr. Speights is kind of taking

25  more time, which then means it's more difficult to find out

1  what Speights claims are really gonna be worth.  So we're

2  really, really focused on maintaining the schedule.

3       THE COURT:  Well, look, it just came up at the Omnibus

4  Hearing last month.

5       MR. BERNICK:  Well, I --

6       THE COURT:  I don't know how the word on the street

7  could be that it's taking more time.

8       MR. BERNICK:  Because, and this is not a criticism of

9  Your Honor at all, it's just that there was a lot of success

10  when the issue first was raised.  In fact, we shouldn't have

11  even been the one's to have raised this to begin with because

12  it should have been raised by Mr. Speights, but it came up

13  during the summer.  And just as a matter of the ordinary course

14  of proceedings, it's just taking time.  So we're very sensitive

15  to slippage of a month or 45 days.  A lot of people are very

16  focused on this issue and it's implication.

17       THE COURT:  Well, here's my ruling about November, you

18  can put on the November calendar whatever you like, but at two

19  hours and one minute I'm stopping the W Grace proceeding,

20  period.

21       MR. BERNICK:  Okay, well, what I was gonna suggest in

22  order to make good use of our time was that we prepare

23  something, a status report or whatever, Mr. Speights can

24  respond to it, that takes up kind of what we have learned and

25  where we think the remaining nut is, so that when we come in on

1  the 31st of October instead of kind of working with the issues

2  here, there and in piecemeal, you have a pretty concrete

3  picture of this third door.

4          THE COURT:  Well, that's fine.

5          MR. BERNICK:  And --

6          THE COURT:  I mean, if you're able --

7          MR. BERNICK:  And that's all that I'm saying.  And

8  then if it's appropriate to get those raised and resolved -- or

9  those resolved in November or at some other point, or if we're

10 gonna have some discovery, which we truly believe that we need

11 when we have claims -- hundreds of claims filed that turn out

12 they should never have been filed, verification is very

13 important, credibility is very important, but you'll have all

14 of it at once so you can decide kind of going forward after

15 October what's next, whatever the timing of that might be.

16         THE COURT:  Well, what don't you prepare that sort of

17 chart with your estimation of where you want to go and when and

18 present it to Mr. Speights in advance, and bring it to the

19 October --

20         MR. BERNICK:  That's what I'm suggesting.

21         THE COURT:  -- 31st hearing?  Yes, that's fine and

22 we'll see if we can work through it.  But in terms of

23 scheduling a long time in November for further argument, if

24 you're already --

25         MR. BERNICK:  I understand.

1          THE COURT:  -- jammed, it's not going to happen.  So

2     that you know, when Mona just handed me the schedule, after

3     October 31st the next day that I have available that's not

4     already scheduled is January 2nd.  So we're --

5          MR. BERNICK:  Yeah.

6          THE COURT:  -- going out some time.  Now, something

7     may come off the calendar in the meantime, I don't know, but --

8     okay, anything else on this one?

9          MS. BROWDY:  On the Speights claim I think there may

10    be a ministerial issue.  We got two lists from Mr. Speights

11    last week, one of claims that he's already -- well, we had a

12    number of lists, but the two at issue right now, one of claims

13    that he says he's previously withdrawn and one of claims that

14    he'd like to withdraw.   We have no problem having all of those

15    claims withdrawn, but because they were objected to, I think,

16    under Rule 3006 we need a Court order.  We've prepared a Form

17    of Order that among other things, just acknowledges that all

18    the withdrawn claims can be disallowed and expunged and ask

19    that to the extent that he's identified claims to be withdrawn

20    that don't have claim numbers, we can't tell what they are,

21    we've asked as part of this order that he identify for us the

22    address and state and when these claims were filed.  And again,

23    I would think it's ministerial, but I don't believe that

24    there's actually agreement on this order.

25          MR. SPEIGHTS:  Mr. Fairey of my office is familiar

1  with that, Your Honor, he's coming around.  And I might say

2  something while he's on the way up, I may respond to.  And I

3  don't think I need to say this, but the fact that Speights and

4  Runyan withdrawals claims in this case or Owens Corning or

5  anything else does not mean that Speights and Runyan did not

6  have authority to file those claims.  And I explained it last

7  time and I just want to underscore that at every hearing.  We

8  go through claims, we have discussions with clients, some

9  people decide for one reason or another they don't want to

10  proceed.  That's not an issue before the Court today, but I

11  just forgot to mention that in response.

12          MR. BERNICK:  Well, I --

13          MR. SPEIGHTS:  I mean --

14          MR. BERNICK:  With due respect, I think that that is

15  not -- at least as I understand it, that is not -- that's not

16  how the bankruptcy process works.  When you file a claim you

17  should have a basis for doing it, you need authority to do it,

18  and it's improper to file a claim on --

19          THE COURT:  That's --

20          MR. SPEIGHTS:  That's not what I'm arguing, Your

21  Honor.

22          THE COURT:  But -- that -- it's not an issue before

23  me.  Why don't you talk to each other about this withdrawing

24  and expunging order.  I take it you haven't shared that order

25  yet.  Put it on the hearing list for October 31st when you

1  folks are around and I'll address it then.  Ms. Baer?

2       MS. BAER:  No, Your Honor, we have gone back and forth

3  on this order.  We only have a dispute on one paragraph that we

4  need to address with Your Honor.  That one paragraph is we're

5  fine with the withdrawals; he's given us two lists, we're in

6  total agreement, they can be withdrawn.  That's what the order

7  says, all the language has been agreed to.  We have one

8  additional paragraph and that is to address the claims where we

9  do not have a claim number.

10       THE COURT:  Well --

11       MS. BAER:  Mr. Speights filed these withdrawals, we

12  don't know what they are, we've asked in this order if Your

13  Honor would direct them to provide information with respect to

14  the name of the claimant, the date and the like.  Mr. Fairey

15  has objected to that being in the order.  He's indicated they

16  can give us the information if they have the information, but

17  he didn't want it in the order.  We felt it very important,

18  Your Honor, for it to be in the order --

19       THE COURT:  Wait, wait, stop.

20       MS. BAER:  -- so we'd get it.

21       THE COURT:  Isn't there a claims agent who has access

22  to the claims?

23       MS. BAER:  Your Honor, there's a claims agent, they've

24  reviewed it, they can't find any trace of them.

25       THE COURT:  Well, all right, well, if that's the case

1   and there's a claim filed and the claims agent can't find it,

2   then I guess Speights is going to have to tell them what claim

3   it is.

4          MS. BAER:  That's what we're asking for.

5          THE COURT:  All right.

6          MR. FAIREY:  We offered to do that, Your Honor, but in

7   the context of -- we think there are 22 claims --

8          THE COURT:  Can you use the microphone, I'm having

9   trouble hearing you?

10          MR. FAIREY:  Absolutely, Your Honor, thank you.  With

11  respect to the -- there are 22 claims we believe we need

12  consent to withdraw, and we're -- and I offered to send them

13  the information and my suggestion would just be let us send

14  them that information, I'll copy the claims agent, and if

15  there's a problem they can file a motion and we can address it

16  in an order that way as opposed to addressing it in an order

17  that we've been discussing for the balance of maybe one day.

18          THE COURT:  Okay, see --

19          MR. FAIREY:  I've offered that --

20          THE COURT:  You're saying that you're intending to

21  withdraw these claims, but you need to get authority from your

22  client to do it before you actually do it?

23          MR. FAIREY:  That's not right, Your Honor.  We're

24  intending to withdraw these claims.  If you remember at the

25  last hearing Your Honor said, "Make a list of claims that we

1   intend to withdraw to clean up --

2         THE COURT:  Right.

3         MR. FAIREY:  -- this process."  And there were 22 that

4   we put on that list.  Those claims have been objected to, so

5   under 3006 we need a Court order and consent.  They consent and

6   we need a Court order to deal with that.  The claims that have

7   the no claim numbers, those are claims that were withdrawn

8   prior to being objected to and I don't -- I've told them I will

9   give them the list, and my suggestion would be just let me give

10  them the information they've asked for, and if that's not

11  enough they can file an appropriate motion or we can deal with

12  it in October as opposed to an order being handed up today to

13  deal with that.

14        THE COURT:  All right, well, what's the difference?

15        MS. BAER:  Your Honor, I frankly don't understand what

16  the problem is.  They have filed a list of withdrawals.  These

17  are claims they've withdrawn.  We didn't object to them, we

18  didn't know they existed.  What we've provided in this order is

19  the claims are withdrawn, but they need to provide the

20  information on claimant name and building number so that we can

21  have our claims agent track them.

22        THE COURT:  Right.

23        MS. BAER:  He's refusing to have that put in the order

24  and I don't understand why, but that makes me suspicious.

25        THE COURT:  Well, I -- it doesn't make me suspicious,

1  but I don't understand why it can't be in the order.  Is it a

2  timing issue?

3          MR. FAIREY:  It's -- well, it is a timing issue, Your

4  Honor, because they first raised this with me I think on

5  Thursday of last week.

6          THE COURT:  No, I mean, it is a timing issue to get

7  the information?

8          MR. FAIREY:  It's not, Your Honor, I offered to send

9  it to 'em last week.

10          THE COURT:  Well --

11          MR. FAIREY:  It's easy to put together and I can send

12  it to 'em.  My suggestion is let me send it to 'em and then

13  let's see where we are.

14          THE COURT:  Why don't we just put it in the order and

15  get it done?  I'm missing why it's significant.

16          MS. BAER:  Your Honor, make the --

17          THE COURT:  I mean, the Court's --

18          MS. BAER:  Can I just make the order?  You can see the

19  language.

20          THE COURT:  Yes, please.  The Court's dockets need to

21  know the claim numbers that are being withdrawn, so --

22          (Pause in proceedings)

23          THE COURT:  Yes, all this does is says that if there

24  isn't a claim number on the exhibits that are attached that

25  Speights will provide one.

1      MR. FAIREY:  And we offered to do that.  The problem

2  is this order's being handed up without a motion and without

3  any notice.

4      THE COURT:  Okay, but the issue is what -- never mind.

5  If -- I don't quite understand what the issue is, but what I

6  will say is this.  Speights and Runyan has agreed to identify

7  for Debtors and the claims agent the name of the claimant, the

8  date the Proof of Claim was submitted and the address.  Rather

9  than saying you will subsequently do it, I'll say you've agreed

10  to do it, is that acceptable?

11      MR. FAIREY:  Thank you, Your Honor, absolutely.

12      THE COURT:  There's no time limit in here.  Does it --

13  do you need a time limit?

14      MR. FAIREY:  The end of the week is fine, but I

15  anticipate being able to do it tomorrow.

16      THE COURT:  All right, then I'm not going to build a

17  time limit in if -- if in fact there's a problem with not

18  getting done, Ms. Baer, you can ask for something further.

19  That order is entered.

20      MS. BROWDY:  Okay, Your Honor, that brings us to the

21  remaining property damage claims.  The -- I think all the

22  Speights issues we were to address today are done.  In the

23  interest of time, I'll skip the status report which was agenda

24  item 12B.  Agenda item 19 was the Property Damage Committee's

25  Motion to Strike the Fifteenth Omnibus.  The Court's already

1  ruled on that, so that's moot.  Item 20 was Certain Louisiana

2  Claimants' Motion for an Extension.  The parties have an

3  agreement on that.  We've agreed that the Louisiana Claimants

4  identified in Mr. Dies' motion, which is docket #9429, those

5  are the people effected by Hurricane Katrina, they're gonna

6  have an agreed extension to January of 2006 to respond to the

7  Fifteenth Omnibus.  And we'll re-address that at the December

8  Omnibus hearing to see what the status is, if that's acceptable

9  to the Court, Your Honor.

10        THE COURT:  Okay, didn't I already do an order on

11  that?

12        MS. BROWDY:  On the -- on docket 9429, not that I've

13  seen.  It's possible that one has since been issued.

14        THE COURT:  Is this the Diocese of Indiana -- or Arch

15  Diocese --

16        MS. BROWDY:  Yes.

17        THE COURT:  -- or something --

18        MS. BROWDY:  Yes, Your Honor.

19        THE COURT:  -- of New Orleans, I mean?

20        MS. BROWDY:  Correct, Your Honor.

21        THE COURT:  I thought I did an order on that.

22        MR. DIES:  Your Honor, may it please the Court, Martin

23  Dies on behalf of the Catholic Arch Diocese of New Orleans,

24  Jefferson Parish and LaFuge Parish.  I believe Your Honor

25  signed the order on the Emergency Motion to hear it today.  It

1   is correct what Ms. Browdy has said, there is an agreement

2   which would extend the time to respond of those claimants for 3

3   months beyond the October 24th date.  However, I'm compelled to

4   bring up some additional matters that relate to the other

5   Louisiana claimants.  I unfortunately didn't have a chance to

6   discuss this with Grace, didn't have a chance to file a motion

7   because I'm basically an evacuee myself right now.  But due to

8   Hurricane Rita, which is the second hurricane, of course, that

9   just hit, I feel compelled to speak for the other Louisiana

10  claimants to seek to add them to this motion and get additional

11  time.  I know for a fact that there is no power, there is no

12  telephone, and most of these counties are flooded and severely

13  damaged, that would include Calcashee Parish -- {cough} excuse

14  me -- Lake Charles --

15        THE COURT:  Mr. Dies, I -- Mr. Dies, let me interrupt,

16  I don't have any problem with that extension for those

17  entities, but I think you're going to need to do something that

18  identifies them.  Maybe if you can have a telephone

19  conversation with counsel for the Debtor, the counsel for the

20  Debtor can prepare an order that will identify those entities.

21        MR. DIES:  Certainly, Your Honor, we can do that.

22        THE COURT:  Yes, I mean -- I understand that you're in

23  a position -- in a pretty untenable position right now, so it

24  seems to me that if we just identify them on the record their

25  time can be extended.

1          MR. DIES:  Certainly, then I'll get with the Debtors

2    and work out an agreed stipulation to include the additional

3    claimants' names in the stipulation.

4          THE COURT:  All right, that's fine.  Is that -- that's

5    all right with counsel for the Debtor?

6          MS. BROWDY:  Yes, Your Honor.

7          THE COURT:  Does anybody have an objection?  No one

8    has an objection, Mr. Dies, so if you'll just get together with

9    counsel for the Debtor I'll take that.  Okay, then maybe what I

10   did was sign the emergency motion.  Okay, I'll -- do you have a

11   substantive order?

12         MS. BROWDY:  I do not, Your Honor, Mr. --

13         MR. DIES:  Your Honor, we don't have one yet, and of

14   course we'll now go ahead and include the other claimants and

15   I'll work that out with Grace and we'll get that to Your Honor.

16         MS. BROWDY:  Yeah.

17         THE COURT:  That would be fine.  Would you rather do

18   it on a Certification --

19         MS. BROWDY:  Yes, Your Honor.

20         THE COURT:  -- then you can put them all in?  All

21   right, okay, Mr. Dies, thank you.

22         MR. DIES:  Thank you, Your Honor.

23         MS. BROWDY:  Thank you, Your Honor.  That leaves us

24   now just with item 21 on the property damage side, which is the

25   Motion to Appoint Mr. Runyan and Mr. Dies as special counsel,

1  and we've objected to that.  I just have one short graphic to

2  hand up to the Court on that, Your Honor.

3       THE COURT:  Okay, I don't know that we're going to get

4  to this today, folks.  Okay, I'll take your graph.

5       MR. BERNICK:  Your Honor, what's Your Honor's

6  preference on that?  I -- we've got one more, I think,

7  significant matter to take up, which is the relation to

8  personal injury.  If we're not gonna get this resolved today

9  and it's gonna be put over --

10      MS. BROWDY:  It's not our motion, so I don't have a

11  problem adjourning it.

12      MR. SAKALO:  Good afternoon, Your Honor, Jay Sakalo on

13  behalf of the Asbestos Property Damage Committee.  We would

14  have a problem with putting it over beyond today.  The

15  reasoning for the motion, and you shorten time to hear that --

16  the application today, is there are deadlines that are imminent

17  under the Case Management Order for the estimation.

18      THE COURT:  Well, I understand.  The problem I have

19  with this specific selection of counsel is as I understand it,

20  at least one, if not two of them were already members of the

21  Committee, and I'm just not sure that as a member of the

22  Committee, and have their own clients involved in the case,

23  that they're appropriate special counsel.  I understand that,

24  you know, there has been some concern as to whether or not the

25  Property Damage Committee can handle this litigation and what

1  it's scope in the litigation should be.  I believe that Mr.

2  Baena has been pretty adamant that the Property Damage

3  Committee is not going to attempt to represent individual

4  Property Damage claimants.  It seems that Mr. Speights has by

5  far in a way the majority of them anyway, so why does the

6  Asbestos Property Damage Committee need special counsel if Mr.

7  Speights is going to be doing the lion's share of the

8  litigation on behalf of his own clients anyhow?

9        MS. BROWDY:  And Your Honor, if we may add to that, if

10  he's going to be doing it anyway, why should the Debtor be

11  paying for that?  Between Mr. Speights and Mr. Dies, when we

12  told -- gave the previous graphic, Your Honor, that shows we're

13  now down to about 3,400 traditional asbestos property damage

14  cases, between Mr. Speights and Mr. Dies, they represent 90% of

15  them.

16        THE COURT:  Okay, it's his turn now.

17        MR. SAKALO:  Thank you, Your Honor.  First of all the

18  reason we believe that the Committee needs special counsel is

19  this is for purposes of the estimation, not for purposes of the

20  claims objection.  Mr. Bernick and Ms. Browdy have made it

21  painfully clear that they're trying to marry those two

22  processes together, but there is a separate estimation process

23  that's going to go forward, and that is phase one and phase

24  two, if the Court elects to hear phase one, which we're going

25  to be back here in November on that crowded calendar arguing.

1  And as a result of that, Your Honor, that is a Committee

2  function, not an individual claimant's function.  The Debtors

3  in their papers suggest it's a foregone conclusion that because

4  they've objected to Mr. Speights' claims and because they've

5  objected to Mr. Dies' claims --

6          THE COURT:  But why does the Committee need special

7  counsel for that purpose?  That's the reason it has counsel.

8          MR. SAKALO:  The --

9          THE COURT:  That's the core bankruptcy function that a

10  committee's counsel is suppose to carry out.

11          MR. SAKALO:  As to the phase two estimation, Your

12  Honor, we would agree, that's a traditional estimation.  What

13  the Debtors have now couched as this phase one issue that

14  relates to science methodology, that is not a traditional

15  committee function.  That is a tort issue that the Debtors have

16  brought into this bankruptcy as a way to try to highjack the

17  process from PD claimants.  What they're trying to do, Your

18  Honor, is create this artifice that there is this air sampling

19  versus dust sampling issue that needs to be decided as a

20  threshold.  Your Honor, we will show to the Court, first, we

21  don't believe it's part of the estimation process.  And even if

22  it is a part of the estimation process, the Debtors' position

23  is flat wrong that air sampling is the only way to determine

24  the methodology for whether or not the products are hazardous.

25          But Your Honor, that is a tort issue; that's an issue

1  that the Debtors have litigated outside in the tort system for

2  the last 20 years and it has consistently lost that issue.

3  That is not a bankruptcy exercise per se, and that is the

4  reason why the Committee believes that special counsel will

5  inform the process and will enhance the process.

6          THE COURT:  Well, then you're going to have to find

7  someone who doesn't have those kinds of potential conflicts and

8  issues with respect to independent clients for whom they have

9  fiduciary responsibilities that are different from their

10  fiduciary responsibilities both as a member of the Committee

11  and then now special counsel to the Committee.  I'm not going

12  there.

13          MR. SAKALO:  Your Honor, there is precedent for

14  allowing this in this exact case.  In the Zonalite Science

15  trial, Your Honor allowed special counsel who represented

16  claimants who were also participants on the Committee to serve

17  as special counsel.  We don't believe in asking the permission

18  for Mr. Dies and Mr. Runyan to serve as special counsel.

19          THE COURT:  I'm not permitting it.  If you need to

20  take an appeal, you can take an appeal.  There are too many

21  issues with respect to Mr. Speights pending, and I'm not making

22  -- please, do not misunderstand, I'm not making any findings

23  with respect to those issues, but they're out there.  There are

24  issues about his authority with respect to his own clients.

25  They may turn out to be nothing, I don't know.  But those

1  issues are pending.  There are issues as to whether or not

2  having not -- what, 2,900 of the 3,400 property damage claims,

3  there was need for a committee at all, probably.  But to the

4  extent that there is need for a committee, how is he ever going

5  to be able to separate out, and therefore the committee, and

6  therefore the fee auditor, and therefore me, what was done on

7  behalf of his own clients as opposed to on behalf of the

8  Committee?  It's fraught with problems.  If you need someone,

9  go find somebody independent.

10         MR. SAKALO:  Your Honor, couple of points.  First, as

11 to the Speights issue itself, this is something that the

12 Debtors have created by filing these authority objections --

13         THE COURT:  No --

14         MR. SAKALO:  -- where --

15         THE COURT:  -- Mr. Speights has created them by not

16 filing the authority on the 2019 statements, that's what caused

17 the problem.

18         MR. SAKALO:  That --

19         THE COURT:  If he has it, he should file it.

20         MR. SAKALO:  That issue will be litigated, as we've

21 heard --

22         THE COURT:  Yes, it will.

23         MR. SAKALO:  -- between -- and I hope nobody's -- is

24 prejudging that issue.

25         THE COURT:  I'm not prejudging anything.  I don't know

1  -- I haven't even looked at them.  I don't know if the

2  authority is there.  I'm simply saying that if their authority

3  isn't there, that's what's created the problem.

4      MR. SAKALO:  As to the -- this issue that now there's

5  3,400 as opposed to 4,000 that -- the Debtors at each chance

6  they get take an opportunity to whack that number down to make

7  it seem as it's just 2,900 -- the 3,400 --

8      THE COURT:  Well, then it's 2,900 out of 4,000 --

9      MR. SAKALO:  But --

10      THE COURT:  -- regardless, it's the lion's share of

11  the claims.  And there isn't a way to separate out what you're

12  doing on behalf of your individual 2,900 claimants versus the

13  4,000 that are encompassed by the Committee.  It's just not

14  possible.

15      MR. SAKALO:  The -- respectfully, Your Honor, we

16  disagree with that.  First of all, as to Mr. Dies, there hasn't

17  been a challenge as to his authority as to filing claims.

18  There have been objections lodged to his claims in the

19  Fifteenth Omnibus Objection.  The Debtors objected to

20  virtually, if not all, claims in that objection.

21      THE COURT:  But that's a different firm, isn't it?

22      MR. SAKALO:  Yes, that is --

23      THE COURT:  Okay, I wasn't at Mr. Dies yet.  I thought

24  you're asking for two special counsel.  My other concern is why

25  do you need two?

1          MR. SAKALO:  The reason we need two, Your Honor, is

2     first, neither firm is a very large firm.  And second, what we

3     are seeking to assist -- what the PD Committee is seeking in

4     assisting them with this estimation is the particular expertise

5     of Mr. Dies and Mr. Runyan.  We're not seeking to employ the

6     firm of Speights & Runyan as a firm to handle the estimation.

7     We're seeking to employ the particular assistance of Mr. Dies

8     and Mr. Runyan.

9          THE COURT:  What --

10         MR. SAKALO:  And --

11         THE COURT:  Dies and Runyan, okay.

12         MR. SAKALO:  And that is the reason why there are two

13    firms that we're seeking.

14         THE COURT:  You want Mr. Dies, I haven't seen an

15    objection.  I suppose in this instance I'll appoint Mr. Dies.

16    I am not appointing Speights & Runyan.  I'm simply not doing

17    it.  I don't think it's appropriate, I don't think the

18    Committee should be asking for it, there's -- I think an actual

19    conflict.  And if there isn't already an actual conflict, the

20    potential for it is so ripe that the first time that somebody

21    from that firm has to appear on behalf of the Committee and

22    their own client is involved in an issue, it will come to

23    fruition.  So I'm not going to appoint that firm that

24    represents the lion's share of the individual claimants.  If

25    you need Mr. Dies, I don't think there has been an objection

1   and I will appoint Mr. Dies.

2          MR. SAKALO:  If I may have a moment, Your Honor?

3       (Pause in proceedings)

4          MR. SAKALO:  Thank you, Your Honor, we will prepare --

5   are the Debtors objecting to --

6          MR. BERNICK:  That's okay with us.

7          MR. SAKALO:  With Dies?

8          MR. BERNICK:  Yes.

9          MR. SAKALO:  Your Honor, we'll prepare an order --

10          THE COURT:  All right.

11          MR. SAKALO:  -- accordingly.

12          THE COURT:  You're filing on a COC, Mr. Sakalo?  Okay.

13          MR. SAKALO:  Yes, Your Honor.

14          THE COURT:  Thank you.

15          MR. BERNICK:  Your Honor, I think that we're pretty

16   much done, if I'm not wrong, with the exception of item 16,

17   which relates to the discovery of the claimants' attorneys, and

18   I think that that's kind of where we're at.  There are some

19   other matters.  I guess the appointment of the mediator, but

20   I'm not sure that we really need to take that.

21          THE COURT:  No, I signed an order that --

22          MR. BERNICK:  Okay.

23          THE COURT:  -- appointed the mediator.

24          MR. BERNICK:  So, I think that this is the last one,

25   which is --

1          MR. LIESEMER:  Your Honor, I do think we have some

2    matter to discuss regarding the mediator.  They're not

3    contested --

4          THE COURT:  I can't hear you.

5          MR. LIESEMER:  -- but --

6          THE COURT:  I can't hear you.  I cannot hear you.

7          MR. LIESEMER:  Your Honor, I think we do have some

8    matters to discuss with respect to the mediator.  They're not

9    contested, but I do think we need to raise them very quickly

10   with the Court.

11         THE COURT:  All right, because I did sign the order --

12         MR. LIESEMER:  Yes, we understand.

13         THE COURT:  -- appointing them.

14         MR. LIESEMER:  Yes, thank you.

15         THE COURT:  All right, well, let's -- we can probably

16   get through that quickly.  Let's do that.

17         MR. LIESEMER:  Your Honor, Your Honor, as you well

18   know, appointed Roger Whelan as -- former Judge Whelan as the

19   discovery mediator in this case.  And last week myself on

20   behalf of the Asbestos Claimants Committee and two attorneys

21   from Kirkland & Ellis who are not here today were on the phone

22   with him in order to have a introductory conversation with him.

23   And two things that we covered with him were, one, we wanted to

24   set up initial meetings with him and also wanted to get him up

25   to speed.  But one question we had for him in particular was

1  how to handle his compensation because obviously he's gonna be

2  making a claim against the estate for the hours that he has

3  incurred.  He didn't advise us as any -- to particular

4  procedure to follow with respect to compensation requests.  He

5  did suggest that he might submit some sort of writing with the

6  Court that outlines his hours.  But I think what we were

7  looking for at the status conference was some guidance from the

8  Court as to how the Court wanted to proceed with respect to

9  getting the mediator paid and what sort of process might make

10  sense.

11       THE COURT:  All right, well, what have you folks tried

12  to work out with him?

13       MR. LIESEMER:  Well, I think I would defer to the

14  Debtor to a certain extent since it -- the money would be

15  coming from the estate.  I do think that the process has to

16  include the following elements.  One, as the mediator

17  suggested, the mediator would have an opportunity to submit

18  something in writing that would outline the amount of time

19  incurred with respect to his fees.  I don't know whether it has

20  to be on the order of a fee application, but some sort of

21  writing, perhaps a letter with the Court.  I do think it would

22  make sense for the U.S. Trustee's benefit and any other parties

23  benefit to have the opportunity to maybe respond or object if

24  there's anything of particular concern, maybe a certain number

25  of days under negative notice, in order for that to be heard.

1  And then maybe at that point the Court can enter an order

2  allowing those fees.

3          THE COURT:  All right, when Judge Woland used the

4  mediator processes for discovery earlier in some of the other

5  cases, about -- I was not involved in that process.  How were

6  the fees paid?

7          MR. LIESEMER:  I'm not familiar with that case, Your

8  Honor.

9          MR. BERNICK:  Yeah, if memory serves, I believe -- and

10 I can only really speak to -- this is just literally memory, I

11 do not believe that there was a formal fee application process

12 for the --

13         THE COURT:  There was because when he was -- when he

14 no longer had jurisdiction over the cases, I had to review

15 them, at least with respect to one litigation in Owens.  I know

16 that for sure.  There was a formal fee process.

17         MR. BERNICK:  Yeah, but that --

18         THE COURT:  I don't know about this case.

19         MR. BERNICK:  That was an -- those were -- that was a

20 more formal -- as I recall Owens Corning, that was a more

21 formal --

22         THE COURT:  Trial.

23         MR. BERNICK:  -- situation.

24         THE COURT:  Yes.

25         MR. BERNICK:  Yeah, and I'm not sure what was done

1  with respect to the less formal ---

2        THE COURT:  Okay.

3        MR. BERNICK:  -- process, for example, in the <u>Grace</u>

4  case.  I do know that the records ultimately became discovered

5  as part of the disqualification effort, and there were records

6  that related to time, but at that -- I don't remember that

7  there was a formal fee application process.

8        THE COURT:  What did --

9        MR. BERNICK:  I -- you know, from our -- I think that

10  counsel has put it well.  Obviously there's some concern about

11  having to go through the formal fee application process --

12        THE COURT:  Right.

13        MR. BERNICK:  -- but it really is -- it's really up to

14  Your Honor, whatever it is that Your Honor believes is

15  appropriate, we're prepared to go along with.

16        THE COURT:  I think maybe an abbreviated application

17  process because the problem I have is I don't want some issue

18  that affects your substantive position in a fee application

19  that's coming from the mediator.  But I think you could do

20  something like, you know, say he met for 2 hours with so and so

21  about issue A or about a discovery related to issue A without

22  going any further so that you would know the amount of time,

23  and if somebody has a challenge, it can be raised.  But

24  frankly, I don't think you're going to be -- going to use him

25  unless you've got serious issues on this discovery side that

1   can be -- that you really need help with.  Otherwise you've

2   been pretty good at working out most discovery things.  I think

3   you're going to work out most discovery matters.  I terms of

4   the fee arrangement, it seems to me that the entity that

5   refuses to do the discovery is equally as liable for fees as

6   the entity that's trying to get the discovery in the first

7   place.  I think they ought to be shared.  So if it's, you know,

8   six entities, then six entities share it.

9        MR. LIESEMER:  Your Honor, yes, since the Asbestos

10  Claimants Committee and the Debtor are basically looking to the

11  same source of funding, I assume that it's gonna be from that

12  same source of funding.

13       MR. BERNICK:  I don't know that that's true.  That

14  could be true in what -- in many if not most cases, but as

15  we've heard frequently and we've heard again today, there are

16  people who are of the view that the claimants themselves should

17  be able to participate in this process.  I expect that there is

18  gonna be some participation, and there you're talking about

19  folks who the state -- it's where the estate's not responsible

20  for the fees that are incurred.

21       THE COURT:  Yes, that's what I was saying earlier

22  about the trouble with separating out what counsel who has

23  clients and counsel who is going to be representing the

24  Committee is all about.  So I think in that instance, the issue

25  -- the mediator will have to address in the fee application

1  process will be whether it is related to an individual claimant

2  or whether it's a Committee issue.  If it's a Committee issue,

3  then I guess the estate's going to be responsible for it.  If

4  it's an individual issue, it will have to be shared by the

5  entities involved.

6          MR. LIESEMER:  Well, perhaps then what we can do since

7  we've had guidance from the Court is for me to sit down with

8  the Debtor's attorneys and work out a procedural order with the

9  mediator that will outline the elements that we've suggested

10 and submit it to the Court.

11         THE COURT:  Okay, that's fine.

12         MR. BERNICK:  I think that now leaves item 16.  Ms.

13 Harding is gonna be arguing that.

14         MS. HARDING:  Good afternoon, Your Honor, Barbara

15 Harding on behalf of Grace.  As the Court knows, the Debtors

16 have filed a Motion to Serve a two page questionnaire on the

17 claimants' attorneys.  And we also -- the Debtors also filed a

18 Motion to Shorten Notice with respect to that motion so that

19 the substantive issues could be heard today.  And as the Court

20 is well aware, the Court did not grant that motion so that the

21 objections are now due on October 7th and the hearing will take

22 place presumably on October 24th.

23      The only thing that the Debtors wanted to do today was to

24 raise the issue of timing and to kind of make sure -- kind of

25 put that issue in perspective.  And I have prepared a couple of

1    slides on that issue if I could just bring them up to the

2    Court.

3         THE COURT:  I'm not -- I'll take the slides, but I'm

4    not addressing this today and I don't -- don't expect to get

5    these motions so regularly to shorten time.  I really don't.

6    There's a process set out, you can all live with it, you know

7    it now.  I've already given you dates today for next year, so

8    there isn't any reason why I need notices to shorten time.

9         MS. HARDING:  I understand, Your Honor, and this is

10   really more to just kind of put it in perspective for going

11   forward about how maybe to deal with the issue --

12        THE COURT:  Fine.

13        MS. HARDING:  -- because we do have a proposal for

14   possibly streamlining it.

15        THE COURT:  All right, thank you.

16     (Telephone interruption)

17        THE COURT:  This is Judge Fitzgerald, we're on the

18   phone in the WR Grace case.

19        OPERATOR:  Excuse me, are you on the phone with Mr.

20   Dies?

21        THE COURT:  Mr. Dies was on the phone earlier, yes.

22        OPERATOR:  Yeah, I think he got either accidentally

23   cut off or we cut him off.  Hang on just a second -- just a

24   minute, please, let me see if I can find him.

25        THE COURT:  Go ahead.

1          MS. HARDING:  Do you want me to wait, Your Honor, or

2    go forward?

3          THE COURT:  No, go.

4          MS. HARDING:  Okay, all right.  As Your Honor can see

5    from the time line, Your Honor, even if nothing goes wrong, if

6    everything kind of goes as fast as it can possibly go, we're

7    looking at getting any kind of follow-up discovery on a

8    questionnaire into March or April at the earliest.  If you go -

9    - kind of go through the schedule and you allow time for

10   objections and allow time for the Court to hear the objections

11   and then to get responses to the discovery, we're on a very

12   tight timeframe.  And so, Your Honor, if you'll see the next

13   page we do have a proposal for possibly streamlining the

14   discovery process.  And we're trying to be realistic about what

15   we can actually accomplish over the next several months so that

16   we get information that actually will be useable in the

17   estimation by the experts.

18        And if you could look at the second slide, Your Honor,

19   you'll see that the first step that we propose would be -- it's

20   consistent with what we raised in our motion, which would be to

21   pursue traditional discovery against about 20 or so firms that

22   have been identified as having silica (indiscern.) against

23   Grace.  Those claims are already identified, we're already

24   aware that the claimants have x-rays that apparently are able

25   to be --

1          THE COURT:  I'm not hearing this today.

2          MS. HARDING:  Okay.

3          THE COURT:  So --

4          MS. HARDING:  Well, then I guess the proposal is that

5   possibly if the Court would consider the streamline process we

6   could deal with this issue in the next -- at the next Omnibus

7   Hearing as opposed to dealing with the issue of having 1,000

8   questionnaires served on 1,000 law firms.

9          THE COURT:  Okay, that's fine except that if I try to

10  address this I've already got three people standing there to

11  address this streamline proposal and we're way out of time.  I

12  need to get to the other hearings.  If you want to stick around

13  until I'm done with the rest of my calendar for the day, I'll

14  get to this today.  Otherwise, it's -- I denied the motion for

15  expedited treatment because I didn't think it was an emergency.

16         MS. HARDING:  I understand that, Your Honor, we're

17  prepared to go forward on October 24th.

18         THE COURT:  All right.

19         MR. BERNICK:  I think that that's all that --

20      (Counsel confer)

21         MS. BAER:  Your Honor, this matter is not on the

22  calendar but we submitted a Certification of Counsel with two

23  stipulations and orders permitting claims of Seaton Insurance

24  Company and One Beacon American Insurance to be deemed timely

25  filed.  Counsel's here today, we really would like to get these

1   stipulations signed.  These are protective claims that the

2   insurance companies filed out of time, but we've examined the

3   records, they should be permitted to be deemed timely filed,

4   and we just ask Your Honor to enter both of these stipulations.

5           THE COURT:  Where were they filed?

6           MS. BAER:  The Certification of Counsel with the

7   stipulations was filed with the Court, Your Honor.  It was

8   circulated to the Creditor's Committees and the Futures Rep.,

9   nobody had an objection but it was not -- these have not yet

10  been entered by the Court.

11          THE COURT:  Okay, what are the docket numbers for the

12  Certifications

13      (Pause in proceedings)

14          THE COURT:  When were they filed?

15          MS. BAER:  I'm sorry, Your Honor, we do not have the

16  docket numbers with us.  They were filed some time last week.

17  I can locate those.  I'll just re-submit them.

18          THE COURT:  The problem is if you give me the orders

19  without the docket numbers and I sign them, then I don't have

20  anything to link them to and my staff goes crazy.  And I

21  haven't seen them, so --

22          MR. BERNICK:  Would it be all right if we -- if we

23  after we're done with this case we just try to determine that

24  and then --

25          THE COURT:  If you would determine it and put the

1  docket numbers of the Certifications on the bottom, then I'll

2  take the orders and sign them now.

3       MS. BAER:  Thank you, Your Honor, we will do that.

4       MR. BERNICK:  The only other matter that I wanted to

5  raise, Your Honor, is really for future reference, and it comes

6  out of some further reflection and frankly some discussions

7  that I've had with some of the constituencies in the case.  But

8  we've now got the questionnaires that have been sent out for

9  people to fill out, people who were personal injury claimants

10 against Grace as of the time that the case was filed.  So that

11 process is underway and those questionnaires will be returned.

12 It's come to our attention they'll be returned -- the due date

13 I think is in January.  It's come to our attention that as many

14 as 80% of the claimants who are covered by those questionnaires

15 are represented by counsel who do not have 2019 statements on

16 file.

17      THE COURT:  They're not going to be voting.

18      MR. BERNICK:  Yeah, well, at -- but here's the thing

19 is that it also affects the -- it potentially affects how

20 responsive people are to the questionnaires.

21      THE COURT:  They won't have claims.

22      MR. BERNICK:  They won't --

23      THE COURT:  It will be real easy.

24      MR. BERNICK:  You're going -- once the 80% came to my

25 attention, that is exactly the path that I went down, I said,

1  "Oh well, you know" -- and I suppose the easy answer is, "Well,

2  gee, if the don't have any claims that tells me the estimate's

3  gonna be real low," but I know the argument that's gonna be

4  made is that, "Gee, the information is not all that useful for

5  estimation purposes because a lot of these people just decided

6  not to fill out the questionnaires."  What's -- what I think is

7  a possibility, and it sounds like it's dramatic, but it's not

8  given the context of what we're operating in, is that we would

9  present to the Court in fairly short order a motion confined to

10 those particular people who are really the targets of the

11 questionnaires, that is people who actually had claims pending

12 against Grace as of the time the bankruptcy was filed that we

13 would ask for a bar date with respect to those particular

14 claimants.  And that they could satisfy the response for the

15 bar date, either by submitting their questionnaires or by

16 filing a simple claim form and that way at least we have a

17 defined population of claimants and perhaps a further incentive

18 for them to participate in the questionnaire return process.

19 So it is a piece of paper, but notice has already, you know,

20 going out, we know how to get -- we now have contacts for all

21 these different people, got the firms.  So we've got the

22 people, we've got the process underway, but it's a way getting

23 perhaps further assurance that we'll have a meaningful response

24 to the questionnaires.  Now, I could get up and make a much

25 more draconian argument, which is the argument that we asked

1   for before which says, "You don't fill out the questionnaires,

2   your claim is" -- but I don't want to go down that road and we

3   don't have to.  All we want to do is to assure that anybody who

4   is going to be claimant at some point in this case actually has

5   to say, "I'm a claimant in connection with this questionnaire

6   process."  So I'm just raising it as a point.  Don't have to

7   just -- obviously there's no motion, I'm not suggesting that it

8   be decided, but it's a significant enough development that I

9   didn't want this hearing to go by without raising it with the

10   Court.

11          THE COURT:  Now --

12          MR. BERNICK:  And it's flagged because you don't have

13   the 2019 statements.

14          THE COURT:  Well, I mean if they're not represented by

15   counsel they won't have a 2019 statement on file --

16          MR. BERNICK:  But --

17          THE COURT:  -- but it's unlikely that 80% of the tort

18   claimants are not represented by counsel.

19          MR. BERNICK:  Well, we already know -- the reason that

20   we know of the 80% figure is we know who the claimants are.

21   They are represented by counsel because they've already

22   prosecuted claims, it's just that counsel -- their counsel has

23   not elected to file the 2019 statement in this bankruptcy case.

24          THE COURT:  Well, maybe we should do some sort of a

25   notice that alerts them that they better contact their

1  insurance carriers.  There are lots of them here.

2       MR. BERNICK:  And I'm surprised to see that after Your

3  Honor made that statement they're still here.

4       THE COURT:  Still here.  Mr. Herbert?

5       MR. HERBERT:  Your Honor, Mark Herbert from Campbell

6  Levine on behalf of the PI Committee.  If I were -- if I

7  remember correctly, and granted I wasn't -- had no idea that

8  this issue was gonna be brought up at this hearing, but if I

9  remember correctly, your 2019 Order said that if anyone has

10 entered their appearance or taken any action in this case they

11 are to file a 2019 statement, assuming they represent more than

12 one Creditor; which just as a side note, it seems to be an

13 issue for the carriers as well.  But that aside, your order

14 also said that if they're going to take any action there were a

15 certain time period in there for them to comply before, for

16 example, voting via master ballot and so forth and so on.

17 There was no obligation for them to do that.  My understanding

18 is a lot firms have gone ahead and done that anyway, but the

19 question was presented to us after your 2019 order was entered,

20 people were calling us saying, "Do I have to file this? -- you

21 know, "Does Judge Fitzgerald have jurisdiction to order for me

22 to file this?"  So forth and so on.  We typically recommended

23 that even though they did not have to comply, that they should.

24 A lot of 'em have filed.  And in fact, on the 2019 issue with

25 insurers just now Kaza & McClain filed, Cooney & Conway filed,

1   Peter Angelos' office filed.  It's a lot of firms that filed

2   just since late July.  And in fact, most of those firms were

3   supplemental, so I'm not really sure where Mr. Bernick's 20 --

4   80% number comes from, but we're creeping back to an asbestos

5   personal injury bar date again, which is -- has just been

6   inherent in this process ever since the middle of July, ever

7   since the questionnaire when they wanted -- if you didn't file

8   a claim, your claim was going to be expunged, which Your Honor

9   ruled was not appropriate and had to be taken out.

10          MR. BERNICK:  To make it clear -- and I -- and that's

11  a fair point because I wasn't being clear.  Number one, while a

12  lot firms have filed their 2019 statements, the firms with

13  large numbers of claims have not, and that's how -- why we get

14  to the 80%.  Second is this problem can be cured by expanding

15  the scope of the 2019 order.  I suppose that's one way to go,

16  but we really had a simpler way of proceeding.  We're not

17  seeking -- because we understood what Your Honor's direction

18  was, we are not seeking to bar claims because people don't fill

19  out their questionnaires.  What we are seeking to know is who

20  is going to be a claimant, and for purposes of making that

21  clear we would be seeking a bar date and they could satisfy

22  their obligation under the bar date either by submitting the

23  questionnaire or by simply submitting the Form 10, which a

24  simple piece of paper that says I got a claim.  So we're not

25  seeking to increase the penalty or impose any kind of penalty

1    for failing to submit a questionnaire.  We are seeking to make

2    sure that if somebody's going to elect to be a claimant in this

3    case, particularly those people who already elected to be

4    claimants as of the time the case was filed, that they do it

5    now.

6            THE COURT:  Well, look, it -- you're going to have to

7    file a motion.

8            MR. BERNICK:  We will.

9            THE COURT:  I don't know what else to say.  Just file

10   a motion and put it on the calendar because I think I did say

11   that the 2019 statement would be due before they could file

12   master ballots.  If they try to file master ballots and haven't

13   filed a 2019 statement they'll be disallowed and their clients

14   will not participate in any distribution out of the estate

15   because they will not have filed a ballot or a claim.  I mean,

16   that's the way it's going to be.  So --

17           MR. HERBERT:  Your Honor, our office continues to work

18   with people who are filing 2019 statements -- amended 2019

19   statements, supplemental, whatever you want.  But I'd just like

20   to point out in response to what Mr. Bernick just said, the

21   purpose of 2019, as Your Honor stated earlier in this hearing,

22   relates to counsel coming forward and representing multiple

23   carriers.  It's not to establish any sort of information for

24   his estimation.

25           MR. BERNICK:  I'm not asking for more 2019's.  We'll

1 make the motion, Your Honor.

2          MR. HERBERT:  Thank you.

3          THE COURT:  All right.

4          MS. BAER:  Your Honor, I now have the docket numbers

5 on those two stipulations.

6          THE COURT:  All right.

7          MS. BAER:  It's docket #9482, it was the Certification

8 of Counsel.

9          THE COURT:  All right, I'll take them, thank you.

10 It's two orders but one Certification?

11          MS. BAER:  It was one Certification that attached the

12 two stipulations --

13          THE COURT:  All right.

14          MS. BAER:  -- and both of them had a so ordered line

15 on the bottom.

16          THE COURT:  All right, 9482 --

17      (Pause in proceedings)

18          THE COURT:  Okay, those are both signed.

19          MS. BAER:  Thank you, Your Honor.

20          THE COURT:  Okay, anything else in Grace?

21          MR. HERBERT:  Your Honor, just one issue for

22 clarification if I -- related to the estimation, and I promise

23 to be quick about this.  Under the CMO for the estimation of

24 traditional property damage and liabilities there is a

25 requirement that a disclosure be made on October 3rd related to

1  fact witnesses and expert witnesses.  Essentially it's an

2  initial list of fact and expert witnesses.  That's kind of the

3  entre into the estimation process.  We've received a number of

4  calls from PD claimants who have individual claims, not members

5  represented by people on the Committee that have lots of

6  claims, but one off or two off claims.  And the questions that

7  they've raised are do they have to make the disclosure on

8  October 3rd that relate to the types of objections that go to

9  their individual claims that the Debtors wish to try on a

10 global basis.  And let me explain to you what I mean by that.

11 When the Debtors filed their Fifteenth Omnibus Objection, they

12 included in that a matrix of when they wished to hear certain

13 types of objections.  And some of those they listed as -- to be

14 heard on the phase hearing or the phase two hearing.  And

15 claimants have called with questions regarding whether or not

16 they now have to participate in the estimation process in order

17 to address those objections as to their individual claims.

18 They've called and they said, "We understood from the Court's

19 instructions that it's not required that individual

20 participants be part of the estimation, that it's elective, the

21 order provides for that."  And their question is is this

22 October 3rd deadline.  So my request is that we just push that

23 October 3rd deadline back as to individual claimants.  The

24 Committee will make those disclosures on October 3rd, but as to

25 individual claimants, we push that back until after the Court

1  makes a ruling as to what the scope of phase one of the

2  estimation is going to be to allow the individual claimants to

3  decide whether or not they wish to make an entre into the

4  estimation.

5      THE COURT:  All right, unless this is something that

6  everybody is stipulating to, people, file motions.  You know,

7  it's been an hour that we've been addressing housekeeping

8  matters that aren't on the agenda for today.

9      MR. BERNICK:  I tell you, this is a serious matter in

10  this case.  A lot of the themes that Your Honor has heard

11  before about who's doing what and who represents whom for what

12  purpose, and (indiscern.) -- I don't even know exactly what the

13  proposal is.  I heard October 24, now it's after Your Honor

14  rules on the phase one.

15      THE COURT:  Okay.  I don't understand what it is

16  either, but I'm not going to address these kinds of things in a

17  status conference.  I can't.  I need to see them in some sort

18  of principled fashion.  You don't necessarily have to give me

19  citations of authority, but you do need to let me know what

20  your argument is so I can put it together in context with the

21  documents and the other sides have a chance to talk.  I think

22  you folks should discuss this issue because we need to get

23  appropriate notice out.  It is elective.  I definitely want the

24  Committees disclosed by October 3rd, if there's some, you know,

25  slippage for individual people, I -- you know, maybe it's okay,

1  but it may not be because the Debtor needs to prepare too.  So

2  it seems to me if they want to participate, they should

3  disclose.

4        MR. HERBERT:  But Your Honor, I understand that, and I

5  apologize for not being on the agenda.  The confusion arose

6  primarily as a result of that matrix that was included in the

7  Debtor's objection, which wasn't filed until after the last

8  hearing that we had.  It was difficult for us to bring that

9  before you.

10        THE COURT:  Yes, I understand the problem, but you

11  know, I think you folks need to talk to each other about these

12  things before you raise them here because otherwise I don't get

13  them in any kind of fashion where there's been some even sense

14  of what's going on in the case from all of you.  So if you need

15  to, file a motion.  If you can come to some agreement, file a

16  Certification of Counsel and I'll amend the order.

17        MR. HERBERT:  Thank you, Your Honor.

18        THE COURT:  Okay, anything else?  All right, Grace is

19  adjourned, thank you.

20        (Court adjourned)

21                         CERTIFICATION
22  I certify that the foregoing is a correct transcript from the
23  electronic sound recording of the proceedings in the above-
24  entitled matter.
25
26  *Lewis Parham*                          10/4/05
27  _____        _____
28  Signature of Transcriber                Date