IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------)
In re                                                  )        Chapter 11
                                                       )
W. R. GRACE & CO., et al.,                             )        Case No.  01-01139 (JKF)
                                                       )        (Jointly Administered)
                                                       )
                              Debtors.                 )        Hearing Date:  November 14, 2005
                                                       )        Response Deadline: October 31, 2005
-------------------------------------------------------)
```

**MEMORANDUM OF LAW OF THE**
**OFFICIAL COMMITTEE OF ASBESTOS PROPERTY DAMAGE CLAIMANTS**
**IN OPPOSITION TO CONSIDERATION OF THE DEBTORS' PROPOSED**
**"METHODOLOGY ISSUE" AS PART OF**
**THE ESTIMATION OF ASBESTOS PROPERTY DAMAGE CLAIMS**

TO:     THE HONORABLE JUDITH K. FITZGERALD,
        UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Asbestos Property Damage Claimants (the "**PD Committee**") of the above-captioned debtors and debtors in possession (the "**Debtors**" or "**Grace**"), by and through undersigned counsel, respectfully files this memorandum of law in opposition to the determination of the so-called "Methodology Issue" (as hereinafter described) as part of the estimation of asbestos property damage claims (the "**PD Estimation**").  In support hereof, the PD Committee would show as follows:

**PRELIMINARY STATEMENT**

On August 29, 2005, the Court entered its Case Management Order for the Estimation of Asbestos Property Damage Liabilities (the "**PD CMO**").  Pursuant to the PD CMO, the PD Committee was directed to file a brief by October 17, 2005, addressing whether the so-called "Methodology Issue" should be addressed by the Court as part of

Phase I or Phase II of the PD Estimation, or not at all.  This memorandum of law is filed in compliance with such direction.

As framed by the Debtors, the "Methodology Issue" would entail two primary issues:  1) whether the dust sampling method (a) can be used to accurately determine the levels of airborne asbestos in buildings and (b) is scientifically reliable; and 2) whether a PD Claimant may only prove the existence of contamination through the use of air sampling to demonstrate a specific level of airborne fibers.  While the Debtors have fabricated and framed the "Methodology Issue" as concerning the admissibility requirement for expert testimony under Fed.R.Evid.702 and *Daubert*[1] and its progeny, upon closer scrutiny, they seek much more than a gatekeeper's finding of admissibility.

By framing the "Methodology Issue" as they have, it is apparent that what the Debtors really seek is to have this Court impose a quantitative risk model based on air sampling – as the sole means by which the holder (a "**PD Claimant**") of an asbestos property damage claim (a "**PD Claim**") can demonstrate contamination and injury. Courts in the underlying tort system have repeatedly refused to endorse the Debtors' construction of a quantitative risk model, holding that PD Claimants may prove contamination or injury resulting from the Debtors' asbestos-containing products ("**ACM**") by other methods, including the use of the scientific dust sampling method and the Environmental Protection Agency ("**EPA**") approved visual and physical evaluation method.

Incredibly, the Debtors have failed to even acknowledge to the Court that the air sampling method has been repeatedly and emphatically rejected by regulatory agencies and the courts as the primary assessment tool for assessing the hazards posed by the

---

[1]     *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).

Debtors' ACM or for determining the remedial action that PD Claimants should employ in response to such hazards.

The PD Committee urges the Court **not** to consider the "Methodology Issue" as part of either Phase I or Phase II of the PD Estimation for the following reasons:

1) the Debtors are attempting to improperly use the PD Estimation to disallow PD Claims that fail to provide proof of contamination via air sampling, or that use dust samples to prove contamination;

2) *Daubert* principles do not authorize the consideration of the "Methodology Issue" at this juncture and, in any event, only concern the reliability of expert evidence;

3) the PD Claims at issue in this bankruptcy case, unlike asbestos floor tile, are surface treatment ACM conclusively determined to be friable;

4) the use of a quantitative risk model based on air sampling as advocated by the Debtors would not be dispositive of any PD Claim because (a) air sampling is not a primary assessment method and it provides no information about asbestos fiber release potential or future asbestos fiber levels, and (b) it would inappropriately impose on PD Claimants the same burden of proof required for personal injury claims, as opposed to the burden of proof required for property damage claims;

5) dust sampling is an appropriate and scientifically reliable method to measure the amount of asbestos contained in surface dust or to establish that asbestos-containing materials ("**ACM**") release asbestos fibers in a building during normal use and building activities; and

6) the primary assessment method recommended and approved by EPA to assess the ACM's potential fiber release and the need for corrective action is the visual and

physical evaluation method performed by an individual accredited by the EPA.

Consequently, substantive consideration of the "Methodology Issue" will result in the needless expenditure of time, effort and money by the parties during the PD Estimation process without any attendant benefit.

## DISCUSSION

I.    **The Debtors' attempt to transform the PD Estimation from a process for determining the aggregate maximum value of all PD Claims into a determination of the value or allowance of individual PD Claims is improper.**

On November 13, 2004, the Debtors filed their joint plan of reorganization (the "**Plan**"). In connection with its consideration of the objections of the PD Committee and others to the approval of the disclosure statement accompanying the Plan, as well as certain overarching objections to confirmation of the Plan, the Court determined that it is essential to undertake estimations of the Debtors' asbestos liabilities, including filed PD Claims. In doing so, the Court observed that estimations of asbestos liabilities would be relevant and necessary in respect of *any* proposed plan of reorganization as the objective of the estimations is to determine the estimated aggregate value of all asbestos liabilities which will enable the Court to conclude whether any plan of reorganization is feasible.[2]

Neither the Bankruptcy Code nor the Federal Rules of Bankruptcy Procedure provide guidelines for the PD Estimation. By its express language, Section 502(c) of the Bankruptcy Code only applies to the estimation of an individual claim for purposes of *allowance* of such claim. Here the proposed PD Estimation is in respect of all filed PD Claims for purposes of determining how much must be distributed to holders of those PD

---

[2]    While the PD Committee has accepted the Court's direction to undertake an estimation of PD Claims, it nonetheless reserves all objections, rights (including rights on appeal), and claims to and in respect of the use of such process.

Claims under a plan of reorganization which, in turn, permits the Court to determine *feasibility* of any such plan.[3]

The estimation process, however, is not without limitation as it must (a) conform with the purpose of the Bankruptcy Code; (b) provide adequate constitutional protections; (c) consider the relevant legal rules that govern the value of the claim; and (d) ensure the process itself will not delay the conclusion of estimation. *See Bittner v. Borne Chemical Co., Inc.,* 691 F.2d 134, 135 (3rd Cir. 1982); *In re Windsor Plumbing Supply Co., Inc.,* 170 B.R. 503, 520 (Bankr. E.D.N.Y. 1994). Specifically, this Court is "bound by the legal rules which may govern the ultimate value of the claim[s] ... [and] those general principles which should inform all decisions made pursuant to the Code." *Bittner,* 691 F.2d at 135-36. Stated another way, although courts may use "whatever [estimation] method is best suited to the particular contingencies at issue," it is clear that under all circumstances they must apply pertinent state law governing the ultimate value of the claim. *Id.* at 135.

In *Owens Corning v. Credit Suisse First Boston,* the District Court cited this authority as the starting point for the estimation of the amount of contingent or unliquidated asbestos personal injury claims against Owens Corning:

> The claims being valued arise under state law, hence state law determines their validity and value. The basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law. The same principle applies to estimation proceedings under § 502(c). And claims are to be valued as of the petition date. This necessarily means that the claims are to be appraised on the basis of what would have been a fair resolution of the claims in the absence of bankruptcy.

---

[3]    It may well be more appropriate to refer to section 1129(a)(11) of the Bankruptcy Code as authority for the PD Estimation.

*In re Owens Corning*, 322 B.R. at 721-22 (internal citations omitted).

Courts have embraced section 502(c) as a means of assigning a dollar value to the whole of a debtor's mass tort liabilities since the Fourth Circuit's opinion in *In re A.H. Robins Co., Inc.,* 880 F.2d 709 (4th Cir. 1989).  We are unaware, however, of a single asbestos bankruptcy case in which a court has treated the estimation of asbestos claims as a limitation on the amount recoverable by asbestos claimants.  Indeed, in *Eagle-Picher,* the court instructed that "the purposes of estimation of asbestos claims are, first, so that a proper allocation of plan funding assets can be made as between the unsecured creditors and the [524 (g) trust] created by the plan, and, second, whether there is any equity available for equity security holders."  *See In re Eagle-Picher Indus., Inc.*, 189 B.R. 681, 682 (Bankr. S.D.Ohio 1995).  On that basis, the court in *Eagle-Picher* "would not decide liability or assign a permanently fixed value for such claims." *Id.*

Estimation, therefore, may be viewed as an *alternative* to individual claim-by-claim allowance otherwise afforded by section 502(c) of the Bankruptcy Code, and should be structured in light of the basic principles underlying allowance.  If, as in this case, a debtor's liability for unliquidated property damage claims is overwhelming---with claims numbering in the thousands---estimation is mandatory because claim-by-claim adjudication would unduly delay administration of the estate.  *See* 11 U.S.C. § 502(c); *see also In re Continental Airlines*, 981 F.2d 1450, 1461 (5th Cir. 1993)("In order for the estimation process of § 502(c) to apply, a claim must be contingent or unliquidated and fixing the claim must entail undue delay in the administration of justice.").  Moreover, although the magnitude of the Debtors' liability to PD Claimants is enormous, such circumstances cannot justify nullifying protections for injured claimants that would apply

6

if their claims were few in number, and thus adjudicated and ultimately liquidated. *See In re UNR Indus., Inc.*, 45 B.R. 322, 325 (N.D. Ill. 1984)(rejecting argument in bankruptcy case involving 17,000 asbestos claims that district courts can conduct "summary hearing" in lieu of full-blown trial, as debtor "points to no statute or rule that either authorizes this departure from normal practice or explains what procedures constitute a 'summary hearing'"). At a bare minimum, then, any estimation must account for basic due process and bankruptcy principles for determining the amount and validity of claims.

The District Court in *Owens Corning* further elaborated on the task at hand when estimating aggregate claims:

> The overall task at this point in the litigation is to determine what each class of creditors has at stake in the reorganization. In the case of the Banks and Bondholders, it is the amount specified in their various agreements. In the case of the asbestos claimants, it is the amount they had a legitimate right to expect as compensation for their injuries. <u>We are not, at this time, deciding how much each claimant will actually be entitled to receive</u>, but the total amount which the claimants, as a group, could legitimately have claimed as compensation, as of the petition date.

*Owens Corning*, 322 B.R. at 722 (emphasis added).

As with *Owens Corning*, the *In re Federal-Mogul* court underscored that the estimation of claims must be focused on aggregate liability and "not the merits of individual or class of individuals claims. To do the latter, would require that each claimant be afforded the procedural protections of the due process clause of the Fifth Amendment...." *In re Federal-Mogul Global, Inc.,* 330 B.R. 133, 154 (D. Del. 2005); *see also In re G-I Holdings, Inc.,* 323 B.R. 583, 622 (Bankr. D. N.J. 2005)(in rejecting the debtor's attempts to liquidate individual asbestos personal injury claims during estimation, the court concluded: "This Court agrees that the estimation proceeding

pursuant to § 502(c) of the Code should estimate the asbestos liability of [the debtor] in the aggregate."); *In re Baldwin-United Corp.*, 57 B.R. 751, 758 (S.D. Ohio 1985)(court refused in context of estimation to decide liability or assign permanently fixed value to claim); *In re Eagle-Picher Indus., Inc.*, 189 B.R. at 682 (the court instructed that "the purposes of estimation of asbestos claims are, first, so that a proper allocation of plan funding assets can be made as between the unsecured creditors and the [524(g) trust] created by the plan, and, second, whether there is any equity available for equity security holders;" and on that basis decided it "would not decide liability or assign a permanently fixed value for such claims.").  The same reasoning should apply to the PD Estimation here.[4]

From the foregoing, two keystone principles emerge which dictate against the determination of the "Methodology Issue" as part of the PD Estimation. First, the objective of the PD Estimation is to estimate what value would have been affixed to the filed PD Claims in the tort system as of the petition date had the Debtors not gone into bankruptcy.  Second, the PD Estimation shall not determine the value or allowance of any individual PD Claims.  Thus, the "Methodology Issue" has no relevance or bearing on the task at hand.

Taking advantage of the fact that there has never been an estimation of asbestos property damage claims in an asbestos bankruptcy case, the Debtors seek the Court's imprimatur on their own fanciful methodology and constructive notice standards to

---

[4]    While the *Bittner* court recognized that an ultimate merits determination may, on occasion, be appropriate in estimation, in each case in which such a determination was made, individual claimants were actual participants in the estimation and could defend the merits of their individual claims.  *See, e.g., Bittner*, 691 F.2d at 137*; see also In re Baldwin-United Corp.*, 55 B.R. 855 (Bankr. S.D. Ohio 1985).  However, that is not the case here as PD Claimants may, but need not, participate in the PD Estimation.

effectuate a wholesale *liquidation* of almost all PD Claims![5]  In so doing, the Debtors brazenly suggest without a scintilla of support that the Court may utilize the estimation process to sweep under the rug unfavorable decisions and verdicts against the Debtors over the last twenty years concerning their property damage liabilities.  The estimation of PD Claims does not and cannot serve the illegitimate purpose of liquidating the amount of individual PD Claims for purposes of distributions under the plan.  Rather, if the Debtors wish to avail themselves of section 524(g), each PD Claim must be allowed and paid by the 524(g) trust, and if the aggregate of such PD Claims exceed their estimated aggregate values, the Debtors must provide a means for the payment of such excess.  *See In re Combustion Engineering*, *Inc*., 391 F.3d 190 (3d Cir. 2004).

## II.    The Debtors' attempt to enlist *Daubert* is unavailing.

In 1993, the Supreme Court in *Daubert* addressed the role that the trial judge is to play in determining the admissibility of expert testimony based on scientific principles or theories.  Focusing on the language of Fed. R. Evid. 702 as then in effect,[6] the *Daubert* court "assign[ed] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 597.  The opinion, which initially applied only to scientific knowledge, simply requires

---

[5]      The PD Committee will address the Debtors' attempt to bar almost all PD Claims through their purely fabricated constructive notice standard in a separate paper to be filed with the Court on or before October 31, 2005, in accordance with the PD CMO.

[6]      Fed. R. Evid. 702 (Pub.L. 93-595, § 1, Jan. 2. 1975, 88 Stat. 1937), formerly provided:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

that to be admissible expert witness testimony be found to "assist the trier of fact" as required by Fed. R. Evid. 702. *Id.* at 591-92.

*Daubert* also requires that experts have "good grounds" for their opinions and provides five factors for determining the reliability of a technique or theory: 1) whether the theory or technique has been or can be tested; 2) whether the theory or technique has been subjected to peer review or publication; 3) the error rate, if any; 4) whether there are standards maintained for the application of the theory or technique; and 5) whether the theory or technique has been generally accepted by experts in the pertinent field. *Id.* at 590-595.

Prior to *Daubert*, the majority of federal courts applied a "general acceptance test" when determining whether to admit expert testimony based on scientific principles or theories. This test was adopted from a 1923 decision by the District of Columbia Court of Appeals in which it was held that an expert's testimony about a device that was a crude ancestor to the polygraph machine was not admissible. *See Frye v. U.S.*, 293 F. 1013, 1014 (App.D.C. 1923). The *Frye* court indicated that the admission into evidence of expert testimony deduced from a scientific principle or discovery requires "the thing from which the deduction is made [to] be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Id.*

The *Frye* standard was extremely restrictive. It severely limited testimony in emerging and evolving fields of science, technology, business, and other disciplines, as well as testimony by individuals who had special knowledge, skill, experience, training, or education. The *Frye* standard excluded expert testimony on new scientific matters that was reliable and reproducible but not yet "generally accepted" in the scientific

community. *See, e.g., Daubert,* 509 U.S. at 583-84 (discussing lower court's refusal to admit the testimony of eight highly-credentialed experts that was based upon live animal and test tube studies because only epidemiological studies were "generally accepted"); *see also Admissibility & Weight of Voice Spectrographic Analysis Evidence*, 95 A.L.R.5th 471 (2005) (noting that the majority of courts that have excluded voice spectrographic analysis evidence have applied the *Frye* test in doing so). Similarly, it excluded expert testimony on new scientific matters where competing theories existed and in which there was no consensus in the scientific community. *Id.* Thus, *Frye* failed to take into account that science is not static but dynamic and continuously evolving.

By its decision in *Daubert*, the Supreme Court confirmed that *Frye* had been superseded. *See Daubert*, 509 U.S. at 589 n.6. Again, focusing on the language of Fed. R. Evid. 702 as then in effect, the *Daubert* Court found no justification for the "generally accepted" standard of *Frye*, and specifically noted the "liberal thrust" of the Federal Rules of Evidence and their general approach of relaxing the requirements for admission of expert testimony. *See Id.* at 588-89

The decisional law from the Supreme Court and the Third Circuit since *Daubert* confirms the flexibility of the reliability concept, as well as the liberal admissibility threshold embodied in Fed. R. Evid. 702.[7] The Third Circuit has also distilled the essence of Fed. R. Evid. 702 to embody three distinct substantive restrictions on the admission of expert testimony: <u>qualifications</u>, <u>reliability</u>, and <u>fit</u>. *See Elcock v. Kmart*

---

[7]    *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 154, 156 (1999); *U.S. v. Mitchell*, 365 F.3d 215, 245 (3d Cir. 2004) *citing In re Paoli R.R. Yard PCB Litig*., 35 F.3d 717, 741 (3d Cir. 1994) ("*Paoli II*"); *Elcock v. Kmart Corp*., 233 F.3d 734, 741 (3d Cir. 2000); *In re Unisys Sav. Plan Litig*., 173 F.3d 145, 162 (3d Cir. 1999) *citing Habecker v. Copperloy Corp.,* 893 F.2d 49, 51 (3d Cir.1990); *accord Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998); *Holbrook v. Lykes Bros. S.S. Co., Inc*., 80 F.3d 777, 782 (3d Cir. 1996); *U.S. v. Downing*, 753 F.2d 1224, 1230 (3d Cir. 1985); *Knight v. Otis Elevator Co*., 596 F.2d 84, 88 (3d Cir. 1979); *see also Kannankeril v. Terminix Int'l, Inc*., 128 F.3d 802, 806 (3d Cir. 1997)); *In re Paoli R.R. Yard PCB Litig.,* 916 F.2d 829, 855 (3d Cir. 1990) ("*Paoli I*").

*Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) *citing Paoli II*.[8]  Cases decided after *Daubert*

have expanded the list of pertinent factors to be assessed by the trial court in its role as

gatekeeper.  *See e.g., Paoli II*, at 742 n.8 (articulating eight factors: 1) whether a method

consists of a testable hypothesis; 2) whether the method has been subject to peer review;

3) the known or potential rate of error; 4) the existence and maintenance of standards

controlling the technique's operation; 5) whether the method is generally accepted; 6) the

relationship of the technique to methods which have been established to be reliable; 7)

the qualifications of the expert witness testifying based on the methodology; and 8) the

non-judicial uses to which the method has been put); *see also* FED. R. EVID. 702, advisory

committee's note.[9]  All of the foregoing points to the liberal flexibility to be applied by

the Court in making admissibility decisions.

---

[8]         Other federal courts of appeal have similarly recognized the liberal thrust for admission of expert
testimony.  *See U.S. v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005) (district court's decision to allow
expert testimony is consistent with the "liberal thrust of the Federal Rules and their general approach of
relaxing the traditional barriers to opinion testimony."); *Nimely v. City of New York*, 414 F.3d 381, 395 (2d
Cir. 2005) ("It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for
expert opinions, representing a departure from the previously widely followed, and more restrictive,
standard of *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923)."); *Dorn v. Burlington Northern Santa
Fe R.R. Co.*, 397 F.3d 1183, 1196 (9th Cir. 2005) (noting liberal admissibility of expert testimony); *U.S. v.
Frazier*, 387 F.3d 1244, 1293-94 (11th Cir. 2004) (noting that the admissibility standard in Rule 702  is a
liberal one, "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the
*exception* rather than the rule.") (emphasis in original).  As recognized by the Eleventh Circuit in *Frazier*:

> Courts have found that an abuse of discretion occurs when under *Daubert* the
> admissibility bar is too high....Trial judges must exercise sound discretion as gatekeepers
> of expert testimony under *Daubert*.... We must not elevate them to the role of St. Peter at
> the gates of heaven, performing a searching inquiry into the depth of an expert witness's
> soul--separating the saved from the damned.

*Id.* at 1294 (internal quotations and citations omitted); *see also Lauzon v. Senco Products, Inc.*, 270 F.3d
681, 686 (8th Cir. 2001)(referring to Rule 702: "[t]he rule clearly 'is one of admissibility rather than
exclusion.'").

[9]         Other decisions recognize that certain factors are inapplicable in certain contexts.  *See, e.g., Tyus
v. Urban Search Management*, 102 F.3d 256 (7th Cir. 1996)(noting that the factors do not neatly apply to
expert testimony from a sociologist); *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997)
(holding that lack of peer review or publication was not dispositive where the expert's opinion was
supported by "widely accepted scientific knowledge").

Thus, *Daubert* did more than overrule *Frye*; it also amplified the intent and purpose of Fed. R. Evid. 702. *Daubert* relegates the trial court's gatekeeper role to assessing whether the expert's opinion is scientifically sound and can assist the trier of fact to understand the evidence or determine a fact in issue. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997)(holding that Federal Rules of Evidence leave in place the "gatekeeper" role of the trial judge in screening evidence); *Kumho*, 526 U.S. at 141 (acknowledging that *Daubert's* general holding – setting forth the trial judge's general "gatekeeping" obligations – applies not only to testimony based on scientific knowledge, but also to testimony based on "technical" and "other specialized" knowledge).

Most importantly, decisional law demonstrates that the Court's gatekeeper role is limited solely to determining the reliability of the expert's principles and methodology, without regard for the conclusions the expert has reached or the correctness of those conclusions. *See Daubert*, 509 U.S. at 595; *Amorgianos v. Nat'l R.R. Passenger Corp*., 303 F.3d 256, 266 (2d Cir. 2002)("In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions."). The *Daubert* Court reasoned that once the expert's opinion was admitted, it would be subjected to the adversarial process – cross examination and contrary expert opinion – leaving to the trier of fact the traditional function of weighing the testimony and determining the credibility of the witness. Also, reliability and correctness are not functionally the same:

> This does not mean that plaintiffs have to prove their case twice -- they do not have to demonstrate to the judge by a preponderance of evidence that the assessments of their experts are *correct*, they only have to demonstrate by a preponderance of evidence that their opinions are reliable.

*Paoli II*, 35 F.3d at 743-44 (emphasis in original).

The whole gist of the "Methodology Issue" as framed by the Debtors is that dust sampling is not the correct methodology to determine contamination, and in turn, air sampling provides the sole means for determining whether there is a hazard sufficient to justify removal of the Debtors' ACM.  What the Debtors seek to determine now is whether the conclusions of those performing dust sampling are correct, not just whether the methodology used to reach such conclusions is reliable. The Debtors look to *Daubert* as authority for making such a determination; however, as the foregoing amply demonstrates, *Daubert* provides no such platform for what the Debtors seek.

As shown above, under Fed. R. Evid. 702, a trial judge must ensure that any and all scientific testimony or evidence is reliable and relevant, but the court ought not to make some *preliminary* analysis of which scientific technique or data makes the most sense to employ in a particular case.  If the threshold criteria of relevance and reliability are met, the inquiry stops there.  The weight, or the validity of the conclusions based upon the data is to be determined by the trier of fact.  Such a determination is not a threshold, or "gatekeeper," issue, but is made after the development of facts during discovery.  The Debtors try to undercut this principle and turn *Daubert* on its head by disguising the weight of the evidence analysis as a gatekeeper or threshold issue to be made prior to any discovery or the development and determination of specific facts relevant to the PD Claim(s).[10]

---

[10]      As stated in the 2000 amendment of FED. R. EVID. 702 advisory committee's notes, a review of the case law after *Daubert* did not work a "sea change over federal evidence law, and the trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system." (Citations omitted).

In fact, what the Debtors really attempt is to transform *Daubert* evidentiary principles into the elements of a *prima facie* case. However, there is no authority for that proposition, particularly in environmental and toxic tort cases. The Debtors' attempt must fail as *Daubert* is a procedural tool, not a substantive component of a cause of action.[11]

**III.    PD Claims involving Grace's surface treatment fireproofing and acoustical ACM products, unlike non-friable ACM, are based upon substantial legal precedent in the underlying tort system, and are the primary object of EPA regulations and Federal law dealing with ACM in buildings.**

For more than twenty years before the commencement of this bankruptcy, the owners, lessors and operators of buildings litigated asbestos property damage claims against Grace, winning substantial jury verdicts and hundreds of millions of dollars in settlements in numerous cases in state and Federal courts throughout the country. Indeed the first property damage cost recovery case was filed against Grace almost 25 years ago.[12] The first jury verdict awarding compensatory and/or punitive damages was also awarded almost twenty years ago.[13] During the years 1988 through 1997 alone, Grace paid hundreds of millions of dollars to settle numerous consolidated or class action lawsuits and individual property damages cases, representing thousands of individual property damage claims.[14] The issues Grace now attempts to raise as obstacles to the

---

[11]       *See, e.g., Legg v. Chopra*, 286 F.3d 286 (6th Cir. 2002), stating Fed. R. Evid. 702 concerns procedural issues.

[12]       *See Dayton Independent School District, et al. v. W.R. Grace & Co., et al. ("Dayton I")*, No. B-81-277-CA Consolidated with No. B-81-293-CA, in the United States District Court for the Eastern District of Texas, Beaumont Division *(1981)*.

[13]       S*ee City of Greenville v. W.R. Grace,* 827 F.2d 975 (4th Cir. 1987).

[14]       *See Dayton Independent School District, et al. v. U.S. Mineral Products Co., et al.,* ("*Dayton II*"), No. B-87-00507-CA, in the United States District Court for the Eastern District of Texas, Beaumont Division); *see also Kirbyville Independent School District, et al., Individually, and on Behalf of All Texas*

allowance of PD Claims, including its objection to the use of dust sampling and its proposed quantitative risk model based solely on air sampling, have been raised time and again in the underlying tort system and in challenges to Federal regulations and Grace virtually always lost.

Grace now tries to place some time and distance between its present circumstance and its history in the tort system by once again attempting to resurrect worn out theories previously roundly rejected by numerous courts throughout the country. Although Grace has changed the forum by filing this bankruptcy, it cannot find shelter from the numerous decisions of Federal and state courts which are squarely contrary to the positions it now seeks to re-assert. This is certainly true with regard to Grace's claim that the only way that a PD Claimant may establish property damage or injury is through the use of air monitoring to demonstrate some as yet unrevealed quantitative level of asbestos fibers. *See infra,* Section IV. Grace's claim that the air sampling method has wide acceptance as a primary method to assess the hazards and potential hazards associated with its friable ACM is also frivolous. *See infra,* Section V. Grace's claim that the dust sampling method is not accepted and/or is scientifically unreliable is also wrong. *See infra,* Section VI.

Surface treatment ACM is the primary object of Federal laws and regulations dealing with ACM in buildings. The reason is quite simple. These friable materials have a characteristic tendency to delaminate, crack, dust, fall out and release millions of invisible asbestos fibers. These fibers float in the building's air and are carried throughout the building where they are deposited upon building surfaces such as walls,

---

*Political Entities v. Asbestospray Corporation, W.R. Grace & Co.-Conn., and United States Gypsum Company,* No. 1:94CV412 (E.D. Tex.); *see also Central Wesleyan College v. W.R. Grace,* 143 FRD 628 (DSC 1992), *affd* 6 F3d 177 (4th Cir. 1993).

desks, and carpets – subject to being re-entrained in the air by normal and routine building activities. In 1987, Congress passed the *Asbestos Hazard Emergency Response Act* ("**AHERA**") pursuant to which the Environmental Protection Agency published its *Asbestos-Containing Materials in Schools* regulations.[15] Under the AHERA regulations public school districts with significantly damaged friable surfacing ACM are required to undertake response actions including removal. Friable ACM that has the potential for significant damage and is present in a building must be removed as soon as possible if appropriate preventive measures cannot be effectively implemented.[16] Unlike floor tile ACM, Grace's friable surface treatment ACM must be removed at the latest prior to major renovation or demolition of the building pursuant to the *National Emission Standards for Hazardous Air Pollutants* ("**NESHAP**").[17]

This background places an entirely different light on the issues that Grace now seeks to raise before this Court. Contrary to the impression Grace seeks to promote that it is raising issues that have not been resolved in the underlying litigation or, are issues of first impression, the matters before the Court have long been settled in state and Federal courts where the underlying claims have been litigated.

**IV. PD Claims require proof of injury or damage to property and courts have consistently rejected the Debtors' attempts to construct a quantitative risk model based on air sampling as this would inappropriately impose in respect of PD Claims the same burden of proof required for asbestos personal injury claims.**

In essence, while the Debtors shroud the "Methodology Issue" in the cloak of *Daubert*, they *seek* to transform the inquiry from a determination of whether air sampling

---

[15]     *See* 40 C.F.R. § 763 et. seq. (enacted October 30, 1987).

[16]     *Id.* at § 763.90.

[17]     *See* Asbestos NESHAP Rules, 40 C.F.R. §61, et. seq. (1984, Rev. 1988 & 1990).

and dust sampling are scientifically reliable so as to be admissible in a merits-based estimation, to a determination that certain levels of ambient asbestos as measured by air sampling must exist to give rise to an allowable PD Claim.  Such an extension is not only unwarranted but, in fact, has been expressly rejected by almost every court that has addressed this issue, as well as by the Federal agency given regulatory responsibility for ACM in buildings.

The Debtor's insistence on a quantitative risk model measured by air sampling is an attempt to blur the obvious distinction between a property damage claim and a personal injury claim. A property damage claim requires proof of contamination to property by the defendant's hazardous asbestos fibers, but not that the contamination has caused personal injury.  In *Perlmutter v. U.S. Gypsum Co*., 4 F.3d 864 (10th Cir. 1993), the Tenth Circuit affirmed in part a jury verdict in favor of a building owner which brought a tort action against the manufacturer of an acoustical plaster product containing asbestos to recover the costs of removing and replacing the product.  The court concluded that the plaintiff had met its burden to prove injury or damage to property:

> At trial, (plaintiff) did more than present evidence that the Audicote plaster . . . contained asbestos or that the plaster could release asbestos dust if disturbed or allowed to flake or crumble … *the (plaintiff) showed that there were significant amounts of asbestos fibers not only on top of a display case but also near an information booth, as well as in an area near certain lighting fixtures and on carpeting* . . .  There was also expert testimony that given the condition of the asbestos, it needed to be removed.

*Id*. at 868 (emphasis added).[18]

---

[18]      In *Adams-Arapahoe School Dist. No. 28-J v. GAF Corp.*, 959 F.2d 868 (10th Cir. 1992), a school district brought claims against various manufacturers of asbestos-containing products, including vinyl asbestos floor tile ("**VAT**"), from public school buildings.  At the trial relating to VAT, the court recognized the viability of VAT claims and the jury returned a verdict in favor of plaintiff and against GAF.  On appeal, the Tenth Circuit reversed holding that *"contamination," not health risk, is the standard*

Courts in the underlying property damage cases have held that there is <u>not</u> a requirement that a PD Claimant show release of asbestos fibers sufficient to cause injury to a person. In *City of Greenville v. W.R. Grace,* 827 F.2d 975 (4th Cir. 1987), the court upheld a jury verdict for the plaintiff as the jury could have reasonably found the subject building to be contaminated by significant amounts of asbestos from Grace's ACM based upon dust samples tested by the plaintiff's experts. The court observed:

> In this case, Greenville cannot be precluded from asserting a claim for negligence on the part of Grace simply because none of the occupants of the Greenville City Hall has yet developed an asbestos-related disease. Such diseases may not develop until decades after exposure to asbestos. We think that a plaintiff such as Greenville should not be required to wait until asbestos-related disease manifest themselves before maintaining an action for negligence against a manufacturer whose product threatens a substantial and unreasonable risk of harm by releasing toxic substances into the environment.

*Id*. at 978.[19]

The Debtors' argument is premised on the assumption that a certain level of airborne asbestos must be present as measured by air sampling for there to be a hazard that justifies removal of the ACM.[20] This assertion is not new. It is precisely the same

---

*in a property damage case in Colorado and that dust sampling was one of the sources of proof it would look to for evidence of contamination* (emphasis added). The court found that under Colorado tort law, a tort action as to VAT could be sustained if plaintiffs "explicitly allege and subsequent evidence demonstrates contamination of the building or other property as a result of fibers released from asbestos products." *Id.* at 872.

[19]      *See, e.g., School Dist. Of City of Independence, Mo., No. 30 v. U.S. Gypsum Co.,* 750 S.W.2d 442, 454-56 (Mo. Ct. App. 1988); *see also Tioga Pub. Sch. Dist. No. 15 of Williams Cty., State of N.D. v. U.S. Gypsum Co.,* 984 F.2d. 915, 919 (9th Cir. 1993).

[20]      At the July 19, 2005 omnibus hearing, counsel for the Debtors stated:

> So, the question about whether this asbestos in place needs to be removed is very much a live issue, and we're here under *Daubert*. And if that constitutes an unreasonable risk under methodologies that are available to the scientific community in the risk models, then we lose. But if, under the methodologies that are in those models, these are background levels of risk, then we win.

Hearing Transcript, p. 41. <u>See</u> Exhibit E attached hereto.

argument previously made by the Debtors and other manufacturers of asbestos-containing building products in *Safe Bldgs. Alliance v. E.P.A.*, 846 F.2d 79 (D.C. Cir. 1988).[21]   In that case, the "Safe Buildings Alliance" and manufacturers of ACM argued that EPA regulations promulgated pursuant to the *Asbestos Hazards Emergency Response Act*, 15 U.S.C.A. §§ 2641-2654, must be set aside because EPA failed to determine what levels of asbestos exposure were safe, or to require the use of air monitoring as the sole or primary assessment method to determine the need for corrective action.   The United States Court of Appeals for the District of Columbia found this argument to be meritless.

In *Safe Bldgs. Alliance,* the D.C. Court of Appeals *rejected the very proposal which the Debtors would now have this Court adopt* – the construction of a quantitative model for determining hazard that would be measured solely by the air sampling method. In rejecting this argument the Court of Appeals stated:

> *Congress nowhere said that EPA need rely exclusively or even mainly on air monitoring techniques* (emphasis added) in selecting response actions, or that it need establish a quantitative measure that it deems safe.  Indeed, the legislative history affirmatively suggests an intent not to impose such requirements. . . . Indeed, the petitioners' insistence that EPA construct a quantitative model before it do anything else offends common sense as well as congressional intent, for the *potential* hazards posed by presently undamaged ACM obviously could not be quantified or measured by air monitoring techniques (emphasis in original).

*Id*. at 83.

Instead, the Court approved the approach adopted by EPA which relies on visual and physical evaluation of the condition of the ACM, the location and accessibility of the ACM and the potential for disturbance of the ACM, determined by inspectors accredited

---

[21]     Grace was a charter member of the "Safe Buildings Alliance," an industry lobby group which was formed to advance the manufacturers' position that it was unnecessary to abate or remove ACM in buildings.

in conformity with EPA regulations, as the primary assessment tool or monitoring technique. *Id.* at 82.

Even more absurdly, the Debtors ask the Court to completely disregard any evidence of airborne asbestos levels that may be obtained during normal and foreseeable building activities and operations. *See Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims*, p.41, ¶127. Rather than conduct air sampling under actual building conditions where building maintenance and/or custodial personnel may routinely be exposed to asbestos fibers released by Grace's ACM, the Debtors would propose that the Court only consider "passive" air sampling. The reason for this is quite simple – Grace has long recognized that building occupants and/or third-party contractors who may disturb or come into contact with Grace's ACM will be exposed to hazardous levels of asbestos fibers. *See City of Greenville v. W.R. Grace & Co.,* 640 F.Supp. 559, 568 (D.S.C. 1986), *aff'd,* 827 F.2d 975 (4th Cir. 1987), *reh'g denied,* 840 F.2d 219 (4th Cir. 1988).

**V.     Air sampling is not a primary assessment tool for evaluating ACM in buildings and is only recommended to be used as a supplement to visual and physical inspection.**

EPA has continually and emphatically rejected the use of air sampling as a primary tool for assessing or determining appropriate responses to in-place ACM. In *Guidance for Controlling Asbestos-Containing Material in Buildings*, June 1985 (the "**Purple Book**"),[22] EPA discussed the need to determine the likelihood of fiber release from ACM, stating:

> The possibility of fiber release should be assessed by evaluating the material's condition, physical characteristics, and location. Another

---

[22]     A copy of the relevant pages is attached hereto as Exhibit A.

approach is to measure the current levels of asbestos in the air. As explained below, however, *assessment by air monitoring alone is not recommended* because it reflects conditions only at the time of sampling….

*Id.* at 4-2 (emphasis added).

EPA again rejected the use of air monitoring as a primary technique for assessing hazards in its 1987 AHERA, although several commentators, primarily from the asbestos industry, encouraged EPA to do otherwise. EPA stated:

> EPA continues to discourage the use of air monitoring as the primary technique for assessing asbestos hazards, since that method only measures current conditions and provides no information about potential and future levels of fiber release…the agency believes that such standards used for the purposes of assessing asbestos hazards could not ensure protection of human Health and the Environment as intended by USCA Title 11.

52 Fed. Reg. 210, 41838 (EPA October 30, 1987).

EPA again reaffirmed its stance that visual and physical assessment of ACM is the best method for determining response actions to ACM in its 1990 publication *Managing Asbestos In Place – A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials,* July 1990 (the "**Green Book**"). In this publication EPA states: "*… air monitoring should supplement, and not replace, physical and visual inspection* [emphasis in original]. *Visual inspection can recognize situations and anticipate future exposure (e.g., worsening water damage), whereas air monitoring can only detect a problem after it has occurred, and fibers have been released.*" (emphasis added). *Id.* at 14.[23] Further, in connection with use of air sampling, EPA cautions that:

> It should be noted that some of the exposures of persons to airborne asbestos fibers in buildings may result from episodic events, such as repair work or the accidental disturbance of ACM or of ACM debris by

---

[23]    A copy of the relevant pages is attached hereto as Exhibit B.

> maintenance activities inside the building. *Air monitoring may not be done frequently enough to include such episodic events; this can lead to a misleading interpretation of air sampling results. In particular, air sampling may underestimate the exposure of O&M workers and building occupants.*

*Green Book* at 15 (emphasis added).

The Debtors' contention that the "Methodology Issue" somehow facilitates construction of risk models by which air sampling results will determine whether removal is necessary is pure fantasy. The Debtors' approach has been consistently rejected. In *City of Greenville,* the trial court observed:

> Grace's defense was built largely on a day of air testing in the building a year before trial which was criticized by Greenville's experts as merely a "snap shot" of the conditions that day. The jury could reasonably have found such evidence unconvincing as a measure of the present and future contamination of the City Hall and rejected it as a reliable indicator of the need for removal. *Not only has EPA cautioned against heavy reliance on air testing*, but Grace's experts, who took and analyzed the air samples in the City Hall, had recommended removal for other clients without air testing.

640 F.Supp. at 568 (emphasis added).

As discussed above, the levels of airborne asbestos present in a building as measured by air sampling is a moment or snap-shot in time and is not dispositive of any PD Claims.

**VI.     Courts throughout the country have consistently found that dust sampling is scientifically reliable and relevant in property damage cases.**

The Debtors' assertion that dust sampling is not a scientifically reliable method for determining that asbestos fibers are released from their products during normal building uses and activities, as well as measuring the amount of asbestos in the surface dust, is patently false. Moreover, courts throughout the country have repeatedly and consistently found dust sampling to be scientifically reliable and relevant in asbestos

property damage cases and denied motions to exclude expert testimony relating thereto. PD Claimants are entitled to introduce results from dust samples taken in buildings to demonstrate the amount of asbestos in surface dust and to establish that the Debtors' products release fibers and thus, that their buildings have been contaminated.

To begin, the dust sampling method involves the collection and analysis of settled dust taken from surfaces within a building. Typically, the dust is vacuumed from a surface into a tube which filters the dust into a cassette. The dust collected in the cassette is removed and mixed in a solution of water and hydrochloric acid. The solution is diluted, shaken and allowed to settle, then placed in an ultrasound bath and sonicated. The solution is then analyzed under a microscope to determine the presence and amount of asbestos fibers. *See Celotex Corp. v. AIU Ins. Co. (In re Celotex Corp.)*, 196 B.R. 973, 986 (Bankr. M.D. Fla. 1996). Typically, dust sampling is conducted according to the procedures of ASTM D5755,[24] a copy of which is attached hereto as Exhibit C. The

---

[24]    The American Society for Testing and Materials ("ASTM") is a non-profit organization that was founded in 1898. For more than 100 years, ASTM has operated as a scientific and technical organization that has developed standards on characteristics and performance of materials, products, systems and services. ASTM has approximately 34,000 members consisting of individuals, corporations, and organizations in the areas of science and technology from 100 different nations concerned with the development of standards in various industries. In 1995, ASTM approved Standard D5755, formally known as The American Society for Testing and Materials, ASTM D5755 Method: *Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Concentrations* ("ASTM D5755"). ASTM D5755 has also been approved by the American National Standard Institute ("ANSI"). ANSI is a private, non-profit organization, which was founded in 1918 by 5 engineering societies and 3 government agencies to coordinate voluntary standardization and conformity assessment of American National Standards. For more than 80 years, ANSI has supported U.S. and global standardization and currently is the sole U.S. member of the International Organization for Standardization ("ISO") and the International Electrotechnical Commission ("IEC"), the two major non-treaty international Standards Organizations. Through the National Institute for Standards and Technology ("NIST"), an agency of the U.S. Department of Commerce, the U.S. government participates in ANSI Committees and recognizes ANSI's role as the U.S. representative to ISO and IEC. ASTM is accredited by ANSI to develop standards.

Debtors will undoubtedly challenge the reliability of ASTM D5755; however, ASTM D5755 has been accepted by the scientific community for a long time.[25]

Whereas the dust sampling method is designed to identify the presence and concentration of asbestos in dust that has settled on building surfaces, the air sampling method is designed to determine the level of respirable airborne asbestos at a given point in time under conditions which exist only at the time of sampling.[26]  *See Celotex*, 196 B.R. at 986.  Air sampling involves the collection of air samples in a building in a collecting filter.  The contents of the filter are then analyzed under a microscope to determine the presence and amount of asbestos fibers.  *Id.*

The use and acceptance of dust sampling to establish contamination is not of recent origin.  The Fourth Circuit in *City of Greenville* affirmed a jury verdict in favor of the building owner, finding that the jury could have reasonably found the subject building to be contaminated by significant amounts of asbestos released from Grace's ACM based upon dust samples tested by plaintiff's experts.  *See also Perlmutter v. U.S. Gypsum*, 4 F.3d 864, 868 (10th Cir. 1993)(finding that significant amounts of asbestos fibers on top of a display case, near an information booth, and on carpeting was sufficient to overcome a motion for directed verdict); *Tioga Pub. Sch. Dist. No. 15 of Williams Cty., State of N.D.  v. U.S. Gypsum Co.,* 984 F.2d 915 (8th Cir. 1993)(dust samples taken years after ceiling was encapsulated contained higher than background levels of asbestos); *Reorganized Church of Jesus Christ of Latter Day Saints v. U.S. Gypsum Co.*, 882 F.2d

---

[25]        The technique has been independently verified as scientifically effective and reproducible.  Owen S. Crankshaw, *Quantitative Evaluation of the Relative Effectiveness of Various Methodologies for the Analysis of Asbestos in Settled Dust*, Research Triangle Institute (1996).  See Exhibit D attached hereto.

[26]        When air monitoring is used to measure airborne fibers that are released during routine building activities such as custodial and maintenance activities which disturb and/or impact the ACM, substantial airborne concentrations of asbestos can be ascertained.

335 (8th Cir. 1989)(expert was permitted to testify regarding dust samples taken from the church's auditorium but objection to testimony on product identification was sustained because of unfair surprise and prejudice); *In re Celotex*, 196 B.R. 973 (Bankr. M.D. Florida 1996)(discussing the collection and testing of dust samples by experts in the context of an insurance coverage dispute).

In seeking to include the "Methodology Issue" in the PD Estimation, the sole case relied on by the Debtors for the proposition that the dust sampling method is not scientifically reliable is *In re Armstrong World Indus., Inc.*, 285 B.R. 864 (Bankr. D. Del. 2002); however, the Debtors' reliance on *Armstrong* is misplaced.  As this Court correctly noted in the July 19, 2005 omnibus hearing, *Armstrong* involved "a different product and different application." Hearing Transcript, pp. 85-86.[27]  The *Armstrong* court determined that dust sampling was not reliable with respect to asbestos-containing *floor tiles*, which the court accurately observed "*is not considered a friable material*" and "presents a minimal risk of asbestos release in buildings."  *Armstrong,* 285 B.R. at 867 (emphasis added).[28]

The *Armstrong* court did not address the scientific reliability of dust sampling for friable asbestos-containing products such as Grace's principal ACMs, Monokote-3 ("MK-3") and Zonolite Acoustical Plaster ("ZAP").  The friability of this type of surface treatment ACM is a major reason for EPA's adoption of the visual and physical evaluation method for such materials.  Implicit in this method to evaluate the need for corrective action is the fact that there is little serious dispute that such materials will over

---

[27]     A copy of the relevant pages is attached hereto as Exhibit E.

[28]     A "friable" asbestos material is one that, "when dry, may be crumbled, pulverized, or reduced to powder by hand pressure."  *See*  40 C.F.R. §763.83 (1990).

time experience deterioration, delamination and physical damage and will shed asbestos containing dust.[29]  Significantly, the *Armstrong* court did find that dust sampling was a "useful tool for determining whether there is *any* asbestos on the surfaces of a room or building." *Id.* at 871 (emphasis in original).  Hence, the dust sampling method is an appropriate method to determine the contamination caused by the Debtor's friable ACM. PD Claimants can therefore demonstrate contamination by dust sample results which show significant levels of asbestos in the surface dust, thereby indicating the need for corrective action to prevent exposures.  The use of dust sampling to measure the amount of surface dust is widely accepted.[30]  Simply stated, the dust sampling method reliably demonstrates the existence of asbestos fibers in surface dust that may be located in the vicinity of ACM.

Moreover, as discussed in Section II above, the Supreme Court has made clear that it is not appropriate for a court to presume that a specific methodology, reasonably relied upon in one circumstance, is reasonably relied upon in all circumstances.  *See Kumho*, 526 U.S. 137, 154, 156 (1999).  In *Kumho*, an expert relied upon a visual and tactile inspection of a damaged tire to support his opinion that the tire had failed due to a manufacturer's defect.  The Court ultimately determined that the expert's testimony was unreliable; however, it distinguished between its rejection of the expert's testimony in the specific case, and a broad rejection of all visual/tactile inspection methodologies for all purposes.

---

[29]    *Guidance for Controlling Asbestos-Containing Materials in Buildings.* United States Environmental Protection Agency.  Office of Pesticides and Toxic Substances, Washington, DC  20460.  EPA 560/5-85-024 June 1985 ("Purple Book"):  *Appendix H. Definition and Description of Factors for Assessing the Need for Corrective Action.*

[30]    *See City of Greenville,* 640 F.Supp. at 568; *Adams-Arapahoe,* 959 F.2d at 872.

> [C]ontrary to respondents' suggestion, the specific issue before the court was not the reasonableness *in general* of a tire expert's use of a visual and tactile inspection to determine whether over deflection had caused the tire's tread to separate from its steel-belted carcass.  Rather, it was the reasonableness of using such an approach, along with [the expert's] particular method of analyzing the data thereby obtained, to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant*. . . . The relevant issue was whether the expert could reliably determine the cause of *this* tire's separation.

*Id*. at 154 (emphasis in original).

*Kumho* instructs that when it comes to the scientific reliability of certain methodologies, one size does not fit all, and *Armstrong* does not stand in contra-distinction to that instruction.  Utilizing the fact-specific inquiry required of *Daubert*, the *Armstrong* court merely found that, with respect to the floor tiles in that specific case, and for the purpose for which it was being used,  dust sampling was scientifically unreliable.

The PD Claims in this case do not involve non-friable VAT but rather, asbestos-containing building products that have been conclusively determined to be friable.  Relatedly, cases like *City of Greenville* and those others referenced in connection therewith, in which the dust sampling method was found to be  scientifically reliable, likewise did not involve non-friable VAT but rather, friable asbestos-containing building products.

In light of the consistent and widespread acceptance of the scientific reliability of the dust sampling method outside of the context of asbestos-containing floor tile, an analysis of *Daubert*, its progeny and statutory law, leads to the inescapable conclusion that the dust sampling method, and any expert testimony relying upon it, will pass muster under Fed. R. Evid. 702 and *Daubert*.

There is no "fundamental" division in the scientific community about dust sampling or air sampling.  Both techniques are frequently used to measure asbestos contamination.   Hence, as a preliminary matter, the Court should not exclude consideration of dust sampling and a *Daubert* analysis is unnecessary.   More importantly perhaps, dust sampling and air sampling are not the only methodologies for assessing the hazards posed by the Debtors' ACM.  *See supra* Section III.

## CONCLUSION

The purpose of the PD Estimation is to place an aggregate estimated value on PD Claims on the basis of what would have been a fair resolution of those claims in the absence of bankruptcy.  As the object of the estimation is to determine just how much must be set aside for PD Claimants under a plan of reorganization, it suits the Debtors' interests to minimize the estimated value of PD Claims.  For just that reason, the Debtors have resorted to the "Methodology Issue" to disallow or place a zero value on most PD Claims, despite the fact that the same argument bearing a different label was roundly rejected in pre-bankruptcy property damage litigation.  The only thing new about the argument is that the Debtors now cloak it in *Daubert* terms.

Any ruling by the Court that, in respect of PD Claims, mandates some quantified level of contamination determined solely by air sampling would be contrary to decisional law on the prerequisites of a legally viable property damage claim in the tort system. Moreover, *Daubert* does not provide a new platform for the "Methodology Issue" as the Debtors suggest.

WHEREFORE, the PD Committee respectfully requests that the Court enter an Order excluding consideration of the "Methodology Issue" as part of the estimation of PD Claims and granting such further and other relief as this Court deems just and proper.

Dated:  October 17, 2005

DIES & HILE, LLP

Martin W. Dies, III (admitted pro hac vice)
Richard Hile (pro hac vice pending)
Don Carona (pro hac vice pending)
1601 Rio Grande
Suite 330
Austin, TX  78701
(512) 476-4394

and

BILZIN SUMBERG BAENA
   PRICE & AXELROD LLP

Scott L. Baena (admitted pro hac vice)
Jay M. Sakalo (admitted pro hac vice)
2500 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131-2336
(305) 374-7580

and

FERRY, JOSEPH & PEARCE, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, Delaware  19899
(302) 575-1555


By: __/s/ Theodore J. Tacconelli_____
        Theodore J. Tacconelli
        (Del. Bar No. 2678)

Special Counsel and Co-Counsel for the Official Committee of Asbestos Property Damage Claimants