## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------  )
                                                              )    Chapter 11
In re:                                                        )
                                                              )
W. R. GRACE & CO., et al.,                                    )    Case No. 01-01139 (JKF)
                                                              )    (Jointly Administered)
                                                              )
            Debtors.                                          )    **Re: Docket No. 9302**
                                                              )    **Responses Due: October 31, 2005**
                                                              )    **Hearing Date:  November 14, 2005**
------------------------------------------------------------  )

## DEBTORS' BRIEF IN SUPPORT OF AN ESTIMATION HEARING ON
## CONSTRUCTIVE NOTICE IN PROPERTY DAMAGE CLAIMS

Bankruptcy courts are charged with a duty that is important to all bankruptcy

proceedings, but absolutely essential in mass tort bankruptcies: the efficient and speedy

assessment of large numbers of claims against a debtor.  This Court has already indicated its

intention to fulfill that responsibility by approaching the estimation process for property damage

claims in orderly successive phases.  Far-reaching factual and legal issues that will affect many

claims are to be decided early in the estimation process -- during Phase I -- with remaining issues

adjudicated through the claims objection process and in Phase II.  One such far-reaching issue to

be decided in Phase I is when property owners or other property damage claimants were on

constructive notice of their claims against the Debtors, thereby triggering relevant statutes of

limitations.  The Third Circuit in *Prudential Ins. Co. v. National Gypsum*, 359 F.3d 226 (3d Cir.

2004), held that at least as early as 1983, property owners should have known that asbestos in

buildings presented potential claims.  Since *Prudential* and many other constructive notice cases

rest upon what reasonable property owners *should have known* from publicly available

information, rather than what they actually knew in a particular case, constructive notice is a

recognized legal doctrine that will apply under state law to virtually all property damage claims involving asbestos.

Subject to the constraints of the Federal Rules of Evidence, Rules of Civil Procedure and substantive state law requirements, bankruptcy courts have discretion *procedurally* in how to assess and value claims. Debtors suggest that there is one path available to the Court that will best serve the ends of efficiency and ease of administration. In particular, the Court during Phase I of the estimation proceedings should convene a hearing at which it considers and decides the issue of when property owners were on constructive notice of property damage claims under the laws of three key states that have the highest numbers of claims, California, New York and Louisiana. Claims from these states comprise 60% of the U.S. claims to which Debtors have objected on constructive notice grounds.[1] A ruling that determines the date upon which claimants had constructive notice under the laws of these states would, therefore, permit the court to adjudicate or estimate these claims in an expedited fashion. Thereafter, in the claims objection process and in Phase II, the Court can also take into account any individual countervailing factors, if necessary, and can broaden the scope of its Phase I analysis to address claims from other states. Because there are only a handful of constructive notice standards that are applied by all of the states in the U.S., the Court should readily be able to extrapolate its Phase I ruling to determine constructive notice issues with respect to remaining states. The details of these procedures are addressed at greater length in Section II.B. below.

---

[1] In the Debtors' 15th Omnibus Objection, the Debtors objected to 3,587 claims on the grounds of constructive notice. Roughly 3,100 of those were U.S. claims; the rest were Canadian claims. California, New York and Louisiana alone account for more than 1,800 of the U.S. claims.

2

I.      **Factual Background.**

When the Debtors filed these Chapter 11 cases in April 2001, Grace's asbestos property

damage litigation was nearly 20 years old and appeared to have run its course.  Of more than 370

property damage lawsuits filed since 1983, only 7 property damage cases were still pending as of

February 2001, 2 of which were on appeal and one which was on a suspense calendar.  It was not

surprising that Grace's litigation was coming to an end, since the company had ceased selling

asbestos-containing products decades before and health issues relating to asbestos building

materials had come to be widely recognized in the intervening years.

A.      **Grace Products and Their Uses.**

Grace's involvement with asbestos began in 1963 with its purchase of the assets of the

Zonolite Company.  Zonolite purchased asbestos from commercial suppliers and incorporated it

into certain building products.  Zonolite also mined and processed vermiculite from its mines in

South Carolina and near Libby, Montana.

Grace permanently ended all U.S. manufacture of asbestos-added products in 1973 and

closed the Libby facility in 1990.  From 1963 through 1973, however, Grace manufactured and

sold certain asbestos-containing construction products that were installed in buildings.  This

included acoustical plaster products, as well as Monokote-3, a wet-sprayed, cementitious fire-

proofing product.  Acoustical plaster products were phased out in approximately 1969 except for

occasional customer requests.  Due to federal regulations that banned the spraying of asbestos-

containing materials, Grace ceased selling MK-3 in the United States on July 4, 1973 and in Canada after 1975.[2]

### B.     Grace's Property Damage Litigation.

The first property damage case was filed against Grace in 1983.  Between 1983 and early 2001, a total of 379 property damage lawsuits covering thousands of buildings were filed.  The cases typically sought recovery for property damage allegedly resulting from asbestos-containing Monokote-3 fireproofing used in high-rise commercial construction.  A smaller number of lawsuits were asserted for property damage allegedly caused by asbestos-containing acoustical plaster.  Many of the acoustical plaster claims were brought by schools, where acoustical plaster may have been used in the 1950s and early 1960s.

Grace had been managing its asbestos property damage suits effectively through litigation and settlement.  By February 1, 2001, two months before the Debtors filed for Chapter 11, only 7 property damage cases remained pending against Grace.  In the nearly 20 years of litigating property damage cases, Grace had achieved dismissals or summary judgment victories in 140 cases; in cases tried to verdict, after all appeals had run, Grace obtained defense wins in 9 cases and losses in 7 cases; and 207 cases were resolved through settlements, including several large settlements with school districts.

### C.     Grace's March 2003 Property Damage Filings.

Despite the fact that Grace's property damage litigation was winding down in the early 2000s, in response to the notice and bar date, the Debtors received over 4000 asbestos property damage claims ("PD claims").  On September 1, 2005, the Debtors filed their 15th Omnibus

---

[2] Some states, including New York, had already banned the spraying of asbestos-containing products in the early 1970s prior to the federal ban.

4

Objection (Substantive) to PD claims. Among these objections, the Debtors objected to approximately 3,587 claims on the ground of constructive notice. Of the claims objected to on the ground of constructive notice, roughly 1,499 originate in California, 217 in New York, 147 in Louisiana, and the remainder in other states and Canada. Nearly 3,000 of the pending claims were filed by a single law firm -- the Speights & Runyan law firm.

The number of property damage claims filed stands in sharp contrast to the waning of litigation against the company. The fact that new PD lawsuits had slowed to a trickle was not happenstance. By the early 2000s, asbestos property damage litigation was nearly 20 years old and building owners had been on notice for decades of asbestos issues. As the Third Circuit explained in *Prudential*, "Asbestos had . . . already become a well-known and important public health and safety issue in the United States prior to 1984." 359 F.3d at 229. The *Prudential* court delineated some of the key events that had brought asbestos to nationwide attention, including:

- The U.S. Environmental Protection Agency's establishment in 1973 of a National Emission Standard for asbestos that restricted the demolition of buildings containing asbestos-containing materials (ACMs), and subsequent amendments in 1975 and 1978 involving demolition, renovation and spraying of ACMs;

- EPA's publication of various guidelines and regulations on asbestos management, including the 1978 "Hazard Abatement from Sprayed Asbestos-Containing Materials in Buildings: A Guidance Document"; and

- Regulations issued by the Occupational Safety and Health Administration concerning exposure of workers to asbestos.

359 F.3d at 230.

Given the lengthy history of asbestos property damage litigation, the undisputed history of public information campaigns and regulations, as well as public and private asbestos mitigation efforts in U.S. buildings, the question of what claimant property owners *should have known* about asbestos will be relevant with respect to thousands of the PD claims filed. Thus, in

5

estimating the value, if any, of property damage claims, the Court will be faced again and again

with the question of whether property owners were on constructive notice of asbestos-related

injuries such that the relevant state statutes of limitations have run on those claims. The

necessity for expediency in resolution of these claims calls for the use of consolidated

proceedings to determine constructive notice issues with regard to large numbers of these claims.

The scope of the Court's authority to do so, and a plan for proceeding in the most efficient and

orderly manner, are presented in the following sections.

## II.    Argument.

### A.    The Court Has Discretion To Decide
### Constructive Notice Issues in a Phase I Hearing.

Bankruptcy courts may determine how best to proceed to assess the validity and value of

claims, subject to certain substantive and procedural constraints. The Court is bound by the

Federal Rules of Civil Procedure and Evidence as well as the federal and/or state laws that

govern the merits of a particular claim. As the Third Circuit stated in *Bittner v. Borne Chemical*

*Co., Inc.*, 691 F.2d 134, 135 (3d Cir. 1982): A bankruptcy court "is bound by the legal rules

which may govern the ultimate value of the claim. For example, when the claim is based on an

alleged breach of contract, the court must estimate its worth in accordance with accepted contract

law." Thus, bankruptcy judges must abide by the Federal Rules as incorporated into the

Bankruptcy Rules, and must apply any substantive state law that controls the merits of

underlying claims.

Within these constraints, however, a bankruptcy judge has discretion to determine the

procedures or methods by which an estimation of claims will occur. The Third Circuit has noted

that, "[t]he Code, the Rules of Bankruptcy Procedure, 11 U.S.C. app (1977), and the Suggested

Interim Bankruptcy Rules, 11 U.S.C.A. (1982), are silent as to the manner in which contingent or

6

unliquidated claims are to be estimated." *Bittner v. Borne Chemical Co., Inc.*, 691 F.2d 134, 135 (3d Cir. 1982). Section 502(c) of the Bankruptcy Code, 11 U.S.C.A. § 502(c) (West Supp. 1989), simply instructs that: "There shall be estimated for purposes of allowance under this section- (1) any contingent or unliquidated claim, fixing or liquidation of which, as the case may be, would unduly delay closing of the case. . . ."

In the absence of specific instruction in the Code, the Court determines how best to proceed, taking into account the exigencies of each situation and the goals that Congress sought to achieve in the Bankruptcy Code. "Despite the lack of express direction on the matter, we are persuaded that Congress intended the procedure to be undertaken initially by bankruptcy judges, *using whatever method is best suited to the particular contingencies at issue. The principal consideration must be an accommodation to the underlying purposes of the code.*" *Bittner,* 691 F.2d at 135 (emphasis supplied); *see also Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 356-57 (3d Cir. 2002).

One principle that informs all decisions made pursuant to the code is the need to ensure that the estimation of claims is done efficiently and without undue delay. According to the Third Circuit, "in order to realize the goals of Chapter 11, a reorganization must be accomplished quickly and efficiently." *Bittner,* 691 F.2d at 137. With respect to the policy underlying reorganization proceedings, "One cannot overemphasize the advantages of speed and simplicity to both creditors and debtors." *Id.* at 136-37 (*quoting* 124 Cong.Rec. H 11101-H 11102 (daily ed. Sept. 28, 1978) (statement of Rep. D. Edwards)).

This policy has been echoed by other courts, including the Supreme Court in *Katchen v. Landy*, 382 U.S. 323, 328-330 (1966) (citations omitted): "[T]his Court has long recognized that a chief purpose of the bankruptcy law is 'to secure a prompt and effectual administration and

7

settlement of the estate of all bankrupts within a limited period.. . .' and that provision for

summary disposition, 'without regard to usual modes of trial attended by some necessary delay,'

is one of the means chosen by Congress to effectuate that purpose." *See also In re G-I Holdings,*

*Inc.*, 295 B.R. 211, 216 (D.N.J. 2003) ("The importance of case management in large bankruptcy

reorganizations cannot be overstated. Efficient case management is ever more imperative in

mass tort bankruptcies. . . "); *In re G-I Holdings*, 323 B.R. 583, 599 (D.N.J. 2005) ("Thus, to the

greatest extent possible, a selected estimation procedure should not run counter to the efficient

and expeditious administration of the bankruptcy estate.").

Operating within these parameters, and in accordance with applicable state laws and

federal rules governing the underlying merits of the claim, bankruptcy judges have the authority

to summarily dispose of claims, adjudicate claims, and estimate the value of claims, as

appropriate.  In setting forth the authority of bankruptcy judges to manage claims, 28 U.S.C

§ 157(b) states that:

> (b)(1) Bankruptcy judges *may hear and determine* all cases under title 11 and all
> core proceedings arising under title 11.

> * * *

> (2) Core proceedings include, but are not limited to --

> * * *

> (B) *allowance or disallowance of claims* against the estate or
> exemptions from property of the estate and *estimation* of claims or
> interests for the purpose of confirming a plan under chapter 11.

28 U.S.C § 157(b) (emphasis supplied).  Where appropriate, bankruptcy judges employ summary

judgment to disallow claims prior to the estimation of a claim's value. In *In re G-I Holdings,*

*Inc.,* the court noted that "The summary judgment process 'will serve to weed out those claims

which do not present a genuine issue of material fact, and for which the debtor is entitled to

8

judgment as a matter of law.' . . . By placing this responsibility with the bankruptcy court in the first instance, the debtor will be able to dispense with those claims that it believes are meritless in a somewhat expeditious fashion, which in turn will lessen the financial burden upon the debtor and prevent G-I Holdings from experiencing what it describes as the 'law of large numbers' and 'bundling.'" *In re G-I Holdings,* 323 B.R. at 615 (*quoting In re Dow Corning Corp.*, 215. B.R. 346, 360 (E.D.Mich. 1997) (citation omitted). *See also In re Chateaugay Corp.,* 111 B.R. 68 (S.D.N.Y. 1990) ("Bankruptcy courts are often called upon to allow or disallow claims in the context of motions to expunge claims based upon, *inter alia:* an applicable bar date in the bankruptcy proceeding; an applicable statute of limitations . . . or some other basis which tends, if established, to negate the existence of a claim against a debtor.").

Where summary disposition is not available, bankruptcy courts must adjudicate claims based upon the legal and factual merits, but have discretion procedurally on how to structure the proceedings. For example, in *Kool, Mann*, the bankruptcy judge held a trial on the papers rather than an evidentiary hearing to decide the merits of the underlying claim. On appeal, the Third Circuit approved this approach: "Judge Gindin's decision to conduct a trial on the papers in connection with the claim objection and dispense with an Estimation Hearing was not an abuse of discretion. From a judicial economy standpoint, the Bankruptcy Court's decision to forego an extraneous Estimation Hearing under 502(c) makes practical sense since there would be no need to *estimate* the Coffey's claim once the claims were *actually adjudicated* and *valued* under § 502(b)." *Kool, Mann*, 300 F.3d at 357.

Similarly, the Third Circuit agreed that the bankruptcy judge in *Bittner* had the authority to estimate the value of a claim by first determining the merits of the claim under state laws. "If the bankruptcy court estimated the value of the Rolfite stockholders' claims according to the

9

ultimate merits of their state court action, such a valuation method is not inconsistent with the principles which imbue Chapter 11." *Bittner,* 691 F.2d at 137

Cases such as these demonstrate the bankruptcy court's authority to structure proceedings to determine the merits and value of claims using methods that are in accord with the federal rules and state substantive law, while achieving the ends of efficiency and equity. "Although much of the bankruptcy process is administrative, bankruptcy courts also supervise litigation conducted under streamlined, technical procedures. . . . Bankruptcy courts exercise surprisingly far-reaching substantive influence. They frequently adjudicate and issue written opinions on matters of state law, including the UCC, tax, and even family law issues." *In re G-I Holdings,* 295 B.R. at 216.

A necessary adjunct to a bankruptcy judge's ability to efficiently handle claims is the court's power to group cases together and decide both legal and factual issues on a consolidated basis. "Federal Rule of Bankruptcy Procedure 7042 incorporates Rule 42 of the Federal Rules of Civil Procedure which provides in relevant part as follows: '[w]hen actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.' Fed. R. Civ. P. 42(a) (West 2004)." *In re G-I Holdings*, 323 B.R. at 626 (allowing Debtor to "move for summary judgment on certain issues on a claims wide basis pursuant to Federal Rule of Bankruptcy Procedure 7042").

Other courts have employed Rule 42 consolidation in mass tort bankruptcies. For example, after an in-depth review of the considerations under Rule 42, Judge Spector determined in *In re Dow Corning Corporation*, that consolidation of claimants for purposes of trials on

10

universal issues would be appropriate to serve the ends of justice and judicial economy. Judge Spector explained that application of the rule was consistent with the rule's purpose of permitting the Court to conduct its business "with expedition and economy." 211 B.R. 545, 582 (Bankr. E.D. Mich. 1997) (quoting *Advey v. Celotex Corp.*, 962 F.2d 1177, 1180 (6th Cir.1992)). The court further held that, "the question of '[w]hether cases ... should be consolidated for trial is a matter within the discretion of the trial judge.'" *Id.* (quoting *Stemler v. Burke*, 344 F.2d 393, 396 (6th Cir.1965).

In sum, the Court has available an array of procedural approaches that it may use to assess claims. Claims may be disallowed entirely or be assigned an estimated value of zero using summary judgment or an evidentiary hearing on the merits. The court may hold hearings on the values of claims that include presentation of factual evidence pursuant to the Federal Rules of Evidence and examination of applicable state and federal law. One bankruptcy court has summarized these alternatives as follows: "Options for the court in estimating claims include accepting the claimant's claim at face value, estimating the claim at zero and waiving discharge of the claim . . ., arriving at its independent estimation of the claim, or utilizing a jury trial to obtain an accurate estimation." *In the Matter of Federal Press Co.*, 116 B.R. 650, 653 (N.D.Ind. 1989) (footnote omitted). The Court should select here those proceedings that will best effectuate the Bankruptcy Code's goals of efficient and speedy resolution of claims while remaining within the bounds of the federal rules and state law that are applicable. Debtors suggest that a process on the subject of constructive notice, as detailed in the following section, will best serve the principles embodied in the Code.

**B.      An Estimation Hearing On the Issue of Constructive
Notice in Phase I Is the Most Efficient Way To Estimate and
<u>Adjudicate Thousands of Pending Property Damage Claims.</u>**

11

The Court has already indicated that it intends to address the estimation of property damage claims in successive phases. "Phase I is to be bifurcated to deal with 2 issues: Daubert methodology and constructive notice. Phase 2 will consist of merits-based estimation of the Asbestos PD claims." Case Management Order for the Estimation of Asbestos Property Damage Liabilities at 2 (August 29, 2005). The plan to bifurcate estimation proceedings and to address first the two most far-reaching issues in property damage litigation is in perfect accord with the goals of speed and simplicity in estimating claims. The details of the procedures to be employed have not yet been determined by the Court, but Debtors suggest the following plan as the most effective way to resolve the PD claims on constructive notice.[3]

1.      In The Phase I Estimation Hearing, the Court Should First Decide the Date Upon Which Claimants Were On Constructive Notice of Claims Under the Laws of Three Key States.

Debtors propose that the Court decide the issue of constructive notice during a Phase I estimation hearing that would consider only legal and factual issues that will be relevant to certain claims on a consolidated basis. To simplify and speed the process, the estimation in Phase I would consider the issue of *when* claimants from three main states, California, New York and Louisiana, were constructively on notice of legal claims relating to asbestos property damage. Claims from these states make up more than half of all of the PD claims that have been filed; or approximately 1,863 (59%) out of 3,155 U.S. claims that received constructive notice objections.

---

[3] In accordance with the Case Management Order for the Estimation of Asbestos Property Damage Liabilities (the "PD Estimation CMO") at ¶¶ 9-11, the Debtors submit this brief on constructive notice issues only, on the same day on which the PD Committee is to submit a brief on the Daubert methodology aspect of Phase I. On October 31, each side will submit its responsive paper on the other aspect of the Phase I Estimation, with hearing set for November 14, 2003 on both aspects.

Considering the laws of only three states will greatly simplify the Court's decision-making with respect to the applicability and effect of state constructive notice doctrines. "It is, after all, a general principle in bankruptcy law that, for bankruptcy purposes, state law governs the validity and amount of a claim." *In re Federal-Mogul Global, Inc.*, 330 B.R. 133, 155 (D.Del. 2005); *see also Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20 (2000). Thus, to determine when constructive notice applied with respect to commercial property owners, the Court will look to the constructive notice laws and statutes of limitations of the states from which the claims arise. The states of California, New York and Louisiana each have case law governing when a building owner should have known of a claim arising from on-site asbestos, and therefore when the statutes of limitations would be triggered for such claims. Moreover, the state-to-state variation in constructive notice law is limited, which should permit the Court easily to discern the laws in the three main states in Phase I as well as, thereafter, determine the standards for groups of states. *See* Section II.B.3 below.

To assist the Court in determining the timing of constructive notice in the three states, Debtors and Claimants will file two main categories of documents. First, the parties will file expert reports describing the state of knowledge surrounding use of asbestos-containing materials in buildings. PD Estimation CMO at ¶¶ 8,13, 14. The Debtors' expert witnesses on October 17, 2005 will file opening reports detailing the extensive information that was available to the public -- particularly commercial property owners. In total, the experts have identified tens of thousands of articles and publications that were publicly available to property owners concerning the issues raised by asbestos-containing materials in buildings. They will opine, just as the Third Circuit determined in *Prudential*, that commercial property owners in the U.S.

13

should have known at least since the early to mid-1980s of asbestos in their buildings and related

issues based upon the massive amount of information that was publicly available.[4]

The Court will have the opportunity to examine evidence collected and synthesized by

these experts about the government literature and regulations that resulted in nationwide

awareness of asbestos issues.  The Third Circuit summarized some of this remarkable history of

regulation and information in *Prudential*:

> As [defendant] correctly states in its brief: 'In sum, before October 20, 1983, not
> only had the federal government (OSHA and EPA) issued mandatory regulations
> regarding asbestos products in buildings, but the EPA had issued numerous
> guidance documents detailing for building owners the widespread use of asbestos-
> containing building materials, the association between asbestos exposure and
> disease, the potential risks of in-place asbestos-containing products, methods to
> detect asbestos, and recommendations for proper actions to be taken once
> asbestos-containing products are identified.

359 F.3d at 230 (citation omitted).

Second, the parties in February-March, 2006 will file briefs outlining the constructive

notice laws and relevant statutes of limitations in California, New York and Louisiana.[5]  PD

Estimation CMO at ¶ 17.  By limiting its legal analysis to three states, the Court should be able

quickly to discern the few legal standards that will apply to the thousands of claims from those

states.  In particular, under the laws of each state, property owners were on constructive notice --

---

[4] In arguing against the use of "Constructive Notice Experts", attorneys for the claimants misapprehend the role of
the Debtors' experts.  The experts would not be presenting opinions on "an ultimate issue of law" or "whether
the statute of limitations has even begun to run" as suggested by claimants' attorneys.  *See* Proposed Case
Management Order of the Official Committee of Asbestos Property Damage Claimants and Incorporated
Memorandum of Law in Support of Proposal, at 20-21 (July 13, 2005).  Rather, they would be offering an
analysis of public information that was available to property owners in the U.S. and the level of knowledge that
commercial property owners would have been expected to have given the publicly available information,
government regulations, and wide-spread publicity surrounding asbestos issues.  It would, of course, be the
Court that would ascertain the relevant legal standards, and use the information provided by experts at its
discretion in deciding whether and when statutes of limitations had commenced to run.

[5] Debtors will also file a list of the claims that are from the states of California, New York and Louisiana and that
will therefore be covered by the Court's ruling with respect to constructive notice in those states.

*i.e.,* they *should* have known from publicly available information -- that asbestos in buildings may raise potential health risks that must be investigated and handled appropriately. *See e.g., City of San Diego v. United States Gypsum Co.,* 30 Cal. App. 4th 575, 35 Cal. Rptr.2d 876 (Cal. Ct. App. 2nd Dist. 1994); *MRI Broadway Rental, Inc. v. United States Mineral Products Co.,* 704 N.E.2d 550 (Ct. App. N.Y. 1998); *Orleans Parish School Board v. United States Gypsum Co.,* 892 F. Supp. 794 (E.D.La. 1995).

Courts in each state have applied a version of the "discovery rule" to the determination of when the statute of limitations begins to run with respect to an asbestos-related "injury" to a building. In particular, the cause of action accrues, and the statute of limitations begins to run, when the party discovers or *should have discovered* that they have been injured. Debtors believe that the Court will find that claimants had constructive notice of asbestos-related property damage claims since *at least* 1983. Those claims are now barred by all relevant statutes of limitations in the states from which the claims arise.

The Court should also hold a March 2006 evidentiary hearing where fact and expert testimony will be proffered regarding the issue of constructive notice. See PD Estimation CMO at ¶ 18. The parties would also be prepared to address any additional legal issues or questions that Court might propound at this point. At the end of the Phase I estimation, the Court would issue a ruling on when, under the laws of California, New York and Louisiana, claimants were on constructive notice of their claims such that the state statutes of limitations had begun to run on those claims. The Court could also then easily expand the ruling in the claims objection process and Phase II to cover claims from other states as described further in the next section.

2.    **After the Phase I Ruling, the Court Should Apply the Ruling to Estimate the Value of Property Damage Claims, Taking Into Account Individual Circumstances or Defenses As Needed.**

Phase I, the claims allowance process and Phase II of the estimation process will aid the court in placing a monetary value on property damage claims. In Phase I, the Court will decide two primary issues -- the date that constructive notice was effective and the admissibility of dust sampling methodology -- that will apply to the vast majority of claims that are to be adjudicated or estimated. Rulings on these issues will greatly expedite the adjudication or estimation of the remaining claims and the validity of groups of claims.

Assuming that the Court determines in Phase I that under the laws of California, New York and Louisiana, property owners were on constructive notice of asbestos-related property damage claims as of the early 1980s, that ruling will apply to all claims from those states. The practical effect of such a ruling is that those claims will be time-barred by state statutes of limitations and the claims will be disallowed. Thus, by deciding the issue of constructive notice early on, the Court will be able to adjudicate a large number of claims with speed and efficiency. As the Third Circuit explained in *Kool Mann*, "From a judicial economy standpoint, the Bankruptcy Court's decision to forego an extraneous Estimation Hearing under 502(c) makes practical sense since there would be no need to *estimate* the Coffey's claim once the claims were *actually adjudicated* and *valued.*" 300 F.2d at 357.

To ensure that the Court has the opportunity to consider all factors that may affect the value of these claims, however, some individual claimants may be afforded, as necessary, an opportunity in Phase II or otherwise through the ongoing claims objection process to show cause why the Phase I ruling does not apply to the specific circumstances underlying their claims. The scope of these individual issues, if any, will become more apparent after responses to the Debtors' 15th Omnibus Objection (Substantive) are submitted on October 24, 2005. It would

16

then be claimants' burden to overcome the presumption that they were on constructive notice as of 1983 (or whatever date is determined by the Court in Phase I), however. Should the Court find these exceptions meritorious after an evidentiary hearing or other evidentiary submissions, it could then adjust the estimation of the value of individual or categories of claims accordingly, using whatever estimation methodology is selected.

Permitting claimants the opportunity to overcome the presumed applicability of the Phase I ruling will address any possible concerns raised by claimants' attorneys about the use of consolidated Phase I proceedings to decide constructive notice issues. It allows the Court to take into account unusual factual circumstances that may affect the value of certain claims. It also addresses concerns raised by claimants' attorneys regarding the need to consider events that they argue might toll the statute of limitations, such as alleged fraudulent concealment or other fraud.[6] The Court could later consider, for example, the issue of whether U.S. commercial property owners could have reasonably relied upon any allegedly fraudulent statements from Debtors in the face of the avalanche of government-issued and other publicly available information that accumulated during the 1970s and 1980s concerning the perceived hazards inherent in the presence of asbestos-containing materials in buildings.[7] The *Prudential* court found allegations

---

[6] Proposed Case Management Order of the Official Committee of Asbestos Property Damage Claimants and Incorporated Memorandum of Law in Support of Proposal, at 19 (July 13, 2005).

[7] Fraud claims lack merit for the additional reason that once a plaintiff is on notice of a claim, the alleged actions of a defendant do not toll the statute of limitations. *See e.g., Barber v. Superior Court*, 234 Cal. App. 3d 1076 (1991) (surgeon's failure to cooperate in investigation did not toll statute of limitations because plaintiff was already on notice of its claim); *Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528 (9th Cir. 1985) (IUD manufacturer's alleged misrepresentation of pregnancy rate did not toll statute once plaintiff was on notice of her claim); *Miller v. Lakeside Village Condominium Association, Inc.*, 1 Cal. App. 4th 1611 (1991) (once plaintiff was on notice, misdiagnosis of illness by physician did not toll statute); *Snapp & Associates Ins. Services, Inc. v. Robertson*, 96 Cal. App. 4th 884, 890-891, 117 Cal.Rptr.2d 331 (2002) ("The fraudulent concealment doctrine 'does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim.' (Rita M. v. Roman Catholic Archbishop (1986) 187

(Continued...)

17

of fraud to be unavailing: "irrespective of the defendants' attempts to conceal from Prudential the hazards posed by ACMs in Prudential's buildings, Prudential had many other sources of information sufficient to place it on inquiry notice of such ACM-related injuries. Prudential should have, for example, given heed to government warnings and regulations to undertake surveys and testing of its buildings." *Prudential*, 359 F.3d at 238.

Defendants believe that it is unlikely, however, that many claims will fall outside the scope of the Phase I ruling. The very essence of the constructive notice standard turns on what a property owner *should have known*, not an individualized examination or what it actually *did* know about their alleged asbestos-related injuries. As the Third Circuit explained: "We note, however, that the injury discovery rule . . . allows the limitations period of civil RICO claims to accrue not only if [plaintiff] actually knew of its injuries, but also if [plaintiff] should have known of its injuries." *Prudential*, 359 F.3d at 235. Thus, individual questions of whether a particular claimant had actual knowledge of an asbestos-related injury are not relevant to the constructive notice inquiry and will not defeat the applicability of a Phase I constructive notice ruling.

Moreover, even a claimant's lack of knowledge of government regulations and publications is not relevant since property owners *should* have known of their existence: "For example, the EPA regulations on the removal of asbestos during building demolitions were promulgated in the 1970s. Therefore even if the demolition of the [plaintiff's] building in 1984 was the first demolition of any of the [plaintiff's] buildings, it *should have had prior awareness,*

---

Cal.App.3d 1453, 1460.) 'A plaintiff is under a duty to reasonably investigate, and a *suspicion* of wrongdoing, coupled with a knowledge of the harm and its cause, commences the limitations period.' ( Jolly v. Eli Lilly & Co. (1988) 44 Cal.3d 1103, 1112.)").

18

*as a major real estate investor*, of the regulations and the ACM-related danger to which they were aimed." *Prudential*, 359 F.3d at 236. Individual objections to the Phase I ruling should, therefore, rarely succeed.

**3.    The Court Should Expand Its Legal Analysis in Further Claims Adjudication and Phase II to Address Claims From Remaining States.**

Finally, to address the claims from other states that would not fall automatically within the ambit of the Phase I ruling, the Court should broaden the scope of its legal analysis in Phase II and other claims adjudication processes.[8] Debtors believe that the Court will find it useful to assess the merits of additional groups of claims according to the constructive notice standards and statutes of limitations in those states. Such analyses can be conducted with relative ease by grouping the states according to the few legal standards that govern constructive notice inquiries throughout the U.S.

To assist the Court, Debtors would provide the Court with a summary of the standards governing constructive notice, and listing the particular states (and cases) that employ each standard.[9] Since the Court will have looked at the laws of California, New York and Louisiana in Phase I, it will already be generally familiar with these doctrines, and will simply have to assess the handful of variations applied among the states. Debtors believe that, regardless of the legal standard that is applied, constructive notice and state statutes of limitations will operate to bar virtually all property damage claims.

---

[8] Alternatively, this broader legal analysis could readily be done during Phase I. Since it would involve some examination of the laws of a number of states while covering fewer claims, however, such broader analysis would necessarily be somewhat less efficient as an initial inquiry. The Court may, therefore, choose to conduct the wider scope of analysis during Phase II after it has had the opportunity to flesh out -- by first looking only at three states -- the legal and factual issues pertaining to constructive notice.

[9] The Debtors would also provide the statutes of limitations applying to claims in each state.

Summarizing briefly here, there are 3 main constructive notice standards within the U.S. While each standard finds constructive notice on the date that a claimant *should have known* of an "injury", the standards vary somewhat in defining the particular "injury" that must occur for the claimant to be on notice. First, under the "presence standard," the mere presence of asbestos in a building is a sufficient injury to trigger the statute of limitations. *See e.g., Roseville Plaza Ltd Partnership v. United States Gypsum Co.*, 31 F.3d 397, 400 (6th Cir. 1994) (applying Michigan law to find that "knowledge of the presence of asbestos is enough to inform an individual, through the exercise of reasonable diligence, of a 'possible cause of action' for asbestos abatement or removal"). Second, in a similar rule, some states find the date of the installation of the asbestos-containing material is the relevant "injury" date. *See MRI Broadway Rental, Inc. v. United States Mineral Products Co.*, 704 N.E.2d 550, 551 (Ct. App. N.Y. 1998) ("Consistent with our long line of precedents, we hold that, for Statute of Limitations purposes, plaintiff's injury occurred when the asbestos-containing material was installed."). Third, some states find that constructive knowledge of alleged "contamination" starts the statute of limitations clock ticking. *See e.g., Catasauqua v. Eagle-Pitcher*, 1988 WL 102689 (E.D. Pa. 1988).

Attorneys for the claimants will likely argue that the Court cannot address claims from states applying a "contamination" standard on a consolidated basis because the issue of when asbestos "contamination" occurred in a particular building must be decided on a case-by-case basis.[10] Such arguments fail to overcome a finding that claimants had constructive notice of their claims since the 1980s. Many plaintiffs in property damage litigation historically have

---

[10] *See* Proposed Case Management Order of the Official Committee of Asbestos Property Damage Claimants and Incorporated Memorandum of Law in Support of Proposal, at 12 (July 13, 2005) ("Ultimately, any determination of whether a building has suffered contamination causing a hazard must occur on a claim-by-claim individual basis.").

20

contended that "contamination" occurs with all asbestos containing products.  In essence, they allege that all of Debtors' products presented a health hazard from the date they were installed in a building because all asbestos containing materials shed asbestos fibers, and all asbestos fibers are dangerous.  According to the attorneys for the claimants, "the Debtors manufactured friable products which juries have regularly found to release fibers and to be unreasonably dangerous."[11] If, as claimants allege, Debtors' friable asbestos products were shedding fibers and thereby "contaminating" buildings, then building owners should have been aware of any legal claims arising from the use those products in the 1980s when they knew or should have known of the reported hazards inherent in such products.

Furthermore, commercial building owners were on notice of the need to ascertain the nature of the materials in their buildings and whether those materials were posing a health hazard.  Efforts to do so, coupled with ongoing and routine maintenance, repair, renovation and demolition activities in buildings that disturb, impact or dislodge asbestos-containing materials, would have put building owners on notice of alleged "contamination" (again defined by plaintiffs as release of fibers) and potential legal claims.  Debtors' products were installed no later than the 1970s.  Subsequently, those materials were continuously being disturbed in connection with activities undertaken to maintain, renovate and repair the building in which they were installed.  Based upon that undisputed history, the Court should have no difficulty finding that all reasonable property owners had constructive notice as of a certain date of "contamination" with asbestos fibers sufficient to trigger the statute of limitations.

---

[11] *Id.* at 11

DOCS_DE:112374.1

Collectively, there are over 20 states employing these three standards, including

California, New York and Louisiana. Broadening the Court's legal analysis in Phase II or other

claims adjudication processes to address the remaining states that have enunciated standards

would cover hundreds of other PD claims in other states. Given the lengthy history of

widespread public education about, and government regulation of, the use of asbestos-containing

materials in buildings, the results of applying the different standards will be largely the same.

That is, property owners will be found to have had constructive notice of an injury decades ago,

and virtually all claims will be barred under the respective states' statutes of limitations.

After using this procedure to determine when claimants from *groups of states* had

constructive notice of asbestos property damage claims, the Court could apply those rulings in

conjunction with state statutes of limitations to bar claims by state groups. The objection process

would operate in the same manner as employed for the claimants from the three original states.

Claimants deemed to be on constructive notice of an injury as early as 1983 (if that is the date

determined by the Court), will have their claims barred under state statutes of limitations unless

those claimants can show cause why such a ruling should not apply to the specific circumstances

of their claim.

**III.    Conclusion.**

The Court has the opportunity to quickly assess and estimate the value of the majority of

the property damage claims that have been filed in these Chapter 11 cases. By analyzing the

constructive notice laws of three states, California, New York, and Louisiana, claims arising

from those states can be estimated as a group, and if constructive notice standards apply to bar

the claims, those claims can be disallowed and expunged early on. Later, the Court may also

expand its legal analysis, as appropriate and expedient, to cover groups of other states with

22

similar legal standards.  This approach will best serve the goals of speed and efficiency that are

so crucial to achieving the ends embodied in the Bankruptcy Code.


Dated:  October 17, 2005                           Respectfully submitted,

                                                   KIRKLAND & ELLIS LLP
                                                   David M. Bernick, PC
                                                   Michelle Browdy
                                                   Janet S. Baer
                                                   200 East Randolph Drive
                                                   Chicago, IL  60601
                                                   (312) 861-2000

                                                   and

                                                   PACHULSKI, STANG, ZIEHL, YOUNG, JONES
                                                   & WEINTRAUB P.C.

                                                   _James E. O'Neill_____

                                                   Laura Davis Jones (Bar No. 2436)
                                                   James E. O'Neill (Bar No. 4042 )
                                                   919 North Market Street, 16th Floor
                                                   P.O. Box 8705
                                                   Wilmington, DE 19899-8705 (Courier 19801)
                                                   (302) 652-4100

                                                   Co-Counsel for Debtors and Debtors in Possession