IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

---

MILDRED E. JOHNSON,

      Plaintiff,

  -vs-

W. R. GRACE AND COMPANY,

      Defendant.

Civil Docket
No. 88-145-M-HP



---

### TRANSCRIPT OF JURY TRIAL PROCEEDINGS

Heard in the Courtroom
United States Courthouse
Missoula, Montana
August 23, 1990

BEFORE THE HONORABLE HARRY PREGERSON

UNITED STATES NINTH CIRCUIT COURT JUDGE

TINA C. BRILZ, RPR
Official Court Reporter
United States District Court
301 South Park - Drawer 10122
Helena, Montana  59626



EXHIBIT

"C"

A P P E A R A N C E S :

PRESENT ON BEHALF OF THE PLAINTIFF, MILDRED E.
JOHNSON:

        MR. THOMAS A. BAIZ, JR.
        Attorney at Law
        600 Central Plaza, Suite 316
        Great Falls, Montana  59401

            and

        MR. TOM L. LEWIS
        Attorney at Law
        REGNIER, LEWIS & BOLAND
        P.O. Box 2325
        Great Falls, Montana  59403

PRESENT ON BEHALF OF THE DEFENDANT, W. R. GRACE AND
COMPANY:

        MR. GARY L. GRAHAM
        Attorney at Law
        GARLINGTON, LOHN & ROBINSON
        P.O. Box 7909
        Missoula, Montana  59807

1    The following proceedings were had:

2

3            (A jury was duly impaneled and sworn.)

4            (The following proceedings were had in open

5    court, with the jury present, beginning at 10:49 a.m.:)

6            THE COURT:  Please be seated.  See I have a lap

7    computer here, and our courts are all tied in with

8    electronic mail and cover all the western states, so I'm

9    trying to rig it up here, and we're having problems getting

10   through and programming it, so my law clerk is working with

11   someone from San Francisco who's walking him through all

12   the steps.  Once we get it hooked up, then we'll not only

13   be able to pick up all the mail electronically, but then we

14   have access to a vast library of books and resources all

15   through the computer system.  It's an amazing gadget when

16   it works.

17         Now, I'm just going to briefly give you an outline of

18   how this case is going to proceed.  We're going to start by

19   the Plaintiff through her attorney making an opening

20   statement.  And then the Defendant may make an opening

21   statement or may reserve making an opening statement until

22   the Plaintiff puts on its case, probably the Defendant will

23   make an opening statement at this time.

24         Now, opening statements are not evidence, they're just

25   an aid to understanding the significance of the evidence

1   when it comes in.  They're really an overview or a road

2   map.  The evidence comes in piecemeal.  The opening

3   statement will kind of arch over all of that, and give you

4   an overview of what the case is about from the Plaintiff's

5   side and from the Defendant's side, so that when the

6   evidence comes in, you'll be able to fit some of the pieces

7   together.

8        And after the opening statements are made, the

9   Plaintiff will introduce evidence.  When the Plaintiff is

10   through introducing her evidence, then, of course, the

11   Defendants will put on their evidence and there may be some

12   rebuttal, and then the Court will instruct you on the law

13   and you'll hear argument of counsel and the case will be

14   submitted to you for deliberation and for your decision.

15        All right.  Is counsel ready to proceed?  Mr. --

16        MR. BAIZ:  Yes, Your Honor.

17        THE COURT:  You're going to make the opening

18   statement, Mr. Baiz?

19        MR. BAIZ:  Yes, I am, Your Honor.

20        THE COURT:  Very well.

21        MR. BAIZ:  May it please the Court, members of

22   the jury.  My name is Tom Baiz.  Seated at counsel table is

23   Millie Johnson.  She's the Plaintiff in this action.

24   Seated next to her is Tom Lewis.  You'll also hear from Don

25   Johnson who is Millie's husband sitting in the first row

1   back there, and you'll see Debbie Enruth a lot during this

2   trial.  She is a legal assistant, and she'll be working

3   with us during this trial.

4       If you look at a trial as a puzzle, the opening

5   statement is an opportunity for me to show you what the

6   puzzle will look like once the pieces of evidence and

7   testimony have been put together.  The testimony and

8   evidence in this case will lead you down W. R. Grace's

9   asbestos dust trail starting on the east coast and

10  spreading to Libby, Montana, where W. R. Grace and its

11  predecessor, Zonolite, have operated a vermiculite mine and

12  mill for many years.

13      The vermiculite ore which is mined at Libby is and has

14  always been contaminated with an asbestos fiber known as

15  tremolite.  Exposure to tremolite asbestos at that facility

16  in Libby has meant death and disease to many workers and to

17  their families.  And it's that same exposure to W. R.

18  Grace's tremolite asbestos which has caused Millie Johnson

19  to develop asbestosis.

20      Asbestosis is a disease caused by exposure to

21  asbestos.  And it's a lung disease which is very slow to

22  develop, sometimes taking 20 to 40 years after first

23  exposure for an individual to start showing symptoms of the

24  disease.  But it's a disease that literally squeezes the

25  air from an individual's lungs.

1        The testimony and evidence in this case will show that

2    Millie Johnson is a totally innocent victim of W. R.

3    Grace's tremolite asbestos and an innocent victim as well

4    of W. R. Grace's utter disregard for her health and welfare

5    and the health and welfare of its workers and their family

6    members.

7        Millie Johnson is 53 years of age and a lifelong

8    resident of Libby, Montana.  During her early childhood,

9    her father even worked at the vermiculite mine and mill

10   there.  He worked there for about five or six years.  And

11   Millie went to school at Libby, graduated from high school

12   at Libby.  Shortly thereafter she married Don Johnson in

13   1955, and they've raised their four boys in Libby.

14       From the date of their marriage until 1981, or what is

15   26 years, Don Johnson was exposed to great amounts of

16   tremolite asbestos every workday throughout the 26 years.

17   And you will hear from him about that.  No one at W. R.

18   Grace ever informed Don Johnson of the dangers of asbestos

19   or hazards of asbestos, even though they knew them.  So for

20   26 years, Don Johnson had no idea what he was doing to his

21   lungs.

22       In the early 1980s, Don was diagnosed as having

23   asbestosis.  And he's been followed by Dr. Allen

24   Whitehouse, a pulmonoloigst in Spokane from whom you'll

25   hear in this case.  And Dr. Whitehouse advised Don in 1981

1   that he was totally disabled from his asbestosis.  So Don,

2   at the age of 48, became totally disabled and hasn't worked

3   a day since then.  His asbestosis is now severe and

4   drastically restricting his lung capacity and many of the

5   activities that he could perform as a result.

6       The importance of establishing Don Johnson's disease

7   and the nature of and extent of his disease is because it

8   is from Don Johnson, more particularly from his clothing

9   that Millie Johnson contracted her asbestosis.  Don Johnson

10  would bring the asbestos dust home on his clothes on a

11  regular basis for 26 years.  He worked in a place called

12  the wet mill, and in the wet mill the asbestos dust would

13  stick to his clothes and then it would cake on his

14  clothes.  And so on a regular basis he'd take this clothing

15  home, and it would be caked with asbestos dust.  Millie

16  Johnson would take the clothes, she'd pull open the pockets

17  and there'd always be a considerable amount of dust in the

18  pockets.  She'd shake out the clothes vigorously to get as

19  much of the dust off as he she could, and she'd put it in

20  the washing machine always washing it separately from the

21  family's clothing.  She'd have to clean out the washing

22  machine after washing them.  She'd sometimes rewash, she'd

23  sometimes wash three and four times to try and get the dust

24  out of the clothes.

25      And that is the primary place where she got her

1    exposure.  Also through the family vehicle, which Don would

2    drive to a parking lot and then he would take a bus up to

3    the facility and take a bus back.  And, of course, he'd get

4    in and out of that, and Millie would ride in the car.  And

5    she was the one to clean out the car, and some she got

6    exposure that way too.

7        But even after Don was diagnosed as having asbestosis

8    in the early '80s, Millie never dreamed that she was at any

9    risk whatsoever.  Nobody at W. R. Grace ever told her

10   anything.  She had no idea.  So it was that Millie began to

11   notice shortness of breath.  And she decided to go with Don

12   to Spokane to see Dr. Whitehouse when Don went for his

13   regular exam in 1988.

14       At that time, Dr. Whitehouse performed the

15   examination, and in taking a routine chest x-ray, he found

16   extensive pleural disease.  Now, you'll hear about the

17   pleura and pleural plaques.  But the pleura is the area

18   that -- it's the covering of the lung and the covering of

19   the chest wall.  And it's the area in between those two.

20   It's a very small area.  And what happens is when the

21   asbestos dust is inhaled, it either goes through the lymph

22   system and gets into the pleura or goes through the lungs

23   and travels through lung tissue itself and gets into the

24   pleura.  And then it lodges in the pleura and forms what is

25   called pleural plaques.  And you'll hear that term used.

1  Sometimes they -- pleura plaques are called the calling

2  cards of asbestos.

3      But in any event, he found that and he also did a lung

4  function test or what's called pulmonary functioning test,

5  P-F-Ts.  This is where Millie would blow into a tube and

6  various figures would registered, registering as to her

7  vital capacity in her lungs, her total lung capacity, and

8  that sort of thing.  It was in 1988 that Dr. Whitehouse

9  found that Millie's forced vital capacity was only 83

10  percent of what was -- of the predicted normal for a woman

11  Millie's age, and her total lung capacity was only 87

12  percent.  And this must be considered in the context of a

13  woman who's kept herself in good shape all her life and has

14  been a lifetime non-smoker.  So those figures should have

15  been much higher, like around a hundred percent anyway.

16      So Millie went back for a followup in 1989.  At that

17  time, Dr. Whitehouse determined that she had lost 200 cubic

18  centimeters off of her forced vital capacity and off of her

19  total lung capacity, and you'll hear Dr. Whitehouse explain

20  forced vital capacity, total lung capacity, and the

21  significance of those figures.  In March of this year, she

22  went back for her annual followup examination, and her

23  forced vital capacity had dropped to 80 percent of the

24  predicted normal, her total lung capacity to 83 percent of

25  predicted normal for a woman her age.  And her diffusion

1    capacity to 75 percent.

2        Now diffusion is the ability of the lung tissue to

3    transfer the gases, to transfer -- to make a carbon

4    monoxide and oxygen transfer across the lung tissue.  And

5    that was reduced to 75 percent.  And you'll hear Dr.

6    Whitehouse testify about how that restriction is directly

7    attributable to asbestos and her asbestos exposure.

8        As time has gone on, Millie has become more short of

9    breath with no way of predicting the future.  At the

10   present time, she is still working at U-P-S 15 to 20 hours

11   per week.  But she's finding it increasingly difficult to

12   perform the job tasks, and she fears that her asbestosis

13   may cut her career short there.  And we'll present some

14   testimony as to the compensatory damages attached to that

15   during this trial.

16       Millie's also concerned about her cancer risk.  The

17   fact that she's been exposed to asbestos places her at

18   greater risk for developing a deadly cancer known a

19   malignant mesothelioma.  It's a cancer that attacks the

20   lining of lungs and lining of the chest wall, the pleura,

21   right where Millie has the plaques right now.  And asbestos

22   is one of the few substances known to cause malignant

23   mesothelioma.  And the fact that she has the plaques in

24   addition to asbestos exposure, makes it even more likely

25   that they could cause malignant mesothelioma.  And she has

1    a fear of that.

2        She also has a fear of suffocation.  With weather

3    changes, and if there's pollution in the air like there is

4    in Missoula sometimes, she'll have a difficult time and

5    she'll, you know, be gasping for breath and feel a real

6    tightness in her chest.

7        You'll hear from Millie and Don Johnson about how

8    asbestosis has affected them, and you'll hear from their

9    treating physician, Dr. Allen Whitehouse.  Dr. Whitehouse

10   is in Spokane, and he's a pulmonologist in Spokane.  A

11   pulmonologist is a specialist in pulmonary diseases, lung

12   diseases, including asbestosis and asbestos-related

13   diseases.  He'll talk about his experience with asbestos-

14   caused lung disease.  His experience in general and more

15   importantly his experience with people from Libby in

16   particular, and the people from Libby are those who are

17   exposed through the W. R. Grace facility there, the mine

18   and mill.

19       He'll discuss the types of lung diseases that are

20   caused by exposure to asbestos.  Asbestosis, of course, is

21   the non-malignant type, and he'll talk about that, and

22   he'll talk about how the lungs are affected and how the

23   individual is affected symptomatically.  He'll tell you

24   that asbestosis is not curable, and it's not treatable

25   except maybe symptomatically.  If somebody were to get a

1    cough or something like that, they could maybe treat the

2    cough, but there's no cure and there's no real treatment

3    for it.

4         And as I indicated before, he'll also talk about the

5    mesothelioma risk.  He'll tell you, too, that because he

6    had so many patients from Libby who worked at the mine and

7    mill, that he wanted to go there.  And one day he got an

8    invitation from W. R. Grace to tour the facility and he was

9    very interested, and he accepted it.  But for some reason,

10   it was withdrawn, the invitation was withdrawn at the last

11   minute, so he's never been able to visit the facility

12   there.

13        Finally, Dr. Whitehouse will tell you about Millie's

14   asbestosis and what he thinks about her future, and he'll

15   also discuss Don Johnson's asbestosis, because he's

16   followed him for nine years.  And as I indicated before,

17   that's where Millie got her disease.

18        You will hear, too; in fact, you'll see a video

19   presentation from the Defendant's medical consultant in

20   this case, a man by the name of Nicholas Sargent.  Now, Dr.

21   Sargent has no real relationship to this case whatsoever,

22   except that he was hired by W. R. Grace's lawyer at the

23   rate of $500 per hour to offer testimony at this trial.  We

24   took his deposition at his office in Los Angeles less than

25   a month ago.  He'll testify that he's a radiologist, not a

1   pulmonologist.  In other words, a radiologist is someone

2   who just interprets chest x-rays, and his opinion is based

3   almost exclusively on interpretation of chest x-rays.

4   He'll talk about the criteria for diagnosing asbestosis,

5   which includes a history from the patient; it includes

6   chest x-rays, it includes pulmonary function testing, a

7   finding of shortness of breath, and physiological

8   abnormalities.  And he will admit that he's only trained to

9   do one of those things, and that is interpret the chest

10  x-ray.  And he will tell you that you must look to the

11  treating doctors, in this case, Dr. Whitehouse for any

12  indication as to functional impairment or disability,

13  because he can't offer that as a radiologist.

14      He'll tell you that he's been a consultant in the past

15  for various asbestos manufactures including Johns-Manville;

16  that in four out of five cases in which he's consulted, he

17  testifies on behalf of asbestos companies; and he's been

18  asked by W. R. Grace to consult in 10 or 15 other asbestos

19  injury lawsuits arising out of the W. R. Grace facility at

20  Libby.

21      He was not asked to consult by Dr. Whitehouse in this

22  case.  He's never been involved in any treatment of Millie

23  Johnson.  He's never examined Millie Johnson.  He's never

24  even seen Millie Johnson.  He knows nothing about the W. R.

25  Grace facility.  But despite Dr. Sargent's demonstrated

1    bias in favor of asbestos manufacturers, here is what he

2    states which is of relevance in this case:  That asbestos

3    is a dangerous substance; that the health risk of asbestos

4    exposure has been known in England since the early 1900s

5    and in the world community for many, many years; that

6    tremolite asbestos such as found in Libby is amphibole form

7    of asbestos which is the type most commonly found in lung

8    tissue of workers.  He's seen asbestos caused lung disease

9    in people who simply live in the same house with an

10   asbestos worker.  He admits that Millie Johnson has pleural

11   disease from asbestos exposure.  And he characterizes

12   Millie Johnson's pleural disease as moderately severe.  He

13   admits that asbestos exposure increases the risk of getting

14   the deadly cancer known as malignant mesothelioma; and

15   future progress of Millie's disease is unknown.  He states

16   that only Millie Johnson's treating doctor, in other words,

17   Dr. Whitehouse, can make any determination as to her

18   disability or her impairment.

19        Then we get into the other aspect of this case, which

20   is W. R. Grace's knowledge of the hazards of asbestos in

21   general and their knowledge of the hazards at their Libby

22   mine and mill in particular.  You'll hear excerpts from

23   depositions of, hopefully, J. Peter Grace himself, the

24   chairman of the board, who set up his worldwide corporation

25   so as to know as little as possible about his operations,

1    such as the Libby mine and mill.

2         You'll hear the deposition testimony of a man named

3    Rodney Vining who was in charge of the entire construction

4    products division of W. R. Grace, and that was the

5    subdivision which was in charge of the mine and mill

6    operation in Libby.  And you'll hear from him.  And it's

7    amazing that despite having visited the Libby operation 25

8    to 50 times, receiving documents about it over the years,

9    and authorizing documents, he remembers very little.

10        You'll also hear from Earl Lovick who is seated here

11   today.  He started working for W. R. Grace's predecessor,

12   Zonolite Company in Libby as an accountant in 1948, became

13   assistant manager in '62, and worked in that capacity until

14   1968, at which time he became general manager of the Libby

15   mine and mill.  He was W. R. Grace's corporate connection

16   at Libby.  He saw much of the flow of documents which

17   you'll see that went between W. R. Grace officials and

18   which related to the Libby mine and mill.

19        Finally, you'll be able to see the trail of documents

20   establishing W. R. Grace's knowledge of the hazards of

21   asbestos.  This starts with the knowledge of the hazards of

22   asbestos at their corporate headquarters on the east coast

23   many years before W. R. Grace took over the Zonolite

24   operation at Libby, Montana.  You'll be able to see Montana

25   State Board of Health documents from inspections which they

1    did at the Libby facility starting in the mid 1950s.

2    You'll be able to look at an x-ray study which was

3    performed on workers back in 1959 and which showed 48 out

4    of a hundred and thirty employees that were checked had

5    abnormal chest x-rays.   In 1963 and 1964 the Montana State

6    Board of Health performed followup inspections at Libby.

7    The dust counts taken in those followups, this is after

8    W. R. Grace took over in '63, all exceed the 5 million

9    paricles per cubic foot allowable concentration.   And what

10   you have to understand is that's a concentration that has

11   been drastically reduced over the years.   Now the allowable

12   concentration is like point two fibers per cubic

13   centimeter.   Back then the allowable concentration was 5

14   million particless per cubic foot of air.   Yet all of the

15   figures registered were well over that.   In fact in the

16   1963 counts the dust counts ranged from 10.7 million

17   particles per cubic foot to 10.2 million particles per

18   cubic foot.   Also these reports pointed out a serious dust

19   concentration at Libby.

20        And in those reports -- you'll be able to look at

21   them-- it will show the connection between asbestos

22   exposure and cancers such as malignant mesothelioma which

23   I've already mentioned.

24        None of this information was made available to Don or

25   Millie Johnson, even though they had it and had had it for

1   years.  You'll be able to look at an x-ray and spirometry

2   study.  Now, spirometry is basically the pulmonary function

3   test which I referred to earlier and which you will hear

4   about.  A spirometry study was done in 1964 showing serious

5   hazard for its employees, and Don Johnson was even a part

6   of that in one or more of the documents.  You'll even see

7   his name listed as to the x-ray results.

8       Also in 1964, W. R. Grace knew that a worker of seven

9   years, only seven years was diagnosed as having asbestos

10  caused lung disease.  In January of 1965, the man who was

11  in charge of the Libby operation at the time, a Mr. Blake,

12  was reviewing a decade of reports on the Libby mine and

13  mill, and he stated this:  I quote, "I can only say that it

14  represents a very sorry record."

15      Also, in 1965, there were abnormal chest x-rays in 18

16  out of 39 employees at Libby who had ten or more years of

17  employment there.  By 1968 or 1966, excuse me, W. R. Grace

18  had knowledge of the link between asbestos exposure and

19  cancer.  And in fact, they had knowledge that the exposure

20  didn't need to be continuous for the link to be shown.  A

21  1967 American Journal of Medicine article reported that

22  simply living in the same house as an asbestos worker could

23  produce serious lung disease.

24      This certainly would have been important for Millie

25  Johnson to know, but she was never told.  Also in 1967,

1   there was a hearing before the Montana State Industrial

2   Accident Board.   And this hearing was concerning a W. R.

3   Grace worker at Libby who had asbestosis from his work at

4   the mine and mill there.   A W. R. Grace lawyer from the

5   east coast who was reporting to other Grace officials on

6   this hearing stated, and I quote:   "A record has now been

7   made that there is a danger of asbestosis in our

8   operation."

9       In 1968, W. R. Grace knew that relatives of asbestos

10   workers were at risk for lung disease, and this included

11   women who had washed their husband's work clothes

12   regularly.

13       Despite knowing this, there was still no warning, no

14   mention to Millie Johnson.   In 1969, W. R. Grace officials

15   were still pondering just how much they should tell their

16   employees that their own lung conditions.

17       In 1969, also, a document entitled "The Vermiculite

18   Ore Review" appears to have crossed the desk of J. Peter

19   Grace himself, the chairman of the board of W. R. Grace;

20   and it indicated that tremolite asbestos at Libby was a

21   definite health hazard.

22       Microscopic tests which were done revealed that the

23   Libby tremolite asbestos had a five to ten times greater

24   chance of causing a cancer than a more common type of

25   asbestos fiber known as crysotile.

1       In the latter 1960s, the Public Health Service was

2   interested in studying populations that were exposed to

3   asbestos disease.  W. R. Grace refused to cooperate.  In

4   June of 1968, the Public Health Service sought the names of

5   former employees at the Libby mine and mill so they could

6   do some research on asbestos disease.  W. R. Grace

7   superiors refused to give permission to release the names

8   and they stated, "We should not give any listings of

9   employees unless there is a legal requirement to do so."

10      When permission was sought again to release the names,

11  the Grace superiors stated that they'd run it through

12  Cambridge, which is their headquarters again, and the

13  answer is still the same, "We do not choose to divulge the

14  information."

15      Members of the jury, at the close of this case, we're

16  confident that Judge Pregerson will present to you

17  questions as to the compensatory damages that may be

18  awardable to Millie Johnson to compensate her for her

19  losses, past, present, and future.  And also a question as

20  to punitive damages which are used to punish W. R. Grace

21  for their conduct.

22      The testimony and evidence that we present in this

23  case will be presented in support of our two theories as

24  the judge has already indicated to you.  The first is

25  strict liability.  And with our strict liability theory, we

1    are -- our position is that W. R. Grace is liable for

2    allowing an abnormally dangerous substance, namely

3    asbestos, to escape its mine and mill operation and to

4    damage Millie Johnson's lungs.

5        Our other theory of liability is negligence.  And here

6    we'll show that W. R. Grace knew of the health hazards of

7    asbestos and the health hazards of its own operation at

8    Libby, but despite knowing that, that they failed to warn

9    Millie Johnson of the dangers.  They had a duty to warn,

10   but they failed to warn.  They had a duty to take

11   precautions to protect Millie Johnson and others in her

12   position, but they failed to take those precautions.  They

13   didn't -- They didn't provide washers and dryers up on the

14   hill.  Showers were only there for a very short period of

15   time and got so clogged with asbestos that they used it as

16   a storage room, and they didn't have adequate facilities to

17   protect.  They just simply didn't take adequate measures to

18   keep their asbestos dust on their own premises, even though

19   they knew how dangerous it was.

20       Then at the conclusion of the case, it will be in your

21   hands.  And as my dad always used to tell me, you need to

22   keep your eye on the ball.  We don't have any ball here,

23   but the ball is the truth, ladies and gentlemen.  And don't

24   be diverted from the truth in this case, the truth about

25   W. R. Grace's conduct and the truth about asbestosis and

1    what it has done and will do to Don and Millie Johnson.

2    Because the truth was the same yesterday as it is today and

3    as it will be tomorrow.  I'm confident that you'll find the

4    truth in this case and that you will do justice through

5    your verdict.

6        Thank you.

7        THE COURT:  Thank you, Mr. Baiz.  Mr. Graham, do

8    you wish to make an opening statement?

9        MR. GRAHAM:  Yes, sir, Your Honor.  We would at

10   this time.

11       THE COURT:  Vey well.

12       MR. GRAHAM:  May it please the Court, lady and

13   gentlemen of the jury.  It's always difficult going second,

14   because you have to many things that you want to say in

15   reaction to the things that were said initially.  But I

16   suppose it's better going second than going first and not

17   being able to respond to the comments that are being made.

18       Obviously, in this case, the evidence will be

19   presented after these arguments -- after these opening

20   statements, and then there will be a lot of argument about

21   what the evidence means.  So you'll get a lot more of

22   lawyer talk after the evidence comes in.

23       What I would like to do, and it may take -- it may

24   take a few minutes, and I would appreciate your patience

25   during the few minutes that it takes me, what I would like

1    to do would be to provide you with a little bit of a

2    historical background with respect to the Libby operation

3    so that you can understand the evidence as it comes in

4    throughout the case, and so that you can get a better

5    picture of precisely what aspects of knowledge were known

6    to various groups of people at various times.  That's

7    undoubtedly going to be very significant as you listen to

8    the evidence.

9        The events in this case span about 40 years.  Go back

10    to the '50s.  And each of you could look back in your life,

11    and 40 years is a lot of time and a lot of documents and a

12    lot of things that have happened.  But in any event, as I

13    go through this 40 years, I'll try to capsulize it, and

14    like I say, I hope that it will help you as you're

15    listening to the evidence understand how everything came

16    together.

17        First of all, I'd like to remark as to the

18    relationship between the parties.  Because as you know, we

19    have Mrs. Johnson as the Plaintiff in this case and W. R.

20    Grace, who's represented here today by Mr. Lovick, as the

21    Defendant in this case.  Mr. Lovick is here because of the

22    fact that of all of the people who were involved with W. R.

23    Grace and its predecessor Zonolite in Libby, Earl is

24    probably the one that knows more about what happened up

25    there.

1       In any event, there is no direct relationship between

2    these parties.  Mrs. Johnson, as you know, did not work at

3    the mine and mill in Libby.  She visited on a few occasions

4    with guests but didn't work there.  Her husband worked

5    there as has been described.  The claim as has been told to

6    you is that he brought his clothing home and it had some

7    asbestos dust on the clothing.  The claim is that that led

8    to the asbestos related disease that has been diagnosed in

9    Mrs. Johnson.

10       The evidence will be primarily from the testimony of

11    Mr. Lovick that W. R. Grace nor Zonolite before it had any

12    idea that any of the asbestos that they knew to be a

13    natural contaminant at the Libby mine and mill would find

14    its way into homes and affect the people, the housewives

15    and other people living in the homes.

16       It will be the evidence on the part of the Defendant,

17    W. R. Grace, that there was no knowledge by Grace that

18    Mrs. Johnson would be harmed.  There was no medical basis

19    at that time for making that prediction, and it was not

20    reasonably foreseeable based on Grace's knowledge.

21       Now, what was the purpose of the mine and mill at

22    Libby?  The purpose of the mine and mill was to mine and

23    process -- put into concentrate form a substance known as

24    vermiculite.  It was discovered there in the 1900s.  The

25    mill and mine are about 12 miles out of Libby, and I always

1    get confused out of Libby because what I think is east and

2    west is usually north and south.  But it's 12 miles out

3    towards the Libby dam.

4         Vermiculite is a very versatile product.  It expands

5    and has been used as insulation.  A lot of people have

6    known it to be a substance called Zonolite.  And it -- It's

7    strange because when it's mined, it's mined in little flat

8    flake sorts of things, or substance.  And then to change it

9    into the substance that is marketed ultimately, it's put

10   into a high heat process and the moisture in the

11   vermiculite causes it to expand and it forms a very light-

12   weight insulating type of substance.  Sometimes it's

13   referred to as worms, because it looks sort of like a worm

14   that has gone from a flat little piece of vermiculite.

15        We'll show you photographs of that, the two different

16   substances, the vermiculite before it's expanded and

17   vermiculite after it's expanded, so you can see what it

18   looks like.

19        As I say, it's used in a number of ways.  Insulation

20   is one.  Gardens, texturing, various and sundry things.

21        Now, this mine and mill were established by Zonolite.

22   And it's an open mining, open operation.  The ore was taken

23   from this sort of open hilltop and transferred to a

24   transfer point with trucks and then went through a milling

25   process.  And basically, the milling process consisted of

1    taking the waste rock from this vermiculite so that when

2    the -- when the process came out of the mill or when the

3    product came out of the mill, it was essentially

4    vermiculite.  This is the process that ended up creating

5    the dust problem that they had at Libby right in the

6    inception, particularly in the dry mill, because what they

7    would do is they would use shakers and screeners, something

8    like, I suppose, you could imagine an old-fashioned

9    threshing machine or a combine shaking things and causing

10   the flake material to precipitate out and then go off and

11   be processed.

12       As I say, in this rock was a natural product called

13   tremolite, and it is as Mr. Baiz indicated, a form of

14   asbestos.  That was part of what they were trying to take

15   out of this product before they marketed it.  And that was

16   part of this whole manufacturing process.  The Libby mill

17   was unique in that regard, because that's, as I understand

18   it, the one location where there was this tremolite in the

19   vermiculite deposits that they were working with.

20       Anyway, it didn't involve situations where asbestos

21   was produced or utilized for purposes of commercial

22   marketing.  In fact, they didn't want to have the asbestos

23   in the product.  After the stuff was concentrated, after

24   the vermiculite was concentrated, then typically it would

25   be sent off to be expanded in other areas.

1    Now, as I indicated, it was the -- the operation was

2    originally owned by Zonolite Company, and it was a smaller

3    company with headquarters in Chicago, as I recall.  They

4    owned the mine, the mill, and some expanding plants, other

5    expanding plants operated under license.

6    W. R. Grace first became involved in this thing in

7    1963, and this would have been some 10 to 15 years -- 10 to

8    12 years after Don Johnson started working up at the Libby

9    mine and mill.  W. R. Grace has operated it since that

10   time.

11   There was a problem with dust at the Libby mine and

12   mill and the facility from the beginning.  As I indicated,

13   it was the dry mill where these rocks and debris were taken

14   from the vermiculite that was the dustiest of the

15   locations.  As Mr. Baiz indicated, the Board of Health made

16   a number of visits.  And they originally came up, I think

17   in about 1940 sometime, but the first report that is

18   probably significant and will be shown to you is the report

19   in 1956.

20   What they did is they tested for the particulates in

21   the air something like they do here in Missoula during the

22   wintertime, I guess.  Over the years, the concept and ideas

23   of the amount of dust exposure changed as you've seen it

24   change in other situations.  Originally it was spoken of as

25   the maximum allowable concentration.  And it presumably at

1   that point was the line between what was safe and what

2   could be considered to be unsafe.  It wasn't a precise

3   dividing line as the reports that you will read show.

4        In the '40s and '50s, there was a safe level of 50

5   million parts per cubic foot of dust.  In 1956, another

6   standard came into play, and that was 5 parts per million

7   -- or five million parts per cubic foot, but that was a

8   hundred percent asbestos dust.  And the problem was that no

9   one knew how much tremolite dust was contained in all of

10  this dust that they were getting.  There weren't accurate

11  ways to measure that at that time.

12       The Board of Health estimated it at 8 percent, and at

13  some times some of the locations exceeded that, and W. R.

14  Grace or at that time it was Zonolite, but that's something

15  that's shown in the reports, and it's admitted to be the

16  case.

17       Over the years, the Board of Health continued their

18  inspections, and when W. R. Grace -- and that information

19  will be provided to you.  When W. R. Grace took over, they

20  attempted to accelerate the cleanup process, and over the

21  years before W. R. Grace had taken over, there were some

22  attempts made to try to clean up the dust.  They had fans

23  and tried to cover up the areas that were creating the dust

24  and all of that.  But at the time that W. R. Grace took

25  over, there wasn't any indication that it was an emergency

1    situation.  And so they -- That was not indicated by what

2    they heard of the conditions.  So they proceeded to try to

3    continue to clean it up at a reasonable rate.

4         As time went on, as I indicated, the standards that

5    the Board of Health were applying became more stringent as

6    you frequently see with Board of Health types of things as

7    more is discovered.  They went to a 20 million part per

8    cubic foot figure, then down a 10 million part per cubic

9    foot figure, then to a totally different measurement called

10   fiber count.

11        At any rate, the old mill could only be cleaned up so

12   much.  And ultimately when the technology became available

13   and as soon as the technology became available, W. R. Grace

14   eliminated the old dry mill and a wet mill which was

15   operating at that time, as Mr. Baiz indicated, that's where

16   Don Johnson worked, they eliminated those two and put a

17   totally new mill in which satisfied all of the federal and

18   state requirements with respect to dust exposure.

19        The engineering of that mill started in 1969.  And it

20   was a difficult process to get it engineered, because it

21   was something entirely new, and the testimony will be that

22   it was very difficult to get it up and running and

23   processing the ore.

24        From that point on, the dust levels at the vermiculite

25   mine and mill were believed to be safe.  It involved this

1    whole process of improvement, first from the 1963 period

2    until 1974, and then the construction of the new mill

3    involved considerable expenditures of funds establishing a

4    commitment by W. R. Grace to the safety of its workers.

5        Now, Mr. Baiz has described briefly for you the

6    concept of asbestos exposure and what health effects there

7    are related to asbestos.  As we now know, asbestos is a

8    dangerous substance.  Different forms of asbestos seem to

9    be more dangerous than other forms.  Usually, however, when

10   we hear of asbestos being dangerous, we hear of it in terms

11   of insulations or fire protection, or we remember it being

12   used on furnaces or boilers.  We thought it was then a

13   miracle fiber because it was perhaps the best insulator or

14   fire protective device that existed.

15       But at Libby, the tremolite, which is a form of

16   asbestos, is a natural product.  It comes right out of the

17   ground.  You can pick up pieces of it.  We'll have

18   photographs to show you of the asbestos as it just comes

19   out of the ground.  But as we know now, it can cause

20   problems in susceptible people.  For instance, Mr. Baiz

21   spoke of lung cancer where there are high exposures to

22   asbestos.  That's not one of the matters that need concern

23   you in this case.

24       A person who's sufficiently also exposed can also get

25   asbestosis.  Mr. Johnson is an example of a person with

1   asbestosis.  In that disease, the asbestos affects the

2   lungs by scarring the lungs.  Sometimes called interstitial

3   fibrosis.  You'll probably get a lot of these terms thrown

4   at you throughout the period of this trial, but they'll be

5   explained by the doctors or by whoever's testifying.

6       Then there's another disease process which is related

7   to asbestos which is involved in this particular case, and

8   that's pleural disease.  Pleural plaques.  And the best way

9   to describe that is by just illustrating where it is that

10  the pleura is and where the plaques form.  And if you take

11  my two fists and say that my left arm is the lung and my

12  right arm is the chest wall, the space in between is called

13  the pleural space.  My left hand, or the lung, would be

14  covered by a layer, a very thin layer of tissue called the

15  visceral pleura.  The chest wall part of my hand would be

16  covered by a very thin layer called the parietal pleura.

17  And with pleural disease, there are plaques that form on

18  the inside of the parietal pleura.  Those are typically

19  asymptomatic, and as Mr. Baiz said, are referred to

20  frequently as just a calling card of asbestos exposure.

21      So if you have had -- If you have pleural plaques,

22  essentially what it means is that you've been exposed to

23  asbestos.  They typically only show up on x-rays or C-T

24  scans, and as I say, it only shows that the person was

25  exposed.  And that's what we have involved in this

1    particular case.

2         There is one similarity between all of these, and that

3    is the latency period from the time of exposure until the

4    time of the -- the disease becomes apparent.  And Mr. Baiz

5    spoke of that as well.  We're talking in terms of 15 to 30

6    years between the time of the exposure and the development

7    of the disease to the point that you can see it.  So when

8    you look at what's happening today as far as health picture

9    is concerned, you have to look back 15 to 30 years before

10   to find out what the situation was like as far as the

11   exposure and as far as the knowledge concerning asbestos at

12   that time.

13        Now, as I indicated, W. R. Grace or Zonolite before

14   W. R. Grace, was aware of the dusty conditions and they

15   provided respirators, breathing devices in the dustier

16   parts of the mine and mill, made them mandatory in the dry

17   mill which was the dust creator up there.  You'll be shown

18   Board of Health reports by the Plaintiff in this action,

19   and you'll note that most of them relate to inspections

20   only of the dry mill, because that was the area that they

21   were concerned with.  They knew that the dust was not

22   healthful to the workers, but they didn't know about

23   tremolite.  There was very little written about tremolite.

24        The testimony will be that the stuff that was written

25   related to the other forms of asbestos that are more

1    common.   Tremolite is fairly rare as far as occupational

2    exposure.

3         Now, in 1959, W. R. Grace took x-rays of all their

4    employees.   And it was a system -- They used a system that

5    was designed in cooperation with the doctors in Libby.   And

6    the idea was that all of the employees would be -- would be

7    x-rayed to determine whether they had lung problems.   Now,

8    the doctors agreed that this procedure would be the best.

9    They provided the results to the family physician of each

10   one of the employees, so that the person who ended up with

11   the x-ray report was the doctor that was normally in charge

12   of treating that particular individual.   The idea was that

13   the doctors would then tell the employees about the results

14   of the x-ray.

15        Mr. Lovick will testify that the reason that that was

16   done was so that qualified medical people would be able to

17   talk to the individuals who were the workers up there about

18   any conditions that they may have, rather than have the

19   information provided by non-medical personnel.

20        Now, the workers were told when their x-ray reports

21   were available and so they were supposed to go in and see

22   their doctor when the x-ray reports were available.   The

23   x-rays, as Mr. Baiz indicated, did in fact show a number of

24   abnormal chests, but they were abnormal for all different

25   kinds of reasons.   And when we go into that particular

1    area, we'll discuss it in more detail in the testimony.

2         In 1964, there was a program set up so that there were

3    x-rays every year.  And the individuals were told to talk

4    to their doctor about the x-ray reports every year so the

5    health of the employees was monitored on a yearly basis.

6         You've heard that pulmonary function tests were taken

7    in 1964, and then starting in the '70s, they were taken

8    every year and the employees were told of all of the

9    pulmonary function test results.  In 1964 when they took

10   those pulmonary function tests, which are breathing tests,

11   they attempted to correlate them with the x-rays.  They

12   were sent off and nothing of a conclusive nature was found

13   with regard to the examination of those pulmonary function

14   tests.

15        Similarly, a study was -- Or the doctors consulted --

16   Libby doctors consulted with regard to the x-rays up there

17   in 1959 and didn't find any conclusions that could be drawn

18   from the x-rays as to whether Libby presented a danger or

19   didn't present a danger to the health of the workers.  And

20   that was done with the doctors.

21        So as time went on, in the mid '60s, there was some

22   indication of the first asbestosis case.  The first

23   asbestosis hearing as has been discussed previously was in

24   1967.  And at that point, W. R. Grace recognized that some

25   of the people who were the employees up there might be

1    getting diseased.  At that very same point, W. R. Grace

2    undertook with a sense of urgency, the improvement of the

3    conditions at the mine and mill.  And very shortly

4    thereafter is when the technology finally became available

5    to replace the whole thing.  And as I indicated, at

6    substantial cost, they replaced the whole mill.

7        So over the years the dust levels had been lowered by

8    various improvements.  There will be the testimony about

9    each one of those steps.  The standards had been lowered by

10   the Health Department as always.  And the plant was

11   redesigned.  And that was 17 years ago that that was done.

12   A long time ago.

13       Over the years, studies had been suggested, and

14   Mr. Baiz had pointed out, for example, we'll take the H-E-W

15   request for information concerning employees' names and so

16   forth.  There was a request for providing the names so that

17   H-E-W could conduct a study, and the decision was made for

18   some reason or another not then to provide the names.  But

19   a year or two later, the names and information were all

20   provided, and H-E-W did not undertake the test simply

21   because of the fact, apparently, that they didn't have the

22   funds to do the study at that time.  So while there were

23   studies proposed, we'll talk about the studies that were

24   proposed and the difficulties in getting those

25   accomplished.

1      Now, I've taken too much of your time, but I want to

2    spend just a few moments with respect to relating it to

3    this specific case.  As we've indicated, Mrs. Johnson has

4    pleural plaques.  It's been diagnosed by x-ray.  We've

5    indicated that those are the calling cards of asbestos

6    exposure, and so she got that asbestos exposure at some

7    point in her life.  Presumably between 20 and 30 years

8    ago.  But typically, pleural plaques are asymptomatic, they

9    don't cause any symptoms.

10      She claims, Mrs. Johnson claims some shortness of

11   breath, and that's been reported to her physician, and it's

12   been reported by her to have existed over a number of

13   years.  Her testimony at the time we took her deposition

14   was that it didn't interfere with her work, and she'll tell

15   you about all of that.

16      I should mention that during the part of the lawsuit

17   where we're preparing to get ready for the trial, we take

18   depositions, which are documents that are sworn statements

19   under oath, and so we have an idea what the other side's

20   going to say and what the testimony is going to be.  And we

21   have to rely upon what's said in those depositions in

22   preparing for our cases.

23      So at the time the deposition was taken, Mrs. Johnson

24   indicated that it didn't interfere with her work.  She'd

25   had no medical expenses except for the two, I think, doctor

1   visits or maybe three doctor visits that she had had to

2   Dr. Whitehouse.   There will be testimony that there was no

3   progression in her disease and that there was no disability

4   related to her disease.

5        Now, undoubtedly, her husband, Don Johnson, will

6   testify here at trial.   And there will be testimony

7   concerning the fact that he has a serious breathing

8   problem, a lung problem.   Mr. Johnson has had his own claim

9   and that's all been entirely resolved.   So the only claim

10  that's being forwarded here by the Plaintiff is the

11  Plaintiff's own claim, Mrs. Johnson's own claim that has

12  nothing whatsoever to do with any claim by her husband.

13  We're only concerned about her physical condition as it

14  relates to this particular case.

15       There was slight mention of Dr. Sargent.   And you'll

16  see a videotape deposition of Dr. Sargent, and it is in

17  fact true that his fee was fairly substantial.   But when

18  you look at his curriculum vita, his resume that's attached

19  as an exhibit in this case, you will see that he is one of

20  the world's foremost experts on radiology, x-rays, and

21  asbestos-related diseases.   He has written extensively in

22  the field, and the reason that he can't be here at trial,

23  you'll find out from his deposition, is that he's

24  presenting a paper on asbestos-related problems at a

25  conference in Sweden, so his testimony is going to be with

1    respect to the x-rays that he looked at and his testimony

2    is going to be -- or is that Mrs. Johnson's problems as far

3    as you can see from the radiology, from the x-ray, is all

4    on the chest wall parietal pleura, pleural plaques side;

5    and that she has no problems inside the lung.  Nothing

6    inside the lung creating a problem with her breathing.

7        There will be testimony as well indicating that there

8    are other reasons for shortness of breath.  There are a lot

9    of other things that can happen when people get short of

10   breath, and some of us even notice it as a natural process

11   of aging, we breathe a little deeper as we go up the stairs

12   when we are going home.

13       In conclusion, I've -- I don't know whether you've

14   ever seen it, they've had these brief histories of time

15   things where they've taken photographs and run through a

16   long period of time with photographs in just a few minutes;

17   and that's what I sort of feel like I've done here.  We've

18   gone through 40 years' progress with respect to the

19   Zonolite plant and W. R. Grace plant in Libby.  We'll round

20   that out for sure during the testimony here today.

21       Much has happened, and much of what has happened, I

22   haven't had the opportunity or the time to mention to you

23   this morning.  But it's our contention and our belief that

24   when you view all of the evidence, you will find that there

25   has been continual improvement from the early '50s in the

1    operating conditions at the mine and mill as far as

2    attempting to control the dust problem.  There will have

3    been some fluctuations with regard to dust level, but the

4    improvement has been continuing.  There will be evidence of

5    careful monitoring of the employees from at least 1964 on,

6    and that's when W. R. Grace took over the mine and mill.

7    And it's our belief that there will not be evidence of any

8    callous disregard of either the employees or any third

9    parties like Mrs. Johnson in this particular case.  The

10   evidence simply will be and Mr. Lovick will tell you that

11   they had no idea that there would be exposure problems that

12   could be created to people who weren't employees at the

13   mine and mill and who didn't come up to the mine and mill

14   for any purposes.

15       During the process of this trial, we will trust that

16   you will do several things.  We will trust that you will

17   judge the case on facts and not on sympathy.  We trust that

18   you will await until the entire case is submitted to you

19   before you make up your mind what's right and what's wrong

20   in this case.  We trust that you will treat W. R. Grace the

21   same as you would treat an individual that walked into the

22   courtroom.  We trust that you will apply the law that the

23   Judge gives you.  We trust that you will remember the

24   context of this action.  And by "context" I mean, the time

25   periods in which the events occurred that are significant

1    in the case and the knowledge that was available at that

2    time.  And then finally, we trust that you will treat only

3    the case that is presented to you here today and over the

4    next few days and won't think about other people's cases,

5    particularly Mr. Johnson's which has already been

6    resolved.

7        I certainly appreciate your attention, ladies and

8    gentlemen of the jury, and thank you for serving here

9    today.

10       THE COURT:  Thank you, Mr. Graham.  I think this

11   would be an appropriate time for us to take a noon recess.

12   I'll excuse you until one o'clock, and you'll start hearing

13   testimony at that time.  But please remember that you are

14   not to discuss this case among yourselves or with anyone

15   else until it's finally submitted to you.  And that will

16   happen, as I pointed out earlier, after you've heard all

17   the evidence, the Court's instructions on the law, and the

18   argument of counsel, and that will take place probably

19   sometime early next week.

20       So with that, I'll excuse you and we'll resume at one

21   o'clock.

22           (The proceedings in this matter were recessed at

23   11:52 a.m. and reconvened at 1:13 p.m.)

24           (The following proceedings were had in open

25   court, with the jury present, beginning at 1:13 p.m.:)

1          THE COURT:  All the jurors are present and all

2     counsel are present.  Before I ask the attorneys for the

3     Plaintiff to call their first witness, I just want to tell

4     you two things, members of the jury:  Remember that Mildred

5     Johnson is the only Plaintiff in this case.  In considering

6     the issues in her case, you are not to consider or be

7     influenced by the disposition of her husband's case.  Do

8     you understand that?  Do you understand what I'm saying?

9     Okay.

10         And then the other statement I wish to make is this:

11    That the W. R. Grace and Company is the successor to

12    Zonolite Company.  And unless you're otherwise instructed,

13    the conduct and activities of Zonolite are to be considered

14    as the conduct and activities of the W. R. Grace and

15    Company.  Do you understand that?  Is that clear to you?

16         THE COURT:  All right.  Fine.  Thank you.  You

17    may call your first witness.

18         MR. LEWIS:  Thank you, Your Honor.  The Plaintiff

19    would call Mr. Earl Lovick to the witness stand.

20

21    EARL D. LOVICK, having been called as a witness on behalf

22    of the Plaintiff, being first duly sworn according to law,

23    was examined and testified as follows:

24

25         CLERK OF COURT:  Would you please state your name

1    and spell your last name.

2            THE WITNESS:  My name is Earl D. Lovick.

3    L-O-V-I-C-K.

4            CLERK OF COURT:  Thank you.  You may be seated.

5                    DIRECT EXAMINATION

6    BY MR. LEWIS:

7    Q    Mr. Lovick, where do you currently reside?

8    A    1021 Idaho Avenue, Libby, Montana.

9    Q    Who is your employer?

10   A    I'm unemployed.  I am retired.

11   Q    Well now, Mr. Lovick, that's not quite true, is it?

12   Isn't it a fact that you're employed to attend this trial

13   for W. R. Grace?

14   A    Yes, sir.

15   Q    And they're paying you to appear in this trial; is

16   that true?

17   A    Yes, sir.

18   Q    And you do consulting work for W. R. Grace from time

19   to time, and you've done so ever since you've retired; is

20   that true?

21   A    Yes, sir.

22   Q    When did you technically retire or retire as a full-

23   time employee from W. R. Grace?

24   A    June 30th, 1983.

25   Q    When you retired from W. R. Grace on June 30, 1983,

1    how long had you been in the service of W. R. Grace or its

2    predecessor in interest, Zonolite Corporation?

3    A    Just over 35 years.

4    Q    Since your retirement, have you been asked by W. R.

5    Grace to -- or paid by W. R. Grace to compile certain

6    information concerning asbestos-related lung disease

7    arising out of the Libby operations?

8    A    Yes, sir.

9    Q    And have you been paid to give depositions by W. R.

10   Grace in a number of cases similar to this?

11   A    Yes, sir.

12   Q    And is it true that this is the first case of this

13   kind to ever be submitted to a jury or to be tried to a

14   jury?

15   A    I don't know.

16   Q    Well, Mr. Graham said in his opening statement that

17   you were the corporate representative.  And the reason you

18   were the corporate representative was because you knew more

19   than anyone else about what went on at the mine and the

20   mill.  Do you recall that statement he made?

21   A    Yes, sir.

22   Q    Do you know of any other case that's ever been

23   submitted to a jury in Montana?

24   A    No, sir.

25   Q    What's your educational background, sir?

1    A    I have a Bachelor of Art's Degree in business

2    administration from the University of Montana.

3    Q    When did you obtain that degree?

4    A    In 1947.

5    Q    After you graduated from the University of Montana,

6    what was your first job?

7    A    After I graduated from the University of Montana, I

8    took two quarters of graduate work, and then I was hired by

9    Zonolite Company.

10    Q    What was the nature of your graduate work?

11    A    It was in the -- It was in business administration

12    with a major in accounting.

13    Q    You were hired by Zonolite in the accounting

14    department; is that correct?

15    A    Yes, sir.

16    Q    What was your initial job title?

17    A    Accountant.

18    Q    How long did you hold that particular position?

19    A    Well, I held the position of accountant until 19- --

20    1961, I believe it was.

21    Q    So from 1948 to 1961, you worked as an accountant; is

22    that true?

23    A    Yes, sir.

24    Q    And then what position did you take?

25    A    Well, my title at that time in 1961 was assistant to

1    the manager, and the up until that time, I had the

2    responsibility for the accounting plus -- plus some other

3    responsibilities.  And in 1961 an accountant was hired to

4    do the major part of the accounting work.

5    Q    From 1948 to 1961, as an accountant, where was your

6    office located?

7    A    In the town of Libby, City of Libby.

8    Q    Is the headquarters for Zonolite or W. R. Grace's

9    operations located in the town of Libby as opposed to on

10   the mountain?

11   A    For the Libby operations, it was in the City of Libby,

12   yes.

13   Q    So for the entire period of your employment by

14   Zonolite or W. R. Grace, the headquarters was in the town

15   of Libby; is that correct?

16   A    Yes, sir.

17   Q    And that was about 12 miles away from the mill; is

18   that correct?

19   A    By road, yes.

20   Q    And how far -- How far as the crow flies?

21   A    From -- Between seven and nine miles.

22   Q    You know, when I go to Libby, sometimes I stay at a

23   place called the Venture Motel.  Have you ever been there?

24   A    Yes, sir.

25   Q    You can stand at the Venture Motel and see that white

1    gash, you know, on the side of that mountain.    Is that the

2    mine?

3    A    Yes, sir, it is.

4    Q    Do you recall when W. R. Grace acquired Zonolite

5    Company?

6    A    Yes, sir.

7    Q    What was the date of that acquisition?

8    A    April 20th, 1963.

9    Q    And at that time, were you still assistant manager?

10    A    Yes, sir.

11    Q    Who was your immediate supervisor when you became

12    assistant manager?

13    A    Raymond A. Blake.

14    Q    And was he -- Did he maintain the position of manager

15    of the mill when W. R. Grace acquired the company?

16    A    Yes, sir.

17    Q    For how long?

18    A    Until 1968.

19    Q    What happened that caused him to leave the company or

20    to cease being manager in 1968?

21    A    He died.

22    Q    What did he die of?

23    A    Lung cancer.

24    Q    When Mr. Blake died of lung cancer in 1968, did you

25    become manager of the plant?

1    A    Yes, sir.

2    Q    And was your office still at that time in the town of

3    Libby?

4    A    Yes, sir.

5    Q    And was your office as assistant manager in the town

6    of Libby?

7    A    Yes, sir.

8    Q    And your primary function up until that time had been

9    in the area of accounting and business; is that true?

10    A    Yes, sir.

11    Q    And that was what your formal education involved,

12    accounting, crunching numbers, that sort of thing; is that

13    correct?

14    A    Yes, sir.

15    Q    And so up until 1968, it would be fair to say that you

16    spent very little time on the mountain; is that correct?

17    A    I don't know what "very little time" means, sir.

18    Q    Well, you spent the vast majority of your time in the

19    office; is that correct?

20    A    Yes.

21    Q    And in fact, I've seen some exhibits here, and to

22    speed things up, I'll try to deal with it in a general

23    way.    There are exhibits here where you folks at the mine

24    tried to differentiate between the various jobs as to who

25    had the most dust exposure; right?

1    A    Yes, sir.

2    Q    Would you agree with me that the place that had the

3    least dust exposure in the whole company was the office

4    where you worked in the town of Libby?

5    A    Might I ask when you say "the whole company," are you

6    speaking of the Libby operation?

7    Q    That's good point.  I apologize.  Let me change the

8    question.  Good point.  As to the operations in Libby, the

9    place in the company that had the least dust exposure,

10    would that be the office where you worked in the town of

11    Libby?

12    A    Yes, sir.

13    Q    And when you became manager of the company in 1968,

14    how long did you hold that position?

15    A    Until 1971.

16    Q    What happened in 1971 that resulted in your changing

17    your position.

18    A    In 1971, there was a man brought in from another

19    branch of the Grace organization to head up the Libby

20    operation while they were building a new mill and getting

21    that on stream.

22    Q    Is the mine or the mountain where the mine is located

23    sometimes referred to as Vermiculite Mountain?

24    A    Yes, sir.

25    Q    In 1971, you had already been diagnosed as having

1    asbestosis yourself; is that true?

2    A    No, sir, that's not true.

3    Q    Did you in fact have surgery for asbestos-related

4    pleural disease in the early 1970s?

5    A    Yes, sir.

6    Q    When?

7    A    To the best of my recollection, it was 1972 or 1973.

8    Q    And it's true, is it not, that virtually all your time

9    with the company up until that time that your lung disease

10   was diagnosed was spent at the office in downtown Libby; is

11   that true?

12   A    Well, I must -- I must say that, again, I don't know

13   what you mean by all of my time.  I'd like to explain a

14   little bit.  For six months, approximately, in 19 -- in

15   1946, I worked at the mine primarily as a truck driver.

16   And after I came to work in 1948, on a full-time basis with

17   the title of accountant and later as assistant manager, I

18   made frequent trips to the mining and milling operation and

19   spent time at that operation.

20   Q    But I think you just testified that the vast majority

21   of your time was spent in the office at the safest place in

22   the company, downtown Libby; is that true?

23   A    Yes, sir.

24   Q    And did you have surgery to remove pleural thickening

25   or some such thing from your lungs in the early '70s?

1    A    It was -- It was -- The purpose of the surgery was to

2    remove pleural plaque, yes, sir.

3    Q    Now, you continued in your employment up until 1983 as

4    a full-time regular employee; is that correct?

5    A    Yes, sir.

6    Q    Did you hold any other positions besides assistant to

7    the general manager after the new man was brought in in, I

8    think you said 1971?

9    A    Well, no, I didn't.  In the period the position

10   essentially remained the same, but the title changed, I

11   think, to when I retired it was manager of administration.

12   But the duties and responsibilities really didn't change.

13   Q    Would you tell the jury what the business of Zonolite

14   and W. R. Grace was in Libby, Montana during your tenure of

15   employment there in general terms.  What were you folks

16   doing?

17   A    Well, the purpose of the operation at Libby was to

18   mine vermiculite from Vermiculite Mountain.  It was mined

19   by power shovels or frontend loaders, loaded onto trucks

20   and haled to a transfer point where it was conveyed to the

21   mill.  And over the years there were -- there were

22   different mills.

23        And the milling operation, the purpose of this was to

24   concentrate the vermiculite from the total mill feed.  And

25   by "concentrate," I mean to get the vermiculite in as pure

1    a form as possible and remove as many of the contaminants

2    and other materials from the ore which were not of a value

3    in the final product which was used primarily in the

4    building industry.

5    Q    Thank you, sir.  Then if I understand -- Well, let me

6    ask you one other question:  Did you have an expansion

7    facility for the vermiculite in the Libby area?

8    A    Yes, sir.

9    Q    Do you still have one there?

10    A    No, sir.

11    Q    When did that cease?

12    A    In 1969, I believe.

13    Q    So up until 1969, you had a facility where you

14    expanded the raw vermiculite into its usable form; is that

15    true?

16    A    Well, that's true.  But I must say that it was only a

17    very small part of the production that was expanded in the

18    Libby expanding plant.

19    Q    I think I understand.  That means your two principal

20    functions there were, first, mining the ore; right?  Is

21    that one of them?

22    A    Yes, sir.

23    Q    And then what you called concentrating the vermiculite

24    in the mill; is that true?

25    A    Yes, sir.

1    Q    Did the mining operations continue in that same

2    general pattern throughout your direct employment with

3    Zonolite and W. R. Grace up until 1983?

4    A    The same general manner, yes, sir.

5    Q    Now, I know that there were changes in the way you

6    milled the ore, and I'm not implying otherwise, and I'll

7    get into that in a minute; but the same functions were

8    there.  You mined it and you milled it, right?

9    A    Yes, sir.

10   Q    Is this an open pit mine?

11   A    Yes, sir.

12   Q    Would you tell the jury what that means.

13   A    Well, it means that all of the mining is above

14   ground.  The mine was literally located on the top of a

15   mountain, and the ore was removed in layers, if you will,

16   and -- which we referred to as levels from the top going

17   down.  These levels varied in height over the period I was

18   there, depending on the type of the equipment that we

19   used.

20       The equipment generally got larger in size, but the

21   levels ranged from about 18 feet to about 24 feet in

22   height, and the ore would be taken from the face on these

23   levels and loaded into trucks, and as one level would be

24   fully mined, then they would drop down and mine on the

25   level blow it.

1    Q    So there weren't tunnels involved in the mining

2    operations generally?

3    A    No, sir.

4    Q    What kind of a mill did you have when you came on

5    board in 1984 -- excuse me -- 1948 to concentrate raw

6    vermiculite?

7    A    A dry mill.

8    Q    Okay.  What does that mean in general terms?

9    A    It means that the ores that came from the mine was put

10   through a dryer to take off the surface moisture, and all

11   of the work which was done to that ore in the mill in the

12   concentration process was done by a dry process.  There was

13   no water or any other moisture added to it.

14   Q    Was that the only mill in 1948?

15   A    Yes, sir.

16   Q    And was that in one building?

17   A    Yes, sir.

18   Q    Was the building in multiple levels?

19   A    Yes, sir.

20   Q    How many floors?

21   A    Well, to the best of my recollection, there were about

22   six floors.

23   Q    And was this known as the old dry mill?

24   A    Yes.

25   Q    Okay.  When you started in 1948, is it true that the

1    concentrate which was produced in the mill from the ore fed

2    into the mill was in the neighborhood of 500 tons per day?

3    A    Yes, sir.

4    Q    So the end product, concentrated vermiculite, was 500

5    tons a day?  That was the production?

6    A    That was the approximate production, yes, sir.

7    Q    Did that production increase as time went by?

8    A    Yes, sir.

9    Q    To what level did that increase?

10   A    Well, when I retired -- When I retired in 1983, they

11   were producing approximately a thousand tons a day.

12   Q    1983?

13   A    Yes.

14   Q    And that would be a thousand tons per day of

15   concentrated vermiculite?

16   A    Yes, sir.

17   Q    Did the production ever exceed that between 1948 and

18   1983?

19   A    Well, it would exceed it -- It would exceed it in this

20   respect:  When I say a thousand tons a day, that was an

21   approximate average.  They could produce maybe twelve

22   hundred tons one day or eleven hundred tons, but

23   essentially, the production never exceeded that -- in that

24   area of tonnage.

25   Q    Over the years, they changed from a dry mill process

1    to a wet mill process; is that correct?

2    A    Yes, sir.

3    Q    When did they put in the first wet mill?

4    A    The first wet mill was put on stream in 1954.

5    Q    And did the -- Did that mean that was the end of the

6    dry mill, or was that in addition to the dry mill?

7    A    That was in addition to the dry mill.

8    Q    So in 1954 when the first wet mill came on, you

9    continued to use the dry mill full bore; is that correct?

10   A    Yes, sir.

11   Q    And that expanded your production substantially; is

12   that correct?

13   A    No, sir, it did not.  It increased the production

14   somewhat, but it didn't increase it substantially.

15   Q    What was the increase?

16   A    Well, I don't believe -- possibly a hundred tons a

17   day.

18   Q    Okay.  Now, when was the new wet mill put in place?

19   A    Well, it was built in the early '70s.  It went on

20   stream full-time in early 1974.

21   Q    So early 1974, the wet mill went on stream?

22   A    Yes.

23   Q    The new one?

24   A    Yes, sir.

25   Q    And I heard Mr. Graham say in his opening statement --

1    Excuse me.

2         I want to know if you agree with this:  You folks

3    admit that at least by 1967 you knew then you had a serious

4    asbestos-related disease problem in that mill?  Do you

5    agree with that?

6    A    No.  I don't believe I agree with that -- those

7    terms.

8    Q    Do you agree that at least by 1967, there was

9    significant evidence that asbestosis or asbestos-related

10   disease was a serious health hazard to your employees?

11   A    I think it's true that by 1967, we recognized that

12   there was -- that there was a problem with asbestosis with

13   some of our employees, yes.

14   Q    Isn't it a fact that you knew for many years before

15   that that you had a problem with asbestos-related disease

16   among your employees.

17   A    No, sir.  I don't think that I agree with that

18   statement.

19   Q    Okay.  Well, we'll get into that more later then.

20        But in any event, you knew in 1967 you had a problem.

21   And the wet mill didn't come on line until 1974; is that

22   correct?

23   A    Yes, sir.

24   Q    When you got the new wet mill on, did that increase

25   your production --

1    A    Yes, sir.

2    Q    -- to about a thousand tons per day?

3    A    Yes, sir.

4    Q    Okay.  Mr. Lovick, for every ton of vermiculite, that

5    is, vermiculite concentrate that you produced at that mill,

6    you had to go through a lot of ore; is that correct?

7    A    Yes, sir.

8    Q    Would you agree with me that for every ton of

9    vermiculite concentrate, it took about 22 tons of ore?

10    A    That is a -- Over the period, that -- That figure

11    varied, but that is roughly an accurate figure, and I say

12    "roughly an accurate figure," because you'd have to take a

13    particular period of time to put on it.  But an average, I

14    would say over the years, an estimated 5 percent of the

15    material that was moved in the mine became a salable

16    product.  So that would be -- that one ton from every 20

17    tons.

18                MR. LEWIS:  Well, could I have Exhibit G-42,

19    please.

20        I have another book up there.  May I approach the

21    witness with this exhibit, Your Honor?

22                THE COURT:  Yes.

23    Q    (BY MR. LEWIS)  I have a copy of this exhibit, sir,

24    and I'll direct your attention to the portion of that

25    exhibit that I want to question you about.

1        Now, is G-42, a document -- Well, the first page of

2    G-42 is a confidential letter or note to C. N. Graff from

3    R. M. Vining dated July 24, 1969; is that correct?

4    A    Yes, sir.

5    Q    And who was Mr. Vining.

6    A    Mr. Vining was president of construction products

7    division of which Zonolite operation at Libby was a part

8    of.

9    Q    So to explain that to the jury, after W. R. Grace

10   acquired Zonolite Company, Zonolite became a division

11   within the Grace family of companies or divisions; is that

12   true?

13   A    Zonolite became a part of a division within the

14   Zonolite family.

15   Q    So Zonolite was a subdivision of this division you

16   just named which Mr. Vining was the head of; is that

17   correct?

18   A    Yes.

19   Q    And what was that division?

20   A    Construction products division.

21   Q    And where was their headquarters?

22   A    In Cambridge, Massachusetts.

23   Q    Okay.  Turn to the second page of this document.  This

24   says, "Zonolite vermiculite ore review," dated July 24,

25   1969, by Harry Brown and Floyd Stuart.  Is that correct?

1    A    Yes, sir.

2    Q    On page Roman numeral four dash one of that report, it

3    talks about "bottlenecks are eliminating factors at

4    Zonolite operations in Libby."

5         Do you see that?

6    A    Yes.

7    Q    And under three here it says, "Higher mine waste ore

8    ratio exists at Libby.  At Libby the mine moves

9    approximately 22 tons of ore for each ton of concentrate

10    produced"; is that correct?

11    A    Yes, sir.

12    Q    Would you agree with that generally?

13    A    Yes, sir, I would.

14    Q    Okay.  What percentage of that ore was tremolite

15    asbestos?

16    A    I don't know.

17    Q    Of that 22 tons, what percentage would be asbestos?

18    A    I don't know.

19    Q    Would 3 percent sound about accurate?

20    A    I don't know, sir.

21    Q    Plaintiff's Exhibit 40.1.  What is that document?

22    A    It's a letter or report from R. A. Schneider to R. M.

23    Vining.

24    Q    And who was Mr. Schneider?

25    A    Mr. Schneider was chief engineer of construction

1    products division.

2    Q    In Cambridge, Massachusetts?

3    A    Yes, sir.

4    Q    And this letter is personal and confidential, March 3,

5    1969 letter entitled, "Insight to Environmental Dust

6    Control for Vermiculite Mining Expanding Operations for" --

7    to you among others; is that correct?

8    A    Yes, sir.

9    Q    And did you actually receive this personal and

10   confidential document?

11   A    Yes, sir.

12   Q    Okay.  I'll get back to that first page later, but I

13   want to direct your attention to the fourth page where it

14   says "introduction problem."  Do you see that?

15   A    Yes.

16   Q    It says, "The vermiculite mine at Libby contains about

17   3 percent tremolite, a type of asbestos," do you see that?

18   A    Yes.

19   Q    Okay.  So the ore was about 3 percent asbestos; is

20   that correct?

21   A    This is what it states here, yes.

22   Q    Do you have any reason to question that?

23   A    No, sir.

24   Q    So if the production was 1,000 tons of concentrated

25   vermiculite a day after the wet mill was put in, that means

1    that there would have been 21,000 tons of waste material

2    that had to go through that mill and be disposed of; is

3    that true?

4    A    Yes, sir.

5    Q    And what's 3 percent of 21,000 tons?  Would you agree

6    with me that's about -- about 660 tons of asbestos a day

7    that had to be discarded through that plant?

8    A    About 630.

9    Q    I won't argue with that.

10   A    Yeah.

11   Q    A lot of asbestos; right?

12   A    Yes.

13   Q    Where did that asbestos go?  Where was it discarded?

14   A    Well, it was discarded in one of two -- one of two

15   places.  It would have been -- one of three places,

16   actually.  It would have been discarded in the mine dump in

17   lower grade material which would never have gone to the

18   mill.

19        And the second place it would have been discarded

20   would have been in the mill tailings of which there were --

21   there were two mill tailing circuits, a coarse circuit and

22   a fine circuit.  And they were discarded -- The coarse

23   tailings were discarded -- well, at that time, they were

24   all discarded on the side of the mountain.

25        And the third place they would have gone is that some

1    of the tremolite would have been retained in the

2    concentrate.

3    Q    Well, that's not quite true, is it?  Isn't it a fact

4    that some of the fine tailings went into a stream that ran

5    right into the Kootenai River for a long time?

6    A    It was discarded on the side of that mountain, as I

7    stated, and some of that material, yes, did end up in the

8    Kootenai River.

9    Q    Did not you testify in your deposition that some of it

10    was discarded into a creek that went by the mill?

11    A    It ran down the mountain into a creek, yes.

12    Q    What was the creek?

13    A    Rainy Creek.

14    Q    Did that run right into the Kootenai?

15    A    Yes, sir.

16    Q    About 12 miles above the town of Libby?

17    A    Well, about -- roughly a little over five miles above

18    the --

19    Q    Closer than that than, five miles from Libby?

20    A    Yes, sir.

21    Q    But in any event, there were tons and tons of asbestos

22    waste material, just the asbestos portion, were put over

23    the side of that mountain everyday of that mill's

24    operations; is that correct?

25         MR. GRAHAM:  Your Honor, I don't know whether now

```
 1   would be an appropriate time to make an objection as to

 2   Mr. Lewis' and Mr. Lovick's calculations, but so we don't

 3   mislead the jury further, I think if you take twenty-one

 4   hundred tons of material and multiply it times point zero

 5   three, you come out with substantially less than 630 tons.

 6           MR. LEWIS:  Twenty-one thousand tons.

 7           MR. GRAHAM:  Okay.  I'm sorry.

 8   Q   (BY MR. LEWIS)  The witness has testified 630 tons of

 9   asbestos a day; right?

10   A   Yes, sir.

11           MR. LEWIS:  Okay?

12           MR. GRAHAM:  I'm sorry.  I misunderstood.

13   Q   (BY MR. LEWIS)  This might be informative to the

14   jury.  I've got some photos that were given to me by your

15   counsel here.  I'd like to have them marked.

16           MR. LEWIS:  G-101 through --

17           CLERK OF COURT:  G-1 --

18           MR. LEWIS:  One-oh-one.

19           CLERK OF COURT:  One-oh-one.  Okay.

20           MR. LEWIS:  One-oh-tow.  One-oh-three.

21   One-oh-four.  One-oh-five, and 106.  And there's the

22   order.

23           While she's marking, I think I can proceed, Your

24   Honor, if that's all right.

25           May I approach the witness?
```

1          THE COURT:  Go ahead.  Yes.

2    Q    (BY MR. LEWIS)  Mr. Lovick, I'm handing you what is a

3    photo which has been marked for purposes of identification

4    Plaintiff's Exhibit G-101.  Do you recognize that photo?

5    A    Yes, sir.

6    Q    Did you take that photo?

7    A    No, sir.

8    Q    Do you know who took it?

9    A    No, sir.

10   Q    Do you know what it represents?

11   A    Yes, sir.  It shows a sample of No. 1 concentrate

12   vermiculite in its concentrated form and it's in its

13   expanded form.

14   Q    And there's a ruler there; is that correct?

15   A    Yes.

16   Q    On the right side of the ruler is the concentrated

17   form of vermiculite; is that correct?

18   A    Yes.

19   Q    And on the left side is the expanded form?

20   A    Yes.

21   Q    And that's a coarser grade of vermiculite; is that

22   true?

23   A    That's the largest commercial grade that they market

24   at this time.

25   Q    Does that accurately portray concentrated and expanded

1   vermiculite of that coarse grade?

2   A    I would say that it did, yes.

3           MR. LEWIS:  Move admission of Plaintiff's Exhibit

4   G-101.

5           MR. GRAHAM:  No objection, Your Honor.

6           THE COURT:  Be received.

7       Any objection to receiving these other photos that

8   have been marked?

9           MR. GRAHAM:  No, Your Honor.  In fact, we had

10  submitted them as Defendant's Proposed Exhibits included in

11  our packet.

12          THE COURT:  All right.  What are the numbers on

13  them again?

14          MR. LEWIS:  Okay.  I now hand you --

15          THE COURT:  Just give me the span of the numbers.

16          MR. LEWIS:  G-102 through G-107.

17          THE COURT:  They're all admitted.

18          MR. LEWIS:  Thank you, Your Honor.

19          THE COURT:  All right.

20  Q    (BY MR. LEWIS)  I'm handing you G-102 through G-107.

21  Now is it true that G-102 through G-106 all show different

22  forms of or grades of vermiculite?

23  A    Yes, sir.  They're different grades or different

24  sizes.  One-oh-six is not the particular grade.  It's just

25  a piece of vermiculite.

1    Q    It's quite a large piece of vermiculite?

2    A    Yes.

3    Q    And it's expanded so the jury can see that?

4    A    Yes, sir.

5    Q    Okay.  Now, G-107 is not vermiculite at all; is it?

6    A    No, sir.

7    Q    What is that?

8    A    That is tremolite.

9    Q    Tremolite asbestos?

10    A    Yes, sir.

11    Q    And it's sort of a white color; is it not?

12    A    Yes, sir.

13           MR. LEWIS:  May I give these to the jury to look

14    at?

15           THE COURT:  Yes.  Just hand them to the jury, and

16    they'll pass them among themselves.

17           MR. LEWIS:  Thank you, Your Honor.

18    Q    (BY MR. LEWIS)  Now, that white tremolite or whitish

19    substance, tremolite asbestos, is that what would makes up

20    the white dust that would coat the mills where the men

21    worked?

22    A    Well, generally, the tremolite which is found up there

23    is the white material that forms the dust in the area, yes,

24    sir.

25    Q    Now, in the old dry mill, that was a terribly dusty

1    place; was it not?

2    A    Yes, sir.

3    Q    And it had that tremolite asbestos in very fine dust

4    from top to bottom in all those six levels you testified

5    about; is that true?

6    A    Yes, sir.

7    Q    And you knew that and saw that when you first went to

8    work there in 1948; is that true?

9    A    Yes, sir.

10    Q    And in fact on the top levels it would accumulate on

11    the rafters four or five inches deep from time to time; is

12    that true?

13    A    Well, in regard to this entire line of questions and

14    my answers, the tremolite would be one of the ingredients

15    of the dust which would accumulate.

16    Q    The dust would be white, right?

17    A    Not -- Not necessarily.  The dust would be generally

18    more of a golden color than a white or a gray color.

19    Q    Okay.  What about when you got to the wet mill

20    process?  Was there tremolite asbestos in the wet mills?

21    A    Yes.  Because all of the ore came into the wet mill.

22    It was -- It was fed into the wet mill before any of it

23    went to the dry mill, and the tremolite was one of the

24    ingredients in the mill feed.

25    Q    And would there be -- In the wet mill, would there be

1    a very fine mud that would develop and cover some of the

2    machines?

3    A    In some areas, yes.

4    Q    Well, like for, say, a millwright, would a millwright

5    have to get down in that mud from time to time and get it

6    on his clothes to do his work, or do you know?

7    A    Well, in some of the work that a millwright would be

8    required to do, he would certainly come in contact with

9    some of the mud, yes, sir.

10   Q    And it would be the whitish mud that we're talking

11   about, right?

12   A    Possibly.

13   Q    Just so that we can get a perspective, you said, I

14   think, that the coarse waste would be discarded up at the

15   mine level; is that correct?

16   A    Well, no, sir.  The mill was actually, elevation-wise,

17   was located below the mine.  And the tailings from the mill

18   would be discarded at the mill level, which were somewhat

19   lower than the mine.

20   Q    Okay.  I understand that.  Maybe I misspoke or you

21   misunderstand me.  I apologize for lack of clarity in the

22   question.  But there was a waste disposal area at the mine

23   itself above the mill; is that correct?

24   A    Yes.  For mine waste there was.

25   Q    All right.  And that would be discarded in one

1    direction off the mountain; right?

2    A    Well, one --

3    Q    Would it be discarded over the side of the mountain?

4    A    It would be discarded over the side of the mountain,

5    yes, sir.

6    Q    Right now how many miles down that mountain does that

7    waste area go?

8    A    Well, I'm not sure.  Possibly the better part of a

9    mile.

10    Q    And how about the waste area or the tailings that come

11    out of the mill?  How far down the mountain does that go?

12    A    Probably in the neighborhood of a mile.

13    Q    And that's that white gash that you see when you look

14    up from Libby; is that right?

15    A    Yes, sir.

16    Q    And those fine tailings continued to be discarded into

17    the Kootenai River at least until 1970 or 1971; is that

18    true?

19    A    Yes, sir.

20    Q    And then in '70 and '71, you folks built a impoundment

21    dam; is that true?

22    A    Yes.

23    Q    And that's where the fine tailings were discharged?

24    A    Yes.

25    Q    But the tailings were never buried; were they?

1   A   No, sir.

2   Q   All tailings were always open to exposure from the

3   air; right?

4   A   Yes, sir.

5   Q   And these tailings would include tremolite asbestos.

6   Do you agree with that?

7   A   Yes.

8   Q   Were you ever able to get all of the asbestos out of

9   the final concentrated tremolite?

10   A   No, sir.

11   Q   So in those photos that the jury's just seen, those

12   first six photos that have concentrated vermiculite and

13   expanded vermiculite, they still contain some asbestos; is

14   that true?

15   A   It's possible that they contain some asbestos.

16   Q   Do you know a percentage of that tremolite -- or

17   excuse me, that vermiculite is asbestos?

18   A   No, sir.

19   Q   Mr. Lovick, you know as you sit right now that the

20   asbestos mined at Libby is dangerous to your employees'

21   health.  Is that true?

22   A   Yes, sir.

23   Q   Would you agree with me that it is in fact, you know

24   now, at least, that it is in fact a hazardous material.  Is

25   that true?

1   A     Yes, sir.

2   Q     And the dispute, if I understand the opening statement

3   and the position taken by the company, is you folks claim

4   that you didn't know it was dangerous until about 1967.   Is

5   that correct?

6   A     That's roughly correct, yes.

7   Q     Is it your testimony that Zonolite or W. R. Grace

8   never became concerned with removing the tremolite asbestos

9   from the final vermiculite material because it could cause

10  disease?

11  A     No, sir.   That's not true.

12  Q     Maybe I misunderstood your --

13        MR. LEWIS:  Do you have Mr. Lovick's deposition?

14  The original?  That's not the original.  Oh, there it is.

15  I'm sorry, Deb.  Thank you very much.  I should have known

16  better than to question.

17        September 6th, 1989.

18        May I approach the witness, Your Honor?

19        THE COURT:  Very well.

20  Q     (BY MR. LEWIS)  Sir, I'm handing you what appears to

21  be your original deposition in this case and others.   Was

22  that deposition taken on September 6th, 1989?

23  A     Yes, sir.

24  Q     Would you turn to page 26 of that deposition.   And

25  look at line 20.  And was this question asked and this

1    answer given:

2        "Are you aware of any concern of W. R. Grace or the

3    Zonolite Company to remove the tremolite from the material

4    because the tremolite could cause disease?"

5        And your answer is:  "Well, my answer is I don't

6    know."

7        Do you see that?

8    A    Yes, sir.

9    Q    So you don't know of any concern or you did not know

10    as of 1989 of any concern by W. R. Grace or Zonolite to

11    remove the tremolite because it would cause disease?

12    A    This statement, because it could cause disease and I

13    say, "I don't know," but this does not mean -- My answer

14    did not mean that we were not concerned about removing

15    tremolite from the concentrate.

16    Q    I know that.  You were removing tremolite from the

17    concentrate because it was a waste material and not useful

18    for the final end product, concentrated or expanded

19    tremolite; is that true?

20    A    That's partially true.  We were also concerned about

21    removing tremolite like we were concerned about removing

22    all contaminants because of the fact that they -- tremolite

23    was one of the ingredients of the dust which was found in

24    the area which we always knew was not a healthful

25    situation.

1    Q    Okay.  So your testimony is part of the reason you

2    removed the tremolite from the concentrate was because it

3    created a health hazard to the users of the concentrated

4    vermiculite?  Is that your testimony?

5    A    That's -- That's a part of the reason that we did.

6    Q    Okay.  And what's the other part?  Because you had to

7    get it out so you could sell it?

8    A    No.  Because it -- We wanted to remove all of the

9    foreign material we could from the concentrate.

10   Q    But were you motivated by health concerns for the end

11   product user?  That's what the question goes to.

12   A    Well, I -- I'm not sure -- I'm not sure that I can

13   answer that question.

14   Q    Are you aware that vermiculite insulation from the

15   W. R. Grace plant was used in the home of Don and Millie

16   Johnson?

17   A    No, sir, I did not know that.

18   Q    Now, you said earlier that when this -- this ore comes

19   into the mill, you testified that a substantial tonnage is

20   tremolite asbestos.  And you said that it goes into the

21   tailings, different types of tailings; right?

22   A    Some of it, yes.

23   Q    But some of the it goes in the air, right?

24   A    Yes, sir.

25   Q    Some of it goes in the rafters and covers the

1   equipment; right?

2   A    Yes, sir.

3   Q    And some of it goes all the way into the air above the

4   plant; right?

5   A    Yes, sir.

6   Q    And when that plant's running, it's a dusty mess;

7   right?

8   A    It's dusty, yes, sir.

9   Q    And the dust goes right up into the sky and spreads

10  all over Libby; isn't that true?

11  A    No, sir.

12  Q    It doesn't?

13  A    No, sir.

14  Q    All right.  This morning when I came to trial, I gave

15  you this book which has been marked for the record, Your

16  Honor, G -- Plaintiff's Exhibit G-57.

17       Did you have an opportunity to look through this book?

18  A    Yes, sir I did.

19            MR. LEWIS:  May I approach the witness, Your

20  Honor?

21            THE COURT:  Sure.

22  Q    (BY MR. LEWIS)  Do you recall your -- Excuse me, I

23  don't mean to turn my back on you.  I'm sorry.

24       Do you recall your deposition being taken in the

25  Gidley case?

1    A    Yes, sir.

2    Q    Do you recall identifying a file that you maintained

3    concerning asbestos matters at the -- at the plant or the

4    mill in Libby?

5    A    Well, I'm not really sure what file you will refer to

6    but --

7    Q    In any event, are the documents contained in G-57

8    those documents you compiled in the ordinary and usual

9    course of your business with W. R. Grace or Zonolite?

10   A    Yes, sir.  These would all come from our files.

11   Q    And they are true and correct copies of what's

12   contained in your file?

13   A    I believe so, yes, sir.

14   Q    And they were accumulated in the ordinary course of

15   your business?

16   A    Yes, sir.

17            MR. LEWIS:  I'd move the admission of G-57.

18            MR. GRAHAM:  We would object to the introduction

19   of G-57, Your Honor, on the basis of relevancy and

20   materiality.  Most of these documents, as the witness will

21   testify, were accumulated subsequent to all of the matters

22   realted to this lawsuit and were accumulated in connection

23   with a study and not with the ordinary course of business.

24   So we would so object.

25            THE COURT:  Any response?

1          MR. LEWIS:  The witness has testified they were

2     accumulated in the ordinary and necessary course of

3     business of the company.  They certainly come within an

4     exception to the hearsay rule.

5          THE COURT:  Very well.  The objection is

6     overruled.

7     Q    (BY MR. LEWIS)  Now, these were referred in your

8     deposition as your documents.  Do you recall that?

9     A    No.  I can't say that I -- You mean just now?

10    Q    No.  In the Gidley deposition?

11    A    Well, I certainly don't remember everything that was

12    asked of me in the Gidley deposition but --

13    Q    Would you tell the jury what these documents are

14    generally, in general terms.

15    A    These documents cover a wide range -- a wide range of

16    material.  They cover -- They include letters and data that

17    I collected for a study.  There is included in here reports

18    from state agencies, reports that were compiled by myself

19    and others, there are engineering reports in here on the

20    results of dust sampling, there are many letters in here

21    that were written by others in and outside of the company

22    which refer to -- to dust matters and inspections that were

23    made by agencies and by air sampling.  There is a

24    considerable number of reports which pertain to a study

25    which I participated in gathering the raw data for -- after

1    I retired on former employees.  And included in these is a

2    large number of death certificates on people who had

3    previously worked for us.

4    Q    You went around and obtained those death certificates

5    for the McGill study.  That is correct?

6    A    Yes, sir.

7    Q    And those death certificates that you obtained are --

8    they're included in this Exhibit G-57; is that correct?

9    A    Copies of them, yes, sir.

10   Q    I stand corrected.  Copies of them.  That's correct.

11   And what was the purpose of securing these death

12   certificates?

13   A    This was data for the McGill study by a team of

14   epidemiologists who wished to evaluate the effects of

15   tremolite exposure by former employees and reasons for --

16   reasons for the deaths of the -- these employees who were

17   in the cohort list.

18   Q    What do you mean cohort list?

19   A    Well, we compiled a list of all employees who had ever

20   worked for us.  And for the study, in order for it to be

21   meaningful, there had to be some criteria.  And they used a

22   criteria of people who had been employed 20 or more years

23   previous to the study, which was done in 1983, which meant

24   that anybody who had been hired in 1963 or prior to that

25   and had worked for us one or more years were to be included

1    in this cohort list.

2    Q    And W. R. Grace acquired this company in 1963; is that

3    correct?

4    A    Yes, sir.

5    Q    So the study went back only as far as as 1963 and did

6    not include people that were employed before 1963; is that

7    correct?

8    A    Included all people that were employed before 1963.

9    Q    It included them?

10    A    Before 1963 not after 1963.

11    Q    Okay.  I misunderstood.  So this included only

12    employees that were --

13    A    Had been employed one or more years and had been hired

14    in 1963 or prior.

15    Q    All right.  Now we're tracking.  Thank you.

16         So if somebody got employed in 1964, they would not be

17    included in this study?

18    A    That is correct.

19    Q    All right.  Now, you said that these were a group of

20    epidemiologists that wanted to study this.  Actually, Grace

21    paid for this study; is that true?

22    A    It was not -- It was not the epidemiologists that

23    wanted this.  Grace made a grant to McGill University to

24    conduct this study.

25    Q    Grace paid for the study; right?

1    A    Yes, sir.

2    Q    Okay.  And where is McGill university?

3    A    In Montreal, Quebec.

4    Q    Isn't it a fact that long before the McGill study in

5    '83, you already knew that this tremolite asbestos was very

6    dangerous to your employees?

7    A    I don't understand the term "very dangerous," so I

8    can't agree.

9    Q    How about just dangerous?  Dangerous to your

10   employees?

11   A    We knew that tremolite was a toxic material, but we

12   did not know the degree of the danger it was.

13   Q    You didn't know in 1983, you didn't know -- You knew

14   only that tremolite was a dangerous -- or a toxic material,

15   but you didn't know how dangerous it was?  Is that your

16   testimony?

17   A    Yes, sir.

18   Q    Oh.  You've got the exhibits.  Thank you.

19        Did the State of Montana routinely do -- That's a bad

20   word.  Did the State of Montana from time to time do

21   studies or -- or inspect the plant that Zonolite or W. R.

22   Grace was operating in Libby?

23   A    Yes, sir.

24   Q    And did you always receive copies of those reports?

25   A    I believe so, yes, sir.

1    Q    Did you receive copies of those reports before W. R.

2    Grace acquired the company?

3    A    Yes, sir.

4    Q    I direct your attention to Plaintiff's Exhibit G-9.

5    I'll help you find it, sir.

6    A    G what?

7    Q    G-9.   These are tabulated on the side.   I hope you can

8    find it.

9    A    Yes, sir.

10   Q    Right here would be G-9.

11        Is G-9 a report from the Montana State Board of Health

12   Division of Disease Control concerning an industrial

13   hygiene study at Zonolite of Libby, Montana on August 8 and

14   9, 1956?

15   A    Yes, sir.

16   Q    Did you receive a copy of this report?

17   A    Yes, sir.

18   Q    Turn to page three of that report.   And do you see an

19   area that says "toxicity"?

20   A    Yes, sir.

21   Q    You just said you knew that asbestos was toxic, you

22   just don't know how dangerous it was; right?

23   A    Yes, sir.

24   Q    Okay.

25             MR. LEWIS:   First of all, I'd move the admission

1    of Plaintiff's Exhibit G-9.

2              MR. GRAHAM:  No objection, Your Honor.

3              THE COURT:  Be received.

4              MR. LEWIS:  Thank you, Your Honor.

5    Q    (BY MR. LEWIS)  Under "toxicity," would you read those

6    paragraphs to the jury.

7    A    It's titled "Toxicity."  It states:  "A review of the

8    literature indicates that vermiculite or the dust from this

9    material is not especially toxic, and it's generally

10   included only as a nuisance dust.  However, the asbestos

11   dust in the dust in the air is of considerable toxicity and

12   is a factor in the consideration of reducing dustiness in

13   this plant."

14              Next paragraph:  "According to Drinker and Hatch, the

15   pathological changes produced by asbestos are not like

16   those of silicosis.  The asbestos fiber group about the

17   neck of the small air sacks in the lungs and stimulate the

18   formation of a diffuse fibrosis.  There is no definite

19   migration or transportation of the dust particles to lymph

20   nodes and no formation of fibrous nodules.  As the fibrosis

21   increases, the reduction in lung area causes a serious

22   decrease in lung capacity, more difficulty in breathing.

23   Hence it is suggested that enlarged hearts noted frequently

24   in the cases of secondary asbestosis may be the result of

25   the increased work with the heart resulting from this

1   condition.  It takes more work to pump the blood through

2   the asbestotic than through the normal lung."

3   Q    Now, you said you received this report.  Did that not

4   put -- Do you not understand that the asbestos in your mind

5   created a significant health hazard to your employees after

6   reading that?

7   A    Yes, sir.

8   Q    You did understand or did not?

9   A    Yes, sir.

10  Q    You knew that?

11  A    Yes.

12  Q    Did you give a copy of that report to any of your

13  employees?

14  A    No, sir.  Not to my knowledge.

15  Q    Now going to page four of that report, 1956 report, do

16  you see those conclusions?

17          THE COURT:  What year was this?

18          MR. LEWIS:  Excuse me, Your Honor.  It's 1956.

19          THE COURT:  Fifty-six.

20          MR. LEWIS:  August 8 and 9, 1956.

21  Q    (BY MR. LEWIS)  Do you see the conclusions and

22  recommendations there?

23  A    Yes, sir.

24  Q    I'm going to read some of those to speed this up and

25  see if you agree with me.  Number one -- Well, I'll skip

1    part of it.  Says, "The following are several reasons why

2    the dustiness in the dry mill and heavy -- and why the

3    exhaust mechanism in design does not function:  One.  Dust

4    vibrates almost continuously off the rafters which have

5    become loaded and are continually loaded with dust

6    generating from many sources."

7         Is that there?

8    A    Yes.

9    Q    "Rubber connectors between vibrating screens in the

10   feed spouts are not tight nor are they replaced when they

11   vibrate off or they are worn out."

12        Is that there?

13   A    Yes, sir.

14   Q    I could go on and read, but in any event, there's

15   about 14 different findings.  In fact, the summary says in

16   14, "In summary, the foregoing points are illustrative of

17   what would be poor policy in matters of maintenance and

18   operation of this plant.  The following recommendations are

19   based on the observations presented and on the basis of

20   dust counts, silica content, and asbestos content of the

21   dust.  It will be recognized that the following

22   recommendations are particularly broad and non-specific.

23   Until such time as the general overall maintenance and

24   repair of existing deduct work both in the exhaust system

25   and ore feed pipes have been sufficiently repaired, no

1   specific recommendations appear to be justified."

2        So it was -- the place was in such bad shape, they

3   couldn't make specific recommendations.  Is that true?

4   A    No.  I don't think that's true.  I think they could

5   have made specific recommendations.

6   Q    Well -- Okay.  Now turn to Exhibit G-10.  The first

7   page of that is a January 12, 1959 letter from Benjamin

8   Wick, industrial hygiene engineer for the Division of

9   Disease Control to Mr. R. A. Blake, manager of Zonolite

10  Company.  Is that correct?

11  A    Yes.

12  Q    And he's enclosing two copies of the industrial

13  hygiene study done on December 16 and 17 1958.  Is that

14  correct?

15  A    Yes, sir.

16  Q    And also included in this Exhibit G-10 is that

17  industrial hygiene study which is dated, I guess the date

18  of the study is January 12, 1959.  Is that correct?

19  A    Yes.

20        MR. LEWIS:  Move the admission of Plaintiff's

21  Exhibit G-10.

22        MR. GRAHAM:  No objection, Your Honor.

23        THE COURT:  Very well.  Be received.

24  Q    (BY MR. LEWIS)  Would you go to page one of that

25  report.  Under "concentrations," is there a paragraph or

1    subsection that says "concentrations" there?

2    A    Yes.

3    Q    Is there any mention of asbestos in that?

4    A    Yes, sir.

5    Q    Would you read that to the jury, please.

6    A    "A review of table one indicates that the

7    concentrations in the dust were somewhat lower than they

8    were during the previous study in August, 1956.  But the

9    concentrations were still significant in view of the

10   concentration of asbestos particles found in each of the

11   samples.  The concentration of asbestos was estimated by

12   counting the asbestos particles contained in each of the 13

13   samples collected.  The percentage of airborne asbestos was

14   determined to be in a concentration of from 12 to 31

15   percent with an average being approximately 27 percent.

16   The values found in the asbestos particles column is based

17   generally on the average concentration of 27 percent.  It

18   should be noted that this concentration may be less than

19   that actually present in the air, since the particles which

20   had characteristics of asbestos were the only ones counted

21   and those particles that are so small that the rod-like

22   appearance could not be observed were not counted asbestos

23   -- as asbestos but were evaluated as overall dust level."

24   Q    So they found concentrations of from 12 to 31 percent

25   of asbestos in the airborne dust, but they said that those

1    counts, if anything, would be low.  Is that true?

2    A    Yes, sir, it said they could be low.

3    Q    And that the actual amount of asbestos in the air

4    could have been higher?

5    A    Yes, sir.

6    Q    Did you receive this report?

7    A    Yes, sir.

8    Q    And would you agree with me that on pages three --

9    actually two through six of this report, there are a

10   multitude of specific recommendations that needed to be

11   accomplished to clean up the dust problem at the mill?

12   A    Yes, sir.

13   Q    And those were the same kinds of problems pointed out

14   with more specificity in this report, the same kinds of

15   problems that were in the 1956 report.  Is that true?

16   A    Yes, sir.

17   Q    It was in that time that you folks heard about a

18   gentleman by the name of Glen Taylor having developed some

19   lung problems.  Is that true?

20   A    Yes, sir.

21   Q    Would you look at Plaintiff's Exhibit G-10.1.

22   A    Yes.

23   Q    And that indicates that there was a question of

24   asbestosis in that man's medical findings on that date.  Is

25   that correct?

1    A    Yes.

2    Q    And he's also had pulmonary tuberculosis; is that

3    correct?

4    A    Yes.

5    Q    But you were put on notice at least by February 11,

6    1959 that there was a questionable diagnosis of asbestosis

7    for one of your employees; is that true?

8    A    Yes, sir.

9    Q    And you knew about that?

10   A    Yes.

11   Q    Is that true?

12   A    Yes.

13   Q    The direct your attention to Plaintiff's Exhibit

14   G-10.2.

15   Q    Do you recognize that document?

16   A    Yes, sir.

17   Q    What is the date of that document?

18   A    July 20th, 1959.

19   Q    And who was it addressed to?

20   A    It was addressed to Raymond A. Blake.

21   Q    Who was the author of the document?

22   A    Dr. J. M. Carins.

23   Q    And who was Dr. Carins?

24   A    He was a general practitioner and surgeon in Libby

25   Montana.

1   Q     Did you receive a copy of this report?

2   A     Mr. Blake received a copy and I saw a copy, yes, sir.

3   Q     Did you see a copy very soon after Mr. Blake received

4   it?

5   A     I don't remember exactly when, but it would have been

6   relatively soon.

7   Q     What does this report tell Mr. Blake?

8   A     It's an analysis of the -- a breakdown of the results

9   of the interpretations of an x-ray study that were done of

10   all of our employees in 1959.

11   Q     Who commissioned that x-ray study?

12   A     The company did.

13   Q     So this was an x-ray study done at the request of the

14   company?

15   A     Yes, sir.

16   Q     And how many employees were examined?

17   A     A hundred and thirty.

18   Q     How many of them had abnormal chest x-rays?

19   A     Forty-eight.

20   Q     And was there evidence of pleural thickening --

21   A     Yes, sir.

22   Q     -- in some of those?

23   A     Yes, sir.

24   Q     And interstitial fibrosis?

25   A     Yes, sir.

1    Q    Do you understand interstitial fibrosis to be a form

2    of asbestosis?

3    A    No, sir.

4    Q    You don't understand that to be asbestosis?

5    A    No, sir.

6    Q    In any event, an interstitial fibrosis -- there were

7    26 cases of that in those x-rays; is that correct?

8    A    Yes.

9    Q    And there was at least one malignant lesion.  Is that

10   true?

11   A    Yes, sir.

12   Q    Now, were you informed by this doctor that that was an

13   inordinately high incident of lung disease for that group

14   of employees?

15   A    I don't -- I don't really recall.

16   Q    You don't recall?

17   A    No.

18   Q    You don't recall one way or the other?

19   A    No.  I think that -- I think the answer is yes.

20   Q    The answer is yes; isn't it?

21   A    Yes.

22   Q    You know that that's an exceptionally high level of

23   lung problems for a group of a hundred and thirty people;

24   is that true?

25   A    Yes.

1    Q    And those findings, pleural thickening and

2    interstitial fibrosis, are consistent with asbestos-related

3    disease, if nothing else; is that true?

4    A    I don't know.

5    Q    But in any event, in 1959, would you agree with me

6    this identified a potential serious health hazard to the

7    lungs of your workers?

8    A    Yes, sir.

9    Q    I want to ask you to go to --

10              MR. LEWIS:  Well, I better move the admission of

11   that, Your Honor.  I'm sorry.  Move the admission of

12   Plaintiff's Exhibit G-10.2.

13              THE COURT:  Objection?

14              MR. GRAHAM:  No objection.

15              THE COURT:  Received.

16              MR. GRAHAM:  That's the report of July 20th,

17   1959?

18              MR. LEWIS:  I apologize, counselor.  Yes, it is.

19   July --

20              THE COURT:  We'll go for about another ten

21   minutes then take a coffee break.

22              MR. LEWIS:  Thank you, Your Honor.

23   Q    (BY MR. LEWIS)  Would you turn to Plaintiff's Exhibit

24   G-11.  Did that come from the W. R. Grace file?

25   A    Yes, sir.

1   Q    It's got "file" marked in the upper left-hand corner.

2   Is that your writing?

3   A    I believe not.

4   Q    But in any event, you received a copy of this April

5   19, 1962 report; is that correct?

6   A    Well, I'm not sure that I received a copy.  It would

7   have been received in the company.  I would have seen it

8   sometime after that.

9   Q    And that's another report from the Montana Department

10  of Health people; is that correct?

11  A    Yes, sir.

12  Q    Now, that's -- I apologize for the copy there.  That's

13  the best we can do.  Can you struggle with me to read this?

14  A    Yes, sir.

15  Q    Okay.

16  A    I'll certainly try.

17  Q    Okay.  I want to get a look at the very first

18  paragraph -- in fact the very first sentence of this

19  report.  Would you read that to the jury.

20  A    "On March 6th, 7th, and 8th, 1962, an industrial

21  hygiene study was made of the Zonolite mill at Libby,

22  Montana to determine if any of the" -- I can't read that

23  word.

24  Q    Does it look like components or -- It is difficult to

25  read.

1   A    ". . . if any of the components . . ."  That fits, but

2   -- ". . . if any of the components of the operations

3   continued to be a threat to the health of the employees.

4   The last" --

5   Q    That --

6   A    Excuse me.

7   Q    Go ahead.  Go ahead and read on if you want.

8   A    "The last study of December, 1958 indicated

9   substantial quantities of dust in various areas of the

10  plant for which recommendations were made concerning a

11  substantial reduction.  The study of March 6th through 8th,

12  1962 was made after a conference with Mr. R. A. Blake,

13  manager of the company, and Mr. R. J. Kujawa, chief

14  engineer of the plant.  Mr. Robert Vinion acted as guide

15  during the study and supplied information needed for the

16  performance of the investigation."

17  Q    Now Mr. Blake you've already said was the manager of

18  the company.  Mr. Kujawa -- that's K-U-J-A-W-A -- he was

19  the chief engineer.  Was he stationed in Libby?

20  A    Yes, sir.

21  Q    Is he still alive?

22  A    No, sir.

23  Q    Do you know what he died of?

24  A    Colonic cancer.

25          THE COURT:  What?

1    Q    (BY MR. LEWIS)   Do you know if he had any lung-related

2    problems?

3    A    Not to my knowledge.

4    Q    How about Mr. Vinion?  Is he still alive?

5    A    No, sir.

6    Q    What did he die of?

7    A    He died of lung cancer to my understanding from what

8    -- what I was told in both cases.

9    Q    Well, in any event, you checked into these employees

10   as part of your McGill study?

11   A    No, sir.  These two people were not included.

12   Q    They weren't?

13   A    They've died since that study was made.

14   Q    I see.  You only looked at people who died, you didn't

15   look for people who were still living and afflicted by this

16   disease; is that right?

17   A    Well, that and --

18   Q    In the McGill study?

19   A    That's not entirely true.  When you say "looked at,"

20   I'm not sure what that means, sir.

21   Q    Well, that's fair criticism.  When you did the McGill

22   study, was that a mortality study?

23   A    Basically, yes.

24   Q    And you obtained in 1983 death certificates; right?

25   A    Yes.

1  Q   That was the major thrust of the study; right?

2  A   Well, included in that, we -- If I may expand on this.

3  Q   Well, I'll ask you, did you look for people that were

4  still alive?  Did you look for people that were still alive

5  who suffered from lung disease?  Did you do that?

6  A   May I explain?

7  Q   Sure.  Go ahead.

8  A   Because that -- that statement is partially true, and

9  I'll explain why it's true.  These people, and there were

10  over 400 people included in the cohort list.  As I've

11  previously stated, I believe a hundred and sixty-five

12  people of these were dead, which meant that there were 240

13  or so alive.  And these people were scattered all over the

14  United States.  It was not practical to examine all of

15  those.

16     What we did is get addresses of these people as to

17  where they were located.  People that were located within

18  200 miles of Libby, we contacted them by writing letters

19  and asked them if they would be willing to participate in

20  this study and asked them if they would come into Libby for

21  a questionnaire and a chest x-ray and a pulmonary function

22  test.  And if they did, well, we would pay their expenses.

23     Some of these people, of course, lived in Libby and in

24  the area, and others within 200 miles.  There were

25  something over 200 people on this list, just over 200, and

1    I think we got compliance of about 80 or 90 of these

2    people.

3        So we did, to use your words, we did look at some of

4    them.

5    Q    Okay.

6    A    But not all of them.

7    Q    And they were -- And McGill conducted that study,

8    McGill University?

9    A    Yes, sir.

10   Q    Okay.  Now, to go on, in this report, does it not say

11   under "Description of Operations" the second paragraph,

12   that the dry mill was observed most closely during this

13   study, and it was found as during all previous

14   investigations to be extremely dusty and in the need of

15   repair and modification to reduce dustiness to acceptable

16   limits?

17   A    Yes, sir.

18   Q    You see that?

19   A    Yes, sir.

20   Q    And participating in arriving at that conclusion was

21   the manager, Mr. Blake, the chief engineer, Mr. Kujawa, and

22   I guess Mr. Vinion as guide.  They were consulted before

23   that finding was made; is that correct?

24   A    Yes, sir.

25   Q    And the report indicates in the next paragraph that

1    the sampling that they did was conducted on what appeared

2    to be average days of operations; is that true?

3    A    Yes.

4    Q    So that would appear to make it, would you agree, an

5    adequate or reasonable sampling?

6    A    Yes, sir, I would agree.

7    Q    So you continued to have a serious dust problem in the

8    dry mill in 1962.  Do you agree with that?

9    A    Yes, sir.

10    Q    Now, look at Plaintiff's Exhibit G-11.1.  It's

11    entitled "Acquisition of Zonolite Company R-C-A No. 225."

12    Have you ever seen that document before?

13    A    Yes, sir.

14    Q    And is that part of the records of W. R. Grace?

15    A    I would assume that it is, yes, sir.

16    Q    Well, in fact, it was generated by W. R. Grace

17    employees; is that true?

18    A    When I say I've seen this, I have -- I've only seen it

19    in connection with preparation of a deposition very

20    recently.  So I am not familiar with it.  I have not read

21    this.

22    Q    All right.  I won't ask you any questions about it.

23    That's fair.  I appreciate that.

24        But you do recognize this as an official Grace

25    document; is that right?

1  A    Yes, sir.

2  Q    And it was produced by Grace employees?

3  A    Yes, sir.  I would assume so.

4          MR. LEWIS:  Move the admission of Plaintiff's

5  Exhibit G-11.1.

6          MR. GRAHAM:  No objection, Your Honor.

7          THE COURT:  Be received.

8  Q    (BY MR. LEWIS)  Now, I'll direct your attention to

9  Plaintiff's Exhibit G-12.  This is an agreement and plan of

10 reorganization between W. R. Grace and Company and Zonolite

11 Company.  Do you see that?

12 A    Yes, sir.

13 Q    Have you had an opportunity to review this document?

14 A    Yes, sir.  I've seen it.  Again, I have not read it.

15 Q    It was generated by W. R. Grace and Zonolite, but it's

16 not within your area of expertise.  Is that fair?

17 A    That's correct.

18 Q    But you do recognize it as a Grace document?

19 A    Yes, sir.

20          MR. LEWIS:  For the record, we move for the

21 admission of Plaintiff's Exhibit G-12, Your Honor, because

22 it includes our representation concerning assumption of

23 liabilities and completes the record.

24          MR. GRAHAM:  We have no objection to the

25 admission of that, Your Honor.

1          THE COURT:  Be received.

2          MR. LEWIS:  Thank you, Your Honor.

3    Q    (BY MR. LEWIS)  Okay.  The next document is

4    Plaintiff's G-13.  Is that another Montana State Board of

5    Health report of industrial hygiene study at Zonolite?

6    A    Yes, sir.

7    Q    For April 11, 1963?

8    A    Yes, sir.

9    Q    Would you read the first paragraph under "Description

10   of Operations" on page two.

11   A    "The operation of the plant is essentially that as

12   described in previous reports and will not be repeated here

13   except to evaluate the overall dustiness on each floor and

14   concern-- comments concerning dust producers at the

15   locations noted.  In general, there appeared to be little

16   if any improvement at any point in the plant except perhaps

17   at the row grinder where a significant reduction in dust

18   contributed to this area has been accomplished.

19   Specifically, the major dust producing areas were as

20   follows . . ."

21   Q    Fifth floor the screens were very dusty.  Is that

22   true?

23   A    Yes.

24   Q    "Fourth floor:  Much dustiness continues to be

25   apparent in this area."  True?

1   A    Yes.

2   Q    "Third floor:  The main dust producers in this area

3   were at No. 3 concentrator bin"?

4   A    Yes.

5   Q    And there's other dust leaks on the third floor.  Is

6   that true?

7   A    Yes.

8   Q    And it goes on all the way down, at all levels there

9   was too much dust.  Do you agree with that?

10  A    Yes.

11  Q    Who was the general manager of Zonolite on April 11,

12  1963?

13  A    Mr. Blake.

14  Q    And you reported to him; is that correct?

15  A    Yes, sir.

16        THE COURT:  Well, perhaps this would be a good

17  time to -- we'll take a coffee break, members of the jury.

18  Get back here in about 15 minutes.  I think the coffee

19  ought to be ready for the jurors.  We'll recess.

20        (The proceedings in this matter were recessed at

21  2:40 p.m. and reconvened at 3:26 p.m.)

22        (The following proceedings were had in open court

23  with the jury present, beginning at 3:23 p.m.)

24        THE COURT:  Back on the matter of Mildred Johnson

25  versus W. R. Grace and Company.

1       Members of the jury, during the 15 minute coffee break

2    which stretched into 45 minutes, the case has been settled

3    to the complete satisfaction of both parties.  So it's

4    over.

5       Sometimes it doesn't happen until the jury is sitting

6    in the box and heard some evidence.  So you provided an

7    important public function just being here and moving this

8    matter along.  And we have two other matters that are very

9    similar to this; one has been settled, the other is very

10   close to being settled.  So I want to thank you for your

11   time and your service in this case.  And that's it.  You're

12   free to go.

13       Thank you very much.  You're discharged.

14          (The proceedings in this matter were adjourned

15   and the jury was released at 3:28 p.m.)

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3    STATE OF MONTANA             )
                                   :  SS
4    County of Lewis and Clark )

5        I, TINA C. BRILZ, RPR, Official Court Reporter and

6    Notary Public of the State of Montana residing at Helena,

7    Montana, do hereby certify as follows:

8        That the foregoing trial was reported by me on August

9    23, 1990, in the courtroom in the United States Courthouse

10   in Missoula, Montana.

11       That the foregoing ninety-seven (97) pages of

12   typewritten material constitute a true and accurate

13   transcription of my stenographic notes which were reduced

14   to writing by means of computer-aided transcription.

15       I further certify that I am not an attorney nor counsel

16   of any of the parties nor a relative or employee of any

17   attorney or counsel connected with this action or otherwise

18   interested in the event thereof.

19       IN WITNESS WHEREOF, I have hereunto set my hand and

20   affixed my Official Seal on this 25th day of August, 1990.

21

22                       _Tina C. Brilz_
                         REGISTERED PROFESSIONAL REPORTER
23
                         NOTARY PUBLIC for the State of
24                       Montana residing at Helena,
                         Montana.  My commission expires
25                       November 26, 1992.