```
 1              MONTANA EIGHTH JUDICAL DISTRICT COURT

 2                        CASCADE COUNTY

 3

 4
    MEL PARKER and LERAH PARKER,          )
 5                                        )
                                          )    Cause No.
 6                                        )    ADV-00-669
           Plaintiffs,                    )
 7                                        )
           -vs-                           )
 8                                        )
    W.R. GRACE & COMPANY (CONNECTICUT);   )
 9  W.R. GRACE & COMPANY (DELAWARE);      )
    KOOTENAI DEVELOPMENT COMPANY;         )
10  MICHAEL D. RAY, d/b/a RAY             )
    ENGINEERING; ROBINSON INSULATION      )
11  COMPANY; JACK DeSHAZER and DOES A-Z,  )
                                          )
12         Defendants.                    )
                                          )
13

14
                      DEPOSITION OF
15
                     ALAN R. STRINGER
16
               (On behalf of the Plaintiffs.)
17

18

19

20

21

22
                  Taken at the Venture Inn
23                    Libby, Montana
              Tuesday, March 6, 2001 - 9:00 a.m.
24
         Reported by Beth Gilman, RPR and Notary Public
25        for the State of Montana, County of Flathead
```

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

Page 2

1

2

3

4                    A P P E A R A N C E S
5

6

    Appearing on behalf of the Plaintiffs:
7
            ERIK B. THUESON, ESQ.
8           Thueson & Lamb
            P.O. Box 280
9           Helena, MT  59624-0280

10

    Appearing on behalf of the Defendants, W.R. Grace
11  and K.D.C.:

12          TERRY J. MacDONALD, ESQ.
            Garlington, Lohn & Robinson
13          199 West Pine
            P.O. Box 7909
14          Missoula, MT  59807-7909

15  Appearing on behalf of the Defendant, W.R. Grace:

16          KENNETH W. LUND, ESQ
            Holme, Roberts & Owen
17          1700 Lincoln Street, Suite 4100
            Denver, CO  80203-4541
18

19

20

21

22

23

24

25


            HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

Page 3

1

2

3

4

5
                                I N D E X
6

7   EXAMINATION                                      PAGE

8   BY MR. THUESON:                                    5

9

10

11

12

13

14

15

16   EXHIBITS:

17        Exhibit No. 1:                              49

18        Exhibit No. 2:                              93

19

20

21

22

23

24

25

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1

2

3

4

5

6

7               S T I P U L A T I O N S

8

9          It was stipulated by and between counsel

10    for the respective parties that this Deposition be

11    taken by Beth Gilman, Registered Professional

12    Reporter and Notary Public for the State of Montana,

13    County of Flathead.

14          It was further stipulated and agreed by

15    and between counsel for the respective parties that

16    the Deposition be taken at the time and place set

17    out on the caption and pursuant to the Rules of

18    Civil Procedure.

19          It was further stipulated and agreed by

20    and between counsel for the respective parties and

21    the witness that the reading and signing of the

22    Deposition be expressley reserved.

23

24

25

1          ALAN R. STRINGER, after having been

2    duly sworn, was examined and testified as follows:

3

4                    EXAMINATION

5    BY MR. THUESON:

6        Q.    Would you state your name for the record?

7        A.    Alan, A-L-A-N, Stringer, S-T-R-I-N-G-E-R.

8        Q.    And how old are you?

9        A.    Fifty-seven.

10       Q.    What is your position with the Grace

11   Company?

12       A.    I am Grace's representative in Libby,

13   Montana.

14       Q.    How would you describe your duties as

15   Grace's representative?

16       A.    All encompassing.  Everything from media

17   relations to first contact for people who have any

18   questions about any issues that are ongoing in

19   Libby.

20       Q.    Now, I also understand you're the

21   president of Kootenai Development Company?

22       A.    That's correct.

23       Q.    When did that come about?

24       A.    I don't know the specific date, but it was

25   last fall sometime, late last spring -- or late last

1   summer or early fall.

2       Q.   Could you describe to me how you became

3   the president of Kootenai Development?

4       A.   I was asked by my boss if I would serve as

5   president of the company.

6       Q.   For what reason?

7       A.   As I was the person here who had most

8   knowledge and best knowledge of what the issues were

9   relative to Kootenai Development.

10      Q.   Who's your boss?

11      A.   William Corcoran, C-O-R-C-O-R-A-N.

12      Q.   How would you describe your duties with

13  Kootenai Development Company?

14      A.   Right now there are no duties other than

15  being available for answering any questions relevant

16  to the properties, doing the necessary regulatory

17  work with respect to permits that are still in

18  existence.

19      Q.   Have you been deposed before?

20      A.   Yes, I have.

21      Q.   Can you give me the names of cases where

22  you've been deposed?

23      A.   I've been deposed by Tom Lewis in the Don

24  Wilkins case.

25      Q.   Other cases?

1      A.    They were too many years ago to recall

2   what the cases were.  They were not with W.R. Grace.

3      Q.    Not with W.R. Grace?

4      A.    That I can recall.

5      Q.    Have you ever served as W.R. Grace's

6   representative in any of the trials that have

7   transpired up here in Libby as a result of asbestos?

8      A.    Yes, I have.

9      Q.    What cases were those?

10      A.    There was the Benefield case, the Finstad

11   case.  I think that's all.

12      Q.    What year was Benefield's case?

13      A.    I don't recall.

14      Q.    Early '90s?

15      A.    Oh, no.  No.  No.  It was since '95.

16            MR. MacDONALD:  Also, Erik, for the

17   record too, I think Alan forgot a deposition taken

18   by Roger Sullivan.

19            THE WITNESS:  Oh, yeah.  How can I

20   forget?  Just recently.

21            MR. MacDONALD:  And I can't remember

22   what case it was in.

23            THE WITNESS:  I don't either.

24            MR. MacDONALD:  It was last spring

25   sometime.

1          THE WITNESS:  Right.  Right.  It was

2    last spring, April.

3          MR. MacDONALD:  Yeah.  I don't

4    remember the case.

5    BY MR. THUESON:

6        Q.   Do you have any duties with regard to the

7    litigation going on up here in Libby?

8        A.   No, none.

9        Q.   Other than what your bosses may direct you

10   to do?

11       A.   What anybody may ask me to do, whether

12   it's our counsel or my supervisor.

13       Q.   Where are you a resident of?

14       A.   California.

15       Q.   Citizen?

16       A.   U.S.

17       Q.   Of California?

18       A.   United States.

19       Q.   Well, I mean, you have a citizenship in a

20   certain state.  Is your citizenship in California or

21   Montana?

22       A.   That's the first time I ever heard that.

23   I'm a legal resident of California.

24       Q.   And where do you buy your driver's

25   license?

Page 9

```
 1      A.    California.

 2      Q.    Do you fish and hunt?

 3      A.    I fish and hunt.

 4      Q.    Where do you get your fishing and hunting

 5 licenses?

 6      A.    California.

 7      Q.    You don't have any here in Montana?

 8      A.    I haven't fished or hunted in Montana.

 9      Q.    How much time do you spend up here in

10 Montana every year since you've been given your jobs

11 at Grace Company?

12      A.    Probably 90 percent.

13      Q.    Does your family live up here?

14      A.    No, they do not.

15      Q.    They live in California?

16      A.    Yes.

17      Q.    Children grown?

18      A.    Yes.

19      Q.    So it's just you and your wife.

20      A.    That's correct.

21      Q.    So your wife is also living in California?

22      A.    That's correct.

23      Q.    How long have you been the Grace

24 representative?

25      A.    Less than five years.
```

1     Q.    Would it be correct --

2     A.    Excuse me.  Which representative?  I'm

3  sorry.  Could you clarify the question?  You asked

4  me --

5     Q.    Well, you've indicated you're the Grace

6  representative in Libby.  My understanding is --

7     A.    One year.

8     Q.    Okay.  November, 1999?

9     A.    That's correct.

10    Q.    Now, what was your job before you were

11  Grace's representative up here in November of '99?

12    A.    I was regional production manager for

13  Construction Products Division of W.R. Grace.

14    Q.    What were your duties there?

15    A.    I managed a number of manufacturing

16  facilities that Construction Products had, one in

17  Phoenix, one in Santa Ana, one in Inchon, Korea.

18    Q.    If you had not been called up here to

19  Libby, what do you suspect you would be doing today?

20    A.    The same as I was one year ago.

21    Q.    Did you have any special contract or were

22  you just transferred up here to become Grace's

23  representative?

24    A.    I was asked if I would -- I was asked who

25  I would recommend for coming up here and taking this

1    job, and I said I felt that I was the person who

2    should come up here and do this job.

3        Q.    Okay.  Again, my question was, was there

4    any written contract signed for you to come up here

5    as opposed to just a normal transfer?

6        A.    Well, there were -- there were certain --

7    How to put it.  There were certain arrangements made

8    between myself and my bosses that we agreed to in

9    order for me to come up here.  There was no contract

10   though.

11       Q.    Nothing in writing.

12       A.    As to what my agreement was to come up

13   here?  Absolutely.

14       Q.    There is.

15       A.    Yes.

16       Q.    Okay.

17       A.    But it's not a contract.  It's just an

18   agreement that this is the changes and what Grace

19   will agree to.

20       Q.    Does the agreement include a hold harmless

21   clause indicating that if you're sued, Grace will

22   indemnify you?

23       A.    No, it does not.

24       Q.    Does it have any guarantee with regard to

25   your pensions and benefits if you make the transfer?

1     A.    Not that I'm aware of.

2     Q.    Now, I suspect the people at Libby have

3 come up to you and asked you a variety of questions

4 as the Grace representative up here.

5     A.    Correct.

6     Q.    And one of the subjects I think that's on

7 everybody's mind right now is when is Grace going to

8 go bankrupt.  Has that been asked you?

9     A.    Numerous times.

10     Q.    What's your response?

11     A.    I have no idea.

12     Q.    That's not information that Grace shares

13 with you.

14     A.    Absolutely not.

15     Q.    Because?

16     A.    I have no need to know, and I don't know

17 that Grace has even made the decision to do it yet.

18     Q.    Well, I mean, you must report back to Mr.

19 Corcoran that people in Libby are coming up and

20 asking, Is Grace going to be bankrupt?

21     A.    Right.

22     Q.    And, What shall I say to them? you must be

23 saying.

24     A.    And the answer is that we plan to continue

25 in operations as we are today, but there is the

1   possibility that we'll have to file Chapter 11.   And

2   preparations are being made if that has to happen,

3   but at this time there is no decision as to do it.

4        Q.   No rumors about when Grace is going to do

5   it?

6        A.   No.

7        Q.   I've heard 45 days.

8        A.   I have heard zero days.

9        Q.   Do you mean --

10       A.   I haven't heard any day.

11       Q.   Now, my understanding is you started

12  working for Grace in 1981.  Am I right?

13       A.   That's correct.

14       Q.   And initially you were in charge of the

15  mine.

16       A.   That's correct.

17       Q.   And then later, about '88, I think you

18  became in charge of the entire operations.

19       A.   That's correct.

20       Q.   Now, when you were in charge of the entire

21  operations in '88, the mine was still up and

22  running.

23       A.   That's correct.

24       Q.   And you were still using the screening

25  plant?

1    A.    Yes, we were.

2    Q.    And the loading area across the river.

3    A.    That's correct.

4    Q.    In fact, would it be a fair statement that

5  by '88 all of this vermiculite was being shipped

6  through the screening plant down to the loading area

7  across the river?

8    A.    That's correct.

9    Q.    How would you describe your duties between

10  '81 and '90 when the mill closed down?

11    A.    Well, they were diverse.  As mine

12  superintendent, I was responsible for the mine

13  planning, of the actual mining of the vermiculite

14  and the assurance that adequate material was fed to

15  the mill.  Also was responsible for the costs

16  associated with all of the mining operation, with

17  the long-term mine planning as well as the

18  short-term mine planning, maintenance of all the

19  equipment.

20    Q.    How about safety of the men?

21    A.    Absolutely, and that's how I was going to

22  end.  As well as the various safety programs that we

23  had, that's correct.

24    Q.    Now, when did you become the main Grace

25  manager at the --

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1      A.    Either the summer of '87 or the summer of

2  '88.  I don't recall which.  I think it was the

3  summer of '88.

4      Q.    And who did you have working under you

5  that you considered like your lieutenants or your

6  main managers?

7      A.    Well, there were a number.  There was the

8  mill superintendent, there was the mine supervisor,

9  there was the garage supervisors, construction

10  supervisors, plant engineer, warehouse supervisors,

11  there were a number of accounting people.

12      Q.    Are there documents available where one

13  could see the chain of command at Zonolite Mountain?

14      A.    I'm sure there is.  I don't have them.

15      Q.    Now, who would be in charge of the

16  screening plant facility where the Parkers, Mel

17  Parkers, eventually bought in 1993?

18      A.    At what time?

19      Q.    Well, let's start off in '81 when you

20  came.

21      A.    There was a screen plant supervisor.  His

22  name was Dale Thompson, if I recall.

23      Q.    And he worked right on the screening --

24      A.    As far as I know, he did, yes.

25      Q.    Okay.  Did he eventually suffer from

```
 1   asbestos-related disease?

 2        A.    As far as I know, he did.

 3        Q.    When did you learn that?

 4        A.    I don't recall.

 5        Q.    Was it before or after you sold it to

 6   Parkers?

 7        A.    That I don't recall either.

 8        Q.    Now, how long has Mr. Thompson -- was he

 9   the screening plant supervisor or superintendent?

10        A.    Until he retired, and I don't know when

11   that was.  In '83, '84, '85.  Somewhere in there.

12        Q.    Is he still living?

13        A.    Not to my knowledge.

14        Q.    Then after Mr. Thompson who took over the

15   screening plant?

16        A.    I don't know.  I think it was Bruce Zwang.

17        Q.    How do you spell his last name?

18        A.    Z-W-A-N-G, but I'm not sure.

19        Q.    Do you know where he is now?

20        A.    He resides in Libby.

21        Q.    Is he still working for Grace?

22        A.    No, he does not.

23        Q.    Okay.  And after Mr. Zwang?

24        A.    Ed Erickson, E-R-I-C-K-S-O-N.

25        Q.    What years was he in charge?
```

1      A.    I don't remember, but it was up through

2 closure and shortly thereafter.

3      Q.    Did you have a safety officer to deal with

4 potential hazards at the mine and mill?

5      A.    There was a safety manager or a safety

6 director.  I don't recall exactly what his title

7 was, but, yes, there was.

8      Q.    And who was that in the early years versus

9 going forward up to 1990?

10     A.    Bill Melcher when I came to work for W.R.

11 Grace.

12     Q.    Okay.  And after Mr. Melcher?

13     A.    There was a man by the name of Terry

14 Jacobs.

15     Q.    Okay.

16     A.    And then I don't recall who was after

17 Terry.

18     Q.    Mr. Jacobs and Mr. Melcher, do you know

19 where they reside now?

20     A.    Mr. Melcher is no longer alive, and I

21 don't know where Mr. Jacobs lives.

22     Q.    Did Mr. Melcher die of asbestos-related

23 diseases?

24     A.    I don't know.

25     Q.    Did you maintain files at the mine with

1  regard to worker health and safety?

2      A.    On an individual basis, I don't recall.

3  On a general basis, yes.

4      Q.    And within those files was there

5  information about how to protect the work force from

6  hazards of asbestos?

7      A.    Yes, there were.

8      Q.    Okay.  Do you know where those files are?

9      A.    No, I do not.

10     Q.    Now, as the person in charge of the mine

11  initially and then the entire operations, did you

12  participate in providing safety instructions to the

13  men and women that worked up there?

14     A.    Periodically, yes.

15     Q.    Okay.  You mentioned that your files would

16  have how to protect against hazards of asbestos.

17  How would you protect men and women at the mine

18  through the 1990 closure against the hazards of

19  potential asbestos exposure?

20     A.    By ensuring that they understood how to

21  use the approved respirators that we had on the

22  property.

23     Q.    Okay.  What else?

24     A.    Well, that was basically it, other than in

25  a few locations you had to have special clothing on.

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1      Q.    Okay.  When you had men doing the strip

2    mining, didn't they have to be in air conditioned,

3    controlled --

4      A.    Sure.  I'm sorry.  I forgot about that.

5    All of our equipment up there was pressurized,

6    that's correct.

7      Q.    So you had positive pressure?

8      A.    Yes.

9      Q.    Ventilation within the buildings?

10     A.    Not necessarily.  The buildings were

11   ventilated, but they weren't positive pressure.

12     Q.    I mean, what about the mill, for instance?

13     A.    The mill was a wet mill process.

14     Q.    But did you have any controlled

15   ventilation within the wet mill?

16     A.    I'm sure there was, but I don't know

17   anything specific.

18     Q.    Down at the screening plant, what type of

19   controlled ventilation was down there?

20     A.    There was baghouses.

21     Q.    Could you describe what baghouses are?

22     A.    A baghouse is a structure that has a

23   number of, basically, various diameter bags that the

24   air is pulled through.  It's like a vacuum cleaner,

25   and the dust or particles stick to the outside of

1  the bag.  The air passes through the bag and is

2  exhausted.

3      Q.    Where would the baghouses be located?

4      A.    As close to the equipment that needed to

5  be ventilated.

6      Q.    So when you brought trucks down there and

7  you unloaded the vermiculite --

8      A.    Where?

9      Q.    Down at the screening plant you would have

10 dust clouds and so you would use these --

11     A.    No.  There was a -- If I recall the

12 operation of the screen plant, as the truck dumped

13 in, there was ventilation pulling off that so that

14 material, as the truck dumped into the receptacle,

15 there was -- the dust was being pulled off of it.

16     Q.    By a controlled ventilation system?

17     A.    By controlled ventilation, if there was

18 any dust.

19     Q.    Any other safeguards down at the screening

20 plant that you recall?

21     A.    Well, we -- There were the dust

22 collectors.  We also sprayed a soybean oil on the

23 vermiculite before it was shipped out.

24     Q.    Why do you do that?

25     A.    In order to bind any remaining dust that

1   may have been generated to the particle itself.

2       Q.    And the dust you were concerned about of

3   course would be the tremolite.

4       A.    Well, just dust in general, whether it

5   contained tremolite or not.

6       Q.    But you had up to one percent tremolite

7   asbestos still remaining even after you went to the

8   wet mill.

9       A.    That's not necessarily true.  It could and

10  at periods of time it may have, but when we were

11  manufacturing, we were testing the product and we

12  were down as low as a tenth of a percent.

13      Q.    On some of them.

14      A.    On some of them.

15      Q.    But what I'm saying, the reason for the

16  soybean oil though, your primary concern was the

17  tremolite asbestos?

18      A.    Certainly, but it was all dust as well,

19  other dust as well.

20      Q.    I mean as far as a toxic dust that is

21  carcinogenic, the only one we know of is tremolite

22  asbestos.

23      A.    That's correct.

24      Q.    That's what your main concern was?

25      A.    That's correct.  We wanted to keep any

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1  residual that was there binded.

2      Q.   Now, did you put up any signs anywhere so

3  the men would know that, whether they were working

4  with the vermiculite or the ore, that there was a

5  hazard or a potential of asbestos exposure?

6      A.   Only where it was necessary that -- where

7  it was required to wear respirators.

8      Q.   I understood that at the loading area

9  across the river they did have signs up, asbestos

10 signs.

11     A.   I don't recall anything specific.

12     Q.   Let me talk to you about around 1990 when

13 you closed the mill.  What explanation was given to

14 you by your bosses as to why the mill was being

15 closed down, and the mine?

16     A.   That there was no longer a sufficient

17 market to justify running the operation.

18     Q.   Can you describe to me how the market had

19 fallen off?

20     A.   We had gone from using vermiculite as the

21 main ingredient in one of our construction products

22 called Monokote 5.  That product had been improved

23 and was graded Monokote 6 and it did not include any

24 vermiculite.

25     Q.   Are you saying you had a substitute for

1   vermiculite?

2        A.    That's correct.

3        Q.    Now, was Monokote 6 more expensive to make

4   than Monokote 5?

5        A.    I don't know.  I wasn't in that part of

6   the business.

7        Q.    Now, my understanding is the government

8   was tightening up on asbestos exposure standards as

9   well in the late 1980s.  You're aware of that as

10  being the head of the mill; aren't you?

11       A.    Well, I know that the standards from the

12  time that I came there in 1981 to the time that I

13  left did change, and they did get more restrictive,

14  yes.

15       Q.    In '81 I think it was five fibers per

16  cubic centimeter?

17       A.    That's correct.

18       Q.    And by the time of 1990 it was down to

19  what?  Two or point two?

20       A.    Two.

21       Q.    And then I think in '94 they went down

22  even more?

23       A.    I don't recall what they were in '94

24  because we had nobody working there in 1994.

25       Q.    In your discussions with your Grace

1  officials, was a factor of asbestos being in the

2  tremolite -- or excuse me -- in the vermiculite

3  mixtures a factor in the closure of the mine?

4      A.    That was never discussed with me.  My

5  reasoning for closing the mine that I was ever aware

6  of was it was just no longer economical to run that

7  size of operation for the small amount of tonnage

8  that we had sales for.

9      Q.    Did you make recommendations to your

10 bosses that it should be closed because production

11 was down?

12     A.    No.

13     Q.    Is there paper work concerning the reasons

14 why the mine was shut down in 1990?

15     A.    I'm not aware of any.

16     Q.    Obviously there is; you're just not aware

17 of it.

18     A.    That's quite possible.

19     Q.    There came a time when of course that

20 Grace wanted to liquidate the properties around

21 here.

22     A.    Okay.

23     Q.    You're with me, around 19 -- What?  When

24 did you start talking about that?

25     A.    From the moment that we closed the

1    operation we had to take into consideration

2    liquidation of property as well as assets on the

3    property.

4         Q.    Tell me Grace's plans as relayed to you as

5    you recall them as to how this was -- how they were

6    going to dispose of the properties.

7         A.    I don't recall any specific plan for

8    disposing of the properties.  We had a value that we

9    had placed on each of the properties, and --

10        Q.    How did you arrive at the values?

11        A.    Basically looking around as to what was

12   comparable values here in the area.  At the time

13   timber values were pretty low and we set a value on

14   the mine property of a certain amount.  And then the

15   various pieces of property that we had along the

16   river we looked at and set a value of what we

17   thought those would be based on comparable other

18   areas.

19        Q.    What I'm aware of is the mine site which

20   covers over 2,000 acres.

21        A.    It's about 3600 acres.

22        Q.    And about a thousand was disturbed, a

23   little over a thousand?

24        A.    That's correct.

25        Q.    Then I'm aware of the river properties,

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1  one being the screening plant that the Parkers

2  bought.

3      A.    That's correct.

4      Q.    And that was about 21 acres I think?

5      A.    That's correct.

6      Q.    And there was about 20 acres just to the

7  south of that?

8      A.    Up-river or down-river?

9      Q.    I don't know.  I'll just ask you.

10     A.    There were other pieces of property.  I

11 don't recall exactly how many pieces of property

12 were down there.  There were probably one, two,

13 three, four, five, six -- There may have been around

14 eight separate pieces of property.

15     Q.    Were they all adjacent to each other?

16     A.    Basically, yes, except for three were

17 across the river.  I think three or four were across

18 the river.

19     Q.    Oh, the loading area.

20     A.    Right.

21     Q.    How many acres did that comprise?

22     A.    I think the whole thing was around 250

23 acres.

24     Q.    Would that include the exporting plant?

25     A.    No.

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1    Q.    Okay.  And so there was the exporting

2  plant too.

3    A.    As well as there was another piece of

4  property near the St. John's Hospital.

5    Q.    And the exporting plant is what, like

6  eight or nine acres?

7    A.    Seventeen.

8    Q.    And then the piece near the hospital?

9    A.    About five.

10    Q.    What was the piece near the hospital used

11  for?

12    A.    It had softball fields on it, girls'

13  softball fields.

14    Q.    Had it been used in the business at all?

15    A.    Not that I was ever aware of.

16    Q.    Were there any piles of vermiculite ore

17  there?

18    A.    In the time I was here I never saw

19  anything.  It was always a softball field.

20    Q.    Okay.  Who did you confer with concerning

21  the strategy for selling this land?

22    A.    Which land?

23    Q.    Well, just all the land here that --

24    A.    Again, I think just between myself and my

25  accountant, Bob Marozzo, and various -- you know,

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1    just people around town trying to determine what we

2    thought was the value for it and then we set it.

3        Q.    How about with your upper management

4    outside of the Libby area?

5        A.    No.

6        Q.    Well, there must be some word coming down

7    from above about what to do with the property.

8        A.    Well, you asked the question about setting

9    value, and nobody above me did I discuss setting

10   value with.

11       Q.    I just meant timetables, need to sell the

12   land, options.  Who at the upper management were you

13   conferring with as the main man down here in Libby?

14       A.    My direct supervisor.

15       Q.    Who was?

16       A.    Jack Wolter.

17       Q.    Okay.  He's here too; right?

18       A.    He's here where?

19       Q.    Well, I mean, he was in Libby as well.

20       A.    No, he was not.  He was in Cambridge,

21   Mass.

22       Q.    Okay.  Anybody else at the main

23   headquarters?

24       A.    No, not that I recall.

25       Q.    Were there instructions in writing by the

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1  main company down to you?

2       A.    With respect to what?

3       Q.    Well, just procedures, what you should do,

4  not do and reasons why we're doing this, and so on?

5       A.    No, none that I recall.

6       Q.    Did you go back to headquarters to talk to

7  any of the higher-ups about what to do to dispose of

8  the property down here?

9       A.    No.  I think all the conversations I ever

10  had about any disposal of any properties was with my

11  immediate supervisor.

12      Q.    And always by phone?

13      A.    Oh, I'm sure, or he was out here -- He

14  usually came out here once or twice a year, so there

15  were those.

16      Q.    But you didn't travel back east?

17      A.    Not specifically to talk to him about any

18  of this, no, not that I recall.

19      Q.    Was there any discussion about CERCLA or

20  any federal or state laws pertaining to Grace's

21  responsibility for toxic waste left on properties?

22      A.    There were discussions relative to

23  underground storage tanks.

24      Q.    Okay.

25      A.    There were discussions relative to the

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

```
 1   existence of P.C.Bs.

 2        Q.    Okay.

 3        A.    And that's basically all I recall.

 4        Q.    No discussion with regard to tremolite

 5   asbestos?

 6        A.    As relative to what?

 7        Q.    Well, just to the existence of that on any

 8   of the properties you were selling.

 9        A.    No.  No.

10        Q.    And you're saying there's no documentation

11   to your knowledge concerning the procedure to

12   dispose of land up here in the early 1990s by the

13   Grace Company.

14        A.    I'm sure there's documentation that --

15   basically generated from me saying this is what I've

16   set the value at, but that would be all.

17        Q.    What was Bob Marozzo's role in the sale of

18   land?

19        A.    Advice.

20        Q.    What do you mean by advice?

21        A.    What do we think the land is worth, what

22   do you think -- Basically that was all.

23        Q.    What was Bob's -- How long did Bob work

24   for the Grace Company?

25        A.    Longer than I did, so --
```

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1      Q.    He was here when you started?

2      A.    Yes.  I don't know what his years of

3   service were.

4      Q.    How would you describe his duties when you

5   were here?

6      A.    Accountant.

7      Q.    I mean, he would procure things and --

8      A.    No, not procure.  He was the accountant.

9      Q.    Okay.

10      A.    He would take care of the books, pay the

11   bills.

12      Q.    Who took care of the books concerning

13   Occupational Disease claims?

14      A.    When I first came, probably if -- I mean,

15   you used the word "books."  I don't know what that

16   information --

17      Q.    Well, documents, records.

18      A.    Earl Lovick would have done that.

19      Q.    After Earl?

20      A.    Probably Marozzo may have had some

21   relationship, but I don't think he had much.  I

22   think it mainly stayed with the general manager and

23   the manager's secretary.

24      Q.    Who was the general manager after Earl

25   Lovick left?

1      A.   You're implying that Earl Lovick was the

2  general manager.  He was not the general manager.

3      Q.   I stand corrected.

4      A.   William McCaig, Bill McCaig.

5      Q.   How long was he the general manager?

6      A.   From about 1979, 1980 to 1988.

7      Q.   So for those last two years?

8      A.   Myself.

9      Q.   So you would have had the Occupational

10  Disease claims files?

11      A.   Yes, I would have seen them.  I would have

12  had to have affixed my signature to any, yes, that's

13  correct.  The files were not in my office though.

14      Q.   Were there claims being made for

15  occupational asbestos-related disease?

16      A.   I don't recall any.

17      Q.   You're saying there weren't any from '88

18  to '90?

19      A.   Not to say that they weren't, but I don't

20  recall any.  There were occupational claims, but

21  they were mainly for occupational injuries.

22      Q.   Weren't there some lawsuits filed before

23  the mill closed, the mine closed?

24      A.   I'm sure there were, but I don't know of

25  any specific ones.

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1    Q.    But there were lawsuits filed against the

2   Grace Company for workers who were making claims

3   that they had suffered asbestos-related diseases.

4    A.    If you say so, but I don't recall any

5   specifically.

6    Q.    You don't recall either way?

7    A.    No.  That's not to say that they weren't

8   there, but I don't recall any specific claims.

9    Q.    Now, if I have you right then, when the

10  Grace Company directed you to sell the properties

11  here, they made no representations to you concerning

12  potential risk of asbestos that was on the property

13  either in the form of, say, ore up at the mine or

14  vermiculite or ore that might have been on the

15  screening plant, etc.

16    A.    What is the question again?

17    Q.    Yeah.  If I have you correct, you're

18  telling me that no one at the Grace Company when

19  they directed you to sell these lands made any

20  mention that there may be potential hazards

21  regarding asbestos on those lands.

22    A.    There was never any communications to me

23  about that.

24    Q.    Let me ask you about your relationship

25  with Mel and Lerah Parker.  How long have you known

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1  them?

2      A.   Well, I had an acquaintance with Mel and

3  Lerah prior to 1990, I guess, when they had their

4  nursery out at Rollins tracks.

5      Q.   Did you ever go out to Rollins tracks?

6      A.   Yes, I did.

7      Q.   Nice nursery out there?

8      A.   Yes, it was.

9      Q.   Did you see their home?

10     A.   Yes, I did.

11     Q.   Were you a house guest there or anything?

12     A.   No.

13     Q.   Well, what occasion did you have to go out

14 to the nursery there?

15     A.   I don't recall specifically, but I'm sure

16 it was to probably purchase something.

17     Q.   Went to their church as well?

18     A.   I don't know what church they go to.

19     Q.   Catholic church.

20     A.   I went to catholic church, but I don't

21 recall seeing Mel and Lerah on a normal basis at the

22 church.

23     Q.   Okay.  Hard working people as far as you

24 can tell?

25     A.   Absolutely.

1     Q.    Outstanding probably.

2     A.    Yes.

3     Q.    I mean, if you go out and took a look at

4  their old nursery, you can see the work they did out

5  there?

6     A.    I've always been impressed by the work

7  ethic that they have.

8     Q.    Honest people?

9     A.    I've never had any reason to say

10  otherwise.

11     Q.    Good solid citizens.

12     A.    Yes, as far as I've always been concerned.

13     Q.    How did it come about that the Parkers

14  were made aware of the Grace land along the river?

15     A.    I don't recall how they became aware of

16  it.  I had an agreement with a local realtor to

17  market it for us, and it may have come about through

18  there.

19     Q.    Let me tell you what Mel's recollection is

20  and see if you have any reason to disagree.

21          Mel's recollection is that he had met you

22  at a craft show in Libby one day, I think it was

23  Saturday or Sunday, and you just did some small

24  talking, and one of the things he had mentioned is

25  that he was expanding his nursery and I guess going

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1    to build some platforms or greenhouses or something

2    like that.  And you had mentioned to him that if he

3    had interest in expanding a nursery, that Grace had

4    some excellent land along the Kootenai River that

5    would be perfect for that.

6        A.    I have no reason to dispute Mel's

7    recollection on that.  I don't recall it as such.

8        Q.    And then I think you directed him to Mr.

9    DeShazer, who I assume was the realtor that you were

10   using.

11       A.    There again, I have no reason to dispute

12   that.

13       Q.    Do you recall any inspections that Mel or

14   Lerah made before they purchased the property?

15       A.    I recall Mel and Lerah being on the

16   property before they purchased it and talking about

17   how they would use it.  If you characterize that as

18   an inspection, then, yes.

19       Q.    Okay.  Now, let me ask you, how did they

20   tell you they were going to use it?

21       A.    As a nursery.

22       Q.    And as a home?

23       A.    That probably at one time probably they

24   would like to build their home there, yes, that's

25   correct.

1    Q.    Well, you knew that their home was on

2    their other nursery.

3    A.    That's correct.

4    Q.    So your natural assumption would be the

5    same.

6    A.    That they would build a home there, that's

7    correct.

8    Q.    Okay.  And do you recall any of the

9    conversations prior to the time that, you know, you

10   actually signed the written agreement with the

11   Parkers?

12   A.    Nothing specific, no.

13   Q.    Overall, how did that land transaction

14   go?  Were there any snags or anything?  Do you

15   recall?

16   A.    I don't recall.  I really don't.  I mean,

17   I recall that they had entered into a buy/sell

18   agreement, but that was a considerable amount of

19   time, and I don't recall what it was, between when

20   the buy/sell agreement was and when we finally

21   signed the deed.  But I think a lot of that was due

22   to the fact that we weren't through with the

23   property as well as anything.  Other than that, I

24   don't recall anything.

25   Q.    Now, when you say you weren't through with

1  the property, what did you have to do?

2      A.    Well, we were still in the process of

3  dismantling certain things and disposing of certain

4  assets.

5      Q.    Okay.  Were you making any plans to remove

6  anything that would be characterized as a toxic

7  waste or asbestos or anything like that?

8      A.    None that I recall.

9      Q.    You're aware that literally tons of

10  vermiculite was left on the property.

11      A.    I know that vermiculite was left on the

12  property, yes.

13      Q.    How do you know that?

14      A.    I know it from having been on the property

15  and knowing what was on the property when we sold it

16  to the Parkers.

17      Q.    Could you describe just the physical

18  condition of the property when you sold it to the

19  Parkers?

20      A.    Well, it was a piece of property that had

21  a number of buildings that had been used for

22  industrial purposes left standing on it.  There

23  were -- There was a large area that had been

24  concreted, concrete was there, and there was an area

25  that had a lot of -- that had been used for storing

1  vermiculite on that was asbestos -- Excuse me.

2  Asbestos.  Excuse me.  Asphalt.

3      Q.   Okay.  Were there piles of vermiculite

4  over the 20 acres?

5      A.   Over the 20 acres there were probably --

6  you could characterize as some piles of vermiculite.

7      Q.   And then on the long shed itself along the

8  beams and everything there were vermiculite

9  scrapings or piles left there?

10     A.   I'm sure there were.

11     Q.   And within the tunnels there was

12 considerable vermiculite which had fallen off the

13 conveyor belts?

14     A.   I'm sure there was, yes.

15     Q.   Would it be a fair statement that the site

16 when the Parkers bought it was similar to a

17 construction site and that there wasn't any greenery

18 or anything?  It was mainly some asphalt, concrete

19 and scraped dirt all over?

20     A.   That's a fair depiction.

21     Q.   And then I understood that as part of the

22 contract, and in fact, it's written in the contract

23 and I can show it, but Grace made a promise to clean

24 and landscape their land for the Parkers before they

25 bought it.  Do you recall that?

1      A.    I don't recall it specifically, but if

2    it's in the contract, then I'll accept that.

3      Q.    Okay.  I can show it to you, but I guess

4    what my next question is, how did you go about

5    cleaning and landscaping the property for the

6    Parkers?

7      A.    Well, I don't recall what the definition

8    of -- what the cleaning was or landscaping.  I do

9    know that -- I recall having conversations with Mel

10   and Lerah as to what they wanted left there, and I

11   do know that there were certain areas where there

12   was exposures of concrete and things like this that

13   needed to be covered up that we agreed to do.

14     Q.    And did you do that?

15     A.    Yes, we did.

16     Q.    Where did you get the fill in order to

17   cover up the concrete?

18     A.    I specifically don't know where the fill

19   came from because I didn't see it when it was done,

20   so I have to assume that it probably came from the

21   mine, but I don't know for sure.

22     Q.    Okay.  Who would know?

23     A.    The people who were doing the work.

24     Q.    And that would be who?

25     A.    Well, there were a number of hourly guys.

1    I don't recall their names specifically who was on

2    still at that time.

3        Q.    Now, before the mine shut down, it was my

4    understanding that the Rainy Creek Road was being

5    resurfaced using mine tailings?

6        A.    That's not true.

7        Q.    Where was the dirt coming from that Grace

8    was putting on Rainy Creek to resurface it?

9        A.    We resurfaced the road in probably 1985,

10   and the material that was used to resurface that

11   came out of a gravel pit that was adjacent to the

12   mine.

13       Q.    So it wasn't mine waste?

14       A.    It was not mine waste.  It was screened

15   gravel.

16       Q.    Before 1993 when the Parkers purchased the

17   screening plant, had you received any complaints or

18   warnings that there were asbestos hazards related to

19   Rainy Creek Road?

20       A.    No.

21       Q.    We kind of described the overall condition

22   of the land at the time the Parkers purchased it

23   from you.  How would you describe the Parkers'

24   efforts over the years -- You've seen those; right?

25   I mean, you've seen what they've done with the land?

1      A.    Yes.

2      Q.    How would you describe their efforts to

3 turn that into a garden spot, so to speak?

4      A.    Well, it depends on your definition of

5 garden spot.  I mean, they did an outstanding job of

6 working with the piece of property that they had

7 there setting up their nursery and everything else.

8 But if you were to look at it one year ago versus

9 when we left it, it looked a lot the same except

10 that there was a lot more grass, a lot more trees

11 and things like that, but it still basically looked

12 the same.  You still had the long shed, you still

13 had the concrete, you still had the asphalt, you

14 still had the small office building.

15      Q.    But it was landscaped.  It was green?

16      A.    There was considerably more green on it,

17 that's correct.

18      Q.    There was no doubt that they put an

19 extremely large amount of sweat equity into that

20 land since they bought it.

21      A.    There's no question.

22      Q.    Now, let me take you back to -- Have we

23 pretty much exhausted your memory about what you

24 remember from the time that the Parkers started

25 looking at the property to the time that the

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1    contract was signed?

2        A.    Yeah.    I don't recall anything specific in

3    there.

4        Q.    Okay.    Then they didn't actually purchase

5    the land until approximately a year later, which

6    would have been the fall of '93, to help you.

7        A.    I think that's correct.

8        Q.    Do you recall any conversations you had

9    with Mel or Lerah about the land during that time

10    period?

11        A.    Nothing specific, no.

12        Q.    Okay.    So that gets us up to, say, the

13    fall of '93 when they signed the papers.    At any

14    time prior to the Parkers actually purchasing the

15    land in the fall of '93, did you make any statements

16    to them about any potential hazards on the land?

17        A.    None that I recall.

18        Q.    Any statements to them concerning the

19    existence of asbestos on the land?

20        A.    No.

21        Q.    Now, there was asbestos on the land.

22    There had to be; correct?

23        A.    I don't know that I knew that at the time.

24        Q.    Well, you know there's vermiculite there,

25    and although that was certainly vermiculite that had

1    been milled, we do know that there are various

2    amounts of tremolite asbestos.

3        A.    That's true.

4        Q.    So we do know that there was some asbestos

5    on the land.

6        A.    That's correct.

7        Q.    And you knew that when you sold it to

8    them.

9        A.    But I didn't recognize it as a hazard.

10       Q.    Okay.  You subjectively did not recognize

11   it as a hazard.

12       A.    That's fair.

13       Q.    Okay.  And if I understand you right --

14   Well, and perhaps I could clarify that.  Was Grace

15   Company sharing with you any of the information they

16   had about the studies or research they had done

17   about the hazards of asbestos in the vermiculite

18   through that time?

19       A.    I don't recall anything specific, no.

20       Q.    Okay.  So it would be fair to say that the

21   Grace Company officials, the higher-ups, were not

22   saying anything to you about potential hazards the

23   asbestos on the screening plant and other Grace

24   properties might pose to potential purchasers.

25       A.    There were no discussions with me about

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1  any of that.

2      Q.    Let me paraphrase what I understand Mel

3  says occurred back when you met him in '92 at this

4  craft fair.  Basically Mel indicates that you

5  represented to him, If you're looking for a place to

6  expand your nursery, this land along the Kootenai

7  would be a great fit, or words to that effect.

8      A.    I have no reason to dispute those words.

9      Q.    Okay.  Then Lerah was talking about the

10  property next door to the screening plant, which was

11  eventually purchased by Kootenai Development.  Are

12  you with me?

13      A.    Okay.

14      Q.    Okay.  I think there's about 20 acres

15  there too.

16      A.    Approximately.

17      Q.    Do you recall what the discussions were

18  about whether the Parkers wanted the screening plant

19  more or at that time did they want the land next to

20  it?

21      A.    I don't recall any discussion as to which

22  one they wanted more than the other.  I do know that

23  they wanted both pieces of property.

24      Q.    Okay.  How do you know that?

25      A.    Well, I recall the discussions about

1    wanting the properties.  They knew that -- If I

2    recall, they had -- they had the funds available to

3    buy the screening plant property, and they might be

4    able to get enough funds together to buy the other

5    piece of property.

6        Q.    Okay.  Do you know why that fell through?

7        A.    No, I don't.

8        Q.    Now, do you recall that the Parkers were

9    also interested in purchasing the mine itself?

10       A.    Yes.

11       Q.    And that they I think made an offer to buy

12   it for a couple million dollars, I think?

13       A.    I think that's correct.

14       Q.    Do you know, why did that fall through?

15       A.    That was something that I was not

16   privilege to.

17       Q.    Okay.  Who would be?

18       A.    Probably Jack Wolter.

19       Q.    So you don't know anything about that?

20       A.    I was not involved in any of the

21   negotiations with respect to the selling of the 3600

22   acres.

23       Q.    Okay.  Did you ever see any of the paper

24   work that was submitted by Mel on the mine, his

25   proposed purchase agreement?

1       A.    I may have, but I don't recall.

2       Q.    Okay.   In selling the mine site eventually

3   to Kootenai Development and other properties being

4   sold around Lincoln County, was there ever any

5   mention to the potential purchasers about the

6   presence of asbestos on the land?

7       A.    None that I recall.

8       Q.    Okay.   Were you involved with all of those

9   sales?

10      A.    Yeah.   Yes, I was.

11      Q.    And would you have been the main person

12  signing on behalf of Grace when the paper work came

13  across about the real estate?

14      A.    Not all of them, but for the most part,

15  yes.

16      Q.    Which ones were you not involved with?

17      A.    Actually, I don't know that I ever signed

18  any transfer.   That would have had to come out of

19  somebody in Cambridge probably.

20      Q.    Did any one of the potential purchasers

21  inquire about a potential hazard of asbestos on the

22  property?

23      A.    None that I recall.

24      Q.    Now, eventually in 1994 Kootenai

25  Development purchased the mine site.

1    A.    That's correct.

2    Q.    What was your involvement in that sale?

3    A.    None, other than showing the purchasers

4  around the property.

5    Q.    Jack Wolter was one of the purchasers;

6  wasn't he?

7    A.    No, he was not.

8    Q.    He wasn't?

9    A.    No, he was not.

10    Q.    He later became a member of the --

11    A.    That's correct, after the sale.

12    Q.    Who were the original purchasers?

13    A.    I think the only one was Lum Owens.

14    Q.    He was the only one?

15    A.    I think so.  There was no Kootenai

16  Development.  It was Lum Owens.

17    Q.    And later on Kootenai Development was --

18    A.    There again, I'm not privilege to that

19  information.  Not that I couldn't find out, but --

20    Q.    As president you probably could find out

21  now.

22    A.    Probably go back and read the

23  incorporation, but it was Lum Owens who bought the

24  property.

25    Q.    Do you have any information, hearsay or

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1    otherwise, why Mr. Owens received the property and

2    not the Parkers?

3        A.    No, none whatsoever.  I -- I mean, I just

4    presumed it was best price.

5        Q.    Who would make that decision?

6        A.    Somebody with Grace.

7        Q.    Probably Mr. Wolter?

8        A.    I'm sure Mr. Wolter would have had some

9    input to it.

10       Q.    I wanted to show you that document.  I've

11   got the full one here, and then I've got almost the

12   full one.

13            MR. THUESON:  Terry, with the

14   exception of this first page, I think that goes with

15   it, the second page here, I'm going to give him a --

16            Can you mark this?

17   (Exhibit Number 1 marked for identification.)

18            MR. MacDONALD:  I'm not sure I've

19   ever seen this before, Erik.  But

20   nonetheless --

21   BY MR. THUESON:

22       Q.    Let me show you what's been marked as

23   Exhibit Number 1, Mr. Stringer, and I'll represent

24   to you this is -- You don't have the front page, but

25   I have it here.  This is a Priority

1    Review, Asbestos-Contaminated Vermiculite, dated

2    June, 1980, put together by the U.S. E.P.A.  Do you

3    see that?

4        A.    Yes.

5        Q.    And the document you have is their report,

6    with the exception of this "Duplicate" language in

7    blue at the bottom is my notes jotted down.

8            First of all, have you ever read or seen

9    this report?

10       A.    No, I have not.

11       Q.    And I want to give you a chance to look at

12   parts of it.  I'll represent to you, and certainly

13   you can read this ledger if you like, that the Scott

14   company made a report to the government that they

15   were buying half their vermiculite from the Grace

16   mine and they were buying half of it from Africa,

17   and that Africa vermiculite was tested and it didn't

18   have any tremolite in it, and they had reports of

19   men at their expansion plant coming down with

20   asbestos-related diseases.

21           In this E.P.A. report they describe on

22   page 13 the screening process at the Grace site near

23   Libby, and I was wondering if you could turn to page

24   13 and take a look at what they describe.

25       A.    Okay.

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1      Q.    In that paragraph they describe exposure

2    levels at the screening plant as per a W.R. Grace &

3    Company report, 1979.  Do you have any information

4    that would be different from what is said on page 13

5    during that time that you ran the -- when you were

6    up here in Libby from 1981 to --

7      A.    I have no information.

8      Q.    Do you know what the exposures were to men

9    working at the screening plant?

10     A.    Not specifically, no.

11     Q.    Okay.  And again, do you see where it says

12   point two to five fibers per cubic centimeter

13   according to Grace, 1979?

14     A.    I see that.

15     Q.    You don't know what the exposures were to

16   the men down there at all?

17     A.    No, I do not, not in 1979.

18     Q.    Well, I mean 1980 to 1990.  I'm trying to

19   see if it was different during the time you were

20   there.

21     A.    All I know is the exposure of the

22   employees on the operation were always maintained at

23   a level below what the regulatory standards required

24   us to be at.

25     Q.    How often was that tested at the screening

Page 52

1    plant?

2        A.    I don't know specifically, but I do know

3    that it was -- somebody down there was tested at

4    least every month.

5        Q.    Let me turn you to page 14.  Just on the

6    other side at the top of the page they talk about

7    men at the Scott company unloading the vermiculite

8    that comes in rail cars, presumably from Grace

9    Company.  Do you see that?

10       A.    Yes.

11       Q.    And go ahead and read down that first

12   paragraph up to the word "Packaging."

13       A.    "Before 1976, employees --"

14       Q.    Yeah, from there on down.

15       A.    Okay.  "Before 1976 --"

16       Q.    You don't need -- You can read it to

17   yourself.  I just wanted to get you --

18       A.    I'm sorry.  I guess I've already read it,

19   yes.

20       Q.    Okay.

21       A.    Okay.

22       Q.    So do you see where they're saying there's

23   basically huge amounts of tremolite asbestos fibers

24   when these men were working without controlled

25   ventilation or respiratory equipment?  Do you see

1  that?

2      A.   I see that.

3      Q.   Okay.  And just to make this a more

4  complete discussion, if you go down to the bottom of

5  page 14, they talk about maintenance.

6      A.   Okay.

7      Q.   Do you see that?  And the reason I wanted

8  to bring in the maintenance is they talk about --

9  They said, quote, "Workers are exposed to the

10 highest dust levels when the emissions control

11 equipment, e.g., baghouse, air collecting fans and

12 ventilation systems, is being repaired.  Although

13 exposure levels during repair operations depend on

14 the extent of the repair and the housekeeping

15 practices of the plant, they tend to be above the

16 two fibers per cubic centimeter, O.S.H.A. standard."

17     A.   I see that.

18     Q.   My understanding from talking to you

19 earlier is that the way you kept the fiber count of

20 asbestos down at the screening plant during the time

21 you were there were with the type of control

22 measures they were talking about here in this

23 maintenance paragraph.  In other words, air

24 collection fans, ventilation systems, etc.

25     A.   That's correct.

P. O. 394 -- KALISPELL, MONTANA

1    Q.   Would you allow your men to work down

2 there without those control measures?

3    A.   I don't recall any instance where people

4 were told to continue working when there was

5 maintenance -- when there was no adequate dust

6 collection.

7    Q.   As a manager, would you allow them to

8 work?

9    A.   No, I would not.

10    Q.   Why is that?

11    A.   Because it puts them in a position of

12 potential risk for all dust, whether it be asbestos

13 or not.

14    Q.   Well, certainly the asbestos would be the

15 major one you would worry about.

16    A.   Certainly, but I was just as concerned

17 about any other dust as well.

18    Q.   Okay.  So in order to protect the men's

19 health at the screening plant, you made sure that

20 there was controlled ventilation, and that if the

21 controlled ventilation did not work, the men were

22 not supposed to work in those areas.

23    A.   Yeah.  As I recall, the operating

24 procedures were that the operation would only run

25 when there was adequate ventilation.

1    Q.    Okay.  Do you have any reason to dispute

2    the statements in this report which seem to indicate

3    if you don't use control measures around

4    vermiculite, even after it's screened, you create a

5    potential of overexposing people to asbestos dust?

6    A.    I have no reason to dispute that.

7    Q.    Did you know that Scott was a large

8    purchaser of your vermiculite up here?

9    A.    I came in 1981.  I don't recall that they

10   were.

11   Q.    Oh, okay.  So they may not have been after

12   that time.

13   A.    I don't recall.

14   Q.    You say you never saw this report before?

15   A.    No, I have not.

16   Q.    Did you see any tests or reports while you

17   were up at the mine between '80 and '90 done by

18   people about the health of Grace workers?

19   A.    The only report I ever remember seeing

20   specifically was the McDonald report.

21   Q.    And that was in '85?

22   A.    Early to mid '80s, yes.

23   Q.    Now, what's your recollection of what it

24   said?

25   A.    That the exposure of the people who were

1    working at that operation at the time that I was

2    there was no more than the rest of the general

3    population.

4        Q.    Okay.  What do you attribute that to?

5              Let me go back a little.  I think the

6    report also said that men who had worked there

7    before in the early years, like '60s, '50s and up

8    into the '70s, there were a lot of asbestos-related

9    disease.  Is that your --

10       A.    I don't know if that was specific, but I

11   have no reason to dispute what you say.

12       Q.    What do you attribute the -- Obviously

13   there had to be a dust, asbestos, problem back there

14   before you came there.  What do you attribute the

15   improvement of the work place to be so that

16   according to the McDonald report you were within

17   safe limits?

18       A.    Because of what the operation was going

19   through, the metamorphosis over the years of once

20   understanding what the risks were, what the issues

21   were, there was continuous improvement in the

22   operation, starting with respirators in the '60s,

23   starting with implementation of the wet mill, the no

24   smoking policy, the asbestos education program and

25   all the dust collection that was going on, as well

1   as the addition of the soybean oil.  All of these

2   were improvements to the operation that minimized

3   the risk to any of the employees.

4        Q.    When you say dust collection, you mean

5   controlled ventilation?

6        A.    That's correct.

7        Q.    From the time you were there in '81

8   through '90, were there additional protections added

9   so men would not be exposed, or was everything

10  pretty much in place by the time you got there?

11       A.    Well, there was a continuous improvement

12  within the milling process to minimize the

13  exposures.  I don't know of anything specific.  I

14  recall the implementation of the wearing of

15  coveralls.  I recall the implementation of adding

16  soybean oil, and there was continuous improvement in

17  the ventilation systems.

18       Q.    Okay.  At the mill?

19       A.    And mill -- At the entire operation.

20       Q.    Now, the coveralls, were they taken off so

21  that the people would not take the asbestos to their

22  homes?

23       A.    Not take any dust home, that's correct.

24       Q.    So those were issued, and then they were

25  taken off and left at the mill and the mill would

1  wash them?

2      A.    That's correct.

3      Q.    Was that at the mill and the mine site?

4      A.    That was everywhere.

5      Q.    Including the screening plant?

6      A.    Including the screening plant.

7      Q.    Okay.  Any other changes you can think of

8  during your time there?

9      A.    I don't recall anything specific.

10     Q.    During the shutdown, were there any

11 concerns about asbestos at all, to your

12 recollection?

13     A.    Relative to what?

14     Q.    Well, just tearing down buildings up there

15 at the mine site.

16     A.    There were instances where we were

17 concerned about exposures of our employees to

18 excessive levels of dust where there were

19 precautions taken.  But for just the general

20 dismantling of the buildings and pulling equipment

21 out, there were no special precautions taken.

22     Q.    Were there problems because no special

23 precautions were taken when tearing the buildings

24 down?

25     A.    We were cited by the E.P.A., or the State

1    of Montana, for failure to get a permit for tearing

2    down the buildings.

3        Q.    And --

4        A.    That was a violation of the Clean Air Act.

5        Q.    Because of the release of asbestos?

6        A.    Because of the potential release of

7    asbestos, or not having identified whether there was

8    any asbestos there or not and ensuring that it was

9    removed and then getting the permit to tear down.

10        Q.    There was asbestos there though.

11        A.    There was -- As far as I was under the

12    understanding of, there was no commercial asbestos

13    in the plant -- in the operation when we --

14        Q.    In the buildings?

15        A.    In the buildings when we started tearing

16    them down.

17        Q.    Eventually Grace paid half a million

18    dollars.

19        A.    That's correct.

20        Q.    Well, would you have done that if there

21    was no asbestos in those buildings?

22        A.    We were cited for violation of the Clean

23    Air Act which said we did not go through and do an

24    inspection.    Therefore, because we didn't do an

25    inspection, it in all likelihood existed.    And

1  because it existed, we probably illegally removed

2  it.  Because we illegally removed it, we illegally

3  transported it.  And because we illegally

4  transported it, we illegally disposed of it.

5      Q.    Well, the buildings were burned down;

6  weren't they?

7      A.    No, they were not.  They were dismantled.

8      Q.    Any other concerns by government agencies

9  about anything during the shutdown besides the

10 matter we just discussed about --

11     A.    Well, we had underground storage tank

12 issues and we had some releases with respect to

13 underground storage tanks, so there was involvement

14 in that.  There was involvement of state regulatory

15 agencies relative to clean water and the testing

16 that needed to be done in order to assure that the

17 water leaving the property met applicable Montana

18 State water quality standards.

19     Q.    Anything else?

20     A.    I don't recall of anything else.

21     Q.    The clean water standards had to do with

22 the mine tailings and the pond at Rainy Creek?

23     A.    Well, it had to do with all the water

24 coming off the property that was flowing into the

25 Kootenai River, that's correct.

1    Q.    But what they were concerned about was the

2    mine tailings which came out of the mill which would

3    have the asbestos in it that was cleaned off the

4    vermiculite.

5    A.    No, that's not true.  They were concerned

6    about the water that was coming out of the bottom of

7    the tailings, that it would have contaminants in it

8    that were in violation of the Montana Clean Water

9    Act.

10    Q.    They weren't worried about asbestos

11    flowing down the river?

12    A.    Asbestos was not an issue.

13    Q.    Let me ask you about the existence of --

14    Can you think of any way the Parkers would know

15    there was asbestos in the vermiculite left on their

16    land or possibly in the fill that Grace brought down

17    there and landscaped it with?

18    A.    I don't know of any reason why they would

19    know.

20    Q.    Okay.  Have you heard any hearsay sometime

21    before 1999 when the Seattle Post Intelligence came

22    out that they would have any reason to suspect that

23    there was anything dangerous on their land?

24    A.    I didn't think that there was anything

25    dangerous on their land.  I don't know that they

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1   would ever have any reason to suspect it either.

2       Q.   You haven't heard that somebody told them

3   that or anything; have you?

4       A.   No.

5       Q.   Have you talked to Mel about when he first

6   found out that they had asbestos on the land?

7       A.   I don't know that I've specifically talked

8   to Mel about that particular thing.  I know I have

9   read articles in the paper where he's probably been

10  quoted as to saying when they first found out about

11  it.

12      Q.   Well, now, talking to the Parkers, I

13  understand that you've made statements to the effect

14  that, I would have never sold you the land if I had

15  known there was a danger of asbestos on it.

16      A.   It's an absolute truth.

17      Q.   And you have told them that.

18      A.   Yes, I did.

19      Q.   What role did Mr. Michael Ray play in the

20  shutdown of the mine and mill?

21      A.   He was an employee of W.R. Grace.

22      Q.   Okay.  Was he an employee of W.R. Grace

23  when he was doing excavation on the Parker land to

24  be sold to the Parkers?

25      A.   Yes, he was.

1    Q.    What other types of work did he do?

2    A.    He was the engineer who basically reported

3    to me, and his responsibility was to tear down all

4    of the buildings.

5    Q.    Okay.

6    A.    All of the hourly workers reported

7    directly to him.

8    Q.    Okay.  Now, how long was he an employee of

9    W.R. Grace approximately?  I know you don't know --

10    A.    Again, he was there when I came, and his

11    last day there was probably in 1993 sometime.

12    Q.    Okay.  Then, do you know, did he ever work

13    for Grace again?

14    A.    No.  Well, only on a contract basis.

15    Q.    Is he under retainer with Grace now?

16    A.    No, he's not.

17    Q.    Do you know of any contractual

18    arrangements that Grace currently has with Mr. Ray?

19    A.    I am aware that there are none.

20    Q.    Now, it's my understanding that you were

21    transferred shortly after the sale to the Parkers.

22    A.    I don't know -- You tell me when the sale

23    to the Parkers was finalized.

24    Q.    Fall of '93.

25    A.    I was transferred in May of '94.

1    Q.    Okay.  You would continue to come up here

2   from time to time.

3    A.    Every year.

4    Q.    Okay.  For what reason?

5    A.    For -- There was still an ongoing

6   obligation that we were responsible for on

7   reclamation of the mine properties themselves, and

8   so I would come up here at least once a year to tour

9   the facilities with the Montana Regulatory

10   Department.

11    Q.    Okay.  During that period, were there any

12   discussions about the dangers of asbestos and

13   release of the bond on the property?

14    A.    No.

15    Q.    Or any of the regulatory permits?

16    A.    There was definitely discussions about

17   release of the bond.  There was never any discussion

18   about asbestos on the property.

19    Q.    For any reason?

20    A.    For any reason.

21    Q.    It's my further understanding that you

22   would stop and visit with the Parkers from time to

23   time between '94 and maybe '99.

24    A.    I always made it a point.

25    Q.    Okay.  Because --

```
 1      A.    Because they were special people and I

 2  wanted to see how they were doing.

 3      Q.    How were they doing?

 4      A.    They were doing very well.

 5      Q.    Did you ever go to their family gatherings

 6  over there or anything?

 7      A.    No, I did not.

 8      Q.    You knew they were having family

 9  gatherings over there; didn't you?

10      A.    I have no reason to think they weren't.

11      Q.    There's a swingset out back.  They don't

12  have children, so they must have --

13      A.    Well, yeah.

14      Q.    You could see that.

15      A.    Certainly.

16      Q.    Did you ever receive any citizen

17  complaints during the 1990s about potential hazards

18  on the Parkers' property?

19      A.    No.

20      Q.    Nothing ever came to your attention?

21      A.    Nothing that I ever recall.

22      Q.    No one ever said, you know, you should

23  never sell that property to them; it's got asbestos

24  on it?

25      A.    Nobody -- Nope.  No.
```

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1       Q.    You are aware that Lerah was starting up a

2    project to grow mushrooms in the tunnels?

3       A.    I was made aware sometime in the last

4    couple of years that they were doing the Reishi

5    mushrooms in the tunnels, yes.

6       Q.    You had gone down the tunnels with them;

7    hadn't you?

8       A.    After they had them all set up, yes.

9       Q.    How did they get the vermiculite out of

10   the tunnels?

11      A.    That I'm not, you know, I'm not privilege

12   to understanding.  I know that Mel said that they

13   had to get it out of there, but I don't know how

14   they did it.

15      Q.    Okay.  Did you say anything to them about

16   any hazards of asbestos if they were cleaning out

17   those tunnels?

18      A.    No, I did not.

19      Q.    During the 1990s were men -- And I use the

20   term men to mean men and women, but I imagine most

21   of the people who worked at the mine are men.  Were

22   people making claims that they had sustained

23   asbestos-related injury as a result of working in

24   the screening plant?

25      A.    I have no reason to assume that they

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1  weren't.

2        Q.   I mean, there were claims during the

3  1990s -- Let's say up to the Seattle Post

4  Intelligence in November of 1999, there were claims

5  being made against the Grace Company for

6  asbestos-related injury which the workers claimed

7  occurred at the screening plant.

8        A.   That's true.

9        Q.   What cases are you aware of?

10        A.   I mean, I really don't know.  If you gave

11  me a name and said, Are you aware of that one?  I

12  might be able to say yes or no.  But I know what

13  trials I sat in on.

14        Q.   Okay.

15        A.   I do know of maybe one before that, but I

16  mean, I really don't recall any specific name of

17  somebody who had filed a suit against Grace.

18        Q.   You saw the 20/20 report?

19        A.   I was in it.

20        Q.   There was a man there, kind of a cowboyish

21  looking man.  I don't know his name.  Did he work at

22  the screening plant?

23        A.   I have no idea.  He didn't work there when

24  I worked there.

25        Q.   Do you know how many claims approximately,

1    were there more than ten, of people who alleged

2    asbestos-related disease from men working at the

3    screening plant?

4         A.    I have no idea what the number would be.

5         Q.    But you did become aware that there were

6    some?

7         A.    I am aware that people have filed claims,

8    yes.

9         Q.    From the screening plant?

10        A.    From the operation.

11        Q.    Was there a Skramstad or something like

12   that?

13        A.    There is a Les Skramstad.

14        Q.    Did he work at the screening plant?

15        A.    I have no idea.

16        Q.    Did he make an asbestos-related claim?

17        A.    If you believe what you read in the

18   newspapers and on the media, then I have to assume

19   that he probably did, but he was not employed while

20   I was there.

21        Q.    Did you have any contacts with the people

22   who were defending the litigation during the 1990s

23   on behalf of W.R. Grace?  I know you were

24   representative in a few cases; correct?

25        A.    Prior to 1995 I had no discussions with

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1    anybody.

2        Q.    Okay.  So from ninety -- But before '95

3    there were claims being made; right?

4        A.    But I wasn't involved in them.

5        Q.    But you were aware of them.

6        A.    I was aware that people were filing

7    claims, but I had no specific knowledge of what they

8    were, who they were.

9        Q.    Okay.  At any time before November, '99

10   when the Seattle Post Intelligence broke the story

11   about asbestos, did you inform the Parkers that

12   there were people who worked at the Grace operations

13   who were making claims that they sustained

14   asbestos-related injuries?

15       A.    No, I did not.

16       Q.    Okay.

17       A.    Can I take a little break?

18   (Short recess.)

19   BY MR. THUESON:

20       Q.    Let's take the period from shutdown in

21   1990 to November of 1999, which would be the

22   approximate date when the Seattle Post Intelligence

23   came out with their story and you were rehired up

24   here.

25            Are you aware of any citizen complaints

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1    during that period, outside of claims made by

2    workers, about asbestos hazards on the screening

3    plant, or more generally, in the Libby area?

4        A.    No, I'm not.

5        Q.    Now, you mentioned an asbestos awareness

6    program, I take it that that was outlined in

7    writing, that you gave your men --

8        A.    Well, there was --

9        Q.    -- and your workers.

10        A.    There was the new hire program, and this

11    was all -- You know, I had seen this all when I was

12    hired, and this was something that was presented to

13    all the new hires.

14        Q.    Well, is there a document that would tell

15    me what's in the program?

16        A.    There possibly is, but I wouldn't know

17    where it's at.

18        Q.    Could you describe to me what it says

19    about asbestos?

20        A.    I can't recall other than that it is a

21    mineral that can cause lung damage and precautions

22    should be taken against the inhalation of it.

23        Q.    Now, let me take your conversations with

24    the Parkers after you were rehired up here.   So

25    that's when the Seattle papers talked about

1    asbestos, all this stuff is going on, E.P.A. is out

2    at the Parkers' screening plant and so on.  Are you

3    with me?

4        A.    Yes.

5        Q.    Okay.  What discussions did you have about

6    the screening plant with the Parkers?

7              We've talked about one where you said, I'm

8    sorry.  If I had known there was asbestos dangers

9    here I would have never sold it to you, or words to

10    that effect; correct?

11        A.    To that effect, correct.

12        Q.    And then you've had several conversations

13    with Lerah.  She was quite upset.

14        A.    I've had several conversations with both

15    Lerah and Mel.

16        Q.    Let's take Lerah first.  She was quite

17    upset; correct?

18        A.    Specifically when?

19        Q.    Well, after the E.P.A. started coming out

20    there and told them there was a problem out there.

21        A.    Well, I think that you could classify her

22    as being upset with all of the disruption that was

23    going on to their business and to their life, yes.

24        Q.    What did she tell you her concerns were?

25        A.    I don't know specifically any particular

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1   thing other than that the whole issue was very

2   disconcerting.

3       Q.   Okay.  She told you she was losing her

4   business?

5       A.   Well, there was that discussion, that it

6   was the effect upon her business, yes, that's

7   correct, that people had stopped coming out there.

8       Q.   Did she tell you that her children and

9   grandchildren and those of Mel have been exposed out

10  there to high levels of asbestos?

11      A.   I recall her making statements to that

12  effect, yes.

13      Q.   And she was quite concerned about that?

14      A.   She was concerned about the potential that

15  they had been exposed, yes.

16      Q.   Did they challenge you with words to the

17  effect of, How could you not know there was an

18  asbestos hazard out here?

19      A.   I don't recall that discussion.

20      Q.   Did she ever send you any documents or

21  anything indicating her displeasure with the fact

22  that you had sold the land to them or that Grace had

23  sold it to them?

24      A.   I got a letter from Lerah, but I don't

25  remember specifically what its contents were.

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1     Q.    Okay.  Well, she had a little poem, The

2  Man in the Mirror; didn't she?

3     A.    That's correct, yes.

4     Q.    How did you take that?

5     A.    That she was quite upset.

6     Q.    Because she felt that you had betrayed

7  her.

8     A.    That's correct.

9     Q.    Did you talk to her about that?

10    A.    No, I did not.

11    Q.    Because?

12    A.    I was in California when I received the

13  letter.

14    Q.    I don't mean the letter, but just the fact

15  that Lerah feels so betrayed.

16    A.    I don't know that I ever had a specific

17  discussion with Lerah about my betraying her.

18    Q.    How about Grace Company?

19    A.    Neither.

20    Q.    Did you tell her that Grace would make it

21  all good, make it up to them?

22    A.    When this all happened, I did tell them.

23  I said, Don't worry.  We'll take care of this, or

24  words to that effect.

25    Q.    When did you tell them that?

1      A.    At the very beginning of it.

2      Q.    What did you mean by, We'll take care of

3  it?

4      A.    That we would take care of any of the

5  issues that would come out of this, that they

6  wouldn't be harmed on this.

7      Q.    Was that a settlement offer?

8      A.    No.  No, absolutely not.

9      Q.    Did you talk to your bosses about taking

10  care of it for the Parkers?

11      A.    No.

12      Q.    What particular thing were you going to

13  take care of?

14      A.    We would take care of any remediation that

15  needed to be done.

16      Q.    Remediation.  What about their business

17  losses?

18      A.    At that time that wasn't anything that I

19  specifically recall as being something that I

20  thought about, no.

21      Q.    Okay.  How many times did you have

22  conversations with either Mel or Lerah to the effect

23  that Grace would take care of this?

24      A.    Well, I don't know a specific number, but

25  it was more than one.

1          I do know that Mel approached me at one

2     point and said that there was some issues relative

3     to cash flow in the spring of 1999 -- or spring of

4     2000, that they would normally have monies coming in

5     to do certain things and they weren't going to have

6     it, and I made the commitment to provide 40,000

7     dollars to him within the week.

8          Q.    Okay.  And how did you get the approval

9     from Grace Company?

10         A.    I said that it was necessary, told my

11    boss, and he accepted my request and cut the check.

12         Q.    Was that Corcoran?

13         A.    Yes, it was.

14         Q.    Was that a settlement offer?

15         A.    No, it was not.  It was to help them with

16    their cash flow issues.

17              MR. MacDONALD:  And I'll just have a

18    continuing objection, Erik, with regard to any legal

19    conclusions that may be drawn with regard to the

20    phrase "settlement offer."

21    BY MR. THUESON:

22         Q.    You weren't conferring with lawyers on

23    those things.

24         A.    Absolutely not.

25         Q.    Is Mr. Corcoran a lawyer?

1     A.    Not to my knowledge.

2     Q.    How did you feel after the E.P.A. came out

3  there and performed their tests and what-not and

4  discovered asbestos as high as four percent by

5  weight on some of the Parkers' property?

6     A.    Well, I think it's -- There is still some

7  question as to just exactly what is out there.  The

8  E.P.A. has made their statements.  The E.P.A. has

9  come down and done their testing, and I think

10 there's still some question just to the risk or the

11 hazards that existed on the property.

12    Q.    You don't consider asbestos four percent

13 by weight to be a -- within the soils, like under

14 the swingset, to be a matter of concern?

15    A.    I think that asbestos at four percent is

16 above the standard and is an issue that needs to be

17 addressed, yes.

18    Q.    How did you feel about it when you read

19 the E.P.A. reports showing high levels of asbestos

20 on the Parker land?

21    A.    I saw the report that the E.P.A. had that

22 it was a very localized area and it was an area that

23 could be readily remediated.

24    Q.    So you didn't feel badly for the Parkers

25 or anything?

1     A.    I felt badly for the Parkers for the whole

2   disruption, for everything that was going on out

3   there with respect to the E.P.A. and with respect to

4   all this.  I felt very bad about the way that had

5   disrupted their life.

6     Q.    You didn't feel bad because they were

7   exposed to asbestos?

8     A.    I think that there is still some question

9   as to what level of exposures that they may have

10  been at.

11    Q.    Whether they were or not, are you saying

12  that there's some safe level of asbestos exposure?

13    A.    I don't know that.  I don't know that

14  anybody can tell us what the level of safe exposure

15  is.  When I came here, the level was five CCs or

16  five fibers per CC.  We know now that that level

17  should be lower.  So I don't know what the level of

18  safe exposure is.

19    Q.    What I'm trying to get at is, do you feel

20  any remorse that the Parkers were exposed to

21  asbestos after they purchased that land?

22    A.    I -- I feel it is very unfortunate, the

23  disruption that the Parkers have had to go through

24  as a result of this whole situation relative to the

25  potential -- the inference that there is asbestos on

1   the property that is of such level that would put

2   them at risk.

3        Q.   What other things did the Grace Company do

4   to try to help the Parkers out after the E.P.A. had

5   made their at least preliminary examinations of the

6   land?

7        A.   I don't specifically know exactly what all

8   the conversations were, but I know Grace through our

9   legal people entered into discussions about

10  compensation.

11       Q.   Okay.  What input did you have with regard

12  to the amount of compensation the Parkers should

13  get?

14       A.   None.

15       Q.   Well, you attended as more or less

16  mediator in one of those settlement conferences;

17  didn't you?

18       A.   Only at the end.  Not up to that point.

19       Q.   What discussions -- What was -- Let me

20  strike that.

21            We pretty much clarified what Lerah's

22  reaction was to the discovery of the asbestos on the

23  land; correct?  She was angry and she brought those

24  issues up with you.  Am I right?

25       A.   Lerah brought up issues that indicated

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1  that she was concerned and -- about potential

2  exposures, yes, that's true.

3      Q.   What was Mel's reaction in conversations

4  with you?

5      A.   I don't recall anything of anger.  Mainly

6  concern possibly.

7      Q.   Concern about what?

8      A.   Any potential exposures that may have been

9  there.

10     Q.   To him and to others?

11     A.   To anybody.

12     Q.   Okay.  What specific conversations do you

13  recall with Mel about the subject matter?

14     A.   I don't recall any specific conversations.

15     Q.   Can you remember the details of any

16  conversations other than what we've already talked

17  about?

18     A.   None.

19     Q.   Did you make reports back to the Grace

20  Company about your contacts with the Parkers with

21  regard to the asbestos?

22     A.   None that I know of.

23     Q.   So there's no reports to Corcoran or

24  anything about, I've talked to the Parkers today and

25  this is what they said, or, I'm going to talk to the

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1   Parkers today and what do you want me to say?

2        A.    None that I recall.  I mean, it's not to

3   say that we didn't have phone conversations about, I

4   met with Mel, Mel and Lerah, and they're upset, but

5   that would be the extent of it.

6        Q.    What about computerized data which would

7   memorialize some of the statements?

8        A.    I've made no memos to them.

9        Q.    Well, you e-mail with them; don't you?

10       A.    I have e-mail conversations, yes.

11       Q.    So are your e-mails saved?

12       A.    Some are, depending on the relevancy of

13   them.

14       Q.    Have you eliminated any with regard to

15   discussions with the Parkers?

16       A.    I couldn't say if I have or not.

17       Q.    And you're saying you're unaware of any

18   written documents from Grace or back from you

19   pertaining to the Parkers.

20       A.    I'm not completely a hundred percent sure,

21   but I would be quite accurate I think if I was to

22   say there are none.

23       Q.    Okay.  If there were some that you're

24   aware of, they would be in your office?

25       A.    Possibly.

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1    Q.    Do you have file folders over there?

2    A.    Yes, I do.

3    Q.    Okay.  Correspondence with the main

4    company, what-not?

5    A.    No.

6    Q.    What's in your file folders?

7    A.    Usually it's information that comes up.

8    In this here example, there are C.A.G. meeting

9    memos, there are E.P.A. documents, there are

10   E.P.A. -- I'm trying to think of some of the stuff.

11   St. John's Lutheran Hospital correspondence.

12   Basically just things that -- D.E.Q., correspondence

13   with the D.E.Q., Department of Environmental

14   Quality, things like that.

15   Q.    Okay.  So if I have you right, your office

16   contains no written memos, correspondence or

17   documents of any type to your knowledge pertaining

18   to what Grace has instructed you to do with regard

19   to the asbestos issues up here in Libby.

20   A.    I don't know of any.

21   Q.    And as far as your writing back to them

22   with what you have done up here or should be doing,

23   or asking for instructions from Grace, you have no

24   written documents in your files pertaining to that.

25   A.    No, there are none.

1    Q.   Isn't that kind of an odd way to do

2  business, not to have written histories of what's

3  going on up here?

4    A.   I don't know that it's odd.  This is --

5  This situation here and what's going on here

6  required me to do more media, public relations

7  things rather than definitive events that require

8  documentation.

9    Q.   Were you told not to put things in

10  documentation back and forth between the Grace

11  Company and yourself?

12    A.   Never.

13    Q.   How many times would you say you've talked

14  to the Parkers approximately since the story broke

15  in November, '99?

16    A.   A dozen times.

17    Q.   Other than what we've talked about here,

18  and I've tried to pick your brain about it, do you

19  have any recollections of the specifics of any of

20  those conversations?

21    A.   No.

22    Q.   Okay.  My intent here is just to -- is to

23  exhaust your recollection of those things, because

24  obviously I don't want to hear later on that you do

25  have specific recollection.

1     A.    Well, I mean, if you would say something

2   that might trigger something I could remember.

3           I think the only two specific

4   conversations -- There may be three conversations

5   I've had with Mel.  One of them was when it was

6   getting him the 40,000 dollars.  And then the other

7   one probably the day after the settlement

8   negotiations with Grace fell through and he came to

9   my office, and then there was one with Lerah a few

10  weeks later.

11    Q.    Okay.  The subject matter specifically I'm

12  trying to allude to is, number one, why they weren't

13  told about asbestos being on the land.  Have we

14  exhausted your recollection concerning all

15  conversations about that?

16    A.    I don't know of any recollection of any

17  other conversation that we might have had.

18    Q.    Okay.  Number two, how Grace was going to

19  make things better, or right.

20    A.    And I think I've fairly accurately

21  portrayed what my recollection of that is.

22    Q.    Okay.  Did you ever throw any figures out

23  to the Parkers as to what would be appropriate

24  compensation for what had happened to them?

25    A.    No, I have not.

1    Q.    Did the Grace Company ever give you any

2  figures that they would be willing to give to the

3  Parkers in order to make things right?

4    A.    Only when there were the negotiations

5  going on I knew what had been offered to them.

6    Q.    Okay.  And the other subject matter is Mel

7  and Lerah's reaction to the fact that there was

8  asbestos on the land; they had not been told.  Have

9  we covered your recollection as to what they said to

10  you on that subject matter?

11    A.    I think we have.

12    Q.    Did you say words to the effect to Lerah,

13  and maybe Mel, We can work this thing out.  You're

14  not the kind of people that would hire lawyers and

15  file a suit against Grace?

16    A.    I don't recall that conversation.

17    Q.    Are you saying it didn't occur?

18    A.    No, I'm not saying it didn't occur.  I

19  just don't recall the conversation.

20    Q.    Did you have a conversation with them that

21  Grace was paying about an average of 750,000 dollars

22  for asbestos-related illness and so maybe that would

23  be an appropriate figure for them to come in at, or

24  words to that effect?

25    A.    No, I don't recall ever saying anything to

1    that effect, and I don't know that I would have even

2    known that to be a relevant number.

3        Q.    So you made no suggestions to them with

4    regard to what they should ask Grace for to --

5        A.    No, I don't recall anything.

6        Q.    What did you say to the Parkers with

7    regard to the hazards to them of living on the

8    property even after the E.P.A. had found the

9    asbestos there?

10       A.    I don't know.  What's the question?  I

11   don't understand the question.

12       Q.    Well, did you tell them it's safe for them

13   to live there, unsafe for them to live there, no big

14   deal, or --

15       A.    I don't know any specific discussions that

16   would have been relevant to is it safe or isn't it

17   safe.

18       Q.    So --

19       A.    I mean, we had to wait to see what the

20   tests came out to be.

21       Q.    So is it your position that it would be

22   safe for the Parkers to continue to live on that

23   land without the land being remediated?

24       A.    Was or --

25       Q.    Well, obviously now the land is torn up by

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1   the E.P.A.; correct?

2       A.    That's correct.

3       Q.    Before the E.P.A. tore up the land to get

4   rid of the asbestos, is it your position it would

5   have been safe for the Parkers to live on that land,

6   bring their family on that land, without anything

7   being done to the property?

8       A.    I don't know what would have had to have

9   been done to the property.  There may have been some

10  isolated issues that would have had to have been

11  remediated, but I don't think that it would have

12  been necessary to have to tear down their home and

13  destroy their property.

14      Q.    Let me ask it this way.  If the E.P.A.

15  hadn't come in there, are you saying it would have

16  been safe for the Parkers to continue to do

17  business, to have their home and their family on

18  that land without any changes in it at all?

19      A.    Well, I don't know.  I don't know what the

20  issues are.  The E.P.A. has said they've come in

21  there and they have found some issues, but there's

22  still some question just as to the validity of those

23  issues.

24      Q.    So you don't know whether it's safe or not

25  in the condition that you sold it to the Parkers.

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1      A.    I felt that when I sold them the property

2   that it was safe to live there.

3      Q.    I realize that.  Now that you know what

4   the E.P.A. has found, are you still taking the

5   position it would have been safe to live there?

6      A.    I still believe that there were -- that it

7   would have been safe to live there.  There may have

8   been some issues that needed to be identified and

9   taken care of, but that is still an issue that is

10  being discussed with the E.P.A.

11     Q.    Now, are you saying your only

12  participation in the meetings between Parkers and

13  the attorneys was at that second meeting where you

14  acted as a mediator?

15     A.    No.  I don't know that I said that, but I

16  don't recall any other meeting where I was with them

17  and the lawyers who were talking about settlement.

18  I don't recall any other meeting with them that I

19  was present at.

20     Q.    Now, did the Parkers tell you how much

21  they felt would be necessary to put them in the same

22  condition they were in before this?

23     A.    Only after -- or just before the final

24  meeting that you say that I mediated.

25     Q.    Okay.

Page 88

1    A.    It was at that meeting that I was able to

2    finally get Lerah to come up with a number.

3    Q.    Okay.  And which was what?

4    A.    Three million dollars.

5    Q.    Okay.  Did they say that was negotiable?

6    A.    I don't know that there was a discussion

7    of whether it was negotiable or what.  It was

8    finally a number that Lerah came up with that she

9    said she felt the property was worth.

10    Q.    Or business and property.

11    A.    Excuse me?

12    Q.    The business, the property, the household

13    and everything she was saying was three million.  In

14    other words, that was --

15    A.    Well, three million dollars is what she

16    put value on the business, on the structures and on

17    the property.

18    Q.    Well, three million -- If Grace paid them

19    three million, she indicated they would walk away,

20    correct, except for potential personal injury

21    claims?

22    A.    At that meeting or later?

23    Q.    Well, when she told you three million, she

24    told you that was intended to be a package for

25    anything.

1      A.    Well, I took it that that was a package

2    that she felt the value of the property was, that's

3    correct.

4      Q.    Compensate them for everything but health

5    risks.

6      A.    That's correct.

7      Q.    Did they tell you about their concern that

8    they didn't want to have claims against them and

9    they wanted Grace to indemnify them if there had

10   been claims against them?

11     A.    I think there was probably that

12   discussion.

13     Q.    What do you recall about that discussion?

14     A.    That it was a concern that they had.

15     Q.    Do you think that was a fair concern?

16     A.    I think it was a fair concern.

17     Q.    Did you do anything acting as mediator to

18   see that that was cleared up?

19     A.    No, I did not.

20     Q.    Okay.  You didn't discuss it or anything?

21     A.    Not that I know of.  I may have made the

22   concern known to the lawyers, but that would have

23   been all.

24     Q.    Okay.  Would that be an accurate way to

25   say at that last meeting that you were more or less

1  a mediator between the two of them?

2      A.    Well, I don't know that I was the

3  mediator.  I was the person who got everybody back

4  together.

5      Q.    Okay.

6      A.    But I did not sit in the meeting and act

7  as a mediator, no.

8      Q.    What was Grace's offer that you're

9  aware --

10      A.    In dollars?

11      Q.    Yeah.

12      A.    If I recall, it was 1.2.

13      Q.    Okay.

14      A.    Tax-free.

15      Q.    Why would it be tax-free?

16      A.    Because it would have been set up as some

17  form of personal injury rather than loss of

18  business.

19      Q.    And the Parkers indicated they didn't want

20  that; didn't they?

21      A.    That dollar amount?

22      Q.    No.  They didn't want to give up their

23  personal injuries claims as part of the 1.2.

24      A.    Oh, yeah.  Well, I think there was an

25  issue relative to the personal injury, but I also

1   think there was discussion that they would be

2   indemnified against any personal injury claims, that

3   they could still bring that on at a later date.  I

4   don't specifically recall how it was worded, but I

5   think it was laid out that they would still have

6   that ability to bring that about at some later date.

7        Q.    Okay.  If they got asbestos-related

8   disease.

9        A.    That's correct.

10       Q.    They could still maintain an action.

11       A.    From what I understand, that's correct.

12       Q.    Okay.  Why did those discussions break

13  down, from what you could see?

14       A.    Because it wasn't the amount that Lerah

15  wanted.

16       Q.    And Grace didn't want to go any higher.

17       A.    I don't know that Grace wouldn't have gone

18  any higher, but Grace was not willing to go as high

19  as Lerah was wanting to go.

20       Q.    Lerah didn't tell you that was negotiable?

21       A.    She did later on when she came back and

22  had been upset.  She used the words "horse trading."

23       Q.    She came back to your office afterwards.

24       A.    A number of weeks later.

25       Q.    Tell me about that conversation.

1     A.    She was quite emotional.

2     Q.    Tell me what was said by her and you.

3     A.    That she was very upset about the whole

4  issue, that it was -- she was on medication, she was

5  depressed, despondent, that this was so disruptive

6  to their life and she thought that when she had come

7  up with her number that it would be something that

8  they could, quote, "horse trade" about.

9     Q.    What did you tell her?

10     A.    I said that I wasn't involved in any of

11  that and that, you know, when the lawyers heard what

12  she wanted, that, you know, they weren't willing to

13  go that high.

14     Q.    Okay.  You mentioned Lerah was

15  distressed.  In your contacts with her afterwards,

16  did she start crying at times?  By afterwards I mean

17  after '99.

18     A.    Oh, certainly.

19     Q.    About what subject matters?

20     A.    Just the whole disruption to their life as

21  a result of what was happening on their property.

22     Q.    Did you think that was an unusual

23  reaction?

24     A.    Not at all.

25     Q.    Can you think of any other contacts you

1  had with the Parkers about trying to get this matter

2  resolved between Grace and them?

3      A.   Nothing specific.  I'm sure I had seen

4  them once or twice here and there, and we had had

5  conversations about I wish we could find some way to

6  resolve this.

7      Q.   That was even after April 19th when you

8  went in to the settlement conference with them?

9      A.   I think I recall one time seeing them in

10  the parking lot at Rosauer's and having a

11  conversation and, you know, I wish we could find

12  some way to resolve this.  It was more of a general

13  issue.

14      Q.   Did you talk to your boss or anybody from

15  Grace about trying to find a way to resolve this

16  after that mediation?

17      A.   None that I recall.

18      Q.   Because --

19      A.   It wasn't my place.  It was in the hands

20  of the lawyers.

21      Q.   Let me ask you about Kootenai Development

22  Corporation.  I have here which I'll mark Exhibit 2

23  a little advertisement that you put into the paper.

24  (Exhibit Number 2 marked for identification.)

25  BY MR. THUESON:

1    Q.   Do you recognize that?

2    A.   Yes, I do.

3    Q.   How did that come about?

4    A.   How did it come about?  What --

5    Q.   Yeah, that you started advertising,

6 putting advertisements about Kootenai Development

7 Company, Grace and E.P.A. in the newspapers.

8    A.   Well, we had -- The E.P.A. had filed suit

9 against Grace and K.D.C. for access to our

10 properties for disposal of the material from the

11 nursery.  The Judge ordered mediation.  K.D.C., W.R.

12 Grace and the E.P.A. met in Portland with the Judge

13 as part of that court-ordered mediation.

14       In that mediation a number of compromises,

15 a number of offers, were made to the E.P.A. by W.R.

16 Grace and K.D.C.  They were all turned down by the

17 E.P.A.  And when we came back, I don't remember what

18 precipitated this, but it was apparent that the

19 E.P.A. was portraying it as that we were the problem

20 about the failed negotiations rather than they were

21 the problem with the failed negotiations, and so

22 this was developed to let the people know what had

23 actually gone on.

24    Q.   Okay.  Let me take you back.  What were

25 you told was the reason why the Grace Company bought

1   back -- or bought K.D.C.?

2       A.   W.R. Grace bought controlling stock of

3   K.D.C. because prior to that time the E.P.A. had

4   asked us to talk to K.D.C. about access to the

5   property for disposal of materials from any of the

6   remediation sites.  In those talks it became

7   apparent to us -- or it became apparent to Grace

8   that there was going to be considerable problems

9   with the E.P.A. with respect to disposal on the

10  property, and that one of the ways that Grace could

11  manage the situation was to own the property.  If

12  the E.P.A. was going to put it up there and force

13  Grace to pay for it, Grace might as well control

14  their own destiny.

15      Q.   More than that, it's a negotiation chip

16  with the E.P.A. if you own the mine site; correct?

17      A.   It could be used as a negotiation, yes, it

18  could.

19      Q.   Because if they don't have the mine site,

20  they've got a lot of stuff down at the screening

21  plant, the exporting plant and perhaps elsewhere

22  where they've got to tote it off somewhere else.

23      A.   That's correct.

24      Q.   What persons were involved in the purchase

25  back from K.D.C. of the controlling interests

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1    besides yourself?

2         A.    I was not involved.

3         Q.    Okay.  Who was involved?

4         A.    Our legal department.

5         Q.    And who officially besides the legal

6    department?  Who would be in the legal department,

7    first of all?  Who were the lawyers that you know

8    of?

9         A.    One would have been David Cleary.

10        Q.    Okay.  Others?

11        A.    I don't recall.  I don't know of any

12   others by name.

13        Q.    And who of Grace officials would be

14   involved in the buy-back that you are thinking of?

15        A.    My boss, Corcoran.

16        Q.    Corcoran.  Anyone else?

17        A.    Well, obviously it would have to be

18   approved by the C.E.O.

19        Q.    Have you seen a document -- I mean, you're

20   the president of K.D.C.  I assume they made you

21   president right after they bought the controlling

22   interests.

23        A.    Shortly thereafter.

24        Q.    Have you seen documentation concerning the

25   purchase?

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1    A.    I have seen the buy/sell agreement.    I

2    have not read the buy/sell agreement.

3    Q.    How much was it bought back for?

4    A.    I don't know the specific amount, but it

5    was basically what we sold it for.

6    Q.    Three million?

7    A.    Around 3.6 million, three million.

8    Somewhere in there.

9    Q.    Okay.  So that would get you a 51 percent

10   share.

11   A.    No.  It got two thirds.  No.  No.  Excuse

12   me.  Three million.  The question was what did we

13   buy it back for is different than what we paid for

14   the two thirds share.

15   Q.    Okay.  Explain that to me.

16   A.    Well, what we bought -- What we agreed,

17   from what I understand, to buy the property back for

18   was what K.D.C. bought it for, and I think that

19   number was around 3.6 million dollars.

20   Q.    Okay.

21   A.    But at this time Grace only bought two

22   thirds of the stock, so what Grace paid for was

23   probably two thirds of that 3.6.

24   Q.    Oh, I see.  So 2.4 probably.

25   A.    Somewhere in there, whatever the math is.

1    Q.   And that gave them a 67 percent interest

2  in the stock?

3    A.   That's correct.

4    Q.   The company, is it a corporation?

5    A.   Yes, it is.

6    Q.   Who are the other stockholders?

7    A.   The majority stockholders are W.R. Grace.

8  The minority stockholders are still Jack Wolter and

9  Mark Owens.

10    Q.   What was the E.P.A. proposing about the

11  disposal of the asbestos up there that was so bad,

12  or so disagreeable?

13    A.   That they were -- The disposal of the

14  material on the property was not necessarily the

15  issue.  The issue was that they were taking private

16  properties without due compensation.

17    Q.   How was it being taken?

18    A.   Because they were going to put it there

19  without having an agreement with K.D.C. to put it

20  there.  They were of the position that they had the

21  right and they were going to put it there no matter

22  what K.D.C. said.

23    Q.   Now, in making an agreement to purchase

24  those shares for 2.4, was there any indemnity at

25  this agreement made for Jack Wolter and Mr. Owens to

1    hold them harmless from any damages or lawsuits?

2        A.    Again, that may be in the purchase,

3    buy/sell agreement, but I haven't read it.

4        Q.    Okay.  Do you have that in your office?

5        A.    I think I have a copy, yes.

6        Q.    Are there other documents explaining the

7    reason why Grace wanted to buy back or negotiated to

8    buy back K.D.C.?

9        A.    I'm not aware of any.

10       Q.    This is an aside, but while I'm up to it,

11   did Grace have someone photographing and videotaping

12   the E.P.A. cleanup of the screening plant?

13       A.    Our contractor was doing that, yes.

14       Q.    Who is that?

15       A.    The contractor, U.R.S.

16       Q.    Okay.  Who for the contractor was doing

17   that?

18       A.    Specifically by name?

19       Q.    Yeah.

20       A.    I can't remember.  Jeff -- Jeff was his

21   first name, but I can't recall specifically.  Jeff

22   Bader I think was his last name.

23       Q.    Did you hear that he was going on the

24   property posing as a government official?

25       A.    No, I did not hear that.

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1      Q.    Or that he was going on the property?

2      A.    What I know is that when he was going on

3   the property, at the beginning he was representing

4   himself as a contractor for U.R.S.

5      Q.    Where was he taking photographs?  From up

6   on the hill there across from --

7      A.    Above the property.

8      Q.    Videotapes?

9      A.    I've never seen any videotapes, but that's

10  not to say he wasn't taking them.

11     Q.    For what reason was Grace having him do

12  that?

13     A.    To ensure that the E.P.A. was doing what

14  they had lined out in their work plan.

15     Q.    Now, Mr. Corcoran is your boss in your

16  official capacity as K.D.C. president as well?

17     A.    No.  I don't know that I -- I think that

18  the C.E.O. of W.R. Grace is probably who I would

19  report to as president of --

20     Q.    Is that who you have been reporting to?

21     A.    I don't report to anybody as president of

22  K.D.C.  I never even asked the question.

23     Q.    How does Grace get instructions for you to

24  do things like Exhibit 2, this advertisement, down

25  to you?  I mean, you didn't just do that --

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1      A.    I have conversations with my boss.

2      Q.    Corcoran?

3      A.    Corcoran.

4      Q.    Is that at your idea, Exhibit 2, or at his

5  idea?

6      A.    I don't know whose idea it was.  It may

7  have been a discussion that we said, Let's do this.

8      Q.    Let me take some of the information in --

9  I only have one copy of Exhibit 2.

10         It states that K.D.C. offered a plan that

11  would allow the stalled nursery property cleanup to

12  move forward, and would also result in the

13  remediation of two K.D.C.-owned parcels, with Grace

14  paying the cost.

15      A.    That's correct.

16      Q.    What was the proposal that would allow the

17  nursery to move forward?

18      A.    That we would haul the material under a

19  unilateral article of consent, that we would haul

20  the material that is currently stockpiled on the

21  property to the mine property -- on the nursery

22  property to the mine property.

23      Q.    Now, how did that differ from what the

24  E.P.A. was planning to do before Grace took over the

25  mine site?

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1      A.    They were going to do it without an access

2   agreement.    They were going to take the property and

3   put it there without any kind of an agreement.

4      Q.    Okay.    Now, why is that any skin off

5   Grace's back?

6      A.    Because they were demanding that it would

7   be done.    What we were doing was offering to take

8   the material to put it there.    The E.P.A. was taking

9   private property.    That was our concern.    They felt

10  they had the right to do it.    We felt they had to

11  ask to do it.

12     Q.    Right.    But it was before Grace bought

13  back K.D.C., that was K.D.C.'s problem; correct?

14     A.    That's correct.

15     Q.    Not Grace's.

16     A.    That's correct.

17     Q.    So why were you worried about K.D.C.?

18     A.    Because we had to do the same thing with

19  K.D.C.    We had to negotiate an agreement.    We felt

20  that the E.P.A. was of the opinion that Grace was

21  the primary responsible party and that we were going

22  to be responsible for this irrespective of whether

23  K.D.C. owned it or not.

24     Q.    How does it differ from Grace's pocketbook

25  whether the E.P.A. hauls the stuff up to the mine

1  site or Grace hauls it up there?

2      A.    Because here again, by us having control

3  of our own destiny, we -- by us owning the Grace

4  property, or the K.D.C. property, we can control

5  what the issues were.  The E.P.A. was demanding

6  access.  They said they had the right.  We felt they

7  did not have the right.  They had to negotiate with

8  the owner of the property for just compensation for

9  the taking of that property.

10     Q.    But are you saying Grace bought back -- or

11 bought K.D.C.'s interest because they were concerned

12 that K.D.C.'s constitutional rights were being

13 violated?

14     A.    No.  Absolutely.  We bought K.D.C. --

15 Grace bought K.D.C. because we felt that this was

16 going to be an issue that was going to be pulling

17 Grace in irrespective of whether they owned the

18 property or not.

19     Q.    And how would you be pulled in?

20     A.    Because -- Primary responsible party.

21     Q.    So you would have to pay for any

22 additional --

23     A.    Have to pay for all of that.

24     Q.    So what you're saying --

25     A.    Would have had to pay for the E.P.A.

1  taking it up there as well as our taking our own

2  stuff up there.

3      Q.    So that goes back to buying the mine

4  site.  That becomes a negotiation chip with E.P.A.

5  that you didn't have before.

6      A.    That's correct.

7      Q.    Now, by buying K.D.C., did cleaning up the

8  nursery property somehow become less expensive than

9  what the E.P.A. was proposing?

10     A.    The E.P.A. doesn't do anything that's not

11 expensive.

12     Q.    Right.  My understanding --

13     A.    They are much more inefficient in their

14 use of the tax payers' monies than a private

15 corporation or a private entity is in doing the job.

16     Q.    What is your understanding of the cost the

17 E.P.A. is projecting on the nursery property right

18 now approximately?

19     A.    The only number I've ever heard is the

20 cost for hauling the material.  I've never heard any

21 number associated with the actual cleanup.

22     Q.    Okay.  You haven't heard figures like four

23 million dollars?

24     A.    Only relative to the hauling of the

25 material to Spokane.

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1      Q.    Okay.   In your negotiations with the

2    E.P.A., did you attempt to negotiate to buy back the

3    nursery property and to remediate it yourself?

4      A.    What negotiations with the E.P.A.?

5      Q.    Well, any negotiation.   I'm looking at

6    these right now.   I don't know if it came up at this

7    particular time when you were out on the west coast,

8    but at any time were you discussing buying back the

9    property and remediating it through Grace rather

10   than having the E.P.A. do it?

11     A.    In the beginning there were discussions

12   with the E.P.A. about our ongoing discussions with

13   the Parkers about remediation of their property

14   being done by W.R. Grace.

15     Q.    Okay.

16     A.    There were no discussions at the mediation

17   in Portland relative to any of that.

18     Q.    Are there discussions about buying the

19   nursery?   Are there any discussions in this battle

20   with the E.P.A. or within Grace Company where Grace

21   is thinking it would be helpful to buy the Parker

22   property?

23     A.    I'm not aware of any.

24     Q.    I mean, you're talking about controlling

25   your own destiny.   If you can control the cleanup of

1    the nursery, it seems to me you can control your

2    destiny.

3         A.    We had offered to control the cleanup of

4    that property with the E.P.A. from the beginning.

5         Q.    Did you ever offer to the Parkers to buy

6    back the property?

7         A.    Yes, we did.

8         Q.    When was that?

9         A.    In the early stages.

10        Q.    And their response?

11        A.    I don't think that -- I don't remember

12   what the specific response was, but they didn't want

13   to -- That's not true.  I think in the early

14   negotiations, there was discussion about Grace

15   buying the property back, and I think it was at some

16   point later that they decided that they wanted to

17   keep the property.

18        Q.    Now, the second paragraph says E.P.A. was

19   unwilling to compromise at these talks.  What was

20   E.P.A.'s plan as opposed to yours?

21        A.    The E.P.A. had no plan.  The E.P.A. was

22   there only because the Judge ordered them to be

23   there.

24        Q.    So what they were going to do is assert

25   what they felt was their governmental right to take

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1    asbestos-laden waste to the mine site --

2        A.    They were --

3        Q.    -- and charge Grace ultimately with the

4    cost of it.

5        A.    That's correct.

6        Q.    And that's the position they maintained at

7    the negotiations.

8        A.    The E.P.A. maintained at the initial

9    hearing that they had the right to take private

10   property without due compensation and put

11   asbestos-containing material on it.  They maintained

12   that same position at the mediation hearing.

13       Q.    What I don't understand is let's say Grace

14   didn't get involved with Kootenai.  E.P.A. goes and

15   they drop all the asbestos-laden stuff up at the

16   mine site, and essentially under your argument they

17   are taking private property away from K.D.C.; okay?

18   I still don't know how that affects Grace's

19   pocketbook.

20       A.    By the E.P.A. taking that material up

21   there and just depositing it didn't make the

22   situation go away.  There was still the potential of

23   what would be that material -- what would be the

24   liability or the future or potential liability of

25   that material sitting on that piece of property in

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

1    the future.  It was still kind of a real unknown of

2    what the E.P.A. would ever do with that entire

3    property as a result of putting that material that

4    they classified as asbestos-containing material on

5    to the property.

6         Q.    Okay.  How would that come back on Grace?

7         A.    Because we were the principal -- primary

8    responsible party supposedly for the material coming

9    from the screening plant being put on a piece of

10   property.  There was a real unknown as to what

11   future liability would be involved with Grace as a

12   result of the E.P.A. putting material on the

13   property.

14        Q.    So you're saying K.D.C. could come back

15   against you.

16        A.    I don't know about K.D.C.  I'm not fully

17   familiar with all of the nuances of E.P.A. law.  I

18   don't know of the K.D.C. because all along the

19   E.P.A. was taking the position that Grace was the

20   primary responsible party.

21        Q.    Have any other purchasers of the land,

22   purchasers of the mine site and the other

23   properties, expressed concern to you that they

24   didn't know asbestos was on the land when they

25   bought it earlier?

1     A.   None have.

2     Q.   Did they know asbestos was on the mine

3  site, for instance?

4     A.   Who?

5     Q.   Mr. Owens, perhaps.

6     A.   You would have to ask Mr. Owens.

7     Q.   Okay.  What are the E.P.A.'s claims for

8  penalties?  What do they amount to?

9     A.   Twenty-seven thousand five hundred dollars

10 a day since July 26th, 2000.

11    Q.   Since July, 2000?

12    A.   Since Grace purchased the controlling

13 stock of K.D.C.

14    Q.   So every hundred days that's 2.7.

15    A.   Over five and a half million dollars.

16    Q.   And that penalty is for what?

17    A.   For denying them access to the property.

18    Q.   Okay.  Are there any sampling or testing

19 results available that Grace has done of the

20 screening plant at any time before or after the

21 purchase or before and after E.P.A. got on the land?

22    A.   None that I'm aware of.

23    Q.   I mean, you mentioned, for instance, that

24 the air would be monitored for when the screening

25 plant was in operation.  Are they available,

1  those --

2      A.    If they were kept as records, they would

3  have been in file in the repository, and then I'm

4  sure there are, but I don't know of any specific.

5      Q.    That's back in Boston?

6      A.    I think that's where it's at.

7      Q.    All right.  Well, I have no further

8  questions for you.  Thank you very much, sir.  As

9  Terry and I agreed, you'll have another chance to

10  have a nice discussion with us.  This should sort of

11  help me try to find the documents and the people

12  involved in this affair.

13      A.    Okay.

14              MR. MacDONALD:  And we'll reserve as

15  well.

16

17  (Deposition concluded at 11:30 a.m.  Witness

18  excused.  Signature reserved.)

19

20

21

22

23

24

25

HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334

Page 111

1

2

3                          CORRECTION SHEET
       Page      Line                              Correction
4

5

6

7

8

9

10

11

12

13

14

15

16

17

        I have read the foregoing transcript of my
18  testimony and believe the same to be true, except
    for the corrections noted above.
19

        Dated this      day of           , 2001.
20

21            _____
              ALAN R. STRINGER
        Subscribed and sworn to before me this
22  day of           , 2001.

23            _____
              Notary Public for the State of Montana
24            Residing at _____ Montana
              My Commission expires_____
25

Page 112

1

2

3                    REPORTER'S CERTIFICATE

4

5        I, BETH GILMAN, RPR and Notary Public for the

6   State of Montana, do hereby certify:

7        That I did report the foregoing testimony after

8   having duly sworn the witness to testify to the

9   truth; that said testimony was taken at the time and

10  place stated on the caption hereto; that the

11  testimony of the witness was taken in shorthand by

12  me and subsequently reduced to writing under my

13  direction; that the foregoing is a true and correct

14  transcript of all the testimony of the said witness.

15       I further certify that I am not counsel,

16  attorney or relative of any party, nor otherwise

17  interested in the event of this suit.

18       IN WITNESS WHEREOF, I have hereunto subscribed

19  my name and affixed my seal of office this    day

20  of            , 2001.

21

22

23                    _____
                      BETH GILMAN, RPR and Notary Public
                      for the State of Montana
24                    Residing at Kalispell, Montana
                      My Commission expires 7-29-03
25

           HEDMAN, ASA & GILMAN REPORTING - 752-5751/752-3334