\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

MEL PARKER and LERAH PARKER, Plaintiffs

vs

W.R. GRACE & COMPANY (CONNECTICUT); W.R. GRACE &
COMPANY (DELAWARE); KOOTENAI DEVELOPMENT COMPANY;
MICHAEL D. RAY d/b/a RAY ENGINEERING; ROBINSON
INSULATION COMPANY, JACK DeSHAZER; and DOES A-E,
Defendants

CAUSE NO. ADV-00-669

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

COPY

D E P O S I T I O N

OF

MEL PARKER

Taken at the Venture Inn
443 U.S. Highway 2 West
Libby, Montana
Tuesday, January 9, 2001
9:00 a.m.

Reported by Debra M. Hedman, RPR, RMR
Hedman, Asa & Gilman Reporting, Inc.
947 South Main, P.O. Box 394
Kalispell, Montana 59903-0394
(406)752-5751

**PARKER vs W.R.GRACE & COMPANY**                          Deposition of MEL PARKER

---

```
 1              IN THE DISTRICT COURT OF THE EIGHTH

 2           JUDICIAL DISTRICT OF THE STATE OF MONTANA

 3             IN AND FOR THE COUNTY OF CASCADE

 4    CAUSE NO. ADV-00-669

 5    MEL PARKER and LERAH PARKER,       )

 6             Plaintiffs,               )

 7        vs                             )

 8    W.R. GRACE & COMPANY               )
      (CONNECTICUT); W.R. GRACE &        )
 9    COMPANY (DELAWARE); KOOTENAI       )
      DEVELOPMENT COMPANY; MICHAEL D.    )
10    RAY d/b/a RAY ENGINEERING;         )
      ROBINSON INSULATION COMPANY;       )
11    JACK DeSHAZER; and DOES A-Z,       )

12             Defendants.               )

13

14              D E P O S I T I O N

15                     OF

16                 MEL PARKER

17    (On Behalf of Defendants W.R. Grace & Company
          and Robinson Insulation Company)
18

19

20             Taken at the Venture Inn
               443 U.S. Highway 2 West
21                 Libby, Montana
               Tuesday, January 9, 2001
22                   9:00 a.m.

23

24

25    Reported by Debra M. Hedman, RPR, RMR, and Notary
      Public for the State of Montana, Flathead County
```

---

```
 1

 2              A P P E A R A N C E S

 3

 4    APPEARING ON BEHALF OF THE PLAINTIFFS:

 5        Tom L. Lewis, Esq.
          Lewis, Huppert & Slovak, P.C.
 6        P.O. Box 2325
          Great Falls, Montana 59403

 7

 8    APPEARING ON BEHALF OF THE PLAINTIFFS:

 9        Erik B. Thueson, Esq.
          Thueson & Lamb
10        P.O. Box 535
          Helena, Montana 59624

11

12    APPEARING ON BEHALF OF DEFENDANTS W.R. GRACE &
      COMPANY and ROBINSON INSULATION COMPANY:
13
          Terry MacDonald, Esq.
14        Garlington, Lohn & Robinson, PLLP
          P.O. Box 7909
15        Missoula, Montana 59807-7909

16

17    APPEARING ON BEHALF OF THE DEFENDANT DeSHAZER:

18        Gary Kalkstein, Esq.
          Kalkstein Law Offices
19        P.O. Box 8568
          Missoula, Montana  59807-8568

20

21    ALSO PRESENT:

22        Lerah Parker
          Richard A. Senftleben, Grace Counsel
23        Kenneth Lund, Grace Counsel

24

25
```

---

```
 1                                                    3

 2              S T I P U L A T I O N S

 3

 4             It was stipulated by and between counsel

 5    for the respective parties that the deposition be

 6    taken by Debra M. Hedman, Registered Professional

 7    Reporter, Registered Merit Reporter and Notary

 8    Public for the State of Montana, residing in

 9    Flathead County, Montana.

10             It was further stipulated and agreed by

11    and between counsel for the respective parties that

12    the deposition be taken at the time and place set

13    out on the caption and pursuant to the Montana Rules

14    of Civil Procedure.

15             It was further stipulated and agreed by

16    and between counsel for the respective parties and

17    the witness that the reading and signing of the

18    deposition would be expressly reserved.

19

20

21

22

23

24

25
```

---

```
 1                                                    4

 2

 3                    I N D E X

 4    EXAMINATION                                 PAGE

 5    BY MR. MacDONALD                              5

 6    BY MR. KALKSTEIN                            131

 7

 8

 9

10

11    EXHIBITS     DESCRIPTION                    PAGE

12       1        Proposal to Purchase
                  W.R. Grace Properties
13                                                 56

14       2        Buy-Sell Agreement            (Marked after
                                                   depo.)
15

16

17

18

19

20

21

22

23

24

25
```

---

**HEDMAN, ASA & GILMAN, INC. – 752-5751**          **Page 1 to Page 4**

**PARKER vs W.R.GRACE & COMPANY**                    **Deposition of MEL PARKER**

---

5

```
1                MEL PARKER,
2  having been first duly sworn to tell the truth, the
3  whole truth, and nothing but the truth, testified
4  upon his oath as follows:
5                EXAMINATION
6  BY MR. MacDONALD:
7      Q   Please state your full name.
8      A   Melvin G. Parker.
9      Q   Mr. Parker, how would you like to be
10 addressed today during the deposition?
11     A   As Mel.
12     Q   Mel, what is your current occupation?
13     A   I'm retired.
14     Q   Mel, have you ever had your deposition
15 taken before?
16     A   No, not at all.
17     Q   Let me just run through a couple of ground
18 rules.  Okay?  First of all, you understand you're
19 under oath?
20     A   That is correct.
21     Q   Next, if you could wait and begin your
22 answer until after I finish my question, that will
23 help keep the record clear.  Okay?
24     A   I understand that.
25     Q   Also, if you could remember to answer
```

---

7

```
1      A   No, we have not.
2      Q   How many grandchildren do you have?
3      A   Twenty-five.
4      Q   Are any of your children or grandchildren
5  dependent on you for support?
6      A   No, they are not.
7      Q   Mel, as you sit here today, how would you
8  describe your general health?
9      A   Good.
10     Q   In this lawsuit that brings us here today,
11 you're not currently claiming any type of personal
12 injury; is that right?
13     A   Claiming any personal injury from --
14     Q   From anything as a result of what W.R.
15 Grace or any of the defendants did?
16         MR. THUESON:  He's claiming what's
17 in the lawsuit, Counsel.
18 BY MR. MacDONALD:
19     Q   You're not suffering any personal injury
20 as a result of what any of the defendants did; is
21 that correct?
22         MR. LEWIS:  I think, Counsel, I'm
23 going to object to the form of the question on the
24 grounds that "personal injury" is a vague term as to
25 this witness' understanding.  Personal injury could
```

---

6

```
1  audibly instead of head nods, uh-huhs, huh-uhs,
2  those type of things.  Okay?
3      A   (Deponent nods head.)
4      Q   Most importantly, if you don't understand
5  a question that I ask, please don't be bashful to
6  tell me that --
7      A   I will.
8      Q   -- and I'll rephrase it, so you can be
9  confident and I'll be confident that you are
10 answering the question that's being asked.  Okay?
11     A   (Deponent nods head.)
12     Q   How old are you, Mel?
13     A   Sixty-three.
14     Q   You're currently married to Lerah Parker?
15     A   That is correct.
16     Q   When did you marry?
17     A   In 1986.  September the 2nd, 1986.
18     Q   And you were previously married as well?
19     A   That is correct.
20     Q   How many times?
21     A   Just once prior.
22     Q   You had six children?
23     A   That is correct.
24     Q   Have you and Lerah had any children
25 together?
```

---

8

```
1  be -- Are you talking about a physical injury as
2  opposed to a personal property injury, for example?
3  BY MR. MacDONALD:
4      Q   As you sit here today, are you aware of
5  any physical injury caused to you by W.R. Grace or
6  any of the defendants in this action?
7      A   Not at this point in time.
8      Q   How about emotional injury?
9      A   Yes, sir, I am suffering emotional injury.
10     Q   Okay.  Could you describe that in detail
11 for me.
12     A   Yes, sir, I can.  Frustration, very much.
13 Pain.  Very -- What would you say?  It's very deep
14 feelings towards the fact that we were lied to.
15 Dispossession of property.  I have nothing.  When
16 you take into consideration for 14 years of marriage
17 and trying to build up property, that as we sit here
18 today there is nothing left.  Distrust.
19     Q   Anger?
20     A   Anxiety.  Definitely anger.  Yes, sir.
21     Q   Have you sought any professional help to
22 help alleviate these symptoms?
23     A   No, sir, I have not.
24     Q   Do you plan to in the near future?
25     A   I do hope that I do not have to.
```

---

**PARKER vs W.R. GRACE & COMPANY**                    **Deposition of MEL PARKER**

---

**9**

1  Q  And when you said "pain," what did you
2  mean by pain?
3  A  Mental pain in there. I'm having problems
4  with my marriage in there. I'm having pain when I
5  drive by my property there. You know, you get that
6  gut feeling when you see something that was but it
7  isn't there anymore. That's the type of pain I'm
8  going through.
9  Q  What type of problems are you having with
10  your marriage?
11  A  Well, sir, as I said, when you and your
12  wife have set a goal in life to build up a piece of
13  property and not be in debt anymore, looking for
14  financial security in your retirement and looking
15  forward to those years of retirement, and you have
16  it and you're that far away from it (gesturing), and
17  the next thing you know it's gone, then you find
18  that even your partner feels the same frustrations
19  that you do and where else can you take them but
20  toward each other. And that creates a strain on
21  your relationship, believe me.
22  Q  Mel, is it your understanding that you are
23  not going to be in a position to rebuild all of
24  those things that you just talked about; the
25  business, the property?

---

**10**

1  A  Well, I think one thing that came up here
2  this morning was that W.R. Grace has went out on the
3  fact that that material is not going back up on the
4  mine site again, so where we were promised last year
5  that everything would be done by October the 30th,
6  and here really nothing has been done and now the
7  material is still on the property, we're pretty much
8  assured now we're not going to get -- we're going to
9  have a restricted deed on that piece of property and
10  it doesn't look good for that reason.
11       Another thing I need to mention here is
12  the fact that I am 63 years old, and I was almost
13  there with my goals and my wife's goals in there,
14  and that's gone. We have lost all of our contracts
15  and I am -- I'm at that point in my life where, no,
16  sir, I do not want to start over again.
17  Q  And just to clarify, you understand that
18  the Court has ruled the soil from your property
19  will not be moved up to the mine site?
20  A  That is correct.
21  Q  Who told you that?
22  A  That came over the KLCB news this morning
23  at 6:30.
24  Q  If that were not accurate, would that help
25  relieve some frustration on your part?

---

**11**

1  A  No, sir, it would not, because it did
2  not -- if it was not known yet where it was going
3  there, then when would it be moved off? There is no
4  solution to that problem at this point in time.
5  Q  Right. But when there is a solution to
6  that problem, do you believe that would relieve some
7  frustration on your part?
8  A  No, sir, because we still do not know the
9  extent to which the asbestos is going to be cleaned
10  up on the property.
11  Q  It's not your understanding that it is
12  going to be cleaned up completely?
13  A  I have not been given any assurance that I
14  would have -- that there would not be deed
15  restriction.
16  Q  Who told you that the site would be
17  completely cleaned up by October 30?
18  A  The EPA did. Because in their assessment
19  plan that they had made in March of 1999, they felt
20  that it could be done at that point in time.
21  Q  Have you gone through the screening
22  process?
23  A  Yes, I have.
24  Q  And did you get your results back?
25  A  No. We went in on the 18th of September

---

**12**

1  and my understanding is at least three months will
2  pass before those results are finalized.
3  Q  Three months has passed, hasn't it?
4  A  September, October, November, December, in
5  there. We must be getting close.
6  Q  So you expect some kind of information
7  shortly?
8  A  Yes. Although with the jump from 3,000 to
9  6,000 people being screened in there, I'm sure that
10  the -- it's going to be extended some time before we
11  find out.
12  Q  Mel, you're a graduate of the University
13  of Montana; is that right?
14  A  That is correct.
15  Q  It was Montana State then?
16  A  Yeah, Montana State University.
17  Q  And your degree was in engineering?
18  A  Bachelor's of Science in forest
19  management.
20  Q  And when did you retire?
21  A  1986, sir.
22  Q  And who were you working for at that time?
23  A  At that time we had just finished
24  employment with the Champion International Paper
25  Company.

---

**PARKER vs W.R.GRACE & COMPANY**                    **Deposition of MEL PARKER**

---

**13**

1   Q   And how long had you worked for Champion?
2   A   For 27 years.
3   Q   Have you worked outside the home since
4   1986?
5   A   Not outside the home; no, sir.
6   Q   Have you ever received any type of wage
7   for services since 1986?
8   A   Wage for services, you mean income?
9   Q   Yes.
10  A   Yes, I received a slight income from
11  W.R. Grace for the administration of their lands
12  from 1987 until the time that you closed, in there.
13  Q   And when you say "administration of their
14  lands," what do you mean by that?
15  A   Well, W.R. Grace has 30 -- actually 2,200
16  acres of timberland, in there, and the St. Regis
17  Paper Company in 1980 had drawn up a forest
18  management plan with W.R. Grace.
19      And the forester who was looking after
20  that property from 1980 to 1987 was going on to
21  employment elsewhere, and they approached me -- he
22  approached me -- This was after I retired. --
23  whether or not I would just administer the lands up
24  in there, which basically just involved going onto
25  the property and looking at the timber.  There was

---

**14**

1   some slash disposal that had to be done.  In other
2   words, personal burning of the piles and this type
3   of thing in there.
4   Q   How much were you paid by W.R. Grace?
5   A   I was paid $13 an hour.
6   Q   And that continued until 1990?
7   A   The overall position continued until 1990,
8   but the job was basically done on the property prior
9   to that.
10  Q   Okay.  And did you work for W.R. Grace at
11  all after the mine was -- or, after the mine ceased
12  operations?
13  A   Yes, W.R. Grace had a portion of their
14  ground up on the mine site there where they had put
15  the waste soil on it and then they would -- actually
16  it was the slab of cement that had the soil put on
17  it, and then W.R. Grace put its waste material --
18  its waste soil on that.  And then they had asked me
19  to go up there with my tractor and turn that over on
20  several occasions.  This was a requirement by the
21  Department of Environmental Quality in there.
22  Q   And when was the last time you recall that
23  you did any work with regard to that?
24  A   That was -- The last time that we were up
25  there on that piece of property would be about 1987

---

**15**

1   (sic).  Pardon me, 1997.
2   Q   Between 1990 and 1997 about how many hours
3   would you say that you performed work for W.R.
4   Grace?
5   A   I would estimate at approximately sixty
6   hours.
7   Q   And were you able to clear up the waste
8   soil matter?
9   A   It is ongoing.  Even -- I know that I
10  talked to an individual last year that had been
11  retained by W.R. Grace to do it once again, so
12  apparently the Department of Environmental Quality
13  is still requesting that.
14  Q   Did W.R. Grace follow your advice with
15  regard to any recommendations you gave regarding
16  that work?
17  A   We suggested that they put pure nitrogen
18  and ammonium nitrate on the soil in order to speed
19  up the breakdown of the hydrocarbons.  That's all we
20  did there, yeah.
21  Q   And did you believe that should satisfy
22  the DEQ --
23  A   Apparently it has been, because they have
24  not asked for any additional work.
25  Q   Have you received any other type of income

---

**16**

1   from any source since retirement from Champion?
2   A   No, sir.  Now, when you say "income,"
3   perhaps I need to clarify that, as, yes, I am
4   receiving Social Security disability.  Is that --
5   Are you aware of that?
6   Q   I am.
7   A   Okay.
8   Q   That's actually not what I meant, but I
9   appreciate you clearing that up.
10  A   Okay.
11  Q   How much are you receiving from Social
12  Security disability?
13  A   Right at this point in time?  This amounts
14  to $1,210 I believe, per month.
15  Q   Per month?  And that was for a disability
16  that you suffered in '86?
17  A   Yes, actually what was involved there was
18  an aortic valve was replaced in 1986 -- in 1986,
19  there.  My left knee -- I had tuberculosis in my
20  left knee right after I was born, and the knee
21  began to start to degenerate in there.  And then the
22  hip -- the right hip replacement was in 1997.  I
23  finally had that replaced in there.
24  Q   You never received any compensation from
25  the Raintree business?

---

**PARKER vs W.R. GRACE & COMPANY**                    **Deposition of MEL PARKER**

---

17

1    A    No, sir.
2    Q    But you provided services for the
3    Raintree?
4    A    Yes. Yes, I did.
5    Q    What type of services did you provide for
6    the Raintree over the years?
7    A    What I've done for Raintree over the years
8    was basically in the form of soliciting contractors,
9    because when working for St. Regis Paper Company in
10   there, I had met a considerable number of people who
11   were growing reforestation seedlings in there. So
12   that was one of my jobs with St. Regis in there.
13       Also I spent a considerable amount of
14   time -- I'm sure that you have seen a picture of the
15   property. When we had purchased it in 1993 there
16   was just nothing on the ground at all, you might
17   say. It was just a bare -- Actually it looks about
18   the same today as it did back then, but I've planted
19   the trees and the shrubs and the grass and whatnot
20   on the property in there.
21       You have to understand that the nursery
22   business is not really a labor intensive type --
23   physical labor intensive type operation, so I was
24   able to do other jobs out there as well. And there
25   is the thinning of the seedlings, for example, in

---

18

1    there.
2        We got into the business of putting
3    vehicles and boats and RVs in our storage and using
4    a forklift to maneuver them in. I did that type of
5    thing. I ran the tractor on the property in there.
6    This type of thing is what I was doing. But an
7    awful lot of it was the reconstruction, you might
8    say, of the esthetics on the property in there.
9    Q    In the past few years, prior to the
10   suspension of the business, about how many hours a
11   week would you put in helping out at the Raintree?
12   A    Probably it varies in there. I would say
13   around 48.
14   Q    Mel, were you involved in the decision to
15   open up a nursery business in the first place?
16   A    You mean originally, 14 years ago?
17   Q    Yes.
18   A    Yes. Yes. My wife and I both.
19   Q    What types of considerations were
20   discussed between you and your wife before you
21   opened up the nursery business?
22   A    My wife and I, because Champion
23   International had bought out the St. Regis
24   operations in there, they already had a nursery
25   location down at Plains, Montana. And my wife and I

---

19

1    had a considerable amount of experience in growing
2    reforestation seedlings and they were not wanting --
3    Champion International was not wanting the
4    facilities on the St. Regis property in there.
5        And we talked it over. We decided that we
6    could go ahead and buy out the nursery operation in
7    Libby there and move it out onto a piece of property
8    that we planned to live on in the Rollins tracts and
9    start the operation over. So that's what led to the
10   formation of Raintree Nursery.
11   Q    Do you remember what the purchase price of
12   the business was?
13   A    We -- They wanted $20,000 for the material
14   that they had on the property in there.
15   Q    And what type of material was it? Do you
16   remember?
17   A    This would be greenhouse -- greenhouses.
18   Very low grade type greenhouses, you might say, at
19   the time. All their trees, all of their equipment
20   for seeding. They also did an awful lot of seed
21   extraction. And so we purchased that equipment as
22   well. Basically it was enough to get us started.
23   Q    Did you do any type of market research in
24   terms of prospective income with the business right
25   before you started it?

---

20

1    A    Yes, before we started it, as I told you,
2    because of my years with St. Regis we knew several
3    organizations, Department of Lands, private
4    industry, state, federal, and by calling them and
5    talking to them we got an indication that there was
6    still a need out there for growing reforestation
7    seedlings that couldn't be met by existing
8    nurseries.
9    Q    You never hired a special market
10   consultant or anything like that?
11   A    No, sir.
12   Q    Did the business progress in terms of
13   invested income over the years between '86 and '97?
14   A    The business was building right up to the
15   point in time that we lost everything.
16   Q    And would you describe it as a good,
17   profitable business over that period of time?
18   A    No, sir. It was not a profitable -- what
19   we would consider a good, profitable business in
20   there, but the point in time that we have reached,
21   like right now, it would have been a profitable
22   business.
23   Q    So you would agree, between 1986 and 1997
24   it was not a profitable business?
25   A    Everything that we got on that property in

---

**PARKER vs W.R. GRACE & COMPANY**                    **Deposition of MEL PARKER**

---

**21**

1  terms of income went back into the business again to
2  rebuild it, to keep building it up.
3      Q  During that eleven-year period, '86 to
4  '97, did the business provide an adequate living for
5  you and your wife?
6      A  Between 1986 -- We need to go back just a
7  little bit further if I might in there.
8      Q  Okay.
9      A  And yes, in 1986 in there, when we were --
10  when we did not work for St. Regis Paper Company --
11  or, actually Champion International at that point in
12  time in there, we had some income that we had
13  invested -- we decided we would invest into the
14  nursery business in there to get it started in
15  there. And so that's what we did. And it was money
16  that was put in by both my wife and myself.
17      Q  Did you seek out any loans when you first
18  started the business?
19      A  I think that would probably be better
20  addressed by my wife as to whether we got the loans
21  right away, because we used the income that we had
22  from other sources that we first started the nursery
23  with.
24      Q  But as you sit here today, you don't
25  recall whether you had financing at that time?

---

**22**

1      A  Not at that point in time, I could not say
2  that I did. I know in later time we did, yes.
3      Q  Do you know if you ever had or ever saw
4  any financial statements that were produced for the
5  Raintree business?
6      A  You're talking about, like, tax --
7      Q  No, financial statements that were
8  prepared perhaps for an application of a loan; like
9  assets, liabilities, equity in the business, those
10  type of things?
11      A  Yes. When we went to the bank for loans
12  in there, my wife would draw up these assets and
13  present it to the bank in there, yes. I've seen
14  those.
15      Q  Did you ever -- Well, let me ask you
16  first. What bank did you usually deal with?
17      A  Glacier.
18      Q  Glacier. Do you remember ever dealing
19  with any other banks regarding loans for the
20  business?
21      A  Not for the business, no.
22      Q  Okay. Do you remember about how many
23  times in that eleven-year period that you sought
24  financing through Glacier Bank?
25      A  I could give you a figure, but I think

---

**23**

1  that question asked to my wife would give you a more
2  exact amount, a number in there.
3      Q  What would you -- As you sit here today,
4  what do you think it was?
5      A  Approximately 16.
6      Q  So more than once a year?
7      A  In some cases, I believe that would be a
8  fair statement.
9      Q  Did you have a particular banker that you
10  used to work with at Glacier?
11      A  Yes. There was. And offhand I cannot
12  remember what his name was. He was a manager at
13  Libby and then he became a vice president in the
14  Kalispell office in there.
15      Q  He is still with Glacier, though?
16      A  Yes, he is.
17      Q  Between '86 and '97, Mel, do you recall
18  the net worth of the company increasing?
19      A  The net worth of --
20      Q  I'm sorry, of the business?
21      A  -- of the Raintree Nursery?
22      Q  Yes.
23      A  Yes, sir, it was.
24      Q  And do you believe some financial
25  statements regarding the business would have been

---

**24**

1  produced as late as '96 or '97?
2      A  Yes.
3      Q  Would you have copies, Mel, of those
4  financial statements that were produced?
5      A  Once again, my wife, handling that aspect
6  of it, I think your question would better be
7  directed toward her.
8      Q  But you don't know if you have copies of
9  them?
10      A  We have copies of some of them, but for
11  example, the tax statements are not held for longer
12  than, what, seven to ten years, in there, so I'm
13  sure those are not available prior to that in there.
14          Another understanding I have, too, is
15  that, you see, all of our material was kept down in
16  the long shed and also in portions of the house, and
17  some of that material has been contaminated. It has
18  been considered as contaminated. The accessibility
19  of that I could not tell you for sure.
20      Q  You mention, Mel, the sum $1,200 that
21  you're getting as Social Security. What other
22  sources of income are you receiving right now?
23      A  In 19 -- When I became 55 in 19' -- Let's
24  see, that would be about 1996 -- yes, about 1995,
25  then I received my St. Regis pension.

---

**25**

1  Q  Okay. And how much is that a month?
2  A  That was $312 a month.
3  Q  Any other sources of income, Mel?
4  A  No, sir.
5  Q  I noticed in your --
6       MR. THUESON: Counsel, this is
7  just a clarification. He received some inheritance.
8       THE DEPONENT: Are you talking
9  about --
10      MR. LEWIS: But I don't know if
11 that's income.
12      MR. THUESON: I don't know if it's
13 income, but I don't know --
14      MR. MacDONALD: I appreciate that.
15 BY MR. MacDONALD:
16  Q  Did you just recently receive some
17 inheritance, Mel?
18  A  No, when we were first setting up the
19 Raintree operation, I took what I call an
20 inheritance withdrawal. That is money that has been
21 given to me in the form of an inheritance and we
22 used that money to start the business up, getting it
23 going, and then also we receive a thousand dollars a
24 year as an inheritance income.
25  Q  Is that out of a trust?

**26**

1  A  Basically it's in a trust form, yes.
2  Q  Okay. I thought I read in your discovery
3  responses, Mel, where you're getting $2,000 from the
4  DOT? Does that ring a bell?
5  A  That's -- Yes, that's a temporary -- Yes.
6  Q  Okay.
7  A  We are receiving $2,016 per month for
8  living expenses for relocation.
9  Q  Okay. And you receive that from the
10 Department of Transportation?
11  A  That is correct.
12  Q  And you and your wife together receive
13 $2,016?
14  A  That is correct.
15  Q  Do you have any other sources of money
16 that you receive?
17  A  No, sir.
18  Q  Where are you currently living?
19  A  Address?
20  Q  Uh-huh.
21  A  472 River View Drive.
22  Q  Are you renting?
23  A  Basically -- Yes, we're leasing.
24  Q  And what is your lease amount per month?
25  A  $1,000 per month.

**27**

1  Q  Have you been residing at the same place,
2  Mel, since you left the property -- the old
3  screening plant property?
4  A  Yes, we have been at 472. Yes, we have.
5  Q  Mel, have you tried to look for any other
6  sources of income since leaving the property in
7  terms of employment or carrying on with the
8  business?
9  A  Leaving up there on the mine --
10  Q  Yes.
11  A  -- at the screening plant?
12  Q  Right.
13  A  Since then?
14  Q  Right.
15  A  No, sir.
16  Q  Did you enter into any kind of a written
17 agreement with the DOT to receive that $2,000 per
18 month stipend?
19  A  Yes. My wife did. My wife is the one who
20 has accounted for it, yes.
21  Q  Do you have a copy of that agreement?
22  A  Once again, I believe we do, yes.
23  Q  But it's not an agreement you signed?
24  A  No, sir.
25  Q  Okay. And do you have to pay that back,

**28**

1  Mel?
2  A  No, sir.
3  Q  Have you been able to live okay on the
4  income you and your wife are currently receiving?
5  A  No, sir, we haven't. We have had to pay
6  other expenses that we have had in addition to that
7  that were not included in the stipend.
8  Q  Like what?
9  A  Mortgage payments, vehicle payments,
10 paying on taxes. This type of thing.
11  Q  Okay. Mel, where was the Raintree
12 business first located?
13  A  It was on the -- You want the address in
14 there?
15  Q  If you remember it.
16  A  It's just Quartz Creek Road, Rollins
17 tracts, Libby, Montana.
18  Q  And that was downtown?
19  A  No, that was five miles out on the
20 Kootenai River Road.
21  Q  And how long did the business stay at that
22 location?
23  A  It was there from 1986 until 1993.
24  Q  Did you rent that property or did you own
25 it?

29

1   A   We owned that property; yes, sir.
2   Q   And did you sell that when you purchased
3   the screening plant property?
4   A   That is the money that we used for the
5   screening plant.
6   Q   Between '86 and '93, did you have any
7   other business locations?
8   A   Yes. There was the business that we had
9   downtown at 609 Minnesota.
10  Q   That was your retail store?
11  A   That is correct.
12  Q   And do you still have the retail store?
13  A   That is correct.
14  Q   Is that at the same location?
15  A   Yes.
16  Q   Besides those two places and the screening
17  plant, have you had any other business locations
18  regarding Raintree?
19  A   Yes, we did, in 19 -- I believe it was
20  1991 we bought what was called The Pop Shop in
21  downtown Libby, which is now the submarine sandwich
22  store.
23  Q   And what was The Pop Shop location used
24  for?
25  A   You mean for our benefit or prior to that?

30

1   Q   No, for yours.
2   A   For our purposes in there, it was used as
3   a fruit stand in there, basically. Fruit and
4   vegetables.
5   Q   So was it a separate business from the
6   nursery business?
7   A   It was still a part of the nursery
8   business in there, yes.
9   Q   But you sold vegetables and fruits retail?
10  A   Yes, sir.
11  Q   And how long did that -- did your business
12  stay in that location?
13  A   My wife would probably be better at
14  defining this. My understanding was that we had
15  that for approximately one year and then we sold
16  that to the folks -- to the submarine -- They wanted
17  to set up a submarine store there.
18  Q   Why did you sell that?
19  A   It was getting so that we could not handle
20  basically the business that we were in, and the
21  other thing, it was somewhat of a speculative type
22  business in there. Prior to the time that that was
23  what they called The Pop Shop, where they sold pop
24  and cigarettes and whatnot in there, it was a
25  gasoline station in there and it had gasoline tanks

31

1   in the ground.
2        And so consequently during the period that
3   we held it we pulled the tanks out of the ground and
4   then we put it up for sale. Actually they
5   approached us on it and we sold it to them.
6   Q   Okay. Did you lose money on the sale of
7   that property?
8   A   No, sir, we did not.
9   Q   And how much did you make on it?
10  A   There was $35,000.
11  Q   What was the name of the business that you
12  had there at The Pop Shop? Did you call it the
13  Raintree?
14  A   It was still -- still a portion of the
15  Raintree, as I understand it. My wife could clarify
16  that.
17  Q   Okay. How did you hear that the screening
18  plant property was for sale?
19  A   We were at a craft show in November of
20  1992, and Allen Stringer, who we knew because we
21  were, you know, an acquaintance with him because of
22  the work we did for him on the land, we were talking
23  and we were just mentioning to Allen that the next
24  day we were going to be pouring another slab of
25  cement for another one of our greenhouses in our

32

1   expansion.
2        And he said, Well, why don't you -- He
3   said, We just put our property on the river on the
4   market with Ryan DeShazer Realty. Why don't you
5   come out and take a look at that? He said, We have
6   cement slabs and asphalt slabs that are already in
7   place that may be -- it might be a good place for
8   you to expand your facilities, if you're going to
9   keep doing this.
10       So we did. My wife and I went out to the
11  property there and we took a look at it and we
12  agreed that this may be an opportunity. So that's
13  how we first came to know about that.
14  Q   Was it a much bigger property than what
15  you were using down on Quartz?
16  A   Yes, it was.
17  Q   How big was the property on Quartz?
18  A   Quartz was five acres.
19  Q   So at the time you had this discussion
20  with Allen Stringer you weren't looking for a new
21  place?
22  A   No, not at that point in time. We could
23  still expand somewhat on the -- at the five acres
24  that we had.
25  Q   After you looked at the screening plant

**PARKER vs W.R. GRACE & COMPANY**                  **Deposition of MEL PARKER**

---

33

1  property, did you look at any other properties for
2  relocation prior to buying the screening plant
3  property?
4      A  No, we did not. And what I need to do is
5  correct that, in that W.R. Grace had two pieces of
6  property for sale; there was the screening plant and
7  there was the property adjacent. It belonged to
8  Kootenai Development. So we looked at both pieces
9  of property there. But as far as any other
10  properties in other locations, no.
11     Q  Okay. And the screening plant property
12  was 21 acres?
13     A  21.2 acres; that is correct.
14     Q  And how big was the adjacent land?
15     A  It was 17.2 acres.
16     Q  Do you remember what the list price was
17  for the 21.2 acre parcel?
18     A  Yes, it originally was put down on the
19  bill of sale (sic) as $118,000, but it had been
20  improperly computed in their figures, so it was
21  $126,600.
22     Q  And how about the 17.2 acre parcel?
23     A  That went for sale for $102,200.
24     Q  Did you ever offer to buy the 17.2 acre
25  parcel?

---

34

1      A  Yes. We did. That was in 1994, I
2  believe. In May of 1994. We put money down on
3  that -- earnest money down on the 17.2 acres.
4      Q  And why didn't you consummate that deal?
5      A  At the time that we had just put that
6  money down on there, that's when W.R. Grace was
7  selling its 3,600 acres up on the mine site in
8  there. And for some reason or other, in the
9  dealings that we were making with Kootenai
10  Development in there, that piece of property was
11  included in it.
12         And we still had one month left to go
13  before our earnest money time had expired and we
14  received a call from Jack DeShazer in there stating
15  that they wanted to pull that off the property
16  there, and so we did. We agreed to do that. And
17  that's the end of that.
18     Q  Why did you agree to do that?
19     A  Because for one primary reason in there is
20  that we didn't know whether or not for sure we would
21  have the financing to go ahead and buy that piece of
22  property even though there was contingencies we were
23  working on in there at that point in time.
24     Q  So you voluntarily pulled back that offer?
25     A  Yes, we did.

---

35

1      Q  When you were doing consulting work for
2  W.R. Grace between '87 and '90, did you ever have
3  any discussions about asbestos up at the mine site?
4      A  When I was doing the work up -- No.
5  No, sir.
6      Q  That was never an element of consideration
7  in any of the work that you did for Grace?
8      A  No. No, I did not work around the mine
9  site whatsoever. It was just in the timbered area.
10     Q  Was there ever a discussion of asbestos in
11  the timbered area?
12     A  No.
13     Q  During that period of time, '87 through
14  '90, have you ever heard of any of the workers up at
15  the mine site becoming ill because of asbestos?
16     A  Not during that period of time, no, sir.
17     Q  Have you since?
18     A  Yes. Since the mine was closed, yes.
19     Q  When did you first hear that some workers
20  had become ill as a result of asbestos exposure?
21     A  I believe that it was on November the 16th
22  of 1999 when the Daily Inter Lake first came out
23  with an article regarding the asbestos at the mine,
24  and then I think that it was, what, three days
25  later, on the 19th that -- somewhere in that area

---

36

1  that the Post Intelligencer out of Seattle had come
2  out with an article in the paper regarding that.
3         And then to follow up on that, the EPA
4  showed up on our property about the 21st, or
5  somewhere in that area, and that's when we realized
6  that we had a problem.
7      Q  Mel, you've lived in Libby most of your
8  life, haven't you?
9      A  I was over in Bonners Ferry for ten years,
10  from 1971 to 1981 in there, but yes, other than
11  that, I've spent from 1964 up through that time.
12  So if you make it -- It would be about 26 years that
13  I've been in the Libby area.
14     Q  Okay. Did you have any friends that
15  worked up at the mine?
16     A  I had one friend that worked up at the
17  mine. His name was Bob Graham. He lived in the
18  Rollins tracts. We hunted. We fished together.
19     Q  How long had you known Bob Graham?
20     A  I have known -- Well, Bob Graham in there,
21  we moved out in the Rollins tracts the first time in
22  1968, so you might say I knew Bob until the time --
23  from that time until he passed away.
24     Q  Do you remember when he passed away?
25     A  No, but it wasn't all that long ago. No.

---

37

1  Q  It was in the '90s?
2  A  It would be at that point in time after
3  the mine had been closed, in there.
4  Q  And Bob Graham never mentioned to you that
5  any of the workers had ever gotten sick up at the
6  mine?
7  A  Never mentioned his job at all.
8  Q  When did you first hear that there was
9  even asbestos up at the mine site?
10  A  Well, that there was asbestos in the mine
11  site was basically at the same time that the
12  articles came out in the Western -- Inter Lake and
13  then a follow-up in the Post Intelligencer there,
14  and then talking with the EPA.
15  Q  When --
16  A  Are you talking about the mine site or the
17  screening plant?
18  Q  The mining site.
19  A  Yes, the mining site, yes, sir, at that
20  time.
21  Q  And prior to that did you know that
22  asbestos exposure could cause harm?
23  A  No, sir.  I had no -- no consideration or
24  no affiliation with asbestos whatsoever in there.
25  It was not a concern to me.

38

1  Q  So through the years you had never heard
2  anything on the news or read anything about --
3  A  No, sir.
4  Q  -- about asbestos being harmful?
5  A  No, sir.
6  Q  How many times did you see the screening
7  plant property before you purchased it?
8  A  From the time that we put the Bill of Sale
9  (sic) on the property in there, two or three times.
10  We went back and relooked at the property after
11  Allen Stringer told us about it, about two or three
12  times, and then that was it.  Not prior to that at
13  all.
14  Q  And did you see it with anybody?  Did you
15  go up with Allen Stringer?
16  A  Allen Stringer, yes, showed us the
17  property.
18  Q  How many times was Allen Stringer with
19  you?
20  A  Up until the point where we had signed the
21  buy-sell agreement, possibly twice.
22  Q  Did you ever see it with Allen Stringer
23  after you signed the buy-sell agreement?
24  A  Allen has been on the property several
25  times after the buy-sell agreement.  Even after we

39

1  purchased the property, because he still stayed on
2  the property there.  He was there another year after
3  we signed the buy-sell agreement because there was
4  still cleanup to do on the site itself.
5  Q  Okay.  In the two or three times that you
6  saw the property with Allen Stringer before the
7  buy-sell was signed, what do you recall about those
8  conversations?
9  A  Allen was very optimistic about it
10  because -- As we were walking through the property
11  in there we were going over the areas where the
12  concrete slabs and the asphalt slabs were in there,
13  and then Allen also mentioned to us, Do you want to
14  keep the long shed, he said.
15  And I remember saying to him, That's one
16  of the things that we would like -- we were
17  impressed with on the property was the long shed
18  because we seemed to be constantly building storage
19  wherever we go with our operation, out at Raintree
20  in there.
21  And he said, Well, if you people are going
22  to buy this piece of property, then we will not --
23  we will not tear it down.  He said, This is
24  scheduled to be torn down in the immediate future
25  and we will just leave it in place.

40

1  Q  Okay.  Anything else you recall of those
2  conversations?
3  A  He felt that it was definitely an ideal
4  situation for a nursery.  We told him that we were
5  going to build our home right adjacent to where they
6  currently had their office in there, and we were
7  going to live on the property.  We were going to
8  make that into a retail store but custom built as a
9  house as well, and we would be living -- you know,
10  we would be living right on the property, so it was
11  an ideal location.
12  Q  Anything else you recall?
13  A  Other than -- No, basically those are
14  the -- you know, Allen -- he never said anything
15  other than he was very complimentary about the
16  property and about the fact that, yeah, there was
17  things in there -- We had put down in the buy-sell
18  agreement in there that W.R. Grace would improve the
19  property as far as landscaping it, making it
20  pleasant to view, and whatnot in there.  He said
21  that he would do that.
22  And inside the long shed in there, he
23  would clean up the asbestos -- not the asbestos but
24  the vermiculite that was in the tunnels and also in
25  the long shed itself in there.  I believe -- Okay,

**PARKER vs W.R.GRACE & COMPANY**                    **Deposition of MEL PARKER**

---

41

1   that's fine.
2       Q   Okay.  And did they do that?  Did they
3   clean up the vermiculite in those areas?
4       A   They did not clean up the vermiculite in
5   the tunnel.  I believe he took out one more rail car
6   of vermiculite that was in the long shed and then
7   after we had purchased the property we went in and
8   we cleaned up the rest of it.
9       Q   Okay.  Did you ask Allen to do that after
10  you purchased the property?
11      A   No, Allen was going to do that anyway.
12  He informed us that he was going to do that.  He
13  would do that portion of it.
14      Q   I guess what I'm asking is, did Allen do
15  all the landscaping and cleanup that he represented
16  to you that he would do?
17      A   Yes, he did.
18      Q   In addition to the first buy-sell
19  agreement that was entered into, was there a
20  following or subsequent written agreement that was
21  entered into at the time of the purchase of the
22  property?
23      A   We -- No, none other than the buy-sell,
24  other than that point in time where we actually
25  bought the property and we got the -- you know, the

---

42

1   Warranty Deed in there.  That was the only other
2   agreement that was in place.
3       Q   Okay.  And do you have a copy of that
4   buy-sell that was signed by both parties?
5       A   Yes.  Yes, we do.
6       Q   Do you know where that copy is?
7       A   I believe you should have a copy of that.
8       Q   Okay.
9               MR. LEWIS:  Do you not have it,
10  Counsel?
11              MR. MacDONALD:  I don't think so.
12  The only one I've got is the one that references all
13  the acreage that was presented.  We will get to it.
14  We will talk about that at the time.
15  BY MR. MacDONALD:
16      Q   Do you remember about how long it took,
17  Mel, between the time you signed the buy-sell and
18  you closed the deal?
19      A   The buy-sell -- A year -- It was
20  approximately a year before we -- And once again, my
21  wife could clarify that.  The reason I say one year
22  was because Allen Stringer, at the time we were
23  purchasing the property, he was saying that he --
24              He still had cleanup to do on the property
25  and so we were in the process of selling our

---

43

1   property in there, and it seemed that the timing
2   would be quite well and the people that were going
3   to buy our property matched up with the time that
4   Allen felt that everything would be done.  So in
5   1993 that was done.  We signed a buy-sell agreement
6   in '92 and the property was exchanged in 1993.
7       Q   Okay.  After the buy-sell agreement was
8   entered into, Mel, were any additional materials
9   placed on the property that was subject to the
10  buy-sell agreement?
11      A   Yes, there was.  There was other materials
12  brought in.
13      Q   What materials were those?
14      A   That was the waste materials that came
15  from the mine site.
16      Q   And this was after you signed the
17  buy-sell?
18      A   Yes, it was.
19      Q   Did you ask Allen Stringer why waste
20  materials were being dumped on the property?
21      A   Because he was in the process of
22  landscaping it, you know, basically the way we
23  wanted.  An example of that would be right behind
24  where the slab was we were going to put the house,
25  we were going to put a lawn in there.  Well, that

---

44

1   was all cement slab in there so he put the material
2   over that.
3       Q   With the intention that there would be
4   grass growing over top of it?
5       A   There would be grass in there, yeah.  Then
6   out in front of the house, which is the office, at
7   that point in time, he brought in a bunch of fill
8   material because he had cement pillars there where
9   they had the conveyor system going up to the house.
10      Q   That was to level it off?
11      A   No, that was to basically cover it up.
12  They could not get it out.  There was such
13  tremendous cement pillars in there.
14      Q   Was it also anticipated that grass would
15  be grown over the top of that as well?
16      A   No, no, it wasn't.  But we did.
17      Q   How about -- Were there any rocks dumped
18  on the property?
19      A   No, not to my knowledge.
20      Q   Do you remember when you took possession
21  of the property?
22      A   It was -- I believe that it was in
23  October of 1993.  Once again, you might want to
24  clarify that.
25      Q   Did you take possession right after the

---

45

1 closing?
2     A  Yeah, right after the closing in there,
3 yes.
4     Q  When did you build the home on the
5 property?
6     A  In 1994.
7     Q  And when was that completed, do you
8 remember?
9     A  Well, just a minute here.  I have to
10 clarify that.  We started building that home --
11 that -- we finished it up in 1994.  Let's put it
12 that way.  We took possession in 1993.  Yes, we were
13 building that between 1993 and 1994 in there.
14     Q  And is it a -- Was it a modular home?
15     A  No, it was built on a slab.
16     Q  Who was the contractor?
17     A  I built the house.  My wife and I built
18 the house in there.  We had contractors doing
19 various things, but --
20     Q  And do you remember what the house cost to
21 put up?
22     A  Once again, my wife would better be able
23 to give you those figures, yes.
24     Q  You don't recall?
25     A  No, sir.

46

1     Q  In discovery responses, Mel, it was
2 indicated that there may be other documents
3 responding to our request that were not provided
4 because they possibly were contaminated.  Do you
5 know anything about that?
6     A  I don't know about the responses that you
7 were requesting in there but I am -- I do know that
8 there was material that was considered as
9 contaminated that was on the property, yes.
10     Q  And I'm talking about documents.
11     A  Documents in there, yes.
12     Q  Okay.  Who has those documents right now?
13     A  The EPA has portions of them, and the
14 other portions of them, they were destroyed.
15     Q  Destroyed by whom?
16     A  By the EPA.
17     Q  Okay.  What were those documents?
18     A  A lot of them were information that
19 related to our -- well, such information as you're
20 asking for.  Some forms of taxes and documents on
21 our assets and this type of thing.
22     Q  Okay.  Have you ever asked the EPA to
23 receive back those documents that they have right
24 now?
25     A  No, not to my knowledge, we haven't asked

47

1 for them back.  They do have some of the material in
2 storage.
3     Q  Okay.  And do you know what portions were
4 destroyed by the EPA?
5     A  My wife does.
6     Q  You don't?
7     A  No, sir.
8     Q  Prior to or after the buy-sell, back when
9 you were in the process of purchasing the screening
10 plant property, was there any correspondence that
11 went back and forth -- written correspondence
12 between yourself, Mrs. Parker, and Grace?
13     A  There was the one letter that we had
14 written and that was asking Allen Stringer if he
15 would be willing to extend the time on the 17.2
16 acres, in there.  We asked for an additional month.
17 And he wrote, I recall, and said that was not a
18 problem in there, so Jack DeShazer extended that
19 period for one month.
20         And that's pretty much the conversation
21 that we had with Allen, other than when he visited
22 us off and on during, you know, the time that he
23 would get to Libby here.
24     Q  And how about on the 21 acre parcel, the
25 one you ended up purchasing?  Do you remember any

48

1 written correspondence between yourself and Grace
2 during the purchasing of that?
3     A  Yes.  We did -- With Grace, this would be
4 with Bob Morazzo, who was the purchasing agent for
5 them.  When W.R. Grace left the property, they had
6 already put into effect with a fellow by the name of
7 Montague, and the situation there was that W.R.
8 Grace had all of this equipment, they had all of
9 this material that they had used in the mine that
10 they had brought down, and they had stored it on the
11 screening plant, and Mr. Montague was supposed to
12 clean up all that material prior to when he left the
13 property.  And he did not.  So we had conversed
14 with, I believe, Allen Stringer and also Bob Morazzo
15 as to the situation in here, trying to get
16 Mr. Montague to clean that up.
17         Other than that, I have no knowledge of
18 any additional letters or conversation with those
19 people.
20     Q  Okay.  And the letters that you're
21 referencing, that would have taken place after you
22 took possession of the 21 acres?
23     A  That is correct.
24     Q  So you can't remember any correspondence
25 going back and forth prior to you taking possession?

**PARKER vs W.R.GRACE & COMPANY**                    **Deposition of MEL PARKER**

---

**49**

1    A   Other than there was one letter that I am
2  aware of that we had written to Mr. Stringer and
3  that was in regard to the 17.2 acres.
4    Q   Okay.  Did Grace ever take care of this
5  material that was left that Montague was supposed to
6  take care of?
7    A   No, they did not.  Allen basically said it
8  was out of his hands.
9    Q   And so what did you do with those articles
10  or those matters?
11    A   We fought with Montague until -- he
12  constantly sent over a truck now and then to get his
13  material.  And when it was all said and done he left
14  a tremendous amount of material on the property.
15    Q   And when you say a "tremendous amount,"
16  what types of material are you talking about?
17    A   He left I-beams and he left tanks that
18  they used to store vermiculite in them.  He left
19  culvert material, tremendous amount of -- oh, just
20  framing material that they had used for their walks
21  and whatnot.
22    Q   Did you eventually sell that material?
23    A   No, the material is basically still on the
24  property.
25    Q   Do you know why -- Did you ever ask Allen

---

**50**

1  Stringer why it was out of his control in terms of
2  that property?
3    A   No, Allen basically said that the contract
4  that he had with Montague basically said Montague
5  was supposed to clean that up by a particular point
6  in time and he just gave the indication that W.R.
7  Grace was out of the picture because we had
8  purchased the property there and that was the end of
9  that.  We didn't pursue that any further in there
10  with Stringer because we knew that, you know, he
11  said he was done.
12    Q   Were you able to use any of that material
13  in your business?
14    A   Very -- No, not in the business, no.
15    Q   How about, use it for any purpose?
16    A   No, sir.
17         MR. MacDONALD:  How are you
18  holding up?  Do you want to take a break?
19         MR. THUESON:  That would be good,
20  Counsel, if you're going to start a new subject
21  matter.
22         (A recess held in the proceedings.)
23  ////
24  ////
25  ////

---

**51**

1                EXAMINATION RESUMED
2  BY MR. MacDONALD:
3    Q   Mel, the EPA documents -- or I'm sorry,
4  not the EPA documents, your documents that the EPA
5  took control of, you mentioned that they destroyed
6  some and they have kept some; is that right?
7    A   That is correct.
8    Q   Do you remember when they took control of
9  those documents?
10    A   When we left the property, June the 15th.
11    Q   June or July?
12    A   No, it was June -- June the 15th in there,
13  yes.
14    Q   Okay.  And that's when they took
15  possession of those documents?
16    A   That's when they took possession of the
17  property.
18    Q   Oh, okay.  And Mel, how do you know that
19  they have kept some and destroyed some?
20    A   The documents that were kept, that were
21  down in the long shed, the EPA told them -- told --
22  I think told Grace or told us that they were going
23  to keep those in storage.  The ones in the house,
24  the house is destroyed and the computer was
25  destroyed and the material we had in the house was

---

**52**

1  destroyed with the house.  That's how I know the
2  difference between which ones were kept and which
3  ones were not.
4    Q   Okay.  In terms of the financial
5  information that perhaps was kept in the house that
6  was destroyed, do you have any reason to believe
7  that we wouldn't get copies of those through Glacier
8  Bank?
9    A   Once again, you're better to address my
10  wife on that one.  She was handling that aspect on
11  there.
12    Q   I've handed you a document, Mel, that's
13  entitled Proposal to Purchase W.R. Grace Properties.
14  It was in response to our discovery requests, pages
15  22 through 24.  Have you had a chance to look at
16  that?
17    A   Yes.  I'm familiar with this documentation
18  here, and I think this may very well relate to the
19  question you were asking prior to this break that we
20  took, did we have any correspondence with Allen
21  Stringer or W.R. Grace after that.  And I guess I
22  was relating that to the screening plant.  You know,
23  the screening plant itself.  That was Morazzo and it
24  dealt with this and that.  Yes.  Yes.  This -- I am
25  familiar with this.

---

53

1     Q   What is it?
2     A   Well, in 1993, W.R. Grace put their mine
3 site up for sale. And we drafted a management plan
4 for that piece of property and put an offer on it.
5     Q   And did you draft up this agreement?
6     A   Yes, sir. My wife and I did.
7     Q   And you have the date on it, the 27th of
8 September of 1993. Is that about the time you
9 drafted this agreement?
10     A   Yes.
11     Q   Did you use language from a different
12 agreement that you had to look on?
13     A   Yes, we did. What you see here on the
14 third page given to us, which is labeled 24, the
15 information that regards timber cutting, risk loss,
16 that came from a boiler plate agreement that was
17 drafted for a company over there in Orofino, Idaho.
18 It's called Clearwater Subdivision. They buy a lot
19 of timber property over there and then they
20 subdivide it.
21      And prior to the time that we had
22 submitted this agreement to W.R. Grace, the company
23 known as Miller Shingle -- I have a cousin over
24 there -- a nephew over there who was a forester for
25 them, and he provided this to us.

54

1     Q   Was there a fourth page, a signature page
2 that is missing from this agreement?
3     A   To my knowledge, there should not be any
4 pages at all that have been deleted.
5     Q   So was it your intent then, Mel, on page 3
6 where you say Purchaser: Raintree Nursery, Seller:
7 W.R. Grace, that signature would just be made
8 adjacent to those?
9     A   Yes, our signature would be included as a
10 part of that.
11     Q   This proposal was never accepted by W.R.
12 Grace?
13     A   No, this proposal was not. It was -- I
14 can't remember the exact date, but Jack Walters, who
15 was a vice president, and I guess he was a manager
16 of fire protection resources in there, he and Allen
17 Stringer came to visit with us and they asked us
18 again for a final bid that we might want to submit
19 at that time. And that would be the only
20 documentation that we perhaps may not have here.
21 I don't know.
22     Q   Okay.
23     A   So we submitted another bid on the
24 property. Then from then on we heard nothing more
25 until it was sold.

55

1     Q   And your other bid, was it basically the
2 same agreement, just --
3     A   A different dollar value.
4     Q   -- different figures? Do you know what
5 your additional -- or, your later value was? This
6 one was for $2 million? Do you remember what your
7 later one was?
8     A   Was that $2 million or $2,500,000?
9     Q   This one is $2 million. This is the same
10 one you have.
11     A   Okay, that's correct. As I remember it,
12 the bid had gone from $2 million to $2,500,000, and
13 then I believe it had gone up again to $3,050,000 in
14 there.
15     Q   Mel, how were you expecting to finance
16 this sale, if in fact it had been accepted by Grace?
17     A   What we had done is gone to a timber
18 company over at Bonners Ferry, Idaho called Crown
19 Pacific. They came over and the forester that I was
20 telling you that worked for W.R. Grace on their
21 ownership, he had taken employment with them and he
22 was quite familiar with the area because he had
23 cruised the timber originally on it.
24      So consequently he and the manager for
25 Crown Pacific came over to the property there and

56

1 flew it with a helicopter and verified that the
2 volumes were there, so what they were going to do
3 was to buy the timber, to the amount that had been
4 submitted here, I believe it was $3,050,000 in
5 there, they determined how much volume would have to
6 be cut, and that would be the stumpage that would be
7 paid to them for the timber.
8     Q   Okay. Now, you proposed this to Grace in
9 September of 1993, which was before you closed the
10 deal with regard to the screening plant property,
11 right?
12     A   That is correct.
13     Q   Now, on page -- I guess it would be
14 page 24 --
15      MR. MacDONALD: I guess before we
16 do this, Mel, why don't we introduce that as
17 Deposition Exhibit 1.
18      (Exhibit 1 was marked.)
19 BY MR. MacDONALD:
20     Q   Mel, on page 24, on -- I guess it would be
21 the third page of this document, under paragraph 7
22 under Hazardous Waste; do you see that?
23     A   Yes.
24     Q   That was a paragraph that you proposed to
25 Grace that had they consummated this deal, they

**PARKER vs W.R. GRACE & COMPANY**                    Deposition of MEL PARKER

---

57

1  would have to abide by; is that correct?
2      A   That is the intent of this, yes.
3      Q   When you purchased the 21 acre tract, why
4  didn't you propose that same protection?
5      A   Because at the time that we had that, we
6  had not even began to draft a proposal for their
7  property on the mine site; consequently I was not
8  aware of this particular format here.
9      Q   Was there any particular hazardous waste
10  that you were trying to protect yourself from on the
11  mine site when you proposed paragraph 7?
12      A   No, sir.  Not in -- No.
13      Q   Mel, you said earlier that you do have a
14  copy of the buy-sell agreement that was ultimately
15  executed by you and Grace concerning the 21 acre
16  parcel?
17      A   That is correct.
18          MR. LEWIS:  You guys don't have a
19  copy of that?
20          MR. MacDONALD:  Don't have that.
21          MR. LEWIS:  Does your client have
22  a copy of that?
23          MR. KALKSTEIN:  Say that again.
24          MR. LEWIS:  A copy of the
25  buy-sell?

---

58

1          MR. KALKSTEIN:  I think we should.
2          MR. THUESON:  Terry, I think Grace
3  may have gone to the attorney that closed on that
4  deal and got his documents.  At least that's what my
5  client says.
6          MR. LEWIS:  That's what we know.
7  We know somebody from Grace went to the attorney
8  that handled that transaction and got all the
9  documents.
10          MR. THUESON:  That's what we
11  understand from them.
12          MR. MacDONALD:  Okay.
13  BY MR. MacDONALD:
14      Q   Mel, regarding the buy-sell, do you recall
15  if it was one of those typewritten ones where
16  realtors just fill in the blanks or was it something
17  more typed out by one or two of the parties?
18      A   No, it was basically a format used
19  probably for all transactions and where you fill in.
20      Q   Did you ever deal with Jack DeShazer on
21  this property at all?
22      A   Yes.  Yes.  It all went through Jack
23  DeShazer.  Other than --
24      Q   Let me ask you this then.  The times you
25  saw the property with Allen Stringer, was

---

59

1  Mr. DeShazer there as well?
2      A   No.
3      Q   Did you ever meet with Mr. DeShazer before
4  you entered into the buy-sell agreement about the
5  property?
6      A   Not to my knowledge.  No.
7      Q   In discovery responses, Mel, we also
8  received something that I understand was produced by
9  your wife.  It's on page 25 of your responses.
10  Do you recognize that?
11      A   Yes.
12      Q   Do you remember when that was done?
13      A   That was done at the same time that this
14  proposal was submitted.
15      Q   It was submitted with the proposal?
16      A   That is correct.
17      Q   Okay.  Do you know why your wife did that?
18      A   Why she put that in there?
19      Q   Right.
20      A   I was the one that -- I was the one that
21  drafted that.
22      Q   Oh.  And why did you do that?
23      A   Because I believe in it.
24      Q   You added that as a selling point on your
25  philosophy?

---

60

1      A   Yes, sir.
2      Q   Mel, I apologize if I asked you this
3  before, but the documents from the long shed that
4  the EPA took possession of when they took possession
5  of the property, do you know where they have those
6  now?
7      A   No, sir, I do not.  I do not know where
8  they have them.
9          MR. LEWIS:  That's the buy-sell.
10          MR. MacDONALD:  Thanks.
11          MR. LEWIS:  Just the front.
12          MR. MacDONALD:  I'll just take a
13  look at that at the next break or something.
14  BY MR. MacDONALD:
15      Q   Mel, I'm handing you -- I don't think we
16  need to mark it as an exhibit.  It was something
17  that I received in your discovery responses, pages
18  26 through 36 of those responses.  Do you recognize
19  that?
20      A   Yes, this is part of the proposal.
21      Q   And that accompanied the Exhibit 1 that's
22  already been attached as an exhibit to this
23  deposition?
24      A   Yes.  Yes, sir.
25      Q   Okay.  That's all.

---

**61**

1        MR. LEWIS: Did you identify it
2   for purposes of identification?
3        MR. THUESON: Yeah, he did. He
4   just identified it as pages to the exhibit.
5        MR. LEWIS: Best way to do it.
6   BY MR. MacDONALD:
7    Q   Mel, your offer eventually went to
8   $3,050,000?
9    A   I believe that that's what the final offer
10  was.
11   Q   Whatever your final offer was --
12   A   Yes.
13   Q   -- you never received a response as to why
14  it was not acceptable to Grace?
15   A   No. The first indication of it was that
16  KD&C had bought the property.
17   Q   Have you ever asked Allen Stringer or
18  anyone from W.R. Grace why they didn't sell you that
19  property?
20   A   The property -- What was surprising to us
21  was that Jack Walters came and talked to us with
22  Allen Stringer, as I mentioned, prior to getting the
23  last bid in there. And we did not know Mr. Walters
24  prior to that point in time in there.
25        And he said who he was. And he was

**62**

1   responsible -- Actually Mr. Walters was the one that
2   provided us an offer to buy, and we had read through
3   that and Jack Walters' name was on that as a vice
4   president and manager of the fire protection
5   resources in there.
6        Then when the property was sold, all of a
7   sudden Jack Walters becomes a partner in KD&C. And
8   my wife and I both feel very strongly that because
9   of the questions that Jack Walters asked of us at
10  the last offer that he provided to us -- we provided
11  to him, that he was very interested in the property
12  itself and it became evident after he became a
13  silent partner in there, and we felt Jack was the
14  reason why we didn't get that piece of property in
15  there.
16        He was the one that was in charge of it,
17  he was the one that took our proposal from us, and
18  he was the one that ended up being in partnership
19  when they bought the property. So we felt that we
20  were cheated out of it. Yes, sir.
21   Q   Did you ever ask anybody why your ultimate
22  offer was not accepted?
23   A   We expressed our concerns to Allen
24  Stringer that we didn't feel it was very proper that
25  Mr. Walters would be in charge of the sale of the

**63**

1   property knowing what price we were willing to pay,
2   and we do not know to this date what KD&C had paid
3   for the property.
4    Q   But did you ask Allen why it was not sold
5   to you?
6    A   No, other than expressing our views in
7   there, no. You know. We didn't ask him why it
8   wasn't sold, I guess, no -- No, I can't say
9   definitely.
10   Q   Okay. So I take it that Allen never
11  offered that information, either, then? He never
12  told you why it was not sold to you?
13   A   No, sir.
14   Q   Between 1986 and 1997, Mel, did you ever
15  have the Raintree business appraised by an outside
16  appraiser?
17   A   No.
18        MR. THUESON: Through what dates,
19  Counsel?
20        MR. MacDONALD: '86 through '97.
21        THE DEPONENT: (Deponent nods
22  head.)
23  BY MR. MacDONALD:
24   Q   And that wasn't required by -- to the best
25  of your knowledge, by the bank in any of your

**64**

1   requests for financing?
2    A   Once again, you might be better clarified
3   by my wife, but my understanding was that all loans
4   were drawn against -- they could not be drawn
5   against the business, they had to be drawn against
6   the real property in the form of a house -- houses
7   and that type of thing. The business downtown.
8    Q   Okay. Have you been able to run the
9   retail business since you were dispossessed of the
10  property up at the screening plant property?
11   A   No, sir.
12   Q   How come?
13   A   Because everything that is produced up at
14  the screening plant pretty much is what is sold
15  downtown.
16   Q   You don't buy from wholesalers and sell
17  retail downtown?
18   A   To some extent we could, yes, sir.
19   Q   Did you keep doing that?
20   A   Yes.
21   Q   To what extent?
22   A   Right up to that point in time. Some of
23  that material was bought from wholesalers, but the
24  primary portion of it came right off of the
25  screening plant.

**PARKER vs W.R. GRACE & COMPANY**                    **Deposition of MEL PARKER**

---

65

1    Q    Once you no longer had possession of the
2    screening plant property, why didn't you continue to
3    do the retail work by purchasing materials from
4    wholesalers and using your downtown business?
5    A    In the state of dispossession of the
6    property in there, we were pretty much in a state of
7    chaos. We spent a great deal of our time dealing
8    with the EPA on the property for one reason or
9    another on there, and the home that we lived in at
10   this point in time in there had to be refurnished.
11   You know, it just was not practical to do that.
12   Q    So has -- The retail business downtown,
13   has that been closed since November of '99?
14   A    Yes, sir.
15   Q    And Mel, you own that property downtown?
16   A    My wife and I, yes, in joint ownership.
17   Q    Is that property owned free and clear or
18   do you have a mortgage on that property?
19   A    There is a loan on that property.
20   Q    Is that with Glacier Bank as well?
21   A    That is correct.
22   Q    And how about the screening plant
23   property? Do you still --
24   A    It's free and clear.
25   Q    It is free and clear?

---

66

1    A    Yes, sir.
2    Q    Okay. How long has it been free and
3    clear, do you know?
4    A    Once again, you might check with my wife
5    on that. She would know for sure.
6    Q    What's your best recollection?
7    A    I think the last two years.
8    Q    Since running the business at the
9    screening plant property in 1993, Mel, do you
10   remember any significant expansions in your business
11   in terms of certain products or certain lines of
12   business?
13   A    Yes, sir, the expansion on the
14   reforestation business increased because we were
15   able to set up more greenhouses.
16   Q    And how many greenhouses did you set up on
17   the property?
18   A    There was six.
19   Q    Any others?
20   A    Any other businesses?
21   Q    No, any other aspects of the business that
22   increased considerably after you took over the
23   screening plant property?
24   A    Yeah, the screening plant -- My wife
25   started the Reishi mushroom project. She opened up

---

67

1    the herbal -- she called it Herbal Scent, because we
2    were able to grow herbs out on the property there.
3    And then also in the landscaping, growing trees
4    and -- growing shrubs and flowers and this type of
5    thing. So basically the whole thing expanded from
6    what it was prior to that.
7    Q    When did your wife start the Reishi
8    mushroom aspect of the business?
9    A    In 1999.
10   Q    How about the sale of -- or, the growth of
11   herbs for ultimate sale?
12   A    That basically came between 1997 and 1998.
13   Q    And how about the --
14   A    I need to apologize. On the Reishi in
15   there, that began in basically 1998.
16   Q    Okay. And what type of landscaping work
17   were you referencing?
18   A    In terms of landscaping, trees -- trees
19   and shrubs. Landscaping for residential and
20   commercial areas. This type of thing.
21   Q    Who actually did the physical work to do
22   that landscaping?
23   A    My wife and then people we had employed.
24   Q    Do you remember about what year the
25   landscaping aspect of the business started?

---

68

1    A    The overall landscaping? We started the
2    landscaping business prior to when we had moved out
3    to the screening plant in there.
4    Q    And it just grew through the years?
5    A    That is correct.
6    Q    Were there any aspects of the business
7    that substantially decreased or you cut out of the
8    business after moving to the screening plant?
9    A    We cut back on that because the demand for
10   growing an increased product in reforestation was
11   there. So that decreased. And the landscaping
12   somewhat decreased in the amount that we were doing.
13   Q    Okay. You mentioned that you first found
14   out that there may be a problem with asbestos on the
15   property in November of '99; is that right?
16   A    That is correct.
17   Q    You had read the newspaper articles before
18   you were approached by the EPA?
19   A    Yes, sir.
20   Q    And who approached you from the EPA?
21   A    Mr. Paronard came, Mr. John Konstan. And
22   then Mr. Paronard had two other individuals with him
23   who were taking samples -- soil samples.
24   Q    And you allowed access to take the soil
25   samples?

---

**PARKER vs W.R. GRACE & COMPANY**        **Deposition of MEL PARKER**

---

69

1    A  Yes.  He was wondering whether he could
2  take an overall walk through the property, and so we
3  accompanied him and did so.
4    Q  Did you immediately shut down the
5  business?
6    A  Yes.  Yes.  We went into the tunnels,
7  among other things, and Mr. Paronard took a look at
8  our situation down there and said, You have a
9  problem here.
10    Q  And he told you that before receiving any
11  results of the tests?
12    A  Yes, sir, he did.
13    Q  Did he tell you to shut down your
14  business?
15    A  No, he just said, You have a problem here.
16  And you have to realize that at that point in time
17  pretty much our nursery operation was down for the
18  winter in there.  The reforestation, the
19  landscaping, everything is pretty much completed by
20  that point in time, but the Reishi was still
21  ongoing.
22    Q  Okay.  How much in terms of quantity of
23  Reishi mushrooms did you have at that point?
24    A  Once again, my wife has all of the
25  information that basically relates to that.  That

---

70

1  was her project.
2    Q  Do you have any recollection of it?
3    A  Not at that point in time; no, sir.
4    Q  When did you first receive results of the
5  testing that had been done by the EPA?
6    A  That I cannot say for sure other than they
7  came back and they tested during the months of
8  December -- there was testing going on there.
9  I would think it was a fair guess to say that the
10  first real results came back in March, the following
11  year.
12    Q  March of 2000?
13    A  That is correct.
14    Q  Okay.  And what was your understanding of
15  those test results?
16    A  The test results indicated that the
17  property was pretty much contaminated with asbestos
18  at different levels.
19    Q  Did you have any knowledge of the
20  difference between the airborne contamination versus
21  soil contamination, Mel?
22    A  Not prior to when the EPA arrived.
23    Q  Yeah.  And I'm talking about after you
24  received the airborne results -- I'm sorry, after
25  you received the EPA testing results.  Did you talk

---

71

1  to the EPA about the airborne risk at that time?
2    A  Yes, because the EPA came in and sampled
3  our house, sampled down in the long shed.
4    Q  And what did the EPA tell you about the
5  health risks of what they found airborne versus what
6  they found in the soil?
7    A  That's when the EPA told us that they have
8  an immediate concern, which means to us that there
9  was a level there that was not acceptable.
10    Q  Did they tell you anything about the
11  difference between the risk of the airborne asbestos
12  that they found versus the asbestos found in the
13  soil?
14    A  They said that there was -- My
15  understanding is that there was two different
16  indicators -- the figure you would get for air was
17  not the same way that it was measured for the soil.
18    Q  But in terms of health risks, what was
19  your understanding of the difference, if any?
20    A  No, sir, the difference was that the air
21  indicated that there was an immediate concern, the
22  soil indicated that it was higher than what was
23  acceptable.
24    Q  Okay.  Did the EPA tell you that cleaning
25  of the structures on the property was not an option?

---

72

1    A  What happened there is that in the month
2  of March the EPA brought in a crew of five
3  individuals that were from all over the United
4  States.  They took a look at the property, took
5  measurements, whatever, and finally came back to the
6  EPA and stated that it was much more economical to
7  tear them down than it was to clean them and leave
8  them in place.
9    Q  So it was your understanding it was
10  because of economics, not because of impossibility
11  to clean these structures?
12    A  The economics of it; yes, sir.
13    Q  Okay.  When they told you that there was
14  an immediate concern in March of 2000 with regard to
15  the airborne asbestos that they found --
16    A  The airborne, that is correct.
17    Q  -- did they tell you to leave the property
18  immediately?
19    A  Not immediately; no, sir.
20    Q  Did you ask them if you should leave the
21  property immediately?
22    A  Yes, sir, I believe we did.  We asked
23  whether we should leave immediately, and their
24  response was, No, not immediately.
25    Q  Did you ask them why, if they had an

---

**PARKER vs W.R. GRACE & COMPANY**

---

73

1  immediate concern that you weren't told to leave
2  immediately?
3      A  We understood that we would eventually be
4  moved off of the property there and -- That's not
5  answering your question in here. No. No.
6      Q  Did they ultimately tell you to leave the
7  property or did you voluntarily leave?
8      A  No, they -- June the 15th, that was the
9  exclusion of the property.
10     Q  And when did they tell you that you had to
11  be gone by June 15th?
12     A  I would guess in May, after they had done
13  the assessment on the property and what they were
14  going to do in terms of the cleanup, and the
15  scheduling had been established that that's when
16  they determined that we needed to be off the
17  property.
18     Q  And did they give you any documentation as
19  to when you were to be off the property, what you
20  could take, what you couldn't take, that kind of
21  thing?
22     A  What we could and couldn't take had
23  already been determined prior to the time of June
24  the 15th in there. They had already established a
25  means of determining the level of contamination.

---

74

1      Q  Did you receive documentation -- written
2  documentation as to what you could take --
3      A  No, sir.
4      Q  -- or what you could not take?
5      A  No, sir.
6      Q  Did they verbally tell you what you could
7  take and what you couldn't take?
8      A  They verbally told us what could be
9  decontaminated and what could not be contaminated.
10     Q  And what could be decontaminated?
11     A  Basically decontamination would be wood
12  products that do not have finish on them. And
13  pretty much that was it.
14     Q  How about your -- your clothes?
15     A  Clothes were not. They were contaminated.
16  They sampled them and they found contamination.
17     Q  In your clothes?
18     A  Yes, sir.
19     Q  So you left all your clothes when you left
20  on June the 15th?
21     A  That is correct.
22     Q  Did you have any wood products that you
23  took with you that didn't have a finish on them?
24     A  What we did is there were things that had
25  sentimental value to us; pictures, things that had

---

75

1  been given to us back and forth for gifts and
2  whatnot. They went through the effort of
3  decontaminating them as best they could and then
4  resampled them again, and we were able to get some
5  of those things. Some things were not able to be
6  decontaminated.
7      Q  And the place that you're leasing, was it
8  furnished?
9      A  Yes. It was furnished. It was furnished
10  to the point where we ended up purchasing some of
11  that material to replace what we had lost on the
12  other property.
13     Q  Like what types of things did you
14  purchase?
15     A  Well, we had to purchase a bed. We had to
16  purchase pretty much everything because just about
17  everything in the house was taken. It was
18  contaminated. It was destroyed.
19     Q  In the leased property, was there any
20  furniture in there that was part of the property
21  that you were leasing?
22     A  Very little of it. Some cabinets that had
23  finishing on it were brought over. Other than that,
24  that's the limitation of it.
25     Q  I'm not being very clear, Mel. I

---

76

1  apologize. When I asked you about, was the
2  apartment -- or, the place you're living in now, was
3  it furnished, as part of the lease agreement did the
4  landlord provide any furniture or those types of
5  things?
6      A  No, sir, he did not. He took basically
7  anything that we did not want to buy. He was moving
8  to another house that was very much smaller than
9  what the one that we had leased was in there so
10  consequently we had the opportunity to purchase
11  those things that we had prior to the removal up
12  until the point in time where we moved onto that
13  property in there.
14     Q  Do you remember how much money you spent
15  in terms of furnishing this residence that you're in
16  now?
17     A  My wife would have that figure for you.
18     Q  You don't know?
19     A  No, sir, not really.
20     Q  In addition to a bed, what other types of
21  things do you recall purchasing for the new
22  residence?
23     A  We had to buy, for example, the
24  refrigerator, we had to buy the stove, we had to
25  rebuy some of the cabinets in the front room. We

---

**PARKER vs W.R. GRACE & COMPANY**            **Deposition of MEL PARKER**

---

77

1  lost the davenport, the chairs. Anything that a
2  person would basically consider as a part of your
3  home, that's what had to be replaced. We still
4  don't have some of those things. We're getting by
5  with the necessities right now.
6      Q  Mel, in terms of where you stand now, once
7  this property -- the screening plant property is
8  cleaned up, what are your intentions with regard to
9  that property?
10     A  To be honest with you, I'm not optimistic
11  about the screening plant being cleaned up.
12     Q  Okay.
13     A  I'm more discouraged after what I've heard
14  this morning. I am more discouraged after the
15  information that was provided to us when the EPA
16  moved off in November.
17     Q  Prior to this morning, and assuming, Mel,
18  that it can be cleaned up and it will be cleaned up,
19  is your intention to relocate there and proceed with
20  the Raintree business?
21         MR. LEWIS: Object to the form of
22  the question on the ground that it assumes something
23  that is probably scientifically impossible and
24  certainly is outside the -- any set of facts that
25  can be safely assumed in this case.

---

78

1  BY MR. MacDONALD:
2      Q  You can go ahead and answer.
3      A  That would be my answer, because he has a
4  better understanding than I do, sir.
5      Q  Well, no, what I'm asking you, Mel, is
6  assuming that it can be cleaned up, because we
7  disagree on that point. Okay? Assuming it can be
8  cleaned up, do you have intentions of relocating and
9  residing on the screening plant property and
10  resuming the Raintree business?
11         MR. LEWIS: Object to the form of
12  the question on the grounds it contains testimony of
13  counsel. It's an unintelligible question. It's a
14  compound question, and for the same basis that I
15  previously stated in an objection to the prior
16  question.
17         MR. THUESON: Terry, may I say
18  something?
19         MR. MacDONALD: Sure.
20         MR. THUESON: When you say
21  "cleaned up," do you mean made marketable so there
22  is no stigma about the land whatsoever? It's fully
23  marketable?
24         MR. MacDONALD: No, I mean --
25  Yeah, I guess that would be it.

---

79

1         MR. THUESON: As if this never
2  happened, is what you're saying?
3         MR. MacDONALD: Exactly.
4  BY MR. MacDONALD:
5      Q  If this can be cleaned up and get a clean
6  bill of health from the EPA and everybody else, is
7  your intention to rebuild the business and live on
8  the screening plant property?
9         MR. THUESON: You mean --
10        THE DEPONENT: Based on your
11  rewording of the question here, yes, if that
12  property was made marketable, there was no deed
13  restriction on the property there, I would retain --
14  I speak for myself. I would retain the property and
15  I would build a home on it because that was the goal
16  of retirement, to build a home on the river.
17  BY MR. MacDONALD:
18     Q  Have you and your wife talked about
19  restarting the Raintree business?
20     A  No, sir. We have not anticipated doing
21  that whatsoever.
22     Q  Okay. And why not?
23     A  Well sir, I'm 63 years old and I'll be 64
24  here in four months, and I have nothing. I mean,
25  it's pretty evident that over the 14 years I had a

---

80

1  hell of a lot and right now I have nothing.
2      To start over again, to solicit for
3  contracts that took us 14 years to develop in there,
4  to build up, for example, the storage in the long
5  shed from people that brought in boats and RVs that
6  have had to go elsewhere or whatever, it's just --
7  No, sir. No.
8      Q  Okay.
9      A  I do not anticipate starting the business
10  up again.
11     Q  Has your wife ever said to you that she
12  anticipates starting up a nursery-type business
13  again?
14     A  My wife would -- She never said that
15  basically, to me, that she would or wouldn't start
16  up. I would say the way things are going, it
17  fluctuates from one way to the other, and that she
18  would better answer your question for you.
19     Q  Mel, I'm just asking you what you
20  discussed with your wife. Do you recall your wife
21  ever saying that she was not going to start up the
22  business again?
23     A  No, sir, she never said that she wouldn't
24  start it up again.
25     Q  Okay. Now, Mel, after you were approached

---

**81**

1  by the EPA in November of '99, what was your first
2  contact with any representative of W.R. Grace?
3      A   The first contact that we had with W.R.
4  Grace would be with Allen Stringer and a fellow by
5  the name of Jim Stout, who was a contractor for W.R.
6  Grace. And they came -- they came to our property
7  there.
8      Q   Do you remember when they came to your
9  property?
10     A   No, sir, I can't give you an exact date
11 when they did come.
12     Q   How about the month?
13     A   I am thinking that it was not before the
14 first of the year -- of the year 2000 in there.
15     Q   And what discussions do you recall when
16 they came to your property?
17     A   Mr. Stringer apologized for the situation
18 that we were in. He said he was sorry. He stated
19 that he did not know that there was a problem on the
20 property in there. He knew we were good people.
21         He didn't make us feel any more
22 comfortable than what we were at that point in time
23 because we knew otherwise, that there was something
24 here that somebody knew about the property there and
25 we had been lied to. And so his visit there was not

**82**

1  taken very -- was, you know, taken very lightly in
2  there.
3      Q   Okay. And how had you been lied to
4  before?
5      A   In terms of --
6      Q   In terms --
7      A   -- contamination, you mean?
8      Q   Well, your response was, when Allen
9  Stringer approached you and said that he was sorry,
10 that you felt you had been lied to before.
11     A   My wife addressed him on that. Said
12 that -- And I don't know exact words. You could
13 question her on that in regard to it, but the
14 feeling was that when Allen Stringer came back --
15 went to visit us in there, we took him down through
16 the tunnels in there, and at that point in time
17 that's when we told him that W.R. Grace -- not
18 Grace, but the EPA had identified high levels of
19 vermiculite in the tunnels there, and that --
20         Allen was saying then that he wasn't aware
21 of it. We were saying -- Well, Lerah, she has her
22 exact wording for that. I don't know exactly what
23 it is. But I felt deceived on there; yes, sir.
24     Q   Okay. When -- Well, let me ask you, in
25 what way do you feel that you were deceived by

**83**

1  Grace?
2      A   I feel that somewhere along the line in
3  the purchase of the property W.R. Grace knew that
4  there was a problem and they sold us this piece of
5  ground knowing that there was contamination that was
6  not acceptable to humans.
7         And then I think what's happened -- you
8  know, since that period of time is that W.R. Grace
9  has sold us the property there, we have gone in
10 there in good faith, and the idea of the business
11 was that it would be passed on to our children over
12 the years and that we are basically raising -- we
13 raised one grandchild from the age of 5 up to 7. He
14 was in the tunnels with me when we cleaned it up.
15 And we have a daughter who has one of our
16 grandchildren. She was on the property consistently
17 in there.
18         And we have levels of asbestos there that
19 were shown to be between 3 and 5 percent right next
20 to the swing set. And here in Libby now we find out
21 that people are dying from this. They have got
22 asbestosis. And there is no reason for it, you
23 know. They can't identify the level of exposure
24 that brought that on.
25         And here we are, I'm 63 years old and how

**84**

1  can I justify my grandchildren, my employees, my
2  wife that they don't have asbestosis.
3      Q   So Mel, you feel you were deceived in that
4  Grace knew there was a problem prior to you
5  purchasing that property and didn't tell you?
6      A   That is correct.
7      Q   You don't allege that they made any
8  affirmative misstatements, do you? In other words,
9  nobody from Grace said, There is no problem with
10 this property, prior to you purchasing it?
11     A   Allen Stringer said he would clean this
12 property up. To me that is an indication that if
13 there was a problem, that problem would have been
14 addressed and done.
15     Q   Did you ever ask Allen after May of 1999
16 what he meant by, he would clean the property up?
17     A   No, sir. I did not. He cleaned it up to
18 my understanding to the way we agreed to when we
19 were in the buy-sell agreement in there. He would
20 take care of everything in that regard.
21     Q   Anything else you recall in that
22 discussion with Allen Stringer and Jim Stout the
23 first time you met with them that we haven't
24 discussed?
25     A   No, sir, that's what sticks in my mind the

**PARKER vs W.R. GRACE & COMPANY**                    **Deposition of MEL PARKER**

---

85

1  most is the fact that he said he didn't know that
2  there was a problem. I think that's what his
3  primary purpose for coming out there was, was to
4  tell us that he didn't feel that he -- There wasn't
5  a problem. Not that he didn't think. He said that
6  there was no problem that he knew of.
7      Q   What was your next contact with any Grace
8  representatives, Mel, after that?
9      A   I believe that it was on March (sic) the
10  9th that we were approached by the lawyers from
11  W.R. Grace; Mr. Cleary, Mr. Lund. And Mr. Stout was
12  also there at that meeting.
13      Q   Prior to March the 9th, you had only met
14  with Allen Stringer the one time?
15      A   Yes, sir, in my recollection, that was
16  pretty much it.
17      Q   And what do you recall of the discussion
18  that you had with the gentlemen from Grace on March
19  the 9th?
20      A   When the gentlemen from W.R. Grace came
21  on March the 9th, they provided for us an offer to
22  buy -- an offer for settlement.
23          MR. THUESON:  Was that April or
24  March 9th, or do you remember?
25          THE DEPONENT:  Pardon?

---

86

1          MR. THUESON:  Was that April 9th?
2          THE DEPONENT:  I believe that was
3  the 9th. The first one was the 9th and the next one
4  came on the 19th.
5          MR. THUESON:  I'm asking about the
6  month. You indicated March. That's your
7  recollection?
8          THE DEPONENT:  I'm sorry. It was
9  April the 9th. April the 9th. That is correct.
10  BY MR. MacDONALD:
11      Q   And again, Mel, prior to April the 9th
12  then you only recall the one discussion with Allen
13  Stringer?
14      A   Well, when you say "discussion," I mean,
15  we saw each other at the CAG meetings, meetings that
16  were in town, at the senate hearings, this type of
17  thing in there. Casual conversation. But as far as
18  I can recollect -- and my wife may come up
19  differently on that -- that's the only time I
20  remembered we expressed ourselves, that we felt we
21  had been lied to and deceived in there.
22      Q   Did you ever tell Allen Stringer that you
23  felt you had been deceived by him in the purchase of
24  the property?
25      A   No. My wife did. I was with her at that

---

87

1  point in time, but my wife made that comment.
2      Q   Do you know when she made that comment?
3      A   She will tell you that, I'm sure. I don't
4  remember exactly when.
5      Q   Do you know if it was in that first
6  meeting you had with him?
7      A   No, sir, I don't know that it was.
8      Q   You did not accept the offer that was
9  given to you by the Grace folks as a result of that
10  April 9th meeting; is that correct?
11      A   That's correct.
12      Q   Did you ever make a firm counter offer
13  with regard to your willingness to settle?
14      A   No, sir, we never made an offer at that
15  point in time. Grace came back with a second offer
16  on the 19th of April and made another offer.
17      Q   And you understood in this -- at this time
18  that there was a negotiation process going on?
19      A   Yes, sir, they indicated that. Yes.
20      Q   Mel, after the 19th, did you ever give a
21  firm counter proposal with regard to settlement?
22      A   No, sir, not after the 19th. The reason
23  for that was that on the 19th, when there was no
24  agreement made on their offer at that point in time,
25  the comment was made by Mr. Cleary that, Well, we

---

88

1  will see you folks in court five to seven years from
2  now. And that ended that.
3      Q   So Mel, are you saying that at no time did
4  you ever make an offer of settlement?
5      A   Yes, sir, I believe that we made an offer
6  of settlement in there at the time of the -- my wife
7  provided the information that she had and I believe
8  that there was an offer made to W.R. Grace at that
9  point in time. The exact amount, I wouldn't know
10  for sure. I would be guessing. But that can be
11  answered by my wife.
12      Q   And when you say "that point in time,"
13  what point in time are you talking about?
14      A   That point in time on the -- Just before
15  the collapse of the negotiations, you might say, my
16  wife had made an offer just prior to that -- my wife
17  had made an offer and that led to the end of the
18  negotiations.
19      Q   Okay. And you were there when she made
20  that offer?
21      A   Yes, sir. Yes, sir.
22      Q   And you don't have a recollection as to
23  what that offer was?
24      A   No, sir, I can't remember for sure,
25  because my wife had four or five different

---

**PARKER vs W.R. GRACE & COMPANY**          **Deposition of MEL PARKER**

---

**89**

1  combinations that she had written up, and then when
2  we took a break we all went our own way and then
3  when they came back my wife had made that offer
4  after she had worked on
5  it -- worked it up.
6      Q   And do you know if the offer that your
7  wife made was in writing?
8      A   Yes, my wife had a -- she had a breakdown
9  of the expenses and what she felt that the amount
10  should be. Yes, sir, she did have it written down.
11     Q   Did she provide that to the Grace
12  representatives?
13     A   My understanding is that she gave that to
14  the lawyers at that point in time.
15     Q   Did you keep a copy of that, Mel?
16     A   I believe that we did; yes, sir.
17  I believe that we did.
18     Q   And do you still have a copy of that?
19     A   To my knowledge, we do. Do you not have a
20  copy of that?
21     Q   I do not have a copy of that.
22        MR. MacDONALD: How about we take
23  another five minute break?
24        MR. THUESON: Okay.
25        (A recess was held in the proceedings.)

---

**90**

1          EXAMINATION RESUMED
2  BY MR. MacDONALD:
3      Q   Mel, in response to discovery, we received
4  a couple of proposed Letters of Intent as well as a
5  letter from you to the Grace folks that you were
6  negotiating with last spring. Do those documents --
7  are those pretty complete in terms of the
8  discussions that went back and forth with regard to
9  settlement?
10        MR. THUESON: Do you have them in
11  front of you, Counsel, so he can --
12        MR. MacDONALD: I've got one of
13  them is all.
14        THE DEPONENT: In terms of
15  complete, to cover all aspects of the settlement?
16  BY MR. MacDONALD:
17     Q   Yes.
18     A   No. Not really. They provide for
19  Grace's -- they provide for Grace's intentions on
20  that, but it didn't basically cover all of our
21  concerns in there.
22     Q   Okay. Did the document that we discussed
23  just before the break that you say you have a copy
24  of that was your counter offer, did that have
25  reference to all of your concerns?

---

**91**

1      A   Once again, my wife had drafted that in
2  there and I believe that it pretty much covered the
3  concerns that we felt were not addressed --
4  addressed and not addressed in that. Primarily not
5  addressed.
6      Q   Okay. Outside of the written documents,
7  either drafted by the Grace folks or by you folks,
8  were there any discussions made -- or, any
9  statements made, I'm sorry, by the Grace folks
10  regarding any of the terms that were outside of
11  these written agreements?
12     A   Not to my knowledge.
13     Q   Okay. Was there anything that the Grace
14  folks did to offend you in this negotiation process?
15     A   Yes, sir, there was.
16     Q   And what was that?
17     A   My wife -- When we looked at the initial
18  proposal in there, my wife had had a value there on
19  the Reishi program, and she was stating on how much
20  that would produce over the length of the project in
21  there, that particular project. And both Mr. Cleary
22  and Mr. Lund stated that with income like that, they
23  wouldn't be lawyers. You know, they would get out
24  of the lawyer business in there. And that did not
25  sit well with us. We felt that was very

---

**92**

1  unprofessional for two lawyers to make a statement
2  like that.
3      Q   Okay.
4      A   And I believe, sir, you have a copy of
5  that letter.
6      Q   I do. Do you remember what the amount was
7  of the income that your wife represented was to be
8  expected from the Reishi mushroom production?
9      A   Yes, sir, I believe that it was in the --
10  $900,000 over a five-year period.
11     Q   And would that have been $900,000 over a
12  five-year period in profit or just the gross
13  revenue?
14     A   No, that basically would include
15  everything in there. Primarily, though, it's
16  profit. Once it's set up, most of that income would
17  be a net income.
18     Q   Okay. So your understanding was the
19  $900,000 figure would be net income to the business
20  because of the Reishi production over the next five
21  years?
22     A   That is correct.
23     Q   Anything else that was done by the Grace
24  folks that offended you?
25     A   Yes, sir, there was. The time frame in

---

**PARKER vs W.R. GRACE & COMPANY**                    Deposition of MEL PARKER

---

93

1   there, these gentlemen were late getting to our
2   place and they had to go somewhere, so we only ended
3   up spending about an hour and a half talking to them
4   in regard to the whole operation and the whole
5   settlement in there, and we felt that that was
6   inappropriate for professionalism.
7      Q   Okay. Anything else you were offended by?
8      A   Offended by the offer, sir.
9      Q   Okay. Anything else?
10     A   No, sir, not at this point in time.
11     Q   Did you receive any money from Grace --
12     A   Yes, sir.
13     Q   -- in April of 2000?
14     A   We did.
15     Q   How much?
16     A   We received $40,000.
17     Q   And had you requested money from them at
18  that time?
19     A   I requested that $40,000 from Allen
20  Stringer; yes, sir, I did.
21     Q   And why did you request it?
22     A   Because our operation had been shut down
23  and we had expenses that related back to the year
24  19 -- you know, throughout 1999 in there, and also
25  we had to make payment on an appraisal that was made

---

94

1   on the property there, and it was quite extensive.
2   We also were anticipating the hiring of an
3   accountant to -- a certified public accountant in
4   there. And that's going to be a significant amount.
5      Q   And did you have an appraisal done?
6      A   Yes, sir, we did have an appraisal on the
7   property.
8      Q   Who did that?
9      A   A gentleman by the name of Mr. Lloyd
10  Barrie from Kalispell.
11     Q   And was that an appraisal of the business
12  or just the real property and improvements?
13     A   That was the real property only.
14     Q   Okay. Had --
15         MR. THUESON: I don't think he
16  understands "improvements."
17  BY MR. MacDONALD:
18     Q   The buildings on the property?
19     A   Yes, sir.
20     Q   It included the buildings?
21     A   Yes, sir, it was the buildings, the
22  infrastructure, but it didn't do with the business
23  itself. In other words, the inventory or anything
24  like that. It was just a real property -- the value
25  of the land itself, this type of thing.

---

95

1      Q   Okay. Did the Grace folks ask to see
2   that?
3      A   No, sir, not to my knowledge.
4      Q   Did you ever provide that to them in the
5   negotiations in April?
6      A   No, sir, it was not asked for. I guess if
7   I might go back to, were we insulted or
8   disappointed, yes, we were, because they never asked
9   us for any of the values on any of our property,
10  what figures we had basically come up -- This is
11  what they came up with and that was it.
12     Q   And you mentioned money for CPA work. Who
13  was the CPA?
14     A   The CPA was a fellow by the name of --
15  Mr. Gilbert was his name. My wife had
16  correspondence and conversations with him. She
17  could better relate to that.
18     Q   You weren't present during those
19  discussions?
20     A   No, not with that gentleman, no.
21     Q   Do you have a copy of that appraisal that
22  was done by Lloyd Barrie?
23     A   Yes, sir, we do.
24     Q   Mel, have you, since leaving the
25  property -- what we have described as the screening

---

96

1   plant -- have you had any negotiations with the EPA
2   with regard to the EPA purchasing that property from
3   you?
4      A   Purchasing the land?
5      Q   Uh-huh.
6      A   No, sir.
7      Q   Mel, what was the fraud case about
8   regarding Phil -- I can't read my own handwriting.
9      A   Phil Landis.
10     Q   -- Landis? What was that about?
11     A   That basically dealt with the Reishi
12  project in there. He had got us involved into a
13  training program where we would grow the mushrooms
14  and he would basically sell the final product. And
15  the lawsuit was based over the fact that he was
16  supposed to provide us with a material that is used
17  to activate the mushrooms in the logs and he failed
18  to deliver that at the right point in time. He
19  claimed he had an accident and he had lost it and
20  the whole bit. And so that was what the lawsuit
21  stemmed over.
22     Q   Did you have representation in that
23  lawsuit?
24     A   Yes.
25     Q   Legal representation?

---

**PARKER vs W.R. GRACE & COMPANY**          **Deposition of MEL PARKER**

---

**97**

1  A  Yeah, we had Mr. Slomski, who is the
2  assistant county attorney, represent our case.
3  Q  So it was prosecuted criminally then?
4  A  That is correct.
5  Q  Did it go to trial?
6  A  Yes, sir, it did.
7  Q  Did you testify in that trial?
8  A  No, sir, I did not.
9  Q  Did your wife testify in that trial?
10  A  Yes, sir, she did.
11  Q  Were there documents generated between
12  yourself or the Raintree business and Phil Landis
13  regarding the Reishi mushroom business and what he
14  was supposed to do?
15  A  Yes, sir, we basically had an agreement
16  with Mr. Landis on there on the training program and
17  what his fees would be and what his expectations
18  were. We do have that.
19  Q  Okay. And he was found guilty of fraud?
20  A  That is correct.
21  Q  Was any part of his sentencing to repay
22  you anything?
23  A  Yes, sir, it was to reimburse us the money
24  we had put down for the material that was to be
25  injected into the logs.

---

**98**

1  Q  And how much was that?
2  A  Once again, my wife would be better able
3  to respond on the total amount that we had involved.
4  To me -- It seems to me it was around $2,000 for
5  that.
6  Q  And had you ever had anybody else come in
7  and provide this material for you, for the business?
8  A  No, no, not -- No.
9  Q  Mel, once you got the screening plant
10  property, what improvements did you make to the
11  property? And by "improvements," I mean what did
12  you build on the property or what landscaping type
13  work did you do?
14  A  Well, we built a home on the property
15  there. We improved on the long shed. We built an
16  extraction room within the long shed, which is used
17  for extracting seed from cones. We built, of
18  course, the greenhouses. We set up the six
19  greenhouses on the property there. We had what we
20  call the west shed, which was another area that
21  Grace had left on the property.
22  We filled in the bins -- the bins were
23  basically filled in. What we did was built floors
24  on those -- what used to be the bins there. We
25  built a solarium onto the house. We built what

---

**99**

1  they call a Reishi room, which connected the
2  tunnels -- the two tunnels together where we had the
3  Reishi project going in there. And we put a fence
4  on the property.
5  We put infrastructure in terms of water
6  coming from Rainey Creek on to both sides of the
7  creek. We have infrastructure in terms of water and
8  electricity that pump the water out of the river
9  onto the property there. We established herb
10  beds -- raised herb beds on the property.
11  And over the course of the period of time
12  we were on Raintree my wife and I planted 1,065
13  trees and shrubs and made it what it looked like,
14  you know, prior to the destruction on there.
15  We built a horse path. We have a horse.
16  That was one of the goals of retirement was we both
17  enjoy driving a horse carriage. And that was also
18  put onto the property there. And that's, you know,
19  pretty much it.
20  Q  Okay.
21  A  On the other side of the creek, which
22  would be the south side of the creek in there, we
23  reestablished the orchard in there, replanted a
24  number of fruit trees, reseeded the property, put in
25  grass on the entire properties.

---

**100**

1  I would say in my own mind that there is
2  not a piece of ground on that property now that
3  doesn't have some form of vegetation on it.
4  Q  Do you remember how much it cost you to do
5  the work on the long shed?
6  A  That was -- On the long shed itself in
7  there was right at $18,000.
8  Q  Okay. And how about the cost of the work
9  on the extraction room?
10  A  The extraction room, there was $7,000 in
11  it.
12  Q  And six greenhouses?
13  A  The six greenhouses was over one-hundred-
14  and-some thousand dollars. I can't give it to you
15  offhand here.
16  Q  And how about the floors that you put in
17  the west shed?
18  A  That was approximately $3,500.
19  Q  How about the cost of the solarium?
20  A  The solarium was right around $7,000.
21  Q  How about the Reishi room?
22  A  The Reishi -- Setting up the Reishi room,
23  I believe it was right at $33,000.
24  Q  And the fencing that you did?
25  A  The fencing was at $12,000.

---

**PARKER vs W.R. GRACE & COMPANY**                    **Deposition of MEL PARKER**

---

101

1    Q  The infrastructure you talked about, the
2  water, the electricity, do you have any estimate on
3  the cost of that?
4    A  Oh, man -- No, because we had to bring --
5  Offhand I couldn't even tell you what that is in
6  buried lines that were five feet deep and we took
7  them for as much as 300 yards -- No, sir, I cannot.
8  I cannot give you that figure.
9    Q  That would be part of the cost of building
10  the home?
11    A  No, the home -- The home basically that we
12  lived in already had the infrastructure in it.  That
13  would -- You know, the septic tank and the
14  electricity and the water was already provided in
15  what used to be the office of W.R. Grace.
16    Q  So the infrastructure you were talking
17  about was for what --
18    A  In addition to -- for irrigation.
19  Irrigation on the property for the greenhouses.
20    Q  Okay.
21    A  The entire property was covered with
22  water.
23    Q  You don't have an estimate of what the
24  cost of that infrastructure is?
25    A  No, sir.  My wife may be able to cover

---

102

1  that for you.
2    Q  How about the cost of the trees and shrubs
3  that you placed on the property?
4    A  $72,000.
5    Q  Mel, do you have these costs outlined
6  somewhere?
7    A  Yes, sir, they are.
8    Q  And where are they outlined?  Was that
9  prepared some time since this litigation started?
10    A  Those values were established partially in
11  the appraisal of the property -- the real property
12  in there.
13    Q  How about the horse path?
14    A  The horse path in there, yes, sir.  That
15  is also included in the appraisal.
16    Q  And what was the cost of that?
17    A  Offhand it's difficult to relate to that.
18  Once again, I would rather, rather than make an
19  estimate on that, just refer that to my wife.
20    Q  Now, Mel, when you purchased the
21  property -- the screening plant property, was there
22  expanded vermiculite on the property?
23    A  Yes, sir, there was.
24    Q  And did you ask Allen to remove that
25  expanded vermiculite before you took possession of

---

103

1  the property?
2    A  There was no expanded vermiculite.  All
3  right?  It was unexpanded -- unexfoliated
4  vermiculite on the property there.
5    Q  Okay.  At any time did you bring expanded
6  vermiculite onto the property?
7    A  Yes, sir, we purchased vermiculite --
8  expanded vermiculite in our operation.
9    Q  And when did you do that?
10    A  There was at least two different occasions
11  in there, which would be right around 1997, 1998.
12    Q  And why did you purchase expanded
13  vermiculite?
14    A  Because in the business of reforestation,
15  the media that is used to grow the seedlings in is
16  50 percent peat and 50 percent expanded vermiculite.
17    Q  But you had been doing reforestation work
18  for several years prior to '97, hadn't you?
19    A  That is correct.
20    Q  Why didn't you use expanded vermiculite
21  prior to '97?
22    A  We did use expanded vermiculite prior to
23  1997.  The thing that -- And I can't explain it to
24  you exactly when that was done, but we have a
25  machine, a cement mixer where we could mix our own,

---

104

1  and at one point in time the cost of buying the
2  ready combination of peat and vermiculite was
3  cheaper than us doing it ourselves.
4      So that's what we did for a number of
5  years was go ahead and use the material that was
6  already bagged, and then in the last years of the
7  time before it was destroyed, then we fired up our
8  own cement mixer again and mixed a combination of
9  peat and vermiculite.
10    Q  Okay.  So I'm just a little confused then,
11  Mel.  Prior to '97 you were using unexpanded
12  vermiculite in this process?
13    A  I'm not saying prior to 1997, in there.
14  I'm saying that what I recollect, as the primary
15  times that we were using this expanded material, was
16  1997, 1998, in there.  Yes, prior to that, even when
17  we were over in the Rollins tracts in there, we had
18  expanded vermiculite that we had gotten from
19  Robinson over in Great Falls.  We had gotten that
20  material -- bought 300 bags at that point in time
21  from those folks, and that was used not to mix the
22  vermiculite and the peat but it was used as a top
23  dressing.  In other words, you plant the seed, then
24  in order to keep it from floating off when you water
25  it, you cover over the top, and that's what that

---

105

1  material was used for in there.
2       Q   Okay. And did you go over to Great Falls
3  to buy those bags of expanded vermiculite from
4  Robinson?
5       A   No, sir, W.R. Grace -- Robinson brought
6  the material over to us on a truck.
7       Q   Do you know who was driving that truck?
8       A   Oh, Lord, no, sir. No.
9       Q   Do you know who you ordered it from?
10      A   From Robinson in there. And once again,
11  my wife ordered that material in there. My
12  understanding was that they had called her up in
13  regard to that.
14      Q   That was sometime prior to you owning the
15  screening plant property; is that right?
16      A   Yeah, that would be back around, like,
17  1987, somewhere in there.
18      Q   When you moved onto the screening plant
19  property, did you have any of the 300 bags left?
20      A   Yes, sir, there was a few of the bags that
21  were left in there.
22      Q   How many did you bring onto the screening
23  plant property?
24      A   Once again, my wife has that inventory.
25      Q   You don't know?

106

1       A   Not for sure, no, sir. I know that they
2  were there. I had seen them.
3       Q   What do they look like?
4       A   They were, I believe, in four cubic foot
5  bags in there and they had a different label on them
6  now than what you have got in terms of the color of
7  them.
8       Q   All 300 bags didn't have the same label?
9       A   Yeah, all 300 bags were number 3
10  vermiculite as I remember them in there, and, yes.
11      Q   And what color was the bag?
12      A   As I remember, the color of the bags
13  was -- it had a pink boundary on it, I believe.
14      Q   And did the bags say Robinson Insulation
15  on them?
16      A   Yes, sir, to my knowledge, they did, yes.
17      Q   Do you have any of those bags to this day?
18      A   No, sir, once again, those bags were
19  destroyed with the inventory and the property there.
20      Q   By the EPA?
21      A   Yes, sir.
22      Q   So out of the 300 bags that you purchased
23  in the '80s, as late as the summer of 2000 you still
24  had some bags of vermiculite from Robinson
25  Insulation?

107

1       A   Yes, sir, because there was 300 bags and
2  when you top dress you don't use that many bags.
3       Q   How come you bought so many then?
4       A   Because they needed to bring a truckload
5  over. They wouldn't bring anything other than a
6  truckload of that material in there.
7       Q   And your testimony is that Robinson
8  Insulation -- somebody from Robinson Insulation
9  contacted you about the sale of this?
10      A   Yes, sir, my wife may verify that. She
11  may even know the gentleman that called. I do not
12  know that, sir.
13      Q   Do you remember why they contacted you?
14  I mean, how did they know about you guys?
15      A   The impression I got was that they were --
16  in fact, once again, you may ask my wife. I got the
17  impression that that was one of the last loads they
18  had over at Robinson.
19      Q   Before they ceased operations?
20      A   Yes, sir. And when that is, I do not
21  know.
22      Q   Now, the bag you're talking about, you
23  said it had a pink boundary?
24      A   That's how I remember it. Just the edge
25  of it was --

108

1       Q   What was the rest of the bag color, if it
2  had a pink boundary?
3       A   I couldn't tell you that.
4       Q   Out of 300 bags you can't tell me?
5       A   No, and the reason for that is we got
6  vermiculite from other places in there and those are
7  all different from the ones we used. The
8  vermiculite that's expanded that we got from
9  Chandler, Arizona in there, and that's where we were
10  dealing with primarily in there, those were all
11  different colored bags in there.
12          The bags we got from Sierra Grace prior to
13  when we were in the Rollins tract in there that we
14  used for mixing with the peat in there, they were
15  different colored bags in there.
16      Q   Okay. So all of the vermiculite that you
17  received from Robinson Insulation was unexpanded
18  vermiculite?
19      A   No, it was a number 3 vermiculite in
20  there, so it was expanded.
21      Q   Oh, okay. So Mel, you lost me on one
22  thing. You bought 300 bags and you still had some
23  of that left when you left the property in the
24  summer of 2000, correct?
25      A   Correct.

**PARKER vs W.R. GRACE & COMPANY**

---

**109**

1  Q  Okay. But you also purchased some
2  expanded vermiculite from many other sources over
3  the years; is that right?
4  A  Yes, sir.
5  Q  If you hadn't used the 300 bags of
6  expanded vermiculite since the '80s, why were you
7  purchasing other expanded vermiculite?
8  A  Because the material that we got from
9  Robinson was number 3, which basically it was only
10 good for putting on top dressing. The other
11 material we got was a larger grade of vermiculite
12 and that's what we needed to mix with the peat to
13 grow the seedlings in.
14 Q  Okay. Have you ever seen the invoice from
15 Robinson Insulation for the sale of that
16 vermiculite?
17 A  No, sir, I think my wife has the
18 information that maybe you would want to ask her
19 about in regards to that.
20 Q  Okay, but you have never seen the actual
21 receipt --
22 A  I never saw the invoice. I never handled
23 that portion of the business in there. That's why
24 so many of the questions you ask I relate to my
25 wife.

---

**110**

1  Q  Okay. But this bag on this number 3
2  vermiculite from Robinson Insulation actually said
3  "Robinson Insulation" on it?
4  A  Yes, sir, I believe that it did. I really
5  do believe that it did in there. I'm just trying to
6  focus in my mind on the bags we did have on there.
7  Knowing that they came from Great Falls, from the
8  Robinson company in there, and that they did the
9  expansion, that's where my answer is coming from in
10 there.
11 Q  So you can't recollect actually seeing
12 "Robinson Insulation" on one of those bags?
13 A  No, sir. No more than I can remember
14 seeing "Sierra Grace" or "Chandler" in there, but
15 knowing that that's where they came from in there.
16 Q  Okay. What -- You said four cubic yard
17 (sic) size --
18 A  Four cubic foot bags.
19 Q  I don't think there would be a 4 cubic
20 yard bag.
21 A  That would be a dandy, wouldn't it?
22 Q  Have you itemized, Mel, the personal
23 property that you have lost as a result of leaving
24 the property -- the screening plant property?
25 A  Yes, sir, that has been -- that has been

---

**111**

1  appraised.
2  Q  And who did that appraisal?
3  A  A fellow by the name of Crookshanks out of
4  Missoula.
5  Q  Do you know what his occupation is?
6  A  That is what his occupation -- Him and his
7  wife work together and they have an appraisal --
8  They run an appraisal --
9  Q  For personal property?
10 A  That and also real property as well.
11 Q  And when did they do this appraisal?
12 A  Once again, I would just be estimating at
13 the time on that, but it seemed to me that that
14 appraisal had been completed by -- in September.
15 Q  September of 2000?
16 A  Yes, sir.
17 Q  Do you know what the total value was of
18 your lost personal property?
19 A  Personal property and the business aspect
20 of it were combined together and they were not
21 delineated between the two.
22 Q  But when you say "business" --
23 A  I'm talking about all of the trays and all
24 of the equipment and everything like that. And also
25 the personal property that was not related to that.

---

**112**

1  Q  And when I'm talking about personal
2  property, I mean property that's not real property,
3  whether it's business or personal.
4  A  Oh, yes, sir. If you're combining the
5  both in there, yes.
6  Q  What was that total figure?
7  A  That total was $546,420.91.
8  Q  And again, Mel, the EPA told you that
9  other than the wood products that weren't finished,
10 you couldn't clean this personal property?
11 A  Can you re-define that? The EPA had a
12 time limit set on what they would take to clean
13 something in there. And if it -- that time element
14 did not come into the constraints of what they felt
15 it was worth, then they basically said it wasn't
16 worth decontaminating.
17 Q  Just not economical?
18 A  That is correct.
19 Q  It would be cheaper to replace --
20 A  That is correct.
21 Q  You don't know if that's true, you just
22 are relying on what the EPA told you?
23 A  The EPA had experts on their staff that
24 had made that determination for them.
25 Q  Okay.

---

**PARKER vs W.R.GRACE & COMPANY**                    **Deposition of MEL PARKER**

---

113

1   A   People apparently who are certified to do
2   that.
3   Q   And Mel, did they give you any kind of
4   written document that outlined the different things
5   you had and whether you could replace them or clean
6   them and what the appropriate values were?
7   A   That came through Crookshanks' appraisal.
8   Q   Okay. Mel, you're aware that the EPA
9   ordered Grace to clean up the expanding plant
10  property -- or, the export plant property? Are you
11  aware of that?
12  A   Yes, sir.
13  Q   Did anyone at the EPA ever tell you why
14  Grace was not ordered to clean up your property?
15  A   We requested the EPA to clean up our
16  property.
17  Q   Okay.
18  A   We requested that. We did not want EPA on
19  our property -- Pardon me. We did not want W.R.
20  Grace on our property.
21  Q   Why not?
22  A   Because we felt that they had lied to us.
23  In the agreements -- The offers that were made by
24  W.R. Grace in there, it was indicative to us that
25  W.R. Grace had intended to use the property for deed

---

114

1   restricted area in there and that they would only
2   demolish $500,000 worth of the buildings in there
3   and that they still were not giving us
4   indemnification for all of our claims, our
5   liabilities in there for future asbestos in there --
6   or previous asbestos. We just did not feel good
7   with W.R. Grace being on the property.
8   Q   Okay. Had you approached the EPA at all,
9   Mel, about if Grace were to clean it up, perhaps
10  having someone outside of Grace as a contractor do
11  the work, supervised by the EPA?
12  A   That would be Mr. Stout -- Mr. Stout would
13  do that. That's who was representing their interest
14  when they came to our property was Mr. Stout, yes.
15       MR. THUESON: He said EPA, Mel.
16  BY MR. MacDONALD:
17  Q   Yeah, the EPA. I mean, in other words,
18  you said you didn't want Grace on the property.
19  A   That is correct.
20  Q   Was there any discussion about Grace
21  hiring an outside outfit to clean your property and
22  be under the supervision of EPA but just paid for by
23  Grace?
24  A   No, sir. Not per se, no. No, sir.
25  Q   So no one at the EPA brought that up to

---

115

1   your attention as an option then?
2   A   No.
3   Q   And other than the $2,000 stipend that you
4   received from the DOT that you said is evidenced by
5   a written agreement, have you entered into any other
6   agreements with EPA or any federal agency?
7   A   No, sir, no other agreements.
8   Q   Okay. You haven't entered into a covenant
9   not to sue with the EPA?
10  A   No, sir, we haven't entered into any
11  covenant.
12  Q   Mel, have you and your wife discussed any
13  ways that you may generate income while you're
14  waiting for the cleanup and construction on the
15  property?
16  A   No, sir, we are relying basically on that
17  stipend at this point in time there.
18  Q   But you haven't discussed other ways that
19  you may produce income, like going to work or
20  anything like that?
21  A   No, sir -- Not at this point in time, no,
22  sir, we have not.
23  Q   Has the EPA talked to you or provided
24  anything in writing about any liability you may have
25  for work that's being performed on the property?

---

116

1   A   When the EPA shut the property down, they
2   basically told us that they do not have liability
3   for trespass on the property during the time of
4   closure, but that they were attempting or they were
5   in the process of trying to get some insurance, but
6   they did not have it at the last time we had talked
7   to them.
8        MR. LEWIS: I think he
9   misunderstood the question.
10       MR. MacDONALD: I do, too.
11  BY MR. MacDONALD:
12  Q   Mel, what I was looking for, has the EPA
13  ever talked to you about personal liability that you
14  may have as a result of work that would be performed
15  in the future on that property?
16       MR. LEWIS: I see why he doesn't
17  understand the question.
18       MR. MacDONALD: Well, I mean, if
19  they haven't, they haven't.
20       THE DEPONENT: Okay.
21  BY MR. MacDONALD:
22  Q   Let me -- I can simplify it. Mel, did you
23  have any discussions with EPA about any liability
24  you may have as a result of any of this matter?
25  A   On the property there?

---

117

1    Q   Right.
2    A   The liability we may have on that property
3  in there?
4    Q   Right.
5            MR. LEWIS:  If you are referring
6  to a circle of liability, then maybe he might have
7  some understanding of what you mean.
8  BY MR. MacDONALD:
9    Q   I mean, any liability, but that's kind of
10  what I'm getting at.
11            MR. LEWIS:  He can't understand
12  how he can be liable to anyone else.  Common law.
13  If you're talking circle of liability --
14            MR. MacDONALD:  And that's why
15  I --
16            MR. LEWIS:  I don't know of any
17  such discussion.
18  BY MR. MacDONALD:
19    Q   Mel, do you recall any conversation with
20  anybody at the EPA about any liability for any
21  reason you may have as a result of owning that
22  property?
23    A   Of owning the property in there, I'm just
24  trying to think in here how I could answer that.
25  Whether this answers your question or not, this is

118

1  the basic understanding that I have, is that for the
2  expenses the EPA are incurring cleaning up the
3  property for W.R. Grace and then if the EPA were to
4  submit for payment for the work that they have done
5  with W.R. Grace and W.R. Grace were to sue and win,
6  then basically under the EPA we would be liable for
7  those expenses incurred by EPA.
8    Q   Okay.  Did the EPA ever tell you that they
9  would not prosecute you for those damages, if at any
10  time it were appropriate?
11    A   No, sir, they did not say that they would
12  not.  They said that there was an opportunity there
13  where we could provide some assistance to the EPA
14  that would allow us then to become indemnified.
15  That there was an opportunity there.  There was an
16  opportunity there that we would not be -- you know,
17  we would not be sued in there.
18            The comment I remember with the EPA said
19  that basically they have never sued because they
20  lost a lawsuit to someone else.
21    Q   Okay.  So did that put you at ease that
22  the EPA would never sue you for that?
23    A   That is correct.
24    Q   In your letter you made the statement that
25  the cost value of the long shed was appraised at

119

1  $651,000.  Did you receive that information from
2  that appraisal -- that Boyd (sic) appraisal that we
3  talked about earlier?
4    A   That's correct.
5            MR. MacDONALD:  Let's take a five
6  minute break, Mel.  I've got very little left.  I
7  just want to chat with these fellows and see if I
8  need to follow up on anything.  But we're probably
9  getting close.
10            (A recess was held in the proceedings.)
11
12            EXAMINATION RESUMED
13  BY MR. MacDONALD:
14    Q   Mel, there was a retail store as part of
15  your home out on the property that's the subject of
16  this suit, wasn't there?
17    A   You're talking about the screening plant?
18    Q   Yeah.
19    A   Yes, the home that we lived in was built
20  as a retail store, custom for a home.
21    Q   And so you had the two retail stores, one
22  in town, one out there at the screening plant
23  property?
24    A   That is correct.
25    Q   Which retail store sold the most product?

120

1    A   Well, the retail store that we had as a
2  home remained as a home.  That was going to be the
3  eventual retail store once we built the home on the
4  property.  Okay, so that was our home there.
5    Q   I see.
6    A   And yes, we did sell plants down on the
7  property there, but the greatest income was
8  definitely from the store downtown.  The taking of
9  material that we grew on the property, taking it
10  into town.
11    Q   Okay.  And so Mel, do I understand you
12  correctly then, your ultimate goal, if you will, was
13  going to be to close the downtown retail store and
14  make the home that you were living in the retail
15  store out at the screening plant and build a
16  completely separate home on that property?
17    A   That is correct, other than the question
18  that you said was to shut down the store downtown.
19  No.  There was other possibilities for that store
20  downtown in there other than just for the business
21  that we were in there.  For flowers, for this
22  type of thing in there.  So no, the store downtown
23  wouldn't necessarily have been closed.
24    Q   Okay.  But in any event, you were going to
25  build a separate home eventually on the property

**PARKER vs W.R.GRACE & COMPANY**

**Deposition of MEL PARKER**

121

1  that we have been describing as the screening plant
2  property?
3      A   That is correct.
4      Q   Mel, with regard to the business, would
5  you agree that Lerah would have more of the specific
6  information regarding the business over the years?
7      A   Definitely.
8      Q   Mel, we received a Statement of Claim
9  filed with the Court on your behalf seeking
10  $10 million in compensatory damages.  Do you know
11  how this amount was calculated?
12      A   That must be the figure that my wife would
13  be able to justify and clarify for you.
14      Q   But you weren't in on the calculations?
15      A   No, my wife did that portion of it in
16  there.
17          MR. MacDONALD:  Counsel, I think
18  that there are considerable documents that we did
19  not receive a copy of that I think are responsive to
20  our discovery requests.  I will try to get more
21  specific and give you an additional discovery
22  request, but what I'd ask is that we reserve the
23  right to redepose Mr. Parker with regard to any
24  additional documents we get in discovery.  Would you
25  have any objection to that?

122

1          MR. THUESON:  I don't know if we
2  want to stipulate right now.  But as I told Gary,
3  there are some documents available but they do have
4  asbestos on them, so I don't know how to handle
5  those right now.  But I told Gary they are available
6  after proper procedures are made.
7          MR. MacDONALD:  Well, except like,
8  for instance, the appraisals.  I think they are
9  responsive to our discovery request and I don't
10  think they had asbestos on them.
11          MR. THUESON:  I don't know.  But
12  we're -- We don't have any intention of not giving
13  you documents.
14          MR. MacDONALD:  Right.  That's all
15  I'm asking.
16          MR. THUESON:  I don't even know if
17  you need a formal request for them, but the
18  difficulty here is just stuff that's been shuffled
19  around at the screening plant and what to do with
20  it.
21          MR. MacDONALD:  But if insofar as
22  the materials that are not suspected of being
23  contaminated by asbestos, that were responsive to
24  our discovery request, would you stipulate to
25  holding this deposition open for inquiry with regard

123

1  to any of those documents that we subsequently
2  possess?
3          MR. THUESON:  Well, I won't
4  stipulate, but I don't see that there will be a
5  problem.
6          MR. MacDONALD:  That doesn't give
7  me a lot, Erik.
8          MR. THUESON:  You know, I don't --
9  I don't think it's --
10          MR. MacDONALD:  We'll just -- If
11  we have to fight the battle, we will fight the
12  battle.
13          MR. THUESON:  I don't think we're
14  going to have to fight a battle.  That's what I'm
15  saying.
16          MR. MacDONALD:  Then why won't you
17  stipulate?
18          MR. THUESON:  I don't trust
19  attorneys that are smarter and faster than I am.
20          MR. MacDONALD:  I'm not one of
21  those.  I've never been accused of being smarter
22  than anybody.  Well, with that being said,
23  Mr. Parker, I'm done with my inquiry.  I appreciate
24  your time.
25          MR. LEWIS:  I have a question on

124

1  the record.  We have two additional attorneys here,
2  Mr. -- I apologize for not being able to pronounce
3  your name.  Mr. --
4          MR. SENFTLEBEN:  Senftleben.
5          MR. LEWIS:  -- Senftleben and
6  Mr. Lund.  One of them, Mr. Lund, by the nature of
7  the questions given and the examination of
8  Mr. Parker, appears to now be a witness in this
9  case.  Are these attorneys counsel of record?  What
10  is going on here, Counsel, that they just show up at
11  our deposition?  I thought they were co-counsel, but
12  it's not looking like it now.  Are they co-counsel
13  or not?
14          MR. MacDONALD:  They are
15  co-counsel.
16          MR. LEWIS:  Are they admitted to
17  practice in Montana for this particular case or any
18  other particular case?
19          MR. MacDONALD:  I don't think so.
20  Are you, Ken?
21          MR. LUND:  No.
22          MR. MacDONALD:  I don't think so.
23  They are helping me in this case.
24          MR. LUND:  Just so it's clear, I'm
25  admitted to the Federal Court in Montana by motion.

125

1      MR. LEWIS: This is a State Court
2  action and the rules of the Montana Supreme Court,
3  which have been revisited in the last 18 months, are
4  pretty specific. There is a pretty severe
5  limitation as to who can be admitted to -- for even
6  a particular case.
7      But I don't really care too much about
8  that. I assumed they were helping with the case.
9  But one of them is now a potential witness. That's
10 a big problem for us because he sat here during this
11 deposition and heard everything that Mr. Parker
12 said.
13     MR. MacDONALD: Well, I would
14 disagree with that, Tom, because, first of all, he's
15 not being deposed today so he could read this
16 deposition in a week anyway.
17     And secondly, he is here to help me in
18 this case. It's no different than having a
19 paralegal sit in on this thing right now. He is not
20 going to be trial counsel in this case. So whether
21 or not he is a witness or not, only time will tell.
22     MR. LEWIS: Is he involved in any
23 other litigation or legal work involving the Parkers
24 that's not directly involved with the litigation of
25 this particular case? For example, is he involved

127

1  deposition in a week?
2      MR. LEWIS: Because we have rules
3  in the civil courts of this state that witnesses can
4  be excluded from depositions. Okay?
5      MR. MacDONALD: If there is
6  prejudice. How is the prejudice that he was not
7  going to --
8      MR. LEWIS: I'm not prepared to
9  argue that right now, but I am prepared to say to
10 you right now that if these people are going to be
11 sitting here for Mrs. Parker's deposition, I may
12 object to it. Okay? I'm putting you on notice.
13     MR. MacDONALD: Go ahead and
14 object.
15     MR. LEWIS: I didn't know this
16 counsel was a potential witness and I did not know
17 that these counsel were going to be here. Nobody
18 told us they were going to be here. We have one
19 that's Grace house counsel who could arguably be the
20 corporate representative for this deposition. And
21 probably that's okay. All right? But we have
22 independent counsel from Denver. Probably a very
23 fine lawyer and a very fine man, but it causes me
24 difficulty. Okay?
25     MR. MacDONALD: Tom, there is no

126

1  with the EPA and the CIRCLA issues? I need to know
2  that.
3      MR. MacDONALD: I believe he is,
4  Tom. But I also believe it's --
5      MR. LEWIS: I wish that would have
6  been disclosed --
7      MR. MacDONALD: -- irrelevant.
8      MR. LEWIS: No, I think it is
9  relevant and I wish it had been disclosed ahead of
10 time. I think it is relevant.
11     MR. MacDONALD: Why? Why?
12     MR. LEWIS: Because it would have
13 been the proper thing to do.
14     MR. MacDONALD: To tell you what
15 other things he is working on with W.R. Grace?
16 I don't understand.
17     MR. LEWIS: No, no. He is in here
18 cherry picking on this litigation which involves a
19 civil action under Montana law seeking information
20 to use in the CIRCLA disputes between Grace and the
21 EPA perhaps, and indirectly impacting my client's
22 rights and duties under CIRCLA.
23     MR. MacDONALD: How is it
24 different, him sitting here listening to this
25 deposition, different than him reading the

128

1  restriction on the number of lawyers that can
2  represent a defendant in a case or defendants. Not
3  to mention the fact that his role in this case is
4  simply to assist me in my preparation of this case.
5      MR. LEWIS: Okay.
6      MR. MacDONALD: So --
7      MR. LEWIS: If you want to press
8  it --
9      MR. MacDONALD: I don't --
10     MR. LEWIS: I want this on the
11 record. If we want to press this, okay, neither of
12 these lawyers are admitted to practice before the
13 courts of this state, that I know of, generally or
14 specifically for this case. And they are not
15 entitled to be here. And I won't object any
16 further, but I think, Counsel, we should have been
17 informed.
18     MR. MacDONALD: But just for the
19 record, I totally disagree. Whether they are
20 admitted to practice in this state or not is
21 completely irrelevant. If they are here to assist
22 me in my preparation of the case, they are more than
23 allowed under the Rules of Civil Procedure of this
24 state.
25     MR. LEWIS: I'm prepared to test

**PARKER vs W.R. GRACE & COMPANY**                    **Deposition of MEL PARKER**

---

129

1   that then if you want to take that position,
2   Counsel.
3           MR. MacDONALD: I do take that
4   position.
5           MR. LEWIS: All right. We will
6   have a war on that then. And I hope you don't get
7   these counsel in trouble or you in trouble.
8           MR. MacDONALD: Geez, I hope not,
9   too, Tom. I'm not too worried about it.
10          MR. LEWIS: There's new rules
11  pro hac vice that you have to abide by, Counsel.
12          MR. MacDONALD: I agree. But they
13  are not counsel of record in this case. Garlington,
14  Lohn and Robinson are counsel of record. They are
15  here to assist me, no different than if I had
16  brought in a paralegal.
17          MR. LEWIS: I think there's a big
18  difference. They are not a paralegal, they are not
19  assigned to your firm, they are not accountable to
20  the courts of this state as this case is set up
21  right now, because you haven't got them admitted
22  pro hac vice.
23          MR. MacDONALD: They are not here
24  as counsel of record. They haven't asked a
25  question. They are here to observe.

---

130

1           MR. LEWIS: But these are matters
2   of private record. No private citizen can just come
3   in here and sit in on this deposition.
4           MR. MacDONALD: If they are here
5   to assist me, absolutely they can.
6           MR. LEWIS: I don't think so.
7   I don't think so.
8           MR. MacDONALD: Well, we'll agree
9   to disagree, Tom. But anyway, I apologize for not
10  letting you know if you thought there was something
11  underhanded about it, but the fact of the matter is
12  that they are assisting me in this case. Not as
13  counsel of record but assisting me.
14          MR. LEWIS: They are your
15  paralegals in this case?
16          MR. MacDONALD: All I'm saying is
17  I'm drawing a comparison between the two. I could
18  have a paralegal here and you would certainly have
19  no objection to that. The fact that they are
20  attorneys that represent W.R. Grace, it makes no
21  difference if they are not counsel of record in this
22  case.
23          MR. LEWIS: Well, we have the
24  problem with you not even answering your own
25  interrogatories in these cases. They are done back

---

131

1   east. You won't even vouch that they are done
2   properly or done -- they are done out -- away from
3   your office. You don't even do the discovery in
4   these cases.
5           MR. MacDONALD: Well, Tom, I'm not
6   going to argue with you.
7           MR. LEWIS: We will make our
8   motion.
9           MR. MacDONALD: You have posted
10  your objection. You can make your motion.
11          MR. LEWIS: All right. And we
12  will report it to the Commission on Practice if we
13  have to.
14          MR. MacDONALD: That's fine. Go
15  ahead.
16          MR. THUESON: Go ahead, if you
17  dare, Gary.
18
19              EXAMINATION
20  BY MR. KALKSTEIN:
21      Q   Mr. Parker, my name is Gary Kalkstein and
22  I represent Jack DeShazer and DeShazer Ryan Realty
23  in the lawsuit that you have brought, and I know
24  that you have been going for a while and answering
25  questions that Terry has asked you. If at any time

---

132

1   or if right now you would like to take a break for a
2   minute before we start, that's fine. I don't think
3   I'm going to be very long because my inquiry is
4   going to be pretty well focused to DeShazer Ryan
5   Realty and the actions of Jack DeShazer. Would you
6   like to take a break before we start again?
7       A   No, sir, I think we're ready.
8       Q   I know that you have had the opportunity
9   to hear the admonitions that Terry gave, so I'll
10  just add a couple. First and foremost, we're not
11  going to be here that long but it's not an endurance
12  test. If at any time you'd like to take a break,
13  you look at me and say, Gary, I would like to take a
14  break, and the answer will always be, Yes.
15          And then the most important thing,
16  Mr. Parker, to keep in mind is none of my questions
17  are meant to trick or confuse. If I ask you a
18  question you don't understand or doesn't make sense
19  to you or it's just a bad question, would you let me
20  know?
21      A   I will.
22      Q   And if you do, I'll rephrase it or rework
23  it or repeat it and make sure that I've got it in a
24  form that you feel you can answer. Fair enough?
25      A   All right.

---

133

1    Q   And if you answer the question I'm going
2  to assume that you understood it and are answering
3  it truthfully to the best of your ability; is that a
4  fair assumption on my part?
5    A   That is correct.
6    Q   Can you tell me -- For purposes of my
7  questions, Mr. Parker, my inquiry is related to
8  DeShazer Ryan Realty unless I tell you otherwise.
9  Okay?
10        Can you tell me, with regard to any
11  matters concerning your claim against Jack DeShazer
12  or DeShazer Ryan Realty, if you reviewed any
13  documentation relating to your claim against them
14  today in preparation for this deposition?
15    A   No, sir.
16    Q   Your counsel was kind enough to provide a
17  copy of the buy-sell. And have you had a chance to
18  look at that? If you --
19    A   If you have no need for it, I can use it
20  as reference for your questions in there.
21    Q   Please. In fact, I'm just going to ask
22  one or two very specific ones. Have you had a
23  chance to see that today?
24    A   No, sir, not today in there, but I have
25  looked at it recently.

134

1    Q   And do you recognize --
2        MR. KALKSTEIN: What I would
3  propose we do, Tom, is not mark this, but if we
4  could get a copy later and we can put this as an
5  exhibit.
6  BY MR. KALKSTEIN:
7    Q   Can you tell me what this document before
8  you is --
9        MR. KALKSTEIN: Which exhibit
10  would it be, Deb?
11        THE REPORTER: 2.
12  BY MR. KALKSTEIN:
13    Q   -- which will be marked Exhibit 2. Would
14  you tell me what Exhibit 2 is, please.
15    A   It is a buy-sell agreement between W.R.
16  Grace and my wife and I in regard to the 21.2 acres
17  on the former screening plant.
18    Q   And the 21.2 acres on the screening plant
19  is the property which is the subject of the lawsuit
20  that you brought against DeShazer and DeShazer Ryan
21  Realty; is that correct?
22    A   That is correct.
23    Q   The signatures at the bottom of the
24  buy-sell, can you identify any of those for me?
25    A   Yes, sir, I can identify my wife's

135

1  signature, I can identify my own signature.
2    Q   And would it be fair for me to assume that
3  prior to signing this document, which is Exhibit
4  Number 2, that indeed you did read this document and
5  then once you were comfortable with the contents
6  thereof you affixed your signature to it?
7    A   That is correct.
8    Q   It was my understanding from listening to
9  your conversation with Terry that you didn't have
10  any meetings with Jack DeShazer or anybody at the
11  DeShazer Ryan Realty prior to the signing of the
12  buy-sell; is that correct?
13    A   No, sir.
14    Q   Then apparently I misunderstood. Could
15  you tell me what meeting you had with Jack DeShazer
16  or anybody at DeShazer Ryan Realty prior to the
17  signing of the buy-sell?
18    A   You mean on former sales or whatnot or
19  just --
20    Q   You're exactly right, that was a poorly
21  asked question. I appreciate that. With regard to
22  purchase of this property which is the subject of
23  this suit, did you have any meetings with Jack
24  DeShazer or DeShazer Ryan Realty prior to the
25  signing of the buy-sell?

136

1    A   Our first contact with Jack DeShazer was
2  after we told Allen Stringer that we would buy the
3  property -- we would like to buy the property and we
4  were ready to have a buy-sell agreement prepared for
5  it.
6    Q   So by the time Jack DeShazer came into the
7  picture in terms of his contact with you, you and
8  your wife had already made the decision to purchase
9  the property after your discussions with
10  Mr. Stringer; is that correct?
11    A   That is correct.
12    Q   And you have been a Libby resident I guess
13  for 36 or 37 years?
14    A   About 26 years.
15    Q   I thought it was 1964. Am I wrong?
16    A   Yeah, '64, but you have to add on 10 years
17  when we were down in Bonners Ferry.
18    Q   And during the course of your living in
19  Libby for 26 years, did you have occasion to get to
20  know Jack DeShazer?
21    A   Yes, sir, we did.
22    Q   Have you had dealings with Jack DeShazer
23  personally and professionally, apart from the
24  purchase of the property which is the subject of
25  this suit?

137

1    A   Yes, sir, we did have contact with Jack
2    DeShazer when I was with the St. Regis Paper Company
3    and the subdivision of St. Regis that handles
4    property had turned over St. Regis lands that Jack
5    DeShazer was authorized to sell for St. Regis.
6        Q   And what was the capacity that you had
7    contact with him?
8        A   Certain lands that St. Regis had were
9    under my administration and also -- and consequently
10   then I also had the opportunity to -- you know, to
11   talk to Jack on what was being made available for
12   sale, this type of thing.
13       Q   Is it fair for me to assume, based on the
14   fact that you were willing to deal with Jack
15   DeShazer on the subject property which is the basis
16   of this lawsuit, that your prior dealings with him
17   had been at the very least acceptable and you were
18   comfortable with him in terms of his honesty and
19   integrity as a real estate agent?
20       A   In regards to St. Regis, the only
21   affiliation that I had with Jack was the fact that
22   he was representing -- I did not hire Jack DeShazer.
23   He was hired by St. Regis to sell the properties in
24   there and all I needed to do was to verify those
25   properties and their location in there.

139

1        Q   Friendly acquaintances?  You would say
2    hello to each other?
3        A   Across the table, similar to what I do
4    with you, yes.
5        Q   After the buy-sell was drawn up and
6    signed, did you have any further contact with Jack
7    DeShazer?
8        A   Other than just at the signing of the
9    property over to us from W.R. Grace in there, he was
10   at the lawyer's office when we consummated the deal.
11   The buy -- not the buy-sell agreement, but the
12   paperwork.
13       Q   Okay.  Which office was that?
14       A   That was in the -- It was in the --
15   I can't remember which one of the offices that
16   was in.
17       Q   If you would just do me a great favor,
18   Mr. Parker.  If the name comes to you during the
19   course of our brief conversation, if you would let
20   me know, that would be great.
21       A   I'm going to say it was in the office of
22   Sverdrup -- Larry Sverdrup at that point in time.
23   But my wife could clarify that with you.
24       Q   But subsequent to the paperwork when he
25   was present at the lawyer's office, you have not had

138

1    So as far as Jack being honest or whatnot,
2    I couldn't decide on just that -- the approach I had
3    at that time.
4        Q   Okay.  Did you have any reason to believe
5    at the time you purchased the property in question
6    as evidenced in the buy-sell, Exhibit Number 2, that
7    Jack was not being honest with you in terms of his
8    contacts with you?
9        A   No, sir.
10       Q   And when you purchased the property, did
11   you have a real estate agent?
12       A   When we purchased --
13       Q   The subject property?
14       A   This --
15       Q   Yes, sir.
16       A   Did we have a real estate agent?
17       Q   Representing you?
18       A   No.  One thing I need to clarify is that
19   Jack DeShazer sold our property for us on the
20   Rollins tract.  That money was used to pay for the
21   property that he was representing W.R. Grace on.
22       Q   Okay.  I appreciate that.  Thank you.
23   Did you have any kind of friendship with Jack
24   DeShazer or his wife?
25       A   Just as an acquaintance.

140

1    any conversation with him?
2        A   Other than at that time when we signed on
3    the property Mr. DeShazer stated it was a fine piece
4    of property and he felt it would do good for our
5    business.
6        Q   And you felt that way as well?
7        A   Very much so.
8        Q   You have not had any contacts with him
9    since?
10       A   Yes, sir, we did have contact with him on
11   May the 5th of 1994.  That is when we put a buy-sell
12   agreement on the 17.2 acres that were adjacent to
13   that.
14       Q   And then that's the property that
15   eventually Mr. DeShazer called you and said they
16   would like to take it off the market and you folks
17   agreed to that?
18       A   They took it off the market in there and
19   Jack was somewhat dismayed about that because he
20   would have received a commission for the sale of it.
21   But by withdrawing it from the market then he would
22   not get that, that is correct.
23       Q   Sure.  Sure.  And subsequent to that
24   exchange of information where he informed you that
25   W.R. Grace was pulling that property off the market,

141

1  you have not had any contact with him with regard to
2  this case; is that correct?
3      A  Not in regard to this case; no, sir.
4      Q  You said that the first time you
5  understood the existence of asbestos and, if you
6  will, the dangers associated with asbestos, was
7  November of 1999, correct?
8      A  That is correct.
9      Q  And there were lots and lots of people --
10  I assume as a Libby resident you're aware of the
11  fact that there are a lot of people who have been
12  here for years and understand that the vermiculite
13  has been mined and were unaware of the dangers
14  of asbestos associated with that; is that correct?
15      A  All right, would you pass that one by me
16  again.
17      Q  That was a bad question. Let me try that
18  one again. I'll just cut to the chase. Do you have
19  any reason to believe that Jack DeShazer was aware
20  of the dangers of asbestos and the contamination of
21  the property that you purchased from W.R. Grace at
22  the time he sold it to you?
23      A  He never indicated that there was a
24  problem that he knew of at that time.
25      Q  And do you have any reason or evidence to

142

1  suggest that he was misrepresenting himself to you
2  and that he was aware that there was a problem?
3      A  I have no evidence.
4      Q  And I asked the questions with regard to
5  contact in particular with Jack DeShazer. Did you
6  have any contact with any other member of his firm
7  or of his realty organization with regard to this
8  claim other than Jack DeShazer?
9      A  No, sir.
10      Q  You met with a Mr. Stringer who is a
11  W.R. Grace employee; is that correct?
12      A  He's a manager of W.R. Grace here in
13  Libby.
14      Q  And you met with him twice on the property
15  prior to agreeing to purchase it?
16      A  That is correct.
17      Q  And Mr. DeShazer, nor anyone from his --
18  or, neither Mr. DeShazer or anyone from his realty
19  organization was present at either of those
20  meetings; is that correct?
21      A  No, sir.
22      Q  When you say "no, sir," you're agreeing
23  with me; is that correct?
24      A  No, Jack DeShazer was not there.
25      Q  And the information that you obtained with

143

1  regard to the property prior to making the decision
2  to purchase the property was obtained from
3  Mr. Stringer?
4      A  The information that I had received -- I
5  did not have a copy of the buy-sell agreement, only
6  the amount that -- how much we were paying per acre
7  for that.
8      Q  And I asked that question poorly.
9  I apologize. The information you received about the
10  property, the person who answered and questions that
11  you had, was Mr. Stringer?
12      A  That's correct.
13      Q  And we sort of covered this, but let me
14  just quickly go over it. The only conversations
15  that you had with Jack DeShazer or anyone from
16  DeShazer Ryan Realty related to the preparation of
17  the buy-sell agreement and whatever conversation
18  took place that day, correct?
19      A  Yes, sir.
20      Q  Okay.
21      A  The only other thing would be that the
22  dollar value that they had on the property in there
23  had been misfigured and so Jack had reminded us that
24  that had been corrected.
25      Q  Do you recall any other conversation with

144

1  Jack DeShazer that day of the signing of the
2  buy-sell other than the correction pertaining to the
3  purchase price?
4      A  Only what we would like to have W.R. Grace
5  do in their cleanup of the property in there.
6      Q  Anything else that you recall about --
7      A  Other than Jack basically said that this
8  was a good piece of ground in there. He felt that
9  the property would provide the type of facilities
10  there that we needed to go ahead and expand our
11  business.
12      Q  But you had already made that decision
13  independent of what Jack had to say?
14      A  Yes, sir. Yes, sir. That's why we bought
15  it.
16      Q  And then in a subsequent meeting with Jack
17  at the lawyer's office to sign the paperwork, again
18  I would like to exhaust the entirety of your
19  recollection with regard to any conversation you had
20  with Jack on that day. Was there --
21      A  Basically it was just signing of the
22  paperwork in there and that was it. There was no
23  other conversation in regard to the property that I
24  can recollect.
25      Q  You said -- And jump in if I'm wrong in my

**PARKER vs W.R.GRACE & COMPANY**                    **Deposition of MEL PARKER**

---

**145**

1  recollection, please. You said that Mr. Stringer at
2  some point subsequent to November of '99 met with
3  you, apologized, and said he didn't have -- or, he
4  didn't know about the problem; is that correct?
5      A  That is correct.
6      Q  You have no reason to believe that he told
7  Mr. DeShazer anything different than he told you,
8  which was nothing, about the problems that existed
9  with regard to the asbestos, do you?
10     A  No, sir, I cannot do that.
11     Q  When you say, "I cannot do that" --
12     A  I cannot say that he had conversations
13  with Mr. DeShazer in there.
14     Q  You have no evidence to suggest --
15     A  No, sir, I do not.
16     Q  -- he told Mr. DeShazer anything different
17  than what he told you?
18     A  No, sir; that is correct.
19     Q  You're represented by two fine counsel,
20  and so I recognize that you have excellent
21  representation. I'm just asking for your opinion.
22  What do you think, if anything, Jack DeShazer or
23  DeShazer Ryan Realty did wrong in this case? And if
24  you can't answer the question, you can't answer it.
25  That's fine.

---

**146**

1      A  Jack DeShazer was responsible for the sale
2  of the adjacent properties, not only ours but there
3  was at least three other blocks along the river that
4  Jack DeShazer was responsible for selling.
5      Q  Okay.
6      A  All right. Those acreages in there were
7  stipulated. Let me just give you an example. The
8  17.2 acres that were adjacent to us.
9      Q  Okay.
10     A  All right. The piece of property that was
11  beyond that and the piece of property that was
12  beyond that that belonged to W.R. Grace had acreages
13  there that did not match up with what they were
14  advertised at.
15         For example, the piece that now belongs to
16  Kootenai Development was sold as 17.2 acres. As it
17  turns out, really there is only about 9 or 10 acres
18  in there because the rest of it -- the land was
19  originally surveyed out prior to the time that they
20  built the dam in there, so they extend it out into
21  the river.
22     Q  Okay.
23     A  Consequently our feeling was that Jack
24  really, you know -- Did Jack really follow through.
25  There was a lawsuit that was coming on the second

---

**147**

1  piece of property beyond ours in regard to being
2  misrepresented on the number of acres on that.
3         So the question I had, in Jack's
4  credibility it would seem he should have followed
5  through on allowing -- on notifying these people
6  that there wasn't really 17.2 acres or whatever on
7  the subsequent properties in there.
8      Q  Okay.
9      A  I think he was lax in that.
10     Q  And I understand what you have testified
11  to. Let me focus the question on your situation.
12  What in this particular case do you think Jack did
13  wrong or somebody from his organization did wrong or
14  what particular complaints do you have? And I
15  understand what you just told me. I'm just asking
16  you if you would, please, to focus your comments on
17  the case against Jack that you have brought.
18     A  No, I have -- I have no complaints against
19  Jack per se.
20     Q  Or DeShazer Ryan Realty; is that correct?
21     A  Or DeShazer Ryan Realty.
22         MR. KALKSTEIN: Can we take a
23  break for just a minute? I'm very close to being
24  done. Can I visit with you gentlemen for a minute?
25         (A recess was held in the proceedings.)

---

**148**

1         MR. KALKSTEIN: We're back on the
2  record.
3
4         EXAMINATION RESUMED
5  BY MR. KALKSTEIN:
6      Q  Mr. Parker, just in -- I guess by way of
7  wrapping up, it's my understanding as we sit here
8  today that with regard to this particular sale as
9  evidenced by the buy-sell which is Exhibit Number 2,
10  you don't have any complaint or criticism of Jack
11  DeShazer or DeShazer Ryan Realty; that's correct,
12  isn't it?
13     A  As you present it, no.
14         MR. THUESON: Is that correct or
15  not?
16         THE DEPONENT: That is correct.
17         MR. KALKSTEIN: Thank you. What I
18  would like to do, Counsel, is I would like to keep
19  the deposition open if I could for me with the
20  understanding that if there is further involvement
21  that extends beyond the near future and the need for
22  further questions to be answered, that I may have
23  the opportunity at some time that's convenient to
24  all to ask further questions. Is that agreeable?
25         MR. LEWIS: Yes.

---

**PARKER vs W.R.GRACE & COMPANY**                    **Deposition of MEL PARKER**

---

149

1        MR. KALKSTEIN: Okay. In that
2    case, I think that's all I have. I greatly
3    appreciate your time. Thank you.
4        MR. MacDONALD: We're done.
5        (Whereupon, the deposition of MEL PARKER
6    was concluded at 1:07 p.m. and signature was
7    reserved.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

151

1                    REPORTER'S CERTIFICATE

2

3        I, Debra M. Hedman, Registered
    Professional Reporter, Registered Merit Reporter,
4    and Notary Public for the State of Montana, do
    hereby certify:
5
        THAT I did report the foregoing transcript
6    after having first duly sworn the witness to testify
    to the truth;
7
        THAT said transcript was taken at the time
8    and place stated on the caption hereto; and
9
        THAT the testimony of the witness was
    taken in shorthand by me and subsequently reduced to
10    writing under my direction; and
11
        THAT the foregoing is a true and correct
    transcription of all the testimony of said witness
12    to the best of my ability.
13
        IN WITNESS WHEREOF, I have hereunto
    subscribed my name and affixed my seal of office
14    this 5th day of February, 2001.
15
16
17
18
    _____
19    Debra M. Hedman, RPR, RMR and Notary
    Public for the State of Montana

---

150

1
2    PAGE      LINE            CORRECTION PAGE
3                          CORRECTION
4
5
6
7
8
9
10
11
12
13
14        I have read the foregoing testimony and
15    believe the same to be true, except for the
16    corrections noted above.
17        DATED this __ day of _____, 2001.
18
19        _____
20            MEL PARKER
        Subscribed and sworn to before me this ____ day
21    of _____, 2001.
22
23        _____
        Notary Public for the
24        State of Montana
    DMH        Residing at _____
25        My Commission expires: _____

---

**HEDMAN, ASA & GILMAN, INC. - 752-5751**                    **Page 149 to Page 151**

CONCORDANCE

**PARKER vs W.R.GRACE & COMPANY**                    **Deposition of MEL PARKER**

---

## $

**$1,000** [1] 26:25
**$1,200** [1] 24:20
**$1,210** [1] 16:14
**$10** [1] 121:10
**$102,200** [1] 33:23
**$118,000** [1] 33:19
**$12,000** [1] 100:25
**$126,600** [1] 33:21
**$13** [1] 14:5
**$18,000** [1] 100:7
**$2** [4] 55:6,8-9,12
**$2,000** [4] 26:3 27:17 98:4 125:3
**$2,016** [2] 26:7,13
**$2,500,000** [2] 55:8,12
**$20,000** [1] 19:13
**$3,050,000** [3] 55:13 56:4 61:8
**$3,500** [1] 100:18
**$312** [1] 25:2
**$33,000** [1] 100:22
**$35,000** [1] 31:10
**$40,000** [2] 93:16,19
**$500,000** [1] 114:2
**$546,420.91** [1] 112:7
**$651,000** [1] 119:1
**$7,000** [2] 100:10,20
**$72,000** [1] 102:4
**$900,000** [3] 92:10-11,19

### '

**'64** [1] 136:16
**'80s** [2] 106:23 109:6
**'86** [6] 16:16 20:13 21:3 23:17 29:6 63:20
**'87** [2] 35:2,13
**'90** [2] 35:2,14
**'90s** [1] 37:1
**'92** [1] 43:6
**'93** [1] 29:6
**'96** [1] 24:1
**'97** [8] 20:13 21:4 23:17 24:1 63:20 103:18,21 104:11
**'99** [4] 65:13 68:15 81:1 145:2

## 1

**1** [4] 4:12 56:17-18 60:21
**1,065** [1] 99:12
**10** [2] 136:16 146:17
**131** [1] 4:6
**14** [4] 8:16 18:16 79:25 80:3
**15th** [6] 51:10,12 73:8,11,24 74:20
**16** [1] 23:5
**16th** [1] 35:21
**17.2** [10] 33:15,22,24 34:3 47:15 49:3 140:12 146:8,16 147:6
**18** [1] 125:3
**18th** [1] 11:25
**19** [4] 24:23 29:19 93:24
**1964** [2] 36:11 136:15
**1968** [1] 36:22
**1971** [1] 36:10
**1980** [2] 13:17,20
**1981** [1] 36:10
**1986** [12] 6:17 12:21 13:4,7 16:18 20:23 21:6,9 28:23 63:14
**1987** [4] 13:12,20 14:25 105:17
**1990** [3] 14:6-7 15:2
**1991** [1] 29:20

## 2 (second column)

**1992** [1] 31:20
**1993** [11] 17:15 28:23 43:5-6 44:23 45:12-13 53:2,8 56:9 66:9
**1994** [6] 34:1-2 45:6,11,13 140:11
**1995** [1] 24:24
**1996** [1] 24:24
**1997** [10] 15:1-2 16:22 20:23 63:14 67:12 103:11,23 104:13,16
**1998** [4] 67:12,15 103:11 104:16
**1999** [6] 11:19 35:22 67:9 84:15 93:24 141:7
**19th** [6] 35:25 86:4 87:16,20,22-23
**1:07** [1] 149:6

## 2

**2** [8] 1:20 4:13 134:11,13-14 135:4 138:6 148:9
**2,200** [1] 13:15
**2000** [7] 70:12 72:14 81:14 93:13 106:23 108:24 111:15
**2001** [4] 1:21 150:17,21 151:14
**21** [5] 33:12 47:24 48:22 57:3,15
**21.2** [3] 33:13,17 134:16,18
**21st** [1] 36:4
**22** [1] 52:15
**2325** [1] 2:6
**24** [4] 52:15 53:14 56:14,20
**25** [1] 59:9
**26** [4] 36:12 60:18 136:14,19
**27** [1] 13:2
**27th** [1] 53:7
**2nd** [1] 6:17

## 3

**3** [6] 54:5 83:19 106:9 108:19 109:9 110:1
**3,000** [1] 12:8
**3,600** [1] 34:7
**30** [2] 11:17 13:15
**300** [10] 101:7 104:20 105:19 106:8-9,22 107:1 108:4,22 109:5
**30th** [1] 10:5
**36** [2] 60:18 136:13
**37** [1] 136:13

## 4

**4** [1] 110:19
**443** [1] 1:20
**472** [2] 26:21 27:4
**48** [1] 10:13

## 5

**5** [3] 4:5 83:13,19
**50** [2] 103:16
**535** [1] 2:10
**55** [1] 24:23
**56** [1] 4:12
**59403** [1] 2:6
**59624** [1] 2:17
**59807-7909** [1] 2:15
**59807-8568** [1] 2:19
**5th** [2] 140:11 151:14

## 6

**6,000** [1] 12:9
**609** [1] 29:9
**63** [3] 10:12 79:23 83:25
**64** [1] 79:23
**6:30** [1] 10:23

## 7

**7** [3] 56:21 57:11 83:13
**7909** [1] 2:14

## 8

**8568** [1] 2:18

## 9

**9** [2] 1:21 146:17
**9-26-02** [1] 151:20
**9:00** [1] 1:22
**9th** [12] 85:10,13,19,21,24 86:1,3,9,11 87:10

---

**___** [1] 150:17
**___** [1] 150:20
**___** [1] 150:24
**___** [1] 150:24
**___** [1] 150:19
**___** [1] 150:22
**___** [1]
**151:18**

## A

**A.m.** [1] 1:22
**Abide** [2] 57:1 129:11
**Ability** [1] 129:11
**Able** [14] 15:7 17:24 20:3 45:22 50:12 64:8 66:15 67:2 75:4-5 98:2 101:25 121:13 124:2
**Absolutely** [1] 130:5
**Accept** [1] 87:8
**Acceptable** [5] 61:14 71:9,23 83:6 137:17
**Accepted** [5] 54:11 55:16 62:22
**Access** [1] 68:24
**Accessibility** [1] 24:18
**Accident** [1] 96:19
**Accompanied** [2] 60:21 69:3
**Accountable** [1] 68:15
**Accountant** [2] 94:3
**Accounted** [1] 27:20
**Accurate** [1] 10:24
**Accused** [1] 123:21
**Acquaintance** [2] 31:21 138:25
**Acquaintances** [1] 139:1
**Acre** [7] 33:17,22,24 47:24 57:3,15 143:6
**Acreage** [2] 42:13
**Acreages** [2] 146:6,12
**Acres** [19] 13:16 32:18,23 33:12-13,15 34:3,7 47:16 48:22 49:3 134:16,18 141:20 146:16,17-17 147:2,6
**Action** [3] 8:6 125:2 126:19
**Actions** [1] 132:5
**Activate** [1] 96:17
**Actual** [1] 109:20
**Add** [2] 132:10 136:16
**Added** [1] 59:24
**Addition** [4] 28:6 41:18 76:20 101:18
**Additional** [8] 15:24 43:8 47:16 48:18 55:5 121:21,24 124:1
**Address** [3] 26:19 28:13 52:9
**Addressed** [5] 5:10 21:20 82:11 84:14 91:3-5
**Adequate** [1] 21:4

## A (fourth column)

**Adjacent** [7] 33:7,14 40:5 54:8 140:12 146:2,8
**Administer** [1] 13:23
**Administration** [3] 13:11, 13 137:9
**Admitted** [6] 124:16,25 125:5 128:12,20 129:21
**Admonitions** [1] 132:9
**ADV-00-669** [1] 1:4
**Advertised** [1] 146:14
**Advice** [1] 15:14
**Affiliation** [2] 37:24 137:21
**Affixed** [2] 135:6 151:13
**Age** [1] 83:13
**Agency** [1] 115:6
**Agent** [4] 43:9 137:10 138:11,16 21
**Ago** [2] 10:16 36:25
**Agree** [5] 20:23 34:18 121:5 129:12 130:8
**Agreeable** [1] 148:24
**Agreed** [6] 3:10,15 32:12 34:16 84:18 140:17
**Agreeing** [2] 142:15,22
**Agreement** [35] 4:13 27:17, 21,23 30:1,21,23,25 39:3 40:18 41:19-20 42:2 43:5,7,10 53:5,9,12,16,22 54:2 55:2 97:14 99:4 76:3 84:19 87:24 97:15 115:5 134:15 136:4 139:11 140:12 143:5,17
**Agreements** [3] 119:14 115:23 115:6-7
**Ahead** [9] 16:6 34:21 78:2 104:5 126:9 127:13 131:15-16 144:10
**Air** [2] 71:16,20
**Airborne** [7] 70:20,24 71:1,5, 11 72:15-16
**Allege** [1] 84:7
**Allen** [46] 31:20,23 32:20 38: 11,15-16,18,22,24 39:6,9,13 40:14 41:9,11,14 42:22 43:4,19 47:14,21 48:14 49:7,25 50:3 52:20 54:18,21 59:15,24 61:14 81:4 82: 8,14,20 84:11,15,22 85:14 86:12, 22 93:19 102:24 129:8
**Alleviate** [1] 8:22
**Allow** [1] 118:14
**Allowed** [2] 68:24 128:23
**Allowing** [1] 147:5
**Almost** [1] 81:1
**Ammonium** [1] 75:4
**Amount** [16] 17:13 19:1 23:2 26: 24 49:14-15,19 56:13 88:12 88:9 89: 9 92:6 94:4 98:3 121:11 143:6
**Amounts** [1] 16:13
**And-some** [1] 100:14
**Anger** [2] 8:19-20
**Answer** [12] 5:22,25 78:2-3 80: 18 110:9 117:24 132:14,24 133:1 145:24
**Answered** [3] 68:11 143:10 148:22
**Answering** [5] 6:10 73:5 130: 24 131:24 132:8
**Answers** [1] 117:25
**Anticipate** [1] 80:9
**Anticipated** [2] 44:14 79:20
**Anticipates** [1] 80:12
**Anticipating** [1] 94:2
**Anxiety** [1] 8:20
**Anyway** [3] 41:11 125:16 130:9
**Aortic** [1] 16:18
**Apart** [1] 136:23
**Apartment** [1] 76:2
**Apologize** [6] 60:2 67:14 76:1 124:2 130:9 143:9
**Apologized** [2] 81:17 145:3
**APPEARING** [4] 2:4,8,12,16
**Application** [1] 22:9

---

**PARKER vs W.R. GRACE & COMPANY**                    **Deposition of MEL PARKER**

---

**Apartment** [1] 76:2
**Apologize** [6] 60:2 67:14 76: 1 124:2 130:9 143:9
**Apologized** [2] 81:17 145:3
**APPEARING** [4] 2:4,8,12,16
**Application** [1] 22:8
**Appraisal** [15] 93:25 94:5-6, 13 95:2 102:11,15 111:2,7-8,11,14 113:7 119:2
**Appraisals** [1] 122:8
**Appraised** [3] 63:15 111:1 118:25
**Appraiser** [1] 63:16
**Appreciate** [6] 16:9 25:14 123:23 135:21 138:22 149:3
**Approach** [1] 138:2
**Approached** [9] 13:21-22 31: 5 68:18,20 80:25 82:9 85:10 114:8
**Appropriate** [2] 113:6 118:10
**April** [9] 85:23 86:1,9,11 87: 10,16 93:13 95:5
**Area** [8] 89:11,25 36:5,13 55: 22 80:20 114:1
**Areas** [3] 39:11 41:3 67:20
**Arguably** [1] 127:19
**Argue** [2] 127:9 131:6
**Arizona** [1] 108:9
**Arrived** [1] 70:22
**Article** [2] 35:23 36:2
**Articles** [3] 37:12 49:9 68:17
**Asbestos** [29] 11:9 35:3,10, 15,20,23 37:9-10,22,24 38:4 40:23 68:14 70:17 71:11-12 72:15 83:18 114:5-6 122:4,10,23 141:5-6,14,20 145:9
**Asbestosis** [2] 83:22 84:2
**Aspect** [5] 24:5 52:10 67:8,25 111:19
**Aspects** [3] 66:21 68:6 90:15
**Asphalt** [2] 32:6 39:12
**Assessment** [2] 11:10 73:13
**Assets** [3] 22:9,12 46:21
**Assigned** [1] 129:19
**Assist** [4] 120:4,21 129:15 130: 5
**Assistance** [1] 118:13
**Assistant** [1] 97:2
**Assisting** [2] 130:12-13
**Associated** [2] 141:6,14
**Assume** [4] 133:2 135:2 137:13 141:10
**Assumed** [2] 77:25 125:8
**Assumes** [1] 77:22
**Assuming** [2] 77:17 78:6-7
**Assumption** [1] 133:4
**Assurance** [1] 11:13
**Assured** [1] 10:8
**Attached** [1] 60:22
**Attempting** [1] 116:4
**Attention** [1] 115:1
**Attorney** [3] 50:3,7 97:2
**Attorneys** [4] 123:19 124:1,9 130:20
**Audibly** [1] 6:1
**Authorized** [1] 137:5
**Available** [4] 24:13 122:3,5 137:11
**Aware** [10] 8:4 16:5 49:12 57:8 82:20 113:8,11 141:10,19 142:2
**Awful** [2] 18:7 19:20
**AZ** [1] 1:11

---

**B**

**Bachelor's** [1] 12:18
**Bad** [2] 132:19 141:17
**Bag** [5] 106:11 107:22 108:1 110:

1,20
**Bagged** [1] 104:6
**Bags** [24] 104:20 105:3,19-20 104:5,8-9,12,14,17-18,22,24 107:1-2 108:4,11-12,15,22 109:5 110:6,12, 18
**Bank** [7] 22:11,13,16,24 52:8 63: 14
**Banker** [1] 23:9
**Banks** [1] 22:17
**Bare** [1] 17:17
**Barrie** [2] 94:10 95:22
**Bashful** [1] 6:5
**Basic** [1] 118:1
**Basis** [2] 70:14 137:15
**Battle** [3] 123:11-12,14
**Beams** [1] 49:17
**Became** [4] 23:13 24:23 62:12
**Become** [2] 35:20 118:14
**Becomes** [1] 62:7
**Becoming** [1] 35:15
**Bed** [2] 75:15 76:20
**Beds** [1] 99:10
**Began** [3] 16:21 57:6 67:15
**Begin** [1] 5:21
**Behalf** [1] 1:17 2:4,8,12,16 121:9
**Behind** [1] 43:23
**Bell** [1] 26:4
**Belonged** [2] 33:7 146:12
**Belongs** [1] 146:15
**Benefit** [1] 29:25
**Best** [6] 61:5 63:24 66:6 75:3 133:3 151:12
**Better** [10] 21:19 24:6 30:13 45:22 52:9 64:2 70:4 80:18 95:17 98:2
**Between** [26] 3:4,11,16 15:2 18:20 20:13,23 21:6 23:17 29:6 35: 2 42:17 45:13 47:12 48:1 52:2 63: 14 67:12 70:20 71:13 74:21 97:17 111:21 134:20 138:17 134:15
**Beyond** [4] 146:11-12 147:1 148: 21
**Bid** [5] 54:18,23 55:1,12 61:23
**Big** [4] 32:17 33:14 125:10 129:17
**Bigger** [1] 32:14
**Bill** [3] 33:19 38:8 79:6
**Bins** [1] 98:22,24
**Bit** [2] 21:7 96:20
**Blanks** [1] 58:16
**Blocks** [1] 146:3
**Boats** [1] 30:3 80:5
**Bob** [7] 36:17,19-20,22 37:4 40: 4,14
**Boiler** [1] 53:16
**Bonners** [3] 36:9 55:18 136:17
**Born** [1] 16:20
**Bottom** [1] 134:23
**Bought** [10] 18:23 29:20 41:25 61:16 62:19 64:23 104:20 107:3 108: 22 144:14
**Boundary** [3] 106:13 107:23 108:2
**Box** [4] 2:6,10,14,18
**Boyd** [1] 117:2
**Break** [12] 80:18 52:19 60:13 89:2,23 90:23 119:6 132:1,6,12,14 147:23
**Breakdown** [2] 15:19 89:8
**Brief** [1] 139:19
**Bring** [5] 101:4 103:5 105:22 107:4-5
**Brings** [1] 7:10
**Brought** [3] 43:12 44:7 48:10 72:2 75:23 80:5 83:24 105:5 114:25

---

129:16 131:23 134:20 147:17
**Build** [10] 8:17 9:12 40:5 45:4 79:15-16 80:4 98:12 120:15,25
**Building** [6] 20:14 21:2 39: 18 45:10,13 101:9
**Buildings** [4] 94:18,20-21 114:2
**Built** [14] 40:8 45:15,17 98:14-15,17,23,25 99:15 119:19 120:3 146: 22 147:20
**Bunch** [1] 44:7
**Buried** [1] 101:6
**Burning** [1] 14:2
**Business** [84] 9:25 16:25 17: 22 18:2,10,15,21 19:12,24 20:12, 14,17,19,22,24 21:1,4,14,18 22:5, 9,20-21 23:20,25 24:22 27:2 28:11, 21 29:7-8,17 30:5-6,8,11,20,22 31: 11 50:13-14 63:15 64:5,7,9 65:4,12 69:8,10,12,14,21 67:8,25 68:2,6,8 69:5,14 77:20 78:10 79:7,19 89:9, 12,22 93:10 91:24 92:19 94:11,22 97:12-13 98:7 103:14 109:23 111:19, 22 112:13 120:20 121:4,6 140:5 144: 11
**Businesses** [1] 66:20
**Buy** [30] 19:6 33:24 34:21 39:7, 22 41:23 43:3,17 47:8 53:18 56:3 57:25 58:14 60:9 62:2 64:16 76:7, 23-24 85:22 105:3 133:17 134:24 135:12,17,25 136:2-3 138:6 139:5, 11 140:11 143:5,17 144:2 148:9
**Buy-sell** [38] 4:13 30:21,23, 25 39:3,7 40:17 41:18,23 42:4,17, 19 43:5,7,10,17 47:8 57:14,25 58: 14 59:4 60:9 84:19 133:17 134:15, 24 135:12,17,25 136:4 138:6 139:5, 11 140:11 143:5,17 144:2 148:9
**Buying** [2] 33:2 104:1

---

**C**

**Cabinets** [2] 75:22 76:25
**CAG** [1] 86:15
**Calculated** [1] 121:21
**Calculations** [1] 121:14
**Cannot** [7] 23:11 70:6 101:7-8 145:10-12
**Capacity** [1] 137:6
**Caption** [2] 3:13 151:8
**Car** [1] 41:5
**Care** [4] 49:4,6 84:20 125:7
**Carriage** [1] 99:17
**Carrying** [1] 27:7
**CASCADE** [1] 108:19
**Case** [28] 77:25 96:7 97:2 124:9, 17-18,23 125:6,8,10,20,25 128:2-4, 14,22 129:13,20 130:12,15,22 141:2-3 145:23 147:12,17 149:2
**Cases** [3] 23:7 130:25 131:4
**Casual** [1] 86:17
**Caused** [1] 8:5
**Causes** [1] 127:23
**Ceased** [2] 14:11 107:19
**Cement** [8] 14:16 31:25 32:6 44: 1,8,13 103:25 104:8
**Certain** [3] 66:11 137:8
**Certainly** [2] 77:24 130:18
**CERTIFICATE** [1] 151:1
**Certified** [2] 94:3 113:1
**Certify** [1] 151:4
**Chairs** [1] 77:1
**Champion** [6] 12:24 13:1 16:1 18:22 19:3 21:11
**Chance** [3] 52:15 133:17,23
**Chandler** [2] 108:9 110:14
**Chaos** [1] 65:7
**Charge** [2] 62:16,25
**Chase** [1] 141:18
**Chat** [1] 119:7
**Cheaper** [2] 104:3 112:19
**Cheated** [1] 62:20
**Check** [1] 66:4
**Cherry** [1] 126:18

---

**Children** [4] 6:22,24 7:4 83: 11
**Cigarettes** [1] 30:24
**CIRCLA** [2] 126:1,20,22
**Circle** [2] 117:6,13
**Citizen** [1] 130:2
**Civil** [4] 3:14 126:19 127:3 128: 23
**Claim** [4] 121:8 133:11,13 142:8
**Claimed** [1] 96:19
**Claiming** [3] 7:11,13,16
**Claims** [1] 114:4
**Clarification** [1] 25:7
**Clarified** [1] 64:2
**Clarify** [9] 10:17 16:3 31:15 42:21 44:24 45:10 121:13 138:18 139:23
**Clean** [19] 40:23 41:3-4 48:12, 16 50:5 72:7,11 79:5 84:11,16 112: 10,12 113:5,9,14-15 114:9,21
**Cleaned** [4] 11:9,12,17 41:8 77:8,11,18 78:6,8,21 79:5 83:14 84: 17
**Cleaning** [2] 71:24 110:2
**Cleanup** [6] 39:4 41:15 42:24 73:14 115:14 144:5
**Clear** [8] 5:23 15:7 65:17,24-25 66:3 75:25 124:24
**Clearing** [1] 16:9
**Clearwater** [1] 53:18
**Cleary** [3] 85:11 87:25 91:21
**Client** [2] 57:21 58:5
**Client's** [1] 126:21
**Close** [4] 12:5 119:19 120:13 147: 23
**Closed** [8] 13:12 25:18 37:3 42: 18 56:9 58:3 65:13 120:23
**Closing** [2] 45:1-2
**Closure** [1] 116:4
**Clothes** [4] 74:14-15,17,19
**Co** [1] 124:11
**Co-counsel** [2] 124:11-12,15
**Collapse** [1] 80:15
**Color** [4] 106:6,11-12 108:1
**Colored** [2] 108:11,15
**Combination** [2] 104:2,8
**Combinations** [1] 69:1
**Combined** [1] 111:20
**Combining** [1] 112:4
**Comfortable** [3] 81:22 135:5 137:18
**Coming** [4] 85:3 99:6 110:9 146: 25
**Comment** [4] 87:1-2,25 118:18
**Comments** [1] 147:16
**Commercial** [1] 67:20
**Commission** [4] 131:12 140: 20 150:24 151:20
**Common** [1] 117:12
**Company** [18] 1:8-10,17-18 2: 12 12:25 13:17 19 21:10 23:18 53: 17,22 55:18 110:8 137:2
**Comparison** [1] 130:17
**Compensation** [1] 16:24
**Compensatory** [1] 121:10
**Complaint** [1] 140:10
**Complaints** [2] 147:14,10
**Complete** [2] 90:7,15
**Completed** [3] 45:7 69:19 111: 14
**Completely** [4] 11:12,17 120: 16 128:21
**Complimentary** [1] 40:15
**Compound** [1] 78:14
**Computed** [1] 33:20
**Computer** [1] 51:24

---

**PARKER vs W.R.GRACE & COMPANY**                                    Deposition of MEL PARKER

Compensatory [1] 121:10
Complaint [1] 149:10
Complaints [2] 147:14,18
Complete [2] 90:7,15
Completed [3] 45:7 69:19 111:14
Completely [4] 11:12,17 120:16 128:21
Complimentary [1] 40:15
Compound [1] 78:14
Computed [1] 33:20
Computer [1] 51:24
Concern [5] 37:25 71:8,21 72:14 73:1
Concerning [2] 57:15 133:11
Concerns [4] 62:23 90:21,25 91:3
Concluded [1] 149:6
Concrete [1] 39:12
Cones [1] 90:17
Confident [1] 6:9
Confuse [1] 132:17
Confused [1] 104:10
Connected [1] 99:1
CONNECTICUT [1] 1:8
Consequently [6] 31:2 55:24 57:7 76:10 137:9 146:23
Consider [2] 20:19 77:2
Considerable [4] 17:10,13 19:1 121:18
Considerably [1] 66:22
Consideration [3] 8:16 35:6 37:23
Considerations [1] 18:19
Considered [2] 24:18 46:8
Consistently [1] 83:16
Constantly [2] 39:18 49:12
Constraints [1] 112:14
Construction [1] 115:14
Consultant [1] 20:10
Consulting [1] 35:1
Consummate [1] 34:4
Consummated [2] 56:25 139:10
Contact [2] 81:2-3 85:7 136:1,7 137:1,7 139:6 140:10 141:1 142:5-6
Contacted [2] 107:9,13
Contacts [2] 138:8 140:8
Contains [1] 78:12
Contaminated [9] 24:17-18 46:4,9 70:17 74:9,15 75:18 122:23
Contamination [7] 70:20-21 73:25 74:16 82:7 83:5 141:20
Contents [1] 135:5
Contingencies [1] 34:22
Continue [1] 65:2
Continued [2] 14:6-7
Contract [1] 50:3
Contractor [3] 45:16 81:5 114:10
Contractors [2] 17:8 45:18
Contracts [2] 10:14 80:3
Control [3] 50:1 51:5,8
Convenient [1] 148:23
Conversation [11] 47:20 48:18 86:17 117:19 135:9 139:19 140:1 143:17,25 144:19,23
Conversations [5] 39:8 40:2 95:16 143:14 145:12
Conversed [1] 40:13
Conveyor [1] 44:9
Copies [4] 24:3,8,10 52:7
Copy [19] 27:21 42:3,6-7 57:14, 19,22,24 89:15,18,20-21 90:23 92:

4 95:21 121:19 133:17 134:4 143:5
Corporate [1] 127:20
Correct [70] 5:20 6:15,19,23 7:21 10:20 12:14 26:11,14 29:11,13 33:5,13 40:23 51:7 55:11 56:12 57:1,17 59:16 63:21 69:5,16 70:13 72:14 76:21 84:6 86:9 97:10-11 92:22 97:4,20 103:19 108:24-25 112:18,20 114:19 118:23 119:4,24 120:17 121:1 133:5 134:22-23 135:7,12 136:10-11 140:22 141:2,7-8,14 142:11,16,20,23 143:12,18 145:4-5,18 147:20 148:11,14,16 151:11
Corrected [1] 143:24
Correction [3] 144:2 150:1-2
Corrections [1] 150:16
Correctly [1] 120:12
Correspondence [6] 47:10-11 49:1,24 52:20 95:16
Cost [1] 45:20 100:4,8,19 101:3,9,24 102:2,16 104:1 118:25
Costs [1] 102:5
Counsel [34] 2:22 3:4,11,16 7:17,22 25:6 42:10 50:20 63:19 78:13 90:11 121:17 124:9-11 125:20 127:16-17,19,22 128:16 129:2,7,11,13-14,24 130:13,21 133:16 145:19 148:18
Counter [3] 87:12,21 90:24
County [5] 1:3,25 3:9 97:2 151:19
Couple [3] 5:17 90:4 132:10
Course [3] 98:18 99:11 136:18 139:19
Court [7] 1:1 10:18 88:1 121:9 124:25 125:1-2
Courts [3] 127:3 128:13 129:20
Cousin [1] 53:23
Covenant [2] 115:8,11
Cover [5] 44:11 90:15,20 101:25 104:25
Covered [3] 91:2 101:21 143:13
CPA [1] 95:12-14
Craft [1] 31:19
Creates [1] 9:20
Credibility [1] 147:4
Creek [5] 20:16 90:6-7,21-22
Crew [1] 72:2
Criminally [1] 97:3
Criticism [1] 148:10
Crookshanks [1] 111:3
Crookshanks' [1] 113:7
Crown [2] 55:18,25
Cruised [1] 55:23
Cubic [4] 106:4 110:16,18-19
Culvert [1] 49:19
Current [1] 5:12
Custom [2] 40:8 119:20
Cut [1] 56:6 60:7,9 141:18
Cutting [1] 53:15

## D

D/b/a [1] 1:10
Daily [1] 35:22
Dam [1] 146:20
Damages [2] 110:9 121:10
Dandy [1] 110:21
Dangers [3] 141:6,13,20
Dare [1] 131:17
Date [4] 53:7 54:14 63:2 81:10
DATED [1] 150:17
Dates [1] 63:18
Daughter [1] 93:15
Davenport [1] 77:1
Days [1] 35:24
Deal [2] 22:16 34:4 42:18 56:10,25 58:4,20 65:7 137:14 139:10
Dealing [3] 22:18 65:7 106:10

Dealings [3] 34:9 136:22 137:16
Dealt [2] 52:24 96:11
Deb [1] 134:10
Debra [4] 1:24 3:6 151:3,18
Debt [1] 9:13
Deceived [5] 82:23,25 84:3 86:21,23
December [2] 12:4 70:8
Decide [1] 138:2
Decided [2] 19:5 21:13
Decision [4] 10:14 136:8 143:1 144:12
Decontaminated [3] 74:9-10 75:6
Decontaminating [2] 75:3 112:16
Decontamination [2] 74:11 112:16
Decreased [3] 68:7,11-12
Deed [5] 10:9 11:14 42:1 79:12 113:25
Deep [2] 8:13 101:6
Defendant [2] 2:16 120:2
Defendants [7] 1:12,17 2:12 7:15,20 8:6 128:2
Defining [3] 30:14
Definitely [5] 8:20 40:3 63:9 120:8 121:17
Degenerate [1] 16:21
Degree [2] 12:17
DELAWARE [1] 1:9
Deleted [1] 54:4
Delineated [1] 111:21
Deliver [1] 96:18
Demand [1] 60:9
Demolish [1] 114:2
Denver [1] 127:22
Department [4] 14:21 15:12 20:3 26:10
Dependent [1] 7:5
Depo [1] 4:14
Deponent [2] 6:3,11 25:8 63:21 79:10 85:25 86:2,8 90:14 116:20 148:16
Deposed [2] 125:15
Deposition [19] 3:5,12,18 5:10,14 56:17 60:23 122:25 124:11 125:11,16 126:25 127:1,11,20 130:3 133:14 148:19 149:5
Depositions [1] 127:4
DEQ [1] 15:22
Describe [3] 7:8 8:10 20:16
Described [1] 95:25
Describing [1] 121:1
DESCRIPTION [4] 4:11
DeShazer [57] 1:11 2:16 32:4 34:14 47:18 58:20,23 59:1,3 131:22 132:4-5 133:8,11,12 134:20 135:10-11,15-16,24 134:1,4,20,22 137:2,5, 15,22 138:15,24 139:7 140:3,15 141:19 142:5,8,17-18,24 143:15-16 144:1 145:7,13,16,22-23 146:1,4 147:20-21 148:11

Destroyed [52] 46:14-15 47:4 51:5,19,24-25 52:1,6 75:18 104:7 106:19
Destruction [1] 99:14
Detail [1] 8:10
Determination [1] 112:24
Determined [3] 56:5 73:16,23
Determining [1] 73:25
Develop [1] 80:3
Development [4] 1:9 33:8 34:1 144:16
Difference [7] 52:2 70:20 71:11,13-20 129:18 130:21
Different [18] 53:11 55:3-4 70:18 71:15 80:15 103:10 106:5 108:2 7,11,15 113:4 125:18 126:24-25 129:

15 145:7,16
Differently [1] 86:19
Difficult [1] 102:17
Difficulty [2] 122:18 127:24
Directed [1] 24:7
Direction [1] 151:10
Directly [1] 125:24
Disability [3] 16:4,12,15
Disagree [4] 78:7 125:14 128:19 130:9
Disappointed [1] 95:8
Disclosed [2] 126:6,9
Discouraged [2] 77:13-14
Discovery [12] 26:2 46:1 52:14 59:7 60:17 90:3 121:20-21,24 122:9,24 131:3
Discussed [6] 18:20 80:20 84:24 90:22 115:12,18
Discussion [8] 32:19 35:10 84:22 85:17 86:13,14 114:20 117:17
Discussions [7] 35:3 81:15 90:8 91:8 95:19 116:23 136:9
Dismayed [3] 140:19
Disposal [3] 14:1
Dispossessed [2] 64:9
Dispossession [2] 8:15 65:5
Disputes [1] 126:20
DISTRICT [2] 1:1-2
Distrust [1] 0:18
DMH [1] 150:24
Document [2] 52:12 56:21 90:22 113:14 134:7 135:3-4
Documentation [6] 52:17 54:20 73:18 74:1-2 133:13
Documents [24] 46:2,10-12, 17,20,23 51:3-4,9,15,20 58:4,9 60:3 96:9 97:6 97:11 121:18,24 122:3, 13 123:1
Dollar [2] 55:3 143:22
Dollars [2] 25:23 100:14
Done [28] 10:5-6 11:20 14:1,8 17:7 43:4-5 49:13 50:11 55:17 59:12-13 70:5 73:12 84:14 92:23 94:5 95:22 103:24 128:4 123:23 130:25 131:1-2 147:24 149:4
DOT [3] 26:4 27:17 115:4
Down [26] 18:25 24:15 32:15 33:18 34:2-3,6 39:23-24 40:17 48:10 51:21 69:4,8,13,17 71:3 72:7 82:15 89:10 93:22 97:24 116:1 120:6,18 136:17
Downtown [14] 28:18 29:9,21 64:7,15,17 65:4,12,15 120:8,13,18, 20,22
Draft [2] 53:5 57:6
Drafted [6] 53:3,9,17 59:21 91:1,7
Draw [1] 22:12
Drawing [1] 130:17
Drawn [5] 13:17 64:4-5 139:5
Dress [1] 107:2
Dressing [2] 104:23 109:10
Drive [2] 9:5 26:21
Driving [2] 99:17 105:7
Duly [5] 5:2 151:6
Dumped [2] 43:20 44:17
During [3] 5:10 21:3 31:2 35:13,16 47:22 40:2 70:7 95:18 116:3 125:10 136:18 139:18
Duties [1] 126:22
Dying [1] 83:21

## E

Earnest [2] 34:3,13
Ease [1] 118:21
East [1] 131:1
Economical [2] 72:6 112:17
Economics [2] 72:10,12

Dying [1] 83:21

## E

Earnest [2] 34:3,13
Ease [1] 110:21
East [1] 131:1
Economical [2] 72:6 112:17
Economics [2] 72:10,12
Edge [1] 107:24
Effect [1] 48:6
Effort [1] 75:2
EIGHTH [1] 1:1
Either [3] 63:11 91:7 142:19
Electricity [3] 99:8 101:2, 14
Element [2] 35:6 112:13
Eleven [2] 21:3 22:23
Eleven-year [2] 21:3 22:23
Elsewhere [2] 13:21 80:6
Emotional [2] 8:8-9
Employed [1] 67:23
Employee [1] 142:11
Employees [1] 84:1
Employment [4] 12:24 13:21 27:7 55:21
End [3] 34:17 50:8 80:17
Ended [5] 47:25 62:18 75:10 88:2 93:2
Endurance [1] 132:11
Engineering [2] 1:10 12:17
Enjoy [1] 99:17
Enter [1] 27:16
Entered [7] 41:19,21 43:8 59:4 115:5,8,10
Entire [2] 99:25 101:21
Entirety [1] 144:18
Entitled [2] 52:13 120:15
Environmental [2] 14:21 15:12
EPA [5] 11:18 36:3 37:14 46:13, 16,22 47:4 51:3-4,21 60:4 65:8 68:18,20 70:5,22,25 71:1-2,4,7,24 72:2,6 77:13 79:6 81:1 82:18 96:1-2 106:20 112:8,11,22-23 113:8,13,15,18 114:8,11,15,17,22,25 115:6,9,23 116:11,12,23 117:20 118:2-3,6-8,13,18,22 126:1,21
Equipment [4] 19:13,21 48:8 111:24
Equity [1] 22:9
Erik [2] 2:9 123:7
Esq [2] 2:5,9,13,17
Established [4] 73:15,24 99:9 102:10
Estate [3] 137:19 138:11,16
Esthetics [1] 18:8
Estimate [4] 15:5 101:2,23 102:19
Estimating [1] 111:12
Event [1] 120:24
Eventual [1] 120:3
Eventually [5] 49:22 61:7 73:3 120:25 140:15
Evidence [3] 141:25 142:3 145:14
Evidenced [2] 115:4 130:6 148:9
Evident [2] 62:12 79:25
Exact [6] 23:2 54:14 81:10 82:12,22 88:9
Exactly [5] 79:3 82:22 87:4 103:24 135:20
Examination [8] 4:4 5:5 51:1 90:1 119:12 124:7 131:19 140:4
Example [1] 8:2 17:25 24:11 43:23 76:23 80:4 125:25 146:7,15
Excellent [1] 145:20
Except [2] 122:7 150:15

Exchange [1] 140:24
Exchanged [1] 43:6
Excluded [1] 127:4
Exclusion [1] 73:9
Executed [1] 57:15
Exhaust [1] 144:18
Exhibit [3] 56:17-18 60:16, 21-22 61:4 134:5,9,13-14 135:3 138:6 140:9
EXHIBITS [1] 4:11
Existed [1] 145:8
Existence [1] 141:5
Existing [1] 20:7
Expand [2] 32:8,23 144:10
Expanded [10] 67:5 102:22,25 103:2,5,8,12,16,20,22 104:15,18 105:3 108:8,20 109:2,6-7
Expanding [1] 143:9
Expansion [3] 32:1 66:13 110:9
Expansions [1] 66:10
Expect [1] 12:6
Expectations [1] 97:17
Expected [1] 92:8
Expecting [1] 55:15
Expenses [5] 26:8 28:6 89:9 93:23 118:2,7
Experience [1] 19:1
Experts [1] 112:23
Expired [1] 34:13
Expires [2] 150:24 151:20
Explain [1] 103:23
Export [1] 113:10
Exposure [3] 35:20 37:22 83:23
Expressed [2] 62:23 86:20
Expressing [1] 63:6
Expressly [1] 3:10
Extend [2] 47:15 146:20
Extended [2] 12:10 47:18
Extends [1] 140:21
Extensive [1] 94:1
Extent [3] 11:9 64:18,21
Extracting [1] 98:17
Extraction [1] 19:21 98:16 100:9-10

## F

Facilities [3] 19:4 32:8 144:9
Fact [15] 8:14 10:3,12 40:16 55:16 85:1 96:15 107:16 128:3 130:11,19 133:21 137:14,21 141:11
Facts [1] 77:24
Failed [1] 96:17
Fair [6] 23:8 70:9 132:24 134:4 135:2 137:13
Faith [1] 83:10
Falls [1] 2:6 104:19 105:2 110:7
Familiar [3] 52:17,25 55:22
Far [5] 9:16 33:9 40:19 86:17 130:1
Faster [1] 123:19
Favor [1] 139:17
February [1] 151:14
Federal [3] 20:4 115:6 124:25
Feelings [1] 8:14
Fees [1] 97:17
Feet [1] 101:6
Fellow [4] 48:6 81:4 95:14 111:3
Fellows [1] 119:7
Felt [18] 11:19 40:3 43:4 62:13, 19 82:10,23 86:20,23 89:9 91:3,25 93:5 112:14 113:22 140:4,6 144:8

Fence [1] 99:3
Fencing [2] 100:24-25
Ferry [3] 36:9 55:18 136:17
Few [2] 19:9 105:20
Fight [3] 123:11,14
Figure [7] 22:25 71:16 76:17 92:19 101:8 112:6 121:12
Figures [4] 33:20 45:23 55:4 95:10
Filed [1] 121:9
Fill [3] 44:7 90:16,19
Filled [2] 90:22-23
Final [4] 54:16 61:9,11 96:14
Finalized [1] 12:2
Finally [2] 16:23 72:5
Finance [1] 55:15
Financial [6] 9:14 22:4,7 23:24 24:4 82:4
Financing [4] 21:25 22:24 34:21 64:1
Fine [8] 41:1 127:23 131:14 132:2 140:3 145:19,25
Finish [3] 5:22 74:12,23
Finished [3] 12:23 45:11 112:9
Finishing [1] 75:23
Fire [2] 54:16 62:4
Fired [1] 104:7
Firm [4] 87:12 129:19 142:6
First [29] 5:2,18 18:15 21:17, 22 21:6 25:18 28:12 32:13 35:19, 22 36:21 37:8 41:18 61:15 68:13 70:4,10 81:1,3,14 84:23 86:3 87:5 125:14 132:10 136:1 141:4 151:6
Fished [1] 36:18
Five [13] 7:3 28:19 32:18,23 72:2 80:1,25 89:23 92:10,12,20 101:6 119:5
Five-year [2] 92:10,12
Flathead [3] 1:25 3:9 151:19
Flew [1] 56:1
Floating [1] 104:24
Floors [2] 98:23 100:16
Flowers [2] 67:4 120:21
Fluctuates [1] 80:17
Focus [3] 110:6 147:11,16
Focused [1] 132:4
Folks [2] 30:16 87:9 88:1 90:5 91:7,9,14 92:24 95:1 104:21 140:16
Follow [5] 15:14 36:3 37:13 119:8 146:24
Follow-up [1] 37:13
Followed [1] 147:4
Following [4] 12:0 70:10
Follows [1] 5:4
Foot [2] 106:4 110:18
Foregoing [3] 150:14 151:5,11
Foremost [1] 132:10
Forest [2] 12:18 13:17
Forester [3] 13:19 53:24 55:19
Forklift [1] 18:4
Form [7] 23 17:8 25:21 26:1 64:6 77:21 78:11 100:3 132:24
Formal [2] 122:17
Format [2] 57:8 58:18
Formation [1] 19:10
Former [2] 134:17 135:18
Forms [1] 46:20
Forth [4] 47:11 48:25 75:1 90:8
Forward [1] 9:15
Fought [1] 49:11
Four [5] 79:24 88:25 106:4 110:16,18
Fourth [1] 54:1

Frame [1] 92:25
Framing [1] 49:20
Fraud [2] 96:7 97:19
Free [4] 65:17,24-25 66:2
Friend [1] 36:16
Friendly [1] 139:1
Friends [1] 36:14
Friendship [1] 138:23
Front [4] 44:6 60:11 76:25 90:11
Fruit [2] 30:3 90:24
Fruits [1] 30:9
Frustration [3] 8:12 10:25 11:7
Frustrations [1] 9:18
Full [1] 5:7
Fully [1] 78:22
Furnished [4] 75:8-9 76:3
Furnishing [1] 76:15
Furniture [2] 75:20 76:4
Future [5] 9:24 39:24 114:5 116:15 148:21

## G

Garlington [2] 2:14 129:13
Gary [5] 2:17 122:2,5 131:17,21 132:13
Gasoline [2] 30:25
Geez [1] 129:8
General [1] 7:8
Generally [1] 128:13
Generate [1] 115:13
Generated [1] 97:11
Gentleman [3] 94:9 95:20 107:11
Gentlemen [4] 85:18,20 93:1 147:24
Gesturing [1] 9:16
Gifts [1] 75:1
Gilbert [1] 95:15
Given [6] 11:13 25:21 53:14 75:1 87:9 124:7
Glacier [7] 22:17-18,24 23:10, 15 52:7 68:20
Goal [3] 9:12 79:15 120:12
Goals [1] 30:13 90:14
Grace [25] 1:8,17 2:12,22 4:12 7:15 8:5 10:2 13:11,15,18 14:4, 10,13,17 15:4,11,14 33:5 34:6 35:2, 7 40:18 47:12 48:1,3,5,8 49:4 50:7 52:12 52:21,23,25 53:2,22 54:7,12 55:16,20 56:8,25 57:15 58:2,7 61:14, 18 81:2,4,6 82:17-18 83:1,3,8 84:4, 9 85:7,11,18,20 87:9,15 88:8 89:11 90:5 91:7,9,13 92:3 98:11 99:6 100:5 21 101:15 105:5 108:12 110:14 113:9,14,20,24-25 114:7,9-10,18,20,23 118:3,5 126:15,20 127:19 130:20 134:16 138:21 139:9 140:25 141:21 142:11-12 144:4 146:12
Grace's [2] 90:19
Grade [2] 19:18 109:11
Graduate [1] 12:12
Graham [4] 36:17,19-20 37:4
Grandchild [1] 83:13
Grandchildren [4] 7:2,4 83:16 84:1
Grass [5] 17:19 44:4-5,14 99:25
Great [7] 2:6 65:7 104:19 105:2 110:7 139:17,20
Greatest [1] 120:7
Greatly [1] 149:2
Greenhouse [1] 19:7
Greenhouses [10] 19:17-18 31:25 66:15-16 98:18-19 100:12-13 101:19
Grew [2] 68:4 120:9
Gross [2] 92:12
Ground [9] 5:17 14:14 17:16 31:

**PARKER vs W.R. GRACE & COMPANY**                    **Deposition of MEL PARKER**

Great [7] 2:6 65:7 104:19 105:2 110:7 139:17,20
Greatest [1] 120:7
Greatly [1] 149:2
Greenhouse [1] 19:17
Greenhouses [12] 19:17 18:10-18 31:25 66:15-16 90:18-19 100:12-13 101:19
Grew [2] 60:4 120:9
Gross [2] 92:1,2
Ground [9] 5:17 14:14 17:16 31:1,3 77:22 93:5 100:2 144:8
Grounds [2] 7:24 70:12
Grow [4] 67:2 96:13 103:15 109:13
Growing [7] 17:11 19:1 20:6 44:4 67:3-4 68:12
Grown [2] 44:15
Growth [1] 67:10
Guess [13] 41:14 52:21 54:15 56:13,15,20 63:8 70:9 73:12 78:25 95:6 136:12 148:6
Guessing [1] 88:10
Guilty [1] 97:19
Gut [1] 9:6
Guys [2] 57:18 107:14

## H

Hac [2] 129:11,22
Half [1] 93:3
Handed [1] 52:12
Handing [1] 60:15
Handle [2] 30:19 122:4
Handled [2] 59:8 109:22
Handles [1] 137:3
Handling [2] 24:5 52:10
Hands [1] 49:8
Handwriting [1] 96:8
Harm [1] 37:22
Harmful [1] 30:4
Hazardous [2] 56:22 57:9
Head [4] 6:1,3,11 63:22
Health [4] 7:8 71:5,18 79:6
Heard [5] 38:14 30:1 54:24 77:13 125:11
Hearings [1] 86:16
Hedman [4] 1:24 3:16 151:3,18
Held [6] 24:11 31:3 50:22 89:25 119:10 147:25
Helena [1] 2:10
Helicopter [1] 56:1
Hell [1] 80:1
Hello [1] 139:2
Help [5] 5:23 0:21-22 10:24 125:17
Helping [3] 18:11 124:23 125:8
Herb [1] 99:9-10
Herbal [2] 67:1
Herbs [2] 67:2,11
Hereby [1] 151:4
Hereto [1] 151:8
Hereunto [1] 151:13
High [1] 82:18
Higher [1] 71:22
Highway [1] 1:20
Himself [1] 142:1
Hip [2] 15:2
Hire [1] 137:22
Hired [2] 20:9 137:23
Hiring [1] 94:2 114:21
Holding [2] 50:18 122:25
Home [24] 13:3,5 40:5 45:4,10,

14 65:9 77:3 79:15-16 90:14 101:10-11 115:19,19-20 120:2-4,14,16,25 131:7,8
Honest [3] 77:10 130:1,7
Honesty [1] 137:18
Hope [3] 0:25 129:6,8
Horse [5] 99:15,17 102:13-14
Hour [2] 14:5 93:3
Hours [3] 15:2,6 10:10
House [2] 24:16 40:9 43:24 44:6,9 45:17-18,20 51:23-25 52:1,5 64:6 71:3 75:17 76:8 90:25 127:19
Houses [1] 64:6
Huh-uhs [1] 6:1
Huhs [1] 6:1
Humans [1] 83:6
Hundred [1] 100:13
Hunted [1] 36:18
Huppert [1] 2:5
Hydrocarbons [1] 15:19

## I

I-beams [1] 49:17
Idaho [2] 53:17 55:18
Idea [1] 83:10
Ideal [1] 40:3,11
Identification [1] 61:2
Identified [2] 61:4 82:18
Identify [3] 61:1 83:23 134:24-25 135:1
Ill [2] 35:15,20
Immediate [5] 39:24 71:8,21 72:14 73:1
Immediately [7] 69:4 72:18-19,21,23-24 73:2
Impacting [1] 126:21
Important [1] 132:15
Importantly [1] 6:4
Impossibility [1] 72:10
Impossible [1] 77:23
Impressed [1] 39:17
Impression [2] 107:15,17
Improperly [1] 33:20
Improve [1] 40:18
Improved [1] 98:15
Improvements [4] 94:12,16 98:10-11
Inappropriate [1] 93:6
Include [1] 92:14
Included [5] 20:7 34:11 54:9 94:20 102:15
Income [24] 13:8,10 15:25 16:2 19:24 20:13 21:1,12,21 24:22 25:3,11,13,24 27:6 28:4 92:12 92:7,16-17,19 135:13,19 102:17
Increased [3] 66:14,22 68:10
Increasing [1] 23:18
Incurred [1] 110:7
Incurring [1] 118:2
Indeed [1] 135:4
Indemnification [1] 114:4
Indemnified [1] 110:14
Independent [2] 127:22 144:2
Indicated [7] 46:2 70:16 71:21-22 86:6 87:19 141:23
Indication [4] 20:5 50:6 61:15 84:12
Indicative [1] 113:24
Indicators [1] 71:16
Indirectly [1] 135:23
Individual [1] 15:10
Individuals [2] 68:22 72:3
Industry [1] 20:4
Information [17] 12:6 46:18-19 52:5 53:15 63:11 69:25 77:15

88:7 109:18 119:1 121:6 126:19 140:24 142:25 143:4,9
Informed [3] 41:12 120:17 140:24
Infrastructure [7] 94:22 99:5,7 101:1,12,16,24
Inheritance [5] 25:7,17,20-21,24
Initial [1] 91:17
Injected [1] 97:25
Injury [10] 7:12-13,19,24-25 8:1-2,5,8-9
Inn [1] 1:20
Inquiry [4] 122:25 123:23 132:3 133:7
Inside [1] 40:22
Insofar [1] 122:21
Instance [1] 122:8
Instead [1] 8:2
Insulation [12] 1:10,18 2:12 106:14,25 107:8 108:17 109:15 110:2-3,12
Insulted [1] 95:7
Insurance [1] 116:5
Integrity [1] 137:19
Intelligencer [2] 36:1 37:13
Intended [1] 113:25
Intensive [2] 17:22-23
Intent [3] 54:5 57:2 90:4
Intention [4] 44:3 77:19 79:7 122:12
Intentions [3] 77:8 78:8 90:19
Inter [2] 35:22 37:12
Interest [1] 114:13
Interested [1] 61:11
International [4] 12:24 18:23 19:3 21:11
Interrogatories [1] 130:25
Introduce [1] 56:16
Inventory [4] 94:23 105:24 106:19
Invest [1] 21:13
Invested [2] 20:13 21:13
Invoice [2] 109:14,22
Involved [8] 13:24 16:17 18:1 96:12 98:3 125:22,24-25
Involvement [1] 140:20
Involves [1] 126:18
Involving [1] 125:23
Irrelevant [3] 126:7 128:21
Irrigation [2] 101:18-19
Issues [1] 126:1
Itemized [1] 110:22
Itself [7] 39:4 40:25 52:23 62:12 94:23,25 100:16

## J

Jack [53] 11:1 34:14 47:18 54:14 58:20,22 61:21 62:3,7,9,13 131:22 132:5 133:1 135:10,15,23 136:1,6,20,22 137:1,4,11,14,21-22 138:1,7,19,23 139:16 140:19 141:19 142:5,8,24 143:15,23 144:1,7,13,16,20 145:22 146:1,4,23-24 147:12,17,19 148:10
Jack's [1] 147:3
January [1] 1:21
Jim [2] 81:5 84:22
Job [2] 14:8 37:7
Jobs [2] 17:12,24
John [1] 60:21
Joint [1] 65:16
JUDICIAL [1] 1:2
July [1] 51:11
Jump [2] 12:8 144:25

June [8] 51:10-12 73:8,11,23 74:20
Justify [2] 84:1 121:13

## K

Kalispell [2] 23:14 94:10
Kalkstein [16] 2:17-18 4:6 57:23 58:1 121:20-22 134:2,6,9,12 147:22 148:1,5,17 149:1
KD&C [3] 61:16 62:7 63:2
Keep [5] 5:23 21:2 32:9 39:14 51:23 84:19 99:15 104:24 132:16 140:18
Ken [1] 124:20
Kenneth [1] 2:22
Kept [6] 24:15 51:6,19-20 52:2,5 117:9 133:16 139:23
Kind [7] 12:6 27:16 73:20 113:3 117:9 133:16 139:23
KLCB [1] 10:22
Knee [1] 16:19-20
Knowing [4] 63:1 83:5 110:7,15
Knowledge [11] 44:19 46:25 48:17 54:3 59:6 63:25 70:19 89:19 91:12 95:3 106:16
Known [4] 11:2 36:19-20 53:23
Konstan [1] 68:21
Kootenai [5] 1:9 20:20 33:8 34:9 146:16

## L

Label [2] 106:5,8
Labeled [1] 53:14
Labor [2] 17:22-23
Lake [2] 35:22 37:12
Lamb [1] 2:2
Land [5] 31:22 33:14 78:22 94:25 96:4 146:18
Landis [4] 96:9-10 97:12,16
Landlord [1] 76:4
Lands [6] 13:11,14,23 20:3 137:4,8
Landscaping [14] 40:19 41:15 43:22 67:3,16,18-19,22,25 68:1-2,11 69:19 98:12
Language [2] 53:11
Larger [1] 109:11
Larry [1] 139:2
Last [12] 10:4 14:22,24 15:10 61:23 62:10 66:17 90:6 104:6 107:17 116:6 128:5
Late [3] 24:1 93:1 106:23
Law [2] 2:18 117:12 126:19
Lawn [1] 43:25
Lawsuit [10] 7:10,17 96:15,20,23 118:20 131:23 134:19 137:16 146:25
Lawyer [2] 91:24 127:23
Lawyer's [3] 139:10,25 144:17
Lawyers [6] 85:10 89:14 91:23 92:1 120:1,12
Lax [1] 147:9
Lease [2] 26:24 76:3
Leased [2] 75:19 76:9
Leasing [3] 26:23 75:7,20
Least [5] 12:1 58:4 103:10 137:17 146:3
Leave [8] 39:25 72:7,17,20,23 73:1,6-7
Leaving [4] 27:6,9 95:24 110:23
Led [2] 19:9 80:17
Left [21] 8:18 16:19-20 27:2 34:12 48:5,12 67:3,16,18-19 50:11 74:19 98:21 105:19,21 108:23 119:6
Legal [2] 96:25 125:23
Length [1] 91:20
Lerah [6] 1:5 2:21 6:14,24 82:21 121:5
Letter [5] 47:13 49:1 90:5 92:

**HEDMAN, ASA & GILMAN, INC. - 752-5751**              From Great to Left

**PARKER vs W.R. GRACE & COMPANY**                              Deposition of **MEL PARKER**

---

10 74:19 98:21 105:19,21 108:23
119:6
**Legal** [2] 96:25 125:23
**Length** [1] 91:20
**Lerah** [6] 1:5 2:21 6:14,24 82:
21 121:5
**Letter** [5] 47:13 49:1 90:5 92:
5 112:24
**Letters** [3] 48:18,20 90:4
**Letting** [1] 130:10
**Level** [4] 44:10 71:9 73:25 83:
23
**Levels** [3] 70:18 82:18 83:18
**Lewis** [46] 2:5 7:22 25:10 42:9
57:18,21,24 58:6 60:9,11 61:1,5 77:
21 70:11 116:8,16 117:5,11,16 123:
25 124:15,16 125:22 126:5,8,12,17
127:2,8,15 128:5,7,10,25 129:5,10,
17 130:1,6,14,23 131:7,11 148:25
**Liabilities** [1] 2:19 114:5
**Liability** [9] 115:24 116:2,
13,23 117:2,6,9,13,20
**Liable** [2] 117:12 118:6
**Libby** [13] 1:21 19:7 23:13 28:
17 29:21 36:7,13 47:23 83:20 136:
12,19 141:10 142:13
**Lied** [6] 8:14 61:25 82:3,10 86:
21 113:22
**Life** [3] 9:12 10:15 36:10
**Lightly** [1] 82:1
**Limit** [1] 112:12
**Limitation** [2] 75:24 125:5
**Line** [2] 83:2 150:2
**Lines** [2] 66:11 101:6
**List** [1] 33:16
**Listening** [2] 126:24 135:8
**Litigation** [4] 102:9 125:23-
24 126:18
**Live** [4] 19:8 20:3 40:7 79:7
**Lived** [5] 36:7,17 65:9 101:12
119:19
**Living** [8] 21:4 26:8,18 40:9-
10 76:2 120:14 136:18
**Lloyd** [2] 94:9 95:22
**Loads** [1] 107:17
**Loan** [2] 22:8 65:19
**Loans** [5] 21:17,20 22:11,19 64:
3
**Located** [1] 28:12
**Location** [7] 10:25 28:22 29:
14,23 30:12 40:11 137:25
**Locations** [3] 29:7,17 33:10
**Logs** [2] 96:17 97:25
**Lohn** [2] 2:14 129:14
**Look** [13] 10:10 27:5 32:5,11 33:
1 52:15 53:12 60:13 69:7 72:4 106:
3 132:13 133:18
**Looked** [5] 32:25 33:8 91:17 99:
13 133:25
**Looking** [9] 13:14 13:19,25
32:20 116:12 124:12
**Looks** [1] 17:17
**Lord** [1] 105:8
**Lose** [1] 31:6
**Loss** [1] 53:15
**Lost** [9] 10:14 20:15 75:11 77:1
96:19 108:21 110:23 111:18 118:20
**Low** [1] 19:18
**Lund** [2] 2:22 85:11 91:22 124:6,
21,24

## M

**MacDonald** [78] 2:13 4:5 5:6
7:18 8:3 25:14-15 42:11,15 50:17
44:2 64:15,19 57:20 60:12-13 40:10,
12,14 61:6 63:20,23 78:1,19,24 79:
3-4,17 80:18 80:22 90:2,12,16 94:
17 104:16 116:10-11,18,21 117:8,14,
18 119:5,13 121:17 122:7,14,21 123:
6,10,16,20 124:14,19,22 125:13 126:
3,7,11,14,23 127:5,13,25 128:6,9,
18 129:3,8,12,23 130:4,8,16 131:5,

---

9,14 149:4
**Machine** [1] 103:25
**Man** [2] 101:4 127:23
**Management** [3] 12:19 13:18
53:3
**Manager** [5] 23:12 54:15 55:24
62:4 142:12
**Maneuver** [1] 18:4
**March** [11] 1:19 70:10,12 72:2,
14 85:9,13,18,22,24 86:6
**Mark** [2] 60:16 134:3
**Marked** [4] 4:13 56:18 134:13
**Market** [7] 19:23 20:9 32:4 140:
16,18,21,25
**Marketable** [3] 70:21,23 79:
12
**Marriage** [3] 8:16 9:4,10
**Married** [2] 6:14,18
**Marry** [1] 6:16
**Match** [1] 146:13
**Matched** [3] 30:3,7 14:17
19:13,15 24:15,17 44:1,8 48:8 47:13
48:9,12 49:5,12-14,16,19-20,22-23
50:12 51:25 64:23 75:11 96:16 97:
24 98:7 104:5,15,20 105:1,6,11 107:
6 109:8,11 120:9
**Materials** [7] 43:8,11,13-14,
20 65:3 122:22
**Matter** [4] 15:8 50:21 116:24
130:11
**Matters** [3] 49:10 130:1 133:11
**Mean** [19] 9:2 13:8,14 18:16 29:
25 70:21,24 79:9,22 82:7 86:14 98:
11 107:14 112:2 114:17 116:18 117:
7,9 135:18
**Means** [2] 71:8 73:25
**Meant** [3] 16:8 84:16 132:17
**Measured** [1] 71:17
**Measurements** [1] 72:5
**Media** [1] 103:15
**Meet** [1] 59:3
**Meeting** [5] 85:12 87:6,10 135:
15 144:16
**Meetings** [5] 86:15 135:10,23
142:20
**Mel** [79] 1:5,16 5:1,11-12,14 6:
12 7:7 9:22 12:12 18:14 23:17 24:3,
20 25:3,17 26:3 27:2,5 28:1,11 36:
7 42:17 43:8 46:1 51:3,18 52:12 54:
5 55:15 56:16,20 57:13 58:14 59:7
60:2,15 61:7 63:14 65:15 66:9 70:
21 75:25 77:6,17 78:5 80:19,25 84:
3 85:8 86:11 87:20 88:3 89:15 90:3
95:24 96:7 98:9 102:5,20 104:11
108:21 110:22 112:18 113:3,8 114:9,
15 115:12 116:12,22 117:19 119:6,
14 120:11 121:4,8 149:15 150:19
**Melvin** [1] 5:8
**Member** [1] 142:6
**Mental** [1] 9:3
**Mention** [3] 10:11 24:20 128:3
**Mentioned** [7] 37:4,7 39:13
51:5 61:22 68:13 95:12
**Mentioning** [1] 31:23
**Merit** [2] 3:7 151:3
**Met** [7] 19:20 27:7 84:23 85:13
142:10,14 145:2
**MICHAEL** [1] 1:9
**Might** [13] 17:16 18:7 19:18 21:
7 32:7 36:22 44:23 54:18 64:2 66:4
88:15 95:7 117:6
**Miles** [1] 20:19
**Miller** [1] 53:23
**Million** [5] 55:6,8-9,12 121:10
**Mind** [4] 84:25 100:1 110:6 132:
16
**Mine** [24] 10:4,19 14:11,14 27:9
34:7 35:3,8,15,18,23 36:15,17 37:3,
6,9-10,16 43:15 46:5 53:2 57:7,11
**Mined** [1] 141:13
**Mining** [2] 37:18-19
**Minnesota** [1] 29:9

---

**Minute** [6] 45:9 89:23 119:6
132:2 147:23-24
**Misfigured** [1] 143:23
**Misrepresented** [1] 147:2
**Misrepresenting** [1] 142:1
**Missing** [1] 54:2
**Missoula** [3] 2:15,19 111:4
**Misstatements** [1] 84:8
**Misunderstood** [2] 116:9
135:14
**Mix** [3] 103:25 104:21 109:12
**Mixed** [1] 104:8
**Mixer** [2] 103:25 104:8
**Mixing** [1] 109:14
**Modular** [1] 81:4
**Money** [16] 21:15 25:20,22 26:
15 29:4 31:6 34:2-3,6,13 76:14 93:
11,17 95:12 97:23 138:20
**Mortgage** [7] 48:7,11,16 49:5,
11 50:4
**Montana** [23] 1:2,21,25 2:6,10,
15,19 34:9-9,13 12:13,15-16 18:25
28:17 124:17,25 125:2 126:19 150:
22 151:4,19
**Month** [14] 16:14-15 25:1-2 26:
7,24-25 27:18 34:12 47:16,19 72:1
81:12 86:6
**Months** [5] 12:1,3 70:7 79:24
125:3
**Morazzo** [3] 48:4,14 52:23
**Morning** [4] 10:2,22 77:14,17
**Mortgage** [2] 20:9 65:18
**Most** [6] 6:4 36:7 85:1 92:16
119:25 132:15
**Motion** [3] 124:25 131:8,10
**Move** [1] 19:7
**Moved** [9] 10:19 11:3 36:21 68:
2 73:4 76:12 77:16 105:18
**Moving** [4] 68:8 76:7
**Mushroom** [4] 66:25 67:8 92:8
97:13
**Mushrooms** [3] 69:23 96:13,17
**Must** [2] 12:5 121:12

## N

**Name** [15] 5:7 23:12 31:11 36:17
48:6 62:3 81:5 84:9 98:14-15 111:3
124:3 131:21 139:18 151:13
**Nature** [1] 124:6
**Near** [2] 8:24 148:21
**Necessarily** [1] 120:23
**Necessities** [1] 77:5
**Need** [13] 10:11 16:3 20:6 21:6
33:4 60:16 67:14 119:8 122:17 126:
1 133:19 138:18 148:21
**Needed** [5] 73:16 107:4 109:12
137:24 144:10
**Negotiating** [1] 90:6
**Negotiation** [2] 87:18 91:14
**Negotiations** [4] 88:15,18
95:5 96:1
**Nephew** [1] 53:24
**Net** [4] 23:18-19 92:17,19
**Never** [23] 16:24 20:9 35:6 37:
4,7 38:1 40:14 54:11 63:10-14 63:10-
11 79:1 80:14,23 87:14 95:18 109:20,
22 110:19,22 123:21 141:23
**New** [4] 32:20 50:20 76:21 129:10
**News** [3] 10:22 30:2
**Newspaper** [1] 60:17
**Next** [8] 5:21 9:17 31:23 60:13
83:19 85:7 86:3 92:20
**Nitrate** [1] 15:18
**Nitrogen** [1] 15:17
**Nobody** [2] 84:9 127:17
**None** [4] 41:23 132:16
**Notary** [5] 1:24 3:7 150:23 151:
4,18
**Noted** [1] 150:16

---

**Nothing** [9] 5:3 6:15,18 10:6
17:16 54:24 79:24 80:1 145:8
**Notice** [1] 127:12
**Noticed** [1] 25:5
**Notifying** [1] 147:5
**November** [9] 12:4 31:19 35:
21 65:13 68:15 77:16 81:5 141:17
145:2
**Number** [13] 17:10 23:2 99:24
104:4 106:9 108:19 109:9 110:1 128:
1 135:4 138:16 147:21
**Nurseries** [1] 20:8
**Nursery** [15] 17:21 18:15,21,
24 19:6,10 21:14,22 23:21 36:4 39:
11,15-16 41:24 54:6 69:17 80:12
**Nursery-type** [1] 80:12

## O

**Oath** [2] 5:4,19
**Object** [6] 7:23 77:21 78:11
127:12,14 128:15
**Objection** [4] 78:15 121:25
130:19 131:10
**Observe** [1] 129:25
**Obtained** [3] 142:25 143:2
**Occasion** [1] 136:19
**Occasions** [2] 14:20 103:16
**Occupation** [3] 5:12 111:5-6
**October** [4] 10:5 11:17 12:4
44:23
**Offend** [1] 91:14
**Offended** [3] 92:24 93:7-8
**Offer** [28] 33:24 34:24 53:4 61:
7,9,11 62:2,10,22 85:22 52:9 64:2
65:1 66:4 69:24 77:6 91:1 92:16 98:
2,9 102:18 105:10,24 106:18 107:16
111:12 120:3 135:9
**Offered** [1] 63:11
**Offers** [1] 113:23
**Offhand** [2] 43:21 100:15 101:
5 102:17
**Office** [11] 23:14 40:6 44:6
101:15 131:3 139:10,13,21,25 144:
17 151:13
**Offices** [2] 2:18 139:15
**Old** [5] 6:12 10:12 27:2 79:23 83:
25
**Once** [26] 6:21 15:11 23:6 24:5
57:22 42:20 44:23 45:22 52:9 64:2
65:1 66:4 69:24 77:6 91:1 92:16 98:
2,9 102:18 105:10,24 106:18 107:16
111:12 120:3 135:9
**One** [58] 10:1 17:12 27:19 30:15
31:25 34:12,19 36:14 39:15 41:5 42:
12,21 47:13,19,25 49:1 52:10 55:6-
7,9-10 58:15,17 59:20 62:1,16-18
65:8 76:9 80:17 83:13,15 85:14 96:
3,12 90:12 90:16 100:13 104:1 107:
17 108:21 110:12 114:25 119:21-22
123:20 124:6 125:2 127:18 138:2
138:18 139:15 141:15,18
**One-hundred** [1] 100:13
**Ones** [6] 51:23 52:2-3 58:15 108:
7 133:22
**Ongoing** [1] 9:5 69:21
**Open** [3] 10:15 122:25 140:19
**Opened** [2] 18:21 66:25
**Operation** [7] 17:23 19:6,9
25:19 39:19 69:17 93:4,22 103:8
**Operations** [3] 14:12 19:24
107:19
**Opinion** [1] 145:21
**Opportunity** [8] 32:12 76:
10 118:12,15-16 138:2 137:10 148:23
**Opposed** [1] 8:2
**Optimistic** [2] 39:9 77:10
**Option** [2] 71:25 115:1
**Orchard** [1] 99:23
**Order** [2] 15:18 104:24
**Ordered** [4] 105:9,11 113:9,14
**Organization** [3] 142:7,19
147:13
**Organizations** [1] 20:3

---

**PARKER vs W.R. GRACE & COMPANY**                    **Deposition of MEL PARKER**

Operations [3] 14:12 19:24 107:19
Opinion [1] 145:21
Opportunity [8] 32:12 76:10 119:12,15-16 132:8 137:10 148:23
Opposed [1] 8:2
Optimistic [2] 39:9 77:10
Option [2] 71:25 115:1
Orchard [1] 99:23
Order [2] 15:18 104:24
Ordered [4] 105:9,11 113:9,14 147:13
Organization [3] 142:7,19 147:13
Organizations [1] 20:3
Originally [4] 18:16 33:19 55:23 146:19
Orofino [1] 53:17
Otherwise [2] 81:23 133:8
Ourselves [2] 86:20 104:3
Outfit [1] 114:21
Outlined [3] 102:5,8 113:4
Outside [8] 13:3,5 63:15 77:24 91:6,10 114:10,21
Overall [3] 14:7 68:1 69:2
Own [9] 20:24 65:15 89:2 96:8 100:1 103:25 104:8 130:24 135:1
Owned [2] 29:1 65:17
Ownership [2] 55:21 65:16
Owning [3] 103:14 117:21,23

### P

P.C. [1] 2:5
P.m. [1] 149:6
P.O. [4] 2:6,10,14,18
Pacific [2] 55:19,25
Page [13] 4:4,11 53:14 54:1,5 56:13-14,20-21 59:9 150:1-2
Pages [4] 52:14 54:4 60:17 61:4
Paid [5] 14:4-5 56:7 63:2 114:22
Pain [6] 8:13 9:1-4,7
Paper [12] 12:24 13:17 17:9 21:10 36:2 137:2
Paperwork [4] 139:12,24 144:17,22
Paragraph [3] 56:21,24 57:11
Paralegal [4] 125:19 129:16,18 130:18
Paralegals [1] 130:15
Parcel [5] 33:17,22,25 47:24 57:16
Pardon [1] 51:1 85:25 113:19
Parker [20] 1:5,16 2:21 5:1,8-9 6:14 47:12 121:23 123:23 124:8 125:11 131:21 132:16 133:7 139:18 148:6 149:5 150:19
Parker's [1] 127:11
Parkers [1] 125:23
Paronard [3] 68:21-22 69:7
Part [12] 10:25 11:7 30:7 54:10 60:20 75:20 76:3 77:2 99:21 101:9 119:14 133:4
Partially [1] 102:10
Particular [13] 23:9 50:5 57:8-9 91:21 124:17-18 125:6,25 142:15 147:12,14 148:6
Parties [5] 3:5,11,16 42:4 58:17
Partner [3] 9:18 62:7,13
Partnership [1] 62:18
Pass [2] 12:2 141:15
Passed [4] 12:3 36:23-24 83:11
Past [3] 10:9
Path [3] 99:15 102:13-14
Pay [4] 27:25 28:5 63:1 138:20
Paying [2] 28:10 143:6
Payment [2] 93:25 118:4

Payments [2] 28:9
Peat [6] 103:16 104:2,9,22 108:14 109:12
Pension [1] 24:25
People [14] 12:9 17:10 39:21 43:2 48:19 67:23 80:5 81:20 83:21 113:1 127:10 141:9,11 147:5
Per [9] 16:14-15 26:7,24-25 27:17 114:24 143:6 147:19
Percent [5] 83:19 103:16 116:14
Performed [3] 15:1 115:25 116:14
Perhaps [6] 16:3 22:8 52:5 54:20 114:9 126:21
Period [3] 20:17 21:3 22:23 31:2 35:13,16 47:19 83:8 92:10,12 99:11
Person [2] 77:2 143:10
Personal [5] 7:13,13,19,24-25 8:2 14:2 110:22 111:9,18-19,25 112:1,3,10 116:13
Personally [1] 136:23
Pertaining [1] 144:2
Phil [3] 96:8-9 97:12
Philosophy [1] 59:25
Physical [4] 8:1,5 17:23 67:21
Picking [1] 126:18
Picture [3] 17:14 50:7 136:7
Pictures [1] 74:25
Piece [17] 9:12 10:9 14:25 19:7 34:10,21 38:9 53:4 62:14 83:4 100:2 140:3 144:8 146:10-11,15 147:1
Pieces [2] 33:5,8
Piles [1] 14:2
Pillars [2] 44:8,13
Pink [3] 106:13 107:23 108:2
Place [5] 3:12 10:15 27:1 32:7,21 39:25 42:2 48:21 72:8 75:7 76:2 93:2 143:18 151:8
Placed [2] 43:9 102:3
Places [2] 29:16 108:6
Plains [1] 18:25
Plaintiffs [3] 1:6 2:4,8
Plan [4] 8:24 11:19 13:18 53:3
Planned [1] 19:8
Plant [48] 27:3,11 29:3,5,17 31:18 32:25 33:2,6,11 37:17 38:7 47:10 48:11 52:22-23 56:10 64:10,14,25 65:2,22 66:9,23-24 68:3,8 77:7,11 78:9 79:8 96:1 98:9 102:21 104:23 105:15,18,23 110:24 119:17,22 120:15 121:1 122:19 134:17-18
Planted [2] 17:18 99:12
Plants [1] 120:6
Plate [1] 53:16
Pleasant [1] 40:20
PLLP [1] 2:9
Point [45] 9:7 10:15 11:4,20 16:13 20:15,20 21:11 22:1 32:22 34:23 37:2 38:20 41:24 44:7 50:5 59:24 61:24 64:22 65:10 69:16,20,23 72:16,18 76:12 78:7 81:22 82:16 87:1,15,24 88:9,12-14 89:14 90:12 96:18 104:1,20 115:17,21 139:22 145:2
Poorly [2] 135:20 143:8
Pop [5] 29:20,23 30:23 99:2
Portion [6] 14:13 31:14 41:13 64:24 109:23 121:15
Portions [4] 24:16 46:13-14 47:3
Position [4] 9:23 14:7 129:1,4
Possess [1] 123:2
Possession [1] 44:20,25 45:12 48:22,25 51:15-16 60:4 65:1 102:25
Possibilities [1] 120:19
Possibly [3] 38:21 46:4
Post [2] 36:1 37:13

Posted [1] 131:9
Potential [2] 125:9 127:16
Pouring [1] 31:24
Practical [1] 65:11
Practice [4] 124:17 128:12, 20 131:12
Prejudice [2] 127:6
Preparation [4] 128:4,22 133:14 143:16
Prepared [6] 22:8 102:9 127:8-9 128:25 135:14
Present [6] 2:20 22:13 95:18 139:25 142:13 148:13
Presented [2] 42:13
President [3] 23:13 54:15 62:4
Press [2] 120:7,11
Pretty [17] 47:20 64:14 65:6 69:17,19 70:17 74:13 75:16 79:25 85:16 90:7 91:2 99:19 125:4 132:4
Previous [1] 114:6
Previously [2] 6:18 78:15
Price [4] 19:11 33:16 63:1 144:3
Primarily [3] 91:4 92:15 108:10
Primary [4] 34:19 64:24 85:3 104:14
Private [3] 20:3 130:2
Pro [2] 129:11,22
Problem [21] 11:4,6 36:6 47:18 68:14 69:9,15 81:19 83:4 84:9,13 85:2,5-6 123:15 125:10 130:24 141:24 142:2 145:4
Problems [3] 9:3,9 145:8
Procedure [2] 3:14 128:23
Procedures [1] 122:6
Proceed [1] 77:19
Proceedings [4] 50:22 89:25 119:10 147:25
Process [8] 11:22 42:25 43:21 47:9 87:18 91:14 104:12 116:5
Produce [2] 91:20 115:19
Produced [5] 22:4 24:1,4 59:8 64:13
Product [3] 68:10 96:14 119:25
Production [2] 92:8,20
Products [4] 66:11 74:12,22 112:9
Professional [3] 3:6 8:21 151:3
Professionalism [1] 93:6
Professionally [1] 136:23
Profit [2] 92:12,16
Profitable [5] 20:17-19,21, 24
Program [3] 91:19 96:13 97:16
Progress [2] 20:12
Project [6] 66:25 70:1 91:20-21 96:12 99:3
Promised [1] 20:4
Pronounce [1] 124:2
Proper [5] 62:24 122:6 126:13
Properly [1] 131:2
Properties [9] 4:12 33:1,10 52:13 99:25 137:23,25 146:2 147:7
Property [263] 8:2,15,17 9:5, 13,25 10:7,9,18 11:10 13:20,25 14:8,25 17:15,20 18:5,8 19:4,7,14 20:25 27:2-3,6 28:24 29:1,3 31:7,10 32:3,11,14,17 33:1,3,6-7,9,11 34:10,15,22 36:4 38:7,15-16 40:12 41:2,12 40:7,10,16,19 41:7,10,22,25 43:23-24 43:1,3,6,9,20 44:18,21 45:5 46:9 47:10 49:14,24 50:2,8 51:10,14 54:24 55:25 56:10 57:7 58:21,25 59:1 5 60:5 61:16,19-20 62:6,11,14,19 63:1,3 64:16,10 65:2,6,8,15,17-19, 23 66:9,17,23 67:2 68:15 69:2 70:17 73:25 72:4,17,21 73:4,7,9,13, 17,19 75:12,19-20 76:13 77:7,9 78:

Proposal [11] 4:12 52:13 54:11,13 57:6 59:14-15 60:20 62:17 87:21 91:18
Propose [2] 57:4 134:3
Proposed [4] 56:8,24 57:11 90:4
Prosecute [1] 118:9
Prosecuted [1] 97:3
Prospective [1] 19:24
Protect [1] 57:10
Protection [3] 54:16 57:4 62:4
Provide [12] 17:5 21:4 76:4 89:11 90:18-19 96:14 98:7 118:13 133:16 144:9
Provided [11] 17:2 46:3 53:25 62:2,10 77:15 85:21 88:7 104:11 115:23
Public [6] 1:25 3:18 94:3 150:23 151:4,19
Pull [1] 34:15
Pulled [2] 31:3 34:24
Pulling [1] 140:25
Pump [1] 99:8
Purchase [7] 4:12 19:11 41:21 52:13 75:14-16 76:10 83:21 103:12 135:22 136:8,24 142:15 143:2 144:3
Purchased [17] 17:15 19:21 29:2 38:7 39:1 41:7,10 50:8 57:3 102:20 103:7 106:22 109:1 130:5,10,12 141:21
Purchaser [1] 54:6
Purchasing [13] 42:23 47:9, 25 48:2,4 65:3 75:10 76:4,5,10 96:2,4 109:7
Pure [1] 15:17
Purpose [2] 105:15 85:3
Purposes [3] 30:2 61:2 133:6
Pursuant [1] 3:13
Pursue [1] 50:9
Put [11] 11:24 14:4,16-17 15:17 18:1 21:16 31:4 32:3 33:18 34:2,5 38:8 40:17 43:24-25 44:1 45:11,21 48:6 53:2,4 59:18 97:24 98:3,5,18,24 100:16 118:21 134:14 140:11
Putting [3] 18:2 109:10 127:12

### Q

Quality [2] 14:21 15:12
Quantity [1] 89:12
Quartz [4] 28:16 32:15,17-18
Questions [11] 62:9 109:24 124:7 131:25 132:16 133:7,20 142:4 143:10 148:22,24
Quickly [1] 143:14
Quite [3] 43:2 55:22 94:1

### R

Rail [1] 41:5
Rainey [1] 99:6
Raintree [11] 16:25 17:3,6-7 19:11 19:10 22:5 23:21 25:19 28:11 29:18 31:13,15 39:17 54:6 63:15 77:20 79:10 79:19 97:12 99:12
Raised [2] 83:13 99:10
Raising [1] 63:12
Ran [1] 18:5
Rather [2] 102:18
RAY [2] 1:10
Re-define [1] 112:11

**HEDMAN, ASA & GILMAN, INC. - 752-5751**          **From Operations to Quite**

**PARKER vs W.R.GRACE & COMPANY**                    Deposition of MEL PARKER

## R

**Rail** [1] 41:5
**Rainey** [1] 99:6
**Raintree** [21] 16:25 17:3,6-7 18:11 19:10 22:5 23:21 25:19 28:11 29:18 31:13,15 30:19 54:6 63:15 77: 20 78:10 79:19 97:12 99:12
**Raised** [2] 83:13 99:10
**Raising** [1] 83:12
**Ran** [1] 18:5
**Rather** [2] 102:18
**RAY** [2] 1:10
**Re-define** [1] 112:11
**Reached** [1] 20:20
**Read** [8] 26:2 38:2 62:2 68:17 96:8 125:15 135:4 150:14
**Reading** [2] 3:17 126:25
**Ready** [3] 104:2 132:7 136:4
**Real** [11] 64:6 70:10 94:12-13, 24 102:11 111:10 112:12 137:19 138: 11,16
**Realize** [1] 69:16
**Realized** [1] 36:5
**Really** [10] 10:6 17:22 76:19 90:18 110:4 125:7 146:17,24 147:6
**Realtors** [1] 58:16
**Realty** [16] 32:4 131:22 132:5 133:8,12 134:21 135:11,16,24 142:7, 18 143:16 145:23 147:20-21 148:11
**Reason** [15] 10:10 34:8,19 42: 21 52:6 62:14 65:8 83:22 87:22 108: 5 117:21 138:4 141:19,25 145:6
**Rebuild** [3] 9:23 21:2 79:7
**Rebuy** [1] 76:25
**Receipt** [1] 109:21
**Receive** [12] 25:16,23 26:9,12, 16 27:17 46:23 70:4 74:1 93:11 119: 1 121:19
**Received** [20] 13:6,10 15:25 16:24 24:25 25:7 34:14 59:8 60:17 61:13 70:24-25 90:3 93:16 108:17 115:4 121:8 140:20 143:4,9
**Receiving** [6] 16:4,11 24:22 26:7 28:4 69:10
**Recently** [2] 25:16 133:25
**Recess** [4] 50:22 89:25 119:10 147:25
**Recognize** [4] 59:10 60:18 134:1 145:20
**Recollect** [4] 86:18 104:14 110:11 144:24
**Recollection** [7] 66:6 70:2 85:15 86:7 88:22 144:19 145:1
**Recommendations** [1] 15:15
**Reconstruction** [1] 18:7
**Record** [12] 5:23 124:1,9 128: 11,19 129:13-14,24 130:2,13,21 140: 2
**Redepose** [1] 121:23
**Reduced** [1] 151:9
**Reestablished** [1] 99:23
**Refer** [1] 102:19
**Reference** [3] 90:25 133:20
**References** [1] 42:12
**Referencing** [2] 40:21 67:17
**Referring** [1] 117:5
**Reforestation** [8] 17:11 17:12 20:6 66:14 68:10 69:18 103:14, 17
**Refrigerator** [1] 76:24
**Refurnished** [1] 65:10
**Regard** [30] 14:23 15:15 49:3 56:10 72:14 77:8 82:13 84:20 87:13, 23 90:9 93:4 96:2 103:13 121:4,23 122:25 133:10 134:16 135:21 141:1, 3 140:4,7 145:1 144:19,25 145:9 147:13 150:11,19 151:21
**Regarding** [11] 15:15 22:19 23:25 29:18 35:23 36:2 50:14 91:10 96:8 97:13 121:6
**Regards** [3] 53:15 109:19 137:

---

**20**
**Regis** [15] 13:16 17:9,12 18:23 19:4 20:2 21:10 24:25 137:2-5,0,20, 23
**Registered** [4] 3:6-7 151:3
**Reimburse** [1] 97:23
**Reishi** [15] 66:25 67:7,14 69: 20,23 91:19 92:8,20 96:11 97:13 99: 1,3 100:21-22
**Relate** [4] 52:18 95:17 102:17 109:24
**Related** [5] 46:19 99:23 111: 25 133:7 143:16
**Relates** [1] 69:25
**Relating** [1] 52:22 133:13
**Relationship** [1] 9:21
**Relevant** [2] 126:9-10
**Relieve** [1] 10:25 11:6
**Relocate** [1] 77:19
**Relocating** [1] 78:8
**Relocation** [2] 26:8 33:2
**Relooked** [1] 38:10
**Relying** [2] 112:22 115:16
**Remained** [1] 120:2
**Remember** [37] 5:25 19:11,16 22:18,22 23:12 28:15 33:16 36:24 39:15 42:16 44:20 45:8,20 47:25 48: 24 51:9 54:14 55:6,11 59:12 66:10 67:24 76:14 81:8 85:24 87:4 88:24 92:6 100:4 106:10,12 107:13,24 110: 13 118:18 139:15
**Remembered** [1] 86:20
**Reminded** [1] 143:23
**Removal** [1] 76:11
**Remove** [1] 102:24
**Rent** [1] 20:24
**Renting** [1] 26:22
**Repay** [1] 97:21
**Repeat** [1] 132:23
**Rephrase** [2] 6:8 132:22
**Replace** [3] 75:11 112:19 113:5
**Replaced** [3] 16:18,23 77:3
**Replacement** [1] 16:22
**Replanted** [1] 99:23
**Report** [2] 131:12 151:5
**Reported** [1] 1:24
**Reporter** [5] 3:7 134:11 151:3
**REPORTER'S** [1] 151:1
**Represent** [4] 97:2 128:2 130: 20 131:22
**Representation** [3] 96:22, 25 145:21
**Representative** [2] 81:2 127:20
**Representatives** [2] 85:8 89:12
**Represented** [3] 41:15 92:7 145:19
**Representing** [4] 114:13 137:22 138:17,21
**Request** [6] 46:3 93:21 121:22 128:2 138:18,22
**Requested** [4] 93:17,19 113: 15,18
**Requesting** [2] 15:13 46:7
**Requests** [3] 52:14 64:1 121: 20
**Required** [1] 63:24
**Requirement** [1] 14:20
**Resampled** [1] 75:4
**Research** [1] 19:23
**Reseeded** [1] 99:24
**Reserve** [1] 121:22
**Reserved** [2] 3:18 149:7
**Residence** [2] 76:15,22
**Resident** [2] 136:12 141:10
**Residential** [1] 67:19

---

**Residing** [5] 3:8 27:1 78:9 150:24 151:19
**Resources** [2] 54:16 62:5
**Respective** [3] 3:5,11,16
**Respond** [1] 98:3
**Responding** [1] 46:3
**Response** [5] 52:14 61:13 72: 24 82:8 90:3
**Responses** [7] 26:3 46:1,6 59: 7,9 60:17-18
**Responsible** [3] 62:1 146:1, 4
**Responsive** [3] 121:19 122:9, 23
**Rest** [3] 41:8 108:1 146:19
**Restarting** [1] 79:19
**Restricted** [2] 10:9 114:1
**Restriction** [3] 3:15 79: 13 128:1
**Result** [8] 7:14,20 35:20 87:9 110:23 116:14,24 117:21
**Results** [5] 11:24 12:2 69:11 70:4,10,15-16,24-25
**RESUMED** [4] 51:1 90:1 119:12 148:4
**Resuming** [1] 70:10
**Retail** [16] 29:10,12 30:9 40:8 44:9,17 65:3,12 119:14,20-21,25 120:1,3,13-14
**Retain** [2] 79:13-14
**Retained** [1] 15:11
**Retire** [1] 12:20
**Retired** [2] 5:13 13:22
**Retirement** [5] 9:14-15 16:1 79:16 99:16
**Revenue** [1] 92:13
**Reviewed** [1] 133:12
**Revisited** [1] 125:3
**Rewording** [1] 79:11
**Rework** [1] 132:22
**Richard** [1] 1:7
**Rights** [1] 126:22
**Ring** [1] 26:4
**Risk** [3] 53:15 71:1,11
**Risks** [2] 71:5,18
**River** [7] 26:21 28:20 32:3 79: 16 39:8 146:3,21
**RMR** [2] 1:24 151:18
**Road** [2] 28:16,20
**Robinson** [21] 1:10,18 2:12, 14 104:19 105:4-5,10 106:14,24 107: 7-8,18 108:17 109:9,15 110:2-3,8, 12 129:14
**Rocks** [1] 44:17
**Role** [1] 120:3
**Rollins** [7] 19:8 28:16 36:18, 21 104:17 108:13 138:20
**Room** [7] 76:25 98:16 99:1 100:9-10,21-22
**RPR** [2] 1:24 151:18
**Ruled** [1] 10:18
**Rules** [6] 3:13 5:18 125:2 127: 2 128:23 129:10
**Run** [3] 5:17 64:8 111:8
**Running** [1] 66:8
**RVs** [2] 10:3 80:5
**Ryan** [14] 32:4 131:22 132:4 133: 8,12 134:20 135:11,16,24 143:16 145:23 147:20-21 148:11

## S

**Safely** [1] 77:25
**Sale** [18] 31:4,6,18 33:6,19,23 38:8 53:13 55:16 62:25 67:10-11 107: 9 109:15 137:12 140:20 146:1 140:8
**Sales** [1] 135:18
**Sampled** [1] 71:2-3 74:16
**Samples** [3] 68:23,25

---

**Sandwich** [1] 29:21
**Sat** [1] 125:10
**Satisfy** [1] 15:21
**Saw** [5] 22:3 39:6 50:25 86:15 109:22
**Scent** [1] 67:1
**Scheduled** [1] 39:24
**Scheduling** [1] 73:15
**Science** [1] 12:18
**Scientifically** [1] 77:23
**Screened** [1] 12:19
**Screening** [46] 11:21 27:3,11 29:3,5,16 31:17 32:25 33:2,6,11 37: 17 38:6 47:9 48:11 52:22-23 56:10 64:10,14,25 68:2,22 66:9,23-24 68: 3,8 77:7,11 78:9 79:7 88:7 98:19 102:21 105:15,18,22 110:24 119:17, 22 120:15 121:12 122:19 134:17-18 150:2
**Se** [2] 114:24 147:19
**Seal** [1] 151:13
**Seattle** [1] 36:1
**Second** [2] 87:15 146:25
**Secondly** [1] 121:12
**Security** [4] 9:14 16:4,12 24: 21
**See** [15] 9:6 24:15,24 38:6,14, 22 53:13 56:2 68:21 88:1 95:1 116:16 119:7 120:5 123:4 133:23
**Seed** [3] 19:20 98:17 104:23
**Seeding** [1] 19:20
**Seedlings** [6] 17:11,25 19:2 20:7 103:15 109:13
**Seeing** [2] 110:11,14
**Seek** [1] 21:17
**Seeking** [2] 21:9 126:19
**Seem** [1] 147:4
**Sell** [22] 29:2 30:18 39:7 41:23 43:17 47:8 49:22 57:25 58:11 60:9 61:18 64:16 96:14 120:6 133:17 134: 24 135:12,17,25 137:5,23 138:6
**Seller** [1] 54:6
**Selling** [5] 34:7 42:25 59:24 146:4
**Senate** [1] 86:16
**Senftleben** [4] 2:22 124:4-5
**Sense** [1] 132:18
**Sent** [1] 49:12
**Sentencing** [1] 97:21
**Sentimental** [1] 74:25
**Separate** [3] 30:5 120:16,25
**September** [5] 6:17 11:25 12: 4 53:8 56:9 111:14-15
**Septic** [1] 101:13
**Services** [4] 13:7-8 17:2,5
**Set** [11] 3:12 9:12 30:17 66:15-16 77:24 83:20 92:16 98:18 112:12 129:20
**Setting** [2] 25:18 100:22
**Settle** [1] 87:13
**Settlement** [7] 85:22 87:21 88:4,6 90:9,15 93:5
**Seven** [2] 24:12 88:1
**Several** [4] 14:20 20:2 38:24 103:18
**Severe** [1] 125:4
**Shad** [17] 24:16 39:14,17 40:22, 25 41:6 51:21 60:3 71:3 80:5 98:15-16,20 100:5-6,17 118:25
**Shingle** [1] 53:23
**Shop** [4] 29:20,23 30:23 31:12
**Shorthand** [1] 151:9
**Shortly** [1] 12:7
**Show** [2] 31:19 124:10
**Showed** [2] 36:4 98:16
**Shown** [1] 83:19
**Shrubs** [5] 17:19 67:4,19 99:13 102:2
**Shuffled** [1] 122:18

**PARKER vs W.R. GRACE & COMPANY**                    **Deposition of MEL PARKER**

**Shortly** [1] 12:7
**Show** [2] 31:19 124:10
**Showed** [1] 36:16
**Shown** [1] 83:19
**Shrubs** [5] 17:19 67:4,19 99:13 102:2
**Shuffled** [1] 122:18
**Shut** [5] 69:4,13 93:22 116:1
**Sic** [6] 15:1 33:19 38:9 85:9 110:17 119:2
**Sick** [1] 37:5
**Side** [2] 99:21-22
**Sides** [1] 99:6
**Sierra** [2] 108:12 110:14
**Sign** [1] 144:17
**Signature** [7] 54:1,7,9 135:1, 6 149:6
**Signatures** [1] 134:23
**Signed** [1] 27:23 38:20,23 39: 3,7 42:4,17 43:5,16 139:6 140:2
**Significant** [2] 66:10 94:4
**Signing** [8] 3:17 135:3,11,17, 25 139:8 144:1,21
**Silent** [1] 62:13
**Similar** [1] 139:3
**Simplify** [1] 116:22
**Simply** [1] 128:4
**Sit** [9] 7:7 8:4,17 21:24 23:3 91: 25 125:19 130:3 140:7
**Site** [18] 10:4,19 11:16 14:14 34:7 35:3,9,15 37:9,11,16,18-19 39: 4 43:15 53:3 57:7,11
**Sitting** [2] 126:24 127:11
**Situation** [6] 40:4 48:7,15 69:8 81:17 147:11
**Six** [5] 6:22 66:18 98:18 100:12-13
**Sixty** [2] 6:13 15:5
**Sixty-three** [1] 6:13
**Size** [1] 110:17
**Slab** [5] 14:16 31:24 43:24 44:1 45:15
**Slabs** [2] 32:6 39:12
**Slash** [1] 14:1
**Slight** [1] 13:10
**Slomski** [1] 97:1
**Slovak** [1] 2:5
**Smaller** [1] 76:8
**Smarter** [2] 123:19,21
**Social** [3] 16:4,11 24:21
**Soil** [13] 10:18 14:15-16,18 15: 8,18 68:23-24 70:21 71:6,13,17,22
**Solarium** [3] 98:25 100:19-20
**Sold** [16] 30:9,15,23 31:5 54:25 62:6 63:4,8,12 64:14 83:4,9 119:25 138:19 141:22 146:16
**Solicit** [1] 80:2
**Soliciting** [1] 17:8
**Solution** [2] 1:4-5
**Someone** [2] 114:10 118:20
**Sometime** [1] 105:14
**Somewhat** [4] 30:21 32:23 68: 12 140:19
**Somewhere** [6] 35:25 36:5 83: 2 93:2 102:6 105:17
**Sorry** [7] 22:10 51:3 70:24 81: 18 82:9 86:8 91:9
**Sort** [1] 143:13
**Sought** [2] 8:21 22:23
**Source** [1] 16:1
**Sources** [6] 21:24 22:22 25:3 26:15 27:6 109:2
**South** [1] 99:22
**Special** [1] 20:9
**Specific** [2] 121:5,21 125:4

**Specifically** [1] 128:14
**Speculative** [1] 30:21
**Speed** [1] 15:18
**Spending** [1] 93:3
**Spent** [4] 17:13 36:11 65:7 76: 14
**Spring** [1] 90:6
**St** [15] 13:16 17:9,12 18:23 19:4 20:2 21:10 24:25 137:2-5,8,20,23
**Staff** [1] 112:23
**Stand** [2] 30:3 77:6
**Start** [12] 10:16 16:21 19:9 25: 22 50:20 67:7 80:2,15,21,24 132:2,6
**Started** [11] 19:22,25 20:1 21: 14,18,22 45:10 66:25 67:25 68:1 102:9
**Starting** [2] 80:9,12
**State** [18] 1:2,25 3:8 5:7 12: 15-16 20:4 65:5-6 125:1 127:3 128: 13,20,24 129:20 150:23 151:4,19
**Statement** [4] 23:8 92:1 118: 24 121:8
**Statements** [6] 22:4,7 23:25 24:4,11 91:9
**States** [1] 72:4
**Stating** [2] 34:14 91:19
**Station** [1] 30:25
**Stay** [2] 28:21 30:12
**Stayed** [1] 39:1
**Stemmed** [1] 96:21
**Sticks** [1] 84:25
**Stigma** [1] 78:22
**Still** [22] 10:7 11:8 15:13 20: 6 23:15 29:12 30:7 31:14 32:23 34: 12 39:1,4 42:24 49:23 65:23 69:20 77:3 89:18 106:23 108:22 114:1 115:17
**Stipend** [4] 27:18 28:7 115:3, 17
**Stipulate** [4] 122:2,24 123:4, 17
**Stipulated** [3] 3:4,10,15 146:7
**Storage** [5] 18:3 39:18 47:2 51:23 80:4
**Store** [17] 29:10,12,22 30:17 40:8 49:18 119:14,20,25 120:1,3,8, 13,15,18-19,22
**Stored** [1] 48:10
**Stores** [1] 119:21
**Stout** [6] 81:5 84:22 85:11 114: 12,14
**Stove** [1] 76:24
**Strain** [1] 91:24
**Stringer** [37] 31:20 32:20 38: 11,15-16,18,22 39:6 42:22 43:19 47: 14 48:14 49:2 50:1,10 52:21 54:17 58:25 61:17,22 62:24 81:4,17 82:9, 14 84:11,22 85:14 86:13,22 93:20 136:2,10 142:10 143:3,11 145:1
**Strongly** [1] 42:8
**Structures** [2] 71:25 72:11
**Stuff** [1] 122:18
**Stumpage** [1] 56:6
**Subdivide** [1] 53:20
**Subdivision** [2] 53:18 137:3
**Subject** [8] 43:9 50:20 119:15 134:19 135:22 136:24 137:15 138:1
**Submarine** [3] 29:21 30:16-17
**Submit** [1] 54:18 118:4
**Submitted** [5] 53:22 54:23 56: 4 59:14-15
**Subscribed** [2] 150:20 151:13
**Subsequent** [6] 41:20 130:24 140:23 144:16 145:2 147:7
**Subsequently** [2] 123:1 151: 9
**Substantially** [1] 68:7
**Sudden** [1] 62:7
**Sue** [3] 115:9 118:5,22

**Sued** [2] 118:17,19
**Suffered** [1] 16:16
**Suffering** [2] 7:19 8:9
**Suggest** [2] 142:1 145:14
**Suggested** [1] 15:17
**Suit** [3] 119:16 135:23 136:25
**Sum** [1] 24:20
**Summer** [2] 106:23 108:24
**Supervised** [1] 114:11
**Supervision** [1] 114:22
**Support** [1] 7:5
**Supposed** [5] 48:11 49:5 50:5 96:16 97:14
**Supreme** [1] 125:2
**Surprising** [1] 61:20
**Surveyed** [1] 146:19
**Suspected** [1] 122:22
**Suspension** [1] 10:10
**Sverdrup** [2] 139:22
**Swing** [1] 83:20
**Sworn** [5] 5:2 150:20 151:6
**Symptoms** [1] 8:22
**System** [1] 44:9

**T**

**Table** [1] 139:3
**Tank** [1] 101:13
**Tanks** [3] 30:25 31:3 49:17
**Tax** [2] 22:6 24:11
**Taxes** [2] 28:10 46:20
**Tear** [2] 39:23 72:7
**Temporary** [1] 26:5
**Ten** [2] 24:12 36:9
**Term** [1] 7:24
**Terms** [24] 19:24 20:12 21:1 27: 7 50:1 52:4 66:11 67:18 69:22 71: 18 73:14 76:15 77:6 82:5-6 90:7,14 91:10 99:5,7 106:6 136:7 137:18 138:7
**Terry** [6] 2:13 58:2 78:17 131: 25 132:9 135:9
**Test** [4] 70:15-16 128:25 132:12
**Tested** [1] 70:7
**Testified** [2] 5:3 147:10
**Testify** [3] 97:7,9 151:6
**Testimony** [5] 78:12 107:7 150:14 151:9,11
**Testing** [3] 70:5,8,25
**Tests** [1] 69:11
**Thereof** [1] 135:6
**Thinking** [1] 81:13
**Thinning** [1] 17:25
**Third** [2] 53:14 56:21
**Thousand** [2] 23:23 100:14
**Three** [8] 6:13 12:1,3 35:24 38: 9,11 39:5 146:3
**Throughout** [1] 93:24
**Thueson** [30] 2:9 7:16 25:6,12 50:19 58:2,10 61:3 63:10 78:17,20 79:1,9 85:23 86:1,5 89:24 90:10 94: 15 114:15 122:1,11,16 123:3,8,13, 18 131:16 140:14
**Timber** [7] 13:25 53:15,19 55: 17,23 56:3,7
**Timbered** [2] 35:9,11
**Timberland** [1] 13:16
**Timing** [1] 43:1
**Today** [13] 5:10 7:7,10 8:4,18 17:18 21:24 23:3 126:15 133:14,23- 24 140:8
**Together** [6] 6:25 26:12 36: 18 99:2 111:7,20
**Tom** [8] 2:5 125:14 126:4 127:25 129:9 130:19 131:5 134:3
**Took** [28] 25:19 32:11 41:5 42: 16 44:20 45:12 48:22 51:5,8,14,16

**Sued** ...
52:20 60:4 62:17 66:22 69:7 72:4 74:23 76:6 80:3 82:15 89:2 101:6 102:25 140:18 143:18
**Top** [6] 44:4,15 104:22,25 107:2 109:10
**Torn** [1] 39:24
**Total** [4] 98:3 111:17 112:6-7
**Totally** [1] 128:19
**Toward** [2] 9:20 24:7
**Towards** [1] 8:14
**Town** [3] 86:16 119:22 120:10
**Tract** [5] 57:3 108:13 128:20
**Tractor** [2] 14:19 18:5
**Tracts** [5] 19:8 28:17 36:18,21 104:17
**Training** [2] 96:13 97:16
**Transaction** [1] 58:8
**Transactions** [1] 58:19
**Transcript** [2] 151:5,7
**Transcription** [1] 151:11
**Transportation** [1] 26:10
**Trays** [1] 111:23
**Trees** [8] 17:19 19:19 67:3,18 99:13,24 102:2
**Tremendous** [4] 44:13 49:14-15,19
**Trespass** [1] 116:3
**Trial** [4] 97:5,7,9 125:20
**Trick** [1] 82:3
**Tried** [1] 27:5
**Trouble** [2] 129:7
**Truck** [4] 10:12 105:6-7
**Truckload** [2] 107:4,6
**True** [3] 112:21 150:15 151:11
**Trust** [3] 25:25 26:1 123:18
**Truth** [5] 5:2-3 151:6
**Truthfully** [1] 133:3
**Try** [2] 121:20 141:17
**Trying** [6] 8:17 48:15 57:10 110:5 116:5 117:24
**Tuberculosis** [1] 16:19
**Tuesday** [1] 1:21
**Tunnel** [1] 41:5
**Tunnels** [7] 40:24 69:6 82:16, 19 83:14 99:2
**Turn** [1] 14:19
**Turned** [1] 137:4
**Turns** [1] 146:17
**Twenty** [1] 7:3
**Twenty-five** [1] 7:3
**Twice** [2] 38:21 142:14
**Two** [18] 29:16 33:5 38:9,11 39:5 58:17 66:7 68:22 71:15 92:1 99:2 103:10 111:21 119:21 124:1 130:17 133:22 145:19
**Type** [30] 6:2 7:11 9:7,9 13:6 14:2 15:25 17:5,22-23 18:4,6 19:15, 18,23 22:10 20:10 30:21 46:21 64:7 67:4,16,20 80:12 86:16 94:25 98:12 120:22 137:12 144:19
**Typed** [1] 58:17
**Types** [5] 18:19 49:16 75:13 76: 4,20
**Typewritten** [1] 58:15

**U**

**U.S.** [1] 1:20
**Uh-huhs** [1] 6:1
**Uhs** [1] 6:1
**Ultimate** [3] 62:21 67:11 120: 12
**Ultimately** [2] 57:14 73:6
**Unaware** [1] 141:13
**Under** [10] 5:19 56:21-22 114: 22 118:6 126:19,22 128:23 137:9 161:10
**Underhanded** [1] 130:11

**PARKER vs W.R. GRACE & COMPANY**                    Deposition of MEL PARKER

**Ultimate** [3] 62:21 67:11 120:
12
**Ultimately** [2] 57:14 73:6
**Unaware** [1] 141:13
**Under** [10] 5:19 56:21-22 114:
22 118:6 126:19,22 128:23 137:9
151:10
**Underhanded** [1] 130:11
**Understood** [4] 73:3 87:17
133:2 141:5
**Unexfoliated** [1] 103:3
**Unexpanded** [3] 103:3 104:11
108:17
**Unintelligible** [1] 78:13
**United** [1] 72:3
**University** [2] 12:12,16
**Unless** [1] 133:8
**Unprofessional** [1] 92:1
**Up** [108] 8:17 9:12 10:1,3,19 11:
10,12,17 13:17,23 14:14,19,24 15:
7,19 16:9 18:15,21 20:14 21:2 22:
12 25:18,22 27:9 30:17 31:4 34:7
35:3-4,14 36:3-4,11,15-16 37:5,9,
13 38:15,20 40:23 41:3-4,8 43:3 44:
9,11 45:11,21 47:25 48:12,16 50:5,
18 53:3,5 55:13 62:18 64:10,13,22
66:15-16,25 75:10 76:11 77:8,11,18
78:6,8,21 79:5 80:4,10,12 82:11
84 83:13-14 84:12,16-17 86:18 89:1,
1 92:16 93:3 95:10-11 98:18 100:22
104:7 105:12 113:9,14-15 114:9,25
118:2 119:8 124:10 129:20 139:5 146:
13 148:7

## V

**Vague** [1] 7:24
**Value** [8] 55:3,5 74:25 91:18
94:24 111:17 118:25 143:22
**Values** [3] 95:9 102:10 113:6
**Valve** [1] 16:18
**Varies** [1] 18:12
**Various** [1] 45:19
**Vegetables** [2] 30:4,9
**Vegetation** [1] 100:3
**Vehicle** [1] 28:9
**Vehicles** [1] 18:3
**Venture** [1] 1:20
**Verbally** [2] 74:6,8
**Verified** [1] 56:1
**Verify** [2] 107:10 137:24
**Vermiculite** [37] 40:24 41:
3-4,6 49:18 82:19 102:22,25 103:2,
4,6-8,13,16,20,22 104:2,9,12,18,
22 105:3 106:10,24 108:6,8,16,18-
19 109:2,6-7,11,16 110:12 141:12
**Versus** [3] 70:20 71:5,12
**Vice** [5] 23:13 54:15 62:3 129:
11,22
**View** [2] 26:21 40:20
**Views** [1] 63:6
**Visit** [4] 54:17 81:25 82:15
147:24
**Visited** [1] 47:21
**Volume** [1] 56:5
**Volumes** [1] 56:2
**Voluntarily** [2] 34:24 73:7
**Vouch** [1] 131:1
**Vs** [1] 1:7

## W

**W.R.** [62] 1:8,17 2:12 4:12 7:14
8:5 10:2 13:11,15,18 14:4,10,13,17
15:1,3,11,14 33:5 34:6 35:2 40:18 48:
5,7 50:6 52:13,21 53:2,22 54:7,11
55:20 61:18 81:2-3,5 82:17 83:3,8
85:11,20 88:8 101:15 105:5 113:19,
24-25 114:7 118:3,5 126:15 130:20
134:15 138:21 139:9 140:25 141:21
142:11-12 144:4 146:12
**Wage** [2] 13:6,8
**Wait** [1] 5:21
**Waiting** [1] 115:14
**Walk** [1] 60:2

**Walking** [1] 39:10
**Walks** [1] 49:20
**Walters** [7] 54:14 61:21,23 62:
1,7,9,25
**Walters'** [1] 62:3
**War** [1] 129:6
**Warranty** [1] 42:1
**Waste** [8] 14:15,17-18 15:7 43:
14,19 56:22 57:9
**Water** [7] 99:5,7-8 101:2,14,22
104:24
**Ways** [2] 115:13,18
**Week** [3] 10:11 125:16 127:1
**West** [3] 1:20 98:20 100:17
**Western** [1] 37:12
**Whatnot** [7] 17:19 30:24 40:20
49:21 75:2 135:18 138:1
**Whatsoever** [4] 35:9 37:24
78:22 79:21
**WHEREOF** [1] 151:13
**Whole** [5] 5:3 67:5 93:4 96:20
**Wholesalers** [3] 64:16,23
65:4
**Wife** [77] 9:12 18:18,20,22,25
21:5,16,20 22:12 23:1 24:5 26:12
27:19 28:4 30:13 31:15 32:10 42:21
45:17,22 47:5 52:10 53:6 59:9,17
62:8 64:3 65:16 66:4,24 67:7,23 69:
24 76:17 79:18 80:11,14,20 82:11
84:2 86:18,25 87:1 88:6,11,16,25
89:3,7-8 91:1,17-18 92:7 95:15 97:
9 98:2 99:12 101:25 102:19 105:11,
24 107:10,16 109:17,25 111:7 115:
12 121:12,15 134:16 136:8 138:24
139:23
**Wife's** [2] 10:13 134:25
**Willing** [3] 47:15 63:1 137:14
**Willingness** [1] 87:13
**Win** [1] 110:5
**Winter** [1] 69:18
**Wish** [2] 126:5,9
**Withdrawal** [1] 25:20
**Withdrawing** [1] 140:21
**Witness** [3] 3:17 124:8 125:9,
21 127:16 151:6,9,11,13
**Witness'** [1] 7:25
**Witnesses** [1] 127:3
**Wondering** [1] 69:1
**Wood** [3] 74:11,22 112:9
**Wording** [1] 82:22
**Words** [6] 14:2 82:12 84:8 94:
23 104:23 114:17
**Workers** [3] 35:14,19 37:5
**Worried** [1] 129:9
**Worth** [5] 23:18-19 112:15-16
114:2
**Wrapping** [1] 140:7
**Writing** [3] 89:7 115:24 151:10
**Written** [13] 27:16 41:20 47:
11,14 48:1 49:2 74:1 89:1,10 91:6,
11 113:4 115:5
**Wrote** [1] 47:17

## Y

**Yard** [2] 110:16,20
**Yards** [1] 101:7
**Year** [18] 10:4 15:10 21:3 22:23
23:6 25:24 30:15 39:2 42:19-21 67:
24 70:11 81:14 92:10,12 93:23
**Years** [33] 8:16 9:15 10:12 13:
2 17:6-7 18:9,16 20:2,13 24:12 36:
9,12 38:1 66:7 68:4 79:23,25 80:3
83:12,25 88:1 92:21 103:18 104:5-6
109:3 121:6 136:13-14,16,19 141:12
**Yourself** [4] 47:12 48:1 57:
10 97:12

EXHIBITS

PROPOSAL TO PURCHASE

# W.R. GRACE PROPERTIES

Ownership:

W.R. Grace & Co.
Att: Alan Stringer
P.O. Box 609
Libby, MT  59923

Buyer:

Raintree Nursery
Mel & Lerah Parker
769 N. Central road
Libby, MT  59923

September 27, 1993



REAL ESTATE PURCHASE AND SALE AGREEMENT

THIS REAL ESTATE AND SALE AGREEMENT entered into the 27 day of September and year 1993 written by and between RAINTREE NURSERY, a sole proprietorship, ("Purchaser"), and W.R. Grace & Co., a corporation (hereinafter called "Seller"). Subject to the terms and conditions contained herein, Purchaser hereby agrees to purchase and Seller hereby agrees to sell, on the terms set forth below, approximately 3500 acres of land in Section 10, 11, 13, 14, 15, 21, 22, 23, 24, 26, 27, 28, Township 31 North, Range 30 West, P.M.M., Lincoln County, Montana (the "Property").

1.) Purchase Price. The total prrchase price for the property shall be two million dollars ($2,000,000) which will include the monies needed to secure the reclamation bond through the state of Montana. Payable in all cash at closing.

2.) Condition of Title - Title insurance. Seller shall convey title to the Property to Purchaser at closing by Staturory Warranty Deed, free and clear of all encumbrances, liens and defects, except those approved by Purchaser.

At closing, seller shall furnish to Purchaser an ALTA Owner's Policy of Title Insurance issued by a title insurance company designated by Seller and acceptable to Purchaser insuring Purchaser in the amount of the purchase amount against any loss or damage by reason of defect in Seller's title to the Property, other than exceptions approved by Purchaser. Said title company shall also act as closing agent.

3.) Closing. The transaction shall be closed at the office of closing agent within thirty (30) days after title insurance policy or a report preliminary thereto is delivered showing title insurance. The Purchaser and Seller will deposit on demand with the closing agent all instruments and monies necessary to complete the purchase in accordance with this Agreement: The Purchaser and Seller shall use their best efforts to close said transaction as soom as possible.

4.) Closing Costs and Prorations. At closing, Seller shall pay one half of the closing agent's fee, and the premium for the Owner's ALTA Title Insurance Policy. At closing, the Purchaser shall pay the cost of recording the deed and one-half of the closing agent fee.

5.) <u>Timber Cutting.</u> Seller represents to the best of its knowledge no timber has been cut on, or removed from, the Property since September 27, 1993. Seller covenants that neither it nor any person claiming by or through Seller shall cut or cause to be cut any timber on the Property or cause fallen timber to be removed from the Property, from the of this Agreement, whichever occurs first. The representations and covenants contained herein are intended to survive closing.

6.) <u>Risk of Loss.</u> If prior to closing the Property shall be destroyed or significantly damaged by fire or other casualty, including timber cutting, this Agreement, at the option of the Purchaser, shall be null and void .

7.) <u>Hazardous Waste.</u> Seller represents and warrents to Purchaser that there are no hazardous substances, hazardous wastes or toxic materials (as defined in any applicable federal, state, county, or local government or laws, codes or ordinance) on or in the Property. Seller shall indemnmify and hold Purchaser harmless from any and all liability with reference thereto. The warranties of Seller shall survive closing.

8.) <u>Miscellaneous.</u> Purchaser will assume all present and future responsibilities and expenses incurred to comply with Water Quality Testing, State Inspections, Reclamation Site Maintenance, and long term Revegitation, along with Tailing Dam and Diversion Channel Maintance, and Monitoring as well as providing necessary Bonding Requirments through Montana Bureau of Reclamation and Bureau of Dam Safty.

9.) <u>Possession.</u> Purchaser shall be entitled to possession on closing.

Purchaser:   Raintree Nursery
             Mel and Lerah Parker
             769 N. Central RD.
             Libby, MT 59923

Seller:      W.R. Grace & Co.
             ATT: Allen Stringer
             P.O. Box 609
             Libby, MT 59923

0000024

**R**EALTOR

## AGREEMENT TO SELL AND PURCHASE
### (Including Earnest Money Receipt)

1 This contract stipulates the terms of sale of this property. Read carefully before signing (including information on reverse side). This is a legally binding contract. If not understood, seek competent
2 advice.
3
4 _____ `Libby` _____, Montana, November 23, _____, 19 92
5 Melvin G. Parker   and Lerah Lorene Parker
6 (hereinafter called "Buyer") agree to purchase, and the undersigned Seller, agrees to sell the following described real estate hereinafter referred to as "premises" commonly known as
7 Lot #1  W.R. Grace Land on Kootenai River
8 City of ____Libby_____, County of _____Lincoln_____, Montana, legally described as
9 ___Lot #1 as per plat in Sec. 32 TWP 31N R30W  P.M.M.  Approx 21.1 acres.___
10
11 TOGETHER WITH all fixtures attached to the above-described real property and attached buildings or structures except_____
12
13 SMOKE DETECTOR(S): Property has #_____ None  X _____ smoke detector(s).
14 The following items of personal property, free of liens and without warranty of condition, are included: _____
15
16
17 RECEIPT FOR EARNEST MONEY: The undersigned sales representative hereby acknowledges receipt from Buyer of earnest money in the amount of
18 ___Two Thousand Dollars and no cents_____
19 U.S. Dollars ($ _2,000.00___) as evidenced by ( ) cash, (X) check, or ( )_____ to be deposited with in business days of acceptance.
20 All parties to this transaction agree that such funds will be held in a depository account by: ___A_____ Debra DeShazer_____ Broker and
21 deposited pursuant to Montana State Law. Parties agree that interest accrues on earnest money funds, while deposited shall be payable to __DeShazer Ryan Realty__ Broker and
22 If interest is payable to the Buyer, the terms and condition of the earnest money service are:_____
23 __DeShazer Ryan Realty_____ by _____ Jack DeShazer_____ (Sales Representative)
24 TOTAL PURCHASE PRICE: $ __118,000.00__ One Hundred Eighteen Thousand Dollars and 00/100 based on plat. _____ U.S. Dollars
26 $ __2,000.00_____  payable as follows:_____
27 $ _____  earnest money to be applied at closing.
28 $ _____  as additional cash down payment, payable on or before closing.
29 $ _116,000.00_____  balance of the purchase price will be paid as follows: Buyer to pay all cash at closing. Total
30 price based on the plat and approximately 21.1 acres.
31
32
33 SPECIAL PROVISIONS: The lines of property will be flagged before closing.
34 Seller and Buyer to split closing fee equally. Seller to pay for deed and Buyer
35 to pay for recording.
36 Large Storage Shed - 280 x 140 to remain as well as
37 Office Building currently being used on property.
38 The property will be framed + landscaped
39 so as to be pleasing to Eye and in
40 Agreement to both Buyer + Seller.
41
42 Addendum(s): # _____, None  XX
43 DISCOUNT POINTS: If a Buyer obtains financing from a lender requiring discount points, Seller agrees to pay discount points up to a maximum of __n/a___ percent ( __n/a__%) of the Buyer's
44 loan. Buyer shall pay all other discount points.
45 CONVEYANCE: The Seller shall convey the real property by __warranty_____ Deed, free of all liens and encumbrances except those described in the title insurance
46 section of this agreement. The Seller shall convey the personal property by bill of sale.
47 TITLE INSURANCE: Seller, at Seller's expense, shall furnish Buyer Title Insurance evidenced by a standard form American Land Title Association title insurance commitment in amount equal to the purchase
48 price, contracting to insure merchantable title in the real property in the Buyer's name, free and clear of all liens and encumbrances except encumbrances hereinbefore mentioned, zoning ordinances, building
49 and use restrictions, reservations in federal patents, beneficial utility easements apparent or of record, easements of record, Special Improvement Districts (including rural SIDs), if any, which will be:
50 (X) paid off by seller at closing ( ) assumed by buyer at closing, and __no others_____
51
52
53 If the Seller's title is not merchantable and cannot be made merchantable before the stated closing date, 30 ADDITIONAL DAYS SHALL BE ALLOWED FOR THE SELLER TO MAKE SUCH TITLE
54 MERCHANTABLE. Encumbrances to be discharged by the Seller shall be satisfied prior to closing or from Seller's proceeds at time of closing.
55 TAXES AND ASSESSMENTS: Seller and Buyer agree to prorate taxes, special improvement assessments for the current tax year, as well as pre-paid rents, if any, as of the date of closing, unless otherwise
56 agreed_____
57 CLOSING DATE: The date of closing shall be ____*__June 31_____, 19 93  The parties may, by mutual agreement, agree to close the transaction at any
58 time prior to the date specified. If third party financing is required by the terms of this agreement (includes assumptions, contracts for deed, and lender financing), the closing shall occur on the date specified
59 or as soon thereafter as financing is complete but no later than _____ days after the stated closing date. The Buyer and Seller will deposit with the closing agent all instruments and monies necessary
60 to complete the purchase in accordance with this agreement. If buyer fails to make written application for financing, apply for assumption of an existing loan or contract, or initiate any action required for
61 completion of a contract for deed by 5:00 p.m. (mountain time) ____May _____, 19 93. Buyer will be in breach, and Seller can exercise Seller's remedies
62 under this agreement. If financing is called for herein and cannot be obtained, it is agreed that the earnest money will be returned to the buyer. 5/7 by Sept. 15,1993. if seller
63 PHA BUYER: The appraised value of the property being purchased, for mortgage insurance purposes, must not be less than $ __n/a---___ needs the time to finish work.
64 _____ ($_____). Please refer to this section on the reverse of this form for additional disclosure of your rights.
65 ADDITIONAL TERMS THAT ARE AN INTEGRAL PART OF THIS AGREEMENT ARE PRINTED ON THE REVERSE OF THIS FORM. PLEASE READ THE REVERSE SIDE OF THIS FORM, AS THESE
66 TERMS WILL AFFECT YOUR RIGHTS AND RESPONSIBILITIES UNDER THIS AGREEMENT.
67 SALESPERSON'S REPRESENTATION: Buyer hereby acknowledges that the above identified sales representative has acted and continues to act through closing as representative and agent for the Seller,
68 and not as representative and agent for the Buyer.
69 BUYER'S ACKNOWLEDGEMENT: Buyer acknowledges that he has examined the real and personal property, that Buyer enters into this agreement in full reliance upon his independent investigation and
70 judgement, that prior verbal representations by the Seller or Seller's agents or representatives do not modify or affect this agreement, and that by signing this agreement Buyer acknowledges having read
71 and understood this entire agreement, including the terms printed on the reverse page of this document.
72 BUYER'S COMMITMENT: I/We agree to purchase the above-described property on the terms and conditions set forth in the above offer and grant to said sales representative until
73 ____November 30_____, 19 92  at 5:00 p.m. to receive Seller's written acceptance. Buyer may withdraw this offer at any time prior to seller's written acceptance.
74 If Seller has not accepted by the time specified, this offer is automatically withdrawn.
75 I/WE HEREBY ACKNOWLEDGE receipt of a copy of this RECEIPT AND AGREEMENT TO SELL AND PURCHASE bearing my/our signature(s).
76 Buyer's Address: __769 N. Central  Libby, MT.__  Buyer Signature_____
77 Phone 293-9705  293- 6404 wk  Buyer Signature_____
78 SELLER'S COMMITMENT: I/We agree to sell and convey to Buyer the above-described property on the terms and conditions of the above stated contract. I/We acknowledge receipt of copy of this agreement bearing
79 my/our signature(s) and the(s) of the Buyer named above. Dated this _____ day of _____
80 Seller's Address: _____  Seller Signature_____
81 Phone: _____  Seller Signature_____ 12/9/92
82 DELIVERY TO BUYER OF A COPY OF ACCEPTED OFFER (one of the following methods of delivery should be used):
83 Date _____, 19___  Date _____, 19___
84 The undersigned Buyer acknowledges receipt of a copy of this contract bearing  A copy of this contract bearing Buyer(s) signature and that of the
85 his/her signature and that of the Seller(s).  Seller(s) was sent via ordinary or certified mail to the Buyer.
86 Buyer  Agent

(WHITE ORIGINAL)—Broker's Copy (File in Deal Envelope)    (GREEN COPY)—Purchaser's Copy Completed Contract
(YELLOW COPY)—Listing Agent's Copy Completed Contract    (PINK COPY)—Seller's Copy    (GOLD COPY)—Purchaser's Receipt (For Earnest Money)

EXHIBIT
2