

**U.S. Environmental Protection Agency**

# Region 8 - Community Relations
Serving Colorado, Montana, North Dakota, South Dakota, Utah, Wyoming and 27 Tribal Nations

Contact Us | Print Version    Search: [        ] GO

EPA Home > Region 8 > Community Relations > 5/13/04

**Community Relations**

**Environmental Sampling**

**Contacts**

**Links**

**Background Factsheet**

**cag 12/11/03**

**Cleanup Wages**

**Spring and Cleanup 4/18/04**

**Boat Ramp Cleanup**

**Flyway Cleanup**

**√13/04**

# Libby Community Advisory Group

Meeting Summary
May 13, 2004

**Introductions**                                                EPA Libby Home

Gerald Mueller and members of the Libby Community Advisory Group (CAG) introduced themselves. A list of the members and visitors in attendance is attached below as Appendix 1.

## Agenda

The CAG agreed to the following agenda for this meeting:

- EPA Report
- Attorney General Response
- Tobacco Forum
- Colleen Lux
- Public Comment
- EPA Report

Jim Christiansen reported on behalf of EPA on the following topics.

Resignations - Craig French, the representative of the Montana Department of Environmental Sciences (DEQ) on the CAG and Marianne Horinko, the EPA Assistant Secretary responsible for the Superfund Program, both recently resigned their positions. Mr. French's supervisor, Kevin Kirley, will participate on the CAG until Mr. French's replacement is hired.

EPA Administrator Visit - Mr. Christiansen learned this afternoon that Administrator Leavitt's visit to Libby has been postponed at the request of Senator Baucus. The visit has not been rescheduled. When it is, a press release will announce the new date.

Moto-Cross/BMX Track - The Libby Port Authority recently began construction of a Moto-Cross/BMX track on the Stimson Mill site. Because of the potential for raising dust that use of the track might pose and because soil at the site has not yet been analyzed for asbestos contamination, EPA requested that the construction temporarily cease. EPA will conduct intensive sampling at the track site this coming Saturday.

CAG Member Question - Is it correct that the site was sampled two years ago and determined to be safe?
Answer - Two years ago, EPA conducted sampling at the Stimson Mill. We conducted air sampling, sampled the settled dust in buildings, and took about 100 soil samples scattered across the property. Stimson personnel also wore personal air samplers. Both surface and sub-surface soil samples were taken at the site of an old vermiculite popping plant. In this sampling, asbestos was detected at three locations: behind the building in which we are now meeting, at the site of an old nursery, and one site located midway on the mill property. One sample was taken in the area of the proposed track and asbestos was not detected. However, more soil samples are need before EPA would be satisfied that the track area is clean.

CAG Member Question - I understand that some 74 former workers at Stimson Mill are sick. Do we know why?
Answer - It is hard to say why. The Mill site is not pristine. Some of the buildings contained vermiculite. Some of the logs processed there were probably contaminated with asbestos. This property has asbestos contamination issues.

CAG Member Comment - Personal samplers worn by workers at the Mill indicated that they were exposed to asbestos concentrations of 0.01 fibers per cubic centimeter. This is the explanation of the disease. Years of activity would have resulted in exposure.

CAG Member Question - Has the Port Authority property been tested for contaminants other than asbestos?
Answer - I don't know. My job is to clean up the asbestos. Another Super Fund site with contamination by creosote is located on property.

CAG Member Question - Has the Port Authority found tenants for buildings on its property?
Answer - We have discussed use of some of the buildings other than the central maintenance building, which contains contaminated vermiculite insulation. We have approved demolition of one building. The Port Authority is aware of the asbestos issues.

CAG Member Question - Is a map available of the sampling on this property?
Answer - I am updating the report of sampling results on the Stimson Mill which is now owned by the Port Authority. The update will include a map and results of the current sampling.

CAG Member Comment - We should invite the Port Authority to come to a CAG meeting to share its site utilization plan.
Response - That is a good idea, and I will extend an invitation to the Port Authority to do so. They are conducting land use planning for the site.

CAG Member Question - Is the Port Authority property cleanup in next year's budget?
Answer - Cleanup of the central maintenance building is scheduled for this year. Cleanup of the remainder of the site will be included in a future year budget.

CAG Member Question - If the proposed Moto-Cross/BMX track site is in need of cleanup, will funding be taken from the residential cleanups?
Answer - No.

CAG Member Question - You said that an old nursery site on the Port Authority land is contaminated. Will this site be isolated in some way?
Answer - The site is isolated by a canal. We will also fence it, and may cover it with plastic.

Audience Member Question - The boat ramp site had obvious contamination, but you refused to close it. Is your decision to isolate the old nursery site a change in policy?
Answer - No. We closed off a good portion of the boat ramp site until it was cleaned.

Audience Member Comment - You closed off the area with the port-o-potties and where the trucks parked two months after my request for the closure.
Response - My memory of what happened is different than yours. We did close off and cover the areas with serious contamination and did not wait two months to do so.

Bowling Fund-Raiser - Courtney Zamora, Volpe Center Site Manager, announced a bowling fund-raiser sponsored by the EPA removal contractors, Volpe, CDM, SaLUT, and Marcor, to support travel by local high school students to the Missoula Asbestos Conference. These students will be showing the asbestos documentaries that they made. The fund-raiser will be on Sunday, May 16 from 2-5 p.m. at the Lincoln Lanes.

Audience Member Comment - Thank you for sponsoring this event.

## Attorney General Response

In February of this year the CAG mailed to Attorney General Mike McGrath a letter asking if the Super Fund statute provides "...for health care for those subject to long latency (asbestos-related) disease." The letter asked that any reply be sent to the CAG in care of its facilitator, Gerald Mueller. Because he had not received a reply, Mr. Mueller contacted Attorney General McGrath's office. In response to this contact, Mr. Mueller received via fax a copy of a memo written by Assistant Attorney General Mary Capdeville to the Attorney General. Last week, Mr. Mueller met with the Attorney General to discuss his response to the CAG letter. The Attorney General told Mr. Mueller that based on the research summarized in the Capdeville memo, the federal government's decision to declare a public health emergency appears to be a discretionary act. Citizens and state

officials might sue the federal government seeking to require them to declare the emergency, but such a suit does not appear to be promising. Attorney General McGrath stated that if the CAG wishes that he do so, he will state his conclusions in a letter. However, letters from the Attorney General, even if not formal legal opinions, tend to have weight in any legal proceeding. Because of this fact, Attorney General McGrath asked Mr. Mueller to report his finding to date to the CAG and asked if it wants a letter reply. He also authorized Mr. Mueller to share the Capdeville memo which was labeled confidential with the CAG. Mr. Mueller passed out copies of the memo which is included below as Appendix 2. Mr. Mueller was also asked to announce that Attorney General McGrath planned to come to Libby on May 26 when the EPA Administrator had scheduled his visit. CAG members could discuss this topic with the Attorney General during this visit. However, as reported by Jim Christiansen, the Administrator's visit has now been postponed.

CAG Member Question - The Capdeville memo references a Public Health Emergency Fund. What do we know about this fund?
Answer by Gayla Benefield - We have been aware of it, but prior to September 11, it had never been used. Several law suits have been filed against the state for its failure to warn about the asbestos contamination. The Attorney General has the job of defending against these law suits. It would probably be difficult for him to defend against these suits and turn around and sue the federal government for failure to declare the public health emergency.

CAG Member Comment - We should seek the involvement of the County Attorney in this topic.
Response by Gayla Benefield - This may be a good idea, but we have discussed this with the County before, and there is no funding for the County Attorney to do so.

CAG Member Question - The Capdeville memo also mentions that W.R. Grace's environmental insurance policies might provide needed funding. Do you know more about this?
Answer by Gerald Mueller - I do not. This question should be addressed to the Attorney General.

CAG Action - Rather than request a letter, the CAG decided to form a subcommittee to discuss these matters with the Attorney General. Gordon Sullivan, Gayla Benefield, Clinton Maynard, and Mike Giesey volunteered to serve on this subcommittee.

## Tobacco Forum

Barb Guthneck with the Libby Community Interagencies reported on the effort to assist people with ending their use of tobacco products. She stated that the state has provided $34 thousand to fund this effort in Lincoln County, and that Rep. Carney was instrumental in obtaining the funds for this purpose. Ms. Guthneck reported that the state had recently initiated a Quit Line Program which arranges via a toll free telephone number for services to assist people wishing to quit using tobacco. The available services include 5 counseling sessions and free nicotine patches for those attempting to stop smoking and free nicotine gum for people trying to quit using chewing tobacco. The nicotine patches or gum is free forever until you quit using tobacco. The only restrictions relate to health problems that would necessitate a doctor's approval before using the patches or gum. Ms. Guthneck also reported that a number of school kids are using their lunch hours to understand and counter the tobacco industry advertising aimed at children. The school kids are observing stores where tobacco products are sold and counting the tobacco advertisements and noting if the ads are being placed at eye level for young people. They are discussing the number and the placement of the ads with the tobacco vendors.

Ms. Guthneck introduced Diane Foote who spoke on behalf of Initiative 149 which would raise taxes on tobacco products to reduce tobacco use and to provide funding for health related programs. Ms. Foot stated that to qualify the initiative for the ballot, 500 signatures of registered voters are needed in Lincoln and 10,000 statewide.

Audience Member Question - Would the initiative also provide funding to the state general fund?
Answer - Yes a portion of the funds raised by the tax would go to the state general fund. The tax would also: support the Children's Health Insurance Program, provide funding for health insurance for small businesses, support access by children and the elderly to pharmaceuticals, and help support the state nursing home for veterans.

CAG Member Comment - People who both smoke and who are exposed to asbestos have a 53 to 90 times increased risk for lung cancer over those not exposed to asbestos.

## Colleen Lux Presentation

Colleen Lux who wrote her master's thesis on the Libby CAG, recently traveled to Australia and visited with groups formed because of asbestos-related disease. Australia is about the size of the Untied States, but has only about 20 million people compared with our 290 million. Australia also has the highest per capital incidence of asbestos-related disease in the world. Australians were subject to asbestos exposure from asbestos mining and manufacturing and from use of building products containing asbestos. As was the case here, the companies that mined, manufactured, and sold asbestos products were aware of the health risks caused by asbestos but failed to provide warning about them to workers or the public. Ms. Lux described the experience at a asbestos mining town, Wittenoon, and the Latrobe Valley, an area with a high concentration of electric generating plants that used large amount of asbestos. The state government shut down the mining activity at Wittenoon but, rather than attempt to cleanup up the town, opted to move almost all of its residents away. Over a several year period about 20,000 people were relocated from Wittenoon. Some 6,000 residents of the Latrobe Valley have asbestos-related disease. The state owns the power plants and also provides health care, but not specialized treatment for asbestos-related disease. Ms. Lux said that she met many people facing asbestos-related diseases similar to the situation here in Libby.

Audience Member Comment - I met the Australians, who hosted Ms. Lux, in Brazil in 2000. These folks had been struggling with asbestos issues for 20 years. At that time they were far ahead of us here in Libby, but after four years of effort we have achieved far more health related services and clean up than the Australians. The Libby community should be proud of their effort and what they have achieved.

CAG Member Question - What form of asbestos is at issue in Australia?
Answer - Chrysotile.

CAG Member Question - Are there government protection agencies in Australia?
Answer - Yes, but on a smaller scale than here. The agencies exist at the state rather than federal level.

CAG Member Question - So the companies knew about the exposure risk and the Australian state and local government agencies have not acted?
Response - Yes. The state of New South Wales does have a no fault compensation program for people with dust related diseases including asbestos-related disease. Companies operating or that are headquartered in New South Wales and paid tax in NSW, contributed to this fund. A dust disease tribunal makes awards to people from the fund. The James Hardie Corporation, which is responsible for much asbestos exposure had also set up a private fund for asbestos victims. Unfortunately, James Hardie has moved out of Australia and apparently has not accounted for all the potential cases that could be filed against them, and left an inadequate amount in their fund. The state of NSW is currently investigating the James Hardie Corporation about what they new about their potential caseload before they left the country.

## Public Comment

CAG Member Comment - Royce Ryan who has represented asbestos-victims on the W.R. Grace bankruptcy committee recently died.

Audience Comment - ARD-Net recently received a grant to fund its second year of operation.

CAG Member Question - EPA has said that Libby is the highest priority Superfund Site. Only three properties are currently undergoing cleanup. Is this what being the highest priority means? Why are only three properties being cleaned?
Answer by Jim Christiansen - As I have previously reported to the CAG, residential cleanups have been a little bit ahead of schedule. To avoid running out of funds from the current $15 million budget, the cleanups have been slowed. With additional funding, we could be moving faster. I am optimistic that more funding will be forthcoming for this year which will allow us to quicken the cleanup pace.

CAG Member Question - How many years does your schedule anticipate to be needed to clean all

of the properties? Will it take 10 years?
Answer by Jim Christiansen - For a $15 million budget, we can clean 120 residences per year.

CAG Member Question - We know that the BN rail yard is contaminated. Is dust control in effect there?
Answer by Jim Christiansen - BN developed a sampling and cleanup plan and began the cleanup of the rail yard last spring. However, the method that BN chose to remove contaminated soil beneath the track ballast did not provide an effective cleanup, and EPA requested that the work be stopped. BN and EPA are currently looking at different cleanup options. No dust control is now in effect because the contamination is below the track ballast. Air sampling has not detected asbestos.

Audience Member Comment - According to page 3 of the April 8, 2004 CAG meeting summary, in designing and managing the cleanup you have to "...balance budgetary realities with what is scientifically defensible in court." I don't care about what is scientifically defensible in court. I want a protective cleanup. The courts protect corporate America. I don't believe that the cleanup of Libby is going forward in a protective manner. Rather than spending millions of dollars on a legally defensible cleanup, we should be using the money to remove contamination.
Response by Jim Christiansen - I do not agree that the cleanup is not protective. I do have to balance funding with what is legally defensible and with what EPA allows me to do.

Audience Member Comment - Also on page 3, you state that the detection limit of the technique you are using to analyze soil samples, polarized light microscopy (PLM), is 0.1% asbestos fibers per cubic centimeter of sample. You also state that "(w)hat is important is not the number of fibers in the soil, but the number that gets released and to which people might be exposed when the soil is disturbed. In one gram of soil, a 0.1% concentration contains 10 billion or more fibers. A 1980's study authored by John Addison, a mineralogist from Scotland, found that soil with a 0.001% concentration when disturbed could produce concentrations of 0.01 fibers per milliliter of air. Chris Weis cited this study in the risk assessment
Response by Jim Christiansen - You are raising technical issues that are difficult for me to address in just a few minutes. We should sit down and talk about them. There is no magic method to address soil sampling. If you have a better method than PLM, we should discuss it. We may in fact move to a lower action level as sampling techniques improve. We can go back and re-analyze the soil samples. The Addison study involved putting a soil sample in a box and shaking it to create a uniform concentration inside it. We do not approach these concentrations in actual air sampling associated with cleaning soils containing asbestos at the Addison study levels.

CAG Member Comment - The Technical Advisory Group (TAG) was designed to address issues like this. We can hire experts to help us do so.
Response by Jim Christiansen - We encourage the TAG to take up these issues and make comments on the risk assessment and the cleanup procedure.

CAG Member Comment - I just want people to know that we need to do better in the cleanup.
Response by Jim Christiansen - We do not believe that we are leaving people in danger after cleanups. We are still in the emergency response mode. When we transition to the remedial cleanup, we will target the cleanup at a risk level of no more than a 1 in 10,000 excess death.

CAG Member Question - When will we make the transition from emergency response to remedial cleanup?
Answer by Jim Christiansen - The transition will occur when the final record of decision is issued, which may occur next year or the year after.

CAG Member Question - You have previously reported to us that the operation and maintenance work group (O&M Group) includes representatives of DEQ, Lincoln County, the City of Libby, and W.R. Grace. These are the organizations that failed to protect us in the past. The membership doesn't feel right.
Response by Jim Christiansen - Please give the group a chance. As I have previously explained, the members of this group were chosen because of their ongoing responsibility and authority after EPA completes the cleanup and leaves Libby. If W.R. Grace emerges from bankruptcy, it presumably will have the responsibility and ability to fund continuing activities. The need to warn renters of the hazard caused by the contaminated vermiculite insulation is an example of the issues the O&M Group is considering. EPA cannot require a local ordinance mandating such a warning, but the city and county may be able to do so. Also, the county will be responsible forever for maintaining the asbestos cell in the county landfill. While we need advice from this group about how things can be done, EPA retains the decision making authority regarding the operation and

maintenance plan.

CAG Member Question - Will an opportunity be provided for the community to have input into EPA's decisions on the operation and maintenance plan?
Answer by Jim Christiansen - Yes. EPA will take formal public comment prior to making its decision.

CAG Member Question - Five or six months ago, George Keck was attending the O&M Group on behalf of the TAG. Shouldn't the TAG and the CAG continue to be represented?
Answer by Jim Christiansen - Yes. We would welcome Gayla Benefield as a representative of both groups. We do not wish to turn this group into a question and answer forum, however. A summary of each of the O&M Group meetings is available.

CAG Member Question - What is happening regarding the bidding for cleanup contractors?
Answer by Jim Christiansen - We hope to award contracts for three contractors by the end of May. The award will be announced through the EPA Q&A which is published in the local newspapers.

CAG Member Question - What did you learn about the possibility of transferring unused Region 8 emergency response funds to the Libby cleanup?
Answer by Jim Christiansen - I am optimistic about obtaining additional funding for this year.

## Next Meeting

The next regular CAG meeting is scheduled for 7:00 to 9:00 p.m. on Thursday, June 10, 2004 in the Ponderosa Room of Libby City Hall.

## Appendix 1

CAG Member & Guest Attendance List
May 13, 2004

Members Group/Organization Represented

Mike Giesey CARD
K.W. Maki Libby School District
Gordon Sullivan Self and TAG
Clinton Maynard Area Asbestos Research Group
Ken Hayes Senior Citizens
Norita Skramstad Asbestos Victim
David F. Latham The Montanian Newspaper
Jim Christiansen EPA Project Manager
Gayla Benefield LCAORO/ARD Network
Wendy Thomi EPA Community Involvement
Mike Noble Alternate for LeRoy Thom (CARD, TAG)
Eileen Carney State Representative

## Appendix 2

CONFIDENTIAL

To: Mike McGrath, Attorney General
From: Mary Capdeville, Assistant Attorney General
Re: Option to help Libby
Date: March 22, 2004

There are limited options under CERCLA or any other environmental law to address the concerns raised by the CAG in its February 12, 2004 letter Federal environmental laws are extremely limited

in addressing the individual public health needs resulting from pollution The environmental laws would not cover the listed desires of the community.

One option I see available to the Attorney General is to file a suit parens patriae against ATSDR under CERCLA's citizen suit provision. A preliminary decision to proceed with a citizen suit would require a more thorough legal analysis. I've examined the issue in more detail than presented in this memorandum. I can quickly forward my analysis on the availability of statutory relief and the definition of public health emergency. Further research would also be necessary, such as research into legislative intent.

Other than the citizen suit provision, aid by the Attorney General's Office would be limited to raising awareness of certain remedies These alternatives are provided at the end of this memorandum.

CERCLA's citizen suit provision: The section referenced by the Libby CAG in its February 12, 2004 letter sets forth a nondiscretionary duty for the protection of public health in the case of a public health emergency.

CERCLA states, in part,

In addition, said [ATSDR] Administrator shall-
**
**

(D) in cases of public health emergencies caused or believed to he caused by cxposu1~ to toxic substances, provide medical care and testing to exposed individuals, including but not limited to tissue sampling, chromosomal testing where appropriate, epidemiological studies, or any other assistance appropriate under the circumstances; and

(E) either independently or as part of other health status survey, conduct periodic survey and screening programs to determine relationships between exposure to toxic substances and illness. In cases of public health emergencies. exposed persons shall be eligible for admission to hospitals and other facilities and services operated or provided by the Public Health Service.

CERCLA §1 04(i)(I), 42 USC 9604(i)(1)2004

CERCLA allows civil action in several specified situations. One of these is for performance of a nondiscretionary duty. CERCLA*s citizen suit provision provides,

(a) Authority to bring civil actions. Except as provided in [sections not applicable to the present issue], any person may commence a civil action on his own behalf--

***

(2) against the President or any other officer of the United States (including the Administrator of the Environmental Protection Agency and the Administrator of the ATSDR) where there is alleged fai1ure of the President or of such other officer to perform any act or duty under this Act, including an act or duty under section (relating to Federal facilities), which is not discretionary with the President or such other officer.

CERCLA § 310,42 USC 9659 (2004).

The Attorney General would file Parens patriae on behalf of the present and former residents of Libby, Troy (and perhaps others throughout Montana who were exposed). The suit would also be filed parens patriae on behalf of the Montana citizens who will disproportionately bear the medical costs for those affected by exposure.

The action can be brought in any United States District Court but requires 60 day notice before suit is filed. The Court can order performance of a mandatory duty as its relief.

However, the court may award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing or the substantially prevailing party whenever the court determines such an award is appropriate.

Health surveillance program: CERCLA § 104(i)(E)(9) allows ATSDR to initiate a health surveillance

program, including periodic medical testing and a treatment referral mechanism. ATSDR has to date, provided funding under the other related sections, CERCLA §§ 104(i)(1)(E), (6), (7), (14) & (15), such as funding to evaluate the connection between health risks and exposure, 68 Fed. Reg. 33701 (June 5, 2003) and disease progression in exposed persons. 68 Fed. Reg. 23717 (May 5, 2003). These sections do not requite a public health emergency.

Public Health Emergency Fund: The CAG could seek funding pursuant to the federal Public Health Emergency Fund, a fund that did not seem to be used prior to September 11. Currently, the fund*s use is limited to terrorism effects. However, it is necessary under this provision for the Public Health Service Secretary to declare a public health emergency. That declaration would affect not only funding under the Public Health Emergency Fund, but would also cause action under CERCLA §§ 104(i)(I)(D) & (E).

Environmental insurance policies: One other Attorney General option is to determine the status of the bankruptcy proceedings. Even if W.R. Grace is insolvent, W.R. Grace's environmental insurance policies may provide the needed finds and relief for those affected by the tremolite asbestos in W.R. Grace's vermiculite.

## EPA Libby Links

| Community Involvement | Timeline | EPA Libby Asbestos Home | External Links |
|---|---|---|---|

EPA Home | Region 8 Home | Privacy and Security Notice | Contact Us | Search EPA

Last updated on Tuesday, July 5th, 2005
URL: http://www.epa.gov/region8/superfund/libby/cag040513.html