## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | **Chapter 11** |
| | ) | |
| W. R. Grace & Co., et al.[1], | ) | **Case No. 01-01139 (JKF)** |
| | ) | **Jointly Administered** |
| Debtors. | ) | |
| | ) | Reply Deadline: October 31, 2005@4:00 PM |
| | ) | Hearing Date: November 14, 2005@12:00PM |
| | ) | |
| | ) | Re: Docket No. 9315 |

Claim Nos. and Buildings:  See below
Claimant:  The California State University System

## RESPONSE TO DEBTORS' FIFTEENTH OMNIBUS OBJECTION (SUBSTANTIVE) TO ASBESTOS PROPERTY DAMAGE CLAIMS

The California State University respectfully submits this response to the Debtors'

Fifteenth Omnibus Objection to Property Damage Claims on behalf of the following

claimants: Chico – Butte Hall (Claim # 10597); Chico – Physical Science (Claim # 10621);

Dominguez Hills – Education Resource Center (Claim # 9888); Fresno – McKee Fisk (Claim

---

[1] The Debtors consist of the following 62 entities: W. R Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-I Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Ins., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgracc, Inc., Coalgracc II, Ins., Creative Food 'N Fun Company, Darex Puerto Rico, Inc.,  Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp, Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B 11 Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe. Inc., Grace H-G Inc., Grace H-G II Inc,, Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Ins., MICA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Curving, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

# 9838); Fresno – North Gymnasium (Claim # 10319); Fresno – Psychology (Claim #

10303); Fresno – Science (Claim # 9889); Fullerton – Humanities (Claim # 10053); Fullerton

– Physical Education (Claim # 10019); Fullerton – PJ&G Pollak Library (Claim # 10020);

Fullerton – Performing Arts (Claim # 10058); Hayward – Meikle John Hall (Claim # 11962);

Hayward – Music & Business (Claim # 11957); Humboldt – Forbes PE Complex (Claim #

9839); Humboldt – Natural Resources Bldg. (Claim # 9842); Long Beach – Main Library

(Claim # 10237); Long Beach – University Theater (Claim # 12616); Pomona – Gymnasium

(Kellogg) (Claim # 10018); Pomona – Darlene May Gym (Claim # 10078); Sacramento –

Alpine Hall (Claim # 9988); Sacramento – Kadema Hall (Claim # 9970); San Diego – Art II

(Claim # 9928); San Diego – Aztec Center (Claim # 9925); San Diego – Dramatic Arts

(Claim # 10230); San Diego – East Commons (Claim # 10208); San Diego – East Commons

Addition (Claim # 10229); San Diego – West Commons (Claim # 9993); San Francisco –

Hensill Hall (Claim # 10160); San Jose – Cafeteria (Claim # 11918); San Luis Obispo –

Administration (Claim # 11735); San Luis Obispo – Engineering West (Claim # 11819); San

Luis Obispo – Engineering West Addition (Claim # 11820); San Luis Obispo – Farm Shop

(Claim # 11817); San Luis Obispo – Mott Physical Education (Claim # 11802); San Luis

Obispo – Research & Development (Claim # 11800); San Luis Obispo – Transportation

Services (Claim # 11745); Stanilaus – Drama (Claim # 11876); Stanilaus – Music (Claim #

11866).

    1.    The above-named claimant respectfully submits this response to the Debtors'

Fifteenth Omnibus Objection. The Claimant has previously submitted a court-approved

proof of claim and proof that a Grace-manufactured asbestos-containing product is located in

its building. Grace served the claimant with a notice of insufficient documentation in March

of 2005 and the claimant provided supplemental documentation which is summarized in Exhibit 1. The Debtors' document notification was specifically limited to those items checked in Exhibit 2.

2.    Despite the Debtors' position, applicable case law places a presumption that a properly filed claim is valid. Lundell v. Anchor Construction Specialists, Inc., 223 F.3d 1035, 1039 (9th Cir.2000). The burden is on the Debtor to come forward with specific evidence and authority to refute the claim.

### Background

3.    This claim seeks recovery for asbestos property damage. An asbestos property damage claim seeks to recover the costs associated with management and removal of asbestos-containing surfacing materials that were sold by W.R. Grace & Co. and installed in the claimant's building. Grace's asbestos-containing surfacing materials are hazardous, not because they contain asbestos, but because they release billions of asbestos fibers into the building over time and when they are disturbed. These claims are based on the traditional theories of negligence, strict products liability, warranty and nuisance.

4.    These are not a personal injury claims.[1]    The claimant does not allege that anyone in its building has gotten or will get an asbestos-related disease. To the contrary, since discovering the presence of asbestos its building, the claimant has taken precautions to

---

[1]As noted by the Honorable G. Ross Anderson in the very first Monokote case ever tried to a verdict against Grace:

> Greenville was not attempting to recover, as Grace appears to assume, for future asbestos injury to its employees, but rather to recover the cost of cleansing its building from cancer-causing fibers. If no person ever gets sick from asbestos in the [building], that would not change the fact that Greenville's building is contaminated
> ...

Greenville City Hall v. W. R. Grace & Co., 640 F.Supp. 559 (D.S.C.1986), aff'd, 827 F.2d 975 (4th Cir.1987).

prevent such an event from ever happening. Both the Federal NESHAP regulation[2] and state regulations, as well as sound public health policy, require that the Grace's asbestos-containing surface treatments be separately and carefully removed, at the latest, when disturbed during renovation or when the building is demolished.[2]

### Introduction – Grace's Culpability

5.     W. R. Grace & Co. was in the business of manufacturing and selling asbestos-containing products from 1938 to 1978. 55 F.R. 4144-01 (February 13, 1990). During that time, Grace or its predecessors manufactured and sold at least 22 different asbestos containing surfacing-treatments and at least 34 building products to which asbestos was added as an ingredient. Id. Additionally, Grace mined, processed and sold many other products which contained vermiculite mined and milled at its Libby, Montana facility, including Zonolite Attic Insulation and Zonolite Masonry Fill, that were contaminated with asbestos fibers from the Libby mine.

6.     Grace was founded and operated for a number of years as a shipping company. In the early 1950's, Peter Grace, who had succeeded his father as head of the company, determined that the future of shipping was limited, and decided that Grace should

---

[2] 40 C.F.R. 61.167, et seq.

[2] The Court in City of Greenville further noted:

> Grace's position was basically to manage the asbestos now, remove it in problem areas and leave the rest alone until it deteriorated or until renovation or demolition. [Plaintiff] decided to meet the problem head-on and remove the asbestos under a planned program. As a consequence, the parties were really only at odds over how much to spend and when to spend it, not if money had to be spent to control the asbestos hazard. The jury's conclusion that [plaintiff] had suffered property damage from asbestos contamination is amply supported.

Id at 567. (Emphasis supplied).

become a chemical company. In connection with that decision, Grace purchased the Dewey & Almy Chemical Company (f/n/a the Multibestos Company) of Cambridge, Massachusetts.

7.    Additionally, in December 1962, Grace purchased the Zonolite Company (f/n/a Vermiculite & Asbestos Company), which became part of its Dewey and Almy Division. Zonolite mined vermiculite in Libby, Montana. The vermiculite in this mine contained asbestos. Zonolite shipped the vermiculite to numerous plants which it operated throughout the country. The vermiculite was then used in combination with other ingredients, including commercial asbestos, in the production of construction products.

**The Multibestos Knowledge**

8.    In 1930, Dewey & Almy purchased all but a few of the shares of Multibestos Company, located in Walpole, Massachusetts. Multibestos used asbestos fiber in the manufacture of brake linings and associated products. In 1934, Dewey & Almy took over the entire business of Multibestos.

9.    By 1935, a number of workers at the Multibestos Plant had developed asbestos disease. At a special meeting of Dewey & Almy held on August 23, 1935, the President of Dewey & Almy recommended that Multibestos be sold to Raybestos Manhatten, Inc. The minutes of the meeting reflect that:

> [The President] emphasized that the Executive Committee felt that, though there had been some improvement in the position of Multibestos Operations, the intangible burdens incident to them were greater than were reflected in statistics and that they were taking altogether too large a portion of the time of the Company's executives.

10.    In January 1936, the Multibestos Plant was closed. The lead editorial in the Walpole, Massachusetts newspaper commented, "[p]erhaps you are just as well satisfied that is gone, because it was a health menace."

5

11.     Thereafter, two of the earliest studies of asbestos disease were conducted among the employees and former employees of the Multibestos Plant. Of particular interest was the medical article published by John Hawes in 1937 based upon his study of the Multibestos Plant. Dr. Hawes concluded his article as follows:

> Asbestosis is a relatively new disease, concerning which we know remarkably little except that it does not seem to correspond to the laws governing silicosis in general. There is not the slightest doubt, however, in my mind at least, that asbestos dust is the most dangerous of all dusts. Asbestosis is able to produce total and permanent disability in a remarkably short length of time, even after only 2 or 3 years' exposure and occasionally less, as compared with the much slower and more gradual action of pure silicon and the great majority of silicates. Asbestos is an aluminum or magnesium silicate or a combination of these or others and, in its chemical analysis, agrees closely with that of talc, cement and certain other silicates. The fact remains, however, that asbestos is extremely dangerous and fatal, while talc, cement and other silicates are comparatively innocuous except under prolonged, intense exposure along with a very greatly lowered individual resistance.

12.     Subsequent to the closing of the plant, Bradley Dewey, the president of Dewey & Almy corresponded with Manfrid Bowdich, of the Massachusetts State Board of Health, and in turn, Dr. Leroy Gardner and Dr. Anthony Lanza concerning asbestos disease at the Multibestos Plant. At that same time, Dr. Gardner was director of Saranac Laboratories in Saranac Lake, New York. He had recently been employed by a number of asbestos companies, including Raybestos Manhatten and United States Gypsum Company, to conduct animal experiments with asbestos dust (these studies revealed that asbestos not only produced asbestosis, but that a large number of the animals tested died of lung cancer -- results which the sponsors successfully suppressed until discovery in the asbestos lawsuits years later). This correspondence revealed Mr. Dewey's actual awareness of the problems at

Multibestos, the findings of Dr. Hawes, and reasons for his getting out of the asbestos business. In one poignant statement in his letter of February 23, 1938, Mr. Dewey stated:

> I personally cannot study the disease record of the Walpole plant and not believe that asbestosis is a very serious and sometimes fatal disease. I think it is one that should not be belittled and it is one which should be objectively studied until reliable facts are known and out in the open. All this is simply so that you may know my own personal feeling. Far be it from me to get embroiled in somebody else's troubles.

13.    Subsequently, Multibestos changed its name to Dewey & Almy, and remained a part of Dewey & Almy until purchased by Grace in 1952. All the stock of Multibestos then known as Dewey & Almy was transferred to Grace in connection with that purchase. Bradley Dewey was added to the Grace Board of Directors prior to this purchase. He remained a member of Grace's Board (or a Director Emeritus) until his death in 1974.

**The Zonolite/Libby Knowledge**

14.    In approximately 1950, Zonolite introduced one of the earliest spray-applied acoustical plasters known as "Zonolite Acoustical Plastic". The product contained vermiculite, commercial asbestos, and small amounts of other ingredients. In the ensuing years, Zonolite and later Grace introduced various other spray-applied products which were a direct outgrowth of Zonolite Acoustical Plastic and, in most circumstances, very similar in constituency. Included in this group was the spray fireproofing product Monokote, first introduced in 1959. Prior to the introduction of Monokote, Zonolite marketed a fireproofing which was generally troweled on columns and beams. This product was known as Zonolite plaster fireproofing. It did not contain asbestos.

15.     During the period Zonolite marketed its spray applied products, it knew of the

dangers of asbestos dust. As early as December 21, 1955, John H. Huxley of the Chicago

Corporate Headquarters wrote J.B. Meyers at Libby that:

> I have previously written to you about the danger of exposing our
> employees to asbestos dust while they are manufacturing acoustical
> plastic. In many of our plants, the plastic business has increased over
> 100% in the last year and is still growing. When the business reaches
> these proportions, it is not unusual to have one crew assigned to the
> work continuously. This increases the danger.

(emphasis supplied).

16.     In 1956, the Montana Board of Health investigated the Libby mining

operation, and provided a report to the company which stated that, inter alia, "the asbestos

dust in the air is of considerable toxicity". In the late 1950's the company took a series of x-

rays of its employees with results reflecting that of the one hundred thirty (130) persons

examined, forty-eight (48) had abnormal x-rays, eight had pleural thickenings, twenty-six

(26) had interstitial fibrosis, and eight had pneumoconiosis.

17.     On February 14, 1964, Grace received the report of examination of employee

Eitel Ludwig, indicating that he had pulmonary fibrosis "due to inhalation of dust particles,

almost certainly from the asbestos content of the dust." In May-June of that year, respiratory

function tests were made on 140 men at Libby which revealed that:

> [T]heir respiratory function was below standard, but a serious hazard
> from pneumoconiosis (lung condition resulting from inhalation of dust
> particles) exists to employees at Libby.

18.     The following year, William Locke filed a worker's compensation claim for

pneumoconiosis as a result of seven years of intermittent exposure to asbestos while blending

acoustical material. Thereafter, injury claims proliferated at the Libby mine.

19.     Later in 1964, the Montana State Board of Health returned and conducted

another inspection of the plant, and filed another report. This report discussed the findings of

Dr. Selikoff, reported in the Journal of the American Medical Association, linking asbestosis

and asbestos cancer, including mesothelioma, to building trade insulation workers with

"relatively light intermittent exposure to asbestos". The report also noted that:

> The recent demonstration, by South African and British investigators
> of pleural and peritoneal neoplasms among individuals who had
> chance environmental exposure to asbestos many years before raises
> the very important question of possible wide-spread carcinogenic air
> pollution.

20.     An internal Grace memorandum of December 18, 1964 reports that "it is an

established company policy that all employees making mixed products" must wear

respirators. Another internal memorandum of January 11, 1965 reiterated the importance of

providing approved respiratory protection, but pointed out that "respirators are not to be

considered a substitute for engineering improvement of dust control." Grace's safety

administrator, Peter Kostic emphasized this point in a memorandum of March 29, 1966, in

which he stated that "respirators are fine for short periods of time, but to get a man to wear

one eight hours a day is next to impossible."

21.     On January 2, 1965, R.A. Bleich, General Manager of the Libby operation,

wrote the head of the Zonolite division of Grace, J.A. Kelley. He enclosed copies of all the

reports from the Montana State Board of Health on the dust problem and commented that:

> In going over these reports, I can only say that it presents a very sorry
> record. There is some improvement indicated during 1964 but still
> totally inadequate.

22.     In response, Mr. Kelley wrote George W. Blackwood, President of the Dewey

and Almy Chemical Division of Grace, on January 13, 1965, and advised him that "the

situation at Libby is not as good as it should be as far as the State of Montana is concerned"

and "that the problem of physical condition of employees may be a long term problem."

23.     On October 28, 1965, the Montana State Board of Health forwarded Mr.

Bleich a preliminary report of the Pennsylvania Department of Health which discussed lung

cancer and mesothelioma among Pennsylvania asbestos workers. The following year, L.E.

Park advised Grace that:

> While the average asbestos worker is well protected, the man on the
> street is not.  The 3 by 1 micron asbestos fibers in his lungs come from
> a variety of sources, that is i.e.:
>
>> Asbestos ducts in insulation in home central
>> heating plants.
>>
>> Asbestos line ducts and centrally air
>> conditioned buildings.
>> * * *
>> Asbestos ceiling and floor tiles.
>> * * *
>> Construction and Demolition.

24.     On March 31, 1966, the Montana State Board of Health forwarded Mr. Bleich

a copy of another article dealing with asbestos and cancer.  The article reflected grants

awarded to Dr. Selikoff at Mt. Sinai Hospital for a three-year study.  The article further noted

that Dr. Selikoff's research team had been studying a union group of insulation workers and

had found "six to seven times the 'expected' rate of cancer of the lung and three times the

normal rate of cancer of the stomach, colon and rectum", and in addition to an "extraordinary

high incidence" of mesothelioma.  The following year, in April 1967, the American Journal

of Medicine carried an editorial by Dr. Selikoff, et al. entitled "Asbestosis and Neoplasa",

which was circulated within Grace.

10

25.    On January 9, 1968, Mr. Sterrett forwarded O.F. Stewart a copy of Mr.

Kostic's letter of January 5, 1968, with a summary of his meeting with E. Fenner of Johns-

Manville on December 26, 1967:

> [T]he maximum allowable concentration for asbestos dust is
> controversial. The Industrial Hygiene Foundation is currently
> circulating a communication which I have seen, proposing a 0.0/mppcf
> for asbestos dust. They apparently feel that any exposure to asbestos
> dust is hazardous. Many doctors are of the opinion that there is a
> definite relationship between asbestos dust and certain types of
> cancer."...Fenner & Sheckler emphasize that threshold limits (MAC)
> should be used as guides in the control of health hazards and should
> not be regarded as fine <u>lines</u> between safe and dangerous
> concentrations.

> i.   * *

> It has been JM's experience that personal protective devices such as
> masks and respirators are only 50% effective. This type of equipment,
> therefore, should be used only in emergencies and for exposures of
> short duration.

**The Monokote Problem**

26.    Contemporaneous with the discussions of the asbestos in the dust at the

Libby mine, Grace and the other members of the Vermiculite Institute,(an organization

created to promote the sale of vermiculite products such as Monokote, discussed the "urgent"

need to create Monokote 4, a new "asbestos-free" formulation. In October, 1965, in a

preliminary study to create this product Grace tested Monokote without asbestos. This design

was abandoned until 1968 when publicity in the Northeast caused Grace to again consider

reformulation to remove asbestos from Monokote.

27.    In 1968, a major article on asbestos by Paul Brodeur entitled "The Magic

Mineral" was published in the New Yorker magazine. The article particularly attacked the

dangers of the spraying of asbestos fireproofing. The article immediately came to the attention of Grace.

28.    Additionally, on November 4, 1968, R.S. Arnold wrote Grace about the same questions being asked of Grace in Australia:

> In recent months, the powerful building workers union have been protesting loudly about the hazards of handling fireproofing and insulating products containing asbestos.

> \* \* \*

> Apparently the Building Unions learnt that asbestos is cancer producing from medical research performed in the United Kingdom.

> Neuchatel ask whether Zonolite have ever tested a Monokote formulation without asbestos content. We recently gave them the formula for Monokote MK-3 since they hoped for a more economical formulation to compete with the asbestos companies plus looking for a lower asbestos content.

> Would you comment on the health hazard question please and also advise of the status of a non-asbestos containing Monokote.

29.    On November 22, 1968, the California Department of Public Health forwarded its industrial hygiene study of exposures to asbestos dust at the Beverly Hills High School construction site to California Zonolite Company (a Grace licensee soon to be purchased by Grace). The report noted, inter alia:

> Atmospheric concentrations of asbestos-containing dust were found to be low on a count basis. However, on a weight basis, exposures were found to exceed our suggested threshold limit value for asbestos dust.

> Therefore, because of the added carcinogenic properties of asbestos properties, recommendations for additional personal protection are offered in this report."

30.     On January 23, 1969, Grace received the February issue of "Walls &

Ceilings", containing an article regarding glass fiber re-enforcement for plaster and concrete.

One Grace employee circulated the article with a notation that:

> This might be the answer to a 'maiden's prayer' for getting a substitute
> for asbestos in Monokote.

31.     The following month, on February 13, 1969, Grace manager R.W. Sterrett

discussed various possibilities of substitutes for asbestos in Monokote.[3]

32.     On March 11, 1969, Grace's safety administrator, Peter Kostic, wrote R.W.

Sterrett concerning another article that had appeared in Safety Engineering.  Mr. Kostic

advised Mr. Sterrett that:

> I think it would be well at this time, with the advice of counsel, to
> consider applying a warning or precautionary label or statement on all
> containers of products containing Vermiculite.  This may aid our
> defense in cases of product liability claims.

33.     On June 20, 1969, Jim Cintani advised Thomas Egan, head of Grace's

fireproofing division, with a copy to other top Grace officials, that he had attended a meeting

at New York University on June 15, 1969, on "Asbestos - An Unanticipated Environmental

Hazard."  He attached a copy of the program and a reprint of the article that appeared in the

New Yorker Magazine.  He also noted that:

> Dr. Selikoff presented a very detailed and factual report on the studies
> of the health hazards of asbestos.  He has made a career in the study of
> effects of asbestos and speaks eloquently about the subject.

> Dr. Lee of U.S. Public Health Service agreed with Dr. Selikoff's
> findings.  He felt that the harmful effects of asbestos fibers should be

---

[3] Grace could have found a substitute much earlier if it had desired.  For example, it had in its possession since 1943 a book entitled *Substitutes* which listed at least 22 possible substitutive for asbestos.  Most notably included within this list were fiberglass and wood products, materials that Grace ultimately substituted for the asbestos thirty years later.

neutralized, or if this was not possible, that asbestos should be taken off the market.

Dr. Pundsack, Vice President of Research of Development of Johns-Manville, also acknowledged the harmful effects of asbestos. Dr. Pundsack felt that John's-Manville had controlled the problem of asbestos in their plants through proper ventilation and indoctrination of their employees. However, the use of asbestos in construction posed another problem, particularly in the field of spray fireproofing and acoustical application. Dr. Pundsack was of the opinion this caused the greatest amount of potential hazard because the asbestos fibers were able to be airborne and thereby contaminate a large area.

* * *

The meeting made a deep impression on me. I was surprised that the universal agreement among parties at the meeting on the harmful effects of asbestos. I thought Johns-Manville would try to refute Dr. Selikoff's statements, but they did not do so.

It is my feeling that as these facts are disseminated around the country, the use of asbestos sprayed fireproofing will be discontinued.

I feel we should place a top priority tag on our efforts to secure a substitute for the asbestos in our Monokote fireproofing.

(emphasis supplied).

34.    On July 24, 1969, Mr. Vining circulated a confidential report entitled "Vermiculite Report for Mr. Grace". The report noted the need "to eliminate a serious health hazard caused by the presence of vermiculite and asbestos dust in the mill and expanding plants" and further that "tremolite asbestos is a definite health hazard at both the Libby operation and at the expanding plants using the ore."

35.    By October 1969, a confidential internal report indicated that:

Asbestos fiber is a health hazard during the application of Monokote. Work done late in 1969 to eliminate asbestos from the product indicates that a substitute has been found which does not deter from the properties of the original Monokote.

14

36.    On November 4, 1969, Mr. Egan heard an address by Dr. Selikoff at the

CPLIA Convention.  On December 2, 1969, he forwarded his comments concerning this

address to top officials within Grace:

> His address was very factual about the extreme dangers of the use,
> under current practices, of sprayed fiber fireproofing.  After noting the
> widespread concentration of fibers around major office structures, with
> emphasis on the large amounts distributed blocks from the site, he
> stressed the hazards to the general public of this pollution of the air.
> Also, he noted the concern of possible long term danger to building
> occupants from prolonged minute dusting of fibers through the
> building's air distribution systems.  His use of medical charts, job
> photos, on site readings and expert commentary gave the maximum
> impact.

37.    The preceding day, Mr. Egan had written V.H. Dodson that:

> Knowing the building pressure against the use of asbestos in sprayed
> fireproofing, particularly in the New York, Philadelphia area, and with
> concern spreading rapidly throughout the country, there are two prime
> reasons we should get asbestos out of Monokote.  They are:
>
> > We are going to get included in the
> > indictment since we have asbestos in
> > Monokote.
> >
> > Monokote without asbestos would give a
> > tremendous sales increase at once.
>
> Also, we have an ethical obligation to get it out.

38.    On December 16, 1969, Mr. Egan wrote a number of persons within Grace as

follows:

> Recent internal pressures, mainly the alarm on asbestos, has directed
> us to areas of improvement in Monokote.  The investigation has been
> underway for quite sometime with analysis of glass, mineral and paper
> fibers in lieu of asbestos.  Also, many formulations have used no fiber
> at all, but making changes or additions to the Gypsum are being
> analyzed.
>
> This program has been accelerated recently, and the reports are
> optimistic.

39.     On March 12, 1970, an inter-office correspondence circulated an article from the Seattle Times of March 1, 1970, reporting another speech by Dr. Selikoff in which he again warned that

> [E]ntire buildings sometimes are 'contaminated for life' because asbestos fibers are left loose after pipes and beams are sprayed with the insulating material in the areas between floors and ceilings.

> These areas of 'dead space' often are used as return air ducts for building's circulation system he said. 'When asbestos fibers are being sucked from these areas into the circulation system of a building, I think I would have to call this one of the most reprehensible habits we have found,' he said.

40.     In April, 1970, Mr. Egan reported that Grace had two formulations for asbestos-free Monokote that were being tested at Underwriters Laboratory. That same month, the magazine "Walls & Ceilings" reported a speech by Dr. Selikoff in which he again warned that entire buildings were being "contaminated for life" because of sprayed fireproofing.

41.     On June 1, 1970, Mr. Egan summarized events to date as follows:

> It is very important that each of you have a clear understanding of the issues and the course of events concerning the 'asbestos' pollution.
>
> * * *

> Dr. Selikoff started to speak out publicly to our knowledge in early 1969 around New York and, in fact, got the Fireproofing Subcontractors and Sprayed Fiber Manufacturers Association to form a committee to set standards to improve job conditions.

> The general feeling was that he would go away if he was treated gently. But this was not to be, as he stepped up his attack speaking November 1969 to the CPLIA National Convention and other groups across the country....

> * * *

I have met with Dr.'s Selikoff and Rickles and I'm sure they intend to put an end to pollution, short and long term with materials, asbestos or other, which can in any way endanger the health of workers, office employees, and the general public. This includes during construction, after building, occupancy through air conditioned inhalation, or future demolition of buildings that will release asbestos or other materials into the atmosphere.

42.    On June 11, 1970, Mr. Egan wrote Dr. Selikoff and expressed appreciation "for the excellent work to date in alerting us to the dangers of the present product and working conditions."

43.    On July 10, 1970, Sprayon Research Corporation, which had previously sold an asbestos fireproofing, announced the successful testing of an asbestos-free material known as "SprayDon" standard "J" which had received rating from UL Laboratories. Other companies soon followed.

44.    Additionally, on August 20, 1970, Mr. Egan commented on the Research and Development Program for asbestos-free Monokote and commented that:

Barring some alarming medical fact to the contrary, the health hazard of asbestos will require the ban on loose asbestos particles to the atmosphere, and probably within one year.

45.    A research and development program for asbestos-free Monokote dated August 11, 1970, noted:

Our current Monokote, identified as MK-3, was developed in 1959 and has been successfully marketed since. In two areas of performance, MK-3 is questionable.

Under the requirement that such a product be non-injurious to health, we are attempting to determine code pollution levels and rate MK-3 field performance against these levels. We are also attempting to reformulate the product to completely exclude asbestos...

In the area of requirement that MK-3 be fire resistant, our standard MK-3 has borderline performance in its ability to adhere to a certain

configuration of steel deck during a fire test.  We find that premature
bond failure is the rule rather than the exception in those full scale test
specimens which contain a large area of flat - plate.

46.     The report further discussed MK-3 as follows:

"Complete asbestos elimination for health considerations."
Since June 1969, we have attempted to eliminate asbestos by
substituting other materials.  Within a few months, we had to define
the function of asbestos as primarily a yield increasing additive, also
useful in improving the homogeneity and pumpability of the
composition.  We have discarded the following functions as being
insignificant:

>            Necessity that fiber be inorganic and
>            highly resistant to high temperatures;

>            Contributed to cohesive strength
>            during exposure to fire.

47.     On May 14, 1971, Grace announced its new asbestos-free Monokote IV.  The

bulletin stated:

>            Responding to a critical need, the Construction Products Division,
>            W.R. Grace & Co., has introduced into the New York market a
>            completely asbestos-free formulation of its cementitious fireproofing
>            material, Zonolite Monokote."

48.     On November 16, 1971, Mr. Cintani wrote Mr. Feit that:

>            The New York State area and the New England area are almost
>            entirely changed over from MK-3 to MK-4....The market has
>            definitely switched to a non-asbestos product in the Northeast.

49.     On December 1 and 2, 1971, a meeting of Grace's Plaster and Fireproofing

Committee was held in Cambridge.  The letter forwarding the minutes of meeting reports that

shortly after the meeting, MK-4 had obtained additional necessary ratings.  Nevertheless, the

minutes noted that "MK-3 - continue to use where possible".

50.     On January 14, 1972, Grace's architectural representative advised a plasterer

in Niles, Illinois concerning the Archer Pulaski School that:

18

This is to inform you that Monokote 4 asbestos-free cementitious spray-applied fireproofing has been accepted by the City of Chicago for use within the city limits.

We have successfully shown the pollution control people and city officials that use of Monokote 4 does not create a health hazard and has been fire tested and rated by Underwriters Laboratory, Inc., in accordance with Test Method ASTME-119.

A few jobs we are doing with Monokote 4 in the city at the present time are the Standard Oil Building, Columbus Hospital, the Chicago Mercantile Exchange, and the Audy Juvenile Home.

51.    On February 4, 1972, L.S. Shu reported his attendance at the EPA public hearings in New York City to A.M. Rosenberg.  He reported his general impressions on the hearing as follows:

The most important part of the hearing, so far as asbestos is concerned, was made by Johns-Manville.  They did not mention spray fireproofing materials at all.  Their intention is obvious.  They want to save their major business which is mining and milling of asbestos. The quantity of asbestos used in spray fireproofing industry is comparatively small (estimated 0.5% of asbestos used in U.S.). Maybe they are willing to sacrifice this!  In this respect, I came across a trip report written by Jim Cintani on June 20, 1969.  He attended a meeting at NYU on asbestos.  I am quoting a paragraph from his report:

...Dr. Pundsack felt that Johns-Manville had controlled the problem of asbestos in their plants through proper ventilation and doctrination of their employees.  However, the use of asbestos in construction posed another problem, particularly in the field of spray fireproofing and acoustical application.  Dr. Pundsack was of the opinion this caused the greatest amount of potential hazard because the asbestos fibers were able to be airborne and thereby contaminate a large area.

52.    On February 24, 1972, P.E. Korenberg enclosed a table on the relationship between MK-3 and MK-4.  The table noted that:

Formulation MK-3 contained some asbestos and can be used in locations where asbestos is not banned.  Formulation MK-4 is asbestos free and can be used anywhere -- including those areas where asbestos is banned.

53.    On June 14, 1972, R.C. Erickson advised all Monokote plant superintendents that:

> This memo leaves as a completely open question 'when or if any specific plant will convert to this [MK-4 formula] the trial batching plant is purely for purpose of being prepared when we are forced to close out MK-3.

54.    On August 2, 1972, Thomas P. Feit, who had replaced Mr. Egan as fire protection products manager, advised manufacturing facilities that the effective date of EPA banning of asbestos-containing fireproofing was still in question, but that:

> Anticipating the worst, we have used mid to late September as the cut-off date.  Obviously, if this is not the cut-off date or if we get an additional ninety days, we will continue to make and sell MK-3 until we no longer can.  I do believe that the plant should keep an inventory of such items as asbestos and MK-3 bags and anticipation that the cut-off date will be sometime in September.

55.    By October 1972, Grace had also introduced asbestos-free Monokote V (MK-V):

> Application performance of MK-5 approximates that of MK-3, but it appears to have the additional advantage of making possible greater job site control which will reduce quality problems.

> The material was introduced in October to those markets where asbestos-containing materials had been banned.  In these areas a complete change over from the former non-asbestos MK-4 will take place between now and August 1973.  Announcements will be made in all other market areas with MK-5 to replace MK-3 and MK-4, for an orderly transition in 1973 and 1974 at all plant locations.

56.    Mr. Egan, who was then manager of the midwest region, noted that:

> Zonolite's Monokote-5 is a definite improvement over existing materials and places W.R. Grace & Co. well ahead of all other manufacturers of fireproofing materials in the quality and assured performance of a non-asbestos-containing plaster fireproofing material.

57.    An internal letter of Mr. Feit of January 6, 1973, reported that:

> The MK-5 announcement has been made in the Eastern and
> Midwestern Regions only -- where asbestos-containing fireproofing
> materials have already been banned.  There is at this time no schedule
> set for introducing MK-5 into any other area  until we have completed
> all field testing and/or EPA action.

58.    Even after the EPA banned the spray-application of asbestos-

containing fireproofing in the United States in July of 1973, Grace continued to sell

asbestos-containing Monokote in Canada. In an October 8, 1974 internal memo,

Grace executives weighed the pros and cons of continuing this practice:

> It's my understanding that Jim McKague intends to continue with MK-
> 3 [in Canada] and there are no overall limitations by the Canadian
> government prohibiting its use, although certain local authorities have.
> Where it is prohibited, MK-5 is being sold.
>
> The case for MK-3 is the lower cost possible.
>
> The case against it is:
>
> > Grace could get critical publicity from selling and asbestos-
> > containing material.
> >
> > If there is legislation against MK-3 there can be a concern
> > generated on asbestos content of vermiculite.  (If MK-5 had
> > totally replaced MK-3 prior to EPA's action I don't believe
> > we would ever have had any question generated in the
> > market about asbestos in vermiculite).
> >
> > Selling MK-3 in Canada could continue attention and
> > confusion on Monokote in the U. S.  It will be necessary to
> > list MK-3 at UL and face the kinds of issues as in the
> > attached correspondence.[4]
> >
> > Manufacturing MK-3 creates asbestos problems in our
> > plants.  If this is attacked by an agency, there is a risk that

---

[4] The attached correspondence was from Underwriters' Laboratory proposing to delete all fire ratings for
products containing asbestos in light of the EPA ban upon visible emissions from the spraying of materials
containing more than 1% asbestos.

the investigation would continue to a concern on vermiculite.

Continuing MK-3 will require testing and evaluations at UL plus all the other overhead expenses related to the management of this type of product. UL work alone could be a major cost item. . . .

It is my recommendation that we cancel MK-3 immediately and eliminate the concerns listed above.

59.    Despite this recommendation, Grace continued selling asbestos-containing Monokote in Canada through at least 1975.

**Grace Conceals the Problem in Monokote**

60.    Surprisingly, asbestos was not added to Monokote to increase its fire resistance. Indeed, the vermiculite plaster (to which no asbestos was added) which Monokote replaced had much obtained higher fire ratings than were ever obtained by asbestos-containing Monokote. As Grace's own internal documents reveal, the primary purpose of asbestos in Monokote was to increase the yield (thereby increasing the profit margin). When asbestos was finally removed from Monokote it was replaced with shredded newspaper.

61.    When Grace began marketing its asbestos-containing Monokote throughout the country in the early 1960's, it never disclosed the fact that Monokote contained asbestos. The  evidence from Grace's own files and corporate testimony confirms that Grace's own salesmen did not know that asbestos was in Monokote. Even when Grace's competitors began placing warnings on bags of asbestos-containing fireproofing as early as 1962, Grace did not disclose the asbestos content of Monokote to the salesmen who sold, the architects who specified it or the workmen who mixed it and sprayed it.

62.    In fact, as more information became public about hazard's of asbestos, Grace made a conscious decision not to inform architects that Monokote contained asbestos. When one of its competitors announced its new asbestos-free fireproofing product had achieved approval from Underwriter's Laboratory in 1970, Mr. Thomas Egan, head of Grace's fireproofing division, sent a memo advising Grace's salesmen not to spread this information, but to "let the architect or other find out for himself . . ."

**The Safe Buildings Alliance and Grace's Attempt to Re-write History**

63.    The ban on the sale of asbestos-containing surfacing materials did not end Grace's efforts to conceal the hazards associated with asbestos in its products. Within one month of the first asbestos property damage verdict in the country, the three largest former manufacturers of asbestos containing fireproofing (Grace, United States Gypsum Co. and National Gypsum Co.) met in secret in Washington, D.C. and formed the Safe Buildings Alliance ("SBA").   The SBA has spent millions of dollars (contributed by its member companies) to reduce the members' liability by encouraging building owners to forego the removal of asbestos based upon often incorrect and misleading scientific and technical information prepared with the assistance of counsel for its member companies. In re School Litigation, 842 F.2d 671 (3d Cir.1987) (holding that the SBA was the alter-ego of its member companies).

64.    SBA's internal minutes confirm the Third Circuit's finding.  These reflect, inter alia, that as early as June 1984, SBA intended (1) to lobby and influence Congress, State Legislatures, and Federal and State Regulatory Agencies;   (2) to influence public thinking and building owner's decisions through a massive public relations campaign using national and local media, as well as the scientific, technical and trade press and (3) to

coordinate and, as necessary, directly interact with these [scientific, medical and building sciences] communities in order to maintain current knowledge, and to the extent practicable, influence the emerging trends and communication . . . The information developed in this effort may have utility, and therefore cost savings, in providing assistance in the underlying litigation."

65.    SBA, which eventually consisted of only Grace and U. S. Gypsum, spent millions of dollars in these efforts.  SBA has lobbied the White House, Congressmen and federal agencies.    When the Environmental Protection Agency promulgated the 1990 amendments to the NESHAP regulation, the SBA filed suit against EPA, and spent vast sums challenging the regulation. Rather than waste its own limited time and resources on this issue, EPA agreed to settle the SBA suit and issue the EPA NESHAP Clarification of Intent, 58 Fed.Reg. 51,784-01 (Oct. 5, 1993).[5] Although the clarification did not change the actual regulation, it did make sweeping policy statements in accordance with SBA propaganda. Subsequently, the SBA filed suit against OSHA, challenging its regulations on asbestos.[6]

66.    Despite the fact that it had no interest in this subject outside of litigation (its member companies long ago stopped selling asbestos products), SBA and its members occupied three seats on the EPA Committee which developed the regulations advising school districts what they should do about asbestos-containing materials.  SBA's officers, as well as its member's litigation experts sit on peer review panels for EPA guidance documents and testimonial publications.  Despite having no scientific qualifications, SBA's former president and head lobbyist, John Welch, was a voting member of the ASTM asbestos sub-committee

---

[5] The NESHAP Clarification is cited extensively in Grace's pre-trial memorandum, thus demonstrating that SBA's efforts to influence scientific and federal regulatory agencies have served to aid its members cost-recovery litigation.

[6] 59 Fed.Reg. 40,964-41,162 (August 10, 1994).

of the indoor air quality committee that decided what standards and test procedures would be endorsed by ASTM as scientifically reliable. In the 1980's and 1990's, the SBA blitzed the country with a massive media campaign and generated proposed state and local statutes and regulations to minimize litigation expenses of its members.

67.    SBA's lobbying efforts also included contact directly with many individual state representatives. SBA directly contacted national and local newspapers in an attempt to influence public opinion. Furthermore, newspaper pieces that were written by the SBA and highlighted the misleading pamphlet "What You Should Know About Asbestos in Buildings" were published in newspapers throughout the country.[7] SBA also put their message on the radio waves in a program called "A Question of Safety" which it aired across the country.

68.    As an example of the lengths to which the SBA went to manufacture science, in 1988, the SBA sponsored "the Harvard Symposium," a closed conference in which defense litigation experts were invited to present and publish their work. The information presented at the "symposium" was quickly disseminated by the SBA, which publicized the proceedings in newspapers and radio spots all over the country as a "landmark report." SBA failed to tell that it had contacted Harvard and suggested the symposium and located the co-sponsors. Among those how made presentations at this closed forum were many of Grace's litigation experts.

69.    It is against this backdrop that the Debtors have baldly alleged that claimants' claims should be barred by the statute of limitations, assumption of the risk and that claimants cannot prove that Grace's asbestos containing surfacing products are hazardous or unreasonably dangerous. Coupled with the Debtors' track record of losing substantial

---

[7] See, In re: Asbestos Schools Litigation, 115 F.R.D. 22 (E.D.Pa.1986) for discussion of the content and misleading nature of this publication.

verdicts and settlements in the tort system, it is clear that the Debtors' objections are patently without merit.[8]

**Burden of Proof**

70.     A proof of claim is deemed allowed unless a party in interest objects under 11 U.S.C. § 502(a) and constitutes "*prima facie* evidence of the validity and amount of the claim" pursuant to Bankruptcy Rule 3001(f). See also, Fed. R. Bankr.P. 3007. The filing of an objection to a proof of claim "creates a dispute which is a contested matter" within the meaning of Bankruptcy Rule 9014 and must be resolved after notice and opportunity for hearing upon a motion for relief. *See* Adv. Comm. Notes to Fed. R. Bankr.P. 9014.

71.     Upon objection, the proof of claim provides "some evidence as to its validity and amount" and is "strong enough to carry over a mere formal objection without more." Lundell v. Anchor Construction Specialists, Inc., 223 F.3d 1035, 1039 (9th Cir.2000); citing, Wright v. Holm (In re Holm ), 931 F.2d 620, 623 (9th Cir.1991); see also, Ashford v. Consolidated Pioneer Mort., 178 B.R. 222, 226 (9th Cir. BAP 1995), aff'd, 91 F.3d 151, 1996 WL 393533 (9th Cir.1996). To defeat the claim, the objector must come forward with

---

[8] City of Greenville v. W. R. Grace & Co., 640 F.Supp. 559 (D.S.C. 1986), aff'd 827 F.2d 975 (4th Cir. 1987); New Hampshire-Vermont Health Service Corp. v. U. S. Mineral Products Co., 10 F.3d 805 (1st Cir.1993) (table decision – text at 1993 WL 472829); Kansas City v. W. R. Grace & Co., 778 S.W.2d 264 (Mo.App.1989); Kansas City v. Keene Corp., 855 S.W.2d (Mo.1993); Clayton Center Associates v. W.R. Grace & Co., 861 S.W.2d 686 (Mo.App. 1993); Northridge Co. v. W. R. Grace & Co., 205 Wis.2d 267, 556 N.W.2d 345 (Wis.App.1996); San Franscisco Unified School District v. W. R. Grace & Co., 37 Cal.App.4[th] 1318, 44 Cal.Rptr.2d 305 (Cal.App. 1 Dist. 1995); MDU Resources Group v. W. R. Grace & Co., 14 F.3d 1274 (8th Cir.1994); Farm Credit Bank of Louisville v. U. S. Mineral Product Co., 864 F.Supp. 643 (W.D.Ky.1994); May v. AC & S, Inc. 812 F.Supp. 934 (E.D.Mo.1993); Tioga Public School Dist. No. 15 v. U. S. Gypsum, 984 F.2d 915 (8th Cir.1993); Hebron Public School Dist. No. 13 v. U. S. Gypsum, 953 F.2d 398 (8th Cir.1992); Blue Cross & Blue Shield of SC v. W. R. Grace & Co., 781 F.Supp. 420 (D.S.C.1991); Security Homestead Ass'n v. W. R. Grace & Co., 743 F.Supp. 456 (E.D.La.1990); Drayton Public School Dist. No. 19 v. W. R. Grace & Co., 728 F.Supp. 1410 (D.N.D.1989); Spartanburg County School Dist. Seven v. National Gypsum Co., 805 F.2d 1148 (4th Cir.1986); City of Manchester v. National Gypsum Co., 637 F.Supp. 646 (D.R.I.1986); Town of Hookset School Dist. V. W. R. Grace & Co., 617 F.Supp. 126 (D.N.H.1984)

sufficient evidence and "show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves." In re Holm, 931 F.2d at 623.

**Objection C-1  Alleged Facially Incomplete Proofs of Claim**

72.     The Court's Gateway Objection Order required Grace to provide claimants with notice and 60 days to cure any deficiencies in the claim form.  Grace baldly states that "notice has already been given of the claim's failings and the claimant has still failed to respond adequately." (15th Omnibus Object at ¶53).  This statement is both misleading and inaccurate.

73.     It is Grace's burden to establish its compliance with the Court's Gateway Objection order.  After reasonable inquiry, the claimant cannot find any record of Grace having provided it with its notice of intent to object on the basis of any specific deficiencies that relate to the completeness or adequacy of the responses provided on the Proof of Claim form as listed in Grace's 15th Omnibus Objection, Objections.  Instead, Grace merely provided limited notice that it deemed certain documentary submissions incomplete.  This is not sufficient to bar the claim.  In re: Guidry, 321 B.R. 712 (N.D.Ill.2005).  Accordingly, Grace's objection to the sufficiency of the claim form must be denied, or, alternatively, Grace must provide the claimants 60 days to cure any alleged deficiencies.

**Objection C- 2 Allegedly Insufficient Documentation**

74.     Despite the Debtors' objection, documentation for this claim has been provided.  Apart from providing a claim specific summary of documentation for this claim, copies of all documents have now been provided to Rust Consulting, Grace's claims agent. The documents provided in conjunction with this claim are listed in Exhibit 1.

75.    More importantly, neither the bar date order nor the Proof of Claim form required the production of documents with the form. The Proof of Claim form clearly provided claimants with the option of providing a summary of documents and consent to making them available for inspection upon further request. After Debtors requested copies of the documents listed on Exhibit 1, they were copied and sent to the Claims Agent in accordance with the instructions on the Proof of Claim form. Accordingly, the Debtors' objections are without merit.

76.    Finally, the Debtor's vitriolic allegations regarding the history its objections to this and other claims filed by Speights & Runyan are disingenuous. In fact, contrary to the debtor's direct representations to this Court in February of 2005, S&R filed supporting documentation in March of 2003 with over 1,000 claims and further indicated would work with the Debtor to determine additional documentation was desired by the debtor and provide it. Instead of talking with the S&R claimants, the Debtor chose to serve notice of blanket gateway objections to these claims. S&R diligently worked to obtain additional documentation, and, with 60 days of receiving the notice, provided, in accordance with the specific instructions on the Proof of Claim, summarized the documentation for this and other claims, ultimately identifying almost 30,000 responsive documents. These documents were available for inspection beginning in May of 2005. However, it was not until July, 2005, after the Debtors' had initiated its smear campaign against Speights & Runyan, that Debtors' counsel requested that these documents be copied. After this request, S&R copied 62 boxes of documents in support of this and over a thousand other claims and sent them directly to Grace's claims agent as indicated in the Proof of Claim form.

77.     Moreover, the Debtors' objection to claims based upon the contention that the proofs of claim filed in respect of such claims were facially incomplete or lacked certain documentation is without any basis. The standards for proofs of claim and objections was stated by the Third Circuit Court of Appeals in In re Allegheny International, Inc., 954 F.2d 167 (3d Cir. 1992):

> The burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A. § 502(a) rests on different parties at different times. Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is "*prima facie*" valid. [citations omitted.] In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. The burden of going forward then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim. It is often said that the objector must produce evidence equal in force to the *prima facie* case. [citations omitted.] In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. (citations omitted).

954 F.2d at 173-74.

78.     Accordingly, the pertinent inquiry is whether the proof of claim and documentation filed by a claimant sets forth sufficient evidence of a claim against the Debtors, not whether the proof of claim provides sufficient information for the Debtors to formulate their defenses and objections to the PD Claim. If the proof of claim meets this *prima facie* standard, the burden shifts to the Debtors to produce evidence that the claim is invalid, regardless of whether it would be useful for the proof of claim to provide additional information for the Debtors to assess their defenses as such information is obtainable by discovery.

79.    The fact that claimants may have omitted certain of the information requested in the proof of claim form is not, standing alone, sufficient grounds for the disallowance of the claim which otherwise makes a *prima facie* showing of the Debtors' liability. Indeed, a PD Claim should only be disallowed for one or more of the nine grounds for disallowance enumerated in section 502(b) of the Bankruptcy Code. In re Taylor, 289 B.R. 379, 384 (Bankr. N.D. Ind. 2003). Respectfully, §502(b) affords no discretion in this regard and the disallowance of claims must be based upon the reasons stated in the statute. Id. None of the grounds for disallowance set forth in section 502(b) involves the failure to provide information beyond that which establishes a *prima facie* claim against the Debtors' estates. In re Guidry, 321 B.R. 712 (N.D. Ill. 2005).

## Objection C-3 Alleged Failure to Identify a Grace Product

80.    This claim is properly supported by documents which are *prima facie* evidence that a Grace's asbestos-containing product was installed in the building at issue. The evidence supplied, whether it be Grace's sales records or scientific constituent analysis, is admissible evidence that the product claimed was a Grace product.

## Objection C -4 Identification of a Product other than a Grace Product

81.    This claim is properly supported by documents which are *prima facie* evidence that a Grace's asbestos-containing product was installed in the building at issue. The evidence supplied, whether it be Grace's sales records or scientific constituent analysis, is admissible evidence that the product claimed was a Grace product. Moreover, whether another asbestos-containing product is present or not in the building is irrelevant to Grace's liability. There can be more than one proximate cause of an injury, and in such a situation, one guilty of negligence cannot avoid responsibility merely because another person is guilty

of negligence contributing to the same injury. Accordingly, evidence of exposure to asbestos-containing products manufactured by another party is not relevant. Lipke v. Celotex Corp., 153 IllApp.3d 498, 505 N.E.2d 1213 (1987).

**Objection D-2 and D-4 Statute of Limitaitons – *Nullum Tempus***

82.    Grace erroneously asserts that the California State University claims are barred by the statute of limitations (based on both constructive and actual notice) and by laches. These objections should be stricken for the reasons set forth below.

## NULLUM TEMPUS APPLIES TO AGENCIES AND SUBDIVISIONS OF THE STATE OF CALIFORNIA, INCLUDING THE CALIFORNIA STATE UNIVERITIES

83.    Grace argues that the doctrine of *nullum tempus occurit regist* ("nullum tempus") does not apply to agencies and subdivisions of the State of California. *See Debtors' Fifteenth Omnibus Objection* at 45, ¶ 141. Grace is patently incorrect, as nullum tempus clearly applies to state agencies and subdivisions of the State of California, including the California State University. In California, the long-standing rule is that "general statutes of limitation are held not to bind the state and its agencies unless they do so expressly or by implication." *Philbrick v. State Personnel Board* (1942) 53 Cal.App.2d 222, 228 (citations omitted; emphasis added). Grace erroneously states that *Marin Healthcare District v. Sutter Health* (2002) 103 Cal.App.4th 861, held that "nullum tempus did not apply to political subdivisions of California." *Debtors' Fifteenth Omnibus Objection* at 45, ¶ 141. In fact, *Marin Healthcare* stands for the exact opposite proposition: that the nullum tempus doctrine extends to agencies of California and even in certain circumstances to political subdivisions

of California such as municipal corporations. *See In re Microsoft Corp. Antitrust Litigation,*
Slip Copy, 2005 WL 906364, *2 (D. Md. April 18, 2005).

84.     In *Marin Healthcare*, the plaintiff Marine Healthcare District, "a political
subdivision of the state [of California]," *see* 103 Cal.App.4th at 866 (emphasis supplied),
argued that a part of the nullum tempus doctrine "--that the statute of limitations does not
apply to actions by the state to recover property dedicated for public use against adverse
possession--should be extended to bar the application of the statute of limitations to the
state's action to void a *lease* of public-use property." *Id.* (emphasis in original). The fact
that the Marine Healthcare District was a political subdivision of the state—and not the State
of California itself—had no bearing on the nullum tempus analysis. *See id.* at 871-75. The
California Court of Appeal conducted its analysis as if nullum tempus applied to the political
subdivision. The California Court of Appeal ultimately held that the doctrine would not
prevent the statute of limitations from running against the political subdivision in that
particular case, but that holding was based on a waiver of nullum tempus under the particular
statutes at issue. *See id.* at 873-79. The California Court of Appeal never held that the
doctrine did not apply to political subdivisions. *See id.* Contrary to Grace's assertion, *Marin
Healthcare* must be read as applying nullum tempus to political subdivisions.

85.     In fact, the United States District Court for the District of Maryland has
properly interpreted *Marin Healthcare* as holding that under California law nullum tempus
extends to agencies of the state and, in certain circumstances, to municipal corporations. *See
In re Microsoft Corp.*, 2005 WL at *2. The District of Maryland confronted the issue as to
whether nullum tempus would relieve five California cities and counties from the statute of
limitations in actions brought against Microsoft Corporation for violations of two California

32

statutes. *Id.* at *1. Applying California law, the District of Maryland noted that the nullum tempus doctrine "is part of the law of California," *id.* at *2 (citing *Marin Healthcare*, 103 Cal.App.4th at 873), and that the scope "seems to extend to agencies of the state and to municipal corporations, including counties and their instrumentalities." *Id.* (citing *Marin Healthcare*, 103 Cal.App.4th at 873; other citations omitted). The court stated that, for cities and counties (but, importantly, <u>not</u> for state agencies or other subdivisions), the doctrine applies "only in cases where they are seeking to vindicate their public rights (as opposed to their private rights)." *Id.* The District of Maryland ultimately held that the nullum tempus doctrine would not relieve the California cities and counties from the statute of limitations in that case because their action sought to vindicate private rather than public rights. *Id.* Importantly, even in the context of municipal corporations, the District of Maryland did not hold that, under California law, the doctrine never applies to political subdivisions. As nullum tempus applies to municipal corporations, it clearly applies to agencies and other subdivisions of the State of California such the California State University.

86.     The other case relied upon by Grace, *San Francisco Unified School District v. W.R. Grace & Co.* (1995) 37 Cal.App.4th 1318 ("*SFUSD*"), is completely irrelevant to issue of nullum tempus. As discussed below, *SFUSD* involved the issue of when, under California law, the statute of limitations commences in an asbestos-in-building case. Nullum tempus was never at issue in that case and the California Court of Appeal never discussed it. *See id.* at 1318-43.

87.     As the California State University is more analogous to state agencies than to cities and counties, nullum tempus must apply to their claims. California's application of nullum tempus to agencies and subdivisions of California as well as to California itself is

33

consistent with other areas of governmental immunity law.  Most notably, the broad

immunity afforded by the Eleventh Amendment "encompasses not only actions in which a

State is actually named as the defendant, but also certain actions against state agents and state

instrumentalities." Regents of the University of California v. Doe, 519 U.S. 425, 429 (U.S.

1997) (citations omitted).  Indeed, **the University of California and the California State

University system has been found to be an agency and instrumentality of the State of

California** and therefore entitled to Eleventh Amendment immunity.  *See Thompson v. City

of Los Angeles*, 885 F.2d 1439, 1443 (9th Cir. 1989) ("It has long been established that UC

[the Regents of the University of California] is an instrumentality of the state for purposes of

the Eleventh Amendment.") (citations omitted); *Jackson v. Hayakawa*, 682 F.2d 1344, 1350

(9th Cir. 1982) (California State University is an arm of the State of California entitled to

Eleventh Amendment immunity).  Contrary to Grace's assertion that the California

StateUniversity is separate and independent from the State of California, *see* 15th Objection

at 46, courts repeatedly and consistently have acknowledged that "California state colleges

and universities are 'dependent instrumentalities of the state.'" *Mitchell v. Los Angeles

Community College Dist.*, 861 F.2d 198, 201 (9th Cir. 1988) (quoting *Hayakawa*, 682 F.2d at

1350 (citing *Slivkoff v. California State Univ. and Colleges* (1977) 69 Cal.App.3d 394, 400

("California state universities and colleges are subject to full legislative control.") and

*Poschman v. Dumke* (1973) 31 Cal.App.3d 932, 942, *disapproved on other grounds as

recognized by Armistead v. State Personnel Board* (1978) 22 Cal.3d 198, 204 n.3 ("The

Trustees of California State Colleges are a state agency created by the Legislature.")).

Accordingly, in the absence of an express or implied waiver of the immunity, the doctrine of

nullum tempus applies to the California Universities' claims.

**Objection D-2  Statute of Limitations – Constructive Notice**

88.    Despite the rejection of this argument in courts across the county, Grace would suggest to this Court that virtually every property damage claimant in this bankruptcy is barred because they should have had notice of the "potential dangers" of asbestos.[9] Yet Grace has utterly failed to come forward with any evidence or applicable state law to support this position despite its obligation to do so.  Van Buskirk v. Carey Canadian Mines, Ltd., 760 F.2d 481 (3d Cir.1985); California Sansome v. U. S. Gypsum Co., 55 F.3d 1402 (9th Cir.1995); Clayton Center Asso. v. W. R. Grace & Co., 861 S.W.2d 686 (Mo.App.1993) (statue of limitations is an affirmative defense on which the burden of proof is on the defendant).  More importantly, Grace's objection completely ignores literally scores of reported decisions from across the country that reject this very argument.

89.    Notably, in Kansas City v. W. R. Grace & Co., 778 S.W.2d 264, (Mo.App.1989), the Missouri Court of Appeals reversed the grant of summary judgment on the statute of limitations and specifically rejected the arguments now made the Debtor.  In Kansas City, the appellate court correctly recognized that in order for an asbestos property damage action to accrue, there must be a "release of toxic asbestos fibers into the environment" along with "the ability to ascertain a substantial and unreasonable risk of harm form the release of the toxic asbestos fibers." 778 S.W.3d at 268.  In so finding, the

---

[9] Grace's reliance upon Prudential Insurance Co. v. U. S. Gypsum, 359 F.3d 226 (3d Cir.2004) is misplaced. The only cause of action at issue in Prudential was the federal RICO statute, upon which Prudential claimed it was entitled to a broad range of past and future asbestos related damages.  In holding that Prudential's claims were barred by the RICO statute of limitations, the Third Circuit panel was careful to distinguish Prudential's broad RICO claims from traditional tort claims for asbestos property damage.  Id at 238.  Moreover, despite Debtors suggestion that the Prudential court based its decision solely upon constructive notice of the "potential dangers" of asbestos-in-buildings, the court actually went to great lengths to describe the "actual knowledge" held by Prudential prior to the limitations period at issue in conjunction with the fact that Prudential "is a very sophisticated company that operates a large casualty insurance business and an extensive estate investment business. . . . [which] provided Prudential with more opportunities than an average plaintiff to access ACM-related information." Id at 234 – 236.  Grace has provided to no such evidence here.

Appellate Court held that the type of evidence Grace now claims is sufficient to establish "constructive notice" of a property damage claim was not relevant to the statute of limitations.

90.    Specifically, defendants in Kansas City made the identical claim made by the Debtors in this case: that because the city had constructive notice of NESHAPS regulations (first published in 1973) which banned the spray application of asbestos-containing fireproofing and later required that asbestos material be specially removed at great expense when disturbed by renovation or demolition, that the City's claim was barred by the statute of limitations.[10]  In rejecting this argument, the appellate court aptly held that, "simply because Kansas City had notice of NESHAPS, its causes of action for negligence and strict liability were not caused to accrue until asbestos fibers were released into the environment of the airport buildings and Kansas City was capable of ascertaining that there was a substantial and unreasonable risk of harm from the release of the toxic asbestos fibers." Id. at 269.  Courts across the country are in accord. See, MDU Resources v. W. R. Grace & Co., 14 F.3d 1274, 1279 (38th Cir.1994); THS Northstar v. W. R. Grace & Co., 66 F.3d 173 (8th Cir.1995); BellSouth Communications v. W. R. Grace & Co., 77 F.3d 603 (2d Cir.1996); City of Wichita v. United States Mineral Product Co.. 72 F.3d 1491 (10th Cir.1996); San Francisco Unified School District v. W. R. Grace & Co., 37 Cal.App.4th 1318, 44 Cal.Rptr.2d 305 (Cal.App.4th 1995); Heider v. W. R. Grace & Co., 1992 WL 189254 (N.D.Ill.) (citing, Prosser & Keeton on the Law of Torts, §30 at 165 (5th Ed. 1984)); Clayton Center Asso. v. W. R. Grace & Co., 861 S.W.2d 686 (Mo.App.1993).

---

[10] The NESHAP regulations are the same regulations, amendments and related guidance documents cited by the Debtors in footnote 9, of their Fifteenth Omnibus Objection as evidence of "constructive knowledge."

91.    Moreover, the Debtors' constructive notice argument is patently inconsistent with its claim that its asbestos-containing surfacing materials are not hazardous and do not cause property damage. *See, Debtors' Fifteenth Omnibus Objection,* ¶ 118 (alleging claimants allegedly barred because there is no "proof of hazard."); ¶175 (citing British Columbia court as holding that Monokote does not "contaminate buildings" and is therefore not hazardous). As noted by the Eighth Circuit Court of Appeals in reversing a statute of limitations verdict,

> **Grace** argued at trial not only that the statute of limitations had run, but also that the plaintiff had suffered no injury from the **asbestos** Monokote. The arguments are inconsistent: if MDU has suffered no injury from the Monokote, then it has no cause of action--until an injury is suffered, the statute of limitations cannot begin to run.

MDU Resources Group v. W. R. Grace & Co., 14 F.3d 1274 (8th Cir.1994).

**Objection D-4 Statute of Limitations – Actual Notice**

92.    While Grace acknowledges that in the context of the statute of limitations, "state law applies to individual claims," *see Debtors' Fifteenth Omnibus Objection* at 33, ¶ 96 Grace fails to acknowledge the California law governing the accrual of claims in asbestos-in-building cases.

93.    Under California law, the statute of limitations for this action did not begin to run until the moment **all** of the elements necessary for a cause of action were present. In SFUSD v W.R.GRACE, 37 Cal.App.4th at 1335 it was held: "In California, no cause of action accrues--i.e., the statute of limitations does not commence--until all the elements of the cause of action, including that of damage or injury, have occurred."

94.    As an affirmative defense, Grace-and not the claimants-bears the burden of proof that the California Universities' claims are barred by the statute of limitations. Simply

stated, Grace must prove that <u>contamination was present</u> from its asbestos-containing

fireproofing prior to the applicable accrual date and that <u>its wrongdoing caused the</u>

<u>contamination</u> prior to the applicable accrual date.  Only after Grace first proves each of

these elements does the burden shift to claimants to prove the facts necessary to toll the

limitations period once it is established that the statute of limitations would have otherwise

commenced.  <u>Grace has provided <em>no</em> evidence that <em>any</em> of the subject buildings were</u>

<u>contaminated as a result of Grace's wrongdoing prior to the applicable accrual date</u>.  Because

Grace has failed to provide information that it is required to sustain its burden of proof,

Grace's objections based on timeliness of claims should be stricken.

**1)  Where, As Here, Grace Has Failed To Establish That EVERY Element of the**

**Cause of Action,  Including Contamination, Arose Outside the Statutory Period,**

**Grace Has Failed to Meet Its Burden of Proof That the California Universities'**

**Claims are Barred by the Statute of Limitations**

95.    It is without question that Grace bears the burden of proving its affirmative

defenses, including a defense based on the statute of limitations.  In California, the statute of

limitations in an asbestos-in-building case is governed by <u>SFUSD</u>, 37 Cal.App.4th 1318.  In

<u>SFUSD</u>, the court succinctly stated:

> we hold that in an asbestos-in-building case, the mere presence of asbestos
> constitutes only a threat of future harm.  <u>Contamination by friable asbestos is</u>
> <u>the physical injury and the actual, appreciable harm that must exist before a</u>
> <u>property owner's strict liability or tort cause of action against an asbestos</u>
> <u>manufacturer accrues and the limitation period commences.</u>

<u>Id</u>. at 1335 (emphasis supplied); <u>see also id</u>. at 1322 ("the statute of limitations in an

asbestos-in-building case does not commence until there has been damage in the form of

contamination").  Since this passage is the key to determining when the statute of limitations

commences, it warrants careful consideration.  The California Court of Appeal stated that the

limitations period does not commence until there is contamination by <u>friable</u> asbestos that

causes <u>actual</u> and <u>appreciable</u> harm.  California case law sets six separate hurdles that Grace

must overcome to prevail on its statute of limitations defense.  Grace must prove that its

wrongdoing resulted in the following:

> a.  contamination of the subject building, <u>see</u> <u>SFUSD</u>, 37 Cal.App.4th at
>
>    1335; <u>California Sansome</u>, 55 F.3d 1402, 1406 (9th Cir. 1995); <u>see also</u>
>
>    <u>City of Greenville v. W.R. Grace & Co.</u>, 827 F.2d 975, 980 (4th Cir.
>
>    1987);
>
> b.  by the release of fibers from friable asbestos, <u>see</u> <u>SFUSD</u>, 37 Cal.App.4th
>
>    at 1335;
>
> c.  manufactured by Grace, <u>see California Sansome</u>, 55 F.3d at 1406;
>
> d.  causing actual harm, <u>see SFUSD</u>, 37 Cal.App.4th at 1335;
>
> e.  causing appreciable harm, <u>see id.</u>;
>
> f.  outside the statutory period, <u>see id</u>.

96.    In an asbestos-in-building case arising under California law, the Ninth Circuit

has specifically noted that the defendant has the burden of proof on the statute of limitations

to establish **all** of the essential elements of the cause of action **arose outside the statutory**

**time period.**  In <u>California Sansome v. U.S. Gypsum</u>, 55 F.3d 1402 (9th Cir. 1995), the Ninth

Circuit properly summarized California law as follows:

> **A defendant raising the statute of limitations as an affirmative defense has**
> **the burden of proving the action is time barred.** <u>See, e.g.</u>, <u>Permanente</u>
> <u>Medical Group/Kaiser Found. Hosp. v. Workers' Compensation Appeals Bd.</u>,
> 171 Cal.App.3d 1171, 217 Cal.Rptr. 873, 876 (1985) (citing <u>Kaiser, Found.</u>
> <u>Hosp. V. Workers' Compensation Appeals Bd.</u>, 39 Cal.3d 57, 216 Cal.Rptr. 115,
> 702 P.2d 197 (1985)) ("The burden of producing evidence sufficient to show

[plaintiff's] claim is barred was upon [defendant] who had asserted the statute as a defense."); cf. Palmer v. Hoffman, 318 U.S. 109, 117, 63 S.Ct. 477, 482, 87 L.Ed. 645 (1943) (finding state law governs the allocation of the burden of proof in diversity cases). **Under California law, the limitation period commences "upon the occurrence of the last element essential to a cause of action."** *City of San Diego*, 35 Cal.Rptr.2d at 881; see CAMSI IV v. Hunter Technology Corp., 230 Cal.App.3d 1525, 282 Cal.Rptr. 80, 85 (1991); Leaf v. City of San Mateo, 104 Cal.App.3d 398, 163 Cal.Rptr. 711, 715 (1980). **A tort cause of action does not accrue until there is wrongdoing and "actual and appreciable harm."** *CAMSI IV*, 282 Cal.Rptr. at 85; see Davies v. Krasna, 14 Cal.3d 502, 121 Cal.Rptr. 705, 713; 535 P.2d 1161, 1169 (1975); *City of San Diego*, 35 Cal.Rptr.2d at 881; see also Jolly v. Eli Lilly & Co., 44 Cal.3d 1103, 245 Cal.Rptr.658, 661, 751, P.2d 923, 926-927 (1988) ("[T]he common law rule, that an action accrues on the date of injury . . . applies only as modified by the 'discovery rule' "); Dolan v. Borelli, 13 Cal.App.4[th] 816, 16 Cal.Rptr.2d 714, 717 (1993) (same); Bell v. Hummel and Pappas, 136 Cal.App.3d 1009, 186 Cal.Rptr.688, 694 (1982) ("Even after knowing of a wrongful act, if there is no actual irremediable damage, there is no running of the statute of limitations."). **Thus, the defendant has the burden of demonstrating the complained of wrongdoing and harm occurred outside the limitations period.**

55 F.3d at 1406 (emphasis supplied).

97.    After summarizing the law, the Ninth Circuit went on to reverse and order a new trial where the trial court had <u>wrongfully</u> placed the burden of proof on the plaintiff to establish that pre-statute injury (i.e., contamination) did <u>not</u> occur. The court stated that "The [district] court's analysis mistakenly treats the occurrence of appreciable injury as equivalent to the discovery of that injury." <u>Id</u>. The court continued: "We are not aware of, and [the defendant] fails to cite, any cases in which the occurrence of injury serves as an exception like the discovery rule, thereby shifting the burden to the plaintiff to demonstrate the non existence of appreciable harm." <u>Id</u>.

98.    Applying <u>SFUSD</u> and <u>California Sansome</u> to this case, it is clear that Grace must establish <u>both</u> wrongdoing and <u>injury</u> prior to the applicable accrual date. Therefore, Grace must establish that its product contaminated each of the California State University's buildings as a result of its wrongdoing prior to the accrual date for the statute of limitations to

be a bar.  Grace has mustered <u>no</u> evidence to show that <u>any</u> of the buildings were contaminated <u>at all</u>.

**2) The Statute of Limitations is Determined on a Building-by-Building Basis Using Accepted Scientific Techniques**

99.     Understanding its inability to produce any evidence for when each subject building of the California State University was contaminated, Grace argues that evidence about <u>other buildings</u> bears on the statute of limitations issue regarding the specific buildings at issue here.  However, California law does not permit this type of speculation.  California law clearly states that the statute of limitations in asbestos-in-building cases does not run <u>until there is contamination in the subject building and the plaintiff knows or should know of such contamination in that particular building</u>:

> As we have found, a strict liability or negligence cause of action accrues in an asbestos-in-building case when the building becomes contaminated or the Plaintiff should have known that contamination occurred.  Contamination constitutes injury—when injury is the last element of the cause of action for strict liability or negligence to occur, the cause of action accrues and the statute of limitations begins to run when contamination occurs.

<u>SFUSD</u>, 37 Cal.App.4[th] at 1335-36.  The California Court of Appeal in <u>SFUSD</u> went to direct that "As the trial court <u>erroneously focused on when SFUSD was put on notice that its schools contained potentially dangerous asbestos</u>, we think it prudent to remand this matter to the trial court for a determination of when contamination occurred at <u>each</u> school or when SFUSD should reasonably have discovered that <u>each</u> school's contamination occurred." <u>Id</u>. at 1336 (emphasis supplied); <u>see also id</u>. at 1336 n.6 ("SFUSD alleges that each of the six schools in which asbestos was installed were built at different times, with construction beginning between 1968 and 1973.  Thus, the factual question of when contamination occurred must be resolved on a building-by-building basis.").

41

100.    In this case, Grace has the burden of showing there was contamination present (or the claimants should have known of contamination) in each of the California Universities' buildings prior to the accrual date.  Only evidence regarding the SUBJECT building can establish when the requirements of wrongdoing and injury were actually present in the subject building.  Grace has asserted speculative general statements that the California Universities should have known about the dangers of asbestos.  See, e.g., *Debtors' Fifteenth Omnibus Objection* at 33,  ¶¶ 95, 96.  However, general conclusory statements and speculation are plainly insufficient to meet Grace's burden of establishing that contamination occurred in each building, and that the claims were filed outside the limitations period. Neither the mere presence of asbestos in an uncontaminated subject building nor actual contamination in other buildings are sufficient for the statute of limitations to accrue for a claim based on the subject building.  See SFUSD, 37 Cal.App.4th at 1335.

101.    Contamination, which is the injury in an asbestos-in-building case, encompasses a scientific determination by experts as to the contamination of the building. Such a determination is addressed in MDU Resources Group v. W.R. Grace and Co., 14 F.3d 1274 (8th Cir. 1994), and *City of Greenville v. W.R. Grace & Co.*, 827 F.2d 975.  In City of Greenville, the Fourth Circuit held that a jury could reasonably have found contamination where evidence was presented that "Greenville's experts took samples from the office areas of the city hall and found that a significant number of asbestos fibers had contaminated areas in which people worked.  For example, the testing revealed 8,550,000 asbestos fibers per square foot in the carpet of one office area, and 170,000 asbestos fibers per square foot on the surface of one office computer."  827 F.2d at 979-80.  Upholding a jury verdict against Grace, the Fourth Circuit reviewed trial evidence of testing of dust samples and noted:

"From the evidence presented by Greenville, the jury reasonably could have found that the

city hall was contaminated by significant amounts of asbestos, and that the asbestos had

come from the fallen Monokote and Monokote dust." Id. at 980.

102.    In MDU Resources, the plaintiff sued Grace for Monokote in its building

placed in 1968.  In 1980, Health Department tests revealed that the Monokote fireproofing

contained 15-25% asbestos.  The plaintiff there first learned that the Monokote was releasing

fibers and contaminating its building in 1988, when testing confirmed contamination and

"subsequent tests found an average of more than 78 billion asbestos fibers per square foot on

horizontal surfaces below the fireproofing." MDU Resources, 14 F.3d at 1276.  The Eighth

Circuit applied the contamination standard for Grace's statute of limitations defense and

reversed a jury verdict for Grace that was obtained because the trial court wrongly applied

the "discovery of asbestos" standard.  See also California Sansome, 55 F.3d at 1405 n.5 (the

parties agreed and the court defined contamination as "the release of asbestos fibers into the

air of Sansome's buildings sufficient to constitute elevated levels- is the 'harm' that triggers

the ruling [sic] of the statute of limitation . . . .").

103.    In Landry v. Keene Corp., 811 F.Supp. 367 (N.D.Ill. 1993), the plaintiffs

acquired two separate buildings at the same time in 1984.  At the time they acquired the

buildings, the plaintiffs received reports about the asbestos problems in one of the buildings.

The plaintiffs brought an asbestos property damage suit on the other building after they later

discovered that the second building also contained asbestos.  Notably, the defendant moved

for summary judgment, arguing that the plaintiffs' actual knowledge about the asbestos in the

first building put them on notice that the second building might contain asbestos.  Once the

plaintiffs actually knew about the first building's asbestos problems, the defendant contended,

43

it should have known about the asbestos in the second building and could have easily

contacted the second building's prior building owner or checked that building's

specifications. The Northern District for the District of Illinois disagreed, aptly holding that

the "duty to investigate" under the discovery rule of accrual "does not arise until after

plaintiffs knew or should have known that an injury occurred and that it was wrongfully

caused." *Id.* at 373. The injury, of course, is contamination, not the mere presence of

asbestos in other buildings. "The purpose of the investigation is to determine whether the

injury is actionable," the court held, and not whether one has been injured in the first

instance. *Id.* at 373-74.

104.    While contamination is at the heart of when an asbestos-in-building cause of

action accrues under California law, Grace's Fifteenth Omnibus Objection is silent on when

any building was contaminated. How can Grace possibly argue that claims are barred when

it presents absolutely no evidence of contamination? It is not as if Grace is unaware of the

contamination requirement. Contamination involves analysis of many factors. A surface in a

building is contaminated when the concentration of asbestos fibers in a given area of surface

dust is sufficient to result in significant increase in the airborne concentration of asbestos

when the surface dust is disturbed by activities normally expected to occur. Experts utilize

electron microscopy to examine the surface dust and analyze the concentration of asbestos

fibers in the surface dust. The methods of collection of dust samples are well-recognized and

are performed pursuant to scientific protocols. From its involvement as a defendant in

multiple asbestos-in-building cases (including City of Greenville, MDU Resources and

SFUSD) Grace knows what contamination is and it knows that to sustain its burden of proof

it is necessary to present evidence of specific conditions existing in each of the California

44

State University's buildings prior to the accrual date asserted by the plaintiffs. Grace must show that all of these elements existed. Grace must prove its wrongdoing caused the subject building to be contaminated by friable asbestos from Grace's fireproofing so that an actual and appreciable harm occurred prior to the asserted accrual date. Instead, Grace has attempted to meet its burden with speculation and silence.

### 3) Grace Has Not And Cannot Present Evidence Showing That The Subject Buildings Were Contaminated by Friable Asbestos from Grace's Fireproofing So That an Actual and Appreciable Harm Occurred Outside the Limitations Period

105.     As set forth in numerous cases, there must be actual and appreciable harm from contamination and not just nominal damage. In SFUSD, the mere presence of asbestos or testing of asbestos-containing material that does not reveal contamination does not begin the statute of limitations. See 37 Cal.App.4th at 1335 ("Contamination by friable asbestos is the physical injury and the actual, appreciable harm that must exist before a property owner's strict liability or tort cause of action against an asbestos manufacturer accrues and the limitation period commences."). The presence of potentially dangerous asbestos can only constitute a threat of future harm. Again, SFUSD is instructive:

> Testing and investigation are typically undertaken once a responsible property owner discovers that asbestos may be present in its building. But the act of testing and investigation which discloses no contamination cannot be equated with the actual harm of contamination. At best, such testing and investigation could show a threat of future harm. In light of the 'threat of future harm' cases and the unique analytical problems posed by an asbestos-in-building case, we may reasonably conclude that the California Supreme Court did not intend such a result. These expenses may be found to have been undertaken to determine when the threat of future harm ripens into appreciable, actual harm for purposes of the accrual of a tort cause of action.

Id. at 1332-33.

106.    To succeed on its statute of limitations defense, the law requires Grace to establish that the California Universities' buildings were contaminated outside the statutory period. The possibility of contamination or even nominal damage is insufficient to sustain Grace's the burden of proof. Moreover, the fact that other buildings may have asbestos, or even may be contaminated, does not equate to a finding that claimants' buildings are contaminated. Grace cannot argue, as it has in other cases, that for the purposes of the statute of limitations because claimants assert contamination, any contamination predates the statute; but for all other purposes, there was no injury and no need to do anything. Again MDU Resources is helpful: Grace argued at trial not only that the statute of limitations had run, but also that the plaintiff had suffered no injury from the asbestos Monokote. The arguments are inconsistent: if MDU has suffered no injury from the Monokote, then it has no cause of action - until an injury is suffered, the statute of limitations cannot begin to run. See, MDU Resources, 14 F.3d at 1279-80 n. 9.

### 4) *Jolly v. Eli Lilly & Co.* Is Not Applicable to Establish Contamination

107.    Grace has incorrectly applied the holding in Jolly v. Eli Lilly & Co (1988) 44 Cal.3d 1103. *See Debtors' Fifteenth Omnibus Objection* at 45, ¶ 138. As set forth below, the discovery rule only applies when all of the elements for the cause of action are established. In Jolly, a woman suspected that her injury resulted from her mother's use of a prescription drug. She did not know nor did she investigate the name of the manufacturer. The California Supreme Court held that assuming injury has already occurred, once the plaintiff suspects wrongdoing, the statute of limitations begins to run. In Jolly, it was clear the woman was injured. Here, there is no evidence of injury prior to the applications limitations dates, which, under SFUSD, is contamination in the subject building. If a family

member of Ms. Jolly had been injured, but not Ms. Jolly, the requisite elements would not have been present to start the running of the limitations period.

108.    Grace incorrectly states that knowledge of asbestos in the subject building, in other buildings, or even contamination in another building is sufficient to trigger the statute of limitations for the subject buildings. See, e.g., *Debtors' Fifteenth Omnibus Objection* at 33, ¶ 95. Grace's argument results in the cart driving the horse. Under Grace's theory, the presence of asbestos, or even assuming the presence of contamination in other buildings, means that, for example, an inspection prior to the accrual date would have actually revealed contamination in the subject building. But Grace's argument misses the point of the statute of limitations and the delayed discovery rule. Grace must still establish that an inquiry prior to the accrual date would have established contamination in the subject building. Again, Grace must present evidence and cannot meet its burden with speculation.

109.    California Sansome and SFUSD illustrate Grace's misinterpretation of Jolly. In California Sansome, the district court mistakenly framed delayed injury as an exception to the orthodox running of the limitations period thereby displacing injury as an essential element of the cause of action. "The 'discovery rule,' on the other hand, assumes that the elements of accrual including harm exist, but tolls the ruling of the statute until the plaintiff is on inquiry notice of its injury (and its wrongful cause)." California Sansome, 55 F.3d at 1406. Simply stated, in Jolly, where the issue was the occurrence of wrongdoing, is distinguishable from an asbestos-in-building case, where the issue is occurrence of injury. As SFUSD aptly summarized:

> The issue presented by our case is distinguishable from that present in *Jolly*. SFUSD does not ask whether wrongdoing occurred, but what constitutes an injury in the context of an asbestos-in-building case. **Injury and wrongdoing are distinct legal issues.** See Jolly v. Eli Lilly & Co., supra, 44 Cal. 3d at p.

> 1112. **The word "injury" is a term of art referring to the damaging effect of the wrongful act, not the act itself.** See Zambrano v. Dorough (1986) 179 Cal. App.3d 169, 172 [224 Cal.Rptr.323]. Last year, the California Supreme Court distinguished between ignorance of the identity of the wrongdoer and ignorance of the injury itself. See Bernson v. Browning-Ferris Industries, supra, 7 Cal. 4th at p. 932.) **As *Jolly* assumes injury has occurred, *Jolly* may reasonably be read to apply when the issue is wrongdoing, but not when the issue is what constitutes injury.** The California Supreme Court has recognized that in unusual cases, a plaintiff may be aware of wrongdoing before damage arises. Ordinarily, a plaintiff has already suffered damages by the time the tortious conduct is discovered. Only in an unusual case will the plaintiff discover a defendant's negligence without having suffered any consequential damage. (See Budd v. Nixen, supra, 6 Cal. 3d at p. 201 [legal malpractice case].) **As asbestos-in-building cases are admittedly unique because of the dormant period before asbestos becomes friable, <u>it seems reasonable to infer that contamination often arises after evidence of wrongdoing – the installation of potentially dangerous asbestos – has been discovered.</u>**

37 Cal.App.4th at 1336 (emphasis supplied).

110. California law clearly requires Grace to establish that each building involved in the claims by the California State University was contaminated from its fireproofing outside the statutory period. The possibility of contamination is not enough because Grace has the burden of proof. Moreover, the fact that other buildings may have asbestos, or even may be contaminated, does not equate to a finding that the specific buildings at issue here were also contaminated.

**5) Because Grace Bears the Burden Of Proving Its Affirmative Defenses, Claimants Have No Obligation to Offer Any Evidence On the Statute of Limitations Issue**

111. As demonstrated above, Grace has utterly failed to meet its burden in establishing that the claims by the California State University are barred by the statute of limitations. On that basis alone, this Court may properly strike Grace's objections based on timeliness. "When one party has the burden of proof, the opposing party bringing a motion for summary judgment is not 'required to produce any evidence at all.'" Lust v. Merrell

48

Dow, 89 F.3d 594, 598 (9th Cir. 1996) (citations omitted).  Because of Grace's failure to

meet its burden, claimants need not offer any evidence on the statute of limitations issue.

**6) Grace Is Not Relieved From Its Burden of Proof By the 1990 Lawsuit on Behalf of**

**29 States In Which the "Injury" Suffered Was Unclear and Where No Specific**

**Buildings Were Alleged to be Contaminated**

112.   Grace points to the State of California's involvement in a 1990 lawsuit filed in

the Supreme Court of the United States in which 29 States asserted claims against Grace

under the Public Assistance Doctrine as proof that the California State University had "actual

knowledge of any claims sufficient to bring a lawsuit at least as early as January 1, 1990."[11]

*See Debtors' Fifteenth Omnibus Objection* at 44, ¶ 136,137.  Apparently, this is Grace's only

evidence to establish that each of the subject buildings involved in this bankruptcy were

contaminated before the asserted accrual date.  Grace's sole reliance on the 1990 lawsuit is

fatal to its objection.

113.   First, the 1990 lawsuit pre-dated SFUSD.  Thus, at the time the 1990 lawsuit

was filed, it was unclear in California (and, apparently in many other states) what constituted

"injury" in an asbestos-in-building case.  See, e.g., Alabama, et al., Motion for Leave to File

Complaint, Complaint, and Brief in Support of Motion for Leave to File Complaint ("Motion

for Leave") at 6, 7, 11, 19, and 32 (seemingly different types of injuries asserted).  The State

of California rightfully joined the lawsuit to protect its rights, albeit in hindsight that joining

was premature.  With SFUSD, it is clear that contamination, and not simply the mere

presence of asbestos, is the injury that triggers the accrual date.

114.   Second, Grace's position would eviscerate its burden of proof as required by

SFUSD and California Sansome.  Those cases require Grace to offer evidence of when the

---

[11] The petition was dismissed without comment or prejudice by the United State Supreme Court.

subject buildings were contaminated or when the claimants should have known of contamination.    The 1990 lawsuit did not make allegations about the specific California University buildings at issue in this bankruptcy.    Accordingly, the State of California's decision to participate in an amalgous suit involving 29 states proves nothing about when the specific University buildings may have been contaminated by Grace's asbestos products (or if they have been yet).    Indeed, had the State of Alabama petition been granted by the U. S. Supreme Court, Grace would have undoubtedly argued with some force and based upon existing case law, the State of California (and by extension, the Board of Reagents) could not recover past or future abatement costs because it could not prove that Grace products in state buildings had contaminated the buildings with asbestos.    See, Adams-Arapahoe School District No. 28-J v. GAF Corp., 959 F.2d 868 (10th Cir.1992) (emphasis supplied); City of Greenville v. W.R. Grace & Co., 827 F.2d 975, 976-78 (4th Cir.1987) (the release of toxic fibers from an asbestos-containing fireproofing product rendered the manufacturer liable for damages to the property owner under South Carolina tort law);    Tioga Public School District v. U. S. Gypsum; 984 F.2d 915 (8th Cir.1993) (finding Tioga's claims recoverable in tort because they had alleged and proven that asbestos fibers from the ceiling plaster had been released and contaminated the school);    THS Northstar v. W. R. Grace & Co., 66 F.3d 173 (8th Cir.1995) ("the distinction between the mere presence of asbestos-containing materials in a building and actual release and contamination is critical" because "no cause of action exists until there has been a substantial release");    San Francisco Unified School District v. W. R. Grace & Co., 37 Cal.App.4th 1318, 44 Cal.Rptr.2d 305 (Cal.App.4th 1995) ("the mere presence of asbestos constitutes only a threat of future harm. . . . [c]ontamination by friable asbestos is the physical injury and the actual, appreciable harm that must exist before a

property owner's strict liability or tort cause of action against an asbestos manufacturer accrues and the limitations period commences."); California Sansome v. U. S. Gypsum Co., 55 F.3d 1402 (9th Cir.1995) (contamination must occur in the first instance in order to trigger the running of the statute of limitations); BellSouth Communications v. W. R. Grace & Co., 77 F.3d 603 (2d Cir.1996) (claim does not accrue until contamination of the building by asbestos and consequent health risk occurs); City of Wichita v. United States Mineral Product Co.. 72 F.3d 1491 (10th Cir.1996) (holding actual physical injury by "contamination" is an essential element of any negligence claim and liability may not be premised upon the mere risk of future harm not yet suffered); 3250 Wilshire Blvd. Bldg. v. W.R. Grace & Co., 1989 WL 260222 at *4-8 (C.D.Cal. Jul. 24, 1989) (recognizing that allegations of actual contamination constitute valid tort damages claims, whereas tort claims for injury by virtue of mere presence of asbestos-containing products or by virtue of a potential risk of harm are invalid); Catasauqua Area School District v. Eagle-Picher Indus.,, 1988 WL 102689 (E.D.Pa. Sept. 28, 1988) (removal and replacement costs of asbestos cement constitute economic loss not recoverable under tort absent demonstration that cement contaminated other property or that it created a significant health risk to building occupants); Hebron Pub. Sch. Dist. No. 13 v. U.S. Gypsum, 690 F.Supp. 866, 870 (D. N.D.1988) (negligence claim survived motion to dismiss where plaintiffs alleged asbestos products released harmful fibers into the building); City of Manchester v. National Gypsum Co., 637 F.Supp. 646, 651- 52 (D.R.I.1986) (court denied motion to dismiss finding that allegations of contamination constituted allegations of physical harm sufficient to support a claim for negligence under New Hampshire law); Franklin County Sch. Bd. v. Lake Asbestos of Quebec, Ltd., 1986 WL 69060 at *5-6 (N.D.Ala. Feb. 13, 1986) (school board's negligence claim dismissed for

failing to allege actual, present harm, i.e. contamination); <u>Town of Hooksett Sch. Dist. v.</u> <u>W.R. Grace & Co.</u>, 617 F.Supp. 126, 130-31 (D.N.H.1984) (motion to dismiss denied because plaintiff alleged contamination and contamination constitutes a physical injury cognizable under tort); <u>Kershaw County Bd. of Educ. v. U.S. Gypsum Co.</u>, 302 S.C. 390, 393, 396 S.E.2d 369, 371 (1990) (judgment against manufacturer of asbestos-containing ceiling materials on negligence claim upheld where plaintiff alleged and proved damage to other property); <u>Banc One Bldg. Management Corp. v. W.R. Grace & Co.</u>, 157 Wis.2d 814, 461 N.W.2d 448 (1990) (unpublished disposition) (dismissal of negligence action affirmed where plaintiff failed to allege actual physical harm); <u>Board of Educ. of City of Chicago v.</u> <u>A, C & S, Inc.</u>, 131 Ill.2d 428, 443, 137 Ill.Dec. 635, 642-43, 546 N.E.2d 580, 587-88 (1989) ("dangerousness which creates a risk of harm is insufficient standing alone to award damages in ... negligence;  however, allegations of asbestos release are sufficient to defeat a motion to dismiss"); <u>School Dist. of City of Independence v. U.S. Gypsum Co.</u>, 750 S.W.2d 442, 456 (Mo.App.1988) (jury verdict upheld where school district provided evidence of contamination caused by defendant's asbestos-containing acoustical ceiling plaster).

**Objection D-6 Laches**

115.    As an affirmative defense, Grace once again bears the burden of proving that the claims of the California State University are barred by the doctrine of laches. <u>See</u> <u>Green</u> <u>v. Board of Dental Examiners</u> (1996) 47 Cal.App.4th 786, 792. Unlike the statute of limitations, in which no more than the mere passage of time is required to bar an action, the mere passage of time will never constitute a proper affirmative defense under the doctrine of laches. Rather, for laches to apply, Grace bears the burden of proving that the passage of

time must have been both unreasonable and have caused prejudice to the defendant, and "[p]rejudice is never presumed." Id.

116.     Regarding the first element, as demonstrated above, the claims of the California State University should not be barred by the statute of limitations, and therefore there is not even a sufficient passage of time to warrant laches barring the claims.  In addition, Grace has failed to prove that the delay, if any, in the California State University asserting their claims was unreasonable.

117.     Furthermore, even assuming that the timely claims were somehow unreasonably delayed, Grace has not established prejudice.  Grace's sole assertion of prejudice is a general statement-apparently applicable to every claim listed under this objection - that "witnesses are no longer available; building ownership has changed hands; building-specific documentary evidence is more difficult, if not impossible to find; and no doubt improvements and changes have often been made to the buildings at hand, including demolition." *Debtors' Fifteenth Omnibus Objection* at 38, ¶ 116.  However, such generic conclusions are not sufficient to establish prejudice.  See In re Beaty, 306 F.3d 914, 928 (9th Cir. 2002).  As the Ninth Circuit aptly stated:

> [The debtor's] brief to us makes a handful of additional, but conclusory, claims of prejudice.  [The debtor] contends that he was "deprived of the finality of his discharge," that he faces attorney's fees that he otherwise might not have faced, and that there might be some (unspecified) witnesses and/or documentary evidence that will be unavailable because of the passage of time.  At oral argument, [the debtor] was unable to provide any more specific support for his contention that the delay was prejudicial.  Such generic claims of prejudice do not suffice for a laches defense in any case, and are particularly insufficient in a case in which a heightened showing of extraordinary circumstances and demonstrable prejudice is required.

Id. (citations omitted); see also People ex rel. Franchise Tax Bd. v. Superior Court (1985) 164 Cal.App.3d 526, 535 fn.3 ("prejudice is not presumed by must be affirmatively

demonstrated"). Because Grace has failed to establish both an unreasonable delay and a resulting undue prejudice, Grace's objections based on laches should be stricken.

**Objection F-1 No Supporting Documentation**

118.    Grace's complaint that there is no supporting documentation with this claim is simply wrong. The supporting documentation is set forth in Exhibit 1.

**Objection F-2 -- the Alleged Fabricated 2003 Date**

119.    Grace alleges that the claim form completed by Speights & Runyan states that the claimant first learned that its building contained asbestos in 2003 and that this date must be fabricated. This assertion is patently false. What the claim form completed by Speights & Runyan actually requested is when claimants learned of the "presence of asbestos in the property **of the Grace product for which you are making this claim**." (See Proof of Claim, Question 18) (emphasis supplied). While documents related to this claimants' knowledge about asbestos generally are attached as Exhibit 1, there is no indication that this the California State University knew that Grace was the manufacturer of asbestos-containing products in its building prior to filing this claim. Indeed, the great majority of claimants did not learn that Grace was the manufacturer of an asbestos-containing product in its building until presented with a Grace sales record or until constituent analysis sampling was conducted in conjunction with filing a claim in this bankruptcy. This is hardly surprising given the efforts to which Grace went to conceal the presence of asbestos in Monokote described more fully in the Introduction.

## Conclusion

120.    For the reasons stated herein, the claimant submits that Grace has failed to

meet its burden of proving the invalidity of this claim and that Grace's objections are without

merit.  The Debtors' Fifteenth Omnibus Objection should therefore be stricken.

Respectfully submitted,

Cristopher D. Loizides (#3968)
Michael J. Joyce (#4563)
Legal Arts Bldg.
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 654-0248
Facsimile: (302) 654-0728 (fax)
E-mail: loizides@loizides.com

By: _____

SPEIGHTS & RUNYAN
Daniel A. Speights (SC Fed. ID No. 4252)
Marion C. Fairey, Jr. (SC Fed. ID No. 6101)
200 Jackson Avenue, East
P.O. Box 685
Hampton, SC  29924
Telephone: (803) 943-4444
Facsimile:  (803) 943-4599

Thomas J. Brandi, Esquire
Law Offices of Thomas J. Brandi
44 Montgomery Street, Suite 1050
San Francisco, CA 94104
(415) 989-1800
(415) 989-1801 (fax)

October 24, 2005