# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | **Chapter 11** |
| | ) | |
| W. R. Grace & Co., et al.[1], | ) | **Case No. 01-01139 (JKF)** |
| | ) | **Jointly Administered** |
| Debtors. | ) | |
| | ) | Reply Deadline: October 31, 2005@4:00 PM |
| | ) | Hearing Date: November 14, 2005@12:00PM |
| | ) | |
| | ) | Re: Docket No. 9315 |

Claim No.: 10930
Pacific Freeholds a.k.a. 100 Pine Street
100 Pine Street, Suite 3200  San Francisco, CA
94111

## RESPONSE TO DEBTORS' FIFTEENTH OMNIBUS OBJECTION (SUBSTANTIVE) TO ASBESTOS PROPERTY DAMAGE CLAIMS

Claimant Pacific Freeholds Partnership a/k/a 100 Pine Street, claimant number 10930,

respectfully submits this response to the Debtors' Fifteenth Omnibus Objection to Property

Damage Claims.

---

[1] The Debtors consist of the following 62 entities: W. R Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-I Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Ins., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgracc, Inc., Coalgracc II, Ins., Creative Food 'N Fun Company, Darex Puerto Rico, Inc.,  Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp, Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B 11 Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe. Inc., Grace H-G Inc., Grace H-G II Inc,, Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Ins., MICA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Capital Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Curving, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

1.    This Claimant is the owner of a multi-story office tower in downtown San Francisco, CA that was fireproofed with Grace's asbestos-containing Monokote. At the time the Debtors filed these Chapter 11 proceedings, Pacific Freeholds and Grace had been in active litigation over Grace's asbestos-containing Monokote for over three years and were months away from trial. During the course of this pre-petition litigation, Pacific Freeholds produced tens of thousands of documents to Grace, and participated in over twenty fact depositions taken by Grace's attorneys.

2.    Through this discovery, Grace was provided voluminous information about this building. The documents and deposition testimony that had been taken prior to this bankruptcy established:

- The spraying of 100 Pine's structural supports and metal decking with Monokote began in 1971 and was completed thereafter. Grace sold and delivered Monokote that was used in the 100 Pine building without informing architects or building contractors that the product contained asbestos or that asbestos could have deleterious heath effects.

- The 100 Pine building was purchased by Grosvenor International in 1983. Pacific Freeholds became the general partner of the owner and assumed management responsibility for the 100 Pine building. Pacific Freeholds contracted with several management companies over the years to perform building management functions

- In approximately August of 1985, an organization called the Safe Buildings Alliance and located in Washington, D.C., published and distributed widely a document entitled, "What you should know about asbestos in buildings." This document suggested that the mere presence of asbestos in buildings is not hazardous, and that building were not contaminated with asbestos unless air sampling revealed elevated levels of asbestos in the ambient air inside a building. Although unknown to Pacific Freeholds at the time, the Safe Buildings Alliance was the alter-ego of W. R. Grace and other former manufacturers of asbestos-containing materials.

- In November of 1985, a building survey was conducted by Clayton Environmental. This survey concluded that the 100 Pine Street building had fireproofing material that contained asbestos.

- In January of 1986, an air sampling report was provided to Grosvenor by Thomas J. Walker, Inc. These air sampling results indicated that testing of the levels of asbestos in the ambient air during the sampling period did not detect elevated levels of asbestos.

- In February of 1986, in conjunction with a planned renovation, asbestos containing fireproofing was abated from the 10th floor of the 100 Pine building. In conjunction with the planned renovation, it was clear that the asbestos-containing fireproofing would be disturbed, and that, at a minimum, the disturbance of the material could cause elevated levels asbestos fibers in the air. Accordingly, the asbestos-containing fireproofing was abated with great care and at great expense to contain the release of asbestos fibers and to comply with state and federal regulations.

- In March of 1986, additional air samples were taken of the ambient air in the 100 Pine building. Again, at the particular time and in the particular location the air was sampled, there were no elevated levels of asbestos detected.

- Again in May of 1986, additional air samples were taken of the ambient air in the 100 Pine building. At the particular time and in the particular location the air was sampled, there were no elevated levels of asbestos detected.

- In July of 1986, additional air samples were taken of the ambient air in the 100 Pine building. At the particular time and in the particular location the air was sampled, there were no elevated levels of asbestos detected.

- In December of 1986, additional air samples were taken of the ambient air in the 100 Pine building. At the particular time and in the particular location the air was sampled, there were no elevated levels of asbestos detected.

- In February of 1987, in conjunction with a planned renovation, asbestos containing fireproofing was abated from the 27th floor of the 100 Pine building. In conjunction with the planned renovation, it was clear that the asbestos-containing fireproofing would be disturbed, and that, at a minimum, the disturbance of the material could cause elevated levels asbestos fibers in the air. Accordingly, the asbestos-containing fireproofing was abated with great care and at great expense to contain the release of asbestos fibers and to comply with state and federal regulations.

- In December of 1987, in conjunction with a planned renovation, asbestos containing fireproofing was abated from the 22nd floor of the 100 Pine building. In conjunction with the planned renovation, it was clear that the asbestos-containing fireproofing would be disturbed, and that, at a minimum, the disturbance of the material could cause elevated levels asbestos fibers in the air. Accordingly, the asbestos-containing fireproofing was abated with great care and at great expense to contain the release of asbestos fibers and to comply with state and federal regulations.

- In December of 1987, additional air samples were taken of the ambient air in the 100 Pine building. At the particular time and in the particular location the air was sampled, there were no elevated levels of asbestos detected.

3

- In February of 1988, in a privileged Attorney Client communication that resulted from the solicitation of legal advice, Pacific Freeholds was informed that the asbestos-containing fireproofing in the 100 Pine building was Monokote manufactured by Grace.

- In July of 1988, the Pacific Freeholds and Grace entered into a tolling agreement which tolled the statute of limitation on any cause of action that might be available to the plaintiff as a result of asbestos-containing Monokote contaminating the 100 Pine building. This tolling agreement was extended up until the time suit was filed.

- In March of 1988, Pacific Freeholds instituted an asbestos containment plan.

- In April of 1988, additional air samples were taken of the ambient air in the 100 Pine building. At the particular time and in the particular location the air was sampled, there were no elevated levels of asbestos detected.

- In April of 1988, the Pacific Freeholds received a recommendation from a contractor, Crawford/FPE, that asbestos-containing dust be cleaned up in locations where it had recently been found.

- In July of 1988, the Pacific Freeholds instituted an asbestos management plain for the 100 Pine building.

- In September of 1988, in conjunction with a planned renovation, asbestos containing fireproofing was abated from the 12th and 14th floors of the 100 Pine building. In conjunction with the planned renovation, it was clear that the asbestos-containing fireproofing would be disturbed, and that, at a minimum, the disturbance of the material could cause elevated levels asbestos fibers in the air. Accordingly, the asbestos-containing fireproofing was abated with great care and at great expense to contain the release of asbestos fibers and to comply with state and federal regulations.

- In October of 1988, in conjunction with a planned renovation, asbestos containing fireproofing was abated from the 6th floor of the 100 Pine building. In conjunction with the planned renovation, it was clear that the asbestos-containing fireproofing would be disturbed, and that, at a minimum, the disturbance of the material could cause elevated levels asbestos fibers in the air. Accordingly, the asbestos-containing fireproofing was abated with great care and at great expense to contain the release of asbestos fibers and to comply with state and federal regulations.

- In December of 1988, the building manager for 100 Pine received a report from a consultant, Thomas J. Walker, Inc., which indicated that the asbestos-containing fireproofing was in excellent condition and that the air samples taken in a particular location at a particular time indicated that the air in the building was "safe."

- In February of 1989, in conjunction with a planned renovation, asbestos containing fireproofing was abated from the 6th floor of the 100 Pine building. In conjunction with the planned renovation, it was clear that the asbestos-containing fireproofing would be

4

disturbed, and that, at a minimum, the disturbance of the material could cause elevated levels asbestos fibers in the air. Accordingly, the asbestos-containing fireproofing was abated with great care and at great expense to contain the release of asbestos fibers and to comply with state and federal regulations.

- In March of 1989, the plaintiff received a report from one of its contractors, Pickering Environmental. In contrast to the December 1988 report, the Pickering report indicates that the asbestos-containing fireproofing was "friable" and that it is in good to moderate condition in the building. Pickering also stated that, "Friable materials are more likely than non friable materials to release fibers when disturbed. While some tenant improvements can be accomplished with task specific instructions under an implemented operation and maintenance program, when full floor tenant improvements are undertaken, removal of he fireproofing is recommenced."

- In April of 1989, a building survey was provided to Grosvenor International which contained different scenarios for abating the remaining asbestos-containing fireproofing from 100 Pine.

- In approximately August and September of 1989, the 5th, 13th, 23rd, 24th, and 32nd floors of 100 Pine were abated of asbestos-containing fireproofing.

- In December of 1989, the 28th floor of 100 Pine was abated of asbestos-containing fireproofing.

- In January of 1990, the 19th floor of 100 Pine was abated of asbestos-containing fireproofing.

- In April of 1990, the 11th and 26th floors of 100 Pine were abated of asbestos-containing fireproofing.

- In May of 1990, the 33rd floor of 100 Pine was abated of asbestos-containing fireproofing.

- In June of 1990, the 10th floor of 100 Pine was abated of asbestos-containing fireproofing dust and debris that remained on the floor.

- In October of 1990, the Pacific Freeholds received an Operation & Maintenance manual for dealing with asbestos-containing materials remaining in the 100 Pine building.

- In November of 1990, the 29th floor of 100 Pine was abated of asbestos-containing fireproofing.

- In March of 1991, additional air samples were taken of the ambient air in the 100 Pine building. At the particular time and in the particular location the air was sampled, there were no elevated levels of asbestos detected.

- In April of 1991, the 9th floor of 100 Pine was abated of asbestos-containing fireproofing.

- In October of 1991, the Pacific Freeholds received an air quality survey from Pickering Environmental. The report indicates that the air that was sampled at a particular time and in a particular location in the 100 Pine building had no elevated levels of asbestos detected.

- In July of 1992, an asbestos sampling survey provided by Crawford/FPE to Pacific Freeholds indicated that the air quality in 100 Pine building that was sampled at a particular time and in a particular location was good, but that asbestos-containing fireproofing had delaminated and fallen on top of ceiling tiles in the building. The asbestos-containing fireproofing debris was removed by an abatement contractor in November of 1992.

- In November of 1993, an air sampling report received from Crawford/FPE indicated that air that was sampled at a particular time and in a particular location within the 100 Pine building did not show elevated levels of asbestos.

- From December of 1993 to February of 1994, the 15th, 20th and 29th floors of the 100 Pine building had asbestos-containing fireproofing abated.

- In April of 1994, the 7th floor of 100 Pine had asbestos-containing fireproofing abated.

- In October of 1996, the 16th floor of 100 Pine had asbestos-containing fireproofing abated.

- In January of 1997, Pacific Freehold's consultant, Crawford/FPE, reported that fiberglass insulation around piping and ductwork in the 100 Pine building had been contaminated by asbestos fibers released from the asbestos-containing fireproofing.

- In total, Pacific Freeholds has spent in excess of thirty-three million ($33,000,000.00) dollars to address the asbestos contamination caused by Grace's Monokote fireproofing.

3.      Apart from this extensive knowledge gained through discovery in the pre-petition lawsuit, Pacific Freeholds and Grace entered a tolling agreement which tolled the running of any statute of limitations from three years prior to July 1988. Exhibit 1. Under the terms of this tolling agreement, Grace has had inspection and sampling access to this building for over seventeen years.

4.      Pacific Freeholds has submitted a court-approved proof of claim and documentary proof that a Grace-manufactured asbestos-containing product was located in its building. The Debtors' have never served a notice of gateway objection for proof of claim or

alleged document deficiencies, presumably because Grace's counsel was already in possession of tens of thousands of documents and discovery produced in the underlying litigation. There is a presumption that a properly filed claim is valid. Lundell v. Anchor Construction Specialists, Inc., 223 F.3d 1035, 1039 (9th Cir.2000). The burden is on the Debtor to come forward with specific evidence and authority to refute the claim.

## Background

5.    This claim seeks recovery for asbestos property damage. An asbestos property damage claim seeks to recover the costs associated with management and removal of asbestos-containing surfacing materials that were sold by W.R. Grace & Co. and installed in the claimant's building. Grace's asbestos-containing surfacing materials are hazardous, not because they contain asbestos, but because they release billions of asbestos fibers into the building over time and when they are disturbed. These claims are based on the traditional theories of negligence, strict products liability, warranty and nuisance.

6.    These are not a personal injury claims.[1] The claimant does not allege that anyone in its building has gotten or will get an asbestos-related disease. To the contrary, since discovering the presence of asbestos its building, the claimant has taken precautions to prevent such an event from ever happening. Both the Federal NESHAP regulation[2] and state

---

[1] As noted by the Honorable G. Ross Anderson in the very first Monokote case ever tried to a verdict against Grace:

> Greenville was not attempting to recover, as Grace appears to assume, for future asbestos injury to its employees, but rather to recover the cost of cleansing its building from cancer-causing fibers. If no person ever gets sick from asbestos in the [building], that would not change the fact that Greenville's building is contaminated
> ...

Greenville City Hall v. W. R. Grace & Co., 640 F.Supp. 559 (D.S.C.1986), aff'd, 827 F.2d 975 (4th Cir.1987).

[2] 40 C.F.R. 61.167, et seq.

regulations, as well as sound public health policy, require that the Grace's asbestos-containing surface treatments be separately and carefully removed, at the latest, when disturbed during renovation or when the building is demolished.[2]

### Introduction – Grace's Culpability

7.     W. R. Grace & Co. was in the business of manufacturing and selling asbestos-containing products from 1938 to 1978.  55 F.R. 4144-01 (February 13, 1990).  During that time, Grace or its predecessors manufactured and sold at least 22 different asbestos containing surfacing-treatments and at least 34 building-products to which asbestos was added as an ingredient.  Id.  Additionally, Grace mined, processed and sold many other products which contained vermiculite mined and milled at its Libby, Montana facility, including Zonolite Attic Insulation and Zonolite Masonry Fill, that were contaminated with asbestos fibers from the Libby mine.

8.     Grace was founded and operated for a number of years as a shipping company.  In the early 1950's, Peter Grace, who had succeeded his father as head of the company, determined that the future of shipping was limited, and decided that Grace should become a chemical company.  In connection with that decision, Grace purchased the Dewey & Almy Chemical Company (f/n/a the Multibestos Company) of Cambridge, Massachusetts.

---

[2] The Court in City of Greenville further noted:

> Grace's position was basically to manage the asbestos now, remove it in problem areas and leave the rest alone until it deteriorated or until renovation or demolition. [Plaintiff] decided to meet the problem head-on and remove the asbestos under a planned program.  As a consequence, the parties were really only at odds over how much to spend and when to spend it, not if money had to be spent to control the asbestos hazard.  The jury's conclusion that [plaintiff] had suffered property damage from asbestos contamination is amply supported.

Id at 567.  (Emphasis supplied).

9.    Additionally, in December 1962, Grace purchased the Zonolite Company (f/n/a Vermiculite & Asbestos Company), which became part of its Dewey and Almy Division. Zonolite mined vermiculite in Libby, Montana. The vermiculite in this mine contained asbestos. Zonolite shipped the vermiculite to numerous plants which it operated throughout the country. The vermiculite was then used in combination with other ingredients, including commercial asbestos, in the production of construction products.

**The Multibestos Knowledge**

10.    In 1930, Dewey & Almy purchased all but a few of the shares of Multibestos Company, located in Walpole, Massachusetts. Multibestos used asbestos fiber in the manufacture of brake linings and associated products. In 1934, Dewey & Almy took over the entire business of Multibestos.

11.    By 1935, a number of workers at the Multibestos Plant had developed asbestos disease. At a special meeting of Dewey & Almy held on August 23, 1935, the President of Dewey & Almy recommended that Multibestos be sold to Raybestos Manhatten, Inc. The minutes of the meeting reflect that:

> [The President] emphasized that the Executive Committee felt that, though there had been some improvement in the position of Multibestos Operations, the intangible burdens incident to them were greater than were reflected in statistics and that they were taking altogether too large a portion of the time of the Company's executives.

12.    In January 1936, the Multibestos Plant was closed. The lead editorial in the Walpole, Massachusetts newspaper commented, "[p]erhaps you are just as well satisfied that is gone, because it was a health menace."

13.    Thereafter, two of the earliest studies of asbestos disease were conducted among the employees and former employees of the Multibestos Plant. Of particular interest

was the medical article published by John Hawes in 1937 based upon his study of the

Multibestos Plant.  Dr. Hawes concluded his article as follows:

> Asbestosis is a relatively new disease, concerning which we know
> remarkably little except that it does not seem to correspond to the laws
> governing silicosis in general.  There is not the slightest doubt,
> however, in my mind at least, that asbestos dust is the most dangerous
> of all dusts.  Asbestosis is able to produce total and permanent
> disability in a remarkably short length of time, even after only 2 or 3
> years' exposure and occasionally less, as compared with the much
> slower and more gradual action of pure silicon and the great majority
> of silicates.  Asbestos is an aluminum or magnesium silicate or a
> combination of these or others  and, in its chemical analysis, agrees
> closely with that of talc, cement and certain other silicates.  The fact
> remains, however, that asbestos is extremely dangerous and fatal,
> while talc, cement and other silicates are comparatively innocuous
> except under prolonged, intense exposure along with a very greatly
> lowered individual resistance.

14.    Subsequent to the closing of the plant, Bradley Dewey, the president of

Dewey & Almy corresponded with Manfrid Bowdich, of the Massachusetts State Board of

Health, and in turn, Dr. Leroy Gardner and Dr. Anthony Lanza concerning asbestos disease

at the Multibestos Plant.  At that same time, Dr. Gardner was director of Saranac

Laboratories in Saranac Lake, New York.  He had recently been employed by a number of

asbestos companies, including Raybestos Manhatten and United States Gypsum Company, to

conduct animal experiments with asbestos dust (these studies revealed that asbestos not only

produced asbestosis, but that a large number of the animals tested died of lung cancer --

results which the sponsors successfully suppressed until discovery in the asbestos lawsuits

years later).  This correspondence revealed Mr. Dewey's actual awareness of the problems at

Multibestos, the findings of Dr. Hawes, and reasons for his getting out of the asbestos

business.  In one poignant statement in his letter of February 23, 1938, Mr. Dewey stated:

> I personally cannot study the disease record of the Walpole plant and
> not believe that asbestosis is a very serious and sometimes fatal

10

disease. I think it is one that should not be belittled and it is one which should be objectively studied until reliable facts are known and out in the open. All this is simply so that you may know my own personal feeling. Far be it from me to get embroiled in somebody's else troubles.

15.    Subsequently, Multibestos changed its name to Dewey & Almy, and remained a part of Dewey & Almy until purchased by Grace in 1952. All the stock of Multibestos then known as Dewey & Almy was transferred to Grace in connection with that purchase. Bradley Dewey was added to the Grace Board of Directors prior to this purchase. He remained a member of Grace's Board (or a Director Emeritus) until his death in 1974.

**The Zonolite/Libby Knowledge**

16.    In approximately 1950, Zonolite introduced one of the earliest spray-applied acoustical plasters known as "Zonolite Acoustical Plastic". The product contained vermiculite, commercial asbestos, and small amounts of other ingredients. In the ensuing years, Zonolite and later Grace introduced various other spray-applied products which were a direct outgrowth of Zonolite Acoustical Plastic and, in most circumstances, very similar in constituency. Included in this group was the spray fireproofing product Monokote, first introduced in 1959. Prior to the introduction of Monokote, Zonolite marketed a fireproofing which was generally troweled on columns and beams. This product was known as Zonolite plaster fireproofing. It did not contain asbestos.

17.    During the period Zonolite marketed its spray applied products, it knew of the dangers of asbestos dust. As early as December 21, 1955, John H. Huxley of the Chicago Corporate Headquarters wrote J.B. Meyers at Libby that:

> I have previously written to you about the danger of exposing our employees to asbestos dust while they are manufacturing acoustical plastic. In many of our plants, the plastic business has increased over 100% in the last year and is still growing. When the business reaches

11

these proportions, it is not unusual to have one crew assigned to the work continuously. This increases the danger.

(emphasis supplied).

18.     In 1956, the Montana Board of Health investigated the Libby mining operation, and provided a report to the company which stated that, inter alia, "the asbestos dust in the air is of considerable toxicity". In the late 1950's the company took a series of x-rays of its employees with results reflecting that of the one hundred thirty (130) persons examined, forty-eight (48) had abnormal x-rays, eight had pleural thickenings, twenty-six (26) had interstitial fibrosis, and eight had pneumoconiosis.

19.     On February 14, 1964, Grace received the report of examination of employee Eitel Ludwig, indicating that he had pulmonary fibrosis "due to inhalation of dust particles, almost certainly from the asbestos content of the dust." In May-June of that year, respiratory function tests were made on 140 men at Libby which revealed that:

> [T]heir respiratory function was below standard, but a serious hazard from pneumoconiosis (lung condition resulting from inhalation of dust particles) exists to employees at Libby.

20.     The following year, William Locke filed a worker's compensation claim for pneumoconiosis as a result of seven years of intermittent exposure to asbestos while blending acoustical material. Thereafter, injury claims proliferated at the Libby mine.

21.     Later in 1964, the Montana State Board of Health returned and conducted another inspection of the plant, and filed another report. This report discussed the findings of Dr. Selikoff, reported in the Journal of the American Medical Association, linking asbestosis and asbestos cancer, including mesothelioma, to building trade insulation workers with "relatively light intermittent exposure to asbestos". The report also noted that:

> The recent demonstration, by South African and British investigators
> of pleural and peritoneal neoplasms among individuals who had
> chance environmental exposure to asbestos many years before raises
> the very important question of possible wide-spread carcinogenic air
> pollution.

22.    An internal Grace memorandum of December 18, 1964 reports that "it is an

established company policy that all employees making mixed products" must wear

respirators. Another internal memorandum of January 11, 1965 reiterated the importance of

providing approved respiratory protection, but pointed out that "respirators are not to be

considered a substitute for engineering improvement of dust control." Grace's safety

administrator, Peter Kostic emphasized this point in a memorandum of March 29, 1966, in

which he stated that "respirators are fine for short periods of time, but to get a man to wear

one eight hours a day is next to impossible."

23.    On January 2, 1965, R.A. Bleich, General Manager of the Libby operation,

wrote the head of the Zonolite division of Grace, J.A. Kelley. He enclosed copies of all the

reports from the Montana State Board of Health on the dust problem and commented that:

> In going over these reports, I can only say that it presents a very sorry
> record. There is some improvement indicated during 1964 but still
> totally inadequate.

24.    In response, Mr. Kelley wrote George W. Blackwood, President of the Dewey

and Almy Chemical Division of Grace, on January 13, 1965, and advised him that "the

situation at Libby is not as good as it should be as far as the State of Montana is concerned"

and "that the problem of physical condition of employees may be a long term problem."

25.    On October 28, 1965, the Montana State Board of Health forwarded Mr.

Bleich a preliminary report of the Pennsylvania Department of Health which discussed lung

13

cancer and mesothelioma among Pennsylvania asbestos workers. The following year, L.E.

Park advised Grace that:

> While the average asbestos worker is well protected, the man on the
> street is not. The 3 by 1 micron asbestos fibers in his lungs come from
> a variety of sources, that is i.e.:
>
>> Asbestos ducts in insulation in home central
>> heating plants.
>>
>> Asbestos line ducts and centrally air
>> conditioned buildings.
>>                        * * *
>> Asbestos ceiling and floor tiles.
>>                        * * *
>> Construction and Demolition.

26.    On March 31, 1966, the Montana State Board of Health forwarded Mr. Bleich

a copy of another article dealing with asbestos and cancer. The article reflected grants

awarded to Dr. Selikoff at Mt. Sinai Hospital for a three-year study. The article further noted

that Dr. Selikoff's research team had been studying a union group of insulation workers and

had found "six to seven times the 'expected' rate of cancer of the lung and three times the

normal rate of cancer of the stomach, colon and rectum", and in addition to an "extraordinary

high incidence" of mesothelioma. The following year, in April 1967, the American Journal

of Medicine carried an editorial by Dr. Selikoff, et al. entitled "Asbestosis and Neoplasa",

which was circulated within Grace.

27.    On January 9, 1968, Mr. Sterrett forwarded O.F. Stewart a copy of Mr.

Kostic's letter of January 5, 1968, with a summary of his meeting with E. Fenner of Johns-

Manville on December 26, 1967:

> [T]he maximum allowable concentration for asbestos dust is
> controversial. The Industrial Hygiene Foundation is currently
> circulating a communication which I have seen, proposing a 0.0/mppcf
> for asbestos dust. They apparently feel that any exposure to asbestos

dust is hazardous.  Many doctors are of the opinion that there is a
definite relationship between asbestos dust and certain types of
cancer."...Fenner & Sheckler emphasize that threshold limits (MAC)
should be used as guides in the control of health hazards and should
not be regarded as fine <u>lines</u> between safe and dangerous
concentrations.

i.  * *

It has been JM's experience that personal protective devices such as
masks and respirators are only 50% effective.  This type of equipment,
therefore, should be used only in emergencies and for exposures of
short duration.

**The Monokote Problem**

28.    Contemporaneous with the discussions of the asbestos in the dust at the
Libby mine, Grace and the other members of the Vermiculite Institute, (an organization
created to promote the sale of vermiculite products such as Monokote, discussed the "urgent"
need to create Monokote 4, a new "asbestos-free" formulation. In October, 1965, in a
preliminary study to create this product Grace tested Monokote without asbestos. This design
was abandoned until 1968 when publicity in the Northeast caused Grace to again consider
reformulation to remove asbestos from Monokote.

29.    In 1968, a major article on asbestos by Paul Brodeur entitled "The Magic
Mineral" was published in the New Yorker magazine.  The article particularly attacked the
dangers of the spraying of asbestos fireproofing.  The article immediately came to the
attention of Grace.

30.    Additionally, on November 4, 1968, R.S. Arnold wrote Grace about the same
questions being asked of Grace in Australia:

In recent months, the powerful building workers union have been
protesting loudly about the hazards of handling fireproofing and
insulating products containing asbestos.

15

* * *

>Apparently the Building Unions learnt that asbestos is cancer producing from medical research performed in the United Kingdom.

>Neuchatel ask whether Zonolite have ever tested a Monokote formulation without asbestos content. We recently gave them the formula for Monokote MK-3 since they hoped for a more economical formulation to compete with the asbestos companies plus looking for a lower asbestos content.

>Would you comment on the health hazard question please and also advise of the status of a non-asbestos containing Monokote.

31.  On November 22, 1968, the California Department of Public Health forwarded its industrial hygiene study of exposures to asbestos dust at the Beverly Hills High School construction site to California Zonolite Company (a Grace licensee soon to be purchased by Grace). The report noted, inter alia:

>Atmospheric concentrations of asbestos-containing dust were found to be low on a count basis. However, on a weight basis, exposures were found to exceed our suggested threshold limit value for asbestos dust.

>Therefore, because of the added carcinogenic properties of asbestos properties, recommendations for additional personal protection are offered in this report."

32.  On January 23, 1969, Grace received the February issue of "Walls & Ceilings", containing an article regarding glass fiber re-enforcement for plaster and concrete. One Grace employee circulated the article with a notation that:

>This might be the answer to a 'maiden's prayer' for getting a substitute for asbestos in Monokote.

33.  The following month, on February 13, 1969, Grace manager R.W. Sterrett discussed various possibilities of substitutes for asbestos in Monokote.[3]

---

[3] Grace could have found a substitute much earlier if it had desired. For example, it had in its possession since 1943 a book entitled *Substitutes* which listed at least 22 possible substitutive for asbestos. Most notably

34.    On March 11, 1969, Grace's safety administrator, Peter Kostic, wrote R.W. Sterrett concerning another article that had appeared in Safety Engineering.  Mr. Kostic advised Mr. Sterrett that:

> I think it would be well at this time, with the advice of counsel, to consider applying a warning or precautionary label or statement on all containers of products containing Vermiculite.  This may aid our defense in cases of product liability claims.

35.    On June 20, 1969, Jim Cintani advised Thomas Egan, head of Grace's fireproofing division, with a copy to other top Grace officials, that he had attended a meeting at New York University on June 15, 1969, on "Asbestos - An Unanticipated Environmental Hazard."  He attached a copy of the program and a reprint of the article that appeared in the New Yorker Magazine.  He also noted that:

> Dr. Selikoff presented a very detailed and factual report on the studies of the health hazards of asbestos.  He has made a career in the study of effects of asbestos and speaks eloquently about the subject.

> Dr. Lee of U.S. Public Health Service agreed with Dr. Selikoff's findings.  He felt that the harmful effects of asbestos fibers should be neutralized, or if this was not possible, that asbestos should be taken off the market.

> Dr. Pundsack, Vice President of Research of Development of Johns-Manville, also acknowledged the harmful effects of asbestos.  Dr. Pundsack felt that John's-Manville had controlled the problem of asbestos in their plants through proper ventilation and indoctrination of their employees.  However, the use of asbestos in construction posed another problem, particularly in the field of spray fireproofing and acoustical application.  Dr. Pundsack was of the opinion this caused the greatest amount of potential hazard because the asbestos fibers were able to be airborne and thereby contaminate a large area.

* * *

---

included within this list were fiberglass and wood products, materials that Grace ultimately substituted for the asbestos thirty years later.

The meeting made a deep impression on me. I was surprised that the universal agreement among parties at the meeting on the harmful effects of asbestos. I thought Johns-Manville would try to refute Dr. Selikoff's statements, but they did not do so.

It is my feeling that as these facts are disseminated around the country, the use of asbestos sprayed fireproofing will be discontinued.

I feel we should place a top priority tag on our efforts to secure a substitute for the asbestos in our Monokote fireproofing.

(emphasis supplied).

36.     On July 24, 1969, Mr. Vining circulated a confidential report entitled

"Vermiculite Report for Mr. Grace". The report noted the need "to eliminate a serious health

hazard caused by the presence of vermiculite and asbestos dust in the mill and expanding

plants" and further that "tremolite asbestos is a definite health hazard at both the Libby

operation and at the expanding plants using the ore."

37.     By October 1969, a confidential internal report indicated that:

Asbestos fiber is a health hazard during the application of Monokote. Work done late in 1969 to eliminate asbestos from the product indicates that a substitute has been found which does not deter from the properties of the original Monokote.

38.     On November 4, 1969, Mr. Egan heard an address by Dr. Selikoff at the

CPLIA Convention. On December 2, 1969, he forwarded his comments concerning this

address to top officials within Grace:

His address was very factual about the extreme dangers of the use, under current practices, of sprayed fiber fireproofing. After noting the widespread concentration of fibers around major office structures, with emphasis on the large amounts distributed blocks from the site, he stressed the hazards to the general public of this pollution of the air. Also, he noted the concern of possible long term danger to building occupants from prolonged minute dusting of fibers through the building's air distribution systems. His use of medical charts, job photos, on site readings and expert commentary gave the maximum impact.

18

39.    The preceding day, Mr. Egan had written V.H. Dodson that:

Knowing the building pressure against the use of asbestos in sprayed
fireproofing, particularly in the New York, Philadelphia area, and with
concern spreading rapidly throughout the country, there are two prime
reasons we should get asbestos out of Monokote.  They are:

We are going to get included in the
indictment since we have asbestos in
Monokote.

Monokote without asbestos would give a
tremendous sales increase at once.

Also, we have an ethical obligation to get it out.

40.    On December 16, 1969, Mr. Egan wrote a number of persons within Grace as
follows:

Recent internal pressures, mainly the alarm on asbestos, has directed
us to areas of improvement in Monokote.  The investigation has been
underway for quite sometime with analysis of glass, mineral and paper
fibers in lieu of asbestos.  Also, many formulations have used no fiber
at all, but making changes or additions to the Gypsum are being
analyzed.

This program has been accelerated recently, and the reports are
optimistic.

41.    On March 12, 1970, an inter-office correspondence circulated an article from
the Seattle Times of March 1, 1970, reporting another speech by Dr. Selikoff in which he
again warned that

[E]ntire buildings sometimes are 'contaminated for life' because
asbestos fibers are left loose after pipes and beams are sprayed with
the insulating material in the areas between floors and ceilings.

These areas of 'dead space' often are used as return air ducts for
building's circulation system he said.  'When asbestos fibers are being
sucked from these areas into the circulation system of a building, I

think I would have to call this one of the most reprehensible habits we have found,' he said.

42.　　In April, 1970, Mr. Egan reported that Grace had two formulations for asbestos-free Monokote that were being tested at Underwriters Laboratory. That same month, the magazine "Walls & Ceilings" reported a speech by Dr. Selikoff in which he again warned that entire buildings were being "contaminated for life" because of sprayed fireproofing.

43.　　On June 1, 1970, Mr. Egan summarized events to date as follows:

> It is very important that each of you have a clear understanding of the issues and the course of events concerning the 'asbestos' pollution.
>
> * * *
>
> Dr. Selikoff started to speak out publicly to our knowledge in early 1969 around New York and, in fact, got the Fireproofing Subcontractors and Sprayed Fiber Manufacturers Association to form a committee to set standards to improve job conditions.
>
> The general feeling was that he would go away if he was treated gently. But this was not to be, as he stepped up his attack speaking November 1969 to the CPLIA National Convention and other groups across the country....
>
> * * *
>
> I have met with Dr.'s Selikoff and Rickles and I'm sure they intend to put an end to pollution, short and long term with materials, asbestos or other, which can in any way endanger the health of workers, office employees, and the general public. This includes during construction, after building, occupancy through air conditioned inhalation, or future demolition of buildings that will release asbestos or other materials into the atmosphere.

44.　　On June 11, 1970, Mr. Egan wrote Dr. Selikoff and expressed appreciation "for the excellent work to date in alerting us to the dangers of the present product and working conditions."

45.     On July 10, 1970, Sprayon Research Corporation, which had previously sold an asbestos fireproofing, announced the successful testing of an asbestos-free material known as "SprayDon" standard "J" which had received rating from UL Laboratories. Other companies soon followed.

46.     Additionally, on August 20, 1970, Mr. Egan commented on the Research and Development Program for asbestos-free Monokote and commented that:

> Barring some alarming medical fact to the contrary, the health hazard of asbestos will require the ban on loose asbestos particles to the atmosphere, and probably within one year.

47.     A research and development program for asbestos-free Monokote dated August 11, 1970, noted:

> Our current Monokote, identified as MK-3, was developed in 1959 and has been successfully marketed since. In two areas of performance, MK-3 is questionable.
>
> Under the requirement that such a product be non-injurious to health, we are attempting to determine code pollution levels and rate MK-3 field performance against these levels. We are also attempting to reformulate the product to completely exclude asbestos...
>
> In the area of requirement that MK-3 be fire resistant, our standard MK-3 has borderline performance in its ability to adhere to a certain configuration of steel deck during a fire test. We find that premature bond failure is the rule rather than the exception in those full scale test specimens which contain a large area of flat - plate.

48.     The report further discussed MK-3 as follows:

> "Complete asbestos elimination for health considerations."
> Since June 1969, we have attempted to eliminate asbestos by substituting other materials. Within a few months, we had to define the function of asbestos as primarily a yield increasing additive, also useful in improving the homogeneity and pumpability of the composition. We have discarded the following functions as being insignificant:

> Necessity that fiber be inorganic and
> highly resistant to high temperatures;
>
> Contributed to cohesive strength
> during exposure to fire.

49.　　On May 14, 1971, Grace announced its new asbestos-free Monokote IV.  The

bulletin stated:

> Responding to a critical need, the Construction Products Division,
> W.R. Grace & Co., has introduced into the New York market a
> completely asbestos-free formulation of its cementitious fireproofing
> material, Zonolite Monokote."

50.　　On November 16, 1971, Mr. Cintani wrote Mr. Feit that:

> The New York State area and the New England area are almost
> entirely changed over from MK-3 to MK-4....The market has
> definitely switched to a non-asbestos product in the Northeast.

51.　　On December 1 and 2, 1971, a meeting of Grace's Plaster and Fireproofing

Committee was held in Cambridge.  The letter forwarding the minutes of meeting reports that

shortly after the meeting, MK-4 had obtained additional necessary ratings.  Nevertheless, the

minutes noted that "MK-3 - continue to use where possible".

52.　　On January 14, 1972, Grace's architectural representative advised a plasterer

in Niles, Illinois concerning the Archer Pulaski School that:

> This is to inform you that Monokote 4 asbestos-free cementitious
> spray-applied fireproofing has been accepted by the City of Chicago
> for use within the city limits.
>
> We have successfully shown the pollution control people and city
> officials that use of Monokote 4 does not create a health hazard and
> has been fire tested and rated by Underwriters Laboratory, Inc., in
> accordance with Test Method ASTME-119.
>
> A few jobs we are doing with Monokote 4 in the city at the present
> time are the Standard Oil Building, Columbus Hospital, the Chicago
> Mercantile Exchange, and the Audy Juvenile Home.

53.    On February 4, 1972, L.S. Shu reported his attendance at the EPA public

hearings in New York City to A.M. Rosenberg.  He reported his general impressions on the

hearing as follows:

>   The most important part of the hearing, so far as asbestos is concerned,
>   was made by Johns-Manville.  They did not mention spray
>   fireproofing materials at all.  Their intention is obvious.  They want to
>   save their major business which is mining and milling of asbestos.
>   The quantity of asbestos used in spray fireproofing industry is
>   comparatively small (estimated 0.5% of asbestos used in U.S.).
>   Maybe they are willing to sacrifice this!  In this respect, I came across
>   a trip report written by Jim Cintani on June 20, 1969.  He attended a
>   meeting at NYU on asbestos.  I am quoting a paragraph from his
>   report:
>
>   ...Dr. Pundsack felt that Johns-Manville had controlled the problem of
>   asbestos in their plants through proper ventilation and doctrination of
>   their employees.  However, the use of asbestos in construction posed
>   another problem, particularly in the field of spray fireproofing and
>   acoustical application.  Dr. Pundsack was of the opinion this caused
>   the greatest amount of potential hazard because the asbestos fibers
>   were able to be airborne and thereby contaminate a large area.

54.    On February 24, 1972, P.E. Korenberg enclosed a table on the relationship

between MK-3 and MK-4.  The table noted that:

>   Formulation MK-3 contained some asbestos and can be used in
>   locations where asbestos is not banned.  Formulation MK-4 is asbestos
>   free and can be used anywhere -- including those areas where asbestos
>   is banned.

55.    On June 14, 1972, R.C. Erickson advised all Monokote plant superintendents

that:

>   This memo leaves as a completely open question 'when or if any
>   specific plant will convert to this [MK-4 formula] the trial batching
>   plant is purely for purpose of being prepared when we are forced to
>   close out MK-3.

56.    On August 2, 1972, Thomas P. Feit, who had replaced Mr. Egan as fire

protection products manager, advised manufacturing facilities that the effective date of EPA

banning of asbestos-containing fireproofing was still in question, but that:

> Anticipating the worst, we have used mid to late September as the cut-off date.  Obviously, if this is not the cut-off date or if we get an additional ninety days, we will continue to make and sell MK-3 until we no longer can.  I do believe that the plant should keep an inventory of such items as asbestos and MK-3 bags and anticipation that the cut-off date will be sometime in September.

57.    By October 1972, Grace had also introduced asbestos-free Monokote V (MK-

V):

> Application performance of MK-5 approximates that of MK-3, but it appears to have the additional advantage of making possible greater job site control which will reduce quality problems.
>
> The material was introduced in October to those markets where asbestos-containing materials had been banned.  In these areas a complete change over from the former non-asbestos MK-4 will take place between now and August 1973.  Announcements will be made in all other market areas with MK-5 to replace MK-3 and MK-4, for an orderly transition in 1973 and 1974 at all plant locations.

58.    Mr. Egan, who was then manager of the midwest region, noted that:

> Zonolite's Monokote-5 is a definite improvement over existing materials and places W.R. Grace & Co. well ahead of all other manufacturers of fireproofing materials in the quality and assured performance of a non-asbestos-containing plaster fireproofing material.

59.    An internal letter of Mr. Feit of January 6, 1973, reported that:

> The MK-5 announcement has been made in the Eastern and Midwestern Regions only -- where asbestos-containing fireproofing materials have already been banned.  There is at this time no schedule set for introducing MK-5 into any other area  until we have completed all field testing and/or EPA action.

60.    Even after the EPA banned the spray-application of asbestos-containing fireproofing in the United States in July of 1973, Grace continued to sell asbestos-containing Monokote in Canada. In an October 8, 1974 internal memo, Grace executives weighed the pros and cons of continuing this practice:

> It's my understanding that Jim McKague intends to continue with MK-3 [in Canada] and there are no overall limitations by the Canadian government prohibiting its use, although certain local authorities have. Where it is prohibited, MK-5 is being sold.
>
> The case for MK-3 is the lower cost possible.
>
> The case against it is:
>
>> Grace could get critical publicity from selling an asbestos-containing material.
>>
>> If there is legislation against MK-3 there can be a concern generated on asbestos content of vermiculite. (If MK-5 had totally replaced MK-3 prior to EPA's action I don't believe we would ever have had any question generated in the market about asbestos in vermiculite).
>>
>> Selling MK-3 in Canada could continue attention and confusion on Monokote in the U. S. It will be necessary to list MK-3 at UL and face the kinds of issues as in the attached correspondence.[4]
>>
>> Manufacturing MK-3 creates asbestos problems in our plants. If this is attacked by an agency, there is a risk that the investigation would continue to a concern on vermiculite.
>>
>> Continuing MK-3 will require testing and evaluations at UL plus all the other overhead expenses related to the management of this type of product. UL work alone could be a major cost item. . . .

---

[4] The attached correspondence was from Underwriters' Laboratory proposing to delete all fire ratings for products containing asbestos in light of the EPA ban upon visible emissions from the spraying of materials containing more than 1% asbestos.

It is my recommendation that we cancel MK-3 immediately and
eliminate the concerns listed above.

61.     Despite this recommendation, Grace continued selling asbestos-
containing Monokote in Canada through at least 1975.

**Grace Conceals the Problem in Monokote**

62.     Surprisingly, asbestos was not added to Monokote to increase its fire
resistance.   Indeed, the vermiculite plaster (to which no asbestos was added) which
Monokote replaced had much obtained higher fire ratings than were ever obtained by
asbestos-containing Monokote.   As Grace's own internal documents reveal, the primary
purpose of asbestos in Monokote was to increase the yield (thereby increasing the profit
margin).   When asbestos was finally removed from Monokote it was replaced with shredded
newspaper.

63.     When Grace began marketing its asbestos-containing Monokote throughout
the country in the early 1960's, it never disclosed the fact that Monokote contained asbestos.
The  evidence from Grace's own files and corporate testimony confirms that Grace's own
salesmen did not know that asbestos was in Monokote.   Even when Grace's competitors
began placing warnings on bags of asbestos-containing fireproofing as early as 1962, Grace
did not disclose the asbestos content of Monokote to the salesmen who sold, the architects
who specified it or the workmen who mixed it and sprayed it.

64.     In fact, as more information became public about hazard's of asbestos, Grace
made a conscious decision not to inform architects that Monokote contained asbestos.  When
one of its competitors announced its new asbestos-free fireproofing product had achieved
approval from Underwriter's Laboratory in 1970, Mr. Thomas Egan, head of Grace's

fireproofing division, sent a memo advising Grace's salesmen not to spread this information, but to "let the architect or other find out for himself . . ."

**The Safe Buildings Alliance and Grace's Attempt to Re-write History**

65.    The ban on the sale of asbestos-containing surfacing materials did not end Grace's efforts to conceal the hazards associated with asbestos in its products. Within one month of the first asbestos property damage verdict in the country, the three largest former manufacturers of asbestos containing fireproofing (Grace, United States Gypsum Co. and National Gypsum Co.) met in secret in Washington, D.C. and formed the Safe Buildings Alliance ("SBA"). The SBA has spent millions of dollars (contributed by its member companies) to reduce the members' liability by encouraging building owners to forego the removal of asbestos based upon often incorrect and misleading scientific and technical information prepared with the assistance of counsel for its member companies. In re School Litigation, 842 F.2d 671 (3d Cir.1987) (holding that the SBA was the alter-ego of its member companies).

66.    SBA's internal minutes confirm the Third Circuit's finding. These reflect, inter alia, that as early as June 1984, SBA intended (1) to lobby and influence Congress, State Legislatures, and Federal and State Regulatory Agencies; (2) to influence public thinking and building owner's decisions through a massive public relations campaign using national and local media, as well as the scientific, technical and trade press and (3) to

> coordinate and, as necessary, directly interact with these [scientific, medical and building sciences] communities in order to maintain current knowledge, and to the extent practicable, influence the emerging trends and communication . . . The information developed in this effort may have utility, and therefore cost savings, in providing assistance in the underlying litigation."

67.    SBA, which eventually consisted of only Grace and U. S. Gypsum, spent millions of dollars in these efforts.  SBA has lobbied the White House, Congressmen and federal agencies.    When the Environmental Protection Agency promulgated the 1990 amendments to the NESHAP regulation, the SBA filed suit against EPA, and spent vast sums challenging the regulation. Rather than waste its own limited time and resources on this issue, EPA agreed to settle the SBA suit and issue the EPA NESHAP Clarification of Intent, 58 Fed.Reg. 51,784-01 (Oct. 5, 1993).[5] Although the clarification did not change the actual regulation, it did make sweeping policy statements in accordance with SBA propaganda. Subsequently, the SBA filed suit against OSHA, challenging its regulations on asbestos.[6]

68.    Despite the fact that it had no interest in this subject outside of litigation (its member companies long ago stopped selling asbestos products), SBA and its members occupied three seats on the EPA Committee which developed the regulations advising school districts what they should do about asbestos-containing materials.  SBA's officers, as well as its member's litigation experts sit on peer review panels for EPA guidance documents and testimonial publications.  Despite having no scientific qualifications, SBA's former president and head lobbyist, John Welch, was a voting member of the ASTM asbestos sub-committee of the indoor air quality committee that decided what standards and test procedures would be endorsed by ASTM as scientifically reliable.  In the 1980's and 1990's, the SBA blitzed the country with a massive media campaign and generated proposed state and local statutes and regulations to minimize litigation expenses of its members.

---

[5] The NESHAP Clarification is cited extensively in Grace's pre-trial memorandum, thus demonstrating that SBA's efforts to influence scientific and federal regulatory agencies have served to aid its members cost-recovery litigation.

[6] 59 Fed.Reg. 40,964-41,162 (August 10, 1994).

69.     SBA's lobbying efforts also included contact directly with many individual state representatives. SBA directly contacted national and local newspapers in an attempt to influence public opinion. Furthermore, newspaper pieces that were written by the SBA and highlighted the misleading pamphlet "What You Should Know About Asbestos in Buildings" were published in newspapers throughout the country.[7] SBA also put their message on the radio waves in a program called "A Question of Safety" which it aired across the country.

70.     As an example of the lengths to which the SBA went to manufacture science, in 1988, the SBA sponsored "the Harvard Symposium," a closed conference in which defense litigation experts were invited to present and publish their work. The information presented at the "symposium" was quickly disseminated by the SBA, which publicized the proceedings in newspapers and radio spots all over the country as a "landmark report." SBA failed to tell that it had contacted Harvard and suggested the symposium and located the co-sponsors. Among those how made presentations at this closed forum were many of Grace's litigation experts.

71.     It is against this backdrop that the Debtors have baldly alleged that claimants' claims should be barred by the statute of limitations, assumption of the risk and that claimants cannot prove that Grace's asbestos containing surfacing products are hazardous or unreasonably dangerous. Coupled with the Debtors' track record of losing substantial verdicts and settlements in the tort system, it is clear that the Debtors' objections are patently without merit.[8]

---

[7] See, In re: Asbestos Schools Litigation, 115 F.R.D. 22 (E.D.Pa.1986) for discussion of the content and misleading nature of this publication.
[8] City of Greenville v. W. R. Grace & Co., 640 F.Supp. 559 (D.S.C. 1986), aff'd 827 F.2d 975 (4th Cir. 1987); New Hampshire-Vermont Health Service Corp. v. U. S. Mineral Products Co., 10 F.3d 805 (1st Cir.1993) (table decision – text at 1993 WL 472829); Kansas City v. W. R. Grace & Co., 778 S.W.2d 264 (Mo.App.1989); Kansas City v. Keene Corp., 855 S.W.2d (Mo.1993); Clayton Center

**Burden of Proof**

72.     A proof of claim is deemed allowed unless a party in interest objects under 11

U.S.C. § 502(a) and constitutes "*prima facie* evidence of the validity and amount of the

claim" pursuant to Bankruptcy Rule 3001(f). *See also*, Fed. R. Bankr.P. 3007. The filing of

an objection to a proof of claim "creates a dispute which is a contested matter" within the

meaning of Bankruptcy Rule 9014 and must be resolved after notice and opportunity for

hearing upon a motion for relief. *See* Adv. Comm. Notes to Fed. R. Bankr.P. 9014.

73.     Upon objection, the proof of claim provides "some evidence as to its validity

and amount" and is "strong enough to carry over a mere formal objection without more."

Lundell v. Anchor Construction Specialists, Inc., 223 F.3d 1035, 1039 (9th Cir.2000); citing,

Wright v. Holm (In re Holm ), 931 F.2d 620, 623 (9th Cir.1991); see also,   Ashford v.

Consolidated Pioneer Mort., 178 B.R. 222, 226 (9th Cir. BAP 1995), aff'd, 91 F.3d 151, 1996

WL 393533 (9th Cir.1996). To defeat the claim, the objector must come forward with

sufficient evidence and "show facts tending to defeat the claim by probative force equal to

that of the allegations of the proofs of claim themselves." In re Holm, 931 F.2d at 623.

---

Associates v. W.R. Grace & Co., 861 S.W.2d 686 (Mo.App. 1993); Northridge Co. v. W. R. Grace &
Co., 205 Wis.2d 267, 556 N.W.2d 345 (Wis.App.1996); San Franscisco Unified School District v. W.
R. Grace & Co., 37 Cal.App.4[th] 1318, 44 Cal.Rptr.2d 305 (Cal.App. 1 Dist. 1995); MDU Resources
Group v. W. R. Grace & Co., 14 F.3d 1274 (8th Cir.1994); Farm Credit Bank of Louisville v. U. S.
Mineral Product Co., 864 F.Supp. 643 (W.D.Ky.1994); May v. AC & S, Inc. 812 F.Supp. 934
(E.D.Mo.1993); Tioga Public School Dist. No. 15 v. U. S. Gypsum, 984 F.2d 915 (8th Cir.1993);
Hebron Public School Dist. No. 13 v. U. S. Gypsum, 953 F.2d 398 (8th Cir.1992); Blue Cross & Blue
Shield of SC v. W. R. Grace & Co., 781 F.Supp. 420 (D.S.C.1991); Security Homestead Ass'n v. W.
R. Grace & Co., 743 F.Supp. 456 (E.D.La.1990); Drayton Public School Dist. No. 19 v. W. R. Grace
& Co., 728 F.Supp. 1410 (D.N.D.1989); Spartanburg County School Dist. Seven v. National Gypsum
Co., 805 F.2d 1148 (4th Cir.1986); City of Manchester v. National Gypsum Co., 637 F.Supp. 646
(D.R.I.1986); Town of Hookset School Dist. V. W. R. Grace & Co., 617 F.Supp. 126 (D.N.H.1984)

**Objection C- 2 Allegedly Insufficient Documentation**

74.    Despite the Debtors' objection, documentation for this claim has been provided. Indeed, Pacific Freeholds produced tens of thousands of documents to Grace in the underlying pre-petition litigation. Grace deposed more than twenty fact witnesses regarding the asbestos contamination of the 100 Pine Street building. Moreover, Grace's counsel, Perkins Coie, in the pre-petition litigation has been paid over $165,000.00 to serve as special property damage litigation counsel in this bankruptcy. Exhibit 1. Pacific Freeholds should not have to expend the time, effort and expense to produce the same information to the Debtors' again in this action. The Debtors' contention to the contrary is specious.

75.    Moreover, the Debtors' objection to claims based upon the contention that the proofs of claim filed in respect of such claims were facially incomplete or lacked certain documentation is without any basis. The standards for proofs of claim and objections was stated by the Third Circuit Court of Appeals in In re Allegheny International, Inc., 954 F.2d 167 (3d Cir. 1992):

> The burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A. § 502(a) rests on different parties at different times. Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is "*prima facie*" valid. [citations omitted.] In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. The burden of going forward then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim. It is often said that the objector must produce evidence equal in force to the *prima facie* case. [citations omitted.] In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. (citations omitted).

954 F.2d at 173-74.

76.     Accordingly, the pertinent inquiry is whether the proof of claim and documentation filed by a claimant sets forth sufficient evidence of a claim against the Debtors, not whether the proof of claim provides sufficient information for the Debtors to formulate their defenses and objections to the PD Claim.  If the proof of claim meets this *prima facie* standard, the burden shifts to the Debtors to produce evidence that the claim is invalid, regardless of whether it would be useful for the proof of claim to provide additional information for the Debtors to assess their defenses as such information is obtainable by discovery.

77.     The fact that claimants may have omitted certain of the information requested in the proof of claim form is not, standing alone, sufficient grounds for the disallowance of the claim which otherwise makes a *prima facie* showing of the Debtors' liability.  Indeed, a PD Claim should only be disallowed for one or more of the nine grounds for disallowance enumerated in section 502(b) of the Bankruptcy Code.  In re Taylor, 289 B.R. 379, 384 (Bankr. N.D. Ind. 2003).  Respectfully, §502(b) affords no discretion in this regard and the disallowance of claims must be based upon the reasons stated in the statute.  Id.  None of the grounds for disallowance set forth in section 502(b) involves the failure to provide information beyond that which establishes a *prima facie* claim against the Debtors' estates.  In re Guidry, 321 B.R. 712 (N.D. Ill. 2005).

**Objection C-3 Alleged Failure to Identify a Grace Product**

78.     This claim is properly supported by documents which are *prima facie* evidence that a Grace's asbestos-containing product was installed in the building at issue.  Exhibit 2.  The evidence supplied, whether it be Grace's sales records or scientific constituent analysis, is admissible evidence that the product claimed was a Grace product.

**Objection D-2 Statute of Limitations – Constructive Notice**

79.    Despite the rejection of this argument in courts across the county, Grace

would suggest to this Court that virtually every property damage claimant in this bankruptcy

is barred because they should have had notice of the "potential dangers" of asbestos.[9] Yet

Grace has utterly failed to come forward with any evidence or applicable state law to support

this position despite its obligation to do so.  Van Buskirk v. Carey Canadian Mines, Ltd., 760

F.2d 481 (3d Cir.1985); California Sansome v. U. S. Gypsum Co., 55 F.3d 1402 (9th

Cir.1995); Clayton Center Asso. v. W. R. Grace & Co., 861 S.W.2d 686 (Mo.App.1993)

(statue of limitations is an affirmative defense on which the burden of proof is on the

defendant).  More importantly, Grace's objection completely ignores literally scores of

reported decisions from across the country that reject this very argument.

80.    Notably, in Kansas City v. W. R. Grace & Co., 778 S.W.2d 264,

(Mo.App.1989), the Missouri Court of Appeals reversed the grant of summary judgment on

the statute of limitations and specifically rejected the arguments now made the Debtor.  In

Kansas City, the appellate court correctly recognized that in order for an asbestos property

damage action to accrue, there must be a "release of toxic asbestos fibers into the

environment" along with "the ability to ascertain a substantial and unreasonable risk of harm

form the release of the toxic asbestos fibers."  778 S.W.3d at 268.  In so finding, the

---

[9] Grace's reliance upon Prudential Insurance Co. v. U. S. Gypsum, 359 F.3d 226 (3d Cir.2004) is misplaced. The only cause of action at issue in Prudential was the federal RICO statute, upon which Prudential claimed it was entitled to a broad range of past and future asbestos related damages.  In holding that Prudential's claims were barred by the RICO statute of limitations, the Third Circuit panel was careful to distinguish Prudential's broad RICO claims from traditional tort claims for asbestos property damage.  Id at 238.  Moreover, despite Debtors suggestion that the Prudential court based its decision solely upon constructive notice of the "potential dangers" of asbestos-in-buildings, the court actually went to great lengths to describe the "actual knowledge" held by Prudential prior to the limitations period at issue in conjunction with the fact that Prudential "is a very sophisticated company that operates a large casualty insurance business and an extensive estate investment business. . . . [which] provided Prudential with more opportunities than an average plaintiff to access ACM-related information."  Id at 234 – 236.  Grace has provided to no such evidence here.

Appellate Court held that the type of evidence Grace now claims is sufficient to establish "constructive notice" of a property damage claim was not relevant to the statute of limitations.

81.    Specifically, defendants in <u>Kansas City</u> made the identical claim made by the Debtors in this case: that because the city had constructive notice of NESHAPS regulations (first published in 1973) which banned the spray application of asbestos-containing fireproofing and later required that asbestos material be specially removed at great expense when disturbed by renovation or demolition, that the City's claim was barred by the statute of limitations.[10]  In rejecting this argument, the appellate court aptly held that, "simply because Kansas City had notice of NESHAPS, its causes of action for negligence and strict liability were not caused to accrue until asbestos fibers were released into the environment of the airport buildings and Kansas City was capable of ascertaining that there was a substantial and unreasonable risk of harm from the release of the toxic asbestos fibers." <u>Id.</u> at 269.  Courts across the country are in accord.  <u>See</u>, <u>MDU Resources v. W. R. Grace & Co.</u>, 14 F.3d 1274, 1279 (8th Cir.1994); <u>THS Northstar v. W. R. Grace & Co.</u>, 66 F.3d 173 (8th Cir.1995); <u>BellSouth Communications v. W. R. Grace & Co.</u>, 77 F.3d 603 (2d Cir.1996); <u>City of Wichita v. United States Mineral Product Co.</u>. 72 F.3d 1491 (10th Cir.1996); <u>San Francisco Unified School District v. W. R. Grace & Co.</u>, 37 Cal.App.4[th] 1318, 44 Cal.Rptr.2d 305 (Cal.App.4[th] 1995); <u>Heider v. W. R. Grace & Co.</u>, 1992 WL 189254 (N.D.Ill.) (citing, *Prosser & Keeton on the Law of Torts*, §30 at 165 (5th Ed. 1984)); <u>Clayton Center Asso. v. W. R. Grace & Co.</u>, 861 S.W.2d 686 (Mo.App.1993).

---

[10] The NESHAP regulations are the same regulations, amendments and related guidance documents cited by the Debtors in footnote 9, of their Fifteenth Omnibus Objection as evidence of "constructive knowledge."

82.    Moreover, the Debtors' constructive notice argument is patently inconsistent with its claim that its asbestos-containing surfacing materials are not hazardous and do not cause property damage. *See, Debtors' Fifteenth Omnibus Objection*, ¶ 118 (alleging claimants allegedly barred because there is no "proof of hazard."); ¶175 (citing British Columbia court as holding that Monokote does not "contaminate buildings" and is therefore not hazardous). As noted by the Eighth Circuit Court of Appeals in reversing a statute of limitations verdict,

> Grace argued at trial not only that the statute of limitations had run, but also that the plaintiff had suffered no injury from the **asbestos** Monokote. The arguments are inconsistent: if MDU has suffered no injury from the Monokote, then it has no cause of action--until an injury is suffered, the statute of limitations cannot begin to run.

MDU Resources Group v. W. R. Grace & Co., 14 F.3d 1274 (8th Cir.1994).

**Objection D-4 Statute of Limitation – Actual Notice**

83.    For 100 Pine Street, the operative date of accrual for the statute of limitations is, at the very earliest, July 5, 1985. If all of the elements necessary for accrual of the cause of action (including contamination) occurred prior to July 5, 1985, 100 Pine Street's claims are time-barred. Conversely, if all the necessary elements for the accrual of its cause of action occurred after July 5, 1985, 100 Pine Street's claims are timely.

**1) Burden of Proof is on the Debtors**

84.    It is without question that Grace bears the burden of proving its affirmative defenses, including a defense based on the statute of limitations. In California, the statute of limitations in an asbestos-in-building case is governed by *SFUSD*, 37 Cal.App.4th 1318. In *SFUSD*, the court succinctly stated:

> we hold that in an asbestos-in-building case, the mere presence of asbestos constitutes only a threat of future harm. Contamination by friable asbestos is

35

> the physical injury and the actual, appreciable harm that must exist before a
> property owner's strict liability or tort cause of action against an asbestos
> manufacturer accrues and the limitation period commences.

*Id.* at 1335 (emphasis supplied); *see also id.* at 1322 ("the statute of limitations in an

asbestos-in-building case does not commence until there has been damage in the form of

contamination"). Since this passage is the key to determining when the statute of limitations

commences, it warrants careful consideration. The California Court of Appeal stated that the

limitations period does not commence until there is contamination by friable asbestos that

causes actual and appreciable harm. California case law sets six separate hurdles that Grace

must overcome to prevail on its statute of limitations defense. Grace must prove that its

wrongdoing resulted in the following:

    1) contamination of the subject building, *see SFUSD*, 37 Cal.App.4th at 1335;

       *California Sansome*, 55 F.3d 1402, 1406 (9th Cir. 1995); *see also City of*

       *Greenville v. W.R. Grace & Co.*, 827 F.2d 975, 980 (4th Cir. 1987);

    2) by the release of fibers from friable asbestos, *see SFUSD*, 37 Cal.App.4th at

       1335;

    3) manufactured by Grace, *see California Sansome*, 55 F.3d at 1406;

    4) causing actual harm, *see SFUSD*, 37 Cal.App.4th at 1335;

    5) causing appreciable harm, *see id.*;

    6) outside the statutory period, *see id.*

    85.    In an asbestos-in-building case arising under California law, the Ninth Circuit

has specifically noted that the defendant has the burden of proof on the statute of limitations

to establish **all** of the essential elements of the cause of action **arose outside the statutory**

**time period.** In *California Sansome v. U.S. Gypsum,* 55 F.3d 1402 (9th Cir. 1995), the Ninth

Circuit properly summarized California law as follows:

> **A defendant raising the statute of limitations as an affirmative defense has the burden of proving the action is time barred.** *See, e.g., Permanente Medical Group/Kaiser Found. Hosp. v. Workers' Compensation Appeals Bd.,* 171 Cal.App.3d 1171, 217 Cal.Rptr. 873, 876 (1985) (citing *Kaiser, Found. Hosp. V. Workers' Compensation Appeals Bd.,* 39 Cal.3d 57, 216 Cal.Rptr. 115, 702 P.2d 197 (1985)) ("The burden of producing evidence sufficient to show [plaintiff's] claim is barred was upon [defendant] who had asserted the statute as a defense."); *cf. Palmer v. Hoffman,* 318 U.S. 109, 117, 63 S.Ct. 477, 482, 87 L.Ed. 645 (1943) (finding state law governs the allocation of the burden of proof in diversity cases). **Under California law, the limitation period commences "upon the occurrence of the last element essential to a cause of action."** *City of San Diego,* 35 Cal.Rptr.2d at 881; *see CAMSI IV v. Hunter Technology Corp.,* 230 Cal.App.3d 1525, 282 Cal.Rptr. 80, 85 (1991); *Leaf v. City of San Mateo,* 104 Cal.App.3d 398, 163 Cal.Rptr. 711, 715 (1980). **A tort cause of action does not accrue until there is wrongdoing and "actual and appreciable harm."** *CAMSI IV,* 282 Cal.Rptr. at 85; *see Davies v. Krasna,* 14 Cal.3d 502, 121 Cal.Rptr. 705, 713, 535 P.2d 1161, 1169 (1975); *City of San Diego,* 35 Cal.Rptr.2d at 881; *see also Jolly v. Eli Lilly & Co.,* 44 Cal.3d 1103, 245 Cal.Rptr.658, 661, 751, P.2d 923, 926-927 (1988) ("[T]he common law rule, that an action accrues on the date of injury . . . applies only as modified by the 'discovery rule' "); *Dolan v. Borelli,* 13 Cal.App.4th 816, 16 Cal.Rptr.2d 714, 717 (1993) (same); *Bell v. Hummel and Pappas,* 136 Cal.App.3d 1009, 186 Cal.Rptr.688, 694 (1982) ("Even after knowing of a wrongful act, if there is no actual irremediable damage, there is no running of the statute of limitations."). **Thus, the defendant has the burden of demonstrating the complained of wrongdoing and harm occurred outside the limitations period.**

55 F.3d at 1406 (emphasis supplied).

      86.    After summarizing the law, the Ninth Circuit went on to reverse and order a

new trial where the trial court had <u>wrongfully</u> placed the burden of proof on the plaintiff to

establish that pre-statute injury (i.e., contamination) did <u>not</u> occur. The court stated that "The

[district] court's analysis mistakenly treats the occurrence of appreciable injury as equivalent

to the discovery of that injury." *Id.* The court continued: "We are not aware of, and [the

defendant] fails to cite, any cases in which the occurrence of injury serves as an exception

like the discovery rule, thereby shifting the burden to the plaintiff to demonstrate the non

existence of appreciable harm." *Id.*

87.    Applying *SFUSD* and *California Sansome* to this case, it is clear that Grace

must establish <u>both</u> <u>wrongdoing</u> and <u>injury</u> prior to the applicable accrual date. Therefore,

Grace must establish that its product contaminated 100 Pine Street as a result of its

wrongdoing prior to July 5, 1985, for the statute of limitations to be a bar. Grace has

mustered <u>no</u> evidence to show that 100 Pine Street was contaminated <u>at all</u>.

**2) The Statute of Limitations is Determined on a Building-by-Building Basis Using**

**Accepted Scientific Techniques**

88.    In arguing "Constructive Notice" Grace submits that evidence about <u>other</u>

<u>buildings</u> bears on the statute of limitations issue regarding the specific buildings at issue

here. However, California law does not permit this type of speculation. California law

clearly states that the statute of limitations in asbestos-in-building cases does not run <u>until</u>

<u>there is contamination in the subject building and the plaintiff knows or should know of such</u>

<u>contamination in that particular building</u>:

> As we have found, a strict liability or negligence cause of action accrues in an
> asbestos-in-building case when the building becomes contaminated or the
> Plaintiff should have known that contamination occurred. Contamination
> constitutes injury—when injury is the last element of the cause of action for
> strict liability or negligence to occur, the cause of action accrues and the
> statute of limitations begins to run when contamination occurs.

*SFUSD*, 37 Cal.App.4[th] at 1335-36. The California Court of Appeal in *SFUSD* went to direct

that "As the trial court <u>erroneously focused on when SFUSD was put on notice that its</u>

<u>schools contained potentially dangerous asbestos</u>, we think it prudent to remand this matter to

the trial court for a determination of when contamination occurred at <u>each</u> school or when

SFUSD should reasonably have discovered that <u>each</u> school's contamination occurred." *Id.*

at 1336 (emphasis supplied); *see also id.* at 1336 n.6 ("SFUSD alleges that each of the six schools in which asbestos was installed were built at different times, with construction beginning between 1968 and 1973. Thus, the factual question of when contamination occurred must be resolved on a building-by-building basis.").

89.     In this case, Grace has the burden of showing there was contamination present (or the claimants should have known of contamination) in the 100 Pine building prior to the accrual date.  Only evidence regarding the SUBJECT building can establish when the requirements of wrongdoing and injury were actually present in the subject building.  Grace has asserted speculative general statements that claimants should have known about the dangers of asbestos.  *See, e.g.*, 15th Objection at 33.  However, general conclusory statements and speculation are plainly insufficient to meet Grace's burden of establishing that contamination occurred in each building, and that the claims were filed outside the limitations period.  Neither the mere presence of asbestos in an uncontaminated subject building nor actual contamination in other buildings are sufficient for the statute of limitations to accrue for a claim based on the subject building.  *See SFUSD*, 37 Cal.App.4[th] at 1335.

90.     Contamination, which is the injury in an asbestos-in-building case, encompasses a scientific determination by experts as to the contamination of the building. Such a determination is addressed in *MDU Resources Group v. W.R. Grace and Co.*, 14 F.3d 1274 (8th Cir. 1994), and *City of Greenville v. W.R. Grace & Co.*, 827 F.2d 975.  In *City of Greenville*, the Fourth Circuit held that a jury could reasonably have found contamination where evidence was presented that "Greenville's experts took samples from the office areas of the city hall and found that a significant number of asbestos fibers had contaminated areas

in which people worked. For example, the testing revealed 8,550,000 asbestos fibers per square foot in the carpet of one office area, and 170,000 asbestos fibers per square foot on the surface of one office computer." 827 F.2d at 979-80. Upholding a jury verdict against Grace, the Fourth Circuit reviewed trial evidence of testing of dust samples and noted: "From the evidence presented by Greenville, the jury reasonably could have found that the city hall was contaminated by significant amounts of asbestos, and that the asbestos had come from the fallen Monokote and Monokote dust." *Id.* at 980.

91.     In *MDU Resources*, the plaintiff sued Grace for Monokote in its building placed in 1968. In 1980, Health Department tests revealed that the Monokote fireproofing contained 15-25% asbestos. The plaintiff there first learned that the Monokote was releasing fibers and contaminating its building in 1988, when testing confirmed contamination and "subsequent tests found an average of more than 78 billion asbestos fibers per square foot on horizontal surfaces below the fireproofing." *MDU Resources*, 14 F.3d at 1276. The Eighth Circuit applied the contamination standard for Grace's statute of limitations defense and reversed a jury verdict for Grace that was obtained because the trial court wrongly applied the "discovery of asbestos" standard. *See also California Sansome*, 55 F.3d at 1405 n.5 (the parties agreed and the court defined contamination as "the release of asbestos fibers into the air of Sansome's buildings sufficient to constitute elevated levels- is the 'harm' that triggers the ruling [sic] of the statute of limitation . . . .").

92.     In *Landry v. Keene Corp.*, 811 F.Supp. 367 (N.D.Ill. 1993), the plaintiffs acquired two separate buildings at the same time in 1984. At the time they acquired the buildings, the plaintiffs received reports about the asbestos problems in one of the buildings. The plaintiffs brought an asbestos property damage suit on the other building after they later

discovered that the second building also contained asbestos. Notably, the defendant moved

for summary judgment, arguing that the plaintiffs' actual knowledge about the asbestos <u>in the</u>

<u>first building</u> put them on notice that the <u>second building</u> <u>*might*</u> <u>contain asbestos</u>. Once the

plaintiffs actually knew about the first building's asbestos problems, the defendant contended,

it should have known about the asbestos in the second building and could have easily

contacted the second building's prior building owner or checked that building's

specifications. The Northern District for the District of Illinois disagreed, aptly holding that

the "duty to investigate" under the discovery rule of accrual "does not arise until after

plaintiffs knew or should have known that an injury occurred and that it was wrongfully

caused." *Id.* at 373. The injury, of course, is contamination, not the mere presence of

asbestos in other buildings. "The purpose of the investigation is to determine whether the

injury is actionable," the court held, and not whether one has been injured in the first

instance. *Id.* at 373-74.

93.     While contamination is at the heart of when an asbestos-in-building cause of

action accrues under California law, Grace's 15th Objection is silent on when <u>any building</u>

was contaminated. How can Grace possibly argue that claims are barred when it presents

absolutely no evidence of contamination? It is not as if Grace is unaware of the

contamination requirement. Contamination involves analysis of many factors. A surface in a

building is contaminated when the concentration of asbestos fibers in a given area of surface

dust is sufficient to result in significant increase in the airborne concentration of asbestos

when the surface dust is disturbed by activities normally expected to occur. Experts utilize

electron microscopy to examine the surface dust and analyze the concentration of asbestos

fibers in the surface dust. The methods of collection of dust samples are well-recognized and

are performed pursuant to scientific protocols. From its involvement as a defendant in

multiple asbestos-in-building cases (including *City of Greenville*, *MDU Resources* and

*SFUSD*) Grace knows what contamination is and it knows that to sustain its burden of proof

it is necessary to present evidence of specific conditions existing in each of the California

Universities' buildings prior to the accrual date asserted by the plaintiffs. Grace must show

that all of these elements existed. Grace must prove its wrongdoing caused the subject

building to be contaminated by friable asbestos from Grace's fireproofing so that an actual

and appreciable harm occurred prior to the asserted accrual date. Instead, Grace has

attempted to meet its burden with speculation and silence.

**3) Grace Has Not And Cannot Present Evidence Showing That 100 Pine Street Was**

**Contaminated by Friable Asbestos from Grace's Fireproofing So That An Actual**

**and Appreciable Harm Occurred Prior to July 5, 1985**

94.    As set forth in numerous cases, there must be actual and appreciable harm

from contamination and not just nominal damage. In *SFUSD*, the mere presence of asbestos

or testing of asbestos-containing material that does not reveal contamination does not begin

the statute of limitations. *See* 37 Cal.App.4th at 1335 ("Contamination by friable asbestos is

the physical injury and the actual, appreciable harm that must exist before a property owner's

strict liability or tort cause of action against an asbestos manufacturer accrues and the

limitation period commences."). The presence of potentially dangerous asbestos can only

constitute a threat of future harm. Again, *SFUSD* is instructive:

> Testing and investigation are typically undertaken once a responsible property
> owner discovers that asbestos may be present in its building. But the act of
> testing and investigation which discloses no contamination cannot be equated
> with the actual harm of contamination. At best, such testing and investigation
> could show a threat of future harm. In light of the 'threat of future harm'
> cases and the unique analytical problems posed by an asbestos-in-building

case, we may reasonably conclude that the California Supreme Court did not intend such a result. These expenses may be found to have been undertaken to determine when the threat of future harm ripens into appreciable, actual harm for purposes of the accrual of a tort cause of action.

*Id.* at 1332-33.

95.     To succeed on its statute of limitations defense, the law requires Grace to establish that the 100 Pine building was contaminated outside the statutory period. The possibility of contamination or even nominal damage is insufficient to sustain Grace's the burden of proof. Moreover, the fact that other buildings may have asbestos, or even may be contaminated, does not equate to a finding that claimant's building is contaminated. Grace cannot argue, as it has in other cases, that for the purposes of the statute of limitations because claimants assert contamination, any contamination predates the statute; but for all other purposes, there was no injury and no need to do anything. Again *MDU Resources* is helpful: Grace argued at trial not only that the statute of limitations had run, but also that the plaintiff had suffered no injury from the asbestos Monokote. The arguments are inconsistent: if MDU has suffered no injury from the Monokote, then it has no cause of action - until an injury is suffered, the statute of limitations cannot begin to run. *See MDU Resources,* 14 F.3d at 1279-80 n. 9.

### 4) *Jolly v. Eli Lilly & Co.* Is Not Applicable to Establish Contamination

96.     Grace has incorrectly applied the holding in *Jolly v. Eli Lilly & Co* (1988) 44 Cal.3d 1103. *See* 15th Objection at 45. As set forth below, the discovery rule only applies when all of the elements for the cause of action are established. In *Jolly,* a woman suspected that her injury resulted from her mother's use of a prescription drug. She did not know nor did she investigate the name of the manufacturer. The California Supreme Court held that assuming injury has already occurred, once the plaintiff suspects wrongdoing, the statute of

limitations begins to run.  In *Jolly*, it was clear the woman was injured.  Here, there is no

evidence of injury prior to the applications limitations dates, which, under *SFUSD*, is

contamination in the subject building.  If a family member of Ms. Jolly had been injured, but

not Ms. Jolly, the requisite elements would not have been present to start the running of the

limitations period.

97.    Grace incorrectly states that knowledge of asbestos in the subject building, in

other buildings, or even contamination in another building is sufficient to trigger the statute

of limitations for the subject buildings.  *See, e.g.*, 15th Objection at 33.  Grace's argument

results in the cart driving the horse.  Under Grace's theory, the presence of asbestos, or even

assuming the presence of contamination in other buildings, means that, for example, an

inspection prior to the accrual date would have actually revealed contamination in the subject

building.  But Grace's argument misses the point of the statute of limitations and the delayed

discovery rule.  Grace must still establish that an inquiry prior to the accrual date would have

established contamination in the subject building.  Again, Grace must present evidence and

cannot meet its burden with speculation.

98.    *California Sansome* and *SFUSD* illustrate Grace's misinterpretation of *Jolly*.

In *California Sansome*, the district court mistakenly framed delayed injury as an exception to

the orthodox running of the limitations period thereby displacing injury as an essential

element of the cause of action.  "The 'discovery rule,' on the other hand, assumes that the

elements of accrual including harm exist, but tolls the ruling of the statute until the plaintiff is

on inquiry notice of its injury (and its wrongful cause)."  *California Sansome*, 55 F.3d at

1406.  Simply stated, in *Jolly*, where the issue was the occurrence of wrongdoing, is

44

distinguishable from an asbestos-in-building case, where the issue is occurrence of injury.

As *SFUSD* aptly summarized:

> The issue presented by our case is distinguishable from that present in *Jolly*. SFUSD does not ask whether wrongdoing occurred, but what constitutes an injury in the context of an asbestos-in-building case. **Injury and wrongdoing are distinct legal issues.** *See Jolly v. Eli Lilly & Co., supra,* 44 Cal. 3d at p. 1112. **The word "injury" is a term of art referring to the damaging effect of the wrongful act, not the act itself.** *See Zambrano v. Dorough* (1986) 179 Cal. App.3d 169, 172 [224 Cal.Rptr.323]. Last year, the California Supreme Court distinguished between ignorance of the identity of the wrongdoer and ignorance of the injury itself. *See Bernson v. Browning-Ferris Industries, supra,* 7 Cal. 4th at p. 932.) **As *Jolly* assumes injury has occurred, *Jolly* may reasonably be read to apply when the issue is wrongdoing, but not when the issue is what constitutes injury.** The California Supreme Court has recognized that in unusual cases, a plaintiff may be aware of wrongdoing before damage arises. Ordinarily, a plaintiff has already suffered damages by the time the tortious conduct is discovered. Only in an unusual case will the plaintiff discover a defendant's negligence without having suffered any consequential damage. (*See Budd v. Nixen, supra,* 6 Cal. 3d at p. 201 [legal malpractice case].) **As asbestos-in-building cases are admittedly unique because of the dormant period before asbestos becomes friable, <u>it seems reasonable to infer that contamination often arises after evidence of wrongdoing – the installation of potentially dangerous asbestos – has been discovered.</u>**

37 Cal.App.4th at 1336 (emphasis supplied).

## 5) Because Grace Bears the Burden Of Proving Its Affirmative Defenses, Claimants Have No Obligation to Offer Any Evidence On the Statute of Limitations Issue

99.    As demonstrated above, Grace has utterly failed to meet its burden in establishing that the claim of Pacific Freeholds is barred by the statute of limitations. On that basis alone, this Court may properly strike Grace's objections based on timeliness. "When one party has the burden of proof, the opposing party bringing a motion for summary judgment is not 'required to produce any evidence at all.'" *Lust v. Merrell Dow*, 89 F.3d 594, 598 (9th Cir. 1996) (citations omitted). Because of Grace's failure to meet its burden, claimants need not offer any evidence on the statute of limitations issue.

**6) GRACE'S MISREPRESENTATIONS TO 100 PINE STREET TOLLED**

**THE STATUTE OF LIMITATIONS AND PREVENT GRACE FROM**

**INVOKING LACHES**

100.    Notwithstanding the fact that Grace has failed to establish that all the

necessary elements for 100 Pine Street's claims occurred before July 5, 1985, Grace's

fraudulent concealment provides an independent basis on which the statute of limitations was

tolled.  The well-established law in California is that "the fraudulent concealment by the

defendant of the facts upon the existence of which the cause of action depends tolls the

statute, and such statute does not begin to run until the discovery by plaintiff or until by

reasonable diligence the plaintiff should have discovered the facts." *Kimball v. Pacific Gas*

*& Elec. Co.* (1934) 220 Cal. 203, 215.

101.    By 1970, Grace had been aware for years of the hazards of asbestos in various

settings.  During construction of 100 Pine Street commencing in 1971, a fireproofing

product, "Mono-Kote," was sprayed on the structural members of the building.  Mono-Kote

was manufactured, distributed, advertised, promoted, and sold by Grace.  The Mono-Kote

sold for use in 100 Pine Street contained asbestos fibers.  Beginning in 1970, prior to the

construction of 100 Pine Street, Grace developed an asbestos-free Mono-Kote that

substituted paper for asbestos and which was suitable for use in plaintiff's building.  By late

1970, Grace had acquired Underwriter's Laboratories fire ratings for the non-asbestos Mono-

Kote.  By 1971, Grace was selling its non-asbestos Mono-Kote.  In September 1971, while

Grace commenced widespread sales of non-asbestos Mono-Kote in the east, Grace proposed

to supply, "Mono-Kote," without identifying which formula, for 100 Pine Street.  At the

time, Grace provided to building professionals of 100 Pine Street a Grace Mono-Kote

technical data sheet which failed to reveal that the Mono-Kote Grace proposed to supply for use at 100 Pine Street contained asbestos, despite the fact that Grace was aware of the potential dangers of asbestos and despite the fact that Grace sold on the market a non-asbestos containing Mono-Kote.

102.    Due to representations made by Grace, there was no reason to believe that the Grace product used in 100 Pine Street contained asbestos, was hazardous, and had contaminated building structures. Moreover, Grace's activities through the Safe Buildings Alliance were directed at convincing building owners that asbestos-containing building materials were safe and would not cause contamination. Because of Grace's representations, it was not until years later that Pacific Freeholds uncovered the true propensity for Monokote to contaminate its building. As a result, asbestos abatement was commenced and an O&M program to control asbestos within the building were required.

103.    100 Pine Street owners and its design and construction professionals had a right to rely and did rely on Grace's statements and representations regarding Mono-Kote. These statements and representations were material to the owners of 100 Pine Street and its construction professionals in specifying and approving Mono-Kote.

**Objection D-6 Laches**

104.    As an affirmative defense, Grace once again bears the burden of proving that the Pacific Freeholds claim is barred by the doctrine of laches. *See Green v. Board of Dental Examiners* (1996) 47 Cal.App.4th 786, 792. Unlike the statute of limitations, in which no more than the mere passage of time is required to bar an action, the mere passage of time will never constitute a proper affirmative defense under the doctrine of laches. Rather, for laches to apply, Grace bears the burden of proving that the passage of time must have been both

unreasonable and have caused prejudice to the defendant, and "[p]rejudice is never

presumed." *Id.*

105.    Regarding the first element, as demonstrated above, Pacific Freeholds' claim

should not be barred by the statute of limitations, and therefore there is not even a sufficient

passage of time to warrant laches barring the claim.  In addition, Grace has failed to prove

that the delay, if any, was unreasonable.

106.    Furthermore, even assuming that the timely claim was somehow unreasonably

delayed, Grace has not and can not establish prejudice.  Grace's sole assertion of prejudice is

a general statement-apparently applicable to every claim listed under this objection - that

"witnesses are no longer available; building ownership has changed hands; building-specific

documentary evidence is more difficult, if not impossible to find; and no doubt

improvements and changes have often been made to the buildings at hand, including

demolition." 15th Objection at 38.  However, such generic conclusions are not sufficient to

establish prejudice. *See In re Beaty*, 306 F.3d 914, 928 (9th Cir. 2002).  As the Ninth Circuit

aptly stated:

> [The debtor's] brief to us makes a handful of additional, but conclusory,
> claims of prejudice.  [The debtor] contends that he was "deprived of the
> finality of his discharge," that he faces attorney's fees that he otherwise might
> not have faced, and that there might be some (unspecified) witnesses and/or
> documentary evidence that will be unavailable because of the passage of time.
> At oral argument, [the debtor] was unable to provide any more specific
> support for his contention that the delay was prejudicial. Such generic claims
> of prejudice do not suffice for a laches defense in any case, and are
> particularly insufficient in a case in which a heightened showing of
> extraordinary circumstances and demonstrable prejudice is required.

*Id.* (citations omitted); *see also People ex rel. Franchise Tax Bd. v. Superior Court* (1985)

164 Cal.App.3d 526, 535 fn.3 ("prejudice is not presumed by must be affirmatively

demonstrated"). Because Grace has failed to establish both an unreasonable delay and a resulting undue prejudice, Grace's objections based on laches should be stricken.

107.    Moreover, Grace cannot possibly establish an unreasonable delay or prejudice with respect to the 100 Pine Street building because Grace entered into a tolling agreement, which was annually renewed, which acted to toll or suspended the running of Pacific Freeholds' causes of action relating to asbestos in its building until August 1, 1998. Pursuant to the terms of the tolling agreement, on June 11, 1998, Pacific Freeholds provided written notice to Grace of its intention to bring a lawsuit. Pacific Freeholds filed its action on July 15, 1998, well within the time provided by the tolling agreement.

108.    Regarding the asserted "delay," Pacific Freeholds' claims are clearly timely, especially in light of the tolling agreement. Any "delay" by Pacific Freeholds would clearly be reasonable since Grace itself agreed to toll the statute of limitations until August 1, 1998. *See, e.g., Ornbaun v. Main* (1961) 198 Cal.App.2d 92, 100 ("Where the delay in commencing action is induced by the conduct of the defendant, laches is no defense."). Further, as discussed above, Grace cannot demonstrate prejudice. Clearly if Grace were prejudiced, it would have refused to renew the tolling agreement with Pacific Freeholds.

109.    Moreover, generic assertions of prejudice will not be a substitute for affirmative proof that Grace has suffered prejudice at the hands of Pacific Freeholds. *In re Beaty*, 306 F.3d at 928. Therefore, Grace's objection to Pacific Freeholds' claim based on laches should be stricken.

**Grace Objection E – Proof of Hazard**

110.    Grace has objected to virtually every claim in this bankruptcy on the basis that the claimant did not provide any "proof of hazard" from the asbestos-containing building

materials at issue.  Remarkably, Grace makes this claim after having prepared and requested

a proof of claim form that failed to ask claimants for any evidence that the Grace asbestos-

containing products were hazardous.[11]

111.    As recognized by the extensive body of case-law involving asbestos property

damage cases, Grace's asbestos-containing products do not become hazardous until they

release asbestos fibers and contaminate other parts of the building.  Therefore, claimants are

not injured until their building is contaminated by asbestos fibers released from Grace's

products.  City of Greenville v. W.R. Grace & Co., 827 F.2d 975, 976-78 (4th Cir.1987) (the

release of toxic fibers from an asbestos-containing fireproofing product rendered the

manufacturer liable for damages).

112.    Despite the clear line of cases, nowhere in the proof of claim form does Grace

ask claimants about building contamination.  Grace is clearly prohibited from objecting to

claims because claimants failed to supply information not requested by Grace.

113.    Additionally, Grace ignores the body of scientific literature which establish

that Grace's asbestos containing products release fibers into the building and create

unreasonable health risks under routine and foreseeable conditions.[12]  These scientific studies

---

[11] Perhaps more remarkably, Grace claims that most of these same claimants who allegedly failed to prove Grace's products are hazardous, are also barred by the statute of limitations.  As noted by the Eighth Circuit Court of Appeals in reversing a statute of limitations verdict, this argument is untenable.

> Grace argued at trial not only that the statute of limitations had run, but also that the plaintiff had suffered no injury from the **asbestos** Monokote.  The arguments are inconsistent:  if MDU has suffered no injury from the Monokote, then it has no cause of action--until an injury is suffered, the statute of limitations cannot begin to run.

MDU Resources Group v. W. R. Grace & Co., 14 F.3d 1274 (8th Cir.1994).

[12] See, "Exposure to Airborne Asbestos Associated with Simulated Cable Installation above a Suspended Ceiling," Am.Ind.Hyg.Asso.J., Vol. 52(11), p. 479-84, 1991; Keyes, Chesson, Hays, Hatfield, Ewing, Longo, Millette, "Re-entrainment of Asbestos From Dust in a Building With Acoustical Plaster," Environmental Choices Technical Supplement, July/August 1992; Ewing, Chesson, Dawson, Ewing, Hatfield, Hays, Keyes,

reveal the elevated asbestos fiber levels during building renovation, routine maintenance, and other normal building activities. In a string of Monokote cases ignored by Grace, courts have without exception allowed these experiments into evidence. See The Cheshire Medical Center v. W. R. Grace & Co., 88-516-M (D.N.H. July 26, 1993); Seventh Day Adventists v. W.R. Grace & Co.-Conn., Case No. 74365 (Md. Cir. Ct., Montgomery Co. Jan. 1993); In Re: State of West Virginia Public Buildings Asbestos Litigation, C.A. No. 86-C-458 (W.Va. Cir. Ct., Mongolia Co. Sept. 17, 1992), Tr. at 0078. MDU Resources Group, Inc., d/b/a Montana-Dakota Utilities Co. v. W.R. Grace & Co., C/A No. A1-90-122 (D.N.D.); Clayton Center Associates v. W.R. Grace & Co., No. 581479 (Mo. Cir.Ct., St. Louis Co., Feb. 13, 1992), Tr. at 105-12; Blue Cross and Blue Shield of South Carolina v. W.R. Grace, No. 6:89-1281-17 (D.S.C. May 15, 1991).

114.    All of these studies involved the same type of products manufactured by Grace[13] and most involved Grace's asbestos fireproofing. These experiments all involved activities that normally occur in buildings such as cable installations and other cleaning and maintenance activities. These experiments show that routine maintenance and custodial activities that occur in buildings contaminated by asbestos can result in significant exposures, well in excess of OSHA and EPA permissible levels. The experiments are thus relevant and admissible to show the levels of asbestos contamination and the procedures necessary to deal with the health hazards posed by everyday, foreseeable activities in the buildings.

---

Longo, Millette, Spain, "Asbestos Exposure During and Following Cable Installation in the Vicinity of Fireproofing," Environmental Choices Technical Supplement, March/April 1993.

[13] School District of Independence v. United States Gypsum Co., 750 S.W.2d 442, 453 (Mo.App. 1988) upheld the admission of similar studies "to aid the jury's understanding of exposure to asbestos" even though the studies did not involve exposure to the same product at issue.

115.    Apart from scientific studies, Pacific Freeholds produced actual test and sampling results in the pre-petition litigation which established that the Monokote fireproofing had released millions and millions of asbestos fibers into the 100 Pine building.

116.    Additionally, Grace's attempt to exclude dust sampling reports while relying solely upon non-abatement air sampling results to establish hazard completely misses the point. As the district court stated in City of Greenville v. W. R. Grace,

> The evidence further showed that the asbestos material in the City Hall was falling off the beams in some areas and was laying in pieces on top of ceiling tiles.    Greenville's experts found invisible asbestos fibers on every building surface tested in amounts of up to millions of fibers per square foot of surface area.    Asbestos had contaminated ceiling tiles and carpets.    These findings not only confirmed the earlier warnings of building contamination, but were consistent with Grace's internal knowledge that its asbestos-containing Monokote had poor bonding characteristics which prompted Grace to try to protect Monokote from scrutiny by outside testing laboratories.

> \* \* \*

> Grace's position at trial was basically that the asbestos fiber level had not yet gotten high enough to cause immediate concern for the health of the City Hall occupants, except perhaps maintenance men and contractors, whom Grace suggested could wear respirators.    The problems with this argument are several.    Grace's defense was built largely on a day of air testing in the building a year before trial which was criticized by Greenville's experts as merely a "snap shot" of the conditions that day.    The jury could reasonably have found such evidence unconvincing as a measure of the present and future contamination of the City Hall and rejected it as a reliable indicator of the need for removal.    Not only has EPA cautioned against heavy reliance on air testing, but Grace's experts, who took and analyzed the air samples in the City Hall, had recommended removal for other clients without air testing.

> The air testing defense did not address Greenville's need under any scenario to control the asbestos problem in its building.    Grace's position was basically to manage the asbestos now, remove it in problem areas and leave the rest alone until it deteriorated or until renovation or demolition.    Greenville decided to meet the problem head-on and remove the asbestos under a planned program. As a consequence, the parties were really only at odds over how much to spend and when to spend it, not if money had to be spent to control the asbestos hazard.    The jury's conclusion that Greenville had suffered property

damage from asbestos contamination is amply supported.

640 F.Supp. at 563, 568 (D.S.C.1986) aff'd, 827 F.2d 975 (4th Cir.1987).   While it is

understandable why Grace would want the court to be guided solely by non-abatement air

sampling, this data, by design, ignores the some of the most significant and dangerous

exposures in buildings.  Perhaps, that is why there is no authority to support Grace's position

that only non-abatement air sampling data are relevant to show that Grace's asbestos-

containing building products are hazardous.

**Conclusion**

117.   For the reasons stated herein, the claimant submits that Grace has failed to

meet its burden of proving the invalidity of this claim and that Grace's objections are without

merit.  The Debtors' Fifteenth Omnibus Objection should therefore be stricken.

<div style="margin-left: 40%;">

Respectfully submitted,

Christopher D. Loizides (#3968)
Michael J. Joyce (#4563)
Legal Arts Bldg.
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 654-0248
Facsimile: (302) 654-0728 (fax)
E-mail: loizides@loizides.com

By: _____

SPEIGHTS & RUNYAN
Daniel A. Speights (SC Fed. ID No. 4252)
Marion C. Fairey, Jr. (SC Fed. ID No. 6101)
200 Jackson Avenue, East
P.O. Box 685
Hampton, SC  29924
Telephone: (803) 943-4444
Facsimile:  (803) 943-4599

The Law Offices of THOMAS J. BRANDI
Thomas J. Brandi, Esq.

</div>

44 Montgomery Street, Suite 1050
San Francisco, CA 94104
Telephone (415) 989-1800
Facsimile:  (415) 989-1801

October 24, 2005