# MOTLEY RICE
# MASTER EXHIBIT 3

06151421

June 12, 1984

To: Alliance for Safe Buildings

Fm: Dennis Ross

Re: Organization & Budget

---

The Alliance for Safe Buildings was formed to insure that the public policy response to the issue of the presence of asbestos containing products in buildings is developed in an atmosphere of reason based upon informed scientific opinion. There are four major areas relevant to the formation of public policy on this issue:

1. United States Congress and Federal regulatory agencies
2. State legislatures and regulatory agencies
3. Public information
4. Scientific, medical and building science activities

To date, the AFSB has focused its efforts on the development of a response to a rule-making procedure initiated by the EPA and to responding to the Amendment proposed by Senator Abdnor and others. The long-term activities of the AFSB will include the following:

1. United States Congress and Federal Regulatory Agencies

Follow-up through adjournment of the 98th Congress, of the Abdnor Amendment, including the appropriations element. Participation in the conference process in order to obtain additional improvements in the legislation. Assuming passage of the Abdnor Amendment, interaction with the Environmental Protection Agency in the administration of the grant and loan program proposed, including development of rules and the grant and loan awards process. This will also necessitate monitoring and interaction at the state level regarding the activities of the various governors in carrying out their responsibilities. Participation in the development by the EPA of response to the expected correspondence from Senator Stafford to Administrator Ruckelshaus regarding the superfund issue.

In addition, we must target specific members of the Congress and key staff in order to build relationships and develop a level of knowledge and sophistication on their part in light of the possibility of additional legislative and regulatory activity. This is a time consuming activity which will require substantial staff effort and effective grassroots political involvement.


PLAINTIFF'S EXHIBIT
PX-428

25152509

Appropriate congressional committees must be monitored regarding legislation impacting on this issue, including Federal cause of action. Also, we must initiate a major program of coalition building, including such organizations as NIBS, Alliance of American Insurers, the American Insurance Association, and BOMA. We should also establish lines of communication with groups such as AFL-CIO, NEA, AFT, and the School Boards Association, to the extent practicable.

A budget estimate, including administrative support, for either a stand-alone executive director or a firm specializing in such services would be $150-200,000. The cost of services of consultants to be retained on a topical basis would vary widely based upon need. However, a contingency of approximately $100-150,000 would be appropriate and would include possible state level consultants as discussed below.

The cost of an effective political grassroots program, depending upon the degree of emphasis and the extent of overlap with the public information program, is difficult to estimate at this time but could easily cost $5-20,000 per targeted community or congressional district. The decision to move ahead with a major grassroots program, including the necessary budget support, should be deferred until the appropriate time.

A budget estimate for legislative and regulatory counsel would be in the range of $120-240,000 annually depending on the level of activity.

2. State Legislative and Regulatory Agencies

In addition to the state level involvement which would be necessitated by the passage of the Abdnor Amendment, it is essential to develop a monitoring program at the state legislative and regulatory level and a mechanism for response to unfavorable initiatives. This effort should be managed and coordinated by the AFSB utilizing member company personnel at that level and, as necessary, consultants retained for that purpose. This in itself is an expensive and time consuming process which requires experienced management. If this service were to be performed under the auspices of the executive director function, it likely would require an additional staff person full or part-time, and would require the purchase or utilization of an existing state legislative and regulatory monitoring service. Assuming substantial involvement at the state level by member company personnel, the cost for this activity would be in the range of $50-100,000. Absent such involvement, it would be substantially more costly.

3. Public Information

An effective public information program would have several essential elements including:

    a. National media
    b. Local media on a targeted basis
    c. Scientific technical and trade press
    d. Coordination with the political grassroots program

June 12, 1982
Pg 3

06151423

This service could be performed by hiring either a stand-alone public relations employee or a public relations firm. The cost for this program will vary more than any other component, with the possible exception of grassroots political activity, based on the level of activity required. An estimate for a modest program would be $120-240,000 but the cost could be substantially more based upon the scope of services selected.

4. Scientific, Medical and Building Sciences Activities

It is essential that the AFSB coordinate and, as necessary, directly interact with these communities in order to maintain current knowledge, and to the extent practicable, influence the emerging trends and communication. This activity will be substantially subsumed under the Executive Director, legal, and public infomation functions, but could warrent an identified accountable individual or retained consultants. The information developed in this effort may have utility, and therefore cost savings, in providing assistance in the underlying litigation. No cost estimate is provided for this area.

Organizational Alternatives

The two major functional activities, in addition to legal services, are management and coordination, and public information. These functions can be provided seperately or by single entity. Each can be performed by a stand-alone practitioner or may be obtained from a firm. The advantages of an individual practitioner include accountability and personal commitment to success. The disadvantages include lack of back up, disruption upon loss of the individual, variable work load, and lack of diversity of skills. Each of these disadvantages would be substantially overcome through the selection of a firm, with the trade-off being some loss of accountability and personal commitment.

The relative advantages and disadvantages can be offset substantially in the case of the individual practitioner by associating with an established firm, and in the case of a firm, by negotiating for specified minimum percentage (including 100%) of the time of the lead individual.

Conclusions

The establishment of an effective multi-dimensional program for the AFSB will require an annual budget, once fully operational, of between $500,000 and $1,000,000. The essential element in the selection of the executive director, public relation consultant, and legal consultant, is not organizational but qualitative. Thus, I recommend that the AFSB interview all interested applicants and remain flexible as to the issue of individual vs. firm or a combination thereof (eg: a management firm combined with a public relations individual practitioner.) However, if a firm is selected in any functional catagory, it is essential that clear personnel accountability be negotiated.

June 12, 1984
Pg 4

06151434

### AFSB Organization

1. Incorporation
2. Governance/Management Structure
3. Membership

The AFSB has previously decided to pursue incorporation.

It is necessary that several fundamental organizational issues be resolved. It is assumed that a Board of Directors and/or Steering Committee structure will be necessary. I would recommend that the lead company representative in each instance be an employee of the member company with that individual's alternative permitted to be a retained consultant. There is some legitimate value to the argument that the actual Board of Directors member should be a senior manager. This facilitates decison making, minimizes the tendency towards the development of "organizational politics" at the Washington working level, and expedites budgetary decision making.

Whether to have a Board of Directors comprised of senior company managers or to permit individual company choice must be decided. If that option is selected then there must be a cooresponding working group/steering committee of Washington working representatives which could be company personnel or retained counsel. It is assumed that the Board of Directors have the normal officers i.e., President, Vice President, Secretary and Treasurer. It would be highly desireable for the President and Vice President to be individuals of sufficient stature and communication skills to be able to serve as an effective spokesperson for the Alliance. This obviously requires willingness to permit such public participation. A decision must also be made to utilize a committee structure to include eg., public information committee, legislative lobbying committee, scientific and technical committee, litigation coordination committee, etc.

The question of catagories of membership and allocation of costs must be decided. If there are to be two catagories of membership, what are the voting rights of full and limited members; what is the formula for allocation of budget shares; is voting on the basis of one person- one vote or weighted in some fashion.

I would recommend a Board of Directors comprised of senior company personnel with alternates as selected by the companies and a Washington operating group to be called the Steering Committee comprised of company employees or retained counsel. This committee would have standing committees along functional lines and could have additional committees named by the Board or the Steering Committee. There would be two catagories of membership, ie., full and limited. Full members would pay a prorata share of the annual budget and special assessments and would have full voting rights. Limited members would pay an amount agreed to by the full members and have limited voting rights.

DMR:cb

25152512

ALLIANCE FOR SAFE BUILDINGS

Position Description

06151425

Position Title: Executive Director

### Primary Purpose

Under the supervision of the Steering Committee, to plan, direct, organize, and coordinat the activities of the A.F.S.B.; to serve as liaison among members to insure coordination of efforts towards the common goals and objectives of the A.F.S.B.; and to serve as liais to other organizations impacting upon the goals and objectives of the A.F.S.B.

### Duties and Responsibilities

1. In coordination with the Steering Committee, direct and actively participate in the development and preparation of effective long-range goals, objectives, and plans for the A.F.S.B.; present these plans to the Steering Committee for review and approval and provide for the effective implementation of approved plans.

2. Develop basic policy recommendations for submission to the Steering Committee.

3. Direct the development and implementation of operating procedures and controls which will provide for effective communications and adequate flow of information among the members of the Steering Committee.

4. Coordinate all media contacts on behalf of the A.F.S.B. to insure that the positions and policies of the A.F.S.B. are effectively communicated to the public.

5. In conjunction with the Steering Committee, provide management coordination of the lobbying activities of the A.F.S.B.

6. As directed by the Steering Committee, represent the A.F.S.B. before appropriate public and private entities.

7. Establish and maintain effective communications and insure appropriate coordination with other organizations and persons having an interest in or impact on the goals and objectives of the A.F.S.B.

8. Review, evaluate and administer contracts, appropriations and expenditure and disbursal requests and actions within the guidelines established by the Steering Committee.

### Desirable Personal Qualities

1. Working knowledge of the Congress of the United States and the Administration and its Agencies.

2. Established administrative experience at a high level of individual responsibility, authority and control.

3. Leadership skills, personal presence and articulateness as appropriate to an individual exercising this level of organizational responsibility.

4. Significant experience in the operations of trade associations or industry coalitio

5. Technical expertise in the areas of product liability or the health sciences is a desirable but not essential prerequisite.

25152513