## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | **Chapter 11** |
| | ) | |
| W. R. Grace & Co., et al.[1], | ) | **Case No. 01-01139 (JKF)** |
| | ) | **Jointly Administered** |
| Debtors. | ) | |
| | ) | Reply Deadline:  October 31, 2005 @ 4:00 pm |
| | ) | Hearing Date:  November 14, 2005 @ 12:00 pm |
| | ) | |
| | ) | Re:  Docket No. 9315 |

Claim No.: 11061
Southern New England Telephone Co.
Hartford, CT

## RESPONSE TO DEBTORS' FIFTEENTH OMNIBUS OBJECTION (SUBSTANTIVE) TO ASBESTOS PROPERTY DAMAGE CLAIMS

Claimant Southern New England Telephone Co., CT (Claim No. 11061), respectfully submits this response to the Debtors' Fifteenth Omnibus Objection to Property Damage Claims.

---

[1] The Debtors consist of the following 62 entities: W. R Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-I Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Ins., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgracc, Inc., Coalgracc II, Ins., Creative Food 'N Fun Company, Darex Puerto Rico, Inc.,  Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp, Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B 11 Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe. Inc., Grace H-G Inc., Grace H-G II Inc,, Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Ins., MICA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Curving, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

**Introduction**

1.      The above-named claimant respectfully submits this response to the Debtors'
Fifteenth Omnibus Objection.  The Claimant has previously submitted a court-approved
proof of claim and proof that a Grace-manufactured asbestos-containing product is located in
its building.  Grace served the claimant with a notice of insufficient documentation in March
of 2005 and the claimant provided supplemental documentation which is summarized in
Exhibit 1.  The Debtors' document notification was specifically limited to those items
checked in Exhibit 2.

2.      Despite the Debtors' position, applicable case law places a presumption that a
properly filed claim is valid.  Lundell v. Anchor Construction Specialists, Inc., 223 F.3d 1035,
1039 (9th Cir.2000).  The burden is on the Debtor to come forward with specific evidence and
authority to refute the claim.

**Background**

3.      This claim seeks recovery for asbestos property damage.  An asbestos
property damage claim seeks to recover the costs associated with management and removal
of asbestos-containing surfacing materials that were sold by W.R. Grace & Co. and installed
in the claimant's building.  Grace's asbestos-containing surfacing materials are hazardous,
not because they contain asbestos, but because they release billions of asbestos fibers into the
building over time and when they are disturbed.  These claims are based on the traditional
theories of negligence, strict products liability, warranty and nuisance.

4.      These are not a personal injury claims.[1]    The claimant does not allege that

anyone in its building has gotten or will get an asbestos-related disease.  To the contrary,

since discovering the presence of asbestos in its building, the claimant has taken precautions

to prevent such an event from ever happening.  Both the Federal NESHAP regulation[2] and

state regulations, as well as sound public health policy, require that Grace's asbestos-

containing surface treatments be separately and carefully removed, at the latest, when

disturbed during renovation or when the building is demolished.[2]

### Introduction – Grace's Culpability

5.      W. R. Grace & Co. was in the business of manufacturing and selling asbestos-

containing products from 1938 to 1978.  55 F.R. 4144-01 (February 13, 1990).  During that

time, Grace or its predecessors manufactured and sold at least 22 different asbestos

---

[1]As noted by the Honorable G. Ross Anderson in the very first Monokote case ever tried to a verdict against Grace:

> Greenville was not attempting to recover, as Grace appears to assume, for future asbestos injury to its employees, but rather to recover the cost of cleansing its building from cancer-causing fibers.  If no person ever gets sick from asbestos in the [building], that would not change the fact that Greenville's building is contaminated ...

Greenville City Hall v. W. R. Grace & Co., 640 F.Supp. 559 (D.S.C.1986), aff'd, 827 F.2d 975 (4th Cir.1987).

[2]40 C.F.R. 61.167, et seq.

[2] The Court in City of Greenville further noted:

> Grace's position was basically to manage the asbestos now, remove it in problem areas and leave the rest alone until it deteriorated or until renovation or demolition.  [Plaintiff] decided to meet the problem head-on and remove the asbestos under a planned program.  As a consequence, the parties were really only at odds over how much to spend and when to spend it, not if money had to be spent to control the asbestos hazard.  The jury's conclusion that [plaintiff] had suffered property damage from asbestos contamination is amply supported.

Id at 567.  (Emphasis supplied).

containing surfacing-treatments and at least 34 building products to which asbestos was added as an ingredient. Id. Additionally, Grace mined, processed and sold many other products which contained vermiculite mined and milled at its Libby, Montana facility, including Zonolite Attic Insulation and Zonolite Masonry Fill, that were contaminated with asbestos fibers from the Libby mine.

6.      Grace was founded and operated for a number of years as a shipping company. In the early 1950's, Peter Grace, who had succeeded his father as head of the company, determined that the future of shipping was limited, and decided that Grace should become a chemical company. In connection with that decision, Grace purchased the Dewey & Almy Chemical Company (f/n/a the Multibestos Company) of Cambridge, Massachusetts.

7.      Additionally, in December 1962, Grace purchased the Zonolite Company (f/n/a Vermiculite & Asbestos Company), which became part of its Dewey and Almy Division. Zonolite mined vermiculite in Libby, Montana. The vermiculite in this mine contained asbestos. Zonolite shipped the vermiculite to numerous plants which it operated throughout the country. The vermiculite was then used in combination with other ingredients, including commercial asbestos, in the production of construction products.

**The Multibestos Knowledge**

8.      In 1930, Dewey & Almy purchased all but a few of the shares of Multibestos Company, located in Walpole, Massachusetts. Multibestos used asbestos fiber in the manufacture of brake linings and associated products. In 1934, Dewey & Almy took over the entire business of Multibestos.

9.      By 1935, a number of workers at the Multibestos Plant had developed asbestos disease. At a special meeting of Dewey & Almy held on August 23, 1935, the

President of Dewey & Almy recommended that Multibestos be sold to Raybestos Manhattan,

Inc. The minutes of the meeting reflect that:

> [The President] emphasized that the Executive Committee felt that,
> though there had been some improvement in the position of
> Multibestos Operations, the intangible burdens incident to them were
> greater than were reflected in statistics and that they were taking
> altogether too large a portion of the time of the Company's executives.

10.    In January 1936, the Multibestos Plant was closed. The lead editorial in the

Walpole, Massachusetts newspaper commented, "[p]erhaps you are just as well satisfied that

is gone, because it was a health menace."

11.    Thereafter, two of the earliest studies of asbestos disease were conducted

among the employees and former employees of the Multibestos Plant. Of particular interest

was the medical article published by John Hawes in 1937 based upon his study of the

Multibestos Plant. Dr. Hawes concluded his article as follows:

> Asbestosis is a relatively new disease, concerning which we know
> remarkably little except that it does not seem to correspond to the laws
> governing silicosis in general. There is not the slightest doubt,
> however, in my mind at least, that asbestos dust is the most dangerous
> of all dusts. Asbestosis is able to produce total and permanent
> disability in a remarkably short length of time, even after only 2 or 3
> years' exposure and occasionally less, as compared with the much
> slower and more gradual action of pure silicon and the great majority
> of silicates. Asbestos is an aluminum or magnesium silicate or a
> combination of these or others  and, in its chemical analysis, agrees
> closely with that of talc, cement and certain other silicates. The fact
> remains, however, that asbestos is extremely dangerous and fatal,
> while talc, cement and other silicates are comparatively innocuous
> except under prolonged, intense exposure along with a very greatly
> lowered individual resistance.

12.    Subsequent to the closing of the plant, Bradley Dewey, the president of

Dewey & Almy corresponded with Manfrid Bowdich, of the Massachusetts State Board of

Health, and in turn, Dr. Leroy Gardner and Dr. Anthony Lanza concerning asbestos disease

at the Multibestos Plant. At that same time, Dr. Gardner was director of Saranac

Laboratories in Saranac Lake, New York. He had recently been employed by a number of

asbestos companies, including Raybestos Manhattan and United States Gypsum Company, to

conduct animal experiments with asbestos dust (these studies revealed that asbestos not only

produced asbestosis, but that a large number of the animals tested died of lung cancer --

results which the sponsors successfully suppressed until discovery in the asbestos lawsuits

years later). This correspondence revealed Mr. Dewey's actual awareness of the problems at

Multibestos, the findings of Dr. Hawes, and reasons for his getting out of the asbestos

business. In one poignant statement in his letter of February 23, 1938, Mr. Dewey stated:

> I personally cannot study the disease record of the Walpole plant and
> not believe that asbestosis is a very serious and sometimes fatal
> disease. I think it is one that should not be belittled and it is one which
> should be objectively studied until reliable facts are known and out in
> the open. All this is simply so that you may know my own personal
> feeling. Far be it from me to get embroiled in somebody else's
> troubles.

13.    Subsequently, Multibestos changed its name to Dewey & Almy, and remained

a part of Dewey & Almy until purchased by Grace in 1952. All the stock of Multibestos then

known as Dewey & Almy was transferred to Grace in connection with that purchase.

Bradley Dewey was added to the Grace Board of Directors prior to this purchase. He

remained a member of Grace's Board (or a Director Emeritus) until his death in 1974.

**The Zonolite/Libby Knowledge**

14.    In approximately 1950, Zonolite introduced one of the earliest spray-applied

acoustical plasters known as "Zonolite Acoustical Plastic". The product contained

vermiculite, commercial asbestos, and small amounts of other ingredients. In the ensuing

years, Zonolite and later Grace introduced various other spray-applied products which were a

direct outgrowth of Zonolite Acoustical Plastic and, in most circumstances, very similar in

constituency. Included in this group was the spray fireproofing product Monokote, first

introduced in 1959. Prior to the introduction of Monokote, Zonolite marketed a fireproofing

which was generally troweled on columns and beams. This product was known as Zonolite

plaster fireproofing. It did not contain asbestos.

     15.    During the period Zonolite marketed its spray applied products, it knew of the

dangers of asbestos dust. As early as December 21, 1955, John H. Huxley of the Chicago

Corporate Headquarters wrote J.B. Meyers at Libby that:

> I have previously written to you about the danger of exposing our
> employees to asbestos dust while they are manufacturing acoustical
> plastic. In many of our plants, the plastic business has increased over
> 100% in the last year and is still growing. When the business reaches
> these proportions, it is not unusual to have one crew assigned to the
> work continuously. This increases the danger.

(emphasis supplied).

     16.    In 1956, the Montana Board of Health investigated the Libby mining

operation, and provided a report to the company which stated that, inter alia, "the asbestos

dust in the air is of considerable toxicity". In the late 1950's the company took a series of x-

rays of its employees with results reflecting that of the one hundred thirty (130) persons

examined, forty-eight (48) had abnormal x-rays, eight had pleural thickenings, twenty-six

(26) had interstitial fibrosis, and eight had pneumoconiosis.

     17.    On February 14, 1964, Grace received the report of examination of employee

Eitel Ludwig, indicating that he had pulmonary fibrosis "due to inhalation of dust particles,

almost certainly from the asbestos content of the dust." In May-June of that year, respiratory

function tests were made on 140 men at Libby which revealed that:

7

> [T]heir respiratory function was below standard, but a serious hazard
> from pneumoconiosis (lung condition resulting from inhalation of dust
> particles) exists to employees at Libby.

18.    The following year, William Locke filed a worker's compensation claim for

pneumoconiosis as a result of seven years of intermittent exposure to asbestos while blending

acoustical material.  Thereafter, injury claims proliferated at the Libby mine.

19.    Later in 1964, the Montana State Board of Health returned and conducted

another inspection of the plant, and filed another report.  This report discussed the findings of

Dr. Selikoff, reported in the Journal of the American Medical Association, linking asbestosis

and asbestos cancer, including mesothelioma, to building trade insulation workers with

"relatively light intermittent exposure to asbestos".  The report also noted that:

> The recent demonstration, by South African and British investigators
> of pleural and peritoneal neoplasms among individuals who had
> chance environmental exposure to asbestos many years before raises
> the very important question of possible wide-spread carcinogenic air
> pollution.

20.    An internal Grace memorandum of December 18, 1964 reports that "it is an

established company policy that all employees making mixed products" must wear

respirators.  Another internal memorandum of January 11, 1965 reiterated the importance of

providing approved respiratory protection, but pointed out that "respirators are not to be

considered a substitute for engineering improvement of dust control."  Grace's safety

administrator, Peter Kostic emphasized this point in a memorandum of March 29, 1966, in

which he stated that "respirators are fine for short periods of time, but to get a man to wear

one eight hours a day is next to impossible."

21.    On January 2, 1965, R.A. Bleich, General Manager of the Libby operation,

wrote the head of the Zonolite division of Grace, J.A. Kelley.  He enclosed copies of all the

reports from the Montana State Board of Health on the dust problem and commented that:

>    In going over these reports, I can only say that it presents a very sorry
>    record.  There is some improvement indicated during 1964 but still
>    totally inadequate.

22.    In response, Mr. Kelley wrote George W. Blackwood, President of the Dewey

and Almy Chemical Division of Grace, on January 13, 1965, and advised him that "the

situation at Libby is not as good as it should be as far as the State of Montana is concerned"

and "that the problem of physical condition of employees may be a long term problem."

23.    On October 28, 1965, the Montana State Board of Health forwarded Mr.

Bleich a preliminary report of the Pennsylvania Department of Health which discussed lung

cancer and mesothelioma among Pennsylvania asbestos workers. The following year, L.E.

Park advised Grace that:

>    While the average asbestos worker is well protected, the man on the
>    street is not.  The 3 by 1 micron asbestos fibers in his lungs come from
>    a variety of sources, that is i.e.:
>
>        Asbestos ducts in insulation in home central
>        heating plants.
>
>        Asbestos line ducts and centrally air
>        conditioned buildings.
>                    * * *
>        Asbestos ceiling and floor tiles.
>                    * * *
>        Construction and Demolition.

24.    On March 31, 1966, the Montana State Board of Health forwarded Mr. Bleich

a copy of another article dealing with asbestos and cancer.  The article reflected grants

awarded to Dr. Selikoff at Mt. Sinai Hospital for a three-year study.  The article further noted

that Dr. Selikoff's research team had been studying a union group of insulation workers and

had found "six to seven times the 'expected' rate of cancer of the lung and three times the

normal rate of cancer of the stomach, colon and rectum", and in addition to an "extraordinary

high incidence" of mesothelioma. The following year, in April 1967, the American Journal

of Medicine carried an editorial by Dr. Selikoff, et al. entitled "Asbestosis and Neoplasa",

which was circulated within Grace.

     25.     On January 9, 1968, Mr. Sterrett forwarded O.F. Stewart a copy of Mr.

Kostic's letter of January 5, 1968, with a summary of his meeting with E. Fenner of Johns-

Manville on December 26, 1967:

> [T]he maximum allowable concentration for asbestos dust is
> controversial. The Industrial Hygiene Foundation is currently
> circulating a communication which I have seen, proposing a 0.0/mppcf
> for asbestos dust. They apparently feel that any exposure to asbestos
> dust is hazardous. Many doctors are of the opinion that there is a
> definite relationship between asbestos dust and certain types of
> cancer."...Fenner & Sheckler emphasize that threshold limits (MAC)
> should be used as guides in the control of health hazards and should
> not be regarded as fine <u>lines</u> between safe and dangerous
> concentrations.

i. * *

> It has been JM's experience that personal protective devices such as
> masks and respirators are only 50% effective. This type of equipment,
> therefore, should be used only in emergencies and for exposures of
> short duration.

**The Monokote Problem**

     26.     Contemporaneous with the discussions of the asbestos in the dust at the

Libby mine, Grace and the other members of the Vermiculite Institute, (an organization

created to promote the sale of vermiculite products such as Monokote, discussed the "urgent"

need to create Monokote 4, a new "asbestos-free" formulation. In October, 1965, in a

preliminary study to create this product, Grace tested Monokote without asbestos. This

design was abandoned until 1968 when publicity in the Northeast caused Grace to again

consider reformulation to remove asbestos from Monokote.

27.    In 1968, a major article on asbestos by Paul Brodeur entitled "The Magic

Mineral" was published in the New Yorker magazine.  The article particularly attacked the

dangers of the spraying of asbestos fireproofing.  The article immediately came to the

attention of Grace.

28.    Additionally, on November 4, 1968, R.S. Arnold wrote Grace about the same

questions being asked of Grace in Australia:

> In recent months, the powerful building workers union have been
> protesting loudly about the hazards of handling fireproofing and
> insulating products containing asbestos.
>
> * * *
>
> Apparently the Building Unions learnt that asbestos is cancer
> producing from medical research performed in the United Kingdom.
>
> Neuchatel ask whether Zonolite have ever tested a Monokote
> formulation without asbestos content.  We recently gave them the
> formula for Monokote MK-3 since they hoped for a more economical
> formulation to compete with the asbestos companies plus looking for a
> lower asbestos content.
>
> Would you comment on the health hazard question please and also
> advise of the status of a non-asbestos containing Monokote.

29.    On November 22, 1968, the California Department of Public Health

forwarded its industrial hygiene study of exposures to asbestos dust at the Beverly Hills High

School construction site to California Zonolite Company (a Grace licensee soon to be

purchased by Grace).  The report noted, inter alia:

> Atmospheric concentrations of asbestos-containing dust were found to
> be low on a <u>count</u> basis. However, on a <u>weight</u> basis, exposures were
> found to exceed our suggested threshold limit value for asbestos dust.

> Therefore, because of the added carcinogenic properties of asbestos
> properties, recommendations for additional personal protection are
> offered in this report."

30.    On January 23, 1969, Grace received the February issue of "Walls &

Ceilings", containing an article regarding glass fiber re-enforcement for plaster and concrete.

One Grace employee circulated the article with a notation that:

> This might be the answer to a 'maiden's prayer' for getting a substitute
> for asbestos in Monokote.

31.    The following month, on February 13, 1969, Grace manager R.W. Sterrett

discussed various possibilities of substitutes for asbestos in Monokote.[3]

32.    On March 11, 1969, Grace's safety administrator, Peter Kostic, wrote R.W.

Sterrett concerning another article that had appeared in Safety Engineering. Mr. Kostic

advised Mr. Sterrett that:

> I think it would be well at this time, with the advice of counsel, to
> consider applying a warning or precautionary label or statement on all
> containers of products containing Vermiculite. This may aid our
> defense in cases of product liability claims.

33.    On June 20, 1969, Jim Cintani advised Thomas Egan, head of Grace's

fireproofing division, with a copy to other top Grace officials, that he had attended a meeting

at New York University on June 15, 1969, on "Asbestos - An Unanticipated Environmental

---

[3] Grace could have found a substitute much earlier if it had desired. For example, it had in its possession since
1943 a book entitled *Substitutes* which listed at least 22 possible substitutes for asbestos. Most notably
included within this list were fiberglass and wood products, materials that Grace ultimately substituted for the
asbestos thirty years later.

Hazard." He attached a copy of the program and a reprint of the article that appeared in the

New Yorker Magazine. He also noted that:

> Dr. Selikoff presented a very detailed and factual report on the studies of the health hazards of asbestos. He has made a career in the study of effects of asbestos and speaks eloquently about the subject.

> Dr. Lee of U.S. Public Health Service agreed with Dr. Selikoff's findings. He felt that the harmful effects of asbestos fibers should be neutralized, or if this was not possible, that asbestos should be taken off the market.

> Dr. Pundsack, Vice President of Research of Development of Johns-Manville, also acknowledged the harmful effects of asbestos. Dr. Pundsack felt that John's-Manville had controlled the problem of asbestos in their plants through proper ventilation and indoctrination of their employees. However, the use of asbestos in construction posed another problem, particularly in the field of spray fireproofing and acoustical application. Dr. Pundsack was of the opinion this caused the greatest amount of potential hazard because the asbestos fibers were able to be airborne and thereby contaminate a large area.

* * *

> The meeting made a deep impression on me. I was surprised that the universal agreement among parties at the meeting on the harmful effects of asbestos. I thought Johns-Manville would try to refute Dr. Selikoff's statements, but they did not do so.

> It is my feeling that as these facts are disseminated around the country, the use of asbestos sprayed fireproofing will be discontinued.

> I feel we should place a top priority tag on our efforts to secure a substitute for the asbestos in our Monokote fireproofing.

(emphasis supplied).

    34.    On July 24, 1969, Mr. Vining circulated a confidential report entitled

"Vermiculite Report for Mr. Grace". The report noted the need "to eliminate a serious health

hazard caused by the presence of vermiculite and asbestos dust in the mill and expanding

plants" and further that "tremolite asbestos is a definite health hazard at both the Libby

operation and at the expanding plants using the ore."

      35.     By October 1969, a confidential internal report indicated that:

> Asbestos fiber is a health hazard during the application of Monokote.
> Work done late in 1969 to eliminate asbestos from the product
> indicates that a substitute has been found which does not deter from
> the properties of the original Monokote.

      36.     On November 4, 1969, Mr. Egan heard an address by Dr. Selikoff at the

CPLIA Convention.  On December 2, 1969, he forwarded his comments concerning this

address to top officials within Grace:

> His address was very factual about the extreme dangers of the use,
> under current practices, of sprayed fiber fireproofing.  After noting the
> widespread concentration of fibers around major office structures, with
> emphasis on the large amounts distributed blocks from the site, he
> stressed the hazards to the general public of this pollution of the air.
> Also, he noted the concern of possible long term danger to building
> occupants from prolonged minute dusting of fibers through the
> building's air distribution systems.  His use of medical charts, job
> photos, on site readings and expert commentary gave the maximum
> impact.

      37.     The preceding day, Mr. Egan had written V.H. Dodson that:

> Knowing the building pressure against the use of asbestos in sprayed
> fireproofing, particularly in the New York, Philadelphia area, and with
> concern spreading rapidly throughout the country, there are two prime
> reasons we should get asbestos out of Monokote.  They are:

> > We are going to get included in the
> > indictment since we have asbestos in
> > Monokote.

> > Monokote without asbestos would give a
> > tremendous sales increase at once.

> Also, we have an ethical obligation to get it out.

38.     On December 16, 1969, Mr. Egan wrote a number of persons within Grace as

follows:

> Recent internal pressures, mainly the alarm on asbestos, has directed
> us to areas of improvement in Monokote. The investigation has been
> underway for quite sometime with analysis of glass, mineral and paper
> fibers in lieu of asbestos. Also, many formulations have used no fiber
> at all, but making changes or additions to the Gypsum are being
> analyzed.
>
> This program has been accelerated recently, and the reports are
> optimistic.

39.     On March 12, 1970, an inter-office correspondence circulated an article from

the Seattle Times of March 1, 1970, reporting another speech by Dr. Selikoff in which he

again warned that

> [E]ntire buildings sometimes are 'contaminated for life' because
> asbestos fibers are left loose after pipes and beams are sprayed with
> the insulating material in the areas between floors and ceilings.
>
> These areas of 'dead space' often are used as return air ducts for
> building's circulation system he said. 'When asbestos fibers are being
> sucked from these areas into the circulation system of a building, I
> think I would have to call this one of the most reprehensible habits we
> have found,' he said.

40.     In April, 1970, Mr. Egan reported that Grace had two formulations for

asbestos-free Monokote that were being tested at Underwriters Laboratory. That same

month, the magazine "Walls & Ceilings" reported a speech by Dr. Selikoff in which he again

warned that entire buildings were being "contaminated for life" because of sprayed

fireproofing.

41.     On June 1, 1970, Mr. Egan summarized events to date as follows:

> It is very important that each of you have a clear understanding of the
> issues and the course of events concerning the 'asbestos' pollution.
>                           * * *

> Dr. Selikoff started to speak out publicly to our knowledge in early
> 1969 around New York and, in fact, got the Fireproofing
> Subcontractors and Sprayed Fiber Manufacturers Association to form
> a committee to set standards to improve job conditions.
>
> The general feeling was that he would go away if he was treated
> gently. But this was not to be, as he stepped up his attack speaking
> November 1969 to the CPLIA National Convention and other groups
> across the country....

                                    * * *

> I have met with Dr.'s Selikoff and Rickles and I'm sure they intend to
> put an end to pollution, short and long term with materials, asbestos or
> other, which can in any way endanger the health of workers, office
> employees, and the general public. This includes during construction,
> after building, occupancy through air conditioned inhalation, or future
> demolition of buildings that will release asbestos or other materials
> into the atmosphere.

42.    On June 11, 1970, Mr. Egan wrote Dr. Selikoff and expressed appreciation

"for the excellent work to date in alerting us to the dangers of the present product and

working conditions."

43.    On July 10, 1970, Sprayon Research Corporation, which had previously sold

an asbestos fireproofing, announced the successful testing of an asbestos-free material known

as "SprayDon" standard "J" which had received rating from UL Laboratories. Other

companies soon followed.

44.    Additionally, on August 20, 1970, Mr. Egan commented on the Research and

Development Program for asbestos-free Monokote and commented that:

> Barring some alarming medical fact to the contrary, the health hazard
> of asbestos will require the ban on loose asbestos particles to the
> atmosphere, and probably within one year.

45.    A research and development program for asbestos-free Monokote dated

August 11, 1970, noted:

Our current Monokote, identified as MK-3, was developed in 1959 and has been successfully marketed since. In two areas of performance, MK-3 is questionable.

Under the requirement that such a product be <u>non-injurious to health</u>, we are attempting to determine code pollution levels and rate MK-3 field performance against these levels. We are also attempting to reformulate the product to completely exclude asbestos...

In the area of requirement that MK-3 be <u>fire resistant</u>, our standard MK-3 has borderline performance in its ability to adhere to a certain configuration of steel deck during a fire test. We find that premature bond failure is the rule rather than the exception in those full scale test specimens which contain a large area of flat - plate.

46.    The report further discussed MK-3 as follows:

"<u>Complete asbestos elimination for health considerations</u>."
Since June 1969, we have attempted to eliminate asbestos by substituting other materials. Within a few months, we had to define the function of asbestos as primarily a yield increasing additive, also useful in improving the homogeneity and pumpability of the composition. We have discarded the following functions as being insignificant:

> Necessity that fiber be inorganic and
> highly resistant to high temperatures;
>
> Contributed to cohesive strength
> during exposure to fire.

47.    On May 14, 1971, Grace announced its new asbestos-free Monokote IV. The

bulletin stated:

Responding to a critical need, the Construction Products Division, W.R. Grace & Co., has introduced into the New York market a completely asbestos-free formulation of its cementitious fireproofing material, Zonolite Monokote."

48.    On November 16, 1971, Mr. Cintani wrote Mr. Feit that:

The New York State area and the New England area are almost entirely changed over from MK-3 to MK-4....The market has definitely switched to a non-asbestos product in the Northeast.

49.     On December 1 and 2, 1971, a meeting of Grace's Plaster and Fireproofing

Committee was held in Cambridge.  The letter forwarding the minutes of meeting reports that

shortly after the meeting, MK-4 had obtained additional necessary ratings.  Nevertheless, the

minutes noted that "MK-3 - continue to use where possible".

50.     On January 14, 1972, Grace's architectural representative advised a plasterer

in Niles, Illinois concerning the Archer Pulaski School that:

> This is to inform you that Monokote 4 asbestos-free cementitious
> spray-applied fireproofing has been accepted by the City of Chicago
> for use within the city limits.
>
> We have successfully shown the pollution control people and city
> officials that use of Monokote 4 does not create a health hazard and
> has been fire tested and rated by Underwriters Laboratory, Inc., in
> accordance with Test Method ASTME-119.
>
> A few jobs we are doing with Monokote 4 in the city at the present
> time are the Standard Oil Building, Columbus Hospital, the Chicago
> Mercantile Exchange, and the Audy Juvenile Home.

51.     On February 4, 1972, L.S. Shu reported his attendance at the EPA public

hearings in New York City to A.M. Rosenberg.  He reported his general impressions on the

hearing as follows:

> The most important part of the hearing, so far as asbestos is concerned,
> was made by Johns-Manville.  They did not mention spray
> fireproofing materials at all.  Their intention is obvious.  They want to
> save their major business which is mining and milling of asbestos.
> The quantity of asbestos used in spray fireproofing industry is
> comparatively small (estimated 0.5% of asbestos used in U.S.).
> Maybe they are willing to sacrifice this!  In this respect, I came across
> a trip report written by Jim Cintani on June 20, 1969.  He attended a
> meeting at NYU on asbestos.  I am quoting a paragraph from his
> report:
>
> ...Dr. Pundsack felt that Johns-Manville had controlled the problem of
> asbestos in their plants through proper ventilation and doctrination of
> their employees.  However, the use of asbestos in construction posed
> another problem, particularly in the field of spray fireproofing and

acoustical application.  Dr. Pundsack was of the opinion this caused
the greatest amount of potential hazard because the asbestos fibers
were able to be airborne and thereby contaminate a large area.

52.    On February 24, 1972, P.E. Korenberg enclosed a table on the relationship

between MK-3 and MK-4.  The table noted that:

Formulation MK-3 contained some asbestos and can be used in
locations where asbestos is not banned.  Formulation MK-4 is asbestos
free and can be used anywhere -- including those areas where asbestos
is banned.

53.    On June 14, 1972, R.C. Erickson advised all Monokote plant superintendents

that:

This memo leaves as a completely open question 'when or if any
specific plant will convert to this [MK-4 formula] the trial batching
plant is purely for purpose of being prepared when we are forced to
close out MK-3.

54.    On August 2, 1972, Thomas P. Feit, who had replaced Mr. Egan as fire

protection products manager, advised manufacturing facilities that the effective date of EPA

banning of asbestos-containing fireproofing was still in question, but that:

Anticipating the worst, we have used mid to late September as the cut-
off date.  Obviously, if this is not the cut-off date or if we get an
additional ninety days, we will continue to make and sell MK-3 until
we no longer can.  I do believe that the plant should keep an inventory
of such items as asbestos and MK-3 bags and anticipation that the cut-
off date will be sometime in September.

55.    By October 1972, Grace had also introduced asbestos-free Monokote V (MK-

V):

Application performance of MK-5 approximates that of MK-3, but it
appears to have the additional advantage of making possible greater
job site control which will reduce quality problems.

The material was introduced in October to those markets where
asbestos-containing materials had been banned.  In these areas a
complete change over from the former non-asbestos MK-4 will take

place between now and August 1973. Announcements will be made in all other market areas with MK-5 to replace MK-3 and MK-4, for an orderly transition in 1973 and 1974 at all plant locations.

56.  Mr. Egan, who was then manager of the midwest region, noted that:

Zonolite's Monokote-5 is a definite improvement over existing materials and places W.R. Grace & Co. well ahead of all other manufacturers of fireproofing materials in the quality and assured performance of a non-asbestos-containing plaster fireproofing material.

57.  An internal letter of Mr. Feit of January 6, 1973, reported that:

The MK-5 announcement has been made in the Eastern and Midwestern Regions only -- where asbestos-containing fireproofing materials have already been banned. There is at this time no schedule set for introducing MK-5 into any other area  until we have completed all field testing and/or EPA action.

58.  Even after the EPA banned the spray-application of asbestos-

containing fireproofing in the United States in July of 1973, Grace continued to sell

asbestos-containing Monokote in Canada. In an October 8, 1974 internal memo,

Grace executives weighed the pros and cons of continuing this practice:

It's my understanding that Jim McKague intends to continue with MK-3 [in Canada] and there are no overall limitations by the Canadian government prohibiting its use, although certain local authorities have. Where it is prohibited, MK-5 is being sold.

The case for MK-3 is the lower cost possible.

The case against it is:

Grace could get critical publicity from selling and asbestos-containing material.

If there is legislation against MK-3 there can be a concern generated on asbestos content of vermiculite. (If MK-5 had totally replaced MK-3 prior to EPA's action I don't believe we would ever have had any question generated in the market about asbestos in vermiculite).

Selling MK-3 in Canada could continue attention and confusion on Monokote in the U. S. It will be necessary to list MK-3 at UL and face the kinds of issues as in the attached correspondence.[4]

Manufacturing MK-3 creates asbestos problems in our plants. If this is attacked by an agency, there is a risk that the investigation would continue to a concern on vermiculite.

Continuing MK-3 will require testing and evaluations at UL plus all the other overhead expenses related to the management of this type of product. UL work alone could be a major cost item. . . .

It is my recommendation that we cancel MK-3 immediately and eliminate the concerns listed above.

59.     Despite this recommendation, Grace continued selling asbestos-containing Monokote in Canada through at least 1975.

**Grace Conceals the Problem in Monokote**

60.     Surprisingly, asbestos was not added to Monokote to increase its fire resistance. Indeed, the vermiculite plaster (to which no asbestos was added) which Monokote replaced had much obtained higher fire ratings than were ever obtained by asbestos-containing Monokote. As Grace's own internal documents reveal, the primary purpose of asbestos in Monokote was to increase the yield (thereby increasing the profit margin). When asbestos was finally removed from Monokote it was replaced with shredded newspaper.

61.     When Grace began marketing its asbestos-containing Monokote throughout the country in the early 1960's, it never disclosed the fact that Monokote contained asbestos.

_____

[4] The attached correspondence was from Underwriters' Laboratory proposing to delete all fire ratings for products containing asbestos in light of the EPA ban upon visible emissions from the spraying of materials containing more than 1% asbestos.

The evidence from Grace's own files and corporate testimony confirms that Grace's own salesmen did not know that asbestos was in Monokote. Even when Grace's competitors began placing warnings on bags of asbestos-containing fireproofing as early as 1962, Grace did not disclose the asbestos content of Monokote to the salesmen who sold, the architects who specified it or the workmen who mixed it and sprayed it.

62.    In fact, as more information became public about hazard's of asbestos, Grace made a conscious decision not to inform architects that Monokote contained asbestos. When one of its competitors announced its new asbestos-free fireproofing product had achieved approval from Underwriter's Laboratory in 1970, Mr. Thomas Egan, head of Grace's fireproofing division, sent a memo advising Grace's salesmen not to spread this information, but to "let the architect or other find out for himself . . ."

**The Safe Buildings Alliance and Grace's Attempt to Re-write History**

63.    The ban on the sale of asbestos-containing surfacing materials did not end Grace's efforts to conceal the hazards associated with asbestos in its products. Within one month of the first asbestos property damage verdict in the country, the three largest former manufacturers of asbestos containing fireproofing (Grace, United States Gypsum Co. and National Gypsum Co.) met in secret in Washington, D.C. and formed the Safe Buildings Alliance ("SBA"). The SBA has spent millions of dollars (contributed by its member companies) to reduce the members' liability by encouraging building owners to forego the removal of asbestos based upon often incorrect and misleading scientific and technical information prepared with the assistance of counsel for its member companies. In re School Litigation, 842 F.2d 671 (3d Cir.1987) (holding that the SBA was the alter-ego of its member companies).

64.    SBA's internal minutes confirm the Third Circuit's finding.  These reflect, inter alia, that as early as June 1984, SBA intended (1) to lobby and influence Congress, State Legislatures, and Federal and State Regulatory Agencies;   (2) to influence public thinking and building owner's decisions through a massive public relations campaign using national and local media, as well as the scientific, technical and trade press and (3) to

> coordinate and, as necessary, directly interact with these [scientific, medical and building sciences] communities in order to maintain current knowledge, and to the extent practicable, influence the emerging trends and communication . . . The information developed in this effort may have utility, and therefore cost savings, in providing assistance in the underlying litigation."

65.    SBA, which eventually consisted of only Grace and U. S. Gypsum, spent millions of dollars in these efforts.  SBA has lobbied the White House, Congressmen and federal agencies.   When the Environmental Protection Agency promulgated the 1990 amendments to the NESHAP regulation, the SBA filed suit against EPA, and spent vast sums challenging the regulation. Rather than waste its own limited time and resources on this issue, EPA agreed to settle the SBA suit and issue the EPA NESHAP Clarification of Intent, 58 Fed.Reg. 51,784-01 (Oct. 5, 1993).[5] Although the clarification did not change the actual regulation, it did make sweeping policy statements in accordance with SBA propaganda. Subsequently, the SBA filed suit against OSHA, challenging its regulations on asbestos.[6]

66.    Despite the fact that it had no interest in this subject outside of litigation (its member companies long ago stopped selling asbestos products), SBA and its members

---

[5] The NESHAP Clarification is cited extensively in Grace's pre-trial memorandum, thus demonstrating that SBA's efforts to influence scientific and federal regulatory agencies have served to aid its members cost-recovery litigation.

[6] 59 Fed.Reg. 40,964-41,162 (August 10, 1994).

occupied three seats on the EPA Committee which developed the regulations advising school

districts what they should do about asbestos-containing materials. SBA's officers, as well as

its member's litigation experts sit on peer review panels for EPA guidance documents and

testimonial publications. Despite having no scientific qualifications, SBA's former president

and head lobbyist, John Welch, was a voting member of the ASTM asbestos sub-committee

of the indoor air quality committee that decided what standards and test procedures would be

endorsed by ASTM as scientifically reliable. In the 1980's and 1990's, the SBA blitzed the

country with a massive media campaign and generated proposed state and local statutes and

regulations to minimize litigation expenses of its members.

      67.    SBA's lobbying efforts also included contact directly with many individual

state representatives. SBA directly contacted national and local newspapers in an attempt to

influence public opinion. Furthermore, newspaper pieces that were written by the SBA and

highlighted the misleading pamphlet "What You Should Know About Asbestos in Buildings"

were published in newspapers throughout the country.[7] SBA also put their message on the

radio waves in a program called "A Question of Safety" which it aired across the country.

      68.    As an example of the lengths to which the SBA went to manufacture science,

in 1988, the SBA sponsored "the Harvard Symposium," a closed conference in which

defense litigation experts were invited to present and publish their work. The information

presented at the "symposium" was quickly disseminated by the SBA, which publicized the

proceedings in newspapers and radio spots all over the country as a "landmark report." SBA

failed to tell that it had contacted Harvard and suggested the symposium and located the co-

---

[7] See, In re: Asbestos Schools Litigation, 115 F.R.D. 22 (E.D.Pa.1986) for discussion of the content and
misleading nature of this publication.

sponsors. Among those who made presentations at this closed forum were many of Grace's litigation experts.

69.    It is against this backdrop that the Debtors have baldly alleged that claimants' claims should be barred by the statute of limitations, assumption of the risk and that claimants cannot prove that Grace's asbestos containing surfacing products are hazardous or unreasonably dangerous. Coupled with the Debtors' track record of losing substantial verdicts and settlements in the tort system, it is clear that the Debtors' objections are patently without merit.[8]

**Burden of Proof**

70.    A proof of claim is deemed allowed unless a party in interest objects under 11 U.S.C. § 502(a) and constitutes "*prima facie* evidence of the validity and amount of the claim" pursuant to Bankruptcy Rule 3001(f). See also, Fed. R. Bankr.P. 3007. The filing of an objection to a proof of claim "creates a dispute which is a contested matter" within the meaning of Bankruptcy Rule 9014 and must be resolved after notice and opportunity for hearing upon a motion for relief. *See* Adv. Comm. Notes to Fed. R. Bankr.P. 9014.

---

[8] City of Greenville v. W. R. Grace & Co., 640 F.Supp. 559 (D.S.C. 1986), aff'd 827 F.2d 975 (4th Cir. 1987); New Hampshire-Vermont Health Service Corp. v. U. S. Mineral Products Co., 10 F.3d 805 (1st Cir.1993) (table decision – text at 1993 WL 472829); Kansas City v. W. R. Grace & Co., 778 S.W.2d 264 (Mo.App.1989); Kansas City v. Keene Corp., 855 S.W.2d (Mo.1993); Clayton Center Associates v. W.R. Grace & Co., 861 S.W.2d 686 (Mo.App. 1993); Northridge Co. v. W. R. Grace & Co., 205 Wis.2d 267, 556 N.W.2d 345 (Wis.App.1996); San Francisco Unified School District v. W. R. Grace & Co., 37 Cal.App.4th 1318, 44 Cal.Rptr.2d 305 (Cal.App. 1 Dist. 1995); MDU Resources Group v. W. R. Grace & Co., 14 F.3d 1274 (8th Cir.1994); Farm Credit Bank of Louisville v. U. S. Mineral Product Co., 864 F.Supp. 643 (W.D.Ky.1994); May v. AC & S, Inc. 812 F.Supp. 934 (E.D.Mo.1993); Tioga Public School Dist. No. 15 v. U. S. Gypsum, 984 F.2d 915 (8th Cir.1993); Hebron Public School Dist. No. 13 v. U. S. Gypsum, 953 F.2d 398 (8th Cir.1992); Blue Cross & Blue Shield of SC v. W. R. Grace & Co., 781 F.Supp. 420 (D.S.C.1991); Security Homestead Ass'n v. W. R. Grace & Co., 743 F.Supp. 456 (E.D.La.1990); Drayton Public School Dist. No. 19 v. W. R. Grace & Co., 728 F.Supp. 1410 (D.N.D.1989); Spartanburg County School Dist. Seven v. National Gypsum Co., 805 F.2d 1148 (4th Cir.1986); City of Manchester v. National Gypsum Co., 637 F.Supp. 646 (D.R.I.1986); Town of Hookset School Dist. V. W. R. Grace & Co., 617 F.Supp. 126 (D.N.H.1984)

71.    Upon objection, the proof of claim provides "some evidence as to its validity and amount" and is "strong enough to carry over a mere formal objection without more." Lundell v. Anchor Construction Specialists, Inc., 223 F.3d 1035, 1039 (9th Cir.2000); citing, Wright v. Holm (In re Holm ), 931 F.2d 620, 623 (9th Cir.1991); see also, Ashford v. Consolidated Pioneer Mort., 178 B.R. 222, 226 (9th Cir. BAP 1995), aff'd, 91 F.3d 151, 1996 WL 393533 (9th Cir.1996). To defeat the claim, the objector must come forward with sufficient evidence and "show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves." In re Holm, 931 F.2d at 623.

**Objection C- 2 Allegedly Insufficient Documentation**

72.    Despite the Debtors' objection, documentation for this claim has been provided.  Apart from providing a claim specific summary of documentation for this claim, copies of all documents have now been provided to Rust Consulting, Grace's claims agent. The documents provided in conjunction with this claim are listed in Exhibit 1.

73.    More importantly, neither the bar date order nor the Proof of Claim form required the production of documents with the form.  The Proof of Claim form clearly provided claimants with the option of providing a summary of documents and consent to making them available for inspection upon further request.  After Debtors requested copies of the documents listed on Exhibit 1, they were copied and sent to the Claims Agent in accordance with the instructions on the Proof of Claim form.  Accordingly, the Debtors' objections are without merit.

74.    Finally, the Debtors' vitriolic allegations regarding the history its objections to this and other claims filed by Speights & Runyan are disingenuous.  In fact, contrary to the Debtors' direct representations to this Court in February of 2005, S&R filed supporting

documentation in March of 2003 with over 1,000 claims and further indicated it would work

with the Debtors to determine additional documentation was desired by the Debtors and

provide it. Instead of talking with the S&R claimants, the Debtors chose to serve notice of

blanket gateway objections to these claims. S&R diligently worked to obtain additional

documentation, and, with 60 days of receiving the notice, provided, in accordance with the

specific instructions on the Proof of Claim, summarized the documentation for this and other

claims, ultimately identifying almost 30,000 responsive documents. These documents were

available for inspection beginning in May of 2005. However, it was not until July, 2005,

after the Debtors' had initiated its smear campaign against Speights & Runyan, that Debtors'

counsel requested that these documents be copied. After this request, S&R copied 62 boxes

of documents in support of this and over a thousand other claims and sent them directly to

Grace's claims agent as indicated in the Proof of Claim form.

75. Moreover, the Debtors' objection to claims based upon the contention that the

proofs of claim filed in respect of such claims were facially incomplete or lacked certain

documentation is without any basis. The standards for proofs of claim and objections was

stated by the Third Circuit Court of Appeals in In re Allegheny International, Inc., 954 F.2d

167 (3d Cir. 1992):

> The burden of proof for claims brought in the bankruptcy court under 11
> U.S.C.A. § 502(a) rests on different parties at different times. Initially, the
> claimant must allege facts sufficient to support the claim. If the averments in
> his filed claim meet this standard of sufficiency, it is "*prima facie*" valid.
> [citations omitted.] In other words, a claim that alleges facts sufficient to
> support a legal liability to the claimant satisfies the claimant's initial
> obligation to go forward. The burden of going forward then shifts to the
> objector to produce evidence sufficient to negate the *prima facie* validity of
> the filed claim. It is often said that the objector must produce evidence equal
> in force to the *prima facie* case. [citations omitted.] In practice, the objector
> must produce evidence which, if believed, would refute at least one of the
> allegations that is essential to the claim's legal sufficiency. If the objector

27

produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. (citations omitted).

954 F.2d at 173-74.

76.     Accordingly, the pertinent inquiry is whether the proof of claim and documentation filed by a claimant sets forth sufficient evidence of a claim against the Debtors, not whether the proof of claim provides sufficient information for the Debtors to formulate their defenses and objections to the PD Claim. If the proof of claim meets this *prima facie* standard, the burden shifts to the Debtors to produce evidence that the claim is invalid, regardless of whether it would be useful for the proof of claim to provide additional information for the Debtors to assess their defenses as such information is obtainable by discovery.

77.     The fact that claimants may have omitted certain of the information requested in the proof of claim form is not, standing alone, sufficient grounds for the disallowance of the claim which otherwise makes a *prima facie* showing of the Debtors' liability. Indeed, a PD Claim should only be disallowed for one or more of the nine grounds for disallowance enumerated in section 502(b) of the Bankruptcy Code. In re Taylor, 289 B.R. 379, 384 (Bankr. N.D. Ind. 2003). Respectfully, §502(b) affords no discretion in this regard and the disallowance of claims must be based upon the reasons stated in the statute. Id. None of the grounds for disallowance set forth in section 502(b) involves the failure to provide information beyond that which establishes a *prima facie* claim against the Debtors' estates. In re Guidry, 321 B.R. 712 (N.D. Ill. 2005).

**Objection D-2  Statute of Limitations – Constructive Notice**

78.    Despite the rejection of this argument in courts across the county, Grace

would suggest to this Court that virtually every property damage claimant in this bankruptcy

is barred because they should have had notice of the "potential dangers" of asbestos.[9] Yet

Grace has utterly failed to come forward with any evidence or applicable state law to support

this position despite its obligation to do so.  Van Buskirk v. Carey Canadian Mines, Ltd., 760

F.2d 481 (3d Cir.1985); California Sansome v. U. S. Gypsum Co., 55 F.3d 1402 (9th

Cir.1995); Clayton Center Asso. v. W. R. Grace & Co., 861 S.W.App.1993)

(statue of limitations is an affirmative defense on which the burden of proof is on the

defendant).  More importantly, Grace's objection completely ignores literally scores of

reported decisions from across the country that reject this very argument.

79.    Notably, in Kansas City v. W. R. Grace & Co., 778 S.W.2d 264,

(Mo.App.1989), the Missouri Court of Appeals reversed the grant of summary judgment on

the statute of limitations and specifically rejected the arguments now made by the Debtors.

In Kansas City, the appellate court correctly recognized that in order for an asbestos property

damage action to accrue, there must be a "release of toxic asbestos fibers into the

environment" along with "the ability to ascertain a substantial and unreasonable risk of harm

form the release of the toxic asbestos fibers."  778 S.W.3d at 268.  In so finding, the

Appellate Court held that the type of evidence Grace now claims is sufficient to establish

---

[9] Grace's reliance upon Prudential Insurance Co. v. U. S. Gypsum, 359 F.3d 226 (3d Cir.2004) is misplaced.
The only cause of action at issue in Prudential was the federal RICO statute, upon which Prudential claimed it
was entitled to a broad range of past and future asbestos related damages.  In holding that Prudential's claims
were barred by the RICO statute of limitations, the Third Circuit panel was careful to distinguish Prudential's
broad RICO claims from traditional tort claims for asbestos property damage.  Id at 238.  Moreover, despite
Debtors suggestion that the Prudential court based its decision solely upon constructive notice of the "potential
dangers" of asbestos-in-buildings, the court actually went to great lengths to describe the "actual knowledge"
held by Prudential prior to the limitations period at issue in conjunction with the fact that Prudential "is a very
sophisticated company that operates a large casualty insurance business and an extensive estate investment
business. . . . [which] provided Prudential with more opportunities than an average plaintiff to access ACM-
related information."  Id at 234 – 236.  Grace has provided to no such evidence here.

"constructive notice" of a property damage claim was not relevant to the statute of limitations.

80.     Specifically, defendants in Kansas City made the identical claim made by the Debtors in this case: that because the city had constructive notice of NESHAPS regulations (first published in 1973) which banned the spray application of asbestos-containing fireproofing and later required that asbestos material be specially removed at great expense when disturbed by renovation or demolition, that the City's claim was barred by the statute of limitations.[10]  In rejecting this argument, the appellate court aptly held that, "simply because Kansas City had notice of NESHAPS, its causes of action for negligence and strict liability were not caused to accrue until asbestos fibers were released into the environment of the airport buildings and Kansas City was capable of ascertaining that there was a substantial and unreasonable risk of harm from the release of the toxic asbestos fibers." Id. at 269.  Courts across the country are in accord. See, MDU Resources v. W. R. Grace & Co., 14 F.3d 1274, 1279 (38th Cir.1994);  THS Northstar v. W. R. Grace & Co., 66 F.3d 173 (8th Cir.1995); BellSouth Communications v. W. R. Grace & Co., 77 F.3d 603 (2d Cir.1996); City of Wichita v. United States Mineral Product Co.. 72 F.3d 1491 (10th Cir.1996); San Francisco Unified School District v. W. R. Grace & Co., 37 Cal.App.4[th] 1318, 44 Cal.Rptr.2d 305 (Cal.App.4[th] 1995);  Heider v. W. R. Grace & Co., 1992 WL 189254 (N.D.Ill.) (citing, Prosser & Keeton on the Law of Torts, §30 at 165 (5th Ed. 1984)); Clayton Center Asso. v. W. R. Grace & Co., 861 S.W.2d 686 (Mo.App.1993).

81.     Moreover, the Debtors' constructive notice argument is patently inconsistent with its claim that its asbestos-containing surfacing materials are not hazardous and do not

---

[10] The NESHAP regulations are the same regulations, amendments and related guidance documents cited by the Debtors in footnote 9, of their Fifteenth Omnibus Objection as evidence of "constructive knowledge."

cause property damage. *See, Debtors' Fifteenth Omnibus Objection,* ¶ 118 (alleging

claimants allegedly barred because there is no "proof of hazard."); ¶175 (citing British

Columbia court as holding that Monokote does not "contaminate buildings" and is therefore

not hazardous). As noted by the Eighth Circuit Court of Appeals in reversing a statute of

limitations verdict,

> **Grace** argued at trial not only that the statute of limitations had run, but also
> that the plaintiff had suffered no injury from the **asbestos** Monokote. The
> arguments are inconsistent: if MDU has suffered no injury from the
> Monokote, then it has no cause of action--until an injury is suffered, the
> statute of limitations cannot begin to run.

MDU Resources Group v. W. R. Grace & Co., 14 F.3d 1274 (8th Cir.1994).

**Objection D-4  Statute of Limitations – Actual Notice**

82.     The statute of limitations is an affirmative defense upon which the Debtors

bear the burden of proof. It is the Debtors who bear the burden of establishing that the

wrongdoing and the injury occurred outside the limitations period. Van Buskirk v. Carey

Canadian Mines, Ltd., 760 F.2d 481 (3d Cir.1985);  California Sansome v. U. S. Gypsum

Co., 55 F.3d 1402 (9th Cir.1995); Clayton Center Asso. v. W. R. Grace & Co., 861 S.W.2d

686 (Mo.App.1993).

83.     Since the beginning of asbestos property damage litigation, Courts across the

country have clearly and unambiguously held that an asbestos property damage cause of

action does not accrue until a compensable injury occurs. Stated another way, tort actions for

asbestos property damage can be maintained only where plaintiffs explicitly allege and

subsequent evidence demonstrates contamination of the building or other property as a result

of fibers released from asbestos products. In other words, **only asbestos contamination**

**constitutes a physical injury compensable under tort law.** Adams-Arapahoe School

District No. 28-J v. GAF Corp., 959 F.2d 868 (10th Cir.1992) (emphasis supplied); City of

Greenville v. W.R. Grace & Co., 827 F.2d 975, 976-78 (4th Cir.1987) (the release of toxic

fibers from an asbestos-containing fireproofing product rendered the manufacturer liable for

damages to the property owner under South Carolina tort law);    More importantly,

knowledge of a "potential" future hazard  or injury is not enough. Adams-Arapahoe; MDU

Resources v. W. R. Grace & Co., 14 F.3d 1274, 1279 (8th Cir.1994) ("the District Court erred

when it instructed that the issue for purposes of the statute of limitations was when MDU

learned of the presence of asbestos in the building"); THS Northstar v. W. R. Grace & Co.,

66 F.3d 173 (8th Cir.1995) ("the distinction between the mere presence of asbestos-

containing materials in a building and actual release and contamination is critical" because

"no cause of action exists until there has been a substantial release"); San Francisco Unified

School District v. W. R. Grace & Co., 37 Cal.App.4[th] 1318, 44 Cal.Rptr.2d 305 (Cal.App.4[th]

1995) ("the mere presence of asbestos constitutes only a threat of future harm. . . .

[c]ontamination by friable asbestos is the physical injury and the actual, appreciable harm

that must exist before a property owner's strict liability or tort cause of action against an

asbestos manufacturer accrues and the limitations period commences."); Heider v. W. R.

Grace & Co., 1992 WL 189254 (N.D.Ill.) (knowledge of the presence of asbestos is not

enough to trigger the statute of limitations because the "threat of future harm, not yet

realized, is not enough").

84.    This basic tort principle makes clear that damages may not be awarded for

injuries not yet suffered. General knowledge that a product in the building contains asbestos

and poses a risk of future injury is simply not enough.  MDU Resources v. W. R. Grace, 14

F.3d 1274 (8th Cir.1994) (rejecting Grace's argument that knowledge of the mere presence of

asbestos triggers the statute of limitations, and holding that the proper question was when

MDU could have learned, with the exercise of reasonable diligence, that its building had

been contaminated by asbestos); California Sansome v. U. S. Gypsum Co., 55 F.3d 1402 (9th

Cir.1995) (contamination must occur in the first instance in order to trigger the running of the

statute of limitations); BellSouth Communications v. W. R. Grace & Co., 77 F.3d 603 (2d

Cir.1996) (claim does not accrue until contamination of the building by asbestos and

consequent health risk occurs); City of Wichita v. United States Mineral Product Co.. 72 F.3d

1491 (10th Cir.1996 (holding actual physical injury by "contamination" is an essential

element of any negligence claim and liability may not be premised upon the mere risk of

future harm not yet suffered); 3250 Wilshire Blvd. Bldg. v. W.R. Grace & Co., 1989 WL

260222 at *4-8 (C.D.Cal. Jul. 24, 1989) (recognizing that allegations of actual contamination

constitute valid tort damages claims, whereas tort claims for injury by virtue of mere

presence of asbestos-containing products or by virtue of a potential risk of harm are invalid);

Catasauqua Area School District v. Eagle-Picher Indus.,, 1988 WL 102689 (E.D.Pa. Sept. 28,

1988) (removal and replacement costs of asbestos cement constitute economic loss not

recoverable under tort absent demonstration that cement contaminated other property or that

it created a significant health risk to building occupants); Hebron Pub. Sch. Dist. No. 13 v.

U.S. Gypsum, 690 F.Supp. 866, 870 (D. N.D.1988) (negligence claim survived motion to

dismiss where plaintiffs alleged asbestos products released harmful fibers into the building);

City of Manchester v. National Gypsum Co., 637 F.Supp. 646, 651- 52 (D. R.I.1986) (court

denied motion to dismiss finding that allegations of contamination constituted allegations of

physical harm sufficient to support a claim for negligence under New Hampshire law);

Franklin County Sch. Bd. v. Lake Asbestos of Quebec, Ltd., 1986 WL 69060 at *5-6

(N.D.Ala. Feb. 13, 1986) (school board's negligence claim dismissed for failing to allege actual, present harm, i.e. contamination); Town of Hooksett Sch. Dist. v. W.R. Grace & Co., 617 F.Supp. 126, 130-31 (D.N.H.1984) (motion to dismiss denied because plaintiff alleged contamination and contamination constitutes a physical injury cognizable under tort); Kershaw County Bd. of Educ. v. U.S. Gypsum Co., 302 S.C. 390, 393, 396 S.E.2d 369, 371 (1990) (judgment against manufacturer of asbestos-containing ceiling materials on negligence claim upheld where plaintiff alleged and proved damage to other property); Banc One Bldg. Management Corp. v. W.R. Grace & Co., 157 Wis.2d 814, 461 N.W.2d 448 (1990) (unpublished disposition) (dismissal of negligence action affirmed where plaintiff failed to allege actual physical harm); Board of Educ. of City of Chicago v. A, C & S, Inc., 131 Ill.2d 428, 443, 137 Ill.Dec. 635, 642-43, 546 N.E.2d 580, 587-88 (1989) ("dangerousness which creates a risk of harm is insufficient standing alone to award damages in ... negligence;  however, allegations of asbestos release are sufficient to defeat a motion to dismiss"); School Dist. of City of Independence v. U.S. Gypsum Co., 750 S.W.2d 442, 456 (Mo.App.1988) (jury verdict upheld where school district provided evidence of contamination caused by defendant's asbestos-containing acoustical ceiling plaster).

85.     Grace has failed to provide any evidence that would establish the claimant was injured by the substantial release of asbestos fibers from its products.  Indeed, Grace has denied that products release asbestos fibers into buildings once installed.  Even if they did, however, Grace's substantial efforts to conceal the hazards of asbestos or that its products even contained asbestos are sufficient to toll any statute of limitations period from running.

**Objection D-5 Statutes of Repose**

86.    As with the statute of limitations, Grace's reliance on statutes of repose to bar

claims is misplaced.  Two separate courts of appeal have considered and rejected Grace's

attempts to invoke statutes of repose.  In <u>Corbally v. W. R. Grace & Co.</u>, 993 F.2d 492 (5th

Cir.1992) and <u>State Farm Mutual Insurance Company v. W. R. Grace & Co.</u>, 24 F.3d 955 (7th

Cir.1994) (Posner, J.) the courts conducted a detailed factual analysis of Grace's asbestos-

containing product to conclude that it was not an "improvement to real property" sufficient to

implicate respective statutes of repose of Texas and Illinois.  Moreover, the Seventh Circuit

held that merely supplying bags of product that was mixed with water and sprayed onto a

structured did not qualify Grace as a "designer or builder" of State Farm's buildings under

the Illinois statute, and that even if it did, such actions would not implicate the repose statute

because Grace's negligent acts or omissions were remote "from the building construction"

activities that the repose statute intended to shield.  24 F.3d at 957. <u>See also</u>, <u>Andrews v. W.

R. Grace & Co.</u>, C/A C86-2210A (N.D.Ga.1986) (Georgia statute of repose not applicable to

asbestos property damage case brought by school district); S. C. Code Anno. §15-3-670

(exempting actions for the release of toxic fibers into the environment from improvement to

real property statute of repose); <u>Forsyth Memorial Hospital v. Armstrong World Industries</u>,

336 N.C. 438, 444 S.E.2d 423 (1994) (noting that material suppliers were covered by

improvement to real property statute of repose that contained a fraud and gross negligence

exception); <u>Pascagoula School District v. U. S. Gypsum</u>, C/A S89-0048-G (S.D.Miss.1991)

(noting *nullem tempus* exception to Mississippi statute of repose in asbestos property damage

case); <u>Clarksville-Montgomery County School Board v. U. S. Gypsum</u>, C/A No. 3-84-0315

(M.D.Tenn.1989) (upholding legislative exception to statute of repose for asbestos suits);

<u>Hopkins County Board of Education v. National Gypsum</u>, C/A No. 83-C1-306 (Hopkins

County, Ky., Cir.Ct. 1984) (statute of repose not applicable to asbestos property damage action); Wesley Theological Seminary v. U. S. Gypsum, C/A No. 88-7144 (D.D.C.1989) (upholding asbestos exception to general statute of repose); Uricam Corp. v. W. R. Grace & Co., C/A Civ-89-2217-P (W.D.Okl.1990) (Oklahoma statute of repose no bar to asbestos property damage action).

87.    Additionally, Grace's Objection fails to cite any specific repose statute that it contends bars this claim. Grace's failure to do so deprives this claimant of the opportunity to properly meet Grace's argument is fatal to its objection.

**Objection D-6 Laches**

88.    Laches is an equitable defense to cases that sound in equity. Although a few jurisdictions have applied the doctrine of laches to actions at law, most jurisdictions presume that a case brought within the statutory limitations period are timely. "The general rule is that laches will not bar the assertion of a claim when the statute of limitations pertaining to that claim has not run." Hughes v. Neely, 332 S.W.2d 1, 6 (Mo.1960); see also, Caldwell v. Barnes, 975 S.W.2d 535 (Tex.1998); Norton v. Chioda, 58 N.E.2d 828 (Mass.1945); Kaminski v. Cowan, 282 N.W. 902 (Mich.1938); Wright v. Brooks, 130 P. 968 (Mont.1913); Wilson v. Harper, 25 W.Va. 179 (1884); Hunter v. Hunter, 758 P.2d 1019 (Wash.App.Div.1 1988); A. Sangivanni & Sons v. F. M. Floryan & Co., 262 A.2d 159 (Conn.1969); Jonklaas v. Silverman, 370 A.2d 1277 (R.I.1977); Marsh v. Lott, 105 P. 968 (Cal.1909); Earle Imp. Co. v. Chatfield, 99 S.W. 84 (Ark.1907). Absent extraordinary circumstances which Grace has failed to establish, laches is unavailable independent of the statutory limitations period.

**Grace Objection E – Proof of Hazard**

89.    Grace has objected to virtually every claim in this bankruptcy on the basis that the claimant did not provide any "proof of hazard" from the asbestos-containing building materials at issue. Remarkably, Grace makes this claim after having prepared and requested a proof of claim form that failed to ask claimants for any evidence that the Grace asbestos-containing products were hazardous.[11]

90.    As recognized by the extensive body of case-law involving asbestos property damage cases, Grace's asbestos-containing products do not become hazardous until they release asbestos fibers and contaminate other parts of the building. Therefore, claimants are not injured until their building is contaminated by asbestos fibers released from Grace's products. City of Greenville v. W.R. Grace & Co., 827 F.2d 975, 976-78 (4th Cir.1987) (the release of toxic fibers from an asbestos-containing fireproofing product rendered the manufacturer liable for damages).

91.    Despite the clear line of cases, nowhere in the proof of claim form does Grace ask claimants about building contamination. Grace is clearly prohibited from objecting to claims because claimants failed to supply information not requested by Grace.

92.    Additionally, Grace ignores the body of scientific literature which establish that Grace's asbestos containing products release fibers into the building and create

---

[11] Perhaps more remarkably, Grace claims that most of these same claimants who allegedly failed to prove Grace's products are hazardous, are also barred by the statute of limitations. As noted by the Eighth Circuit Court of Appeals in reversing a statute of limitations verdict, this argument is untenable.

> Grace argued at trial not only that the statute of limitations had run, but also that the plaintiff had suffered no injury from the **asbestos** Monokote. The arguments are inconsistent: if MDU has suffered no injury from the Monokote, then it has no cause of action--until an injury is suffered, the statute of limitations cannot begin to run.

MDU Resources Group v. W. R. Grace & Co., 14 F.3d 1274 (8th Cir.1994).

unreasonable health risks under routine and foreseeable conditions.[12] These scientific studies reveal the elevated asbestos fiber levels during building renovation, routine maintenance, and other normal building activities. In a string of Monokote cases ignored by Grace, courts have without exception allowed these experiments into evidence. See The Cheshire Medical Center v. W. R. Grace & Co., 88-516-M (D.N.H. July 26, 1993); Seventh Day Adventists v. W.R. Grace & Co.-Conn., Case No. 74365 (Md. Cir. Ct., Montgomery Co. Jan. 1993); In Re: State of West Virginia Public Buildings Asbestos Litigation, C.A. No. 86-C-458 (W.Va. Cir. Ct., Mongolia Co. Sept. 17, 1992), Tr. at 0078. MDU Resources Group, Inc., d/b/a Montana-Dakota Utilities Co. v. W.R. Grace & Co., C/A No. A1-90-122 (D.N.D.); Clayton Center Associates v. W.R. Grace & Co., No. 581479 (Mo. Cir.Ct., St. Louis Co., Feb. 13, 1992), Tr. at 105-12; Blue Cross and Blue Shield of South Carolina v. W.R. Grace, No. 6:89-1281-17 (D.S.C. May 15, 1991).

93.    All of these studies involved the same type of products manufactured by Grace[13] and most involved Grace's asbestos fireproofing. These experiments all involved activities that normally occur in buildings such as cable installations and other cleaning and maintenance activities. These experiments show that routine maintenance and custodial activities that occur in buildings contaminated by asbestos can result in significant exposures, well in excess of OSHA and EPA permissible levels. The experiments are thus relevant and

---

[12] See, "Exposure to Airborne Asbestos Associated with Simulated Cable Installation above a Suspended Ceiling," Am.Ind.Hyg.Asso.J., Vol. 52(11), p. 479-84, 1991; Keyes, Chesson, Hays, Hatfield, Ewing, Longo, Millette, "Re-entrainment of Asbestos From Dust in a Building With Acoustical Plaster," Environmental Choices Technical Supplement, July/August 1992; Ewing, Chesson, Dawson, Ewing, Hatfield, Hays, Keyes, Longo, Millette, Spain, "Asbestos Exposure During and Following Cable Installation in the Vicinity of Fireproofing," Environmental Choices Technical Supplement, March/April 1993.

[13] School District of Independence v. United States Gypsum Co., 750 S.W.2d 442, 453 (Mo.App. 1988) upheld the admission of similar studies "to aid the jury's understanding of exposure to asbestos" even though the studies did not involve exposure to the same product at issue.

admissible to show the levels of asbestos contamination and the procedures necessary to deal

with the health hazards posed by everyday, foreseeable activities in the buildings.

94.     Additionally, Grace's attempt to exclude dust sampling reports while relying

solely upon non-abatement air sampling results to establish hazard completely misses the

point. As the district court stated in City of Greenville v. W. R. Grace,

> The evidence further showed that the asbestos material in the City Hall was
> falling off the beams in some areas and was laying in pieces on top of ceiling
> tiles.   Greenville's experts found invisible asbestos fibers on every building
> surface tested in amounts of up to millions of fibers per square foot of surface
> area.   Asbestos had contaminated ceiling tiles and carpets.   These findings
> not only confirmed the earlier warnings of building contamination, but were
> consistent with Grace's internal knowledge that its asbestos-containing
> Monokote had poor bonding characteristics which prompted Grace to try to
> protect Monokote from scrutiny by outside testing laboratories.
>
> * * *
>
> Grace's position at trial was basically that the asbestos fiber level had not yet
> gotten high enough to cause immediate concern for the health of the City Hall
> occupants, except perhaps maintenance men and contractors, whom Grace
> suggested could wear respirators.   The problems with this argument are
> several.   Grace's defense was built largely on a day of air testing in the
> building a year before trial which was criticized by Greenville's experts as
> merely a "snap shot" of the conditions that day.   The jury could reasonably
> have found such evidence unconvincing as a measure of the present and future
> contamination of the City Hall and rejected it as a reliable indicator of the
> need for removal.   Not only has EPA cautioned against heavy reliance on air
> testing, but Grace's experts, who took and analyzed the air samples in the City
> Hall, had recommended removal for other clients without air testing.
>
> The air testing defense did not address Greenville's need under any scenario to
> control the asbestos problem in its building.   Grace's position was basically to
> manage the asbestos now, remove it in problem areas and leave the rest alone
> until it deteriorated or until renovation or demolition.   Greenville decided to
> meet the problem head-on and remove the asbestos under a planned program.
> As a consequence, the parties were really only at odds over how much to
> spend and when to spend it, not if money had to be spent to control the
> asbestos hazard.   The jury's conclusion that Greenville had suffered property
> damage from asbestos contamination is amply supported.

640 F.Supp. at 563, 568 (D.S.C.1986) aff'd, 827 F.2d 975 (4th Cir.1987).   While it is understandable why Grace would want the court to be guided solely by non-abatement air sampling, this data, by design, ignores the some of the most significant and dangerous exposures in buildings.  Perhaps, that is why there is no authority to support Grace's position that only non-abatement air sampling data are relevant to show that Grace's asbestos-containing building products are hazardous.

### F-2 – the Alleged Fabricated 2003 Date

95.    Grace alleges that the claim form completed by Speights & Runyan states that the claimant first learned that its building contained asbestos in 2003 and that this date must be fabricated.  This assertion is patently false.  What the claim form completed by Speights & Runyan actually requested is when claimants learned of the "presence of asbestos in the property **of the Grace product for which you are making this claim.**"  (See Proof of Claim, Question 18) (emphasis supplied).   While documents related to this claimant's knowledge about asbestos generally are attached as Exhibit 1, there is no indication that this claimant knew that Grace was the manufacturer of asbestos-containing products in its building prior to filing this claim.  Indeed, the great majority of claimants did not learn that Grace was the manufacturer of an asbestos-containing product in its building until presented with a Grace sales record or until constituent analysis sampling was conducted in conjunction with filing a claim in this bankruptcy.  This is hardly surprising given the efforts to which Grace went to conceal the presence of asbestos in Monokote described more fully in the Introduction.

### Conclusion

96.    For the reasons stated herein, the claimant submits that Grace has failed to meet its burden of proving the invalidity of this claim and that Grace's objections are without merit. The Debtors' Fifteenth Omnibus Objection should therefore be stricken.

Respectfully submitted,

Christopher D. Loizides (#3968)
Michael J. Joyce (#4563)
Legal Arts Bldg.
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 654-0248
Facsimile: (302) 654-0728 (fax)
E-mail: loizides@loizides.com

By: _____

SPEIGHTS & RUNYAN
Daniel A. Speights (SC Fed. ID No. 4252)
Marion C. Fairey, Jr. (SC Fed. ID No. 6101)
200 Jackson Avenue, East
P.O. Box 685
Hampton, SC  29924
Telephone: (803) 943-4444
Facsimile:  (803) 943-4599

October 24, 2005