SECTION II

# SECTION II

# SUMMARY OF COSTS

Halliwell Engineering Associates, Inc., July 1996

TABLE 1

# 2600 CENTURY CENTER
## Atlanta, GA
### (W.R. Grace)

### TABLE 1
### SUMMARY OF ASBESTOS FIREPROOFING DUST CONTROL,
### IN–PLACE MANAGEMENT, REMOVAL AND REPLACEMENT NET COSTS

| | | |
|---|---|---|
| ASBESTOS FIREPROOFING DUST CONTROL NET COSTS PRIOR TO BUILDING SALE | = | $6,253.00 |
| COMPLETED ASBESTOS FIREPROOFING IN–PLACE MANAGEMENT NET COSTS PRIOR TO BUILDING SALE | = | 4,002.18 |
| NET REMOVAL FUND DUE TO THE PRESENCE OF ASBESTOS FIREPROOFING* | = | 2,400,510.00 |
| TOTAL NET COSTS ATTRIBUTABLE TO ASBESTOS FIRE- PROOFING MANAGEMENT, REMOVAL AND REPLACEMENT | = | $2,410,765.18 |

\* The Prudential Insurance Company of America sold 2600 Century Center on July 28, 1988 with
a removal fund of $2,416,860 reflecting the presence of ACM within the building.
An evaluation of the removal fund, its reasonableness in light of the remaining asbestos fireproofing in the
2600 Building at the time of sale, and a calculation of the removal fund amount due to the asbestos
fireproofing are contained within this report.

96101                    Halliwell Engineering Associates, Inc.  July, 1996

2600 Century Center
Atlanta, GA
(W.R. Grace)

**TABLE 2**
**Detailed Costs for Asbestos Fireproofing Dust Control Projects Prior to Building Sale**

| Floor No. | Vendor | Invoice No. | Invoice Date | Total Invoice | Non FP | Description |
|---|---|---|---|---|---|---|
| A | Central Jersey | 8121 | 08/21/87 | $635.00 | | 9th floor dust control. |
| Suite 450 | Central Jersey | 009 | 09/23/87 | $5,618.00 | | Remove 128 square feet of fireproofing to facilitate renovation work. |
| | Contractor Subtotal= | | | $6,253.00 | | |
| | Total Dust Control Project Costs = | | | $6,253.00 | | |

Halliwell Engineering Associates, Inc. July, 1996

96101

TABLE 3

2600 Century Center
Atlanta, GA
(W.R. Grace)

## TABLE 3

### Detailed Costs for Completed Asbestos Fireproofing In–Place Management Projects Prior to Building Sale

| Floor No. | Vendor | Invoice No. | Invoice Date | Total Invoice | Non FP | Description |
|---|---|---|---|---|---|---|
| | BCM | 11–1486 | 11/30/87 | $840.28 | | Operations and Maintenance training for maintenance personnel. |
| | BCM | 11–1410 | 11/30/87 | 900.75 | | Semi–annual background air monitoring. |
| | BCM | 3–463 | 03/31/88 | 593.76 | | Operations and Maintenance training for maintenance personnel. |
| | BCM | 3–465 | 03/31/88 | 2,092.05 | | Semi–annual background air monitoring. |
| | BCM | 4–501 | 04/29/88 | 1,148.71 | | Emergency air monitoring. |
| | | | Subtotal | $5,575.55 | | |
| | ATEC | 3204609 | 04/29/88 | $3,510.00 | | Operations and Maintenance activity. |
| Total In–Place Management Project Costs= | | | | $9,085.55 | | 2200 Century Center and 2600 Century Center. |
| Prorated Project Costs   (1)  = | | | | $4,002.18 | | 2600 Century Center. |

(1) Note:

2200 Century Century prorated share = (139,480 sq. ft. / 249,287 sq. ft.) = 55.95% x $9,085.55 = $5,083.37

2600 Century Century prorated share = (109,807 sq. ft. / 249,287 sq. ft.) = 44.05% x $9,085.55 = $4,002.18

Halliwell Engineering Associates, Inc.  July, 1996

TAB 4

2600 Century Center
Atlanta, GA
(W.R. Grace)

# TABLE 4

## ANALYSIS OF THE SALES DISCOUNT
## DUE TO ASBESTOS IN THE BUILDING

The Prudential Insurance Company of America did not perform any asbestos fireproofing removal projects at 2600 Century Center prior to the sale of the building. A dust control project, involving 128 square feet of fireproofing was conducted in Suite 450.

On January 20, 1988, Property Management Systems (the building management) forwarded to the Prudential Realty Group, Preliminary Asbestos Removal Estimates for 2200 and 2600 Century Center, together with recommendations that a phased abatement program be expedited in order to maintain the properties' marketability for the future (see Appendix D). The preliminary estimates for 2600 Century Center included asbestos removal as well as total reconstruction costs, as outlined below:

| | | |
|---|---|---|
| Total removal and reconstruction to base building @ $16.28/sq. ft. | = | $ 1,628,000 |
| Total reconstruction @ $17.55 - $20.75/sq. ft. | = | $1,755,000 - $2,075,000 |
| Total Abatement and Reconstruction @ $33.83 - $37.03/sq. ft. | = | $3,383,000 - $3,703,000 |

The July 11, 1988 Proposed Sale Structure for Century Center (see Appendix E) included the establishment of an Asbestos Removal Fund of $4,800,000 for the 2200 and 2600 buildings, whereby a purchaser could request reimbursement for asbestos removal costs incurred.

Paragraph 5K of the July 28, 1988 Agreement for Purchase and Sale for 2600 Century Center (see Appendix F) required the Seller to establish a Materials Removal Fund out of the cash portion of the purchase price, in the amount of $2,416,860. Paragraph 14A of the Agreement states that purchaser shall remove, at purchaser's sole cost (from reimbursements from the Removal Fund), the asbestos containing materials described in the reports of BCM Converse dated 4/26/86 and McCrone Environmental Services dated 4/22/86.

Paragraph 17 of the Mortgage Loan Conditions (Exhibit H of the Agreement For Purchase and Sale for 2600 Century Center) required Prudential to establish a Removal Fund of $2,416,860 out of the proceeds of the cash portion of the purchase price. In addition, paragraph 17 states that Prudential shall disburse to the buyer the sum of $24.07 per square foot of such portion of the building from which asbestos removal has been completed.

Following the sale of the building, the new owner proceeded to remove the asbestos fireproofing from all remaining floors in 2600 Century Center. Periodic disbursements were made from the Removal Fund (at $24.07 per square foot) as fireproofing removal was completed on a floor (see Appendix H), until the entire $2,416,860 was disbursed (see Appendix I).

Halliwell Engineering Associates, Inc., July, 1996

2600 Century Center
Atlanta, GA
(W.R. Grace)

# TABLE 4

## ANALYSIS OF THE REMOVAL FUND
## DUE TO ASBESTOS IN THE BUILDING

The Prudential Insurance Company of America did not perform any full floor asbestos fireproofing removal projects at 2600 Century Center prior to the sale of the building. A dust control project, involving 128 square feet of fireproofing was conducted in Suite 450.

On January 20, 1988, Property Management Systems (the building management) forwarded to the Prudential Realty Group, Preliminary Asbestos Removal Estimates for 2200 and 2600 Century Center, together with recommendations that a phased abatement program be expedited in order to maintain the properties' marketability for the future (see Appendix D). The preliminary estimates for 2600 Century Center included asbestos removal as well as total reconstruction costs, as outlined below:

Total removal and reconstruction to base building @ $16.28/sq. ft.　　=　　$ 1,628,000
Total reconstruction @ $17.55 - $20.75/sq. ft.　　=　　$1,755,000 - $2,075,000

Total Abatement and Reconstruction @ $33.83 - $37.03/sq. ft.　　=　　$3,383,000 - $3,703,000

The July 11, 1988 Proposed Sale Structure for Century Center (see Appendix E) included the establishment of an Asbestos Removal Fund of $4,800,000 for the 2200 and 2600 buildings, whereby a purchaser could request reimbursement for asbestos removal costs incurred.

Paragraph 5K of the July 28, 1988 Agreement for Purchase and Sale for 2600 Century Center (see Appendix F) required the Seller to establish a Materials Removal Fund out of the cash portion of the purchase price, in the amount of $2,416,860. Paragraph 14A of the Agreement states that purchaser shall remove, at purchaser's sole cost (from reimbursements from the Removal Fund), the asbestos containing materials described in the reports of BCM Converse dated 4/26/86 and McCrone Environmental Services dated 4/22/86.

Paragraph 17 of the Mortgage Loan Conditions (Exhibit H of the Agreement For Purchase and Sale for 2600 Century Center) required Prudential to establish a Removal Fund of $2,416,860 out of the proceeds of the cash portion of the purchase price. In addition, paragraph 17 states that Prudential shall disburse to the buyer the sum of $24.07 per square foot of such portion of the building from which asbestos removal has been completed.

Following the sale of the building, the new owner proceeded to remove the asbestos fireproofing from all remaining floors in 2600 Century Center. Periodic disbursements were made from the Removal Fund (at $24.07 per square foot) as fireproofing removal was completed on a floor (see Appendix H), until the entire $2,416,860 was disbursed (see Appendix I).

Halliwell Engineering Associates, Inc., July, 1996

2600 Century Center
Atlanta, GA
(W.R. Grace)


This cost appears to be low in comparison to comparable projects. We believe that it is not representative of all the costs associated with the removal of the fireproofing, including the removal of fireproofing from more difficult and more costly areas such as the elevator shaft, the stairwells, and the other core areas in the building. The true cost for removal and replacement of all fireproofing throughout the building is more likely in the $14. per square foot range.

Under the scenario of the asbestos fireproofing removal program contemplated at the time of the sale of the building, the existing tenants would be temporarily relocated, their leased spaces abated, reconstructed and the tenants moved back in. As a result, the following additional scope of work would become part of the tenant relocation/asbestos fireproofing removal project at 2600 Century Center: 1) two tenant moves (out of space and back); 2) replace partition walls and doors removed for abatement; 3) replace ceiling grid and tiles removed for abatement; 4) replace light fixtures removed for abatement; 5) replace power and light wiring removed for abatement; 6) replace data cabling removed for abatement; 7) replace HVAC flexible ducts and diffusers removed for abatement; 8) replace duct insulation removed for abatement; 9) replace floor finishes (carpet) removed for abatement; and 10) provide supervision of tenant rebuild. Costs to complete this work in 1988 have been estimated as outlined below:

| Description | | Cost/Sq.Ft. |
|---|---|---|
| 1) 2 tenant moves (out of space & back) | $ | 2.50 |
| 2) Partition walls and doors | | 3.50 |
| 3) Ceiling tile and grid | | 2.00 |
| 4) Lighting fixtures | | 2.00 |
| 5) Power & light wiring | | 2.00 |
| 6) Data cabling | | .50 |
| 7) HVAC flex ducts & diffusers | | 1.00 |
| 8) Duct insulation | | .50 |
| 9) Floor finishes (carpet) | | 1.75 |
| | Subtotal | 15.75 |
| 10) Supervision (8%) | | 1.25 |
| | | |
| Total Estimated Relocation Base Buildback = | | $17.00 |

The $14.50 per square foot base buildback costs ($17.00 minus $2.50 moving costs) detailed above, includes no upgrading and is comparable to the hard costs of reconstruction included as a part of the 1/20/88 report to Prudential (see Appendix D).

Adding the $10.76/sq. ft. average past abatement cost incurred at 2200 Century Center to the $17.00/sq. ft. relocation/base buildback cost estimated above, equals a total project cost of $27.76 per square foot.


Halliwell Engineering Associates, Inc., July, 1996

2600 Century Center
Atlanta, GA
(W.R. Grace)

With asbestos fireproofing remaining on 109,807 square feet of floor area at the time of the sale of the building, the estimated total relocation/abatement/base buildback cost (@ $27.76/sq. ft.) would be $3,048,242.30. In addition, inaccessible asbestos fireproofing remaining on the exterior face of the spandrel beam would require abatement at the time of building re-facing or demolition. For purposes of this analysis, however, only the out-of-pocket costs as reflected by the removal fund amount of $2,416,860 ($24.07 per square foot) have been considered.

In addition to the asbestos fireproofing, the BCM survey (see Appendix J) identified asbestos containing pipe fittings in the chiller mechanical room. Transite panels were observed on the ground level cooling tower. Costs to remove these non-fireproofing asbestos containing materials should be deducted from the stated removal fund amount of $2,416,860, and have been estimated as outlined below:

Chiller Mechanical Room=
30 fittings (allowance) x $45/fitting (HEA removal and replacement estimate) =$ 1,350.00

Transite panels on ground level chiller (HEA removal and replacement estimate) =$15,000.00

Total TSI Deduction =$16,350.00

Deducting the estimated TSI removal cost from the total removal fund of $2,416,860 yields a net removal fund amount of $2,400,510 attributable to asbestos fireproofing at 2600 Century Center.

TABLE 5

2600 Century Center
Atlanta, GA
(W.R. Grace)

# TABLE 5

# INTEREST CHARGES

An additional element of costs is interest charges. However, this report does not calculate that aspect of The Prudential Insurance Company of America's damages.

Halliwell Engineering Associates, Inc., July, 1996

TABLE 6

2600 Century Center
Atlanta, GA
(W.R. Grace)

# TABLE 6

# MISCELLANEOUS RELATED COSTS
# NOT INCLUDED IN THIS REPORT

1.    The Prudential Insurance Company of America's internal asbestos management costs.

2.    Costs for initial asbestos survey.

3.    Electrical or water consumption costs incurred during the asbestos removal projects.

4.    Costs for the relocation of furniture, equipment, and employees to other areas of the building during the asbestos abatement project, while Prudential owned the property.

5.    Elevator after hours operational costs for asbestos removal projects.


In addition to the above costs that were not included, this report did not consider or calculate lost rental income due to the asbestos fireproofing in the building.

Halliwell Engineering Associates, Inc., July, 1996

SECTION III

# SECTION III

# STATEMENT OF OPINIONS

## STATEMENT OF OPINIONS

### 2600 CENTURY CENTER

In preparing this report, we have formulated certain opinions pertaining to the costs for the management of the asbestos containing fireproofing. Those opinions relate specifically to costs incurred to date, and an explicit removal fund established at the time of sale due to the presence of the remaining asbestos fireproofing.

For the purposes of the opinions set forth herein, we have:

(1)     collected and reviewed certain information relating to the original design and construction of the building;

(2)     discussed with the building management, issues pertaining to the building=s construction and operations as well as the management, removal and replacement of the asbestos containing fireproofing;

(3)     inspected and photographed the building on two independent occasions;

(4)     collected and reviewed cost information pertaining to the management of the asbestos containing fireproofing;

(5)     collected and reviewed project information pertaining to the management of the asbestos containing fireproofing;

(6)     evaluated past costs pertaining to the asbestos abatement contractors, asbestos consultants and miscellaneous costs related to the management of asbestos containing materials on a project by project basis;

(7)     reviewed certain documents pertaining to the sale of the building, that identify an agreed upon removal fund due to the presence of asbestos containing materials remaining in the building at the time of the sale;

(8)     analyzed the removal fund for all identified asbestos containing materials remaining in the building at the time of the sale, and determined the amount of the net removal fund attributable to the asbestos containing fireproofing;

(9)    evaluated the net removal fund amount for the asbestos containing fireproofing, based upon past costs in the building for asbestos fireproofing abatement, subsequent costs incurred by the new owner for this work, and estimates of future asbestos fireproofing abatement costs in this building;

(10)   performed such other analyses as we have deemed appropriate.

Based upon and subject to the foregoing, we are of the opinion that the asbestos management actions taken by The Prudential Insurance Company of America, in the 2600 Century Center building, were both reasonable and appropriate; and

Based upon and subject to the foregoing, we are of the opinion on the date hereof, that the total net project costs as calculated in this report, were incurred due to the past management of asbestos containing fireproofing in this building, and that those costs are both fair and reasonable; and

Based upon and subject to the foregoing, we are of the opinion on the date hereof that the net removal fund as calculated in this report, due to the presence of the remaining asbestos containing fireproofing in the building, is both fair and reasonable.

Jack L. Halliwell, P.E.
*President*
Halliwell Engineering Associates, Inc.

July, 1996

APPENDIX A

# APPENDIX A

**PART A:** **ASBESTOS ABATEMENT PROJECT INFORMATION**

**PART B:** **BUILDING INSPECTIONS CONDUCTED BY HALLIWELL ENGINEERING ASSOCIATES**

**PART C:** **LOCATION AND DETAILS OF INFORMATION CONSIDERED IN THE DEVELOPMENT OF THIS REPORT**

Halliwell Engineering Associates, Inc., July 1996

## PART A:    ASBESTOS ABATEMENT PROJECT INFORMATION:

1.  Total floor area abated by Prudential:    <u>None</u>

2.  Floors abated by Prudential:    <u>None,   Dust control project on 4th floor, suite 450</u>

3.  Dates of Prudential's abatement:    <u>N/A</u>

4.  Floors with asbestos fireproofing remaining as of July 1996:    <u>All    fireproofing    removed after the sale</u>

5.  Total floor area with fireproofing remaining as of July 1996:    <u>All    fireproofing    removed after sale</u>

6.  Asbestos abatement scope of work (prior to sale):    <u>N/A</u>

96101\2600SectL.st

**PART B:** **BUILDING INSPECTIONS CONDUCTED BY HALLIWELL ENGINEERING ASSOCIATES**

1. **Initial Inspection:**

   Date/Inspectors:               4/30/96; Paul Keitz, Project Manager and Gary Halliwell, Project Manager

   Building contact person:       Scott A. Clark, Vice President

   Inspection guide:              Tony Flemmings, Building Engineer

   Unabated floors inspected:     All floors abated

   Abated floors inspected:       Basement, ground and 3rd

   Photographic record:           69 photos

2. **Second Inspection:**

   Date/Inspectors:               5/29/96; Jack Halliwell, P.E. and Todd Cormier, P.E.

   Building contact:              Scott A. Clark, Vice President

   Inspection guide:              Tony Flemmings, Building Engineer,

   Unabated floors inspected:     All floors abated

   Abated floors inspected:       Basement, ground and 3rd

   Photographic record:           95 photos

96101\2600SectLst

PART C:   LOCATION  AND  DETAILS  OF  INFORMATION  CONSIDERED  IN  THE
DEVELOPMENT OF THIS REPORT

1.  **Building Information:**    Located in HEA Box No. C.C.-1

        Building design drawings:    Architectural, Mechanical, Structural and Electrical

        Asbestos survey:    4/86; BCM Converse

        Correspondence:    Miscellaneous

        Building inspections:    4/30/96; Paul Keitz, Project Manager and Gary Halliwell,
        Project Manager;
        5/29/96; Jack Halliwell, P.E. and Todd Cormier, P.E.

        Photographs and photo logs:    From the inspection above

        Discussions with building personnel:    Scott A. Clark, Vice President and Tony
        Flemmings, Building Engineer

2.  **Asbestos Abatement Cost Information:**    Located in HEA Box No. C.C.-1

      Contract documents

      Contractor's applications for payment

3.  **Asbestos Abatement Project Information:**    Located in HEA Box No. C.C.-1

      Federal and state asbestos regulations

4.  **Removal Fund Information:**  Located in HEA Box No. C.C.-2

      Asbestos removal estimates

      Proposed sale structure

      Agreement for Purchase and Sale

      Survey

      Removal Fund Allocation requests

APPENDIX B

# APPENDIX B

## PROJECT FLOOR AREA/FIREPROOFING AREA CALCULATIONS

Halliwell Engineering Associates, Inc., July 1996

# 2600 CENTURY CENTER

## FIREPROOFED FLOOR AREA CALCULATIONS

| Floor | Gross Area | Non-Fireproofed Floor Areas | Net Fireproofed Floor Area | |
|---|---|---|---|---|
| | | | Total | Abated by Pru |
| Basement | 1,680 | 0 | 1,680 | 0 |
| Ground | 29,683 | 3,360 | 26,323 | 0 |
| 2 | 30,628 | 3,360 | 27,268 | 0 |
| 3 | 30,628 | 3,360 | 27,268 | 0 |
| 4 | 30,628 | 3,360 | 27,268 | 0 |
| TOTALS | | | 109,807 | 0 |
| FIREPROOFED FLOOR AREA REMAINING AT TIME OF SALE | | | | 109,807 |

Typical Floor used for fireproofing ratio:   3rd Floor

Floor area:   27,268 Sq. Ft.

Halliwell Engineering Associates, Inc., July, 1996

# FIREPROOFING SURFACE AREA CALCULATIONS (Typical Office Floor)

**BUILDING:** 2600 CENTURY CENTER Atlanta, GA — (Beams and Columns)
**Fireproofed Floor Area (Typical Floor):** 27,268 sf
**Typical Floor Location:** 3rd Floor

| BEAM NUMBER | BEAM SIZE | TOTAL BEAM LENGTH (No. Beams @ linear feet (f) = Total lf) | | | NET BEAM FIREPROOFED AREA (sq ft /lf) | TOTAL BEAM FIREPROOFED AREA (sq ft) | AVERAGE (1) OVERSPRAY WIDTH (lf/side) | TOTAL OVERSPRAY AREA (length x width x 2 sides x 1.5 deck factor) (sq ft) | TOTAL BEAM & OVERSPRAY FIREPROOFING AREA (sq ft) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | W24 x 61 | 4 @ | 40.90 = | 163.60 | 5.57 | 911.25 | 0.5 | 245.40 | 1,156.65 |
| 2 | W24 x 61 | 2 @ | 40.00 = | 80.00 | 5.57 | 445.60 | 0.5 | 120.00 | 565.60 |
| 3 | G-1 (2) | 2 @ | 40.00 = | 80.00 | 6.09 | 487.20 | 0.5 | 120.00 | 607.20 |
| 4 | G-2 (2) | 5 @ | 40.90 = | 204.50 | 6.09 | 1,245.41 | 0.5 | 306.75 | 1,552.16 |
| 5 | G-2A (2) | 4 @ | 40.90 = | 163.60 | 6.09 | 996.32 | 0.5 | 245.40 | 1,241.72 |
| 6 | 245799 (3) | 4 @ | 19.50 = | 78.00 | 5.54 | 432.12 | 0.5 | 117.00 | 549.12 |
| 7 | 205654 (4) | 7 @ | 19.50 = | 136.50 | 4.94 | 674.31 | 0.5 | 204.75 | 879.06 |
| 8 | 205654 (4) | 8 @ | 20.00 = | 160.00 | 4.94 | 790.40 | 0.5 | 240.00 | 1,030.40 |
| 9 | G-2B (2) | 4 @ | 40.90 = | 163.60 | 6.09 | 996.32 | 0.5 | 245.40 | 1,241.72 |
| 10 | G-3 (2) | 1 @ | 40.90 = | 40.90 | 6.09 | 249.08 | 0.5 | 61.35 | 310.43 |
| 11 | 14W22 | 10 @ | 29.50 = | 295.00 | 3.44 | 1,014.80 | 0.5 | 442.50 | 1,457.30 |
| 12 | 14W22 | 8 @ | 30.50 = | 244.00 | 3.44 | 839.36 | 0.5 | 366.00 | 1,205.36 |
| 13 | 16W26 | 10 @ | 30.25 = | 302.50 | 3.89 | 1,176.73 | 0.5 | 453.75 | 1,630.48 |
| 14 | 16W31 | 4 @ | 29.50 = | 118.00 | 3.92 | 462.56 | 0.5 | 177.00 | 639.56 |
| 15 | 16 x 26 | 28 @ | 29.50 = | 826.00 | 3.89 | 3,213.14 | 0.5 | 1,239.00 | 4,452.14 |
| 16 | 16W31 | 4 @ | 30.50 = | 122.00 | 3.92 | 478.24 | 0.5 | 183.00 | 661.24 |
| 17 | 12 x 19 | 10 @ | 29.75 = | 297.50 | 2.95 | 877.63 | 0.5 | 446.25 | 1,323.88 |
| 18 | 12 x 19 | 10 @ | 30.00 = | 300.00 | 2.95 | 885.00 | 0.5 | 450.00 | 1,335.00 |
| 19 | 16 x 26 | 10 @ | 29.75 = | 297.50 | 3.89 | 1,157.28 | 0.5 | 446.25 | 1,603.53 |
| 20 | 12 x 19 | 10 @ | 30.25 = | 302.50 | 2.95 | 892.38 | 0.5 | 453.75 | 1,346.13 |
| 21 | 10 x 11.5 | 8 @ | 8.00 = | 64.00 | 2.56 | 163.84 | 0.5 | 96.00 | 259.84 |
| 22 | 12 x 27 | 2 @ | 20.50 = | 41.00 | 3.58 | 146.78 | 0.5 | 61.50 | 208.28 |
| 23 | 10 x 11.5 | 2 @ | 10.50 = | 42.00 | 2.56 | 107.52 | 0.5 | 63.00 | 170.52 |
| 24 | 10 x 11.5 | 4 @ | 10.00 = | 40.00 | 2.56 | 102.40 | 0.5 | 60.00 | 162.40 |
| 25 | 10 x 49 | 4 @ | 20.50 = | 82.00 | 4.04 | 331.28 | 0.5 | 123.00 | 454.28 |
| 26 | 10 x 33 | 2 @ | 20.50 = | 41.00 | 3.49 | 143.09 | 0.5 | 61.50 | 204.59 |
| 27 | 10 x 21 | 2 @ | 10.50 = | 21.00 | 3.05 | 64.05 | 0.5 | 31.50 | 95.55 |
| 28 | 6 x 12 | 1 @ | 20.00 = | 20.00 | 1.93 | 38.60 | 0.5 | 30.00 | 68.60 |
| 29 | 24 x 76 | 1 @ | 20.00 = | 20.00 | 6.09 | 121.80 | 0.5 | 30.00 | 151.80 |
| 30 | 10 x 21 | 2 @ | 6.90 = | 13.80 | 3.05 | 42.09 | 0.5 | 20.70 | 62.79 |
| 31 | 10 x 21 | 2 @ | 9.10 = | 18.20 | 3.05 | 55.51 | 0.5 | 27.30 | 82.81 |
| 32 | 10 x 29 | 2 @ | 10.00 = | 20.00 | 3.10 | 62.00 | 0.5 | 30.00 | 92.00 |
| 33 | 10 x 29 | 3 @ | 11.60 = | 34.80 | 3.10 | 107.88 | 0.5 | 52.20 | 160.08 |
| | **Beam and Overspray Totals** | | | **4,833.50** | | **19,711.97** | | **7,250.25** | **26,962.22** |

| | AVERAGE COLUMN SIZE | AVG. COLUMN FIREPROOFED AREA (sq ft /lf) | COLUMN LENGTH (linear feet (f)) | NUMBER OF COLUMNS | TOTAL COLUMN FIREPROOFED AREA (sq ft) |
|---|---|---|---|---|---|
| **COLUMN TOTALS** | 10x39 | 4.19 | 12.1 | 45 | 2,281.46 |

**TOTAL FIREPROOFING SURFACE AREA (Typical Floor)**     29,243.68

**FIREPROOFING SURFACE AREA/FLOOR AREA RATIO (Typical Floor)**     (29,243.68 / 27,268)    1.07

(1) 6" is the minimum fireproofing overspray amount observed in most buildings.
(2) Girder size assumed at 24W76.
(3) Beam size assumed at 24W55.
(4) Beam size assumed at 21W44.

Halliwell Engineering Associates, Inc.  July, 1996



TYPICAL FLOOR FRAMING PLAN

Century Center
Building Four

S-2

APPENDIX C

# APPENDIX C

## REDUCED BUILDING DRAWINGS



**3** BASEMENT PLAN
1/4 =1 .0



PIS 4010179



AMERICAN HARDWARE MUTUAL
27106 RSF
24202 USF
SUITE 200

(OPTIONS)

CENTURY CENTER IV—2ND FLOOR

PIS 4010180





CENTURY CENTER IV 400 FLOOR

UNITED ARTIST
4406 RSF
3666 USF
SUITE 455

(OPTIONS)

CENTURY 21
5461 RSF
4876 USF
SUITE 430

VACANT
375 RSF
315 USF
SUITE 460

VACANT
235 RSF
197 USF
SUITE 470

VACANT
251 RSF
212 USF
SUITE 472

VACANT
509 RSF
407 USF
SUITE 425

AMC FILM MKTG., INC.
2530 RSF
2259 USF
SUITE 475

TRIANGLE PUBLISHING
6017 RSF
5372 USF
SUITE 480

PIS 4010182

# APPENDIX D

## PROPERTY MANAGEMENT SYSTEMS' PRELIMINARY ASBESTOS REMOVAL ESTIMATES AND RECOMMENDATIONS, DATED JANUARY 20, 1988

Halliwell Engineering Associates, Inc., July 1996



PROPERTY
MANAGEMENT
SYSTEMS

1800 CENTURY BOULEVARD • SUITE 1500 • ATLANTA, GEORGIA 30345 • 404/325-0402

Associated with White & Associates / Real Estate

January 20, 1988

Mr. Jeffrey R. DuFresne
Associate Investment Manager
The Prudential Realty Group
One Ravinia Drive, Suite 1400
Atlanta, Georgia  30346

RE:  Asbestos Abatement
     2200 and 2600 Buildings
     Century Center
     Atlanta, Georgia

Dear Jeff:

*Enclosed are preliminary numbers we discussed the other day,
along with materials concerning the abatement work.*

*Please give me a call after you have reviewed these.*

Very truly yours,

Kip R. Marshall
Project Manager

KRM/cb

Enclosure

PIS 4002282

PRELIMINARY ASBESTOS REMOVAL ESTIMATES
2200 and 2600 BUILDINGS
CENTURY CENTER

Asbestos Removal

| | |
|---|---|
| Removal of Asbestos and Reapplication of Fireproofing | $ 9.50/s.f. |
| Engineering Fees | 1.00/s.f. |
| Demolition of Existing Interior Construction | 2.50/s.f. |
| Replacement of Ceiling and Grid | 2.00/s.f. |
| Supervision | 1.23/s.f. |
| Total Removal and Reconstruction to Base Building | $16.23/s.f. ← |

Reconstruction

| | |
|---|---|
| Tenant Construction | $12-14/s.f. |
| Moving Cost | 1.25/s.f. |
| Telephone/Computer Relocation | .50-1/s.f. |
| Space Planning | .75/s.f. |
| Stationary | .75/s.f. |
| Leasing Commissions | 1-1.50/s.f. |
| Tenant Upgrades | ? |
| Supervision | 1.30-1.50/s.f. |
| Total Reconstruction | $17.55-20.75/s.f. |

| | |
|---|---|
| TOTAL ESTIMATED COSTS | $33.83-37.03/s.f. ← |

Cost Estimate - 2200 Building

| | |
|---|---|
| Asbestos Removal | $2,279,000 |
| Reconstruction | $2,457,000-$2,905,000 |
| Total 2200 Building | $4,736,000-$5,184,000 |

Cost Estimate - 2600 Building

| | |
|---|---|
| Asbestos Removal | $1,628,000 |
| Reconstruction | $1,755,000-$2,075,000 |
| Total 2600 Building | $3,383,000-$3,703,000 |

Grand Total

PIS 4002283

| | |
|---|---|
| Asbestos Removal | $3,907,000 |
| Reconstruction | $4,212,000-$4,980,000 |
| Grand Total | $8,119,000-$8,887,000 |

*Datalines, computer moving, and supplemental HVAC could increase this figure.

PROJECT:

Century Center
2200 and 2600 Building

SCOPE OF WORK:

Phased removal of asbestos containing fireproofing from
structural steel members.

BUILDING HISTORY:

### Century Center I (2200 Building)

Century Center I is a ten-story office building built in the
early seventies with average occupancy of 80%.  It presently
has asbestos containing fireproofing on the structural steel
members with some overspray on adjacent metal decking.  The
property has in place an Operations and Maintenance procedure
for protecting and monitoring asbestos containing fireproofing
prepared by BCM Converse, a professional engineering firm
specializing in asbestos control and abatement.

### Century Center IV (2600 Building)

Century Center IV is a four-story office building built in the
early seventies with an average occupancy of 90%.  It presently
has asbestos containing fireproofing on the structural members
with some overspray on adjacent metal decking.  The same O & M
procedure developed for Century Center I is in use in this
building.

Both projects remain viable real estate investments despite the
presence of asbestos containing material (ACM) because of the
healthy real estate submarket, stable tenants, and general tenant
confidence in the project administration and ownership.  Prospects
for the continued success of these projects, however, are
jeopardized by the growing concern in the real estate community
about ACM.  Tenants and brokers are beginning to avoid projects
with ACM because of the liabilities they are subject to with
respect to their obligations to their employees and/or clients.
This trend is manifesting itself in the gradual relocation of
tenants to projects without ACM, further perpetuating the
hazardous stigma associated with a building with ACM.

PIS 4002284

RECOMMENDATIONS:

Prudential's interest in Century Center can take one of two
paths in the future: 1) The continued development and operations
of the project or 2) the sale of the project.  In either scenario,
Property Management Systems recommends the expeditious institution
of a phased abatement program in the 2200 and 2600 properties
to maintain their marketability in the future.  Most investors
looking at the project will either not be interested in these two
properties or will want to see a viable program in place to
eradicate the ACM problem.

If Prudential continues to own the project, the phased abatement
program will provide evidence of the project's commitment to
improving the tenant environment and encourage tenants who are
happy with the location to renegotiate their leases without the
added concern of asbestos in the building.

To accomplish the abatement process, the program must be phased
by floors as vacancies and relocation opportunity arise.  PMS's
recent survey of the leases in the 2200 Building indicated an
ideal opportunity to begin the abatement program on level 10 and
continue it on level 8 upon relocation of Chambers, Mabry,
McClelland and Brooks presently on 8 to the abated level 10.
Utilizing this opportunity as a starting point, we can project
the following phasing schedule for the 2200 Building: (see attached
spread sheets).  Also, Roddy White of White and Associates is
talking with Southern Bell (total occupancy in 2200 Building is
30,000± s.f.), and their reaction is critical to the relocation
program following the 8th and 10th floor abatements.

Although this phasing schedule is far from ideal, it represents
a starting point from which corrective measures will invariably
need to be made along the way.  Since the 2600 Building's leases
tend to extend further into the 1990's than the 2200 Building's,
we have not addressed the development of a phasing schedule for it
pending the success we encounter in the 2200 Building.  Additionally,
with the pending renewal of Canada Dry in the 2600 Building, the
entire program depends on the direction that this negotiation takes.

EXECUTION OF ABATEMENT PROJECT:

A brief review of the proposed phasing of the abatement project
in the 2200 Building illustrates the complex interrelationship
that must occur between the tenants, PMS and the brokerage
group.  Many of the sequences are contingent on the success of
the tenant relocation effort in relatively short periods of time.
The brokerage group will in turn need to work closely with and have
strong support from Prudential to accomplish the goals established
and move through the building smoothly.

PIS 4002285

PMS's role will be to orchestrate the various players in the program (contractors, consultants, tenants, architects/engineers and brokers) to achieve the eventual abatement of the buildings. The main responsibilities of this role will be as follows:

Document Preparation: PMS will direct the architect/engineer/ consultant selected by Prudential during the development of plans and specification for the removal of the ACM. PMS will endeavor to provide these professionals with relevant insight into the idiosyncrasies of the operations and routines of the occupants in order to provide a program sensitive to the on-going needs of the tenants.

Tenants Relocation: PMS, White and Associates and a space planner of Prudential's choice will need to work quickly and effectively to meet with tenants affected by the phased sequence to relocate and/or renegotiate their leases to accommodate the abatement project. PMS will initially meet with and outline the program to all tenants defining the parameters to be used in the project and establish a confidence and awareness level which is reassuring to the tenants.

Contractor Selection: Once project documents have been established for the abatement process, PMS will establish a list of qualified contractors and solicit bids for the first phases of the project. A pre-bid conference will be held to elaborate on the specifics of the project, the phasing approach and the guidelines that PMS will maintain to minimize tenant inconvenience.

Because of the phased nature, the extended period of time involved in the execution of the project, and the potential lag time between abatement activity, a comprehensive bid for the entire project would be difficult to define. Instead, the bidding will be based on current phases with unit prices for work uncovered which was not anticipated. Although rebidding each phase may add somewhat to the complexity of the process, it will assure the project of pricing based on definable parameters, maintain a competitive spirit with respect to cost and encourage high performance from successful bidders interested in staying involved in the project. If one of the successful contractors proves to be superior in cost and quality consistently, the option to negotiate future phases to solidify a team approach and increase efficiencies can be considered.

Interior Construction Contractors: Depending on the nature of the abatement contractors in the Atlanta area and the extent of alternative construction activity they pursue, the project may need to provide for the necessary lease finish construction activity required to build out new tenant space for relocated tenants.

PIS 4002286

Once the list of abatement contractors has been established and
the extent of their construction expertise in other forms of
construction can be assessed, the decision to incorporate or
segregate the leasehold construction in their contracts can be
determined.  If the abatement contractor can offer this service
cost effectively, the continuity provided would enhance the
project and control liability exposure.

Special Logistical and Technical Consideration: The execution of
the actual ACM abatement presents less of a problem than the
access and exiting requirements that must be developed to prevent
interaction of the tenants and the work.  Because of the stigma
associated with abatement work, PMS recommends that the work occur
afterhours on a second shift basis to maintain a low profile.
The lack of a segregated service elevator and entrance requires
that workmen and material be transported in a passenger car protected
for construction.  By performing the work afterhours, the risks of
"exposure claims" can be minimized and clearance level air samples
outside the work area can be prepared before the regular business
day begins.

Movement of ACM materials to certified landfills can also be
scheduled to minimize transition in the building by storing sealed
containers on the abatement floor until a complete dumpster load is
collected.

Most logistical and technical problems worked out for abatement on
level 10 will remain the same for all of the floors except the
ground level.  The ground level represents a unique problem
because it is the main entrance and a retail level.  To execute
the abatement on this level, our proposal still anticipates
relocating or vacating all tenants but also would incorporate a
tunnel designed to allow unrestricted access to the building
while allowing abatement efforts to occur above and around it.
A similar approach was used at Houston's Hobby Airport successfully.

Staffing: PMS proposes that this project be initially set up by
Wallace Harberson, our Corporate Construction Manager, with Steve
Beverly, the on-site manager handling leasehold improvements.

Once the project is in full swing, we believe the importance of
close supervision and continuous coordination of the tenant phasing
program will require the addition of a manager to carry on the
program or relieve Mr. Beverly of his operational duties for the
course of the abatement project.

PIS 4002287

<u>Compensation</u>: PMS remains flexible with respect to the form of compensation for a project of this nature. Asbestos in buildings presents the same uncomfortable problem to PMS as managers as it does to you as the owner; therefore, we would like to facilitate any effort to remove it. Because of the uncertainty inherent in a phase project like this, we have estimated a 8.5% fee on the total project costs over a four-year period would cover overhead and expense to manage the project as proposed.

PIS 4002288

APPENDIX E

# APPENDIX E

### EXCERPT FROM
### PROPOSED SALE STRUCTURE FOR
### 2600 CENTURY CENTER,
### DATED JULY 11, 1988

MEMO TO:      George C. Peterson
              Vice President, Acqs. & Sales
              Corporate Office

FROM:         Frank J. Rojas
              Director, Acqs. & Sales

              J. Elizabeth Andress
              Investment Manager, Acqs. & Sales
              Atlanta Realty Group

DATE:         July 11, 1988

SUBJECT:      Proposed Sale Structure

---

The following summary represents the proposed sale structure for Century
Center we negotiated with Goldman, Janger, and White.

PURCHASE PRICE:  $72,500,000

     Cash to Pru at Closing:          $11,985,000 PRISA
                                        2,215,000 General Account
                                      $14,200,000

PURCHASE MONEY MORTGAGES:

° $ 5,778,400 (Secured by Phase II and IV - PRISA)
° $ 8,861,600 (Secured by Phases I and III - General Account)
° $14,940,000 (Secured by Phase VIII).
° On Phases II and IV $3,361,540 funded at Closing.  The remainder will
  begin earning interest as the asbestos is removed on a $20 per square foot
  pro rata basis and income support funds are drawn down until $2,416,860
  support fund is disbursed.  See proposed contract language following.
° On Phases I and III $5,478,460 funded at closing.  The remaining
  $3,383,140 will begin earning interest as provided for in Phases II and IV.
° Interest only for 5 years @ 9.0%
° Two year extension option for Phases I-IV at market rate with a 10.0% cap.
° Three year extension option for Phase VIII if AT&T does not renew at least
  50% of their space, otherwise they have a two year extension option.  At
  market rate with a 10.0% cap.
° 80% LTV ratio except on the AT&T Building which has a ratio of
  approximately 81%.  Secondary financing permitted with restrictions.
° Purchaser may transfer loans one time with no fee.  Restrictions on
  secondary financing with sale.

Asbestos Removal Fund:  ($4,800,000) As purchaser removes asbestos from
Phases I and IV, purchaser will request from Prudential reimbursement of
the removal costs.  As Prudential reimburses purchaser, purchaser must
begin paying interest on the cost of the removal.  Purchaser must remove at

PIS 4005759

least 50% of the asbestos within 5 years in order to be permitted to extend
the loan. If purchaser has not removed at least 50%, then the remaining
balance of the asbestos fund shall be credited to the gross principal
balance of the loan and the loan becomes due and payable.

*Support Fund*: ($1,000,000) Every six months, purchaser may request from
Prudential the difference between actual cash flow and the cash flow
projected in the offering brochure. As Prudential makes disbursements,
purchaser must begin paying interest on the amount of the disbursements
as part of the loan. Any fund remaining at the end of five or seven
years will be credited against the gross loan amount.

GAP LOAN:  $28,720,000 (Secured by Phases V and VIII)

° Matures 6-30-89
° 8% interest rate from Closing through 12-31-88
° 12% interest rate from 1-1-89 through 6-30-89
° 80% LTV ratio

TIMING:

° Completion of Due Diligence: 7-1-88
° Contract execution: 7-20-88 ($500,000 earnest money deposit)
° Closing: 9-1-88

SOUTHERN BELL CONTINGENCY:

Closing is conditioned upon the execution of the Southern Bell leases in
Phase V. See following summary of Southern Bell lease proposal.

GROSS PURCHASE PRICE ALLOCATIONS:

| Phase | Property Number | Gross Price Allocation | Prudential Appraisal | Description | Address |
|-------|-----------------|------------------------|----------------------|-------------|---------|
| I | IP 4046 | $ 7,250,000 | $ 6,225,000 | Old Pru Bldg.(asbestos) | 2200 Century Pkwy. |
| II | PR 154 ✓ | $ 3,728,000 | $ 3,200,000 | Low Rise | 1900 Century Blvd. |
| III | IP 4056 | $ 3,827,000 | $ 3,285,000 | Low Rise | 1700 Century Circle |
| IV | PR 171 ✓ | $ 3,495,000 | $ 3,000,000 | Sunkist Bldg.(asbestos) | 2600 Century Pkwy. |
| V | PR 177 ✓ | $19,000,000 | $17,000,000 | Triangle | 1800 Century Blvd. |
| VII | PR 388 | $16,900,000 | $18,000,000 | Twin Glass Bldg. | 2635 Century Pkwy. |
| VIII | PR 753 ✓ | $18,300,000 | $20,000,000 | AT&T Building | 2800 Century Pkwy. |
| | | $72,500,000 | $70,710,000 | | |

PIS 4005760

APPENDIX F

# APPENDIX F

## EXCERPTS FROM
## AGREEMENT FOR PURCHASE AND SALE FOR
## 2600 CENTURY CENTER,
## DATED JULY 28, 1988

Halliwell Engineering Associates, Inc., July 1996

<u>AGREEMENT FOR PURCHASE AND SALE</u>

(PRISA Account)


by and between


THE PRUDENTIAL INSURANCE COMPANY OF AMERICA

as Seller,

and

CENTURY CENTERGROUP

as Purchaser


July 28, 1988


PIS 4007317

TABLE OF CONTENTS

| PARAGRAPH | TITLE | PAGE |
|---|---|---|
| 1 | Purchase and Sale | 3 |
| 2 | Purchase Price | 3 |
| 3 | Earnest Money | 5 |
| 4 | Title | 6 |
| 5 | Conveyance of Title | 7 |
| 5.A | Ground Lease Assignment | 7 |
| 5.B | Limited Warranty Deed | 7 |
| 5.C | Bill of Sale | 7 |
| 5.D | Assignments | 7 |
| 5.E | Commission Agreements | 8 |
| 5.F | Ground Lease Estoppels | 9 |
| 5.G | Space Lease Estoppels | 11 |
| 5.H | Files and Records | 13 |
| 5.I | Notices of Assignment and Assumption | 14 |
| 5.J | Non-Foreign Certificate; Affidavits and Other Instruments | 14 |
| 5.K | Materials Removal Fund | 15 ← |
| 6 | Closing | 15 |
| 7 | Closing Costs | 16 |
| 8 | Prorations | 16 |
| 9 | Inspection of Property | 19 ← |
| 10 | Condition of Premises at Closing | 21 |
| 10.A | "As-Is" Conveyance | 21 ← |
| 10.B | No Right of Set-Off | 21 |
| 10.C | Operation and Leasing Prior to Closing | 22 |
| 11 | Default | 24 |
| 12 | Brokers | 26 |
| 13 | Notices | 27 |
| 14 | Asbestos Materials | 28 |
| 14.A | Removal of Asbestos Materials | 28 ← |
| 14.B | Asbestos Litigation | 28 ← |
| 15 | Termination of Contracts | 30 |
| 16 | Casualty | 31 |
| 17 | Condemnation | 32 |
| 18 | Representations | 34 |
| 19 | E.R.I.S.A. | 37 |
| 20 | Purchaser's Southern Bell Right of Termination | 38 |
| 21 | General | 40 |
| 21(a) | Agreement Binding | 40 |
| 21(b) | Entire Agreement | 40 |
| 21(c) | Execution Necessary | 40 |
| 21(d) | Confidentiality | 42 |
| 21(e) | Agreement Irrevocable | 42 |
| 21(f) | Time is of the Essence | 43 |
| 21(g) | Governing Law | 43 |

PIS 4007318

## SCHEDULE OF EXHIBITS

| EXHIBIT | TITLE | REFERENCE PARAGRAPH |
|---|---|---|
| A | Ground Leases | Recitals |
| B | Leasehold Property | Recitals |
| C | Fee Property | Recitals |
| D | Space Lease Tenants | Recitals |
| E | Commission Agreements | Recitals |
| F | Service Contracts | Recitals |
| G | Personal Property | Recitals |
| H | Mortgage Loan Conditions | 2A |
| H-1 | Gap Loan Conditions | 2A |
| H-2 | 2800 Loan Conditions | 2A |
| I | Permitted Title Exceptions | 4 |
| J | Ground Lease Assignment | 5A |
| K | Deed | 5B |
| L | Bill of Sale | 5C |
| M | Space Lease Assignment | 5D |
| N | Service Contract Assignment | 5D |
| O | Broker/Agent Agreements | 5E |
| P | Ground Lease Estoppel Certificate | 5F |
| Q | Space Lease Estoppel Certificate | 5G |
| R | Prior Estoppel Form | 5G |
| S | Section 1445 Certificate | 5J |
| T | Affidavit of Title | 15J |
| U | Exceptions to Representations | 18A |
| V | Note | 2A |
| W | Security Deed | 2A |

PIS 4007319

Purchaser the following:  (a) an Affidavit with respect to
liens in substantially the form of Exhibit T attached hereto
and made a part hereof; (b) a conveyance or assignment of any
portion of the Property sold hereunder for which the conveyance
is not otherwise provided in this Agreement; (c) the legal
opinion of Seller's counsel confirming the authority of Seller
to enter into and consummate this Agreement and the authority
of those executing the documents executed by Seller at Closing
to do so; and (d) an incumbency certificate duly executed by an
Assistant Secretary of Seller with respect to the offices held
by the persons who at Closing execute documents on behalf of
Seller.

    K.   <u>Materials Removal Fund</u>.  At Closing, Seller shall
establish a fund out of the proceeds of the cash portion of the
Purchase Price in the amount of Two Million Four Hundred
Sixteen Thousand Eight Hundred Sixty Dollars ($2,416,860.00)
(the "Removal Fund"), which Removal Fund shall be held and
disbursed by Seller pursuant to the terms of the Mortgage Loan
Conditions; in the event that, prior to Closing, Seller
removes all Materials (as defined in the Mortgage Loan
Conditions) from portions of the building located at
2600 Century Parkway in accordance with the standards of the
Mortgage Loan Conditions, then the amount of the Removal Fund
so established at Closing shall be reduced only to the extent
that such removal, and the cost thereof, have been approved and
consented to by Purchaser in writing after the date of July 21,
1988.

    6.   <u>Closing</u>.  Closing (the "Closing") shall occur in the
offices of Alston & Bird, 1200 C&S National Bank Building,
35 Broad Street, Atlanta, Georgia 30335 at 9:00 a.m. on
September 1, 1988, except that in the event that on or before
August 25, 1988 a New Southern Bell Lease has not been executed
and delivered by each of Seller and Southern Bell (as
hereinafter defined), then the date of Closing shall be

- 15 -

PIS 4007334

are not refundable to Seller by the holder thereof and which deposits are either transferred to Purchaser or shall benefit Purchaser following closing.

   G. In the event that the actual amounts of any of the aforesaid proration items are unavailable as of the date of Closing, then such proration shall be made on the basis of an amount reasonably estimated by Purchaser and Seller at Closing and Purchaser and Seller shall thereupon reprorate such items at such times as the exact amounts for such proration items become available (but such prorations will be made within six months after the date of Closing or upon such later date as the exact amounts for such proration become available).

In the event that the Purchase Price is received by Seller at or after two o'clock P.M. local Atlanta, Georgia time on the date of Closing, then the prorations set forth above shall each be made as of 11:59 o'clock P.M. local Atlanta, Georgia time on the date of Closing and, in each such proration set forth above, the portion thereof allocable to periods beginning with the day following the date of Closing shall be credited to Purchaser, or charged to Purchaser, as applicable, at Closing or, in the case of allocations made after Closing under Subparagraph 8B hereinabove, upon receipt of such Rental Payments.

   9. Inspection of Property.  Purchaser shall, at all reasonable times prior to the date of Closing or the earlier termination of this Agreement and subject to the rights of tenants under the Space Leases, have the privilege of going upon the Property with its agents, representatives and contractually retained independent contractors as needed to inspect, examine, test, appraise and survey the Property, all of which tests, studies and reviews shall be performed at Purchaser's sole cost and expense, but without having any right to terminate this Agreement except as otherwise expressly set

- 19 -

*7247 (P*(SA)

PIS 4007338

forth herein, Purchaser having previously completed tests,
studies and reviews of the Property and of the documents and
records related thereto sufficient to determine to purchase the
Property as herein set forth.   Furthermore, in consideration of
Purchaser's right to inspect the Property as described in this
Paragraph 9, Purchaser shall, and does hereby agree to,
indemnify, defend and hold Seller harmless from any actions,
suits, liens, claims, damages, expenses, losses and liability
arising out of the exercise of such rights and privileges by
Purchaser (including, without limitation, any rights or claims
of materialmen or mechanics to liens on the Property), which
indemnity, defense and hold harmless agreement shall survive
Closing hereunder and any termination of this Agreement.   In
addition, in the event of any termination of this Agreement,
Purchaser shall deliver to Seller the originals or photocopies
of all inspection reports and results, test reports and
results, appraisals, analyses, surveys or other reports
received or obtained by or for Purchaser with respect to the
Property or any part thereof.   In addition to the foregoing,
Purchaser acknowledges and agrees that Purchaser is aware that
certain of the Improvements (namely, the building located at
2600 Century Parkway and otherwise as previously disclosed to
Purchaser) contain asbestos and asbestos-containing materials
(the "Materials") and that, as a consequence thereof, Purchaser
has required that Seller set aside at Closing the Removal Fund
and Purchaser has agreed to remove the Materials after
Closing.   Purchaser has investigated the status of the Property
with respect to the Materials and has received bids from
contractors with respect to the cost of removal of the
Materials and has otherwise become satisfied with Purchaser's
capacity to own and operate the Property notwithstanding the
existence of the Materials, with the costs of removing the
Materials and with the obligations and liabilities related
thereto upon acquisition of the Property by Purchaser.

- 20 -

PIS 4007339

Therefore, Purchaser acknowledges and agrees that Purchaser shall not be entitled to terminate this Agreement in the event that Purchaser hereafter becomes dissatisfied with the Property on account of the Materials or any costs, expenses, claims or liabilities related thereto or involved in the removal thereof.

10.    Condition of Premises at Closing.

A.    "As-Is" Conveyance.  In consideration of Seller's creation of the Removal Fund, Seller's agreement to provide to Purchaser at Closing a credit against the cash portion of the Purchase Price in the amount of $150,000.00 (as an amount provided to Purchaser to provide repairs to certain items disclosed by Purchaser's inspections as hereinbelow provided) and Purchaser's receiving access to the Property as permitted by Seller prior to the execution of this Agreement in order for Purchaser to conduct such studies, tests, investigations, inspections and analyses with respect to the Property as Purchaser has desired, Purchaser acknowledges and confirms that Purchaser shall accept Seller's conveyance of the Property to Purchaser in "as-is" condition free of any warranty by Seller except as otherwise expressly provided in this Agreement and free of any obligation by Seller to perform any repairs or other improvement work with respect to the Property except as otherwise expressly provided in Paragraph 10C hereof.

B.    No Right of Set-Off.  Furthermore, Purchaser acknowledges and agrees that Purchaser shall have, and shall claim, no right of set-off, reduction, counterclaim or any other similar claims or defenses against payment or performance under any instruments executed to evidence or secure the purchase money financing described herein by virtue of any representations and warranties given to Purchaser in this Agreement or otherwise in the instruments of conveyance to Purchaser delivered at Closing and by virtue of any loss, damage or expenses on account of said representations and warranties or the correctness or incorrectness thereof.

- 21 -

<u>If to Purchaser</u>:

          Jerome Janger, Esq.
          138 South Lasky Drive
          Beverly Hills, California   90212

<u>with a copy to</u>:

          Mr. Roderick T. White
          White & Associates, Inc.
          Suite 1500
          1800 Century Boulevard, NE
          Atlanta, Georgia   30345

14.   <u>Asbestos Materials</u>.

A.   <u>Removal of Asbestos Materials</u>.   After Closing,
Purchaser shall remove, at Purchaser's sole cost and expense
(including, but not limited to, reimbursements for costs and
expenses drawn from the Removal Fund), the asbestos-containing
materials described in the reports of BCM Converse, Inc. dated
April 28, 1986 and McCrone Environmental Services, Inc. dated
April 22, 1986 (the "Reports") from the building located at
2600 Century Parkway in such a manner as to prevent the
disbursement of asbestos fibers.   Purchaser shall conduct such
removal and shall transport, store and dispose of such asbestos
in a manner which is in compliance with all federal, state and
local laws, regulations and standards whenever and by whomever
triggered (including, but not limited to, the Federal Clean Air
Act, 42 U.S.C. Sec. 7401 <u>et seq</u>.) with respect to the removal
of such materials and Purchaser shall initiate and complete
such removal in an orderly and timely manner, all as set forth
in the Mortgage Loan Conditions.   Nothing in this subparagraph
shall be deemed a representation by Seller that the work
contemplated by the Reports is the only asbestos work required
or desirable at the Property.

B.   <u>Asbestos Litigation</u>.   In consideration of the
establishment of the Removal Fund to be held by Seller pursuant
to the terms of the Mortgage Loan Conditions referenced in
Paragraph 2B hereof, and notwithstanding anything in this
Agreement to the contrary, it is understood and agreed that
Seller is not selling to Purchaser and Purchaser is not

- 28 -

??:??  ??:5A?

PIS 4007347

purchasing from the Seller any interest in Civil Action
No. 87-4227, in the U.S. District Court for the District of New
Jersey: The Prudential Insurance Company of America; PIC Realty
Corporation; and 745 Property Investments, Plaintiffs v. United
States Gypsum Company, et al., or Civil Action No. 87-4238, in
the U.S. District Court for the District of New Jersey: The
Prudential Insurance Company of America and PIC Realty
Corporation, Plaintiffs v. National Gypsum Company, being
generally, actions seeking damages against numerous entities
involved with asbestos located in certain buildings, including
the Property (hereinafter, such proceedings are referred to as
the "Existing Actions"). In addition, it is understood and
agreed that Seller is not selling to Purchaser and Purchaser is
not purchasing from Seller any claims, actions, causes of
action or other rights against any asbestos manufacturer,
distributor, vendor, architect, engineer, contractor,
subcontractor or other asbestos supplier with respect to the
Property, but rather all such claims and other rights shall
continue to remain with and belong to Seller, whether pursuant
to the terms of the Existing Actions or any other action or
claim now or hereafter made or commenced by Seller against the
parties in the Existing Actions or any other company or entity
or in any other action or method which Seller may pursue.
Nothing in the foregoing is intended to restrict Purchaser from
pursuing any rights or remedies it may have against its own
asbestos contractors in connection with the removal, enclosure
or encapsulation of the asbestos. Purchaser agrees to
cooperate with Seller in any such action or method of pursuing
asbestos damage recovery, all at no cost or expense to
Purchaser. Without limiting the above, it is understood that
Purchaser shall provide access to Seller to take such tests and
do other discovery as Seller or said parties in the Existing
Actions may deem necessary or desirable, provided that Seller
shall pay the costs of any such testing and discovery; Seller

- 29 -

PIS 4007348

shall, and does hereby agree to, indemnify, defend and hold
Purchaser harmless from any actions, suits, liens, claims,
damages, expenses, losses and liability arising out of the
exercise of such rights by Seller and said parties in the
Existing Actions (including, without limitation, any rights or
claims of materialmen or mechanics to liens on the Property),
which indemnity, defense and hold harmless agreement shall
survive Closing hereunder.  Any such testing or discovery shall
be coordinated with Purchaser and shall be conducted in a
manner which will not materially interfere with any tenants or
any other business operations on the Property.  At such time as
Purchaser is prepared to commence the actual removal of any of
the asbestos from the Property, Purchaser shall give Seller
notice prior to such commencement of actual removal (which
notice shall be in writing and shall be given not less than 70
days prior to the commencement of such actual removal, unless
such removal is in accordance with a schedule previously
submitted by Purchaser and approved by Seller) in order that
Seller or other litigants or their agents or representatives
shall be able to conduct such tests or take such other
discovery as it shall deem appropriate or desirable prior to
such removal.  The terms of this Paragraph 14B shall survive
the Closing, shall "run with the land" and be binding upon the
Purchaser and its successors and assigns.  Each of the Deeds
and Ground Lease Assignments to be delivered pursuant to
Paragraph 5 of this Agreement (or, in lieu thereof, a separate
instrument acceptable in form to Seller and Purchaser which
shall be in recordable form and shall be recorded along with
said Deeds and Assignments) shall contain a provision
preserving to Seller the rights reserved by this Paragraph 14B.

15.  <u>Termination of Contracts</u>.  Purchaser acknowledges that
the Property is currently managed under a management contract
with Property Management Systems ("PMS") and that the Property
is subject to a leasing agreement with White & Associates.

- 30 -

PIS 4007349

APPENDIX G

# APPENDIX G

## EXCERPTS FROM EXHIBIT H OF AGREEMENT FOR PURCHASE AND SALE MORTGAGE LOAN CONDITIONS FOR 2600 CENTURY CENTER

Halliwell Engineering Associates, Inc., July 1996

EXHIBIT H

Mortgage Loan Conditions

Atlanta                                    Loan No.: _____
                                           (PRISA Account Loan)

1.  Loan Terms

    Amount:   $5,778,400.00

    Interest Rate:  9.00% during the first five (5) years of
    the Loan; thereafter, during the sixth and seventh years of
    the Loan, the interest rate shall be a rate equal to a
    fixed annual interest rate equal to the implied annual
    yield on U.S. Treasury Securities with a two-year maturity
    [as determined by Prudential based on the weekly average
    Treasury Constant Maturity Yield reported in Federal
    Reserve Statistical Release H.15-Selected Interest Rates
    for the week preceding the fifth anniversary of the date of
    the Note (as hereinafter defined); Prudential's
    determination of such rate shall be binding absent manifest
    error] plus one and one-quarter percent (1.25%), but in no
    event in excess of ten percent (10%) per annum; no points
    or origination fee.

    Payments:  Interest only, payable monthly in arrears during
    the first five (5) years of the Loan; thereafter, during
    the sixth and seventh years of the Loan, equal monthly
    payments shall be made in an amount sufficient to pay all
    accrued interest on the outstanding principal balance of
    the Loan on a current monthly basis and to amortize the
    principal balance of the Loan together with such interest
    over an assumed 360-month period; notwithstanding such
    amortization schedule, the entire then-outstanding
    principal balance of the Loan, all advances and other
    charges and fees thereunder, and all accrued but unpaid
    interest thereon, shall be due and payable seven years from
    the date of the Note; interest shall accrue on an amount
    equal to the difference obtained by subtracting (a) the
    total outstanding balance of the Removal Fund (as
    hereinafter defined) from (b) the outstanding principal
    balance of the Loan.

# EXHIBIT H

PIS 4007433

the Mortgaged Premises subject to the same
limitations on liability as are applicable
to Mortgagor and without any other change in
the Loan terms.  If requirements (1) through
(7), inclusive, are met, then simultaneously
with such transfer Prudential shall remove
all cross-default provisions which would
cause the Mortgage on the premises so
transferred to be or become in default
because of a default under any other
Mortgage.

Applicant shall deliver to Prudential
written notification of Applicant's intent
to transfer the Mortgaged Premises at least
thirty (30) days prior to the date of the
closing of the transfer.  Said notification
shall identify the proposed transferee,
state the transferee's relationship to
Applicant and demonstrate compliance with
the requirements set forth above.

(b)  <u>Hazardous Waste and Asbestos</u>

(i)  <u>Compliance</u>.  At its sole cost and expense,
Mortgagor shall comply with all federal, state and
local laws, regulations and orders with respect to the
discharge and removal of hazardous or toxic wastes,
pay immediately when due the cost of removal of any
such wastes, and keep the Mortgaged Premises free of
any lien imposed pursuant to such laws, rules,
regulations and orders.

(ii)  <u>No Installation</u>.  In addition, Mortgagor
shall not install or permit to be installed in the
Mortgaged Premises, asbestos or any substance
containing asbestos and deemed hazardous by federal,
state or local laws, rules, regulations or orders
respecting such material.

(iii)  <u>Removal</u>.  Furthermore, from and after the
Closing Date, Mortgagor shall, at Mortgagor's sole
cost and expense, remove or cause the removal of all
asbestos and asbestos-containing materials
(hereinafter collectively referred to as the
"Materials") from the building (the "Building")
located at 2600 Century Parkway in a continuous,
efficient, orderly and timely manner as soon as such

- 12 -

removal is practicable, all as set forth below. The
removal of all Materials from each floor of such
Building shall be completed, with respect to each such
floor within such Building, on or before twelve (12)
months after the earlier of: (y) the date on which the
last Space Lease (in effect as of the Closing Date)
leasing space on such floor expires or (z) the date on
which the last tenant under a Space Lease on such
floor actually vacates such floor. In addition, on or
before five (5) years from the date of the Note,
Applicant shall fully remove all Materials from not
less than fifty percent (50%) of the square footage of
the portion of the Building which, as of the Closing
Date, contained Materials. Subject to the requirement
of the preceding sentence, Mortgagor may permit the
renewal or extension of existing Space Leases so long
as the term of such renewal or extension will
terminate on or before five (5) years after the date
of the Note. Mortgagor acknowledges that Mortgagor's
obligations as herein set forth with respect to the
removal of the Materials are in no way conditioned on
the availability or sufficiency of the Removal Fund
(as hereinafter defined) as a source for reimbursement
of all or any part of Mortgagor's costs and expenses
in connection with such removal and that Mortgagor
shall be and remain obligated to remove or cause the
removal of the Materials even in the event that
Mortgagor is unable to obtain disbursement from the
Removal Fund as a result of any failure to comply with
the conditions applicable to the Removal Fund or as a
result of the exhaustion of the Removal Fund.

The process of the removal of all Materials shall
be carried out in accordance with Mortgagor's plans
for such removal, which have been outlined to
Prudential as follows:

(A)      Mortgagor shall retain a qualified, fully
licensed, independent professional asbestos
consulting firm (such firm, together with any
replacement firm approved as herein provided, is
hereinafter referred to as the "Consultant"),
approved by Prudential, which approval shall not
be unreasonably withheld. Mortgagor shall notify
Prudential in writing of the name of the
Consultant proposed by Mortgagor. If, within
ten (10) business days after Prudential's receipt
of Mortgagor's notice as aforesaid, Prudential

- 13 -

PRISA Account Loan

PIS 4007445

fails to object to the identity of the
Consultant, Prudential shall be deemed to have
consented to the identity of the Consultant.
Mortgagor shall retain the right to replace the
Consultant subject to the foregoing approval
provisions.  The Consultant shall prepare and
deliver to Mortgagor, not later than one year
from the Closing Date, a Removal, Operations and
Maintenance Plan (this Removal, Operations and
Maintenance Plan, as the same may be amended or
replaced as hereinafter provided, is hereinafter
referred to as the "Plan") with respect to the
removal of the Materials and with respect to the
policies and procedures for employees, tenants
and other parties impacted by such removal
process, which Plan shall incorporate all
applicable legal and regulatory requirements and
insurance recommendations with respect to
asbestos removal.  Upon completion of the Plan,
Mortgagor shall promptly forward a true, correct
and complete copy of the Plan to Prudential and
shall promptly institute the recommendations of
the Plan with respect to the Mortgaged Premises.
Mortgagor shall retain the right to permit the
Consultant to revise, update and replace the Plan
in accordance with the foregoing standards.  Upon
any such revision, update or replacement,
Mortgagor shall promptly forward a true, correct
and complete copy of such revision, update or
replacement to Prudential.

(B)        Mortgagor shall, on or before one year from
the Closing Date, prepare a schedule showing on a
floor by floor basis the expiration dates of the
current terms of all of the Space Leases (as
defined in the "Purchase Agreement") in the
Building, and shall disclose this schedule to the
Contractor (as hereinafter defined) and to the
Consultant.  The Mortgagor retains the right to
revise and update the schedule as necessary to
facilitate the removal of the Materials (for
example, as tenants vacate or decline to exercise
extension or renewal options or as Mortgagor
permits extensions or renewals to the extent
herein permitted).  Any changes to this schedule
which arise during the course of removal shall be
promptly forwarded to Prudential, the Contractor
and the Consultant.  The Plan shall incorporate

- 14 -

such schedule and shall include specific time
deadlines for the removal of Materials from each
space leased in the Building, based on the
anticipated vacancy dates thereof.

(C)        Mortgagor shall, on or before two years from
the Closing Date, negotiate and enter into an
agreement (this agreement, as the same may be
amended or replaced as hereinafter provided, is
hereinafter referred to as the "Removal
Agreement") with a qualified, fully licensed,
reputable independent professional asbestos
removal contractor (such contractor, together
with any replacement contractor approved as
herein provided, is herein referred to as the
"Contractor"), approved by Prudential, which
approval shall not be unreasonably withheld.  The
Contractor shall agree in such Removal Agreement
to remove the Materials in accordance with the
Plan and in accordance with the provisions
hereof.  Promptly upon selection of a proposed
Contractor and while negotiations with such
proposed Contractor are ongoing with respect to
the Removal Agreement, Mortgagor shall notify
Prudential in writing of the name of the
Contractor proposed by Mortgagor and shall
provide Prudential with such further information
with respect to the Contractor as Prudential may
require.  If, within ten (10) business days after
Prudential's receipt of Mortgagor's notice as
aforesaid, Prudential fails to object to the
identity of the Contractor, Prudential shall be
deemed to have consented to the identity of the
Contractor.  Mortgagor shall retain the right to
replace the Contractor subject to the foregoing
approval provisions.  Upon execution of the
Removal Agreement, Mortgagor shall promptly
provide a true, correct and complete copy of the
Removal Agreement to Prudential.  Mortgagor shall
retain the right to revise, update and replace
the Removal Contract in accordance with the
foregoing standards.  Upon any such revision,
update or replacement, Mortgagor shall promptly
forward a true, correct and complete copy of such
revision, update or replacement to Prudential.
Mortgagor shall assign Mortgagor's rights under
the Removal Agreement to Prudential as additional
security for the Loan.  Mortgagor shall obtain

- 15 -

PRISA ACCOUNT LOAN

PIS 4007447

the consent of the Contractor to the assignment
of the Removal Agreement, which assignment and
consent shall be evidenced by assignment and
consent instruments which are entirely acceptable
to Prudential.

(D)        At Prudential's option, and at the sole cost
and expense of Prudential (but only as to work
ordered by Prudential independent of work ordered
by Mortgagor), Prudential may appoint an
independent professional asbestos consulting firm
("Prudential's Consultant") to inspect the work
done by the Contractor with respect to the
removal of the Materials.  Promptly after
selection of Prudential's Consultant as
aforesaid, Prudential shall notify Mortgagor of
the identity of Prudential's Consultant.
Prudential may require that, as a condition
precedent to the receipt by Mortgagor of any
amounts from the Removal Fund, Prudential receive
a certificate from Prudential's Consultant, in
form and substance satisfactory to Prudential,
that all of the Materials for the space certified
by the Mortgagor have been in fact properly
removed in accordance with the provisions of the
Plan; in the event that Prudential's Consultant
is unable to deliver such certificate, Prudential
shall forward to Mortgagor the results of
Prudential's Consultant's examination and direct
Prudential's Consultant to meet with the
Consultant to determine whether the Materials
have in fact been properly removed as aforesaid.
In the event that Prudential's Consultant and the
Consultant are unable to concur as to whether the
Materials have been properly removed as
aforesaid, then Prudential's Consultant and the
Consultant shall jointly select a third
consultant at the sole cost and expense of
Mortgagor who shall conduct an independent
examination; and Prudential shall have no
obligation to advance funds as aforesaid unless
and until said third consultant issues a
certificate to Prudential that all such Materials
have been removed as aforesaid.

(iv)  Event of Default.  In the event that
Mortgagor fails to comply in any and all respects and
at all times with any of the preceding covenants,

- 16 -

(e)  of the misapplication of (i) any proceeds paid under
     any insurance policies by reason of damage, loss or
     destruction to any portion of the Mortgaged Premises
     (to the full extent of such proceeds), (ii) any
     proceeds or awards resulting from the condemnation of
     all or any part of the Mortgaged Premises (to the full
     extent of such proceeds or awards), or (iii) rents
     received after any notice of default or foreclosure or
     exercise of other remedies by Prudential in the event
     of default by Applicant hereunder; or

(f)  of any tenant's security deposits not turned over to
     the Prudential upon foreclosure;

(g)  of any actionable waste of the Mortgaged Premises;

(h)  should Applicant fail for any reason to discharge in a
     timely manner its covenants and obligations under
     Paragraph 7(b) hereof or under the Purchase Agreement
     with respect to the removal of asbestos, but such
     recourse liability shall apply only to the extent of
     an amount equal to the balance then remaining in the
     Removal Fund; or

(i)  of the misuse of the Removal Fund, or any portion
     thereof, as established pursuant to the Purchase
     Agreement, these Mortgage Loan Conditions or the
     Mortgage.

The recourse liability resulting from (e), (f), (g) and (i)
above shall apply only to the extent of Prudential's
deficiency as a direct result of the action or omission
described in such clause.

16.  Extension

     Not applicable.

→ 17.  Removal Fund.

          At Closing, Prudential shall establish a fund (said
     fund, as the same may be reduced from time to time as
     disbursements are made as herein set forth, is hereinafter
     referred to as the "Removal Fund") in the amount of Two
     Million Four Hundred Sixteen Eight Hundred Sixty Dollars
     ($2,416,860.00) out of the proceeds of the cash portion of
     the Purchase Price (as defined in the within Purchase
     Agreement), which Removal Fund shall be disbursed to

- 23 -

Applicant and deposited by Applicant with Prudential, which
fund shall belong to Prudential and shall be held and
deposited by Prudential along with other funds of
Prudential in a bank of Prudential's choosing or otherwise
at the option of Prudential, and all interest thereon shall
accrue for the account of Prudential. Prudential shall
hold the Removal Fund pursuant to these conditions for a
period equal to the term of the Loan. In the event that
there is any event of default under the Loan, Prudential
may, and is hereby authorized to, apply the Removal Fund to
repayment of the Loan after written notice to Applicant and
the failure of Applicant to cure such default prior to the
expiration of thirty (30) days after such written notice,
and thereafter Applicant shall have no further rights with
respect to the Removal Fund.

    Applicant shall be entitled to a disbursement of
amounts from the Removal Fund only upon completion of the
removal of the Materials from a specific, definable portion
(subject to verification of Prudential) of the Building
(the square footage of which shall be located on a floor
plan of the Building) in increments of Five Thousand (5000)
square feet, in accordance with the Removal Agreement, the
Plan and this instrument.

    Applicant may request disbursement from the Removal
Fund by presentation of the following items to Prudential:

        A.   An affidavit of a duly authorized general
    partner of Applicant that all Materials with respect
    to such portion of the Building have been removed in
    accordance with the Plan and that Applicant has not
    previously given any disbursement affidavit with
    respect to such portion; and either:

        B.   A certificate of the Contractor certifying
    that all Materials with respect to such portion of the
    Building have been removed in accordance with the
    Plan; or

        C.   A certificate from the Consultant that all
    Materials with respect to such portion of the Building
    have been removed in accordance with the Plan.

Upon receipt of the same by Prudential, Prudential shall
disburse to Applicant the sum of $24.07 per square foot of
such portion of the Building covered by said items.
Applicant shall make not more than one request per calendar

- 24 -

month for disbursement from the Removal Fund; no request
for disbursement shall be made unless the amount requested
is equal to or greater than $100,000.00. Until Applicant
becomes entitled hereunder to the Final Disbursement (as
defined below), Applicant shall not be entitled to receive
any disbursement which would reduce the Removal Fund to
less than $250,000, anything herein provided to the
contrary notwithstanding.

Applicant shall be entitled to a final disbursement
("Final Disbursement") of all remaining amounts from the
Removal Fund upon completion of the removal of all
Materials from the Building in accordance with the
provisions of the Removal Agreement, the Plan and this
instrument. Applicant may request such Final Disbursement
from the Removal Fund by presentation of the following
items to Prudential:

    A.   An affidavit of a duly authorized general
partner of Applicant that all Materials have been
removed from the Building in accordance with the Plan;

    B.   A certificate of the Contractor certifying
that all Materials have been removed from the Building
in accordance with the Plan;

    C.   A certificate from the Consultant that all
Materials have been removed from the Building in
accordance with the Plan;

    D.   Affidavits and certificates from the
Applicant and Contractor that all costs related to the
removal of the Materials have been paid in full and
that no further costs shall be incurred or billed in
connection therewith.

Upon receipt of the same by Prudential, Prudential shall
disburse to the party named in any final invoice set forth
in such request the amount to which such party is entitled
hereunder, and any remaining amounts of the Removal Fund
shall thereupon be applied in repayment of the Loan; or if
the Loan has been paid in full, shall be paid to
Applicant.

In addition, notwithstanding that Applicant has not
yet qualified for the Final Disbursement, the Removal Fund
shall be applied against the current balance of the Loan
upon payment in full of the Loan at maturity or upon

- 25 -

PRISA Account Loan

PIS 4007457

APPENDIX H

# APPENDIX H

## REMOVAL FUND ALLOCATION REQUEST
## FOR 2600 CENTURY CENTER - FOURTH FLOOR

Halliwell Engineering Associates, Inc., July 1996



**WHITE & ASSOCIATES**
R E A L   E S T A T E

April 27, 1990

Ms. Elizabeth Andress
The Prudential Acquisitions and Sales Group
One Ravinia Drive
Suite 1400
Atlanta, Georgia  30346

SUBJECT:      REMOVAL FUND ALLOCATION
2600 CENTURY PARKWAY-FOURTH FLOOR
ATLANTA, GEORGIA

Dear Elizabeth:

In accordance with Exhibit H, Section 17 of the loan agreement between  Century
Centergroup and the Prudential Insurance Company of America, we respectfully
make a request for disbursement of $585,636.22.  This amount is based upon the
substantial completion of asbestos abatement from the above referenced project; said
project comprising approximately 24,746 square feet.  As agreed, this disbursement
is allocated at a unit price of $24.07 per square foot, less an estimated $10,000 for
ongoing abatement of stairwells.

Included with this letter you should find copies of the following documents, further
attesting to the completion of the above-referenced project:

1.      Exhibit A - "Final Report on Project Monitoring During Asbestos Abatement,
2600 Century Parkway First Floor", dated April 26, 1990.

2.      Exhibit B - Certificate of Substantial Completion, AIA G704, completed by
Owner, Environmental Consultant, and Contractor, dated April 27, 1990.

3.      Exhibit C - Final Work Area Inspection Form, First Floor - 2200 Building,
completed by the Environmental Consultant and Contractor, dated April 20,
1990.

4.      Exhibit D - Signed Affidavit of duly authorized general partner, dated April
27, 1990.

I have already transmitted to you under March 22, 1990 cover letter the following
project information:

1.      Supplement to Assignment of Borrower's Interest in Plans and Contracts;
dated March 22, 1990;

2.      Contractor's Consent to Assignment, signed by General Contractor, dated
March 15, 1990;

PIS 4009761

Ms. Elizabeth Andress
Prudential Acquisitions and Sales Group
April 27, 1990
Page 2

3.  Agreement and General Conditions Between Owner and Contractor, dated
    March 15, 1990;

4.  Specifications for Asbestos Abatement, 2600 Century Parkway, Fourth Floor
    and Second through Fourth Floor Stairwells, Atlanta, Georgia, prepared by
    Westinghouse Environmental and Geotechnical Services, Inc., (Westinghouse)
    dated February 22, 1990;

5.  Specifications for Spray Applied Fireproofing and Reinsulation, 2600 Century
    Center, Fourth Floor and Stairwells, prepared by Westinghouse, dated
    January 9, 1990;

6.  Plans for Asbestos Abatement, (drawings AA-1 through AA-8) dated January
    9, 1990, prepared by Westinghouse.

Based upon these documents and upon our personal observations, we consider this
phase of the project to have been performed in substantial compliance with
applicable Federal and State regulations and in accordance with specifications
prepared by our environmental consultant.  This represents our first of two
disbursements on this project.  Please note that upon substantial completion of the
Second through Fourth Floor Stairwells, we will submit an additional disbursement
request for $30,000.00.  I anticipate submitting this in about ten business days.

At this time, I would also like to submit to you a revised schedule for upcoming
asbestos abatement work in the 2200 and 2600 Buildings.  This schedule has been
updated from the previous one which was sent under March 22, 1990 cover letter.

**Century Center - Phase I (2200 Century Parkway):** To include removal and disposal
of friable asbestos containing fireproofing materials, potentially friable asbestos-
containing insulative materials, and miscellaneous non-friable asbestos-containing
materials (where applicable).

| Floor | Square Footage | Approximate Start/Finish Date |
|---|---|---|
| Third | 12,557 | 05/16/90 - 06/14/90 |
| Ninth | 12,557 | 06/11/90 - 07/15/90 |
| Fourth | 12,557 | 06/04/90 - 06/30/90 |
| Stairwells | N/A | 06/11/90 - 07/15/90 |
| 1st - 9th Floors | | |

Please note that the ground, first, second, fifth, sixth, seventh, eighth, and tenth
floors are substantially complete.

PIS 4009762

Ms. Elizabeth Andress
Prudential Acquisitions and Sales Group
April 27, 1990
Page 3

**Century Center - Phase IV (2600 Century Parkway):** To include removal and disposal of friable asbestos containing fireproofing materials, potentially friable asbestos-containing insulative materials, and miscellaneous non-friable asbestos-containing materials (where applicable).

| Floor | Square Footage | Approximate Start/Finish Date |
|-------|----------------|-------------------------------|
| Stairwells | N/A | Work-in-Progress |

Please note that floors one two, three, four and the basement are substantially complete.

White & Associates Management Group is pleased to provide this information to Prudential. If you have any questions about this correspondence, or if you require any further information, please contact me.

Sincerely,

WHITE & ASSOCIATES MANAGEMENT GROUP

G. Scott Walters
Vice President Development

GSW.ods

Attachments

PIS 4009763

APPENDIX I

# APPENDIX I

## SUMMARY OF DISBURSEMENTS AND REMOVAL FUND ALLOCATION - FINAL REQUEST, 2600 CENTURY CENTER

Halliwell Engineering Associates, Inc., July 1996

ASBESTOS ABATEMENT
2600 BUILDING
CENTURY CENTER

| FLOOR | SQFT | COST/SQFT | DISBURSEMENT REQUEST | ABATEMENT DATE | |
|-------|------|-----------|----------------------|----------------|---|
| BASEMENT | 1425 | $24.07 | $34,315.12 | COMPLETED | PAID AUG 1, 1989 |
| FIRST | 24746 | $24.07 | $595,636.22 | COMPLETED | PAID AUG 1, 1989 |
| SECOND | 24746 | $24.07 | $595,636.22 | COMPLETED | PAID JAN 3, 1990; HOLDBACK OF $10,000 FOR STAIRWELLS |
| THIRD | 24746 | $24.07 | $595,636.22 | COMPLETED | PAID NOV 10,1989; HOLDBACK OF $10,000 FOR STAIRWELLS |
| | | | $1,801,223.78 | | |
| FOURTH | 24746 | $24.07 | $595,636.22 | Apr-90 | |
| | | | $595,636.22 | | |
| HOLDBACK FOR STAIRWELLS | | | $20,000.00 | | |
| TOTAL | | | $2,416,860.00 | | |



## WHITE & ASSOCIATES
R E A L   E S T A T E

June 13, 1990

Ms. Elizabeth Andress
The Prudential Acquisitions and Sales Group
One Ravinia Drive
Suite 1400
Atlanta, Georgia  30346

SUBJECT:   REMOVAL FUND ALLOCATION-FINAL REQUEST
2600 CENTURY PARKWAY BUILDING
ATLANTA, GEORGIA

Dear Elizabeth:

In accordance with Exhibit H, Section 17 of the loan agreement between Century
Centergroup and the Prudential Insurance Company of America, we respectfully
make a final request for disbursement in the amount of $250,000.00. This amount
is based upon the substantial completion of all asbestos abatement from the above
referenced project; as detailed in our five previous requests for disbursement. Included
with this letter you should find copies of the following documents, further
attesting to the final completion of the above-referenced project:

1.    Exhibit A - Affidavit of duly authorized general partner of Century
Centergroup, dated June 12, 1990 attesting that; 1) all Materials have been
removed from the Building, and; 2) all costs related to the removal of all
Materials have been paid in full;

2.    Exhibit B - Certificate from Samurai Construction Company, Inc., dated June
8, 1990 certifying that all Materials have been removed from the basement,
first, second, and third floors, and first floor stairwells, i.e., those portions of
the Building which they were contractually obligated to perform removal of
the Materials in accordance with the Plan;

3.    Exhibit C - Certificate from HEPACO, Inc., dated June 8, 1990 certifying that
all Materials have been removed from the fourth floor and second through
fourth floor stairwells, i.e, those portions of the Building which they were
contractually obligated to perform removal of the Materials in accordance
with the Plan;

4.    Exhibit D - Certificate from the Consultant, Westinghouse Environmental and
Geotechnical Services, Inc., dated June 12, 1990, stating that all materials
have been abated from the Building, in accordance with the Plan;

---

Suite 800, 2200 Century Parkway, NE, Atlanta, Georgia 30345-3203    Tel. 404/321-6555    Fax 404/325-4173

**ATLANTA/ST. SIMONS ISLAND**

PIS 4009711

Elizabeth Andress
Prudential Acquisitions and Sales Group
June 13, 1990
Page 2

5.      Exhibit E - Final Release of Lien from Samurai Construction Company, Inc.,
         dated June 8, 1990; and,

6.      Exhibit F - Final Release of Lien from HEPACO, Inc., dated June 12, 1990.

To the best of my knowledge, this satisfies your requirements for final disbursement
request as set forth in the closing documents between Prudential and Century
Centergroup.  If you have any questions about the submittals provided herein,
require any further information, or if I may be of further assistance, please do not
hesitate to contact me.

Sincerely,

WHITE & ASSOCIATES MANAGEMENT GROUP

G. Scott Walters
Vice President Development

GSW.ods

attachments

cc:  Sharon Tiller
      Ted Jacobson

PIS 4009712

APPENDIX J

# APPENDIX J

## BCM CONVERSE ASBESTOS SURVEY REPORT, DATED APRIL 26, 1986

Halliwell Engineering Associates, Inc., July 1996

# ASBESTOS SURVEY REPORT

FOR

## PRUDENTIAL INSURANCE COMPANY
## CENTURY CENTER COMPLEX

### PROJECT NO. 05-4151-06



· APRIL 28, 1986



Engineers, Planners and Scientists

PIS 4009963

ASBESTOS SURVEY REPORT

FOR

PRUDENTIAL INSURANCE COMPANY

CENTURY CENTER COMPLEX

BCM PROJECT NO. 05-4151-06

APRIL 28, 1986

_____
W. T. Dumas, P. E.
Manager, Engineering Services

BCM CONVERSE INC.
108 ST. ANTHONY STREET
MOBILE, ALABAMA 36602

© 1986 BCM CONVERSE INC.

PIS 4010036

TABLE OF CONTENTS

PAGE

1.0    INTRODUCTION..........................................1

2.0    METHODS OF ANALYSIS...:...............................2

3.0    RESULTS ..............................................4

4.0    RECOMMENDATIONS......................................14

APPENDICES

APPENDIX A   INTERIM CONTROLS

APPENDIX B   OSHA REGULATIONS

APPENDIX C   AIR MONITORING DATA REPORT

PIS 4010037

1.0    INTRODUCTION

Prudential Insurance Company retained BCM Converse Inc. to survey and
sample properties held by Prudential in the South and Southeastern
regions for the presence of friable asbestos-containing materials.  On
April 17, 1985 Prudential's representative, Bud Burt, requested BCM to
perform the survey and sampling of the Century Center Office Complex.

A visual survey was conducted on April 18, 19, and 20, 1986, to locate
friable potentially asbestos-containing materials (ACM).  When friable
materials were found, samples were collected for laboratory analysis to
confirm the presence or absence of asbestos fibers within the material.
Following the visual survey, air quality monitoring was performed to
determine the concentration of airborne fibers within the areas.

Although the quantitive results are included in this report, further
investigation is in progress to determine the significance of the data.
An additional report addressing the air monitoring results will be issued
in the near future.

-1-

PIS 4010038