NORTHWEST FINANCIAL CENTER
7900 XERXES AVENUE
BLOOMINGTON, MN 55431

# W.R. GRACE & CO.
# ASBESTOS PROPERTY DAMAGE
# PROOF OF CLAIM FORM

*The United States Bankruptcy Court for the District of Delaware*
*In re: W.R. Grace & Co., et al., Debtors, Case No. 01-01139 (JKF)*
*(Jointly Administered)*

## SUBMIT COMPLETED CLAIMS TO:

**Claims Processing Agent**
**Re: W.R. Grace & Co. Bankruptcy**
**PO Box 1620**
**Faribault, MN 55021-1620**

**INSTRUCTIONS FOR FILING THE W.R. GRACE & CO.
ASBESTOS PROPERTY DAMAGE PROOF OF CLAIM FORM**

## WHO SHOULD USE THIS ASBESTOS PROPERTY DAMAGE PROOF OF CLAIM FORM

1.  This Asbestos Damage Proof of Claim Form (referred to in this document as the "Form") applies only to <u>current</u> claims made against Grace by or on behalf of parties who are alleging property damage with respect to asbestos in real property owned by the party (such person is referred to in this document as the "claiming party") from a Grace asbestos-containing product or as a result of one of Grace's vermiculite mining, milling, or processing facilities.

2.  The Bar Date does not apply to Asbestos Personal Injury Claims, Settled Asbestos Claims or Zonolite Attic Insulation Claims. Those claims will be subject to a separate claim submission process and should not be filed at this time.

3.  This form should not be used for Medical Monitoring Claims or Non-Asbestos Claims. Instead, separate specialized proof of claim forms for these claims should be completed.

4.  If you are alleging current claims against Grace with respect to asbestos in more than one (1) real property, the claiming party should complete an Asbestos Property Damage Proof of Claim Form for <u>each</u> property. You may request additional forms by calling the Claims Processing Agent at 1-800-432-1909.

## GENERAL INSTRUCTIONS

1.  This form must be signed by the claimant or authorized agent of the claimant. THIS FORM MUST BE RECEIVED ON OR BEFORE 4:00 PM EASTERN TIME ON MARCH 31, 2003, or you forever will be precluded from asserting your claim(s) against or receiving payment from Grace. Return your completed form to the Claims Processing Agent, Re: W.R. Grace & Co. Bankruptcy, P.O. Box 1620, Faribault, MN 55021-1620.
    If you are returning this form by mail, allow sufficient time so that this form is received on or before March 31, 2003. Forms that are postmarked before March 31, 2003 but received after March 31, 2003 will not be accepted. Only original forms will be accepted for filing. Forms transmitted by facsimile will not be accepted for filing.

2.  If you cannot fit all information in any particular section or page, please make a copy of that page before filling it out and attach as many additional pages as needed.

3.  If you are unable to provide any of the information required by the proof of claim form, please so specify, as well as provide a short statement describing why such information is unavailable. If you are in the process of obtaining such information at the time you file your proof of claim, please so advise and indicate that the same shall be provided when obtained.

4.  This form must be filled out completely using BLACK or BLUE ink or may be typewritten.
    • Please print clearly using capital letters only.       • Do not use a felt tip pen.
    • Skip a box between words.                              • Do not bend or fold the pages of the form.
    • Do not write outside of the boxes or blocks.

5.  Because this form will be read by a machine, please print characters using the examples below. For optimum accuracy, please print in capital letters and avoid contact with the edge of the character boxes.

6.  Mark check boxes with an "X" (example at right). ☒    **NAME HERE**

7.  Be <u>accurate</u> and <u>truthful</u>. A Proof of Claim Form is an official court document that may be used as evidence in any legal proceeding regarding your claim. The penalty for presenting a fraudulent claim is a fine of up to $500,000 or imprisonment for up to five years or both. 18 U.S.C. §§ 152 & 3571.

8.  Make a copy of your completed Form to keep for your records. Send only <u>original</u> Forms to the Claims Processing Agent at the following address: Claims Processing Agent, Re: W.R. Grace & Co. Bankruptcy
    PO Box 1620
    Faribault, MN 55021-1620.

9.  You will receive written notification of the proof of claim number assigned to this claim once it has been processed.

## PART 1: CLAIMING PARTY INFORMATION

**NAME:**

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA

*Name of individual claimant (first, middle and last name) or business claimant*

**SOCIAL SECURITY NUMBER (Individual Claimants):**

*(last four digits of SSN)*

**F.E.I.N. (Business Claimants)**

22-1211670

**Other names by which claiming party has been known (such as maiden name or married name):**

*First*          *MI*   *Last*

*First*          *MI*   *Last*

**GENDER:** ☐ MALE   ☐ FEMALE   **N/A**   ■

**Mailing Address:**

751 BROAD STREET, 21ST FLOOR

*Street Address*

NEWARK

*City*

NJ

*State (Province)*

07102

*Zip Code (Postal Code)*

USA

*Country*

## PART 2: ATTORNEY INFORMATION

**The claiming party's attorney, if any (You do not need an attorney to file this form):**

**Law Firm Name:**

RIKER DANZIG SCHERER HYLAND & FERRETTI LLP

**Name of Attorney:**

ROBERT

*First*

J

*MI*

GILSON

*Last*

**Mailing Address:**

HEADQUARTERS PLAZA ONE SPEEDWELL AVENUE

*Street Address*

MORRISTOWN

*City*

NJ

*State (Province)*

07962

*Zip Code (Postal Code)*

**Telephone:**

(973) 451-8435   ■

*Area Code*

9276101

1018577

**PART X. PROPERTY INFORMATION**

**A. Real Property for Which A Claim Is Being Asserted**

1. What is the address of the real property for which a claim is being asserted (referred to herein as "the property")?

   `7 9 0 0   X E R X E S   A V E N U E`
   *Street Address*

   `B L O O M I N G T O N`  `M N`  `5 5 4 3 1`
   *City*   *State (Province)*   *Zip Code (Postal Code)*

   `U S A`
   *Country*

2. Are you completing an Asbestos Property Damage Proof of Claim Form for any other real property other than the one listed at "1" above?

   ☒ Yes    ☐ No

3. Do you currently own the property listed in Question 1, above?

   ☐ Yes    ☒ No

4. When did you purchase the property?   ☐☐ – ☐☐ – `1 9 7 2`    **SEE ADDENDUM**
   *Month   Day   Year*

5. What is the property used for (check all that apply)?
   ☐ Owner occupied residence
   ☐ Residential rental
   ☒ Commercial
   ☐ Industrial   Specify: _____
   ☐ Other   Specify: _____

6. How many floors does the property have?   `0 0 4`

7. What is the approximate square footage of the property?   `0 0 0 1 7 5 0 5 1`

8. When was the property built?
   ☐ Before 1969
   ☒ 1969 – 1973
   ☐ After 1973

9. What is the structural support of the property?
   ☐ Wood frame
   ☐ Structural concrete
   ☐ Brick
   ☒ Steel beam/girder
   ☐ Other   Specify: _____

10. Have you or has someone on your behalf completed any interior renovations on the property which affected any asbestos on the property?
    ☒ Yes    ☐ No

9276102

1018577

## A. Real Property For Which A Claim Is Being Asserted (Continued)

If yes, please specify the dates and description of such renovations.

| Year | Description | SEE ADDENDUM |
|---|---|---|
| Year | Description | |
| Year | Description | |

11. To the best of your knowledge, have any other interior renovations been completed on the property during any other period of time which affected any asbestos on the property?

☒ Yes   ☐ No   SEE ADDENDUM

If yes, please specify the dates and descriptions of such renovations.

| Year | Description | SEE ADDENDUM |
|---|---|---|
| Year | Description | |
| Year | Description | |

## B. Claim Category

12. For which category are you making a claim on the property?

☒ Category 1:   Allegation with respect to asbestos from a Grace product in the property
☐ Category 2:   Allegation with respect to one of Grace's vermiculite mining, milling or processing operations

If you checked Category 1 in question 12, complete section C.
If you checked Category 2 in question 12, complete section D.

## C. Category 1 Claim: Allegation With Respect To Asbestos From A Grace Product In The Property

13. For what alleged asbestos-containing product(s) are you making a claim?

☒ Monokote-3 fireproofing insulation
☐ Other.   Specify:

(For a list of the brand names under which Grace manufactured products that may have contained commercially added asbestos, see Exhibit 2 to the Claims Bar Date Notice provided with this Proof of Claim Form.)

14. When did you or someone on your behalf install the asbestos containing product(s) in the property?

| Year |
|---|

☒ I did not install the product(s)

15. If you or someone on your behalf did not install the asbestos containing product(s), to the best of your knowledge, when was/were the product(s) installed?

| 1 | 9 | 7 | 1 |
|---|---|---|---|
Year

☐ Don't know.

9276103                                    1018577

16. Do you have documentation relating to the purchase and/or installation of the product in the property?

&#9747; Yes    ☐ No

If Yes, attach all such documents. If the documents are too voluminous to attach, attach a summary of the documents indicating the name of each document, date of each document, a brief description of the document, the location of the document, and who has possession and control of the document.

If you provide a summary of documents rather than the documents themselves, you are required to consent to the production and release of those documents to Grace upon Grace's further request.

17. If you do not have any such documents, explain why not and indicate who may have possession or control of such documents with respect to the property.

SEE ADDENDUM

18. When did you first know of the presence of asbestos in the property of the Grace product for which you are making this claim?

| 1 | 9 | 8 | 5 |
Year

Please attach all documents relating or referring to the presence of asbestos in the property for which you are making this claim. If the documents are too voluminous to attach, attach a summary of the documents indicating the name of each document, date of each document, a brief description of the document, the location of the document, and who has possession and control of the document.

If you provide a summary of documents rather than the documents themselves, you are required to consent to the production and release of those documents to Grace upon Grace's further request.

19. How did you first learn of the presence of asbestos in the property of the Grace product for which you are making this claim?

SEE ADDENDUM

20. When did you first learn that the Grace product for which you are making this claim contained asbestos?

| 1 | 9 | 8 | 5 |
Year

21. How did you first learn that the Grace product for which you are making the claim contained asbestos?

SEE ADDENDUM

22. Have you or someone on your behalf made an effort to remove, contain and/or abate the Grace product for which you are making this claim?

&#9747; Yes    ☐ No

If Yes, attach all documents relating or referring to such efforts. If the documents are too voluminous to attach, attach a summary of the documents indicating the name of each document, date of each document, a brief description of the document, the location of the document, and who has possession and control of the document.

If you provide a summary of documents rather than the documents themselves, you are required to consent to the production and release of those documents to Grace upon Grace's further request.

23. If you do not have any such documents, explain why not and indicate who may have possession and control of such documents with respect to the property.

SEE ADDENDUM

24. If you or someone on your behalf did not make an effort to remove, contain and/or abate the Grace product(s) for which you are making a claim, to the best of your knowledge, did anyone else make such an effort?

☐ Yes    ☐ No    N/A

9276104

1018577

25. If you responded Yes to question 22. or 24. and you have not supplied documents, please specify the dates and descriptions of any such efforts.

| | Description | SEE ADDENDUM |
Year

| | Description |
Year

| | Description |
Year

26. Have you or anyone on your behalf ever conducted any testing or sampling for the presence of asbestos or other particulates in the property?

☒ Yes      ☐ No      If Yes, Attach All Documents Related To Any Testing Of The Property.

27. If you responded Yes to question 26., but you have not provided documents, indicate who may have possession or control of such testing documents or where such documents may be located.

SEE ADDENDUM

28. If you or someone on your behalf did not conduct any testing or sampling for the presence of asbestos or other particulates on the property, to the best of your knowledge, did anyone else conduct such testing or sampling with respect to the property?

☐ Yes      ☐ No      N/A SEE ADDENDUM

29. If you responded Yes to question 26. or 28. and you have not supplied related documents, please describe when and by whom and the type of testing and/or sampling (e.g. air, bulk and dust sampling).

| | Company/Individual | SEE ADDENDUM |
Year
| | Type of testing: |

| | Company/Individual |
Year
| | Type of testing: |

| | Company/Individual |
Year
| | Type of testing: |

30. Has the Grace product or products for which you are making this claim ever been modified and/or disturbed?

☒ Yes      ☐ No

31. If yes, specify when and in what manner the Grace product or products was modified and/or disturbed?

| | Description | SEE ADDENDUM |
Year

| | Description |
Year

| | Description |
Year

9 2 7 6 1 0 5                                        1018577

**D.   Category 2 Claim: Allegation With Respect To One of Grace's Vermiculite Mining, Milling Or Processing Operations**

32. What is the business address or location of the Grace operation which has led to your claim?

Business Name

Street Address

City                                                                State        Zip Code
                                                                  (Province)   (Postal Code)

Country

33. If your claim relates to a personal residence, does (or did) anyone living in the household work for Grace?

☐ Yes      ☐ No

34. If yes, specify the following for each such individual:

| Name of Individual Working at Grace Operation | Name of Individual Working at Grace Operation |
|---|---|
| **Date of Birth** | **Date of Birth** |
| ☐ – ☐ – ☐  Month  Day  Year | ☐ – ☐ – ☐  Month  Day  Year |
| **Occupation(s) of Individual** | **Occupation(s) of Individual** |
| **Dates Worked at Operation** | **Dates Worked at Operation** |
| From: ☐ To: ☐  Year   Year | From: ☐ To: ☐  Year   Year |
| Name of Individual Working at Grace Operation | Name of Individual Working at Grace Operation |
| **Date of Birth** | **Date of Birth** |
| ☐ – ☐ – ☐  Month  Day  Year | ☐ – ☐ – ☐  Month  Day  Year |
| **Occupation(s) of Individual** | **Occupation(s) of Individual** |
| **Dates Worked at Operation** | **Dates Worked at Operation** |
| From: ☐ To: ☐  Year   Year | From: ☐ To: ☐  Year   Year |

35. When did you first know of the presence of asbestos on your property?

Year

36. How did you first learn of the presence of asbestos on your property?

Attach all documents relating or referring to the presence of asbestos on the property. If the documents are too voluminous to attach, attach a summary of the documents indicating the name of each document, date of each document, a brief description of the document, the location of the document, and who has possession or control of the document.

If you provide a summary of the documents rather than the documents themselves, you are required to consent to the production and release of those documents to Grace upon Grace's further request.

37. If you do not have any documents relating or referring to the presence of asbestos on the property, explain why not and indicate who may have possession or control of any such documents with respect to the property.

38. Have you or anyone on your behalf made an effort to remove, contain and/or abate the asbestos on your property?

☐ Yes    ☐ No

If Yes, attach all documents relating or referring to such efforts. If the documents are too voluminous to attach, attach a summary of the documents indicating the name of each document, date of each document, a brief description of the document, the location of the document, and who has possession or control of the document.

If you provide a summary of the documents rather than the documents themselves, you are required to consent to the production and release of those documents to Grace upon Grace's further request.

39. If you do not have any documents relating or referring to the removal, containment and/or abatement of the asbestos on your property, explain why not and indicate who may have possession and control of such documents with respect to the property.

40. If you or someone on your behalf did not make an effort to remove, contain and/or abate the asbestos on your property, to the best of your knowledge, did anyone else make such an effort?

☐ Yes    ☐ No

9276107                                    1018577

41. If you responded Yes to question 38. or question 40. and you have not supplied related documents, please specify the dates and descriptions of any such efforts.

| Year | Description | |
| Year | Description | |
| Year | Description | |

42. Have you or anyone on your behalf conducted any other testing or sampling for the presence of asbestos on your property?

☐ Yes    ☐ No

If Yes, attach all documents relating or referring to such efforts. If the documents are too voluminous to attach, attach a summary of the documents indicating the name of each document, date of each document, a brief description of the document, the location of the document, and who has possession or control of the document.

If you provide a summary of the documents rather than the documents themselves, you are required to consent to the production and release of those documents to Grace upon Grace's further request.

43. If you do not have any documents relating or referring to any other such testing or sampling for the presence of asbestos on your property, explain why not and indicate who may have possession or control of such documents with respect to the property.

44. If you or someone on your behalf did not conduct any other testing or sampling for the presence of asbestos on your property, to the best of your knowledge, did anyone else conduct such testing or sampling?

☐ Yes    ☐ No

45. If you responded Yes to question 42. or question 44. and you have not supplied related documents, please specify the dates and descriptions of any such efforts.

| Year | Description | |
| Year | Description | |
| Year | Description | |

46. Were you aware of the presence of asbestos on your property when you purchased your property?

☐ Yes    ☐ No

47. If you have sold the property, were you aware of the presence of asbestos on your property when you sold your property?

☐ Yes    ☐ No    ☐ Not Applicable, have not sold the property

9276108

1018577

## PART 4. ASBESTOS LITIGATION AND CLAIMS

### A. INTRODUCTION

1. Has any asbestos-related property damage lawsuit or claim been filed against Grace on behalf of this claiming party relating to the property for which you are making this claim?

☐ No

XX Yes – lawsuit

☐ Yes – non-lawsuit claim (other than a workers' compensation claim)

2. Has any asbestos-related property damage lawsuit or claim been filed against any other party on behalf of this claiming party relating to the property for which you are making this claim?

☒ No    **SEE ADDENDUM**

☐ Yes – lawsuit

☐ Yes – non-lawsuit claim (other than a workers' compensation claim)

*If an asbestos-related property damage lawsuit has been filed by or on behalf of this claiming party relating to the property for which you are making a claim, complete Section B. below.*

*If an asbestos-related property damage non-lawsuit claim has been made by or on behalf of this claiming party relating to the property for which you are making a claim, complete Section C. on the following page.*

### B. LAWSUITS

1. Please provide the following information about each asbestos-related property damage lawsuit which has been filed relating to the property for which you are making this claim or attach a copy of the face page of each complaint filed.

a. Caption **SEE ADDENDUM**

b. Court where suit **originally filed:** |__|__|__|__|__|__|__|__|__|__|__|__|    Docket No.: |__|__|__|__|__|__|__|
   *County/State*

c. Date filed: |__|__| - |__|__| - |__|__|__|__|
   *Month   Day   Year*

a. Caption

b. Court where suit **originally filed:** |__|__|__|__|__|__|__|__|__|__|__|__|    Docket No.: |__|__|__|__|__|__|__|
   *County/State*

c. Date filed: |__|__| - |__|__| - |__|__|__|__|
   *Month   Day   Year*

a. Caption

b. Court where suit **originally filed:** |__|__|__|__|__|__|__|__|__|__|__|__|    Docket No.: |__|__|__|__|__|__|__|
   *County/State*

c. Date filed: |__|__| - |__|__| - |__|__|__|__|
   *Month   Day   Year*

(Attach additional pages if necessary.)

## C. NONLAWSUIT CLAIMS

1. If the claiming party has made any claims relating to the property for which you are making a claim (including administrative claims) against anyone, that was not filed with a court of law, please provide the following information for each claim:

   a. Description of claim:

   b. Date submitted: [ ][ ] – [ ][ ] – [ ][ ][ ][ ]    ■
      Month    Day    Year

   c. Name of entity to whom claim was submitted:
      ☐ Grace
      ☐ Other
      _Name of Entity_

   a. Description of claim:

   b. Date submitted: [ ][ ] – [ ][ ] – [ ][ ][ ][ ]
      Month    Day    Year

   c. Name of entity to whom claim was submitted:
      ☐ Grace          ■
      ☐ Other
      _Name of Entity_

   a. Description of claim:

   b. Date submitted: [ ][ ] – [ ][ ] – [ ][ ][ ][ ]
      Month    Day    Year

   c. Name of entity to whom claim was submitted:
      ☐ Grace
      ☐ Other
      _Name of Entity_

## PART 5: SIGNATURE PAGE

All claims must be signed by the claiming party.

I have reviewed the information submitted on this proof of claim form and all documents submitted in support of my claim. I declare, under penalty of perjury,* that the above statements are true, correct, and not misleading.

CONSENT TO RELEASE OF RECORDS AND INFORMATION: To the extent that I have produced a summary rather than the documents themselves as requested above or indicated who has possession and control of certain documents, I hereby authorize and request that all other parties with custody of any documents or information concerning my property damage or the information contained in this Form, upon the reasonable request of Grace or Grace's representative, with a copy to the claiming party, disclose any and all records to Grace or to Grace's representative.

_Ramsay Lanim_, VP-Corporate Counsel         [0][3] – [2][4] – [2][0][0][3]
SIGNATURE OF CLAIMANT                              Month    Day    Year

*The penalty for presenting a fraudulent claim is a fine up to $500,000.00 or imprisonment up to 5 years, or both. 18 U.S.C. §§ 152 & 3571.

9276110

Copyright © 2002 NCS Pearson, Inc.  All rights reserved.

1018577

RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP,
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962-1981
(973) 538-0800
Robert J. Gilson (RG 6618)

Attorneys for The Prudential Insurance Company of America

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | Chapter 11 |
| **W.R. GRACE & CO., et al.,** | Case No. 01-01139 (JKF) (Jointly Administered) |
| **Debtors.** | |

---

## ADDENDUM TO PROOF OF CLAIM OF PRUDENTIAL INSURANCE COMPANY OF AMERICA FOR:

### NORTHWEST FINANCIAL CENTER
### 7900 XERXES AVENUE SOUTH
### BLOOMINGTON, MINNESOTA 55431

---

### VOLUME I OF II

RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP,
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962-1981
(973) 538-0800
Robert J. Gilson (RG 6618)

Attorneys for The Prudential Insurance Company of America

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**W.R. GRACE & CO., et al.,**<br><br>Debtors. | Chapter 11<br><br>Case No. 01-01139 (JKF)<br>(Jointly Administered)<br><br>**ADDENDUM TO PROOF OF CLAIM OF PRUDENTIAL INSURANCE COMPANY OF AMERICA FOR: NORTHWEST FINANCIAL CENTER (BLOOMINGTON, MINNESOTA)** |

## A. CREDITOR INFORMATION

1.     The Prudential Insurance Company of America for itself and various of its subsidiaries and affiliates (collectively "Prudential"), submits this addendum to its proof of claim with respect to its Asbestos Property Damage Claims against the Debtors, pursuant to their voluntary petition for reorganization under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

2.     This addendum relates to the following property:

> Northwest Financial Center
> 7900 Xerxes Avenue South
> Bloomington, MN 55431

Prudential is concurrently filing proofs of claims for Asbestos Property Damage for seven other properties.

3.    Notices to Prudential should be addressed as follows:

> Robert J. Gilson, Esq.
> Riker, Danzig, Scherer, Hyland & Perretti LLP
> Headquarters Plaza
> One Speedwell Avenue
> Morristown, New Jersey 07962-1981

and

> W.H. Ramsay Lewis, Esq.
> The Prudential Insurance Company of America
> 751 Broad Street, 21st Floor
> Newark, New Jersey 07102

## B. SUPPLEMENTAL RESPONSES

1.    The following answers supplement those given on the W.R. Grace & Co. Asbestos Property Damage Proof of Claim Form ("Proof of Claim Form"):

### PART 3: PROPERTY INFORMATION

Response to Question No. 4:

The Northwest Financial Center was completed in two phases. Phase I was completed by the Rauenhorst Corporation in 1972 and upon its completion Prudential formed a joint venture with Rauenhorst to own and operate the building and to develop Phase II and the parking facility. In 1973, PIC Realty Corporation, a wholly owned subsidiary of Prudential, acquired Prudential's interest in the venture. The joint venture continued until a phased buy-out of Rauenhorst's interest in 1982. The property was owned as a joint venture by PIC Realty and Prudential until 1984, at which time PIC Realty conveyed interest in the property to Prudential through a corporate dividend.

**Response to Question No. 10**

This building was the subject of a previous litigation entitled <u>The Prudential Insurance Company of America, et al. v. United States Gypsum Company, et al.,</u> as set forth in Part 4 of the Proof of Claim Form. Extensive discovery was conducted in this case. Prudential produced documents relating to its efforts to abate asbestos and all other renovations on the property to W.R. Grace and its counsel, Anthony J. Marchetta, Esq. of the Morristown, New Jersey law firm of Pitney, Hardin, Kipp and Szuch LLP. Therefore, W.R. Grace, or its counsel, is already in possession of any other documents which may be further responsive to this request. In the event that W.R. Grace is unable to obtain such responsive documentation previously produced to its counsel, to the extent the documents are in Prudential's possession, they will be made available upon reasonable request.

See also Responses to Question Nos. 22, 25, and 31.

**Response to Question No. 11**

See Responses to Question Nos. 31, 22, 25 and 10.

**Response to Question No. 16:**

Documents relating to the purchase and/or installation of the product in the property include, but are not limited to, the documents attached hereto as Exhibit A.

In addition, this building was the subject of a previous litigation entitled <u>The Prudential Insurance Company of America, et al. v. United States Gypsum Company, et al.,</u> as set forth in Part 4 of the Proof of Claim Form, in which extensive discovery was conducted. Prudential produced documents relating to the purchase

3

and/or installation of the product in the property to W.R. Grace and its counsel, Anthony J. Marchetta, Esq. of the Morristown, New Jersey law firm of Pitney, Hardin, Kipp and Szuch LLP. Therefore, W.R. Grace, or its counsel, is already in possession of any other documents which may be further responsive to this request. In the event that W.R. Grace is unable to obtain such responsive documentation previously produced to its counsel, to the extent the documents are in Prudential's possession, they will be made available upon reasonable request.

**Response to Question No. 17**

See Response to Question No. 16.

**Response to Questions Nos. 18, 19, 20 and 21**

Prudential first became aware of the presence of asbestos-containing material in the building in and around 1985 from the results of a survey conducted by Twin City Testing Corp. Prudential first learned that the asbestos-containing fireproofing in the property was a Grace product in 1990, when it received the results of constituent analysis performed by Materials Analytical Services, and when it conducted an independent investigation to identify the manufacturer of the asbestos-containing fireproofing found in the property.

Documents responsive to questions 18,19, 20 and 21 include, but are not limited to, documents attached hereto as Exhibit B.

4

**Response to Question Nos. 22 and 23**

The documents relating to Prudential's abatement efforts are too voluminous to provide with this Proof of Claim. Instead, Prudential is attaching as Exhibit C the report of Halliwell Engineering Associates ("Halliwell Report"), which summarizes Prudential's abatement efforts and sets forth its claim for damages, as well as a summary of the documents which form the basis of the Halliwell Report.

In addition, this building was the subject of a previous litigation entitled The Prudential Insurance Company of America, et al. v. United States Gypsum Company, et al., as set forth in Part 4 of the Proof of Claim Form, in which extensive discovery was conducted. Prudential produced documents relating to its efforts to abate asbestos on the property to W.R. Grace and its counsel, Anthony J. Marchetta, Esq. of the Morristown, New Jersey law firm of Pitney, Hardin, Kipp and Szuch LLP. Therefore, W.R. Grace, or its counsel, is already in possession of any other documents which may be further responsive to this request. In the event that W.R. Grace is unable to obtain such responsive documentation previously produced to its counsel, to the extent the documents are in Prudential's possession, they will be made available upon reasonable request.

See also Responses to Question Nos. 10, 25 and 31.


**Response to Question No. 25**

The tables attached as Exhibit D summarize the removal of asbestos containing materials that was performed when Prudential owned the property. The tables, though focused on costs, contain the dates and descriptions of the abatement work performed.

In addition, this building was the subject of a previous litigation entitled
The Prudential Insurance Company of America, et al. v. United States Gypsum
Company, et al., as set forth in Part 4 of the Proof of Claim Form, in which extensive
discovery was conducted. Prudential produced documents relating to its efforts to abate
asbestos-containing material on the property to W.R. Grace and its counsel, Anthony J.
Marchetta, Esq. of the Morristown, New Jersey law firm of Pitney, Hardin, Kipp and
Szuch LLP. Therefore, W.R. Grace, or its counsel, is already in possession of any other
documents which may be further responsive to this request. In the event that W.R.
Grace is unable to obtain such responsive documentation previously produced to its
counsel, to the extent the documents are in Prudential's possession, they will be made
available upon reasonable request.

**Response to Question Nos. 26, 27, 28 and 29**

Documents relating to the testing of materials on the property include, but
are not limited to, the constituent analysis performed by Materials Analytical Services,
a report on representative sampling of the asbestos-containing fireproofing, a dust
sampling report, and a report of William M. Ewing relating to asbestos testing. These
documents, along with other testing documents responsive to Question No. 26, are
attached hereto as Exhibit E.

In addition, this building was the subject of a previous litigation entitled
The Prudential Insurance Company of America, et al. v. United States Gypsum
Company, et al., as set forth in Part 4 of the Proof of Claim Form, in which extensive
discovery was conducted. To the extent that they exist, Prudential produced other
documents relating to sampling/testing (i.e. air, dust or bulk sampling) on the property

6

to W.R. Grace and its counsel, Anthony J. Marchetta, Esq. of the Morristown, New Jersey law firm of Pitney, Hardin, Kipp and Szuch LLP. Therefore, W.R. Grace, or its counsel, is already in possession of any other documents which may be further responsive to this request. In the event that W.R. Grace is unable to obtain such responsive documentation previously produced to its counsel, to the extent the documents are in Prudential's possession, they will be made available upon reasonable request.

**Response to Question No. 31**

Evidence pertaining to disturbance or modification of asbestos-containing materials in the property includes Prudential's abatement and renovation efforts, as set forth in the Responses to Question Nos. 10, 22, 23 and 25. In addition, the report of William H. Ewing, attached hereto in Exhibit E, specifically addresses modifications and disturbances of the asbestos-containing materials in the building.

In addition, this building was the subject of a previous litigation entitled The Prudential Insurance Company of America, et al. v. United States Gypsum Company, et al., as set forth in Part 4 of the Proof of Claim Form, in which extensive discovery was conducted. Prudential produced documents relating to any disturbance or modification of asbestos-containing materials on the property to W.R. Grace and its counsel, Anthony J. Marchetta, Esq. of the Morristown, New Jersey law firm of Pitney, Hardin, Kipp and Szuch LLP. Therefore, W.R. Grace, or its counsel, is already in possession of any other documents which may be further responsive to this request. In the event that W.R. Grace is unable to obtain such responsive documentation previously

produced to its counsel, to the extent the documents are in Prudential's possession, they will be made available upon reasonable request.

## PART 4: ASBESTOS LITIGATION AND CLAIMS

### Response to Questions A.2 and B.1

This building was the subject of previous litigation, captioned: The Prudential Insurance Company of America, et al. v. United States Gypsum Co.; W.R.Grace & Co.; The Celotex Corporation; United States Mineral Products Co.; Keene Corporation; Asbestospray Corporation, Civil Action No. 87-4277 and The Prudential Insurance Company of America, et al. v. National Gypsum Company, Civil Action No. 87-4328. These cases were filed in the United States District Court for the District of New Jersey.

The Complaint in The Prudential Insurance Company of America, et al. v. United States Gypsum Co., et al. was filed on October 20, 1987. The Complaint in The Prudential Insurance Company of America v. National Gypsum was filed on October 21, 1987. These actions were consolidated on October 17, 1988. On April 13, 1989, Prudential filed its First Amended Complaint and Jury Demand in the consolidated litigation. Copies of the First Amended Complaint, and the face pages of the two earlier Complaints, are attached hereto as Exhibit F.

No lawsuit other than what is set forth above has been brought, but that litigation did include claims of joint and several liability. During the pendency of the above identified action all of the defendants filed for bankruptcy or dissolution. While there are claims pending in several bankruptcy proceedings and there is also a pending appeal, the claim related to the property that is the subject of this Proof of Claim is only being pursued against W.R. Grace & Co.

## C. MISCELLANEOUS PROVISIONS

1.  <u>No Waiver of Security or Rights:</u>  In executing and filing this proof of claim, Prudential does not waive any right to security held by it or for its benefit or any other right or rights that Prudential has or may have against Debtors or any other person or persons.

2.  <u>Right to Amend Reserved:</u>  Prudential expressly reserves the right to amend or supplement this proof of claim (including, but not limited to, for purposes of asserting a claim for rejection damages, administrative priority, fixing the amount of damages, fees, costs and expenses referred to herein) at any time and in any respect.

3.  <u>Jurisdiction Only Over Claim:</u>  In filing the within claim, Prudential does not submit itself to the jurisdiction of the Court for any other purpose other than with respect to such claim.

4.  <u>Additional Claims:</u>  This proof of claim is made without prejudice to the filing by Prudential of additional proofs of claim with respect to any other indebtedness or liability of Debtors to Prudential.

3250944.01

9

# EXHIBIT A

*Exhibit B*

*Sind Sum*

(Preliminary)

SPECIFICATIONS FOR NORTHWESTERN FINANCIAL CENTER
(PHASE I)
HIGHWAY 494 at XERXES AVENUE
BLOOMINGTON, MINNESOTA
RAUENHORST CORPORATION
ENGINEERS AND CONTRACTORS
December 21, 1970

## 1.   GENERAL REQUIREMENTS

### 1.1.   General Conditions

A.   Intent - This specification and the accompanying drawings are comple-
mentary, and what is called for by either shall be as binding as if
called for by both.  It is the intent of these specification and the
drawings to include all labor, materials, equipment and transport-
ation necessary for the proper execution and completion of the entire
project.  Each of the Contractors, Subcontractors, and Material
Suppliers working under the specifications and the drawings shall
turn over his portion of the project in a complete operating condi-
tion irrespective of whether the drawings or the specifications, or
both, cover each individual item in minute detail.

IT IS INTENDED THAT THIS SECTION OF THE SPECIFICATIONS
SHALL APPLY TO ALL OTHER SECTIONS OF THE SPECIFICATIONS
AND TO THE GENERAL CONTRACTOR, SUBCONTRACTORS, AND
MATERIAL SUPPLIERS WORKING UNDER SEPARATE SECTIONS.

B.   Schedules - It is intended that this project, including the work necessary
around the building, but within grading limits, shall be completed no
later than November 1, 1971. In the event that any Contractor (other than
Rauenhorst Corporation), Subcontractor, or Material Supplier would
delay his work, or that of other Contractors, so that the completion
of the entire project would not be possible prior to November 1, 1971.
liquidated damages in the amount of $200.00 per day may be assessed
against the responsible party.

C.   Guarantees - It is understood that all Contractors and Subcontractors
shall guarantee their work for ONE YEAR BEYOND THE COMPLE-
TION OF PROJECT.  This guarantee shall include all materials
and workmanship incorporated into the building.

D.   Tests - The Owner shall have the right to perform independent tests
on all material and equipment furnished for the project.

E.   Permits, Licenses, Notices - The General Contractor, each Sub-
contractor and each Material Supplier shall give to the proper author-
ities all notices as required by law, relative to the work in his direct
charge or direct responsibility, obtain and pay for all official building
permits, licenses for water, temporary enclosures, obstructions or
excavations in public streets, etc.  Further, the general contractor and
each subcontractor shall adequately protect adjacent property as provided
by law and required by these specifications and drawings.

F.   For building details not specifically shown or indicated in these documents.
it is the intent that the building shall be equal to the existing Dunn and
Curry Four Story Building, 7600 Parklawn, Edina, Minnesota;
and it is understood that the building constructed hereunder shall be
at least equal in all similar items to said Dunn & Curry Four Story buildin

1.2.   Special Conditions

A.   Scope - The scope of the work outlined herein and shown on the drawings is intended that the General Contractor, all Subcontractors, and Material Suppliers shall furnish complete all labor, materials, equipment, tools, skill, transportation, etc. necessary for the complete construction of the first phase of the Northwestern Financial Center, Bloomington, Minnesota.

B.   Insurance - The following type and amounts of insurance shall be carried by all Subcontractors and the General Contractor:

1.   Workmen's Compensation Insurance, Public Liability and Unemployment Insurance, as required by law.

2.   Bodily Injury and Property damage Insurance in the amount of $100,000 to $300,000 limit.

3.   Builders' Risk Insurance to be carried by the General Contractor until the building is occupied. In the event that the building is occupied by the Owner while construction work is still being carried on, a partial occupancy clause shall be added to the insurance policy. The amount of the Builders' Risk shall be the complete value less cost of footings and other underground work.

Each Subcontractor shall furnish to the General Contractor satisfactory proof of carriage of the insurance required, with duplicate copies being forwarded immediately after the award of the subcontract.

The General Contractor shall supply all temporary utilities, temporary office, temporary toilet, and temporary telephone.

C.   Protection - During the construction of the project, the General Contractor and each Subcontractor shall provide all heat, service and service necessary to protect the work and materials against injury from dampness and cold.

D.   Temporary Heating - The General Contractor and each responsible Subcontractor shall provide approved temporary heating devices, electrical power, adequate and proper fuel, fire, enclosures, etc. for the work of his trades for the temporary protection of his materials and workmanship. The General Contractor and all Subcontractors shall cooperate fully to enclose the building as promptly as possible.

E.   Clean-up - The General Contractor and each responsible Subcontractor shall at all times keep the premises free from accumulations of waste materials or rubbish caused by his employees or work and, at the completion of the work, he shall remove all rubbish from and about the building, and all tools, scaffolding, and surplus materials and shall leave his work broom clean.

F.    TAXES - ALL SUBCONTRACTORS AND MATERIAL SUPPLIERS
SHALL BE RESPONSIBLE FOR PAYING ALL SALES TAX AND
USE TAX APPLICABLE ON ITEMS THEY FURNISH.  SUB-
CONTRACTORS AND MATERIAL SUPPLIERS SHALL BID THEIR
WORK ACCORDINGLY.

G.    REQUEST FOR PAYMENT.  THE INFORMATION ON THE FOLLOW -
ING  PAGE SHALL BE SUBMITTED BY ALL SUBCONTRACTORS
WHEN REQUESTING PAYMENT.  IT MAY BE SUBMITTED IN THIS FC
OR SIMILAR FORM.  IF THE ABOVE INFORMATION IS NOT SUB-
MITTED, BILLS WILL NOT BE RECOGNIZED AND DISCOUNT TIME
WILL BE EXTENDED.

H.    TERMS OF PAYMENT - ALL SUBCONTRACTORS  AND
MATERIAL SUPPLIERS SHALL INCLUDE A 2% DISCOUNT FOR
PAYMENT BEFORE THE 15TH OF THE MONTH APPROXIMATE
FOR ALL INVOICES RECEIVED ON OR BEFORE THE 5TH OF
THE SAME MONTH.  INVOICES RECEIVED AFTER THE 5TH
OF THE MONTH WILL HAVE THE DISCOUNT EXTENDED TO
THE 15TH OF THE FOLLOWING MONTH.

-3-

## SUBCONTRACTOR APPLICATION FOR PAYMENT

Date of Application: _____    Period From: _____

Application Number: _____

Subcontractor: _____ .

_____

_____

_____

Project: _____

To:     Rauenhorst Corporation
        4444 Rauenhorst Circle
        Minneapolis, Minnesota  55435

OROGINAL CONTRACT AMOUNT                              $_____

Change Orders:    Number and Description of Work

    1.                                                $_____

    2.                                                $_____

    3.                                                $_____

    4.                                                $_____

    5.                                                $_____

    6.                                                $_____

TOTAL  CONTRACT AMOUNT TO DATE                        $_____

AMOUNT EARNED TO DATE                                 $_____

    Less_____% Retainage                    $_____

    Less Previous Payments                            $_____

THIS APPLICATION FOR PAYMENT                          $_____

TOTAL REMAINING TO BE BILLED                          $_____

                        Contractor:_____

                        By:_____    Date:_____

2.    SITE WORK

    2.1.    Earthwork

        A.    Site Grading - The top soil and all vegetation thereon shall be stripped inside the building lines.  Grading of site to levels indicated for the building, parking areas, ditches, etc. shall be performed by this Subcontractor.  Allowance shall be made for granular fill called for in excavating and backfill section.

        B.    Excavating and Backfill - This Subcontractor shall perform all excavation and backfill necessary for the construction of this project, excluding excavation and backfill for mechanical and electrical work.  At least 4" of granular material shall be placed under all concrete slab areas.  All backfill material under footings and floor areas shall be mechanically compacted to 95% of maximum proctor density.

        C.    Soil Conditions - Subsurface investigations and soil borings have been made, and the results are available in the office of the General Contractor.  This information was obtained primarily for use in verifying foundation design, but this contractor may draw his own conclusion therefrom.

    2.2.    Lawns and Planting

        A.    Scope - All landscaping and sod shall be performed by the Contractor.

    2.3.    Stabilized base and Bituminous Surfacing

        A.    This Subcontractor is to perform final finish grading, as necessary for proper drainage, and is to furnish and place 4" thick stabilized, Class 5 gravel base, compacted and rolled smooth.  Over the stabilized base, the Subcontractor shall furnish and install a 2" mixture of coarse and fine mineral aggregate with hot bituminous cement, mixed in accordance with the MHD specifications #2341 finished to meet proper drainage.

        B.    Striping - Parking lot striping is covered in the painting section.

    2.4.    Request for Payment

        Please note request for payment section in Special Conditions for submission of bills.

-4-

## 3. CONCRETE

### 3.1. Concrete Form Work

A.    Scope - Included here are all forms for footings, piers, walls, lintels, etc. as required.

B.    Material - Material for concrete forms shall be wood or metal or other approved material. Wood forms shall be of sound clean lumber free from holes and defects. Exposed concrete shall be formed with smooth new plywood or steel.

C.    Workmanship - Forms, where required, shall conform to the shape, lines and dimensions of the members as called for on the drawing and shall be substantial and sufficiently tight to prevent leakage of mortar. They shall be properly braced and tied together so as to maintain position and shape when under load of fresh concrete. Forms shall not be removed until concrete has hardened sufficiently.

### 3.2. Concrete Reinforcement

A.    Scope - Included here is all labor, equipment, and material for concrete reinforcing.

B.    Materials

     1.    Reinforcing steel shall be of intermediate grade steel, meeting the requirements of the standard specifications for Billet steel concrete reinforcing bars ASTM-A-15-58T and A-16 Grade 60.

     2.    Deformed bars shall be used throughout with deformations to conform with ASTM-305-56T.

     3.    Reinforcing mesh shall conform to ASTM A-82-581 and shall be sizes as shown on the drawings.

     4.    Spacers, chairs, etc. as required . Materials shall be free from excessive rust, loose scale or other coatings which will reduce or prevent bond.

C.    Workmanship - Reinforcing steel shall be placed as required by the drawings and shall be adequately secured in position by concrete or metal chairs or spacers. The clear distance between parallel bars shall not be less than 1-1/3 times the maximum size of aggregate, or less than one inch. Bars shall be spliced by lapping a minimum distance of 20 bar diameters, but not less than 12 inches. All reinforcing shall have a minimum concrete covering as follows:

| | |
|---|---|
| Footings | 3 inches |
| Surfaces exposed to weather or in contact with ground: | 2 inches for bars larger than No. 5 and 1-1/2" for No. 5 bars or smaller |
| Surfaces not exposed to weather or ground: | 3/4" for slabs in walls and 1-1/2" for beams and girders |
| Slabs on ground: | Mesh at mid-thickness of slab. |

3.3.    Cast-in-Place Concrete

A.    Scope - The work under this section shall include the complete
construction of all concrete work in the building for concrete footings,
walls, floors, columns, concrete-filled block pilasters, concrete-
filled block bond beams, exterior platforms, stairs, sidewalks,
and all the necessary accessories, setting of anchor bolts, ties, etc.

B.    Materials

1.    Portland Cement shall conform to ASTM C-150, Type I or
Type III.  Portland Cement, air entraining, shall conform to
ASTM C-175, Type IA or Type IIIA.  Air-entraining agents
conforming to ASTM C-260 may be used in lieu of air entraining
cement.

2.    Fine aggregate shall consist of clean, hard natural sand
conforming to ASTM C-33.  Coarse aggregate shall con-
form to ASTM C-33, and shall be graded in accordance with
Table II, with maximum aggregate size of 1-1/2" for footing,
3/4" for slabs and columns, 3/8" for topping.

3.    Water shall be clean and free of deleterious matter.

4.    Expansion joint filler shall be non-extruding, resilient,
bituminous type, conforming to ASTM D-1751.

5.    Curing compound shall be clear, conforming to ASTM C-309,
Type I, Tremcrete, as manufactured by the Tremco Manufacturing
Company, or approved equal.

6.    Concrete shall have a minimum compressive strength of 3000 psi
at 28 days.  All concrete for exterior work, such as sidewalks,
curbs, and driveways, steps, shall be air-entrained concrete to a
maximum of 5% air content, 3500 psi in 28 days.  Concrete shall
be ready mix in accordance with ASTM C-94.  Maximum slump
for concrete used for floors, walks, and pavements - 3 inches.
Maximum slump for concrete used for all other work - 4 inches.

7.    The concrete topping finish on the floors shall be as smooth as
possible for future application of vinyl asbestos tile or carpeting,
as indicated on the room finish schedule.  Extreme care shall be
exercised to obtain smooth and level floors throughout the entire
building by the use of vibrating screeds, mechanical vibrators,
and the placement of concrete with a maximum slump of 3 inches.

-6-

8.  Type I precast concrete curb units, 6 inches high, complete with iron rod anchors, and equal to those manufactured by the Marshall Block Company, shall be furnished for the parking area, as shown on the drawings.

C.  Workmanship - All concrete work shall be done in accordance with "Building Code Requirements for Reinforced Concrete " A. C. I. 318-63.

Any and all concrete transported to the job or placed on the job during which the temperature is below 38° shall be heated to a temperature of 73° Fahrenheit. Equipment for ready-mixed concrete work and transportation of ready-mixed concrete shall be of such size and design as to assure a practically continuous flow of concrete at the delivery end.

There shall be no separation of materials or loss of ingredients. Retempering of concrete will not be allowed nor addition of water at the jobsite.

If any concrete is found defective in strength, is not true to line or level, is poured out of place, or has been damaged by freezing, or if any reinforcing is found exposed, the concrete shall be removed and replaced.

3.4.  Grout

Grout for all structural steel base plates to be non-shrink, Embeco or equal.

3.5.  Precast Panel

A.  Scope - This section includes the furnishing and erecting of the precast concrete as shown on the drawings included in this section is the design of reinforcements for the panels and of all required anchorments.

Related work specified elsewhere, structural steel in Section 5 and caulking and sealing in Section 7.

B.  General - Before the manufacturing proceeds, shop drawings must be submitted for approval to the general contractor. One full size panel of each type shall be prepared for inspection and approval. All other panels shall have the same texture and general appearance of the approved panel.

C.  Material

Cement- All cement for each type of panel shall come from one source and be of uniform color. Cement for column and fascia concrete shall be white, such as Trinity White Cement.

Sand - Sand shall be clean washed sand suitable for precast concrete. Where inforcing shall conform to ASTM 618 Grade 40.

Anchor - Anchors shall be be Gateway of sufficient size and capacity for the particular type of panel (the type and connection designed shall be submitted at the time of submitting the bid).

D.  Design - Panels shall be designed for all normal loadings including wind, snow and dead load. The fascia shall be designed for normal loading by window washing apparatus.

-7-

The design shall be in accordance with the latest
ACI recommendations including those from Committee 533
as published in the Journal of the American Concrete Institute
of April, 1970.

Concrete for all panels shall have a minimum strength of 5,000
psi in 28 days and contain a minimum of 7 sacks of cement
per cubic yard.

E.    Manufacturing - All form lines shall be true and straight and
constructed of either metal or plastic line. All blemishes visible
from a distance of 8' shall be patched and rubbed.

All exposed corners shall be either shampered or have rounded edges.

Form releasing agents shall be of the non-standing type.

(Panels shall be sealed with a silicone sealant.

F.    Transportation - Panels shall be handled and transported so as not
to induce incompatible stresses in the panels. The panels shall be
protected from surface mars and edge chipping.

G.    Erection - Panels shall be erected in accordance with the approved
shop drawings. All field welds shall be touched up and painted where
welds occur on galvanized parts, these welds shall be touched up with
Gap weld paint.

Panels shall be erected and permanently bolted or welded in place.
Temporary bolting and welding shall not be used unless previous
approval has been obtained from the general contractor.

H.    Cooperation - This Subcontractor shall coordinate his work with that
of the steel erector and supplier with the window manufacturer
and installer and with the caulking subcontractors. The establishing
of erecting tolerances shall be coordinated with the steel supplier
at the time of shop drawing submittal.

I.    Guarantee - This subcontractor shall guarantee his work against
deficiencies in workmanship and material for a period of one
year after the acceptance of the building.

3.6.    Request for Payment

Please note request for payment section in Special Conditions for
submission of bills.

-8-

## 4.  MASONRY

### 4.1.  Scope

This Subcontractor shall furnish all labor, materials, equipment and services necessary, or reasonably incidental to complete all masonry work shown on the drawings and specified herein.

### 4.2.  Masonry Materials

A.  Concrete masonry units shall be modular, hollow, load bearing unit of sizes and shapes required by the drawings and shall conform to ASTM C-90 66T Grade "A" when delivered to the job, and shall be protected against wetting prior to laying. All units exposed to view shall be of uniform texture, square, and with no broken edges or corners. Sand and gravel concrete block shall be used for all masonry walls below grade or in contact with the earth. Concrete block exposed on interior of office shall be lightweight of expanded slag or shale aggregate.

B.  Portland Cement shall conform to ASTM C-150, Type I.

C.  Masonry cement shall conform to ASTM C-91, Type II.

D.  Hydrated lime shall conform to ASTM C-207, Type S. Quick lime shall conform to ASTM C-5.

E.  Sand shall conform to ASTM C-144.

F.  Water shall be clean and free from deleterious matter.

G.  Masonry reinforcing shall be ladder or truss type, made of galvanized steel wire with longitudinal wires not less than 9 gauge and cross wires not less than 12 gauge.

H.  Control joint filler shall be regular section manufactured by Keywall or approved equal.

I.  All materials shall be stored and maintained in a dry, clean condition by stockpiling on planks or other supports, free of the ground. Materials shall be protected from the weather with a waterproof covering.

J.  Mortar

1.  Mortar shall be proportioned by volume and mixed to proper consistency with uniform color throughout. Retempering the use of antifreeze materials will not be permitted.

2.  Type M mortar shall be used for all masonry work below grade or in contact with the earth and shall be composed as follows: One part Portland cement, one-quarter part lime, and three parts sand; or one part Portland cement, one part masonry cement, and six parts sand.

-9-

3.  Type S mortar shall be used for all exterior masonry above grade and shall be composed as follows: One part Portland cement, one-half part lime, and four and one-half parts sand; or one-half part Portland cement, one part masonry cement, and four and one-half parts sand.

4.  Type N mortar shall be used for interior masonry and shall be composed as follows: One part Portland cement, one part lime, and six parts sand; or one part masonry cement and three parts sand.

5.  Mortar for bedding and grouting shall be one part Portland cement and two parts sand.

### 4.3.   Workmanship

A.  All masonry walls shall be true and plumb and built to the thickness and to the bond or pattern shown on the drawings. Where no bond or pattern is indicated, masonry shall be laid in common bond. Masonry units shall be dry when laid. All workmanship shall be of the highest quality.

B.  All masonry walls shall be reinforced. Masonry reinforcement for common bond block walls shall be placed in first and second bed joints above and below opening, and in every third bed joint throughout the remainder of the wall. Reinforcement shall be lapped at splices a minimum of six inches. At the corners, the reinforcement shall be cut and bent to the proper angle. Masonry reinforcements shall not be continuous through vertical control joints.

C.  Mortar joints shall be 3/8" thick with full mortar coverage on vertical and horizontal face shells. Mortar joints shall be struck off flush with wall surface, and when practically set, shall be tooled concave, unless indicated otherwise on the drawings.

### 4.4.   Clean-Up

After completion of the masonry work, all exposed masonry surfaces shall be cleaned and washed down.

### 4.5.   Request for Payment

Please note request for payment section in Special Conditions for submission of bills.

5.2.    Miscellaneous Irons

A.    Scope - This Subcontractor shall furnish all miscellaneous iron work, which shall include all ladders, pipe rails, nosings for concrete stairs, and other miscellaneous metals as shown on plans.

B.    Materials, Workmanship and Shop Drawings same as Structural Steel.

5.3.    Steel Joists

A.    Scope - This Subcontractor shall fabricate all steel joists as shown on the drawings and specified herein, including bridging, anchors, and necessary accessories.

B.    Material - Steel joists shall be open web type which carry the designation to meet the requirements of S. J. I. specifications. All accessories, including joist, wall, and beam anchors, bridging and bridging anchors and extended ends shall be in accordance with manufacturers standards and shall meet the requirements of S. J. I. specifications.

C.    Workmanship - Joists shall be fabricated in accordance with "Standard Specifications for Open Web Joists", published by the Steel Joist Institute, latest adoption, hereinafter referred to as "S. J. I. Specs".

After fabrication, all joists and accessories shall be cleaned of loose mill scale, loose rust, weld slag or flux, dirt and other foreign matter, and painted with one coat of red oxide rust-inhibitive paint, standard with the manufacturer, complying with the steel joist institute specification of latest adoption. The use of asphaltic base paint will not be permitted.

D.    Shop Drawings - Shop drawings showing the number, type, locations, spacing, sizes and anchorage of all joists and details of all necessary accessories. shall be submitted in quadruplicate for approval.  The type of shop paint shall be marked on the drawings.  No fabrication shall proceed until the shop drawings have been approved.

5.4.    Steel Erection

A.    Scope - Included here is the erection of all structural steel, steel bar joist, reinforcing steel placement and hoisting of the metal deck to the roof.

B.    Materials - The materials are specified elsewhere in this specification.

C.    Workmanship

1.    Structural steel - Structural steel shall be erected plumb and true to conform with current specifications for design,

-12-

fabrication and erection of structural steel for buildings
and code of standard practice of steel buildings and bridges
by the American Institute of Steel Construction.

Temporary bracing shall be installed to safely maintain
structural steel in alignment during construction.

2.   Reinforcing - Reinforcing steel shall be placed in accordance
     with the recommendations of the American Concrete Institute.

3.   Welding - All welding shall conform to code for arc and gas
     welding in building construction by the American Welding
     Society. Exposed field welds shall be cleaned by power grinding.

4.   Supervision - Steel erectors shall provide a responsible foreman
     who will remain in charge of their project until completion of
     steel erection. Steel erectors shall provide qualified personnel
     trained in the aspect of steel erection required on the project.

5.   Shop drawings - All steel shall be erected according to approved
     shop drawings submitted. Any steel improperly erected shall
     be replaced at the expense of the steel erector.

## 5.5.   Metal Deck

A.   Scope - Included here is furnishing all steel roof deck as
     shown on the drawings and herein described.

B.   Materials - Steel roof deck shall be designed and manufactured in
     accordance with the "Basic Design Specifications for Steel Roof
     Deck Construction", as adopted by the Steel Deck Institute.
     Steel roof deck shall be a minimum of 1-1/2" depth and 22 ga.
     thickness, designed for spans as shown on drawings and for LL+
     DL of 55 pounds per square foot. Deck to have maximum flute
     opening of 1-3/4". All necessary accessories such as closer
     plates, cant strips, and ridge and valley plates as required to
     provide a finished surface for application of insulation and
     roofing, shall be furnished.

C.   Workmanship - Roof deck shall be fastened to supporting steel by
     securely welding the bottom of the rib to all structural supports
     at maximum spacings of six inches on the lap portion and twelve
     inches on the intermediate spans. All welding shall be done by
     competent welders in strict accordance with deck manufacturer's
     specifications and instructions. All end laps shall be a minimum
     of two inches and shall be centered directly over supports.
     Accessories shall be tack-welded in place.

-13-

D.    Shop Drawings – Four copies of shop drawings showing layout and erection of metal deck work, shall be prepared and submitted for approval prior to delivery. Metal deck shall be manufactured by a member of the Steel Deck Institute, or other approved manufacturer.

5.6.    Composite Floor Construction

A.    General Conditions – The work under this section of the specification shall be subject to all provisions of the Instruction to Bidders and Bid Form.

B.    Scope – To perform all work necessary to complete the satisfactory installation of the corrugated steel decking as shown on the drawings and specified herein. The work includes the following principal items:

1.    Composite form and reinforcing steel decking.

2.    Composite beam construction.

3.    Preparation and submitting shop drawings for approval.

C.    Related Work Specified Elsewhere

1.    Concrete fill and negative reinforcement

2.    Structural steel for supporting steel decking

3.    Fireproofing materials

4.    Installation of ceiling suspension system

5.    Cutting of openings in steel decking not shown on drawings, for the passage of materials by other trades, and the reinforcing of such openings.

6.    Transverse temperature or distribution steel except where attached directly to composite form.

D.    General

1.    The following specifications shall govern and form a part of this specification:

a)    American Iron and Steel Institute "Light Gage Cold-Formed Steel Design Manual" (Latest edition).

b)    American Institute of Steel Construction "Specification for the Design, Fabrication, and Erection of Structural Steel for Buildings" (1963 edition).

c)    American Welding Society "Code of Welding in Building Construction."

-14-

2. The design of the composite form and reinforcing floor system shall be based on the procedures and formulae applicable to the design of conventional reinforced concrete slabs.

3. Steel decking and accesories shall be delivered, stored, handled, and installed so as not to be damaged or deformed. Decking stored at the site before erection shall be stacked on platforms or pallets. The decking shall not be used for storage or as a working platform until the sheets have been securely fastened in position and shall not be damaged or overloaded during the entire construction period.

4. Substitute materials may be considered only if a request for approval is submitted to the Architect/Engineer at least ten days prior to bid date. The request shall include complete information to show that the alternates meet all the requirements of materials indicated on the drawings or in the specifications.

5. Composite form supplier shall state at the time of bidding the concrete slab requirements over the form material to provide a 1 hour fire rating accepted by the Bloomington Building Department. Lack of acceptance of the slab system by Bloomington will constitute grounds for rejection of bid.

E.  Materials

1. The composite form deck shall be a galvanized steel unit having a 1.25 oz. coating. The deck shall be capable of carrying all construction loads and a superimposed live-load of 100 psf. Design calculation shall be submitted with the bid, substantiating the load carrying capacity of the composite form deck.

2. Shear connectors shall be of a type compatable with the composite form deck capable of developing full composite action between the concrete slab and the supporting steel member. The plans call for Granco shear connectors capable of developing 11 Kips of shears. Other type shear connectors may be used but must be approved prior to bidding.

3. Temperature reinforcing shall be furnished by either Transverse wire welded to the composite form deck or a steel mesh. The amount of spacing of the temperature reinforcing shall be based on ACI design criteria.

4. Accessories shall be furnished with a galvanized coating fabricated from not less than 20 gage stub.

5. An alternate bid will be received for 1-1/2" type "B" Hi-bond 22 gage phosphate treated upper surface, painted with Duo primer underside as manufactured by Inland-Ryerson Construction Products Company.

-15-

F.    Construction

1.    The slab assembly, including steel decking and regular concrete fill shall provide 1-hour fire-resistant construction without the application of spray-on fire proofing.

2.    Calcium chloride admixtures or admixtures containing chloride salts shall not be added to the concrete used in the slab construction.

G.    Erection

1.    Supporting members shall be completely in place before the laying of the steel decking is undertaken. Laying and aligning of units shall be done so as to maintain the required number of units shown on the shop drawings. The steel decking shall have a minimum bearing of 2 inches on steel framing members and shall be fastened by arch welding of shear connectors. All decking units are to have a side lap of one half corrugation. No corrugation closures are required on steel framing members if provided with a minimum bearing of 2 inches. If the supporting members are not in the proper alignment or at proper elevations, the architect shall be immediately notified for corrective action.

2.    Arch type shear connectors shall be fillet welded through the steel deck to the supporting steel beams. Welds shall be made on each side of the flat bottom portion of the connector and shall extend the full length of the flat portion. The contractor shall conform to the manufacturer's recommended welding procedure.

3.    Field cutting of the steel decking for openings or columns shall be done in a workmanlike fashion. All openings out in decking for pipe sleeves, ducts, etc., shall be done by the trade involved in their installation and shall be reinforced as shown on the drawings. No opening exceeding 12 inches in width parallel to permanent supports shall be cut in the steel decking unless shown on structural drawings or with the approval of the architect.

4.    Side Laps shall be mechanically fastened by button-punching at a maximum of 24" O.C. to insure a grout tight formed deck to conform to UL fire rating.

-16-

H.  Shop Drawings – Shop drawings shall be prepared and submitted to the architect for approval prior to fabrication or erection of the steel decking.  These drawings shall show the complete details of the deck system and shall include the following:

    1.     Type, size, location, and gage of deck.

    2.     Closure materials and accessories

    3.     The number and location of shear connectors

5.7.    Steel Centering

A.  Scope – All concrete over steel joists shall be placed on corrugated type permanent steel forms.

B.  Material – Permanent steel form shall be Granco Standard Corruform, Inland Ribform, Wheeling tensilform or other equal product.  Sheets shall be uncoated, full hard temper.

C.  Erection – Erection shall be in accordance with manufacturers recommended practice.

5.8.    Request for Payment

Please note request for payment section in Special Conditions for submission of bills.

-17-

## 6.   CARPENTRY

### 6.1.   Scope

Included in this section is all rough and finish carpentry, and millwork including, but not limited to metal studding and Gypsum Board, installation of finish hardware, blocking, cants and curbings.

All exterior walls of the building, unless otherwise shown on the floor plan, shall be hardwood prefinished wall panelling as selected by the Owner.  Window trim shall be of hardwood material to match the panelling.  Wood panelling on exterior walls is to be installed on 2" furring strips with batt insulation behind it. Wood base to match panelling shall be furnished on all panelled walls. Vanities and a formica shelf below the mirrors in the rest rooms shall also be included in this section.

### 6.2.   Materials

A.   Framing lumber and blocking shall be Douglas fir kiln dried.

B.   All interior doors shall be 1-3/4" hollowcore stain grade birch unless otherwise shown.

C.   Roof curbs shall be of 2" x 12" kiln dried Douglas fir located and sized to suit requirements of the mechanical contractor.

D.   Pre-finished plywood paneling where scheduled shall be "Forestglo" by Weyerhaeuser or approved equal as selected by the General Contractor.

### 6.3.   Workmanship

A.   Metal studs shall be framed according to manufacturers standard methods, adequately braced true to line, plumb and level.

B.   Gypsum wall board shall be attached by nailing, screwing or gluing.  Recess heads of nails and screws, spackle and sand to smooth finish.

C.   Framing and blocking of wood shall be accurately cut and adequately fastened.

D.   Pre-finished paneling shall be attached over concrete blocks or Gypsum Board by construction adhesive as recommended by the Plywood manufacturer.  Panelling shall be accurately fitted, plumb.  Protect all pre-finished plywood from damage before and after installation.

E.   Cabinet work shall have metal or plastic drawer guides – smoothly operating.  Cabinet hardware will be supplied under hardware section.

F.   Trim for exterior windows shall be provided to match panelling.

-18-

7.   MOISTURE PROTECTION

### 7.1.   Roofing and Sheet Metal

A.   Scope - Included here is all roofing, flashing, installing metal deck on roof, and sheet metal.

B.   Materials

1.   Roof shall be 4 ply, 15 year type, dead level asphalt and gravel application over 2" thick rigid       insulation laid in two layers of 1" with staggered joints over roof areas. Thickness of rigid insulation shall be 2" throughout the building area unless otherwise shown.

2.   Roof drains are to be furnished and installed by the plumbing subcontractor and roofed in by roofer. Sheet metal furnished for roofing work shall be as shown on plans. This Subcontractor to furnish all base and counterflashing necessary for the complete installation of the roofing material, including all flashing necessary to flash in sleeves and holes through the roof by other contractors. Also includes canopy fascia and other flashing as shown on drawings.

C.   Workmanship

1.   Roofing shall be installed in the fashion recommended by the roofing material supplier for a 15-year installation.

2.   Sheet metal shall be installed in a permanently water tight manner with neat appearance and good sound mechanical connections and joints.

3.   See also section 5.5.

D.   Guarantee - This Subcontractor is to supply his own 10-year guarantee to the general contractor and to the owner against a defective roof or roof leakage due to defective workmanship or materials.

### 7.2   Caulking and Sealants

A.   Scope - Caulking around all doors, windows, at control joints, joints between precast panels, or wherever sealants are required. Caulking backup, if required, is also included.

B.   Material - Caulking shall be non-hardening plastic material designed for its purpose - "Tremco" or equal.

C.   Workmanship - Caulking shall be installed neat, straight, smoothly concave. Surfaces receiving caulking must be clean and dry for good adhesion. Apply as directed by the caulking manufacturer.

-19-

8.    DOORS, WINDOWS AND GLASS

### 8.1.    Hollow Metal

A.    Scope - All "B" label door frames,    and interior door frames    are covered under this section.

B.    Materials - All "B" label door frames, the frame for door of boiler room and the exterior door to the underground garage shall be 16 gauge hollow metal prepared for 1-3/4" thick doors.  Other interior door frames shall be 18 gauge hollow metal prepared for 1-3/4" thick doors unless otherwise shown.  Masonry anchors shall be provided with door frames for installation into masonry partitions.  Care shall be taken by workmen to see that all voids are filled with mortar.

All exterior doors except the exterior door of the underground garage which shall be an 18 gauge hollow metal door,  shall be aluminum and glass and are included in another section.  All other doors shall be 1-3/4" thick birch or aluminum and glass and are furnished under another section.

C.    Workmanship - Frames shall be set plumb and true with at least three (3) anchors per jamb.  Voids in frames shall be filled carefully with mortar.

### 8.2.    Overhead doors

A.    Scope - Overhead fiberglass doors, power operated, shall be furnished and installed under this section, as shown on the drawings for the underground garage.  Installation to include installation of electric controls with power wiring by electrical subcontractor only.

B.    Material - Doors shall be similar to those manufactured by The Barber Coleman Company, The Overhead Door Corp., Crawford Door Company, Ridge Door Company, McKee Door Company or approved equal.

Doors shall be complete with torsion spring counter-balancing key-type locks, continuous vertical track brackets, and rubber astragals on bottom of doors for full width.

### 8.3.    Windows

A.    Scope - Included in this section is all material and labor for aluminum windows.

B.    Material - All exterior windows for the office area shall be of anodized bronze aluminum 2" x 4" tubular sections with stops to accept 1" insulating glass.

Stops for the entrances shall accept $\frac{1}{4}$" plate glass.

Samples are to be furnished for approval.

C.    Workmanship - This subcontractor shall be responsible for a complete weather tight, workmanlike installation, including all caulking.

8.4.    Finish Hardware

A.    Scope - Furnish and install all finish hardware as required for the project.

B.    Materials - Schlage passage type "A" latchsets shall be furnished throughout for doors except that push and pull plates with closers shall be furnished on lavatory doors. Closers shall be furnished for the labeled doors, and boiler room doors. Door bumpers shall be provided for all interior doors. Tamper-proof butts shall be furnished on exterior doors. A lockset shall be provided for the door of the boiler room. Lock cylinders for aluminum entrances shall also be furnished.

C.    Temporary locksets may be furnished to lock building during construction, or building shall be rekeyed after occupancy by the Owner to assure proper safety of building contents.

D.    Keying of locks shall be approved by Owner.

E.    Locks furnished for all exterior doors shall have night latch accessory similar to the doors furnished for the building located at 7600 Parklawn, Edina.

F.    Finish hardware schedule, showing location and identification of each item necessary for completion of the project, shall be furnished for approval.

8.5.    Glass and Glazing

A.    Scope - This Subcontractor shall furnish all labor, material and equipment, and services necessary, or reasonably incidental to complete glass and glazing work, as shown on the drawings and specified herein.

B.    Materials - Plate glass shall be solar bronzed $\frac{1}{4}$" polished plate glass conforming to Federal specification DD-G-451a, as manufactured by Pittsburgh Plate Glass, Libbey-Owens Ford Glass Co. or approved equal. Insulating glass shall be solar bronzed 1" thick thermopane or equal.

Mirrors shall be $\frac{1}{4}$" polished plate glass, copper back type with stainless steel frame. Install a 16" x 24" mirror over each lavatory. D.S.A. glass shall be double strength "A" quality.

Glazing compound shall be a product of Tremco or an approved equal. Products shall be suited to their specific use - for wood or metal as required.

C.    Workmanship - Installation of glass shall be according to manufacturer's recommendations and best trade practice. Install mirrors with hidden fasteners.

8.6.    Aluminum Doors and Frames

A.    Scope - Included in this section is all labor, material and equipment
to furnish and install aluminum and glass entrances, sidelights and
vestibules.

B.    Materials - Entrance doors and frames shall be factory assembled
narrow style tubular aluminum construction with nominal 2" x 4"
aluminum tubular frame. Doors and vestibules shall be constructed
to accept $\frac{1}{4}$" plate glass. Manufacturer shall be Kawneer, Cronstrom's
or Armalite or approved equal. Aluminum shall be anodized bronze
finish. Hardware shall include push and pull plates, top and bottom
pivots, "D" size closers, lock which will accept 1-1/8" standard cylinder,
4" aluminum threshold. The cylinders of these doors will be supplied
in the hardware section of the specifications. Closers shall be trim-line,
heavy duty, overhead closer with back-check action, adjustable
tension, and hold open device equal to Kawneer #205. All doors shall
open to a full 3'0" width.

C.    Workmanship - This subcontractor shall be responsible for a complete
weather-tight workmanlike installation, including caulking.

8.7.    Request for Payment

Please note request for payment section in Special Conditions
for submission of bills.

9.3.    Acoustical Treatment

A.    Scope - Included here is acoustical tile for the entire ceiling area
      except for the mechanical rooms, stairwells, janitor's rooms, etc.

B.    Materials - Ceiling shall be exposed grid system with 24" x 48"
      lay-in ceiling board units (Armstrong Minaboard). *Suspension
      system shall be heavy-duty T system.* Ceiling boards shall be
      5/8" thick panels. Acoustic material shall have standard factory applied
      finish and shall be noncombustible, *mineral fiber tile.* Ceiling
      tile material shall be delivered to the jobsite, but only the grid shall
      be installed except at sprinkler heads.

      Metal grid shall be standard metal tees in 24" x 48" grid. Tile
      above corridor areas shall be 1 hour fire rated.

C.    Workmanship - Main T shall be installed on 48" center, suspended
      with hanger wire directly from the bar joists at 4'0" maximum
      spacing. *Cross T's* shall be installed at right angles to main T's
      to complete grid. Edge molding shall be installed wherever the
      suspended grid system abuts walls, columns, *and other vertical
      surfaces.* The suspension system shall be installed with all T's and
      moldings locked into place. T's shall be straight in alignment and
      flush at intersections. *Suspension system* shall be adequate to support
      the weight of lighting fixtures and shall be installed level to within
      1/8" to 12'.

      Lay-out of acoustical panels shall be made to accommodate light
      fixtures and air registers.

9.4.    Resilient Flooring

A.    *Scope - Included here is all resilient floor and base where scheduled.*

B.    Material - Resilient flooring material shall be as *manufactured by
      Armstrong, Azrock, Kentile, Johns-Manville, Matico or Musson.*
      All materials shall be first quality.

      All floors, as shown on the room finish schedule, shall receive
      1/16" thick vinyl asbestos floor covering in color to be selected
      by the Owner. Rubber base shall be applied where composition floor abuts
      masonry wall construction, millwork toe recesses, etc. , but this
      Subcontractor shall note that wood base is being furnished for all
      exterior panelled walls. This Subcontractor shall furnish to the
      building site an extra 0.5% of the total tile for the Owner's use in
      future repair.

      All materials shall be stored in undamaged condition as packaged
      by the manufacturer, with seals and labels intact. From at least
      24 hours before installation of material, until at least 48 hours after
      installation, the temperature shall not be less than 70° F. or more
      than 90° F. A minimum temperature of 55° shall be maintained after
      flooring is installed.

C.    Workmanship - *Surfaces to receive resilient flooring shall be dry,*
      thoroughly clean, and free of defects. *Concrete floor surfaces shall
      not vary more than plus or minus 1/4" in 10 feet. Any defects in sub-
      floor surfaces* shall be corrected before starting resilient flooring
      installation.

Adhesive shall be mixed and applied in accordance with manufacturer's directions. Surface shall be covered evenly with adhesive. Area covered by one application of adhesive shall not exceed maximum working area recommended by manufacturer. Resilient flooring shall be installed within the time limits recommended by manufacturers. If adhesive films over or dries, it shall be removed and the area recoated.

The top cove base shall be installed wherever tile floor and wall joint is exposed to view. Firmly cement base to dry wall. Form internal and external corners with job formed units.

Beveled edge strips shall be installed at all traffic areas where tile meets exposed concrete floor.

### 9.5. Painting

A.   Scope - All material and labor, including equipment necessary for the complete and satisfactory application of the paint materials, shall be furnished under this section.

All wood doors, window trim, unfinished millwork, panelling trim, and other finish hardware material throughout shall be stained, sealed and varnished. Nail holes in all prefinished panelling are to be filled to match the panelling.

All interior concrete block work throughout shall be painted as shown on the room finish schedule.

All exposed exterior structural steel, masonry, wood material, galvanized metal fascia, vent hoods, sleeves and equipment furnished by other Subcontractors, except those items furnished with a factory finish, shall be painted. All exposed piping shall be color coded according to recognized national standards.

All parking lot striping is included in this section.

B.   Materials - All painting materials supplied by this Contractor shall be standard materials of the trade for their particular application. All exterior paint shall be of the waterproof type and is to be applied according to manufacturer's instructions. Brochures and color charts shall be provided.

C.   Workmanship - It is anticipated that this Subcontractor shall apply a minimum of two coats of paint material to all surfaces to receive painting. If this Subcontractor fails to produce a satisfactory coverage of the painted surfaces with two coats, additional coats will be applied, as directed, at no additional cost.

D.   Each bidder shall submit the following unit prices for finishing tenant areas:
1.   Painting sheetrock _____ /ft.$^2$
2.   Painting concrete block _____ /ft.$^2$
3.   Doors and frames _____ /ft.$^2$
4.   Vinyl wall covering _____ /ft.$^2$

( Installed based on $2.50/yd$^2$ material price. )

9.6.  Wall Covering

A.  Scope - Included here is all vinyl wall fabric and all wood panelling where scheduled. Bid for interior decorating to include a unit price per square foot to furnish and install vinyl wall fabric at a material allowance of $2.50 per square yard.

B.  Materials

1.  Vinyl wall fabric at an allowance of $2.50 per square yard is to ne furnished and installed where scheduled. Samples are to be submitted and selection will be by Owner.

2.  Wood panelling in finishes as selected by Owner is to be provided. "Forestglow" by Weyerhauser.

C.  Workmanship

1.  Vinyl fabric is to be installed in a workmanlike manner with plastic closure strips at ceiling.

2.  Wood panelling is to be installed with countersunk nails and joints shall be tight, with nail holes and joints touched up in matching colors after installaion is complete.

9.7.  Sprayed in Fireproofing

A.    Scope

1.    Work included - the work required under this section
is intended to provide a fire rating, satisfactory to the
City of Bloomington Building Inspector in accordance
with the uniform building code, 1967 addition.  This
fire protection shall give a two hour rating for structural
columns and beams.  This work consists of furnishing
all labor, materials and equipment necessary for
spraying fireproofing of structural steel members
as indicated in the drawings and as specified herein
and clean-up subsequent to that application.

2.    Work not included

a)    Structural steel incased in concrete.

b)    Structural steel shown in detail as incased
in masonry.

c)    Structural steel detailed as enclosed in a
fire rated sheetrock application in accordance
with a subsequent section of this specification.

d)    Trowelled plaster fireproofing, if required,
will be specified under the plastering section.

e)    The cleaning of the surfaces to receive sprayed
fireproofing.

f)    In the event of sprayed fireproofing application
in cold weather, the supply of temporary heat
shall be by others.

B.    Examination and coordination

1.    The subcontractor's attention is directed to the drawings and
specifications for both structural steel and metal decking,
so that he may properly determine the exact scope of the
work required.

2.    This Subcontractor shall examine all surfaces to which
the sprayed fireproofing is to be applied and shall notify
the general contractor in writing if any conditions exist
which would be detrimental to the proper and expeditious
installation of the work.  Starting of work within an area
will be construed as acceptance of the conditions of that
area.

3.      All clips, hangers, supports, sleeves and other attachments to the fireproofing bases, as covered under other sections of this specification, are to be placed by others prior to the application of the fireproofing material where these materials can be anticipated in advance.

4.      Ducts, piping or conduit or other suspended equipment that could interfer with the uniform application of the fireproofing material are to be positioned after the application of the sprayed fireproofing. This Subcontractor shall notify the General Contractor if any of these conditions do exist within two weeks after award of the contract.

5.      The Contractor shall cooperate in the coordination and scheduling of the work of this section to avoid delays in the job progress.

C.    Samples - This Subcontractor shall submit samples of sprayed fireproofing and proof that these have been accepted by the City of Bloomington as acceptable for the fire ratings required and stated above. The fireproofing material shall not be subject to losses from the finished application by sifting, flaking, or dusting.

D.    Material

1.      The sprayed fireproofing shall be cementious setting type and shall be Mono-coat as manufactured by Zono-Lite Division, W. R. Grace and Company or its processing distributors or an equal product. All manufactured materials shall be mill-mixed and shall be delivered in original unopened packages bearing the name of the product, the manufacturers name and the Underwriters Laboratories, Inc. label. The materials shall be stored off the ground under cover and away from damp surfaces. Materials shall be kept dry until ready for use. Materials that have been exposed to water before actual use shall be discarded. Water shall be clean, fresh and free from organic and mineral impurities which would be harmful to the sprayed fireproofing material.

E.    Installation

1.      Application of sprayed fireproofing shall be in accordance with the printed instructions of the material manufacturer and the fire test report information.

2.      Only experienced applicators approved by the material's manufacturer and architect shall be allowed to place the material. Upon request, the qualified manufacturer's representative can be present for initial application to guide and assist applicator's personnel.

3.     All surfaces to which sprayed fireproofing will be applied shall be thoroughly cleaned of oil, grease, dirt, loose paint, mill scale, or any other matter which would impair bond.

4.     Temperatures and enclosure conditions shall be as specified by the material manufacturer.

5.     All patching and repairing of sprayed fireproofing due to cutting by other trades shall be performed under this section and paid for by the trade that performs the cutting.

F.     Clean-up - After completion of fireproofing work, equipment shall be removed and all wall and floor areas cleaned of deposits of sprayed fireproofing materials.

## 9. 8. Sheetwork Fireproofing

A.     Scope - This Subcontractor shall include all labor, materials and equipment necessary for the application of sheetrock, drywall, fireproofing, to achieve a two hour fire rating in accordance with a Underwriters Laboratory approved method.

B.     Materials - All materials used for this fireproofing application shall be materials that when applied in accordance with manufacturer's recommendation will give a two hour fire rating.

C.     Installation - Installation shall be in accordance with requirements for a two hour fire rating.

10.    SPECIALTIES

### 10.1.  Metal Toilet Partitions

A.    Scope - Metal toilet partitions shall be furnished and installed in the lavatories where shown for the office and the shop area. This work shall include the furnishing of urinal screens and door screening shown on the drawings.

B.    Material - All partitions shall be equal to those manufactured by Accurate Partitions, Inc., in baked enamel finish selected by Owner.

All metal toilet partitions shall be complete with coat hooks, rubber-tipped bumpers, and roll-type paper holders.

### 10.2.  Roof Hatch

A.    Scope - Roof hatches where shown on drawings shall be Bilko or approved equal with insulated curb in accordance with local requirements.

### 10.3.  Elevator.

A.    Scope - Two hydraulic elevators shall be installed where shown on the plan.

1.  Cab 1 & 2 - Platform size is to be 7'-0" x 6'-2" with a net lifting capacity of 3500 pounds. The elevator car shall have an up speed of approximately 160 feet per minute.

2.  Controls - Duplex selective collective with call register light.

3.  Workmanship - Quality shall be equal to the elevator located at 7600 Parklawn.

15.    MECHANICAL

15.1.  Plumbing Work

A.    General Provisions - Requirements of the General Conditions and
      Special Conditions apply to all work under this section.

B.    Scope - This Subcontractor shall include all labor, materials,
      services, equipment, transportation, etc. necessary for a complete
      workmanlike installation of all materials specified and shown on
      the drawings for the plumbing work for a new office building.

      It is the intent of this work that the Plumbing Subcontractor shall
      furnish and install all plumbing work as shown on the plan and
      indicated in the specification in strict accordance with the
      Plumbing Code of The City of Bloomington and the State Board
      of Health.  This specification and plan is intended as a design
      guide only, and this Subcontractor shall be responsible for the
      proper design, sizing and installation of all piping, equipment,
      specialties, appurtenances, etc. to provide a complete and
      workmanlike plumbing design and installation.  In certain cases
      minimum sizes are indicated on the drawings.  This Subcontractor
      shall further be responsible for the procurement of all approvals
      and payment of fees necessary for permits and approval by
      The City or any authorized agency of his design and installation
      of the plumbing system.

      This Subcontractor shall furnish and install a building water
      supply system, a building sanitary drainage system, a roof
      drainage system, a complete installation of all fixtures and
      equipment shown on the drawings and specified herein and cold
      water fill and make-up water piping to the core water system and
      cooling tower.

C.    Material, Equipment, Installation and Workmanship - All
      material and equipment shown on the drawings shall be new and
      manufactured by reputable manufacturers.

      All excavation and backfill work, including compaction of backfill
      inside the building to 95% of maximum modified density, shall be
      performed by this Subcontractor.  Any detrimental settlement of
      any surface shall be corrected by the responsible subcontractor.

      This Subcontractor shall connect to the municipal sanitary sewer,
      storm sewer and water at locations indicated on the drawings.
      The entire water piping system, fixtures and equipment shall be
      disinfected in accordance with applicable codes.

      This Subcontractor shall include all waste and vent, circulating
      hot and cold water piping necessary for fixtures and equipment
      shown on the drawings.  Provide plugged tees or wyes for future
      kitchen equipment.

      The building sanitary and storm sewers shall be standard strength
      vitrified clay sewer pipe and approved compression type joints
      from 5' outside building.

The combination domestic and fire service shall be Class 150 AWWA C.I.; Class 250 fittings; mechanical joints or push-on rubber ring gaskets, ASTM A-74. Provide thrust blocks and tie rods as required. Make all arrangements to provide domestic water meter and 8" tee with blind flange for sprinkler contractor. Provide post indicator valve on service as required.

All storm drainage and sanitary drainage piping inside the building shall be service weight cast iron with hot leaded joints or approved neoprene gasket. Waste and vent piping above grade shall be schedule 40 galv. steel pipe with 125# C. I. drainage fittings. Waste and vent piping shall pitch not less than 1/8" per foot, and 1/4" per foot where possible. Vent stacks shall be provided with frostproof roof jacket.

Water piping above ground shall be Type L or M, as required, hard copper tubing on 2-1/2" and smaller and schedule 40 galvanized steel on 3" and larger; cast bronze or wrought solder type fittings 1" and smaller, wrought solder type fittings 1-1/4" through 2-1/2", 125# galvanized malleable iron 3" and larger; 50-50 solder with flux equal to "Streamline" for solder joints.

Cold, hot and circulating hot water and horizontal runs of rain water piping and sumps of roof drains shall be insulated with 3/4" fiberglass pipe covering having vapor proof jacket equal to Johns Manville "Flame Safe" VB, with valve bodies and fittings insulated to same thickness as pipe.

Valves shall be installed on lines to all individual equipment except those specified to be equipped with stop valves and shall be of one make. Gate valves shall be for 125 psi working pressure and shall be equal to Nibco/Scott - T122 or S122.

Install unions at connections to all equipment and dielectric unions or couplings on joints between copper and steel. Provide chromium plated escutcheons where pipes pass through finished walls, partitions, floors and ceilings.

Provide hangers, inserts, anchors, alignment guides and expansion loops or joints as required for a complete straight and true piping installation. Provide pipe sleeves, vacuum breakers and shock absorbers as required.

All piping systems shall be tested and inspected in accordance with applicable codes.

Floor drains in mechanical rooms shall be equal to Minneapolis Pattern, C. I., and elsewhere shall be equal to Josam Series 300 with backwater valve and Nickaloy strainer. Area drains shall have tractor grate. Cleanouts in finished areas shall be equal to Josam, compatible with surface in which installed. Provide inflammable waste trap and duplex sump pump installation as indicated, sump pump installation shall be capable of handling full flow of sprinkler system test.

Furnish and install under the direction of the General Contractor
roof drains where shown, Josam, Smith, Wade, or Zurn, the
equivalent of Josam 4110 with deck clamp.

Plumbing fixtures shall be American Standard, Crane, Eljer or
Kohler, the equivalent of types listed, with chrome plated
traps, escutcheons, faucets, stop valves, and supplies.

Lavatory - American Standard 0351.023 "Lucerne", 20" x 18"
V. C. with 2121.267 "Colony" supply fitting with pop-up waste,
17 gauge bent tube P-trap with cleanout, 3/8" I.P.S. or 1/2"
copper angle supplies with stops and flexible risers.

Counter-top Lavatory - American Standard 0475.020 "Aqualyn"
20" x 17" oval V. C. self-rimming with trim as above.

Water Closet - American Standard 2477.016 "Afwall" V. C.
elongated rim, siphon jet wall hung bowl with Sloan Royal
115FYVQ or equal flush valve, Church 395-C black open front
seat less cover and adjustable chair carrier system, Josam,
Smith, Wade or Zurn.

Urinal - American Standard 6500.011 "Washbrook" wall hung
V. C. washout urinal with 3/4" top inlet. Sloan Royal 186-11-
FYV flush valve and wall hangers.

Counter-top Sink - Carlton, Elkay or Just 20 ga. type 302, 18-8
stainless steel ledge back, approximately 21 x 16 x 6-1/2 overall,
self-rimming, with sound deadening coating, equal to Just
"Continental". Provide gooseneck mixing faucet, 3/8" I.P.S.
or 1/2" copper angle supplies with stop and flexible riser,
17 ga. bent tube P-trap with cleanout and basket strainer.
Mount in counter top opening provided by the General Contractor.

Janitors receptor - Williams "Serv-i-ceptor" or Twin City Granitine
"Red-E-Basin" 32"x32"x6" precast terrazo with aluminum cap
on exposed sides, 2" trap and Chicago 897 faucet mounted 44"
above floor.

Water Cooler - Cordley "Cordwall" WHA-8 wall hung self-contained
drinking water cooler with 1/5 HP compressor.

Electric Water Heater - Equal to Lochinvar Glass Lined
electric water heater with one year commercial warranty and
U.L. approval. Provide ASME approved T & P relief valve
with discharge piped to 4" above the floor. Provide all bronze
circulating pump. Wiring will be by the Electrical Subcontractor.

Wall Hydrants - Cast brass non-freeze with straight nozzle, 3/4"
hose connection, loose key handle, equal to Woodford 7P.

D.    Drawings, Manuals, Shop Drawings - This Subcontractor shall
      furn sh at the completion of the work a complete manual of
      instructions and guarantees for equipment furnished and installed
      under this section of the work, including maintenance instructions
      and parts lists complete with labels and addresses of local
      suppliers, as well as reproducible tracings of the "as built"
      plumbing and drainage systems for the Owner's information
      and maintenance of the building. This material shall be submitted
      to the General Subcontractor for review and forwarding to the Owner.

This Subcontractor shall furnish a piping layout and brochures, diagrams, shop drawings, information or samples as necessary of all equipment and materials he proposes to furnish and install for the complete plumbing installation for the General Contractor's approval prior to beginning work. The piping layout shall be complete with necessary riser diagrams showing pipe sizes, etc. and shall be prepared by or under the direct supervision of a registered engineer who shall so certify the plan.

E. Guarantee - The Subcontractor shall guarantee all material and equipment installed by him against defects in workmanship and material for a period of 12 months after final acceptance of the work, and he shall repair or replace any materials and equipment developing such defects within that time, promptly on due notice given him by the Owner and at no additional expense to the Owner.

F. Request for Payment - Please note request for payment section in Special Conditions for submission of bills.

15.2. Heating, Ventilating and Air Conditioning

A. General Provisions - Requirements of the General Conditions and Special Conditions apply to all work under this section.

B. Scope - This Subcontractor shall furnish all labor, materials, skill services, equipment, transportation, etc. as necessary for a complete workmanlike and fully acceptable installation as described within the specifications and shown on the drawings for the heating, ventilating and air conditioning work for a new office building.

Heating, Air Conditioning and Ventilating work shall be done in accordance with the code of The City of Bloomington, The State Board of Health and the State Industrial Commission. This specification and plan is a design guide only, and this Subcontractor shall be responsible for the proper design, sizing, and installation of all duct work, piping, equipment, specialties, etc. to provide a complete and workmanlike design and installation. In certain cases minimum sizes are indicated on the drawings and are specified herein.

It is this Subcontractor's responsibility to obtain all approvals necessary from the General Contractor as well as to provide all fees necessary for permits and approval by The City or any other authorized agency of his design and installation of the heating, ventilating and air conditioning systems. Any and all ventilation work necessary, as shown on the plans or as required by the authorized building codes for general building ventilation, shall be included under this section of the work.

This Subcontractor shall guarantee the office heating systems to a $95°$ temperature differential and air conditioning systems to a $20°$ temperature differential and the garage heating and ventilating system to a $60°$ temperature differential.

Heating and Air Conditioning shall be principally by means of a unitary heat pump system and overhead duct systems, of sizes required, with distribution of air flow by means of ceiling diffusers and with return air through return air grilles in the ceiling return air plenum. The size, quantity and location of diffusers and means of distribution shall be the responsibility of the Subcontractor, and those shown on the drawings are for general intent only. Hot water baseboard radiation shall supplement the heating requirements as required.

The garage shall be heated and ventilated by means of a make-up air unit having a water coil supplied with an anti-freeze solution from a heat exchanger. An electric boiler shall be provided as supplementary heat source and a closed circuit cooling tower for heat rejection.

Exhaust systems and electric heaters shall be supplied as indicated.

C.  Electrical work - The Heating and Air Conditioning Subcontractor shall provide all starters with proper overload and low voltage protection and control and interlock wiring as required. Electrical equipment shall be of proper size, type and electrical characteristics. The electrical Subcontractor will provide all power wiring.

D.  Curbs and Flashings - The Mechanical subcontractor shall cut all holes thru the roof for his equipment. Provide counterflashing for all duct openings in roof and provide roof jackets or pitch pockets for pipe and conduit passing through the roof.

Roof curbs and skids for Mechanical Equipment on the roof will be furnished and hoisted to the roof by the General Contractor and shall be located and installed by the Mechanical Subcontractor.

E.  Unitary Heat Pumps - Units shall be equal to American Standard "Electro-Hydronic" water-to-air reverse cycle air conditioning units of type and minimum capacity indicated on the drawings, complete with filters, automatic change-over wall mounted thermostats having on-off switch and all other operating and safety controls.

Hang horizontal units from overhead construction using rubber-in-shear vibration isolator hangers and so located as to provide easy access through the lay-in ceiling for service and replacement. This Subcontractor shall provide all condensate drain piping, terminating at a janitor's receptor or floor drain.

F.  Package Air Conditioning Unit - Unit shall be equal to American Standard, Carrier or Trane, with water cooled condensing unit, 30 tons nominal cooling capacity, complete with vibration isolator mounting, air filtering system and all operating and safety controls. Provide an electric resistance heating coil in the unit or supply duct for pick-up, fresh and return air dampers and heating-cooling thermostat.

G.   Fans and Blowers - Garage ventilating unit shall be equal to
Carrier or Trane backward curved centrifugal cabinet blower
with water coil sized for ethylene-glycol solution, filter
section and motorized intake damper, sized to make-up
garage exhaust when added to relief air supplied from the main
three floors.

Relief air unit shall be equal to Barry BVB with gravity backdraft
damper and vibration isolator.

Central ventilation unit shall be similar, sized for a minimum of
0.1 cfm outside air per sq. ft. of gross area, excluding central
banking floor and future restaurant.  Provide air filtration system
and motorized intake dampers.

Roof and curb mounted units shall be centrifugal exhausters with
weatherproof housing, backward curved aluminum wheel,
rubber vibration isolators, bird screen, factory wired disconnect
switch, heavy duty aluminum gravity backdraft damper, adjustable
pitch V-belt drive and AMCA certified ratings.  Units shall be equal
to Cook.  Garage exhaust units shall be up-blast discharge, sized
for 0.75 cfm per sq. ft. of garage area.

Ceiling units shall be equal to ILG, Broan,Air King or Trade Wind,
complete with centrifugal aluminum wheel, gravity backdraft
damper and grille.  Provide discharge roof cap as required.

H.   Discharge Roof Caps and Fresh Air Intake Units - Units shall
have weatherproof aluminum or galvanized steel housing with
1/2" mesh bird screen.  Provide mastic coated water tight
drip pan for each unit.

I.   Electric Baseboard Heating Units - Units shall be complete with
self-contained thermostat and all safety controls.

J.   Air Distribution Duct System - Sheet metal work shall be in
accordance with ASHRAE guide recommendations.  Provide
turning vanes in all elbows where throat radius is less than
one-half duct width.  All supply, return, fresh air and exhaust
ductwork shall be lined with acoustic duct insulation, air stream
side grey Neoprene coated, meeting NBFU 90A.  Provide splitter
dampers or volume dampers as required for proper balancing.
Prefabricated fiberglass duct may be used where concealed as
option.

Provide access openings at automatic and fire damper locations.

Provide 5/8" diameter steel security rods 6" on center, both ways,
welded to an angle iron frame secured to masonry at all duct
openings to areas occupied by the bank.

Gravity backdraft dampers not furnished with exhaust units shall
be aluminum counter-balanced units equal to Penn CBD-20.

Provide UL labelled fire dampers at locations indicated
and as required, installed in accordance with local codes
and NFPA recommendations. Fusible links shall be for
225 deg. in supply ducts and 160 deg. in return and exhaust
ducts.

Provide between ductwork and inlet and outlet of ventilating units,
flexible duct connectors equal to Duro-Dyne "Durolon" flame-
proof, coated, heavy duty glass fabric meeting NBFU 90A.
requirements.

Grilles, registers and diffusers shall be standard manufactured
products finished in factory applied prime coat, unless other-
wise noted. They shall be of style, size and spacing to
provide reasonably even air distribution and noise level
compatible with the type of occupancy.

All duct systems shall be tested and balanced to provide reasonably
even temperature and air distribution.

K.    Piping - Provide hangers, inserts, anchors, alignment guides
and expansion loops or joints as required for a complete straight
and true piping installation. All piping shall be tested in
accordance with applicable codes. Provide pipe sleeves as
required.

Hot water heating and core water piping shall be Schedule 40
black steel pipe with 125# C.I. or malleable iron screwed
fittings or standard welding fittings or, at contractor's option,
Type L hard copper tubing, wrought copper or cast bronze
solder fittings with 95-5 tin-antimony solder. Piping shall be a
reverse return system on each floor, sized for an additional 20%
future capacity, leaving plugged tees instead of couplings at
each joint.

Condensate drain piping shall be Type M hard copper tubing
with sweat fittings and 50-50 solder or Schedule 40 galvanized
steel pipe with galvanized screwed fittings, or where permitted,
Schedule 40 PVC with cementable joints, at Contractor's option.

Valves and unions shall be installed on lines to all individual
equipment and shall be of one make. Provide balancing valve
and thermometers at each unit and as required to balance the system.
Provide chromium plated escutcheons where pipes pass through
finished walls, partitions, floors and ceilings.

Provide flexible connections at all ceiling hung units, at each base
mounted pump. Provide manual air vents and collection chambers
as required and drain valves at low points.

Hot water heating piping shall be insulated with 3/4" thick
fiberglass pipe covering having jacket equal to Johns-Manville
"Flame Safe" VB. Valve bodies and fittings shall be insulated
same as pipe. Core water and condensate drain piping need
not be insulated.

L.      Baseboard Radiation - Radiation shall be equal to Standard
        Fin-Pipe Radiator Corp. Type CMT enclosure with one row
        $3\frac{1}{4}$" fin pipe with fins spaced to provide even heat distribution
        equal to approximately 30% of the combined glass, wall and
        infiltration heat loss. Radiation shall be installed in series,
        with a maximum temperature drop of $10^{\circ}$ F. at design conditions.

M.      Boiler and Hot Water Specialties - Boiler shall be equal to Precision
        Parts Corporatinn electric hot water boiler, ASME Code complete
        with all operating and safety controls for step control operation.

        Heat exchanger shall be equal to Bell and Gossett or Taco,
        for ethylene-glycol solution.

        Pumps shall be Armstrong, Bell and Gossett, Taco or Thrush,
        selected to be non-overloading on all parts of the pump curve
        and with mechanical seals.

        Provide air elimination fittings, compression tank, boiler
        compound feeder, thermometers, pressure gauges, etc. to
        provide complete system.

N.      Cooling Tower - Unit shall be a closed circuit evaporative water
        cooler compatible with and specifically designed for the unitary
        heat pump system. Unit shall be complete with modulating control
        dampers, inlet and discharge dampers and sequential blower
        control. Provide electric sump heaters and electric heating tape
        around all exposed water piping to prevent freeze-up. Provide
        an automatic feed and bleed system. Provide by-pass piping around
        the tower and drain valves.

O.      Provisions for Future - Provide plugged tees to permit addition of
        second boiler and second cooling tower to permit parallel or
        independent operation.

P.      Controls - In addition to controls previously specified with
        equipment, provide a three-way mixing valve and an
        electronic outdoor reset control for the hot water heating
        system supplying finned radiation. Controls shall have nearly
        infinite reset ratio and control point adjustments. Provide an
        insertion controller in the core water return to operate a boiler
        water injection pump to maintain minimum return core water
        temperature of $60^{\circ}$ F. and an insertion controller to modulate
        the cooling tower capacity so that core water does not exceed
        $90^{\circ}$ F.

Q.      Drawings - Manuals, Shop Drawings - At the completion of all
        work, this Subcontractor shall furnish a complete manual describing
        the construction, guarantees, operation and maintenance of each
        major piece of equipment installed under this contract and complete
        reproducible "As Built" drawings of all work. Further, a list
        giving the name and address of the nearest supply house carrying
        spare parts of all equipment shall be furnished. Completed
        drawings of all work should show layout of controls, control wiring,
        equipment layout and sizing, duct work and piping layout and
        sizing, etc. This material shall be submitted to the General
        Contractor for review.

This Subcontractor shall furnish complete piping and ductwork and equipment layout and brochures, diagrams, shop drawings, information or samples, as necessary of all equipment and material he proposes to furnish and install for the complete installation to the General Contractor and obtain approval prior to beginning of work. The layout shall be complete with all duct sizes, register, grille and diffuser sizes, models and CFM, piping sizes, equipment identification, etc., and shall be prepared by or under the direct supervision of a registered professional engineer who shall so certify the plan.

R.     Guarantee - The Subcontractor shall guarantee all material and equipment installed by him against defects in workmanship and material for a period of 12 months after final acceptance of the work, and he shall repair or replace any materials and equipment developing such defects within that time, promptly on due notice given him by the Owner and at no additional expense to the Owner.

All equipment bearing a manufacturer's guarantee, such as motors, compressors, condensers, fans, blowers, controls, etc. shall be construed to have an extended guarantee to the Owner by the manufacturer. Any such equipment that proves defective in materials or workmanship within the guarantee period, is to be replaced by the Subcontractor in accordance with the manufacturer's guarantee.

Heating and Air Conditioning Equipment shall be serviced free of additional charge for one complete season for each cycle.

S.     Request for Payment - Please note request for payment section in Special Conditions for submission of bills.

16.  ELECTRICAL WORK

### 16.1.  Lighting and Power

A.  Scope - This Subcontractor shall furnish all design, drawings, labor,
materials, equipment, skill, services, transportation, etc. as required
to complete the installation of all electrical work necessary for the
entire project as shown on the drawings or vice versa, it is to be con-
sidered as binding for the installation under the electrical work as
though mentioned in both specifications and drawings.

This Subcontractor shall include under his work all permits, fees, and
licenses required for the complete installation of his work before the
actual installation begins.

This Subcontractor is responsible for furnishing all brochures, main-
tenance and operation information, names and addresses of local
suppliers for parts of the equipment, and specific instructions to
the Owner's personnel for maintenance and operation of all equipment
and material furnished under this section of the specification. This
Subcontractor is to include all guarantees, in writing, for all equip-
ment furnished under this section of the specification. Material
supplied shall be equal to Square D or Bulldog.

At the completion of all work, this Subcontractor shall furnish and
turn over the Owner a complete manual, fully describing the con-
struction operation and maintenance of each major piece of equip-
ment installed under this contract and complete "As Built" reprodu-
cible tracings of all work. Further, a list giving the name and
address of the nearest supply house carrying spare parts for all
equipment, including lighting fixtures, shall be furnished to the
Owner.

Any and all costs required for furnishing factory - Trained personnel
to supervise the installation or operation of any and all equipment
furnished under this section of the work shall be included in the
Subcontractor's price for performing the work. This work shall
be performed at no additional cost or change in the contract price
to the Owner.

This specification is intended as a design media only, and this
Subcontractor shall be responsible for an adequate and satisfactory
installation within the limits of information given him in this specifi-
cation. All electrical work shall be performed in accordance with the
electrical code of Bloomington and the National Electrical   Code.

B.  Material

1.  Main Service - This Subcontractor shall provide a 2500 amp,
3 phase, 480 volt electrical service. Power shall be brought
into the underground garage to a main panel in an electrical
room underground from a Northern States Power transformer
station located adjacent to the building.

2.   Distribution Boxes - This Subcontractor shall provide a distribution box or boxes at each floor level.

3.   Emergency Exit Lights - This Subcontractor shall provide an approved emergency exit lighting system with exit light fixtures at all locations required by the City of Bloomington.

4.   This Subcontractor shall supply all required power and make all : quired connections for the elevators shown.

5.   Plugmold - 110 volt plugmold, with outlets at approximately 30 on centers, shall be provided on the perimeter of the office walls and where else required.

6.   Duplex Outlets - 110 volt duplex outlets shall be provided as required. For estimating purposes, 300 duplex outlets shall be provided per floor for all floors.

7.   Lighting - Lighting shall, in general, be with 2' x 4' four tube Lithonia 2G440K fluorescent fixtures. Lighting of storage areas and the underground garage shall be with 8' two-tube, instant start Wakefield fluorescent fixtures. All lights shall be switched from switches located on the rooms where they are installed.

8.   Heating and Ventilating - Electrical Contractor shall provide circuits and necessary disconnects to motors as shown on mechanical drawings. The mechanical contractor shall provide all necessary starters. Installation of starters shall be by the elect cal contractor.

Power feed wiring only for the heating and air conditioning equip ment shall be furnished by this Subcontractor, with all control w ing completely installed by the heating and ventilating subcontrac All vent fans furnished in the lavatories and conference rooms s be completely wired by this contractor.

9.   Boiler and Plumbing - Power feed wiring only for the boiler equ ment and plumbing equipment shall be furnished by this Sub-contractor, with all control wiring completely installed by other

10.  Conduit - Conduit shall be of sizes required to accommodate the number of conductors in accordance with the National Electrical Code. Exposed conduit shall be run parallel to, or at right angles with the lines of the building. All conduit shall be run to clear all openings in floors, plumbing pipes, heating pipes and air conditioning ducts. Any work installed without regard to the work of other crafts, which must necessarily be moved in order to permit proper installation of other work, shall be moved as a part of the electrical work without extra charge.

11.    Fuses - All parts of all systems shall be effectively grounded throughout. All work, equipment, materials, etc. included under this general heading shall be tested, repaired, and adjusted as required, and turned over in working order, completely fused, ready for operation. Install a complete set of fuses for all circuits and provide to the Owner, at the completion of the work, a complete replacement set for all feeder and motor branch circuits.

C.    Guarantee - Furnish all required certificates of inspection, together with a written guarantee, to replace, without cost to the Owner, any and all work, materials, equipment and attachments furnished under this heading which prove to be defective within a period of one year from the date of occupation of the affected area.

D.    Design - This specification is intended as a design media only, and this Subcontractor shall be responsible for an adequate and satisfactory installation within the limits of the information given in this specification. This Subcontractor may submit any alternate that he thinks may improve the quality or economy of this section and should list such alternates on his proposal.

16.2. Request for Payment

Please note request for payment section in Special Conditions for submission of bills.

17.    Automatic Sprinkler Fire Prevention System

    A.    Scope - This Subcontractor shall furnish and install all labor,
materials, equipment, services, skill, tools, transportation, etc.
required for a complete workmanlike installation of all materials
and systems specified herein for the entire building. This
Subcontractor shall submit shop drawings in quadruplicate
approved by Factory Mutual.

       This Subcontractor is referred to all other sections of the specifica-
tions for information and requirements regarding materials and work-
manship of all other materials specified and included in the building.

       Basically, this section of the work shall require the complete fur-
nishing and installation of an automatic fire protection sprinkler
system, as shown, including the complete design drawings and
engineering required for fire protection insurance benefits to
the Owner, as well as completely in accordance with codes of
the City of Bloomington, the State Fire Marshall's office of the
State of Minnesota, Factory Mutual, and all other authorized agencies.
This Subcontractor is to furnish and install all valves, automatic
equipment, sprinkler heads, correct piping sizes, headers, hangers,
and complete installation for the entire system. Sprinkler heads in the
office areas shall be inverted, chrome heads.

       Brass sprinkler heads shall be furnished for  the underground
garage.  Temperature design requirements for fusible links
on sprinkler heads shall be the responsibility of this Subcontractor.

       This Subcontractor shall furnish a reproducible set of drawings for
the Owner's use at job completion.

       A secondary water supply booster pump, reservoir system or
standpipe system is not included.

    B.    Request for Payment - Please note request for payment section
in Special Conditions for submission of bills.

March 4, 1975

## NORTHWESTERN FINANCIAL CENTER
## JOB # 384

| | Rauenhorst Cost | Subcontracts |
|---|---|---|
| Acoustical - Dale Tile Company | $ | $ 51,848.00 |
| Bank Casework - Shur-Nuff | | 34,635.57 |
| Blacktop - Northwest Bituminous | | 41,900.00 |
| Building Permit - City of Bloomington | 7,172.75 | |
| Caulking - A. J. Spanjers Co. | | 2,975.00 |
| Ceramic Tile - Grazzini Bros. | | 12,013.00 |
| Concrete #1 - Oscar Roberts | 67,998.67 | |
| Concrete #2 - Ready Mixed Conc. | 3,685.30 | |
| Concrete Block - Chas. Freidheim | 12,840.21 | |
| Concrete Pumping - Conc. Pumping Service | 1,568.35 | |
| Custom Draperies - Designers Workroom | 10,415.96 | |
| Deck - Keelor Steel & Alum. Co. | | 36,908.00 |
| Electrical - Peoples Electric Co. | | 315,402.64 |
| Electrical (move power tower) - N.S.P. | 24,033.09 | |
| Elevators - R & O Elevator | | 66,175.00 |
| Erection - Midwest Erection | | 35,797.43 |
| Fence - Century Fence | 1,050.00 | |
| FICA/unemployment | 22,905.46 | |
| Fireproofing - Plastercraft | | 20,000.00 |
| Flag poles - Vaughn's | | 1,308.79 |
| Floor Tile - Jayson's Lin. & Carpet | | 4,042.23 |
| Folding Partition - Mahin-Walz, Inc. | | 720.00 |
| Glass and Glazing - Minneapolis Glass Co. | | 91,015.00 |
| Hollow Metal and Hardware - F.O.K. & Co. | | 6,786.36 |
| Hollow Metal #1 - United Hardware Dist. | 8,410.73 | |
| Hollow Metal #2 - Glewwe Metals Co. | | 2,217.00 |
| HVAC - Horwitz & Son | | 518,640.00 |
| Joists - Paper Calmenson Co. | | 66,940.00 |
| Landscaping - Urban Landscaping Co. | | 27,273.30 |
| Lumber - Stewart Lumber Co. | 14,067.51 | |
| Millwork - Roland Millwork Co. | | 28,131.96 |
| Misc. Conc. Forms #1 - Brock White Co. | 4,764.55 | |
| Misc. Conc. Forms #2 - Symons Mfg. Co. | 1,675.81 | |
| Misc. Floor Tile - Northwestern Tile Co. | | 2,165.00 |
| Misc. Materials & Services | 34,148.04 | |
| Misc. Metals - Ironworks, Inc. | | 9,645.61 |
| OH Doors - Steel Structures | | 1,400.00 |
| Painting - Leo Lockway | | 18,170.20 |

Northwestern Financial Center      -2-          March 4, 1975
Job #384

| | Rauenhorst Cost | Subcontracts |
|---|---|---|
| Plastering - Ostlund Plastering Co. | | $     688.00 |
| Precast - Wells Concrete | | 128,695.88 |
| Precast Cleaning - Park Brick Finisher | | 3,460.00 |
| Rauenhorst labor | $266,564.00 | |
| Rebar Placing - Holman Erection Co. | | 10,022.89 |
| Roofing & Sheet Metal - B. Dalsin Co. | | 24,888.00 |
| Security Officers — Guardsmark | 1,690.00 | |
| Sheet Metal Work - Ryan Air Cond. | 2,680.26 | |
| Sheetrock - Wunder-Klien-Donohue | 27,636.79 | |
| Shop Materials | 11,273.42 | |
| Shoring - Advance Shoring | 1,694.80 | |
| Signs - Architectural Graphics | | 5,315.00 |
| Sod - Glen Rehbein, Inc. | | 7,062.03 |
| Sprinkler - Viking Auto. Sprinkler | | 60,128.92 |
| Sprinkler (underground) - Minn-Turf, Inc. | | 9,640.00 |
| Structural Steel - Cowin & Co. | | 140,400.92 |
| Taping - Statewide Sprayers Co. | | 13,122.41 |
| Toilet Partitions (furnish) — Builders Eng. | | 4,042.03 |
| Toilet Partitions (install) - Metal Specialties | 1,074.00 | |
| Trash Removal - AMMA Corp. | 1,087.00 | |
| Waterproofing (found.) - Bentonize Co. | | 4,040.96 |
| Waterproofing (vault) - MacPherson-Towne Co. | | 3,007.00 |
| Window Cleaning - J & D Window Cleaning | 1,670.00 | |
| Totals | $530,106.70 | $1,810,822.13 |

Total of R.C. Costs and Subcontractors      $2,340,928.83

Grading & Storm Sewer            75,727.25

GRAND TOTAL           $2,416,656.08

jt

RIKER, DANZIG, SCHERER, HYLAND & PERRETTI
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey  07962-1981
(201) 538-0800

Attorneys for Plaintiffs
The Prudential Insurance Company
      of America, et al.

| | |
|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, et al., | UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY |
| Plaintiffs, | Hon. Harold A. Ackerman |
| vs. | |
| UNITED STATES GYPSUM COMPANY, et al., | CIVIL ACTION |
| Defendants. | No. 87-4227  (HAA) No. 87-4238  (HAA) |
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, | |
| Plaintiff, | AFFIDAVIT OF ROBERT JACOBSEN |
| vs. | |
| NATIONAL GYPSUM COMPANY, | |
| Defendant. | |

State of Minnesota  :
                    :  ss
County of Hennepin  :

        I, Robert Jacobsen, of full age and duly sworn according
to law, upon my oath depose and say:

        1.  I am the owner of Plastercraft, Inc. ("Plastercraft")
which is located in Minnetonka, Minnesota.

        2.   During the 1970's, Plastercraft was a specialty
subcontractor engaged in the business of installing sprayed-on

PIS 00061539

fireproofing and plastering materials in the Minneapolis/Bloomington area.

    3.  Plastercraft was the subcontractor selected to install a portion of the sprayed-on fireproofing in the Norwest Financial Building ("Norwest Financial") in the 1970's.  Norwest Financial is a low-rise office building which is part of the Norwest Financial Center Complex in Bloomington, Minnesota.

    4.  As part of my responsibilities with Plastercraft I selected the materials used by Plastercraft on the Norwest Financial project.

    5.  I recall that the sprayed-on fireproofing material installed by Plastercraft in Norwest Financial was Mono-Kote.  I further recall that Mono-Kote was virtually the only product we used for sprayed-on fireproofing jobs at that time.

    I have read this statement and can attest that the statement is true and accurate.

                      Robert Jacobsen

STATE OF MINNESOTA  :
                    : ss
COUNTY OF HENNEPIN  :

    The foregoing instrument was acknowledged before me the June day of twenty first , 1990 by Robert Jacobsen.

                      Notary Public

My Commission Expires:

    9-20-95

MARY A. COOPER
NOTARY PUBLIC--MINNESOTA
HENNEPIN COUNTY
My Commission Expires Sept. 20, 1995

-2-

PIS 00061540

# EXHIBIT B



 **twin city testing**
and engineering laboratory, inc.
662 CROMWELL AVENUE
ST PAUL, MN 55114
PHONE 612/645-3601

**REPORT OF:** ASBESTOS ANALYSIS
BULK INSULATION SAMPLES

**PROJECT:**

**REPORTED TO:**

Normandale Properties Inc
Attn: Keith Junge
Suite 730
Northwestern Financial Center
7900 Xerxes Avenue South
Minneapolis, MN 55431

**DATE:** June 6, 1985

**FURNISHED BY:**

**COPIES TO:**

**LABORATORY No.** 4416 86-337.90

### INTRODUCTION:

This report presents the results of our recent testing of three bulk samples of insulation submitted to our laboratory for analysis by Keith Junge of Normandale Properties Inc. These samples were submitted on May 31, 1985 and the work was authorized under purchase order number 6696M.

The scope of our services was limited to microscopic analysis sufficient to determine the presence of asbestos in these bulk samples.

### CONCLUSIONS:

Our testing identifies asbestos as present in two of the submitted bulk samples. The asbestos mineral found was chrysotile.

### METHODOLOGY:

Identification of the presence of asbestos fiber in bulk samples is performed in this laboratory using two methods: polarized light microscopy and infrared spectroscopy.

This analysis was done by polarized light microscopy using dispersion staining particle identification technique. This laboratory uses a Leitz Laborlux 12 POL microscope at 100X magnification in accordance with EPA procedures.

### RESULTS:

| TCT Sample Number | Sample Identification | Asbestos Type Approximate Percent | Balance of Material Approximate Percent |
|---|---|---|---|
| 5377 | QI Garage | Chrysotile 8 | Nonfibrous 92 |
| 5378 | QI 3rd floor | Chrysotile 14 | Cellulose Trace Nonfibrous 86 |
| 5379 | QII 14th floor | ND[1] | Cellulose 14 Nonfibrous 86 |

[1] - ND - None Detected - No asbestos fiber observed in the portion of the sample examined.

PIS 6002255

AS A MUTUAL PROTECTION TO CLIENTS, THE PUBLIC AND OURSELVES, ALL REPORTS ARE SUBMITTED AS THE CONFIDENTIAL PROPERTY OF CLIENTS, AND AUTHORIZATION FOR PUBLICATION OF STATEMENTS, CONCLUSIONS OR EXTRACTS FROM OR REGARDING OUR REPORTS IS RESERVED PENDING OUR WRITTEN APPROVAL




662 CROMWELL AVENUE
ST PAUL MN 55114
PHONE 612/645-3601

**REPORT OF:** ASBESTOS ANALYSIS

**LABORATORY No.** 4416 86-337.90

**DATE:** June 6, 1985

**PAGE:** 2

REMARKS:

Our testing was performed on bulk samples submitted for analysis and does not document the level of asbestos which may be contained in the work space air.

Twin City Testing and Engineering Laboratory routinely participates in the EPA sponsored Asbestos Bulk Sample Analysis Quality Control Program maintained for commercial Laboratories by Research Triangle Institute. Our microscopists count NIOSH fiber samples originating from SRI International for the Proficiency Analytical Testing Program (PAT).

The samples will be retained by our laboratory for thirty days from the date of this report and then discarded unless otherwise notified.

TWIN CITY TESTING AND
ENGINEERING LABORATORY INC

Rennie Smith
Microscopist

Rosemary Breiland
Principal Chemist

William F Welbes
Manager-Organic Chemistry

RS/RB/WFW/sa

Steve Reynolds

PIS 6002256

AS A MUTUAL PROTECTION TO CLIENTS, THE PUBLIC AND OURSELVES, ALL REPORTS ARE SUBMITTED AS THE CONFIDENTIAL PROPERTY OF CLIENTS, AND AUTHORIZATION FOR PUBLICATION OF STATEMENTS, CONCLUSIONS OR EXTRACTS FROM OR REGARDING OUR REPORTS IS RESERVED PENDING OUR WRITTEN APPROVAL

ASBESTOS SURVEY REPORT

FOR

PRUDENTIAL INSURANCE COMPANY

PROPERTY IP942, N.F.C.

BCM PROJECT NO. 05-4151-09-B22

JULY 15, 1986

BCM CONVERSE INC.
108 ST. ANTHONY ST.
MOBILE, ALABAMA  36602

PIS 6000212

## BCM CONVERSE INC.
## BCM NO. B22

BUILDING EVALUATION:

Prudential Portfolio No.:    IP942
Building Name:      N.F.C.
Address:            Bloomington, Minnesota

BCM Field Evaluator:    Mark Johnson
Date of Survey:    7/15/86
Property Manager:  Bart Wold
Phone No.:    (612) 936-4635
Person(s) Contacted:    Mark Smith

Type of Building:  Multistory Office

Results of Visual Inspection:    Potential asbestos-containing material
found within the facility.

| QUANTITY | DESCRIPTION | LOCATION |
|---|---|---|
| 5,920 SF | Ceiling Material | Bank 2nd Floor |
| 370 Ea. | Pipe Elbows | Bank and Tower |
| 180 SF | Equipment Covering | Bank Boiler Room |
| 600,000 SF | Coating on Beams | Bank Basement, 1st, 2nd and 3rd Floors |

BCM CONVERSE INC.

PIS 6000213

RESULTS OF LABORATORY ANALYSIS OF BULK SAMPLES OBTAINED:

| LOCATION | DESCRIPTION | SAMPLE I.D. | RESULTS/TYPE ASBESTOS* | |
|---|---|---|---|---|
| 2nd Level Link | Coating on Beams | B22-0001 | | 0% |
| Bank Basement | Pipe Elbows | B22-0002 | | 0% |
| Bank Basement | Coating on Beams | B22-0003 | | 3%(2) |
| Bank Basement Boiler Rm | Equipment Covering | B22-0004 | 3%(2) | 15%(1) |
| 2nd Fl. High Bank Area | Ceiling Material | B22-0005 | | 0% |
| 2nd Fl. High Bank Area | Coating on Beams | B22-0006 | | 5%(2) |
| 1st Fl. Bank Mech. Room | Coating on Beams | B22-0007 | | 10%(2) |
| 3rd Floor Bank | Coating on Beams | B22-0008 | | 10%(2) |
| Tower Basement | Coating on Beams | B22-0009 | | 0% |
| Tower Basement | Pipe Elbows | B22-0010 | | 0% |
| 2nd Floor Tower | Coating on Beams | B22-0011 | | 0% |
| 10th Floor Tower | Coating on Beams | B22-0012 | | 0% |
| Penthouse | Pipe Elbows | B22-0013 | | 0% |

LOCATION AND DESCRIPTION OF ASBESTOS-CONTAINING MATERIALS:

| QUANTITY | DESCRIPTION | LOCATION |
|---|---|---|
| 600,000 SF | Coating on Beams | Bank Basement, 1st, 2nd and 3rd Floors |
| 180 SF | Equipment Covering | Bank Boiler Room |

* The number in parenthesis identifies the type asbestos present, as follows: (1) Amosite, (2) Chrysotile, (3) Crocidolite, (4) Anthophyllite, (5) Tremolite, and (6) Actinolite.

BCM CONVERSE INC.

PIS 6000214

ATTACHMENT 1
BCM No. B22

| QUANTITY | DESCRIPTION | REMOVAL COST | REPLACEMENT COST |
|---|---|---|---|
| 600,000 SF | Coating on Beams | $6,000,000 | $1,200,000 |
| 180 SF | Equipment Covering | 1,800 | 900 |
| | TOTAL | $6,001,800 | $1,200,900 |

Estimate includes removal of asbestos-containing material and replacement with an equal non-asbestos material.

Time for completion of the work will depend on the number of isolated work areas. Areas from 10,000 SF through 40,000 SF of asbestos materials are of optimum size, and the work can be performed within 14 days for the small areas, through 21 days for the larger areas.

Estimate does not include demolition of the existing space nor does it include building out the space after asbestos removal.

BCM CONVERSE INC.

2206

PIS 6000215



MATERIALS
ANALYTICAL
SERVICES

June 25, 1990


Re:  Northwest Financial Center
     Bloomington, Minnesota


Based on the constituent analysis of the fireproofing
samples for the above-referenced project, it is my
opinion that the samples analyzed are Mono-Kote 3,
which was manufactured by W. R. Grace.

Worksheets reflecting our analysis are attached.



William E. Longo, Ph.D.


PIS 00060599

3597 Parkway Lane • Suite 250
Norcross, Georgia 30092
(404) 448-3200   FAX (404) 368-8256

BUILDING:          Northwest Financial Center
                   Bloomington, Minnesota


The following bulk samples from the above-referenced building
were analyzed and were used to form an opinion of the manufactur-
er and product.

| Bulk Sample | Sample Location | Collected By |
|-------------|-----------------|--------------|
| 1 | 1st Floor Mechanical | McCrone |
| 2 | 1st Floor Men's Room | McCrone |
| 3 | 2nd Floor Men's Room | McCrone |
| 4 | 3rd Floor Lunch Room | McCrone |
| 5 | 3rd Floor Accounting | McCrone |
| 7 | Northwest Parking Ramp | McCrone |
| 8 | Northwest Parking Ramp | McCrone |

PIS 00060600

# MATERIALS ANALYTICAL SERVICES, INC.

## BULK ANALYSIS SHEET

Project # - Spl #: _M1629-1_                              Date: _11/1/88_

Project Name: _LAW ASSOCIATES/HATFIELD_                   Analyst: _____
                                                          Reviewer: _____

Sample Identification: _A88-120.29  NORTHWEST FINANCIAL BUILDING_
_1ST FLOOR  MECHANICAL ROOM._

Gross Visual Description: _LIGHT TAN TO LIGHT GRAY. GOLD FLAKES THROUGHOUT._
_FIBERS EXPOSED._

**ASBESTOS MINERALS:**                    Est. Vol. %

Chrysotile . . . . . . . . . . .   _15_
Amosite . . . . . . . . . . . .   _____
Crocidolite . . . . . . . . . .   _____
Tremolite/Actinolite . . . . .   _____
Anthophyllite . . . . . . . . .   _____

**OTHER FIBROUS COMPONENTS:**

Mineral/Rock wool . . . . . . .   _____
Fibrous glass . . . . . . . . .   _____
Cellulose . . . . . . . . . . .   _____
Synthetic . . . . . . . . . . .   _____
Talc . . . . . . . . . . . . .   _____

**NON-FIBROUS COMPONENTS:**

Perlite . . . . . . . . . . . .   _____
Vermiculite . . . . . . . . . .   _40_
Mica . . . . . . . . . . . . .   _____
Quartz . . . . . . . . . . . .   _____
Calcite . . . . . . . . . . . .   _____
Gypsum . . . . . . . . . . . .   _____
Diatoms . . . . . . . . . . . .   _____
Other . . . . . . . . . . . . .   _____

Binders . . . . . . . . . . . .   _45_
_GYPSUM PREDOMINATES, SCATTERED QUARTZ AND CARBONATE_

EFFERVESCENCE: _WEAK TO MODERATE_

COMMENTS:
_NO STARCH OBSERVED_

## MATERIALS ANALYTICAL SERVICES, INC.

### BULK ANALYSIS SHEET

Project # - Spl #: _M1629-2_          Date: _11/1/88_

Project Name: _LAw ASSOCIATES/HATFIELD_          Analyst: _W. B. E._
Reviewer: _____

Sample Identification: _APP-120.29. NORTHWEST FINANCIAL BUILDING._
_1ST FLOOR MEN'S ROOM._

Gross Visual Description: _LIGHT TAN TO LIGHT GRAY. GOLD FLAKES THROUGHOUT._
_FIBERS EXPOSED_

ASBESTOS MINERALS:                Est. Vol. %

Chrysotile . . . . . . . . . .  _13_
Amosite . . . . . . . . . . .
Crocidolite . . . . . . . . .
Tremolite/Actinolite . . . . .
Anthophyllite . . . . . . . .

OTHER FIBROUS COMPONENTS:

Mineral/Rock wool . . . . . .
Fibrous glass . . . . . . . .
Cellulose . . . . . . . . . .
Synthetic . . . . . . . . . .
Talc . . . . . . . . . . . .

NON-FIBROUS COMPONENTS:

Perlite . . . . . . . . . . .
Vermiculite . . . . . . . . .  _39_
Mica . . . . . . . . . . . .
Quartz . . . . . . . . . . .
Calcite . . . . . . . . . . .
Gypsum . . . . . . . . . . .
Diatoms . . . . . . . . . . .
Other

Binders . . . . . . . . . . .  _48_
_GYPSUM PREDOMINATES, SCATTERED GRANULAR MINERALS_

EFFERVESCENCE: _WEAK TO MODERATE_

COMMENTS:
_NO STARCH OBSERVED_

## MATERIALS ANALYTICAL SERVICES, INC.

### BULK ANALYSIS SHEET

Project # - Spl #: _M/629-3_          Date: _11/1/88_

Project Name: _LAW ASSOCIATES /HATFIELD_          Analyst: _W.B.E._
Reviewer: _____

Sample Identification: _A88-120.29   NORTHWEST FINANCIAL BUILDING._
_2ND FLOOR   ABOVE   MAINT/ MEN'S ROOM_

Gross Visual Description: _LIGHT TAN.  GOLD FLAKES THROUGHOUT. FIBERS_
_EXPOSED._

**ASBESTOS MINERALS:**                    Est. Vol. %

Chrysotile . . . . . . . . . . . :  _18_
Amosite . . . . . . . . . . . . :  _____
Crocidolite . . . . . . . . . . :  _____
Tremolite/Actinolite . . . . . :  _____
Anthophyllite . . . . . . . . :  _____

**OTHER FIBROUS COMPONENTS:**

Mineral/Rock wool . . . . . :  _____
Fibrous glass . . . . . . . . :  _____
Cellulose . . . . . . . . . . :  _____
Synthetic . . . . . . . . . . :  _____
Talc . . . . . . . . . . . . . :  _____

**NON-FIBROUS COMPONENTS:**

Perlite . . . . . . . . . . . :  _____
Vermiculite . . . . . . . . . :  _38_
Mica . . . . . . . . . . . . . :  _____
Quartz . . . . . . . . . . . . :  _____
Calcite . . . . . . . . . . . :  _____
Gypsum . . . . . . . . . . . :  _____
Diatoms . . . . . . . . . . . :  _____
Other . . . . . . . . . . . . :  _____

Binders . . . . . . . . . . . _44_
_GYPSUM PREDOMINATES. SCATTERED GRANULAR MINERALS_

EFFERVESCENCE: _WEAK_

COMMENTS:
_NO STARCH OBSERVED._

# MATERIALS ANALYTICAL SERVICES, INC.

## BULK ANALYSIS SHEET

Project # - Spl #: _M1629-4_                    Date: _11/1/88_

Project Name: _LAW ASSOCIATES/HATFIELD_         Analyst: _W.B.E._
                                                Reviewer: _____

Sample Identification: _A88-120.29. NORTHWEST FINANCIAL BUILDING_
_3RD FLOOR, IBM LUNCH ROOM - PILLAR._

Gross Visual Description: _LIGHT TAN TO LIGHT GRAY. GOLD FLAKES_
_THROUGH OUT. FIBERS EXPOSED._

ASBESTOS MINERALS:                    Est. Vol. %

Chrysotile . . . . . . . . . .  _12_
Amosite . . . . . . . . . . .  _____
Crocidolite . . . . . . . . .  _____
Tremolite/Actinolite . . . . .  _____
Anthophyllite . . . . . . . .  _____

OTHER FIBROUS COMPONENTS:

Mineral/Rock wool . . . . . .  _____
Fibrous glass . . . . . . . .  _____
Cellulose . . . . . . . . . .  _____
Synthetic . . . . . . . . . .  _____
Talc . . . . . . . . . . . . .  _____

NON-FIBROUS COMPONENTS:

Perlite . . . . . . . . . . .  _____
Vermiculite . . . . . . . . .  _38_
Mica . . . . . . . . . . . . .  _____
Quartz . . . . . . . . . . . .  _____
Calcite . . . . . . . . . . .  _____
Gypsum . . . . . . . . . . . .  _____
Diatoms . . . . . . . . . . .  _____
Other

Binders . . . . . . . . . . .  _50_
_GYPSUM PREDOMINANT. SCATTERED GRANULAR MINERALS_

EFFERVESCENCE: _WEAK TO MODERATE_

COMMENTS:
_NO STARCH OBSERVED_

PIS 00060604

MATERIALS ANALYTICAL SERVICES, INC.

BULK ANALYSIS SHEET

Project # – Spl #: _M 1629-5_                    Date: _11/1/88_

Project Name: _LAW ASSOCIATES/HATFIELD_          Analyst: _W. B.E._
                                                  Reviewer: _____

Sample Identification: _A&P-120.29   NORTHWEST   FINANCIAL   BUILDING_
    _3RD FLOOR   ACCOUNTING – UNOCCUPIED_

Gross Visual Description: _LIGHT TAN TO LIGHT GRAY.  GOLD FLAKES THROUGH_
    _FIBERS EXPOSED._

ASBESTOS MINERALS:                 Est. Vol. %

Chrysotile . . . . . . . . . . .    _11_ _____
Amosite . . . . . . . . . . . .    _____
Crocidolite . . . . . . . . . .    _____
Tremolite/Actinolite . . . . . .   _____
Anthophyllite . . . . . . . . .    _____

OTHER FIBROUS COMPONENTS:

Mineral/Rock wool . . . . . . .    _____
Fibrous glass . . . . . . . . .    _____
Cellulose . . . . . . . . . . .    _____
Synthetic . . . . . . . . . . .    _____
Talc . . . . . . . . . . . . . .   _____

NON-FIBROUS COMPONENTS:

Perlite . . . . . . . . . . . .    _____
Vermiculite . . . . . . . . . .    _35_ _____
Mica . . . . . . . . . . . . . .   _____
Quartz . . . . . . . . . . . . .   _____
Calcite . . . . . . . . . . . .    _____
Gypsum . . . . . . . . . . . . .   _____
Diatoms . . . . . . . . . . . .    _____
Other . . . . . . . . . . . . .    _____

Binders . . . . . . . . . . . .    _54_ _____
_GYPSUM PREDOMINATES, FINE GRANULAR MINERALS SCATTERED THROUGHOUT._

EFFERVESCENCE: _WEAKLY_

COMMENTS:
    _NO STARCH OBSERVED._

## MATERIALS ANALYTICAL SERVICES, INC.

## BULK ANALYSIS SHEET

Project # - Spl #: _M1629-7_                     Date: _11/1/88_

Project Name: _CAL ASSOCIATES / HATFIELD_          Analyst: _W.D.S._
                                                   Reviewer: _____

Sample Identification: _A88-120.29    NORTHWEST FINANCIAL BUILDING_
_FIRE PROOFING NORWEST PARKING RAMP._

Gross Visual Description: _LIGHT TAN TO LIGHT GRAY. GOLD FLAKES_
_THROUGHOUT. FIBERS EXPOSED._

**ASBESTOS MINERALS:**                  Est. Vol. %

Chrysotile . . . . . . . . . . . _13_
Amosite . . . . . . . . . . . . _____
Crocidolite . . . . . . . . . . _____
Tremolite/Actinolite . . . . . . _____
Anthophyllite . . . . . . . . . _____

**OTHER FIBROUS COMPONENTS:**

Mineral/Rock wool . . . . . . . _____
Fibrous glass . . . . . . . . . _____
Cellulose . . . . . . . . . . . _____
Synthetic . . . . . . . . . . . _____
Talc . . . . . . . . . . . . . . _____

**NON-FIBROUS COMPONENTS:**

Perlite . . . . . . . . . . . . _____
Vermiculite . . . . . . . . . . _37_
Mica . . . . . . . . . . . . . . _____
Quartz . . . . . . . . . . . . . _____
Calcite . . . . . . . . . . . . _____
Gypsum . . . . . . . . . . . . . _____
Diatoms . . . . . . . . . . . . _____
Other

Binders . . . . . . . . . . . . _50_
_GYPSUM PREDOMINATES, SCATTERED FINE GRANULAR MINERALS_

EFFERVESCENCE: _WEAK_

COMMENTS:
    _NO STARCH OBSERVED._

PIS 00060606

# MATERIALS ANALYTICAL SERVICES, INC.

## BULK ANALYSIS SHEET

Project # - Spl #: *M1629-8*                    Date: *11/1/88*

Project Name: *LAW ASSOCIATES/HATFIELD*        Analyst: *W.B.E.*
                                               Reviewer:

Sample Identification: *A88-720.29   NORTHWEST FINANCIAL BUILDING.*
*FIRE PROOFING - NORWEST PARKING RAMP.*

Gross Visual Description: *LIGHT TAN TO LIGHT GRAY. GOLD FLAKES*
*THROUGHOUT. FIBERS EXPOSED.*

**ASBESTOS MINERALS:**                 Est. Vol. %

Chrysotile . . . . . . . . . .  *12*
Amosite . . . . . . . . . . .
Crocidolite . . . . . . . . .
Tremolite/Actinolite . . . . .
Anthophyllite . . . . . . . .

**OTHER FIBROUS COMPONENTS:**

Mineral/Rock wool . . . . . .
Fibrous glass . . . . . . . .
Cellulose . . . . . . . . . .
Synthetic . . . . . . . . . .
Talc . . . . . . . . . . . .

**NON-FIBROUS COMPONENTS:**

Perlite . . . . . . . . . . .
Vermiculite . . . . . . . . .  *37*
Mica . . . . . . . . . . . .
Quartz . . . . . . . . . . .
Calcite . . . . . . . . . . .
Gypsum . . . . . . . . . . .
Diatoms . . . . . . . . . . .
Other

Binders . . . . . . . . . . . .  *51*
*GYPSUM PREDOMINATES, SCATTERED FINE GRANULAR MINERALS.*

EFFERVESCENCE: *WEAK*

COMMENTS:
*NO STARCH OBSERVED.*

**MATERIALS ANALYTICAL SERVICES, INC.**
3597 PARKWAY LANE, SUITE 250
NORCROSS, GA 30092
404/448-3200

TEM ANALYSIS: Binder

MAS SAMPLE ID: M-1629-7

PROJECT: A88-120.29

SAMPLE NUMBER: Northwest France 1

DATE OF ANALYSIS: 11/25/88

ANALYST: WEf

| | Rel. Conc. | Morphology | Photo | SAED | Photo | EDS | Disc/File | Comments |
|---|---|---|---|---|---|---|---|---|
| **Asbestos Minerals:** | | | | | | | | |
| Chrysotile | | ✓ | | ✓ | | ✓ | | Austent? |
| **Other Components:** | | | | | | | | |
| Vermiculite | | ✓ | | ✓ | | ✓ | | Austent |
| Gypsum | | ✓ | | ✓ | | ✓ | | Austent |

COMMENTS:

PIS 00060608