MATERIALS ANALYTICAL SERVICES          FRI 25-NOV-88   12:05
Cursor: 7.340keV = 5        ROI (SIKα) 1.660: 1.820=1005



0.000      B- 5                        VFS = 256      10.240
28       M1629-7 CHRYSOTILE

PIS 00060609

MATERIALS ANALYTICAL SERVICES          FRI 25-NOV-88  11:55
Cursor: 7.340keV = 14       ROI (SIKα) 1.660: 1.820=1001

0.000        B- 5                      VFS = 256     10.240
  69      M1629-7 VERMICULITE

PIS 00060610

MATERIALS ANALYTICAL SERVICES          FRI 25-NOV-88   11:59
Cursor: 7.340KeV = 60      ROI (SIKα) 1.660: 1.820=768



0.000      B- 5                        VFS = 1024    10.240
43         M1629-7 GYPSUM

PIS 00060611

Π.Π.Σ.
3597 PARKWAY LANE
NORCROSS GA. 30092

# BULK ANALYSIS

W. B. Eglund

DATE

## ANALYSIS USING 2% SOLUTION HCl

| NO. | SAMPLE # | P-D + SAMPLE | P-D - SAMPLE | SAMPLE WEIGHT | FILTER WEIGHT | FINAL WT + FILTER | FINAL WT - FILTER | PERCENT FINAL WT | AMOUNT IN SOLU. |
|---|---|---|---|---|---|---|---|---|---|
| 1 | M1629-7 | 8.9307₃ | 7.6600₃ | 1.2707₃ | 8.0053₃ 7.6278₅ | +.044 8.1391₃ | 0.4458₃ | 35.1% | 64.9% |
| 2 | | | | | | | | | |
| 3 | | | | | | | | | |
| 4 | | | | | | | | | |
| 5 | | | | | | | | | |
| 6 | | | | | | | | | |
| 7 | | | | | | | | | |
| 8 | | | | | | | | | |
| 9 | | | | | | | | | |
| 10 | | | | | | | | | |
| 11 | | | | | | | | | |
| 12 | | | | | | | | | |
| 13 | | | | | | | | | |
| 14 | | | | | | | | | |
| 15 | | | | | | | | | |
| 16 | | | | | | | | | |
| 17 | | | | | | | | | |
| 18 | | | | | | | | | |
| 19 | | | | | | | | | |
| 20 | | | | | | | | | |
| 21 | | | | | | | | | |
| 22 | | | | | | | | | |
| 23 | | | | | | | | | |
| 24 | | | | | | | | | |
| 25 | | | | | | | | | |
| XX | | | | | | | | | |

PIS 00060612



**MATERIALS
ANALYTICAL
SERVICES**

ADDITIONAL BULK ANALYSIS

# STARCH VERIFICATION

Sample # *17/629-7*                    Analyst *W.S. Eghard*

Date    *6/24/90*

**1) Sample Analyzed before/after acid dissolutions**

## Starch observed                    (no)  ✓

                                      yes _____

## Iodine test
(ceiling tile only)          positive _____

                             negative _____

**PIB 00060613**

3597 Parkway Lane • Suite 250
Norcross, Georgia 30092
(404) 448-3200



**MATERIALS
ANALYTICAL
SERVICES**

March 22, 1991


RE:       Northwest Financial Center
          Bloomington, Minnesota

The constituent analysis of additional fireproofing samples for
the above-referenced project supplements my June 25, 1990 opinion
and confirms that the samples analyzed are Mono-Kote 3, which was
manufactured by W. R. Grace.

Worksheets reflecting the analysis are attached.


William E. Longo, Ph.D.

PIS 00111034

3597 Parkway Lane • Suite 250
Norcross, Georgia 30092
(404) 448-3200    FAX (404) 368-8

BUILDING:        Northwest Financial Center
                 Bloomington, Minnesota

The following bulk samples from the above-referenced building
were analyzed and were used to supplement the opinion regarding
the manufacturer and product.

| Bulk Sample | Sample Location | Collected By |
|---|---|---|
| 364A39A | 1st Floor, IBM Space 2nd Column from SW Corner | IEA |
| 364A42A | 1st Floor, East End of Hall at Exit Sign | IEA |
| 364A48A | 2nd Floor, NE Corner of Building | IEA |
| 364A49A | 2nd Floor, Bank Area | IEA |
| 364A51A | 3rd Floor, NW Area 2nd Column from North | IEA |

PIS 00111035

MATERIALS ANALYTICAL SERVICES, INC.

### BULK ASBESTOS SHEET

Project # – Spl #: __M 3290-1__                     Date: __3/7/91__

Project Name: __Prudential / 120.29__                Analyst: __C. May__

Sample Identification: __± 364A39A    Northwest Financial Center__

__Bldg. IP 442    Sprayed on fireproofing__

Gross Visual Description: __Beige with fine fibers gold flakes and books__

__bound in a fine grained matrix__

---

#### Optical Data for Asbestos Identification

| | | | |
|---|---|---|---|
| Morphology | wavy | | |
| Pleochroism | no | | |
| Refractive Index | 1.55||1.54 | | |
| Sign of Elongation | + | | |
| Extinction | 0 | | |
| Birefringence | low | | |
| Melt | no | | |
| Fiber Name | Chrysotile | | |

---

**ASBESTOS MINERALS:**                     Est. Vol. %

| | |
|---|---|
| Chrysotile | 10 |
| Amosite | |
| Crocidolite | |
| Tremolite/Actinolite | |
| Anthophyllite | |

**OTHER FIBROUS COMPONENTS:**

| | |
|---|---|
| Mineral/Rock wool | |
| Fibrous glass | |
| Cellulose | |
| Synthetic | |
| Other | |

**NON-FIBROUS COMPONENTS:**

| | |
|---|---|
| Perlite | |
| Vermiculite | 35 |
| Other | |
| Binders | 55 |

__Abundant Gypsum, fine grained aggregate__

EFFERVESCENCE: __none - weak in isolated areas__

COMMENTS: __NSD__

MATERIALS ANALYTICAL SERVICES, INC.

## BULK ASBESTOS SHEET

Project # – Spl #: _M3290-5_      Date: _3/5/91_

Project Name: _Prudential / 120.29_      Analyst: _J. Max_

Sample Identification: _364 A42A    North West Financial Center_
_bldg. IP 942    Sprayed on Fireproofing_

Gross Visual Description: _Beige with fine fibers, gold flakes and books_
_bound in a fine grained matrix_

### Optical Data for Asbestos Identification

| | | | | |
|---|---|---|---|---|
| Morphology | wavy | | | |
| Pleochroism | no | | | |
| Refractive Index | 1.551/1.546 | | | |
| Sign of Elongation | + | | | |
| Extinction | 0 | | | |
| Birefringence | low | | | |
| Melt | no | | | |
| Fiber Name | Chrysotile | | | |

ASBESTOS MINERALS:                    Est. Vol. %

| | |
|---|---|
| Chrysotile | 10 |
| Amosite | |
| Crocidolite | |
| Tremolite/Actinolite | |
| Anthophyllite | |

OTHER FIBROUS COMPONENTS:

| | |
|---|---|
| Mineral/Rock wool | |
| Fibrous glass | |
| Cellulose | |
| Synthetic | |
| Other | |

NON-FIBROUS COMPONENTS:

| | |
|---|---|
| Perlite | |
| Vermiculite | 35 |
| Other | |

Binders . . . . . . . . . . . . 55
_Abundant Gypsum, fine grained aggregate_

EFFERVESCENCE: _None - weak in isolated areas_

COMMENTS: _N 90_

MATERIALS ANALYTICAL SERVICES, INC.

BULK ASBESTOS SHEET

Project # - Spl #:  M 3290-17                      Date: 3/7/91

Project Name: Priesby Trial / /120.29             Analyst: G. Mich

Sample Identification: # 364 A48A    Northwest Financial Center

Bldg. IP942    2nd Floor  North East Corner  Sprayed-on: fire-proofing

Gross Visual Description: Beige with fine fibers, gold flakes and hards

bound in a fine grained matrix

---

### Optical Data for Asbestos Identification

| | |
|---|---|
| Morphology . . . . . . . . . | Wavy |
| Pleochroism. . . . . . . . . | no |
| Refractive Index . . . . . . | 1.551/1.54 |
| Sign of Elongation . . . . . | + |
| Extinction . . . . . . . . . | 0 |
| Birefringence. . . . . . . . | low |
| Melt . . . . . . . . . . . . | no |
| Fiber Name . . . . . . . . . | Chrysotile |

---

**ASBESTOS MINERALS:**                    Est. Vol. %

| | |
|---|---|
| Chrysotile . . . . . . . . . . . | 10 |
| Amosite . . . . . . . . . . . . | |
| Crocidolite . . . . . . . . . . | |
| Tremolite/Actinolite . . . . . . | |
| Anthophyllite . . . . . . . . . | |

**OTHER FIBROUS COMPONENTS:**

| | |
|---|---|
| Mineral/Rock wool . . . . . . . | |
| Fibrous glass . . . . . . . . . | |
| Cellulose . . . . . . . . . . . | |
| Synthetic . . . . . . . . . . . | |
| Other | |

**NON-FIBROUS COMPONENTS:**

| | |
|---|---|
| Perlite . . . . . . . . . . . | |
| Vermiculite . . . . . . . . . | 35 |
| Other | |

| | |
|---|---|
| Binders . . . . . . . . . . | 55 |

Abundant Gypsum, fine grained aggregate

---

EFFERVESCENCE: none - weak in Isolated areas

COMMENTS:

NSD

PIS 00111038

MATERIALS ANALYTICAL SERVICES, INC.

BULK ASBESTOS SHEET

Project # - Spl #: M3290-21                         Date: 3/7/91

Project Name: Prudential: 1120.29                   Analyst: G. McIn

Sample Identification: # 364A49A  Northwest Financial Center

Bldg. IP942    2nd Floor Bank area

Gross Visual Description: Beige with fine fibers, gold flakes and binders

bound in a fine grained matrix

| Optical Data for Asbestos Identification |
|---|
| Morphology . . . . . . . . . . . . wavy . . . _____ . . _____ |
| Pleochroism. . . . . . . . . . . . no . . . _____ . . _____ |
| Refractive Index . . . . . . . 1.544/1.541 . _____ . . _____ |
| Sign of Elongation . . . . . . + . . . . _____ . . _____ |
| Extinction . . . . . . . . . . . . 0 . . . . _____ . . _____ |
| Birefringence. . . . . . . . . . low . . . _____ . . _____ |
| Melt . . . . . . . . . . . . . . . no . . . _____ . . _____ |
| Fiber Name . . . . . . . . . . Chrysotile . _____ . . _____ |

ASBESTOS MINERALS:                    Est. Vol. %

Chrysotile . . . . . . . . . . . . . 10 _____
Amosite   . . . . . . . . . . . . . _____
Crocidolite . . . . . . . . . . . . _____
Tremolite/Actinolite . . . . . . . _____
Anthophyllite . . . . . . . . . . . _____

OTHER FIBROUS COMPONENTS:

Mineral/Rock wool . . . . . . . . _____
Fibrous glass . . . . . . . . . . _____
Cellulose . . . . . . . . . . . . _____
Synthetic . . . . . . . . . . . . _____
Other . . . . . . . . . . . . . . _____

NON-FIBROUS COMPONENTS:

Perlite . . . . . . . . . . . . . _____
Vermiculite . . . . . . . . . . . 35 _____
Other . . . . . . . . . . . . . . _____

Binders . . . . . . . . . . . . . 55 _____

Abundant Gypsum, fine grained aggregate

EFFERVESCENCE: none- weak in Isolated areas

COMMENTS:
                              NSO

PIS 00111039

## MATERIALS ANALYTICAL SERVICES, INC.

### BULK ASBESTOS SHEET

Project # - Spl #: _M3290-25_    Date: _3/7/91_

Project Name: _Prudential / 120.2g_    Analyst: _G. Mist_

Sample Identification: _#364 A 51A    Northwest Financial Center_
_Bldg. IP942    3rd floor North west    Sprayed on Fireproofing_

Gross Visual Description: _Beige with fine t. has gold flakes and books_
_bound in a fine grained matrix_

| Optical Data for Asbestos Identification | |
|---|---|
| Morphology . . . . . . . . . | Wavy . . _____ . _____ |
| Pleochroism. . . . . . . . | no . _____ . _____ |
| Refractive Index . . . . . . | 1.55/1.54 . _____ . _____ |
| Sign of Elongation . . . . . | + . _____ . _____ |
| Extinction . . . . . . . . | 0 . _____ . _____ |
| Birefringence. . . . . . . | low . _____ . _____ |
| Melt . . . . . . . . . . | no . _____ . _____ |
| Fiber Name . . . . . . . . | Chrysotile . _____ . _____ |

**ASBESTOS MINERALS:**    Est. Vol. %

Chrysotile . . . . . . . . . . . . . _10_
Amosite . . . . . . . . . . . . _____
Crocidolite . . . . . . . . . _____
Tremolite/Actinolite . . . . . . _____
Anthophyllite . . . . . . . . . _____

**OTHER FIBROUS COMPONENTS:**

Mineral/Rock wool . . . . . . . _____
Fibrous glass . . . . . . . . . _____
Cellulose . . . . . . . . . . . _____
Synthetic . . . . . . . . . . _____
Other _____

**NON-FIBROUS COMPONENTS:**

Perlite . . . . . . . . . . _____
Vermiculite . . . . . . . . . . _35_
Other _____

Binders . . . . . . . . . . _55_
_____ _Abundant Gypsum, fine grained aggregate_

EFFERVESCENCE: _None—weak in Isolated areas_

COMMENTS: _____ _NSO_
_____
_____

# EXHIBIT C

# NORTHWEST FINANCIAL CENTER

## BLOOMINGTON, MINNESOTA

## (W.R. GRACE)

## SUMMARY OF ASBESTOS
## FIREPROOFING MANAGEMENT,
## REMOVAL AND REPLACEMENT NET COSTS

*Prepared By*

**Halliwell Engineering Associates, Inc.**

**July, 1996**

# NORTHWEST FINANCIAL CENTER
# BLOOMINGTON, MN
## (W.R. GRACE)

### TABLE OF CONTENTS

**SECTION I:**    **INTRODUCTION**

    A.    BUILDING EXTERIOR PHOTOGRAPH

    B.    ASBESTOS FIREPROOFING REMOVAL STATUS DRAWING

    C.    BUILDING INFORMATION SUMMARY

    D.    INFORMATION CONSIDERED IN THE DEVELOPMENT OF THIS REPORT

**SECTION II:**    **SUMMARY OF COSTS**

    TABLE 1    SUMMARY OF ASBESTOS FIREPROOFING IN-PLACE MANAGEMENT, REMOVAL AND REPLACEMENT NET COSTS

    TABLE 2    SUMMARY OF ASBESTOS FIREPROOFING REMOVAL AND REPLACEMENT NET COSTS PRIOR TO BUILDING SALE

    TABLE 3    DETAILED COSTS FOR COMPLETED ASBESTOS FIREPROOFING REMOVAL AND REPLACEMENT PROJECTS PRIOR TO BUILDING SALE

    TABLE 4    DETAILED COSTS FOR COMPLETED ASBESTOS FIREPROOFING IN-PLACE MANAGEMENT PROJECTS PRIOR TO BUILDING SALE

    TABLE 5    ANALYSIS OF THE SALES DISCOUNT DUE TO ASBESTOS IN THE BUILDING

    TABLE 6    INTEREST CHARGES

    TABLE 7    MISCELLANEOUS RELATED COSTS NOT INCLUDED IN THIS REPORT

**SECTION III:**    **STATEMENT OF OPINIONS**

Halliwell Engineering Associates, Inc., July, 1996

# NORTHWEST FINANCIAL CENTER
# BLOOMINGTON, MN
# (W.R. GRACE)

TABLE OF CONTENTS (cont'd)

SECTION IV:       QUALIFICATIONS OF HALLIWELL ENGINEERING
                  ASSOCIATES, INC. AND JACK L. HALLIWELL (SUBMITTED
                  UNDER SEPARATE COVER)

        A.    MR. HALLIWELL'S CURRENT CURRICULUM VITAE

        B.    HALLIWELL ENGINEERING ASSOCIATES INC; SUMMARY
              OF EXPERIENCE AND CAPABILITIES

        C.    MR. HALLIWELL'S PRIOR TESTIMONY RECORD

        D.    ARTICLES ON ASBESTOS ABATEMENT AND
              MANAGEMENT AUTHORED BY MR. HALLIWELL

        E.    COMPENSATION SCHEDULES FOR MR. HALLIWELL AND
              HALLIWELL ENGINEERING ASSOCIATES, INC.

APPENDICES:

    APPENDIX A

        PART A:    ASBESTOS ABATEMENT PROJECT INFORMATION

        PART B:    BUILDING INSPECTIONS CONDUCTED BY
                   HALLIWELL ENGINEERING ASSOCIATES

        PART C:    LOCATION AND DETAILS OF INFORMATION
                   CONSIDERED IN THE DEVELOPMENT OF THIS
                   REPORT

    APPENDIX B     PROJECT FLOOR AREA/FIREPROOFING AREA
                   CALCULATIONS

    APPENDIX C     REDUCED BUILDING DRAWINGS

    APPENDIX D     EXCERPTS FROM PROPERTY SALE PROPOSAL
                   NORTHWESTERN FINANCIAL CENTER, DATED
                   MAY 20, 1991

Halliwell Engineering Associates, Inc., July, 1996

# NORTHWEST FINANCIAL CENTER
# BLOOMINGTON, MN
# (W.R. GRACE)

TABLE OF CONTENTS (cont'd)

**APPENDIX E**     EXCERPTS FROM PURCHASE AND SALE AGREEMENT, DATED AUGUST 22, 1991

**APPENDIX F**     BCM ENGINEERS' ASBESTOS SURVEY REPORT, DATED JULY 15, 1986

**APPENDIX G**     EXCERPTS FROM INSTITUTE FOR ENVIRON-MENTAL ASSESSMENT'S INSPECTION PROFILE, DATED MAY 2, 1988

**APPENDIX H**     EXCERPTS FROM INSTITUTE FOR ENVIRON-MENTAL ASSESSMENT'S PLAN AND ESTIMATE FOR ENVIRONMENTAL MANAGEMENT AND ABATEMENT PROJECT COSTS, DATED DECEMBER 29, 1989

**APPENDIX I**     SIDE LETTER TO PURCHASE AND SALE AGREEMENT, DATED AUGUST 22, 1991

**APPENDIX J**     UNIPRO CONSTRUCTION COMPANY'S BUDGET ESTIMATE IN SUPPORT OF ASBESTOS ABATEMENT

Halliwell Engineering Associates, Inc., July, 1996

Section I

# SECTION I

# INTRODUCTION

## A)    BUILDING EXTERIOR PHOTOGRAPH



# Northwest Financial Center
# Bloomington, Minnesota

## B. ASBESTOS FIREPROOFING REMOVAL STATUS DRAWING

# NORTHWEST FINANCIAL CENTER
## BLOOMINGTON, MINNESOTA



LEGEND:

FIREPROOFING REMOVED PRIOR TO SALE

FIREPROOFING REMOVED AFTER SALE

FIREPROOFING REMAINS

FIREPROOFING NEVER APPLIED

Halliwell Engineering Associates, Inc., July, 1996

## C. BUILDING INFORMATION SUMMARY

| | |
|---|---|
| Building name: | The Northwest Financial Center consists of 2 buildings. The 3 story building completed in 1971 and the Tower, constructed in 1973 to 1974. Only the 3 story building contained asbestos fireproofing and is, therefore the only building being considered in this report. |
| Location: | Bloomington, Minnesota |
| Ownership: | Sold by The Prudential Insurance Company of America (8/22/91) |
| Building use: | Multi-tenant commercial offices |

Total number of floors: 4 floors; garage and 1st through 3rd floor

Number of floors with spray-applied fireproofing: 4 floors; garage through 3rd floor

Total floor area with fireproofing:        175,051 sq. ft.

| | |
|---|---|
| Location of fireproofing: | Beams and full columns. Bar joists are not sprayed. |
| Type of deck: | Corrugated steel |
| Core area: | Bathrooms and mechanical rooms contain spray-applied fireproofing; elevator shafts, mechanical shafts and stairwells do not. |

Fireproofing surface area on a typical office floor: 8,157.69 sq. ft.

Fireproofing surface area to floor area ratio (typical floor):        $8,157.69 \div 43,518 = 0.19$

| | |
|---|---|
| Type of HVAC system: | Mechanical Rooms are located in the garage and 1st floor. The original system remains and is constant volume with heat pumps supplying the interior and perimeter diffusers. The perimeter heating is augmented with fin tub baseboard radiators. Ceiling space is open return air plenum. |

96105/SectLst

## D. INFORMATION CONSIDERED IN THE DEVELOPMENT OF THIS REPORT

### 1. Building Information:

Building design drawings

Asbestos survey

Asbestos management plan

Correspondence

Building inspections

Photographs and photo logs

Discussions with building personnel

### 2. Asbestos Abatement Cost Information:

Consultant's proposals

Contractor's bids

Bid Evaluation (Suite 200)

Contract documents

Consultant's invoices

Contractor's applications for payment

Change orders

Correspondence

### 3. Asbestos Abatement Project Information:

Abatement specifications

Abatement plans

Consultant's final reports

96105/SectLst

Correspondence

Bulk/air sampling results

Federal and state asbestos regulations

## 4.  Building Sale Information:

Property Sale Proposal

Purchase and Sales Agreement

Cost Estimates

Survey

96105/SectLst

Section II

# SECTION II

# SUMMARY OF COSTS

Halliwell Engineering Associates, Inc., July 1996

ALL STATE | STAC™ 800-222-0510 Ⓡ

Table 1

# NORTHWEST FINANCIAL CENTER
# Bloomington, MN
### (W.R. Grace)

### TABLE 1
### SUMMARY OF ASBESTOS FIREPROOFING IN—PLACE
### MANAGEMENT, REMOVAL AND REPLACEMENT NET COSTS

| | | |
|---|---|---|
| ASBESTOS FIREPROOFING REMOVAL AND REPLACEMENT NET COSTS PRIOR TO BUILDING SALE | = | $253,306.70 |
| ASBESTOS FIREPROOFING IN—PLACE MANAGEMENT NET COSTS PRIOR TO BUILDING SALE | = | 12,596.40 |
| NET SALES DISCOUNT DUE TO THE PRESENCE OF ASBESTOS FIREPROOFING* | = | 1,205,560.00 |
| TOTAL NET COSTS ATTRIBUTABLE TO ASBESTOS FIREPROOFING MANAGEMENT, REMOVAL AND REPLACEMENT | = | $1,471,463.10 |

\* The Prudential Insurance Company of America sold Northwest Financial Center on August 23, 1991 with
a sales discount of $1,205,560 to reflect the presence of ACM within the building.
An evaluation of that discount, its reasonableness in light of the remaining asbestos fireproofing at the time
of sale, and a calculation of the net discount due to the asbestos fireproofing are contained within this report.

Table 2

Northwest Financial Center
Bloomington, MN.
(W.R. Grace)

TABLE 2

Summary of Asbestos Fireproofing Removal and Replacement Net Costs Prior to Building Sale

| PROJECT INFORMATION | Parking Garage | Suite 200/IBM | TOTALS |
|---|---|---|---|
| Asbestos Abatement Dates | 08/87−09/87 | 03/88−04/88 | |
| Asbestos Abatement Contractor | Metco Inc. | Metco Inc. | |
| Asbestos Abatement Consultant | Inst Env. Asses. | Inst Env. Asses. | |
| Project Floor Area (square feet) | 44,181 | 10,000 | 54,181 |
| **GROSS ABATEMENT PROJECT COSTS    (1)** | | | |
| Asbestos Abatement Contractor | $145,383.00 | $60,220.00 | $205,603.00 |
| Asbestos Abatement Consultant | 24,420.70 | 25,283.00 | 49,703.70 |
| Miscellaneous | 0.00 | 0.00 | 0.00 |
| Total Gross Abatement Project Costs | $169,803.70 | $85,503.00 | $255,306.70 |
| Total Cost per square foot of floor area | $3.84 | $8.55 | $4.71 |
| **DEDUCTIONS FOR NON FIREPROOFING PROJECT COSTS (NON FP)** | | | |
| Vinyl Asbestos Floor Tile (VAT) Removal    (2) | $0.00 | $0.00 | $0.00 |
| Thermal System Insulation (TSI) Removal    (3) | 2,000.00 | 0.00 | 2,000.00 |
| Miscellaneous Project Cost Deductions    (4) | 0.00 | 0.00 | 0.00 |
| Total Project Deductions | $2,000.00 | $0.00 | $2,000.00 |
| **CONTAMINATED BUILDING COMPONENT REPLACEMENT COSTS    (5)** | | | |
| Ceilings | $0.00 | $0.00 | $0.00 |
| Light Fixtures | 0.00 | 0.00 | 0.00 |
| Ductwork | 0.00 | 0.00 | 0.00 |
| Total Contaminated Bldg. Component Replacement Cost | $0.00 | $0.00 | $0.00 |
| **TOTAL NET PROJECT COSTS** | | | |
| Total Net Project Costs | $167,803.70 | $85,503.00 | $253,306.70 |
| Total Net Project Costs Per Square Foot of Floor Area | $3.80 | $8.55 | $4.68 |

Notes:

(1) Refer to Table 3 for detailed listing of Gross Abatement Project Costs.

(2) No VAT removal required by project documents, therefore deduct = $0.

(3) Refer to Table 3 for listing of TSI Project Cost Deductions.

(4) No Miscellaneous Project Cost Deductions, therefore deduct = $0.

(5) Refer to Table 5 for costs not included in this report.

Halliwell Engineering Associates, Inc.  July 1996

96105

Table 3

Northwest Financial Center
Bloomington, MN
(W.R. Grace)

## TABLE 3

### Detailed Costs for Completed Asbestos Fireproofing Removal and Replacement Projects Prior to Building Sale

| Floor No. | Vendor | Invoice No. | Invoice Date | Total Invoice | Non FP | Description |
|---|---|---|---|---|---|---|
| Parking Garage | Metco Inc. | App #1 | 9/18/87 | $148,350.00 | | Asbestos abatement & respray/Original Contract Sum. |
| Parking Garage | Metco Inc. | | | 3,400.00 | | CO#1: Additional cost of fireproofing. |
| Parking Garage | Metco Inc. | | | 2,000.00 | x | CO#2: Heat exchanger tank insulation removal and replacement. TSI deduct = $2,000.00 |
| Parking Garage | Metco Inc. | | | (2,400.00) | | CO#3: Damage to electrical circuit board. |
| Parking Garage | Metco Inc. | | | (3,000.00) | | CO#4: Penalty on completion of Contract –3 day overrun ($1,000 per day). |
| Parking Garage | Metco Inc. | | | (2,967.00) | | 2% discount –invoice paid within 10 days. |
| | | Contractor Subtotal= | | $145,383.00 | | |
| Parking Garage | I.E.A. | 9736 | 10/14/87 | $24,420.70 | | Project design and project management. |
| | | Consultant Subtotal= | | $24,420.70 | | |
| | Gross Abatement Project Costs = | | | $169,803.70 | | Total TSI deduct = $2,000.00 (Deducted on Table 2). |

Halliwell Engineering Associates, Inc. July, 1996

96105

Northwest Financial Center
Bloomington, MN
(W.R. Grace)

TABLE 3

## Detailed Costs for Completed Asbestos Fireproofing Removal and Replacement Projects Prior to Building Sale

| Floor No. | Vendor | Invoice No. | Invoice Date | Total Invoice | Non FP | Description |
|---|---|---|---|---|---|---|
| Suite 200/IBM | Metco Inc. | App #1 | 3/30/88 | $48,279.00 | | Asbestos abatement. |
| Suite 200/IBM | Metco Inc. | App #2 | 4/7/88 | 11,941.00 | | Asbestos abatement. |
| | | Contractor Subtotal= | | $60,220.00 | | Total Contract Value = $53,620 (P.O.) + $6,600 (C.O.'s) = $60,220<br>CO #1 = $4,700 : Remove and replace styrofoam insulation<br>CO #2 = $1,900 : Respray styrofoam insulation |
| Suite 200/IBM | I.E.A. | 11027 | 5/25/88 | $25,283.00 | | Design, consulting monitoring and laboratory services. |
| | | Consultant Subtotal= | | $25,283.00 | | |
| | Gross Abatement Project Costs = | | | $85,503.00 | | |

Halliwell Engineering Associates, Inc.  July, 1996

Table 4

Northwest Financial Center
Bloomington, MN
(W.R. Grace)

TABLE 4

Detailed Costs for Completed Asbestos Fireproofing In – Place Management Projects Prior to Building Sale

| Floor No. | Vendor | Invoice No. | Invoice Date | Total Invoice | Non FP | M | Description |
|---|---|---|---|---|---|---|---|
| | Inst. Env. Assessment | 9742 | 11/11/87 | $96.40 | | | Inspection and samples of fire material from 3 – story building. |
| | Inst. Env. Assessment | 11305 | 8/16/88 | $12,500.00 | | | Risk Assessment. |
| Total In – Place Management Projects Costs = | | | | $12,596.40 | | | |

Halliwell Engineering Associates, Inc.    July, 1996

Table 5

Northwest Financial Center
Bloomington, MN
(W.R. Grace)

# TABLE 5

# ANALYSIS OF THE SALES DISCOUNT
# DUE TO ASBESTOS IN THE BUILDING

<u>Asbestos Abatement Sales Discount</u>

Two asbestos abatement projects were completed by Prudential Insurance Company of America at Northwest Financial Center prior to the sale of the building on May 20, 1991. The 44,181 square foot parking garage was abated in September and October of 1987 after being flooded. Suite 200 (10,000 square feet on the 2nd floor) was abated in March and April of 1988.

A December 29, 1989 plan and estimate for environmental management and abatement costs for Northwest Financial Center (see Appendix H) provided a detailed nine phase abatement project and an estimated project cost of $1,205,560 (including $20,000 for specifications and full time project monitoring), to remove the asbestos fireproofing.

At the time of sale (August, 1991), 120,870 square feet of the 3-story building had asbestos fireproofing remaining. The May 20, 1991 Property Sale Proposal for Northwestern Financial Center (see Appendix D) states that the purchaser would receive a credit at the closing in the amount of $3,012,000 "for the removal of asbestos materials and other necessary capital expenditures." The proposal further defined the credit as follows:

| | | |
|---|---|---|
| 1. | Asbestos Abatement | $1,205,560 |
| 2. | Property Repairs | $1,806,440 |
| | Total | $3,012,000 |

Also, on the date of the sale, a side letter to the Purchase and Sale Agreement (see Appendix I), from the purchaser to Prudential, outlined the final breakdown of the total sales credit as follows:

1.  $1,871,560 for the presence of asbestos containing material and to offset any additional expenses directly related to asbestos maintenance or abatement.

2.  $1,141,440 for capital improvements and other property repairs.

In addition, the August 22, 1991 Purchase and Sales Agreement (see Appendix E) states that the buyer shall receive a credit of $3,012,000 in consideration of accepting the property "as is". In Section 10 of the Agreement, buyer acknowledged receipt of the following: a) July 15, 1986 BCM Engineers' Asbestos Survey Report, b) May 2, 1988 Inspection Profile by the Institute for Environmental Assessment, and c) December 29, 1989 Plan and Estimate by the Institute for Environmental Assessment.

Halliwell Engineering Associates, Inc., July, 1996

Northwest Financial Center
Bloomington, MN
(W.R. Grace)

In analyzing the original breakdown, as outlined in the Property Sale Proposal (asbestos abatement = $1,205,560) and as outlined in the August 21, 1991 Purchase and Sale Agreement side letter ($1,871,550), it would appear that some of the earlier amounts credited for property repairs were re-allocated to asbestos abatement. Specifically, UNIPRO Construction Company's January 20th, 1990 budgetary estimate letter for construction work in support of the expected asbestos abatement (see Appendix J) totaled $666,000. This amount, combined with the $1,205,560 estimate for asbestos abatement, totals $1,871,560. This total compares almost identically with the revised credit for asbestos abatement in the Purchase and Sale Agreement side letter of $1,871,550, and would seem to explain the revised credit for abatement at the sales closing.

However, in calculating the costs per square foot for the asbestos abatement credit, we find that the originally stated credit in the May 1991 Property Sale Proposal ($9.97 per square foot) more closely reflects the historic abatement costs in this building of $8.85 per square foot. The final abatement allocation as outlined in the side letter to the August 1991 Purchase and Sale Agreement equates to $15.48 per square foot. Therefore, for the purposes of this report, the originally proposed asbestos abatement sales credit amount of $1,205,560 will be used.

Other Asbestos Containing Materials

BCM Engineers' July 15, 1986 Asbestos Survey Report (see Appendix F) did not identify any asbestos containing materials in the Tower building. In addition to the asbestos fireproofing found throughout the 3-story building, 180 square feet of mechanical equipment insulation covering was identified in the basement boiler room. All pipe fittings tested negative for contain asbestos.

The Institute for Environmental Assessment's May 2, 1988 Inspection Profile (see Appendix G) analyzed 66 samples of suspect materials in both buildings and identified the fireproofing in the 3-story building as the only asbestos containing material present (the equipment covering in the basement boiler room had been abated).

For the purpose of this report, the net sales discount attributable to asbestos containing fireproofing is $1,205,560, as stated in the May 20, 1991 Property Sale Proposal and the December 29, 1989 Plan and Estimate.

With 120,870 square feet of asbestos fireproofing remaining at the time of the sale, the sales discount is equivalent to $9.97 per square foot of floor area, this 1989 cost is comparable (within 15 percent) of the actual costs incurred on the Suite 200 project in 1988.

Halliwell Engineering Associates, Inc., July, 1996

Table 6

Northwest Financial Center
Bloomington, MN
(W.R. Grace)

# TABLE 6

# INTEREST CHARGES

An additional element of costs is interest charges. However, this report does not calculate that aspect of The Prudential Insurance Company of America's damages.

Halliwell Engineering Associates, Inc., July, 1996

Table 7

Northwest Financial Center
Bloomington, MN
(W.R. Grace)

# TABLE 7

## MISCELLANEOUS RELATED COSTS
## NOT INCLUDED IN THIS REPORT

1. The Prudential Insurance Company of America's internal asbestos management costs.

2. Costs for asbestos survey and Operations and Maintenance Plan.

3. Costs for Operations and Maintenance related to the asbestos fireproofing.

4. Electrical or water consumption costs incurred during the asbestos removal projects.

5. Costs for the relocation of furniture, equipment, and employees to other areas of the building during the asbestos abatement project.

6. Elevator after hours operational costs for asbestos removal projects.

7. Costs for the replacement of asbestos contaminated building components (ceilings, column enclosures and light fixtures).

In addition to the above costs that were not included, this report did not consider or calculate lost rental income due to the asbestos fireproofing in the building.

Halliwell Engineering Associates, Inc. July, 1996

Section III

# SECTION III

# STATEMENT OF OPINIONS



# HALLIWELL

ENGINEERING ASSOCIATES INCORPORATED

## STATEMENT OF OPINIONS

### NORTHWEST FINANCIAL CENTER

In preparing this report, we have formulated certain opinions pertaining to the costs for the management, removal and replacement of the asbestos containing fireproofing. Those opinions relate specifically to costs incurred to date, and any explicit discount of the property, realized at the time of sale due to the presence of the remaining asbestos fireproofing.

For the purposes of the opinions set forth herein, we have:

(1)  collected and reviewed certain information relating to the original design and construction of the building;

(2)  discussed with building management, issues pertaining to the building's construction and operations as well as the management, removal and replacement of the asbestos containing fireproofing;

(3)  inspected and photographed the building on two independent occasions;

(4)  collected and reviewed cost information pertaining to the management, removal and replacement of the asbestos containing fireproofing;

(5)  collected and reviewed project information pertaining to the management, removal and replacement of the asbestos containing fireproofing;

(6)  evaluated past costs pertaining to the asbestos abatement contractors, asbestos consultants and miscellaneous costs related to the management, removal and replacement of asbestos containing materials on a project by project basis;

(7)  determined gross costs for the asbestos abatement;

(8)  reviewed project and cost information relating to the abatement of other non-fireproofing asbestos containing materials and miscellaneous costs not directly related to the asbestos fireproofing;

(9)  developed cost deductions for each type of non-fireproofing ACM that was abated, as well as other miscellaneous costs not directly related to the asbestos fireproofing;

(10)  determined the net project costs directly related to the abatement of the asbestos fireproofing;

(11)   determined the abatement project areas and calculated the net costs per square foot for the abatement of the asbestos fireproofing;

(12)   calculated the net individual project costs, the net individual project costs per square foot, and the net total project costs per square foot and compared them to the project size, the amount of asbestos fireproofing being abated, the scope of the work, the level of difficulty, the method of contractor selection, the location of the project and the timeframe in which the work occurred;

(13)   compared the net costs for the abatement of the asbestos containing fireproofing with those of certain other comparable projects;

(14)   reviewed certain documents pertaining to the sale of the building, that identify an agreed upon sales price discount due to the presence of asbestos containing materials remaining in the building at the time of the sale;

(15)   analyzed the sales discount for all identified asbestos containing materials remaining in the building at the time of the sale, and determined the amount of the net sales discount attributable to the asbestos containing fireproofing;

(16)   evaluated the net sales discount for the asbestos containing fireproofing, based upon past costs in the building for asbestos fireproofing abatement, and Consultant's estimates of future asbestos fireproofing abatement costs in this building;

(17)   performed such other analyses as we have deemed appropriate.

Based upon and subject to the foregoing, we are of the opinion that the asbestos abatement actions taken by The Prudential Insurance Company of America, in the Northwest Financial Center building, were both reasonable and appropriate; and

Based upon and subject to the foregoing, we are of the opinion on the date hereof, that the total net project costs as calculated in this report, were incurred due to the past abatement of asbestos containing fireproofing in this building, and that those costs are both fair and reasonable; and

Based upon and subject to the foregoing, we are of the opinion on the date hereof that the net sales discount as calculated in this report due to the presence of the remaining asbestos containing fireproofing in the building is both fair and reasonable.

Jack L. Halliwell, P.E.
*President*
Halliwell Engineering Associates, Inc.

July, 1996

Appendix A

# APPENDIX A

**PART A:    ASBESTOS ABATEMENT PROJECT INFORMATION**

**PART B:    BUILDING INSPECTIONS CONDUCTED BY
HALLIWELL ENGINEERING ASSOCIATES**

**PART C:    LOCATION AND DETAILS OF INFORMATION
CONSIDERED IN THE DEVELOPMENT OF THIS
REPORT**

Halliwell Engineering Associates, Inc., July 1996

## PART A:    ASBESTOS ABATEMENT PROJECT INFORMATION:

1. Total floor area abated by Prudential:    54,181 sq. ft.

2. Floors abated by Prudential:    Garage and 2nd floor, Suite 200

3. Dates of Prudential's abatement:    8/87 to 4/88

4. Floor area abated after sale:    120,870 sq. ft.

5. Floors abated after the sale:    1st, 2nd and 3rd floors

6. Floors with asbestos fireproofing remaining as of July, 1996:    All floors have been abated. Small inaccessible amounts may remain throughout the structure.

7. Total floor area with fireproofing remaining as of July, 1996:    All floors have been abated. Small inaccessible amounts may remain throughout the structure.

8. Asbestos abatement scope of work (prior to sale):

    a. Fireproofing locations:    Beams and tops of columns

    b. Fireproofing surface area to floor area ratio:    $8,157.69 \div 43,518 = 0.19$

    c. Location of inaccessible fireproofing left in place:    All floors have been abated. Small inaccessible amounts may remain throughout the structure.

    d. Base building components:

    - HVAC duct mains:    Left in place during abatement

    - Heat pumps:    Left in place during abatement

    - Duct insulation:    Left in place during abatement

    - Sprinklers:    Left in place during abatement

    - Electrical main feeds:    Left in place during abatement

    - Column enclosures:    Enclosures demolished; overspray on columns abated and resprayed

e. Core Area:

- Telephone/electrical closet:     <u>Garage: fireproofing removed and resprayed.</u>

- Bathrooms:     <u>All bathrooms contained spray-applied fireproofing but were not abated during these two projects.</u>

- Stairwells:     <u>Stairwells did not contain fireproofing.</u>

f. Other ACM:

- VAT:     <u>VAT was not referenced in the asbestos abatement project documents, cost information or asbestos survey.</u>

- TSI:     <u>The only TSI referenced in the survey (180 square feet of equipment covering in the basement boiler room) was removed as a Change Order to the Garage Abatement Project.</u>

- Miscellaneous:     <u>No other ACM was mentioned in the asbestos project documents, cost information or asbestos survey.</u>

g. Special Conditions:

Garage:

- <u>All utilities were left in place.</u>

- <u>Prior to abatement the fireproofing was moist and delaminating as a result of a flood.</u>

2nd Floor (Suite 200):

- <u>Area remained occupied. IBM personnel needed to access the computer equipment; therefore, tunnel enclosures to the equipment were constructed.</u>

- <u>A series of connecting containment tunnels were constructed to enclose and access the beams and columns.</u>

- <u>Height from floor to deck = 18'-8".</u>

**PART B:   BUILDING  INSPECTIONS  CONDUCTED  BY  HALLIWELL  ENGINEERING ASSOCIATES**

1. **Initial Inspection:**

   Date/Inspectors:            5/8/96; Gary Halliwell, Project Manager and Richard Pellechio, Project Manager

   Building contact person:    Judi Christofferson, Senior Property Manager

   Inspection guide:           Kevin Ruddle, Security

   Unabated floors inspected:  All floors were abated

   Abated floors inspected:    Garage, 1st, 2nd and 3rd floors

   Photographic record:        90 photos

2. **Second Inspection:**

   Date/Inspectors:            5/18/96; Jack Halliwell, P.E. and Todd Cormier, P.E.

   Building contact:           Judi Christofferson, Senior Property Manager

   Inspection guide:           Dale Stewart, Building Engineer

   Unabated floors inspected:  All floors were abated

   Abated floors inspected:    Garage, 1st, 2nd and 3rd floors

   Photographic record:        49 photos

**PART C:**  **LOCATION AND DETAILS OF INFORMATION CONSIDERED IN THE DEVELOPMENT OF THIS REPORT**

1. **Building Information:**        Located in HEA Box No. N.W.-1

   Building design drawings:        Architectural, Structural and Mechanical

   Asbestos survey:                7/15/86; BCM Converse Inc.
                                   5/88; Institute of Environmental Assessment (IEA)

   Asbestos management plan:        5/89; IEA

   Correspondence:                 Miscellaneous

   Building inspections:           5/8/96; Gary Halliwell, Project Manager and
                                   Richard Pellechio, Project Manager
                                   5/18/96; Jack Halliwell, P.E. and Todd Cormier, P.E.

   Photographs and photo logs:      From inspections above

   Discussions with building personnel:   Judi Christofferson, Senior Property Manager

2. **Asbestos Abatement Cost Information:**   Located in HEA Box No. N.W.-1

   Consultant's proposal

   Contractor's bid

   Bid Evaluation (Suite 200)

   Contract documents

   Consultant's invoices

   Contractor's applications for payment

   Change orders

   Correspondence

3. **Asbestos Abatement Project Information:**    Located in HEA Box No. N.W.-1

   Abatement specifications

   Abatement plans

Consultant's final reports

Correspondence

Bulk/air sampling results

Federal and state asbestos regulations

4. **Building Sale Information:**    <u>Located in HEA Box No. N.W.-1</u>

Property Sale Proposal

Purchase and Sales Agreement

Cost Estimates

Survey

96105/SectLst

Appendix B

# APPENDIX B

## PROJECT FLOOR AREA/FIREPROOFING AREA CALCULATIONS

Halliwell Engineering Associates, Inc., July 1996

# NORTHWEST FINANCIAL CENTER

## FIREPROOFED FLOOR AREA CALCULATIONS

| Floor | Gross Area | Non-Fireproofed Floor Areas | Net Fireproofed Floor Area | |
|---|---|---|---|---|
| | | | Total | Abated by Pru |
| Garage | 45,200 | Stairwells & Elevator = 1,019 | 44,181 | 44,181 |
| 1st | 45,200 | Stairwells, Elevator & HVAC Shafts = 1,682 | 43,518 | 0 |
| 2nd | 45,200 | Stairwells, Elevator & HVAC Shafts = 1,682 | 43,518 | 10,000 |
| 3rd | 45,200 | Stairwells, Elevator & HVAC Shafts = 1,366 | 43,834 | 0 |
| | | TOTALS | 175,051 | 54,181 |
| FIREPROOFED FLOOR AREA REMAINING AT TIME OF SALE | | | | 120,870 |

Typical Floor used for fireproofing ratio:   2nd Floor

Floor area:   43,518 sq. ft.

96100\FIREPRF.CHT          Halliwell Engineering Associates, Inc., July, 1996

# FIREPROOFING SURFACE AREA CALCULATIONS (Typical Office Floor)

**BUILDING:** NORTHWEST FINANCIAL CENTER  Bloomington, MN -- (Beams only, no columns)

Fireproofed Floor Area (Typical Floor): 43,518 sf

Typical Floor Location: 2nd Floor

| BEAM NUMBER | BEAM SIZE | TOTAL BEAM LENGTH | | | NET BEAM FIREPROOFED AREA (sq.ft./ft) | TOTAL BEAM FIREPROOFED AREA (sq.ft.) | AVERAGE (1) OVERSPRAY WIDTH (ft/side) | TOTAL OVERSPRAY AREA [ length x width x 2 sides x 1.5 deck factor] (sq.ft.) | TOTAL BEAM & OVERSPRAY FIREPROOFING AREA (sq.ft.) |
|---|---|---|---|---|---|---|---|---|---|
| | | No. Beams | Linear feet (ft) | Total ft | | | | | |
| 1 | 16B31 | 4 @ | 14.30 = | 57.20 | 3.92 | 224.22 | 0.5 | 85.80 | 310.02 |
| 2 | 16B31 | 28 @ | 14.00 = | 392.00 | 3.92 | 1,536.64 | 0.5 | 588.00 | 2,124.64 |
| 3 | 27WF94 | 25 @ | 14.00 = | 350.00 | 6.82 | 2,387.00 | 0.5 | 525.00 | 2,912.00 |
| 4 | 18B35 | 6 @ | 14.30 = | 85.80 | 4.34 | 372.37 | 0.5 | 128.70 | 501.07 |
| 5 | 30WF99 | 1 @ | 14.30 = | 14.30 | 7.37 | 105.39 | 0.5 | 21.45 | 126.84 |
| 6 | 30WF108 | 1 @ | 6.50 = | 6.50 | 7.41 | 48.17 | 0.5 | 9.75 | 57.92 |
| 7 | 14B172 | 8 @ | 14.70 = | 117.60 | 3.30 | 388.08 | 0.5 | 176.40 | 564.48 |
| 8 | 21B44 | 6 @ | 14.00 = | 84.00 | 4.94 | 414.96 | 0.5 | 126.00 | 540.96 |
| 9 | 21B44 | 2 @ | 7.00 = | 14.00 | 4.94 | 69.16 | 0.5 | 21.00 | 90.16 |
| 10 | 14B172 | 10 @ | 14.00 = | 140.00 | 3.30 | 462.00 | 0.5 | 210.00 | 672.00 |
| 11 | 21B44 | 1 @ | 40.00 = | 40.00 | 4.94 | 197.60 | 0.5 | 60.00 | 257.60 |
| Beam and Overspray Totals | | | | 1,301.40 | | 6,205.59 | | 1,952.10 | 8,157.69 |

(1) 6' is the minimum fireproofing overspray amount observed in most buildings.

| | AVERAGE COLUMN SIZE | AVG. COLUMN FIREPROOFED AREA (sq.ft./ft) | COLUMN LENGTH linear feet (ft) | NUMBER OF COLUMNS | TOTAL COLUMN FIREPROOFED AREA (sq.ft.) |
|---|---|---|---|---|---|
| COLUMN TOTALS | | 0 | 0 | 0 | 0.00 |

TOTAL FIREPROOFING SURFACE AREA (Typical Floor)     8,157.69

FIREPROOFING SURFACE AREA/FLOOR AREA RATIO (Typical Floor)     (8,157.69 / 43,518)     0.19



ALL - ILLEGAL   BIG-222-0-0-12

Appendix C

# APPENDIX C

## REDUCED BUILDING DRAWINGS

Halliwell Engineering Associates, Inc., July 1996



PIS 6000501

FLOOR PLAN

NORTHWESTERN FINANCIAL CENTER 3-STORY

A RAUENHORST BUILT PROPERTY
MANAGED BY
NORMANDALE PROPERTIES, INC.
NORTHWESTERN FINANCIAL CENTER    MPLS, MN.
PHONE: (612) 835-8488

DATE:

BASEMENT

SCALE:
0    5    10



**Suite 170**
IBM (lease #3)
7,098 rsf
Expires:   4/30/90
Options:   . . .

. Norwest Bank has right of
notice after IBM vacates.
Two one year options to extend with six
months notice in writing in each
instance.  (5th Amendment to
Lease No. 1)

**Suite 180**
NORWEST BANK
2,300 rent sf
Expires: 12/31/2001
Options: 1st-may renew for
10 years upon notice by
6/30/01. 2nd-may renew
for 10 years upon notice
by 6/30/11.

**Suite 110**
NORWEST
BANK
551 R sf
Expires
12/31/01
Opt: see
#180

**Suite 100**
IBM (lease #3)
17,804 rsf
Expires: 4/30/90
Options: Two one year options t
extend with six months
prior notice in writin
in each instance.
(5th Amendment to
Lease No. 1)

**Suite 150**
NORWEST BANK
10,235 rentable square feet

Expires: 12/31/2001
Options: May renew for two 10 year
terms upon six months prior notice

**Suite 111**
NORWEST BANK
982 rent sf
Exp: 12/31/01
Options:
see lease
for suite
180 above

**Suite 130**
NORWEST
BANK
3,127 rentable square feet
Expires: 12/31/2001
Options: May renew for two 10
year terms upon six months prior
notice.

**Suite 142**
NORWEST
BANK
see "A"

**Suite 145**
NORWEST BANK
1,495 rentable sq.ft.

Exp: 12/31/2001
Opt: May renew for
2 ten yr.
periods w/
6 mos. prior
notice

FLOOR PLAN

"A" - Suite 142/NORWEST BANK
335 square feet
Expires: 12/31/2001
Opt: May renew for two 10 yr. terms

PRUDENTIAL CONFIDENTIAL
Civil Action No. 87-4227(HAA)(D.N.J)
No. 87-4238(HAA)(D.N.J)

10/30/87

NORTHWESTERN FINANCIAL CENTER 3-STORY          PIS 6000202



Suite 207    __NORWEST BANK__
2,312 rentable square feet
Exp: 12/31/2001    Opt: May renew for
                   2 periods of 10 years
                   with six mos. notice

Suite 203
__NORWEST BANK__
3,301 square feet
Expires: 12/31/2001
Options: May renew for two terms of
10 years each upon one year advance
written notice

Suite 200
__IBM__  (lease #2)
11,852 rsf
Expires:  4/30/90
Options:  Two one year options to extend with six
months prior notice in writing in each instance
(5th amendment to Lease No. 1)

Suite 201
__NORWEST BANK__
27,830 rentable square feet

Expires: 12/31/2001
Options: May renew for two terms of ten years each
upon six months prior notice

PRUDENTIAL
Civil Action N: ..:.-227(HAA)(D.N.J)
No. 87-4238(HAA)(D.N.J)

CONFIDENTIAL

__FLOOR PLAN__

10/30/87

NORTHWESTERN  FINANCIAL  CENTER  3-STORY          PIS  6000203



Suite 350
**VACANT**
9,195 rsf

IBM
250 sq. ft.
Expires: M-T-M

IBM

APOGEE
ENTERPRISES
519 s.f.
M-T-M

Suite 310
**IBM**
37,008 rentable sq. ft.
Expires: 4/30/87
Options: Two one year options to extend with
six months prior notice in writing in each
instance (5th Amendment to Lease No. 1.)

PRUDENTIAL CONFIDENTIAL
Civil Action No. 87-4227(HAA)(D.N.J.)
No. 87-4238(HAA)(D.N.J.)

FLOOR PLAN

10/30/87

DATE:
3rd FL.
SCALE
0   5

NORTHWESTERN FINANCIAL CENTER 3-STORY          PIS 6000204

Appendix D



# APPENDIX D

## EXCERPTS FROM PROPERTY SALE PROPOSAL NORTHWESTERN FINANCIAL CENTER, DATED MAY 20, 1991

IP 942

## NORTHWESTERN FINANCIAL CENTER

### BLOOMINGTON, MINNESOTA

PROPOSAL:

The Chicago Office requests authorization to sell IP 942, a suburban Minneapolis office building, to Zeller Realty Corporation for $19,812,000 ($45.57 psf). *Purchaser would receive a credit at closing of $3,012,000 for the removal of asbestos materials and other necessary capital expenditures.* Net sale price is $16,800,000. Prudential would also provide a $5,000,000 interest only second mortgage to the purchaser for a four-year term at an annual interest rate of 14.00% with an annual pay rate of 9.50%. The balance of the interest rate would accrue until the loan is paid off. The closing is scheduled on or before July 31, 1991. A binding, non-contingent Purchase and Sale Agreement has been negotiated and will be executed as soon as corporate authorization has been received and the purchaser has received his first mortgage commitment.

PROPERTY
DESCRIPTION:

Northwestern Financial Center (NFC) is a two building office complex of masonry and steel-and-masonry construction on a 16.75 acre rectangular lot. Construction was completed in two phases: Phase I, a three-story office building, was completed in 1971; Phase II, a 24-story office tower, was completed in 1974. The two buildings are connected at the basement, first and second floor levels by an enclosed three level link passageway. There are a total of nine elevators, two of which are in the three story building. The entire complex contains approximately 473,000 gross square feet and 434,746 square feet of net rentable area. The buildings are fully sprinklered. A two level concrete parking structure provides parking for 1,300 automobiles. Surface parking is provided for 500 cars and an underground heated garage provides another 100 spaces. The total of 1,900 parking spaces provides 4.4 spaces per 1,000 square feet of net rentable area. The property also has a drive-up banking facility on a ground lease to Norwest Bank. Approximately 60,000 square feet of the three story building has fire retardant insulation that contains chrysotile asbestos materials. This asbestos issue is discussed later in this memorandum.

LOCATION:

NFC is located in the southwest quadrant of the intersection of Xerxes Avenue and Interstate 494 in Bloomington, Minnesota. I-494 is the major highway serving the southern and western suburbs of Minneapolis.

Access to the property from I-494 is possible via a four-way interchange located on France Avenue, one block to the west of the subject

1

**HAZARDOUS
SUBSTANCES
PCB/UNDERGROUND
TANKS:**

Approximately 60,000 square feet of the three story building contains chrysotile asbestos laden fire retardant materials. The total estimated cost of removing the asbestos containing materials and refitting the space is approximately $1,870,000 (see below). <u>NFC is included in Prudential's litigation against the asbestos manufacturers. Prudential's rights to recover costs associated with the presence of asbestos are being reserved in the contract.</u>

Total costs associated with asbestos abatement are estimated as follows:

| | |
|---|---|
| Norwest Asbestos Abatement | $    835,000 |
| Norwest Relocation, and | |
|   Temporary Space Buildout | $    665,000 |
| IBM Asbestos Abatement | $    350,000 |
| Abatement Consulting Fee | <u>$     20,000</u> |
| Total Abatement Costs | $1,870,000 |

Zeller's lender, Bank of Montreal, requires asbestos abatement to occur within a 4-year period so asbestos would not be an issue when the building is sold or refinanced when the loan matures. An asbestos abatement program is a typical requirement for all lenders that provide acquisition financing.

There are three underground storage tanks on the property: one 1,000 gallon fiberglass tank for one tenant's emergency power; one 50 gallon metal tank for the building; and one 250 gallon metal tank for emergency power for the building. Zeller has tested two of the tanks (see Buyers Due Diligence below) and found no contamination.

The property contains no PCB transformers. Building management has advised us that there was a transformer explosion on the property in the past. We are not aware of any PCB or other hazardous material contamination that may have resulted from this transformer explosion.

**BUYER'S DUE
DILIGENCE:**

Zeller intends to finance this acquisition with funds provided by Bank of Montreal. BOM is currently reviewing the due diligence reports in anticipation of closing by July 31, 1991.



MAY   2 :

Zeller's original due diligence review for G.E Credit and USWFS review uncovered several issues and costs. Prudential negotiated these items and agreed to a total credit of $3,012,000 in September 1990. The following are the respective issues and credits that Prudential and Zeller have agreed to:

<u>Plaza Deck:</u> The plaza area west of the tower forms the roof of the loading dock. The waterproofing membrane beneath the concrete surface has failed and water infiltration has caused considerable damage to precast concrete planks. Zeller's architect and structural engineer recommended the removal of the

8

concrete topping, the replacement of waterproofing and repaving of the deck, along with sandblasting, repainting and fireproofing the steel structure. Since Zeller's discovery the City of Bloomington has required Prudential to begin repairing the failing deck. By April 1991 Prudential had completed some of the work required, however a permanent solution to this problem will be required.

Parking Deck: Zeller's parking consultants, Walker Consultants, inspected the parking deck and reviewed Prudential's parking deck report prepared by BKBM Engineers in December, 1989. The BKBM report stated that the deck was underdesigned at certain locations and would support a live load capacity of only 20 psf versus the 40 psf live load requirement at the time of the deck's original construction. BKBM originally recommended that parking be decreased at the underdesigned locations and that vehicle load restrictions be placed on the deck. This recommendation is not legally feasible because the number of on site parking spaces cannot be decreased because of the City of Bloomington's parking code requirements. If Bloomington became aware of this live load capacity issue, it is likely that Bloomington would require the 20 psf live load capacity be increased to 40 psf live load.

Asbestos Abatement: The asbestos abatement involves the Norwest space and the IBM space in the low-rise building. Zeller obtained cost estimates to remove, replace and monitor asbestos removal. The costs include performing abatement work in occupied space, including temporary relocation of personnel and equipment, ceiling removal and replacement, refinishing/replacement of tenant spaces.

Underground Fuel Oil Tanks: There are three tanks on the property. Zeller performed testing on two of the three tanks. They requested that we remove two of the three tanks because of the tanks' 10 to 15 year age. Prudential will not remove the tanks prior to closing, nor be responsible for their removal after closing.

Roof Replacement: The roof covering the low rise portion of the building is in need of complete replacement. A copy of the most recent roof report is included in the ROOF REPORT appendix.

After review of the engineering reports, Prudential and Zeller negotiated the following credits:

| | | |
|---|---|---|
| 1. | Asbestos Abatement | $1,205,560 |
| 2. | Property Repairs | $1,806,440 |
| | Total | $3,012,000 |

Zeller Realty would receive a credit of $3,012,000 with respect to asbestos abatement and property repairs at the closing.

MAY 2

9

PROPERTY SALE PROPOSAL

Property No. IP 942        Address or Location: 7900 Xerxes Ave. So.
                                               Bloomington, MN

Purchaser: Zeller Realty Corporation, or nominee acceptable to Prudential.

Sale Price ....................................................... $19,812,000

Cash ............................................................. $

Earnest Money Deposit ............................................ $    50,000

Purchase Money Second Mortgage for a term of 4 years with
   interest at 14.00% accrued and 9.50% payable beginning 9/1/91
   and payments of $39,583.33 interest only payable monthly
   beginning one month from closing date (9/1/91).
   Prepayment Privilege: May prepay at any time during term.
                                                       Principal  $ 5,000,000

Commission payable to  Eastdil Asset Group, Inc.      .......... $   432,623
              Address  New York, NY


Tax I.D. No.

Credit for Asbestos .............................................. $ 1,205,560

Credit for Repairs to be made by Prudential .................... $ 1,806,440

Taxes, Fees and Charges to be paid by Prudential:
   Transfer tax ................................................. $    55,500
   Title Insurance Premiums ............. .................... $
   Recording Charges ............. ........................ $
   Other closing costs (Itemized):  Title & Survey            $    22,377
                                    Legal & Miscellaneous     $    40,000
                                    Mortgage Balance          $ 1,369,856

                     NET SALES PROCEEDS   . . . . . . . .     $14,879,644


SPECIAL PROVISIONS:
Insurance
Taxes

Assessments

Title to be conveyed by limited warranty deed
Closing date on or before July 31, 1991
Other Special Provisions:

Approved for submission  . . . . . . . . . . . . . . . 5/20/91.Attorney

| Recommended                              | Signature                          |                |
|------------------------------------------|------------------------------------|----------------|
| Paul N. Geyer<br>Investment Manager      | Peter L. Ruggieri, VP, A+S<br>Recommended / Title | 5/29/91<br>Date |
| Recommended                              | Authorized   Signature<br>On       |                |
|                                          | Title                              |                |

# APPENDIX E

## EXCERPTS FROM PURCHASE AND SALES AGREEMENT
## DATED AUGUST 22, 1991

17%15.5A
06/14/91

I.P. 942

Purchase And Sale Agreement
County of Hennepin, State of Minnesota

This Agreement is entered into and made effective as of the 22ᵈ day of August,
1991, by and between THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,
a New Jersey corporation ("Seller") and ZELLER REALTY CORPORATION, an Illinois
corporation ("Buyer").

WHEREAS Seller is the owner of certain real estate commonly known as 7900
Xerxes Avenue South, Bloomington, Minnesota located in the County of Hennepin and
State of Minnesota and legally described in Exhibit A attached hereto and incorporated
herein, together with the improvements and fixtures located thereon and all easements,
hereditaments, rights and privileges appurtenant thereto (the "Premises"), and

WHEREAS Seller desires to sell and convey, and Buyer desires to purchase, pay for
and acquire, the Premises on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises herein set forth, and
other good and valuable consideration the receipt and sufficiency of which are hereby
acknowledged, the Parties do hereby make this Agreement on the following terms and
conditions, intending to be bound hereby:

1.     SALE AND PURCHASE.  Seller hereby agrees to sell and convey to Buyer,
and Buyer hereby agrees to purchase, pay for and acquire from Seller, the Premises for the
Purchase Price specified in Section 2 and on the other terms and conditions set forth in this
Agreement.

2.     PURCHASE PRICE; EARNEST MONEY DEPOSIT.

A.     Purchase Price.  The total purchase price (the "Purchase Price") to be
paid by Buyer to Seller for the Premises is Nineteen Million Eight Hundred Twelve
Thousand and No/100 Dollars ($19,812,000.00), which sum shall be adjusted for certain
charges and credits as provided in this Agreement.  Buyer shall receive a credit on the
closing statement in the amount of $3,012,000.00 in consideration of Buyer's acceptance of
the Premises "as is," as provided in Section 4.C hereof.  If and when this transaction closes
pursuant to the terms of this Agreement, Buyer shall receive an additional credit on the
closing statement (which is in addition to all other credits set forth herein) in the amount
of $50,000.00, which credit shall be applied in full to pay the PMCC (as hereinafter defined)
second mortgage application fee.

B.     Payment.  The Purchase Price shall be due and payable by Buyer as
follows: (1) $50,000.00 cash (in the form of a certified or cashier's check or wire transfer
of federal funds payable to Seller)which has been paid by Buyer to Seller upon Buyer's
execution of this Agreement; and (2) the remaining balance of the Purchase Price, plus or
minus prorations, shall be paid at Closing in cash by wire transfer of immediately available

PIS-6003061

federal funds to a financial institution and account designated by Seller, with Buyer initiating the wire transfer of its funds prior to 12:00 noon C.D.T. on the Closing Date as provided in Section 3.

3.    THE CLOSING. The transaction that is the subject of this Agreement shall be pre-closed by no later than August 22, 1991, and shall be closed by the delivery of the closing documents as provided in Section 8 and by the payment of the Purchase Price (the "Closing") on or before August 23, 1991, or on such other date as may be acceptable to both parties (the "Closing Date"). Unless otherwise agreed, the place of the Closing shall be the offices of the Near North National Title Corporation ("Title Company") or, at Seller's election, in the office of Seller's outside counsel.

4.    INSPECTION AND CONDITION OF THE PREMISES.

A.    Access to and Inspection of the Premises. Buyer acknowledges that it has had access to the Premises, and to the leases, contracts and other documents which pertain to the Premises in order to conduct surveys, tests, examinations, appraisals and inspections thereof. Buyer may conduct additional inspections of the Premises provided Buyer gives Seller not less than twenty-four (24) hours prior notice and provided that Buyer uses its best efforts to minimize disruption of or interference with tenants and business activities upon the Premises. Buyer shall indemnify, defend and hold harmless Seller from and against any and all liability, loss, damage, claim, cost or expense (including reasonable attorneys' fees) which may have resulted or may result from any entry upon or inspection of the Premises by Buyer, its employees, agents, contractors, agents or representatives of Buyer's proposed lenders, or any other person for whom Buyer is legally responsible. Buyer's indemnification to Seller hereunder shall survive Closing or termination of this Agreement for a period of one year.

B.    Notice of Code Violation. After the effective date hereof, Seller agrees to give to Buyer written notice of any citation or other notice of which Seller may have actual knowledge or which Seller may receive from any governmental authority concerning a violation of any law, ordinance, regulation or order regulating the use of the Premises or of any threatened condemnation of the Premises. For purposes of this paragraph, Seller shall be deemed to have actual knowledge of only those matters known to Ryan Toole or Paul Geyer, employees of Seller, who shall have made inquiry of Premisys Real Estate Services, Inc. (hereafter "Premisys") for purposes hereof. If, after the date hereof and prior to Closing, a notice of violation or violations of any law, ordinance or governmental regulation is received by Seller, or if Seller has knowledge of such violations, Seller agrees to use reasonable efforts to cure such violations if such cure can be accomplished by payment of money and if the cost to cure (cumulatively, for all such violations) is equal to or less than Twenty-Five Thousand and No/100 Dollars ($25,000.00). If the estimated cost to cure such violation(s) exceeds Twenty-Five Thousand and No/100 Dollars ($25,000.00) and Seller does not elect to effect such cure, either Seller or Buyer may elect to terminate this Agreement by notice to the other; provided that Buyer shall have the right to avoid Seller's termination by electing, by written notice to Seller, to assume the obligations to cure such violations, in which event this transaction shall close. Notwithstanding any of the foregoing, Seller shall have no obligation to make any improvement, repair or alteration with respect to any of the items or matters listed on Exhibit B hereto.

C.   Condition of the Premises. Except as specifically provided in Section 15 in this Agreement, the Premises (including the fixtures and improvements located thereon) are being purchased by Buyer in their present physical condition. Buyer has inspected the Premises and reviewed the documentation provided by Seller and shall rely solely upon such inspection and such review with regard to the leasing, operation, design, construction and condition of the Premises, including the tenants, location, size, subsurface or soil condition, state of repair, presence of pcb's, underground storage tanks, asbestos or other hazardous or toxic substance of any kind whatsoever, and character thereof, and shall purchase the Premises "As Is", without any representation or warranty whatsoever, express or implied. Seller expressly disclaims any warranties, express or implied, including but not limited to the IMPLIED WARRANTY OF HABITABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

D.   Continued Operation. So long as there is no default hereunder beyond any applicable cure period by Buyer after the effective date of this Agreement and until the Closing Date, Seller shall operate, maintain and manage the Premises in accordance with Seller's customary and usual practices and shall maintain the Premises in substantially the same condition as it was in on April 23, 1991.

5.   ADDITIONAL AGREEMENTS OF SELLER.

A.   Continued Operation. So long as Buyer is not in default hereunder beyond any applicable cure period after the effective date of this Agreement and until the Closing Date, Seller covenants and agrees as follows:

(1)   To maintain any and all insurance coverage presently in effect with respect to the Premises;

(2)   To comply in all material respects with all leases, service contracts and all instruments of record and to pay all taxes and utility charges which have become due and payable prior to the date of Closing.

(3)   Except for business invitees occupying or using the Premises in accordance with past practice, not to permit anyone to occupy or use the Premises, or any portion thereof, for any reason whatsoever, except pursuant to the Leases and service contracts existing on the date hereof (as hereinafter defined);

(4)   Except with Buyer's prior written consent, which consent shall not be unreasonably withheld or delayed, not to enter into any contract that will be a material obligation affecting Buyer or the Premises subsequent to the Closing; and

(5)   To observe and keep in force and effect all permits necessary or required to carry on the present business being conducted upon the Premises.

B.   Leasing Arrangements. Seller agrees it will not enter into any new leases or modifications of existing leases without the prior written approval of Buyer, which approval shall not be unreasonably withheld or delayed. Seller shall provide Buyer with a copy of any new lease or modification, and if Buyer fails to give its approval or disapproval to a proposed new lease, or modification of existing lease within three (3) business days

(8) a quitclaim bill of sale from Seller transferring to Buyer, or its assignee, all personal property and improvements located on the Premises;

(9) any certificates of insurance which have been furnished by the tenants and which are available in Seller's or Premisys's possession;

(10) assignment by Seller to Buyer, or its assignee, of Seller's right, title and interest in and to the service contracts (which service contracts are set forth on Exhibit F hereto), together with any manually executed copies to the extent available and in Seller's possession, but only if such assignment is permitted by such contracts and can be made at no expense to Seller;

(11) all transferable guarantees and warranties pertaining to the Premises, and which are available in Seller's possession, if any, together with assignments thereof to Buyer, or its assignee, but only if such assignment can be made at no expense to Seller;

(12) copies of all available architectural plans, specifications and the working drawings for all improvements (including plans showing the location of water, sewer and other underground utilities) located on the Premises, if such documents are possessed by Seller and located either at the Premises or in the offices of Seller's property management company; and

*(13) notice to tenants regarding the sale.

B.   Documents to be Delivered by Buyer.  At the Closing, Buyer shall execute and deliver to Seller the following documents:

(1) a real property conveyance fee statement or transfer declaration if required in the state or county where the Premises are located;

(2) a closing statement executed in quadruplicate and such other documents as are customarily executed and delivered at real estate closings in the state and county in which the Premises are located;

(3) the Assumption of Leases as specified in Section 7;

(4) certificate of Buyer containing such statements concerning ERISA as may be required by Section 17;

(5) certificate of Buyer, in form and substance reasonably satisfactory to Seller, that Seller is not in default of any of its obligations under this Agreement, or if Seller is in default as of the Closing Date, specifying the nature of such default(s) and, at Buyer's option, waiving any or all such defaults; and

(6) asbestos credit sideletter, in form and substance acceptable to Prudential.

free exchange, including but not limited to reasonable attorney's fees. Seller shall indemnify and hold harmless Buyer from any liability, costs, or expenses, of any kind or nature, including, without limitation, Buyer's reasonable attorney's fees, arising by reason of such exchange, except any which may be attributable to gross negligence or wrongdoing by Buyer.

## 20.   HAZARDOUS MATERIALS.

In addition to and not by way of limitation of the sale of the Premises on an "AS IS" basis under this Agreement, Buyer acknowledges receipt of a copy of the following: (a) that certain asbestos survey report (BCM Project No. 05-451-09-B22) dated July 15, 1986 prepared by BCM Engineers, Inc. (formerly BCM Converse, Inc.); (b) Inspection Profile - Northwestern Financial Center, dated May 2, 1988, prepared by The Institute for Environmental Assessment, and (c) Plan and Estimate for Environmental Management and Abatement Project Costs for Northwestern Financial Center dated December 29, 1989, prepared by the Institute for Environmental Assessment, (collectively, the "Asbestos Survey"). The Asbestos Survey discloses the presence of asbestos at the Premises. Buyer shall not rely on and Buyer hereby represents to Seller that it has not relied on the Asbestos Survey. Seller makes no representations or warranties whatsoever to Buyer regarding: (i) the Asbestos Survey (including, without limitation, the contents and/or accuracy thereof), and (ii) the presence, location or scope of any hazardous materials or chemicals in, at or under the Premises. Prior to the date hereof Buyer has made such studies and investigations, conducted such tests and surveys, and engaged such specialists as Buyer has deemed appropriate to fairly evaluate the Premises and the risks from environmental and hazardous materials and chemicals. By its execution hereof, Buyer hereby agrees to execute a Hazardous Chemical Disclosure and Access Agreement in the form attached hereto as Exhibit I at Closing.

## 21.   SECOND MORTGAGE.

A.    This Agreement shall be contingent upon Buyer receiving a mortgage loan commitment satisfactory to Buyer from the Bank of Montreal ("BOM") on or before August 22, 1991; provided however, that Buyer must either: (a) waive this contingency and proceed with the transaction, or (b) terminate this Agreement (in which case Buyer shall be entitled to the return of the Earnest Money Deposit), no later than the first to occur of: (i) two (2) business days after BOM issues a mortgage loan commitment, or (ii) August 23, 1991. Failure by Buyer to furnish notice of termination within the time period set forth above shall be deemed to be a waiver of this financing contingency.

B.    This Agreement shall also be contingent upon the issuance of a commitment for a second mortgage loan by Prudential Mortgage Capital Company ("PMCC") at least one (1) day prior to the Closing Date in the amount of $5,000,000.00 having an annual rate of 14% and a pay rate of 9.5% per annum for a term coterminous with the above-referenced BOM first mortgage (which shall be no greater than four (4) years plus a one year extension option) and providing for a 1% application fee, .1% processing fee, and requiring such other terms and conditions as customarily required by PMCC including, without limitation, an intercreditor agreement with BOM in form and substance acceptable to PMCC. In the event such commitment does not issue, Buyer may either waive this contingency by notice to Seller (which waiver must be made in writing within one (1) day after Buyer is notified by PMCC the commitment will not issue), or this

Appendix F

# APPENDIX F

## BCM ENGINEERS' ASBESTOS SURVEY REPORT
## DATED JULY 15, 1986

ASBESTOS SURVEY REPORT

FOR

PRUDENTIAL INSURANCE COMPANY

PROPERTY IP942, N.F.C.

BCM PROJECT NO. 05-4151-09-B22

JULY 15, 1986

BCM CONVERSE INC.
108 ST. ANTHONY ST.
MOBILE, ALABAMA  36602

PIS 6000212

BCM CONVERSE INC.
BCM NO. 622

BUILDING EVALUATION:

Prudential Portfolio No.:    IP942
Building Name:      N.F.C.
Address:           Bloomington, Minnesota

BCM Field Evaluator:    Mark Johnson
Date of Survey:    7/15/86
Property Manager:  Bart Wold
Phone No.:     (612) 936-4635
Person(s) Contacted:    Mark Smith

Type of Building:  Multistory Office

Results of Visual Inspection:    Potential asbestos-containing material
                                 found within the facility.

| QUANTITY | DESCRIPTION | LOCATION |
|---|---|---|
| 5,920 SF | Ceiling Material | Bank 2nd Floor |
| 370 Ea. | Pipe Elbows | Bank and Tower |
| 180 SF | Equipment Covering | Bank Boiler Room |
| 600,000 SF | Coating on Beams | Bank Basement, 1st, 2nd and 3rd Floors |

BCM CONVERSE INC.

PIS 6000213

BCM No. B22
Page 2 of 2

RESULTS OF LABORATORY ANALYSIS OF BULK SAMPLES OBTAINED:

| LOCATION | DESCRIPTION | SAMPLE I.D. | RESULTS/TYPE ASBESTOS* |
|----------|-------------|-------------|------------------------|
| 2nd Level Link | Coating on Beams | B22-0001 | 0% |
| Bank Basement | Pipe Elbows | B22-0002 | 0% |
| Bank Basement | Coating on Beams | B22-0003 | 3%(2) |
| Bank Basement Boiler Rm | Equipment Covering | B22-0004 | 3%(2) 15%(1) |
| 2nd Fl. High Bank Area | Ceiling Material | B22-0005 | 0% |
| 2nd Fl. High Bank Area | Coating on Beams | B22-0006 | 5%(2) |
| 1st Fl. Bank Mech. Room | Coating on Beams | B22-0007 | 10%(2) |
| 3rd Floor Bank | Coating on Beams | B22-0008 | 10%(2) |
| Tower Basement | Coating on Beams | B22-0009 | 0% |
| Tower Basement | Pipe Elbows | B22-0010 | 0% |
| 2nd Floor Tower | Coating on Beams | B22-0011 | 0% |
| 10th Floor Tower | Coating on Beams | B22-0012 | 0% |
| Penthouse | Pipe Elbows | B22-0013 | 0% |

LOCATION AND DESCRIPTION OF ASBESTOS-CONTAINING MATERIALS:

| QUANTITY | DESCRIPTION | LOCATION |
|----------|-------------|----------|
| 600,000 SF | Coating on Beams | Bank Basement, 1st, 2nd and 3rd Floors |
| 180 SF | Equipment Covering | Bank Boiler Room |

* The number in parenthesis identifies the type asbestos present, as
follows:  (1) Amosite, (2) Chrysotile, (3) Crocidolite, (4) Anthophyllite,
(5) Tremolite, and (6) Actinolite.

BCM CONVERSE INC.

PIS 6000214

ATTACHMENT 1
BCM No. 822

| QUANTITY | DESCRIPTION | REMOVAL COST | REPLACEMENT COST |
|---|---|---|---|
| 600,000 SF | Coating on Beams | $6,000,000 | $1,200,000 |
| 180 SF | Equipment Covering | 1,800 | 900 |
| | TOTAL | $6,001,800 | $1,200,900 |

Estimate includes removal of asbestos-containing material and replacement with an equal non-asbestos material.

Time for completion of the work will depend on the number of isolated work areas. Areas from 10,000 SF through 40,000 SF of asbestos materials are of optimum size, and the work can be performed within 14 days for the small areas, through 21 days for the larger areas.

Estimate does not include demolition of the existing space nor does it include building out the space after asbestos removal.

BCM CONVERSE INC.

PIS 6000215

Appendix G

# APPENDIX G

## EXCERPTS FROM INSTITUTE FOR ENVIRONMENTAL ASSESSMENT'S INSPECTION PROFILE, DATED MAY 2, 1988

Exhibit H, B and C

```
INSPECTION PROFILE
NORTHWESTERN FINANCIAL CENTER
IP #942
MINNEAPOLIS, MINNESOTA
```

# Institute for

# Environmental

# Assessment

2829 Verndale Ave., Anoka, MN 55303



PIS 6000124

INSPECTION PROFILE

NORTHWESTERN FINANCIAL CENTER

IP #942

MINNEAPOLIS, MINNESOTA

May 1988

INSTITUTE FOR ENVIRONMENTAL ASSESSMENT
500 West Main Street
Anoka, MN  55303

(612) 427-7870

PIS 6000125

- INSPECTION PROFILE -

NORTHWESTERN FINANCIAL CENTER

I.    INTRODUCTION

A.    Inspection Protocol

Per our agreement, Institute staff have inspected the Northwestern
Financial Center Building and identified materials that might
reasonably be expected to contain asbestos in a form that could
potentially contaminate breathing zones of employees and other
building occupants.  Samples of potentially contaminating material
have been analyzed following preferred Environmental Protection
Agency (EPA) analytical procedures.  To supplement the analysis, a
videotape has been produced profiling individual phenomenon within
the building which could exacerbate or contribute to building
contamination.  All samples, documents and the videotape are archived
and available upon request.

The videotape and complementary analytical data have been reviewed
by a team of Institute staff and their conclusions will be indepen-
dently reviewed by the following health care professionals:

. Dr. Robert Sawyer, a physician in industrial medicine with
  extensive training in engineering sciences.  He designed the
  original "Sawyer Algorithm" used initially by the EPA for rating
  phenomena in buildings relative to risk.  He also served as the
  lead medical consultant for the EPA in the development of the new
  Asbestos Hazard Emergency Response Act.  He has worked in Europe
  and the United States on asbestos policy for eight years and has
  published extensively in the area of etiology and building
  phenomena related to asbestos and cancer.

. Dr. Jeffrey Stevens, a toxicologist in environmental health at
  the University of Minnesota Department of Public Health and
  a leading asbestos/cancer researcher for the American Lung
  Association.

(1)

PIS 6000126