1    Asbestos was removed in conjunction with renovation activities at the W.R. Grace

2    headquarters building in New York. Proposals were submitted by Primo Construction,

3    Inc. to W.R. Grace & Co. for construction cost for the 46th floor alteration at 1114

4    Avenue of the Americas in 1987.[119]  The proposals indicate the alteration involved a

5    variety of general contract work such as drywall, ceilings, taping and cleaning, electrical,

6    painting, carpeting and base, and demolition and asbestos removal. The proposals indicate

7    an allowance of $40,000 to $45,000 was made for asbestos removal and related work in

8    the Conference Room on the 46th Floor.

9

10    A letter from Brian J. Smith, Senior Vice President of W.R. Grace & Co. to Mr. John

11    O'Brien of Primo Construction indicates that the project was approved.[119]  It specifically

12    references the 46th floor Conference Room where asbestos removal was scheduled to be

13    conducted on October 8-12, 1987.

14

15    Following this abatement activity, on December 4, 1987 an evaluation was made of

16    procedures for incidental contact with asbestos-containing materials in the Headquarters

17    Building of W.R. Grace & Company.[120]  This evaluation was conducted by Peter L.

18    Zavon, a Certified Industrial Hygienist with Agatha Corporation.

19

20    The evaluation was limited to floors 4, 5 and 41-48, which were the floors occupied by

21    W.R. Grace & Company. The evaluation included observation of telephone technicians'

22    work and a discussion with W. R. Grace personnel of other activities conducted above the

1   suspended ceiling. Personal air sampling was performed on telephone technicians as they

2   accessed the space above the suspended ceiling to pull telephone wires.   In addition to

3   telephone company personnel, the report indicated some or all of the five maintenance

4   staff might have need to work above the ceiling.

5

6   The report noted that fireproofing reported to contain asbestos was sprayed on beams and

7   slab decking.  Fiberglass, tongue-in-groove tiles formed a suspended ceiling about three

8   feet below the slab.  Small pieces of fireproofing were seen on the upper surfaces of the

9   tile.  All tiles were considered potentially contaminated.

10

11  Recommendations listed in the report included establishment of formal Respiratory

12  Protection and Asbestos Operations and Maintenance Programs.  In addition, more refined

13  techniques for entry above the suspended ceiling were suggested.[120]

14

15  A W.R. Grace & Company memo from P.J. Walsh to R.P. Turner discusses the need to

16  remove asbestos-containing insulation from the underside of the roof and peaked wall

17  areas at both ends of the dry storage warehouse (Bldg. # 10) at the North Bergen, NJ

18  facility.  Insulation was also applied on the east and west walls to a level 4.5 feet down

19  from the top of the wall.  The memo indicates the ¾ inch thick insulation was composed

20  of mineral wool and chrysotile asbestos.[121]

21

1    The insulation had been damaged by forklift activities and there was concern that the

2    insulation could fall to the floor and be spread around the warehouse on the fork truck

3    tires without the operator being aware of it. The memo also indicates make-up air was

4    drawn from inside the building at the base of one of the sprayed walls and air movement in

5    the area was substantial. "Due to the damage and the material's highly friable nature,

6    removal seems to be the most viable alternative."[121]    The memo also discusses the

7    differences between cementitious and fibrous asbestos-containing products with respect to

8    management options.

9

10   A document titled Airborne Asbestos Monitoring, W.R. Grace, North Bergen, New Jersey

11   was prepared for Joe Miller of Finishing Touch Asbestos Abatement Corporation, Inc.[122]

12   This document indicates air monitoring was conducted in conjunction with asbestos

13   removal in Warehouse No. 10, North Bergen, NJ on October 1, 1986. Finishing Touch

14   had submitted a proposal on June 11, 1986 for removal of approximately 5,780 ft$^2$ of

15   asbestos containing insulation from the underside of the roof and beams in the warehouse

16   storage area at North Bergen.[123] The proposed removal price was $31,450.

17

18   A request was made for appropriations to remove asbestos insulation from the old #2 and

19   #3 festoons in the Quakertown, PA facility in 1987.[124]. The content of the insulation was

20   reported as 80-90% asbestos in a ratio of 8:1 chrysotile and Amosite.    The request

21   indicated that much of the insulation was damaged. "In light of the fact that both pieces of

80

1   equipment are permanently idle we propose to have all insulation removed and disposed of

2   by a certified asbestos specialist."[124]

3

4   A purchase order was issued to Asbestos Removal and Hazards Control to remove the

5   insulation from the festoons and transite paneling from exterior oven walls and partition

6   walls between ovens.[125] The cost for this work was $33,468.

7

8   A deposition taken of Mr. James P. Verhalen on September 21, 1995 indicated that U.S.

9   Mineral had no formal written policy with regard to asbestos in company owned buildings.

10   When asked, "Does U.S. Mineral Products Company ever believe that it's appropriate to

11   remove asbestos-containing material during renovation?"   Mr. Verhalen replied,

12   "Sometimes you have to. There is no avoiding it. And sometimes you have to. I think it's

13   foolish to remove asbestos-containing materials if you don't have to." Mr. Verhalen cited

14   the following example of when ACM would have to be removed. "If ACM is applied to a

15   ceiling and the ceiling is going to be removed, the ACM must be removed."[126]

16

17   When asked if U.S. Mineral believes there are times when it is appropriate to abate and

18   remove asbestos-containing fireproofing material from a building, Mr. Verhalen replied

19   that generally, U.S. Mineral supports the Federal government's position on operations and

20   maintenance (in-place management) and removal. "Therefore, circumstances where it's

21   safe and sound and economical and practical to remove asbestos-containing materials."[126]

22

1   When asked if U.S. Mineral held the position that no precaution need to be taken when

2   ACM is disturbed during renovation, Mr. Verhalen replied "No".[126]  He indicated that

3   U.S. Mineral supports the maintenance and operations regulations that are federally

4   required and the EPA Greenbook. He stated that these regulations are "practical, logical

5   and safe."[126]  Mr. Verhalen also stated that U.S. Mineral supports monitoring in-place

6   ACM as part of the Federal government program.   "Monitoring I believe is always

7   desirable."[126]

8

9   U.S. Mineral monitored ACM in its own building in the early 1970's when the transition

10  was taking place between asbestos and non-asbestos products.  Initially, just air testing

11  was done.   Later written procedures for air monitoring were developed when the

12  government programs became more formal.  In recent years a map was drawn of the plant

13  and locations of asbestos-containing material were identified.

14

15  According to Mr. Verhalen, there are two U.S. Mineral office buildings that have

16  asbestos-containing material above suspended ceiling systems and "they're not subject to

17  any exposure or risk."  Air sampling for asbestos was done in late 1994 or early 1995 at

18  the Stanhope office which has Cafco Heat Shield applied to a metal skin roof. The results

19  were negative.   However, monitoring is done if someone goes above the suspended

20  ceiling.

21

1    All ACM was removed in approximately June of 1995 from factory metal skin buildings.

2    The metal skins on the Butler buildings needed to be replaced.    According to Mr.

3    Verhalen, it was necessary prior to replacing the metal skins to remove the asbestos.[126]

4    Other removals conducted at U.S. Mineral facilities include thermal system insulation from

5    a boiler that was replaced (1987, 1989) and removal of ACM in conjunction with a roof

6    replacement (approx. 1990).[126]

7

8    In May 1984 U.S. Gypsum (USG) issued a document to all US plants titled "Managing an

9    Asbestos Control Program, Maintaining in Place".[127]    The memo attached to the

10    guidelines stated, "The past use of asbestos in insulation, and in other products, presents a

11    problem for plants, both in maintaining safe conditions in areas where the material was

12    used, and in its removal when necessary.  The objectives in any asbestos control program

13    are to protect all persons from exposure to airborne fibers in all sections where asbestos is

14    present, and if removal is necessary, to remove and dispose of the material in the manner

15    prescribed by Federal Regulations."[127]    These guidelines directed plants to survey and

16    identify ACM; identify ACM that appeared to be damaged or needed repair; repair

17    material that could be repaired; and if material was damaged beyond repair it was to be

18    removed.

19

20    An Asbestos Compliance Guide dated February 18, 1986 was distributed to all plant

21    managers.  This guide provided instructions on conducting renovation and demolition

22    work involving ACM.  This document was revised on June 22, 1987 to include a re-

1    statement of the Corporation's policy to maintain asbestos-containing materials in place,

2    unless removal is necessary.[128] In the "Purpose" section it is stated, "The intent of these

3    guidelines is to assist plant management in situations where removal is necessary. This

4    includes preparations for capital installations, revisions of equipment arrangements or

5    where asbestos-containing material is damaged beyond repair."[128]

6

7    At least 15 different removal projects took place between July 1983 and February of 1985.

8    In May of 1985 there were numerous capital expansion projects at USG plants which

9    required ACM removal.[129]

10

11   A July 9, 1984 memorandum from M.J. Bagel to S.T. Hadley of USG provides

12   information on a seminar by the Building Owners Managers Association titled "Asbestos

13   In Office Buildings - A Tenant's Problem, and an Owner's Problem."[130] At the end of

14   the memorandum Mr. Bagel states, "I believe the above provides sufficient information to

15   alert management to the fact that there is a potential problem in buildings that contain

16   asbestos materials. On the basis of this information I believe that a meeting should be held

17   as to what steps if any will be taken should asbestos material be found in the USG

18   building."[130]

19

20   The Headquarters Building at South Wacker Drive in Chicago contains Firecode

21   fireproofing. A building committee was formed to handle asbestos problems at the

22   Headquarters Building. A document titled "USG Building, Interim Report, Modifications

84

1    to Permit Interior Work" introduced in Mr. May's deposition describes the situation: "A

2    problem identified with doing any above ceiling work on floors two through 16 is that

3    when the fireproofing insulation is disturbed, as by changing pipes, wiring or supports for

4    ducts, ceiling, lighting or other utilities, installing partitions within the plenum to isolate a

5    space for separate air-conditioning and the like, asbestos fibers contained in the

6    fireproofing insulation may be released. This can be caught up in the circulating air within

7    the plenum and thereby distributed to the entire floor, recirculated through the return

8    ducts and ultimately spread throughout the entire building."[129]    USG called upon Dr.

9    Morton Corn to assist them in dealing with the ACM in the Headquarters Building.[131]

10    Clayton Environmental conducted air monitoring at the Headquarters Building on January

11    4-6, 1985.    Eighty samples were collected and analyzed by phase contrast and

12    transmission electron microscopy.[132]

13

14    A memo dated September 2, 1987 from D.E. Warrick to J.D. Cornell discusses the need

15    for a written facility plan relating to the inplace asbestos-containing material in the

16    Headquarters Building.[133]    Mr. Warrick stated, "I would feel much better if we had a

17    written plan to be followed by our own maintenance staff as well as outside workers."[133]

18

19    In summary, the procedures for management of asbestos in buildings which are used by

20    W.R. Grace & Company, U.S. Mineral Products Company, and U.S. Gypsum are similar

21    to those implemented by Prudential. All have conducted inspections in their buildings,

85

1   have instituted asbestos control procedures, and have removed asbestos-containing

2   materials in conjunction with renovation and demolition activities.

1    X.    REGULATIONS

2

3    The management and removal of the asbestos-containing fireproofing in the Prudential

4    buildings are subject to numerous federal, state and local regulations.  At the federal level

5    the two major regulations are the Occupational Safety and Health Administration (OSHA)

6    asbestos standard (29 CFR 1926.1101) and the EPA asbestos NESHAP standard.[134, 135]

7    In addition, the US Department of Transportation (DOT) standards for the transportation

8    of hazardous materials impact the buildings as well as the EPA Asbestos Hazard

9    Emergency Response Act (as amended) (AHERA) regulations which pose additional

10    burdens on the buildings.[136, 137]

11

12    The newly revised OSHA asbestos standard has further reduced the permissible exposure

13    limit (PEL) to 0.1 f/cc based on an 8-hour, time-weighted average (TWA).[134]  This

14    standard also requires work practices (regardless of exposure concentration) be

15    implemented when working around or on asbestos-containing materials.  It was noted by

16    OSHA in the preamble to the current revision that significant risk remains at the 0.1 f/cc

17    level.

18

19    The new OSHA asbestos standard provides a classification of work activities.  Class I

20    work includes removal of surfacing materials (such as fireproofing) and thermal system

21    insulation (such as pipe and boiler insulation).  Class II work includes removal of asbestos-

22    containing materials such as flooring, wallboard and roofing products.  Class III work

87

1    includes repair and maintenance operations where ACM is likely to be disturbed. Class IV

2    work includes clean-up of asbestos waste and debris.[134]

3

4    The work practices required under the OSHA asbestos standard are progressively more

5    stringent, with Class IV work the least stringent, and Class I work the most stringent. The

6    removal of fireproofing from a building is Class I work. This work must be conducted by

7    trained workers and supervisors, employ a negative pressure containment system, provide

8    for the use of respirators and protective clothing, and numerous other requirements.[134]

9

10   Custodial and maintenance activities which involve asbestos-containing fireproofing

11   generally fall into Class III or Class IV work. Class III work usually requires isolation of

12   the work area, use of respirators, specific work practices, a competent person (as defined

13   by OSHA) on site, and trained employees and supervisors. Class IV work requires trained

14   employees and specific work practices but does not mandate the use of respirators.[134]

15

16   The new OSHA standard contains numerous other provisions including notification and

17   labeling requirements, medical surveillance of employees, decontamination procedures,

18   testing requirements, and waste disposal procedures. The standard represents the latest

19   revision to the OSHA asbestos standards providing for greater stringency in the

20   requirements. It lowered the permissible exposure limit (PEL) to 0.1 f/cc from 0.2 f/cc (8-

21   hour, TWA) which had been in effect since July 1986. Prior to this time the PEL was 2

22   f/cc, expressed as an 8-hour, TWA.

1

2    The EPA NESHAP asbestos standard has likewise evolved and become more stringent

3    over the years.[135]  In summary, the standard requires building owners and operators to

4    properly remove friable asbestos-containing materials prior to renovation or demolition

5    activities which will disturb these materials.  It further regulates the method of removal

6    and disposal of the asbestos waste.[135]

7

8    In addition to the federal asbestos regulation, all of the buildings discussed in this report

9    were, or are subject to one or more state asbestos regulations.   Like the federal

10   regulations, the state asbestos regulations have evolved over the years, beginning in the

11   mid-1980s.

12

13   The provisions of the state regulations have been summarized repeatedly by the National

14   Conference of State Legislatures (NCSL) under a grant from the EPA.[137, 138]  The Bureau

15   of National Affairs (BNA) has also provided a history of early state asbestos

16   regulations.[139]  Certain cities and localities, such as New York City, Dallas, Philadelphia,

17   and Allegheny County (Pittsburgh) also passed regulations regarding asbestos in buildings.

18

19   Among these regulations the common issue was the provision for certification of

20   individuals who perform various asbestos-related activities.   In many states formal

21   licensing programs were established.   Initially, some programs only applied to school

22   buildings.  However, when the EPA AHERA regulations were amended, public and

1   commercial buildings were included nationwide in the Model Accreditation Plan (except

2   for Management Planners).[140]

3

4   The Prudential buildings discussed in this report contracted maintenance and renovation

5   work. The state regulations required work involving the disturbance of asbestos materials

6   be performed by certified or licensed personnel. Accordingly, it became common practice

7   for only certified workers to conduct asbestos activities in the vicinity of the fireproofing

8   in Prudential buildings.

9

10  Some states were also delegated authority from OSHA and EPA to implement and enforce

11  their own OSHA asbestos standard and NESHAP standard. For these Prudential

12  buildings, the states of California, Maryland, Michigan, Minnesota, and New York have

13  state OSHA programs. In these states, the regulations must be at least as stringent as the

14  federal standard. Most states adopted the federal OSHA asbestos standard(s) with little

15  modification. However, using California as an example, CAL-OSHA redefined an

16  asbestos-containing material as greater than 0.1% asbestos, and require all asbestos

17  workers to be registered with the agency.[141, 142]

18

19  California also has adopted, and revised the EPA asbestos NESHAP standard. For

20  Embarcadero I and II, located in San Francisco, they must comply with the Bay Area Air

21  Quality Management District (BAAQMD) NESHAP requirements.[143]   This regulation

1 significantly lowers the threshold for amounts of friable asbestos involved in renovation or

2 demolition activities.

3

4 City regulations have also impacted Prudential's management of asbestos in their

5 buildings. New York and Philadelphia's comprehensive asbestos in buildings regulation

6 have no threshold amounts before they are applicable.[144 - 146] The City of Dallas has

7 adopted the rules of the Texas Air Control Board.[147 - 149]

8

9 The multitude of federal, state and local regulations creates difficulty for large building

10 owners and operators with holdings in many states and localities. At the building level, it

11 is necessary to develop a site-specific plan to achieve compliance with the regulations. At

12 the national level, policies must be appropriate and flexible to allow for provisions of

13 various regulations to be met.

1    IV.    **CONCLUSIONS**

2

3    The following conclusions are based on site visits to the Prudential buildings, results of

4    bulk, air, dust and debris samples, interviews with building management representatives,

5    and reviews of asbestos-related building documents applicable standards, regulations,

6    guidance and research.

7

8    1.    The spray-applied asbestos-containing fireproofing currently or formerly present on

9          structural steel (and/or the decking) is friable.

10

11   2.    In all buildings assessed pursuant to the EPA assessment protocol, the fireproofing

12         was in the vast majority of areas rated as "damaged friable surfacing asbestos-

13         containing building materials."

14

15   3.    In all buildings assessed, the original asbestos-containing fireproofing had both

16         physical damage and damage due to deterioration.    Instances of water damage and

17         delamination were evident at some locations.

18

19   4.    In all buildings assessed and in which testing was performed it is concluded that

20         asbestos has released from the fireproofing.    This asbestos dust and debris has

21         accumulated and resulted in significant contamination of building surfaces.

22

1    5. Studies have demonstrated that routine maintenance, custodial, and renovation

2    activities that disturb in-place fireproofing or accumulated dust and debris from the

3    fireproofing can result in elevated airborne asbestos exposure to the workers and

4    others in the vicinity of the work.

5

6    6. Air sampling data from these Prudential buildings demonstrates that elevated

7    exposures have occurred among workers performing maintenance and renovation

8    activities.

9

10    7. These Prudential buildings are subject to the federal OSHA standard, EPA asbestos

11    NESHAP standard, the applicable state regulations for the states in which the

12    buildings are located, and local (city and county) ordinances for some buildings.

13

14    8. It has been necessary and prudent for Prudential to develop and implement asbestos

15    management plans, including asbestos operations and maintenance programs to

16    continue operating these buildings.

17

18    9. The removal of the asbestos-containing fireproofing following a phased approach has

19    been, and continues to be, appropriate and reasonable.

20

1    10. The Prudential asbestos policy, and implementation of that policy is consistent with

2        applicable regulations, standards, guidelines, and the actions of other major property

3        owners.

4

5    This report prepared by:

6                                   William M. Ewing, CIH

7                                   Technical Director

94

# EXHIBIT F

3591489.1

RIKER, DANZIG, SCHERER & HYLAND
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey  07960-1981
(201) 538-0800
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA; PIC REALTY CORPORATION; and 745 PROPERTY INVESTMENTS, | HON. HAROLD A. ACKERMAN<br><br>Civil Action No. 87-4227<br>Civil Action No. 87-4328 |
| Plaintiffs, | |
| v. | FIRST AMENDED<br>COMPLAINT AND JURY DEMAND |
| UNITED STATES GYPSUM COMPANY; W.R. GRACE & COMPANY; THE CELOTEX CORPORATION; UNITED STATES MINERAL PRODUCTS COMPANY; KEENE CORPORATION; ASBESTOSPRAY CORPORA- TION; and "JOHN DOE COMPANIES," Fictitious names for presently unidentified entities, | |
| Defendants. | |
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, | |
| Plaintiff | |
| v. | |
| NATIONAL GYPSUM COMPANY, | |
| Defendant | |

-1-

Plaintiffs, by their attorneys, bring this civil action against the above-named defendants, and complain and allege as follows:

I.

## JURISDICTION AND VENUE

1.  This complaint is filed and this civil action is instituted pursuant to the jurisdiction of this Court as conferred by the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§9601, et seq.; Section 1965(a) of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961, et. seq., and by principles of pendent jurisdiction. The matter in controversy raises questions under federal statutes, and exceeds $200,000,000 in value, exclusive of interest and costs.

2.  Each of the defendants is found in, transacts business in, or has an agent in the District of New Jersey. Some of the claims which are the subject of this action arose in the District of New Jersey. Venue is proper in this District pursuant to 28 U.S.C. § 1391.

3.  An actual controversy, as more fully described herein, exists between plaintiffs and defendants.

II.

## THE PLAINTIFFS

4.  Plaintiff the Prudential Insurance Company of America (hereinafter "Prudential") is a corporation organized and existing under the laws of the State of New Jersey, with

-2-

its principal place of business in Newark, New Jersey. Prudential is engaged in various states of the United States in the businesses of insurance, financial services and real estate, and employs approximately 78,000 people, including approximately 17,000 people in the State of New Jersey. Prudential is the owner or a partner in the ownership of a number of the commercial office buildings, hotels and residential rental properties that are the subject of this action and listed in the Appendix to this Complaint, incorporated herein by reference.

5. Plaintiff PIC Realty Corporation (hereinafter "PIC Realty") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Newark, New Jersey. PIC Realty is a wholly-owned subsidiary of Prudential. PIC Realty is the owner or a partner in the ownership of a number of the properties that are the subject of this action and listed in the Appendix to this Complaint.

6. Plaintiff 745 Property Investments is a voluntary trust organization existing under the laws of the Commonwealth of Massachusetts, with its principal place of business in Newark, New Jersey. Prudential is the majority shareholder and manager of 745 Property Investments. 745 Property Investments is the owner or a partner in the ownership of a number of the properties that are the subject of this action and listed in the Appendix to this Complaint.

-3-

III.

## THE DEFENDANTS

7. Each of the defendants (including their predecessors and successors) at all times material to this action has been regularly and directly engaged in the business of designing, manufacturing, processing, marketing, distributing, supplying and/or selling products containing asbestos fiber for use as fireproofing, insulation and other materials in the construction and maintenance of commercial and other buildings.

8. One or more of the defendants (including their predecessors and successors), identified in paragraphs 9 through 16 of this Complaint, designed and manufactured the asbestos-containing materials used in the construction or maintenance of each of the buildings described in the Appendix to this Complaint.

9. Defendant United States Gypsum Company is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Chicago, Illinois.

10. Defendant W.R. Grace & Company is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business in New York, New York. It is the successor to Dewey and Almy Chemical Company and the Zonolite Company.

11. Defendant The Celotex Corporation is a subsidiary of Jim Walter Corporation organized and existing under the laws

-4-

of the State of Delaware, with its principal place of business
in Tampa, Florida.   Celotex Corporation is the successor in
interest to the Philip-Carey Manufacturing Company, Smith &
Kanzler Corporation, and the Panacon Corporation.

12. Defendant United States Mineral Products Company
is a corporation organized and existing under the laws of the
State of New Jersey, with its principal place of business in
Stanhope, New Jersey.

13. Defendant Keene Corporation is a corporation
organized and existing under the laws of the State of New York,
with its principal place of business in New York, New York.
Keene Corporation is the successor in interest to Keene Build-
ing Products Corporation, Baldwin-Ehret-Hill, Inc., Baldwin-
Hill Company, Ehret Magnesia Manufacturing Company, Mundet Cork
Co. and Asten Hill Manufacturing Corporation.

14. Defendant Asbestospray Corporation is a corpora-
tion which was organized under the laws of the State of New
York, with its principal place of business in Brooklyn, New
York.

15. Defendant National Gypsum Company is a corpora-
tion organized and existing under the laws of the State of
Delaware, with its principal place of business in the State of
Texas.

16. Defendants the "John Doe Companies" are an as yet
undetermined number of business entities, whose identities are
presently unknown, who have regularly and directly engaged in

-5-

the business of designing, manufacturing, processing, market-
ing, distributing, supplying and selling products containing
asbestos fiber for use as fireproofing, insulation and other
materials in the construction and maintenance of commercial and
other buildings.

IV.

## NATURE OF THE CASE

17. Asbestos is a fibrous mineral which until the
1970s was commonly used as a component in a variety of building
materials for fireproofing, insulation and other purposes.
Some asbestos-containing building materials were sprayed onto
steel beams, girders, and floor decking. Others were used as
plasters and for other purposes, and were used on or in ceil-
ings, ventilation ducts, walls, and other building structures
and surfaces.

18. The disturbance, damage, or natural deterioration
of asbestos-containing building materials causes the invisible
release of asbestos fibers into the ambient air, internal sur-
faces, and contents of buildings. The size and shape of asbes-
tos fibers enable them to be readily dispersed and to remain
airborne for long periods of time. There is a risk that
building occupants, users, visitors, maintenance personnel, and
others will inhale the airborne asbestos fibers.

19. Exposure to airborne asbestos dust can cause a
number of serious and often fatal diseases. Asbestos fibers

-6-

are a known human carcinogen.  The three primary health hazards associated with the inhalation of asbestos fibers are (a) lung cancer; (b) mesothelioma, a diffuse and invariably fatal cancer of the membranes lining the lungs, chest cavity, and abdominal cavity; and (c) asbestosis, a disabling, irreversible, and often fatal scarring of the lung tissue which prevents the exchange of gases during breathing.

20. The symptoms of asbestos diseases do not become apparent until many years after exposure.  This latency period often lasts 10 to 40 years or more before the effects of asbestos exposure manifest themselves.

21. Each of the buildings identified in the Appendix to this First Amended Complaint has been found to contain substantial amounts of asbestos-containing materials that were, upon information and belief, manufactured, processed, designed, distributed and/or sold by one or more of the defendants, and used in the construction and maintenance of the buildings. Other buildings in which plaintiffs have an interest may also contain such materials and may be made the subject of this action as well.  Asbestos-containing materials in a number of the buildings have been and could be subject to deterioration, damage and/or disturbance.

22. Upon information and belief, at least one or more of the defendants designed, manufactured, processed, supplied, distributed or sold the asbestos containing products in each of the plaintiffs' buildings identified in the Appendix.

-7-

23. The asbestos-containing materials manufactured, designed, processed, marketed, distributed, or sold by defendants constitute a substantial and unreasonable risk of harm. For many years before its sale of asbestos-containing materials, the defendants knew or should have known that published medical and scientific reports from at least as early as the 1930s through the early 1960s documented the incidence of asbestosis and lung cancer among those exposed to asbestos. A number of other published medical and scientific reports from at least as early as the 1950s and early 1960s concluded that asbestos was a cause of mesothelioma. In addition, numerous jury verdicts were rendered against the defendants wherein it was determined that defendants' products pose a substantial risk of injury or death, and many Workmen's Compensation claims were successfully filed against the defendants based on asbestosis. Defendants knew or should have known of the health hazards to building occupants and the general public during the occupancy, renovation, alteration, modification, and demolition of the buildings, and knew or should have known of the building contamination hazards. Despite this knowledge, defendants failed to warn or adequately warn foreseeable users of the known and documented hazards associated with its asbestos-containing materials, failed to represent accurately the risks associated with those materials, failed to test or adequately test those materials to determine the risks or danger in an environmental setting, and failed to develop and offer asbestos-free substitutes for those materials. The failures of

-8-

defendants to warn, to represent accurately the risks, to test their products, and to develop and offer substitutes are continuing in nature.

24. Defendants fraudulently concealed the health hazards associated with exposure to asbestos and acted to hinder research that might add to knowledge about such hazards. Defendants also fraudulently concealed the risk of damage to and contamination of buildings caused by the asbestos in the building materials which it made.

25. The means by which defendants concealed these hazards, risks and damages include, but are not limited to, suppression of medical research results, including those of the Saranac Laboratory in Saranac Lake, New York during the 1930s through the 1950s; misrepresentations during the 1960s through the 1980s concerning the existence, nature and extent of the hazard created by their asbestos-containing materials; misrepresentations during the 1950s through the 1980s concerning the suitability of their materials for use in buildings; efforts since the 1960s to protect their asbestos-containing materials from scrutiny by outside testing laboratories; failures during the 1960s and 1970s to disclose their internally-developed information regarding such materials' hazards and risks; a refusal in 1968 to supply asbestos health risk information to the United States Public Health Service; false and misleading answers to party and court interrogatories; conscious and willful withholding of relevant documents and the submission of a false affidavit in 1983 and 1984 regarding the

-9-

asbestos health hazards knowledge of defendant United States Gypsum Company in <u>Greenville County School District v. W. R. Grace & Co., et al</u>. (D.S.C. Civil Action No. 6:82-3142-14).

26. Plaintiffs could not by due diligence have discovered such hazards, risks, and injuries due to the affirmative concealment by defendants until a recent investigation by plaintiffs revealed the nature and cause of the hazards and injury, and the need to determine whether remedial action, through removal and reconstruction or through other measures, was necessary.

27. With respect to the manufacturing, marketing, distribution, supply, and/or sales by defendants of their asbestos-containing materials, the defendants acted in a reckless, willful, egregious, and wanton manner, and with conscious disregard and outrageous indifference to the consequences and the rights of plaintiffs. Consciously, intentionally, in bad faith, or through gross negligence, defendants failed to warn or adequately warn foreseeable users of the risks associated with their asbestos-containing materials, failed to represent accurately the risks associated with those materials, failed to test or test adequately their asbestos-containing materials, and failed to develop and offer asbestos-free substitute materials. Defendants acted and failed to act in order to protect their own economic interests in the continued profits generated by the sale and distribution of asbestos-containing building materials, and in order to evade responsibility for the consequences of their prior sales and distribution thereof.

-10-

28. Plaintiffs have and are continuing to put in operation an inspection, monitoring, maintenance, and abatement program with respect to the buildings described in the Appendix to this First Amended Complaint.   Because of the potential health and contamination dangers, plaintiffs have been compelled to determine the extent to which asbestos-containing materials are present in their buildings and the extent to which the buildings and their contents have been or may be contaminated with asbestos fibers.   Where such materials or contamination have been or are found, plaintiffs have adopted or will have to adopt, pursuant to governmental regulations and common-law duties, costly abatement measures to remove and replace, enclose, encapsulate, or repair such materials in order to eliminate the potential asbestos health hazard created by such contamination of the buildings.   Costly removal measures with stringent precautions will inevitably be required in each of the buildings described in the Appendix to this First Amended Complaint no later than the renovation, alteration, modification or demolition of each building. Such measures and precautions are now required by a number of governmental entities.

29. The Federal Government will not lease space in a building with asbestos-containing products unless and until there is abatement.   Since the Federal Government is a major lessee of office space, this is a major problem for owners such as plaintiffs.

-11-

30. The use of the buildings identified in the Appendix to this First Amended Complaint has been and will be materially impaired due to the presence of the asbestos-containing materials of defendants in the buildings, both through a diminution of market value and physical property damage to the buildings. Because of the contamination caused by the asbestos-containing materials in plaintiffs' buildings, plaintiffs have paid and will continue to pay substantial costs and fees relating to abatement and building monitoring actions, building survey and testing costs, tenant relocation costs, operations and maintenance program costs for asbestos-containing materials before their removal from buildings, substantial disruption to their business, substantial property damage to their property (such as carpeting, ceilings, curtains, etc.), and other costs associated with the contamination or potential contamination of the buildings. Plaintiffs have also suffered and will suffer, among other damages, the loss of rental income from the buildings during abatement procedures or due to premature tenant departures, and the diminution in the commercial value of the properties.

31. Since plaintiffs own so many buildings and have so many tenants and occupants, it is likely that some tenants and/or occupants will attempt to initiate legal action against plaintiffs related to asbestos problems.

## COUNT ONE

### Hazardous Substance Disposal and Release

32. Plaintiffs incorporate herein by reference paragraphs 1 through 31 of this First Amended Complaint.

33. Within the meaning of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§9601 - 9675 (CERCLA), defendants are persons who have arranged for the transport, treatment and disposal of a hazardous substance in the facilities of the buildings identified in the Appendix to this First Amended Complaint, from which the substance has been and will continue to be released into the environment.

34. Costly investigative, monitoring and abatement actions by plaintiffs have been and will be necessary response actions consistent with the Federal National Contingency Plan.

35. The actions and failures to act by defendants have directly, foreseeably, and proximately caused damage and injury to plaintiffs, including but not limited to physical harm to and contamination of plaintiffs' buildings, and the expense of testing, monitoring, and abating the asbestos-containing product hazards in those buildings, for which recovery is allowed under CERCLA.

## COUNT TWO

### Strict Liability for Design Defect

36. Plaintiffs incorporate herein by reference paragraphs 1 through 35 of this First Amended Complaint.

-13-

37. At the time of the design, manufacture, process-ing, marketing, and/or sale of its asbestos-containing products, defendants knew or should have known that these products would be used by plaintiffs or their predecessors in interest in the buildings as the ultimate users or consumers. Moreover, the plaintiffs, their agents or their predecessors in interest in the buildings expected that the asbestos-containing materials were suitable and fit for their intended purpose but the materials were not suitable and fit.

38. Defendants knew or should have known that the asbestos-containing products which they designed, manufactured, processed, marketed, distributed, and/or sold were not fit, suitable, and safe or were otherwise inherently dangerous for use by plaintiffs and any other foreseeable users, and defendants acted unreasonably and recklessly in selling and marketing or otherwise making available dangerous, harmful, or otherwise unfit asbestos-containing products.

39. Defendants have put into the stream of commerce or otherwise made available products which are not reasonably fit, suitable and safe for their intended or reasonably fore-seeable purposes or were otherwise inherently dangerous.

40. Similar, comparable and otherwise suitable pro-ducts were available which would have adequately and safely performed the intended functions without the attendant hazard-ous exposure to a documented and known danger, as well as with-out the resulting damage and loss of value to plaintiffs' buildings.

41. Defendants have put into the stream of commerce or otherwise made available products which are defectively

designed in that they are not reasonably fit, suitable and safe for their intended or reasonably foreseeable purposes in that governmental rules and regulations preclude the use of such products and require that plaintiffs abate, remove or encapsulate asbestos-containing products at considerable expense and disruption to their business.

42. Defendants are strictly liable to plaintiffs by reason of the defective design of their asbestos-containing products.

43. The actions and failures to act of defendants have directly, foreseeably and proximately caused damage and injury to plaintiffs, including but not limited to physical harm and damage to and contamination of plaintiffs' buildings, and the expense of testing, monitoring, and abating the asbestos-containing product hazards in those buildings.

COUNT THREE

Risks/Benefits

Strict Liability

44. Plaintiffs incorporate herein by reference paragraphs 1 through 43 of the First Amended Complaint.

45. Defendants are strictly liable by reason of the fact that the risks of their asbestos-containing products outweighed their benefits and therefore the products were not reasonably fit, suitable and safe for their intended purpose.

46. The actions and failures to act of defendants have directly, foreseeably and proximately caused damage and injury to plaintiffs, including but not limited to physical harm to and contamination of plaintiffs' buildings, and the expense of testing, monitoring, and abating the asbestos-containing product hazards in those buildings.

-15-

## COUNT FOUR

### Strict Liability for Failure to Warn

47. Plaintiffs incorporate herein by reference para-graphs 1 through 46 of the First Amended Complaint.

48. At the time of the design, manufacture, process-ing, marketing, and/or sale of its asbestos-containing products, defendants knew or should have known that these products would be used by plaintiffs or its predecessors in interest in the buildings as the ultimate users.

49. These products were expected to and did reach the users or consumers without substantial change in their original condition.

50. Defendants knew or should have known that the asbestos-containing products which they designed, manufactured, processed, marketed, distributed, and/or sold were not fit, suitable, and safe or were otherwise inherently dangerous for use by plaintiffs and any other foreseeable users, and defendants acted unreasonably and recklessly in selling and marketing or otherwise making available dangerous, harmful, or otherwise unfit asbestos-containing products. Indeed, it was immaterial whether defendants knew or should have known that the asbestos-containing material were not fit, suitable, and safe or otherwise inherently dangerous for use by plaintiffs or any other foreseeable users.

51. Defendants failed to warn or provide plaintiffs and its predecessors in interest with adequate warnings re-garding the risks and dangers inherent in exposure to its as-bestos containing products which it put or caused to be placed in the stream of commerce, and failed to test or adequately

-16-

test its products.   In addition, defendants failed to warn plaintiffs of the hazards associated with the asbestos — containing products after defendants admittedly knew of the hazards associated with its asbestos-containing products.

52. Defendants have put into the stream of commerce or otherwise made available without adequate warnings products which are not reasonably fit, suitable and safe or were otherwise inherently dangerous for their intended or reasonably foreseeable purposes in that governmental rules and regulations preclude the use of such products and require that plaintiffs abate, remove or encapsulate asbestos-containing products at considerable expense and disruption to their business.

53. The actions and failures to act of defendants have directly, foreseeably and proximately caused damage and injury to plaintiffs, including but not limited to physical harm and damage to and contamination of plaintiffs' buildings, and the expense of testing, monitoring, and abating the asbestos-containing product hazards in those buildings.

## COUNT FIVE

### Negligence

54. Plaintiffs incorporate herein by reference paragraphs 1 through 53 of this First Amended Complaint.

55. At the time defendants caused asbestos-containing products to be sold and placed in the buildings identified in the Appendix to this First Amended Complaint and at all other times material hereto defendants knew or should have known in the exercise of ordinary and reasonable care that their asbestos-containing products would be used for fireproofing, ceiling

-17-

tiles, textured ceiling materials such as paint, insulation, and other purposes in such buildings.

56. At all times material hereto, defendants designed, manufactured, processed, marketed, distributed, and/or sold asbestos-containing products that defendants knew or should have known in the exercise of reasonable care were inherently dangerous, defective, and hazardous and created unreasonable risks of harm to persons and damage to commercial and other buildings.

57. Defendants owed a duty to plaintiffs to exercise reasonable care in designing, manufacturing and/or selling their products in order to avoid subjecting the buildings identified in the Appendix to this First Amended Complaint, and occupants and users thereof, to the unreasonable risk of harm created by the presence of asbestos-containing products in the buildings.

58. In breach of this duty, the defendants failed to warn or notify, or adequately warn or notify, plaintiffs or their predecessors in interest in the buildings, of the asbestos content of or the risks associated with these products. Defendants also failed to represent accurately in sales literature, advertisements, and trade publications relied upon by plaintiffs, their predecessors in interest in the buildings and their agents, the risks associated with these products.

59. Defendants also failed to test, or adequately test, their asbestos-containing products to determine in an environmental setting their risks or dangers. Defendants also failed to develop and offer asbestos-free substitute products.

-18-

60. Defendants also failed to remove or recommend the removal of asbestos-containing products from the market, or to undertake responsibility to test, remove, and replace those products in the buildings of plaintiffs.

61. The negligence of defendants, as described above, directly, foreseeably, and proximately caused damage and injury to plaintiffs, including but not limited to physical harm to and contamination of plaintiffs' buildings, and the expense of testing, monitoring, and abating the asbestos-containing product hazards in those buildings.

## COUNT SIX

### Breach of Express Warranties

62. Plaintiffs incorporate herein by reference paragraphs 1 through 61 of this First Amended Complaint.

63. Defendants expressly warranted, directly or through sales literature, advertisements, and trade publications, that their asbestos-containing products were safe and non-toxic, fully tested, suitable and desirable for use in commercial and other buildings, and durable so that the asbestos-containing material would permanently bind to the structure of the buildings and would not deteriorate over time.

64. Plaintiffs, or their agents, representatives, or predecessors in interest in the buildings, relied upon the express warranties by defendants described above.

65. Defendants breached their express warranties because their asbestos-containing products were not safe and non-

-19-

toxic, were not fully tested, were not suitable, fit and desirable for use in commercial and other buildings, and the asbestos-containing material deteriorated releasing asbestos.

66. The breaches by defendants of their express warranties have directly, foreseeably, and proximately caused damage and injury to plaintiffs, including but not limited to physical harm to and contamination of plaintiffs' buildings, and the expense of testing, monitoring, and abating the asbestos-containing product hazards in those buildings.

## COUNT SEVEN

### Breach of Implied Warranties

67. Plaintiffs incorporate herein by reference paragraphs 1 through 66 of this First Amended Complaint.

68. Defendants impliedly warranted that the asbestos-containing products they manufactured and sold were of good and merchantable quality and fit for their intended purpose, and that their specification for use in the buildings owned by plaintiffs was proper in all respects.

69. Defendants breached their implied warranties because their asbestos-containing products were not of good and merchantable quality and were not fit for their intended purposes in the buildings owned by plaintiffs.

70. Plaintiffs were a foreseeable and intended user of the products sold by defendants. Plaintiffs, or their agents, representatives, or predecessors in interest in the buildings, foreseeably relied upon the warranties, skill,

-20-

expertise, and judgment of defendants in assuming that the asbestos-containing products designed, manufactured, processed, marketed, distributed, or sold by defendants would perform as warranted, would be safe, and would not cause property damage to plaintiffs or endanger the health of persons occupying or using the buildings identified in the Appendix to this First Amended Complaint and would not result in substantial testing, monitoring, and abatement costs.

71. The breaches by defendants of their implied warranties have directly, foreseeably, and proximately caused damage and injury to plaintiffs, including but not limited to physical harm to and contamination of plaintiffs' buildings, and the expense of testing, monitoring, and abating the asbestos-containing product hazards in those buildings.

## COUNT EIGHT

### Fraud, Misrepresentation and Fraudulent Concealment

72. Plaintiffs incorporate herein by reference paragraphs 1 through 71 of this First Amended Complaint.

73. The asbestos-containing products manufactured and sold by defendants, and placed in the buildings identified in the Appendix to this First Amended Complaint, were purchased in reliance upon various statements and representations made by defendants directly or through advertisements, sales literature, and trade publications during the 1950s, 1960s, 1970s and 1980s. Those statements and representations were made for the purpose of inducing reliance thereon and inducing the purchase of the products manufactured by one or more of the defendants.

-21-

Such statements and representations included, but were not limited to, representations that those asbestos-containing products were safe and non-toxic, fully tested, and suitable and desirable for use in commercial or other buildings as indicated by the following examples:

(a) In product descriptions that appear in Sweet's Catalog, defendant U.S. Gypsum represented Audicote acoustical plaster as particularly suitable for use in large continuous areas and represented it as fit and merchantable, although defendant U.S. Gypsum knew or should have known that the product was not suitable for its intended use in buildings.

(b) Defendant Keene Corporation and its predecessors represented in the Sweet's Catalog that its sprayed-on materials were resistant to erosion and would not result in dusting or flaking, thereby implying that its products would not release hazardous or harmful asbestos fibers into the air when defendant knew or should have known that its products would release harmful or hazardous asbestos into the ambient air. Defendant Keene also represented in the Sweet's Catalog that its Pyrospray was suitable for fireproofing, insulation application and acoustical treatment. Keene stated that Pyrospray would allow remodeling without damage or removal of the material. In fact, Keene knew or should have known that asbestos products were not suitable for fireproofing, insulation and acoustical treatment and that remodeling of treated areas, which would likely disturb the material, would create problems and generate great expense. Keene also recommended

-22-

to the vanishing point and that the products were worthy of "a large place...in the construction industry."

(e) Defendant U.S. Mineral Products Co. represented in the Sweet's Catalog that its sprayed-on fireproofing was "permanent," when in fact defendant knew or should have known that its products would release harmful or hazardous asbestos fibers into the ambient air. Further, defendant represented in the Sweet's Catalog that its sprayed-on acoustical products would not lose their "integrity", when in fact defendant knew or should have known that its products release harmful or hazardous asbestos fibers into the ambient air.

(f) By placing product descriptions in the Sweet's Catalog, defendant Celotex represented its acoustical systems and products as suitable for use in buildings, although defendant knew or should have known that asbestos-containing building products were unsafe and unsuitable because they were a health hazard and would result in building contamination.

(g) Defendant National Gypsum placed product descriptions in the Sweet's Catalog which misrepresented asbestos-containing products as safe and suitable for use in buildings.

74. Each of the above representations by defendants that asbestos products were safe and suitable for use in buildings, referred to in paragraph 73 above, was false, incomplete, and untrue and was known or should have been known by defendants to be false, incomplete, and untrue when made. Upon information and belief, defendants made other false, incomplete or otherwise untrue statements which they knew or should have

-24-

Hansonite with asbestos for wall treatment, although it knew or should have known asbestos products cause building contamination.

(c) Defendant W. R. Grace represented in the Sweet's Catalog that its products would last as long as the building lasts, when in fact defendant knew that the natural deterioration and disturbance of asbestos-containing products would result in harmful asbestos fibers being released into the ambient air.   In addition, Grace admitted in the Sweet's Catalog that Mono-Kote contained asbestos, but represented that the asbestos was "locked in" during the mixing process, thus misleading purchasers as to the safety of its products, although W. R. Grace knew or should have known that the products were unsafe and unsuitable for use in buildings.

(d) Defendant Asbestospray represented in the Sweet's Catalog that its asbestos-containing products were "permanent" and would not result in "dropout", when in fact defendant knew or should have known that its products deteriorate over time. Moreover, defendant made statements in the Sweet's Catalog that its products would not contaminate the surrounding air, when in fact defendant knew or should have known that its products release harmful or hazardous asbestos into the ambient air. Furthermore, Asbestospray misrepresented in the Sweet's Catalog that its products were trouble-free and suitable for use in return air plenums and for application to pipes and ducts.   It also misrepresented in the Sweets Catalog that the installation procedures though which its products were applied reduced dust

-23-

known to be false, incomplete or otherwise untrue when made. Each was made with the intention to deceive and defraud or to conceal the truth about asbestos products, or with disregard to its truth or completeness, or in spite of the fact that it was untrue. Each was made in order to earn profits for defendants by inducing the purchase and use in buildings of the asbestos-containing products designed, manufactured, distributed, processed or sold by defendants and by concealing that use of asbestos building products results in building contamination. Plaintiffs, or their agents, representatives, or predecessors in interest in the buildings, had no knowledge of the falsity, incompleteness, or untruth of the statements and representations of defendants when they purchased the asbestos-containing products manufactured by defendants or purchased the buildings containing those products.

75. Plaintiffs, or their agents, representatives, or predecessors in interest in the buildings, had a right to rely on and did rely on such statements and representations. Each of the statements and representations of defendants was material to the purchases of the asbestos-containing products of defendants in that plaintiffs, or their agents, representatives, or predecessors in interest in the buildings, would not have purchased those asbestos-containing products or the buildings containing such asbestos-containing products if they had known that the statements and representations of defendants were false, incomplete, and untrue.

76. In addition, defendants failed to disclose and concealed the dangers of their asbestos-containing products

-25-

despite their superior knowledge of such dangers and their superior opportunity to discover such dangers. Defendants were clearly aware of the potential hazards of asbestos-containing products and nevertheless manufactured, designed, distributed, supplied or sold asbestos-containing products. Indeed, such knowledge is fairly traceable back to asbestos studies conducted at the Saranac Laboratories in the 1930s, 1940s and 1950s. Defendant U.S. Gypsum responded to inquiries regarding the hazards of their product in a fraudulent manner as late as 1979, as set forth in Spartanburg School Dist. v. National Gypsum, et al., 805 F.2d 1148 (4th Cir. 1986). Upon information and belief, defendant W.R. Grace & Co., as late as 1987, responded through the U.S. mail to inquiries concerning the safety of its asbestos building products by knowingly misrepresenting them as safe. Upon information and belief, defendant National Gypsum continually ignored the hazards of its product as brought forth by defendant's own safety personnel. Furthermore, upon information and belief, defendant National Gypsum fraudulently concealed the true nature of asbestos-containing products by delaying labeling them to warn of their hazards. In addition, defendants have engaged in fraudulent concealment of the dangers of asbestos from the 1930's to this day through participation in asbestos industry groups. This participation includes, but is not limited to: (a) participation of defendants United States Gypsum, National Gypsum and predecessors of defendants Celotex and W.R. Grace in the group which funded the asbestos research carried out by the Saranac Laboratory, in

-26-

Saranac Lake, New York, and suppressed findings of that research which showed that asbestos was a health hazard, as described more fully in paragraph 125(a) below; (b) participation in the Industrial Hygiene Foundation (IHF), originally formed in 1936 as the Air Hygiene Foundation, which through meetings, conferences, and confidential surveys suppressed information about the health hazards of asbestos as described more fully in paragraph 125(b) below; (c) participation in the Asbestos Textile Institute (ATI), whose members have included a predecessor of defendant Keene Corporation, which attempted to suppress, discredit, and discourage research showing the health hazards of asbestos, as described more fully in paragraph 125(c) below; (d) participation in the Magnesia Insulation Manufacturers Association (MIMA), whose members have included predecessors of defendants Celotex and Keene, which published insulation manuals that contained misleading information about the dangers of asbestos in insulation, as more fully described in paragraph 125(d) below; (e) participation in the Asbestos Cement Products Association by defendant National Gypsum in an attempt to reword a health and safety practices booklet to knowingly misrepresent the hazards of asbestos as described more fully in paragraph 125(e), below; (f) participation in the Safe Building Alliance, whose members have included defendants United States Gypsum, National Gypsum, W.R. Grace & Company, and the Celotex Corporation, which misrepresented the dangers of asbestos through its booklet "What You Should Know About Asbestos in Buildings," as described more fully in paragraph

-27-

125(f) below; (g) participation in the Asbestos International Association, which has discussed delaying applying warning labels to asbestos products in countries which do not require them, as discussed more fully in paragraph 125(g) below; and (h) participation in the Asbestos Information Agency of North America (AIA/NA), which defendant National Gypsum and other asbestos companies have actively supported, and which, among its actions in support of the asbestos industry, represents in its booklet "What You Should Know About Asbestos and Health" that "[C]urrently marketed asbestos products are not hazardous when properly handled or used," as described more fully in paragraph 125(h) below.   Whether additional individual defendants have participated in the groups described above and whether defendants have participated in additional groups which have misrepresented asbestos as safe or suppressed information about the hazards of asbestos is peculiarly within the knowledge of defendants and of the industry groups in which they have participated.

77. The false, incomplete, and untrue statements and representations of defendants and actions of their industry groups have directly, foreseeably, and proximately caused damage and injury to plaintiffs, including but not limited to physical harm to and contamination of plaintiffs' buildings, and the expense of testing, monitoring, and abating the asbestos-containing product hazards in those buildings, as well as the expense of implementing additional operations and maintenance procedures.

-28-

## COUNT NINE

### Equitable Fraud

78. Plaintiffs incorporate herein by reference paragraphs 1 through 77 of this First Amended Complaint.

79. Defendants made incorrect, incomplete, or otherwise untrue statements concerning the safety of asbestos-containing building materials and their fitness for use in buildings.

80. The above alleged incorrect, incomplete and untrue statements and representations were made directly or indirectly to plaintiffs or their agents, representatives, or predecessors in interest through advertisements, sales literature, and trade publications during the 1950s, 1960s, 1970s and 1980s. Those statements and representations were made for the purpose of inducing reliance thereon and inducing the purchase of the products manufactured by defendants. Such representations and statements included, but were not limited to, representations that those asbestos-containing products were safe and non-toxic, fully-tested, and suitable and desirable for use in commercial buildings. In addition, defendants failed to disclose the dangers of their asbestos-containing products and their potential for causing property damage to commercial buildings and economic loss to the owners of those buildings.

81. Each of the above, and other, statements and representations by defendants was false, incomplete, and untrue when made. Each was made in order to induce the purchase and use in buildings of the asbestos-containing products manufactured by defendants.

-29-

82. Plaintiffs foreseeably and justifiably relied upon the incorrect and incomplete representations about asbestos building products made by defendants and purchased asbestos-containing building materials for use in their buildings or purchased buildings containing such materials.

83. As a result of such reliance, plaintiffs have suffered and will continue to suffer damage to their buildings and property and economic loss resulting from the diminution in value of their property.

84. Such property damage and economic damage proximately resulted from the actions of the defendants in making untrue, incorrect, and incomplete statements regarding asbestos and asbestos products, whether or not defendants knew, in fact, that their statements with regard to asbestos were false and incomplete.

## COUNT TEN

### Unfair and Deceptive Trade Practices

85. Plaintiffs incorporate herein by reference paragraphs 1 through 84 of this First Amended Complaint.

86. The actions and failures to act of defendants, including false representations regarding the goods they sold, constitute unfair and deceptive acts and practices under several state fraud acts, including but not limited to Ariz. Rev. Stat. Ann. §44-1521 et seq.; Ark. Stat. Ann. §70-901 et seq.; Colo. Rev. Stat. §6-1-101 et seq.; Neb. Rev. Stat. §59-1601 et seq.; N.J.S.A. 56:8-1.1; Okla. Stat. tit. 15, §751 et seq.; Tenn Code Ann. §47-18-101 et seq.; and Tex. Bus. & Comm. Code Ann. §17.41 et seq.

-30-

87. The unfair and deceptive trade acts and practices of defendants have directly, foreseeably, and proximately caused damage and injury to plaintiffs, including but not limited to physical harm, property damage and contamination of plaintiffs' buildings, and the expense of testing, monitoring, and abating the asbestos-containing product hazards in those buildings.

## COUNT ELEVEN

### Civil Conspiracy

88. Plaintiffs incorporate herein by reference paragraphs 1 through 87 of this First Amended Complaint.

89. Upon information and belief, in an effort to fraudulently sell and market the asbestos-containing materials in question, defendants combined and conspired with each other and/or others to conceal, suppress, and ignore medical and scientific information they possessed relating to the hazards of exposure to asbestos, and to fail to warn the public and users of that information, thereby depriving plaintiffs or their agents, representatives, or predecessors in interest of the opportunity to decide for themselves whether or not to risk exposure to the asbestos-containing products of defendants.

90. This combination and conspiracy provided defendants with additional power to inflict injury, physical harm, and damages upon plaintiffs.

91. This tortious combination and conspiracy has directly, foreseeably, and proximately caused damage and injury to plaintiffs, including but not limited to physical harm,

-31-

property damage to and contamination of plaintiffs' buildings, and the expense of testing, monitoring, and abating the asbestos-containing product hazards in those buildings.

## COUNT TWELVE

### Restitution

92. Plaintiffs incorporate herein by reference paragraphs 1 through 91 of this First Amended Complaint.

93. As a result of the actions and failures to act of defendants, including failures to warn, to test, and to develop substitutes, defendants have a continuing duty to test, monitor, and abate the resulting hazards. Defendants' failure to perform their duty has placed plaintiffs in a position where they must perform said testing and abatement in order to satisfy the immediate demands of public health and safety. Plaintiffs hereby demand that defendants perform their duty. Defendants have refused similar demands by others, and defendants have not volunteered to perform that duty. Prior demands by plaintiffs would have been futile.

94. As a result of the failure and refusal by defendants to perform their duty by taking appropriate action to test, monitor, and abate the resulting hazards in plaintiffs' buildings, plaintiffs have been compelled to perform defendants' duty and the direct, foreseeable, and proximate damage and injury to plaintiffs includes but is not limited to physical harm to and contamination of plaintiffs' buildings, and the expense of testing, monitoring, and abating the asbestos-

-32-

containing product hazards in those buildings, for which defendants should make restitution.

## COUNT THIRTEEN

### Indemnification

95. Plaintiffs incorporate herein by referenced paragraphs 1 through 94 of this First Amended Complaint.

96. As a result of defendants' aforementioned conduct, and as a result of both common law and governmentally imposed duties, it has become necessary for plaintiffs to test for, and has or will become necessary for plaintiffs to abate, asbestos in all of their buildings which contain asbestos. None of the expenses associated therewith would have been incurred by plaintiffs but for the aforementioned breach of duties by defendants, thereby entitling plaintiffs to indemnification for all the expenses associated with discharging defendants' duties.

97. Since plaintiffs own so many buildings and have so many tenants and occupants, it is likely that some tenants and/or occupants will attempt to initiate legal action against plaintiffs related to the asbestos problem.

98. Defendants should be held to indemnify and hold the plaintiffs harmless from any and all losses, damages, costs and expenses, including attorneys' fees and the costs of litigation, with respect to such claims and actions.

-33-

## COUNT FOURTEEN

### Declaratory Judgment

99. Plaintiffs incorporate herein by reference paragraphs 1 through 98 of this First Amended Complaint.

100. The occupants, users, and visitors in all of plaintiffs' buildings that contain asbestos have been or may have been exposed to asbestos fibers or asbestos particles, and/or have or may have fear of being exposed to asbestos or contracting asbestos-related diseases. Since plaintiffs own so many buildings and have so many tenants and occupants, it is likely that some tenants and/or occupants will attempt to initiate legal action against plaintiffs related to the asbestos problems.

101. Plaintiffs should be entitled to full and complete indemnification from all losses or damages, including attorneys' fees and litigation costs and expenses, relating to any injury, damage, or loss alleged to have been caused in whole or in part by exposure to or the presence of asbestos in the buildings of plaintiffs. Plaintiffs are entitled to a declaration of rights and obligations to this effect pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## COUNT FIFTEEN

### Absolute Liability

102. Plaintiffs incorporate herein by reference paragraphs 1 through 101 of this First Amended Complaint.

-34-

103.   As a result of the actions and failures to act
of defendants, as heretofore specified, defendants engaged in
ultrahazardous activities and produced and distributed abnor-
mally dangerous substances resulting in products defined by the
government as hazardous substances.   These activities have
engendered unreasonable risks of harm to occupants, users,
visitors, and others in the buildings described in the Appendix
to this First Amended Complaint.

104.   The defendants acted at their peril in so doing
and are absolutely liable to plaintiffs.

105.   The substances and activities of defendants
have directly, foreseeably, and proximately caused damage and
injury to plaintiffs, including but not limited to physical
harm, property damage and contamination of plaintiffs' build-
ings, and the expense of testing, monitoring, and abating the
asbestos-containing product hazards in those buildings.

COUNT SIXTEEN

Racketeer Influenced and Corrupt Organization Act

106.   Plaintiffs incorporate herein by reference
paragraphs 1 through 105 of this First Amended Complaint.

107.   The plaintiffs are entities capable of holding
legal or beneficial interests.

108.   Plaintiffs have sustained property damage and
economic loss, including costs incurred in asbestos monitoring,
testing, and abatement of their buildings; lost rental income;
and diminution in the value of their property because their
buildings have been contaminated with asbestos and because they
relied on the misrepresentations of defendants.

-35-

109.   The property damage and economic loss described above resulted from the purchase by plaintiffs or their pre-decessors in interest of building materials containing asbestos and of properties which contained asbestos building materials manufactured and misrepresented as safe by defendants.

110.   The purchase and incorporation of asbestos building materials which contaminated plaintiffs' buildings occurred by reason of defendants' violation of 18 U.S.C. 1962(a), 18 U.S.C. 1962(c), and 18 U.S.C. 1962(d) and from the commission by the defendants of the predicate acts of mail fraud and wire fraud which constitute such prohibited conduct, as set forth more fully below:

### Violations by Defendants
### of 18 U.S.C. 1962(a)

111.   Defendants, each of which is an entity capable of holding a legal or beneficial interest and each of which is an "enterprise" as that term is defined in 18 U.S.C. 1961(4), reinvested in themselves and/or used in their operations income earned through the carrying out of a "pattern of racketeering" as prohibited under 18 U.S.C. 1962(a) as described below:

112.   Each of the defendants received and reinvested in itself or used in its operations income derived, directly or indirectly, through its manufacture and sale of asbestos-con-taining building materials.

113.   In order to obtain such income, each of the defendants-enterprises carried on a "pattern of racketeering," in that it perpetrated a scheme which included committing acts

-36-

of mail fraud and wire fraud chargeable or indictable under 18 U.S.C. 1341 and 18 U.S.C. 1343 upon the potential purchasers of its asbestos-containing products and upon purchasers of buildings containing those products.

114. The scheme perpetrated by each defendant-enterprise involved intentionally misrepresenting asbestos building materials as safe for use in buildings and fit for their intended purpose as building materials. The purpose of this scheme was to earn profits by inducing the many potential purchasers of these many products to buy them for use in their buildings and inducing many potential purchasers of buildings containing such products to purchase property without regard to whether or not they contained asbestos. In furtherance of the scheme, each defendant-enterprise used the U.S. mail and interstate wires.

115. The knowing misrepresentations of defendants included, but were not limited to, representations that asbestos-containing building materials were safe, non-toxic, fully tested, and suitable and desirable for use in commercial buildings. They were made by defendants directly or through advertisements, sales literature, and trade publications during the 1950s, 1960s, 1970s and 1980s for the purpose of inducing reliance thereon and for the purpose of inducing the purchase of the products manufactured by defendants. Some examples of these representations and other related misconduct of the defendants are as follows:

-37-

(a)   As part of its scheme to defraud, defendant U.S. Gypsum fraudulently responded to inquiries as late as 1979 concerning the health hazards of its products in that it denied the health hazards associated with its products when in fact it knew of the true nature of its products.  Furthermore, as early as 1969 and continuing until 1973, defendant U.S. Gypsum failed to place warning labels on its asbestos-containing Audicote acoustical plaster, although it manufactured a spray-applied asbestos-containing acoustical plaster for another company, Sprayon Research Corporation, which carried warning labels because it contained asbestos and from which asbestos was removed in 1970.  Moreover, upon information and belief, U.S. Gypsum sent answers to interrogatories through the United States mail stating that it first became aware of the link between asbestos and asbestosis in 1975, when in fact defendant knew of the true, harmful nature of asbestos as early as the 1930's.  In product descriptions which appeared in the Sweet's Catalog, defendant U.S. Gypsum represented its Audicote acoustical plaster as particularly suitable for use in large continuous areas and represented it as fit and merchantable, although defendant U.S. Gypsum knew that the product was not suitable for its intended use in buildings.

(b)   Asbestospray Corporation knowingly misrepresented its asbestos-containing products through misleading, false, fraudulent or otherwise inaccurate statements.  For example, in the Sweet's Catalog, defendant Asbestospray represented that its testing programs ensured that the products

conformed with latest building developments, thereby implying that the products had been rendered fit and safe for their intended and reasonably foreseeable purpose, when defendant knew that its asbestos-containing products were not fit or safe for their intended or reasonably foreseeable purposes. In addition, Asbestospray represented in the Sweet's Catalog that its products contain an additive that reduces dust production to the vanishing point, although defendant knew such was not the true nature of its asbestos-containing products, which naturally deteriorate over time. Furthermore, Asbestospray Corporation represented in the Sweet's Catalog that the use of its products results in a clean job which does not contaminate surrounding air, when in fact the statement was untrue. Defendant Asbestospray also represented in the Sweet's Catalog that its asbestos-containing products were "permanent" and would not cause "drop-out," when in fact defendant knew that its products deteriorate over time. Furthermore, Asbestospray knowingly misrepresented in the Sweet's Catalog that its products were "trouble-free" and suitable for use in return air plenums and for application to pipes and ducts and stated that its products were worthy of "a large place ... in the construction industry," although defendant knew its asbestos-containing products were not suitable for use in buildings.

(c) Upon information and belief, defendant W.R. Grace & Co., as late as 1987, responded through the U.S. mails to inquiries concerning the safety of its asbestos-containing products by knowingly misrepresenting its products as safe.

-39-

Moreover, defendant W.R. Grace & Co. represented in the Sweet's Catalog that its products will last as long as the building lasts, when in fact defendant knew that the statement was untrue. Grace admitted in the Sweet's Catalog that Mono-Kote contained asbestos, but represented that the asbestos was "locked in" during the mixing process, thus misleading purchasers as to the safety of its products, although W. R. Grace knew that the products were unsafe and unsuitable for use in buildings.

(d) Defendant Keene Corporation and its predecessors represented in the Sweet's Catalog that its sprayed-on materials were resistant to erosion and would not result in dusting or flaking, thereby implying that its products would not release hazardous or harmful asbestos fibers into the air, when defendant knew that the statement was untrue. Defendant Keene also represented in the Sweet's Catalog that its Pyrospray was suitable for fireproofing, insulation and acoustical treatment. Keene stated that Pyrospray would allow remodeling without damage or removal of the material. In fact, Keene knew that asbestos products were not suitable for fireproofing, insulation and acoustical treatment and that remodeling of treated areas, which would likely disturb the material, would create problems and generate great expense. Keene also recommended Hansonite with asbestos for wall treatment, although it knew asbestos products cause building contamination.

(e) Defendant U.S. Mineral Products Co. represented in the Sweet's Catalog that its sprayed-on fireproofing was

-40-

"permanent," when in fact defendant knew that the statement was untrue.  Further, defendant represented in the Sweet's Catalog that its sprayed-on acoustical products would not lose their "integrity," when in fact defendant knew that the products would lose their "integrity."

(f)   By placing product descriptions in the Sweet's Catalog, defendant Celotex and its predecessors represented their acoustical systems and products as suitable for use in buildings, although defendant knew that asbestos-containing building products were in fact not suitable for such use.

(g)   Defendant National Gypsum Company represented in the Sweet's Catalog that its asbestos-containing building products were suitable for use in buildings, although defendant National Gypsum knew in fact that these products were unsafe and unsuitable.  Furthermore, upon information and belief, defendant National Gypsum Company circulated memoranda which stated that defendant's officers wanted to delay the labeling of its products with warnings describing asbestos hazards associated with them, all in a plan to further its scheme of fraudulently concealing and misrepresenting the true nature of asbestos-containing products.

116.   In addition to knowingly misrepresenting their asbestos-containing building products in the Sweet's Catalog, all defendants utilized various other means to knowingly misrepresent these products, including product brochures and other advertisements which contained implied or express representations that the products were safe and suitable for use in buildings.

-41-

117.   The representations set forth in paragraphs 115 and 116 above, both those made in the Sweet's Catalog and others, were false, and defendants knew them to be false or acted in willful, reckless disregard of whether they were true or not. Defendants made the misrepresentations with the intent that purchasers of building materials and of buildings would rely upon them. The representations were material to and were foreseeably relied upon by plaintiffs, their agents, representatives, or predecessors in interest in the purchase of asbestos building products and of building containing asbestos.

118.   In furtherance of its scheme to defraud, each defendant used the U.S. mails and interstate wires on numerous occasions to, among other things take, confirm, and solicit orders generated by its misrepresentations for its asbestos building products and for other purposes.

119.   In addition to the representations set out above, information regarding other misrepresentations relating to the safety and suitability of asbestos building materials and information regarding additional uses of the U.S. mail and interstate wires in furtherance of defendants' scheme to de-fraud are within the knowledge and control of the defendants.

120.   As part of its scheme to induce purchasers of buildings and building materials to buy asbestos-containing products and buildings containing them, defendants failed to disclose and concealed knowledge they had about the dangers of asbestos building products and the likelihood that their use in buildings would contaminate the buildings and lead to property damage and diminution in the value of the building.

-42-

examples of which are set forth in paragraph 115 above and further examples of which are set forth below, affected many purchases of asbestos building products and many purchasers of buildings containing those products.

123.   The purpose of the scheme carried out through the Asbestos Alliance was to increase the profits of defendants.

124.   In furtherance of the scheme to defraud, the defendants, in carrying out the affairs of the Asbestos Alliance, used the U.S. mail and interstate wires to convey information, to make knowing misrepresentations, and to fraudulently induce purchasers of building products to buy asbestos-containing products and fraudulently induce building purchasers to buy buildings without regard to whether or not they contained asbestos building products.

125.   The activities of the Asbestos Alliance stretch back to the 1930s and continue to this day.  Some examples of activities that have been part of its scheme include the following:

a.   The Saranac Laboratory for Research, in Saranac Lake, New York, was used in the 1930s, 1940s and 1950s to conduct research on the health hazards of asbestos.  The research was funded by various asbestos firms, including defendant United States Gypsum Company, the Quebec Asbestos Mining Association, of which Phillip Carey Manufacturing Company, a predecessor of defendant Celotex Corporation, was a member, defendant National Gypsum Company, and Dewey and Almy, an as-

-44-

121.   Each defendant's scheme to misrepresent asbestos building products is part of a broad scheme stretching back over nearly 70 years in which defendants and their predecessor companies misrepresented and concealed the dangers of asbestos. The predicate acts of mail and wire fraud which were part of these schemes, including misrepresentations made and sales transacted through use of the U.S. mail and interstate wires, continued into the 1970s and 1980s.

## Violations by Defendants
## of 18 U.S.C. 1962(c)

122.   The defendants were associated with each other and with other John Doe Companies and individuals and asbestos industry organizations, functioning as an association in fact (hereinafter referred to as the "Asbestos Alliance"), which is an "enterprise" as that term is defined in 18 U.S.C. 1961(4).   The Asbestos Alliance, the activities of which affected interstate commerce, acted to further the interests of its members by conducting its affairs through a "pattern of racketeering," as that term is defined in 18 U.S.C. 1961(5) in that its members carried out or caused to be carried out a scheme to fraudulently misrepresent asbestos building products as safe and suitable for use in buildings and to knowingly conceal, suppress, refuse to make known, and minimize the safety hazards of asbestos.   The scheme, which was comprised of many instances of knowing misrepresentation and concealment,

-43-

bestos manufacturer purchased by defendant W.R. Grace in 1954. The asbestos research activities of the Saranac Laboratory were controlled by, and its findings showing the serious health hazards of asbestos were suppressed by, the asbestos industry sponsors. The contributors regarded the results of the Saranac asbestos studies to be their property and maintained the right to prior approval of any manuscripts to be published, and to control over the extent and manner in which the results of the research would be made public. Suppression of the findings of the Saranac studies continued into the 1970s. In addition, between 1953 and 1972, defendant National Gypsum remained in contact with a radiologist formerly associated with the Saranac Laboratory. The radiologist advised National Gypsum not to take a strong approach to dealing with employees with abnormal X-ray films, but rather merely to inform them that they had abnormal films.

b. The Industrial Hygiene Foundation (IHF), also known as the Air Hygiene Foundation and the Industrial Health Foundation, was formed in 1936. In 1957, it undertook a study for the Quebec Asbestos Mining Association (QAMA), of which the Phillip Carey Manufacturing Company, a predecessor of defendant Celotex Corporation, was a member. The results of that study were edited and reviewed by QAMA. The Industrial Hygiene Foundation also arranged informal meetings and conferences, held annual meetings, and conducted confidential surveys for members of the asbestos industry. A 1946 IHF summary of a conference on chemistry toxicology stated: "Under no

-45-

circumstances should chemicals be overlabeled, i.e. the degree of hazard should not be exaggerated." Upon information and belief, activities conducted through the IHF which misrepresented and suppressed the true health hazards of asbestos continued beyond October 15, 1970.

c. The Asbestos Textile Institute (ATI), whose members have included Astin-Hill Manufacturing Company, a predecessor of defendant Keene Corporation, held discussions in 1949 concerning an article in the magazine Scientific American which named asbestos as a carcinogen. Minutes of ATI meetings also show that ATI participants were concerned about 1956 publications which said that asbestosis and lung cancer could occur among asbestos plant neighbors; that ATI refused, in 1957, to fund an animal study on the carcinogenicity of asbestos because it would "stir up a hornet's nest and put the whole industry under suspicion;" that ATI had advance notice, in 1963, of a paper on cancer among asbestos insulation workers written by Dr. Irving Selikoff of Mount Sinai School of Medicine, New York; and, in 1971, that ATI participants discussed Dr. Selikoff as a "dangerous man" and referred to pressure on Mount Sinai Medical School. Activities conducted through ATI which misrepresented and suppressed the true health risks of asbestos continued beyond October 15, 1970.

d. The Magnesia Insulation Manufacturers Association (MIMA), founded in 1944, published the 85% Magnesia Insulation Manual in 1949 in which it represented that insulation material, some of which contained asbestos, could be "shipped,

-46-

sorted, and handled without any special precautions." In a revised, 1955, edition of the manual, the association represented that 85% magnesia insulation "is easily cut and fit. . . and offers no hazard to the workman." Members of MIMA listed on page one of the second edition of the manual included the Phillip Carey Manufacturing Co., predecessor of defendant Celotex, and Ehret Magnesia Manufacturing Co. and Mundet Cork, predecessors of defendant Keene Corporation. The association knew at the time the representations were made that asbestos-containing material was hazardous to health and required special precautions. Activities conducted through MIMA and its successors which knowingly misrepresented and suppressed the true health hazards of asbestos continued beyond October 15, 1970.

e.    Meetings were held and correspondence was exchanged between a number of asbestos manufacturers beginning in 1968 regarding the creation of a health and safety practices booklet which was to be produced through the Asbestos Cement Products Association. Participants in this effort included defendant National Gypsum. In 1968, National Gypsum recommended toning down the booklet by taking out what it referred to as "scare" wording, and changing statements that could be used against the asbestos industry.

f.    In the mid-1980s, the Safe Buildings Alliance (SBA) mailed over 45,000 copies of a booklet entitled What You Should Know About Asbestos in Buildings to various building owners.    The booklet contains various misrepresentations and false or otherwise inaccurate statements which minimize the

-47-

problems of asbestos building contamination. Defendants United States Gypsum, National Gypsum, W.R. Grace, and Celotex have all been members of SBA.

g.    Minutes of the Asbestos International Association show that in 1978 its labeling committee discussed delaying the use of warning labels in countries where they were not required because of the adverse effect such labeling would have on sales.

h.    The Asbestos Information Association of North America (AIA/NA), an organization to which defendant National Gypsum and Panacon Corporation, a predecessor of defendant Celotex Corporation, have belonged, has been in existence since 1968. Its purposes are to provide a channel of information, to publicly rebut the criticism of the asbestos industry, and to disseminate information on the uses of asbestos in ways that serve the interests of the asbestos industry. Defendants have used AIA/NA to suppress and minimize the public perception of the dangers of asbestos. For example, in its booklet "What You Should Know About Asbestos and Health" AIA/NA knowingly mis- represents asbestos products as safe by stating: "[C]urrently marketed asbestos products are not hazardous when properly handled or used." In addition, a speaker at a 1981 AIA/NA conference stated that the industry had reduced asbestos dust levels to a point where the dust is not causing any more disease, although members of the industry knew that not to be true.

-48-

126.   In addition to the specific actions alleged above, and to the parallel conduct of knowing misrepresentation and suppression of knowledge of the danger of asbestos committed through the above-alleged industry groups by corporations, including defendants, numerous other actions by and through industry groups and combinations of individuals and companies involved in the Asbestos Alliance and its scheme will come to light as discovery progresses.   These alleged and yet to be alleged inter-relationships and activities overlap in time and involve a variety of configurations of participants from the asbestos industry, all of which are part of the Asbestos Alliance.

127.   The above-described pattern of activity conducted by defendants through the Asbestos Alliance in misrepresenting and suppressing information about the harmful nature of asbestos was intended to and did further the scheme of the industry in general, and of defendants in particular, to allow continued profit-making from the fraudulent sale of asbestos products.

128.   The activities of the Asbestos Alliance have affected interstate commerce in that by knowingly concealing and misrepresenting the true hazards of asbestos, the Asbestos Alliance facilitated the nationwide sale of asbestos building products.   In addition, the activities of each asbestos industry group set forth in paragraph 125 above, including the group of manufacturers that controlled the Saranac Laboratory asbestos experiments, affected interstate commerce.

-49-

129.    Plaintiffs, their agents, and their predeces-
sors in interest reasonably relied upon the fraudulent misre-
presentations of defendants and the public perception of the
safety of asbestos products created by the activities of the
Asbestos Alliance. If the members of the Asbestos Alliance had
not fraudulently concealed the dangers of asbestos and asbestos
products, plaintiffs, their agents, and their predecessors in
interest in the buildings would not have purchased asbestos
building products for use in their buildings. In addition,
plaintiffs would not have purchased buildings containing
asbestos products.

130.    In addition to violating 18 U.S.C. 1962(c)
through conducting and participating in the affairs of the
Asbestos Alliance as described above, defendants violated 18
U.S.C. 1962(c) by participating in the affairs of each indivi-
dual trade association and industry group alleged above as part
of the Asbestos Alliance, because the Saranac sponsors, the
Industrial Hygiene Foundation, the Asbestos Textile Institute,
the Magnesia Insulation Manufacturers Association, the Safe
Buildings Alliance, the Asbestos International Association, and
the Asbestos Information Association  of North America, as well
as the predecessors and successors of these groups, all meet
the definition of "enterprise" as stated in 18 U.S.C. 1961 (4)
and because defendants participated in the affairs of each of
these groups through a "pattern of racketeering" as described
above in paragraph 125 of this Complaint. In addition, whether
defendants participated in or conducted the affairs of other
industry groups or trade associations in a manner which

-50-

violated 18 U.S.C. 1962(c) is peculiarly within the knowledge of defendants and will be alleged as it comes to light during discovery.

131. Defendants also have violated 18 U.S.C. 1962 (c) by participating in the affairs of the Sweet's Catalog and/or McGraw-Hill Information Systems Company, of which Sweet's Catalog is a division, through a pattern of "racketeering" that consisted of the commission of acts of mail and wire fraud in violation of 18 U.S.C. 1341 and 1343. An entity affecting interstate commerce, the Sweet's Catalog, meets the definition of an "enterprise" under 18 U.S.C. 1961(4). It was used by defendants as the innocent instrument of their scheme. Each of the defendants contributed to the text of the Catalog, paid its share of the cost of the production of the Catalog, and participated in the Catalog's system to facilitate the purchase of products described in it through use of the U.S. mail and interstate wires. Through their participation, the defendants used the Catalog in their scheme to earn profits by knowingly misrepresenting asbestos products as safe and suitable for use in buildings. Plaintiffs, their predecessors in interest in the buildings and their agents, who reasonably and foreseeably relied upon the knowing misrepresentation made by defendants about asbestos building products in the Sweet's Catalog, have suffered economic loss and property damage because their buildings became contaminated with asbestos by reason of such reliance. Examples of knowing misrepresentations made by defendants through the Sweet's Catalog are set forth in paragraphs 113 through 121.                     -51-

### Violations by Defendants

### of 18 U.S.C. 1962(d)

132.   The defendants' concealment, suppression, and refusal to make known or available information about the true safety hazards of asbestos and asbestos-containing products and their potential for contaminating buildings, as set forth more fully above, was achieved through an active conspiracy to violate 18 U.S.C. 1962(a) and (c), resulting in a violation of 18 U.S.C. 1962(d).   Defendants knowingly and willfully conspired and agreed to carry out the affairs of the association in fact alleged above in paragraphs 122 through 130 through a pattern of "racketeering activity" consisting of fraudulent use of the U.S. mail and interstate wires in furtherance of defendants' scheme to earn profits by misrepresenting asbestos building products as safe and suitable for use in buildings.   They also knowingly and willingly conspired to violate 18 U.S.C. 1962(a), as described above in paragraphs 111 through 121 and to violate 18 U.S.C. 1962(c) by participating in the affairs of the Sweet's Catalog through a pattern of activity as described in paragraph 131 above.   These conspiracies increased defendants' ability to inflict damages upon plaintiffs.

### COUNT SEVENTEEN

### Shared Liability

133.   Plaintiffs incorporate herein by reference paragraphs 1 through 132 of this First Amended Complaint.

134.   Asbestos-containing products are identically defective and pose identical risks in that all of the defendants' products must be abated pursuant to government rules and regulations and to ensure safety.   The asbestos-containing products referred to herein serve the same purposes, such as fireproofing, acoustical ceiling purposes, insulation, etc., and the products expose plaintiffs and others to documented and known identical hazards.

135.   The inability of plaintiffs to identify a particular defendant is not because of any act or omission on the part of the plaintiffs.

136.   Upon information and belief, these defendants are primarily responsible for designing, distributing, manufacturing, supplying or selling the asbestos-containing materials in plaintiffs' buildings; therefore a substantial share of the market represented by the manufacturers is before the Court.

137.   Without the imposition of industry-wide liability, it may be possible for defendants to escape liability and thus leave plaintiffs without a remedy when in fact defendants knew or should have known that their products did and would subject plaintiffs and others to documented and known hazards as well as diminish the value of plaintiffs' buildings; and cause plaintiffs to incur considerable inspection, abatement, and removal costs and property damage.

138.   Due to the above, in the event that in any particular building it is not possible to identify the responsible defendant, defendants are liable under the theory of market share liability.

-53-

## COUNT EIGHTEEN

### Theory of Alternative Liability

139.   Plaintiffs  incorporate  herein  by  reference paragraphs 1 through 138 of this First Amended Complaint.

140.   Defendants are liable in that these defendants were  responsible  for  designing,  manufacturing,  processing, marketing,  distributing  and  selling  the  asbestos-containing building materials at issue herein and thus all of the necessary parties are before the Court.  As a result, one or more of the defendants is responsible for the injuries complained of herein in each of plaintiffs' buildings.

141.   These defendants all had a role in the fraudulent coverup, concealment, and withholding of information regarding  the  true  nature  of  the  asbestos-containing  products. In addition, defendants possess and control, and have full knowledge of the facts necessary to establish the identity of, the particular defendants responsible for the designing, manufacturing, processing, marketing, distributing and selling of the asbestos-containing items in specific buildings of plaintiffs.

142.   All of the defendants have a duty not to place in the stream of commerce unsafe or unsuitable products.

143.   Due to the above, in the event that in any particular building it is not possible to identify the responsible defendant, defendants are liable under the theory of alternative liability.

-54-

## COUNT NINETEEN

### Concert of Action Liability

144.   Plaintiffs incorporate herein by reference paragraphs 1 through 143 of this First Amended Complaint.

145.   The defendants acted in concert, collaborated and gave substantial assistance to each other as set forth more fully above, in causing plaintiffs to incur damages.

146.   The defendants gave substantial encouragement or assistance to each other in that the defendants conspired and acted fraudulently to conceal, suppress, or otherwise make unavailable the true nature of asbestos-containing products.

147.   Due to the above, in the event that in any particular building it is not possible to identify the respon- sible defendant, defendants are liable under the concert of action theory of liability.

## COUNT TWENTY

### Enterprise Theory of Liability

148.   Plaintiffs incorporate herein by reference paragraphs 1 through 147 of this First Amended Complaint.

149.   The defendants had industry-wide control of the risk, as more fully set forth above.

150.   The defendants had industry-wide cooperation in that the defendants conspired and fraudulently concealed, sup- pressed, or otherwise made unavailable the true nature of as- bestos-containing products.   The defendants adhered to a in-

-55-

dustry-wide standard of placing asbestos fibers in their pro-
ducts and the defendants had a common understanding directed at
the fraudulent concealment or suppression of the true nature of
asbestos-containing products.

151.   Due to the above, in the event that in any
particular building it is not possible to identify the respon-
sible defendant, defendants are liable under the enterprise
theory of liability.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully pray that:

(a)   Defendants be adjudged in violation of the Com-
prehensive Environmental Response, Compensation, and Liability
Act and liable for all costs under it, defendants be directed
to comply with the Comprehensive Environmental Response, Com-
pensation and Liability Act by being ordered to abate all as-
bestos in plaintiffs' buildings and defendants be declared
liable for any response costs plaintiffs have or may incur
under the Comprehensive Environmental Response, Compensation
and Liability Act;

(b)   Plaintiffs be awarded judgment against defen-
dants for the actual damages sustained by reason of the conduct
of defendants;

(c)   Plaintiffs be awarded judgment against defen-
dants for punitive and exemplary damages in such amount as will
serve to deter similar conduct by defendants and others;

(d)    Plaintiffs be awarded treble damages under 18 U.S.C. §1964(c) and be awarded reasonable attorneys' fees and the costs of this suit pursuant to 18 U.S.C. §1964(c);

(e)    Plaintiff be awarded appropriate damages under the state fraud acts set out in Count Ten herein;

(f)    Plaintiffs be awarded declaratory relief to the effect that plaintiffs should be entitled to full and complete indemnification from all losses or damages, including attorneys' fees and litigation costs and expenses, relating to any injury, damage, or loss alleged to have been caused in whole or in part by exposure to or the presence of asbestos in the buildings owned by plaintiffs;

(g)    Plaintiffs be awarded declaratory relief to the effect that plaintiffs should be entitled to restitution of all expenses and losses incurred by plaintiffs as a result of defendants' sale of products containing asbestos;

(h)    Plaintiffs be awarded such other and further relief as this Court deems just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

RIKER, DANZIG, SCHERER & HYLAND
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey  07960
Attorneys for Plaintiffs

By:  _____
     Edward A. Zunz, Jr.
     A Member of the Firm

Dated:  April 13, 1988

-57-

APPENDIX TO FIRST AMENDED COMPLAINT IN
THE PRUDENTIAL INSURANCE COMPANY OF AMERICA
v. UNITED STATES GYPSUM COMPANY, ET AL.

| Property Name | Address |
|---|---|
| Sturbridge Apts. | 1400 Old Forge Drive<br>Little Rock, AR |
| Merabank and Trader Buildings | 3003 North Central Avenue<br>Phoenix, AZ |
| First Service Title Building and East Mall | 3033 North Central Avenue<br>Phoenix, AZ |
| Valley Bank Center | 201 North Central Avenue<br>Phoenix, AZ |
| Beverly Hilton | 9876 Wilshire Blvd.<br>Beverly Hills, CA |
| MHIA Rodeway Inn | 101 South State College Blvd.<br>Orange, CA  90740 |
| Carson Industrial Park | Carson, CA  90740 |
| Bunker Hill Towers | 222 & 234 S. Figueroa<br>Los Angeles, CA  90012 |
| Bunker Hill Towers Condominiums | 800 West 1st Street<br>Los Angeles, CA  90012 |
| Todd Towers | 888 and 898 North Sepulveda<br>El Segundo, CA  90245 |
| Vista Del Lago Apts. | Adams Ave. & Mesa Verde Dr.<br>Costa Mesa, CA |
| Embarcadero Center One | One Embarcadero Center<br>San Francisco, CA |
| Embarcadero Center Two | Two Embarcadero Center<br>San Francisco, CA |
| Lockheed Building | 645 Almanor Avenue<br>Sunnyvale, CA  94086 |
| Prudential Plaza | 1050 17th Street<br>Denver, CO |
| Airport Rodeway Inn | 4590 Quebec Street<br>Denver, CO |

| Property Name | Address |
|---|---|
| Oaks Mall | 6419 Newberry Road<br>Gainesville, FL  32605 |
| Orlando Central Park No. 6 | 6900 So. Orange Blossom Trail<br>Orlando, FL  32809 |
| First Florida Tower | 111 Madison Street<br>Tampa, FL  33602 |
| Colony Square Hotel | 14th at Peachtree<br>Atlanta, GA  30361 |
| Century Center Complex | 2200 & 2600 Century Parkway<br>Atlanta, GA  30345 |
| Twin Towers | 235 Peachtree Street, NE<br>Atlanta, GA  30303 |
| Colony Square | 100 Colony Square, NE<br>Atlanta, GA  30361 |
| Turtle Bay Hilton and Country Club | Rural Oahu<br>Kahuku, Hawaii  96731 |
| Prudential Center | One Prudential Plaza<br>Chicago, IL 60601 |
| Hunt Valley Marriott | I-83 at Shawn Road<br>Hunt Valley, MD |
| Comerica Building | 151 South Rose Street<br>Kalamazoo, MI 49007 |
| Northland Pointe | Eight Mile & Greenfield Roads<br>Southfield, MI |
| 241 Building | Abbot Road<br>East Lansing, MI |
| Southdale Office Complex | 5600 France Ave.<br>Edina, MN |
| Palisades | 535-70 Sandhurst Avenue<br>Roseville, MN |
| Northwestern Financial Center | 7900 Xerxes Avenue, South<br>Bloomington, MN 55431 |
| Salem Green Apts. | 1475 Salem Church<br>Inver Grove Heights, MN |

| Property Name | Address |
| --- | --- |
| Westroads Shopping Ctr. | 102 Dodge Street<br>Omaha, NE |
| Prudential Plaza Bldg. | 745 Broad Street<br>Newark, NJ   07101 |
| Short Hills Office Building | 51 John F. Kennedy Parkway<br>Short Hills, NJ 07078 |
| Emigrant Savings Bank | 6 East 43rd Street<br>New York, NY |
| 130 John Street | 130 John Street<br>New York, NY |
| Midland Center | 134 Robert S. Kerr Avenue<br>Oklahoma City, OK   73102 |
| Park Centre | 525 South Main<br>Tulsa, OK   74103 |
| 200 Market Street Building | 200 Market Street<br>Portland, OR |
| Five Penn Center | 16th & Market Streets<br>Philadelphia, PA |
| Chatham Center | 5th Avenue, Crosstown Expressway<br>Pittsburgh, PA |
| Hyatt Pittsburgh | 112 Washington Street<br>Pittsburgh, PA   15219 |
| Hyatt Regency | 623 Union Street<br>Nashville, TN   37219 |
| Ramada Inn | 200 23rd Street<br>Chattanooga, TN |
| Renaissance Tower | 1201 Elm Street<br>Dallas, TX   75270 |
| Executive Plaza | 4615-35 Southwest Freeway<br>Houston, TX   77027 |
| Brookhollow I | 2800 North Loop West<br>Houston, TX   77092 |
| 1100 Milam | 1100 Milam<br>Houston, TX   77002 |

| Property Name | Address |
|---|---|
| Houston Natural Gas Building | 1200 Travis Street<br>Houston, TX  77002 |
| Park Towers | 1233 and 1333 West Loop South<br>Houston, TX  77027 |
| 3120 Southwest Freeway Building | 3120 Southwest Freeway<br>Houston, TX  77098 |
| Rodeway Inn | 833 North Watson Road<br>Arlington, TX  76011 |
| Colony Parke Hotel | 6060 North Central Expressway<br>Dallas, TX |
| Midland Hilton | Wall and Loraine Streets<br>Midland, TX |
| Fondren Place<br>(Stone Forest) Apts. | 9801 Fondren Road<br>Houston, TX  77096 |
| Summerfield Apts. | 4901 Fourth Street<br>Lubbock, TX  79416 |
| Houston Marriott Galleria | 1750 West Loop South<br>Houston, TX |
| Hyatt Regency Hotel | 1200 Louisiana<br>Houston, TX  77002 |
| Brookwood Apartments | 1003 Afton Street<br>Houston, TX |

James R. Gillen
THE PRUDENTIAL INSURANCE
    COMPANY OF AMERICA
745 Broad Street
Newark, New Jersey  07101
(201) 877-7001

John S. Kingdon
Robert M. Bruskin
Lewis M. Barr
HOWREY & SIMON
1730 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 783-0800

ORIGINAL FILED

OCT 2 0 1987

WILLIAM T WALSH, CLERK

IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA; PIC REALTY CORPORATION; and 745 PROPERTY INVESTMENTS, <br><br> 745 Broad Street <br> Newark, New Jersey 07101, <br><br>          Plaintiffs, <br><br>     v. <br><br> UNITED STATES GYPSUM COMPANY; W.R. GRACE & COMPANY; THE CELOTEX CORPORATION; UNITED STATES MINERAL PRODUCTS COMPANY; KEENE CORPORATION; PFIZER, INC.; ASBESTOSPRAY CORPORATION; and "JOHN DOE COMPANIES," fictitious names for presently unidentified entities, <br><br>          Defendants. | Civil Action No. 87-4227 (H?<br><br><br><br><br><br> The Hon. Harold A. Ackerman <br><br><br><br> Action Seeking Compensatory and Punitive Damages and Declaratory and Equitable Relief |

COMPLAINT AND DEMAND FOR JURY TRIAL

ORIGINAL FILED

OCT 21 1987

WILLIAM T WALSH, CLERK

SHANLEY & FISHER, P.C.
131 Madison Avenue
Morristown, New Jersey  07960
(201) 285-1000
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

------------------------------------

THE PRUDENTIAL INSURANCE      : Civil Action No.
COMPANY and PIC REALTY        :
CORPORATION,                  :
                              :
        Plaintiffs,           : COMPLAINT AND JURY DEMAND
                              :
vs.                           :
                              :
NATIONAL GYPSUM COMPANY,      :
                              :
        Defendant.            :
                              :
------------------------------------

Plaintiffs, by their attorneys, Shanley & Fisher, P.C.,
by way of Complaint against the defendant, says:

JURISDICTION AND PARTIES

1.   This complaint is filed and this civil action is
instituted pursuant to the jurisdiction of this Court as con-
ferred by 28 U.S.C. §1331, the Comprehensive Environmental Re-
sponse, Compensation, and Liability Act, 42 U.S.C. §9601, et
seq., and by principles of pendent jurisdiction.  The matter in
controversy raises questions under federal statute, and exceeds
$10,000 in value, exclusive of interest and costs.