**FILED**

NOT FOR PUBLICATION

'JUN 0 9 1994

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

AT 8:30 .............. M
WILLIAM T. WALSH
CLERK

THE PRUDENTIAL INSURANCE )
COMPANY OF AMERICA, et. al., )
               Plaintiffs,)
)
v. )
)
U.S. GYPSUM, et. al., )
               Defendants.)

Civ. Action No. 87-4238
(HAA)

O P I N I O N

Ackerman, D.J.

      The defendants in this action -- W. R. Grace & Co.-Conn. ("Grace"), United States Gypsum Company ("U.S. Gypsum"), National Gypsum Company ("National Gypsum"), United States Mineral Products, Inc. ("U.S. Mineral"), Asbestospray Corporation ("Asbestospray") and Keene Corporation ("Keene")[1] -- supplied products containing asbestos to buildings which plaintiffs -- The Prudential Insurance Company of America and two of its subsidiaries (hereinafter "Prudential") -- subsequently acquired.

      Prudential claims the following:

      The use of the buildings identified in the Appendix to this First Amended Complaint has been and will be materially impaired due to the presence of the asbestos-containing materials of defendants in the buildings, both through a diminution of market value and physical property damage to the buildings. Because of the contamination caused by the asbestos-containing materials

---

    [1] I am informed by Keene's counsel that Keene is in bankruptcy. However, the court has not been officially informed of this fact and no proceedings have been initiated to remove Keene from this litigation. Therefore, as far as the court is concerned, at this point in time, Keene is an active defendant in this matter.

in plaintiffs' buildings, plaintiffs have paid and will continue to pay substantial costs and fees relating to abatement and buildings monitoring actions, buildings survey and testing costs, tenant relocation costs, operations and maintenance program costs for asbestos-containing materials before their removal from buildings, substantial disruption to their business, substantial property damage to their property . . . and other costs associated with the contamination or potential contamination of the buildings. Plaintiffs have also suffered and will suffer, among other damages, the loss of rental income from the buildings during abatement procedures or due to premature tenant departures, and the diminution in the commercial value of the properties.

Prudential's Amended Complaint, ¶30.

This case has a lengthy and convoluted procedural history, which is not worth detailing at this juncture. Suffice it to say that after the first found of discovery, the parties made a plethora of motions.   In July, 1993, this court denied Defendants' Motion to Dismiss Plaintiff's RICO Claim on Substantive Grounds, and also denied Plaintiff's Motion to Strike the Defendants' Statute of Limitations Defenses on Equitable Grounds.  The court then granted defendants' motion to certify the RICO ruling for interlocutory appeal pursuant to 28 U.S.C. §1292, and stayed this action pending the Third Circuit's determination.  On October 13, 1993, the Third Circuit declined to hear the interlocutory appeal.

This Opinion addresses the remaining motions in the case. They are:

(1) U.S. Gypsum and Asbestospray's motion for summary judgment dismissing plaintiff's RICO claim as barred by the statute of limitations;

(2) Defendants' motion for summary judgment dismissing plaintiffs' common law tort and fraud claims as barred by the applicable statute of limitations;

(3) Defendants' motion for summary judgment dismissing plaintiffs' complaint as barred by the applicable statutes of repose;

(4) Defendants' motion for summary judgment dismissing plaintiffs' breach of warranty claim as barred by the applicable statutes of limitation;

(5) Defendants' motion for summary judgment dismissing plaintiff's claims under the applicable Unfair Trade Practices Acts.

This opinion first sets out the standard for summary judgment, then addresses each motion in turn.

I.  Standard for Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment may be granted only if the pleadings, supporting papers, affidavits, and admissions on file, when viewed with all inferences in favor of the nonmoving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. See also Todaro v. Bowman, 872 F.2d 43, 46 (3d Cir. 1989); Chippolini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir.), cert. dism'd, 483 U.S. 1052 (1987). Put differently, "summary judgment may be granted if the movant shows that there exists no genuine issues of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Indiana Hospital, 843 F.2d 139, 143 (3d Cir.), cert. denied, 488 U.S. 870 (1988). An issue is "genuine" if a reasonable jury could

3

possibly hold in the nonmovant's favor with regard to that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A fact is material if it influences the outcome under the governing law. Id. at 248.

Within the framework set out above, the moving party essentially bears two burdens: First, there is the burden of production, of making a prima facie showing that it is entitled to summary judgment. This may be done either by demonstrating there is no genuine issue of fact and that as a matter of law, the moving party must prevail or by demonstrating the nonmoving party has not shown facts relating to an essential element of the issue for which it bears the burden. Once either showing is made, this burden shifts to the nonmoving party who must demonstrate facts supporting each element for which it bears the burden as well as establish the existence of genuine issues of material fact. Second, there is the burden of persuasion. This burden is a stringent one which always remains with the moving party. If there remains any doubt as to whether a trial is necessary, summary judgment should not be granted. See Celotex Corp. v. Catrett, 477 U.S. 317, 330-33 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-61 (1970); Advisory Committee's Notes on Fed. Rule of Civ. Pro. 56(e), 1963 Amendment; see generally C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2727 (2d ed. 1983).

## II. RICO Claim

4

Defendants U.S. Gypsum and Asbestospray move for summary judgment dismissing Prudential's RICO claim as barred by the statute of limitations.

In the case of <u>Agency Holding Corp. v. Malley-Duff & Assoc.</u>, 483 U.S. 143, 156 (1987), the Supreme Court held that civil RICO actions must be brought within four years of the date of accrual. The Third Circuit, in turn, has defined the date of accrual as follows:

> [T]he limitations period for a civil RICO claim runs from the date the plaintiff knew or should have known that the elements of the civil RICO cause of action existed . . . . <u>Keystone Insurance Co. v. Houghton</u>, 863 F.2d 1125, 1130 (3d Cir. 1988).

However, if "as a part of the same pattern of racketeering activity, there is further injury to the plaintiff or further predicate acts occur . . . the accrual period shall run from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering activity." <u>Id</u> at 1126.

Prudential argues first that it did not know of (and should not have known of) facts which would constitute the basis of a RICO cause of action until the mid-1980s at the earliest. Secondly, Prudential argues that at any rate, the statute of limitations began to run over and over again because the defendants continued -- and continue -- to commit predicate acts. I will address these in turn.

In <u>Glessner v. Kenney</u>, 952 F.2d 702 (3d Cir. 1993), the Court upheld a district court finding that the plaintiffs were

aware of the elements of their RICO claim more than four years prior to their filing of their complaint.  In that case, the defendants had advertised their products as "state of the art residential heating systems that were highly efficient and would result in considerable savings in home oil heating costs." Id. at 705.  The plaintiff purchased his unit in 1977, "knew in the early 1970's of both the carbon monoxide emissions and the need for 'extraordinary amounts of servicing' because he worked for the defendant . . . and further knew his own unit began pulsating within three years of its 1977 installation." Id. at 707.  Thus, plaintiff knew of his injuries well before the suit was filed in 1988.

U.S. Gypsum argues that by 1983, Prudential knew of the building contamination and further, the promotional literature put out by defendants had been published prior to Prudential's purchase of the buildings.  Thus, the argument goes, Prudential relied on the alleged misrepresentations and then realized that they were false.  This, the defendants argue, is analogous to Glessner, in which plaintiffs' knowledge of problems inconsistent with the manufacturers' representations constituted knowledge of the basis for the RICO claims.  As U.S. Gypsum put it in its reply brief: "Presumably . . . Prudential bases its claim of ignorance on the legal supposition that it did not know of its RICO claims until some creative person within Prudential developed the specific idea of pleading a RICO theory." Reply Brief in Support of Defendant United States Gypsum Company's Motion for Summary Judgment o

**Plaintiffs' RICO Claims Based on Statute of Limitations Grounds** at 3.

The argument is not without merit. But <u>Glessner</u> never really what it means to be aware of the elements of a RICO claim. It appears, though, that the plaintiffs did not appeal the district judge's finding that they knew of the elements prior to 1984. Rather, the issue on appeal was whether plaintiffs suffered <u>further</u> injury after 1984 that restarted the statute of limitations.

In this case, it is clear that knowledge of the elements of a RICO claim means knowledge that the defendants engaged in predicate acts of mail or wire fraud constituting a pattern of racketeering activity. The facts put forward by U.S. Gypsum and Asbestospray in support of their respective motions simply do not establish such knowledge on Prudential's part. Rather, the defendants' facts go to Prudential's knowledge of this injury. The two types of knowledge are different.

At any rate, there also is a disputed issue of fact as to whether, even if Prudential knew of the elements of its cause of action, the statute of limitations began running anew after that time.

Defendants rely on another part of <u>Glessner</u> to support their argument that it did not. In <u>Glessner</u>, the plaintiffs argued that "although they realized that their . . . units needed extensive servicing prior to June, 1984, their RICO actions are timely because they replaced their units after June, 1984, within the limitations period." <u>Glessner</u>, 952 F.2d at 707. Holding that

"further injury under Keystone means a new and distinct injury from the initial injury", id. at 708, the Court upheld the dismissal.

Defendants' reliance on Glessner is somewhat misplaced. Although Prudential does argue that it sustained new injury, its primary argument is that the defendants committed further predicate acts. As noted above, the commission of further predicate acts can restart the statute of limitations. But any predicate acts which may restart of the statute of limitations must be of the same character as the pattern of conduct that constitutes the basis for the RICO claim. Thus, in Davis v. Grusemeyer, 996 F.2d 617 (3d Cir. 1993), the Court held that "[a]n attempt to cover up a completed scheme of criminal activity . . . does not constitute a predicate act in furtherance of a RICO conspiracy that might itself postpone accrual of [the RICO claim]." Id. at 626. This case is not like Davis, however. Here, defendants' alleged acts of concealment are precisely the conduct that Prudential claims constitutes unlawful RICO activity. In other words, the alleged continuing acts of concealment and misrepresentation -- committed over decades and decades -- are in fact the predicate acts that Prudential claims lulled them into a false sense of security about the dangers of asbestos.

U.S. Gypsum nonetheless claims that the further predicate acts involve simple lobbying, which is protected by the first amendment. However, as this court noted in its July, 1993 Opinion, plaintiff alleges more than lobbying activities directed at the public generally. As I noted then, plaintiff alleges that:

8

In 1983, the EPA mentioned in a guidance document called the Blue Book that commercial buildings should consider operations and maintenance programs to monitor in-place asbestos. In response to the Blue Book, in 1984, defendants Grace, U.S. Gypsum, National Gypsum, and Keene joined with AIA/NA's special counsel and formed the Safe Buildings Alliance ("SBA"), which focused on problems associated with asbestos in buildings. In 1984 the SBA published and distributed a booklet called "What You Should Know About Asbestos in Buildings." The booklet stated that "experts believe that removing asbestos-containing materials in buildings often does more harm than good" and that proper removal does not pose a potential health hazard. <u>In 1986, the booklet was revised and targeted towards building owners and managers.</u>

Looking at the facts in the light most favorable to plaintiff, this representation can be seen as more akin to promotional marketing literature than to lobbying activity. As such, I cannot say as a matter of law that the AIA/NAS actions cannot constitute a predicate RICO act.

Finally, Asbestospray contends that since it stopped marketing asbestos in the early 1970s and since it dissolved as a corporation in 1982, it cannot be held liable under RICO. However, ordinary conspiracy law governs section 1962(d), and, as long as Asbestospray did not withdraw from the conspiracy, it may be liable when its co-conspirators continue with predicate acts. The record does not evince any clear evidence of Asbestospray's withdrawal, such as notifying other asbestos companies of its refusal to be part of any scheme.

Therefore, I will deny the motion to dismiss the RICO claim on the basis of the statute of limitations.

## III. Statute of Limitations

First, I will address defendants' motion for summary judgment dismissing Prudential's claim as barred by the statute of limitations. The threshold inquiry is into what state's law should govern.

A. Choice of Law

The defendants contend that the applicable statute of limitations is the statute of the state in which each affected building is located. Thus, for example, Prudential's claim regarding a building in Wisconsin is governed by Wisconsin law. And so on. In defendants' view, these statutes mandate that all of Prudential's claims be dismissed. Prudential responds by arguing that New Jersey's fairly lengthy statute of limitations applies to all of its state law claims.

A federal court sitting in diversity must apply the conflicts of law rules of the forum state, see Klaxon Co. v. Stentor Electric Mfg Co., 313 U.S. 487 (1941); Henry v. Richardson-Merrell Inc., 508 F.2d 28, 31 (3d Cir. 1975). Thus, New Jersey conflicts of law principles govern the choice of law in the instant case.

First, it must be said that there are definite conflicts between the laws of the various states. The states where the buildings are located provide limitations periods varying from two to six years. Moreover, the states' discovery rules vary. Thus, a conflicts analysis is necessary.

The general common-law rule distinguished betwee

10

conflicts of law regarding substantive legal questions and conflicts of law regarding the applicable statute of limitations. The general rule was that the statute of limitations was a procedural rule. Thus, irrespective of the substantive law that governed the claim, the forum state's statute of limitations applied.

However, in 1973, when given the opportunity to revisit the statute of limitations issue, the New Jersey Supreme Court expressed dissatisfaction with the general rule. Deciding that the time was ripe to depart from the rule, the Court held that:

> [w]hen the cause of action arises in another state, the parties are all present in and amenable to the jurisdiction of that state, New Jersey has no substantial interest in the matter, the substantive law of the foreign state is to be applied, and its limitation period has expired at the time suit is commenced here, New Jersey will hold the suit barred. In essence, we will "borrow" the limitations law of the foreign state.

However, the Court made it clear that it was articulating only a very narrow exception from the general rule. In its own words:

> We presently restrict our conclusion to the factual pattern identical with or akin to that in the case before us, for there may well be situations involving significant interests of this state where it would be inequitable or unjust to apply the concept we here espouse.

Heavner v. Uniroyal, Inc., 63 N.J. 130, 141 (1973). Subsequent cases have emphasized that the Heavner rule is a narrow exception to the general rule. As the New Jersey Supreme Court stated several years later, "[t]he Heavner rule provides a limited and special exception to the general rule that the rule of the forum determines the applicable period of limitations." O'Keefe v.

Snyder, 83 N.J. 478, 490 (1980).

More specifically, when New Jersey retains a substantial interest in the matter, the Heavner exception is inapplicable and New Jersey courts afford plaintiffs the benefit of New Jersey's statute of limitations. As the Third Circuit noted in a case decided soon after Heavner, "[i]mplicit in Heavner is a finding that New Jersey was a disinterested forum"; thus, in a tort suit, where the primary purpose of a recovery is to "compensate plaintiffs for their injury", New Jersey's interest is substantial. Henry, 508 F.2d at 33. Similarly, in Allen v. Volkswagen of America, Inc., 555 F.2d 361 (3d Cir. 1977), the Court again looked primarily to whether New Jersey had a substantial interest in the case.[2]

Thus, the question is whether, since Prudential is domiciled in New Jersey, this state retains a substantial interest in the matter such that its limitations period should apply.

In Draper v. Airco, Inc. 580 F.2d 91 (3d Cir. 1978), the Third Circuit held that when the plaintiff is domiciled in New Jersey, the Heavner exception simply does not apply. Rather, New Jersey's interest in compensating its domiciliary was sufficiently

---

[2]Both parties contend that after Heavner, New Jersey applies the governmental interest approach to statute of limitations questions. It is true that New Jersey generally applies the governmental interest analysis to choice of law issues. See, e.g., Van Slyke v. Worthington, 265 N.J. Super 603 (Law Div. 1992)(citing cases). However, the New Jersey and Third Circuit cases indicate that when the plaintiff is domiciled in New Jersey, the state does not engage in the balancing required by the governmental-interest approach to decide upon the applicable statute of limitation. See, e.g. In re Reach, McClinton & Co., Inc., 102 B.R. 392, 397-98 (D.N.J. 1989)(Lifland, D.J.).

substantial to outweigh all other factors warranting application of a foreign state's limitations law.  As the Court put it in <u>Warner v. Auberge Gray Rocks, Inn., Ltee.</u>, 827 F.2d 938, 941 (3d Cir. 1987), "it is clear that when a plaintiff suing on an out-of-state cause of action is domiciled in New Jersey, the courts of New Jersey are not disposed to find that, within the meaning of the <u>Heavner</u> formulation, 'New Jersey has no substantial interest in the matter.'"   In fact, in a 1986 case, the Court of Appeals found reversible error where the district court applied a foreign state's statute of limitations to an action in which the plaintiffs were domiciled in New Jersey.  <u>Dent v. Cunningham</u>, 786 F.2d 173, 177 (3d Cir. 1986).  See also <u>Pine v. Eli Lilly & Co.</u>, 201 N.J. Super. 186 (A.D. 1985) ("New Jersey has a clearly recognized governmental interest in the compensation of its domiciliaries. . . <u>which is alone</u>" sufficient to outweigh all other factors, including an interest in deterring forum-shopping) (emphasis added); <u>In re Reach</u>, 102 B.R. at 399 (same).

The defendants argue that New Jersey's interest in compensating its domiciliaries is significantly diminished by the fact that virtually all the cases endorsing the domicile rule are personal injury cases, and that New Jersey's interest in compensating domiciled plaintiffs is significantly diminished when the plaintiff is a large corporation.  The language of the cases does not, however, support this interpretation.  In fact, in <u>In re Reach</u>, the court concluded that "a corporate plaintiff which is incorporated in New Jersey is entitled to rely on New Jersey's

13

applicable statute of limitations when filing a suit in New Jersey, notwithstanding the fact that the corporate plaintiff's other ties in New Jersey may be slim." Id. at 399.

Defendants next argue that New Jersey's statute of limitations should not apply because one of the three named plaintiffs, a subsidiary of Prudential, was incorporated in another state. There is no dispute that Prudential, the corporate parent and primary plaintiff in this case, is incorporated in New Jersey and has its principal place of business in Newark, New Jersey. PIC Realty Corporation ("PIC"), another named plaintiff, however, is incorporated under the laws of Delaware. PIC maintains its principal place of business in Newark, New Jersey.[3]

New Jersey law provides that a corporation is a "domiciliary" of its state of incorporation. See State v. Garford Trucking, 4 N.J. 346, 351 (1950); In re Reach, 102 B.R. at 399. Nevertheless, New Jersey's statute of limitations rule is premised on New Jersey's compensation interest. Thus, the question is whether New Jersey has an interest in compensating a corporation incorporated in a foreign state with its principal place of business in New Jersey. New Jersey clearly has such an interest. The case of Eastern Seaboard Pile Driving Corp. v. New Jersey Property-Liability Ins. Guaranty Ass'n., 175 N.J. Super. 589 (App. Div. 1980) is indicative. There, the Court held that the plaintiff, which was incorporated in Delaware and had its principal

_____

[3]745 Investment Properties, another named plaintiff, is no longer a party to this action. Therefore, its location has no bearing on this case.

14

place of business in New Jersey, was a "resident" of New Jersey under the New Jersey Property Liability Insurance Guaranty Act. Therefore, plaintiff was entitled to the benefits of the statute. The Court held that determining whether a corporation is a resident "depends upon the aim and context of the statute" in question. Id. at 592.

In keeping with this, New Jersey's strong policy in favor of compensating its domiciliaries seems logically to extend to corporations with their principal place of business in this state. Even if this were not so, however, the minor stake of PIC in this litigation, in comparison to Prudential, its corporate parent, merits the application of New Jersey's statute of limitations in this case.

Defendants also claim that the application of the domiciliary rule would be just as mechanical as the forum state rule, which New Jersey allegedly abandoned. The old rule was abandoned because New Jersey found itself in the troubling position of adjudicating cases in which it had little or no interest. But as Heavner and its progeny demonstrates, New Jersey has consistently treated the question of statute of limitations differently than other questions of substantive law. In other words, in this narrow area, there is essentially a presumption that the forum state's statute of limitations applies, which is based on New Jersey's substantial interest in compensating its domiciliaries. Defendants' policy arguments are well taken but ultimately made to the wrong forum -- the role of this court is to

predict how the New Jersey Supreme Court would rule.

At any rate, this is not a case where the plaintiff's only connection to New Jersey is the fact that it is domiciled in New Jersey. Two of the buildings involved in this litigation are located in New Jersey, and the defendants have some contacts with New Jersey. Moreover, many of the corporate financial decisions for which Prudential seeks compensation took place in New Jersey.

Finally, defendants point to areas of law in which New Jersey applied the law of a different state, even when the plaintiff was domiciled in New Jersey. Again, though, New Jersey treats statute of limitations differently than other substantive choice of law questions.

Thus, I conclude that because plaintiff Prudential is a New Jersey domiciliary whose primary place of business is in New Jersey, the New Jersey Supreme Court would be persuaded by its interest in compensating its domiciliary to apply its own statute of limitations in this case.

## B.  Statute of Limitations

New Jersey employs the discovery rule to toll statutes of limitation.  Thus, the statute of limitations begins to run only when the plaintiff knows facts or has reason to know facts that would form the basis of a cause of action. See  Viviano v. CBS, Inc., 101 N.J. 538, 546 (1986) ("Under [discovery] rule, a cause of action does not accrue 'until the injured party discovers, or by an

16

exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim.") (citing Lopez v. Swyer, 62 N.J. 267, 272 (1973)).

New Jersey's statute of limitations in this area is six (6) years. Prudential filed its complaint on October 20, 1987. Thus, the critical date is October 20, 1981. If Prudential knew of or should have discovered the basis of its claim before that date, the claim is barred and must be dismissed.

Here, the parties hotly dispute what facts a plaintiff must know in order to start the statue of limitations clock.

In the recent case of Savage v. Old Bridge-Sayreville Medical Group, P.A., 134 N.J. 241, 247 (1993), the New Jersey Supreme Court made clear that two distinct kinds of knowledge must be attributable to plaintiff before the statute or limitations may begin to run. First, the plaintiff must have knowledge of the injury; and second, plaintiff must have knowledge of fault. Thus, "when a party is either unaware that he has sustained an injury or, although aware that an injury has occurred, he does not know that it is, or may be, attributable to the fault of another, the cause of action does not accrue until the discovery of the injury or facts suggesting the fault of another person." Id. (quoting Tevis v. Tevis, 79 N.J. 422, 432 (1979)). Specifically, knowledge of fault requires "the awareness of facts that would alert a reasonable person exercising ordinary diligence that a third party's conduct may have caused or contributed to the cause of injury and that conduct itself might possibly have been

17

unreasonable or lacking in due care." Id. Furthermore the court stated that knowledge of injury plus knowledge of cause does not "logically or necessarily" equal knowledge of fault. Id.

Applied to this case, in order for the statute of limitations to begin running, Prudential would have to be aware not only of the presence of asbestos in its buildings, but further that it has suffered damage by the asbestos and that the presence of this hazardous material in Prudential's buildings was possibly caused in part by the unreasonable actions of another.[4]

Defendants argue that Prudential's suspicions prior to 1981 constitute actual knowledge that begins the running of the statute of limitations. See Reply Brief of Defendant, W.R. Grace Co. -- Conn., In Support of its Motion for Summary Judgment to Dismiss Plaintiffs' Amended Complaint As Barred By the Statute of Limitations in New Jersey at 8. Defendants further argue that Prudential confuses knowledge of injury with knowledge of the extent of the injury, and that in fact, Prudential did have actual knowledge of its injuries, even if those injuries were slight at the time of its initial knowledge.

It is true that some courts have held that suspicions trigger the statute of limitations. For instance, in Board of Education of the School District of the City of Detroit v. Celotex Corporation, No. 84-429634 (Circuit Court, Wayne County Michigan)

---

[4]Prudential argues in addition that before the statute of limitation begins to run, it would need confirmation by an expert that the buildings were in fact contaminated and it would need actual knowledge of the identity of the defendants. Because of the disposition of the motions, I need not reach those issues.

(March 1, 1988), <u>aff'd on this ground</u>, 493 N.W.2d 513, 519-20 (Mich. App. 1992) (applying Michigan law), the court found that plaintiff's claim accrued when it obtained a general knowledge of the hazards of friable asbestos as well as knowledge that its buildings contained asbestos.  Similarly, in <u>Roseville Plaza Ltd. Partnership v. U.S. Gypsum Co.</u>, 811 F. Supp. 1200 (E.D. Mich. 1992), the Court rejected defendants' argument that the plaintiff's cause of action accrued only when it discovered that its buildings were actually contaminated.   Instead, the court held that the statute of limitations had accrued when plaintiffs were informed by the Michigan Department of Public Health of the presence of asbestos, and of the fact that asbestos presents a potential for danger. <u>Id.</u> at 1207-09.

In <u>Roseville Plaza</u>, however, the court was motivated in significant part by the fact that "plaintiff waited four years after receiving the MDOPH investigation to order a professional survey of the asbestos-containing materials in Roseville Plaza." <u>Id.</u> at 1209.   Thus, as the court put it, plaintiffs' cause of action had accrued because "plaintiffs <u>should have</u> discovered its claims through the exercise of reasonable diligence before May 31, 1988" (emphasis added). <u>Celotex</u> is also better characterized as a "should have known" case, since that is the nature of the two-component test of knowledge of a generalized potential for danger and knowledge that the plaintiff's buildings contained asbestos. To be sure, in most cases, "known" and "should have known" are combined in the analysis.   But because of the character of

defendants' motion, that is not the case here.[5]

At any rate, in light of the requirements of Savage, I believe that New Jersey courts would find that Prudential had actual knowledge of its injury only when it came into knowledge that the asbestos in its buildings posed a hazard that needed addressing.   The Eighth Circuit recently adopted this approach while interpreting North Dakota law.  MDU Resources Group v. W.R. Grace & Co., 14 F.3d 1274 (8th Cir. 1994).  In that case, the Court reasoned that "the injury for which asbestos plaintiffs are being recompensed is the contamination of their buildings and not the mere presence of asbestos."  Id. at 1279.  Thus, the court held:

the District Court erred when it instructed that the issue for purposes of the statute of limitations was when MDU learned of the presence of asbestos in its building; instead, the proper question was when MDU could have learned with the exercise of reasonable diligence, that its building had been contaminated by asbestos.  Id. at 1279.

This is clearly a correct description of the discovery rule, one that would be applied in New Jersey, see, e.g. Board of Trustees of Middlesex County College, No. W-38801-88, slip op. at 3 (N.J. Super. Law Div. August 20, 1992) (unpublished opinion) ("statute of

---

[5]Defendants filed a supplemental motion for summary judgment based on the argument that Prudential cannot satisfy the due diligence requirement.  This is essentially a "should have known" argument.  In July of last year, in deciding Prudential's equitable estoppel motion, I found that there were disputed issues of fact concerning whether defendants fraudulently concealed material information about the hazards of asbestos.  I also held that Prudential is entitled to try to prove that because of the extent of the fraud (if any), a due diligence requirement arose late or never arose.   Because of this finding, I am unable to grant defendants' motion on this ground.

20

limitations does not run until asbestos in a building poses an actual hazard.")   As the court put it,   "[r]egardless of the plaintiff's knowledge of a potential cause of action, no cause of action exists until the plaintiff suffers some compensable harm." Id. at 1278.   Thus, mere suspicions are not enough to satisfy the actual knowledge test. (Although, of course, suspicions may be enough to put Prudential on inquiry notice).   And, in order for Prudential to know of its injuries, it must know that the asbestos in its buildings poses a hazard.   Without this, Prudential has suffered no harm.

Defendants' arguments do not end here, though.   They point to several pre-1981 factual scenarios in the record, which, they contend, demonstrate that Prudential had actual knowledge of facts constituting its cause of action.   I will address a number of these factual scenarios -- the ones I consider exceptionally important.[6]

### (1) Presence of Asbestos

First, defendants point out that prior to 1981, Prudential was aware of the presence of asbestos-containing materials in its buildings. Def. U.S. Gypsum Co. Reply Brief at 5 (hereinafter U.S. Gypsum brief).   This fact by itself, though, does not satisfy the Savage threshold, since the presence of asbestos is

---

[6]The parties should be aware, however, that the court has examined the 12(g) statements in great detail and, in all situations not specifically addressed in this opinion, finds disputed issues of fact.

not synonymous with the presence of a danger resulting from the presence of asbestos. Board of Trustees slip op. at 3; MDU Resources Group, 14 F.3d at 1279 (statute of limitations begins to run when plaintiff knew or should have known that building was contaminated by asbestos).

### 2. BOMA Material

Second, defendants cite material published by a group called the Building Owners and Managers Association ("BOMA"). Defendants contend that BOMA's newsletter referred repeatedly to the dangers of asbestos. Def. 12(g) Statement at ¶¶ 54-63. While this information may well be relevant in determining what Prudential should have known, it is impossible -- in light of Prudential's counterstatement -- for this court to hold -- without making a credibility determination -- that Prudential actually knew of these publications.

### 3. Federal, state and local regulation

Third, defendants point to the increasingly strict regulation of asbestos by the federal government, by several cities and by the State of New Jersey. See Defendants Rule 12(g) Statement, ¶¶45; see also Brief of United States Gypsum Company in Support of its Motion for Summary Judgment at 9 (summarizing defendants' Rule 12(g) statement). The Rule 12(g) statement goes into great detail about the controversy about asbestos in schools that occurred in the mid and late 1970s. Indeed, these regulations

and public debates resulted in a series of personal injury lawsuits against asbestos companies alleging health problems due to asbestos. Def. 12(q) Statement ¶¶ 46-53. Moreover, as a result of public concern over asbestos in schools, campaigns were begun and certain schools were closed.

Plaintiffs make several responses to these facts, including the following: (1) The bulk of the legislation did not address the asbestos problem of this case, namely the alleged harmful affect of in-place asbestos; (2) Agents of plaintiffs were not aware of particular newspaper articles and other media distributions about the potential effect of in-place asbestos; (3) Agents of Prudential were unaware of the asbestos-related lawsuits being filed. Keeping in mind that defendants' motion is based on Prudential's actual knowledge, I must find that there are disputed material facts, whatever a jury might find about what Prudential should have known.

## 4.  Testing performed at various buildings

Fourth, defendants note that "[b]efore 1981, Prudential received requests for testing and expressions of concern from employees, tenants and one its liability insurer's [sic] regarding the presence of asbestos-containing materials." U.S. Gypsum brief at 5.

To support this allegation, defendant first describes incidents that occurred at the IBM Building in Jacksonville, Florida.  In 1979, IBM, the building's major tenant, raised a

concern about asbestos to the building's manager, Sidney Register,
and arranged for air-tests to determine the   concentrations of
asbestos.    IBM forwarded the reports to Mr. Register, which
disclosed the presence of a certain level of asbestos. IBM then
requested that the asbestos be encapsulated or removed.  Defendants
have submitted a series of letters and testimony memorializing
Prudential's response to the situation.       Of   particular
importance is a meeting that allegedly took place between three
Prudential representatives and Edmund Drazga, President of KRC
Research, an asbestos consulting firm.  Apparently at Prudential's
request, Mr. Drazga submitted a proposal to encapsulate the
asbestos at the IBM building, sent it to Mr. Register, who in turn
sent it to Earl Starr for approval. See e.g. Defendant's Exhibit 71
(June 12 letter from Ronald Harmson to Earl Starr). However, in
January 1981, IBM decided not to proceed with the KRC proposal.

        This last fact, combined with Prudential's contention
that all tests done showed an asbestos concentration within
acceptable limits, make it impossible to determine that Prudential
had knowledge of actual injury at this time.  Rather, Prudential
argues, it approached the problem only as a tenant-relations
situation, and when IBM was satisfied, Prudential pursued the it no
further.  The fact that the asbestos appeared to be within limits,
and the fact that IBM continued as a tenant, make it possible that
Prudential was unaware of any harm to the building.  Of course, a
jury may find that after these incidents, Prudential should have
known about facts constituting a cause of action.    But on this

24

summary judgment motion, I cannot find that this scenario -- looked at in a light most favorable to plaintiff -- constitutes <u>actual</u> knowledge on the part of Prudential.

Next, the defendants discuss a series of incidents that occurred at the Five Penn Center in Philadelphia, Pennsylvania.

First, defendants point to a letter from R.L. Albertson, Prudential's Associate General Manager, to the prior owner of the building.   This alleged letter charges that the prior owner breached the purchase contract because "[i]t appears that the building was in violation of law pertaining to concentrations of air-borne asbestos on and prior to the date of settlement under said Agreement of Sale."  Defendant's exhibit 104 (September 29, 1976 letter from R.L. Albertson to Uris Buildings Corporation). Prudential's response is to quote deposition testimony from Mr. Albertson flatly denying preparing the letter, signing the letter and mailing the letter.

This creates a classic dispute of fact.

Defendants also point to a June 1971 letter to 5 Penn Center from Jessie Lieberman, Chief of the Occupational and Radiological Health Section of the Philadelphia Department of Public Health, notifying the building management of its intent to "conduct air measurements for concentrations of airborne asbestos" in the building.  This letter, defendants contend, was delivered to Carolyn Hatcher, the Prudential representative responsible for sales and management agreements, on September 29, 1976.  Once again, Ms. Hatcher testified that she had not seen the letter.

25

This also creates a dispute of fact.

Also in 1976, Traveler's Insurance Company apparently requested that Prudential perform tests to determine the amount of airborne asbestos in the building, and in 1979, Travelers commissioned its own tests. But, as Prudential points out, the tests may have shown that the asbestos level was acceptable.

Next is a report issued by John G. Reutter Associates that analyzed the asbestos content in the building. This report was commissioned after a doctor in the group discovered loose asbestos in his office. A January 15, 1981 report was written in somewhat ominous terms, and essentially recommended additional investigations. A subsequent report, however, issued February 4, 1981, found that asbestos levels in various parts of the building were below the OSHA limits. Therefore, Prudential and Prudential's contract manager for the building, Eastman-Arnold Company, concluded that there was "nothing to be concerned about." The record does reflect that Prudential nonetheless commissioned some special cleaning of the building. Prudential maintains that the "special cleaning" it did at Five Penn Center was performed in "the interest of tenant relations, and in order to appease Colonial Penn." These facts push Prudential closer and closer to the wall, but I must remain cognizant of the standard for summary judgment. If Prudential's argument about the content of asbestos and its knowledge of the early 1970s letters is plausible to a jury, it may be that it did not have actual knowledge at that time.

Defendants also cite to a request by a tenant at the

Kent-Albert Building in Ottowa, Canada. A tenant in the building requested certain unspecified tests to be performed. Prudential's counterstatement indicates that the results showed the asbestos to be "non-hazardous" and that "no control procedures" were required. Prudential conveyed these results to the tenant. According to Prudential, no further discussion of asbestos at the Kent-Albert Building arose prior to the sale of the property in December 1981. It is difficult to see how requested testing by a tenant which showed no problem with the asbestos, and which did not result in any further actions by the tenant, alerted Prudential that the asbestos in its buildings posed a hazard.

Defendants then point to a series of incidents that occurred at the Prudential Center in Boston, Massachusetts. According to the affidavit of George A. Hindy, Manager of the Building Service Division of the Prudential Center at the time, in 1978 an OSHA inspector visited the building in response to a concern raised by a Prudential employee about asbestos problems in the 5th floor media room. The OSHA inspector took air samples, but later informed Mr. Hindy that the air quality was "healthful". Affidavit of George A. Hindy, January 15, 1992, Exhibit 178 to Plaintiff's Counterstatement and Response. Mr. Hindy also apparently requested a written copy of the OSHA test results. The report stated that "[a]nalysis indicated .01 asbestos fibers per cubic centimeter of air, which is well below the OSHA standard allowable . . ." Defendant's Exhibit 144.

Defendant points to other testing and memoranda related

27

to the Boston site.  For instance, testing performed by the Haller
Laboratory at the Prudential Center to determine the contents of
the fireproofing concluded that the fireproofing was probably
nonhazardous in the absence of vibratory conditions.    This and
other evidence adduced by defendants is susceptible to different
interpretations and cannot be the basis for a grant of summary
judgment.

        To summarize defendants' arguments relating to testing
requested at various buildings, the legal standard is that one must
have knowledge of injury and that this injury was caused by the
possibly unreasonable acts of another.    While expressions of
concern by tenants about asbestos might be somewhat indicative of
the potential for injury, such expressions do not necessarily go to
knowledge of contamination by asbestos.    Prudential has adduced
evidence intended to demonstrate that the tests performed at the
requests of tenants indicated that the asbestos was nonhazardous.

        ### 5.  Zielinski material

        Next, defendants cite to memoranda and statements made by
Arcadius Zielinski, an architect in Prudential's Corporate Services
& Building Department, which detail the presence of asbestos in
various Prudential buildings, and cite applicable regulations in
the event of the removal of asbestos.    It is true that Mr.
Zielinski does appear to indicate that prior to 1981 he believed
that asbestos was a hazard.    See, e.g. Zielinski Deposition

Transcripts, October 20, 1987, August 2, 1989, September 19, 1991;
Exhibit 100 to Plaintiffs' Counterstatement and Response to the
Rule 12G Statement Submitted by Defendant. However, a close review
of all the submitted portions of Mr. Zielinski's deposition
demonstrates first, that he was often confused about the questions
and about what his thinking was in the late 1970s and early 1980s,
and second, that Mr. Zielinski may not have been concerned with
alleged contamination or hazards in Prudential's buildings. See,
e.g. Transcript, Zielinski Deposition, October 1, 1987 at 161
(testimony that if asbestos was "firm" it is not a hazard); Id. at
208 (testimony that nothing need be done to in-place asbestos
unless there is disturbance). Thus, it would be inappropriate for
the court to rely on this evidence to grant defendants' motion
based on Prudential's actual knowledge.


        Finally, the defendants claim that Prudential's "attempts
to minimize its knowledge of its injury by asserting that air-level
testing showed low levels of airborne asbestos, is inconsistent
with Prudential's position that it is seeking to recover for the
mere presence of asbestos-containing materials without regard to
air levels. Indeed, Prudential has not shown a change in air
levels or that any such change brought about this action." This
argument simply does not address the question of when Prudential
knew of its injury. Prudential's argument is essentially that it
learned of its injury very late, and then came to believe that any

presence of asbestos is hazardous.

## IV.  Statute of Repose

Defendants next move to dismiss plaintiffs' complaint because it is barred by various states' statutes of repose.  This too requires a choice of law analysis.

### A.  Choice of Law

Statutes of repose serve a similar purpose to statutes of limitations.  Like limitations period, repose periods -- if elapsed -- prevent plaintiffs from filing an action on a particular claim. Unlike statutes of limitations, though, statutes of repose are unrelated to when the cause of action accrues.  <u>Rosenberg v. Town of North Bergen</u>, 61 N.J. 190, 199 (1972).  Rather, a typical statute of repose "prevents what might otherwise be a cause of action from ever arising" after a specified period of time.  <u>Id.</u> at 199., <u>Van Slyke</u>, 265 N.J. Super. at 608.  Statutes of repose are, therefore, principles of substantive law and would ordinarily require a governmental interest analysis.  <u>Id.</u>

In this case, defendants are essentially using the statue of repose as a statute of limitations, to argue to the court that plaintiff's causes of action are time-barred.  <u>See</u> <u>Brief in Support of Defendant, W.R. Grace & Co.-Conn.'s Motion for Summary Judgment to Dismiss Plaintiff's Amended Complaint Upon the Statutes of Repose</u> at 7 ("While statues of limitation and repose differ, their underlying policies are the same").  And in fact, a statute of repose, in balancing the right to recover with the interest of

promoting timely and efficient litigation, raises many of the same policy concerns as a statute of limitations. And that is what this series of motions is all about. Therefore, this court concludes that in this case, the New Jersey Supreme Court would apply the same choice-of-law analysis in choosing New Jersey's statute of repose as it would in choosing the correct statute of limitations to apply. Accord, Mowrey v. Duriron Co., Inc., 260 N.J. Super. 402, 415 n.5 (App. Div. 1992) (even though case involved statute of repose, "we see no reason to depart from the Heavner analysis").

It is true that the recent case of Van Slyke v. Worthington applied the governmental interest analysis to a statue of repose question. That court, however, focussed on the particular facts of the case, namely that if New Jersey law applied, the statute of repose would bar plaintiff's claim and New Jersey's compensation interest would be defeated. Van Slyke, 265 N.J. Super. at 613.

But even using the governmental interest analysis, I find that New Jersey would not apply the statutes of repose of the non-forum states.

Under the governmental interest analysis, the court applies the law of the state with the greatest interest in governing the particular issue. Veazey v. Doremus, 103 N.J. 244, 249 (1986); Henry, 508 F.2d at 32. If a conflict exists, the court must assess the governmental policies of each state to determine which law to apply. The emphasis is on the quality, and not the quantity, of contacts.

31

Defendants are certainly correct in pointing out that the states where the various buildings are located have a strong interest in determining the fate of claims related to those respective buildings.   The other important concerns are the interest in avoiding stale claims and the plaintiff's right to have an adjudication of its claim and receive compensation if the claim is meritorious.  As detailed above, when the plaintiff is domiciled in New Jersey, New Jersey courts place strong emphasis on its compensation interest -- particularly when the alternative is to foreclose any forum to the plaintiff.   Thus, I believe that even under a governmental interest analysis, New Jersey would apply its own law regarding statutes of repose.

### B.   The substantive issue

In light of the foregoing discussion, since New Jersey law governs the application of statutes of repose, and since New Jersey does not have an applicable statute (and in fact, the defendants have not moved on any such statute), the defendants' motion for summary judgment based on the statutes of repose is denied.

### V.   Defendants' motion on breach of warranty claim

Defendants next move to dismiss plaintiff's breach of warranty claim, as barred by the statute of limitations.   The parties, for once, agree on a number of points here:  First, that the UCC provides the relevant statute of limitations; second, that

normally, the statute of limitations is four years from the date of performance of the contract; and third, that the UCC provides a limited exception for warranties of future performance.[7] Prudential has conceded that any claim it has for breach of an express warranty for present performance are barred by any and all applicable statutes of limitations. It claims, though, that it has made out a claim for breach of a warranty of future performance.

The Uniform Commercial Code provides generally that "[a]n action for breach of any contract for sale must be commenced within four years after the cause of action has accrued." N.J.S.A. 12A:2-725 (1). It further provides that:

> A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty <u>explicitly</u> extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

N.J.S.A. 12A:2-725 (2) (emphasis added).

There are a few principles discernible from the UCC itself. First, any warranty for future performance must be express, because implied warranties "by their very nature . . . never explicitly extend to future performance." <u>Western Recreational Vehicles, Inc. v. Swift Adhesives, Inc.</u>, ___ F.3d ___,

---

[7] To some extent, the parties dispute the law to be applied. First, it does not appear that any conflicts exist, so this court can apply law governing the UCC. Second, to the extent that any conflicts do exist, this court will apply New Jersey law, since even under that law (which Prudential wishes applied), this claim must be dismissed.

1994 WL 176740 (9th Cir. (Wash.), May 11, 1994) (No. 92-36879, 92-36899). The UCC also provides a definition of express warranties. Section 2-313 states:

> (1) Express warranties by the seller are created as follows:
>
> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description. N.J.S.A. 12A:2-313(1).

In this case, Prudential's claims can be divided into two categories: First, it claims that at the time of the contracts, the defendants, through advertising and promotional literature, provided express warranties of future performance. Second, it contends that after the initial contracts were entered into, the defendants, through responses to inquiries, continued to make representations about future performance.

First, I will address Prudential's claim that the defendants made a number of warranties for future performance prior to or at the time of the sale. It cites to the following as warranties of future performance given in "Advertisements and Product Descriptions." Plaintiff's Brief in Opposition to Defendant W.R. Grace & Co.'s Motion for Summary Judgment (1) On Plaintiff's Breach-of-Warranty Claims Based Upon the Statutes of Limitations and (2) On Plaintiff's Statutory Claims Under the Unfair and Deceptive Trade Practices Act at 4. The citations are

34

divided into categories based on the individual defendant.

### Grace

(1) Promotional literature describes Zonolite Vermiculite, an asbestos-containing product as containing "an amazing mineral discovered during World War I". In one sentence of a several page brochure, the company stated "**permanent** -- Inorganic, sterile, will not rot or decompose. Moisture does not harm Zonolite. Even if accidentally wetted, it regains its original efficiency when dried out. Appendix in Support of Plaintiff's Motion to Strike Defendants' Statute of Limitations Defenses Upon the Grounds of Equitable Estoppel, Volume II §A at 2 (emphasis in original) (hereinafter, references to this Appendix will be cited as A, followed by the volume of the appendix, followed by the particular section (A, B, C, D, or E), followed by the page number).

(2) Other promotional literature contains a similar description of Zonolite as "Permanent -- Inorganic, sterile, will not rot or decompose." AII §A at 12;

(3) Several pieces of literature refer to the zonolite brand of vermiculite as durable. AII §A at 22, 30, 38, and 46;

(4) Literature states: "And you don't build a dusting problem into your building when you specify Mono-Kote. It dries hard, not punky . . . doesn't 'snow' when the building vibrates.
"All in all, it simply makes sense to specify Zonolite Mono-Kote. It gives you the fire protection you need where the fire protection belongs . . . on the steel itself. It requires little or no policing. And it causes no problems after it's in place." AII §A at 103.

(5) Another piece of literature states that "[s]ubjected to hurricane force winds for over 85 hours, MONO-KOTE demonstrated no erosion." (emphasis in original). AII §A at 105.

(6) A Zonolite pamphlet states that "[i]ndependent laboratory test subjected standard, machine-applied Mono-Kote surface to winds exceeding hurricane velocity . . . over 100 M.P.H. for 87 hours . . . with no erosion." AII §A at 124.

(7) Literature contains additional reference to test showing no erosion at hurricane-velocity winds. AII §A

at 131.

(8)  Literature states:  "The fireproofing material shall not be subject to losses from the finished application by sifting, flaking or dusting.  This performance shall be measured by the results of a test for erosion resistance when subjected to high velocity air flow cross the surface of dried samples. . . . Material shall not crack or delaminate when the structural element is subjected to downward deflection of 1/120 of the span."  AII -§A at 141.

(10)  Material states that "[e]xisting formulations of Mono-Kote contain minimal amounts of asbestos which are 'locked in' during the mixing process.  Mono-Kote is wet-mixed, pumped and sprayed, and hardens to a cementitious mass."  AII §A at 142.

(11)  Further reference to wind velocity test:  "[Z]ero erosion, after being tested in 100 m.p.h. winds for 87 hours.  Result:  no 'dusting' in air-conditioning and ventilating systems."  AII §A at 148.

(12)  Literature states "Monokote, a cementitious, plaster fireproofing stays applied during application and throughout subsequent construction procedures <u>for the life of your building</u>."  AII §A at 159 (emphasis added).

### United States Gypsum

(1)  Literature about SprayDon, an asbestos product manufactured and marketed by United States Gypsum Co., Inc. (hereinafter U.S. Gypsum) states that U.S. Gypsum's method of application "results in a mat that is hard, firm -- so durable that it can be used on sidewalls . . . ."  Also:  "no cracking from shrinkage or fire" and able to withstand erosion.  AII §B at 235.

### Asbestospray

(1)  Promotional literature states that "[l]aboratory tests prove that Type S Surface Sealer, used by the Asbestospray corporation in its asbestos products, will enable Asbestospray to withstand flow of air up to 1500 feet per minute without dusting or flaking."  AII §C at 372.

(2)  Literature states that among the advantages of Asbestospray are:  "High bonding strength -- provides a permanent surface that will not crack, dust or flake."

AII §C at 374, 381, 387, 395, and 403.

(3)     Similarly, other literature **states** **that** "Asbestospray forms a strong, lasting bond **with** steel, masonry, plaster, gypsum lath and other rigid surfaces." AII §C at 386.

(4) Another product description details the Fireproofing advantages of Asbestospray's product:   "Permanent. Asbestospray forms an extremely strong bond with the surface to which it is applied. . . . . Laboratory tests prove that Type S Surface Sealer will enable Asbestospray to withstand flow of air up to 1500 feet per minute without dusting or flaking." AII §C at 387, 395, and 403.

(5)  In another reference to testing, literature states that "Field tests have been run in areas used for this purpose and definitely prove that there is no erosion of the installed material." AII-§C-413.

<u>Keene Corporation</u>

(1)   Literature states that "[l]aboratory tests prove Pyrospray Fireproofing effectively resists erosion, dusting or flaking due to high velocity air movement." AII §D at 480.

<u>United States Mineral Products</u>

(1) Literature states that "Under normal structural movement of framing, floor or roof sections, BLAZE-SHIELD Type D maintains high bond strength without surface cracking or spalling.  Shrinkage cracks, resulting in limited effective fire retardancy, are eliminated." AII §E at 490.

(2)  "The monolithic coating [of Blaze-Shield Type H] absorbs normal structural movement without surface cracking or spalling." AII §E at 492, 500, and 502.

(3) Literature states that "[w]ith Blaze-Shield Type D, old heavy wet mix materials are eliminated and it provides permanent protection to deflection, impact, structural systems without surface cracking or spalling due to normal structural expansion or contraction." AII-E-498.

Prudential is correct in its contention that express

warranties can be made through advertising.  Indeed, advertisements are obviously constructed to induce purchases, and when purchasing decisions are reasonably made based on advertisements, the representations contained in the advertising become part of the bargain.  See, e.g. Cipollone v. Liggett Group, Inc., 893 F.2d 541, 564 n.20 (3d Cir. 1990), modified, 112 S.Ct. 2608 (1991); see also Spring Motors Distributors, Inc. v. Ford Motor Co., 191 N.J. Super. 22, 46 (App. Div. 1983), rev'd in part, 98 N.J. 555 (1985) ("The seller need not use the formal words such as 'warrant' or 'guarantee' or have the specific intention to make a warranty in order that an express warranty arise . . . . [A] warranty that a machine is 'well-constructed,' 'satisfactory,' or 'in good working order' will ordinarily bind the seller."  (quoting 1 Anderson, Uniform Commercial Code (2nd ed. 1970), §2-313:37 at 502)).

But the question here is not whether the representations in the promotional literature were express and therefore part of the bargain; rather, the issue before the court is whether the literature conveyed representations regarding future performance.

Courts generally have narrowly construed the definition of "explicit" in deciding whether a warranty extends to future performance under the UCC.  Stating the general rule, one court has held that the term explicit in this context means "not implied merely or conveyed by implication; distinctly stated; plain in language; clear, not ambiguous; express; unequivocal."  Binkley Co. v. Teledyne Mid-America Corp., 333 F. Supp. 1183 (E.D. Mo. 1971) (quoting Hvidsten v. Northern Pacific Ry. Co., 76 N.D. 111, 121,

(1948), aff'd, 460 F.2d 276 (8th Cir. 1972) (cited with approval in

Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp, 626 F.2d

280, 291 n.25 (3d Cir. 1980)).

Jones & Laughlin is instructive about the standard that

must be met before a warranty for future performance may be found.

In that case, the plaintiff claimed that the defendant, who had

sold it a roof, had made an express warranty about future

performance. Johns-Manville had made the following representations

during negotiations:

> Johns-Manville has been reducing roofing felts made of
> asbestos for over 100 years.   On the record, Johns-
> Manville can cite many asbestos roofs that, today, are
> still performing satisfactorily after more than forty
> (40) years of exposure to heat, cold, water, air and even
> fire.  And, all of this service with minimum maintenance
> and repair costs.
>
> *   *   *
>
> Improved Fesco Board resits the tensions, twists and
> pulls created by high winds, tornadoes, hurricanes and
> building movements.   Laboratory tests pictured here,
> demonstrate Improved Fesco Board's great tensile strength
> and outstanding resistance to diagonal shear and
> horizontal shear . . . Many roof insulations barely meet
> the Factual Mutual minimum requirements but Improved
> Fesco Board withstands 120 miles per hour with a 100%
> factor of safety.

Jones & Laughlin, 626 F.2d at 291.   Nonetheless, the Court of

Appeals held as a matter of law that "[t]he statements regarding

the strength and wind resistance of Fesco Board, as well as the

boast that many roofs . . . are still performing satisfactorily

after more than forty (40) years of use, may not reasonably be

relied on by Jones & Laughlin as explicit extensions of any

warranty to cover the future performance of the product . . . ."

Id. at 291.

The vast majority of courts -- including New Jersey appellate division courts -- have, in line with the Third Circuit's view, construed the UCC language narrowly. What this means is that in order for there to be a warranty of future performance, the warranty must "make specific reference to a future time". Fire Dist. No. 9 v. American La France, 176 N.J. Super. 566, 573 (App. Div. 1980); Spring Motors, 191 N.J. Super. at 47. As stated very recently by the Ninth Circuit:

> "Most courts have been very harsh in determining whether a warranty explicitly extends to future performance. Emphasizing the word 'explicitly', they have ruled that there must be specific reference to a future time in the warranty. As a result of this harsh construction, most express warranties cannot meet the test . . . ." Western Recreational Vehicles, Inc., 1994 U.S.App. LEXIS at *8 (citing Standard Alliance Industries, Inc. v. Black Clawson Co., 587 F.2d 813, 820 (6th Cir. 1978), cert. denied, 441 U.S. 923 (1979).

It is possible to read Cipollone somewhat broader than Jones & Laughlin.[8] In the more recent case, the defendants' advertisements had represented that according to scientific tests performed on tobacco, cigarettes are not harmful. Writing for the Court, Judge Becker wrote that representations of "studies" conducted by medical specialists on individuals who had smoked for thirty years could be

---

[8]Although it could be argued that Cipollone speaks to warranties for future performance, Prudential relies on the case for the proposition that the defendants gave express warranties. Prudential's brief divides as follows: (1) Defendants gave express warranties; (2) The warranties extended to future performance. Prudential's brief in Opposition to Breach of Warranty Claim, at 16-24. Cipollone is cited only in the first section.

taken as "representing that smoking for a long period of time was safe". <u>Cipollone</u>, 893 F.2d at 576. The whole series of advertisements -- including representations that a particular brand of cigarettes was "just what the doctor ordered" told the Court that "a reasonable jury could conclude from these advertisements, and the many others entered into evidence, that [the defendant] had represented to the consumer that the long-term smoking of chesterfield or L & M cigarettes would not endanger the consumer's health, and that these warranties were untrue." <u>Id.</u> at 575-76..

Cipollone, however, addressed neither the standard for finding an express warranty of future performance nor the statute of limitations question. The arguments before the court, and the decision that was rendered, addressed simply the question of whether there was "sufficient evidence to support a jury finding that Mrs. Cipollone's injury was caused by Liggett's breach of express warranty". <u>Id.</u> at 574. The question of causation is different from the question of whether an action is time-barred.

Prudential relies primarily on several cases for the proposition that the representations in this case amounted to representations of future performance. These cases, however, while citing the general rule, do not really analyze the representations at issue to determine whether they in fact meet the rigorous test. For example, in <u>Kansas City v. W.R. Grace & Co.</u>, 778 S.W.2d 264 (Mo. Ct. App. 1989), the Missouri Court of Appeals addressed the trial court's grant of summary judgment to a series of asbestos companies on the plaintiff's express warranty of future performance

41

claim. The record contained representations that the defendants'
products were "easy to maintain", and that they provided a
permanent surface that would not crack or dust. The appeals court
simply cited the statements and held that the representations
constituted an express warranty of future performance. The court
did not address whether the representations were explicit (although
they were) or whether they unambiguously and explicitly warranted
the product for a particular time period.

This was also the case in <u>Mittasch v. Seal Lock Burial
Vault, Inc.</u>, 42 A.D.2d 573, 344 N.Y.S.2d 101 (App. Div. 1973).
There, the defendant had represented that the burial vault it sold
plaintiff would perform satisfactorily at all times. The Appellate
Division stated, again without analysis, that "[i]n our opinion,
defendants' warranty that the burial vault would give 'satisfaction
at all times' explicitly extended to future performance."

This approach has been criticized by the Ninth Circuit as
being at odds with the language of the UCC. <u>Western Recreational
Vehicles</u>, 1994 WL 176740 at 4-5. Indeed, the cases fail to take
into account the policies and balancing behind the UCC's
provisions. For one thing, the cases do not pay sufficient
attention to the fact that the future performance provision is an
exception to the general rule. And the general rule provides a
useful rule to govern sales specifically and business situations
generally. It makes eminent sense to provide a four year statute
of limitations when a product is sold and a warranty is given. But
if a purchaser wishes the seller to guarantee the product for

years, decades or forever, the law requires a special explicit-
ness, to ensure that the parties have in fact bargained for the
additional warranty.  Thus, the requirement that the warranty be
explicit ensures that the parties get what they intended.  In the
absence of such explicit language, the UCC establishes "a
reasonable period of time, four years, beyond which business
persons need not worry about stale warranty claims . . . ."
Standard Alliance, 587 F.2d at 820.  As one court has held, the
general rule "serves the important function of providing a point of
finality for businesses after which they can destroy their business
records without the fear of a subsequent breach of contract for
sale or breach of warranty suit arising to haunt them."  Ontario
Hydro v. Zallea Systems, Inc., 569 F. Supp. 1261, 1266 (D.Del.
1983).  Put differently, the explicitness requirement ensures that
before the exception applies, "the parties to the contract have
knowingly agreed to alter the usual statute of limitations."
Stumler v. Ferry-Morse Seed Co, 644 F.2d 667, 672; see also H. Sand
& Co. v. Airtemp Corp., 738 F.Supp. 760, 770 (S.D.N.Y. 1990),
modified 934 F.2d 450 (2d Cir. 1991) ("The drafters of the UCC
decided that the seller's need to have some clearly defined limit
on the period of its potential liability outweighed the buyer's
interest in an extended warranty and reserved the benefits of an
extended warranty to those who explicitly bargained for them.")
Moreover, "[a]ny harshness that results from the statute is
directly attributable to the restrictive language of the code,
which leaves courts with no alternative but to render a narrow

decision." <u>Western Recreational Vehicles</u> at *5 (<u>quoting</u> <u>Poppenheimer v. Bluff City Motor Homes, Div. of Bluff City Buick</u> <u>Co.</u>, 658 S.W.2d 106, 111 (Tenn. App. 1983)).

Thus, the provision must be applied narrowly. With this in mind, I do not believe that the representations amount to warranties of future performance. It is fairly clear that these representation amount to representations of current use. But they simply do not rise to that level of specificity required for future use. Many of the representations refer to test results. In <u>Jones</u> <u>& Laughlin</u>, the Third Circuit specifically rejected the notion that representation of test results could create an express warranty of future performance. Similarly, while many of the representations describe the product as durable and permanent and not subject to cracking, that is a far cry from an <u>explicit</u> representation that the product is warranted for a specific future time. Moreover, the statements are briefly worded in the context of lengthy promotional literature. They certainly are not the bargained-for representations contemplated by the UCC.

The closest example to a warranty of future performance is Grace's representation that Monokote stays applied for construction projects for the life of the building. But even this statement does not provide a warranty for a specific time in the future. See, <u>e.g.</u>, <u>South Burlington School Dist. v. Calcagni-</u> <u>Frazler-Zajchowski Architects, Inc.</u>, 410 A.2d 1359, 1366 (1980) (refusing to apply exception to representation that product would last as long as the built-up roofing would last.) Moreover, that

particular representation is ambiguous, in that it is unclear whether it is speaking about future construction projects or about the life of the building generally.

In short, to hold that the representations in the promotional literature rose to the level of an explicit representation referring to specific future date would allow the exception to swallow the rule. I decline to follow that path.

Prudential does not end its argument here, however. It contends that representations made by the defendants after the contracts were completed presented future warranties. These representations occurred through responses from the defendants to inquiries about their asbestos products.

The following list is derived from Prudential's exhibits:

(1) April 28, 1969 letter from Thomas F. Egan, Manager Fireproofing Products for Zonolite, a division of Grace, states that "Zonolite Mono-Kote has been tested for dusting and air-erosion with 105 M.P.H. winds for 87 hours and no loss of material. This would hold as to application for our plaster or acoustical plaster." AIII §B at 127.

(2) December 9, 1970 letter from William V. Culver, District Manager of Grace, to the Chief Industrial Hygienist of Workmen's Compensation Board, states that "Mono-Kote is a cementitious brand of fireproofing which does contain approximately 8& asbestos. I hasten to point out that being mixed in a plaster mix with water and pumped as a slurry, at no time is the asbestos free as occurs with the normal sprayed fibrous kind of fireproofing." AIII §B at 169.

(3) January 15, 1971 letter disseminated by W.R. Grace (actually written by the Texas Vermiculite Company) to Neuhaus & Taylor, Architects, states that "If we are fortunate enough to supply your [building] we will be

45

supplying Mono-Kote which has had an excellent history and does not contribute to health hazards." AIII §B at 171 (emphasis added).

(4) February 8, 1971 letter from Thomas F. Egan of Grace to McNulty Bros. Co., an architecture firm, states that Mono-Kote "has a definite set containing approximately 60% gypsum and 'locks' the fiber in the hardened mass." Further, "The in-place density is assured and provides tested --- erosion hardness for use in plenums." It further states, however, that "[f]rom the test data, we contend that Mono-Kote is not causing the health hazard that is being charged." AIII §B at 176-77.

(5) November 15, 1972 letter from R.O. de Bastian of Grace to Sayre & Associates states that under applicable regulations, "exposure [to asbestos] shall not exceed 5 fibers per milliliter greater than 5 microns in length. Tests have shown that Mono-Kote is well below these standards." AIII §B at 200.

(6) October 25, 1972 letter from the Carpenter Plastering Company to Henry C. Back Company, attaching literature furnished by W.R. Grace & Co. showing technical data and specifications in connection with Zonolite Mono-Kote fireproofing. This material states that "[i]ndependent laboratory test subjected standard, machine-applied Mono-Kote surface to winds exceeding hurricane velocity . . . over 100 M.P.H. for 87 hours . . . with no erosion." Further, "[t]he fireproofing material shall not be subject to losses from the finished application by sifting, flaking or dusting." AIII §B at 202.

(7) January 25, 1977 letter from Robert A. Merther of Grace states "This is to certify that no commercial asbestos is used in the manufacture of MONOKOTE Fireproofing. Further, any trace contaminates of naturally occurring forms of asbestos in MONOKOTE are bound in the 'in-place' MONOKOTE, so as to prevent asbestos fibers from entering the environment." AIII §B at 236.

(8) Draft of a letter from Merther of Grace to the Supervising Principal of Berne-Knox-Westerlo Central School District states that "Zono-Coustic acoustical plaster sets to a relatively hard condition. The asbestos which was in the material, therefore, is bound in the set plaster and is not free to enter the environment." AIII §B at 238.

(9) March 7, 1977 letter from Grace to Horner & Krause

46

Architects, states that "[B]ecause in place 'Monokote' is a hard plaster like material, it is our opinion that in place MK-3 poses no health hazard to building occupants." AIII §B at 242.

(10)   March 18, 1977 letter from Grace to the Illinois Superintendent of Education, responds to concerns about pre-1973 monokote:

>     "The material manufactured by our company . . ., because it provides a much more durable surface, is far less likely to be damaged and quite difficult to remove. Furthermore, although prior to 1973 , MONOKOTE MK-3 was manufactured with 5 asbestos, the asbestos was housed in the in-place material by the set gypsum and therefore not free to enter the environment. We understand, in fact, that tests have been run in buildings which have been sprayed with MONOKOTE MK-3 with these tests showing no detectable levels of asbestos fibers coming from the MONOKOTE Fireproofing. It is our opinion, therefore, that in-place MONOKOTE MK-3 Fireproofing presents no hazards to building occupants due to release of asbestos fibers in the air. Air sampling tests in buildings would confirm this." AIII §B at 247.

(11)   The record contains a number of letters written by representatives of defendant companies from January 18, 1979 through June 7, 1982, responding to concerns expressed by architects, school boards and others. Typically, the letters assure the writers that "Because of the 'setting' characteristic of many materials sold prior to reformulation without asbestos, we believe that the asbestos fibers would be encapsulated in the matrix. This conclusion assumes that the material is undisturbed and has suffered no in-place damage." The letters go on to advise on the course to take (removal or sealing) if the material has been "subjected to external forces which have left the surface sifting and flaking". AIII at §B 264 (see also AIII §B at 266-329).

(12)   September 19, 1975 letter from a U.S. Gypsum scientist to Bristol Meyers Industries, stating that in some of defendants' material:

>     "the asbestos fibers are securely embedded in the gypsum plaster matrix and would not be released to the air unless it were forcefully pulverized.

>     "In summary, asbestos is a minor additive in both products, and is embedded in the matrix of the

plaster for the purpose of modifying its dry and/or wet integrity.  In my opinion it would not present a health hazard in the context of the Occupational Safety and Health Administration regulations that are aimed at controlling excessive airborne concentrations for full-time occupational exposure to free asbestos."  AIII §D at 415.

(13)   January 21, 1977 letter from U.S. Gypsum to a Mrs. Sandra Malikin states:

> "The small amount of asbestos is securely embedded in the mortar matrix and should not be released to the air unless it is forcefully pulverized.  There is no possibility of asbestos contamination from normal air currents or water leakage. . . .
> "I am not aware of, nor can I conceive of, a hazardous exposure resulting from a properly installed and maintained LC-NC Spray Texture Ceiling."  AIII §C at 424.

(14)   December 10, 1976 letter from U.S. Gypsum to Radey & Radey Associates, an architectural firm, regarding the products Audicote and Sabinite, states:

> "The asbestos fibers are securely embedded in the mortar matrix and should not be released to the air unless it is forcefully pulverized or abraded. I am not aware of, nor can I conceive of, a hazardous exposure resulting from a properly installed and maintained AUDICOTE or SABINITE Acoustical Plaster ceiling.  However, if there is concern about the surface, for whatever reason, I would suggest that the ceiling be painted . . . ."
> AIII §C at 433; see also AIII §C at 437, AIII §C at 450; AIII §C at 482; AIII §C at 484.

(15)   January 29, 1979 letter from U.S. Gypsum to A.E. Zielinski, regarding the asbestos-containing products Audicote and Sabinite.  U.S. Gypsum represented that it was "not aware of, nor can [it] conceive of a hazardous exposure resulting from a properly installed and maintained [asbestos-containing material.]"  Exhibit 101 to Prudential's Motion to Strike Defenses:

(16)   February 1, 1979 memorandum from Grace to Sales Organization and March 7, 1977 letter from Grace to Jack Herner, regarding concerns of health hazards from in-place asbestos-containing construction materials:  ". . . In-place [asbestos-containing material] poses no health hazards to building occupants".  AIII §B at 233, 240-41.

48

(17)  December 20, 1980 letter from Grace to C.H. Easton
states that "The presence of asbestos fiber . . .should
not be of concern."  AIII §B at 312.

(18)  April 20, 1983 memorandum from Grace to Sales
Organization states in "Attachment A" that "The asbestos
fireproofing and plastering products which were produced
in the past by [Grace] were cementitious material and
were applied in a wet slurry form.  Because of this, they
did not, in our opinion, pose a health problem in spite
of their commercial asbestos content (which generally
ranged between 12 and 19&).  AIII §B at 346-49.

Prudential is correct in their assumption that post-sale
representations can constitute binding warranties.  As the Tenth
Circuit put it in e.g. Downie v. Abex Corp., 741 F.2d 1235, 1240
(10th Cir. 1984), in quoting with approval the Official Comments to
the UCC:

> The precise time when words of description or
> affirmation are made . . . is not material.  The sole
> question is whether the language . . . [is] fairly to be
> regarded as part of the contract.  If language is used
> after the closing of the deal (as when the buyer when
> taking delivery asks and receives an additional
> assurance), the warranty becomes a modification, and need
> not be supported by consideration if it is otherwise
> reasonable and in order.

This is a sound principle, since post-sale representations allow
the seller to attempt to promote future sales as well as to
generate good will for its business.  See, e.g. Downie, 741 F.2d at
1240 (citing Bigelow v. Agway, Inc., 506 F.2d 551, 555 n.6 (2d Cir.
1974)).

But, even assuming that the representations constitute

warranties[9], there still remains the question of whether these constitute representations of future performance. Here, the representations are even more keyed to the present than those described in the previous section. There are no explicit warranties for a specified time in the future.

Thus, at best, the warranties are additional present warranties, and as such, should extend the limitations period for no longer than four years. And, the latest letters cited were written in the early 1980s, none prior to four years before this action was filed.

Therefore, I will grant defendants' motion for summary judgment and dismiss Prudential's breach of warranty claim.


## VI.  Claim Under New Jersey Consumer Fraud Act

Defendants next move to dismiss plaintiff's allegations of violations of consumer Fraud statutes. Prudential responded by stating that it wished to proceed solely on the basis of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1.

The Act prohibits:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression or omission, of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . , or with the subsequent performance of such person as aforesaid . . . .

_____

[9]As to at least the more recent letters, this remains questionable. Those letters tend to speak in terms of opinion, rather than representation of fact.

50

Defendants make several arguments for why this claim should be
dismissed.

First, they contend that the Act was meant to apply only
to sales of ordinary consumer goods and was not intended to protect
massive commercial entities like Prudential. While it is true that
"certain practices unlawful in a sale of personal goods to an
individual consumer would not be held unlawful in a transaction
between particular business entities", the Act fairly clearly
applies to business entities generally. See Hundred East Credit
Corp. v. Shuster Corp., 212 N.J. Super. 350, 355 (App. Div. 1986)
(while "the strongest case for relief is presented by the poor, the
naive and the uneducated, others can qualify as consumers as
well"); N.J.S.A. 56:8-1(d) (defining person as "any natural person
or his legal representative, partnership, corporation company,
trust, business entity or association . . . .") Here, while
defendants and plaintiff are large corporations, the disparity in
their respective knowledge about asbestos is clearly material.
Thus, I decline to hold as a matter of law that the Act does not
intend to protect Prudential in this matter.

Moreover, this case is not like BOC Group, Inc. v. Lummus
Crest, Inc., 251 N.J. Super. 271 (Law Div. 1990), in which the
Court dismissed a claim under the Act. The claim in that case
involved three parties which the court characterized as "large
corporations who negotiated for years before entering into a multi-
million dollar contract for the sale of a design and for services
collateral thereto." Id. at 280. The court relied on the peculiar

nature of the contract, and the fact that "plaintiff . . . knew it was purchasing a new, state of the art idea which was still in an experimental phase . . . . Plaintiff independently tested [the] design repeatedly before it entered into an agreement with defendant for its implementation." Id. at 281. Those mitigating circumstances simply are not present in this case, where the plaintiff entered into ordinary building agreements that contained asbestos products placed by defendants.[10]

Defendants next argue that plaintiff's claim fails because of lack of privity. New Jersey courts have squarely rejected this argument. See, e.g., Perth Amboy Iron Works, Inc. v. American Home Assur. Co., 226 N.J. Super. 200, 211 (App. Div. 1988).[11]

---

[10]Defendants also rely on two New Jersey District court cases: Unifoil Corp. v. Cheque Printers and Encoders, Ltd., 622 F. Supp. 268, 270 (D.N.J. 1985); Werner & Pfleiderer Corp. v. Gary Chemical Corp., 697 F. Supp. 808, 814-15 (D.N.J. 1988). The latter case held that the Act does not apply to protect "commercial entities involved in a dispute which is essentially contractual in nature, and the disputed performance is covered by the contract." Gary Chemical, 697 F. Supp. at 815. Not only are those cases inapposite -- this case is essentially a tort case -- but the Appellate Division has expressly reached a contrary conclusion. Dreier Co., Inc. v. Unitronix Corp., 218 N.J. Super. 260 (App. Div. 1986).

[11]Finally, defendants make an amalgam of arguments in one section of the brief; some of these arguments are difficult to follow. But they include
     (1) By proceeding based solely on the New Jersey statute, plaintiff has improperly amended its complaint without leave of the court. It is unclear why Prudential's willingness to abandon certain claims implicates the concerns of Fed. R. Civ. P. 15. At any rate:    (1) Under the liberal interpretation of the Rule, Prudential would certainly have been entitled to amend; (2) To the extent that defendants believe that Prudential is improperly trying to use the Consumer Fraud Act to get at actions not covered by the Act, they may make an appropriate in limine motion.
     (2)    Plaintiff has not proved reliance on any of

**FILED**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

'JUN 0 9 1994

AT 8:30 ...............M
WILLIAM T. WALSH
CLERK

THE PRUDENTIAL INSURANCE )
COMPANY OF AMERICA, et. al., )
                    Plaintiffs,)
                              )
v.                            )
                              )
U.S. GYPSUM, et. al.,         )
                    Defendants.)
                              )

Civ. Action No. 87-4238
        (HAA)

ORDER

Ackerman, D.J.

This matter having come before the court upon a series of
motions made by defendants in this matter; and this Court having
considered the entire record in the case, including the submitted
briefs; and for the reasons expressed in an Opinion issued this
same day; and for good cause shown,

IT IS ON THIS _9th_ day of June, 1994,

ORDERED that:

(1) Defendant U.S. Gypsum's and Asbestospray's motion for
summary judgment dismissing plaintiff's RICO claim as barred by the
statute of limitations is DENIED;

(2) Defendants' motion for summary judgment dismissing
plaintiffs' common law tort and fraud claims as barred by the
applicable statute of limitations is DENIED;

(3) Defendants' motion for summary judgment dismissing
plaintiffs' complaint as barred by the applicable statutes of
repose is DENIED;

(4) Defendants' motion for summary judgment dismissing

Therefore, I decline to dismiss Prudential's claims under the New Jersey Consumer Fraud Act.

## CONCLUSION

For the reasons detailed above, I will deny all of the defendants' motions except its motion for summary judgment dismissing Prudential's breach of warranty claim. That motion is granted.

---

defendant's statements. But Prudential has alleged that because of defendants' fraudulent failure to disclose, the asbestos problem never entered into Prudential's business deliberations. At this point in the litigation, I decline to dismiss the claim on this ground.

plaintiff's claims under the applicable Unfair Trade Practices Acts is DENIED; and

(5)    Defendants' motion for summary judgment dismissing plaintiffs' breach of warranty claim as barred by the applicable statutes of limitation is GRANTED.


Harold A. Ackerman, U.S.D.J.

2



RECEIVED
JUN 10 1994
RIKER DANZIG
SCHERER HYLAND
& PERRETTI