IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **W. R. GRACE & CO., et al.** | ) | **Case No. 01-01139 (JKF)** |
| | ) | |
| Debtors. | ) | **(Jointly Administered)** |

**Hearing Date: November 14, 2005**

**THE DEBTORS' RESPONSE TO THE PD COMMITTEE'S
OPPOSITION TO CONSIDERATION OF THE "METHODOLOGY ISSUE"
AS PART OF THE ESTIMATION OF ASBESTOS PROPERTY DAMAGE CLAIMS**

**INTRODUCTION**

This briefing poses a single, procedural issue for consideration by this Court: Is a *Daubert* challenge to the property damage claimants' use of the dust sampling methodology appropriate for hearing as a threshold matter in the property damage estimation process? The Court has already decided that it is.[1] The same issue has been decided by the bankruptcy court in *In re Armstrong World Indus., Inc.*, which held that such a *Daubert* challenge is warranted and, indeed, meritorious. *See, e.g., In re Armstrong World Indus., Inc.*, 285 B.R. 864 (Bankr. D. Del. 2002). Pursuant to the Court's property damage Case Management Order,[2] the Debtors have

---

[1] *See* Case Management Order for the Estimation of Asbestos Property Damage Liabilities at 2 (8/29/2005) ("The Court has determined to proceed in two phases. Phase I is to be bifurcated to deal with 2 issues: *Daubert* methodology and constructive notice. Phase II will consist of merits-based estimation of the Asbestos PD claims."); *see also* 7/19/2005 Hrg. Tr. at 33 (noting that "*Daubert* applies"), at 85 (noting that the *Daubert* hearing "has to be done" because "I need to know whether using dust samples is an appropriate methodology to get me to the estimation of these claims"), at 92 (noting that "I have to hear it"), and at 102 (noting that "[t]here will be a *Daubert* hearing on the methodology issue. . . . [t]here has to be"); 8/29/2005 Hrg. Tr. at 99-100 (noting that "[t]he phase one litigation . . . is to determine two things" including "the *Daubert* issues as to what form of evidence the Court will accept during the phase two hearing").

[2] "On October 17, 2005, the Debtors shall designate experts and submit expert reports addressing two issues: (i) that certain methodologies for determining exposure to asbestos must comply with Rule 702 of the Federal Rules of Evidence (specifically, the use of dust versus air sampling (the 'Methodology Issue'))." Case Management Order for the Estimation of Asbestos Property Damage Liabilities at 4 (8/29/2005).

already submitted expert reports on the topic, aimed directly at challenging the relevance and reliability of the dust sampling method.[3] Nonetheless, after a last-ditch plea by counsel for the PD Committee, this Court permitted the Committee the final opportunity to re-argue the issue one more time. (7/19/2005 Hrg. Tr. at 105-06). And once again, the PD Committee's argument should be rejected.

As the *Armstrong* case demonstrated, dust sampling is uniquely well suited for a threshold *Daubert* challenge. Just as in the proceedings here, *Armstrong* involved a proceeding to determine the validity of asbestos property damage claims. A two-day *Daubert* hearing was held on the issue of whether a potential hazard in a building could be established through the use of dust sampling techniques. The Debtors argued that dust sampling could not be used to show a hazard. Specifically, the methodology failed the tests for both relevance and reliability under *Daubert*: (1) The method is not reliable because, as was shown at the hearing, it is not repeatable and is fraught with potential error, among other problems; (2) the method is not relevant, because all epidemiological studies that pertain to the potential existence of a health hazard in a building are based upon asbestos concentrations in the air, not dust sampling tests. As the *Armstrong* court stated: "It is generally agreed that the risk of harm from asbestos stems from inhalation of fibers, not from how much asbestos is on the surfaces of a room." *In re Armstrong*, 285 B.R. at 867-68.

The *Daubert* issues decided in *Armstrong* are directly relevant to this case. Here, as in *Armstrong*, the dust method fails under *Daubert* for each of the following reasons:

---

[3]  *See* Corn Rpt. (Dckt. No. 9663); Morse Rpt. (Dckt. No. 9664); Lee Rpt. (Dckt. No. 9665); Hughson Rpt. (Dckt. No. 9666).

2

- The method for collecting samples of dust introduces uncontrolled variability, the extent of which is unknown, because of variations in surface texture, cleaning history, nozzle velocity, and collection technique, and because the distribution of dust on a floor surface is non-random.

- The "indirect" method specified for analyzing dust samples alters the material that is collected by shaking it and subjecting it to ultrasonic waves in an acidic solution, which introduces a large, but variable, bias into the reported results.

- Even if the dust method accurately reported asbestos concentrations in settled dust – which it does not – it cannot be used to predict the concentration of respirable asbestos that is, or may be, in the air.

- For all the reasons stated above, the settled dust method has not won general acceptance by government regulators or scientists as a measure of the human exposure hazard posed by asbestos.

The Court is not being asked in this brief to make these findings on relevance and reliability. Rather, even a cursory examination of this list of shortcomings in dust sampling techniques demonstrates why dust sampling is so well suited for a threshold *Daubert* hearing, so that these determinations can be made in Phase I. The issues have already been briefed and argued in *Armstrong*, and many of these issues were also briefed before this Court in advance of the ZAI hearing in these cases. Four experts have already submitted reports on dust sampling. With this easily accessible record, the Debtors submit that this *Daubert* issue is appropriately addressed early in Estimation Phase I and will significantly advance the resolution of this Chapter 11.

It is worth noting at the outset that -- contrary to the alarmist predictions presented in claimants' brief -- the Court also is not being asked here to determine the validity of particular air sampling methodologies or the precise amount of respirable asbestos that must be present in a building to pose a human health hazard. In other words, Phase I will not be a generalized examination of air sampling methods and it will certainly not be a determination of "a quantitative risk model" as posited by claimants. Rather, Phase I will be narrowly focused on the

single issue of whether dust sampling is a scientific technique that meets the strictures of *Daubert* such that it may be admitted as proof in a federal bankruptcy court.

## ARGUMENT

1. **THE ESTIMATION PROCESS MUST CONSIDER THE VALIDITY OF CLAIMS.**

The Bankruptcy Code requires a specific claims objection process to ensure that only valid claims receive compensation. A debtor must be afforded the opportunity to make objections to any asserted claims. *See* 11 U.S.C. § 502(a). Once a properly supported objection is lodged, the underlying burden is on the claimant to show, by a preponderance of the evidence, that the claim is valid. *See* 9 Collier on Bankruptcy ¶ 3001.09[2] at 3001-26 (15th ed. revised).

Under the plain language of the Bankruptcy Code, these procedures must be employed to eliminate claims for which the debtor is not liable. *See, e.g., In re G.I. Indus. Inc.*, 204 F.3d 1276, 1281 (9th Cir. 2000) ("[A] claim cannot be allowed [under section 502(b)(1)] if it is unenforceable under nonbankruptcy law."); *In re Sanford*, 979 F.2d 1511, 1513 (11th Cir. 1992) ("A claim against the bankruptcy estate will not be allowed in a bankruptcy proceeding if the same claim would not be enforceable against the debtor outside of bankruptcy."); *In re Buchholz*, 224 B.R. 13, 19 (Bankr. D.N.J. 1998) (disallowing claim that was "defective under both Federal and New Jersey State law").

Not only does the Bankruptcy Code contemplate objections to the validity of claims, it expressly reserves the debtor's right to assert any and all defenses to claims: "[]the estate shall have the benefit of a defense available to the debtor as against any entity . . . including statute of limitations, statutes of brands, usury and other personal defenses." 11 U.S.C. § 558. *See In re Nuisance Corp.*, 17 B.R. 80, 82 (Bankr. D.N.J. 1981) ("If . . . the claim falls within one of the paragraphs of § 502(b), it is simply not allowable. . . . To the extent that applicable law,

including state law, provides the debtor a defense to the claim of a creditor, absent bankruptcy, such defense is available . . . in objecting to the claim.").

Bankruptcy courts repeatedly have indicated that estimation is a streamlined adjudication to determine the merits of asserted claims. In conducting an estimation, "[t]he court is bound by the legal rules which may govern the ultimate value of the claim." *Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134, 136 (3d Cir. 1982). *See also In re O.P.M. Leasing Serv., Inc.*, 79 B.R. 161 166 (S.D.N.Y. 1987) (same). Accordingly, courts have made clear that these rules apply in *estimation* proceedings, as well as in the *liquidation* of individual claims. *See Bittner*, 691 F.2d at 135-47 (affirming bankruptcy court's estimation where the bankruptcy court "estimated the value of . . . stockholder's claims according to the ultimate merits of their state court action"). *See also In re Brings Cotton Mktg., Inc.*, 737 F.2d 1338, 1340-41 (5th Cir. 1984) (affirming a bankruptcy court's estimation of the value of certain contingent "on-call" contracts for purposes of a liquidation based on applicable principles of bankruptcy law and state law); *In re Aspen Limousine Serv., Inc.*, 193 B.R. 325, 337 (D. Colo. 1996) (holding that in conducting an estimation, "the court is bound by the legal rules governing the ultimate value of the claim").

Claimants' argument that the Court cannot invalidate claims during the estimation process because it would somehow amount to a claim-by-claim adjudication is specious. Bankruptcy courts *must* reject invalid claims, and routinely do so during the process of estimation. Indeed, one of cases that claimants cite, *In re G-I Holdings*, actually held that the Debtor would be allowed *during initial phases of the estimation* to bring summary judgment motions to strike invalid claims: "During the first stage G-I Holdings will be permitted to present any relevant defenses and can attack any medical evidence submitted by the Committee *in an estimation proceeding*. Moreover, G-I Holdings will be permitted to move for summary

5

judgment on certain issues on a claims-wide consolidated basis pursuant to Federal Rules of Bankruptcy Procedure 7042." *In re G-I Holdings, Inc.*, 323 B.R. 583, 626 (Bankr. D. N.J. 2005); *id.* at 607 ("creditors are not entitled to a jury trial *in an estimation proceeding* under § 502(c) when the purpose of the proceeding is to determine the *allowance or disallowance* of claims against the bankrupt estate"); *id.* at 615 ("Consequently, this Court has jurisdiction to determine any claims objections that G-I Holdings may assert *during the course of the estimation proceedings.*") (emphasis added). *See also In re Chateaugay Corp.*, 111 B.R. 67, 77 (Bankr. S.D.N.Y. 1990) ("[T]his Court believes that its jurisdictional mandate to determine the Objection goes beyond merely estimating these Claims for the purpose of confirming a plan although that may be the ultimate purpose of the entire claims adjudication process. A bankruptcy court has the right and duty to disallow claims as a threshold matter *if no legal basis* for the claim exists against the debtor.").

Because *all* PD claims are now before this Court, the objection/disallowance process and the estimation process can and must work together hand and glove. To the extent claims are disallowed through objections, these claims need not be estimated or may be estimated at zero. Alternatively, to the extent estimation determines common issues affecting large numbers of claims, those claims may in turn be disallowed. Recognizing this crucial interrelationship between objections and estimation, the PD case management orders that are in place are designed to make efficient use of both processes to resolve the universe of PD claims. Specifically, the orders reflect a system whereby the issues easiest to address are raised first, through objections to batches of claims for which minimal evidentiary fact development is necessary, and then proceeding on through Phase I and Phase II estimations, where increasingly complex matters may be addressed.

2.  **THE ESTIMATION PROCESS MAY ASSIGN VALUE ONLY TO CLAIMS SUPPORTED BY EVIDENCE ADMISSIBLE UNDER THE FEDERAL RULES OF EVIDENCE.**

As demonstrated above, the Bankruptcy Code requires that only valid claims receive consideration during an estimation process. Although the validity of a claim is determined by application of state substantive law, the Court must apply the Federal Rules of Evidence to the estimation proceedings. Accordingly, an estimation of Grace's asbestos liability, both current and future, should assign value only to claims that are supported by evidence (1) that is admissible under the Federal Rules of Evidence, and (2) that establishes each element of liability under state substantive law.

The estimation process is governed by the Bankruptcy Rules, which require the courts to apply the Federal Rules of Evidence. *See* Fed. R. Bankr. P. 9017 ("The Federal Rules of Evidence . . . apply in cases under the Code."). Accordingly, courts have universally recognized that even though bankruptcy courts can apply state substantive law, they are required to apply the Federal Rules of Evidence. *See, e.g., In re Lids Corp.*, 281 B.R. 535, 541 n. 3 (Bankr. D. Del. 2002) ("Federal Rules of Bankruptcy Procedure makes the Federal Rules of Evidence applicable in bankruptcy cases.").

The applicability of the Federal Rules of Evidence to bankruptcy cases and proceedings is not altered in the estimation context. For example, in *In re USG Corp.*, 290 B.R. 223, 227 (Bankr. D. Del. 2003), the court held that in presenting its defenses during an estimation proceeding regarding asbestos personal injury claims, the debtors may "attack certain medical evidence under the Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm.* . . . ." *See also In re CLC of Am., Inc.*, 68 B.R. 512, 515 (Bankr. E.D. Mo. 1986) (applying Federal Rules of Evidence in estimation proceeding to determine admissibility of admissions made by debtor in

7

underlying state court action). Accordingly, the Federal Rules of Evidence govern admission of evidence during the estimation proceedings that will take place in these Chapter 11 cases.

It is a logical fallacy to conclude that merely because state substantive law determines a claim's validity and value, claims are to be valued according to what would happen in the state tort system. There is a distinct difference between valuing claims pursuant to state law and valuing claims according to state court awards/settlements.[4] Indeed, although the court in *Owens Corning* held that state substantive law applies in determining the validity of claims, federal procedural law was applied in the estimation process. *Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719 (D. Del. 2005). Accordingly, an estimation must acknowledge that claims will be determined under the application of federal procedures rather than state procedures.

The U.S. Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), established that a federal trial court must act as a gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589. In 2000, Rule 702 of the Federal Rules of Evidence was amended to incorporate, among other things, the "reliability" requirement of *Daubert*. *See* Fed. R. Evid. 702 Advisory Committee's Note (noting that the amendment affirms the trial court's responsibility to ensure the reliability of expert evidence). As discussed above, estimation proceedings are governed by the Federal Rules of Evidence. Thus, the assessment of whether proffered expert testimony is

---

4   Rule 408 of the Federal Rules of Evidence prohibits using settlement history to determine liability. Rule 408 makes clear that such evidence "is not admissible to prove liability for . . . the claim or its amount." Fed. R. Evid. 408. The rationale of Rule 408's prohibition on the use of settlement history is equally applicable in an estimation proceeding. The exclusion of evidence of past settlements for determining liability is based upon the recognition that a party may settle a particular case or a group of cases for any number of reasons unrelated to the actual merits of the dispute of the validity of the underlying claims. Rule 408 typically is not invoked in other Chapter 11 asbestos cases because other cases appear to involve estimations in which settlement history is used with the consent of the debtors.

admissible under Rules 702 and 703 in such proceeding must include an analysis of the reliability standards established in *Daubert*. *See* Fed. R. Evid. 104(a); *Daubert*, 509 U.S. at 592-93.

3. **THE DUST SAMPLING METHODOLOGY IS UNIQUELY WELL-SUITED TO A THRESHOLD *DAUBERT* PROCEEDING.**

The principles of *Daubert*, as articulated above, are applicable in bankruptcy claims estimation proceedings to assess the admissibility of scientific and technical evidence. Bankruptcy courts, pursuant to Rule 702 and *Daubert*, have excluded unreliable scientific and medical evidence in contested proceedings involving the evaluation of bankruptcy claims.

As noted above, in *In re Armstrong*, a proceeding to determine on the merits the validity of certain asbestos property damage claims, the bankruptcy court excluded evidence purporting to measure the amount of airborne asbestos in approximately 600 properties on the ground that the method used to measure such alleged "contamination" -- dust sampling -- did not meet the standards of scientific reliability and validity mandated by *Daubert*. Specifically, the *Armstrong* court found that (1) the method in question was not a scientifically valid method of quantifying the level of asbestos "contamination" in a room or building, and (2) because there was no statistical correlation between surface dust (which was collected by the method in question and then misused by attempting to calculate the amount of airborne dust in the room or building) and airborne dust, the method had "no valid scientific connection to the pertinent inquiry." 285 B.R. at 870-71.

(a)   **The *Armstrong* Court Found That Dust Sampling Is Not Reliable.**

The "settled dust" method at issue in *Armstrong* was an analytical protocol (ASTM D 5755) adopted by the American Society for Testing and Materials ("ASTM").[5] The ASTM Method begins with collection of a sample of dust from a known surface area (usually 10cm x 10cm) using a special microvacuum that is connected to the same type of "cassette" used to collect samples in air monitoring. ASTM Method at §§ 8.1-8.8. The sample is analyzed using the "indirect preparation" method of examining a specimen through transmission electron microscopy (TEM). *Id.* at §§ 104.-15.5. Notably, the indirect method requires that the material collected by the microvacuum on the original filter be washed, put into an acidic solution, shaken, sonicated (bombarded by high energy sound waves), diluted, and then distributed on a new filter for reading under a microscope.

The *Armstrong* court found that the settled dust method was not an admissible scientific method because, in part, it contains bias and variability. 285 B.R. at 869. In fact, the court found that the data from the indirect method may "suffer from significant variability in the size and number of structures reported by different laboratories preparing and analyzing identical samples." *Id.* The court also found that the number of asbestos structures counted under the indirect method is always higher than through the direct method. *Id.* Finally, the court held that

---

[5]   The PD Committee argues that EPA has rejected the use of air sampling as a primary tool for assessing responses to in-place ACM. See Memorandum of Law of the Official Committee of Asbestos Property Damage Claimants In Opposition to Consideration of the Debtors' Proposed "Methodology Issue" as Part of the Estimation of Asbestos Property Damage Claims at 21. The Committee is correct that EPA recommends air sampling in conjunction with visual inspection for ongoing monitoring of possible asbestos contamination in a building. *See* Managing Asbestos In Place, A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials at 14-15 (July 1990). Significantly, however, EPA does *not* recommend *dust sampling* for any such monitoring. Rather, EPA notes that dust testing has no "universally accepted standardized protocols" and "the results of this testing are difficult to interpret and evaluate at this time." *Id.* at 14.

10

settled dust testing was not admissible because its peer review left its accuracy in serious doubt. *Id.* at 870.

### (b) The *Armstrong* Court Found That Dust Sampling Is Not Relevant.

In addition, the *Armstrong* court determined that the indirect method had a problem with "fit." *Armstrong*, 285 B.R. at 871. Rule 702 requires, in addition to adequate qualifications and methodology, that the proffered expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." *U.S. v. Mathis*, 264 F.3d 321, 334 (3d Cir. 2001), *cert. denied*, 535 U.S. 908 (2002). In other words, even if the expert's proffered testimony constitutes scientific knowledge based on a reliable methodology, it will be excluded under the fit requirement if it is not scientific knowledge for purposes of the case. *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3d Cir. 1994).

The settled dust method was found not to "fit" in *Armstrong* because it could not establish whether respirable asbestos fibers are or could become airborne – as they must to pose a threat to human health.[6] It is beyond dispute that asbestos fibers represent a hazard to human beings only if they are breathed into the lungs in sufficient quantities to cause disease. As stated by the EPA, "[a]sbestos must be in the air to pose a health problem." Environmental Protection

---

[6] Attorneys for the PD Committee argue in their brief that the *Armstrong* court found that dust sampling could be used to ascertain whether there is *any* asbestos on a surface in a building. *See* Memorandum of Law of the Official Committee of Asbestos Property Damage Claimants In Opposition to Consideration of the Debtors' Proposed "Methodology Issue" as Part of the Estimation of Asbestos Property Damage Claims at 27 (quoting *Armstrong*, 285 B.R. at 871) ("the *Armstrong* court did find that dust sampling was a 'useful tool for determining whether there is *any* asbestos on the surfaces of a room or building.'"). That is not the issue here, however, since it is only respirable asbestos at certain levels that creates a health risk and therefore an unreasonable risk of harm. Since the presence of dust on a building surface, even if it could be measured reliably, which it cannot, does not correlate in any way to respirable asbestos in the air, the dust sampling method is not relevant to determining the existence of a valid claim based upon alleged asbestos contamination. The *Armstrong* court likewise found that the presence of surface dust was irrelevant: "In other words, the indirect method simply doesn't fit. Any attempt to estimate airborne asbestos levels from measurements of surface dust would be based on nothing more than subjective belief and sheer speculation." *Armstrong,* 285 B.R. at 871.

Agency, "EPA Response to September 11," Frequently Asked Questions, *available at* http://www.epa.gov/wtc/questions/ index.html at 4. Accordingly, for asbestos exposure, it has long been established that air monitoring is the most suitable method for determining the airborne concentration of respirable asbestos. *See, e.g.*, 29 C.F.R. § 1910.1001 (OSHA air monitoring requirements); 40 C.F.R. § 763.90(i) (EPA air monitoring requirements for clearance of asbestos abatement project).

The settled dust method tells the user nothing about what is in the air, nor does it tell the user about what is likely to get in the air. In rejecting the settled dust results, the *Armstrong* court stated, "it is generally agreed that the risk of harm from asbestos stems from inhaling fibers, not from how much asbestos is on the surfaces of a room." *Armstrong*, 285 B.R. at 867-868. "Thus, the focus of testing is not on how much asbestos is present in a room or building, but upon how many respirable asbestos structures are in the air during the normal activity." *Id.* at 868.

Furthermore, as the *Armstrong* court noted, ASTM D5575 itself warns the user that there is no known "single direct relationship between asbestos-containing dust and potential human exposure..." and that the method is not suitable to "evaluate the safety or habitability of buildings with asbestos-containing materials." *Id.* at 869; ASTM D5575 at § 5.1.2. Judge Newsome concluded: "because there is no statistical correlation between surface dust and airborne dust, and because airborne dust is what poses the risk of harm, the indirect method has no valid scientific connection to the pertinent inquiry." *Armstrong*, 285 B.R. at 871. As a result, Judge Newsome found the dust sample results were not admissible in the proceeding to determine the validity of asbestos property damage claims.

### (c) The *Armstrong* Court's Approach Was Effective And Confirms That This Court Should Decide The Dust Sampling Methodology Issue As A Threshold Matter

The *Armstrong* case confirms that the dust sampling methodology issue should be heard as part of Phase I of the estimation process. Both estimation (and consensual resolution) of these Chapter 11 cases will be sped significantly if critical issues are heard early in the estimation process, much as *Armstrong* achieved consensual resolution in part by holding an early *Daubert* hearing on the dust sampling methodology. As this Court observed, it makes sense to determine whether the dust sampling methodology is reliable and relevant "before everybody goes out and tries to get dust samples in 4,003 buildings." (7/19/2005 Hrg. Tr. at 86). Doing so may save time and money and "streamline this process." (7/19/2005 Hrg. Tr. at 86; *see also id.* at 92). With good reason, the Court noted at the July 19, 2005 hearing that it was "inclined to say the *Daubert* hearing should go forth first." (7/19/2005 Hrg. Tr. at 106).

The PD Committee makes a transparent attempt to avoid the implications of *Armstrong* by arguing that the *Armstrong* ruling was dependent upon the non-friability of the asbestos-containing product. That is flat wrong.[7] Nothing in the *Armstrong* court's reasoning depended on the fact that the floor tiles at issue were considered non-friable.[8] Even a cursory reading of the *Armstrong* opinion confirms that the decision turned on the reliability of the collection

---

[7] Moreover, the PD Committee's argument misses the point. The very purpose of the Phase I *Daubert* hearing would be to determine whether dust sampling could be a reliable methodology to be used *in the circumstances here*. The PD Committee will have the opportunity to present scientific evidence, if any exists, about the relative validity of dust sampling in varying conditions at such a hearing.

[8] The PD Committee also attempts to distinguish friable from non-friable asbestos products by reference to government regulation of those products, including the National Emission Standards for Hazardous Air Pollutants. 40 C.F.R. § 763 et. seq. The Committee is correct that surface treatment ACM must be removed prior to renovation or demolition of the building. They fail to acknowledge, however, that asbestos floor tiles and certain other non-friable asbestos containing materials are also subject to regulation and must also be removed prior to renovation or demolition if the materials will be subjected to sanding, grinding, cutting, or abrading during renovation or demolition. 40 C.F.R. § 61.145.

13

process and the relevance of the measurement results, *not* on the source of the asbestos.[9] The steps in the dust sampling method are unreliable (*e.g.*, the court points out that the method was not tested in a "sufficiently controlled fashion", that peer review "leaves its accuracy in serious doubt" and that "the potential rate of error has not been quantified") and lacking "fit" (the court concluded that dust sampling "simply doesn't fit" because "there is no statistical correlation between surface dust and airborne dust, and because airborne dust is what poses risk of harm, the indirect method has no valid scientific connection to the pertinent inquiry."). 285 B.R. at 870. The same methodological inadequacies apply whether the dust method is being used to sample dust that potentially contains asbestos fibers from the background environment, from floor tiles or from fireproofing products, and there is no correlation to levels of airborne dust no matter what the surface dust source. Plainly, the court's decision does not turn on the source of the surface dust being tested.

Finally, the PD Committee agues that other courts have admitted dust sampling evidence.[10] What the Committee fails to mention is that, even for the few cases they managed to

---

[9] The PD Committee is also incorrect when it asserts, without support, that over time Monokote-3 and acoustical plaster will "experience deterioration, delamination and physical damage and will shed asbestos containing dust." See Memorandum of Law of the Official Committee of Asbestos Property Damage Claimants In Opposition to Consideration of the Debtors' Proposed "Methodology Issue" as Part of the Estimation of Asbestos Property Damage Claims at 27. As Dr. Lee states in his report, "[t]he constituents of the cementitious fireproofing materials and acoustical plasters at issue are stable and do not spontaneously degrade or shed individual fibers even when physically or chemically attacked." Lee Rpt. at 15. The fact that the parties dispute this fundamental issue only underscores the need to have a Phase I Daubert hearing.

[10] In its brief, the PD Committee references a purported "history" of Grace asbestos litigation that the company is now supposedly attempting to distance itself from, implying that Grace has resoundingly lost in its asbestos property damage litigation. These insinuations are misleading with respect to Grace's overall rate of success in litigation and resolution of cases. Between 1983 and early 2001, Grace faced a total of 379 property damage lawsuits covering thousands of buildings. In nearly 20 years of litigating traditional property damage cases, Grace's success rate included: 140 cases resulting in dismissals or summary judgment victories for Grace; in cases tried to verdict, after all appeals had run, defense wins in 9 cases and losses in 7 cases; and 207 cases resulting in settlements. It can hardly be said that Grace's defenses were "roundly rejected," as counsel for claimants assert.

find where dust sampling had been used by a testifying plaintiff's expert, virtually all of the opinions predate the Supreme Court's explication of the standards for admissibility of scientific evidence in *Daubert*.[11] The two cases that claimants' attorneys cite that were dated after the *Daubert* ruling, *i.e*, after June 1993, do not address the issue before this Court. Those cases simply *mention* the taking of dust samples by plaintiffs' experts, but do not decide the admissibility of such evidence.[12]

4. **THE PD COMMITTEE'S ATTACKS ARE OFF-BASE.**

The PD Committee's brief spends more than eight pages arguing an issue that is not before the Court. Specifically, the Debtors are not seeking a determination that a quantitative risk model based on air should be decided in Phase I of the estimation process. As set out in the Debtors' 15th Omnibus Objection at pages 6-8, the Debtors seek threshold rulings only on dust sampling and constructive notice as part of Phase I. *See* Debtors' 15th Omnibus Objection at 6-8; *see also* Debtors' Brief in Support of Entry of Case Management Orders for Asbestos Property Damage Claims at 7-8. Thus, the only question that will be before the Court in Phase I is

---

[11] Decisions in *City of Greenville v. W.R. Grace & Co.*, 827 F.2d 975 (4th Cir. 1987), *Tioga Pub. Sch. Dist. No. 15 of Williams Cty., State of N.D. v. U.S. Gypsum Co.*, 984 F.2d 915 (8th Cir. 1993), *Reorganized Church of Jesus Christ of Latter Day Saints v. U.S. Gypsum Co.*, 882 F.2d 335 (8th Cir. 1989) all were published before *Daubert*. The Tenth Circuit's opinion in *Perlmutter v. U.S. Gypsum Co.*, 4 F.3d 864 (1993) was published only three months after *Daubert*, and was an appeal from a trial that took place prior to 1993. As such, the appellate court was required to "tak[e] the evidence and all reasonable inferences in the light most favorable to" the plaintiffs. None of these cases addressed the issue of whether dust sampling methodology was reliable or admissible under existing federal standards for admissibility of scientific evidence or under the standards set forth in *Daubert*.

[12] These cases are *Perlmutter v. U.S. Gypsum Co.*, 4 F.3d 864 (1993), discussed in the previous footnote, and *Celotex Corp. v. AIU Ins. Co. (In re Celotex Corp.)*, 196 B.R. 973 (Bankr. M.D. Fla. 1996). While the Celotex court noted that plaintiff's experts "contend the dust sampling method is the appropriate method to measure for asbestos concentrations within a building," the Court did not address the admissibility of such evidence and indeed, criticized aspects of such proposed testing. *Id*. at 987 ("While the experts agreed the accuracy of the dust sample is dependent in large part on the accuracy of the collection of the sample, in this Court's view, Mr. Hatfield's methodology used to collect dust samples was anything but precise and accurate."); *id*. at 988 ("the experts testified that there is no correlation between asbestos concentration in the air and asbestos concentration in dust thus no correlation exists to compare the two").

15

whether dust sampling is a reliable and relevant methodology for accurately measuring respirable asbestos in a building. More complex issues, including what levels of airborne asbestos constitute a health risk, are deferred to Phase II. At the July 19, 2005 hearing, the Debtors could not have been more clear on this point:

> Well, the first issue has really got two parts to it. The first part is methodology, that is what kind of data can be considered in determining whether there is a risk necessitating removal. The second issue is if the data has been properly obtained, what does that data show? Does it show that this asbestos-containing product in place actually gives rise to a risk sufficient to warrant removal? So, there are really two parts to it, and we have constructive notice. (7/19/2005 Hrg. Tr. at 31-32).

> The phase three estimation is relatively straightforward. First we take on the second prong of the hazard issue, which is, well, if there is air data, does it show that there's a problem? There are then a whole series of other issues. (7/19/2005 Hrg. Tr. at 40).

Laboring under the false assumption that the Debtors are seeking to impose a quantitative risk model based on air sampling as part of Phase I, the PD Committee explains that their interpretation of the "contamination" required for a property damage claim is at odds with the Debtors'. But, the Court need only decide in Phase I whether dust sampling is a reliable and relevant methodology such that it could ever be used in *later* phases of the estimation by a claimant attempting to demonstrate that alleged contamination creates an unreasonable risk of harm to people in a building.

It is claimants' burden ultimately to prove an unreasonable risk of harm from asbestos in order to maintain a valid claim against the Debtors. In later Phases of the estimation of PD claims, the Court will have to determine the precise showing that must be made for recovery for alleged property damage. Thus, the Court will have to determine whether asbestos-containing materials in a building present an unreasonable risk of harm such that a claim arises. It makes perfect sense to take the first step -- in Phase I -- of ruling on the admissibility of the dust

16

sampling method so that this issue is not disputed repeatedly in the merit's based estimation of thousands of PD claims.

In Phase I, therefore, the Court's analysis will be limited to whether dust sampling is sufficiently reliable and relevant to be admissible as evidence that might demonstrate an unreasonable risk of harm to people. Because dust sampling reveals nothing about the presence of asbestos in the air that people breathe, among other reliability problems with the method, the Debtors believe the Court will find that dust sampling is not so admissible.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]

## CONCLUSION

For the reasons stated above, this Court should hold a Daubert hearing on the reliability and relevance of the dust sampling methodology as part of Phase I of the estimation of asbestos property damage claims.

Dated: October 31, 2005

        Respectfully submitted,

        KIRKLAND & ELLIS LLP
        David M. Bernick, P.C.
        Michelle H. Browdy
        200 East Randolph Drive
        Chicago, Illinois 60601
        (312) 861-2000

        and

        PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB, PC

        */s/ James E. O'Neill*
        Laura Davis Jones (Bar No. 2436)
        James E. O'Neill, Jr. (Bar No. 4042)
        919 North Market Street, 16th Floor
        P.O. Box 8705
        Wilmington, DE 19899-8705
        Telephone: (302) 652-4100
        Facsimile: (302) 652-4400

        Co-Counsel for the Debtors and Debtors in Possession