UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                              .
IN RE:                        .      Chapter 11
                              .
W.R. Grace & Co., et al.,     .
                              .
        Debtor(s).            .      Bankruptcy #01-01139 (JKF)
```
.......................................................

Wilmington, DE
October 24, 2005
12:00 p.m.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For The Debtor(s):              Janet S. Baer, Esq.
                                Kirkland & Ellis, LLP
                                200 E. Randolph Drive
                                Chicago, IL 60601

                                Amanda C. Basta, Esq.
                                Kirkland & Ellis, LLP
                                655 Fifteenth Street, N.W.
                                Washington, DC 20005

                                Barbara H. Harding, Esq.
                                Kirkland & Ellis, LLP
                                655 Fifteenth Street, N.W.
                                Washington, DC 20005

                                Michelle H. Browdy, Esq.
                                Kirkland & Ellis, LLP
                                200 E. Randolph Drive
                                Chicago, IL 60601

                                James O'Neill, Esq.
                                Pachulski, Stang, Ziehl,
                                Young, Jones & Weintraub
                                919 North Market Street
                                Wilmington, DE 19801

| | |
|---|---|
| For UCC: | Kenneth Pasquale, Esq.<br>Stroock Stroock & Lavan, LLP<br>180 Maiden Lane<br>New York, NY 10038 |
| | Lewis Kruger, Esq.<br>Stroock Stroock & Lavan, LLP<br>180 Maiden Lane<br>New York, NY 10038 |
| For Asbestos PI Committee,:<br>The Eaves Law Firm | Mark T. Hurford, Esq.<br>Campbell & Levine, LLC<br>800 North King St.-Ste. 300<br>Wilmington, DE 19801 |
| For Official Committee of:<br>Asbestos Property Damage<br>Claimants | Theodore J. Tacconelli, Esq.<br>Ferry, Joseph & Pearce, PA<br>824 Market Street<br>Wilmington, DE 19899 |
| For Equity Security Holders:<br>Committee | Gary M. Becker, Esq.<br>Kramer Levin Naftalis<br>& Frankel, LLP<br>919 Third Ave.<br>New York, NY 10022 |
| For D.K. Acquisition: | Jennifer L. Scoliard, Esq.<br>Klehr Harrison Harvey<br>Branzburg & Ellers, LLP<br>Mellon Bank Center<br>919 Market St.-Ste. 1000<br>Wilmington, DE 19801 |
| For Maryland Casualty:<br>Company | Jeffrey C. Wisler, Esq.<br>Connolly, Bove, Lodge<br>& Hutz, LLP<br>1220 Market Street-10th Fl.<br>Wilmington, DE 19899 |
| For Campbell Cherry Harrison:<br>Davis Dove, PC | Adam Landis, Esq.<br>Landis Rath & Cobb, LLP<br>919 Market st.-Ste. 600<br>Wilmington, DE 19801 |
| For Certain Asbestos:<br>Claimants | Peter Lockwood, Esq.<br>Caplin & Drysdale, Chartered<br>One Thomas Circle, N.W.<br>Washington, DC 20005 |

```
For                            Etta R. Wolfe, Esq.
                               Smith Katzenstein & Furlow, LLP
                               The Corporate Plaza
                               800 Delaware Ave.
                               Wilmington, DE 19899

For State of Montana:          Francis A. Monaco, Jr., Esq.
                               Monzack & Monaco, PA
                               Ste. 400
                               1201 North Orange Street
                               Wilmington, DE 19801

For Century:                   Linda Carmichael, Esq.
                               White & Williams, LLP
                               824 N. Market St.-Ste. 902
                               Wilmington, DE 19899

For One Beacon/Seaton:         David Primack, Esq.
                               Drinker Biddle & Reath, LLP
                               One Logan Square
                               18th & Cherry Street
                               Philadelphia, PA 19103

For Lloyds of London &:        Mary K. Warren, Esq.
Certain London Market          Linklaters
Companies                      1345 Ave. of the Americas
                               New York, NY 10105

                               Brenda DiLuigi, Esq.
                               Linklaters
                               1345 Ave. of the Americas
                               New York, NY 10105

For Continental Casualty:      Elizabeth M. DiCristofaro, Esq.
Ins.                           Ford Marrin Esposito Witmeyer
                               & Gleser, LLP
                               Wall Street Plaza
                               New York, NY 10005

For Federal Insurance:         Jacob C. Cohn, Esq.
Company                        Cozen O'Connor
                               1900 Market Street
                               Philadelphia, Pa 19103

For Travelers Insurance:       Elisa Alcabes, Esq.
Company                        Simpson Thatcher & Bartlett, LLP
                               425 Lexington Ave.
                               New York, NY 10017
```

For The Futures:                    Jack Phillips, Esq.
Representative                      Phillips, Goldman & Spence
                                    1200 North Broom Street
                                    Wilmington, DE 19806

                                    Richard H. Wyron, Esq.
                                    Swidler Berlin, LLP
                                    The Washington Harbour
                                    3000 K. street, N.W.-Ste. 300
                                    Washington, DC 20007

For Speights & Runyan:              Christopher Loizides, Esq.
Claimants, Dies & Hile              Loizides & Associates
Claimants, Perrini                  Legal Arts Building
Corporation                         1225 King Street-Ste. 800
                                    Wilmington, DE 19801

For Macerich Fresno Limited:        Amanda Winfree, Esq.
Partnership                         Ashby & Geddes
                                    222 Delaware ave.-17th Fl.
                                    Wilmington, DE 19899

For Baron & Budd, Reaud:            Sander L. Esserman, Esq.
Morgan & Quinn                      Stutzman Bromberg Esserman
                                    & Pfilka, PC
                                    2323 Bryan St.-Ste. 2200
                                    Dallas, TX 75201

                                    Steven A. Felsenthal, Esq.
                                    Stutzman Bromberg Esserman
                                    & Pfilka, PC
                                    2323 Bryan St.-Ste. 2200
                                    Dallas, TX 75201

For ZAI Claimants:                  William D. Sullivan, Esq.
                                    Buchanan Ingersoll, PC
                                    The Nemours Building
                                    1007 N. Orange Street-Ste. 1110
                                    Wilmington, DE 19801

For Robbins Cloud Greenwood:        Joseph Frank, Esq.
& Lubel                            Frank Gecker, LLP
                                    325 N. LaSalle St.-Ste. 625
                                    Chicago, IL 60610

For State of California,:           Christina J. Kang, Esq.
Department of General              Hahn & Hessen, LLP
Services                           488 Madison Ave.-14th Fl.
                                    New York, NY 10022

```
(Via telephone)

For the Debtors:              David M. Bernick, Esq.
                             Kirkland & Ellis, LLP
(Via telephone)              200 E. Randolph Drive
                             Chicago, IL 60601


                             Lori Sinanyan, Esq.
(Via telephone)              Kirkland & Ellis
                             777 S. Figueroa Street
                             Los Angeles, CA 90017


                             David Siegel, Esq.
(Via telephone)              In-House counsel
                             W.R. Grace & Company


                             Paul J. Norris, Esq.
(Via telephone)              In-House counsel
                             W.R. Grace & Company


                             Mark Shelnitz, Esq.
(Via telephone)              In-House counsel
                             W.R. Grace & Company

The Official Committee of:   Scott L. Baena, Esq.
Asbestos Property Damage      Bilzin Sumberg Baena Price
Claimants                     & Axelrod, LLP
(Via telephone)              200 S. Biscayne Blvd. -Ste. 2500
                             Miami, FL 33131


                             Matthew I. Kramer, Esq.
(Via telephone)              Bilzin Sumberg Baena Price
                             & Axelrod, LLP
                             200 S. Biscayne Blvd. -Ste. 2500
                             Miami, FL 33131


                             Allyn Danzeisen, Esq.
(Via telephone)              Bilzin Sumberg Baena Price
                             & Axelrod, LLP
                             200 S. Biscayne Blvd. -Ste. 2500
                             Miami, FL 33131


                             Daniel Speights, Esq.
(Via telephone)              Speights & Runyan
                             200 Jackson Ave. E.
                             Hampton, SC 29924
```

```
For Baron & Budd, Reaud:        Van J. Hooker, Esq.
                                Stutzman Bromberg Esserman
                                & Pfilka, PC
                                2323 Bryan St.-Ste. 2200
                                Dallas, TX 75201

                                David J. Parsons, Esq.
  (Via telephone)               Stutzman Bromberg Esserman
                                & Pfilka, PC
                                2323 Bryan St.-Ste. 2200
                                Dallas, TX 75201

For AIG Member Companies:       Michael S. Davis, Esq.
                                Zeichner Ellman & Krause, LLP
  (Via telephone)               575 Lexington Ave.
                                New York, NY 10022

                                Michael Insalco, Esq.
                                Zeichner Ellman & Krause, LLP
  (Via telephone)               575 Lexington Ave.
                                New York, NY 10022

For Everest Reinsurance:        Brian L. Kasprzak, Esq.
Company                         Marks O'Neill O'Brien
  (Via telephone)               & Courtney, PC
                                1880 JFK Pkwy.-Ste. 1200
                                Philadelphia, PA 19103

Financial Advisor to FCR:       Monique Almy, Esq.
                                Swidler Berlin, LLP
  (Via telephone)               The Washington Harbour
                                3000 K. Street, N.W.-Ste. 300
                                Washington, DC 20007

                                Joseph Radecki, Esq.
  (Via telephone)               Swidler Berlin, LLP
                                The Chrysler Building
                                405 Lexington Ave.
                                New York, NY 10174

                                Jonathan Brownstein, Esq.
  (Via telephone)               Swidler Berlin, LLP
                                The Chrysler Building
                                405 Lexington Ave.
                                New York, NY 10174
```

For Royal Insurance:           Sarah Edwards, Esq.
                               Wilson Elser Moskowitz
(Via telephone)                Edelman & Dicker, LLP
                               3 Gannett Drive
                               White Plains, NY 10604


For The State of Montana:      Dale R. Cockrell, Esq.
                               Christensen Moore Cockrell
(Via telephone                 Cummings & Axelberg, PC
                               The Medicine Building
                               160 Heritage Way-Ste. 104
                               Kalispell, MT 59904


For C.N.A. Insurance:          Daniel M. Glosband, Esq.
                               Goodwin Procter, LLP
                               Exchange Place
                               Boston, MA 02109


For ZAI Claimants:             Edward J. Westbrook, Esq.
                               Richardson, Patrick, Westbrook
(Via telephone)                & Brickman, LLC
                               174 E. Bay Street
                               Charleston, SC 29401


For One Beacon/Seaton:         Michael Brown, Esq.
                               Drinker Biddle & Reath, LLP
(Via telephone)                One Logan Square
                               18th & Cherry Street
                               Philadelphia, PA 19103


For Allstate Insurance Co.:    Andrew K. Craig, Esq.
                               Cuyler Burk, LLP
(Via telephone)                Parsippany Corporate Center
                               Four Century Drive
                               Parsippany, NY 07054


For Claimants:                 Steve Baron, Esq.
                               Silber Pearlman, LLP
(Via telephone)                LB 32-5th Fl.
                               2711 N. Haskell Ave.
                               Dallas, TX 75204


For Everest Reinsurance Co.:   Leslie A. Epley, Esq.
McKinley Insurance             Crowell & Moring, LLP
(Via telephone)                1001 Pennsylvania Ave., NW
                               Washington, DC 20004

8

```
For Property Damage:          Darrell W. Scott, Esq.
Claimants                     Lukins & Annis, PS
(Via telephone)               717 W. Sprague Ave.-Ste. 1600
                              Spokane, WA 99201

For Libby Claimants:          Christopher M. Candon, Esq.
                              Cohn Whitesell & Goldberg, LLP
(Via telephone)               101 Arch Street
                              Boston, MA 02110

For Scotts Company:           Tiffany S. Cobb, Esq.
                              Vorys Sater Seymour
(Via telephone)               & Pease, LLP
                              52 East Gay Street
                              Columbus, OH 43216

For Acting U.S. Trustee:      David Klauder, Esq.
(Roberta A. DeAngelis)        U.S. Trustee's Office
                              844 King Street-Ste. 2313
                              Lock Box 35
                              Wilmington, DE 19801

Audio Operator:               Brandon J. McCarthy

Transcribing Firm:            Writer's Cramp, Inc.
                              6 Norton Rd.
                              Monmouth Jct., NJ 08852
                              732-329-0191
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1          THE CLERK:  All rise.

2          THE COURT:  Good afternoon.  Please be seated.  This

3  is the matter of <u>W.R. Grace</u>, Bankruptcy #01-1139.  The list of

4  participants I have by phone are Lori Sinanyan, David Bernick,

5  Andrew Craig, Steve Baron, Leslie Epley, Brian Kasprzak, Scott

6  Baena, Sean Walsh, Matthew Kramer, Allyn Danzeisen, Daniel

7  Speights, Mary Martin, Michael Brown, Darrell Scott, Edward

8  Westbrook, Joseph Radecki, Christopher Candon, Tiffany Cobb,

9  John O'Connell, Jonathan Brownstein, Monique Almy, Sarah

10  Edwards, Marti Murray, Daniel Glosband, David Siegel, Paul

11  Norris, Mark Shelnitz, Dale Cockrell, Michael Davis, Michael

12  Insalco, Van Hooker, and David Parsons.  Good afternoon.

13          MS. BAER:  Good afternoon, Your Honor, Janet Baer on

14  behalf of the Debtors.  Your Honor, with respect to item #1 on

15  the agenda, that matter's been continued to the November

16  hearing.  With respect to items #2, 3, and 4 these relate to a

17  matter in the State of Montana.  At the Montana Plaintiff's

18  request these matters are all being continued to the December

19  hearing.

20          THE COURT:  Just one second.  All right.

21          MS. BAER:  Your Honor, with respect to item #5, the

22  matter regarding the New Jersey Department of Environmental

23  Protection, that matter is being continued to the November

24  hearing on agreement of the parties.  And the same with #6,

25  Your Honor, which relates to it, the Debtor's Motion for An

1  Injunction.

2          THE COURT:  Okay.

3          MS. BAER:  That takes us to agenda item #7, which is

4  the Debtor's Fifth Omnibus Objection.  Your Honor, remaining on

5  the 5th omnibus objection are the matter of Peter Pierson's

6  claim.  There's a new briefing scheduled for Summary Judgment

7  Motions on that matter, which is contained in the Order I have

8  submitted and will be handing up.  There are a number of

9  environmental matters on there which we are working on a

10  stipulation on and hope that by the next hearing those will be

11  removed from that matter.  And there's a third matter involving

12  CHL.  That matter's being withdrawn, so hopefully the next time

13  I come before you this Fifth Omnibus Objection will be taken

14  care of, but for the Peter Pierson matter, which will be set

15  for substantive hearing in January.

16          THE COURT:  All right.  Thank you.

17     (Pause in proceedings)

18          THE COURT:  All right, that Order's entered, thank

19  you.

20          MS. BAER:  Your Honor, agenda item #8 is the Debtor's

21  eighth Omnibus Objections to claims.  There is one remaining

22  contested objection, it's to the claim of National Union.  We

23  have been negotiating a stipulation with Mr. Davis on behalf of

24  National Union.  I heard from him this morning that the

25  stipulation is -- looks to be okay in form, but he's waiting

1  for his client's authority.  He promises we will resolve this

2  and get this off your agenda by the next hearing.  So I have an

3  Order continuing it to the next hearing.

4        THE COURT:  All right. Thank you.

5     (Pause in proceedings)

6        THE COURT:  Okay, that Order's entered.

7        MS. BAER:  Thank you, Your Honor.  Agenda item #9 is

8  the Debtor's Eleventh Omnibus Objections to Claims.  There are

9  three matters, they're all being resolved by this Order, and

10  you will not see this one on your calendar any more.

11        THE COURT:  Okay.  Thank you.

12     (Pause in proceedings)

13        THE COURT:  And counsel for the Claimants are aware

14  that you presented this Order?

15        MS. BAER:  Yes, they are, Your Honor.  We've

16  discussed it with all of them and they've seen it.

17     (Pause in proceedings)

18        THE COURT:  Okay, that Order's signed.

19        MS. BAER:  Thank you, Your Honor.  That moves us to

20  agenda item #10, which is the Debtor's Fourteenth Omnibus

21  Objections to Claims.  This is a nonsubstantive objection to

22  expressed as property damage claims.  Your Honor, it falls into

23  a few categories, but it's very simple.  There were a number of

24  claims that were objected to because there was no documentation

25  filed whatsoever.  We received responses from Thomas Louis of

1   the firm of Louis Slovat & Covosich in Montana.  As it turns

2   out he provided some documentation with response to a different

3   omnibus objection quite a while ago and the two are not put

4   together.  We have worked out a -- or we have agreed with

5   Mr. Louis to withdraw the Fourteenth Omnibus Objection, which

6   was again nonsubstantive, because he has provided

7   documentation.  The substance of the claims will be dealt with

8   in the Fifteenth Omnibus Objection, where we've also filed

9   objections.

10          THE COURT:  All right.

11          MS. BAER:  The second portion of the claims were a

12  number of ZAI claims.  The objection was that they were filed

13  untimely.  That was a mistake.  They should not have been on

14  this omnibus objection, but because they were filed on property

15  damage claim forms the objection got filed.  It shouldn't have

16  been.  We've worked out a stipulation with Darrell Scott, who

17  represents all of these Claimants, agreeing that we will

18  reclassify these claims as ZAI claims.  Everybody reserves all

19  rights, and we'll take those up when and if appropriate, and I

20  do have a stipulation, which we will file with the Order I'll

21  be handing up that resolves that matter.

22          THE COURT:  Okay.

23          MS. BAER:  Your Honor, there's one objection to the

24  claim of William Wittenberg, which is also on status on the

25  Fifteenth Omnibus Objection.  We will withdraw the objection on

1   the Fourteenth Omnibus Objection and take it up with respect to

2   the Fifteenth Omnibus.  There's one claim on the Fourteenth,

3   Macerich Fresno Limited Partnership.  That was an objection to

4   a late claim.  As it turns out, the claim was not late.  It was

5   a supplement to an earlier and timely filed claim which is

6   being dealt with on the Fifteenth Omnibus Objection.  We have a

7   stipulation with them which will be attached to the Fourteenth

8   Omnibus Objection that resolves that, consolidates the two

9   claims, gets rid of the one that was the supplement, and then

10  just keeps the one remaining claim, and those objections will

11  be taken up in substance on the Fifteenth Omnibus.

12          THE COURT:  All right.

13          MS. BAER:  The last claim, Your Honor, is a claim of

14  Edward Cur.  This is a pro se Claimant.  He filed a handwritten

15  response that basically says he has a lot of Grace Products in

16  his property and you should sustain the objection.  Your Honor,

17  he's attached no documentation whatsoever.  To the extent that

18  his claim relates to a traditional asbestos property damage,

19  which if you read the response looks like he has some

20  acoustical plaster, that's what he claims, we would ask that

21  that objection be sustained to the extent that he is claiming a

22  claim for ZAI, we would say that this withdrawal would be

23  without prejudice to that.  We do not have a bar date for ZAI.

24  We have not asked for ZAI claims.  We're not asking for a

25  ruling on that.

1           THE COURT:  All right, that's fine.

2           MS. BAER:  Your Honor, at this point I'd like to hand

3     up then the Order with the attached two stipulations.

4           THE COURT:  Okay.  Thank you.

5       (Pause in proceedings)

6           THE COURT:  Okay, that Order's signed.

7           MS. BAER:  Your Honor, that takes us to agenda item

8     #11, but before we get to that, we're now moving into matters

9     that relate to both asbestos personal injury estimation and

10    asbestos property damage estimation.  I'd like to take one

11    matter out of order, and that is I'd like to take the asbestos

12    property damage matter first.  We have a very quick issue we'd

13    like to resolve with respect to the briefing schedule and the

14    Fifteenth Omnibus Objection, and my colleague Michelle Browdy

15    will address that.

16          THE COURT:  Okay.

17          MS. BROWDY:  Good afternoon, Your Honor.

18          THE COURT:  Good afternoon.

19          MS. BROWDY:  May it please the Court, Michelle Browdy

20    on behalf of the Debtors, and I'll be very brief because I know

21    that there's a lot to cover on the personal injury side.

22        First, the Fifteenth Omnibus Objection, which we filed on

23    September 1st, making all substantive objections to the

24    property damage claims so we could identify by that time, it's

25    set for status today.  I want to give a brief update.

1       Originally over the summer we were identifying that we

2   were dealing with roughly 4,000 property damage claims.  The

3   Court may recall by the last hearing we had parsed through

4   those and we realized approximately 3,400 of those were

5   traditional asbestos property damage claims with a miscellany

6   of other claims making up the rest.  We've been working hard on

7   those claims, including entering into a significant stipulation

8   with the Speights Firm that was filed on Friday dealing with

9   claims that had no proof of product identification, and our

10  expectation is that by Monday the 31st we will be down to a

11  total of 2,200 property damage claims of the original 4,000,

12  and only 1,800 of those, or so, will be traditional property

13  damage claims.

14      Another result of the stipulation we have entered into

15  with the Speights Firm, and Mr. Speights is on the phone, he

16  can correct me if I'm mistaken, but the implication is for the

17  hearing set for Monday the 31st on the Speights claims there

18  were originally going to be three items up, and now only two

19  items.  Specifically we will still need to address the Anderson

20  Memorial in state and out-of-state claims, but the California

21  conspiracy claim issue is now going to be moot.

22      The other significant issue, though, that we need to take

23  up with the Court today for the Fifteenth Omnibus Objection the

24  Court, by on Order entered September 19th, required all

25  responses to be due today, so it gave the Claimant seven weeks

1  to respond.   Replies, including evidentiary support, is

2  supposed to be due on Monday the 31st, with surreplies on

3  November 4th.   Your Honor, since Friday we've received more

4  than 700 responses, and they were still continuing to pour in

5  as of last night, and as a practical matter we just cannot file

6  our reply by Monday the 31st with evidentiary support.   I'd

7  like to hand up a proposed schedule to the Court if I may.

8           THE COURT:   Thank you.

9           MS. BROWDY:   And Your Honor may recall, in fact, that

10  the Order dated September 19th did have a provision that if the

11  process became unmanageable we could break the process up into

12  batches, and in fact the Fifteenth Omnibus itself in the first

13  10 pages or so had proposed dealing with these claims in

14  batches.   And what we propose, Your Honor, is to not file reply

15  papers on Monday the 31st, to use the November 14th hearing for

16  a status conference, and I think you'll see -- I handed up two

17  pieces of paper.   One was a two-page sheet that identifies the

18  categories of claims to which we've -- to which we've made

19  objections in the Fifteenth, and this is a chart taken from the

20  Fifteenth Omnibus Objection itself.   And then the one-page

21  piece of paper identifies how we propose hearing those, and

22  again, my proposal is that for the November 14th hearing we

23  identify which batches it will make sense to set for briefing

24  and argument at the December, January, and February omnibus

25  conferences.   We can break up, again, smaller bites of these

1  objections and set schedules on those, and as the chart

2  indicates, and as our Fifteenth Omnibus paper itself indicated,

3  we believe that some of the objections actually don't have to

4  be heard until as part of the estimation process, so they won't

5  need a separate briefing argument schedule.

6       So that's our proposal, Your Honor, but again, as a

7  practical matter, we cannot review and respond to a thousand

8  claims with evidentiary support by the 31th.

9       THE COURT:  Has this been circulated with the

10 parties?

11      MS. BROWDY:  Your Honor, I just -- again, these

12 claims were pouring in over the weekend, so we literally just

13 put it together yesterday.  There is a version of it in the

14 Fifteenth Omnibus Objection itself where again we had initially

15 proposed handling these objections in batches, and again, the

16 September 19th Order, docket 9473 at paragraph 5 had indicated

17 to the extent that the Fifteenth Omnibus Objection to Claims

18 proves unmanageable the Court will address requests to

19 bifurcate this omnibus into separate batches or docket entries.

20 And that's what we're requesting now as part of the status.

21      THE COURT:  All right.  So for November, according to

22 this sheet for the people who are on the phone who may not have

23 seen it that you've passed up, for November you want to discuss

24 the procedural issue of how estimation phase one should

25 proceed, and that will deal with constructive notice, the

1  Daubert standards on dust sample and methodology --

2         MS. BROWDY:  Actually, that's just reflecting that

3  that is called for in the PD estimation CMO, so that is

4  definitely on for November 14th, and then the question becomes

5  what else could we even fit on the schedule for the 14th?

6         THE COURT:  Okay.  And your proposal is to do is

7  status conference on the Fifteenth Omnibus, and then at that

8  time take a look at the briefing and argument schedules for

9  what can be done in December, January, and February on the

10  merits?

11        MS. BROWDY:  Yes, Your Honor.  And then that would

12  also -- we've have to strike the October 31st reply date, and

13  then November 4th surreply date.

14        THE COURT:  Okay.  Then for December -- well --

15        MS. BROWDY:  And then what I've indicated in the next

16  box, Your Honor, is that somehow between the December, January,

17  and February omnibus hearings there are a handful of different

18  types of claims to be addressed, and we would want to divide

19  them up in a way that makes sense, and if by deferring this to

20  status in mid-November that will give us an opportunity to

21  circulate this chart to the parties and try to come up with

22  some agreement for which should be heard at which conference.

23        THE COURT:  Okay.  Then I apologize, but I don't

24  recall, do you have dates in March for an estimation hearing?

25  Did we get as far as dates?

1        MS. BROWDY:  Your Honor, the PD estimation CMO called

2   for a trial to be set in March at the January or February

3   status conference.

4        THE COURT:  Okay.  I suggest that you folks, if we're

5   really going to do a trial in March, had better contact my

6   staff in Pittsburgh a little sooner, because with all the other

7   cases getting into either litigation or plan confirmation mode

8   I'm already starting to fill up hearing dates in March.

9        MS. BROWDY:  Thank you, Your Honor.  We'll contact

10   and find out the schedule and confer with Mr. Baina.

11        THE COURT:  Okay.  And then the phase two you're

12   proposing for about September, that's too far away right now to

13   worry about so -- okay.  Good afternoon.

14        MR. LOIZIDES:  Yes, good afternoon, Your Honor, Chris

15   Loizides.  I am Delaware counsel for the Speights & Runyan firm

16   Claimants, also for some states and some Louisiana Claimants

17   represented by the firm of Dies & Hile, and also Delaware

18   counsel for Perrini Corporation.  I think the Perrini

19   Corporation matter has been continued.  It's -- from what I

20   understand it's been recharacterized, it's not an asbestos

21   property damage claim, it is something else.  I think that was

22   dealt with earlier.

23        With respect to the Fifteenth Omnibus Claims Objection, I

24   have to confess, most of the -- I believe most of the responses

25   are being filed by Speights & Runyan through my firm, and as of

1  yesterday around 6 p.m. we had -- I think we had filed around

2  682 of them.  It might not be quite the right number.  And

3  we're continuing to file them.  I don't know if -- I hope

4  someone is on the phone today from the Speights & Runyan firm.

5       The only thing that I would mention is we are certainly

6  doing our very best to try to get all of these filed by today,

7  which is the deadline of course.  And I believe that we will be

8  able to.  It is conceivable -- the only thing I would just

9  mention to be up front with the Court, and I was here during

10  the Pioneer hearing this morning, it made me a little nervous,

11  of course those were very different facts, is there may be a

12  few stragglers, and if we're gonna break these into groups

13  which -- and I have discussed this with Mr. Speights, but there

14  seems to be a reasonable suggestion, that if there are a couple

15  stragglers that we simply --

16       THE COURT:  Well, I think we can extend that filing

17  date a day or two just to accommodate the need to get

18  everything done when you're filing that many, if we're going to

19  extend the hearing date anyway, I don't see that that causes a

20  problem --

21       MR. LOIZIDES:  Yeah.

22       THE COURT:  -- and with respect to this morning, we

23  were talking about a 3½ year delay, not a 3½ hour delay.

24       MR. LOIZIDES:  I realize that, Your Honor, I -- and I

25  just happen to be here and I wanted to mention that.  With

1  respect to the firm of Dies & Hile, and I don't know if

2  Mr. Dies is on the phone or not, I have tried for weeks now to

3  get a hold of him.  His house and his office were both

4  destroyed -- I'm trying to think which hurricane it was.  Well,

5  I think it was Rita, and I did get an e-mail from him today,

6  and he wants to file some form of place holder response.  I

7  don't know how the Court wants to deal with this.  Perhaps --

8            MS. BROWDY:  Actually --

9            MR. LOIZIDES:  Perhaps it has been dealt with, but I

10  haven't been in touch with them.

11            MS. BROWDY:  Thank you, Your Honor.  Michelle Browdy

12  again on behalf of the Debtors.  In fact, I e-mailed Mr. Dies

13  this morning and responded to an e-mail from him, and the Court

14  may recall we addressed the issue, for example, that a number

15  of Louisiana Claimants needed additional time to respond, and

16  we addressed that at the last hearing.  That needs to be

17  memorialized in an order, but we have an agreement.  Their

18  papers are not due today, they're due in January.

19            UNIDENTIFIED SPEAKER:  The order's on file.

20            MS. BROWDY:  Oh, the order is on file.  So, we're

21  working with Mr. Dies.  I don't anticipate any problems.

22            MR. LOIZIDES:  This is -- Your Honor, that is

23  correct.  But I believe that that Order only applies to certain

24  Louisiana Claimants who were destroyed by Katrina.  This

25  relates more to the second hurricane --

1          THE COURT:  You know --

2          MR. LOIZIDES:  Again --

3          THE COURT:  -- I'm sorry, I'm probably not alone in

4    the United States in confessing the fact that I don't know

5    which hurricanes have caused which damage any more.  You're

6    just doing so much to the South.

7      (Laughter)

8          THE COURT:  I don't really care which hurricane.  If

9    something's home and office was destroyed they obviously cannot

10   get in touch with clients, and if the Order says Katrina I

11   think we can expand the Ordered to include any and all

12   hurricanes, or tropical storms --

13     (Laughter)

14         THE COURT:  -- that cause this kind of damage.

15         MS. BROWDY:  Thank you, Your Honor.  I believe we

16   already have that agreement with Mr. Dies.

17         MR. LOIZIDES:  Okay, that may be true, but as I said,

18   I was -- I just wasn't aware of that.  So with that, Your

19   Honor, as I said, we'll be trying to file all of these

20   responses today.  There may be a few stragglers, and I don't

21   know if Mr. Speights is on the phone if he wishes to address

22   any of this.  I haven't been able to touch base with him.

23         THE COURT:  Mr. Speights?  Mr. Speights, are you on

24   the phone?  He's apparently not on, Mr. Loizides.

25         MR. LOIZIDES:  Your Honor, as I said, without having

1   spoken to him, you know, I think that if we can get some

2   additional time to complete the filings, at least from my

3   perspective, I don't see --

4          THE COURT:  Well, how much?

5          MR. LOIZIDES:  Is a week too much?  I mean, if it's

6   too much we'll do it sooner.  I think we'll get everything done

7   today.  It's really a matter of double checking everything.

8      (Court speaks with operator)

9          MR. SPEIGHTS:  Good morning, Your Honor.  I've been

10  listening but I couldn't get anybody to hear.  I was on the

11  wrong line.

12         THE COURT:  I'm sorry, Mr. Speights.  Okay, I guess

13  maybe --

14         MR. LOIZIDES:  I would defer to Mr. Speights on this.

15         THE COURT:  All right.

16         MR. SPEIGHTS:  Well, actually, I think it's just a

17  mechanical issue of getting everything to local counsel and

18  getting everything filed, and I talked to Mr. Perry who's

19  actually doing that, and I think we're gonna probably get

20  everything filed today, but I appreciate your giving us, you

21  know, two or three days to -- if it's some mechanical problem.

22  We've done our work, it's just getting this massive number of

23  claims on file, as I understand it.

24         THE COURT:  All right.  Is Thursday enough time this

25  week?

1        MR. LOIZIDES:  That's fine, Your Honor.  As I said,

2   we were planning on getting everything filed today.  It's

3   really a question of double checking the list and making sure

4   someone didn't fall through the cracks.

5        THE COURT:  All right, that's fine.  Then I'll say

6   the absolute date is by Thursday, but please, the sooner you

7   can do it the better, because I'm already facing one

8   continuance, which is, frankly, not unexpected, but

9   nonetheless, it's here so I don't want to have to do another

10  one.

11       MR. SPEIGHTS:  And on Ms. Browdy's remarks, Your

12  Honor, I certainly have no objection to pushing those deadlines

13  and having the status conference at the November hearing.  I

14  have not seen what she's provided the Court, and as I

15  understand we'll have an opportunity to comment on that and how

16  we should configure the process of dealing with these

17  objections.  But I certainly don't have a problem with having

18  the status conference on the 14th and pushing back the two

19  deadlines on the replies and surreplies.

20       THE COURT:  All right.  That's good, thank you,

21  Mr. Speights.  And yes, she will circulate this, and it's

22  broken into categories the way the Debtor categorizes them.

23  You know, if there's a disagreement about that -- probably not.

24  They're pretty broad categories.  But you folks can discuss all

25  of it and see what you think would be a rational proposal for

1  breaking the categories down.

2          MS. BROWDY:  Thank you, Your Honor.

3          THE COURT:  Okay, thank you.  Do you need an Order of

4  some sort, or --

5          MS. BAER:  Your Honor, the Fifteenth Omnibus

6  Objection is up for status.  We can just indicate on the docket

7  that it's been, you know, continued to November 14 for status.

8          MS. BROWDY:  I think we probably now will need an

9  Order, though, on those reply and surreply dates.  We could

10 pass it up in the next couple days.  Would that be okay, Your

11 Honor?

12         THE COURT:  Sure.  Just do it on a Certification of

13 Counsel.  Can you folks work out the dates?  Do I have to take

14 time to do it now, or can you work out the continuation dates?

15         MS. BAER:  I think the anticipation is we will

16 circulate this scheduling work out and try to work out dates

17 with respect to the schedule.  I think the only thing we need

18 to have is an -- on an Order is that these two dates that you

19 had in your previous Order have been vacated.

20         THE COURT:  Well, they're vacated but I'd like to get

21 new dates entered.  So see if you can work them out, okay?

22         MS. BAER:  We'll work through that, Your Honor.

23         THE COURT:  All right, thank you.  I'm sorry, which

24 agenda item is the Fifteenth Omnibus today?

25         MS. BAER:  It is agenda item #14.

1          THE COURT:  Fourteen.  All right, just one second

2     please.

3          (Pause in proceedings)

4          THE COURT:  So I'm continuing it for status

5     conference to the November omnibus and a COC changing the

6     response and reply dates will be submitted, and if you're not

7     able to I guess we'll address them on the 14th, but hopefully

8     you can get some of the information filed before then.  It will

9     be a more productive status conference if I at least have

10    something on the other side.

11         MS. BAER:  We understand, Your Honor.

12         THE COURT:  Okay, all right, thank you.

13         MS. BAER:  Your Honor, one other thing on the

14    Fifteenth Omnibus Objection is we have worked out a number of

15    agreements with various parties, especially with respect to

16    environmental claims, that the property damage objection

17    process, the Fifteenth Omnibus Objection, was not intended to

18    cover regular environmental claims, and we've worked out

19    stipulations with most of those parties that those will be in

20    fact reclassified as environmental claims not dealt with in the

21    Fifteenth Omnibus Objection, and I will be submitting a COC

22    with an Order memorializing those various agreements and

23    stipulations.  And on the parties where we have not worked it

24    out, Perrini being one of them, City of Cambridge another, and

25    the Massachusetts Bay, I think it's Transportation Authority,

1  we've just given them an additional amount of time to respond

2  so we can work out a stipulation.  We do not anticipate taking

3  up any regular environmental claims at this time.  So we will,

4  again, submit a Certification of Counsel with all of those

5  stipulations.

6           THE COURT:  Okay.

7           MS. BAER:  Your Honor, that takes us now to agenda

8  item #11, which is the Debtor's Motion for Leave to Take

9  Discovery of Claimant's Attorneys.  This relates to asbestos

10  personal injury, and I'm gonna turn the podium over to Barbara

11  Harding for that.

12           MS. HARDING:  Good afternoon, Your Honor.  If it

13  pleases the Court I will address the Court from counsel table

14  so I can work the screen, is that all right?

15           THE COURT:  That's fine.  And you can be seated.  You

16  don't need to stand.

17           MS. HARDING:  Okay, thank you, Your Honor.  As the

18  Court is well aware, the Debtor's filed a motion seeking to

19  serve a two-page questionnaire on attorneys of record in the --

20  with respect to the Grace personal injury pre-petition claims.

21  Your Honor, the -- and actually I have several slides that I'm

22  gonna be showing today, Your Honor.  I'm happy to bring you a

23  copy.

24           THE COURT:  Thank you.

25      (Pause in proceedings)

1          THE COURT:  Are these just prints of what you're

2   showing on the Power Points?

3          MS. HARDING:  Yes, they are, Your Honor.

4          THE COURT:  All right.

5          MS. HARDING:  Your Honor, the purpose of the

6   questionnaire is to seek information that bears on the

7   reliability or unreliability of the underlying medical data

8   supporting the personal injury claims.  There have been several

9   objections, as the Court is well aware.  I'm not gonna try to

10  address each objection that was filed individually.  What I've

11  done though is I've gone through all the objections, and I

12  think that the objections can be classified into three major

13  categories.

14      First, the objectors assert that this isn't silica, and

15  they didn't file silica claims, and therefore the attorney

16  questionnaire shouldn't be issued.  Second, the objectors also

17  make the claim that the information that we're seeking isn't

18  relevant or necessary to the estimation.  And third, the third

19  major category of objections is that the Court doesn't have the

20  authority to issue the questionnaire.

21      The Debtors believe very strongly that the information

22  that they're seeking is essential to the estimation, and I will

23  attempt to address all those objections as I go through the

24  presentation.

25      First, Your Honor, I think it's very important to note

1  that from the beginning of this case the Debtors have challenge

2  the medical data underlying these claims.  I think in almost

3  every major pleading this issue as been raised.  As you can

4  see, we said that we were -- a central goal of what we were

5  trying to do is to define a universe of valid claims.  We

6  wanted to adjudicate the validity of certain bodily injury

7  claims and evidence, the evidence underlying them.  And again,

8  it's -- I think it's been raised repeatedly, and even before

9  the Debtors filed for bankruptcy the Debtors had a belief that

10  there was -- there were significant problems with the data

11  underlying the medical evidence.

12      Again, here's another slide that I think has been used

13  repeatedly before the Court demonstrating that, you know, we're

14  seeking to ask the Court to look at the reliability of the

15  medical evidence and in part also the bias and fraud problem

16  associated with the doctor's screening companies that are

17  producing that evidence.

18      And what have we said all along about the underlying

19  claims and the evidence that's there?  We've said four basic

20  things.  That the mass x-ray screenings were unreliable, we've

21  said that the PFTs are easily manipulated and unreliable.

22  We've said that the claims rates that these Debtors and other

23  Debtor and Defendants around the country are seeing bear no

24  relationship at all to incidence of disease and to past

25  consumption or exposure to asbestos.  And we've identified

1  numerous audits and studies that have recognized this problem

2  in the past.

3      Indeed, we even in our original questionnaire to the

4  Claimants, that I think was first filed back in January, I'm

5  not sure, maybe even earlier, but we asked there, we asked for

6  information on the relationships between the lawyers and the

7  law firms and the doctors and the screening companies.  Again,

8  we asked for it with respect to the B readers.

9      So I raise this because Grace has continually maintained

10  from the beginning through all of these different pleadings and

11  everything that we've done that these -- that the underlying

12  medical evidence isn't valid, and that that's a -- has

13  substantial relevance to the estimation because large

14  percentages of the claims, we believe, are based on unreliable

15  medical evidence.

16      I say all this because -- and actually, the Court

17  recognized that even in June, June 27th.  I raise those issues

18  because all of this occurred prior to the issuance of the

19  Silica opinion.  We've raised all these issues, we've put

20  forward the evidence.  We've been seeking the discovery, we've

21  been seeking the information.  Well prior to Judge Jack's

22  decision on June 30th, 2005.

23      Now -- one second please.  The question now is, is the

24  silica decision important to what the Debtors are trying to do

25  in this litigation?  Absolutely.  It couldn't be more

1  important.  We now have a Federal District Court Judge who has

2  acknowledged and found, made findings, that support the

3  allegations and the positions that the Debtors have been taking

4  all along.  One of the statements from Judge Jack's opinion,

5  "This evidence of the unreliability of the B reads performed

6  for this NDL is matched by evidence of the unreliability of B

7  reads and asbestos litigation."

8        THE COURT:  Yes, but here's the problem.  She's made

9  those statements apparently based on some evidence.  I don't

10 have any such evidence.  Number one, I don't have an NDL, and

11 number two, I don't know that you can compare B reads in this

12 case with B reads in other cases because I don't know that the

13 -- a) Plaintiffs are the same, b) B readers are the same, c)

14 doctors are the same, d) that the type of asbestos exposure was

15 the same.  So there are a host of factors all of which seem to

16 me to make this relevant perhaps to the Trust that's going to

17 be evaluating claims, but why is it relevant to the Debtor?

18        MS. HARDING:  Your Honor, I think it's relevant right

19 now, and the reason we raise it is because we're seeking the

20 information to be able to demonstrate that to the Court.

21        THE COURT:  But how are you going to get that

22 information?  You know, it seems to me that there's a

23 structural problem, and maybe I just don't understand how you

24 intend to make use of this information.  If there was a claims

25 bar date and people were filing claims with medical evidence

1   attached and you were looking for objections to claims to say

2   this B read is unreliable because -- of whatever reason, you're

3   going to allege, then I think I could understand the relevance

4   of why you want to get some information.  I don't know about

5   the questionnaires per se, but why you want some information to

6   look at the B reads.  But that isn't the structure that this

7   case is in.  That's not the posture the case is in.  The

8   posture is not in a position of having claims filed by asbestos

9   Plaintiffs, and at the moment, based on the fact that you're

10  looking for 524(g) injunctive relief, if anything those claims

11  are going to be processed through the TDP process.

12      So I -- I'm -- there's a disconnect in how -- in what I am

13  understanding that you're driving at.  I'm not following the

14  process by which you're trying to a) get the information, or b)

15  why you need it from the attorneys.

16          MS. HARDING:  Well, Your Honor, first of all, with

17  respect to the estimation, the reason that the information is

18  relevant and important at this stage is because the Plaintiff's

19  Committee and other Committees have taken the position that

20  past settlement history is the best evidence of what the

21  estimation in this Court should be for current claims and for

22  future claims.

23          THE COURT:  But we've gone through that.  They'll

24  present their evidence, and you're going to present your

25  evidence that says it's not the best, and I have to decide

1   whether the plan constitutes a form of settlement negotiation

2   in which it may be relevant, or whether it doesn't constitute a

3   form of settlement negotiation in which it may not be relevant.

4            MS. HARDING:  And Your Honor, I think you just said

5   exactly what we're looking -- you said they're gonna present

6   their evidence, we have to present our evidence, but we have to

7   get the evidence to present it.  And that's what this process

8   is for.  We believe that this -- that the attorney

9   questionnaire, along with the Claimant questionnaire, will

10  provide us evidence that will enable us to show the Court that

11  systematically huge categories of claims should not -- should

12  receive very little to no value in this estimation, for the

13  current claims, and going forward for future claims.

14           THE COURT:  Well, aren't there already published

15  studies that do things like tell you that within any given

16  population of exposure to asbestos disease that X percentage

17  will develop maybe plural thickening but are -- be sometimes

18  referred to as the asymptomatics, that there will be another

19  percentage that will have some form of cancer, some percentage

20  that will have a form of lung cancer, and a small percentage

21  that will develop mesophelioma?  I mean, are those studies

22  unreliable?

23           MS. HARDING:  Your Honor, there are lots of -- lots

24  and lots -- thousands of studies addressing asbestos disease,

25  and actually, those are the very kinds of studies -- some of

1  the evidence that the Debtors plan to present are precisely

2  those kinds of studies.  And one of the things that we intend

3  to present is that those -- that many of those studies that are

4  out there demonstrate that with respect to certain exposures

5  that somebody might have to asbestos that those exposures don't

6  lead to asbestos disease, particularly asbestosis, which

7  requires 25 fiber years of exposure to get it.

8       And so the important part here is that that's the exposure

9  side of the equation.  The other side of the equation has

10  nothing really to do with exposure except to the extent we

11  don't think that they've had sufficient exposure.  It goes to

12  the question of whether they even had a disease to begin with,

13  and that -- if we can't rely on --

14          THE COURT:  But how are you going --

15          MS. HARDING:  -- past studies --

16          THE COURT:  But how are you going to get that

17  information unless you actually have the B read documents

18  attached to something like a ballot or a Proof of Claim, or a

19  demand for relief?  I mean, at the moment we have a Committee

20  that's out there and we know that we've got 188,000 asbestos

21  Claimants that may file some current claims that may file some

22  request against a Trust for relief, but until you get that

23  information I don't think as a global matter you can just

24  say, "All of the B reads that were ever done in the past are

25  unreliable."

1          MS. HARDING:  Absolutely.  That's why we're seeking

2    the evidence.  In other words, the Claimant's questionnaire we

3    expect if the Claimants comply with the Court's Order that we

4    will be getting in those B reads, and we'd be getting in that

5    information.  We'll then know what percentage -- and actually,

6    if I could go forward, I think I can probably demonstrate a

7    little bit better perhaps how the -- how we believe this

8    information will be relevant to the estimation.

9          THE COURT:  Well --

10          MS. HARDING:  And I'm happy to come back --

11          THE COURT:  Tell me first, a) what you seek, and b)

12    why it should be coming from the lawyers?  I mean, there are

13    all sorts of problems with attempting to send these

14    questionnaires to the lawyers without some formal discovery

15    process in place, and I'm not certain that I've heard anything

16    that convinces me that you don't have access to this

17    information elsewhere.

18      You know, if you've got specific B readers that you want

19    to challenge and they read the B reads do they keep copies?  I

20    don't know.  If they don't then do the asbestos Claimants have

21    them?  And if they don't, do the hospitals and the doctors have

22    them, or you know, the tables that were set up in the back of

23    the room to take the reads?  There must be a place where you

24    can get this without asking questions of the lawyer that may

25    impinge on their ability to represent their clients.

1          MS. HARDING:  But, Your Honor, I think that you've

2     actually hit the very heart of why we need to get the

3     information from the lawyers, because the doctors have -- often

4     don't have the information.  The Claimants often don't have the

5     information.  Indeed, some of the law firms -- in other words,

6     we don't know what the relationships are.  They've said -- most

7     of these -- the law firms that have objected have said, "We

8     don't file silica claims, all right."  Well, how is it that the

9     Claimants that they represented in asbestos became silica

10    Claimants?

11         THE COURT:  I don't know, ask their silica lawyers.

12         MS. HARDING:  All right, we want to know that.  I

13    think we're entitled to know did they send the B reads and the

14    x-rays --

15         THE COURT:  Wait, wait.  There is -- what difference

16    does it make whether in a different case some Claimant is

17    filing a fraudulent claim?  The question is, are they filing a

18    correct claim in this case?  And the fact that they behaved

19    badly in some other case, in the event that they testify or

20    something may be a credibility issue, but to the extent that a

21    B read is used in two different cases doesn't mean that it's

22    automatically unreliable in at least one of those cases.

23         Now, I understand that you've presented the studies before

24    that show that it's unlikely that a person who has asbestos --

25    an asbestos disease also has a silica disease if there's not a

1  mixed dust exposure at least.  I understand all that.  But the

2  question is, what you're trying to do now is seek evidence that

3  a potential Claimant in this case has also filed a silica

4  claim.  So what?

5          MS. HARDING:  But --

6          THE COURT:  I mean, that's the problem of the Court

7  that's dealing with the silica claim, isn't it?

8          MS. HARDING:  Your Honor, I understand precisely

9  where you're coming from, and I think I have literally the next

10 four or five slides to address that very issue.

11         THE COURT:  Starting at what numbers?

12         MS. HARDING:  Starting at #13.

13         THE COURT:  All right.

14         MS. HARDING:  Okay.  This is just -- I mean, I think

15 the Court -- I wanted to give the Court some context as to why

16 Judge Jack was so incensed, okay, by what she saw --

17         THE COURT:  Oh, I understand why Judge Jack is

18 incensed.

19         MS. HARDING:  Okay.

20         THE COURT:  She made it very evident in her opinion

21 why she was incensed.

22         MS. HARDING:  If you look at this particular exhibit

23 you've got a diagnosis of a Claimant on one side, Barry Barret,

24 and there's no representation that this particular Claimant is

25 a Claimant in Grace.  I don't know whether this person is or is

1  not.  We've not identified him as a Claimant.  It could be a

2  past Claimant, but he's certainly not a current Claimant, but

3  it's an --

4          THE COURT:  Well, then, what's the relevance?

5          MS. HARDING:  Because it's the -- because as getting

6  forward we have these very kinds of claims where the person was

7  diagnosed with an x-ray on 7/21 with asbestosis, and with the

8  same x-ray on the same day with silicosis by Dr. Harron, who's

9  filed thousands, thousands of claims against Grace.  Current

10 claims and past claims by this doctor, and there's -- you know,

11 it is --

12         THE COURT:  But the remedy for that --

13         MS. HARDING:  -- staggering.

14         THE COURT:  But the remedy for that may be to do

15 something like tell every Claimant that has been diagnosed by a

16 person who, for whatever reason, can be shown to have done

17 unreliable diagnoses to go get new ones.  But why isn't that

18 Trust issue?

19         MS. HARDING:  Because, Your Honor, the Trust is gonna

20 be -- is going to be formed and it's gonna be financed -- out

21 of the Debtor's Estate, and how much money goes into that Trust

22 is dependant upon what claims the Court finds to be valid and

23 reliable for estimation purposes current and future.

24         THE COURT:  So you want to take a look at every what?

25 See, that's why I'm still losing it.  We don't have any

1   Claimants here.  So that -- how do you just go out to all of

2   the law firms and say, "For every one of your clients give me

3   this information," when they haven't filed claims?

4          MS. HARDING:  Well --

5          THE COURT:  The whole purpose of doing an estimation,

6   essentially, is so that you don't have to worry about people

7   filing claims, you put that work into the Trust after the case.

8          MS. HARDING:  Right, Your Honor, but I think the

9   Court has made it clear from the beginning of the estimation

10  that the -- I think going back even to the statement the Court

11  made about the discovery to the Claimants, the Debtor has the

12  right to know what the current claims are, and that will be a

13  much better basis for estimation of current claims and possibly

14  future claims.  And so --

15         THE COURT:  That was the purpose for the 2019

16  statements, so you would know what attorneys are representing

17  clients who may submit claims.

18         MS. HARDING:  Right, Your Honor.  And as you know

19  that's been an issue we've got.  And I'm gonna get to that

20  later on, but all -- many, many, 2019 statements are not filed,

21  and indeed --

22         THE COURT:  Well, then they're not going to be voting

23  unless they get them filed so that you don't have to worry

24  about them, do you?

25         MS. HARDING:  Well, and we've also -- I mean, I think

1  the Court has -- I don't know if the Court's seen or not but

2  the Debtors have filed a Motion Seeking a Proof of Claim Form

3  for the pre-petition Claimants, not to disallow claims, but

4  simply to -- so that the Court and the Debtors will know what

5  the pool of Claimants are that will be making claims against

6  the trust in the future so that we can make the estimation

7  valid.  I mean, it doesn't -- if we don't know what the current

8  claims are how can we base an estimate in the future on them?

9         THE COURT:  But if it's not for disallowance purposes

10  what hook do you have to get anybody to file it?  You know, so

11  maybe people will file the claim, and maybe you'll get -- just

12  to pick a number, say you get 100,000, but you know from what

13  the attorneys are telling you that there are 200,000.  So what

14  difference does getting a claim that isn't a mandatory Proof of

15  Claim form governed by the Rules for disallowance purposes

16  going to do you for estimation?

17         MS. HARDING:  Well, Your Honor, the point that -- the

18  point of filing -- well, I don't know if we want to argue the

19  Proof of Claim form issue right now.  The only reason I raised

20  it is because the Court asked about why are we looking at the

21  underlying claims?  And as the Court also -- I think we've

22  mentioned in our brief, in the Federal Mogel estimation the

23  issue about these -- the invalidity and the unreliability of

24  the past claims was raised.  There was -- the Court even

25  recognized that those issues were out there.  But the Court

1    said that it didn't have a way of quantifying the affect of

2    that problem --

3              THE COURT:  Right.

4              MS. HARDING:  -- on the estimation.  And our -- what

5    we're trying to do with this -- with getting this information

6    from the lawyers and from the Claimants is to give the Court

7    data and evidence to help quantify the affect and to provide a

8    basis for our experts to quantify that affect.  And I think

9    we're entitled to get that information to make those arguments.

10             THE COURT:  Well, the only way that I can see offhand

11   that that kind of information may be able to come in is to set

12   a claims bar date, and then you don't need to worry about

13   estimation any more because at that point in time you're going

14   to have actual claims filed and there will be a bar date.  So

15   they'll either be allowed or disallowed.  You'll have to go

16   through an allowance process, unless you want to estimate for

17   allowance.

18             MS. HARDING:  But Your Honor, our -- the point from

19   the beginning has been with respect to estimation, that the

20   only evidence that the Court can consider in estimation is

21   evidence that meets the Federal Rules of Evidence Standards.

22   And so the evidence that comes in has to meet Daubert, and

23   that's what all of this is going to, is getting to the issue of

24   does their evidence meet the Daubert standard?  Because if it

25   doesn't it doesn't come in, and the Court can't consider it for

1   estimation.  I mean, that's been kind of the foundation for

2   this discovery.

3       But I would like to go forward because it gets to your

4   issue about why, you know, about the silicosis diagnosis and

5   the other proceedings and why is that relevant here.  It's

6   relevant here because the lawyers, the lawyers in the silica

7   action, when Judge Jack asked them, you know, how could -- this

8   stretches credibility that they could have both, the lawyers

9   said in the silicosis action that it's the asbestosis diagnosis

10  that were wrong.  All right?  And then asked again, I know that

11  these -- the lawyer says, "I know that these Claimants have

12  Daubert proof silicosis claims."  And Judge Jack said, "And

13  apparently they had Daubert proof asbestosis claims as well."

14  And the lawyer, Mr. Lemack said, "I doubt they had claims."

15  And she says, "Claims, or asbestosis?"  And he says, "Both.  I

16  doubt they had claims, and I doubt they had asbestosis."

17      And then, Your Honor, I think extremely important for kind

18  of the events of what has occurred is that the -- is that David

19  Ostern, who is the Future's Claimants representative in this

20  litigation, has filed a letter and suspended payment of

21  asbestos claims based on this same evidence.  And --

22          THE COURT:  But in his case it's probably relevant,

23  because his duty under the Trust, under the -- you're talking

24  about under the Manville Trust?

25          MS. HARDING:  Yes, Ma'am.

1          THE COURT:  Okay.  Under the Manville Trust is to do

2    just that, to pay those claims.  But we're not there yet.

3          MS. HARDING:  We're not there, absolutely, and the

4    only reason we've even raised silica, Your Honor, is because we

5    think it lays the foundation for getting the information, for

6    getting the discovery.  All we're asking for right now is the

7    information to be able to give to our experts to make the -- so

8    that they can evaluate it and consider it when they're making

9    their estimation.

10          THE COURT:  I -- it seems to me that what is relevant

11    evidence, at least at a minimum in this case, is some proof

12    that there is a universe of personal injury Claimants with some

13    form of asbestos disease, and that they in fact will prosecute

14    a claim against Grace.  Grace has a history of having dealt

15    pre-petition with huge numbers of Claimants who have filed

16    asbestos claims.  Of all categories.  You know, the asbestosis

17    right up through the mesophelioma claims.  And Grace has paid

18    them in one capacity or another, or denied payment in one

19    capacity or another.

20          Surely Grace has the same type of evidence that you're

21    already trying to seek now from lawyers in your own files

22    because in order to pay those claims you had to meet either

23    your own company's standards, appropriate medical standards

24    under the State laws, and the insurer's concerns about

25    reimbursement to Grace when you made a claim.  So you must have

1  exactly the same type of information in your files about past

2  claims that you're looking for for current claims.  Why isn't

3  that relevant?

4         MS. HARDING:  Your Honor, I think -- I mean, the

5  testimony from J. Hughes in a previous proceeding with respect

6  to that issue I think is very telling.  And this is -- I mean,

7  everyone in asbestos litigation understands the pressure that

8  companies were under to settle these claims with less than

9  credible evidence, with evidence that they the insurers --

10         THE COURT:  Well, pardon me.  Not everyone in the

11  room understands that.  There's one person sitting in the front

12  who doesn't understand that.

13         MS. HARDING:  I apologize, Your Honor, but -- and

14  that -- and I understand that, Your Honor.  I didn't mean to be

15  flip, but I was -- I'm trying to -- that is the evidence we're

16  trying to develop now, and as the Court has said --

17         THE COURT:  But you have it, because if you paid them

18  on less than whatever competent evidence was before you still

19  have the evidence.

20         MS. HARDING:  We have -- Your Honor, we have very

21  limited -- we have some B reads, we have the bare minimum of

22  what was required to settle the claim and to get it processed

23  so the company could try to stay afloat and deal with these

24  thousands, and thousands, and thousands of claims.  We do not

25  have the kind of evidence that we're seeking here.  And the

1    Court has said in the -- I think the Court has said on more

2    than one occasion, "I don't care what's happened in the past.

3    I'm dealing with these claims now.  And what -- you know, what

4    is the -- what are the current claims?  What is the evidence of

5    the current claims?  And can it get in under the Federal Rules

6    of Evidence?"  And that's the part that we're dealing with

7    right now.  We're trying to demonstrate to the Court that that

8    evidence cannot pass Daubert, and I think that that's a

9    perfectly appropriate procedure for an estimation proceeding.

10              THE COURT:  What's the cost of a B read, of getting

11   somebody in, you know, in a sort of consecutive person comes in

12   to get the x-rays and have the B read environment?  What's the

13   cost per person of doing that?

14              MS. HARDING:  Your Honor, I don't know.  I suspect

15   there are some lawyers in the room that might know that that

16   have paid screening companies for many of them.  I don't know.

17              THE COURT:  Well, maybe it would be a better idea to

18   have everybody who wants to file a claim get a new x-ray and a

19   new B read.

20              MS. HARDING:  Well, Your Honor --

21              THE COURT:  And we'll appoint Court experts to read

22   them, and then you'll all be stuck with it.

23              MS. HARDING:  Well, Your Honor, I don't know.  I

24   would like to consult my clients on that, but it is something

25   --

1          THE COURT:  Stuck with the Court expert, that is.

2          MS. HARDING:  Right.  It is something we've

3    considered, and we're perfectly willing to talk about it.

4    There are actually recommendations from various scientific

5    bodies about how to do that.  The important part is that you

6    can't just have one person doing it.  You have to have a panel,

7    and there are procedures for doing it, because the very

8    evidence itself -- that's the part that is so remarkable about

9    this, and why this has been able to occur.

10        The B reads, when it's a 1/0, the degree of variability

11   among experts in the field is huge.  That's why all the other

12   diagnostic steps are so important before you diagnose somebody

13   with a potentially life-threatening disease.  And so we are not

14   opposed to that, and we would be willing to talk about it.

15         THE COURT:  Well, maybe that's the thing to do,

16   because to the extent that Claimants have claims in more than

17   one case it may eliminate the need to have this happen in more

18   than one case anyway.  And then the issue can come down to

19   whose product caused the problem, or products, plural, caused

20   the problem.

21        What's the cost?  You folks who do this work, somebody

22   give me an estimate of what the cost of doing massive, mass

23   scale B reads would be.

24         MR. LOCKWOOD:  Your Honor, I have no idea.  I mean, I

25   think it would be substantial for 118,000 people.  Some -- the

1    ones that are dead can't do it.  You'd have to agree between

2    the Debtor and the Plaintiff as to who the B reader, -- if

3    you're only talking about one.  One of the things that happens

4    --

5             THE COURT:  Oh, no, I think a good thing --

6             MR. LOCKWOOD:  -- in the Court system is that the

7    Debtors hire B readers that are known to very seldom read

8    positive results, and the Plaintiffs find B readers that --

9    that's the way experts work.

10            THE COURT:  That's why I'm saying I think what we can

11   do is you can hire your own and then we'll have some Court

12   experts who are answerable to the Court.  Mr. Esserman?

13            MR. ESSERMAN:  Your Honor, Sandy Esserman.  Just to

14   try and answer the question.  I have no first-hand knowledge of

15   this, but I was informed by one of the firms that I represent

16   that to get a new diagnosis for a Plaintiff can run between 500

17   and $1000.  That's what you're looking at, per person.  Because

18   there has to be an individual evaluation, this is not a quick

19   process, and it's not necessarily cheap either.

20            THE COURT:  So we're looking at a million -- roughly

21   anywhere between a million and two million dollars, which might

22   still save the trust a whole lot of money in the event that it

23   turns out that people are asymptomatic, and to the extent that

24   it turn us out that they're really seriously ill it's going to

25   cost the Debtor a lot, maybe in the long run --

1          MR. ESSERMAN:  I'm not good at math, but I think it's

2    a 100,000 times 1,000.

3          THE COURT:  Oh, 100,000, that's right, sorry.

4          MS. HARDING:  Your Honor --

5          MR. ESSERMAN:  It's between 50 and 100 million

6    dollars.

7          MS. HARDING:  Your Honor, first of all, I'm fairly

8    certain that to get a B read is not 500 -- I actually know that

9    for a fact.  I don't know exactly what it is.  I would say to

10   get a B read it's substantially less.  It's more like in the

11   $100 range for the B read --

12         THE COURT:  Well, I guess --

13         MS. HARDING:  -- but I'm not advocating this right

14   now.  It's just that I think that it's certainly something that

15   the Court should consider with the B reads.

16         MR. LOCKWOOD:  Your Honor, before we get too much

17   farther on this, as the Debtor's papers made clear, they

18   believe that in order to have a valid claim you have to have

19   two independent B readers, you have to have pulmonary function

20   tests that comply with the standards that they prescribe, and

21   various other things.  If the Court were to agree with that

22   then the Plaintiffs would have to go out and pay for all that

23   to be done.

24         THE COURT:  They're going to have to pay to submit

25   evidence of their claims anyway.

1       MR. LOCKWOOD:  Depending on what is required either

2   by the Court, if you're gonna go through a claims bar date for

3   purpose for 118,000 claims and make each person prove up their

4   claim individually, or in the Trust.  The Trusts have their own

5   standards for what's required.

6       THE COURT:  Well, let me interrupt for a second.

7   Because it seems to me that this issue is really going to come

8   down to probably the 1/0 B reads, and I guess -- I don't know

9   whether that's the largest quantity of them or not.  I suspect

10  it probably is.

11      MS. HARDING:  Absolutely.

12      THE COURT:  But to the extent that there's been a

13  diagnosis of mesophelioma or lung cancer I don't know that you

14  need a B read at this point in time anyway.  So the question

15  is, how many of these 100 plus, 1,000 claims are going to be

16  supported by that type of a B read diagnosis, and what would it

17  cost?  Because in the long run it may still be cheap.

18      MS. HARDING:  Your Honor, the -- slide 24 shows you

19  that over 120,000 of the claims -- there's 129,000 pre-petition

20  litigation claims.  Approximately 95% of those claims are for

21  non-malignant or unknown claims.  So you can see on the slide

22  there that there's about 1,500 mesophelioma claims, about 2,300

23  lung cancer claims, and approximately 700 other cancer claims.

24      So the non-malignant or unknown claims clearly make up

25  the, you know, large majority of the claims in the current data

1  base.  I don't know, I can't tell you because we don't have

2  that information, so many of the claims are unknown, whether

3  the B readings are 1/0 or not.  But our suspicion based on past

4  claims histories, and other bankruptcies, and other Defendants

5  is that a large portion of them are.

6       THE COURT:  Well -- some of the B reader's

7  credibility has obviously been put at issue by Judge Jack's

8  opinion, but not everyone, and as a result I'm -- and I --

9  obviously I have no knowledge of any of these folks, so I only

10  know from reading the opinion that she was offended, I think is

11  a good word, by the use of some of the outcomes of some of the

12  B readers and the process that they had employed.  But that

13  doesn't mean that every B reader in the world is behaving in a

14  fashion that was offensive to Judge Jack.  So perhaps the first

15  question is, how many of the Plaintiffs in this case might have

16  evidence that is submitted by one of those B readers, and

17  whether or not the x-rays, which I take it are still available

18  if they've been read by the B readers, shouldn't be reread by

19  somebody everybody agrees to, or is a Court appointed expert,

20  and we don't need to go down any other path perhaps.

21       MS. HARDING:  I can make a few representations about

22  that, Your Honor.  We know that, for instance, at least four of

23  the B readers on the -- if you go back to the Manville letter,

24  there are -- I think there are eight, nine doctors identified

25  from the silica decision, and we know for certain that at least

1 four of those doctors have diagnosed thousands, and I'm

2 underestimating, I think, when I say thousands.  I think I

3 could say tens of thousands with respect to past claims of

4 Grace Claimants.

5      With respect to the screening companies involved, again,

6 we know much less about the screening companies, because we

7 don't -- when Grace did settle claims they would get a B read.

8 They wouldn't necessarily get the information on the screening

9 companies, and the screen -- the relationship between the

10 screening companies and the law firms and how those screening

11 companies are used, how referrals to -- how screening companies

12 get paid more if they get a referral to a law firm for a

13 positive read, all of those things are information the Debtors

14 do not have and that bear directly on the reliability of the

15 evidence.

16      I can make the representation that NNM has diagnosed -- or

17 has screened thousands of Grace Claimants.  That's the most I

18 can say.  Importantly, I think from the information we have so

19 far with respect to the silica NBL Plaintiffs, we know that

20 nearly half have filed claims against Grace, either currently

21 or in the past.  We know that in the Kaiser bankruptcy where a

22 bunch of silica claims apparently have just been filed or were

23 filed previously, two-thirds of those silica Claimants were

24 either -- are either currently or formerly Grace Claimants.

25      Now, I don't know -- today I don't know, we just got some

1  information.  I don't know to the extent that there's overlap

2  between the silica MDL and the <u>Kaiser</u> MDL, but we know that the

3  doctors, the screening companies, and the Claimants that are

4  involved in the baseless practices that Judge Jack found are

5  involved in our claims to a large extent.

6      And you know, the last part of this presentation goes to

7  trying to explain to the Court why we do think it's important

8  to get this information from the lawyers.  The lawyers are the

9  ones that have the information on the screening companies.  The

10  screening companies are where this all starts.  And you know,

11  it's really trying to get at the web of relationships and how

12  it ultimately impacts the diagnosis.

13      Again there's -- I think it's remarkable, there are 655

14  law firms that were -- that represent approximately 70% of

15  these unknown or non-malignant Claimants.  And 8% of the law

16  firms -- 8% of the law firms, 52 law firms -- represent over

17  70% of those Claimants.  And each and every one of those law

18  firms has represented Claimants against Grace that have also

19  been diagnosed with silica -- silicosis.  And half of those law

20  firms -- half of the 52 haven't filed 2019s.

21      So, Your Honor, we are -- we know -- we believe finally

22  that the Court has the authority to issue the questionnaire.

23  We -- Grace -- the -- all of the objectors agree, we could do -

24  - we could do subpoenas for depositions.  We could do subpoenas

25  to get documents.  So we have the ability to get the

1  information and we would argue over privilege and things like

2  that.  But the Court wouldn't be issuing some new substantive

3  right that the Debtors don't have the right to do.  The

4  question is, what's the best method in an estimation?  What's

5  the most efficient method in an estimation for getting out this

6  information?

7       And finally, the last thing I wanted to say, Your Honor,

8  is to the extent that there's any concern that their procedural

9  rights, the law firms' procedural rights won't be protected, I

10 circulated this time line last time.  We've built in time for

11 objections to the -- we expect to get objections to the

12 questionnaire based on privilege and we can litigate those.

13 But we think this is the most efficient way to proceed to get

14 the information, but we're happy to listen to the Court's views

15 on how we should go about it.

16       THE COURT:  Okay, does anyone want to be heard in

17 support of the Debtor's motion first?

18       ALL:  (No verbal response).

19       THE COURT:  All right, I'll take opponents, then.  Mr.

20 Lockwood?

21   (Pause in proceedings)

22       MR. LOCKWOOD:  As Your Honor heard just now, the vast

23 amount of the argument on this attorney questionnaire has to do

24 with the inferences that the Debtor would like this Court to

25 draw from what's gone on in front of Judge Jack in the silica

1   case, and I think Your Honor early on indicated that that's a

2   different case and what went on there doesn't necessarily have

3   any real bearing on what's going on here.  And I agree with

4   that, obviously.  But I think it's important, given some of the

5   arguments that Ms. Harding has made here today, to focus on at

6   least some of the differences because they really do undermine

7   some of the premises that the Debtor is using this for.

8       One, the constant repetition of the fact that there are, I

9   {quote} "retreads" that have occurred here.  One really ought

10  to focus on the term retread and think a little bit about what

11  it means.  What it means is that once upon a time somebody

12  filed an asbestos claim and had a diagnosis of an asbestos-

13  related disease.  And in many instances, as some of the

14  individual firm filings that we've seen here, Grace actually

15  settled those asbestos claims using whatever kind of diligence

16  it chose to employ in evaluating the identity of the B reader,

17  the quality of the B read, the quality of any other evidence

18  that was done.  Indeed some of the cases were settled after

19  trial and verdict.  But the important thing to know is that

20  almost -- is that not almost -- by definition what has happened

21  is some lawyers have submitted subsequently to these asbestos

22  claims, silica claims to some other set of Defendants.  And

23  some of those -- many, indeed, apparently, of the 10,000 or so

24  that were coordinated before Judge Jack for pre-trial purposes,

25  were people who had previously been diagnosed with asbestos-

1  related disease.  And Judge Jack, among other things, noted

2  that unlike asbestos, silica diseases had pretty much begun to

3  disappear in this country over the preceding 20 years and that

4  the normal expectation was you would see very few of 'em.  And

5  that therefore this was an incredible anomaly here.

6      In contrast, you know, they're simply -- there's -- you

7  can dispute about whether or not there should be a decline

8  curve about asbestos-related diseases and when it should begin,

9  but there's absolutely nothing that Grace or any other

10  Defendant has ever indicated that would suggest that you would

11  have such a dramatic decrease of -- in the asbestos --

12  incidence of asbestos disease.

13      So that essentially what Judge Jack found was that, you

14  know, whether she's right or wrong about it, that there were

15  lawyers who had decided to try and double dip on asbestos and

16  silica.  Now that gave her a basis for evaluating and having

17  discovery aimed at the doctors, not the lawyers.  The doctors

18  who had furnished these B reads.  Well, that gets us to stage 2

19  of what's going on in silica.

20      A B read may or may not be the -- a something that

21  somebody uses to go to trial in.  Frequently, B reads -- and

22  this is where the screening companies come in -- there's a

23  stage to -- a process to which these claims have historically

24  gone in the tort system prior to the bankruptcy of Grace and

25  others.  Which is -- the first thing is, the Claimant has to in

1  some manner or another become aware that he may have a claim.

2  That's where the screening companies have come in as we've seen

3  the literature and the Court decisions.  They go around.  Some

4  of 'em are legitimate.  Judge Jack even admitted in her opinion

5  that screening for diseases is not intrinsically illegitimate.

6  Some of 'em were sponsored by unions for their members that

7  have worked in industrial things.  Others were, to use one of

8  Mr. Bernick's favorite phrases, entrepreneurial efforts

9  sponsored by lawyers apparently.

10      But again, what the result of that would be, would be that

11  a Claimant and a lawyer somehow or another would get together

12  based on this reading and decide that the Claimant had a claim.

13  However, that was just the first stage.  Now, the -- depending

14  upon what an individual Defendant's practice was, you could

15  very possibly settle claims that weren't even filed in the tort

16  system.  Some Defendants had what were called processing

17  agreements whereby lawyers with large numbers -- usually with

18  large numbers of cases would have an agreement that would set

19  forth certain requirements negotiated between that lawyer and

20  the Defendant over, you know, the submission outside of a Court

21  of claims with certain prerequisites for product identification

22  in terms of exposure and medical evidence of the existence of a

23  disease.  And those claims would be processed.  And some would

24  be rejected.  And some would be accepted and none of that would

25  ever see the light of day in a Courtroom.  And more importantly

1   none of them would ever be subjected to the frequently invoked

2   Federal Rules of Evidence and Daubert because that was a

3   consensual process that was being worked on out of Court.

4        Then there you have another large category of claims which

5   were filed in a Court.  Now, again, Defendants at that point

6   had two choices.  They could settle early and cheaply.  And one

7   of the things that we're gonna be focusing on as these

8   estimation procedures go on is how much cheaper it was to

9   settle a case, sort of at the inception of it, than it was to

10  settle it on the Courthouse steps before a trial, during trial,

11  after trial, et cetera.  But again, if you settled it pre-

12  trial, before you had any substantial discovery, and before you

13  were required to designate your experts, and before those

14  experts could be subjected to Daubert Motions based on whatever

15  expert testimony they proposed to give, you would resolve cases

16  under whatever criteria the Debtor and its insurers regarded as

17  acceptable for settling cases and utilizing whatever

18  evidentiary submissions, including B reads, from the Plaintiffs

19  that justified those settlements.

20       Then you would have cases that would go to trial.  And you

21  would have -- some of those would be subjected to Motions for

22  Summary Judgment in advance of 'em, and it's at that stage that

23  you have -- the Daubert issue comes up.  Because most cases --

24  most Courts have Case Management Orders that require you to

25  identify your experts and frequently Judges will allow people

1   to make Motions in Limine -- Defendants -- if they think the

2   expert testimony that's going to be proffered pursuant to a

3   Case Management Order identification process at trial doesn't

4   measure up.

5        And that's where Judge Jack was.  Judge Jack said that she

6   had set pre-trial proceedings for these 10,000 cases and that

7   she had required the trial lawyers to identify their trial

8   experts.  And those trial lawyers said, according to Judge

9   Jack, these are our experts and these are the diagnoses that

10  they will be proffering in the trial.  Now I should say by the

11  way that I got a call from one of the lawyers in that trial who

12  said that our papers had inaccurately described those as trial

13  experts because it -- they really hadn't gotten to that stage

14  yet.  All I can say about that is I have to take what Judge

15  Jack says in her opinion at face value 'cause she's the Judge

16  and she said they were trial experts.  And that's presumably

17  the only reason that she was able to apply Daubert to these

18  doctors' diagnoses because Daubert under the Federal Rules of

19  Evidence, as the Debtors have to concede, is a rule that tells

20  you what kind of expert evidence you put in a trial.  It isn't

21  a rule that tells you what kind of expert evidence you have to

22  have for you and your lawyer to file a lawsuit.  And -- or to

23  file a claim in a Bankruptcy Court.

24       And one of the things that I wanted to focus on in this

25  connection was the discussion that we had earlier here about

1    possibly having a new B read and all this.  If we are going to

2    have a claim allowance procedure for 118,000 claims, then after

3    the Debtors object to those of the 118,000 claims that they

4    believe should be not allowed, we will have under Rule 9014 an

5    adversary process commence at which case every one of those

6    Claimants will have the right to proceed forward.  And at some

7    point in that process, pursuant to Orders that this Court will

8    presumably present an Order, there will be a requirement that

9    the Plaintiff identify his expert for the trial of that case.

10   And at that point, either at the trial itself or through

11   possibly a Summary Judgment form of Motion in Limine type

12   practice, the Debtors will have an opportunity to challenge

13   those designated experts.

14        I rather suspect that if that process occurs, no matter

15   whose B reads may have originally prompted the filing of a

16   claim against Grace, we will not see Dr. Harron proffered as

17   the trial expert for these asbestos Claimants.  There's no

18   requirement that just because somebody got a B read from Dr.

19   Harron, you know, a few years back, even if it was pursuant to

20   some screening process, that somehow or another that Plaintiff

21   is locked in by that fact to the selection of Dr. Harron or Dr.

22   Oaks or any one of the other doctors that Judge -- I mean Judge

23   Jack criticized in the silica case.

24        And so, to some extent this is a gigantic red herring

25   here.  Because this is -- all this stuff about B readers and

1    everything is aimed at focusing on a stage in the process where

2    sort of the claim is sort of being originated by the Plaintiff

3    and his lawyer and not being focused on the process of where

4    the claim was actually going to be to tried.  Which is the only

5    time that this Court under the Federal Rules of Evidence and

6    the Supreme Court's decision in Daubert would have the ability

7    to apply a Daubert standard.

8        Now, what is it that the Debtors want to do here with

9    these attorney questionnaires?  Essentially what they want to

10   do is go out and show that many of these B readers are biased.

11   And therefore their B reads should be rendered sufficiently

12   incredible that they should be rejected out of hand.  Remember,

13   this -- the Court has already imposed -- over our continuing

14   objection, I should confess -- a requirement that individual

15   Claimants file 118,000 questionnaires.  And those

16   questionnaires are gonna have to contain -- because they

17   require it -- the identification of the diagnosing doctor in

18   the B reader.

19           THE COURT:  Right.

20           MR. LOCKWOOD:  So -- and --

21           THE COURT:  Which is why I don't know why you need to

22   get it from the lawyers.

23           MR. LOCKWOOD:  I'm -- you won't get any push back from

24   me on that point, Your Honor.  But so what is it that the

25   attorney questionnaire is going to add to that process?  Well,

1    they say, the attorney questionnaire is gonna enable them to

2    determine the direct or indirect financial relationship --

3    those are their words -- that's what the questionnaire is.

4    Direct or indirect financial relationship between the lawyers,

5    screening companies, and doctors.  And okay, let's -- put aside

6    for the moment at least, the incredible vagueness of what on

7    earth you mean by a direct or indirect financial relationship

8    between a doctor and a lawyer.  And I might add, they also want

9    it between law firms.  Apparently, they're interested in

10   finding out every law firm's referral arrangements with other

11   law firms, and whatever that has to do with the validity of the

12   underlying claim is not immediately apparent to me.  And has

13   never been explained by the Debtor.  But let's assume they

14   establish through these questionnaires that, gee, Dr. Harron

15   got --

16            THE COURT:  Mr. Lockwood, let me stop you.  Oh.  I

17   just got a yellow screen.  I was -- oh, it's happening again.

18   Now it's red.  All right.  When my screen turns colors, I get

19   frightened because it's usually the blue screen of death.  This

20   one is the red and yellow screen of something.

21            MR. LOCKWOOD:  Is it functioning now, Your Honor?  I

22   mean --

23            THE COURT:  I don't know and I'm afraid to find out.

24            MR. LOCKWOOD:  Should I hold off?

25            THE COURT:  Wait.  Yes, just wait, please.  It's

1  vivid.

2          MR. LOCKWOOD:  I hope that's not an editorial

3  comment by the computer manufacturer on my argument, Your

4  Honor.

5          THE COURT:  Cable?  Whoa.  Yes.  I have text.  And my

6  cursor's flashing.  So I should be all right?  I can trust you

7  on this, right?

8      (Laughter)

9          THE COURT:  It flashed yellow and then green.  Yes,

10  and then yellow and then red.  Why don't you just take a couple

11  seconds recess?  I'm really -- I mean, I would like to continue

12  but I'm afraid.  I really don't want to lose everything that

13  we've done so far.  Okay.  Thank you.  I have no idea.

14      (Court in recess)

15          THE COURT:  Okay, thank you.  Right, we're ready.  I

16  killed the monitor.  It just went, that was it.  You're not

17  going to let me come back to Delaware anymore.  Three months in

18  a row, three hurricanes and three computers dead.  So, okay.

19  Mr. Lockwood, I'm sorry.  You were at -- they want to see how

20  one law firm refers clients to another and that has never been

21  explained as to how it relates to the testimony that they're

22  seeking to induce.

23          MR. LOCKWOOD:  Right.  We were focusing, Your Honor,

24  on the actual questionnaire itself, which is Exhibit-A to the

25  Motion of the Debtors.  And just to back up again, it seeks the

1  --

2      THE COURT:  Oh --

3      MR. LOCKWOOD:  -- details --

4      THE COURT:  Mr. Lockwood.  I'm sorry.  It's typing --

5  all the letters are typing over each other.  I'm going to get

6  some paper and we'll start taking notes by hand while they fix

7  this.  But --

8      (Pause in proceedings)

9      THE COURT:  Okay.  Mr. Lockwood, I'm sorry.  We'll try

10  it one more time.  Third time's a charm, otherwise I'll go back

11  to the old fashioned way.  Okay.  Exhibit-A.

12      MR. LOCKWOOD:  Exhibit-A.  The critical language that

13  we start from here is, "Does your firm, a member of your firm,

14  or an employee of your firm have a past or current, direct or

15  indirect financial relationship with any of the following --

16  check all that apply."  Then they list other law firms that

17  represent asbestos claimants, doctors who diagnose asbestos-

18  related disease, doctors or technicians who perform chest x-

19  rays, B readers, doctors or technicians who perform PFTs, et

20  cetera, et cetera.

21      And then for each of those entities that you've checked

22  the box on page 1, there's a second page that requires you to

23  answer something like seven questions.  And then identify and

24  produce all documents relating to -- describing the

25  relationship.  These relations -- first, the term direct and

1  indirect financial relationship as I was in the process of

2  saying, it's just -- I mean, it's completely vague.  I mean, do

3  I have a direct or indirect financial relationship if I paid an

4  expert witness fee to a doctor?  If I've -- a member of the

5  same investment club and we pay dues, invest together?  If I

6  were part of a mutually supported club of some sort where we're

7  sharing expenses in something?

8      I mean, what is an indirect financial relationship?  If I

9  have a fee-sharing agreement on a couple of cases with law firm

10 X and law firm X has paid Dr. Y an expert witness fee, does

11 that -- an indirect financial relationship through the other

12 law firm?  I mean, with all candor, Your Honor, I wouldn't know

13 how -- I wouldn't know what I was being asked to respond to if

14 I got this questionnaire.  The vagueness and the breadth of it.

15     Secondly, these questions are asked for sort of any

16 relationship with anybody that fits in the described category

17 as long as they have something to do -- well, the first two of

18 'em have to have something to do with asbestos.  The rest of

19 'em are doctors or technicians who perform x-rays, or read x-

20 rays or something.  But essentially there's no nexus at all

21 between the questionnaire -- the individual questionnaire of

22 the Claimant whose claim is before you, and the relationship

23 that you're being asked to describe.  This isn't sort of a

24 followup, if you will, of a questionnaire.  It's a wholly

25 independent, self-generated category of information.

1      Then let's assume you get the information.  And you --

2  okay, the expert witness fees or I -- I'm a law firm and

3  somehow or another I paid the screening company to go out and

4  give x-rays to people and see if they had asbestos diseases.

5  Let's focus on the screening -- they said there's basically

6  three problems.  Law firms, doctors, screening companies.

7  Let's focus on screening companies for the moment, because as

8  Your Honor pointed out earlier, the existence of screening

9  companies in this business has been known for at least 10

10  years.  I mean, it was a function -- it was -- the Owens-

11  Corning in 1996, sued three screening companies in -- I believe

12  it was Alabama.  And Your Honor's heard about that in the

13  Owens-Corning case.  So this is not like something new that

14  Grace somehow or another just kind of discovered because Judge

15  Jack brought it to their attention.

16      What happens?  Let's assume some lawyer pays the screening

17  company to screen people.  So what?  Does that make the result

18  of the screening invalid?  Remember, why are we here?  What is

19  Grace saying they want to do?  They're saying, "Judge, we need

20  this evidence to help us establish the validity or invalidity

21  of claims."  Well, now how -- we're either doing an aggregate

22  estimation, which is what I always thought we were doing, or

23  we're doing individual claims allowance.  I'm totally at a loss

24  to know what the inference would be in the aggregate estimation

25  context of the fact that some lawyers paid screening companies

1    other than to suggest that they're out there trying to find

2    people with asbestos-related diseases.  And -- but in the

3    individual claim area, since the screening company doesn't

4    testify, they're not a witness in support of the Plaintiff's

5    claim, that the fact that the claim was generated by a

6    screening conceivably might be used as evidence of -- I don't

7    know, maybe bias?  You ask the doctor, did you know that this

8    person was identified through a screening process where the

9    lawyer paid money to the screening company?  I mean, maybe they

10   could use that.  I'm not even sure they could, frankly.  It

11   seems kind of tenuous.

12       But at the end of the day, that would be an individual

13   case involving the individual claim of that person.  And at a

14   minimum, I'm not aware of any law or principle that would allow

15   some expert to come in here and say, "Judge, you know, we just

16   -- looked at all these questionnaires and, boy, there's a bunch

17   of these law firms that have a lot of claims that paid

18   screening companies money and a lot of the claims we infer or

19   maybe we'll do more discovery of the screening companies to

20   really find out, but really, we infer that because the claims

21   originated through screenings, they are ipso facto invalid."  I

22   mean, that's not -- that's not expert testimony.  That's just,

23   you know, ranks sort of -- basically you're saying that somehow

24   or another you don't like the process.  You think it's unseemly

25   or whatever, I --

1           THE COURT:  But, look -- I think we're getting far

2    afield because I'm still not clear what they want to -- what

3    evidence it is that is really supposed to be relevant to this

4    issue.  And I really need to have some argument, I think, from

5    the Movant as to what specific evidence is relevant.  Because,

6    I'm not seeing it except for the fact that if there is a

7    challenge to the B reads themselves -- the x-rays themselves,

8    and the Debtors want to take a look at that evidence, it seems

9    to me that in challenging whether a person has an actual claim

10   of the type they allege here, that the -- whoever wants to in

11   quotes "object" to that claim would have access to that

12   information.

13        The problem I still have is that information is going to

14   be handled according to the Debtor's proposed Plan through a

15   Trust, not by the Debtors.  So for estimation purposes it may

16   be relevant to have -- some in global terms -- evidence that

17   particular B readers submitted X numbers of claims.  And I

18   guess then there has to be some follow-up evidence if that's a

19   relevant point which is that in fact those claims are -- or

20   those B reads are not correct.  But the -- all of it, it seems

21   to me, comes down to getting the x-rays and having the Debtor

22   have their own people -- if that's what they want to do -- look

23   at the x-rays to determine whether or not in their opinion the

24   B read that was submitted is correct.  Because that's the

25   evidence that we have to get to.

1          MR. LOCKWOOD:  Your Honor, let me --

2          THE COURT:  If we're going down that road --

3          MR. LOCKWOOD:  The questionnaires -- which Your Honor

4  has authorized to be sent out have lines in there saying --

5          THE COURT:  The Plaintiff questionnaires, yes.

6          MR. LOCKWOOD:  -- who's -- the individual

7  questionnaires.  They identify the B readers.  The Debtors

8  already think they know who the bad B readers are.  There's

9  nothing to prevent them from making the same kind of arguments

10  citing Judge Jack, and newspaper articles, and Wall Street

11  Journal editorials, and heaven knows whatever source of public

12  relations material they are fond of relying on in their briefs

13  in support of their arguments about that.  But if they want to

14  get into individual x-rays, then what we're going to be

15  involved in is individual claims allowance.

16          THE COURT:  That's --

17          MR. LOCKWOOD:  And I mean, I thought Your Honor had

18  made perfectly clear that that's not what we're gonna do here.

19  I realize the Debtors have from time to time said, "Well, if we

20  don't get to do estimation the way we want to do estimation" --

21  however that is -- "we will fall back and set a bar date and

22  we'll go through an allowance process."  All I can say to Your

23  Honor is, to go through an allowance process for 118,000

24  personal injury claims when people have rights to trial by jury

25  and to be heard those claims -- have those claims heard in a

1    District Court --

2          THE COURT:  The District Court will be thrilled.

3          MR. LOCKWOOD:  Well, while this isn't a 502(c)

4    estimation, it certainly won't advance -- the actual allowance

5    will certainly delay the process of getting this Debtor out of

6    bankruptcy for your and my remaining life spans.  Fortunately

7    yours is probably longer than mine, but it'll easily cover both

8    of us.  And so I just -- to me that's empty rhetoric,

9    threatening a bar date unless this Debtor really thinks they

10   can wear down everybody in the Courtroom and eventually some --

11   go away and leave 'em alone.

12         THE COURT:  Well, okay.  The point is still, I do not

13   see how this request is calculated to lead to relevant and

14   admissible evidence with respect to an overall estimation.  And

15   although I asked you to comment, Mr. Lockwood, I'm going to ask

16   if I could turn back to the Debtors to see.  Because maybe if I

17   start from the fundamental principles, I'll understand it a

18   little better.  Because I don't see it.

19         MS. HARDING:  Your Honor, could -- permit me to go to

20   the board here and make a --

21         THE COURT:  Sure, and #1, why is it something that

22   can't wait until you find out who the B readers are from the

23   individual claims that are coming in?  I mean, why do we need

24   to go the next step --

25         MS. HARDING:  Your Honor, I think the main reason why

1   we can't wait to do it is because we don't have enough time.

2            THE COURT:  Oh, look --

3            MS. HARDING:  I mean --

4            THE COURT:  How old is this case?  Pardon me.  This

5   case has been around for almost a third of my tenure on the

6   bench.  We have plenty of time.

7            MS. HARDING:  Well -- but Your Honor, we have -- we've

8   got a trial date set for September.  We've got expert reports

9   due in January.  We've got our other expert reports due in

10  March --

11           THE COURT:  And if we can't meet those deadlines, then

12  we can't meet the deadlines.  The question still is, what more

13  information you need and why.  If you're going to get the B

14  readers and you've got some thing that leads you to be

15  suspicious of those B readers, once you know who they are,

16  you'll have the information that you will need to take it to

17  the next step, whatever that next step is.

18           MS. HARDING:  I understand, and with respect to the B

19  reads we can get to that.  But I want to start with the issue

20  of exactly what is -- what do we want from the questionnaires

21  that we can't get from the Plaintiff questionnaires?  I'm going

22  to give you a couple of -- Your Honor, first of all, Mr.

23  Lockwood said if they pay -- if a screening company -- if a law

24  firm pays a screening company for a B read, there's nothing

25  wrong with that.  Your Honor, what if the law firm pays the

1   screening company zero for a screen that's negative and zero

2   for a screen that's positive but the law firm doesn't get the

3   referral?

4          THE COURT:  The way you file that -- find that

5   information out, if you suspect that that's the case -- #1, I

6   think Mr. Lockwood's right.  That may be reprehensible in some

7   fashion or other, but the question still is, is the screen that

8   led to the x-ray that led to the read correct or not correct?

9   And whether the screening company, you know, read more at -- or

10  sent more for readings to the B readers than otherwise they

11  would have done, isn't relevant.  The question is, you know --

12  and plus, the Debtors have this information for the last 20

13  years while it's been settling asbestos claims.  So this isn't

14  something new.  If it was a problem before, why did the Debtor

15  either settle or pay claims?

16         MS. HARDING:  Your Honor, I think it's inaccurate to

17  suggest that the Debtor had all this information.  The Debtor

18  had suspicions about a lot of things.  And the problem was that

19  -- and I mean, we've talked about this in the Court before, I

20  know Mr. Burnick has -- the Debtors are in essence held hostage

21  if they try to push this issue in one Court, they were held to

22  huge settlement demands in other Courts.  And I mean that --

23         THE COURT:  Then you file bankruptcy and you're held

24  to one huge demand by one Judge and here you are.  I still

25  don't get it.  I understand if you're going to get the B

1   readers, you can go take their depositions, you can ask

2   witnesses.  You know, the individual Plaintiffs if need be.

3   How they got to that specific B read if they know.  But why do

4   you need this information from the law firms?  I'm certainly

5   not going to give you proprietary -- access to proprietary

6   information of the firms.  You're not going to get that.  Not

7   from this Court.  I don't see any relevance to whether or not a

8   specific x-ray B read and/or the Debtor's ability to estimate

9   claims -- how in any way that is dependent on whether or not

10  one law firm member is a social club member of a doctor in a

11  case.

12          MS. HARDING:  And Your Honor, and let me be very

13  clear.  I'm happy to try to narrow the focus of the

14  questionnaire.  One, if we could narrow it directly to Grace

15  Claimants.  In other words, relationships with doctors --

16          THE COURT:  Wait.  We had this --

17          MS. HARDING:  -- related to Grace Claimants.

18          THE COURT:  We had this very discussion in dealing

19  with the individual witness questionnaires.  And the Debtor has

20  gone back and done exactly the same thing in the lawyer

21  questionnaire that I already said you couldn't do in the

22  individual questionnaires.  I mean, I confess I don't have a

23  good long-term memory but I do remember from month to month

24  what I've ruled --

25          MS. HARDING:  But, Your Honor, and actually I have the

1  record from that discussion with -- between you and Mr.

2  Burnick.  And the precise discussion was that we sought the

3  information, we explained why we thought the information was

4  relevant, and Your Honor said it may be that the Claimant won't

5  know.  So we can't ask it here.  That was --

6       THE COURT:  Of the relationship between the law firm

7  and the doctors?

8       MS. HARDING:  Right.  Exactly.  That was the issue.

9  And so that is why we filed the motion --

10       THE COURT:  But --

11       MS. HARDING:  -- because we want to get the

12  information and we --

13       THE COURT:  But the question still is, what's the

14  relevance?  What I said was, it may be.  I don't see the

15  relevance.  Now you've put it in a motion.  I have it in front

16  of me.  You're still telling me that what you want to do is

17  challenge the B reads.  So challenge the B reads.  But you

18  can't do it in a fashion that's not calculated to lead to

19  relevant and admissible evidence.  And I don't see how this is.

20       MS. HARDING:  Your Honor, it's not just the B reads.

21  And I think I -- with all due respect I do think it is relevant

22  to -- and calculated to lead to discovery -- discoverable

23  information.  I'm trying to find, Your Honor, I can't get the

24  screen up.  But there is a slide from David Ostern's letter,

25  Your Honor.  It's slide #18.

1          THE COURT:  Okay.

2          MS. HARDING:  If you take a quick look at that.

3          THE COURT:  All right.

4          MS. HARDING:  All right, these are the doctors and

5    screening companies that were identified in the silica

6    litigation.  And that now are no longer receiving the Trust --

7    the Manville Trust is no longer paying claims supported by

8    these doctors.  All right?

9          THE COURT:  So what?

10         MS. HARDING:  And these screening companies.  Your

11   Honor, the information we're seeking in here is trying to get

12   at what other doctors and what other screening companies should

13   be on this list?  And that is absolutely --

14         THE COURT:  None of these doctors are on a list in

15   this case.  Let's get something clear --

16         MS. HARDING:  Well --

17         THE COURT:  These doctors may be challenged in some

18   other fashion in some other way.  Right now, I don't have any

19   evidence that these doctors even have submitted claims or that

20   individuals of these doctors will be submitting claims.  You're

21   going to get that information from the Plaintiff's

22   questionnaires.  When you get it, if you've got some reason to

23   challenge the reliability of the diagnosis, then you can take

24   it to the next step.  But you don't need to ask lawyers what's

25   your financial relationship indirect or direct with, for

1   example, just to pick a name -- Dr. James Ballard.

2          MS. HARDING:  But, Your Honor.  I think it's --

3   absolutely goes to the reliability of that evidence under

4   Daubert --

5          THE COURT:  All right.  I've overruled it.  You're not

6   getting that.  So what's next?

7          MS. HARDING:  With respect to?

8          THE COURT:  What you need.  What you're asking for and

9   what the relevance is.

10         MS. HARDING:  Your Honor, we're asking for -- I'd like

11  -- I'll go through a series of questions I think that they were

12  trying to get at -- the information we're trying to get at, all

13  right?  "Did you have a relationship with a doctor or a

14  screening company where the compensation of the doctors or

15  technicians who examined your clients varied depending on

16  whether the opinion or diagnosis rendered supported a claim for

17  an asbestos-related disease?"  That absolutely is relevant to

18  the reliability of those claims.  If a doctor's getting paid if

19  it's positive and not paid if it's negative, that goes to the

20  reliability of that underlying evidence.  And that -- the

21  Claimant will not know that.

22         THE COURT:  Well, the Claimant may or may not know

23  that, but I think likely the Claimant probably would not know

24  that.  But then you could take the depositions of the doctors.

25  Because they're the ones who got paid and gave the diagnosis.

1  And it's their testimony you're trying to challenge.  You can't

2  use the Collateral Evidence Doctrine to get through the back

3  door what you can't get through the front door.

4          MS. HARDING:  Your Honor, I hesitate to raise this

5  now, but as the Court is well aware, the doctors stopped

6  testifying in the silica case.

7          THE COURT:  Well, then -- this isn't the silica case.

8  I --

9          MS. HARDING:  Well, I understand, Your Honor.  They're

10  also under a grand jury investigation and Congressional

11  investigation.

12          THE COURT:  Then they'll take the Fifth Amendment and

13  you'll have adverse inferences that you can draw if it's

14  appropriate.  And so might the other side if it's appropriate.

15          MS. HARDING:  I mean, other information that we

16  think's highly relevant to the reliability of the underlying

17  evidence under Daubert.  Did another law firm --

18          THE COURT:  Wait.  Wait.  What -- maybe we have a

19  difference of opinion about what Daubert talks about.  Daubert

20  talks about the methodology by which an expert has rendered an

21  opinion and whether that methodology has met the test, in

22  essence, of reliability.  Whether it's subject to peer review,

23  whether it's been published and all the other forms that you go

24  through for reliability.  That's what it says.  It doesn't say

25  that you strike the doctor's testimony because the doctor may

1  be biased.

2          MS. HARDING:  But you --

3          THE COURT:  That's an evidentiary principle that

4  doesn't get to the methodology, the reasonableness and the

5  reliance of the methodology used in an expert in Daubert.

6          MS. HARDING:  Well, but, Your Honor -- this -- I

7  believe there's absolutely a reliability factor involved but

8  there's also the issue of the involvement of the law firms in

9  the diagnostic process.  That's what we're trying to get at.  I

10  mean, how -- to what extent --

11          THE COURT:  The -- let's just assume without deciding

12  for the moment that the lawyer paid either a screening company,

13  or a B reader, or a doctor, or maybe in the given case, all

14  three, in order to get a report.  Is there something unusual

15  about a lawyer -- a law firm paying for an expert report?

16          MS. HARDING:  It -- Your Honor, I think it absolutely

17  would be -- would not be acceptable medical practice to get

18  payment for -- only for those people for whom you diagnose as

19  positive?

20          THE COURT:  That --

21          MS. HARDING:  And not to take payment for people you

22  don't --

23          THE COURT:  I don't know --

24          MS. HARDING:  -- you don't diagnose as positive?

25          THE COURT:  I know a lot of tax accountants who take a

1  look at a person's income and say, gee, you've only earned

2  $10,000 this year.  I'll do this one for free.

3       MS. HARDING:  But, Your Honor --

4       THE COURT:  But then they look at somebody else who's

5  made a million dollars and say, I'm going to charge you a

6  thousand dollars for this return.  Is that inappropriate?  Of

7  course not.

8       MS. HARDING:  In the medical practice -- and I think

9  we're entitled to get the evidence so that our experts can

10 testify whether that is acceptable medical practice for

11 diagnostic purposes.  I mean that's -- we're just trying to get

12 information --

13      THE COURT:  You can ask the doctors --

14      MS. HARDING:  -- that our experts can review.

15      THE COURT:  You may ask the doctors.

16      MS. HARDING:  And if we can't get the information from

17 the doctors, Your Honor --

18      THE COURT:  Then I'll deal with it then.

19      MS. HARDING:  -- can we come back?

20      THE COURT:  You'll have to come back if --

21      MS. HARDING:  Other information we're looking for.

22 "Did you have relationships with" -- I'm sorry -- "with other

23 law firms that handled the screening of the client and the --

24 and shopped the B read around to the point where you got a

25 positive diagnosis and then now the new law firm files the

1    claim?"

2             THE COURT:  So what you're saying is, was there more

3    than one B read?  One was negative and one was positive and

4    you're only giving us the positive?

5             MS. HARDING:  Absolutely.

6             THE COURT:  Why aren't you going to --

7             MS. HARDING:  Because another law firm --

8             THE COURT:  -- get --

9             MS. HARDING:  -- handled the screening.

10            THE COURT:  Why aren't you going to get that from the

11   individual Plaintiffs who are required to tell you --

12            MS. HARDING:  Because the law --

13            THE COURT:  -- the doctors and the B reads that they

14   had?

15            MS. HARDING:  Sorry, Your Honor.  Because the law firm

16   that files the claim doesn't have that information.  They don't

17   know --

18            THE COURT:  But the individual does.

19            MS. HARDING:  -- the information.  Pardon me?

20            THE COURT:  But the individual does.

21            MS. HARDING:  No, the individual doesn't.  They don't

22   know where their x-ray's been sent.  That's the whole point.

23   They get shopped around -- the individual has no idea where

24   their x-ray was sent.

25            THE COURT:  So you want a very specifically narrowed

1  question, which is have you with respect to -- let me just say,

2  Plaintiff A --

3            MS. HARDING:  Right.

4            THE COURT:  -- for a moment.  With respect to

5  Plaintiff A, have you taken this B read and given it to more

6  than one doctor or B reader and as a result of that gotten

7  inconsistent B reads?

8            MS. HARDING:  That is one question, Your Honor.  That

9  is one part of it.  But the second part of it that gets to the

10  issue of the relationships between the law firms is did you get

11  this claim from another law firm?  Okay, what is your

12  relationship with other law firms because the record seems to

13  suggest that there are law firms that do the screening, shop

14  the B read 'til they get a positive and then that group of

15  claims then goes to another law firm.  That law firm files the

16  claim and these guys get some --

17            THE COURT:  Look --

18            MS. HARDING:  -- kind of payment for it.  That's

19  relevant --

20            THE COURT:  -- I don't --

21            MS. HARDING:  -- to the reliability of the underlying

22  -- and to the method of the diagnosis.

23            THE COURT:  No.

24            MR. LOCKWOOD:  Your Honor, I object to that statement.

25  I'm sorry.  I've sat here and listened to Ms. Harding make

1  representations.  There's not one word in any of the pleadings

2  that Grace has filed in this case and newspaper articles and

3  other inadmissible sources included that suggests that the

4  problem of shopping B reads arises not when a single firm might

5  shop a B reader out on multiple doctors, but when they're in

6  effect laundering the shopping by having one firm do the

7  shopping and then in order to somehow or another make it clean,

8  you pass the claim to another law firm.  That -- there's just -

9  - she just made that up as far as this record is concerned.

10         THE COURT:  I --

11         MS. HARDING:  I'm searching --

12         THE COURT:  Whether made up or not, this is going far

13  afield of what an estimation hearing's all about.

14         MS. HARDING:  Your Honor, the only thing we're asking

15  for here is the right to take the discovery -- is to issue the

16  questionnaire and to -- and the law firms that get the

17  questionnaire --

18         THE COURT:  I'm not permitting the questionnaire.  If

19  -- #1, if you want evidence from a specific firm, then you do

20  the formal discovery according to the Rules of Evidence,

21  because I believe that there are constitutional problems with

22  what you're asking.  That without consent of their clients the

23  lawyers may in fact be compromising some piece of advice that

24  they have given to a client for what reason.  There may be

25  attorney-client privilege.  There may be work product.  There

82

1  could be all sorts of problems.  There are definitely with

2  respect to the financial relationships and how firms transfer

3  clients or share clients among one another, proprietary

4  information involved.  There are all sorts of problems with

5  this questionnaire.  So, I'm not going to approve it.

6      If you've got need for specific discovery, focused on a

7  specific area, you can take it and we'll deal with it

8  piecemeal.  But overall, I am not going to permit these broad-

9  based questions.  I didn't permit them with the individuals.

10  I'm not going to permit them with the lawyers.  If you try in

11  discovery I'm going to permit it, so please -- although I'm not

12  giving you advisory opinions, I'm giving you advice.  I'm not

13  going to permit it.

14      So tailor your questions if you have some need to this

15  specific whatever it is that you're looking for so that when I

16  say, what's the relevance, you can tell me how it fits to a

17  particular strategy, theory, piece of evidence, whatever in the

18  estimation hearing, because this doesn't.  This is not

19  enhancing that process.

20          MS. HARDING:  Can I try one more time?

21          THE COURT:  One more.

22          MS. HARDING:  Your Honor, in the end, and so I don't -

23  - so we're going to have a Trust, all right?  And then the

24  trust is going to be funded, all right, from an estimation from

25  this Court on what should -- how much money should go into the

1    Trust.

2           THE COURT:  Right.

3           MS. HARDING:  All right.  And the first part of the

4    estimation that the Court is talking about, in the past, at

5    least, is what our -- what's the basic liability for the

6    current claims?

7           THE COURT:  Right.

8           MS. HARDING:  Okay.  And our position has been all

9    along from the very beginning, and I think the Court has at

10   least acknowledged that the Debtors have the right to assert

11   this position, that the funding for the current plan has to be

12   supported by evidence admissible in Federal Court.  And all of

13   the discovery that's been going on is trying to get at the

14   issue of what evidence is admissible and meets the Daubert

15   standards under the Federal Rules.  And so that -- all the

16   discovery is tailored and is then intended to get at that

17   issue.  And we believe that experts -- very highly credible and

18   distinguished experts will tell this Court that the diagnoses

19   based on the kind of practices that occurred and were found in

20   silica are not reliable.  Their methods would never be

21   acceptable in --

22           THE COURT:  Please don't mention silica anymore.  This

23   isn't a silica case.  I'm not -- if you try to introduce what

24   they did in the silica case, I'm telling you right now, it's

25   not relevant to what I'm doing.  I don't want to hear anymore

1   about silica.

2          MS. HARDING:  All right.  The point I want to make on

3   it -- in doing that, we believe that in the same way, in some

4   respects that you're handling in -- that there will be certain

5   filters that will filter out the roots of these claims.  And it

6   will provide -- and the evidence we're seeking now is the data

7   to help the experts quantify those numbers.

8          THE COURT:  That's what you told me you were seeking

9   when I permitted the individual claim questionnaires to go out.

10          MS. HARDING:  Right.  And at that time, Your Honor, we

11   -- I think we've been clear all along that we think that we can

12   do so much with those questionnaires and that evidence.  But we

13   also think that we can get further evidence that those claims

14   should be filtered out even more based on these kinds of

15   practice and relationships.  And that's what it's going to

16   because then that also debates the current and future claims

17   are going to be estimated and we know from the Ostern letter.

18   We know from the -- that the kinds of practices that were

19   acceptable in the past are no longer acceptable.  And even if

20   it weren't an issue with the current claims, with respect to

21   future claims the Court is entitled to know what part of those

22   current claims are going to meet those standards in the future.

23          THE COURT:  I do not want to see improper claims

24   filed or allowed -- if they are filed, allowed.  I don't want

25   to see a single dime go to a Plaintiff who doesn't have a

1   legitimate claim against this Estate.  However, you've got to

2   substantiate that the discovery that you're trying to get to is

3   going to enhance either -- that determination one way or the

4   other.  That is, what claims are legitimate and what claims are

5   not legitimate for allowance and payment purposes.  This

6   evidence about relationships between the law firms is too

7   tangential.  It's not calculated to lead to that kind of

8   evidence.

9       The Plaintiff's questionnaires I think are calculated in

10  that fashion.  You're going to get a description of the

11  doctors, the B readers, who the lawyers were -- all sorts of

12  things.  When that evidence comes in and your experts have a

13  chance to look at whatever they're going to do with that

14  evidence, and they say to you, we can't do -- we can't give you

15  an opinion because we need this piece of evidence, then you

16  come back and say, my experts say they need this piece of

17  evidence or we can't get any decision from them, any opinion

18  from them.  And then I'll understand what the relevance is.

19  But until you get through the process that's currently on track

20  and your experts look at it, and decide that they can't in fact

21  get you an opinion, I don't see the relevance of doing more.

22  The whole purpose for going through that exercise for several

23  hours was to make sure that you got relevant evidence that was

24  what your experts needed.

25          MS. HARDING:  Absolutely, Your Honor.  I mean, I

1  understand where the Court's coming from.  We will tailor any

2  specific direct questions we have with respect to law firms in

3  that regard.  Thank you, Your Honor.

4          THE COURT:  All right.  If no one else wants to be

5  heard, I'm going to do an Order that denies --

6      (Laughter)

7          MR. ESSERMAN:  Your Honor, I've always been told that

8  after you've won a motion, make sure you charge the podium to

9  see if you can reverse the Judge's mind.  So I'm not going to

10  make the presentation that I was scheduled to make but in

11  particular, one of the respondents had something further that

12  might require an evidentiary presentation, and we'll therefore

13  request pursuant to your procedures a hearing, probably in

14  Pittsburgh, at a later date.

15          THE COURT:  Okay.  What is -- what's the nature of an

16  evidentiary presentation?

17          MR. ESSERMAN:  Well, we believe -- the Reaud Morgan &

18  Quinn firm believes that upon presentation of evidence we will

19  be able to show you that this Motion was completely based on

20  evidence that does not exist, that was made up as to the firm,

21  as to Reaud Morgan & Quinn firm.  And that has no basis in fact

22  or law.  That that was pointed out to the Debtors, that we were

23  asked to be removed from this motion, and we were cited in a

24  motion that used some very harsh terminology such as fraudulent

25  medical evidence, junk asbestos claims, bogus claims,

1  questionable attorney practices.  And they cited two cases of

2  Reaud Morgan & Quinn, both of which have been accepted by

3  Grace.  We attached the medical evidence to our response.  The

4  doctor we used was a defense doctor.  And we --

5              THE COURT:  Let me stop you, Mr. Esserman, because --

6  I'm denying the motion, so I'm not having an evidentiary

7  hearing on this motion.  If you've got some further motion to

8  bring, you file it.  And if we need an evidentiary --

9              MR. ESSERMAN:  There's part of it --

10             THE COURT:  -- hearing, I'll hear it.

11             MR. ESSERMAN:  It was part of sanctions.

12             THE COURT:  Well, the sanction -- I think the

13  sanctions issues have to be brought separately under Rule --

14  are you talking about a 9020 sanction?

15             MR. ESSERMAN:  Yes.

16             THE COURT:  Well, you'll have to bring -- you'll have

17  to comply with that.  I'm not setting up an evidentiary hearing

18  in response to a motion.

19             MR. ESSERMAN:  Thank you, Your Honor.

20             THE COURT:  Okay.

21             MS. HARDING:  Your Honor, may I respond just briefly?

22             THE COURT:  No.  Actually, no.

23             MS. HARDING:  All right.

24             THE COURT:  We're done.

25             MS. BAER:  Your Honor, I see that it's past 2 o'clock.

1   We have three matters left on your calendar, and I wanted to

2   take up maybe logically which way we should take them in order.

3   One matter we have, matter #12 is the matter with respect to

4   the 2019 statements.  Your rulings last week -- last month and

5   the inability, as you may not be terribly surprised, of the

6   Debtor, the insurers and the futures rep to come to an

7   understanding with respect to an Order.

8        The second issue that's still pending before you on the

9   calendar is matter #13, which is the Motion of Reaud Morgan &

10  Quinn -- Mr. Esserman's clients -- to modify the Case

11  Management Order with respect to PI estimation.

12       The third matter that's up, Your Honor, is status, as you

13  asked for us to put on the calendar, of the ZAI rulings.  In

14  light of the time, Your Honor, I'd ask for guidance -- it seems

15  to me logical that we take up the matter of the PI Case

16  Management Order as that is governing the way we proceed and we

17  should get some clarification right away if there's going to be

18  any changes whatsoever.

19            THE COURT:  All right.  With respect to the ZAI

20  rulings, I had asked to put that on so that I hopefully would

21  get the opinion done by this month.  I'm not close.  I am

22  working my way through all 14 volumes of evidence, and I am

23  simply not close to an opinion.  However, in the process of

24  looking at some of that evidence, I had an idea that I wanted

25  to raise off the record, not as part of the rulings, because

89

1  what I was thinking about would have absolutely no bearing on

2  the ultimate issue.  So it does not have to be done today.  I

3  think it would be appropriate to perhaps set a telephone

4  conference only with counsel -- all parties, whoever counsel --

5  because it's simply something that I wanted to run up as a

6  trial balloon to see whether I could get you folks talking

7  again.

8       MS. BAER:  Whatever you'd like, Your Honor.  We'd be

9  happy to participate.

10       THE COURT:  All right.  So maybe if you can work with

11  ZAI representatives -- attorney representatives then -- and

12  call my office in Pittsburgh, perhaps we can schedule a

13  telephone conference call.  I don't think it will take more

14  than -- well, I'd say 15 minutes except that there are so many

15  people.  Let's say half an hour.

16       MS. BAER:  Your Honor, I'll -- I will talk with Mr.

17  Westbrook and others and we will give your clerk a call in

18  terms of the timing.

19       THE COURT:  All right.  And that's all I wanted to say

20  about ZAI.

21       MS. BAER:  So, Your Honor, that leaves the two

22  remaining matters which are the PI Case Management Order and

23  the insurance matter.

24       THE COURT:  All right.  That's fine.  If you want to

25  do the Case Management Order fine that's -- first, that's fine.

1          MS. BAER:  Thank you, Your Honor.

2          MR. ESSERMAN:  I assume that's my motion, Your Honor,

3   and just so the record's clear, did I understand you were gonna

4   do an Order yourself on the attorney questionnaire?

5          THE COURT:  No, I expect the parties will simply give

6   me an Order on a Certificate of Counsel that denies it without

7   prejudice to --

8          MR. ESSERMAN:  Okay.

9          THE COURT:  -- you know, asking the information in

10  some other fashion as appropriate.

11         MR. ESSERMAN:  Thank you.  Your Honor, I will now

12  proceed on -- on the other motion, which is Motion for

13  Clarification or Alternatively, Modification of the Case

14  Management Order.  Reaud, Morgan, & Quinn received 26 boxes of

15  questionnaires and the first response would be, so what?  Maybe

16  they've got that many Claimants, but -- but I think the factual

17  scenario that they present is quite different and it was not

18  one intended to be covered by the attorney questionnaire.

19     Reaud, Morgan & Quinn mostly represents vast, vast, vast

20  majority of settled claims.  These claims have been settled

21  pursuant to written Settlement Agreements, signed by the

22  parties, in which we've actually had some arguments before Your

23  Honor.  I know Your Honor's had so much, but we've had

24  arguments and we've got another litigation involving some of

25  this for two firms, Environmental Litigation Group and Reaud,

1  Morgan & Quinn.

2      In those questionnaires, it set forth what was required by

3  Reaud, Morgan & Quinn and Environmental Litigation Group to

4  prove a claim, what they had to show, and that was all

5  submitted medical, exposure evidence, all submitted to Grace

6  and it remains in their Palm Beach facility.  And pursuant to

7  that settlement, Grace agreed to pay Reaud, Morgan & Quinn 21.6

8  million and Environmental Litigation 59.9 million.

9      Now, that, in and of itself, is not all of the facts.  Out

10  of those monies, Reaud, Morgan & Quinn is only owed 2.5 million

11  and Environmental Litigation Group 11 million.  These are all

12  approximate numbers.  And the claims have all been analyzed by

13  Grace and accepted by Grace, including some back and forth

14  regarding various claims, which were either good or not.

15      So they've got all of the data that is required under the

16  written Settlement Agreement in their own warehouse, and,

17  furthermore, they have the releases.  They have releases of

18  claims all from these clients.  And the question exists, why in

19  the world would they need to fill out an attorney

20  questionnaire?

21      In addition, payment of these amounts due and owing is

22  secured by a bond, by an AIG National Union Bond, a payment

23  bond.  So we've got a written Settlement Agreement, analysis of

24  claims, medical submissions, and evidentiary exposure

25  submissions to Grace, reviewed by Grace's senior asbestos

1  counsel, and approved by Grace.  Actually approved by Grace and

2  payment, in large part, made by Grace.

3      So what kind of response are we getting to this?  Well, we

4  need the information as part of estimation.  Well, these claims

5  have been estimated.  They've been estimated.  Grace has set

6  forth specifically what they needed in these particular claims

7  estimated and they've accepted it or not.

8      In addition, well, we need to know the size of the Trust.

9  All through there is we've got to know the size of the Trust.

10  Well, I've looked at their -- I looked at their Plan and I was

11  surprised in one way and not surprised in another claim.  These

12  aren't even Trust claims.  These are unsecured claims, by

13  definition, in Grace's own Plan, these claims do not go to the

14  Trust.  They get paid 85 percent in cash, 15 percent in stock,

15  and that also assumes that the bond isn't paid.  Well, the last

16  time I checked AIG was pretty solvent, and we think that that

17  bond is going to be good.

18      So there's a real questions as to whether or not Grace is

19  ever going to see these claims as a result of Reaud, Morgan &

20  Quinn, but certainly under their Plan, the Trust will never see

21  these claims, because Grace is committed to pay them in cash.

22          THE COURT:  Well, then I -- if they're committed to be

23  paid in cash and not part of the claim, I don't know why

24  they're part of the estimation.

25          MR. ESSERMAN:  Well, in --

1          THE COURT:  The numbers are -- you're saying that the

2   numbers of fixed.

3          MR. ESSERMAN:  Yes.  In agreed amounts set by Grace

4   and agreed to Grace after review of whatever evidence the

5   parties had agreed to.

6          THE COURT:  So Grace could make whatever use they

7   choose --

8          MR. ESSERMAN:  Absolutely.  They've got a warehouse

9   full of stuff on 10,000 claims.

10         THE COURT:  I don't --I don't know --

11         MR. ESSERMAN:  And why should we have to fill out 26

12   boxes of questionnaires on these claims, when we've already

13   submitted all of this stuff to Grace?  It makes no sense to me,

14   but I could not get any relief other than having to make this

15   motion before the Court.

16         THE COURT:  Okay.

17         MS. HARDING:  Your Honor, I don't think we're that far

18   apart on this issue.  Our question is in which of the Reud,

19   Morgan & Quinn Claimants are going to be filing claims against

20   the Trust?  That's what we want to know.

21         THE COURT:  Well, they can't --

22         MS. HARDING:  And --

23         THE COURT:  -- if they've settled and you're not

24   putting them into the Trust.

25         MS. HARDING:  Well, but the problem is that there are

1  three categories.  I think we agree on this.  There's three

2  categories of Claimants.  There are clients who have settled

3  claims that have not been paid.  There are Reaud, Morgan &

4  Quinn clients who have settled and have partial payment and

5  then there are Reaud, Morgan & Quinn clients that have settled

6  and have been partially paid, and then there's a bond.

7       And the -- from our records and our database, we don't --

8  we can't -- any Claimant in our database that has been fully

9  paid, it doesn't appear as open claim and didn't get a

10  questionnaire.  But any Claimant that hasn't been fully paid,

11  is an unresolved claim, and the -- the questionnaire was issued

12  to all Claimants of unresolved claims.

13       And this particular issue came up in the -- during the

14  discussion about the Claimant questionnaire and there was a

15  specific discussion about.  I think it was Mr. Finch that

16  raised the issue.  We've got settled claims.  People have this

17  information and our point was that it's not the same

18  information that's requested in the questionnaire, first of

19  all.  And that's --

20       THE COURT:  But it's never going to go into the

21  estimation process because you've already got it settled.  The

22  only thing you can put into the estimation is your Settlement

23  Agreement, isn't it?

24       MS. HARDING:  Well, Your Honor, that's what -- there's

25  -- I don't know if that's true or not.  In other words, we said

1  are you going to -- are you not going to file a claim against

2  the Trust and they wouldn't agree to give us the names of the

3  people that were not going to be filing against the Trust.

4        THE COURT:  How can they file a claim against the

5  Trust if you don't put them in as known claims to be paid

6  through the Trust?  If you've separately categorized them,

7  assuming that this Plan is confirmed, and you've separately

8  classified them in another claim because they're the equivalent

9  of a contract Claimants with unpaid claims, how can they make a

10  claim against the Trust?  They've settled.

11        MS. HARDING:  Your Honor, the only thing I can say is

12  it was my understanding that that was not the way the Plan was

13  set up and so I can't -- so that it was our assumption in this

14  -- in this agreement, this part of it, that these claims would

15  be paid by the Trust in some form or another and, for that

16  reason, had to be part of the estimation.

17        THE COURT:  Well --

18        MS. HARDING:  I agree that if they're not part of the

19  estimation, they should not have to fill out the questionnaire.

20        THE COURT:  Well, if they're going to be paid by the

21  Trust, but they've been settled, then the only claim they have

22  is the settlement claim.  So in any -- no matter how you look

23  at it, they don't go back to square one if they've already

24  issued releases and -- and especially if they're secured claims

25  by a bond.

1          MS. HARDING:  But, Your Honor, it's -- somebody

2    correct me if I'm wrong, but I think it's true that there's no

3    -- there's certainly no guarantee that that will happen in the

4    Trust or maybe there is.  I don't know, but I don't believe you

5    can predict that now.

6          THE COURT:  Well, what will happen in the Trust?

7          MS. HARDING:  That those claims will be paid at that

8    amount.  I just don't know if there's a procedure for

9    guaranteeing --

10         THE COURT:  But they can't --

11         MS. HARDING:  -- that.

12         THE COURT:  -- file a claim that they don't have and

13   if they've settled, isn't that their claim?  So you already

14   know the numbers.  I mean, you can add -- you can make use of

15   the numbers in your estimation procedure because there's a

16   settlement.

17         MS. HARDING:  Well, Your Honor, I don't -- I

18   completely agree that if they're not going to be part of the

19   estimation, then -- they shouldn't answer the questionnaire,

20   but I will say this with respect to claims that are going to be

21   paid by the Trust.  Any claims paid by the Trust, what we're

22   trying to do with the questionnaire, and I think the Court has

23   agreed that the Debtors' have the right to do it, is we're

24   trying to take a universe of claims, okay, so that the Court

25   and the Debtors, and the other parties can try to determine

1   what would be an adequate funding for the Trust.  Okay?

2       And in that mix of current Claimants there are various

3   stages of claims.  There are claims that are completely open.

4   There are claims that have reached some level of settlement,

5   but the the Debtors have taken the position that we don't just

6   want to have a sample of the claims for the estimation.  We

7   want to have information on all of the claims and these are

8   still -- they're not fully resolved and so, to that extent, I

9   think that the information that is in addition to the

10  information that they would have given us in the Settlement

11  Agreement, I've got a slide, Your Honor.  If you'll see there's

12  a significant amount of information that wasn't called for

13  under their Settlement Agreements.  Information about previous

14  or subsequent diagnosis or diagnostic tests.

15      THE COURT:  But you can't get into that.  You've

16  settled.

17      MS. HARDING:  But it's still relevant, Your Honor, to

18  the estimation of the future claims.

19      THE COURT:  No, it's -- how is it relevant?  You've

20  settled.  You've already looked at those claims and accepted

21  the information.  You've already got it.  The Claimants don't

22  have to reproduce something they've already given you.

23      MS. HARDING:  I'm sorry for interrupting, Your Honor.

24  For the precise reason that it's the Plaintiff's Committee that

25  wants to use settlement history as being the valid and most

1  reliable evidence about what the reliable claims are.

2       THE COURT:  Well, for settled claims that are in the

3  process of being paid, especially when they're secured by a

4  bond, that's pretty darn good evidence.

5       MS. HARDING:  No, no.  I don't disagree, Your Honor.

6  I'm talking about the use of the current claims for the

7  prediction of future claims.  It is very relevant evidence to

8  know that for these claims that were settled in the past that

9  those claims, lo and behold, are part of the kinds of claims

10  that we will, and our experts will, I believe, give the opinion

11  will not be paid in the future.  So you've got to know what

12  percentage of the settled claims are like that.

13       THE COURT:  You've already got all of that information

14  in your database.  You've got everything you asked for from the

15  Claimants in order to settle and you've got releases.  I don't

16  see how, at this stage of the game, the Debtor has any standing

17  to request additional information from settled claims as to

18  which you've got releases, because they can't possibly file

19  anything against the Debtor, except for the unpaid portion of

20  their settlement.

21       MS. HARDING:  Your Honor, with respect to -- as long

22  as we're calling those claims fully resolved, then it meets the

23  --

24       THE COURT:  No, they're --

25       MS. HARDING:  -- definition of the questionnaire, but

1   that's the -- that was the issue that was left open, I think.

2          THE COURT:  Well, the claim itself is apparently

3   resolved.  The payment of the claim isn't.

4          MS. HARDING:  Right.  And that's the part that goes

5   into the Trust.

6          THE COURT:  Apparently not under the Plan.  Plus, to

7   the extent there's a bond out there, it's not going to go into

8   the Trust because it has a separate asset that can be reached.

9          MS. HARDING:  Your Honor, part of the --

10         MR. LOCKWOOD:  Your Honor, even if it goes into the

11  Trust, if it's resolved, it goes into the Trust, as Your Honor

12  said, as a -- at the settled amount.  Okay?  Unless there --

13  the Debtor want to repudiate and have the legal capacity to

14  repudiate the settled, but not fully paid claims, this is all

15  fantasy.  I mean, the number that goes in, as Your Honor

16  pointed out, to the estimation, even if it goes to the Trust,

17  it would be the dollars obtained by adding up the settlement

18  amounts and those will be what are called pre-petition

19  liquidated claims.

20         MS. HARDING:  But, Your Honor, how -- what I propose

21  is what if we -- can we put this over to the next hearing?  We

22  will investigate, with respect to the Plan, whether these

23  claims are treated as claims that get paid by the Trust or not

24  under the Plan, and then proceed --

25         MR. ESSERMAN:  It doesn't matter whether it's paid by

1   the Trust or not and I don't want to put it off.  I want -- a

2   ruling from the Court up or down or whatever because this seems

3   to me to be perfectly clear, and we're just going to get a

4   bunch mysto magic from the Debtor.

5       They would like the Trust to have to pay this.  Their Plan

6   is currently structured, which they haven't read and haven't

7   gone through the analysis with regard to these claims, doesn't

8   provide, and I've got the references right here.  But that's

9   almost irrelevant.

10      The point is these are settled claims, secured by a bond,

11  with evidence and releases in the possession of the Debtor.

12          THE COURT:  If the Debtor already has releases, the

13  only obligation appears to be to pay the unsettled portion,

14  however you're going to do that through the Plan, but if it --

15  if it's paid through the Plan, then the only amount that's

16  going to go into the Plan is the -- into the Trust, pardon me,

17  is the unpaid portion of the settlement amount anyway.

18          MS. HARDING:  But, Your Honor, the only thing I'd ask

19  for right is just -- it's not even three weeks away, Your

20  Honor.  To give us time to go back to the Plan, to look at how

21  they're treated, and then because, Your Honor, this impacts not

22  just -- in other words, this is the extreme of the issue, but

23  then the question becomes what do we do with respect to other

24  claims that are in various stages of settlement?  And I think

25  we should -- before we make a --

1          THE COURT:  Well, I'm not -- I'm not prepared at this

2     point to talk about claims that are in other stages of

3     settlement.  I do think this.  If the information has already

4     been given to the Debtors, then all the Claimant ought to have

5     to do is say we gave you this by cover letter dated X or

6     whatever it is that is going to be the relevant information,

7     and they shouldn't have to reproduce what they've already given

8     the Debtor.

9          MS. HARDING:  Your Honor --

10         THE COURT:  But with respect to claims that are fully

11    settled, where the Debtor has already done its administrative

12    process, agreed to a number, and accepted a release, I don't --

13    see any --

14         MR. LOCKWOOD:  Your Honor, that's why the committee

15    supports Your Honor ruling today.  They're -- these

16    questionnaires are out to hundreds of law firms.  Reaud, Morgan

17    brought their motion with respect to some claims that were

18    uniquely settled because they had bonds and stuff, but there's

19    plenty of other people who have fully settled claims.  They're

20    not paid.

21         We keep hearing this notion that somehow or another if you

22    haven't been paid, the claim is not, {quote) "fully resolved."

23    I don't know what fully resolved means in that sense, but it

24    seems to me, and the Committee, as Ms. Harding pointed out

25    through referring to a conversation with my partner, Mr. Finch,

1    takes the position that if Grace has agreed with you in a

2    binding settlement on -- binding on both parties to pay you X

3    dollars, and has received a release from you, that you don't

4    have the right to go back and ask that person for the kinds of

5    medical information that --

6             THE COURT:  I agree.

7             MR. LOCKWOOD:  -- Grace might have, had they thought

8    about it, asked for before they settled it.

9             THE COURT:  Well, I agree.

10            MR. LOCKWOOD:  And so we would like a ruling on this,

11   Your Honor.

12            THE COURT:  To the extent that there is a fully

13   resolved claim; that is, that the Debtor has admitted the

14   liability, and the damages have been fixed, and all that

15   remains is payment on that damage claim, then whether it's paid

16   through the Trust or not, there is nothing more that the Debtor

17   needs to know because the Debtor already has decided what the

18   value of that claim is pursuant to the Settlement Agreement.

19            MR. LOCKWOOD:  And as for the Debtor's need to take

20   account of these claims in its estimates of future liability,

21   I"m sure the Debtor's skilled experts that we constantly hear

22   references to --

23            THE COURT:  Okay.

24            MR. LOCKWOOD:  -- will be able to figure that out,

25   Your Honor.

1           THE COURT:  All right.

2           MS. HARDING:  Your Honor --

3           THE COURT:  It's getting late and I'm tired, so

4    please.  Let's keep the vituperative comments to a minimum.

5    I'm having enough trouble getting to the relevance of the

6    arguments.

7           MR. ESSERMAN:  Thank you, Your Honor.

8           THE COURT:  I will -- Mr. Esserman, I don't think I

9    have the Orders here.  Would you submit one, a Certification of

10   Counsel?

11          MR. ESSERMAN:  I will, Your Honor.  Thank you.

12          MS. HARDING:  Your Honor, could I just ask?  We just,

13   I mean, have three weeks to come back and to make sure that

14   we're clear about what groups of claims are not going to be

15   included in the estimation because that's highly relevant to

16   how the estimation gets done.

17          THE COURT:  The issue for me today isn't whether

18   they're in the estimation or out of the estimation.  The issue

19   is do the claims -- do the plaintiffs who have fully settled

20   their claims with Grace, to the point where they have given

21   releases, but have not been paid in full, have to complete

22   these questionnaires?  And my answer to that is no.  They

23   don't.  Grace already has the information because it's already

24   agreed to settled, so it's acknowledged either maybe in a

25   settlement document and it's the settlement without

1  acknowledging liability.  I don't know what those settlements

2  may say, but it has acknowledged that, for whatever reason,

3  it's going to pay a claim at X dollar level, and that's all for

4  actual claims amounts that Grace needs to know.

5       MS. HARDING:  Your Honor, I understand the Court's

6  position and the part that I want clarification on is the part

7  that -- in other words, it's relevant to the universe of

8  current claims that will form the basis for the estimation.  We

9  just want to make --

10      THE COURT:  And you know the amount.

11      MS. HARDING:  Pardon me?

12      THE COURT:  And you know the amount.

13      MS. HARDING:  And we know the amount.

14      THE COURT:  Okay.

15      MS. HARDING:  The appropriate amount, not based on

16  past settled claims, but based -- and if the Court was looking

17  to the current claims to make a determination of funding of the

18  Trust for the current claims, and then, more importantly, using

19  that base --

20      THE COURT:  Well, there has never been a Trust that

21  I've seen yet that hasn't taken into account what the Debtor's

22  settlement history is, even the Debtor wants to consider the

23  settlement history because you're not going to litigate every

24  claim.  You don't litigate every claim in the bankruptcy

25  context.  You're certainly not going to come in here and tell

1  me that you're going to litigate every asbestos claim.

2        MS. HARDING:  No, Your Honor.

3        THE COURT:  Okay.

4        MS. HARDING:  That's the point of it is is that with

5  respect to the settlement history and the percent of valid

6  claims, the percent of claims that will be paid in the future -

7  -

8        THE COURT:  You already know that these are valid

9  claims because you've accepted them, you've settled them, and

10  you've priced them.

11        MS. HARDING:  It -- perhaps, Your Honor, that is

12  absolutely not the Debtor's position that they were -- that

13  we've paid them and settled them because they were valid

14  claims.  And that's the important -- that's the important

15  distinction.

16        THE COURT:  You can't have it both ways.  On the one

17  hand, you can't accept a release by these Claimants so that

18  you're relationship with them has come to an end, and that they

19  have taken themselves out of the tort system; and, therefore,

20  had an opportunity to prove that their claim's worth a whole

21  lot more than you're paying or you to succeed in defending

22  against this, that it's worth a whole lot less.

23        MS. HARDING:  But, Your Honor, the point is that

24  they've not taken themselves out of the tort system.  I think

25  as far as our records indicate, they have over 3,000 open

1  claims and the question goes to what --

2          THE COURT:  Settled claims are open claims?

3          MS. HARDING:  They have more -- those are not all of

4  the claims.

5          THE COURT:  Well, I'm  not talking about the ones that

6  aren't settled.

7          MS. HARDING:  But, no, no, but --

8          MR. ESSERMAN:  Your Honor, we're just talking about

9  the settled claims --

10          THE COURT:  Right.

11          MR. ESSERMAN:  -- subject to the agreements.  This is

12  over.

13          MS. HARDING:  But the --

14          MR. ESSERMAN:  I mean --

15          MS. HARDING:  -- question goes to whether that --

16  what's the best evidence for how to value the open claims?

17          THE COURT:  The settlement.  No, the question is not

18  on the open claims.  To the open claims, Mr. Esserman, you have

19  to fill out the questionnaires.

20          MR. ESSERMAN:  We're not asking for anything on the

21  open claims.

22          THE COURT:  Fine.  On the open claims --

23          MR. ESSERMAN:  It's the settled claims.

24          THE COURT:  -- they need to submit it.  On the settled

25  claims, that's the best evidence you're going to get because

1  it's your agreement.

2       MR. ESSERMAN:  And we do have an Order, Your Honor.

3       THE COURT:  All right.  I'll take it.  Thank you.  Oh,

4  I'm not going to have attorney's fees and costs paid.

5    (Laughter)

6       MR. ESSERMAN: I had to ask, Your Honor.

7       THE COURT:  I have modified this to strike Paragraph

8  2, and then I've signed the Order.

9       MR. ESSERMAN:  Thank you, Your Honor.

10      MS. BAER:  Your Honor, I think that takes us back to

11 agenda item # 12, which was the insurers' Motion for Leave from

12 Your Honor's Order to get information from the 2019 statements.

13      THE COURT:  Okay.

14      MS. BAER:  As you may recall, Your Honor, the Debtor

15 did not oppose that motion.  In fact, we supported the

16 insurers' getting that information.  The hearing took a little

17 bit different turn and the ultimate outcome of the hearing,

18 Your Honor, was that you ordered the insurers, the Debtors, and

19 the others to try to negotiate an order reflecting what your

20 ruling was.

21     Your Honor, the insurers circulated an order last week

22 that was wholly unacceptable to the Debtors.  The Debtors got

23 in contact with the future claims representative who also

24 believed the order was wholly unacceptable.  The future claims

25 representative circulated his own order to the insurers, which

1   was a lot closer to what your rulings were, although we had one

2   open issue with it.

3       At this point in time, nobody has an agreement, Your

4   Honor, but in going back to your transcript, I think what you

5   ruled was actually relatively simple.  The problem is the

6   insurers are not comfortable with just what you've ruled.  They

7   want to also indicate in your Order what it means and that's

8   where the Debtor gets very troubled.

9       And, Your Honor, I think you made a couple of relatively

10  simple points.  Number one, you denied without prejudice the

11  right to the 2019 information.  Again, the Debtors did not

12  oppose it and still do not oppose their participation in the

13  estimation process.  If we are going to not revisit that issue,

14  but go forward from what you had previously said, where they

15  did not need to participate in 20 -- in the estimation process.

16      Then you went further beyond that to try to clarify

17  exactly what the personal injury claims estimation proceeding

18  is supposed to be.  And you made it very clear, as to the

19  Debtors, that is for the purpose of estimating claims for

20  purposes of funding the Plan and that's it.  It is not

21  insurance coverage litigation.

22      The third thing Your Honor ordered and found was that by

23  the insurers not participating in the estimation, that will not

24  be held against them in any other proceedings.  We have no

25  problem with that.

1      The fourth thing, Your Honor, is, I believe, you addressed

2  the issue of standing and you said the insurers did not have

3  standing to participate in the estimation process.

4      All of that is fine.  That is essentially what the futures

5  rep has put in his draft order, but for one issue.  The

6  insurers, on the other hand, apparently are not content with

7  that Order, want a lot more than that and that is where we

8  whole heartedly disagree, Your Honor, and believe we should go

9  with a simple, straight forward ruling, which is what you had

10  made.  I don't know, Your Honor, if you've seen any of the

11  orders.

12          THE COURT:  No, I haven't.

13          MS. BAER:  And I am happy to, if Your Honor would

14  like, give you all of the Orders.  In fact, the Debtors also

15  drafted one, or take it any way in which it works out best for

16  you.

17          MS. WARREN:  Your Honor, may I be heard?

18          THE COURT:  Yes.

19          MS. WARREN:  Mary Warren for the London Market.  Your

20  Honor, first of all, the insurers did submit a proposed Order

21  for your hearing binder and we were told by the Debtors that,

22  in fact, it was in your hearing binder.

23          THE COURT:  It may be.  It's just that with respect to

24  this specific hearing, I was not anticipating taking a look at

25  that today, and I just didn't do it, so I can't say that it's

1  not there.  I just haven't looked at it.

2       MS. WARREN:  All right.  Well, understood.  Well, let

3  me then go over with you, Your Honor --

4       THE COURT:  Right.

5       MS. WARREN:  -- why we think this is a fair Order.

6  And I'm happy -- I have an extra copy I can hand up to you.

7       THE COURT:  All right.  That would be fine.  I'm

8  sorry.  Which agenda item is this?

9       MS. WARREN:  This is number 12.

10     (Attorneys confer)

11          THE COURT:  Thank you.

12     (Attorneys confer)

13          MS. WARREN:  Your Honor, at the last hearing --

14          THE COURT:  I apologize because in taking a look at

15  that item, I must have misunderstood what was in the binder,

16  because the only thing that I had on my own notes and my law

17  clerk's notes, too, were notes from the last hearing.  So I

18  apparently didn't appreciate the fact that the Orders that were

19  being submitted were after the last hearing, so I'm sorry.

20  That's where the confusion is because I look at the binders and

21  I didn't understand why I wouldn't have seen the Order.  That's

22  the reason why.  I must have seen it and ignored it, thinking

23  that it was from the last hearing.

24          MS. WARREN:  All right.  And just to clarify, the

25  insurers did submit an Order for your binder last Monday.  We

1  did get a draft from the FCR late Friday afternoon and we've

2  never seen anything from the Debtors, so we --

3          THE COURT: I gave you them, so --

4          MS. WARREN:  -- did give you something to consider

5  early on.

6          THE COURT:  Okay.  Thank you.

7          MS. WARREN:  So anyway, to go back to the matter at

8  hand, at the lasting hearing in response to the insurers' 2019

9  motion Your Honor did ask that the insurers go and draft an

10 Order that would clarify the scope asbestos PI estimation;

11 namely, that the purpose was for funding, determining the

12 adequacy of funding of the Plan, and not for insurance coverage

13 issues, and to ensure that the Debtor's insurers wouldn't

14 suffer prejudice by virtue of not participating in the PI

15 estimation.

16     We did draft that.  We did show it to the Debtors, to the

17 FCR, and the ACC.  We actually believe the Debtors and the ACC

18 or I'm sorry, the F -- the FCR and the ACC are conceptually

19 fine with it, but they do -- they did have some wording

20 changes, and the FCR did give us an Order later on Friday.  The

21 Debtors, as far -- the last we heard before today, just said

22 no, we don't like it.

23     So let me go through it with you, Your Honor, and  let you

24 know that we think it really does accurately reflect your

25 intentions.  I'm going to skip over the whereas clauses.  We

1  can come back to those, if you like.

2          THE COURT:  No.  I'm going to read this on my own.  I

3  can tell you right now it's a six-page Order, I think, or five-

4  page Order, and I apologize for not having done it in advance.

5  It was simply my misunderstanding of what was in the binder.

6  But I'm going to do it on my own in connection with the

7  transfer.  If there's something specific you want to highlight,

8  Ms. Warren, please do.  You don't need to read the whereas

9  clauses to me.  I will be reading them on my own.

10         MS. WARREN:  All right.  Then let me just point out

11 paragraph 2, which I think maybe gets to the gist of what the

12 issues are here, and that's the so ordered paragraph # 2 on

13 page 3 --

14         THE COURT:  All right.

15         MS. WARREN:  -- of the proposed Order.  It has three

16 parts and all of the parts are necessary.  And everything else

17 in the Order either flows from this or is just -- are

18 provisions to effectuate the Court's jurisdiction and ability

19 to enforce compliance.  Again, this is limited to PI

20 estimation.  We're not going to issue as a Plan confirmation,

21 Plan neutrality, nothing like that.  Just with respect to PI

22 estimation.

23         Number one, "This Order clarifies that it shall apply only

24 to the determination of the adequacy of funding for the Plan."

25 Then there's two other parts that provide what this Order --

1   what the PI estimation is not.

2       Part two of paragraph 2 says, that "the PI estimation

3   shall have no impact on issues of insurance coverage."  And,

4   again, that's straight forward.

5       Part three is intended to effectuate and clarify the

6   Court's intent in issuing this Order or whatever Your Honor

7   determines to issue, and that is that "findings made with

8   respect to the PI estimation are not intended to affect or

9   support a UNR or Fuller Austin type of result."

10      And, Your Honor, that is very tellingly the big issue that

11  the Debtors don't want to agree to.  And, Your Honor, at the

12  last hearing you asked the courtroom at large, you asked the

13  Plan proponents is there anything else you want to get out of

14  this PI estimation?  Anything else than determination of the

15  adequacy of the funding of the Plan?  And you were met by a

16  deafening silence.

17      This provision just makes that clear; that there's nothing

18  that's going to come out of this PI estimation with respect to

19  insurance coverage.

20          THE COURT:  Well, it seems to me that I can make this

21  one a lot easier by saying the Court's findings with respect to

22  the PI estimation shall apply only to the determination of the

23  adequacy of funding for the Plan and will not determine issues

24  of insurance coverage or the obligation of any insurer to

25  provide indemnity for asbestos PI claims, if that much of this

1   Order is agreeable to people and that should end it.  Because

2   I'm stating affirmatively that I am not determining issues of

3   insurance coverage.

4          MS. WARREN:  Your Honor, that certainly is something

5   that the insurers are in favor of and thank you for that.  But

6   let me just say with respect to part three, we're not -- I

7   understand that Your Honor isn't saying, well, I can control

8   what another later coverage court might rule.

9          THE COURT:  Right.

10         MS. WARREN:  I understand that.  That's not what this

11  is trying to do.  This is trying to make your intention clear

12  and the reason it's in there is because in Fuller Austin, which

13  as Your Honor knows, is a concern here, the Bankruptcy Court

14  did say to insurers go away, you have no standing, and later

15  the Fuller Austin State Court said, oh, well, that didn't

16  really mean that the insurers weren't bound by all of this.

17      Now, Fuller Austin had issues of California State Law that

18  were unique and so on, but the fact is it's out there and

19  that's why this provision is in here.  We're not saying that

20  Your Honor is predicting how another court will rule later on

21  down the line.  This is just -- this is intended to just make

22  this Court's intention clear, for whatever purposes later on.

23         THE COURT:  Well, I will consider it, Ms. Warren.  I

24  don't know whether I have the authority to give that type of an

25  opinion or not, but I will consider it.

1          MS. WARREN:  All right.  One more thing on that, Your

2   Honor, and then I'll sit down.  But, Your Honor, the -- you

3   said at the last hearing, which is absolutely right, that you

4   have the ability to control your own docket.  You have the

5   ability to state what your intentions are in making findings

6   and conclusions.  That's all that this does.

7          THE COURT:  Okay.

8          MS. WARREN:  Thank you.

9          THE COURT:  I understand the point.  I'll see where I

10  can go.

11         MR. ESSERMAN:  Your Honor, Sandy Esserman on behalf of

12  Barron and Bud, and Reaud Morgan.  There are four responses

13  filed to the hearing last month.  I filed two of them.  I don't

14  believe anyone shared any of their Orders with me at all, and I

15  trust Your Honor to -- if Your Honor wants to enter an Order,

16  that's fine.  But all of these Orders that have been flying

17  around, the FCR, for some reason I haven't gotten them.

18         THE COURT:  I haven't either.  At least as far as I

19  know, so if I have, I haven't seen then.

20         MR. ESSERMAN:  But I have -- they -- I haven't even

21  gotten what was handed up to you, so I just wanted to make sure

22  that was clear.

23         THE COURT:  Okay.  Well, maybe it's in the binder, Mr.

24  Esserman.  Okay.  My clerk's telling me that this proposed

25  Order actually doesn't show up on a docket as having been

1  filed.

2      (Court and clerk confer)

3      THE COURT:  On the -- as of the date of the amended

4  agenda, which was the 19th.

5      MR. COHN:  That's true.  If I may speak for a minute?

6  Jacob Cohn for Federal Insurance Company, Your Honor.  I think

7  what had happened with respect to that was the insurers were

8  hoping that we might get to a consensual Order with at least,

9  if not the Debtors, then with the asbestos Claimant

10 constituencies and we held off on filing anything and that it

11 came to the point where weren't going to get there, so nothing

12 officially got on the docket.  It wasn't anything trying not to

13 give notice to people.  We were just hoping that we might get

14 somewhere, but we also wanted to get something in your binder,

15 so at least you would have read something.

16     THE COURT:  Okay.  Well, the problem is that that's

17 the other problem.  If it's in the binder, but I haven't also

18 gotten the information from Rachel, my staff, then I basically

19 don't have a double check to know that, in fact, there's

20 something there that I should be looking at because sometimes

21 the agenda letters, not necessarily in this case, but sometimes

22 they're not really accurate in determining what's in a binder.

23 One of the cases today, for example, has a #31 that has no

24 information in it that's relevant to #31.  It's just the way

25 they are, so I don't usually look at the letters for that

1  purpose.  It was confusing me more than helping.

2        MR. COHN:  But, Your Honor, I just wanted to point out

3  very quickly and one of the things I thought got a little lost

4  here is to say it will not affect insurance coverage issues, I

5  think I pointed this out on the transcript last time, does not

6  cleanly address our concerns because what has happened, and

7  especially happened in Fuller Austin, was that later on in

8  coverage litigation, counsel turned around and said that the

9  confirmation, and I don't want to pre-empt the fact that

10 neutrality is in Your Honor's estimation, a Plan confirmation

11 issue.

12        THE COURT:  Right.

13        MR. COHN:  But they said that the confirmation, for

14 example, would be a judgment, or an adjudication, or the

15 imposition of legal liability.

16        THE COURT:  But this isn't a confirmation.  This is

17 only talking about the estimation process.

18        MR. COHN:  I agree.

19        THE COURT:  I'm certainly -- this is certainly not

20 going to be a Plan Confirmation Order.  Let me make that very

21 clear.  Nothing that I'm dealing with in these submitted Orders

22 in agenda #12 has anything to do with a Confirmation Order.

23        MR. COHN:  I --

24        THE COURT: It has to do with the estimation process.

25        MR. COHN:  Agreed, Your Honor.

1          THE COURT:  Okay.

2          MR. COHN:  And Mr. Lockwood said that it is not a

3  502(c) estimation.  I just wanted to suggest to Your Honor that

4  perhaps you could add some language in here to make it clear

5  that the result of the estimation and the process will not be

6  anything --

7          THE COURT:  Probably not.

8          MR. COHN:  -- that will be an --

9          THE COURT:  Probably I'm not going to do that because

10  I think it's going to be an advisory opinion, but I'll think

11  about it.

12          MR. COHN:  Thank you.

13          THE COURT:  I will think about it.

14          MS. BAER:  Your Honor, when you began to address this

15  issue, you stated what you believed was your ruling last time,

16  and I whole heartedly agree with you.  The problem is we've got

17  a five-page Order from the insurers and guess what?  It's not

18  the paragraph she was talking about that bothers me.

19      I have some issues with the language, although they're not

20  major.  What I have problems with is everything else.  They

21  over complicated by taking what you said and then trying to

22  explain it seven different ways.  And paragraph after paragraph

23  I have problems with because, at the end of the day, we

24  absolutely reserve the right to say a Confirmation Order is a

25  judgment; and, therefore, we know what comes from that or what

1   a court can say can come from -- comes from that.

2       What they do is they talk about PI estimation and then

3   they say, or proceedings, or other undertakings, or other

4   litigation, and the next thing I know I'm afraid we've got an

5   Order that says I've got a problem on confirmation.

6       THE COURT:  Miss Baer, I don't generally write -- I

7   tend to be verbose in opinions, but my Orders do -- usually

8   tend to be one sentence.  Something to the effect that it's

9   granted or it's denied.  There won't be a lot more than that in

10  this Order.

11      MS. BAER:  Your Honor, what I might suggest is the

12  future claims rep did draft an Order.  He did circulate it and

13  I actually like the Order except for one --

14      THE COURT:  If you folks want to circulate an Order,

15  just do it on a Certification of Counsel this time.  Not

16  something that's not filed on the record and it appears in a

17  binder.  Do it as a Certification of Counsel.  If you can't

18  agree, submit all of your drafts.  I'll consider all of your

19  drafts, and then I'll do my own Order.

20      MS. BAER:  That's what I'd suggest, Your Honor, would

21  be the best thing to do here.

22      THE COURT:  Fine.  Then how -- just do it before the

23  next hearing then, so that I have a chance to consider it

24  before the next hearing.

25      MS. BAER:  We will do so, Your Honor.  Thank you.

1          THE COURT:  All right.  Okay.  Anybody who wants to

2    submit an Order, go ahead and do it.  Yours, Ms. Warren, has

3    already been, I guess, submitted to the Debtor, but maybe not

4    to some of the other parties, so I think you need to circulate

5    it.

6          MS. WARREN:  We've circulated it to all of the other

7    parties, Your Honor.

8          THE COURT:  All right.

9          MS. WARREN:  Believe me.

10         THE COURT:  Okay.

11         MS. WARREN:  And we're happy to do it again, but it

12   would have been useful, to say the least, if these parties had

13   submitted proposed Orders before today.

14         THE COURT:  Yes, it would.

15         MS. WARREN:  And we think that this is another effort

16   to delay resolving the insurers' status here.

17         THE COURT:  I thought I've already resolved the

18   insurers' status.  All I'm trying to do is the ministerial act

19   of putting what I've already ruled onto paper.

20         MS. WARREN:  Yeah.  Understood and I understand Your

21   Honor will consider what apparently are now competing Orders,

22   although we didn't know that.

23      But one point about our Order is Ms. Baer keeps

24   complaining that it's long.  The fact that something's long

25   doesn't mean that it's wrong.  We actually thought very

1  carefully about the wording of this Order and it's meant to

2  take into account the complexities of insurance policies and

3  evidentiary findings --

4          THE COURT:  I am not --

5          MS. WARREN:  -- and so on.

6          THE COURT:  -- doing insurance coverage litigation,

7  Ms. Warren.  If I were going to be doing all of the insurance

8  complexities, then you'd be here in a whole different capacity

9  with standing, so I can assure you, I'm not going to be making

10  all of those findings.  The whole purpose for which I'm pushing

11  this off is so that I don't have to make all of these findings.

12      But I will consider everything in your Order and whatever

13  anybody else wants to submit.  If I don't have a resolved Order

14  on a Certification of Counsel by the time that the, I guess,

15  preliminary binders or are they already due?  This is a short

16  week.

17          MS. WARREN:  Shall we say that we should submit the

18  Orders -- the, I guess, competing Orders by what?  November --

19          THE COURT:  Why don't you --

20          MS. WARREN:  -- 7th?

21          THE COURT:  Yes.  Submit them to the Debtor, I think,

22  then have the Debtor attach all competing Orders to one

23  Certification of Counsel, so I have them in one package.  I

24  will consider them all and draft an Order, if you haven't

25  agreed.

1          MS. BAER:  Your Honor, when would you like us to

2     submit that?

3          THE COURT:  Can you do this?  Can you try to get

4     together and see if you really can resolve this by -- and still

5     submit something by the 7th of November, which is a week before

6     the next hearing?

7          MS. BAER:  Sure.

8          THE COURT:  Fine.  Then I'll expect a certification

9     one way or the other by November 7th, either with an agreed

10    Order or else with all of your competing Orders attached.

11         MS. WARREN:  All right.  And I -- Your Honor,

12    hopefully you will give special consideration to our Order

13    because it is the insurers' view of what will get rid of these

14    issues in the PI estimation period.  The Debtors, FCR, they do

15    not understand our situation as we do, so, respectfully, thank

16    you, Your Honor.

17         THE COURT:  I will consider it.  Okay.  What else?

18         MS. BAER:  Your Honor, I believe that concludes the

19    formal agenda, although I believe Mr. Hurford had something he

20    wanted to take up with the Court.

21         THE COURT:  Mr. Hurford?

22         MR. HURFORD:  Thank you, Your Honor.  Mark Hurford of

23    Campbell & Levine on behalf of the Asbestos PI Committee.  I

24    stand to raise an issue with Your Honor with regards to the

25    mechanics for responding to the asbestos personal injury

1  questionnaire and to back up just a little bit.  We've been

2  fielding a lot of phone calls from firms that are asking about

3  the actual mechanics of responding to the questionnaire, spaces

4  provided aren't large enough.  Can we use electronic

5  formatting, so forth, and so on.

6      Most of that we've been able to resolve either through

7  dealing with the Debtor's counsel or through Rust.  I

8  understand individual claim firms have been calling or Claimant

9  firms have been calling him as well.  As of the beginning of

10 last week it looked like we were going to have an issue.  We

11 ended up filing a motion on Friday afternoon.  It's a Motion to

12 Clarify how they can mechanically respond.  Like I said, it has

13 nothing to do with the substance of the questions.  The order

14 of the questions, anything else.

15     We also filed a Motion for Leave to Shorten Notice or a

16 Motion for Short Notice, so that we could get it on for the

17 November 14th hearing.  Now, late Friday, kind of end of the

18 weekend, we were able to reach a resolution with the Debtors

19 and our plan is this.  We've put the motion on file.  We've

20 circulated it to Claimant firms and we've basically told them,

21 hey, if you have other issues than what's raised in the motion,

22 please file a response, but I would like to read for Your

23 Honor, onto the record right now.  It's just half a page, what

24 the resolution is between the ACC and the Debtors, so that we

25 can distribute this as well and tell people, hey, this is how

1  you can actually respond mechanically.

2          THE COURT:  I haven't even seen the motion, so if

3  you're asking me for a ruling today, you're not going to get

4  one.

5          MR. HURFORD:  I'm not, Your Honor.

6          THE COURT:  Okay.

7          MR. HURFORD:  All I'm asking is if I can read this

8  into the record.  Debtor's counsel knows this is actually their

9  revised version, so that we can start dealing --

10          THE COURT:  All right.  Let's do it quickly.

11          MR. HURFORD:  Thank you.  "Asbestos personal injury

12  Claimants may take the questionnaire, convert it into some form

13  of electronic format (Microsoft Word is Rust's preferred

14  format), however the questionnaire may also be converted to

15  Word Perfect or other format which requires" -- I'm sorry,

16  "which will allow all responses to be typed in, respond to the

17  questions, which may alter the length or pagination of the

18  questionnaire, and then either print out the completed

19  questionnaire or convert it into a PDF format when submitting

20  it to Rust.  This will be acceptable as long as the order and

21  the substance of the questions are not changed and the unique

22  Claimant identification provided" -- I'm sorry, "unique

23  claimant number provided on the cover of the original packet is

24  provided on any modified form and attachments.  If the

25  questionnaire is provided to Rust in electronic form, the

1  Claimant must still sign the questionnaire, however Claimants'

2  signatures may be provided in PDF format.  Asbestos personal

3  injury claimants may provide the questionnaire, questionnaire

4  responses, and any documents attached to the questionnaire to

5  Rust in electronic format, such as a CD-Rom."  That's it.

6          THE COURT:  Does Rust have a web site and the Debtor

7  have a web site?

8          MR. HURFORD:  I believe the Rust does have a web site.

9          THE COURT:  Why don't you both post it on the web

10  sites in the appropriate Word and Word Perfect format, so that

11  people can simply copy it, and then you don't lose the ability

12  or the fact that they're going to not answer all of the

13  questions, so that they can have the copy.  If it's in Word or

14  Word Perfect format, they can, you know, put in their answers

15  and however many pages it takes.

16          MR. HURFORD:  I think, Your Honor, that was

17  actually --

18          MS. BAER:  It's --

19          MR. HURFORD:  -- proposed in USG and Rust is the claims

20  processing agent, USG, where they were going to post it, so it

21  could be downloaded, but obviously Claimant firms don't want to

22  have to be handwriting all of these responses.  Some of the

23  response -- the blanks for the responses aren't large enough.

24          THE COURT:  Well, that's fine.  I appreciate the fact

25  that somebody may need it in another format, but, you know, to

1  expect somebody to sit and type it all, if they don't want to

2  answer the question, you're not going to get the question

3  typed.  If you post it on a web site, and they can download it,

4  I think that's going to be a lot easier.

5      MS. BAER:  That's under consideration, Your Honor.  I

6  think it may occur very shortly.

7      THE COURT:  Okay.  In any event, I don't have a

8  problem with the change in format, so that, you know, people

9  have enough room to adequately respond.

10     MR. HURFORD:  Thanks, Your Honor.  And the Motion for

11 -- to Shorten Notice is obviously -- has been filed.  We can

12 send a copy to your Chambers, but we missed the deadline for

13 the November 14th hearing.  If we went forward to December

14 19th --

15     THE COURT:  Well --

16     MR. HURFORD:  -- we would be in trouble for the

17 January --

18     THE COURT:  Are you going to --

19     MR. HURFORD:  -- 12th deadline.

20     THE COURT:  -- have a November 14th hearing on this?

21     MR. HURFORD:  Only if individual firms raise other

22 issues or this somehow doesn't resolve it.  I would imagine if

23 they post it on the web site, that's going to go a long way to

24 resolving it, but we just wanted to leave it open because as

25 many firms that are out there --

127

1            THE COURT:  All right.

2            MR. HURFORD:  -- you can name the question.

3            THE COURT:  You'll deal with it on a Certification of

4    Counsel or whatever as appropriate or else it'll hit the agenda

5    next month, and I'll see if there's anything else.  But I don't

6    have a problem with a downloadable format.

7            MR. HURFORD:  Thank you, Your Honor.

8            THE COURT:  Okay.  Anything else?

9            MS. BAER:  No, Your Honor.

10           THE COURT:  We're adjourned.  Thank you.

11       (Court adjourned)

12

13                      CERTIFICATION
14   I certify that the foregoing is a correct transcript from the
15   electronic sound recording of the proceedings in the above-
16   entitled matter.
17
18   *Lewis Parham*                        10/28/05
19   _____      _____
20   Signature of Transcriber                 Date