**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **In re:** | ) |
| | ) **Chapter 11** |
| | ) **Case No. 01-1139 (JKF)** |
| **W.R. GRACE & CO., et al.,** | ) **(Jointly Administered)** |
| | ) |
| **Debtors.** | ) **Related Docket No. 11067** |
| | ) **Hearing Date: December 19, 2005 at 12:00 p.m.** |

**FUTURE CLAIMANTS REPRESENTATIVE'S OBJECTION TO DEBTORS'**
**NINTH MOTION FOR ORDER FURTHER EXTENDING EXCLUSIVE**
**PERIODS FOR FILING A PLAN AND SOLICITING VOTES THEREON**

David T. Austern, the legal representative for future asbestos claimants (the "Future Claimants Representative" or "FCR") appointed by this Court in the above-captioned Chapter 11 cases, by counsel, objects to the Ninth Motion for an Order Pursuant to 11 U.S.C. § 1121(d) Extending Debtors' Exclusive Periods in Which to File A Chapter 11 Plan and to Solicit Votes Thereon (the "Motion") [Docket No. 11067], filed by W.R. Grace & Co. and its affiliates (collectively, the "Debtors"), and in support thereof states:[1]

## PRELIMINARY STATEMENT

In this, their ninth motion on this issue, the Debtors ask that the Court (a) extend the exclusive right to file a chapter 11 plan of reorganization through and including the 90th day after a final order is issued in the estimation hearings, and (b) extend the exclusive right to solicit acceptances thereto through and including an additional 60 days thereafter. In other words, the Debtors are now asking this Court to extend their exclusive periods for an indeterminate amount of time, but at the very least, through December 2006. In support thereof, the Debtors have crafted an illusion of "progress" through a series of wholly inaccurate statements premised on the

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Glossary of Terms Used in Plan Documents, filed by the Debtors on January 13, 2005 [Docket No. 7561].

"fact" that "the Debtors have made substantial progress toward confirmation of a plan of reorganization" and that "all constituencies continue to engage in discussions concerning a consensual plan." (Motion ¶¶ 1 and 16). Such statements could not be further from the truth.

Since their filing in 2001, the Debtors' chapter 11 cases have been marked by litigation, and have made little progress; the limited progress that has been made has come only as a result of directives issued by this Court. In fact, in the six months since the filing of the Debtors' eighth motion to extend the exclusive periods, the Debtors have met only once, as directed by the Court, with the FCR and all of the asbestos constituencies, and that meeting addressed the estimation-related case management orders. One meeting does not justify the Debtors' statements to the Court that "settlement discussions have increased" and "continue." (Motion ¶ 16).

After more than four and a half years, the Debtors have neither formulated a consensual chapter 11 plan of reorganization nor filed a confirmable plan, and are no closer to doing so than they were at the start of their cases. The lack of meaningful progress with the FCR and the asbestos constituencies this many years into these cases should compel the Court to conclude that further extensions of exclusivity will only serve to further isolate the parties in interest from the plan process.

While the Court previously expressed some concern about the potential impact termination of exclusivity would have upon the Debtors' business, the declarations in the record confirm that the Debtors have prospered in these cases, with results improving even with the threat of losing exclusivity, and are likely to continue to prosper. Under the worst case scenario, the lifting of exclusivity will result in the status quo, i.e., the Debtors' businesses will not be affected, and these cases will continue to stall without any progress toward a confirmable plan.

Under the best case scenario, however, the lifting of exclusivity will jump-start negotiations with all parties, provide the constituents with a level playing field at the negotiating table, permit the filing of competing plans, and ultimately lead to agreement upon the terms of a consensual plan.

While the estimation process for both personal injury and property damage claims has begun, the results of estimation, which are not likely until, at the earliest, the end of 2006, should naturally and quickly lead to plan confirmation. Under the Debtors' proposal, however, the real negotiations would not even begin until 90 days *after* the estimation process ends with a "final order." The Debtors should not be permitted to continue to cling to exclusivity as leverage to avoid real negotiations (if the Debtors are interested in real negotiations) or to continue to delay these cases.

The time has come, after more than four and a half years, to terminate the Debtors' exclusive periods and permit the filing of one or more alternative plans. Accordingly, the FCR respectfully requests that the Debtors' Motion be denied.

## BACKGROUND

1.      Because the Debtors' cases have been marked by extraordinary delay and excessive litigation, a brief discussion of the events leading up to the filing of the Motion may assist the Court in assessing the relief sought therein.

### A. The Debtors' Chapter 11 Cases and Proposed Plan of Reorganization

2.      On April 2, 2001, the Debtors each filed a petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

3.      After the Debtors' cases had languished for almost three years, the Court, at a hearing on February 23, 2004, expressed concern with the Debtors' lack of progress in these

cases and their inability to advise the Court when a plan would be filed. Specifically, the Court stated:

> Well, then, I need some answers. This case is now 3 years old. It's time for the Debtor to know what it's [sic] business plan is, what it's [sic] operational plan is, what it's [sic] reorganization plan, in structure. I don't expect that you've got all the negotiations done. I understand your need to figure out what the asbestos liabilities are before you can even conclude that piece. But, I sent you off to talk to all the other constituent groups 2 months ago, and I expect that you're still doing that, so that the basis of a plan can be put together. It's very long, folks, it's very long, and I'm starting to wonder whether the Debtor-In-Possession, is going to be able to get this done, and if not whether to replace the Debtor. That's the point I'm at.

February 23, 2004 Hr'g Tr., at pp. 17-18 (alterations added).

4.    At a hearing on March 22, 2004, the Court considered the Debtors' sixth motion to extend the exclusive periods and asked the Debtors whether they intended to seek a 524(g) injunction. In response, the Debtors stated, "Your Honor, to this day, I can't tell you that it will be a 524(g) plan." March 22, 2004 Hr'g Tr., p. 47. The Debtors did tell the Court, however, that a 524(g) plan "may make sense here." March 22, 2004 Hr'g Tr., at p. 48. In response, the Court stated:

> Then let's get a Futures Rep. I mean, you can't have it both ways. We either need the pieces in place to get a 524(g), or else we need a plan that doesn't have one. Take your pick. Let's do it. It's been a long time. And, frankly, I'm getting to the point where if I don't lift exclusivity, I'm going to appoint a trustee, and that will cause all sorts of problems, I know, for the debtors lending perspective, if nothing else. But, this has gone on too long, with too little progress. Now, last September, I thought I provided some marching orders so that people could start talking. I'm glad to hear that the debtor has taken that to heart and attempted to try to get the constituents together. But, I still don't see any progress as a result of it, and that was six months ago.

Id. The argument on the Debtors' sixth motion to extend the exclusive periods was continued to the May 24, 2004 hearing.

5.     In response to the Court's comments at the hearing on March 22, 2004, the Debtors filed a motion to appoint David T. Austern – one of three candidates – as the Future Claimants Representative, which motion was granted at a hearing on May 24, 2004.

6.     Also at the May 24, 2004 hearing, and again in response to the Court's previous directives, the Debtors proposed that they would be prepared to file a plan within 90 to 120 days that they "hope will be one that reflects consent and agreement for all of the constituencies, all of the constituencies except the bodily injury constituency." May 24, 2004 Hr'g Tr., at p. 52. Despite the Debtors' position, the Court appeared reluctant to extend the Debtors' exclusive periods for the sixth time:

> Well, I'm not inclined to deny it [the Debtors' sixth motion to extend the exclusive periods] right now, Mr. Lockwood, but I am, like you, getting a little frustrated with the fact that I don't have a plan on the table. So I think I am going to give the debtor a last period of exclusivity, and that's what it's going to be, a last period of exclusivity to get this done.

Id. at 68. The Court gave the Debtors a deadline of October 14, 2004 to file a plan and stated: "[b]ut if I don't have a plan that's on track and headed toward the confirmation arena, if nothing else, I don't think there will be another extension." Id. at 70.

7.     A series of discussions ensued between June 2004 and October 2004. See Austern Declaration ¶ 8.[2]  The FCR spoke with representatives of each of the asbestos constituencies and the Debtors, to seek common ground on the terms of a consensual plan. Id.

8.     As the October 14, 2004 deadline for the Debtors to file a plan approached, it appeared that the parties were making progress.[3]  Accordingly, the FCR and the other parties

---

[2] The "Austern Declaration" refers to the Declaration of David T. Austern, Future Claimants Representative, In Support of Future Claimants Representative's Objection to Debtors' Ninth Motion for Order Further Extending Exclusive Periods for Filing a Plan and Soliciting Votes Thereon, which is attached hereto as Exhibit A.

consented to the Debtors' request for a one-month extension of the plan filing deadline, to November 15, 2004.

9.    Further plan-related discussions ensued, culminating in exchanges of potential settlement terms among the parties in late October and early November, 2004.  See id ¶ 10.  On November 3, 2004, the FCR provided a revised proposal directed to the Debtors.  Id.  The FCR followed up with certain additional terms on November 5, 2004, and on November 10, 2004 (collectively, the "November 2004 Proposal").  See id.  The Debtors have never provided the FCR with any substantive response to his November 2004 Proposal.  See id. ¶ 11.

10.    The preliminary negotiations in late October and early November, 2004 were short-lived and had essentially ceased by November 13, 2004, when the Debtors filed their Disclosure Statement [Docket No. 6896] and Plan of Reorganization [Docket No. 6895] (the "Plan"), without the consent of the asbestos constituencies, including the FCR.

11.    In certain follow-up conversations between the FCR and the Debtors regarding the November 2004 Proposal, the last of which occurred on February 23, 2005, the Debtors essentially acknowledged that they were not going to respond to the November 2004 Proposal, particularly in light of the results of the 2004 presidential and congressional election.  See Austern Declaration ¶ 11.

12.    On January 13, 2005, the Debtors filed their Amended Disclosure Statement [Docket No. 7559] and Amended Plan of Reorganization [Docket No. 7560] (the "Amended Plan"), again without the consent of the asbestos constituencies.  In fact, in negotiating the

---

[3] The Debtors premised the need for such an extension on the fact that there had been various discussions with various parties, and in the Debtors' view, "sufficient progress was made for the parties to conclude that additional negotiations could lead to a consensual chapter 11 plan."  Debtors' Motion for Entry of an Order Extending the Time Within Which the Debtors Must File a Chapter 11 Plan, dated October 14,

Amended Plan, the Debtors failed to reach out to the FCR and the other asbestos constituencies. Instead, the Debtors focused their energies on the unsecured creditors, winning their consent to the Amended Plan by agreeing to pay their claims at 100 cents on the dollar plus interest.

13.    The same day the Debtors filed their Plan, they also filed several plan related motions (the "Plan Related Motions") [Docket Nos. 6898, 6899 and 6900]. More than twenty objections to the Disclosure Statement and Plan Related Motions have been filed by various parties-in-interest, including a consolidated objection filed by the FCR [Docket No. 7340], which establish, inter alia, that the Disclosure Statement should not be approved because the Plan is patently unconfirmable.

14.    Specifically, the Amended Plan improperly seeks to estimate property damage and personal injury asbestos claims (including future demands) for distribution purposes without appropriate procedural safeguards, and improperly caps the Debtors' aggregate asbestos liability at $1.7 billion. The Amended Plan does not provide for any alternative in the likely event that the Debtors' aggregate asbestos liability is estimated at an amount exceeding $1.7 billion. Despite this treatment, the Amended Plan wrongly provides that asbestos claims are unimpaired and not entitled to vote.

### B. The Debtors' PI CMO Motion and the Estimation Process

15.    At a hearing on January 21, 2005, the Debtors proposed a process for estimating the value of their asbestos-related claims. In response, the Court directed the Debtors to work with the asbestos committees and the FCR to develop case management procedures for proceeding with the process. But the Debtors did not negotiate the terms of their proposed

---

2004, p. 3 [Docket No. 6641].

estimation procedures with the asbestos personal injury committee and the FCR, although there were discussions among the parties, there was no real give and take.

16.    On May 10, 2005, the Debtors filed their Motion to Approve PI CMO and Questionnaire [Doc. No. 8394] ("the PI CMO Motion").

17.    The FCR and the asbestos constituencies objected to the PI CMO Motion [Doc. Nos. 8818, 8817 and 8847].

18.    At a hearing on the PI CMO on June 27, 2005, the Court once again ordered the parties to meet to discuss the form of a case management order and questionnaire. The parties met on July 8, 2005, and while some progress was made, the parties did not reach agreement on the terms of a consensual case management order and questionnaire. On July 13, 2005, the Debtors, the FCR and the Asbestos PI Committee each filed a proposed case management order and questionnaire [Doc. Nos. 8995, 8992 and 8989].

19.    On July 19, 2005, the Court heard argument on the proposed case management order and questionnaire and instructed the Debtors to revise the documents consistent with its oral rulings from the bench.

20.    On August 29, 2005, the Court approved the Debtors' revised case management order and questionnaire. [Doc. No. 9301] (the "PI CMO"). Pursuant to the PI CMO, the estimation hearing is not scheduled to begin until, at the earliest, September 2006.

21.    On October 10, 2005, after the Court had already addressed and turned down the idea of a bar date in connection with approving the PI CMO, the Debtors filed a motion seeking an order requiring pre-petition asbestos litigation claimants to file a proof of claim by a date certain, in the specific format demanded by the Debtors, or be forever barred from receiving any

distribution on their claims.  [Doc. No. 9622].  The FCR and the Asbestos PI Committee objected to the Debtors' request for a bar date.  [Doc. Nos. 10917 and 10930].

22.    At a hearing on November 14, 2005, the Court denied the Debtors' motion.

### C. The Debtors' Nine Motions for Extension of Exclusive Periods

23.    On July 25, 2001, the Debtors filed their first motion seeking to extend their exclusive periods to file a plan and to solicit acceptances.  That motion was granted; since that time, the Debtors have sought and obtained seven further extensions of their exclusive periods bringing the total period of exclusivity to more than four years.

24.    As they had done seven times before, on May 23, 2005, with their unconfirmable Amended Plan already on file, the Debtors filed their eighth motion seeking an order extending their exclusive periods to file a plan and solicit votes thereon for an additional six months to November 23, 2005 and January 23, 2006, respectively [Doc. No. 8486].  The FCR and the asbestos constituencies strongly opposed the extension [Doc. No. 8598, 8599 and 8600].

25.    On June 27, 2005, the Court heard argument on the Debtors' eighth motion to extend their exclusive periods.  The Court made it clear that it wanted to see some progress in these cases.[4]  The Court also inquired about the effect that termination of exclusivity would have on the Debtors' businesses:

---

[4] The Court also made it clear that it wants the parties to engage in discussions regarding a confirmable plan: "Mr. Bernick, I'm holding you personally responsible for making calls on a weekly basis to start settlement discussions and, folks, you'd better be there to answer them or return those calls promptly." June 27, 2005 Hr'g Tr., at pp. 88-89.

> [I]f I do terminate exclusivity, what does that do to the debtors on the business side? Because frankly, I'm not seeing much progress, and I think the case needs more. So, I don't know that I'm prepared to terminate exclusivity today, but I think I am prepared to put an end to exclusivity, an end date to exclusivity, and it's not going to be December of 2006.

June 27, 2005 Hr'g Tr., at p. 70.

26.    At the conclusion of the June 27, 2005 hearing, the Court granted a brief extension of the exclusive periods until the July omnibus hearing, ordered the parties to meet to work out a case management order and questionnaire in connection with estimation (as described above), and ordered the parties to file briefs in advance of the July hearing which addressed the effect (if any) that terminating the exclusive periods would have on the Debtors' businesses (the "Business Brief").

27.    On July 7, 2005, the Debtors filed a Business Brief which was premised on a series of *ifs*, *coulds*, *mights*, and *mays* and failed to establish as a matter of proof, that the termination of exclusivity would have a detrimental impact on their businesses [Doc. No. 8963]. The FCR and the asbestos constituencies each filed responses to the Debtors' Business Brief [Doc. Nos. 8982, 8984, and 8985].

28.    At a hearing on July 19, 2005, the Court focused its attention on resolving the issues surrounding the case management order and questionnaire and continued the Debtors' eighth motion to August 29, 2005. See July 19, 2005 Hr'g Tr., at p. 207.

29.    At a hearing on August 29, 2005, the Court focused again on resolving the "technical issues" surrounding the case management order and the questionnaire and stated that it would be more appropriate to have "a serious discussion about exclusivity" after the case management order was entered. See Aug. 29, 2005 Hr'g Tr., at pp. 131-33. Accordingly, the

Court extended the Debtors' exclusive periods, and continued the hearing on the eighth motion, to December 19, 2005. Id. at p. 134, lines 15-16.

30.     On November 14, 2005, the Debtors' filed the instant Motion, which is replete with misleading and unsupported statements about the Debtors' "substantial progress toward confirmation of a plan" and the ongoing "negotiations" between all the parties in interest. The truth is that no such progress has occurred and no such global negotiations have taken place.

## ARGUMENT

### A. The Debtors Have a Heavy and Increasing Burden to Establish "Cause" to Extend the Exclusive Periods

31.     Section 1121(d) of the Bankruptcy Code provides that the Court may reduce or increase the 120-day or 180-day exclusive periods for a debtor to file and solicit acceptances of its reorganization plan if "cause" exists. 11 U.S.C. § 1121(d).[5]

32.     Requests to extend or reduce a period of exclusivity should "be granted neither routinely nor cavalierly." In re McLean Indus., Inc., 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987); In re Curry Corp., 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992) ("This court will not routinely extend the exclusivity period absent a showing of 'cause' when creditors object to such requests for extensions."); In re Pine Run Trust, Inc., 67 B.R. 432, 434 (Bankr. E.D. Pa. 1986) ("Furthermore, both the language and purpose of this statutory provision require that an extension not be granted routinely.").

33.     The burden is on the Debtors to demonstrate the existence of good cause warranting extensions. In re Newark Airport/Hotel LP, 156 B.R. 444, 451 (Bankr. D. N.J.),

---

[5] Although not applicable here, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 amends Section 1121(d) of the Bankruptcy Code and provides that a debtor's 120-day exclusive period to file a plan and 180-day exclusive period to solicit acceptances may not be extended beyond 18 months and 20 months, respectively.

aff'd, FGH Realty Credit Corp. v. New Airport/Hotel LP, 155 B.R. 93 (D. N.J. 1993). Moreover, the "Debtor[s'] burden gets heavier with each extension it seeks as well as the longer the period of exclusivity lasts; and a creditor's burden to terminate gets lighter with the passage of time." In re Dow Corning Corp., 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997). The Debtors have failed to meet this burden at this time. Rather, the Debtors conjure up a series of illusory and wholly inaccurate statements to support the requested relief.

### B. The Debtors Have Failed to Establish that "Cause" Exists to Extend the Exclusive Periods

34.    Courts consider a series of factors in determining whether section 1121(d)'s "for cause" language has been satisfied.[6] As the FCR explained more fully in his objection to the Debtors' eighth motion to extend the exclusive periods [Doc. No. 8599], when these factors are considered in light of the length of time that has elapsed in these cases, the Debtors' pending unconfirmable Amended Plan, the fact that the limited progress that has occurred in these cases has happened only after clear directives from the Court, and the fact that the termination of exclusivity will not have a detrimental impact on the Debtors' businesses, they do not weigh in favor of an eighth extension of the exclusive periods.

35.    The Debtors have put forth only superficial arguments for why they are entitled to an extension of the exclusive periods. The Debtors claim that the estimation of their asbestos-related liabilities is likely to be "time-consuming and complex" and will require the Debtors and

---

[6] Courts usually consider (1) the size and complexity of the case; (2) the necessity of sufficient time to negotiate and prepare adequate information; (3) the existence of good faith progress; (4) whether the debtor is paying its debts as they become due; (5) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (6) whether the debtor has made progress negotiating with creditors; (7) the length of time a case has been pending; (8) whether the debtor is seeking an extension to pressure creditors; and (9) whether or not unresolved contingencies exist. In re Central Jersey Airport Servs., LLC, 282 B.R. 176, 184 (Bankr. D. N.J. 2002); McLean Indus., Inc., 87 B.R. at 834.

asbestos constituencies to "devote a tremendous amount of time and a large number of resources." Motion ¶ 16. "As the Court has focused all the parties on an estimation process, the relief requested herein would afford the Debtors an opportunity to continue to work toward estimation without the ancillary distraction of addressing potential competing plans." Id. They further claim that "the Debtors and all constituencies continue to engage in discussions concerning a consensual plan. In fact, of late, as the estimation discovery progresses, these settlement discussions have increased and all parties have a renewed commitment to attempting to make progress." Id.

### (i) The Debtors' Plan is Patently Unconfirmable and There Has Been No Good Faith Progress Toward Filing a Confirmable Plan

36.    If the Debtors have their way, at the end of 2006, when the Court reaches an estimate of the Debtors' asbestos-related liabilities, the only plan on the table will be the Debtors' patently unconfirmable plan. As a result, the parties, instead of proceeding directly to confirmation following the results of the estimation, will have to expend additional time and resources litigating, or negotiating the terms of a confirmable plan. The Court should not delay the start of that process for another year, but rather should permit all parties in interest to file competing plans now.

37.    The Debtors cannot demonstrate that they have made good faith progress toward filing a confirmable plan, yet alone a consensual plan. Despite the passage of *years* during which the Debtors could have negotiated with their asbestos constituencies, it was only last November, when the Court set a firm deadline, that the Debtors filed any plan, and the plan they chose to file is so fatally flawed as to be unconfirmable on its face. That hardly shows sufficient progress to warrant a ninth extension. See In re Am. Fed'n of Television and Radio Artists, 30 B.R. 772,

774 (Bankr. S.D.N.Y. 1983) (cause for extension of a debtor's exclusive periods does not exist where the debtor has made no showing that it can successfully reorganize if the exclusive periods are extended).

38.    Specifically, the Amended Plan improperly seeks to estimate all asbestos claims (including future demands) for distribution purposes without appropriate procedural safeguards, and in a manner that improperly caps the Debtors' aggregate asbestos liability at $1.7 billion. Even more troubling is that the Amended Plan is destined to fail because it does not provide for any alternative in the likely event that the Debtors' aggregate asbestos liability is estimated at an amount exceeding $1.7 billion.[7] There is nothing in Section 524(g) that requires that the Court estimate or cap the Debtors' asbestos-related liability. On the contrary, to confirm a plan, the Court must find that the actual amounts, numbers and timing of future demands cannot be determined. 11 U.S.C. § 524(g)(2)(B)(ii)(II). When the Court estimates future asbestos claims to determine whether the Amended Plan is fair and equitable, such an estimation should not be final for distribution purposes. This is particularly so where, as here, equity holders are retaining substantial interests.

39.    To throw salt on the wound, the Amended Plan then provides that asbestos claims are unimpaired and not entitled to vote. Simply asserting that asbestos claims will be paid in full, as the Amended Plan does, does not mean that such claims are unimpaired. The term "impaired" is read in broad terms. See, e.g., In re Barakat, 99 F.3d 1520, 1527 (9th Cir. 1996) ("Congress intended to define impairment broadly, and generally, any alteration of a creditor's legal rights constitutes impairment."). "Impairment" under the Bankruptcy Code is a standard that is easily

---

[7] In fact, if the Debtors were serious about exiting chapter 11, they could have filed a plan that provided for a greater share of the equity to be paid to the asbestos claimants if the Debtors' aggregate asbestos liability was estimated to be higher than $1.7 billion.

met. In re American Solar King Corp., 90 B.R. 808, 819 (Bankr. W.D. Tex. 1988) (noting even the smallest impairment entitles a creditor to participate in voting). Thus, the question is whether the provisions of the Amended Plan, if approved, would alter the rights of asbestos claimants in any respect. Even a cursory examination of the Amended Plan shows that this is not even a close question, and that the answer is "Yes." The Debtors should not be allowed to use the estimation of asbestos claims to back into their positions that asbestos claims are unimpaired and that their liability to all asbestos claimants should be capped while equity holders retain substantial interests.

### (ii) The Debtors Mislead The Court About the Status of Negotiations and the (Lack of) Progress Toward Confirmation of a Plan

Through a series of illusory and wholly inaccurate statements, the Debtors inform this Court that:

- they "have made substantial progress toward confirmation of a plan of reorganization" (Motion ¶ 1);

- "[t]he various parties in these chapter 11 cases have tried to negotiate a consensual plan and continue to have discussions in this regard;" (Motion ¶ 3); and

- "the Debtors and all constituencies continue to engage in discussions concerning a consensual plan. In fact, of late, as the estimation discovery progresses, these settlement discussions have increased and all parties have a renewed commitment to attempting to make progress" (Motion ¶16).

The Debtors fail to provide any factual support for their statements. In fact, the truth is that the Debtors have not had any meaningful discussions with the FCR since the Court last ordered the parties to meet in July 2005. See Austern Declaration ¶¶ 5 and 12. The FCR is hard-pressed to understand how one meeting more than four months ago addressing only the estimation-related case management orders can be viewed as "substantial progress" or "increased" discussions. It is

clear, after more than four and a half years, that the Debtors are unwilling or unable to move these cases toward a consensual plan.

### (iii) Termination of the Exclusive Periods Will Not Cause Material Harm to the Debtors or Their Businesses

40.    The Debtors know well the issues separating the parties, and are merely using exclusivity, their unconfirmable Amended Plan and the time consuming nature of the estimation process as leverage in their negotiations with the asbestos constituencies. There is no reason to believe that the Debtors, after four and a half years, will now begin meaningful discussions as long as no other party has the authority to file a competing plan. In fact, because the Debtors are operating comfortably in bankruptcy, they have no real incentive to emerge from chapter 11. The Debtors continue to maintain a strong market position, strong cash flow, a significant cash position and low borrowing needs. See Radecki Declaration ¶ 9.[8]

41.    The Debtors have apparently examined approximately 70 significant asbestos-related chapter 11 cases that have been filed over the last 20 years (albeit with very different facts than those present here) and point to only three cases where exclusivity has been terminated – Federal-Mogul Global Inc., Babcock & Wilcox and U.S. Minerals Products Company.[9] Motion ¶ 21. The Debtors do not point out, however, that termination of exclusivity in each of these

---

[8] The "Radecki Declaration" refers to the Declaration of Joseph J. Radecki, Jr. in Support of Future Claimants Representative's Response to Debtors' Ninth Motion for an Order Pursuant to 11 U.S.C. § 1121(d) Extending Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and to Solicit Votes Thereon, which is attached hereto as Exhibit B.

[9] The Debtors fail to inform the Court of the recent denial of exclusivity in the asbestos-related chapter 11 case of Congoleum Corporation, Case No. 03-51524 (Bankr. D. N.J.) (J. Ferguson). On November 7, 2005, at a hearing on Congoleum's sixth motion to extend their exclusive periods, the Court terminated the Debtors' exclusive right to file a plan and solicit votes thereon because of, among other things, the "lack of meaningful progress with such significant parties this far into the case" and noted that "Congress was sending a clear message that it thought extension of exclusivity in bankruptcy cases was being abused" when it amended Section 1121(d) of the Bankruptcy Code.

cases has had little effect on each debtors' business prospects or perception in the debt or equity markets. In fact, the loss of exclusivity seems to have precipitated a consensual plan.

42.    Federal-Mogul Global, Inc. and its affiliates (collectively, "Federal-Mogul"), which filed for bankruptcy protection on October 1, 2001, had their exclusivity terminated on October 1, 2003. The loss of exclusivity, however, did not impair Federal-Mogul's business prospects. See Radecki Declaration ¶ 12. In the fourth quarter of 2003, Federal-Mogul reported 5% higher revenue and approximately 22% higher EBITDA than during the previous quarter. Id. Over the following quarter, revenue and EBITDA continued to be significantly higher than during the third quarter of 2003. Id. The loss of exclusivity also did not affect the markets' perception of Federal-Mogul. Neither Federal-Mogul's bond nor stock prices moved appreciably until several months later, when its stock price rose over 30% upon the report of improving financial results. Id. The loss of exclusivity also did not ultimately impact Federal-Mogul's ability to agree on a consensual plan of reorganization with its credit constituencies. On November 3, 2003, just one month after exclusivity was terminated, Federal-Mogul announced it had reached agreement on an amended plan of reorganization with its Unsecured Creditors Committee, Asbestos Claimants Committee, Future Claimants Representative, Agent for its Prepetition Lenders, and its Equity Committee.

43.    Similarly, Babcock & Wilcox and its affiliates (collectively, "B&W"), which filed for bankruptcy protection in February 2000, had their exclusivity terminated in May 2002. The loss of exclusivity, however, had little impact on its business. Id. ¶ 13. In fact, the stock of B&W's parent, McDermott International, Inc. ("McDermott"), has increased from approximately $15 per share when B&W lost exclusivity to over $41 per share today, partially as a result of McDermott's determination to "repurchase" control in B&W's business from its asbestos

creditors. Id. Within six months after B&W's loss of exclusivity, McDermott announced that it would file a consensual plan of reorganization, agreed to by its Asbestos Claimants Committee and Future Claimants Representative. Id.

44.     In the case of U.S. Minerals Products Company ("U.S. Minerals"), which filed for bankruptcy protection in July 2001, the loss of its exclusivity in 2003 did not negatively impact its business prospects. Id. ¶ 14. Within two quarters, U.S. Minerals was reporting sharply higher revenues and EBITDA. In November 2005, the Chapter 11 trustee for U.S. Minerals confirmed a consensual plan of reorganization. Id.

45.     Permitting the filing of competing plans in the Debtors' cases, including, for example, one or more plans filed by various asbestos constituencies, will create a meaningful discourse among the various parties-in-interest, which should weed out unfavorable plans and lead to the best possible result for all concerned parties. In re Geriatrics Nursing Home, Inc., 187 B.R. 128, 133 (D. N.J. 1995) (affirming bankruptcy court's denial of debtors' motion to extend exclusive period). The Future Claimants Representative is not asking the Debtors to withdraw their Amended Plan. Instead, the time has come for the Court to permit other parties-in-interest to submit competing plans that have a greater likelihood of confirmation.

46.     Denial of the Debtors' Motion will not end their chances for reorganization. See, e.g., In re All Seasons Indus., Inc., 121 B.R. 1002, 1005 (Bankr. N.D. Ind. 1990) ("Denying such a motion only affords creditors their right to file the plan; there is no negative effect upon the debtor's co-existing right to file its plan."); In re Grossinger's Assocs., 116 B.R. 34, 36 (Bankr. S.D.N.Y. 1990) ("loss of plan exclusivity does not mean the debtor is foreclosed from promulgating a meaningful plan of reorganization; only that the right to propose a Chapter 11 plan will not be exclusive with the debtor"). Rather, denying the Motion at this time will level

the playing field and permit others to file competing plans. See, e.g., Curry Corp., 148 B.R. at 756 (denying debtors' motion to extend exclusive periods, noting that extensions "should not be employed as a tactical devise to put pressure on creditors to yield to a plan that they might consider unsatisfactory").

47.    If the Court denies the Debtors' Motion and exclusivity is lifted, one (or a combination of several) of the following scenarios can occur, none of which will cause material harm to the Debtors:

Scenario #1:    Competing plans can be filed and the estimation hearing can proceed to a result. Once an estimation result is reached, the Court can immediately proceed to confirmation and choose between the best possible plans on file.

Scenario #2:   A competing plan can be filed and confirmed without the need for an estimation proceeding.

Scenario #3:   The playing field will finally be level among the Debtors and all the constituent parties and serious plan negotiations can begin for the first time. The ultimate result will be a consensual plan.

Scenario #4:   Even if serious plan negotiations do not take place, the Debtors and all the constituent parties are no worse off than they were when the Debtors had the exclusive right to file a plan and solicit votes thereon.

## CONCLUSION

The Debtors have had over four and one-half years to move these cases to resolution. But the last four and one-half years have been filled with litigation and delay, and the numerous efforts by the Court and the other parties to prompt the Debtors to engage in real negotiations with their asbestos constituents have been unsuccessful. Enough is enough. The FCR respectfully submits that the best way, and perhaps the only way, now to generate meaningful negotiations among all parties-in-interest is for the Court to deny the Debtors' Motion, and authorize parties in addition to the Debtors to file and solicit votes upon plans of reorganization.

For the foregoing reasons, the Future Claimants Representative respectfully requests that the Court deny the Motion.

Dated:  December 2, 2005

Respectfully submitted,

PHILLIPS, GOLDMAN & SPENCE, P.A.

John C. Phillips, Jr., Esquire (#110)
1200 North Broom Street
Wilmington, DE 19806
Telephone:  (302) 655-4200
Facsimile:  (302) 655-4210

Roger Frankel, Esquire
Richard H. Wyron, Esquire
Swidler Berlin LLP
3000 K Street, N.W., Suite 300
Washington, D.C. 20007
Telephone:  (202) 424-7500
Facsimile:  (202) 424-7643

Counsel for David T. Austern,
Future Claimants Representative

9260045v5