# Exhibit B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) Case No. 01–1139 (JKF) |
| W.R. GRACE & CO., et al., | ) (Jointly Administered) |
| | ) |
| Debtors. | ) |

DECLARATION OF JOSEPH J. RADECKI, JR. IN SUPPORT OF
FUTURE CLAIMANTS REPRESENTATIVE'S RESPONSE TO DEBTORS'
NINTH MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. § 1121(D) EXTENDING
DEBTORS' EXCLUSIVE PERIODS IN WHICH TO FILE A CHAPTER 11 PLAN AND
TO SOLICIT VOTES THEREON

I, Joseph J. Radecki Jr., state as follows:

1.      I am a Managing Director of CIBC World Markets Corp. ("CIBC"). CIBC is a full service investment bank, which offers a comprehensive set of products and services for its corporate and institutional clients. I have provided a range of financial advisory, investment banking and valuation services to debtors and debtors-in-possession, creditors' committees, acquirers, future claims representatives and other parties-in-interest in connection with bankruptcy cases and financially distressed situations. I have served or am presently serving as a financial advisor to debtors, creditors, trustees, and other parties in numerous chapter 11 proceedings, including currently serving as the financial advisor to future claimants representatives in three other asbestos bankruptcy cases. I am familiar with the matters stated herein and I make this affidavit based on my own personal knowledge, information and belief.

2.      On September 27, 2004, the Court authorized the employment of CIBC as the financial advisor to David T. Austern, the Future Claimants Representative in the above-

captioned chapter 11 cases of W.R. Grace & Co. and its affiliated debtors (collectively, the "Debtors").[1]

3.      I have reviewed and am familiar with the nature of the Debtors' businesses and their current and historical financial position.

4.      I have reviewed the Debtors' Report on Business Effects of Terminating Exclusivity (the "Debtors' Business Report") and the Affidavit of Fred Festa in support thereof (the "Festa Affidavit") that were filed in connection with the Debtors' Eighth Motion for an Order Pursuant to 11 U.S.C. § 1121(d) Extending Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and to Solicit Votes thereon (the "Debtors' Eighth Exclusivity Motion"). Additionally, I have reviewed the Debtors' Ninth Motion for an Order Pursuant to 11 U.S.C. § 1121(d) Extending Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and to Solicit Votes thereon (the "Debtors' Ninth Exclusivity Motion").

**The Debtors' Financial Condition in July 2005**

5.      In response to the Debtors' Eighth Exclusivity Motion and in connection with the Future Claimants Representative's Response to Debtors' Report on Business Effects of Terminating Exclusivity (the "FCR's Response"), I filed an affidavit (the "Response Affidavit") which is incorporated herein.

6.      As explained more fully in the Response Affidavit, I detailed that:

    (a) the Debtors and their affiliates had over $400 million in available cash[2] and over $200 million of undrawn availability in the post-petition financing facility (the "DIP");

---

[1] Order Authorizing the Retention and Employment of CIBC World Markets Corp. as Financial Advisor to David T. Austern, Future Claimants' Representative, dated Sept. 27, 2004, as extended on March 14, 2005 and June 27, 2005.

[2] W.R. Grace & Co. SEC Form 10-Q for the quarterly period ended June 30, 2005, p-I-5.

(b) the termination of the Debtors' exclusivity would not cause a breach of the DIP;[3]

(c) the Debtors themselves had publicly reported that these sources and amounts of liquidity were sufficient to support their strategic initiatives[4] and the Chapter 11 proceedings and that the Debtors were current in their vendor payments;

(d) the Debtors' annual revenues had increased approximately fifty percent (50%) since 2001[5] despite the uncertainty of the bankruptcy and numerous adverse events;

(e) the Debtors manufacture many high quality and unique products that are specialized for their customers and it was unlikely that a loss of exclusivity would interfere with the Debtors' strong relationships with their customers;

(f) the Debtors had implemented four long term incentive programs for key employees aggregating over $47 million[6] and had contributed on a regular basis over $110 million in the aggregate to its pension plans[7] and that a loss of exclusivity would likely have little effect on employee performance or retention; and

(g) the Debtors have employed two senior consultants to focus primarily on the Debtors' reorganization process[8] and accordingly, a loss of exclusivity would not unduly burden the Debtors' management.

7.    The Response Affidavit concluded that termination of the Debtors' exclusivity would have no meaningful effect on the Debtors' business prospects.

**The Debtors' Current Business Condition**

8.    The Court continued consideration of the Debtors' Eighth Exclusivity Motion until the omnibus hearing scheduled for December 19, 2005. Since that time and despite public

---

[3] Debtors' Business Report ¶ 1.

[4] W.R. Grace & Co. Press Release, Grace Reports First Quarter Financial Results, released April 20, 2005.

[5] Debtors' Business Report ¶ 13; Festa Affidavit ¶ 13.

[6] This includes recently approved contributions of approximately $46 million pursuant to the Court's Order dated June 22, 2005.

[7] This excludes similar bonus payments to the CEOs but includes payments under the Debtors' 2005-2007 incentive program.

[8] The Debtors are paying Messrs. Norris and Siegel approximately $425,000 and $450,000 a year,

3

knowledge of the potential lapse of the Debtors' exclusivity, the Debtors and their affiliates have continued to prosper.

9.     Revenues for the third quarter of 2005 for the Debtors have increased 12.7% from the same period a year ago to $653.4 million and nine month revenues now stand 15.7% higher than the first nine months of 2004.[9] The Debtors' pre-tax income from core operations before depreciation and amortization for the year-to-date is approximately 7% higher than the same period last year.[10] The Debtors' cash position also continues to build.  As of the end of the third quarter of 2005, the Debtors and their affiliates reported a cash position of $463.5 million,[11] nearly $80 million higher than the same time last year despite paying over $90 million to the Internal Revenue Service to settle tax audits for the years 1993-1996 and over $21 million to settle an environmental litigation.

10.     This continuation of the Debtors' improving financial results occurred despite several major obstacles in the Debtors' business aside from the potential loss of exclusivity, including the Gulf Coast hurricanes which resulted in lost sales, incremental costs and the loss of a key plant for the Debtors for over two weeks during the third quarter.

**Other Instances of Exclusivity Loss**

11.     Termination of exclusivity in other asbestos-related bankruptcies has had little effect on such debtors' business prospects or perception in the debt or equity markets.

---

respectively.

[9] W.R. Grace, Co. Press Release, Grace Reports Third Quarter Financial Results, released October 31, 2005.

[10] Ibid.

[11] Ibid.

12.    Federal-Mogul Global, Inc. and its affiliates (collectively, "Federal-Mogul"), which filed for bankruptcy protection on October 1, 2001, had their exclusivity terminated on October 1, 2003. The loss of exclusivity, however, did not impair Federal-Mogul's business prospects. In the fourth quarter of 2003, Federal-Mogul reported 5% higher revenue and approximately 22% higher EBITDA than during the previous quarter.[12] Over the following quarter, revenue and EBITDA continued to be significantly higher than during the third quarter of 2003.[13] Nor did the loss of exclusivity affect the markets' perception of Federal-Mogul. Neither Federal-Mogul's bond nor stock prices moved appreciably until several months later, when its stock price rose over 30% upon the report of its improving financial results. On November 3, 2003, just one month after exclusivity was terminated, Federal-Mogul announced it had reached agreement on an amended plan of reorganization with its Unsecured Creditors Committee, Asbestos Claimants Committee, Future Claimants Representative, Agent for its Prepetition Lenders, and its Equity Committee.[14]

13.    Similarly, Babcock & Wilcox and its affiliates (collectively, "B&W"), which filed for bankruptcy protection in February 2000, had their exclusivity terminated in May 2002. The loss of exclusivity, however, had little impact on its business. In fact, the stock of B&W's parent, McDermott International, Inc. ("McDermott"), has increased from approximately $15 per share when B&W lost exclusivity to over $41 per share today, partially as a result of McDermott's determination to "repurchase" control in B&W's business from its asbestos creditors. Within six months after B&W's loss of exclusivity, McDermott announced that it

---

[12] Federal-Mogul Corporation quarterly earnings releases dated October 31, 2003 and February 18, 2004.

[13] Federal-Mogul Corporation quarterly earnings releases dated October 31, 2003 and April 20, 2004.

[14] Federal-Mogul Corporation Press Release, Federal-Mogul Corp. – Consensual Agreement on Plan of Reorganization, released November 3, 2003.

would file a consensual plan of reorganization, agreed to by its Asbestos Claimants Committee and Future Claimants Representative.[15]

14.    In the case of U.S. Minerals Products Company ("U.S. Minerals"), which filed for bankruptcy protection in July 2001, the loss of its exclusivity in 2003 did not negatively impact its business prospects.  Within two quarters, U.S. Minerals was reporting sharply higher revenues and EBITDA.[16]  The Chapter 11 trustee for U.S. Minerals confirmed a consensual plan of reorganization in November 2005.

---

[15] McDermott International, Inc. Press Release, McDermott Announces Filing of Substantially Complete Consensual Plan of Reorganization and Settlement, released December 19, 2002.

[16] U.S. Minerals Products Company, monthly operating reports filed with the United States Bankruptcy Court, District of Delaware.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on December __1__, 2005

Joseph J. Radecki, Jr.