## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | ) | Chapter 11 |
|  | ) |  |
| W.R. GRACE & CO., *et al.*, | ) | Case No. 01-01139 (JKF) |
|  | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) | [Related to Docket No. 11067; |
|  | ) | Hearing: December 19, 2005] |
|  | ) |  |

### RESPONSE IN OPPOSITION TO DEBTORS' NINTH MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. 1121(d) EXTENDING DEBTORS' EXCLUSIVE PERIODS IN WHICH TO FILE A CHAPTER 11 PLAN AND TO SOLICIT VOTES THEREON [DOCKET NO. 11067].

Baron & Budd, P.C.; Environmental Litigation Group, P.C.; The Law Office of Peter G. Angelos, P.C.; Provost & Umphrey, LLP; Reaud, Morgan & Quinn, Inc.; Silber Pearlman, LLP; and SimmonsCooper, LLC, by and through their undersigned attorneys, hereby respond in opposition to Debtors' Ninth Motion for an Order Pursuant to 11 U.S.C. 1121(d) Extending Debtors' Exclusive Periods in which to File a Chapter 11 Plan and to Solicit Votes Thereon (the "Motion") [Docket No. 11067], and would respectfully show the Court as follows:

## I.    INTRODUCTORY STATEMENT

Debtors'[1] Motion should be denied.  Despite the fact that the exclusivity periods set forth in 11 U.S.C. § 1121(c) expired four years ago, Debtors have sought and received 8 prior extensions to exclusivity.  In the Motion, they  request a

---

[1]    This case is a jointly administered bankruptcy involving W.R. Grace & Co and numerous affiliated entities.  Throughout this Opposition, the debtors are referred to collectively as "Debtors" or "Grace".

further extension – the 9th – of at least two years.  This case is no closer to a successful reorganization than it was on the petition date, due primarily to the uniquely combative posture the Debtors have adopted against their tort creditor constituencies.  This Court should not reward Debtors' complacent antagonism for creditors with a further extension of exclusivity.  Debtors bear a heavy burden of proof in seeking an extension, especially in light of the recent amendments to the Bankruptcy Code.  This Court should deny the Motion in its entirety, but if the Court were to determine that a further extension is warranted, it should be limited to a very short period.  The Court should also couple any further extension of exclusivity with the appointment of a neutral trustee or examiner to oversee the negotiation and confirmation of a consensual plan.

## II.    PERTINENT HISTORY OF THIS CASE

Debtors sought refuge in Chapter 11 on April 2, 2001.  Almost immediately, they adopted a sharply adversarial posture for their reorganizational efforts.  In June 2001, Debtors sought entry of a case management order, which the Official Committee of Asbestos Personal Injury Claimants appropriately decried as an "an unprecedented package of extraordinarily expensive, burdensome and time-consuming bar date, proof of claim, notice and case management programs, each of which [was] designed to eliminate from their pool of creditors large numbers of legitimate asbestos personal injury claimants … ."[2]  Debtors have persisted in the

---

[2]    Opposition of the Official Committee of Asbestos Personal Injury Claimants to Debtors' Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Proof of Claim Forms, and Approval of Notice Program [Docket No. 902].  The underlying motion and brief to which the Committee was responding are docketed as nos. 586 and 587.

litigious pursuit of their "wish list" throughout the pendency of this bankruptcy.

Indeed, at the November 14, 2005, omnibus hearing – more than 4½ years into

these Chapter 11 cases – the Court revisited with skepticism Debtors' revived effort

to impose a bar date and proof of claim upon pre-petition asbestos creditors and the

motion was denied for the second time.[3]

At the November 14 hearing, the Court observed, pointedly and correctly,

that "[t]his case is stuck", elaborating as follows:

> This case is so stuck that I am really concerned about keeping
> it in its current posture.  I've expressed this for over a year and
> I don't see progress being made.

*Id.* at 161, 145.  The Court has expressed concern over the lack of progress in the

case for considerably more than a year, in fact.  On May 24, 2004 – 3 years into

Grace's bankruptcy and 6 months before any plan materialized – the Court stated:

> … [I]f I don't have a plan that's on track and headed toward
> the confirmation arena, if nothing else, I don't think there will
> be another extension [of exclusivity].

Tr. of  Hrg. at 70 (May 24, 2004) Docket No. 6033.  That was 18 months ago.

As of today, the plan that Debtors put on the table a year ago is, in fact, not

on track.  The current plan is neither consensual nor confirmable.  The Debtors are

committing massive resources to litigation that ultimately will not result in a

confirmed plan.    There is no discernible momentum toward confirmation.  No

confirmation hearing has been set, and under the Debtors' current schedule will not

---

[3]    Tr. of Hrg. at 145 (Nov. 14, 2005).  The docketing of this transcript is pending, and copy obtained
from the transcription service is attached as Exhibit A.  Remarked the Court at that hearing, "I
don't for the life of me understand how [a bar date's] going to advance this case … ."  *Id.*

be set until probably 2008.  The mired state of Debtors' reorganization is, as the Court observed, tied to the contentiousness of the case:  "… it's largely because the Debtor is taking the track where it wants to litigate everything."  *Id.* at 143.  That explains why it took the Debtors more than 3½ years to come up with a plan.[4] Not surprisingly, Debtors' plan proposes to take advantage of the particularized protections of 11 U.S.C. § 524(g).  Surprisingly, Debtors propose to ignore one of § 524(g)'s central requirements: a supermajority vote of asbestos creditors in favor of confirmation before any plan implementing a 524(g) injunction may be confirmed. *See* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).  Disregarding this statutory precept, Debtors would deny plan suffrage to asbestos personal injury claimants and propose to achieve confirmation over asbestos claimants' strong objections in what amounts to an unlawful cramdown.  The Future Claimants' Representative is correct in his observation, made in response to the Debtors' *seventh* motion to extend exclusivity, that the plan "provides no basis for meaningful further discussions."  Docket No. 7503 at 2.[5]  The Debtor's *ninth* motion to extend exclusivity is now before the Court,

---

[4] Grace's proposed plan is its Amended Joint Plan of Reorganization, dated January 13, 2005. [Docket No. 7560].

[5] Future Claimants Representative's Objection to Debtors' Seventh Motion for Order Further Extending Exclusive Periods for Filing a Plan and Soliciting Votes Thereon.  In January 2005, Mr. Austern astutely noted that "the Debtors [were] clinging to exclusivity as leverage in negotiations over the terms of a real plan in these cases."  *Id.* at 2.

and it is time for the "serious discussion about exclusivity" that the Court anticipated this summer.[6]

Recent developments offer little prospect for extricating the case from its current posture. The Court suspects (correctly) that "the whole questionnaire process is woefully inefficient, but it's what the Debtor wants to do and the Debtor controls its discovery." Tr. of Hrg. at 142 (Nov. 14, 2005). Nevertheless, the Court is concerned that the questionnaire may be more of an impediment to progress in Grace's reorganization. *Id.* at 164 ("Well, if there's no hook to [the questionnaire], then withdraw it and let's move on."). Debtors' renewed push for a bar date struck the Court as "penny wise and pound foolish" to the point of being "really distressing." *Id.* at 155.

> You're going to spend all of this money to get Proofs of Claims filed and then say that you're going to litigate them on a claim by claim basis. The whole purpose for 524, which you're invoking in your Plan, is to set up a Trust so that this issue doesn't create all of the Debtors' funds going to pay legal fees and experts, but, in fact, gets to the injured who need the money.

*Id.* The claims process for property damage claims is similarly stalled. In the Court's words, "[w]e can't even get through the property damage issues in this case in any kind of recognized orders." *Id.* at 139.

---

[6]  Tr. of Hrg. at 133 (Aug. 29, 2005), Docket No. 9349. In August, the Court observed that exclusivity was "a serious issue", but wanted to defer the "serious discussion about exclusivity" until "little technical issues" were "hopefully finished." *Id.* These "little technical issues" were largely subsumed within Debtors' push for case management orders on the estimation of asbestos claims (personal injury and property damage) and a succession of actual and attempted adjustments thereto.

### III.   THE PURPOSE OF CHAPTER 11 IS REORGANIZATION, NOT THE ESTABLISHMENT OF A SEMI-PERMANENT REFUGE OF PROTECTION FROM CREDITORS

In assessing the appropriateness of extending exclusivity for the ninth time in a 4½ year-old case that is unquestionably not on track toward confirmation, it should be borne in mind that the protection from creditors afforded by the Code "is not an end in itself." *In re Antilles Yachting, Inc.*, 4 B.R. 470, 472 (Bankr. D.V.I. 1980).   "[T]he purpose of a Chapter 11 proceeding is reorganization, not the establishment of a semi-permanent refuge." *In re Caringi*, 19 B.R. 12, 14 (Bankr. M.D. Pa. 1982).   As the court stated in *In re BGNX, Inc.*, 76 B.R. 851, 853 (Bankr. S.D. Fla. 1987),

> Chapter 11 provides a reasonable opportunity for corporate reorganization, it does not guarantee reorganization nor does it permit an indefinite suspension of creditors' rights and remedies pending the unsuccessful attempts of any party to effect a reorganization of debt.

"The legislative purpose of Chapter 11 is the *speedy* rehabilitation of financially troubled businesses." *In re 312 West 91st St. Co.*, 35 B.R. 346, 347 (Bankr. S.D.N.Y. 1983) (emphasis added).   Congress has repeatedly addressed the problem of delay in the reorganizational process.   In *In re Timbers of Inwood Forest Associates, Inc.*, 793 F.2d 1380, 1405 (5th Cir. 1986), *aff'd en banc*, 808 F.2d 363, *aff'd* 484 U.S. 365 (1988), the Fifth Circuit observed that "delay was an overriding concern of Congress in recodifying the … reorganization provisions in 1978" and stressed the importance of "limiting the delay of the reorganization process."   793 F.2d at 1406.   In affirming, the Supreme Court stressed Congress' expectation that

chapter 11 debtors would proceed with their reorganizations promptly. *United Sav. Ass'n v. Timbers of Inwood Forest, Ltd.*, 484 U.S. at 375-76.[7]

Moreover, as will be discussed more fully in the next section, the congressional mandate for expedition in the reorganizational process intensified with the passage last October of the Bankruptcy Abuse Prevention and Consumer Protect Act of 2005 ("BAPCPA"). For chapter 11 cases filed after the effective date of BAPCPA, the exclusivity period is capped at 18 months. Grace has already enjoyed exclusivity for *three times* that long and has precious little to show for it.

IV.    **THIS COURT SHOULD DENY THE DEBTORS REQUEST FOR A FURTHER EXTENSION OF EXCLUSIVITY.**

A.    **Exclusivity under the Bankruptcy Code is intentionally conferred for a finite period of time, a period which, in this case, ended four years hence.**

As noted, the Motion marks the ***ninth time*** Debtors have sought an extension of the exclusivity period. Debtors have long since exhausted the statutory exclusivity periods. Section 1141(c) of the Bankruptcy Code vests a reorganizing debtor with the exclusive right to file a plan of reorganization for the first 120 days following the petition date (the "Filing Exclusivity Period"). Once a debtor has filed a plan, the Bankruptcy Code extends exclusivity until 180 days after the petition date to allow time for the debtor to solicit acceptances in respect its filed plan (the "Solicitation Exclusivity Period") (collectively, the "Exclusivity Periods"). The

---

[7]    While *Timbers* addressed issues relating to a secured creditor's right to relief from the automatic stay, the mandate of both the Fifth Circuit and the Supreme Court that a chapter 11 debtor must address issues relevant to its reorganization within a reasonable time is equally relevant in the instant case.

Exclusivity Periods would have expired before the end of 2001 absent the eight previous extensions conferred by the Court. Prior to BAPCPA, bankruptcy courts were empowered to extend the Exclusivity Periods indefinitely upon a showing of cause by the Debtor. *See* 11 U.S.C. § 1121(d).

In October 2005, a seismic shift occurred in the manner in which bankruptcy courts may dispense extensions to exclusivity. While retaining the necessity of showing cause, BAPCPA capped the power to extend the exclusive periods to a strict and immovable 18 month maximum for the Filing Exclusivity Period, and a 20 month maximum for Solicitation Exclusivity Period. No discretion is permitted beyond these fixed periods. Had the BAPCPA reforms had been in place prior to April 2, 2001 (the petition date in this case), the Exclusivity Periods, even if extended to the outer limits of the maximum permitted under the Bankruptcy Code as revised by BAPCPA, would have expired ***exactly three years ago today***. Of course, this aspect of BAPCPA does not apply directly in this case, but this Court's decision upon whether to extend exclusivity for a ninth time should be informed by the clear congressional resolve to sharply curtail extensions of exclusivity and should sharpen the focus of this Court's inquiry. The reforms to the exclusivity regime were undertaken principally to prevent the automatic and routine extensions of exclusivity at the mere request of a debtor in possession sought here. At a minimum, the changes wrought by BAPCPA should heighten Debtors' burden to prove the existence of cause for a further extension.

As a threshold matter, Debtors should not need a further extension of the Filing Exclusivity Period, as they filed their plan more than a year ago.[8]  If yet another extension were warranted (the Tort Victims Law Firms contend that no further extension is warranted), then any additional exclusivity that the Court chooses to allow Debtors should be confined to a brief extension of the Solicitation Exclusivity Period.  This case has moved beyond the initial 120-day post-petition period, and the Debtors have a plan on file.  Any further extension of exclusivity should appropriately be limited to soliciting acceptances.

### B.    Exclusivity may be extended only for cause, and should be granted neither routinely nor cavalierly.

As noted, under the pre-BAPCPA regime that governs the extension of the Exclusivity Periods in this case, the Court may increase the period for Debtors to file a plan and solicit acceptances thereon only upon a showing of cause.  *See* 11 U.S.C. § 1121(d).  Requests to extend the Exclusivity Periods should "be granted neither routinely nor cavalierly."  *In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987).[9]  The purpose of the requirement of cause is plainly to ensure that, in the normal course of events, Exclusive Periods will be confined to the statutorily prescribed timescales and only where, in an exceptional case, a debtor can show good and valid reason should they be extended.  This purpose is

---

[8]   The fact that the Debtors' plan is unconfirmable on its face does not detract from the fact that a plan has been filed.

[9]   *See also*, *In re Curry Corp.*, 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992) ("This court will not routinely extend the exclusivity period absent a showing of 'cause' when creditors object to such requests") and *In re Pine Run Trust, Inc.*, 67 B.R. 432,434 (Bankr. E.D. Pa. 1986) ("both the language and purpose of this statutory provision require that an extension not be granted routinely.").

underscored by the BAPCPA amendments that impose an outer bound on permissible extensions, this ensuring that that Exclusive Periods will remain close to those original designed by Congress and not extended as a matter of course.

Debtors offer up only the mechanical argument that courts have "routinely granted exclusive period extensions covering several years even when resolution of the chapter 11 cases did not revolve around complex litigation issues." Motion at 9. While individual courts in the past may have done so, the statutory requirement of proving cause simply does not permit routine extensions.

C.    **Debtors bear the burden of proving cause for a further extension, a burden made heavier by recent legislative changes.**

Debtors are required to do more than merely request exclusivity and parrot the same tired justifications for the ninth extension as for the eighth. They bear the burden of demonstrating the existence of cause sufficient to warrant an extension. *In re Newark Airport/Hotel LP*, 156 B.R. 444, 451 (Bankr. N.J. 1993), aff'd *FGH Realty Credit Corp. v. New Airport Hotel LP*, 155 B.R. 93 (D. N.J 1993). As a matter of logic and basic fairness, the further removed in time the request for an extension is from the standard Exclusivity Periods established in the Bankruptcy Code, the heavier that burden must weigh and the more difficult it must be for Debtors to discharge. The Exclusivity Periods are intended to give Debtors the first clear shot at proposing a confirmable plan of reorganization and soliciting acceptances thereto, and should not be extended as a matter of course. Every other party in interest must not be indefinitely deprived of the opportunity to propose a

confirmable plan.  On the showing of their Ninth request for extension, Debtors

have singularly failed to meet the burden laid upon them.

**D.**    **The factors to be considered when determining whether cause exists for an further extension of exclusivity mandate denial of the Motion.**

In determining whether cause exists to extend the Exclusivity Periods,

bankruptcy courts generally consider nine factors:

1.  The size and complexity of the case;

2.  The necessity of sufficient time to negotiate and prepare adequate information;

3.  The existence of good faith progress;

4.  Whether the debtor is paying its debts as they become due;

5.  Whether the debtor has demonstrated reasonable prospects for filing a viable plan;

6.  Whether the debtor has made progress negotiating with creditors;

7.  The length of time the case has been pending;

8.  Whether the debtor is seeking an extension to pressure creditors;

9.  Whether or not unresolved contingencies exist.

*See In re Central Jersey Airport Servs.*, LLC, 282 B.R. 176, 184 (Bankr. D. N.J.

2002); *In re Mclean Indus., Inc.*, 87 B.R. at 834.  Of course, these factors have been

considered by the Court and were factored into the eight previous extensions of

exclusivity.  They no longer constitute cause for another extension.

In the Motion, Debtors plead that this case is large and complex, and point to

spurious indicators of "progress."  Any progress is illusory and virtually

undetectable by any objective observer.  Debtors further contend that no plan may

be confirmed, no matter who might propose it, absent a successful resolution of an

estimation hearing along the lines of that advocated by them.  Motion at 9.  This is

misdirection.  If Debtors approached the plan process in good faith, a compromise

could be negotiated without awaiting the resolution of the estimation process, or

else the estimation could continue alongside a plan process in which other parties in

interest have the right to propose competing plans.

Debtors also claim to fear harm to their businesses in the absence of a

further extension of the Exclusivity Periods, as a result of the uncertainty caused by

the prospect of competing plans.  Motion at 10.  In reality, the solution to that

problem lies in Grace's hands:  it can stop attacking its creditors at every

opportunity, and seek a more consensual resolution of this case.

Almost every one of the nine factors listed above weighs heavily ***against*** yet

another extension of the Exclusivity Periods.  First, although the case is large and

complex, this has no bearing upon the lack of tangible progress.  Debtors'

reorganizational inertia is, as noted, attributable to Debtors' combative posture

towards its largest creditor constituencies.  Second, Debtors have shown no

willingness to negotiate in a constructive manner with their tort creditors.  They

have shown no inclination to prepare adequate information for disclosure of their

irredeemably flawed plan.  Consideration of the third and fourth factors also

provides no basis for an extension.  Debtors' combative approach to their tort

creditors and continuing attempts to press their unique approach to § 524(g)

evidence a lack of good faith progress toward a consensual or even a confirmable

plan.  Debtors may or may not be paying their debts as they become due, but seem

perfectly content to let the victims of their tortious activities languish without compensation during the interminable pendency of this bankruptcy.

The fifth factor – whether there is a reasonable prospect for a viable plan – is extremely problematic in this case.  The plan filed a year ago cannot be confirmed – a fact to which Debtors seem indifferent (it will assuredly fail to garner the 75% asbestos personal injury creditor support required for confirmation of a § 524(g) plan).  This issue is discussed more fully in the next section of this response. In addition, Debtors have eschewed meaningful negotiations with creditors (the sixth factor), with productive dialogue made impossible by the confrontational tenor of Debtors' approach to their reorganizations.  The seventh factor asks how long the case has been pending.  Grace's case has been pending for more than **4½ years** – fully four years beyond the statutorily provided Exclusivity Periods – and the requested extension would draw it out another two or three years (with little prospect of a confirmable plan).  Debtors clearly seek to gain strategic advantage over their creditors through yet another extension of exclusivity.  Each additional delay brings more pressure to bear on tort victims who look to the Debtors for just and fair compensation for their injuries, which is the harm sought to be avoided by consideration of the eighth factor.  Finally, this case does not involve the existence of unresolved contingencies.  In short, the Debtors fail to meet the heavy burden laid upon them for even a brief extension of the Exclusivity Period, let alone the lengthy protection from competing plans sought in the Motion.

**E.    If the Court were to grant a further extension of exclusivity, the additional time accorded Debtors should be limited to a short period of weeks.**

The interests of the creditors and the estates will be served best by denying the Motion in its entirety and allowing exclusivity to end now.  However, if the Court determines that any further extension is appropriate, it should not be on the scale that Debtors audaciously request: almost two more years, at which point this case will have been pending for over 6 years.[10]  It is not hard to imagine that there could be some slippage in the estimation timetable, and Debtors could retain exclusivity into 2008.  Such a lengthy extension of exclusivity is as unwarranted as it is unprecedented, and should not be countenanced by the Court, especially given Debtors' woefully inadequate showing of cause and the expression of congressional disapproval in BAPCPA.  If this Court is minded to grant a further extension of exclusivity, it should be short and tightly controlled – weeks rather than years.

## V.    A NEUTRAL PARTY SHOULD BE APPOINTED TO SUPERVISE THE PLAN NEGOTIATION PROCESS.

As demonstrated above, further extension of exclusivity is unwarranted.   If it is extended, however, the extension should be for a very short period and

---

[10]   The Motion seeks an extension of the Filing Exclusive Period "through and including the 90th day after a final order is issued in the estimation hearings" and an extension of the Solicitation Exclusive Period "through and including an additional 60 days thereafter."   Motion at 11. According to the Case Management Order for the Estimation of Asbestos Personal Injury Liabilities [Docket No. 9301] (the "Estimation CMO"), pre-trial motions in respect of the estimation proceeding are to be filed no later than August 1, 2006.  Estimation CMO at ¶ 14. Sometime thereafter, the hearing will take place, although any deadline specified in the Estimation CMO may be extended either by consent of the parties or order of this Court.  *Id.* at ¶ 18.   Assuming that the hearing takes place before the end of 2006, and this Court renders an opinion on estimation by the end of the first quarter of 2007, the Filing Exclusivity Period would be extended through June 2007 and the Solicitation Exclusivity Period will be extended through August 2007.  This amounts to an extension of exclusivity for a period just 3 months shy of a further 2 years.

appointment of a neutral party to supervise the plan negotiation process from this point forward may be advisable.

A.   **The current plan is not confirmable because it denies asbestos claimants the vote required under 524(g).**

Under § 524(g), a plan implementing a channeling injunction must establish a separate class or classes of claimants whose claims are to be addressed by a plan trust, and such class or classes must approve the plan by the affirmative vote of "at least 75 percent of those voting … ."  11 U.S.C.§ 524(g)(2)(B)(ii)(IV)(bb).  Debtors' current plan, however, attempts to disenfranchise asbestos claimants, asserting that all such creditors will be unimpaired and thus not entitled to vote under § 1126(f).  As demonstrated below, this is incorrect.

Debtor's tout that their plan will pay all asbestos claimants in full because the estimation proceeding currently underway will estimate the aggregate value of all asbestos claims and Debtors will contribute to the § 524(g) trust securities in the amount of the Court's estimate.[11]  Plan at §§ 3.1.6 - 3.1.8, 7.6.1(v) & (w).  As a result, Debtors contend that under § 1124(1), asbestos claimants are not impaired under the plan.  Debtors then argue that § 1126(f), a general statute applicable to all Chapter 11 cases, controls § 524(g), a specific statute applicable only in asbestos reorganizations.  Thus, Debtors posit that asbestos claimants – notwithstanding the provisions of § 524(g) – are  not entitled to vote because they are unimpaired.

---

[11]  A condition precedent to plan confirmation, however, is that the Court's estimate of Grace's asbestos liability is no greater than $1.43 billion for class 6 claims and $130 million for class 7 claims.  See Proposed Plan § 7.6.1(v).  Grace is obviously unwilling to commit its full resources to assuring that asbestos claimants are paid in full.  If $1.66 billion ultimately turns out to not be enough to pay all claimants 100% of their claims, there is no recourse against Grace under the plan.

Debtors' analysis ignores basic tenets of statutory construction. "[I]t is a commonplace of statutory construction that the specific governs the general." *Morales v. Trans World Airline, Inc.*, 504 U.S. 374, 384 (1992). "Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one." *Morton v. Mancari,* 417 U.S. 535, 550-51 (1973); *see also In re Cybridge Corporation,* 304 B.R. 681, 686 (Bankr. D. Del. 2004). Section 524(g) therefore, a specific statute addressing the requirements for a 524(g) injunction in bankruptcies involving asbestos creditors, controls and mandates that claimants have a vote on plans containing the trust provisions and injunctive relief authorized under that statute.

Even if Debtors were correct in their interpretation of the interaction of the two statutes, however, there is no question that asbestos claimants are impaired under the current plan. Debtors intend to fund their § 524(g) trust based upon the ruling of this Court in the estimation proceeding trial that currently appears set to occur sometime in the year 2007. However, the estimation proceeding is only a means of determining feasibility and is not intended to determine, and of course cannot determine, the actual total amount of all claims that may be asserted against, and allowed by, any plan trust. It is an estimation proceeding, not an allowance proceeding. In all likelihood the estimation will not be perfect, and some claims might not be paid 100 cents on the dollar. This is not a "pass through" plan. It is a § 524(g) plan that will channel all claims to a trust with limited resources. Debtors concede in their Disclosure Statement that the trust may not be able to pay

all of the claims that are submitted to it.[12]  The possibility of less than full payment therefore results in an impairment of the claimant's legal rights under § 1124(1).[13]

Either way, a favorable vote of 75% of asbestos claimants will be required to confirm a 524(g) plan in this case.  As there is little question that asbestos claimants will ***not*** approve the plan currently proposed by Debtors, which will substantially under-fund the plan trust, Debtors' plan is therefore unconfirmable. There is no reason to wait another year or two, after spending millions of dollars to litigate a multitude of issues and disputes that will inevitably arise in the estimation proceeding and elsewhere in this case, to have a vote on a plan that can not be approved.  This case requires an immediate course correction before more years are squandered at heavy cost to all parties.

### B.     The Court should appoint a neutral party to supervise the plan negotiation process.

Although Debtors would have the Court believe this case is on a streamlined path to confirmation, nothing is further from the truth.  This case is thoroughly mired in litigation and going nowhere.  Debtors' petition was filed in ***2001***.  Nearly five years later, and more than a year after Debtors filed their plan, the case is no

---

[12] In its disclosure statement Grace acknowledges that "the amount of Allowed Asbestos Claims could be significantly more than estimated by the Court" and that "[t]here is no guarantee that . . . the Asbestos Trust . . . will be able to pay all Allowed Asbestos Claims."  Disclosure Statement, p. 86.

[13] There are numerous other provisions of the plan itself that impair the claims of asbestos claimants.  For example, among other things (i) the delay of payment under the trust distribution procedures, (ii) requiring claimants to make an election of either a "Cash-Out" or "Litigation" option before knowing how their claims will be evaluated and (iii) the lack of interest payments on delayed payments of claims, would each alter the pre-existing "legal, equitable and contractual rights" of the claimants, resulting in the impairment of the claims under Section 1124.  11 U.S.C. §1124(1).  This list is not exhaustive.

closer to resolution than it was on the petition date.   The parties are at odds on every issue.  Every few weeks Debtors move this Court to approve another oppressive procedure (or one the Court has considered and rejected previously, such as a bar date) designed solely to eliminate participation by more asbestos creditors and skew the estimation proceeding in favor of Debtors' and their equity holders. Debtors persist in the mistaken belief that they can litigate their way into a § 524(g) plan over the vociferous objections of the very creditors § 524(g) is designed to protect.

In order to move this reorganization toward a consensual resolution and beyond the litigation campaign currently being waged by Debtors, the Court should appoint a neutral party to oversee the plan process from this point forward.  That person can be assigned the role of a trustee with limited powers or an examiner with expanded powers.  The title is not important.  But someone must be vested with power from this Court to take control of a process that is currently out of control.  The delay and expense in this case will increase exponentially without the intervention of an intermediary.

The appointment of a neutral with plan oversight powers is authorized by the Bankruptcy Code.  Section 1104 of the Code authorizes the Court to appoint a trustee for "cause, including … incompetence, or gross mismanagement of the affairs of the debtor … ." 11 U.S.C. §1104(a)(1).  In addition, the Court may appoint a trustee, or alternatively, an examiner, if "such appointment is in the interests of creditors, any equity security holders, and other interests of the estate … ."  11

U.S.C. §1104(a)(2) & (c)(1).  Subsection (a)(2) of § 1104 creates a flexible standard, exercisable in the Court's sole discretion, to remedy many different problems that may arise during a Chapter 11 case.  *In re Sharon Steel,* 871 F. 2d 1217, 1226-27 (3rd Cir. 1989).  A bankruptcy court may appoint a trustee under Subsection (a)(2) even where no "cause" exists under Subsection (a)(1).  *Id.*

Deep-seated conflict and animosity between a debtor and its creditors justifies the appointment of a trustee under Subsection (a)(2), and in fact has been held to constitute "cause" for the appointment under Subsection (a)(1).  *In re Marvel Entertainment Group, Inc,* 140 F. 3d. 463, 472-75 (3rd. Cir. 1998); *see also In re Cajun Elec. Power Corp.,*  74 F.3d 599, 600 (5th Cir.) (adopting on rehearing the opinion of the dissent in 69 F.3d at 751), *cert denied,* 519 U.S. 808 (1996).  Indeed, many courts have recognized that factors such as continued litigious behavior from a debtor, acrimony between the parties, a demonstrated inability to resolve matters cooperatively, and a lack of progress toward a consensual plan, are sufficient bases to appoint a trustee under Subsection (a)(2).  *See e.g., In re United States Mineral Prod. Co.*, 105 Fed. Appx. 428 (3rd Cir. 2004) (acrimony between debtor and asbestos creditors sufficient for appointment of trustee); *Marvel Entertainment Group,* 140 F. 3d. at 472-75 (litigious nature of case and acrimonious failure of cooperation between debtor and creditor rose to the level of "cause" under (a)(1) and was also basis for discretionary appointment of trustee under (a)(2)); *Cajun Elec. Power Corp.,* 74 F.3d at 600 (due to conflicts between owners and creditors, appointment of trustee was "only way effective way to pursue reorganization"); *Petit v. New*

*England Mortgage Services, Inc.,* 182 B.R. 64, 70 (Bankr. D. Me. 1995) (trustee appointed when "friction" between debtor and creditors had reached a "particular intensity" that was "complicating efforts to reorganize"); *In re The Bible Speaks*, 74 B.R. 511, 512 (Bankr. D. Mass. 1987) (animosity between debtor and committee that "threatene[d] to engulf … estate in costly and legalistic bickering over the entire range of the reorganization process" resulted in appointment of Chapter 11 trustee).

In the *United States Mineral* case, the Third Circuit recently affirmed the decision of the bankruptcy court to appoint a trustee under § 1104(a)(2) where the acrimony between the debtor and the creditor constituencies prevented progress toward a consensual plan. *In re United States Mineral Prod. Co.*, 105 Fed. Appx. 428 (3rd Cir. 2004). Proceedings in the case were marked by "contentious and acrimonious relationships among the parties," and the bankruptcy court grew weary of the lack of progress toward plan confirmation. *Id.*, at 430-431. After several extensions of exclusivity, the court denied a further extension and *sua sponte* appointed a trustee to prepare a plan and move it toward confirmation. *Id.* The Third Circuit found such action to be a proper exercise of the bankruptcy court's discretion under Subsection 1104(a)(2).[14] *Id.*, at 431. As this court is well aware, after the appointment of a trustee in that case, an agreement on a consensual plan was in fact reached, and it was recently confirmed.

---

[14] The Third Circuit found that a sufficient evidentiary basis existed for the *sua sponte* action of the bankruptcy court because "a bankruptcy judge has broad discretion to take judicial notice of the entire file" in making an appointment under Subsection 1104(a)(2).

Similarly here, something must be done to move this case toward conclusion. Without the appointment of a neutral, the litigation and acrimony will fester and no progress will be made.  The current plan will be disapproved – perhaps many years hence and after the expenditure of substantial effort and significant expense – and the parties will be back at square one.  The Tort Victims' Law Firms are not seeking the appointment of a trustee for all purposes, only to take control of the plan process.  Alternatively, an examiner with expanded powers to exercise some control over the plan process could be appointed.[15]  Under § 1106 the Court may expand the powers of an examiner to perform "any other duties of the trustee that the court orders the debtor in possession not to perform."  11 U.S.C. § 1106(b).  An examiner could be appointed in this case to prepare and negotiate a consensual plan for the Debtors, thereby avoiding what will otherwise be an inevitable continuation of the counterproductive litigation that has been the hallmark of this case to date.[16]

## V.    CONCLUSION

A ninth extension of exclusivity is not warranted here, and in fact will only serve to further distance the parties and delay cooperative efforts toward a

---

[15] "If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, … the court shall appoint an examiner … if – (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate."  11 U.S.C. § 1104(c)(1).

[16] The appointment of an examiner to control some aspect of the plan process has been used in other mass tort bankruptcies.  Some courts have coupled the extension of exclusivity with the appointment of an examiner to assist the parties in resolving their differences.  *See., e.g., In re Keene Corp.*, 188 B.R. 903, 912 n. 11 (Bankr. S.D.N.Y. 1995) ("Following an evidentiary hearing in connection with Keene's motion to extend exclusivity, we appointed an examiner to supervise plan negotiations and report back to the Court.  To ensure that supervised negotiations took place, we directed the parties to meet every Thursday afternoon from at least 2:00 p.m. to 5:00 p.m., and gave them the opportunity to meet more frequently.  [The examiner] was able to bring about the negotiation of the consensual plan.")

consensual plan. Debtors and their asbestos creditors are at loggerheads. Grace

wants to litigate its way through Chapter 11 and seems uninterested in formulating

a consensual plan. The Plan is not confirmable in its present form, because it

denies asbestos claimants the right of the vote required under § 524(g). Unless

something is done to set this case back on a constructive course, several more years

will pass without any real progress made toward a plan of reorganization.

WHEREFORE, for the foregoing reasons, Debtors' Motion should be, in all

things, denied; alternatively, any extension of exclusivity granted should be limited

to 60 days; and this Court should appoint a neutral individual as plan trustee or

examiner to oversee negotiations towards a consensual Plan of Reorganization; and

grant such other and further relief to which the Tort Victims' Law Firms may be

entitled.


Dated: December 2, 2005              Sander L. Esserman
                                     Van J. Hooker
                                     David A. Klingler
                                     David J. Parsons
                                     **STUTZMAN, BROMBERG,**
                                     **ESSERMAN & PLIFKA,**
                                     **A Professional Corporation**
                                     2323 Bryan Street, Suite 2200
                                     Dallas, Texas 75201
                                     Telephone:  (214) 969-4900
                                     Facsimile:   (214) 969-4999

                                     **COUNSEL FOR**
                                     **THE TORT VICTIMS LAW FIRMS**

/s/ Kathleen M. Miller
Kathleen M. Miller (ID no. 2898)
**SMITH, KATZENSTEIN & FURLOW, LLP**
The Corporate Plaza
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, Delaware 19899 (Courier 19801)
Telephone:  (302) 652-8400
Facsimile:   (302) 654-8405
E-mail:   KMM@skfdelaware.com

**LOCAL COUNSEL FOR
ENVIRONMENTAL LITIGATION GROUP,
P.C., and REAUD, MORGAN & QUINN,
INC.**

/s/ Daniel K. Hogan
Daniel K. Hogan (ID no. 2814)
**THE HOGAN FIRM**
1311 Delaware Avenue
Wilmington, Delaware 19806
Telephone:  (302) 656-7540
Facsimile:   (302) 656-7599
E-mail:   dkhogan@dkhogan.com

**LOCAL COUNSEL FOR BARON & BUDD,
P.C.; THE LAW OFFICES OF PETER G.
ANGELOS, P.C.; PROVOST & UMPHREY,
LLP; SILBER PEARLMAN, LLP; and
SIMMONSCOOPER, LLC**