# Exhibit A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  | . |  |
|---|---|---|
| IN RE: | . | Chapter 11 |
|  | . |  |
| W.R. Grace & Co., et al., | . |  |
|  | . |  |
| Debtor(s). | . | Bankruptcy #01-01139 (JKF) |

..........................................................

Wilmington, DE
November 14, 2005
11:30 a.m.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For The Debtor(s):              Janet S. Baer, Esq.
                                Kirkland & Ellis, LLP
                                200 E. Randolph Drive
                                Chicago, IL 60601

                                Barbara H. Harding, Esq.
                                Kirkland & Ellis, LLP
                                655 Fifteenth Street, N.W.
                                Washington, DC 20005

                                Michelle H. Browdy, Esq.
                                Kirkland & Ellis, LLP
                                200 E. Randolph Drive
                                Chicago, IL 60601

                                Salvatore Bianca, Esq.
                                Kirkland & Ellis, LLP
                                200 E. Randolph Drive
                                Chicago, IL 60601

                                James O'Neill, Esq.
                                Pachulski, Stang, Ziehl,
                                Young, Jones & Weintraub
                                919 North Market Street
                                Wilmington, DE 19801

```
                                  Mark Shelnitz, Esq.
                                  In-house Counsel
                                  W.R. Grace & Company

                                  Will Sparks, Esq.
                                  In-house Counsel
                                  W.R. Grace & Company

For The New Jersey Dept.:         Edward Devine, Esq.
of Law & Public Safety            Office of the Attorney General
                                  Hughes Justice Complex-CN 093
                                  Trenton, NJ

                                  John F. Dickinson, Jr., Esq.
                                  Office of the Attorney General
                                  Hughes Justice Complex-CN 093
                                  Trenton, NJ

For Sealed Air Corporation:       Mark Chehi, Esq.
                                  Skadden Arps
                                  One Rodney Square
                                  Wilmington, DE 19801

For UCC:                          Kenneth Pasquale, Esq.
                                  Stroock Stroock & Lavan, LLP
                                  180 Maiden Lane
                                  New York, NY 10038

For Asbestos PI Committee,:       Mark T. Hurford, Esq.
The Eaves Law Firm                Campbell & Levine, LLC
                                  800 North King St.-Ste. 300
                                  Wilmington, DE 19801

For Official Committee of:        Theodore J. Tacconelli, Esq.
Asbestos Property Damage          Ferry, Joseph & Pearce, PA
Claimants                         824 Market Street
                                  Wilmington, DE 19899

                                  Scott L. Baena, Esq.
                                  Bilzin Sumberg Baena Price
                                  & Axelrod, LLP
                                  200 S. Biscayne Blvd. -Ste. 2500
                                  Miami, FL 33131

                                  Allyn Danzeisen, Esq.
                                  Bilzin Sumberg Baena Price
                                  & Axelrod, LLP
                                  200 S. Biscayne Blvd. -Ste. 2500
                                  Miami, FL 33131
```

                              Jay Sakalo, Esq.
                              Bilzin Sumberg Baena Price
                              & Axelrod, LLP
                              200 S. Biscayne Blvd.-Ste. 2500
                              Miami, FL 33131

For Special Counsel to:       Martin Dies, Esq.
PD Committee                  Dies Henderson & Carona
                              1009 West Green
                              Orange, TX 77630

For Equity Security Holders:  Gary M. Becker, Esq.
Committee                     Kramer Levin Naftalis
                              & Frankel, LLP
                              919 Third Ave.
                                New York, NY 10022

For D.K. Acquisition:         Jennifer L. Scoliard, Esq.
                              Klehr Harrison Harvey
                              Branzburg & Ellers, LLP
                              Mellon Bank Center
                              919 Market St.-Ste. 1000
                              Wilmington, DE 19801

For ACE:                      Marc Casarino, Esq.
                              White & Williams, LLP
                              824 N. Market St.-Ste. 902
                              Wilmington, DE 19899

For Bear Stearns:             John Weiss, Esq.
                              Latham & Watkins, LLP
                              885 Third Avenue-Ste. 1000
                              New York, NY 10022

For Asbestos Claimants:       Peter Lockwood, Esq.
Committee                     Caplin & Drysdale, Chartered
                              One Thomas Circle, N.W.
                              Washington, DC 20005

For State of Montana:         Francis A. Monaco, Jr., Esq.
and Canada                    Monzack & Monaco, PA
                              Ste. 400
                              1201 North Orange Street
                              Wilmington, DE 19801

For C.N.A. Insurance:         Daniel M. Glosband, Esq.
                              Goodwin Procter, LLP
                              Exchange Place
                              Boston, MA 02109

4

| | |
|---|---|
| For Lloyds of London &:<br>Certain London Market<br>Companies | Brenda DiLuigi, Esq.<br>Linklaters<br>1345 Ave. of the Americas<br>New York, NY 10105 |
| For The Futures:<br>Representative | Richard Wyron, Esq.<br>Swidler Berlin, LLP<br>The Washington Harbour<br>300 K. Street, N.W.-Ste. 300<br>Washington, DC 20007 |
| For Federal Insurance: | David Liebman, Esq.<br>Cozen O'Connor<br>1900 Market St.<br>Philadelphia, PA 19103 |
| For Anderson and California:<br>Claimants | Daniel Speights, Esq.<br>Speights & Runyan<br>200 Jackson Ave. East<br>Hampton, SC 29924 |
| For Macerich Fresno Limited:<br>Partnership | Amanda Winfree, Esq.<br>Ashby & Geddes<br>222 Delaware ave.-17th Fl.<br>Wilmington, DE 19899 |
| For Baron & Budd, Reaud:<br>Morgan & Quinn | Sander L. Esserman, Esq.<br>Stutzman Bromberg Esserman<br>& Pfilka, PC<br>2323 Bryan St.-Ste. 2200<br>Dallas, TX 75201 |
| | Steven A. Felsenthal, Esq.<br>Stutzman Bromberg Esserman<br>& Pfilka, PC<br>2323 Bryan St.-Ste. 2200<br>Dallas, TX 75201 |
| For the City of:<br>Philadelphia | Joseph DiGiuseppe, Esq.<br>City of Philadelphia Law Dept.<br>1515 Arch St., 15th Floor<br>Philadelphia, PA 19103 |
| For Acting U.S. Trustee:<br>(Roberta A. DeAngelis) | David Klauder, Esq.<br>U.S. Trustee's Office<br>844 King Street-Ste. 2313<br>Lock Box 35<br>Wilmington, DE 19801 |

5

(Via telephone)

For the Debtors:                      David M. Bernick, Esq.
                                      Kirkland & Ellis, LLP
                                      200 E. Randolph Drive
                                      Chicago, IL 60601

                                      Lori Sinanyan, Esq.
                                      Kirkland & Ellis
                                      777 S. Figueroa Street
                                      Los Angeles, CA 90017

                                      David Siegel, Esq.
                                      In-House counsel
                                      W.R. Grace & Company

                                      Paul J. Norris, Esq.
                                      In-House Counsel
                                      W.R. Grace & Company

                                      Jay Hughes, Esq.
                                      In-house Counsel
                                      W.R. Grace & Company

For PD Claimants:                     Matthew I. Kramer, Esq.
                                      Bilzin Sumberg Baena Price
                                      & Axelrod, LLP
                                      200 S. Biscayne Blvd. -Ste. 2500
                                      Miami, FL 33131

For Baron & Budd, Reaud:              Van J. Hooker, Esq.
                                      Stutzman Bromberg Esserman
                                      & Pfilka, PC
                                      2323 Bryan St.-Ste. 2200
                                      Dallas, TX 75201

                                      David J. Parsons, Esq.
                                      Stutzman Bromberg Esserman
                                      & Pfilka, PC
                                      2323 Bryan St.-Ste. 2200
                                      Dallas, TX 75201

For AIG Member Companies:             Michael S. Davis, Esq.
                                      Zeichner Ellman & Krause, LLP
                                      575 Lexington Ave.
                                      New York, NY 10022

(Via Telephone)

For AIG Member Companies:    Michael Infalco, Esq.
                             Zeichner Ellman & Krause, LLP
                             575 Lexington Ave.
                             New York, NY 10022

For Futures Claim:           Monique Almy, Esq.
Representative               Swidler Berlin, LLP
                             The Washington Harbour
                             3000 K. Street, N.W.-Ste. 300
                             Washington, DC 20007

                             Roger Frankel, Esq.
                             Swidler Berlin, LLP
                             The Washington Harbour
                             300 K. Street, N.W.-Ste. 300
                             Washington, DC 20007

For Financial Advisor:       Joseph Radecki, Esq.
to FCR                       Swidler Berlin, LLP
                             The Chrysler Building
                             405 Lexington Ave.
                             New York, NY 10174

                             Jonathan Brownstein, Esq.
                             Swidler Berlin, LLP
                             The Chrysler Building
                             405 Lexington Ave.
                             New York, NY 10174

For Royal Insurance:         Sarah Edwards, Esq.
                             Wilson Elser Moskowitz
                             Edelman & Dicker, LLP
                             3 Gannett Drive
                             White Plains, NY 10604

For Princeton University:    Edward J. Westbrook, Esq.
                             Richardson, Patrick, Westbrook
                             & Brickman, LLC
                             174 E. Bay Street
                             Charleston, SC 29401

For Continental Casualty:    Elizabeth M. DiCristofaro, Esq.
Ins.                         Ford Marrin Esposito Witmeyer
                             & Gleser, LLP
                             Wall Street Plaza
                             New York, NY 10005

(Via Telephone)

For Allstate Insurance Co.:          Andrew K. Craig, Esq.
                                     Cuyler Burk, LLP
                                     Parsippany Corporate Center
                                     Four Century Drive
                                     Parsippany, NY 07054

For Prudential                       Curtis Plaza, Esq.
                                     Riker Danzig Scherer Hyland
                                     & Peretti
                                     Headquarters Plaza
                                     One Speedwell Ave.
                                     Morristown, NJ 07962

For Property Damage:                 Darrell W. Scott, Esq.
Claimants                            Lukins & Annis, PS
                                     717 W. Sprague Ave.-Ste. 1600
                                     Spokane, WA 99201

For The Asbestos Claimants:          Robert Horkovich, Esq.
Committee                            Anderson Kill & Olick, P.C.
                                     1251 Avenue of the Americas
                                     New York, NY 10020

For Libby Claimants:                 Christopher M. Candon, Esq.
                                     Cohn Whitesell & Goldberg, LLP
                                     101 Arch Street
                                     Boston, MA 02110

For Scotts Company:                  Tiffany S. Cobb, Esq.
                                     Vorys Sater Seymour
                                     & Pease, LLP
                                     52 East Gay Street
                                     Columbus, OH 43216

For Sonoma County:                   Mark Bartholomew, Esq.
                                     Sonoma County Counsel

For Murray Capital:                  Marti Murray
Management                           Murray Capital Management

                                     Scott Beechert
                                     Murray Capital Management

8

(Via Telephone)

| | |
|---|---|
| For Macerich Freson:<br>Limited Partners | Gerald George, Esq.<br>Pillsbury Winthrop Shaw<br>Pittman, LLP<br>50 Fremont Street<br>San Francisco, CA 94105 |
| For Financial Advisor,:<br>The Blackstone Group | John O'Connell<br>The Blackstone Group |
| Claimant, State of:<br>California Dept. of<br>General Services | Steven Mandelsberg, Esq.<br>Hahn & Hessen, LLP<br>488 Madison Avenue<br>14th & 15th Floor<br>New York, NY 10022 |
| For USG Corporation: | Mary A. Martin<br>USG Corporation |
| For Labor Union Local 310: | Cara Santosuoss<br>Ratatori Bender Gragel Stoper<br>& Alex |
| Audio Operator: | Brandon J. McCarthy |
| Transcribing Firm: | Writer's Cramp, Inc.<br>6 Norton Rd.<br>Monmouth Jct., NJ 08852<br>732-329-0191 |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

THE COURT:  Good morning.  Please be seated.
Everything working now?  Everything is working?  Okay.  This is
the matter of W.R. Grace, 01-1139.  The call-in list I have --

(Telephone interruption)

UNIDENTIFIED SPEAKER:  Good morning.

THE COURT:  Good morning.  Would you all please put
your mute buttons on.  It sounds like somebody's typing or
something in the background.  And I will read your names -- the
list of names I have for the record.  David Siegel, Paul
Norris, Elizabeth DeCristofaro, Edward Westbrook, Curtis Plaza,
Darrell Scott, Matthew Kramer, Robert Horkovich, Tiffany Cobb,
Jay Hughes, Christopher Candon, Mark Bartholomew, Sarah
Edwards, Michael Davis, Marti Murray, Michael Infalco, Scott
Beechert, Gerald George, John O'Connell, Steven Mandelsberg,
Mary Martin, Van Hooker, David Parsons, David Bernick, Lori
Sinanyan, Cara Santosuoss, S-A-N-T-O-S-U-O-S-S,  Jennifer
Scoliard, Andrew Craig, Roger Frankel, Monique Almy, Jonathan
Brownstein, Joseph Radecki.  Good morning.

MS. BAER:  Good morning, Your Honor, Janet Baer on
behalf of the Debtors.  Your Honor, agenda item #1 is the
Debtor's Motion to Approve the Settlement with Intercat.  The
parties are still negotiating that document and we ask that
that matter be continued to the December 19th hearing.

THE COURT:  All right.

MS. BAER:  Your Honor, agenda item #2 is the Debtors'

Application for the Authority to retain Bear Stearns.

        THE COURT:  May I interrupt you second?

        MS. BAER:  Sure.

        THE COURT:  The parties on the phone, please put your mute buttons on.  I can still hear somebody.  I'm sorry, Ms. Baer, go ahead.

        MS. BAER:  No problem.  Your Honor, the Debtor is asking to retain Bear Stearns as a financial advisor for one specific transaction and one transaction only.  They are a potential bidder in purchasing a specialty chemicals business.  The business itself, Your Honor, would be a $60 million purchase and that would come to Your Honor on a separate motion.  All the Debtor is asking for today is to ask to retain Bear Stearns to assist them in that transaction.  The Debtors would like to use Bear Stearns because Bear Stearns knows the seller.  They've had a relationship with the seller and know the seller's business and that respect can be, and have in fact, been very helpful in assisting the Debtors in this transaction.

        Again, we're not attempting to retain Bear Stearns for any other transaction other than this transaction.  We do not believe Bear Stearns is a professional, Your Honor.  We believe that under 363 you clearly could authorize the Debtor to expend the funds to retain Bear Stearns to assist in this transaction.  In fact, Your Honor, we believe that it may not even be an out

of the ordinary course transaction, it may be something the
Debtors could just do.  But we came here because we wanted
everybody to know what we were doing.  We came here, frankly,
for a comfort order so that we knew that Bear Stearns could
move forward, assist the Debtor and get paid for assisting the
Debtor.

Under these circumstances, Your Honor, we do not believe
the U.S. Trustee's motion really is an impediment.  The U.S.
Trustee filed a motion -- or, I'm sorry, a response indicating
that if we are seeking to retain Bear Stearns as a professional
under Section 327, they are not disinterested and can not be
retained.  The U.S. Trustee is taking the position that Bear
Stearns has an actual conflict.  The Bear Stearns trading desk,
Your Honor, owns some unsecured debt and some equity in the
company.  They have established ethical walls which the Debtors
and Bear Stearns believed were adequate and under case law
could in fact permit this Court in its discretion to retain
them as a 327 professional.  However, Your Honor, we really
don't need to get there.  Bear Stearns is not a professional
under the First Merchants Acceptance Corporation Test.

THE COURT:  Well, then do you want to withdrawal the
motion?

MS. BAER:  What we'd like to do, Your Honor, is ask
for the authority under Section 363 to retain Bear Stearns,
rather than under 327, and ask Your Honor for permission to go

12

forward and obtain a comfort order under Section 363 retaining
Bear Stearns.

THE COURT:  But even under 363, that would be because
you're essentially using Bear Stearns as, not necessarily a
broker, but an agent --

MS. BAER:  As a --

THE COURT:  -- to negotiate the transaction?

MS. BAER:  They're actually a -- they are an
investment banking firm.  It's essentially like an agent and
they are assisting by reviewing the due diligence with the
Debtors and assisting in understanding the business.

THE COURT:  Okay.  Number one, this motion was not
filed in time to get on to this agenda, so I -- and I have no
Motion to Shorten, and I believe my staff contacted somebody to
advise about that.  Number two, to the extent that it's a --
probably something that needs to be addressed, I would have
granted the Motion to Shorten, so I will permit it to go
forward, but nonetheless, that's what my staff tells me.  So
please, I want to get things back to the point where they are
filed on schedule to be heard for hearings.

MS. BAER:  Your Honor, I believe local counsel can
address this because it was submitted on time.

THE COURT:  That's -- it's okay.

MR. O'NEILL:  It was filed timely, Your Honor, and we
did talk with your Chambers about the timely filing.  So --

13

THE COURT:  It was filed on time?

MR. O'NEILL:  It was filed timely.  On the preliminary agenda the date of the filing was wrong.  It was fixed for the final agenda.

THE COURT:  All right.

MR. O'NEILL:  But the motion was filed timely.

THE COURT:  Okay, thank you.

MS. BAER:  Your Honor, we understand and we truly tried to adhere to the letter and the spirit of that order.

THE COURT:  I know and frankly, this case doesn't usually have those problems, which is why I didn't interrupt you at the beginning when I thought it was still a problem, but thank you for the correction.  Okay, on behalf of the U.S. Trustee?

(Telephone interruption)

THE COURT:  People on the phone, please, if you don't put your mute buttons on, I'm going to disconnect the call. Please, I don't want to hear the paper clicks and the typing. Please put your mute buttons on.  Good morning.

MR. KLAUDER:  Good morning, Your Honor, David Klauder for the United States Trustee's Office.  I guess I have to ask Your Honor for some guidance.  What's before Your Honor is a 327 Application.

THE COURT:  Yes.

MR. KLAUDER:  Bear Stearns to be retained as a

14

professional.  I think our argument is quite clear there that they are a Creditor and therefore, under Price Waterhouse, they cannot be retained under 327.  It now sounds like -- and I've spoken to the Debtors, we had some discussions about this before, but they're doing a 180 here and saying, "No, they're not a professional.  Can we do it under 363?"  Our position would be, yes, they are a professional under the First Merchants Test.  Now, if Your Honor wants to get through that -- go through that analysis now, I'm happy to do so, but that really is not before Your Honor at this juncture.

THE COURT:  Well, I guess they've made an oral motion and the Court can hear oral motions, provided that appropriate Parties-In-Interest are notified.  And I could state for the record that this a large Courtroom that is at least b full, and although I didn't take entries of appearance of those of you in the Courtroom, we could do it for purposes of this record, but all, from my visual observation, constituent parties who have been taking an active role in this case are represented by counsel in the Courtroom.  So I think we could go forward on that basis if you want to address the 363 issue.

MR. KLAUDER:  That's fine, Your Honor, and it comes down to is Bear Stearns a professional, which would be -- which would implicate the First Merchants Test that is widely used in this District.  I would say first, Your Honor, it's the U.S. Trustee's position dealing with a professional that -- and I

15

take this from Bankruptcy Judge Fox's opinion in Metropolitan
Hospital, which is at 119 BR 910, that a professional is anyone
who assists the Debtor in operating the business in a prudent
and competent fashion, i.e. assist the Debtor-in-Possession in
its duties under the Bankruptcy Code and that that particular
entity needs to be retained.

Getting to the First Merchants Analysis, there are six
factors, and going through those, the number one factor is
whether the entity controls, manages, administers, invests,
purchases or sells assets significant to the Debtor's
reorganization.  I guess from our perspective, this transaction
-- which we don't know much about, we know it's a potential
purchase of the asset.  It has to be significant to the
Debtor's business.  Why would the Debtor be entering into the
transaction?  Then we would argue ultimately that would be
significant to the Debtor's reorganization.  And Bear Stearns
is involved in helping the Debtor consummate the transaction,
therefore, it would be our position that they are a
professional, when looking at it, under that circumstance; that
these are assets significant to the Debtor's reorganization and
Bear is intimately involved in helping facilitate that
transaction.

The second factor is whether the entity is involved in
negotiating the Plan terms.  I don't think we can argue that
they are, where there's been nothing brought in front of us

that they are gonna be involved in the Plan.  But again, I would go back to the first -- the analysis under the first part.  These are significant assets and Bear is gonna be intimately involved in consummating that transaction.

The third factor is whether the employment is directly related to the type of work carried out by the Debtor or the routine maintenance of the Debtor's operations.  Again, we don't know much about the transaction, but I'm not so sure that we can consider this a routine transaction in the Debtor's business.  It's a purchase of a competing business.  I'm not so -- the Debtor is not involved in the routine aspects of its business, in purchasing businesses.  It obviously has some significance.  The Debtor wants to move forward with it, so I would -- we would argue it's not a routine matter.  It's not the ordinary operations of the business.

The fourth factor is whether the entity is given discretion or autonomy to exercise their professional judgment.  I think clearly Bear is gonna have that here.  They are being hired for that reason.  Their professional judgment is key here and I think that clearly has been satisfied.

The extent of the -- the fifth factor is the extent of the entities involvement in the administration of the Debtor's estate.  No, they are not the estate's financial advisor, I think that's clear.  But again, they are providing much needed skill and expertise on a significant transaction to the

Debtor's business and, ultimately, the Debtor's reorganization.

THE COURT:  Okay, is the fact that there is apparently an ethical wall set up between the trading desk and whatever arm of Bear Stearns would be assisting the Debtor and looking at both the financial and other business aspects of this transaction and how it would fit with the Debtor's business to engage it a sufficient way around the 363 issue?

MR. KLAUDER:  Well, I don't think so.  I don't think that gets into the professional analysis, Your Honor.  That would be a factor under 327, and we considered that, but under Price Waterhouse, I don't -- that doesn't matter.  The entity is a Creditor, the entity is an equity holder.  That doesn't matter about ethical walls.  They are not disinterested, therefore, they cannot be retained under 327.  Under a 363 analysis, I don't -- or under professional -- whether it is a professional analysis, I don't think that factors in at all.

THE COURT:  All right, so, the U.S. Trustee's position is if you're a professional, you can't be retained under anything other than 327?

MR. KLAUDER:  Correct.

THE COURT:  Okay.

MR. KLAUDER:  The final factor, Your Honor, the sixth and final factor is when a -- whether the entity services involves some degree of special knowledge or skill such that the entity can be considered a professional within the ordinary

meaning of the term.  This is kind of the "if it looks and acts like a professional, it must be a professional."  At least that's the way I would put it in front of Your Honor.  Bear Stearns certainly puts themself out in the market as a professional.  I think under the ordinary meaning of the term, Bear Stearns is a professional, as it were, so I think that that factor has been satisfied as well.

So with all that, Your Honor, I think Bear Stearns -- it's -- I understand it's one transaction, but the -- you kind of have to go through this analysis.  It's a significant transaction.  You can't get around 327 here.  They're trying to get away from it and go a different route, and I don't think the Code or the law provides that.  Unfortunately, they are a Creditor, they are an equity holder and they're not allowed to be retained.  So you can't just kind of shoehorn it a different way here.  And therefore, from our perspective, they cannot be involved in the transaction.

THE COURT:  All right.

MR. KLAUDER:  Thank you.

THE COURT:  Thank you.  Yes, sir, good morning.

MR. WEISS:  Good morning, Your Honor, John Weiss of Latham & Watkins on behalf of Bear Stearns.  I just wanted to point out a few facts that I think are relevant here, and also frankly, to correct the record as well.  We have engaged the U.S. Trustee in discussions for some time and very much

appreciate the Trustee's speaking with us about this, and the
Trustee was aware of the fact that we were going to talk to
Your Honor about 363 today.

I think it's important to point out that the transaction
that we're dealing with here is not the sale transaction -- or
the -- rather, the purchase transaction.  It's not the purchase
of the specialty chemical business.  What we're dealing with
here is a letter of understanding between Bear Stearns and the
Debtors that involves a nominal fee, really a de minimis fee in
the context of these cases.  In fact, the fee was originally
listed as $1.25 million.  That fee actually would be reduced to
$1 million in agreement with the Official Committee of
Unsecured Creditors in this case.  So this is a $1 million
issue, Your Honor, to be considered here.

Bear Stearns has been working with the Debtors with
respect to this transaction for some time.  And when you look
at this I think that you do -- were correct to focus on the
First Merchants Factors, and I would actually focus on certain
factors that the U.S. Trustee pointed out to reflect the fact
that Bear Stearns actually is not a professional under the
First Merchants Factors.  And really, particularly, the issue
here is that when you're looking at this transaction, a $1
million retention agreement, more or less, it's a de minimus
transaction and it really is wholly unrelated to what happens
ultimately in these cases with respect to a Plan of

Reorganization.  This isn't a situation where Bear Stearns is

to provide services that are intimately related to the

administration of the estates.  It's not a situation where Bear

Stearns is dealing even with an ultimate transaction that will

have any bearing on whether this estate is able to effectively

reorganize or not.  This is a situation where Bear Stearns is

assisting the Debtors and taking advantage of a very good

business opportunity.  And it's really as simple as that, and

that's why we come to Your Honor under 363.

Now, whether Your Honor determines that this is a -- that

Bear Stearns is a professional or not a professional, in fact,

there actually is authority for Your Honor having discretion

under 363 to allow the retention of Bear Stearns, very recent

authority out of the Southern District of New York in the <u>Enron</u>

case.  The District Court actually allowed the retention of a

special counsel and essentially makes the statement to the

effect that {quote}, "The authorization of certain types of

payments under 363(b) is not prohibited simply because there is

another section to the Bankruptcy Code related to the same type

of payment."  And that -- there the Court was talking about

327(e).  So there is discretion here for Your Honor to

authorize this under 363, and we would ask that Your Honor do

so to enable us to go forward.

THE COURT:  Well, the special counsel provisions were

somewhat different.  I don't -- I mean, I -- I'm not familiar

with that aspect of the Enron case.  I don't know why the Court

would go to 363(b) when you've got 327(e).  I mean --

          MR. WEISS:  Well, there was a question as to the basis

for retention because of the nature of the services to be

provided, Your Honor.

          THE COURT:  Well, I -- okay, I don't know how that

fits into this analysis because if it's a special counsel issue

and you meet 327(e), I don't even think you need to take on the

proposition of 363(b).  But I -- but Bear Stearns is not being

asked to provide legal advice, correct?

          MR. WEISS:  Correct.

          THE COURT:  You're being asked to provide financial

advice of some sort in terms of, as I understand it, figuring

out whether this aspect -- this sale would be a good, I'll use

the word fit, for the Debtor's business?

          MR. WEISS:  Correct, Your Honor.  I -- you know, I

think that when you look at the transaction at hand here and

you apply sort of the vertical and horizontal tests that are

controlling in this Circuit with respect to whether this is

just purely an ordinary course of business transaction, I think

that you come down and you get to where we need to get here,

which is that this is an ordinary course of business

transaction.  I mean, industries of this size or companies of

this size and Bear Stearns engage in these types of engagements

all the time.

THE COURT:  Well, if that's the case, then I don't need to do an order.

MR. WEISS:  True, Your Honor, except --

THE COURT:  In fact, I probably can't do an order.

MR. WEISS:  Except that the United States Trustee has questioned whether, in fact, this is an ordinary course of business transaction.  So in light of that questioning, Bear Stearns can't go forward with providing services not knowing the --

THE COURT:  Well, look --

MR. WEISS:  -- ultimate result.

THE COURT:  -- it doesn't seem like an ordinary course of business transaction.  I appreciate the fact that businesses do from time to time merge or purchase other businesses and so forth, but Grace is not in the business of purchasing other businesses for some purpose.  And so although this may be an expansion or -- I'll use that word in a loose sense -- of Grace's business, I don't know that that makes it in the ordinary course.  It's a pretty significant transaction and -- but what would be in the ordinary course is that the Debtor, in connection with carrying out this transaction, does have to do due diligence and hire somebody to assist it in the course of doing that due diligence, and that, I would say, is in the ordinary course of investigating this transaction.  So I appreciate the fact that the Debtor needs the assistance.  The

issue is whether Bear is conflicted out by virtue of being a
stock holder in the Debtor.

MR. WEISS:  Well, and I think Your Honor points to the
exact distinction that we stress here, which is the distinction
between the two -- you know, the two transactions; in other
words, the engagement transaction versus the purchase
transaction.  We would say that Your Honor can authorize Bear
Stearns to go forward and can authorize payment to Bear Stearns
because it's not -- this wouldn't be a situation where we're
dealing with 327 and disinterestedness.

THE COURT:  But ultimately, isn't what Bear is being
asked to do for the Debtor is give the Debtor the financial
information that's going to let the Debtor's Board decide
whether or not to enter into this transaction?  So, I mean, I
don't know how you can say you're not involved ultimately in
the transaction.  Isn't that the purpose by which you're being
asked to give financial information?

MR. WEISS:  That is the purchase -- that is the
purpose for the types of services that Bear is to provide, but
the test that you should be -- the transaction that you should
be applying the ordinary course of business test to is the
contract at hand.  There's no telling whether there will
ultimately be a purchase in this instance, Your Honor.  Bear
Stearns may not get paid at all.  It's essentially a question
of can Bear Stearns get the comfort to go forward over the

coming months, knowing that they'll be essentially reimbursed

for their expenses and paid for their services that -- many of

which have already been provided.

THE COURT:  Well, the Debtor is not going to be happy

with this comment, but I'll ask it anyway.  If there is some

negotiation that considers Bear to be paid for whatever

services that are provided not keyed on the success of this

deal going forward, does that eliminate the U.S. Trustee's

objection?  Is part of the problem in considering Bear to be a

professional in this instance that fact that your compensation

depends on the outcome of the deal, because you're acting in

the nature of, not quite a broker, an agent.  I don't know what

else -- what other word to use.

MR. WEISS:  I'm not sure I understand exactly the

question.

THE COURT:  You said ultimately you may not get paid.

MR. WEISS:  That's true.  In other words, it's sort of

a completion fee-type situation.

THE COURT:  Right, which is what I'm asking, whether

that's the problem that the U.S. Trustee has, that your

compensation depends on the completion of the deal as opposed

to the fact that the Debtor is retaining you to give it some

financial advice about the transaction?

MR. WEISS:  I wouldn't want to speak for the United

States Trustee.  That's not a distinction that I've had --

personally had discussions with the United States Trustee that that's the specific item of concern there.

THE COURT:  Well, does it eliminate it if the deal is re-done at -- you know, I -- maybe it can be even a less expensive fee.  If you know you're going to get paid, there's no contingency aspect to it.  Does that eliminate it and make it more ordinary course, where the Debtor is simply hiring somebody to analyze a transaction and give it financial advice?

MR. WEISS:  Speaking personally, Your Honor, I don't think --

THE COURT:  No?

MR. WEISS:  -- that it would change anything because the ordinary course of business with these types of arrangements is, in fact, to get paid upon completion.

THE COURT:  Completion?

MR. WEISS:  Yes.

THE COURT:  Okay.

MR. WEISS:  That's been my personal experience, at least, in dealing with these, Your Honor.

THE COURT:  All right, thank you.  Ms. Baer?

MS. BAER:  Your Honor, just a couple final points. The status of the transaction, Your Honor, is that there was an auction proceeding that Bear Stearns assisted the Debtor in in putting together their bid.  The bid's been made.  It's down to two potential purchasers.  A letter of intent is due this week,

and then there'll be some more due diligence.  That's all Bear
Stearns is being asked to do is look over the letter of intent,
assist with the due diligence.  In that respect, Your Honor, it
is really ordinary course of business for the Debtor to hire
consultants to help them with various transactions.  It's a
dynamic company that buys and sells businesses.  It's a dynamic
company that does different kinds of transactions all the time,
in spite of the fact that we're in Chapter 11.  But we came
here, Your Honor, because we are, in fact, going to be paying
Bear Stearns a million dollars if this transaction is
completed.  We believe that that is an expenditure of funds
that was something we should bring to the attention of the
Court.  But under 363, Your Honor, you have the authority to
let us spend that money outside the ordinary course when, in
fact, it makes good business judgment.  Here, it does make good
business judgment.  They will assist us in a potential
transaction that can further the Debtor's business.  They're
not a professional.  There's no discretion involved here
whatsoever.  This potential merger or this potential sale is
not key to the Debtor's reorganization.  The Debtor's
reorganization will go forward whether or not it happens.  We
hope that it will help to the value of the business and the
value of the business helps everybody.  But it is truly just a
transaction in the Debtor's business versus -- and I mean the
retention of Bear Stearns is just a transaction in the Debtor's

business, the kinds of things they do.  It's different from the merger.

(Telephone interruption)

THE COURT:  People on the phone, say your names.

MR. HORKOVICH:  Robert Horkovich.

THE COURT:  Don't --

MS. ALMY:  Monique Almy.

THE COURT:  Folks, please, don't put your mute buttons -- don't -- put your mute buttons on, please, all of you and then say your names.

ALL:  (No verbal response).

THE COURT:  There is someone who still has not put a mute button on.  Are you using Court Call?  You're not using Court Call?

MS. BAER:  Yes, we're using Court Call.

THE COURT:  You are?  Okay, can the Court Call operator -- whoever it is --

OPERATOR:  I can mute all of their lines.  I just don't know when somebody needs to speak, you know -- who to open up lines.

THE COURT:  Well, can you detect who it is who's not putting the mute button on because we're still getting feedback here and that --

OPERATOR:  I just now did, yes.

THE COURT:  Okay, then disconnect that person, please.

OPERATOR:  Okay.

THE COURT:  Thank you.  Okay, Ms. Baer.

MS. BAER:  Your Honor, in conclusion, the Debtor is trying to be practical here and move forward.  All we're asking for is the authority to pay Bear Stearns a fee if a transaction is ultimately consummated.  All we're asking for is the authority to go forward and retain Bear Stearns to assist it in this potential transaction.

THE COURT:  But that's -- I mean, that's begging the question, truly.  I -- that's why you always hire a professional, to get advice.  What you're telling me is it's in the Debtor's best -- ordinary course of business to get advice, and that's probably true, but that doesn't stop the fact that what you're looking for is professional advice.

MS. BAER:  Well, Your Honor, again, it's what is a professional under the Bankruptcy Code?  A professional are the lawyers in this room who are involved in the bankruptcy in the Chapter 11 case and assisting the Debtors there.  That's not what Bear Stearns is doing.  We have Blackstone.  They're our financial consultant.  Bear Stearns is simply a consultant being asked to lend help to the Debtor in one aspect of its business, which is the aspect involved in buying and selling businesses, expanding its business lines and the like.  It is not a professional that has, frankly, anything to do with this Chapter 11 case, other than the fact that we happen to be in

Chapter 11.

        THE COURT:  Yes, I appreciate the problem.  I also
know then in the Price Waterhouse=s opinion -- although that
was different because I think there the Debtor definitely was
attempting to use the accountant services for the same purposes
that it had used them pre-petition and in -- expected an
ongoing relationship.  So I agree that the parameter of the
retention was different, but it seems to me that you're still
looking for professional advice because if you had the
capability of doing it in-house, you would do it in-house.  You
wouldn't be reaching outside for that advice.  Nonetheless,
having said that, it seems to me that 363 does permit me to let
the Debtor expend funds out of the ordinary course of business
for limited purposes, and this does appear to be a use of money
that the Debtor actually has to incur if it's going to make any
sense to go forward with this transaction at all.  I guess what
I don't know and what I didn't pick up from the papers is why
it has to be Bear that has a conflict as a professional and not
someone else.  You've indicated that there's a relationship
with the buyer, but in and of itself, I don't understand the
dynamic and why that is a significant issue.

        MS. BAER:  The reason why Bear, Your Honor, is because
Bear knows the buyer.  So Bear brings good faith, Bear brings
knowledge about the business, Bear brings more legitimacy to
the Debtor's bid.  Our concern, frankly, Your Honor, is if

Bears drops out now and we complete this transaction on our own

or with Blackstone or anything else, that will be a negative

impact on the buy -- on the seller.  And the seller is now

trying to determine which bid to go forward with.  And Bear's

being present in this transaction is assisting the Debtor in

having its bid looked at and taken very seriously by the

purchaser -- I'm sorry, by the seller.

        THE COURT:  Well, okay, that's kind of a cart before

the horse analysis too because Bear got involved before this

whole transaction went forward, and that's what I see as the

problem.  You know, it's sort of that you create the problem

and therefore -- or create the circumstance that leads to the

problem and then say, "Okay, the only solution is to accept the

fact that we created a problem because if we try to get out of

it, there's going to be an even bigger one."  And I'm not sure

that's what the purpose of Section 363 is either.  Having said

that, in this instance, I'm going to permit the Debtor to

expend the funds.  It appears to me that with no one -- no

Party-In-Interest who has an economic stake in this transaction

objecting that it is an appropriate use.  However, the next

time the Debtor expects to do this, come here before you retain

someone because I'm not going to approve it again with

hindsight, as opposed to foresight.

        MS. BAER:  Thank you, Your Honor.  We will submit an

order to the Court on a Certification of Counsel that will

outline the transaction and the fee reduction that was
negotiated with the Unsecured Creditors Committee.

        THE COURT:  All right, thank you.

        MS. BAER:  Thank you.

        MR. PASQUALE:  Just on that point, Your Honor, Ken
Pasquale from Stroock for the Creditors Committee.  The
reduction was already mentioned.  The other item that was
agreed to was that for what's called the adjusted fee in the
relationship -- in the transaction, that Bear Stearns will
return to the Court for approval of any adjusted fee that might
be sought on notice to all parties so that we have a chance --

        THE COURT:  Other than the million dollars, you mean?

        MR. PASQUALE:  I'm sorry?

        THE COURT:  Other than the million dollars --

        MR. PASQUALE:  Yes, except that --

        THE COURT:  -- that you're agreeing to?

        MR. PASQUALE:  That's right, it's an alternative.

        THE COURT:  Okay, let me --

        MR. PASQUALE:  Thank you.

        THE COURT:  Let me assure Bear Stearns that unless
some really good deal happens and some -- whatever, probably
you're looking at a million dollar fee under these
circumstances.

        MR. WEISS:  Actually, Your Honor, I believe the
mechanism is actually designed to deal with, generally, fees

that would be less than a million dollars.

          THE COURT:  Okay.

          MR. WEISS:  And we could return to the Court in the

event that that negotiation had to occur for a lesser fee

amount.

          THE COURT:  Well, sure, you know, I think those

issues, if you're going to agree on lesser fee amounts,

probably will come here by stipulation.  If you have to -- you

know, if you -- if there's a fight, obviously you can always

come to Court.

          MR. WEISS:  Right, thank you --

          THE COURT:  Okay.

          MR. WEISS:  -- Your Honor.  If I may be excused?

          THE COURT:  Yes, sir, thank you.

          MR. WEISS:  Thank you.

          MS. BAER:  Your Honor, that takes us to agenda item

#3, which is the Debtor's Motion to Approve a Stipulation with

the Bank of American with respect to their claim.  No

objections were filed to that, Your Honor.  We did have a

couple of minor adjustments to the stipulation and submitted it

on Certification of Counsel on Friday.  The two adjustments

which were negotiated with the Unsecured Creditors Committee

were, one, just a mathematical adjustment, and #2, an

additional paragraph that clarifies that since these Proofs of

Claim are contingent, it has to do with letters of credit that

have been posted and if B of A pays a letter of credit, they

have an allowed Unsecured Claim.  There's a paragraph

clarifying that clearly then their contingent claim is reduced

by whatever is paid and that becomes, then, a regular

liquidated claim.  We did submit it under Certification of

Counsel, but I have another copy here that I could hand up if

Your Honor would be willing to sign it today.

         THE COURT:  All right, this has been circulated to all

the parties and everyone agrees?

         MS. BAER:  Your Honor, the original stipulation was

circulated to all the parties, it was filed as part of the

motion, and the only change, Your Honor, is that there were

these -- this mathematical calculation and this additional

paragraph added Friday at the request of the Unsecureds and

that was filed on Friday.

         THE COURT:  Okay, I'll take your order.  I had a

question, though.  I'm not sure whether this stipulation has

some effect on the adversary that's pending between Grace and

National Union?

         MS. BAER:  No, Your Honor, it does not.  The National

-- it does not in the direct sense.  If in fact B of A would

pay the letter of credit posted on behalf of National Union,

that would then become a liquidated claim that is governed by

this stipulation.  This simply is allowing whatever claims B of

A has in the event that letters of credit are drawn and paid.

THE COURT:  Okay, so the summary judgments that are still pending still have to go forward on the National Union adversary related to claims under those various protocols?

MS. BAER:  Yes, Your Honor, at this point B of A has not paid those letters of credit and there're still issues as to whether or not any of those letters of credit should be drawn and payments made.

THE COURT:  Okay.  Okay, thank you.

(Pause in proceedings)

MS. BAER:  Your Honor, I apologize, the order is kind of buried in the middle.  I don't know if you found it.  If not, I can point it out.

THE COURT:  I think I found the order.  I'm looking at, I think, Exhibit-B had -- is the blackline, is that the one you wanted filed?  Okay.

MS. BAER:  Yes.

(Pause in proceedings)

THE COURT:  All right, that order is entered.

MS. BAER:  Thank you, Your Honor.  Agenda item #4, you already signed an order on that last week, Your Honor.  That takes us to agenda item #5, which relates to the phase one property damage estimations, and I'll turn the microphone over to my colleague, Michelle Browdy.

THE COURT:  May I suggest that we go through whatever else is on this agenda before this?  I think this is going to

take more time, and to the extent that other parties may choose to leave if they're not involved, I think we should go through other items.

MS. BAER:  Your Honor, our concern is -- and the reason we put it on the agenda where it is is because Ms. Browdy is on trial in Spokane, Washington and she needs to catch a flight back to Spokane for trial tomorrow, which is why we put it where we did on the agenda.

THE COURT:  What time is your flight?

MS. BROWDY:  Your Honor, I have a 5 o'clock flight out of Philadelphia.

THE COURT:  All right, so you need to leave by 2?

MS. BROWDY:  I thought 3, but 2.

THE COURT:  Let's finish the rest of the agenda items. I'll make sure you're -- I have other cases that are set, so --

MS. BROWDY:  Thank you, Your Honor.

THE COURT:  Okay.

MS. BROWDY:  And just for clarification, we did make efforts to try to move this hearing first, but this is the only date that worked out.  I apologize for the need to leave.

THE COURT:  Okay, all right.

MS. BAER:  Your Honor, agenda item #6 is related. That has to do with the 15th Omnibus Objection and I think Ms. Browdy was going to give a status and it's relationship to the

phase one matters.  So perhaps it makes sense to then also skip
that for now.

THE COURT:  All right.

MS. BAER:  Agenda item #7 is the Debtor's --

MR. BAENA:  I'm sorry, I have to interrupt, counsel.
Your Honor, I believe that --

THE COURT:  I can't hear you, Mr. Baena, I'm sorry.

MR. BAENA:  I'm sorry, may it please the Court, Scott
Baena on behalf of the Asbestos Property Damage Claimants
Committee.  I believe there are a lot of people on the phone,
Judge, in respect of item #6.  And maybe we could --

THE COURT:  Do the status report --

MR. BAENA:  -- take #6 and deal with the order so that
these people who don't want to listen to the rest of this
calendar can move on and we won't have the interruption of the
background noise.

MR. LOCKWOOD:  Your Honor, I'm the next one up after
this (indiscern.) and I'm perfectly willing to wait and
accommodate other folks.  I'm gonna be here for the Kaiser
hearing anyway, so that can go last.

THE COURT:  All right, let's start with 6 then, Ms.
Browdy, thank you.

MS. BROWDY:  Okay, Your Honor, well, while we're
dealing generally with the property damage claims, I have two
orders to hand up.  The first is an order memorializing the

results of the Anderson Memorial Hearing we had on the 31st,
and that's gonna lead to the expungement of just under 600
claims.  We've gone over the Form of Order with Mr. Speights
and the parties are in agreement on it.

        THE COURT:  All right.

        MS. BROWDY:  The second order I'm gonna hand up is an
order granting certain relief under the 15th Omnibus Objection.
 Those are basically defaults and certain stipulated
withdrawals or recharacterizations.

        THE COURT:  All right.  Thank you.

        MS. BROWDY:  And to clarify, Your Honor, on the 15th
Omnibus Order that we handed up, the exhibits -- essentially
the defaults, there are about 100 fewer on the order that we
just handed up versus the one that was circulated with the
agenda.  Sixty claims we discovered were general unsecured
claims, so that we're removing those from the property damage
buckets, but we aren't seeking to default them.

        THE COURT:  All right.

        MS. BROWDY:  They just shouldn't have been there.  And
then there's about another 30 claims filed by a particular law
firm who has asked for a 30-day extension, and we've granted
that.  So those claims should not be defaulted at this time.

        THE COURT:  Okay, with respect to the other order
concerning the hearing last month, what -- do you know what the
agenda number was and can somebody tell me the date of the

hearing so I can add that?

       MS. BROWDY:  The hearing was on October 31st.

       THE COURT:  All right.

       MS. BROWDY:  And that was the only item up.

       THE COURT:  Okay.

       MS. BROWDY:  And other than that, again, I think that the status item that we originally had up on the 15th was the issue that rather than deal with all the claims that were at issue on the 15th Omnibus -- and just to refresh the Court's recollection, that's where we raised all substantive objections to all property damage claims, at least that we could, by September 1st.  We received on October 24th on the order of 1,000 individualized responses to those, and it was just not feasible within a matter of a week to put in our replies and then to expect sur-replies 4 days later.  So we submitted in a proposed order on Certification of Counsel indicating, by the way, that there were disagreements with the proposal that the 15th Omnibus, we should hear certain batches in December, January and February.  In December we sought to have argument on certain claims, what we call the category A objections. Those are medical monitoring claims, other things that really weren't property damage claims.  Category B claims that were previously settled or adjudicated.  Certain of the category C claims where the claimants literally had come up with no proof of product ID.  We're not at this point trying to tee up

complexities of is it enough product ID or not enough, is it really ours.  This is just, again, the pretty simple is there product ID or not.  And then category H claims, which raise a singular legal issue, which is whether contribution and indemnification claims can go forward.  Those we propose teeing up for the December hearing.  In January we're gonna tee up certain Speights claims, certain category G claims, which were claims from people in Minneapolis seeking recovery for supposed stigma to property, rather than actual remediation costs.  And category D, certain state claims that are barred essentially by statute of repose; a little more complex than that, but not much.  And then in February we want to tee up any additional Speights claims that weren't covered in January and claims for buildings built after 1973 that really couldn't have Monocoat 3.  And we think by, again, tearing off those small bites of claims do not raise complicated legal issues.  It's gonna be a very efficient way to continue marching through the property damage claims.

THE COURT:  All right, Mr. Baena?

MR. BAENA:  May it please the Court, Scott Baena on behalf of the Property Damage Committee.  Your Honor, first, I would ask as a point of personal privilege that you not enter the second order granting relief sought in Debtor's 15th Omnibus Objection to Claims, which was submitted to you today. And the reason I ask that, Judge, is I'm not asking you to

deny it either, I'm just asking you to allow us to go back to
our office and go through this new Exhibit-A.  And I ask that
because last week when I got the original proposed order and I
looked at the Exhibit-A which was attached, I believe, to the
agenda for today's hearing, it struck me that there were
claimants listed as not having provided responses or what-have-
you in respect of their claims that just didn't conceivably
seem to be right to me.  And I had my office start calling
claimants to find out if it was correct.  I found out in one
case, one law firm -- and I believe that's the same law firm
that counsel just alluded to -- the lawyer that was handling
the matter left the firm and the matter had not been reassigned
in the firm; it was a big mess and it fell between the cracks.
 I found another law firm had, in fact, filed responses, but it
was recorded as not having filed responses.  So I'm getting
very, very leary and concerned about the exhibits to these --
these massive exhibits that refer to hundreds of claims.  And I
do wish to have an opportunity to scrub the exhibit to make
sure it's correct.

     This has implications on a variety of different levels.
Obviously, it affects the claimants claim.  And indeed, it does
so in the most pejorative way possible, it expunges the claims.
 Secondly, it affects the universe of claims that we are
dealing with in the contest of the estimation, and it could
have profound effects there too.  So if you'll just grant us

the opportunity of a week perhaps to just go through and ensure
that these exhibits are correct --

THE COURT:  That's fine.  I thought that when I was
handed this order up that it had been vetted with counsel and
you were satisfied with it.

MR. BAENA:  And I just got this new exhibit just now.

MS. BROWDY:  And Your Honor, if I could ask perhaps
for a slightly different procedural approach.  I actually
thought there was agreement on it.  But the order that we
handed up, part of it is the default issue that Mr. Baena
raises, but part of it are well over 100 agreed stipulated
withdrawals and the like by people who were either dropping
their claims or we recognized that they're environmental claims
and the like.  And I hate to have those continue to float out
there when --

THE COURT:  No, I think the way to do it is just to
have you file a new order on a Certification of Counsel after
Mr. Baena has a chance to go through Exhibit-A and they -- that
way I'll have everything in one document the way it's proposed.
I think that's fine.  If he says he needs a week, I think you
can file it in 10 days.  That should be sufficient.  I don't
see how it's going to affect anybody significantly for 10 days.

MS. BROWDY:  Okay, so the Anderson Order will be
entered, but this other one we'll submit in 10 days on
Certification of Counsel?

THE COURT:  With respect to the order that you handed up on the October 31st hearing, I've signed that one.

MS. BROWDY:  Thank you, Your Honor.

MR. BAENA:  I've got a comment about that, Judge.

THE COURT:  I'm sorry?

MR. BAENA:  It -- that's the Speights order?

MS. BROWDY:  Yeah, on that --

MR. BAENA:  Okay.

MS. BROWDY:  Yeah.

MR. BAENA:  Okay, I'm sorry.  There are a lot of orders floating around.  I -- there was another order I wanted to discuss --

THE COURT:  Wait, I'm not done with this one yet.

MR. BAENA:  Yes.

THE COURT:  With respect to the order that I've just been handed up on the 15th Objection, I'm throwing it in the waste can so that you can file it on a new Certification of Counsel and this one will not be signed, unless you want these exhibits back.  Do you?

MS. BAER:  No, Your Honor.  Actually, Your Honor, those exhibits --

THE COURT:  That's the order page.

MS. BAER:  The exhibits may have (indiscern.).

THE COURT:  You may have them all back.  The only thing I threw away was the page that had my signature that

wasn't appropriate.  All right, so let me make a note.  That
will be entered when a Certification of Counsel is filed.  And
you're going to call it second order, correct?

        MS. BAER:  Yes, Your Honor.

        THE COURT:  Okay, Mr. Baena.

        MR. BAENA:  Your Honor, you have already signed,
apparently, an order that was submitted by the Debtor with a
Certificate of Counsel that was alluded to earlier.  The
Certificate indicated that there was --

        THE COURT:  On #6?

        MR. BAENA:  It's -- yes, it's the Scheduling Order
regarding Debtor's 15th Omnibus Objection --

        THE COURT:  Okay.

        MR. BAENA:  -- to Claims, Substantive.

        THE COURT:  All right.

        MR. BAENA:  There was indeed a Certificate of Counsel,
which faithfully represented to the Court that there were
objections to the order that was being proposed by the Debtor.
 Indeed, it's my understanding that Mr. Speights has objected
in respect of certain aspects of it, and the Committee objected
as well.  And I'd like to talk about that and the improvidence
of the order.

        THE COURT:  All right.

        MR. BAENA:  Judge, this order has been before the
Court only obliquely.  Last hearing, at about the same time I

44

was listening to the rest of my roof blow off in Hurricane
Wilma, that was what was left from Katrina, I believe Ms.
Browdy was approaching the podium and telling the Court about
the scheduling issues that were engendered by the massive
amounts of information that were being provided by some
property damage claimants.  And the Court suggested that they
confer with parties and work on the scheduling issues.  They
proposed this order.  This order was not proposed to us before
last week, I believe, and at the time it was, I immediately
responded to Ms. Baer telling her I has some grave concerns
about this order.

     Your -- the Court will recall that back in March of '04
you had before you the Debtor's proposal for gateway objections
to property damage claims.  And the issue was are we gonna
allow the Debtor relief from local rules to tee up just several
discreet types of objections to property damage claims before
the Debtor is obligated, consistent with local rules, to
articulate all of their substantive objections to PD claims,
and the Court allowed that.  And one of the concerns that we
articulated at that point in time was, Judge, this could lead
to a real parade of comic possibilities because by doing it
that way, property damage claimants would be subjected to this
slow drip of claims objections.  And the Court assured us that
that was not the Court's intention.  Indeed, the Court stated
at page 24 of the transcript of that hearing that what the

Court intended was one gateway objection in respect of
everybody's -- all PD claims, and then one substantive
objection.  You went on to say that you would only expect
property damage claimants to be before this Court twice in
respect of their objections to a single claim.

What the order that you signed does is ensure that we will
not have that result because instead of setting down claims for
objection and hearing, this sets down subjects for hearing, so
that if 100 claims are subject the same sort of objection, that
objection will come before the Court on a particular day.  If a
particular claim is subject of a variety of different
objections, that claimant will have to come back to a series of
hearings in the cattle car with every other PD claimant whose
claim or claims are subjected to the same subject of objection.

THE COURT:  Okay, then I think if that's the case, I
misunderstood what the process was to be because I thought we
were talking about one -- I don't know what the right word is
to use for this -- gateway.  Okay, let's say we have Claimant A
and Claimant B and there are three gateway objections to
Claimant A and one different gateway objection to Claimant B.
I thought what this order would do is tee up the three gateway
objections for Claimant A on one track and a different tee up -
- different track for the claims objection on B.  I did not
appreciate that it was to be each Creditor in each objection.

MR. BAENA:  Judge, if the technician could just flip

us on here --

THE COURT:  Well, if it is, Mr. Baena --

MR. BAENA:  What I would --

THE COURT:  -- what I would --

MR. BAENA:  Let me suggest to you, Judge, by this
order -- we did a little bit of calculation.  And by this
order, some 380 claimants will have to attend five hearings in
respect of objections to one single claim.

THE COURT:  Well, that was never my intent, and if
that's the impact, then it has to be modified.

MR. BAENA:  That's right.

MS. BROWDY:  Again, Your Honor --

MR. BAENA:  And what we have --

MS. BROWDY:  -- that is certainly not the impact, but
we'll get to that on the --

MR. BAENA:  Well, that is the impact.  And in fact,
Judge, it's on each of the -- the occasion of each of these
hearings, there are going to be property damage claimants there
on multiple occasions in respect of objections to a single
claim.  And we don't think that that's what the Court intended,
and we don't think that that's a workable process.  And that's
why we thought that this would be done just the way it's done
all the time in bankruptcy.  You set down a claim to be heard
for objections.

You know, the other aspect of the unfairness of this,

Judge, is that theoretically there could be discovery that's relevant to the type of objection and everybody's gonna feel constraint to attend the discovery because they're all in that same cattle car.

THE COURT:  Well, I'm not opposed to the Debtor doing subject oriented objections.  I mean, I -- every objection to claim is subject oriented in -- at it's bottom line.  But I am opposed to the Debtor attempting to bring parties back in here more than twice, once from the gateway, once from the substantive.

MR. BAENA:  Judge, I don't know that you're gonna be able to have it both ways.

THE COURT:  Maybe not.

MR. BAENA:  I don't know that that works.  I think that in order to avert multiple visits to the Court on a single objection you have to set these objections down by objection. They could be batched, theoretically, if there are, you know, a universe of claims that suffer from the same purported deficiencies.  Maybe they can all be brought on at the same time, but it's by claim, so that an -- a PD claimant will show up one time after the gateway objection is heard in respect of it's claim.

THE COURT:  Well, actually, Mr. Baena -- and I know this is getting into the argument on the #5 that I wanted to differ, but I have been trying to figure out a structure by

which the constructive notice issues can be done in batches.
And frankly, I'm not sure how it's not going to have to raise
an objection to the claim itself anyway, because I really think
that's an issues that's going to require some procedural due
process to the claimant involved.  Now, I don't have that same
view, just so you know, with respect to the other issues that
they're trying to litigate, but I -- in thinking -- trying to
think this through, frankly, it's something I wanted to discuss
in #5.  It appears to me that we ought to get whatever the
procedural gateway objections are out the door to the extent we
can.  And then I really do think the Debtor is just going to
have to file objections to the claims that are left over.  I
think that's what's going to have to happen, or else we're
going to have figure out a way to have some -- I don't want to
say class Proof of Claim, that's not what I mean, but class
proceeding to deal with the issues that are relevant to a
variety of objections to claims.

        MR. BAENA:  On a claimant basis?

        THE COURT:  Well, I think the claimants would
certainly have the right to be here to participate.  Now, maybe
the Debtor wants to do an Omnibus Objection.  I'm not
attempting to set the structure at this point.

        MR. BAENA:  Okay.

        THE COURT:  But I can --

        MR. BAENA:  Judge, we're going to address that in

depth, and I don't want to use this objection as the
platform --

THE COURT:  For that.

MR. BAENA:  -- for that substantive argument 'cause
it's much more complicated.  But I would like to prevail upon
the Court to vacate the order that you entered and send us back
to the drawing board.  The -- it was -- frankly, Judge, it was
unacceptable that we raised the concern, and in the most polite
way we were told, "Too bad."  And that's not dialogue.

THE COURT:  Well, okay, at this point, I don't really
want to get into whatever happened outside this Courtroom.  I -
- the error is mine.  I signed the order, apparently, thinking
that it did something other than what the parties intend,
unless that is what the party intended.  I didn't expect that
it was going to work the way you're articulating.  If it is
going to work that way, yes, I need to vacate it, it has to be
revised.  I think I was pretty clear that I did not expect any
claimant to have to be here more than twice.  I'm not opposed
to claimants having to come in on the gateways, the
procedurals, and then separately on the substantive.  I think
in a case of this size that happens routinely and I'm not
concerned -- overly concerned with that.  But I am concerned
about bringing people back here more than twice.

MS. BROWDY:  Your Honor, if I may briefly respond.  I
ticked off earlier which items we wanted to be heard in

December and January and February --

        THE COURT:  Yes.

        MS. BROWDY:  -- and we were very selective about

those.  Each of those, for examples -- let me take that

(indiscern.), please -- that, again, different items for

December, January and February.  Each of them would be

dispositive.  For example --

        THE COURT:  Yes, but the question is as to each of

those items, is one Creditor going to be in more than one

category?  If so, you can't do it that way.

        MS. BROWDY:  Okay, I don't believe that it'll be

multiple times, but here's my proposal.  And in part, the

reason we broke it up into chunks is because obviously we all

know we have limited time at these Omnibus proceedings.  I

would ask that we get a separate hearing then in January and

then all the one's that we identified to be teed up that were

in this 15th Omnibus, we just hear in one day in January.

        THE COURT:  Okay.  Well, I think hearing these in one

day is -- unless it's simply for further scheduling or some

pre-trial orders, you're not going to get through all of these

objections in one day, I don't think.

        MS. BROWDY:  Well, again, Your Honor, we were very

selective about what's in there.  For example, contribution and

indemnification, that's a legal issue, a previously settled or

adjudicated claim.  Either they --

THE COURT:  Well --

MS. BROWDY:  -- previously settled it or not --

THE COURT:  I think --

MS. BROWDY:  -- they were --

THE COURT:  I think this is what the Debtor needs to
do.  I think the Debtor needs to do a chart that says to all
Creditors, "Here are the objections that we're going to raise
as to your claim."  And you need to list all of the objections
for all Creditors that you're going to list.  Then we need to
have a scheduling process that says, "Okay, these are the
issues as to these Creditors that we're going to pick up."
Now, I realize, Mr. Baena, that that isn't exactly what I said
before, but I didn't have a universe of claims to look at when
I was hypothesizing how this might be best handled.  It seems
to me that there may be categories of issues that can be
addressed in a mass kind of proceeding as opposed to a claim by
claim proceeding.  But until we know for sure which objections
the Debtor intends to lodge as to which Creditors, we don't
know how best to aggregate those proceedings.

MS. BROWDY:  Your Honor, that was actually -- that was
the 15th Omnibus Objection.

THE COURT:  Right, that -- well, that's --

MS. BROWDY:  Where we identified each category, and
within each category we identified each claimant that falls
into it and you can slice or dice it different ways.  You can

say under objection A which claimants fall into, or I believe

the Court ordered us to provide a list in late September --

       THE COURT:  I did.

       MS. BROWDY:  It said for each claimant, each of the

objections.  So that's already been done.

       MR. BAENA:  I think we do know --

       THE COURT:  Okay.

       MR. BAENA:  -- to a great extent, not entirely.

There's -- like this language in this proposed order that talks

about the remaining aspects -- and I don't know whose claims

that would impact.  It was just stylistic, I think, more than

anything else.  But I think we do know whose claims are

affected by what objections that -- the issue though is, taking

each one of those objections to a single claim and setting them

up for a separate hearing.

       THE COURT:  Well --

       MS. BROWDY:  And --

       THE COURT:  The reason I was suggesting this newest

approach -- and I apologize, I -- you have told me that the

15th Omnibus was everything you intended to file, and frankly,

I just lost track of that fact.  So I agree, you have done

that.  What I was going to suggest next was, however, you could

take a look at -- all parties could take a look at which

Creditors are in which groups of objections.  And I understand

that the Debtor's view in terms of how to best manage the bulk

of objections is the proposal that you've set out.  But for
some Creditors, that may not work, simply because of the
multiple appearances.  So what may make sense is to go through
this list, find out, for example, how many Creditors have only
one or two categories of objections, and deal with those in one
proceeding.  And then take a look at the Creditors whose claims
fall into more than one category.  Because, you know, the
problem for a Creditor is if they lose on any one theory, they
lose.  But the Debtor has multiple opportunities to attempt to
show how that claim should not be paid.  And it's difficult for
a Creditor to defend against one thing knowing, "Okay, I won
that battle, but I have to come back again."  And frankly, that
expense should not have to be born by every Creditor in this
kind of a case.  So when I said two shots at the apple, I
really did mean two shots at the apple because I think that's
the way, in this case, the economics are most fairly addressed
between the Debtor and Creditor constituents.

        MS. BROWDY:  And again, Your Honor, we'll try and come
up with an order that obviously is satisfactory to the Court,
but because of the limited time at the Omnibus, again, I would
repeat that I would request a hearing date or two in January --

        THE COURT:  Okay.

        MS. BROWDY:  -- to tee these up for.

        THE COURT:  All right, well, I think that's fine, but
let me work -- why don't I have whoever, Mr. O'Neill I guess,

contact my staff in Pittsburgh so that we can take a look at a
date.  Tell me how much time at this point you think you're
going to need.  Are you planning at this point to do nothing in
December, but to put all of these three objections that you
would have done December, January and February into one hearing
in January?

          MS. BROWDY:  That would be my proposal because I think
as a practical matter we can't tee it up for December.  The
class -- the Speights proposed class certification issue that
was raised at the October 31st hearing, that will be set at the
December Omnibus, so we would go forward with that.  But the
objections that we would otherwise have raised in December, I
suggest clumping the December, January and February one's into
a hearing in January.

          MR. BAENA:  The only other issue, if I may, is
briefing, Your Honor.

          THE COURT:  You --

          MR. BAENA:  The only other issue, Your Honor, is
briefing.  There has been no briefing of any of these issues by
either side.

          MS. BROWDY:  Actually, that's not correct.  We had the
15th Omnibus was filed.  We've gotten the responses to the 15th
Omnibus.  So all that's left is the reply and the sur-reply,
and that was covered by a previous order.

          MR. BAENA:  I'll accept that clarification, but we

need to allow time for that to occur, taking into account
holidays.

THE COURT:  Well, okay, I guess my -- what I am not
sure of, because I don't look at Certificates of Service unless
somebody raises an issue about one, has each Claimant been
served with the 15th Omnibus so that we're going to get --
we've gotten responses in from any claimant who intends to
respond?

MS. BROWDY:  Yes.

THE COURT:  Okay.

MS. BROWDY:  Yes, we have.

MR. BAENA:  But they have not been served, to the best
of my knowledge, with this order.  My understanding is that
this order went to the 2002 --

THE COURT:  Okay.

MR. BAENA:  -- mailing list, which wouldn't include
all property damage claimants.

THE COURT:  All right, well, it -- since it's going to
be vacated and redone, that's kind of an irrelevancy at this
point anyway.  So why don't you folks see if you can work out a
new order that comports with what I've just said, that vacates
the one that is of record, that will go out on notice to all
parties.  And I know you need to get the dates before then.  If
Mr. O'Neill calls my staff tomorrow -- between today and
tomorrow, I'll call them to let them know that you're asking

56

for two days in January and I'll give you some -- or my staff
will give you dates.

        MS. BROWDY:  Thank you, Your Honor, and then we'll
work with Mr. Baena to back out the dates for the reply and the
sur-reply.

        THE COURT:  All right, so this was also on item 6
then.

        MR. BAENA:  Thank you, Your Honor.

        THE COURT:  When -- Mr. Baena, when was that order
entered?

        UNIDENTIFIED SPEAKER:  It was Wednesday, I believe.

        THE COURT:  Okay.

        MR. BAENA:  Let me give it to you, Judge, it --

        MR. TACCONELLI:  Your Honor, Theodore Tacconelli.
It's Docket #11035, it was entered on November 10th.

        THE COURT:  All right, Mr. Tacconelli, what was the
docket number, again, please?

        MR. TACCONELLI:  The order was Docket #11035.

        THE COURT:  Okay, I'll just make a note that that will
be vacated and a new order entered when a COC is submitted.
And I'm orally vacating that order, so whatever is set up by
way of procedures at this point is vacated, but the order --
written order will confirm it.  Mr. Speights?

        MR. SPEIGHTS:  May it please the Court, Your Honor, on
this matter you've been discussing.  I'm appearing solely on

behalf of my law firm and the clients I represent.  And it may
be, in light of the Court's decision, that what I want to say
could be taken up at December when we are together on the
Motion to Certify, but I want to make sure my position is
protected.  And I informed the Debtor's counsel of my position
before they submitted the order, and they noted that I did have
an objection.  May I approach, Your Honor?

        THE COURT:  Yes.  Thank you.

        MR. SPEIGHTS:  Your Honor, I really believe I am in a
unique position with respect to the 15th Omnibus Objection
because as Your Honor recalls, the Debtors filed a 13th
Objection challenging my authority to file all of my claims.
They later withdrew their 13th Objection as to one building in
California.  And Your Honor, when they filed that objection
they previously, of course, had filed a motion with the Court
to seek a waiver of the local rule.  And that's what led to our
August 29th hearing when I talked for more than an hour before
Your Honor.  And in their motion, which I've handed up to you
just a portion of, which I've highlighted, they represented to
Your Honor that they wanted to go forward with these authority
objections prior to the Court having to adjudicate the merits
of any legitimate claims, that it would save the Court
significant time in adjudicating the claims, and that they
wanted to do this before dealing with the remaining claims.
And I relied on that and I consented.  On August 29th I told

Your Honor we welcome the authority objections being heard
first, and we had been going forward, and I know we've given
the Court a lot of work.  I'll assure you my law firm, and I
believe the Debtor's law firm, have spent a lot of time going
through these authority objections.  Your Honor, I relied on
that, and I'm engaged in that process now, and I don't think I
should have to deal with this 15th Objection on Substance
until, as the Debtors the represented when the filed these
authority objections, we get through with these authority
objections.  They said --

        THE COURT:  Well, are your clients -- are -- your
clients, I think, Mr. Speights, are not in the same category as
the other Creditors for whom Mr. Baena raised the objection,
because if I understand it, the Debtor would be filing
objection to your client's claims in -- well, the Debtor
proposed two batches, in addition to the authority objections.

        MR. SPEIGHTS:  Well, that -- then they were -- and
that's why I said I may be, in a sense, premature in light of
that.  I will have a number of objections, like Mr. Baena has
articulated, on behalf of the Committee.  But the theory of the
Debtors -- and while I disagree with almost everything the
Debtors say, their theory actually was pretty solid.  If we're
gonna get rid of a lot of the claims on authority, let's get
rid of them first, and I agreed to do that.

     Now, having said that, Your Honor, I don't know why the

Debtors, having gone through this exercise, will not now
realize that they ought to withdraw the remaining authority
objections, or most of 'em.  For example, I've got hundreds,
hundreds of California colleges and universities I represent
under a written -- under two written contracts of
representation.  But now, in addition to their still having the
authority objections on that, they want to litigate the
California issues, four, five six issues per California claim.
And I think, you know, between now and December, maybe the
Debtor could say, "Okay, we've gotten Mr. Speights to agree to
withdraw some claims.  Mr. Speights voluntarily has withdrawn
some claims, and Your Honor has stricken, as of today, 600
claims.  Maybe we're close to the finish line."  But I have no
idea where the finish line is on that authority objection
process and one World War fight is enough for me.  I don't, in
the middle of this authority process, now need to get involved
in this other objection process.  Again, Your Honor, I'd be
happy to discuss this with you in December after the Motion to
Certify, and maybe we'll make some progress by then.  But I
want the record straight that in addition to whatever reasons
the PD Committee has, uniquely, we think authority should be
decided in moving -- before moving to door two.

         MS. BROWDY:  Your Honor, if I may be heard?  Michelle
Browdy on behalf of the Debtors.  I certainly agree with Mr.
Speights that he stands in a unique situation.  Here's someone

who filed 75% of the 4,000 property damage claims that were
filed in this case.  Since July, 2,300, 2,300 of Mr. Speights
have been expunged or withdrawn and he still has 60% of the
remaining property damage claims in this case.  And now he's
saying that because he went and filed hundreds upon thousands
of claims with no authority, he should be treated specially and
not have to comply with the same rules as everybody else.  He
is seeking special dispensation on the grounds that he
improperly filed thousands of claims in the first place.  That
certainly cannot be the right approach for this Court to take.

        And let me give you an example, when we originally teed
up the hearing for October 31st, we said we're gonna try to get
through the Speights claims in an efficient way.  And we would
deal, for example, with the Anderson Memorial claims, for which
he had no authority, and we would deal with California claims
that he had no proof of product identification, because that
was a merits issue that could be addressed simply in one spot
and we could get a ruling with an early hearing.  We had an
agreement that that was gonna be set up, and then low and
behold, Mr. Speights withdrew about 1,500 claims that had no
product ID.  But I use that as an example that to get through
these claims efficiently, some of the things we want to tee up
early are the authority objections, some of the things we want
to tee up early are the merits objections.  There's no reason
to slow down the merits determinations of the Speights and

Runyan claims when those are gonna help us efficiently get through what remains.

And again, the statistics, Your Honor, I believe that after the Anderson Order was entered and once we get clarity on the default and the stipulations on the 15th that we are going to be down to roughly, from 4,000 claims, we're gonna be down to roughly 1,150 property damage claims.  We're gonna have just over 1,000 traditional property damage claims.  Of those traditional property damage claims, about 340 of those are Canadian claims filed by Mr. Speights.  And then that will leave us with fewer than 700 U.S. buildings that have traditional property damage claims that need to be addressed. We're still gonna be in a position, though, that of the 1,000 -- roughly 1,000 traditionally property damage claims, 60% of those are on file from the Speights firms.  We cannot slow down this process.  There's no reason he should get, again, a special dispensation --

THE COURT:  Well --

MS. BROWDY:  -- not to follow the same schedule as everyone else.

THE COURT:  Okay, well, where are you in terms of the document production on the authority issues, because quite frankly, it seems to me that that one should be pretty easy. To the extent that there is a written document that provides authority, there's authority.

MS. BROWDY:  Well, here's the real issue, Your Honor,
is it's been the volume.  You know, we started out with 3,000
Speights claims that we had to deal with, and then 200 went
away because they were withdrawn.  And then we got to the verge
of the Anderson hearing and 1,500 of them went away.  And we
finally -- it wasn't until this morning that we got the order
agreed to on the Anderson claims, and that's another 600.  So
it's been such a moving target, it's hard to see what's left to
go back and test what there is or is not authority for.  And in
point of fact, Your Honor, that's actually why when we had
proposed the December, January and February hearings, we had
split the Speights into two batches, because we thought it's
just gonna take us a while to get through and figure out what's
there --

THE COURT:  Well then --

MS. BROWDY:  -- and we're always trying to tee up the
easier things first.

THE COURT:  -- maybe the thing to do, rather than
giving you a January hearing date, is to give you a February
hearing date, because by then you will have been through the
Speights authority issues, hopefully, you know -- and at that
point in time whatever is left with respect to the Speights
claims will fit into the same mold as all the other claims.

MS. BROWDY:  Well, actually, Your Honor.  Again, now
that we've gotten rid of nearly 3,000 claims, we're to a much

more manageable universe.  As I said, it's gonna be about 100 or 50 -- 150 or so that are not the traditional property damage claims.  Things like contribution and indemnification and the like, we'll deal with those separately.  Those are good issues to tee up for a hearing in January, quite honestly -- something like contribution and indemnification.  Of the traditional property damage claims, again, once we're gonna be closer to 1,000 I believe it's gonna be much easier to work with the 600 Speights authority claims and we'll tee up some of those in January as well.

THE COURT:  Well, of the 150 that you want to tee up, that are the -- for example, contribution indemnity claims -- as to how many of those are you alleging that Mr. Speights didn't have any authority?  I mean, why do we need to bifurcate the issues?  If you're gonna do discovery on those claims, why can't we just put the authority issue at this point into whatever the objection is on this specific claim?

MS. BROWDY:  Right.  Again, the January hearing I would think would be both -- again, merits on certain batches like contribution indemnification, then maybe merits objections that go to certain batches of the Speights claims, and authorization objections that go to the Speights claims.  But again, Speights shouldn't get special privileges because he filed such bad claims.

THE COURT:  Okay, well, I'm not seeing how there are

special privileges.  I think you two are saying the same thing.
 It sounds like a timing problem rather than an issue as to the
procedural process.

        MS. BROWDY:  Again, I think these all can be teed up
in January, Your Honor.

        MR. SPEIGHTS:  May I respond to that, Your Honor?

        THE COURT:  (No verbal response).

        MR. SPEIGHTS:  Thank you.  Three simple sentences,
Your Honor.  I'm not trying to get special dispensation.  I've
been out front not because I had bad claims, because I had the
most claims, probably.  I'm simply trying to enforce the
proposal and the agreement that I relied on to go first with
authority.  I think I have every right to say that's what the
Debtor proposed and I agreed to it.

        Number 2, Your Honor, unfortunately, Counsel just said to
you two or three times, "Well, Mr. Speights has these bad
claims he withdrew" -- and I can't remember the number, was it
1,000 California claims on the eve of the hearing.  Those are
the so-called conspiracy claims.  Those are the claims that
I=ve told you often I talked to Mr. Beeburn, was to think about
before they ever started this process.  I consented to an
agreement.  I proposed they be done, and I consented to a
written agreement that I negotiated with Ms. Browdy in which
the Debtor said it would never stand before Your Honor and try
to say that I had done something improper by withdrawing those

claims.  And here we go.  You know, when I withdraw 'em, I'm
jumped upon.  I withdrew them and Mr. Beeburn and I could have
worked out those claims a year ago but that doesn't mean they
were improper.

Number 3, Your Honor, Counsel has just told you that it
was only today that we got this stipulation.  Well, I dealt
very pleasantly with Ms. Baer on the Order.  We got the Order.
 We have a little problem on emails between one of her
associates and one of my associates.  We agreed to the Order
but we had to go through those attachments of 600 that Mr.
Baena was describing to you today.  You've got to be real
careful.  For example, they had the Anderson Memorial Hospital
-- the individual building which I've litigated since 1992 with
Grace on that list that you would have signed and expunged
their claim.  So it takes some time to go through those.

So, Your Honor, again, I suggest that we discuss this in
December and see where we are, but if I've got written
contracts -- you know, for 500 or 1,000 claims, and they've got
'em.  They've got copies of the contracts for the California
Universities.  Why am I being put through this ordeal of going
through authority objections, but if I have to, let me --

THE COURT:  Well, I don't know --

MR. SPEIGHTS:  -- enforce the agreement they proposed.

THE COURT:  If -- to the extent that there are written
agreements it seems to me that it -- that -- it's not an issue

that needs to be litigated.  I'm not sure how the Debtor will win an authority issue if in fact there is some authority that's in writing.  So, I don't know the answer.  I haven't seen the documents, Mr. Speights.  I'm not trying to make rulings.  I'm just trying to get through the process.

It seems to me that the process ought to be that you take one more stab at looking at the volume of authority issues and at the end of that time, if there is some agreement that additional claims ought to be expunged, or disallowed, or whatever because of lack of authority, fine.  And what's left ought to just go into the traditional objection to claim process for whatever else the issue is going to be on that claim.  And if there's a lack of authority, we deal with it for that specific Creditor in that specific claims objection. Because I'm not going to hold up the process simply to bifurcate out the -- your client's claims, Mr. Speights, to do that pretty much means bifurcating out most of the process.  So it won't work.  But by the same token, I agree that you need a structure in place in order to be able to deal with the Debtor's objections.

MS. BROWDY:  Your Honor, if I may respond just briefly.  First, I did not intend to imply that there was wrongdoing in the withdrawal of those claims.  I mean, part of the agreement to withdraw those 1,500 claims --

THE COURT:  Look --

MS. BROWDY:  -- was to say we're not arguing it was wrongdoing and again it was not my intention.  It's simply a fact there are a lot of claims falling by the wayside which makes it a little hard to track along the way.  But again, I did not wanna suggest there was something improper about the withdrawal.

In terms of the written agreements, again, it would be my intent to try to tee up in this January proceeding -- or to tee up in the proceeding, authority objections.  But I wanna clarify.  We have always proposed that we wanna stage the property damage proceedings in an efficient way to get -- you know, that's why we teed up 600 Anderson Memorial cases, 'cause you could do one argument and deal with so many claims.  The written authority issue with Mr. Speights may well raise discovery issues.  You know, we have not yet taken Mr. Speights' deposition.  If we can -- we have not sought the depositions of the people at the University of California that supposedly signed his contract.  If we can get rid of some of the Speights claims on the merits, it could reduce the need or perhaps even eliminate the need to do the discovery.  So I'm not saying right now I wanna give up the right to depose Mr. Speights, we may well --

THE COURT:  No, no, no.

MS. BROWDY:  -- need to.

THE COURT:  Look.  If there is a written document that

was signed within whatever the relevant time is -- unless
you've got some reason to suspect or want to take a deposition
to verify that in fact it's the person whose signature was --
it's purports to be on that document, I don't know what other
information the Debtor has the right to contest.  You clearly
have the right to take a look at claims that are filed without
authority because they're improper claims.  And they shouldn't
be filed.  And it's improper to file them, and if the Debtor
won't say it, I'll say it.  And I don't want to see it happen
in other cases.  That's the reason we're going through this
process in this case.  But to the extent that there is written
authority, I don't know what information the Debtor needs other
than to verify that in fact it's a client who signed it.

        MS. BROWDY:  Well, what about the issue again that the
Court just raised?  If there are written agreements within the
relevant time -- I've looked at some of the written agreements
that the Speights firm has given to us.  Some are signed late
in 2004.  Some in 2005 as part of this process.  That does not
mean that he had authority in March --

        THE COURT:  So take the depositions or send out a
written interrogatory or do whatever you want to do in that
score.  I don't see that that issue at this point should be
holding up the rest of the objection to claim processes.

        MS. BROWDY:  Right, well -- exactly, Your Honor.
That's why our proposal would be to tee up both authority and

merits objections.  We're trying to tee up the easy ones, so if
I can go after authority ones that aren't going to raise
evidentiary issues like the Anderson Memorial ones we did it --
if we can tee up merits objections to Speights claims that
don't raise evidentiary issues we'd like to do it --

THE COURT:  I think I've given you the parameters.  I
don't think I can say anything more.  Okay?  The parameters
are, not more than twice will any claimant be here.  If the
Debtor can't take two shots at this apple and disallow a claim
as the result, then the claim's going to get allowed and dealt
with somehow or other.  That's it.  That's my bottom line
parameter.  I don't think I can be any more clear than that.
You folks can attempt to work out the Order that determines how
those batches will be done.  If you have some disagreement,
call me on the phone and set up a hearing by phone to discuss
it.  I want this issue done before the next Omnibus, not at the
next Omnibus.

With respect to the -- Mr. Speights, with respect to the
issue of getting this teed up for January, I mean, I don't see
that there's a great difference between January and February
unless something helps your schedule particularly one way or
the other.  If it does, I mean, these cases are going to be
here.  You've got lots of plan confirmation issues.  I want the
Debtor to march along, and as a result I want the Creditors to
march along, but the difference between January and February in

the grand scope of things isn't going to mean much.

MS. BROWDY:  And, Your Honor, if I can clarify, one of the reasons we want January is because the objections process is going in parallel with the estimation process, and in February we're going to get to the close of discovery on Phase 1.  We're going to get to briefing the Daubert issues.  The things we're going to be discussing on item 5, January's a more clear time for us to do it.  Again, February bumps up against Phase 1, that's why we asked for January.

THE COURT:  All right.  So, Mr. Speights, if I pick a date that's sometime in January, can you live with the fact that you'll work with the Debtor to see what other authority issues can be dealt with in batches, and to the extent that there aren't any then the issue of the authority will simply be another issue that will be part of whatever other objection claim as to that building the Debtor's raising, or that client of yours that the Debtor is raising.

MR. SPEIGHTS:  I understand what Your Honor wants and I'm not gonna sit here and argue with Your Honor.  I would request, Your Honor, to direct the Debtors, now that we're going through all of this authority and now that they've heard what you've said today about your views on authority and having a signed piece of paper for them to let me know at some reasonable -- within a reasonable period of time -- a week or 10 days -- which ones they are not going forward on, on

authority objections.  Because I believe that at the end of the
day the Debtors will not go forward in light of what Your Honor
said on a large number of these claims for which I have written
contracts, pre-bar date.

MS. BROWDY:  Your Honor, I'm not adverse to letting
Mr. Speights know which ones we will or will not be going
forward on authority grounds.  As a practical matter, it's not
going to be a week or 10 days.  As we've mentioned earlier, I'm
on trial in Spokane right now.  It's likely to go through
Thanksgiving.  But we can certainly let him know that before
the December Omnibus.

THE COURT:  All right.  Mr. Speights, they'll get to
you before the December Omnibus so that we will know at the
December Omnibus what else is going to happen with respect to
objections to your clients' claims.  Okay, having gone through
all that, is there any Supplemental Order that I need or is
this going to be taken care of in the Order that's vacating the
November 10th Order and then adding -- and setting up a new
process?

MS. BAER:  Your Honor, I think given you've vacated
the November 10th Order, we will then work with Mr. Baena and
Mr. Speights to submit new Orders --

THE COURT:  All right.

MS. BAER:  -- dealing with this issue or contact you
if we have issues we have to deal with.

72

THE COURT:  Okay, thank you.

MS. BAER:  Your Honor, at this point, it is 1:15.  So it probably makes sense to take up agenda item #5.

THE COURT:  Probably does.

MR. BAENA:  Can you give us a sense of what our timing is today?  Do we only have 15 minutes to cover these two pretty substantial issues?

MS. BROWDY:  I'd be happy to do it in 15 minutes, Mr. Baena.

THE COURT:  Well, Kaiser is set to start at 1:30.

MR. BAENA:  Okay.

THE COURT:  So that's 15 minutes.  Unfortunately, Kaiser's probably going to get a little delayed as a result. USG has nothing going forward this afternoon, so I think I can allow a little slippage so that we'll start Kaiser -- let's say at 2.  So I'll give you until 2.

MS. BROWDY:  Okay.

MR. BAENA:  Would you like to dispose of Kaiser now and then we can come back and finish in --

THE COURT:  It's --

MR. BAENA:  -- one fell swoop?

MS. BROWDY:  Your --

THE COURT:  I think, Mr. Baena, that Kaiser's going to be just as bad.

(Laughter)

          MS. BROWDY:  Yeah.  Yeah.  Your Honor -- and I'll be
very, very brief.  I'll try to finish my remarks within 10 to
15 minutes.  The issue we have right now is a procedural one.
How do we structure Phase 1 of property damage estimation to
deal with the issues of constructive notice and the Daubert
applicability to dust sampling?  The property damage estimation
CMO, which is Docket 93-02, already calls for a Phase 1
estimation to deal with these two issues.  We've already as the
Debtors submitted our fact and expert disclosures on October
17th.  We submitted expert reports on the Daubert issue, and we
submitted expert reports and disclosures on the constructive
notice issue.

          THE COURT:  Look, can I see if I can cut through this?
 Because I have spent my entire weekend reading item 15 and all
of the -- or 5, pardon me -- not 15.  And going through these
reports and I have some preliminary views.  And so I think at
this point, I should just go to the preliminary views and see
where we stand.

     On the Daubert issue with respect to the dust sampling, I
think it is appropriate to go forward with that on a Daubert
hearing in advance.  To the extent that you are prepared to
argue whether dust sampling is an appropriate technique for the
circumstances, I think we need to set up an argument.  I'm not
sure what other papers you folks want to file on that issue but
I think it's appropriate to go forward en masse on that issue.

74

On the constructive notice, frankly, I think the Debtor
is going to have to put that constructive notice issue into the
claims objection process that we've just been discussing on
item 6 and figure out claim by claim whether or not the Debtor
is going to raise -- and it's actually in the nature of an
affirmative defense.  I think the constructive notice issue --
because it's really a statute of limitations issue.  So if I
treat the objection to claim as {in quotes} "the complaint,"
and the Debtor's objection to it as {in quotes} "the answer" --
which raises the constructive notice issue then I think we need
to get whatever factual discovery, if any is appropriate, done
on those constructive notice issues.  I'm not sure that you
need any.  It may be a matter of law.  I don't really know
enough about the State laws to know what your views will be
about that.  But to the extent that you need some discovery I
think it can be limited because certainly whether Grace product
was installed in a specific building and when is going to be
the start of when that limitations period will start in any
event.  It can't start before that date no matter what.  It has
to start on a date in which there was some product that's
installed in a building and then whether or not the -- you
know, there was some change to the building.  For example, a
renovation that may have clued somebody in by way of actual
notice that there was asbestos -- may be an issue.  Whether
there has not been any change to a building may be an issue.

I'm hypothesizing.  I don't know what all the issues are that
you'd want to raise, but I'm suggesting that if you need
discovery we should build it in and then I think we can tee up
probably by way of a Summary Judgment process -- once you get
those known facts in place, whether or not there was
constructive notice.  That's my guess.

     If I'm in error and there are really material facts in
dispute then maybe it can't be done on a Summary Judgment
process.  And I think there may be issues where the Summary
Judgment will have to be filed by claim but the arguments can
be addressed at one time.  For example, the law applicable in
California is going to be the law applicable in California.
How it applies to a specific building may be the focus of the
Summary Judgment argument.  And that may vary depending on when
the product's installed, what evidence there is, whether
there's been a change -- a whole host of factors.  I'm not
attempting to articulate them all.  So, those are my
preliminary views.  I think that Daubert works in this fashion.
 I don't know that the constructive notice does.

          MS. BROWDY:  Okay.  Let me respond then, briefly just
on the constructive notice point.  In our 15th Omnibus
objection, we have raised objections to individual claims on
the grounds of constructive notice.  So we have an exhibit to
that 15th Omnibus -- I believe it's Exhibit D-2 but we can
double check.  So we know exactly which buildings are at issue,

which states they're in and the like.  So we again, know who's going to be affected.  And I don't have the exact figures in front of me but my guess it's gonna be most if not all of the traditional property damage claims.  'Cause the whole point is this information has been kicking out for so long.  And in fact if you look at our expert reports I think we say it's the late '70s, early-mid '80s, something like that by which time people should have known.

We also know that for example, Grace Monocoat-3 product -- that's off the market by '73 or that era.  So we know the buildings would already have it if they're bringing claims and that sometime after that we think constructive notice kicked in.  And our proposal then has been to use Phase 1 -- we understand it's gonna be a state substantive standard on constructive notice and that rather than tee up all the claims -- although if we were instructed to by the Court we could -- we thought that it would become easier in Phase 1 if we took the chunks that we made objections to on the 15th Omnibus, the D-2 constructive notice and took in the most -- essentially the most populous states that has the most claims, it's largely going to be California -- that's about a third of the U.S. traditional property damage claims.  Louisiana is also a big chunk but we agreed at the request of the counsels affected by Katrina to take Louisiana off the table.  But certainly at the time we put in our papers, California, New York and then we

thought Louisiana were the top claims that had the most number

of claims in there.  And we thought by focusing on those early

it's a manageable number of claims.  For example of the

California, I think it's on the order of --

THE COURT:  We're -- I'm losing track of what you're

trying to tell me.

MS. BROWDY:  It's that lets tee up California and New

York claims on Exhibit D-2 as part of Phase 1 constructive

notice.  I don't think we're on any different page than the

Court's on.

MR. BAENA:  Well, I disagree.  I disagree completely.

 As I heard the Court, you have concluded and obviously we

completely agree with the conclusion you've reached, that this

matter can't be approached on anything other than a claim by

claim basis because it's based upon knowledge as a fundamental

element in any state, it's based on knowledge.  And I heard Ms.

Browdy agree with you and then reel right back to the same

proposal that you just said won't work.

Your Honor, the illustrative examples that you gave of the

kinds of -- Omnibus facts, if you will -- that might need to be

developed really aren't the facts at all that need to be

developed here, in all due respect.  Ms. Browdy is correct, the

large majority -- or the state with the largest number of

buildings, I should put it that way -- is California.  Now,

parenthetically I'll tell you that does not necessarily mean

California law applies to those.  But the largest number of buildings in a given state is California.  Louisiana appears to be next but they're off the table.  New York was third, however, with the expungement of the Speights and Runyon claims that were in that state, New York fell to eight in terms of the number of buildings that are in that state.

The clear majority of jurisdictions are contamination jurisdictions, Your Honor.  In order for a claim to accrue -- accrue -- in those states you have to prove -- you have to have contamination in your building.  You're quite right.  The issue of constructive notice is an affirmative defense, it relates to statute of limitations.  And in the large majority of jurisdictions and clearly in the state of California, there are two cases directly on point that I couldn't have done better if I ghost-wrote those cases.  Those cases make it absolutely abundantly clear that the burden of proving when contamination occurs for purposes of the statute of limitations, is on them.
 Not on the claimant.  On them.  The claimant only has to allege and prove the fact of contamination.  The claimant does not have to prove when the contamination occurred, and for them to invoke the discovery rule in any of those jurisdictions the burden is on them.

And that's why their proposal is so bad.  Because their proposal attempts, mischievously, I might add -- to shift that burden to PD claimants.  So any time Ms. Browdy reels back to

that proposal, my hair on my neck is gonna go up because that
proposal just doesn't work.  And Your Honor, when a building
was contaminated is obviously different from building the
building.  And when that owner should have known or knew of the
contamination is entirely different.  But it's their burden.
We're not turning the totem pole upside down.  We're not
creating federal common law.  We're not saying California --
they don't really know what they're doing, let's change the law
out there.  That's the law.  And so if they want to go take
discovery now about when contamination occurred, I suppose
they're allowed to do it.  But it's a claim by claim analysis.
 And I think that's all we can say about constructive notice at
this point in time.  It has nothing to do with estimation,
Judge, as a result.  It is not part of Phase 1.  We've got to
tell Ms. Browdy that we are not going to talk about
constructive notice as a Phase 1 estimation issue because there
aren't any Claimants in this room that are participating in
that Phase 1 process.  The estimation is between us and them.
And this is a very individualized analysis.

          THE COURT:  But if we're going to do objections to
claims one by one, what are we estimating?  I --

          MR. BAENA:  Oh, Judge.  Thank you, Judge.  I agree
with you, Judge.  We have said from the very beginning that you
know -- Judge, don't have a bar date, let's just estimate what
the claims are.  We will review it.  Court decided to have a

80

bar date.  We then got Proof of Claim forms and somehow, Judge, we ended up with the worst of every world.  We've got claims objections going on.  PD Claimants are defending themselves. Some regularly on a full-time basis.  Some who will be confronted with multitudinous appearances before the Court. And then we have the estimation process down this other track. Which is really not gonna chug along any faster until we identify the universe of claims.

     And so if claims fall out of bed because of constructive notice, or because the statute of limitations generally -- that's -- that informs the estimation process.  But it's not the same process.  And that's what this Debtor has done, and that's the part of the presentation that is so dangerous to forget -- that there are two very dissimilar processes going on.  They're not one and the same.  They're not the same parties.  They're not intended to end up with the same result.

     All we're doing in estimation judge is coming up with a number that anybody that proposes a plan has to fund in order to pay PD claims.  That's the worst-case analysis.  That's the absolute worst-case analysis.  It does not mean that you can't or a trust can't disallow a claim.  It just means that if the claims are allowed, you're gonna have to pay 'em.  This Debtor's plan is 100 cent plan.  You want to insure that 100% of the allowable -- not allowed -- allowable PD claims can be provided for.  That's what the process is about.  The process

for allowance and disallowance of claims -- individual claims -
- entirely different process.

     And if we accept the proposals that the Debtor is
proposing, they're creating a calculus that only benefits one
constituency.  Just one constituency.  Equity.  Because they
would have you determine a smaller number for the aggregate
estimated value of property damage claims and then they don't
care what happens in the allowance process.  Because if a claim
that you predicted was worth 0, is allowed at 100 cents, there
won't be enough money to pay every PD Claimant.  That's the
problem here.

          THE COURT:  Well --

          MR. BAENA:  And that's why we have these separate
paths and the difference between the two has got to be absorbed
and the impact of each on the other has to be recognized and
not confused.  And so I say, obviously I feel very strongly,
Judge.  But constructive notice issue is an individualized
issue.  It is not part of this estimation.  Let them go forth
but not here.

          MS. BROWDY:  Your Honor, just briefly in response, all
property damage claims are before the Court.  We had notice in
a bar date and as we've made clear from asking for the Phase
CMO process, the estimation process and the claims objection
process can and should work hand in glove.  We know what the
California claims are that we've made constructive notice

objections to on the grounds of statute of limitations.  We can

tee up an estimation hearing to ask what is the standard of law

in California for the adjudication of constructive notice?  You

know, is there a constructive notice statute -- standard, and

what is it?  And then second, assuming there is one, and we

think there is -- what is the date that people in California

were on constructive notice?

        THE COURT:  Okay, well, I think maybe this isn't an

estimation issue.  It might be a Summary Judgment issue as to

whether or not there is a set standard for constructive notice,

pick any State law, I don't really care.  Let's just use

California as an example because if the objection to claim is

based on the fact that under California the statute of

limitations ran and on top of that constructive notice applied

as of a specific date and therefore the statute ran, then maybe

that's a legal issue.  But I think Mr. Baena is correct, from

limited research I've been able to do so far, I don't think you

can knock out every building in California by saying that as of

a certain date everybody in California knew that asbestos in a

building created some property damage claim that should have

been addressed by the -- should have been raised with and then

addressed by the Debtor.

        MS. BROWDY:  Well, here's exactly the procedure that

we're asking for, Your Honor.  Under estimation, the Court has

a great deal of flexibility to set up a procedure.  The Federal

Rules apply, the Federal Rules of Evidence apply, its underlying claims are guided by State law, but again, the procedure that the Court sets up to do it -- again, under Bittner and other cases you have a lot of flexibility. We have proposed an estimation proceeding that for -- we actually again suggested for California, New York and Louisiana. Now it's looking more and more like California makes the most sense, to have an estimation to say, you know, what can you do in an estimation? You can do findings of fact and conclusions of law. What's the legal standard for California under constructive notice, what -- I mean, you have the authority to make those findings.

THE COURT: I don't think that's estimating the claim. I think what that's doing is determining by way of a judgment whether you have an allowable claim that can go forward. Because I would not be determining the value of that claim. Let's say that I decide -- again, hypothetically, just to get to the point -- let's say I decide that in fact, California's constructive notice statute is not applicable to whatever claims objections the Debtor raises. That doesn't tell me that the claim is allowed at a certain value. It simply tells you that that defense doesn't work. So it doesn't estimate the claim.

MS. BROWDY: Well, but, see -- exactly. That's why we're saying this is Phase 1. It's Phase 1 of a two-phase

process --

        THE COURT:  Then --

        MS. BROWDY:  And again, we're trying to -- again,

figure out and make Phase -- the ultimate goal is to make Phase

2 estimation of the remaining buildings a manageable task.

        THE COURT:  Well, I --

        MS. BROWDY:  We --

        THE COURT:  -- think it -- I really don't see how this

is going to be done on something other than a claim by claim

objection.  I agree that we can aggregate issues for the

equivalent of a Rule 42 type of procedure, and to the extent

that you have this objection that you want to raise as to every

building in California that's filed a claim here, it may make

sense to tee up the argument on those -- on that motion

collectively.  You know, just because I say Creditors don't

have to come back here more than twice doesn't mean that we

can't bifurcate issues in some case management process that

makes sense.  And maybe it makes sense to pick out these big-

chunk issues and maybe this is one of them.  But I don't think

it's an estimation process.  It's a Summary Judgment process

you're asking me to determine as a matter of law that there is

a constructive notice statute, that it means X and that it

applies to these cases in Y fashion.

        MS. BROWDY:  Actually, we're not asking for that Y

application until Phase 2.  I mean, that's why we're splitting

it up.  If we just have the finding, what's the legal standard
and what's the date, we can then seek disallowance of the
claims, we know which the claims are or we can seek --

THE COURT:  But the date may be different depending on
each building.

MS. BROWDY:  Well, again, we actually don't believe
it's an individualized issue.  Again, we're seeking
constructive notice finding, not the actual --

THE COURT:  Well, I understand, but constructive
notice still depends on -- under every State law -- on certain
underlying facts.  And I don't think you can make the broad
leap to say that because asbestos is in a building that for
example, again, all hypothetically -- you know, the owners have
changed five times in the past 20 years.  No renovations.
None.  Ever.  Have ever been done in a building.  The current
owner doesn't know whether there was any asbestos in the
building because no -- nothing has ever prompted the owner to
even think about the issue for whatever reason.  You have to
prove that that owner had some reason to have constructive
knowledge.

MS. BROWDY:  But, Your Honor, again.  This is why
we're seeking to split this up.  Because to do it as part of
estimation Phase 1 we wanna again do chunks -- generalized
issues and that's why, again, if we have a finding of what date
of constructive notice and the legal standard, later we can see

--

THE COURT:  I think --

MS. BROWDY:  -- are there individualized issues --

THE COURT:  -- I just addressed the date.  I don't
think you're going to get a finding.  I may be wrong.  Maybe
your discovery will show you that the same date applies
universally to all 1,500 buildings.  I -- that -- seems to be a
pretty quantum leap, but maybe not, you know.  Maybe the same
day will apply.  I don't think you're going to get there in a
Summary Judgment phase.

MS. BROWDY:  Oh --

THE COURT:  But you may.  But you're going to need
discovery to do it.  You're going to have to make the
allegations that say Building Owner X had constructive
knowledge as of a certain date.

MS. BROWDY:  So the proposal is that we tee up a Rule
42 Motion before the Court?

THE COURT:  Well, no.  I think what you need to do is
tee up the objections to claims.  Let's get briefing with -- or
discovery, if that's what you need -- as to the issues that are
going to be relevant on a constructive notice issue.  And then
tee up those briefs, people who wish to participate will and
maybe at that sense it does make sense to join them all for
purposes of decision because the issue may be the same.

MS. BROWDY:  Okay.  And can we get that on the

schedule to tee that up as -- because we have dates blocked out
in March as is, to back those up?

        THE COURT:  If you can do the discovery.

        MR. BAENA:  I'm sorry, tee up?

        MS. BROWDY:  Again, the California issue.

        MR. BAENA:  Well, Judge, I think Plaintiffs ought to
have a right to complain about these issues being treated as
Rule 42 common issues.

        THE COURT:  Well, I'm not saying that that's the way
to do it.  I'm thinking that it may make some sense to go that
way after we get the briefs in and certainly -- whether they
like it or not, if I think that the same issue is going to be
decided the same way, we're going to consolidate them for
argument purposes.

        MR. BAENA:  I understand.  But on briefing, Judge,
you'll come to a different conclusion, I'm confident, but what
I hear counsel urging you to do is give her a date now when
that common issue will be heard, and I don't think we've
accomplished the first step -- should it be heard on a common
basis?

        MS. BROWDY:  Well, again, I think that the Court has
already indicated that, again, for rules -- for a state like
California there are gonna be some common issues but we can --
we know even more than that.  We know there's on the order of,
again, let's say 225 California claims, or so, 200 of those are

represented by Mr. Speights, and I'll lay you odds he's gonna

tell you that most of those are the California universities.

So we're only dealing with a few counsel to begin with.  So --

and again, they already know constructive notice has been

called out in the Phase 1 -- in the CMO as something that we

teed up in March, so again, the timing would make sense.

THE COURT:  Well, if the discovery on the issues

related to the constructive notice can be done in a fashion

that gets you to file whatever appropriate Motion for Summary

Judgment you're asking for, and let the other side respond and

get the affidavits and briefs, I don't have a problem with an

argument on those issues in March.  To the extent that the

issue is the same, i.e., is there a constructive notice statute

that is applicable and if so what factors do I need to know to

apply it to a specific building and if in fact the facts are

agreed upon, whatever you folks decide are the relevant facts.

 And I can do the whole thing by Summary Judgment.  We're going

to do one argument where everybody can have their peace.

MS. BROWDY:  Thank you, Your Honor.

MR. BAENA:  Not in the context of the estimation,

Judge, but in the context of objections to claims.

THE COURT:  Yes.

MR. BAENA:  Correct?

THE COURT:  Well, yes, but I mean, the Debtor --

MR. BAENA:  The --

THE COURT:  I think the Debtor is using the concept of estimation the same way that I'm thinking in terms of Summary Judgment, and their phases really are trying to address legal issues that will then get you into the valuation phase.  So for the Phase 1 issues, which are a subset of legal issues, yes it's a Phase 1 issue.  It's part of the estimation process but I'm not looking at it as an estimation issue.  I'm looking at it as a Summary Judgment issue because if it knocks claims out, they're not going to be estimated.

MR. BAENA:  Judge, I appreciate that.  And I only raised it because I don't want there to be any misgivings about the fact that Claimants have to be involved in the process.

THE COURT:  Well, they've said they've already served the objections on the Claimants.

MR. BAENA:  That's correct.  But the Claimants have to be involved in this process of --

THE COURT:  They have to be if they choose to be.

MR. BAENA:  Yeah.

THE COURT:  If they don't choose to be, they don't have to be.  They've been served.

MR. BAENA:  Well -- look, no.  Let's back up for a second, Judge.  The issue that frankly we think is misguided is whether or not you can bundle claims in California for purposes of determining a uniform date by which all California Claimants received constructive notice such that --

THE COURT:  Well, that's --

MR. BAENA:  -- their claim became time barred.

THE COURT:  Right.  The Debtor's proposition is that one date is going to be a means all and end all for everybody.  I'm not convinced that that's the case.

MR. BAENA:  Okay.

THE COURT:  But that's the Debtor's proposition and maybe that's what they'll prove.

MR. BAENA:  Okay.  I agree with you.  In fact, I can't even conceive of how the argument is made in the face of the substantial law that expressly holds to the contrary in California.  Now, with that, what is the process, then, Judge?

THE COURT:  The process is that the Debtors will file Motions for Summary Judgment as to whatever this issue is.  You can do it first and then do the discovery, which --

MR. BAENA:  As to claim objections, though.

THE COURT:  As to claim objections.

MR. BAENA:  Okay.

THE COURT:  Okay, so -- and it may be appropriate to have those Motions filed first, then open it up for discovery, then get some responses filed or get the objection and the responses and then open it up for discovery.  Then get the briefs in.  So that we can see whether or not you could stipulate to the underlying facts.  The discovery may be more focused if the issue is raised first rather than just on

wholesale opening up discovery.  May make more sense to do
that.  And they want to start with California.  Fine.  So we'll
start with California.  Clear?  Okay?

        MR. BAENA:  I hear you.  We need to --

        THE COURT:  Work out.

        MR. BAENA:  -- notify Claimants about how this works --

        THE COURT:  Well, sure, they'll get notice of the
Motion for Summary Judgment.  And if they choose to respond
they will.  And if they don't, the order that schedules it will
tell them that there will be a default entered against them and
they won't have another opportunity to challenge it later.

        MR. BAENA:  And I presume that the Committee can weigh
in as amicus on the issue, Your Honor?

        THE COURT:  The Committee is entitled to appear and be
heard on any issue, Mr. Baena.  We're always delighted to have
Committee involvement in cases.

    (Laughter).

        MR. BAENA:  Thank you.

        THE COURT:  With possibly one exception that I
addressed earlier in a different case today.  Okay?  Is this --
does that -- well, that addresses the constructive notice.  Now
on the --

        MR. BAENA:  There's only one housekeeping issue that
emerges as a result of your ruling, Judge.  And that is, the PD

CMO, which governs the estimation of property damage claims, left it to this hearing to determine what the shape of Phase 1 would be.  And so we need to -- I suppose -- enter an Order that states that constructive notice is not going to be heard as part of Phase 1.

THE COURT:  Well, no.  I don't think that's quite right.  I mean, we're not using the same language trying to get to the same point.  I'm saying that this Phase 1, if you want to use the Debtor's words, can include Motions for Summary Judgment that address peculiar legal issues or specific legal issues applied to specific claims.  That's an appropriate use of Phase 1.  So to the extent that the Debtor wants to say Phase 1 is going to be Motions for Summary Judgment directed against buildings in California on -- or owners, whoever -- Claimants in California, based on the applicability of California constructive notice provisions, that's an appropriate {in quotes} "Phase 1 determination."  The process by which we get there, however, is not what the Debtor has asked for.  I'm agreeing with you that the process has to be an objection on a claim by claim basis.

MR. BAENA:  Okay.

THE COURT:  But it is, in the Debtor's view, a Phase 1 issue.

MR. BAENA:  I do understand that, Judge.  And the only reason I raised it was because under the CMO, depending upon

the outcome of this hearing, the PD Committee has additional
responsibilities too.  For example if you said we're going to
do constructive notice as part of Phase 1, then we would have
to submit expert reports in December -- early December.  All of
that is by the boards now.  And that's the only reason I was
asking for us to enter an Order which would -- relieves the PD
Committee of having to do any more in respect to the
constructive Trust -- constructive notice issue.

          THE COURT:  Okay.  Well, somebody hopefully is going
to tell me what the law is, if you don't agree with the
Debtor's view.

          MR. BAENA:  Well, we'll be there to tell you what the
law is, Judge.

          MS. BROWDY:  And then just for a clarification, under
the CMO -- the PD Committee will presumably be putting in
reports on dust sampling in -- consistent with the terms of the
CMO.

          MR. BAENA:  We have an obligation for both Phase 1
issues.  If you decide to go forward then we heard you decide
to go forward.

          THE COURT:  Yes, I think the dust sampling issue --

          MR. BAENA:  Is there any point in trying to persuade
you not to go forward on methodology?

          THE COURT:  On the dust sampling?  If you want to
argue whether dust sampling is appropriate to determine the

quantity as opposed to the fact of contamination, we can go forward because, frankly, from everything I've seen so far I'm prepared to knock that out.  And not permit dust sampling.

MR. BAENA:  Well --

THE COURT:  In this case for reasons which I really don't want to take your last 15 minutes to go into.  That's my preliminary view.  But I haven't heard -- I haven't seen your expert reports.  I haven't addressed the specifics of the issue.  I'm taking this all from the briefs and this testing standards that have been given to me and the research in Armstrong and a couple of other cases that I've read.  That's all.  So --

MR. DIES:  Your Honor, Martin Dies, Special Counsel for the Committee.  I certainly have heard what you just said and I hope you will give me a few moments to try to persuade you differently.  At least as to treating this as an overarching issue.

THE COURT:  Oh, it is an overarching issue.

MR. DIES:  Well, respectfully, Your Honor, I don't think it is, the way the Debtor has framed it.  And I will try to cut to the chase and get to the heart of the issue here.  Your Honor, in the July hearing Your Honor made the statement that she did not know if the Armstrong ruling would be applicable to the products in this case because of the difference in the products.

95

          THE COURT:  Right.

          MR. DIES:  That in fact is a substantial difference.

          THE COURT:  There is a substantial difference but so
far in the record I have no information that indicates that
what the Debtors -- how the Debtors' product has been -- I'll
use the words misused.  That is, I know that the Debtor has --
Debtors' product is an asbestos wall insulation that is
generally applied in some liquid format according to the
information that's in the record so far.  I know that it can be
encapsulated in some cases.  It can be covered up in some
cases.  It may not even be accessible to being in a state which
makes it friable at any point in time.  There are significant
factual issues as to whether the Debtors' product is friable,
from my point of view, I mean, from what I see on the record
right now.

     Judge Newsome determined that among other things -- that
the Armstrong floor tile was not friable and therefore the dust
sampling wasn't even a fit for that case.  But in addition, he
went into great length to go through the standards that applied
to dust sampling and why the collection methods can't be
replicated, the results can't be replicated, the process by
which the fragments are sonicated means that there is no means
of telling whether or not the same amount of asbestos fibers in
the same length and the same volume existed before the process
as opposed to after.  All of that means that it's not reliable.

I've looked at the briefs.  I've looked at the standards
that have been attached to the briefs in these cases and I
think he must have done the same thing.  And from just looking
at that, I'm pretty much of the same view.  Now, I haven't
heard the arguments.  I'm only giving you a preliminary sense
because that's what I said I would do.  So I'm giving you my
preliminary sense.  I think dust sampling can be used for one
purpose and that is to show that in a place there is
contamination.  But at this point in time, I'm not sure that
that's the issue.  The issue is is there an unreasonable risk
of contamination?  And I don't think dust sampling is going to
be a fit for that purpose.

        MR. DIES:  Your Honor, may I respond?

        THE COURT:  Yes.

        MR. DIES:  At least briefly.  First of all, Your Honor
is correct.  Judge Newsome said that dust sampling could -- can
be a useful tool to quantify the amount of asbestos.  The
reason that's important, Your Honor, is because in reality, the
products at issue -- fireproofing or sprayed or troweled on
acoustical products are friable by definition.  They're friable
by definition -- by EPA definition and three decades of
regulations that have addressed these products.  There's
absolutely no question about it.

        THE COURT:  If that's the case that they're friable
and they've been in buildings since 1973, we know the last one

was -- last product -- at least, I say we know, from this
record -- was applied in 1973.  Then I think by now people
would understand that there are asbestos issues that are
related to a specific product in a specific building.  If -- I
didn't say that very well.

    What I'm trying to get to, I guess, is to what I said
earlier.  This type of product could be, for example, above the
ceiling in this room.  Okay?  It may never result in anything
that becomes airborne and causes a problem.  It may never do
that.  So if it doesn't, then to use Mr. Baena's word, there is
probably no contamination.  Without contamination, there is no
claim.  Without a claim there's not something that we have to
address.  Now, whether or not there will be contamination
because this claim is somehow contingent is a whole different
issue that may need to be addressed.  But for purposes of the
dust sampling, you can't figure out a contingent claim based on
dust sampling, because it's either there or it's not there.  So
it's either a current claim or it's no claim.

        MR. DIES:  Your Honor's -- is perfectly correct.  The
EPA says that if the material is in good condition, you don't
have to do anything to it.  It's not a problem.  The problem
comes in however, Your Honor, with the type of activities that
occur in these buildings that typically impact and cause these
materials to release fibers.  That sort of thing does not
happen with regard to floor tile.  But what happens in these

98

buildings is --

THE COURT:  Well, sure it does.  You can rip up the
floor tile in your kitchen and stamp on it and, you know,
release asbestos fibers.  Of course it does.

MR. DIES:  Yes, Your Honor.  But EPA says that floor
tile is considered not friable --

THE COURT:  Right.

MR. DIES:  -- unless you do those things -- that you
cut it, you saw it, and you try to remove it.  So that's a
substantial difference because these types of materials are
rendered to release fibers under a myriad conditions in the
buildings such as normal maintenance and custodial activities.
 You don't have to saw it, you don't have to cut it.

THE COURT:  Okay.

MR. DIES:  You don't have to impact it.

THE COURT:  The only thing that the dust sampling is
going to do for you, I think, is show you that if the Debtor
contests that there is asbestos contamination in the building,
the dust sample will show you that in fact there are asbestos
fibers in the building.  That's all it's going to do.  It's not
going to quantify them for you.  It's not going to tell you
whether they're in the air.  It's not going to show you whether
somebody can breathe them.

MR. DIES:  In a general sense, perhaps, Your Honor.
But respectfully, what the dust sampling will show, Your Honor,

is if those materials have released fibers you can definitely
tell if those -- if that material is in the surface dust.  That
can be determined very easily.

            THE COURT:  Sure.  Okay.

            MR. DIES:  So you can tell the historical accumulation
of dust.  And here is the big issue, that the Debtor's proposal
ignores.  There's really two issues here.  One is that this
material, because of the fact that it is rendered friable in
dust under all these typical conditions in the building, unlike
floor tile it does create surface dust.  And the fact of the
surface dust is in itself an exposure hazard.  Yes, it's true
that asbestos has to be inhaled to cause disease, but the whole
point of these cases, Your Honor, is they're property damage
for present property damage.  And looking at it from the
standpoint of the owner, the damage is that his building
environment, and his building property has been allowed to be
contaminated and because of this huge body of EPA regulations
and laws, that building, Your Honor, he or she must act to
control that hazard -- that surface dust before it's
reintrained or resuspended in the air.  And there's absolutely
no case in the underlying tort system that stands for the
proposition that the building owner can only prove hazard by
air sampling to reveal some undisclosed level of fibers.

            THE COURT:  I think what I already said was the
surface dust can be used, as I understand it, to show that

there is contamination, but not how much.  Because the test

can't be replicated.  Under Daubert, the fact that they can't

be replicated I think means up front that they're not able to

be subjected to some reliability factor.  Because you can do

the same test and get different results.

MR. DIES:  Well, Your Honor, respectfully, we will be

presenting evidence on that and I --

THE COURT:  Okay.

MR. DIES:  -- and I think that they are -- dust

sampling is reliable under the ASTM standard.  As a matter of

fact, it's been repromulgated at least once, maybe twice since

the Armstrong case, and Debtor's expert, Mr. Morris, is on that

Committee, and it is something that is used by commercial

building owners and public building owners and EPA daily and

regularly outside of litigation.

THE COURT:  Well, if that's the case and you've got

that evidence that is clearly appropriate for a Daubert

hearing.  You've just convinced me even more that this is an

overarching issue and we're going to do it in a Phase 1

estimation hearing.

MR. DIES:  One final point, Your Honor --

THE COURT:  Okay.

MR. DIES:  -- and I will sit down.  And that is the

reason it's not an overarching issue is the way that the

Debtors framed this is dust or air.  But it's never dust or air

in the underlying cases because the building owner under all of

the EPA regulations for these types of materials, not friable

floor tile, can prove their case by other methods, and --

        THE COURT:  That's not the issue for me.  The issue

for me is what am I going to allow in as proof that there is in

fact contamination that's going to cause some level of harm or

some property damage, and how am I going to make that

determination?  That's what this hearing's going to tell me,

whether you can or can't go forward on dust samples.  As I

said, if there had been new standards, fine, I'm not aware of

them.  Give them to me, give me the evidence of reliability.

I'm happy to hear it.  My preliminary view from reading all of

this is that for the most part in the Federal system the few

entities that have looked at it have concluded otherwise.  I

may -- I don't always follow the crowd so maybe I'll conclude

that you're correct and that there is some reliability that --

factor that it's relevant to the issue at hand and that it

fits.  If I can conclude all that you can use it.  If I don't

conclude all that you can't use it.  But we ought to know that

going forward before the valuation hearing starts.

        MR. DIES:  Your Honor, I certainly don't dispute that

Your Honor should, could look at the reliability of dust

sampling or air sampling.  I think it's, however, difficult to

unhinge it from the facts of the claim, and the discovery and

the evidence you would see in each claim and each building

because it really is an individual building by building
determination.

THE COURT:  Well, that may be a relevance issue, but
it's not going to be a reliability issue.  You can either
replicate it or you can't.  It's either accepted or it isn't.
It's either -- you know, there are -- or maybe there are shades
of gray, and if there are shades of gray I have to make a
decision.

MR. DIES:  I'm certainly not gonna try to make that
argument today, Your Honor.  But I know the acceptance issue is
not in the rule, rule similar to a more general acceptance, but
it is reliable --

THE COURT:  No, but it is something that Daubert
talks about, whether the testing methodology is generally
accepted in the scientific community is one of the specifically
enumerated factors, and it is something I'm going to want to
hear about.

MR. DIES:  Yes, Your Honor, and the question is is it
reliable and valid, and I think we can prove that it is.  But
just the one more point.  The reason that I don't think it's
going to result in some overreaching expungement of claims is
because whatever you decide with regard to dust sampling these
Claimants can prove their claims by other methods as envisioned
by the case law.

THE COURT:  I understand.  But the issue is whether

or not going forward in the valuation hearing I'm going to hear any evidence of dust sampling as a method for determining the value of claims for purposes of funding the Trust.  I have a very limited focus in what I'm doing.  This isn't the -- this piece isn't the Proof of Claim itself.  Now, maybe the Debtor will want to take on that issue, or maybe the Claimants will, and if so then maybe I have a different relevance issue.  But in figuring this as part of the estimation phase what I'm eventually trying to get to is what are the value of the claims that have to be funded?  That's it.  And whether dust sampling will be a methodology that I will permit to be used as evidence of what the value of those claims are to get to the funding of the Trust.  That's my issue.  In the estimation phase.  Now, you folks disagree then, you know, tell me how you're going to rephrase the issue so that I understand it.  That's what I understood the Debtor intended to do in an estimation.  It seems to me that that's an overarching issue, and it ought to be addressed in that fashion.

          MR. DIES:  Just respectfully, Your Honor, the issue -- even when you decide dust, as we've said, and we cited the Safe Building Alliance case in our brief, what the Debtors propose to determine whether a claim exists on the basis of their sampling has been rejected by every Court that's ever heard this.  So --

          THE COURT:  Well, I --

MR. DIES:  -- that leaves you -- that leaves us with the Claimant can then come in and prove their claim and we've wasted all this time and all this effort.

THE COURT:  They're going to be objecting on -- to specific claims on some other basis.  If the Claimants can come in with some other method to prove a claim more power to them.  Whether or not dust sampling will be permitted is still an overarching issue and Claimants ought to know whether I'm going to let them pursue that evidence.  Because if not they're going to spend a lot of money on experts reports that aren't going to come in and there's no point.  And if so then they should go spend that money on expert reports because that may very well be a good way for them to prove contamination.  One way or another before they spend the money or don't spend the money they ought to know.

MR. DIES:  Well, Your Honor, we will certainly be ready and willing and -- to convince you that this is a reliable method, and I really think that it is.  When you hear it in the context of these cases and not floor tile, for which they were never any cases in the tort system, and we will take that burden on, and I think we can convince you at that time.

THE COURT:  All right.

MR. DIES:  Thank you.

THE COURT:  Ms. Browdy, before you have to run, do you have a concluding comment?

MS. BROWDY:  Thanks.  First of all, again, I
appreciate the Court hearing this in this order.  At the
Court's suggestion last time we talked to your offices and we
have dates blocked out in March and we'll submit an Order on
Certificate of Counsel.

THE COURT:  For the Daubert hearing?

MS. BROWDY:  For Daubert and then I think also the
constructive notice summary judgment.  We may as well tag them
on to the same dates in March.

THE COURT:  Oh, okay.  Well, you can talk to the
other counsel about that and make sure it fits.  If it does
that's fine.

MS. BROWDY:  Thank you, Your Honor.

THE COURT:  Okay.  Ms. Baer.

MS. BAER:  Your Honor, that takes us to agenda item
#7, which is the Debtor's Motion for Proof of Claim Bar Date
for asbestos personal injury claims.

THE COURT:  We are not going to do that today.  Call
my office and get a new date unless you've got some agreement.

MS. BAER:  Your Honor, we don't have an agreement,
although I will say we're very anxious because we have the
questionnaire deadline in January, and I know that Your Honor
does not have any availability until January the hear these
matters, and that creates a serious problem for us.

THE COURT:  Well, then my other option is after I get

finished with every other case today I'll hear it today.  But
I'm going forward with the rest of the agenda first.  My
proposal for Grace starting next year is I'm going to do these
in Pittsburgh.  I think you're right that at this point in time
you're going to need a significant period of time, and I think
I'm not going to hold the rest up.  I do have my staff,
however, looking at adjusting the time frames for the other
cases.  So that if I can do all the other ones in the morning
then I'll give Grace the whole afternoon.  So I don't know
quite when that's going to be.  I will take care of this
problem starting in January, but I can't between now and
January.  I just don't have the time to solve it.  But so if
you want to stay until the end of the day I'll hear it at the
end of the day.

        MS. BAER:  Your Honor, we have to.  I really do think
we have to go forward and address it.

        THE COURT:  All right.

        MS. BAER:  The other significant matter on your
agenda, Your Honor, is our Motion for an Injunction with
respect to the New Jersey civil action, and we are prepared to
go forward and argue that if Your Honor will hear it now.

        THE COURT:  I think we should just put that until the
end of the day to -- well, let me see.  The parties in Kaiser,
what's your estimation for how long the hearing's going to
take?

MR. GORDON:  Greg Gordon, Your Honor.  I would say probably no longer than 45 minutes.

THE COURT:  Well, why don't you take a 45 minute lunch recess and come back in and I'll get as much of Grace done at that time as I can.  Okay.

MS. BAER:  So, Your Honor, you're proposing that we take a recess in Grace now and come back --

THE COURT:  Take a recess in Grace now.  However, I do have a conference call at 4 o'clock.  I cannot have any cases heard between 4 and 5.  You know what, that's not going to work.  We'll just hear them at the end of the day.  Because I have a conference call I have to take at 4.

UNIDENTIFIED SPEAKER:  That clock hasn't be set back, Your Honor.

THE COURT:  Oh.

MS. BAER:  It's only --

(Interruption in recording)

MS. BAER:  -- Grace and come back to Grace at 3 and do Kaiser now, is that what you're saying?

THE COURT:  We'll do Kaiser now.  We'll recess Grace until 3.  Let you folks get some lunch, let Ms. Browdy go so she can catch her plane, and we'll start Grace again at -- as soon as Kaiser's finished.  But at 4 o'clock I'm off the bench until -- okay.

MS. BAER:  We understand, Your Honor, and we're

prepared to come back then, as long as we need to.

THE COURT:  Okay, well, the other thing is I have a
plan confirmation hearing in U.S. Minerals at 5.  I don't think
it's going to take a long time, but it is scheduled.

MS. BAER:  Okay.

THE COURT:  So it will be after that.  Okay.

MS. BAER:  Thank you.

(Recess)

THE COURT:  We're back on the record in W.R. Grace.

MS. BAER:  Thank you, Your Honor.  We have
essentially two contested matters left for the day, and before
we get into either of those I'd like to just get rid of the two
non-contested matters which are the last two agenda items, 11
and 12.  These are the Debtor's Orders with respect to its
Fifth Omnibus Objection and its Eleventh Omnibus Objection.
Your Honor, with respect to the Fifth Omnibus Objection, I have
a Continuance Order continuing what are essentially the last
two contested items on there, and I'd like to hand that up.

THE COURT:  All right.  You can do them both at the
same time, please.  Thank you.  And 12?

MS. BAER:  Your Honor, with respect to agenda item
#12, the only thing left on there was the National Union
claims, and the stipulation, which I handed up, is also an
Order, and that resolves the National Union claims.  It's just
duplicate claims.  There are still National Union claims of

record.  This resolves the duplicates and resolves the rest of that Omnibus Objection, and it will no longer be on your call.

THE COURT:  All right, one second.  Okay, those Orders are entered.

MS. BAER:  Thank you, Your Honor.  That takes us back to agenda item #7, which is the Debtor's request for a personal injury Proof of Claim bar date.  And I'm going to turn that over to Barb Harding.

MS. HARDING:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

THE COURT:  Barbara Harding on behalf of W.R. Grace. Your Honor, as you know we have filed a Motion for a Proof of Claim Form, and by way of a preliminary statement, Your Honor, I do want to just talk briefly about the Proof of Claim.  It's a fundamental feature of bankruptcy, obviously, as the Court knows, and there can be no doubt about the Court's authority and power to issue an order, a bar date in this asbestos bankruptcy proceeding at this time and for these -- this small and limited class of Claimants.

The only question I think that's before the Court is why should the Court do that at this time and how should the Court go about doing it?  And before getting to those two questions I do want to raise one preliminary matter, which relates to the burden involved with this motion.  What party, or what parties have the burden of demonstrating to the Court why or why not?

110

Why should this bar date be issued or why the bar date
shouldn't be issued.  And I just want to call the Court's
attention to a couple of statements.

If you could -- could you turn on the screen please?
Thank you.  Before it comes up, Your Honor, obviously the rule
with respect to the Proof of Claim says shall, and with respect
to the bar date it says shall as well.  And without getting
into whether it has to be ordered I think that there has been
in the cases established that the burden is on the objectors to
the bar date to prove, to make a persuasive showing to the
Court as to why a bar date should not be issued.  And I wanted
to show the Court, and actually I think I could bring up to the
Court the slides if we can't get it on the screen.

THE COURT:  Okay, thank you.

(Pause in proceedings)

MS. HARDING:  We tested it before, Your Honor, and it
worked.  I apologize.  But I will read the quote from Eagle
Pitcher.  "We consider that this rule, 303(c)(3), sets up
something in the nature of a presumption that a bar date will
be set.  But as is the case with the presumption it may be
overcome by a persuasive showing.  We reached the conclusion
that a bar date for the filing of Proofs of Claim should be set
for present asbestos Claimants for insufficient reason has been
shown not to do so."

So with respect to the motion that we've made, Your Honor,

we submit that it is the objector's burden to demonstrate that
the bar date should not issue.  It's their burden to
demonstrate persuasively that the reason for which it's sought
is not legitimate, and that the purpose for which it is sought
can't be served by issuing the bar date.  So I think that's an
important -- the burden is an important thing to consider in
this context.

     Now, let's talk about why the bar date should issue.  The
Court has made -- and the parties, the Debtors and all the
parties have made substantial progress over the past year,
coming up with a structure for dealing with asbestos personal
injury claims.  The Court has put in place many pieces to make
sure that there is a structure in place for dealing with these
claims and that there is a process by which those claims can be
valued, the liability of the Debtor can be determined for those
claims.  And there are several pieces in place.  The Court has
determined that there will be estimation, and that's how we'll
go about it.  There's now a CMO that, you know, took
considerable time went into negotiating that CMO.  There's a
focus on the current pre-petition Claimants determining that
the Debtor's liability for those claims so that we can then
predict the liability for future claims.  The Court has ordered
a questionnaire to be issued on, you know, over 100,000
Claimants.  The Debtor's claims agent -- they've served that
questionnaire out on over 100,000 Claimants.  We've got this

process in place and it's moving along.  We're making progress.

        And the reason that we've made the motion for the bar
date is to make sure now that there is -- that the last piece
is in place, that the Court has the authority to make sure that
the process and structure that it's put in place works.  The
very narrow reason, and I think we've been very transparent
about it, the reason we think we need the bar date is to that
the Court has jurisdiction over the Claimants, the pre-petition
litigation Claimants, to make sure that they return the
questionnaire, and that if they don't return the questionnaire
that the Court has the authority to issue some kind of sanction
to compel them to do so.  And right now there's no process in
place to insure that that can take place.  And I have not seen
anything in any of the objector's pleadings -- they have not
argued about this issue.  They do not dispute that that -- that
the Court's authority is not there on this issue.  And so I
don't -- they haven't even argued it.  And so I think it's a
very important point.

        Now, I was not involved in this case back in January when
this was -- there was a hearing where this issue came up.  And
at that time the Court said, as I understand, I read it all
again last night, the Court said, "I don't think I have to
issue a bar date at this time."  And I think the Court
said, "We're in estimation, I'm going to order this
questionnaire, I don't think we need the bar date at this

time."  And at that time Mr. Bernick raised this very issue.
He said, "I don't think the issue of the bar date goes to the
question of necessarily assessing liability, although it can
help with that."  He said these very words.  AWe need to have a
way to have process over the Claimants.@  And at that time I
think it's very important -- I wrote it down last night.  At
that time Your Honor said to Mr. Bernick, Your Honor said,
"Well, I think we can deal with that."  And you said two things
that I think are very important.  First you said, "It seems to
me that the attorneys -- that if the attorneys are willing to
go back to their clients and file something that says my client
understands that there's going to be an estimation hearing and
that they will be bound maybe I don't need a bar date."  Now,
as far as I know that's never occurred.

     The second thing that the Court said was that I've got
gazillions of 2019s and maybe -- and I can't get process over
the Claimants but maybe I can get it over the lawyers.  And so
that's where it was really left, with this idea that there
might be this other mechanism for having process over the
Claimants.  And that was the context in which the questionnaire
was negotiated and the context in which Mr. Bernick made the
statement in the July hearing.  We had originally had a
questionnaire that had on it, in the front of it it said Proof
of Claim/questionnaire.

     And so when Mr. Bernick said we're not seeking a Proof of

Claim, we're not seeking a bar date it was in connection with
the questionnaire, which we are not.  We are not seeking to
make the questionnaire a Proof of Claim form or a bar date.
We're simply saying that there's nothing in place right now for
the Court to have jurisdiction over these Claimants.  And I
don't see anything coming from the other side suggesting that
that's not true.  And so the only thing that I see in their
pleadings arguing for why there should not be a bar date I
think are simply, one, not relevant to purpose for which it's
being requested, and two, I think they've been soundly rejected
in the past.  First -- the first issue, if you can turn, Your
Honor -- and actually, before we get there Your Honor, if you
-- does the Court disagree or want more argument on the issue
of jurisdiction --

          THE COURT:  No.

          MS. HARDING:  -- in the 2019?  Okay.  With respect to
the question of -- the fact that other cases have not issued
bar dates, other asbestos cases have not issued bar dates, I
did actually prepare -- the objectors make a big deal about,
well, they do this all the time without bar dates, but there's
a couple of, I think, very important distinctions, and I think
it actually gets back to something Mr. Bernick said all along.
 You have to view each individual asbestos case in the context
with which the issues arise.  And it's different in every case.

          And so I note for Your Honor two main things with respect

to the other cases where bar dates either have or haven't been
issued.  Well, first of all, they have been issued in the
context of the case where estimation is going on.  In Babcock &
Wilcox and in Eagle Pitcher, in both of those cases estimation
occurred and there was a bar date with respect to asbestos PI
claims.  So in connection with the other cases that were listed
by the objectors as reasons why a bar date shouldn't issue here
there are two important distinctions.  One, as far as the
Debtors can tell, in those cases the Debtors didn't request a
bar date.  There are a couple places where I think in -- I'm
not sure, in Owens Corning, I think, another party requested a
bar date, but the Debtors didn't request a bar date.  And I
think if Your Honor will look at slide #6 from the Eagle
Pitcher case, Your Honor, the Court in that case made a very
important statement, and I'm gonna read it because it's not in
front of Your Honor.  So, "Initially we deal with the
contention of the Debtors that they have an absolute right to
have a bar date set by which time Proofs of Claim must be
filed.  After careful consideration of this question we have
reached the conclusion that while such bar dates are commonly
set upon good cause shown the Court may dispense with one in
any given case.@  Again, upon good cause shown.  "In reaching
this conclusion we are not aided" -- I think it's very
important -- "not aided by the information communicated to the
Committee that in none of the other cases, asbestos cases,

which are known has a bar date been set for there is no
indication in any of the decisions in those cases that where no
bar date was set that the Debtor which was involved desired
that there be one."  I think that's an important distinction
with respect to this matter.

Secondly, in none of those cases, I think I can say
unequivocally was there a discovery questionnaire that the
Court had issued and had required that the pre-petition
litigation Claimants return.  And so this issue of the Court's
jurisdiction over the claim it just simply wasn't present in
any of those other cases, or quite frankly, in any other
asbestos bankruptcy case, I don't think.  And so I think that's
another important distinction to make.

The next point I want to make, Your Honor, I think it goes
to the fundamental objection that the objectors have to the bar
date, which is they say it doesn't get to finality.  It doesn't
real help us with finality, and they say it's the primary
purpose of a bar date is finality.  And I can't find anywhere
in the case law that says that the Debtors have to show that
it's the primary reason for issuing the bar date.

One, we disagreed with the idea that it's not -- it
doesn't help serve the purpose of finality.  We think it does,
and I have some quotes here from prior cases, Your Honor, where
I think that that idea that it doesn't help get to finality is
not true.  But importantly, it doesn't -- it still doesn't get

to the fact that the reason that the Debtors are asking for the
bar date in this case is more fundamentally about jurisdiction,
and I think we quoted, Your Honor -- I don't have a slide, but
I have the quote here from the IN RE: Hooker case, Your Honor,
where the Court stated, "Filing a Proof of Claim is not merely
a means of providing information to the Bankruptcy Court but as
a means of involving the Bankruptcy Court's equitable
jurisdiction over the bankruptcy Estate to establish the
Creditors rights to participate in the distribution of the
Estate."  The idea that the bar date is important for
jurisdiction I think is it's established, it's certainly a
legitimate purpose for seeking a bar date, and I think that the
objectors have the burden of demonstrating why it shouldn't be
issued to serve that purpose in the context of this bankruptcy.

    And finally, Your Honor, with respect to the finality
argument, I think the two statements from IN RE: Eagle Pitcher
and from Babcock are very important.  And I am going to go
ahead and read them, Your Honor, because I think it's important
to focus on them.  With respect to slide 7, it says in IN RE:
Eagle Pitcher, "Only two of the grounds urged by the Committee
against the setting of a bar date warrant more than a cursory
comment.  The first of these that the setting of a bar date
will not serve the purpose that a bar date usually does in a
Chapter 11 case of assuring finality and affixing the universe
of liability is not persuasive.  There is no question that the

setting of a date by which a claim must be filed, the procedure employed in virtually all bankruptcy cases, does help fix the universe of Claimants to be faced by a Debtor."  That's true of this.  With respect to our pre-petition litigation Claimants it will help us understand precisely who among that universe of Claimants intends to pursue a claim against the Trust.  And I'm happy to address the question of whether we really know who those people are or not.

But I think the objector's own pleadings demonstrate that we don't because they've said that we -- they make a statement, an unqualified statement, there are lots of people that haven't received their questionnaires that should.  Well, the Debtor's sending out to everybody in their data base that we think had a pre-petition litigation claim.  And we sent correspondence requesting information about those Claimants.  We haven't received a response back, but that surely is one indication that we don't necessarily know the universe of these Claimants.

Secondly, Your Honor, the objectors have made a couple of statements over the course of the past several months that I think is simply not true.  When we bring up this issue and we say how are the experts gonna treat these people that don't respond?  They say, "Well, if they filed a claim before they're gonna file a claim against the Trust."  That -- I mean, the PD experience demonstrates that it's not necessarily true, and Your Honor, local counsel for Grace received a call on Friday

from counsel in Mississippi stating that they wanted to figure
out how they could withdraw their claims from the personal
injury context.  Three thousand of them.  So we have a problem
of identifying this universe of Claimants, and the bar date
will help us to set that universe, and then there's no doubt
that that helps us with respect to finality in this proceeding.

Secondly, while -- back to Eagle Pitcher.  "While the
Committee is perfectly correct that ascertaination of the total
number of Claimants in and of itself will not yield a value of
present asbestos claims, nevertheless, it is manifest that
fixing the number and identity of such Claimants will lend
considerable assistance to the process of arriving at a value
of the claims of this class."  It will absolutely help us
determine the value of the claims of this class, the
pre-petition litigation Claimants.  Which is very important,
obviously, as the Court has recognized, for helping us to
assess future claims.

So -- and finally, Your Honor, the Babcock & Wilcox
decision, I think, is very informative for the issue before the
Court.  In that case another quote, "This Court does not find
that the prospect of establishing a section 524(g) Trust
justifies relieving present Claimants from asserting their
claims before a bar date.@  That's the main argument raised in
the objections.  That we're gonna have a Trust we don't need a
bar date, and the Court resoundly rejected that argument and

gave three reasons.  AAscertaining the number and identity of present Claimants will assist in valuing the claims in this class by facilitating the claims allowance and estimation process," including estimation right there.  "This in turn will assist the parties in the negotiation and formulation of a viable reorganization plan, and third, moreover, although future Claimants are not governed by a bar date an identification of the number and nature of present asbestos related claims will help to predict the Debtor's future claims liability, which is necessary for determining the size and structure of the Trust."

So Your Honor, we think that there is absolutely no reason not to issue a bar date here.  It serves several very legitimate purposes, and it's the objector's burden to make a persuasive showing as to why it should not issue.  So, thank you, Your Honor.

MR. PASQUALE:  Good afternoon, Your Honor, Ken Pasquale for the Official Committee.  Just wanted to mention, we do support the Debtor's motion.  Ms. Harding mentioned some comments the Court made in January.  In fact, those comments were made in response to my partner Mr. Kreuger=s comments to the Court about the need for a bar date, mentioning the fact, of course, that not only did our constituency fill out Proof of Claim forms, but of course the property damage Claimants did, and they were quite detailed.  I'm not gonna belabor those

arguments again now, but we do think when the Court said there might be a time later this seems to be the time, at least for this limited subset, in light of the fact that the information simply isn't there in the 2019 filings.

Putting aside whether they should be or shouldn't be at this point, the fact is they're not.  So I think the Debtor's motion should be granted.  Thank you.

MR. LOCKWOOD:  Your Honor, this is a really remarkable performance.  Normally parties seeking discovery do so because they have a case that they're litigating with somebody, and the discovery is the aid of litigating the case.
 Here the Debtors have no case against anybody, because the claims haven't been filed, but they want to take discovery.  So how do they solve their problem?  Well, they say, "We'll get the Court to order these people to file cases which will then give us jurisdiction to get the discovery we need."  On the face of it that's got it backward, but the other thing is what the Debtor never addresses here, in particular in connection with its Power Point charts and the rest, is what actually is the purpose of a bar date in a Bankruptcy Court, and what are the consequences of filing one?

They want -- number one, first they're not asking for a bar date for an entire universe of claims.  They're just not.
They're not asking for a bar date against anybody who either didn't happen to file a lawsuit prior to the petition date but

nevertheless had become sick and just hadn't filed the lawsuit, nor are they asking for a bar date for the 42 years worth of people that have gotten sick since June of 2001 when they filed their petition and would have filed claims against Grace if they hadn't be subject to the automatic stay.  So they're clearly not asking for the entire universe, they're just saying they are.  And moreover, the entire universe actually includes the future Claimants, who they couldn't get a bar date against even if they wanted to.

Secondly, they say they don't want to do anything with respect to individual claims.  They say they want to do a 524(g) plan.  As the Court is well aware, in a 524(g) plan you set up a Trust, the Trust resolves all the claims.  So by hypothesis, if you're going to elect the 524(g) route there's absolutely no purpose to be served in setting a bar date to force people to file claims in the Bankruptcy Court, which by hypothesis is for the purpose of allowing the Bankruptcy Court to determine whether a claim should be allowed or disallowed. But they're not doing that here.  And most of the cases they cite about bar dates are not 524(g) cases.  They're cases in which one way or another the Bankruptcy Court believed it was gonna have to resolved the individual claims.

Now, they have cited two cases as authority for the proposition where you would have a bar date.  <u>Babcock & Wilcox</u> and <u>Eagle Pitcher</u>.  In <u>Eagle Pitcher</u>, although the Court did

have a bar date, there's absolutely nothing in the reported decisions of that case or that the Debtor has ever brought to this Court's attention that suggests that the bar date ever produced anything that was used in the estimation to any useful purpose.  And there certainly -- in the discussion of the contested estimation that did occur it was done on the basis of the settlement history of the Debtor.  It was not done on the basis of dragging some experts in in some undisclosed manner who are gonna tell the Court which of the pending claims are valid and which aren't, which is the Debtor's posture here.

They still haven't told us how the experts are gonna do it, but they keep saying, trust us Judge, trust us Judge, we need this information because our experts are gonna take it, and our experts are gonna tell you how these 150,000 claims should be sliced and diced in terms of their validity and their value.  And Babcock & Wilcox, which the Kirkland & Ellis firm was the -- the firm that got the Debtor to make the motion for a bar date and it was granted.  What happened?  They did in fact persuade Judge Vance that they should have a bar date, and they did it for the purpose of saying that they wanted claims allowed and disallowed.  They were gonna have Rule 42 consolidated trials.  They were gonna have Summary Judgment Motions.  Had nothing to do with estimation.

And when -- after the bar date was passed and 240,000 claims came in they were then in front of Judge Vance and Judge

Vance was asking, "Well, okay, now that I've got 240,000 claims what do you expect me to do with them?"  And the transcript recites Mr. Bernick attempting to explain to Judge Vance about how she was gonna do Summary Judgment Motions and for groups of cases, and consolidated joint trials, and these were all gonna be done in big groups.  They weren't gonna be done one by one because Judge Vance said, "I'm not young enough to do 240,000 claims."  And eventually Judge Vance said, "Well, you haven't convinced me, but go off and brief it, and explain to me how this process is gonna work."  And the next thing we knew we had a consensual plan.  So it was never used in Babcock & Wilcox either.

So now we're back to this case, and the Debtors are correct.  There's never been a case in which any Court ever ordered 150,000 people to fill out questionnaires of the length and breath that this Court has argued in this case.  So, they're right.  This is a unique case.  But they're boot strapping themselves.  Having gotten the Court to order a questionnaire which the Court justified on the grounds of giving them discovery on an estimation which was supposed to be for aggregate purposes, not individual claims allowance.  They're now here saying, "We want a bar date."

Okay, supposing the Court gives them the bar date.  What happens?  Hundred fifty thousand people file claims.  First, the notion that the questionnaire isn't really the Proof of

Claim form is sort of ridiculous because the two-page Proof of Claim form that they give as an alternative, if somebody files that and doesn't answer the questionnaire you know and I know, and that's what this whole jurisdictional stuff is about, that they'll come in and say, "Well, Judge, they didn't file the questionnaire, so even though they filed the Proof of Claim their claim should be disallowed as a discovery sanction." That's their first point.

The second point is what happens in a bankruptcy case when somebody files a Proof of Claim?  They're only required to file it if they want the claim allowed.  But once they file it is it prima facie valid.  The Debtor then, if it doesn't -- if it wants to contest it has to file an objection to it.  And the Debtor in this jurisdiction, and in no jurisdiction could file an objection that says -- a global objection says they filed 150,000 claims, we object to all of them.  Which means that therefore in theory unless they go through them one at a time they're all gonna be allowed.

But the Debtor says, "No, no, no, no.  We're not gonna do that.  We're gonna estimate it."  Well, what do you mean you're gonna estimate it?  Section 502(c) of the Code provide for the estimation in lieu of a 502(a) allowance.  But 502(c) talks about estimating the claim for purposes of allowance, and that means that if you're gonna estimate claims rather than go through the full litigation you still have to estimate them one

by one, and when you come in and you say I want to estimate

your claim, Mr. Claimant, that initiates a contested matter,

which gives the Claimant the full panoply of discovery and due

process rights.  What happens then?  Well, if you're estimating

a personal injury claim for purposes of distribution, say 28

U.S.C. section 157(b)(2)(b) says the Bankruptcy Court can't do

that.  Only the District Court can do that.  It's not a core

matter.

        THE COURT:  But it doesn't mean I can't do it.

        MR. LOCKWOOD:  Well, you could --

        THE COURT:  For estimation purposes I can do it.  I

just can't do it as a core matter without making proposed

findings of fact --

        MR. LOCKWOOD:  Right.

        THE COURT:  -- or the party's consent.

        MR. LOCKWOOD:  You would have to make recommendations

under Rule 9033.

        THE COURT:  But I could certainly --

        MR. LOCKWOOD:  You could --

        THE COURT:  That's right.  But I can do it.

        MR. LOCKWOOD:  -- do it.  But you wouldn't have the

final word.

        THE COURT:  Exactly.

        MR. LOCKWOOD:  Instead they'd all go up to the

District Court, which would have de novo review under 9033.

THE COURT:  Unless the parties had good sense and consented to the entry of a Final Order in the Bankruptcy Court.

MR. LOCKWOOD:  Well, maybe, but that's 150,000 individual estimations, and moreover, in the District Court there's -- you run into 28 U.S.C. section 1411 that says you're entitled to a jury trial, and all of these things --

THE COURT:  I don't know about on the estimation issue.

MR. LOCKWOOD:  Well --

THE COURT:  On the allowance issue -- you see, that's the problem.  I think there is a big difference between estimation and allowance.  Estimation of a personal injury matter probably isn't core simply because the ultimate allowance of the claim is removed from Bankruptcy Court jurisdiction, but the estimation purpose is not to allow the claim itself, it's to figure out for distribution and confirmation, I should say, issues what the likely universe of claims will be and what the value is.  It's a different purpose from the analysis of the claim itself.

MR. LOCKWOOD:  That's why 157(b)(2)(b) distinguishes estimation for purposes of feasibility, which is a core matter and which is done on an aggregate basis, from estimation for individual claims for distribution purposes, which -- why does the statute say the District Court has to do that?  And it's

because estimation for -- of a tort claim is considered to be
the functional equivalent of resolving the tort claim, and if
you're gonna resolve the tort claim you have to do it in front
of a jury to get the value out of it.

But in any event, we're not here today to debate whether
that is or isn't.  What I'm -- the point I'm trying to make is
that when you set a bar date you set in motion a process.  And
that process is the resolution of those individual claims.  And
this Debtor doesn't intend, it says, to set in motion that
process.  It's gonna have what I would call a bogus bar date.
It's gonna set a bar date, and then the minute the claims come
in it's gonna say, "Stop, go no further.  We're not actually
gonna use the mechanisms that a bar date is put in the Code and
the Rules to work with, namely claims allowance and
disallowance.  Instead we're gonna just leave it there forever
and it's solely gonna be for the purpose of allowing the Court
to disallow claims for -- as discovery sanctions if they don't
fill out a questionnaire.@  And Ms. Harding said, "Well, I
never heard of anybody challenging the Court's power to do
something like this."  Well that's because nobody's ever asked
the Court to do anything like this before.

They haven't cited any case where a bar date was proposed
to be set for purposes of setting up discovery sanctions on
people who aren't even parties.  We start out again with the
aggregate estimation.  These Claimants are not parties unless

they choose to be parties in that case, and while the Debtors
-- basically the Debtors sort of want to commandeer them into
that role, and with all due respect, we think that that is
inappropriate and is inconsistent, and is gonna give rise to a
lot of problems down the road because if I were a Claimant and
the Debtor forced me to file a claim, and the Debtor didn't
object to my claim and didn't get it disallowed my position
would be, is my claims allowed?  And what's gonna -- what
happens then?

        THE COURT:  Well, I think if I have a bar date that
requires people to file claims and there's no objection to it
the claims are allowed.

        MR. LOCKWOOD:  And furthermore, they can't make an
objection by saying I object to 150,000 claims on some piece of
paper that Mr. Bernick and his troops are gonna draft and file
here.

        THE COURT:  But that still doesn't set the value
issue.  You know, there -- look, the bottom line for the
Debtor, and for probably all the experts, really is to try to
get a grip on not just the number of claims that are going to
be filed against the Estate, but what level of asbestos
disease, if any, people are claiming.  And --

        MR. LOCKWOOD:  I understand that, Your Honor.  And
the irony of all of this is that the Debtor's experts and our
experts are able to do that probably better without looking at

the pending claims than they would with looking at the pending

claims, because number one, they've got the history, and number

two, they've got -- they're all gonna be making predictions

about what the impact of the new laws are in the states, for

example, where you can't file nonmalignant claims unless you

meet very rigid medical and exposure requirements and things of

that nature, and it's gonna be -- it's not gonna get involved

in going through claim by claim 150,000 claims and having some

expert put -- make piles, here's a good claim, here's a bad

claim, here's a medium claim, and come into Court and say,

"I've reviewed 150,000 claims."  It's just not gonna happen.

     And moreover, as I said earlier, it's incomplete because

they're not estimating the 42 years of claims that are -- that

have accrued since then through this method.  They're gonna

have to estimate them some other way.  What is the other way

gonna be?  It's gonna be their experts are gonna make

predictions about where those claims -- they're either gonna

predict on the basis of history, they're gonna predict on the

basis of some selected number of the pending claims that

they've reviewed as part of the questionnaire process, they're

gonna use the Manville Trust experience because Manville gets

all the claims.  I don't know what they're gonna use.  They

haven't told us.  But the idea that somehow or another

subjecting the claims -- the subset of claims that was filed in

a Court, which they say in their first brief that -- on page

10, oh, we know what they are, and now Ms. Harding here today
says, "Oh, no, what we don't know what we are because we're
getting lawyers who are telling us you didn't send me enough
questionnaires because I have more claims than you think I
have."  Or, "You did send me a questionnaire but I didn't
really -- I don't really have that case."  Or, "I don't know
whether the Plaintiff is the same," or whatever.  I don't know
at the end of the day whether they'll ever sort that out or
not, but the fact is Your Honor put her finger on it at the
very first time this was argued, which is, no matter how they
slice and dice the 150,000 claims, and no matter how big a
subset it may be it's still a sample.  Because they're gonna be
extrapolating hundreds of thousands of future claims from it,
and they're gonna be extrapolating the unfiled present cases
from it.  So it's still gonna be a sample.  It's not gonna be a
universe.  And who -- where have we seen any expert affidavit
or anything that says, "Gee, Judge, if the questionnaires only
came back with 75,000 claims I couldn't estimate what the -- do
my estimation job properly, because I have to have 100% return
on 150,000 claims."

     She said -- they argue that there's gonna be bias.  Well,
I mean, maybe yeah, maybe no.  I guess you'd have to look at
the 75,000 claims before you could really determine whether
there was bias or not.  You'd need to know why some -- why the
75,000 questionnaires that weren't answered or the claims that

weren't filed, why they weren't filed.  Maybe they'd be

representatives of the ones that were filed.  Maybe they'd be

unrepresentative.  Is the -- how is the Debtor's expert -- the

Debtor's expert, I suggest to you, is gonna take the position

that every claim that does -- every questionnaire that doesn't

get answered, and/or every claim that doesn't get filed is

because, a) it's an invalid claim, b) they'll derive

percentages from the non-filers from the universe, supposedly.

 So if a third, let's say, or in my hypothetical, if half of

the them didn't respond to the questionnaires, the Debtors

argue, that shows half of all our future liability is already

-- should be gone, because those people have basically admitted

they have no claims by failing to file the questionnaire.  And

now we'll look at the remaining 75,000 and our experts will

tell you how to further reduce the validity and amount of those

claims.

     And again, none of this has anything to do with a bar

date.  And it certainly doesn't answer the problem that you're

gonna create if you wind up having people with entitlements to

have their claims allowed because they filed them and no

process for objecting to them.  If the Debtors were really

serious about this proposal, Your Honor, they would do what

they tried to do, or said they were gonna do in B&W, which is

they would say, "Okay, we'll step up to the plate.  We'll admit

what we're really doing here is individual claims analysis,

evaluation, and disallowance, and we'll go through the process, and we'll try and explain to Judge Fitzgerald, and to Judge Cotty, or whoever the District Court Judge here turns out to be, we'll explain how we're gonna do that for 150,000 cases, and then where that's gonna take us for the other cases that haven't yet been filed and the futures.  But they're not doing that.  They're just presenting this whole thing as a discovery mechanism on their part, and that is not an appropriate use of a bar date, and no Court has ever held it was.  Thank you.

        THE COURT:  Okay.  I'm sorry but I told you I had a conference call at 4 o'clock.  I do.  So I'm going to take my conference call.  You've got -- at your discretion you can try to stick around if you want and see if I get done before 5 o'clock.  I have my doubts.  Or else I will reconvene this after the U.S. Minerals plan confirmation hearing, which starts at 5 and will end when it ends.  As far as I know, most of the issues have been resolved, so I don't expect it to be too lengthy.  We'll be in recess.

        (Recess)

        THE COURT:  All right.  We're back on the record in WR Grace now.  Thank you.  Mr. Esserman?

        MR. ESSERMAN:  Yes, Your Honor, Sandy Esserman on behalf of Baron & Budd, ELG, Peter Angelos, Reaud, Morgan & Quinn, & Silber Pearlman.  I'm gonna be very brief.  I think Mr. Lockwood made many of the arguments.  I would point the

Court to a couple of things.

One is the purported reasons for this Proof of Claim put for the Debtor in their own motion.  They had five bullet points that I think are sort of instructive.  The first bullet point is why they need a Proof of Claim with the Reaud, Morgan & Quinn firm disputed the Debtor's definition of what constitutes an unresolved claim.  Filed an objection to complete the PI questionnaire on behalf of those claimants who settled, but unpaid or partially paid claim.  That's no longer a reason and you've already ruled on that.  And they know all of the information about those claims.  They've got records.

The second bullet point out of five was despite having filed the Rule 2019 Statement in the case, it appears that Reaud, Morgan & Quinn's Rule 2019 Statement may be incomplete.  Once again, they discovered 50 claims that were filed in the Silicam DL that did not appear on Reaud, Morgan's 2019.  Well, Reaud, Morgan doesn't represent those people.  We've been through this once before.  That's reason number two out of five as to why we need a bar date.  I would contend that none of those are reasons.

Further, law firms have denied that they presently represented, or in some cases ever represented claimants and the Debtor's records indicate they are counsel of record.  That's always gonna be the case.  People -- whenever you're dealing in a mass tort with 100,000 claimants, clients are

gonna fire their lawyers, they're gonna change lawyers, that's
just a fact of life, bar date or not.  Law firms have been
requesting extra questionnaires.  I don't know what that has to
do with a bar date.  And then law firms have been requesting
lists of Social Security Numbers of claimants where they
received PI questionnaires for purposes of cross-referencing
their list of PI claimants.  Once again, I'm not so sure that
necessitates a bar date.

So I think the reasons why this bar date has been
requested just don't support the institution of a bar date.
I'm gonna reserve my argument on due process issues.  I don't
really want to get into it right now and the due process issue
should -- sort of an alternative argument.  I certainly don't
want to be in a position of waiving that argument.  I don't
want to have to make it now until it appears that we need one,
but need to have such an argument, but the Debtors have
proposed a January, I can't remember the date, 15, 17, 12th,
some date in January for the return date for a bar date and
this -- that just does not even come close to complying with
due process.  In cases where we've have bar dates, we've had
extensive notice proceedings.  We've had advertising.  We've
had newspaper advertising.  Sometimes you'll have TV
advertising and it's sometimes a year process, eight-month
process to get all of that done and, in fact, the Kirkland firm
is very familiar with cases that have had bar dates, Dow-

Corning, you know, these -- the notice has been extensive and certainly would go well into 2006.  I'm not sure that that's really what is -- what would serve any purpose at all.  But those are my major points, Your Honor, and I reserve the right should we get into the due process issue.  This is sort of a highlight of the argument.

THE COURT:  All right.  Good afternoon.

MR. WYRON:  Good afternoon, Your Honor, Richard Wyron for David Austin, the Futures Claimants rep.  I join in the comments Mr. Lockwood made and won't repeat them.  I raised just one other point.  One other rationale offered by the Debtor was we needed a bar date to establish jurisdiction. That certainly can't be the case for estimation on an aggregate basis, as opposed to an individual claim basis.  It was most recently done in Owens Corning where there was no bar date and yet the District Court did an aggregate estimation.  It certainly is possible to do.  Our concern is one of distraction.  There are an awful lot of issues associated with the bar date. It reminds of a question Your Honor posed earlier in the day to Mr. Baena, which was if you're doing a individual claim objection on PD, why have an estimation?  This is the flip side.  We're doing an estimation.  We're going to have to do an estimation of unsettled present claims, unlitigated present claims, and future claims anyway, but why do a bar date and tap into an objection process?  Our concern is that it will

become a side show.  It will become a delaying process.  It
will take an awful lot of Court time and futures rep interest
is getting this case moving forward, so perhaps one day we can
stand here like the case you just heard and have a consensual
confirmation.  And if we detour to bar dates, and fights over
due process, and the like, and the lengthy additional time
periods, I fear we move that goal further away, rather than
closer.  And for that reason, we oppose the Debtor's Motion,
Your Honor.  Thank you.

          THE COURT:  All right.  Mr. Becker.

          MR. BECKER:  Good evening, Your Honor, Gary Becker,
Kramer, Levin, Naftalis & Frankel for the Equity Committee.
Your Honor, something I would just mention.  I hadn't
originally intended to speak, but something that was just
mentioned struck me.  Your Honor, as the holder of the residual
interest in this estate, we are entitled by virtue of
1129(a)(7) to ensure that the payment waterfall of 725(a) is
followed and when you look at Section 725(a) it talks about
after the 507 claims to payment of allowed unsecured claims
that are timely filed or tardily filed.  It doesn't talk about
claims that are not filed and, in fact, as we know, under the
law Mr. Lockwood's clients, if they aren't scheduled as claims
and they haven't filed a Proof of Claim, they don't have a
claim.

          THE COURT:  But, wait.  No.  I don't think that 1129

and 524 operate in that fashion.

   MR. BECKER:  No, it's 725, Your Honor.

   THE COURT:  725?

   MR. BECKER:  725.

   THE COURT:  I don't think that 725 and 524 operate in
that fashion.  The whole purpose for setting up the trust is to
figure out a mechanism outside the bankruptcy process by which
tort -- the asbestos personal injury claims, specifically, can
be adjudicated.  There isn't a need, I think, for filing Proofs
of Claim in bankruptcy.  I agree with the Debtor that there are
cases in which it's appropriate.  I agree with the Debtor that
it's the people who oppose it who have a burden to show why it
shouldn't be done when a Party-In-Interest has filed an
appropriate motion, but that's what we're here for.  I don't
think that that 524 can be just excised out of the Code and you
can say that 725 applies in that instance with respect to the
distribution on allowed claims.

   MR. BECKER:  Your Honor --

   THE COURT:  That's the whole purpose for a trust.

   MR. BECKER:  I think I know where you are on that and
I don't think it's inconsistent, Your Honor.  That there are a
number of cases, aside from asbestos cases, there are a number
of cases where there's a claims bar date and there are a lot of
claims.  They come in.  Nothing's done with them.  At the
confirmation of the plan they're handed off to a post

confirmation trust, which objects to the claims, pays the

claims, whatever.  That is analogous -- directly analogous to

the situation here.  We can have a bar date, have those claims

transferred to the personal injury --

        THE COURT:  Mr. Becker, what are we going to do with a

bar date?

        MR. BECKER:  -- or property damage costs --

        THE COURT:  You know, if a bar date makes sense at all

in this case, it seems to me to make sense when we're sending

out for votes on a confirmation of a plan and we can treat, at

that point, the ballot as a Proof of Claim.  I really don't see

what we're getting at by attempting, at this stage, to create a

bar date.  We can't even get through the property damage issues

in this case in any kind of recognized orders.  The Debtor

hasn't been able to get its Constituent Creditors to agree on a

process for litigating those claims yet and we've 1100 and some

of those still to go.  What are we going to do with 150,000

more claims that the Debtor can't get people to agree on the

litigation mode for?

        MR. BECKER:  I don't propose to litigate them, Your

Honor.

        THE COURT:  Well --

        MR. BECKER:  What I --

        MR. BECKER:  -- if you filed Proofs of Claims, believe

me, you're going to litigate.

          MR. BECKER:  It is not inconsistent to have filed

Proofs of Claims and have estimation process.

          THE COURT:  You don't need a Proof of Claim to

estimate.  The whole process of a Proof of Claim is for the

Debtor or some other Party-In-Interest to substantiate that

that specific claim is either allowed or disallowed in the

bankruptcy process.  For estimation, if you're looking at an

aggregate, you don't need a Proof of Claim for that function.

          MR. BECKER:  But we --

          THE COURT:  The reason I permitted the questionnaires

was to try to get the -- what the Debtor said the Debtor needed

for its experts to evaluate in terms of the current mass of

claims and it was only ever supposed to be a sample.  Nobody

ever expected that every claimant was going to answer that

questionnaire, at least I certainly didn't.  Just like probably

not ever claimant's going to file a Proof of Claim.  There will

be entities that will miss bar dates.  It happens all of the

time.  There will be entities that don't respond to the

questionnaire.

          MR. BECKER:  That is -- and that is the problem, Your

Honor.

          THE COURT:  Well, it's not a problem.

          MR. BECKER:  We need a data source.  I'm sorry, Your

Honor.

          THE COURT:  I don't understand what the Debtor needs

by way of a data source.  The Debtor has been litigating these
claims for 30 years.

        MR. BECKER:  But suppose, Your Honor, there are
118,000 of these identified claimants and only, pick a number,
10,000 of them file the personal injury questionnaire?  What do
you assume about the other 100,000 people?

        THE COURT:  That they weren't interested in answering
the questionnaire.

        MR. BECKER:  And for purposes of estimation, you
assume they have zero claim?  Do you assume they are like the
10,000 who filed?

        THE COURT:  I don't know that even getting the
questionnaire answered is going to give you the information
that you need to analyze the estimation issues on all fours.
Hopefully it will go to be some track to verify, or to justify
whatever appropriate spin you want to put on that word, what
the experts are saying with respect to their numbers.  That's
the use that's going to be most appropriate of that
questionnaire, not to set the sample upon which the whole
estimation process is going to go forward.

        MR. BECKER:  Your Honor, if it were the Court's rule
that you could assume, or the experts could assume, for
purposes of making that estimation, that the claims -- the PI
questionnaires that were not filed represented a zero claim
when you calculate the numbers --

THE COURT:  You can't make that assumption.

MR. BECKER:  Well, then you have  --

THE COURT:  You can't make that --

MR. BECKER:  -- to figure out how to force them to file.

THE COURT:  No.  I don't have to make that decision. I agree with the Debtor that some limit -- some appropriate discovery to the extent that people want to submit to discovery and agree to provide the information is appropriate and that -- that's it.  I think the Debtor is entitled to take some discovery.  It's entitled to know, for example, what its assets and what its liabilities are.  It could use 2004 depositions with respect to that, if it chose.  That's all this questionnaire is.

MR. BECKER:  And that would be woefully inefficient to use to use 2004 --

THE COURT:  Well --

MR. BECKER:  -- depositions.

THE COURT:  I think the whole questionnaire process is probably woefully inefficient, but it's what the Debtor wants to do and the Debtor controls its discovery.  I don't.  So it's fine with me.  If that's the way they want to go, it's the way they want to go.

MS. HARDING:  Your Honor, may I be heard?  Your Honor -- Your Honor, I think it's very, very important to get back to

what I said at the very beginning of the hearing, because I

think that all of this is a big red herring and it served

exactly the purpose that the Objectors hoped that it would.

The Objectors have the burden here of demonstrating that the

bar date shouldn't issue.  There is a presumption that it's

legitimate and that it serves a useful purpose in --

          THE COURT:  Fine.

          MS. HARDING:  -- any bankruptcy, including estimation.

          THE COURT:  Set a bar date for the proof -- for the

balloting. If you want a bar date, we'll say if you don't

submit a ballot as a current claimant, you don't have one,

period.  Then you can't file a claim against the trust if you

don't file a ballot.

          MS. HARDING:  But, Your Honor, if you're gonna -- if

Your Honor is going to set that bar date for a ballot, then the

Court has to recognize the quandary that is basically in effect

in the process that's been set up.  For the Court --

          THE COURT:  No, I don't see a quandary.  Every other

case that I've been involved in was -- except U.S. Minerals,

has not had a bar date and the cases have gone through

consensual confirmations.  This is the only case in which the

parties are this contentious and it's largely because the

Debtor is taking the track where it wants to litigate

everything.  Okay.  Litigate everything.  If you want to

litigate all of the claims, tell me that, and I will set a bar

date, and then I expect to see objections to claims, and that's

what we're going to litigate.  And then we don't need an

estimation process for the current.

MS. HARDING:  Your Honor, with all due respect, I

think and one thing that's important to recognize is that this

bankruptcy occurs in a very different timeframe, in a very

different than many other bankruptcies.

THE COURT:  No.  I'm sorry.  But no, it doesn't.

MS. HARDING:  Well, there's -- I didn't want to get to

that issue, Your Honor, but Miss Baer suggested maybe I should,

Your Honor.  Under the Debtor's current Plan, which is what we

are estimating under, these claimants don't get to vote.  That

is what the Plan says.

THE COURT:  We haven't adjudicated that issue yet,

but, quite frankly, if you're going to unimpair them, you don't

need to estimate them.  All you need to do is say, "Fine,

here's the Trust.  We'll commit all of our assets for the rest

of our existence to paying these estimated claims," and they'll

go out either into the tort system or the District Court

system, and you'll litigate whatever you need to.  You know, as

long as you're going to give a pot plan, how are you going to

convince me that it is feasible that you've got 100 percent

that can fund every claim, both current and estimated?  It's

only an estimate.  Whatever I do by way of setting up the

numbers that go into this Trust by way of the Debtor's Plan

that says it's going to pay 100 percent of its allowed claims,
is only an estimate.  And if I'm wrong, you still have to pay
100 percent of the claims.

          MS. HARDING:  Your Honor, I'd like -- I really would
like to just back up in terms of what we're asking for and what
the -- who has the burden here and why it should issue.  And I
do --

          THE COURT:  I understand who has the burden.  I
understand why a bar date could issue and why the presumption
is in favor of a bar date.  I don't, for the life of me,
understand how it's going to advance this case, getting off
stuck.

          MS. HARDING:  Okay.

          THE COURT:  This case is so stuck that I am really
concerned about keeping it in its current posture.  I've
expressed this for over a year and I don't see progress being
made.

          MS. HARDING:  But, Your Honor, that's precisely why we
moved for this now.  We're actually on a very fast track --

          THE COURT:  I'm telling you.  If you want --

          MS. HARDING:  -- and we're making progress.

          THE COURT:  -- a bar date, I will give you a bar date,
but you have to understand, unless you file an objection to
every single one of those claims, they're going to be allowed
and the Debtor will have to provide 100 percent of their

payment because that's what your Plan says.  If you want the

bar date, you take both the responsibility and the duties that

are imposed in that bar date.  So you figure it out.  If you

want to object to every single claim that may be filed, I will

permit you to do that.  Otherwise, there is not point to a bar

date.  You don't need it for aggregate estimation purposes.

MS. HARDING:  Your Honor, two things.  One, we have

been, I believe, perfectly willing for the entire process that

this case has been in bankruptcy to litigate these claims, to

try to find common issues, and litigate the personal injury

asbestos claims, and we are perfectly kind of ready, able, and

willing to do that.  But the Court has issued estimation, and

that we are living with estimation, and we're trying to work

with an estimation, but we do --

THE COURT:  Wait, wait, wait.  The Debtor asked for

estimation hearings.  I didn't set up estimation as some

vehicle by which this has to go forward.  The Debtor wants to

estimate the aggregate because you have to estimate for future

purposes, even if you object to every allowed claim.  That's

not going to get you the means all and end all for what you

have to fund in the Plan --

MS. HARDING:  But --

THE COURT:  -- for the future.

MS. HARDING:  That's right, Your Honor, but we did ask

-- in January we did ask for a bar date for all claims and

so --

      THE COURT:  You did.

      MS. HARDING:  -- we didn't get that.

      THE COURT:  But you don't want to take the objection process that is incumbent upon you in the event that a Proof of Claim is filed.  A Proof of Claim by operation of law is prima facie evidence of the claim and it governs, unless and until somebody interposes an objection and is successful.  Do you really want to do that?

      MS. HARDING:  Your Honor, it's my understanding that the adjudication of the claims would take place in the Trust and that the process here is for estimation.

      THE COURT:  Not -- no.  If I have a Proof of Claim bar date, that means you're asking me to invoke personal jurisdiction over the claimant.  That's what you stood up here several hours ago and argued.  If you want me to invoke personal jurisdiction over the claimant, I'll do it, but you're going to be litigating here and I'm telling you, all of us will be retired before you'll be done.  Now, is that really what you want to do?  I don't think so.  I really don't think so.

      MS. HARDING:  Your Honor, I believe that our position continues to be that we don't -- that we think that the bar date has other purposes than just that and that they don't have to be -- you don't have to get to the allowance process in order to do a proper estimation.

          THE COURT:  Well --

          MS. HARDING:  Can I just --

          THE COURT:  -- I understand that you -- that it does
have other purposes, but the issue that you argued to me
primarily, both in the papers and here is that you want an
assertion of this Court's jurisdiction over the claimant and
the reason you want the bar date is so that the Court can
exercise jurisdiction.  I'm not going to exercise it in part.
I'm either going to do it or I'm not going to do it.  That's my
prerogative with respect to jurisdiction and that's how I deem
my obligation.  If you have me invoke it, then you're going to
have to live with the outcome.  And that means potentially
litigating 100,000 or I don't know how many, 100,000 claims.
Now, that isn't what you want to do and that's not the reason
you want the bar date.  You want the bar date, I believe,
without -- and I'm not casting aspersions, to put some teeth
behind the questionnaire.  Well, maybe there are no teeth
behind the questionnaire.

          MS. HARDING:  Well, Your Honor, then we have gone
through an entire process of sending a hundred and some
thousand --

          THE COURT:  I understand.

          MS. HARDING:  -- questionnaires out and --

          THE COURT:  But that's what everybody argued against
you and you want to do it anyway --

MS. HARDING:  Well -- no --

THE COURT:  -- so fine.

MS. HARDING:  The -- Your Honor, with all due respect, Your Honor, this issue was raised at each hearing and the Court did not say, "Oh, you don't have jurisdiction."  The Court clearly indicated that the Court thought it could have teeth.

THE COURT:  I think the Court Order can have teeth because it's got -- it's going out to attorneys and I required under some circumstances that people comply with it.  I think the Order does have some teeth, but your argument has been that it doesn't have teeth, unless I assert jurisdiction over the claimant.  That's what you've been arguing to me.

MS. HARDING:  Actually, Your Honor, that's not -- that's actually the Objectors' argument, but, frankly, if we could show -- excuse me, Mr. -- could you put on the 2019 Statement?

THE COURT:  The slide?

MS. HARDING:  You have to hit slide show.

(Pause in proceedings)

MS. HARDING:  Your Honor, these are the 2019 Statements that are filed.  This is just an example.  Is it coming up?  Try again.  It'll come on.  Give it a second.

(Pause in Proceedings)

MS. HARDING:  Technical difficulties today.

(Pause in proceedings)

MS. HARDING:  I'm sorry, Your Honor.

(Pause in Proceedings)

MS. HARDING:  Well, Your Honor --

(Pause in proceedings)

MS. HARDING:  Slide No. 3, Your Honor.

THE COURT:  All right.  I have it.

MS. HARDING:  Those are the 2019 Statements that are being filed and it almost -- we have -- I haven't looked at every single one of them, but I can tell you that this statement appears on all of them.

THE COURT:  Just because they want to say they're not submitting to the Bankruptcy Court jurisdiction or that they're not waiving any right, doesn't mean that they're not submitting to the Bankruptcy Court jurisdiction.  People put that in Proofs of Claim all of the time.  We're submitting this Proof of Claim, but we're not conceding that we're submitting to Bankruptcy Court jurisdiction.  You can't have it both ways, folks.

MS. HARDING:  I'm not -- Your Honor, we were going along with the idea that the Court did have the jurisdiction.  It was --

THE COURT:  Okay.  I agree.  I think I have it, too.

MS. HARDING:  And when we saw that there were so few 2019s being filed, it caused us concern, so we raised the --

THE COURT:  Those folks aren't going to get to vote.

Why are you concerned?  If they don't file 2019 Statements,
your ballot agent isn't going to have a 2019 Statement to
compare against the ballots and those firms who submit master
ballots aren't going to get to vote.  Why are you concerned?
You ought to be happy.

        MS. HARDING:  Because, Your Honor, here -- let me --
if I could go to the board and show the precise problem that
Mr. Lockwood is well aware of and not willing to concede the
part that's important.

    (Presentation away from microphone)

        MS. HARDING:  We've got a universe of pre-existing
claims, Your Honor.  All right.  That we sent out.
(Indiscern.) in our database as people who have pre-Petition
personal injury litigation claims --

    (Presentation ends)

        MS. HARDING:  -- against the Trust, Your Honor.

        THE COURT:  All right.

        MS. HARDING:  And we know already, according to Mr.
Lockwood, that apparently we don't know the whole universe
because their briefing says that there are people that didn't
get these questionnaires that should have, so --

        THE COURT:  Okay.

        MS. HARDING:  -- we've got a slice here of people who
we don't -- who are not identified.  All right?  And we don't
know who they are.  Right.  Now, we also know we've got -- we

just received a call, we've got another 3,000 claims where somebody wants to no longer pursue them.  Right?  But there's no mechanism for allowing them to withdraw them in this case because they're not, quite frankly, before the Court and so we have this other group of claims.

THE COURT:  Then they won't vote.

MS. HARDING:  But, Your Honor, before we get to the vote issue, the issue is with respect to the estimation, and how the estimation gets done, and the data that the experts rely on.  And I understand that their experts may not want to rely on this data, but our experts do want to rely on this data.

THE COURT:  Well, look, with respect to the 3,000 whatever they are, I'll just call them claims, that somebody wants to withdraw, you know, you tell the experts that they've been withdrawn and they take them out of the pool.  That's an easy one.

MS. HARDING:  That is an easier one, but, Your Honor, the bigger one and the bigger problem is this next group of people who don't return the questionnaire, and who sit in the background, and don't assert -- don't come forward, and let the Court or the Debtors know whether they intend to pursue their claim against Grace.  And they have what we believe to be unsupportable claims.

THE COURT:  But that's a Trust function.

MS. HARDING:  Right?  Your Honor, but it's important
to the estimation, Your Honor.  It's very important whether
those people are considered by the experts to be people that
are like other people with valid claims or whether they're not.
 Whether, which is probably the better presumption, is that
they didn't have the information to support the claim, which is
why they didn't answer the questionnaire.

THE COURT:  Okay.  Wait.  For the past 30 years,
roughly, 20 to 30 years the Debtor has been litigating,
settling, handling, let me just use that word, handling
asbestos personal injury claims.  You mean that your experts
are not going to look at that universe of claims in this case
or any other case and as a matter of comparison, extrapolate
from the data that's already available?  There are a -- I hate
to use this word again, but a gazillion published studies on,
you know, estimation issues, and how many people exposed to
certain types of estimation contract mesothelioma, and how many
contract lung diseases, and how many contract other diseases.
Is there a suggestion that that data is all invalid and that
your experts are going to do something totally different in
this case?

MS. HARDING:  Your Honor, from the beginning I think
we've made it very clear that -- and the Court has agreed that
the best -- I mean, I have the quote here.  The Court has
agreed that the best evidence of the Debtors' liability for its

current pool of claimants is the current claims.

THE COURT:  I agree.

MS. HARDING:  And so what is -- why would we -- why when we can set up a very easy process to identify those claimants  --

THE COURT:  Because you --

MS. HARDING:  -- would we guess?

THE COURT:  -- because you have half a loaf.  You don't want to do the burdens that go along with what you're asking the Creditors to do.  The Creditors have a significant burden in filing a Proof of Claim and they have the right to know that if they submit to the Court's jurisdiction, and file that Proof of Claim, so that they can get a distribution against the estate, then their claim's going to be allowed, unless a valid objection to is formed, argued, and sustained. So you can't have it both ways.  I'm not going to permit a half a loaf.  I don't think it's proper.  If you want to argue the Code parameters to me; that a Proof of Claim is generally the way to go, then so are objections to claims.  So what's the purpose to doing this for an estimation procedure?  You can figure out the allowance of every single Proof of Claim that's filed.

MS. HARDING:  Your Honor, may I --

(Presentation away from microphone)

MS. HARDING:  I just want to show the Court

(indiscern.) --

    (Presentation ends)

       MS. HARDING:  These are all of the reasons why we think a Proof of Claim with respect to these pre-Petition litigation claimants is appropriate in this case.  Now, in Babcock & Wilcox and in Eagle Pitcher they didn't -- they ended up at a consensual Plan, but they had a POC and they were doing estimation, so I don't think it's out of the realm of possibility to have a POC here and to go down this process. Now, those -- there are six legitimate reasons why it makes sense to have a Proof of Claim with respect to these claimants in this case and, Your Honor, I cannot -- actually, if I take a break, I will consult with my client.  I mean, I think we are willing to make objections to those claims and to pursue it that way as well, and to be bound to do that as well.  But -- these -- the Objectors have not addressed --

       THE COURT:  Have the --

       MS. HARDING:  -- why that is -- why those are not appropriate reasons.

       THE COURT:  The -- this case is getting to the point where it's so penny wise and pound foolish, it's really distressing.  You're going to spend all of this money to get Proofs of Claims filed and then say that you're going to litigate them on a claim by claim basis.  The whole purpose for 524, which you're invoking in your Plan, is to set up a Trust

so that this issue doesn't create all of the Debtors' funds going to pay legal fees and experts, but, in fact, gets to the injured who need the money.

MS. HARDING:  But, Your Honor, our position from the beginning of this case, and I think it's been very, very clear through all of the pleadings, is we don't believe that these claims, many of them, should be paid.  And that the company does have equity, if the Court will look, and only consider evidence permissible in Federal Court.  And that -- I mean, that is what we've been trying to do all along, whether it's through estimation or through a claims allowance/disallowance process.

THE COURT:  Look, the Trust procedures, to the extent that there is some settlement method that is established, will have its own mechanisms for dealing with the claims.  In terms of the estimation, I don't know what evidence it is at this point that you expect me to look at or not to look at.  We're not that far along in the matter.  I would expect that I'm going to admit evidence that's applicable under the Federal Rules of Evidence.  That's my standard, but I'm not certain, in the instance that you're asking me to project claims, I'm just not certain.  I don't have a ruling on it.  I'm just not certain, so don't anybody say to me I said X, when I'm telling you now I'm not certain.  I'm not certain that the settlement history isn't relevant to a process, which is going to involve

settlements.

MS. HARDING:  I understand, Your Honor, but I'm going to go back to the Court's point about the allowance of claims. This -- the -- a Proof of Claim was permitted in those cases and those cases clearly anticipated and were in the process of estimation, so that should not be a bar to issuing the bar date here.  And I --

THE COURT:  I don't know what those Courts did, Miss Harding.  If somehow or other they let the Debtors bifurcate the loaf, in fact, I think they were in error.  If you want to file a -- Proofs of Claims filed, your first line on this chart is established jurisdiction over claimant.  You want me to establish that jurisdiction, fine.  I'll establish that jurisdiction, but that means they will have allowed claims to the extent that they are filed, unless the Debtor files objections and it gets an objection to that claim sustained. That's what the Proof of Claim process does.  Now, why do you want do you want to march down that road?

MS. HARDING:  Your Honor, the point of getting a Proof of Claim was to get jurisdiction, so that the claimants are required -- or that the Court has some authority to issue some sanctions, which is not a bar.  Which actually the Court has already ruled that the Court is not gonna bar claims because people don't return the questionnaire.

THE COURT:  That's right.

MS. HARDING:  The Court said that it would -- that there would be some sanction available to it under the rules and right now, according to the Objectors, the Court doesn't have that jurisdiction and I raised --

THE COURT:  Why are you worried about sanctions when you don't even have the questionnaires back yet?  I mean, I don't understand this.  Why are we trying to penalize people for not responding to something when the questionnaires aren't even all distributed yet?

MS. HARDING:  But Your Honor, maybe that gets to the heart of it.  We are not trying to penalize people.  And I think that's actually -- that's something that's been a red herring here.  I just want to show the Court -- I mean --

THE COURT:  (Indiscern.).

MS. HARDING:  I will I'll go back up (indiscern.).  I mean, what are they being asked to do here?  All right, they're already -- the Court has ordered that they must return this questionnaire.  And this a one page Proof of Claim.  And if you look at the last slide, Your Honor, we actually pared it down to a post card that could be returned.  The Debtors are willing to issue some other kind of notice other than just serving it.  We're willing to do some kind of publication as well.  I just don't see what is so burdensome about doing that when it would clearly have a legitimate purpose?

THE COURT:  Mr. Lockwood's argument that you're not

even getting the entire universe of claims by this one post

card form, the last page of your slides, is correct.  What it

says is, "Name of Creditor, name and address where notices

should be sent, title and number of case, Court where complaint

was filed, and name and address of your legal counsel."  That's

it.  That's exactly what the 2019 Statement should be doing.

And to the extent that there's no 2019 Statement, there isn't

going to be a ballot.

          MS. HARDING:  Your Honor, but the ballot will occur

well after the estimation, and it will serve as no useful

purpose with respect to getting information on the

questionnaires --

          THE COURT:  And this postcard will?

          MS. HARDING:  Your Honor, if that goes out with notice

about who is supposed to fill it out, only pre-petition

litigation claimants who had a pending case against Grace at

the time --

          THE COURT:  And the Debtor doesn't already know that

it's been sued, and who the claimants were, and where it was

sued?

          MS. HARDING:  Your Honor, we believe we -- we believe

that we know, we believe we have a very good idea.  We're told

by the objectors that we don't have the complete database, but

more importantly, we don't know which of those claimants intend

to pursue their claim at this time.  That's the important part.

THE COURT:  You can make the assumption that if you were sued in State Court and the claim is not resolved that they intend to file a claim against the estate.

MS. HARDING:  But Your Honor --

THE COURT:  You can make that assumption.  That has happened in every other case.

MS. HARDING:  That is an assumption that is -- that completely biases the estimate, Your Honor.  That's exactly what we're trying to avoid.

THE COURT:  Ms. Harding, it's happened.  Take a look at the other cases.  Not only do people who have currently filed causes of action pending in State and Federal Courts against the Debtor file claims, but a whole host of other entities file claims.  You don't eliminate the database by filing a post card that says where was your State Court cause of action filed against the Debtor.  That doesn't even get to the tip of the iceberg.

MS. HARDING:  Your Honor, but this is a -- this is now -- I beg the Court to kind of think of this issue right now in the context of this timeframe.  This is not the same.  There are claimants who will not be pursuing their claims because of what is happening with respect to grand jury proceedings, what is happening with respect to medical evidence, what's happened in Manville, what's happened recently in another trust.  We've already gotten word from at least one law firm that they don't

intend to pursue their claims, and we've seen what's happened
in the PD.

THE COURT:  Then I have a suggestion for you.  If this
is going to be a hundred percent Plan, let's send an
announcement out to the world, in fact the Plan, that says,
"It's going to be a hundred percent Plan, are you going to fie
your claim?"  You'll find out what the claims are and then
you'll know what the Trust has to be.  You know, you're trying
to eliminate a universe of claims before the appropriate time
to file those claims is.  And I understand why you're trying to
do it, to preserve equity.  Frankly, I don't see how equity's
in the money in this case.  I don't see it.  I don't see it
from Debtor's operations, I don't see it from the litigation
strategies in the case.  I don't see it from the fact that the
Plan's been on the table since January and you're not even
close to getting consensus.  This case is stuck.  And it's
really distressing.  I don't see how the Proof of Claim is
going to advance that.  It's just going to create more
fractionalization.

MS. HARDING:  Your Honor, the very -- the reason that
Mr. Bernick brought it up in September, the concern that we had
was really very limited.  We thought we had in place a
structure by which the claimants would be required and have
some incentive to return the questionnaire.  And in essence,
that's all we're really looking for here is some kind of

incentive from the Court that will tell the claimants or
suggest to them that if they are going to pursue their claim
against Grace at some point, they better turn in the
questionnaire.

THE COURT:  Weren't they given the advice -- pardon
me, I do have a lot of cases and it is late, so if I'm
misstating this, please correct me.  Were those entities who
got the questionnaire not told that if they fill out the
questionnaire, they'll be the first into the distribution que
for the Trust?  What more incentive do they need?

MS. HARDING:  Your Honor, it's the incentive for the
people that don't have strong claims that we're looking for.
It's the incentive for the people that have the least
supportable claims, which is the group of people that we're
most, and I think legitimately, worried about.  And --

THE COURT:  But Ms. Harding, the information that you
want from them is, "Your name, your counsel's name, and where
did you sue me."  That doesn't tell you what type of claim you
have, and you already have this information in your database as
to where you were sued.

MS. HARDING:  No, Your Honor, all that does is tell us
who's going to elect to pursue their claim that they filed.
And then we have the questionnaire information, the experts
will be able to determine the universe of claims that intend to
move forward.  And they can assume that they others that didn't

don=t have the information to support their claim, which is really the part that we're really most concerned about.  We want -- the experts need something to rely on so that they can make the assumption that if somebody doesn't return the questionnaire, it's because they didn't have the information to support it.

THE COURT:  They're not going to be able to make that assumption.  They were never able to make that assumption.  And they're not going to be able to make that assumption now.  If they do make it, their information is going to be biased and it will be unusable.  And this Proof of Claim form, which simply says, "Tell us where you sued us," isn't going to get you any more information in terms of the estimation than you already have because people could file this claim form and still not pursue a claim against the Trust.

MS. HARDING:  Well, Your Honor, given what you just said, what incentive does anybody have to return the questionnaire then?

THE COURT:  The fact that they get into the que first. They think they have a legitimate claim, they don't want to wait forever to get paid from the Trust, and the incentive is that, you know, there may be 100,000 people out there who will have to be compensated in some manner through the Trust, so the 70,000 who return the questionnaires will be in the que first.

MS. HARDING:  And so all that does, Your Honor, is

ensure that the people with the strongest claims that Grace
intends to pay order the questionnaire --

THE COURT:  You know what then, if this is that much
of an issue, then I suggest that the Debtor go about formal
discovery and forget the questionnaire.  I mean, this was
intended to help the process, not impede the process.  And now
you're arguing backwards to me that instead of the
questionnaire advocating -- or advancing the cause, it's
impeding the cause because there's no hook to it.  Well, if
there's no hook to it, then withdraw it and let's move on.

MS. HARDING:  Your Honor, that's not -- that's -- I
think that's -- I mean, that would completely take away
everything we've done over the last 9 months to try to put this
structure in place, and I think that it's -- it's not just the
Debtors that were under the impression that there was some meat
and taste to the questionnaire, I think that the Court was
under that impression too --

THE COURT:  And I --

MS. HARDING:  -- and I read that --

THE COURT:  -- still am of that impression.  I don't
have any Motions for Sanctions.  I don't know that people
aren't going to return the questionnaire.  You're making a
grand assumption that because you issued 50,000 -- in
hypothetical numbers, 50,000 questionnaires that only 1% of
them are going to be returned.  I mean, you know, that's not

necessarily the case.

MS. HARDING:  Well, Your Honor, will you at least reserve open the issue that if when the questionnaires do come due that if it does appear that there are a large number of claimants that are not responding to the questionnaire or leaving most of it blank that the Court will at least entertain the idea of having some kind of Proof of Claim or doing something to try to get those claimants to respond to the questionnaire.

THE COURT:  I definitely will leave open the issue of trying to get people to respond appropriately to the questionnaire.  And I will keep open the issue of the Proof of Claim form in that connection, but I don't see the necessity, at this stage still, for a Proof of Claim form, especially the one the Debtor's asking for because you've already got that information.  And I think you can assume that if somebody took the time to sue you in a State Court and have been stayed from pursuing that litigation because of the bankruptcy, that in all probability they intend to pursue it post-confirmation.

MS. HARDING:  Your Honor, one other thought was Mr. Bernick raised the issue of possibly amending the 2019 Statement to require attorneys to file the 2019's earlier than what's required now in the order.

THE COURT:  Well, that, you know, may be something -- if people intend to file claims I think they're going to have

to file the 2019 Statement because I've already said if they
don't they're not going to vote.

        MS. HARDING:  So could we amend the 2019 Statement to
say, "If you intend to file a claim -- if you have a claim --
you represent a claimant that is a pre-petition litigation
claimant and you intend to pursue that claim against Grace, you
have to file a 2019 by, you know, February," or something like
that?

        THE COURT:  Well, assuming that --

        MS. BAER:  Your Honor, this is not on the agenda.  If
you're going to argue Rule 2019, I'd like an opportunity --

        THE COURT:  Well, it's not on the agenda, but I want
to have a caveat to anything that's said with respect to 2019,
not everybody who represents a claimant may have an obligation
to file a 2019 Statement.  You know, there may be attorneys who
have only one client, and they're not required to file those
statements.  Those people can vote.  I'm talking about people
who are required to file those statements who will have
problems with their -- with submitting ballots and having them
counted if they haven't filed a 2019 Statement.

        MS. HARDING:  Okay, Your Honor, and those are the law
firms that represent the large groups of claims, and those are
the ones that we're most interested in at least having that.
So we will file a motion to at least amend the 2019 Order to
require that sooner.  Thank you, Your Honor.

THE COURT:  This Proof of Claim issue at this point --
when are the questionnaires due back?

MS. HARDING:  January 12th, Your Honor.

THE COURT:  All right, put this issue back on the
agenda.  When will you know, in aggregate numbers, you know,
like percentages of people who have applied?  Will it be for
the January hearing or the February hearing?

MS. HARDING:  Yes, we'll probably know by then, Your
Honor.

THE COURT:  All right, then put this issue of the
Proof of Claim form back on the January 30th agenda.

MS. HARDING:  Thank you, Your Honor.

MR. LOCKWOOD:  Your Honor, I just want -- on this Rule
2019, I mean, obviously they can make whatever motion they want
to on that subject --

THE COURT:  Yes.

MR. LOCKWOOD:  -- but essentially what they're going
to be doing is they're going to be saying somebody who --
lawyer who has not entered an appearance in the case but who,
the way Ms. Harding put it, intends at some point in the future
to file a ballot or file a claim that that lawyer should,
because of their intention in the future, be required to file a
2019 now.  And what the Rule talks about is representing
somebody in the case, not intending to represent somebody in
the case at a later date.  But we can address that on the

papers when they make the motion.

          THE COURT:  Yes, I think that's -- we'll defer that
issue until later.  Mr. Monaco?

          MR. MONACO:  Good evening, Your Honor, for the record,
Frank Monaco for the State of Monaco and Her Majesty the Queen
and Right of Canada.  I represent Canada -- a very diverse
client base, Your Honor.

     (Laughter)

          MR. MONACO:  Your Honor, I know the hour's --

          THE COURT:  Would Her Royal Highness like to file a
Proof of Claim --

     (Laughter)

          MR. MONACO:  Well, that's why I came up to address
that issue, Your Honor.  I know the hour's late and it's very
warm in here and I will be brief.  Your Honor, both of my
clients have contribution indemnification claims stemming from
lawsuits that were filed against both Montana and Canada.  And
most of these lawsuits are post-petition lawsuits.  In the case
of Montana, the Libby claimants filed 107 actions against
Montana on the theories that Montana failed to warn these
claimants of the asbestos contamination.  And in the case of
Montana, those are primarily personal injury claims, there are
some property damage claim elements.  It's sort of the opposite
for Canada.  They are primarily post -- they are primarily
property damage claims, again, with a sprinkling of personal

injury claims.  All of those lawsuits are class actions, and it
is my understanding were filed after the bar date, which was
March 31, 2003.  So it's a relatively new phenomena.

I was just engaged to represent Canada and it's my
understanding that today there is a Injunction Hearing, similar
to a Section 105 Hearing, in front of Justice Farley in
Toronto.  And as Your Honor is probably aware, there is a 105
Injunction Hearing scheduled next month in the case of Montana.

Your Honor, part of the problem with this entire process
is that structurally it just doesn=t really deal with my
clients' claims, either the Plan as presently proposed or the
claims estimation process.  And I've had some discussions with
Ms. Baer and with Mr. Lockwood, for instance, about the
questionnaire.  And if you look at the questionnaire, it is
totally geared towards people that have asbestos related
diseases.  But technically, Canada and Montana have to fill out
these questionnaires for any pre-petition litigation
contribution indemnification claims.

Now, I've discuss this problem with both the Debtor and
Mr. Lockwood.  And everyone is agreement that it just doesn=t
make any sense to fill these questionnaires out.  It doesn't
advance the process whatsoever.  And I just wanted some kind of
affirmative acknowledgment from both counsel that we don't have
to fill it out, that we won't be prejudiced if we don't because
it is presently -- I think if you look at the definition of

that kind of claim, it does include a contribution

indemnification claim, but I think it just doesn't advance the

ball and just causes us extra expense.  I wanted to bring this

to the Court's attention.

And it's pretty much the same thing with the bar date and

filling out a Proof of Claim.  Again, I don't think it's really

geared, but it's -- towards that, but it sounds like Your Honor

has just deferred this issue so we don't have to deal with it.

 But I wanted to make sure for the record that we do not have

to file -- fill out one of these questionnaire forms, given the

type of claim that we have, and get acknowledgment of the Court

and both parties to that.

And just one final note, Your Honor, on a more positive

note.  I think we need to sit down with the Debtor and try to

hammer out a mechanism to resolve these claims because they're

complicated enough, and then you have this bankruptcy overlay

that makes it even more complicated.  And it's not something

that I think is going to be necessarily resolved with a lot of

litigation.  I think we just need to sit down and work through

a mechanism to get these claims resolved so that my client

isn't -- clients aren't prejudiced by all this.

THE COURT:  Okay --

MR. MONACO:  Thank you.

THE COURT:  -- Ms. Baer?

MS. BAER:  Your Honor, first of all, a reminder that

the questionnaire process is only geared toward pending pre-
petition litigation claims that were pending against Grace at
the time we filed Chapter 11.  It does not apply to Canada
whatsoever.  It does not apply to all of the new Montana
actions that have been commenced against Montana post-confirm -
- post-petition.  The only exception would be, as I understand
it, at the time we filed the Plan and Disclosure Statement, at
the time we filed Chapter 11, there was one pending case in
Montana.  That was dealt with separately in the Plan and
Disclosure Statement and would not, again, require Mr. Monaco
to file a questionnaire.  So at the present time, I don't think
that the questionnaire process applies to Mr. Monaco vis-a-vis
Canada or Montana.  And even if it did, we are not requiring
Mr. Monaco's clients to file questionnaires at this time.  It
will and can be relevant toward estimation.  We will talk to
him about that, the contribution and indemnification claims do
create some interesting challenges that we're going to have to
figure out what to do with.

          THE COURT:  Okay.  Mr. Lockwood?

          MR. LOCKWOOD:  Well, I don't really see that the
Committee has a role in saying who should fill out the
questionnaire or who should not, but it certainly doesn't have
any objection to Ms. Baer's -- what she told Mr. Monaco.

          THE COURT:  All right.  Mr. Monaco, neither Montana
nor Canada need to fill out the questionnaire at this time.

MR. MONACO:  Thank you.

THE COURT:  And if anybody's position on that matter changes, they are required to give you advance notice in accordance with the published schedule for hearings so that you can take some position.  They'll have to raise a motion so that you can defend against it.

MR. MONACO:  Thank you, Your Honor.

THE COURT:  Okay.  Ms. Baer?

MS. BAER:  Your Honor, with that, we finally get to items numbers 9 and 10 on the agenda, which relate to the Debtors' adversary complaint filed against the State of New Jersey with respect to some -- a civil action in New Jersey and the corresponding motion under Section 362 and 105 to enjoin that action.  Your Honor, the hour is very late.  The State of New Jersey has been here all day very patiently.  I am happy to go forward on the merits of this matter.  We had talked about continuing it until December, but frankly, the December hearing, being in Pittsburgh, is not particularly convenient. So unless Your Honor just can't go on --

THE COURT:  Oh, no --

MS. BAER:  -- we're happy to go forward.

THE COURT:  -- I said we were going to finish the agenda, we'll finish the agenda.

MS. BAER:  Thank you, Your Honor.  Your Honor, the Debtor's Motion to Enjoin the New Jersey Civil Action is to

enjoin an action that was brought in 2005 by the State of New
Jersey having to do with a 1995 report filed by the Debtor
related to vermiculite operations at a Hamilton, New Jersey
site.  It was a site that's not owned by the Debtor, it was
leased by the Debtor for some period of time.  They've been out
of that facility for 10 years.

New Jersey is seeking a fine, $75,000 per day for every
day that Grace did not correct this alleged false report.  All
they're seeking is a fine, Your Honor.  This does not have to
do with clean-up.  There was some clean-up going on on that
leased property that's subject to the EPA's supervision.  It's
not a cost recovery case.  New Jersey's not seeking any money
to pay for a clean-up or anything else vis-a-vis the public
health and safety; they're just seeking a fine.

Your Honor, Grace seeks to enjoin this action, and
ultimately we will seek to have this Court adjudicate the
nature of this fine, the amount of this fine.  There is a
pending Motion to Transfer Venue in the New Jersey District
Court.  Grace removed the action to the New Jersey District
Court.  The State of New Jersey has sought to remand the action
back to the State of New Jersey State Court.  The State of New
Jersey District Court has not ruled.  It is pending, it is
unclear right now when now when they=re going to rule on
transfer of venue.  Frankly, we've suggested that they should
transfer venue here and you decide the remand action.  We don't

174

know what they'll do.

But right now, Your Honor, what we're asking is we're not asking you to stop the District Court in New Jersey from adjudicating the transfer of venue.  What we're asking is we're asking for a stay.  We believe, Your Honor, that this case is actually stayed under Section 362.  This is not a police power action.  It's an action for a fine related to a 10-year old report that allegedly had some falsities in it.  Grace has not operated there for 10 years, and as I said before, the property's being -- has been cleaned up by the EPA.  There's no health or welfare issue involved.  In fact, neighboring properties have been sampled by the State; there are no issues on neighboring properties.

What's happening here, Your Honor, is the State of New Jersey is sort of taking advantage of the fact that they are a State entity in trying to go froward to collect a fine against the Debtors in the State Court rather than coming to this Court.  They're essentially saying it's a police power action when it really is not a police power action.  And Your Honor, many of the issues that would be adjudicated in that action will actually be dealt with by this Court because it has to do with vermiculite, it has to do with whether there's a risk of harm, and issues that will come up in both the PD and the PI claims here in this Court.

Under Section 362(b)(4), governmental entities have a

right to pursue actions if they are for police -- if they are police or regulatory actions.  The legislative history indicates that the idea is that the government be able to protect the safety and welfare of its populants and stop things like fraud or environmental hazard and safety risks.  But the 3rd Circuit has recognized, Your Honor, clearly that not every regulatory action is a police power action that merits the exception to the automatic stay.  The Court must measure the action against the purpose for which it is being brought.  Does the proceeding relate to safety and welfare, or does it really relate to the government's interest in the Debtor's funds? Here, Your Honor, clearly that's what's happening.  All they want is a fine.  They're not seeking clean-up, they're not seeking cost recovery.

Your Honor, the Penterra case very clearly established that if you're seeking clean-up, it's a police power action. The Nickelette case clearly established if you're trying to fix damages for a clean-up, it's a police power action.  But the 3rd Circuit has never held anywhere that where the government action is not proportional to any direct or ongoing public hazard, that the action can proceed outside of the Bankruptcy Court.  Your Honor, the magnitude of what New Jersey is seeking, $75,000 per day for 10 years, is well in excess of any possible normal type of action.  It's a gigantic fine that relates not, again, whatsoever to any environmental hazard and

the like that has been taking place on that property.

Your Honor, under the circumstances, you have to look at exactly what's going on here.  Is the police power action -- is it a police power action or is it not?  And that's a fact intensive inquiry.  Does it relate to the government's pecuniary interest in the Debtor's estate?  Is so, no, it's not a police power action.  Does it involve a public policy, an interest in it's general welfare?  Yes, that's a police power action.  Your Honor, the Penterra case, the Nickelette case, the Trarico case, all cases cited by New Jersey, those are 3rd Circuit cases involving clean-ups and cost remediation.

We, Your Honor, direct the Court's attention to the Bach case.  That's a 3rd Circuit case that actually does both.  It deals with an OSHA violations.  To the extent we were talking about remediating violations, future monies needing to be spent, clearly a police power action.  But the Court found that to the extent that they were seeking a fine, that was not a police power action, that was stayed by the automatic stay.

The one case that the State of New Jersey has cited that is somewhat similar to this case is the LTV case.  But Your Honor, in LTV, it was the Western District of Pennsylvania District Court, it's not controlling here.  Furthermore, it ignores the Brach distinction that the 3rd Circuit made between the clean-up action and the penalty action.  And also, Your Honor, in that case, it was an existing regulatory action that

was ongoing before the Debtor filed bankruptcy.  And one of the
big concerns of the Court there was they were concerned that
Debtor was filing just for the purpose of stopping this police
-- this action.  And they were very concerned that they didn't
want to send a message that you could stop any kind of an
action with respect to environmental clean-up and the like with
respect to environmental liabilities by filing a bankruptcy.
But here, Your Honor, we've been in bankruptcy for 42 years.
New Jersey's known that.  Other entities in the State of New
Jersey have actually filed Proofs of Claim against the Debtor.
 But here, the State EPA, instead of filing a claim in the
bankruptcy case or filing an adversary proceeding against the
Debtor in the bankruptcy case, filed a case in the State Court
of New Jersey simply to collect a very large fine.

        Your Honor, we do not believe it's a police power action.
 We do believe under Section 362 it is enjoined and this Court
should in fact enforce that injunction.  Alternatively, Your
Honor, the Court does certainly have the power under 105 to
enjoin the action, and doing so would be very similar to many
things you've done in this case before, although those were
third party actions.  This one is unique, this one is actually
against the Debtor.  And we're seeking to have that action
stayed.

        In the Penterra case, the 3rd Circuit clearly established
that the Court does have the power to enjoin a police power

action under Section 105 in order to assure the orderly conduct
of the reorganization process.  It is very clear, Your Honor,
from that case and other cases of its like that this Court can
protect the interest of other Creditors by enjoining a police
power action if that police power action would, in fact, weigh
against the bankruptcy process and hurt the bankruptcy process.
 You have the right under 105 to prevent interference with the
Chapter 11 process.  The Federal interest in bankruptcy
outweighs the State's interest in collecting its fine.

     In order to make the determination as to whether or not
under 105 you should issue the injunction, the regular
injunction elements apply, Your Honor, and here they all apply
quite clearly.  The likelihood of success on the merits, not
the merits of whether or not New Jersey would ultimately be
able to collect the fine, it's the merits of whether or not
enforcing the State law in the State Court will unduly
interfere with the bankruptcy process.  That's the way in which
the Court looks at the likelihood of success on the merits.
And Your Honor, here, clearly, it would.  The potential size of
this penalty, the distraction of time and attention of the
Chapter 11 Debtor at a time which is a very time intensive case
already here.  We are down the road of estimation, we're
spending a lot of time.  The Debtors employees, the
professionals, everybody's spending a tremendous amount of
time.  To have to divert their attention and defend this action

in New Jersey would hurt the process.

Furthermore, Your Honor, it makes the playing field uneven.  While all of the other Creditors of the Chapter 11 Debtor here have to wait and adjudicate their claims as part of this bankruptcy process, the State of New Jersey wants to adjudicate its claim separately in the state of New Jersey, where I'm sure it believes it has the home court advantage. But Your Honor, that's not the way it works.  The way it works is if you want to collect against the Debtor, you come here and collect against the Debtor.

Separate -- second element, Your Honor.  The Debtors will suffer irreparable harm for the reasons I just said, forcing us to participate in substantial litigation elsewhere, diversion of key personnel and money.  And frankly, Your Honor, this Court can more easily and better handle efficiently these issues than the State of New Jersey Court.  And Your Honor, we can avoid the possibility of different rulings here and there because again, you will be dealing with some of the very same issues about vermiculite, vermiculite harm, and its effect on claims.

The third element, Your Honor, Defendant's risk of harm. There's essentially none here.  The State of New Jersey has waited years to file this action.  The alleged false report is 10 years old.  And again, they're just looking for a fine. That's all they're looking for.  There's no remediation,

there's no cost recovery.

And fourth, Your Honor, we have the public interest.  Here there's a strong bankruptcy policy that everybody be put on an even playing field.  By permitting New Jersey to go forward with this action in the State will change that process, that's exactly why 362 exists, it's exactly why 105 exists.  There's a public interest in honoring those provisions and staying this action.

Your Honor, there's one other thing that's going on here, and that is in addition to Grace, two individuals have been sued.  One of the individuals in an officer of Grace and the other individual is a former employee.  Your Honor has the jurisdiction to also enjoin those actions.  In fact, you already have.  The injunction that you issued on day one of this case enjoined third party claims against officers, directors and employees of Grace.  The same exact behavior is involved here.  The same -- they're asking employees and officers to defend themselves in exactly the same claims that they're making against Grace.  They're indistinguishable from the claims against Grace, and yes, Grace's bylaws provide for indemnification of these officers and directors and employees, both for the behavior as well as attorney's fees.  Under the very same case law that permitted you to issue the injunction in the Shakarian adversary proceeding where we have it, it would apply here.  And again, this is belts and suspenders; we

probably already have the injunction in the other injunction.
But to the extent we don't, Your Honor, for the very same
reasons you issued that injunction, we would ask that the
injunction here also relate to the directors, officers and
employees who are in exactly the same position as Grace.

Your Honor, under these circumstances, again, we believe
this is not a police power action, and under Section 362 it's
already enjoined and Your Honor should simply enforce that
injunction.  Alternatively, we would ask that Your Honor issue
a stay under Section 105 enjoining the State action from going
froward.  Again, we're not asking you to deal with the transfer
of venue and stop that from going forward.  The District Court
in New Jersey can decide that.  But it's the merits of the case
we do not believe should be going forward.

THE COURT:  All right.  Thank you.  Good evening.

MR. DEVINE:  Good evening, Your Honor.  Edward Devine,
Deputy Attorney General for the Defendants in this action, Mr.
Harvey and Mr. Campbell.  The Debtor went through a whole line
of cases for the Court from the 3rd Circuit.  What the Debtor
failed to clarify, however, is that when the Court prevented
the state government entity from going forward with a penalty,
that was because they were trying to enforce that penalty.  In
Bach, for example, the Court states clearly that the government
agency is not before it to fix a penalty, it's here to collect.

The State of New Jersey is not, in it's State Court

action, seeking to collect money, it is seeking to fix the amount of the penalty.  Legislative history of Section 362(b)(4) states that the governmental unit suing a Debtor to prevent fraud, environmental protection safety, or attempting to fix damages for violation of such a law.  That's why the State commenced this action in State Court.

THE COURT:  But this isn't a penalty provision seeking to fix damages, it's just a fine.  And the fine, as I understand it, at $75,000 a day for 10 years can't be, at this point in time, related to the actual cost of clean-up, so you're not asking that the damage be fixed, you're asking to impose a fine.

MR. DEVINE:  First of all, the statute says up to 75,000, if you read it carefully.

THE COURT:  Okay.

MR. DEVINE:  The Jersey Court will have the discussion to set that fine wherever it chooses.

THE COURT:  Okay, but regardless of where the Court decides to fix the fine, the fine is not the damage, it's simply a penalty.

MR. DEVINE:  That's correct.

THE COURT:  Okay.  So I'm not sure how that's not stayed by 362.

MR. DEVINE:  Because part of the police and regulatory power of the DEP is to assign penalties.  In this case, a very

important document -- in fact, one of the other counsel
mentioned ISRA.  When you shut down a business, you have to go
through a very complicated process to ensure that it's clean.
And it was that form stating there was no contamination on the
site that these two individual Defendants signed off on and
which later proved to be false.  Now, in 1995 when they signed
it, we had no knowledge that it was incorrect.  It was only
years later when the EPA began a clean-up that we found out
that the vermiculite contamination was all throughout the site.
 So that fine, as I said, if and when it's applied, this state
government agency is not intending to collect from Grace,
therefore, it's not going to disrupt this bankruptcy
proceeding.

        THE COURT:  Well, I think it is going to disrupt the
bankruptcy if its officers and directors and have to defend a
75 million times 365 or 366 per day for 10 years fine
allegation.  That's definitely going to cause some disruption,
not just to the officers and the directors, but to every other
process in this case.  That's probably larger than the Libby
Plaintiffs' claim in the case.

        MR. DEVINE:  But as I said, Your Honor, there's no
knowledge at this moment that anything near that amount would
be imposed.

        THE COURT:  But the Debtor has to defend against it,
that's the problem.  The Debtor has to undertake a defense.  If

you're saying "up to," what is the fine that's being sought?
If it's a dollar a day for 10 years, then maybe the litigation
isn't going to cause that kind of disruption to the estate.
The Debtor might even concede a dollar a day for 10 years.  But
if it's $75,000 a day, that's going to cause some disruption
and the Debtor has to defend against it.  So if the pleading
says "up to," but there is no limitation on the "up to," then
the Debtor has to be prepared to defend against $75,000 a day.
 And that's a significant issue in this case.

          MR. DEVINE:  When you say "prepare to defend," do you
mean the litigation itself?

          THE COURT:  Well, sure.

          MR. DEVINE:  Okay --

          THE COURT:  If you=re saying that you're attempting to
fix the claim --

          MR. DEVINE:  Yes.

          THE COURT:  -- in the State Court.

          MR. DEVINE:  That's right.

          THE COURT:  Okay.  And the claim that you're
attempting to fix is up to $75,000 per day for the past 10
years.

          MR. DEVINE:  That's correct.

          THE COURT:  Okay.  That issue is a significant issue
in this estate, and there will be a consequence to the extent
that a claim is fixed in that amount, especially a penalty

claim which under some circumstances may even be subordinatable
in the case.  I don't know that it is or isn't, but it's
possible that it may be.  So not only will the Debtor have to
defend against it, but on top of that, the Debtor may not have
to pay it.  So -- and it's a fine.  It's not for damages.  So
why isn't it stayed by 362?

        MR. DEVINE:  Well, in the cases that I was just
discussing, including Penterra, they speak of the dichotomy
between a government and the enforcing a money judgment and
fixing a money judgment.  So in that case, Penterra, in
Nickelette, in Brach, and in James, they all say that, just as
the legislative history there mentioned, that the state --
police power allows the state to go into Court and establish or
fix an amount --

        THE COURT:  Well, I think --

        MR. DEVINE:  -- of the penalties.

        THE COURT:  -- they're talking -- well, I'm sorry,
I'll have to go back and look at the cases.  I didn't -- I
don't, at the moment, appreciate that they're talking about
penalties.  I thought they were fixing -- talking about
damages.

        MR. DEVINE:  No, it's penalties, Your Honor, and in
fact --

        THE COURT:  Okay.

        MR. DEVINE:  -- as I said, in the legislative history

that I started with -- okay.  The police power permits the
entry, entry, of a money judgment but does not extend to permit
enforcement of a money judgement.

      THE COURT:  Okay.

      MR. DEVINE:  That's the dichotomy of that.  So that's
why we're saying that we're within the exception of (b)(4)
because we're attempting to fix a penalty.

     As to the 105 injunction, the State contends that Grace is
not faced with any irreparable harm.  The standard that's been
established in the 3rd Circuit, again, is that it can't be
irreparable if it can be fixed with money.  In other words, if
you can make it up down the road by recovering monetary
damages, then it's not irreparable harm.

      THE COURT:  Well, I appreciate the legal premise.  I
can also appreciate the fact that if Grace loses a $75 million
claim every day for the last 10 years -- or $75,000 claim every
day for the last 10 years that this case is a Chapter 7 and
nobody's going to be paid.  So there is irreparable harm, not
just to the Debtor, but to every other constituency in the
case.  You folks need to talk.

      MR. DEVINE:  That could be arranged, Your Honor.

      THE COURT:  That's what you need to do.  Why don't I
defer this issue for, I don't know, a month or two.  You tell
me what's appropriate and let me see if you folks can't talk --

      MR. DEVINE:  Let's say two, we'd rather not go to

Pittsburgh, no offense.

THE COURT:  That's fine.

MR. DEVINE:  It's a long ride.  Thank you, Your Honor.

MS. BAER:  Your Honor, for the record, we're always willing to talk, and I do believe there have been some discussions with New Jersey, although not in terms of the details here.  But Your Honor, what we're asking here for is a stay, and we think that that's appropriate, and we're always willing to talk with them.  We would certainly hope that they would not be really serious about $75,000 a day, but that's what they've asked for.

THE COURT:  Well, I think a stay for a brief period of time while you folks talk is not inappropriate.  And I'm willing, if New Jersey also agrees, especially if New Jersey would agree, to keep a stay in place to see if you can't come to some negotiated resolution to this that will not require litigation in any Court with respect to the fine amount.

MR. DEVINE:  Your Honor, it's effectively stayed right now.  They have the Remand Motion but they haven't acted on it so.

THE COURT:  Okay.  All right, the hearings in January are on the 30th?

MS. BAER:  It's January 30th.

THE COURT:  I will accept an order from the Debtor -- this is on items 9 and 10, correct?

MS. BAER:  Yes, Your Honor.

THE COURT:  That will impose a temporary stay through the conclusion of the January 30 Omnibus so that the parties can meet and confer in an effort to resolve the issues that were discussed today consensually.  And then this hearing, if continued to January 30 with the Omnibus, and I'll see where you are, whether you've come up with some negotiated resolution, and if not, whether you want a further stay, and if not, if you want a decision.  But I'll hear what you have to stay at that time.

MR. DEVINE:  Thank you, Your Honor.

MS. BAER:  Thank you, Your Honor.

THE COURT:  All right.  Okay.

MS. BAER:  Your Honor, I'm pleased to say that that concludes the agenda for today.

THE COURT:  Well, thank you all for your patience today.  I'm sorry about the in and out's for the case, but I just couldn't help it based on the other matters that were going on, so thank you.

MS. BAER:  Your Honor, we appreciate that you would stay with us and get this done.

THE COURT:  Okay.  We'll see you next month.

(Court adjourned)


CERTIFICATION

189

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          _____
Signature of Transcriber                      Date