**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., *et al.*, | ) | Case No. 01-1139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | **Hearing Date: December 19, 2005 @ Noon** |
| | ) | **Related to Docket No. 11067** |
| | ) | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY
CLAIMANTS TO THE DEBTORS' NINTH MOTION FOR AN
ORDER PURSUANT TO 11 U.S.C. §1121(d) EXTENDING DEBTORS'
EXCLUSIVE PERIODS IN WHICH TO FILE A CHAPTER 11 PLAN
AND TO SOLICIT VOTES THEREON [DI 11067]**

The Official Committee of Asbestos Personal Injury Claimants (the "PI Committee"), by

and through its undersigned counsel, respectfully submits its objection to the motion of W.R.

Grace & Co., et al. ("Debtors") for the entry of an order pursuant to 11 U.S.C. §1121(d) further

extending the exclusive periods during which the Debtors have the exclusive right to file a

Chapter 11 plan through the 90th day after a final order is issued in the Estimation Hearings.[1]

(the "Motion"). In support of its objection, the PI Committee states as follows:

**PRELIMINARY STATEMENT**

1.      At issue is Grace's *ninth* request to extend the § 1121(d) exclusive periods – a

request made more than fifty-five months after the Debtors filed for bankruptcy on April 2, 2001.

Even though the Grace bankruptcy cases have been pending for almost five years, the Debtors

have little to show for their efforts, other than (1) intractable litigation and delay stemming from

their crusade against asbestos creditors, (2) a proposed chapter 11 plan that is unconfirmable *per

se*, and (3) a mounting administrative-expense burden as the Debtors' "litigate everything"

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the
Debtors' Motion.

strategy generates more fees for their professionals, to the detriment of creditors.  The Debtors

are asking this Court to allow this state of affairs to continue, almost indefinitely.  They ask that

exclusivity be extended until the 90th day after a *final* order in the "Estimation Hearings" is

entered, meaning that the exclusive periods would not run until *after* estimation-related

discovery, trials, and appeals have run their course, which could take years.  After almost five

years of reorganization proceedings, the Debtors essentially want a blank check to continue what

they are doing, with no conclusion to these reorganization proceeding in sight and no light at the

end of the proverbial tunnel.

2.	In support of their ninth request, the Debtors cite to alleged "discussions"

concerning a consensual plan."  But such talk of "discussions" is illusory.  As explained in

greater detail below, there have been, at best, only minimal "discussions" between the Debtors

and the Committee that have yielded no real progress toward ending the litigation and creating a

consensual plan.  The few "discussions" that have occurred appear to have been set-pieces

contrived by the Debtors to enable them to argue in their papers that "consensual plan

discussions" are underway and thus a further extension of the exclusive periods is warranted.

Yet, this is nothing but a cynical ploy on the Debtors' part to hold out a "consensual resolution"

of this case as a fleeting hope.  Once exclusivity is extended, however, the Debtors simply

resume their "litigate everything" strategy, and nothing thus far suggests that this pattern will

end, unless the Court denies this renewed request to extend the exclusive periods.

## **<u>INTRODUCTION</u>**

3.	On April 2, 2001 (the "Petition Date"), in the face of 'overwhelming asbestos-

related lawsuits,' the Debtors commenced the instant proceedings by filing voluntary petitions

for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the Clerk of this Court.

4.        On November 14, 2005, over fifty-five (55) months after the Debtors commenced these proceedings, the Debtors filed their ninth motion to extend the periods within which the Debtors have the exclusive right to file a plan of reorganization and solicit acceptances thereto.

5.        The Debtors' request must be denied as the Debtors have failed to demonstrate that any cause exists for the extension of exclusivity and furthermore, the Debtors have failed to make good faith progress towards a confirmable plan of reorganization.  Given the facts of this case, particularly the events over the last several months, the Debtors' latest attempt to delay the resolution of these cases must be denied.

**Prior Extensions of Exclusivity**

6.        Prior to the instant request for extension of the exclusivity periods, the Debtors filed eight motions to extend the Exclusive Periods.  Thus far, the exclusivity periods have been extended for almost five years.[2]  Quite amazingly, the instant Motion seeks to extend both the Exclusive Filing Period and the Exclusive Solicitation Period for at least another twelve months.[3]

7.        The Debtors have been given ample opportunity, in connection with the Debtors' previous motions to extend exclusivity, to progress towards a consensual, and confirmable, plan of reorganization.  As discussed more thoroughly in the PI Committee's Objection to the Debtors' Eighth Motion to Extend Exclusivity [DI 8598], this Court has been repeatedly

---

[2] As more fully discussed below, the Debtors' Eighth Motion to Extend Exclusivity was not granted, but continued to the December 2005 omnibus hearing.

[3] As noted in the Motion, the PI CMO targets a PI Estimation Hearing in September 2006.  Based upon the events in this case over the last several months, it is reasonable to question whether the hearing will take place at that time.  In any event, should this Court issue an order during the same month in which the hearing is held, the proposed period of 90 days after a final order is issued in the Estimation Hearings would continue the Exclusive Filing Period through at least December 2006.

compelled to direct the Debtors to move these cases forward.  Indeed, what minimal progress has

been made toward a resolution of these cases has come as a direct result of this Court's

expressions of concern and frustration, as well as this Court's specific directions to the Debtors

to move these cases forward.  For instance, at the hearing on February 23, 2004, following an

exchange with Debtors' counsel concerning when the Debtors would be filing a plan, this Court

expressed concern with the Debtors' lack of progress.  After Debtors' counsel stated that he

could not advise the Court when a plan would be filed, this Court stated: "It's very long, folks,

it's very long, and I'm starting to wonder whether the Debtor-in Possession, is going to be able

to get this done, and if not whether to replace the Debtors.  That's the point I'm at."  *See*,

Transcript of Hearing of February 23, 2004, *In re W.R. Grace & Co. Inc.,* Case No. 01-1139 (JKF),

Tr. 17 - 18, annexed as Exhibit A.

8.    Thereafter, this Court held a hearing on the Debtors' Sixth Motion to Extend

Exclusivity ("Sixth Exclusivity Motion").  At that hearing, counsel to the PI Committee

discussed the Debtors' inactivity in the many months leading up thereto.  For example, during a

status conference with Judge Wolin in approximately July of 2002, counsel raised the issue that

there was no Futures Representative appointed in this case.  At the presiding Judge's request, the

PI Committee suggested two candidates for the role of Futures Representative.  One of those

individuals was thereafter appointed in USG.  The Grace Debtors, on the other hand, rejected

without explanation the other proposed candidate.  At that time, the PI Committee asked the

Debtors to suggest an acceptable candidate.  The Debtors waited for over one year to respond.

The delay in the appointment of a Futures Representative was the result of the Debtors' inability,

or unwillingness, to move these cases forward.

9.      Similarly, during the argument on the Sixth Exclusivity Motion, this Court asked counsel for the Debtors whether the Debtors intended to seek a 524(g) injunction.  In response, counsel for the Debtors stated "Your Honor, to this day, I can't tell you that it will be a 524(g) plan."  Transcript of Hearing of March 22, 2004, *In re W.R. Grace & Co. Inc.,* Case No. 01-1139 (JKF), Tr. 47, annexed as Exhibit B.  At that time, these cases were almost three years old and the Debtors were unable to make an unequivocal representation to the Court as to whether they would even be seeking a Section 524(g) injunction.  This is despite the fact that they have repeatedly asserted to this Court that these cases were filed due to "overwhelming asbestos-related lawsuits against the Company."

10.      During this hearing in March 2004, the Court also stated:

It's been a long time.  And, frankly, I'm getting to the point where if I don't lift exclusivity, I'm going to appoint a trustee, and that will cause all sorts of problems, I know, for the debtors lending perspective, if nothing else.  But, this has gone on too long, with too little progress.

Transcript of Hearing of March 22, 2004, *In re W.R. Grace & Co. Inc.,* Case No. 01-1139 (JKF), Tr. 48, annexed as Exhibit B.

11.      Later in the same hearing, this Court stated:

There is no reason for me to lift exclusivity if [you are not seeking a 524(g) injunction].  But there's also no reason for the debtor to be delaying any further.  If you want 524, then get the constituent parts in place, meaning a Futures Rep, and I expect a motion, one way or the other, telling me what you're going to do set for the next omnibus hearing.

Transcript of Hearing of March 22, 2004, *In re W.R. Grace & Co. Inc.,* Case No. 01-1139 (JKF), Tr. 49, annexed as Exhibit B.

12.      As a result of this directive, the argument on the Debtors' Sixth Exclusivity Motion was continued to the May 24, 2004 Hearing.  At that hearing, and clearly in response to this Court's previous comments, counsel to the Debtors stated that they would be prepared to file a plan of reorganization within 90 to 120 days that they "hope will be one that reflects consent and agreement

for all of the constituencies, all of the constituencies *except the bodily injury constituency*."

Transcript of Hearing of May 24, 2004, *In re W.R. Grace & Co. Inc.,* Case No. 01-1139 (JKF), Tr.

52, annexed as Exhibit C. Near the conclusion of that argument, this Court stated:

> Well, I'm not inclined to deny it [the Debtors' Sixth Motion to Extend Exclusivity]
> right now, Mr. Lockwood, but I am, like you, getting a little frustrated with the fact
> that I don't have a plan on the table. So I think I am going to give the debtor a last
> period of exclusivity, and that's what it's going to be, a last period of exclusivity to
> get this done.

Transcript of Hearing of May 24, 2004, *In re W.R. Grace & Co. Inc.,* Case No. 01-1139 (JKF), Tr.

68, annexed as Exhibit C. At that hearing, this Court gave the Debtors a deadline to file a plan of

reorganization and stated "[b]ut if I don't have a plan that's on track and headed toward the

confirmation arena, if nothing else, I don't think there will be another extension." *Id.*, at 70.

13.    Six months later, on November 13, 2004, the Debtors' Plan of Reorganization (the

"Plan") and Disclosure Statement *were filed without the support of any other constituency*. On

January 13, 2005, the Debtors, Official Committee of Unsecured Creditors, and the Official

Committee of Equity Security Holders ("Plan Proponents") filed the Amended Joint Plan of

Reorganization ("Amended Plan") and Amended Disclosure Statement. The Amended Plan does

not have the support of the Futures Representative, the PD Committee, or the PI Committee. More

importantly, the Amended Plan has such serious deficiencies that the Amended Plan is

unconfirmable as a matter of law.[4] These deficiencies, include, but are not limited to, the $1.7

billion cap of the Debtors' asbestos liabilities, and the legally unsupportable position that the two

proposed classes of asbestos personal injury claims "shall be paid in full," and are therefore

"unimpaired." Following this flawed theory, the Amended Plan asserts that asbestos creditors shall

---

[4] *See*, Objection of the Official Committee of Asbestos Personal Injury Claimants to the Debtors'
Proposed Disclosure Statement [DI 7313].

{D0051778:1 }

6

be conclusively presumed to have accepted the plan under 11 U.S.C. § 1126(f), and, accordingly,

they have no right to vote.  *See*, Amended Plan §§ 3.1 & 6.3.

14.     The Debtors' Eighth Motion to Extend Exclusivity was initially argued during the

June 2005 hearing.  At that time, the Debtors were requesting an additional six-month extension of

the Exclusive Periods, through November 2005.  During that hearing, Debtors' lead counsel

discussed all of the litigation which the Debtors would like to embark upon for PI Estimation and

PD Estimation, apologized for missing hearings over the last nine months, and advised that he was

"totally focused on this case."  This Court, once again, commented about the Debtors' lack of

progress in these cases and gave the Debtors specific instructions to move them forward.  The

instructions to the Debtors included shortening their proposed time period for holding the PI

Estimation Hearing, shortening their proposed PI Questionnaire, and initiating weekly contacts with

the other constituencies to discuss settlement.

15.     This Court also gave the Debtors yet another warning that their Exclusive Periods

would be terminated.  Specifically, this Court stated:  "Because, frankly, I'm not seeing much

progress, and I think the case needs more.  So, I don't know that I'm prepared to terminate

exclusivity today, but I think I am prepared to put an end to exclusivity, and end date to exclusivity,

and it's not going to be December of 2006."  Transcript of Hearing of June 27, 2005, *In re W.R.*

*Grace & Co. Inc.,* Case No. 01-1139 (JKF), Tr. 70, annexed as Exhibit D.  The Court also advised

Debtors' counsel that the Amended Plan has a "defect" (or "problem") in that it has no alternative in

the event that the Debtors' asbestos-related liabilities are greater than their $1.7 billion cap.  The

Court stated that since it has to be a hundred percent plan, that there has to be some alternative.  Id.,

at 81.  Despite this caution, given over five months ago, the Debtors have not sought to amend the

plan on file to address this defect.

16.     At the conclusion of the June 27, 2005 hearing, the Court directed the parties to brief the issue of the potential consequences to the Debtors' business plans and financing abilities by the termination of exclusivity.  Thereafter, the Debtors filed the Debtors' Report on Business Effects of Terminating Exclusivity [DI 8963] ("Debtors' Report").  As more fully laid out in the Response of the Official Committee of Asbestos Personal Injury Claimants to the Debtors' Report on the Business Effects of Terminating Exclusivity [DI 8984], annexed as Exhibit E, the Debtors' failed to identify a single, objective adverse consequence that will result from the termination of exclusivity and, indeed, admitted that terminating exclusivity "will not be a breach" of any of the Debtors' "current lending and other financing agreements and contracts." *Debtors' Report*, page 1.[5]

17.     As recently as the November 2005 hearing, this Court noted the Debtors' continuing dedication to litigation, stating "[t]his is the only case in which the parties are this contentious and it's largely because the Debtor is taking the track where *it wants to litigate everything*.  Okay. *Litigate everything*."  Transcript of Hearing of November 14, 2005, *In re W.R. Grace & Co. Inc., Case No. 01-1139 (JKF)*, at 149 (emphasis added), annexed as Exhibit F.

18.      The Court also noted the lack of progress, while the Debtors' continue to maintain exclusivity, in stating that "[t]his case is so stuck that I am really concerned about *keeping it in its current posture*.  I've expressed this for over a year and I don't see progress being made." *Id.*, at 151 (emphasis added).

19.     During argument on the Debtors' motion for an asbestos personal injury bar date, "We can't even get through the property damage issues in this case in any kind of recognized orders.  The Debtor hasn't been able to get its Constituent Creditors to agree on a process for

---

[5] The most significant statement in the Debtors' Report was the announcement, <u>for the first time</u>, that maintaining exclusivity is a condition to the continued support of the Creditors' Committee for the pending Plan.

litigating those claims yet and we've 1100 and some of those still to go.  What are we going to do with 150,000 more claims that the Debtor can't get people to agree on the litigation mode for?" *Id.*, at 144-145.  The comments from the Court cast serious doubt on the Debtors' statement in the pending Motion that "the parties [are] on a clear path toward estimation and ultimately confirmation."

## STANDARD FOR EXTENSION OF EXCLUSIVITY PERIODS

20.    Section 1121(d) of the Bankruptcy Code provides that the Court may reduce or increase the 120-day or 180-day exclusive periods for a debtor to file and solicit acceptances of its reorganization plan if "cause" exists.  Debtors, in this instance, allege sufficient "cause" exists to extend the Exclusivity Periods for at least additional twelve (12) months, bringing the total extension to nearly six years.  In seeking the extension, Debtors seek to retain total control over the plan process, unencumbered by any input from, and without any regard to, the interest of its asbestos creditors.  Such a result is improper under Section 1121(d).

21.    Requests to extend or reduce a period of exclusivity should "be granted neither routinely nor cavalierly."  *In re Lehigh Valley Professional Sports Club, Inc.,* 2000 WL 290187, at *3 (Bankr. E.D. Pa. 2000); *Matter of All Seasons Indus. Inc.,* 121 B.R. 1002, 1003 (Bankr. N.D. Ind. 1990); *In re Curry Corp.,* 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992) ("The court will not routinely extend the exclusivity period absent a showing of 'cause' when creditors object to such requests for extensions"); *In re Pine Run Trust Inc.,* 67 B.R. 432, 434 (Bankr. E.D.Pa. 1986) ("Furthermore, both the language and the purpose of this section require that an extension not be granted routinely"); *In re Nicolet, Inc.,* 80 B.R. 733, 740-741 (Bankr. E.D. Pa. 1988).

22.    In enacting Section 1121(d), Congress explicitly sought to achieve two goals: (1) grant the debtor a reasonable time to confirm a plan without the threat of a competing plan; and (2)

at the same time, ensure that a debtor would not use Chapter 11 as a mechanism through which to operate indefinitely without attempting to reorganize.  *See In re Clamp-All Corp.,* 233 B.R. 198, 207 (Bankr. D. Mass. 1999) *citing Matter of Mother Hubbard, Inc.,* 152 B.R. 189, 195 (Bankr. W.D. Mich. 1993); *In re River Bend-Oxford Assocs.,* 114 B.R. 111, 114 (Bankr. D. Md. 1990); *In re Geriatrics Nursing Home, Inc.,* 187 B.R. 128, 131-132 (D.N.J. 1995).

23.    Legislative history reveals Section 1121(d) is an attempt to create a balance between the rights of debtors and creditors by allowing debtors *sufficient time to negotiate a settlement*, while at the same time avoiding undue delay for creditors. H. R. REP. NO. 595, 95th Cong., 1st Sess. 231-32 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6190-92.  Long and numerous extensions of the exclusivity period upset that balance and should not be encouraged.  *In re Timbers of Inwood Forest Assoc.,* 808 F.2d 363, 372 (5th Cir. 1987), *aff'd,* 484 U.S. 365 (1988).  In virtually every case where an extension has been granted, the debtor has shown substantial progress in formulating a plan during the first 120 days.  *Southwest Oil Co. of Jourdanton,* 84 B.R. 488, 451 (Bankr. W.D. Tex. 1987).

24.    The burden is on the party seeking an extension of the exclusive periods to file a plan and solicit acceptances thereof to demonstrate the existence of good cause warranting the extensions.  *Matter of Newark Airport/Hotel LP*, 156 B.R. 444, 451 (Bankr. D.N.J.) *aff'd* 155 B.R. 93 (D.N.J. 1993).

25.    Cause for extension of a debtor's exclusive periods does not exist where the debtor had made no showing that it can successfully reorganize if the exclusive periods are extended. *Matter of American Fed'n of Television and Radio Artists*, 30 B.R. 772, 774 (Bankr. S.D.N.Y. 1983). *See Curry Corp.,* 148 B.R. at 756 (denying an extension where "[t]he debtor has not even

demonstrated that a plan of reorganization might be forthcoming"); *Southwest Oil Co. of Jourdanton,* 84 B.R. at 451; *Pine Run Trust*, 67 B.R. at 435.

## OBJECTION

26.    This court should not extend the Debtors' Exclusivity Periods and thereby allow the Debtors to retain total control over the plan process for what is likely to last over six (6) years.  In support of the pending Motion, the Debtors cite to a variety of factors that courts consider in determining whether cause exists to extend the Exclusive Periods.  Despite recognizing these factors, the Debtors' Motion does not even address some of them, and, in some instances, only provides conclusory statements that the elements are met by unspecified facts.[6]

**The Debtor Has Failed to Work Toward Progress in Negotiating with Creditors**

27.    The Debtors have not only failed to make progress with negotiations since the last exclusivity extension, but they have made minimal progress over the last several years.  It is particularly troubling that what minimal negotiations that have occurred resulted from this Court's insistence.  The Debtors' assertion in the Motion that "all constituencies continue to engage in discussions concerning a consensual plan" is not only misleading, but does not support the further extension of the Exclusive Periods, as this element requires more than mere negotiations, but a showing that the Debtors have made progress in these negotiations.  A review of the Motion shows that the Debtors do not even allege that they have made progress in negotiations.  When considering the Debtors' failure respond in recent negotiating attempts, it is understandable why the Debtors to not even allege that progress is being made.

---

[6] Noticeably absent from this list is an element which the Debtors' have cited in previous motions, the necessity of sufficient time to negotiate and prepare adequate information.  The Debtors' silence on this issue must be accepted as recognition that this element does not support the pending Motion.

28.    When this Court granted the Debtors' fifth motion to extend exclusivity, it ordered the parties to confer.  On September 5, 2003, the Debtors and the PI Committee conferred.  The proposal made by the Debtors at that time could not be regarded as a serious, good faith, attempt to reach a consensual plan.  The next negotiations took place between the PI Committee and the Debtors in the later part of 2004, following the entry of this Court's order requiring the Debtors to file a plan of reorganization.  Although the Court's deadline resulted in some meaningful activity, no resolution was reached.

29.    In June 2005, in connection with the Debtors' eighth motion to extend exclusivity, this Court once again ordered the parties to confer and this time gave Debtors' counsel instructions to make regular contact with the other constituencies in an effort to reach a consensual plan of reorganization.    Not only has this regular contact not occurred, but the Debtors have not followed through with what minimal efforts they have made to resolve this case.  Specifically, on September 12, 2005, Debtors' counsel met with counsel and representatives of the PI Committee.  At that meeting, Debtors' counsel represented that a substantive proposal would be prepared and sent to the PI Committee within a week to ten days.  To this date, almost two months later, the PI Committee has not received that proposal.  Nevertheless, the PI Committee is willing to discuss with the Debtors the alternatives for a consensual resolution of these cases at any time.

30.    Due to the lack of follow up from the Debtors, the PI Committee has moved on to negotiate directly with other creditor constituencies.  In an effort to resolve this case without the need to continue the endless litigation that the Debtors continue to pursue, the PI Committee has had serious and substantive discussions with other asbestos constituencies.  These negotiations have involved all economic issues, including ZAI.  The PI Committee is pleased to report that substantial progress is being made.  The PI Committee believes that a deal between the creditor groups is very

possible and that terminating exclusivity will serve as sufficient impetus to spur these negotiations to a conclusion which would result in a confirmable plan approved by all significant creditor groups.

31.     In opposing the Debtors' ninth motion to extend exclusivity, the PI Committee argued that it is time to terminate exclusivity and level the playing field to see if the other creditor constituencies can do what the Debtors have failed to do, to reach an agreement among the creditors. Unbeknownst to the PI Committee at that time, an agreement between the Debtors and the Creditors Committee existed which required the Debtors to maintain exclusivity as a condition to the Creditors Committee's continued support for the Amended Plan. This agreement between the Debtors and the Creditors' Committee continues to operate as an impediment to the consensual resolution of this case and provides yet another reason for this Court to deny the pending Motion.

**The Incessant Desire to Litigate Everything Does Not Show Good Faith Progress Toward Reorganization**

32.     Other than trumpeting the entry of the Case Management Orders for the estimation of PI and PD claims, the Debtors' are unable to point toward actual, good faith, progress toward reorganization. As this Court recently noted, "this case is stuck" and the Debtors' litigation tactics are seeking to elevate the already highly contentious nature of this case. Transcript of Hearing of November 14, 2005, *In re W.R. Grace & Co. Inc.,* Case No. 01-1139 (JKF), Tr. 168, annexed as Exhibit F. Just last month, this Court expressed concern during the argument on the Debtors' motion for an asbestos personal injury bar date. At that time, this Court stated:

> And I understand why you're trying to do it [a PI bar date], to preserve equity. Frankly, I don't see how equity's in the money in this case. I don't see it. I don't see it from Debtors' operations, I don't see it from the litigation strategies in this case. I don't see it from the fact that the Plan's been on the table since January and you're not even close to getting consensus. This case is stuck. And it's really distressing. I don't see how the Proof of Claim is going to advance that. It's just going to create more fractionalization.

Transcript of Hearing of November 14, 2005, *In re W.R. Grace & Co. Inc.,* Case No. 01-1139

(JKF), Tr. 168, annexed as Exhibit F.

33.     Indeed, the Debtors' litigation strategy has resulted in a substantial increases in the

monthly fee applications of Kirkland & Ellis, LLP ("Kirkland").  From January 2004 through

September 2004, Kirkland's monthly applications (for fees only) averaged approximately $485,500.

For the same time period in 2005, the monthly applications more than doubled to an average of over

$1,156,500 a month.  As a result, Kirkland's fees for January through September 2005 are in excess

of $10,400,000.  Despite these large fees, the last nine months of litigation in this case has resulted

in minimal meaningful progress to a toward reorganization.

34.     The Debtors assert in their Motion that pending litigation regarding claims justifies a

further extension of time.  Pending litigation does not automatically justify an extension of time.  *In*

*re Scott*, 37 B.R. 184, 185 (Bankr. W.D. Ky. 1984).  Denial of an extension is appropriate even

where the debtor contends waiting for the outcome of pending litigation is necessary or that the

litigation is distracting.  *All Seasons*, 121 B.R. at 1005-06. *See In re Parker Street Florist & Garden*

*Center, Inc.,* 31 B.R. 206, 208 (Bankr. D. Mass. 1983); *Southwest Oil Co.,* 84 B.R. at 452; *Scott*, 37

B.R. at 186; *American Fed'n*, 30 B.R. at 774.

35.     During the November 2005 hearing, this Court expressed its concern of the Debtors'

litigation tactics and their difficulty in moving this case forward in stating:

> You know, if a [personal injury] bar date makes sense at all in this case, it seems
> to me to make sense when we're sending out for votes on a confirmation of a plan
> and we can treat, at that point, the ballot as a Proof of Claim.  I really don't see
> what we're getting at by attempting, at this stage, to create a bar date.  We can't
> even get through the property damage issues in this case in any kind of
> recognized orders.  The Debtor hasn't been able to get its Constituent Creditors to
> agree on a process for litigating those claims yet and we've 1100 and some of
> those still to go.  What are we going to do with 150,000 more claims that the
> Debtor can't get people to agree on the litigation mode for?

Transcript of Hearing of November 14, 2005, *In re W.R. Grace & Co. Inc.,* Case No. 01-1139

(JKF), Tr. 144-145, annexed as Exhibit F.

36.     Where the need to conclude litigation does not appear to be critical to the debtor's

efforts to propose a plan, the debtor should be able to "propose its plan taking into consideration the

possible results of that action." *All Seasons*, 121 B.R. at 1005; *Parker,* 31 B.R. at 208.  While it may

be more convenient to know the results of the litigation, it is not necessary for this Chapter 11

proceeding to be placed in limbo until that time.  *Id.*

37.     The Debtors must not be permitted to embark on this track of years of litigation,

with costly professional fees, while continuing to maintain exclusivity.  If pending litigation was the

test for extending exclusivity, then such relief would be granted routinely in every case for great

lengths of time.  Through nearly five years of exclusivity, the Debtors have had ample time to make

a good faith effort to resolve their issues.

**The Debtors Have Failed To Demonstrate Reasonable Prospects for Filing a Viable Plan**

38.     The Debtors' Motion fails to even argue that that they have demonstrated

reasonable prospects for filing a viable plan.  The reasons for this are obvious.  These cases are

nearly five years old.  For the first three and a half (3 ½) years, there was minimal, meaningful

effort made by the Debtors to reorganize with a consensual plan and emerge.  When the Debtors

finally filed a plan of reorganization, after being ordered to do so by the Court, they proposed a

completely unconfirmable plan[7].

39.     Grace entered Chapter 11 for the avowed purpose of resolving its crushing

asbestos liabilities.  According to the Disclosure Statement, the Debtors were defendants in

---

[7] See Objection of the Official Committee of Asbestos Personal Injury Claimants to the Debtors'
Proposed Disclosure Statement [D.I. 7313].

lawsuits asserting approximately 118,000 Asbestos PI Claims.  Despite the passage of nearly five

years, the Debtors continue to push for a structure of litigation, in the Amended Plan and related

documents, which will require years to resolve.  Setting the Debtors' desire for seemingly

endless litigation aside, the Amended Plan, and its contention that asbestos claimants are

"unimpaired" and therefore conclusively presumed to accept the Amended Plan, is legally

unsupportable.  As more fully discussed in the PI Committee's Objection to the Debtors'

Proposed Disclosure Statement [DI 7313], this contention is wrong for two distinct reasons.

First, the classes of Asbestos PI Claimants would clearly be "impaired" under the Amended Plan,

and their acceptance of the Amended Plan must be solicited under Sections 1125 and 1126(c) of

the Bankruptcy Code.  Second, and whether or not the Asbestos PI Claimants are afforded the

right to vote under Section 1126(c) of the Bankruptcy Code, their vote is affirmatively required

under Section 524(g) of the Bankruptcy Code, compliance with which the Amended Plan

requires as a condition precedent to confirmation.

40.    The most obvious example that the Debtors have failed to demonstrate reasonable

prospects for filing a viable plan is one that this Court has directly addressed with the Debtors;

the Amended Plan has a defect in that it provides no alternative should the estimates on asbestos

claims exceed the $1.7 billion cap stated therein.  Despite the passage of several months since the

Court raised this concern with the Debtors, they have not come forward with any remedy for this

defect.  As a result, and after nearly five years of maintaining exclusivity, the Debtors have failed

to demonstrate reasonable prospects for filing a viable plan.

## Size and Complexity of the Case

41.    As in the previous motions, the Debtors' Motion relies on the size and complexity of

this case as a basis to extend exclusivity.  However, the size and complexity alone do not provide

cause for extension of the exclusivity periods.  *In re Public Service Co. of New Hampshire*, 88 B.R.

521, 537 (Bankr. D.N.H. 1988); *Curry Corp.,* 148 B.R. at 755; *In re Sharon Steel Corp.*, 78 B.R.

762 (Bankr. W.D. Pa. 1987).  Section 1121(d)'s "for cause" language requires the presence of

factors in addition to timing, size, and complexity that are specific to the particular debtor and its

reorganization to justify an extension of exclusivity.  *Public Service,* 88 B.R. at 537.  If size and

complexity alone were sufficient to find cause then debtors in complex cases would have an

unlimited right to exclusivity and Section 1121(d) would be rendered meaningless in complex cases.

As this Court is aware, the Bankruptcy Reform Act prohibits the extension of exclusive periods to

file a plan of reorganization beyond eighteen (18) months after the petition date.  *See* 11 U.S.C.

Section 1121(d)(2)(A).

42.     Denial of Debtors' Motion will not end their chances for reorganization. "Denying

such a motion only affords creditors their right to file the plan; there is no negative effect upon the

debtor's co-existing right to file its plan." *All Seasons*, 121 B.R. at 1005. *citing Parker*, 31. B.R. at

207; *See also In re Groosinger's Assocs.*, 116 B.R. 34, 36 (Bankr. S.D.N.Y. 1990) ("A loss of plan

exclusivity does not mean the debtor is foreclosed from promulgating a meaningful plan of

reorganization; only that the right to propose a Chapter 11 plan will not be exclusive with the

debtor").  "The risk is, of course, that while it is developing its plan, another party in interest will

file a plan.  However, that is as Congress intended." *In re Tony Downs Foods Co.,* 34 B.R. 405, 408

(Bankr. D. Minn. 1983).  *See also Southwest Oil Co.,* 84 B.R. at 455.  In keeping with the purpose

of Section 1121(d), the creditors in this case should have the opportunity to present a viable plan of

reorganization, as the Debtors have failed to do so.

{D0051778:1 }                                                    17

## **CONCLUSION**

43.     The Debtors have failed to establish the requisite cause that would justify a ninth, and virtually indefinite, extension of the exclusive periods.  Moreover, extending the exclusive periods will not resolve the principal problem in this case, which is the intractable motions practice, discovery, and delay being caused by the Debtors' "litigate everything" strategy.  This Court has acknowledged the Debtors' lack of progress on many occasions, and has warned the Debtors that the exclusive periods may be terminated as a consequence.  After fifty-five months of pending reorganization proceedings, the Debtors have little to show for their efforts.  They still have yet to come forward with a proposed plan of reorganization that fairly and sensibly resolves their asbestos liabilities, and makes a reasonable attempt to enlist the support of the asbestos creditor constituencies.  Instead, they have used their almost half-decade-long sojourn in chapter 11 to pursue their self-serving "tort reform" agenda and to experiment with ways of turning aggregate estimation into a mass claims disallowance proceeding.  And now, the Debtors are asking for a blank check to continue with what they are doing, with only years of further litigation in sight.

44.     Enough is enough.  To bring this reorganization proceeding to a fair, sensible, and seasonable conclusion, it is time to level the playing field and to permit creditors to come forward with their own plans for reorganizing the Debtors.  Thus exclusivity should be lifted. For all the reasons set forth above, the Committee respectfully requests that the Court deny the Motion, permit creditors and other interested parties to file proposed chapter 11 plans and to solicit acceptances thereof, and grant to the Committee such other and further relief as the Court deems just and appropriate.

{D0051778:1 }

WHEREFORE, for the foregoing reasons, the PI Committee respectfully requests that the Court deny Debtors' Ninth Motion for an Order Extending Debtors' Exclusive Periods in which to File a Chapter 11 Plan and to Solicit Votes Thereon.

Date:   December 2, 2005

CAMPBELL & LEVINE, LLC

*/S/ Mark T. Hurford*

Marla R. Eskin (No. 2989)
Mark T. Hurford (No. 3299)
800 King Street, Suite 300
Wilmington, DE  19801
(302) 426-1900

-and-

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue, 35th Floor
New York, NY  10152-3500
(212) 319-7125

-and-

CAPLIN & DRYSDALE, CHARTERED
Peter Van N. Lockwood
Nathan D. Finch
Jeffrey A. Liesemer
One Thomas Circle, N.W.
Washington, D.C.  20005
(202) 862-5000

Counsel to the Official Committee of
    Asbestos Personal Injury Claimants