# EXHIBIT E

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., *et al.*, | ) | Case No. 01-1139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | **Hearing Date: July 19, 2005 @ 9:00 a.m.** |
| | ) | **Related to Docket No. 8486** |
| | ) | |

### RESPONSE OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS TO THE DEBTORS' REPORT ON THE BUSINESS EFFECTS OF TERMINATING EXCLUSIVITY [DI 8963]

The Official Committee of Asbestos Personal Injury Claimants (the "PI Committee") respectfully submits this Response to the Debtors' Report on Business Effects of Terminating Exclusivity (the "Debtors' Report") pertaining to the Debtors' Eighth Motion for an Order Pursuant to 11 U.S.C Section 1121(d) Extending Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and to Solicit Votes Thereon [DI 8486] (the "Eighth Exclusivity Motion").

### INTRODUCTION

1.      On June 27, 2005, during oral argument on the Debtors' Eighth Exclusivity Motion, this Court requested supplemental briefing on the consequences of terminating exclusivity from a business perspective.  Specifically, this Court requested analysis concerning the potential consequences with regard to "the debtors' lines and letters of credit, the debtors' financing facilities, [and] the debtors' business plans."  Transcript of June 27, 2005 Hearing, page 98.  In response to this request, the Debtors' Report conceded what is abundantly clear - that terminating exclusivity "will not be a breach" of <u>any</u> of the Debtors' "current lending and other financing agreements and contracts."  Debtors' Report, ¶ 1 (emphasis supplied).

{D0045699:1 }

1

2.      Having failed to identify even a single, objective adverse consequence that will result from the termination of exclusivity, the Debtors' Report should have stopped there. Instead, without the support of any competent evidence, the Debtors' Report continued with mere speculation positing a parade of potential horribles that the Debtors allege "could," "may," or "might" result if exclusivity is terminated.  This Pandora's Box of possibilities is pure speculation which finds no support in the record or otherwise.  Although specifically invited to do so by this Court, the Debtors presented no analysis whatsoever from their financial advisors to support their baseless conjecture.  Further, the Debtors' Report failed to offer even a single affidavit from any of the Debtors' lenders, bankers, customers or suppliers to evidence that <u>any</u> adverse consequences will result to the Debtors' business if this Court terminates exclusivity. Instead, the only support offered for the Debtors' Report was an affidavit by the Debtors' newly appointed CEO that contained nothing more than his own unconfirmed opinion and supposition.

3.      Rather, the gist of much of the Debtors' Report is their assertion that terminating exclusivity may engender of vague form of "uncertainty" resulting in a negative perception of Debtors' management.  Debtors' Report, page 2.  If there were to be any negative perception of the Debtors' management it surely already would have arisen as a result of either the criminal indictment of WR Grace and several of its senior management or the New Jersey  civil suit seeking well in excess of $1,000,000,000 in cumulative penalties for the Debtors' alleged submission false or misleading information to state regulators.  If these events are not enough to result in a "negative perception" of the Debtors' management by their employees or customers, then surely the termination of exclusivity will have no effect on those preceptions.  Rather, terminating exclusivity will level the playing field and give all creditors the chance for

meaningful negotiations toward what will be most beneficial to all parties in interest –
expeditiously moving to a confirmed plan of reorganization in these cases.

4.      Instead, the Debtors' Report discloses a glaring impediment to the possibility of
good faith settlement negotiations involving all of the creditor constituencies in these cases.
Specifically, the Debtors now admit that "maintaining exclusivity is a condition to continued
Unsecured Creditor Committee support of the Joint Plan."  Debtors' Report, ¶ 20.  It is clear
from Debtors' arguments during the June 27, 2005 Hearing on the Debtors' Eighth Exclusivity
Motion that they will continue to cling to their defective Joint Plan.

5.      Having locked the Unsecured Creditor Committee into support of the fatally
flawed Joint Plan, no meaningful negotiations can proceed among the creditor bodies so long as
the Debtors' exclusivity continues.  Rather, the Debtors merely will continue to hold the plan
process hostage and further delay the resolution of these cases.  This log jam must be broken.

6.      Because, as admitted by the Debtors, none of their financial agreements or
contracts will be breached or otherwise adversely affected by the termination of exclusivity, and
for the reasons stated in the Official Asbestos Personal Injury Committee's Objection to Debtors'
Eighth Exclusivity Motion, this Court should terminate the Debtors' Exclusive Periods.

<u>**RESPONSE**</u>

**THERE ARE NO CURRENT LENDING OR OTHER FINANCING
AGREEMENTS OR CONTRACTS WHICH WILL BE BREACHED
<u>BY THE TERMINATION OF EXCLUSIVITY.</u>**

7.      The ultimate question posed by this Court is whether terminating the Debtors'
exclusivity will result in any objective adverse effects on the Debtors' business, current lending
and other financial agreements and contracts.  The answer to that question, as admitted by the

Debtors, is unequivocally - <u>no</u>.  The Court's inquiry should end here and Debtors' Exclusive

Periods should be terminated.

8.     In their Report, however, the Debtors ask the Court to ignore the objective and

unambiguous fact that <u>none</u> of the Debtors' financial or other business agreements will be

breached by termination of exclusivity and instead to side-step into nebulous and unsupported

speculation that terminating exclusivity <u>may</u>, <u>might</u>, or <u>could</u> have any of a variety of ill

consequences in the future.[1]  The Court should reject such unsupported speculation out of hand.

9.     Much of the Debtors' Report concentrates on rank speculation as to the potential

effect that termination of exclusivity <u>may have</u> on future extensions of its DIP loan facility and

financing arrangements.  See Debtors' Report, pp 4-5.  In so doing, the Debtors refer specifically

to the April 1, 2006 renewal date of the current DIP facility.  The PI Committee, as supported by

---

[1] <u>See</u> <u>e.g.</u>  Debtors' speculative allegations that loss of exclusivity:

"…<u>could</u> have an adverse impact on the Debtors' ability to obtain a renewal of the DIP Agreement…" (Report ¶4)

"…<u>may</u> have an adverse impact on the Debtors' ability to obtain other financing arrangement…" (Report ¶5)

"…Grace <u>could</u> be asked to provide more security…" (Id.)

"…concerns (by foreign customers)…<u>could</u> well re-emerge…<u>potentially</u> resulting in impairment of Grace's standing as a global supplier…"(Report, ¶6)

<u>See</u> <u>also</u>  Debtors' vague assertions concerning alleged "uncertainty" due to terminating exclusivity:

"(<u>If</u>) the Debtors' suppliers alter these (credit) terms due to uncertainty concerning the Debtors' future…will have an adverse effect." (Report, ¶7)

"…uncertainty in the marketplace that <u>could</u> be caused by terminating exclusivity <u>may</u> also affect Grace's relationships with its existing customers…(and) <u>could</u> result in reluctance …(of) customers to enter into long term sales contracts." (Report, ¶8)

"…<u>could</u> impact Grace's position with…customers…" (Report, ¶9)

"…growth with…joint venture partners will be hampered due to uncertainty that <u>could</u> result from terminating exclusivity...(and)…locating additional strategic partners …<u>may</u> be hampered." (Report, ¶16)

"…deals that are still under negotiation <u>could</u> be jeopardized…" (Report, ¶18)

"…current acquisition deals…<u>could</u> be jeopardized by a lack of confidence…" (Report, ¶19)

(all emphasis supplied)

{D0045699:1 }

4

the Affidavit of Robert W. Matthews (the "Matthews Affidavit"), disputes the Debtors' vague

assertions that terminating exclusivity will have any adverse impact on the Debtors' ability to

obtain financing arrangements.

10.    Specifically, as set forth in the Matthews Affidavit, the Debtors' ability to obtain

similar financing arrangements will not be adversely impacted as the present DIP financing

market and short-term outlook are comparable, if not more favorable, for borrowers than when

the Debtors' current DIP facility was negotiated.  Matthews Affidavit, ¶ 7(a).  In addition, the

Debtors' current financial position, liquidity and financial outlook are stronger than when the

current DIP became effective.  Matthews Affidavit, ¶ 7(b).  More importantly, the DIP lenders

are protected by financial and other covenants and do not require interminable exclusivity as a

lending condition.  Matthews Affidavit, ¶ 7(d).  Rather, lenders are primarily concerned with a

debtor's ability to repay the amounts it borrows on emergence and the lender's primary

assurance of re-payment results from its super-priority collateral position - a position that is not

effected by terminating exclusivity.  Matthews Affidavit, ¶ 7(d).

11.    Indeed, it is significant that there is no termination of exclusivity provision in the

Debtors' current DIP facility.  The present DIP facility was negotiated by highly sophisticated

parties, who were undoubtedly cognizant of the potential for termination of exclusivity.

Notwithstanding the Debtors' groundless speculation concerning prospective future DIP

negotiations, if the Debtors' current DIP lenders were concerned that terminating exclusivity

would create any additional lending risk, then the current DIP facility surely would have made

termination of exclusivity an event of default – it did not.

12.    Moreover, despite the Debtors' baseless concern over future DIP negotiations, it

is also significant to note that, except for limited letter of credit and holdback usage, the Debtors

have made only minimal use of their existing DIP facility.  Even when the existing facility was used in these cases it was only for strategic cash management purposes during a brief time in the second and third quarter of 2003.  At that time, the Debtors borrowed $40 million despite having a consolidated cash balance of nearly $300 million.  Matthews Affidavit, ¶ 7(c).  Indeed, as of March 31, 2005, the Debtors' cash balance increased to $474.8 million (excluding $81 million in additional liquidity represented by the cash value of life insurance policies).  Matthews Affidavit, ¶ 7(b).  In addition, the Debtors' sales, EBIT, and operating cash flow have also improved materially since 2003 and are projected to continue to improve in 2005.  Matthews Affidavit, ¶ 7(b).

13.     In sum, the question of whether or not terminating exclusivity will cause any negative consequences to the Debtors' financing facilities, letters or lines of credit is clearly that it will not.  The Debtors have failed to produce any demonstrable evidence to the contrary and this Court should give no credence whatsoever to the Debtors' self-serving, speculative laundry list of mere "ifs," "coulds," or "mights."

**ANY INTERNAL OR EXTERNAL "NEGATIVE PERCEPTION"**
**CONCERNING THE DEBTORS' SENIOR MANAGEMENT IS UNRELATED**
**TO THE TERMINATION OF EXCLUSIVITY.**

14.     After admitting, as it must, that terminating exclusivity will not result in a breach of any of the Debtors'  financing facilities or other contracts, the remainder of the Debtors' Report is nothing more than rife speculation by the Debtors' newly appointed CEO of what might, could, or may happen if exclusivity is terminated.[2]

---

[2]     The PI Committee notes that, with the exception of the purported "distraction" to Debtors' management that might result from competing plans, the Debtors' failed to include any of these alleged speculative consequences in either their Eighth Exclusivity Motion or their Reply to Objections to Extension of Plan Exclusivity [DI 8639].

15.     Much of that speculation merely asserts that termination of exclusivity may create negative perceptions of the Debtors' management that may be detrimental to the Debtors' business.

16.     In their recitation of perceived harm, the Debtors' Report asserts that the termination of exclusivity ". . . will set off alarm bells that are sure to affect the Debtors' businesses.  These effects essentially relate to [the] negative perception of Debtors' management both externally and internally" and that "termination is sure to be viewed as a signal that management was wrong…that management is no longer in control of Grace or the reorganization process."  Debtors' Report, page 2.

17.     Contrary to the Debtors' assertions, the alarm bells concerning the Debtors' management have been ringing for some time and the clamor has nothing to do with termination of exclusivity.

18.     As the Court is aware, in February 2005, WR Grace and seven of its current and former senior executives were indicted (the "Criminal Indictment") by a federal grand jury.  The former executives include the past Manufacturing Manager of Specialty Vermiculite for the Construction Products Division Business Unit; the Director of Health, Safety, and Toxicology for the Industrial Chemicals Group; the Vice-President and General Manager of the Construction Products Division; and a Senior Vice-President of WR Grace.

19.     The following current senior executives of WR Grace have been indicted: (1) Robert Bettachi, president of the Debtors' Construction Products Division and a Senior Vice President of the Debtors; (2) O. Mario Favorito, Chief Group Counsel and Assistant Secretary for the Debtors; and (3) Alan R. Stringer, the Debtors' representative for the Environmental Protection Agency's Superfund clean-up efforts.  The Criminal Indictment alleges that WR

Grace & Co. and its current and former executives conspired to conceal and misrepresent the hazardous nature of the tremolite asbestos contaminated vermiculite and otherwise defrauded the United States and others by impairing, impeding and frustrating the functions of the EPA and NIOSH.  In addition to conspiracy, WR Grace and these seven executives are also charged with wire fraud and obstruction of justice.  The Criminal Indictment further alleges that WR Grace and the other defendants:

> concealed the full extent of their knowledge of the hazardous nature and friability of the tremolite asbestos contaminated vermiculite from **employees** of defendant W.R. Grace Libby vermiculite mining and procession operations; **families of employees** of defendant W.R. Grace Libby vermiculite mining and processing operations; **industrial customers** of defendant W.R. Grace Libby vermiculite products; **employees of industrial customers** of defendant W.R. Grace Libby vermiculite products; **residents** of Libby, Montana and surrounding communities in Lincoln County, Montana; and **government authorities**.

(Emphasis supplied).  Criminal Indictment, ¶ 76.

20.     According to the indictment, for a period of approximately 17 years, WR Grace leased a property contaminated with tremolite asbestos to "various people and entities to use for organized youth baseball games and practices."  Criminal Indictment, ¶ 156.  Following this period of time, WR Grace and current executives Messrs. Bettacchi and Favorito signed a deed transferring title of the asbestos contaminated property to the City of Libby without disclosing the health hazard associated with the property.  Criminal Indictment, ¶ 158.

21.     On June 1, 2005, the New Jersey Attorney General filed a civil complaint (the "Civil Suit") against WR Grace & Co. and two company executives, including Robert J. Bettachi.  The Civil Suit seeks well in excess of $1,000,000,000 in cumulative penalties and asserts that the defendants therein submitted false or misleading information to state regulators concerning asbestos-tainted vermiculite it processed at a New Jersey plant.

22.     In light of this recent history, the Debtors' assertions that merely terminating the Debtors' exclusivity to seek confirmation of a plan of reorganization would create a "negative perception" of management, either externally (with customers) or internally (with employees), is simply not credible.  Indeed, if anything were to cause a "negative perception" of the Debtors' management by their customers and employees, the Criminal Indictment and Civil Suit would do so.  Termination of exclusivity simply pales in comparison.

**TERMINATING EXCLUSIVITY WILL GIVE ALL CREDITORS**
**A CHANCE TO HAVE MEANINGFUL SETTLEMENT NEGOTIATIONS**
**TO RESOLVE THIS CASE IN THE FORESEEABLE FUTURE.**

23.     The Debtors entered Chapter 11 for the avowed purpose of resolving the companies' crushing asbestos liabilities.  According to the Disclosure Statement, the Debtors were defendants in lawsuits asserting approximately 118,000 Asbestos PI Claims as of the Petition Date.  The Debtors' current request to extend exclusivity was filed on May 23, 2005.  Prior to the instant motion, Debtors requested, and were granted, seven (7) extensions of exclusivity to propose and obtain confirmation of a plan.  Thus far, the Debtors' exclusivity periods have been extended for almost four years.[3]  The Debtors have been given ample opportunity to resolve their asbestos liabilities and to progress towards a consensual plan of reorganization.  They have failed to do so.  If it was not clear before the briefing and argument on the Debtors' Eighth Exclusivity Motion, it is certainly now clear that the Debtors have failed at negotiating a consensual resolution to these cases.

24.     As noted above, the Debtors' Report discloses a significant impediment to moving forward with good faith negotiations between all creditor constituencies in these cases.

---

[3] The Bankruptcy Reform Act put the public policy questions surrounding Congress's views of lengthy extensions of the Debtors' exclusivity periods to rest.  Revised section 1121(d) eliminates the ability of Debtors to receive an extension of the exclusive period to file a plan beyond eighteen months from the petition date.

Specifically, the Debtors have now disclosed that "maintaining exclusivity is a condition to continued Unsecured Creditor Committee support of the Joint Plan." Debtors' Report, ¶ 20. As such, there is no incentive for the unsecured creditor constituencies to negotiate a consensual plan with the PI Committee and the other asbestos creditors. This is particularly the case where the Debtors' facially defective Joint Plan purports that to pay general, unsecured, non-asbestos creditors in full with post-petition interest. In short, so long as the Debtors maintain exclusivity, no meaningful negotiations can proceed among the creditor body toward a realistic and confirmable plan.

25.     Unfortunately, the Debtors clear strategy is to continue to hold the plan process hostage and to embark on extensive litigation that will likely take years to complete. The continued delay toward the emergence of these Debtors will serve only to increase administrative costs and to reduce the recoveries received by the Debtors' creditors. Grace's Chapter 11 reorganization expenses, net of $4.3 million in interest income, were $78.6 million through Decenber 31, 2004, and are estimated to be an additional $15 million in 2005. In addition, the Debtors' 2004 10K report notes that "for 2004, 2003 and 2002, Grace's pre-tax income from core operations included expenses of $12.3 million, $9.0 million and $7.4 million, respectively for Chapter 11-related compensation charges."

26.     Further, the Debtors' 2003 10K notes that "there are numerous other indirect costs to manage Grace's Chapter 11 proceedings such as: management time devoted to Chapter 11 matters; added cost of debt capital; added costs of general business insurance, including D&O liability insurance premiums; and lost business and acquisition opportunities due to the complexities of operating under Chapter 11." In contrast to the escalating costs associated with a further extension of exclusivity, terminating exclusivity will move these cases forward by

leveling the playing field and allowing all of the creditors an opportunity to negotiate and file a confirmable plan of reorganization, thereby ending these Chapter 11 related costs.

27.     Contrary to the Court's direction, nothing in the Debtors' Report establishes any business related reason why the Debtors' exclusivity should not be terminated at once.  Rather, what underlies the Report is merely the Debtors' strategic desire to maintain Grace's management solely in control of the reorganization process.  That approach has failed to progress these cases to a confirmable plan for more than four years and it is time to put it to an end. Accordingly, the Asbestos PI Committee urges this court to deny the Debtors' Eighth Exclusivity Motion thereby opening up the possibility of meaningful settlement negotiations for a consensual resolution of these cases.

Date:   June 12, 2005

                                        CAMPBELL & LEVINE, LLC

                                         /s/ Mark T. Hurford
                                        Marla R. Eskin (No. 2989)
                                        Mark T. Hurford (No. 3299)
                                        800 King Street, Suite 300
                                        Wilmington, DE  19801
                                        (302) 426-1900

                                           -and-

                                        CAPLIN & DRYSDALE, CHARTERED
                                        Elihu Inselbuch
                                        399 Park Avenue, 27th Floor
                                        New York, NY  10022-4614
                                        (212) 319-7125

                                           -and-

CAPLIN & DRYSDALE, CHARTERED
Peter Van N. Lockwood
Nathan D. Finch
Ronald E. Reinsel
One Thomas Circle, N.W.
Washington, D.C.  20005
(202) 862-5000

Counsel to the Official Committee of
    Asbestos Personal Injury Claimants

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                    Chapter 11

W.R. GRACE & CO., *et al.*                Case No. 01-1139 (JKF)

Debtors.                                  Jointly Administered

## AFFIDAVIT OF ROBERT W. MATHEWS IN RESPONSE TO THE DEBTOR'S REPORT ON BUSINESS EFFECTS OF TERMINATING EXCLUSIVITY

STATE OF CONNECTICUT

                              ss:

COUNTY OF FAIRFIELD

Robert W. Mathews, being first duly sworn, deposes and says

1      I am a Managing Director of L. Tersigni Consulting P.C   LTC"), a firm providing financial advisory services in bankruptcy proceedings and complex litigation  My expertise is derived from over thirty years of experience in global commercial and investment banking and financial consulting  Attachment   to this Affidavit is a description of my professional qualification:

2.     In April 2001, the Asbestos PI Committee retained LTC to provide financial advisory services in connection with the W. R. Grace & Co. bankruptcy cases. LTC is also currently the financial advisor to many other committees of asbestos claimants appointed as official committees in the bankruptcy cases of various companies that have filed for reorganization under Chapter  1 of the Bankruptcy Code.

3      I have conducted a review and analysis of Debtor In Possession Financing Agreements, their extensions and subsequent exit financing for numerous Chapter 1  asbestos companies. Over the past several years I have prepared assessments of the financing associated with at least nine asbestos-related bankruptcies.

4        have also assessed other financing arrangements for non-debtor businesses with extensive asbestos issues. As part of these assessments, my involvement has included monitoring the bank and bond markets and discussing details of prospective commitments of capital and credit with various financial institutions.

5.        I have been asked by counsel for the Asbestos PI Committee to provide my opinion as to whether the loss of exclusivity would have an adverse impact on W.R. Grace's ability to obtain a renewal of its DIP Agreement on terms and conditions substantially similar to its existing Debtor In Possession Financing Agreements ("DIP Agreement").

6        In forming my opinion, I have reviewed the DIP Agreement for W. R. Grace and the Debtor In Possession Financing Agreements for debtors in numerous other asbestos bankruptcy cases.    have also considered public information and my personal experience with lenders in the restructuring market concerning general market terms and conditions for obtaining Debtor In Possession Financing Agreements.

7        Based on my analysis and evaluation of the company's financial position, market conditions and my experience with credit practices and financial markets, the loss of exclusivity would not have an adverse impact on W. R. Grace's ability to obtain a renewal of its DIP Agreement on the current terms and conditions for the following reasons:

a)        The present debtor in possession financing market and short-term outlook is comparable if not more favorable for borrowers than in April 2003 (when the existing DIP Agreement terms became effective)  The financing market continues to be favorable to borrowers because of a stable economic environment, lack of defaults and excess of potential supply over actual demand for financing.  As a result, it is likely that the

principal terms and conditions of a DIP Agreement renewal, such as the rate, amount, security and maturity, would be no worse than the terms of the existing DIP Agreement

    b)    W. R. Grace's current financial position, liquidity and financial outlook are stronger than it was in April 2003 (when the existing DIP Agreement terms became effective). In terms of liquidity, W. R. Grace's cash balance was $275.0 million, excluding an additional $87.7 million (representing the cash value of life insurance policies which the Debtor characterizes as additional liquidity), at March 31, 2003, the nearest quarter-end prior to obtaining the current DIP Agreement terms. By March 31 2005, W. R. Grace's cash balance increased significantly to $474.8 million, excluding an additional $81.0 million, representing additional liquidity for the cash value of life insurance policies. Cash is projected to decline by year-end 2005 because of non-core and mostly non-recurring cash outflows, but is projected to remain at levels significantly higher than year-end 2003. In terms of financial performance, W. R. Grace's sales, EBIT and operating cash flow improved materially from 2003 to 2004 and are projected to continue to improve in 2005

    c)    W. R Grace does generally not utilize its $250 million existing credit facility except for limited letter of credit and holdback usage. Letters of credit outstanding were approximately $29 million on May 31, 2005, and have not significantly deviated from that level. During a 5-month period in 2003, W.R. Grace borrowed up to $40 million under its credit facility, even though the Company's consolidated cash balance was roughly $300 million during that period (excluding more than $80 million for the cash value of life insurance policies). Borrowings were only temporary until the Company repatriated cash from its foreign, non-filing entities to repay its loan. Therefore,

the borrowings were used for strategic cash management purposes and were not necessarily because of limited cash balances.

   d)    The DIP Agreement lenders are protected by financial and other covenants, which have never been violated, and have not required exclusivity as a lending condition. The principal financial covenant is a DIP cash flow covenant requiring certain minimal levels of EBITDAR. In addition, the lenders require the receipt of certain financial projections. In my experience, lenders are primarily concerned with repayment on emergence, which is protected by their priority collateral position and is not impacted by exclusivity. In this instance, the Debtor's DIP lenders do not require interminable exclusivity as a lending condition.

        In my opinion, the debtor could obtain commitment proposals for renewal and extension of its existing DIP Agreement under terms and conditions no worse than those currently in place despite the termination of exclusivity. This assessment is based upon a comparison of the details of the existing terms and conditions for the DIP Agreement in amount, price and other conditions with the present market terms and conditions.

*Robert W. Mathews*
Robert W. Mathews

SWORN TO and subscribed before me this 12th day of July 2005.

Notary Public

**HARRIET A. ROSS**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES JULY 31, 2009

**Attachment 1**

<u>Professional Qualifications of</u>

<u>Robert W. Mathews</u>

<u>BACKGROUND</u>

Mr. Mathews has over thirty years of experience in global commercial and investment banking and financial consulting. His expertise includes direct and syndicated credit and lending integrated with capital market engagements, legal documentation and loan portfolio management. His experience has included corporate, international, leveraged, real estate and project finance transactions in New York, Tokyo and London.

He has been involved with over ninety transactions in excess of $20 billion in financing and has had extensive experience with resolving issues and completing financings under difficult project or market conditions. These have involved less liquid transactions, complex financings, unique and out of favor industries, cross border financings, domestic  and international restructuring, and non recourse special purpose project financing.

As an independent consultant to large project sponsors, early stage business owners, debtors, creditors and investment banks, his financial advisory services have included assessments of financing feasibility, debt capacity, investments, capital commitments, and arranging financing. Mr. Mathews is presently a Managing Director with L. Tersigni Consulting P.C. , which is the financial advisor to the Asbestos Claimants' Committee in connection with numerous Chapter 11 proceedings.

<u>EDUCATION</u>

- University of Florida - MBA, Finance  (1974)
- Washington and Lee University  - BA, Journalism (1969)

<u>EMLOYMENT HISTORY</u>

- December, 2002 to Present           LTersigni Consulting P.C.
- October, 1996  -  March 2001          The Chase Manhattan Bank
- April 1993    -   October 1996          Redcliffe Capital Limited
- November 1989  - March 1993           Barclays De Zoete Wedd Securities
- October 1974  - November 1989          The Chase Manhattan Bank N.A.