IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
|  | ) | Case No. 01-01139 (JKF) |
|  | ) | (Jointly Administered) |
| W.R. GRACE & CO., et al., | ) |  |
|  | ) | PD Claim No. 12684, |
|  | ) | Cook County Children's Hospital, |
| Debtors. | ) | 700 S. Wood St., Chicago, IL 60612 |
|  | ) |  |

**Response Deadline: December 8, 2005**
**Hearing Date: TBD**
**Re: Docket No. 9315**

## RESPONSE OF COOK COUNTY, ILLINOIS TO DEBTORS' FIFTEENTH OBJECTION (SUBSTANTIVE) TO ASBESTOS PROPERTY DAMAGE CLAIMS

COMES NOW COOK COUNTY, ILLINOIS ("Claimant")[1] and files this Response to

Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims,

regarding the claim it filed on behalf of Cook County Hospital (Claim No. 12684), and would

show as follows:

### I.  CLAIMANTS' RESPONSES TO DEBTORS' OBJECTIONS TO PROOFS OF CLAIM

In April 2002, the Bankruptcy Court, after protracted debate and hearings, ordered

Property Damage Claimants to file a Proof of Claim for each building at issue. This Order and

the claim form approved by the Court required specific information to be provided regarding

each building, including, but not limited to, the date of construction, the date that Debtors'

asbestos-containing materials ("ACM") were installed, the identity of the specific Debtors' ACM

installed in the building, the actions taken that impacted the Debtors' ACM, and any bulk and/or

air sampling taken in such buildings. In addition to the information required in the Proof of

---

[1] Attached hereto as Exhibit A is a list of claims filed by Claimant, the claim number, identity of the building and the specific objections filed by Debtors.

Claim, Claimants were to also provide copies of any documents relating or referring to the installation of the Debtors' ACM in the building, the presence of asbestos in the building, and to efforts to remove, contain and/or abate the Debtors' ACM. If the requested documents were too voluminous, Claimants were allowed to attach a summary of the documents, including the name of each document, date of each document, a brief description of each document, the location of each document, and who has possession and control of each document.

Counsel for Claimants, Dies & Hile, LLP ("Dies & Hile") represents cities, counties, housing authorities and states, and their universities, colleges, agencies and departments. To comply with the Court's Order, Counsel for Claimants retained licensed asbestos consultants to inspect buildings owned, operated or used by Claimants to determine whether they contain or contained asbestos-containing surface treatment materials. Bulk samples of suspect material were taken and forwarded to Material Analytical Services, Inc. ("MAS"). MAS first analyzed the bulk samples to confirm the presence of asbestos, and if the bulk samples contained asbestos, further tests were performed to identify the manufacturer of the ACM.

Property Damage Claimants were also asked to produce building-specific information required by the Court for each building identified as containing Debtors' ACM. An exhaustive review of these construction and abatement-related documents was then undertaken. The Claimants and their Counsel have spent several hundred hours attempting to locate, review and copy responsive documents that contain information requested by Debtors. Plans and specifications for buildings in issue were reviewed, and those portions of the specifications related to installation of the ACM in such buildings were copied. Whenever correspondence between the architects and contractors who designed and constructed a building was available, those documents were reviewed, and documents related to the installation of Debtors' ACM were also copied. Documents referring or relating to the management and abatement of Debtors'

ACM were also reviewed and relevant portions copied. These documents included asbestos building surveys, asbestos operations and management policies, abatement plans and specifications, contracts with abatement contractors and consultants, and air sampling results taken by building owners or their contractors. Tens of thousands of documents were reviewed, and thousands were copied.[2] Because of the voluminous nature of these documents, Claimants often summarized the relevant documents. A total of 137 claims were filed by Claimants represented by Dies & Hile. The claim forms and attached documents filled over twenty bankers boxes.

On July 19, 2004, this Court entered an Order [Docket No. 6009], which waived various provisions of Local Rule 3007-1, thereby allowing Debtors to file Gateway Objections regarding a) claims with substantially incomplete Proof of Claim Forms; b) claims that contain materially insufficient supporting information; c) claims that fail to include product identification information; d) claims that are barred by applicable statutes of limitations or repose; e) claims that are barred by laches; and f) claims that are barred by prior settlements. However, the Court's Order further provided that, prior to asserting any objection to a claim on the basis of Materially Insufficient Supporting Information, Debtors must serve written notice of their intent to object to such claim. Debtors served twenty-two notices of deficiency upon Counsel for Claimants. Debtors did not file any notices of deficiency regarding the Cook County Claim. Dies & Hile immediately sought to set up a meeting with Debtors' representatives to discuss each of the claims for which it received a deficiency notice. Each of the deficiency claims was reviewed in detail. For some of these claims, Debtors agreed to withdraw their objection. For other claims, Debtors could not identify the specific nature of the deficiency, and agreed to

---

[2] Many of the documents requested were prepared over thirty-five years ago and may have been destroyed or misplaced during the intervening time.

review and identify the specific deficiency. Dies & Hile agreed to provide supplemental information or documentation and/or obtain new asbestos surveys of the remaining buildings identified by Debtors. Debtors also agreed to extend the deadline for providing additional information or documentation regarding the other claims. To date, thirteen Supplemental Proofs of Claim and/or responses to such objections have been filed, and Claimants are continuing their efforts to locate documents and ascertain additional information. As one might expect, this has been a tremendous undertaking in both time and labor. Claimants are confident that a review of the original and Supplemental Proofs of Claim filed to date will establish that they have used their best efforts to comply with the Court's Order and either provide the information requested or include summaries of the documents which contain the requested information.

## II.    DEBTORS' OBJECTIONS TO CLAIMANTS' CLAIMS

### A.    Debtors Have Failed to Identify the Specific Objections to Claims

On September 1, 2005, Debtors filed their Fifteenth Omnibus Objection to Asbestos Property Damage Claims. The exhibits referenced in Debtors' objections which identified the particular claimant and applicable objections, were not served until September 7, 2005. To compound the confusion surrounding the Debtors' objections, they served amended exhibits identifying claims that were not identified in the original exhibits or which should not have been included in the original exhibits on September 16, 2005.

In most instances, Claimants can determine the specific objection asserted by Debtors. In some instances, it is impossible because Debtors state their objection in the alternative. For example, Debtors assert that certain Claimants failed to attach requested documents. *See* Exhibit C-2. In this regard, Debtors assert that

> Claimant (1) indicated it had documentation relating to the purchase and/or installation of the product on the property but did not attach those documents or a summary of them; or (2) indicated it made an effort to remove, contain and/or

abate the Grace product for which the claim is made but did not attach documents or a summary of them relating to such efforts; and/or (3) did not attach documents relating to the purchase and/or installation of the product in the property and did not attach documents relating or referring to the presence of asbestos in the property for which the claim is made.

In instances such as this, it is impossible for Claimants to know exactly what objection is made. If Debtors claim that relevant documents or summaries have not been provided, they should identify them rather than state alternative propositions which make it impossible to determine the exact nature of the objection.

**B.    Debtors Are Not Entitled to Have Claims Expunged or Disallowed**

Debtors request that the claims identified in Exhibit "A-1" through "H-1" of their Fifteenth Omnibus Objection be disallowed and expunged, except as otherwise expressly noted in their objections (Omnibus Objections, Conclusions, p 67). Claimants would show that a) Debtors have failed to comply with the Gateway Objections Order; b) Claimants have promptly responded to any notice of intent to file Gateway Objections served by Debtors; and c) the alleged failure of Claimants to produce documents or summaries is not dispositive of Debtors' liability, and therefore does not justify disallowance.

**1.    Debtors' Failure to Give Notice of Intent to File Gateway Objections**

Debtors assert that claims which fail to provide requested information or documentation should be disallowed and expunged as such failure precludes Debtors from properly preparing objections to such. Information sought in questions where responses are alleged to be "Facially Incomplete," they argue, is critical to the preparation of their defenses and "where, as here, notice has already been given of the claim's failings and the claimant has still failed to respond adequately – the Debtors cannot evaluate the claim and the claim should be disallowed and expunged ..." (Fifteenth Omnibus Objection, ¶ 53). Debtors also assert that claims with insufficient documentation should be disallowed and expunged because "[p]ursuant to this

Court's Gateway Objection Order dated July 19, 2004, the Debtors have already served each of these claimants … with at least one notice of intent to object and, therefore, the respective PD Claimants have already had an opportunity to supplement their documentation …" (Fifteenth Omnibus Objection, ¶ 59).    These statements are not only incorrect, but also a gross misrepresentation of Debtors' presentation of their Gateway Objections and the Claimants' responses to the objections raised.

In December 2004, Debtors served on Dies & Hile, twenty-two deficiency notices pursuant to the Gateway Objections. Dies & Hile immediately began a review of these Proofs of Claim to determine if it had failed to provide the requested information or documentation.    A meeting was scheduled with Debtors, and each of the deficiency notices was reviewed.    In some instances, Debtors determined that the responses were proper and in other instances, Dies & Hile agreed to provide additional information and/or documentation. Subsequent to this meeting, Claimants represented by Dies & Hile filed thirteen Supplemental Proofs of Claim and/or responses, which included additional information or documentation sought by Debtors.

A review of the Fifteenth Omnibus Objection indicates that Debtors have filed objections to everyone of the one hundred and thirty-seven claims filed by Dies & Hile, yet Debtors served notice of intent to file Gateway Objections to only twenty-two claims. Claimants, not Debtors, have been prejudiced as a result of Debtors' failure to follow the procedures outlined by the Court in its Gateway Objection Order, as this has precluded Claimants from addressing the concerns now raised in these objections.  Claimants should therefore be allowed sufficient time to file supplemental information or documentation based on the objections raised.

### 2.    Debtors Have Not Met Their Burden of Proof

A proof of claim is deemed allowed unless a party in interest objects under 11 U.S.C. § 502(a) and constitutes "prima facie evidence of the validity and amount of the

claim" pursuant to Bankruptcy Rule 3001(f). *See also* Fed. R. Bankr. P. 3007. The filing of an

objection to a proof of claim "creates a dispute which is a contested matter" within the meaning

of Bankruptcy Rule 9014 and must be resolved after notice and opportunity for hearing upon a

motion for relief. *See* Adv. Comm. Notes to Fed. R. Bankr. P. 9014.

The Debtors' objections to the Claimants' claims listed in Exhibit C to the Omnibus

Objection, which are based on the contention that the Proofs of Claim filed in respect to such

claims were "facially incomplete," are without any basis in the law. The rubric for proofs of

claim and objections thereto were articulated by the Third Circuit Court of Appeals in *In re*

*Allegheny International, Inc.*, 954 F.2d 167 (3rd Cir. 1992), as follows:

> The burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A.
> §502(a) rests on different parties at different times. Initially, the claimant must
> allege facts sufficient to support the claim. If the averments in his filed claim
> meet this standard of sufficiency, it is '*prima facie*' valid. [citations omitted.] In
> other words, a claim that alleges facts sufficient to support a legal liability to the
> claimant satisfies the claimant's initial obligation to go forward. The burden of
> going forward then shifts to the objector to produce evidence sufficient to negate
> the *prima facie* validity of the filed claim. It is often said that the objector must
> produce evidence equal in force to the *prima facie* case. [citations omitted.] In
> practice, the objector must produce evidence which, if believed, would refute at
> least one of the allegations that is essential to the claim's legal sufficiency. If the
> objector produces sufficient evidence to negate one or more of the sworn facts in
> the proof of claim, the burden reverts to the claimant to prove the validity of the
> claim by a preponderance of the evidence. [citations omitted.]

954 F.2d at 173-74.

Thus, the pertinent inquiry is whether the Proofs of Claim filed by Claimants set forth

sufficient evidence of a claim against the Debtors, not whether the Proofs of Claim provide

sufficient information for the Debtors to formulate their defenses and objections to the claim. If

it does, the burden of production shifts to the Debtors to produce evidence that the claim is

invalid, regardless of whether it would be useful for the Proofs of Claim to provide additional

information for the Debtors to assess their defenses, as such information is obtainable in discovery.

The omission of some information in the Proofs of Claim by Claimants is not sufficient grounds for the disallowance of any Claimant's claim, which otherwise makes a prima facie showing of the Debtors' liability. Said another way, Claimants' claims may only be disallowed for one or more of the nine grounds for disallowance enumerated in Section 502(b) of the Bankruptcy Code. *In re Taylor,* 289 B.R. 379, 384 (Bankr. N.D. Ind. 2003). Indeed, the Court has no discretion in this regard and cannot disallow a claim for reasons beyond those stated in the statute. *Id.* None of the grounds for disallowance set forth in Section 502(b) involves the failure to provide information beyond that which establishes a prima facie claim against the Debtors' estates. *In re Guidry*, 321 B.R. 712 (Bankr. N.D. Ill. 2005).

The Debtors' Objections are clearly premature and without basis. Until the Debtors come forward with specific evidence and authority to refute the Claimants' claims, it is presumed that these properly filed claims are valid. *See Lundell v. Anchor Construction Specialist, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000).

III.    **CLAIMANT'S RESPONSE TO DEBTORS' FACTUAL ALLEGATIONS REGARDING THE HISTORY OF GRACE PRODUCTS AND USES**

A.    **Grace's Asbestos-Containing Surface Treatment Material ("Surface Treatment ACM") is Classified as Friable by the EPA**

Grace argues that its Surface Treatment ACM is "cementitious" and therefore does not release asbestos fibers during normal and foreseeable building operations. Nothing could be further from the truth. One need look no further than the statements of the EPA to see that such statements are absurd.

Grace's Surface Treatment ACM is classified as "friable" Surface Treatment ACM by the EPA. Thus, even though Grace characterizes Mono-Kote as "cementitious" material,

Mono-Kote is nevertheless considered by the EPA to fall within the definition of friable surface treatment.[3]  According to NESHAPs, friable materials are those likely to readily release fibers "… when dry … can be easily crumbled, pulverized or reduced to powder by hand pressure … reduced to powder mean(s) … changed to a dust or powder that **can become airborne.**"[4] Further, "**ACM that is sprayed or troweled on ceilings and walls is often the main source of airborne asbestos in the building ….**"[5]

**B.**    **Grace's Objections to Claimant's Product Identification Reports Are Without Merit**

      **1.**    **Grace's Surface Treatment ACM was Manufactured Pursuant to Grace's Formula and Mixing Instructions by Twenty-Three Licensee Plants Throughout the Country**

In April 1963, Grace purchased the Zonolite Company.  After purchasing Zonolite, Grace immediately began selling the Zonolite brand of Surface Treatment ACM through its construction products division.  Grace's Surface Treatment ACM products, which primarily consisted of two types described below, were predominant in the United States construction industry and are uniquely identifiable because of their three primary ingredients.  The two types of Grace Surface Treatment ACM were:

> (1) Fireproofing and acoustical ACM with the primary ingredients vermiculite, chrysotile asbestos, and gypsum, which were sold predominantly under the trade names Zonolite Mono-Kote 1 ("MK-1"), and Mono-Kote 3 ("MK-3"), and also sold as Spra-Insulation, Z-Tex (aka EZ-Tex), Zono-Coustic (aka "Zonocoustic") and Hi-Sorb Acoustical Plaster or Oyster White Hi-Sorb (collectively referred to as "Mono-Kote"); and

> (2) Acoustical plaster ACM with the primary ingredients vermiculite, chrysotile asbestos, and bentonite clay, which were sold predominantly under the trade names Zonolite Acoustical Plaster or Plastic ("ZAP") and Zonolite Finish Coat (collectively referred to as "ZAP").

---

[3] *See Guidance For Controlling Asbestos-Containing Materials In Buildings* ("Purple Book"), EPA 560/5-85-024, June 1985, Chapter 2, Sec. 2.2.2, at pp. 2-4, "Friable forms (Surfacing materials) are either … fibrous … or granular and cementitious …."
[4] EPA Part III (40 CFR Part 61 – NESHAPs Revision:  Final Rule) Tuesday, November 20, 1990.
[5] *Ibid.* "Purple Book," Ch. 3, Sec. 3.3.1, at pp. 3-2.

Both Mono-Kote and ZAP incorporated vermiculite mined by Grace primarily at Libby, Montana,[6] and they were manufactured according to Grace's specifications at vermiculite expansion plants owned and operated by twenty-three separate Grace Licensees across the country. These Licensees included, among others, Texas Vermiculite Company ("Texas Vermiculite"), Ari-Zonolite, Inc., Vermiculite-Northwest, Inc., California Zonolite/Diversified Insulation, Vermiculite of Hawaii, Inc. ("Vermiculite of Hawaii") and Western Mineral Products Company ("Western Mineral") (collectively referred to as "Licensees"). Texas Vermiculite's plant was located in Dallas, Texas. Vermiculite of Hawaii's plant was located in Honolulu, Hawaii. Other Grace Licensee plants were located throughout the United States, Canada and in other countries.

### 2. The Constituents and Their Proportions as Identified in a Bulk Sample of In-Place Grace Surface Treatment May Vary From the Formula List Prepared by Grace's Counsel For Its Litigation Defense

Grace provided its Licensees with product formulas and mixing instructions for manufacturing Mono-Kote and ZAP in batches of hundreds of pounds and with a specifications list of approved vendors from which the Licensees were to purchase the raw materials required by the formulas. Grace's manufacturing formulas measured the primary ingredients by weight, as these raw materials were generally sold by vendors in bags of 50 to 100 pounds. The **primary** ingredient supplied by Grace was vermiculite, added either according to weight or by cubic feet, which was shipped to the Licensees from Grace's Libby Montana mine and expanded in furnaces in the Licensee's plants before being used in these products. In litigation, Grace's longtime product identification expert, Dr. Richard J. Lee, has repeatedly testified that he has never seen or been provided copies of the actual formulas, instructions and specifications used by Grace's

---

[6] Grace also had a much smaller vermiculite mine in South Carolina which provided at least some of the vermiculite used in its South Carolina manufacturing operations.

Licensees in manufacturing the products. Instead, he has uniformly relied upon a list of Grace ACM products with percentages of ingredients, which he identifies by volume rather than weight, and which he believes were extrapolated from actual Grace manufacturing formulas by one or more attorneys from a law firm that represented Grace. This litigation formula list as it has been amended or added to over time by Grace's attorneys, has been the basis of his opinions as to whether the ingredients he found in bulk samples of in-place ACM were or were not "consistent with" Grace's "formulas."

Some variation in Grace's Surface Treatment ACM products as commercially manufactured according to the formulations and instructions provided by Grace was foreseeable and inevitable. These variations often involved the amount or percentage of the raw ingredients as specified in Grace's formulas, or the inclusion of impurities that occur naturally in the mined raw materials (such as tremolite asbestos in Grace's vermiculite, or quartz accompanying gypsum or bentonite) or contaminants from the Licensee's use of the same industrial equipment to manufacture both types of products (*i.e.*, the Mono-Kote products containing gypsum and the ZAP products containing bentonite). Grace's own analysis of bulk samples of its surface treatment materials from the Construction Products Division - Denver plant found ingredients that were not listed in the Grace manufacturing formulas. Dr. Yang, a longtime Grace research employee, duly noted on one such report that "numerous XRD analysis have been made due to the presence of some unidentifiable compounds ...."[7] Some variation from the actual formulas was a reality given these types of building products, the raw material ingredients whose very specifications anticipated they would contain a certain percentage of contaminants, the manner in

---

[7] "Request for Technical Service," dated 10/20/88, Material Research and Analytical Group, W.R. Grace & Co., Julie C. Yang.

which they were manufactured, and the absence of a quality assurance program uniformly administered by Grace over the Licensees.[8]

Some difference in the amount or percentages of particular ingredients also often resulted from actions taken during the application of the Surface Treatment ACM. Grace's employees knew of and sometimes even suggested these actions. For example, applicators may have added chrysotile asbestos to Grace's product at the jobsite. Mono-Kote and ZAP were delivered to job sites in sealed bags. Applicators at the job site opened the bags and poured the dry material into a hopper or mixer where water was added and mechanically mixed prior to spraying the fireproofing or acoustical plaster. According to Grace employees, it was not uncommon for applicators on the jobsite to add additional chrysotile asbestos to aid in the pumping or spraying of the material.[9] Grace was not only aware of the ways in which applicators changed the portions of ingredients in its products, but, in fact encouraged such practices. For example, in a memorandum of test report dated January 9, 1968, Grace concluded

> there is no doubt that Calcium ... in the form of gypsum ... or lime ... was added to (the) Decorator's White Acoustical Plastic at the rate of approximately 10% by weight.[10]

In a memo to C.A. Pratt, the owner of Western Mineral, one of its employees reported that "I have also seen gypsum added to our acoustical plaster in repairing fallouts and it has resulted in an excellent job. I hope that something simple like an additive to ... acoustical to make it harder can be found. This will make it so much easier for us in sales to continue selling our present

---

[8] Memorandum from F.L. Veltman to T.G. Gibian, Grace Research Division, dated December 6, 1971, "There are numerous potential causes for problems to erupt in the Mono-Kote business. Notably, Grace has 13 suppliers of gypsum, and the product is manufactured in 23 locations".

[9] Oral Deposition of Thomas Cheatham, Grace employee, taken on December 12, 1991 (Volume I) in *Dayton Independent School District, et al. v. U. S. Mineral Products Company, W.R. Grace & Co. and United States Gypsum Company*, No. CA-B-87-00507 (E.D. Tex). *See* Testimony at p. 163, "... it was not uncommon ... to add asbestos ... it dealt generally with pumping ... they had to play with the recipe."

[10] Zonolite Division of W.R. Grace & Co., Test Result #1444, "Decorator's White Acoustical Plastic From Lake City Junior College and Forest Rangers School, Florida," dated January 9, 1968.

acoustical with an improvement."[11]  Thus, variations in the amount of raw ingredients specified by Grace's formulas occurred as a result of application techniques among the various licensees which Grace knew of and sometimes encouraged.

Component variations in bulk samples of in-place Surface Treatment ACM from the original manufacturing formulas also were known to occur because the material sometimes undergoes chemical changes after installation as a result of normal environmental conditions. For example, in March 1955, Western Mineral submitted two samples of ZAP to Twin City Testing Engineering Laboratory ("Twin City") for testing.  One sample came from a ceiling from the Southeast High School in Lincoln, Nebraska while the other sample was of ZAP from Western Mineral's Minneapolis plant stock.  Western Mineral had submitted the sample from Southeast High School because of a complaint that a discoloration had occurred in the ZAP as applied to the high school ceiling.  Twin City reported to Western Mineral that the sample of ZAP from its plant contained no carbonate and no sulfate, and that the sample taken from Southeast High School in Lincoln, Nebraska contained no carbonate but was **very high in sulfate**.  Twin City concluded that

> We therefore believe that the effervescence you mentioned is a calcium sulfate deposited by water leeching through the Gypsum plaster above the acoustical plastic.  The moisture causing this leeching could be either the high moister content which is prevalent ... or could be from possible leaks in the roof.[12]

The mere fact that there may be some variations in the percentages of the three primary ingredients in Grace Mono-Kote or ZAP as compared to the formulas, or the presence of minor amounts of raw materials or ingredient contaminants not listed in the formulas, does not preclude

---

[11] Interoffice Memo from Warren to C.A. Pratt, Western Mineral Products Company, Grace document 25022422.
  [12] Twin City report to Western Mineral Products Company re: Southeast High School, Lincoln, Nebraska, dated March 17, 1955; WRG 006192.

such product from having been manufactured by Grace or its Licensees.[13]  Even with variations, these Grace products were so predominant and unique within the industry by their formulation using vermiculite, chrysotile asbestos and either gypsum or bentonite, that they remain clearly identifiable as Grace Surface Treatment ACM.

### 3.    Grace and Its Product Identification Expert Deliberately Ignore the Product Variations Such That Their Product Identification Analyses Are Consistently Flawed

Since the first asbestos property damage case was filed in the early 1980's, building owners have proved the manufacturer of the ACM in its building by obtaining bulk samples of the in-place ACM.  These bulk samples are then analyzed by laboratories such as MAS, who conduct constituent analysis of the sample and, as in the instant case, determine that they are consistent with actual plant formulas and application information for Grace's Surface Treatment ACM.

In prior litigation, Grace has consistently denied that its Surface Treatment ACM was in buildings at issue because the constituents in bulk samples from such buildings either contained small amounts of ingredients that are not listed in Grace's litigation formula list, or contained Grace's signature key ingredients, but in proportions that differ from those listed in Grace's litigation formula list.  The same objections are once again asserted in this matter.  *See* Fifteenth Omnibus Objection, ¶ 83, p. 30.  Grace was unable to sustain its position in the prior suits, and likewise such objections in the instant case are untenable.  In prior litigation, as long as a claimant could show by appropriate expert state-of-the-art product identification analysis that a particular bulk sample from a building at issue contained the signature ingredients of Mono-Kote

---

[13] Oral Deposition of Ian Stewart, taken on July 14, 1998, in *State of Hawaii v W. R. Grace & Co.-Conn., et al.,* Civil No. 93-4161-10, In the Circuit Court of the First Circuit, Hawaii, an employee of RJ Lee Group and a consultant for Grace testified that the ranges of variation in an analysis of a bulk sample was plus or minus about ten percent (10%).  "Very often that will show up in specifications or formulations that are provided.  You'll be given a range of acceptable level, something they say it should be about 10 to 15.  But generally I allow a little margin [8 to 20 percent] beyond that …" at p. 69.

or ZAP, even if present in percentages which did not precisely match Grace's formulas, Grace inevitably admitted product identification or settled the claim.[14]

In the case, *State of Hawaii v. W.R. Grace*, Grace's longtime product identification expert, Dr. Richard J. Lee, denied that most of the State's bulk samples of ZAP from hundreds of buildings were a Grace product because the scanning electron microscope which he had invented and for which he had programmed the software did not find the "Wyoming montmorillinite" type of bentonite used by Grace in the split bulk samples that he analyzed. MAS had previously reported the bulk samples as representing a Grace product. The Discovery Master ordered that Dr. Lee's microscope and unconventional software, which was not used, much less relied upon by any other laboratory in the country, be produced for analysis by the State's experts. After the State's experts analyzed the microscope and software, and before trial, Grace abruptly settled the case which included payment on all of the buildings Dr. Lee had previously disputed.

Dr. Lee consistently opined that Hawaii's product identification reports, which identified bulk samples of surface treatment material as a Grace product, were incorrect. His opinion was based solely on his comparison of such samples to the Grace litigation formula list prepared and provided by Grace's lawyers. Dr. Lee testified he has never made any effort to acquire knowledge of Grace's actual manufacturing formulas for Surface Treatment ACM or how the products might vary depending on manufacturing or application techniques.

Dr. Lee also conceded that Grace had never provided him with a "sample of known ZAP that (he) analyzed ... to use as a standard for determining whether an unknown bulk sample was ZAP ..."[15]    Instead, Grace provided Dr. Lee a "vial" of vermiculite, which is a primary

---

[14] Reference is made to state-of-the-art product identification analysis performed by a laboratory, such as MAS which product identification reports, even if initially denied by Grace, were eventually proven correct in thousands upon thousands of bulk sample reports.
[15] Oral Deposition of Richard Lee, Ph.D., taken on October 15, 1998 in *State of Hawaii v W. R. Grace & Co.-Conn., et al.,* Civil No. 93-4161-10, In the Circuit Court of the First Circuit, Hawaii, at p. 1201.

ingredient of both types of its Surface Treatment ACM, and that he relied on this sample as "being, a, quote, standard for the vermiculite ...."[16] Under cross-examination, Dr. Lee admitted that he had no knowledge that Grace had a range of different grades of vermiculite which varied from approximately 95.3% vermiculite (with the remainder being contaminant materials) down to approximately 81.3% vermiculite (with the remainder contaminant materials), and that he did not have samples of the other grades for purposes of a standard.[17]

Debtors' assertion that the products in Claimant's building were not manufactured by Grace is incorrect. Moreover, Dr. Lee's findings and Debtors' objections are flawed as they are based on a litigation strategy developed by Debtors and Dr. Lee which is intentionally designed to eliminate bulk samples clearly containing Grace's signature ingredients because of certain variables that routinely occur during and subsequent to the application of the Grace Surface Treatment ACM or that are merely artifacts of the type of analysis Grace and Dr. Lee choose to perform.

C.     Grace's Libby Montana Vermiculite is Contaminated with Tremolite Asbestos

The signature ingredients of Mono-Kote were gypsum, vermiculite aggregate, and chrysotile asbestos and of ZAP were bentonite, vermiculite aggregate and chrysotile asbestos. As previously discussed, the vermiculite supplied by Grace came from its Libby, Montana mine. This vermiculite is contaminated with tremolite asbestos. Tremolite is amphibole asbestos and is also recognized as a potent carcinogen. Thus, it is important to recognize that dust released from Mono-Kote or ZAP contains not only chrysotile asbestos which was an additive to the formulas, but may also contain tremolite asbestos. High levels of tremolite present in vermiculite dust are released during the manufacturing process of Mono-Kote. This continued to pose problems in

---

[16] *Ibid.*, p. 1205.
[17] *Ibid.*, p. 1224.

the plants long after chrysotile asbestos was eliminated as an additive in 1973 pursuant to federal law.[18] Hence, there can be no question that an exposure to a Grace Surface Treatment ACM may include both chrysotile and tremolite exposure.

**D.    Grace Admitted That It Knew That Its Friable Surface Treatment ACM Would Be Subjected To Delamination, Disturbance and Other Foreseeable Factors After Installation That Would Cause the ACM To Become Unbonded, Fallout and Dust**

Grace was aware that certain "factors" could undermine the performance of its Surface Treatment ACM and lead to fallout. Such factors included the potential that the product could be disturbed during normal maintenance and cleaning of the building.[19] The testimony of Walter Payment, the Director of Grace's Construction Products Division Laboratory at Traveler's Rest, is significant because of his admissions regarding Grace's knowledge of product defects and its failure to instruct or warn building owners of these defects. Payment admitted:

Grace was aware that once the ACM was applied in-place there were a number of factors in addition to humidity and air erosion that could interfere with proper performance.[20]

Grace recognized that the in-place ACM was subject to disturbance during normal cleaning and maintenance activities.[21]

That another factor would be renovation type activities.[22]

That the factors to which the in-place ACM could be exposed during ordinary use were "**foreseeable** and **within (Grace's) knowledge** ..."[23]

Grace **knew** that the factors and forces to which the in-place ACM would be subjected to "would **cause the material to become un-bonded**, not adhere the way it should, **fall out** ..."[24]

---

[18] Oral Deposition of Curtis Gipson taken on January 27, 1992, in *Dayton Independent School District, et al. v. U.S. Mineral Products Company, W.R. Grace & Co. and United States Gypsum Company*, No. CA-B-87-00507 (E.D. Tex). Tremolite exposure was a "continual concern ..." in the Dallas plant. *See* Ex. 4, Memo from Grace Cambridge, "... We are investigating further to determine the cause of this unaccceptable level of tremolite in the air ..." at p. 177.

[19] Oral Deposition of Walter Payment taken November 4, 1986, in *Dayton Independent School District, et al. v. W.R. Grace & Co., et al.*, Civil No. B-81-277-CA consolidated with Civil No. B-81-293-CA, at p. 105.

[20] *Ibid.*, p. 104.

[21] *Ibid.*, p. 105.

[22] *Ibid.*, p. 106.

[23] *Ibid.*, p. 106.

Grace **knew** that if this occurred, "there was a **likelihood of potential for the creation of dust** as the material became un-bonded and fell out."[25]

That despite this knowledge, Grace **failed** to make "any specific recommendations to the applicators or the users ... that would prevent or contain or maintain the material to prevent fall out or dust."[26]

Grace never placed any warnings or cautionary labels on the MK and/or ZAP bags concerning the fact that the product contained asbestos or of the potential hazards associated with the dust.[27]

## E. Grace's Licensees Continued to Manufacture and Sell ZAP on an On-Going Basis Post-1969

Grace has asserted that "with rare exception Grace stopped selling acoustical plaster containing asbestos in 1969 ..." (Fifteenth Omnibus Objection, ¶ 92, p. 32). This is utterly false. Grace's Licensees continued to manufacture and sell acoustical asbestos-containing products right up to, and even past the July 1973 EPA ban. In fact, ZAP was the most popular Grace product even as late as 1971.[28] Curtis Gibson, the plant manager of Texas Vermiculite, testified that he received a memorandum from Mike Moran, president of Texas Vermiculite, to eliminate asbestos from the products, **"during the (1973) time frame"**.[29] Likewise, Stephan Sheeran, a sales representative for Texas Vermiculite, stated that "the Dallas plant shipped material to job sites into **June of 1973**."[30] This is particularly revealing since Texas Vermiculite was the only Licensee that was majority owned by W.R. Grace.

---

[24] *Ibid.*, p. 107.
[25] *Ibid.*, p. 107.
[26] *Ibid.*, p. 108.
[27] *Ibid.*, Sheeran Deposition, p. 47.
[28] *Ibid.*, Deposition of Curtis Gipson, p. 28.
[29] *Ibid.*, Deposition of Curtis Gipson, p. 136.
[30]*Ibid.*, Deposition of Stephan John Sheeran, p. 17; *see also* Exhibit 5-A which shows that Texas Vermiculite shipped MK-3 to Oklahoma, as well.

John York, who was president of another major Grace licensee, Vermiculite of Hawaii, testified that submittals from his office for ZAP which were dated **April 27, 1972** and **August 7, 1972**, related to "acoustical plastic" that was installed at Honolulu International Airport **subsequent** to the date of the submittals.[31] Mr. York further testified that Mono-Kote 3 was also manufactured and shipped to the airport by Vermiculite of Hawaii during the same period. The amounts of Grace Surface Treatment ACM required for installation at the Honolulu International Airport were so large, that in addition to the large quantities supplied by Vermiculite of Hawaii, additional bags of Surface Treatment ACM was shipped from mainland Grace Licensees direct to the jobsite in Hawaii.[32] In a letter dated May 15, 1974 to a potential customer in San Francisco, Mr. York offered to supply asbestos-containing **ZAP** as long as he received "fourteen days lead time to fill an order."[33] Mr. York also testified that during the entire time that Vermiculite of Hawaii was a Licensee for Grace's Surface Treatment ACM, such Grace products had the dominant market share in Hawaii.[34]

William V. Culver was employed as district manager for W.R. Grace Construction Products Division from 1966 to 1973 for the area that included the states of Oregon, Washington, Alaska, the Panhandle of Idaho, and North and Western Montana.[35] All of Grace's Vermiculite products were manufactured at the Vermiculite Northwest plants located at Portland,

---

[31] Oral Deposition of John C. York, taken on April 14, 1999, in *State of Hawaii v. W.R. Grace & Co., et al.,* Civil No. 93-4161-10 (1st Cir. Ct. Hawaii) at pp. 74, 75, 76 and 77.

[32] *Ibid.,* Deposition of John York, pp. 15, 16, and 78.

[33] Letter from John C. York, President of Vermiculite of Hawaii, to Buddy Redmond dated May 15, 1974.

[34] *Ibid.,* p. 13 (Vermiculite of Hawaii continued to operate as a Grace Licensee through at least April 1982 – *Ibid.,* p. 82).

[35] Deposition of William V. Culver taken on December 12, 1988, in *The 3250 Wilshire Boulevard Building, et al. v. Metropolitan Life Insurance Company, et al.,* No. 87-06048 WMB (CHKX), in the United States District Court for the Central District of California at p. 10.

Oregon and at Spokane, Washington.[36] Mr. Culver testified that in **March 1972** it continued to be his "responsibility to sell as much of the Grace products ..." as he could.[37]

As a practical matter, it remained business as usual and the Licensees were trying to sell as much of the product as they could before the July 1973 cutoff date. Claimant believes that additional discovery will further confirm that Grace's contention is not supported by the facts.

## F.    Grace's Knowledge of the Health Hazards of Asbestos

The body of facts representing Grace's longstanding knowledge regarding the hazards of the asbestos in its Surface Treatment ACM is far too voluminous to set forth in this response. However, Grace's knowledge of the health hazards associated with asbestos date back to the 1930's through it ownership of the Dewey and Almy Chemical Co. and Multibestos Company, who, in turn, acquired the Walpole Asbestos Carding Factory in 1931, through its purchase of the Zonolite Company (collectively referred to as "Grace") and its operation of the Libby Montana vermiculite mine. This knowledge was acquired well before its ACM was installed in Claimants' buildings. Grace therefore knew that its ACM was defective, and would result in asbestos fibers (both chrysotile and tremolite) being released into the air to be breathed and inhaled by building occupants. Grace was also aware of the grave health hazards associated with inhalation of asbestos fibers. Yet, as previously discussed, Grace not only did not disclose the asbestos content of its ACM, it also failed to provide any cautions or warnings whatsoever in connection with the products' asbestos hazards.

## G.    Grace's Efforts to Prevent Building Owners From Removing Surface Treatment ACM and/or Seeking Cost Recovery From Grace

Despite Grace's intimate knowledge of the hazard of its Surface Treatment ACM, from at least the early 1950's, Grace has been a primary sponsor of a massive public relations effort to

---

[36] *Ibid.*, pp. 45, 46.
[37] *Ibid.*, p. 180.

convince building owners, the public, and regulatory and legislative bodies, that its Surface

Treatment ACM presents no hazard to building occupants and should not be removed. Grace's

efforts were channeled through the activities of the "Safe Buildings Alliance (the "SBA")," an

organization composed of former leading building material companies which formerly

manufactured ACM building products.[38]

Working through the SBA, Grace has acted on many fronts to: (1) reduce the members'

liability to building owners for property damage asbestos claims by encouraging building owners

to forego the removal of asbestos based upon incorrect and/or misleading scientific and technical

information; and (2) to lobby and influence Congress, state legislatures, and federal and state

regulatory agencies to limit removal of in-place ACM. SBA literature was sent to building

owners across the country, entities managing buildings, and the public in general asserting that

there was no hazard associated with the use of in-place ACM during normal building activities

such as manufactured by Grace. At the same time, SBA launched massive litigation to have

courts set aside the laws and regulations dealing with in-place ACM such as AHERA and

NESHAPs.[39]

Grace's representations to building owners were false and misleading, and were

intentionally designed to prevent building owners from taking actions to remove and/or replace

the Grace Surface Treatment ACM and to prevent or suppress legal actions against them. For

example, Grace hired former Gov. Hugh Carey as an Executive Vice President for the "newly

established" "Office of Environmental Policy". Gov. Carey's function apparently was to lobby

Congress, state legislatures and the EPA to pull back with regard to their policies intended to

minimize the hazards of in-place ACM. His testimony provided to Congress was not modest in

---

[38] Members of the "Safe Buildings Alliance" include W.R. Grace & Co., the Celotex Corporation and United States Gypsum Company.

[39] See Safe Bldg. Alliance v. E.P.A., 846 F.2d 79 (D.C. Cir. 1988).

its attempts to create the impression that Grace's in-place ACM was safe, "In fact these products were specified under national and state building codes to protect human life and safety … when Grace manufactured these products, we believed then – as we believe now—that properly installed and maintained asbestos-containing fireproofing does not endanger building occupants."[40]

Contrast Gov. Carey's statement with the testimony of Walter Payment, Grace Research Director, that the reason for the use of asbestos in the (Mono-Kote) fireproofing had nothing to do with a fireproofing purpose, but rather was added to the product to increase "pumpability," or, in other words, to increase the profitability of the product.[41]  Mr. Payment testified that Grace knew that by 1969 the asbestos in Mono-Kote provided no increased fireproofing ability to Mono-Kote.  Grace could have easily determined this fact, if they had wanted to, by the early 1960's.[42]  Yet Grace was still repeating the falsehood that Grace developed its Mono-Kote fireproofing "to protect human life and safety" almost 20 years after Mr. Payment says he had determined as Grace's Research Director that this claim was false!  Grace also made similar written misrepresentations directly to building owners, architects and to the public.  This example is merely the tip of the iceberg of deceit with regard to Grace's attempts to mislead building owners to neither remove their ACM, nor to seek legal damages from Grace for their damages.  Grace should not now be allowed to avoid liability by claiming that building owners failed to timely file suit where it has intentionally for years sought to prevent claimants from pursuing causes of action based on such representations.

---

[40] Oral Deposition of Kenneth Young Millian taken March 1, 1992, in *Dayton Independent School District, et al. v. U. S. Mineral Products Co., et al.,* No. B-87-00507-CA (E.D. Tex); *see* Exhibit 22, "Testimony of Hugh L. Carey, Executive Vice President, W.R. Grace & Co., On Behalf Of The Safe Buildings Alliance On The Public Policy Issue Of How To Deal With Asbestos In Buildings, Before The Subcommittee On Hazardous Waste And Toxic Substances, United States Senate, September 27, 1988," Grace document KM006137.

[41] *Ibid.*, Payment Deposition, pp. 74-75.

[42] *Ibid.*, p. 81.

**H.      Jury Verdicts and Settlements by Grace in the Underlying Litigation Have Established the Prima Facie Validity of PD Claims**

For almost twenty-five years property damage claimants have recovered their damages against Grace through litigation in various state and federal courts.  Not only have such courts consistently found Grace to be liable under principles of state law, Grace's conduct in connection with its sale of Surface Treatment ACM has been found to constitute gross negligence entitling the claimant to punitive damages.  In *City of Greenville v. W. R. Grace & Co.*, the City was awarded millions of dollars in compensatory and punitive damages related to Mono-Kote fireproofing in the Greenville, South Carolina City Hall, which had to be removed because of the hazard posed.[43]

The numerous underlying cases which have held Grace liable for their Mono-Kote and/or ZAP ACM are reported and are part of the record in this case.  As a matter of record, Grace has paid several hundred million dollars in settlement of claims of various governmental entity claimants similar in all pertinent aspects of knowledge, bulk sample constituents and expert findings to the claimants represented by Dies & Hile in this Bankruptcy case.[44]

Thus, Grace's liability for asbestos PD cases is well-established.  More importantly, the validity of PD claims such as those represented by Dies & Hile, and which are pending in this Bankruptcy, has been overwhelmingly established under applicable state law.   This is particularly true for claims by governmental entities that are protected from the application or

---

[43] *See City of Greenville v. W. R. Grace & Co.*, 640 F. Supp. 559, *aff'd*, 827 F.2d 975 (4th Cir. 1987).  *See also The Corporation of Mercer University v. National Gypsum Co., et al.*, No. 85-126-3-MAC (M.D. Ga. 1986) (reversed on a Certified Question to the Georgia Supreme Court by the Eleventh Cir. on grounds involving the applicability of the Georgia statute of repose).

[44] *See Dayton Independent School District, et al. v. W.R. Grace & Co., et al.*, Civil No. B-81-277-CA consolidated with Civil No. B-81-293-CA; *Dayton Independent School District, et al. v. U. S. Mineral Products Co., et al.*, No. B-87-00507-CA (E.D. Tex.); *Kirbyville Independent School District, et al., Individually, and on Behalf of All Texas Political Entities v. Asbestospray Corporation, W. R. Grace & Co.-Conn., and United States Gypsum*, No. 1:94CV412 (E.D. Tex.); *The State of Utah, et al. v. W. R. Grace & Co.-Conn., et al.*, No. 940906356, In the Third Judicial District Court, Salt Lake County, State of Utah; *State of Hawaii v W. R. Grace & Co.-Conn., et al.*, Civil No. 93-4161-10, In the Circuit Court of the First Circuit, State of Hawaii.

running of applicable statutes of limitations and repose, such as the "Dies & Hile Claimants." As

history will show, Grace cannot point to any asbestos PD claims in the history of the litigation

that are consistently any better documented and prepared than are the claims filed by the Dies &

Hile Claimants. And, Grace has said as much repeatedly in this Bankruptcy.

## I.    Claimant's Causes of Action

Claimant seeks to recover the costs that it has incurred or will be forced to incur in

maintaining, removing and replacing the Debtors' Surface Treatment ACM from its building(s).

It asserts state law causes of action, including breach of express and implied warranty, civil

conspiracy, fraudulent concealment and misrepresentations, negligence, nuisance and strict

liability/products liability. These causes of action not only arise out of acts and omissions that

took place before and at the time of the sale and installation of Grace's Surface Treatment ACM,

but also acts and omissions that occurred after the sale and installation of such products.[45]

## J.    Preservation of Discovery Rights

Claimant has discussed only a small fraction of the evidence that would and will be

further explored through discovery in connection with Debtors' objections. Claimant preserves

and does not hereby waive its rights to obtain further discovery from Debtor once Debtor

clarifies the basis of said objections, most of which are simply contentions with no supporting

facts or foundation whatsoever.

---

[45] In regard to Claimant's allegations of continuing duty to warn, Claimant alleges that even after the Debtors' Surface Treatment ACM was installed in Claimant's buildings, Grace learned of additional information concerning the hazards of its Surface Treatment ACM, and yet failed to warn Claimant, other building owners, and the public in general of such hazards. Faced with this new and additional information, Grace not only failed to warn Claimant of such, it also embarked on a "public relations" campaign whereby it affirmatively misrepresented to Claimant, other building owners and the public in general that its Surface Treatment ACM was safe for continued use in buildings and that they posed no hazard to building occupants, and that no further corrective actions were necessary.

IV.    **CLAIMANT'S RESPONSES TO DEBTORS' OBJECTIONS**

Debtors have alleged numerous objections to Claimant's claim, including, but not limited to,  a) the PD claim provides insufficient information; b) the PD claim is brought too late; and c) the PD claim provides no proof of hazard.   Claimant's response to each such objection follows:

A.    **Claimants with Insufficient Documentation (Grace Ex. C-2)**

The Debtors object to Claimant's claim on the grounds that Claimant provided insufficient supporting documentation of the claim and that the claim has at least one of the following deficiencies:

> A.    The claimant indicates that it has documentation "relating to the purchase and/or installation of the product on the property" but did not attach these documents or a summary of them;
>
> B.    The claimant indicates that "it made an effort to remove, contain and/or abate the Grace product for which you are making the claim" but did not attach documents or a summary of documents relating or referring to such efforts; or
>
> C.    The claimant did not attach documents or a summary of documents "relating to the purchase and/or installation of the product in the property" and did not attach documents or a summary of documents "relating or referring to the presence of asbestos in the property for which you are making this claim ..."

(the "C-2 Objection").   For the reasons set forth in Section II and those below, Debtors' objection should be denied.

Debtors do not provide clear information regarding what documentation the Debtors believe is missing from the Claimant's claim.  In fact, Claimant is left to guess as to which of these three categories of information Debtors contend was not supplied by Claimant with respect to this claim.   Accordingly, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further clarification is provided by Debtors. Clearly, Debtors have failed to provide "sufficient detail as to why the

claim should be disallowed," Del. Bankr. LR 3007-1(e)(iii)(I), which makes it difficult, if not impossible, for Claimant to understand what documentation Debtors believe is missing from Claimant's claim.

In any event, Claimant has already provided, as an attachment to the Proof of Claim at issue, all documentation that is specified to be produced. If Claimant had documentation that relates to the purchase or installation of Debtors' products in the buildings at issue, such documents, or a summary thereof, were provided to Debtors. Claimant would further show that even if it made an effort to "remove, contain and/or abate" the Grace product(s), it does not necessarily have (nor may it ever have had) documents relating to such efforts.

To the extent that documentation responsive to this objection exists and is in the possession of Claimant, such has either been produced to Debtors or a summary thereof attached to the Proof of Claim.

**B.    Claims Allegedly Failing to Rule Out Non-Grace Products (Grace Ex. C-4)**

The Debtors have objected to Claimant's claim alleging that the "bulk sampling data is consistent with a Grace product and either bulk sampling data that is inconsistent with a Grace product or bulk sampling data insufficient to determine the presence of a non-Grace product in addition to a Grace product ..." (the "C-4 Objection"). For the reasons set forth below, Debtors' objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection to Claimant's claim. Claimant has requested, and is entitled to conduct discovery regarding Debtors' allegation that the "bulk sampling data provided by Claimant is consistent with a Grace product and either bulk sampling data that is inconsistent with a Grace product or the bulk sampling data is insufficient to determine the presence of a non-Grace product in addition to a Grace product." (Fifteenth Omnibus Objection ¶ 85, p. 30). Until Claimant is provided the data

that Debtors rely upon in making this objection, Claimant cannot fully respond to such. As such, Claimant reserves its right to supplement or amend its response to the extent further information is provided. Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claim, *see In re Allegheny*, 954 F.2d 167, 173 (3rd Cir. 1992), and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

It is instructive that Debtors state that "these bulk samples ... indicate that the building at issue potentially contains both Grace asbestos-containing products and asbestos-containing products manufactured by another company." In fact, Debtors lodge this objection "only out of an abundance of caution," and "are not seeking at this time to disallow or expunge the PD Claim ..., unless those claims also happen to fall in another category for which this remedy is sought." By Debtors' own admission, this particular objection is simply invalid.

This objection is substantively without basis as Claimant has attached to the Proof of Claim at issue a constituent analysis performed by MAS, regarding the asbestos-containing product in the building in issue, as well as a letter report of Dr. William Longo. This report establishes that the ACM in Claimant's building was manufactured by Grace. As previously discussed in Section III.B above, Grace has, time and time again, accepted similar reports from Dr. Longo as valid proof of product identification. This occurred even where there are slight variances between the bulk sample analysis and the alleged formulas.

## C.    Claims Allegedly Barred by the Statute of Limitations Based Upon Constructive Notice (Grace Ex. D-2)

The Debtors object to Claimant's claim asserting that such is barred "under the applicable statutes of limitations, based upon the doctrine of constructive notice ..." (the "D-2 Objection."). For the reasons set forth below, Debtors' objection should be denied.

Debtors have failed to identify the specific statutes of limitations or decisional rulings that they allege bar these claims. As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further information is produced. Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claim, *see In re Allegheny*, *supra*, and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

Claimant's claim is not barred by limitations as the common law maxim of *nullum tempus occurrit regi* exempts the State of Illinois and its political subdivisions, such as Claimant, from the operation of statutes of limitations. *See Clare v. Bell*, 378 Ill. 128, 130-31, 37 N.E.2d 812, 814 (Ill. 1941). In *City of Chicago v. Latronica Asphalt and Grading, Inc.*, 346 Ill. App. 3d 264, 805 N.E.2d 281 ((2004), the Court of Appeals, citing *City of Shelbyville v. Shelbyville Restorium, Inc.*, 96 Ill. 2d 457, 71 Ill.Dec. 720, 451 N.E.2d 874 (1983), reaffirmed the viability of the *nullum tempus* doctrine stating, "[u]nder the common law, 'the statute of limitations may not be asserted against the State or its county or municipal subdivisions as plaintiffs in actions involving 'public rights' [citation].'" *Id.* at 459. Claimant is clearly pursuing a "public right" in seeking to recover the costs to remove and replace Debtors' hazardous ACM. *Board of Education of City of Chicago v. A, C and S, Inc.*, 131 Ill. 2d 428. 482-83, 546 N.E.2d 580 (Ill. 1989) (School district was asserting a "public right" "in pursuing these common law remedies against ... [manufacturers of ACM] to recoup costs of repairing or replacing the ACMs...."). In effect, Debtors have merely alleged an invalid defense to the claim of the Claimant and have not provided any support for this defense.

In further response to Debtors' D-2 Objection, Claimant hereby incorporates by reference as if fully contained herein, the Response and Memorandum of Law of the Official Committee of Asbestos Property Damage Claimants in Opposition to Debtors' Brief in Support of an

Estimation Hearing on Constructive Notice in Property Damage Claims (the "PDC Constructive

Notice Brief"; Document No. 10940).

Finally, Debtors' own pleading and representations to Claimant and the Court are totally

at odds with its D-2 Objection.    Time and time again, Debtors have argued that its asbestos-

containing materials are not hazardous and do not cause property damage.    See Fifteenth

Omnibus Objection, ¶¶ 119-120, p. 39; see also Hearing Transcript July 19, 2005, pp. 33-34.

The Debtors' contention that building owners should have known of the hazards of its asbestos-

containing building products is inconsistent with their prior claim that their ACM is not harmful

in the first place.    The Eight Circuit Court of Appeals recognized this inconsistency in reversing

a statute of limitations verdict for Grace, stating:

> Grace argued at trial not only that the statute of limitations had run, but also that
> the plaintiff had suffered no injury from the asbestos Monokote.  The arguments
> are inconsistent:  if MDU has suffered no injury from the Monokote, then it has
> no cause of action – until an injury is suffered, the statute of limitations cannot
> begin to run.

*MDU Resources Group v. W. R. Grace & Co.*, 14 F.3d 1274 (8th Cir. 1994).    To put it another

way, if, as Debtors claim, their asbestos-containing products pose no hazard, limitations would

not have begun to run regarding such claim, let alone expire.

**D.    Claims Allegedly Barred by the Statute of Limitations Pursuant to Actual Notice
(Grace Ex. D-4)**

The Debtors object to Claimant's claim "because they are barred by the statute of

limitations based upon claimants' actual knowledge of their claims ..." (the "D-4 Objection").

For the reasons set forth below, Debtors' objection should be denied.

Debtors do no provide any information or evidence regarding the basis for this objection

to the Claimant's claim.  They have also failed to identify the specific statutes of limitations or

decisional rulings that they allege bar this claim.  As such, Claimant cannot fully respond to this

objection, and Claimant reserves its right to supplement or amend its response to the extent further information is produced.  Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claim, *see In re Allegheny, supra*, and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

Claimant's claim is not barred by limitations as the *nullum tempus* doctrine provides governmental immunity to the State of Illinois and its political subdivisions such as Claimant from statutes of limitation.  *See* discussion regarding *nullum tempus* maxim, Section IV.C. pp. 28-29.   In effect, Debtors have merely alleged an invalid defense to the claim of the Claimant and have not provided any support for this defense.

**E.    Claims Allegedly Barred by Laches (Grace Ex. D-6)**

The Debtors object to Claimant's claim because Claimants "have delayed in asserting their claims against Grace, often for decades  ..." (the "D-6 Objection").  For the reasons set forth below, Debtors' objection should be denied.

Debtors do no provide any information or evidence regarding the basis for this objection to the claim of Claimant.  As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further information is produced.  Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claim, *see In re Allegheny, supra,* and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

Laches may not be invoked to bar the Claimant's claim. *See Village of Hartford v. First Nat. Bank of Wood River,* 308 Ill. App. 447, 30 N.E.2d 524, 527 (1940) (the doctrine of laches does not apply against a unit of government that is asserting a public right). *See* discussion regarding *nullum tempus,* Section IV.C, pp. 28-29.   Moreover, there being no fixed period of

time for a state or its political subdivisions to bring suit, it cannot be said that it unreasonably delayed in failing to do so.    In effect, Debtors have merely alleged an invalid defense to the claim of the Claimant and have certainly not provided any support for this defense.

Even if laches was applicable to Claimant's claim, it would not bar such.  Laches is an equitable remedy that prevents a plaintiff from asserting a claim due to a lapse of time.    To prevail on such a defense, a party must show "lack of diligence by the party asserting the claim and prejudice to the opposing party." *Van Milligan v. Board of Fire & Police Commissioners of the Village of Glenview,* 158 Ill. 2d 85, 89 196 Ill.Dec. 665, 630 N.E.2d 830 (1994).    First, there is no evidence to suggest that Claimant failed to diligently pursue its claim.  In fact, the evidence will show that Claimant has followed Grace's advice and has maintained the acoustical and fireproofing products located in its buildings.  Second, any alleged delay has not prejudiced the Debtors.  Grace has never changed its position regarding ACM.  It has consistently advocated that its products pose no hazard as they do not release asbestos fibers into buildings once installed.    The mere lapse of time does not constitute laches.  There must be prejudice to the defendant, which cannot be shown in this case.

## F.    Claims Allegedly Providing No Measurement of Relevant Asbestos Levels (Grace Ex. E-1)

The Debtors object to Claimant's claim "because they are not accompanied by any documentation reflecting airborne asbestos levels inside the building … is dangerous …" (the "E-1 Objection").  For the reasons set forth below, Debtors' E-1 Objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection to the Claimant's claim.  As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further information is produced.  Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity

31

of Claimant's claim, *see In re Allegheny, supra*, and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

The Debtors' argument is premised on the assumption that a certain level of airborne asbestos must be present as measured by air sampling for there to be a hazard that justifies removal of the ACM. This assertion is not new. It is precisely the same argument previously made by the Debtors and other manufacturers of asbestos-containing building products in *Safe Bldgs. Alliance v. E.P.A.*, 846 F.2d 79 (D.C. Cir. 1988).[46] In that case, the "Safe Buildings Alliance" and manufacturers of ACM argued that EPA regulations promulgated pursuant to the Asbestos Hazards Emergency Response Act, 15 U.S.C.A. §§ 2641-2654, must be set aside because the EPA failed to determine what levels of asbestos exposure were safe, or to require the use of air monitoring as the sole or primary assessment method to determine the need for corrective action. The United States Court of Appeals for the District of Columbia found this argument to be meritless.

In *Safe Bldgs. Alliance*, the D.C. Court of Appeals rejected the contention Debtors now make, stating:

> *Congress nowhere said that EPA need rely exclusively or even mainly on air monitoring techniques* (emphasis added) in selecting response actions, or that it need establish a quantitative measure that it deems safe. Indeed, the legislative history affirmatively suggests an intent not to impose such requirements ... . Indeed, the petitioners' insistence that EPA construct a quantitative model before it do anything else offends common sense as well as congressional intent, for the *potential* hazards posed by presently undamaged ACM obviously could not be quantified or measured by air monitoring techniques (emphasis in original).[47]

Instead, the Court approved the approach adopted by EPA which relies on visual and physical evaluation of the condition of the ACM, the location and accessibility of the ACM and the

---

[46] Grace was a charter member of the "Safe Building Alliance," an industry lobby group which was formed to advance the manufacturers' position that it was unnecessary to abate or remove ACM in buildings.

[47] *Id*. at 83.

potential for disturbance of the ACM, determined by inspectors accredited in conformity with EPA regulations, as the primary assessment tool or monitoring technique.[48]

It is interesting to note that Debtors cite no case in support of this novel approach. The reason for this is quite simple: No court has ever adopted such a proposal. In fact, courts in the underlying tort litigation have consistently rejected Grace's contention. Further, discovery in the underlying litigation has firmly established Grace's liability to Claimant. *See* Sections III.A, C, D, and F above.

The use of air sampling to determine hazard has consistently been rejected by the EPA:

> EPA continues to discourage the use of air monitoring as the primary technique for assessing asbestos hazards, since that method only measures current conditions and provides no information about potential and future levels of fiber release ... the agency believes that such standards used for the purposes of assessing asbestos hazards could not ensure protection of human Health and the Environment as intended by USCA Title 11.[49]

Any attempt to determine hazard via static area air sampling is doomed from the outset. This is true because such air sampling only provides a snapshot of the levels of asbestos fibers in the building environment during a particular time period and under the circumstances which then exist. Such static area air sampling, which is the only type of sampling performed by Debtors' consultants, does not present a representative picture of exposures that exists under routine and foreseeable building conditions.[50] As previously discussed, the EPA has rejected adopting an air sampling approach to determining hazard, concluding that a comprehensive building inspection can provide better results.[51]

---

[48] *Id.* at 82.

[49] 52 Fed. Reg. 210, 41838 (EPA, October 30, 1987).

[50] Numerous studies simulating actual maintenance and/or custodial activities which utilize personnel air samples taken at the breathing zone of such workers, have shown much higher levels of airborne fibers. Such studies will be the subject of evidence presented by the PD Committee's expert witnesses in the Phase I trial.

[51] Claimant hereby adopts by reference as if fully set forth herein Sections III, IV and V of the Memorandum of Law of the Official Committee of Asbestos Property Damage Claimants in Opposition to Consideration of the Debtors' Proposed "Methodology Issue" as Part of the Estimation of Asbestos Property

## V.    CLAIMANT'S AFFIRMATIVE DEFENSES

Debtors assert that the Claimant's claim is time-barred by applicable statutes of limitations, statutes of repose and/or the common law doctrine of laches. As noted above, the claim of Claimant is not time-barred, as the statutes of limitations and/or repose do not apply to Claimant by virtue of the common law doctrine of *nullum tempus occurrit regi*, and/or applicable statutes. However, even if such defenses were available to Debtors, these defenses do not bar Claimant's claim as the doctrines of equitable estoppel and equitable tolling are applicable.

Equitable tolling and equitable estoppel are "based primarily on the view that a defendant should not be permitted to escape liability by engaging in misconduct that prevents the plaintiff from filing her claim on time." *In re: Enron,* 310 F. Supp 819 (S.D. 2004). The primary difference in these doctrines is that equitable estoppel focuses its attention on the defendant's conduct while equitable tolling focuses on the claimant's excusable neglect.

The doctrine of equitable estoppel includes a number of interrelated, but separate, defenses, including equitable estoppel, quasi-equitable estoppel, judicial estoppel[52] and fraudulent concealment. These doctrines are recognized by virtually all jurisdictions in one form or another and are founded upon principles of fair dealing. The underlying premise for these doctrines is that a party should not be allowed to gain an advantage by asserting inconsistent positions or mutually contradictory positions, which either results in an unfair advantage to one party or detriment to the other party. In applying estoppel in the context of litigation, the focus is on preventing parties from "playing fast and loose with the court" and to "protect the integrity of the judicial process." *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir. 1982).

---

Damage Claims filed October 17, 2005 (the "PDC Methodology Brief"; Document No. 9671), which discusses in more detail the fact that air sampling results are not dispositive of the claims of Claimant.

[52] Some jurisdictions refer to judicial estoppel as "the doctrine against the assertion of inconsistent positions." *Scarano v. Central R. Co. of New Jersey*, 203 F.2d 510, 513 (3rd Cir. 1953).

As discussed earlier, almost every state has adopted the discovery rule either as part of its statutory scheme regarding accrual of limitations or its courts have judicially adopted such a rule to determine when a plaintiff's cause of action accrues. The discovery rule holds that the limitations period is tolled until the plaintiff discovers, or through the exercise of reasonable diligence should have discovered, the nature of his or her injury. The discovery rule is an affirmative defense to limitations.

Time and time again, Debtors have represented to building owners and now to this Court, in both their pleadings and in oral argument, that their asbestos-containing products pose no hazard to building occupants. Yet, in the same breath they assert that Claimant's claim is time-barred. Grace cannot have it both ways: On one hand asserting no hazard, and then on the other hand asserting that the Claimant's claim is time-barred.

The Debtors' conduct is exactly what these equitable doctrines are designed to prevent – allowing a party from asserting its rights under a general technical rule of law when it has so conducted itself that it would be contrary to equity and good conscience to do so.

## VI.   DEBTORS ARE NOT ENTITLED TO ASSERT ADDITIONAL OBJECTIONS TO CLAIMANT'S CLAIM

Claimant opposes and objects to Debtors' request that 1) it not be required to comply with Del. Bankr. LR 3007-1 (this rule requires all "substantive objections" to a particular proof of claim be asserted in a single omnibus objection or such objection is waived); and 2) they have the opportunity to make further objection if and when it is determined that information provided by Claimant is untrue and inaccurate. *Id.* at ¶¶ 217-19, pp. 64-65. Both requests should be denied. Debtors have now had two occasions to raise objections to Claimant's claims. The Court has previously accepted Debtors' proposal regarding information to be included in the claim form. Claimants provided this information over two years ago. Debtors have had more

than sufficient time to review this information and formulate their objections to Claimant's claims. Debtors should not be allowed to continue to raise objections, in repeated piecemeal fashion, as this will unduly prolong the estimation process, rather than provide an efficient means of resolving claims.

## VII.   CLAIMANT'S   RIGHT   TO   FILE   SUPPLEMENTAL   RESPONSE   TO OBJECTIONS

Debtors have failed to comply with Del. Bankr. LR 3007-1(e)(iii)(I) by providing sufficient detail regarding objections to Claimant's claims. Debtors have failed to:  1) provide relevant information and documentation to support their objections; 2) provide the specific key elements which it contends are not present in bulk samples or not in the correct proportions; 3) identify the specific statutes of limitations or repose; and 4) provide the relevant decisional law that supports Debtors' argument that Claimant's claims are barred.   Absent this information, Claimant cannot more fully respond to the objections raised by Debtors, and therefore reserves the right to file supplemental responses if such information is provided by Debtors.

## VIII.   CONCLUSION

For the reasons set forth hereinabove, Claimant requests that

1.      Debtors' objections be denied;

2.      Debtor be required to set forth the specific basis for each objection rather than asserting objections in the alternative; and

3.      Claimant be allowed to conduct discovery regarding all issues and defenses to such issues that may be raised.

Dated:  December 8, 2005

Respectfully submitted,

Christopher D. Loizides (Bar No. 3968)
Michael J. Joyce (No. 4563)
LOIZIDES & ASSOCIATES
1225 King Street, Suite 800
Wilmington, DE  19801
Telephone:      (302) 654-0248
Facsimile:       (302) 654-0728
Email:            loizides@loizides.com

-- and --

Martin W. Dies
DIES & HILE, L.L.P.
1009 Green Avenue
Orange, TX  77630
Telephone:      (409) 883-4394
Facsimile:       (409) 883-8414

Special State's Attorney,
Cook County, Illinois

Co-Counsel for Claimant