IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 01-01139 (JKF) |
| W.R. GRACE & CO., et al., | (Jointly Administered) |
| | PD Claim No. 12700, |
| | The County of Orange, Texas |
| Debtors. | Class Claim |

**Response Deadline:  December 8, 2005**
**Hearing Date: TBD**
**Re:  Docket No. 9315**

**RESPONSE OF THE COUNTY OF ORANGE INDIVIDUALLY AND AS
REPRESENTATIVE OF A CLASS OF SIMILARILY SITUATED BUILDING OWNERS
TO DEBTORS' FIFTEENTH OBJECTION (SUBSTANTIVE) TO
ASBESTOS PROPERTY DAMAGE CLAIMS**

COMES NOW the COUNTY OF ORANGE, TEXAS ("Claimant"),[1] individually, and on

behalf of a limited class consisting of public and private building owners in the State of Texas

whose buildings contain W.R. Grace asbestos-containing materials and files this Response to

Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims

("Fifteenth Omnibus Objection") , and would show as follows:

I.    **CLAIMANT'S CLASS PROOF OF CLAIM**

In April 2002, the Bankruptcy Court, after protracted debate and hearings, ordered

Property Damage Claimants to file a Proof of Claim on or before March 31, 2003.   The County

of Orange timely filed a class claim on behalf of:

> A limited class consisting of subdivisions of the State of Texas and the owners of
> Texas private and/or commercial buildings identified in Exhibit B, attached
> hereto, that contain or contained asbestos-containing surface treatment material
> manufactured by Debtor, W.R. Grace & Co-Conn.

---

[1] Attached hereto as Exhibit A is the claim number and the specific objections filed by Debtors.

Exhibit "B" identifies one hundred and thirty-two (132) buildings that Claimant contends contain asbestos-containing fireproofing or acoustical plaster surface treatment materials ("ACSTM") manufactured by Debtor,[2] Grace and/or its licensees Texas Vermiculite Company or Vermiculite, Inc. All of these buildings are located in the State of Texas.

## II.    REQUIREMENTS FOR CLASS CERTIFICATION – RULE 7023

The requirements for class certification are set forth in Rules 7023, Fed.R.Bankr.P. and, by reference, Rule 23, F.R.C.P. The four prerequisites for class certification under Rule 23(a) are commonly referred to as numerosity, commonality, typicality, and adequacy of representation. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). In addition, a proposed class must fall within one of the class types enumerated in Rule 23(b). Claimant seeks to certify an opt-out class pursuant to Rule 23(b)(3).

### A.    Numerosity

The Rule 23(a)(1) "numerosity" requirement implicates the impracticability of joinder of all parties in a single proceeding. Generally, the Third Circuit has stated that if the class representative establishes that the potential number of class members exceeds 40, the numerosity requirement is satisfied." *Stewart v. Abraham*, 275 F.3d 220, 227 (3rd Cir. 2001). In this case, the proposed class includes 132 building owners.

### B.    Commonality

Commonality is satisfied when "there is at least one issue whose resolution will affect all or a significant number of the putative class members." *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir. 1982). *See also Stewart*, 275 F.3d at 227 (Commonality element requires the representative of the class to "share at least one question of fact or law with the grievances of the

---

[2] Individual claims were also filed on behalf of the City of Amarillo (Claim Nos. 5656 and 5661), City of Houston (Claim Nos. 6968 and 6969), Coleman Housing Authority (Claim No. 5658), Harlingen Housing Authority (Claim No. 5659), El Paso County (Claim No. 5657 ), and the Sabine River Authority (Claim No. 5660) .

perspective class."). The courts throughout this country have recognized the existence of common questions in asbestos property damage cases on at least 4 separate occasions. *See Central Wesleyan College v. W. R. Grace & Co.*, 6 F.3d 177 (4th Cir. 1993); *In re: School Asbestos Litigation*, 789 F.2d 996 (3d Cir.), cert denied, 479 U.S. 852, 915 (1986); *National Gypsum Co. v. Kirbyville Independent School Dist.,* 770 S.W.2d 621 (Tex. App. 1989); *Kirbyville Independent School District v. Asbestospray Corporation, W. R. Grace & Co.-Conn., and United States Gypsum Co.*, No. 1:94CV412 (E.D. Tex.). There can be little, if any, doubt that the requirement of commonality is satisfied in asbestos property damage litigation. Indeed, commonality can be satisfied by a single common issue, and as such, this requirement is easily met.

## C.    Typicality

The threshold for typicality, like that of commonality, is not high. *Shipes v. Trinity Industries*, 987 F.2d 311 (5th Cir. 1993). The focus of the typicality inquiry is on whether the interest of the class representative are sufficiently aligned with the interest of the absent class members. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183 (3rd Cir. 2001). Although typicality does not require identity of the claims, *Phillips v. Joint Legislative Comm. On Performance & Expenditure Review*, 637 F.2d 1014, 1024 (5th Cir. 1981), cert. denied, 456 U.S. 960 (1982), the legal theories asserted by Claimant are the same as those of the proposed class.

## D.    Adequacy of Representation

Rule 23's representativeness element requires that the named representatives of the class must fairly and adequately represent the interest of the absent class members. Rule 23(a)(4). This issue is addressed to both the class representative and class counsel. *In re Prudential Ins. Co. of America Sales Practice Litigation*, 148 F.3d 283, 312 (3d Cir. 1998). Claimant has

previously served as class representative regarding claims brought against other manufacturers of asbestos-containing products.  There is no conflict of interest between the claimant and the rest of the class. *Id.*  Class Counsel, Dies & Hile, LLP ("Dies & Hile"), is also competent and experienced in class action lawsuits, and will vigorously represent the interests of the class. Since 1982, Dies & Hile has successfully represented over 750 cities, counties, hospital districts, housing authorities, port authorities, public school districts,  community colleges and the State of Texas, its agencies, departments and  universities, the State of Utah, and the State of Hawaii in similar asbestos cost recovery litigation.  They have also served as class counsel in four asbestos cost recovery class action suits.

## E.    Rule 23(b)(3) – Predominance and Superiority

In addition to satisfying the requirements of Rule 23(a), a party seeking to certify a class must also satisfy one of the three elements of subdivision (b).  A Claimant seeking certification under Rule 23(b)(3),  must show that

> the questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3).   This requirement has been carefully analyzed by the parties in the case at bar and numerous courts throughout this land.  The Fourth Circuit, in *Central Wesleyan College v. W. R. Grace & Co.*, in addressing this issue, stated:

> Experience shows that in the asbestos litigation arena redundant evidence is the rule rather than the exception..."  The problem created by such repetitious, wasteful presentation of proof in individual asbestos litigation led directly to mass consolidation of personal injury cases, see, In re Asbestos Product Liability Litigation No. (VI), 771 F. Supp. 415 (J.P.M.L. 1991) and to certification of the class of local school districts.  School Asbestos Litigation, 789 F.2d at 1010. Findings in a common issue trial on even a few of the eight identified questions may  eventually  save  considerable  time  and  judicial  resources.   Significant

4

economies may be achieved by relieving education institution of the need to prove over and over when defendants knew or should have known of asbestos hazards, or whether defendants engaged in concerted efforts to conceal this knowledge, or even whether certain defendants products crumble and release dust under hand pressure.

6 F.3d at 185. The issue of superiority and predominance is met.

## III.    DEBTORS' OBJECTIONS TO CLAIMANTS' CLAIMS

### A.    Debtors Have Failed to Identify the Specific Objections to Claims

On September 1, 2005, Debtors filed their Fifteenth Omnibus Objection to Asbestos Property Damage Claims. The exhibits referenced in Debtors' objections which identified the particular claimant and applicable objections, were not served until September 7, 2005. To compound the confusion surrounding the Debtors' objections, they served amended exhibits identifying claims that were not identified in the original exhibits or which should not have been included in the original exhibits on September 16, 2005.

In most instances, Claimants can determine the specific objection asserted by Debtors. In some instances, it is impossible because Debtors state their objection in the alternative. For example, Debtors assert that certain Claimants failed to attach requested documents. *See* Exhibit C-1(d). In this regard, Debtors assert that

> The proof of claim does not provide one or more of the following: (1) information regarding prior asbestos-related property damage lawsuits or claims for the property, (2) the date that the product at issue was installed at the property; (3) the date that the claimant learned that the product at issue contained asbestos; or (4) the date the claimant learned of the presence of asbestos on the property.

Fifteenth Omnibus Objection, ¶ 57, p. 23. In instances such as this, it is difficult for Claimants to know exactly what objection is made. If Debtors claim that relevant documents or summaries have not been provided, they should identify them rather than state alternative propositions, which make it impossible to determine the exact nature of the objection.

**B.    Debtors Are Not Entitled to Have Claims Expunged or Disallowed**

Debtors request that the claims identified in Exhibit "A-1" through "H-1" of their Fifteenth Omnibus Objection be disallowed and expunged, except as otherwise expressly noted in their objections (Fifteenth Omnibus Objection, Conclusions, p. 67). Claimants would show that a) Debtors have failed to comply with the Gateway Objection Order; b) Claimants have promptly responded to any notice of intent to file Gateway Objections served by Debtors; and c) the alleged failure of Claimants to produce documents or summaries is not dispositive of Debtors' liability and therefore does not justify disallowance.

**1.    Debtors' Failure to Give Notice of Intent to file Gateway Objections**

Debtors assert that claims which fail to provide requested information or documentation should be disallowed and expunged, as such failure precludes Debtors from properly preparing objections to such. Information sought in questions where responses are alleged to be "Facially Incomplete," they argue, is critical to the preparation of their defenses and "where, as here, notice has already been given of the claim's failings and the claimant has still failed to respond adequately – the Debtors cannot evaluate the claim and the claim should be disallowed and expunged ..." (Fifteenth Omnibus Objection, ¶ 53). Debtors also assert that claims with insufficient documentation should be disallowed and expunged because "[p]ursuant to this Court's Gateway Objection Order dated July 19, 2004, the Debtors have already served each of these claimants ... with at least one notice of intent to object and, therefore, the respective PD Claimants have already had an opportunity to supplement their documentation ..." (Fifteenth Omnibus Objection, ¶ 59). These statements are not only incorrect, they misrepresent Debtors' presentation of their Gateway Objections and the Claimants' responses to the objections raised.

In December 2004, Debtors served on Dies & Hile, twenty-two deficiency notices pursuant to the Gateway Objections. A notice was provided regarding The County of Orange

Claim. Upon receipt of the deficiency notice, Dies & Hile contacted Grace and scheduled a time to discuss the issues raised therein.    After discussing these issues, Dies & Hile agreed that pending further discussions with Debtors no motion for class certification would be filed at that time.

### 2.    Debtors Have Not Met Their Burden of Proof

A proof of claim is deemed allowed unless a party in interest objects under 11 U.S.C. § 502(a) and constitutes "prima facie evidence of the validity and amount of the claim" pursuant to Bankruptcy Rule 3001(f). *See also* Fed. R. Bankr. P. 3007. The filing of an objection to a Proof of Claim "creates a dispute which is a contested matter" within the meaning of Bankruptcy Rule 9014 and must be resolved after notice and opportunity for hearing upon a motion for relief. *See* Adv. Comm. Notes to Fed. R. Bankr. P. 9014.

The Debtors' objections to the Claimants' Claims listed in Exhibit C to the Fifteenth Omnibus Objection, which are based on the contention that the Proofs of Claim filed in respect to such claims were "facially incomplete," are without any basis in the law. The rubric for proofs of claim and objections thereto were articulated by the Third Circuit Court of Appeals in *In re Allegheny International, Inc.*, 954 F.2d 167 (3d Cir. 1992), as follows:

> The burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A. §502(a) rests on different parties at different times. Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is '*prima facie*' valid. [citations omitted.] In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. The burden of going forward then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim. It is often said that the objector must produce evidence equal in force to the *prima facie* case. [citations omitted.] In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. [citations omitted.]

954 F.2d at 173-74.

Thus, the pertinent inquiry is whether the Proofs of Claim filed by Claimants set forth sufficient evidence of a claim against the Debtors, not whether the Proofs of Claim provide sufficient information for the Debtors to formulate their defenses and objections to the claim. If it does, the burden of production shifts to the Debtors to produce evidence that the claim is invalid, regardless of whether it would be useful for the Proofs of Claim to provide additional information for the Debtors to assess their defenses, as such information is obtainable in discovery.

The omission of some information in the Proofs of Claim by Claimants is not sufficient grounds for the disallowance of any Claimant's claim, which otherwise makes a prima facie showing of the Debtors' liability. Said another way, Claimants' claims may only be disallowed for one or more of the nine grounds for disallowance enumerated in Section 502(b) of the Bankruptcy Code. *In re Taylor,* 289 B.R. 379, 384 (Bankr. N.D. Ind. 2003). Indeed, the Court has no discretion in this regard and cannot disallow a claim for reasons beyond those stated in the statute. *Id.* None of the grounds for disallowance set forth in Section 502(b) involves the failure to provide information beyond that which establishes a prima facie claim against the Debtors' estates. *In re Guidry,* 321 B.R. 712 (Bankr. N.D. Ill. 2005).

IV.    **CLAIMANT'S RESPONSE TO DEBTORS' FACTUAL ALLEGATIONS REGARDING THE HISTORY OF GRACE PRODUCTS AND USES**

A.    **Grace's Asbestos-Containing Surface Treatment Material ("Surface Treatment ACM") is Classified as Friable by the EPA**

Grace argues that its Surface Treatment ACM is "cementitious" and therefore does not release asbestos fibers during normal and foreseeable building operations. Nothing could be

further from the truth. One need look no further than the statements of the EPA to see that such statements are absurd.

Grace's Surface Treatment ACM is classified as "friable" Surface Treatment ACM by the EPA. Thus, even though Grace characterizes Mono-Kote as "cementitious" material, Mono-Kote is nevertheless considered by the EPA to fall within the definition of friable surface treatment.[3] According to NESHAPs, friable materials are those likely to readily release fibers "… when dry … can be easily crumbled, pulverized or reduced to powder by hand pressure … reduced to powder mean(s) … changed to a dust or powder that can become airborne."[4] Further, "ACM that is sprayed or troweled on ceilings and walls is often the main source of airborne asbestos in the building …."[5]

**B.    Grace's Objections to Claimant's Product Identification Reports Are Without Merit**

**1.    Grace's Surface Treatment ACM was Manufactured Pursuant to Grace's Formula and Mixing Instructions by Twenty-Three Licensee Plants Throughout the Country**

In April 1963, Grace purchased the Zonolite Company. After purchasing Zonolite, Grace immediately began selling the Zonolite brand of Surface Treatment ACM through its construction products division. Grace's Surface Treatment ACM products, which primarily consisted of two types described below, were predominant in the United States construction industry and are uniquely identifiable because of their three primary ingredients. The two types of Grace Surface Treatment ACM were:

(1) Fireproofing and acoustical ACM with the primary ingredients vermiculite, chrysotile asbestos, and gypsum, which were sold predominantly under the trade names Zonolite Mono-Kote 1 ("MK-1"), and Mono-Kote 3 ("MK-3"), and also sold as Spra-Insulation, Z-Tex (aka EZ-Tex), Zono-Coustic (aka "Zonocoustic")

---

[3] *See Guidance For Controlling Asbestos-Containing Materials In Buildings* ("Purple Book"), EPA 560/5-85-024, June 1985, Chapter 2, Sec. 2.2.2, at pp. 2-4, "Friable forms (Surfacing materials) are either … fibrous … or granular and cementitious …."

[4] EPA Part III (40 CFR Part 61 – NESHAPs Revision: Final Rule) Tuesday, November 20, 1990.

[5] *Ibid.* "Purple Book," Ch. 3, Sec. 3.3.1, at pp. 3-2.

and Hi-Sorb Acoustical Plaster or Oyster White Hi-Sorb (collectively referred to as "Mono-Kote"); and

(2) Acoustical plaster ACM with the primary ingredients vermiculite, chrysotile asbestos, and bentonite clay, which were sold predominantly under the trade names Zonolite Acoustical Plaster or Plastic ("ZAP") and Zonolite Finish Coat (collectively referred to as "ZAP").

Both Mono-Kote and ZAP incorporated vermiculite mined by Grace primarily at Libby, Montana,[6] and they were manufactured according to Grace's specifications at vermiculite expansion plants owned and operated by twenty-three separate Grace Licensees across the country.   These Licensees included, among others, Texas Vermiculite Company ("Texas Vermiculite"), Ari-Zonolite, Inc., Vermiculite-Northwest, Inc., California Zonolite/Diversified Insulation, Vermiculite of Hawaii, Inc. ("Vermiculite of Hawaii") and Western Mineral Products Company ("Western Mineral") (collectively referred to as "Licensees").   Texas Vermiculite's plant was located in Dallas, Texas.   Vermiculite of Hawaii's plant was located in Honolulu, Hawaii.   Other Grace Licensee plants were located throughout the United States, Canada and in other countries.

### 2. The Constituents and Their Proportions as Identified in a Bulk Sample of In-Place Grace Surface Treatment ACM May Vary From the Formula List Prepared by Grace's Counsel For Its Litigation Defense

Grace provided its Licensees with product formulas and mixing instructions for manufacturing Mono-Kote and ZAP in batches of hundreds of pounds and with a specifications list of approved vendors from which the Licensees were to purchase the raw materials required by the formulas.   Grace's manufacturing formulas measured the primary ingredients by weight, as these raw materials were generally sold by vendors in bags of 50 to 100 pounds. The primary ingredient supplied by Grace was vermiculite, added either according to weight or by cubic feet,

---

[6] Grace also had a much smaller vermiculite mine in South Carolina which provided at least some of the vermiculite used in its South Carolina manufacturing operations.

which was shipped to the Licensees from Grace's Libby Montana mine and expanded in furnaces in the Licensee's plants before being used in these products. In litigation, Grace's longtime product identification expert, Dr. Richard J. Lee, has repeatedly testified that he has never seen or been provided copies of the actual formulas, instructions and specifications used by Grace's Licensees in manufacturing the products. Instead, he has uniformly relied upon a list of Grace ACM products with percentages of ingredients, which he identifies by volume rather than weight, and which he believes were extrapolated from actual Grace manufacturing formulas by one or more attorneys from a law firm that represented Grace. This litigation formula list as it has been amended or added to over time by Grace's attorneys, has been the basis of his opinions as to whether the ingredients he found in bulk samples of in-place ACM were or were not "consistent with" Grace's "formulas."

Some variation in Grace's Surface Treatment ACM products as commercially manufactured according to the formulations and instructions provided by Grace was foreseeable and inevitable. These variations often involved the amount or percentage of the raw ingredients as specified in Grace's formulas, or the inclusion of impurities that occur naturally in the mined raw materials (such as tremolite asbestos in Grace's vermiculite, or quartz accompanying gypsum or bentonite) or contaminants from the Licensee's use of the same industrial equipment to manufacture both types of products (*i.e.*, the Mono-Kote products containing gypsum and the ZAP products containing bentonite). Grace's own analysis of bulk samples of its surface treatment materials from the Construction Products Division - Denver plant found ingredients that were not listed in the Grace manufacturing formulas. Dr. Yang, a longtime Grace research employee, duly noted on one such report that "numerous XRD analysis have been made due to

the presence of some unidentifiable compounds ....."[7]  Some variation from the actual formulas was a reality given these types of building products, the raw material ingredients whose very specifications anticipated they would contain a certain percentage of contaminants, the manner in which they were manufactured, and the absence of a quality assurance program uniformly administered by Grace over the Licensees.[8]

Some difference in the amount or percentages of particular ingredients also often resulted from actions taken during the application of the Surface Treatment ACM. Grace's employees knew of and sometimes even suggested these actions. For example, applicators may have added chrysotile asbestos to Grace's product at the jobsite.  Mono-Kote and ZAP were delivered to job sites in sealed bags.  Applicators at the job site opened the bags and poured the dry material into a hopper or mixer where water was added and mechanically mixed prior to spraying the fireproofing or acoustical plaster.  According to Grace employees, it was not uncommon for applicators on the jobsite to add additional chrysotile asbestos to aid in the pumping or spraying of the material.[9]   Grace was not only aware of the ways in which applicators changed the portions of ingredients in its products, but, in fact encouraged such practices.  For example, in a memorandum of test report dated January 9, 1968, Grace concluded

> there is no doubt that Calcium … in the form of gypsum … or lime … was added to (the) Decorator's White Acoustical Plastic at the rate of approximately 10% by weight.[10]

---

[7] "Request for Technical Service," dated 10/20/88, Material Research and Analytical Group, W.R. Grace & Co., Julie C. Yang.

[8] Memorandum from F.L. Veltman to T.G. Gibian, Grace Research Division, dated December 6, 1971, "There are numerous potential causes for problems to erupt in the Mono-Kote business.  Notably, Grace has 13 suppliers of gypsum, and the product is manufactured in 23 locations".

[9] Oral Deposition of Thomas Cheatham, Grace employee, taken on December 12, 1991 (Volume I) in *Dayton Independent School District, et al. v. U. S. Mineral Products Company, W.R. Grace & Co. and United States Gypsum Company*, No. CA-B-87-00507 (E.D. Tex). *See* Testimony at p. 163, "… it was not uncommon ... to add asbestos … it dealt generally with pumping … they had to play with the recipe."

[10] Zonolite Division of W.R. Grace & Co., Test Result #1444, "Decorator's White Acoustical Plastic From Lake City Junior College and Forest Rangers School, Florida," dated January 9, 1968.

In a memo to C.A. Pratt, the owner of Western Mineral, one of its employees reported that "I have also seen gypsum added to our acoustical plaster in repairing fallouts and it has resulted in an excellent job. I hope that something simple like an additive to ... acoustical to make it harder can be found. This will make it so much easier for us in sales to continue selling our present acoustical with an improvement."[11] Thus, variations in the amount of raw ingredients specified by Grace's formulas occurred as a result of application techniques among the various licensees which Grace knew of and sometimes encouraged.

Component variations in bulk samples of in-place Surface Treatment ACM from the original manufacturing formulas also were known to occur because the material sometimes undergoes chemical changes after installation as a result of normal environmental conditions. For example, in March 1955, Western Mineral submitted two samples of ZAP to Twin City Testing Engineering Laboratory ("Twin City") for testing. One sample came from a ceiling from the Southeast High School in Lincoln, Nebraska while the other sample was of ZAP from Western Mineral's Minneapolis plant stock. Western Mineral had submitted the sample from Southeast High School because of a complaint that a discoloration had occurred in the ZAP as applied to the high school ceiling. Twin City reported to Western Mineral that the sample of ZAP from its plant contained no carbonate and no sulfate, and that the sample taken from Southeast High School in Lincoln, Nebraska contained no carbonate but was **very high in sulfate**. Twin City concluded that

> We therefore believe that the effervescence you mentioned is a calcium sulfate deposited by water leeching through the Gypsum plaster above the acoustical plastic. The moisture causing this leeching could be either the

---

[11] Interoffice Memo from Warren to C.A. Pratt, Western Mineral Products Company, Grace document 25022422.

high moister content which is prevalent ... or could be from possible leaks in the roof.[12]

The mere fact that there may be some variations in the percentages of the three primary ingredients in Grace Mono-Kote or ZAP as compared to the formulas, or the presence of minor amounts of raw materials or ingredient contaminants not listed in the formulas, does not preclude such product from having been manufactured by Grace or its Licensees.[13] Even with variations, these Grace products were so predominant and unique within the industry by their formulation using vermiculite, chrysotile asbestos and either gypsum or bentonite, that they remain clearly identifiable as Grace Surface Treatment ACM.

### 3.    Grace and Its Product Identification Expert Deliberately Ignore the Product Variations Such That Their Product Identification Analyses Are Consistently Flawed

Since the first asbestos property damage case was filed in the early 1980's, building owners have proved the manufacturer of the ACM in its building by obtaining bulk samples of the in-place ACM. These bulk samples are then analyzed by laboratories such as MAS, who conduct constituent analysis of the sample and, as in the instant case, determine that they are consistent with actual plant formulas and application information for Grace's Surface Treatment ACM.

In prior litigation, Grace has consistently denied that its Surface Treatment ACM was in buildings at issue because the constituents in bulk samples from such buildings either contained small amounts of ingredients that are not listed in Grace's litigation formula list, or contained

---

[12] Twin City report to Western Mineral Products Company re: Southeast High School, Lincoln, Nebraska, dated March 17, 1955; WRG 006192.

[13] Oral Deposition of Ian Stewart, taken on July 14, 1998, in *State of Hawaii v W. R. Grace & Co.-Conn., et al.*, Civil No. 93-4161-10, In the Circuit Court of the First Circuit, Hawaii, an employee of RJ Lee Group and a consultant for Grace testified that the ranges of variation in an analysis of a bulk sample was plus or minus about ten percent (10%). "Very often that will show up in specifications or formulations that are provided. You'll be given a range of acceptable level, something they say it should be about 10 to 15. But generally I allow a little margin [8 to 20 percent] beyond that ..." at p. 69.

Grace's signature key ingredients, but in proportions that differ from those listed in Grace's litigation formula list. The same objections are once again asserted in this matter. *See* Fifteenth Omnibus Objection, ¶ 83, p. 30. Grace was unable to sustain its position in the prior suits, and likewise such objections in the instant case are untenable. In prior litigation, as long as a claimant could show by appropriate expert state-of-the-art product identification analysis that a particular bulk sample from a building at issue contained the signature ingredients of Mono-Kote or ZAP, even if present in percentages which did not precisely match Grace's formulas, Grace inevitably admitted product identification or settled the claim.[14]

In the case, *State of Hawaii v. W.R. Grace*, Grace's longtime product identification expert, Dr. Richard J. Lee, denied that most of the State's bulk samples of ZAP from hundreds of buildings were a Grace product because the scanning electron microscope which he had invented and for which he had programmed the software did not find the "Wyoming montmorillinite" type of bentonite used by Grace in the split bulk samples that he analyzed. MAS had previously reported the bulk samples as representing a Grace product. The Discovery Master ordered that Dr. Lee's microscope and unconventional software, which was not used, much less relied upon by any other laboratory in the country, be produced for analysis by the State's experts. After the State's experts analyzed the microscope and software, and before trial, Grace abruptly settled the case which included payment on all of the buildings Dr. Lee had previously disputed.

Dr. Lee consistently opined that Hawaii's product identification reports, which identified bulk samples of surface treatment material as a Grace product, were incorrect. His opinion was based solely on his comparison of such samples to the Grace litigation formula list prepared and provided by Grace's lawyers. Dr. Lee testified he has never made any effort to acquire

---

[14] Reference is made to state-of-the-art product identification analysis performed by a laboratory, such as MAS which product identification reports, even if initially denied by Grace, were eventually proven correct in thousands upon thousands of bulk sample reports.

knowledge of Grace's actual manufacturing formulas for Surface Treatment ACM or how the products might vary depending on manufacturing or application techniques.

Dr. Lee also conceded that Grace had never provided him with a "sample of known ZAP that (he) analyzed … to use as a standard for determining whether an unknown bulk sample was ZAP …"[15]    Instead, Grace provided Dr. Lee a "vial" of vermiculite, which is a primary ingredient of both types of its Surface Treatment ACM, and that he relied on this sample as "being, a, quote, standard for the vermiculite …."[16]  Under cross-examination, Dr. Lee admitted that he had no knowledge that Grace had a range of different grades of vermiculite which varied from approximately 95.3% vermiculite (with the remainder being contaminant materials) down to approximately 81.3% vermiculite (with the remainder contaminant materials), and that he did not have samples of the other grades for purposes of a standard.[17]

Debtors' assertion that the products in Claimant's building were not manufactured by Grace is incorrect.  Moreover, Dr. Lee's findings and Debtors' objections are flawed as they are based on a litigation strategy developed by Debtors and Dr. Lee which is intentionally designed to eliminate bulk samples clearly containing Grace's signature ingredients because of certain variables that routinely occur during and subsequent to the application of the Grace Surface Treatment ACM or that are merely artifacts of the type of analysis Grace and Dr. Lee choose to perform.

## C.    Grace's Libby Montana Vermiculite is Contaminated with Tremolite Asbestos

The signature ingredients of Mono-Kote were gypsum, vermiculite aggregate, and chrysotile asbestos and of ZAP were bentonite, vermiculite aggregate and chrysotile asbestos. As

---

[15] Oral Deposition of Richard Lee, Ph.D., taken on October 15, 1998 in *State of Hawaii v W. R. Grace & Co.-Conn., et al.,* Civil No. 93-4161-10, In the Circuit Court of the First Circuit, Hawaii, at p. 1201.
[16] *Ibid.,* p. 1205.
[17] *Ibid.,* p. 1224.

previously discussed, the vermiculite supplied by Grace came from its Libby, Montana mine. This vermiculite is contaminated with tremolite asbestos. Tremolite is amphibole asbestos and is also recognized as a potent carcinogen. Thus, it is important to recognize that dust released from Mono-Kote or ZAP contains not only chrysotile asbestos which was an additive to the formulas, but may also contain tremolite asbestos. High levels of tremolite present in vermiculite dust are released during the manufacturing process of Mono-Kote. This continued to pose problems in the plants long after chrysotile asbestos was eliminated as an additive in 1973 pursuant to federal law.[18] Hence, there can be no question that an exposure to a Grace Surface Treatment ACM may include both chrysotile and tremolite exposure.

**D.  Grace Admitted That It Knew That Its Friable Surface Treatment ACM Would Be Subjected To Delamination, Disturbance and Other Foreseeable Factors After Installation That Would Cause the ACM To Become Unbonded, Fallout and Dust**

Grace was aware that certain "factors" could undermine the performance of its Surface Treatment ACM and lead to fallout. Such factors included the potential that the product could be disturbed during normal maintenance and cleaning of the building.[19] The testimony of Walter Payment, the Director of Grace's Construction Products Division Laboratory at Traveler's Rest, is significant because of his admissions regarding Grace's knowledge of product defects and its failure to instruct or warn building owners of these defects. Payment admitted:

> Grace was aware that once the ACM was applied in-place there were a number of factors in addition to humidity and air erosion that could interfere with proper performance.[20]

---

[18] Oral Deposition of Curtis Gipson taken on January 27, 1992, in *Dayton Independent School District, et al. v. U.S. Mineral Products Company, W.R. Grace & Co. and United States Gypsum Company*, No. CA-B-87-00507 (E.D. Tex). Tremolite exposure was a "continual concern ..." in the Dallas plant. *See* Ex. 4, Memo from Grace Cambridge, "... We are investigating further to determine the cause of this unacceptable level of tremolite in the air ..." at p. 177.

[19] Oral Deposition of Walter Payment taken November 4, 1986, in *Dayton Independent School District, et al. v. W.R. Grace & Co., et al.*, Civil No. B-81-277-CA consolidated with Civil No. B-81-293-CA, at p. 105.

[20] *Ibid.*, p. 104.

Grace recognized that the in-place ACM was subject to disturbance during normal cleaning and maintenance activities.[21]

That another factor would be renovation type activities.[22]

That the factors to which the in-place ACM could be exposed during ordinary use were "**foreseeable** and **within (Grace's) knowledge** ..."[23]

Grace **knew** that the factors and forces to which the in-place ACM would be subjected to "would **cause the material to become un-bonded**, not adhere the way it should, **fall out** ..."[24]

Grace **knew** that if this occurred, "there was a **likelihood of potential for the creation of dust** as the material became un-bonded and fell out."[25]

That despite this knowledge, Grace **failed** to make "any specific recommendations to the applicators or the users ... that would prevent or contain or maintain the material to prevent fall out or dust."[26]

Grace never placed any warnings or cautionary labels on the MK and/or ZAP bags concerning the fact that the product contained asbestos or of the potential hazards associated with the dust.[27]

**E.    Grace's Licensees Continued to Manufacture and Sell ZAP on an On-Going Basis Post-1969**

Grace has asserted that "with rare exception Grace stopped selling acoustical plaster containing asbestos in 1969 ..." (Fifteenth Omnibus Objection, ¶ 92, p. 32). This is utterly false. Grace's Licensees continued to manufacture and sell acoustical asbestos-containing products right up to, and even past the July 1973 EPA ban. In fact, ZAP was the most popular Grace product even as late as 1971.[28] Curtis Gibson, the plant manager of Texas Vermiculite, testified that he received a memorandum from Mike Moran, president of Texas Vermiculite, to eliminate

---

[21] *Ibid.*, p. 105.
[22] *Ibid.*, p. 106.
[23] *Ibid.*, p. 106.
[24] *Ibid.*, p. 107.
[25] *Ibid.*, p. 107.
[26] *Ibid.*, p. 108.
[27] *Ibid.*, Sheeran Deposition, p. 47.
[28] *Ibid.*, Deposition of Curtis Gipson, p. 28.

asbestos from the products, "during the (1973) time frame".[29]    Likewise, Stephan Sheeran, a sales representative for Texas Vermiculite, stated that "the Dallas plant shipped material to job sites into **June** of 1973."[30]    This is particularly revealing since Texas Vermiculite was the only Licensee that was majority owned by W.R. Grace.

John York, who was president of another major Grace licensee, Vermiculite of Hawaii, testified that submittals from his office for ZAP which were dated April 27, 1972 and August 7, 1972, related to "acoustical plastic" that was installed at Honolulu International Airport subsequent to the date of the submittals.[31]    Mr. York further testified that Mono-Kote 3 was also manufactured and shipped to the airport by Vermiculite of Hawaii during the same period.    The amounts of Grace Surface Treatment ACM required for installation at the Honolulu International Airport were so large, that in addition to the large quantities supplied by Vermiculite of Hawaii, additional bags of Surface Treatment ACM was shipped from mainland Grace Licensees direct to the jobsite in Hawaii.[32]    In a letter dated May 15, 1974 to a potential customer in San Francisco, Mr. York offered to supply asbestos-containing ZAP as long as he received "fourteen days lead time to fill an order."[33]    Mr. York also testified that during the entire time that Vermiculite of Hawaii was a Licensee for Grace's Surface Treatment ACM, such Grace products had the dominant market share in Hawaii.[34]

William V. Culver was employed as district manager for W.R. Grace Construction Products Division from 1966 to 1973 for the area that included the states of Oregon,

---

[29] *Ibid.*, Deposition of Curtis Gipson, p. 136.

[30]*Ibid.*, Deposition of Stephan John Sheeran, p. 17; *see also* Exhibit 5-A which shows that Texas Vermiculite shipped MK-3 to Oklahoma, as well.

[31] Oral Deposition of John C. York, taken on April 14, 1999, in *State of Hawaii v. W.R. Grace & Co., et al.,* Civil No. 93-4161-10 (1st Cir. Ct. Hawaii) at pp. 74, 75, 76 and 77.

[32] *Ibid.*, Deposition of John York, pp. 15, 16, and 78.

[33] Letter from John C. York, President of Vermiculite of Hawaii, to Buddy Redmond dated May 15, 1974.

[34] *Ibid.*, p. 13 (Vermiculite of Hawaii continued to operate as a Grace Licensee through at least April 1982 – *Ibid.,* p. 82).

Washington, Alaska, the Panhandle of Idaho, and North and Western Montana.[35] All of Grace's

Vermiculite products were manufactured at the Vermiculite Northwest plants located at Portland,

Oregon and at Spokane, Washington.[36] Mr. Culver testified that in **March 1972** it continued to

be his "responsibility to sell as much of the Grace products ..." as he could.[37]

As a practical matter, it remained business as usual and the Licensees were trying to sell

as much of the product as they could before the July 1973 cutoff date. Claimant believes that

additional discovery will further confirm that Grace's contention is not supported by the facts.

F.    **Grace's Knowledge of the Health Hazards of Asbestos**

The body of facts representing Grace's longstanding knowledge regarding the hazards of

the asbestos in its Surface Treatment ACM is far too voluminous to set forth in this response.

However, Grace's knowledge of the health hazards associated with asbestos date back to the

1930's through it ownership of the Dewey and Almy Chemical Co. and Multibestos Company,

who, in turn, acquired the Walpole Asbestos Carding Factory in 1931, through its purchase of the

Zonolite Company (collectively referred to as "Grace") and its operation of the Libby Montana

vermiculite mine. This knowledge was acquired well before its ACM was installed in

Claimants' buildings. Grace therefore knew that its ACM was defective, and would result in

asbestos fibers (both chrysotile and tremolite) being released into the air to be breathed and

inhaled by building occupants. Grace was also aware of the grave health hazards associated with

inhalation of asbestos fibers. Yet, as previously discussed, Grace not only did not disclose the

asbestos content of its ACM, it also failed to provide any cautions or warnings whatsoever in

connection with the products' asbestos hazards.

---

[35] Deposition of William V. Culver taken on December 12, 1988, in *The 3250 Wilshire Boulevard Building, et al. v. Metropolitan Life Insurance Company, et al.*, No. 87-06048 WMB (CHKX), in the United States District Court for the Central District of California at p. 10.
    [36] *Ibid.*, pp. 45, 46.
    [37] *Ibid.*, p. 180.

G.     **Grace's Efforts to Prevent Building Owners From Removing Surface Treatment ACM and/or Seeking Cost Recovery From Grace**

Despite Grace's intimate knowledge of the hazard of its Surface Treatment ACM, from at least the early 1950's, Grace has been a primary sponsor of a massive public relations effort to convince building owners, the public, and regulatory and legislative bodies, that its Surface Treatment ACM presents no hazard to building occupants and should not be removed. Grace's efforts were channeled through the activities of the "Safe Buildings Alliance (the "SBA")," an organization composed of former leading building material companies which formerly manufactured ACM building products.[38]

Working through the SBA, Grace has acted on many fronts to: (1) reduce the members' liability to building owners for property damage asbestos claims by encouraging building owners to forego the removal of asbestos based upon incorrect and/or misleading scientific and technical information; and (2) to lobby and influence Congress, state legislatures, and federal and state regulatory agencies to limit removal of in-place ACM. SBA literature was sent to building owners across the country, entities managing buildings, and the public in general asserting that there was no hazard associated with the use of in-place ACM during normal building activities such as manufactured by Grace. At the same time, SBA launched massive litigation to have courts set aside the laws and regulations dealing with in-place ACM such as AHERA and NESHAPs.[39]

Grace's representations to building owners were false and misleading, and were intentionally designed to prevent building owners from taking actions to remove and/or replace the Grace Surface Treatment ACM and to prevent or suppress legal actions against them. For

---

[38] Members of the "Safe Buildings Alliance" include W.R. Grace & Co., the Celotex Corporation and United States Gypsum Company.

[39] *See Safe Bldg. Alliance v. E.P.A.*, 846 F.2d 79 (D.C. Cir. 1988).

example, Grace hired former Gov. Hugh Carey as an Executive Vice President for the "newly established" "Office of Environmental Policy". Gov. Carey's function apparently was to lobby Congress, state legislatures and the EPA to pull back with regard to their policies intended to minimize the hazards of in-place ACM. His testimony provided to Congress was not modest in its attempts to create the impression that Grace's in-place ACM was safe, "In fact these products were specified under national and state building codes to protect human life and safety … when Grace manufactured these products, we believed then − as we believe now—that properly installed and maintained asbestos-containing fireproofing does not endanger building occupants."[40]

Contrast Gov. Carey's statement with the testimony of Walter Payment, Grace Research Director, that the reason for the use of asbestos in the (Mono-Kote) fireproofing had nothing to do with a fireproofing purpose, but rather was added to the product to increase "pumpability," or, in other words, to increase the profitability of the product.[41] Mr. Payment testified that Grace knew that by 1969 the asbestos in Mono-Kote provided no increased fireproofing ability to Mono-Kote. Grace could have easily determined this fact, if they had wanted to, by the early 1960's.[42] Yet Grace was still repeating the falsehood that Grace developed its Mono-Kote fireproofing "to protect human life and safety" almost 20 years after Mr. Payment says he had determined as Grace's Research Director that this claim was false! Grace also made similar written misrepresentations directly to building owners, architects and to the public. This example is merely the tip of the iceberg of deceit with regard to Grace's attempts to mislead

---

[40] Oral Deposition of Kenneth Young Millian taken March 1, 1992, in *Dayton Independent School District, et al. v. U. S. Mineral Products Co., et al.,* No. B-87-00507-CA (E.D. Tex); *see* Exhibit 22, "Testimony of Hugh L. Carey, Executive Vice President, W.R. Grace & Co., On Behalf Of The Safe Buildings Alliance On The Public Policy Issue Of How To Deal With Asbestos In Buildings, Before The Subcommittee On Hazardous Waste And Toxic Substances, United States Senate, September 27, 1988," Grace document KM006137.

[41] *Ibid.,* Payment Deposition, pp. 74-75.

[42] *Ibid.,* p. 81.

building owners to neither remove their ACM, nor to seek legal damages from Grace for their damages. Grace should not now be allowed to avoid liability by claiming that building owners failed to timely file suit where it has intentionally for years sought to prevent claimants from pursuing causes of action based on such representations.

## H.   Jury Verdicts and Settlements by Grace in the Underlying Litigation Have Established the Prima Facie Validity of PD Claims

For almost twenty-five years property damage claimants have recovered their damages against Grace through litigation in various state and federal courts. Not only have such courts consistently found Grace to be liable under principles of state law, Grace's conduct in connection with its sale of Surface Treatment ACM has been found to constitute gross negligence entitling the claimant to punitive damages. In *City of Greenville v. W. R. Grace & Co.*, the City was awarded millions of dollars in compensatory and punitive damages related to Mono-Kote fireproofing in the Greenville, South Carolina City Hall, which had to be removed because of the hazard posed.[43]

The numerous underlying cases which have held Grace liable for their Mono-Kote and/or ZAP ACM are reported and are part of the record in this case. As a matter of record, Grace has paid several hundred million dollars in settlement of claims of various governmental entity claimants similar in all pertinent aspects of knowledge, bulk sample constituents and expert findings to the claimants represented by Dies & Hile in this Bankruptcy case.[44]

---

[43] *See City of Greenville v. W. R. Grace & Co.*, 640 F. Supp. 559, *aff'd*, 827 F.2d 975 (4th Cir. 1987). *See also The Corporation of Mercer University v. National Gypsum Co., et al.*, No. 85-126-3-MAC (M.D. Ga. 1986) (reversed on a Certified Question to the Georgia Supreme Court by the Eleventh Cir. on grounds involving the applicability of the Georgia statute of repose).

[44] *See Dayton Independent School District, et al. v. W.R. Grace & Co., et al.*, Civil No. B-81-277-CA consolidated with Civil No. B-81-293-CA; *Dayton Independent School District, et al. v. U. S. Mineral Products Co., et al.*, No. B-87-00507-CA (E.D. Tex.); *Kirbyville Independent School District, et al., Individually, and on Behalf of All Texas Political Entities v. Asbestospray Corporation, W. R. Grace & Co.-Conn., and United States Gypsum*, No. 1:94CV412 (E.D. Tex.); *The State of Utah, et al. v. W. R. Grace & Co.-Conn., et al.*, No. 940906356, In the Third Judicial District Court, Salt Lake County, State of Utah; *State of Hawaii v W. R. Grace & Co.-Conn., et al.*,

Thus, Grace's liability for asbestos PD cases is well-established. More importantly, the validity of PD claims such as those represented by Dies & Hile, and which are pending in this Bankruptcy, has been overwhelmingly established under applicable state law. This is particularly true for claims by governmental entities that are protected from the application or running of applicable statutes of limitations and repose, such as the "Dies & Hile Claimants." As history will show, Grace cannot point to any asbestos PD claims in the history of the litigation that are consistently any better documented and prepared than are the claims filed by the Dies & Hile Claimants. And, Grace has said as much repeatedly in this Bankruptcy.

## I.    Claimant's Causes of Action

Claimant seeks to recover the costs that it has incurred or will be forced to incur in maintaining, removing and replacing the Debtors' Surface Treatment ACM from its building(s). It asserts state law causes of action, including breach of express and implied warranty, civil conspiracy, fraudulent concealment and misrepresentations, negligence, nuisance and strict liability/products liability. These causes of action not only arise out of acts and omissions that took place before and at the time of the sale and installation of Grace's Surface Treatment ACM, but also acts and omissions that occurred after the sale and installation of such products.[45]

## J.    Preservation of Discovery Rights

Claimant has discussed only a small fraction of the evidence that would and will be further explored through discovery in connection with Debtors' objections. Claimant preserves

---

Civil No. 93-4161-10, In the Circuit Court of the First Circuit, State of Hawaii.

[45] In regard to Claimant's allegations of continuing duty to warn, Claimant alleges that even after the Debtors' Surface Treatment ACM was installed in Claimant's buildings, Grace learned of additional information concerning the hazards of its Surface Treatment ACM, and yet failed to warn Claimant, other building owners, and the public in general of such hazards. Faced with this new and additional information, Grace not only failed to warn Claimant of such, it also embarked on a "public relations" campaign whereby it affirmatively misrepresented to Claimant, other building owners and the public in general that its Surface Treatment ACM was safe for continued use in buildings and that they posed no hazard to building occupants, and that no further corrective actions were necessary.

and does not hereby waive its rights to obtain further discovery from Debtors once Debtors clarify the basis of said objections, most of which are simply contentions with no supporting facts or foundation whatsoever.

## V.   CLAIMANT'S RESPONSES TO DEBTORS' OBJECTIONS

Debtors have alleged numerous objections to Claimant's claim, including, but not limited to, a) the PD Claim provides insufficient information, b) the PD claim is brought too late, and c) the PD Claim provides no proof of hazard. Claimant's response to each such objection follows:

## A.   Claimant Whose Claim Has Been Previously Adjudicated (Grace Ex. B-1)

The Debtors object to Claimant's claim on the ground that such claim has already been adjudicated and therefore should be disallowed ("Debtors' B-1 Objection"). For the reasons set forth below, Debtors' objection should be denied.

Debtors do not provide any information or evidence regarding the alleged adjudication of Claimant's claim or the claims of members of the putative class. Rather, it states in Exhibit B-1 that "Claim # 12700 – County of Orange: "Claim previously adjudicated. 6/20/01 (Summary Judgment Prince George Center Bldg)." Claimant was not a member of the *Prince George* Class and is not aware of any member of the putative class having been a member of such class. Debtors do not provide any other information in support of this objection. Debtors state that "because of the size of this Fifteenth Omnibus Objection, the Debtors are not attaching as Exhibits the backup documentation confirming prior adjudication" of this claim, but "will be made provided if this Court or the claimant so requests." *See* Debtors' Fifteenth Omnibus Objection, ¶ 45, p. 20. Claimant has requested this information and is entitled to review and conduct discovery regarding the same before this objection is considered. As such, Claimant cannot fully respond to this objection and reserves its right to supplement or amend its response to the extent further information is produced.

Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claim, *see In re Allegheny*, 954 F.2d 167, 173 (3d Cir. 1992), and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

## B.    Alleged Previously Settled Claims (Grace Ex. B-2)

The Debtors also object to Claimant's claim on the grounds that the claims "have already been settled and satisfied by the Debtors pursuant to prior settlement agreements ..." and therefore, should be disallowed (the "B-2 Objection").   For the reasons set forth below, Debtors' objection should be denied.

Debtors do not provide any evidence regarding the alleged settlement and satisfaction of Claimant's claim.  In Exhibit B-2, Debtors state:  "Claim previously settled: *In re: School Asbestos Litigation*, U.S. District Court, Eastern District of PA., No. 83-0268 ('National School Class Action')  Settlement Date: 8/5/1994.  Grace Payment:  No. 99901116, Dated 8/9/94; No. 999251, Dated 1/31/2000; No. 9990200, Dated 8/15/1996; No. 9990046, Dated 1/15/93." Claimant is not a school district and therefore, is not a member of the *National School Asbestos Class* Action.   Debtors do not provide any other information in support of this objection. Instead, Debtors state that "because of the size of this Fifteenth Omnibus Objection, the Debtors are not attaching as Exhibits the backup documentation confirming prior adjudication" of this claim, but "will be made provided if this Court or the claimant so requests."  *See* Debtors' Fifteenth Omnibus Objection, ¶ 45, p. 20. The Claimant has made such a request and is entitled to review and conduct discovery regarding the same before this objection is considered. As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further information is produced.

Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claim, *see In re Allegheny*, 954 F.2d 167, 173 (3d Cir. 1992), and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

### C.    Missing Basic Information About the Claimant's Knowledge (Grace Ex. C-1(d))

The Debtors object to Claimant's claim on the grounds that the "PD Claim Form fails to provide information relating to the Claimant's knowledge ..." (the "C-1(d) Objection"). Debtors allege that the Proof of Claim "does not disclose one or more of the following: (1) information regarding prior asbestos-related property damage lawsuits or claims for the property; (2) the date that the product at issue was installed at the property; (3) the date that the claimant learned that the product at issue contained asbestos; or (4) the date the claimant learned of the presence of asbestos on the property." For the reasons set forth in Section III as well as those below, Debtors' objection should be denied.

Debtors do not provide clear information regarding what information Debtors believe is missing from the Claimant's claim regarding "knowledge" of these matters. In fact, Claimant is left to guess as to which of these four categories of information Debtors contend was not supplied by Claimant with respect to this claim. Accordingly, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further clarification is provided to Debtors. Clearly, Debtors have failed to provide "sufficient detail as to why the claim should be disallowed ...," Del. Bankr. LR 3007-1(e)(iii)(I), which makes it difficult, if not impossible, for Claimant to understand what documentation Debtors believe is missing from Claimant's claim.

Debtors assert that Claimant has failed to provide information relating to Claimant's knowledge and that without this information it cannot adequately assess the applicability of

limitations. As discussed in Section IV.E below, limitations do not run against The County of Orange as it is a political subdivision of the State of Texas. As such, when the County learned of the presence of asbestos is irrelevant to any issue in this Bankruptcy. In regard to members of the putative class, Debtors assert that this is irrelevant because all building owners knew or should have known of these hazards by 1983.    Whether limitations have run on the putative class members' claims is a common issue which will be addressed in the class context.

**D.    Claims for Buildings Allegedly Built Too Late to Contain Grace ACM (Grace Ex. D 1(b))**

The Debtors object to Claimant's claim on the grounds that the acoustical plaster was installed in Claimant's building after 1969, stating that "with rare exception … Grace stopped selling acoustical plaster containing asbestos by 1969 …" (the "D-1(b) Objection"). For the reasons set forth below, Debtors' objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection to the Claimant's claim. As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its responses to the extent further information is produced. Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claims, *see In re Allegheny*, *supra,* and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

This objection is substantively without basis as Claimant has attached a list of buildings that contains Grace Mono-Kote fireproofing. This list was prepared by representatives for Grace and identifies buildings in Texas in which Grace's ACSTM was installed. *See also* discussion, Section III.E, regarding Grace's sale of ZAP after 1969.

**E.    Claims Allegedly Barred by the Statute of Limitations Based Upon Constructive Notice (Grace Ex. D-2)**

The Debtors object to Claimant's claims asserting that such are barred "under the applicable statutes of limitations, based upon the doctrine of constructive notice ..." (the "D-2 Objection."). For the reasons set forth below, Debtors' objection should be denied.

Debtors have failed to identify the specific statutes of limitations or decisional rulings that they allege bar this claim. As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further information is produced. Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claim, *see In re Allegheny*, *supra*, and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

The statutes of limitations do not bar the claims of The County of Orange, Texas, as limitations do not apply to the State of Texas and its political subdivisions, such as Claimant and the other public entity putative class members. *See* TEX. CIV. PRAC. & REM. CODE § 16.061. ("A right of action of this state or a political subdivision of the state, including a county, an incorporated city or town ... is not barred ..."). (Emphasis added). *See also City of Port Arthur v. Tillman*, 398 S.W.2d 750 (Tex. 1965) ("... limitations do not run against an incorporated city ..."). Grace has repeatedly recognized the validity of claims similar to those asserted herein. *See* Section III.H, above. In effect, Debtors have merely alleged an invalid defense to the claim of the Claimant and have certainly not provided any support for this defense.

Debtors contend that they need information regarding when proposed class members first discovered that asbestos-containing products were installed in their buildings or when they learned that Grace was the manufacturer of the ACSTM. This information is not necessary to determine whether class certification is appropriate. In fact, discovery directed to potential

members of the class is not, as a general rule, allowed prior to class certification. *See In re Folding Carton Antitrust Litigation*, 83 F.R.D. 260 (N.D. Ill.1979) ("Named plaintiffs are always parties subject to discovery, while absent class members are not subject to discovery except under special circumstances."). Absent special circumstances justifying precertification discovery, such should not be allowed. The better course would be to bifurcate the discovery - allowing discovery of the named plaintiff regarding class issues and after the Court rules on certification, allowing discovery regarding individual class claims. For purposes of class certification, Debtors have sufficient information to respond to the class certification issues. If the Court grants class certification, then discovery regarding the claims of the class members, including constructive notice, limitations and laches can take place.

In further response to Debtors' D-2 Objection, Claimant hereby incorporates by reference as if fully contained herein the Response and Memorandum of Law of the Official Committee of Asbestos Property Damage Claimants in Opposition to Debtors' Brief in Support of an Estimation Hearing on Constructive Notice in Property Damage Claims (the "PDC Constructive Notice Brief"; Document No. 10940).

Finally, Debtors' own pleading and representations to Claimant and the Court are totally at odds with its D-2 Objection. Time and time again, Debtors have argued that its asbestos-containing materials are not hazardous and do not cause property damage. *See* Fifteenth Omnibus Objection, ¶¶ 119-120, p. 39; *see also* Hearing Transcript July 19, 2005, pp. 33-34. The Debtors' contention that building owners should have known of the hazards of its asbestos-containing building products is inconsistent with their prior claim that their ACM is not harmful in the first place. The Eight Circuit Court of Appeals recognized this inconsistency in reversing a statute of limitations verdict for Grace, stating:

Grace argued at trial not only that the statute of limitations had run, but also that the plaintiff had suffered no injury from the asbestos Monokote. The arguments are inconsistent: if MDU has suffered no injury from the Monokote, then it has no cause of action – until an injury is suffered, the statute of limitations cannot begin to run.

*MDU Resources Group v. W. R. Grace & Co.*, 14 F.3d 1274 (8th Cir. 1994).   To put it another way, if, as Debtors claim, their asbestos-containing products pose no hazard, limitations would not have begun to run regarding such claim, let alone expire.

**F.     Claims Allegedly Barred by the Statute of Limitations Pursuant to Actual Notice (Grace Ex. D-4)**

The Debtors object to Claimant's claim "because they are barred by the statute of limitations based upon claimants' actual knowledge of their claims ..." (the "D-4 Objection"). For the reasons set forth below, Debtors' objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection to Claimant's claim.  They have also failed to identify the specific statutes of limitations or decisional rulings that they allege bar these claims. As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further information is produced.  Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claim, *see In re Allegheny*, *supra*, and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

Limitations are an affirmative defense, and the burden of proving limitations is on the party asserting the defense. *See Morriss v. Enron Oil & Gas Co.*, 948 S.W.2d 858, 868 (Tex. App. - San Antonio 1997, no writ). ("The defendant must, therefore, demonstrate when a cause of action accrued to establish that a statute of limitations is applicable as a bar to a plaintiff's case."). "Where, as here, the plaintiff pleads the discovery rule as an exception to limitations, the

defendant has the burden of negating that exception as well." *Velsicol Chem. Corp. Winograd*, 956 S.W. 2d 529, 530 (Tex. 1997). The courts throughout this country have consistently ruled that the mere presence of asbestos-containing products does not trigger the running of limitations. *MDU Resources v. W.R. Grace*, 14 F.3d 1276 (8th Cir. 1994) (injury is the contamination of building, rejecting argument that knowledge of the mere presence of asbestos triggers the statute of limitations); *Bellsouth Telecomm., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 605 (2nd Cir. 1996) (Under Connecticut law, claim for asbestos abatement accrues when "a plaintiff discovers or should discover, actionable harm caused by an asbestos-containing product. Actual harm, in the context of an abatement claim, occurs when the plaintiff has knowledge, or should have knowledge, of (i) actual contamination and (ii) the causal connection between the defendant's product and the contamination."); *Adams-Arapahoe Sch. Dist. v. GAF Corp.*, 959 F.2d 868, 872 (10th Cir. 1992) ("[o]nly asbestos contamination constitutes a physical injury compensable under tort law."); *THS Northstar v. W. R. Grace & Co.*, 66 F.3d 173 (8th Cir. 1995) ("the distinction between the mere presence of asbestos-containing materials in a building and actual release and contamination is critical" because "no cause of action exists until there has been a substantial release"); *San Francisco Unified School Dist. v. W. R. Grace & Co.*, 37 Cal. App. 4[th] 1318, 44 Cal. Rptr. 2d 305 (Cal. App. 1 Dist. 1995) ("…the mere presence of asbestos constitutes only a threat of future harm. Contamination by friable asbestos is the physical injury and the actual, appreciable harm that must exist before a property owner's strict liability or tort cause of action against the asbestos manufacturer accrues and the limitations period commences."). Texas courts have not addressed the specific issue of when limitations would accrue in the context of asbestos property damage cases. They do, however, require that there be a "legal injury" for limitations to be triggered. "Under the 'legal injury' rule, a cause of action

sounding in tort generally accrues when the tort is completed, that is, the act committed and damaged suffered … This is the date of legal injury and the statue of limitations begins to run at that time." *Waxler v. Household Credit Services, Inc.*, 106 S.W. 3d 277 (Tex. App. – Dallas, 2003, no writ). *See also S.V. v. R.V.,* 933 S.W.2d 1, 4 (Tex. 1996) (Generally, a cause of action accrues, and the limitations period begins running, when a wrongful act causes some legal injury.…"). Claimant further adopts by reference, Section IV.B, pp. 26-27, and the discussion contained therein regarding representations made by Grace regarding its Surface Treatment ACM.

**G.    Claims Allegedly Barred by Laches (Grace Ex. D-6)**

The Debtors object to Claimant's claim because Claimants "have delayed in asserting their claims against Grace, often for decades …" (the "D-6 Objection"). For the reasons set forth below, Debtors' objection should be denied.

Debtors do no provide any information or evidence regarding the basis for this objection to the Claimant's claim other than their statement that

> Given that Grace has not sold asbestos-containing construction products for more than 30 years, and the courts have recognized that property owners have been on constructive notice for more than 20 years, it is difficult to see how Grace has not been prejudiced by the claimants' delay. Among other things, witnesses are no longer available; building ownership has changed hands; building-specific documentary evidence is more difficult, if not impossible to find; and no doubt improvements and changes have often been made to the buildings at hand, including demolition.

Fifteenth Omnibus Objection, ¶ 116, p. 38. Of course these conclusory statements without specific information, is of little value. As such, Claimant cannot fully respond to this objection, and therefore reserves its right to supplement or amend its response to the extent further information is produced. Moreover, Debtors have failed to offer any evidence to rebut the prima

facie validity of Claimant's claims, *see In re Allegheny*, *supra*, and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

Laches does not bar Claimant's claim as this equitable doctrine only applies when Claimant brings a suit in equity or asserts equitable claims. "[L]aches is usually available only in suits in equity or in actions at law that involve claims of an essentially equitable character." *See Brewer v. NationsBank of Texas, NA.*, 28 S.W.3d 801, 804 (Tex. App. - Corpus Christi 2000, no writ). The defense of laches is not applicable to the claim asserted by Claimant, individually, or claims asserted by members of the class since they only seek monetary damages.

Notwithstanding the above, "laches is an equitable remedy that prevents a plaintiff from asserting a claim due to a lapse of time." *Id.* To prevail on such a defense, a party must show (1) there was an unreasonable delay by the other party in asserting legal or equitable rights, and (2) the party asserting laches made a good faith change in position to his detriment because of the delay. *Id. See also A.C. Aukerman Co. v. R.L. Chaides Construction Co.,* 960 F.2d 1020, 1028-29 (Fed. Cir. 1992) (en banc); *Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 153 (5th Cir. 1985). Since laches is an affirmative defense, Debtors bear the burden of proof regarding this issue. *Advanced Cardiovascular Systems, Inc. v. SciMed Life Systems, Inc.,* 988 F.2d 1157, 1161 (Fed. Cir. 1993).

First, there is no evidence to suggest that Claimant or members of the class have unreasonably delayed in pursuing their claim. Debtors are correct that the Grace ACM was installed in the class members' buildings more than thirty years ago. This, they argue, proves that they unreasonably delayed in bringing their claims. Mere delay in itself is not sufficient to establish laches. Of course, the Debtors fail to apprise the Court that their effort to conceal the hazards of these asbestos-containing building products was a primary cause for the delay. For

years Grace did not even disclose that its products contained asbestos.  When pressed by building owners regarding any hazards associated with their products, Grace instructed its sales force to tell building owners that there was very little asbestos in the products and that asbestos fibers would not be released during normal and foreseeable activities.  This argument is absurd in light of Debtors' concerted effort to conceal the hazards associated with their asbestos-containing products, which continues today.  *See* Section III.G, above.  As Debtors note in their objection, "Laches is unreasonable delay in enforcing a *known right* ...."  (Emphasis added) (Fifteenth Omnibus Objection ¶ 115, p. 38).  Even today, Debtors promulgate their position that their asbestos-containing products have not damaged the buildings at issue.  Given this position of Debtors, it is ludicrous for Debtors to likewise contend that Claimant "unreasonably delayed" pursuing its claim.

Second, Debtors have not shown that they will be materially prejudiced by Claimant's failure to file its asbestos property damage claim earlier.  See *Aukerman* (the second laches factor is material prejudice attributable to the delay in bringing suit).  "Delay coupled with disadvantage to another are essential elements of laches."  *Conan Properties, Inc.,* 752 F.2d at 153.  Debtors allege that witnesses are no longer available; documentary evidence is impossible to find, and changes have been made to the buildings.  These allegations are of no moment.  In fact, as discussed earlier, Debtors' own acts and conduct caused the problems identified in their response.   If anyone has been prejudiced, it is Claimant and members of the class.  Laches, being an equitable doctrine, requires "... good faith change in position to his detrimental...." *Brewer,* 28 S.W.3d at 804.  The position of Debtors has not changed, much less detrimentally so, due to the action or inaction of Claimant. Claimant must still prove that the product in its

buildings were manufactured by Grace and that it is liable for the costs already expended or that will be expended in the future in managing and removing such.

Finally, as discussed earlier, laches is an equitable doctrine. In the application of the doctrine of laches, each case depends on its particular circumstances. Debtors must ultimately show that it would be inequitable or unjust for Claimant to seek relief now. Debtors' actions and conduct during the past thirty years require that the Court deny this objection as it would be inequitable and unjust to allow Debtors to benefit from its own wrongful conduct and bar Claimant's claim based on this equitable defense.

**H.    Claims Allegedly Providing No Measurement of Relevant Asbestos Levels (Grace Ex. E-1)**

The Debtors object to Claimant's claims "because they are not accompanied by any documentation reflecting airborne asbestos levels inside the building ... is dangerous ..." (the "E-1 Objection"). For the reasons set forth below, Debtors' E-1 Objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection to the Claimant's claims. As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further information is produced. Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claims, *see In re Allegheny, supra*, and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

The Debtors' argument is premised on the assumption that a certain level of airborne asbestos must be present as measured by air sampling for there to be a hazard that justifies removal of the ACM. This assertion is not new. It is precisely the same argument previously made by the Debtors and other manufacturers of asbestos-containing building products in *Safe*

*Bldgs. Alliance v. E.P.A.*, 846 F.2d 79 (D.C. Cir. 1988).[46]  In that case, the "Safe Buildings

Alliance" and manufacturers of ACM argued that EPA regulations promulgated pursuant to the

Asbestos Hazards Emergency Response Act, 15 U.S.C.A. §§ 2641-2654, must be set aside

because the EPA failed to determine what levels of asbestos exposure were safe, or to require the

use of air monitoring as the sole or primary assessment method to determine the need for

corrective action.  The United States Court of Appeals for the District of Columbia found this

argument to be meritless.

In *Safe Bldgs. Alliance*, the D.C. Court of Appeals rejected the contention Debtors now

make, stating:

> *Congress nowhere said that EPA need rely exclusively or even mainly on air
> monitoring techniques* (emphasis added) in selecting response actions, or that it
> need establish a quantitative measure that it deems safe.  Indeed, the legislative
> history affirmatively suggests an intent not to impose such requirements ... .
> Indeed, the petitioners' insistence that EPA construct a quantitative model before
> it do anything else offends common sense as well as congressional intent, for the
> *potential* hazards posed by presently undamaged ACM obviously could not be
> quantified or measured by air monitoring techniques (emphasis in original).[47]

Instead, the Court approved the approach adopted by EPA which relies on visual and physical

evaluation of the condition of the ACM, the location and accessibility of the ACM and the

potential for disturbance of the ACM, determined by inspectors accredited in conformity with

EPA regulations, as the primary assessment tool or monitoring technique.[48]

It is interesting to note that Debtors cite no case in support of this novel approach.  The

reason for this is quite simple:  No court has ever adopted such a proposal.  In fact, courts in the

underlying tort litigation have consistently rejected Grace's contention.  Further, discovery in the

---

[46] Grace was a charter member of the "Safe Building Alliance," an industry lobby group which was formed
to advance the manufacturers' position that it was unnecessary to abate or remove ACM in buildings.
   [47] *Id.* at 83.
   [48] *Id.* at 82.

underlying litigation has firmly established Grace's liability to Claimant. *See* Sections ___.A, C,

D, and F above.

> The use of air sampling to determine hazard has consistently been rejected by the EPA:

> EPA continues to discourage the use of air monitoring as the primary technique for assessing asbestos hazards, since that method only measures current conditions and provides no information about potential and future levels of fiber release ... the agency believes that such standards used for the purposes of assessing asbestos hazards could not ensure protection of human Health and the Environment as intended by USCA Title 11.[49]

> Any attempt to determine hazard via static area air sampling is doomed from the

outset. This is true because such air sampling only provides a snapshot of the levels of

asbestos fibers in the building environment during a particular time period and under the

circumstances which then exist. Such static area air sampling, which is the only type of

sampling performed by Debtors' consultants, does not present a representative picture of

exposures that exists under routine and foreseeable building conditions.[50] As previously

discussed, the EPA has rejected adopting an air sampling approach to determining

hazard, concluding that a comprehensive building inspection can provide better results.[51]

## VI.    CLAIMANT'S AFFIRMATIVE DEFENSES

Debtors assert that the Claimant's claims are time-barred by applicable statutes of

limitations and/or the common law doctrine of laches. Even if these defenses were available to

Debtors, these defenses do not bar the claim of Claimant or class members' claims, as the

doctrines of equitable estoppel and equitable tolling are applicable.

---

[49] 52 Fed. Reg. 210, 41838 (EPA, October 30, 1987).

[50] Numerous studies simulating actual maintenance and/or custodial activities which utilize personnel air samples taken at the breathing zone of such workers, have shown much higher levels of airborne fibers. Such studies will be the subject of evidence presented by the PD Committee's expert witnesses in the Phase I trial.

[51] Claimant hereby adopts by reference as if fully set forth herein Sections III, IV and V of the Memorandum of Law of the Official Committee of Asbestos Property Damage Claimants in Opposition to Consideration of the Debtors' Proposed "Methodology Issue" as Part of the Estimation of Asbestos Property Damage Claims filed October 17, 2005 (the "PDC Methodology Brief"; Document No. 9671), which discusses in more detail the fact that air sampling results are not dispositive of the claims of Claimant.

Equitable tolling and equitable estoppel are "based primarily on the view that a defendant should not be permitted to escape liability by engaging in misconduct that prevents the plaintiff from filing his or her claim on time." *In re: Enron*, 310 F.Supp.2d 819 (S.D. 2004). The primary difference in these doctrines is that equitable estoppel focuses its attention on the defendant's conduct while equitable tolling focuses on the claimant's excusable neglect.

## A.    Equitable Estoppel

The doctrine of equitable estoppel includes a number of interrelated defenses including equitable estoppel, quasi-equitable estoppel, judicial estoppel and fraudulent concealment. The equitable estoppel doctrine is founded upon principles of fair dealing and is intended to subserve the ends of justice. *See Smith v. Chipley*, 24 S.W. 2d 87 (Tex. App. – Amarillo 1928, no writ) (Equitable estoppel is founded upon the principles of morality and fair dealing, and estoppel is intended to subserve the ends of justice.). This doctrine precludes a party with knowledge of the facts from taking a position inconsistent with his or her former position to the disadvantage or injury of another.

Debtors intentionally misrepresented to Claimant and other building owners that Grace ACM posed no hazard during normal and foreseeable building operations. These representations were not only made by Debtors, but also by third party groups financed by Debtors such as the Safe Buildings Alliance, and other trade groups. Grace knew that such representations were false, yet made them so that building owners would not file or pursue claims against them and/or seek to remove its ACM from their buildings.[52] As a result of these misrepresentations, Claimant took no action until the filing of the instant proceedings.

---

[52] *See* discussion regarding Grace's efforts to conceal hazards associated with its asbestos-containing building products, Section III.G, above.

39

The defense of equitable estoppel precludes Debtors from asserting limitations as a defense to Claimant's claim. The elements of equitable estoppel are: 1) a false representation or concealment of material facts made with the intent that another party act on the false representation or silence, 2) the false representation or concealment of material facts was made by a party with knowledge of the facts, 3) the party to whom the representation was made or from whom facts were concealed was without knowledge or the means of knowledge of the real facts, and 4) detrimental reliance. *See Gulbenkian v. Penn*, 151 Tex. 412, 252 S.W.2d 929, 932 (Tex. 1952). The evidence establishes that Grace's acts, representations and admissions in this case should preclude it from relying upon limitations as a defense.

The doctrine of quasi estoppel also precludes Debtors from relying on limitations as a defense in this matter. Unlike equitable estoppel, quasi estoppel requires no showing of a false representation or detrimental reliance. *See Stimpson v. Plano Indep. School Dist.*, 743 S.W.2d 944, 946 (Tex. App.- Dallas 1987, writ denied). "[T]he principle precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by him. The doctrine applies where it would be unconscionable to allow a person to maintain a position inconsistent with one in which he acquiesced, or of which he accepted a benefit." 31 C.J.S. Estoppel § 107 (1996).

Moreover, the doctrine of judicial estoppel is applicable and precludes Debtors from relying on limitations as a bar to Claimant's claim. "Judicial estoppel is a common law principle that precludes a party from asserting a position in a legal proceeding inconsistent with a position taken by that party in the same or prior litigation." *See Cleaver v. Cleaver,* 140 S.W. 3d 771 (Tex. App. - Tyler 2004). In federal law, the inconsistency sought to be estopped need not arise from a sworn statement.

Finally, the courts in Texas recognize fraudulent concealment as an equitable defense tolling limitations until the fraud is discovered. *See Prieto v. John Hancock Mutual Life Insurance Co. et al.*, 132 F.Supp.2d 506, 515-18 (N.D. Tex. 2001) ("Unlike the discovery rule exception, deferral in the context of fraud or concealment resembles equitable estoppel."). Under Texas law, the necessary elements for a showing of fraudulent concealment to toll a statute of limitations are 1) actual knowledge by a defendant that a wrong has occurred, and 2) a fixed purpose to conceal the facts necessary for plaintiffs to know that it has a cause of action. *See Mellon Service Co. v. Touche Ross & Co.*, 17 S.W. 3d 432, 436 (Tex. App. - Houston [1ˢᵗ Dist.] 2000, no pet.). *See also Advent Trust Co. v. Hyder,* 12 S.W. 3d 534, 541 (Tex. App. - San Antonio 1999, pet. denied.).

Debtors no doubt will argue that "fraudulent concealment" does not apply because it had no duty to disclose facts regarding their ACM. As the district court explained in *Prieto*, "The element of 'duty to disclose the wrong' in *Mellon Service Co.* and *Li* is not an absolute requirement; it is a supplemental requirement applicable to 'a party relying on passive fraud [rather than active misrepresentation] to sustain a fraudulent concealment defense.'" *Id.* Debtors are guilty on both counts. Not only did they conceal the health hazards regarding their products, they affirmatively sought to mislead building owners regarding these hazards.[53]

The Debtors' actions and conduct both before and during these proceedings support the application of these equitable doctrines. Time and time again, Debtors have represented to Claimant and the Court, in both their pleadings and in oral argument, that their asbestos-containing products pose no hazard to building owners unless certain levels of airborne

---

[53] Texas Courts have long recognized that once a party undertakes to speak, that it is not permitted to misrepresent the truth. *See International Sec. Life Ins. Co. v. Finck*, 475 S.W.2d 363, 370 (Tex. App. - Amarillo 1971), *rev'd in part on other grounds*, 496 S.W. 2d 544 (Tex. 1973) (holding that a speaker who makes a partial disclosure assumes a duty to tell whole truth, even when the speaker was under no duty to make disclosure in the first place).

asbestos are exceeded.  Yet, in the same breath, they assert that Claimant's claim is time-barred. Grace cannot have it both ways.  On one hand asserting no hazard, and then on the other hand asserting that the Claimant's claim is time-barred.

The Debtors' conduct is exactly what these equitable doctrines are designed to prevent – allowing a party from asserting its rights under a general technical rule of law when it has so conducted itself that it would be contrary to equity and good conscience to do so.

## B.    Equitable Tolling – Discovery Rule

Most if not all states have adopted in one form or fashion equitable tolling.  This doctrine, as typically applied, defers the accrual of the statute of limitations until the discovery of the existence of a cause of action. Texas courts first recognized the "discovery rule" in *Gaddis v. Smith,* 417 S.W. 2d 577, 578 (Tex. 1967).

The courts in Texas, like a number of other jurisdictions, have held that "a cause of action accrues when a wrongful act causes some *legal injury*, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred."  *See S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996).  The primary exception to this rule is the discovery rule, which defers accrual of the cause of action until the plaintiff knew or, in the exercise of reasonable diligence, should have known of the wrongful act and resulting injury. *Id.* at 4.

For the discovery rule to apply, the nature of the injury incurred by Claimant must be inherently undiscoverable and the evidence of injury must be objectively verifiable. *See Computer Associates International Inc. v. Altai, Inc.*, 918 S.W. 2d 453 (Tex. 1996).  Both of these elements are present.

This Court has ruled that the issue of constructive notice will be addressed as a motion for summary judgment.  Thus, in regard to both constructive and actual notice defenses, Debtors must *negate* the rule by proving when the plaintiff actually discovered or should have discovered

the nature of the injury. *Burns v. Thomas*, 786 S.W.2d 266, 267 (Tex. 1990). Debtors have failed to meet their burden as to either of these defenses. Limitations have not run on the Claimant's claim as the discovery rule exception defers accrual of the cause of action until the Claimant knew or, exercising reasonable diligence, should have known of the facts giving rise to its cause of action.

## VII.    DEBTORS ARE NOT ENTITLED TO ASSERT ADDITIONAL OBJECTIONS TO CLAIMANT'S AND THE CLASS MEMBERS CLAIMS

Claimant objects to Debtors' request that 1) it not be required to comply with Del. Bankr. LR 3007-1, which requires all "substantive objections" to a particular proof of claim be asserted in a single omnibus objection and that any substantive objection not so asserted is waived; and 2) they have the opportunity to make further objection if and when it is determined that information provided by Claimant is untrue and inaccurate. *Id.* at ¶¶ 217-19, pp. 64-65. Both requests should be denied. First, the Court has previously accepted Debtors' proposal regarding information to be included in the claim form. Claimants provided this information over two years ago. Debtors have had more than sufficient time to review this information and formulate their objections to Claimant's claim. Moreover, Claimant's responses are truthful and accurate and as such, there is no reason to allow Debtors to make further objections.

## VIII.   CLAIMANT'S RIGHT TO FILE SUPPLEMENTAL RESPONSE TO OBJECTIONS

Debtors have failed to comply with Del. Bankr. LR 3007-1(e)(iii)(I) by providing sufficient detail regarding objections to Claimant's claim. This has prevented Claimant from being able to fully and completely respond to such objections. Claimant reserves the right to supplement its responses should Debtors provide additional information, including, but not limited to, 1) backup documentation regarding bulk samples; 2) alleged prior adjudication of

claims; and 3) the specific statutes of limitations, or the decisional law that supports Debtors' argument that Claimant's claims are barred.

## IX.    CONCLUSION

For the reasons set forth hereinabove Claimants request that:

1.    Debtors objections be denied;

2.    Debtors be required to set forth the specific basis for each objection rather than asserting objections in the alternative; and

3.    Claimant, individually, and on behalf of the class, be allowed to conduct discovery regarding all objections before any such objections are sustained.

Date:  December 8, 2005

Respectfully submitted,

Christopher D. Loizides (Bar No. 3968)
Michael J. Joyce (No. 4563)
LOIZIDES & ASSOCIATES
1225 King Street, Suite 800
Wilmington, DE  19801
Telephone:      (302) 654-0248
Facsimile:      (302) 654-0728
Email:          loizides@loizides.com

-- and --

Martin W. Dies
DIES & HILE
1009 Green Avenue
Orange, TX  77630
Telephone:      (409) 883-4394
Facsimile:      (409) 883-8414

Special Counsel, The County of Orange, Texas

*Co-Counsel for the Claimant and
Members of the Class*