IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:

W. R. GRACE & CO., et al.,

Debtors.

Chapter 11
Case No. 01-01139 (JKF)
(Jointly Administered)
**Response Deadline: December 8, 2005**
**Hearing Date: TBD**
**Re: Docket No. 9315**

| PD CLAIM # | ENTITY / BUILDING |
|---|---|
| 6067 | MARICOPA COUNTY, ARIZONA - Arizona Courts - East Courts Building, 101 W. Jefferson St., Phoenix, AZ 85003 |
| 6068 | MARICOPA COUNTY, ARIZONA - Board of Supervisors Auditorium, 205 W. Jefferson St., Phoenix, AZ 85003 |
| 6069 | MARICOPA COUNTY, ARIZONA -Hospital Power Plant Building, 2601 E. Roosevelt, Phoenix, AZ 85008 |
| 6070 | MARICOPA COUNTY, ARIZONA – Public Health Administration Bldg., 1845 E. Roosevelt, Phoenix, AZ 85006 |
| 6071 | MARICOPA COUNTY, ARIZONA - Health Clinic Building, 1825 E. Roosevelt, Phoenix, AZ 85006 |
| 6072 | MARICOPA COUNTY, ARIZONA -Juvenile Court Center, 3125 W. Durango, Phoenix, AZ 85003 |
| 6073 | MARICOPA COUNTY, ARIZONA - Arizona Courts - West Courts Building, 111 S. 3rd Ave., Phoenix, AZ 85003 |
| 6074 | MARICOPA COUNTY, ARIZONA - Courts Complex - Sheriff Offices Administration, 120 S. 1st Ave., Phoenix, AZ 85003 |

**RESPONSE OF
MARICOPA COUNTY, ARIZONA TO DEBTORS' FIFTEENTH OMNIBUS
OBJECTION (SUBSTANTIVE) TO ASBESTOS PROPERTY DAMAGE CLAIMS**

Comes now MARICOPA COUNTY, ARIZONA ("Claimant")[1] and files this response to

Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims

("Fifteenth Omnibus Objection") and would show as follows:

I.    **CLAIMANTS' RESPONSES TO DEBTORS' OBJECTIONS TO PROOFS OF CLAIM**

In April 2002, the Bankruptcy Court, after protracted debate and hearings, ordered

Property Damage Claimants to file a Proof of Claim for each building at issue. This Order and

the claim form approved by the Court required specific information to be provided regarding

each building, including, but not limited to, the date of construction, the date that Debtors'

---

[1]    Attached hereto as Exhibit A is a list of claims filed by Claimant, the claim number, identity of the building and the specific objections filed by Debtors.

asbestos-containing materials ("ACM") were installed, the identity of the specific Debtors' ACM installed in the building, the actions taken that impacted the Debtors' ACM, and any bulk and/or air sampling taken in such buildings. In addition to the information required in the Proof of Claim, Claimants were to also provide copies of any documents relating or referring to the installation of the Debtors' ACM in the building, the presence of asbestos in the building, and to efforts to remove, contain and/or abate the Debtors' ACM. If the requested documents were too voluminous, Claimants were allowed to attach a summary of the documents, including the name of each document, date of each document, a brief description of each document, the location of each document, and who has possession and control of each document.

Counsel for Claimants, Dies & Hile, LLP ("Dies & Hile") represents cities, counties, housing authorities and states, and their universities, colleges, agencies and departments. To comply with the Court's Order, Counsel for Claimants retained licensed asbestos consultants to inspect buildings owned, operated or used by Claimants to determine whether they contain or contained asbestos-containing surface treatment materials. Bulk samples of suspect material were taken and forwarded to Material Analytical Services, Inc. ("MAS"). MAS first analyzed the bulk samples to confirm the presence of asbestos, and if the bulk samples contained asbestos further tests were performed to identify the manufacturer of the ACM.

Property Damage Claimants were also asked to produce building-specific information required by the Court for each building identified as containing Debtors' ACM. An exhaustive review of these construction and abatement-related documents was then undertaken. The Claimants and their Counsel have spent several hundred hours attempting to locate, review and copy responsive documents that contain information requested by Debtors. Plans and specifications for buildings in issue were reviewed, and those portions of the specifications related to installation of the ACM in such buildings were copied. Whenever correspondence

between the architects and contractors who designed and constructed a building was available, those documents were reviewed, and documents related to the installation of Debtors' ACM were also copied. Documents referring or related to the management and abatement of Debtors' ACM were also reviewed and relevant portions copied. These documents included asbestos building surveys, asbestos operations and management policies, abatement plans and specifications, contracts with abatement contractors and consultants, and air sampling results taken by building owners or their contractors. Tens of thousands of documents were reviewed, and thousands were copied.[2] Because of the voluminous nature of these documents, Claimants often summarized the relevant documents. A total of 137 claims were filed by Claimants represented by Dies & Hile. The claim forms and attached documents filled over twenty bankers boxes.

On July 19, 2004, this Court entered an order [Docket No. 6009] which waived various provisions of Local Rule 3007-1, thereby allowing Debtors to file Gateway Objections regarding a) claims with substantially incomplete Proof of Claim Forms; b) claims that contain materially insufficient supporting information; c) claims that fail to include product identification information; d) claims that are barred by applicable statutes of limitations or repose; e) claims that are barred by laches; and f) claims that are barred by prior settlements. However, the Court's Order further provided that, prior to asserting any objection to a claim on the basis of Materially Insufficient Supporting Information, Debtors must serve written notice of their intent to object to such claim. Debtors served twenty-two notices of deficiency upon Counsel for Claimants. With respect to Maricopa County, Arizona, Debtors only provided notice of intent to object to Claim No. 6070 (Public Health Administration Offices). Dies & Hile immediately sought to set up a meeting with Debtors' representatives to discuss each of the claims for which

---

[2] Many of the documents requested were prepared over thirty-five years ago and may have been destroyed or misplaced during the intervening time.

it received a deficiency notice.  Each of the deficiency claims was reviewed in detail.  For some of these claims Debtors agreed to withdraw their objection.  For other claims, Debtors could not identify the specific nature of the deficiency and agreed to review and identify the specific deficiency.  Dies & Hile agreed to provide supplemental information or documentation and/or obtain new asbestos surveys of the remaining buildings identified by Debtors.  Debtors also agreed to extend the deadline for providing additional information or documentation regarding the other claims.  To date, thirteen Supplemental Proofs of Claim and/or responses to such objections have been filed, and Claimants are continuing their efforts to locate documents and ascertain additional information.  As one might expect, this has been a tremendous undertaking in both time and labor.  Claimants are confident that a review of the original and Supplemental Proofs of Claim filed to date will establish that they have used their best efforts to comply with the Court's Order and either provides the information requested or include summaries of the documents which contain the requested information.

## II.   DEBTORS' OBJECTIONS TO CLAIMANTS' CLAIMS

### A.   Debtors Have Failed to Identify the Specific Objections to Claims

On September 1, 2005, Debtors filed their Fifteenth Omnibus Objections to Asbestos Property Damage Claims.  The exhibits referenced in Debtors' objections which identified the particular claimant and applicable objections, were not served until September 7, 2005.  To compound the confusion surrounding the Debtors' objections, they served amended exhibits identifying claims that were not identified in the original exhibits or which should not have been included in the original exhibits on September 16, 2005.

In most instances, Claimants can determine the specific objection asserted by Debtors.  In some instances, it is impossible because Debtors state their objection in the alternative.  For

example, Debtors assert that certain Claimants failed to attach requested documents. *See* Exhibit

C-2. In this regard, Debtors assert that

> Claimant (1) indicated it had documentation relating to the purchase and/or installation of the product on the property but did not attach those documents or a summary of them; or (2) indicated it made an effort to remove, contain and/or abate the Grace product for which the claim is made but did not attach documents or a summary of them relating to such efforts; and/or (3) did not attach documents relating to the purchase and/or installation of the product in the property and did not attach documents relating or referring to the presence of asbestos in the property for which the claim is made.

In instances such as this, it is impossible for Claimants to know exactly what objection is

made. If Debtors claim that relevant documents or summaries have not been provided, they

should identify them rather than state alternative propositions, which make it impossible to

determine the exact nature of the objection.

**B.    Debtors Are Not Entitled to Have Claims Expunged or Disallowed**

Debtors request that the claims identified in Exhibit "A-1" through "H-1" of their

Fifteenth Omnibus Objection be disallowed and expunged, except as otherwise expressly noted

in their objections (Omnibus Objections, Conclusions, p 67). Claimants would show that

a) Debtors have failed to comply with the Gateway Objection Order; b) Claimant's have

promptly responded to any notice of intent to file Gateway Objections served by Debtors; and

c) the alleged failure of Claimants to produce documents or summaries is not dispositive of

Debtors' liability and therefore does not justify disallowance.

**1.    Debtors' Failure to Give Notice of Intent to file Gateway Objections**

Debtors assert that claims which fail to provide requested information or documentation

should be disallowed and expunged as such failure precludes Debtors from properly preparing

objections to such. Information sought in questions where responses are alleged to be "Facially

Incomplete," they argue, is critical to the preparation of their defenses and "where, as here,

notice has already been given of the claim's failings and the claimant has still failed to respond

adequately – the Debtors cannot evaluate the claim and the claim should be disallowed and expunged" (Fifteenth Omnibus Objection, ¶ 53). Debtors also assert that claims with insufficient documentation should be disallowed and expunged because "[p]ursuant to this Court's Gateway Objection Order dated July 19, 2004, the Debtors have already served each of these claimants … with at least one notice of intent to object and, therefore, the respective PD Claimants have already had an opportunity to supplement their documentation" (Fifteenth Omnibus Objection, ¶ 59). These statements are not only incorrect, they are a gross misrepresentation of Debtors' presentation of their Gateway Objections and the Claimants' responses to the objections raised.

In December 2004, Debtors served on Dies & Hile, twenty-two deficiency notices pursuant to the Gateway Objections. Dies & Hile immediately began a review of these Proofs of Claim to determine if it had failed to provide the requested information or documentation. A meeting was scheduled with Debtors, and each of the deficiency notices was reviewed. In some instances, Debtors determined that the responses were proper and in other instances, Dies & Hile agreed to provide additional information and/or documentation. Subsequent to this meeting, Claimants represented by Dies & Hile have filed thirteen Supplemental Proofs of Claim and/or responses which included additional information or documentation sought by Debtors.

A review of the Fifteenth Omnibus Objection indicates that Debtors have filed objections to everyone of the one hundred and thirty-seven claims filed by Dies & Hile, yet Debtors served notice of intent to file Gateway Objections to only twenty-two claims. Claimants, not Debtors, have been prejudiced as a result of Debtors' failure to follow the procedures outlined by the Court in its Gateway Objection Order, as this has precluded Claimants from addressing the concerns now raised in these objections. Claimants should therefore be allowed sufficient time to file supplemental information or documentation based on the objections raised.

6

2.    **Debtors Have Not Met Their Burden of Proof**

A proof of claim is deemed allowed unless a party in interest objects under 11 U.S.C. § 502(a) and constitutes "prima facie evidence of the validity and amount of the claim" pursuant to Bankruptcy Rule 3001(f). *See also* Fed. R. Bankr. P. 3007. The filing of an objection to a Proof of Claim "creates a dispute which is a contested matter" within the meaning of Bankruptcy Rule 9014 and must be resolved after notice and opportunity for hearing upon a motion for relief. *See* Adv. Comm. Notes to Fed. R. Bankr. P. 9014.

The Debtors' objections to the Claimants' Claims listed in Exhibit C to the Omnibus Objection, which are based on the contention that the Proofs of Claim filed in respect to such claims were "facially incomplete," are without any basis in the law. The rubric for proofs of claim and objections thereto were articulated by the Third Circuit Court of Appeals in *In re Allegheny International, Inc.*, 954 F.2d 167 (3rd Cir. 1992), as follows:

> The burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A. §502(a) rests on different parties at different times. Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is '*prima facie*' valid. [citations omitted.] In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. The burden of going forward then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim. It is often said that the objector must produce evidence equal in force to the *prima facie* case. [citations omitted.] In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. [citations omitted.]

954 F.2d at 173-74.

Thus, the pertinent inquiry is whether the Proofs of Claim filed by Claimants sets forth sufficient evidence of a claim against the Debtors, not whether the Proofs of Claim provide sufficient information for the Debtors to formulate their defenses and objections to the claim. If it does, the burden of production shifts to the Debtors to produce evidence that the claim is

invalid, regardless of whether it would be useful for the Proofs of Claim to provide additional information for the Debtors to assess their defenses, as such information is obtainable in discovery.

The omission of some information in the Proofs of Claim by Claimants is not sufficient grounds for the disallowance of any Claimant's claim, which otherwise makes a prima facie showing of the Debtors' liability. Said another way, Claimants' claims may only be disallowed for one or more of the nine grounds for disallowance enumerated in Section 502(b) of the Bankruptcy Code. *In re Taylor,* 289 B.R. 379, 384 (Bankr. N.D. Ind. 2003). Indeed, the Court has no discretion in this regard and cannot disallow a claim for reasons beyond those stated in the statute. *Id.* None of the grounds for disallowance set forth in Section 502(b) involves the failure to provide information beyond that which establishes a prima facie claim against the Debtors' estates. *In re Guidry*, 321 B.R. 712 (Bankr. N.D. Ill. 2005).

The Debtors' objections are clearly premature and without basis. Until the Debtors come forward with specific evidence and authority to refute the Claimants' Claims, it is presumed that these properly filed Claims are valid. *See Lundell v. Anchor Construction Specialist, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000).

## III.   CLAIMANT'S RESPONSE TO DEBTORS' FACTUAL ALLEGATIONS REGARDING THE HISTORY OF GRACE PRODUCTS AND USES

### A.   Grace's Asbestos-Containing Surface Treatment Material ("Surface Treatment ACM") is Classified as Friable by the EPA

Grace argues that its Surface Treatment ACM is "cementitious" and therefore does not release asbestos fibers during normal and foreseeable building operations. Nothing could be further from the truth. One need look no further than the statements of the EPA to see that such statements are absurd.

Grace's Surface Treatment ACM is classified as "friable" Surface Treatment ACM by the EPA. Thus, even though Grace characterizes Mono-Kote as "cementitious" material, Mono-Kote is nevertheless considered by the EPA to fall within the definition of friable surface treatment.[3] According to NESHAPs, friable materials are those likely to readily release fibers "... when dry ... can be easily crumbled, pulverized or reduced to powder by hand pressure ... reduced to powder mean(s) ... changed to a dust or powder that **can become airborne.**"[4] Further, "**ACM that is sprayed or troweled on ceilings and walls is often the main source of airborne asbestos in the building ....**"[5]

**B.      Grace's Objections to Claimant's Product Identification Reports Are Without Merit**

   **1.      Grace's Surface Treatment ACM was Manufactured Pursuant to Grace's Formula and Mixing Instructions by Twenty-Three Licensee Plants Throughout the Country**

In April 1963, Grace purchased the Zonolite Company. After purchasing Zonolite, Grace immediately began selling the Zonolite brand of Surface Treatment ACM through its construction products division. Grace's Surface Treatment ACM products, which primarily consisted of two types described below, were predominant in the United States construction industry and are uniquely identifiable because of their three primary ingredients. The two types of Grace Surface Treatment ACM were:

> (1) Fireproofing and acoustical ACM with the primary ingredients vermiculite, chrysotile asbestos, and gypsum, which were sold predominantly under the trade names Zonolite Mono-Kote 1 ("MK-1"), and Mono-Kote 3 ("MK-3"), and also sold as Spra-Insulation, Z-Tex (aka EZ-Tex), Zono-Coustic (aka "Zonocoustic") and Hi-Sorb Acoustical Plaster or Oyster White Hi-Sorb (collectively referred to as "Mono-Kote"); and

> (2) Acoustical plaster ACM with the primary ingredients vermiculite, chrysotile asbestos, and bentonite clay, which were sold predominantly under the trade

---

[3] *See Guidance For Controlling Asbestos-Containing Materials In Buildings* ("Purple Book"), EPA 560/5-85-024, June 1985, Chapter 2, Sec. 2.2.2, at pp. 2-4, "Friable forms (Surfacing materials) are either ... fibrous ... or granular and cementitious ...."

[4] EPA Part III (40 CFR Part 61 – NESHAPs Revision: Final Rule) Tuesday, November 20, 1990.

[5] *Ibid.* "Purple Book," Ch. 3, Sec. 3.3.1, at pp. 3-2.

names Zonolite Acoustical Plaster or Plastic ("ZAP") and Zonolite Finish Coat (collectively referred to as "ZAP").

Both Mono-Kote and ZAP incorporated vermiculite mined by Grace primarily at Libby, Montana,[6] and they were manufactured according to Grace's specifications at vermiculite expansion plants owned and operated by twenty-three separate Grace Licensees across the country. These Licensees included, among others, Texas Vermiculite Company ("Texas Vermiculite"), Ari-Zonolite, Inc., Vermiculite-Northwest, Inc., California Zonolite/Diversified Insulation, Vermiculite of Hawaii, Inc. ("Vermiculite of Hawaii") and Western Mineral Products Company ("Western Mineral") (collectively referred to as "Licensees"). Texas Vermiculite's plant was located in Dallas, Texas. Vermiculite of Hawaii's plant was located in Honolulu, Hawaii. Other Grace Licensee plants were located throughout the United States, Canada and in other countries.

### 2.   The Constituents and Their Proportions as Identified in a Bulk Sample of In-Place Grace Surface Treatment May Vary From the Formula List Prepared by Grace's Counsel For Its Litigation Defense

Grace provided its Licensees with product formulas and mixing instructions for manufacturing Mono-Kote and ZAP in batches of hundreds of pounds and with a specifications list of approved vendors from which the Licensees were to purchase the raw materials required by the formulas. Grace's manufacturing formulas measured the primary ingredients by weight, as these raw materials were generally sold by vendors in bags of 50 to 100 pounds. The **primary** ingredient supplied by Grace was vermiculite, added either according to weight or by cubic feet, which was shipped to the Licensees from Grace's Libby Montana mine and expanded in furnaces in the Licensee's plants before being used in these products. In litigation, Grace's longtime product identification expert, Dr. Richard J. Lee, has repeatedly testified that he has never seen

---

[6] Grace also had a much smaller vermiculite mine in South Carolina which provided at least some of the vermiculite used in its South Carolina manufacturing operations.

or been provided copies of the actual formulas, instructions and specifications used by Grace's Licensees in manufacturing the products. Instead, he has uniformly relied upon a list of Grace ACM products with percentages of ingredients, which he identifies by volume rather than weight, and which he believes were extrapolated from actual Grace manufacturing formulas by one or more attorneys from a law firm that represented Grace. This litigation formula list as it has been amended or added to over time by Grace's attorneys, has been the basis of his opinions as to whether the ingredients he found in bulk samples of in-place ACM were or were not "consistent with" Grace's "formulas."

Some variation in Grace's Surface Treatment ACM products as commercially manufactured according to the formulations and instructions provided by Grace was foreseeable and inevitable. These variations often involved the amount or percentage of the raw ingredients as specified in Grace's formulas, or the inclusion of impurities that occur naturally in the mined raw materials (such as tremolite asbestos in Grace's vermiculite, or quartz accompanying gypsum or bentonite) or contaminants from the Licensee's use of the same industrial equipment to manufacture both types of products (*i.e.*, the Mono-Kote products containing gypsum and the ZAP products containing bentonite). Grace's own analysis of bulk samples of its surface treatment materials from the Construction Products Division - Denver plant found ingredients that were not listed in the Grace manufacturing formulas. Dr. Yang, a longtime Grace research employee, duly noted on one such report that "numerous XRD analysis have been made due to the presence of some unidentifiable compounds ...."[7] Some variation from the actual formulas was a reality given these types of building products, the raw material ingredients whose very specifications anticipated they would contain a certain percentage of contaminants, the manner in

---

[7] "Request for Technical Service," dated 10/20/88, Material Research and Analytical Group, W.R. Grace & Co., Julie C. Yang.

which they were manufactured, and the absence of a quality assurance program uniformly administered by Grace over the Licensees.[8]

Some difference in the amount or percentages of particular ingredients also often resulted from actions taken during the application of the Surface Treatment ACM. Grace's employees knew of and sometimes even suggested these actions. For example, applicators may have added chrysotile asbestos to Grace's product at the jobsite. Mono-Kote and ZAP were delivered to job sites in sealed bags. Applicators at the job site opened the bags and poured the dry material into a hopper or mixer where water was added and mechanically mixed prior to spraying the fireproofing or acoustical plaster. According to Grace employees, it was not uncommon for applicators on the jobsite to add additional chrysotile asbestos to aid in the pumping or spraying of the material.[9] Grace was not only aware of the ways in which applicators changed the portions of ingredients in its products, but, in fact encouraged such practices. For example, in a memorandum of test report dated January 9, 1968, Grace concluded

> there is no doubt that Calcium ... in the form of gypsum ... or lime ... was added to (the) Decorator's White Acoustical Plastic at the rate of approximately 10% by weight.[10]

In a memo to C.A. Pratt, the owner of Western Mineral, one of its employees reported that "I have also seen gypsum added to our acoustical plaster in repairing fallouts and it has resulted in an excellent job. I hope that something simple like an additive to ... acoustical to make it harder can be found. This will make it so much easier for us in sales to continue selling our present

---

[8] Memorandum from F.L. Veltman to T.G. Gibian, Grace Research Division, dated December 6, 1971, "There are numerous potential causes for problems to erupt in the Mono-Kote business. Notably, Grace has 13 suppliers of gypsum, and the product is manufactured in 23 locations".

[9] Oral Deposition of Thomas Cheatham, Grace employee, taken on December 12, 1991 (Volume I) in *Dayton Independent School District, et al. v. U. S. Mineral Products Company, W.R. Grace & Co. and United States Gypsum Company*, No. CA-B-87-00507 (E.D. Tex). *See* Testimony at p. 163, "... it was not uncommon ... to add asbestos ... it dealt generally with pumping ... they had to play with the recipe."

[10] Zonolite Division of W.R. Grace & Co., Test Result #1444, "Decorator's White Acoustical Plastic From Lake City Junior College and Forest Rangers School, Florida," dated January 9, 1968.

acoustical with an improvement."[11] Thus, variations in the amount of raw ingredients specified by Grace's formulas occurred as a result of application techniques among the various licensees which Grace knew of and sometimes encouraged.

Component variations in bulk samples of in-place Surface Treatment ACM from the original manufacturing formulas also were known to occur because the material sometimes undergoes chemical changes after installation as a result of normal environmental conditions. For example, in March 1955, Western Mineral submitted two samples of ZAP to Twin City Testing Engineering Laboratory ("Twin City") for testing. One sample came from a ceiling from the Southeast High School in Lincoln, Nebraska while the other sample was of ZAP from Western Mineral's Minneapolis plant stock. Western Mineral had submitted the sample from Southeast High School because of a complaint that a discoloration had occurred in the ZAP as applied to the high school ceiling. Twin City reported to Western Mineral that the sample of ZAP from its plant contained no carbonate and no sulfate, and that the sample taken from Southeast High School in Lincoln, Nebraska contained no carbonate but was **very high in sulfate**. Twin City concluded that

> We therefore believe that the effervescence you mentioned is a calcium sulfate deposited by water leeching through the Gypsum plaster above the acoustical plastic. The moisture causing this leeching could be either the high moister content which is prevalent … or could be from possible leaks in the roof.[12]

The mere fact that there may be some variations in the percentages of the three primary ingredients in Grace Mono-Kote or ZAP as compared to the formulas, or the presence of minor amounts of raw materials or ingredient contaminants not listed in the formulas, does not preclude

---

[11] Interoffice Memo from Warren to C.A. Pratt, Western Mineral Products Company, Grace document 25022422.
[12] Twin City report to Western Mineral Products Company re: Southeast High School, Lincoln, Nebraska, dated March 17, 1955; WRG 006192.

such product from having been manufactured by Grace or its Licensees.[13] Even with variations, these Grace products were so predominant and unique within the industry by their formulation using vermiculite, chrysotile asbestos and either gypsum or bentonite, that they remain clearly identifiable as Grace Surface Treatment ACM.

### 3. Grace and Its Product Identification Expert Deliberately Ignore the Product Variations Such That Their Product Identification Analyses Are Consistently Flawed

Since the first asbestos property damage case was filed in the early 1980's, building owners have proved the manufacturer of the ACM in its building by obtaining bulk samples of the in-place ACM. These bulk samples are then analyzed by laboratories such as MAS, who conduct constituent analysis of the sample and, as in the instant case, determine that they are consistent with actual plant formulas and application information for Grace's Surface Treatment ACM.

In prior litigation, Grace has consistently denied that its Surface Treatment ACM was in buildings at issue because the constituents in bulk samples from such buildings either contained small amounts of ingredients that are not listed in Grace's litigation formula list, or contained Grace's signature key ingredients, but in proportions that differ from those listed in Grace's litigation formula list. The same objections are once again asserted in this matter. *See* Fifteenth Omnibus Objection, ¶ 83, p. 30. Grace was unable to sustain its position in the prior suits, and likewise such objections in the instant case are untenable. In prior litigation, as long as a claimant could show by appropriate expert state-of-the-art product identification analysis that a particular bulk sample from a building at issue contained the signature ingredients of Mono-Kote

---

[13] Oral Deposition of Ian Stewart, taken on July 14, 1998, in *State of Hawaii v W. R. Grace & Co.-Conn., et al.,* Civil No. 93-4161-10, In the Circuit Court of the First Circuit, Hawaii, an employee of RJ Lee Group and a consultant for Grace testified that the ranges of variation in an analysis of a bulk sample was plus or minus about ten percent (10%). "Very often that will show up in specifications or formulations that are provided. You'll be given a range of acceptable level, something they say it should be about 10 to 15. But generally I allow a little margin [8 to 20 percent] beyond that ..." at p. 69.

or ZAP, even if present in percentages which did not precisely match Grace's formulas, Grace inevitably admitted product identification or settled the claim.[14]

In the case, *State of Hawaii v. W.R. Grace*, Grace's longtime product identification expert, Dr. Richard J. Lee, denied that most of the State's bulk samples of ZAP from hundreds of buildings were a Grace product because the scanning electron microscope which he had invented and for which he had programmed the software did not find the "Wyoming montmorillinite" type of bentonite used by Grace in the split bulk samples that he analyzed. MAS had previously reported the bulk samples as representing a Grace product. The Discovery Master ordered that Dr. Lee's microscope and unconventional software, which was not used, much less relied upon by any other laboratory in the country, be produced for analysis by the State's experts. After the State's experts analyzed the microscope and software, and before trial, Grace abruptly settled the case which included payment on all of the buildings Dr. Lee had previously disputed.

Dr. Lee consistently opined that Hawaii's product identification reports, which identified bulk samples of surface treatment material as a Grace product, were incorrect. His opinion was based solely on his comparison of such samples to the Grace litigation formula list prepared and provided by Grace's lawyers. Dr. Lee testified he has never made any effort to acquire knowledge of Grace's actual manufacturing formulas for Surface Treatment ACM or how the products might vary depending on manufacturing or application techniques.

Dr. Lee also conceded that Grace had never provided him with a "sample of known ZAP that (he) analyzed ... to use as a standard for determining whether an unknown bulk sample was ZAP ..."[15] Instead, Grace provided Dr. Lee a "vial" of vermiculite, which is a primary

---

[14] Reference is made to state-of-the-art product identification analysis performed by a laboratory, such as MAS which product identification reports, even if initially denied by Grace, were eventually proven correct in thousands upon thousands of bulk sample reports.

[15] Oral Deposition of Richard Lee, Ph.D., taken on October 15, 1998 in *State of Hawaii v W. R. Grace & Co.-Conn., et al.,* Civil No. 93-4161-10, In the Circuit Court of the First Circuit, Hawaii, at p. 1201.

ingredient of both types of its Surface Treatment ACM, and that he relied on this sample as "being, a, quote, standard for the vermiculite ...."[16] Under cross-examination, Dr. Lee admitted that he had no knowledge that Grace had a range of different grades of vermiculite which varied from approximately 95.3% vermiculite (with the remainder being contaminant materials) down to approximately 81.3% vermiculite (with the remainder contaminant materials), and that he did not have samples of the other grades for purposes of a standard.[17]

Debtors' assertion that the products in Claimant's building were not manufactured by Grace is incorrect. Moreover, Dr. Lee's findings and Debtors' objections are flawed as they are based on a litigation strategy developed by Debtors and Dr. Lee which is intentionally designed to eliminate bulk samples clearly containing Grace's signature ingredients because of certain variables that routinely occur during and subsequent to the application of the Grace Surface Treatment ACM or that are merely artifacts of the type of analysis Grace and Dr. Lee choose to perform.

## C.   Grace's Libby Montana Vermiculite is Contaminated with Tremolite Asbestos

The signature ingredients of Mono-Kote were gypsum, vermiculite aggregate, and chrysotile asbestos and of ZAP were bentonite, vermiculite aggregate and chrysotile asbestos. As previously discussed, the vermiculite supplied by Grace came from its Libby, Montana mine. This vermiculite is contaminated with tremolite asbestos. Tremolite is amphibole asbestos and is also recognized as a potent carcinogen. Thus, it is important to recognize that dust released from Mono-Kote or ZAP contains not only chrysotile asbestos which was an additive to the formulas, but may also contain tremolite asbestos. High levels of tremolite present in vermiculite dust are released during the manufacturing process of Mono-Kote. This continued to pose problems in the plants long after chrysotile asbestos was eliminated as an additive in 1973 pursuant to federal

---

[16] *Ibid.,* p. 1205.
[17] *Ibid.,* p. 1224.

law.[18]  Hence, there can be no question that an exposure to a Grace Surface Treatment ACM may

include both chrysotile and tremolite exposure.

**D.      Grace Admitted That It Knew That Its Friable Surface Treatment ACM Would Be
Subjected To Delamination, Disturbance and Other Foreseeable Factors After
Installation That Would Cause the ACM To Become Unbonded, Fallout and Dust**

Grace was aware that certain "factors" could undermine the performance of its Surface

Treatment ACM and lead to fallout.  Such factors included the potential that the product could be

disturbed during normal maintenance and cleaning of the building.[19]   The testimony of

Walter Payment, the Director of Grace's Construction Products Division Laboratory at

Traveler's Rest, is significant because of his admissions regarding Grace's knowledge of product

defects and its failure to instruct or warn building owners of these defects.  Payment admitted:

> Grace was aware that once the ACM was applied in-place there were a number of
> factors in addition to humidity and air erosion that could interfere with proper
> performance.[20]
>
> Grace recognized that the in-place ACM was subject to disturbance during normal
> cleaning and maintenance activities.[21]
>
> That another factor would be renovation type activities.[22]
>
> That the factors to which the in-place ACM could be exposed during ordinary use
> were "**foreseeable** and **within (Grace's) knowledge** …"[23]
>
> Grace **knew** that the factors and forces to which the in-place ACM would be
> subjected to "would **cause the material to become un-bonded**, not adhere the
> way it should, **fall out** …"[24]

---

[18] Oral Deposition of Curtis Gipson taken on January 27, 1992, in *Dayton Independent School District, et
al. v. U.S. Mineral Products Company, W.R. Grace & Co. and United States Gypsum Company*, No.
CA-B-87-00507 (E.D. Tex).  Tremolite exposure was a "continual concern …" in the Dallas plant.  *See* Ex. 4,
Memo from Grace Cambridge, "… We are investigating further to determine the cause of this unacceptable level of
tremolite in the air …" at p. 177.

[19] Oral Deposition of Walter Payment taken November 4, 1986, in *Dayton Independent School District, et
al. v. W.R. Grace & Co., et al.*, Civil No. B-81-277-CA consolidated with Civil No. B-81-293-CA, at p. 105.

[20] *Ibid.*, p. 104.

[21] *Ibid.*, p. 105.

[22] *Ibid.*, p. 106.

[23] *Ibid.*, p. 106.

[24] *Ibid.*, p. 107.

Grace **knew** that if this occurred, "there was a **likelihood of potential for the creation of dust** as the material became un-bonded and fell out."[25]

That despite this knowledge, Grace **failed** to make "any specific recommendations to the applicators or the users ... that would prevent or contain or maintain the material to prevent fall out or dust."[26]

Grace never placed any warnings or cautionary labels on the MK and/or ZAP bags concerning the fact that the product contained asbestos or of the potential hazards associated with the dust.[27]

**E.    Grace's Licensees Continued to Manufacture and Sell ZAP on an On-Going Basis Post-1969**

Grace has asserted that "with rare exception Grace stopped selling acoustical plaster containing asbestos in 1969 ..." (Fifteenth Omnibus Objection, ¶ 92, p. 32). This is utterly false. Grace's Licensees continued to manufacture and sell acoustical asbestos-containing products right up to, and even past the July 1973 EPA ban. In fact, ZAP was the most popular Grace product even as late as 1971.[28] Curtis Gibson, the plant manager of Texas Vermiculite, testified that he received a memorandum from Mike Moran, president of Texas Vermiculite, to eliminate asbestos from the products, "**during the (1973) time frame**".[29] Likewise, Stephan Sheeran, a sales representative for Texas Vermiculite, stated that "the Dallas plant shipped material to job sites into **June** of **1973**."[30] This is particularly revealing since Texas Vermiculite was the only Licensee that was majority owned by W.R. Grace.

John York, who was president of another major Grace licensee, Vermiculite of Hawaii, testified that submittals from his office for ZAP which were dated **April 27, 1972** and **August 7, 1972**, related to "acoustical plastic" that was installed at Honolulu International Airport

---

[25] *Ibid.*, p. 107.

[26] *Ibid.*, p. 108.

[27] *Ibid.*, Sheeran Deposition, p. 47.

[28] *Ibid.*, Deposition of Curtis Gipson, p. 28.

[29] *Ibid.*, Deposition of Curtis Gipson, p. 136.

[30] *Ibid.*, Deposition of Stephan John Sheeran, p. 17; *see also* Exhibit 5-A which shows that Texas Vermiculite shipped MK-3 to Oklahoma, as well.

**subsequent** to the date of the submittals.[31] Mr. York further testified that Mono-Kote 3 was also manufactured and shipped to the airport by Vermiculite of Hawaii during the same period. The amounts of Grace Surface Treatment ACM required for installation at the Honolulu International Airport were so large, that in addition to the large quantities supplied by Vermiculite of Hawaii, additional bags of Surface Treatment ACM was shipped from mainland Grace Licensees direct to the jobsite in Hawaii.[32] In a letter dated May 15, 1974 to a potential customer in San Francisco, Mr. York offered to supply asbestos-containing **ZAP** as long as he received "fourteen days lead time to fill an order."[33] Mr. York also testified that during the entire time that Vermiculite of Hawaii was a Licensee for Grace's Surface Treatment ACM, such Grace products had the dominant market share in Hawaii.[34]

William V. Culver was employed as district manager for W.R. Grace Construction Products Division from 1966 to 1973 for the area that included the states of Oregon, Washington, Alaska, the Panhandle of Idaho, and North and Western Montana.[35] All of Grace's Vermiculite products were manufactured at the Vermiculite Northwest plants located at Portland, Oregon and at Spokane, Washington.[36] Mr. Culver testified that in **March 1972** it continued to be his "responsibility to sell as much of the Grace products …" as he could.[37]

As a practical matter, it remained business as usual and the Licensees were trying to sell as much of the product as they could before the July 1973 cutoff date. Claimant believes that additional discovery will further confirm that Grace's contention is not supported by the facts.

---

[31] Oral Deposition of John C. York, taken on April 14, 1999, in *State of Hawaii v. W.R. Grace & Co., et al.*, Civil No. 93-4161-10 (1st Cir. Ct. Hawaii) at pp. 74, 75, 76 and 77.

[32] *Ibid.*, Deposition of John York, pp. 15, 16, and 78.

[33] Letter from John C. York, President of Vermiculite of Hawaii, to Buddy Redmond dated May 15, 1974.

[34] *Ibid.*, p. 13 (Vermiculite of Hawaii continued to operate as a Grace Licensee through at least April 1982 – *Ibid.*, p. 82).

[35] Deposition of William V. Culver taken on December 12, 1988, in *The 3250 Wilshire Boulevard Building, et al. v. Metropolitan Life Insurance Company, et al.*, No. 87-06048 WMB (CHKX), in the United States District Court for the Central District of California at p. 10.

[36] *Ibid.*, pp. 45, 46.

[37] *Ibid.*, p. 180.

F.    **Grace's Knowledge of the Health Hazards of Asbestos**

The body of facts representing Grace's longstanding knowledge regarding the hazards of the asbestos in its Surface Treatment ACM is far too voluminous to set forth in this response. However, Grace's knowledge of the health hazards associated with asbestos date back to the 1930's through it ownership of the Dewey and Almy Chemical Co. and Multibestos Company, who, in turn, acquired the Walpole Asbestos Carding Factory in 1931, through its purchase of the Zonolite Company (collectively referred to as "Grace") and its operation of the Libby Montana vermiculite mine.    This knowledge was acquired well before its ACM was installed in Claimants' buildings.   Grace therefore knew that its ACM was defective, and would result in asbestos fibers (both chrysotile and tremolite) being released into the air to be breathed and inhaled by building occupants.   Grace was also aware of the grave health hazards associated with inhalation of asbestos fibers.   Yet, as previously discussed, Grace not only did not disclose the asbestos content of its ACM, it also failed to provide any cautions or warnings whatsoever in connection with the products' asbestos hazards.

G.    **Grace's Efforts to Prevent Building Owners From Removing Surface Treatment ACM and/or Seeking Cost Recovery From Grace**

Despite Grace's intimate knowledge of the hazard of its Surface Treatment ACM, from at least the early 1950's, Grace has been a primary sponsor of a massive public relations effort to convince building owners, the public, and regulatory and legislative bodies, that its Surface Treatment ACM presents no hazard to building occupants and should not be removed.  Grace's efforts were channeled through the activities of the "Safe Buildings Alliance (the "SBA")," an organization composed of former leading building material companies which formerly manufactured ACM building products.[38]

---

[38] Members of the "Safe Buildings Alliance" include W.R. Grace & Co., the Celotex Corporation and United States Gypsum Company.

Working through the SBA, Grace has acted on many fronts to: (1) reduce the members' liability to building owners for property damage asbestos claims by encouraging building owners to forego the removal of asbestos based upon incorrect and/or misleading scientific and technical information; and (2) to lobby and influence Congress, state legislatures, and federal and state regulatory agencies to limit removal of in-place ACM. SBA literature was sent to building owners across the country, entities managing buildings, and the public in general asserting that there was no hazard associated with the use of in-place ACM during normal building activities such as manufactured by Grace. At the same time, SBA launched massive litigation to have courts set aside the laws and regulations dealing with in-place ACM such as AHERA and NESHAPs.[39]

Grace's representations to building owners were false and misleading, and were intentionally designed to prevent building owners from taking actions to remove and/or replace the Grace Surface Treatment ACM and to prevent or suppress legal actions against them. For example, Grace hired former Gov. Hugh Carey as an Executive Vice President for the "newly established" "Office of Environmental Policy". Gov. Carey's function apparently was to lobby Congress, state legislatures and the EPA to pull back with regard to their policies intended to minimize the hazards of in-place ACM. His testimony provided to Congress was not modest in its attempts to create the impression that Grace's in-place ACM was safe, "In fact these products were specified under national and state building codes to protect human life and safety ... when Grace manufactured these products, we believed then – as we believe now—that properly installed and maintained asbestos-containing fireproofing does not endanger building occupants."[40]

---

[39] See *Safe Bldg. Alliance v. E.P.A.*, 846 F.2d 79 (D.C. Cir. 1988).
[40] Oral Deposition of Kenneth Young Millian taken March 1, 1992, in *Dayton Independent School District, et al. v. U. S. Mineral Products Co., et al.*, No. B-87-00507-CA (E.D. Tex); *see* Exhibit 22, "Testimony of Hugh L.

Contrast Gov. Carey's statement with the testimony of Walter Payment, Grace Research Director, that the reason for the use of asbestos in the (Mono-Kote) fireproofing had nothing to do with a fireproofing purpose, but rather was added to the product to increase "pumpability," or, in other words, to increase the profitability of the product.[41]  Mr. Payment testified that Grace knew that by 1969 the asbestos in Mono-Kote provided no increased fireproofing ability to Mono-Kote.  Grace could have easily determined this fact, if they had wanted to, by the early 1960's.[42]  Yet Grace was still repeating the falsehood that Grace developed its Mono-Kote fireproofing "to protect human life and safety" almost 20 years after Mr. Payment says he had determined as Grace's Research Director that this claim was false!  Grace also made similar written misrepresentations directly to building owners, architects and to the public.  This example is merely the tip of the iceberg of deceit with regard to Grace's attempts to mislead building owners to neither remove their ACM, nor to seek legal damages from Grace for their damages.  Grace should not now be allowed to avoid liability by claiming that building owners failed to timely file suit where it has intentionally for years sought to prevent claimants from pursuing causes of action based on such representations.

**H.    Jury Verdicts and Settlements by Grace in the Underlying Litigation Have Established the Prima Facie Validity of PD Claims**

For almost twenty-five years property damage claimants have recovered their damages against Grace through litigation in various state and federal courts.  Not only have such courts consistently found Grace to be liable under principles of state law, Grace's conduct in connection with its sale of Surface Treatment ACM has been found to constitute gross negligence entitling the claimant to punitive damages.  In *City of Greenville v. W. R. Grace & Co.*, the City was

---

Carey, Executive Vice President, W.R. Grace & Co., On Behalf Of The Safe Buildings Alliance On The Public Policy Issue Of How To Deal With Asbestos In Buildings, Before The Subcommittee On Hazardous Waste And Toxic Substances, United States Senate, September 27, 1988," Grace document KM006137.

[41] *Ibid.*, Payment Deposition, pp. 74-75.
[42] *Ibid.*, p. 81.

awarded millions of dollars in compensatory and punitive damages related to Mono-Kote fireproofing in the Greenville, South Carolina City Hall, which had to be removed because of the hazard posed.[43]

The numerous underlying cases which have held Grace liable for their Mono-Kote and/or ZAP ACM are reported and are part of the record in this case. As a matter of record, Grace has paid several hundred million dollars in settlement of claims of various governmental entity claimants similar in all pertinent aspects of knowledge, bulk sample constituents and expert findings to the claimants represented by Dies & Hile in this Bankruptcy case.[44]

Thus, Grace's liability for asbestos PD cases is well-established. More importantly, the validity of PD claims such as those represented by Dies & Hile, and which are pending in this Bankruptcy, has been overwhelmingly established under applicable state law. This is particularly true for claims by governmental entities that are protected from the application or running of applicable statutes of limitations and repose, such as the "Dies & Hile Claimants." As history will show, Grace cannot point to any asbestos PD claims in the history of the litigation that are consistently any better documented and prepared than are the claims filed by the Dies & Hile Claimants. And, Grace has said as much repeatedly in this Bankruptcy.

## I.    Claimant's Causes of Action

Claimant seeks to recover the costs that it has incurred or will be forced to incur in maintaining, removing and replacing the Debtors' Surface Treatment ACM from its building(s).

---

[43] *See City of Greenville v. W. R. Grace & Co.,* 640 F. Supp. 559, *aff'd,* 827 F.2d 975 (4th Cir. 1987). *See also The Corporation of Mercer University v. National Gypsum Co., et al.,* No. 85-126-3-MAC (M.D. Ga. 1986) (reversed on a Certified Question to the Georgia Supreme Court by the Eleventh Cir. on grounds involving the applicability of the Georgia statute of repose).

[44] *See Dayton Independent School District, et al. v. W.R. Grace & Co., et al.,* Civil No. B-81-277-CA consolidated with Civil No. B-81-293-CA; *Dayton Independent School District, et al. v. U. S. Mineral Products Co., et al.,* No. B-87-00507-CA (E.D. Tex.); *Kirbyville Independent School District, et al., Individually, and on Behalf of All Texas Political Entities v. Asbestospray Corporation, W. R. Grace & Co.-Conn., and United States Gypsum,* No. 1:94CV412 (E.D. Tex.); *The State of Utah, et al. v. W. R. Grace & Co.-Conn., et al.,* No. 940906356, In the Third Judicial District Court, Salt Lake County, State of Utah; *State of Hawaii v W. R. Grace & Co.-Conn., et al.,* Civil No. 93-4161-10, In the Circuit Court of the First Circuit, State of Hawaii.

It asserts state law causes of action, including breach of express and implied warranty, civil conspiracy, fraudulent concealment and misrepresentations, negligence, nuisance and strict liability/products liability. These causes of action not only arise out of acts and omissions that took place before and at the time of the sale and installation of Grace's Surface Treatment ACM, but also acts and omissions that occurred after the sale and installation of such products.[45]

### J.    Preservation of Discovery Rights

Claimant has discussed only a small fraction of the evidence that would and will be further explored through discovery in connection with Debtors' objections. Claimant preserves and does not hereby waive its rights to obtain further discovery from Debtor once Debtor clarifies the basis of said objections, most of which are simply contentions with no supporting facts or foundation whatsoever.

## IV.    CLAIMANT'S RESPONSES TO DEBTORS' OBJECTIONS

Debtors have alleged numerous objections to Claimant's claims, including, but not limited to, a) the PD claims provide insufficient information; b) the PD claims are brought too late; and c) the PD Claims provide no proof of hazard. Claimant's response to each such objection follows:

### A.    Missing Basic Information About the Property at Issue (Grace Ex. C-1(d))

The Debtors object to Claimant's claim(s) on the ground that the "PD Claim Form fails to provide information relating to the Claimant's knowledge ..." (the "C-1(d) Objection"). Debtors allege that the Proof of Claim(s) "does not provide one or more of the following: (1) information

---

[45] In regard to Claimant's allegations of continuing duty to warn, Claimant alleges that even after the Debtors' Surface Treatment ACM was installed in Claimant's buildings, Grace learned of additional information concerning the hazards of its Surface Treatment ACM, and yet failed to warn Claimant, other building owners, and the public in general of such hazards. Faced with this new and additional information, Grace not only failed to warn Claimant of such, it also embarked on a "public relations" campaign whereby it affirmatively misrepresented to Claimant, other building owners and the public in general that its Surface Treatment ACM was safe for continued use in buildings and that they posed no hazard to building occupants, and that no further corrective actions were necessary.

regarding prior asbestos-related property damage lawsuits or claims for the property; (2) the date

that the product at issue was installed at the property; (3) the date that the claimant learned that

the product at issue contained asbestos; or (4) the date the claimant learned of the presence of

asbestos on the property." For the reasons set forth in Section II as well as those below,

Claimant requests that this objection be denied.

Debtors do not provide clear information regarding what information Debtors believe is

missing from the Claimant's claims regarding "knowledge" of these matters. In fact, Claimant

is left to guess as to which of these four categories of information Debtors contend was not

supplied by Claimant with respect to these claims. Accordingly, Claimant cannot fully respond

to this objection, and Claimant reserves its right to supplement or amend its response to the

extent further clarification is provided by Debtors. Clearly, Debtors have failed to provide

"sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I),

which makes it difficult, if not impossible, for Claimant to understand what documentation

Debtors believe is missing from Claimant's claim.

Counsel for Claimant has reviewed the Proof of Claim for Claim No. 6073 (Arizona

Courts – West Courts Building), and cannot determine the basis for Debtors' C-1(d) Objection. It

is precisely this reason why Debtors are required to provide "sufficient detail as to why the claim

should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I). Moreover, Debtors did not file their

Notice of Intent to file a Gateway Objection to this claim, in violation of the Court's Gateway

Objection Order. If such notice had been provided, Claimant would have met with the Debtors

to discuss the basis for the objection, and if necessary, filed a supplemental response providing

such information. Debtors are not entitled to have this claim disallowed, where it is the Debtors

who have failed to comply with the procedure outlined in the Order allowing Gateway

Objections, and further where Claimant has made a good faith effort to locate and produce the information and documentation requested.

**B.    Claims With Insufficient Documentation (Grace Ex. C-2)**

The Debtors object to Claimant's claims on the grounds that Claimant provided insufficient supporting documentation of the claim and that the claim has at least one of the following deficiencies:

> A.    The claimant indicates that it has documentation "relating to the purchase and/or installation of the product on the property" but did not attach these documents or a summary of them;
>
> B.    The claimant indicates that "it made an effort to remove, contain and/or abate the Grace product for which you are making the claim" but did not attach documents or a summary of documents relating or referring to such efforts; or
>
> C.    The claimant did not attach documents or a summary of documents "relating to the purchase and/or installation of the product in the property" and did not attach documents or a summary of documents "relating or referring to the presence of asbestos in the property for which you are making this claim."

For the reasons set forth in Section II and those below, Debtors' objection should be denied.

Debtors do not provide clear information regarding what documentation the Debtors believe is missing from the Claimant's claims. In fact, Claimant is left to guess as to which of these three categories of information Debtors contend was not supplied by Claimant with respect to these claims. Accordingly, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further clarification is provided by Debtors. Clearly, Debtors have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I), which makes it difficult, if not impossible, for Claimant to understand what documentation Debtors believe is missing from Claimant's claim.

In any event, Claimant has already provided, as an attachment to the Proofs of Claim at issue, all documentation that is specified to be produced. If Claimant had documentation that

relates to the purchase or installation of Debtors' products in the buildings at issue, such documents, or a summary thereof, were provided to Debtors. Claimant would further show that even if it made an effort to "remove, contain and/or abate" the Grace product(s), they do not necessarily have (nor may it ever have had) documents relating to such efforts.

To the extent that documentation responsive to this objection exists and is in the possession of Claimant, such has either been produced to Debtors or a summary thereof attached to the Proof of Claim.

## C.    Inconsistent Product Identification (Grace Ex. C-3(f))

The Debtors object to Claimant's claims on the grounds that they are invalid because they are accompanied by bulk sampling data that is inconsistent with a Grace product (the "C-3(f) Objection").[46]   For the reasons set forth below, Claimant requests that this objection be denied.

Debtors have failed to provide "sufficient detail as to why the claim should be disallowed," Del. Bankr. LR 3007-1(e)(iii)(I), and this makes it difficult, if not impossible, for Claimant to understand what documentation Debtors believe is missing from Claimant's claims. In any event, the actual percentages of particular ingredients that comprise Grace's asbestos-containing products have varied throughout the time during which they were manufactured.    Not only did the ingredients and the proportions used in these asbestos-containing products often vary from facility to facility, they also varied year to year in the same facility.

Debtors are also aware that ingredients not contained in their products are often present in bulk sample analysis.  For example, Debtors' ACM that is used for acoustical or decorative purposes is typically painted by building owners after a number of years.  Bulk samples of this

---

[46] Debtors allege that the bulk sample results "either (i) indicate that the product found at the building was missing a key ingredient that would have been found if the product at issue was manufactured by Grace; (ii) contain ingredients that are not found in Grace product; (iii) contain key ingredients but in the wrong proportionality of those used by Grace; or (iv) provide data insufficient to determine consistency with a Grace product."

material will often include paint, and the bulk sample analysis will include ingredients in the paint that are not present in the Debtors' ACM. Additionally, individuals applying fireproofing products occasionally added raw chrysotile asbestos while mixing such under various circumstances. Thus, the fact that there may be additional ingredients in the bulk sample or more of a certain ingredient does not preclude such from being the Debtors' ACM. *See* discussion, Section III.B above (Debtors' assertion that it did not manufacture the ACM in Claimant's building because of the date of installation, variances in the constituents, or the percentages of the constituents is without basis).

Debtors also state that "because of the size of this Fifteenth Omnibus Objection, the Debtors' analysis of bulk sampling results attached to the claimants' PD Claims is not attached as an Exhibit," but will be made available upon request. The Claimant has made such a request, and is entitled to review and conduct discovery regarding the same before this objection is considered. More specifically, Debtors must disclose and provide proof of what "key" ingredients are missing, what ingredients that are not found in Grace products are present, what key ingredients are allegedly included but in the wrong proportionality to those used by Grace, or what data provided is insufficient to determine consistency with a Grace product. Presently, the claims of Claimant are prima facie valid, and Debtors' objection should be denied.

Further, in prior asbestos property damage litigation, experts retained by Debtors to perform constituent analysis of bulk samples designed their software programs and/or calibrated their equipment so as to alter the constituent results. *See also* discussion Section III.B, pp.9-15, Grace's Objections to Claimant's Product Identification Reports Are Without Merit). Accordingly, Claimant is entitled to conduct appropriate discovery regarding the Debtors' bulk sample analysis reports, the testing methodology used, and the software and equipment used in analyzing the bulk samples at issue.

This objection is substantively without basis as Claimant has attached to each of the Proofs of Claim at issue a constituent analysis performed by MAS, regarding the asbestos-containing product in the buildings in issue, as well as a letter report of Dr. William Longo. These reports establish that the ACM in Claimant's buildings was manufactured by Grace.

**D.    Claims Allegedly Failing to Rule Out Non-Grace Products (Grace Ex. C-4)**

The Debtors have objected to Claimant's claim(s) alleging that the "bulk sampling data is consistent with a Grace product and either bulk sampling data that is inconsistent with a Grace product or bulk sampling data insufficient to determine the presence of a non-Grace product in addition to a Grace product ..." (the "C-4 Objection").   For the reasons set forth below, Debtors' objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection to Claimant's claim.   Claimant has requested, and is entitled to conduct discovery regarding Debtors allegation that the "bulk sampling data provided by Claimant is consistent with a Grace product and either bulk sampling data that is inconsistent with a Grace product or the bulk sampling data is insufficient to determine the presence of a non-Grace product in addition to a Grace product." (Fifteenth Omnibus Objection ¶ 85, p. 30).  Until Claimant is provided the data that Debtors rely upon in making this objection Claimant cannot fully respond to such.  As such, Claimant reserves its right to supplement or amend it response to the extent further information is provided.   Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claim, see In re Allegheny, 954 F.2d 167, 173 (3rd Cir. 1992), and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

It is instructive that Debtors state that "these bulk samples ... indicate that the building at issue potentially contains both Grace asbestos-containing products and asbestos-containing products manufactured by another company." In fact, Debtors lodge this objection "only out of an abundance of caution," and "are not seeking at this time to disallow or expunge the PD Claim ..., unless those claims also happen to fall in another category for which this remedy is sought." By Debtors' own admission, this particular objection is simply invalid.

This objection is substantively without basis as Claimant has attached to each of the Proofs of Claim at issue a constituent analysis performed by MAS, regarding the asbestos-containing product in the buildings in issue, as well as letter reports of Dr. William Longo. These reports establish that the ACM in Claimant's buildings was manufactured by Grace. As previously discussed in Section III.B above, Grace has, time and time again, accepted similar reports from Dr. Longo as valid proof of product identification. This occurred even where there are slight variances between the bulk sample analysis and the alleged formulas.

**E.    Claims for Buildings Allegedly Built Too Late to Contain Grace ACM (Grace Ex. D-1(b))**

The Debtors object to Claimant's claims on the grounds that the acoustical plaster was installed in Claimant's building after 1969, stating that "with rare exception ... Grace stopped selling acoustical plaster containing asbestos by 1969 ..." (the "D-1(b) Objection"). For the reasons set forth below, Debtors' objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection to the Claimant's claims. As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its responses to the extent further information is produced. Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity

of Claimant's claims, *see In re Allegheny*, *supra,* and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

This objection is substantively without basis as Claimant has attached a constituent analysis performed by MAS, regarding the buildings in issue, as well as a letter report of Dr. William Longo.   These reports establish that the ACM in Claimant's buildings was manufactured by Grace. *See also* discussion, Section III.E regarding Grace's sale of ZAP after 1969.

## F.    Claims for Buildings Built Before 1969 (Grace Ex. D-1(c))

The Debtors object to Claimant's claims on the grounds that any acoustical plaster installed in buildings built before 1969 would have been replaced years ago (the "D-1(c) Objection").   For the reasons set forth below, Debtors' objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection to the Claimant's claims. As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its responses to the extent further information is produced.  Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claims, *see In re Allegheny*, *supra*, and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

There are three problems with Debtors' objection:   First, the assertion that Grace's acoustical plaster installed prior to 1969 would have been replaced by now is contrary to the representations made in its own sales and marketing literature.  Counsel for Claimant has been litigating with Debtors regarding the manufacture and sale of Grace ACM for over twenty years, and this is the first time that they have ever seriously raised this argument.  Debtors continually touted the durability of their products in literature provided to architects, contractors and building owners.   Second, even if the product has been removed in whole or in part, such removal does

31

not bar Claimant's claim. Claimant would still have incurred significant costs associated with the maintenance and removal of the acoustical plaster that would not have been incurred if the product was not asbestos-containing. Last, but most importantly, Claimant has submitted evidence that the acoustical plaster in the building(s) in issue was manufactured by Grace. Claimant has already provided to Debtors a constituent analysis performed by MAS, regarding the building(s) at issue, as well as letter reports of Dr. William Longo. These reports establish that the ACM in Claimant's building was manufactured by Grace.

**G.     Claims Allegedly Barred by the Statute of Limitations Based Upon Constructive Notice (Grace Ex. D-2)**

The Debtors object to Claimant's claims asserting that such are barred "under the applicable statutes of limitations, based upon the doctrine of constructive notice ..." (the "D-2 Objection"). For the reasons set forth below, Debtors' objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection to the Claimant's claims. They have also failed to identify the specific statutes of limitations or decisional rulings that they allege bar these claims. As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further information is produced. Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claims, *see In re Allegheny*, *supra*, and have failed to provide "sufficient detail as to why the claims should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

The statutes of limitations do not bar these claims as limitations do not apply to the State of Arizona or its political subdivisions, such as Claimant. Claimant is exempt from the limitations period prescribed under the common law doctrine of *nullum tempus occurrit regi* and applicable statutes that provide that limitations shall not apply to actions brought in the name of the state or its political subdivisions, such as Claimant. *See* Arizona Revised Civil Statute

("A.R.S.") § 12-510 ("Except as provided in § 12-529, the state shall not be barred by the limitations of actions prescribed in this chapter.").[47]  *See also Tucson Unified Sch. Dist. v. Owens-Corning Fiberglas Corp.,* 174 Ariz. 336, 849 P.2d 790 (Ariz. 1993) (A school district suing to clean up asbestos in buildings was not subject to statute of limitations regardless of whether asbestos cleanup was proprietary or governmental function.)[48];  *City of Bisbee v. Cochise County,* 52 Ariz. 1, 18,  78 P.2d 982, 989 (Ariz. 1938) ("[R]ule of *nullum tempus* ... applies not only to the state itself when suing in its own name, but to all of its subdivisions...."); *Maricopa County v. Rogers,* 52 Ariz. 19, 23 (Ariz. 1938) ("[W]here the recovery of public money due a political subdivision of the state is concerned, the rule of *nullum tempus occurrit regi,* as reiterated and confirmed by the Legislature in ... [§12-510], applies and the plea of limitations may not be made against such a claim."). In effect, Debtors have merely alleged an invalid defense to the claims of the Claimant and have certainly not provided any support for this defense.

Notwithstanding the above, Debtors wrongly assert that Claimant knew or should have known of the hazards associated with its asbestos-containing products because of various governmental regulations passed in the 1970's and early 1980's, and that therefore such claims should be disallowed based on the Third Circuit Court of Appeals' decision in *Prudential v. United States Gypsum Co.*, 359 F.3d 226 (3rd Cir. 2004). Their reliance on *Prudential* is misplaced as it is both factually and legally distinguishable from the claims at bar.  First, *Prudential* only involved a RICO claim, while Claimant herein seeks redress through state law

---

[47] A.R.S. § 12-529 applies "to actions for rents or profits from lands, based on a claim of navigability of any watercourse ..." not claims for property damage such as those brought by Claimant.

[48] In *Tucson Unified Sch. Dist.,* the Arizona Supreme Court was asked whether a school district that sued to clean up asbestos contamination was acting in a proprietary capacity and subject to limitations. The Supreme Court, citing *City of Bisbee,* stated that "the distinction ... between municipalities acting in their sovereign and their private capacity was practically obsolete." The Court found that limitations did not apply to the school district stating that "[w]hether the state be acting in its governmental or proprietary capacity, it is nonetheless exercising its sovereign powers." *Id.* at 793.

claims that require different accrual analyses than used in RICO cases. The Court, in *Prudential*,

placed great emphasis on the "actual knowledge" held by Prudential and the fact that Prudential

"is a very sophisticated company that operates a large casualty insurance business and an

extensive estate investment business ... [which] provided Prudential with more opportunities

than an average plaintiff to access ACM-related information." *Id.* at 234-36.

Debtors have also failed to prove that limitations have run on Claimant's claims. The

issue of when Claimant had constructive notice of "potential dangers" of asbestos is not the

relevant inquiry regarding accrual of Claimant's cause of action. The courts throughout this

country have consistently held that general knowledge regarding the hazards of asbestos does not

cause injury, much less property damage. *See, e.g.*, *MDU Res. Group v. W. R. Grace & Co.*,

14 F.3d 1274, 1278-79 (8th Cir. 1994), *cert. denied*, 15 U.S. 824 (1994) (rejecting Grace's

argument that knowledge of the mere presence of asbestos triggers the statute of limitations, and

holding that the proper question was when MDU could have learned, with the exercise of

reasonable diligence, that its building had been contaminated by asbestos); *Adams-Arapahoe*

*Sch. Dist. v. GAF Corp.*, 959 F.2d 868, 872 (10th Cir. 1992) ("[o]nly asbestos contamination

constitutes a physical injury compensable under tort law."); *Kansas City v. W.R. Grace & Co.*,

778 S.W.2d 264, (Mo. App. 1989) (simply because Kansas City had notice of NESHAPs, its

causes of action for negligence and strict liability were not caused to accrue); *California*

*Sansome Co. v. U.S. Gypsum,* 55 F.3d 1402, 1403 (9th Cir. 1995) (ruling that articles,

publications, regulations, and seminars on the hazards of asbestos did not put plaintiff "on

inquiry notice" of asbestos contamination). Thus, even if the Debtors establish a date certain

whereby Claimant allegedly had constructive notice of the potential harm relating to asbestos,

that date is not the time at which the statute of limitations would begin to run against Claimant's

claims.

In further response to Debtors' D-2 Objection, Claimant hereby incorporates by reference as if fully contained herein the Response and Memorandum of Law of the Official Committee of Asbestos Property Damage Claimants in Opposition to Debtors' Brief in Support of an Estimation Hearing on Constructive Notice in Property Damage Claims (the "PDC Constructive Notice Brief"; Document No. 10940).

Finally, Debtors' own pleading and representations to Claimant and the Court are totally at odds with its D-2 Objection. Time and time again, Debtors have argued that its asbestos-containing materials are not hazardous and do not cause property damage. See Fifteenth Omnibus Objection, ¶¶ 119-120, p. 39; see also Hearing Transcript July 19, 2005, pp. 33-34. The Debtors' contention that building owners should have known of the hazards of its asbestos-containing building products is inconsistent with their prior claim that their ACM is not harmful in the first place. The Eight Circuit Court of Appeals recognized this inconsistency in reversing a statute of limitations verdict for Grace, stating:

> Grace argued at trial not only that the statute of limitations had run, but also that the plaintiff had suffered no injury from the asbestos Monokote. The arguments are inconsistent: if MDU has suffered no injury from the Monokote, then it has no cause of action – until an injury is suffered, the statute of limitations cannot begin to run.

*MDU Resources Group v. W. R. Grace & Co.*, 14 F.3d 1274 (8th Cir. 1994). To put it another way, if, as Debtors claim, their asbestos-containing products pose no hazard, limitations would not have begun to run regarding such claim, let alone expire.

## H.   Claims Allegedly Barred by the Statute of Limitations Pursuant to Actual Notice (Grace Ex. D-4)

The Debtors object to Claimant's claim(s) "because they are barred by the statute of limitations based upon claimants' actual knowledge of their claims ..." (the "D-4 Objections"). For the reasons set forth below, Debtors' objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection to the Claimant's claims. They have also failed to identify the specific statutes of limitations or decisional rulings that they allege bar these claims. As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further information is produced. Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claim, *see In re Allegheny*, *supra*, and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

Most importantly, the statutes of limitations do not bar these claims as limitations do not apply to the State of Arizona, or its political subdivisions, such as Claimant under the common law doctrine of *nullum tempus occurrit regi* and applicable statutes. *See* discussion regarding limitations, Section IV.G, pp. 32-35. In effect, Debtors have merely alleged an invalid defense to the claims of the Claimants and have certainly not provided any support for this defense.

Notwithstanding the above, in Arizona, like most other jurisdictions, a cause of action generally accrues when a wrongful act causes some legal injury. It is the Debtors who bear the burden of establishing that the wrongdoing and the injury occurred outside the limitations period. *Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481 (3rd Cir. 1985). The courts throughout this country have consistently ruled that the mere presence of asbestos-containing products does not trigger the running of limitations. *MDU Resources v. W.R. Grace*, 14 F.3d 1276 (8th Cir. 1994) (injury is the contamination of building, rejecting argument that knowledge of the mere presence of asbestos triggers the statute of limitations); *Adams-Arapahoe Sch. Dist. v. GAF Corp.*, 959 F.2d 868, 872 (10th Cir. 1992) ("[o]nly asbestos contamination constitutes a physical injury compensable under tort law."); *THS Northstar v. W. R. Grace & Co.*, 66 F.3d 173 (8th Cir. 1995) ("the distinction between the mere presence of asbestos-containing materials in a building

and actual release and contamination is critical" because "no cause of action exists until there has been a substantial release"); *San Francisco Unified School Dist. v. W. R. Grace & Co.*, 37 Cal. App. 4th 1318, 44 Cal. Rptr. 2d 305 ("[T]he mere presence of asbestos constitutes only a threat of future harm ... [c]contamination by friable asbestos is the physical injury and the actual, appreciable harm that must exist before a property owner's strict liability or tort cause of action against the asbestos manufacturer accrues and limitations period commences.").

Further, Arizona has also adopted the discovery rule. *See Tom Reed Gold Mines Co. v. United Eastern Mining Co.*, 39 Ariz. 533, 535, 8 P.2d 449, 450 (Ariz. 1932); *see also Matusik v. Dorn,* 157 Ariz. 249, 756 P.2d 346 (Ariz. App. 1988) (discovery rule applies to products liability action whether injury is to the person or his property). In applying the discovery rule, the relevant inquiry for statute of limitations purposes is when a plaintiff knew (*i.e.*, had actual knowledge) or should have known (*i.e.*, had constructive knowledge) that its particular building was actually contaminated with asbestos. *See San Francisco Unified*, 37 Cal. App. 4th at 1336; 44 Cal. Rptr. 2d at 315. In remanding the case, the Court of Appeals instructed the trial court that both (i) "the dates of actual contamination of each school" were "issues of fact" that must be resolved on remand, and (ii) the ultimate inquiry on remand for purposes of Grace's statute of limitations affirmative defense was "when [the plaintiff] should have reasonably discovered that each school's contamination [had] occurred." *Id.* (Emphasis added). This process is not only fact specific, it is also building specific. A claimant's general knowledge regarding the hazards of asbestos is not determinative.

Debtors have failed to come forward with any evidence establishing when Claimant knew of its injury. In fact, the Debtors assert that Claimant has suffered no injury from its ACM. If this is true, limitations as a matter of law cannot have commenced to run.

I.     **Claims Allegedly Barred by Statutes of Repose (Grace Ex. D-5)**

The Debtors object to Claimant's claims because they are allegedly barred by statutes of repose (the "D-5 Objection").  For the reasons set forth below, Debtors' objection should be denied.

Debtors have failed to identify the specific statutes of repose or decisional rulings that they allege bar these claims.  In any event, the statutes of repose do not bar these claims as limitations do not apply to the State of Arizona or to its political subdivisions, such as Claimant under the common law doctrine of *nullum tempus occurrit regi* and applicable statutes.  *See* discussion regarding *nullum tempus* doctrine in Section IV.G, pp. 32-35.

Notwithstanding the above, Arizona has two repose provisions: A.R.C. § 12-551, a products liability statute of repose, and A.R.C. § 12-552, the construction statute of repose.  Neither provision is applicable to the claims asserted by Claimant.  First, the Arizona Supreme Court, in *Hazine v. Montgomery Elevator Co.*, 176 Ariz. 340, 861 P.2d 625 (Ariz. 1993), held that Arizona's product liability statute of repose, A.R.S. 12-551, is unconstitutional as it violates Ariz. Const. art. 18, § 6.  This article states:  "The right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation."  This prohibition applies not only to personal injuries, but also to property damage actions as well.  *See Boswell v. Phoenix Newspapers, Inc.*, 152 Ariz. 9, 15, 730 P.2d 186, 192 (Ariz. 1986).  Second, A.R.S. § 12-552 does not apply to tort claims to recover property damage.  Instead, this provision by its terms is limited to actions based on contract.  *See Fry's Food Stores of Arizona, Inc. v. Mather and Associates, Inc.,* 183 Ariz. 89, 900 P.2d 1225 (Ariz.App.Div.1, 1995).  In effect, Debtors have merely alleged an invalid defense to the claims of the Claimant and have certainly not provided any support for this defense.

**J.    Claims Allegedly Barred by Laches (Grace Ex. D-6)**

The Debtors object to Claimant's claims because Claimants "have delayed in asserting their claims against Grace, often for decades ..." (the "D-6 Objection"). For the reasons set forth below, Debtors' objection should be denied.

Debtors do no provide any information or evidence regarding the basis for this objection to the Claimant's claims. As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further information is produced. Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claims, *see In re Allegheny, supra,* and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

More importantly, the doctrine of laches cannot be applied as to bar a claim by the State or its political subdivisions. *George v. Arizona Corporation Comm'n,* 83 Ariz. 387, 392, 322 P.2d 369, 372 (Ariz. 1958) ("The doctrine of laches is a form of estoppel, and where the public interest is involved neither estoppel nor laches can be permitted to override that interest."); *see also Maricopa County v. Cities & Towns of Avondale,* 12 Ariz. App. 109, 113, 467 P.2d 949, 953 (1970) ("[N]either laches nor its generic parent, estoppel, can be asserted to gain rights against the public or to defeat the public interest."). *See also* discussion regarding *nullum tempus,* Section IV.G, pp. 32-35. There being no fixed period of time for Claimant to bring suit, it cannot be said that it unreasonably delayed in failing to do so. In effect, Debtors have merely alleged an invalid defense to the claims of the Claimant and have certainly not provided any support for this defense.

Notwithstanding the above, "[l]aches is a defense when lack of diligence on the part of the plaintiff results in injury or prejudice to the defendant. Mere passage of time does not amount to the required prejudice." *Mobile Discount Corp. v. Schumacher,* 139 Ariz. 15, 676 P.2d 649

(Ariz. App. 1983) (citing *Leon v. Byus,* 115 Ariz. 451, 565 P.2d 1312 (App.1977)).  A proponent of laches must do more than merely allege prejudice by delay, it "must also demonstrate prejudicial change of position." *Cauble v. Osselaer*, 150 Ariz. 256, 259, 722 P.2d 983, 986, (Ariz. App. 1986) (citing *Ivancovich v. Meier,* 122 Ariz. 346, 351, 595 P.2d 24 (Ariz. 1979)). Debtors have failed to meet the requirements for establishing laches.

First, there is no evidence to suggest that Claimant has unreasonably delayed in pursuing its claims.  Debtors assert that the Grace ACM in Claimant's buildings was installed more than thirty years ago, and that Claimant has been on constructive notice of potential PD claims for more than twenty years. (Fifteenth Omnibus Objections, ¶ 116, p. 38).  This, they argue, proves that Claimant unreasonably delayed in bringing its claim.  This argument is absurd as Debtors have engaged in a concerted effort to conceal the hazards associated with their asbestos-containing products for as long as their products have been installed in Claimant's buildings. *See* Section III.G, above.  As Debtors note in their objection, "Laches is unreasonable delay in enforcing a known right." (Emphasis added).  (Omnibus Objection ¶ 115, p. 38). Claimant was not aware of the hazards of Debtors' ACM at the time the building was constructed or for that matter, twenty years ago.  Even today, Debtors promulgate their position that their asbestos-containing products have not damaged the buildings at issue.  Given this position of Debtors, it is ludicrous for Debtors to likewise contend that Claimant "unreasonably delayed" pursuing its claims.

Second, Debtors have not been prejudiced by Claimant's failure to file its asbestos property damage claims earlier.  Laches, being an equitable doctrine, is premised on some detrimental change in position made in reliance upon the action or inaction of the other party *Cauble,* 50 Ariz. at 260.  The position of Debtors has not changed, much less detrimentally so, due to the action or inaction of Claimant. Grace merely alleges, but offers no proof, that

"witnesses are no longer available; building ownership has changed hands; [and] building-specific documentary evidence is more difficult, if not impossible to find." (Fifteenth Omnibus Objection ¶ 116, p. 38). Even if Debtors produced evidence of such, which it has not, Debtors likewise completely fail to produce any evidence that it has suffered a detrimental change in position.

Finally, as discussed earlier, laches is an equitable doctrine. "Equity does not encourage laches, and the doctrine may not be invoked to defeat justice but only to prevent injustice." *Beltran v. Razo*, 163 Ariz. 505, 788 P.2d 1256 (Ariz. App. 1990) (citing *Higgins v. McElwee*, 680 S.W.2d 335 (Mo. App.1984)). "Fundamental fairness is the *sine qua non* of the laches doctrine." *Mathieu v. Mahoney*, 174 Ariz. 456, 460, 851 P.2d 81, 85 (1993). Debtors' own wrongful acts in concealing the hazards associated with its asbestos-containing products require that the Court deny this objection as it would be inequitable and unjust to allow Debtors to benefit from its own wrongful conduct by barring Claimant's claims based on this equitable defense.

## K.   Claims Allegedly Providing No Measurement of Relevant Asbestos Levels (Grace Ex. E-1)

The Debtors object to Claimant's claims "because they are not accompanied by any documentation reflecting airborne asbestos levels inside the building ... is dangerous ..." (the "E-1 Objection"). For the reasons set forth below, Debtors' E-1 Objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection to the Claimant's claims. As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further information is produced. Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claims, *see In re Allegheny, supra*, and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

The Debtors' argument is premised on the assumption that a certain level of airborne asbestos must be present as measured by air sampling for there to be a hazard that justifies removal of the ACM. This assertion is not new. It is precisely the same argument previously made by the Debtors and other manufacturers of asbestos-containing building products in *Safe Bldgs. Alliance v. E.P.A.*, 846 F.2d 79 (D.C. Cir. 1988).[49] In that case, the "Safe Buildings Alliance" and manufacturers of ACM argued that EPA regulations promulgated pursuant to the Asbestos Hazards Emergency Response Act, 15 U.S.C.A. §§ 2641-2654, must be set aside because the EPA failed to determine what levels of asbestos exposure were safe, or to require the use of air monitoring as the sole or primary assessment method to determine the need for corrective action. The United States Court of Appeals for the District of Columbia found this argument to be meritless.

In *Safe Bldgs. Alliance*, the D.C. Court of Appeals rejected the contention Debtors now make, stating:

> *Congress nowhere said that EPA need rely exclusively or even mainly on air monitoring techniques* (emphasis added) in selecting response actions, or that it need establish a quantitative measure that it deems safe. Indeed, the legislative history affirmatively suggests an intent not to impose such requirements ... . Indeed, the petitioners' insistence that EPA construct a quantitative model before it do anything else offends common sense as well as congressional intent, for the *potential* hazards posed by presently undamaged ACM obviously could not be quantified or measured by air monitoring techniques (emphasis in original).[50]

Instead, the Court approved the approach adopted by EPA which relies on visual and physical evaluation of the condition of the ACM, the location and accessibility of the ACM and the potential for disturbance of the ACM, determined by inspectors accredited in conformity with EPA regulations, as the primary assessment tool or monitoring technique.[51]

---

[49] Grace was a charter member of the "Safe Building Alliance," an industry lobby group which was formed to advance the manufacturers' position that it was unnecessary to abate or remove ACM in buildings.

[50] *Id.* at 83.

[51] *Id.* at 82.

It is interesting to note that Debtors cite no case in support of this novel approach. The reason for this is quite simple: No court has ever adopted such a proposal. In fact, courts in the underlying tort litigation have consistently rejected Grace's contention. Further, discovery in the underlying litigation has firmly established Grace's liability to Claimant. *See* Sections III.A, C, D, and F above.

The use of air sampling to determine hazard has consistently been rejected by the EPA:

> EPA continues to discourage the use of air monitoring as the primary technique for assessing asbestos hazards, since that method only measures current conditions and provides no information about potential and future levels of fiber release ... the agency believes that such standards used for the purposes of assessing asbestos hazards could not ensure protection of human Health and the Environment as intended by USCA Title 11.[52]

Any attempt to determine hazard via static area air sampling is doomed from the outset. This is true because such air sampling only provides a snapshot of the levels of asbestos fibers in the building environment during a particular time period and under the circumstances which then exist. Such static area air sampling, which is the only type of sampling performed by Debtors' consultants, does not present a representative picture of exposures that exists under routine and foreseeable building conditions.[53] As previously discussed, the EPA has rejected adopting an air sampling approach to determining hazard, concluding that a comprehensive building inspection can provide better results.[54]

---

[52] 52 Fed. Reg. 210, 41838 (EPA, October 30, 1987).

[53] Numerous studies simulating actual maintenance and/or custodial activities which utilize personnel air samples taken at the breathing zone of such workers, have shown much higher levels of airborne fibers. Such studies will be the subject of evidence presented by the PD Committee's expert witnesses in the Phase I trial.

[54] Claimant hereby adopts by reference as if fully set forth herein Sections III, IV and V of the Memorandum of Law of the Official Committee of Asbestos Property Damage Claimants in Opposition to Consideration of the Debtors' Proposed "Methodology Issue" as Part of the Estimation of Asbestos Property Damage Claims filed October 17, 2005 (the "PDC Methodology Brief"; Document No. 9671), which discusses in more detail the fact that air sampling results are not dispositive of the claims of Claimant.

L.    **Claims Relying on Air Sampling Results That Are Inapplicable (Grace Ex. E-3)**

The Debtors object to Claimant's claims because "the only evidence of airborne asbestos levels is air sampling data related to abatement and/or other situations irrelevant to show risk during normal operations in a building ..." (the "E-3 Objection"). For the reasons set forth below, Debtors' E-3 Objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection to the Claimant's claims. As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further information is produced. Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claims, *see In re Allegheny, supra*, and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

Air sampling taken during abatement-related activities is relevant to potential health hazards and, in fact, reflects the release of fibers that will occur during the normal and foreseeable operations in a building.[55] Moreover, the results of static area air sampling as advocated by Debtors is not a basis upon which to determine the need for corrective action. *See* discussions in Section IV.K. above. This issue was addressed in depth in the PDC Methodology Brief, and Claimant also adopts by reference the discussions set forth in that brief.

V.    **CLAIMANT'S AFFIRMATIVE DEFENSES**

Debtors assert that the Claimant's claims are time-barred by applicable statutes of limitations, statutes of repose and/or the common law doctrine of laches. As noted above, the claims of Claimant are not time-barred, as the statutes of limitations and/or repose do not apply to the claims of Claimant by virtue of the common law doctrine of *nullum tempus occurrit regi*, and/or applicable statutes. However, even if such defenses were available to Debtors, these

---

[55] *See* discussion regarding Grace's knowledge of building activities that would impact the performance of its Surface Treatment ACM, Section III.D., above.

defenses do not bar Claimant's claims as the doctrines of equitable estoppel and equitable tolling are applicable.

Equitable tolling and equitable estoppel are "based primarily on the view that a defendant should not be permitted to escape liability by engaging in misconduct that prevents the plaintiff from filing her claim on time." *In re: Enron,* 310 F. Supp 819 (S.D. 2004). The primary difference in these doctrines is that equitable estoppel focuses its attention on the defendant's conduct while equitable tolling focuses on the claimant's excusable neglect.

The doctrine of equitable estoppel includes a number of interrelated, but separate, defenses, including equitable estoppel, quasi-equitable estoppel, judicial estoppel[56] and fraudulent concealment. These doctrines are recognized by virtually all jurisdictions in one form or another and are founded upon principles of fair dealing. The underlying premise for these doctrines is that a party should not be allowed to gain an advantage by asserting inconsistent positions or mutually contradictory positions, which either results in an unfair advantage to one party or detriment to the other party. In applying estoppel in the context of litigation, the focus is on preventing parties from "playing fast and loose with the court" and to "protect the integrity of the judicial process." *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir. 1982).

As discussed earlier, almost every state has adopted the discovery rule either as part of its statutory scheme regarding accrual of limitations or its courts have judicially adopted such a rule to determine when a plaintiff's cause of action accrues. The discovery rule holds that the limitations period is tolled until the plaintiff discovers, or through the exercise of reasonable diligence should have discovered, the nature of his or her injury. The discovery rule is an affirmative defense to limitations.

---

[56] Some jurisdictions refer to judicial estoppel as "the doctrine against the assertion of inconsistent positions." *Scarano v. Central R. Co. of New Jersey*, 203 F.2d 510, 513 (3rd Cir. 1953).

Time and time again, Debtors have represented to building owners and now to this Court, in both their pleadings and in oral argument, that their asbestos-containing products pose no hazard to building occupants. Yet, in the same breath they assert that Claimant's claim is time-barred. Grace cannot have it both ways: On one hand asserting no hazard, and then on the other hand asserting that the Claimant's claim is time-barred.

The Debtors' conduct is exactly what these equitable doctrines are designed to prevent – allowing a party from asserting its rights under a general technical rule of law when it has so conducted itself that it would be contrary to equity and good conscience to do so.

## VI.   DEBTORS ARE NOT ENTITLED TO ASSERT ADDITIONAL OBJECTIONS TO CLAIMANT'S CLAIMS

Claimant opposes and objects to Debtors' request that 1) it not be required to comply with Del. Bankr. LR 3007-1 (this rule requires all "substantive objections" to a particular proof of claim be asserted in a single omnibus objection or such objection is waived); and 2) they have the opportunity to make further objection if and when it is determined that information provided by Claimant is untrue and inaccurate. *Id.* at ¶¶ 217-19, pp. 64-65. Both requests should be denied. Debtors have now had two occasions to raise objections to Claimant's claims. The Court has previously accepted Debtors' proposal regarding information to be included in the claim form. Claimants provided this information over two years ago. Debtors have had more than sufficient time to review this information and formulate their objections to Claimant's claims. Debtors should not be allowed to continue to raise objections, in repeated piecemeal fashion, as this will unduly prolong the estimation process, rather than provide an efficient means of resolving claims.

VII.    **CLAIMANT'S RIGHT TO FILE SUPPLEMENTAL RESPONSE TO OBJECTIONS**

Debtors have failed to comply with Del. Bankr. LR 3007-1(e)(iii)(I) by providing sufficient detail regarding objections to Claimant's claim.  This has prevented Claimant from being able to fully and completely respond to such objections.  Claimant reserves the right to supplement its responses should Debtors provide additional information, including, but not limited to, 1) the specific key elements not present in bulk samples; 2) specific documents not provided in response to questions; and 3) the specific statutes of limitations or repose, or the decisional law that supports Debtors' argument that Claimant's claims are barred.

VIII.   **CONCLUSION**

For the reasons set forth hereinabove Claimant, requests that:

1.  Debtors' objections be denied;

2.  Debtors be required to provide "sufficient detail as to why the claims should be disallowed" pursuant to Del. Bankr. LR 3007-1(e)(iii)(I); and

3.  Claimant be allowed to conduct discovery regarding all of Debtors' objections before any such objection is sustained.

Dated:  December 8, 2005

Respectfully submitted,

Christopher D. Loizides (Bar No. 3968)
Michael J. Joyce (No. 4563)
LOIZIDES & ASSOCIATES
1225 King Street, Suite 800
Wilmington, DE  19801
Telephone:      (302) 654-0248
Facsimile:      (302) 654-0728
Email:            loizides@loizides.com

-- and --

Martin W. Dies
DIES & HILE
1009 Green Avenue
Orange, TX  77630
Telephone:      (409) 883-4394
Facsimile:      (409) 883-8414

Special Counsel, Maricopa County, Arizona

*Co-Counsel for the Claimant*