# EXHIBIT A

# SETTLEMENT AGREEMENT

This Settlement Agreement and Release ("Settlement Agreement") is entered into as of June 7, 2005 by and between, on the one hand, Intercat, Inc ("Intercat") a Delaware Corporation with offices in Sea Girt, New Jersey, and on the other hand, W.R. Grace & Co.-Conn., ("Grace"), a Connecticut Corporation with offices at 7500 Grace Drive, Columbia, Maryland, 21044, hereinafter respectively referred to as a "Party" or collectively as the "Parties."

## RECITALS

WHEREAS, the Parties are presently engaged in a lawsuit entitled Intercat, Inc. v. Nol-Tec Systems, Inc. and W.R. Grace & Co.-Conn., currently pending in the United States District Court for the District of Minnesota No. 03-CV-4886 RHK/AJB (the "Action"); and

WHEREAS, Grace is a co-defendant with Nol-Tec Systems, Inc. (hereinafter "Nol-Tec") in the Action; and

WHEREAS, Nol-Tec and Intercat are entering into a separate settlement agreement to resolve the Action (hereinafter "Nol-Tec Settlement Agreement"); and

WHEREAS, in the Action, each Party has asserted various Claims (as herein defined) against each other regarding the Intercat Patent-In-Suit (hereinafter defined); and

WHEREAS, the Parties desire to reach an amicable resolution of the Action in a voluntary, convenient, efficient and expeditious manner, without regard to the merits of the respective Claims of the Parties hereto, subject to a complete reservation of rights as to matters not specifically resolved by this Settlement Agreement; and

WHEREAS, without prejudice to or waiver of their respective positions in other matters, without further trial or adjudication of any issues of fact or law, and without any admission of liability or fault under the Action, the Parties each desire to avoid the expense, uncertainties and distraction of the Action, and therefore, through their authorized representatives have agreed to a full and final settlement that releases and terminates all rights, obligations and liabilities of the Parties with respect to the Action, in accordance with the terms and conditions, and subject to the exceptions, set forth herein without prejudice to any other actions, and, further without prejudice to any Claim against any person not a Party to this Settlement Agreement; and

WHEREAS, as a result of a prior litigation Grace was awarded damages of over $22 million from Intercat (W.R. Grace & Co.-Conn. v. Intercat et al., 60 F. Supp. 2d 316, 52 U.S.P.Q. 2nd 1331 (D. Del. 1999)) (hereinafter "Prior Suit"); and

WHEREAS, Intercat commenced a Chapter 11 case (the "Intercat Chapter 11 Case") in the United States Bankruptcy Court for the Southern District of Georgia, Case No. 99-42795-LWD, after the judgment in the Prior Suit was entered; and

WHEREAS, Grace filed an unsecured claim in the Intercat Chapter 11 Case based upon the judgment, which was allowed in the amount of $22,519,770 (the "Grace Claim"); and

WHEREAS, a Plan was confirmed in the Intercat Chapter 11 Case (the "Intercat Plan"), which provided for 40 quarterly payments on general unsecured claims, including the Grace Claim, totaling 105% of the amount of each of such claims; and

WHEREAS, Intercat still owes Grace 28 quarterly payments in accordance with, and in the amount shown in, the schedule attached hereto as Exhibit 1; and

WHEREAS, contemporaneously with the execution of this Settlement Agreement, Grace and Intercat have entered into an option agreement (hereinafter Option Agreement) attached hereto as Exhibit 2 under which each Party grants to the other Party, an option to obtain a license with respect to certain of its patent rights currently existing or developed before June 7, 2010; and

WHEREAS, the terms of the license that can be elected in accordance with the Option Agreement are provided in a model license agreement (hereinafter "Model License Agreement") attached to the Option Agreement; and

WHEREAS, subject to the terms and conditions, and subject to the exceptions, set forth herein, Intercat is granting to Grace herein, a prospective worldwide license under the Intercat '236 Patents (hereinafter defined) commencing on the Effective Date.

NOW THEREFORE, for and in consideration of the complexity of the issues to be litigated and the substantial risks and uncertainties enumerated above, the Option Agreement or License Agreement elected thereunder, the promises contained herein, and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

Article1.    Definitions.

All definitions provided in this Settlement Agreement are subscribed to and adopted by the Parties for purposes of this Agreement only and no other purpose.

1.01    "Affiliate" of any Party shall mean a Person, which at the time in question, is directly or indirectly affiliated with the Party. For the purposes of this definition, a Person is:

2

(a)  directly affiliated with a Party, when it directly controls, is directly controlled by, or is under common control with said Party, and

(b)  indirectly affiliated with a Party when any other Person or entity legally interposed between the Person in question and the Party is directly affiliated either with the Party or with another Person that is directly affiliated with the Party.

As used in this definition, "control" of a specified Person means the direct or indirect possession of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract, or otherwise, and in any event shall include ownership of voting securities of such Person having at least 50% of the voting power of the voting securities or other ownership rights of such Person.

"Affiliate extendee" shall mean any Affiliate of a Party hereto to which this Settlement Agreement has been extended pursuant to Section 7.07.

1.02  "Approval Order" means an order unconditionally approving and authorizing the execution and full performance of this Settlement Agreement by the Parties entered by the Bankruptcy Court (hereinafter defined).

1.03  "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware, in which the Grace Chapter 11 Case (hereinafter defined) is pending.

1.04  "Catalyst" shall mean particulate FCC catalyst and/or particulate FCC additive adapted for use in an FCC Unit.

1.05  "Claim" means any and all claims, counterclaims, causes of action, demands, agreements, contracts, covenants, representations, warranties, promises, undertakings, actions, obligations, controversies, debts, costs, expenses, attorneys' fees, expert witness fees, court costs, accounts, damages (consequential or punitive), losses, injuries and liabilities, of whatever kind or nature, in law, equity, or otherwise, whether known or unknown, suspected or unsuspected, for or by reason of any matter, cause or thing whatsoever, whether sounding in contract, tort or otherwise.

1.06  Corrective Action Definitions:

(a)  "Actual Weight" shall mean:
  (i)  in respect to a Loader characterized as operating under a Gain-In-Weight principle, the weight of Catalyst actually introduced into an FCC Unit in a particular injection or series of injections, which weight shall be the difference between:
    (1)  the weight of the Evacuation Container after the Catalyst is charged into it, and

3

        (2)    the actual or assumed weight (e.g., tare weight) of the Evacuation Container before that Catalyst was charged into it; provided that for a series of injections, the weight is the aggregate difference, if any, between (1) and (2) for the series of injections; and

    (ii)    in respect to a Loader characterized as operating under a Loss-In-Weight principle, the weight of Catalyst actually introduced into an FCC Unit in a particular injection or series of injections, which weight shall be the difference between:

        (1)    the weight of the container containing Catalyst before the one or more injections is (are) made, and

        (2)    the weight of the container after the corresponding one or more injections of Catalyst is (are) made.

(b)    "Automatic" and grammatical variations thereof in respect to all or part of a program (a sequence of logical steps ("Program")) performed by a Controller, as it relates to recited subject matter of the definition of Corrective Action, shall mean such a Program, or a part thereof, that once initiated, is capable of continuing for a period of time (e.g., Cycle) independent of subsequent external human influence or conscious human control for that time period.

(c)    "Controller" shall mean a computerized control device, adapted to control and/or acquire information about, at least some of the operations of a Loader, comprised of electronic, mechanical, and/or other associated componentry not necessarily located in a single housing. For purposes of determining whether or not a Controller is capable of Corrective Action, reference shall first be made to the capability of the Loader and associated Controller componentry supplied by Grace and use thereof. However, it is agreed that to the extent a third-party user (e.g., refiner) modifies or enhances the capability or the componentry of the Controller as supplied by Grace and/or provides or uses equipment or components not provided by Grace, to provide Corrective Action and/or capability of Corrective Action, the issue of whether Grace is liable under this agreement for a royalty to Intercat shall be evaluated under applicable law of indirect infringement, including 35 U.S.C. § 271(c). More specifically, this evaluation is to be made assuming for purposes of argument that a process using a Loader operating with Corrective Action would infringe, and a process using a Loader not operating with Corrective Action would not infringe.

(d)    "Cycle" shall mean a period during which a designated Target Weight of Catalyst is intended, estimated, or assumed to be injected.

4

(e)    "Discrepant Amount" shall mean the discrepancy between weight of Catalyst actually injected into an FCC Unit by the Loader (defined hereinabove as Actual Weight) in one or more injections, and the weight intended, estimated, or assumed to have been introduced into the FCC Unit (defined hereinbelow as the Target Weight) in those one or more previous injections.

(f)    "Gain-In-Weight" in respect to a particular injection or series of injections, means the principle of operation of a Loader in which:

    (i)    an evacuation container (Evacuation Container) of the Loader is charged with Catalyst intended to be injected into an FCC Unit and the charged Catalyst is thereafter attempted to be substantially completely evacuated from the container to the FCC Unit, and

    (ii)    the evacuation container is:

        (1)    weighed (or assigned a tare weight) at least before the Catalyst charge, and then

        (2)    weighed after the Catalyst charge (or weighed continuously for such time), but before the injection.

Thus, for example, a Loader's Evacuation Container is weighed (or assigned a tare weight) and thereafter an amount of product intended to be injected into the FCC Unit is charged to the container; the container is thereafter weighed again, before evacuation (injection) of its contents to the FCC Unit.

(g)    "Loss-In-Weight" in respect to a particular injection or series of injections, means the principle of operation of a Loader in which:

    (i)    a container, that holds Catalyst (e.g., an Inventory Container or an Evacuation Container) for injection into an FCC Unit, is associated with the Loader, and

    (ii)    the container is weighed both before and after each of the one or more injections of Catalyst is/are made from the container (or is weighed continuously for such period).

(h)    "Manual" and grammatical variations thereof, as applied within the context of Corrective Action shall mean those actions that are initiated through conscious action by a human. Manual may include the use of a calculator or similar device.

(i)    "Substantially Automatic" and grammatical variations thereof within the context of Corrective Action shall mean use of Controller programming that permits Manual action with respect to the pertinent portion of Corrective Action. This can include Manual action for the purpose of (a) supplying information needed to complete a Program embodied in steps (k)(i) to (k)(iii), and optionally (b) restarting the Program to use the Manually supplied information to achieve completion of said Program. Substantially Automatic includes Automatic. Notwithstanding anything in

this or other definitions, Substantially Automatic is subject to paragraphs (l), (m), and (n), which evidence and reflect non-exhaustive (i) examples and (ii) exceptions to the literal definitions of Corrective Action.

(j)    "Target Weight" in respect to particular injection or series of injections of Catalyst into an FCC Unit, by a Loader, shall mean the weight of Catalyst intended, estimated, or assumed to have been injected into the FCC Unit in such injection or series of injections .

(k)    "Corrective Action" means those actions carried out in conjunction with the operation of a Loader to the extent referenced in (i)-(iii) below, to control or adjust for the amount of Catalyst injected into an FCC Unit in one or more previous injections, by adding or withholding all or any part of the Discrepant Amount arising from such one or more previous injections;

where, subject to the examples and exceptions reflected in (l), (m), and (n) below (and notwithstanding anything else in the Agreement), such actions must be implemented by or involve a Controller that is, without further programming (which programming is not then contemplated for use without paying a royalty under Section 7.04), enabled with the capability to:

(i)    on an Automatic basis: acquire information about the Actual Weight injected during one or more injections over a given period of time and send such information for use in (ii);

(ii)    on a Substantially Automatic basis: determine all or a percentage (i.e., a portion) of a Discrepant Amount using the information acquired in (i), and send or provide, for use in (iii), information embodying all or a percentage (i.e., a portion) of the Discrepant Amount; and

(iii)    on a Substantially Automatic basis: use the information of (ii) to correct or adjust in one or more subsequent injections for any portion of the Discrepant Amount determined in (ii) by adding or withholding all or part of the Discrepant Amount during one or more subsequent injections.

(l)    The Parties have agreed:
(i)    The full scope of the degree of Manual activity permitted to be incorporated into and/or utilized in connection with exceptions to the literal scope of the operations of Steps (k)(ii and iii) without disqualifying such operations as being Substantially Automatic (and hence also disqualifying the Loader as operating with Corrective Action), cannot be comprehensively stated herein in writing. Consequently, notwithstanding the express wording of Sections

6

(k)(ii and iii) above, mutually agreed upon non-exhaustive examples and/or exceptions to the literal wording of Steps (k)(ii and iii) have been adopted. These examples and/or exceptions (recited in Sections (m) and (n)) are representations of what is and what is not considered to be Corrective Action, regardless of whether any literal inconsistency may exist between any exception and the definitions. However, such examples and exceptions are not exhaustive of what is or is not Corrective Action and the full scope of such possible examples and exceptions to the literal wording of Step (k)(ii and iii). To the extent that the subject matter informed by one or more sub-parts of Sections (m) and (n) is interpreted to be inconsistent with the Corrective Action definitions, such subject matter shall be construed to constitute controlling exceptions to the literal wording of the definitions but nevertheless otherwise part of the definition as a whole, and to the extent one or more sub-parts of Sections (m) and (n) are interpreted to be consistent with the Corrective Action definition, they shall inform the interpretation thereof.

(ii)     A programmed functionality for "pre-act," which is the use of an adjustable setpoint to automatically close or jog a valve or feed device that controls the filling of minor amounts of material into an evacuation container of a Gain-In-Weight Loader as described, for example, in the pertinent portions of deposition transcripts of Wertwijn and Harmon (e.g., in connection with charging (i.e., filling) Catalyst into an evacuation container in a Gain-In-Weight Loader), does not in and of itself constitute Corrective Action.

(m)     Notwithstanding anything else in this Agreement, the following examples and/or exceptions illustrate Manual interventions/actions within the scope of "Substantially Automatic" and satisfying, completely, steps (k)(ii and (iii):

(i)     Manual use or control of the information produced in accordance with step (k)(ii) that thereby embodies a Discrepant Amount to add or withhold all or any portion of the Discrepant Amount. "Corrective Action" shall, for example, include the use, by a human or refinery control system, of the information signal of (ii) (e.g., a display thereof) embodying a Discrepant Amount, to add or withhold all or any portion of a Discrepant Amount. This may be done, for example, by manual or remote (e.g., DCS) operation of a valve, a shot pot, or other means to add or stop the flow of product.

(ii)     Manual use or control of the signal produced in accordance with step (k)(ii) (that thereby embodies a Discrepant Amount) to initiate and/or make a Yes/No decision to thereafter Automatically add or

7

withhold all or any portion of the Discrepant Amount (This is a species of the above example).

(iii)    Where there is a display of information embodying a Target Weight and the Actual Weight (but not embodying an actual Discrepant Amount), whether such information is on a per injection or cumulative basis with respect to previous injections (e.g., for one or more Cycles or portions thereof), and there is a Manual determination of all or a portion of the Discrepant Amount and Manual adding or withholding of all or a portion of the Discrepant Amount; provided that the Controller Automatically resets to zero the display of the Target Weight and/or Actual Weight (whether for an individual injection or a cumulative weight from previous multiple injections), and such a reset is effectuated after 48 hours or less of corresponding injection operation (e.g., Cycle(s) or portion thereof).

(n)    Notwithstanding anything in this Agreement, the following illustrate Manual interventions outside the scope of Substantially Automatic and do not satisfy steps (k)(ii) and (iii):

(i)    Any Manual operation of a Controller that is not programmed at any time to Automatically calculate, determine, display and send an information signal embodying a Discrepant Amount for one or more injections, irrespective of whether it calculates, determines, or displays:

(1)    a Target Weight for a Cycle (e.g., a daily amount), or any portion of a Cycle,

(2)    a cumulative total Actual Weight from previous injections during one or more Cycles, and /or

(3)    an Actual Weight from one or more previous injections,

and irrespective of what further Manual use is made of such information; provided that the Controller is **not** programmed to Automatically reset to zero the Controller display of the Target Weight and/or Actual Weight after less than 48 hours (e.g., two 24 hour Cycles) of injection operation.

(ii)    The same as (m)(i), except that the Controller display of Target Weight and Actual Weight is Manually reset to zero at any time during a Cycle, e.g., at the end of a 24 hour Cycle, but is not Automatically reset to zero after less than 48 hours of corresponding injection operation (e.g., Cycle or portion thereof).

(iii)    The same as (m)(i), except that:

(1)    the Controller Program can be Manually stopped at any time within a Cycle, and a single injection amount within a Cycle

8

can be Manually changed to correct for a Discrepant Amount Manually calculated from the displayed information, and

(2) the Target Weight and Actual Weight displays are not Automatically reset to zero after less than 48 hours of corresponding injection operation (e.g., Cycle or portion thereof).

(o) For purposes of clarification, and by way of example only, the following constitute Loss-In-Weight Loaders with Corrective Action:

(i) any automated catalyst and/or additive catalyst injection system ("AACIS") provided and/or previously referenced under any of the following W. R. Grace & Co.–Conn. model nos./descriptors: NIS-CA60-VA1; NIS-CA60-VA2. Pertinent structure and/or operation of the foregoing Loss-in-Weight type Loaders is evident from (at least) portions of one or more of the following: Nol-Tec's Second Supplemental Answer to Intercat's Interrogatory No. 10; W.R. Grace's Supplemental Responses to Intercat's Corrected Second Supplemental Set of Interrogatories (No. 8); Harmon I (1/21/04) deposition transcript at pp. 66-75, 77-84, 115-117, 122-126, 137, 147-150, 161-163, 168-171, and 176; Harmon II (1/22/04) deposition transcript at pp. 84-87, 89-93, 101-104, 122-124, 126, and 150-152; Plaintiff's deposition exhibit nos. 7-9, 14, 35, 37, 39, 40, and 43; at least the "rate" subroutines disclosed in Plaintiff's deposition exhibit nos. 44, 45, 45A, and 46-50; and Plaintiff's deposition exhibit nos. 52A and 52B (all of which materials may be maintained in escrow by counsel for Plaintiff for the term of this Agreement); and/or

(ii) any Loss-In-Weight Loader that employs the above referenced Corrective Action to automatically stop or adjust a 24 hour (or other period) injection schedule prior to the end of a 24 hour time (or other time) period, and/or modify a later or last injection amount of a 24 hour (or other period) injection schedule in view of prior actual and/or assumed injections.

(p) For purposes of clarification, and by way of example only, the following constitute Gain-In-Weight" Loaders with Corrective Action:

(i) W. R. Grace & Co.–Conn. model nos./descriptors: NIS-B1250-PA2; NIS-A250-VA2 (Post-) "Hovensa" Catalyst Injection System. Pertinent structure and/or operation of the foregoing Gain-in-Weight type Loaders is evident from (at least) portions of one or more of the following: Nol-Tec's Second Supplemental Answer to Intercat's Interrogatory No. 10; W.R. Grace's Supplemental Responses to Intercat's Corrected Second Supplemental Set of Interrogatories

9

(No. 8); Harmon II (1/22/04) deposition transcript at pp. 153-157; Wertwijn deposition transcript at pp. 50-57, 73-86, and 89-102; Plaintiff's deposition exhibit nos. 16, 59, 60, and 63; and at least pages 17159-17160 of Plaintiff's deposition exhibit no. 64 (all of which materials may be maintained in escrow by counsel for Plaintiff for the term of this Agreement); and/or

    (ii)    any Gain-In-Weight Loader that employs the above described Corrective Action to automatically stop or adjust a 24 hour (or other period) injection schedule prior to the end of a 24 hour time (or other time) period, and/or modify a later or last injection amount of a 24 hour (or other period) injection schedule in view of prior actual and/or assumed injections.

1.07    "Covered Country" means a country wherein at least one claim of an Intercat '236 Patent exists that is issued and unexpired and has not been held invalid or unenforceable by a patent office or court of competent jurisdiction beyond possibility of review and/or appeal.

1.08    "Effective Date" means the date the Approval Order entered in the Grace Chapter 11 Case (hereinafter defined) becomes final and non-appealable.

1.09    "Effective Settlement Date" means June 7, 2005.

1.10    "Field" means particulate FCC catalyst and/or particulate FCC additive.

1.11    "Grace Chapter 11 Case" means the chapter 11 cases filed by Grace and certain affiliated debtors in the Bankruptcy Court, titled In re W.R. Grace & Co., et al., Case No. 01-01139 (JKF).

1.12    "Grace Claim Remaining Payment Obligation" (GCRPO) means the obligation of Intercat to make payments on the Grace Claim pursuant to the Intercat Plan. The remaining quarterly payments, due on the Grace Claim, as of June 7, 2005, are shown at Exhibit 1.

1.13    "Group" when used in connection with a Party means present and former officers, directors, employees, agents, assigns (to the extent permitted herein), heirs, executors, reinsurers, successors, administrators, liquidators, predecessors, representatives, members, partners, attorneys, subsidiaries, Affiliates, and divisions of said Party.

1.14    "Intercat '236 Patents" means (a) the Intercat Patent-In-Suit, (b) all patents and/or patent applications claiming priority to or common priority with the Intercat Patent-In-Suit, together with all continuations, continuations-in-part and divisionals of such patents and patent applications, and (c) all patents issuing from any patent application described in clause (b), and (d) all reissues, re-

examinations, extensions and foreign counterparts of any of the foregoing patents and patent applications.

1.15    "Intercat Patent-In-Suit" means U.S. Patent No. 5,389,236.

1.16    Loader Related Definitions:

(a)    "FCC Unit" means a fluid catalytic cracking unit comprising at least a fluidized reaction zone and regeneration zone employed in the chemical and/or petrochemical industries for converting petroleum oils to gasoline and olefins, using catalysts and catalyst additives.

(b)    "Loader" means an apparatus for controlling introduction of Catalyst, directly or indirectly (i.e., through a feed line connected to an FCC Unit), into an FCC Unit, comprising a container (hereinafter "Container") for holding Catalyst that is to be introduced into the FCC Unit, a weigh system for weighing the Container, a computerized control device, and one or more communication lines used for communication of actual and/or assumed weight information between the weigh system and the computerized control device. The Container can perform a primary function of storage, in which case it is referred to as an Inventory Container, or it can perform a primary function of holding a charge of Catalyst from which the Catalyst is evacuated into the FCC Unit, in which case it is referred to as an Evacuation Container.

(c)    "Licensed Grace Loader" means a Loader supplied by or on behalf of Grace or its Affiliate to a refinery customer on or after the Effective Settlement Date, wherein (A) (i) the Loader, as supplied to a refinery customer, is programmed to employ Corrective Action, or (ii) the Loader is adapted by or on behalf of Grace, after it is installed at a refinery customer, to be programmed to employ Corrective Action, and (B) the Loader is used, sold for use in, or imported into a Covered Country for use in that Country. A royalty is due on Licensed Grace Loaders pursuant to Section 7.04.

(d)    "Settled Grace Loader" means any and all Loaders supplied to a customer by or on behalf of Grace or its Affiliate prior to the Effective Settlement Date and which is listed at Exhibit 3A.

(e)    "Non-Settled outside-US-Grace Loader" means any and all Loaders supplied outside the United States to a customer outside the United States by or on behalf of Grace or its Affiliate prior to the Effective Settlement Date and which is listed at Exhibit 3B

1.17    "Person" means any individual, corporation, partnership, firm, joint venture, association, limited liability company, joint-stock company, trust, unincorporated

11

division or other organization, any federal, state or local government or quasi government body or political subdivision or any agency, department, board or instrumentality thereof, or any other entity, whether or not for profit.

1.18  "Settlement Agreement" means this settlement agreement including (unless context requires otherwise) any Exhibits and other attachments incorporated by reference in this agreement. The recitals shall be included in the terms of the Settlement Agreement.

Article 2.    Release by Intercat.

2.01  Intercat's Release of Grace. For the consideration specified at Section _7.01, and subject to Grace's compliance with Sections 7.01 and 7.02, Intercat for itself and the Intercat Group:

(a)  does hereby forever and irrevocably release, acquit, discharge and covenants not to sue for, or bring or maintain any claim for patent infringement under any of the Intercat '236 Patents, against Grace and/or any other member of the Grace Group, that Intercat, or any other member of the Intercat Group have, had, or may have, against Grace and/or any other member of the Grace Group, wherein said Claim, arises out or relates to a Settled Grace Loader; and

(b)  does hereby forever and irrevocably release, acquit, discharge and covenants not to sue for, or bring or maintain any claim for patent infringement under any other patents owned or controlled (in the sense of having the right to license without accounting to others) by Intercat or any member of the Intercat Group, against Grace and/or any other member of the Grace Group, that Intercat, or any other member of the Intercat Group have, had, or may have, against Grace and/or any other member of the Grace Group, wherein said Claim, arises out or relates to a Settled Grace Loader to the extent the Settled Grace Loader and use thereof was disclosed in the Action and to the extent the Settled Grace Loader is configured as disclosed in the Action.

2.02  For the consideration specified at Sections 7.01 and 7.02, and subject to Grace's compliance with Sections 7.01 and 7.02, Intercat, for itself and the Intercat Group, also does hereby forever and irrevocably release, acquit, and discharge, and covenant not to sue or bring or maintain any Claim for patent infringement under any Intercat '236 Patent, against, any refining customers, manufacturers, distributors, or agents of Grace or any member of the Grace Group, that the Intercat Group have, had, or may have against any of them wherein said Claim, arises out of or relates to a Settled Grace Loader. This release also specifically covers, and is applicable to, the use of any Settled Grace Loader before or after the Effective Settlement Date and each and any refinery customer using a Settled Grace Loader after the Effective Settlement Date shall have a fully paid up license under the Intercat '236 Patents with respect to said Loader for its

remaining useful life. (Nothing in this Agreement shall be construed as changing applicable law with respect to issues of repair vs. reconstruction).

2.03   The release, discharge, etc, by Intercat specified at Section 2.02, shall conditionally exclude Nol-Tec therefrom, i.e., such exclusion shall only become effective upon the complete and effective release, discharge, covenant not to sue, and acquittal of Nol-Tec under any Claim for patent infringement under any Intercat '236 Patent, against, Nol-Tec, that the Intercat Group have, had, or may have against Nol-Tec, wherein said Claim, arises out of or relates to a Settled Grace Loader, and such exclusion shall remain effective only so long as said release etc. of Nol-Tec remains effective. It is contemplated that such release etc, of Nol-Tec by Intercat will occur upon execution of the Nol-Tec Settlement Agreement by Nol-Tec and Intercat.

2.04   The releases by Intercat and the Intercat Group set forth in Sections 2.01 and 2.02 shall be effective only upon the occurrence of the Effective Date.

2.05   The Parties agree that treatment of each and every Non-Settled outside-US-Grace Loader as a Licensed Loader in accordance with Article 7 (including payment of the pertinent royalty under Section 7.04) of this Agreement shall be available to Grace and its Affiliates, at the request of Grace, upon importation of the Loader into, or use of the Loader in, a Covered Country, if it is concluded by Grace that said Loader operates with Corrective Action.

Article 3.   Release by Grace.

3.01   Grace's Release of Intercat. Grace for itself and the Grace Group releases, acquits, discharges and covenants not to sue or bring or maintain against Intercat and/or the Intercat Group as to all claims, causes of action, demands, or suits regarding or relating to Intercat's '236 Patents, the Action and/or the Settled Grace Loaders that Grace or any member of the Grace Group have, had, or may have and/or that were or could have been asserted in the Action by Grace prior to the Effective Settlement Date.

3.02   The releases by Grace and the Grace Group set forth in Section 3.01 shall be effective only upon the occurrence of the Effective Date.

Article 4 Dismissals/Withdrawals.

4.01   Grace and Intercat agree to dismiss with prejudice all Claims asserted against one another in the Action conditioned upon the occurrence of the Effective Date.

4.02   Grace and Intercat agree that within three (3) business days of the last to occur of the execution of this Settlement Agreement or the Effective Date, they will jointly sign and file with the United States District Court of Minnesota a Stipulation and [Proposed] Order of Dismissal With Prejudice of all claims and

counterclaims in the form attached hereto as Exhibit 4.  Intercat and Grace will each bear their own costs, expenses, and attorneys' fees in connection with this litigation, negotiation, and settlement of this litigation.

4.03    In the event that the Court has not entered the Stipulation and [Proposed] Order of Dismissal With Prejudice in substantially the form set forth in Exhibit 4 within thirty (30) days after its filing, the Parties agree to contact the Court jointly and use their best efforts in order to expedite entry of the Stipulation and [Proposed] Order of Dismissal With Prejudice.

Article 5.    Bankruptcy Court Approval

5.01   (a)    Grace and Intercat shall use their best efforts to reach agreement on the terms of the Settlement Agreement, the Option Agreement, and the Model License Agreement, and Grace shall use its best efforts to seek and obtain the Approval Order from the Bankruptcy Court as soon as mutual agreement is reached on the three settlement documents.

(b)    If the Approval Order is not entered in the Bankruptcy Court on or prior to January 1, 2006 or the Approval Order does not become final and non-appealable prior to February 28, 2006 (the January 1, 2006 and February 28, 2006 dates being referred to hereinafter as the "Critical Dates") the Effective Date has failed to occur.  However, either or both of the Critical Dates, may be unilaterally extended in one month increments by either Grace or Intercat by giving written notice to the other of each of such extensions, up to a maximum combined total of two (2) extensions taking into account the extensions of both Parties.

(c)    Upon the failure of the Effective Date to occur pursuant to Section 5.01(b):
   (i)     this Settlement Agreement shall be null and void and terminated;
   (ii)    subject to obligations of, best efforts, good faith and fair dealing, neither party shall be liable to the other Party as a result of the failure of the Effective Date to occur;
   (iii)   the following shall apply:
       (1)    the confidentiality obligations of the protective order used in the Action shall remain in full force and effect,
       (2)    the terms of this Settlement Agreement shall be treated as part of a settlement discussion;
       (3)    neither this Settlement Agreement nor its contents can or should be used in any litigation for any purpose;
       (4)    the terms of this Settlement Agreement shall be treated as coming under Rule 408, Fed. R. Evidence, and not as an admission that the Intercat Patent-In-Suit is valid or enforceable or that the Grace Group or customers of the Grace Group directly or indirectly infringe the Intercat Patent-In-Suit.

(iv)    pursuant to Section 7.02, any resulting payments made by Intercat to Grace after the Settlement Effective Date shall not constitute a default under the Intercat Plan, and Intercat will make an additional payment to Grace, on the next quarterly payment date, to offset and pay back to Grace any credits taken against the GCRPO by Intercat after the Effective Settlement Date, as set forth in Exhibit 1.

Article 6.      Representations and Indemnities.

6.01    Each Party to this Settlement Agreement represents and warrants to the other that, as of the date hereof, it is a corporation, duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has all requisite power and authority, corporate or otherwise, b execute, deliver and perform this Settlement Agreement and Option Agreement or License Agreement elected thereunder.    This Settlement Agreement and Option Agreement or License Agreement elected thereunder is a legal, valid and binding obligation enforceable against each of the Parties in accordance with its terms and conditions, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws, from time to time in effect, affecting creditor's rights generally and by general principles of equity.

6.02    Each Party to this Settlement Agreement represents and warrants that it has not assigned or transferred any portion of any Claims released under this Settlement Agreement to any other person, individual, firm, corporation or entity.  Each Party to this Settlement Agreement further represents and warrants that no other person, individual, firm, corporation or entity has any lien, right, claim or interest in any Claims released under this Settlement Agreement.  Each Party to this Settlement Agreement shall indemnify, defend, and hold harmless any other Party to or beneficiary of this Settlement Agreement from and against any and all Claims arising out of, related to, or connected with any prior assignment or transfer, or any purported assignment or transfer, of any Claims released under this Settlement Agreement or breach of the warranties provided herein.

6.03    Intercat represents and warrants to Grace and the Grace Group that, as of the date hereof, (i) it possesses the sole right to assert the Intercat Patent-In-Suit, and has all requisite power and authority, corporate or otherwise, to release and discharge any and all Claims relating to infringement of the Intercat Patent-In-Suit under Sections 2.01, 2.02, and 2.03 to the extent such Claims exist, and (ii) it has the authority and power to grant all rights and licenses under the Patent-In-Suit specified in this Agreement.

6.04    Intercat represents and warrants that it is the sole owner of the Intercat '236 Patents, including the sole right to sue and collect damages for past infringement thereunder.

15

6.05    Intercat shall indemnify, defend, and hold harmless Grace, each member of the Grace Group, and each beneficiary of this Settlement Agreement from and against any and all Claims arising out of, related to, or connected with any breach or failure of the representations and warranties of this Article 6 by Intercat.

6.06    Grace shall indemnify, defend, and hold harmless Intercat, each member of the Intercat Group, and each beneficiary of this Settlement Agreement from and against any and all Claims arising out of, related to, or connected with any breach or failure of the representations and warranties of this Article 6 by Grace.

Article 7.    Payments, Licenses, and Credits

7.01    As of the Effective Date, Grace hereby reduces the GCRPO by nine million dollars ($9,000,000.00).   The reduced GCRPO shall be paid to Grace on a quarterly basis as set forth in the last column on the schedule attached hereto as Exhibit 1.

7.02    As of the Effective Settlement Date, Intercat is authorized to make the payments set forth in the last column on Exhibit 1.  The fact that the resulting payments owed by Intercat to Grace are less than the original GCRPO payment amounts shall not constitute a default under the Intercat Plan.

7.03    (a)    As of the Effective Settlement Date, and subject to the terms and conditions set forth herein including the reduction of the GCRPO pursuant to Section 7.01, Intercat grants Grace, a royalty bearing, world -wide, non-transferable (except as provided herein), non-exclusive, non-sublicensable, license under the Intercat '236 Patents, on a Loader-by-Loader basis, to make; have made for use by refinery customers; use, cause to be used by refinery customers; and import, lease, sell, have sold, and offer for sale all to Grace refinery customers, Licensed Grace Loaders.  Grace shall have the right to extend this license, on a Loader by Loader basis to:
        (i)    the manufacturer of said Loader,
        (ii)    any non-catalyst/additive manufacturer or distributor (that is not a catalyst/additive manufacturer) through which said Loader is transported to a Grace refining customer, and
        (iii)    any Grace refining customer who purchases, leases or obtains and utilizes the Licensed Grace Loader directly or indirectly from Grace.

        Except as provided herein, Grace shall have no right to extend or sublicense this license to any third party. This license shall be deemed to commence as of the Effective Settlement Date. The term of the license in a particular Covered Country shall be the date of last expiration of the Intercat '236 Patent in that Country.

16

(b)     Any license from Intercat under this Agreement shall be non-exclusive. Intercat reserves the right to grant licenses to other parties under the Intercat '236 Patents.

(c)     The license from Intercat under this Agreement shall be limited to the field of loading equipment for Catalyst for FCC Units.

(d)     No other licenses are expressly or impliedly granted to Grace by Intercat except (i) as expressly set forth herein, (ii) as provided pursuant to the attached Option Agreement, and/or (iii), with respect to Settled Grace Loaders and Licensed Grace Loaders herein, under any Intercat patent that is limited to an aspect of Corrective Action as defined herein and dominated by the '236 Patent.

7.04    As to each Licensed Grace Loader under Section 7.03 that Grace delivers to a third-party during the enforceable term of any applicable Intercat '236 Patent, and within thirty (30) days of the end of the calendar quarter in which such delivery occurs, Grace shall make the following lump sum payment to Intercat:

(a)     for each Licensed Grace Loader that operates in accordance with a Loss-In-Weight principal, wherein the volume of the Loader Inventory Container is less than 500 cubic feet, the amount of $50,000.00 USD;

(b)     for each Licensed Grace Loader that operates in accordance with a Loss-In-Weight principal, wherein the volume of the Loader Inventory Container is 500 cubic feet or greater, the amount of $100,000.00 USD;

(c)     for each Licensed Grace Loader that operates in accordance with a Gain-In-Weight principal, and that has a Threshold Volume of less than 500 cubic feet, the amount of $16,666.00 USD:
        wherein the Threshold Volume is defined as follows:
        (i)     for Loaders having only one Inventory Container that is incorporated into the physical structure of the Loader, the Threshold Volume is the larger of (1) the volume of said Inventory Container or (2) the volume of the Loader Evacuation Container, and
        (ii)    for Loaders not meeting the requirements of (c)(i), the Threshold Volume is the volume of the Evacuation Container.

(d)     for each Licensed Grace Loader that operates in accordance with a Gain-In-Weight principal and that has a Threshold Volume of 500 cubic feet or greater, the amount of $33,333.00 USD:
        wherein the Threshold Volume is defined as follows:
        (i)     for Loaders having only one Inventory Container that is incorporated into the physical structure of the Loader, the Threshold Volume is the larger of (1) the volume of said Inventory Container and (2) the volume of the Loader Evacuation Container, and

17

(ii) for Loaders not meeting the requirements of (d)(i), the Threshold Volume is the volume of the Evacuation Container.

7.05 During the period between the Settlement Effective Date and the Effective Date, Grace shall accrue license payments to Intercat as set forth in Section 7.04. Within 60 days of the Effective Date, Grace shall pay the accrued amount to Intercat and accompany the same with a royalty report in accordance with Section 7.11. Thereafter, the royalty reports shall be on a quarterly calendar basis pursuant to Section 7.11. Upon delivery of such payments, the licenses granted under Section 7.03 shall be effective as of the Effective Settlement Date as set forth above. In the event the Bankruptcy Court denies approval of this Settlement Agreement, such licenses on the Licensed Grace Loaders shall be void ab initio, provided, however, that Intercat shall not contend in any further proceeding that the placement of Licensed Grace Loaders by or on behalf of Grace prior to the date of Bankruptcy Court denial, constituted or was evidence of willful infringement.

7.06 For each Licensed Grace Loader on which a payment is made in accordance with Section 7.04, Grace and any refining customer utilizing said Loader shall have a fully paid up, world wide, irrevocable license under all of the Intercat '236 Patents in all Covered Countries for said Loader only. Each license of a particular Licensed Grace Loader shall run with the Loader, and each Licensed Grace Loader for which a royalty payment under Section 7.04 has been made, may be resold, re-leased, transferred, and shipped any where in the world to any Grace refining customer in the world for use thereby without further payment under the license for its remaining useful life (including any life imparted by permissible repair), upon written notice to Intercat of the changed status of the Loader, but failure to provide such notice shall not change the status of the Loader as being licensed.

7.07 Each Party shall have the right to extend the license granted in this Article 7 to any of its Affiliates upon notice to the other Party. All the terms and conditions of this Article 7 except the right to extend shall apply to each such Affiliate extendee to the same extent as they apply to the extending Party and the operations of such Affiliate extendees shall be deemed to be the operations of the extending Party hereunder and the extending Party shall account therefor and be primarily responsible for the performance by its Affiliate extendee of all of its obligations hereunder.

7.08 With respect to the Intercat '236 Patents, Grace is free, without payment or accounting to Intercat of any kind, to make, have made, lease, sell, have sold, offer to sell, import, export, or use or cause to be used any Loader having programmed functionality that does not satisfy or constitute, alone or in conjunction with any other action, Corrective Action (as defined herein, including with respect to any portion of sections 1.06 (k), (l), (m) and (n)). No license under Section 7.03 above is necessary with respect to the Intercat '236 Patents

18

and no payment is due Intercat for any such activity by Grace with respect to the Intercat '236 Patents.

7.09    Verification:

(a)    During the term of the license granted under Section 7.03, Grace and its Affiliates shall keep, or cause to be kept, complete and accurate records of the method of operation of the Controller of any Loader it ships to customers after the Effective Date, and shipment/installation locations thereof and note whether such Loader incorporates any Corrective Action functionality.    Such records shall associate the Controller method of operation (including software code and sequence of operations) with a Loader model, serial number, and trade designation.

(b)    To the extent that a particular Loader model is designated as not incorporating Corrective Action functionality and therefore no royalty under the Intercat '236 Patents is being paid to Intercat, Grace shall permit an independent evaluator (Evaluator), to whom Grace has no reasonable objection, during Grace's regular business hours, to inspect a representative example of such Loader model, including any associated Controller method of operation including software code and manuals, and other documentation describing its sequence of operation, in a manner sufficient to permit the Evaluator(s) to conclude whether such Loader model does or does not possess programmed functionality for employing Corrective Action.  Should Intercat's Evaluator(s) seek access to a Loader located in a refinery for purposes of ascertaining whether its programming is consistent with the programming asserted by Grace to be associated with a particular model number, Grace shall use its best efforts to arrange or permit Intercat to gain access to said Loader during normal business hours and in accordance with said refiner's safety and access procedures. The Evaluator shall prepare a written report of its conclusions and reasoning behind the same, and supply the report to Intercat and Grace. If the Evaluator concludes that a particular Loader model is programmed for Corrective Action functionality, and Grace disagrees with this conclusion, Grace shall prepare a written report summarizing the basis for its contrary conclusion and promptly supply the same to Intercat within no later than thirty (30) days from receipt of the Evaluator's report.

(c)    The parties shall then meet in accordance with the procedures outlined in Section 11.18 and attempt to resolve this dispute.  If after 90 days of the date of the Grace report, the parties are unable to resolve this dispute, the matter will be submitted to binding arbitration in accordance with Section 11.20.

(d)    The cost of all such inspections shall be borne by Intercat, unless it is discovered and ultimately concluded, that the Loader possessed programmed functionality capable of performing Corrective Action, i.e.,

19

functionality that does not satisfy or constitute, alone or in conjunction with any other functionality, Corrective Action (as defined herein, including with respect to any portion of sections 1.06 (k), (l) (m) and (n)), in which case the cost of the Evaluation shall be borne by Grace.

(e)     The Evaluator shall sign a confidentiality agreement and shall not disclose any of the technical details of the Loader operation to Intercat other than necessary to complete the report and/or testify or otherwise participate on behalf of a party in connection with any dispute that may arise.

7.10    Records and Inspection: Grace shall maintain and retain full and accurate books and records relating to each Licensed Grace Loader supplied, setting forth (a) the date of each Loader shipment and type (e.g., Loss-In-Weight or Gain-In-Weight ), (b) its identification number (e.g., serial number) and model number, (c) customer name and address, (d) the Covered Country and locations whereat the manufacture, sale, installation and/or set up occurs, and (e) the pertinent Threshold Volume pursuant to Section 7.04 for Gain-in-Weight type Loaders, and the Inventory Container volume for Loss-In-Weight type Loaders, for no less than three (3) years after each calendar year in which the Licensed Grace Loader is supplied. Grace shall permit Intercat, at Intercat's expense, to have such books and records examined by independent certified public accountants or other representatives retained by Intercat during regular business hours upon reasonable advance notice, but no more often than two (2) times per year. Such independent accountants or representatives shall keep confidential any information obtained during such examination and shall report to Intercat only the information required in this Agreement that the independent accountant or representative reasonably believes is necessary to calculate the royalty owed hereunder for each unit shipment of Licensed Grace Loader provided by Grace in any Covered Country, i.e., its identification no., model number, type of Loader, the Covered Country whereat the manufacture, shipment, installation and/or set up occurs, and the pertinent Threshold Volume pursuant to Section 7.04, for Gain-In-Weight type Loaders and Inventory Container volume for Loss-In-Weight type Loaders. Should any underpayment of royalties be detected, Grace shall pay for the cost of the inspection/audit.

7.11    Royalty Reporting: Grace shall submit to Intercat a quarterly report showing for each Licensed Grace Loader on which a royalty obligation has accrued during such accounting period:
(a)     the Loader type (e.g., Loss-In-Weight), identification number, model number, the Covered Country whereat the manufacture, shipment, installation and/or set up occurs, and the pertinent Threshold Volume pursuant to Section 7.04, for Gain-In-Weight type Loaders and Inventory Container volume for Loss-In-Weight type Loaders. Such report shall be made during the term of the license whether or not a royalty is due.

20

(b)     a list of each Licensed Grace Loader for which an allowance for a return within a quarterly accounting period constituting a full adjustment of the royalty has been taken during such accounting period, including product name, model numbers, and other designations used by Grace to identify and correlate units sold or otherwise transferred or used, for each unit of returned product covered by the report;

(c)     the amount of the royalties due for each Licensed Grace Loader covered by the report; and

(d)     the total royalties due for all Licensed Grace Loaders covered by the report after accounting for returns set forth in Section 7.11(b).

(e)     The royalty report shall be accompanied by the total royalty due specified at Section 7.11(d).

Article 8.     Cross-Default.

8.01    Except as provided in any provisions of the Option Agreement or License Agreement elected thereunder, the Parties acknowledge and agree that a breach or default under any of such Option Agreement or License Agreement elected thereunder shall not constitute a breach or default under this Settlement Agreement.

Article 9. Breach, Cure and Termination

9.01    Upon material breach of this Settlement Agreement in regard to a particular Licensed Grace Loader shipped to a refinery customer after the Effective Date, Intercat shall have the right to terminate the license grant for that Loader, by giving Grace at least thirty (30) days written notice of its intention to terminate specifying the cause for termination. If Grace remedies the breach within that period, the license as to that Loader shall remain in full force and effect. Termination of a license under this paragraph with respect to a particular Loader, without more, does not result in, cause, or permit termination with respect to any other Loader upon which a royalty has been correctly calculated and paid.

9.02    Upon any future bankruptcy of Grace, Intercat shall have the right to terminate the license grant for Licensed Grace Loaders shipped to refinery customers after the Effective Date and on which a royalty has not yet been paid. This provision is not applicable to the presently pending Grace bankruptcy.

9.03    Termination of the license grant under Section 9.02 for Licensed Grace Loaders shipped to refinery customers after the Effective Date shall not excuse Grace's obligation to make payments of license fees due and payable thereunder at the time of termination thereof or sums due and payable after the termination date

based upon Grace's manufacture, use, sale, or distribution of Licensed Grace Loaders pursuant to this Settlement Agreement prior to termination.

9.04    In no event shall the credits from Grace to Intercat under Section 7.01 totaling $9,000,000 be alleviated or otherwise rendered null and void, even if the license for a particular Licensed Grace Loader shipped to or installed at refinery customers after the Effective Date is terminated as provided for under Section 9.02.

Article 10.    Reservation of Rights.

10.01    Nothing in this Settlement Agreement shall be interpreted as an admission or warranty by either Party of the validity or invalidity or enforceability or unenforceability of any patent, or as an admission by either Party of its direct or contributory or inducement of infringement of any patent, or as an admission by Grace of any issue relating to the Action. Notwithstanding any other provision in this Settlement Agreement or the Option Agreement or License Agreement elected thereunder, as to any matters not subject to the release(s) set forth above, it is expressly understood that neither Party is waiving or has waived any Claim or affirmative defense that any patents are valid, invalid, enforceable, or unenforceable, including any Claim or affirmative defense based upon the factual allegations made in the Action which each Party expressly reserves. It is likewise expressly understood that the reduction of the GCRPO totaling $9,000,000 pursuant to Section 7.01 shall in no event be rendered null, void, unenforceable, contingent upon or otherwise subject to any action by Grace and/or any Person, including as to any future action that may challenge the infringement, validity, and/or enforceability of the '236 Patent.

10.02    None of the stipulations, consents, or judgments entered into or against Nol-Tec as part of the separate settlement of this matter between Intercat and Nol-Tec is binding on Grace or affects any right of Grace, and no part of that agreement reduces or otherwise alters any rights of Grace under this Settlement Agreement or under applicable law.

10.03    Subject to Section 2.03, none of the provisions of this Agreement shall inure to the benefit of, or affect the rights of Nol-Tec.

Article 11. Miscellaneous.

11.01    Product Marking.
    (a)    Upon execution of this Agreement, Grace will take commercially reasonable efforts to cause to be affixed to each Loader, quotation for sale or lease of a Licensed Grace Loader, and to each package label, and each invoice for commercial units of Licensed Grace Loaders shipped, sold or leased to a third party, the following information (or an

22

updated version thereof authorized by Intercat, consistent with the latest status of the Intercat '236 Patents of which Grace has been informed),:

"Patent(s) applied for in one or more countries [List App Nos or Pat Nos] claiming priority in whole or in part on U.S. Patent No.5,389,236.

(b)    In addition, Grace intends to add the following to the above statement:

"Direct and indirect refining customers of each commercial unit of [Describe Licensed Grace Loader] enjoy an immunity from suit by Intercat, Inc., under such patent(s) to use such commercial unit (only) of [Describe Licensed Grace Loader] to load FCC catalyst or catalyst additive into an FCC unit."

11.02    Production documents. Outside Counsel for the parties may retain copies of all discovery conducted in this case, including documents and things produced, deposition transcripts and exhibits, interrogatory answers, and discovery responses under the terms of the protective order entered herein.

11.03    The parties consent to the personal jurisdiction and venue of the United States District Court for the District of Minnesota as to enforcement of this Agreement, and further consent that any process, notice of motion or other application to either such court or a judge thereof may be served outside the State of Minnesota by registered or certified mail or by personal service, provided that a reasonable time for appearance is allowed.

11.04    Retention of Jurisdiction.  The parties agree that the United States District Court for the District of Minnesota will retain jurisdiction over the parties and this matter to enforce the terms of this Agreement, including as provided pursuant to Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375 (1994).

11.05    Each Party represents and acknowledges that it has read this Settlement Agreement and fully understands and agrees to its terms, and that each Party has been represented by counsel in connection with the negotiation and execution of this Settlement Agreement.

11.06    This Settlement Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.07    The Parties agree that this Settlement Agreement will be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of laws principles of such State.

11.08    This Settlement Agreement and Option Agreement or License Agreement elected thereunder shall constitute the entire understanding between the Parties with respect to the subject matter hereto and supersede all previous communications (including the court transcript or oral tape recordings made by the court in the Action on which the Settlement Agreement, Option Agreement, and Model License Agreement are based), and may be amended only by written agreement signed by the Parties to the Agreement.    The provisions of all of such Agreements shall be construed together so as to give effect to the provisions of each of the Agreements to the greatest extent possible.

11.09    Except to the extent provided in Articles 2 and 3 and Section 7.07, this Settlement Agreement is intended only for the benefit of the Parties hereto, the Grace Group and the Intercat Group and no other person or entity is entitled to any rights or benefits hereunder.

11.10    Each Party shall perform any further acts, and sign and deliver any further instruments and documents, as may be required to accomplish the purposes of this Settlement Agreement; provided, however, that nothing in this provision shall be interpreted to modify any of the specific terms of this Settlement Agreement.

11.11    Disclaimer.    Nothing herein shall be construed as a warranty or representation by Intercat as to the validity and/or enforceability of Intercat patents or that the manufacture, use, sale, offering for sale or importing of licensed subject matter under its patents shall be free from infringement of any third party patents or other intellectual property rights.  Intercat shall have no liability whatsoever hereunder to the other for or on account of any injury, loss, or damage, of any kind or nature, sustained by, or any damaged assessed or asserted against, or any other liability incurred by or imposed by or on Grace or any third party, arising out of or in connection with or resulting from: (a) the manufacture, use, sale, offering for sale or importing of any apparatus, product, or method, or the subject matter of or practice of any licensed patents; or (b) any advertising or other promotional activities with respect to any of the foregoing.  Intercat makes no warranties with respect to any of the licensed subject matter, whether express or implied, either in fact or by operation of law, by statute or otherwise.  Without limiting the generality of the foregoing, Intercat specifically disclaims any implied warranties of quality, merchantability, fitness for a particular purpose and noninfringement. Intercat shall not have any liabilities or responsibilities whatsoever with respect to any licensed products.

11.12    Indemnity.  Grace shall indemnify and hold Intercat and its predecessors, successors, assigns, parents, subsidiaries, and affiliated corporations, and each and all of their present and former officers, directors, partners,

24

principals, employees, shareholders, trustees, attorneys, insurers, suppliers and customers (direct or indirect) acting in their capacity as suppliers to and/or customers of Intercat, their respective spouses, successors, heirs, executors, estates, administrators, representatives, attorneys and agents, harmless from and against any third party claims, judgments, damages, costs (including attorneys' fees) and expenses arising out of Grace's making, using, selling or offering for sale its Licensed Grace Loaders.

11.13    Enforceability.   Intercat and Grace each represent and warrant that this Agreement has been duly and validly executed and delivered by it and constitutes its valid and legally binding obligation, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights and except as enforcement is subject to general equitable principles.

11.14    Acknowledgement.  Each party acknowledges that (i) it has carefully read this Agreement, (ii) it has had the assistance of legal counsel of its choosing (and such other professionals and advisors as it has deemed necessary) in the review and execution hereof, (iii) the meaning and effect of the various terms and provisions hereof have been fully explained to it by such counsel, (iv) it has conducted such investigation, review and analysis as it has deemed necessary to understand the provisions of this Agreement and the transactions contemplated hereby, and (v) it has executed this Agreement of its own free will.

11.15    Notice: All notices given by either Party to the other Party shall be in writing and transmitted and delivered (1) personally, (2) deposited in the United States Postal Service prepaid, by certified mail, (3) by overnight courier, (4) by receipt confirmed facsimile, or (5) electronically transmitted or communicated by cable, or telex.  Notices shall be deemed served on the date actually received by the addressee, and all cable, telex, or fax notices shall be deemed to be received when sent and an answerback received, except that a notice that would otherwise be effective on a Saturday, a Sunday, or a holiday, shall be effective at 9:00 a.m. on the next regular business day thereof.   Notices shall be addressed as follows, which addresses may be changed at any time by the respective Party upon written notice to the other Party:

(a)    if intended for Intercat, then addressed to:

Intercat, Inc.
Ramshorn Executive Center
Unit C, Suite C1
2399 Highway 34
Manasquan, NJ 08736

25

Attention: James A. Sylvester, Esq.,
Telephone No.:  (732) 223-4644
Facsimile No.:    (732) 223-3447
Email Address:  jsylvester@intercatinc.com

with a courtesy copy not required for the notice to be effective, to

Thomas J. Wimbiscus, Esq.
McAndrews, Held & Malloy, Ltd.
Suite 3400
500 West Madison St.
Chicago, IL 60661
Telephone No.:  (312) 775-8000
Facsimile No.:    (312) 775-8100
Email Address: twimbiscus@mhmlaw.com

and

(b)    if intended for Grace, then addressed to:

W. R. Grace & Co.-Conn.,
7500 Grace Drive,
Columbia, MD, 21044
Attention: Gregory Poling, President Davison
Telephone No.: 410-531-4555
Facsimile No.: 410-531-4289
Email Address: gregory.e.poling@grace.com

with a courtesy copy not required for the notice to be effective, to

W. R. Grace & Co.-Conn.,
7500 Grace Drive,
Columbia, MD, 21044
Legal Services Division
Attention: Chief Patent Counsel

11.16    Assignability: This Agreement shall not be assignable by either Party without
the written consent of the other Party, except that either Party may assign this
Agreement to an Affiliate or to any party incident to the sale or other transfer
to the assignee of substantially all of the assets of the Catalyst and Loader
assets of the assigning Party and its Affiliates, provided the assignee agrees
to accept the assignment, but unless the non-assigning Party to this
Agreement agrees to a novation, which agreement shall not be unreasonably
withheld, the Party assigning this Agreement shall remain primarily liable for
the performance of the duties and obligations owed the non-assigning Party.
Except as herein provided, any attempted assignment of this Agreement by

either Party, whether by merger, instrument, or otherwise, without the prior written consent of the other Party, shall be void, ab initio.

11.17   Grace and Intercat agree that they will not use any information or materials obtained pursuant to the Protective Order in the Action except in those matters, and that they will not disclose any such information or materials to, or use them on behalf of, any other person or entity, except as permitted by the Protective Order referenced in Section 10.11.

11.18   During the two year period commencing on the Effective Date, neither Grace nor Intercat will initiate, sponsor, finance or participate in any court proceeding or arbitration relating to intellectual property rights against the other Party within the scope of this agreement without first engaging in the following procedures:

    (a)   The Party which desires to initiate, sponsor, finance or participate in any such court proceeding or arbitration shall first notify the other Party in writing of its intention to do so, which notice shall contain a brief but reasonably complete description of the nature of the claims to be brought in such court proceeding or arbitration (the "Dispute Notice").

    (b)   During a period of forty five (45) days from the date of the Dispute Notice, the Chief Executive Officers of Grace and Intercat shall discuss the matters described in the Dispute Notice with a view to resolving such matters in a manner satisfactory to the Parties.

11.19   The Parties stand in relation as independent contractors, and nothing contained herein shall constitute this arrangement to be employment, a joint venture, or a partnership.

11.20   **Arbitration:**

    (a)   Any controversy or claim arising out of or relating to Section 7.09, that the Parties are unable to resolve within ninety (90) days after written notice ("Notice") by one Party to the other of the existence of such claim of controversy, shall be finally resolved by arbitration in accordance with the CPR Rules for Non-Administered Arbitration then currently in effect. The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. §§1–16, and judgment upon the award rendered by the arbitrator(s) may be entered by any court having jurisdiction thereof. The place of arbitration shall be New York, New York unless agreed otherwise by the parties.

    (b)   The arbitral tribunal shall consist of a single arbitrator mutually chosen by the Parties, but if the Parties have not agreed upon a single arbitrator within thirty (30) days after Notice of the arbitration, then a single arbitrator shall be appointed by the CPR Dispute Resolution Services Organization

and shall be a person fluent in the English language having substantial experience and recognized expertise in the field(s) of patent law.

(c)     All arbitrator(s) eligible to conduct the arbitration must undertake in writing as a condition of service to render their opinion(s) promptly after the final arbitration hearing and to provide a reasoned written opinion setting forth the findings of fact and conclusions of law.

(d)     The arbitrator(s) shall apply the law of New York, provided that all questions concerning the construction or effect of patent applications and patents shall be decided in accordance with the laws of the country in which the patent application or patent exists.  The award of the arbitrator(s) shall be final.  Judgment upon such award may be entered by the prevailing Party in any court having jurisdiction thereof.

(e)     Except to the extent entry of judgment and any subsequent enforcement may require disclosure, or except as required by law, all matters relating to the arbitration, including the award, shall be held in confidence by the Parties.

(f)     Notwithstanding the above, the Arbitrator shall not consider and/or rule upon the validity and/or enforceability of any claim of any patent, or challenge the validity or enforceability of any patent in dispute.

(g)     All costs of the arbitration shall be borne equally by the Parties hereto.

IN WITNESS WHEREOF, Grace and Intercat have caused this Agreement to be executed on their behalf by their duly authorized representatives as of the dates written below.

Intercat, Inc.              W.R. Grace & Co.-Conn.

Signature:_____    Signature:_____

By:_____    By:_____
        (Print Name)                (Print Name)
Title: _____    Title: _____

Date:_____    Date:_____

| Exhibit 1 | | | | |
|---|---|---|---|---|
| Payment Schedule to Grace from Intercat As Modified By Grace Settlement Obligation | | | | |
| Payment Adjustment Month | Remaining GCRPO Quarterly Payments | Original GCRPO Quarterly Payment Amount | Credit To GCRPO Resulting From Settlement | Modified GCRPO Quarterly Payment Amount |
| June, 2005 | 1 | $562,994 | ($321,429) | $241,565 |
| | 2 | $562,994 | ($321,429) | $241,565 |
| | 3 | $562,994 | ($321,429) | $241,565 |
| | 4 | $562,994 | ($321,429) | $241,565 |
| June 30, 2006 | 5 | $619,294 | ($321,429) | $297,865 |
| | 6 | $619,294 | ($321,429) | $297,865 |
| | 7 | $619,294 | ($321,429) | $297,865 |
| | 8 | $619,294 | ($321,429) | $297,865 |
| | 9 | $619,294 | ($321,429) | $297,865 |
| | 10 | $619,294 | ($321,429) | $297,865 |
| | 11 | $619,294 | ($321,429) | $297,865 |
| | 12 | $619,294 | ($321,429) | $297,865 |
| | 13 | $619,294 | ($321,429) | $297,865 |
| | 14 | $619,294 | ($321,429) | $297,865 |
| | 15 | $619,294 | ($321,429) | $297,865 |
| | 16 | $619,294 | ($321,429) | $297,865 |
| | 17 | $619,294 | ($321,429) | $297,865 |
| | 18 | $619,294 | ($321,429) | $297,865 |
| | 19 | $619,294 | ($321,429) | $297,865 |
| | 20 | $619,294 | ($321,429) | $297,865 |
| | 21 | $619,294 | ($321,429) | $297,865 |
| | 22 | $619,294 | ($321,429) | $297,865 |
| | 23 | $619,294 | ($321,429) | $297,865 |
| March, 2011 | 24 | $562,994 | ($321,429) | $241,565 |
| | 25 | $562,994 | ($321,429) | $241,565 |
| | 26 | $562,994 | ($321,429) | $241,565 |
| | 27 | $562,994 | ($321,429) | $241,565 |
| March, 2012 | 28 | $562,994 | ($321,429) | $241,565 |
| Total | | $16,833,532 | ($9,000,000) | $7,833,532 |

GRACE MANAGEMENT TO CHECK

Exhibit 2

[Option Agreement]
[Attached License Agreement]

Exhibit 3A

Settled Grace Loader List

| Model | Serial No (s). | Loader Type | Ship Date | Destination | Refiner |
|---|---|---|---|---|---|
| NIS-C60-VA1 (1-ton) | 0 | Loss-in-Weight | 3/97 | Singapore | SPRC |
| NIS-C60-VA1 (1-ton) | 1 | Loss-in-Weight | 12/97 | Lake Charles, LA | ConocoPhillips |
| NIS-C60-VA1 (1-ton) | 2 | Loss-in-Weight | 12/97 | Krotz Springs, LA | Valero |
| | | | 12/04 | Port Allen, LA | Placid |
| NIS-C60-VA1 (1-ton) | 3 | Loss-in-Weight | 1/98 | Texas City, TX | Valero |
| NIS-C60-VA1 (1-ton) | 4 | Loss-in-Weight | 1/98 | Ponca City, OK | ConocoPhillips |
| | | | 6/00 | Lemont, IL | Citgo |
| NIS-C60-VA1 (1-ton) | 5 | Loss-in-Weight | 6/98 | El Paso, TX | Western Refining (formerly Chevron) |
| NIS-C60-VA1 (1-ton) | 6 | Loss-in-Weight | 6/98 | Texas City, TX | Marathon-Ashland |
| NIS-C60-VA1 (1-ton) | 7 | Loss-in-Weight | 2/99 | Houston, TX | Valero |
| | | | 7/04 | Krotz Springs, LA | Valero |
| NIS-C60-VA1 (1-ton) | 8 | Loss-in-Weight | 2/99 | Detroit, MI | Marathon-Ashland |
| NIS-C60-VA1 (1-ton) | 9 | Loss-in-Weight | 3/00 | Beaumont, TX | ExxonMobil |
| NIS-C60-VA1 (1-ton) | 10 | Loss-in-Weight | 3/00 | Krotz Springs, LA | Valero |
| | | | 3/04 | Artesia, NM | Navajo |
| NIS-C60-VA1 (1-ton) | 11 | Loss-in-Weight | 01/00 | Brazil | Petrobras |
| NIS-C60-VA1 (1-ton) | 12 | Loss-in-Weight | 01/00 | Brazil | Petrobras |
| NIS-C60-VA1 (1-ton) | 13 | Loss-in-Weight | 10/00 | Meraux, LA | Murphy |
| NIS-C60-VA1 (1-ton) | 14 | Loss-in-Weight | 10/00 | Oakville, ONT | PetroCanada |
| | | | 9/01 | Sinclair, WY | Sinclair |
| | | | 6/04 | Wynnewood, OK | Wynnewood |

31

| Model | Serial No (s). | Loader Type | Ship Date | Destination | Refiner |
|---|---|---|---|---|---|
| NIS-C60-VA1 (1-ton) | 15 | Loss-in-Weight | 2/01 | Coffeyville, KS | Coffeyville Resources Refining (formerly Farmland) |
| NIS-C60-VA1 (1-ton) | 16 | Loss-in-Weight | 3/01 | Indianapolis, IN | Reilly Industries |
| NIS-C60-VA1 (1-ton) | 17 | Loss-in-Weight | 8/01 | Texas City, TX | BP Amoco |
| NIS-C60-VA2 (1-ton) | 18 | Loss-in-Weight | 9/01 | Pine Bend, MN | Flint Hills Resources (formerly Koch Industries) |
|  |  |  | 11/03 | Laurel, MT | Cenex |
| NIS-C60-VA1 (1-ton) | 19 | Loss-in-Weight | 11/01 | Meraux, LA | Murphy |
| NIS-C60-VA1 (1-ton) | 20 | Loss-in-Weight | 11/01 | Texas City, TX | BP Amoco |
| NIS-C60-VA2 (1-ton) | 21 | Loss-in-Weight | 1/02 | Sarnia, OT | Imperial Oil Ltd. |
|  |  |  | 6/03 | Borger, TX | ConocoPhillips |
| NIS-C60-VA2 (1-ton) | 22 | Loss-in-Weight | 2/02 | Billings, MT | ConocoPhillips |
| NIS-C60-VA2 (1-ton) | 23 | Loss-in-Weight | 3/02 | Whiting, IN | BP Amoco |
| NIS-C60-VA2 (1-ton) | 24 | Loss-in-Weight | 8/02 | Regina, Saskatchewan | Consumer's Co-op |
|  |  |  | ~1/05 | Alliance | ConocoPhillips |
| NIS-C60-VA2 (1-ton) | 25 | Loss-in-Weight | 4/03 | Mandan, ND | Tesoro |
| NIS-C60-VA1 (1-ton) | 26 | Loss-in-Weight | 4/02 | Superior, WI | Murphy |
| NIS-C60-VA2 (1-ton) | 27 | Loss-in-Weight | 4/03 | Texas City, TX | BP Amoco |
| NIS-C60-VA2 (1-ton) | 28 | Loss-in-Weight | 6/03 | Martinez, CA | Tesoro |
| NIS-C60-VA2 (1-ton) | 29 | Loss-in-Weight | 10/03 | Borger, TX | ConocoPhillips |
| NIS-C60-VA2 (1-ton) | 30 | Loss-in-Weight | 4/03 | Sinclair, WY | Sinclair |
| NIS-C60-VA2 (1-ton) | 31 | Loss-in-Weight | 10/03 | Krotz Springs, LA | Valero |
| NIS-C60-VA2 (1-ton) | 32 | Loss-in-Weight | 11/03 | Great Falls, MT | Montana (parent is Holly Corp.) |
| NIS-B1250-PA2 (25-ton) | 501 | Loss-in-Weight | 6/97 | Ponca City, OK | ConocoPhillips |

| Model | Serial No (s). | Loader Type | Ship Date | Destination | Refiner |
|---|---|---|---|---|---|
| NIS-A250-VA2 (5-ton) | 502 | Loss-in-Weight | 5/00 | Port Arthur, TX | Motiva |
| NIS-A250-VA2 (5-ton) | 503 | Loss-in-Weight | 3/03 | Ponca City, OK | ConocoPhillips |
| NIS-A250-VA2 (5-ton) | 504 | Loss-in-Weight | 9/02 | Ponca City, OK | ConocoPhillips |
| NIS-A250-VA2 (5-ton) | 505 | Gain-in-Weight | 12/03 | Toledo, OH | BP Amoco |
| NIS-A250-VA2 (5-ton) | 506 | Gain-in-Weight | 1/02 | Sinclair, WY | Sinclair |
| Fresh Catalyst | 210 | Gain-in-Weight | 3/02 | St. Croix, Virgin Islands | Hovensa |
| Fresh Catalyst | 211 | Gain-in-Weight | 3/03 | Ponca City, OK | ConocoPhillips |
| Fresh Catalyst | 212 | Gain-in-Weight | 3/03 | Ponca City, OK | ConocoPhillips |
| Fresh Catalyst | 290 SN1494E | Gain-in-Weight | 10/03 | Lake Charles, LA | Citgo |
| Fresh Catalyst | SN1685 | Gain-in-Weight | 10/01 | Chile | Petrox Refining Co. |
| Fresh Catalyst | SN1688 | Gain-in-Weight | 8/01 | Columbia, South America | Ecopetrol |
| Fresh Catalyst | SN1736A | Gain-in-Weight | 10/02 | Peru | Talara Refinacion |
| Multiloader | 100 | Gain-in-Weight | 4/04 | Coffeyville, KS | Coffeyville |
| Multiloader | 101 | Gain-in-Weight | 12/04 | Coffeyville, KS | Coffeyville |
| Multiloader | 102 | Gain-in-Weight | 3/05 | New Castle, WY | Wyoming |
| Multiloader | 103 | Gain-in-Weight | 2/05 | Krotz Springs, LA | Valero |
| Multiloader | 104 | Gain-in-Weight | 3/05 | Artesia, NM | Navajo |
| Multiloader | 105 | Gain-in-Weight | 3/05 | Wilmington, CA | Shell |
| Multiloader | 106 | Gain-in-Weight | 5/05 | Warren, PA | United |
| Multiloader | 107 | Gain-in-Weight | 6/3/05 | Yorktown, VA | Giant |
| Fresh Catalyst (Clemtex) | 200 | Gain-in-Weight | 12/04 | Martinez, CA | Tesoro |
| Fresh Catalyst (Clemtex) | 201 | Gain-in-Weight | 5/05 | Del City | Premcor |
| Fresh Catalyst (Clemtex) | 202 | Gain-in-Weight | 4/05 | Mandan, ND | Tesoro |

Exhibit 3B
Non-Settled Outside-US Grace Loaders

| Davison/Pneumix* | A1 | Gain-in-Weight | 12/96 | Outside US | CEPSA Huelva |
| Davison/Pneumix* | A2 | Gain-in-Weight | 11/94 | Outside US | TOTAL Lindsey Oil Grimsby |
| Davison/Pneumix* | A3 | Gain-in-Weight | 11/95 | Outside US | ExxonMobil France Fos-sur-mer |
| Davison/Pneumix* | A4 | Gain-in-Weight | 01/97 | Outside US | TOTAL Gonfreville |
| Davison/Pneumix* | A5 | Gain-in-Weight | 05/96 | Outside US | TOTAL Antwerp |
| Davison/Pneumix* | A6 | Gain-in-Weight | 10/99 | Outside US | PCK Schwedt |
| Davison/Pneumix* | A7D | Gain-in-Weight | 12/98 | Outside US | TOTAL Antwerp |
| Davison/Pneumix* | A8 | Gain-in-Weight | 11/99 | Outside US | ORL Haifa |
| Davison/Pneumix* | A9 | Gain-in-Weight | 11/00 | Outside US | TOTAL La Mede |
| Davison/Pneumix* | A10 | Gain-in-Weight | 10/00 | Outside US | ORL Ashdod |
| Davison/Pneumix* | A11 | Gain-in-Weight | 12/00 | Outside US | HELLENIC Petroleum |
| Davison/Pneumix* | A12 | Gain-in-Weight | 1/03 | Outside US | CEPSA La Rabida |
| Davison/Pneumix* | A13 | Gain-in-Weight | 11/01 | India | India Oil Corporation LTD. |
| Davison/Pneumix* | A14 | Gain-in-Weight | 6/02 | Taiwan | Formosa Petrochem. Corp. |
| Davison/Pneumix* | A15 | Gain-in-Weight | 12/03 | Outside US | S-Oil Cooperation Ulsan Korea |
| Davison/Pneumix* | A16 | Gain-in-Weight | 12/03 | Outside US | Shell Oil Singapore |
| Davison/Pneumix* | B1 | Gain-in-Weight | 03/95 | Outside US | OMV Schwechat |
| Davison/Pneumix* | B2 | Gain-in-Weight | 04/95 | Outside US | TOTAL Milford Haven |
| Davison/Pneumix* | B3 | Gain-in-Weight | 4/97 | Outside US | MAZHEIKIAI |
| Davison/Pneumix* | B4 | Gain-in-Weight | 4/00 | Outside US | INA Zagreb |
| Davison/Pneumix* | B5 | Gain-in-Weight | 11/96 | Outside US | ChrevronTexaco Pembroke |
| Davison/Pneumix* | B6 | Gain-in-Weight | 10/95 | Outside US | CONOCO Humberside |
| Davison/Pneumix* | B7 = C1 | Gain-in-Weight | 6/96 | Outside US | GalpEnergia |
| Davison/Pneumix* | B8 = C2 | Gain-in-Weight | 12/96 | Outside US | MOL Szazalombatta |
| Davison/Pneumix* | B9 | Gain-in-Weight | 07/97 | Outside US | ExxonMobil France Port Jerome |
| Davison/Pneumix* | B10 = C4 | Gain-in-Weight | 5/97 | Outside US | BO Ingolstadt |
| Davison/Pneumix* | B11 = C3 | Gain-in-Weight | 5/97 | Outside US | BO Vohburg |
| Davison/Pneumix* | B12 | Gain-in-Weight | 08/97 | Outside US | CEPSA San Roque |
| Davison/Pneumix* | B13 | Gain-in-Weight | 11/97 | Outside US | PETRONOR Somorrostro |
| Davison/Pneumix* | B14 | Gain-in-Weight | 09/97 | Outside US | REPSOL Puertollano |
| Davison/Pneumix* | B15 | Gain-in-Weight | 02/99 | Outside US | SHELL Stanlow |

| | | | | | |
|---|---|---|---|---|---|
| Davison/Pneumix* | B16 | Gain-in-Weight | 07/01 | Outside US | OMV Schwechat |
| Davison/Pneumix* | B17 | Gain-in-Weight | 10/01 | Outside US | REPSOL La Coruna |
| Davison/Pneumix* | B18 =C15 | Gain-in-Weight | 6/02 | Outside US | Shell Pernis |
| Davison/Pneumix* | B19 = C20 | Gain-in-Weight | 5/04 | Outside US | Rompetrol |
| Davison/Pneumix* | ECO unit 1 | Gain-in-Weight | 12/03 | Outside US | ROMPETROL |
| Davison/Pneumix* | C5 | Gain-in-Weight | 07/97 | Outside US | Esso Trecate |
| Davison/Pneumix* | C6 | Gain-in-Weight | 08/97 | Outside US | Statoil |
| Davison/Pneumix* | C7 | Gain-in-Weight | 04/98 | Outside US | Bapco |
| Davison/Pneumix* | C8 | Gain-in-Weight | 11/97 | Outside US | Petronor Bilbao |
| Davison/Pneumix* | C9 | Gain-in-Weight | 11/97 | Outside US | NIS Pancevo |
| Davison/Pneumix* | C10 | Gain-in-Weight | 05/97 | Outside US | Neftochim Bourgas |
| Davison/Pneumix* | C11 | Gain-in-Weight | 04/01 | Outside US | Turkmenbashi |
| Davison/Pneumix* | C12 | Gain-in-Weight | 08/01 | Outside US | Lisichansk |
| Davison/Pneumix* | C13 | Gain-in-Weight | 01/02 | Outside US | Repsol La Plata |
| Davison/Pneumix* | C14 | Gain-in-Weight | 01/02 | Outside US | Repsol Lujan de Cuyo |
| Davison/Pneumix* | C15 | Gain-in-Weight | 10/01 | Outside US | UFA NPZ |
| Davison/Pneumix* | C16 | Gain-in-Weight | 01/03 | Outside US | ORL Haifa |
| Davison/Pneumix* | C17 | Gain-in-Weight | 09/02 | Outside US | Cepsa Algeciras |
| Davison/Pneumix* | C18 | Gain-in-Weight | 02/03 | Outside US | MOL Szazalombatta |
| Davison/Pneumix* | C19 | Gain-in-Weight | 03/03 | Outside US | ENI Sannazzaro |
| Davison/Pneumix* | C21 | Gain-in-Weight | 11/04 | Outside US | ERGMed Priolo |
| Davison/Pneumix* | C22 | Gain-in-Weight | 2005 | Outside US | Sasol Secunda |
| Davison/Pneumix* | C23 | Gain-in-Weight | 2005 | Outside US | ENI Sannazzaro |
| Davison/Pneumix* | C24 | Gain-in-Weight | 2005 | Outside US | Raffineria di Milazzo |
| Davison/Pneumix* | C25 | Gain-in-Weight | 2005 | Outside US | ENI Gela |
| Davison/Pneumix* | PA1 | Gain-in-Weight | 8/98 | India | Bechtel (Reliance) |
| Davison/Pneumix* | PA2 | Gain-in-Weight | 2/01 | Taiwan | FPC Taiwan (supply Akzo) |
| Davison/Pneumix* | PB1 | Gain-in-Weight | 3/02 | Outside US | Scanraff |
| Davison/Pneumix* | PC1 | Gain-in-Weight | 4/01 | Outside US | Ceska |
| Davison/Pneumix* | PC2 | Gain-in-Weight | 4/01 | Outside US | PCK |
| Davison/Pneumix* | PC3 | Gain-in-Weight | 2/02 | Outside US | Holborn |
| Davison/Pneumix* | PC4 | Gain-in-Weight | 3/02 | Outside US | Scanraff |
| Davison/Pneumix* | PC5 | Gain-in-Weight | 7/02 | Outside US | Vohburg |
| Davison/Pneumix* | PC6 | Gain-in-Weight | 10/03 | Outside US | Sarpom Trecate |
| Davison/Pneumix* | PC7 | Gain-in-Weight | 7/04 | Outside US | Bapco |
| Davison/Pneumix* | PC1XL+ PC2XL | Gain-in-Weight | Mid 2004 | Indonesia | Pertamina Indonesia |
| Davison/Pneumix* | CXL3 + CXL4 | Gain-in-Weight | End 2004 | | Formosa Petrochemical Corp. Taiwan |

35

Exhibit 4
Proposed Stipulation Order and Order Of Dismissal

## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

INTERCAT INC.,
a Delaware Corporation,

        Plaintiff,

    v.

NOL-TEC SYSTEMS, INC
and W.R. Grace &Co.-Conn,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 03-4886(RHK/AJB)

**STIPULATION AND [PROPOSED] ORDER**

Honorable Richard H. Kyle
Magistrate Judge Arthur J. Boylan

WHEREAS Intercat, Inc. ("Intercat") and W.R. Grace & Co.-Conn. ("GRACE") have entered into a settlement in the form of a settlement agreement ("Settlement Agreement"), and Intercat and Nol-Tec Systems, Inc, ("Nol-Tec") have entered into a separate settlement, which provide a basis for conclusion of this action;

THEREFORE, INTERCAT AND GRACE HEREBY STIPULATE AND AGREE, through their counsel of record, that:

1.    This Court has jurisdiction over the subject matter of this action and has personal jurisdiction over the parties. Intercat has standing to enforce the patent in suit.

2.    Venue properly lies in this district.

3.    All claims, defenses, and counterclaims in Case No. 03-

36

4886(RHK/AJB) as between Intercat and Grace are hereby dismissed with prejudice. However, it is expressly understood that neither Intercat nor Grace is admitting the validity or invalidity of any patent, or its direct, contributory, or inducement of infringement, or non-infringement, of any patent, or any issue relating to the above-captioned action.

4.      It is further expressly understood that neither Intercat nor Grace is waiving or has waived any claim, affirmative defense or contention that any patents are valid, invalid, enforceable or unenforceable. Intercat and Grace expressly reserve such issues, contentions, claims and/or defenses.

5.      Subject to the terms of the Settlement Agreement, Intercat and Grace do not accept, admit, or waive any issue, matter, or position raised in or relating to these above-captioned actions.

6.      Each Party shall bear its own attorneys' fees and costs of suit.

7       This Court shall retain jurisdiction over this matter with respect to disputes concerning the interpretation and/or enforcement of the Settlement Agreement and this Stipulation and Order. The Parties agree, pursuant to Fed. R. Civ. P. 73(b), that all proceedings concerning the finalization and enforcement of the settlement, to the extent not specifically reserved in the Settlement Agreement for Arbitration, shall be conducted before a Magistrate Judge Boylan or other judge of this Court sitting in his stead.

| Dated: December ___, 2005 | McANDREWS, HELD, & MALLOY,<br>Thomas J. Wimbiscus<br>500 West Madison Street, 34th Floor<br>(312) 775-8000<br>Counsel for Intercat |
|---|---|
| Dated: December ___, 2005 | FISH & RICHARDSON, P.C., P.A.<br>Michael E. Florey (#214322)<br>60 South Sixth Street<br>3300 Damn Rauscher Plaza Minneapolis,<br>MN 55402<br>(612) 335-5070<br>Counsel for Intercat |

| Dated: December ___, 2005 | By: Gary H. Levin<br>WOODCOCK WASHBURN LLP<br>One Liberty Place, 46th Floor<br>Philadelphia, PA 19103<br>Telephone: (215) 568-3100<br>Facsimile: (215) 568-3439 |
|---|---|
| | Counsel for Grace |
| Dated: December ___, 2005 | William A. Dossett, Esq.<br>DORSEY & WHITNEY LLP<br>50 South Sixth Street, Suite 1500<br>Minneapolis, Minnesota 55402-1498<br>Telephone: 612-340-2600<br>Facsimile: 612-340-2868<br>Counsel for Grace |

## ORDER

IT IS SO ORDERED this ___ day of _____, 2005.

_____
Richard H. Kyle
United States District Judge