UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                        .  Case No.  01-01139
                              .
  W. R. GRACE & CO., et al,   .
                              .  5414 USX Tower Building
                    Debtors,  .  Pittsburgh, PA  15222
                              .  December 19, 2005
. . . . . . . . . . . . . . . .  9:41 a.m.
```

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

```
For the Debtor:             Kirkland & Ellis LLP
                            By:  DAVID BERNICK, ESQ.
                                 MICHELLE BROWDY, ESQ.
                                 JANET BAER, ESQ.
                                 JAMES O'NEILL, ESQ.
                            200 Randolph Drive
                            Chicago, IL  60601

For the Asbestos            Caplin & Drysdale
Claimants Committee:        By:  PETER VAN N. LOCKWOOD, ESQ.
                            One Thomas Circle, N.W.
                            Washington, DC  20005

For the Future             Swidler Berlin Shereff
Claimants Rep:               Friedman, LLP
                            By:  ROGER FRANKEL, ESQ.
                            3000 K. Street, N.W., Suite 300
                            Washington, DC  20007

Audio Operator:             Cathy Younker
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311   Fax No. (609) 587-3599**

APPEARANCE CONT'D:

For PD Claims
Committee:
        Bilzin Sumberg Baena Price &
         Axelrod LLP
        By:  SCOTT BAENA, ESQ.
            JAY SAKALO, ESQ.
        200 S. Biscayne Blvd., Suite 2500
        Miami, FL  33131

For Baron & Budd,
ELG Environmental
Litigation Group,
Law Offices of Peter
Angelos, et cetera:
        Stutzman Bromberg Esserman &
         Plifka
        By:  SANDER ESSERMAN, ESQ.
            STEVEN FELSENTHAL, ESQ.
        2323 Bryan Street, Suite 2200
        Dallas, TX  75201

For the Equity Committee:
        Kramer Levin Naftalis &
         Frankel LLP
        By:  GARY BECKER, ESQ.
        1177 Avenue of the Americas
        New York, NY  10036

For CNA Insurance:
        Goodwin Procter LLP
        By:  DANIEL GLOSBAND, ESQ.
        Exchange Place
        53 State Street
        Boston, MA  02109

For AIG Member Companies:
        Zeichner Ellman & Krauss LLP
        By:  MICHAEL DAVIS, ESQ.
        575 Lexington Avenue
        New York, NY  10022

For the State of Montana:
        Monzack and Monaco, P.A.
        By:  FRANK A. MONACO, ESQ.
        1201 North Orange St., Suite 400
        P.O. Box 2031
        Wilmington, DE  19899

For Anderson Memorial
Hospital:
        Speights & Runyan
        By:  DANIEL SPEIGHTS, ESQ.
            BUD FAIREY, ESQ.
        200 Jackson Avenue East
        P.O. Box 685
        Hampton, SC  29924

For Maryland Casualty
and Zurich:
        Connolly Bove Lodge & Hutz LLP
        By:  JEFFREY WISLER, ESQ.
        The Nemours Building
        1007 North Orange St., Suite 878
        Wilmington, DE  19801

APPEARANCE CONT'D:

```
For Libby Claimants:          Cohn, Whitesell & Goldberg, LLP
                              By:  DANIEL COHN, ESQ.
                              101 Arch Street
                              Boston, MA  02110


TELEPHONIC APPEARANCES:

For Intercat, Inc.            Hogan & Hartson, LLP
                              By:  IRA GREENE, ESQ.
                              555 13th Street, N.W.
                              Washington, DC 20004

For PD Claimants:             Bilzin Sumberg Baena Price &
Committee:                       Axelrod LLP
                              By:  ALLYN DANZEISEN, ESQ.
                                   MATTHEW KRAMER, ESQ.
                              200 S. Biscayne Blvd., Suite 2500
                              Miami, FL  33131

                              LECG
                              By:  SEAN WALSH, ESQ.

                              Richardson Patrick Westbrook &
                                 Brickman, LLC
                              By:  EDWARD WESTBROOK, ESQ.
                              1037 Chuck Dawley Blvd., Bldg. A
                              Mount Pleasant, SC  29464

                              Scott Law Group
                              By:  DARRELL SCOTT, ESQ.

For Macerich Limited          Ashby & Geddes, LLP
Fresno Partners:              By:  AMANDA WINFREE, ESQ.
                              222 Delaware Ave., 17th Floor
                              P.O. Box 1150
                              Wilmington, DE  19899

For Fireman's Fund            Stevens & Lee, P.C.
Insurance Company:            By:  THOMAS WHALEN, ESQ.
                              1107 North Market St., 7th Floor
                              Wilmington, DE  19801

For U.S. Trustee:             U.S. Trustee Department
                              By:  DAVID KLAUDER, ESQ.
```

TELEPHONIC APPEARANCES CONT'D:

For DK Acquisition          Willkie Farr & Gallagher
Partners:                   By:  STEPHEN VOGEL, ESQ.
                            787 Seventh Avenue
                            New York, NY  10019

For Everest Reinsurance     Marks, O'Neill, O'Brien &
Co. & McKinley Ins. Co.:      Courtney, P.C.
                            By:  BRIAN KASPRZAK, ESQ.
                            913 North Market St., Suite 800
                            Wilmington, DE  19801

                            Crowell & Moring, LLP
                            By:  LESLIE EPLEY, ESQ.
                            1001 Pennsylvania Avenue NW
                            Washington, DC  20004

For USG Corporation:        USG Corporation
                            By:  MARY MARTIN

                            Morgan Lewis & Bockius
                            By:  BRADY GREEN, ESQ.
                            1701 Market Street
                            Philadelphia, PA  19103

For David Austern:          Phillips, Goldman & Spence, P.A.
                            By:  JOHN PHILLIPS, JR. ESQ.
                            1200 N. Broom Street
                            Wilmington, DE  19806

For Libby Claimants:        Landis Rath & Cobb, LLP
                            By:  KERRI MUMFORD, ESQ.
                            919 Market Street, Suite 600
                            Wilmington, DE  19801

For Ace Insurance Co.:      White & Williams LLP
                            By:  MARC CASARINO, ESQ.
                            824 N. Market Street, Suite 902
                            Wilmington, DE  19801

For Prudential Insurance:   Riker, Danzig, Scherer, Hyland &
                              Perret
                            By:  CURTIS PLAZA, ESQ.
                            Headquarters Plaza
                            One Speedwell Avenue
                            Morristown, NJ  07962

TELEPHONIC APPEARANCES CONT'D:

For Allstate Insurance Co.:    Cuyler Burk, LLP
                               By:  ANDREW CRAIG, ESQ.
                               Parsippany Corporate Center
                               Four Century Drive
                               Parsippany, NJ  07054

For Radian Assurance:          Sidley Austin Brown & Wood LLP
                               By:  JOEL SAMUELS, ESQ.
                               555 West Fifth Street
                               Los Angeles, CA  90013

For the State of Montana:      Christensen, Moore, Cockrell,
                                 Cumming
                               By:  DALE COCKRELL, ESQ.
                               Two Medicine Building
                               160 Heritage Way, Suite 104
                               P.O. Box 7370
                               Kalispell, MT  59904

For the Debtor:                W.R. Grace & Co.
                               By:  WILLIAM SPARKS
                                    MARK SHELNITZ
                                    PAUL NORRIS
                                    DAVID SIEGEL

                               Kirkland & Ellis,
                               By:  LORI SINANYAN, ESQ.
                               777 South Figueroa Street
                               Los Angeles, CA  90017

For ZAI Claimants:             Buchanan Ingersoll, P.C.
                               By:  WILLIAM SULLIVAN, ESQ.
                               The Nemours Building
                               1007 North Orange St., Suite 1110
                               Wilmington, DE  19801

For the Official Committee     Stroock & Stroock & Lavan, LLP
of Unsecured Creditors:        By:  LEWIS KRUGER, ESQ.
                               180 Maiden Lane
                               New York, NY  10038

                               Duane Morris, LLP
                               By:  MICHAEL LASTOWSKI, ESQ.
                               1100 North Market St., Suite 1200
                               Wilmington, DE  19801

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES CONT'D:

For Virtue Management LLC:        Virtue Management LLC
                                  By:  DAVID WITKIN

For Scotts Company:               Vorys, Sater, Seymour &
                                     Pease, LLP
                                  By:  TIFFANY COBB, ESQ.
                                  52 East Gay Street
                                  P.O. Box 1008
                                  Columbus, OH  43216

For the Official Committee        Campbell & Levine
of Asbestos PI Claimants:         By:  MARK HURFORD, ESQ.
                                       MARLA ESKIN, ESQ.
                                  800 North King Street, Suite 300
                                  Wilmington, DE  19801

For The Blackstone Group:         The Blackstone Group
                                  By:  JOHN O'CONNELL

For Baron & Budd, & Reaud,        Stutzman, Bromberg, Esserman &
Morgan & Quinn, et al.:              Plifka
                                  By:  DAVID PARSONS, ESQ.
                                  2323 Bryan Street, Suite 2200
                                  Dallas, TX  75201

For Continental Casualty          Ford Mirrian
Company:                          By:  ELIZABETH DeCRISTOFARO, ESQ.

For Travelers Casualty            Simpson Thacher & Bartlett LLP
Insurance Co.:                    By:  ELISA ALCABES, ESQ.
                                  425 Lexington Avenue
                                  New York, NY  10017

For Murray Capital                Murray Capital Management, Inc.
Management, Inc.:                 By:  SCOTT BEECHERT
                                       MARTI MURRAY

For Federal Insurance Co.:        Cozen O'Connor
                                  By:  JACOB COHN, ESQ.
                                  1900 Market Street
                                  Philadelphia, PA  19103

For Port of Seattle,              Motley Rice, LLC
et al.:                           By:  JAMES WHALEN, ESQ.

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES CONT'D:

For Fee Auditor:                 Warren H. Smith & Associates,
                                   P.C.
                                 By:  WARREN SMITH, ESQ.
                                 325 N. St. Paul, Suite 4080
                                 Dallas, TX  75201


For Future Claimants             Swidler Berlin Shereff
Representatives:                   Friedman, LLP
                                 By:  MONIQUE ALMY, ESQ.
                                 3000 K. Street, N.W., Suite 300
                                 Washington, DC  20007


Financial Advisor to             Swidler Berlin Shereff
FCR:                               Friedman, LLP
                                 By:  JONATHAN BROWNSTEIN, ESQ.
                                 405 Lexington Avenue
                                 New York, NY  10174


For Tort Claimants:              Simmons Cooper, LLC
                                 By:  ROBERT PHILLIPS, ESQ.
                                 707 Berkshire
                                 East Alton, IL  62024

1          COURT CLERK:  All rise.

2          THE COURT:  Please be seated.

3          This is the matter of W.R. Grace, Bankruptcy No. 01-

4  1139.  The participants by phone that I have listed are Ira

5  Greene, Allyn Danzeisen, Matthew Kramer, Amanda Winfree, Thomas

6  Whalen, David Klauder, Stephen Vogel, Brian Kasprzak, Leslie

7  Epley, Mary Martin, John Phillips, Kerrie Mumford, Brady Green,

8  Marc Casarino, Sean Walsh, Edward Westbrook, Darrell Scott,

9  Andrew Craig, Joel Samuels, Dale Cockrell, William Sparks, Lori

10 Sinanyan, William Sullivan, Lewis Kruger, David Witkin, Tiffany

11 Cobb, Michael Davis, Mark Hurford, Marla Eskin, Michael

12 Lastowski, John O'Connell, David Parsons, Elizabeth

13 DeCristofaro, Elisa Alcabes, Scott Beechert, Marti Murray,

14 Jacob Cohn, James Whalen, Warren Smith, Monique Almy, Jonathan

15 Brownstein, Robert Phillips, Mark Shelnitz, Paul Norris and

16 David Siegel.

17         Take entries in court, please.

18         MR. BERNICK:  Good morning, Your Honor.  David

19 Bernick for Grace.

20         MS. BROWDY:  Your Honor, Michelle Browdy for Grace.

21         MS. BAER:  Janet Baer for Grace.

22         MR. O'NEILL:  James O'Neill for Grace.

23         MR. LOCKWOOD:  Peter Lockwood for the asbestos

24 claimants.

25         THE COURT:  Wait.  Wait, I'm sorry, I can't type this

1  fast.

2       (Pause)

3            THE COURT:  Okay, sorry, Mr. Lockwood.

4            MR. LOCKWOOD:  Peter Lockwood for the asbestos

5  claimants committee, Your Honor.

6            MR. FRANKEL:  Good morning, Your Honor.  Roger

7  Frankel for David Austern, the future claimants representative.

8            MR. BAENA:  May it please the Court.  Good morning,

9  Your Honor.  Scott Baena and Jay Sakalo on behalf of the

10  property damage claimants committee.

11            MR. ESSERMAN:  Morning, Your Honor.  Sander Esserman

12  on behalf of Baron & Budd, ELG Environmental Litigation Group,

13  Law Offices of Peter Angelos (phonetic), Provost Humphrey Real

14  Morgan Silver Pearlman (phonetic) and Simmons Cooper.  And with

15  me today is Stephen Felsenthal.

16            THE COURT:  Morning.

17            MR. BECKER:  Good morning, Your Honor.  Gary Becker

18  from --

19            COURT CLERK:  You'll have to use a --

20            MR. BECKER:  -- the equity committee.

21            COURT CLERK:  -- microphone.

22            MR. BECKER:  Good morning, Your Honor.  Gary Becker,

23  Kramer Levin Naftalis & Frankel for the equity committee.

24            MR. GLOSBAND:  Morning, Your Honor.  Dan Glosband

25  from Goodwin Procter for CNA Insurance.

1          MR. DAVIS:  Michael Davis for the AIG member

2  companies not on the phone.

3          MR. MONACO:  Frank Monaco for the State of Montana.

4          MR. SPEIGHTS:  Good morning, Your Honor.  Dan

5  Speights and Bud Fairey for Anderson Memorial Hospital.

6          MR. WISLER:  Good morning, Your Honor.  Jeffrey

7  Wisler on behalf of Maryland Casualty and Zurich.

8          MR. BERNICK:  May I proceed, Your Honor?

9          THE COURT:  Yes.

10          MR. BERNICK:  On the agenda this morning, I think

11  that there are three principal matters that will occupy most of

12  our time.  The first is exclusivity, which is item one on the

13  agenda.  Then flipping further through, there's a motion for

14  class certification regarding property damage claims; that's

15  item four on the list.  And there are items five, six and seven

16  which relate to the status of the litigation against the State

17  of Montana.

18          There's some other miscellaneous items that we'll

19  take up in between, but I think those are the three principal

20  items that we have this morning.  And if Your Honor would

21  permit, I'm prepared to address exclusivity first of all.

22          THE COURT:  Well, could we deal with the fee

23  application so we can let Mr. Smith go his way?

24          MR. BERNICK:  Sure.

25      (Pause)


**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Good morning.

2          MS. BAER:  Good morning, Your Honor.  Janet Baer on

3     behalf of the debtors.

4          Your Honor, we have presented an order approving the

5     quarterly fee applications for the seventeenth period.  We

6     believe all matters have been resolved and have an order to

7     present for entry.

8          THE COURT:  Mr. Smith, do you have any objections to

9     the entry of the order that was attached to the certification

10    of counsel?

11         MR. SMITH:  No, Your Honor, we reviewed the order and

12    it correctly reflects all the reductions that we recommended.

13         THE COURT:  Okay.  I have that order.  I'll simply

14    have it entered today.  I actually signed it yesterday, but it

15    hasn't had a chance to hit the docket yet, and then when Mr.

16    Smith was on the phone, I thought perhaps there were some

17    objections.  So I'll take care of that order.

18         MS. BAER:  Thank you, Your Honor.

19         THE COURT:  All right, thank you.

20         MR. BERNICK:  Your Honor, if there are other -- some

21    other smaller matters we should just get out of the way

22    first --

23         THE COURT:  I think we should do that --

24         MR. BERNICK:  Yeah, that's fine.

25         THE COURT:  -- so that we can --

1          MR. BERNICK:  Dan, are you --

2          MR. SMITH:  Your Honor, if I could be excused -- this

3  is Warren --

4          THE COURT:  Yes, sir.  Thank you.

5          MR. SMITH:  Thank you, Your Honor.

6          MS. BAER:  Your Honor, there's one other small, but

7  significant matter on the agenda.  It's item number three and

8  it's the motion of the debtors to approve the settlement with

9  Intercat.

10          Your Honor, this is a situation where the debtors

11  have managed to work out a settlement with Intercat.  The

12  settlement agreement that was originally circulated had some

13  issues in it.  We've now finalized that settlement agreement.

14  It has to do with patent infringement.  Pursuant to the

15  settlement agreement, the patent infringement litigation is

16  completely settled.

17          Grace is currently owed about $16 million by

18  Intercat.  Pursuant to the settlement agreement, Grace will

19  give Intercat a credit or $9 million to settle the patent

20  litigation that's presently pending against Grace and a company

21  called Nultech (phonetic).  That will be done by credits to the

22  quarterly amounts that Intercat has been paying to Grace.

23          In addition to that, they have worked out a royalty

24  agreement going forward with respect to the technology at

25  issue.  They've also worked out a license agreement for future

1  technology that also will implicate the same issues.  The whole

2  idea being, Your Honor, that there will be no more patent

3  litigation going either way in a history that's gone on for

4  many many years.

5          The unsecured creditors committee and the property

6  damage committee both originally had reserved their rights on

7  objections.  They have been provided with all of the final

8  documents.  They have both now asked for changes that were

9  made, discussions have occurred and neither of them are any --

10 are objecting to the settlement agreement.

11         Under those circumstances, Your Honor, we would ask

12 that you enter an order approving the settlement.

13         THE COURT:  Well, has the final settlement agreement

14 been filed?  If it has, I haven't seen it.

15         MS. BAER:  The final settlement agreement has not

16 been filed.  The final agreement was circulated to the parties

17 and everybody was acceptable of that.  If Your Honor would

18 like, we could file the final settlement agreement.  We did not

19 file the originals because they were confidential.  The final

20 settlement agreement is not confidential.  We can file it on a

21 certification of counsel with the order if that's what you

22 would like.

23         THE COURT:  Okay.  Yes, I think -- as long as it's

24 not confidential and doesn't have to be filed under seal, then

25 yes, I think it should just be filed so I can take a look at

14

1  it.  Are the unsecured creditors committee and the property

2  damage committee now satisfied with the terms?  The objections

3  were basically that you hadn't seen the final documents and --

4          MR. BAENA:  Yes, Your Honor, on --

5          THE COURT:  -- that's a good objection.

6          MR. BAENA:  On behalf of the property damage

7  committee, we're okay with the final form that was circulated

8  last week.

9          THE COURT:  All right.

10          MR. KRUGER:  And on behalf of the official committee

11  of unsecured creditors, Lewis Kruger, Your Honor, we're

12  comfortable with it as well.

13          THE COURT:  All right.  Thank you.

14          MS. BAER:  Your Honor, then we'll submit the final

15  settlement agreement with a certification of counsel and the

16  order for entry.

17          THE COURT:  All right.  Thank you.

18          MR. BERNICK:  Is that it with the --

19          MS. BAER:  Your Honor, the only other matter on the

20  agenda other than the big three issues is the final matter on

21  the agenda which is our fifth omnibus objections to claims.  In

22  that one, Your Honor, there are a couple of claims left.  The

23  majority of those -- well, the one, the Peter Pearson

24  (phonetic) claim is on cross-motions for summary judgment.  The

25  final briefs are due in on the cross-motions I believe on

1  January 12th.  That matter is set for hearing on the merits at

2  the January 30th omnibus hearing.

3          The other matters on the agenda, one is a contested

4  matter where briefing is ongoing and the other one is a matter

5  we're attempting to resolve, and that's it on the fifth omnibus

6  objection.  So we would ask that an order be entered, Your

7  Honor, continuing that to the January 30th hearing.

8          THE COURT:  Okay, do you have an order?

9          MS. BAER:  I do.

10          THE COURT:  All right.

11      (Pause)

12          THE COURT:  Thank you.

13      (Pause)

14          THE COURT:  Okay.  That order's entered.

15          MR. BERNICK:  As I approach the podium, Your Honor, I

16  have to say it occurs to me that I've been on trial for some

17  time in Colorado in a matter and one of the amenities of the

18  courtroom that I most appreciate is they have a podium that

19  goes up and down, so those of us who are vertically challenged

20  can press a little button and then we don't feel so bad

21  anymore.

22          I'd like to address two questions in connection with

23  the exclusivity matter this morning.  And one may seem a little

24  bit out of order, but it's almost a carry over from a comment

25  that Your Honor made last time and it does have some relevance

1 here and I want to spend a little bit of time on it.  And the

2 question that Your Honor put and that I'd like to talk about

3 for a brief period of time is why does the debtor believe with

4 all the different claims that are pending that there is yet

5 equity value in Grace.

6          And I'm not going to go back over all of the

7 different procedural aspects of the litigation that we have

8 asked for and received the opportunity to pursue, but I do want

9 to put in perspective why it is that we're doing all of this

10 because we would not be wasting the Court's time, we would not

11 be wasting the assets of the estate if we didn't have a strong

12 belief that there is in fact equity, indeed substantial equity

13 in Grace.

14          And from that point of view, I want to take the Court

15 back to where we were when we filed the case.  Your Honor will

16 recall --

17          Is the Elmo working here at this point?

18          MALE VOICE:  Yeah.

19          FEMALE VOICE:  It is.

20          MR. BERNICK:  Okay.  And then I need probably one

21 more folder here.

22          Yeah, you can just hand those out.

23          This show up right?  Yeah.

24          This is the chart that is bound and determined to get

25 under brother Lockwood's skin and for that reason alone, I

1  decided that I would start with it.

2         This is the chart that indicates the basic --

3         MALE VOICE:  Excuse me.  Is there copies for everyone

4  else --

5         MR. BERNICK:  Yeah, there are copies --

6         MALE VOICE:  -- because it's pretty hard to see this.

7         MR. BERNICK:  Yeah, we're going to be distributing it

8  to everybody.

9         Do we have some extra copies there, Jan?  Oh, just

10 for the Judge?

11        You want to scoot over and --

12        THE COURT:  Mona --

13        FEMALE VOICE:  We have some on the way.

14        THE COURT:  Mona --

15        MR. BERNICK:  We have some on the way.  We had a slow

16 printer this morning.

17        MALE VOICE:  Okay.

18        Can they put it onto these monitors here?

19        MR. BERNICK:  I'm sorry?

20        MALE VOICE:  It's on ours here.

21        THE COURT:  They should be on that monitor, but I

22 don't know whether you can see it from there.

23        MR. BERNICK:  This other monitor here I think is --

24        MALE VOICE:  Apparently --

25        MR. BERNICK:  -- Delaware.

1           MALE VOICE:  Yeah, it's --

2           THE COURT:  You can terminate the -- is anybody in

3  court in Delaware on this case?

4           MR. BERNICK:  It doesn't look like it's active --

5           THE COURT:  Is anybody in court in Delaware on Grace?

6      (No audible response.)

7           THE COURT:  I don't think -- I think you can

8  terminate the Delaware video.  I don't know whether that lets

9  us get --

10          MALE VOICE:  You have it up here?

11          MALE VOICE:  We have it on --

12          FEMALE VOICE:  Your Honor, Etta Wolf (phonetic).

13          THE COURT:  Oh.

14          MR. BERNICK:  We'll just --

15          FEMALE VOICE:  I'm here in Delaware.

16          THE COURT:  Oh, I'm sorry.

17          MALE VOICE:  All right, all right, all right, all

18  right.

19          THE COURT:  Never mind.

20          MR. BERNICK:  She's going to get all -- get all this

21  money, you can look at the screen over here.

22          MALE VOICE:  Let me get over here with my band of

23  brothers.

24          MR. BERNICK:  Yeah.

25          MALE VOICE:  Small.

1           MR. BERNICK:  The first chart --

2           MALE VOICE:  Read --

3           MR. BERNICK:  The first chart is actually a chart

4  that we show -- and this is not going to be an extensive

5  presentation because I know Your Honor wants to get on to the

6  second question which is where do we stand on the negotiation

7  process.  And there's a lot to report on that and I think we'll

8  have an active discussion this morning on that score.

9           And all that I'm going to set out is obviously

10 Grace's perspective.  I think it would be premature to be

11 arguing the details of estimation that's not why we're going to

12 address this, this morning.

13          But to put the matter in perspective, when Grace

14 filed for Chapter 11, this chart which shows the annual rate of

15 claims filing was Exhibit Number 1.  Because it really reflects

16 why it is that Grace filed for Chapter 11; that is, that the

17 claims seemed to be headed down and in the year 2000, they

18 literally skyrocket in a way that didn't appear to reflect any

19 underlying medical issue or any underlying scientific

20 development, but rather probably due to a variety of

21 circumstances and effort to shift a number of claims to Grace.

22          In any event, since that time -- at that time, Grace

23 was a financially strong company and the principal reason that

24 we filed for Chapter 11 was to bring that spike under control

25 and in a sense sort out the wheat from the chaff.  And we were

1  absolutely explicit.  We filed a brief day one of the Chapter

2  11 proceeding that laid out what the problem was and what our

3  proposed solution was.  And the proposed solution was

4  relatively simple, which was to go into that spike and

5  determine what portion of that spike in claims really

6  represented viable claims in the bankruptcy and that if we

7  could sort that out, everybody could -- the claims could be

8  paid in full, Grace could proceed with its business and

9  continue to recognize value for its shareholders.

10         Since that time, and that's now four years ago, there

11  have been a lot of developments, but I've only focused on four.

12  And I focused on four because I think that they are basic

13  factors that are difficult to dispute and they are facts that

14  very much drive our perspective which is that there -- as --

15  there is as there was in fact substantial equity value if we

16  bring greater rationality to the claims.

17         The first development ironically was an effort to

18  obtain federal legislation, which the Court I'm sure is

19  familiar with.  It's currently denominated the FAIR Act.  And

20  the reason that that effort got traction was very simple, which

21  is that there were in fact members of the plaintiff's bar

22  itself; that is people who were pursuing asbestos product

23  liability claims who came before congress and basically said

24  yeah, as everybody has long suspected, the system is broken.

25  They're claims that are not good claims that are nonetheless

1 being pursued and the net result of all that is the people who

2 do have good claims are not able to get full compensation or

3 not able to get timely compensation.

4        And that recognition then prompted what became I

5 think a significant amount of legislative, but also popular

6 media coverage of the problem.  And while there was an effort

7 and remains an effort on the part of the plaintiff's personal

8 injury bar to say well, gee, everything's okay, the system's

9 never been broken, in point of fact, they're about the only

10 ones who believe it and that was a significant development.

11        At about the same time, studies started to come out

12 that actually went into some of the scientific -- the question

13 of whether there really was reliable scientific data that was

14 being used to prosecute these claims.

15        And I've got on the screen here just a summary chart

16 that deals with one of the studies that came out of Johns

17 Hopkins.  And what was significant about this was that whatever

18 the -- whatever might be believed to be the criteria for non-

19 malignant disease, the real issue was the quality of the data.

20 And in particular, whether the B-reads or the interpretations

21 of x-rays by doctors who interpret those x-rays to find that

22 there's evidence of non-malignant disease -- whether that

23 interpretation really was reliable.

24        And this study proved very dramatically that in

25 looking at claim files that had been submitted on behalf of

1 claimants in the asbestos litigation and the interpretations of

2 ILOs or the interpretations the B-reads in the context of those

3 files that efforts by doctors who did have a tie to the

4 litigation process to in a sense replicate this same

5 interpretation demonstrated very dramatically that the

6 interpretations were not reproducible or not replicable.

7        This actually echoed and was in a sense not a

8 terribly surprising fact it echoed the results of an audit that

9 took place in the late 1990s and should have been more

10 prominently featured in these Chapter 11 cases because it told

11 the whole story way back when.  When the Manville Trust

12 reopened its doors for the second time -- the first time, the

13 Manville Trust was bankrupt and a new deal had to be done to

14 establish criteria for the resolution and payment of claims.

15 And once those criteria were put in, they were put in by

16 agreement, it turns out they created an enormous opening for

17 people to exploit criteria for non-malignant disease.

18        There was an audit that was done at the request in

19 fact of the Trust itself and the results are set forth on this

20 slide and they show that there was -- the top 10 doctors that

21 submitted claims on behalf of -- or, information on behalf of

22 claimants against the Manville Trust, they were -- 46 percent

23 of them were -- they were responsible for 46 percent of all

24 claims, but they had a 63 percent failure rate on audit.

25 Again, very very prophetic of what would ultimately be found by

1 the Hopkins study.

2        So we had federal legislation the last several years.

3 We have studies that have in a sense picked up the theme that

4 was struck in the context of the federal legislative hearings

5 which theme was that there was a problem with the underlying

6 data and a problem with the underlying claims.  We all know

7 that the legislation at the federal level thus far has not

8 succeeded, but we also know that the issue was then taken up at

9 the state legislative level.

10       And I don't know if the Court is aware of it, but

11 there are no less than four prominent states -- there are

12 others as well -- that specifically have adopted criteria and

13 limitations on the ability of claimants to pursue non-malignant

14 claims absent a demonstration of physical impairment.  And the

15 ones that I featured here are Florida, Ohio, Georgia and Texas.

16       Yeah, what is the impact of all that, as the next

17 slide indicates.  Those four states account for 40 percent of

18 the pending pre-petition personal injury claims against Grace

19 and 44 percent of all pending and closed claims.  So if all

20 that we focus on -- forget about the federal legislation and

21 what it brought to life, forget about the studies and what they

22 brought to life.  If all that we focus on is the applicable

23 state law -- state procedural law that applies here, we can see

24 that there be a very dramatic impact on the prosecution of

25 claims against Grace if these cases still were in the state

1   court system.

2          We then get to the last point which is well, to what

3   extent has all of this found resonance with the courts.  And

4   Your Honor is well aware of the frustration that we have faced

5   in this process.  Day one in this case we said that the answer

6   to this is to have people submit data relating to their claim

7   so we can find out which ones are based upon reliable

8   reproducible data.  Never mind the criteria for diagnosis.

9   Never mind state substantive law, federal substantive law.  The

10  question really is an evidentiary question and that is are

11  these claims accompanied by reliable in the sense of

12  reproducible medical data.

13         We proposed that at the beginning of this case.  It

14  was put on a very slow boat.  Ultimately, Judge Wolin decided

15  that there were matters that had higher priority.  We found

16  some traction in the Brown and -- in the Babcock & Wilcox case.

17         In Babcock & Wilcox, there was a claim form that was

18  adopted and at least we got the data.  Those 10 doctors that

19  were the subject of the Manville audit where there was a 63

20  percent failure rate, they accounted for 46 percent of the

21  asbestos claims against Babcock & Wilcox.  So we can see

22  already that it was unsurprisingly right and that is that there

23  was an enormous reliability problem when it came to the claims

24  that were being prosecuted.

25         In the context of the Grace case, there was progress

1  made on the property damage side.  Judge Newsome decided to

2  adopt our _Daubert_ proposal with respect to dust sampling.  Your

3  Honor knows the results there.  And of course most recently,

4  we've seen Judge Jack down in Corpus Christi adopt the same

5  procedures in examining the claims that were brought for silica

6  related illness by many of the same law firms that are

7  prosecuting asbestos claims.

8          Your Honor is familiar with that fact and I'm not

9  going to spend a lot of time on it, except to say that 17 law

10  firms that were centrally involved in the silica MDL --

11  plaintiff's law firms -- are responsible or have been

12  representing 35 percent of the total claims in this case.  We

13  can't track exactly which claimants at this point, but we do

14  know that the same 17 firms are responsible for a huge portion

15  of the claims that are being pursued here.

16          Where does all this leave us in terms of the impact?

17  I think that there are three impacts.  One, just working with

18  these basic facts, not any of the details, not -- you know, not

19  all the ins and outs of estimation, there is unquestionably --

20  it is only the courts that there has a slow recognition that

21  there's a fundamental problem with the prosecution of asbestos

22  claims.  Everybody else in the world knows about it.  And

23  there's been a broad call both at the state and federal level

24  to solve that problem.

25          Two, the courts have begun to recognize in the

1  context of bankruptcy and also outside of bankruptcy the tools

2  are available to solve this problem in the courts.  It's not

3  something where people had to throw up their hands and say

4  let's wait for congress to act.  The problem can be solved in

5  the court system.

6        And number three, in particular in this case because

7  this Court acted actually a while ago in this area, we are now

8  poised to get the very information that's going to be most

9  material to scoping out the problem in connection with the

10 personal injury claims.  We're on the verge of getting it and

11 we believe there's no reason not to believe that it won't show

12 exactly the same as what we saw in the studies, the John

13 Hopkins studies, exactly the same as what we saw in the

14 Manville Trust and exactly the same as what we saw in the case

15 of the <u>Babcock & Wilcox</u> case.

16       How do we translate that into actually sorting

17 through the claims?  And the answer's relatively simple.  With

18 respect to the personal injury claims, there are two basic

19 drivers -- diagnostic drivers.  One are the pulmonary functions

20 tests.  They're designed to show impairment.  And the other is

21 the B-reading.  They're designed to show that there is an

22 asbestos related illness.

23       I'm not going to go through the details of it, but if

24 you take a look at the standards themselves for follow through

25 for interpreting a PFT and the standards themselves for doing

1  B-reads, it is central to both standards -- central -- that the
2  results be reproducible, that the ILOs have more than one
3  reader and that the PFT scores all overlay so that the
4  exhalation profile matches in all cases is right in the
5  standards.

6          And if all that we did was to require that the
7  medical data that's being submitted in support of these claims
8  simply complied with what the standards have said for years --
9  not, you know, how much does it take to support a diagnosis,
10 but whether the data is reliable data, this problem would be
11 solved.  I mean it is that simple.  All you do is require that
12 the B-reads be re-read by people who are independent.  The
13 claimants themselves can go find doctors.  We could probably
14 set up a system to have them re-read, but it's the re-reading.
15 It's the subjectivity of the initial reading.  It's the re-
16 reading that's key.  The standard requires it.  All you do is
17 follow it.  We would sort them out.

18         And on the PFT scores, it's actually interesting with
19 respect to the PFT scores, they're all supposed to be
20 accompanied by the profile.  When you blow the air out, you get
21 an exhalation rate.  Those little tracings and there are three
22 of them have to overlap, and if they don't, there's a problem
23 with the way the test is administered.  You can read those by
24 computer.  So we can sort through these claims in half a
25 heartbeat.

**J&J COURT TRANSCRIBERS, INC.**

1          What is -- what kind of impact would that have?  The

2  impact would be dramatic.  And to give the Court a flavor for

3  it and Your Honor's asked me this question before, but I'm

4  going to be a little bit more concrete.  In projecting forward

5  the value of the personal injury claims, typically the

6  estimators following their convention, which as Your Honor

7  knows from other matters is very dubious in many respects, it's

8  nonetheless what has been used in the context of estimation

9  previously.  The key is there's a curve that predicts the

10 overall trend of future asbestos injury claims and the trend

11 itself -- that is, the shape of this curve -- is not hotly

12 contested.  There are issues on the margin, but typically it's

13 huge.

14         The question is what is the height of the curve that

15 you're working with.  And obviously, if it's higher, you got

16 more value.  If it's lower, you got less value on an ongoing

17 basis following the same form of the curve.

18         Well, what are we doing?  Well, we're taking in the

19 case of Grace is to begin with a snapshot of that curve as of

20 the Spring of 2001 when the bankruptcy case was filed.  The

21 plaintiffs would like to say -- the claimants would like to say

22 that all those claims are valid claims to some degree and they

23 ought to drive the curve.  So of course the curve starts very

24 high and it has a lot of area under the curve, a lot of value

25 under the curve as time goes on.

1         The essence of what we're doing when we have the

2    questionnaires filled out and we take up this question of

3    reliability, is we're taking that profile, that snapshot as of

4    the Spring of 2000 (sic) and we're sorting out which claims are

5    based upon or accompanied by the submission of the reliable PFT

6    and ILO data and which claims are not.  And that fact alone as

7    you can see, has basically a 75 percent impact on the number of

8    claims that would clear that filter.  That is, if all that we

9    did was require the information that the standards require

10   before you can get to the question of diagnosis, our review of

11   the claim files using those criteria shows a drop of 75 percent

12   in the number of claims that would clear.

13        If we then apply another test, which is to take the

14   question of whether people are specifically enough identifying

15   a significant exposure to Grace asbestos, it lowers the

16   percentage even further so that what you're left with is

17   essentially about 18 percent of the claims that were pending in

18   2001.

19        And how do we get that?  If you go back to the period

20   of time when Grace had a smaller number of claims and could

21   spend the time actually reviewing the claims for which ones

22   reflected a real and substantial exposure to asbestos kind of

23   product ID, but real product ID, the dismissal rate was much

24   higher.  What happened was that Grace, like other companies,

25   was swamped with a volume of claims such that it couldn't

1 pursue that anymore.  So there's historical data on the basis

2 of which to determine what impact there would be on the number

3 of claims that could be pursued if that same degree of scrutiny

4 were to be applied.

5          So, Your Honor can see that with two very simple

6 steps, we get very quickly from the huge number of claims that

7 were being prosecuted in the Spring of 2001 down to a much more

8 modest and much more real group of claims.

9          What's happened to pricing in between?  Pricing in

10 between has fluctuated.  Meso claims during this period of time

11 rose and more recently, they've fallen.

12          What's happened to the pricing of non-malignant

13 claims?  It's dropped like a stone and this is what's happened

14 in the system.

15          So while there is pricing fluctuation and while the

16 number of claims that are being projected obviously exceeds

17 where we were in 2001, when the numbers are run, we believe

18 that there is not only equity, there's very very substantial

19 equity left in this company.

20          We can see a similar situation with respect to

21 property damage.  Basically in July of this year, we showed

22 this chart and this chart illustrates how we were -- we plan to

23 show that you could take the 4,000 pending claims and with

24 relatively small numbers of issues teed up, come down to a

25 number of property damage claims that was much more in harmony

1  with our history which said that the property damage litigation

2  largely was at an end.

3        Even in the five months that have now elapsed, we've

4  seen the impact of the current litigation involving the

5  property damage claims.  Four thousand went to 2,200, went to

6  1,600, went to 1,300, went to 1,100 and that's before we now

7  get to the remaining objections that have to be taken up.

8  During the course of the next year, we believe that the 1,100

9  will come down to a number that's probably less than 100 claims

10 much more consistent with the history of the company's

11 litigation before Chapter 11.

12       So, Your Honor, we believe that this is a very

13 transparent, very doable process and will result in recognition

14 that substantial equity exists in Grace as we set out before

15 the Court at the outset.  Now again, I want to underscore I

16 know that my brethren here will rise as a chorus as they're

17 obliged to do, to say oh come on, this is more talk of

18 revolution.  Can't you get it straight?  We'll never agree to

19 this.

20       And the answer to that is very simple.  We hope to

21 reach a consensual plan.  But if we don't reach a consensual

22 plan, on the PD side, the Court has already seen how much value

23 there is and is not in the pending PD claims and we expect that

24 to continue.  On the PI side literally, these courts are the

25 only place in the entire country it is not in harmony with what

1 everybody recognizes which is a lot of these claims are bogus

2 claims.

3           THE COURT:  Well --

4           MR. BERNICK:  No one's sitting here trying to change

5 the world --

6           THE COURT:  But, Mr. Bernick, the problem is that the

7 other courts aren't dealing with 524(g) injunctions and I think

8 the debtor may have somewhat of a choice.  Maybe it's not as

9 much a black and white issue as I'm going to make it, but just

10 to sort of illustrate the point.  It seems to me that if the

11 debtor is convinced that there's equity, then I really question

12 whether the debtor is looking at a 524(g) injunction at all.

13          If what you want to do is file -- is get the claims

14 filed and take a look at -- in some fashion, at the scope of

15 the claims, then I -- you know, maybe there's a way to go about

16 doing that if you're convinced that there's equity, but why do

17 it in the bankruptcy system?  I mean you filed the cases to

18 avoid the litigation in the tort system and what I heard at the

19 -- and why I was frustrated I think at the last hearing --

20          MR. BERNICK:  Uh-huh.

21          THE COURT:  -- was based on the fact that what I'm

22 hearing is we want the proofs of claim filed and then we want

23 to object to them all.  Well, okay, that's fine, but that's

24 exactly what the tort system lets the debtor do.

25          MR. BERNICK:  Yeah.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  So, if you want to go back into the tort

2    system and litigate all the claims, quite frankly, I don't see

3    any problem with that.  We'll just, you know, dismiss the

4    injunction --

5          MR. BERNICK:  But I --

6          THE COURT:  -- grant relief from stay, let the debtor

7    liquidate the claims and then you won't have to worry about

8    estimation.

9          MR. BERNICK:  And that's a fair point and I think the

10   easiest response is the one that Your Honor anticipated, which

11   is it's not black white, there's a course that's in between.

12   And the course that's in between is relatively simple, which is

13   that we do emerge with a plan, the plan does contemplate the

14   continuation of litigation, but at the same time, the plan also

15   provides for litigation on a controlled basis in the federal

16   system as in fact was contemplated -- is in fact is perfectly

17   contemplate by the rules and to a certain extent, was

18   contemplated even in the Manville case.

19         THE COURT:  Well, I mean but there's no guaranty that

20   but for the trust setup that the claims are going to get

21   litigated in the tort system.  I mean to the extent that you

22   want to litigate each individual claim, I mean my guess is that

23   the district court in taking a look at the debtors' request to

24   litigate -- and I don't know, let's say you'll get it down

25   to -- just to pick a number.  I'm not --

1           MR. BERNICK:  Uh-huh.

2           THE COURT:  You know, it's just a number --

3  hypothetical --

4           MR. BERNICK:  Right.

5           THE COURT:  -- number.  Let's say you'll get it down

6  to 10,000 claims and you have to litigate each one of 10,000

7  claims --

8           MR. BERNICK:  No, but I -- again --

9           THE COURT:  -- in the federal district court, it's

10 not going to happen.

11          MR. BERNICK:  Again, there are really two simple

12 answers.  One is that we're absolutely entitled to demonstrate

13 even down to a claim-by-claim basis, which is after all what

14 the personal injury committee will say when you propose

15 anything that would impair any of their claims is we want to do

16 it one by one -- we're entitled in this process to take out of

17 the system the claims that are bad claims.

18          THE COURT:  Sure.

19          MR. BERNICK:  And there's no question, but the

20 bankruptcy process provides a streamlined mechanism for doing

21 that.  The real issue that Your Honor is raising is at the end

22 of the day if you want to emerge from Chapter 11, does Chapter

23 11 provide a mechanism for in a sense continuing that process.

24 And the answer to that I think is -- and what would the

25 succeeding court do.  And the answer to the first of those

1    questions is clearly yes.  There's no reason why the court

2    can't maintain jurisdiction.  This is exactly what was done in

3    the case of <u>Dow Corning</u>.  Indeed over objection, it was done in

4    the case of <u>Dow Corning</u>, even outside of the asbestos context.

5          But beyond that what would any district court do?

6    They would do exactly what Judge Jack did.  They'd say we're

7    not going to litigate all these claims individually.  We're

8    going to develop a screening process that's designed to figure

9    out which ones of these claims are decent, which ones aren't --

10          THE COURT:  Well, wait --

11          MR. BERNICK:  -- and the debtor's going to have to --

12          THE COURT:  -- she's an MDL Judge.  She's not

13    litigating the claims.  She's dealing with the --

14          MR. BERNICK:  So the --

15          THE COURT:  -- discovery issues, but she's not going

16    to do --

17          MR. BERNICK:  Oh --

18          THE COURT:  -- the trials of 500,000 --

19          MR. BERNICK:  She doesn't --

20          THE COURT:  -- silica claims.

21          MR. BERNICK:  She doesn't -- absolutely, but she

22    doesn't -- in a sense, she didn't have to, but what she did was

23    exactly what is necessary.  That is, she had whatever it was,

24    10,000 claims.  She said, "Look, this is very simple.  I want

25    to know how all these claims are created."  And she had

1  discovery conducted on that question.  It's the same discovery

2  that we're now seeking both through the questionnaire and

3  otherwise to find out how they're created.

4        I don't care if there's 10,000.  I don't care if it's

5  100,000.  They all comes from the same lawyers and the same

6  doctors.  So don't tell me that we can't find out what the

7  truth of the matter was and she found out the truth of the

8  matter and it was enormously impactful.

9        Now what will happen with those case?  Well, first of

10 all, a lot of those cases are just going to disappear because

11 her having found that will have enormous influence on any Judge

12 that's going to try any one of those cases.  Secondly, the fact

13 that she's an MDL Judge gave her certain powers.  They are

14 actually far less than the power of the -- of this court and

15 the power of the district court that sits over this court.  Far

16 less.

17       All she had was the order of the Judicial Panel on

18 Multidistrict Litigation consolidating those cases before her

19 solely for discovery purposes and Daubert.  This Court has far

20 more power.  You have the ability, not only by -- not only is

21 there an obligation to consolidate all these cases, they can

22 remain consolidated and they can be handled pursuant to case

23 management order that extends out over time.  There -- so,

24 right there, there is a stronger procedural mechanism for

25 achieving consolidation which she never had.  But --

1        THE COURT:  But we're talking apples and oranges.

2  You brought a -- you have a plan on the table --

3        MR. BERNICK:  Right.

4        THE COURT:  -- that structurally tries to cap the

5  liability --

6        MR. BERNICK:  Right.

7        THE COURT:  -- at the same time that it says you're

8  going to pay claims in full.  Now --

9        MR. BERNICK:  Well --

10       THE COURT:  -- that's somewhat of an anomaly in my

11 view because --

12       MR. BERNICK:  Well --

13       THE COURT:  -- I don't how you cap the liability if

14 you're going to pay claims in full.

15       MR. BERNICK:  And those are all good questions,

16 but --

17       THE COURT:  But I'm not done.

18       MR. BERNICK:  Okay, I'm sorry.

19       THE COURT:  And you've got a 524(g) trust mechanism

20 in place that will be the vehicle by which the truth of these

21 claims and the medical basis for which the claims are filed is

22 to be tested.  That's the whole purpose of taking a look at a

23 524(g) trust.  So, I am utterly confused as to why the debtor

24 wants to get all these proofs of claim on file, apparently

25 wants to object to all the proofs of claim because if you do

1  that, that's not an estimation process, you're going to take

2  the claims on head on one-on-one and you're going to be

3  litigating here even longer that you'd be litigating in the

4  tort system.

5          MR. BERNICK:  I --

6          THE COURT:  I do have the discretion to control the

7  calendar.  I'm not going to litigate 118,000 personal injury

8  claims.

9          MR. BERNICK:  I'm now really happy that we're talking

10  about this, this morning because we're not asking the Court to

11  do any such thing.  First of all, the issues that we're putting

12  before the Court are not -- you know, it is their shtick that

13  oh, we're asking to litigate all these claims, you know,

14  individually.  We're not asking to do that.  It's not even

15  necessary to be done.

16          We are objecting to the claims for purposes of

17  lodging what might become individual bases for disallowing each

18  and every claim that at this point are simply by way of

19  defenses supported by evidence.  For what purpose?  To tee up a

20  contested proceeding in which we can get the information that's

21  necessary to estimate the overall value of a subcategory of

22  claims.

23          THE COURT:  But --

24          MR. BERNICK:  That --

25          THE COURT:  Okay, but those are nice words, but let's

1  look at the practicality of what you're suggesting, I think.

2              MR. BERNICK:  Okay.

3              THE COURT:  What you're suggesting is file proofs of

4  claims.  They have to be attached --

5              MR. BERNICK:  Right.

6              THE COURT:  They have to be accompanied by medical

7  evidence --

8              MR. BERNICK:  Correct.

9              THE COURT:  -- the PFTs, the B-reads, whatever it

10 is --

11             MR. BERNICK:  Right.

12             THE COURT:  -- that there is medical evidence for.

13 Then, you want the claimants who are I guess those who are

14 still alive at least either to be re-examined or you want

15 somebody else to take another look at the documents that have

16 been submitted --

17             MR. BERNICK:  Uh-huh.

18             THE COURT:  -- to see whether or not the documents

19 are reliable indicators of the disease level that the plaintiff

20 -- the claimant says the claimant has.  The difficulty of

21 course is that if the information -- if the data isn't correct,

22 are you simply suggesting that the interpretation isn't correct

23 or that the underlying document -- that is, the B-read, the PFT

24 study in the first place -- is not correct?

25             MR. BERNICK:  Well, let me be clear on that.  What

1  the standards say in black and white is that the ILO -- the B-

2  read itself needs to be replicated.

3            THE COURT:  Right.

4            MR. BERNICK:  Okay.  And the PFT score needs to be --

5  they need -- the tracings need to overlap.  If those criteria

6  are not met, there is no B-read that meets standards and there

7  is no PFT test that meets standards.

8            THE COURT:  Okay.

9            MR. BERNICK:  If there's no B-read that meets

10  standards, there's no ability to diagnose asbestos related

11  disease --

12            THE COURT:  Except that you've got, as to claimants

13  who are still alive --

14            MR. BERNICK:  Right.

15            THE COURT:  -- the possibility that they're going to

16  go back and get --

17            MR. BERNICK:  Sure.

18            THE COURT:  -- additional --

19            MR. BERNICK:  We would hope that --

20            THE COURT:  -- documentation.

21            MR. BERNICK:  We would hope that they would.

22            THE COURT:  Okay.

23            MR. BERNICK:  But all this is for purposes at this

24  point of an estimation of an overall aggregate value for a

25  subcategory of claims.

1              THE COURT:  But how are you going to estimate it?

2  Once you undertake the objection process -- this is -- I guess

3  this is where I'm losing --

4              MR. BERNICK:  Okay.

5              THE COURT:  -- the argument that the debtor's making.

6              MR. BERNICK:  Right.

7              THE COURT:  Once you object to a claim --

8              MR. BERNICK:  Right.

9              THE COURT:  -- because -- well, let me start from the

10 beginning.  Again, let's just pick 10,000 claims.  You get --

11             MR. BERNICK:  Right.

12             THE COURT:  -- 10,000 claims filed.

13             MR. BERNICK:  Right.

14             THE COURT:  All right, and let's forget the easy

15 ones, the mesotheliomas.  Let's only talk about what the debtor

16 would say are unimpaired claims --

17             MR. BERNICK:  Uh-huh.

18             THE COURT:  -- potentially unimpaired claims.

19             MR. BERNICK:  Right.

20             THE COURT:  All right, and so of that group, let's

21 say that 8,000 of them are these potentially unimpaired claims.

22             MR. BERNICK:  Correct.

23             THE COURT:  All right, and all of these people are

24 still alive.

25             MR. BERNICK:  Right.

**J&J COURT TRANSCRIBERS, INC.**

1            THE COURT:  So the debtor's going to object to each

2   of these 8,000 claims.

3            MR. BERNICK:  That -- no, debtor's already objected

4   to the claims.  I believe that we have objected to the -- I

5   know the personal injury claims --

6            THE COURT:  They're not --

7            MR. BERNICK:  Yeah, we actually haven't -- we don't

8   have a bar date, so that's correct.  We don't have --

9            THE COURT:  Right.

10           MR. BERNICK:  We don't have that objection process,

11  that's correct.  That doesn't -- it doesn't really make that

12  much difference because --

13           THE COURT:  Well --

14           MR. BERNICK:  -- the purpose of this exercise at this

15  point -- we originally went down the road of saying give us a

16  bar date, we will then object and we will then litigate to

17  disallow.

18           THE COURT:  Right.

19           MR. BERNICK:  We're not doing that anymore.

20           THE COURT:  Okay.

21           MR. BERNICK:  And I've said that we're not doing that

22  anymore --

23           THE COURT:  Well, but --

24           MR. BERNICK:  -- and we said that repeatedly.  What

25  we are doing is to seek the information with respect to the

1 people who had claims on file as of the Spring of 2001 in order

2 to estimate an aggregate value for claims for purposes of then

3 funding a trust --

4           THE COURT:  All right, so you don't want to --

5           MR. BERNICK:  -- that would pay those claims.

6           THE COURT:  -- object to the claims, what you want is

7 to get the medical evidence that supports the claims so that

8 your experts can take a look and say in our opinion, X

9 percentage of the B-reads aren't correct, they can't be

10 replicated and therefore for estimation purposes, even though

11 we've got 8,000 unimpaired claims, from your experts' point of

12 view, they're really only 2,000 --

13           MR. BERNICK:  That's correct.

14           THE COURT:  -- unimpaired claims and so going

15 forward, we're going to assume that only one-quarter of the

16 unimpaired claims are going to be valid.

17           MR. BERNICK:  That are going to be ultimately paid,

18 that's correct.  That's exactly right.  And we would then --

19 this is what our plan calls for.  Our plan is divided --

20 divides the personal injury claims into two buckets.  And this

21 is very important.

22           The first bucket are people who have -- who meet --

23 who have the kind of data that says that there is reliable

24 evidence that they're actually sick and also reliable evidence

25 they actually have a claim against Grace.  And with respect to

44

1 those, we have a subfund to pay them and we have provided a

2 number for that subfund in our plan based upon the information

3 that we have today, which is admittedly incomplete.

4       With respect to everybody else who's got a personal

5 injury claim, we are not going to seek an estimation of the

6 overall value of those claims and in the post-bankruptcy trust,

7 we will litigate those claims with equity being at risk.  Those

8 are the non-malignant unimpaireds or people who don't have

9 substantial evidence of substantial exposure to a Grace

10 product.

11       The only so-called cap that we're seeking to

12 establish is a value for the claims which do meet the standards

13 for having reliable data.  And with respect to those, we are

14 going to seek to estimate the aggregate value of those claims.

15       No claim will be dismissed.  No claim will be

16 disallowed.  But we will be able to establish we believe

17 through this process that all claims will be paid in full.  And

18 because all claims will be paid in full, we believe that we're

19 not subject to the problem of the opposing vote under 524(g).

20 If we were, the plaintiffs would -- I mean this is the

21 interpretation the plaintiffs advance.  We would never get

22 their vote and we would -- because we would never get their

23 vote, there would never be a 524(g) plan --

24       THE COURT:  Well, I don't --

25       MR. BERNICK:  -- which doesn't make --

1          THE COURT:  I don't know about any of that.  It seems

2   to me that the plan could fix that problem pretty easily by

3   simply saying that to the extent that the $1.7 billion isn't

4   sufficient because of the estimation process that the debtor is

5   either going to up the ante in the trust or do something

6   else --

7          MR. BERNICK:  And it --

8          THE COURT:  -- will satisfy it.

9          MR. BERNICK:  And --

10         THE COURT:  Mr. Bernick, I have not taken a look at

11  this voting issue as a voting issue.  But I have to tell you,

12  I'm very uncomfortable about the process that under 524(g) that

13  uses the word ballot or vote whereas Chapter 11 doesn't, that

14  somehow or other I'm going to be able to disenfranchise the

15  people who have to vote on a 524(g) trust.  I am really

16  uncomfortable and to convince me that that is going to be

17  appropriate is going to take some pretty good briefing and

18  argument.

19         MR. BERNICK:  Well, we will provide the briefing and

20  all that I will say at this point, Your Honor, is that if there

21  is -- if the answer is different -- if the answer is that they

22  have an absolute right to vote, even though all the evidence

23  that Your Honor believes is admissible evidence under Daubert

24  which is a threshold issue, Daubert applies absolutely in this

25  case.  It requires a screening of their evidence.  Their say so

1  doesn't make any difference whatsoever.  If they don't have

2  that evidence, they're out of luck.

3          THE COURT:  It's not a <u>Daubert</u> issue.

4          MR. BERNICK:  It is --

5          THE COURT:  It's a question of whether or not you're

6  going to be able to satisfy me that not just the claims that

7  are filed, but the future demands as to which I have to make a

8  finding that I can't estimate the number of future demands

9  because if I can estimate the number, you're not entitled to a

10 524(g) trust, that the futures rep can't -- is somehow

11 disenfranchised and that the asbestos claimants are

12 disenfranchised.

13         MR. BERNICK:  And I know that with those words, we're

14 going to hear -- you're going to hear one after -- and they're

15 all going to stand up and say amen, Judge, you hear what the

16 problem is.  But --

17         THE COURT:  Well, that's a problem.

18         MR. BERNICK:  -- to be -- but to --

19         THE COURT:  That's not --

20         MR. BERNICK:  To be --

21         THE COURT:  That's just a problem.

22         MR. BERNICK:  No, I --

23         THE COURT:  And maybe it's a fixable one.

24         MR. BERNICK:  All kinds --

25         THE COURT:  I don't know yet.

1          MR. BERNICK:  There are all -- there are huge

2    problems.  I mean nobody has ever solved the problem of the

3    asbestos Chapter 11 cases, period.  I mean it's just not

4    happened, but the fact the matter is -- and everybody's been

5    waiting for the legislation.  We're not counting on the

6    legislation.  The legislation may or may not happen.

7          THE COURT:  Not everyone's waiting for legislation.

8    This person --

9          MR. BERNICK:  Well, I --

10          THE COURT:  -- has never been waiting for

11    legislation.

12          MR. BERNICK:  That's right.  That's right, and we're

13    kind of in exactly the same camp, otherwise we wouldn't be

14    taking up the Court's time.

15          But with respect to the futures, there's no different

16    issue with respect to the futures.  They all use this little

17    curve here.  The presents use it -- the current claimants use

18    it to say oh my gosh, we own Grace.  And the futures do the

19    same thing.  It's the same analysis.  And if the current claims

20    are reviewed and they're found not to be -- they're found most

21    of them not be valid, the curve goes down and the futures are

22    in exactly the same position as the currents.

23          So there's no different -- but I want to distinguish,

24    Your Honor, in this way.  Your Honor's looking down the road as

25    I know from many other cases now, you do, and you're raising

1  fine questions and they're questions that have to be answered.

2  I think that the answer at the end of the day is relatively

3  simple, which is the 524(g) gave an absolute blocking position

4  to the personal injury claimants such that if we assume that

5  they're entitled to vote and it doesn't make any difference

6  whether they're going to be paid in full or not -- no

7  difference whatsoever, then 524(g) put them into a position

8  where if they don't like a plan for any reason -- any reason

9  whatsoever --

10         THE COURT:  Now, Mr. Bernick --

11         MR. BERNICK:  -- they --

12         THE COURT:  -- that's stating in a hypothetical.  I'm

13  looking at this plan in this case and the problem is that I

14  don't know yet.  I haven't had any evidence.  But let's assume

15  that I do get evidence in and I find that 1.7 billion isn't

16  going to be enough to pay all the allowed claims in full, you

17  don't have a confirmable plan.

18         MR. BERNICK:  Right.

19         THE COURT:  That's the problem.

20         MR. BERNICK:  That's the problem and that problem --

21         THE COURT:  That's a big problem.

22         MR. BERNICK:  That's a big --

23         THE COURT:  And that's a problem I --

24         MR. BERNICK:  I'll say, Your Honor, it is a --

25         THE COURT:  -- need to address today.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  It is a huge problem.

2          THE COURT:  Okay.

3          MR. BERNICK:  Okay, enormous.  Okay.  But, beginning

4  at the beginning, that's a problem that's a fixable problem.

5  We can focus on fixing the problem.  We can't fix the

6  interpretation that's been advanced historically by the

7  plaintiffs here.  And that's the position that says forget

8  about whether it's 1.7 or 1.8 or 2.3, if we don't vote in

9  favor, you're out of luck.  If that's the position, then 524(g)

10 basically took the bankruptcy process and said it is not

11 available, unless you please us, the claimants, and we are

12 absolutely entitled to vote against and forget about whether it

13 makes sense or it's fair or claims are --

14         THE COURT:  Well --

15         MR. BERNICK:  -- good or bad, we're voting against.

16 That is an untenable position.

17         THE COURT:  It may be untenable, but what is -- but

18 what the problem is that is the position, unless you can

19 satisfy me that all claims and future demands are going to be

20 paid in full.  And I don't think in full means the value of

21 that claim as it would be stated through a trust.  It means the

22 claim.

23         MR. BERNICK:  Well --

24         THE COURT:  That's what in full means.

25         MR. BERNICK:  Very interesting question and that is

1  again something that we can take up.  That falls into the area

2  from my point of view of, A, how it is that we're working

3  through the details of the plan and the trust structure and B,

4  what Your Honor finds and determines to be what these claims

5  really are all about.

6          THE COURT:  No --

7          MR. BERNICK:  And all of that --

8          THE COURT:  No, it has to do with one simple thing,

9  impairment.  Because if you're impaired, you vote.

10          MR. BERNICK:  Yeah, well but --

11          THE COURT:  Even under Chapter 11, forget --

12          MR. BERNICK:  We went --

13          THE COURT:  -- 524(g).

14          MR. BERNICK:  We went through impairment and

15  impairment -- and this is absolutely vital and we'll do this

16  again down the road.  Impairment doesn't mean that if you

17  twiddle a right for any reason, there's impairment and they are

18  entitled to vote.  That's not what it means.  It's not what it

19  means under the law.  It's not what it means under the code.

20          What it means is if the plan independently of

21  operation of bankruptcy process and bankruptcy law, the plan

22  itself additively affects rights.  The fact of claims being

23  reduced in value, the fact of claims being found not to have

24  value, estimation there are score, different processes in

25  bankruptcy that affect claim rights.  And that is -- that's

1  exactly and we brief this and I remember very well the chart

2  that I pointed out.  The question is not whether rights are

3  affected, the question is how they are affected; were they

4  affected by operation of law or they're affected by operation

5  of the plan.

6         THE COURT:  For purposes of today, I don't disagree

7  with that.  The issue for today I think is whether or not the

8  debtor is on track to getting a confirmable plan.  Forget even

9  consensual, just a confirmable plan.

10         MR. BERNICK:  That's correct.

11         THE COURT:  And my concern is -- I have several

12  concerns, but the ones I've attempted to articulate in this

13  brief discussion are with a 524(g) trust in place, I'm not -- I

14  do not understand -- I understand a little better now that

15  you've made this recitation.  I didn't last month.  Understand

16  how it is that the debtor expects to get the proof of claim

17  process in, object to claims and somehow or other have it all

18  estimated.

19         What I'm -- I want to be clear.  What I'm hearing

20  from you is you don't expect to be objecting to claims.  What

21  you expect to do is get the medical criteria that support the

22  claims so that your experts for purposes of estimation can do

23  their own analysis of that medical criteria and determine in

24  their view for their testimony whether or not that criteria is

25  reliable and can be replicated and/or meets the other

1  standards.

2        MR. BERNICK:  That's correct so that then Your Honor

3  can determine as a gatekeeper as Your Honor is obligated to do

4  for purposes of estimation.  Not for purposes of allowance or

5  disallowance.  For purposes of estimation, whether their data

6  meets <u>Daubert</u> standards.

7        THE COURT:  Okay.

8        MR. BERNICK:  And --

9        THE COURT:  Fine.  I got that point.

10        MR. BERNICK:  Yeah.

11        THE COURT:  The second problem I have and this is a

12  problem --

13        MR. BERNICK:  Yeah.

14        THE COURT:  -- is that the plan structure with a cap

15  purporting to pay all claims in full and not permitting votes

16  which deems all of these claims unimpaired I think requires me

17  to make findings to get this structure in place that will be

18  inconsistent with what I'm required to find under 524(g).

19  Because to get you a 524(g) injunction as the plan requests, I

20  have to find that I cannot accurately estimate the future

21  demands --

22        MR. BERNICK:  And that -- we're close, but it's a

23  caveat.  That's why it's really important to -- for us to

24  underscore to Your Honor the two funds.  We are not seeking to

25  establish that all claims will be paid in full.  We are seeking

53

1   to establish that the subcategory of claims, which are the

2   claims that do meet the criteria and do have value and are

3   prosecutable against Grace, that those claims will be paid in

4   full.

5          THE COURT:  Oh, well, then everybody else can vote.

6          MR. BERNICK:  Everybody else can -- no, everybody

7   else we would say is unimpaired.  They're unimpaired because

8   they still -- they have every -- they have all of the same

9   rights that they would have had in this bankruptcy process.

10  That is to say to be clear let's take the case --

11         THE COURT:  Their rights outside bankruptcy would be

12  to sue the debtor, to get judgments and to execute on assets to

13  the point where there will be no equity left --

14         MR. BERNICK:  No.

15         THE COURT:  -- for anybody other than claimants.

16         MR. BERNICK:  That's the issue --

17         THE COURT:  And that's the other structure --

18         MR. BERNICK:  No, no, that's the --

19         THE COURT:  -- problem.

20         MR. BERNICK:  Well, but that's the issue, Your Honor,

21  that I think that we're going to have to focus on in the

22  following way.  If this case were --

23         THE COURT:  Like plan modifications.  Let's start

24  with those.

25         MR. BERNICK:  Well, it may be that there have to be

54

1  plan modifications, but in this case, if the Court were to

2  follow the rules -- let's say you only had 10 claims, not

3  10,000 claims -- we would be entitled to have each and every

4  one of those 10 claims litigated in a federal court under the

5  federal rules and on a centralized, consistent basis.  They

6  would never go back someplace else to be litigated unless they

7  were already substantially in progress in state court already.

8         So, if Your Honor weren't focused on the docket as in

9  fact you are and on closure as you are and properly so, we

10 would take all of the people who would qualify for our first

11 category and all the people in the second -- and we would

12 litigate their claims all in federal court under the federal

13 rules and nobody would be able to say that their rights were

14 impaired.  All of their rights would have been preserved.

15 There is no right -- zero right for any of these claimants to

16 litigate their claims in state court.  Once the bankruptcy case

17 is filed, this Court has got exclusive jurisdiction --

18         THE COURT:  Okay.

19         MR. BERNICK:  -- including the liquidation, the

20 allowance and disallowance of claims.

21         THE COURT:  That's true.

22         MR. BERNICK:  So all that I'm saying is that with

23 respect to the people where we are including them in that first

24 subfund and are including them in the kind of the unwashed

25 crowd that in a sense gets passed through to post-bankruptcy

1  litigation or post-bankruptcy payment, provided that they are

2  in federal court under the federal rules applying state

3  substantive law, they are in exactly the same position --

4  because they had access to equity under the plan, they are

5  exactly the same position as they would be in this court.

6          Now --

7          THE COURT:  But they're not because your -- the plan

8  is saying that despite whatever allowance of their claim

9  results from that litigation, you're not going to pay it in

10  full and for bankruptcy purposes, that's impairment.

11          MR. BERNICK:  To the contrary, we believe that they

12  will be paid completely in full, but if they're not, they get

13  access to equity.  They get their shot at equity.  Because

14  equity is at risk with respect to that group of claims.

15          THE COURT:  Yes, it is and I think the plan's at risk

16  as long as it provides that there's an equity distribution

17  unless and until --

18          MR. BERNICK:  There's not an equity distribution.

19          THE COURT:  -- all the creditors are paid.

20          MR. BERNICK:  There's not an equity distribution.

21          THE COURT:  Well, then what's the fight about the

22  fact that there is some going -- some reserve for equity?

23          MR. BERNICK:  There shouldn't be.  In other words,

24  all that we're seeking to do is to be able to take care of, to

25  have the determination that the people who we believe really do

1 have claims are in fact adequately provided for; i.e., hundred

2 cent dollars.  And once we get that determination, we're

3 prepared to emerge from bankruptcy and in a sense deal with all

4 the junking claims.  And that's what our -- exactly as Your

5 Honor anticipated provide that it's in federal court under a

6 case management order in federal court because that is exactly

7 what we would be entitled to in the bankruptcy.

8         THE COURT:  So the debtor expects to retain control

9 of the trust and do the liquidation of the claims through the

10 trust.

11         MR. BERNICK:  No, the debtor expects -- not

12 necessarily.  And this is exactly why -- this is exactly what

13 we worked out in the case of -- in the Dow Corning case.  The

14 trust, in terms of the administration of funds, can be in the

15 control of other people.  When it comes to the liquidation of

16 claims -- that is, the litigation process -- yeah, the debtor

17 ought to be in charge of the litigation process.  The trust

18 shouldn't have to do that.

19         So, I mean this is not -- this structure, Your Honor,

20 this two-part structure is almost identical to what was done in

21 Dow Corning.

22         THE COURT:  It's -- I --

23         MR. BERNICK:  And --

24         THE COURT:  I'm not attempting in any way to

25 challenge the debtors' plan except to see whether you're on

1 | track for something that's confirmable --

2 |         MR. BERNICK:  And what --

3 |         THE COURT:  -- because I have an exclusivity issue

4 | and that's really --

5 |         MR. BERNICK:  Right.

6 |         THE COURT:  This whole discussion is designed to get

7 | to exclusivity and --

8 |         MR. BERNICK:  Yes.

9 |         THE COURT:  -- nothing more.  I see some structural

10 | problems.  I see a problem with impairment, unless and until

11 | you can litigate and show me that all the claimants who are to

12 | be paid a hundred cents on the dollar will be paid a hundred

13 | cents on the dollar.  I see a problem with the cap because

14 | there is no alternative if your numbers turn out to be

15 | incorrect.

16 |         MR. BERNICK:  Yeah.

17 |         THE COURT:  And I think those are problems that the

18 | debtor has to work around.

19 |         MR. BERNICK:  Absolutely.  So now let's get to where

20 | we are today.  And where we are today, Your Honor, is that we

21 | heard you the first time that you expressed those reservations.

22 | We're very sensitive to it.  Now's not --

23 |         THE COURT:  Well, nothing's been done about it.

24 |         MR. BERNICK:  Well, no, no, to the contrary --

25 |         THE COURT:  And it's been several exclusivity

1 extensions since then, too.

2          MR. BERNICK:  To the -- Your Honor, candidly and

3 respectfully, to the contrary.  The plan modification -- the

4 structural issues that you've raised -- from our point of view,

5 if we thought that it would be timely to tee those things up

6 and say well, let's get them all resolved now, we would have

7 done it.  But we had a discussion before Your Honor where

8 exactly that proposal was made.  And where Your Honor was and

9 where I think we have been since that time is different.  It

10 is.

11          The number one order of business under any set of

12 circumstances is to continue to go down the road of finding out

13 what these claims really are --

14          THE COURT:  I agree.

15          MR. BERNICK:  -- and that's where we --

16          THE COURT:  But that's not to say that the debtor

17 shouldn't have a confirmable plan on the table.

18          MR. BERNICK:  Okay, well, but here's --

19          THE COURT:  Because how are we estimating -- you

20 know, what's the point?  The concern I have -- I've forgotten

21 who's raised this issue, but one of the objectors has raised an

22 issue that says that given the debtors' plan --

23          MR. BERNICK:  Uh-huh.

24          THE COURT:  -- if exclusivity is extended and the

25 estimation comes out to be whatever it's going to come out to

1  be, but it isn't 1.7 billion, then the debtor wants 90 more

2  days to get the documents in line to fix the plan.  And

3  frankly, I think the debtor ought to be fixing the plan now.

4          MR. BERNICK:  Well, but -- and I'm prepared -- we're

5  prepared to talk about that today, but I think that the

6  answer's probably pretty simple, which is that the structural

7  issues are issues that we may have to reach.  If Your Honor

8  wants us to address them earlier, we can certainly do that, but

9  they are really -- they're really in a sense a distraction from

10 the main order of business whether this is going to be a non-

11 consensual plan or consensual plan which is to find out what

12 these claims really are.

13         Why?  Because the whole reason that you can't get to

14 a negotiated resolution is there continues to be differences of

15 view and ambiguity on what the pie is and who gets what piece

16 of the pie.  That's what this whole thing's about from a

17 negotiation point of view --

18         THE COURT:  Well, I'm -- I wasn't aware of the fact

19 that there was ambiguity with respect to what the pie is.  If

20 we need --

21         MR. BERNICK:  Oh, no --

22         THE COURT:  If we need to know what the debtors'

23 values are --

24         MR. BERNICK:  No, no, no, I -- no, I --

25         THE COURT:  -- then I think --

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  I misstated.  Who gets what portion --

2          THE COURT:  Okay.

3          MR. BERNICK:  -- of the pie.  And with respect to

4 that, this is exactly what we've gone through with respect to

5 the property damage claimants.  They had lots and lots of

6 claims and we started to sort through that.  The same process

7 has to take place with respect to personal injury whether

8 you're going to have a non-consensual plan or a consensual

9 plan.  And at least as we understood Your Honor, that was to be

10 the priority and then addressing structural issues with respect

11 to a non-consensual plan was something -- I mean everybody

12 knows what the issues are.  It's not like our crafting a new

13 plan is going to inform somebody of something new that they

14 haven't thought of --

15          THE COURT:  Well, yes --

16          MR. BERNICK:  -- but --

17          THE COURT:  -- but it's going to eliminate the

18 concern, assuming that the debtor can craft a confirmable plan,

19 that says that the debtors' exclusivity period shouldn't be

20 terminated because the debtor doesn't have a confirmable plan

21 on the table.

22          MR. BERNICK:  Well, I --

23          THE COURT:  And, Mr. Bernick, this case is very old.

24          MR. BERNICK:  Yeah, but it's not going to get --

25          THE COURT:  It's really --

**J&J COURT TRANSCRIBERS, INC.**

1            MR. BERNICK:  It's not going to get any younger by

2   having a bunch of papers exchanged on structural issues.  The

3   only way this case is advanced -- and let me get into this

4   because I know that other people are going to walk to talk.

5   Let me talk about what's happened with respect to the

6   negotiation process because I think it illustrates this point.

7            And let me say preliminarily that exclusivity is a

8   good thing and it's a bad thing.  It's a good thing in that

9   we're accountable to the Court and the Court is pressing the

10  parties and we're not opposed to that at all.  It's a bad thing

11  in the sense that one thing -- it's one thing to talk about

12  what actually is happening in the negotiation process.  It's

13  another thing to come in and report -- one thing to do the --

14  it's another thing come to report -- court to report on it.

15           As soon as people report on what's happening in the

16  negotiation process, inevitable they're all posturing before

17  the Court to in a sense develop leverage through the court

18  process, but that affects the negotiations and that's happened

19  in a significant way here.  And the way I want to illustrate

20  this is to draw a sharp contrast between what's been said in

21  the briefing and what reality is when it comes to what's

22  happened in the negotiation process.

23           And the essence of what I'm going to say, Your Honor,

24  is that at the end of the day, we're prepared to have a

25  relatively short extension of exclusivity this time for

62

1  purposes of seeing whether these negotiations can work out.

2  But one thing is not getting in the way of the negotiations and

3  that is these plan structural issues.  They have almost nothing

4  to do with the negotiations.  The negotiations are focused on

5  economics.  And there's only one thing that drives the

6  economics, which is who's got claims and what value.

7        THE COURT:  Well, that's all true, but then the

8  trouble is, as we know, that sometimes you have to get to the

9  plan confirmation hearing and you actually need a confirmable

10  plan to make the economics work.

11        MR. BERNICK:  Perhaps yes, but in this case, I would

12  suspect the answer -- all that the discussion about structure

13  does -- all that it does is to say to people who don't want to

14  do a deal that oh, I'm not going to do a deal because I'm going

15  to continue to litigate on structural issues.  That's all that

16  it does.  At the end of the day --

17        THE COURT:  Well, what it does for a court is put me

18  in a position where I can't confirm a plan and at the end of

19  the day after --

20        MR. BERNICK:  Well, Your Honor --

21        THE COURT:  -- four years or five years invested in

22  this, just like everybody else, I'd like to be able to

23  confirm --

24        MR. BERNICK:  Yes.

25        THE COURT:  -- that plan.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  I understand, but the best way to do

2    that is to have a consensual plan.  The only way there's going

3    to be a consensual plan is by having a better idea of what the

4    claim values are or for whatever reason, having a consensual

5    process that -- where people are more willing to do a deal.

6          If we litigate what 524(g) does and does not do and

7    what plan structure does and does not do, that is a sure fire

8    recipe for not being any kind of deal at all.  What has

9    progressed the discussions to date is in fact a focus on what

10   are the claims and what are the real claims and who gets what

11   piece of the pie.  And this is actually illustrated by the

12   history here.

13         Your Honor would believe by looking at the papers

14   that essentially nothing has happened in connection with the

15   plan negotiation process.  People are basically still sitting

16   around and arguing with one another.  And that's just false.

17   And the papers that have been filed saying that the debtor

18   hasn't done anything, they're just absolutely false.  And

19   that's the respect in which this exclusivity hearing process

20   tends to impede rather than advance the negotiation process

21   because -- two people start talking about where we are, things

22   actually for the first time were starting to develop some

23   motion.

24         And let me just review it in the following way.  Your

25   Honor ordered a plan last -- a year ago June, as roughly June

64

1 or July of '04.  We filed in 120 days.

2           In anticipation of that, we put together a very

3 specific financial proposal for who gets what, what the value

4 of the company was and where it all was going.  And we also

5 proposed a structure -- a plan structure such that if agreement

6 could not be reached in total, there was still a way that the

7 litigation process can continue post-confirmation and equity be

8 at risk.

9           This was not some effort to say oh, you know, gee,

10 we'd like to just continue the litigation forever.  It wasn't.

11 Was exactly the opposite.  Was an effort to say look, we're not

12 going to be held up by people who believe in the most extreme

13 proposition which is we don't care what you believe the value

14 of the claims to be, we're not going to vote.  And I know Peter

15 -- Mr. Lockwood does a very good job of explaining that.  I

16 respect and understand where they're coming from, but you're

17 not going to get a deal out of that kind of position.

18           So we developed a plan structure which we thought was

19 absolutely right in the middle of two options.  One option was

20 at one extreme, we'll just continue to litigate forever and we

21 won't ever emerge from bankruptcy.  The other extreme was you

22 can't emerge from bankruptcy unless you pay us everything that

23 we want.  The middle position was to say no.  There is a middle

24 position.  There's a way to do an estimation and way to

25 structure a post-bankruptcy trust such that if there is not a

1 complete agreement, we can still go forward and the people that

2 have got good claims get paid and the people that don't have

3 good claims don't get paid.

4        That was the structural effort that we put into the

5 plan.  And it may be that more things have to be done to make

6 it viable under the law from Your Honor's point of view but

7 that's why we put the plan on the table.  Was not protract

8 litigation.  It was to break the log jam between two extreme

9 positions.

10        We also put the money out.  And I went around and we

11 made a bunch of presentations with more elaborate slides than

12 you're going to see here today that talked about here's how the

13 thing is structured and here's where the money is to make it

14 work.  And we did that all last year.

15        Now, this prompted what I called here multiparty plan

16 discussions.  That is, all the constituencies were involved.

17 Mr. Kruger on behalf of the unsecureds was involved.  Futures,

18 property damage, everybody was involved in these discussions.

19 And they actually, in the Fall of last year, got very close to

20 a resolution.  Driven by finances.  Wasn't a question of some

21 new structure.  It was driven by a financial discussion.  And I

22 thought personally we were there and this case was going to

23 end.

24        It broke down.  It broke down for reasons that are

25 very difficult to ascertain.  I've got theories.  I'm sure that

1 other people have theories about which particular

2 constituencies were responsible.  I think I've made some

3 editorial comments about at least one constituency that was

4 responsible.  But we were within very close range in the Fall

5 of last year and the result of that was that we deferred -- we

6 asked delay the filing of the plan.

7        And Your Honor will recall that and granted that

8 request.  And that wasn't just because gee, we'd like a little

9 bit more time.  It was because there really was some prospect

10 of having a consensual plan.

11        Well, that failed and we filed our revised plan in --

12 on the 1st of this year.  Your Honor then said in January of

13 '05 when we had all these same discussions and the structural

14 issues and the like -- Your Honor said, "Well, let's focus on

15 estimation."  And that's exactly what we've been doing ever

16 since.  And the process has been hotly contested at all points.

17 The questionnaire in particular took a long time to get done.

18 We finally got underway on the property damage litigation and

19 that process has now yielded a lot of fruit.  That is, we've

20 made some important advances there.  And we're not in the

21 process of people filling out questionnaires.

22        So, we have done exactly what it is that Your Honor

23 directed us to do.  One hundred percent we have done what Your

24 Honor directed us to do and we've seen fruit come out of that.

25 I don't think that we would be here today announcing that there

1 is some progress that has been made but for the fact that Your

2 Honor put pressure on all parties.

3        So now does this mean that after the -- this interim

4 period of time, the discussions simply end when things kind of

5 fell apart last Fall?  No.  Throughout this period of time

6 since January of this year, there have been discussions with a

7 very small number of people -- not all constituencies, not all

8 parties -- to try to keep this thing alive.

9        And when Your Honor directed in June of this year --

10 Your Honor told me and I remember very well "Mr. Bernick, it's

11 your job to get things going."  So you're now looking at me

12 like so, what did you do?  Right?

13        THE COURT:  Yes.

14        MR. BERNICK:  So what did I do?  Well, at least

15 you're smiling.

16        In point of fact, I was diligent and we did have some

17 initial meetings to try to determine what was the best way in

18 which to go forward and here's exactly how it matured.  It

19 would have been nice if we all sat around a room and locked the

20 door and said we got to read a deal.  History has said that

21 doesn't work.  That's what we tried last year.

22        And it's not because the door is not -- is unlocked

23 rather than locked.  It's because people have substantive, real

24 disagreements.  That's just the fact.  It's not -- everybody

25 knows everything here.  There are no -- not any secrets.

1  There's no new idea or something out there that has not been

2  shared.  Isn't they don't  -- they don't agree.

3           And even within constituencies, not everybody agrees.

4  There's not always complete harmony within the personal injury

5  committee.  There's not always complete harmony within the

6  property damage committee.  There's not always complete harmony

7  between the unsecureds and the other constituencies.  Then

8  you've got ZAI.

9           So this is not a question of having failed to lock

10 the door, of having failed to call meetings.  We tried all of

11 those different things.  The feeling this time around was to

12 begin with a much smaller number of people who didn't represent

13 all constituencies.

14          And I would -- I was -- I attended a meeting in New

15 York and I don't believe that anybody here was present at that

16 meeting, but it was no secret.  I said -- this was with Parry

17 White and Peter's partner, Elihu Inselbuch, and Russell Budd

18 and we all sat around and say well, should the debtor and the

19 personal injury people do their own deal first?  I said, "Gee,

20 that makes a lot of sense.  If I can get rid of this guy, you

21 know, maybe we'll make some progress here.  And he can, you

22 know, take whatever it is that is necessary to get a consensual

23 plan."

24          We did not go down that road.  We went down a

25 different road.  Because it turns out that Mr. Dies has a very

1  strong relationship in terms of communication with the company.

2  It goes long back before this case was filed, long back before

3  I became involved.  And Mr. Dies, in discussion with the former

4  general counsel in place, said, "Well, let's see what I can do

5  to try to put together an overall deal."

6         And while we had -- there obviously were

7  alternatives, we deferred it -- not just to Mr. Dies, but to

8  Mr. Dies and the former general counsel at Grace and say well,

9  let's see what can happen.  And if there's anybody who deserves

10 credit for having advanced the ball in this case since that

11 time, it's Mr. Dies and the lawyer from the personal injury

12 group that he was dealing with which is Russell Budd.  They've

13 had a lot of very productive discussions.

14        So, when you read the papers and they say oh, well,

15 the debtor hasn't done anything and, you know, personal

16 injury's the only one whose done it, is just not a reality.  No

17 one has told you about this sequence because it's very hard to

18 get people when it's exclusivity hearing time to come to court

19 and actually talk about what's happening.  But this is what's

20 happened.

21        So, these discussions have been very productive and

22 very fruitful in so far as I know because we have not been

23 involved in any of these discussions.  We have taken at face

24 value the idea of letting the property damage people and the

25 personal injury people talk and see if they can make progress.

1  And the signs that I understand, my client understands are

2  positive signs.

3          The futures representative has not been involved in

4  those discussions.  They're not happy about that.  They would

5  like to be involved in the discussions.  We would like to be

6  involved in the discussions.  I don't know whether the ZAI

7  people are happy or not.  All that I know is that for the first

8  time in the case, I at least hear back reports that say

9  something may actually happen on this case.  There may actually

10 be a deal and there may be a deal that happens sometime within

11 a relatively short, modest period of time after the 1st of the

12 year.

13         So, with that, we are content as a debtor that

14 progress is being made and we very much want to get involved to

15 see if the deal is something that we can live with.  We don't

16 know that we can.  And I'm sure that the futures representative

17 feels the same way.

18         From our point of view, the most important thing is

19 that those discussions continue and if in fact they reach the

20 point that there is a deal or the outlines of a deal and Mr.

21 Dies has not overrepresented to us that it's there -- he thinks

22 it might be there.  Reports that I have heard now making

23 contact with some of the personal injury lawyers myself is they

24 feel the same way.  Maybe it's there.  Maybe it's not.  The

25 best way of course to screw it up is everybody talk about it

1  here today in court.  But we have to do that because we have to
2  account to Your Honor.
3         So, we believe the most important thing is for those
4  discussions to continue.  If they bear fruit, I think we'll
5  know that within January.  If they don't bear fruit, we'll know
6  that within January, too.  If it looks like they're going on
7  the right path, we hope to be included so that we can know
8  what's going on, as do others.  And we'll see what happens.
9  We'll see if it matures into there being an overall deal.
10         Most important thing today is two things from our
11  point of view.  One is that we get candid factual statements of
12  what's happening in these negotiations, instead of all the
13  posturing that we saw in the brief.  We're very anxious to hear
14  from Mr. Dies and I'll defer to whatever it is that he has to
15  say about the negotiations because we basically put our bet on
16  Mr. Dies and the folks that he's working with in the personal
17  injury committee.
18         That two, we believe that there ought to be an
19  extensive of exclusivity as follows.  We're not going to ask
20  for a long extension.  We don't want a long extension of
21  exclusivity.  We want an extension of exclusivity for 60 days.
22  The sole purpose of which is to get a report to the Court
23  within 60 days on where the negotiations stand.
24         As soon as you start to deal with other aspects of
25  what's happening with the case and a longer period of

72

1 exclusivity, we're going to have all kinds of discussions about

2 well, you know, what ought to happen at the next exclusivity

3 hearing and this and that and the other. I don't think that

4 that's productive.

5          We should have a short extension of exclusivity, not

6 because we believe that well, that's the only exclusivity we're

7 going to ask for down the road. Because if things fail, we

8 believe this process of litigation/negotiation must continue.

9 But we don't want this request for exclusivity to become

10 burdened with a lot of other discussions about what else is

11 happening in the case. Don't think that that's productive. We

12 think the case should go forward. But we do believe it's very

13 important to continue the discussions that have taken place so

14 far and to have reportability back to the Court in 60 days.

15          So I'm going to sit down now, unless the Court has

16 further questions, and I would ask -- would say our proposal is

17 60 days. Come back to the Court at that time. See if we have

18 a deal or we're on the way to the deal. We don't have a deal?

19 We can take up the question of where we're going with the

20 estimation and the timing for the rest of this coming year,

21 which we're prepared to do today, but we think is more

22 productive to do 60 days from now so we'll see if it's really

23 necessary. But there ought to be 60 days for that purpose.

24          And that as people rise to speak now, that they are

25 candid and accurate with the Court on exactly what is happened

1  with the negotiation process.  If it breaks down, then, you

2  know, maybe we'll talk about some other way to do the

3  negotiations.  We want a consensual plan.  But we think that

4  what's taking place so far is promising.

5        So, with that I'll sit down and unless the Court has

6  something else to ask me.

7        THE COURT:  No.  Thank you.

8        Mr. Lockwood?

9     (Pause)

10       MR. LOCKWOOD:  Your Honor, this is -- we've listened

11 to Mr. Bernick for an hour and a half so far and approximately

12 15 minutes of that has addressed the agenda item this morning

13 of exclusivity.  I'm not sure frankly how to proceed at this

14 point because what we've heard from Mr. Bernick is a spirited,

15 albeit unbelievably facile description of what a piece of cake

16 it's going to be for him to, A, do what he wants to do in

17 estimation and B, have his plan that's in front of the Court

18 today confirmed.

19       The Court has, in the course of his presentation,

20 asked many questions, identified many problems.  The answers

21 again have largely been facile accompanied by of course or it's

22 clear or nobody can doubt or we have an absolute right to do

23 this, that and the other thing.  And I'm frankly -- I don't

24 want to spend an hour and a half rebutting all this and I'm

25 sure the Court doesn't want me to either.

1          But by the same token, I'm reluctant to stand by and

2    allow incessant repetitions of argumentative points to be made

3    on record here and simply sort of say well, gee, if all they

4    really want a 60 day extension of exclusivity because they hope

5    that there will be some productive negotiations going on in

6    that 60 days, how can I argue with that?  I mean 60 -- we came

7    here this morning on a motion in which they asked for a period

8    of an extension until a final judgment was entered on the

9    estimation and I believe it was 90 days thereafter.  And as the

10   Court pointed out, that's a really long time at the rate we're

11   going here.  And it was that request for exclusivity that the

12   parties filed the spirited objections that Mr. Bernick referred

13   to.

14          THE COURT:  Well, let me get to the point that I'm

15   concerned with.  Because I'm not concerned at this point with

16   the rhetoric.  I am concerned is to whether or not there is

17   some negotiation going on that's going to get to a confirmable

18   and/or preferably consensual plan and if there is and some, you

19   know, extension is in order to let that happen, okay.  But at

20   this point in time, I want some progress reports because I'm

21   not confident that there is significant movement and I don't

22   know how to be confident that there's significant movement

23   without doing what Mr. Bernick suggests which is to try to get

24   information put on the record which I don't think is

25   appropriate to have on the record at this time.

1        So, that's my concern.  If you're making progress and

2   it's likely that in fact there's going to be a consensual plan,

3   then tell me that fact and let's start with that.  And if

4   you're not making progress and no matter what the personal

5   injury claimants are going to fight till the cows come home,

6   then tell me that and let's just get on with the process.

7        MR. LOCKWOOD:  Your Honor, that is a very hard

8   question to answer.

9        THE COURT:  Hard question to ask.

10       MR. LOCKWOOD:  Because it's almost impossible to

11  answer without getting into the substance of negotiations which

12  I think Your Honor correctly indicated was not a good idea on a

13  public record.  Let me say this:  From the asbestos claimants

14  committee's perspective, what negotiations there have been with

15  the debtor and the folks on the debtor side of the table, which

16  is the unsecured creditors committee and the equity committee,

17  beginning with the period starting last Fall that Mr. Bernick's

18  chart deal with have been intermittent, sporadic and non-

19  productive.

20       Indeed, the meeting in New York that Mr. Bernick

21  referred to I canvassed the participants in that meeting before

22  Mr. Bernick testified to it here this morning and what I was

23  told was that Mr. Bernick had promised -- this was a meeting

24  that took on September the 21st of this year and Mr. Bernick

25  had told the asbestos PI people present that he would present a

1  proposal within 10 days.  And there was never any proposal

2  presented.  As Mr. Bernick said, the debtor decided to go a

3  different way and that way apparently involved some discussions

4  with Mr. Dies, who is here in court this morning who, to the

5  extent that he deems it appropriate, can say things to Your

6  Honor that I don't know anything about.

7       But, suffice it to say that whatever was said between

8  Mr. Dies and Mr. Bernick and Mr. Beaver (phonetic) and whoever

9  else might have been involved, it is true, as Mr. Bernick

10 stated, that there have been some discussions and are being

11 some discussions between the property damage folks, including

12 Zonolite -- or at least so we're informed -- and the committee.

13 As Mr. Bernick said, those discussions have not yet involved

14 the debtor, the UCC, the equity committee, nor have they

15 involved the futures representative.

16      If you consider that having the PI committee and the

17 PD committee see whether they can reach a common ground on what

18 they think their piece of the pie ought to be to be progress,

19 then yeah, I guess you could say that there's some progress.

20      THE COURT:  Yes, I would think that would be --

21      MR. LOCKWOOD:  It is --

22      THE COURT:  -- significant progress.

23      MR. LOCKWOOD:  We haven't reached that yet --

24      THE COURT:  Yes.

25      MR. LOCKWOOD:  -- but I will -- there are discussions

1  going on and there's certainly not people sitting there saying,

2  you know, drop dead, I'm standing on my rights.  I can, as Mr.

3  Bernick puts it, demand whatever I want and say I'm not going

4  to vote for it if I don't get it.  That's not the way -- I mean

5  Your Honor's involved in a lot of cases with me and my firm and

6  committee we represent and some of them we have successful

7  negotiations in and some of them we have less successful

8  negotiations in.

9         THE COURT:  I like the successful ones better.

10        MR. LOCKWOOD:  Well, so do we.  But I'm not --

11        MR. BERNICK:  (Indiscernible) --

12        MR. LOCKWOOD:  I'm saying that because --

13        MR. BERNICK:  -- gotten it all.

14        MR. LOCKWOOD:  -- there's a demonstrated fact that we

15 are not -- we don't just, as groups, as committees representing

16 asbestos claimants, sit there and say, you know, our way or the

17 highway.  We have strenuous disagreements with people and we

18 have negotiations.

19        Now there -- Grace has been a more difficult case for

20 everybody precisely because of the litany that you heard for an

21 hour and 15 minutes here this morning of, to put it politely,

22 creative arguments from this debtor that it can effectively

23 litigate its way out of its insolvency by taking advantage of

24 what it perceives to be procedural devices available in

25 bankruptcy that are not available to it outside of bankruptcy.

**J&J COURT TRANSCRIBERS, INC.**

1 And as Your Honor knows, we strenuously dispute both the

2 procedural creativity that the debtor is exhibiting here and

3 the substantive proposals that the debtor proposes to implement

4 through that creativity.

5       And I would be delighted to go through chapter and

6 verse of Mr. Bernick's presentation and explain to Your Honor

7 why large quantities of it are a violation of the bankruptcy

8 code, the bankruptcy rules and the case law, but I don't really

9 think that's appropriate.  But I do want to make it clear that

10 by not doing so, everybody in this courtroom and on this -- on

11 the phone should understand that from my committee's

12 perspective, what the debtor wants to do here is simply

13 undoable.  It is undoable as a legal matter through the process

14 they want to do it.  It's undoable as a practical matter.  This

15 nonsense about oh, well, we could always make claims objections

16 for 118,000 claims and send them to district courts and we're

17 absolutely entitled to do that and it's a matter of right under

18 the code, et cetera is preposterous.  It's exactly why 524(g)

19 was put in the code in the first place because you can't do it.

20       Among other things just to point out the most obvious

21 reason it's preposterous, even if you could somehow or another

22 figure out a way to litigate 118,000 pending claims, you've got

23 hundreds of thousands of future claims and those claims aren't

24 claims.  And this Bankruptcy Court for all Mr. Bernick's

25 preaching about its power and Judge Jack and everybody else in

the world, doesn't have jurisdiction over things that aren't

claims.  It can't send those things to federal court if they

have rights to litigate in state court.

That's impairment.  His plan, for example, proposed

to do that.  That's impairment or at least that's our position.

Now we'll hear debate if we ever get to that point about

whether it is or it isn't and Mr. Bernick obviously disagrees

with that, but the whole reason why asbestos bankruptcies are

different from Dow Corning, among other things, which involved

people who presently had breast implants.  It wasn't people who

were going to have breast implants in the future or didn't know

they had breast implants and would somehow or another become

aware in the future that they had breast implants.

MR. BERNICK:  Let's litigate that issue, Mr.

Lockwood.

MR. LOCKWOOD:  It's a whole different kettle of fish.

As I say, however, the PD and PI are talking and

there is, I suppose, a prospect, a possibility that if we can

agree on something -- the reason we're talking and trying to

agree on something is obviously since we can't do it all by

ourselves, that we would come together and then present it to

other people and see if we can enlist them.  And certainly my

committee is willing to go along with a 60 day extension of

exclusivity for the purpose of allowing that process to either

play itself out or move forward to the point where we could

1   come back to the Court and say, you know, give you a further

2   progress report.  But I really can't give you anything more

3   positive --

4            THE COURT:  That's fine.

5            MR. LOCKWOOD:  -- than that.  And --

6            THE COURT:  What about the question of what to do

7   with the estimation process while the 60 days plays itself out?

8            MR. LOCKWOOD:  Well, Your Honor, I'm glad you brought

9   that up because I was going to bring it up otherwise.  A lot of

10  the firms are having trouble meeting the deadline on the

11  questionnaires.  They're just -- many of them have a lot of

12  claims.  There's a lot of documentation that's needed, et

13  cetera.  And I was requested, even though we don't have any

14  motion or anything on file, to ask both the debtor and the

15  Court for a 60 day extension of the questionnaire period and

16  that would obviously involve some other equivalent extensions

17  of things that are based on the questionnaires, like I believe

18  Russ Consulting is supposed to prepare the navigable database

19  and so they need 60 days, but a 60 day time -- more time which

20  would coincide with the exclusivity extension for people to be

21  able to get those questionnaires in.

22           But beyond that, we're prepared to continue to go

23  forward on the theory that, you know, we're not trying to seek

24  some sort of tactical advantage over by tying that to

25  exclusivity in some way or another.

**J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  All right.

2           MR. LOCKWOOD:  Thank you, Your Honor.

3           THE COURT:  Mr. Baena?

4           MR. BAENA:  May it please the Court.  Scott Baena on

5    behalf of the property damage committee.

6           Several points, Judge.  Mr. Dies has in fact been

7    involved in negotiations with members of the -- with the

8    personal injury constituency, not the debtor.  And if the Court

9    wants to inquire of him about that, I'm concerned as Mr.

10   Lockwood is about doing that in open court and we'd be happy to

11   go into chambers with the Court and discuss that.

12          But it's important to understand that the property

13   damage committee's objection to exclusivity, which you alluded

14   to in your comments, was very narrowly focused.  We complained

15   about the extension of exclusivity because all we're doing is

16   marching in place if at the end of the day we're left with this

17   plan.

18          And I'm not going to repeat what you already said

19   about the obvious deficiencies in the plan.  We didn't think it

20   was productive to go through a year or so of estimation

21   proceedings, conclude that, regardless of what Mr. Bernick

22   prognosticates the outcome will be, there will be meaningful

23   asbestos liabilities at the end of the day and a plan will have

24   to be fashioned to deal with that because the present plan

25   doesn't do that at all.  And so we said let's have something

82

1  less abstract to be arguing about in all of this.  Because the

2  only benefit of the debtors' plan has already lost its

3  significance.

4         It's clear that the debtor was trying to signal

5  something to Your Honor about the value of claims they'd like

6  to see you bring out of these estimations.  That's why they

7  haven't yet amended the plan that's on the table.  They want

8  you to remember that billion seven, Judge.

9         THE COURT:  I'll remember it, but it's irrelevant.

10         MR. BAENA:  It's totally irrelevant.  And so their

11  resistance to modifying the plan shouldn't -- in the face of

12  universal recognition of its deficiencies, shouldn't be

13  rewarded by continue exclusivity simply because we're playing

14  this litigation in drag game of estimation.  They've gotten

15  their way.  They've gotten their litigation agenda fulfilled by

16  taking this rather undefined process called estimation and

17  larding it up with the same thing they would have been doing if

18  Judge Farnan so many years ago had accepted the propositions

19  that they set forth in their then proposed case management

20  order.

21         And so, why should they be rewarded now?  Indeed,

22  it's an ironic -- an absolute testament to the advocacy of the

23  debtor to stand up and say they hated our plan so much that

24  they began to negotiate with one another and we should continue

25  to have exclusivity for that.  It's incredible position that he

83

takes when he suggests 60 more days to allow us to do what
they've refused to take the initiative for, for the last four
and a half years.  And we don't think that any agreement that's
reached by those who have now engaged in meaningful dialogue
will bear any resemblance to what's on the table.

        And certainly, we can't file a plan tomorrow, Judge.
And we recognize that.  But why would we be pinned and
constrained by this continual hostage situation that we're in
with exclusivity?  They view it as so important to their agenda
because it is the last vestige of the control on their
litigation game.

        Judge, there's never going to be a consensual plan
that resembles their plan, which contemplates a cap on asbestos
claimants and that contemplates that we're going to continue to
litigate with Grace after confirmation?  The mentality of Grace
is just -- it's legion with this plan.  It's so self-evident
that what they've done for the last 25 years, they intend to
continue to do for the next 25 years.  They're going to
litigate everything.

        Mr. Bernick is a wonderful lawyer.  He's national
trial counsel for Grace.  He's not national bankruptcy counsel
for Grace.  And he only shows up and he only comes and talks to
you about litigation.  Litigation.  Not reorganization.  On the
reorganization front, let's just hold off until we've spent our
last litigation bullet.

1          We say it's time to end exclusivity, Judge.  Even the

2    playing field.  Allow those people who are now toiling, trying

3    to bring this thing to a graceful, not pun intended, landing,

4    are unencumbered to go forward with whatever agreements they

5    reach at the end of that day if we're so fortunate as to have

6    that agreement reached.  And if we're not, we didn't lose

7    anything by dumping this plan because it's going nowhere,

8    Judge.  Thank you.

9          THE COURT:  Mr. Frankel?

10          MR. FRANKEL:  Morning, Your Honor.

11      (Pause)

12          THE COURT:  Thank you.

13          MR. FRANKEL:  We only have one chart, Your Honor.

14          I thought that I would approach this from the

15    perspective of a bankruptcy lawyer.  Exclusivity is a

16    bankruptcy concept and I think that we have to get back to

17    bankruptcy law when we talk about their motion for exclusivity,

18    the ninth motion for exclusivity.

19          I'm actually not going to refer to this chart.  It's

20    just a backdrop.  It is the way the future claims

21    representative, Mr. Austern, looks at this case and looks at

22    the history of plan negotiations.

23          I actually refer to the debtors' plan negotiation

24    time line which was a chart earlier and there is a notation in

25    there from November 10th of '04, right after the election I

believe, where the FCR made a revised proposal.  As the time
line accurately reflects, there is no response to that and
there has still been no response to that.

Mr. Austern tried to get actively involved in the
discussions.  Got CIBC involved in the discussions.  As Mr.
Bernick says, we think we were very close to a deal.  The
elections occurred and we never heard back from Grace.  We're
now fast forward a year and a month and they're seeking another
exclusivity extension and we think that enough's enough.

The burden is on Grace, on the debtor to show cause
for an extension of exclusivity.  What is cause under the
cases?  Well, the most that's been demonstrated this morning is
that there's so much ongoing litigation, to estimate the claims
that this alone is cause.  It can't be the case or every debtor
would simply litigate and that would be their cause.

The real key, as Your Honor has pointed out, is
whether the litigation is one, designed to lead to a
confirmable plan and two, is necessary for a consensual plan,
and whether we're on track for either of those.  The answer is
no.  And again, we must keep in mind cause is the burden of the
debtors.

Other important factors in deciding whether the
debtors have met their burden.  There are no serious
negotiations involving the debtor, at least none that the FCR
is aware of.  As was indicated this morning -- and some of this

1  we are hearing for the first time, and we're happy to hear

2  it -- there are what may be productive discussions between some

3  of the constituencies.

4        I believe that Mr. Austern, at various times during

5  the last few weeks, was called and asked if he was available on

6  such and such a date.  He gave an answer he was or he wasn't.

7  But, never attended a meeting and to his knowledge, there was a

8  meeting -- there was never a meeting that he was invited to

9  that he should have attended.

10        On the other hand, he's happy if there are ongoing

11  discussions that are constructive between the asbestos

12  constituencies.  But as Mr. Baena pointed out, this has nothing

13  to do with exclusivity and the idea that the debtors' time for

14  exclusivity should be extended because the asbestos

15  constituencies are talking is ludicrous.

16        So let's talk about the debtors' efforts at

17  confirming a plan.  The debtor made several affirmative

18  decisions about their plan.  First, they would do whatever it

19  took to get the commercial creditors and old equity on board.

20  In fact, their negotiations even after their plan were

21  apparently with those same constituents because they amended

22  their plan, sweetening the treatment for commercial creditors

23  so that they would get post-petition interest.

24        Second, the debtors decided to take a scorched earth

25  policy toward all present and future bodily injury and property

1  damage asbestos claimants.  Novel in many regards, as Your

2  Honor has pointed out, treatment as unimpaired, even though it

3  defies common sense that the claimant's rights are being

4  altered.

5          Just thought I would go back again to the bankruptcy

6  code.  Impairment actually is defined in 1124(1).  Says:

7          "Except as provided in Section 1123(a)(4)

8          of this title" -- and that's irrelevant for

9          this purpose -- "a class of claims or

10         interest is impaired under a plan unless

11         with respect to each claim or interest of

12         such class, the plan leaves unaltered the

13         legal, equitable and contractual rights to

14         which such claim or interest entitles the

15         holder of such claim."

16         The plan seeks 524(g) protection for Grace and

17 others, but does not give present claimants even the right to

18 vote under 524(g).  To put it bluntly and I think the Court can

19 see this from all the litigation, the debtors have never made

20 any effort to forge a consensual plan with the asbestos

21 constituencies.

22         With regard to current discussions, there are none

23 that we're involved in.  But as I said, if there are productive

24 discussions, that's great, but it has absolutely nothing to do

25 with the debtor and should not be a basis and is not cause for

1  extension of exclusivity.

2          So what's the harm if this Court allows other parties

3  in interest to file a plan?  Well, it's clear from the two CIBC

4  affidavits that have been filed in this case that there won't

5  be any business harm.  In fact, we never heard today any issue

6  that there would be any business harm from that.

7          So what will actually happen if the Court terminates

8  exclusivity?  There are several possibilities.  None of them

9  are worse than the status quo.

10          One, the debtors may begin earnest negotiations over

11  a consensual plan.  This will either result in a consensual

12  plan or not, but no one will have the sole negotiating leverage

13  in those discussions.  That really is critical here.

14          Two, there will be no negotiations with the debtors,

15  but the other parties or some subset of them negotiate over a

16  consensual plan.  And just so we're clear here, if exclusivity

17  were terminated, a consensual plan could be filed which the

18  debtors oppose, but which has the support of major

19  constituents.

20          Three, competing plans could be filed.  If the

21  debtors' is the best plan and the asbestos liabilities are as

22  low as they project, their plan may well be confirmed.

23  Although as has been discussed today, we think it has other

24  infirmities that aren't curable.  More importantly, the Court

25  and other constituencies will be able to consider those

1  competing plans and those that will be viable, particularly if

2  the aggregate present and future asbestos liability is in

3  excess of 1.6 billion, which almost surely it is.

4          Just so we are clear, we would not be so presumptuous

5  to tell the debtors or their counsel how they should run this

6  case, but they have made affirmative decisions since the

7  beginning of the case for which they must be accountable.

8  Exclusivity is not a bankruptcy right.  It must be earned.  In

9  fact, the code is clear that the debtors bear a heavy burden to

10 show cause for any extension, but particularly for each

11 succeeding extension when there is no objective progress.  I

12 say objective progress being made toward a confirmable plan.

13         Notwithstanding the wonderful arguments of debtor's

14 counsel, objectively, there is simply no progress.  The time

15 has come to try a different approach to getting this company

16 out of Chapter 11.  Thank you, Your Honor.

17         THE COURT:  Mr. Esserman?

18    (Pause)

19         MR. ESSERMAN:  Your Honor --

20         THE COURT:  I followed into work this morning, Mr.

21 Esserman, a bus, which in my memory will now be known as the

22 Baron & Budd mesothelioma bus.

23         MR. ESSERMAN:  I'll --

24         THE COURT:  Advertising for mesothelioma claimants.

25         MR. ESSERMAN:  I'll let them know you saw it.

1          MR. BERNICK:  Mr. Esserman only represents them in

2 the good things that they do.

3          MALE VOICE:  Represent the bus.

4          MR. ESSERMAN:  Thank you, Your Honor.  I'll try not

5 to repeat anything that's been said.  We've had a long day and

6 my colleagues at the table I think have articulated and

7 accurately summarized the points.  There's a few things I'd

8 like to talk about.

9          I think at least we believe that this plan is

10 unconfirmable on its face and it's very clear to us that Grace

11 wants to litigate rather than try and resolve its claims.  In

12 fact, their whole strategy, as I was listening to it, really

13 calls into question the Chapter 11 process itself as to Grace

14 and whether or not Grace really needs a Chapter 11.  They think

15 they're solvent.  They want to pay their legitimate claims that

16 they get through the tort system and -- or, through the -- that

17 have proof and this, that and the other thing.  Well, that's

18 what the tort system's about.  That's what the courts are

19 about.  Let them pay their creditors and they don't need a

20 524(g), if you listen to them.  And I'm not so sure that they

21 deserve a 524(g) or that they qualify for a 524(g), especially

22 if their facts are correct.

23          There's no cause shown for an extension of

24 exclusivity.  There's certainly cause -- if they've shown any

25 cause, it's that they like to litigate all these issues.

**J&J COURT TRANSCRIBERS, INC.**

1        In trying to decide what paper to submit, I was sort

2   of struck by our last hearing in Delaware and what sort of

3   struck me was one of the smaller cases Your Honor had came up

4   for confirmation, and that was I think the US Minerals case.

5   Well, US Minerals isn't Grace and we all understand that

6   they're huge differences, but nevertheless, that case seemed to

7   be locked and what Your Honor did was sort of appoint someone

8   in that case to sort of get the process going.  And that's sort

9   of what I suggested in my papers.  I said, "Gee, you know, that

10  case was a locked mess, maybe this case needs something -- some

11  impetus to get it going."  And so I suggested a trustee or an

12  examiner to put together a confirmable plan.

13       Faced with a two year extension of exclusivity which

14  the debtor has asked for in their motion, I understand it has

15  been modified now to 60 days.  I think that that's clearly

16  justified and should be done.  Whether anything can change in

17  60 days, I don't know.  Will 60 days hurt anybody?  No.  We've

18  been in this four and half years.  Sixty days isn't going to

19  matter.  Whether anything happens to change anyone's mind in 60

20  days is another thing and I think the only way we'll be able to

21  tell that is when we all stand up here 60 days from now.

22       But if nothing else, I think the creditors are

23  getting fed up -- perhaps the Court is -- that we need to get

24  this process going in a resolution way, not a litigation way.

25  We can litigate this thing for the next 10 or 20 years.  That's

1  not what the Chapter 11 process is about.  It's about trying to

2  resolve your claims in a consensual way, trying to reach a

3  consensus, knowing that if there are creditors that do not

4  consent in certain cases, the code has its remedies.

5       But that's the way the process is supposed to work.

6  That's the way this process hasn't worked.  I think Grace has

7  taken a litigation approach with a very political agenda.  They

8  haven't met a Wall Street Journal editorial they haven't liked

9  or probably planted in some direct or indirect way.  I think

10  it's time we get this thing done and out of the courts.  Or

11  send Grace back to the tort system.

12       Like I said, 60 days in four and a half year context

13  isn't going to matter.  What will matter is to me a strong

14  message.  If we're back here in 60 days, fine.  We can do that

15  and see what happens, but if the Court's inclined to see what

16  happens in 60 days, I think the Court needs to expect progress.

17  Significant progress, not what you heard here today from the

18  parties.  Because frankly, 60 days is a gift.  It's a Christmas

19  gift.  Because there's been no cause shown by this debtor.

20       Merry Christmas, Your Honor.

21       THE COURT:  Thank you.

22       Good morning.

23       MR. DIES:  Your Honor, Martin Dies, member of the

24  property damage committee.  I'm not sure anybody wants me to

25  confuse their position of the facts.  There have been some

1  discussions and I've been involved in discussions.  Listening

2  to all this, I think due to the delicate nature, maintain the

3  efficacy of the discussions.  But out of respect to the Court,

4  I should say, Your Honor, if you have questions, I will be glad

5  to answer them hopefully in chambers in a general sense.  I

6  just don't think it's productive to go much beyond what has

7  been said here today.

8          THE COURT:  No, I agree I guess with one caveat, and

9  that is I guess I'm asking for a personal read.  Mr. Dies,

10 you've been involved in this case and in many other cases for

11 many -- many cases for a long time.  Is there progress or is

12 there not progress?

13         MR. DIES:  (No audible response.)

14         THE COURT:  Because talking is one thing and getting

15 somewhere with the talks is another.

16         MR. DIES:  That's correct, Your Honor.  Your Honor,

17 the basis of these talks really has to do with the working

18 relationship I have with Mr. Budd from another case.  I will

19 say this to Your Honor:  I had extensive discussions with the

20 property damage constituencies, with Zonolite, Mr. Westbrook

21 and Mr. Scott, Mr. Speights and I feel like all the property

22 damage constituencies made significant concessions, such that

23 we were able to give a unified proposal to Mr. Budd.  I do not

24 have a response to that.

25         THE COURT:  That's all right.  That's progress.  I

94

1  will accept that as progress.

2          MR. DIES:  Anything else I've --

3          THE COURT:  No, sir.  Thank you.

4          MR. DIES:  Okay.  Thank you.

5          MR. BERNICK:  Your Honor, just very briefly.  It is

6  very much as I made a comment on and -- and that is that the

7  best things to do in negotiations is to do it rather than talk

8  about it.  As soon as people start to talk about it, they're

9  looking for leverage in their discussions.  And I just want to

10 comment on a couple of things that have been said and then at

11 the end come back to the remarks that Mr. Dies just made.

12         First there are a bunch of things that have been said

13 that really are not to the point of what we should be talking

14 about this morning, which is whether the debtor has made

15 progress -- whether the case has made progress in the context

16 of the different challenges that we face which are first of all

17 the litigation and second of all the negotiations.

18         Four things I want to respond to that really are not

19 germane to that issue, but warrant response.  First, it's one

20 thing to hear from the Court that the Court has got concerns

21 with the plan.  We heard that before.  We're very mindful of

22 them.  And as the discussion with the Court this morning I

23 think reflects, these are hard issues.  They're not simple

24 issues.

25         I respect Mr. Lockwood when he says that they have

1  got a position and the position is very much opposed to ours.

2  I understand that.  The personal injury claimants in this case

3  have a significant and unique position that we can't deny.  And

4  they've had that for quite some time.  It is a position that at

5  the end of the day we don't believe is black and white,

6  otherwise they're in a position to stalemate these cases and it

7  is a position that we have to deal with and we've recognized

8  that.

9         It's totally different with respect to the property

10 damage claimants and Mr. Baena hasn't shown the same kind of

11 restraint.  Says the plan is plainly unconfirmable.  Plan is

12 completely confirmable almost without issue with respect to the

13 property damage claimants who are in a complete and utterly

14 different position.  They have no jury trial right.  Estimation

15 can be used for allowance or disallowance.  We have object to

16 their claims.  They have not prosecuted claims in good faith in

17 part through one of the principal lawyers that's been acting

18 here.

19        So there are huge problems the property damage

20 claimants have and yet they most of all want to talk about how

21 the plan is not confirmable.  In a sense, that's not even their

22 business.  This plan is a no brainer legally from the point of

23 view of the property damage claimants.

24        Secondly with respect to the $1.7 billion, it was

25 said, "Well, gee, they wanted to kind of air condition Your

1  Honor about the 1.7."  That was not the purpose of the 1.7 at

2  all.  Completely misapprehended it.  We didn't believe that the

3  Court would have any particularly notion of what 1.7

4  represented or didn't represent.  There's no way --

5            THE COURT:  I don't.

6            MR. BERNICK:  -- Your Honor would.  That's what the

7  whole estimation process is all about.

8            But the purpose of the 1.7 and the purpose of all the

9  other financial figures that were put out before the different

10 constituencies in this case a year ago was to set the table for

11 substantive economic negotiations.  The 1.7 didn't come out of

12 the sky.  It came out of a -- it was result of an analysis.

13 There was -- there were a lot of details and a lot of analyses

14 that went into the 1.7 billion.

15           It also had continuity both with respect to Grace's

16 historical reserve and with respect to prior discussions that

17 had taken place about a consensual plan.  So the 1.7 was for

18 purposes as I indicated of getting the economic table --

19 economics table laid and set so that we could have discussions

20 that in fact ensued.

21           So when Mr. Baena says that well, we were just

22 interested in telling the Court something, we weren't telling

23 the Court anything.  What we're doing is telling the other

24 parties here's what we believe is a reasonable number to be

25 talking about and in fact there were productive discussions

1  that ensued with respect to that.

2        Mr. Frankel says well, gee, we never got back to them

3  on the FCR's proposal.  The FCR's proposal came at the end of

4  the day in an effort to try to bridge gaps that had emerged

5  elsewhere in the negotiations and it wasn't a productive

6  proposal because not only did it not bridge those gaps, it made

7  them worse.  So we didn't respond to it because it wouldn't

8  have been productive.  We had problems that had emerged on that

9  negotiation with respect to other constituencies and all that

10  the FCR's proposal did was to make matters worse.  Why respond

11  to it?  The negotiations were dead in the water, they weren't

12  going anywhere.

13        Mr. Frankel then says well, gee, what's happened

14  since that time, the FCR's not been included.  And it's true

15  the FCR's not been included, but you believe that somehow as a

16  result of the representations that were made here in court we'd

17  hear something that was more productive out of Mr. Frankel

18  other than talk -- to give a speech that he could have given if

19  he hadn't known anything.  Things have happened and he's not

20  been included.  His client's not been included.  We've not been

21  included.  And I want to get to that in just a moment.

22        The third -- fourth point that was made that really

23  is not to the point is well, gee, all that Grace wants to do is

24  litigate forever.  That has been said since the beginning of

25  the case.  It's never been true since the beginning of the

1  case.  Your Honor understands why it is that we believe we have

2  no choice but to litigate because there are issues about which

3  the parties disagree.

4        Judge Farnan in fact -- it was ironic.  Judge Farnan

5  was prepared to rule back in September of 2001, five months

6  after the bankruptcy started, on all of these different issues

7  concerning case management order and how to proceed.  The

8  morning that we were supposed to have the hearing and get his

9  determination the case was transferred to Judge Wolin.  I think

10 that maybe we would have made a lot of progress if Judge Farnan

11 had the opportunity at that point in time to give us the

12 benefit of his decision making.

13       But all these points are really beside the point.

14 There are two issues this morning and really they reduce to

15 one.  The first issue is whether we have done what the Court

16 has asked us to do with respect to formal proceedings before

17 the Court.  And I could put the time line back on.  We have

18 done every single thing that the Court has asked us to do.  We

19 proposed a plan.  We put the plan out on the table.  Briefs

20 were filed.  We responded to the briefs.  Your Honor said,

21 "Let's go forward with the estimation."

22       Maybe there was a cross wire in terms of Your Honor's

23 expectation that we would revise the plan to deal with the

24 issues that have been raised, and we'll take responsibility for

25 that.  We thought that the top priority was estimation.  We

1  have gone forward.  We proposed case management orders.  We

2  sought to streamline the resolution of the issues.  We've been

3  working very very hard to do exactly what Your Honor asked us

4  to do, including the negotiation front.

5         The second matter is well, what's happened with the

6  negotiation and what's so disconcerting about the proceedings

7  this morning is how everybody wants to in a sense go like this

8  and say don't let's talk about what's actually happening with

9  the negotiations.  Let's talk about how well, gee, we've not

10 been included or let's talk about -- Mr. Baena says well, the

11 debtor has done nothing and therefore we've got to get this

12 thing done with or the future claims representative says let's

13 do something productive and terminate exclusivity so they can

14 then quarrel over competing plans rather than negotiate.

15        Come on.  What happened was very simple and is

16 undisputed.  What happened was that after the last round, the

17 debtor made a decision.  And we made it transparently.  We said

18 we're going to go with the Dies Budd relationship and see if

19 something comes out of it.  Because if it has some promise, it

20 is the first real promise in this case since the Fall of last

21 year when things got very close.  We're looking for a way to

22 break the log jam.  That is a fact.

23        Now, we took a step back from that process saying

24 let's let it work.  Why shouldn't the futures representative

25 take a step back from the process and let it work?  Why does

1  the futures representative blame the debtor for doing what it

2  absolutely should have done, which was to work with a promising

3  beginning?  What's wrong with that?  Why does that have now to

4  be a basis for a request to terminate exclusivity?  That's

5  ridiculous.

6          Mr. Baena says the debtors refused.  We didn't refuse

7  to do anything.  And it's just amazing to me that Mr. Dies is

8  working hard to try to do a deal and the committee stands up

9  here and says the debtors have refused?  Come on.

10          What's the best thing going in this case is Mr. Dies

11 and Mr. Budd trying to make something work out.  And Mr. Dies

12 is candid that it hasn't happen.  It may not happen.  But it's

13 a beginning and all that's happened here this morning is that,

14 with the exception of Mr. Lockwood who was notably restrained

15 in his remarks, everybody else that stands up want to sit there

16 and talk about how the world's -- the sky's falling in and Your

17 Honor's got to intervene and stop this thing before it gets

18 further out of control.  All of which would have the effect of

19 diminishing rather than enhancing the chances of a consensual

20 plan.

21          And the only disappointment that I have with Mr. Dies

22 is that at least Mr. Dies could tell us what it's wrong that

23 the debtor has not acted here and has been irresponsible.  Mr.

24 Dies knows that that's a fact.  He knows the debtor has acceded

25 to his request in this process.  The debtor's done exactly what

J&J COURT TRANSCRIBERS, INC.

1  Mr. Dies has recommended and now all that we're greeted with is

2  well, gee -- it's an opportunity -- let no deed go unpunished.

3  It's an opportunity for recrimination, rather than opportunity

4  to say hey, let's work with what's going on here.

5          So, let's just strip away all -- people say this is

6  litigation.  What's going on here?

7          THE COURT:  Mr. Bernick --

8          MR. BERNICK:  It's bankruptcy litigation.

9          THE COURT:  You have an hour and 10 minutes to get

10 through the rest of the agenda.  I have heard this.  I listened

11 to it for an hour and half this morning.  I really -- it's -- I

12 don't need to hear it again.  If you've got something --

13         MR. BERNICK:  Okay.

14         THE COURT:  -- specific that you want to do in

15 rebuttal to the arguments, please do it.  Otherwise, I really

16 don't need to get into this again.

17         MR. BERNICK:  That's fine, Your Honor, but the

18 arguments that have been made with respect to exclusivity are

19 not oriented towards the key task which is to encourage and

20 continue the negotiation process that's underway and I think

21 that we've made a sound proposal for doing that and the rest is

22 really -- and the reason I really rise to deal with it is that

23 it makes me concerned about the intentions of the committees

24 here.  Because if people are look -- just looking at this as 60

25 more days to run out the clock so that there can then be

1  renewed, you know, posturing about how to get this case on

2  track, that makes me feel much more pessimistic about the next

3  60 days.

4          I thought that we should have some optimism here

5  today coming from the parties and coming from the committees

6  that finally progress is being made.  And all that I see here

7  is a lot of people saying no, no, nothing's going to happen

8  here, we're going to be back in 60 days and --

9          THE COURT:  No.

10         MR. BERNICK:  -- asking for more.

11         THE COURT:  I'm hearing optimism on behalf of some of

12  the constituents.  What I'm hearing that's pessimistic is

13  whether or not the debtor is ever going to be on board with

14  what the committees think is the way the world ought to be

15  after confirmation.

16         MR. BERNICK:  And that is exactly, Your Honor -- if

17  Your Honor believes that, that is exactly why I should be

18  rising to my feet.  Because what's happened in the last several

19  months is exactly the opposite.  We have deferred to Mr. Dies

20  and Mr. Budd --

21         THE COURT:  Well, that's okay.

22         MR. BERNICK:  -- to work this --

23         THE COURT:  I think the question is the end of the

24  day.  For example -- and again, this is totally hypothetical.

25  No one, as you all know, have put any numbers on the record, so

1  I'm making this up and I'm making it very exaggerated for the

2  purpose of making it up.  Let's assume that the committees

3  decide that they will live with an asbestos claim estimation,

4  property damage and personal injury, everything, all of it,

5  that's $100 billion and the debtor simply says no, I'm not

6  going to do it.  Well, they may have agreed, but the debtor

7  isn't going to agree --

8          MR. BERNICK:  Well, Your Honor, your --

9          THE COURT:  -- and that's what they're looking at.

10 Now the debtors --

11         MR. BERNICK:  Your Honor, that --

12         THE COURT:  -- haven't been involved in the

13 negotiations to date.  At some point obviously, the debtors are

14 going to have to get involved, as will the futures rep.  I

15 agree that a 60 day -- I'm not sure what the right word is --

16 exclusivity extension, but not -- I'm looking at it in a

17 litigation scenario, not in a bankruptcy scenario for the

18 moment.  Basically a standstill agreement for 60 days is

19 probably a good thing to see if this process will play itself

20 out.

21         MR. BERNICK:  Well --

22         THE COURT:  And so, I will extend exclusivity for

23 that period, but I'm doing it with some conditions.

24         MR. BERNICK:  Well -- I'm sorry, before you give the

25 conditions then I -- let me just say that it is very

1 disappointing to the debtor and maybe we're responsible for it

2 -- very disappointing to the debtor that Your Honor could have

3 that degree of skepticism.

4          THE COURT:  I don't have a degree.

5          MR. BERNICK:  Well, I -- but I -- I'm --

6          THE COURT:  What I said is I'm hearing from the

7 committees that that's where the skepticism is.

8          MR. BERNICK:  That's the problem --

9          THE COURT:  You said you heard negative --

10          MR. BERNICK:  -- Your Honor.  That's the problem.

11          THE COURT:  Well --

12          MR. BERNICK:  I mean I can't control --

13          THE COURT:  -- Mr. Bernick --

14          MR. BERNICK:  I can't --

15          THE COURT:  -- you've got a plan on the table that

16 from day one everybody's been fighting with and there's been no

17 effort to get it fixed at least by --

18          MR. BERNICK:  But why do you --

19          THE COURT:  -- filing documents.

20          MR. BERNICK:  Why do you think --

21          THE COURT:  What else could you expect from them but

22 to expect that they think that the debtor's not going to agree

23 with any resolution that they come up with?

24          MR. BERNICK:  Fair enough, Your Honor, but that is

25 exactly -- see the -- yeah, I -- maybe I'm repeating myself.

1 Maybe I should just sit down.

2        THE COURT:  I think you should.

3        MR. BERNICK:  But I --

4        THE COURT:  Because I am not attributing to the

5 debtor any type of bad motive in this.  So to the extent that

6 you think I am, I'm not.  If the debtor believes at this point

7 that the best way to get these negotiations concluded is to let

8 the, in quotes, the principals who have the lion share of the

9 claims involved see if they can work it out, that's fine.  I'll

10 give you the 60 days to see if that process --

11        MR. BERNICK:  Yeah.

12        THE COURT:  -- will conclude.

13        MR. BERNICK:  Well, I -- then I -- I'll just make a

14 statement and then I will sit down.

15        Number one, I think that Your Honor has

16 misapprehended where the facts really are as concerns the

17 negotiation.  Maybe it would be appropriate to have a more

18 detailed discussion before the Court.  Because the discussions

19 are not animated to our knowledge by any kind of proposal to

20 accept any kind of estimation.  They're animated by the very

21 simple idea of dividing up dollars.  That's --

22        THE COURT:  Of course.

23        MR. BERNICK:  Well, but, Your Honor, when you suggest

24 that somehow the concern being expressed by the committees is

25 that the debtor at the end of the day will be the problem

1 because it'll be too aggressive about what the economics are,

2 that in and of itself, just like Your Honor's comment at the

3 end of the last hearing, has a very significant affect on

4 exactly what the negotiations are.  And I'm sorry, Your Honor.

5        THE COURT:  I'm not making any comments.  What I'm

6 saying is that that's how I read what the other side is saying.

7        MR. BERNICK:  That --

8        THE COURT:  I don't -- Mr. Bernick, I don't know

9 what's going to happen at the outcome.  I've already expressed

10 several times I hope to be able to sign an order that confirms

11 this plan that lets the debtor deal with its asbestos

12 liabilities that gets this very good business back on its feet

13 outside Chapter 11 without having to bother any of the

14 constituent parties or any of the counsel or the Court in the

15 future.  That's my -- to the extent I have a goal, that's my

16 goal.

17        MR. BERNICK:  Yeah.

18        THE COURT:  It's not my dog, however.  All I can do

19 is deal with what the parties give me and then react to it.  I

20 don't get the chance in this instance to write the plan or do

21 the negotiations or to get the claims fixed --

22        MR. BERNICK:  That --

23        THE COURT:  -- and out in a settlement posture.

24        MR. BERNICK:  That's fine.  And then what I'm saying,

25 Your Honor, is that in light of that, if what the committees

1 have managed to do in this exclusivity hearing is to convince

2 the Court that there -- that at least from what they have to

3 say, this is situation where it is up to the debtor to

4 demonstrate that it is acting in good faith in the

5 negotiations, then I certainly have not done my job.

6          THE COURT:  Mr. Bernick, it's --

7          MR. BERNICK:  Maybe my client has not done --

8          THE COURT:  -- the debtors' burden to show me why

9 exclusivity --

10          MR. BERNICK:  That's what I --

11          THE COURT:  -- should be extended.

12          MR. BERNICK:  That's what I tried to do here, Your

13 Honor, and all that's happened here --

14          THE COURT:  Then what you should say, Mr. Bernick, is

15 congratulations, you did a good job.

16          MR. BERNICK:  No, but I'm not --

17          THE COURT:  I'm going to extend exclusivity.

18          MR. BERNICK:  I'm not --

19          THE COURT:  You're shooting yourself in the foot, Mr.

20 Bernick.  The first law of --

21          MR. BERNICK:  Maybe --

22          THE COURT:  -- trial law -- the first --

23          MR. BERNICK:  Yeah.

24          THE COURT:  -- rule of trial lawyers is what when

25 you've won the point?  What do you do, Mr. Bernick?

**J&J COURT TRANSCRIBERS, INC.**

1              MR. BERNICK:  Yeah, I --

2              THE COURT:  What do you tell your students to do?

3              MR. BERNICK:  Yeah, but I thought, Your Honor, that I

4    had -- that we had won the point before the last hearing where

5    Your Honor stated at the end what is the debtor doing here.

6    And I still have exactly the same concern that all of what you

7    have heard here this morning is putting the burden on the

8    debtor somehow in the negotiation process to demonstrate

9    greater flexibility.  And instead, what ha happened in the

10   negotiation process is we've tried to be ultimately flexible.

11             And the only consequence of that, Your Honor, is that

12   we come out of this process this morning with all these

13   statements being made about us that are wrong and the one

14   statement -- the only statements that really are germane, which

15   is what has happened in the negotiation process including the

16   cooperation of the debtor, has -- is never even shared with the

17   Court.  And, you know --

18             THE COURT:  Mr. Bernick, this is posturing pure and

19   simple.  I've agreed --

20             MR. BERNICK:  Okay.

21             THE COURT:  -- that the debtors' exclusivity period

22   can be extended for 60 days with some conditions which I am

23   going to put in place.  I am happy that there are negotiations

24   that appear to be productive, at least in so far as one

25   constituent group has made a uniform proposal to another

1 constituent group.  In my view, that is significant progress.

2        I hope that the other constituent group will react

3 favorably so that we can actually get some real progress, not

4 just negotiated progress.  And at some point in time, I expect

5 that all of the other constituents, the debtor, the futures

6 rep, the trade committee, the equity committee and anybody else

7 that is appropriate in these negotiations will be included.

8        I think that is progress and I'm going to give the 60

9 day period to let things play themselves out.  If they do,

10 that's great.  If they don't, then we'll be right back in

11 litigation mode where we've been for a while and we'll see how

12 it plays out in that score.

13        So, that's fine.  You've won that point.  I am not

14 casting any negative aspersions on any constituent group,

15 including the debtor, and to the extent that you're reading

16 what I'm saying that way, you're reading me incorrectly.

17        MR. BERNICK:  Thank you.

18        THE COURT:  All right, with respect to the

19 conditions, if there is in fact some consensual agreement

20 reached, then I think what would be appropriate is to report

21 that at the end of this 60 day period and then to consider

22 whether or not some additional period of exclusivity is

23 necessary.

24        If that is the case, it's going to be a short period.

25 I want to get a plan on the table.  I thought this case should

1 have exited by the end of this year and you're not even close.

2 So, at this point in time, I will grant this extension for 60

3 days.

4          Does that take you to the February or March omnibus

5 dates?

6          MALE VOICE:  February --

7          MS. BAER:  February 21st hearing.

8          THE COURT:  Okay.

9          Then exclusivity will be extended through the hearing

10 on February 21 and we'll deal with whether or not it should be

11 extended further at that time.  No new motion is necessary.  If

12 anybody wants to supplement the pleadings at that point, you

13 may do so, but no new motion.  I'm simply going to grant this

14 extension, but keep it on the calendar for 60 days as another

15 interim extension.

16          If a consensual agreement has not been arrived at,

17 then I am going to appoint someone to assist in the plan

18 negotiation process.  The context is something we will talk

19 about at the February 21st hearing.  I am very hesitant to

20 consider even a trustee with limited powers.  I'm not sure

21 that's necessary in this case.  Although of course that's what

22 did get the ball rolling in US Minerals, but there were a whole

23 different set of problems in that case that really do not apply

24 in this case and I -- so I don't think a trustee, even one with

25 limited powers, is the way to go.

1          Maybe a mediator, I don't know.  You folks, generally

2   speaking, don't seem to make a great deal of progress with

3   mediators, but, you know, maybe that's -- you know, we need a

4   person.  The title of the person is something that you folks

5   can discuss if it's necessary to get that far, but I will

6   appoint someone to see whether or not progress can really be

7   made.  And if progress can't be made at the end of whatever

8   period of time that person's appointed for, then I may put an

9   examiner in place to do a plan.  I don't know.  I'll think

10  about it.

11         And if I need to do that, I will terminate

12  exclusivity so that not just the examiner, but other parties

13  can be involved.  But again, I'm not sure at this point.  What

14  I've heard today convinces me that progress is being made, so I

15  hope I don't have to go down this road.  But to the extent that

16  you want a level playing field, it's as level as it can get

17  because nobody's going to be in charge of this process for much

18  longer than 60 days.

19         With respect to the debtors' motion to set a bar date

20  for the personal injury claims, I want that put back on the

21  calendar for the February 21st motion.  I am going to

22  reconsider whether I should, in light of Mr. Bernick's

23  articulation of the need for the medical evidence, consider

24  either a claims bar date or something short of a claims bar

25  date that will get the medical criteria in.

**J&J COURT TRANSCRIBERS, INC.**

1              With respect to Mr. Lockwood's request for an

2    additional 60 days to get the documents put together, that's

3    granted, and it's granted with the expectation that the medical

4    evidence will be submitted as often as possible so that I don't

5    have to get to a bar date issue, if that's at all possible.

6    But that's what I would like, so it will be granted.

7              All of the other dates that are tied to the

8    production of the questionnaires will be also extended for 60

9    days and that one I think I need an order for because people

10   are under a specific order with respect to that.

11             Now, what else can I do to keep things in basically a

12   status quo to let the negotiations hopefully play themselves

13   out within this 60 days?  That's what I'm trying to do.

14             MR. BAENA:  Can I have one second, Your Honor?

15        (Pause.)

16             MR. BAENA:  Judge, as you know, we have the PD

17   estimation ongoing and we are proceeding in accordance with the

18   Court's directions.  There's only one little problem I foresee,

19   and that is Mr. Dies has already been identified as principally

20   responsible for the negotiations that are going on.  Mr. Dies

21   is also principally responsible for phase one, methodology, in

22   the PD estimation and the discovery cutoff ends mid-February.

23             We didn't come here with a motion, Your Honor, to

24   extend the deadlines and what have you under the PDCMO, but

25   there's just so much that one person can do.  We'd ask you to

1 take that into account.

2          THE COURT:  Well, what -- maybe you should talk to

3 the debtor to see -- I'm not sure, for example, the things that

4 are teed up for January, can we go forward with those --

5          MR. BAENA:  Those are objections.

6          THE COURT:  -- items?

7          MR. BAENA:  That's different, Judge.

8          THE COURT:  Right.

9          MR. BAENA:  I'm talking about the PD estimation and

10 I'm only talking about discovery in respect to phase one,

11 methodology, where we've exchanged now our expert reports with

12 them.  We got theirs previously.  Their rebuttal reports are

13 due this week.  And discovery ensues in regard to experts now,

14 as well as factual discovery which I believe could have been

15 commenced already.  And there's a cutoff for discovery in mid-

16 February which is, you know, entirely coincidental with this 60

17 days of negotiations that you're talking about.

18          THE COURT:  Well, let me inquire of Mr. Dies what his

19 expectations are for how much time will be necessary for the

20 plan negotiations.

21          MR. BAENA:  Thank you.

22          MR. DIES:  Your Honor, the -- as Mr. Baena said, the

23 problem is unexpected and coincidental, but I anticipate there

24 will be a great flurry of discovery with the debtor and their

25 experts and our experts between first of the year and February

114

1 which is the time period really that is involved in this

2 extension, so if we could get some short extension, 30, 40

3 days, then that would be acceptable in my view.

4          THE COURT:  Okay, how much time do you expect that

5 you're going to be involved with the parties in the plan

6 negotiations?

7          MR. DIES:  I'm sorry in?

8          THE COURT:  In the plan negotiation process, as

9 opposed to the property damage side of things.

10         MR. DIES:  Your Honor, that has varied so much --

11 even a small case like US Mineral became just all encompassing.

12 It's hard to say, until I -- until we know what the response of

13 the other committee is.  But I would think it would be quite

14 intensive.

15         THE COURT:  Mr. Esserman, when is Mr. Budd going to

16 respond to the proposal?

17         MR. LOCKWOOD:  Your Honor --

18         MR. ESSERMAN:  I don't know, Your Honor.

19         MR. LOCKWOOD:  -- with all due respect, that's not an

20 appropriate question for Mr. Esserman.  Mr. Budd is acting on

21 behalf of a committee --

22         THE COURT:  Oh, I'm sorry.

23         MR. LOCKWOOD:  -- not acting in his individual

24 capacity.

25         THE COURT:  Okay, I apologize.  I'll ask --

1          MR. ESSERMAN:  I wouldn't now anyway.

2          THE COURT:  -- that question Mr. Lockwood then.

3          MR. LOCKWOOD:  Your Honor, the committee has had one

4  meeting already to discuss that proposal and is formulating a

5  response, and the response is not going to be turn blue.  And I

6  can't tell you exactly when the response will be made, but we

7  understand that there's a short fuse on all of this and we hope

8  to be making a constructive response in the relatively near

9  future.

10         THE COURT:  By the end of the year?

11         MR. LOCKWOOD:  We're coming up on Christmas week.  I

12 -- I mean I -- I'm not sure, Your Honor, but maybe, but

13 certainly in that sort of a time frame, week, couple weeks,

14 something like that.  I mean we're not -- there are a lot of

15 things that have to be sorted out in it.  More -- both the

16 basic and the sort of collateral effects, but I mean I -- we

17 had a positive meeting and I think that we can look forward to

18 some productive discussions with the PD folks on this.

19         THE COURT:  Okay.

20         Ms. Browdy?

21         MS. BROWDY:  Thank you, Your Honor.  I think that

22 your suggestion was the right one, which is that we should try

23 to work things out in terms of scheduling with Mr. Dies because

24 unlike on the PI side of things, bumping a certain date back a

25 few weeks won't necessarily cascade through the rest of the

1  schedule, so I think we should just confirm this.

2         MR. BERNICK:  Well, I think that there ought to be a

3  discussion with Mr. Dies so that maybe we can see if we can

4  reach an agreement and if we can't, then we'll the Court know.

5  We're very loathe to change the dates because that first phase

6  is very very important.  At the same time, Mr. Dies is very

7  important to the negotiation process, so I don't know that we

8  have to negotiate this now.  Seems to me we ought to have a

9  telephone call and figure it out.

10         MR. BAENA:  I don't think it's a negotiation either.

11         COURT CLERK:  Speak into the mic, please.

12         MR. BAENA:  I'm sorry.  I don't believe this is a

13  negotiation I -- you know, Mr. Dies didn't say give us the

14  whole 60 days, Judge.  He said give us 30 or 40 days if -- we

15  are in the holidays.

16         MR. BERNICK:  Well, I --

17         MR. BAENA:  Nothing is really meaningful going to

18  happen before the beginning of the year and -- Judge, we're not

19  -- we weren't laying the weeds waiting for this opportunity to

20  slow things down.  We've been moving punctually.  We haven't

21  asked for any extensions of time.  We're just worried about a

22  distraction because the Court is focused on this plan process.

23  People will be reactive to your reaction to all of this.

24         MR. BERNICK:  Yeah, that --

25         MR. BAENA:  And --

**J&J COURT TRANSCRIBERS, INC.**

1              MR. BERNICK:  Okay.

2              MR. BAENA:  And Mr. Dies does have principal

3    responsibility for that expert discovery and --

4              THE COURT:  Well, frankly, I think that's the way at

5    this point in time that the time would be best spent.  Because

6    to the extent that there can be some agreement, I'm not sure

7    it's going to eliminate the need for estimation on the property

8    damage side of the objections to claim process.  That may still

9    have to go forward, I don't know, but I'm not sure that that

10   can't wait until some agreement with respect to the division of

11   the plan proceeds can be agreed upon.  Because I don't know

12   that the debtor will really have a dog in the fight as to the

13   division of proceeds if in fact an agreement is reached among

14   the committees, although it may certainly have something to say

15   about how much --

16             MR. BERNICK:  Well --

17             THE COURT:  -- goes in.

18             MR. BAENA:  And --

19             MR. BERNICK:  I'm sorry.

20             That again is -- the discussions that are underway

21   are piece of the pie for everybody --

22             THE COURT:  Yes.

23             MR. BERNICK:  -- including the debtor.  So, when --

24   again, this is the problem working with the abstract --

25             THE COURT:  No.  I meant with respect to the property

118

1  damage estimation vis-a-vis the personal injury.  I think it's

2  going to have to go forward, but I'm not sure that it has to go

3  forward while the parties are trying to figure out how among

4  themselves they're going to look at the asbestos --

5          MR. BAENA:  Judge --

6          MR. BERNICK:  What we're --

7          MR. BAENA:  Judge, and --

8          THE COURT:  -- or, asbestos division.

9          MR. BAENA:  And, Judge, I just want to make sure.

10 We're not asking to unduly extend this period of time and I'm

11 not asking for anything in respect to phase two where Mr. Dies

12 isn't critically involved.

13         THE COURT:  Okay, I think some brief period of

14 extension's not going to cause too much of a problem, but, Ms.

15 Browdy, I think your idea to talk to Mr. Dies and work out an

16 order is a good one, so I'll just let you two work out an order

17 and I will grant whatever extension you folks can come up with.

18 It seems to me that the request for a minimum of 30 days is not

19 inappropriate, so you can work on that basis.

20         MS. BROWDY:  Thank you, Your Honor.

21         MR. BAENA:  Judge, and can -- if there is an impasse,

22 which I hope there isn't, can we contact you telephonically

23 like we did recently --

24         THE COURT:  Yes.

25         MR. BAENA:  -- to have a hearing?  Thank you, Judge.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Yes, you may, but I don't think that will

2    be a problem.

3          MR. BAENA:  I don't either.  Thank you, Your Honor.

4          THE COURT:  Okay, so with respect to item one, the

5    debtors' exclusivity period is extended through the conclusion

6    of the February omnibus hearing.  The item is continued to that

7    hearing so that we can discuss it at that time.

8          The response to the questionnaire time is extended

9    for 60 days as are the other deadlines key to it.  For that

10   one, I want an order.

11         The property damage phase one will be extended.  For

12   that, I need an order.

13         What else can I do to keep this -- keep all the balls

14   in the air for 60 days?

15     (Pause.)

16         THE COURT:  Mr. Speights?

17         MR. BERNICK:  Well, I -- I'm sorry.  I'm just getting

18   prompts that you all -- Your Honor also made some statements

19   about the proof of claim bar date being back on.

20         THE COURT:  Yes, put it back on for February because

21   I want to consider whether some form of medical evidence --

22         MR. BERNICK:  Right.

23         THE COURT:  -- is necessary, but I -- well, let me

24   ask.  Maybe it should be for a hearing after the February 1

25   because you won't know what you get by virtue of the responses

1  to the questionnaires until that February date since I'm

2  extending it for 60 days and you may not want to go forward --

3          MR. BERNICK:  Well, I think it's probably -- first of

4  all, I think we will know.  Secondly, I think that -- we'll

5  know just because of what's coming in the door.  But, Your

6  Honor, just like everything else that's happening this morning,

7  it all, you know, has ramifications.  It's very important that

8  we get the bar date back on if in fact we don't have the deal.

9  So, I think it would be timely to take it up at that point in

10  time, rather than setting it off.

11          THE COURT:  Okay.

12          MR. BERNICK:  Effectively we're talking about is 90

13  days --

14          THE COURT:  That's fine.  Put it back in February.

15  If it's not ready to be discussed, we'll put it on in March.

16  That's all.

17          MR. LOCKWOOD:  Your Honor, I have been trying to

18  restrain myself from --

19          THE COURT:  And doing a very good job, Mr. Lockwood.

20          MR. LOCKWOOD:  -- saying anything further this

21  morning.  I just want to make one observation about this.  The

22  questionnaire process is going to -- is asking for people to

23  produce what medical evidence --

24          THE COURT:  Right.  They have.

25          MR. LOCKWOOD:  -- they have --

1          THE COURT:  That's right.

2          MR. LOCKWOOD:  -- not what medical evidence the Court

3 might decide was necessary to support the allowance of a claim.

4          THE COURT:  That's right.

5          MR. LOCKWOOD:  And I just don't want there to be any

6 misunderstanding about what's going on here, particularly

7 because of Mr. Bernick's incessant reference to <u>Daubert</u>.  The

8 questionnaire is not a pretrial order and it doesn't require

9 anybody to go out and gin up an expert witness report.  All it

10 requires is for them to deliver whatever diagnostic materials,

11 including x-ray readings and --

12          THE COURT:  Right, and -- but what I'm --

13          MR. LOCKWOOD:  -- et cetera, and that's what we're

14 talking about.

15          THE COURT:  And what I'm hoping, Mr. Lockwood, as I

16 think I expressed at the last hearing, too, is that the

17 information that will come in will be sufficient so that the

18 debtor doesn't have to address any further need for medical

19 evidence in the estimation process.

20          MR. LOCKWOOD:  I --

21          THE COURT:  If it doesn't come in that way and the

22 debtor still has some basis for feeling that it's necessary,

23 then I'm going to re-examine --

24          MR. LOCKWOOD:  Well, that's where the bar date

25 issue --

**J&J COURT TRANSCRIBERS, INC.**

```
 1            THE COURT:  Right.
 2            MR. LOCKWOOD:  -- undoubtedly will come up --
 3            THE COURT:  That's right.
 4            MR. LOCKWOOD:  -- and I just wanted to make sure that
 5   we're all on the same page on --
 6            MR. BERNICK:  Well --
 7            THE COURT:  Well, I'm calling it --
 8            MR. LOCKWOOD:  -- what's going on here.
 9            THE COURT:  -- a bar date, but I don't --
10            MR. BERNICK:  It's a --
11            THE COURT:  -- know that that's exactly the correct
12   term.
13            MR. BERNICK:  It's a more limited bar date --
14            THE COURT:  Bar date.
15            MR. BERNICK:  -- than a usual bar date.  But I -- I'm
16   a little bit -- I don't want to --
17            MR. LOCKWOOD:  Bar date is a bar date is a bar
18   date --
19            THE COURT:  Well --
20            MR. LOCKWOOD:  -- to quote --
21            MR. BERNICK:  No, it's bar date for --
22            MR. LOCKWOOD:  -- Gertrude Stein, Your Honor.
23            MR. BERNICK:  It's bar date for certain kinds of --
24            MR. LOCKWOOD:  Paraphrase rather.
25            MR. BERNICK:  -- claims.  And in fact in the
```

bankruptcy rules committee this was taken up in connection with

305 -- Rule 3005, revisions proposal, and in fact, the dialogue

there was well, you don't need a bar date for that purpose, you

just have a more limited bar date.  So this is a -- will be a

limited bar date for those people who already had claims on

file --

THE COURT:  Okay.

MR. BERNICK:  Yeah.

THE COURT:  We're going to hear this in February, not

today, after hopefully you folks know whether you even need to

pursue it.  So if you need to pursue it, put it back on for

February.  If the debtor wants then to continue it till March

because you haven't had a chance to analyze yet everything

that's coming in by virtue of the questionnaires, then we'll

continue it to March.  So, we'll deal with it then.

MR. LOCKWOOD:  My only --

THE COURT:  My views about --

MR. LOCKWOOD:  The --

THE COURT:  -- bar dates aren't going to change much

from what I said at the last hearing, but the purpose for which

the debtor's asking for this is not to object to claims, so

we'll see.

MR. LOCKWOOD:  That's what they say anyway.  My only

concern, Your Honor, frankly, is that by -- right now it's --

it was briefed before the last hearing --

124

1          THE COURT:  Yes, it was, and argued.

2          MR. LOCKWOOD:  -- and argued, and I guess we're going

3 to have some sort of re-argument.  I'm a -- I just want to

4 express a hope that perhaps the Court might implement if

5 necessary that I'm not going to be hit five days before the

6 February hearing with a supplemental brief by the debtor,

7 elaborating on things like the --

8          THE COURT:  Look, you know what?

9          MR. LOCKWOOD:  -- rules committee on Rule --

10          THE COURT:  Let --

11          MR. LOCKWOOD:  -- 3005 which I never --

12          THE COURT:  Stop.

13          MR. LOCKWOOD:  -- heard a word before today.

14          THE COURT:  Stop.  Stop.  I'm just going to have it

15 put on the March hearing.  I still think until you get those

16 questionnaires, the debtor's not going to know whether it wants

17 to go forward with it.  It'll be put on the March hearing.

18 It'll be after everybody's negotiation period's over.  So it

19 will not obstruct your ability to go forward and I'll deal with

20 it at that time.

21          MR. LOCKWOOD:  Thank you, Your Honor.

22          MR. BERNICK:  What date is that, Your Honor?

23          THE COURT:  I don't know.

24          Ms. Baer, do you know the March date?

25          MR. ESSERMAN:  I don't know exactly, Your Honor, no.

1          MR. BERNICK:  Okay.  We'll figure it out.

2          THE COURT:  Mr. Speights?

3          MR. SPEIGHTS:  Your Honor, I just want to briefly

4  comment on the discussion you've had about maintaining the

5  status quo and what else you can do.  I'm perfectly happy to

6  take that up in the context of several matters that are coming

7  up involving me later in the hearing today and I'm not trying

8  to jump the gun, but I didn't want to leave a vacuum here.  You

9  know, and then there was Mr. Speights.  Because if anybody's

10 been under the gun, I think Your Honor appreciate I've been

11 under the gun more than anybody else who's spoken today.

12          And I do want to say -- add a little context to

13 matters by saying that as I told you back in August, Mr. Dies

14 and I were the ones that went to the future claimants

15 representative back in November and tried to encourage that

16 deal and we got that close to the deal through tremendous

17 efforts of David Austern.  I think he was greatly disappointed

18 that the deal for some reason didn't get consummated at that

19 point.

20          And then in June -- I was interested in Mr. Bernick's

21 comments that we're not here to litigate forever.  Well, in

22 June, he also said and he turned to me -- I don't know if you

23 picked it up -- we were told by people to go after these guys

24 or words to that effect, which was me, and the war started in

25 July.  And I say that not to bring all that up.  You know, at

126

1  that point, I tried to enter a stipulation which the debtor was

2  not interested in to deal with all of this stuff.  We could

3  have avoided months of work.

4        But after Mr. Dies listened to you and me argue

5  before you for that hour and 15 minutes back on August 29 or

6  30, Mr. Dies said enough and Mr. Dies -- my good friend now; we

7  used to be competitors, but also good friends for many years --

8  picks up the phone and calls Russell Budd.  What is going on?

9  We're the good guys in the white hats against these guys all

10 these years.  Why don't we come together and add some sanity to

11 this process.  And so it was started in September and Mr. Dies

12 has done a wonderful job, and I appreciate Mr. Budd's efforts

13 as well.

14       We have a four-member committee.  Mr. Scott and I are

15 co-chair of the Grace property damage committee, so we have ZAI

16 and Traditional and Mr. Westbrook and Mr. Dies are the other

17 two members, and we all let Mr. Dies talk to Mr. Budd and we've

18 all worked with great enthusiasm on trying to see if some deal

19 could be together and we've all made a lot of concessions

20 intramurally within our four -- two groups to get to this

21 point.  So I would endorse everything Mr. Dies said and I will

22 continue to work with Mr. Dies to try to find some consensual

23 plan.

24       That will give us the context I think, Your Honor,

25 when I -- I think I'm next up -- and I don't know if you're

1  going to take a brief break -- to deal with both the class

2  certification issue and the fifteenth omnibus objection

3  scheduling order and without trying to take advantage of

4  things, but to tell you that I think there are some things with

5  respect to those matters that would also be helpful in the

6  settlement issues, as well as my individual ones.

7          You know, at the end of the day, I'm hopeful that in

8  60 days, we're going to have a plan and a trust for PD and an

9  administrator will determine everything about Anderson and

10  everything about all these other claims.

11          In any event, that's all I wanted to say at this

12  point.  We'll be back up in a minute.

13          THE COURT:  All right.

14          Yes, why don't we take really just a five minute

15  break because this case is going to have to be over at 1:30

16  today and I realize that that's going to press people to get

17  through the rest of the agenda.  So we'll be in recess for five

18  minutes.

19      (Recess.)

20          THE COURT:  Ms. Browdy?

21          MS. BROWDY:  Thank you, Your Honor.  Michelle Browdy

22  for the debtors.  I'm going to be addressing property damage

23  issues.  The main substantive thing on the agenda for this

24  afternoon is the class certification motion that Mr. Speights

25  has filed.  But before we get into that, I have a couple

1  ministerial things or quasi ministerial things to address.

2        First, we have a scheduling order on the fifteenth

3  omnibus objection.  The Court will recall we did a telephonic

4  hearing on that.  On Monday, we submitted under certification

5  of counsel, but it still hadn't been entered, so I just had

6  another copy to hand up.

7        THE COURT:  It should have been.

8        COURT CLERK:  (Indiscernible) --

9        THE COURT:  The fifteenth omnibus scheduling order

10 that was submitted on the certification of counsel last week.

11       COURT CLERK:  (Indiscernible) --

12       MS. BROWDY:  Okay.  So that was one thing to get

13 entered.

14       THE COURT:  All right.

15       MR. SPEIGHTS:  Well, Your Honor, I did have an

16 objection to it and I think Ms. Baer will confirm that.  But I

17 have not agreed to it.

18       COURT CLERK:  You need to speak into a microphone.

19       MS. BAER:  The certificate of counsel indicates that

20 Mr. Speights does fact have objections.

21       THE COURT:  I saw in the certification that there was

22 a disagreement, but there was nothing that came in that

23 indicated what the disagreement was, so I just assumed it

24 wasn't something significant.  Maybe incorrectly.

25       MR. SPEIGHTS:  Maybe in the global context it's not

1  that significant, Your Honor, but --

2          THE COURT:  All right.

3          MR. SPEIGHTS:  -- Ms. Baer and I have continued to

4  discuss it and I'd hoped as late as Thursday night that we

5  could resolve it, but we couldn't.  But, let me see if I can be

6  succinct given the time pressures we're all now under, Your

7  Honor.

8          First of all, I speak only for my law firm on this

9  and this is an objection to claims, and I hope that the debtor

10 has served all other counsel who have claims because although

11 the committee has signed on off on the order, the committee has

12 made it very clear that its interest was only in one point and

13 that was a number of bites of the apple which Mr. Baena has

14 discussed with you several times.

15         Frankly, Your Honor, I'm not a moving target, I'm a

16 target with a moving gun.  The debtor has gone from gateway

17 objections, saying we would do those first, to authority

18 objections, saying we will do those and nothing else, and now

19 to the fifteenth objections, raising all of the substantive

20 objections on many of them.  And the problem for me from the

21 last hearing until now which is five or six weeks was that I

22 needed to know which authority objections the debtors was going

23 to drop.  Because without that, I've got this huge globe and

24 Your Honor told him very directly if he's got a contract, I

25 don't see a basis for it.

1          Well unfortunately, Your Honor -- and I make this

2   point several times in the motion to cert hearing, but the

3   debtor seems to go out always on Friday night after everybody

4   leaves with its information.  I got that information on a

5   Friday night of which ones they were withdrawing and

6   thankfully, they withdrew a lot of them as they should have.

7   Hundreds they withdrew I believe.

8          And in addition, at that point, I was in a position

9   to talk to Ms. Baer about her scheduling order on the fifteenth

10  objection.  And when she sent it out also that Friday night, I

11  pointed out to her and my concern remains today the fact that

12  the way it is set up now is for the debtor to file replies on

13  December 22.

14         Now, I'm not comfortable with what these replies are.

15  We've had objections and we've had responses.  They get replies

16  and we get surreplies.  And I am concerned about their

17  scheduling order that has maybe 600 objections against me to be

18  heard in January and I haven't even seen their replies, which I

19  believe frankly the objections were basically generic.  And now

20  they're going to put in these replies the meat.  They're going

21  to tell you exactly what it is wrong with my claims.

22         Now, if this is one reasonably short, concise brief

23  which I can respond to, that's one thing.  Ms. Baer assured me

24  that it's not going to be 637 briefs, which I was very relieved

25  of that so we made some progress on our discussions.

1           But until I see the reply itself, I only can tell

2    you, Your Honor, I need to reserve my position of hey, these

3    things shouldn't come up in January for the following reasons:

4    I may need discovery, I may need something else, we can have a

5    telephone call, whatever it is.  I just can't buy a pig in a

6    poke.

7           The order trying to schedule things is not nearly as

8    much concern to me -- even though it goes beyond authority,

9    it's not nearly as much of concern to me as is not knowing all

10   the basis and all the law they're going to cite or what factual

11   assertions are they going to make.

12          So I guess I just stand up here, Your Honor, and sort

13   of say okay, go ahead and enter it, but please give me a chance

14   if it presents a problem of these replies coming to you and say

15   this goes far beyond authority, it goes far beyond

16   administration and it's simply not fair to file something on

17   Thursday night, December 22 -- ain't nobody in my office going

18   to be working Friday, Saturday, Sunday, Monday.  You'll be hard

19   pressed to find people the following week.  And I think it may

20   be a little much.  It may not be.  It may be concise.  I may

21   not have a problem.  I may call you in morning say Your Honor,

22   will you give me some more time on these matters and that's the

23   only thing I wanted to say about it.

24          THE COURT:  If the replies go beyond the -- what I

25   think from having taken look at the objection are pretty much

1 standard objections that the debtor's making to all of those

2 claims, Mr. Speights, then I'm probably not going to be in a

3 position to be able to address them all either.  But I think

4 there is a place in that brief for surreplies.

5            MR. SPEIGHTS:  It is.

6            THE COURT:  Okay.  So --

7            MR. SPEIGHTS:  And I'm worried about having enough

8 time and manpower to do all of that in the short amount of time

9 and get ready for all these objections.

10           THE COURT:  All right.  Well, if there isn't enough

11 time, I'll hear that objection on the day that the hearings are

12 scheduled.  Surely we ought to be able to get through some of

13 those issues.  We may not be able to get done with all of them

14 in any event, so --

15           MR. SPEIGHTS:  Let me tell you what I know that we

16 can get through --

17           THE COURT:  All right.

18           MR. SPEIGHTS:  -- I think and then maybe it'll ease

19 Ms. Browdy's mind a little bit.  I certainly know we can get

20 through the balance of the authority objections for which they

21 contend that they're entitled to have the objection sustained

22 as a matter of law and I certainly think we can get -- even

23 though I don't believe they are entitled to do anything else

24 against me because they said they wanted to do authority first,

25 I have no problem if they want to tee up issues like claim form

1 unsigned or all the claims say 2003 and it can't be, or the

2 date of the building was too late to have Monokote in it.

3 That's not what I'm worried about, so sure, let's get those out

4 the way, too.  But, I'm not sure what the balance will be until

5 I see the reply.

6          THE COURT:  All right.  Well, then let me order you

7 two after the reply comes in and before the surreply's due to

8 talk.  Because at that point in time, it's very possible that

9 you'll be able to get me a better -- a more concise scheduling

10 of how you think the process would work best anyway.

11          MR. SPEIGHTS:  Thank you, Your Honor.

12          MS. BROWDY:  We will, Your Honor.  Just to make

13 clear, the kinds of objections that Mr. Speights was just

14 noting that he could reply to are exactly the kind that are in

15 there.

16          THE COURT:  Yes, the -- it didn't -- this one didn't

17 seem to be from first blush obviously too onerous, but whether

18 it will be when you get the replies, obviously I --

19          MR. SPEIGHTS:  I hope that's the case.

20          THE COURT:  -- don't know either.

21          MR. SPEIGHTS:  For some reason, I'm a little

22 suspicious, but I hope that's the case, Your Honor.

23          THE COURT:  All right.

24          MS. BROWDY:  Okay.  So we do need that order entered

25 and I have another copy if it hasn't been.

**J&J COURT TRANSCRIBERS, INC.**

1          COURT CLERK:  Is that what was filed Friday at 4:20?

2  Because no one was --

3          MS. BROWDY:  It was filed on December 14th, Docket

4  No. 11352.

5          COURT CLERK:  (Indiscernible) --

6          THE COURT:  Okay, I'll take it, Ms. Browdy, if it

7  hasn't been on the docket and then hopefully, it won't get

8  entered twice.

9          COURT CLERK:  There's a second revised filed on

10  Friday.

11          MS. BROWDY:  That actually I think is my next order

12  which is the default order.

13          COURT CLERK:  (Indiscernible) okay.

14          MS. BROWDY:  Yeah.

15          THE COURT:  This is Docket No. 9315.

16          MS. BROWDY:  It relates to Docket --

17          THE COURT:  Relates to Docket No. 9315.

18          MS. BROWDY:  And I believe actually it also relates

19  to 9311, which are the authority objections.

20          THE COURT:  This one has the surreplies due January

21  13th, Mr. Speights.

22          MR. SPEIGHTS:  Yes, Your Honor, and I would like a

23  little more time if you could accommodate me.  I don't know if

24  you -- if it's proper to ask for it now or to file some piece

25  of paper later.  I'm not sure -

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  When is the hearing?

2          MR. SPEIGHTS:  Think it's January the 20th, if I'm

3 not --

4          THE COURT:  24th?

5          MS. BROWDY:  The 24th and 26th.

6          And for what it's worth, I mean we're still working

7 on the brief which is due Thursday, but I think the amount of

8 space devoted to the Speights claims I think is probably on the

9 order of 15 pages.  Ten pages possibly, but it may be as many

10 as 15 for all of the claims at issue.  Again, these aren't

11 rocket science objections at this point.

12          MR. SPEIGHTS:  Let me make an offer they can't

13 refuse, Your Honor.  They can have until the following Tuesday.

14 Ain't nobody going to read that brief if it comes in Thursday

15 night.

16          THE COURT:  Mr. Speights, if you can get me the

17 surreplies by the close of business on Wednesday, January 18th?

18          MR. SPEIGHTS:  That's (indiscernible) Your Honor.

19 Thank you.

20          THE COURT:  I could think have time to read them.

21          MR. SPEIGHTS:  That would be good, Your Honor, and I

22 understand --

23          THE COURT:  Actually, the 24th --

24          MR. SPEIGHTS:  -- that hearing is in Pittsburgh, so

25 we'll be sending everything here.

**J&J COURT TRANSCRIBERS, INC.**

136

1          THE COURT:  Wait, I'm sorry.  That hearing is

2 actually on Tuesday, the 24th.

3          MS. BROWDY:  Yes, Your Honor, it's two days, the 24th

4 and the 26th.

5          THE COURT:  Actually, Mr. Speights, if you can get

6 them to me by Friday, I can read it over the weekend.

7          MR. SPEIGHTS:  Thank you, Your Honor.

8          THE COURT:  So, if you can get it by noon Friday,

9 however, the 20th.  I have a personal matter that afternoon, so

10 I won't be in the office to get it if it comes in later than

11 noon.

12          MR. SPEIGHTS:  And let me correct something I said in

13 my offer.  If they can get it to me Monday night -- okay, so I

14 have it on Tuesday morning, not Tuesday night because I'm not

15 going back to work till Tuesday.

16          THE COURT:  All right, so you're agree till the 26th?

17          MR. SPEIGHTS:  26th.

18          MS. BROWDY:  Your Honor, my staff will kill me if we

19 turn it in on the 26th.  We'll have it in on the 22nd.

20          THE COURT:  All right, I'll just keep the debtors at

21 the 22nd, extend yours till the 20th at noon, Mr. Speights, and

22 then keep the hearing --

23          MR. SPEIGHTS:  Thank you, Your Honor.

24          THE COURT:  -- dates the same on the 24th and 26th.

25 Okay.

**J&J COURT TRANSCRIBERS, INC.**

1           MS. BROWDY:  Thank you, Your Honor.

2           The next order that we wanted to make sure got

3  entered was the second amended default order.  About five

4  percent of the 4,000 claims didn't respond by October 24th as

5  they were required to.  It's been addressed at one, if not two

6  of these hearings.  We had an order, it was either the last

7  hearing or the previous one and the Court gave Mr. Baena an

8  extra 10 days to respond.  After which we submitted the default

9  order and again, I don't --

10          THE COURT:  I don't remember having seen the default

11 order.

12          MS. BAER:  Your Honor, we submitted the default order

13 and then last week, we submitted a revised one because we found

14 three claims were in error on it and two claims were in error

15 not on it.  And so we submitted on the 16th Docket No. 11363, a

16 revised default order.

17          MS. BROWDY:  And I have an extra copy to hand up --

18          THE COURT:  All right, I'll take that one.  Maybe

19 when I see it, it'll refresh my recollection, but I don't

20 recall this one.

21          COURT CLERK:  That's the one that was filed

22 (indiscernible) --

23          MS. BAER:  The previous one had been filed about two

24 weeks ago.

25          THE COURT:  All right, now Mr. Baena, you're in

**J&J COURT TRANSCRIBERS, INC.**

138

1  accord with this order?

2          MR. BAENA:  It was only the exhibit we had a problem

3  with, Judge, on that order and we've gone through the exhibit.

4  We're okay with the exhibit.

5          THE COURT:  Okay.  This also relates to Docket No.

6  9315 on the fifteenth omnibus then?

7          MS. BROWDY:  Yes, Your Honor.

8          THE COURT:  Okay, and what was the docket number of

9  this order?

10         MS. BAER:  The certification of counsel was filed

11 Docket No. 11363.  The --

12         THE COURT:  All right.

13         MS. BAER:  The previous certification of counsel was

14 filed on November 22nd and it was Docket No. 11147.

15         THE COURT:  Okay.  All right, I've signed this order

16         MS. BROWDY:  Thank you, Your Honor.

17         And then the third order -- I'm not sure it actually

18 had previously been submitted to the Court, but the debtor and

19 the Speights firm had entered into a stipulation in October

20 which had led to the withdraw of approximately 1,500 claims

21 that had no proof of product ID.  And as part of that

22 stipulation, the Speights firm was given until Friday, December

23 the 16th, to check for 50 California claims whether or not they

24 could find product ID.

25         They were responsible to give us that product ID

                    **J&J COURT TRANSCRIBERS, INC.**

1  information by the 16th and anything they didn't have product

2  ID for is supposed to be withdrawn at this hearing.  So I have

3  a copy of the withdraw order on those 50 what we call them, the

4  further review claims.  This was sent to Mr. Speights.  Again,

5  I don't know that it was previously submitted to the Court.  It

6  was not.

7          THE COURT:  Mr. Speights?

8          MR. SPEIGHTS:  I object, but I think this can be very

9  quick, Your Honor.  This is another one of these Friday night

10 deliveries from Kirkland & Ellis that came in last Friday night

11 after my staff had gone home and Ms. Baer showed me the order

12 today.  I actually pulled it off the computer as I was catching

13 the plane yesterday.  I need to study the order and I need to

14 share it my co-counsel in California and I need let my staff

15 look at the list of 50 buildings.

16         But we're not going to have a problem.  I'm sure Ms.

17 Baer and I in a day or so can submit an order, work out the

18 language if I have problem with it because we do not intend to

19 show product ID for these buildings.  There's no question that

20 the time has now run.  We reserved 50 buildings to do some

21 further tests.  We did not come up with product ID in those 50

22 buildings and we will consent to an order with Ms. Baer I would

23 hope in the next day or two after my co-counsel reads it --

24         THE COURT:  Okay, just submit it on a certificate of

25 counsel and I'll deal with it that way.

1          MS. BROWDY:  Thank you, Your Honor.

2          On the property damage side, that just leaves the

3 Anderson motion for class certification.  While I'm happy to go

4 first, that's Mr. Speights's motion, so I believe that he has

5 privileges here.

6          MR. SPEIGHTS:  May it please the Court.  This is a

7 very important motion and if I take a little more time than the

8 schedule permits, I apologize, but it's something I've been

9 working on since 1992.  It's something our firm has a million

10 dollars of expenses in and millions of dollars of hours in, and

11 that is the litigation of the Anderson punitive class action

12 and the Anderson certified state class action.

13          So, I'll -- I'm not going to allow myself to gallop

14 through this when the stakes are so high to my clients and my

15 firm, frankly.

16          THE COURT:  Well, Mr. Speights, would you prefer that

17 I just give you an oral argument date?

18          MR. SPEIGHTS:  Yes, Your Honor, because the first

19 thing I was going to say was I thought it was premature to

20 argue it today and I have about 10 minutes just on that point

21 alone.

22          THE COURT:  Why is it premature?

23          MR. SPEIGHTS:  Because, Your Honor, the debtors filed

24 objections to these claims in September, two and half years

25 after the claims were filed.  Under the case law which I was

1 going to cite to Your Honor, but trying to quickly go through

2 this -- under the case law, that triggered our right to file a

3 motion to certify the class.  We filed a motion to certify the

4 class four, five weeks later.

5          By the way, I told you back in August at the long

6 hearing that I was going to file it once they file the

7 objections.  They still hadn't done so.  And then they file

8 their response.

9          Well, in their response, they make a number of

10 factual statements and I wrote the debtors within a week and

11 said, "I would like to do some limited discovery."  This is a

12 contested matter.  They may hate my motion.  They may have all

13 these arguments, but it's a contested matter and they made

14 factual statements in their response and I want discovery on a

15 limited basis.  I've got a lot to do.  I'm not looking for

16 discovery I don't need, I'll assure you, Your Honor.  On a

17 limited basis to prove the points which I think are essential

18 to the motion to certify and points which they contest in their

19 response.

20          And I suggested that one of us should do a CMO and

21 present it to you today and have limited discovery.  The

22 debtors refused, so therefore I served some discovery last

23 week.  I'm not saying it's all the discovery, but it certainly

24 got the thrust of the discovery I think I need out and I served

25 it for January.

1          I would be glad to meet and confer, as I've told the

2   debtors, about the discovery.  Find convenient date.  See if we

3   can stipulate to things which don't require discovery.  But I

4   can't be in the position of going here with Your Honor and this

5   record or some appeal if that should come down the road with a

6   record that does not have a factual presentation of a number of

7   issues both on the merits, as they challenge adequacy of

8   counsel.

9          One of the things I want to do is to ask Your Honor

10  to lift the stay solely for purposes of asking the South

11  Carolina court to lift the protective order on the proceedings

12  down there where much of this was heard and ruled upon and

13  deals directly with accusations they make about the proceedings

14  down there, and to take discovery on the other issue of how

15  many -- what sort of database they have on their documents

16  showing specific job sites where Monokote was applied, both

17  from invoices and from advertisements and from a variety of

18  other sources which I think goes directly to one of the points

19  that we argue.

20         They say in their brief Mr. Speights has not proven

21  one building owner did not give notice.  Well, you know, you

22  may agree or disagree with my theory on that, but I want to

23  build my factual record.  And therefore, Your Honor, I was

24  going to stand up here and take 20 minutes to tell you what

25  I've taken three minutes to do and say and therefore, Your

1  Honor, I'd like to have discovery and a CMO and I would suggest

2  90 days.  I see since Mr. Lockwood got 60 and somebody else, 60

3  seems to be the popular day today and I would do my best --

4          THE COURT:  It's on the roulette wheel, Mr. Speights.

5          MR. SPEIGHTS:  I would do my best to live with 60.

6  This is not going to decide this bankruptcy.  We're going to be

7  on this estimation next September.  I'm going to be on my

8  objections until my hair turns gray.  We've got -- there's no

9  reason why this certification issue can't be submitted to you

10 either on stipulations or with discovery or if we need an

11 evidentiary hearing and I hope we don't, on an evidentiary

12 hearing or an oral argument on a separate day.

13         And, you know, that's what I would like and to argue

14 this in 35 minutes and when I'm going to -- if you wouldn't let

15 me have discovery, I'm going to start pulling out documents and

16 say well, I'd like to add this to the record and that to the

17 record and this to the record because I think they are factual

18 issues that go to the heart of my motion to certify.

19         THE COURT:  All right.

20         Ms. Browdy:

21         MS. BROWDY:  And the -- Your Honor, the Court won't

22 be surprised to learn that we disagree with Mr. Speights'

23 position.  The Anderson Memorial issue was discussed at length

24 with this Court in October on the October 31st hearing.  After

25 which, the Court expunged nearly 600 claims that had been filed

1  without permission, without authority by Mr. Speights,

2  supposedly on behalf of Anderson claimants and we told the

3  Court at the time that -- again, that the Speights firm had

4  filed those claims wrongly in 2003 and also that the Speights

5  firm had wrongly filed proposed class proofs of claims for the

6  Anderson Memorial class -- that's claims 9911 and 9914 -- in

7  direct violation of what this Court said at the February 2002

8  hearing when the Court said, "There will be no class proofs of

9  claim unless a motion is brought before me first."

10        And we've told Your Honor because at the time of the

11 31st hearing, the Speights firm had just brought on for hearing

12 this issue of the motion for class certification.  They just

13 filed it.  And we said they shouldn't even be able to go

14 forward.  This is just an attempt to delay.  They're trying to

15 drag this process out.  They've had their bite at the apple.

16 We've already had the litigation on the Anderson issue and

17 there was no reason -- the Court shouldn't even hear the class

18 certification issue.

19        And at page 93 to 94 of the transcript, I expressly

20 raise the issue that Speights is going to try to drag this out

21 by trying to take discovery and just trying to build up the

22 number of claims when this Court was far along the process now

23 of trying to get rid of claims and the Court said, "Well" --

24 and this is the October 31st transcript at page 94.  The Court

25 said:

**J&J COURT TRANSCRIBERS, INC.**

1     "Well, I think I need a brief on what I

2     believe to be a legal issue, which is with

3     the bar date having past and you now know

4     the universe of individual claims, how the

5     class can be bigger than the individual

6     claims.  Because it seems to me if the bar

7     date notice was appropriate and I found

8     that it was, that's why I let it go out and

9     an individual hasn't file a proof of claim,

10     then they can't be part of a class because

11     they haven't submitted a claim.  But I want

12     that issue briefed."

13   And, Your Honor, we've briefed the issue and the

14 Court's instinct was right.  The courts due deny class proofs

15 of claims submitted after notice and the bar date has passed.

16 As this -- again, this attempt to serve discovery, the

17 discovery asks for information, for example, about the notice

18 program which this Court already heard at length four years ago

19 and approved.

20   So we would ask, Your Honor -- I don't have a problem

21 moving this hearing because you don't want to condense it into

22 a 10 minute period.  But the discovery is totally frivolous and

23 we would ask, Your Honor, that you hear the merits of this

24 class certification motion, just as we discussed on the

25 transcript on October 31st at pages 93 to 94.  We said we

1  didn't want to delay this.  It should go forward.  There's no

2  need for discovery.  If Your Court then hears the argument and

3  views it differently, then we can address the issue of

4  discovery.  But, again, we think it's a legal issue.  It's been

5  briefed.  The Court recognized it in October as a legal issue

6  and we should go forward and hear the merits.

7          THE COURT:  Well, okay, Mr. Speights, I think the

8  issue that I identified at that time is still the one now

9  having read the briefs that seems to be the most trouble to me

10  regardless of what the outcome of whether or not a class proof

11  of claim might under some circumstances be appropriate for.

12  Because in this instance, there was a bar date and to the

13  extent that all the universe and property damage claims are

14  known and at this point, they're down to -- I don't know the

15  exact number, something like 1,000 or 600, that doesn't seem to

16  require class certification.  So I think I'm a little bit at a

17  loss as to why I need a class action when I have the universe

18  of claims addressed.

19          Now, if that -- and that's what I would like to hear

20  the argument on first.  And I'm happy to put it off to another

21  day, but that's still the threshold question in my mind.

22          MR. SPEIGHTS:  I understand that and I would prefer

23  you putting it off to another day.  I'll take two minutes just

24  to explain it, but not in a full thing so that at least you

25  might mull it over between now and then, Your Honor.  Because I

147

1  understand what the bar date was all about and I understand

2  your understandable sensitivity to the bar date.  You spent a

3  lot of time on it.  The debtor says they spent $4 million with

4  the bar date, et cetera.

5          And I'm not here challenging your bar date.  Your bar

6  date was an effort to give notice to people by constructive

7  notice, by publication --

8          THE COURT:  Well, it was also direct notice to the

9  extent that the debtor knew the claims and in fact, in some

10 instances, I recall people asking not to have to identify their

11 clients so that the debtor would send the claims directly, the

12 attorneys wanted to send the claims out.  So --

13         MR. SPEIGHTS:  Here's --

14         THE COURT:  -- it was direct notice, too.

15         MR. SPEIGHTS:  Some direct notice, I understand, Your

16 Honor.  Here's the gravamen of the dispute.  The debtor -- and

17 especially in one of its cases it cites 10 or 15 times in its

18 brief -- recognizes that if there are people that you have

19 knowledge of that have the product, you should give actual

20 notice.  Because actual notice is always preferred, U.S.

21 Supreme Court authority, to constructive notice.

22         So they recognize that and they recognize that that

23 is a basis for class certification; that it would help the

24 bankruptcy process, it would help the reorganization efforts if

25 you gave actual notice to these people.  I say they haven't

148

1   given notice.  Okay.  I say -- as a matter of fact, I allege, I

2   assert that they have numerous building owners -- addresses for

3   them who have buildings -- of buildings where their product was

4   applied, not only through invoices, but also through

5   advertisements, reports from salesmen, reports from people who

6   went and inspected the property and other sources, such as

7   what's called a building register which gives a mammoth amount

8   of information.

9        Now I assert that in my brief.  I thought the debtor

10  would deny -- I mean would admit yes, we didn't give notice to

11  all these people for the following reasons.  It didn't admit or

12  deny as I read it.  It said Mr. Speights has not proven that.

13  And therefore, I need discovery on that point.

14       I agree with you if I come forward to you whenever we

15  argue this matter and I can't show that they failed to give

16  notice to a whole lot of people, actual notice that they had

17  records demonstrating their product was in the building, I've

18  got a steep incline.

19       I acknowledge that, Your Honor.  That's on the

20  national class action, not the state class action which should

21  be a lay up in my opinion to certify.  But, you know, if I

22  don't -- you know, I take the discovery, I find that out, it's

23  yes or no and that's cleared up for purposes of arguing, and

24  that's all I want to do.

25       I mean that's not all the discovery I want to do, but

**J&J COURT TRANSCRIBERS, INC.**

1 that's all I want to do on that point.

2          MS. BROWDY:  And, Your Honor, two brief points and

3 they're both spelled out in the briefs that we were prepared to

4 argue the merits of today.  One is timeliness is a key issue

5 that the Court looks at on the entire class certification side

6 of things.  It's very clear particularly when you see class

7 certification the bankruptcy --

8          THE COURT:  Well, I know, but that's a different

9 issue than the notice.

10          MS. BROWDY:  No -- but it's not, Your Honor, because

11 notice was taken up in 2001 and 2002 --

12          THE COURT:  Oh, oh --

13          MS. BROWDY:  -- and if Mr. Speights --

14          THE COURT:  -- key issue on the notice.

15          MS. BROWDY:  Yeah, and if the Mr. Speights had that

16 concern, he should have brought it up four years ago.

17          And second and I think even more importantly, the

18 Speights firm should be judicially estopped from even raising

19 this point because we asked for additional information and the

20 property damage committee moved to abate the requirement that

21 we contact people that they knew potentially had claims.  They

22 asked for it.  They received it in an order entered and again,

23 they cannot re-litigate an issue that they won on by taking a

24 previous position before.

25          But regardless, Your Honor, I think it's clear in the

1  briefs that the Court's already read, this is a legal issue.

2  There are cases directly on point.  Let's have the hearing on

3  the merits and if the Court agrees with our position, there's

4  no need to go forward on the discovery.  Because again, we

5  think the discovery is solely designed to avoid having the

6  merits hearing on this issue.

7        THE COURT:  Okay.  Well, I am happy to defer this

8  issue.  I think it should be argued on the legal merits, but

9  this raises for me something I hadn't thought about yet which

10 is not I think addressed in the briefs and so how about doing a

11 supplemental, but short brief for me on the issue of what

12 happens when the debtor -- and I'm not assuming that the debtor

13 did, but just if, hypothetically.  If the debtor missed an

14 actual notice, isn't that the purpose for giving a constructive

15 notice?

16        MS. BROWDY:  Well, again, Your Honor, and I think

17 we'll --

18        THE COURT:  As a legal matter, I want a brief on what

19 the purpose of the constructive notice is and the effect in the

20 event that somebody as to which the debtor should have provided

21 actual notice was missed.  I want a brief on that issue and add

22 that to the argument.

23        MS. BROWDY:  Yes, Your Honor.  And I would suggest --

24 again, we had two full days of hearings set out on the 24th and

25 26th on property damage issues.  I have no problem just dealing

1 with this as part of that.

2        THE COURT:  Okay.  That makes sense I think.  That

3 should give you time to get the briefing in, too.

4        MS. BROWDY:  Thank you, Your Honor.

5        THE COURT:  Mr. Speights?

6        MR. SPEIGHTS:  Since the second day of that is the

7 Speights day, could we just set it for the second day when --

8        THE COURT:  Sure, January 26th.

9        Okay, then -- I'm sorry, what agenda number was this?

10 I apologize.  I've lost it here.

11        MS. BAER:  Number four.

12        THE COURT:  Four?  Okay.

13        Just follow the normal briefing schedule then,

14 please, so that you can get it.  I know that's not an omnibus

15 date, but -- in fact, the briefing schedule that I gave you

16 earlier for the 22nd of -- you can't make that one?

17        MS. BROWDY:  I think it would be hard to brief this

18 by Thursday, Your Honor --

19        THE COURT:  Oh, that's Thursday.

20        MS. BROWDY:  -- because we're trying to get the other

21 one done.

22        THE COURT:  That's right.  How about a week before

23 Mr. Speights is due?  That would be the 13th of January and Mr.

24 Speights is due the 20th.

25        MS. BROWDY:  Yes, Your Honor.

1          THE COURT:  All right, thank you.

2          Okay, item number 24 is continued till the January

3    26th hearing.  And that's in Pittsburgh.

4          Okay, thank you.

5          Ms. Baer?

6          MS. BAER:  Your Honor, that takes us to agenda item

7    number five which is the debtors' motion to extend the Court's

8    preliminary injunction to include as a protected party State of

9    Montana.

10          Your Honor, I can't help but resist saying here we go

11   again.  Same people.  Same issues.  Same plaintiffs.  The

12   debtor's motion is to extend the preliminary injunction once

13   again to prevent another attempt which is another end run by

14   the Montana plaintiffs around the debtors' automatic stay.

15          Your Honor, it's happened three times before.  The

16   first time, the <u>Maryland Casualty vs Carol Gerard</u> matter.  Your

17   Honor extended the preliminary injunction to Maryland Casualty

18   and the Third Circuit agreed.

19          The second time it happened, Your Honor, there was an

20   attempt to do discovery while these actions were stayed.  Again

21   Your Honor did not permit that discovery to go forward.

22          The third time, Your Honor, was with respect to

23   Montana Vermiculite Company, the predecessor to the debtor in

24   Libby, Montana.  Once again Your Honor included them in the

25   preliminary injunction and extended it to stay that third party

153

1  litigation.

2          Now they're attempting exactly the same thing.  This

3  time suing the State of Montana, alleging this similar

4  independent cause of action; the same kind of a thing they

5  alleged against Maryland Casualty.

6          And, Your Honor, it's exactly the same situation.

7  They're talking about the Libby, Montana vermiculite mining

8  operations.  It is wholly and completely derivative of the

9  debtors.  Even if they have an independent cause of action,

10 that still completely and totally involves the debtors, the

11 debtors' operations.

12         And under those circumstances, Your Honor, it is in

13 fact exactly what the preliminary injunction was meant to do.

14 It is an action that arises from alleged exposure to asbestos

15 indirectly or directly caused by the debtors.  Those are the

16 words from the injunction.

17         Your Honor, the State -- or, the debtors understand

18 that the State has now been named in 123 separate actions

19 involving the debtors' Libby, Montana operations.  At least 21

20 of them that we could find were exactly the same cases that

21 were brought against the debtors that were either also brought

22 against Montana at the time or then expanded to include

23 Montana.

24         Since the petition date, many many more of these

25 cases were filed.  At first, the complaints looked identical to

1 the ones against the debtor.  Now they have changed them

2 somewhat.  But no matter how you state it, Your Honor, the

3 underlying cause of action is still a cause of action with

4 respect to whether or not these people were injured due to the

5 operations in Libby, Montana.

6          Under these circumstances, Your Honor, this stay

7 should be extended to include the State of Montana.  The

8 standard you need to look at on whether to issue a 105

9 injunction, which is what we are asking here, is whether the

10 debtor and the non-debtor share an identity of interest, such

11 that a suit against one is essentially a suit against the

12 debtor.  And whether the third party action will have an

13 adverse impact, and that is what the injunction was meant to

14 prevent.

15          The Montana actions are exactly this circumstance.

16 Grace and the State share an identity of interest because at

17 the core of this is our Montana operations.

18          Secondly, the underlying any claim here is whether

19 the debtors negligently exposed the Montana plaintiffs to

20 asbestos.  In McCartney vs Integra, the Third Circuit held that

21 collateral litigation like this should be enjoined and the

22 Fourth Circuit followed suit in AH Robbins.

23          Here there's no question, Your Honor, the debtors'

24 conduct will be at issue.  And for that reason, Your Honor,

25 moving forward against the debtors will be harmful.  Harmful in

1 several ways:

2          Number one, the State has in fact filed proofs of

3 claim for indemnity and contribution.  There's no question here

4 about a further suit later on down the line.  These proofs of

5 claim are filed in this case and will have to be adjudicated by

6 this Court and dealt with under the Chapter 11 plan.

7          Secondly, there is a risk of record taint.

8          And thirdly, there is a risk of collateral estoppel.

9          Your Honor, it's clear with respect to

10 indemnification we have the proofs of claim.  We need to deal

11 with them.  And this is one of the reasons why this Court and

12 the Third Circuit extended the injunction as to Montana

13 Vermiculite Company and as to Maryland Casualty Company; the

14 possibility of those indemnification claims and the effect on

15 the debtors' estate.

16          Secondly and equally important, Your Honor, is record

17 taint, which was first articulated in the <u>Manville</u> case and

18 articulated quite well there, but then sustained by this Court

19 and Third Circuit in the <u>Gerard</u> matter.

20          There is a danger, Your Honor, that evidence and

21 testimony would be taken if these actions proceed against the

22 State of Montana that could in fact harm the debtor if the

23 debtor's not there.  Once evidence is taken, we can't change it

24 and once evidence is taken, indemnity and contribution claims

25 may in fact be liquidated if you will.

**J&J COURT TRANSCRIBERS, INC.**

1          In addition, Your Honor, of course the time and

2 commitment the debtors would have to provide here if these

3 hundred and some cases went forward in Montana with respect to

4 Libby, would be staggering at a time in this Chapter 11 case

5 when we hope everybody will be spending all of their efforts

6 talking about trying to conclude it.  It could duplicate

7 expenses and costs over time that will be borne in other places

8 and potentially could open the floodgates for others to try to

9 do exactly the same thing.

10          In addition, Your Honor, the State of Montana -- I'm

11 sorry, the Montana plaintiffs would have you say that there's

12 no risk of collateral estoppel here.  I have to turn to the

13 Third Circuit in the <u>Gerard</u> case for that, Your Honor.  They

14 dealt with it very easily and quickly and said they rejected

15 the Libby plaintiffs' theory that collateral estoppel and

16 record taint were not legitimate concerns.  They said

17 collateral estoppel should not be tested at Grace's peril.  "We

18 think the issue to be at least unclear."  That's the Third

19 Circuit's words.

20          Plus they went on to say the test is not whether

21 there's a lack of collateral estoppel risk.  The test is

22 whether or not the action could interfere with the

23 reorganization efforts.  There's no question here, Your Honor,

24 it could.  This is an action derivative of the debtors'

25 operations.

1          The Montana plaintiffs in their response, focus on

2    two issues.  Number one, they focus on the issue of subject

3    matter jurisdiction and indicate that under 1334, this is not a

4    related to action.  There's no question, Your Honor, this is

5    related to.  Again, completely derivative of the debtors'

6    operations.

7          The Third Circuit in this case in this very same

8    issue in the Gerard Maryland Casualty matter, distinguish both

9    the Pacor case and the Federal-Mogul case, pointing out that

10   those cases were removal cases.  The issue was whether the

11   bankruptcy court has jurisdiction to remove to the bankruptcy

12   court and thus hear and decide in the bankruptcy court

13   litigation pending in state court.  That's not what we're doing

14   here.

15         Your Honor, we're asking for a 105 injunction to

16   simply say the actions against the State of Montana; actions

17   that are derivative of the debtors' operations, derivative of

18   the debtors' liability until the conclusion of this Chapter 11

19   case when then it should be a lot more clear what's going to

20   happen with the debtors' obligations.

21         The Court upheld related to jurisdiction, Your Honor,

22   in the Carol Gerard matter and again here in the Montana

23   Vermiculite matter.  Exact same situation applies today.

24         The second thing, Your Honor, that the plaintiffs

25   raise is a Combustion Engineering case.  And they argue that

1  for the same reasons that the Combustion Engineering plan was

2  overturned, the injunction should not issue here.

3          And, Your Honor, that is completely misplaced.  First

4  of all, Combustion Engineering involved the issuance of a

5  channeling injunction for non-debtors under Section 105 in

6  conjunction with the confirmation of a plan with a 524(g)

7  trust.  A very different circumstance from what we are talking

8  about here which is simply a 105 stay until the end of this

9  case.

10         THE COURT:  I don't see how Combustion's -- I read

11 that part of the brief, but frankly, I don't see how

12 Combustion's involved with this issue, not the Third Circuit's

13 opinion on the 105 issue.

14         MS. BAER:  And, Your Honor, for the same reason,

15 again, in Combustion, you were not talking about derivative

16 claims, you were talking about independent third parties who

17 had their independent own asbestos operations and liabilities.

18 These are wholly derivative.  The State of Montana would not be

19 sued but for the fact that the debtors' Libby, Montana

20 operations are in question.

21         Under these circumstances, Your Honor, we think it's

22 very very clear that the 105 injunction issued by this Court on

23 day one should be extended to include the State of Montana.

24         THE COURT:  Well, I'm a little concerned about the

25 debtors' identity of interest issue.  It seems to me that most

1  of the cases that look at the question of identity of interest

2  -- <u>Montana Vermiculite's</u> an easy one.  It's a predecessor in

3  interest.  <u>Maryland Casualty</u> wasn't perhaps quite as easy, but

4  nonetheless had undertaken some actions, if I recall the

5  allegation correctly, on behalf of the debtor and there were

6  contractual issues which seemed to provide an identity of

7  interests.

8         Frankly, I don't know where the State and the

9  debtors' interests are identical.  I agree that there is a

10 problem with respect to a possible indemnification claim

11 because of the proofs of claim that have been filed and that

12 definitely would be litigated as part of the Court's core

13 jurisdiction.  But, it appears that there is some independent

14 obligation on behalf of the State to disclose whatever it finds

15 by way of hazardous substances to the employees and that's the

16 theory by which the State's being sued.  Yes, it involves the

17 debtors' operations because it happened allegedly at the

18 debtors' plant, but I'm not sure I see the identity of interest

19 argument there.

20        MS. BAER:  Well, Your Honor, if you read the

21 plaintiff's briefs and you look at what they said about what

22 this obligation is of the State of Montana, what's very very

23 clear is before the State of Montana ever gets to having that

24 obligation, there has to be proof that in fact what the debtor

25 was doing was causing harm and the State of Montana was aware

1  of that.  That is not a simple, straightforward issue.

2          This is not that different frankly from the Maryland

3  Casualty situation.  There, they were claiming an independent

4  cause of action because Maryland Casualty was involved in the

5  dust control system.  Here with the State of Montana, it's

6  somewhat the same.  They're claiming the State of Montana had a

7  duty because the State of Montana knew or didn't know certain

8  things about the debtors' operations.

9          Your Honor, if you look at the third party complaint

10 that the State of Montana wishes to file against the debtors if

11 the automatic stay would be lifted here, which is how we all

12 got here in the first place, that does exactly the same kinds

13 of things that Maryland Casualty was doing and alleging back

14 and forth.

15         Again, the whole key there is what was -- what were

16 the debtors doing, what were they not doing.  What were they

17 disclosing to the State, what were they not.  They come running

18 back at us with respect to what we were doing and find their

19 duty only to be based on what we were doing, not doing,

20 disclosing and not disclosing.

21         So, it's actually quite clear and you -- when you

22 look at what parties want to file, the connection is

23 unseverable.

24         THE COURT:  So, if I understand what you're saying,

25 in your view, the debtor is actually an indispensable party if

1  this were to be litigated in the state because from the State's

2  point of view, the State can't either prove or disprove its

3  claim without involving the debtor and what the debtor was

4  disclosing to the State?

5        MS. BAER:  The State has said that in its motion to

6  lift the automatic stay.  The debtor doesn't believe we're

7  necessarily an indispensable party, but the problem is we're

8  real close.  And if we're not there, we're going to face the

9  question of what do we do.  Do we watch those proceedings and

10 hope we don't have collateral estoppel?  Do we participate in

11 those proceedings to protect the record and then have a record

12 taint problem later on down the line?  And number three,

13 whatever we do or don't do, they're going to end up liquidating

14 claims that are claims against our bankruptcy case.

15       Under those circumstances, we're kind of darned if we

16 do and darned if we don't.  And the only thing that really

17 makes sense right now is to stop it until we see how this plays

18 out and then it may become irrelevant.

19       THE COURT:  Okay.

20       MS. BAER:  Thank you, Your Honor.

21       THE COURT:  Good afternoon.

22       MR. COHN:  Good afternoon, Your Honor.

23       COURT CLERK:  Your name again, please?

24       MR. COHN:  Yes, Daniel Cohn of Cohn, Whitesell &

25 Goldberg for the Libby claimants.

**J&J COURT TRANSCRIBERS, INC.**

1          Your Honor, as I hear this, the start of Ms. Baer's

2    argument and the ad hominem attacks, I really want to make one

3    brief reply, which is let's not forget that there are real

4    people involved here.  In this one small town in Montana, we

5    have 60 people who are dead.  We have 80 people who are on

6    oxygen from this, 100 other people who are in severe condition

7    and all of this is established by the affidavits that we put

8    into the record.

9          THE COURT:  Yes, and I have no dispute about that,

10   but I don't think that affects whether or not the action at

11   this point should go forward.  I think earlier I gave you the

12   opportunity to preserve testimony so that in the event that

13   there was some circumstance where a person was seriously ill,

14   that testimony could be preserved and certainly that's

15   something appropriate to be done.  But that's a whole different

16   matter from essentially commencing 120 however many lawsuits

17   plus however many others may be commenced against the State

18   which in turn thinks that it has to join the debtor.

19          MR. COHN:  Well, that's -- I understand that that's

20   the State's position, but now let's talk about the law here.

21          Combustion Engineering is relevant, Your Honor.

22   Combustion Engineering effectively overruled the Gerard case,

23   but --

24          THE COURT:  Oh, no, those two issues were not the

25   same.  I'm sorry.  Having been involved directly in those,

163

1  there is no way those two cases were in anywhere -- way

2  comparable.

3          MR. COHN:  Well, let me explain, Your Honor.  For

4  starters, there is the issue of related to jurisdiction.

5          Now, at the time that <u>Gerard</u> was decided -- and I'm

6  including at the Third Circuit level -- it was before

7  <u>Combustion Engineering</u> and it was possible to make the

8  distinction between <u>Pacor</u> and <u>Federal-Mogul</u> on the one hand as

9  being cases involving removal of third party litigation to the

10 bankruptcy court and the separate case of whether an injunction

11 should issue, barring third party litigation from going

12 forward.

13         THE COURT:  Only in connection with a 524(g)

14 confirmation order.  These two cases are totally not related.

15 The factual circumstances are so different that they simply

16 cannot be read to stand for the propositions that you're

17 arguing.

18         MR. COHN:  What --

19         THE COURT:  105 supplementary jurisdiction is clearly

20 available at certain points in time.  What the circuit said is

21 that it isn't available as a basis for jurisdiction against a

22 non-debtor third party who wants to channel its independent

23 asbestos liabilities to a trust.  That's all.  It doesn't deal

24 with --

25         MR. COHN:  That --

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:   -- with a pre-confirmation adversarial

2   injunction.

3          MR. COHN:   That -- Your Honor, that is one of the --

4   what you have just stated is one of the holdings of Combustion

5   Engineering.   However, when you look at what the court did, the

6   court established that you need to do two inquiries.   And

7   you've described how they came out on the second one, but we

8   can't skip over the first --

9          THE COURT:   Oh --

10         MR. COHN:   -- of the two inquiries, which is whether

11  related to a jurisdiction exists.

12         THE COURT:   Okay.   I agree.

13         MR. COHN:   What the Third Circuit did --

14         THE COURT:   You have to take a look at that, but I

15  think the other thing is had the circuit wanted to overrule

16  Gerard, it had just decided it, it could have done that.

17         MR. COHN:   Well, Gerard is a non-precedential

18  decision --

19         THE COURT:   Doesn't matter.

20         MR. COHN:   -- Your Honor.   There's no -- well, it

21  does, Your Honor, because the third --

22         THE COURT:   Well, it doesn't.   It can be cited now.

23         MR. COHN:   Well, the -- I don't think there's any

24  reason to suppose that the Third Circuit to whom -- and by the

25  way, I don't know whether Gerard was even cited to the Third

165

1  Circuit in the <u>Combustion</u> argument, but there would not

2  necessarily be any reason for the circuit to overrule a non-

3  precedential decision.

4          THE COURT:  All right.  In any event --

5          MR. COHN:  Under --

6          THE COURT:  -- I agree you have to look at subject

7  matter of jurisdiction first, not under 105.

8          MR. COHN:  And so -- right, and so -- well, so that

9  is -- what <u>Combustion Engineering</u> established was --

10          THE COURT:  No, that's been established for years.

11  <u>Combustion</u> had nothing to do with the decision that you have to

12  look at your own jurisdiction except to restate that premise in

13  connection with a 524(g) thrust.

14          MR. COHN:  What -- yes, but what <u>Combustion</u>

15  <u>Engineering</u> established is that -- and this was not a

16  discussion of Section 524(g), Your Honor.  This is at the

17  beginning of the decision of the law -- discussion part of the

18  decision.  What the court said was that when an injunction is

19  sought against third party litigation that there are two

20  analytically distinct inquiries, one is do we have related to

21  jurisdiction over the litigation sought to be enjoined.  And

22  then the second issue is of course on the merits and that was

23  the one that you just discussed a moment ago.

24          But we cannot skip over that first inquiry.  The

25  Third Circuit instructs us to make it.  The case of -- in that

1 respect, by the way, the Third Circuit was following something

2 that had previously been done in the Zale case by the Fifth

3 Circuit, which is to say simply that you cannot enjoin

4 litigation unless you have related to a jurisdiction over that

5 litigation.

6       And in so doing, Your Honor, the court discussed

7 Pacor, it discussed Federal-Mogul and essentially said it's all

8 one inquiry, which is do you have related to jurisdiction over

9 the underlying litigation.  Whether it's being removed to the

10 bankruptcy court or whether the bankruptcy court is being asked

11 to enjoin it, it's all the same inquiry.

12       And so, what has now become clear as a result of

13 Combustion Engineering and its express discussion of Pacor and

14 Federal-Mogul is that this -- the instant case is on all fours

15 with Pacor and Federal-Mogul.  You have related to jurisdiction

16 being asserted by the debtor on the basis that the case

17 involved its asbestos.

18       In the case of Pacor, of course it was the Johns-

19 Manville asbestos products that were manufactured by that

20 Chapter 11 debtor and were being sold by Pacor.

21       In Federal-Mogul, it was the asbestos products that

22 were being manufactured by Federal-Mogul and included in the

23 cars that were being sold by the big three automakers.

24       And in each case, there was a -- an asbestos

25 plaintiff and the asbestos plaintiff was bringing suit against

1 the third party, _Pacor_ or the big three automobile

2 manufacturers, and the issue before the court was is this

3 underlying litigation related to the Chapter 11 case of the

4 debtor.  And in each case, the Third Circuit said no.

5          And what was jurisdiction premised on?  Well, it was

6 premised on allegations of contribution and indemnity claims.

7          In the case of _Federal-Mogul_, Your Honor, you might

8 recall that Chrysler was actually standing there in court

9 waving -- I mean w-a-v, not w-a-i-v -- waving an actual

10 contract of indemnity which was included in their purchase

11 order.  That was not enough to establish that the case was

12 related to the Chapter 11 case.  And here, where you simply

13 have the State of Montana asserting a right of indemnity

14 without any contractual basis, that's a much weaker case for

15 there being a relationship to the bankruptcy case within the

16 meaning of the _Pacor_ and _Federal-Mogul_ decisions.

17          _Pacor_ and _Federal-Mogul_ each involved asbestos being

18 manufactured by debtor, just as this one does here.  And Grace

19 stands at this podium and says well, Your Honor, this -- the

20 litigation against the State of Montana by the Libby claimants

21 will inevitably involve Grace's operations in Libby.

22          Yes, it will, Your Honor.  It will.  Just as the

23 litigation by Higgins against Pacor inevitably was going to

24 Johns-Manville's operations because that's where the allegedly

25 harmful product came from.  And just as in the _Federal-Mogul_

1  case, the brake pads -- the manufacture by Federal-Mogul of

2  those brake pads was inevitably going to be at the heart of the

3  case.  Because if the asbestos was not unsafe, if the product

4  was okay, then there would be no claim, but in order to

5  establish their claim, the plaintiffs would have to establish

6  that the product was unsafe.

7          THE COURT:  But there's a -- but I think there's a

8  significant difference between establishing a product liability

9  case and establishing a harm based on the fact that there's an

10 alleged conspiracy between the debtor and the State as to which

11 the debtor won't be a party to essentially not disclose to the

12 people who were, to make it easy, employed at the mine in Libby

13 of the danger of the asbestos products.

14         MR. COHN:  Well, first of all, Your Honor, there --

15 we need to separate two separate kinds of claims.  There are --

16 I think Mr. Heberling's affidavit establishes that there were

17 three out of 72 of the cases that involve -- that have been

18 brought by his firm that have a conspiracy allegation.  That's

19 not the claim that is common to all of these claims against the

20 State of Montana.

21         THE COURT:  It's not a products liability claim.

22         MR. COHN:  No, no, no, Your Honor.  The principal

23 claim is failure to warn --

24         THE COURT:  Right.

25         MR. COHN:  -- breach of the duty to warn.  That was a

**J&J COURT TRANSCRIBERS, INC.**

1 matter that went all the way up to the Supreme Court of Montana

2 and the Supreme Court of Montana held that -- on the facts

3 alleged, that there was a duty to warn and that the facts have

4 established -- would establish a breach of that duty.

5        So, you -- so, what you have here is not any -- there

6 was no -- the -- there is no necessary allegation of conspiracy

7 against Grace to sustain that count.  If you read the Orr

8 decision, Orr v. State of Montana, all that needs to be

9 established is that the State had information from Grace.  In

10 fact, would appear to be the opposite of a conspiracy because

11 presumably the information was obtained from Grace.  But the

12 State had its own duty to disclose it, failed to disclose it

13 and is being sued on that basis.

14        So, yes, of course it involves the debtors'

15 operations in Libby in the sense that that's where -- that's

16 what the information concerned, but it is an independent claim

17 based on an independent duty by the State.

18        Now, the -- Grace, in both its argument and in its

19 papers, attempts to create a new category really out of whole

20 cloth, Your Honor, of claims which are independent because

21 Grace acknowledges this is an independent claim against the

22 State of Montana based on that State's independent duty.  But,

23 nevertheless, Grace uses the term derivative.  It's derivative

24 of the Grace operations in Libby.

25        With all due respect, Your Honor, there is no fair

1  reading of <u>Combustion Engineering</u> that would sustain a concept

2  that independent and derivative -- strike that -- independent

3  and non-derivative are not the same thing.  To put it another

4  way, Your Honor, independent and non-derivative are the same

5  and they're the -- they are using that decision consistently as

6  being the opposite of a claim that it is derivative.

7          THE COURT:  I'm sorry.

8          MR. COHN:  It's either --

9          THE COURT:  Say that again.  I'm sorry.  I lost it.

10          MR. COHN:  Well, you know something, Your Honor?  I

11  lost it, too.  So may I start again?  Yes.

12          THE COURT:  Please.

13          MR. COHN:  Derivative and independent are opposites,

14  Your Honor.  The <u>Combustion Engineering</u> decision uses them

15  largely as opposites.  I acknowledge that there are some --

16  that you can do some wordplay and say that if you describe a

17  claim as an independent, non-derivative claim, that you could

18  try to extract from that sentence the thought that independent

19  and non-derivative are two separate concepts, as opposed that

20  they mean the same thing.

21          But that is not I would submit a fair reading of

22  <u>Combustion Engineering</u> and the reason we know it's not a fair

23  reading of <u>Combustion Engineering</u> is because that very portion

24  of the discussion in <u>Combustion Engineering</u> is where the court

25  discussed the <u>Pacor</u> and <u>Federal-Mogul</u> cases.  And those were

1 cases in which the claims that were sought to be -- over which

2 jurisdiction was sought were derivative in the very sense that

3 Grace attempts to use that term.  But the court -- because, as

4 I say, they involved the operations conducted by Johns-Manville

5 and they involved the operations that were conducted by

6 Federal-Mogul.

7          THE COURT:  No --

8          MR. COHN:  So those claims were derivative in that

9 sense, but that was not -- that's not the sense in which the

10 court uses the term.

11          The term derivative, Your Honor, would refer to the

12 type of liability that you would have if say an employee of a

13 company went out and committed an act.  And then you would say

14 well, all right, the corporation's liability is derivative in

15 the sense that, you know, you're dealing with a -- you're

16 dealing with an agency relationship where the employer is

17 liable under respondeat superior for whatever its agent does

18 within the scope of its employment.  That's what's meant by

19 derivative.

20          And derivative cannot be extended and you -- it is

21 really not a fair reading of Combustion Engineering to say that

22 derivative includes this notion of well, it had to do with

23 Grace's asbestos.  It proves too much because if so, Combustion

24 Engineering would have overruled Federal-Mogul and Pacor.

25          THE COURT:  I'm sorry.  I'm not following it.  The

1  term derivative liability is unfortunately not used in Section

2  524(g) and in that case, all of us started using it as a

3  shorthand for something that it really doesn't mean I think,

4  which is liability based on the debtors' asbestos products, not

5  claims that were not based on the debtors' asbestos products.

6  And that's what derivative and non-derivative meant.

7          If it was based on the debtors' asbestos products, it

8  was derivative and if it was based on something that wasn't the

9  debtors' asbestos products, it wasn't derivative.  And it's

10  probably a really bad choice of words to have in an opinion

11  when it's not even in the statute.

12          Nonetheless, I don't see how that has anything to do

13  with what we're talking about here.

14          MR. COHN:  Well, the -- yeah, I agree, Your Honor.

15  It has nothing to do with what we're talking about.

16          THE COURT:  Okay.

17          MR. COHN:  Because what the Third Circuit clearly is

18  doing in the trio of cases, Combustion Engineering, Federal-

19  Mogul and Pacor, is saying the issue is are these independent

20  claims against a third party.  And if they're independent

21  third-party claims, then you have this standard that has been

22  set forth in Pacor and its progeny.  And that standard is that

23  there -- that related to jurisdiction will exist only if the

24  outcome of that lawsuit can result in direct liability to the

25  bankruptcy estate, without the intervention of some further

1 proceeding.

2          Now, when Ms. Baer says --

3          THE COURT: But that's not -- that doesn't even track

4 the language of 524(g), which is what the Court was involved

5 with there because you can channel both direct and indirect

6 liability for derivative claims.  I can't see <u>Combustion</u>

7 related here.  I guess that's where I'm having some difficulty.

8 I'm trying to meld two concepts together into contexts that

9 don't apply.

10          MR. COHN: Well, the -- I think -- and I think part

11 of it, Your Honor, is that when -- I keep wanting to talk about

12 jurisdiction.  I will get to the merits, by the way, in a

13 moment, but right now I'm talking about jurisdiction and

14 jurisdiction is analytically separate.

15          The court said that in <u>Combustion Engineering</u>

16 following the Fifth Circuit.  And that incorporates <u>Pacor</u> and

17 <u>Federal-Mogul</u>.  Those cases were expressly discussed by the

18 court.  And the court expressly said that the fact that it was

19 Johns-Mansville's asbestos that was at issue, the fact that it

20 was Federal-Mogul's asbestos at issue did not make the third

21 party litigation related to the bankruptcy case for purposes of

22 establishing jurisdiction.

23          That's why that is very important.  It's exactly what

24 we're -- it's exactly the situation that we're dealing with

25 here because what Grace has offered up to the Court as the

1  reason why this litigation should be enjoined is the fact that

2  it inevitably concerns Grace's operations in Libby.  And that

3  the Third Circuit has already said is not sufficient to confer

4  related to jurisdictions, nor is an allegation of indemnity or

5  contribution right which is not automatic, which does not

6  automatically create liability.  Those were -- those are the

7  direct holdings of <u>Pacor</u> and <u>Federal-Mogul</u>, and I would

8  respectfully submit are applicable here on the issue of

9  jurisdiction.

10          Now, when you turn -- turning to the merits, the --

11  Ms. Baer articulated the unusual circumstances test and that

12  involves both establishing that the harm, the adverse impact on

13  the reorganization and also, as Your Honor correctly focused

14  on, unity of interest between the debtor and the defendant in

15  the non-bankruptcy litigation.

16          In addition, Your Honor -- in addition, in order to

17  be entitled to an injunction, the debtor would have to

18  establish that it meets the traditional four-part test for

19  issuance of an injunction.  And because I want to pick up on

20  the discussion of Section 524(g) that we were having a moment

21  ago, I want to say that I think where that fits into this whole

22  analysis is the issue of probability of success on the merits.

23          The ultimate success on the merits in this case would

24  consist of being able to obtain a permanent injunction against

25  litigation between the Libby claimants and the State of Montana

1  under a Chapter 11 plan.  To do that, as <u>Combustion Engineering</u>

2  has now made clear, Grace would have to establish its

3  entitlement to an injunction under Section 524(g).  There could

4  not be a Section 105 injunction under a plan.

5         It is undisputed, at least Grace hasn't even

6  attempted to allege it, that the State of Montana does not bear

7  any of those four types of relationships to Grace which would

8  be sufficient under Section 524(g) to permit a channeling

9  injunction.  Therefore, there ultimately will be no channeling

10  injunction in this case.  I'm sorry, no channeling injunction

11  that governs the claims of the Libby claimants against the

12  State of Montana.

13         Because of that, there is no, zero, probability of

14  success ultimately on the merits of this matter and a

15  preliminary injunction cannot be granted, Your Honor, in a

16  situation where there is not a probability of success

17  ultimately on the merits.

18         But let me now back up to the threshold that you have

19  to cross even to get to the four-part test, which is this

20  unusual circumstances test.

21         Your Honor, if anything, I think you understated the

22  dichotomy of interest between the State of Montana and Grace.

23  Grace has expressed the concern that the State of Montana is

24  going to defend these claims on the basis that it's all Grace's

25  fault.

**J&J COURT TRANSCRIBERS, INC.**

1          In other words, what we have is the opposite of an

2     identity of interests.  You have two parties who are in the

3     classic joint tortfeasor situation of each one wanting to blame

4     the other.  That is not the kind of unity of interest that the

5     other cases that have dealt with this concept have said is

6     sufficient to establish unusual circumstances.  It's not the

7     situation where you have directors and officers being sued for

8     things that are -- that would, if they're have found liable,

9     would also be the liability of the debtor corporation.

10          We're not talking about insurance here, Your Honor.

11     We're talking about the State of Montana.  It's a -- oh, excuse

12     me, and we're not talking about any other kind of affiliated

13     entity.  The State of Montana is not affiliated with Grace.

14          So, you have the independent liability of a

15     completely independent entity out there which has its own

16     interest in establishing it did nothing wrong and that if

17     anything was done wrong, it was Grace's fault.  That is not a

18     unity of interest.  That's a disunity of interest.

19          Now, Grace has argued that there is a danger of

20     record taint here and the reason why that's important is

21     because the -- without that, there is no harm really even to

22     Grace that has been alleged here.

23          I mean if you stand back and look at the liability

24     here, Your Honor, the -- it doesn't matter whether the Libby

25     claimants are asserting claims against Grace or whether the

1  State of Montana is asserting contribution claims.  There will

2  only be one recovery for the Libby claimants.  So if Libby

3  claimants were to recover from the State of Montana and the

4  result is that the State of Montana in effect takes over the

5  Libby claimants' claims in this Chapter 11 case, Grace's

6  liability has not been affected one way or the other.

7         So, the only harm that could arise to Grace is this

8  harm from so-called record taint.  And --

9         THE COURT:  So you're suggesting that the -- although

10 there's an independent duty to warn, if the plaintiffs recover

11 against the State, then they have essentially no further claim

12 against the debtor?

13        MR. COHN:  Yes, Your Honor.  It's a classic joint

14 tortfeasor situation --

15        THE COURT:  All right.

16        MR. COHN:  -- in which there can only be one

17 recovery.  If you fully recover your damages, then you're done.

18        THE COURT:  All right.

19        MR. COHN:  Now, the problem with record taint, Your

20 Honor, is -- and is once again, this potential for record taint

21 has existed in every case that's been decided by the Third

22 Circuit on this issue.  Pacor.  Johns-Mansville faced the

23 problem of record taint because its operations were going to be

24 at issue.  And same thing in Federal-Mogul.

25        So record taint is just another way of dressing up a

1 relationship to the Chapter 11 case which the Third Circuit has

2 held is not sufficient to bring a matter within bankruptcy

3 court jurisdiction or in this case, to give rise to a

4 legitimate concern on Grace's behalf.

5 But I would also point out, Your Honor, you know,

6 record taint is a matter of -- it's a factual allegation, Your

7 Honor.  You have nothing in the record that provides you any

8 basis to rule that there is any legitimate concern about record

9 taint.

10 We have pointed out in our papers, Your Honor, that

11 the liability of Grace to the Libby claimants has been tried

12 three times to a verdict in Montana.  The key witness, who is

13 the former general manager of the Libby plant, Grace's former

14 employee, is dead.  There will be no further record taint.  I

15 mean his testimony, you have to use it in the present form.

16 There will be no further testimony.

17 Grace has not alleged that any current employee of

18 Grace will be called as a witness.  And we know of none, Your

19 Honor.  The only possible discovery that we know of -- and by

20 the way, this is not discovery that the Libby claimants would

21 need, but that we infer that perhaps the State of Montana might

22 wish to avail itself of -- would be document discovery.

23 And as I believe you've been made aware on previous

24 occasions, Your Honor, the documents are all sitting in Boston

25 in a document repository and -- where they can be produced with

1 minimal inconvenience to Grace.

2          And in any event, those documents --

3          THE COURT:  Excuse me.

4          I'm sorry, I have to sneeze and I'll --

5          MR. COHN:  We'll wait.

6          THE COURT:  Sorry.  Go ahead.

7          MR. COHN:  And so those documents can be made

8 available with minimal inconvenience to Grace, certainly not

9 something that has an impact on the reorganization and there's

10 nothing new that -- there that we don't already have and that

11 hasn't already been introduced in the cases that have been

12 tried to a verdict out in Montana.

13          So, in this case, whatever you may think of the

14 concept of record taint generally -- and I would not for a

15 moment suggest that record taint is a legitimate concern, but

16 even if you disagree, Your Honor, the fact is that there is

17 nothing in this record that would provide a basis for ruling

18 that record taint is a legitimate concern of Grace in this

19 matter.

20          And then third, collateral estoppel.  What Grace said

21 in its papers -- little different from what Ms. Baer said here.

22 What Grace said in its papers is the danger of collateral

23 estoppel would arise if Grace chose to intervene in the

24 proceedings once these cases against the State of Montana went

25 to trial.

1          Now, on the issue of jurisdiction, Your Honor, you

2 obviously cannot confer jurisdiction by your own actions, but I

3 would also point out that it is almost impossible to conceive

4 that Grace would inflict upon itself this type of wound of

5 voluntarily foregoing the protection of the automatic stay and

6 placing itself in harm's way.

7          And if it did, Your Honor, I would respectfully

8 submit that that is not a ground for Grace to obtain an

9 injunction against those proceedings by this Court.  Collateral

10 estoppel, if it occurs, would be a self-inflicted wound.

11          And why do we know that?  Well, I understand the

12 reference to collateral estoppel in the Gerard decision.  As I

13 have said, Gerard was non-precedential and we respectfully

14 submit that it's been overruled.

15          But the discussion on collateral estoppel

16 specifically, Your Honor, is completely at variance with the

17 court's considered treatment of the issue in the Federal-Mogul

18 decision especially.  Because there it was observed that the

19 only reason that cases like Pacor and Federal-Mogul made sense

20 is that the automatic stay protects the debtor from collateral

21 estoppel effect of any litigation that's going on in some non-

22 bankruptcy forum.  The automatic stay would mean nothing if

23 what could happen in some non-bankruptcy forum was that issues

24 could be adjudicated in a way that would bind the debtor.

25          So, the Third Circuit has made it clear that

**J&J COURT TRANSCRIBERS, INC.**

collateral estoppel or anything else that happens in the

litigation between the Libby claimants and the State of Montana

cannot result in collateral estoppel against Grace.

So, we would respectfully submit, Your Honor, that

there is nothing to bring this particular situation outside of

the rule that the Third Circuit has spent so much time and

attention on in <u>Pacor</u>, <u>Federal-Mogul</u> and <u>Combustion</u>

<u>Engineering</u>, whereby there is no related to jurisdiction over

this third party dispute.

And in addition, Your Honor, we would respectfully

submit that there -- even if there were jurisdiction, Your

Honor, there would not be grounds either in the form of unusual

circumstances or meeting the traditional four-part test for

this Court to grant the injunction.

THE COURT:  All right, thank you.

MR. COHN:  Thank you, Your Honor.

THE COURT:  Mr. Monaco?

MR. MONACO:  Good afternoon, Your Honor.  For the

record, Frank Monaco for the State of Montana.

Your Honor, I'll try to avoid repeating the comments

that Ms. Baer had made, but I did want to let the Court know

that my co-counsel, Dale Cockrell, who is a Montana attorney,

is on the phone and is here to answer any specific questions

regarding the underlying actions or finer points of Montana

law.

1            Your Honor, just to give very brief background, we

2    have been sued in 123 actions in Montana.  Complaints allege

3    that the State of Montana failed to warn the Libby miners and

4    their families of the dangers associated with the mine operated

5    by W.R. Grace.

6            Your Honor, Montana denies any such liability, but to

7    the extent that we are found liable, will assert and have

8    asserted contribution indemnification claims against Grace.

9            Your Honor, since the actions revolve around the

10   conduct of Grace, the State would be severely prejudiced if

11   these trials go forward without Grace's participation.  We

12   would take issuance with some of the statements made about

13   whether or not they would be an indispensable party.

14           Because discovery is -- has commenced and that trials

15   either have or will be scheduled, we filed a motion for relief

16   from the automatic stay in order to assert a third party

17   complaint against Grace, even though one could argue that in

18   light of the Third Circuit decision in <u>Frenville</u>, we may not

19   have had to do that.  I'll return to the motion later in my

20   comments.

21           Your Honor, one thing you should be aware of is as

22   Your Honor's aware --

23           THE COURT:  Gentlemen, use the conference room,

24   please.

25           MALE VOICE:  I'm sorry, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. MONACO:  As Your Honor is aware, I also represent

2     Her Majesty in Royal Dominion, the Queen.  Canada has --

3          THE COURT:  But you're not properly dressed for that,

4     Mr. Monaco.

5          MR. MONACO:  Right.  I don't have my wig today, Your

6     Honor, I'm sorry.

7          Canada has been sued in class actions in various

8     provinces in Canada for asbestos property damage claims and we

9     -- Canada also has claims for contribution indemnification.

10    And just so Your Honor is aware, on November 14th of this year,

11    Justice Barley (phonetic) issued a stay of those proceedings

12    very similar to a 105 injunction that this Court would issue

13    for very -- many of the same reasons that have been espoused by

14    Grace today.

15         Your Honor, I'd like to respond to a couple of points

16    made by Mr. Cohn in respect to bankruptcy law.  It seems the

17    Libby claimants rely heavily upon three cases decided in the

18    Third Circuit, <u>Pacor</u>, <u>Federal-Mogul</u> and <u>Combustion Engineering</u>.

19    We believe that the reliance is misplaced.

20         First of all, they state that there's no related

21    jurisdiction, but they ignore the Third Circuit decision in

22    <u>Gerard</u> which is the law of this case.  The jurisdiction really

23    is a red herring because there is an existing order which

24    imposes the permanent injunction and Grace is trying to extend

25    that order to encompass the Montana actions.

**J&J COURT TRANSCRIBERS, INC.**

1            With respect to the <u>Pacor</u> and <u>Federal-Mogul</u> cases,

2    Your Honor, those are also distinguishable.  They involve

3    removal of actions and I think is a much different standard.

4    And I dare say that if we were here asking Your Honor to have

5    123 actions removed to this Court, we might need smelling salts

6    to revive you.  That's not what we're asking for here.  I think

7    the focus needs to be on not the underlying actions themselves,

8    but what the effect of that underlying action is on the

9    bankruptcy case.

10            They also cite the <u>Combustion Engineering</u> case in

11    support of their position.  But again, that involves technical

12    interpretations of Section 524(g).  It does not involve a 105

13    injunction standard.

14            And I would submit what the Court should look at is

15    the analysis employed by Judge Walsh, <u>American Film Technology</u>

16    case.  And the two --

17            THE COURT:  In which case?

18            MR. MONACO:  The <u>American Film</u> --

19            THE COURT:  Okay.

20            MR. MONACO:  -- <u>Technology</u> case.  I am fully aware of

21    that case.  It's cited all the time.  I was on the losing end

22    of that decision, so I'm very well familiar with it.

23            But the two things that Judge Walsh looked at in that

24    decision were indemnification and collateral estoppel.  And one

25    thing I would take issue with Mr. Cohn is it's not whether the

185

1 judgment is binding, it's whether there is the possibility of

2 collateral estoppel or, as Ms. Baer stated also, record taint.

3 And that's what Judge Walsh based his decision on in issuing

4 the 105 injunction.

5       I don't think there's any question that Montana's

6 liability, the extent that they have any, it is derivative and

7 that it is legally and factually impossible to find Montana

8 liable without finding that Grace has engaged in malfeasance.

9       I would also like to respond to several misstatements

10 made by counsel for the claimants with respect to underlying

11 Montana law.  First, the Libby claimants have misstated the

12 holding of the Montana court decision in Orr.

13       So Your Honor's aware, the Montana Supreme Court did

14 not decide that there was a breach of duty in Orr and I would

15 like to quote from that decision.  This is found at 106 P.3d at

16 100:

17       "Based on the -- upon the foregoing, we

18       conclude the district court erred in

19       determining that the State had no legal

20       duty to the miners and in dismissing the

21       miners' complaints.  We therefore reverse

22       the district court's order of dismissal and

23       remand for determination by the fact finder

24       of whether the State breached its duty to

25       the miners.  And if so, whether such breach

1      caused the damages claimed by them."

2      So there was no determination that there was breach

3 and I wanted the record to reflect that.

4      Second, Your Honor, I think Mr. Cohn alluded to some

5 statements made in his papers that there was no right of

6 contribution indemnification by Montana against Grace.  That is

7 a misstatement of the law.

8      Their interpretation the relevant statutes is faulty

9 and moreover, the Montana Supreme Court decision in Plum vs.

10 Fourth Judicial District Court specifically recognized that the

11 third party complaints could establish a procedural mechanism

12 for asserting contribution indemnification claims.

13      Finally, Your Honor, we did file a response which

14 generally supports the injunction sought by Grace.  As a

15 practical matter, I think that this injunction would facilitate

16 the negotiation and resolution of our contribution

17 indemnification claims as well as the underlying claims.  We

18 did, however, reserve our rights with respect to the plan, our

19 claims themselves, our rights to the underlying action and the

20 motion for relief.

21      And with respect to the motion for relief, Your

22 Honor, if Your Honor was inclined to deny this motion by Grace,

23 it puts my client in a very untenable position.  We would have

24 to go forward with discovery tomorrow and we would request an

25 expedited discovery schedule with respect to the motion for

1  relief and that this motion be heard at the next available

2  omnibus hearing.

3          Obviously, Your Honor, if the injunction is issued,

4  we would be prepared to withdraw our motion for relief without

5  prejudice.

6          I have nothing further, Your Honor.

7          THE COURT:  All right, thank you.

8          Mr. Lockwood?

9          MR. LOCKWOOD:  Your Honor, I'm here on behalf of the

10  committee not so much to focus on the particulars of the Libby

11  claimants issue, vis-a-vis the State of Montana, but to discuss

12  briefly the scope of some of the arguments that are being put

13  forward here by Grace.

14          We have -- I -- we are getting concerned about what

15  seems to be a pyramiding effect in these cases of the scope of

16  related to jurisdiction and 105 injunctions.  We started out in

17  Grace with a Grace insurer getting the protection of an

18  injunction.  And as Your Honor pointed out earlier, insurers

19  have a unique relationship with insured debtors and one that's

20  indeed reflected in Section 524(g) itself.

21          We then got to Montana Vermiculite or maybe I have

22  them backward.  Maybe Montana Vermiculite came first.  I don't

23  remember, but it was a predecessor company and Grace had

24  acquired its liabilities and it also would have been entitled

25  potentially to a 524(g) injunction, as Mr. Cohn pointed out.

**J&J COURT TRANSCRIBERS, INC.**

188

1          Now we're at the State of Montana.  As Mr. Cohn
2   pointed out, the State of Montana, under no view of any
3   provision of Section 524, could ever possibly be the subject of
4   a channeling injunction.  The State of Montana is a co-
5   defendant.  There are hundreds, there are thousands of co-
6   defendants of Grace in the tort system.

7          And then there is -- and there is a particular
8   category of co-defendants in the tort system that I am
9   particularly concerned may be given aid and comfort, depending
10  upon how the Court analyzes and resolves this motion, and
11  they're what is known as premises defendants.  And they involve
12  companies like Exxon and General Motors and General Electric
13  and whatever.

14         And these are companies who are sued by invitees, not
15  employees, to their premises to work on their premises, install
16  asbestos containing products or be around them or whatever.
17  And they have direct actions against these companies.  And
18  those companies may very well -- the asbestos that the premises
19  defendant's using could be Grace asbestos, just like it could
20  be anybody -- any other manufacturer's asbestos.

21         And under the analysis that Grace is using here, if
22  some premises defendants come in here and said hey, Your Honor,
23  I was using Grace asbestos or Grace vermiculite and -- on my
24  premises and this plaintiff is now suing me for that and if I'm
25  liable, I have a contribution right against Grace as under

1  joint and several liability principals or maybe I have some

2  indemnity right; the type that Chrysler was claiming in

3  <u>Federal-Mogul</u> under some sort of I bought your product and you

4  gave me a warranty of merchantability or something like that.

5       That now I'm entitled to have a 105 injunction

6  brought against me if I can persuade Grace to go along with it

7  on the theory that there might be record taint.  Some witness

8  might testify that Grace's vermiculite product contained

9  asbestos and was dangerous or there might be some contribution

10  claim that would arise.

11       On the contribution claim, I want to reiterate a

12  point made by Mr. Cohn which is important.  Every state in the

13  union has what's known as a single satisfaction rule.  A

14  plaintiff can get one recovery and only one recovery.  If these

15  Libby plaintiffs collect their personal injury claim out of

16  State of Montana, that's it.  They don't have a claim against

17  Grace anymore.

18       All we're talking about here is substituting the

19  State of Montana for these Libby plaintiffs.  And the State of

20  Montana will have a different kind of claim.  Indeed, it may

21  even -- they may actually do -- be doing Grace a favor.

22  Because the plaintiffs' claims against Grace I think sound like

23  they're pretty good claims.  Whereas the State of Montana's

24  claims against Grace, I'm not sure they're anywhere near as

25  good as the plaintiffs' claims are and if they're not, then

1  Grace will actually save money on this.

2        But to -- Federal-Mogul and Pacor, and Federal-Mogul

3  in particular, talked about if you're going to try and use

4  indemnification -- they reject contribution flat out as being

5  by itself a basis for jurisdiction over non-debtor actions.

6  And they say if you're going to do -- indemnification has to be

7  automatic.

8        Whatever else Montana and Grace have said in their

9  papers or here today, nobody's alleged there's automatic

10  indemnification here.  And even if there were, the effect of it

11  would be simply that you would have liquidated the amount of

12  Montana's claim, as opposed to having it be unliquidated on the

13  part of the Libby claimants.  That might be a problem if it was

14  automatic, but it's not.

15        And there was further discussion that somehow or

16  another because Pacor and Federal-Mogul are removal cases, that

17  that makes them different from a case where you're just trying

18  to enjoin the action.  With all due respect, Pacor -- they were

19  removal cases, but they denied removal on the ground there was

20  no jurisdiction.  If there's no jurisdiction for removal,

21  there's no jurisdiction for an injunction of a separate action,

22  unless you can show -- make the kind of showing that you're

23  using the injunction as a temporary mechanism to allow somebody

24  to construct a plan which would deal with the claims that are

25  being enjoined.

1          And I reiterate, there's no showing here that any

2   plan that Grace has on the table or is going to be able to put

3   on the table in the future will ever address protecting Montana

4   against claims because it can't.  And that's the relevance of

5   Combustion Engineering and the only relevance of Combustion

6   Engineering as far as I'm concerned.

7          So, as I say, my concern isn't so much with the

8   specifics.  I don't know about Montana law.  I don't know about

9   the particulars of the cases.  But the breadth of these

10  arguments is way way way beyond what the Third Circuit has done

11  and if the Gerard case is in some way or another perceived by

12  Your Honor to be inconsistent with that, to say it's the law of

13  the case here when it's a non-precedential decision dealing

14  with somebody that isn't a state and doesn't have the kind of

15  independent relationship to Grace that Libby does, is I think

16  way overstating the case.

17          THE COURT:  Well, it's law of the case.  I don't know

18  whether it applies directly on this issue, but to the extent

19  that it involves the Gerard plan --

20          MR. LOCKWOOD:  Well, it's the law of the --

21          THE COURT:  -- it's clearly law of the case.

22          MR. LOCKWOOD:  It's the law of the case for Montana

23  Vermiculite and Maryland Casualty perhaps.  I suggest that it's

24  not the law of the case for Montana.  Thank you, Your Honor.

25          MR. BERNICK:  Your Honor, very briefly.  I know that

1  we're very late.

2        I do have some investment and knowledge about most of

3  the decisions that have been cited here and I think it's

4  important to keep -- to bear in mind accurately the analytical

5  structure that applies to this issue because I believe it's

6  been misstated by Mr. Cohn and also by Mr. Lockwood.

7        The Gerard decision, which I will say is the only

8  Third Circuit case of the three cases that I actually was

9  involved in where we prevailed (indiscernible) getting this

10  kind of relief, was in a very different posture from both

11  Federal-Mogul, which I litigated, and also the CE case, which I

12  also litigated.

13        Both Federal-Mogul and also Pacor -- and I'll get to

14  the CE here in a moment.  Federal-Mogul and Pacor, which are

15  cited in the Gerard case, both involved efforts by a non-debtor

16  to obtain relief from the bankruptcy case.  And therefore the

17  issue of related to jurisdiction was put before the court in

18  the posture of people who are not parties to the case seeking

19  to involve themselves in the bankruptcy case.

20        The Gerard decision was entirely different.  The

21  Gerard decision emanated from the effort of the debtor to apply

22  the injunction that previously had been issued by this Court to

23  foreclose action that would be taken against third parties.

24  And that distinction was very very meaningful from the Third

25  Circuit's point of view.

1          The Third Circuit specifically held that the issue of

2  related to jurisdiction was not before it in the <u>Gerard</u> case,

3  precisely because the order at issue had emanated -- had been

4  entered at the request of the debtor based upon its notion of

5  how to protect the bankruptcy case itself.

6          And that was explicit.  I could read the language

7  from the decision in <u>Gerard</u>.  But that is absolutely core,

8  which was that Grace asked for the original relief that was at

9  issue with <u>Gerard</u>, obtained it, not on the grounds of related

10  to jurisdiction, but on the grounds of protecting the core

11  proceeding, the bankruptcy case itself.

12          Now, there is some argument that <u>CE</u> overturned

13  <u>Gerard</u>.  Not only is that wrong for the reason that I've

14  indicated, but it's wrong chronologically and I remember very

15  very distinctly exactly how this emerged.

16          The <u>CE</u> case was actually filed and came before the

17  Third Circuit first.  It was briefed.  It was fully argued I

18  believe by the Spring of 2004; maybe even earlier.

19          In the meantime, the <u>Gerard</u> decision came up for

20  review by the Third Circuit.  As the opinion cites, it was

21  actually argued -- that is, the <u>Gerard</u> case was argued in

22  September of 2004 and decided in October of 2004.  That was

23  after the <u>CE</u> case had been fully brief, had been fully heard,

24  but before the decision in <u>CE</u> had issued.  And therefore, the

25  Third Circuit, as a practical matter, had both cases pending

194

1 before it at exactly the same time.

2          There's actually correspondence in connection with

3 the Gerard appeal where the Third Circuit asked for

4 supplemental letters to be submitted to the court, and the

5 force of those letters and the issues that they raised had to

6 do with this very issue, which is whether CE was really the

7 same as the Gerard case or not.  And those questions were very

8 pointed questions and led to exactly the distinctions that are

9 drawn in the Gerard decision, which is that it was not a

10 confirmation decision and didn't come up on the request of a

11 third party to become involved in the bankruptcy case.

12          The jurisdictional basis for the Gerard case is not

13 related to jurisdiction.  It's the core jurisdiction of the

14 court.  And that's the number one point.  Related to

15 jurisdiction was not at issue in the Gerard case.

16          The question then becomes whether 524(g) applies to

17 the analysis or Section -- or 105 and what the appropriate test

18 should be.  As Your Honor has indicated, the CE case, which is

19 now the case that I want to address -- the CE case came up

20 before the Third Circuit under 524(g) in the context of a

21 confirmation.  And obviously there the Third Circuit held that

22 the 524(g) was exhaustive and exclusive and occupied the total

23 area and 524(g) was not applicable.

24          524(g) is not a ground for the issuance of an

25 injunction prior to confirmation.  It is a provision of the

1   code that deals with the issuance of a final order in

2   connection with confirmation.  Therefore, the arguments that

3   were adopted by the Third Circuit finding the 524(g) occupied

4   the area do not apply in the case of orders that are issued in

5   aid of the court's jurisdiction prior to the submission and

6   approval of a plan.

7           Section 105 still does apply to that analysis.

8           So, 524(g) is not germane, Section 105 is.  And

9   there's nothing about the CE case that runs to the contrary.

10          The third issue is whether under Section 105 there

11  really is an identity of interest.  And argument has been made

12  how can there be an identity of interest when there's actual

13  hostility between the State of Montana potentially with respect

14  to a claim against Grace.  And that again mistakes the issue.

15          Your Honor will recall that in connection with the

16  original issuance of the injunction, Sealed Air was active in

17  the process of asking for relief.  Grace did not believe that

18  there was an indemnity -- proper indemnity claim over against

19  Grace under the indemnity, but nonetheless, Grace was facing

20  the same kind of threat of liability that Sealed Air did face,

21  and therefore supported Sealed Air's request for injunctive

22  relief, and Judge Farnan went down that road and issued that

23  relief.

24          The issue is not whether there is an identity of

25  interest in the sense that there can never be a conflict.  The

**J&J COURT TRANSCRIBERS, INC.**

1  issue is whether there is an initial identity of interest in

2  the issuance of the injunction and here that is the case.  That

3  is, the State of Montana shares the interest in Grace

4  regardless of what ultimately might be their conflict inter se.

5        The fourth issue is whether there is a threat of

6  double recovery, collateral estoppel and the rest.  There's all

7  kinds of assurances that have been made that there will be only

8  one recovery.  And if there's a recovery against the State of

9  Montana, Grace will walk off into the sunset and be relieved of

10  the liability.

11       That's terrific and we'd be all fine with the idea

12  that the State of Montana would pay for any liability that

13  Grace faces.  The problem is that there is not that assurance.

14  And that is exactly what gives rise to a risk of double

15  recovery and also it gives risk to the -- rise to the risk of

16  collateral estoppel.  Nobody knows at this point how those

17  things will sort out.  The point is that you can't take the

18  chance.  And that is why the injunction have issued under

19  Section 105 under circumstances such as these.

20       Last point.  Brother Lockwood rises to express

21  concern with the potential reach of some of the arguments that

22  are being made and I'll agree with him that -- in this respect

23  that there is a question of when the line gets drawn.  And

24  Grace does not approach all these matters saying oh, well,

25  we'll agree to anybody's request.  And Your Honor will recall

1 we did not agree in the case of the request that was made by

2 the Scott folks.

3         The premises issue has yet to arise.  If it does

4 arise, which I frankly doubt that it will, we'll then address

5 it.  Initially, the company will address it.  The estate will

6 address it and determine whether it's appropriate for us to be

7 seeking this kind of relief.  But we're not there yet and I

8 know that we will address that issue if and when it comes up

9 with great sensitivity to the arguments and concerns that have

10 been expressed by Mr. Lockwood, but they're not arguments and

11 concerns that have to be resolved by the Court today.  Thank

12 you.

13         THE COURT:  Okay, Mr. Monaco, five minutes.

14         MR. MONACO:  I'll won't even be five minutes, Your

15 Honor.  I just want to address two comments made by Mr.

16 Lockwood.

17         First of all, the single satisfaction rule.  That is

18 not what the law in Montana is with respect to contribution

19 indemnification.  So I do object to and disagree with that

20 characterization of the law.  It's not what it is.

21         Second, I do take exception to his personal

22 assessment of the underlying actions or Montana's defenses.  So

23 I wanted to state that for the record as well.

24         THE COURT:  Okay.  I'm sorry, you're saying -- I

25 don't understand the not single satisfaction rule issue.

1  People can recover twice for the same injury?

2          MR. MONACO:  I think what Mr. Lockwood is saying is

3  that if State of Montana's found liable, we have no further

4  rights against Grace --

5          THE COURT:  Oh, no, no, no, that the plaintiffs --

6          MR. MONACO:  -- for contribution indemnification.

7          THE COURT:  -- have no further rights against the

8  debtor.  If Montana is found liable by -- against the

9  plaintiffs and the plaintiffs recover a judgment and Montana

10 pays it, you may be subrogated to their claim against the

11 debtor, but the debtor doesn't have a direct action that would

12 be -- rise against the claim -- or, that the plaintiffs could

13 sue the debtor for in the future.

14         MR. MONACO:  Well, I'm -- then I misunderstood --

15         THE COURT:  Okay.

16         MR. MONACO:  -- what was being said.

17         THE COURT:  All right.

18         MR. MONACO:  Sorry.

19         THE COURT:  Mr. Cohn, few minutes on rebuttal.

20         MR. COHN:  Yeah, there's obviously a huge tendency to

21 repeat oneself, which I am not going to indulge in.

22         I did want to, on the subject of related to

23 jurisdiction in the Combustion Engineering case, draw your

24 attention in particular to pages 230 to 233 of the decision.

25 That's where the discussion is found.  And I would ask you to

1 consider that, although you don't need to reach the issue if

2 you simply rule that there's no identity of interest because

3 then the injunction isn't granted and who cares what the reason

4 is.

5         I did want to spend just a moment on the notion that

6 the <u>Gerard</u> decision is the law of the case.  You might recall

7 before I got involved in the case, the proceedings were

8 presented to this Court in the form of a motion for

9 reconsideration or clarification of the injunction.

10        THE COURT:  Uh-huh.

11        MR. COHN:  That had the effect, as the Third Circuit

12 held, of shifting the burden of proof from Grace where it

13 originally lay in obtaining the injunction to the Libby

14 claimants in trying to get it clarified or reconsidered.  And

15 so, I would respectfully submit that for that reason alone,

16 that case is inapposite to what we're doing here.

17        Here, Grace has the burden of proof.  And once again,

18 I come back to the -- to the point that I made that the record

19 is devoid of a basis for this injunction to be issued.

20        Thank you, Your Honor.

21        THE COURT:  Okay.  Thanks.

22        I'm going to take this matter under advisement.

23        I have entered orders, by the way -- I don't think I

24 stated this on the record earlier -- with respect to the

25 debtors' request to file a reply brief in support of the ninth

1  request for exclusivity extension and on -- well, I thought I

2  had on this seventh period fee applications.  I'll make sure

3  that gets docketed.  And on the debtors' request to file a

4  reply with respect to item five, the item that we've just

5  addressed now, so I have signed those orders that permit those

6  documents to be filed.

7           Anything else today?

8           MS. BAER:  Your Honor, if you look at the agenda,

9  item number six was the debtors' motion for leave to amend its

10 adversary complaint to add the State of Montana.  It probably

11 should be carried along with the item number five being taken

12 under advisement.

13          THE COURT:  Yeah, I think items five and six should

14 go together.  Montana's motion for relief from stay, I think

15 Mr. Monaco's indicated would simply be withdrawn and I could do

16 that if the injunction's granted.  And if it's not granted,

17 then it needs to be scheduled promptly and I would put it back

18 on the next agenda for hearing.

19          MS. BAER:  Thank you, Your Honor.

20          THE COURT:  Mr. Monaco?

21          MR. MONACO:  Your Honor, there is one slight problem

22 with taking it under advisement.  We currently have an

23 agreement among the parties to stay discovery in the underlying

24 Montana actions.  I spoke to both Ms. Baer and Mr. Cohn before

25 the hearing started to see if they would agree to extend that

1  stay until we -- if Your Honor did take it under advisement.

2  Mr. Cohn is refusing to stay discovery underlying action, so I

3  would at least request that Your Honor stay the Libby claimants

4  from taking discovery or proceeding any further with the

5  actions until Your Honor renders a decision on this.

6          THE COURT:  Yeah.

7          Mr. Cohn, that seems to me to be appropriate, until I

8  know whether or not there is going to be an injunction, to stay

9  discovery.  I don't really see why that should go forward.  I

10  don't think -- I want to go back and take a look at the cases

11  that have been cited.  I don't expect this to take a long time.

12          MR. COHN:  Well, Your Honor, I do need to make clear

13  the discussion that we had was in the context that we might not

14  reach this matter for argument today.  And that was the context

15  in which I said I wouldn't agree to a further stay.  So I'd

16  really just ask you what period are we talking about?

17          THE COURT:  Well, I think until -- well, if the

18  injunction's issued, it would be stayed until the injunction's

19  lifted.  If the injunction isn't issued, how about until the

20  motion for relief from stay is scheduled on -- because it would

21  come up on the next omnibus agenda, but since I don't know

22  exactly when I'm going to get an opinion out, I don't know what

23  agenda that would be.  But I would then take the issue of

24  lifting the stay of discovery up in connection with motion for

25  relief from stay --

J&J COURT TRANSCRIBERS, INC.

1        MR. COHN:  Well, the  --

2        THE COURT:  -- filed by the State.

3        MR. COHN:  Well, the -- okay, the difficulty that I

4   have, Your Honor, is that this is regarded as a matter of

5   terrible urgency out in Montana, so obviously I can -- I guess

6   what I'm saying is I can't agree to something that's open-

7   ended.

8        THE COURT:  Well, I don't know when I'm going to

9   rule.  So, how about until the omnibus hearing after I rule so

10  that I can discover -- I mean, I -- you know, I can't --

11       MR. COHN:  Well --

12       THE COURT:  -- give you a specific date.  I can give

13  you --

14       MR. COHN:  Well --

15       THE COURT:  -- something like December 31st of 2006

16  and then lift it earlier, but I don't think that makes a great

17  deal of sense either.

18       MR. COHN:  Well, no, if you -- if this ruling is --

19  I'm sorry, 2006?

20       THE COURT:  '7  Thank you.  Yes.

21       MR. COHN:  2007?

22       THE COURT:  No, '6.

23       MR. COHN:  Well, Your Honor --

24       THE COURT:  2006.  This is '5.  I was talking about

25  '6.

1          MR. COHN:  Well, Your Honor, we -- in the <u>Montana</u>

2    <u>Vermiculite</u> matter, we actually argued it at the same time of

3    year.  The decision was not forthcoming until it turned out

4    maybe August -- or, I'm sorry, October or November of the

5    following year and in light of the fact that this is an

6    injunction that they're just not entitled to, we have great

7    difficulty just assenting to the relief --

8          THE COURT:  All right, then I'll just order it.

9          MR. COHN:  -- for an extended period of time.

10         THE COURT:  I'll order a stay of discovery until I

11   have an opportunity to determine whether or not there -- it is

12   appropriate to issue this injunction because it appears that,

13   to the extent that the plaintiffs will want discovery from the

14   State, the State in turn may want discovery against Grace.  And

15   at this point, these appear to be all pre-petition claims for

16   the most part.  The allegations are that the State has known

17   since the 1950's or approximately that the debtor was allegedly

18   operating a hazardous mine and did not reveal that circumstance

19   to the plaintiffs.

20         Quite frankly, I think an action that has been

21   pending or possibly pending for 50 years is not the kind of

22   emergency action that a brief stay of discovery would burden

23   people.  As to, however, in the event that you have tort

24   plaintiffs who are likely to die or are in some extremis

25   situation, I would certainly permit discovery to go forward so

204

1  that their depositions could be taken and preserved for

2  testimony.

3             MR. COHN:  Thank you, Your Honor.

4             THE COURT:  So, I've ordered it.

5             Now, somebody want to give me an order to reflect

6  what I've said?

7             MS. BAER:  We'll prepare an order and work with Mr.

8  Cohn.

9             THE COURT:  All right, and also with respect to the

10 relief from stay that it will be continued in the event -- to

11 the next omnibus in the event that the injunction is not issued

12 and withdrawn in the event that the injunction is.

13            MS. BAER:  Yes, Your Honor.

14            THE COURT:  Anything more in Grace today?

15            MS. BAER:  No, Your Honor.  That's the agenda.

16            THE COURT:  All right.

17            Well, I don't know whether it has been issued yet or

18 not, but you might want to check your dockets later today

19 because hopefully the Combustion Engineering confirmation order

20 and proposed findings will be docketed.

21            It's on?

22            MR. BERNICK:  Yeah, everybody's been --

23            THE COURT:  It's docketed today.

24            MR. BERNICK:  -- clicking back and forth.

25            THE COURT:  Oh, okay.  So, I will be transmitting the

1 record to Judge Irenas either today or --

2          MR. BERNICK:  We appreciate your efforts there, Your

3 Honor.

4          THE COURT:  -- tomorrow.

5          MR. LOCKWOOD:  Who won, Your Honor?

6          THE COURT:  You did, Mr. Lockwood.

7          MR. BERNICK:  Everybody won.

8          THE COURT:  We'll take a five minute recess so we can

9 -- parties can set up for Kaiser and then we'll start the

10 Kaiser case.

11     (Court adjourned)

12                         * * * * *

13

14                      **CERTIFICATION**

15          I, TRACY GEGENHEIMER, court-approved transcriber,

16 certify that the foregoing is a correct transcript from the

17 official electronic sound recording of the proceedings in the

18 above-entitled matter.

19

20 /s/ Tracy Gegenheimer          Date:  December 28, 2005

21 TRACY GEGENHEIMER     CERT*D-282

22 J&J COURT TRANSCRIBERS, INC.

23

24

25

                    **J&J COURT TRANSCRIBERS, INC.**