UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                                   .
IN RE:                             .        Chapter 11
                                   .
W.R. Grace & Co., et al.,          .
                                   .
          Debtor(s).               .     Bankruptcy #01-01139 (JKF)
.......................................................
```

Wilmington, DE
November 14, 2005
11:30 a.m.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For The Debtor(s):                 Janet S. Baer, Esq.
                                   Kirkland & Ellis, LLP
                                   200 E. Randolph Drive
                                   Chicago, IL 60601

                                   Barbara H. Harding, Esq.
                                   Kirkland & Ellis, LLP
                                   655 Fifteenth Street, N.W.
                                   Washington, DC 20005

                                   Michelle H. Browdy, Esq.
                                   Kirkland & Ellis, LLP
                                   200 E. Randolph Drive
                                   Chicago, IL 60601

                                   Salvatore Bianca, Esq.
                                   Kirkland & Ellis, LLP
                                   200 E. Randolph Drive
                                   Chicago, IL 60601

                                   James O'Neill, Esq.
                                   Pachulski, Stang, Ziehl,
                                   Young, Jones & Weintraub
                                   919 North Market Street
                                   Wilmington, DE 19801

2

```
                                    Mark Shelnitz, Esq.
                                    In-house Counsel
                                    W.R. Grace & Company

                                    Will Sparks, Esq.
                                    In-house Counsel
                                    W.R. Grace & Company

For The New Jersey Dept.:           Edward Devine, Esq.
of Law & Public Safety              Office of the Attorney General
                                    Hughes Justice Complex-CN 093
                                    Trenton, NJ

                                    John F. Dickinson, Jr., Esq.
                                    Office of the Attorney General
                                    Hughes Justice Complex-CN 093
                                    Trenton, NJ

For Sealed Air Corporation:         Mark Chehi, Esq.
                                    Skadden Arps
                                    One Rodney Square
                                    Wilmington, DE 19801

For UCC:                            Kenneth Pasquale, Esq.
                                    Stroock Stroock & Lavan, LLP
                                    180 Maiden Lane
                                    New York, NY 10038

For Asbestos PI Committee,:         Mark T. Hurford, Esq.
The Eaves Law Firm                  Campbell & Levine, LLC
                                    800 North King St.-Ste. 300
                                    Wilmington, DE 19801

For Official Committee of:          Theodore J. Tacconelli, Esq.
Asbestos Property Damage            Ferry, Joseph & Pearce, PA
Claimants                           824 Market Street
                                    Wilmington, DE 19899

                                    Scott L. Baena, Esq.
                                    Bilzin Sumberg Baena Price
                                    & Axelrod, LLP
                                    200 S. Biscayne Blvd. -Ste. 2500
                                    Miami, FL 33131

                                    Allyn Danzeisen, Esq.
                                    Bilzin Sumberg Baena Price
                                    & Axelrod, LLP
                                    200 S. Biscayne Blvd. -Ste. 2500
                                    Miami, FL 33131
```

```
                                  Jay Sakalo, Esq.
                                  Bilzin Sumberg Baena Price
                                  & Axelrod, LLP
                                  200 S. Biscayne Blvd.-Ste. 2500
                                  Miami, FL 33131

For Special Counsel to:           Martin Dies, Esq.
PD Committee                      Dies Henderson & Carona
                                  1009 West Green
                                  Orange, TX 77630

For Equity Security Holders:      Gary M. Becker, Esq.
Committee                         Kramer Levin Naftalis
                                  & Frankel, LLP
                                  919 Third Ave.
                                  New York, NY 10022

For D.K. Acquisition:             Jennifer L. Scoliard, Esq.
                                  Klehr Harrison Harvey
                                  Branzburg & Ellers, LLP
                                  Mellon Bank Center
                                  919 Market St.-Ste. 1000
                                  Wilmington, DE 19801

For ACE:                          Marc Casarino, Esq.
                                  White & Williams, LLP
                                  824 N. Market St.-Ste. 902
                                  Wilmington, DE 19899

For Bear Stearns:                 John Weiss, Esq.
                                  Latham & Watkins, LLP
                                  885 Third Avenue-Ste. 1000
                                  New York, NY 10022

For Asbestos Claimants:           Peter Lockwood, Esq.
Committee                         Caplin & Drysdale, Chartered
                                  One Thomas Circle, N.W.
                                  Washington, DC 20005

For State of Montana:             Francis A. Monaco, Jr., Esq.
and Canada                        Monzack & Monaco, PA
                                  Ste. 400
                                  1201 North Orange Street
                                  Wilmington, DE 19801

For C.N.A. Insurance:             Daniel M. Glosband, Esq.
                                  Goodwin Procter, LLP
                                  Exchange Place
                                  Boston, MA 02109
```

4

| | |
|---|---|
| For Lloyds of London &:<br>Certain London Market<br>Companies | Brenda DiLuigi, Esq.<br>Linklaters<br>1345 Ave. of the Americas<br>New York, NY 10105 |
| For The Futures:<br>Representative | Richard Wyron, Esq.<br>Swidler Berlin, LLP<br>The Washington Harbour<br>300 K. Street, N.W.-Ste. 300<br>Washington, DC 20007 |
| For Federal Insurance: | David Liebman, Esq.<br>Cozen O'Connor<br>1900 Market St.<br>Philadelphia, PA 19103 |
| For Anderson and California:<br>Claimants | Daniel Speights, Esq.<br>Speights & Runyan<br>200 Jackson Ave. East<br>Hampton, SC 29924 |
| For Macerich Fresno Limited:<br>Partnership | Amanda Winfree, Esq.<br>Ashby & Geddes<br>222 Delaware ave.-17th Fl.<br>Wilmington, DE 19899 |
| For Baron & Budd, Reaud:<br>Morgan & Quinn | Sander L. Esserman, Esq.<br>Stutzman Bromberg Esserman<br>& Pfilka, PC<br>2323 Bryan St.-Ste. 2200<br>Dallas, TX 75201 |
| | Steven A. Felsenthal, Esq.<br>Stutzman Bromberg Esserman<br>& Pfilka, PC<br>2323 Bryan St.-Ste. 2200<br>Dallas, TX 75201 |
| For the City of:<br>Philadelphia | Joseph DiGiuseppe, Esq.<br>City of Philadelphia Law Dept.<br>1515 Arch St., 15th Floor<br>Philadelphia, PA 19103 |
| For Acting U.S. Trustee:<br>(Roberta A. DeAngelis) | David Klauder, Esq.<br>U.S. Trustee's Office<br>844 King Street-Ste. 2313<br>Lock Box 35<br>Wilmington, DE 19801 |

(Via telephone)

For the Debtors:                David M. Bernick, Esq.
                               Kirkland & Ellis, LLP
                               200 E. Randolph Drive
                               Chicago, IL 60601

                               Lori Sinanyan, Esq.
                               Kirkland & Ellis
                               777 S. Figueroa Street
                               Los Angeles, CA 90017

                               David Siegel, Esq.
                               In-House counsel
                               W.R. Grace & Company

                               Paul J. Norris, Esq.
                               In-House Counsel
                               W.R. Grace & Company

                               Jay Hughes, Esq.
                               In-house Counsel
                               W.R. Grace & Company

For PD Claimants:              Matthew I. Kramer, Esq.
                               Bilzin Sumberg Baena Price
                               & Axelrod, LLP
                               200 S. Biscayne Blvd. -Ste. 2500
                               Miami, FL 33131

For Baron & Budd, Reaud:       Van J. Hooker, Esq.
                               Stutzman Bromberg Esserman
                               & Pfilka, PC
                               2323 Bryan St.-Ste. 2200
                               Dallas, TX 75201

                               David J. Parsons, Esq.
                               Stutzman Bromberg Esserman
                               & Pfilka, PC
                               2323 Bryan St.-Ste. 2200
                               Dallas, TX 75201

For AIG Member Companies:      Michael S. Davis, Esq.
                               Zeichner Ellman & Krause, LLP
                               575 Lexington Ave.
                               New York, NY 10022

6

(Via Telephone)

| | |
|---|---|
| For AIG Member Companies: | Michael Infalco, Esq.<br>Zeichner Ellman & Krause, LLP<br>575 Lexington Ave.<br>New York, NY 10022 |
| For Futures Claim:<br>Representative | Monique Almy, Esq.<br>Swidler Berlin, LLP<br>The Washington Harbour<br>3000 K. Street, N.W.-Ste. 300<br>Washington, DC 20007 |
| | Roger Frankel, Esq.<br>Swidler Berlin, LLP<br>The Washington Harbour<br>300 K. Street, N.W.-Ste. 300<br>Washington, DC 20007 |
| For Financial Advisor:<br>to FCR | Joseph Radecki, Esq.<br>Swidler Berlin, LLP<br>The Chrysler Building<br>405 Lexington Ave.<br>New York, NY 10174 |
| | Jonathan Brownstein, Esq.<br>Swidler Berlin, LLP<br>The Chrysler Building<br>405 Lexington Ave.<br>New York, NY 10174 |
| For Royal Insurance: | Sarah Edwards, Esq.<br>Wilson Elser Moskowitz<br>Edelman & Dicker, LLP<br>3 Gannett Drive<br>White Plains, NY 10604 |
| For Princeton University: | Edward J. Westbrook, Esq.<br>Richardson, Patrick, Westbrook<br>& Brickman, LLC<br>174 E. Bay Street<br>Charleston, SC 29401 |
| For Continental Casualty:<br>Ins. | Elizabeth M. DiCristofaro, Esq.<br>Ford Marrin Esposito Witmeyer<br>& Gleser, LLP<br>Wall Street Plaza<br>New York, NY 10005 |

(Via Telephone)

| | |
|---|---|
| For Allstate Insurance Co.: | Andrew K. Craig, Esq.<br>Cuyler Burk, LLP<br>Parsippany Corporate Center<br>Four Century Drive<br>Parsippany, NY 07054 |
| For Prudential | Curtis Plaza, Esq.<br>Riker Danzig Scherer Hyland<br>& Peretti<br>Headquarters Plaza<br>One Speedwell Ave.<br>Morristown, NJ 07962 |
| For Property Damage:<br>Claimants | Darrell W. Scott, Esq.<br>Lukins & Annis, PS<br>717 W. Sprague Ave.-Ste. 1600<br>Spokane, WA 99201 |
| For The Asbestos Claimants:<br>Committee | Robert Horkovich, Esq.<br>Anderson Kill & Olick, P.C.<br>1251 Avenue of the Americas<br>New York, NY 10020 |
| For Libby Claimants: | Christopher M. Candon, Esq.<br>Cohn Whitesell & Goldberg, LLP<br>101 Arch Street<br>Boston, MA 02110 |
| For Scotts Company: | Tiffany S. Cobb, Esq.<br>Vorys Sater Seymour<br>& Pease, LLP<br>52 East Gay Street<br>Columbus, OH 43216 |
| For Sonoma County: | Mark Bartholomew, Esq.<br>Sonoma County Counsel |
| For Murray Capital:<br>Management | Marti Murray<br>Murray Capital Management<br><br>Scott Beechert<br>Murray Capital Management |

(Via Telephone)

| | |
|---|---|
| For Macerich Freson:<br>Limited Partners | Gerald George, Esq.<br>Pillsbury Winthrop Shaw<br>Pittman, LLP<br>50 Fremont Street<br>San Francisco, CA 94105 |
| For Financial Advisor,:<br>The Blackstone Group | John O'Connell<br>The Blackstone Group |
| Claimant, State of:<br>California Dept. of<br>General Services | Steven Mandelsberg, Esq.<br>Hahn & Hessen, LLP<br>488 Madison Avenue<br>14th & 15th Floor<br>New York, NY 10022 |
| For USG Corporation: | Mary A. Martin<br>USG Corporation |
| For Labor Union Local 310: | Cara Santosuoss<br>Ratatori Bender Gragel Stoper<br>& Alex |
| Audio Operator: | Brandon J. McCarthy |
| Transcribing Firm: | Writer's Cramp, Inc.<br>6 Norton Rd.<br>Monmouth Jct., NJ 08852<br>732-329-0191 |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1          THE COURT:  Good morning.  Please be seated.

2  Everything working now?  Everything is working?  Okay.  This is

3  the matter of W.R. Grace, 01-1139.  The call-in list I have --

4          (Telephone interruption)

5          UNIDENTIFIED SPEAKER:  Good morning.

6          THE COURT:  Good morning.  Would you all please put

7  your mute buttons on.  It sounds like somebody's typing or

8  something in the background.  And I will read your names -- the

9  list of names I have for the record.  David Siegel, Paul

10  Norris, Elizabeth DeCristofaro, Edward Westbrook, Curtis Plaza,

11  Darrell Scott, Matthew Kramer, Robert Horkovich, Tiffany Cobb,

12  Jay Hughes, Christopher Candon, Mark Bartholomew, Sarah

13  Edwards, Michael Davis, Marti Murray, Michael Infalco, Scott

14  Beechert, Gerald George, John O'Connell, Steven Mandelsberg,

15  Mary Martin, Van Hooker, David Parsons, David Bernick, Lori

16  Sinanyan, Cara Santosuoss, S-A-N-T-O-S-U-O-S-S,  Jennifer

17  Scoliard, Andrew Craig, Roger Frankel, Monique Almy, Jonathan

18  Brownstein, Joseph Radecki.  Good morning.

19          MS. BAER:  Good morning, Your Honor, Janet Baer on

20  behalf of the Debtors.  Your Honor, agenda item #1 is the

21  Debtor's Motion to Approve the Settlement with Intercat.  The

22  parties are still negotiating that document and we ask that

23  that matter be continued to the December 19th hearing.

24          THE COURT:  All right.

25          MS. BAER:  Your Honor, agenda item #2 is the Debtors'

1    Application for the Authority to retain Bear Stearns.

2         THE COURT:  May I interrupt you second?

3         MS. BAER:  Sure.

4         THE COURT:  The parties on the phone, please put your

5    mute buttons on.  I can still hear somebody.  I'm sorry, Ms.

6    Baer, go ahead.

7         MS. BAER:  No problem.  Your Honor, the Debtor is

8    asking to retain Bear Stearns as a financial advisor for one

9    specific transaction and one transaction only.  They are a

10   potential bidder in purchasing a specialty chemicals business.

11   The business itself, Your Honor, would be a $60 million

12   purchase and that would come to Your Honor on a separate

13   motion.  All the Debtor is asking for today is to ask to retain

14   Bear Stearns to assist them in that transaction.  The Debtors

15   would like to use Bear Stearns because Bear Stearns knows the

16   seller.  They've had a relationship with the seller and know

17   the seller's business and that respect can be, and have in

18   fact, been very helpful in assisting the Debtors in this

19   transaction.

20        Again, we're not attempting to retain Bear Stearns for any

21   other transaction other than this transaction.  We do not

22   believe Bear Stearns is a professional, Your Honor.  We believe

23   that under 363 you clearly could authorize the Debtor to expend

24   the funds to retain Bear Stearns to assist in this transaction.

25   In fact, Your Honor, we believe that it may not even be an out

1    of the ordinary course transaction, it may be something the

2    Debtors could just do.  But we came here because we wanted

3    everybody to know what we were doing.  We came here, frankly,

4    for a comfort order so that we knew that Bear Stearns could

5    move forward, assist the Debtor and get paid for assisting the

6    Debtor.

7        Under these circumstances, Your Honor, we do not believe

8    the U.S. Trustee's motion really is an impediment.  The U.S.

9    Trustee filed a motion -- or, I'm sorry, a response indicating

10   that if we are seeking to retain Bear Stearns as a professional

11   under Section 327, they are not disinterested and can not be

12   retained.  The U.S. Trustee is taking the position that Bear

13   Stearns has an actual conflict.  The Bear Stearns trading desk,

14   Your Honor, owns some unsecured debt and some equity in the

15   company.  They have established ethical walls which the Debtors

16   and Bear Stearns believed were adequate and under case law

17   could in fact permit this Court in its discretion to retain

18   them as a 327 professional.  However, Your Honor, we really

19   don't need to get there.  Bear Stearns is not a professional

20   under the First Merchants Acceptance Corporation Test.

21       THE COURT:  Well, then do you want to withdrawal the

22   motion?

23       MS. BAER:  What we'd like to do, Your Honor, is ask

24   for the authority under Section 363 to retain Bear Stearns,

25   rather than under 327, and ask Your Honor for permission to go

1   forward and obtain a comfort order under Section 363 retaining

2   Bear Stearns.

3         THE COURT:  But even under 363, that would be because

4   you're essentially using Bear Stearns as, not necessarily a

5   broker, but an agent --

6         MS. BAER:  As a --

7         THE COURT:  -- to negotiate the transaction?

8         MS. BAER:  They're actually a -- they are an

9   investment banking firm.  It's essentially like an agent and

10  they are assisting by reviewing the due diligence with the

11  Debtors and assisting in understanding the business.

12        THE COURT:  Okay.  Number one, this motion was not

13  filed in time to get on to this agenda, so I -- and I have no

14  Motion to Shorten, and I believe my staff contacted somebody to

15  advise about that.  Number two, to the extent that it's a --

16  probably something that needs to be addressed, I would have

17  granted the Motion to Shorten, so I will permit it to go

18  forward, but nonetheless, that's what my staff tells me.  So

19  please, I want to get things back to the point where they are

20  filed on schedule to be heard for hearings.

21        MS. BAER:  Your Honor, I believe local counsel can

22  address this because it was submitted on time.

23        THE COURT:  That's -- it's okay.

24        MR. O'NEILL:  It was filed timely, Your Honor, and we

25  did talk with your Chambers about the timely filing.  So --

1          THE COURT:  It was filed on time?

2          MR. O'NEILL:  It was filed timely.  On the preliminary

3    agenda the date of the filing was wrong.  It was fixed for the

4    final agenda.

5          THE COURT:  All right.

6          MR. O'NEILL:  But the motion was filed timely.

7          THE COURT:  Okay, thank you.

8          MS. BAER:  Your Honor, we understand and we truly

9    tried to adhere to the letter and the spirit of that order.

10         THE COURT:  I know and frankly, this case doesn't

11   usually have those problems, which is why I didn't interrupt

12   you at the beginning when I thought it was still a problem, but

13   thank you for the correction.  Okay, on behalf of the U.S.

14   Trustee?

15       (Telephone interruption)

16         THE COURT:  People on the phone, please, if you don't

17   put your mute buttons on, I'm going to disconnect the call.

18   Please, I don't want to hear the paper clicks and the typing.

19   Please put your mute buttons on.  Good morning.

20         MR. KLAUDER:  Good morning, Your Honor, David Klauder

21   for the United States Trustee's Office.  I guess I have to ask

22   Your Honor for some guidance.  What's before Your Honor is a

23   327 Application.

24         THE COURT:  Yes.

25         MR. KLAUDER:  Bear Stearns to be retained as a

1  professional.  I think our argument is quite clear there that

2  they are a Creditor and therefore, under Price Waterhouse, they

3  cannot be retained under 327.  It now sounds like -- and I've

4  spoken to the Debtors, we had some discussions about this

5  before, but they're doing a 180 here and saying, "No, they're

6  not a professional.  Can we do it under 363?"  Our position

7  would be, yes, they are a professional under the First

8  Merchants Test.  Now, if Your Honor wants to get through that -

9  - go through that analysis now, I'm happy to do so, but that

10  really is not before Your Honor at this juncture.

11         THE COURT:  Well, I guess they've made an oral motion

12  and the Court can hear oral motions, provided that appropriate

13  Parties-In-Interest are notified.  And I could state for the

14  record that this a large Courtroom that is at least ⅔ full,

15  and although I didn't take entries of appearance of those of

16  you in the Courtroom, we could do it for purposes of this

17  record, but all, from my visual observation, constituent

18  parties who have been taking an active role in this case are

19  represented by counsel in the Courtroom.  So I think we could

20  go forward on that basis if you want to address the 363 issue.

21         MR. KLAUDER:  That's fine, Your Honor, and it comes

22  down to is Bear Stearns a professional, which would be -- which

23  would implicate the First Merchants Test that is widely used in

24  this District.  I would say first, Your Honor, it's the U.S.

25  Trustee's position dealing with a professional that -- and I

1  take this from Bankruptcy Judge Fox's opinion in <u>Metropolitan</u>

2  <u>Hospital</u>, which is at 119 BR 910, that a professional is anyone

3  who assists the Debtor in operating the business in a prudent

4  and competent fashion, i.e. assist the Debtor-in-Possession in

5  its duties under the Bankruptcy Code and that that particular

6  entity needs to be retained.

7       Getting to the First Merchants Analysis, there are six

8  factors, and going through those, the number one factor is

9  whether the entity controls, manages, administers, invests,

10  purchases or sells assets significant to the Debtor's

11  reorganization.  I guess from our perspective, this transaction

12  -- which we don't know much about, we know it's a potential

13  purchase of the asset.  It has to be significant to the

14  Debtor's business.  Why would the Debtor be entering into the

15  transaction?  Then we would argue ultimately that would be

16  significant to the Debtor's reorganization.  And Bear Stearns

17  is involved in helping the Debtor consummate the transaction,

18  therefore, it would be our position that they are a

19  professional, when looking at it, under that circumstance; that

20  these are assets significant to the Debtor's reorganization and

21  Bear is intimately involved in helping facilitate that

22  transaction.

23       The second factor is whether the entity is involved in

24  negotiating the Plan terms.  I don't think we can argue that

25  they are, where there's been nothing brought in front of us

1   that they are gonna be involved in the Plan.  But again, I

2   would go back to the first -- the analysis under the first

3   part.  These are significant assets and Bear is gonna be

4   intimately involved in consummating that transaction.

5        The third factor is whether the employment is directly

6   related to the type of work carried out by the Debtor or the

7   routine maintenance of the Debtor's operations.  Again, we

8   don't know much about the transaction, but I'm not so sure that

9   we can consider this a routine transaction in the Debtor's

10  business.  It's a purchase of a competing business.  I'm not so

11  -- the Debtor is not involved in the routine aspects of its

12  business, in purchasing businesses.  It obviously has some

13  significance.  The Debtor wants to move forward with it, so I

14  would -- we would argue it's not a routine matter.  It's not

15  the ordinary operations of the business.

16       The fourth factor is whether the entity is given

17  discretion or autonomy to exercise their professional judgment.

18  I think clearly Bear is gonna have that here.  They are being

19  hired for that reason.  Their professional judgment is key here

20  and I think that clearly has been satisfied.

21       The extent of the -- the fifth factor is the extent of the

22  entities involvement in the administration of the Debtor's

23  estate.  No, they are not the estate's financial advisor, I

24  think that's clear.  But again, they are providing much needed

25  skill and expertise on a significant transaction to the

1  Debtor's business and, ultimately, the Debtor's reorganization.

2        THE COURT:  Okay, is the fact that there is apparently

3  an ethical wall set up between the trading desk and whatever

4  arm of Bear Stearns would be assisting the Debtor and looking

5  at both the financial and other business aspects of this

6  transaction and how it would fit with the Debtor's business to

7  engage it a sufficient way around the 363 issue?

8        MR. KLAUDER:  Well, I don't think so.  I don't think

9  that gets into the professional analysis, Your Honor.  That

10 would be a factor under 327, and we considered that, but under

11 Price Waterhouse, I don't -- that doesn't matter.  The entity

12 is a Creditor, the entity is an equity holder.  That doesn't

13 matter about ethical walls.  They are not disinterested,

14 therefore, they cannot be retained under 327.  Under a 363

15 analysis, I don't -- or under professional -- whether it is a

16 professional analysis, I don't think that factors in at all.

17       THE COURT:  All right, so, the U.S. Trustee's position

18 is if you're a professional, you can't be retained under

19 anything other than 327?

20       MR. KLAUDER:  Correct.

21       THE COURT:  Okay.

22       MR. KLAUDER:  The final factor, Your Honor, the sixth

23 and final factor is when a -- whether the entity services

24 involves some degree of special knowledge or skill such that

25 the entity can be considered a professional within the ordinary

1  meaning of the term.  This is kind of the "if it looks and acts

2  like a professional, it must be a professional."  At least

3  that's the way I would put it in front of Your Honor.  Bear

4  Stearns certainly puts themself out in the market as a

5  professional.  I think under the ordinary meaning of the term,

6  Bear Stearns is a professional, as it were, so I think that

7  that factor has been satisfied as well.

8        So with all that, Your Honor, I think Bear Stearns -- it's

9  -- I understand it's one transaction, but the -- you kind of

10  have to go through this analysis.  It's a significant

11  transaction.  You can't get around 327 here.  They're trying to

12  get away from it and go a different route, and I don't think

13  the Code or the law provides that.  Unfortunately, they are a

14  Creditor, they are an equity holder and they're not allowed to

15  be retained.  So you can't just kind of shoehorn it a different

16  way here.  And therefore, from our perspective, they cannot be

17  involved in the transaction.

18        THE COURT:  All right.

19        MR. KLAUDER:  Thank you.

20        THE COURT:  Thank you.  Yes, sir, good morning.

21        MR. WEISS:  Good morning, Your Honor, John Weiss of

22  Latham & Watkins on behalf of Bear Stearns.  I just wanted to

23  point out a few facts that I think are relevant here, and also

24  frankly, to correct the record as well.  We have engaged the

25  U.S. Trustee in discussions for some time and very much

1   appreciate the Trustee's speaking with us about this, and the

2   Trustee was aware of the fact that we were going to talk to

3   Your Honor about 363 today.

4       I think it's important to point out that the transaction

5   that we're dealing with here is not the sale transaction -- or

6   the -- rather, the purchase transaction.  It's not the purchase

7   of the specialty chemical business.  What we're dealing with

8   here is a letter of understanding between Bear Stearns and the

9   Debtors that involves a nominal fee, really a de minimis fee in

10  the context of these cases.  In fact, the fee was originally

11  listed as $1.25 million.  That fee actually would be reduced to

12  $1 million in agreement with the Official Committee of

13  Unsecured Creditors in this case.  So this is a $1 million

14  issue, Your Honor, to be considered here.

15      Bear Stearns has been working with the Debtors with

16  respect to this transaction for some time.  And when you look

17  at this I think that you do -- were correct to focus on the

18  First Merchants Factors, and I would actually focus on certain

19  factors that the U.S. Trustee pointed out to reflect the fact

20  that Bear Stearns actually is not a professional under the

21  First Merchants Factors.  And really, particularly, the issue

22  here is that when you're looking at this transaction, a $1

23  million retention agreement, more or less, it's a de minimus

24  transaction and it really is wholly unrelated to what happens

25  ultimately in these cases with respect to a Plan of

1    Reorganization.  This isn't a situation where Bear Stearns is

2    to provide services that are intimately related to the

3    administration of the estates.  It's not a situation where Bear

4    Stearns is dealing even with an ultimate transaction that will

5    have any bearing on whether this estate is able to effectively

6    reorganize or not.  This is a situation where Bear Stearns is

7    assisting the Debtors and taking advantage of a very good

8    business opportunity.  And it's really as simple as that, and

9    that's why we come to Your Honor under 363.

10    Now, whether Your Honor determines that this is a -- that

11    Bear Stearns is a professional or not a professional, in fact,

12    there actually is authority for Your Honor having discretion

13    under 363 to allow the retention of Bear Stearns, very recent

14    authority out of the Southern District of New York in the <u>Enron</u>

15    case.  The District Court actually allowed the retention of a

16    special counsel and essentially makes the statement to the

17    effect that {quote}, "The authorization of certain types of

18    payments under 363(b) is not prohibited simply because there is

19    another section to the Bankruptcy Code related to the same type

20    of payment."  And that -- there the Court was talking about

21    327(e).  So there is discretion here for Your Honor to

22    authorize this under 363, and we would ask that Your Honor do

23    so to enable us to go forward.

24    THE COURT:  Well, the special counsel provisions were

25    somewhat different.  I don't -- I mean, I -- I'm not familiar

1  with that aspect of the <u>Enron</u> case.  I don't know why the Court

2  would go to 363(b) when you've got 327(e).  I mean --

3        MR. WEISS:  Well, there was a question as to the basis

4  for retention because of the nature of the services to be

5  provided, Your Honor.

6        THE COURT:  Well, I -- okay, I don't know how that

7  fits into this analysis because if it's a special counsel issue

8  and you meet 327(e), I don't even think you need to take on the

9  proposition of 363(b).  But I -- but Bear Stearns is not being

10  asked to provide legal advice, correct?

11        MR. WEISS:  Correct.

12        THE COURT:  You're being asked to provide financial

13  advice of some sort in terms of, as I understand it, figuring

14  out whether this aspect -- this sale would be a good, I'll use

15  the word fit, for the Debtor's business?

16        MR. WEISS:  Correct, Your Honor.  I -- you know, I

17  think that when you look at the transaction at hand here and

18  you apply sort of the vertical and horizontal tests that are

19  controlling in this Circuit with respect to whether this is

20  just purely an ordinary course of business transaction, I think

21  that you come down and you get to where we need to get here,

22  which is that this is an ordinary course of business

23  transaction.  I mean, industries of this size or companies of

24  this size and Bear Stearns engage in these types of engagements

25  all the time.

1          THE COURT:  Well, if that's the case, then I don't

2    need to do an order.

3          MR. WEISS:  True, Your Honor, except --

4          THE COURT:  In fact, I probably can't do an order.

5          MR. WEISS:  Except that the United States Trustee has

6    questioned whether, in fact, this is an ordinary course of

7    business transaction.  So in light of that questioning, Bear

8    Stearns can't go forward with providing services not knowing

9    the --

10          THE COURT:  Well, look --

11          MR. WEISS:  -- ultimate result.

12          THE COURT:  -- it doesn't seem like an ordinary course

13    of business transaction.  I appreciate the fact that businesses

14    do from time to time merge or purchase other businesses and so

15    forth, but Grace is not in the business of purchasing other

16    businesses for some purpose.  And so although this may be an

17    expansion or -- I'll use that word in a loose sense -- of

18    Grace's business, I don't know that that makes it in the

19    ordinary course.  It's a pretty significant transaction and --

20    but what would be in the ordinary course is that the Debtor, in

21    connection with carrying out this transaction, does have to do

22    due diligence and hire somebody to assist it in the course of

23    doing that due diligence, and that, I would say, is in the

24    ordinary course of investigating this transaction.  So I

25    appreciate the fact that the Debtor needs the assistance.  The

1  issue is whether Bear is conflicted out by virtue of being a

2  stock holder in the Debtor.

3        MR. WEISS:  Well, and I think Your Honor points to the

4  exact distinction that we stress here, which is the distinction

5  between the two -- you know, the two transactions; in other

6  words, the engagement transaction versus the purchase

7  transaction.  We would say that Your Honor can authorize Bear

8  Stearns to go forward and can authorize payment to Bear Stearns

9  because it's not -- this wouldn't be a situation where we're

10  dealing with 327 and disinterestedness.

11        THE COURT:  But ultimately, isn't what Bear is being

12  asked to do for the Debtor is give the Debtor the financial

13  information that's going to let the Debtor's Board decide

14  whether or not to enter into this transaction?  So, I mean, I

15  don't know how you can say you're not involved ultimately in

16  the transaction.  Isn't that the purpose by which you're being

17  asked to give financial information?

18        MR. WEISS:  That is the purchase -- that is the

19  purpose for the types of services that Bear is to provide, but

20  the test that you should be -- the transaction that you should

21  be applying the ordinary course of business test to is the

22  contract at hand.  There's no telling whether there will

23  ultimately be a purchase in this instance, Your Honor.  Bear

24  Stearns may not get paid at all.  It's essentially a question

25  of can Bear Stearns get the comfort to go forward over the

1  coming months, knowing that they'll be essentially reimbursed

2  for their expenses and paid for their services that -- many of

3  which have already been provided.

4          THE COURT:  Well, the Debtor is not going to be happy

5  with this comment, but I'll ask it anyway.  If there is some

6  negotiation that considers Bear to be paid for whatever

7  services that are provided not keyed on the success of this

8  deal going forward, does that eliminate the U.S. Trustee's

9  objection?  Is part of the problem in considering Bear to be a

10  professional in this instance that fact that your compensation

11  depends on the outcome of the deal, because you're acting in

12  the nature of, not quite a broker, an agent.  I don't know what

13  else -- what other word to use.

14          MR. WEISS:  I'm not sure I understand exactly the

15  question.

16          THE COURT:  You said ultimately you may not get paid.

17          MR. WEISS:  That's true.  In other words, it's sort of

18  a completion fee-type situation.

19          THE COURT:  Right, which is what I'm asking, whether

20  that's the problem that the U.S. Trustee has, that your

21  compensation depends on the completion of the deal as opposed

22  to the fact that the Debtor is retaining you to give it some

23  financial advice about the transaction?

24          MR. WEISS:  I wouldn't want to speak for the United

25  States Trustee.  That's not a distinction that I've had --

1  personally had discussions with the United States Trustee that

2  that's the specific item of concern there.

3         THE COURT:  Well, does it eliminate it if the deal is

4  re-done at -- you know, I -- maybe it can be even a less

5  expensive fee.  If you know you're going to get paid, there's

6  no contingency aspect to it.  Does that eliminate it and make

7  it more ordinary course, where the Debtor is simply hiring

8  somebody to analyze a transaction and give it financial advice?

9         MR. WEISS:  Speaking personally, Your Honor, I don't

10  think --

11         THE COURT:  No?

12         MR. WEISS:  -- that it would change anything because

13  the ordinary course of business with these types of

14  arrangements is, in fact, to get paid upon completion.

15         THE COURT:  Completion?

16         MR. WEISS:  Yes.

17         THE COURT:  Okay.

18         MR. WEISS:  That's been my personal experience, at

19  least, in dealing with these, Your Honor.

20         THE COURT:  All right, thank you.  Ms. Baer?

21         MS. BAER:  Your Honor, just a couple final points.

22  The status of the transaction, Your Honor, is that there was an

23  auction proceeding that Bear Stearns assisted the Debtor in in

24  putting together their bid.  The bid's been made.  It's down to

25  two potential purchasers.  A letter of intent is due this week,

1   and then there'll be some more due diligence.  That's all Bear

2   Stearns is being asked to do is look over the letter of intent,

3   assist with the due diligence.  In that respect, Your Honor, it

4   is really ordinary course of business for the Debtor to hire

5   consultants to help them with various transactions.  It's a

6   dynamic company that buys and sells businesses.  It's a dynamic

7   company that does different kinds of transactions all the time,

8   in spite of the fact that we're in Chapter 11.  But we came

9   here, Your Honor, because we are, in fact, going to be paying

10  Bear Stearns a million dollars if this transaction is

11  completed.  We believe that that is an expenditure of funds

12  that was something we should bring to the attention of the

13  Court.  But under 363, Your Honor, you have the authority to

14  let us spend that money outside the ordinary course when, in

15  fact, it makes good business judgment.  Here, it does make good

16  business judgment.  They will assist us in a potential

17  transaction that can further the Debtor's business.  They're

18  not a professional.  There's no discretion involved here

19  whatsoever.  This potential merger or this potential sale is

20  not key to the Debtor's reorganization.  The Debtor's

21  reorganization will go forward whether or not it happens.  We

22  hope that it will help to the value of the business and the

23  value of the business helps everybody.  But it is truly just a

24  transaction in the Debtor's business versus -- and I mean the

25  retention of Bear Stearns is just a transaction in the Debtor's

1  business, the kinds of things they do.  It's different from the

2  merger.

3      (Telephone interruption)

4      THE COURT:  People on the phone, say your names.

5      MR. HORKOVICH:  Robert Horkovich.

6      THE COURT:  Don't --

7      MS. ALMY:  Monique Almy.

8      THE COURT:  Folks, please, don't put your mute buttons

9  -- don't -- put your mute buttons on, please, all of you and

10 then say your names.

11     ALL:  (No verbal response).

12     THE COURT:  There is someone who still has not put a

13 mute button on.  Are you using Court Call?  You're not using

14 Court Call?

15     MS. BAER:  Yes, we're using Court Call.

16     THE COURT:  You are?  Okay, can the Court Call

17 operator -- whoever it is --

18     OPERATOR:  I can mute all of their lines.  I just

19 don't know when somebody needs to speak, you know -- who to

20 open up lines.

21     THE COURT:  Well, can you detect who it is who's not

22 putting the mute button on because we're still getting feedback

23 here and that --

24     OPERATOR:  I just now did, yes.

25     THE COURT:  Okay, then disconnect that person, please.

1          OPERATOR:  Okay.

2          THE COURT:  Thank you.  Okay, Ms. Baer.

3          MS. BAER:  Your Honor, in conclusion, the Debtor is

4    trying to be practical here and move forward.  All we're asking

5    for is the authority to pay Bear Stearns a fee if a transaction

6    is ultimately consummated.  All we're asking for is the

7    authority to go forward and retain Bear Stearns to assist it in

8    this potential transaction.

9          THE COURT:  But that's -- I mean, that's begging the

10   question, truly.  I -- that's why you always hire a

11   professional, to get advice.  What you're telling me is it's in

12   the Debtor's best -- ordinary course of business to get advice,

13   and that's probably true, but that doesn't stop the fact that

14   what you're looking for is professional advice.

15         MS. BAER:  Well, Your Honor, again, it's what is a

16   professional under the Bankruptcy Code?  A professional are the

17   lawyers in this room who are involved in the bankruptcy in the

18   Chapter 11 case and assisting the Debtors there.  That's not

19   what Bear Stearns is doing.  We have Blackstone.  They're our

20   financial consultant.  Bear Stearns is simply a consultant

21   being asked to lend help to the Debtor in one aspect of its

22   business, which is the aspect involved in buying and selling

23   businesses, expanding its business lines and the like.  It is

24   not a professional that has, frankly, anything to do with this

25   Chapter 11 case, other than the fact that we happen to be in

1  Chapter 11.

2         THE COURT:  Yes, I appreciate the problem.  I also

3  know then in the Price Waterhouse's opinion -- although that

4  was different because I think there the Debtor definitely was

5  attempting to use the accountant services for the same purposes

6  that it had used them pre-petition and in -- expected an

7  ongoing relationship.  So I agree that the parameter of the

8  retention was different, but it seems to me that you're still

9  looking for professional advice because if you had the

10  capability of doing it in-house, you would do it in-house.  You

11  wouldn't be reaching outside for that advice.  Nonetheless,

12  having said that, it seems to me that 363 does permit me to let

13  the Debtor expend funds out of the ordinary course of business

14  for limited purposes, and this does appear to be a use of money

15  that the Debtor actually has to incur if it's going to make any

16  sense to go forward with this transaction at all.  I guess what

17  I don't know and what I didn't pick up from the papers is why

18  it has to be Bear that has a conflict as a professional and not

19  someone else.  You've indicated that there's a relationship

20  with the buyer, but in and of itself, I don't understand the

21  dynamic and why that is a significant issue.

22         MS. BAER:  The reason why Bear, Your Honor, is because

23  Bear knows the buyer.  So Bear brings good faith, Bear brings

24  knowledge about the business, Bear brings more legitimacy to

25  the Debtor's bid.  Our concern, frankly, Your Honor, is if

1  Bears drops out now and we complete this transaction on our own

2  or with Blackstone or anything else, that will be a negative

3  impact on the buy -- on the seller.  And the seller is now

4  trying to determine which bid to go forward with.  And Bear's

5  being present in this transaction is assisting the Debtor in

6  having its bid looked at and taken very seriously by the

7  purchaser -- I'm sorry, by the seller.

8         THE COURT:  Well, okay, that's kind of a cart before

9  the horse analysis too because Bear got involved before this

10 whole transaction went forward, and that's what I see as the

11 problem.  You know, it's sort of that you create the problem

12 and therefore -- or create the circumstance that leads to the

13 problem and then say, "Okay, the only solution is to accept the

14 fact that we created a problem because if we try to get out of

15 it, there's going to be an even bigger one."  And I'm not sure

16 that's what the purpose of Section 363 is either.  Having said

17 that, in this instance, I'm going to permit the Debtor to

18 expend the funds.  It appears to me that with no one -- no

19 Party-In-Interest who has an economic stake in this transaction

20 objecting that it is an appropriate use.  However, the next

21 time the Debtor expects to do this, come here before you retain

22 someone because I'm not going to approve it again with

23 hindsight, as opposed to foresight.

24         MS. BAER:  Thank you, Your Honor.  We will submit an

25 order to the Court on a Certification of Counsel that will

1  outline the transaction and the fee reduction that was

2  negotiated with the Unsecured Creditors Committee.

3          THE COURT:  All right, thank you.

4          MS. BAER:  Thank you.

5          MR. PASQUALE:  Just on that point, Your Honor, Ken

6  Pasquale from Stroock for the Creditors Committee.  The

7  reduction was already mentioned.  The other item that was

8  agreed to was that for what's called the adjusted fee in the

9  relationship -- in the transaction, that Bear Stearns will

10 return to the Court for approval of any adjusted fee that might

11 be sought on notice to all parties so that we have a chance --

12         THE COURT:  Other than the million dollars, you mean?

13         MR. PASQUALE:  I'm sorry?

14         THE COURT:  Other than the million dollars --

15         MR. PASQUALE:  Yes, except that --

16         THE COURT:  -- that you're agreeing to?

17         MR. PASQUALE:  That's right, it's an alternative.

18         THE COURT:  Okay, let me --

19         MR. PASQUALE:  Thank you.

20         THE COURT:  Let me assure Bear Stearns that unless

21 some really good deal happens and some -- whatever, probably

22 you're looking at a million dollar fee under these

23 circumstances.

24         MR. WEISS:  Actually, Your Honor, I believe the

25 mechanism is actually designed to deal with, generally, fees

32

1   that would be less than a million dollars.

2           THE COURT:  Okay.

3           MR. WEISS:  And we could return to the Court in the

4   event that that negotiation had to occur for a lesser fee

5   amount.

6           THE COURT:  Well, sure, you know, I think those

7   issues, if you're going to agree on lesser fee amounts,

8   probably will come here by stipulation.  If you have to -- you

9   know, if you -- if there's a fight, obviously you can always

10  come to Court.

11          MR. WEISS:  Right, thank you --

12          THE COURT:  Okay.

13          MR. WEISS:  -- Your Honor.  If I may be excused?

14          THE COURT:  Yes, sir, thank you.

15          MR. WEISS:  Thank you.

16          MS. BAER:  Your Honor, that takes us to agenda item

17  #3, which is the Debtor's Motion to Approve a Stipulation with

18  the Bank of American with respect to their claim.  No

19  objections were filed to that, Your Honor.  We did have a

20  couple of minor adjustments to the stipulation and submitted it

21  on Certification of Counsel on Friday.  The two adjustments

22  which were negotiated with the Unsecured Creditors Committee

23  were, one, just a mathematical adjustment, and #2, an

24  additional paragraph that clarifies that since these Proofs of

25  Claim are contingent, it has to do with letters of credit that

1  have been posted and if B of A pays a letter of credit, they

2  have an allowed Unsecured Claim.  There's a paragraph

3  clarifying that clearly then their contingent claim is reduced

4  by whatever is paid and that becomes, then, a regular

5  liquidated claim.  We did submit it under Certification of

6  Counsel, but I have another copy here that I could hand up if

7  Your Honor would be willing to sign it today.

8           THE COURT:  All right, this has been circulated to all

9  the parties and everyone agrees?

10          MS. BAER:  Your Honor, the original stipulation was

11  circulated to all the parties, it was filed as part of the

12  motion, and the only change, Your Honor, is that there were

13  these -- this mathematical calculation and this additional

14  paragraph added Friday at the request of the Unsecureds and

15  that was filed on Friday.

16          THE COURT:  Okay, I'll take your order.  I had a

17  question, though.  I'm not sure whether this stipulation has

18  some effect on the adversary that's pending between Grace and

19  National Union?

20          MS. BAER:  No, Your Honor, it does not.  The National

21  -- it does not in the direct sense.  If in fact B of A would

22  pay the letter of credit posted on behalf of National Union,

23  that would then become a liquidated claim that is governed by

24  this stipulation.  This simply is allowing whatever claims B of

25  A has in the event that letters of credit are drawn and paid.

1          THE COURT:  Okay, so the summary judgments that are

2     still pending still have to go forward on the National Union

3     adversary related to claims under those various protocols?

4          MS. BAER:  Yes, Your Honor, at this point B of A has

5     not paid those letters of credit and there're still issues as

6     to whether or not any of those letters of credit should be

7     drawn and payments made.

8          THE COURT:  Okay.  Okay, thank you.

9     (Pause in proceedings)

10          MS. BAER:  Your Honor, I apologize, the order is kind

11    of buried in the middle.  I don't know if you found it.  If

12    not, I can point it out.

13          THE COURT:  I think I found the order.  I'm looking

14    at, I think, Exhibit-B had -- is the blackline, is that the one

15    you wanted filed?  Okay.

16          MS. BAER:  Yes.

17    (Pause in proceedings)

18          THE COURT:  All right, that order is entered.

19          MS. BAER:  Thank you, Your Honor.  Agenda item #4, you

20    already signed an order on that last week, Your Honor.  That

21    takes us to agenda item #5, which relates to the phase one

22    property damage estimations, and I'll turn the microphone over

23    to my colleague, Michelle Browdy.

24          THE COURT:  May I suggest that we go through whatever

25    else is on this agenda before this?  I think this is going to

1  take more time, and to the extent that other parties may choose

2  to leave if they're not involved, I think we should go through

3  other items.

4         MS. BAER:  Your Honor, our concern is -- and the

5  reason we put it on the agenda where it is is because Ms.

6  Browdy is on trial in Spokane, Washington and she needs to

7  catch a flight back to Spokane for trial tomorrow, which is why

8  we put it where we did on the agenda.

9         THE COURT:  What time is your flight?

10        MS. BROWDY:  Your Honor, I have a 5 o'clock flight out

11 of Philadelphia.

12        THE COURT:  All right, so you need to leave by 2?

13        MS. BROWDY:  I thought 3, but 2.

14        THE COURT:  Let's finish the rest of the agenda items.

15 I'll make sure you're -- I have other cases that are set, so --

16        MS. BROWDY:  Thank you, Your Honor.

17        THE COURT:  Okay.

18        MS. BROWDY:  And just for clarification, we did make

19 efforts to try to move this hearing first, but this is the only

20 date that worked out.  I apologize for the need to leave.

21        THE COURT:  Okay, all right.

22        MS. BAER:  Your Honor, agenda item #6 is related.

23 That has to do with the 15th Omnibus Objection and I think Ms.

24 Browdy was going to give a status and it's relationship to the

25 phase one matters.  So perhaps it makes sense to then also skip

1  that for now.

2          THE COURT:  All right.

3          MS. BAER:  Agenda item #7 is the Debtor's --

4          MR. BAENA:  I'm sorry, I have to interrupt, counsel.

5  Your Honor, I believe that --

6          THE COURT:  I can't hear you, Mr. Baena, I'm sorry.

7          MR. BAENA:  I'm sorry, may it please the Court, Scott

8  Baena on behalf of the Asbestos Property Damage Claimants

9  Committee.  I believe there are a lot of people on the phone,

10 Judge, in respect of item #6.  And maybe we could --

11         THE COURT:  Do the status report --

12         MR. BAENA:  -- take #6 and deal with the order so that

13 these people who don't want to listen to the rest of this

14 calendar can move on and we won't have the interruption of the

15 background noise.

16         MR. LOCKWOOD:  Your Honor, I'm the next one up after

17 this (indiscern.) and I'm perfectly willing to wait and

18 accommodate other folks.  I'm gonna be here for the Kaiser

19 hearing anyway, so that can go last.

20         THE COURT:  All right, let's start with 6 then, Ms.

21 Browdy, thank you.

22         MS. BROWDY:  Okay, Your Honor, well, while we're

23 dealing generally with the property damage claims, I have two

24 orders to hand up.  The first is an order memorializing the

25 results of the Anderson Memorial Hearing we had on the 31st,

1  and that's gonna lead to the expungement of just under 600

2  claims.  We've gone over the Form of Order with Mr. Speights

3  and the parties are in agreement on it.

4          THE COURT:  All right.

5          MS. BROWDY:  The second order I'm gonna hand up is an

6  order granting certain relief under the 15th Omnibus Objection.

7  Those are basically defaults and certain stipulated withdrawals

8  or recharacterizations.

9          THE COURT:  All right.  Thank you.

10         MS. BROWDY:  And to clarify, Your Honor, on the 15th

11  Omnibus Order that we handed up, the exhibits -- essentially

12  the defaults, there are about 100 fewer on the order that we

13  just handed up versus the one that was circulated with the

14  agenda.  Sixty claims we discovered were general unsecured

15  claims, so that we're removing those from the property damage

16  buckets, but we aren't seeking to default them.

17         THE COURT:  All right.

18         MS. BROWDY:  They just shouldn't have been there.  And

19  then there's about another 30 claims filed by a particular law

20  firm who has asked for a 30-day extension, and we've granted

21  that.  So those claims should not be defaulted at this time.

22         THE COURT:  Okay, with respect to the other order

23  concerning the hearing last month, what -- do you know what the

24  agenda number was and can somebody tell me the date of the

25  hearing so I can add that?

1          MS. BROWDY:  The hearing was on October 31st.

2          THE COURT:  All right.

3          MS. BROWDY:  And that was the only item up.

4          THE COURT:  Okay.

5          MS. BROWDY:  And other than that, again, I think that

6    the status item that we originally had up on the 15th was the

7    issue that rather than deal with all the claims that were at

8    issue on the 15th Omnibus -- and just to refresh the Court's

9    recollection, that's where we raised all substantive objections

10   to all property damage claims, at least that we could, by

11   September 1st.  We received on October 24th on the order of

12   1,000 individualized responses to those, and it was just not

13   feasible within a matter of a week to put in our replies and

14   then to expect sur-replies 4 days later.  So we submitted in a

15   proposed order on Certification of Counsel indicating, by the

16   way, that there were disagreements with the proposal that the

17   15th Omnibus, we should hear certain batches in December,

18   January and February.  In December we sought to have argument

19   on certain claims, what we call the category A objections.

20   Those are medical monitoring claims, other things that really

21   weren't property damage claims.  Category B claims that were

22   previously settled or adjudicated.  Certain of the category C

23   claims where the claimants literally had come up with no proof

24   of product ID.  We're not at this point trying to tee up

25   complexities of is it enough product ID or not enough, is it

1   really ours.  This is just, again, the pretty simple is there

2   product ID or not.  And then category H claims, which raise a

3   singular legal issue, which is whether contribution and

4   indemnification claims can go forward.  Those we propose teeing

5   up for the December hearing.  In January we're gonna tee up

6   certain Speights claims, certain category G claims, which were

7   claims from people in Minneapolis seeking recovery for supposed

8   stigma to property, rather than actual remediation costs.  And

9   category D, certain state claims that are barred essentially by

10  statute of repose; a little more complex than that, but not

11  much.  And then in February we want to tee up any additional

12  Speights claims that weren't covered in January and claims for

13  buildings built after 1973 that really couldn't have Monocoat

14  3.  And we think by, again, tearing off those small bites of

15  claims do not raise complicated legal issues.  It's gonna be a

16  very efficient way to continue marching through the property

17  damage claims.

18          THE COURT:  All right, Mr. Baena?

19          MR. BAENA:  May it please the Court, Scott Baena on

20  behalf of the Property Damage Committee.  Your Honor, first, I

21  would ask as a point of personal privilege that you not enter

22  the second order granting relief sought in Debtor's 15th

23  Omnibus Objection to Claims, which was submitted to you today.

24  And the reason I ask that, Judge, is I'm not asking you to deny

25  it either, I'm just asking you to allow us to go back to our

1   office and go through this new Exhibit-A.  And I ask that

2   because last week when I got the original proposed order and I

3   looked at the Exhibit-A which was attached, I believe, to the

4   agenda for today's hearing, it struck me that there were

5   claimants listed as not having provided responses or what-have-

6   you in respect of their claims that just didn't conceivably

7   seem to be right to me.  And I had my office start calling

8   claimants to find out if it was correct.  I found out in one

9   case, one law firm -- and I believe that's the same law firm

10  that counsel just alluded to -- the lawyer that was handling

11  the matter left the firm and the matter had not been reassigned

12  in the firm; it was a big mess and it fell between the cracks.

13  I found another law firm had, in fact, filed responses, but it

14  was recorded as not having filed responses.  So I'm getting

15  very, very leary and concerned about the exhibits to these --

16  these massive exhibits that refer to hundreds of claims.  And I

17  do wish to have an opportunity to scrub the exhibit to make

18  sure it's correct.

19       This has implications on a variety of different levels.

20  Obviously, it affects the claimants claim.  And indeed, it does

21  so in the most pejorative way possible, it expunges the claims.

22  Secondly, it affects the universe of claims that we are dealing

23  with in the contest of the estimation, and it could have

24  profound effects there too.  So if you'll just grant us the

25  opportunity of a week perhaps to just go through and ensure

1  that these exhibits are correct --

2       THE COURT:  That's fine.  I thought that when I was

3  handed this order up that it had been vetted with counsel and

4  you were satisfied with it.

5       MR. BAENA:  And I just got this new exhibit just now.

6       MS. BROWDY:  And Your Honor, if I could ask perhaps

7  for a slightly different procedural approach.  I actually

8  thought there was agreement on it.  But the order that we

9  handed up, part of it is the default issue that Mr. Baena

10  raises, but part of it are well over 100 agreed stipulated

11  withdrawals and the like by people who were either dropping

12  their claims or we recognized that they're environmental claims

13  and the like.  And I hate to have those continue to float out

14  there when --

15       THE COURT:  No, I think the way to do it is just to

16  have you file a new order on a Certification of Counsel after

17  Mr. Baena has a chance to go through Exhibit-A and they -- that

18  way I'll have everything in one document the way it's proposed.

19  I think that's fine.  If he says he needs a week, I think you

20  can file it in 10 days.  That should be sufficient.  I don't

21  see how it's going to affect anybody significantly for 10 days.

22       MS. BROWDY:  Okay, so the Anderson Order will be

23  entered, but this other one we'll submit in 10 days on

24  Certification of Counsel?

25       THE COURT:  With respect to the order that you handed

1   up on the October 31st hearing, I've signed that one.

2          MS. BROWDY:  Thank you, Your Honor.

3          MR. BAENA:  I've got a comment about that, Judge.

4          THE COURT:  I'm sorry?

5          MR. BAENA:  It -- that's the Speights order?

6          MS. BROWDY:  Yeah, on that --

7          MR. BAENA:  Okay.

8          MS. BROWDY:  Yeah.

9          MR. BAENA:  Okay, I'm sorry.  There are a lot of

10  orders floating around.  I -- there was another order I wanted

11  to discuss --

12         THE COURT:  Wait, I'm not done with this one yet.

13         MR. BAENA:  Yes.

14         THE COURT:  With respect to the order that I've just

15  been handed up on the 15th Objection, I'm throwing it in the

16  waste can so that you can file it on a new Certification of

17  Counsel and this one will not be signed, unless you want these

18  exhibits back.  Do you?

19         MS. BAER:  No, Your Honor.  Actually, Your Honor,

20  those exhibits --

21         THE COURT:  That's the order page.

22         MS. BAER:  The exhibits may have (indiscern.).

23         THE COURT:  You may have them all back.  The only

24  thing I threw away was the page that had my signature that

25  wasn't appropriate.  All right, so let me make a note.  That

1  will be entered when a Certification of Counsel is filed.  And

2  you're going to call it second order, correct?

3        MS. BAER:  Yes, Your Honor.

4        THE COURT:  Okay, Mr. Baena.

5        MR. BAENA:  Your Honor, you have already signed,

6  apparently, an order that was submitted by the Debtor with a

7  Certificate of Counsel that was alluded to earlier.  The

8  Certificate indicated that there was --

9        THE COURT:  On #6?

10       MR. BAENA:  It's -- yes, it's the Scheduling Order

11  regarding Debtor's 15th Omnibus Objection --

12       THE COURT:  Okay.

13       MR. BAENA:  -- to Claims, Substantive.

14       THE COURT:  All right.

15       MR. BAENA:  There was indeed a Certificate of Counsel,

16  which faithfully represented to the Court that there were

17  objections to the order that was being proposed by the Debtor.

18  Indeed, it's my understanding that Mr. Speights has objected in

19  respect of certain aspects of it, and the Committee objected as

20  well.  And I'd like to talk about that and the improvidence of

21  the order.

22       THE COURT:  All right.

23       MR. BAENA:  Judge, this order has been before the

24  Court only obliquely.  Last hearing, at about the same time I

25  was listening to the rest of my roof blow off in Hurricane

1    Wilma, that was what was left from Katrina, I believe Ms.

2    Browdy was approaching the podium and telling the Court about

3    the scheduling issues that were engendered by the massive

4    amounts of information that were being provided by some

5    property damage claimants.  And the Court suggested that they

6    confer with parties and work on the scheduling issues.  They

7    proposed this order.  This order was not proposed to us before

8    last week, I believe, and at the time it was, I immediately

9    responded to Ms. Baer telling her I has some grave concerns

10    about this order.

11        Your -- the Court will recall that back in March of '04

12    you had before you the Debtor's proposal for gateway objections

13    to property damage claims.  And the issue was are we gonna

14    allow the Debtor relief from local rules to tee up just several

15    discreet types of objections to property damage claims before

16    the Debtor is obligated, consistent with local rules, to

17    articulate all of their substantive objections to PD claims,

18    and the Court allowed that.  And one of the concerns that we

19    articulated at that point in time was, Judge, this could lead

20    to a real parade of comic possibilities because by doing it

21    that way, property damage claimants would be subjected to this

22    slow drip of claims objections.  And the Court assured us that

23    that was not the Court's intention.  Indeed, the Court stated

24    at page 24 of the transcript of that hearing that what the

25    Court intended was one gateway objection in respect of

1  everybody's -- all PD claims, and then one substantive

2  objection.  You went on to say that you would only expect

3  property damage claimants to be before this Court twice in

4  respect of their objections to a single claim.

5      What the order that you signed does is ensure that we will

6  not have that result because instead of setting down claims for

7  objection and hearing, this sets down subjects for hearing, so

8  that if 100 claims are subject the same sort of objection, that

9  objection will come before the Court on a particular day.  If a

10 particular claim is subject of a variety of different

11 objections, that claimant will have to come back to a series of

12 hearings in the cattle car with every other PD claimant whose

13 claim or claims are subjected to the same subject of objection.

14     THE COURT:  Okay, then I think if that's the case, I

15 misunderstood what the process was to be because I thought we

16 were talking about one -- I don't know what the right word is

17 to use for this -- gateway.  Okay, let's say we have Claimant A

18 and Claimant B and there are three gateway objections to

19 Claimant A and one different gateway objection to Claimant B.

20 I thought what this order would do is tee up the three gateway

21 objections for Claimant A on one track and a different tee up -

22 - different track for the claims objection on B.  I did not

23 appreciate that it was to be each Creditor in each objection.

24     MR. BAENA:  Judge, if the technician could just flip

25 us on here --

1          THE COURT:  Well, if it is, Mr. Baena --

2          MR. BAENA:  What I would --

3          THE COURT:  -- what I would --

4          MR. BAENA:  Let me suggest to you, Judge, by this

5    order -- we did a little bit of calculation.  And by this

6    order, some 380 claimants will have to attend five hearings in

7    respect of objections to one single claim.

8          THE COURT:  Well, that was never my intent, and if

9    that's the impact, then it has to be modified.

10         MR. BAENA:  That's right.

11         MS. BROWDY:  Again, Your Honor --

12         MR. BAENA:  And what we have --

13         MS. BROWDY:  -- that is certainly not the impact, but

14   we'll get to that on the --

15         MR. BAENA:  Well, that is the impact.  And in fact,

16   Judge, it's on each of the -- the occasion of each of these

17   hearings, there are going to be property damage claimants there

18   on multiple occasions in respect of objections to a single

19   claim.  And we don't think that that's what the Court intended,

20   and we don't think that that's a workable process.  And that's

21   why we thought that this would be done just the way it's done

22   all the time in bankruptcy.  You set down a claim to be heard

23   for objections.

24       You know, the other aspect of the unfairness of this,

25   Judge, is that theoretically there could be discovery that's

1  relevant to the type of objection and everybody's gonna feel

2  constraint to attend the discovery because they're all in that

3  same cattle car.

4         THE COURT:  Well, I'm not opposed to the Debtor doing

5  subject oriented objections.  I mean, I -- every objection to

6  claim is subject oriented in -- at it's bottom line.  But I am

7  opposed to the Debtor attempting to bring parties back in here

8  more than twice, once from the gateway, once from the

9  substantive.

10         MR. BAENA:  Judge, I don't know that you're gonna be

11  able to have it both ways.

12         THE COURT:  Maybe not.

13         MR. BAENA:  I don't know that that works.  I think

14  that in order to avert multiple visits to the Court on a single

15  objection you have to set these objections down by objection.

16  They could be batched, theoretically, if there are, you know, a

17  universe of claims that suffer from the same purported

18  deficiencies.  Maybe they can all be brought on at the same

19  time, but it's by claim, so that an -- a PD claimant will show

20  up one time after the gateway objection is heard in respect in

21  of it's claim.

22         THE COURT:  Well, actually, Mr. Baena -- and I know

23  this is getting into the argument on the #5 that I wanted to

24  differ, but I have been trying to figure out a structure by

25  which the constructive notice issues can be done in batches.

1   And frankly, I'm not sure how it's not going to have to raise

2   an objection to the claim itself anyway, because I really think

3   that's an issues that's going to require some procedural due

4   process to the claimant involved.  Now, I don't have that same

5   view, just so you know, with respect to the other issues that

6   they're trying to litigate, but I -- in thinking -- trying to

7   think this through, frankly, it's something I wanted to discuss

8   in #5.  It appears to me that we ought to get whatever the

9   procedural gateway objections are out the door to the extent we

10  can.  And then I really do think the Debtor is just going to

11  have to file objections to the claims that are left over.  I

12  think that's what's going to have to happen, or else we're

13  going to have figure out a way to have some -- I don't want to

14  say class Proof of Claim, that's not what I mean, but class

15  proceeding to deal with the issues that are relevant to a

16  variety of objections to claims.

17          MR. BAENA:  On a claimant basis?

18          THE COURT:  Well, I think the claimants would

19  certainly have the right to be here to participate.  Now, maybe

20  the Debtor wants to do an Omnibus Objection.  I'm not

21  attempting to set the structure at this point.

22          MR. BAENA:  Okay.

23          THE COURT:  But I can --

24          MR. BAENA:  Judge, we're going to address that in

25  depth, and I don't want to use this objection as the

1  platform --

2          THE COURT:  For that.

3          MR. BAENA:  -- for that substantive argument 'cause

4  it's much more complicated.  But I would like to prevail upon

5  the Court to vacate the order that you entered and send us back

6  to the drawing board.  The -- it was -- frankly, Judge, it was

7  unacceptable that we raised the concern, and in the most polite

8  way we were told, "Too bad."  And that's not dialogue.

9          THE COURT:  Well, okay, at this point, I don't really

10  want to get into whatever happened outside this Courtroom.  I -

11  - the error is mine.  I signed the order, apparently, thinking

12  that it did something other than what the parties intend,

13  unless that is what the party intended.  I didn't expect that

14  it was going to work the way you're articulating.  If it is

15  going to work that way, yes, I need to vacate it, it has to be

16  revised.  I think I was pretty clear that I did not expect any

17  claimant to have to be here more than twice.  I'm not opposed

18  to claimants having to come in on the gateways, the

19  procedurals, and then separately on the substantive.  I think

20  in a case of this size that happens routinely and I'm not

21  concerned -- overly concerned with that.  But I am concerned

22  about bringing people back here more than twice.

23          MS. BROWDY:  Your Honor, if I may briefly respond.  I

24  ticked off earlier which items we wanted to be heard in

25  December and January and February --

1          THE COURT:  Yes.

2          MS. BROWDY:  -- and we were very selective about

3    those.  Each of those, for examples -- let me take that

4    (indiscern.), please -- that, again, different items for

5    December, January and February.  Each of them would be

6    dispositive.  For example --

7          THE COURT:  Yes, but the question is as to each of

8    those items, is one Creditor going to be in more than one

9    category?  If so, you can't do it that way.

10         MS. BROWDY:  Okay, I don't believe that it'll be

11   multiple times, but here's my proposal.  And in part, the

12   reason we broke it up into chunks is because obviously we all

13   know we have limited time at these Omnibus proceedings.  I

14   would ask that we get a separate hearing then in January and

15   then all the one's that we identified to be teed up that were

16   in this 15th Omnibus, we just hear in one day in January.

17         THE COURT:  Okay.  Well, I think hearing these in one

18   day is -- unless it's simply for further scheduling or some

19   pre-trial orders, you're not going to get through all of these

20   objections in one day, I don't think.

21         MS. BROWDY:  Well, again, Your Honor, we were very

22   selective about what's in there.  For example, contribution and

23   indemnification, that's a legal issue, a previously settled or

24   adjudicated claim.  Either they --

25         THE COURT:  Well --

1          MS. BROWDY:  -- previously settled it or not --

2          THE COURT:  I think --

3          MS. BROWDY:  -- they were --

4          THE COURT:  I think this is what the Debtor needs to

5    do.  I think the Debtor needs to do a chart that says to all

6    Creditors, "Here are the objections that we're going to raise

7    as to your claim."  And you need to list all of the objections

8    for all Creditors that you're going to list.  Then we need to

9    have a scheduling process that says, "Okay, these are the

10   issues as to these Creditors that we're going to pick up."

11   Now, I realize, Mr. Baena, that that isn't exactly what I said

12   before, but I didn't have a universe of claims to look at when

13   I was hypothesizing how this might be best handled.  It seems

14   to me that there may be categories of issues that can be

15   addressed in a mass kind of proceeding as opposed to a claim by

16   claim proceeding.  But until we know for sure which objections

17   the Debtor intends to lodge as to which Creditors, we don't

18   know how best to aggregate those proceedings.

19         MS. BROWDY:  Your Honor, that was actually -- that was

20   the 15th Omnibus Objection.

21         THE COURT:  Right, that -- well, that's --

22         MS. BROWDY:  Where we identified each category, and

23   within each category we identified each claimant that falls

24   into it and you can slice or dice it different ways.  You can

25   say under objection A which claimants fall into, or I believe

1   the Court ordered us to provide a list in late September --

2            THE COURT:  I did.

3            MS. BROWDY:  It said for each claimant, each of the

4   objections.  So that's already been done.

5            MR. BAENA:  I think we do know --

6            THE COURT:  Okay.

7            MR. BAENA:  -- to a great extent, not entirely.

8   There's -- like this language in this proposed order that talks

9   about the remaining aspects -- and I don't know whose claims

10  that would impact.  It was just stylistic, I think, more than

11  anything else.  But I think we do know whose claims are

12  affected by what objections that -- the issue though is, taking

13  each one of those objections to a single claim and setting them

14  up for a separate hearing.

15           THE COURT:  Well --

16           MS. BROWDY:  And --

17           THE COURT:  The reason I was suggesting this newest

18  approach -- and I apologize, I -- you have told me that the

19  15th Omnibus was everything you intended to file, and frankly,

20  I just lost track of that fact.  So I agree, you have done

21  that.  What I was going to suggest next was, however, you could

22  take a look at -- all parties could take a look at which

23  Creditors are in which groups of objections.  And I understand

24  that the Debtor's view in terms of how to best manage the bulk

25  of objections is the proposal that you've set out.  But for

1   some Creditors, that may not work, simply because of the

2   multiple appearances.  So what may make sense is to go through

3   this list, find out, for example, how many Creditors have only

4   one or two categories of objections, and deal with those in one

5   proceeding.  And then take a look at the Creditors whose claims

6   fall into more than one category.  Because, you know, the

7   problem for a Creditor is if they lose on any one theory, they

8   lose.  But the Debtor has multiple opportunities to attempt to

9   show how that claim should not be paid.  And it's difficult for

10  a Creditor to defend against one thing knowing, "Okay, I won

11  that battle, but I have to come back again."  And frankly, that

12  expense should not have to be born by every Creditor in this

13  kind of a case.  So when I said two shots at the apple, I

14  really did mean two shots at the apple because I think that's

15  the way, in this case, the economics are most fairly addressed

16  between the Debtor and Creditor constituents.

17          MS. BROWDY:  And again, Your Honor, we'll try and come

18  up with an order that obviously is satisfactory to the Court,

19  but because of the limited time at the Omnibus, again, I would

20  repeat that I would request a hearing date or two in January --

21          THE COURT:  Okay.

22          MS. BROWDY:  -- to tee these up for.

23          THE COURT:  All right, well, I think that's fine, but

24  let me work -- why don't I have whoever, Mr. O'Neill I guess,

25  contact my staff in Pittsburgh so that we can take a look at a

1   date.  Tell me how much time at this point you think you're

2   going to need.  Are you planning at this point to do nothing in

3   December, but to put all of these three objections that you

4   would have done December, January and February into one hearing

5   in January?

6          MS. BROWDY:  That would be my proposal because I think

7   as a practical matter we can't tee it up for December.  The

8   class -- the Speights proposed class certification issue that

9   was raised at the October 31st hearing, that will be set at the

10  December Omnibus, so we would go forward with that.  But the

11  objections that we would otherwise have raised in December, I

12  suggest clumping the December, January and February one's into

13  a hearing in January.

14         MR. BAENA:  The only other issue, if I may, is

15  briefing, Your Honor.

16         THE COURT:  You --

17         MR. BAENA:  The only other issue, Your Honor, is

18  briefing.  There has been no briefing of any of these issues by

19  either side.

20         MS. BROWDY:  Actually, that's not correct.  We had the

21  15th Omnibus was filed.  We've gotten the responses to the 15th

22  Omnibus.  So all that's left is the reply and the sur-reply,

23  and that was covered by a previous order.

24         MR. BAENA:  I'll accept that clarification, but we

25  need to allow time for that to occur, taking into account

1  holidays.

2         THE COURT:  Well, okay, I guess my -- what I am not

3  sure of, because I don't look at Certificates of Service unless

4  somebody raises an issue about one, has each Claimant been

5  served with the 15th Omnibus so that we're going to get --

6  we've gotten responses in from any claimant who intends to

7  respond?

8         MS. BROWDY:  Yes.

9         THE COURT:  Okay.

10         MS. BROWDY:  Yes, we have.

11         MR. BAENA:  But they have not been served, to the best

12  of my knowledge, with this order.  My understanding is that

13  this order went to the 2002 --

14         THE COURT:  Okay.

15         MR. BAENA:  -- mailing list, which wouldn't include

16  all property damage claimants.

17         THE COURT:  All right, well, it -- since it's going to

18  be vacated and redone, that's kind of an irrelevancy at this

19  point anyway.  So why don't you folks see if you can work out a

20  new order that comports with what I've just said, that vacates

21  the one that is of record, that will go out on notice to all

22  parties.  And I know you need to get the dates before then.  If

23  Mr. O'Neill calls my staff tomorrow -- between today and

24  tomorrow, I'll call them to let them know that you're asking

25  for two days in January and I'll give you some -- or my staff

1  will give you dates.

2          MS. BROWDY:  Thank you, Your Honor, and then we'll

3  work with Mr. Baena to back out the dates for the reply and the

4  sur-reply.

5          THE COURT:  All right, so this was also on item 6

6  then.

7          MR. BAENA:  Thank you, Your Honor.

8          THE COURT:  When -- Mr. Baena, when was that order

9  entered?

10          UNIDENTIFIED SPEAKER:  It was Wednesday, I believe.

11          THE COURT:  Okay.

12          MR. BAENA:  Let me give it to you, Judge, it --

13          MR. TACCONELLI:  Your Honor, Theodore Tacconelli.

14  It's Docket #11035, it was entered on November 10th.

15          THE COURT:  All right, Mr. Tacconelli, what was the

16  docket number, again, please?

17          MR. TACCONELLI:  The order was Docket #11035.

18          THE COURT:  Okay, I'll just make a note that that will

19  be vacated and a new order entered when a COC is submitted.

20  And I'm orally vacating that order, so whatever is set up by

21  way of procedures at this point is vacated, but the order --

22  written order will confirm it.  Mr. Speights?

23          MR. SPEIGHTS:  May it please the Court, Your Honor, on

24  this matter you've been discussing.  I'm appearing solely on

25  behalf of my law firm and the clients I represent.  And it may

57

1    be, in light of the Court's decision, that what I want to say

2    could be taken up at December when we are together on the

3    Motion to Certify, but I want to make sure my position is

4    protected.  And I informed the Debtor's counsel of my position

5    before they submitted the order, and they noted that I did have

6    an objection.  May I approach, Your Honor?

7            THE COURT:  Yes.  Thank you.

8            MR. SPEIGHTS:  Your Honor, I really believe I am in a

9    unique position with respect to the 15th Omnibus Objection

10   because as Your Honor recalls, the Debtors filed a 13th

11   Objection challenging my authority to file all of my claims.

12   They later withdrew their 13th Objection as to one building in

13   California.  And Your Honor, when they filed that objection

14   they previously, of course, had filed a motion with the Court

15   to seek a waiver of the local rule.  And that's what led to our

16   August 29th hearing when I talked for more than an hour before

17   Your Honor.  And in their motion, which I've handed up to you

18   just a portion of, which I've highlighted, they represented to

19   Your Honor that they wanted to go forward with these authority

20   objections prior to the Court having to adjudicate the merits

21   of any legitimate claims, that it would save the Court

22   significant time in adjudicating the claims, and that they

23   wanted to do this before dealing with the remaining claims.

24   And I relied on that and I consented.  On August 29th I told

25   Your Honor we welcome the authority objections being heard

1  first, and we had been going forward, and I know we've given

2  the Court a lot of work.  I'll assure you my law firm, and I

3  believe the Debtor's law firm, have spent a lot of time going

4  through these authority objections.  Your Honor, I relied on

5  that, and I'm engaged in that process now, and I don't think I

6  should have to deal with this 15th Objection on Substance

7  until, as the Debtors the represented when the filed these

8  authority objections, we get through with these authority

9  objections.  They said --

10       THE COURT:  Well, are your clients -- are -- your

11  clients, I think, Mr. Speights, are not in the same category as

12  the other Creditors for whom Mr. Baena raised the objection,

13  because if I understand it, the Debtor would be filing

14  objection to your client's claims in -- well, the Debtor

15  proposed two batches, in addition to the authority objections.

16       MR. SPEIGHTS:  Well, that -- then they were -- and

17  that's why I said I may be, in a sense, premature in light of

18  that.  I will have a number of objections, like Mr. Baena has

19  articulated, on behalf of the Committee.  But the theory of the

20  Debtors -- and while I disagree with almost everything the

21  Debtors say, their theory actually was pretty solid.  If we're

22  gonna get rid of a lot of the claims on authority, let's get

23  rid of them first, and I agreed to do that.

24       Now, having said that, Your Honor, I don't know why the

25  Debtors, having gone through this exercise, will not now

1    realize that they ought to withdraw the remaining authority

2    objections, or most of 'em.  For example, I've got hundreds,

3    hundreds of California colleges and universities I represent

4    under a written -- under two written contracts of

5    representation.  But now, in addition to their still having the

6    authority objections on that, they want to litigate the

7    California issues, four, five six issues per California claim.

8    And I think, you know, between now and December, maybe the

9    Debtor could say, "Okay, we've gotten Mr. Speights to agree to

10   withdraw some claims.  Mr. Speights voluntarily has withdrawn

11   some claims, and Your Honor has stricken, as of today, 600

12   claims.  Maybe we're close to the finish line."  But I have no

13   idea where the finish line is on that authority objection

14   process and one World War fight is enough for me.  I don't, in

15   the middle of this authority process, now need to get involved

16   in this other objection process.  Again, Your Honor, I'd be

17   happy to discuss this with you in December after the Motion to

18   Certify, and maybe we'll make some progress by then.  But I

19   want the record straight that in addition to whatever reasons

20   the PD Committee has, uniquely, we think authority should be

21   decided in moving -- before moving to door two.

22        MS. BROWDY:  Your Honor, if I may be heard?  Michelle

23   Browdy on behalf of the Debtors.  I certainly agree with Mr.

24   Speights that he stands in a unique situation.  Here's someone

25   who filed 75% of the 4,000 property damage claims that were

1  filed in this case.  Since July, 2,300, 2,300 of Mr. Speights

2  have been expunged or withdrawn and he still has 60% of the

3  remaining property damage claims in this case.  And now he's

4  saying that because he went and filed hundreds upon thousands

5  of claims with no authority, he should be treated specially and

6  not have to comply with the same rules as everybody else.  He

7  is seeking special dispensation on the grounds that he

8  improperly filed thousands of claims in the first place.  That

9  certainly cannot be the right approach for this Court to take.

10      And let me give you an example, when we originally teed up

11  the hearing for October 31st, we said we're gonna try to get

12  through the Speights claims in an efficient way.  And we would

13  deal, for example, with the Anderson Memorial claims, for which

14  he had no authority, and we would deal with California claims

15  that he had no proof of product identification, because that

16  was a merits issue that could be addressed simply in one spot

17  and we could get a ruling with an early hearing.  We had an

18  agreement that that was gonna be set up, and then low and

19  behold, Mr. Speights withdrew about 1,500 claims that had no

20  product ID.  But I use that as an example that to get through

21  these claims efficiently, some of the things we want to tee up

22  early are the authority objections, some of the things we want

23  to tee up early are the merits objections.  There's no reason

24  to slow down the merits determinations of the Speights and

25  Runyan claims when those are gonna help us efficiently get

1  through what remains.

2      And again, the statistics, Your Honor, I believe that

3  after the Anderson Order was entered and once we get clarity on

4  the default and the stipulations on the 15th that we are going

5  to be down to roughly, from 4,000 claims, we're gonna be down

6  to roughly 1,150 property damage claims.  We're gonna have just

7  over 1,000 traditional property damage claims.  Of those

8  traditional property damage claims, about 340 of those are

9  Canadian claims filed by Mr. Speights.  And then that will

10  leave us with fewer than 700 U.S. buildings that have

11  traditional property damage claims that need to be addressed.

12  We're still gonna be in a position, though, that of the 1,000 -

13  - roughly 1,000 traditionally property damage claims, 60% of

14  those are on file from the Speights firms.  We cannot slow down

15  this process.  There's no reason he should get, again, a

16  special dispensation --

17          THE COURT:  Well --

18          MS. BROWDY:  -- not to follow the same schedule as

19  everyone else.

20          THE COURT:  Okay, well, where are you in terms of the

21  document production on the authority issues, because quite

22  frankly, it seems to me that that one should be pretty easy.

23  To the extent that there is a written document that provides

24  authority, there's authority.

25          MS. BROWDY:  Well, here's the real issue, Your Honor,

1  is it's been the volume.  You know, we started out with 3,000

2  Speights claims that we had to deal with, and then 200 went

3  away because they were withdrawn.  And then we got to the verge

4  of the Anderson hearing and 1,500 of them went away.  And we

5  finally -- it wasn't until this morning that we got the order

6  agreed to on the Anderson claims, and that's another 600.  So

7  it's been such a moving target, it's hard to see what's left to

8  go back and test what there is or is not authority for.  And in

9  point of fact, Your Honor, that's actually why when we had

10  proposed the December, January and February hearings, we had

11  split the Speights into two batches, because we thought it's

12  just gonna take us a while to get through and figure out what's

13  there --

14          THE COURT:  Well then --

15          MS. BROWDY:  -- and we're always trying to tee up the

16  easier things first.

17          THE COURT:  -- maybe the thing to do, rather than

18  giving you a January hearing date, is to give you a February

19  hearing date, because by then you will have been through the

20  Speights authority issues, hopefully, you know -- and at that

21  point in time whatever is left with respect to the Speights

22  claims will fit into the same mold as all the other claims.

23          MS. BROWDY:  Well, actually, Your Honor.  Again, now

24  that we've gotten rid of nearly 3,000 claims, we're to a much

25  more manageable universe.  As I said, it's gonna be about 100

1  or 50 -- 150 or so that are not the traditional property damage

2  claims.  Things like contribution and indemnification and the

3  like, we'll deal with those separately.  Those are good issues

4  to tee up for a hearing in January, quite honestly -- something

5  like contribution and indemnification.  Of the traditional

6  property damage claims, again, once we're gonna be closer to

7  1,000 I believe it's gonna be much easier to work with the 600

8  Speights authority claims and we'll tee up some of those in

9  January as well.

10        THE COURT:  Well, of the 150 that you want to tee up,

11 that are the -- for example, contribution indemnity claims --

12 as to how many of those are you alleging that Mr. Speights

13 didn't have any authority?  I mean, why do we need to bifurcate

14 the issues?  If you're gonna do discovery on those claims, why

15 can't we just put the authority issue at this point into

16 whatever the objection is on this specific claim?

17        MS. BROWDY:  Right.  Again, the January hearing I

18 would think would be both -- again, merits on certain batches

19 like contribution indemnification, then maybe merits objections

20 that go to certain batches of the Speights claims, and

21 authorization objections that go to the Speights claims.  But

22 again, Speights shouldn't get special privileges because he

23 filed such bad claims.

24        THE COURT:  Okay, well, I'm not seeing how there are

25 special privileges.  I think you two are saying the same thing.

64

1   It sounds like a timing problem rather than an issue as to the

2   procedural process.

3        MS. BROWDY:  Again, I think these all can be teed up

4   in January, Your Honor.

5        MR. SPEIGHTS:  May I respond to that, Your Honor?

6        THE COURT:  (No verbal response).

7        MR. SPEIGHTS:  Thank you.  Three simple sentences,

8   Your Honor.  I'm not trying to get special dispensation.  I've

9   been out front not because I had bad claims, because I had the

10  most claims, probably.  I'm simply trying to enforce the

11  proposal and the agreement that I relied on to go first with

12  authority.  I think I have every right to say that's what the

13  Debtor proposed and I agreed to it.

14       Number 2, Your Honor, unfortunately, Counsel just said to

15  you two or three times, "Well, Mr. Speights has these bad

16  claims he withdrew" -- and I can't remember the number, was it

17  1,000 California claims on the eve of the hearing.  Those are

18  the so-called conspiracy claims.  Those are the claims that

19  I've told you often I talked to Mr. Beeburn, was to think about

20  before they ever started this process.  I consented to an

21  agreement.  I proposed they be done, and I consented to a

22  written agreement that I negotiated with Ms. Browdy in which

23  the Debtor said it would never stand before Your Honor and try

24  to say that I had done something improper by withdrawing those

25  claims.  And here we go.  You know, when I withdraw 'em, I'm

1   jumped upon.  I withdrew them and Mr. Beeburn and I could have

2   worked out those claims a year ago but that doesn't mean they

3   were improper.

4        Number 3, Your Honor, Counsel has just told you that it

5   was only today that we got this stipulation.  Well, I dealt

6   very pleasantly with Ms. Baer on the Order.  We got the Order.

7   We have a little problem on emails between one of her

8   associates and one of my associates.  We agreed to the Order

9   but we had to go through those attachments of 600 that Mr.

10  Baena was describing to you today.  You've got to be real

11  careful.  For example, they had the Anderson Memorial Hospital

12  -- the individual building which I've litigated since 1992 with

13  Grace on that list that you would have signed and expunged

14  their claim.  So it takes some time to go through those.

15       So, Your Honor, again, I suggest that we discuss this in

16  December and see where we are, but if I've got written

17  contracts -- you know, for 500 or 1,000 claims, and they've got

18  'em.  They've got copies of the contracts for the California

19  Universities.  Why am I being put through this ordeal of going

20  through authority objections, but if I have to, let me --

21            THE COURT:  Well, I don't know --

22            MR. SPEIGHTS:  -- enforce the agreement they proposed.

23            THE COURT:  If -- to the extent that there are written

24  agreements it seems to me that it -- that -- it's not an issue

25  that needs to be litigated.  I'm not sure how the Debtor will

1  win an authority issue if in fact there is some authority

2  that's in writing.  So, I don't know the answer.  I haven't

3  seen the documents, Mr. Speights.  I'm not trying to make

4  rulings.  I'm just trying to get through the process.

5      It seems to me that the process ought to be that you take

6  one more stab at looking at the volume of authority issues and

7  at the end of that time, if there is some agreement that

8  additional claims ought to be expunged, or disallowed, or

9  whatever because of lack of authority, fine.  And what's left

10 ought to just go into the traditional objection to claim

11 process for whatever else the issue is going to be on that

12 claim.  And if there's a lack of authority, we deal with it for

13 that specific Creditor in that specific claims objection.

14 Because I'm not going to hold up the process simply to

15 bifurcate out the -- your client's claims, Mr. Speights, to do

16 that pretty much means bifurcating out most of the process.  So

17 it won't work.  But by the same token, I agree that you need a

18 structure in place in order to be able to deal with the

19 Debtor's objections.

20      MS. BROWDY:  Your Honor, if I may respond just

21 briefly.  First, I did not intend to imply that there was

22 wrongdoing in the withdrawal of those claims.  I mean, part of

23 the agreement to withdraw those 1,500 claims --

24      THE COURT:  Look --

25      MS. BROWDY:  -- was to say we're not arguing it was

1  wrongdoing and again it was not my intention.  It's simply a

2  fact there are a lot of claims falling by the wayside which

3  makes it a little hard to track along the way.  But again, I

4  did not wanna suggest there was something improper about the

5  withdrawal.

6      In terms of the written agreements, again, it would be my

7  intent to try to tee up in this January proceeding -- or to tee

8  up in the proceeding, authority objections.  But I wanna

9  clarify.  We have always proposed that we wanna stage the

10 property damage proceedings in an efficient way to get -- you

11 know, that's why we teed up 600 Anderson Memorial cases, 'cause

12 you could do one argument and deal with so many claims.  The

13 written authority issue with Mr. Speights may well raise

14 discovery issues.  You know, we have not yet taken Mr.

15 Speights' deposition.  If we can -- we have not sought the

16 depositions of the people at the University of California that

17 supposedly signed his contract.  If we can get rid of some of

18 the Speights claims on the merits, it could reduce the need or

19 perhaps even eliminate the need to do the discovery.  So I'm

20 not saying right now I wanna give up the right to depose Mr.

21 Speights, we may well --

22          THE COURT:  No, no, no.

23          MS. BROWDY:  -- need to.

24          THE COURT:  Look.  If there is a written document that

25 was signed within whatever the relevant time is -- unless

1  you've got some reason to suspect or want to take a deposition

2  to verify that in fact it's the person whose signature was --

3  it's purports to be on that document, I don't know what other

4  information the Debtor has the right to contest.  You clearly

5  have the right to take a look at claims that are filed without

6  authority because they're improper claims.  And they shouldn't

7  be filed.  And it's improper to file them, and if the Debtor

8  won't say it, I'll say it.  And I don't want to see it happen

9  in other cases.  That's the reason we're going through this

10  process in this case.  But to the extent that there is written

11  authority, I don't know what information the Debtor needs other

12  than to verify that in fact it's a client who signed it.

13      MS. BROWDY:  Well, what about the issue again that the

14  Court just raised?  If there are written agreements within the

15  relevant time -- I've looked at some of the written agreements

16  that the Speights firm has given to us.  Some are signed late

17  in 2004.  Some in 2005 as part of this process.  That does not

18  mean that he had authority in March --

19      THE COURT:  So take the depositions or send out a

20  written interrogatory or do whatever you want to do in that

21  score.  I don't see that that issue at this point should be

22  holding up the rest of the objection to claim processes.

23      MS. BROWDY:  Right, well -- exactly, Your Honor.

24  That's why our proposal would be to tee up both authority and

25  merits objections.  We're trying to tee up the easy ones, so if

1  I can go after authority ones that aren't going to raise

2  evidentiary issues like the Anderson Memorial ones we did it --

3  if we can tee up merits objections to Speights claims that

4  don't raise evidentiary issues we'd like to do it --

5        THE COURT:  I think I've given you the parameters.  I

6  don't think I can say anything more.  Okay?  The parameters

7  are, not more than twice will any claimant be here.  If the

8  Debtor can't take two shots at this apple and disallow a claim

9  as the result, then the claim's going to get allowed and dealt

10 with somehow or other.  That's it.  That's my bottom line

11 parameter.  I don't think I can be any more clear than that.

12 You folks can attempt to work out the Order that determines how

13 those batches will be done.  If you have some disagreement,

14 call me on the phone and set up a hearing by phone to discuss

15 it.  I want this issue done before the next Omnibus, not at the

16 next Omnibus.

17        With respect to the -- Mr. Speights, with respect to the

18 issue of getting this teed up for January, I mean, I don't see

19 that there's a great difference between January and February

20 unless something helps your schedule particularly one way or

21 the other.  If it does, I mean, these cases are going to be

22 here.  You've got lots of plan confirmation issues.  I want the

23 Debtor to march along, and as a result I want the Creditors to

24 march along, but the difference between January and February in

25 the grand scope of things isn't going to mean much.

1          MS. BROWDY:  And, Your Honor, if I can clarify, one of

2    the reasons we want January is because the objections process

3    is going in parallel with the estimation process, and in

4    February we're going to get to the close of discovery on Phase

5    1.  We're going to get to briefing the Daubert issues.  The

6    things we're going to be discussing on item 5, January's a more

7    clear time for us to do it.  Again, February bumps up against

8    Phase 1, that's why we asked for January.

9          THE COURT:  All right.  So, Mr. Speights, if I pick a

10   date that's sometime in January, can you live with the fact

11   that you'll work with the Debtor to see what other authority

12   issues can be dealt with in batches, and to the extent that

13   there aren't any then the issue of the authority will simply be

14   another issue that will be part of whatever other objection

15   claim as to that building the Debtor's raising, or that client

16   of yours that the Debtor is raising.

17         MR. SPEIGHTS:  I understand what Your Honor wants and

18   I'm not gonna sit here and argue with Your Honor.  I would

19   request, Your Honor, to direct the Debtors, now that we're

20   going through all of this authority and now that they've heard

21   what you've said today about your views on authority and having

22   a signed piece of paper for them to let me know at some

23   reasonable -- within a reasonable period of time -- a week or

24   10 days -- which ones they are not going forward on, on

25   authority objections.  Because I believe that at the end of the

71

1 day the Debtors will not go forward in light of what Your Honor

2 said on a large number of these claims for which I have written

3 contracts, pre-bar date.

4         MS. BROWDY:  Your Honor, I'm not adverse to letting

5 Mr. Speights know which ones we will or will not be going

6 forward on authority grounds.  As a practical matter, it's not

7 going to be a week or 10 days.  As we've mentioned earlier, I'm

8 on trial in Spokane right now.  It's likely to go through

9 Thanksgiving.  But we can certainly let him know that before

10 the December Omnibus.

11         THE COURT:  All right.  Mr. Speights, they'll get to

12 you before the December Omnibus so that we will know at the

13 December Omnibus what else is going to happen with respect to

14 objections to your clients' claims.  Okay, having gone through

15 all that, is there any Supplemental Order that I need or is

16 this going to be taken care of in the Order that's vacating the

17 November 10th Order and then adding -- and setting up a new

18 process?

19         MS. BAER:  Your Honor, I think given you've vacated

20 the November 10th Order, we will then work with Mr. Baena and

21 Mr. Speights to submit new Orders --

22         THE COURT:  All right.

23         MS. BAER:  -- dealing with this issue or contact you

24 if we have issues we have to deal with.

25         THE COURT:  Okay, thank you.

1          MS. BAER:  Your Honor, at this point, it is 1:15.  So

2     it probably makes sense to take up agenda item #5.

3          THE COURT:  Probably does.

4          MR. BAENA:  Can you give us a sense of what our timing

5     is today?  Do we only have 15 minutes to cover these two pretty

6     substantial issues?

7          MS. BROWDY:  I'd be happy to do it in 15 minutes, Mr.

8     Baena.

9          THE COURT:  Well, Kaiser is set to start at 1:30.

10         MR. BAENA:  Okay.

11         THE COURT:  So that's 15 minutes.  Unfortunately,

12    Kaiser's probably going to get a little delayed as a result.

13    USG has nothing going forward this afternoon, so I think I can

14    allow a little slippage so that we'll start Kaiser -- let's say

15    at 2.  So I'll give you until 2.

16         MS. BROWDY:  Okay.

17         MR. BAENA:  Would you like to dispose of Kaiser now

18    and then we can come back and finish in --

19         THE COURT:  It's --

20         MR. BAENA:  -- one fell swoop?

21         MS. BROWDY:  Your --

22         THE COURT:  I think, Mr. Baena, that Kaiser's going to

23    be just as bad.

24         (Laughter)

25         MS. BROWDY:  Yeah.  Yeah.  Your Honor -- and I'll be

1  very, very brief.  I'll try to finish my remarks within 10 to

2  15 minutes.  The issue we have right now is a procedural one.

3  How do we structure Phase 1 of property damage estimation to

4  deal with the issues of constructive notice and the Daubert

5  applicability to dust sampling?  The property damage estimation

6  CMO, which is Docket 93-02, already calls for a Phase 1

7  estimation to deal with these two issues.  We've already as the

8  Debtors submitted our fact and expert disclosures on October

9  17th.  We submitted expert reports on the Daubert issue, and we

10  submitted expert reports and disclosures on the constructive

11  notice issue.

12       THE COURT:  Look, can I see if I can cut through this?

13  Because I have spent my entire weekend reading item 15 and all

14  of the -- or 5, pardon me -- not 15.  And going through these

15  reports and I have some preliminary views.  And so I think at

16  this point, I should just go to the preliminary views and see

17  where we stand.

18       On the Daubert issue with respect to the dust sampling, I

19  think it is appropriate to go forward with that on a Daubert

20  hearing in advance.  To the extent that you are prepared to

21  argue whether dust sampling is an appropriate technique for the

22  circumstances, I think we need to set up an argument.  I'm not

23  sure what other papers you folks want to file on that issue but

24  I think it's appropriate to go forward en masse on that issue.

25       On the constructive notice, frankly, I think the Debtor is

1   going to have to put that constructive notice issue into the

2   claims objection process that we've just been discussing on

3   item 6 and figure out claim by claim whether or not the Debtor

4   is going to raise -- and it's actually in the nature of an

5   affirmative defense.  I think the constructive notice issue --

6   because it's really a statute of limitations issue.  So if I

7   treat the objection to claim as {in quotes} "the complaint,"

8   and the Debtor's objection to it as {in quotes} "the answer" --

9   which raises the constructive notice issue then I think we need

10  to get whatever factual discovery, if any is appropriate, done

11  on those constructive notice issues.  I'm not sure that you

12  need any.  It may be a matter of law.  I don't really know

13  enough about the State laws to know what your views will be

14  about that.  But to the extent that you need some discovery I

15  think it can be limited because certainly whether Grace product

16  was installed in a specific building and when is going to be

17  the start of when that limitations period will start in any

18  event.  It can't start before that date no matter what.  It has

19  to start on a date in which there was some product that's

20  installed in a building and then whether or not the -- you

21  know, there was some change to the building.  For example, a

22  renovation that may have clued somebody in by way of actual

23  notice that there was asbestos -- may be an issue.  Whether

24  there has not been any change to a building may be an issue.

25  I'm hypothesizing.  I don't know what all the issues are that

1  you'd want to raise, but I'm suggesting that if you need

2  discovery we should build it in and then I think we can tee up

3  probably by way of a Summary Judgment process -- once you get

4  those known facts in place, whether or not there was

5  constructive notice.  That's my guess.

6     If I'm in error and there are really material facts in

7  dispute then maybe it can't be done on a Summary Judgment

8  process.  And I think there may be issues where the Summary

9  Judgment will have to be filed by claim but the arguments can

10  be addressed at one time.  For example, the law applicable in

11  California is going to be the law applicable in California.

12  How it applies to a specific building may be the focus of the

13  Summary Judgment argument.  And that may vary depending on when

14  the product's installed, what evidence there is, whether

15  there's been a change -- a whole host of factors.  I'm not

16  attempting to articulate them all.  So, those are my

17  preliminary views.  I think that Daubert works in this fashion.

18  I don't know that the constructive notice does.

19     MS. BROWDY:  Okay.  Let me respond then, briefly just

20  on the constructive notice point.  In our 15th Omnibus

21  objection, we have raised objections to individual claims on

22  the grounds of constructive notice.  So we have an exhibit to

23  that 15th Omnibus -- I believe it's Exhibit D-2 but we can

24  double check.  So we know exactly which buildings are at issue,

25  which states they're in and the like.  So we again, know who's

1    going to be affected.  And I don't have the exact figures in

2    front of me but my guess it's gonna be most if not all of the

3    traditional property damage claims.  'Cause the whole point is

4    this information has been kicking out for so long.  And in fact

5    if you look at our expert reports I think we say it's the late

6    '70s, early-mid '80s, something like that by which time people

7    should have known.

8         We also know that for example, Grace Monocoat-3 product --

9    that's off the market by '73 or that era.  So we know the

10   buildings would already have it if they're bringing claims and

11   that sometime after that we think constructive notice kicked

12   in.  And our proposal then has been to use Phase 1 -- we

13   understand it's gonna be a state substantive standard on

14   constructive notice and that rather than tee up all the claims

15   -- although if we were instructed to by the Court we could --

16   we thought that it would become easier in Phase 1 if we took

17   the chunks that we made objections to on the 15th Omnibus, the

18   D-2 constructive notice and took in the most -- essentially the

19   most populous states that has the most claims, it's largely

20   going to be California -- that's about a third of the U.S.

21   traditional property damage claims.  Louisiana is also a big

22   chunk but we agreed at the request of the counsels affected by

23   Katrina to take Louisiana off the table.  But certainly at the

24   time we put in our papers, California, New York and then we

25   thought Louisiana were the top claims that had the most number

1  of claims in there.  And we thought by focusing on those early

2  it's a manageable number of claims.  For example of the

3  California, I think it's on the order of --

4       THE COURT:  We're -- I'm losing track of what you're

5  trying to tell me.

6       MS. BROWDY:  It's that lets tee up California and New

7  York claims on Exhibit D-2 as part of Phase 1 constructive

8  notice.  I don't think we're on any different page than the

9  Court's on.

10       MR. BAENA:  Well, I disagree.  I disagree completely.

11  As I heard the Court, you have concluded and obviously we

12  completely agree with the conclusion you've reached, that this

13  matter can't be approached on anything other than a claim by

14  claim basis because it's based upon knowledge as a fundamental

15  element in any state, it's based on knowledge.  And I heard Ms.

16  Browdy agree with you and then reel right back to the same

17  proposal that you just said won't work.

18       Your Honor, the illustrative examples that you gave of the

19  kinds of -- Omnibus facts, if you will -- that might need to be

20  developed really aren't the facts at all that need to be

21  developed here, in all due respect.  Ms. Browdy is correct, the

22  large majority -- or the state with the largest number of

23  buildings, I should put it that way -- is California.  Now,

24  parenthetically I'll tell you that does not necessarily mean

25  California law applies to those.  But the largest number of

1  buildings in a given state is California.  Louisiana appears to

2  be next but they're off the table.  New York was third,

3  however, with the expungement of the Speights and Runyon claims

4  that were in that state, New York fell to eight in terms of the

5  number of buildings that are in that state.

6       The clear majority of jurisdictions are contamination

7  jurisdictions, Your Honor.  In order for a claim to accrue --

8  accrue -- in those states you have to prove -- you have to have

9  contamination in your building.  You're quite right.  The issue

10  of constructive notice is an affirmative defense, it relates to

11  statute of limitations.  And in the large majority of

12  jurisdictions and clearly in the state of California, there are

13  two cases directly on point that I couldn't have done better if

14  I ghost-wrote those cases.  Those cases make it absolutely

15  abundantly clear that the burden of proving when contamination

16  occurs for purposes of the statute of limitations, is on them.

17  Not on the claimant.  On them.  The claimant only has to allege

18  and prove the fact of contamination.  The claimant does not

19  have to prove when the contamination occurred, and for them to

20  invoke the discovery rule in any of those jurisdictions the

21  burden is on them.

22       And that's why their proposal is so bad.  Because their

23  proposal attempts, mischievously, I might add -- to shift that

24  burden to PD claimants.  So any time Ms. Browdy reels back to

25  that proposal, my hair on my neck is gonna go up because that

1   proposal just doesn't work.  And Your Honor, when a building

2   was contaminated is obviously different from building the

3   building.  And when that owner should have known or knew of the

4   contamination is entirely different.  But it's their burden.

5   We're not turning the totem pole upside down.  We're not

6   creating federal common law.  We're not saying California --

7   they don't really know what they're doing, let's change the law

8   out there.  That's the law.  And so if they want to go take

9   discovery now about when contamination occurred, I suppose

10  they're allowed to do it.  But it's a claim by claim analysis.

11  And I think that's all we can say about constructive notice at

12  this point in time.  It has nothing to do with estimation,

13  Judge, as a result.  It is not part of Phase 1.  We've got to

14  tell Ms. Browdy that we are not going to talk about

15  constructive notice as a Phase 1 estimation issue because there

16  aren't any Claimants in this room that are participating in

17  that Phase 1 process.  The estimation is between us and them.

18  And this is a very individualized analysis.

19       THE COURT:  But if we're going to do objections to

20  claims one by one, what are we estimating?  I --

21       MR. BAENA:  Oh, Judge.  Thank you, Judge.  I agree

22  with you, Judge.  We have said from the very beginning that you

23  know -- Judge, don't have a bar date, let's just estimate what

24  the claims are.  We will review it.  Court decided to have a

25  bar date.  We then got Proof of Claim forms and somehow, Judge,

1  we ended up with the worst of every world.  We've got claims

2  objections going on.  PD Claimants are defending themselves.

3  Some regularly on a full-time basis.  Some who will be

4  confronted with multitudinous appearances before the Court.

5  And then we have the estimation process down this other track.

6  Which is really not gonna chug along any faster until we

7  identify the universe of claims.

8      And so if claims fall out of bed because of constructive

9  notice, or because the statute of limitations generally --

10  that's -- that informs the estimation process.  But it's not

11  the same process.  And that's what this Debtor has done, and

12  that's the part of the presentation that is so dangerous to

13  forget -- that there are two very dissimilar processes going

14  on.  They're not one and the same.  They're not the same

15  parties.  They're not intended to end up with the same result.

16      All we're doing in estimation judge is coming up with a

17  number that anybody that proposes a plan has to fund in order

18  to pay PD claims.  That's the worst-case analysis.  That's the

19  absolute worst-case analysis.  It does not mean that you can't

20  or a trust can't disallow a claim.  It just means that if the

21  claims are allowed, you're gonna have to pay 'em.  This

22  Debtor's plan is 100 cent plan.  You want to insure that 100%

23  of the allowable -- not allowed -- allowable PD claims can be

24  provided for.  That's what the process is about.  The process

25  for allowance and disallowance of claims -- individual claims -

1  - entirely different process.

2      And if we accept the proposals that the Debtor is

3  proposing, they're creating a calculus that only benefits one

4  constituency.  Just one constituency.  Equity.  Because they

5  would have you determine a smaller number for the aggregate

6  estimated value of property damage claims and then they don't

7  care what happens in the allowance process.  Because if a claim

8  that you predicted was worth 0, is allowed at 100 cents, there

9  won't be enough money to pay every PD Claimant.  That's the

10 problem here.

11         THE COURT:  Well --

12         MR. BAENA:  And that's why we have these separate

13 paths and the difference between the two has got to be absorbed

14 and the impact of each on the other has to be recognized and

15 not confused.  And so I say, obviously I feel very strongly,

16 Judge.  But constructive notice issue is an individualized

17 issue.  It is not part of this estimation.  Let them go forth

18 but not here.

19         MS. BROWDY:  Your Honor, just briefly in response, all

20 property damage claims are before the Court.  We had notice in

21 a bar date and as we've made clear from asking for the Phase

22 CMO process, the estimation process and the claims objection

23 process can and should work hand in glove.  We know what the

24 California claims are that we've made constructive notice

25 objections to on the grounds of statute of limitations.  We can

1  tee up an estimation hearing to ask what is the standard of law

2  in California for the adjudication of constructive notice?  You

3  know, is there a constructive notice statute -- standard, and

4  what is it?  And then second, assuming there is one, and we

5  think there is -- what is the date that people in California

6  were on constructive notice?

7       THE COURT:  Okay, well, I think maybe this isn't an

8  estimation issue.  It might be a Summary Judgment issue as to

9  whether or not there is a set standard for constructive notice,

10  pick any State law, I don't really care.  Let's just use

11  California as an example because if the objection to claim is

12  based on the fact that under California the statute of

13  limitations ran and on top of that constructive notice applied

14  as of a specific date and therefore the statute ran, then maybe

15  that's a legal issue.  But I think Mr. Baena is correct, from

16  limited research I've been able to do so far, I don't think you

17  can knock out every building in California by saying that as of

18  a certain date everybody in California knew that asbestos in a

19  building created some property damage claim that should have

20  been addressed by the -- should have been raised with and then

21  addressed by the Debtor.

22       MS. BROWDY:  Well, here's exactly the procedure that

23  we're asking for, Your Honor.  Under estimation, the Court has

24  a great deal of flexibility to set up a procedure.  The Federal

25  Rules apply, the Federal Rules of Evidence apply, its

1  underlying claims are guided by State law, but again, the

2  procedure that the Court sets up to do it -- again, under

3  Bittner and other cases you have a lot of flexibility.  We have

4  proposed an estimation proceeding that for -- we actually again

5  suggested for California, New York and Louisiana.  Now it's

6  looking more and more like California makes the most sense, to

7  have an estimation to say, you know, what can you do in an

8  estimation?  You can do findings of fact and conclusions of

9  law.  What's the legal standard for California under

10  constructive notice, what -- I mean, you have the authority to

11  make those findings.

12          THE COURT:  I don't think that's estimating the claim.

13  I think what that's doing is determining by way of a judgment

14  whether you have an allowable claim that can go forward.

15  Because I would not be determining the value of that claim.

16  Let's say that I decide -- again, hypothetically, just to get

17  to the point -- let's say I decide that in fact, California's

18  constructive notice statute is not applicable to whatever

19  claims objections the Debtor raises.  That doesn't tell me that

20  the claim is allowed at a certain value.  It simply tells you

21  that that defense doesn't work.  So it doesn't estimate the

22  claim.

23          MS. BROWDY:  Well, but, see -- exactly.  That's why

24  we're saying this is Phase 1.  It's Phase 1 of a two-phase

25  process --

1          THE COURT:  Then --

2          MS. BROWDY:  And again, we're trying to -- again,

3    figure out and make Phase -- the ultimate goal is to make Phase

4    2 estimation of the remaining buildings a manageable task.

5          THE COURT:  Well, I --

6          MS. BROWDY:  We --

7          THE COURT:  -- think it -- I really don't see how this

8    is going to be done on something other than a claim by claim

9    objection.  I agree that we can aggregate issues for the

10   equivalent of a Rule 42 type of procedure, and to the extent

11   that you have this objection that you want to raise as to every

12   building in California that's filed a claim here, it may make

13   sense to tee up the argument on those -- on that motion

14   collectively.  You know, just because I say Creditors don't

15   have to come back here more than twice doesn't mean that we

16   can't bifurcate issues in some case management process that

17   makes sense.  And maybe it makes sense to pick out these big-

18   chunk issues and maybe this is one of them.  But I don't think

19   it's an estimation process.  It's a Summary Judgment process

20   you're asking me to determine as a matter of law that there is

21   a constructive notice statute, that it means X and that it

22   applies to these cases in Y fashion.

23         MS. BROWDY:  Actually, we're not asking for that Y

24   application until Phase 2.  I mean, that's why we're splitting

25   it up.  If we just have the finding, what's the legal standard

1  and what's the date, we can then seek disallowance of the

2  claims, we know which the claims are or we can seek --

3          THE COURT:  But the date may be different depending on

4  each building.

5          MS. BROWDY:  Well, again, we actually don't believe

6  it's an individualized issue.  Again, we're seeking

7  constructive notice finding, not the actual --

8          THE COURT:  Well, I understand, but constructive

9  notice still depends on -- under every State law -- on certain

10  underlying facts.  And I don't think you can make the broad

11  leap to say that because asbestos is in a building that for

12  example, again, all hypothetically -- you know, the owners have

13  changed five times in the past 20 years.  No renovations.

14  None.  Ever.  Have ever been done in a building.  The current

15  owner doesn't know whether there was any asbestos in the

16  building because no -- nothing has ever prompted the owner to

17  even think about the issue for whatever reason.  You have to

18  prove that that owner had some reason to have constructive

19  knowledge.

20          MS. BROWDY:  But, Your Honor, again.  This is why

21  we're seeking to split this up.  Because to do it as part of

22  estimation Phase 1 we wanna again do chunks -- generalized

23  issues and that's why, again, if we have a finding of what date

24  of constructive notice and the legal standard, later we can see

25  --

1          THE COURT:  I think --

2          MS. BROWDY:  -- are there individualized issues --

3          THE COURT:  -- I just addressed the date.  I don't

4    think you're going to get a finding.  I may be wrong.  Maybe

5    your discovery will show you that the same date applies

6    universally to all 1,500 buildings.  I -- that -- seems to be a

7    pretty quantum leap, but maybe not, you know.  Maybe the same

8    day will apply.  I don't think you're going to get there in a

9    Summary Judgment phase.

10         MS. BROWDY:  Oh --

11         THE COURT:  But you may.  But you're going to need

12   discovery to do it.  You're going to have to make the

13   allegations that say Building Owner X had constructive

14   knowledge as of a certain date.

15         MS. BROWDY:  So the proposal is that we tee up a Rule

16   42 Motion before the Court?

17         THE COURT:  Well, no.  I think what you need to do is

18   tee up the objections to claims.  Let's get briefing with -- or

19   discovery, if that's what you need -- as to the issues that are

20   going to be relevant on a constructive notice issue.  And then

21   tee up those briefs, people who wish to participate will and

22   maybe at that sense it does make sense to join them all for

23   purposes of decision because the issue may be the same.

24         MS. BROWDY:  Okay.  And can we get that on the

25   schedule to tee that up as -- because we have dates blocked out

1   in March as is, to back those up?

2          THE COURT:  If you can do the discovery.

3          MR. BAENA:  I'm sorry, tee up?

4          MS. BROWDY:  Again, the California issue.

5          MR. BAENA:  Well, Judge, I think Plaintiffs ought to

6   have a right to complain about these issues being treated as

7   Rule 42 common issues.

8          THE COURT:  Well, I'm not saying that that's the way

9   to do it.  I'm thinking that it may make some sense to go that

10  way after we get the briefs in and certainly -- whether they

11  like it or not, if I think that the same issue is going to be

12  decided the same way, we're going to consolidate them for

13  argument purposes.

14         MR. BAENA:  I understand.  But on briefing, Judge,

15  you'll come to a different conclusion, I'm confident, but what

16  I hear counsel urging you to do is give her a date now when

17  that common issue will be heard, and I don't think we've

18  accomplished the first step -- should it be heard on a common

19  basis?

20         MS. BROWDY:  Well, again, I think that the Court has

21  already indicated that, again, for rules -- for a state like

22  California there are gonna be some common issues but we can --

23  we know even more than that.  We know there's on the order of,

24  again, let's say 225 California claims, or so, 200 of those are

25  represented by Mr. Speights, and I'll lay you odds he's gonna

1  tell you that most of those are the California universities.

2  So we're only dealing with a few counsel to begin with.  So --

3  and again, they already know constructive notice has been

4  called out in the Phase 1 -- in the CMO as something that we

5  teed up in March, so again, the timing would make sense.

6      THE COURT:  Well, if the discovery on the issues

7  related to the constructive notice can be done in a fashion

8  that gets you to file whatever appropriate Motion for Summary

9  Judgment you're asking for, and let the other side respond and

10  get the affidavits and briefs, I don't have a problem with an

11  argument on those issues in March.  To the extent that the

12  issue is the same, i.e., is there a constructive notice statute

13  that is applicable and if so what factors do I need to know to

14  apply it to a specific building and if in fact the facts are

15  agreed upon, whatever you folks decide are the relevant facts.

16  And I can do the whole thing by Summary Judgment.  We're going

17  to do one argument where everybody can have their peace.

18      MS. BROWDY:  Thank you, Your Honor.

19      MR. BAENA:  Not in the context of the estimation,

20  Judge, but in the context of objections to claims.

21      THE COURT:  Yes.

22      MR. BAENA:  Correct?

23      THE COURT:  Well, yes, but I mean, the Debtor --

24      MR. BAENA:  The --

25      THE COURT:  I think the Debtor is using the concept of

1  estimation the same way that I'm thinking in terms of Summary

2  Judgment, and their phases really are trying to address legal

3  issues that will then get you into the valuation phase.  So for

4  the Phase 1 issues, which are a subset of legal issues, yes

5  it's a Phase 1 issue.  It's part of the estimation process but

6  I'm not looking at it as an estimation issue.  I'm looking at

7  it as a Summary Judgment issue because if it knocks claims out,

8  they're not going to be estimated.

9        MR. BAENA:  Judge, I appreciate that.  And I only

10  raised it because I don't want there to be any misgivings about

11  the fact that Claimants have to be involved in the process.

12        THE COURT:  Well, they've said they've already served

13  the objections on the Claimants.

14        MR. BAENA:  That's correct.  But the Claimants have to

15  be involved in this process of --

16        THE COURT:  They have to be if they choose to be.

17        MR. BAENA:  Yeah.

18        THE COURT:  If they don't choose to be, they don't

19  have to be.  They've been served.

20        MR. BAENA:  Well -- look, no.  Let's back up for a

21  second, Judge.  The issue that frankly we think is misguided is

22  whether or not you can bundle claims in California for purposes

23  of determining a uniform date by which all California Claimants

24  received constructive notice such that --

25        THE COURT:  Well, that's --

1          MR. BAENA:  -- their claim became time barred.

2          THE COURT:  Right.  The Debtor's proposition is that

3     one date is going to be a means all and end all for everybody.

4     I'm not convinced that that's the case.

5          MR. BAENA:  Okay.

6          THE COURT:  But that's the Debtor's proposition and

7     maybe that's what they'll prove.

8          MR. BAENA:  Okay.  I agree with you.  In fact, I can't

9     even conceive of how the argument is made in the face of the

10    substantial law that expressly holds to the contrary in

11    California.  Now, with that, what is the process, then, Judge?

12         THE COURT:  The process is that the Debtors will file

13    Motions for Summary Judgment as to whatever this issue is.  You

14    can do it first and then do the discovery, which --

15         MR. BAENA:  As to claim objections, though.

16         THE COURT:  As to claim objections.

17         MR. BAENA:  Okay.

18         THE COURT:  Okay, so -- and it may be appropriate to

19    have those Motions filed first, then open it up for discovery,

20    then get some responses filed or get the objection and the

21    responses and then open it up for discovery.  Then get the

22    briefs in.  So that we can see whether or not you could

23    stipulate to the underlying facts.  The discovery may be more

24    focused if the issue is raised first rather than just on

25    wholesale opening up discovery.  May make more sense to do

1  that.  And they want to start with California.  Fine.  So we'll

2  start with California.  Clear?  Okay?

3       MR. BAENA:  I hear you.  We need to --

4       THE COURT:  Work out.

5       MR. BAENA:  -- notify Claimants about how this

6  works --

7       THE COURT:  Well, sure, they'll get notice of the

8  Motion for Summary Judgment.  And if they choose to respond

9  they will.  And if they don't, the order that schedules it will

10  tell them that there will be a default entered against them and

11  they won't have another opportunity to challenge it later.

12       MR. BAENA:  And I presume that the Committee can weigh

13  in as amicus on the issue, Your Honor?

14       THE COURT:  The Committee is entitled to appear and be

15  heard on any issue, Mr. Baena.  We're always delighted to have

16  Committee involvement in cases.

17       (Laughter).

18       MR. BAENA:  Thank you.

19       THE COURT:  With possibly one exception that I

20  addressed earlier in a different case today.  Okay?  Is this --

21  does that -- well, that addresses the constructive notice.  Now

22  on the --

23       MR. BAENA:  There's only one housekeeping issue that

24  emerges as a result of your ruling, Judge.  And that is, the PD

25  CMO, which governs the estimation of property damage claims,

1  left it to this hearing to determine what the shape of Phase 1

2  would be.  And so we need to -- I suppose -- enter an Order

3  that states that constructive notice is not going to be heard

4  as part of Phase 1.

5        THE COURT:  Well, no.  I don't think that's quite

6  right.  I mean, we're not using the same language trying to get

7  to the same point.  I'm saying that this Phase 1, if you want

8  to use the Debtor's words, can include Motions for Summary

9  Judgment that address peculiar legal issues or specific legal

10  issues applied to specific claims.  That's an appropriate use

11  of Phase 1.  So to the extent that the Debtor wants to say

12  Phase 1 is going to be Motions for Summary Judgment directed

13  against buildings in California on -- or owners, whoever --

14  Claimants in California, based on the applicability of

15  California constructive notice provisions, that's an

16  appropriate {in quotes} "Phase 1 determination."  The process

17  by which we get there, however, is not what the Debtor has

18  asked for.  I'm agreeing with you that the process has to be an

19  objection on a claim by claim basis.

20        MR. BAENA:  Okay.

21        THE COURT:  But it is, in the Debtor's view, a Phase 1

22  issue.

23        MR. BAENA:  I do understand that, Judge.  And the only

24  reason I raised it was because under the CMO, depending upon

25  the outcome of this hearing, the PD Committee has additional

1  responsibilities too.  For example if you said we're going to

2  do constructive notice as part of Phase 1, then we would have

3  to submit expert reports in December -- early December.  All of

4  that is by the boards now.  And that's the only reason I was

5  asking for us to enter an Order which would -- relieves the PD

6  Committee of having to do any more in respect to the

7  constructive Trust -- constructive notice issue.

8         THE COURT:  Okay.  Well, somebody hopefully is going

9  to tell me what the law is, if you don't agree with the

10 Debtor's view.

11        MR. BAENA:  Well, we'll be there to tell you what the

12 law is, Judge.

13        MS. BROWDY:  And then just for a clarification, under

14 the CMO -- the PD Committee will presumably be putting in

15 reports on dust sampling in -- consistent with the terms of the

16 CMO.

17        MR. BAENA:  We have an obligation for both Phase 1

18 issues.  If you decide to go forward then we heard you decide

19 to go forward.

20        THE COURT:  Yes, I think the dust sampling issue --

21        MR. BAENA:  Is there any point in trying to persuade

22 you not to go forward on methodology?

23        THE COURT:  On the dust sampling?  If you want to

24 argue whether dust sampling is appropriate to determine the

25 quantity as opposed to the fact of contamination, we can go

1  forward because, frankly, from everything I've seen so far I'm

2  prepared to knock that out.  And not permit dust sampling.

3          MR. BAENA:  Well --

4          THE COURT:  In this case for reasons which I really

5  don't want to take your last 15 minutes to go into.  That's my

6  preliminary view.  But I haven't heard -- I haven't seen your

7  expert reports.  I haven't addressed the specifics of the

8  issue.  I'm taking this all from the briefs and this testing

9  standards that have been given to me and the research in

10 Armstrong and a couple of other cases that I've read.  That's

11 all.  So --

12         MR. DIES:  Your Honor, Martin Dies, Special Counsel

13 for the Committee.  I certainly have heard what you just said

14 and I hope you will give me a few moments to try to persuade

15 you differently.  At least as to treating this as an

16 overarching issue.

17         THE COURT:  Oh, it is an overarching issue.

18         MR. DIES:  Well, respectfully, Your Honor, I don't

19 think it is, the way the Debtor has framed it.  And I will try

20 to cut to the chase and get to the heart of the issue here.

21 Your Honor, in the July hearing Your Honor made the statement

22 that she did not know if the Armstrong ruling would be

23 applicable to the products in this case because of the

24 difference in the products.

25         THE COURT:  Right.

1          MR. DIES:  That in fact is a substantial difference.

2          THE COURT:  There is a substantial difference but so

3    far in the record I have no information that indicates that

4    what the Debtors -- how the Debtors' product has been -- I'll

5    use the words misused.  That is, I know that the Debtor has --

6    Debtors' product is an asbestos wall insulation that is

7    generally applied in some liquid format according to the

8    information that's in the record so far.  I know that it can be

9    encapsulated in some cases.  It can be covered up in some

10   cases.  It may not even be accessible to being in a state which

11   makes it friable at any point in time.  There are significant

12   factual issues as to whether the Debtors' product is friable,

13   from my point of view, I mean, from what I see on the record

14   right now.

15       Judge Newsome determined that among other things -- that

16   the Armstrong floor tile was not friable and therefore the dust

17   sampling wasn't even a fit for that case.  But in addition, he

18   went into great length to go through the standards that applied

19   to dust sampling and why the collection methods can't be

20   replicated, the results can't be replicated, the process by

21   which the fragments are sonicated means that there is no means

22   of telling whether or not the same amount of asbestos fibers in

23   the same length and the same volume existed before the process

24   as opposed to after.  All of that means that it's not reliable.

25       I've looked at the briefs.  I've looked at the standards

1    that have been attached to the briefs in these cases and I

2    think he must have done the same thing.  And from just looking

3    at that, I'm pretty much of the same view.  Now, I haven't

4    heard the arguments.  I'm only giving you a preliminary sense

5    because that's what I said I would do.  So I'm giving you my

6    preliminary sense.  I think dust sampling can be used for one

7    purpose and that is to show that in a place there is

8    contamination.  But at this point in time, I'm not sure that

9    that's the issue.  The issue is is there an unreasonable risk

10   of contamination?  And I don't think dust sampling is going to

11   be a fit for that purpose.

12          MR. DIES:  Your Honor, may I respond?

13          THE COURT:  Yes.

14          MR. DIES:  At least briefly.  First of all, Your Honor

15   is correct.  Judge Newsome said that dust sampling could -- can

16   be a useful tool to quantify the amount of asbestos.  The

17   reason that's important, Your Honor, is because in reality, the

18   products at issue -- fireproofing or sprayed or troweled on

19   acoustical products are friable by definition.  They're friable

20   by definition -- by EPA definition and three decades of

21   regulations that have addressed these products.  There's

22   absolutely no question about it.

23          THE COURT:  If that's the case that they're friable

24   and they've been in buildings since 1973, we know the last one

25   was -- last product -- at least, I say we know, from this

1   record -- was applied in 1973.  Then I think by now people

2   would understand that there are asbestos issues that are

3   related to a specific product in a specific building.  If -- I

4   didn't say that very well.

5       What I'm trying to get to, I guess, is to what I said

6   earlier.  This type of product could be, for example, above the

7   ceiling in this room.  Okay?  It may never result in anything

8   that becomes airborne and causes a problem.  It may never do

9   that.  So if it doesn't, then to use Mr. Baena's word, there is

10  probably no contamination.  Without contamination, there is no

11  claim.  Without a claim there's not something that we have to

12  address.  Now, whether or not there will be contamination

13  because this claim is somehow contingent is a whole different

14  issue that may need to be addressed.  But for purposes of the

15  dust sampling, you can't figure out a contingent claim based on

16  dust sampling, because it's either there or it's not there.  So

17  it's either a current claim or it's no claim.

18      MR. DIES:  Your Honor's -- is perfectly correct.  The

19  EPA says that if the material is in good condition, you don't

20  have to do anything to it.  It's not a problem.  The problem

21  comes in however, Your Honor, with the type of activities that

22  occur in these buildings that typically impact and cause these

23  materials to release fibers.  That sort of thing does not

24  happen with regard to floor tile.  But what happens in these

25  buildings is --

1          THE COURT:  Well, sure it does.  You can rip up the

2   floor tile in your kitchen and stamp on it and, you know,

3   release asbestos fibers.  Of course it does.

4          MR. DIES:  Yes, Your Honor.  But EPA says that floor

5   tile is considered not friable --

6          THE COURT:  Right.

7          MR. DIES:  -- unless you do those things -- that you

8   cut it, you saw it, and you try to remove it.  So that's a

9   substantial difference because these types of materials are

10  rendered to release fibers under a myriad conditions in the

11  buildings such as normal maintenance and custodial activities.

12  You don't have to saw it, you don't have to cut it.

13         THE COURT:  Okay.

14         MR. DIES:  You don't have to impact it.

15         THE COURT:  The only thing that the dust sampling is

16  going to do for you, I think, is show you that if the Debtor

17  contests that there is asbestos contamination in the building,

18  the dust sample will show you that in fact there are asbestos

19  fibers in the building.  That's all it's going to do.  It's not

20  going to quantify them for you.  It's not going to tell you

21  whether they're in the air.  It's not going to show you whether

22  somebody can breathe them.

23         MR. DIES:  In a general sense, perhaps, Your Honor.

24  But respectfully, what the dust sampling will show, Your Honor,

25  is if those materials have released fibers you can definitely

1  tell if those -- if that material is in the surface dust.  That

2  can be determined very easily.

3          THE COURT:  Sure.  Okay.

4          MR. DIES:  So you can tell the historical accumulation

5  of dust.  And here is the big issue, that the Debtor's proposal

6  ignores.  There's really two issues here.  One is that this

7  material, because of the fact that it is rendered friable in

8  dust under all these typical conditions in the building, unlike

9  floor tile it does create surface dust.  And the fact of the

10  surface dust is in itself an exposure hazard.  Yes, it's true

11  that asbestos has to be inhaled to cause disease, but the whole

12  point of these cases, Your Honor, is they're property damage

13  for present property damage.  And looking at it from the

14  standpoint of the owner, the damage is that his building

15  environment, and his building property has been allowed to be

16  contaminated and because of this huge body of EPA regulations

17  and laws, that building, Your Honor, he or she must act to

18  control that hazard -- that surface dust before it's

19  reintrained or resuspended in the air.  And there's absolutely

20  no case in the underlying tort system that stands for the

21  proposition that the building owner can only prove hazard by

22  air sampling to reveal some undisclosed level of fibers.

23          THE COURT:  I think what I already said was the

24  surface dust can be used, as I understand it, to show that

25  there is contamination, but not how much.  Because the test

1  can't be replicated.  Under Daubert, the fact that they can't

2  be replicated I think means up front that they're not able to

3  be subjected to some reliability factor.  Because you can do

4  the same test and get different results.

5          MR. DIES:  Well, Your Honor, respectfully, we will be

6  presenting evidence on that and I --

7          THE COURT:  Okay.

8          MR. DIES:  -- and I think that they are -- dust

9  sampling is reliable under the ASTM standard.  As a matter of

10  fact, it's been repromulgated at least once, maybe twice since

11  the Armstrong case, and Debtor's expert, Mr. Morris, is on that

12  Committee, and it is something that is used by commercial

13  building owners and public building owners and EPA daily and

14  regularly outside of litigation.

15          THE COURT:  Well, if that's the case and you've got

16  that evidence that is clearly appropriate for a Daubert

17  hearing.  You've just convinced me even more that this is an

18  overarching issue and we're going to do it in a Phase 1

19  estimation hearing.

20          MR. DIES:  One final point, Your Honor --

21          THE COURT:  Okay.

22          MR. DIES:  -- and I will sit down.  And that is the

23  reason it's not an overarching issue is the way that the

24  Debtors framed this is dust or air.  But it's never dust or air

25  in the underlying cases because the building owner under all of

1    the EPA regulations for these types of materials, not friable

2    floor tile, can prove their case by other methods, and --

3        THE COURT:  That's not the issue for me.  The issue

4    for me is what am I going to allow in as proof that there is in

5    fact contamination that's going to cause some level of harm or

6    some property damage, and how am I going to make that

7    determination?  That's what this hearing's going to tell me,

8    whether you can or can't go forward on dust samples.  As I

9    said, if there had been new standards, fine, I'm not aware of

10   them.  Give them to me, give me the evidence of reliability.

11   I'm happy to hear it.  My preliminary view from reading all of

12   this is that for the most part in the Federal system the few

13   entities that have looked at it have concluded otherwise.  I

14   may -- I don't always follow the crowd so maybe I'll conclude

15   that you're correct and that there is some reliability that --

16   factor that it's relevant to the issue at hand and that it

17   fits.  If I can conclude all that you can use it.  If I don't

18   conclude all that you can't use it.  But we ought to know that

19   going forward before the valuation hearing starts.

20       MR. DIES:  Your Honor, I certainly don't dispute that

21   Your Honor should, could look at the reliability of dust

22   sampling or air sampling.  I think it's, however, difficult to

23   unhinge it from the facts of the claim, and the discovery and

24   the evidence you would see in each claim and each building

25   because it really is an individual building by building

1  determination.

2        THE COURT:  Well, that may be a relevance issue, but

3  it's not going to be a reliability issue.  You can either

4  replicate it or you can't.  It's either accepted or it isn't.

5  It's either -- you know, there are -- or maybe there are shades

6  of gray, and if there are shades of gray I have to make a

7  decision.

8        MR. DIES:  I'm certainly not gonna try to make that

9  argument today, Your Honor.  But I know the acceptance issue is

10  not in the rule, rule similar to a more general acceptance, but

11  it is reliable --

12        THE COURT:  No, but it is something that Daubert

13  talks about, whether the testing methodology is generally

14  accepted in the scientific community is one of the specifically

15  enumerated factors, and it is something I'm going to want to

16  hear about.

17        MR. DIES:  Yes, Your Honor, and the question is is it

18  reliable and valid, and I think we can prove that it is.  But

19  just the one more point.  The reason that I don't think it's

20  going to result in some overreaching expungement of claims is

21  because whatever you decide with regard to dust sampling these

22  Claimants can prove their claims by other methods as envisioned

23  by the case law.

24        THE COURT:  I understand.  But the issue is whether

25  or not going forward in the valuation hearing I'm going to hear

1  any evidence of dust sampling as a method for determining the

2  value of claims for purposes of funding the Trust.  I have a

3  very limited focus in what I'm doing.  This isn't the -- this

4  piece isn't the Proof of Claim itself.  Now, maybe the Debtor

5  will want to take on that issue, or maybe the Claimants will,

6  and if so then maybe I have a different relevance issue.  But

7  in figuring this as part of the estimation phase what I'm

8  eventually trying to get to is what are the value of the claims

9  that have to be funded?  That's it.  And whether dust sampling

10 will be a methodology that I will permit to be used as evidence

11 of what the value of those claims are to get to the funding of

12 the Trust.  That's my issue.  In the estimation phase.  Now,

13 you folks disagree then, you know, tell me how you're going to

14 rephrase the issue so that I understand it.  That's what I

15 understood the Debtor intended to do in an estimation.  It

16 seems to me that that's an overarching issue, and it ought to

17 be addressed in that fashion.

18        MR. DIES:  Just respectfully, Your Honor, the issue

19 -- even when you decide dust, as we've said, and we cited the

20 Safe Building Alliance case in our brief, what the Debtors

21 propose to determine whether a claim exists on the basis of

22 their sampling has been rejected by every Court that's ever

23 heard this.  So --

24        THE COURT:  Well, I --

25        MR. DIES:  -- that leaves you -- that leaves us with

1  the Claimant can then come in and prove their claim and we've

2  wasted all this time and all this effort.

3         THE COURT:  They're going to be objecting on -- to

4  specific claims on some other basis.  If the Claimants can come

5  in with some other method to prove a claim more power to them.

6  Whether or not dust sampling will be permitted is still an

7  overarching issue and Claimants ought to know whether I'm going

8  to let them pursue that evidence.  Because if not they're going

9  to spend a lot of money on experts reports that aren't going to

10  come in and there's no point.  And if so then they should go

11  spend that money on expert reports because that may very well

12  be a good way for them to prove contamination.  One way or

13  another before they spend the money or don't spend the money

14  they ought to know.

15         MR. DIES:  Well, Your Honor, we will certainly be

16  ready and willing and -- to convince you that this is a

17  reliable method, and I really think that it is.  When you hear

18  it in the context of these cases and not floor tile, for which

19  they were never any cases in the tort system, and we will take

20  that burden on, and I think we can convince you at that time.

21         THE COURT:  All right.

22         MR. DIES:  Thank you.

23         THE COURT:  Ms. Browdy, before you have to run, do

24  you have a concluding comment?

25         MS. BROWDY:  Thanks.  First of all, again, I

1  appreciate the Court hearing this in this order.  At the

2  Court's suggestion last time we talked to your offices and we

3  have dates blocked out in March and we'll submit an Order on

4  Certificate of Counsel.

5          THE COURT:  For the Daubert hearing?

6          MS. BROWDY:  For Daubert and then I think also the

7  constructive notice summary judgment.  We may as well tag them

8  on to the same dates in March.

9          THE COURT:  Oh, okay.  Well, you can talk to the

10  other counsel about that and make sure it fits.  If it does

11  that's fine.

12          MS. BROWDY:  Thank you, Your Honor.

13          THE COURT:  Okay.  Ms. Baer.

14          MS. BAER:  Your Honor, that takes us to agenda item

15  #7, which is the Debtor's Motion for Proof of Claim Bar Date

16  for asbestos personal injury claims.

17          THE COURT:  We are not going to do that today.  Call

18  my office and get a new date unless you've got some agreement.

19          MS. BAER:  Your Honor, we don't have an agreement,

20  although I will say we're very anxious because we have the

21  questionnaire deadline in January, and I know that Your Honor

22  does not have any availability until January the hear these

23  matters, and that creates a serious problem for us.

24          THE COURT:  Well, then my other option is after I get

25  finished with every other case today I'll hear it today.  But

1  I'm going forward with the rest of the agenda first.  My

2  proposal for Grace starting next year is I'm going to do these

3  in Pittsburgh.  I think you're right that at this point in time

4  you're going to need a significant period of time, and I think

5  I'm not going to hold the rest up.  I do have my staff,

6  however, looking at adjusting the time frames for the other

7  cases.  So that if I can do all the other ones in the morning

8  then I'll give Grace the whole afternoon.  So I don't know

9  quite when that's going to be.  I will take care of this

10  problem starting in January, but I can't between now and

11  January.  I just don't have the time to solve it.  But so if

12  you want to stay until the end of the day I'll hear it at the

13  end of the day.

14        MS. BAER:  Your Honor, we have to.  I really do think

15  we have to go forward and address it.

16        THE COURT:  All right.

17        MS. BAER:  The other significant matter on your

18  agenda, Your Honor, is our Motion for an Injunction with

19  respect to the New Jersey civil action, and we are prepared to

20  go forward and argue that if Your Honor will hear it now.

21        THE COURT:  I think we should just put that until the

22  end of the day to -- well, let me see.  The parties in Kaiser,

23  what's your estimation for how long the hearing's going to

24  take?

25        MR. GORDON:  Greg Gordon, Your Honor.  I would say

1 probably no longer than 45 minutes.

2         THE COURT:  Well, why don't you take a 45 minute

3 lunch recess and come back in and I'll get as much of Grace

4 done at that time as I can.  Okay.

5         MS. BAER:  So, Your Honor, you're proposing that we

6 take a recess in Grace now and come back --

7         THE COURT:  Take a recess in Grace now.  However, I

8 do have a conference call at 4 o'clock.  I cannot have any

9 cases heard between 4 and 5.  You know what, that's not going

10 to work.  We'll just hear them at the end of the day.  Because

11 I have a conference call I have to take at 4.

12         UNIDENTIFIED SPEAKER:  That clock hasn't be set back,

13 Your Honor.

14         THE COURT:  Oh.

15         MS. BAER:  It's only --

16     (Interruption in recording)

17         MS. BAER:  -- Grace and come back to Grace at 3 and

18 do Kaiser now, is that what you're saying?

19         THE COURT:  We'll do Kaiser now.  We'll recess Grace

20 until 3.  Let you folks get some lunch, let Ms. Browdy go so

21 she can catch her plane, and we'll start Grace again at -- as

22 soon as Kaiser's finished.  But at 4 o'clock I'm off the bench

23 until -- okay.

24         MS. BAER:  We understand, Your Honor, and we're

25 prepared to come back then, as long as we need to.

1         THE COURT:  Okay, well, the other thing is I have a

2    plan confirmation hearing in U.S. Minerals at 5.  I don't think

3    it's going to take a long time, but it is scheduled.

4         MS. BAER:  Okay.

5         THE COURT:  So it will be after that.  Okay.

6         MS. BAER:  Thank you.

7     (Recess)

8         THE COURT:  We're back on the record in W.R. Grace.

9         MS. BAER:  Thank you, Your Honor.  We have

10    essentially two contested matters left for the day, and before

11    we get into either of those I'd like to just get rid of the two

12    non-contested matters which are the last two agenda items, 11

13    and 12.  These are the Debtor's Orders with respect to its

14    Fifth Omnibus Objection and its Eleventh Omnibus Objection.

15    Your Honor, with respect to the Fifth Omnibus Objection, I have

16    a Continuance Order continuing what are essentially the last

17    two contested items on there, and I'd like to hand that up.

18         THE COURT:  All right.  You can do them both at the

19    same time, please.  Thank you.  And 12?

20         MS. BAER:  Your Honor, with respect to agenda item

21    #12, the only thing left on there was the National Union

22    claims, and the stipulation, which I handed up, is also an

23    Order, and that resolves the National Union claims.  It's just

24    duplicate claims.  There are still National Union claims of

25    record.  This resolves the duplicates and resolves the rest of

1   that Omnibus Objection, and it will no longer be on your call.

2           THE COURT:  All right, one second.  Okay, those

3   Orders are entered.

4           MS. BAER:  Thank you, Your Honor.  That takes us back

5   to agenda item #7, which is the Debtor's request for a personal

6   injury Proof of Claim bar date.  And I'm going to turn that

7   over to Barb Harding.

8           MS. HARDING:  Good afternoon, Your Honor.

9           THE COURT:  Good afternoon.

10          THE COURT:  Barbara Harding on behalf of W.R. Grace.

11  Your Honor, as you know we have filed a Motion for a Proof of

12  Claim Form, and by way of a preliminary statement, Your Honor,

13  I do want to just talk briefly about the Proof of Claim.  It's

14  a fundamental feature of bankruptcy, obviously, as the Court

15  knows, and there can be no doubt about the Court's authority

16  and power to issue an order, a bar date in this asbestos

17  bankruptcy proceeding at this time and for these -- this small

18  and limited class of Claimants.

19      The only question I think that's before the Court is why

20  should the Court do that at this time and how should the Court

21  go about doing it?  And before getting to those two questions I

22  do want to raise one preliminary matter, which relates to the

23  burden involved with this motion.  What party, or what parties

24  have the burden of demonstrating to the Court why or why not?

25  Why should this bar date be issued or why the bar date

1   shouldn't be issued.  And I just want to call the Court's

2   attention to a couple of statements.

3       If you could -- could you turn on the screen please?

4   Thank you.  Before it comes up, Your Honor, obviously the rule

5   with respect to the Proof of Claim says shall, and with respect

6   to the bar date it says shall as well.  And without getting

7   into whether it has to be ordered I think that there has been

8   in the cases established that the burden is on the objectors to

9   the bar date to prove, to make a persuasive showing to the

10  Court as to why a bar date should not be issued.  And I wanted

11  to show the Court, and actually I think I could bring up to the

12  Court the slides if we can't get it on the screen.

13          THE COURT:  Okay, thank you.

14      (Pause in proceedings)

15          MS. HARDING:  We tested it before, Your Honor, and it

16  worked.  I apologize.  But I will read the quote from Eagle

17  Pitcher.  "We consider that this rule, 303(c)(3), sets up

18  something in the nature of a presumption that a bar date will

19  be set.  But as is the case with the presumption it may be

20  overcome by a persuasive showing.  We reached the conclusion

21  that a bar date for the filing of Proofs of Claim should be set

22  for present asbestos Claimants for insufficient reason has been

23  shown not to do so."

24      So with respect to the motion that we've made, Your Honor,

25  we submit that it is the objector's burden to demonstrate that

1  the bar date should not issue.  It's their burden to

2  demonstrate persuasively that the reason for which it's sought

3  is not legitimate, and that the purpose for which it is sought

4  can't be served by issuing the bar date.  So I think that's an

5  important -- the burden is an important thing to consider in

6  this context.

7      Now, let's talk about why the bar date should issue.  The

8  Court has made -- and the parties, the Debtors and all the

9  parties have made substantial progress over the past year,

10 coming up with a structure for dealing with asbestos personal

11 injury claims.  The Court has put in place many pieces to make

12 sure that there is a structure in place for dealing with these

13 claims and that there is a process by which those claims can be

14 valued, the liability of the Debtor can be determined for those

15 claims.  And there are several pieces in place.  The Court has

16 determined that there will be estimation, and that's how we'll

17 go about it.  There's now a CMO that, you know, took

18 considerable time went into negotiating that CMO.  There's a

19 focus on the current pre-petition Claimants determining that

20 the Debtor's liability for those claims so that we can then

21 predict the liability for future claims.  The Court has ordered

22 a questionnaire to be issued on, you know, over 100,000

23 Claimants.  The Debtor's claims agent -- they've served that

24 questionnaire out on over 100,000 Claimants.  We've got this

25 process in place and it's moving along.  We're making progress.

1      And the reason that we've made the motion for the bar date

2  is to make sure now that there is -- that the last piece is in

3  place, that the Court has the authority to make sure that the

4  process and structure that it's put in place works.  The very

5  narrow reason, and I think we've been very transparent about

6  it, the reason we think we need the bar date is to that the

7  Court has jurisdiction over the Claimants, the pre-petition

8  litigation Claimants, to make sure that they return the

9  questionnaire, and that if they don't return the questionnaire

10  that the Court has the authority to issue some kind of sanction

11  to compel them to do so.  And right now there's no process in

12  place to insure that that can take place.  And I have not seen

13  anything in any of the objector's pleadings -- they have not

14  argued about this issue.  They do not dispute that that -- that

15  the Court's authority is not there on this issue.  And so I

16  don't -- they haven't even argued it.  And so I think it's a

17  very important point.

18      Now, I was not involved in this case back in January when

19  this was -- there was a hearing where this issue came up.  And

20  at that time the Court said, as I understand, I read it all

21  again last night, the Court said, "I don't think I have to

22  issue a bar date at this time."  And I think the Court

23  said, "We're in estimation, I'm going to order this

24  questionnaire, I don't think we need the bar date at this

25  time."  And at that time Mr. Bernick raised this very issue.

1   He said, "I don't think the issue of the bar date goes to the

2   question of necessarily assessing liability, although it can

3   help with that."  He said these very words.  "We need to have a

4   way to have process over the Claimants."  And at that time I

5   think it's very important -- I wrote it down last night.  At

6   that time Your Honor said to Mr. Bernick, Your Honor said,

7   "Well, I think we can deal with that."  And you said two things

8   that I think are very important.  First you said, "It seems to

9   me that the attorneys -- that if the attorneys are willing to

10  go back to their clients and file something that says my client

11  understands that there's going to be an estimation hearing and

12  that they will be bound maybe I don't need a bar date."  Now,

13  as far as I know that's never occurred.

14      The second thing that the Court said was that I've got

15  gazillions of 2019s and maybe -- and I can't get process over

16  the Claimants but maybe I can get it over the lawyers.  And so

17  that's where it was really left, with this idea that there

18  might be this other mechanism for having process over the

19  Claimants.  And that was the context in which the questionnaire

20  was negotiated and the context in which Mr. Bernick made the

21  statement in the July hearing.  We had originally had a

22  questionnaire that had on it, in the front of it it said Proof

23  of Claim/questionnaire.

24      And so when Mr. Bernick said we're not seeking a Proof of

25  Claim, we're not seeking a bar date it was in connection with

1   the questionnaire, which we are not.  We are not seeking to

2   make the questionnaire a Proof of Claim form or a bar date.

3   We're simply saying that there's nothing in place right now for

4   the Court to have jurisdiction over these Claimants.  And I

5   don't see anything coming from the other side suggesting that

6   that's not true.  And so the only thing that I see in their

7   pleadings arguing for why there should not be a bar date I

8   think are simply, one, not relevant to purpose for which it's

9   being requested, and two, I think they've been soundly rejected

10  in the past.  First -- the first issue, if you can turn, Your

11  Honor -- and actually, before we get there Your Honor, if you

12  -- does the Court disagree or want more argument on the issue

13  of jurisdiction --

14          THE COURT:  No.

15          MS. HARDING:  -- in the 2019?  Okay.  With respect to

16  the question of -- the fact that other cases have not issued

17  bar dates, other asbestos cases have not issued bar dates, I

18  did actually prepare -- the objectors make a big deal about,

19  well, they do this all the time without bar dates, but there's

20  a couple of, I think, very important distinctions, and I think

21  it actually gets back to something Mr. Bernick said all along.

22  You have to view each individual asbestos case in the context

23  with which the issues arise.  And it's different in every case.

24      And so I note for Your Honor two main things with respect

25  to the other cases where bar dates either have or haven't been

1  issued.  Well, first of all, they have been issued in the

2  context of the case where estimation is going on.  In Babcock &

3  Wilcox and in Eagle Pitcher, in both of those cases estimation

4  occurred and there was a bar date with respect to asbestos PI

5  claims.  So in connection with the other cases that were listed

6  by the objectors as reasons why a bar date shouldn't issue here

7  there are two important distinctions.  One, as far as the

8  Debtors can tell, in those cases the Debtors didn't request a

9  bar date.  There are a couple places where I think in -- I'm

10  not sure, in Owens Corning, I think, another party requested a

11  bar date, but the Debtors didn't request a bar date.  And I

12  think if Your Honor will look at slide #6 from the Eagle

13  Pitcher case, Your Honor, the Court in that case made a very

14  important statement, and I'm gonna read it because it's not in

15  front of Your Honor.  So, "Initially we deal with the

16  contention of the Debtors that they have an absolute right to

17  have a bar date set by which time Proofs of Claim must be

18  filed.  After careful consideration of this question we have

19  reached the conclusion that while such bar dates are commonly

20  set upon good cause shown the Court may dispense with one in

21  any given case."  Again, upon good cause shown.  "In reaching

22  this conclusion we are not aided" -- I think it's very

23  important -- "not aided by the information communicated to the

24  Committee that in none of the other cases, asbestos cases,

25  which are known has a bar date been set for there is no

1   indication in any of the decisions in those cases that where no

2   bar date was set that the Debtor which was involved desired

3   that there be one."  I think that's an important distinction

4   with respect to this matter.

5        Secondly, in none of those cases, I think I can say

6   unequivocally was there a discovery questionnaire that the

7   Court had issued and had required that the pre-petition

8   litigation Claimants return.  And so this issue of the Court's

9   jurisdiction over the claim it just simply wasn't present in

10  any of those other cases, or quite frankly, in any other

11  asbestos bankruptcy case, I don't think.  And so I think that's

12  another important distinction to make.

13       The next point I want to make, Your Honor, I think it goes

14  to the fundamental objection that the objectors have to the bar

15  date, which is they say it doesn't get to finality.  It doesn't

16  real help us with finality, and they say it's the primary

17  purpose of a bar date is finality.  And I can't find anywhere

18  in the case law that says that the Debtors have to show that

19  it's the primary reason for issuing the bar date.

20       One, we disagreed with the idea that it's not -- it

21  doesn't help serve the purpose of finality.  We think it does,

22  and I have some quotes here from prior cases, Your Honor, where

23  I think that that idea that it doesn't help get to finality is

24  not true.  But importantly, it doesn't -- it still doesn't get

25  to the fact that the reason that the Debtors are asking for the

1   bar date in this case is more fundamentally about jurisdiction,

2   and I think we quoted, Your Honor -- I don't have a slide, but

3   I have the quote here from the IN RE: Hooker case, Your Honor,

4   where the Court stated, "Filing a Proof of Claim is not merely

5   a means of providing information to the Bankruptcy Court but as

6   a means of involving the Bankruptcy Court's equitable

7   jurisdiction over the bankruptcy Estate to establish the

8   Creditors rights to participate in the distribution of the

9   Estate."  The idea that the bar date is important for

10  jurisdiction I think is it's established, it's certainly a

11  legitimate purpose for seeking a bar date, and I think that the

12  objectors have the burden of demonstrating why it shouldn't be

13  issued to serve that purpose in the context of this bankruptcy.

14      And finally, Your Honor, with respect to the finality

15  argument, I think the two statements from IN RE: Eagle Pitcher

16  and from Babcock are very important.  And I am going to go

17  ahead and read them, Your Honor, because I think it's important

18  to focus on them.  With respect to slide 7, it says in IN RE:

19  Eagle Pitcher, "Only two of the grounds urged by the Committee

20  against the setting of a bar date warrant more than a cursory

21  comment.  The first of these that the setting of a bar date

22  will not serve the purpose that a bar date usually does in a

23  Chapter 11 case of assuring finality and affixing the universe

24  of liability is not persuasive.  There is no question that the

25  setting of a date by which a claim must be filed, the procedure

1  employed in virtually all bankruptcy cases, does help fix the

2  universe of Claimants to be faced by a Debtor."  That's true of

3  this.  With respect to our pre-petition litigation Claimants it

4  will help us understand precisely who among that universe of

5  Claimants intends to pursue a claim against the Trust.  And I'm

6  happy to address the question of whether we really know who

7  those people are or not.

8      But I think the objector's own pleadings demonstrate that

9  we don't because they've said that we -- they make a statement,

10  an unqualified statement, there are lots of people that haven't

11  received their questionnaires that should.  Well, the Debtor's

12  sending out to everybody in their data base that we think had a

13  pre-petition litigation claim.  And we sent correspondence

14  requesting information about those Claimants.  We haven't

15  received a response back, but that surely is one indication

16  that we don't necessarily know the universe of these Claimants.

17      Secondly, Your Honor, the objectors have made a couple of

18  statements over the course of the past several months that I

19  think is simply not true.  When we bring up this issue and we

20  say how are the experts gonna treat these people that don't

21  respond?  They say, "Well, if they filed a claim before they're

22  gonna file a claim against the Trust."  That -- I mean, the PD

23  experience demonstrates that it's not necessarily true, and

24  Your Honor, local counsel for Grace received a call on Friday

25  from counsel in Mississippi stating that they wanted to figure

1  out how they could withdraw their claims from the personal

2  injury context.  Three thousand of them.  So we have a problem

3  of identifying this universe of Claimants, and the bar date

4  will help us to set that universe, and then there's no doubt

5  that that helps us with respect to finality in this proceeding.

6  Secondly, while -- back to Eagle Pitcher.  "While the

7  Committee is perfectly correct that ascertainment of the total

8  number of Claimants in and of itself will not yield a value of

9  present asbestos claims, nevertheless, it is manifest that

10  fixing the number and identity of such Claimants will lend

11  considerable assistance to the process of arriving at a value

12  of the claims of this class."  It will absolutely help us

13  determine the value of the claims of this class, the

14  pre-petition litigation Claimants.  Which is very important,

15  obviously, as the Court has recognized, for helping us to

16  assess future claims.

17  So -- and finally, Your Honor, the Babcock & Wilcox

18  decision, I think, is very informative for the issue before the

19  Court.  In that case another quote, "This Court does not find

20  that the prospect of establishing a section 524(g) Trust

21  justifies relieving present Claimants from asserting their

22  claims before a bar date."  That's the main argument raised in

23  the objections.  That we're gonna have a Trust we don't need a

24  bar date, and the Court resoundly rejected that argument and

25  gave three reasons.  "Ascertaining the number and identity of

1  present Claimants will assist in valuing the claims in this

2  class by facilitating the claims allowance and estimation

3  process," including estimation right there.  "This in turn will

4  assist the parties in the negotiation and formulation of a

5  viable reorganization plan, and third, moreover, although

6  future Claimants are not governed by a bar date an

7  identification of the number and nature of present asbestos

8  related claims will help to predict the Debtor's future claims

9  liability, which is necessary for determining the size and

10  structure of the Trust."

11      So Your Honor, we think that there is absolutely no reason

12  not to issue a bar date here.  It serves several very

13  legitimate purposes, and it's the objector's burden to make a

14  persuasive showing as to why it should not issue.  So, thank

15  you, Your Honor.

16          MR. PASQUALE:  Good afternoon, Your Honor, Ken

17  Pasquale for the Official Committee.  Just wanted to mention,

18  we do support the Debtor's motion.  Ms. Harding mentioned some

19  comments the Court made in January.  In fact, those comments

20  were made in response to my partner Mr. Kreuger's comments to

21  the Court about the need for a bar date, mentioning the fact,

22  of course, that not only did our constituency fill out Proof of

23  Claim forms, but of course the property damage Claimants did,

24  and they were quite detailed.  I'm not gonna belabor those

25  arguments again now, but we do think when the Court said there

1   might be a time later this seems to be the time, at least for

2   this limited subset, in light of the fact that the information

3   simply isn't there in the 2019 filings.

4       Putting aside whether they should be or shouldn't be at

5   this point, the fact is they're not.  So I think the Debtor's

6   motion should be granted.  Thank you.

7       MR. LOCKWOOD:  Your Honor, this is a really

8   remarkable performance.  Normally parties seeking discovery do

9   so because they have a case that they're litigating with

10  somebody, and the discovery is the aid of litigating the case.

11  Here the Debtors have no case against anybody, because the

12  claims haven't been filed, but they want to take discovery.  So

13  how do they solve their problem?  Well, they say, "We'll get

14  the Court to order these people to file cases which will then

15  give us jurisdiction to get the discovery we need."  On the

16  face of it that's got it backward, but the other thing is what

17  the Debtor never addresses here, in particular in connection

18  with its Power Point charts and the rest, is what actually is

19  the purpose of a bar date in a Bankruptcy Court, and what are

20  the consequences of filing one?

21      They want -- number one, first they're not asking for a

22  bar date for an entire universe of claims.  They're just not.

23  They're not asking for a bar date against anybody who either

24  didn't happen to file a lawsuit prior to the petition date but

25  nevertheless had become sick and just hadn't filed the lawsuit,

1   nor are they asking for a bar date for the 4½ years worth of

2   people that have gotten sick since June of 2001 when they filed

3   their petition and would have filed claims against Grace if

4   they hadn't be subject to the automatic stay.  So they're

5   clearly not asking for the entire universe, they're just saying

6   they are.  And moreover, the entire universe actually includes

7   the future Claimants, who they couldn't get a bar date against

8   even if they wanted to.

9       Secondly, they say they don't want to do anything with

10  respect to individual claims.  They say they want to do a

11  524(g) plan.  As the Court is well aware, in a 524(g) plan you

12  set up a Trust, the Trust resolves all the claims.  So by

13  hypothesis, if you're going to elect the 524(g) route there's

14  absolutely no purpose to be served in setting a bar date to

15  force people to file claims in the Bankruptcy Court, which by

16  hypothesis is for the purpose of allowing the Bankruptcy Court

17  to determine whether a claim should be allowed or disallowed.

18  But they're not doing that here.  And most of the cases they

19  cite about bar dates are not 524(g) cases.  They're cases in

20  which one way or another the Bankruptcy Court believed it was

21  gonna have to resolved the individual claims.

22      Now, they have cited two cases as authority for the

23  proposition where you would have a bar date.  Babcock & Wilcox

24  and Eagle Pitcher.  In Eagle Pitcher, although the Court did

25  have a bar date, there's absolutely nothing in the reported

123

1   decisions of that case or that the Debtor has ever brought to

2   this Court's attention that suggests that the bar date ever

3   produced anything that was used in the estimation to any useful

4   purpose.  And there certainly -- in the discussion of the

5   contested estimation that did occur it was done on the basis of

6   the settlement history of the Debtor.  It was not done on the

7   basis of dragging some experts in in some undisclosed manner

8   who are gonna tell the Court which of the pending claims are

9   valid and which aren't, which is the Debtor's posture here.

10      They still haven't told us how the experts are gonna do

11  it, but they keep saying, trust us Judge, trust us Judge, we

12  need this information because our experts are gonna take it,

13  and our experts are gonna tell you how these 150,000 claims

14  should be sliced and diced in terms of their validity and their

15  value.  And Babcock & Wilcox, which the Kirkland & Ellis firm

16  was the -- the firm that got the Debtor to make the motion for

17  a bar date and it was granted.  What happened?  They did in

18  fact persuade Judge Vance that they should have a bar date, and

19  they did it for the purpose of saying that they wanted claims

20  allowed and disallowed.  They were gonna have Rule 42

21  consolidated trials.  They were gonna have Summary Judgment

22  Motions.  Had nothing to do with estimation.

23      And when -- after the bar date was passed and 240,000

24  claims came in they were then in front of Judge Vance and Judge

25  Vance was asking, "Well, okay, now that I've got 240,000 claims

1   what do you expect me to do with them?"  And the transcript

2   recites Mr. Bernick attempting to explain to Judge Vance about

3   how she was gonna do Summary Judgment Motions and for groups of

4   cases, and consolidated joint trials, and these were all gonna

5   be done in big groups.  They weren't gonna be done one by one

6   because Judge Vance said, "I'm not young enough to do 240,000

7   claims."  And eventually Judge Vance said, "Well, you haven't

8   convinced me, but go off and brief it, and explain to me how

9   this process is gonna work."  And the next thing we knew we had

10  a consensual plan.  So it was never used in <u>Babcock & Wilcox</u>

11  either.

12       So now we're back to this case, and the Debtors are

13  correct.  There's never been a case in which any Court ever

14  ordered 150,000 people to fill out questionnaires of the length

15  and breath that this Court has argued in this case.  So,

16  they're right.  This is a unique case.  But they're boot

17  strapping themselves.  Having gotten the Court to order a

18  questionnaire which the Court justified on the grounds of

19  giving them discovery on an estimation which was supposed to be

20  for aggregate purposes, not individual claims allowance.

21  They're now here saying, "We want a bar date."

22       Okay, supposing the Court gives them the bar date.  What

23  happens?  Hundred fifty thousand people file claims.  First,

24  the notion that the questionnaire isn't really the Proof of

25  Claim form is sort of ridiculous because the two-page Proof of

1  Claim form that they give as an alternative, if somebody files

2  that and doesn't answer the questionnaire you know and I know,

3  and that's what this whole jurisdictional stuff is about, that

4  they'll come in and say, "Well, Judge, they didn't file the

5  questionnaire, so even though they filed the Proof of Claim

6  their claim should be disallowed as a discovery sanction."

7  That's their first point.

8      The second point is what happens in a bankruptcy case when

9  somebody files a Proof of Claim?  They're only required to file

10  it if they want the claim allowed.  But once they file it is it

11  prima facie valid.  The Debtor then, if it doesn't -- if it

12  wants to contest it has to file an objection to it.  And the

13  Debtor in this jurisdiction, and in no jurisdiction could file

14  an objection that says -- a global objection says they filed

15  150,000 claims, we object to all of them.  Which means that

16  therefore in theory unless they go through them one at a time

17  they're all gonna be allowed.

18      But the Debtor says, "No, no, no, no.  We're not gonna do

19  that.  We're gonna estimate it."  Well, what do you mean you're

20  gonna estimate it?  Section 502(c) of the Code provide for the

21  estimation in lieu of a 502(a) allowance.  But 502(c) talks

22  about estimating the claim for purposes of allowance, and that

23  means that if you're gonna estimate claims rather than go

24  through the full litigation you still have to estimate them one

25  by one, and when you come in and you say I want to estimate

1  your claim, Mr. Claimant, that initiates a contested matter,

2  which gives the Claimant the full panoply of discovery and due

3  process rights.  What happens then?  Well, if you're estimating

4  a personal injury claim for purposes of distribution, say 28

5  U.S.C. section 157(b)(2)(b) says the Bankruptcy Court can't do

6  that.  Only the District Court can do that.  It's not a core

7  matter.

8          THE COURT:  But it doesn't mean I can't do it.

9          MR. LOCKWOOD:  Well, you could --

10         THE COURT:  For estimation purposes I can do it.  I

11 just can't do it as a core matter without making proposed

12 findings of fact --

13         MR. LOCKWOOD:  Right.

14         THE COURT:  -- or the party's consent.

15         MR. LOCKWOOD:  You would have to make recommendations

16 under Rule 9033.

17         THE COURT:  But I could certainly --

18         MR. LOCKWOOD:  You could --

19         THE COURT:  That's right.  But I can do it.

20         MR. LOCKWOOD:  -- do it.  But you wouldn't have the

21 final word.

22         THE COURT:  Exactly.

23         MR. LOCKWOOD:  Instead they'd all go up to the

24 District Court, which would have de novo review under 9033.

25         THE COURT:  Unless the parties had good sense and

1  consented to the entry of a Final Order in the Bankruptcy

2  Court.

3      MR. LOCKWOOD:  Well, maybe, but that's 150,000

4  individual estimations, and moreover, in the District Court

5  there's -- you run into 28 U.S.C. section 1411 that says you're

6  entitled to a jury trial, and all of these things --

7      THE COURT:  I don't know about on the estimation

8  issue.

9      MR. LOCKWOOD:  Well --

10     THE COURT:  On the allowance issue -- you see, that's

11  the problem.  I think there is a big difference between

12  estimation and allowance.  Estimation of a personal injury

13  matter probably isn't core simply because the ultimate

14  allowance of the claim is removed from Bankruptcy Court

15  jurisdiction, but the estimation purpose is not to allow the

16  claim itself, it's to figure out for distribution and

17  confirmation, I should say, issues what the likely universe of

18  claims will be and what the value is.  It's a different purpose

19  from the analysis of the claim itself.

20     MR. LOCKWOOD:  That's why 157(b)(2)(b) distinguishes

21  estimation for purposes of feasibility, which is a core matter

22  and which is done on an aggregate basis, from estimation for

23  individual claims for distribution purposes, which -- why does

24  the statute say the District Court has to do that?  And it's

25  because estimation for -- of a tort claim is considered to be

1   the functional equivalent of resolving the tort claim, and if

2   you're gonna resolve the tort claim you have to do it in front

3   of a jury to get the value out of it.

4        But in any event, we're not here today to debate whether

5   that is or isn't.  What I'm -- the point I'm trying to make is

6   that when you set a bar date you set in motion a process.  And

7   that process is the resolution of those individual claims.  And

8   this Debtor doesn't intend, it says, to set in motion that

9   process.  It's gonna have what I would call a bogus bar date.

10  It's gonna set a bar date, and then the minute the claims come

11  in it's gonna say, "Stop, go no further.  We're not actually

12  gonna use the mechanisms that a bar date is put in the Code and

13  the Rules to work with, namely claims allowance and

14  disallowance.  Instead we're gonna just leave it there forever

15  and it's solely gonna be for the purpose of allowing the Court

16  to disallow claims for -- as discovery sanctions if they don't

17  fill out a questionnaire."  And Ms. Harding said, "Well, I

18  never heard of anybody challenging the Court's power to do

19  something like this."  Well that's because nobody's ever asked

20  the Court to do anything like this before.

21       They haven't cited any case where a bar date was proposed

22  to be set for purposes of setting up discovery sanctions on

23  people who aren't even parties.  We start out again with the

24  aggregate estimation.  These Claimants are not parties unless

25  they choose to be parties in that case, and while the Debtors

1   -- basically the Debtors sort of want to commandeer them into

2   that role, and with all due respect, we think that that is

3   inappropriate and is inconsistent, and is gonna give rise to a

4   lot of problems down the road because if I were a Claimant and

5   the Debtor forced me to file a claim, and the Debtor didn't

6   object to my claim and didn't get it disallowed my position

7   would be, is my claims allowed?  And what's gonna -- what

8   happens then?

9        THE COURT:  Well, I think if I have a bar date that

10  requires people to file claims and there's no objection to it

11  the claims are allowed.

12       MR. LOCKWOOD:  And furthermore, they can't make an

13  objection by saying I object to 150,000 claims on some piece of

14  paper that Mr. Bernick and his troops are gonna draft and file

15  here.

16       THE COURT:  But that still doesn't set the value

17  issue.  You know, there -- look, the bottom line for the

18  Debtor, and for probably all the experts, really is to try to

19  get a grip on not just the number of claims that are going to

20  be filed against the Estate, but what level of asbestos

21  disease, if any, people are claiming.  And --

22       MR. LOCKWOOD:  I understand that, Your Honor.  And

23  the irony of all of this is that the Debtor's experts and our

24  experts are able to do that probably better without looking at

25  the pending claims than they would with looking at the pending

1  claims, because number one, they've got the history, and number

2  two, they've got -- they're all gonna be making predictions

3  about what the impact of the new laws are in the states, for

4  example, where you can't file nonmalignant claims unless you

5  meet very rigid medical and exposure requirements and things of

6  that nature, and it's gonna be -- it's not gonna get involved

7  in going through claim by claim 150,000 claims and having some

8  expert put -- make piles, here's a good claim, here's a bad

9  claim, here's a medium claim, and come into Court and say,

10  "I've reviewed 150,000 claims."  It's just not gonna happen.

11      And moreover, as I said earlier, it's incomplete because

12  they're not estimating the 4½ years of claims that are -- that

13  have accrued since then through this method.  They're gonna

14  have to estimate them some other way.  What is the other way

15  gonna be?  It's gonna be their experts are gonna make

16  predictions about where those claims -- they're either gonna

17  predict on the basis of history, they're gonna predict on the

18  basis of some selected number of the pending claims that

19  they've reviewed as part of the questionnaire process, they're

20  gonna use the Manville Trust experience because Manville gets

21  all the claims.  I don't know what they're gonna use.  They

22  haven't told us.  But the idea that somehow or another

23  subjecting the claims -- the subset of claims that was filed in

24  a Court, which they say in their first brief that -- on page

25  10, oh, we know what they are, and now Ms. Harding here today

1   says, "Oh, no, what we don't know what we are because we're

2   getting lawyers who are telling us you didn't send me enough

3   questionnaires because I have more claims than you think I

4   have."  Or, "You did send me a questionnaire but I didn't

5   really -- I don't really have that case."  Or, "I don't know

6   whether the Plaintiff is the same," or whatever.  I don't know

7   at the end of the day whether they'll ever sort that out or

8   not, but the fact is Your Honor put her finger on it at the

9   very first time this was argued, which is, no matter how they

10  slice and dice the 150,000 claims, and no matter how big a

11  subset it may be it's still a sample.  Because they're gonna be

12  extrapolating hundreds of thousands of future claims from it,

13  and they're gonna be extrapolating the unfiled present cases

14  from it.  So it's still gonna be a sample.  It's not gonna be a

15  universe.  And who -- where have we seen any expert affidavit

16  or anything that says, "Gee, Judge, if the questionnaires only

17  came back with 75,000 claims I couldn't estimate what the -- do

18  my estimation job properly, because I have to have 100% return

19  on 150,000 claims."

20      She said -- they argue that there's gonna be bias.  Well,

21  I mean, maybe yeah, maybe no.  I guess you'd have to look at

22  the 75,000 claims before you could really determine whether

23  there was bias or not.  You'd need to know why some -- why the

24  75,000 questionnaires that weren't answered or the claims that

25  weren't filed, why they weren't filed.  Maybe they'd be

1    representatives of the ones that were filed.  Maybe they'd be

2    unrepresentative.  Is the -- how is the Debtor's expert -- the

3    Debtor's expert, I suggest to you, is gonna take the position

4    that every claim that does -- every questionnaire that doesn't

5    get answered, and/or every claim that doesn't get filed is

6    because, a) it's an invalid claim, b) they'll derive

7    percentages from the non-filers from the universe, supposedly.

8    So if a third, let's say, or in my hypothetical, if half of the

9    them didn't respond to the questionnaires, the Debtors argue,

10   that shows half of all our future liability is already --

11   should be gone, because those people have basically admitted

12   they have no claims by failing to file the questionnaire.  And

13   now we'll look at the remaining 75,000 and our experts will

14   tell you how to further reduce the validity and amount of those

15   claims.

16       And again, none of this has anything to do with a bar

17   date.  And it certainly doesn't answer the problem that you're

18   gonna create if you wind up having people with entitlements to

19   have their claims allowed because they filed them and no

20   process for objecting to them.  If the Debtors were really

21   serious about this proposal, Your Honor, they would do what

22   they tried to do, or said they were gonna do in B&W, which is

23   they would say, "Okay, we'll step up to the plate.  We'll admit

24   what we're really doing here is individual claims analysis,

25   evaluation, and disallowance, and we'll go through the process,

1   and we'll try and explain to Judge Fitzgerald, and to Judge

2   Cotty, or whoever the District Court Judge here turns out to

3   be, we'll explain how we're gonna do that for 150,000 cases,

4   and then where that's gonna take us for the other cases that

5   haven't yet been filed and the futures.  But they're not doing

6   that.  They're just presenting this whole thing as a discovery

7   mechanism on their part, and that is not an appropriate use of

8   a bar date, and no Court has ever held it was.  Thank you.

9           THE COURT:  Okay.  I'm sorry but I told you I had a

10   conference call at 4 o'clock.  I do.  So I'm going to take my

11   conference call.  You've got -- at your discretion you can try

12   to stick around if you want and see if I get done before 5

13   o'clock.  I have my doubts.  Or else I will reconvene this

14   after the U.S. Minerals plan confirmation hearing, which starts

15   at 5 and will end when it ends.  As far as I know, most of the

16   issues have been resolved, so I don't expect it to be too

17   lengthy.  We'll be in recess.

18       (Recess)

19           THE COURT:  All right.  We're back on the record in WR

20   Grace now.  Thank you.  Mr. Esserman?

21           MR. ESSERMAN:  Yes, Your Honor, Sandy Esserman on

22   behalf of Baron & Budd, ELG, Peter Angelos, Reaud, Morgan &

23   Quinn, & Silber Pearlman.  I'm gonna be very brief.  I think

24   Mr. Lockwood made many of the arguments.  I would point the

25   Court to a couple of things.

1          One is the purported reasons for this Proof of Claim put

2    for the Debtor in their own motion.  They had five bullet

3    points that I think are sort of instructive.  The first bullet

4    point is why they need a Proof of Claim with the Reaud, Morgan

5    & Quinn firm disputed the Debtor's definition of what

6    constitutes an unresolved claim.  Filed an objection to

7    complete the PI questionnaire on behalf of those claimants who

8    settled, but unpaid or partially paid claim.  That's no longer

9    a reason and you've already ruled on that.  And they know all

10   of the information about those claims.  They've got records.

11         The second bullet point out of five was despite having

12   filed the Rule 2019 Statement in the case, it appears that

13   Reaud, Morgan & Quinn's Rule 2019 Statement may be incomplete.

14   Once again, they discovered 50 claims that were filed in the

15   Silicam DL that did not appear on Reaud, Morgan's 2019.  Well,

16   Reaud, Morgan doesn't represent those people.  We've been

17   through this once before.  That's reason number two out of five

18   as to why we need a bar date.  I would contend that none of

19   those are reasons.

20         Further, law firms have denied that they presently

21   represented, or in some cases ever represented claimants and

22   the Debtor's records indicate they are counsel of record.

23   That's always gonna be the case.  People -- whenever you're

24   dealing in a mass tort with 100,000 claimants, clients are

25   gonna fire their lawyers, they're gonna change lawyers, that's

1  just a fact of life, bar date or not.  Law firms have been

2  requesting extra questionnaires.  I don't know what that has to

3  do with a bar date.  And then law firms have been requesting

4  lists of Social Security Numbers of claimants where they

5  received PI questionnaires for purposes of cross-referencing

6  their list of PI claimants.  Once again, I'm not so sure that

7  necessitates a bar date.

8      So I think the reasons why this bar date has been

9  requested just don't support the institution of a bar date.

10  I'm gonna reserve my argument on due process issues.  I don't

11  really want to get into it right now and the due process issue

12  should -- sort of an alternative argument.  I certainly don't

13  want to be in a position of waiving that argument.  I don't

14  want to have to make it now until it appears that we need one,

15  but need to have such an argument, but the Debtors have

16  proposed a January, I can't remember the date, 15, 17, 12th,

17  some date in January for the return date for a bar date and

18  this -- that just does not even come close to complying with

19  due process.  In cases where we've have bar dates, we've had

20  extensive notice proceedings.  We've had advertising.  We've

21  had newspaper advertising.  Sometimes you'll have TV

22  advertising and it's sometimes a year process, eight-month

23  process to get all of that done and, in fact, the Kirkland firm

24  is very familiar with cases that have had bar dates, Dow-

25  Corning, you know, these -- the notice has been extensive and

1  certainly would go well into 2006.  I'm not sure that that's

2  really what is -- what would serve any purpose at all.  But

3  those are my major points, Your Honor, and I reserve the right

4  should we get into the due process issue.  This is sort of a

5  highlight of the argument.

6          THE COURT:  All right.  Good afternoon.

7          MR. WYRON:  Good afternoon, Your Honor, Richard Wyron

8  for David Austin, the Futures Claimants rep.  I join in the

9  comments Mr. Lockwood made and won't repeat them.  I raised

10  just one other point.  One other rationale offered by the

11  Debtor was we needed a bar date to establish jurisdiction.

12  That certainly can't be the case for estimation on an aggregate

13  basis, as opposed to an individual claim basis.  It was most

14  recently done in Owens Corning where there was no bar date and

15  yet the District Court did an aggregate estimation.  It

16  certainly is possible to do.  Our concern is one of

17  distraction.  There are an awful lot of issues associated with

18  the bar date. It reminds of a question Your Honor posed earlier

19  in the day to Mr. Baena, which was if you're doing a individual

20  claim objection on PD, why have an estimation?  This is the

21  flip side.  We're doing an estimation.  We're going to have to

22  do an estimation of unsettled present claims, unlitigated

23  present claims, and future claims anyway, but why do a bar date

24  and tap into an objection process?  Our concern is that it will

25  become a side show.  It will become a delaying process.  It

1  will take an awful lot of Court time and futures rep interest

2  is getting this case moving forward, so perhaps one day we can

3  stand here like the case you just heard and have a consensual

4  confirmation.  And if we detour to bar dates, and fights over

5  due process, and the like, and the lengthy additional time

6  periods, I fear we move that goal further away, rather than

7  closer.  And for that reason, we oppose the Debtor's Motion,

8  Your Honor.  Thank you.

9        THE COURT:  All right.  Mr. Becker.

10        MR. BECKER:  Good evening, Your Honor, Gary Becker,

11  Kramer, Levin, Naftalis & Frankel for the Equity Committee.

12  Your Honor, something I would just mention.  I hadn't

13  originally intended to speak, but something that was just

14  mentioned struck me.  Your Honor, as the holder of the residual

15  interest in this estate, we are entitled by virtue of

16  1129(a)(7) to ensure that the payment waterfall of 725(a) is

17  followed and when you look at Section 725(a) it talks about

18  after the 507 claims to payment of allowed unsecured claims

19  that are timely filed or tardily filed.  It doesn't talk about

20  claims that are not filed and, in fact, as we know, under the

21  law Mr. Lockwood's clients, if they aren't scheduled as claims

22  and they haven't filed a Proof of Claim, they don't have a

23  claim.

24        THE COURT:  But, wait.  No.  I don't think that 1129

25  and 524 operate in that fashion.

1          MR. BECKER:  No, it's 725, Your Honor.

2          THE COURT:  725?

3          MR. BECKER:  725.

4          THE COURT:  I don't think that 725 and 524 operate in

5   that fashion.  The whole purpose for setting up the trust is to

6   figure out a mechanism outside the bankruptcy process by which

7   tort -- the asbestos personal injury claims, specifically, can

8   be adjudicated.  There isn't a need, I think, for filing Proofs

9   of Claim in bankruptcy.  I agree with the Debtor that there are

10  cases in which it's appropriate.  I agree with the Debtor that

11  it's the people who oppose it who have a burden to show why it

12  shouldn't be done when a Party-In-Interest has filed an

13  appropriate motion, but that's what we're here for.  I don't

14  think that that 524 can be just excised out of the Code and you

15  can say that 725 applies in that instance with respect to the

16  distribution on allowed claims.

17         MR. BECKER:  Your Honor --

18         THE COURT:  That's the whole purpose for a trust.

19         MR. BECKER:  I think I know where you are on that and

20  I don't think it's inconsistent, Your Honor.  That there are a

21  number of cases, aside from asbestos cases, there are a number

22  of cases where there's a claims bar date and there are a lot of

23  claims.  They come in.  Nothing's done with them.  At the

24  confirmation of the plan they're handed off to a post

25  confirmation trust, which objects to the claims, pays the

1  claims, whatever.  That is analogous -- directly analogous to

2  the situation here.  We can have a bar date, have those claims

3  transferred to the personal injury --

4          THE COURT:  Mr. Becker, what are we going to do with a

5  bar date?

6          MR. BECKER:  -- or property damage costs --

7          THE COURT:  You know, if a bar date makes sense at all

8  in this case, it seems to me to make sense when we're sending

9  out for votes on a confirmation of a plan and we can treat, at

10 that point, the ballot as a Proof of Claim.  I really don't see

11 what we're getting at by attempting, at this stage, to create a

12 bar date.  We can't even get through the property damage issues

13 in this case in any kind of recognized orders.  The Debtor

14 hasn't been able to get its Constituent Creditors to agree on a

15 process for litigating those claims yet and we've 1100 and some

16 of those still to go.  What are we going to do with 150,000

17 more claims that the Debtor can't get people to agree on the

18 litigation mode for?

19         MR. BECKER:  I don't propose to litigate them, Your

20 Honor.

21         THE COURT:  Well --

22         MR. BECKER:  What I --

23         MR. BECKER:  -- if you filed Proofs of Claims, believe

24 me, you're going to litigate.

25         MR. BECKER:  It is not inconsistent to have filed

1  Proofs of Claims and have estimation process.

2        THE COURT:  You don't need a Proof of Claim to

3  estimate.  The whole process of a Proof of Claim is for the

4  Debtor or some other Party-In-Interest to substantiate that

5  that specific claim is either allowed or disallowed in the

6  bankruptcy process.  For estimation, if you're looking at an

7  aggregate, you don't need a Proof of Claim for that function.

8        MR. BECKER:  But we --

9        THE COURT:  The reason I permitted the questionnaires

10 was to try to get the -- what the Debtor said the Debtor needed

11 for its experts to evaluate in terms of the current mass of

12 claims and it was only ever supposed to be a sample.  Nobody

13 ever expected that every claimant was going to answer that

14 questionnaire, at least I certainly didn't.  Just like probably

15 not ever claimant's going to file a Proof of Claim.  There will

16 be entities that will miss bar dates.  It happens all of the

17 time.  There will be entities that don't respond to the

18 questionnaire.

19        MR. BECKER:  That is -- and that is the problem, Your

20 Honor.

21        THE COURT:  Well, it's not a problem.

22        MR. BECKER:  We need a data source.  I'm sorry, Your

23 Honor.

24        THE COURT:  I don't understand what the Debtor needs

25 by way of a data source.  The Debtor has been litigating these

1  claims for 30 years.

2          MR. BECKER:  But suppose, Your Honor, there are

3  118,000 of these identified claimants and only, pick a number,

4  10,000 of them file the personal injury questionnaire?  What do

5  you assume about the other 100,000 people?

6          THE COURT:  That they weren't interested in answering

7  the questionnaire.

8          MR. BECKER:  And for purposes of estimation, you

9  assume they have zero claim?  Do you assume they are like the

10  10,000 who filed?

11          THE COURT:  I don't know that even getting the

12  questionnaire answered is going to give you the information

13  that you need to analyze the estimation issues on all fours.

14  Hopefully it will go to be some track to verify, or to justify

15  whatever appropriate spin you want to put on that word, what

16  the experts are saying with respect to their numbers.  That's

17  the use that's going to be most appropriate of that

18  questionnaire, not to set the sample upon which the whole

19  estimation process is going to go forward.

20          MR. BECKER:  Your Honor, if it were the Court's rule

21  that you could assume, or the experts could assume, for

22  purposes of making that estimation, that the claims -- the PI

23  questionnaires that were not filed represented a zero claim

24  when you calculate the numbers --

25          THE COURT:  You can't make that assumption.

1        MR. BECKER:  Well, then you have  --

2        THE COURT:  You can't make that --

3        MR. BECKER:  -- to figure out how to force them to

4   file.

5        THE COURT:  No.  I don't have to make that decision.

6   I agree with the Debtor that some limit -- some appropriate

7   discovery to the extent that people want to submit to discovery

8   and agree to provide the information is appropriate and that --

9   that's it.  I think the Debtor is entitled to take some

10  discovery.  It's entitled to know, for example, what its assets

11  and what its liabilities are.  It could use 2004 depositions

12  with respect to that, if it chose.  That's all this

13  questionnaire is.

14       MR. BECKER:  And that would be woefully inefficient to

15  use to use 2004 --

16       THE COURT:  Well --

17       MR. BECKER:  -- depositions.

18       THE COURT:  I think the whole questionnaire process is

19  probably woefully inefficient, but it's what the Debtor wants

20  to do and the Debtor controls its discovery.  I don't.  So it's

21  fine with me.  If that's the way they want to go, it's the way

22  they want to go.

23       MS. HARDING:  Your Honor, may I be heard?  Your Honor

24  -- Your Honor, I think it's very, very important to get back to

25  what I said at the very beginning of the hearing, because I

1  think that all of this is a big red herring and it served

2  exactly the purpose that the Objectors hoped that it would.

3  The Objectors have the burden here of demonstrating that the

4  bar date shouldn't issue.  There is a presumption that it's

5  legitimate and that it serves a useful purpose in --

6          THE COURT:  Fine.

7          MS. HARDING:  -- any bankruptcy, including estimation.

8          THE COURT:  Set a bar date for the proof -- for the

9  balloting. If you want a bar date, we'll say if you don't

10 submit a ballot as a current claimant, you don't have one,

11 period.  Then you can't file a claim against the trust if you

12 don't file a ballot.

13         MS. HARDING:  But, Your Honor, if you're gonna -- if

14 Your Honor is going to set that bar date for a ballot, then the

15 Court has to recognize the quandary that is basically in effect

16 in the process that's been set up.  For the Court --

17         THE COURT:  No, I don't see a quandary.  Every other

18 case that I've been involved in was -- except U.S. Minerals,

19 has not had a bar date and the cases have gone through

20 consensual confirmations.  This is the only case in which the

21 parties are this contentious and it's largely because the

22 Debtor is taking the track where it wants to litigate

23 everything.  Okay.  Litigate everything.  If you want to

24 litigate all of the claims, tell me that, and I will set a bar

25 date, and then I expect to see objections to claims, and that's

1   what we're going to litigate.  And then we don't need an

2   estimation process for the current.

3       MS. HARDING:  Your Honor, with all due respect, I

4   think and one thing that's important to recognize is that this

5   bankruptcy occurs in a very different timeframe, in a very

6   different than many other bankruptcies.

7       THE COURT:  No.  I'm sorry.  But no, it doesn't.

8       MS. HARDING:  Well, there's -- I didn't want to get to

9   that issue, Your Honor, but Miss Baer suggested maybe I should,

10  Your Honor.  Under the Debtor's current Plan, which is what we

11  are estimating under, these claimants don't get to vote.  That

12  is what the Plan says.

13      THE COURT:  We haven't adjudicated that issue yet,

14  but, quite frankly, if you're going to unimpair them, you don't

15  need to estimate them.  All you need to do is say, "Fine,

16  here's the Trust.  We'll commit all of our assets for the rest

17  of our existence to paying these estimated claims," and they'll

18  go out either into the tort system or the District Court

19  system, and you'll litigate whatever you need to.  You know, as

20  long as you're going to give a pot plan, how are you going to

21  convince me that it is feasible that you've got 100 percent

22  that can fund every claim, both current and estimated?  It's

23  only an estimate.  Whatever I do by way of setting up the

24  numbers that go into this Trust by way of the Debtor's Plan

25  that says it's going to pay 100 percent of its allowed claims,

1  is only an estimate.  And if I'm wrong, you still have to pay

2  100 percent of the claims.

3        MS. HARDING:  Your Honor, I'd like -- I really would

4  like to just back up in terms of what we're asking for and what

5  the -- who has the burden here and why it should issue.  And I

6  do --

7        THE COURT:  I understand who has the burden.  I

8  understand why a bar date could issue and why the presumption

9  is in favor of a bar date.  I don't, for the life of me,

10 understand how it's going to advance this case, getting off

11 stuck.

12       MS. HARDING:  Okay.

13       THE COURT:  This case is so stuck that I am really

14 concerned about keeping it in its current posture.  I've

15 expressed this for over a year and I don't see progress being

16 made.

17       MS. HARDING:  But, Your Honor, that's precisely why we

18 moved for this now.  We're actually on a very fast track --

19       THE COURT:  I'm telling you.  If you want --

20       MS. HARDING:  -- and we're making progress.

21       THE COURT:  -- a bar date, I will give you a bar date,

22 but you have to understand, unless you file an objection to

23 every single one of those claims, they're going to be allowed

24 and the Debtor will have to provide 100 percent of their

25 payment because that's what your Plan says.  If you want the

1  bar date, you take both the responsibility and the duties that

2  are imposed in that bar date.  So you figure it out.  If you

3  want to object to every single claim that may be filed, I will

4  permit you to do that.  Otherwise, there is not point to a bar

5  date.  You don't need it for aggregate estimation purposes.

6        MS. HARDING:  Your Honor, two things.  One, we have

7  been, I believe, perfectly willing for the entire process that

8  this case has been in bankruptcy to litigate these claims, to

9  try to find common issues, and litigate the personal injury

10  asbestos claims, and we are perfectly kind of ready, able, and

11  willing to do that.  But the Court has issued estimation, and

12  that we are living with estimation, and we're trying to work

13  with an estimation, but we do --

14        THE COURT:  Wait, wait, wait.  The Debtor asked for

15  estimation hearings.  I didn't set up estimation as some

16  vehicle by which this has to go forward.  The Debtor wants to

17  estimate the aggregate because you have to estimate for future

18  purposes, even if you object to every allowed claim.  That's

19  not going to get you the means all and end all for what you

20  have to fund in the Plan --

21        MS. HARDING:  But --

22        THE COURT:  -- for the future.

23        MS. HARDING:  That's right, Your Honor, but we did ask

24  -- in January we did ask for a bar date for all claims and

25  so --

1          THE COURT:  You did.

2          MS. HARDING:  -- we didn't get that.

3          THE COURT:  But you don't want to take the objection

4  process that is incumbent upon you in the event that a Proof of

5  Claim is filed.  A Proof of Claim by operation of law is prima

6  facie evidence of the claim and it governs, unless and until

7  somebody interposes an objection and is successful.  Do you

8  really want to do that?

9          MS. HARDING:  Your Honor, it's my understanding that

10  the adjudication of the claims would take place in the Trust

11  and that the process here is for estimation.

12          THE COURT:  Not -- no.  If I have a Proof of Claim bar

13  date, that means you're asking me to invoke personal

14  jurisdiction over the claimant.  That's what you stood up here

15  several hours ago and argued.  If you want me to invoke

16  personal jurisdiction over the claimant, I'll do it, but you're

17  going to be litigating here and I'm telling you, all of us will

18  be retired before you'll be done.  Now, is that really what you

19  want to do?  I don't think so.  I really don't think so.

20          MS. HARDING:  Your Honor, I believe that our position

21  continues to be that we don't -- that we think that the bar

22  date has other purposes than just that and that they don't have

23  to be -- you don't have to get to the allowance process in

24  order to do a proper estimation.

25          THE COURT:  Well --

1          MS. HARDING:  Can I just --

2          THE COURT:  -- I understand that you -- that it does

3   have other purposes, but the issue that you argued to me

4   primarily, both in the papers and here is that you want an

5   assertion of this Court's jurisdiction over the claimant and

6   the reason you want the bar date is so that the Court can

7   exercise jurisdiction.  I'm not going to exercise it in part.

8   I'm either going to do it or I'm not going to do it.  That's my

9   prerogative with respect to jurisdiction and that's how I deem

10  my obligation.  If you have me invoke it, then you're going to

11  have to live with the outcome.  And that means potentially

12  litigating 100,000 or I don't know how many, 100,000 claims.

13  Now, that isn't what you want to do and that's not the reason

14  you want the bar date.  You want the bar date, I believe,

15  without -- and I'm not casting aspersions, to put some teeth

16  behind the questionnaire.  Well, maybe there are no teeth

17  behind the questionnaire.

18          MS. HARDING:  Well, Your Honor, then we have gone

19  through an entire process of sending a hundred and some

20  thousand --

21          THE COURT:  I understand.

22          MS. HARDING:  -- questionnaires out and --

23          THE COURT:  But that's what everybody argued against

24  you and you want to do it anyway --

25          MS. HARDING:  Well -- no --

1          THE COURT:  -- so fine.

2          MS. HARDING:  The -- Your Honor, with all due respect,

3   Your Honor, this issue was raised at each hearing and the Court

4   did not say, "Oh, you don't have jurisdiction."  The Court

5   clearly indicated that the Court thought it could have teeth.

6          THE COURT:  I think the Court Order can have teeth

7   because it's got -- it's going out to attorneys and I required

8   under some circumstances that people comply with it.  I think

9   the Order does have some teeth, but your argument has been that

10  it doesn't have teeth, unless I assert jurisdiction over the

11  claimant.  That's what you've been arguing to me.

12         MS. HARDING:  Actually, Your Honor, that's not --

13  that's actually the Objectors' argument, but, frankly, if we

14  could show -- excuse me, Mr. -- could you put on the 2019

15  Statement?

16         THE COURT:  The slide?

17         MS. HARDING:  You have to hit slide show.

18     (Pause in proceedings)

19         MS. HARDING:  Your Honor, these are the 2019

20  Statements that are filed.  This is just an example.  Is it

21  coming up?  Try again.  It'll come on.  Give it a second.

22     (Pause in Proceedings)

23         MS. HARDING:  Technical difficulties today.

24     (Pause in proceedings)

25         MS. HARDING:  I'm sorry, Your Honor.

1        (Pause in Proceedings)

2            MS. HARDING:  Well, Your Honor --

3        (Pause in proceedings)

4            MS. HARDING:  Slide No. 3, Your Honor.

5            THE COURT:  All right.  I have it.

6            MS. HARDING:  Those are the 2019 Statements that are

7    being filed and it almost -- we have -- I haven't looked at

8    every single one of them, but I can tell you that this

9    statement appears on all of them.

10            THE COURT:  Just because they want to say they're not

11   submitting to the Bankruptcy Court jurisdiction or that they're

12   not waiving any right, doesn't mean that they're not submitting

13   to the Bankruptcy Court jurisdiction.  People put that in

14   Proofs of Claim all of the time.  We're submitting this Proof

15   of Claim, but we're not conceding that we're submitting to

16   Bankruptcy Court jurisdiction.  You can't have it both ways,

17   folks.

18            MS. HARDING:  I'm not -- Your Honor, we were going

19   along with the idea that the Court did have the jurisdiction.

20   It was --

21            THE COURT:  Okay.  I agree.  I think I have it, too.

22            MS. HARDING:  And when we saw that there were so few

23   2019s being filed, it caused us concern, so we raised the --

24            THE COURT:  Those folks aren't going to get to vote.

25   Why are you concerned?  If they don't file 2019 Statements,

1  your ballot agent isn't going to have a 2019 Statement to

2  compare against the ballots and those firms who submit master

3  ballots aren't going to get to vote.  Why are you concerned?

4  You ought to be happy.

5          MS. HARDING:  Because, Your Honor, here -- let me --

6  if I could go to the board and show the precise problem that

7  Mr. Lockwood is well aware of and not willing to concede the

8  part that's important.

9          (Presentation away from microphone)

10          MS. HARDING:  We've got a universe of pre-existing

11  claims, Your Honor.  All right.  That we sent out.

12  (Indiscern.) in our database as people who have pre-Petition

13  personal injury litigation claims --

14          (Presentation ends)

15          MS. HARDING:  -- against the Trust, Your Honor.

16          THE COURT:  All right.

17          MS. HARDING:  And we know already, according to Mr.

18  Lockwood, that apparently we don't know the whole universe

19  because their briefing says that there are people that didn't

20  get these questionnaires that should have, so --

21          THE COURT:  Okay.

22          MS. HARDING:  -- we've got a slice here of people who

23  we don't -- who are not identified.  All right?  And we don't

24  know who they are.  Right.  Now, we also know we've got -- we

25  just received a call, we've got another 3,000 claims where

1  somebody wants to no longer pursue them.  Right?  But there's

2  no mechanism for allowing them to withdraw them in this case

3  because they're not, quite frankly, before the Court and so we

4  have this other group of claims.

5          THE COURT:  Then they won't vote.

6          MS. HARDING:  But, Your Honor, before we get to the

7  vote issue, the issue is with respect to the estimation, and

8  how the estimation gets done, and the data that the experts

9  rely on.  And I understand that their experts may not want to

10  rely on this data, but our experts do want to rely on this

11  data.

12          THE COURT:  Well, look, with respect to the 3,000

13  whatever they are, I'll just call them claims, that somebody

14  wants to withdraw, you know, you tell the experts that they've

15  been withdrawn and they take them out of the pool.  That's an

16  easy one.

17          MS. HARDING:  That is an easier one, but, Your Honor,

18  the bigger one and the bigger problem is this next group of

19  people who don't return the questionnaire, and who sit in the

20  background, and don't assert -- don't come forward, and let the

21  Court or the Debtors know whether they intend to pursue their

22  claim against Grace.  And they have what we believe to be

23  unsupportable claims.

24          THE COURT:  But that's a Trust function.

25          MS. HARDING:  Right?  Your Honor, but it's important

1  to the estimation, Your Honor.  It's very important whether

2  those people are considered by the experts to be people that

3  are like other people with valid claims or whether they're not.

4  Whether, which is probably the better presumption, is that they

5  didn't have the information to support the claim, which is why

6  they didn't answer the questionnaire.

7        THE COURT:  Okay.  Wait.  For the past 30 years,

8  roughly, 20 to 30 years the Debtor has been litigating,

9  settling, handling, let me just use that word, handling

10  asbestos personal injury claims.  You mean that your experts

11  are not going to look at that universe of claims in this case

12  or any other case and as a matter of comparison, extrapolate

13  from the data that's already available?  There are a -- I hate

14  to use this word again, but a gazillion published studies on,

15  you know, estimation issues, and how many people exposed to

16  certain types of estimation contract mesothelioma, and how many

17  contract lung diseases, and how many contract other diseases.

18  Is there a suggestion that that data is all invalid and that

19  your experts are going to do something totally different in

20  this case?

21        MS. HARDING:  Your Honor, from the beginning I think

22  we've made it very clear that -- and the Court has agreed that

23  the best -- I mean, I have the quote here.  The Court has

24  agreed that the best evidence of the Debtors' liability for its

25  current pool of claimants is the current claims.

1           THE COURT:  I agree.

2           MS. HARDING:  And so what is -- why would we -- why

3    when we can set up a very easy process to identify those

4    claimants  --

5           THE COURT:  Because you --

6           MS. HARDING:  -- would we guess?

7           THE COURT:  -- because you have half a loaf.  You

8    don't want to do the burdens that go along with what you're

9    asking the Creditors to do.  The Creditors have a significant

10   burden in filing a Proof of Claim and they have the right to

11   know that if they submit to the Court's jurisdiction, and file

12   that Proof of Claim, so that they can get a distribution

13   against the estate, then their claim's going to be allowed,

14   unless a valid objection to is formed, argued, and sustained.

15   So you can't have it both ways.  I'm not going to permit a half

16   a loaf.  I don't think it's proper.  If you want to argue the

17   Code parameters to me; that a Proof of Claim is generally the

18   way to go, then so are objections to claims.  So what's the

19   purpose to doing this for an estimation procedure?  You can

20   figure out the allowance of every single Proof of Claim that's

21   filed.

22          MS. HARDING:  Your Honor, may I --

23       (Presentation away from microphone)

24          MS. HARDING:  I just want to show the Court

25   (indiscern.) --

1      (Presentation ends)

2          MS. HARDING:  These are all of the reasons why we

3  think a Proof of Claim with respect to these pre-Petition

4  litigation claimants is appropriate in this case.  Now, in

5  Babcock & Wilcox and in Eagle Pitcher they didn't -- they ended

6  up at a consensual Plan, but they had a POC and they were doing

7  estimation, so I don't think it's out of the realm of

8  possibility to have a POC here and to go down this process.

9  Now, those -- there are six legitimate reasons why it makes

10  sense to have a Proof of Claim with respect to these claimants

11  in this case and, Your Honor, I cannot -- actually, if I take a

12  break, I will consult with my client.  I mean, I think we are

13  willing to make objections to those claims and to pursue it

14  that way as well, and to be bound to do that as well.  But --

15  these -- the Objectors have not addressed --

16          THE COURT:  Have the --

17          MS. HARDING:  -- why that is -- why those are not

18  appropriate reasons.

19          THE COURT:  The -- this case is getting to the point

20  where it's so penny wise and pound foolish, it's really

21  distressing.  You're going to spend all of this money to get

22  Proofs of Claims filed and then say that you're going to

23  litigate them on a claim by claim basis.  The whole purpose for

24  524, which you're invoking in your Plan, is to set up a Trust

25  so that this issue doesn't create all of the Debtors' funds

1  going to pay legal fees and experts, but, in fact, gets to the

2  injured who need the money.

3        MS. HARDING:  But, Your Honor, our position from the

4  beginning of this case, and I think it's been very, very clear

5  through all of the pleadings, is we don't believe that these

6  claims, many of them, should be paid.  And that the company

7  does have equity, if the Court will look, and only consider

8  evidence permissible in Federal Court.  And that -- I mean,

9  that is what we've been trying to do all along, whether it's

10  through estimation or through a claims allowance/disallowance

11  process.

12        THE COURT:  Look, the Trust procedures, to the extent

13  that there is some settlement method that is established, will

14  have its own mechanisms for dealing with the claims.  In terms

15  of the estimation, I don't know what evidence it is at this

16  point that you expect me to look at or not to look at.  We're

17  not that far along in the matter.  I would expect that I'm

18  going to admit evidence that's applicable under the Federal

19  Rules of Evidence.  That's my standard, but I'm not certain, in

20  the instance that you're asking me to project claims, I'm just

21  not certain.  I don't have a ruling on it.  I'm just not

22  certain, so don't anybody say to me I said X, when I'm telling

23  you now I'm not certain.  I'm not certain that the settlement

24  history isn't relevant to a process, which is going to involve

25  settlements.

1          MS. HARDING:  I understand, Your Honor, but I'm going

2    to go back to the Court's point about the allowance of claims.

3    This -- the -- a Proof of Claim was permitted in those cases

4    and those cases clearly anticipated and were in the process of

5    estimation, so that should not be a bar to issuing the bar date

6    here.  And I --

7          THE COURT:  I don't know what those Courts did, Miss

8    Harding.  If somehow or other they let the Debtors bifurcate

9    the loaf, in fact, I think they were in error.  If you want to

10   file a -- Proofs of Claims filed, your first line on this chart

11   is established jurisdiction over claimant.  You want me to

12   establish that jurisdiction, fine.  I'll establish that

13   jurisdiction, but that means they will have allowed claims to

14   the extent that they are filed, unless the Debtor files

15   objections and it gets an objection to that claim sustained.

16   That's what the Proof of Claim process does.  Now, why do you

17   want do you want to march down that road?

18         MS. HARDING:  Your Honor, the point of getting a

19   Proof of Claim was to get jurisdiction, so that the claimants

20   are required -- or that the Court has some authority to issue

21   some sanctions, which is not a bar.  Which actually the Court

22   has already ruled that the Court is not gonna bar claims

23   because people don't return the questionnaire.

24         THE COURT:  That's right.

25         MS. HARDING:  The Court said that it would -- that

1  there would be some sanction available to it under the rules

2  and right now, according to the Objectors, the Court doesn't

3  have that jurisdiction and I raised --

4       THE COURT:  Why are you worried about sanctions when

5  you don't even have the questionnaires back yet?  I mean, I

6  don't understand this.  Why are we trying to penalize people

7  for not responding to something when the questionnaires aren't

8  even all distributed yet?

9       MS. HARDING:  But Your Honor, maybe that gets to the

10  heart of it.  We are not trying to penalize people.  And I

11  think that's actually -- that's something that's been a red

12  herring here.  I just want to show the Court -- I mean --

13       THE COURT:  (Indiscern.).

14       MS. HARDING:  I will I'll go back up (indiscern.).  I

15  mean, what are they being asked to do here?  All right, they're

16  already -- the Court has ordered that they must return this

17  questionnaire.  And this a one page Proof of Claim.  And if you

18  look at the last slide, Your Honor, we actually pared it down

19  to a post card that could be returned.  The Debtors are willing

20  to issue some other kind of notice other than just serving it.

21  We're willing to do some kind of publication as well.  I just

22  don't see what is so burdensome about doing that when it would

23  clearly have a legitimate purpose?

24       THE COURT:  Mr. Lockwood's argument that you're not

25  even getting the entire universe of claims by this one post

1 card form, the last page of your slides, is correct.  What it

2 says is, "Name of Creditor, name and address where notices

3 should be sent, title and number of case, Court where complaint

4 was filed, and name and address of your legal counsel."  That's

5 it.  That's exactly what the 2019 Statement should be doing.

6 And to the extent that there's no 2019 Statement, there isn't

7 going to be a ballot.

8          MS. HARDING:  Your Honor, but the ballot will occur

9 well after the estimation, and it will serve as no useful

10 purpose with respect to getting information on the

11 questionnaires --

12          THE COURT:  And this postcard will?

13          MS. HARDING:  Your Honor, if that goes out with notice

14 about who is supposed to fill it out, only pre-petition

15 litigation claimants who had a pending case against Grace at

16 the time --

17          THE COURT:  And the Debtor doesn't already know that

18 it's been sued, and who the claimants were, and where it was

19 sued?

20          MS. HARDING:  Your Honor, we believe we -- we believe

21 that we know, we believe we have a very good idea.  We're told

22 by the objectors that we don't have the complete database, but

23 more importantly, we don't know which of those claimants intend

24 to pursue their claim at this time.  That's the important part.

25          THE COURT:  You can make the assumption that if you

1  were sued in State Court and the claim is not resolved that

2  they intend to file a claim against the estate.

3          MS. HARDING:  But Your Honor --

4          THE COURT:  You can make that assumption.  That has

5  happened in every other case.

6          MS. HARDING:  That is an assumption that is -- that

7  completely biases the estimate, Your Honor.  That's exactly

8  what we're trying to avoid.

9          THE COURT:  Ms. Harding, it's happened.  Take a look

10  at the other cases.  Not only do people who have currently

11  filed causes of action pending in State and Federal Courts

12  against the Debtor file claims, but a whole host of other

13  entities file claims.  You don't eliminate the database by

14  filing a post card that says where was your State Court cause

15  of action filed against the Debtor.  That doesn't even get to

16  the tip of the iceberg.

17          MS. HARDING:  Your Honor, but this is a -- this is now

18  -- I beg the Court to kind of think of this issue right now in

19  the context of this timeframe.  This is not the same.  There

20  are claimants who will not be pursuing their claims because of

21  what is happening with respect to grand jury proceedings, what

22  is happening with respect to medical evidence, what's happened

23  in Manville, what's happened recently in another trust.  We've

24  already gotten word from at least one law firm that they don't

25  intend to pursue their claims, and we've seen what's happened

1   in the PD.

2          THE COURT:  Then I have a suggestion for you.  If this

3   is going to be a hundred percent Plan, let's send an

4   announcement out to the world, in fact the Plan, that says,

5   "It's going to be a hundred percent Plan, are you going to fie

6   your claim?"  You'll find out what the claims are and then

7   you'll know what the Trust has to be.  You know, you're trying

8   to eliminate a universe of claims before the appropriate time

9   to file those claims is.  And I understand why you're trying to

10  do it, to preserve equity.  Frankly, I don't see how equity's

11  in the money in this case.  I don't see it.  I don't see it

12  from Debtor's operations, I don't see it from the litigation

13  strategies in the case.  I don't see it from the fact that the

14  Plan's been on the table since January and you're not even

15  close to getting consensus.  This case is stuck.  And it's

16  really distressing.  I don't see how the Proof of Claim is

17  going to advance that.  It's just going to create more

18  fractionalization.

19         MS. HARDING:  Your Honor, the very -- the reason that

20  Mr. Bernick brought it up in September, the concern that we had

21  was really very limited.  We thought we had in place a

22  structure by which the claimants would be required and have

23  some incentive to return the questionnaire.  And in essence,

24  that's all we're really looking for here is some kind of

25  incentive from the Court that will tell the claimants or

1   suggest to them that if they are going to pursue their claim

2   against Grace at some point, they better turn in the

3   questionnaire.

4           THE COURT:  Weren't they given the advice -- pardon

5   me, I do have a lot of cases and it is late, so if I'm

6   misstating this, please correct me.  Were those entities who

7   got the questionnaire not told that if they fill out the

8   questionnaire, they'll be the first into the distribution que

9   for the Trust?  What more incentive do they need?

10          MS. HARDING:  Your Honor, it's the incentive for the

11  people that don't have strong claims that we're looking for.

12  It's the incentive for the people that have the least

13  supportable claims, which is the group of people that we're

14  most, and I think legitimately, worried about.  And --

15          THE COURT:  But Ms. Harding, the information that you

16  want from them is, "Your name, your counsel's name, and where

17  did you sue me."  That doesn't tell you what type of claim you

18  have, and you already have this information in your database as

19  to where you were sued.

20          MS. HARDING:  No, Your Honor, all that does is tell us

21  who's going to elect to pursue their claim that they filed.

22  And then we have the questionnaire information, the experts

23  will be able to determine the universe of claims that intend to

24  move forward.  And they can assume that they others that didn't

25  don't have the information to support their claim, which is

1  really the part that we're really most concerned about.  We

2  want -- the experts need something to rely on so that they can

3  make the assumption that if somebody doesn't return the

4  questionnaire, it's because they didn't have the information to

5  support it.

6          THE COURT:  They're not going to be able to make that

7  assumption.  They were never able to make that assumption.  And

8  they're not going to be able to make that assumption now.  If

9  they do make it, their information is going to be biased and it

10  will be unusable.  And this Proof of Claim form, which simply

11  says, "Tell us where you sued us," isn't going to get you any

12  more information in terms of the estimation than you already

13  have because people could file this claim form and still not

14  pursue a claim against the Trust.

15          MS. HARDING:  Well, Your Honor, given what you just

16  said, what incentive does anybody have to return the

17  questionnaire then?

18          THE COURT:  The fact that they get into the que first.

19  They think they have a legitimate claim, they don't want to

20  wait forever to get paid from the Trust, and the incentive is

21  that, you know, there may be 100,000 people out there who will

22  have to be compensated in some manner through the Trust, so the

23  70,000 who return the questionnaires will be in the que first.

24          MS. HARDING:  And so all that does, Your Honor, is

25  ensure that the people with the strongest claims that Grace

1  intends to pay order the questionnaire --

2       THE COURT:  You know what then, if this is that much

3  of an issue, then I suggest that the Debtor go about formal

4  discovery and forget the questionnaire.  I mean, this was

5  intended to help the process, not impede the process.  And now

6  you're arguing backwards to me that instead of the

7  questionnaire advocating -- or advancing the cause, it's

8  impeding the cause because there's no hook to it.  Well, if

9  there's no hook to it, then withdraw it and let's move on.

10       MS. HARDING:  Your Honor, that's not -- that's -- I

11  think that's -- I mean, that would completely take away

12  everything we've done over the last 9 months to try to put this

13  structure in place, and I think that it's -- it's not just the

14  Debtors that were under the impression that there was some meat

15  and taste to the questionnaire, I think that the Court was

16  under that impression too --

17       THE COURT:  And I --

18       MS. HARDING:  -- and I read that --

19       THE COURT:  -- still am of that impression.  I don't

20  have any Motions for Sanctions.  I don't know that people

21  aren't going to return the questionnaire.  You're making a

22  grand assumption that because you issued 50,000 -- in

23  hypothetical numbers, 50,000 questionnaires that only 1% of

24  them are going to be returned.  I mean, you know, that's not

25  necessarily the case.

1         MS. HARDING:  Well, Your Honor, will you at least

2    reserve open the issue that if when the questionnaires do come

3    due that if it does appear that there are a large number of

4    claimants that are not responding to the questionnaire or

5    leaving most of it blank that the Court will at least entertain

6    the idea of having some kind of Proof of Claim or doing

7    something to try to get those claimants to respond to the

8    questionnaire.

9         THE COURT:  I definitely will leave open the issue of

10   trying to get people to respond appropriately to the

11   questionnaire.  And I will keep open the issue of the Proof of

12   Claim form in that connection, but I don't see the necessity,

13   at this stage still, for a Proof of Claim form, especially the

14   one the Debtor's asking for because you've already got that

15   information.  And I think you can assume that if somebody took

16   the time to sue you in a State Court and have been stayed from

17   pursuing that litigation because of the bankruptcy, that in all

18   probability they intend to pursue it post-confirmation.

19        MS. HARDING:  Your Honor, one other thought was Mr.

20   Bernick raised the issue of possibly amending the 2019

21   Statement to require attorneys to file the 2019's earlier than

22   what's required now in the order.

23        THE COURT:  Well, that, you know, may be something --

24   if people intend to file claims I think they're going to have

25   to file the 2019 Statement because I've already said if they

1    don't they're not going to vote.

2            MS. HARDING:  So could we amend the 2019 Statement to

3    say, "If you intend to file a claim -- if you have a claim --

4    you represent a claimant that is a pre-petition litigation

5    claimant and you intend to pursue that claim against Grace, you

6    have to file a 2019 by, you know, February," or something like

7    that?

8            THE COURT:  Well, assuming that --

9            MS. BAER:  Your Honor, this is not on the agenda.  If

10   you're going to argue Rule 2019, I'd like an opportunity --

11           THE COURT:  Well, it's not on the agenda, but I want

12   to have a caveat to anything that's said with respect to 2019,

13   not everybody who represents a claimant may have an obligation

14   to file a 2019 Statement.  You know, there may be attorneys who

15   have only one client, and they're not required to file those

16   statements.  Those people can vote.  I'm talking about people

17   who are required to file those statements who will have

18   problems with their -- with submitting ballots and having them

19   counted if they haven't filed a 2019 Statement.

20           MS. HARDING:  Okay, Your Honor, and those are the law

21   firms that represent the large groups of claims, and those are

22   the ones that we're most interested in at least having that.

23   So we will file a motion to at least amend the 2019 Order to

24   require that sooner.  Thank you, Your Honor.

25           THE COURT:  This Proof of Claim issue at this point --

1   when are the questionnaires due back?

2          MS. HARDING:  January 12th, Your Honor.

3          THE COURT:  All right, put this issue back on the

4   agenda.  When will you know, in aggregate numbers, you know,

5   like percentages of people who have applied?  Will it be for

6   the January hearing or the February hearing?

7          MS. HARDING:  Yes, we'll probably know by then, Your

8   Honor.

9          THE COURT:  All right, then put this issue of the

10  Proof of Claim form back on the January 30th agenda.

11         MS. HARDING:  Thank you, Your Honor.

12         MR. LOCKWOOD:  Your Honor, I just want -- on this Rule

13  2019, I mean, obviously they can make whatever motion they want

14  to on that subject --

15         THE COURT:  Yes.

16         MR. LOCKWOOD:  -- but essentially what they're going

17  to be doing is they're going to be saying somebody who --

18  lawyer who has not entered an appearance in the case but who,

19  the way Ms. Harding put it, intends at some point in the future

20  to file a ballot or file a claim that that lawyer should,

21  because of their intention in the future, be required to file a

22  2019 now.  And what the Rule talks about is representing

23  somebody in the case, not intending to represent somebody in

24  the case at a later date.  But we can address that on the

25  papers when they make the motion.

1         THE COURT:  Yes, I think that's -- we'll defer that

2    issue until later.  Mr. Monaco?

3         MR. MONACO:  Good evening, Your Honor, for the record,

4    Frank Monaco for the State of Monaco and Her Majesty the Queen

5    and Right of Canada.  I represent Canada -- a very diverse

6    client base, Your Honor.

7         (Laughter)

8         MR. MONACO:  Your Honor, I know the hour's --

9         THE COURT:  Would Her Royal Highness like to file a

10    Proof of Claim --

11        (Laughter)

12        MR. MONACO:  Well, that's why I came up to address

13    that issue, Your Honor.  I know the hour's late and it's very

14    warm in here and I will be brief.  Your Honor, both of my

15    clients have contribution indemnification claims stemming from

16    lawsuits that were filed against both Montana and Canada.  And

17    most of these lawsuits are post-petition lawsuits.  In the case

18    of Montana, the Libby claimants filed 107 actions against

19    Montana on the theories that Montana failed to warn these

20    claimants of the asbestos contamination.  And in the case of

21    Montana, those are primarily personal injury claims, there are

22    some property damage claim elements.  It's sort of the opposite

23    for Canada.  They are primarily post -- they are primarily

24    property damage claims, again, with a sprinkling of personal

25    injury claims.  All of those lawsuits are class actions, and it

1   is my understanding were filed after the bar date, which was

2   March 31, 2003.  So it's a relatively new phenomena.

3       I was just engaged to represent Canada and it's my

4   understanding that today there is a Injunction Hearing, similar

5   to a Section 105 Hearing, in front of Justice Farley in

6   Toronto.  And as Your Honor is probably aware, there is a 105

7   Injunction Hearing scheduled next month in the case of Montana.

8       Your Honor, part of the problem with this entire process

9   is that structurally it just doesn't really deal with my

10  clients' claims, either the Plan as presently proposed or the

11  claims estimation process.  And I've had some discussions with

12  Ms. Baer and with Mr. Lockwood, for instance, about the

13  questionnaire.  And if you look at the questionnaire, it is

14  totally geared towards people that have asbestos related

15  diseases.  But technically, Canada and Montana have to fill out

16  these questionnaires for any pre-petition litigation

17  contribution indemnification claims.

18      Now, I've discuss this problem with both the Debtor and

19  Mr. Lockwood.  And everyone is agreement that it just doesn't

20  make any sense to fill these questionnaires out.  It doesn't

21  advance the process whatsoever.  And I just wanted some kind of

22  affirmative acknowledgment from both counsel that we don't have

23  to fill it out, that we won't be prejudiced if we don't because

24  it is presently -- I think if you look at the definition of

25  that kind of claim, it does include a contribution

1  indemnification claim, but I think it just doesn't advance the

2  ball and just causes us extra expense.  I wanted to bring this

3  to the Court's attention.

4      And it's pretty much the same thing with the bar date and

5  filling out a Proof of Claim.  Again, I don't think it's really

6  geared, but it's -- towards that, but it sounds like Your Honor

7  has just deferred this issue so we don't have to deal with it.

8  But I wanted to make sure for the record that we do not have to

9  file -- fill out one of these questionnaire forms, given the

10 type of claim that we have, and get acknowledgment of the Court

11 and both parties to that.

12     And just one final note, Your Honor, on a more positive

13 note.  I think we need to sit down with the Debtor and try to

14 hammer out a mechanism to resolve these claims because they're

15 complicated enough, and then you have this bankruptcy overlay

16 that makes it even more complicated.  And it's not something

17 that I think is going to be necessarily resolved with a lot of

18 litigation.  I think we just need to sit down and work through

19 a mechanism to get these claims resolved so that my client

20 isn't -- clients aren't prejudiced by all this.

21          THE COURT:  Okay --

22          MR. MONACO:  Thank you.

23          THE COURT:  -- Ms. Baer?

24          MS. BAER:  Your Honor, first of all, a reminder that

25 the questionnaire process is only geared toward pending pre-

1  petition litigation claims that were pending against Grace at

2  the time we filed Chapter 11.  It does not apply to Canada

3  whatsoever.  It does not apply to all of the new Montana

4  actions that have been commenced against Montana post-confirm -

5  - post-petition.  The only exception would be, as I understand

6  it, at the time we filed the Plan and Disclosure Statement, at

7  the time we filed Chapter 11, there was one pending case in

8  Montana.  That was dealt with separately in the Plan and

9  Disclosure Statement and would not, again, require Mr. Monaco

10 to file a questionnaire.  So at the present time, I don't think

11 that the questionnaire process applies to Mr. Monaco vis-a-vis

12 Canada or Montana.  And even if it did, we are not requiring

13 Mr. Monaco's clients to file questionnaires at this time.  It

14 will and can be relevant toward estimation.  We will talk to

15 him about that, the contribution and indemnification claims do

16 create some interesting challenges that we're going to have to

17 figure out what to do with.

18      THE COURT:  Okay.  Mr. Lockwood?

19      MR. LOCKWOOD:  Well, I don't really see that the

20 Committee has a role in saying who should fill out the

21 questionnaire or who should not, but it certainly doesn't have

22 any objection to Ms. Baer's -- what she told Mr. Monaco.

23      THE COURT:  All right.  Mr. Monaco, neither Montana

24 nor Canada need to fill out the questionnaire at this time.

25      MR. MONACO:  Thank you.

1          THE COURT:  And if anybody's position on that matter

2     changes, they are required to give you advance notice in

3     accordance with the published schedule for hearings so that you

4     can take some position.  They'll have to raise a motion so that

5     you can defend against it.

6          MR. MONACO:  Thank you, Your Honor.

7          THE COURT:  Okay.  Ms. Baer?

8          MS. BAER:  Your Honor, with that, we finally get to

9     items numbers 9 and 10 on the agenda, which relate to the

10    Debtors' adversary complaint filed against the State of New

11    Jersey with respect to some -- a civil action in New Jersey and

12    the corresponding motion under Section 362 and 105 to enjoin

13    that action.  Your Honor, the hour is very late.  The State of

14    New Jersey has been here all day very patiently.  I am happy to

15    go forward on the merits of this matter.  We had talked about

16    continuing it until December, but frankly, the December

17    hearing, being in Pittsburgh, is not particularly convenient.

18    So unless Your Honor just can't go on --

19         THE COURT:  Oh, no --

20         MS. BAER:  -- we're happy to go forward.

21         THE COURT:  -- I said we were going to finish the

22    agenda, we'll finish the agenda.

23         MS. BAER:  Thank you, Your Honor.  Your Honor, the

24    Debtor's Motion to Enjoin the New Jersey Civil Action is to

25    enjoin an action that was brought in 2005 by the State of New

1  Jersey having to do with a 1995 report filed by the Debtor

2  related to vermiculite operations at a Hamilton, New Jersey

3  site.  It was a site that's not owned by the Debtor, it was

4  leased by the Debtor for some period of time.  They've been out

5  of that facility for 10 years.

6      New Jersey is seeking a fine, $75,000 per day for every

7  day that Grace did not correct this alleged false report.  All

8  they're seeking is a fine, Your Honor.  This does not have to

9  do with clean-up.  There was some clean-up going on on that

10  leased property that's subject to the EPA's supervision.  It's

11  not a cost recovery case.  New Jersey's not seeking any money

12  to pay for a clean-up or anything else vis-a-vis the public

13  health and safety; they're just seeking a fine.

14      Your Honor, Grace seeks to enjoin this action, and

15  ultimately we will seek to have this Court adjudicate the

16  nature of this fine, the amount of this fine.  There is a

17  pending Motion to Transfer Venue in the New Jersey District

18  Court.  Grace removed the action to the New Jersey District

19  Court.  The State of New Jersey has sought to remand the action

20  back to the State of New Jersey State Court.  The State of New

21  Jersey District Court has not ruled.  It is pending, it is

22  unclear right now when now when they're going to rule on

23  transfer of venue.  Frankly, we've suggested that they should

24  transfer venue here and you decide the remand action.  We don't

25  know what they'll do.

1       But right now, Your Honor, what we're asking is we're not

2   asking you to stop the District Court in New Jersey from

3   adjudicating the transfer of venue.  What we're asking is we're

4   asking for a stay.  We believe, Your Honor, that this case is

5   actually stayed under Section 362.  This is not a police power

6   action.  It's an action for a fine related to a 10-year old

7   report that allegedly had some falsities in it.  Grace has not

8   operated there for 10 years, and as I said before, the

9   property's being -- has been cleaned up by the EPA.  There's no

10  health or welfare issue involved.  In fact, neighboring

11  properties have been sampled by the State; there are no issues

12  on neighboring properties.

13      What's happening here, Your Honor, is the State of New

14  Jersey is sort of taking advantage of the fact that they are a

15  State entity in trying to go froward to collect a fine against

16  the Debtors in the State Court rather than coming to this

17  Court.  They're essentially saying it's a police power action

18  when it really is not a police power action.  And Your Honor,

19  many of the issues that would be adjudicated in that action

20  will actually be dealt with by this Court because it has to do

21  with vermiculite, it has to do with whether there's a risk of

22  harm, and issues that will come up in both the PD and the PI

23  claims here in this Court.

24      Under Section 362(b)(4), governmental entities have a

25  right to pursue actions if they are for police -- if they are

1    police or regulatory actions.  The legislative history

2    indicates that the idea is that the government be able to

3    protect the safety and welfare of its populants and stop things

4    like fraud or environmental hazard and safety risks.  But the

5    3rd Circuit has recognized, Your Honor, clearly that not every

6    regulatory action is a police power action that merits the

7    exception to the automatic stay.  The Court must measure the

8    action against the purpose for which it is being brought.  Does

9    the proceeding relate to safety and welfare, or does it really

10   relate to the government's interest in the Debtor's funds?

11   Here, Your Honor, clearly that's what's happening.  All they

12   want is a fine.  They're not seeking clean-up, they're not

13   seeking cost recovery.

14        Your Honor, the <u>Penterra</u> case very clearly established

15   that if you're seeking clean-up, it's a police power action.

16   The <u>Nickelette</u> case clearly established if you're trying to fix

17   damages for a clean-up, it's a police power action.  But the

18   3rd Circuit has never held anywhere that where the government

19   action is not proportional to any direct or ongoing public

20   hazard, that the action can proceed outside of the Bankruptcy

21   Court.  Your Honor, the magnitude of what New Jersey is

22   seeking, $75,000 per day for 10 years, is well in excess of any

23   possible normal type of action.  It's a gigantic fine that

24   relates not, again, whatsoever to any environmental hazard and

25   the like that has been taking place on that property.

1    Your Honor, under the circumstances, you have to look at

2  exactly what's going on here.  Is the police power action -- is

3  it a police power action or is it not?  And that's a fact

4  intensive inquiry.  Does it relate to the government's

5  pecuniary interest in the Debtor's estate?  Is so, no, it's not

6  a police power action.  Does it involve a public policy, an

7  interest in it's general welfare?  Yes, that's a police power

8  action.  Your Honor, the Penterra case, the Nickelette case,

9  the Trarico case, all cases cited by New Jersey, those are 3rd

10  Circuit cases involving clean-ups and cost remediation.

11    We, Your Honor, direct the Court's attention to the Bach

12  case.  That's a 3rd Circuit case that actually does both.  It

13  deals with an OSHA violations.  To the extent we were talking

14  about remediating violations, future monies needing to be

15  spent, clearly a police power action.  But the Court found that

16  to the extent that they were seeking a fine, that was not a

17  police power action, that was stayed by the automatic stay.

18    The one case that the State of New Jersey has cited that

19  is somewhat similar to this case is the LTV case.  But Your

20  Honor, in LTV, it was the Western District of Pennsylvania

21  District Court, it's not controlling here.  Furthermore, it

22  ignores the Brach distinction that the 3rd Circuit made between

23  the clean-up action and the penalty action.  And also, Your

24  Honor, in that case, it was an existing regulatory action that

25  was ongoing before the Debtor filed bankruptcy.  And one of the

1  big concerns of the Court there was they were concerned that

2  Debtor was filing just for the purpose of stopping this police

3  -- this action.  And they were very concerned that they didn't

4  want to send a message that you could stop any kind of an

5  action with respect to environmental clean-up and the like with

6  respect to environmental liabilities by filing a bankruptcy.

7  But here, Your Honor, we've been in bankruptcy for 4½ years.

8  New Jersey's known that.  Other entities in the State of New

9  Jersey have actually filed Proofs of Claim against the Debtor.

10 But here, the State EPA, instead of filing a claim in the

11 bankruptcy case or filing an adversary proceeding against the

12 Debtor in the bankruptcy case, filed a case in the State Court

13 of New Jersey simply to collect a very large fine.

14     Your Honor, we do not believe it's a police power action.

15 We do believe under Section 362 it is enjoined and this Court

16 should in fact enforce that injunction.  Alternatively, Your

17 Honor, the Court does certainly have the power under 105 to

18 enjoin the action, and doing so would be very similar to many

19 things you've done in this case before, although those were

20 third party actions.  This one is unique, this one is actually

21 against the Debtor.  And we're seeking to have that action

22 stayed.

23     In the Penterra case, the 3rd Circuit clearly established

24 that the Court does have the power to enjoin a police power

25 action under Section 105 in order to assure the orderly conduct

1  of the reorganization process.  It is very clear, Your Honor,

2  from that case and other cases of its like that this Court can

3  protect the interest of other Creditors by enjoining a police

4  power action if that police power action would, in fact, weigh

5  against the bankruptcy process and hurt the bankruptcy process.

6  You have the right under 105 to prevent interference with the

7  Chapter 11 process.  The Federal interest in bankruptcy

8  outweighs the State's interest in collecting its fine.

9      In order to make the determination as to whether or not

10  under 105 you should issue the injunction, the regular

11  injunction elements apply, Your Honor, and here they all apply

12  quite clearly.  The likelihood of success on the merits, not

13  the merits of whether or not New Jersey would ultimately be

14  able to collect the fine, it's the merits of whether or not

15  enforcing the State law in the State Court will unduly

16  interfere with the bankruptcy process.  That's the way in which

17  the Court looks at the likelihood of success on the merits.

18  And Your Honor, here, clearly, it would.  The potential size of

19  this penalty, the distraction of time and attention of the

20  Chapter 11 Debtor at a time which is a very time intensive case

21  already here.  We are down the road of estimation, we're

22  spending a lot of time.  The Debtors employees, the

23  professionals, everybody's spending a tremendous amount of

24  time.  To have to divert their attention and defend this action

25  in New Jersey would hurt the process.

1    Furthermore, Your Honor, it makes the playing field

2  uneven.  While all of the other Creditors of the Chapter 11

3  Debtor here have to wait and adjudicate their claims as part of

4  this bankruptcy process, the State of New Jersey wants to

5  adjudicate its claim separately in the state of New Jersey,

6  where I'm sure it believes it has the home court advantage.

7  But Your Honor, that's not the way it works.  The way it works

8  is if you want to collect against the Debtor, you come here and

9  collect against the Debtor.

10    Separate -- second element, Your Honor.  The Debtors will

11  suffer irreparable harm for the reasons I just said, forcing us

12  to participate in substantial litigation elsewhere, diversion

13  of key personnel and money.  And frankly, Your Honor, this

14  Court can more easily and better handle efficiently these

15  issues than the State of New Jersey Court.  And Your Honor, we

16  can avoid the possibility of different rulings here and there

17  because again, you will be dealing with some of the very same

18  issues about vermiculite, vermiculite harm, and its effect on

19  claims.

20    The third element, Your Honor, Defendant's risk of harm.

21  There's essentially none here.  The State of New Jersey has

22  waited years to file this action.  The alleged false report is

23  10 years old.  And again, they're just looking for a fine.

24  That's all they're looking for.  There's no remediation,

25  there's no cost recovery.

1       And fourth, Your Honor, we have the public interest.  Here

2   there's a strong bankruptcy policy that everybody be put on an

3   even playing field.  By permitting New Jersey to go forward

4   with this action in the State will change that process, that's

5   exactly why 362 exists, it's exactly why 105 exists.  There's a

6   public interest in honoring those provisions and staying this

7   action.

8       Your Honor, there's one other thing that's going on here,

9   and that is in addition to Grace, two individuals have been

10  sued.  One of the individuals in an officer of Grace and the

11  other individual is a former employee.  Your Honor has the

12  jurisdiction to also enjoin those actions.  In fact, you

13  already have.  The injunction that you issued on day one of

14  this case enjoined third party claims against officers,

15  directors and employees of Grace.  The same exact behavior is

16  involved here.  The same -- they're asking employees and

17  officers to defend themselves in exactly the same claims that

18  they're making against Grace.  They're indistinguishable from

19  the claims against Grace, and yes, Grace's bylaws provide for

20  indemnification of these officers and directors and employees,

21  both for the behavior as well as attorney's fees.  Under the

22  very same case law that permitted you to issue the injunction

23  in the <u>Shakarian</u> adversary proceeding where we have it, it

24  would apply here.  And again, this is belts and suspenders; we

25  probably already have the injunction in the other injunction.

1   But to the extent we don't, Your Honor, for the very same

2   reasons you issued that injunction, we would ask that the

3   injunction here also relate to the directors, officers and

4   employees who are in exactly the same position as Grace.

5       Your Honor, under these circumstances, again, we believe

6   this is not a police power action, and under Section 362 it's

7   already enjoined and Your Honor should simply enforce that

8   injunction.  Alternatively, we would ask that Your Honor issue

9   a stay under Section 105 enjoining the State action from going

10  froward.  Again, we're not asking you to deal with the transfer

11  of venue and stop that from going forward.  The District Court

12  in New Jersey can decide that.  But it's the merits of the case

13  we do not believe should be going forward.

14      THE COURT:  All right.  Thank you.  Good evening.

15      MR. DEVINE:  Good evening, Your Honor.  Edward Devine,

16  Deputy Attorney General for the Defendants in this action, Mr.

17  Harvey and Mr. Campbell.  The Debtor went through a whole line

18  of cases for the Court from the 3rd Circuit.  What the Debtor

19  failed to clarify, however, is that when the Court prevented

20  the state government entity from going forward with a penalty,

21  that was because they were trying to enforce that penalty.  In

22  Bach, for example, the Court states clearly that the government

23  agency is not before it to fix a penalty, it's here to collect.

24      The State of New Jersey is not, in it's State Court

25  action, seeking to collect money, it is seeking to fix the

1  amount of the penalty.  Legislative history of Section

2  362(b)(4) states that the governmental unit suing a Debtor to

3  prevent fraud, environmental protection safety, or attempting

4  to fix damages for violation of such a law.  That's why the

5  State commenced this action in State Court.

6       THE COURT:  But this isn't a penalty provision seeking

7  to fix damages, it's just a fine.  And the fine, as I

8  understand it, at $75,000 a day for 10 years can't be, at this

9  point in time, related to the actual cost of clean-up, so

10  you're not asking that the damage be fixed, you're asking to

11  impose a fine.

12       MR. DEVINE:  First of all, the statute says up to

13  75,000, if you read it carefully.

14       THE COURT:  Okay.

15       MR. DEVINE:  The Jersey Court will have the discussion

16  to set that fine wherever it chooses.

17       THE COURT:  Okay, but regardless of where the Court

18  decides to fix the fine, the fine is not the damage, it's

19  simply a penalty.

20       MR. DEVINE:  That's correct.

21       THE COURT:  Okay.  So I'm not sure how that's not

22  stayed by 362.

23       MR. DEVINE:  Because part of the police and regulatory

24  power of the DEP is to assign penalties.  In this case, a very

25  important document -- in fact, one of the other counsel

1 mentioned ISRA.  When you shut down a business, you have to go

2 through a very complicated process to ensure that it's clean.

3 And it was that form stating there was no contamination on the

4 site that these two individual Defendants signed off on and

5 which later proved to be false.  Now, in 1995 when they signed

6 it, we had no knowledge that it was incorrect.  It was only

7 years later when the EPA began a clean-up that we found out

8 that the vermiculite contamination was all throughout the site.

9 So that fine, as I said, if and when it's applied, this state

10 government agency is not intending to collect from Grace,

11 therefore, it's not going to disrupt this bankruptcy

12 proceeding.

13        THE COURT:  Well, I think it is going to disrupt the

14 bankruptcy if its officers and directors and have to defend a

15 75 million times 365 or 366 per day for 10 years fine

16 allegation.  That's definitely going to cause some disruption,

17 not just to the officers and the directors, but to every other

18 process in this case.  That's probably larger than the Libby

19 Plaintiffs' claim in the case.

20        MR. DEVINE:  But as I said, Your Honor, there's no

21 knowledge at this moment that anything near that amount would

22 be imposed.

23        THE COURT:  But the Debtor has to defend against it,

24 that's the problem.  The Debtor has to undertake a defense.  If

25 you're saying "up to," what is the fine that's being sought?

1  If it's a dollar a day for 10 years, then maybe the litigation

2  isn't going to cause that kind of disruption to the estate.

3  The Debtor might even concede a dollar a day for 10 years.  But

4  if it's $75,000 a day, that's going to cause some disruption

5  and the Debtor has to defend against it.  So if the pleading

6  says "up to," but there is no limitation on the "up to," then

7  the Debtor has to be prepared to defend against $75,000 a day.

8  And that's a significant issue in this case.

9          MR. DEVINE:  When you say "prepare to defend," do you

10 mean the litigation itself?

11         THE COURT:  Well, sure.

12         MR. DEVINE:  Okay --

13         THE COURT:  If you're saying that you're attempting to

14 fix the claim --

15         MR. DEVINE:  Yes.

16         THE COURT:  -- in the State Court.

17         MR. DEVINE:  That's right.

18         THE COURT:  Okay.  And the claim that you're

19 attempting to fix is up to $75,000 per day for the past 10

20 years.

21         MR. DEVINE:  That's correct.

22         THE COURT:  Okay.  That issue is a significant issue

23 in this estate, and there will be a consequence to the extent

24 that a claim is fixed in that amount, especially a penalty

25 claim which under some circumstances may even be subordinatable

1  in the case.  I don't know that it is or isn't, but it's

2  possible that it may be.  So not only will the Debtor have to

3  defend against it, but on top of that, the Debtor may not have

4  to pay it.  So -- and it's a fine.  It's not for damages.  So

5  why isn't it stayed by 362?

6        MR. DEVINE:  Well, in the cases that I was just

7  discussing, including Penterra, they speak of the dichotomy

8  between a government and the enforcing a money judgment and

9  fixing a money judgment.  So in that case, Penterra, in

10  Nickelette, in Brach, and in James, they all say that, just as

11  the legislative history there mentioned, that the state --

12  police power allows the state to go into Court and establish or

13  fix an amount --

14        THE COURT:  Well, I think --

15        MR. DEVINE:  -- of the penalties.

16        THE COURT:  -- they're talking -- well, I'm sorry,

17  I'll have to go back and look at the cases.  I didn't -- I

18  don't, at the moment, appreciate that they're talking about

19  penalties.  I thought they were fixing -- talking about

20  damages.

21        MR. DEVINE:  No, it's penalties, Your Honor, and in

22  fact --

23        THE COURT:  Okay.

24        MR. DEVINE:  -- as I said, in the legislative history

25  that I started with -- okay.  The police power permits the

1  entry, entry, of a money judgment but does not extend to permit

2  enforcement of a money judgement.

3          THE COURT:  Okay.

4          MR. DEVINE:  That's the dichotomy of that.  So that's

5  why we're saying that we're within the exception of (b)(4)

6  because we're attempting to fix a penalty.

7      As to the 105 injunction, the State contends that Grace is

8  not faced with any irreparable harm.  The standard that's been

9  established in the 3rd Circuit, again, is that it can't be

10  irreparable if it can be fixed with money.  In other words, if

11  you can make it up down the road by recovering monetary

12  damages, then it's not irreparable harm.

13          THE COURT:  Well, I appreciate the legal premise.  I

14  can also appreciate the fact that if Grace loses a $75 million

15  claim every day for the last 10 years -- or $75,000 claim every

16  day for the last 10 years that this case is a Chapter 7 and

17  nobody's going to be paid.  So there is irreparable harm, not

18  just to the Debtor, but to every other constituency in the

19  case.  You folks need to talk.

20          MR. DEVINE:  That could be arranged, Your Honor.

21          THE COURT:  That's what you need to do.  Why don't I

22  defer this issue for, I don't know, a month or two.  You tell

23  me what's appropriate and let me see if you folks can't talk --

24          MR. DEVINE:  Let's say two, we'd rather not go to

25  Pittsburgh, no offense.

1          THE COURT:  That's fine.

2          MR. DEVINE:  It's a long ride.  Thank you, Your Honor.

3          MS. BAER:  Your Honor, for the record, we're always

4  willing to talk, and I do believe there have been some

5  discussions with New Jersey, although not in terms of the

6  details here.  But Your Honor, what we're asking here for is a

7  stay, and we think that that's appropriate, and we're always

8  willing to talk with them.  We would certainly hope that they

9  would not be really serious about $75,000 a day, but that's

10  what they've asked for.

11          THE COURT:  Well, I think a stay for a brief period of

12  time while you folks talk is not inappropriate.  And I'm

13  willing, if New Jersey also agrees, especially if New Jersey

14  would agree, to keep a stay in place to see if you can't come

15  to some negotiated resolution to this that will not require

16  litigation in any Court with respect to the fine amount.

17          MR. DEVINE:  Your Honor, it's effectively stayed right

18  now.  They have the Remand Motion but they haven't acted on it

19  so.

20          THE COURT:  Okay.  All right, the hearings in January

21  are on the 30th?

22          MS. BAER:  It's January 30th.

23          THE COURT:  I will accept an order from the Debtor --

24  this is on items 9 and 10, correct?

25          MS. BAER:  Yes, Your Honor.

1          THE COURT:  That will impose a temporary stay through

2     the conclusion of the January 30 Omnibus so that the parties

3     can meet and confer in an effort to resolve the issues that

4     were discussed today consensually.  And then this hearing, if

5     continued to January 30 with the Omnibus, and I'll see where

6     you are, whether you've come up with some negotiated

7     resolution, and if not, whether you want a further stay, and if

8     not, if you want a decision.  But I'll hear what you have to

9     stay at that time.

10          MR. DEVINE:  Thank you, Your Honor.

11          MS. BAER:  Thank you, Your Honor.

12          THE COURT:  All right.  Okay.

13          MS. BAER:  Your Honor, I'm pleased to say that that

14     concludes the agenda for today.

15          THE COURT:  Well, thank you all for your patience

16     today.  I'm sorry about the in and out's for the case, but I

17     just couldn't help it based on the other matters that were

18     going on, so thank you.

19          MS. BAER:  Your Honor, we appreciate that you would

20     stay with us and get this done.

21          THE COURT:  Okay.  We'll see you next month.

22          (Court adjourned)

23

24

25

189

```
1                        CERTIFICATION
2
3    I certify that the foregoing is a correct transcript from the
4    electronic sound recording of the proceedings in the above-
5    entitled matter.
6
7    Lewis Parham                          11/18/05
8    _____        _____
9    Signature of Transcriber               Date
```