Supplement to Expert Report of Morton Corn, Ph.D., CSP
Submitted October 14, 2005

January 18, 2006

The purpose of this supplement is to respond to the Expert Reports of Plaintiff's Experts, as specified below.

1. Expert Report of William B. Ewing, CIH titled "Application and Use of Dust Sampling for Asbestos."

    - Ewing has offered expert testimony for many years in asbestos building litigation. He has testified that air sampling is not relevant to health risk assessment of occupant exposure because it is a snapshot in time and the results of air sampling cannot predict occupant exposure other than at the sampled location during that sampling time period. In the courtroom he did not offer any air sampling results and refused to recognize the relevance of defendant's measurements of exposure from air sampling. He alleged that visual inspection and settled dust were the relevant and appropriate measures to be used to judge the risk of in-place Asbestos-Containing Materials (ACM) in buildings. Mr. Ewing now states (Report, Executive Summary #4) that "dust sampling, air sampling and other assessment tools supplement the visual inspection but do not replace it." What is the reason for this statement, which now recognizes air sampling in health risk assessment of in-place ACM? The reason is that literally thousands of air sampling measurements in buildings containing ACM indicate asbestos-in-air concentrations comparable to asbestos-in-air concentrations outdoors when fibers greater than 5 microns in length are measured (1). Mr. Ewing omits the Health Effects Institute-Asbestos Research blue ribbon committee report which assessed the state of knowledge of asbestos in buildings and any associated health risk. The report found that airborne concentrations of asbestos in buildings and any associated inhalation risk to be low (5).

    Mr. Ewing groups air sampling, visual observation, settled dust, etc. together for assessment of ACM. Settled dust measurements of asbestos will always be positive and most often high based on the criteria he espouses (Expert Report, p. 14) for structures per square centimeter ($s/cm^2$) in settled dust. Faced with air sampling results that are no longer "snapshots," but a veritable motion picture that indicate no elevation of indoor asbestos concentrations over outdoor concentrations, Mr. Ewing now includes air sampling in his list of evaluation methods. Nevertheless, settled dust measurements will always prevail in his evaluation because results will almost always be positive while air sampling results in buildings will be the same as outdoor concentrations. Thus, a building owner will always be faced with a decision to cleanup when dust sampling results have been demonstrated to not be related to air sampling results.

1

Mr. Ewing cites the four EPA guidance documents for ACM in buildings from 1979, 1983, 1985 and 1990, yet many statements and concepts in the earlier documents have been rejected in light of later learning. He focuses on the earlier document concepts of secondary dispersal and re-entrainment of settled asbestos, which were invoked by EPA early in the learning curve for ACM in buildings; these concepts did not hold up when the results of air sampling began to cumulate in the mid to late 1980's. Mr. Ewing does not refer to the algorithm all school administrators were compelled to use, a visual assessment tool to judge the risk of ACM in place. The algorithm was later demonstrated to be internally inconsistent and to not correlate with measures of asbestos in air.

Perhaps the most revealing omission in Mr. Ewing's selective use of the EPA guidance documents is the summary Five Facts from the EPA "Green Book," the final of the four guidance documents and the one that represents the culmination of an 11 year learning curve for the potential health effects of ACM in buildings (2). These Five Facts are reproduced below in their entirety.

- Fact One: Although asbestos is hazardous, the risk of asbestos-related disease depends upon exposure to airborne asbestos fibers.

- Fact Two: Based upon available data, the average airborne asbestos levels in buildings seem to be very low. Accordingly, the health risk to most building occupants also appears to be very low.

- Fact Three: Removal is often not a building owner's best course of action to reduce asbestos exposure. In fact, an improper removal can create a dangerous situation where none previously existed.

- Fact Four: EPA only requires asbestos removal in order to prevent significant public exposure to airborne asbestos fibers during demolition or building renovation.

- Fact Five: EPA does recommend a pro-active, in-place management program whenever asbestos-containing material is discovered in buildings.

The "Green Book" was published shortly after an article, which I was privileged to coauthor, was published in <u>Science</u> (3) and after a Congressional hearing stimulated by this article. In the article the authors cited common risks to school children and the relatively very minor risk, if any, associated with ACM in buildings. The authors questioned the wisdom of the inordinately expensive and unnecessary policy to remove asbestos in schools. Fortunately, the Congressional consideration of extending this policy to commercial and public buildings was never incorporated into regulations.

Many of the descriptions by Mr. Ewing of approaching and characterizing ACM

2

in buildings are related to the 1980's period of the "learning curve for ACM in buildings." Mr. Ewing does not recognize the results of the scientific and technical progress made to place this late 1979 and 1980's concern in perspective.

Mr. Ewing describes (Expert Report, pp. 6-8) procedures relevant to renovation and demolition projects in buildings and regulations thereto. Such activities create large amounts of airborne dust and debris; governing regulations contain stringent multiple control procedures for accomplishment and cleanup of the work, and correctly so. However, this is not analogous or relevant to settled dust sampling in homes or buildings where renovation or removal is not occurring.

- Mr. Ewing describes worksite analysis procedures and refers to the OSHA Technical Manual (Expert Report, p. 8). However, the only exposure citations issued by OSHA for asbestos are based on air sampling and the Permissible Exposure Limit. Citations can also be issued for violations of other aspects of the standard, but the only monitoring recognized is air monitoring.

- Mr. Ewing cites the World Trade Centre (WTC) Indoor Dust Test and Clean Program Plan (Expert Report, pp. 13-14) and the benchmarks adopted in the program for different potentially toxic materials dispersed by the burning and collapse of the twin towers. Because the explanation of risk-based and non-risk-based benchmarks in this plan was omitted by Mr. Ewing (the asbestos benchmark is not risk-based), the explanation of these benchmarks in the report is included in the plan and is reproduced below (underlining added).

"EPA preferred approach to establishing cleanup benchmarks is risk-based. Risk-based benchmarks for lead and PAHs in settled dust were developed in the COPC Report because the primary route of exposure for these two contaminants in an indoor environment is incidental ingestion associated with direct contact to settled dust. PAHs and lead are both toxic via ingestion. Asbestos and MMVF toxicity occurs primarily from inhalation exposure. <u>Accordingly, the risk from asbestos and MMVF exposure would be assessed by determining fiber concentrations in air</u>. Risk-based benchmarks for asbestos and MMVF in indoor air were developed in the COPC Report and will be employed in this program. Concern was raised by members of the public and the panel that reservoirs of asbestos and MMVF may be present that might not be readily re-entrained during air sampling. Consequently, sampling for asbestos and MMVF in settled dust will also be performed in this program. <u>The benchmarks developed to trigger cleanup for asbestos and MMVF in settled dust are not risk-based</u>. Rather they are intended to identify a significant fiber load in settled dust based on multiple lines of evidence including an experience standard developed by experts in the field of asbestos sampling, comparison with background and consideration of, and consistency with the trigger level employed in the cleanup of asbestos contaminated residences in Libby, Montana. <u>These benchmarks are not risk-based, and since they are in part based on site specific background, they are not intended for use elsewhere.</u>" (4)

The last sentence of this paragraph is a direct contrast to the widespread use of asbestos in settled dust in health risk assessment advocated by Mr. Ewing. The asbestos benchmark is used in the WTC case for input to a cleanup decision, but it is clearly stated to not be a risk based benchmark. It should be noted that Polynuclear Aromatic Hydrocarbons and Lead, soluble contaminants subject to

3

ingestion and pickup on the skin (fingers, etc.), are subjects of risk based benchmarks in the post-WTC collapse cleanup.

- Mr. Ewing refers to the Surface Contamination Proceedings for a 1964 Symposium sponsored by the Oak Ridge National laboratory. The focus of the meeting was radioactive surface contamination. As in the cases of soluble dusts such as Lead, surface sampling is appropriate for radioactive settled dust which emanates ionizing radiation which can penetrate the skin and can also be ingested after being transported from the surface to the mouth on fingers and hands. This is an entirely different case than asbestos in settled dust.

- Mr. Ewing refers to the EPA and OSHA adoption of the no threshold risk model of disease to calculate risks and that "these exposure levels carry a significant risk of disease" (Expert Report, p. 15). The significant level of disease arrived at with this model is often referred to as hypothetical risk. Because long-term exposures at the level of the OSHA standard since 1986 (the PEL was 0.2 f/cc 8-hr. TWA from 1986-1994 and 0.1 f/cc 8-hr. TWA since 1994) have not been studied epidemiologically, it is not known if a risk does or does not exist for long-term exposures at or below these concentrations. Thresholds have been identified for asbestosis and lung cancer. They are higher than the dosage allowed by a PEL of 0.1 f/cc 8-hr. TWA for 45 years (4.5 fiber/cc-yr.).

  In my own practice I am aware of cases of disease, particularly mesothelioma, where asbestos exposure cannot be definitely established. However, I am also aware that a large fraction of mesotheliomas (variously cited as 10-15%) are idiopathic, or without known cause. One must be careful about attributing the occurrence of mesothelioma in workers that only infrequently are exposed, or do not appear to be exposed at all, to asbestos. Mr. Ewing cites such categories of occupations on p. 14 of his Expert Report, without any insight into the particular circumstances of each case, a necessity in epidemiologic investigation.

- In the expert report on settled dust that I submitted, my purpose was to explain the discrepancy between the presence of large numbers of asbestos fibers in settled dust and the very low numbers or absence of such fibers in air. I drew on the science which explains the mechanism of fiber re-entrainment from a surface, a mechanism that requires energy input. The science has been confirmed by many measurements of settled and airborne asbestos in buildings. The concept of fibers (or particles) that settle on surfaces over extended time periods and then being made airborne, resettling, being made airborne again, etc. is a mental construct unsupported by actual measurements.

  Mr. Ewing refers to visual assessment and re-entraining debris (Expert Report, pp. 11-12). Debris is usually present during removals or gross ACM failure; it is not settled dust. Heavy activity with what are essentially piles of ACM is not relevant to settled dust assessment, which requires microscopy to detect. His reference to dust, unaccompanied by debris (Expert Report, p. 6) does not reflect OSHA

4

procedures because the OSHA compliance extract refers to "visibly deteriorated ACM, which is not intact, and in close proximity to dust accumulation." The settled dust measurement is usually performed in homes and buildings at locations which are distant from any ACM and appear to have what could be described as "normal dustiness." For example, in buildings the major sites of ACM are structural fireproofing above the hung ceiling and lagging on pipes above the ceiling or in mechanical rooms. In homes, attic insulation is in attics. Settled dust is measured in offices and homes. Re-entrainment from energy brought to bear on piles of ACM or debris is not analogous to making airborne those invisible respirable asbestos fibers submerged in a surface viscous layer.

- Mr. Ewing addresses specific points in my Expert Report on pp. 16-17 of his report. I have addressed his first comment where he states surface dust sampling has been used in Libby and New York City for inhalation risk assessment. It has not been used for this purpose in New York City for WTC aftermath evaluations. I have addressed his comments on OSHA compliance.

  The use of aggressive sampling for the EPA clearance standard is to apply a worst case scenario to dislodge any material that can be dislodged. It is an unrealistic test in terms of normal building usage. It is a prudent test. If the criterion for airborne dust concentration is met in these circumstances, it will be met during normal usage.

2. Expert Report of Dr. William Longo titled "The Scientific Reliability of the ASTMD-5-7555-3 Dust Method for the Quantification of Asbestos Surface Contamination."

- In his Executive Summary, Dr. Longo states (p. 4, Opinion 5):

  "Science has established that such fibers and bundles which contaminate surface dust can be re-entrained by a variety of activities which typically occur in buildings. Hence, such asbestos fibers and bundles in surface dust represent an exposure hazard in the building."

  Dr. Longo does not give us examples (with evidence) that "a variety of activities" can re-entrain respirable dust from surfaces. In fact, as stated in my Expert Report, it is very difficult to re-entrain respirable fibers, by either mechanical force (such as sweeping) or with normal room air currents.

  Dr. Longo states that surface dust represents an exposure hazard in a building. As my Expert report and the above responses to Mr. Ewing indicate, surface dust is not used to judge inhalation risk, which Dr. Longo refers to as exposure risk.

5

References

1. Lee, R.J., Van Orden, D.R., Corn, M. and K.S. Crump. Exposure to Airborne Asbestos in Buildings. Reg. Tox. Pharm. 16: 93-107 (1992).

2. U.S.E.P.A.: Managing Asbestos In Place: A Building Owners' Guide to Operations and Maintenance Programs for Asbestos-Containing Materials, OPTS, Washington, D.C. 1990.

3. Mossman, B.T., Bignon, J., Corn, M., Seaton, A. and J.B.L. Gee: Asbestos: Scientific Developments and Implications for Public Policy. Science 247: 294-301 (1990).

4. U.S.E.P.A.: World Trade Center Indoor Dust Test and Clean Program Plan. November, 2005 pp. 6-7.

5. HEI-AR, Asbestos in Public and Commercial Buildings; A Literature Review and Synthesis of Current Knowledge, HEI-AR Cambridge, MA 1991.