defendants' motion, that is not the case here.[5]

At any rate, in light of the requirements of Savage, I believe that New Jersey courts would find that Prudential had actual knowledge of its injury only when it came into knowledge that the asbestos in its buildings posed a hazard that needed addressing. The Eighth Circuit recently adopted this approach while interpreting North Dakota law. MDU Resources Group v. W.R. Grace & Co., 14 F.3d 1274 (8th Cir. 1994). In that case, the Court reasoned that "the injury for which asbestos plaintiffs are being recompensed is the contamination of their buildings and not the mere presence of asbestos." Id. at 1279. Thus, the court held:

> the District Court erred when it instructed that the issue for purposes of the statute of limitations was when MDU learned of the presence of asbestos in its building; instead, the proper question was when MDU could have learned with the exercise of reasonable diligence, that its building had been contaminated by asbestos. Id. at 1279.

This is clearly a correct description of the discovery rule, one that would be applied in New Jersey, see, e.g. Board of Trustees of Middlesex County College, No. W-38801-88, slip op. at 3 (N.J. Super. Law Div. August 20, 1992) (unpublished opinion) ("statute of

---

[5]Defendants filed a supplemental motion for summary judgment based on the argument that Prudential cannot satisfy the due diligence requirement. This is essentially a "should have known" argument. In July of last year, in deciding Prudential's equitable estoppel motion, I found that there were disputed issues of fact concerning whether defendants fraudulently concealed material information about the hazards of asbestos. I also held that Prudential is entitled to try to prove that because of the extent of the fraud (if any), a due diligence requirement arose late or never arose. Because of this finding, I am unable to grant defendants' motion on this ground.

20

limitations does not run until asbestos in a building poses an actual hazard.") As the court put it, "[r]egardless of the plaintiff's knowledge of a potential cause of action, no cause of action exists until the plaintiff suffers some compensable harm." Id. at 1278. Thus, mere suspicions are not enough to satisfy the actual knowledge test. (Although, of course, suspicions may be enough to put Prudential on inquiry notice). And, in order for Prudential to know of its injuries, it must know that the asbestos in its buildings poses a hazard. Without this, Prudential has suffered no harm.

Defendants' arguments do not end here, though. They point to several pre-1981 factual scenarios in the record, which, they contend, demonstrate that Prudential had actual knowledge of facts constituting its cause of action. I will address a number of these factual scenarios -- the ones I consider exceptionally important.[6]

### (1) Presence of Asbestos

First, defendants point out that prior to 1981, Prudential was aware of the presence of asbestos-containing materials in its buildings. Def. U.S. Gypsum Co. Reply Brief at 5 (hereinafter U.S. Gypsum brief). This fact by itself, though, does not satisfy the Savage threshold, since the presence of asbestos is

---

[6] The parties should be aware, however, that the court has examined the 12(g) statements in great detail and, in all situations not specifically addressed in this opinion, finds disputed issues of fact.

21

not synonymous with the presence of a danger resulting from the presence of asbestos. Board of Trustees slip op. at 3; MDU Resources Group, 14 F.3d at 1279 (statute of limitations begins to run when plaintiff knew or should have known that building was contaminated by asbestos).

### 2. BOMA Material

Second, defendants cite material published by a group called the Building Owners and Managers Association ("BOMA"). Defendants contend that BOMA's newsletter referred repeatedly to the dangers of asbestos. Def. 12(g) Statement at ¶¶ 54-63. While this information may well be relevant in determining what Prudential should have known, it is impossible -- in light of Prudential's counterstatement -- for this court to hold -- without making a credibility determination -- that Prudential actually knew of these publications.

### 3. Federal, state and local regulation

Third, defendants point to the increasingly strict regulation of asbestos by the federal government, by several cities and by the State of New Jersey. See Defendants Rule 12(g) Statement, ¶¶45; see also Brief of United States Gypsum Company in Support of its Motion for Summary Judgment at 9 (summarizing defendants' Rule 12(g) statement). The Rule 12(g) statement goes into great detail about the controversy about asbestos in schools that occurred in the mid and late 1970s. Indeed, these regulations

22

and public debates resulted in a series of personal injury lawsuits against asbestos companies alleging health problems due to asbestos. Def. 12(q) Statement ¶¶ 46-53. Moreover, as a result of public concern over asbestos in schools, campaigns were begun and certain schools were closed.

Plaintiffs make several responses to these facts, including the following: (1) The bulk of the legislation did not address the asbestos problem of this case, namely the alleged harmful affect of in-place asbestos; (2) Agents of plaintiffs were not aware of particular newspaper articles and other media distributions about the potential effect of in-place asbestos; (3) Agents of Prudential were unaware of the asbestos-related lawsuits being filed. Keeping in mind that defendants' motion is based on Prudential's actual knowledge, I must find that there are disputed material facts, whatever a jury might find about what Prudential should have known.

### 4. Testing performed at various buildings

Fourth, defendants note that "[b]efore 1981, Prudential received requests for testing and expressions of concern from employees, tenants and one its liability insurer's [sic] regarding the presence of asbestos-containing materials." U.S. Gypsum brief at 5.

To support this allegation, defendant first describes incidents that occurred at the IBM Building in Jacksonville, Florida. In 1979, IBM, the building's major tenant, raised a

23

concern about asbestos to the building's manager, Sidney Register, and arranged for air-tests to determine the concentrations of asbestos. IBM forwarded the reports to Mr. Register, which disclosed the presence of a certain level of asbestos. IBM then requested that the asbestos be encapsulated or removed. Defendants have submitted a series of letters and testimony memorializing Prudential's response to the situation. Of particular importance is a meeting that allegedly took place between three Prudential representatives and Edmund Drazga, President of KRC Research, an asbestos consulting firm. Apparently at Prudential's request, Mr. Drazga submitted a proposal to encapsulate the asbestos at the IBM building, sent it to Mr. Register, who in turn sent it to Earl Starr for approval. See e.g. Defendant's Exhibit 71 (June 12 letter from Ronald Harmson to Earl Starr). However, in January 1981, IBM decided not to proceed with the KRC proposal.

This last fact, combined with Prudential's contention that all tests done showed an asbestos concentration within acceptable limits, make it impossible to determine that Prudential had knowledge of actual injury at this time. Rather, Prudential argues, it approached the problem only as a tenant-relations situation, and when IBM was satisfied, Prudential pursued the it no further. The fact that the asbestos appeared to be within limits, and the fact that IBM continued as a tenant, make it possible that Prudential was unaware of any harm to the building. Of course, a jury may find that after these incidents, Prudential *should* have known about facts constituting a cause of action. But on this

24

summary judgment motion, I cannot find that this scenario -- looked at in a light most favorable to plaintiff -- constitutes <u>actual</u> knowledge on the part of Prudential.

Next, the defendants discuss a series of incidents that occurred at the Five Penn Center in Philadelphia, Pennsylvania.

First, defendants point to a letter from R.L. Albertson, Prudential's Associate General Manager, to the prior owner of the building. This alleged letter charges that the prior owner breached the purchase contract because "[i]t appears that the building was in violation of law pertaining to concentrations of air-borne asbestos on and prior to the date of settlement under said Agreement of Sale." Defendant's exhibit 104 (September 29, 1976 letter from R.L. Albertson to Uris Buildings Corporation). Prudential's response is to quote deposition testimony from Mr. Albertson flatly denying preparing the letter, signing the letter and mailing the letter.

This creates a classic dispute of fact.

Defendants also point to a June 1971 letter to 5 Penn Center from Jessie Lieberman, Chief of the Occupational and Radiological Health Section of the Philadelphia Department of Public Health, notifying the building management of its intent to "conduct air measurements for concentrations of airborne asbestos" in the building. This letter, defendants contend, was delivered to Carolyn Hatcher, the Prudential representative responsible for sales and management agreements, on September 29, 1976. Once again, Ms. Hatcher testified that she had not seen the letter.

25

This also creates a dispute of fact.

Also in 1976, Traveler's Insurance Company apparently requested that Prudential perform tests to determine the amount of airborne asbestos in the building, and in 1979, Travelers commissioned its own tests. But, as Prudential points out, the tests may have shown that the asbestos level was acceptable.

Next is a report issued by John G. Reutter Associates that analyzed the asbestos content in the building. This report was commissioned after a doctor in the group discovered loose asbestos in his office. A January 15, 1981 report was written in somewhat ominous terms, and essentially recommended additional investigations. A subsequent report, however, issued February 4, 1981, found that asbestos levels in various parts of the building were below the OSHA limits. Therefore, Prudential and Prudential's contract manager for the building, Eastman-Arnold Company, concluded that there was "nothing to be concerned about." The record does reflect that Prudential nonetheless commissioned some special cleaning of the building. Prudential maintains that the "special cleaning" it did at Five Penn Center was performed in "the interest of tenant relations, and in order to appease Colonial Penn." These facts push Prudential closer and closer to the wall, but I must remain cognizant of the standard for summary judgment. If Prudential's argument about the content of asbestos and its knowledge of the early 1970s letters is plausible to a jury, it may be that it did not have actual knowledge at that time.

Defendants also cite to a request by a tenant at the

Kent-Albert Building in Ottowa, Canada. A tenant in the building requested certain unspecified tests to be performed. Prudential's counterstatement indicates that the results showed the asbestos to be "non-hazardous" and that "no control procedures" were required. Prudential conveyed these results to the tenant. According to Prudential, no further discussion of asbestos at the Kent-Albert Building arose prior to the sale of the property in December 1981. It is difficult to see how requested testing by a tenant which showed no problem with the asbestos, and which did not result in any further actions by the tenant, alerted Prudential that the asbestos in its buildings posed a hazard.

Defendants then point to a series of incidents that occurred at the Prudential Center in Boston, Massachusetts. According to the affidavit of George A. Hindy, Manager of the Building Service Division of the Prudential Center at the time, in 1978 an OSHA inspector visited the building in response to a concern raised by a Prudential employee about asbestos problems in the 5th floor media room. The OSHA inspector took air samples, but later informed Mr. Hindy that the air quality was "healthful". Affidavit of George A. Hindy, January 15, 1992, Exhibit 178 to Plaintiff's Counterstatement and Response. Mr. Hindy also apparently requested a written copy of the OSHA test results. The report stated that "[a]nalysis indicated .01 asbestos fibers per cubic centimeter of air, which is well below the OSHA standard allowable . . ." Defendant's Exhibit 144.

Defendant points to other testing and memoranda related

27

to the Boston site. For instance, testing performed by the Haller Laboratory at the Prudential Center to determine the contents of the fireproofing concluded that the fireproofing was probably nonhazardous in the absence of vibratory conditions. This and other evidence adduced by defendants is susceptible to different interpretations and cannot be the basis for a grant of summary judgment.

To summarize defendants' arguments relating to testing requested at various buildings, the legal standard is that one must have knowledge of injury and that this injury was caused by the possibly unreasonable acts of another. While expressions of concern by tenants about asbestos might be somewhat indicative of the potential for injury, such expressions do not necessarily go to knowledge of contamination by asbestos. Prudential has adduced evidence intended to demonstrate that the tests performed at the requests of tenants indicated that the asbestos was nonhazardous.

### 5. Zielinski material

Next, defendants cite to memoranda and statements made by Arcadius Zielinski, an architect in Prudential's Corporate Services & Building Department, which detail the presence of asbestos in various Prudential buildings, and cite applicable regulations in the event of the removal of asbestos. It is true that Mr. Zielinski does appear to indicate that prior to 1981 he believed that asbestos was a hazard. See, e.g. Zielinski Deposition

28

Transcripts, October 20, 1987, August 2, 1989, September 19, 1991; Exhibit 100 to Plaintiffs' Counterstatement and Response to the Rule 12G Statement Submitted by Defendant. However, a close review of all the submitted portions of Mr. Zielinski's deposition demonstrates first, that he was often confused about the questions and about what his thinking was in the late 1970s and early 1980s, and second, that Mr. Zielinski may not have been concerned with alleged contamination or hazards in Prudential's buildings. See, e.g. Transcript, Zielinski Deposition, October 1, 1987 at 161 (testimony that if asbestos was "firm" it is not a hazard); Id. at 208 (testimony that nothing need be done to in-place asbestos unless there is disturbance). Thus, it would be inappropriate for the court to rely on this evidence to grant defendants' motion based on Prudential's actual knowledge.

Finally, the defendants claim that Prudential's "attempts to minimize its knowledge of its injury by asserting that air-level testing showed low levels of airborne asbestos, is inconsistent with Prudential's position that it is seeking to recover for the mere presence of asbestos-containing materials without regard to air levels. Indeed, Prudential has not shown a change in air levels or that any such change brought about this action." This argument simply does not address the question of when Prudential knew of its injury. Prudential's argument is essentially that it learned of its injury very late, and then came to believe that any

29

presence of asbestos is hazardous.

IV. Statute of Repose

Defendants next move to dismiss plaintiffs' complaint because it is barred by various states' statutes of repose. This too requires a choice of law analysis.

A. Choice of Law

Statutes of repose serve a similar purpose to statutes of limitations. Like limitations period, repose periods -- if elapsed -- prevent plaintiffs from filing an action on a particular claim. Unlike statutes of limitations, though, statutes of repose are unrelated to when the cause of action accrues. Rosenberg v. Town of North Bergen, 61 N.J. 190, 199 (1972). Rather, a typical statute of repose "prevents what might otherwise be a cause of action from ever arising" after a specified period of time. Id. at 199., Van Slyke, 265 N.J. Super. at 608. Statutes of repose are, therefore, principles of substantive law and would ordinarily require a governmental interest analysis. Id.

In this case, defendants are essentially using the statue of repose as a statute of limitations, to argue to the court that plaintiff's causes of action are time-barred. See Brief in Support of Defendant, W.R. Grace & Co.-Conn.'s Motion for Summary Judgment to Dismiss Plaintiff's Amended Complaint Upon the Statutes of Repose at 7 ("While statues of limitation and repose differ, their underlying policies are the same"). And in fact, a statute of repose, in balancing the right to recover with the interest of

30

promoting timely and efficient litigation, raises many of the same policy concerns as a statute of limitations. And that is what this series of motions is all about. Therefore, this court concludes that in this case, the New Jersey Supreme Court would apply the same choice-of-law analysis in choosing New Jersey's statute of repose as it would in choosing the correct statute of limitations to apply. Accord, Mowrey v. Duriron Co., Inc., 260 N.J. Super. 402, 415 n.5 (App. Div. 1992) (even though case involved statute of repose, "we see no reason to depart from the Heavner analysis").

It is true that the recent case of Van Slyke v. Worthington applied the governmental interest analysis to a statue of repose question. That court, however, focussed on the particular facts of the case, namely that if New Jersey law applied, the statute of repose would bar plaintiff's claim and New Jersey's compensation interest would be defeated. Van Slyke, 265 N.J. Super. at 613.

But even using the governmental interest analysis, I find that New Jersey would not apply the statutes of repose of the non-forum states.

Under the governmental interest analysis, the court applies the law of the state with the greatest interest in governing the particular issue. Veazey v. Doremus, 103 N.J. 244, 249 (1986); Henry, 508 F.2d at 32. If a conflict exists, the court must assess the governmental policies of each state to determine which law to apply. The emphasis is on the quality, and not the quantity, of contacts.

31

Defendants are certainly correct in pointing out that the states where the various buildings are located have a strong interest in determining the fate of claims related to those respective buildings. The other important concerns are the interest in avoiding stale claims and the plaintiff's right to have an adjudication of its claim and receive compensation if the claim is meritorious. As detailed above, when the plaintiff is domiciled in New Jersey, New Jersey courts place strong emphasis on its compensation interest -- particularly when the alternative is to foreclose any forum to the plaintiff. Thus, I believe that even under a governmental interest analysis, New Jersey would apply its own law regarding statutes of repose.

### B. The substantive issue

In light of the foregoing discussion, since New Jersey law governs the application of statutes of repose, and since New Jersey does not have an applicable statute (and in fact, the defendants have not moved on any such statute), the defendants' motion for summary judgment based on the statutes of repose is denied.

### V. Defendants' motion on breach of warranty claim

Defendants next move to dismiss plaintiff's breach of warranty claim, as barred by the statute of limitations. The parties, for once, agree on a number of points here: First, that the UCC provides the relevant statute of limitations; second, that

32

normally, the statute of limitations is four years from the date of performance of the contract; and third, that the UCC provides a limited exception for warranties of future performance.[7] Prudential has conceded that any claim it has for breach of an express warranty for present performance are barred by any and all applicable statutes of limitations. It claims, though, that it has made out a claim for breach of a warranty of future performance.

The Uniform Commercial Code provides generally that "[a]n action for breach of any contract for sale must be commenced within four years after the cause of action has accrued." N.J.S.A. 12A:2-725 (1). It further provides that:

> A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty <u>explicitly</u> extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

N.J.S.A. 12A:2-725 (2) (emphasis added).

There are a few principles discernible from the UCC itself. First, any warranty for future performance must be express, because implied warranties "by their very nature . . . never explicitly extend to future performance." <u>Western Recreational Vehicles, Inc. v. Swift Adhesives, Inc.</u>, ___ F.3d ___,

---

[7] To some extent, the parties dispute the law to be applied. First, it does not appear that any conflicts exist, so this court can apply law governing the UCC. Second, to the extent that any conflicts do exist, this court will apply New Jersey law, since even under that law (which Prudential wishes applied), this claim must be dismissed.

33

1994 WL 176740 (9th Cir. (Wash.), May 11, 1994) (No. 92-36879, 92-36899). The UCC also provides a definition of express warranties. Section 2-313 states:

> (1) Express warranties by the seller are created as follows:
>
> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description. N.J.S.A. 12A:2-313(1).

In this case, Prudential's claims can be divided into two categories: First, it claims that at the time of the contracts, the defendants, through advertising and promotional literature, provided express warranties of future performance. Second, it contends that after the initial contracts were entered into, the defendants, through responses to inquiries, continued to make representations about future performance.

First, I will address Prudential's claim that the defendants made a number of warranties for future performance prior to or at the time of the sale. It cites to the following as warranties of future performance given in "Advertisements and Product Descriptions." <u>Plaintiff's Brief in Opposition to Defendant W.R. Grace & Co.'s Motion for Summary Judgment (1) On Plaintiff's Breach-of-Warranty Claims Based Upon the Statutes of Limitations and (2) On Plaintiff's Statutory Claims Under the Unfair and Deceptive Trade Practices Act</u> at 4. The citations are

34

divided into categories based on the individual defendant.

### Grace

(1) Promotional literature describes Zonolite Vermiculite, an asbestos-containing product as containing "an amazing mineral discovered during World War I". In one sentence of a several page brochure, the company stated "**permanent** -- Inorganic, sterile, will not rot or decompose. Moisture does not harm Zonolite. Even if accidentally wetted, it regains its original efficiency when dried out. <u>Appendix in Support of Plaintiff's Motion to Strike Defendants' Statute of Limitations Defenses Upon the Grounds of Equitable Estoppel</u>, Volume II §A at 2 (emphasis in original) (hereinafter, references to this Appendix will be cited as A, followed by the volume of the appendix, followed by the particular section (A, B, C, D, or E), followed by the page number).

(2) Other promotional literature contains a similar description of Zonolite as "Permanent -- Inorganic, sterile, will not rot or decompose." AII §A at 12;

(3) Several pieces of literature refer to the zonolite brand of vermiculite as durable. AII §A at 22, 30, 38, and 46;

(4) Literature states: "And you don't build a dusting problem into your building when you specify Mono-Kote. It dries hard, not punky . . . doesn't 'snow' when the building vibrates.
"All in all, it simply makes sense to specify Zonolite Mono-Kote. It gives you the fire protection you need where the fire protection belongs . . . on the steel itself. It requires little or no policing. And it causes no problems after it's in place." AII §A at 103.

(5) Another piece of literature states that "[s]ubjected to hurricane force winds for over 85 hours, MONO-KOTE demonstrated <u>no erosion</u>." (emphasis in original). AII §A at 105.

(6) A Zonolite pamphlet states that "[i]ndependent laboratory test subjected standard, machine-applied Mono-Kote surface to winds exceeding hurricane velocity . . . over 100 M.P.H. for 87 hours . . . with no erosion." AII §A at 124.

(7) Literature contains additional reference to test showing no erosion at hurricane-velocity winds. AII §A

35

at 131.

(8) Literature states: "The fireproofing material shall not be subject to losses from the finished application by sifting, flaking or dusting. This performance shall be measured by the results of a test for erosion resistance when subjected to high velocity air flow cross the surface of dried samples. . . . Material shall not crack or delaminate when the structural element is subjected to downward deflection of 1/120 of the span." AII -§A at 141.

(10) Material states that "[e]xisting formulations of Mono-Kote contain minimal amounts of asbestos which are 'locked in' during the mixing process. Mono-Kote is wet-mixed, pumped and sprayed, and hardens to a cementitious mass." AII §A at 142.

(11) Further reference to wind velocity test: "[Z]ero erosion, after being tested in 100 m.p.h. winds for 87 hours. Result: no 'dusting' in air-conditioning and ventilating systems." AII §A at 148.

(12) Literature states "Monokote, a cementitious, plaster fireproofing stays applied during application and throughout subsequent construction procedures <u>for the life of your building</u>." AII §A at 159 (emphasis added).

### United States Gypsum

(1) Literature about SprayDon, an asbestos product manufactured and marketed by United States Gypsum Co., Inc. (hereinafter U.S. Gypsum) states that U.S. Gypsum's method of application "results in a mat that is hard, firm -- so durable that it can be used on sidewalls . . . ." Also: "no cracking from shrinkage or fire" and able to withstand erosion. AII §B at 235.

### Asbestospray

(1) Promotional literature states that "[l]aboratory tests prove that Type S Surface Sealer, used by the Asbestospray corporation in its asbestos products, will enable Asbestospray to withstand flow of air up to 1500 feet per minute without dusting or flaking." AII §C at 372.

(2) Literature states that among the advantages of Asbestospray are: "High bonding strength -- provides a permanent surface that will not crack, dust or flake."

36

AII §C at 374, 381, 387, 395, and 403.

(3) Similarly, other literature states that "Asbestospray forms a strong, lasting bond with steel, masonry, plaster, gypsum lath and other rigid surfaces." AII §C at 386.

(4) Another product description details the Fireproofing advantages of Asbestospray's product: "Permanent. Asbestospray forms an extremely strong bond with the surface to which it is applied. . . . . Laboratory tests prove that Type S Surface Sealer will enable Asbestospray to withstand flow of air up to 1500 feet per minute without dusting or flaking." AII §C at 387, 395, and 403.

(5) In another reference to testing, literature states that "Field tests have been run in areas used for this purpose and definitely prove that there is no erosion of the installed material." AII-§C-413.

### Keene Corporation

(1) Literature states that "[l]aboratory tests prove Pyrospray Fireproofing effectively resists erosion, dusting or flaking due to high velocity air movement." AII §D at 480.

### United States Mineral Products

(1) Literature states that "Under normal structural movement of framing, floor or roof sections, BLAZE-SHIELD Type D maintains high bond strength without surface cracking or spalling. Shrinkage cracks, resulting in limited effective fire retardancy, are eliminated." AII §E at 490.

(2) "The monolithic coating [of Blaze-Shield Type H] absorbs normal structural movement without surface cracking or spalling." AII §E at 492, 500, and 502.

(3) Literature states that "[w]ith Blaze-Shield Type D, old heavy wet mix materials are eliminated and it provides permanent protection to deflection, impact, structural systems without surface cracking or spalling due to normal structural expansion or contraction." AII-E-498.

Prudential is correct in its contention that express

37

warranties can be made through advertising. Indeed, advertisements are obviously constructed to induce purchases, and when purchasing decisions are reasonably made based on advertisements, the representations contained in the advertising become part of the bargain. See, e.g. Cipollone v. Liggett Group, Inc., 893 F.2d 541, 564 n.20 (3d Cir. 1990), modified, 112 S.Ct. 2608 (1991); see also Spring Motors Distributors, Inc. v. Ford Motor Co., 191 N.J. Super. 22, 46 (App. Div. 1983), rev'd in part, 98 N.J. 555 (1985) ("The seller need not use the formal words such as 'warrant' or 'guarantee' or have the specific intention to make a warranty in order that an express warranty arise . . . . [A] warranty that a machine is 'well-constructed,' 'satisfactory,' or 'in good working order' will ordinarily bind the seller." (quoting 1 Anderson, Uniform Commercial Code (2nd ed. 1970), §2-313:37 at 502)).

But the question here is not whether the representations in the promotional literature were express and therefore part of the bargain; rather, the issue before the court is whether the literature conveyed representations regarding future performance.

Courts generally have narrowly construed the definition of "explicit" in deciding whether a warranty extends to future performance under the UCC. Stating the general rule, one court has held that the term explicit in this context means "not implied merely or conveyed by implication; distinctly stated; plain in language; clear, not ambiguous; express; unequivocal." Binkley Co. v. Teledyne Mid-America Corp., 333 F. Supp. 1183 (E.D. Mo. 1971) (quoting Hvidsten v. Northern Pacific Ry. Co., 76 N.D. 111, 121,

(1948), aff'd, 460 F.2d 276 (8th Cir. 1972) (<u>cited with approval in Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp</u>, 626 F.2d 280, 291 n.25 (3d Cir. 1980)).

<u>Jones & Laughlin</u> is instructive about the standard that must be met before a warranty for future performance may be found. In that case, the plaintiff claimed that the defendant, who had sold it a roof, had made an express warranty about future performance. Johns-Manville had made the following representations during negotiations:

> Johns-Manville has been reducing roofing felts made of asbestos for over 100 years. On the record, Johns-Manville can cite many asbestos roofs that, today, are still performing satisfactorily after more than forty (40) years of exposure to heat, cold, water, air and even fire. And, all of this service with minimum maintenance and repair costs.
>
> * * *
>
> Improved Fesco Board resits the tensions, twists and pulls created by high winds, tornadoes, hurricanes and building movements. Laboratory tests pictured here, demonstrate Improved Fesco Board's great tensile strength and outstanding resistance to diagonal shear and horizontal shear . . . Many roof insulations barely meet the Factual Mutual minimum requirements but Improved Fesco Board withstands 120 miles per hour with a 100% factor of safety.

<u>Jones & Laughlin</u>, 626 F.2d at 291. Nonetheless, the Court of Appeals held as a matter of law that "[t]he statements regarding the strength and wind resistance of Fesco Board, as well as the boast that many roofs . . . are still performing satisfactorily after more than forty (40) years of use, may not reasonably be relied on by Jones & Laughlin as <u>explicit</u> extensions of any warranty to cover the future performance of the product . . . ."

39