<u>Id.</u> at 291.

The vast majority of courts -- including New Jersey appellate division courts -- have, in line with the Third Circuit's view, construed the UCC language narrowly. What this means is that in order for there to be a warranty of future performance, the warranty must "make specific reference to a future time". <u>Fire Dist. No. 9 v. American La France</u>, 176 N.J. Super. 566, 573 (App. Div. 1980); <u>Spring Motors</u>, 191 N.J. Super. at 47. As stated very recently by the Ninth Circuit:

> "Most courts have been very harsh in determining whether a warranty explicitly extends to future performance. Emphasizin~ .'e word 'explicitly', they have ruled that there mus~ . .pecific reference to a future time in the warranty. .a a result of this harsh construction, most express warranties cannot meet the test . . . ." <u>Western Recreational Vehicles, Inc.</u>, 1994 U.S.App. LEXIS at *8 (citing <u>Standard Alliance Industries, Inc. v. Black Clawson Co.</u>, 587 F.2d 813, 820 (6th Cir. 1978), <u>cert. denied</u>, 441 U.S. 923 (1979).

It is possible to read <u>Cipollone</u> somewhat broader than <u>Jones & Laughlin</u>.[8] In the more recent case, the defendants' advertisements had represented that according to scientific tests performed on tobacco, cigarettes are not harmful. Writing for the Court, Judge Becker wrote that representations of "studies" conducted by medical specialists on individuals who had smoked for thirty years could be

_____

[8]Although it could be argued that <u>Cipollone</u> speaks to warranties for future performance, <u>Prudential</u> relies on the case for the proposition that the defendants gave express warranties. Prudential's brief divides as follows: (1) Defendants gave express warranties; (2) The warranties extended to future performance. <u>Prudential's brief in Opposition to Breach of Warranty Claim</u>, at 16-24. <u>Cipollone</u> is cited only in the first section.

taken as "representing that smoking for a long period of time was safe". Cipollone, 893 F.2d at 576. The whole series of advertisements -- including representations that a particular brand of cigarettes was "just what the doctor ordered" told the Court that "a reasonable jury could conclude from these advertisements, and the many others entered into evidence, that [the defendant] had represented to the consumer that the long-term smoking of chesterfield or L & M cigarettes would not endanger the consumer's health, and that these warranties were untrue." Id. at 575-76.

Cipollone, however, addressed neither the standard for finding an express warranty of future performance nor the statute of limitations question. The arguments before the court, and the decision that was rendered, addressed simply the question of whether there was "sufficient evidence to support a jury finding that Mrs. Cipollone's injury was caused by Liggett's breach of express warranty". Id. at 574. The question of causation is different from the question of whether an action is time-barred.

Prudential relies primarily on several cases for the proposition that the representations in this case amounted to representations of future performance. These cases, however, while citing the general rule, do not really analyze the representations at issue to determine whether they in fact meet the rigorous test. For example, in Kansas City v. W.R. Grace & Co., 778 S.W.2d 264 (Mo. Ct. App. 1989), the Missouri Court of Appeals addressed the trial court's grant of summary judgment to a series of asbestos companies on the plaintiff's express warranty of future performance

41

claim.  The record contained representations that the defendants'
products were "easy to maintain", and that they provided a
permanent surface that would not crack or dust.  The appeals court
simply cited the statements and held that the representations
constituted an express warranty of future performance.  The court
did not address whether the representations were explicit (although
they were) or whether they unambiguously and explicitly warranted
the product for a particular time period.

This was also the case in Mittasch v. Seal Lock Burial
Vault, Inc., 42 A.D.2d 573, 344 N.Y.S.2d 101 (App. Div. 1973).
There, the defendant had represented that the burial vault it sold
plaintiff would perform satisfactorily at all times.  The Appellate
Division stated, again without analysis, that "[i]n our opinion,
defendants' warranty that the burial vault would give 'satisfaction
at all times' explicitly extended to future performance."

This approach has been criticized by the Ninth Circuit as
being at odds with the language of the UCC.  Western Recreational
Vehicles, 1994 WL 176740 at 4-5.  Indeed, the cases fail to take
into account the policies and balancing behind the UCC's
provisions.  For one thing, the cases do not pay sufficient
attention to the fact that the future performance provision is an
exception to the general rule.  And the general rule provides a
useful rule to govern sales specifically and business situations
generally.  It makes eminent sense to provide a four year statute
of limitations when a product is sold and a warranty is given.  But
if a purchaser wishes the seller to guarantee the product for

42

years, decades or forever, the law requires a special explicit-ness, to ensure that the parties have in fact bargained for the additional warranty.  Thus, the requirement that the warranty be explicit ensures that the parties get what they intended.  In the absence of such explicit language, the UCC establishes "a reasonable period of time, four years, beyond which business persons need not worry about stale warranty claims . . . ." _Standard Alliance_, 587 F.2d at 820.  As one court has held, the general rule "serves the important function of providing a point of finality for businesses after which they can destroy their business records without the fear of a subsequent breach of contract for sale or breach of warranty suit arising to haunt them." _Ontario Hydro v. Zallea Systems, Inc._, 569 F. Supp. 1261, 1266 (D.Del. 1983).  Put differently, the explicitness requirement ensures that before the exception applies, "the parties to the contract have knowingly agreed to alter the usual statute of limitations." _Stumler v. Ferry-Morse Seed Co_, 644 F.2d 667, 672; _see also H. Sand & Co. v. Airtemp Corp._, 738 F.Supp. 760, 770 (S.D.N.Y. 1990), _modified_ 934 F.2d 450 (2d Cir. 1991) ("The drafters of the UCC decided that the seller's need to have some clearly defined limit on the period of its potential liability outweighed the buyer's interest in an extended warranty and reserved the benefits of an extended warranty to those who explicitly bargained for them.")  Moreover, "[a]ny harshness that results from the statute is directly attributable to the restrictive language of the code, which leaves courts with no alternative but to render a narrow

decision."   <u>Western Recreational Vehicles</u> at *5 (<u>quoting</u> <u>Poppenheimer v. Bluff City Motor Homes, Div. of Bluff City Buick</u> <u>Co.</u>, 658 S.W.2d 106, 111 (Tenn. App. 1983)).

Thus, the provision must be applied narrowly. With this in mind, I do not believe that the representations amount to warranties of future performance. It is fairly clear that these representation amount to representations of current use. But they simply do not rise to that level of specificity required for future use. Many of the representations refer to test results. In <u>Jones</u> <u>& Laughlin</u>, the Third Circuit specifically rejected the notion that representation of test results could create an express warranty of future performance. Similarly, while many of the representations describe the product as durable and permanent and not subject to cracking, that is a far cry from an <u>explicit</u> representation that the product is warranted for a specific future time. Moreover, the statements are briefly worded in the context of lengthy promotional literature. They certainly are not the bargained-for representations contemplated by the UCC.

The closest example to a warranty of future performance is Grace's representation that Monokote stays applied for construction projects for the life of the building. But even this statement does not provide a warranty for a specific time in the future. <u>See</u>, <u>e.g.</u>, <u>South Burlington School Dist. v. Calcagni-</u> <u>Frazler-Zajchowski Architects. Inc.</u>, 410 A.2d 1359, 1366 (1980) (refusing to apply exception to representation that product would last as long as the built-up roofing would last.) Moreover, that

44

particular representation is ambiguous, in that it is unclear whether it is speaking about future construction projects or about the life of the building generally.

In short, to hold that the representations in the promotional literature rose to the level of an explicit representation referring to specific future date would allow the exception to swallow the rule. I decline to follow that path.

Prudential does not end its argument here, however. It contends that representations made by the defendants after the contracts were completed presented future warranties. These representations occurred through responses from the defendants to inquiries about their asbestos products.

The following list is derived from Prudential's exhibits:

(1) April 28, 1969 letter from Thomas F. Egan, Manager Fireproofing Products for Zonolite, a division of Grace, states that "Zonolite Mono-Kote has been tested for dusting and air-erosion with 105 M.P.H. winds for 87 hours and no loss of material. This would hold as to application for our plaster or acoustical plaster." AIII §B at 127.

(2) December 9, 1970 letter from William V. Culver, District Manager of Grace, to the Chief Industrial Hygienist of Workmen's Compensation Board, states that "Mono-Kote is a cementitious brand of fireproofing which does contain approximately 8& asbestos. I hasten to point out that being mixed in a plaster mix with water and pumped as a slurry, at no time is the asbestos free as occurs with the normal sprayed fibrous kind of fireproofing." AIII §B at 169.

(3) January 15, 1971 letter disseminated by W.R. Grace (actually written by the Texas Vermiculite Company) to Neuhaus & Taylor, Architects, states that "If we are fortunate enough to supply your [building] we will be

supplying Mono-Kote which has had an excellent history
and does not contribute to health hazards." AIII §B at
171 (emphasis added).

(4) February 8, 1971 letter from Thomas F. Egan of Grace
to McNulty Bros. Co., an architecture firm, states that
Mono-Kote "has a definite set containing approximately
60% gypsum and 'locks' the fiber in the hardened mass."
Further, "The in-place density is assured and provides
tested --- erosion hardness for use in plenums."  It
further states, however, that "[f]rom the test data, we
contend that Mono-Kote is not causing the health hazard
that is being charged." AIII §B at 176-77.

(5)  November 15, 1972 letter from R.O. de Bastian of
Grace to Sayre & Associates states that under applicable
regulations, "exposure [to asbestos] shall not exceed 5
fibers per milliliter greater than 5 microns in length.
Tests have shown that Mono-Kote is well below these
standards." AIII §B at 200.

(6)    October   25,   1972   letter   from   the   Carpenter
Plastering Company to Henry C. Back Company, attaching
literature furnished by W.R. Grace & Co. showing
technical data and specifications in connection with
Zonolite Mono-Kote fireproofing.  This material states
that "[i]ndependent laboratory test subjected standard,
machine-applied Mono-Kote surface to winds exceeding
hurricane velocity . . . over 100 M.P.H. for 87 hours .
. . with no erosion."  Further, "[t]he fireproofing
material shall not be subject to losses from the finished
application by sifting, flaking or dusting." AIII §B at
202.

(7)  January 25, 1977 letter from Robert A. Merther of
Grace states "This is to certify that no commercial
asbestos   is   used   in   the   manufacture   of   MONOKOTE
Fireproofing.     Further,   any   trace   contaminates   of
naturally occurring forms of asbestos in MONOKOTE are
bound in the 'in-place' MONOKOTE, so as to prevent
asbestos fibers from entering the environment." AIII §B
at 236.

(8)   Draft of a letter from Merther of Grace to the
Supervising Principal of Berne-Knox-Westerlo Central
School District states that "Zono-Coustic acoustical
plaster sets to a relatively hard condition.   The
asbestos which was in the material, therefore, is bound
in the set plaster and is not free to enter the
environment." AIII §B at 238.

(9)  March 7, 1977 letter from Grace to Horner & Krause

46

Architects, states that "[B]ecause in place 'Monokote' is
a hard  plaster like material, it is our opinion that in
place MK-3 poses no health hazard to building occupants."
AIII §B at 242.

(10)  March 18, 1977 letter from Grace to the Illinois
Superintendent of Education, responds to concerns about
pre-1973 monokote:

> "The material manufactured by our company . .
> ., because it provides a much more durable surface,
> is  far  less  likely  to  be  damaged  and  quite
> difficult to remove.  Furthermore, although prior
> to 1973 , MONOKOTE MK-3 was manufactured with 5
> asbestos, the asbestos was housed in the in-place
> material by the set gypsum and therefore not free
> to enter the environment. We understand, in fact,
> that tests have been run in buildings which have
> been sprayed with MONOKOTE MK-3 with these tests
> showing no detectable levels of asbestos fibers
> coming from the MONOKOTE Fireproofing.  It is our
> opinion, therefore, that in-place MONOKOTE MK-3
> Fireproofing  presents  no  hazards  to  building
> occupants due to release of asbestos fibers in the
> air.  Air sampling tests in buildings would confirm
> this."  AIII §B at 247.

(11)  The record contains a number of letters written by
representatives of defendant companies from January 18,
1979  through  June  7,  1982,  responding  to  concerns
expressed  by  architects,  school  boards  and  others.
Typically, the letters assure the writers that  "Because
of the 'setting' characteristic of many materials sold
prior to reformulation without asbestos, we believe that
the asbestos fibers would be encapsulated in the matrix.
This conclusion assumes that the material is undisturbed
and has suffered no in-place damage."  The letters go on
to advise on the course to take (removal or sealing) if
the material has been "subjected to external forces which
have left the surface sifting and flaking".  AIII at §B
264 (see also AIII §B at 266-329).

(12)   September 19, 1975 letter from a U.S. Gypsum
scientist to Bristol Meyers Industries, stating that in
some of defendants' material:

> "the asbestos fibers are securely embedded in
> the gypsum plaster matrix and would not be released
> to the air unless it were forcefully pulverized.

> "In summary, asbestos is a minor additive in
> both products, and is embedded in the matrix of the

47

plaster for the purpose of modifying its dry and/or wet integrity. In my opinion it would not present a health hazard in the context of the Occupational Safety and Health Administration regulations that are aimed at controlling excessive airborne concentrations for full-time occupational exposure to free asbestos." AIII §D at 415.

(13)  January 21, 1977 letter from U.S. Gypsum to a Mrs. Sandra Malikin states:

> "The small amount of asbestos is securely embedded in the mortar matrix and should not be released to the air unless it is forcefully pulverized. There is no possibility of asbestos contamination from normal air currents or water leakage. . . .
> "I am not aware of, nor can I conceive of, a hazardous exposure resulting from a properly installed and maintained LC-NC Spray Texture Ceiling." AIII §C at 424.

(14)  December 10, 1976 letter from U.S. Gypsum to Radey & Radey Associates, an architectural firm, regarding the products Audicote and Sabinite, states:

> "The asbestos fibers are securely embedded in the mortar matrix and should not be released to the air unless it is forcefully pulverized or abraded. I am not aware of, nor can I conceive of, a hazardous exposure resulting from a properly installed and maintained AUDICOTE or SABINITE Acoustical Plaster ceiling. However, if there is concern about the surface, for whatever reason, I would suggest that the ceiling be painted . . . ." AIII §C at 433; see also AIII §C at 437, AIII §C at 450; AIII §C at 482; AIII §C at 484.

(15)  January 29, 1979 letter from U.S. Gypsum to A.E. Zielinski, regarding the asbestos-containing products Audicote and Sabinite. U.S. Gypsum represented that it was "not aware of, nor can [it] conceive of a hazardous exposure resulting from a properly installed and maintained [asbestos-containing material.]" Exhibit 101 to Prudential's Motion to Strike Defenses;

(16)  February 1, 1979 memorandum from Grace to Sales Organization and March 7, 1977 letter from Grace to Jack Herner, regarding concerns of health hazards from in-place asbestos-containing construction materials: ". . . In-place [asbestos-containing material] poses no health hazards to building occupants". AIII §B at 233, 240-41.

48

(17)  December 20, 1980 letter from Grace to C.H. Easton states that "The presence of asbestos fiber . . .should not be of concern."  AIII §B at 312.

(18)  April 20, 1983 memorandum from Grace to Sales Organization states in "Attachment A" that "The asbestos fireproofing and plastering products which were produced in the past by [Grace] were cementitious material and were applied in a wet slurry form. Because of this, they did not, in our opinion, pose a health problem in spite of their commercial asbestos content (which generally ranged between 12 and 19&).  AIII §B at 346-49.

Prudential is correct in their assumption that post-sale representations can constitute binding warranties.  As the Tenth Circuit put it in e.g. Downie v. Abex Corp., 741 F.2d 1235, 1240 (10th Cir. 1984), in quoting with approval the Official Comments to the UCC:

> The precise time when words of description or affirmation are made . . . is not material.  The sole question is whether the language . . . [is] fairly to be regarded as part of the contract.  If language is used after the closing of the deal (as when the buyer when taking delivery asks and receives an additional assurance), the warranty becomes a modification, and need not be supported by consideration if it is otherwise reasonable and in order.

This is a sound principle, since post-sale representations allow the seller to attempt to promote future sales as well as to generate good will for its business.  See, e.g. Downie, 741 F.2d at 1240 (citing Bigelow v. Agway, Inc., 506 F.2d 551, 555 n.6 (2d Cir. 1974)).

But, even assuming that the representations constitute

warranties[9], there still remains the question of whether these constitute representations of future performance. Here, the representations are even more keyed to the present than those described in the previous section. There are no explicit warranties for a specified time in the future.

Thus, at best, the warranties are additional present warranties, and as such, should extend the limitations period for no longer than four years. And, the latest letters cited were written in the early 1980s, none prior to four years before this action was filed.

Therefore, I will grant defendants' motion for summary judgment and dismiss Prudential's breach of warranty claim.

VI.  Claim Under New Jersey Consumer Fraud Act

Defendants next move to dismiss plaintiff's allegations of violations of consumer Fraud statutes. Prudential responded by stating that it wished to proceed solely on the basis of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1.

The Act prohibits:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression or omission, of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . , or with the subsequent performance of such person as aforesaid . . . .

---

[9]As to at least the more recent letters, this remains questionable. Those letters tend to speak in terms of opinion, rather than representation of fact.

Defendants make several arguments for why this claim should be dismissed.

First, they contend that the Act was meant to apply only to sales of ordinary consumer goods and was not intended to protect massive commercial entities like Prudential. While it is true that "certain practices unlawful in a sale of personal goods to an individual consumer would not be held unlawful in a transaction between particular business entities", the Act fairly clearly applies to business entities generally. See Hundred East Credit Corp. v. Shuster Corp., 212 N.J. Super. 350, 355 (App. Div. 1986) (while "the strongest case for relief is presented by the poor, the naive and the uneducated, others can qualify as consumers as well"); N.J.S.A. 56:8-1(d) (defining person as "any natural person or his legal representative, partnership, corporation company, trust, business entity or association . . . .") Here, while defendants and plaintiff are large corporations, the disparity in their respective knowledge about asbestos is clearly material. Thus, I decline to hold as a matter of law that the Act does not intend to protect Prudential in this matter.

Moreover, this case is not like BOC Group, Inc. v. Lummus Crest, Inc., 251 N.J. Super. 271 (Law Div. 1990), in which the Court dismissed a claim under the Act. The claim in that case involved three parties which the court characterized as "large corporations who negotiated for years before entering into a multi-million dollar contract for the sale of a design and for services collateral thereto." Id. at 280. The court relied on the peculiar

51

nature of the contract, and the fact that "plaintiff . . . knew it was purchasing a new, state of the art idea which was still in an experimental phase . . . . Plaintiff independently tested [the] design repeatedly before it entered into an agreement with defendant for its implementation." Id. at 281. Those mitigating circumstances simply are not present in this case, where the plaintiff entered into ordinary building agreements that contained asbestos products placed by defendants.[10]

Defendants next argue that plaintiff's claim fails because of lack of privity. New Jersey courts have squarely rejected this argument. See, e.g., Perth Amboy Iron Works, Inc. v. American Home Assur. Co., 226 N.J. Super. 200, 211 (App. Div. 1988).[11]

---

[10]Defendants also rely on two New Jersey District court cases: Unifoil Corp. v. Cheque Printers and Encoders, Ltd., 622 F. Supp. 268, 270 (D.N.J. 1985); Werner & Pfleiderer Corp. v. Gary Chemical Corp., 697 F. Supp. 808, 814-15 (D.N.J. 1988). The latter case held that the Act does not apply to protect "commercial entities involved in a dispute which is essentially contractual in nature, and the disputed performance is covered by the contract." Gary Chemical, 697 F. Supp. at 815. Not only are those cases inapposite -- this case is essentially a tort case -- but the Appellate Division has expressly reached a contrary conclusion. Dreier Co., Inc. v. Unitronix Corp., 218 N.J. Super. 260 (App. Div. 1986).

[11]Finally, defendants make an amalgam of arguments in one section of the brief; some of these arguments are difficult to follow. But they include
   (1) By proceeding based solely on the New Jersey statute, plaintiff has improperly amended its complaint without leave of the court. It is unclear why Prudential's willingness to abandon certain claims implicates the concerns of Fed. R. Civ. P. 15. At any rate:   (1) Under the liberal interpretation of the Rule, Prudential would certainly have been entitled to amend; (2) To the extent that defendants believe that Prudential is improperly trying to use the Consumer Fraud Act to get at actions not covered by the Act, they may make an appropriate in limine motion.
   (2)    Plaintiff has not proved reliance on any of

Therefore, I decline to dismiss Prudential's claims under the New Jersey Consumer Fraud Act.

## CONCLUSION

For the reasons detailed above, I will deny all of the defendants' motions except its motion for summary judgment dismissing Prudential's breach of warranty claim. That motion is granted.

---

defendant's statements. But Prudential has alleged that because of defendants' fraudulent failure to disclose, the asbestos problem never entered into Prudential's business deliberations. At this point in the litigation, I decline to dismiss the claim on this ground.

FILED

JUN 0 9 1994

AT 8:30 .............. ¯. M
WILLIAM T. WALSH
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

THE PRUDENTIAL INSURANCE )
COMPANY OF AMERICA, et. al., )
                    Plaintiffs, )
                              )    Civ. Action No. 87-4238
v.                            )         (HAA)
                              )
                              )         ORDER
U.S. GYPSUM, et. al.,         )
                    Defendants. )
_____ )

Ackerman, D.J.

        This matter having come before the court upon a series of
motions made by defendants in this matter; and this Court having
considered the entire record in the case, including the submitted
briefs; and for the reasons expressed in an Opinion issued this
same day; and for good cause shown,

        IT IS ON THIS 9th day of June, 1994,

        ORDERED that:

        (1) Defendant U.S. Gypsum's and Asbestospray's motion for
summary judgment dismissing plaintiff's RICO claim as barred by the
statute of limitations is DENIED;

        (2) Defendants' motion for summary judgment dismissing
plaintiffs' common law tort and fraud claims as barred by the
applicable statute of limitations is DENIED;

        (3) Defendants' motion for summary judgment dismissing
plaintiffs' complaint as barred by the applicable statutes of
repose is DENIED;

        (4) Defendants' motion for summary judgment dismissing

plaintiff's claims under the applicable Unfair Trade Practices Acts
is DENIED; and

(5)   Defendants' motion for summary judgment dismissing
plaintiffs' breach of warranty claim as barred by the applicable
statutes of limitation is GRANTED.

Harold A. Ackerman, U.S.D.J.

2