B.     The claimant indicates that "it made an effort to remove, contain and/or abate the Grace product for which you are making the claim" but did not attach documents or a summary of documents relating or referring to such efforts; or

C.     The claimant did not attach documents or a summary of documents "relating to the purchase and/or installation of the product in the property" and did not attach documents or a summary of documents "relating or referring to the presence of asbestos in the property for which you are making this claim."

For the reasons set forth in Section II and those below, Debtors' objection should be denied.

Debtors do not provide clear information regarding what documentation the Debtors believe is missing from the Claimant's claims.  In fact, Claimant is left to guess as to which of these three categories of information Debtors contend was not supplied by Claimant with respect to these claims.  Accordingly, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further clarification is provided by Debtors. Clearly, Debtors have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I), which makes it difficult, if not impossible, for Claimant to understand what documentation Debtors believe is missing from Claimant's claim.

However, as stated earlier, since the original construction records were either destroyed or lost in the mid-1970's, none of the records concerning the "purchase and installation" were found.

Since the Claimant is a public body of the State of Louisiana, it must comply with the Public Bid Laws of the state.  Accordingly, when an architect wanted to use asbestos containing material (ACM) on a job, the specifications could call for a particular brand of ACM but would have to contain the words: "...or equal."  The public body's records would not necessarily contain the name of the manufacturer of the AMC actually installed in a school because such material was purchased and installed by the contractor from the list of approved "equals" in the specifications.  The public body itself did not purchase and install the ACM.

If Claimant had documentation that relates to the purchase, installation or abatement of Debtors' products in the buildings at issue, such documents, or a summary thereof, have been provided to Debtors. To the extent that documentation responsive to this objection exists and is in the possession of Claimant, such has either been produced to Debtors or a summary thereof attached to the Proof of Claim, Supplemental Response, or Second Supplemental Response.

**B.      Claims Allegedly Failing to Rule Out Non-Grace Products (Grace Ex. C-4)**

The Debtors have objected to Claimant's claim(s) alleging that the "bulk sampling data is consistent with a Grace product and either bulk sampling data that is inconsistent with a Grace product or bulk sampling data insufficient to determine the presence of a non-Grace product in addition to a Grace product ..." (the "C-4 Objection").   For the reasons set forth below, Debtors' objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection to Claimant's claim.   Claimant has requested, and is entitled to conduct discovery regarding Debtors allegation that the "bulk sampling data provided by Claimant is consistent with a Grace product and either bulk sampling data that is inconsistent with a Grace product or the bulk sampling data is insufficient to determine the presence of a non-Grace product in addition to a Grace product." (Fifteenth Omnibus Objection ¶ 85, p. 30).  Until Claimant is provided the data that Debtors rely upon in making this objection Claimant cannot fully respond to such.  As such, Claimant reserves its right to supplement or amend it response to the extent further information is provided.  Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claim, see In re Allegheny, 954 F.2d 167, 173 (3rd Cir. 1992), and have failed to provide "sufficient detail as to why the claim should be disallowed."  Del. Bankr. LR 3007-1(e)(iii)(I).

It is instructive that Debtors state that "these bulk samples ... indicate that the building at issue potentially contains both Grace asbestos-containing products and asbestos-containing products manufactured by another company." In fact, Debtors lodge this objection "only out of an abundance of caution," and "are not seeking at this time to disallow or expunge the PD Claim ..., unless those claims also happen to fall in another category for which this remedy is sought." By Debtors' own admission, this particular objection is simply invalid.

This objection is substantively without basis as Claimant has attached to each of the Proofs of Claim at issue a constituent analysis performed by MAS, regarding the asbestos-containing product in the buildings in issue, as well as letter reports of Dr. William Longo. These reports establish that the ACM in Claimant's buildings was manufactured by Grace. As previously discussed in Section III.B above, Grace has, time and time again, accepted similar reports from Dr. Longo as valid proof of product identification. This occurred even where there are slight variances between the bulk sample analysis and the alleged formulas.

C.    **Claim for Buildings Allegedly Built Too Late to Contain Grace ACM (Grace Ex. D-1(b))**

The Debtors object to Claimant's claims on the grounds that the acoustical plaster was installed in Claimant's building after 1969, stating that "with rare exception ... Grace stopped selling acoustical plaster containing asbestos by 1969 ..." (the "D-1(b) Objection"). For the reasons set forth below, Debtors' objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection to the Claimant's claims. As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its responses to the extent further information is produced. Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity

of Claimant's claims, *see In re Allegheny*, *supra,* and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

This objection is substantively without basis as Claimant has attached a constituent analysis performed by MAS, regarding the buildings in issue, as well as a letter report of Dr. William Longo. These reports establish that the ACM in Claimant's buildings was manufactured by Grace. *See also* discussion, Section III.E regarding Grace's sale of ZAP after 1969.

### D.    Claims for Buildings Built Before 1969 (Grace Ex. D-1(c))

The Debtors object to Claimant's claims on the grounds that any acoustical plaster installed in buildings built before 1969 would have been replaced years ago (the "D-1(c) Objection"). For the reasons set forth below, Debtors' objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection to the Claimant's claims. As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its responses to the extent further information is produced. Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claims, *see In re Allegheny*, *supra*, and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

There are three problems with Debtors' objection: First, the assertion that Grace's acoustical plaster installed prior to 1969 would have been replaced by now is contrary to the representations made in its own sales and marketing literature. Counsel for Claimant has been litigating with Debtors regarding the manufacture and sale of Grace ACM for almost twenty years, and this is the first time that they have ever seriously raised this argument. Debtors continually touted the durability of their products in literature provided to architects, contractors and building owners. Second, even if the product has been removed in whole or in part, such

removal does not bar Claimant's claim. Claimant would still have incurred significant costs associated with the maintenance and removal of the acoustical plaster that would not have been incurred if the product was not asbestos-containing. Last, but most importantly, Claimant has submitted evidence that the acoustical plaster in the building(s) in issue was manufactured by Grace. Claimant has already provided to Debtors a constituent analysis performed by MAS, regarding the building(s) at issue, as well as letter reports of Dr. William Longo. These reports establish that the ACM in Claimant's building was manufactured by Grace.

**E.    Claims Allegedly Barred by the Statute of Limitations Based Upon Constructive Notice (Grace Ex. D-2)**

The Debtors object to Claimant's claims asserting that such are barred "under the applicable statutes of limitations, based upon the doctrine of constructive notice ..." (the "D-2 Objection"). For the reasons set forth below, Debtors' objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection to the Claimant's claims. They have also failed to identify the specific statutes of limitations or decisional rulings that they allege bar these claims. As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further information is produced. Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claims, *see In re Allegheny, supra,* and have failed to provide "sufficient detail as to why the claims should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

In the early 1980's, school districts in the nation were being made aware of a growing concern about the exposure to asbestos by school children. As a result, school districts began the process of inspecting their facilities to determine whether asbestos-containing materials existed in the facilities, and if so, whether any remedial action should be taken. In some instances, school

districts were simply being advised to encapsulate or paint any potential friable asbestos containing material so as to prevent any contamination or release from occurring.

On January 17, 1983, the mandatory class action lawsuit, mentioned previously, was filed which included the potential claims of Claimant, and which prevented Claimant from filing any suit on its own behalf.

The Louisiana Legislature, in 1985, enacted a specific statute involving the prescriptive period (statute of limitations) allowed for asbestos claims. The statute, effective September 6, 1985, was codified as La. R.S. 9:5644 and provides as follows:

A. Asbestos abatement shall include any of the following:

(1) The removal of asbestos or materials containing asbestos from any building.

(2) Any other measures taken to detect, correct, or ameliorate any problem related to asbestos in a building.

(3) Reimbursement for the removal, correction, or amelioration of asbestos or materials containing asbestos.

B. Notwithstanding any other provision of law to the contrary, any time limitation or prescriptive period which may be applicable to any action to recover for asbestos abatement work shall not apply or expire until five years after the date on which the party seeking to recover has completed the abatement work or discovered the identity of the manufacturer of the materials which require abatement, whichever is later.

C. Any person who has an action to recover for asbestos abatement work under the provisions of this Section but whose action is barred by the prescriptive period provided in R.S. 9:5644 shall have one year from the effective date of this Act within which to bring an action or be forever barred.

D. Nothing in this Section is intended to nor shall it have the effect of changing in any respect the applicable prescription periods fixed by law for benefits under the worker's compensation law for claims for damages due to asbestos related injury or disease.

The Claimant, when finally authorized in the Pennsylvania class-action to opt out of the lawsuit, did opt out on November 30, 1987. In filing the lawsuit on August 31, 1988, in the Eastern District of Louisiana with the other school systems in the state, and in performing

additional discovery and inspections, the School Board was able to identify the Debtor as a manufacturer of some of the asbestos-containing materials in its buildings.

Clearly, in Louisiana, the emphasis to determine the full extent of hazards associated with asbestos-containing products in schools only came to fruition in the mid-1980's, as set out earlier in this brief.[39]  Claimant did not learn that W.R. Grace was the manufacturer of any of the asbestos-containing materials in its buildings until after the enactment of La. R.S. 9:5644, which allowed for a period of five years from that determination to file suit  Even if some of Claimant's causes of action resulting from the Debtor's asbestos-containing materials accrued before the enactment of La. R.S. 9:5644, which they did not, such cause(s) of action did not accrue more than one year prior to the filing of the National Class-Action in Pennsylvania.

Notwithstanding the above, Debtors wrongly assert that Claimant had constructive knowledge and knew or should have known of the hazards associated with its asbestos-containing products because of various governmental regulations passed in the 1970's and early 1980's, and that therefore such claims should be disallowed based on the Third Circuit Court of Appeals' decision in *Prudential v. United States Gypsum Co.*, 359 F.3d 226 (3rd Cir. 2004). Their reliance on *Prudential* is misplaced as it is both factually and legally distinguishable from the claims at bar.  First, *Prudential* only involved a RICO claim, while Claimant herein seeks redress through state law claims that require different accrual analyses than used in RICO cases. The Court, in *Prudential,* placed great emphasis on the "actual knowledge" held by Prudential and the fact that Prudential "is a very sophisticated company that operates a large casualty insurance business and an extensive estate investment business ... [which] provided Prudential with more opportunities than an average plaintiff to access ACM-related information." *Id.* at 234-36.

---

[39] See pages 3-5.

Debtors have also failed to prove that limitations have run on Claimant's claims. The issue of when Claimant had constructive notice of "potential dangers" of asbestos is not the relevant inquiry regarding accrual of Claimant's cause of action. The courts throughout this country have consistently held that general knowledge regarding the hazards of asbestos does not cause injury, much less property damage. *See, e.g., MDU Res. Group v. W. R. Grace & Co.,* 14 F.3d 1274, 1278-79 (8th Cir. 1994), *cert. denied,* 15 U.S. 824 (1994) (rejecting Grace's argument that knowledge of the mere presence of asbestos triggers the statute of limitations, and holding that the proper question was when MDU could have learned, with the exercise of reasonable diligence, that its building had been contaminated by asbestos); *Adams-Arapahoe Sch. Dist. v. GAF Corp.,* 959 F.2d 868, 872 (10th Cir. 1992) ("[o]nly asbestos contamination constitutes a physical injury compensable under tort law."); *Kansas City v. W.R. Grace & Co.,* 778 S.W.2d 264, (Mo. App. 1989) (simply because Kansas City had notice of NESHAPs, its causes of action for negligence and strict liability were not caused to accrue); *California Sansome Co. v. U.S. Gypsum,* 55 F.3d 1402, 1403 (9th Cir. 1995) (ruling that articles, publications, regulations, and seminars on the hazards of asbestos did not put plaintiff "on inquiry notice" of asbestos contamination). In a case dealing with the **removal** of asbestos containing material, not just the encapsulation of it, the Louisiana Supreme Court in *Cameron Parish School Board v. Acands, Inc., et al.,* 687 So.2d 84 (1997) stated on page 88:

> "Though prescription under La. C.C. art. 3492 begins to run from the day injury or damage is sustained, damage is considered to have been sustained only when it has manifested itself with sufficient certainty to support accrual of a cause of action. *Cole v. Celotex Corp.,* 620 So.2d 1154, 1156 (La. 1993). As this court stated in *Jordan v. Employee Transfer Corp.,* 509 So.2d 420, 423 (La. 1987):
>
> Prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong. Prescription should not be used to force a person who believes he may have been damaged in some way to rush to file suit against all parties who might have caused that damage. On the other hand, a plaintiff will be responsible to seek out those whom he believes may be responsible for a

specific injury. When prescription begins to run depends on the reasonableness of a plaintiff's action or inaction.

The question, therefore, is whether, in light of the information known, a plaintiff was *reasonable* to delay in filing suit. *Cole,* 620 So.2d at 1156 (citing *89Knaps v. B & B Chemical Co., Inc.,* 828 F.2d 1138, 1140 (5th Cir. 1987

The issue of constructive knowledge for the purpose of prescription (statute of limitations) claims is fact driven and complex. Louisiana's test of imputing knowledge is based upon the reasonableness of the delay in filing suit and completely fact sensitive.

The issue of when a plaintiff had actual or constructive notice of its claims is fact-driven. When a school board in Louisiana claimed damages to its property as a result of gas pipelines, the court on appeal said:

> "An investigation into causation need not be made and constructive notice need not be imputed, until damage becomes apparent. . . . and it was legal error for the district court to hold that the Board's failure to hire an expert or investigate the erosion at the time it became aware of the damage does not prevent prescription from commencing." *Terrebonne Parish School Board v. Columbia Gulf Transmission et al,* 290 F.3d 303, 323 (5th Cir. 2002).

This Claimant acted differently than Cameron Parish School Board did in 1981. Claimant did not incur the extensive costs of removing any ACM. In fact, not until several years later did Claimant even encapsulate the ACM in some of its buildings. Again, Debtor offers no facts to support imputing any knowledge to Claimant sufficient to start the accrual of prescription prior to January 17, 1983.

In further response to Debtors' D-2 Objection, Claimant hereby incorporates by reference as if fully contained herein the Response and Memorandum of Law of the Official Committee of Asbestos Property Damage Claimants in Opposition to Debtors' Brief in Support of an Estimation Hearing on Constructive Notice in Property Damage Claims (the "PDC Constructive Notice Brief"; Document No. 10940).

Finally, Debtors' own pleading and representations to Claimant and the Court are totally at odds with its D-2 Objection. Time and time again, Debtors have argued that its asbestos-containing materials are not hazardous and do not cause property damage. See Fifteenth Omnibus Objection, ¶¶ 119-120, p. 39; see also Hearing Transcript July 19, 2005, pp. 33-34. The Debtors' contention that building owners should have known of the hazards of its asbestos-containing building products is inconsistent with their prior claim that their ACM is not harmful in the first place. The Eight Circuit Court of Appeals recognized this inconsistency in reversing a statute of limitations verdict for Grace, stating:

> Grace argued at trial not only that the statute of limitations had run, but also that the plaintiff had suffered no injury from the asbestos Monokote. The arguments are inconsistent: if MDU has suffered no injury from the Monokote, then it has no cause of action − until an injury is suffered, the statute of limitations cannot begin to run.

*MDU Resources Group v. W. R. Grace & Co.*, 14 F.3d 1274 (8th Cir. 1994). To put it another way, if, as Debtors claim, their asbestos-containing products pose no hazard, limitations would not have begun to run regarding such claim, let alone expire. In a somewhat analogous situation, in *Our Lady of the Lake Hospital v. Carboline Company, et al.*, 632 So.2d 339 (La. App. 1st Cir. 1994), *writs denied* 635 So.2d 228 (La. 3/25/94) and 637 So.2d 1052 (La. 5/6/94), the appeals court remanded the case since the Hospital had, subsequent to the judgment of the trial court, obtained documents that indicated as early as 1979, the defendant knew their product was suffering severe corrosion problems in the field. The Hospital had been lulled into a false belief that the defendant's corrosion problems had been eliminated. The case was remanded since such evidence could apply the doctrines of *contra non valentem* and a continuing tort on the part of the defendant. Claimant here had no reason to doubt Debtor's contentions about the safety of its products.

**F.    Claims Allegedly Barred by the Statute of Limitations Pursuant to Actual
Notice (Grace Ex. D-4)**

The Debtors object to Claimant's claim(s) "because they are barred by the statute of
limitations based upon claimants' actual knowledge of their claims ..." (the "D-4 Objections").
For the reasons set forth below, Debtors' objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection
to the Claimant's claims. They have also failed to identify the specific statutes of limitations or
decisional rulings that they allege bar these claims. As such, Claimant cannot fully respond to
this objection, and Claimant reserves its right to supplement or amend its response to the extent
further information is produced. Moreover, Debtors have failed to offer any evidence to rebut
the prima facie validity of Claimant's claim, *see In re Allegheny*, *supra*, and have failed to
provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR
3007-1(e)(iii)(I).

As noted previously, even if the Claimant wanted to, beginning January 17, 1983, it could
not have interrupted the tolling of prescription by filing a lawsuit against any of the
manufacturers (if it could have identified them, which it could not), because of the existence of
the mandatory class action lawsuit.

The general prescriptive period (statute of limitations) is provided in Louisiana Civil
Code Article 3492, which provides for a liberative prescription of one year. Debtors have
produced no facts or evidence to prove that, prior to January 17, 1983, or even prior to the
effective date of La. R.S. 9:5644, Claimant had sustained actual damages to such a sufficient
extent to put Claimant on notice that liberative prescription was beginning to run under
Louisiana law. In *Cameron Parish School Board v. Acands, Inc., et al., supra,* the court noted:

> While we further noted in *Cole* that "[i]t is often difficult to identify a precise
> point in time at which the claimant becomes aware of sufficient facts to begin the
> running of prescription ...," our review of the record in the instant case reveals no

such problem.    In the instant case, the Board, sufficiently aware of the hazards posed by the continuing presence of asbestos in its school buildings, decided on November 9, 1981, to seek bids for the removal of the asbestos at one of its schools.    At this point in time, the Board clearly was aware it had asbestos in at least some of its buildings, the asbestos posed a serious health problem to its employees and students, the problem was severe enough to warrant immediate removal of the material, and the removal of the material would cost the Board a significant amount of money. *at page 89.*

None of the facts present in the above case are applicable to Claimant.  Quite the opposite, Claimant did not even know of the presence of ACM in some of its schools until a much later date; even then, Claimant did not believe that immediate removal of the material was necessary. Claimant followed the advice of governmental and industry consultants and simply encapsulated the ACM in some of its buildings.  The determination of when prescription begins to toll is fact-driven and is applicable to each separate claim for each building.

La. R.S. 9:5644 provides that any time limit or prescriptive period applicable to an action to recover for asbestos abatement work shall not apply or expire until five years after the date on which the party seeking to recover has completed the abatement work or discovered the identity of the manufacturer of the materials which require abatement, whichever is later.    This determination of when the expiration of this time period occurs is fact-driven and is applicable to each separate claim.

Debtors have not presented any evidence that the Claimant's claims were prescribed before 1985 or that the prescriptive period provided in La. R.S. 9:5644 had run.

An example of the application of La. R.S. 9:5644 is in *Jefferson Parish Hospital Service District No. 2 v. W. R. Grace & Co., et al.,* 1994 USL 577357 (E.D. La. 1994).  The hospital did not discover until March 1991, that fire-proofing material contains asbestos.  W. R. Grace, the defendant, had argued that the hospital actually knew of the asbestos no later than March 1990. The hospital did not file suite until March 1992, which was beyond a one-year prescriptive

period. The court held that La. R.S. 9:5644 suspends the prescriptive period for any action to recover for asbestos abatement. The court stated that the East Jefferson Hospital cause of action prescribed only if it filed suit more than five years after finishing the abatement work or discovering the identity of the manufacturer of the asbestos. W. R. Grace had not presented any evidence that the Hospital's claims were prescribed before 1985, or that the prescriptive period provided in La. R.S. 9:5644 had run. Here too, Debtors provide no evidence.

Information was furnished to Debtor in the lawsuit filed by the Claimant, together with other school systems in the United States District Court for the Eastern District of Louisiana, bearing Civil Action No. 88-3844, consisting of Master Answers on Behalf of all Plaintiffs to Defendants Product Identification, Interrogatories and Request for Production of Documents, and the Individual Answers of the Plaintiff, Claimant, filed therein on or about April 30, 1990. Debtors have had such information for over fifteen years.

The facts of the situation in the case of the Claimant are vastly different and completely distinguishable from the reported cases involving the Court's interpretations of the relationship between the one year period for filing a claim and the provisions of La. R.S. 9:5644. In *Cameron Parish School Board v. Acands, Inc., et al. supra,* the Supreme Court of Louisiana, based upon a fact situation that the Cameron Parish School Board on November 9, 1981, passed a resolution seeking bids for the **removal** of asbestos at one of its schools, found no error in the trial court's conclusion that prescription began to run no later than November 9, 1981, and determined that the Board's claim had prescribed when the Pennsylvania class-action suit was instituted on January 17, 1983. Further, the Supreme Court found that the Cameron Parish School Board's cause of action had also clearly prescribed prior to September 6, 1985, the effective date of the La. R.S. 9:5644. The Court went on to state that since the Cameron Parish

School Board's claims were prescribed nearly three years before the enactment of La. R.S. 9:5644, nothing in the legislation was present to revive such prescribed claims.

In a case removed to the federal court involving the Orleans Parish School Board, the district court in *Orleans Parish School Board v. United States Gypsum Company, et al.,* 892 F. Supp. 794 (U.S.D.C. E.D. La. 1995), based on an intense fact situation involving surveys that began in the New Orleans public schools in 1979, considered the New Orleans School Board's claims to be prescribed by the time the national class-action was filed in January, 1983. The district court considered La. R.S. 9:5644 to be merely suspending for a one year period the prescriptive period generally applicable. Upon appeal, the United States Court of Appeals for the Fifth Circuit in *Orleans Parish School Board v. Asbestos Corp., Ltd., et al.,* 114 F.3d 66 (5th Cir. 1997), affirmed the district court judgment generally agreeing that with extensive inspection and collection of samples in the New Orleans public schools beginning in 1979 and the commencement of the removal of the material, that the one year liberative prescription period began to accrue against the School Board at that time, and thus the School Board claims are prescribed by the time the national class-action lawsuit was filed in 1983. Further, the Court of Appeal, relying on the state court decision involving Cameron Parish, determined that La. R.S. 9:5644 could not be retroactively applied to claims to which prescription had already accrued.

Notwithstanding the above, in Louisiana, like most other jurisdictions, a cause of action generally accrues when a wrongful act causes some legal injury. It is the Debtors who bear the burden of establishing that the wrongdoing and the injury occurred outside the limitations period. *Van Buskirk v. Carey Canadian Mines, Ltd.,* 760 F.2d 481 (3rd Cir. 1985). The courts throughout this country have consistently ruled that the mere presence of asbestos-containing products does not trigger the running of limitations. *MDU Resources v. W.R. Grace,* 14 F.3d 1276 (8th Cir. 1994) (injury is the contamination of building, rejecting argument that knowledge of the mere

presence of asbestos triggers the statute of limitations); *Adams-Arapahoe Sch. Dist. v. GAF Corp.*, 959 F.2d 868, 872 (10th Cir. 1992) ("[o]nly asbestos contamination constitutes a physical injury compensable under tort law."); *THS Northstar v. W. R. Grace & Co.*, 66 F.3d 173 (8th Cir. 1995) ("the distinction between the mere presence of asbestos-containing materials in a building and actual release and contamination is critical" because "no cause of action exists until there has been a substantial release"); *San Francisco Unified School Dist. v. W. R. Grace & Co.*, 37 Cal. App. 4th 1318, 44 Cal. Rptr. 2d 305 ("[T]he mere presence of asbestos constitutes only a threat of future harm ... [c]ontamination by friable asbestos is the physical injury and the actual, appreciable harm that must exist before a property owner's strict liability or tort cause of action against the asbestos manufacturer accrues and limitations period commences.").

Further, Louisiana has also adopted the discovery rule. *See, Bailey v. Khoury,* 891 So.2d 1268 (La. 2005); *Griffin v. Kinberger,* 507 So.2d 821 (La. 1987); *Grefer v. Alpha Technical,* 901 So.2d 1117 (La. App. 4th Cir. 2005). In applying the discovery rule, the relevant inquiry for statute of limitations purposes is when a plaintiff knew (*i.e.*, had actual knowledge) or should have known (*i.e.*, had constructive knowledge) that its particular building was actually contaminated with asbestos. *See San Francisco Unified*, 37 Cal. App. 4th at 1336; 44 Cal. Rptr. 2d at 315. In remanding the case, the Court of Appeals instructed the trial court that both (i) "the dates of actual contamination of each school" were "issues of fact" that must be resolved on remand, and (ii) the ultimate inquiry on remand for purposes of Grace's statute of limitations affirmative defense was "when [the plaintiff] should have reasonably discovered that each school's contamination [had] occurred." *Id.* (Emphasis added). This process is not only fact specific, it is also building specific. A claimant's general knowledge regarding the hazards of asbestos is not determinative.

Debtors have failed to come forward with any evidence establishing when Claimant knew

of its injury. In fact, the Debtors assert that Claimant has suffered no injury from its ACM. If

this is true, limitations as a matter of law cannot have commenced to run.

### G.    Claims Allegedly Barred by Laches (Grace Ex. D-6)

The Debtors object to Claimant's claims because Claimants "have delayed in asserting

their claims against Grace, often for decades ..." (the "D-6 Objection"). For the reasons set forth

below, Debtors' objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection

to the Claimant's claims. As such, Claimant cannot fully respond to this objection, and Claimant

reserves its right to supplement or amend its response to the extent further information is

produced. Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity

of Claimant's claims, *see In re Allegheny, supra,* and have failed to provide "sufficient detail as

to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I). Debtor ignores the

fact that Claimant filed suit against it, as noted earlier, in August 1988.

More importantly, the doctrine of laches is not applicable under Louisiana law. In

*Fishbien v. State of Louisiana through Louisiana Health Sciences Center, 898 So. 2d 1260*

*(2005)*, the Louisiana Supreme Court stated:

> Regarding that portion of plaintiff's claim that is not prescribed, we find no merit
> in defendant's affirmative defense of estoppel. As the court of appeal correctly
> stated in the instant case, equitable considerations and estoppel cannot be
> permitted to prevail when in conflict with positive written law. *See* La. C.C. art.
> 4 ("When no rule for a particular situation can be derived from legislation or
> custom, the court is bound to proceed according to equity...."); *Morris v.
> Friedman,* 94-2808, p. 10 (La.11/27/95), 663 So.2d 19, 26; *Palermo Land Co. v.
> Planning Comm'n of Calcasieu Parish,* 561 So.2d 482, 488 (La.1990). La. C.C.
> art. 3457 provides, "There is no prescription other than that established by
> legislation." Comment (b), which explicitly addresses the doctrine of laches,
> states, "Under the Louisiana legal system, there is no room for the common law
> doctrine of laches." Citing article 3457, this court has previously concisely stated,
> "The common law doctrine of laches does not prevail in Louisiana and the
> legislature may create, shorten, lengthen or abolish prescriptive periods at its

discretion." *Picone v. Lyons,* 601 So.2d 1375, 1377 (La.1992). *See also Corbello v. Sutton,* 446 So.2d 301, 302 (La.1984) ( "[T]he doctrine of laches has no place in the law of this state."). While the legislature and the opinions of this court have made it clear that the common law doctrine of laches does not belong in Louisiana's system of civil law, there are nevertheless opinions by this court that leave open the possibility of the application of the doctrine in certain cases. *See e.g. T.D. v. M.M.M.,* 98-0167 (La.3/2/99), 730 So.2d 873; *Bradford v. City of Shreveport,* 305 So.2d 487 (La.1974). Because the doctrine of laches is in conflict with this state's civil laws of prescription, the statements contained in those civil opinions that suggest the doctrine of laches may be applicable under certain circumstances are hereby repudiated. We find no other equitable basis upon which LSU can be afforded relief as to plaintiff's claims that have not prescribed; therefore, we reject its affirmative defense of estoppel. *At page 1270.*

**H.    Claims Allegedly Providing No Measurement of Relevant Asbestos Levels (Grace Ex. E-1)**

The Debtors object to Claimant's claims "because they are not accompanied by any documentation reflecting airborne asbestos levels inside the building ... is dangerous ..." (the "E-1 Objection"). For the reasons set forth below, Debtors' E-1 Objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection to the Claimant's claims. As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further information is produced. Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claims, *see In re Allegheny, supra,* and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

The Debtors' argument is premised on the assumption that a certain level of airborne asbestos must be present as measured by air sampling for there to be a hazard that justifies removal of the ACM. This assertion is not new. It is precisely the same argument previously made by the Debtors and other manufacturers of asbestos-containing building products in *Safe Bldgs. Alliance v. E.P.A.,* 846 F.2d 79 (D.C. Cir. 1988).[40] In that case, the "Safe Buildings

---

[40] Grace was a charter member of the "Safe Building Alliance," an industry lobby group which was formed

Alliance" and manufacturers of ACM argued that EPA regulations promulgated pursuant to the

Asbestos Hazards Emergency Response Act, 15 U.S.C.A. §§ 2641-2654, must be set aside

because the EPA failed to determine what levels of asbestos exposure were safe, or to require the

use of air monitoring as the sole or primary assessment method to determine the need for

corrective action. The United States Court of Appeals for the District of Columbia found this

argument to be meritless.

In *Safe Bldgs. Alliance, supra,* the D.C. Court of Appeals rejected the contention Debtors

now make, stating:

> *Congress nowhere said that EPA need rely exclusively or even mainly on air monitoring techniques* (emphasis added) in selecting response actions, or that it need establish a quantitative measure that it deems safe. Indeed, the legislative history affirmatively suggests an intent not to impose such requirements ... . Indeed, the petitioners' insistence that EPA construct a quantitative model before it do anything else offends common sense as well as congressional intent, for the *potential* hazards posed by presently undamaged ACM obviously could not be quantified or measured by air monitoring techniques (emphasis in original).[41]

Instead, the Court approved the approach adopted by EPA which relies on visual and physical

evaluation of the condition of the ACM, the location and accessibility of the ACM and the

potential for disturbance of the ACM, determined by inspectors accredited in conformity with

EPA regulations, as the primary assessment tool or monitoring technique.[42]

It is interesting to note that Debtors cite no case in support of this novel approach. The

reason for this is quite simple: No court has ever adopted such a proposal. In fact, courts in the

underlying tort litigation have consistently rejected Grace's contention. Further, discovery in the

underlying litigation has firmly established Grace's liability to Claimant. *See* Sections III.A, C,

D, and F above.

The use of air sampling to determine hazard has consistently been rejected by the EPA:

---

to advance the manufacturers' position that it was unnecessary to abate or remove ACM in buildings.

[41] *Id.* at 83.

[42] *Id.* at 82.

EPA continues to discourage the use of air monitoring as the primary technique for assessing asbestos hazards, since that method only measures current conditions and provides no information about potential and future levels of fiber release ... the agency believes that such standards used for the purposes of assessing asbestos hazards could not ensure protection of human Health and the Environment as intended by USCA Title 11.[43]

Any attempt to determine hazard via static area air sampling is doomed from the outset. This is true because such air sampling only provides a snapshot of the levels of asbestos fibers in the building environment during a particular time period and under the circumstances which then exist. Such static area air sampling, which is the only type of sampling performed by Debtors' consultants, does not present a representative picture of exposures that exists under routine and foreseeable building conditions.[44] As previously discussed, the EPA has rejected adopting an air sampling approach to determining hazard, concluding that a comprehensive building inspection can provide better results.[45]

## V.     CLAIMANT'S AFFIRMATIVE DEFENSES

Debtors assert that the Claimant's claims are time-barred by applicable statutes of limitations and/or the common law doctrine of laches.

Equitable tolling and equitable estoppel are "based primarily on the view that a defendant should not be permitted to escape liability by engaging in misconduct that prevents the plaintiff from filing her claim on time." *In re: Enron,* 310 F. Supp 819 (S.D. 2004). The primary difference in these doctrines is that equitable estoppel focuses its attention on the defendant's conduct while equitable tolling focuses on the claimant's excusable neglect.

---

[43] 52 Fed. Reg. 210, 41838 (EPA, October 30, 1987).

[44] Numerous studies simulating actual maintenance and/or custodial activities which utilize personnel air samples taken at the breathing zone of such workers, have shown much higher levels of airborne fibers. Such studies will be the subject of evidence presented by the PD Committee's expert witnesses in the Phase I trial.

[45] Claimant hereby adopts by reference as if fully set forth herein Sections III, IV and V of the Memorandum of Law of the Official Committee of Asbestos Property Damage Claimants in Opposition to Consideration of the Debtors' Proposed "Methodology Issue" as Part of the Estimation of Asbestos Property Damage Claims filed October 17, 2005 (the "PDC Methodology Brief"; Document No. 9671), which discusses in more detail the fact that air sampling results are not dispositive of the claims of Claimant.

The doctrine of equitable estoppel includes a number of interrelated, but separate, defenses, including equitable estoppel, quasi-equitable estoppel, judicial estoppel[46] and fraudulent concealment. These doctrines are recognized by virtually all jurisdictions in one form or another and are founded upon principles of fair dealing. The underlying premise for these doctrines is that a party should not be allowed to gain an advantage by asserting inconsistent positions or mutually contradictory positions, which either results in an unfair advantage to one party or detriment to the other party. In applying estoppel in the context of litigation, the focus is on preventing parties from "playing fast and loose with the court" and to "protect the integrity of the judicial process." *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir. 1982).

As discussed earlier, almost every state has adopted the discovery rule either as part of its statutory scheme regarding accrual of limitations or its courts have judicially adopted such a rule to determine when a plaintiff's cause of action accrues. The discovery rule holds that the limitations period is tolled until the plaintiff discovers, or through the exercise of reasonable diligence should have discovered, the nature of his or her injury. The discovery rule is an affirmative defense to limitations.

Time and time again, Debtors have represented to building owners and now to this Court, in both their pleadings and in oral argument, that their asbestos-containing products pose no hazard to building occupants. Yet, in the same breath they assert that Claimant's claim is time-barred. Grace cannot have it both ways: On one hand asserting no hazard, and then on the other hand asserting that the Claimant's claim is time-barred.

---

[46] Some jurisdictions refer to judicial estoppel as "the doctrine against the assertion of inconsistent positions." *Scarano v. Central R. Co. of New Jersey*, 203 F.2d 510, 513 (3rd Cir. 1953).

The Debtors' conduct is exactly what these equitable doctrines are designed to prevent – allowing a party from asserting its rights under a general technical rule of law when it has so conducted itself that it would be contrary to equity and good conscience to do so.

## VI.   DEBTORS ARE NOT ENTITLED TO ASSERT ADDITIONAL OBJECTIONS TO CLAIMANT'S CLAIMS

Claimant opposes and objects to Debtors' request that 1) it not be required to comply with Del. Bankr. LR 3007-1 (this rule requires all "substantive objections" to a particular proof of claim be asserted in a single omnibus objection or such objection is waived); and 2) they have the opportunity to make further objection if and when it is determined that information provided by Claimant is untrue and inaccurate. *Id.* at ¶¶ 217-19, pp. 64-65. Both requests should be denied. Debtors have now had two occasions to raise objections to Claimant's claims. The Court has previously accepted Debtors' proposal regarding information to be included in the claim form. Claimants provided this information over two years ago. Debtors have had more than sufficient time to review this information and formulate their objections to Claimant's claims. Debtors should not be allowed to continue to raise objections, in repeated piecemeal fashion, as this will unduly prolong the estimation process, rather than provide an efficient means of resolving claims.

## VII.   CLAIMANT'S   RIGHT   TO   FILE   SUPPLEMENTAL   RESPONSE   TO OBJECTIONS

Debtors have failed to comply with Del. Bankr. LR 3007-1(e)(iii)(I) by providing sufficient detail regarding objections to Claimant's claim. This has prevented Claimant from being able to fully and completely respond to such objections. Claimant reserves the right to supplement its responses should Debtors provide additional information, including, but not limited to, 1) the specific key elements not present in bulk samples; 2) specific documents not

provided in response to questions; and 3) the specific statutes of limitations or repose, or the decisional law that supports Debtors' argument that Claimant's claims are barred.

## VIII. CONCLUSION

For the reasons set forth hereinabove Claimant, requests that:

1. Debtors' objections be denied;

2. Debtors be required to provide "sufficient detail as to why the claims should be disallowed" pursuant to Del. Bankr. LR 3007-1(e)(iii)(I); and

3. Claimant be allowed to conduct discovery regarding all of Debtors' objections before any such objection is sustained.

Dated: January 30, 2006

Christopher D. Loizides (Bar No. 3968)
Michael J. Joyce (Bar No. 4563)
LOIZIDES & ASSOCIATES
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone:     (302) 654-0248
Facsimile:     (302) 654-0728
Email:     loizides@loizides.com

-and-

Jack A. Grant (LA Bar No. 6222)
GRANT & BARROW, APLC
238 Huey P. Long Avenue
P.O. Box 484
Gretna, LA  70054
Telephone:     (504) 368-7888
Facsimile:     (504) 368-7263
Email:  jgrant@grantbarrow.com

*General Counsel for Jefferson Parish School Board*

-and-

Martin W. Dies
DIES & HILE
1009 Green Avenue
Orange, TX  77630
Telephone:     (409) 883-4394
Facsimile:     (409) 883-8414

*Special Counsel for Jefferson Parish School Board*