UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .  Case No.  01-01139
                                .
  W. R. GRACE & CO., et al.,    .
                                .  5414 USX Tower Building
                    Debtors,    .  Pittsburgh, PA  15222
                                .  January 24, 2006
. . . . . . . . . . . . . . . . .  9:05 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:            Kirkland & Ellis LLP
                            By:  MICHELLE BROWDY, ESQ.
                                 SALVATORE BIANCA, ESQ.
                                 MICHAEL DIERKES, ESQ.
                                 MICHAEL ROSENBERG, ESQ.
                                 ERIN SKAURON, ESQ.
                            200 E. Randolph Drive
                            Chicago, IL  60601

                            W.R. Grace & Company
                            By:  RICHARD FINKE, ESQ.
                            7500 Grace Drive
                            Columbia, MD  21044

                            Reed, Smith LLP
                            By:  DOUGLAS CAMERON, ESQ.
                            435 Sixth Avenue
                            Pittsburgh, PA  15219


Audio Operator:             Cathy Younker


Proceedings recorded by electronic sound recording, transcript
produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES CONT'D:

For Prudential Insurance:       Riker Danzig Scherer Hyland
                                   & Perretti LLP
                                By:  ROBERT GILSON, ESQ.
                                Headquarters Plaza
                                One Speedwell Avenue
                                Morristown, NJ  07962

For PD Committee:               Bilzin Sumberg Baena Price
                                   & Axelrod LLP
                                By:  SCOTT BAENA, ESQ.
                                     MATTHEW KRAMER, ESQ.
                                200 S. Biscayne Blvd., Suite 2500
                                Miami, FL  33131

For FAI:                        Scott Law Group
                                By:  DARRELL SCOTT, ESQ.


TELEPHONIC APPEARANCES:

For Everest Reinsurance         Marks, O'Neill, O'Brien &
Co. & McKinley Ins. Co.:          Courtney, P.C.
                                By:  BRIAN KASPRZAK, ESQ.
                                913 North Market St., Suite 800
                                Wilmington, DE  19801

                                Crowell & Moring, LLP
                                By:  LESLIE EPLEY, ESQ.
                                1001 Pennsylvania Avenue NW
                                Washington, DC  20004

Pacific Freeholds               The Brandi Law Firm
Partnership:                    By:  TERENCE EDWARDS, ESQ.
                                44 Montgomery Street, Suite 1050
                                San Francisco, CA  94104

Roman Catholic Church           Dies, Henderson & Carona
Archdiocese of New Orleans:     By:  MARTIN DIES, ESQ.
                                1009 Green Avenue
                                Orange, TX  77630

For Fireman's Fund              Stevens & Lee, P.C.
Insurance Company:              By:  THOMAS WHALEN, ESQ.
                                1107 North Market St., 7th Floor
                                Wilmington, DE  19801

For Ace Insurance Co.:          White & Williams LLP
                                By:  MARC CASARINO, ESQ.
                                824 N. Market Street, Suite 902
                                Wilmington, DE  19801


**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES CONT'D:

For the Official Committee        Stroock & Stroock & Lavan, LLP
of Unsecured Creditors:           By:  RYAN PAPIR, ESQ.
                                  180 Maiden Lane
                                  New York, NY  10038

For Off Date Insurance Co.:       Cuyler Burk, LLP
                                  By:  ANDREW CRAIG, ESQ.
                                  Parsippany Corporate Center
                                  Four Century Drive
                                  Parsippany, NJ  07054

For PD Claimants                  Bilzin Sumberg Baena Price &
Committee:                          Axelrod LLP
                                  By:  JAY SAKALO, ESQ.
                                  200 S. Biscayne Blvd., Suite 2500
                                  Miami, FL  33131

For the State of Montana:         Monzack and Monaco, P.A.
                                  By:  FRANCES MONACO, ESQ.
                                  1201 North Orange St., Suite 400
                                  P.O. Box 2031
                                  Wilmington, DE  19899

Official Committee of             Ferry, Joseph & Pearce, P.A.
Asbestos PD Claimants:            By:  THEODORE TACCONELLI, ESQ.
                                  824 Market Street, Suite 904
                                  P.O. Box 1351
                                  Wilmington, DE  19899

For PD Claimants:                 Richardson Patrick Westbrook
                                    & Brickman, LLC
                                  By:  EDWARD WESTBROOK, ESQ.
                                  1037 Chuck Dawley Blvd., Bldg. A
                                  Mount Pleasant, SC  29464

For The Blackstone Group:         The Blackstone Group
                                  By:  JOHN O'CONNELL

For David Austern:                Phillips, Goldman & Spence, P.A.
                                  By:  JOHN PHILLIPS, JR. ESQ.
                                  1200 N. Broom Street
                                  Wilmington, DE  19806

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES CONT'D:

For Prudential Insurance:        Riker Danzig Scherer Hyland
                                    & Perretti LLP
                                 By:  CRAIG MORAN, ESQ.
                                 Headquarters Plaza
                                 One Speedwell Avenue
                                 Morristown, NJ  07962

For USG Corporation:             USG Corporation
                                 By:  MARY MARTIN, ESQ.

For DK Acquisition               Willkie Farr & Gallagher
Partners:                        By:  STEPHEN VOGEL, ESQ.
                                 787 Seventh Avenue
                                 New York, NY  10019

For the Debtors:                 Kirkland & Ellis LLP
                                 By:  JANET BAER, ESQ.
                                 200 E. Randolph Drive
                                 Chicago, IL  60601

For Official Committee           Duane Morris, LLP
of Unsecured Creditors:          By:  MICHAEL LASTOWSKI, ESQ.
                                 1100 North Market St., Suite 1200
                                 Wilmington, DE  19801

For Continental Casualty         Ford Marrin Esposito Witmeyer
Company:                            & Gleser, LLP
                                 By:  ALEXANDER HENLIN, ESQ.
                                 Wall Street Plaza
                                 New York, NY  10005

Unofficial Committee of          Montgomery, McCraken, Walker
Select Asbestos Claimants:          & Rhoads, LLP
                                 By:  NATALIE D. RAMSEY, ESQ.
                                 123 South Broad Street
                                 Philadelphia, PA  19109

For Minnesota Stigma             Law Office of William Butler
Claimants:                       By:  WILLIAM BUTLER, ESQ.
                                 Minneapolis, MN

Also:                            RICHARD PARK, ESQ.

**J&J COURT TRANSCRIBERS, INC.**

1          THE CLERK:  All rise.

2          THE COURT:  Good morning.  Please be seated.

3          This is the matter of W.R. Grace, Bankruptcy No. 01-

4  1139.  This is a continuation of a part of the debtors'

5  fifteenth omnibus objection to asbestos property damage claims.

6  The list of participants by phone:  Leslie Epley, Terence

7  Edwards, Martin Dies, Thomas Whalen, Marc Casarino, Ryan Papir,

8  Andrew Craig, Jay Sakalo, Frances Monaco, Theodore Tacconelli,

9  Edward Westbrook, John O'Connell, John Phillips, Craig Moran,

10  Mary Martin, Richard Park, Stephen Vogel, Janet Baer, Michael

11  Lastowski, Alexander Henlin, Natalie Ramsey and Brian Kasprzak.

12          I'll take entries of those of you in court, please.

13          MS. BROWDY:  Good morning, Your Honor, Michelle

14  Browdy for the debtors.

15          MR. BIANCA:  Good morning, Your Honor, Salvatore

16  Bianca for the debtors.

17          THE COURT:  Spell your last name.

18          MR. BIANCA:  B-i-a-n-c-a.

19          THE COURT:  Thank you.

20          MR. BIANCA:  You're welcome.

21          MR. DIERKES:  Michael Dierkes for the debtors, Your

22  Honor.

23          THE COURT:  Spell your last name.

24          MR. DIERKES:  D-i-e-r-k-e-s.

25          THE COURT:  K-e-s?

1          MR. DIERKES:  Yes.

2          THE COURT:  Thank you.

3          MR. GILSON:  Good morning, Your Honor, Robert Gilson

4  from Riker Danzig Scherer Hyland & Perretti on behalf of

5  Prudential Insurance Company of America.

6          MR. BAENA:  Good morning, Your Honor, Scott Baena and

7  Matthew Kramer on behalf of the PD Committee.

8          THE COURT:  Ms. Browdy?

9          MS. BROWDY:  Thank you, Your Honor.

10          Your Honor, first of all, we want to thank the Court

11  for taking the time to have this special setting.  We

12  understand and appreciate how busy the Court is and again, we

13  appreciate you taking the time.

14          Today will be somewhat less busy than we initially

15  anticipated since all the Speights claims have been deferred.

16  So the only issues up for argument this morning are the claims

17  of two Prudential buildings, the claim of two pro se plaintiffs

18  and the, quote unquote, stigma claims of 54 Minnesota claimants

19  that all raise the same legal argument.

20          I think we'll start off with the Prudential claims.

21  Before we do that, I'll just raise one brief ministerial

22  matter.  Your Honor, we noted in the Speights surreply brief

23  that we received on Friday that there's a new legal argument

24  that hasn't really been briefed before, which is the question

25  of whether -- for the claims that were signed late after the

1  bar date whether an agent can receive late ratification from a

2  principal.

3         And what we thought we'd do, Your Honor, there's

4  actually supreme court precedent exactly on point that was not

5  cited in Mr. Speights' brief.  So we thought we would put on

6  file a very short paper today with motion for leave to file it

7  just to bring the additional precedent to the Court's and

8  counsels' attention so we're not springing it on people for the

9  first time at the argument.  So, this afternoon again we'll put

10 in a very short paper with leave to file.

11        THE COURT:  All right, you don't need to file a

12 motion under these circumstances.  If there is a new legal

13 argument, I'll accept the -- a short brief on that point.  I'll

14 grant you the oral authority and you can simply -- unless

15 you've already filed that motion.  If you haven't, you can just

16 say that it's -- that your oral request is granted and you're

17 filing it.

18        MS. BROWDY:  Thank you very much, Your Honor.  We

19 appreciate that.

20        So that brings us to the issue of the two Prudential

21 buildings.  Those are two claims from Georgia, Your Honor.

22 Claims 6945, which is for 2200 Century Parkway in Atlanta,

23 Georgia.  And that claim form indicates that product was

24 installed in that building in 1970.  The second building is

25 Claim 6948 for 2600 Century Parkway in Atlanta.  That claim

1  form indicates the product was installed in 1972.

2         Your Honor, Georgia has a four year statute of

3  limitations with no discovery rule.  An action must be brought

4  within four years of substantial completion of the building;

5  that's the case <u>Corporation of Mercer University vs National</u>

6  <u>Gypsum</u>, 258 Ga. 365.  It's a Georgia 1988 Supreme Court opinion

7  and again, we cited that in our papers.

8         So it's absolutely plain, Your Honor, that under the

9  Georgia statute of limitation, the claims for these two

10 buildings were barred approximately 30 years ago.

11        Now, Prudential doesn't and really can't contest that

12 under the Georgia statute of limitations these claims are

13 barred.  So what instead they argue is that it shouldn't be

14 Georgia law that applies to these Georgia buildings, but rather

15 New Jersey law.  Because in the mid-'80s, they brought a suit

16 in federal district court in New Jersey in a case that was

17 stayed as to Grace when Grace went into bankruptcy in 2001.

18        And, Your Honor, having had a chance now to read the

19 surreply papers of Prudential, there's some fundamental

20 problems with this application of the New Jersey law.  One

21 thing is that the Prudential brief treats these two property

22 damage claims as if somehow what they've done is transferred

23 venue of that 1987 New Jersey case to this Court.

24        But that's not what they've done, Your Honor.  What

25 they've done is Prudential has filed two proof of claims in the

bankruptcy court for Georgia buildings.  By filing those proofs

of claims, the Prudential Company has submitted itself to the

jurisdiction of this Court.  The bankruptcy courts apply the

choice of law rules from the venue where it sits.  In this

instance, it would be Delaware.  And Delaware has a borrowing

statute which would look to the statute of limitations from

where the action arose.

I believe there's an exception potentially for

Delaware residents, but New -- Prudential's in New Jersey.  Its

residence is in New Jersey.  So, again, what they've done is

not transfer this New Jersey action here.  They filed

bankruptcy proof of claims from Georgia buildings, so Georgia

law applies and the claims are barred by the statute of

limitations.

Further, for this New Jersey action, there's no final

judgment in it.  Again, it got stayed as to Grace when Grace

went into bankruptcy.  And the decision they rely on it's

actually pretty interesting.  The case was filed in New Jersey

in 1987.  In 1994 -- the district court decision that the Court

wants this Court to rely -- 1994, the federal district court

denied the -- two of the defendants' motion for statute of

limitations summary judgment on RICO grounds.

They -- the Court did a choice of law analysis for

the state law claims and then denied summary judgment as to the

statute of limitations claim.  Again, the defendant said that

1 it was barred under statute of limitations at this preliminary

2 phase in the proceedings.  The Court said, "I'm not going to

3 grant you a summary judgment at this time."

4        What happens then though is the case proceeds.  I

5 think Prudential's briefs make that clear.  A lot of work was

6 done.  But then in 2001, the district court revisits its

7 opinion and finds that for those claimants that aren't in

8 bankruptcy, because it's stayed as to them, but for the

9 claimants who stuck around in that case, the Court changed its

10 mind on the RICO statute of limitations and actually found

11 those claims were barred by the statute of limitations.

12        It then said, "For the state law claims that I

13 decided on in 1994, I'm going to dismiss those because I no

14 longer have a federal cause of action.  I'm not going to retain

15 these state causes of action" and the case gets thrown out.

16 And that's reflected in the Third Circuit's opinion affirming

17 that the Prudential case, 359 F.3d 226.  So in fact, if the

18 case had not been stayed as to Grace, it would have been thrown

19 out.

20        And what they -- Prudential hasn't asked to do is to

21 transfer the case here.  They haven't asked to lift the stay.

22 Because obviously the claims would go away.  What they want to

23 somehow say is that by filing these Georgia proofs of claims,

24 they can go back to this old decision on choice of law, which

25 again is not a final judgment, and somehow evade the Georgia

1  statue of limitations.  We don't think we -- that they can and

2  we would ask that these two claims be disallowed and expunged.

3        MR. GILSON:  Good morning, Your Honor.

4        THE COURT:  Good morning.

5        MR. GILSON:  Again it's Robert Gilson on behalf of

6  Prudential.

7        Your Honor, I would welcome questions at any point

8  because I believe that this is a very straightforward

9  application which should be denied.  It is clear, if Your Honor

10  has had a chance to review Judge Ackerman's decision, that

11  Judge Ackerman addressed this very issue; the question of what

12  law governs, on statute of limitations grounds, Prudential's

13  claims.  He addressed it following full briefing, full hearing

14  and after careful consideration, applying the applicable law in

15  New Jersey, found that in fact New Jersey statute of

16  limitations governs of all Prudential's claims.  And he did it

17  under a detailed analysis.

18        Your Honor, we submit that that decision is binding

19  on this Court under principles of collateral estoppel.  Your

20  Honor is familiar with that the supreme court has held that

21  collateral estoppel principles apply in bankruptcy.  The Third

22  Circuit has recognized that concept as well.  And with regard

23  to the application in the Third Circuit, the courts distinguish

24  between res judicata and collateral estoppel; that being issue

25  preclusion versus claim preclusion.

1          And with regard to issue preclusion, which is what

2  we're addressing here, the courts say you have to have

3  basically four things:

4          The issue must be the same in the prior action and be

5  no dispute there.  This is the exact question that was

6  presented to Judge Ackerman.

7          The issue must have been actually litigated.  No

8  dispute there.  Over 30 briefs were filed on this issue.  Judge

9  Ackerman spent a great deal of time considering the arguments

10  of the party and then issued a lengthy, thorough decision.

11          The issue must be a final judgment in the sense of

12  finality.  And I'll come back to that.

13          And then the issue must have been essential to the

14  particular ruling, which clearly it is here.

15          So the only issue that could even be questioned is

16  the question of finality for collateral estoppel purposes.

17          The Third Circuit in the In re Brown decision, which

18  is found at 951 F.2d 564.  And in particular, I'll draw Your

19  Honor's attention to the discussion on 569.  There the Third

20  Circuit teaches that when you're looking at issue preclusion,

21  you don't need finality in the sense of a fully appealed final

22  judgment.  What you need to look at is did this proceeding

23  reach such a stage that there's no good reason to re-litigate

24  the issue that's already been decided.  And we respectfully

25  submit that clearly it did.

**J&J COURT TRANSCRIBERS, INC.**

1              Think about that from two different perspectives.

2   First of all, the issue was presented to Judge Ackerman.  They

3   were on summary judgment motions, fully briefed, fully

4   considered.  Now think about the practical and procedural

5   implications of adopting Grace's position.  In essence, they

6   want to come back to you and re-litigate an issue all over

7   again with no new law and simply arguing that ignore Judge

8   Ackerman, ignore the fact that the parties briefed this, ignore

9   the fact that the exact same argument was presented and

10  rejected and ignore the fact that a federal judge carefully

11  considered and applied the law and issued a decision.

12              THE COURT:  Well, does the fact that you filed a

13  proof of claim and you're now looking to Delaware's choice of

14  law rules -- I don't know how the case got filed in New Jersey

15  as to -- unless that's where the contract was led or something

16  as to buildings in Georgia.  It's kind of counterintuitive that

17  a New Jersey statute of limitations would somehow apply to a

18  building in Georgia.

19              MR. GILSON:  Well, let me address that and I think if

20  Your Honor has a chance to look at Judge Ackerman's opinion,

21  you'll see exactly why that was his ruling.  Prudential, at the

22  time it filed this lawsuit, was one of the largest owners of

23  buildings --

24              THE COURT:  Yes.

25              MR. GILSON:  -- throughout the country.  It brought

1  an action in New Jersey in federal court involving buildings in

2  New Jersey as well as other places.

3         THE COURT:  Was it a class action somehow?

4         MR. GILSON:  No, it's one --

5         THE COURT:  Well, then how does New Jersey assert

6  jurisdiction over a Georgia building in the first place?

7         MR. GILSON:  Because it's a -- Prudential is a New

8  Jersey corporation --

9         THE COURT:  Yes.

10         MR. GILSON:  -- headquartered there and the decisions

11  at issue -- and in fact it was always our position and Judge

12  Ackerman effectively accepted this position:  We believe the

13  causes of action arose in New Jersey.  Most of these buildings

14  were purchased after they were constructed.  And when you look

15  at the cause of action, you look at where the injury occurred.

16  It was an investment made by Prudential in buying these

17  buildings.  That investment decision was made from New Jersey

18  at the corporate headquarters.

19         THE COURT:  Well, that's a stretch, but okay.

20         MR. GILSON:  Your Honor, they've cited no law that

21  would allow you to find the opposite.  And, Your Honor, if

22  you're get into that, then you're beyond the scope of their

23  petition.  They need --

24         THE COURT:  Well --

25         MR. GILSON:   -- to come before you on a Black Letter

1   Law no fact issue dispute.  If Your Honor's raising the

2   question of how should I consider where the cause of action

3   accrued, I submit to you that you don't have enough in this

4   record to support it other than to follow what Judge Ackerman

5   did, which having looked at it -- and there was extensive

6   briefing with literally thousands of pages of submissions

7   supporting that application on both sides.

8           And what he looked at is, he said, "Here you have a

9   company that's domiciled in New Jersey since the prior century

10  that made investment decisions from its corporate headquarters

11  in purchasing these buildings.  And therefore, under New Jersey

12  law and choice of law, New Jersey recognizes the interest of

13  its citizens and applies its own statute of limitations to that

14  for all buildings no matter where they're located."

15          THE COURT:  But you're not under New Jersey law in

16  filing a proof of claim.  You're subject --

17          MR. GILSON:  We --

18          THE COURT:  -- to Delaware law.

19          MR. GILSON:  We respectfully submit two issues there,

20  Your Honor.  As I understand the law, the Third Circuit has not

21  yet clarified what choice of law in fact a bankruptcy court

22  should apply whether sitting in Delaware or from the case --

23  the court where either federal common law or where the action

24  was originally filed.  This is the way we look at it and

25  respectfully submit the analysis should follow.

1          We were litigating in New Jersey.  That's where we

2     brought our action.  The court found jurisdiction.  We were

3     pursuing those claims there.  Grace files for bankruptcy.  That

4     action is stayed.  Effectively, what we're pursuing there is

5     the same claim that has been stayed by operation of the

6     bankruptcy code.  That means the claim is the same one that we

7     were pursuing in New Jersey.  It has simply been transferred to

8     the District of Delaware for purposes of administering the

9     estate of the debtor.

10          THE COURT:  Well, I'm not sure that your transfer

11    analysis works.  I -- you filed a claimed here and my

12    understanding is that when you file the claim in a bankruptcy,

13    you're subject to the jurisdiction of the bankruptcy court.

14    It's not a transferred action.  If you wanted the New Jersey

15    action to go forward in New Jersey, then the way you would do

16    it -- I'm not saying it would be granted, but the way you would

17    do it is to file a motion for relief from stay and prosecute

18    that action in New Jersey.  To transfer it here, you physically

19    need to remove the action from New Jersey here and then it's

20    the same action.  This is not the same action.

21          MR. GILSON:  As I understand it, Your Honor, that

22    action is still stayed pending and the claim is simply being

23    pursued here.  And there's two --

24          THE COURT:  Well, the action is still stayed.  I

25    agree with that and I agree that the claim is here, but I'm not

1 sure that that means that the same body of law applies on all

2 fours because you're filing the claim here means that at some

3 point, you've got to substantiate whatever the damages are that

4 you're alleging.  And I think the question is as a bankruptcy

5 court applying Delaware law, what choice of law rule do I use.

6 Do I ignore --

7          MR. GILSON:  Well, let me stop you.

8          THE COURT:  -- the Delaware choice of law rule and go

9 back to where the initial action's filed.  And I don't think

10 unless you had physically removed that action from New Jersey

11 here that that's what I do.

12          MR. GILSON:  Well, let me stop on that analysis

13 because I'm not sure we're sort of leaping to a point.

14          The first point is I think Your Honor makes a full

15 stop at the issue has this issue been litigated.  And there,

16 that issue -- for example, Your Honor, had there been a final

17 judgment in the New Jersey action --

18          THE COURT:  Then you wouldn't be here.  You'd be here

19 in a different capacity with a liquidated, as opposed to an

20 unliquidated --

21          MR. GILSON:  Correct.

22          THE COURT:  -- claim.

23          MR. GILSON:  But no one could dispute that that

24 ruling by Judge Ackerman applied in this court.

25          THE COURT:  Well, that's right and unless and --

1          MR. GILSON:  And what --

2          THE COURT:  -- until it's reversed on appeal.  But --

3          MR. GILSON:  Right.

4          THE COURT:  But you're not -- I don't know that

5    you're there yet.  Because Ms. Browdy said something that has

6    me a little confused and I don't want to go off on in the wrong

7    tangent.  She said that Judge Ackerman later looked at this

8    opinion in which he refused to grant summary judgment and then

9    reversed himself and did grant summary judgment saying that

10   even under New Jersey law --

11         MR. GILSON:  No.

12         THE COURT:  -- the statute had expired.

13         MR. GILSON:  That's not what happened and I think

14   counsel was careful in her choice of words, but let me explain

15   exactly what did happen.

16         There were various claims in the New Jersey action.

17   One of which was a RICO claim, which has a four year statute of

18   limitations different accrual rules.  Defendants appealed that

19   issue -- well, brought that issue a second time.  That was what

20   the court addressed in 2001.  The state court claims were not

21   at issue and they didn't bring a motion on that.  And Judge

22   Ackerman changed his ruling on RICO because there had been a

23   subsequent change of law at the supreme court level.  The only

24   thing that was dismissed in 2001 were the federal causes of

25   action under the RICO Statute.  So no one ever challenged his

1  state law decision on any kind of re-argument --

2          THE COURT:  So the state law are still pending?

3          MR. GILSON:  They -- well, what happened is because

4  he lost federal jurisdiction when the RICO claims went out,

5  what he did was he made a ruling saying I will dismiss those

6  and send them to state court.  But because there's an automatic

7  stay, it's just sitting there pending resolution.  Obviously if

8  the stay was lifted, we would re-file in federal -- state

9  court.  And under state court law, it all relates back to the

10  original filing date.

11          THE COURT:  So now you -- now a state court in New

12  Jersey is going to assert jurisdiction over buildings in

13  Georgia?  Not a federal court, but a state court?

14          MR. GILSON:  There's -- yes, and there's no doubt

15  that they have that right.

16          THE COURT:  Oh.

17          MR. GILSON:  These district -- these -- Your Honor,

18  these defendants are located in and subject to the jurisdiction

19  in New Jersey.  The question is where does the cause of action

20  arise and if Judge Ackerman, never addressing that issue, but

21  saying a New Jersey plaintiff doing the things that led to

22  these causes of action has the right to apply New Jersey

23  statute of limitations law.  That decision, under the In re

24  Brown decision, Your Honor, is binding on Your Honor.  You

25  would be ignoring that decision by a federal district court --

1          THE COURT:  Well --

2          MR. GILSON:    -- on that issue.

3          THE COURT:  -- except that, as I understand it, that

4    issue hasn't been subject to appeal because it's stayed.

5          MR. GILSON:   And the <u>In re Brown</u> decision of the

6    Third Circuit tells you that what you need to do is look at it

7    and decide was it final enough in the sense that -- and what

8    the courts look to is was it fully briefed?  Was it fully

9    litigated?  Was it fully considered?  And all of those

10   questions are affirmatively answered here.  It was fully

11   briefed after extensive discovery.  It was fully litigated in

12   the sense that Judge Ackerman considered it.  And Your Honor

13   has his opinion attached to our papers where he issued an

14   opinion of over 60 pages.  Seven of which are devoted to this

15   choice of law question.

16         Let me come to another point and look at it

17   differently.  We're all assuming here that Your Honor implies

18   Delaware law.  I'm not -- I don't accept that assumption.  I

19   believe that issue is still open in the Third Circuit; that you

20   would properly look to federal common law as to the choice of

21   law analysis.

22         You really have three choices when it comes to what

23   do I apply in terms of choice of law.  First would be New

24   Jersey.  And I believe under the transfer theory enunciated in

25   the <u>VanDuzen</u> case, Your Honor, by the supreme court, that

1 reasoning should apply and control here that effectively this

2 is effective transfer.  The parties litigating a case, the

3 bankruptcy court stays it under the automatic stay and that

4 claim then gets pursued in bankruptcy.  That's effectively

5 transferring.  And the same analysis that would apply -- that

6 led the supreme court to apply, should apply here.

7        Second choice would be, all right, if that's not the

8 case, what does a bankruptcy court sitting in Delaware look to?

9 Your choices are choice of law under Delaware, which is the

10 Klaxon Rule, or federal common law.  As I understand it, that

11 decision has not yet ever been squarely addressed by the Third

12 Circuit.  Although there is a case, I believe, that in dicta

13 indicates that the Court would lean towards the Klaxon.  But in

14 this situation, I would submit to you this is better applied

15 federal common law.

16        And then you look to the substantial relationship

17 test.  And New Jersey would be the proper law to apply since

18 Prudential, as a New Jersey corporation, brought those claims

19 there and we submit the claims effectively arose in New Jersey

20 when they bought the building --

21        THE COURT:  Look --

22        MR. GILSON:  -- from New Jersey.

23        THE COURT:  See, that's the problem that I think I'm

24 having a disconnect as to when the claim arose.  It seems to me

25 that to the extent that there's property damage and we're

1  looking at a building that's contaminated, the building was

2  contaminated when the asbestos was put in regardless of who the

3  owner was.

4          MR. GILSON:  Well, that --

5          THE COURT:  So, the cause of action arose when the

6  building was built.  Who has that cause of action may change

7  because the ownership of the cause of action itself may have

8  changed, but that doesn't mean that the accrual of the cause of

9  action took place just because the ownership of the building

10  changed.

11          MR. GILSON:  I believe --

12          THE COURT:  And so I have a great deal of difficulty

13  seeing how the accrual rule would say that Prudential has the

14  cause of action that its predecessor didn't have.  You can't

15  have a cause of action based on an installation of a product in

16  a building that you purchased that was already built that

17  didn't already exist.  How --

18          MR. GILSON:  Well, if you read --

19          THE COURT:  How would you get it?

20          MR. GILSON:   -- debtors' papers on their other

21  motions, Your Honor, in fact, they argue inconsistent positions

22  on that.  What they contend is that you need the release of

23  asbestos-containing material that somehow contaminates the

24  building and that doesn't happen at installation.  These are --

25          THE COURT:  Well, if there's a release issue, then we

1 have a different problem.  We may not have a statute of

2 limitations issue at all.  I don't know whether there's been a

3 release.  I mean I don't know.

4          MR. GILSON:  Well, there's evidence for all the

5 Prudential buildings.  We had experts go in and address that

6 issue.  But my point is that simply saying that the cause of

7 action arises on the installation of the material in the

8 building, I do not believe is consistent with the case law nor

9 is it consistent with the position that the debtors will be

10 arguing to you on other points of law.  So they want to have it

11 both ways.  You have a cause of action that, according to them,

12 expired before you ever had damages and that can't happen.

13 Logically, it can't happen.

14          But my point is that your choice is still that you

15 back view federal common law and federal common law would get

16 you then to the same analysis as Judge Ackerman applied and

17 there you should apply again New Jersey law.

18          THE COURT:  Well, I don't see any reason why when

19 there is a Delaware choice of law rule that is historic through

20 the Delaware system that I'd be looking to federal common law.

21          MR. GILSON:  Well, let's look at --

22          THE COURT:  That's usually your bottom line choice;

23 your fall back choice if you can't find anything else.  That's

24 not the first choice that you pick as a general proposition.

25          MR. GILSON:  Generally, that's correct, Your Honor,

1  but I believe in this situation, I still submit that it would

2  be the better analysis.  But let's look at Delaware law.

3  Delaware law says, all right, you apply either Delaware's

4  statute or you apply where the cause of action accrued.  The

5  question of cause of action accrues gets you still back.  And I

6  understand Your Honor's skepticism, but I don't believe you

7  have the record in front of you in order to make a proper

8  ruling on that.

9           THE COURT:  But even if it's release -- no -- I think

10 I don't need a record --

11          MR. GILSON:  I'm not submitting it's release.  Let

12 me --

13          THE COURT:  Okay.

14          MR. GILSON:  Let me articulate exactly what I am

15 saying.

16          THE COURT:  All right.

17          MR. GILSON:  Prudential is a corporation making

18 investments.

19          THE COURT:  I don't -- doesn't matter what the

20 purpose is.

21          MR. GILSON:  Well --

22          THE COURT:  I mean it's not harmed because it made an

23 investment decision.  It's harmed because one of the buildings

24 it has is contaminated.

25          MR. GILSON:  But it bought that building --

1           THE COURT:  So it did.

2           MR. GILSON:   -- and incurred the injury.

3           THE COURT:  So it did.  So sue the owner who hid it

4  from you.

5           MR. GILSON:  But --

6           THE COURT:  That's --

7           MR. GILSON:  It did that from New Jersey and that's

8  where the cause of action.

9           THE COURT:  No, I can't see that.

10          MR. GILSON:  And if Your Honor --

11          THE COURT:  I just simply can't see it.  I think --

12          MR. GILSON:  I --

13          THE COURT:  -- it's wrong.

14          MR. GILSON:  I --

15          THE COURT:  You're -- I just think it's wrong.

16          MR. GILSON:  But I don't believe Your Honor's had a

17  chance to be briefed on that.  And if you're going to go that,

18  I think you're raising a fact question that is beyond this

19  motion --

20          THE COURT:  A fact question as to where the cause of

21  action accrues?

22          MR. GILSON:  Isn't that?

23          THE COURT:  Well, I'm willing to accept the

24  proposition that Prudential is a New Jersey corporation that

25  makes its investment decisions from New Jersey.  I accept that

1  as a stipulated fact.  The issue is where are --

2          MR. GILSON:  And I believe there is law under

3  Delaware that would support the argument, Your Honor, that that

4  is then where the cause of action accrued.

5          THE COURT:  Well, okay.  And that's --

6          MR. GILSON:  Because --

7          THE COURT:  That's --

8          MR. GILSON:  -- Delaware law looks to, as I

9  understand it under its choice of law analysis, looks to the

10 point of injury.

11         THE COURT:  Right, and the point of injury is --

12         MR. GILSON:  And the point of injury is --

13         THE COURT:  -- where the building is.

14         MR. GILSON:  Well, no, the investment.

15         THE COURT:  No, I can't see that, I'm sorry.  That

16 may be a measure of your damages.  May be the fact that your

17 investment is worth less than you thought it would be.  But the

18 harm is due to the fact that you bought a building that's

19 contaminated and the injury that you suffer is based on the

20 contamination in the building.  Your damages all flow from that

21 initial decision.  Had you made a different investment decision

22 and not bought this building, your investment decision would

23 still be there, but you wouldn't have had an injury.

24         So it can't be that where you made the decision is

25 what prompted the injury.  Because if that's the case, every

1 decision that you ever make, including somebody who slips and

2 falls on your building in Georgia, would be subject to New

3 Jersey law.  Because eventually your client's net worth will be

4 lowered if you have to pay a judgment based on somebody who

5 slipped and fell in Georgia based on the fact that your

6 investment decision was based on buying that Georgia building,

7 and that's just not the way the law works.

8       MR. GILSON:  I understand Your Honor's position on

9 that and having listened to that, I want to come back to --

10 because I don't think -- and I want to be able to address our

11 first and primary argument.

12       Your Honor seems to have stepped beyond Judge

13 Ackerman's decision.  And if you're doing that on the basis --

14 I think the only basis that you could is that it wasn't a final

15 decision.  I submit to you that under the Brown decision, which

16 is a controlling decision in this court in the Third Circuit,

17 what you do is you look at the finality for purposes of full

18 litigation that the issue was considered and that issue was

19 fully considered and decided in 1994.  It has never been

20 reversed.  It stands as the law of the case and it directly

21 controls this question that's before Your Honor.

22       Why would you revisit that question at this point in

23 time is the question that is posed.  So that the debtors can

24 simply throw out a claim that the district court in New Jersey

25 said was a valid, timely claim or least there were material

1  issues of disputed fact?  That's not the appropriate analysis

2  and that's not what should happen in bankruptcy court.  Simply

3  that they -- because they filed, they get to re-litigate an

4  issue that they lost.  That -- almost every principal that we

5  stand for in terms of a system of federalism would be undercut

6  if you accept that argument.

7          THE COURT:  Well, that I agree with.  I guess the

8  question is what happened?  Is there an appeal?  Was there an

9  appeal?  Was the time to appeal stayed?

10         MR. GILSON:  Let me take you right through that, Your

11  Honor.  Then here's the procedural history.  Prudential sues in

12  1987.  There's a -- discovery period goes on.  Summary judgment

13  motions are filed in 1992, including summary judgment dealing

14  with statute of limitations.

15         Now there are various claims.  One of which is a RICO

16  claim.  The other are state law, common law claims.  The

17  district court originally denies all of those with the

18  exception of certain claims under the breach of warranty.

19  Those stand.  Defendants seek to certify those questions to the

20  Third Circuit.  The Third Circuit refuses to accept them.

21         So that's the standing decision.  A final pretrial

22  order is entered and the case is supposed to go to trial in

23  1996.  For a series of unrelated issues, it doesn't go at that

24  point.

25         In 2001, defendants resubmit a motion for summary

**J&J COURT TRANSCRIBERS, INC.**

1  judgment based only on the RICO statute of limitations.  And

2  they base it because there's been a change in the law; a new

3  2001 decision by the U.S. Supreme Court that further clarifies

4  what accrual means under the RICO statute of limitations.

5  Judge Ackerman considers that.  He reverses himself on that

6  issue; on the RICO.  And expressly states, "I am not addressing

7  the statute of limitation claims --

8            THE COURT:  Okay.

9            MR. GILSON:  -- under the state law claims."

10            THE COURT:  All right.  Well, then there is no final

11  decision.

12            MR. GILSON:  Well, what happens then -- and here's

13  why I believe it is final in terms of Brown's analysis.  He,

14  having lost federal jurisdiction, enters an order saying I'm

15  going to dismiss the federal cases, but at that point, every

16  defendant that's involved in that case has filed for

17  bankruptcy.  So effectively, the case is stayed and just sits

18  there at that point.

19            THE COURT:  He never issued the order?

20            MR. GILSON:  He did issue the order.

21            THE COURT:  Then the cases are dismissed.

22            MR. GILSON:  Well, there's -- but there can be no

23  action by the parties because they're all under stay orders.

24            THE COURT:  Well, the court can dismiss a case.

25  That's not an action --

1            MR. GILSON:  Yes, the court --

2            THE COURT:  -- that's stayed against the debtor.

3            MR. GILSON:  The court dismissed those claims --

4            THE COURT:  So they're gone.  There are no federal

5   cases pending in New Jersey.

6            MR. GILSON:  Well, there -- it's -- as to U.S. Gypsum

7   and U.S. Mineral Products Company, because Grace was already in

8   bankruptcy, that was stayed.

9            THE COURT:  But it's dismissed.  You don't stay a

10  dismissal.  That's not an action against the debtor.  That was

11  their motion --

12           MR. GILSON:  When that --

13           THE COURT:  -- for summary judgment.

14           MR. GILSON:   -- decision was issued, Your Honor,

15  they were already in bankruptcy.

16           THE COURT:  But -- wait, I'm confused.  Was it not

17  Grace's motion for summary judgment that Judge Ackerman was

18  acting on and he said, "I was wrong based on the new supreme

19  court analysis; therefore, I'm dismissing the federal case"?

20  That's not an action against the debtor that's --

21           MR. GILSON:  It was actually not -- it didn't --

22  Grace had filed that motion.  They went into bankruptcy before

23  the district court ever considered it, so we addressed it as to

24  the other defendants that were still not in bankruptcy.

25           THE COURT:  All right, so I -- but I can reasonably

**J&J COURT TRANSCRIBERS, INC.**

1  assume that based on the fact that there is now a supreme court

2  -- United States Supreme Court decision that determines the

3  accrual, that Judge Ackerman's initial decision, he says, was

4  in error and he dismissed all the other defendants, that when

5  that same issue comes up as to Grace, he's going to dismiss

6  Grace, too.

7        MR. GILSON:  For collateral estoppel reasons, I agree

8  with Your Honor.  That's my point --

9        THE COURT:  All right.  So Grace is gone --

10        MR. GILSON:  -- that collateral estoppel controls

11  Prudential on that issue.  It also controls Grace --

12        THE COURT:  But here's the problem.

13        MR. GILSON:  -- on the earlier issue.

14        THE COURT:  He's now said he's not addressing the

15  state issues because they weren't before him.

16        MR. GILSON:  But he already had ruled.

17        THE COURT:  But that's not binding on a state court.

18        MR. GILSON:  Oh, absolutely, Your Honor, if it went

19  to --

20        THE COURT:  How?

21        MR. GILSON:  -- the state court because for exactly

22  the same collateral estoppel issues.  A state court --

23        THE COURT:  It was --

24        MR. GILSON:  -- in New Jersey would not revisit Judge

25  Ackerman's decision on that.

1          THE COURT:  Well, somebody has the right to appeal.

2  And if the Third Circuit wouldn't take it until a final order

3  was entered and now were going into state court, either it's

4  not a final order in the federal side because now the appeal

5  could be ripe if we -- if it were re-prosecuted because the

6  federal actions are being dismissed or else the ruling can't

7  have collateral estoppel consequences because there's no right

8  to appeal.

9          MR. GILSON:  That's where we disagree, Your Honor.

10  That's where I would ask you to re-look at the <u>Brown</u> decision

11  because the --

12          THE COURT:  Well, <u>Brown</u> --

13          MR. GILSON:  -- <u>Brown</u> decision --

14          THE COURT:  -- involved the final judgment on

15  liability and granted relief from stay to let the state court

16  adjudicate the issues as to the amount of damages that were

17  due.  It was a final judgment as to liability.  There's no

18  final judgment as to liability in any of the state courts

19  systems.

20          MR. GILSON:  Correct, but you can --

21          THE COURT:  It's just in --

22          MR. GILSON:  -- have an issue that is collaterally

23  estoped from further litigation --

24          THE COURT:  But it isn't because it hasn't been

25  subject to appeal and since the Third Circuit denied the

1  request to take it on an expedited basis, at some point when

2  you finally get the litigation finished, that issue is

3  preserved.  The statute of limitations issue is preserved.  It

4  has never been subject to an appeal --

5            MR. GILSON:  Then --

6            THE COURT:  -- yet.

7            MR. GILSON:  -- Your Honor, then that's what Your

8  Honor would have to address rather than dismiss this simply by

9  saying that Georgia law would apply here.  Because in essence,

10  you would be throwing Judge Ackerman's decision out.

11            THE COURT:  But he threw it out.

12            MR. GILSON:  No, he did not --

13            THE COURT:  He said he was --

14            MR. GILSON:  -- throw out his prior decision.  What

15  he did was he made a ruling on a totally separate decision.

16  His 1994 decision stands as a decision of that court.  It's

17  never been reversed --

18            THE COURT:  As to --

19            MR. GILSON:  -- and I agree --

20            THE COURT:  -- the state law issues.

21            MR. GILSON:  Right.  And as to it's never been

22  subject to final full appeal.  But In re Brown, the Third

23  Circuit Court says to you what you look for is, is there a

24  reason to permit re-litigation.  And I respectfully submit to

25  you there's no point in allowing Grace, simply because they

1  chose to file for bankruptcy, to re-litigate an issue that they

2  had lost.

3         THE COURT:  Well, okay, I don't like the concept much

4  that somebody's re-litigating an issue that you lost by way of

5  a final judgment.  The problem in <u>Brown</u> was that that was a

6  decision as to liability.  And all that was happening in that

7  issue -- in that instance was where you going to go to figure

8  out what the damages are.  You can't re-litigate the issue of

9  liability because it was fixed.  So, you know, there was

10 liability.  The only question is how much is it going to cost

11 the debtor.

12        That's a whole different ball of wax from whether or

13 not the appropriate choice of law rules have been applied in a

14 way to determine whether there's liability in the first place.

15 We're not even up to a determination if there was liability.

16 We're still trying to figure out what law applies to get to the

17 question of whether there's liability.

18        MR. GILSON:  I think Your Honor's analysis is

19 correct, except what you need to do is apply it to the issue

20 because you're dealing with an issue -- the question is

21 applying <u>Brown's</u> rationale.  What they basically say to you is

22 look at the issue -- here, the choice of law issue -- and

23 determine should it be allowed to be re-litigated.

24        THE COURT:  Well, I think it should for this reason.

25 Delaware's choice of law premise, based on the fact that there

1   was no bankruptcy, wasn't even considered at the time

2   　　　　MR. GILSON:  Well --

3   　　　　THE COURT:  -- and the --

4   　　　　MR. GILSON:  -- Delaware wasn't the issue, Your

5   Honor.

6   　　　　THE COURT:  I'm sorry?

7   　　　　MR. GILSON:  Delaware wasn't the issue because no one

8   ever argued nor would they even here argue that Delaware

9   statute of limitations --

10   　　　　THE COURT:  Well, certainly --

11   　　　　MR. GILSON:   -- should apply.

12   　　　　THE COURT:  Oh -- no, Delaware's choice of law rules.

13   　　　　MR. GILSON:  Well --

14   　　　　THE COURT:  Not Delaware --

15   　　　　MR. GILSON:  -- you bring a suit --

16   　　　　THE COURT:  -- statute of limitations.

17   　　　　MR. GILSON:  Prudential brought its suit in New

18   Jersey.

19   　　　　THE COURT:  Yes, it did.

20   　　　　MR. GILSON:  That's where it was domiciled.  That's

21   where it believed it's cause of action arose.  The district

22   court addressed those issues and found New Jersey law controls

23   it.  Now Grace wants to come in front of you and say because we

24   filed for bankruptcy, we get to re-litigate that issue and we

25   get to get, effectively, a summary judgment on proceedings

1 where Your Honor has no facts before you.  It simply says apply

2 Delaware's law and Delaware would apply Georgia.

3 I respectfully submit that, A, you shouldn't accept

4 that proposition that you should follow Judge Ackerman; B, this

5 is more akin to a transfer situation and therefore again New

6 Jersey law applies; and C, even if you get to Delaware law, I

7 respectfully submit that there are fact questions as to where

8 this cause of action accrued and that Delaware could well look

9 at under its choice of law and apply New Jersey law here and/or

10 its own statute of limitations.

11 And then we're dealing with two buildings.  And

12 here's where Grace wants its cake and eat it too.  If you're

13 going to accept their analysis, in essence you have to analyze

14 each building separately --

15 THE COURT:  Uh-huh.

16 MR. GILSON:   -- is their contention.  And forget

17 what Prudential knew up in New Jersey.  It's what it knew in

18 Georgia.

19 Well, the facts of record in this case are that

20 Prudential discovered the material in this building, that it

21 had asbestos-containing material in 1986.  It brought its claim

22 in 1987.  Delaware has a three year statute of limitations.

23 It's within that period of time.  And we would submit that

24 Delaware would be more likely to apply its own statute of

25 limitations in that situation rather than go to Georgia.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  I don't know about that.  I've had to

2     look at Delaware's choice of law rules a number of times and

3     frankly, Delaware's choice of law rules seem to look at a most

4     significant contact type of analysis.  And the fact that the

5     bankruptcy's here in Delaware may mean that Delaware has some

6     nexus on that score.  But in terms of the most significant

7     contacts, that may be where the fact is in dispute.

8          MR. GILSON:  If you go to the most significant

9     contacts, Your Honor, and I suggest that that's a good way of

10    looking at it, then read Judge Ackerman's decision because in

11    essence that's exactly what he looked at.  That's what New

12    Jersey law looks at and he said, "Given New Jersey and given

13    the presence of Prudential in New Jersey, I'm going to apply

14    New Jersey's --

15          THE COURT:  Well, I know.

16          MR. GILSON:   -- law.

17          THE COURT:  A New Jersey judge applying New Jersey

18    law to a New Jersey corporation that's a major enterprise in

19    New Jersey really isn't too surprising if New Jersey -- if in

20    his view, New Jersey law is going to support it.  That's not my

21    issue.

22          The issue for this bankruptcy case is where did the

23    harm accrue and I can't for the life of me, accept that the

24    investment decision is what caused the harm.  Because you make

25    investment decisions of all types all the time and yes, an

1  investment decision, in some instances, could cause harm.

2       You know, you may have, for example, insider trading

3  that's an SEC violation.  That investment decision probably

4  caused that harm, but buying a building that was contaminated

5  from somebody else who owned the building, who had the cause of

6  action and therefore, essentially stepping into the shoes of

7  the prior owner, doesn't seem to me to change the accrual time

8  frame for when the harm began -- aside from the discovery rule,

9  I'm not addressing that right now -- or where the harm occurred

10  and that's what I wanted to focus on.

11       This harm occurred in that building in Georgia.

12  Because but for that building, you wouldn't be standing here.

13  This has nothing to do with the investment decision as an

14  investment decision.  It has to do with the fact that there was

15  a -- that you bought damaged goods.

16       MR. GILSON:  Your Honor, the train of thought you

17  just ran through is very logical, but I'm not sure is based in

18  correct choice of law analysis --

19       THE COURT:  Well, I don't know either.  I have to

20  look.

21       MR. GILSON:  And that's my point that if you get to

22  that point, you should simply deny this motion because you

23  don't have the record in front of you in order to go through

24  that analysis.  No party gave you a briefing on Delaware choice

25  of law and how that applies and because it wasn't submitted by

1 Grace.  This is Grace's motion where they want to overcome the

2 presumption that a valid claim has been filed and they want to

3 do it simply by saying just look at Black Letter Law.

4          Well, it isn't Black Letter Law.  Once you get into

5 the analysis that you got into, Your Honor, you're into a

6 factual analysis.  It's impacted by the law, but that has not

7 been laid out to you and not briefed.  And on that ground

8 alone, you should deny this motion.

9          THE COURT:  Well, either that or I should get briefs

10 that explicate the real issue, which is what choice of law rule

11 apply.

12          MR. GILSON:  If you see that as a real issue.  But I

13 respectfully submit, Your Honor, you ought to look again at the

14 Brown decision and think about why would a bankruptcy court

15 revisit what a federal district court has already decided --

16          THE COURT:  Because it's not a final order.

17          MR. GILSON:  Okay.

18          THE COURT:  That's the problem.

19          MR. GILSON:  But why would you come to a different

20 decision?

21          THE COURT:  Because it wasn't a final order.

22          MR. GILSON:  Right.

23          THE COURT:  And so I'm not bound by it.

24          MR. GILSON:  All right, so now you're left with the

25 same question that was in front of the district court.  And

1  what you're saying is it's not a final order.  But why would

2  you disregard his analysis and thinking --

3          THE COURT:  Because it's wrong.

4          MR. GILSON:  No, because it's in -- it's simply the

5  only difference is that Prudential, who is pursuing claims in

6  New Jersey, is not allowed to under the Bankruptcy Code because

7  there's an automatic stay and it has to bring its claim here in

8  a bankruptcy court in Delaware.  But that has no relationship

9  to ignoring a district court's decision --

10          THE COURT:  Oh, I certainly --

11          MR. GILSON:  -- on a choice of law.

12          THE COURT:  -- would not ignore the district court's

13  decision under any circumstances.  I don't want to make it

14  sound as that.  But if I --

15          MR. GILSON:  I didn't think Your Honor would.

16          THE COURT:  -- have to reexamine it -- if I have to

17  re-look at this issue and I think a district court sitting in

18  New Jersey that is not binding on me as a Delaware bankruptcy

19  judge is wrong, I'm not going to apply it.  If I think it's

20  correct, obviously I will apply it.  Not because it's

21  precedential, but because I think the analysis is correct.

22          But to the extent that that decision focuses on the

23  investment decision as being the cause of the harm, under the

24  facts of this bankruptcy where I am looking at asbestos

25  contamination in a building, I'm hard pressed to see how that's

1 correct for the hypothetical reasons that I just went over

2 earlier.  But I do agree that to the extent that the issue is

3 which choice of law rules apply, I'm not prepared to rule

4 today.  I think everybody needs an opportunity to take a look

5 at this brief.

6          And what I want to know from the debtor is how is

7 that issue fairly encompassed within the debtors' motion?

8 Because do I need to start this process over or can I pick it

9 up where it is?  And if I can pick it up where it is, I need

10 some facts that underlay this argument.

11          I don't think you folks are really disputing the

12 major facts.  It doesn't sound as though you've got a dispute

13 about the fact that the building's in Georgia.  The investment

14 decision was made in New Jersey.  Prudential's a New Jersey

15 company.  You know, you probably aren't even going to disagree

16 about as to when Prudential, I guess, found out that it's

17 Grace's product in the building.  But maybe that's a fact in

18 dispute, I don't know.

19          MS. BROWDY:  Actually, Your Honor, on the issue of

20 the discovery rule, that's irrelevant under Georgia law.

21 That's in fact why the Mercer --

22          THE COURT:  I don't know why I'm applying Georgia law

23 either, necessarily.  I mean I think I'm applying Delaware law.

24 You folks filed a bankruptcy in Delaware --

25          MS. BROWDY:  Correct.

1            THE COURT:  -- and my understanding of <u>Klaxon</u>, which

2    I think is good law, is that I look to Delaware's choice of law

3    rules.

4            MS. BROWDY:  Correct.

5            THE COURT:  And now where that's going to get me is

6    the different issue.

7            MS. BROWDY:  Correct.  Actually, Delaware has a

8    borrowing statute.

9            THE COURT:  It does have a borrowing statute.

10           MS. BROWDY:  Right, and it would pull in, again,

11   Georgia law because that's where it arose.  But if the Court

12   wants briefing on this, we're happy to supply it --

13           THE COURT:  Well, I do want the briefing on that, but

14   I also want to know whether there any material facts in dispute

15   with respect to that issue.

16           MS. BROWDY:  I don't believe so.  Again, it's very

17   plain under Georgia law that four years after substantial

18   completion of building, that's it.  That's all you have.  This

19   is a building in Georgia.  We think it's very plain that an

20   asbestos property damage claim arising out of a Georgia

21   building would be under Georgia law.  But again, we're happy to

22   put in a brief on that.

23           THE COURT:  Okay.

24           Did you address how that's fairly encompassed -- this

25   Delaware issue is fairly encompassed in your motion?  I want to

**J&J COURT TRANSCRIBERS, INC.**

1  make sure I don't need some supplemental motion.  And I do want

2  to make sure I don't have any material facts in dispute.  And

3  to the extent that there's a discovery rule that may have to

4  apply -- and I don't know yet that the discovery rule will or

5  won't apply.  I think it's going to depend on the choice of law

6  rule.  But if there is a discovery rule, are the facts in

7  dispute?

8          MR. GILSON:  Your Honor, as to that last point, if

9  there's a discovery rule that applies, it clearly will have

10  factual disputes.  I mean this has been litigated for years.

11  Judge Ackerman found numerous factual disputes on that issue.

12  You have the question of not only what was known and should

13  have known, but also the impact of what defendants were saying

14  about their own material.

15          I do agree with counsel that if you get to Georgia

16  law, as I understand Georgia law, they don't have a discovery

17  rule.  But I think Your Honor's on the right track is it's not

18  clear you get to Georgia law.  And on that issue, that's where

19  I submit you need further briefing.

20          And I believe that, you know, given their motion,

21  this current motion should be denied.  They should be given the

22  permission to file a new motion because in essence it is a new

23  motion and a new briefing schedule.  And I can't answer the

24  question fully of whether there will be fact disputes until I

25  see their papers.

1          MS. BROWDY:  Your Honor, I went back to our papers

2 and we've asserted in our objection to their claim that it is

3 barred by statute of limitations and in particular, it's barred

4 under Georgia statute of limitations.  So we've not briefed

5 what is apparently now the precedent question, which is legally

6 whose statute of limitation apply the choice of law issue.

7          So, I think at most we should have narrow briefing on

8 the choice of law question.  And again, we think it'll be --

9 again, there's a couple cases that show why a bankruptcy court

10 sitting in Delaware would apply Delaware choice of law and then

11 we tell you why Delaware choice of law would implicate the

12 borrowing statute and lead to Georgia.

13          So, again, I think it's just a legal brief.  I don't

14 believe there's any factual issues.

15          THE COURT:  Well, actually, if I'm -- to the extent

16 that the debtor can show me that Georgia law applies, I'd be

17 granting the motion for summary judgment, not denying it.

18          So -- but what I'm not convinced at the moment is

19 that Georgia law applies.  So if you want a termination of this

20 motion, it would be I guess somewhat in the nature of an

21 advisory opinion which says if Georgia law applies, this claim

22 is barred.  The question then is does Georgia law apply.

23          So do you want that type of an order or do you simply

24 want to address the choice of law rule?  Perhaps have the

25 debtor amend it's motion for summary judgment to include a

1  choice of law provision, so that you can understand where the

2  debtor's coming from.

3          MR. GILSON:  Based on the way Your Honor's laying it

4  out, I think it probably makes more sense for them to file a

5  brief on the current motion without the need for an order being

6  entered.  And then we'll respond to that brief.  I would just

7  want the opportunity they would file a supplemental brief, we

8  would respond to that and then, you know, we can address it --

9          THE COURT:  All right.

10         MR. GILSON:  -- again before Your Honor.

11         THE COURT:  Okay.  Then, the debtor is to file a

12 supplemental brief as to the two Prudential buildings at issue

13 on the question of the choice of law to be applied and the

14 collateral estoppel, a fact of Judge Ackerman's order.  Because

15 I think that's all implicated in this choice of law question.

16 Judge Ackerman's order -- really regarding the state law

17 claims.  At this point, the RICO claims have been dismissed.

18         You're not re-pursuing the RICO claims are you, Mr.

19 Gilson?

20         MR. GILSON:  No, Your Honor.

21         THE COURT:  All right.  So, order regarding the state

22 law claims.

23         How much time do you need?

24         MS. BROWDY:  We can do it in a week or 10 days.

25 Maybe by Friday the 3rd?

**J&J COURT TRANSCRIBERS, INC.**

46

1          THE COURT:  Sure.

2          And how much time do you want to respond, Mr. Gilson?

3          MR. GILSON:  I'd ask for the Court's indulgent on

4   this because I think I have a series of briefs due on the 17th.

5   If I could have till the following Friday?

6          THE COURT:  The 24th?

7          MR. GILSON:  Yes, that --

8          THE COURT:  Okay.

9          MR. GILSON:  -- would be better for me.

10         THE COURT:  That's fine.

11         And the debtor may reply since it's still your

12  burden, five pages.

13         MS. BROWDY:  Thank you, Your Honor.

14         THE COURT:  How -- when do you want to do that?

15         MS. BROWDY:  I'm actually trying to back this out for

16  how do we it get at the next omnibus hearing.

17         THE COURT:  Which is when?

18         MS. BROWDY:  It looks like if they're first putting

19  in their response on February 24th, the sooner we -- the

20  soonest we could heard it would be the March 27th --

21         THE COURT:  Right.

22         MS. BROWDY:   -- omnibus hearing.  So maybe if we

23  took -- I don't think we need it, but if we took two weeks till

24  March 10th?

25         THE COURT:  How about just till March 3rd?  If

1 they're taking that -- I don't really think there's going to be

2 anything new.  You've heard the basis for the argument.

3          MS. BROWDY:  That's fine, Your Honor.

4          THE COURT:  All right.  So then this is continued.  I

5 don't want to re-hear the portion of the argument that I've

6 heard, but I do want you to focus on the choice of law

7 provisions which I've sort of blown past a little bit today and

8 where they point me.

9          MR. GILSON:  Your Honor, just a point of

10 clarification on that.  I did hear you ask Grace to address the

11 collateral estoppel issue.  I understand you don't want to re-

12 hear argument, but in our supplemental brief if we find more

13 law that supports the Brown decision would you --

14          THE COURT:  Oh, absolutely.

15          MR. GILSON:  -- accept that?

16          THE COURT:  I meant that for both of you.

17          MR. GILSON:  Okay.

18          THE COURT:  I want some -- whatever further argument

19 you want to make.  I'm not convinced that Brown is enough on

20 point based on the fact that there was final judgment as to

21 liability and the only question is where were you going to

22 litigate damages.  I really am not convinced that Brown

23 applies.

24          MR. GILSON:  I understand, Your Honor.

25          THE COURT:  Okay.

1          MS. BROWDY:  And then, Your Honor, just to clarify

2    for our kind of bookkeeping purposes that we can set this for

3    the March 27th omnibus hearing?

4          THE COURT:  Yes.

5          MS. BROWDY:  Thank you, Your Honor.

6          MR. BIANCA:  Good morning, Your Honor, Salvatore

7    Bianca on behalf of the debtors.  The next two objections on

8    the agenda pertain to two claims filed by two different pro se

9    claimants.

10         THE COURT:  All right.  Excuse me just one second,

11   I'm sorry.

12         MR. BIANCA:  No problem.

13      (Pause.)

14         THE COURT:  Okay, thank you.

15         MR. BIANCA:  No problem.  I'll continue.  Claim No.

16   14400 was filed by Phillip Shawn Moore.  The debtors object to

17   Mr. Moore's claim because it excludes information regarding

18   whether he owns the property at issue and the date in which he

19   purchased the property.  These were questions 3(a)(3) and

20   3(a)(4) on the proof of claim form.  This information is

21   necessary to determine whether or not Mr. Moore has any basis

22   to even assert a claim for this property since his ownership is

23   not clear from the forms.

24         The response filed by Mr. Moore on October 20th of

25   2005 doesn't attempt to remedy this issue and -- of these

1 deficiencies on the claim form and in our reply, we reiterated

2 the objection, reiterated the need for this information and we

3 still have not received that.  And no surreply was filed by Mr.

4 Moore.  On this basis, we seek the claim to be disallowed.

5           THE COURT:  Is anybody representing Mr. Moore?

6           No one is responding.

7           And was Mr. Moore notified of today's hearing?

8           MR. BIANCA:  Yes, he was.

9           THE COURT:  All right.  I will accept an order that

10 disallows his claim for failure to state the essential elements

11 of that claim.

12           MR. BIANCA:  Thank you, Your Honor.

13           The next claim is Claim No. 15352, which was filed by

14 Marcella Paulette.  This was filed on a non-asbestos proof of

15 claim form and purports to amend Claim No. 2361, which alleges

16 property damage from MK-3 plaster and various finishing coats.

17 The objector -- the debtors object to this claim because it

18 lacks any kind of product identification information -- product

19 identification documentation rather.

20           The case law is clear that a necessary prerequisite

21 to recovery for an asbestos property damage claim is a showing

22 that one of the debtors actually manufactured or sold the

23 products for which the claim is alleged.  Neither the claim nor

24 any of claims filed by Ms. Paulette provide any documentation

25 indicating a Grace product.  All that was provided was a list

1  of renovations to her home.  And indeed nowhere in any of the

2  documents does it even mention the presence of asbestos, much

3  less a Grace product.

4        The claimant's response indicates that she's never

5  seen any documents from the building contractor that she could

6  base the assertion that a Grace product is present on.  And,

7  you know, the need for product ID documentation in this case is

8  particularly important because of the assertion that MK-3 is

9  present in her home.  MK-3 was built -- was used on large scale

10 buildings, such as high rises, not individual residences.

11       And so, on the basis of any kind of -- lack of

12 product identification documentation, we request this claim to

13 be also disallowed.

14       THE COURT:  Is anyone representing Ms. Paulette?

15       There's no response.

16       So I will accept an order that disallows her claims

17 for the reasons you've expressed on the record.

18       MR. BIANCA:  Thank you, Your Honor.

19       THE COURT:  And the debtor will submit both of those

20 orders?

21       MR. BIANCA:  Yes, Your Honor.

22       THE COURT:  All right.

23     (Pause.)

24       MS. BROWDY:  Your Honor, that takes us to I think the

25 last argument for this morning, which are the Minneapolis

1  stigma claims.

2         Your Honor, the issue before the Court is whether 54

3  Minnesota property owners can recover property damage claims

4  for a stigma.  As we noted in our fifteenth omnibus objection

5  at paragraph 90 -- or, 190, page 58, these are claims that have

6  either been cleaned up already, that testing was done and no

7  contamination was found or there's no information on testing

8  results.  Essentially, they are simply say there's stigma to my

9  property and as a result, I should be able to recover.

10         As we set out in our reply brief in the burden of

11  proof section, an objection can challenge the legal basis of a

12  claim and by challenging the underlying legal basis, negate the

13  presumption of validity.  And then the burden goes back to the

14  plaintiff to show he has a legal claim.  And we don't think

15  that there's been any showing that under Minnesota law, a

16  property owner would be permitted to pursue a claim solely for

17  stigma to property.

18         Now, we cited, Your Honor, to a number of claims from

19  other jurisdictions that look directly at the issue of whether

20  you can have a tort claim for stigma to property.  We cited,

21  for example, Hammond vs City of Warner Robins.  We cited the

22  Ramirez case from Ohio, Leaf River Forest Products, et cetera.

23  Number of jurisdictions, when they look at it head on, have

24  said stigma claims are too remote and too speculative to

25  recover in tort.

1        And, Your Honor, the same law applies in Minnesota.

2   Minnesota, the Supreme Court in 1977, the <u>Jackson vs Reiling</u>

3   decision, 249 NW.2d 896, makes plain that damages which are

4   remote and speculative cannot be recovered.  So under the same

5   theory that other courts have looked at it, we submit that

6   Minnesota again would reject pure stigma claims as actionable.

7        Now, the only case that the claimants cite in support

8   of their contention on stigma to property is the <u>Dealers</u>

9   <u>Manufacturing</u> case.  That's <u>Dealers Manufacturing vs City of</u>

10  <u>Anoka</u>, A-n-o-k-a, 615 NW.2d 76, a Minnesota Supreme Court

11  decision from 2000.

12       But, Your Honor, the <u>Dealers</u> case is a pure question

13  of statutory interpretation on the tax code.  They're trying to

14  figure out under Minnesota Statute Section 273.11(17), whether

15  stigma claims can or could not be taken to reduce the

16  valuation, the market value of property.  And this subdivision

17  of this Minnesota code literally is saying whether or not, for

18  example, contamination can be used to mark down the value of a

19  claim for tax purposes.  It doesn't address at all the question

20  of whether you could have a tort action, absent other damages,

21  to just simply recover for stigma.  It doesn't address this

22  issue at all.

23       And in terms of understanding the difference between,

24  again, a tax valuation and an underlying tort claim, there's

25  actually a very good analysis undertaken in a decision which we

1   didn't cite because it was overturned on other grounds or it
2   was vacated on other grounds, but it performs the analysis.
3   And I'll offer the cite if the Court's interested.  It's the
4   Mehlenbacker case, M-e-h-l-e-n-b-a-c-k-e-r, vs Akzo, A-k-z-o,
5   71 F.Supp.2d 179 from the Western District of New York, 1999.
6   Again, it was vacated on other grounds; 216 F.3d -- I think
7   216, but I think that actually is a wrong cite.  I can double
8   check that -- from the Second Circuit in 2000.
9        But what the Mehlenbacker case does it's looking to
10  try to figure out -- it's sitting in the Western District of
11  New York.  It's trying to figure out would New York State Court
12  recognize a claim for pure stigma to property.   That case
13  involves something that happened in an underground salt mine.
14  There was nothing above the surface and the question was
15  whether landowners could recover some kind of a damage for
16  stigma.
17       And the Court goes through and looks at what other
18  courts have done on this, ultimately concluding that New York
19  wouldn't recognize a stigma damage claim in tort.  Again,
20  citing the other similar cases that found that, finding it is a
21  near universal rule and compares it to a diminution of property
22  as you might have again in takings or the tax context.
23       And it says suppose you had, for example, property A.
24  And then property owner B did something, maybe built a -- you
25  know, built a separate house or something and -- that broke up

1 your view of a vista or something like that.  Clearly, property

2 owner B could do things that would diminish the value of the

3 property, but it doesn't mean there's an actionable tort.

4         And that's really the problem here, Your Honor, is

5 that when the Minnesota claimants are citing this Dealers case,

6 they're looking at a statutory interpretation which is saying

7 what is the measure of damages going to be for a change in

8 market value for something like contamination.  But that's not

9 this case.

10        This case, property damage claimants are trying to

11 say I have some kind of tort.  I'm entitled to damages because

12 there's been a stigma.  It begs the question, Your Honor.

13 Again, the Dealers case does not say that there is any common

14 law cause of action for pure stigma to property.  Again, the

15 Jackson case from the Minnesota Supreme Court makes clear

16 speculative and remote damages aren't recoverable.  The other

17 cases around the country that look at these kind of stigma

18 damages as a pure cause of action say no, it's remote.  It's

19 speculative.  It's not recoverable.

20        And again, we think that the same rule would apply in

21 Minnesota.  Either way, the burden is on the claimants to show

22 that they have a valid cause of action.  There's no claim

23 unless you have the right to payment and they can't establish

24 right to payment because they haven't established that

25 Minnesota would permit the recovery for pure stigma to

**J&J COURT TRANSCRIBERS, INC.**

1  property.

2          THE COURT:  All right, thank you.

3          Somebody going to argue on behalf of the Minnesota

4  claimants?  Is anybody on the phone for the Minnesota

5  claimants?

6          These are not Mr. Speights's are they?

7          MS. BROWDY:  No, Your Honor.  They're the Biersdorf

8  firm.  And in fact, we had gotten not only the original

9  response paper in October, but we did get a surreply from them

10 last Friday.  So they have been briefing this issue.

11         THE COURT:  Are they aware of the hearing?

12         MS. BROWDY:  They would have received notice like

13 everyone else.  And again, I do have a copy of their surreply.

14 It was filed.  It was filed at 4:00 on Friday.

15         THE COURT:  I haven't seen that.

16         MS. BROWDY:  Should I hand up a copy for the Court?

17         THE COURT:  Well, I'll get it off the Internet.  I

18 guess my question is whether they intentionally did not appear

19 today.  I think they have to appear to prosecute the claim.

20 I'm a little concerned about why they're not on this call or

21 here.

22         Mr. Baena?

23         MR. BAENA:  I'm happy to go out and try and call Mr.

24 Butler.  See if --

25         THE COURT:  Maybe that would a good idea.  Because

1 otherwise I'm about to dismiss their claims for failure to

2 prosecute and I'm not quite sure why they would have taken that

3 level when they filed the papers that they filed.

4         MR. BAENA:  Something sounds a wry, Judge.  Because

5 they have been actively involved.  I'm happy to go outside, if

6 you'll excuse me and --

7         THE COURT:  All right, well --

8         MR. BAENA:  -- make a call.

9         THE COURT:  Why don't we just take a 10 minute

10 recess, Mr. Baena, and I'll go pull the surreply and read it in

11 the meantime.

12         THE CLERK:  I can't find it.

13         THE COURT:  Oh.

14         THE CLERK:  Do you have an idea what docket --

15         MR. BAENA:  I have a copy --

16         THE COURT:  Well, then if I could just take one.

17         MS. BROWDY:  It appears to be filed at 3:59 on the

18 20th.  I don't have a docket number.

19         THE COURT:  Thank you.

20         THE CLERK:  May have filed it under some other --

21 does the caption say surreply?

22         THE COURT:  It says northeast Minneapolis resident

23 surreply, the debtors' fifteenth omnibus.  This is hand-stamped

24 with a copy though.  It looks a -- it looks like it was paper

25 filed.

1          THE CLERK:  A response was filed the 23rd.

2          THE COURT:  This is dated the 19th.  This was filed

3    on the 20th at 3:59.

4          Is this an extra copy, Ms. Browdy --

5          MS. BROWDY:  Yes, Your Honor.

6          THE COURT:  -- or also make one?  It is an extra?

7          MS. BROWDY:  That's for you.

8          THE COURT:  Okay, thank you.

9          I'll just read it now while we're --

10       (Pause/Court and clerk confer.)

11         THE COURT:  Okay.  We'll take a recess for 10

12   minutes.

13         MS. BROWDY:  Thank you, Your Honor.

14         THE COURT:  Thank you, Mr. Baena.

15         MR. BAENA:  Thank you.

16       (Recess.)

17         THE CLERK:  All rise.

18         THE COURT:  Please be seated.

19         Mr. Baena?

20         MR. BAENA:  Mr. Butler is on the phone, Your Honor.

21         THE COURT:  Mr. Butler?

22         MR. BUTLER:  Yes, Your Honor.

23         THE COURT:  Were you on the phone to hear Ms.

24   Browdy's argument on behalf of the debtor with respect to the

25   Minnesota claims?

**J&J COURT TRANSCRIBERS, INC.**

1        MR. BUTLER:  I was not.

2        THE COURT:  Okay.  Did you intend to argue today?

3        MR. BUTLER:  I did, Your Honor, but I was -- got a

4    conflict with another judge that essentially ordered me in

5    town, so I was -- I could not physically appear and I

6    appreciate the opportunity to appear by phone.  I think I can

7    surmise from the briefs what the debtors represented.  If I

8    could say my piece, I would sincerely appreciate it?

9        THE COURT:  I think the case management order in this

10   case requires that if you can't appear and want to appear by

11   phone that you simply notify the people so that you can get the

12   dial-in numbers.

13       MR. BUTLER:  I wasn't aware of that, Your Honor, I'm

14   sorry.

15       THE COURT:  All right, go ahead.

16       MR. BUTLER:  Okay.

17       Essentially what we have here, Your Honor, is a

18   dispute over the burden of proof and for the debtors' objection

19   to be successful under 502(a), they have to overcome what is --

20   what the law interprets to be a prima facie valid claim.

21       The debtors have two options to challenge that and

22   they have to challenge that -- they have to meet their burden

23   by a preponderance of the evidence according to the Allegheny

24   case and I believe the ID Craig Service Corp. case decided by

25   this Court.  They have two options; challenge that on the facts

**J&J COURT TRANSCRIBERS, INC.**

1  or challenge that on the law.  The debtors have not challenged

2  the facts.

3          The facts are W.R. Grace contaminated a northeast

4  Minneapolis neighborhood over a period of almost 40 years.  The

5  EPA has investigated that, has cleaned up I believe

6  approximately 200 homes, has inspected 1,500 homes and it's not

7  clear to me that it has been declared a Superfund site, but

8  Superfund monies have been used to perform the clean up.  And

9  the Minnesota Department of Health is also involved in cleaning

10 up the properties.

11         Debtors do not challenge those facts.  What they

12 challenge is the law.  They claim that Minnesota law does not

13 provide for stigma value loss.  We disagree with that

14 interpretation of the law.

15         The Dealers Manufacturing case that was cited by us

16 and by the debtors clearly stands for the proposition that

17 stigma value loss, whether or not your property was actually

18 contaminated or adjacent to a contaminated property, is a

19 compensable item of damages in a valuation dispute or a -- when

20 the issue of property value is in dispute, stigma is a

21 compensable, recognizable loss according to the highest court

22 in Minnesota.

23         THE COURT:  Well, it may be a loss for tax purposes

24 or even for some other purpose, but how does that give you a

25 tort claim?

1           MR. BUTLER:  It doesn't give us a tort claim.  The

2    tort claim is from the contamination.  The --

3           THE COURT:  But there is no proven contamination.

4    All you're saying is that there's a stigma associated with

5    contamination and in fact, if only 200 of the 1,600 homes had

6    any sort of contamination in, it's not -- you know, there's a

7    better than even chance that you can't prove that any specific

8    home was contaminated.

9           MR. BUTLER:  Well, the -- and that's a good point,

10   Your Honor, but that's not what's at issue at this point at the

11   objection stage.  That would be an appropriate issue for

12   summary judgment as to whether or not the plaintiffs or the

13   claimants actually have any damages, but the fact of the matter

14   is the property in northeast Minneapolis has been contaminated

15   over a period of 39 years.  Stigma is a --

16          THE COURT:  And what is the --

17          MR. BUTLER:  -- cognizable, recognizable --

18          THE COURT:  -- property damage based on stigma?

19          MR. BUTLER:  What's that?

20          THE COURT:  What is -- what's the amount of the

21   property damage based on the stigma?

22          MR. BUTLER:  I don't have that for you right now,

23   Your Honor.

24          THE COURT:  Well --

25          MR. BUTLER:  I --

1          THE COURT:  -- who's going to give it --

2          MR. BUTLER:  I don't know the --

3          THE COURT:  -- to me?

4          MR. BUTLER:  What's that?

5          THE COURT:  How are you going to give it to me?  How

6  are you going to prove the -- whatever the diminution in value

7  is and how are you going to prove that there's actually

8  somebody who sustained a loss just based on the diminution in

9  value?

10          MR. BUTLER:  Well, I anticipate that we will hire an

11  appraiser who will evaluate the properties and put a value loss

12  based on the contamination in the neighborhood for each

13  claimant in this case.

14          THE COURT:  Which is highly speculative.  How --

15  until the property is actually sold and somebody comes forward

16  and says gee, I would have paid 100,000 for that property but

17  for the fact that it's located in an area where 200 homes out

18  of 1,600 have been remediated, so I'm only going to pay you X,

19  how is there anything other than a speculative damage?

20          MR. BUTLER:  Well, if it's a speculative damage, that

21  is an issue for a finder of fact at the time the Court has had

22  a full trial on the merits.  But at this point, that is not a

23  valid challenge under 502(a).

24          THE COURT:  Well, it is to the extent that --

25          MR. BUTLER:  That's a --

1         THE COURT:  -- Minnesota may not provide you the
2   opportunity to raise that issue because there is a decision
3   that says it's simply too speculative.  You can't prove it.
4   Therefore, if you can't ever prove it, you don't have a cause
5   of action.
6         MR. BUTLER:  Your Honor, I think you're referencing
7   the Russell case and that case is an unreported decision, which
8   according to Minnesota statutes, it is not precedential.  But
9   even if it were, Your Honor, the facts of that case are as
10   follows.
11         What happened was the plaintiff in that case brought
12   a stigma claim arising out of a -- stigma damage claim arising
13   out of a fraud claim.  The court, after the defendant attempted
14   to exclude stigma evidence, heard the evidence, allowed the
15   appraiser to testify, allowed the case to go forward and
16   allowed the plaintiff to present evidence of stigma value loss.
17   The court, after having heard all the evidence, having had
18   heard the appraisal evidence, decided no, I'm not buying it.
19   And that's fine.
20         If this Court doesn't buy it after the claimants have
21   had the full opportunity to have their claims heard, that's
22   fine.  But at this stage, dismissing these claims is not
23   warranted under Minnesota law.
24         In that case, the plaintiff had full due process
25   rights under Minnesota law to present the appraisal evidence

**J&J COURT TRANSCRIBERS, INC.**

1  and the stigma value loss arising out of a tort claim and the

2  statement that it was speculative was after a full trial on the

3  merits and it was -- and the district courts decision to deny

4  stigma value loss was affirmed by the court of appeals.  Again,

5  in an unreported decision, but the underlying facts are the

6  plaintiff in that case had her day in court.

7          THE COURT:  But you -- but the precedent to the

8  extent that what the court said is "Fine, I'm going to hear

9  this and see whether or not you can prove an actual damage" and

10  the court determined that based on an appraiser testifying, it

11  wasn't an actual damage, it's only at best an estimate and in

12  fact was a speculative estimate and that's upheld; whether it's

13  an unreported decision or not seems to be a logical course for

14  a court to take.

15          So, if the only basis on which you can prove any sort

16  of loss is based on an appraiser's testimony that is by nature

17  speculative -- because first it's setting a fair market value

18  based on probably comparison approaches in the use of

19  residences so that in and of itself is somewhat speculative --

20  and then on top of that, it's going to talk about how much of a

21  loss there is in the mind of a reasonable buyer who doesn't

22  exist -- that's even more speculative -- how do you ever prove

23  the tort?  And if you can't prove the tort, then where is the

24  cause of action?

25          MR. BUTLER:  Two separate things, Your Honor.

1 There's proving the tort, which I don't think is an issue, and

2 there's an issue of proving damages, which I acknowledge is an

3 issue.

4        But again, the court of appeals -- the unreported

5 court of appeals decision that the debtors are relying on, the

6 defendant in that case, as I recall reading the case, attempted

7 to do essentially the same thing W.R. Grace is doing here,

8 which is move to exclude the evidence prior to trial.

9 Essentially, cutting off plaintiff's right to have her day in

10 court and present her stigma value loss in relation to her tort

11 claims.  And the district court said, "No, I'm going to let

12 that come in."  And the court of appeals affirming that

13 decision is essentially the affirmance of a district court's

14 decision to refute the credibility of the plaintiff's expert

15 witness.

16        THE COURT:  Well, okay, but I think in federal court

17 -- I don't whether Minnesota has adopted the _Daubert_ standard

18 in _Frye_ line of cases -- the old _Frye_ line of cases, the

19 _Daubert_ standard, the _Kumho Tire_.  I don't know what Minnesota

20 does as a matter of its evidentiary law.

21        But with respect to the bankruptcy court, looking at

22 the nature of expert testimony, the first question is going to

23 be whether or not the methodology that the appraiser uses to

24 determine this alleged diminution in value is subject to peer

25 review or is somehow reliable.  How are you going to -- just as

1  a matter of proof on the damages, how are you going to get past

2  that?

3          Let me assume for the moment that the debtor did all

4  the bad things -- that you can prove that the debtor did all

5  the bad things.  It piled up the asbestos.  It gave it to

6  people for free.  It did everything that it shouldn't have

7  done.  You still have to prove a measure of damages to have a

8  compensable injury.  So how --

9          MR. BUTLER:  Right.  Yeah --

10          THE COURT:  How do we get that far?

11          MR. BUTLER:  Well, that is frankly still in the

12  process, but here's what my thoughts are on that.  I think an

13  appraiser would take a statistically relevant sample of

14  properties in this neighborhood, do a comparable sales approach

15  with a statistically relevant sample in a very similar

16  Minneapolis neighborhood and compare the two.  And determine

17  through that data what the stigma value loss was associated

18  with the northeast Minneapolis neighborhood.  That is --

19          THE COURT:  Okay.  So now we have an appraiser saying

20  hypothetically, again, that there is a loss to the

21  neighborhood.  So the properties --

22          MR. BUTLER:  Right.

23          THE COURT:  -- in the neighborhood instead of having

24  an average sales price at 100,000 have an average sales price

25  of 95,000, just --

1          MR. BUTLER:  Correct.

2          THE COURT:  -- to pick some numbers.

3          MR. BUTLER:  Correct.

4          THE COURT:  But that still doesn't show that any

5  single homeowner has any damage because their property may

6  still sell at whatever a true fair market value, undiminished

7  by the stigma is.  There's no way to get around the speculative

8  nature of this type of testimony that I can see.

9          MR. BUTLER:  Any property owner -- if the entire

10 neighborhood is affected by the dumping of asbestos throughout

11 the neighborhood, you are correct that a property may sell over

12 and above a -- if an appraiser comes in and says there's a five

13 percent diminution in value for every property in this four

14 square mile area and one of the claimant's properties sells for

15 in excess of what that -- say it sells it for five percent

16 over, that doesn't mean that stigma loss or stigma damages

17 didn't attach to that property.  There's -- there are other

18 factors that would go into that property for, you know, I spent

19 $30,000 on landscaping.  I just put a new roof on.  I just put

20 a new furnace on.

21          So, just because a property may sell at a price

22 higher than, for example, the debtors' expert would testify

23 doesn't mean that stigma value loss is not attached to that

24 property.

25          THE COURT:  But it means that they have no damage and

1  in fact, the point you just made proves the speculative --

2        MR. BUTLER:  No, no --

3        THE COURT:  -- nature because properties sell for

4  whole lots of reasons and it's very difficult with respect to

5  any one property to determine why somebody's going to purchase

6  it.

7        I can't see, even if there were a tort somehow, which

8  I don't think there is because if you can't prove damage, you

9  don't have a recoverable tort.  So I don't see how you have a

10 cause of action if there is no method by which you can prove

11 damages as a result of the tort because the tort itself, in

12 order to be compensable, you have to prove damages.  I can't

13 see how, under any stretch, these damages would be anything

14 other than so speculative that they cannot be determined.

15       MR. BUTLER:  Well, and if I might just finish off,

16 Your Honor, the -- that is a premature determination for this

17 Court.  Whether or not to determine at this point without an

18 expert report that the damages are speculative is not the

19 standard under 502(a).

20       THE COURT:  Well, I don't think it's the standard

21 under 502(a).  Where I was trying to get with this was assuming

22 that there is a tort at all, assuming you can prove that there

23 is some bad act that happened, how do you prove the damages

24 that flow from that bad act?

25       Because it's a two-prong test.  If you can't prove

J&J COURT TRANSCRIBERS, INC.

1  the damages, then at best you have a contingent claim and an

2  unliquidated claim.  And those are disallowable under Section

3  502 and that's where I'm headed.  Because it seems to me that

4  you have nothing other than a contingent claim.  To the extent

5  that any of these specific property owners have some damage

6  that they can attribute to their specific property at a later

7  point in time, then their claim at that point may not be

8  contingent any longer.  But at the moment, at best all they

9  have is the contingent disputed, an unliquidated claim and

10 that's the whole purpose for 502 disallowance.

11          So I think at this point, there is no cause of

12 action.  Even if there were a cause of action, it seems to me

13 that the experts who would testify could only give speculative

14 diminution in loss as to any of the property owners, so the

15 claims have to be disallowed.

16          However, the Court can always reexamine claims.  So

17 if the Court disallows a contingent claim and something happens

18 before plan confirmation that indicates that these particular

19 claimants have a real claim and have sustained real damage that

20 they can prove, I think at that point you can move to reopen

21 this adjudication and the Court has to take a look at it and

22 hear the evidence.  But I don't -- at this point, I just don't

23 see where there is a general concept that stigma damage

24 attaches in a vacuum.

25          MR. BUTLER:  Okay.

**J&J COURT TRANSCRIBERS, INC.**

1           MS. BROWDY:  And I don't if Your Honor wants to just

2  -- I would not reexamine the damages issue which the Court

3  already covered the remote and speculative nature of it, but

4  I'd also make the further point, again, you did the damage

5  analysis assuming that there could be some underlying

6  compensable tort.  And part of our legal objection to the claim

7  is that these claimants haven't shown that there is such a

8  compensable tort under Minnesota law.

9           And the Dealers case is actually pretty interesting.

10  Again, that's determining a measure of assessing market value

11  for tax purposes under a very specific provision of the tax

12  code that talks about contamination.  But the Dealers case as

13  part of the analysis when trying to figure out what stigma is,

14  it said, you know, you can have stigma if there's

15  contamination.  You can have stigma if there's no

16  contamination.  You can have stigma if there was contamination

17  and it has been cleaned up.  And this is talking about, again,

18  under that provision, is the measure on market value is stigma

19  the same as contamination.

20           Well, recognizing that distinction, again, these

21  claimants could be people that never had a wit of Grace

22  anything on their property, but there's stigma.  And that's the

23  underlying problem that not only is there no measure of damages

24  that's is so speculative, but there's no underlying cause of

25  action.

**J&J COURT TRANSCRIBERS, INC.**

1          And again, the claimants had the opportunity in their

2    brief to show it.  The only case they could come up with is

3    <u>Dealers</u>.  And again, that's a statutory interpretation on a tax

4    case.  It doesn't show there's a contamination -- or a cause of

5    action for stigma.

6          THE COURT:  Well, I don't think <u>Dealers</u> talks in the

7    tort world.

8          MS. BROWDY:  Correct.

9          THE COURT:  But it does take a look at the issue of

10   what's property worth for figuring out values of property for

11   assessing taxes.

12         MS. BROWDY:  Correct.

13         THE COURT:  And to the extent that it's saying, yes,

14   your property's worth less as a tax assessment matter because

15   we assess taxes at fair market value and somebody's not willing

16   to pay as much for this property because of the stigma

17   associated with it, I think it's saying that properties are

18   worth less because of stigma.

19         I'm not convinced there's not a total cause of

20   action, but I don't think it's a general theory.  I think

21   you've got to prove that the specific property is diminished in

22   value based on stigma.  And I don't think it's just something

23   that you can do neighborhood by neighborhood because that

24   doesn't give any specific property owner a measure of damage.

25   You don't -- you know, the neighborhood doesn't have a claim in

1 this estate, each property owner has a claim.

2        So, I think at this point, they are contingent,

3 unliquidated and disputed and subject to disallowance.  But if

4 any of these property owners have some real basis on which to

5 prove that -- again, this is hypothetical -- property owner A

6 tries to sell property and somebody comes in and says I'm not

7 going to pay what you want because all the -- your property may

8 not be contaminated, but the five around you are and it's not

9 worth that much to me, then maybe there is some form of

10 testimony that can be brought into play that will show that a

11 specific property owner has a loss which is compensable by the

12 debtor.

13        But I can't see it just based on the proofs of claim

14 that are filed at this point because there is no allegation

15 that any of these property owners have attempted in anyway to

16 liquidate those damages.  And I think under these unusual

17 circumstances, the contingent nature of this claim is such that

18 the claim is disallowed for this purpose; for purposes right

19 now of taking a look at voting and recovery on a plan.  But I

20 think at any point in time that there is something that makes

21 this not a contingent claim --

22        MS. BROWDY:  Okay.

23        THE COURT:  -- then maybe there's something that can

24 be reassessed.

25        MS. BROWDY:  So should we prepare a form of order

1 indicating that these 54 claims are for now disallowed as

2 contingent, disputed, unliquidated claims under 502?

3        THE COURT:  Well -- take a look here for a second.

4 I'm not totally sure I know where I want to go with this yet,

5 so give me a second.

6     (Pause.)

7        THE COURT:  I think I have to get a ruling as to

8 whether or not there is actually a claim under Minnesota law.

9 I don't think at this point that the claims are disallowable

10 simply because the damages can't be proven.  I think that would

11 get us perhaps into an estimation process, which I think at

12 this point would say they're estimated at zero because you

13 can't prove the damages.

14        But, I think I have to examine the issue as to

15 whether or not the claim exists.  I think if the claims exists,

16 they're probably entitled to attempt to prove it a.  And if the

17 debtor has some summary process or whatever that can be

18 brought, you can use it.  Otherwise, I think we have to take a

19 look at whether the claim has any value.

20        So, I need to take a look at the cases and the

21 Minnesota statute I think to figure out whether there is a tort

22 that sounds.  You know, sometimes, especially in bankruptcy,

23 property values have a whole lot of different connotations and

24 are done for different reasons and that may be true under

25 Minnesota law, too.  I don't know.  I want to spend some more

1  time on this issue.

2          MS. BROWDY:  Okay, Your Honor, and again, both sides

3  have submitted briefs citing cases.

4          THE COURT:  Yes.

5          MS. BROWDY:  And then the only other case that,

6  again, I mentioned during the argument today was that

7  Mehlenbacker case, which is vacated, but it does an analysis of

8  what does it mean to have stigma damages.

9          THE COURT:  Okay, I'm going to take this issue under

10  advisement because I think I have to go to the level of looking

11  at whether or not there is a viable cause of action.  Because I

12  do agree with Mr. Butler that you -- there is a way to separate

13  out the cause of action from whether or not it's compensable.

14  It has to be disallowed for the purposes that I've been talking

15  about if it's not compensable, but maybe there's still an

16  opportunity to prove the claim.

17          MR. BUTLER:  Your Honor?

18          THE COURT:  Yes.

19          MR. BUTLER:  Your Honor, Bill Butler here.  Would you

20  allow a submission of a brief on the available underlying

21  claims of the claimants?

22          THE COURT:  Of whether or not there is a -- is as a

23  proposition under Minnesota law, the right to file a tort claim

24  based on the stigma?

25          MR. BUTLER:  Well, I think it would be appropriate to

1 examine the entire universe of claims that would be available

2 to these claimants under Minnesota law and we --

3        THE COURT:  Well, I thought you'd only raised them as

4 a stigma matter.  I'm not reopening the claims.

5        MS. BROWDY:  Right.  Yeah, the contention was stigma.

6 That's why we objected to -- that's the grounds on which we

7 objected to them.  That's the issue before the Court is the

8 stigma damages.

9        THE COURT:  I'm not going to allow you to amend the

10 claims at this point in time.  I don't see any basis for that.

11 The bar date's gone.

12        MR. BUTLER:  I understand that, but if the Court is

13 going to perform an examination as I understand it, the Court

14 is going to look at what underlying tort claims would exist;

15 trespass, nuisance, violation of --

16        THE COURT:  No, absolutely I'm not going to do that.

17 I think the proof of claims are filed as a stigma loss,

18 correct?

19        MR. BUTLER:  Correct.

20        THE COURT:  Okay.  So, that's what I want to know; is

21 there a cause of action that says that just because somebody

22 else's property is contaminated, I have a right to recover

23 against the contaminator because my property has gone down in

24 value.  That's the issue --

25        MR. BUTLER:  Okay.

1          THE COURT:  -- of stigma as I understand it.

2          MS. BROWDY:  And, Your Honor --

3          MR. BUTLER:  Right.

4          MS. BROWDY:  -- that's the issue that's been fully

5  briefed.

6          THE COURT:  Are the -- do the proofs of claim list

7  anything else?

8          MS. BROWDY:  It's --

9          MR. BUTLER:  Other than a stigma loss?  No.

10          THE COURT:  Okay.  Then I -- at this point, the only

11  thing I'm interested in is whether these claims are allowable

12  or not based on stigma and I have -- I don't want to mix up the

13  difference between having a cause of action and being able to

14  prove damages, but it seems to me that in this instance it's

15  pretty speculative.  So, I'm going to take a look and see

16  whether or not I can find a cause of action that exists and if

17  I can, I'm going to let them go forward.  And if I can't, I'm

18  going to strike the claims.

19          MR. BUTLER:  Okay.

20          THE COURT:  Okay, I'll take this one under

21  advisement.

22          MR. BUTLER:  Thank you, Your Honor.

23          MS. BROWDY:  Thank you, Your Honor.  And I believe

24  that's all we have up today.  And tomorrow at 1:00 I believe

25  the Speights' claims are under -- will be taken up.

1         THE COURT:  Okay.  We're adjourned for today then.

2   Thank you.

3         MS. BROWDY:  Thank you very much, Your Honor.

4         MR. BUTLER:  Thank you.

5      (Court adjourned.)

6                      *  *  *  *  *

7

8                      **<u>CERTIFICATION</u>**

9         I, TRACY GEGENHEIMER, court-approved transcriber,

10  certify that the foregoing is a correct transcript from the

11  official electronic sound recording of the proceedings in the

12  above-entitled matter.

13

14  <u>/s/ Tracy Gegenheimer</u>              Date: January 31, 2006

15  TRACY GEGENHEIMER     CERT*D-282

16  J&J COURT TRANSCRIBERS, INC.

17

18

19

20

21

22

23

24

25

**J&J COURT TRANSCRIBERS, INC.**