UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          .    Chapter 11
                                .
W.R. GRACE & CO., *et al.*,     .    Case No. 01-01139(JKF)
                                .    Jointly Administered
        Debtors.                .
                                .    Jan. 30, 2006 (2:07 p.m.)
                                .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE COURT: Good afternoon.  Please be seated.  This

2     is the matter of W.R. Grace, 01-1139.  The participants

3     listed by phone are David Siegel, Paul Norris, Daniel

4     Speights, Debra Felder, Jonathan Brownstein, Mark Shelnitz,

5     Tiffany Cobb, Peter Pearson, Craig Moran, Edward Westbrook,

6     Alan Madian, Brian Kasprzak, Leslie Epley, Stephen Vogel,

7     Darrell Scott, David Parsons, Matthew Kramer, David Bernick,

8     Saul Bianca, Brenda Diluigi, Barbara Seniawski, Marti Murray,

9     Elizabeth DeCristofaro, Andrew Craig, Michael Davis, if I

10     didn't already call him, Michael Insalco, John Phillips, Sara

11     Gooch, Christina Kang, Sandy Esserman, March Colelman, and

12     Daniel Glosband.  Ms. Baer, good afternoon.

13          MS. BAER: Good afternoon, Your Honor.  Jane Baer on

14     behalf of the debtors.  Your Honor, we have only one

15     contested matter left on the agenda today.  What I'd like to

16     do for everybody's benefit is to run through everything else

17     routinely first and then that will bring us down to the one

18     contested matter, which is the matter involving the cross-

19     motions for summary judgment, Peter Pearson.  Your Honor,

20     item 1 on the agenda is the motion of BDM Construction

21     Company for an order granting a modification of the automatic

22     stay.  We have been in contact with BDM.  We believe we have

23     resolved this matter by agreeing to a lifting of the stay in

24     the event that there is insurance coverage, and the insurance

25     carrier will defend.  BDM is going to waive any rights they

1   may have to a deductible if there is one.  It's unclear right

2   now whether the insurance company will defend and whether or

3   not there is a deductible, and we are going to work through

4   that with the insurance carrier.  So, we're asking this be

5   put over to next month in the hopes that if we come to an

6   agreement, we'll just submit it on a certificate of counsel.

7            THE COURT: All right, that's fine.

8            MS. BAER: Your Honor, agenda item number 2 is the

9   debtors' fifth omnibus objections to claims. There are two

10   claims left other than the Peter Pearson claim.  One of them

11   involves Michelle and David Archer.  The other one involves

12   the Weatherford Company.  There are a number of claims all

13   with the same claimant.  We're continuing the Archer matter

14   to February 21st.  That will actually have to be dealt with

15   somewhat like the Peter Pearson matter with a motion for

16   summary judgment.  They are also pro se and so the

17   alternative dispute resolution procedures probably will not

18   apply.  With respect to the Weatherford matter, that's being

19   handled by Delaware counsel, and they are talking about

20   settlement of that claim, so, I'd like to submit an order

21   continuing those two matters to the next hearing.

22            THE COURT: Okay, the next hearing with respect to

23   Archer, you expect just to do a scheduling order?

24            MS. BAER: Yes, Your Honor.  And we are excepting

25   out the Peter Pearson matter.  That will be subject to a

1   separate order after we have the arguments and the Court

2   determines what to do there.

3         THE COURT: All right.  Okay, that's signed.

4         MS. BAER: We'll skip item number 3 right now.

5   That's the Peter Pearson matter as is item number 4.  That

6   takes us to item number 5, which is the pretrial on the

7   debtors' motion for an injunction, vis-a-vis, the State of

8   New Jersey, and also item number 6, which is the debtors'

9   related motion with respect to the adversary proceeding and

10  the automatic stay.  Your Honor, the State of New Jersey has

11  asked that we continue those matters to the February 21st

12  hearing.  The parties are discussing settlement, but because

13  of the change in administration in New Jersey, the New Jersey

14  government needs a little bit more time.  I have an order I'd

15  like to submit on continuing this matter to February 21 and,

16  most importantly, continuing the stay until the conclusion of

17  the February hearing.  New Jersey has seen this order and is

18  in agreement with its form.

19        THE COURT: All right.  Thank you.  Okay, that order

20  is entered.

21        MS. BAER: Thank you, Your Honor.  That takes care

22  of agenda items 5 and 6.  Agenda item number 7, the motion of

23  BNSF for clarification of the case management order, you

24  already signed an order on that one.

25        THE COURT: Just a second.  I'm sorry.  I'm sorry,

1   what item were you addressing next that you said I signed an

2   order on?

3           MS. BAER: Item number 7, the motion of BNSF.

4           THE COURT: All right, all right, thank you.

5           MS. BAER: That takes us to item number 8.  Item

6   number 8 is with respect to the Anderson Memorial class

7   action.  That was continued to February 21st.

8           THE COURT: Okay.

9           MS. BAER: Item number 9 is also related to Anderson

10  Memorial, also continued to February 21st.

11          THE COURT: All right.

12          MS. BAER: Item number 10 was the debtors' motion to

13  strike or compel full disclosure by the Property Damage

14  Committee related to Fact I witnesses.  The parties have

15  conferred on that matter.  We're asking that the motion be

16  continued to the February 21 hearing.  The Property Damage

17  Committee has indicated they're going to provide some

18  supplemental information and hopefully that will resolve the

19  matter, but for control purposes we'd like to continue it to

20  February 21.

21          THE COURT: Mr. Baena?

22          MR. BAENA: That is correct, Your Honor.

23          THE COURT: Okay, thank you.

24          MS. BAER: Your Honor, that concludes the items on

25  the agenda, but we have one cleanup matter, and that is as an

1    outcome of the hearings with Mr. Speights and his related

2    claims last week.  The parties entered into a stipulation

3    resolving certain claims and allowing a withdrawal.  I have

4    the signed stipulation signed by both parties and the order

5    disallowing those claims I'd like to present for entry.

6          THE COURT: All right.  Thank you.  Okay.

7          MS. BAER: Your Honor, that takes us back to items

8    number 3 and 4, and this relates to an unsecured claim.  I

9    believe that at this point the other parties in the

10   courtroom, especially the Property Damage Committee and the

11   Personal Injury Committee lawyers would like to be excused

12   from the rest of the hearing.

13         THE COURT: That's fine.  Have a safe trip back.

14         ALL: Thank you, Your Honor.

15         THE COURT: Go ahead.

16         MS. BAER: Your Honor, item number 3 and item number

17   4 relate to a claim filed by Peter Pearson, a pro se

18   claimant, Claimant No. 2281.  Your Honor, the debtors

19   objected to this claim in the fifth omnibus objection.  This

20   claim is a claim for $741,600.  It's a non-asbestos personal

21   injury claim.  In the proof of claim, Mr. Pearson alleges

22   that the debtor failed to provide certain safety equipment,

23   information, and training regarding Grace's roofing membrane

24   product or GRMs.  He attached to the proof of claim a

25   statement and an affidavit.  He indicates in the statement

1    that he worked as a supervisor for Grace out of its Arizona

2    office in the Warranty Division doing warranty work on the

3    Grace roofing membrane product.  Grace apparently provided a

4    ten-year warranty and had its own staff to do the warranty

5    work.  He alleges that while working for Grace he handled

6    toxic chemicals, and Grace did not provide him adequate

7    instruction or information.  He alleges damages and in his

8    claim and backup documentation suggests that he had severe

9    head pain and rashes while working for Grace.  He demands

10   $400 per day for each day he worked for Grace.  Your Honor,

11   there are a number of papers that were filed in the objection

12   process before the motions for summary judgment were filed,

13   and I apologize, I note on the agenda that they were not

14   listed, therefore, not attached, but I do have a copy of all

15   of those papers here in court and can submit them to you.

16   But I'll briefly summarize what all those papers did then

17   leading up to the motions for summary judgment.  Your Honor,

18   first Mr. Pearson responded to the debtors' objection to his

19   claim.  In there he provided a little bit more detail with

20   respect to his injury indicating that he had acute joint pain

21   in his hands, diminished vision, and had a couple of skin

22   lesions removed that he indicates were caused by him spilling

23   toxic chemicals while working for Grace.  He alleges that

24   Grace motivated solely by its quest for profits and malice

25   harmed him by exposing him to these chemicals.  He said that

1  he did not discover this until 2002 when doing his own

2  research to try to explain why he was having certain health

3  issues.  The only evidence Mr. Pearson attached to his proof

4  of claim-related documents was a letter from a Grace customer

5  dated in 1991 that was actually provided to Mr. Pearson in

6  1995 that indicates that the customer's complaining that some

7  chemicals that they believed were toxic were washed down the

8  sidewalk and into a drain.  He actually in the letter is

9  thanking Grace for doing the warranty work but asking them to

10  be a little more neat and clean in doing the work.  Later on,

11  Your Honor, Mr. Pearson supplemented his response and in the

12  supplement attached some material safety data sheets that he

13  obtained, again, from Grace.  The material safety data sheets

14  are not actually for the product that he was working on.

15  They're provided by Grace with a cover indicating that these

16  are similar to the materials he was working on, but the

17  materials he was working on were actually discontinued in

18  1986.  In the documentation Mr. Pearson supplies an affidavit

19  indicating he never saw this information prior to the time he

20  just got it from Grace, and he claims that the chemicals

21  involved that he was exposed to were very severe and toxic.

22  Grace replied to those objection papers and response to

23  objection papers indicating that Mr. Pearson had not provided

24  any evidence of an injury.  He had simply provided his own

25  affidavit saying he did in fact have injury.  Mr. Pearson

1   never filed a lawsuit against Grace.  Mr. Pearson never filed

2   a Workman's Compensation claim against Grace.  In Grace's

3   response, Grace also alleged that Mr. Pearson's claims were

4   barred by the Arizona Worker's Compensation Statute, that

5   that statute provides that when a worker has a claim against

6   his employer, his exclusive remedy is under the Worker's

7   Compensation Statute.  The only option would be if the worker

8   opted out.  Mr. Pearson did not opt out and did not make a

9   Worker's Comp. claim.  In addition to, Your Honor, Grace also

10  responded in those papers that in the event that the Worker's

11  Compensation Statute did not apply, there's a two-year

12  personal injury statute in Arizona, and there's a discovery

13  rule when the plaintiff knew or should have known in the

14  exercise of reasonable diligence of his cause of action.

15  Here, Your Honor, the claimant indicates he didn't know until

16  2002 of these injuries, but on the other hand, Your Honor, he

17  actually incurred injuries as he alleged in his other papers

18  more than ten years ago, alleges that certain doctors told

19  him in 1991 he had these issues, and then attaches a document

20  he received in 1995 related to these alleged toxic chemicals.

21  Mr. Pearson also makes a Fourteenth Amendment claim arguing

22  that Grace violated his due process by not giving him

23  adequate knowledge, instructions, and the like with respect

24  to handling the chemicals.  Your Honor, Grace responded by

25  indicating that he must demonstrate there's a state action

1   here, and that there is no state action.  Grace is a private

2   company, and the fact that Grace may have to comply with

3   certain rules and regulations does not make it a state

4   action, and therefore, a Fourteenth Amendment claim could not

5   be sustained.  Mr. Pearson in his reply on the objection

6   papers then alleged one new cause of action, and that is a

7   violation of EPCRKA, the Emergency Planning Community Right-

8   to-Know Act.  He alleged that Grace violated the statute

9   which was passed to protect the public from chemical

10   emergencies and chemical dangers.  That lead us up to the

11   point, Your Honor, where Mr. Pearson filed a motion for

12   summary judgment indicating that Grace should be liable for

13   his claim.  In his motion for summary judgment, he alleges as

14   uncontested facts that Grace has not established its

15   compliance with EPCRKA.  That he has suffered severe injury.

16   He acknowledges in his motion for summary judgment that there

17   may be an issue of fact on the statute of limitations, and he

18   then argues that Grace did in fact violate EPCRKA, that the

19   statute of limitation was tolled because of the theory of

20   adverse domination, and that the Worker's Compensation Act

21   was not applicable because Grace had engaged in wilful

22   misconduct.  Your Honor, in response to Mr. Pearson's motion

23   for summary judgment, we also filed a cross-motion for

24   summary judgment.  It's clear, Your Honor, from what has been

25   provided by Mr. Pearson that summary judgment cannot be

1    granted in his favor.  He has in fact raised several

2    questions of fact.  First of all, there's an issue as to

3    whether or not there was any hazard existing at the

4    workplace.  Second, there's an issue as to whether even if

5    there was a hazard, any harm was caused by this hazard to Mr.

6    Pearson.  Mr. Pearson has provided no medical evidence of any

7    injury or a causal connection.  As a result of discovery, he

8    did provide one medical report that he obtained after we made

9    a discovery request on him last year.  In that medical

10   report, a doctor outlined Mr. Pearson's complaints with

11   respect to his eyesight, with respect to joint pain,

12   indicated that they observed some red eyes, dry eye, and

13   joint pain and suggested to Mr. Pearson that he see a

14   specialist to see whether or not there is any causal

15   connection between the complaints he had in any of his

16   workplace situations.  There's nothing further with respect

17   to medical evidence.  In addition, Your Honor, Mr. Pearson

18   has clearly raised issues with respect to whether Grace

19   violated any of the EPCRKA rules or had any OSHA violations.

20   Your Honor, if need be, Grace can provide evidence that there

21   was regular training regarding use of these products, that

22   the materials provided employees - the materials were

23   provided to the employees along with information with respect

24   to what they were.  Grace can provide evidence that the

25   claimant did not make any complaints against the company, did

1   not file any reports, did not file any lawsuits, and did not

2   file a Worker's Compensation claim.  And in addition, Your

3   Honor, Grace can prove that there were no OSHA violations and

4   no EPCRKA violations.  Under those circumstances, Your Honor,

5   the motion for summary judgment filed by Mr. Pearson must be

6   denied.  There are substantial issues of material fact.  On

7   the other hand, Your Honor, you never need to get to them.

8   As Grace has outlined in its cross-motion for summary

9   judgment, Mr. Pearson cannot state a cause of action under

10  the many theories that he has come up with along the line

11  here as this claim has evolved.  First of all, Your Honor,

12  EPCRKA.  There is no standing by an individual to assert a

13  claim against EPCRKA, and no entitlement to private damages.

14  In order to bring an EPCRKA violation a citizen may in fact

15  bring it to the attention of a governmental entity.  He needs

16  to give 60 days' notice to the governmental entity, the EPA,

17  or the state environmental agency, and then they investigate.

18  There's no private right to damages.  To the extent that a

19  violation would be found, the penalties would be paid to the

20  United States or the state.  Mr. Pearson did not provide the

21  appropriate 60-day notice.  No investigation was done, and

22  again, even if there was one or even if there was a

23  violation, it would not provide Mr. Pearson any personal

24  rights nor would it provide him any individual damages.

25  Second, Your Honor, Mr. Pearson has no independent cause of

1    action under OSHA.  Although OSHA is a statute that protects

2    workers in the workplace, there is no individual right of a

3    worker to bring a suit for violations of OSHA.  It is not a

4    private cause of action.  That again is something that only a

5    governmental entity can investigate, and ultimately if

6    violations are found, they must be corrected and penalties

7    paid to the government, not to individuals.  Thirdly, Your

8    Honor, with respect to Worker's Compensation.  Arizona law

9    governs here, Your Honor.  Mr. Pearson was employed by the

10   company in Arizona.  Under Arizona law, the suit is barred by

11   the exclusive remedy provision which indicates that a worker,

12   if he wants to bring a claim against an employer, must bring

13   it in the Worker's Compensation system unless he opts out.

14   Mr. Pearson here did not opt out.  He also did not file a

15   Worker's Compensation claim.  Mr. Pearson alleges that there

16   is an exception to this exclusive remedy for wilful

17   misconduct.  However, Mr. Pearson will not be able to

18   establish anything that would get him to wilful misconduct.

19   It is a very restrictive provision under the law.  A claimant

20   must establish a deliberate intention to harm an individual,

21   not just gross negligence.  No evidence could be shown here,

22   Your Honor, of Grace knowing and purposely acting to cause

23   the injury involved, and that is what would have to be

24   established in order to get around the Worker's Compensation

25   exclusive remedy provision.  But, Your Honor, even if

1  Worker's Compensation's exclusive remedy provision did not

2  apply, we still have the statute of limitations.  The statute

3  of limitations for personal injury claims in Arizona is two

4  years.  There is a discovery rule, when he knew or should

5  have known of the injury.  Here, Your Honor, Mr. Pearson

6  worked for Grace from mid-1986 to early 1992.  The injuries

7  he complained of, the headaches, the rashes took place while

8  he was working for Grace.  He indicates that while he was

9  working for Grace, he did question the materials he was using

10  and how to handle them.  He also said that he saw a doctor in

11  1991 about his complaints.  He also got a letter in 1995

12  which indicates in there that some of these materials may

13  have been toxic.  All of the evidence that he has provided,

14  Your Honor, suggests that he knew of these injuries many,

15  many years ago and did not bring a cause of action within the

16  applicable statute of limitations.  Now, Mr. Pearson also

17  alleges that there's a way to get around the statute of

18  limitations, and that is the doctrine of adverse domination.

19  However, Your Honor, that too is inapplicable in this

20  situation.  The doctrine of adverse domination is there for a

21  corporation to bring a cause of action against its officers

22  and employees who were in positions of control, where the

23  statute is tolled because they did not know of the wrongful

24  acts until these officers and employees were either left the

25  job or the corporation got information another way.  Last but

1   not least, Your Honor, Mr. Pearson alleges the Fourteenth

2   Amendment violations by Grace's behavior, and once again,

3   that cannot be sustained.  He cannot bring a cause of action

4   under the Fourteenth Amendment.  That is a state action.  If

5   the state has violated his due process rights, purely private

6   conduct does not apply, and even if Grace had to comply with

7   federal and state rules and regulations, that does not

8   establish under the law a close enough nexus in order to

9   bring a Fourteen Amendment violation.  Your Honor, finally,

10  Mr. Pearson argues that the bar date notice established in

11  this bankruptcy case somehow revives his right to bring this

12  cause of action.  Once again, Your Honor, this is incorrect,

13  and the cause of action cannot be sustained.  It's very clear

14  under the law that in order for a claim to be enforceable in

15  the first place, it has to be applicable in the first place

16  under state law.  The statute of limitations has already run.

17  The bar date does not revive it.  Under these circumstances,

18  Your Honor, Grace requests that Mr. Pearson's motion for

19  summary judgment be denied, as he has stated numerous issues

20  of contested fact, and then in addition, Your Honor, Grace's

21  motion for summary judgment be granted as Mr. Pearson has not

22  established an appropriate cause of action under the law.

23  Thank you.

24          THE COURT: Is somebody representing Mr. Pearson?

25          MR. PEARSON (TELEPHONIC): Hello, Your Honor.

1                   THE COURT: Hello.

2                   MR. PEARSON (TELEPHONIC): Can you hear me okay?

3                   THE COURT: Yes, I can.  Will you state your name,

4       please.

5                   MR. PEARSON (TELEPHONIC): My name is Peter P.

6       Pearson.

7                   THE COURT: Go ahead, sir.

8                   MR. PEARSON (TELEPHONIC): Well, credit to the

9       attorney for doing quite a bit of homework.  It's unfortunate

10      though that it's not exactly - it's poignantly detailed as I

11      would like to have seen.  I'd like to start off with one of

12      the exhibits that she does move on, and that's the letter

13      from Thompson Max Center or to the W.R. Grace corporation, my

14      supervisor, Ken Porter.  And in this, they point out that had

15      the University of Las Vegas Hazardous Material Department

16      been aware of the hazardous material, they would have shut

17      down the jobs.  And the problem that I'm faced with, Your

18      Honor, is that I was exposed to these toxic materials at a

19      time that it takes - it's almost like a gestation period for

20      these injuries to manifest.  In fact they can take a day or

21      two to manifest.  One thing that counsel pointed out or

22      actually left out was the fact that I did give in answering

23      to their interrogatory medical reference to a Dr. Mike

24      Johannes (phonetical) that I seen, and he stated that, you

25      know, the problems that I was experiencing at the time in '89

1   was because of the chemicals that I was exposed to, but I had

2   at the time no knowledge that there was any possibility of

3   getting any kind of a recourse against the company because I

4   didn't know the seriousness of it.  And this is where the

5   negligence comes in and this is where the deliberate intent

6   of W.R. Grace.  She points out one affidavit from a Tim Berry

7   and paragraph (6) is the only supporting affidavit that Grace

8   has been able to put forth.  In paragraph (6) - mind you,

9   Tim Berry was an employee that worked for me and then he also

10  was a crew member or crew chief at the same time.  The

11  affidavit is accurate but it withholds some serious

12  information.  In the one paragraph with the one sentence it

13  points out, Employees were provided with MSDS for all Grace

14  products and other products, and, in the sentence above it,

15  Products including instructions on the safe use and

16  application of Grace products.  That's true.  We were

17  provided with information on how to properly apply the GRM

18  product materials.  We were not provided safety equipment,

19  and that's clearly . . . (microphone not recording) in Tim

20  Berry's affidavit.  We were not given respirators.   We were

21  not given rubber gloves.  We were not given the information

22  that caused my skin cancer, that caused me to have

23  debilitative eye injuries.  The joints in my hands are

24  enlarged greatly because of the xylene and the . . . that I

25  was exposed to.  Now, the counsel would have you think that

1   somehow they are relieved from any liability on this, but

2   this happened in multi-state jurisdictions, not just Arizona.

3   I worked in California.  I worked in Nevada.  I worked in New

4   Mexico and Texas, and so, we haven't even touched on the laws

5   if we want to apply those to those different states.  But she

6   argues also that there's no Fourteenth Amendment cause of

7   action here.  Well, yet at the same time, she wants to put

8   everything under the Arizona law or Workman's Compensation.

9   I worked for an international corporation.  W.R. Grace is an

10  international corporation, and I was working out of the

11  Arizona office, and so, the deliberate attempt of W.R. Grace

12  comes in the fact that they not only knew the law, they knew

13  the rights and those standards from the congressional act.

14  They chose not to do it for the intent of keeping the

15  financial profits under the umbrella of the GRM area.  The

16  Grace roofing membrane in the Arizona area was a failed

17  product, and they continued to try to fix the product by

18  having new updates with it.  They would come out with a new

19  cleaner.  They would come out with a new something for the

20  laps, you know, using some of the roofing terminology.  But

21  it continued to fail because of the Arizona sun.  Well, in

22  order to keep it - the money within - in order to avert the

23  expenditures, they tried to keep it in-house.  They put a

24  ten-year warranty on these products but the product was

25  failing.  Well, when they tried to downsize the company and

1   keep it in-house, the safety protections that a large company

2   would have, let's say a private roofing company, was gone.

3   Those safety protections were not there.  So, even if they

4   did give out, and I say, if they gave out MSDS forms, they

5   were just a piece of paper that they would give out.  There

6   was no training.  There was no safety equipment.   There was

7   no rubber - There was nothing to protect us from these

8   hazards, and the fact that they take a gestation period to

9   manifest, illustrates the fact that there is some time that

10  has to go by before quite often these things come up in a

11  permanent state, as in my case.  And so, wilful misconduct,

12  under the exclusive remedy provision in Arizona law is

13  applicable, and I do meet the standard on that because W.R.

14  Grace had the obligation to tell me under the right to know,

15  at the time that I was using some of the most hazardous

16  materials in the industry.  I was a roofer, but I was a

17  laborer working with let's say tar and stuff like this.  I

18  wasn't familiar with what xylene is.  I wasn't familiar with

19  cerulean (phonetical), and I'm looking right now at the MSDS

20  form that I downloaded for this case, and it's MSDS No.

21  —85707, Emergency Overview:  May be harmful if absorbed

22  through the skin.  Causes parachugenic effect.  Causes local

23  skin tumors.  That information was never told to me or Tim

24  Berry at the time, and we were not given the safety equipment

25  to protect ourselves.  And these chemicals have different

1   effects on different people.  They may effect you differently

2   than they would effect me because this is not just pure

3   xylene.  We're talking a chemical soup, if you will, of

4   paints and paint thinners and different chemicals in order to

5   try to achieve what W.R. Grace was trying to achieve, and

6   that was a cheap roofing product for commercial buildings in

7   a single-ply manner.  It failed.  And so they were doing

8   everything they could in order to (a) save money, which was

9   the primary objective and the second objective was to get it

10  done as quick as possible, keeping it in-house.  So, I've

11  given the Court and I've given counsel the adequate

12  information.  Yet, what she has done is she's painted a

13  picture that's not exactly accurate because even in the

14  affidavit that Tim Berry provided, it's accurate but it's

15  also very empty in the fact that it does not - it only

16  supports what I'm trying to say, there was no safety

17  equipment provided.  And had we gone further, we had a

18  gentleman that - his name was Randy - We had to take him to

19  the Emergency Room for intoxication of irine fumes, at the

20  Thompson Max Center.  And these were just accidents, these

21  were events that were happening that affected us all and

22  whether they affected us within that time frame of a two-year

23  period, it is questionable because these things take time.

24  These things take time to gestate and to manifest.  But, I

25  leave it in the Court's hands that, you know, I've given the

1   Court the information needed, and if there's anything more

2   the Court needs, I'd be more than willing to provide it.

3        THE COURT: Well, I don't see a basis at this point

4   for a claim.  You have to - Number one, in most of the states

5   that you've discussed, there is exclusive Worker's

6   Compensation remedies to start with, but you would

7   undoubtedly be bound by Arizona's in any event, since you're

8   employed out of the Arizona office.  So, your remedy against

9   - for this kind of violation, to the extent that you were

10  working was a Worker's Compensation suit to start with.  To

11  the extent that you can get beyond the Worker's Compensation

12  claim for some form of wilful misconduct and you had

13  headaches and manifested skin injuries and so forth prior to

14  the time that you left Grace's employ, then you're on an

15  inquiry notice to - obligation that is, to look into what the

16  cause may be.  You say you have a doctor's report now that's

17  a recent report that says what the cause of your injuries may

18  have been back in 1989.  I don't know how a doctor could give

19  you something that says what your injuries were in 1989 if

20  it's not a treating doctor and you don't have those injuries

21  now.

22       MR. PEARSON (TELEPHONIC): Well, in answering

23  interrogatory number 19, it was in 1989 that I seen Johannes

24  and came to Arizona.  And then in - let me see what - what I

25  over here at the University of Arizona, I went and seen

1   another doctor there to look basically as a followup because

2   although I don't have the ability to - How do I put this?  In

3   1989 when I was exposed to this, I was under the impression

4   at the time that there was nothing wrong.  I was told by my

5   supervisors that the chemicals that I was using were safe.

6   There's nothing wrong with them.  Your hands will get red.

7   Your hands are blistered, but that's okay.  It's just part of

8   the working condition.  And that's when I seen Johannes on

9   that.  And, but what was not told to me was the long-term

10  effect.  Workman's Compensation would have been good, had I

11  broke my arm, had I fallen off a ladder at that time, or

12  something within that two-year time frame, but we're talking

13  about something that manifests over a long period of time,

14  outside of the work standard, outside of the window of

15  employment shall we say.  We're talking about something that

16  when this alters and the one thing that I look at on here is

17  the para-genetic term, term genetic effect, that means it

18  alters to some degree my makeup on a genetic level.

19          THE COURT: Well, you have to prove that.  You have

20  to have a doctor's test that shows that in fact that's the

21  case.  You can't just allege it, you know, a lot of things

22  may have an effect but they may not have an effect as well.

23  Those warnings are posted to alert people to the fact that

24  there can be some danger, but you yourself have to have an

25  injury and you have to prove what that injury is worth, is

1    valued at.  To the extent that there is a Worker's

2    Compensation claim, Worker's Compensation isn't limited to

3    the fact that you fall off a ladder or break your arm, it's

4    for all Worker's Compensation claims and to the extent that

5    it's a permanent injury then there's a different remedy that

6    applies at a certain point in time through Social Security

7    Disability or whatever, other mechanisms arise.  So, I don't

8    see at this point how you have a viable claim, Mr. Pearson.

9         MR. PEARSON (TELEPHONIC): The viable nature of the

10   claim comes from the fact that - and W.R. Grace is in support

11   of this in their affidavits that they provided.  They did not

12   provide the safety equipment that was needed at the time.

13        THE COURT: But whether they did or not, that you

14   surely would have known about back at the time that you were

15   working for Grace, if you had no safety equipment.  So,

16   definitely on that score, if you have some private right of

17   action, which you don't under these circumstances under the

18   Fourteenth Amendment or under the other two statues, OSHA or

19   the rest that were cited, if you had a private cause of

20   action it would have arisen at the time that there was no

21   safety equipment, not twenty years later.

22        MR. PEARSON (TELEPHONIC): Oh, the idea - and to

23   some degree, Your Honor, that's accurate but with the

24   exception though that I was told, Tim was told, the other

25   employees were told that these chemicals were safe, and

1    that's where the wilful misconduct comes from, because not

2    only did Ken Porter, which was my supervisor, and Dan Cubalt,

3    they both went forth and said, Don't worry about it.  These

4    things are okay.  These chemicals are safe.  And we began to

5    suspect - I mean, I suspected at the time when I had to take

6    a guy to the hospital, but we were rushed, we were pushed.  I

7    was threatened on my job that if I continued to ask questions

8    at the time, and I asked questions at the time, Is this stuff

9    safe?  Yes, I was told, repeatedly.  Don't worry about it.

10   Well, it wasn't until I got the letter from the Thompson Max

11   Center that this stuff was not safe.

12         THE COURT: But that was in 1995; correct?

13         MR. PEARSON (TELEPHONIC): That's when the letter

14   was - actually I had to write the Thompson Max Center on

15   that, and they gave me that letter.  I did not know about

16   that letter until the outset of this case, which I think was

17   '99 when I filed the initial claim.  I didn't know about

18   that.  That was sent to Ken Porter.  And so, that means, not

19   only Ken knew that, you know, these were hazardous, had the

20   HAZMAT in Nevada been aware, they would have shut down the

21   job, but the people that needed to know the most were the

22   employees.  The employees were not told that this was

23   hazardous stuff.

24         THE COURT: Well -

25         MR. PEARSON (TELEPHONIC): And this is the only

1  element that I can bring a cause of action is in the

2  bankruptcy setting.

3       THE COURT: Well, I think it's too late for you to

4  bring that cause of action in the bankruptcy setting.  I

5  think the issue was a Worker's Compensation claim because you

6  were injured on the job and you were alleging long-term

7  effects of that injury on the job.  I don't see at this point

8  that there is a viable cause of action based on information

9  that's dated back to 1995.

10       MR. PEARSON (TELEPHONIC): Okay. I guess that's it;

11  huh?

12       THE COURT: I'm afraid that is.  I just don't see

13  that you have a compensable injury against this estate at

14  this time.

15       MR. PEARSON (TELEPHONIC): Okay.

16       THE COURT: All right.  I will enter an order that

17  strikes the claim or sustains the objection and grants the

18  motion - the debtor's motion for summary judgment and denies

19  Mr. Pearson's motion.  To the extent that Mr. Pearson is

20  alleging facts that are not of evidence and there were a

21  number of them in this recitation and in the pleadings,

22  obviously those were material facts that the debtor disputes,

23  and it would not be ripe for summary judgment but the

24  debtor's motion is ripe for summary judgment, and as a matter

25  of law, I find that Mr. Pearson cannot state a claim for

1  relief, so I will grant the debtor's motion for summary

2  judgment.

3          MS. BAER: Thank you, Your Honor.  I'll prepare an

4  order reciting it.

5          THE COURT: All right.

6          MR. PEARSON (TELEPHONIC): Thanks, Your Honor.

7          THE COURT: Thank you.

8          MS. BAER: That concludes the agenda for today, Your

9  Honor.

10          THE COURT: Okay.  Any housekeeping matters?

11          MS. BAER: No.

12          THE COURT: Okay.  We're adjourned, thank you.

13          MS. BAER: Thank you.

14          (Whereupon at 2:44 p.m. the hearing in this matter

15  was concluded for this date.)

16

17

18

19          I, Elaine M. Ryan, approved transcriber for the

20  United States Courts, certify that the foregoing is a correct

21  transcript from the electronic sound recording of the

22  proceedings in the above-entitled matter.

23

24  /s/ Elaine M. Ryan                    February 6, 2006
    Elaine M. Ryan
    2801 Faulkland Road
    Wilmington, DE 19808
    (302) 683-0221