UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                        . Case No. 01-1139(JKF)
                              .
                              .
W.R. GRACE & CO.,             . 5414 USX Tower Building
                              . Pittsburgh, PA  15222
                              .
           Debtor.   .
                              . January 25, 2006
. . . . . . . . . . . . . . . . 2:12 p.m.



TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE



APPEARANCES:

For the Property Damage        Bilzin Sumberg Baena Price
Committee:                      & Axelrod LLP
                               By:  SCOTT L. BAENA, ESQ.
                                    MATTHEW KRAMER, ESQ.
                               Wachovia Financial Center
                               200 South Biscayne Boulevard
                               Suite 2500
                               Miami, FL  33131


Audio Operator:                Janet Heller




Proceedings recorded by electronic sound recording, transcript
               produced by transcription service.
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

APPEARANCES (Cont'd.):


For the SNR Claimants:          Speights & Runyon
                                By:  DAN SPEIGHTS, ESQ.
                                200 Jackson Avenue, East
                                P.O. Box 685
                                Hampton, South Carolina  29924


For the Debtor:                 Kirkland & Ellis, LLP
                                By:  MICHELLE BROWDY, ESQ.
                                     SALVATORE BIANCA, ESQ.
                                     MICHAEL DIERKES, ESQ.
                                     JANET S. BAER, ESQ.
                                       (telephonically)
                                Aon Center
                                200 East Randolph Drive
                                Chicago, IL  60601


For the Official Committee      Stroock & Stroock & Lavan, LLP
of Unsecured Creditors:         By:  RYAN PAPIR, ESQ.
                                       (telephonically)
                                180 Maiden Lane
                                New York, NY  10038

                                Duane Morris LLP
                                By:  MICHAEL R. LASTOWSKI, ESQ.
                                       (telephonically)
                                1100 North Market Street
                                Suite 1200
                                Wilmington, DE 19801

For David T. Austern,           Phillips, Goldman & Spence, P.A.
Future Claimants Rep:           By:  JOHN C. PHILLIPS, JR., ESQ.
                                       (telephonically)
                                1200 North Broom Street
                                Wilmington, DE  19806


For Property Damage             Richardson, Patrick, Westbrook &
Claimants:                       Brickman, LLC
                                By:  EDWARD J. WESTBROOK, ESQ.
                                       (telephonically)
                                174 East Bay Street
                                P.O. Box 879
                                Charleston, South Carolina 29401

APPEARANCES (Cont'd.):

For Ace USA & Fireman Funds:    White and Williams LLP
                                By: MARC CASARINO, ESQ.
                                     (telephonically)
                                824 North Market Street
                                Suite 902
                                Wilmington, DE  19801

For Allstate Insurance Co.:     Cuyler Burk, LLP
                                By:  ANDREW K. CRAIG, ESQ.
                                     (telephonically)
                                Parsippany Corporate Center
                                Four Century Drive
                                Parsippany, New Jersey 07054-4663

For Official Committee of       Bilzin Sumberg Baena Price
Property Damage Claimants:       & Axelrod LLP
                                By:  JAY M. SAKALO, ESQ.
                                     (telephonically)
                                Wachovia Financial Center
                                200 South Biscayne Boulevard
                                Suite 2500
                                Miami, FL  33131

For Official Committee of       Ferry, Joseph & Pearce, P.A.
Asbestos Property Damage         By:  Theodore J. TACCONELLI, ESQ.
Claimants:                            (telephonically)
                                824 Market Street
                                Suite 904
                                P.O. Box 1351
                                Wilmington, DE  19899

For Financial Advisor, The      The Blackstone Group
Blackstone Group:               By:  JOHN O'CONNELL
                                     (telephonically)

For USG Corporation:            USG Corporation
                                By:  MARY MARTIN, ESQ.
                                     (telephonically)

For DK Acquisition              Willkie Farr & Gallagher
Partners:                       By:  STEPHEN VOGEL, ESQ.
                                     (telephonically)
                                787 Seventh Avenue
                                New York, NY  10019

APPEARANCES (Cont'd.):

For Continental Casualty Co.:   Ford Marrin
                                By:   LYNNE S. NISSEN, ESQ.
                                      (telephonically)
                                Wall Street Plaza
                                New York, NY  10005

For Unofficial Committee of     Montgomery, McCracken, Walker
Select Asbestos Claimants:       & Rhoads, LLP
                                By:  NATALIE D. RAMSEY, ESQ.
                                      (telephonically)
                                123 South Broad Street
                                Philadelphia, PA  19109

For Everest Reinsurance         Marks, O'Neill, O'Brien &
Co. & McKinley Ins. Co.:          Courtney, P.C.
                                By:  BRIAN KASPRZAK, ESQ.
                                      (telephonically)
                                913 North Market St., Suite 800
                                Wilmington, DE  19801

                                Crowell & Moring, LLP
                                By:  LESLIE EPLEY, ESQ.
                                      (telephonically)
                                1001 Pennsylvania Avenue NW
                                Washington, DC  20004

For Pacific Freeholds           The Brandi Law Firm
Partnership:                    By:  TERENCE EDWARDS, ESQ.
                                      (telephonically)
                                44 Montgomery Street, Suite 1050
                                San Francisco, CA  94104

For Roman Catholic Church       Dies, Henderson & Carona
Archdiocese of New Orleans:     By:  MARTIN DIES, ESQ.
                                      (telephonically)
                                1009 Green Avenue
                                Orange, TX  77630

For Fireman's Fund              Stevens & Lee, P.C.
Insurance Company:              By:  THOMAS WHALEN, ESQ.
                                      (telephonically)
                                1107 North Market St., 7th Floor
                                Wilmington, DE  19801

APPEARANCES (Cont'd.):

For State of California          Hahn & Hessen LLP
Department of General            By:  CHRISTINA J. KANG, ESQ.
Service:                               (telephonically)
                                 488 Madison Avenue
                                 14th and 15th Floor
                                 New York, NY  10022

For Federal-Mogul:               Sidley Austin Brown & Wood, LLP
                                 By:  RICHARD M. PARK, ESQ.
                                       (telephonically)
                                 555 West Fifth Street
                                 Los Angeles, CA  90013

1            THE CLERK:  The court come to order.

2            THE COURT:  Good afternoon.  Please be seated.  This

3  is the matter of W.R. Grace, bankruptcy number 01-1139.  This

4  is the continued hearing on the debtor's 15th omnibus

5  objections to asbestos property damage claims.  The

6  participants by phone are Mr. Richard Park, Marc Casarino, Ryan

7  Papir, Andrew Craig, Jay Sakalo, Theodore Tacconelli, Edward

8  Westbrook, John O'Connell, John Phillips, Mary Martin, Steven

9  Vogel, Janet Baer, Michael Lastowski, Lynne Nissan, Natalie

10 Ramsey, Brian Kasprzak, Leslie Epley, Terrence Edwards, Martin

11 Dies, Christina King, and Thomas Whalen.  I'll take entries of

12 those of you in court, please.

13           MS. BROWDY:  Your Honor, Michele Browdy for the

14 debtors.

15           MR. BIANCA:  Salvatore Bianca for the debtors.

16           MR. DIERKES:  Michael Dierkes for the debtors.

17           MR. SPEIGHTS:  Dan Speights for the SNR claimants,

18 Your Honor.

19           MR. BAENA:  Good afternoon, Your Honor.  Scott Baena

20 and Matt Kramer for the PD Committee.

21           THE COURT:  Okay.  Ms. Browdy.

22           MS. BROWDY:  Thank you, Your Honor.  Your Honor,

23 Michele Browdy on behalf of the debtors.  Today is the second

24 of our three-day property damage festival here this week in

25 Pittsburgh.  Focus this afternoon will be on the claimant -- on

1  the debtor's objections to individual claims filed by the

2  Speights and Runyon firm, and our hope, Your Honor, is to get

3  through as many of these objections as possible today.  Maybe

4  we can get through everything this afternoon.  If not, we would

5  ask to stop in the morning, lead off with the class

6  certification motion, and then take on whatever additional

7  objections we haven't managed to get through today in terms of

8  the order.

9        THE COURT:  Mr. Speights, you're going to be here all

10  day tomorrow anyway?

11        MR. SPEIGHTS:  Yes, Your Honor.

12        THE COURT:  Okay.  All right, then I take it it won't

13  make much difference then if we do it --

14        MR. SPEIGHTS:  It probably won't.  At the end of the

15  day we might revisit that, but that might well suit me to do it

16  that way.

17        THE COURT:  All right.

18        MS. BROWDY:  And then just to put a little bit of

19  perspective on what we're covering today, I have two little

20  slides I'd like to hand up.

21        THE COURT:  All right.  Thank you.

22              (Pause)

23        MS. BROWDY:  Okay.  Your Honor, the first slide is

24  just to give the Court a flavor for how we're doing on the

25  claims objection process.  As the Court knows, we started at

**J&J COURT TRANSCRIBERS, INC.**

1  about 4,000 property damage claims.  By the time of the omnibus

2  hearing last month we were at about 11 hundred and 37.  We

3  believe as of today we're at approximately 949 remaining

4  claims.  That's a little bit of a soft number.  For example,

5  we're working on a stipulation with G-1 Holdings to get rid of

6  51 of their claims, but that hasn't formally been entered yet

7  and the like.  But again we think we're at about 949 active

8  claims still remaining as of today.

9           In terms of the claims set for hearing this week,

10  yesterday, today, and tomorrow, approximately 583 of the claims

11  were to issue.  As the Court knew from yesterday, there's only

12  a handful of other claimants involved, and the gross majority

13  of the claims to which these initial objections have been

14  lodged are the Speights claims.  And in part, Your Honor, the

15  reason I wanted to use this slide is, because it helps frame an

16  issue that Mr. Speights has raised in his response paper, which

17  is we're now at a point that more than half of the remaining

18  Speights claims are Canadian claims, 292 of his 500 plus

19  claims, and, in fact, the Canadian claims now account for

20  roughly a third of the remaining active property damage claims

21  in this court.

22           Now, we're not concerned about the Canadian claims

23  from the standpoint of estimation for the reasons stated in our

24  15th omnibus objection.  We're pretty confident that those

25  Canadian claims have no merit.  And while I don't have my

**J&J COURT TRANSCRIBERS, INC.**

1 expert reports yet for phase two of estimation, I'm pretty

2 confident that those Canadian claims are going to be estimated

3 at zero.  But the question remains what to do about objections

4 along the way.

5       Now, according to the plan, and as we've set out in

6 our 15th omnibus objection, it is our expectation that the

7 merits of Canadian claims will be adjudicated in Canada, so

8 we're never going to come to this court and say help us

9 interpret the statute of limitations in Manitoba, or whether

10 the Yukon territory, you know, recognizes a particular cause of

11 action.  But we did think -- and to the extent that we have

12 merits objections to the Canadian claims, those are in our 15th

13 omnibus objection as objection F-5.  On the F-5 objections,

14 again, we have not teed for hearings this week, and we don't

15 expect to tee up those objections for hearing again before this

16 Court in the United States.

17       That said -- and I'll turn now the second slide -- is

18 that of the actual objections that we are raising, what we

19 think of as kind of the threshold objections that are teed up

20 for argument this week, there are some Canadian claims that

21 fall into these different buckets, and as I said, the way that

22 we've conceptualized this is that the merits -- again, the

23 issues that would involve Canadian law would go up and be

24 decided up there, but this Court we would think has the

25 authority to decide, for example, on an authority objection if

**J&J COURT TRANSCRIBERS, INC.**

1   we're saying there was no authority, there was no signature,

2   there's no proof that Mr. Speights represents this claimant,

3   this kind of gatekeeper function issue would be addressed by

4   this Court.  So I think as a threshold matter before we dive

5   into each individualized argument, we need to figure out to the

6   extent that these procedural objections have been raised to

7   Canadian claims, can we go ahead and have them argued and

8   decided as part of this process, or do the Canadian claims need

9   to be carved out from the hearing process?

10          THE COURT:  The only place that I see a Canadian

11  claim listed on your exhibit two is under letter G, no product

12  I.D.

13          MS. BROWDY:  Your Honor, I flagged that, because so

14  many of the product I.D. claims were Canadian.  I believe

15  though if we looked at -- and we can chase this down, but I

16  believe that there are examples of Canadian claims under A, the

17  unauthorized claims.  The previously settled claims include

18  Canadian claims.  Missing basic property addresses a U.S.

19  claim, so it's not implicated there.  Most of the no signature

20  claims are Canadian.  Missing basic property information is a

21  U.S. claim, so there's no Canadian there.  No product I.D., the

22  majority are Canadian.  Obviously, Georgia and Tennessee

23  statutes don't apply to the Canadian claims.  And the false

24  state of knowledge is both U.S. and Canadian.  So again they're

25  sprinkled throughout.  As I said, they're not, in our view,

**J&J COURT TRANSCRIBERS, INC.**

1  merits-based objections, you know, under Canadian law.  They're

2  more of the procedural -- they would fall within the procedural

3  authority of this Court, but again I thought before we started

4  to dive into the individual objections, we had to address it.

5          THE COURT:  Mr. Speights.

6          MR. SPEIGHTS:  Your Honor, I have a lot of things to

7  say when I address the merits, but -- I won't read my entire

8  introduction, but I do want to thank you for pushing the start

9  of the hearing back to today.  I assure you I was in no

10 condition to travel the day before yesterday and --

11         THE COURT:  Well, I'm glad you're here today.

12         MR. SPEIGHTS:  Thank you, Your Honor.  Just on the

13 question that was raised -- and I'm happy to address it,

14 because I think it should be addressed up front.  Maybe that

15 would simplify matters, and I'm glad I pulled this letter this

16 morning, because this is -- I'm not sure I -- is there anything

17 else I need to do to blow that up, Your Honor?

18         THE COURT:  I don't know.

19         MR. SPEIGHTS:  Well, let me -- this is a --

20         THE COURT:  You can try putting the mike --

21 microphone, yea -- the lens down further.

22         MR. SPEIGHTS:  This is the high way -- the zoom.

23         THE COURT:  The zoom.  Oh, maybe it's on the front.

24 There you go.

25         MR. SPEIGHTS:  This is a letter from Kirkland Ellis

**J&J COURT TRANSCRIBERS, INC.**

1 back on October 19 when we're first starting this ordeal and

2 dealing with the objections, and --

3          THE CLERK:  You'll have to use a microphone.

4          MR. SPEIGHTS:  I'm sorry.  And it says in response to

5 my colleague's question to try and respond to the objections,

6 "Finally, to answer your question regarding the Canadian

7 claims, Grace expects the Canadian claimants to respond to

8 objections even though the merits of their claims ultimately

9 will be adjudicated in Canada.  The Court will need to address

10 the Canadian claims as part of the estimation process."

11          Well, we have known that now certainly since October

12 that there's some process going on in Canada, and Grace intends

13 to take care of the Canadian claims up there on the merits.

14 Two things about that.  Number one, I don't understand what's

15 going on in Canada.  I really don't.  I can't advise my clients

16 what the process is that they can expect if they go to Canada

17 to litigate their claims.  And Grace -- and I'm not being

18 critical when I say this.  Grace has said that they are not at

19 liberty to fully discuss what's going on in Canada or fully

20 don't understand it themselves, and, apparently, the records in

21 Canada are not available to folks just to go through like our

22 court records and examine what's going on.  If they are, I have

23 not been able to get to them, nor have other people I've asked

24 been able to get to them.  So I'm a little bit here arguing

25 about something I know nothing about.

1    Having said that, the second point is our position is

2  all claims should be litigated here.  This is where the

3  bankruptcy is.  This is where the bar date is.  This is where

4  we file our claims, and we should be a part of this bankruptcy

5  and not sent off to Canada.

6    Having said all that, we'll get right down to the

7  heart of the matter that Ms. Browdy presents.  If, in fact, we

8  have to go to Canada, then the worst case of all is not going

9  to Canada but having to go through two different proceedings

10 with our Canadian claims.  I agree with Ms. Browdy that there's

11 certain things this Court should resolve, or at least I'm happy

12 for this Court to resolve this sort of a threshold matter

13 before the claims go to Canada, if that ever happens over our

14 opposition.

15   For example, I stood before you on August 30 or 31

16 and said we're happy to have the authority issues resolved.  I

17 have no problem with going forward on any authority issues

18 dealing with Canada.  I have no authority -- I have no problem

19 with dealing with the signatures of the claims, and I think

20 we've already dealt with all of those and worked that out.  But

21 as far as that's concerned, I have no problem with that.

22   I have no problem -- I probably should have a

23 problem, but I don't have a problem with dealing with these

24 claims as they've been previously settled.  That seems to be

25 something I'd like to know now rather than three years from now

**J&J COURT TRANSCRIBERS, INC.**

1   and some province in Canada where they have been previously

2   settled.  But everything else, Your Honor, it seems to me, is

3   we've got plenty to do, an enormous number of claims to deal

4   with, and I don't believe that we should be dealing with what I

5   call substantive issues down here in this proceeding, so long

6   as the debtor says we're going to have to do all that in

7   Canada.  Certainly, they shouldn't have two bites out of the

8   apple, but I'm not sure why we are doing it and why we should

9   spend all this time arguing about Canadian statute of

10  limitations of all the product I.D.s required in Canada, and if

11  so, what is the quality of the product I.D., etcetera,

12  etcetera, etcetera.

13          So, Your Honor, the bottom line is I'm happy to deal

14  with these authority issues, signature issues, and previously

15  settled issues, but on the other issues, unless and until they

16  agree with me or Your Honor agrees with me that we ought to

17  determine the claims in the United States, then I would oppose

18  going into the merits of the claims, because since October

19  they've said the merits of the claims would be decided in

20  Canada.

21          THE COURT:  Right.  Well, it seems to me that whether

22  or not there was authority to file the claim, whether there was

23  a previously settled claim, whether the claim form contains a

24  proper signature, and I think based on the order that was sent

25  out that set the bar date, whether or not there is appropriate

**J&J COURT TRANSCRIBERS, INC.**

1 I.D. to show that there is a claim against this estate are

2 issues that this Court ought to be addressing as threshold

3 questions.

4          With respect to whether there's a false assertion of

5 2003 as the date of knowledge, frankly, I don't know whether we

6 can do that on these kinds of proceedings anyway, Mr. Speights,

7 so I think I need to reserve not just as to the Canadian but

8 probably as to the American assertions there, because it seems

9 to me that that undoubtedly is going to require some

10 evidentiary matter, unless there is a document that shows that

11 somebody had prior knowledge, it's going to be a matter of

12 evidence I think.  So with respect to the false assertion, I'm

13 a little unsure right now, but it seems to me that that's

14 probably more like a merits objection.  I think the others

15 though are things that deal with the claim form and the proof

16 of claim itself that ought to be addressed here.  So why is the

17 product I.D. one that should not be addressed now?

18          MR. SPEIGHTS:  Well, I can give you two reasons on a

19 compromise, Your Honor.  One thing about it, if you don't feel

20 good, you think of a lot of compromises.  First of all, product

21 I.D. is merits, whether you have product I.D., or do you have

22 to have product I.D. itself.  Frankly, I don't know the law of

23 Canada to know whether there's a conspiracy or market share or

24 anything of that nature.  I can't tell you that, and I would

25 need a Canadian lawyer on board to help me if we're going to

**J&J COURT TRANSCRIBERS, INC.**

1  Canada to litigate that.

2          In addition to that, Your Honor, you know, what is

3  the quality of product I.D., and that's the question for a

4  Canadian court if it's going there.  But here's the

5  practical -- let me give you a solution.

6          THE COURT:  I think I'm not sure -- pardon me one

7  second, because I'm not sure we're arguing about the same

8  thing, and I just want to make sure we are.  I thought the

9  product I.D. issue was the fact that the proof of claim form or

10 the attachments to the proof of claim form did not identify a

11 Grace product.

12         MR. SPEIGHTS:  That is the bottom line, and that's

13 why I'm all for a compromise.

14         THE COURT:  All right.

15         MR. SPEIGHTS:  I'm not trying to negotiate with the

16 Court.  Here's my practical problem in dealing with the

17 Canadian claims on product I.D.  The Canadian claimants I

18 believe without exception have product I.D. on all of the

19 fireproofing.  In order to -- and which Monaco, the big

20 product, of course.

21         In order to prove product I.D. on the ceiling

22 material, be it a texture or acoustical plaster, there's a

23 process to do what's called constituent analysis which you

24 would have to send it off to a laboratory and 500 to 1,000

25 dollars a sample, and one of these PhDs testifies as they

**J&J COURT TRANSCRIBERS, INC.**

1 testified at trial in many cases over the years.  So it's a

2 cause claim.  So number that's the way you can do it.

3       The second way you can do it is through sales

4 records.  We don't have, I don't believe, the sales records of

5 the Canadian licensees and subsidiaries of W.R. Grace.  They're

6 up in Canada, and I'm not sure how we get those.  I'm not even

7 sure if they're under the wings of W.R. Grace here.  I know in

8 other defendants it's always been a problem in getting things

9 out of Canada.

10       And my client's in this position.  Should I spend 500

11 or 1,000 dollars to go identify the product, some of which

12 won't be Grace, when these claims are coming back to Canada,

13 you tell me, Mr. Speights, to be litigated on the merits?  My

14 solution is this, Your Honor.  If your feeling is -- it's your

15 bar date order.  I understand that.  You wanted them to put the

16 product I.D. despite whatever sales records.  I will have those

17 -- tell those clients that they have 30 days to do constituent

18 analysis on those products, and if they don't have constituent

19 analysis, they will withdraw the claims and be done with it.

20       Now, I've got legal arguments to go get Grace's sales

21 records.  I've got legal arguments on merits.  What I mean is

22 as a practical matter, if I've told these people -- and I've

23 discussions with them, at least representing some.  If I tell

24 these people a month ago or two months ago to spend all this

25 money, but you're probably going to Canada and to Grace's plan

1  if it gets it approved, and I don't know what's going to happen

2  up there, etcetera, etcetera, I'd be telling them to burn

3  money.  But if that's your feeling then, I've heard you say you

4  think they ought to ask the product I.D., I'd like to cut

5  through it and move to another issue.

6             THE COURT:  Okay.

7             MS. BROWDY:  Your Honor, our take on it is that Mr.

8  Speights is now offering that his clients will do what they

9  should have done three years ago.  We think their right to

10 strike, on the other hand -- if your court is inclined to

11 accept Mr. Speights argument, I mean it's hard to say, that if

12 we can come back in 30 days, and if they haven't put it up,

13 they'll walk away.  It's hard to say we should take any time

14 arguing it now.

15            THE COURT:  Yes, frankly, I think that's a good

16 solution, because I agree with Mr. Speights.  Some of his

17 clients may want to go to Canada, and others probably won't,

18 and I am also a bit ambivalent about whether the litigation

19 ought to go forward here or in Canada.  But if there's going to

20 be that much of a record issue, it probably should be in

21 Canada, because it'll be a lot harder to get records if it goes

22 forward here than it will be there and a Canadian court is in

23 charge of the litigation.

24            So I think that's a good suggestion, Mr. Speights.

25 Ms. Browdy is apparently willing to take it, so let's do -- let

**J&J COURT TRANSCRIBERS, INC.**

1  me give you some dates.  As to the I guess exhibit -- not

2  exhibit but letter G, product I.D. for Canadian claims.  How

3  much time are you actually -- if they do the analysis in 30

4  days, I take it you're going to need a report.  You're going to

5  have to file something.  So how much time do you actually need

6  to get that product I.D. filed with the Court?

7              MR. SPEIGHTS:  When is the March omnibus date?

8              MS. BROWDY:  March 27th.

9              MR. SPEIGHTS:  Well, certainly before then.  I mean I

10  was -- it could've been early March.  I don't -- I mean I think

11  I could get a result back in 30 days in a letter.  I think I

12  really don't need much more than 30.  I mean --

13             THE COURT:  Why don't we say March 10th?  That would

14  still give the debtor two weeks to address any issues with you

15  or see what else has to happen before the omnibus hearing.  So

16  they're to file the product I.D. by March 10?

17             MR. SPEIGHTS:  Yes, Your Honor.

18             THE COURT:  All right.

19             MR. SPEIGHTS:  And, of course, you -- I know you

20  understood it.  I'm going to fight them going to Canada

21  eventually, but we'll have product I.D. on whatever is left.

22             THE COURT:  Okay.

23             MS. BROWDY:  And perhaps, Your Honor, we should set

24  for status at the status conference where things stand in the

25  Canadian product I.D. for the March 27th --

**J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  I can't hear you, Ms. Browdy.  I'm sorry.

2           MS. BROWDY:  We should set a status for the March

3 27th omnibus on where things stand on the Canadian product I.D.

4 claimants.

5           THE COURT:  Yes, I think that's right.

6           MS. BROWDY:  Thank you, Your Honor.

7           THE COURT:  Now, that's just with respect to the

8 Canadian product I.D. claims.  There are still U.S. product

9 I.D. claims to deal with.

10           MS. BROWDY:  Correct, Your Honor.

11           THE COURT:  All right.

12           MS. BROWDY:  Okay.  Well, with that background then,

13 that takes us back to again the basic agenda, and what we

14 thought we would do, Your Honor, is to start out with the

15 unauthorized claims.  And then I thought after we do the

16 argument on the unauthorized claims, we actually probably

17 should move up G, the U.S. no product I.D. claims, because

18 given how we essentially lost a good chunk of yesterday to

19 argue, I hate to take up time on, you know, one- and two-

20 claimant arguments and risk not having the chance to deal with

21 51 U.S. claims.  So --

22           THE COURT:  We'll do them in whatever order you want

23 to do them.

24           MS. BROWDY:  Thank you, Your Honor.  Then again

25 moving to the issue of unauthorized claims.  These authority

1 objections, Your Honor, were set out in the debtor's 13th

2 omnibus objection, which is docket 9311, filed on September

3 1st.  We also started to deal with the issue of the authority

4 objections really in the context of dealing with the Anderson

5 Memorial claims that we argued here on October 31st, because as

6 part of dealing with those Anderson claims it became apparent,

7 even by Speights own admission, that he had signed and

8 submitted claim forms for claimants that he had never met and

9 didn't have authority from.

10       As part of dealing with the Anderson Memorial issue,

11 Your Honor, the Court ordered Speights and Runyon -- and when I

12 refer to Speights, I'm referring to the law firm not ad hominem

13 comment.  But Speights was ordered to produce evidence of the

14 authority that the firm had to file all of its claims, and that

15 was reflected in docket 9501, which was entered by this Court

16 on September 23rd.

17       So we now have the benefit of what the Speights firm

18 has produced to us, which is supposedly the basis for their

19 authority.  And to put into perspective our 13th omnibus

20 objection initially objected to 2,937 of his claims, which is

21 all but one of them, because they lack authority.  The Speights

22 firm is now down to roughly 525 claims, and we are retaining

23 our authority objection to roughly a hundred of those.  At the

24 time we filed our reply in December we were complaining that 38

25 of the claimants there was no authority to file, and that 71

1  hadn't shown a timely authority to file.  And as you can see

2  from the demonstrative that we handed up, we're now down to 23

3  that we think lack authority and 68 that were not timely -- did

4  not timely receive authorization.  And I think, Your Honor, I'm

5  actually going to start out with argument on the timeliness.

6       We attached as exhibits F, G, and H to our reply on

7  the 15th omnibus, which was docket 11428, three different lists

8  of claims that either were signed late, that is some time

9  April, 2003 to the present, authorizations that were undated,

10  or authorizations that they themselves had no date, but there

11  was a fax line that we could interpret to say it was faxed at

12  some time after the date.  That was the only indication of

13  anything regarding the timeliness of those signatures.  And

14  none of those authorizations, which is what the Speights firm

15  provided in response to the Court's order -- we don't think any

16  of those authorizations establish that the firm had authority

17  to file those claims as of the bar date.

18       Now, when you look at the Speights surreply, the firm

19  argues that there's a presumption of validity when a claim form

20  is filed, and there was no obligation to get express authority

21  before the filing date.  I think there are a number of problems

22  with that argument, Your Honor.  First, as the 13th and 15th

23  omnibus objections and accompanying attachments and pleadings

24  and the like show, there really is not a presumption with

25  respect to the Speights filed claims, that they were authorized

1 when filed.  We just have too much of a track record of claims

2 being filed and signed without authority.  We have claims that

3 were submitted for claimants that were represented by other

4 parties.  We have claims submitted for building owners that the

5 Speights attorney had never met.  They've admitted they could

6 never locate them.  We had claims submitted for claimants who

7 had previously settled or litigated these claims using other

8 counsel.  And again, just there were a number of problems.  I

9 think there's a good discussion of those in our reply brief

10 filed on October 26th of 2005, which was docket 10837, along

11 with the accompanying exhibits.

12      What that really leads us to though is to the legal

13 question that this Court needs to decide, which is does it

14 matter when Speights received authority to file these claims.

15 Again, for the 68 claims that we're still objecting to he's got

16 a signature, but the question is still open when he was

17 authorized to file those claims.  There's a Supreme Court case,

18 Your Honor, that we cited in that short surreply we put on file

19 yesterday that we really think is directly on point.  It's

20 Federal Election Commission vs. NRA Political Victory Fund 513

21 US 88 at 98, Supreme Court decision from 1994.

22      And in that the Supreme Court analyzes basic

23 principles of agency law and points out that the action of an

24 agent cannot be ratified after a deadline.  Again, the Supreme

25 Court at page 98, "If an act to be effective in creating a

**J&J COURT TRANSCRIBERS, INC.**

1  right against another or to deprive him of a right must be

2  performed before a specific time.  An affirmance is not

3  effective against the other unless made before such time."  And

4  there are a couple other quotes like that.  It cites to the

5  restatement of agency law which again makes clear that while in

6  certain circumstances a principal can ratify the actions of an

7  agent after the fact.  You can't do that to do harm to a

8  deadline -- a bar date, something where authority had to be

9  given as of the time.

10          We've also cited, Your Honor, in the that short

11  surreply to some cases like the First Plus decision, 248 BR 60,

12  and I don't have a specific page cite, although it's just

13  before footnote 11.  This is from the U.S. Bankruptcy Court for

14  the Northern District of Texas from 2000.  It says, "To put it

15  another way, Rule 3001 be allows a creditor to decide to file a

16  proof of claim and to instruct an agent to do so.  It does not

17  allow an agent to decide to file a proof of claim and then

18  inform a creditor after the fact."  That's exactly what we're

19  dealing with here, Your Honor.  And interestingly, a couple of

20  the cases we cited like the First Plus decision were courts

21  looking in the context of whether or not you could have a class

22  proof of claim.

23          And before the American Reserve decision and its

24  progeny really parsed out what the rules permitted with respect

25  to class proofs of claim, a number of these District Court or

**J&J COURT TRANSCRIBERS, INC.**

1   Bankruptcy Court decisions were looking at it from the concept

2   of agency law.  Gee, how can someone put in a proof of claim on

3   behalf of someone that hasn't authorized them to do it.  So

4   while the specific details of some of these cases are in a

5   different context, it's in the analysis of agency law, which is

6   directly on point.

7            And, Your Honor, I submit that the decision of the

8   Supreme Court in the <u>Federal Election Commission</u> case and these

9   other cases that show that a -- the action in this context

10  can't be ratified after the fact is very much consistent with

11  the proof of claim form itself.

12                      (Pause)

13           MS. BROWDY:  And again this is -- there's nothing

14  special about this particular signature page.  As the Court has

15  gathered, we have thousands like this.  But that when a claim

16  form is submitted on a particular date, it's signed, and it

17  says, "All claims must be signed by the claiming party."  And

18  in the signature box it indicates the signature of the claimant

19  and the date, and if the claimant, here Mr. Speights -- all of

20  the forms were signed either by him or one of his colleagues.

21  If they didn't actually have authority at the time, they

22  couldn't sign for the claimant.  They weren't representing the

23  claimant, and the claim form requires it.  And that's again

24  consistent with the courts that are interpreting 3001(b) that

25  says you need to have an authorized -- you need authority at

1  the time you're signing this.

2          So it can't be, Your Honor, that an attorney can sign

3  for a claimant without authority,  misrepresent under penalties

4  of perjury, but they actually authority to do it, and then

5  later get authorization after the fact.  So we think that these

6  principles all come together and confirm the notion that again

7  you had to have authority as of the time the claim form was

8  filed for it to be valid.

9          So getting back to where we started, these 68 claims,

10  we've challenged them.  We put the burden back to the claimant,

11  and the Speights firm has not established that it had authority

12  as of the time, so that we would ask these 68 claims be

13  disallowed.

14          THE COURT:  All right.

15          MR. SPEIGHTS:  Well, Your Honor, like the last

16  question, there are several different ways we could approach

17  this issue.  Let me make one historical statement, and one

18  statement to try to cut to where we are on authority.  We've

19  come a long way since last July on the authority issue, and

20  just by way of history, as Ms. Browdy understandably always is

21  going to cite the number of cases Grace has gotten rid of, I

22  emphasize again that the largest bulk of the cases we've gotten

23  rid of voluntarily by me deciding to abandon the conspiracy

24  claims in this bankruptcy including a large number of

25  California claims with written contracts, etcetera, etcetera,

**J&J COURT TRANSCRIBERS, INC.**

1  and not to be used against me and all that other stuff I always

2  mention.

3         And the largest number of authority claims were

4  dismissed, Your Honor, after we had a long hearing -- I'm not

5  even sure which courtroom -- in which you decided that the

6  cases did not give me authority to file claims on behalf of

7  people under the Anderson definition of the class action, for

8  that was the sole basis of authority -- sole basis of claim of

9  authority.  And I understand your decision on that, and we've

10 moved on from that, but that obviously formed the basis of a

11 large number of claims, and when you ruled several months ago

12 on that, I think there were approximately 600 claims, but

13 that's still all they had.

14        Now we are left with several different buckets of

15 claims with several different factual situations.  Grace

16 doesn't dispute it.  I don't dispute it.  There are some claims

17 that there was oral authority, which I -- as far as I

18 understand the cases, is sufficient, but the written authority

19 came later.  There are probably some cases like the Anderson

20 group of 600 that later gave authority.  There are written

21 authorities which are course of dealing with or in e-mails,

22 etcetera, etcetera, and we can, if we have to, sit down and go

23 through those now less than one hundred claims one by one and

24 try to figure out, you know, what's the proper disposition.

25        I suggest, Your Honor, there are two legal issues

**J&J COURT TRANSCRIBERS, INC.**

1 that will take care of this and could take care of everything

2 left on authority.  The first legal issues is the legal issue

3 of ratification which Ms. Browdy just referred to.  If our

4 clients could, in fact, ratify -- we're dealing now almost

5 entirely of clients who have retained us but retained us after

6 the bar date, and if those clients could do so and ratify the

7 earlier filing of the claim form, okay, that subset -- and

8 again some gave authority before.  That takes care of the

9 situation they criticize the most.

10        If ratification is the law dealing with the claim

11 form, if I'm right on ratification, and Ms. Browdy is wrong, we

12 can put this issue behind us, because I think all of them go.

13 And I want to address ratification.

14        THE COURT:  Okay.  My question though is in order to

15 ratify something you had to have had an agent-principal

16 relationship beforehand, and the agent had to have done

17 something that the principal didn't specifically authorize in

18 advance but did authorize later, however, the relationship had

19 to have existed before the ratification.  And I think where I'm

20 losing the ratification argument is if you didn't represent the

21 clients before the proof of claim form was filed, then I can't

22 see how there can be a ratification, because you weren't their

23 agent.  You weren't their attorney.  So even though they may

24 hire you later, they could maybe now ask you to file a proof of

25 claim form for them and, you know, see where that goes, but I

**J&J COURT TRANSCRIBERS, INC.**

1 don't see how that ratifies something that couldn't have been

2 done, because there was no agent -- couldn't have been done

3 with authority, because there was no agent-principal

4 relationship at the time.

5          MR. SPEIGHTS:  And I'll stop there and answer the

6 Court's question -- at least try to answer the Court's

7 question.  And I think -- I say again the reason that we had no

8 authority on some of them, not all of them, before was because

9 of Your Honor's ruling that we have no authority, and that

10 ruling is the law of this case as we sit here.  I accept the

11 ruling as being the law of the case.

12          However, Your Honor, I don't believe that's the law,

13 and, you know, it's sort of crazy.  We've been arguing about

14 authority since July, and now you've gotten two briefs in the

15 last seven days, and I got their brief after I arrived in

16 Pittsburgh last night.  I quickly read the U.S. Supreme Court

17 case.  I haven't read the other cases, and I haven't even

18 shepherdized the U.S. Supreme Court case much less looked at

19 everything.  I certainly have read our cases in support of

20 ratification.  And ratification seemed to me -- it's a

21 principle I never argued before -- a pretty straightforward

22 thing.

23          You know, you can ratify a previous act even though

24 if you had not given authority for that previous act once you

25 establish that relationship.  And the best case in there is a

**J&J COURT TRANSCRIBERS, INC.**

1    1997 case of the United States Court of Appeals for the Fourth

2    Circuit.  I think it's called <u>Hagereth</u> in my notes back at the

3    desk.  I cite it in the brief along with other Court of Appeals

4    and a bunch of decisions from around the country.  But in that

5    case it dealt with the filing of a petition for bankruptcy.

6    And in that case the law required both owners of this company

7    to file the petition for bankruptcy to be a valid filing.  And

8    in that situation one signed the petition, and the other

9    didn't, and a year, a year and a half went along, and the

10   second person, while not very pleased with what was going on

11   with the bankruptcy, never signed it.  And the Court held,

12   well, although he or she did not sign it, he or she ratified

13   the act by not doing anything in that instance by inference.

14   Here we've got a contract, hired you, ratified.  Yes, thank you

15   for filing that claim.

16          THE COURT:  But there's a difference.  I mean I had

17   that same issue come up with respect to a petition in

18   bankruptcy that was filed, and I think it was the <u>I.D. Craig</u>

19   <u>Services</u> case, and the problem in that case was that the people

20   who were involved, i.e., the shareholders, the creditors, all

21   knew about the bankruptcy and could have done something to take

22   an act before the Court that said this is filed without

23   authority but decided to wait and see what happened before

24   acting.

25          Now, in <u>I.D. Craig</u>, a year or two down the road, the

1  principal came in and said, oops, I never got my board to

2  ratify or to agree to this, and so you can't -- you don't have

3  jurisdiction anymore, because even though we've sold all the

4  assets and all this has been done, it wasn't proper.  I don't

5  think that's what the principle of ratification is all about.

6  But even -- but at least in that case there was an agent-

7  principal relationship.

8          The problem I think is -- and I don't disagree that

9  you can ratify the acts of an agent after the fact, but I do

10  disagree that you can ratify the acts of somebody who wasn't

11  your agent at the time that the acts were taken.

12          MR. SPEIGHTS:  Well, Your Honor, I frankly haven't

13  focused on that issue, but I would go back to the cases.  I

14  would say that that is -- I believe I would find that in many

15  of the cases that that would occur.  That you are now in a

16  relation by principal even though you didn't authorize somebody

17  to do something, so they were not your agent at the time.  You

18  later authorized them to do it.  Indeed in the class action

19  cases, as they talk about, there are such things as punitive

20  authorization when you file initially, and then the

21  authorization if the Court certifies the class.

22          THE COURT:  Yes, but I think that's a whole lot

23  different from an individual filing a proof of claim.  In the

24  class action rules and processes are different, simply because

25  you don't even know at the time you file a class action who all

1 the class members are in most instances.  But that's not true

2 here.  These individuals are creditors of the estate.  They

3 have notice, either actual or constructive, of a bar date, and

4 they have an obligation to file a valid proof of claim.  I

5 don't think if they -- I think had they called and said file

6 this for me, fine.  You're their agent.

7          But I don't think you can set up an attorney-client

8 relationship nunc pro tunc and have that agent -- or I'm sorry

9 -- that principal ratify an act that you didn't have the

10 authority to do at the outset, because you weren't their

11 attorney.  So that's the problem I have with the ratification

12 theory.  If you want to see if I'm wrong, because I haven't

13 done a lot of research on this area, but that's how -- that's

14 my gut instinct with respect to ratification.

15          MR. SPEIGHTS:  Well, and I would, Your Honor, for

16 this reason.  I think you have cut through the one issue that

17 bothers me.  We got their brief last night.  I don't even

18 believe -- I'm sure Ms. Browdy might find some support

19 somewhere in the United States Supreme Court for the

20 proposition you've identified.  The Supreme Court case to me --

21 and I read it.  That's the only one I read.  I didn't have time

22 to read five, but I read Chief Justice Rehnquist.  I think that

23 dealt with the situation where by law this agency couldn't file

24 an appeal.  It was a jurisdictional issue --

25          THE COURT:  It did.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. SPEIGHTS:  -- whether you got certiorari,

2   etcetera, etcetera, etcetera, which I don't think is applicable

3   at all, and I think the Fourth Circuit cases are.  But given

4   that we just got the brief last night, and given that the issue

5   has just come up, I would request a few days to give you a

6   supplemental brief on this issue.

7          THE COURT:  I'll a take a supplemental brief.  I'm

8   not convinced that the Supreme Court case that did deal with a

9   specific statutory authority is on all fours with this.  I

10  understand the application of the principle, but I don't think

11  that the holding itself is on all fours with this case, and I

12  agree with you there.  But I'm not sure that's going to save

13  this batch of claims.  Those that you did -- for whom you did

14  not represent the client at the time their proof of claim was

15  filed, I do not think those entities can ratify the proof of

16  claim.

17         MR. SPEIGHTS:  And my -- as I was headed down the

18  track, I was telling you that I think there are two ways I win,

19  and the first way is if I win ratification.  I would like to

20  brief that a little further and address it as soon as you're

21  ready to address it again.  I'm not trying to delay this,

22  because I'd like these authority objections resolved, as I'm

23  sure you would.

24         The second way that it goes away, also -- and I'm not

25  getting into tomorrow's argument, and I'm not sure how far

**J&J COURT TRANSCRIBERS, INC.**

1  we'll go tomorrow on class certification, but certainly if

2  there's class certification that resolves these issues, too,

3  because they would be in the class, and we wouldn't have that.

4  So my request is that you allow us to brief the ratification.

5  If we cannot convince you on ratification, I honestly believe

6  that we could sit down and get a stipulation on what the facts

7  are as to those particular 20/30/40, so we don't have to have a

8  hearing on each individual claim.  I know -- I mean the truth

9  is truth.  If they call us beforehand, that's fine.  If they

10  never call us, some of them didn't like I told the 600.  I did

11  tell them that.  These are the six fact situations.

12       Either they'll agree or won't agree as to authority.

13  They may take to heart what you've said today about the

14  telephone call, and we can almost see it up on a stipulation if

15  you decide as to those who don't agree.  I just don't see us

16  bogging down when ratification resolves everything or

17  certification resolves everything.

18       THE COURT:  Well, the class certification issue may

19  resolve it.  The ratification I guess will if, in fact, you can

20  ratify under these circumstances.  And maybe it does take some

21  fact specific production from you, Mr. Speights, to say what

22  clients you did represent, who you had oral authority from.  If

23  there was oral authority, even though it's not written

24  authority, I'm not so convinced that that's not authority.

25  Authority is authority.  It may not be literally in compliance

1  with the proof of claim form.

2       But I think to that extent the claim form could be

3  amended,  I don't think you could amend a claim form to satisfy

4  the ratification issue.  I think that's not going to be

5  appropriate.  In that instance those claimants would have to

6  show what excusable neglect led them to file a late claim, and

7  I think they have to get some -- if they have a claim at all,

8  then it has to come in that kind of a venue process.  I don't

9  think this will work, but I'd be happy to read some cases if

10  you can give me some.

11       MR. SPEIGHTS:  I appreciate that, Your Honor.  And if

12  we do have to go down the track, in fairness to Grace -- I'm

13  being mighty fair to Grace today.  I don't know what's come

14  over me.  But in fairness to Grace, they don't have the facts

15  about who called whom and that, and I don't want to go through

16  discovery.  I just want to tell them.  I mean they've been

17  asking the question.  I'll tell them if we need to go there,

18  and I'd like to resolve ratification right away, and I'm glad

19  for you to put the shortest leash on getting a brief.

20       THE COURT:  Well, tell me how much time you'd like to

21  brief this issue.  In fact, can both of you do it at the same

22  time?  I mean you've had a chance at this point to see each

23  other's papers.

24       MR. SPEIGHTS:  Seven days.

25       THE COURT:  A week, Ms. Browdy?

1          MS. BROWDY:  Yes, Your Honor.  I think we had that

2  other brief, oh, in Prudential due February 3rd.  Maybe make

3  this due February 3rd as well.

4          MR. SPEIGHTS:  That would be good.  It's a Friday,

5  Your Honor.

6          THE COURT:  All right.  That's fine.  And I'll just

7  take them -- I think -- hopefully, you can do this in ten pages

8  or less.  I really don't think there is going to be that much

9  case law out there, but --

10          MR. SPEIGHTS:  And the brief is just going to be

11  focused on the points you raised, as I understand it, Your

12  Honor.

13          THE COURT:  That's -- at this point that's all I'm

14  looking for on this issue.  Now maybe we'll have to address

15  other issues as we go.  I don't know.  But on ratification

16  that's the only issue I'm concerned about at the moment.

17          MS. BROWDY:  That's fine.

18                    (Pause)

19          MS. BROWDY:  Your Honor, we don't anticipate a

20  problem getting that brief in, and I'm more than happy to keep

21  it less than ten pages.  The only thing that I would add at

22  this point, if we do then have to further down to get

23  development of additional facts to figure out when these

24  conversations took place, I appreciate that we can start with

25  some kind of a stipulation or representation by the Speights

**J&J COURT TRANSCRIBERS, INC.**

1  firm, but we may well need and ask for discovery.  That's the

2  way we got -- that's really the only way we started to learn

3  about these authority problems in the first place, which we

4  started to notice things.

5        THE COURT:  Well, that's okay.  Let's just get the

6  briefs in, put this on to the February agenda, and we'll do a

7  status conference to see whether or not you need additional

8  discovery.  I think with respect to this, if you can file the

9  briefs by February 3rd, I can read the cases and hopefully have

10 an opinion for you on this limited issue at least by that date.

11 So if you need discovery, we'll address it then.

12        MS. BROWDY:  Thank you, Your Honor.  That would then

13 take us to the question of the remaining 23 claims for which

14 there's no authority, and the surreply brief at pages 3 to 4

15 contends that for 17 of those there was written authority, and

16 the bottom line is we just disagree.

17                    (Pause)

18        MS. BROWDY:  And what I'm handing up, Your Honor, to

19 the Court is the collection of what we received from the

20 Speights firm for these 14 claimants that are addressed in the

21 surreply at page 3 and 4.  There's the supposed authority for

22 the Carlton University claims.  Eight claims are in a single

23 little packet -- two Ispko claims, one Hyatt Vancouver claim,

24 an Eden claim, a Lafayette claim, and a Glenn Oaks claim.  I

25 would note for the Carlton, Ispko, and the Hyatt Vancouver

**J&J COURT TRANSCRIBERS, INC.**

1  claims, those weren't even on the 2019 statement.  But the

2  bottom line is these are the authorities we received.  We don't

3  think that they show any indicia of client approval.  It shows

4  that the Speights firm has files on these claimants, but again

5  we don't think that there's been any authority that's been

6  given in these pieces of paper.  And I'm happy to again just to

7  hand those up to the Court and have the Court take it under

8  advisement versus walk them through individually.  I mean

9  whatever the Court's preference would be on that.

10        THE COURT:  No, I think you'd better walk me through

11  these, because I want to make sure I understand with respect to

12  each one.  You know, I have to do a claims allowance and

13  disallowance as to each claim.

14        MS. BROWDY:  Okay.  Well, if --

15        MR. SPEIGHTS:  Just before you start, just to -- have

16  you checked these versus the withdrawals of the last 24 hours?

17        MS. BROWDY:  Yes, I believe that we have.  I believe

18  that we have.  Yes.  We'll double check, but I don't believe

19  that any of these are still active.

20        MR. SPEIGHTS:  The only reason --

21        MS. BROWDY:  I believe they are all still active.

22        MR. SPEIGHTS:  Your Honor, I'm not trying to seize

23  the podium from Ms. Browdy.  I wouldn't do that, but -- and if

24  you want to do that, that's perfectly fine.  I'll tell you that

25  a man who would know about these was writing that brief that

**J&J COURT TRANSCRIBERS, INC.**

1  was sent to you this morning and class certification.  And if

2  we are having to go over tomorrow anyway, we may be able to

3  resolve some of these overnight.  If we could defer this group

4  of how many?

5          MS. BROWDY:  Yes, 14.

6          MR. SPEIGHTS:  Fourteen.  We may save you a little

7  time --

8          THE COURT:  All right.

9          MR. SPEIGHTS:  -- and may not.  I mean I just -- I

10  don't know.

11          THE COURT:  All right, so these will be deferred

12  until tomorrow.  That's 14 of the 23?

13          MS. BROWDY:  Yes, Your Honor.  For another three,

14  there are two claims that are duplicates, and one that we

15  believe now has the problem that it's undated rather than

16  unauthorized, so there shouldn't be a problem with those three.

17  So that just leaves six claims that we don't think there's

18  authority for, and essentially they're the six claims that we

19  objected to on authority grounds that the surreply paper

20  doesn't even address.

21          Those are claims for the Hyatt Corporation at 5

22  Embarcadero, the Rackrose site, the Ruden job, Ruden

23  Management, and Ruden Building, and then one more Carlton

24  University claim.  Those are six claims again that we have no

25  record of authority for, and the surreply brief doesn't address

1 our objection.

2          MR. SPEIGHTS:  And again, Your Honor, Ms. Browdy can

3 just send me an e-mail with that list this evening.  I could

4 quickly resolve them with her.  I'll go right through them

5 tomorrow, and we can tee up the issue very easily of what it

6 is, however you want some other evidence of it.  One of them

7 she named in my mind was one that was withdrawn, but I don't

8 want to say that on the record without checking with Mr. Ferry.

9          THE COURT:  All right.  Okay.  All of the

10 unauthorized claims then are -- will be addressed tomorrow.

11          MS. BROWDY:  Okay.  Thank you, Your Honor.  What I'm

12 going to suggest now is that we move to item G on the agenda

13 which are no product I.D. claims, and specifically in light of

14 the rulings earlier today, we're only going to deal with the 51

15 U.S. claims that have no product I.D., and my colleague, Mr.

16 Bianca, is going to address those.

17          THE COURT:  What ruling?

18          MS. BROWDY:  Oh, on the Canadian claims that he's

19 going to get additional information on, Canadian, so we're only

20 dealing --

21          THE COURT:  Oh.  Oh.

22          MS. BROWDY:  -- with U.S.

23          THE COURT:  Okay.  I'm sorry.  All right.  Thank you.

24          MR. BIANCA:  Good afternoon, Your Honor.  Salvatore

25 Bianca on behalf of the debtors.  I have four charts breaking

1  out the 51 U.S. claims I'd like to hand up.

2          THE COURT:  All right.  Thank you.

3          MR. BIANCA:  The debtors object to this category of

4  claims due to their failure to provide any evidence indicating

5  the presence of a Grace asbestos-containing product on the

6  properties.  As my colleague, Ms. Browdy, has mentioned, it's

7  the burden of the claimant to demonstrate a valid basis for the

8  claim before a claimant can be presumed to have any kind of

9  prima facia validity.  The claimant must demonstrate facts

10 sufficient to bring a claim under applicable substantive law.

11 A necessary prerequisite to recovery for alleged property

12 damage is a showing that one of the debtors manufactured or

13 sold the product for which the claim is made.  This is a

14 fundamental requirement across courts, and the fact that the

15 debtors are in bankruptcy doesn't change the requirement.

16          Indeed, as we indicated in our briefs, the Bankruptcy

17 Code clearly provides that a claim not recoverable outside of

18 bankruptcy isn't recoverable in bankruptcy.  Accordingly, the

19 failure to provide documentation identifying a Grace product is

20 fatal to these claims.  It should be kept in mind that these no

21 product identification documentation objections are also

22 separate from our insufficient product identification

23 objections which will be heard at a later date.

24          Those objections address instances where some type of

25 product identification was provided, but it was insufficient to

**J&J COURT TRANSCRIBERS, INC.**

1  show that a Grace product was present on the property.  For

2  example, a list of jobs proposing to use MK-3 could've been

3  attached, and the issue in dispute is whether or not that's

4  sufficient to show that the product was actually used and

5  placed on the property.  Here we're talking about the easier

6  case where no product identification documentation is provided.

7  Speights simply has failed to meet the burden of proving

8  product identification -- of providing identification

9  documentation.

10         Although he has provided a number of documents, he

11  hasn't provided a factual basis for these claims.  Rather, he

12  just dumped the documents on us and essentially said, okay,

13  Grace, find out if I have a claim, and this isn't the manner in

14  which the validity of the claim is established.  Unless

15  Speights can come here and demonstrate to this Court that a

16  Grace product was present, his claims must be denied.  Speights

17  attempts to destroy the burden of proof in his briefs by

18  arguing that the debtor should be required to prove a negative.

19  That is that a Grace product cannot possibly have been used on

20  the property, which is contrary to case law which places the

21  burden on the same party that it would have been had the claim

22  been litigated outside of bankruptcy.

23         Nevertheless, we've spent countless hours sifting

24  through the documents provided and found that the claims still

25  lacked any product identification evidence.  The lack of

1  product identification is particularly egregious, since it's

2  been almost three years since the bar date's passed, and we

3  still have not seen any evidence that a Grace product was used.

4        Moving on to the substance of each of the claims, I

5  refer you to the four charts I handed up.  The claims are

6  easily divided in to four categories.  We also have available

7  for Your Honor a binder for each of these categories which

8  include the claims and all the documentation provided.  Should

9  Your Honor wish to review them as they're discussed, we've also

10  made a copy for Mr. Speights if he wishes to take a look at

11  them as well.

12        THE COURT:  Yes, I think it would be helpful.  We

13  might as well just put it in, and if there's any issue, we can

14  address it.

15        MR. BIANCA:  We'll provide that right now.

16                      (Pause)

17        MR. BIANCA:  The first set of claims are 29 claims --

18  and this is binder one -- without any supporting documentation

19  whatsoever.  These claims just simply do not provide any

20  evidence that an asbestos product was present generally or a

21  Grace asbestos-containing product in particular.  These are all

22  the documents that have been provided by Mr. Speights.

23  Accordingly, we seek these claims to be disallowed.

24        THE COURT:  Do you want, Mr. Speights, to address

25  these one -- sheet by sheet, or would you prefer that the

**J&J COURT TRANSCRIBERS, INC.**

1 debtor go through all four sheets and then respond to all of

2 them?

3      MR. SPEIGHTS:  Your Honor, I'd like -- I could just

4 sit here and watch you go through this, but I think the debtor

5 is clearly in error about something -- honestly in error about

6 something, and I would be glad to point it out.

7      THE COURT:  All right.  Go ahead.

8      MR. SPEIGHTS:  I believe that we have product I.D.

9 for all of the California State University buildings that are

10 listed here which are a great majority of buildings.  We filed

11 amended claim forms a long time ago and attached constituent

12 analysis of Dr. Longo for all of those buildings.  I haven't

13 checked every number, but I just pulled the first one -- the

14 second out -- 009988, and I have a constituent analysis report,

15 March 22, 2004, which I believe is attached to the amended

16 claim form which has a number 1 -- maybe they gave a new --

17 this is a -- the -- I've got a 9988.

18      UNIDENTIFIED ATTORNEY:  Different building.

19      MR. SPEIGHTS:  Well, I don't believe it is.  I mean

20 I've done my job and brought that to their attention.  I think

21 they need to look at that, because I think -- it was not my

22 intention to have any California State University building by

23 product I.D., and it's not -- I believe -- I may be wrong --

24 that all of them have constituent analysis, and the error is

25 between filing the original claim forms and the amended claim

**J&J COURT TRANSCRIBERS, INC.**

1  forms.  The facility may have assigned new claim numbers, so,

2  therefore, they have two claim forms floating out there.  But

3  if they don't want to check, and they want to proceed, that's

4  fine, and when I get up here, by then maybe I'll have

5  straightened it out.

6       MR. BIANCA:  Actually, we have checked.  These are --

7  these things were pulled off of -- these are from what was

8  submitted to Russ, consulting courts claims agent, and all the

9  documentation that was provided with the claims was reviewed.

10 I believe that, you know, some of these buildings are different

11 -- are buildings that perhaps Mr. Speights believes that there

12 are analyses for, but there just weren't.

13      THE COURT:  Okay.  I don't know.  Mr. Speights, if

14 you've got this analysis, and you think it's been submitted to

15 the claims agent, if you've got some transmittal record, maybe

16 I should give you time to check.  Because if the analysis is

17 there, I don't want to strike claims.  If the analysis isn't

18 there, and, in fact, there's no product I.D., then I don't

19 think I have a choice but to strike claims.  And if it's a

20 mixup somehow or other in claim I.D. numbers, although I doubt

21 -- I mean the claims agent hopefully can track the proof of

22 claim and the amended claim, but I mean he's human.  He/she is

23 -- they're both human.  They can make mistakes, too, I suppose

24 in reporting numbers.

25      MR. SPEIGHTS:  Well, Your Honor, I certainly -- it's

1  still 3:15 in South Carolina.  I certainly can have the claims

2  electronically sent up here, so in the morning, if not tonight,

3  I can show him here are the claims, here's the product I.D.  We

4  went through this several months ago, and I withdrew all the

5  California conspiracy claims, and we went through them.  We

6  were very careful to sort out between the conspiracy and non-

7  conspiracy, and I have some of the product I.D. reports back

8  here.  I didn't bring the whole amended claim forms.  You know,

9  I don't say I'm a hundred percent right any time, but I am very

10  confident I'm right on these California State buildings.  There

11  are a few without product I.D., not California State buildings

12  but the great majority are California State buildings.

13          THE COURT:  Well, okay.  I think to the extent it

14  exists, we ought to find it.  If it doesn't exist, then the

15  claims probably have to be stricken.  So at this point I think

16  I probably should just continue this issue until tomorrow, too,

17  so you can see whether it does or doesn't exist, whether

18  there's a mixup in the filing.  You know, who knows?  If

19  there's a mixup in the filing, I think it can be straightened

20  out.

21      MR. BIANCA:  Thank you, Your Honor.  Moving to the second

22  category of claims, there are six claims that lack any kind of

23  documentation indicating either the presence of asbestos

24  generally or any kind of product identification.  These all

25  were filed on behalf of Coca Cola Enterprises, and the

**J&J COURT TRANSCRIBERS, INC.**

1  supporting documentation for the first two, claim number 12370

2  and 12372, both include documents that where the claimant

3  states that it doesn't have any product identification

4  documentation or any other documentation, because it no longer

5  owns the property.  It sold the property and just didn't have

6  that information.

7          THE COURT:  So is this claim form filed on behalf of

8  Coca Cola?

9          MR. BIANCA:  Yes.

10          THE COURT:  I need to check this, gentlemen.  At one

11  point in time one of my children owned Coca Cola stock.  I

12  don't know if they still do.  I may have a conflict.  I simply

13  have to check this.  Why don't we at least hear your argument,

14  Mr. Speights.  If it's something that can be resolved, it may

15  not be an issue.  If it is -- if my children own the stock,

16  then I'm going to have to not adjudicate the Coca Cola issues.

17  So it may be a different Coca Cola enterprise or Coca Cola

18  subsidiary or something, too.  I just don't know.  I have to go

19  look.  I don't manage any of the stocks, but -- so I generally

20  don't know, but since we're getting dividend statements in at

21  this point in time, this one just came to my attention, so I

22  think I need to check this.  So the issue that Coca -- the

23  claimant doesn't -- for whom the claim was filed said it

24  doesn't have a claim, because it doesn't own the building.

25          MR. BIANCA:  And said the property was sold, and it

**J&J COURT TRANSCRIBERS, INC.**

48

1  doesn't have any documentation.

2         THE COURT:  And that -- the person -- the entity that

3  filed that response is Coca Cola?

4         MR. BIANCA:  Correct.

5         THE COURT:  Okay, so, Mr. Speights, what's the issue

6  with respect to the authority for Coca Cola?

7         MR. SPEIGHTS:  I don't think there's an authority

8  issue with Coca Cola, specifically a product I.D. issue.

9         THE COURT:  Product I.D. issue.  Okay.

10        MR. BIANCA:  The issue is that the claimant doesn't

11  have any documents indicating product identification, because

12  the claimant doesn't own the property anymore.

13        THE COURT:  Well, then how does it have a claim?

14        MR. SPEIGHTS:  Well, it --

15        MR. BIANCA:  It's my question.

16        MR. SPEIGHTS:  Does this microphone work?

17        THE COURT:  It does.  You can stay seated if you

18  like, Mr. Speights.

19        MR. SPEIGHTS:  Thank you.  It would have a claim if

20  it suffered a loss by reason of the sale of the property to

21  somebody else.  If it got less money because of the asbestos,

22  it would be its claim.

23        THE COURT:  Well, yes, except that it's apparently

24  not taking that position.

25        MR. BIANCA:  It's also taking the position that it

**J&J COURT TRANSCRIBERS, INC.**

1 doesn't have any kind of documentation to support a claim.

2        MR. SPEIGHTS:  I'm not sure if you want me to respond

3 or not, Your Honor.  I came here knowing that Coca Cola did not

4 have product I.D.  I also came here knowing that California

5 State did have product I.D.  I think Coca Cola is in that

6 position of not having product I.D. as of this moment, and Your

7 Honor will have to make a decision whether to give it the 30-

8 day period of time or to strike the claim or defer it because

9 of what other situation if --

10        THE COURT:  Well, if I can make a ruling, which I

11 have to go see if I can, it seems that if they're acknowledging

12 that they don't have product I.D., because they don't have the

13 documentation, it's not an issue of giving them 30 days.

14 They're not going to have that product I.D.  They're apparently

15 not filing a claim based on either some diminution in property

16 value or anything else, based on the fact that they're not

17 making an effort to get the documentation.  So I'm not sure

18 where there is a claim at all.

19        MR. SPEIGHTS:  Well, I think, you know, they might

20 have a claim, but I have a feeling that if we wrote them and

21 said they had 30 days, that would be the cleanest way to deal

22 with the situation.  But I do not have product I.D. for the

23 Coca Cola buildings, however, there may well be some samples

24 from that building that were taken that we could track down and

25 have analyzed, and the Coca Cola building is represented by the

**J&J COURT TRANSCRIBERS, INC.**

1 industrial hygienist, the same person who did the Canadian

2 buildings, and in fairness, I would like to see them have 30

3 days for one last shot.  We've gone from 3,000 claims down to

4 five or six down here.  I would --

5        MR. BIANCA:  Your Honor, with all due respect, this

6 should've been done by the bar date in 2003, and even the

7 documents that are submitted, the claimant acknowledges that

8 there are no documents that will demonstrate product I.D.

9        THE COURT:  Okay.  If I can make a ruling on this --

10 and I'll try to let you know tomorrow -- then my ruling with

11 respect to this is this is a big company.  To the extent that

12 it had notice of a bar date, and its claim was filed in 2003,

13 it's had almost three years -- two and a half years to be able

14 to get the product I.D.  I don't think 30 more days is going to

15 make a difference.  So I will disallow those claims.  But I

16 don't know if I can do that, so I'll try to let you know

17 tomorrow.

18        And if I can't -- if I do not have the jurisdiction

19 to address this issue, none of you may use this transcript in

20 front of any other court.  It is not going to be collaterally

21 estopped.  It's not going to be res judicata.  It's not going

22 to be the law of the case.  It's not going to be anything,

23 because I don't have -- I have a conflict in addressing it.  Is

24 that clear?  No one will make use of this preliminary ruling on

25 -- that I am making if I don't have the ability to enter this

**J&J COURT TRANSCRIBERS, INC.**

1 because of a conflict.

2          MS. BROWDY:  Yes, Your Honor.

3          MR. BIANCA:  That's clear, Your Honor.

4          THE COURT:  Mr. Speights?

5          MR. SPEIGHTS:  Yes, ma'am.

6          THE COURT:  Okay.

7          MR. SPEIGHTS:  I won't use it.

8          MR. BIANCA:  Now, in this category we have four

9 remaining Coca Cola claims.  Do you want me to discuss those,

10 or can --

11          THE COURT:  You might as well, because I'm making the

12 same ruling in advance with respect to whatever I do.  If I

13 can't -- if I have a conflict, it can't be used by anybody

14 else.  So I will find out tonight.

15          MR. BIANCA:  All right.  The next claim is claim

16 number 12374.  This actually included an asbestos summary

17 report, but it was redacted, and the unredacted portions do not

18 indicate the presence of any asbestos on the property.

19          MR. SPEIGHTS:  I lost the claim number.

20          THE COURT:  Which one is this?  I'm sorry.

21          MR. BIANCA:  It's claim 12374.

22          THE COURT:  All right, and what's the problem with

23 this one?

24          MR. BIANCA:  This includes a summary report regarding

25 asbestos, but it's redacted, and the unredacted portions of the

1  report do not indicate the presence of any asbestos and, in

2  particular, not a Grace asbestos-containing product.

3          THE COURT:  Okay.  Well, that -- if that's -- if you

4  agree with that, Mr. Speights, that one sort of sounds like

5  there's no claim either if there's no asbestos.

6          MR. SPEIGHTS:  I don't agree with that, but I agree

7  that there's no product I.D. --

8          THE COURT:  All right.

9          MR. SPEIGHTS:  -- for the Coca Cola buildings.

10          THE COURT:  All right, so you agree with that for all

11  of the Coca Cola buildings.

12          MR. SPEIGHTS:  For all of the Coca Cola buildings.

13  My understanding is -- I'll check again tonight, just so I can

14  say wait a minute.  I slipped up.  But my understanding when I

15  came in today was we didn't have product I.D. for these Coca

16  Cola buildings.

17          THE COURT:  Okay, then I'm going to make the same

18  ruling with respect to all Coca Cola claims regarding the

19  buildings in the event that I don't have a conflict.  So I'll

20  -- as I said, I'll address that tomorrow.

21          MR. BIANCA:  Okay.  Fine.  And just to note the last

22  three claims that we have for the Coca Cola buildings only --

23  the only documentation provided was a letter indicating the

24  date in which the property was built.

25          THE COURT:  Okay.  Well, I think Mr. SPeights has

**J&J COURT TRANSCRIBERS, INC.**

1  already agreed that as to all Coca Cola claims, there is no

2  product I.D.

3       MR. BIANCA:  The next category of claims are 11

4  claims that attach documents that generally refer to the

5  presence of asbestos but do not indicate any kind of product

6  identification.  The claim for Methodist Hospital, which is

7  6697, just attaches a proposed abatement and waste removal

8  description without any other documentation.  This simply does

9  not indicate that the asbestos that was removed was due to a

10 Grace-containing product.

11      The same can be said for the Bayshore Community

12 Hospital claim which is 6901 that also includes asbestos

13 abatement or removal documents.  The California State

14 University claims here merely attach an asbestos management

15 plan indicating how the university would plan on going about

16 handling the discovery of asbestos, generally.  It doesn't

17 indicate that any analysis was done, that it's detected

18 asbestos, and this was due to a Grace asbestos-containing

19 product.  It just is what it purports to be, which is a

20 management plan.

21      The St. Vincent's Hospital addition claim, which is

22 claim number 11193, attaches a one-page article merely saying

23 that acoustical plaster was used on the addition.  It doesn't

24 include any other information.  It's the only documentation

25 provided for the claim, and that just doesn't establish that,

**J&J COURT TRANSCRIBERS, INC.**

1  you know, the acoustical plaster was asbestos containing.  It

2  doesn't establish that it was plaster was a Grace asbestos-

3  containing product.  Accordingly, this claim must also be

4  denied.

5          And the final category of claims were two California

6  State University claims which are claims number 11957 and

7  11962, which attached an asbestos -- containing a material

8  survey which only indicates that asbestos was present on the

9  property.  Again, no product identification was provided.

10          THE COURT:  Okay.  Mr. Speights.

11                      (Pause)

12          MR. SPEIGHTS:  I think what we have here are three

13 buckets, Your Honor.  The California State bucket, which I

14 believe I have product I.D. on, the Coca Cola, which I do not

15 believe I have product I.D. on, and I believe he -- although

16 another one's on his list, I only picked up three additional

17 claimants that do not fall under the California or Coca Cola

18 umbrella.

19          Let me say the obvious at the outset, and then try to

20 get to the heart of the matter.  The obvious is that the debtor

21 has the burden of proof on these objections, and it should be

22 the one -- although I'm happy tonight to try to pull those

23 claim forms.  It should be the one to present what was

24 presented in the claim forms and to show you why that is

25 insufficient rather than a summary piece of paper.  But we have

1  advocacy here, and I'll point out where they are deficient in

2  those arguments as I'm going to do in three of these, and I'm

3  going to do in California tomorrow.

4        The Nebraska Methodist Hospital, I have an extensive

5  amount of documents here that I believe have been produced to

6  the debtors which demonstrate Monaco fireproofing, their

7  principal asbestos-containing product, was placed in this

8  building.  I have letters.  I have job site lists.  I have

9  invoices.  I have all kinds of documents here to show that it's

10 Monaco 3 in there, and everybody knows that Monaco 3 has

11 asbestos in it.  So for the life of me, I'm not sure what the

12 problem is with respect to that building.

13       With respect to the Bayshore Community Hospital

14 building in New Jersey, I likewise have documents which show

15 that the material is again Monaco 3, their principal asbestos-

16 containing fireproofing material.  These are Grace invoices

17 documenting that that material is in the building.  Again, I'm

18 not sure what the argument is, and if there's some, quote,

19 failure to communicate, end quote, I'll be glad to discuss it

20 with them, or we can argue back and forth on the record about

21 what is it.

22       And lastly, on the Vincent's Hospital addition in

23 Erie, Pennsylvania I have a portion fo a publication called

24 Plastering Industries, which is an authentic document under the

25 rules, which says that K.E. Nightlinger and Son, plastering

1 contractors in Erie, Pennsylvania, have finished fireproofing

2 the new two million dollar addition of St. Vincent's Hospital

3 there, and it has 6,800 yards of Vermiculite Acoustical Plastic

4 sprayed directly to cellular steel floors, and, of course, I

5 believe it's in the records of this bankruptcy Vermiculite

6 Acoustical Plastic -- that's P-l-a-s-t-i-c -- is the brand name

7 of W.R. Grace's and its predecessor's ceiling material like

8 Monaco for beams.  So I think we have proved product I.D. for

9 all three of these buildings by documentation.

10          Now, that survives a motion to strike.  If they want

11 to argue how much is there or what happened to it, or they want

12 to engage in discovery, this is an objection process, and

13 they've got every right to do it.  But I think we've met the

14 threshold with written documentation on those three claims.  I

15 don't think I missed another one.  It's Coca Cola, Cal State,

16 and those three claims.  If I missed another one, I'll be glad

17 to address that.

18          MR. BIANCA:  Before we get into the Methodist

19 Hospital, Bayshore Community Hospital, and St. Vincent's

20 Hospital claims again, I just wanted to correct Mr. Speights'

21 burden of proof argument.  It is not the debtor's burden in

22 this case to show that there is not a Grace asbestos-containing

23 product on these properties.  It is the claimants' burden to

24 show that the product is there, and that there's a legal basis

25 for the claim.

1          THE COURT:  I agree, but if with respect to those

2   three claims he has produced invoices that are Grace's invoices

3   that show that it used its Monaco product, it was delivered to

4   a building, that's pretty good evidence that, in fact, there's

5   a claim.  At least it's enough to get past the motion to strike

6   the claim.

7          MR. BIANCA:  Right, but what we're looking at are

8   documents that were filed by Mr. Speights --

9          THE COURT:  Yes.

10         MR. BIANCA:  -- and maybe there's another issue that

11  something didn't make its way through, but looking at what was

12  filed -- we did not see those invoices, and if they weren't

13  filed, they should have been filed by March, 2003, and he's had

14  chances to supplement it.

15         THE COURT:  Well, yes, I agree, but I mean he has a

16  file folder there.  Have you looked at his documents to see if

17  you have what he had?  And you mentioned the same article I

18  think that he mentioned --

19         MR. BIANCA:  We mentioned the same article.  Correct.

20         THE COURT:  -- with respect to the Erie claim.

21         MR. BIANCA:  And that one -- again it doesn't

22  indicate any kind of product identifica --

23         THE COURT:  Well, if it says that the contractor just

24  finished installing -- I'm sorry.  I'm not sure I got it.

25  Acoustic --

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BIANCA:  Vermiculite --

2          THE COURT:  Vermiculite Acoustical Plaster --

3  Plastic, and that's Grace's brand name, I mean what more do you

4  need?  You don't have a very high burden of proof with respect

5  to the initial product I.D.  It may turn out that that's not

6  enough after some discovery, but that's certainly enough to get

7  past the motion to strike a claim.

8          MS. BROWDY:  Your Honor, it's my understanding that

9  the brand name would've been Zonolite Acoustical Plastic, and

10 that's not what's reflected -- reflected.  The brand name

11 again, Zonolite, Z-o-n-o-l-i-t-e.

12         THE COURT:  Rather than Vermiculite?

13         MS. BROWDY:  Yes.

14         MR. BIANCA:  Vermiculite --

15         MS. BROWDY:  Yes, I think vermiculite is a substance.

16         MR. BIANCA:  It is a substance.

17         MS. BROWDY:  Yes, it may or may not be a mineral or a

18 rock or something like that, but it's not a brand name.

19         THE COURT:  It's part of Zonolite.

20         MS. BROWDY:  But I don't -- the problem is I don't

21 know what else it is or isn't a part of.

22         THE COURT:  I don't either, but wending my way

23 through all the Zonolite stuff convinces me that it's

24 definitely part of Zonolite, and I'm not so sure that that's

25 not enough to get you into discovery.  It may not say Grace's

**J&J COURT TRANSCRIBERS, INC.**

1    product, but I think to strike a claim when it has at least

2    some evidence that, in fact, there is a product in that

3    building that could be debtor's I think is enough to get into

4    discovery.  So I'm not going to strike St. Vincent.  I think

5    you two -- you and Mr. Speights need to check with respect to

6    the documentation as to Methodist Hospital and Bayshore,

7    because, if, in fact, he's got Grace invoices, frankly, that's

8    enough.  That should be enough.

9          MR. BIANCA:  I will confer with Mr. Speights, but

10    again, we have not seen those documents.  Then regarding the

11    additional I guess California State University claims on this

12    -- of these 11 claims, again, you know, those did not include

13    any kind of product identification.

14          THE COURT:  Well, I think we just need to defer the

15    California issue until tomorrow to see whether there is some

16    miscommunication or some followup in the filing.  So I really

17    don't think I can address those until tomorrow.

18          MR. BIANCA:  Okay.

19          THE COURT:  And I'll defer Methodist and Bayshore

20    until tomorrow, so you can take a look at that.  I think with

21    respect to the St. Vincent, it's not the best, but it's enough

22    to get past this type of a process and into discovery.

23          MR. BIANCA:  The last category of claims are five

24    claims that provided bulk sampling reports but lacked any kind

25    of analysis as to whether or not the samples were consistent

1  with a Grace asbestos-containing product, and these samples

2  merely indicate that asbestos is present, and they don't

3  indicate that it's a Grace product.  The absence of any kind of

4  analysis is unusual given the fact that, as Mr. Speights has

5  stated, these had Dr. Longo given an opinion on --

6          THE COURT:  Well, wait a second.  One of these is

7  California, and the other four are Coca Cola.  Are we into the

8  same issue that we've been in before?

9          MR. BIANCA:  The same issue.  The Coca Cola, again no

10  product identification.

11          THE COURT:  Right, so as I said earlier, with respect

12  to Coca Cola, if I can, I will strike those claims.  With

13  respect to California, I have to defer those to tomorrow,

14  unless, Mr. Speights, there's some reason for me to address

15  these last one, two, three, five claims differently.

16          MR. SPEIGHTS:  Your Honor, I don't have -- you know,

17  it's just the same.  It's just three.  It's California, Coca

18  Cola, and these three claims.  But I do want to say this.  I

19  hope next time that Grace wants to jump on will be as kind as

20  I'm about to be.  These documents were produced to W.R. Grace.

21  This is a log of what was produced to W.R. Grace as a part of

22  the document production on all three of them, and I'm sure that

23  they have their bureaucracy and I have my bureaucracy, I

24  believe that they just lost track of these.  What I was citing

25  to you about these invoices -- after the Gateway objection you

**J&J COURT TRANSCRIBERS, INC.**

1 said everybody go to work, and we went to work, and we gave a

2 lot of documents and have supplemented and supplemented.  These

3 are documents that we've already given to W.R. Grace.  I

4 believe -- and, of course, I could be wrong, and I'll have to

5 apologize tomorrow or some other day, but I believe we've given

6 all of that backup.  And vermiculite by the -- just for a

7 fellow who's been dealing with Grace since 1982, if you look up

8 the word Zonolite, it is a synonym of vermiculite.  That is a

9 definition of Zonolite.  It's vermiculite.

10      MS. BROWDY:  Thank you, Your Honor.  The next

11 category up would be previously settled claims.  We're down to

12 two of those, and they're going to be addressed by my

13 colleague, Mr. Dierkes.

14      MR. DIERKES:  Good afternoon, Your Honor.  Michael

15 Dierkes on behalf of the debtors.  As Ms. Browdy said, I'm

16 going to address the settled claims category, and we're down to

17 just two.  Those are claim numbers 12299, which is Frazier

18 Health Authority in British Columbia, Canada, and claim 12355,

19 which is a British Columbia Institute of Technology, also in

20 BC, Canada.

21      So these are both public buildings in British

22 Columbia, Canada, and as such, they're barred by a settlement

23 that Grace and the Province of British Columbia entered into in

24 1995.  I gave Mr. Speights a copy of the settlement earlier

25 today, and I have a copy for the Court.

1                         (Pause)

2          MR. DIERKES:  The key provision is paragraph 4.1 on

3    page 6.  And what it essentially says is that the Province of

4    British Columbia is barred from bringing any claims against

5    W.R. Grace that relate to asbestos property damage, and that's

6    precisely what the two claims that are still left, 12299 and

7    12355, are.  So we'd respectfully request that the Court

8    disallow those claims.

9          THE COURT:  Mr. Speights.

10         MR. SPEIGHTS:  Your Honor, earlier today was a few

11   minutes before we stepped in here.  Grace had claimed that it

12   could give us a copy of this, because it was confidential.  I

13   accept the fact he now realizes it's not confidential by a

14   provision.  I was a little -- not quite so understanding when

15   they had sent me a letter on all my claims saying

16   confidentiality would be waived, unless you objected within 30

17   days.

18         But leaving that aside, I now have the document.  I

19   haven't read the document.  I will read the document, have

20   somebody in my office read the document, talk to somebody in

21   Canada.  We investigated this -- these two buildings.  We've

22   gotten rid of everything but these two buildings.  We

23   investigated, and the person that they told us to contact did

24   not recall any release of these two buildings, so I don't think

25   this is something I can get back to you tomorrow.  The release

**J&J COURT TRANSCRIBERS, INC.**

1  is -- I'm going to back with one of three answers.  We agree it

2  releases, okay, or we don't agree it releases, and we'd like to

3  point out to you why in a letter or a brief, and we can do that

4  right away, but I just can't deal with a release that's handed

5  to me right while I walk in the courtroom.

6        THE COURT:  Okay.  This relevant section -- because I

7  am seeing it just now -- says that the Province won't commence

8  any action, any place, any time based on any claims advanced

9  under the property actions.  Where is property actions defined?

10 That's in -- on page 3 at the top of paragraph A.  "Property

11 actions means those actions brought in the Supreme Court of

12 British Columbia, Vancouver registry listed in Schedule A to

13 this agreement."

14       MR. DIERKES:  Your Honor, I can address that issue.

15 The settlement attaches Schedule A, which was property damage

16 claims that were pending against Grace at the time that the

17 settlement was entered into.  But if you look at the language

18 on the top of page 7, the settlement also compromises any

19 future claims.  It says -- looking -- starting from the bottom

20 of page 6, "removal or abatement of --" and then moving on to

21 the top of page 7, "-- of asbestos-containing products

22 including --" and I think the key language is "-- without

23 limitation any of the claims advanced under the property

24 actions."

25       THE COURT:  That's what it says.

**J&J COURT TRANSCRIBERS, INC.**

1        MR. DIERKES:  And, Your Honor, we're fine with Mr.

2   Speights' proposal to put this off while he investigates this

3   with his client, and --

4        THE COURT:  So these two buildings are not two

5   buildings that were listed in the action at the time it was

6   commenced.  The debtor is relying on the including without

7   limitation provision.

8        MR. DIERKES:  That's correct, Your Honor.

9        THE COURT:  Okay.  So you want this adjourned until

10  the February omnibus, Mr. Speights?

11       MR. SPEIGHTS:  Yes, Your Honor.  And again if they're

12  right, I'll acknowledge it.  I just -- I don't have evidence of

13  that yet.

14       MR. DIERKES:  That's fine, Your Honor.

15       MS. BROWDY:  Your Honor, that will take us to item D,

16  missing basic property address which --

17       THE COURT:  One minute, Ms. Browdy.  Let me get my

18  notes caught up here.

19                    (Pause)

20       THE COURT:  Okay.  I'm sorry.

21       MS. BROWDY:  Your Honor, agenda item D, missing basic

22  property address.  There's one claim still falling under that

23  objection.

24       THE COURT:  All right.

25       MS. BROWDY:  Mr. Bianca will address it.

1        MR. BIANCA:  The one remaining objection for the

2 missing basic property address, the objection refers to claim

3 number 11253.  This was filed on behalf of the YMCA, and it's

4 missing the city and street address for the property at issue

5 and merely provides that it's a YMCA building in Nebraska

6 somewhere.  The supporting documents fail to shed anymore light

7 on this.  They just mention it's a YMCA building.  Without

8 knowing the actual property at issue here, Speights simply

9 failed to provide --

10        THE COURT:  Yes, that's the basic issue.  Let me find

11 out what the problem is with this one.  That's pretty basic.

12 Mr. Speights.

13        MR. SPEIGHTS:  All right, Your Honor.

14                        (Pause)

15        MR. SPEIGHTS:  This is the claim for 1039 P Street.

16 It's an amended claim form.  We amended it a long time ago.

17 There's the street address.

18        MS. BROWDY:  Your Honor, if I could add some

19 clarification.  If that's an amended claim form, what's the

20 claim number on this one that we're being shown?

21        MR. SPEIGHTS:  I don't know, but I can find out.

22 I'll also point out on the authorization 1039 P Street,

23 Lincoln, Nebraska 68508.  So I'll get the date for an amended

24 claim form.  We customarily amend claim forms to get more

25 information.  This wasn't done last night or a week ago or

        **J&J COURT TRANSCRIBERS, INC.**

1 anything like that.  Apparently, it's the same thing like

2 California.  There seems to be something -- some disconnect on

3 the amended claim forms and claim forms there.

4        MS. BROWDY:  Apparently, Your Honor, there is a

5 disconnect on the amended claim forms, and I know for some of

6 these the amended forms, they're giving them new numbers, so

7 we're getting into duplicates.  I knew we were going to have to

8 clean up that, but if they have an amended one, which has a

9 different number that has the information, then that should be

10 the live claim, and the one we have that's garbage should be

11 stricken.  So I don't know if the parties need to get together

12 to sort that out.

13        THE COURT:  I think you do, and you're correct.  The

14 amended claim should be the claim not the prior claim, because

15 it's amended, and they have duplicate -- or pardon me --

16 different claim numbers.  There should only be one live claim,

17 so I think you do need to speak with Mr. Speights about this.

18        MS. BROWDY:  Yes, we'll meet and confirm.

19        MR. SPEIGHTS:  I'll be glad to speak to Ms. Browdy,

20 but I believe the problem may be a little broad.  I believe

21 whoever is running their facility, they need to have some

22 discussions with, so when these amended claim forms come in,

23 there can be some accounting there to deal with the situation,

24 because I don't think it's limited to two or three.  I think we

25 have a problem here as I perceive it just for the first time

**J&J COURT TRANSCRIBERS, INC.**

1  this afternoon.

2         THE COURT:  Yes, if they can tell what claim form is

3  being amended, but I think that's the issue.  You ought to tell

4  them what claim form it's amending, so if you have the proof of

5  claim number on it, then they know it's amended, and they can

6  market it as such.  But if you don't tell them what claim form

7  is amending, if the first one came in without a building

8  address, and the next one had a building address, they're not

9  going to know that it's the same claim form that you're

10 amending.  I mean so --

11        MR. SPEIGHTS:  My paralegal, who's been doing this,

12 tells me we do have the claim number on it -- the original

13 claim number on it so --

14        THE COURT:  Well, I think you two need to get

15 together, because -- and I think you need to talk to the claims

16 agent, too, so that when an amended claim comes in, if there is

17 not an indication of what the original claim number is, that a

18 copy of it is sent back to the party saying, you know, within

19 five days give me the original claim numbers, so I can mark it

20 appropriately, because this isn't something we should be

21 spending a lot of attorney resources to do.  The claims agent

22 ought to be doing this, and frankly, that's not rocket science

23 to figure out.

24        MS. BROWDY:  It's going to be a lot easier as we have

25 hundreds of claims rather than thousands.  I'd --

1          THE COURT:  Well, maybe, but, you know, you hire a

2 claims agent, because they have expertise in doing this, and if

3 it's that much of an issue -- if, in fact, these amended claim

4 forms are properly filed, I'm a little concerned about this

5 claims agent.  Okay.  What else, Ms. Browdy?

6          MS. BROWDY:  The next one --

7          THE COURT:  I'll defer this one again until February,

8 so you can check it out.

9          MR. SPEIGHTS:  Yes, to assist somebody who's looking

10 into this, I don't believe that we knew there was an amended

11 claim number until we received their schedule for this hearing.

12 So when we file an amended claim, I don't think we get the

13 amended number.  So we've been operating under the original

14 number, and you've been operating apparently under the amended

15 number.  That's based upon a 30-second investigation.

16          THE COURT:  Well, I think they're operating under the

17 original number, too, because they're not aware of the amended

18 claim.  That's the problem.  You know about it but don't have a

19 different number.  They don't know about it.  That's the

20 problem.  So there's a problem with the claims agent that I

21 want fixed, or else I want a different claims agent in place.

22          MS. BROWDY:  We'll follow up with that, Your Honor.

23 That would take us to agenda item E which is 41 claims lacking

24 signature.  My understanding was that Mr. Speights was going to

25 sign them, but I just don't know what the status of that is,

**J&J COURT TRANSCRIBERS, INC.**

1  and, obviously, to say he's going to sign that, that's not

2  without -- that would not prejudice our ratification argument.

3  It's just these are examples where the question is not

4  signature on authorization, rather, it's the claim form itself

5  was not signed.

6          THE COURT:  Isn't signed.

7          MR. SPEIGHTS:  They put a stack in front of me, and I

8  was signing, and one stack somehow got moved from A to B, and I

9  have signed those, and I sent them to the claims agent.

10          THE COURT:  You can, or you did?  I'm sorry.

11          MR. SPEIGHTS:  I did, and I have.

12          THE COURT:  You already signed them.

13          MR. SPEIGHTS:  I have.  In the last few days I signed

14  them and sent them out to the claims agent with my signature on

15  them.

16          THE COURT:  All right.

17          MS. BROWDY:  That would take us to item F, and

18  there's one claim still missing basic information.

19          MR. BIANCA:  This one claim is claim number 12433,

20  and the information -- it didn't contain any information about

21  the claimant on the form, but we were able to discern by

22  looking at the documents attached to it that the claimant

23  appears to be a building called The Record.  Unfortunately, the

24  claim form doesn't answer the questions regarding if the

25  claimant owns the property, the date the property was built,

**J&J COURT TRANSCRIBERS, INC.**

1 the date that the property was purchased, its use, the number

2 of floors, square footage.  All the supporting documentation

3 indicates for us is that the building was constructed in 1973,

4 but it doesn't provide any other information that would remedy

5 the deficiencies on the claim form and --

6          THE COURT:  Mr. Speights.

7          MR. SPEIGHTS:  Your Honor, this is the log if we need

8 the documents --

9          THE CLERK:  You have to use the microphone.

10          THE COURT:  Do you have the Lavalier mike, Jan, or

11 hand held if he needs it?

12          THE CLERK:  Let me get that.  I --

13          MR. SPEIGHTS:  That's fine.  I can read it from here.

14          THE COURT:  Who did?

15          THE CLERK:  We need batteries.

16          THE COURT:  Oh, okay.  Okay.  Get it for tomorrow.

17 Okay?  Thank you.

18          MR. SPEIGHTS:  This is a log of the documents we

19 produced to Grace.  I'm not sure if counsel was referring to

20 the original claim form, or he had gone and looked at all the

21 documents we produced about this claim.  This is a log for this

22 claim form -- for this claim number.  You can see it down the

23 left side, the claim number, and on here are all the various

24 documents it would seem to me to satisfy the objection.  I

25 can't read them, because I don't have a microphone over there,

**J&J COURT TRANSCRIBERS, INC.**

1   but there are a plethora of documents, and I don't believe the

2   objection has merit given what we've already produced.  If they

3   want anything else, they can ask for it.

4          THE COURT:  All right.  These documents, just so the

5   record has some indication of what this report includes, has

6   such things as bulk sample analysis using PLM, project number

7   278.1, etcetera, 17 samples.  Asbestos survey, Kitchner -- I

8   can't read the rest -- Waterloo, I think, Record, 225 Fairway

9   Road, Kitchner, Ontario.

10          The next one is bulk sample analysis using PLM,

11   etcetera.  Then there's a letter from P-i-n-c-h-i-n

12   Environmental.  There is a bulk sample analysis using PLM,

13   etcetera.  So that's the type of thing.  Then there is one

14   invoice from Pinchin Environmental to The Record for consulting

15   services.  There is from what I can see just on the list there

16   isn't anything that tracks Grace to that, but that doesn't

17   necessarily mean that the documents themselves don't.

18          MR. SPEIGHTS:  And I'm not through, Your Honor.

19          THE COURT:  All right.

20          MR. SPEIGHTS:  That's the list there.  In addition,

21   we have an amended claim form here as well, and I don't know if

22   they are looking into the amended claim form which provides

23   more information.

24          MS. BROWDY:  Again, it sounds like the same problem,

25   Your Honor, which we're going to have to dig into.

1          THE COURT:  All right.  This one's continued until

2  February, too, so you both can check into it.

3          MR. SPEIGHTS:  Your Honor, I believe all of these

4  that have been continued to the omnibus probably can quickly be

5  resolved.  Of course, just for the record, I preserve my

6  position in the event I need some sort of evidence.  I know you

7  don't take evidence in omnibus hearings.

8          THE COURT:  Yes.  No, I don't at omnibus hearings,

9  but if we need a trial, I'll schedule one.

10          MS. BROWDY:  Okay, Your Honor.  We've already covered

11  amended item G for no product identification.  Item H is moot.

12  The two claims at issue have been withdrawn.  That gives us

13  item I, which is a Georgia statute of limitations, and J, which

14  are two Tennessee buildings.  My colleague, Mr. Dierkes, is

15  going to be prepared to address those, but I just obviously

16  note for the Court, Your Honor, yesterday we dealt with the

17  choice of law issue which we're going to be briefing in the

18  context of the Prudential case.  Again, we're prepared to go

19  forward to say why these claims are barred under Georgia and

20  Tennessee law, but I don't know if you want us to complete the

21  briefing on choice of law with respect to Prudential first,

22  which I think will have application across the board for

23  claims.

24          THE COURT:  Mr. Speights, what's your position with

25  respect to what law I should be applying to analyze the Georgia

**J&J COURT TRANSCRIBERS, INC.**

1  statute of limitations and the Tennessee statute of repose?

2  　　　　MR. SPEIGHTS:  I wasn't here yesterday, and I'm not

3  sure in what context it came of what state buildings were at

4  issue.

5  　　　　THE COURT:  Georgia.

6  　　　　MR. SPEIGHTS:  Georgia.

7  　　　　THE COURT:  They were I think private buildings in

8  the State of Georgia.

9  　　　　MR. SPEIGHTS:  Well, I do think it's a choice of law

10  question here, and if there's going to be briefing on that

11  issue to effect the decision here, I'd like to cut in on that

12  briefing as well.  I do think in Georgia -- I would say in any

13  state that a building owner has a right to bring the lawsuit

14  not only in the state where the building is located, but in

15  other jurisdictions where it has jurisdiction over W.R. Grace

16  and where the court will entertain such a suit.  That's not

17  every state in the union, but, for example, in the Bell South

18  case an Alabama building owner sued W.R. Grace in Connecticut,

19  and there's a published decision in that.  And where you do

20  that -- in Georgia we're dealing with the statute of

21  limitations questions -- I believe that the statute of

22  limitations -- the forum where you bring the suit typically

23  applies, and there may be exceptions in other states.  So I do

24  think you have a choice of law, and I do think in Georgia that

25  Grace has the burden in meeting its objection here to prove to

**J&J COURT TRANSCRIBERS, INC.**

1  Your Honor that not only would it have been entitled to summary

2  judgment in the State of Georgia on the statute of limitations,

3  which despite Mercer and St. Joe's if we can test for grounds

4  in our brief, but also that our Georgia building owner would've

5  been precluded from bringing the lawsuit in any other

6  jurisdiction.  So I'm happy to put us in the Prudential choice

7  of law with that -- apparently, yesterday that was the

8  discussion -- and run with that.  I'm happy to argue today, but

9  I have a feeling at the end of the day we've probably taken

10  similar positions.

11        THE COURT:  Well, Prudential conceded yesterday that

12  in the event that Georgia law applies, that the statute of

13  limitations was expired.

14        MR. SPEIGHTS:  And I'm not prepared to concede that

15  even though the two lawyers who lost that issue in Georgia are

16  Martin Dies and Dan Speights, but we have come up with some new

17  ways we think now we could survive in Georgia, but I tell you

18  that the first argument out of the box would be we can bring

19  this case somewhere other than Georgia.

20        THE COURT:  All right.  What about Tennessee, statute

21  of repose?

22        MR. SPEIGHTS:  Well, Your Honor, the statute of

23  repose is somewhat different from a statute of limitations.

24  I'm not sure what counsel is asking on that.  I'm happy -- if

25  there's an issue floating around, it would be best to wrap it

**J&J COURT TRANSCRIBERS, INC.**

1 in another issue.  I'm happy to do that.  We can argue today.

2 I don't know what counsel's desire is.

3      MS. BROWDY:  Okay.  Again we're happy to go forward

4 on the argument on the merits on the Tennessee statute of

5 repose.  I just wasn't sure again, in light of the choice of

6 law issues that came up yesterday, whether the Court wanted to

7 make sure we knew which law applied to which buildings at

8 issue.  My understanding from my colleague is that Mr. Speights

9 hasn't actually challenged that Tennessee law would apply to

10 this building, and that's my understanding.

11      MR. SPEIGHTS:  And I haven't conceded that, so I mean

12 I feel so strongly that we're right on the Tennessee statute of

13 repose, and I'm not trying to overstate that.  I mean lawyers

14 believe strongly in their position.  I feel so strongly on

15 that, and having won the issue myself in Tennessee a few years

16 ago, that I don't see the necessity of arguing the other ways

17 to try to deal with the statute of repose by going somewhere

18 else.  Obviously, if Your Honor disagreed with me on the

19 statute of repose, I would be up here saying, well, if I can't

20 litigate this building in Tennessee, I certainly want to

21 litigate it in some other state.

22      MS. BROWDY:  And that's the problem, Your Honor.  I

23 think that a much -- the decision the Court makes is going to

24 be binding on Mr. Speights.  We're arguing it for almost no

25 purpose or --

1          THE COURT:  Well, the debtor is the one who's raising

2     the objection.  I think Mr. Speights' clients just filed a

3     claim.  What your objection says is that the Georgia statute of

4     limitations bars the action.  And maybe the Georgia statute of

5     limitations bar the action, but the question is is Georgia the

6     only -- the applicable law, the only applicable law, and not

7     applicable law.  So I think once the proof of claim is filed,

8     you know, they don't -- the claimant doesn't have to tell you

9     under what state law they would pursue the claim.  But I still

10    question whether or not -- I don't look the Delaware choice of

11    law rules and figure out where Delaware is going to say -- with

12    which law Delaware would apply.  And, frankly, if the buildings

13    are in Tennessee and the issue is about Tennessee buildings,

14    I'm pretty sure that Delaware would probably look to Tennessee

15    law.

16          MS. BROWDY:  And that's certainly what we think that

17    the borrowing statute -- the applicable choice of law analysis

18    would get you.  So, as I said, we're prepared to go forward on

19    the Tennessee argument.

20          THE COURT:  Because these are not actions that were

21    filed pre-petition.  Right?  These are actions that could be

22    filed.  They're just claims against the estate.

23          MR. SPEIGHTS:  And I understand that, and I'm glad

24    we're down to such a narrow issue.  I do not want the record to

25    reflect that they're not choice of law in Tennessee, and I do

**J&J COURT TRANSCRIBERS, INC.**

1 | not want the record to reflect, as I said at the last hearing

2 | -- and nobody remembers this, and I said it to your colleague

3 | the other day -- you know, I thought -- I'm not sure that the

4 | statute of repose issue should be addressed at this point in

5 | the objection process.  Bu having said that, I'm prepared to

6 | argue Tennessee today, but again I'm going to take the position

7 | that if the Tennessee statute of repose applies, then certainly

8 | will available are the forums, and I'm happy to wait until we

9 | flush that out in the Georgia Prudential mess to do it.

10 | THE COURT:  Well, but I think the Georgia Prudential

11 | mess is a little different from this mess, because that mess

12 | involved a cause of action that was already pending in the

13 | State of New Jersey that involved buildings in the State of

14 | Georgia.  And the District Court apparently issued a ruling

15 | saying that New Jersey law would apply -- the statute of

16 | limitations applicable in New Jersey would apply.  If these

17 | actions have not yet been filed somewhere, then there's a whole

18 | different component to it, because I don't have a different

19 | state having exercised jurisdiction, and the complexity of

20 | which law applies is much less.  It's either going to be

21 | Delaware's choice of law rule, which I think without a cause of

22 | action having been filed is going to get you back to Georgia in

23 | the case of the one building and Tennessee in the case of the

24 | other.

25 | The complexity with Prudential is the fact that this

1  other action had already been pending, and under those

2  circumstances Delaware may look to the jurisdiction where the

3  suit was pending as opposed to where the building was.  So I

4  don't think the issues are quite the same, Mr. Speights, and I

5  don't want to mislead you into thinking that I think they're

6  the same.  I'm not sure they are.

7          MR. SPEIGHTS:  I understand that, Your Honor.

8          THE COURT:  So I --

9          MS. BROWDY:  And again to clarify, Your Honor, we're

10  -- let's go back to Georgia now.  Again we are prepared to

11  argue it.  It's my understanding though as part of the Speights

12  surreply they said, gee, any statute of limitations from any

13  state where I could possibly have brought the action, those all

14  have to expire before you can throw out a claim, and I think

15  that's fundamentally wrong, but I do think it's a choice of law

16  issue.

17          THE COURT:  I think it's a choice of law issue, too.

18  I'm not aware that any bankruptcy case has looked at choice of

19  law provisions that broadly to look at a claim that's filed in

20  a bankruptcy where there is no underlying pre-petition

21  litigation filed in some other jurisdiction.  I'm just -- I'm

22  not familiar with those cases, so if they're out there, please

23  cite them to me.  I need to read them.

24          MS. BROWDY:  Okay.  So again to stick with Georgia to

25  avoid mixing it up, again we're permitted to argue the Georgia

**J&J COURT TRANSCRIBERS, INC.**

1 case including why Georgia -- why it's the Georgia statute of

2 limitations that applies, but I offer, Your Honor, if you want

3 briefing on this in the same schedule we're doing for

4 Prudential before hearing the argument and having the benefit

5 of all of that, we're happy to defer it.

6      THE COURT:  I think Mr. Speights wants to piggyback

7 onto that briefing, and I think that's a legitimate request.

8 But, Mr. Speights, I would not rely on the set of facts that's

9 coming up in the Prudential issue.  I don't think it's going to

10 be the same.

11      MS. BROWDY:  Okay, and --

12      THE COURT:  And if you want to do the same thing on

13 the Tennessee statute of repose, that's fine, too, because I

14 think that is also a choice of law issue.

15      MS. BROWDY:  I agree, Your Honor, and just to clarify

16 for the benefit of Mr. Speights, who was not here yesterday,

17 our brief on the choice of law issue is going to go in on

18 February 3rd.  The claimants' brief is due February 24th, reply

19 briefs are due March 3rd, and the issue will be set for the

20 omnibus hearing on March 27th.

21      THE COURT:  Okay.

22      MS. BROWDY:  Okay, so that actually brings us to the

23 last item on the agenda which is the objection to claims that

24 have falsely asserted 2003 as the date the claimant was aware

25 of asbestos in the building.  We have indicated that we raised

**J&J COURT TRANSCRIBERS, INC.**

1  that objection to essentially all pending claims.  My

2  understanding from the Court's ruling earlier this afternoon,

3  we would only go forward as to the U.S. claims not the Canadian

4  ones.  But I also had a sense from the Court that the Court may

5  not believe this issue is ripe for adjudication, and I don't

6  know if I should launch into my argument, or if a discussion in

7  advance would be --

8         THE COURT:  Well, I -- the reason I'm not sure that

9  it is appropriate for adjudication on this basis is I think

10 you're going to have to show me building owner by building

11 owner what day they knew about the -- not just the presence of

12 asbestos but the presence of Grace's product.  Isn't that the

13 issue?

14        MS. BROWDY:  Well, I think that there are a couple

15 problems, Your Honor.  One this is the claim form asks the

16 owner to identify what date they had knowledge of asbestos on

17 the property, which Mr. Speights reply paper has suggested they

18 interpreted it to mean Grace asbestos.  But that's really just

19 not consistent with the record we have in this case.  For

20 example, Your Honor, we know again from dealing with the

21 Anderson Memorial case issues back in October that hundreds or

22 thousands of claims were submitted in this case by Mr. Speights

23 on behalf of claimants the firm had never met and never spoke

24 to, and they all indicated 2003 as the date of knowledge, so,

25 obviously, it's not reflecting anything.

1          The same thing when Speights now says, well, it's not

2    the date we knew of asbestos on the property.  It's when we

3    knew of Grace asbestos on the property.  The problem with that

4    comment, Your Honor, is that because the Court ordered Speights

5    to produce evidence of authority and product I.D. and the like,

6    Speights in response to this Court's order, docket 9501,

7    identified more than 15 hundred buildings that ultimately were

8    withdrawn that had no product I.D., and those all listed 2003

9    as the date of knowledge.  So it was just a -- it's not 2003

10   was when they first knew about Grace.  Two thousand three is a

11   date that the firm just made up on the claim form with no

12   factual basis.  It's --

13          THE COURT:  Well, that may be, but I think you need

14   to prove that as a matter of claimant by claimant.  I don't

15   think it's a valid assumption to say that there is not one of

16   these -- I'm not sure how many -- 60 claims that are in this

17   category -- U.S. claims that are in this category that really

18   didn't have knowledge of something until 2003.  It's a fact

19   inquiry.

20          I understand you want to get into the reasonable duty

21   to inquire, and if, in fact, the building owner had some

22   knowledge of anybody's asbestos on the property, hypothetically

23   speaking, back in 1980, then they may be barred by the statute

24   of limitations.  Maybe they had a duty to inquire and

25   investigate at that time to find out that it was Grace's

**J&J COURT TRANSCRIBERS, INC.**

1  product.  But I don't think it's valid just to say that because

2  they put 2003 down on a claim form, (a) that it's false, or (b)

3  that it's false as to all claimants who listed 2003.  It's a

4  factual issue.  Isn't it?

5          MS. BROWDY:  Well, I think the problem is again that

6  there is such an abysmal track record at this point by this --

7          THE COURT:  Regardless.  I mean there may -- there

8  may be an abysmal track record as to, you know, 2,911 out of

9  2,912 claims, but if there's one valid claim, I'm not going to

10 strike it, simply because the other 2,911 aren't proper.

11         MS. BROWDY:  Well, here's the problem I have again,

12 Your Honor, and we reflected it in our 15th omnibus objection,

13 which is we can only take these clams forms and start with the

14 presumption that the data people gave us signed under the

15 penalties of perjury were true.

16         THE COURT:  Right, so assuming that 2003 really is

17 the right date, then I have to accept that as prima facia

18 evidence that that's the date.

19         MS. BROWDY:  But the problem is we know definitively

20 that that date was a lie.  We know that for at least 15 hundred

21 or --

22         THE COURT:  And they've been stricken --

23         MS. BROWDY:  Correct, Your Honor.

24         THE COURT:  -- or withdrawn.

25         MS. BROWDY:  But then there's no -- there should not

1 be a presumption of validity for the other entries.

2          THE COURT:  I don't think it works that way, Ms.

3 Browdy.  I think every proof of claim form gets a presumption

4 of validity, and it's the debtor's obligation to challenge that

5 presumption.

6          MS. BROWDY:  Again, we're here challenging it.  We've

7 made an objection.  We've made a record of the others, and we

8 would ask then at the least, Your Honor, that Mr. Speights be

9 forced for every remaining claim to go back to his claimants

10 now that we understand that this is a question that we're

11 entitled to a true answer for and go back and get the signature

12 of the claimant under oath answering that question.

13          THE COURT:  All right.  That's fine.  Mr. Speights, I

14 think the issue is not when you knew but when your client knew,

15 and if there's some -- you know, some issue about it, I think

16 your clients ought to tell us what the date of knowledge was.

17          MR. SPEIGHTS:  May I be heard on that, Your Honor?

18          THE COURT:  Sure.

19          MR. SPEIGHTS:  And I'm trying to be constructive.  I

20 understand you think the clients should provide some more

21 information.  I'm not going to argue with you on that.  Ms.

22 Browdy and I seriously disagree on the interpretation of the

23 question at issue.  We don't need to get bogged down in that

24 now.  I've had other people look at it, and I've got a plethora

25 of interpretations of that question by people not involved in

**J&J COURT TRANSCRIBERS, INC.**

1  this.

2           The question is -- and whether it's asked pursuant to

3  your directing us to ask it or my interrogatory to our clients,

4  the question is what is the question?  What is the question

5  that the clients are going to answer?  What is it that we want

6  to know from the clients?

7           THE COURT:  Actually, I think you want to know two

8  things.  Number one, what is the dates that they knew there was

9  asbestos in the building, and number two, what is the date that

10  they knew that it was Grace's asbestos in the building.

11           MR. SPEIGHTS:  And then my third question would be --

12  and I'm not commenting yet on what you think on that, but my

13  third question would be is -- and I'm not trying to be coy with

14  this -- who's the client?

15           THE COURT:  Well --

16           MR. SPEIGHTS:  Because we've done this in litigation.

17  Are you asking for when the CEO of the company knew, when the

18  asbestos coordinator knew, when the maintenance worker knew,

19  when the previous owner knew?  I mean Grace has taken bunches

20  of depositions trying to figure this out from all sorts of

21  people.  Is it sufficient if I write the head honcho at my

22  client and say Judge Fitzgerald has directed me to ask you when

23  did you first know?  I mean I want to get it right this time

24  and --

25           THE COURT:  Corporations act by agents all the time.

**J&J COURT TRANSCRIBERS, INC.**

1  I mean this is not a bankruptcy issue.  This is either a

2  corporation or partnership or whoever owns the building.  Maybe

3  it's an individual owner, and in that case it's pretty easy.

4         MR. SPEIGHTS:  But I asked Grace -- asked them for

5  years when did you first know that asbestos caused

6  mesothelioma, and they would say, well, various employees may

7  have known certain things, but the corporation itself didn't

8  know.  I guess --

9         THE COURT:  They're not going to play that game here

10 either, Mr. Speights.  Neither side is going to play that game.

11        MR. SPEIGHTS:  All right, then I want to comment on

12 the --

13        MS. BROWDY:  Your Honor, this could be very

14 straightforward.  I want the signature of someone who can bind

15 the claimant.

16        MR. SPEIGHTS:  That's what I thought.  Now --

17        THE COURT:  So if it takes the President of the

18 company, and he has to send an e-mail out to every employee,

19 past and present, then I guess, you know, companies do this

20 kind of thing all the time.  They know how to get information.

21        MR. SPEIGHTS:  I understand that, Your Honor, but

22 that leads me to my next concern.  And it may be a concern --

23 I'm not sure.  This may be of concern of other property damage

24 claimants beside my own.  I don't want to do something that's

25 not going to -- this is going to be a lot of work on behalf of

**J&J COURT TRANSCRIBERS, INC.**

1  my clients.  They are claiming in the bankruptcy, and if they

2  need to do the work, they will do the work.  Okay?  But I

3  really would like us to pause a minute and ask is this going to

4  accomplish anything, because the law seems to be almost

5  universal now that it does not matter when you knew that you

6  had asbestos or does not matter when you knew that you had

7  Grace's product.

8          The statute of limitations decisions from throughout

9  the country have now developed over the last 20 years or more

10  into consistent findings that the important question is not

11  when you knew you had asbestos or even if it was Grace's

12  asbestos but when you knew your building had been injured.  In

13  the MBU case, which I've cited many times to you, the lower

14  court judge, an Eisenhower appointee, one of the most

15  experienced judges in the mid-west, charged the jury that they

16  were entitled to know that Grace's product was identified in

17  1980.  That the building owner knew it and didn't bring it for

18  seven/eight years, and not surprisingly, the jury found against

19  the building owner, because the statute had run.  And the

20  Eighth Circuit Court of Appeals said, no, that doesn't trigger

21  a statute, not when you knew you had asbestos in floor tile or

22  TSI or some other material or even in Grace's product.  It

23  doesn't trigger it when you know that Grace's product is in the

24  building.  It's when you knew that -- knew or should have known

25  that you've been injured.

1        So at least I would suggest, Your Honor, that Grace

2 would have to tell you what benefit this information is.  I'm

3 not talking about the claim form now going out to all these

4 claimants.  What benefit is it going to do?  It may even be

5 that in most instances there almost could be a Grace question

6 based on a state by state.  I mean in those states almost

7 request you to admit that you knew about the presence of

8 asbestos before 1992 or 1987 or whatever, because we want to

9 take the position it doesn't matter.  They're going to take the

10 position, at least I've heard Mr. Bernick say, it's when they

11 knew they had asbestos, some sort of constructive notice.

12       But to require building owners to go digging in all

13 sorts of records of themselves and previous owners and previous

14 employees seems to me a gargantuan task if it doesn't get us to

15 where Grace wants to be and you want us to be, and I would ask

16 that we at least try to massage this little bit before we

17 undertake that.

18       MS. BROWDY:  Your Honor, this is actually a very good

19 introduction to tomorrow's class action hearing, because once

20 again Mr. Speights is trying to reargue issues that this Court

21 took head on four years ago.  There was plenty of argument,

22 I've read the transcript, I've seen the briefs as to what ought

23 to be in the claim form, what information the claimant was

24 required to provide.  Everyone else has had to put this

25 information in.

88

1        THE COURT:  Yes, the fact that they have to put the

2    information in and that Grace wants to know that information,

3    because it may prompt an inquiry duty -- I mean it may prompt

4    that, and under some states that may be enough -- is relevant

5    information, but it may not be the means all and end all to the

6    issue of the injury, as Mr. Speights says.  Now proof of claim

7    form from my point of view has many purposes, but the primary

8    purpose is to let the debtor tee up objections to the claims,

9    so that you can figure out what the universe of claims is, so

10   that you can get a plan underway.

11       MS. BROWDY:  Right.  So we're trying to get the same

12   information from Mr. Speights' clients that all the other

13   clients had to provide.

14       THE COURT:  So if you want it, that's fine.  You

15   know, you can send him an interrogatory or send the building

16   owners interrogatories and ask that question as to when they

17   knew whatever it is you want to know, but that's without

18   prejudice to Mr. Speights' ability to argue that that's not the

19   relevant question anyway.

20       MS. BROWDY:  I have no dispute with that, Your Honor,

21   but the point was that this question was posed to the

22   claimants.  The claimants were supposed to sign this under

23   penalty of perjury, and instead we had Mr. Speights and his

24   colleague sign almost 3,000 claim forms without making any

25   inquiry.  We shouldn't have to go through the hoops now of

1 serving discovery, having him make objections, come back before

2 the Court, and the like.  This is the information that the

3 Court required can be provided in response to the claim form,

4 and Mr. Speights should now be ordered by this Court to go back

5 to his clients and get the information that was asked for four

6 years ago from somebody that can bind these claimants.

7         THE COURT:  Ms. Browdy, I'll do that.  Here's the

8 problem.  If I do it, you're going to get the same kind of

9 probably wishy washy information you're getting, because

10 apparently, there is some dispute as to what the meaning of the

11 claim form is.  So if you want me to simply have Mr. Speights

12 go back to his clients, get a different date, if it's a

13 different date or the same date, if it's the same date, and

14 have the client sign it, I'll do that.  If what you really want

15 to know is what did they know and when did they know it, I

16 don't think that form is going to do it for you.

17         MS. BROWDY:  So you'd rather have us prepare

18 interrogatories and serve them?

19         THE COURT:  I don't -- look, it's the debtor's

20 discovery.  I don't have a view about how -- at this point in

21 time how to do it or not do it.  What I would like to do is

22 figure out which claims are valid claims, so that they can move

23 through the system and weed out the ones that aren't valid

24 claims, so that they don't have to weed through the system.

25 I'm just not convinced at this point that that question's going

**J&J COURT TRANSCRIBERS, INC.**

1   to do it for you, but, you know, you're in charge of your case.

2   I'm not.  So that's the -- if that's the form you want signed

3   and the question you want asked, then I'll direct Mr. Speights

4   to go back to each of those clients he's included in K on this

5   chart and get a client with authority to bind the claimants to

6   sign the proof of claim form, and if the date needs to be

7   changed, change the date, so that it's accurate.  If it's the

8   correct date, obviously, they'll leave it alone.

9          MS. BROWDY:  Can I have a brief recess before

10  responding, Your Honor?

11         THE COURT:  I think you should talk to Mr. Speights,

12  too, for a minute, but yes.  How much time would you like?

13         MS. BROWDY:  Well, actually, since we're going to be

14  before the Court at 9:00 a.m., should we just take this up

15  tomorrow morning?

16         THE COURT:  Mr. Speights, do you want to defer until

17  tomorrow to see if you two can figure this one out?

18         MR. SPEIGHTS:  That suits me fine, Your Honor.  I'll

19  also need to call my office and have them overnight all the

20  California State claims, so that gives me a chance to do that.

21         THE COURT:  All right.  It's continued until

22  tomorrow.

23         MS. BROWDY:  That was our agenda for this afternoon,

24  Your Honor.

25         THE COURT:  Anybody else have any matters today?

**J&J COURT TRANSCRIBERS, INC.**

1              (No verbal response)

2         THE COURT:  Okay.  I'll see you tomorrow.

3         MS. BROWDY:  Thank you, Your Honor.

4         MR. SPEIGHTS:  What time are we starting tomorrow,

5  Your Honor?

6         THE COURT:  Nine o'clock.

7         MR. SPEIGHTS:  Thank you, Your Honor.

8                      * * * * *

9                     **CERTIFICATION**

10         I, PATRICIA C. REPKO, court approved transcriber,

11  certify that the foregoing is a correct transcript from the

12  official electronic sound recording of the proceedings in the

13  above-entitled matter to the best of my ability.

14

15  /s/ Patricia C. Repko           Date:  February 3, 2006
16  PATRICIA C. REPKO
17  J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**