IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al. | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## GRACE'S STATUS REPORT ON THE PROGRESS OF THE CASE

Grace appreciates both the substantial efforts undertaken by the Court to date and the fact that progress toward resolution of this case sometimes has been less than clear. Overwhelmingly, such progress turns upon addressing the difficult substantive issues that are central to determining the true scope of Grace's legal liability. Sometimes, however, describing case developments fully to the Court has been a problem for all parties. Grace files this status report in an effort to set forth in the plainest possible fashion (1) a negotiation history that has not previously been fully reported to the Court, and (2) the concrete steps that have been taken by Grace in recent weeks both to respond to certain concerns previously expressed by the Court and to advance the case.

We want to reiterate at the outset, however, that the most persistent obstacle is neither a lack of communication, nor any unwillingness of the Debtors to bring the case to conclusion. Rather, resolving substantive issues remains key. Excepting one, these issues are well known to the Court. They are:

- The difficulty of distinguishing valid personal injury claims from the mass of "screening claims." The latter have been decried by all objective observers, ranging from the scientific community, to the Supreme Court, to legislators and, more recently, to certain federal courts.

- The wholesale creation of a new round of property damage litigation comprising reams of "new" claims,* a formidable undertaking made in this case and elsewhere by the ever-imaginative and patient Dan Speights.

- The less mature effort to hypothesize the existence of ZAI claims that are speculative in dimension and lacking in scientific and legal merit.

Probably less well known to the Court are the additional issues posed by the Government's decision to prosecute criminal environmental claims against Grace. These claims do not comprise a whole new area of civil liability (indeed, any civil injuries flowing from the underlying conduct at issue have been asserted against Grace in this case and in historical litigation that is to be resolved in this case). But the dimensions of the criminal case remain uncertain and its outcome unknown, adding to the uncertainty surrounding Grace's overall liability.

Uncertainty concerning Grace's liabilities nonetheless does not spell insolvency, albeit the claimants here would have the Court prejudge this to be so. The recent announcement of a consensual plan for USG is instructive. USG too claimed that it was solvent and prompted the same denials by the same constituencies that have urged the Court here to simply blink away the critical task of defining Grace's real legal liability. Now it turns out that USG has billions in equity value.

Beyond the substantive issues posed in this case, there are external factors as well – factors that Grace does not control – that have produced delay. Again, the Court is very familiar with some of these factors and less so with others:

- The Court itself has experienced the impact of (a) Judge Becker's decision to reassign the case to Judge Wolin (even as Judge Farnan was set to rule on Grace's request for case management orders), (b) Judge Wolin's decision to postpone even addressing the scope of Grace's personal injury liability, (c) the subsequent recusal of Judge Wolin,

---

* After approximately 20 years of property damage litigation, fewer than ten property damage suits remained pending as of the date Grace filed for Chapter 11 protection.

and (d) the resulting reassignment of the case for a second time. These events literally stopped in its tracks for nearly four years the task of defining Grace's personal injury liability, a task that only began for the first time six months ago when the Court approved the issuance of questionnaires.

- The Court probably is less knowledgeable about the unintended effects of the proposed asbestos legislation. The fact is that while passage of the legislation would have a dramatically positive impact upon this case, the legislation as proposed but not passed has had a dramatically negative effect, particularly on negotiations. It was not until an agreement was reached in the Babcock and Wilcox case last August that the personal injury claimants and an asbestos debtor were able to negotiate a contingency provision that permitted case resolution even though the legislation remained pending. The USG plan contains a similar feature.

So, what does this status report offer up that is new? Four things. *First*, it recounts in detail what was not disclosed fully to the Court last December – a chronology of the recent efforts (undertaken with Grace's full cooperation and indeed its initiative) to reach agreement on a plan. *Second*, it updates that account with a description of what has happened since December. *Third*, it describes the steps that Grace has taken to specifically address concerns expressed by the Court regarding the progress of negotiations and Grace's currently proposed plan. *Finally*, it reviews what can be done by the Court to assure further progress.

## I.    NEGOTIATIONS PRIOR TO THE DECEMBER HEARING

In connection with the extension of exclusivity last December, the Court received briefs from the personal injury claimants, the property damage claimants and David Austern, all asserting (some stridently) that Grace had done nothing to advance settlement negotiations. These representations were inaccurate, in part out of ignorance. Grace pointed this out in its own brief, but relied upon the expected oral report of Mr. Dies to set the record straight. For a variety of reasons, this never occurred and the Court was faced with the task of sorting out the truth from counsel's competing accounts. Not a good situation.

The affidavit of Robert Beber attached as <u>Exhibit A</u> sets out the history that Grace expected would emerge when Mr. Dies rose to speak. In submitting this affidavit, Grace intends

-3-

neither to criticize Mr. Dies nor to impugn his integrity.  Mr. Dies' presentation was constrained by many factors, none of them (in Grace's view) borne of an intent to mislead the Court.  But the fact remains that the full story was never told.

The essence of Mr. Beber's affidavit can be captured in a few sentences.  At the direction of the Court, Grace developed a proposed plan of reorganization in the Fall of 2004.  While the ensuing briefing concerning this plan focused on legal issues, an equally important function of the plan was to propose basic economic terms for a deal.  Grace devoted much thought and analysis to these terms when it put the plan together, and it specifically intended to use the plan as a vehicle for a real, dollar-oriented negotiation.  In doing so, Grace built upon principal-to-principal discussions that had occurred earlier in the case.  The whole idea was to re-start real negotiations.

And this is exactly what occurred.  Before filing the plan, Grace circulated a description of the plan and met with the parties.  The discussions involved principals.  And they came close to success.  The Court may recall that Grace asked for a 30-day extension of the deadline to file the plan.  This request was driven directly by the parties' optimism that an agreement was imminent.

This optimism ultimately proved to be only that.  A deal was not reached for reasons that are still unclear to Grace but that now are irrelevant.  And so the plan was filed without the support of the tort claimants.  The consequent developments in court were totally predictable: extensive briefing on legal issues raised by the plan, briefing on estimation, briefing on case management orders, etc. etc.

When all the dust settled, the Court deferred ruling on the legal issues raised concerning the plan and set the course for estimation.

-4-

But the fire of the nearly-reached agreement did still burn. Mr. Beber, former General Counsel for Grace, had developed a 25 year relationship with Mr. Dies. Both thought that an agreement to resolve the entire case was achievable, notwithstanding the recent stalemate. Mr. Dies, in turn, enjoyed a parallel relationship with Russell Budd, one of the key personal injury attorneys in the case. Dies and Beber agreed that Dies should discuss global resolution with Budd and see if progress could be made. Grace, in turn, met with other representatives of the personal injury committee and heard their suggestion that the personal injury claims should be settled. Judging that resolution of the whole case should be given priority over partial resolution, Grace decided to hold off on negotiating directly with the personal injury claimants (or with any claimants for that matter), leaving the field clear for discussions between Dies and Budd.

As of the December 2005 hearing, Grace had heard promising reports on the dialogue between Dies and Budd. Grace did not, however, know the terms of the deal currently under discussion. Relying upon its relationship with Mr. Dies, Grace was content to await his report to the Court.

As events unfolded, that report was very brief and did nothing to dispel the dark cloud cast over Grace's diligence by the previously submitted briefs.

## II.    WHAT HAS OCCURRED ON THE NEGOTIATION FRONT SINCE THE DECEMBER HEARING

Following the December hearing, Grace has sought to move negotiations forward on two fronts.

*First*, through Mr. Beber, Grace has encouraged the continuation of discussions between Messrs. Dies and Budd. Grace also has asked to learn the terms being negotiated, so as to avoid misunderstandings in the event that an agreement is reached. Grace has learned that the dialogue between Dies and Budd has not progressed, apparently because counsel for the personal injury

claimants have been fully occupied with the USG negotiations. Grace takes these representations at face value and does not suggest that the resulting delay is unreasonable. Grace still has received no response to its request for information concerning the Dies and Budd negotiation.

*Second*, in line with the Courts' prior reminder to Grace that it was responsible for taking the initiative on plan negotiations, Grace has sought to reactivate direct discussions with personal injury representatives. Specifically:

- Grace has had direct discussions with counsel for David Austern and with counsel for personal injury claimants.

- Grace developed and distributed a proposed structure for a consensual plan that would (a) reflect agreement with the general unsecured creditors, (b) resolve all issues with personal injury claimants, and (c) could grow to include an agreement with property damage claimants.

- At the invitation of the personal injury claimants, Grace has recently made a financial proposal for resolution of current and future personal injury claims.

Grace is prepared to proceed with either of the settlement tracks. Each has advantages and disadvantages, but either could produce resolution.

## III.    GRACE'S WORK ON PLAN AMENDMENT

Grace also has been at work both to address the Court's concerns with the plan on file and also to draft a plan to be used if agreement is reached with the personal injury claimants.

As to the plan now on file, the Court will recall that:

- That plan was filed on November 13, 2004 and amended on January 13, 2005 to include the support of equity and the general unsecured creditors.

- The plan called for a capped fund dedicated to the resolution of meritorious personal injury claims, the amount of the cap to be determined through estimation. Estimation would not be done for allowance or disallowance purposes but solely to set the cap.

- The plan further provided that other contested personal injury claims would be liquidated post-confirmation pursuant to a case management order. There would be no cap, and equity would be at risk.

- Property damage claims would be estimated for distribution purposes and paid.

- After the plan was filed, it was challenged on legal grounds, with a major focus being the issue of impairment.

- The Court heard extensive argument on the impairment issue on January 21, 2005 and decided to defer resolution of this and other plan issues and proceed with estimation.

- This the parties did, ultimately leading to the approval of questionnaires and case management orders.

At the December 2005 hearing, the Court re-raised the issue of impairment, focusing both on the proposed use of estimation to fix the value of personal injury claims and also on the hard cap. Grace clarified that the estimation was not for the purpose of liquidating individual claims but, instead, was designed solely to set the hard cap. This is fundamentally different than the approach to property damage claims. Property claims can be estimated for distribution purposes and should be so estimated where, as here, individual claim litigation with full discovery and a full trial would be too time consuming. Grace is prepared to discuss this matter in greater detail in connection with a proposed further amended plan, to which we now will turn.

Given the Court's concern with the hard cap, Grace is ready to file (if necessary) an amended plan that removes the cap on personal injury claims and puts equity at risk. Grace does not believe that the law requires this change but wants to get past the issue. A brief outline of the proposed amended plan is attached as Exhibit B. The actual plan revisions are in process and will be completed by the March omnibus hearing.

Filing such a plan, however, should await the outcome of the current negotiations. So as to minimize delay, Grace also is preparing amendments that could be used in the event that agreement is reached with the personal injury claimants. A short summary of that revised plan structure is attached as Exhibit C.

Again, Grace is doing the work necessary to pursue all options without delay.

IV.    **WHERE TO GO FROM HERE**

The path for keeping this case on track and the parties on a tight leash is clear.

*First*, given the distraction of the USG settlement, exclusivity should be extended for another sixty days so that the current negotiations can be given a fair chance. The deadline for personal injury claimants to submit questionnaires also should be extended accordingly.

*Second*, the estimation process for traditional property damage claims must continue. The large portion of the claims lodged by Mr. Speights solely for strategic and obstructive purposes remains a major impediment to meaningful negotiations.

*Third*, Grace submits that the time has come for the Court to issue its opinion regarding the ZAI claims. The Court previously alerted the parties that an opinion would be forthcoming at the end of January and properly suggested that the parties should use the window of opportunity to resolve the matter consensually. This has not occurred, and ZAI remains a significant uncertainty that limits the prospects of negotiating a consensual plan. The speculative nature of even the number of claims affects the other parties' confidence in dedicating funds to resolve other types of claims.

*Finally*, the Court should take proposals for a mediator to be appointed in the event that the negotiations prove unsuccessful. Grace believes that such an appointment is critical both to moving the parties toward resolution and to providing progress reports (non-substantive, of course) that are not biased by efforts to obtain leverage. The appointment of a mediator proved instrumental to resolving the Babcock and Wilcox case.

If the Court adopts the suggestions set forth above, all bases are covered. The active litigation will be focused, the questionnaire process will be available without delay if the negotiations fail, and the additional resources offered by a separate mediator likewise will be available without delay in that same eventuality.

- 8 -

Wilmington, Delaware
Dated: February 13, 2006

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
Salvatore F. Bianca
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

*And*

PACHULSKI, STANG, ZIEHL, YOUNG, JONES
& WEINTRAUB, PC

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4240)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
(302) 652-4100

Co-Counsel for the Debtors and Debtors in Possession

- 9 -