# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

### AFFIDAVIT OF ROBERT H. BEBER

Robert H. Beber, on oath, hereby testifies as follows:

1.   I am the former General Counsel of W. R. Grace. I was hired by Grace in April, 1988 to form an in-house team to manage asbestos litigation. I served in that capacity for some time and then as General Counsel from April 1991 to August 31, 1998. I am currently a consultant to Grace, having become a consultant on September 1, 1998, upon my retirement.

2.   My experience with asbestos litigation pre-dates my employment with Grace. I joined GAF Corporation in January 1981 as General Counsel and served in that role until May 1984. During my tenure with GAF, GAF was involved in both asbestos PI and asbestos PD litigation as a result of certain GAF floor tile products that contained asbestos.

3.   Both at GAF and then at Grace, I became acquainted with many of the asbestos plaintiffs' lawyers, including Martin Dies, Dan Speights and Ed Westbrook, who litigated and settled numerous significant PD cases with Grace.

4.   In the fall of 2004, I participated in a meeting with other representatives of Grace, representatives of PI and PD claimants and the FCR in Washington DC, to discuss a consensual chapter 11 plan. That meeting took place after Grace had circulated a proposed plan concept, in advance of the October 14, 2004 deadline for filing a plan. At that meeting, I believe that the parties came very close to agreement on the important economic terms of a consensual plan. In

K&E 10932004.4

fact, the parties were so close that PI and PD representatives and the FCR requested that the Debtors obtain a 30-day delay of the October 14, 2004 deadline, so that the parties could continue their efforts to reach consensus.

5. Those efforts continued but ultimately broke down. I was not sure why they broke down. However, based on the productive and positive professional relationship Mr. Dies and I had developed over the past 25 years, we believed that together we could be helpful in moving the Grace chapter 11 cases further along toward a consensual plan.

6. Commencing in or about February 2005, Mr. Dies and I began a regular and frequent dialogue with respect to a consensual plan. Mr. Dies indicated to me that the parties had gotten so close to agreement, that he believed an effort to restart the negotiations would be successful. Mr. Dies also indicated that he had a positive professional relationship with certain attorneys for PI plaintiffs, especially Russell Budd, and that he believed he could work with me, on behalf of Grace and Mr. Budd, on behalf of PI claimants to put together a consensual plan that would work for all constituencies.

7. As a consequence, I have participated in various meetings with key constituencies to discuss a consensual plan. The details of certain meetings, however, remain confidential at the request of the participants.

8. In the spring and summer of 2005, I participated with other Grace representatives in at least two meetings with Dan Speights. It was Grace's impression that the 3000 PD Claims filed by Mr. Speights posed a significant stumbling block to consensus on a plan. The meetings were set up for the purpose of seeing if we could get Mr. Speights to voluntarily withdraw certain claims and settle the balance of his remaining claims.

2

K&E 10932004.4

9.  During the spring and summer of 2005, Mr. Dies and I met several times in person and spoke at least weekly via telephone to discuss progress that had been made in several areas.

10. I understand that in late July or early August 2005, counsel for Grace, David Bernick, spoke with counsel for certain PI constituents. I understand that the parties discussed whether the Debtors and the PI claimants should try to negotiate a resolution of the PI claims separately.

11. At that time, I spoke with Mr. Bernick and others at Grace about the status of the various discussions. We all agreed that it made sense to continue to encourage and support Mr. Dies' efforts to structure a fully consensual plan by concluding his discussions with Mr. Budd and others representing the PI claimants. Failing that, Grace could pursue resolution of the PI claims separately.

12. From approximately September through December 2005 Grace, primarily through me, had almost daily discussions with Mr Dies with respect to plan progress. During that time, Mr. Dies indicated to me that the plan structure being discussed with personal injury claimants would include PI, PD and ZAI.

13. On December 2, 2005, the PI Committee filed an opposition to the Debtors request for an extension of exclusivity. In that opposition, the PI Committee took credit for having discussions with the PD Committee on a consensual plan but did not give either Mr. Dies or Grace any credit for, in fact, being the parties to instigate and push along those discussions. Nor, as I understood it, did Grace's role get accurately reported in the PD claimants report to the Court regarding plan discussions. The PI Committee did acknowledge that "substantial progress is being made" among the PI and PD Committees with respect to a consensual agreement. In

3

fact, Mr. Dies had told me that he had made a formal proposal on behalf of PD which included traditional PD and ZAI, and that the PI Committee was discussing the proposal.

14.  Since that time, I have been in frequent contact with Mr. Dies on the status of the negotiations. He has advised me that he is still waiting for a response from the PI claimants to the proposal made to them in December, 2005.

15.  Still today, neither I nor Grace have been told of the content of the discussions between Messrs. Dies and Budd.

16.  Grace has recently sought to activate discussions on a parallel track directly with the PI claimants.

Dated: February 13, 2006

_____
Robert H. Beber