# Exhibit "2"

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al., | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtor. | ) | Jointly Administered |
| | ) | |
| | ) | **Ref. Nos. 8394, 8395 & 8396** |

## OPPOSITION OF LIBBY CLAIMANTS TO DEBTORS'
## MOTION TO APPROVE PI CMO AND QUESTIONNAIRE

The claimants injured by exposure to tremolite asbestos from the Debtors'
operations near Libby, Montana[1] (the "Libby Claimants"), by and through their counsel, Cohn
Whitesell & Goldberg LLP and Landis Rath & Cobb LLP, hereby oppose W.R. Grace & Co.'s
Motion to Approve PI CMO and Questionnaire dated May 10, 2005 [Docket No. 8394] (the
"Motion") and the corresponding Memorandum of Points and Authorities in Support of W.R.
Grace & Co.'s Motion to Approve PI CMO and Questionnaire dated May 10, 2005 [Docket No.
8395] (the "Memorandum").[2]  This Opposition is based, in part, on the General Affidavit of Dr.
Alan C. Whitehouse (the "Whitehouse General Affidavit") and the Affidavit of Dr. Alan C.
Whitehouse Re: Grace Questionnaire (the "Whitehouse Questionnaire Affidavit"), which are
attached hereto as Exhibit A and Exhibit B, respectively.  In support of this Opposition, the
Libby Claimants state:

---

[1] As identified in the Verified Statement in Connection with the Representation of Creditors as Required by Fed. R.
Bankr. P. 2019 dated December 21, 2004 [Docket No. 7287] filed in Case No. 01-01139 (JFK), as it may be
amended and supplemented from time to time.

[2]  In addition to the objections set forth herein, the Libby Claimants also join in the objections to the Motion and
Memorandum set forth in the Opposition of the Official Committee of Asbestos Personal Injury Claimants to
Debtors' Motion to Approve PI CMO and Questionnaire (the "Asbestos P.I. Committee Opposition") filed on this
same date.

## BACKGROUND

On November 13, 2004, having been in chapter 11 more than three years, and having received six extensions of exclusivity during that time, the Debtors filed the Debtors' Plan of Reorganization dated November 13, 2004 [Docket No. 6895] (the "Plan"), the proposed Disclosure Statement therefor [Docket No. 6896] and several plan related motions [Docket Nos. 6898, 6899, and 6900] (collectively, the "Plan-Related Pleadings"). These documents reflected agreement with none of the asbestos constituencies. Review of the Plan-Related Pleadings as they relate to the Libby Claimants indicates that rather than sincerely attempting to address the claims of the Libby Claimants ("Libby Claims"), the Debtors have devised a mere stratagem designed to disenfranchise and disallow claims that any objective observer would characterize as legitimate—indeed, from the victims' standpoint, horrific—personal injury claims. Accordingly, the Libby Claimants filed a consolidated objection to the Plan-Related Pleadings dated December 22, 2004 [Docket No. 7335] (the "Plan-Related Pleadings Objection").

On January 13 2005, the Debtors filed their Amended Disclosure Statement [Docket No. 7559] and Amended Plan of Reorganization [Docket No. 7560] (the "Amended Plan"), again without reaching agreement with any of the asbestos constituencies. Instead of revising the Plan to address the numerous objections filed against the Plan-Related Pleadings, the Debtors' Amended Plan remains as legally unsupportable as the original Plan. As more fully discussed in the Plan-Related Pleadings Objection, the Amended Plan is erroneously premised on the legally incorrect position that it does not impair asbestos personal injury claims, including the Libby Claims. This defect will bar confirmation of the Amended Plan no matter what the aggregate level of allowable asbestos claims turns out to be. However, as this Court has observed, the Amended Plan contains a second defect: by its terms, the Amended Plan can only

2

be confirmed if the Debtors' aggregate asbestos liability is capped at $1,613,000,000.00. See Amended Plan § 7.6.1.

At a hearing on January 21, 2005, the Court directed the Debtors to work with the asbestos constituencies to negotiate a case management order for estimating the value of asbestos-related claims. Following the hearing, discussions were held among the parties, but the discussions did not result in any meaningful negotiations.

On May 10, 2005, the Debtors filed the Motion and Memorandum, which attempt to foist on this Court and the parties an estimation process that radically departs from norms established in other asbestos cases by making no provision to estimate the Debtors' asbestos-related liabilities based on historical verdicts or settlements. Rather, the Motion invents a series of bogus medical criteria and sets up a process of seemingly endless litigation clearly designed to improperly exclude many of the Libby Claims (as well as other legitimate claims) and to postpone the day when the Debtors must reckon with its asbestos liability. This Court should get this case on track toward a solution by adopting a case management order providing for an estimation process based on historical verdicts and settlements, to be considered within a reasonable period of time without protracted litigation.

## SUMMARY OF OPPOSITION

The Motion and corresponding proposed Asbestos PI Pre-Petition Litigation Proof of Claim Form/Questionnaire (the "Proposed Questionnaire") aim to unfairly limit the Debtors' asbestos liability. It is a fundamental principle of bankruptcy law that (except for express limitations on allowance of claims such as are found in Bankruptcy Code section 502(b)) the validity of claims is determined under applicable non-bankruptcy law. Raleigh v. Illinois Dep't of Revenue, 530 U.S. 15, 20 (2000). See also Butner v. United States, 440 U.S. 48, 55

(1979); <u>Bittner v. Borne Chem. Co., Inc.</u>, 691 F.2d 134, 135 (3d Cir. 1982); <u>Owens Corning v. Credit Suisse First Boston</u>, 322 B.R. 719, 721 (D. Del. 2005); <u>In re USG Corp.</u>, 290 B.R. 223, 225 (Bankr. D. Del. 2003). Flouting this requirement, the Motion and Proposed Questionnaire impose disease classifications and evidentiary requirements that seem designed—and will inevitably have the effect—of excluding or under-valuing claims permitted under state law and which have historically resulted in substantial verdicts and settlements.

As set forth more fully in the Asbestos P.I. Committee Opposition, the estimation method proposed by the Debtors is legally unsound, incapable of implementation, and an abuse of the bankruptcy process. The method is legally unsound because the Debtors are proposing to (a) measure their asbestos liability in accordance with medical standards of their own invention rather than standard American medical practice in the diagnosis and treatment of asbestos disease, and (b) exclude claims that do not meet these invented criteria even though similar claims have resulted in verdicts and settlements. The Debtors' proposed method of estimation is incapable of implementation because the Proposed Questionnaire cannot be completed in the proposed time-frame, there is no practical method of processing and utilizing the mountains of data that would result, and the process would dissolve in a quagmire of protracted litigation over the validity and value of individual claims. And the Debtors' proposed approach is an abuse of the bankruptcy system because it is self-evidently designed to over-burden and intimidate asbestos victims, exclude legitimate claims, and drag out this case through years of litigation— evidently in the hope that Congress will bail them out or the Debtors' victims will surrender. The Motion and Proposed Questionnaire are a barrier, not a pathway, to successful resolution of this case.

4

Even if the Court determines that a questionnaire is necessary, the Debtors' Proposed Questionnaire is not appropriate and must be substantially revised. The Libby Claimants, and other claimants, should not have the burden or expense of providing information that goes beyond what would be necessary to present their case to a jury in the tort system. Nor should the Libby Claimants, or any claimants, bear the risk that a legitimate claim will be under-valued or disallowed for failure to meet the unreasonable requirements and deadlines embodied in the Debtors' Proposed Questionnaire.

## DISCUSSION

### I.   The Proposed Questionnaire is Not Necessary for a Meaningful Estimation Process

The Proposed Questionnaire is not necessary for this Court to conduct a meaningful estimation process. Instead, the estimation process should reflect (a) historical verdicts and settlements in the tort system for the particular type of claim, and (b) the actual medical criteria that have proved sufficient to establish such claims.

### A.   The Estimation Process Should be Based on Historical Settlements and Verdicts

The truest estimation of the Debtors' asbestos liability is the settlements and verdicts that were entered prepetition. But the Debtors' have proposed an estimation process that will ignore history, creating a litigation nightmare that will take years to unfold. As grounds for its deviation from historical settlements and verdicts as a basis for estimation, the Debtors suggest that they are the victims in this case subject to claimants (a) with phony claims from mass screenings; (b) with pulmonary function tests that do not conform to American Thoracic Society (the "ATS") standards; (c) that have used peripatetic, hired gun doctors for diagnoses; (d) that present minimal or no proof of exposure to the Debtors' products; (e) that have shifted

5

their attention to the Debtors as a new target defendant; and (f) who will never be impaired.[3]
None of these complaints apply to the Libby Claimants:[4]

- **Phony claims from mass screenings**. There has never been a mass screening in Libby
  paid for by a law firm. The two screenings done in Libby were conducted by the Agency
  for Toxic Substances and Disease Registry and the State of Montana. As a result of these
  government screenings, the number of diagnosed cases increased dramatically. In the
  case of the Libby Claimants, virtually all saw their doctor before ever contacting an
  attorney about a claim.

- **Pulmonary function tests which do not conform to American Thoracic Society
  standards**. The Center for Asbestos Related Disease in Libby and the Klock and
  Whitehouse Clinic in Spokane, Washington have consistently and rigorously applied
  ATS standards. In fact, Dr. Whitehouse's technician, Mary Kay Collins, won U.S.
  respiratory therapist of the year for her excellence.

- **Use of peripatetic, hired gun doctors**. Long before there was any litigation, a large
  number of the Libby Claimants sought treatment from Dr. Whitehouse. He has treated
  victims of Libby Tremolite Asbestos Disease since 1980. Whitehouse General Affidavit
  at ¶ 5. The Center for Asbestos Related Disease has been treating patients since 2000. In
  virtually all cases, a Libby patient's medical records come from the treating physician,
  with a standard chart consisting of medical reports, physical exam, chest x-ray and/or CT
  scan, and full pulmonary function tests. In Libby, it is the Debtors who have a history of
  bringing in peripatetic, hired gun doctors in an attempt to defeat the testimony of the

---

[3] Memorandum at Tab 2.

[4] The Libby Claimants do not in any way suggest that the Debtors' complaints about asbestos claims apply to any other asbestos claims, only that this brief is meant to address only Libby Claims.

6

patient's own physician.  Not surprisingly, no judge or jury has relied upon the Debtors'

doctors in any of the trials on medical issues.

- **Minimal or no proof of exposure to the Debtors' products.**  In Libby, the Debtors
  were unquestionably the source of the asbestos that has caused the Libby Claimants'
  asbestos disease.  The Debtors do not contest this, nor could they since it is well
  documented that the Debtors' asbestos dust pervaded the community.  There is no issue
  of adequate exposure histories.

- **A shift to new target defendant.**  In Libby, the Debtors are not a victim of a shift in
  defendants.  The Debtors have always been the source of the asbestos exposure.

- **Payments to litigants who will never be impaired.**  Asbestos disease can be diagnosed
  radiographically before impairment sets in.  In Libby, as elsewhere, the current status is
  that most patients are unimpaired (no lung function under 80% of normal).  However,
  with Libby tremolite asbestos disease, there is at least a 76% probability of progression.
  Whitehouse General Affidavit at ¶ 40.  The unimpaired Libby Claimants are very likely
  to become impaired.

Since, as just demonstrated, the Debtors' complaints about asbestos claims do not

apply to the Libby Claims, the Libby Claimants can serve as a sort of "canary in the coal

mine"—an early warning about whether the Debtors are addressing their asbestos liability in

good faith.  If a proposed action by the Debtors, in this case their proposed estimation process,

does not adequately address the Libby Claims, which *the Debtors in accordance with their own*

*articulated criteria should accept as legitimate claims*, this Court can reach no other conclusion

than that the Debtors are trying to dodge rather than address their asbestos liability.  As will be

shown below, the Debtors have designed a Proposed Questionnaire and estimation process

7

calculated to impose on the Libby Claimants a series of medically unsubstantiated, burdensome and expensive requirements that are medically and legally irrelevant to the merits of the Libby Claims—with the apparent intent of excluding and/or under-valuing the majority of Libby Claims.

**B.    The Nature and Medical Criteria for Libby Tremolite Disease are Well Established**

Nowhere have the effects of asbestos been so devastating as in Libby, Montana—a town of about 2,600 residents. From 1963 to 1990, the Debtors owned and operated a mining and manufacturing facility in Libby, at which it produced vermiculite, an ore that was used to create zonolite, an insulation and construction material. But the vermiculite ore also contained dangerous levels of tremolite asbestos.[5]

Before the Debtors acquired the mine, it was operated by The Zonolite Company, which is now known as Montana Vermiculite Company, and is inactive. From the 1920's forward, the operators of the Libby mine knew of the asbestos in the vermiculite ore. In fact, from the 1950's forward, the State of Montana, Division of Disease Control performed industrial hygiene inspections that repeatedly resulted in reports finding asbestos levels far in excess of the standard, citing medical literature on the hazards of asbestos. The State reports also listed many recommendations on dust control. But the recommendations were not followed and, even after the Debtors recognized that the asbestos was toxic and fatal, and "a serious hazard," the workers were not told of the inspection reports or the asbestos hazard. Over the years as inspections continued, the State repeatedly objected to poor progress on dust control. The steps taken to

---

[5] Although the Debtors have manufactured products that contain asbestos as a working ingredient, the asbestos in the Libby mine was essentially a waste product.

address the problem were inadequate. The Libby operation remained hazardous to its workers and the community until after it was shut down in 1990.

Tremolite asbestos—the type found at Libby—is far more deadly than the more common chrysotile asbestos. Whitehouse General Affidavit at ¶¶ 29-40. About 95 percent of the asbestos used in construction materials in the United States was chrysotile asbestos. Id. at ¶ 5. As a result, the vast majority of asbestos disease in the United States is due to chrysotile exposure. Chrysotile is a serpentine asbestos; viewed under a microscope, its fibers have a curly shape. Id. at ¶ 10. The rare tremolite asbestos is amphibole asbestos; the amphiboles present long, sharp spear-like fibers, which migrate more readily through the structure of the lung to the pleura (the lining of the lung), and cause pleural disease. Id. at ¶¶ 10-12. Studies have indicated that tremolite asbestos is roughly five to ten times as fibrogenic (asbestosis causing) as chrysotile asbestos, that pleural disease resulting from Libby tremolite asbestos is much more highly progressive (meaning that the victim has a far greater chance of progressing from mild to moderate to severe disease) and that patients can die of tremolite pleural disease without evidence of interstitial disease. Id. at ¶¶ 34-40. Tremolite asbestos is ten times as carcinogenic as chrysotile asbestos and hundreds of times more productive of mesothelioma, the type of lung cancer specific to asbestos. Id. at ¶ 33.

Hundreds of Libby residents—workers at the Libby mine, their families, and townspeople who had the misfortune to breathe the dust-laden air—have been diagnosed with Libby tremolite asbestos disease. Over 200 people have died of Libby tremolite asbestos disease and others are at or approaching the end-stage disease.

Since 1980, Dr. Alan C. Whitehouse has evaluated or treated over 700 patients for Libby Tremolite Disease. Id. at ¶ 5. Currently he practices at the Center for Asbestos Related

9

Disease in Libby, where there are approximately 1,500 active cases of Libby tremolite asbestos disease. Id. at ¶¶ 2, 5. For the diagnosis of asbestos disease, Dr. Whitehouse follows the criteria established by American Thoracic Society (2004), "Diagnosis and Initial Management of Non-Malignant Diseases Related to Asbestos," Am. J. Respir. Crit. Care Med., Vol. 170:691-715 (2004) ("ATS (2004)"). Id. at ¶ 14. The diagnosis of asbestos disease generally requires at a minimum, a history of exposure to asbestos and a 15-year latency period. Id. at ¶ 15. ATS (2004) states the diagnostic criteria as follows:

- Evidence of structural pathology consistent with asbestos-related disease as documented by imaging or histology.

- Evidence of causation by asbestos as documented by the occupational and environmental history, markers of exposure (usually pleural plaques), recovery of asbestos bodies, or other means.

- Exclusion of alternative plausible causes for the findings.

Id. (citing ATS (2004) at p. 691). It is standard practice to use the ATS (2004) definition. Whitehouse Questionnaire Affidavit at ¶ 6.

> There generally appears to be a distinct pattern for Libby Tremolite Disease:
>
> a.    The disease appears to be predominately pleural, for the large portion of the time that people have the disease. In the Whitehouse (2004) study, 55% of the patients followed had no interstitial disease and 45% had only minimal interstitial disease.[6] By contrast, chrysotile asbestos disease is mainly interstitial disease. In Libby tremolite asbestos disease, interstitial disease becomes radiographically visible rather late in the process, and frequently is only a minor factor.
>
> b.    Frequently, subpleural interstitial fibrosis is seen on CT scans.
>
> c.    The pleural disease is highly progressive, leading to restrictive defect and shortness of breath. In June 2002 at the University of Montana Conference on Asbestos Disease, Dr. Whitehouse

---

[6] See Alan C. Whitehouse, Asbestos-Related Pleural Disease Due to Tremolite Associated with Progressive Loss of Lung Function: Serial Observations in 123 Miners, Family Members, and Residents of Libby, Montana, 43 Am. J. Indus. Med. 219 (2004).

presented four cases of radiographic progression and death by pure pleural disease. There was no evidence of interstitial disease in these four patients. There are many more patients who demonstrate this pattern. The mechanism for death by pleural disease is loss of pleural space resulting in episodes of hypoxia. Due to the highly progressive nature of Libby tremolite asbestos disease, once diagnosed with pleural disease, with multiple pleural plaques or diffuse pleural thickening and a loss of lung function, a patient has a high probability of death. In contrast, a patient diagnosed with chrysotile asbestos disease has a much lower likelihood of death.

d.      Very often there is an obstructive component associated with Libby tremolite asbestos disease. Obstructive defect has generally been associated with asbestos pleural disease in the literature. See Frazer and Pare, p.2445-46. See also Fishman, p. 884. In the Libby cohort it appears to be more pronounced.

e.      Pleural pain is often associated with Libby tremolite disease. This is often misunderstood as cardiac chest pain. See Lockey (1984), "Pulmonary Changes after Exposure to Vermiculite Contaminated with Fibrous Tremolite," American Review of Respiratory Disease (1984), 129:952-958.

f.      DLCO (diffusion capacity) is a particularly important indicator of the severity of restrictive disease in the Libby tremolite asbestos disease patients. In the Libby cohort, DLCO shows progressive decline along with FVC (Forced Vital Capacity) and TLC (Total Lung Capacity). In some individual cases there is significant asbestos disease on the chest x-ray and only the DLCO is reduced, not the FVC or TLC. Some patients with severe shortness of breath are severe only in the DLCO defect. In Whitehouse (2004), 76% of the 123 patients had progressive loss of lung function. Losses were about the same for FVC, TLC and DLCO at 2-3% per year. DLCO defect is probably associated with subpleural interstitial fibrosis. Whitehouse (2004) explains:

> Pleural changes alone are unlikely to cause a decrease in DLCO. DLCO decreases are likely to be associated with interstitial disease not apparent clinically on either plain chest radiograph or HRCT (High Resolution CT Scan).

Whitehouse General Affidavit at ¶ 40.

11

Not surprisingly, the highly progressive and deadly nature of pleural disease in Libby has resulted in historical verdicts and settlements far greater than for pleural disease in other asbestos cases. Libby average settlements for pleural disease have ranged from $212,000 (unimpaired claimant) to $343,000 (impaired claimant). Given that the distinct nature and medical criteria for Libby tremolite asbestos disease are well established, there can be no legitimate reason not to base an estimation on the historical verdicts and settlements for this particular type of claim.

## II.    If the Court Determines that a Questionnaire is Necessary for Estimation Purposes, the Debtors' Proposed Questionnaire Must be Substantially Revised

If the Court ultimately determines that a questionnaire is needed for estimating the value of asbestos-related claims in this case, the Debtors' Proposed Questionnaire must be substantially revised. In its present form, the Proposed Questionnaire is designed to exclude the Libby Claims (as well as other legitimate claims) by creating disease criteria that are not consistent with standard medical practice and devising procedural obstacles that can only be intended to deter (or make impossible) participation in the estimation process. Most notably, the Proposed Questionnaire (a) requires medically irrelevant and burdensome information and documents that go far beyond the requirements to establish a Libby Claim in the tort system; (b) imposes an unreasonable burden on the Libby Claimants to produce certain information and documents, or shifts the burden and expense of producing such information and documents compared to what the tort system would require; and (c) is unclear in important respects. Without substantial revisions to the Proposed Questionnaire, the resulting "estimation" exercise for the Libby Claimants would be narrowed to perhaps a handful of severe cases, resulting in drastic under-valuation of Libby Claims as a whole. Accordingly, if the Proposed Questionnaire is deemed necessary, it must be revised.

12

A.    **The Questionnaire Must Not Call for Medically Irrelevant and
Burdensome Information/Documents that go Beyond the Requirements to
Establish a Libby Tremolite Asbestos Disease Claim in the Tort System**

1. **The Debtors' Definition of Asbestosis is Contrary to Medical Literature
and Standard Practice and Diagnosis of Asbestos Related Disease**

Contrary to medical literature and standard practice and diagnosis of asbestos

related disease, the Debtors propose the following definition of asbestosis:

> **Asbestosis:** Asbestosis (1) diagnosed by an independent pulmonologist or
> internist certified by the American Board of Internal Medicine; (2) with
> either (a) a chest x-ray reading by a B-reader and replicated by an
> independent B-reader, both of whom are certified by the National Institute
> for Occupational Safety and Health, with one of the following: (i) at least
> 1/0 on the ILO grade scale, or (ii) diffuse pleural thickening as defined in
> the ILO's *Guidelines for the Use of the ILO International Classification of
> Radiographs and Pneumoconioses* (2000), or (b) asbestosis determined by
> pathology; (3) with an independent pulmonary function test demonstrating
> a FEV1/FVC ratio greater than or equal to 65% with either (a) total lung
> capacity less than 80% or (b) forced vital capacity less than 80%; and (4)
> with a supporting independent medical diagnosis and supporting
> documentation establishing exposure to Grace asbestos-containing
> products as a cause of the asbestosis.

Proposed Questionnaire at p. iv. This definition of "asbestosis" is so narrow it excludes the vast

majority of the Libby Claimants. As discussed above, the standard diagnosis of "non-malignant

asbestos-related disease" ("asbestosis" to the Debtors) is set forth in ATS (2004). To the ATS

(2004) standard diagnosis, the Debtors improperly add seven additional requirements.

(1) **Blunting of the costophrenic angle is not a requirement in the standard
diagnosis of asbestos related disease. There is no basis in the medical
literature for it. Its use excludes over 72% of Libby Claimants.**

The Proposed Questionnaire defines "asbestosis" to include "diffuse pleural

thickening as defined in the ILO's *Guidelines for the Use of the ILO International Classification

of Radiographs and Pneumoconioses* (2000)." Proposed Questionnaire at p. iv. In turn, the ILO

Guidelines (2000) require two findings:

13

393.001-8619.doc

      i.      blunting of the costophrenic angle[7]; and

      ii.     a minimum width of 3mm in the pleural thickening.

Whitehouse Questionnaire Affidavit at ¶ 5. The requirement of blunting is contrary to the ATS

(2004) statement of standard practice and diagnosis of asbestos related disease. Id. at ¶ 6. The

requirement of blunting is also contrary to standard practice in chest medicine. Id. Libby pleural

disease generally does not cause blunting of the costophrenic angle. Id. at ¶ 10. A study by Dr.

Whitehouse, measuring 79 sets of chest x-rays, found that 72% of the Libby Claimants did not

have blunting of the costophrenic angle. Id. *Of seven Libby Claimants dead of asbestos disease,*

*only four had blunting.* Id.[8] This requirement will exclude many legitimate claims, including

those of Libby Claimants.

      **(2) The requirement of a minimum 3mm pleural thickening is not a standard**
      **requirement in the diagnosis of asbestos related disease. There is no basis**
      **in the medical literature for it. Its use excludes over 38% of the Libby**
      **Claimants.**

      Like the blunting requirement, the 3mm requirement in pleural thickening

contained in the ILO Guidelines (2000) is contrary to the ATS (2004) standards. There is no

scientific basis for a requirement of 3mm thickness to diagnose "diffuse pleural thickening." Id.

at ¶ 11. As stated by the President of the American Thoracic Society, "diffuse pleural scarring

can be associated with greatly diminished FVC regardless of the extent or thickness of the

scarring or its bilaterality." Id., Exhibit 3.

      Dr. Whitehouse's measurements for the study of 79 sets of chest x-rays show that

about 38% of Libby Claimants are excluded by a requirement of a minimum 3mm thickness. Id.

---

[7] Costophrenic angles are the angles formed between the inner surface of the ribs and the dome of the diaphragm.

[8] Dr. Whitehouse performed the measurements of 79 sets of chest x-rays at the request of counsel, in response to a "blunting" requirement in early drafts of the 2005 asbestos bill. The blunting provision has since been removed from the Libby provisions in the 2005 asbestos bill.

14

Also, of the Libby Claimants with severe disease, *seven of 18 would be excluded by the 3mm*

*requirement.* Id. The 3mm requirement is improperly exclusionary upon the Libby Claimants.

> **(3) Lung function test requirements are not a part of the standard practice diagnostic criteria for asbestos related disease. There is no basis in the medical literature for such requirements. Their use excludes the vast majority of Libby Claimants.**

The Proposed Questionnaire defines "asbestosis" in terms of loss of lung function,

as measured on pulmonary function tests. Proposed Questionnaire at p. iv. ATS (2004) states:

> Demonstration of functional impairment is not required for the diagnosis of non-malignant asbestos-related disease.

Whitehouse Questionnaire Affidavit at ¶ 7 (citing ATS (2004) at p. 691). Again, the Debtors'

definition is not consistent with standard practice in chest medicine or the medical literature. Id.

The definition is highly exclusionary upon the Libby Claimants as the vast majority of them are

diagnosed with asbestos disease, but do not meet the lung function test requirements stated in the

Proposed Questionnaire. Id.

> **(4) Using only chest x-rays for diagnosis is contrary to the medical literature and standard practice in chest medicine. This limitation excludes many Libby Claimants.**

Yet another overly exclusionary criterion contained in the Proposed

Questionnaire's definition of "asbestosis" is the requirement for "a chest x-ray reading by a B-

reader and replicated by an independent B-reader." Proposed Questionnaire at p. iv. This too is

contrary to standard practice in chest medicine and the medical literature. Whitehouse

Questionnaire Affidavit at ¶ 8. ATS (2004) does not require the use of a chest x-ray for

diagnosis. Id. In fact, ATS (2004) states:

> Conventional CT is superior to chest films in identifying parenchymal lesions, rounded atelectasis and pleural plaques.

Id. (citing ATS (2004) at p. 696). In the publication by Public Citizen, titled "Leading Medical Experts Fault Arbitrary, Outdated Medical Criteria in Asbestos Bill," May (2005), doctors Harbut, Landrigan, Whitehouse and Oliver state:

> CT scans are about 33% more sensitive in detecting interstitial disease, and over 50% more sensitive in detecting pleural disease.

Id., Exhibit 2. In CT scans of the Libby cohort, sub-pleural interstitial fibrosis is often seen, which is not seen on plain chest x-rays. Id. It is thought that sub-pleural interstitial fibrosis often plays a major role in Libby pleural disease. Id. In the Libby cohort, CT scans are far more diagnostic than are the plain chest x-rays. Id. Thin diffuse pleural thickening is frequently seen in Libby patients. Id. It is difficult to see on chest x-ray, and seems to correlate with severe restrictive lung disease. Id. Use of only chest x-rays in the Proposed Questionnaire to define and diagnose asbestosis is highly exclusionary upon the Libby Claimants, as many are diagnosed through the use of CT scans.

### (5) Requiring a B-reading for diagnosis of asbestos disease is not consistent with the medical literature or standard practice in chest medicine. It is highly exclusionary upon the Libby Claimants.

Pursuant to the Proposed Questionnaire, to meet the definition of "asbestosis" a claimant is required to have two B-readings of a chest x-ray. Proposed Questionnaire at p. iv. Like the other requirements, this is not required in the ATS (2004) statement of standard practice in diagnosing asbestos related disease. Whitehouse Questionnaire Affidavit at ¶ 9. B-readings are not used in clinical practice. Id. There is no B-reader in Montana, and, as a result, very few of the Libby Claimants have had B-readings of x-rays used for disease diagnosis. Id. The requirement is unrealistic and is simply a way to exclude claimants.

**(6) The requirement of an FEV1/FVC ratio over 65 is not consistent with the medical literature or standard practice in chest medicine. Its use would exclude many Libby Claimants who have asbestos disease and COPD.**

The Proposed Questionnaire's definition of "asbestosis" requires an FEV1/FVC ratio of over 65. Proposed Questionnaire at p. iv. Again, this is contrary to the medical literature and standard practice in chest medicine. Whitehouse Questionnaire Affidavit at ¶ 19. The FEV1/FVC ratio is a measure of obstructive disease, meaning that the patient's ability to exhale is obstructed. Id. The lower the ratio, the greater the degree of obstruction.

While asbestos disease generally is a restrictive disease, meaning that the patient's ability to inhale is restricted, there is also an obstructive component. Id. (citing Fraser and Pare's Diagnosis of Diseases of the Chest, (4th ed. 1999), pp. 2445-46 and Fishman, p. 884). This is particularly the case with the Libby Claimants. Id. Accordingly, imposing a FEV1/FVC ratio requirement of 65 or higher will tend to exclude many Libby pleural disease patients who have obstructive disease in addition to their asbestos disease. Id. The obstructive disease may be from asthma, smoking, or even their asbestos disease. Id. This requirement is only another tactic employed by the Debtors to exclude legitimate claims based on their own self-invented disease criteria, and should be stricken from the Proposed Questionnaire. In any event, asbestos patients are independently diagnosed with asbestos disease radiographically and by physical examination, not on FEV1/FVC ratios. Id.

**(7) Use of diagnoses limited to those by a "pulmonologist or internist" is contrary to the medical literature. This limitation is exclusionary upon Libby Claimants.**

The Proposed Questionnaire limits diagnosis to an "independent pulmonologist or internist." Proposed Questionnaire at p. iv. The ATS (2004) statement of standard practice in diagnosis of asbestos disease does not so limit the doctors who may diagnose asbestos disease.

17

Whitehouse Questionnaire Affidavit at ¶ 20. In Libby, family practice doctors routinely diagnose Libby pleural disease. Id. This limitation is exclusionary upon certain Libby Claimants. Id.

The seven additional requirements discussed above are not consistent with ATS (2004) and all should either be stricken from the Proposed Questionnaire, or the Proposed Questionnaire should be clarified to indicate that the information needs to be supplied only if available (thus, for example, only claimants who happen to have obtained x-rays with B-reader readings thereof, would need to supply them). If the Court determines that any of these additional required items must be obtained whether or not already available, (a) the Proposed Questionnaire must be clarified to indicate that inclusion of such requirements is not a determination of the appropriate criteria for estimation of claims, (b) the Libby Claimants must be given a reasonable time to supply such information and/or documents, (c) in the case of examinations (including B-readings), information or documents to be obtained from third parties, the estate should bear the expense, and (d) there must be reasonable assurance of the reliability of the additional required examinations (including B-readings), information or documents.[9]

### 2. The Debtors' Definition of Clinically Severe Asbestos is Equally Baseless

Equally without basis in the medical literature is the Debtors approach to severity of asbestos disease. In the Proposed Questionnaire, the Debtors' propose the following definition of "Clinically Severe Asbestosis":

> **Clinically Severe Asbestosis:** Asbestosis (1) diagnosed by an independent pulmonologist or internist certified by the American Board of Internal

---

[9] This alternative proposal should not be construed as assent by the Libby Claimants to inclusion in Proposed Questionnaire of any of the seven items that the Debtors are seeking contrary to ATS (2004). The Libby Claimants strongly object to the inclusion of any superfluous requirements that are not consistent with the medical literature or standard practice in chest medicine.

> Medicine; (2) with either (a) a chest x-ray reading by a B-reader and replicated by an independent B-reader, both of whom are certified by the National Institute for Occupational Safety and Health, of at least 2/1 on the ILO grade scale, or (b) asbestosis determined by pathology; (3) with an independent pulmonary function test demonstrating either (a) total lung capacity less than 65% or (b) forced vital capacity less than 65% and a FEV1/FVC ratio greater than or equal to 65%; and (4) with a supporting independent medical diagnosis and supporting documentation establishing exposure to Grace asbestos-containing products as a cause of the asbestosis.

Proposed Questionnaire at p. iv. This definition is inconsistent with standard practice in chest medicine for all of the reasons discussed above, but also because it omits the use of DLCO (diffusion capacity). Whitehouse Questionnaire Affidavit at ¶ 12.

DLCO measures the lungs' efficiency in transferring oxygen into the blood stream. Id. at ¶ 13. The DLCO measurement is a key indicator of severity and impairment in asbestos disease,[10] especially with the Libby Claimants. Id. at ¶¶ 13-14. The ATS (2004), p. 697, states:

> Evaluation of subjects with suspected asbestos-related disease should include spirometry . . . all lung volumes and the carbon monoxide diffusing capacity. In addition to diminished lung volumes, the carbon monoxide diffusing capacity is commonly reduced due to diminished alveolar - capillary gas diffusion, as well as ventilation - profusion mismatching.

Whitehouse Questionnaire Affidavit at ¶ 13 (citing ATS (2004) at p. 697). Fishman's Pulmonary Diseases and Disorders (3d ed. 1998), p. 883, states:

> The characteristic pulmonary function changes of asbestosis are a restrictive impairment with a reduction in lung volumes (especially FVC and total lung capacity) decreased diffusion capacity, and arterial hypoxemia.

Whitehouse Questionnaire Affidavit at ¶ 13; see also Fraser and Pare, Diseases of the Chest (4th ed. 1999), p. 2445. Similarly, the AMA Guides to Permanent Impairment (5th ed.) uses

---

[10] The importance of DLCO as an indicator of severity in asbestos pleural disease is long established. Id. at ¶ 17 (citing Cookson (1983) "Pleural Thickening and Gas Transfer in Asbestosis," Thorax 1983; 38:657-661.) In the Cookson study (a study of a cohort exposed to amphibole asbestos) it was determined that "the ratio of transfer factor [the British term for diffusion capacity] to effective alveolar volume correlated directly with the degree of pleural thickening as alveolar volume fell with increasing severity of pleural disease." Id.

diffusion capacity as a basis for assessment of permanent impairment due to respiratory disorders. Whitehouse Questionnaire Affidavit at ¶ 13. Diffusing capacity is available at any lung center, and is standardized. American Thoracic Society, "Single Breath Carbon Monoxide Diffusing Capacity (Transfer Factor). Recommendations for a Standard Technique." Am. Rev. Resp. Dis. 1987; 136:1299. The Center for Asbestos Related Disease in Libby applies this standard technique. Whitehouse Questionnaire Affidavit at ¶ 13.

DLCO is a particularly important indicator of the severity of restrictive disease in the Libby tremolite asbestos disease patients. Whitehouse Questionnaire Affidavit at ¶ 14. In Whitehouse (2004), the study revealed that:

> In a group of 123 patients, including those with improved FVC, the average yearly loss was 2.2% for FVC, 2.3% for TLC, and 3.0% for DLCO as calculated over an average of 35 months.

Whitehouse Questionnaire Affidavit at ¶ 14 (citing Whitehouse (2004) at p. 221).

Of the 123 patients in the Whitehouse study, 76% had progressive loss of lung function. Id. at ¶ 15. In the Libby cohort, DLCO shows progressive decline along with FVC and TLC. Id. In many individual cases, there is significant asbestos disease on the chest x-ray, and only the DLCO is reduced, not the FVC or TLC. Id. Some patients with severe shortness of breath are severe only in the DLCO defect. Id. DLCO defect is often the leading indicator of severity in the Libby cohort, and has the greatest correlation with shortness of breath and the timing of the patients' entry to oxygen treatment. Id.

In the Proposed Questionnaire's definition of "Clinically Severe Asbestosis," the Debtors' true motives are revealed once again—to eliminate or under-value legitimate claims. The definition should be stricken and replaced with one that is consistent with medical literature and practice in chest medicine.

20

**B.     The Questionnaire Must Not Impose an Unreasonable Burden on Claimants or Shift the Burden of Producing Information/Documents Compared to what the Tort System Would Require**

The Proposed Questionnaire demands a host of discovery information and documents beyond what the tort system would require, and which would be expensive and time-consuming to compile. For the reasonable requests, the Libby Claimants are willing to provide what is in their possession within a reasonable time; but certain of the demands are not reasonable and seem designed to serve as a roadblock to the accomplishment of a meaningful estimation process. The most objectionable requirements include:

- **90 Days**. The Debtors propose that the Proposed Questionnaire be completed and returned within 90 days of mailing. This is not sufficient time to answer the burdensome questions. The Debtors assert that:

    [The] information is obtainable without undue burden because:

    (a)     the claimants already have retained counsel and undertaken the burden of litigation; and

    (b)     the claimants likely have completed other claims forms in connection with asserted claims against various asbestos trusts.

Motion at ¶ 7. Neither of these reasons applies to the Libby Claimants. First, as discussed above, the information and documents exceed the normal client information requirements for an asbestos case to obtain a verdict for Libby Tremolite Asbestos Disease. Second, as was fully discussed in the Libby Claimants' Plan-Related Pleadings Objection,[11] where most asbestos claimants may seek recovery from multiple producers of asbestos products, the Libby Claimants' claims result from exposure to a single source of asbestos. Therefore, most Libby Claimants are not asserting claims against any other asbestos trusts. In order to complete the Proposed Questionnaire in its present form, each

---

[11] Docket No. 7335, pp. 4, 11-12.

of the Libby Claimants (more than 100 with prepetition lawsuits) would have to be consulted—a process that will likely take at least six months.

- **Two Certified B-readers**. The Proposed Questionnaire requires that a claimant have x-ray readings by two certified B-readers. Proposed Questionnaire at p. iv. As noted above, this requirement is unreasonable. Even the requirement of one B-reading is inconsistent with standard practice in medicine, and is not necessary for expert testimony in court. As evidence that this requirement is intended to be an obstacle in the estimation process one need look no further than the Debtors' prepetition conduct. *In none of the trials involving Libby Claims did the Debtors use B-readings in their presentation of expert witness testimony.*

- **Medical Records**. The Proposed Questionnaire calls for "any and all documents that you and your counsel have or reasonably can obtain that support or otherwise relate to your diagnosis . . . ." Proposed Questionnaire at p. iv. This requirement is overbroad and burdensome. Of course it is reasonable for the Libby Claimants to supply within a reasonable time the medical records that are *in their possession*, but all other medical records that support or otherwise relate to each individual's diagnosis would be enormously expensive. It would also generally take six months to a year to gather— much longer than the 90-day deadline proposed by the Debtors. Additionally, this type of cost-shifting would not be reasonable. If the Debtors want information that is in the possession of third parties, the Debtors should obtain it, with the particular Libby Claimant's reasonable cooperation (i.e., medical release). This was how the Debtors obtained medical records from third parties in their prepetition litigation of Libby Claims;

22

they should not be permitted to utilize bankruptcy as an excuse to turn customary discovery practice on its head.

- **Exposure History.** The Proposed Questionnaire requests "any and all documents that you and your counsel have or reasonably can obtain that support or otherwise relate to your . . . exposure to asbestos-containing products as a cause of the medical diagnoses, and/or conditions claimed." Proposed Questionnaire at p. iv. For the Libby Claimants, there is no question concerning exposure to the Debtors' asbestos or the Debtors' responsibility for the Libby Claimants' injury. The Debtors have already admitted to the Court of Appeals for the Ninth Circuit that "[t]here is no question, and Grace does not deny, that workplace conditions at the Libby mill . . . were dangerous, and tragically caused or contributed to disease and/or death as a result of asbestos exposure."[12] This request is pointlessly burdensome as it relates to the Libby Claimants. In any event, the Debtors have all of this information already as it pertains to the Libby Claimants. The Libby Claimants should not be required to produce documents that the Debtors already possess.

- **Radon Test.** The Proposed Questionnaire seeks information on whether a claimant's home has ever been tested for radon. Proposed Questionnaire at p. 10. This question is medically irrelevant and burdensome. The Debtors have never shown a connection between radon and asbestos disease.

- **Alcohol Consumption.** The Proposed Questionnaire requests information on the claimant's alcohol consumption history. Proposed Questionnaire at pp. 10-11. This question is medically irrelevant and burdensome.

---

[12] U.S. v. W.R. Grace & Co., No. 03-35924 (9th Cir.), Appellant's Brief dated April 26, 2004, at 8. Grace referred to the period through 1974.

- **Prescription Drug History (20 Years).**   The Proposed Questionnaire requests information on the claimant's prescription drug use within the past 20 years.   Proposed Questionnaire at p. 11.   This question is medically irrelevant and burdensome.

- **Family History of Cancer.**   The Proposed Questionnaire seeks information on whether a claimant's family member has ever been diagnosed with cancer.   Proposed Questionnaire at pp. 11-12.   This question is medically irrelevant and burdensome.   Family history does not break the chain of causation from asbestos exposure to asbestos cancer or other asbestos disease.

- **All Personal Injury Claims.**   The Proposed Questionnaire requests information on the claimant's lifetime history of asserting personal injury claims, including but not limited to claims against asbestos trusts.   Proposed Questionnaire at p. 14.   This question is irrelevant and burdensome.

- **All Other Lawsuits.**   The Proposed Questionnaire requests information on the claimant's lifetime history of bringing lawsuits.   Proposed Questionnaire at p. 14.   This question is irrelevant and burdensome.

In sum, there is simply no requirement of law or medicine that justifies the burdensome and improperly exclusionary requirements discussed above.   Plaintiffs' verdicts in substantial amounts are returned without such evidence.   The pervasiveness of these pernicious provisions indicates that the Motion is not a serious attempt to estimate the Debtors' asbestos liability as it actually exists.   Rather, the Debtors have set themselves up to be judge, jury and legislature—designing a new and constricting set of standards for allowance of asbestos claims so as to diminish the magnitude of its true asbestos liability.   In so doing, the Debtors have set

themselves up in defiance of Supreme Court precedent from <u>Butner</u> on forward, not to mention fundamental fairness and decency.

### C.    The Questionnaire Must be Clarified

Given the tremendous breadth of information and documents requested by the Proposed Questionnaire, it is inevitable that many claimants for one reason or another will not have responsive information or documents for each question. In some instances, the information may be unknown to the claimant, the document may no longer exist or never existed, or the test was never done. While this Court must understand and anticipate that this will be the case, the Proposed Questionnaire does not clearly address this possibility. Accordingly, the Proposed Questionnaire should be clarified to specify that an indication that responsive information or documents do not exist is a sufficient response to any particular question.

### III.    Disallowance of a Claim is Not an Appropriate Sanction for Failure to Complete the Proposed Questionnaire

Finally, the Debtors seek to disallow each claim for which a Proposed Questionnaire is not completed and submitted within 90-days of the mailing of the Proposed Questionnaire. Disallowance of a claim, however, would not be an appropriate sanction for failure to complete the Proposed Questionnaire for such claim. At most, disallowance should be considered only if (a) the lawyer failed to make reasonable efforts to complete the Proposed Questionnaire, and the Proposed Questionnaire as submitted (together with information and documentation already in the Debtors' hands) would be insufficient in the tort system to defeat a motion for summary judgment as to the Debtors' liability on the claim; and (b) failure to complete all portions of the Proposed Questionnaire had the effect of distorting the estimation of the Debtors' asbestos liability.

25

## CONCLUSION

Based on the foregoing, the Motion should be rejected in its entirety.

Dated: Wilmington, Delaware
      June 30, 2005

LANDIS RATH & COBB LLP

_____
Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
James S. Green, Jr. (No. 4406)
919 Market Street, Suite 600
P.O. Box 2087
Wilmington, DE 19801
Telephone:    (302) 467-4400
Facsimile:    (302) 467-4450

- and -

Daniel C. Cohn
Christopher M. Candon
COHN WHITESELL & GOLDBERG LLP
101 Arch Street
Boston, MA 02110
Telephone:    (617) 951-2505
Facsimile:    (617) 951-0679

Counsel for the Libby Claimants