# Exhibit "7"

Exhibit 4 -- Middleton dep.txt

IN THE UNITED STATES DISTRICT COURT         FOR THE DISTRICT OF MONTANA
                    MISSOULA DIVISION

UNITED STATES OF AMERICA    )              )
              Plaintiff,    )              )    CIVIL ACTION
        vs.                 )              )    FILE NO. CV-01-72-M-DWM
W.R. GRACE & COMPANY,       )W.R. GRACE & CO.-Conn.,  )
and KOOTENAI                )DEVELOPMENT CORPORATION,  )
                            )            Defendants.  )

                    DEPOSITION OF
                DANNIE C. MIDDLETON

                August 12, 2002
                  9:05 a.m.

                  Suite 2100              600 Peachtree Street
                Atlanta, Georgia


          Frances Buono, RPR, CCR-B-791

                BROWN REPORTING, INC.
          1740 PEACHTREE STREET, N.W.          ATLANTA, GEORGIA   30309
                (404) 876-8979
❑                APPEARANCES OF COUNSEL

On behalf of the Plaintiff:
        DAVID F. ASKMAN, Esq.
        U.S. Department of Justice      Environment & Natural Resources Division
        Environmental Enforcement Section      999 18th Street
        Suite 945      Denver, Colorado  80202

On behalf of the Defendants:    W.R. Grace & Company
        JOHN D. McCARTHY, Esq.
        Holme, Roberts & Owen, LLP      1700 Lincoln Street
        Suite 4100      Denver, Colorado  80203-4541
        DORI ANNE KUCHINSKY, Esq.
        W.R. Grace & Co.      44084 Riverside Parkway
        Suite 300      Leesburg, Virginia  20176
        GARY L. GRAHAM, Esq.
        Garlington, Lohn & Robinson, Pllp      199 W. Pine
        Missoula, Montana  59807-7909
Also Present:
        Mark S. Kashdan, Attorney Advisor
        Office of the General Counsel      Centers for Disease Control and Prevention
        1600 Clifton Road, N.E.      Atlanta, Georgia  30333

                    - - -

❑          (Reporter disclosure made pursuant to
        Article 8.B. of the Rules and Regulations
        of the Board of Court Reporting of the
        Judicial Council of Georgia.)
                DANNIE C. MIDDLETON,
having been first duly sworn, was examined and
testified as follows:
                CROSS-EXAMINATION
BY MR. McCARTHY:
        Q.    Dr. Middleton, could you please state your
full name and occupation for the record?
        A.    My name is Dannie Carlton Middleton, and I
am a medical epidemiologist at ATSDR.
                Page 1

Exhibit 4 -- Middleton dep.txt

Q.    How long have you held that position?

A.    I believe since about '95.

Q.    Could you briefly describe for us your educational background with respect to epidemiology?

A.    With respect to epidemiology?

Q.    Or medicine, epidemiology?

A.    I have an MD degree from the University of Tennessee, Center for the Health Sciences, and I have a Ph.D. degree from Emory University School of Public Health.

Q.    Are you board certified in epidemiology?

A.    I don't understand the question.

▯    Q.    Are you familiar with board certifications in certain specialties in medicine?

A.    Yes.

Q.    Is there a classification for epidemiology?

A.    Not per se.

Q.    Do you have -- are you board certified in toxicology?

A.    No.

Q.    Or pulmonology?

A.    No.

Q.    Internal medicine?

A.    No.

Q.    Do you have any board certifications?

A.    Yes.

Q.    What would those be?

A.    I am certified by the American Board of Preventative Medicine, and I was certified by the American Board of Family Practice. It was a seven-year thing and I wasn't in family practice after seven years so I didn't take the recertifying test.

Q.    Have you published any articles regarding asbestos-related diseases?

A.    There is a published abstract related to ▯the American Thoracic Society, the poster I presented there.

Q.    Could you just describe that or so that we can find that later? Is there a citation?

A.    Yes. You have my resume, I believe, don't you? It is in there. It is the American Thoracic Society's journal and it is a supplemental abstract issue for the edition 2002 International Conference.

Q.    That is the poster that you presented in May of 2002 regarding your study --

A.    Right. It is the abstract. Actually if you have the poster, I am sure you do, the abstract is on the poster but it is also published. The conference does an abstract edition, or the American Thoracic Society does, and it is published in there.

Q.    Now, Dr. Middleton, have you ever been deposed before?

A.    Yes.

Q.    About how many times?

A.    I think the answer to that is once.

Q.    When was that?

A.    When I was in the practice of medicine, this was maybe in the early '80s, I was deposed as part of a malpractice suit.

Q.    You just discussed briefly your poster and ▯the study that was related to that poster that you

Page 2

Exhibit 4 -- Middleton dep.txt
presented in May of 2002.  Could you describe briefly
what the nature of that study was?
     A.    It was -- I mean do you want me to
describe the poster or the study?
     Q.    The study.
     A.    The study.  It was a case series review of
some patients from Dr. Alan Whitehouse's practice
that were from the Libby area.
     Q.    Why was ATSDR conducting that study?
     A.    Well, it was part of ATSDR's overall
involvement.  We became involved in Libby a couple of
years ago.  There were discussions with
Dr. Whitehouse and I believe he offered to give us
access to his information.
     Q.    When was it decided to do this case series
study?
     A.    It was I would say the first half of 2000,
the year 2000.
     Q.    Were you part of that decision-making
team?
     A.    I think Dr. Lybarger more or less assigned
it to me to pursue at least as a possibility.
     Q.    When did that happen?
     A.    That same -- you know, early in 2000.  I
Ddon't remember exactly when.
     Q.    Was that in a particular meeting?
     A.    I don't remember.  I don't remember.  I
don't remember it being in a meeting, but I just
remember him -- talking about it with him.
     Q.    Who decided that there should be a case
series study done with Dr. Whitehouse's patients?
     A.    I am not sure it was quite that clear-cut.
There were discussions, and Jeff suggested that I
pursue it.  And as we went along it developed as a
real possibility.
     Q.    Are you finished?
     A.    Yes.
     Q.    When you say Jeff, you mean Dr. Lybarger?
     A.    Yes, Jeff Lybarger.
     Q.    Who was involved in the study with you?
     A.    Aubrey -- Dr. Aubrey Miller and Dr. Alan
Whitehouse.
     Q.    What was Dr. Miller's role?
     A.    We worked together on it.
     Q.    What do you mean by that, you worked
together?  Who developed the protocols for the study?
     A.    I took the lead, but Dr. Miller also had
input.  As far as actually putting our thoughts
together in a document, though, I wrote that with
Dinput from other people.
     Q.    What input did Dr. Miller have in
developing the protocols for the study?
     A.    We shared drafts back and forth and it
evolved.  I don't know that I can point out the
specific things.
     Q.    Who provided the first draft?
     A.    I did.
     Q.    So were you the primary author and
Dr. Miller provided comments, would that be a fair
characterization of how you went about it?
     A.    I think it was more we were both listed as
investigators, although for CDC's purposes I was the
principal investigator.  For our institutional review
                                        Page 3

Exhibit 4 -- Middleton dep.txt
board, I was the principal investigator.
    Q.    But getting back to my question, as far as
developing protocols, did you do the first draft and
Dr. Miller provided comments, is that how it worked?
    A.    I think that is probably true, but
honestly, we sent drafts -- we tended to work by
sending drafts back and forth.  So I think I --
probably the way it worked early on is I would write
a draft and send it to him and he would make changes
to the draft and send it back.  It was a
collaboration.
☐   Q.    What role did Dr. Whitehouse have in the
study?
    A.    Primarily furnishing information.  Our
subcontractor, NORC, contracted with him to obtain
copies of the x-rays and other information.
    Q.    Did Dr. Whitehouse have input in, for
example, the protocols, the drafting of the protocols
for the study?
    A.    A little.
    Q.    Do you recall anything specifically that
he -- any input that he provided?
    A.    You know, I don't.  I think his concerns
had to do with confidentiality.  In terms of the --
are you talking about the protocol now or the final
report?
    Q.    Let's talk about the protocols first.
    A.    We talked to him mostly about how to
protect the confidentiality of his patients.
    Q.    Was one of those methods to protect their
confidentiality to provide you copies of x-rays as
opposed to allowing you to examine the actual x-rays?
    A.    I don't think that really was related to
confidentiality.  I don't.
    Q.    Why weren't you permitted to use the
original x-rays?
☐   A.    These were x-rays that were part of
ongoing patient care and he didn't want to release
them from his office.
    Q.    Did that present problems for you not
being able to have the original x-rays?
    A.    I would have preferred the originals.
    Q.    Why is that?
    A.    Well, I think primarily because the
NIOSH's B-reader format doesn't, to my knowledge,
they don't acknowledge copies.  They don't suggest
copies.
    Q.    Would it be fair to say that NIOSH doesn't
approve the use of copies by B-readers in doing this
type of study?
    A.    I think it would be fair to say that they
have not specifically approved the use of copies.
    Q.    And do you know why copies are frowned
upon by NIOSH?
    A.    I don't know why not, no.  I don't know
any of NIOSH's thoughts on that.
    Q.    What were your concerns when using copies?
    A.    There is usually, even really good copies,
there will be a little degradation in the film.
    Q.    And if there is degradation to the film,
would you say then there is a chance that the film
☐could be inaccurately read?
    A.    There is a chance that any film could be
                                        Page 4

Exhibit 4 -- Middleton dep.txt

inaccurately read.

Q.    Do you think that having degraded film increases that chance?

A.    I think it might be less likely to identify abnormalities that were identified on the first film.

Q.    Do you think having degraded film could increase the chance of false positives?

A.    I think it is less likely.

Q.    Do you think having degraded film could increase the chances of false positives?

A.    I don't know.

Q.    Did any of your B-readers, the B-readers that you used in this study, have any comments regarding the quality of the film?

A.    Yes. On each film they indicated the quality of that film.

Q.    And did they have adverse comments regarding the quality of the film that was provided to them?

A.    You know, I believe it was a grade, like they rated it a certain level. They always had the right to -- they made an assessment as to whether the film was good enough quality for them to read and if it wasn't good enough for them to feel comfortable reading, they didn't have to.

Q.    Do you recall with respect to the grading of the film quality by the B-readers, were they required to give reasons if they rated the film other than Grade 1?

A.    I don't recall if they were required to do that or not.

Q.    Do you recall if there was a coding for the reasons that were given for assessing film quality as less than Grade 1?

A.    I don't recall.

Q.    Do you know what a number code regarding film quality of 8 would represent?

A.    I don't.

Q.    Is there a key to your B-reader coding of film quality somewhere?

A.    I don't know.

Q.    Do you know who would know that? Who at ATSDR?

A.    No, but a certified B-reader would know that.

Q.    And you are not a certified B-reader?

A.    No.

□    Q.    Is Dr. Miller a certified B-reader?

A.    I don't know.

Q.    Do you know if Dr. Whitehouse is a certified B-reader?

A.    I think he is not currently certified.

Q.    Do you believe that he was certified at some time?

A.    I believe that he was.

Q.    But you don't know that?

A.    I believe that he said at one point that he had been certified.

Q.    But do you know whether or not he was certified?

A.    I don't personally know.

Q.    That is fine. Let me mark this as 155.

Page 5

Exhibit 4 -- Middleton dep.txt

(Exhibit 155 was marked for identification.)

Q.    (By Mr. McCarthy)  The court reporter has just handed you what has been marked as Exhibit 155. Could you please identify that document for the record?

A.    Well, it appears to be the final report for the case series.

Q.    Could you glance through it and make sure we can actually say that that is the final report or Da copy of the final report?

A.    I believe it is.  The formatting is different between the two, so I am looking at it. But I haven't seen any substantive differences.

Q.    Okay.

MR. ASKMAN:  You might want to tell us, Dan, what you mean by between the two, what you are referring to here.

THE WITNESS:  I have a copy that I printed from my office and apparently this one, I believe that they appear to be, as far as I can tell, on cursory review, they are the same report although there is a little bit of formatting differences.  I am not sure.

Q.    (By Mr. McCarthy)  I will just represent this is what was produced to us by the Justice Department late last week.

A.    Yes, I understand.

Q.    And that would be Exhibit 155.  Why don't you go ahead and keep it in front of you because I am going to ask you a couple of questions about it.

A.    Okay.

Q.    Now, if I am right, this study looked at a selected group of individuals who were assumed to Dhave been exposed to asbestos in Libby, Montana, is that accurate?

A.    I am sorry, would you repeat the question, I am sorry.

Q.    That is all right.

(The record was read by the reporter.)

THE WITNESS:  They are a group of individuals from Libby, Montana, that were in Dr. Whitehouse's practice and had a diagnosis of asbestosis from him.

Q.    (By Mr. McCarthy)  And if we look at Page 2 of the report, you define asbestos.  Is that correct?

A.    I don't think there is a definition.  I think it is a description.

Q.    When you refer to asbestos in this report, what are you referring to?

A.    Amphibole minerals, including tremolite and actinolite and any others that are considered to be like them.

Q.    Now, at the bottom of Page 2, doesn't it actually expressly state asbestiform?

A.    Yes.

Q.    Amphibole minerals?

A.    The phrase "amphibole asbestiform Dminerals" is there, yes.

Q.    Is that significant, that the minerals are asbestiform in order to be considered asbestos for

Page 6

Exhibit 4 -- Middleton dep.txt

the purposes of your report?

A.      I think that we certainly know that some amphibole asbestos fibers are present in Libby, but I am not an expert on the various possibilities, so rather than try to define it down more specifically, this served the purpose.

Q.      Would it be important to you, though, that the amphibole minerals in question were asbestiform as opposed to massive?

A.      I don't understand the question.

Q.      And maybe I am just going somewhere that is beyond the scope of your expertise.

Are you aware that not all amphiboles are fibrous or asbestiform?

A.      I am sorry, would you say that again.  Am I aware that?

Q.      Not all amphibole minerals are fibrous or asbestiform?

A.      I don't think that is an area that I have a great deal of expertise.  But, I mean, we were told that certain amphibole types were there and that there were others that were, perhaps, hadn't been ☐fully characterized, so that was our working proposition.

Q.      So it wasn't important to your study to know whether or not the minerals in question were asbestiform?

A.      Well, the reason we were doing the study is because there were amphibole asbestiform minerals there.  I am sure -- I don't think every mineral in Libby would fit that category.

Q.      That is fine.  Going to Page 3 and 4 of your report, Exhibit 155, you discuss your goals and objectives.

A.      Right.

Q.      And goal 1 is "Confirm environmental cases of asbestos-related pulmonary disease;" is that right?

A.      Confirm environmental cases of asbestos-related pulmonary disease, yes.

Q.      How did you define an asbestos-related pulmonary disease?

A.      I think you have to -- it has to be in the context of the purpose.

Q.      The purpose of what, I am sorry, I don't understand?

A.      Well, if you are going to -- maybe I ☐didn't understand the question.  Would you repeat it.

Q.      How did you define asbestos-related pulmonary disease for the purpose of this study?

A.      Well, any pulmonary disease that could have resulted from asbestos exposure.

Q.      And what is the pulmonary disease for the purpose of this report?

A.      I am not sure what you are asking me. What is a pulmonary disease?

Q.      For the purpose of this report, what diseases, what are the diseases that you were looking for?

A.      Well, there are several diseases that can be related to asbestos in that we would have been concerned about had they been present but, for example, mesothelioma, any changes in the lung or the

Page 7

Exhibit 4 -- Middleton dep.txt
lung lining that are associated with asbestos
exposure.  Others are caused by asbestos, but are not
quite as specific of the types of lung cancers.
    Q.     Well, let me ask you this -- are you
finished?  I didn't mean to interrupt you.
    A.     Yes, I think so.
    Q.     In this study, did you look for
mesothelioma?  Is that one of the things that were
reported in this study?
□    A.     We, I mean -- there weren't any
mesotheliomas in this small group.  But this was a
very small group.
    Q.     What about lung cancers, did you -- I
didn't see anything in your report that mentions lung
cancer.  Was that one of the criteria that you were
looking for in your study?
    A.     I am sorry, what was the question, was
there --
    Q.     Well, the original question is, you say
your goal is to confirm environmental cases of
asbestos-related pulmonary disease, right?
    A.     Uh-huh.
    Q.     And I wanted to know what you meant by
asbestos-related pulmonary disease.  Okay?  And you
mentioned lung cancer and I didn't see any mention of
lung cancer in your report.  Is that one of the
things that you were looking for in these patients
that you -- whose records you looked at, is that
something that you were looking for, lung cancer?
    A.     You know, it would have come up as we read
the records.  There was at least one cancer in the
lungs but I don't believe it was a -- I don't
remember the details.  But I don't believe it was --
we thought it was related to asbestos.
□    Q.     You had mentioned changes in the lung or
lining as one of the diseases you were looking at; is
that right?
    A.     Changes consistent with asbestos exposure.
    Q.     And are changes in the lung or lung lining
considered a disease?
    A.     If they are pathologic.
    Q.     Did this study determine whether or not
the changes identified were pathologic?
    A.     I believe the study, the -- I believe the
sorts of changes you get with asbestos exposure are
pathologic.
    Q.     Did this study make that determination?
    A.     Well, we didn't do biopsies.
    Q.     Could you answer my question, please?
    A.     I don't understand your question.
    Q.     Did this study make a determination
whether or not changes in the lung or lung lining
were pathologic?
    A.     They were asked to identify changes
associated with asbestos exposure.  Those changes are
pathologic.
    Q.     So, is there an assumption made in this
report that any changes that were found in the lungs
or lung linings were associated with asbestos
□exposure?
    A.     No.
    Q.     How did you, if you determined that there
was a change, let's say, in lung lining, what was

Exhibit 4 -- Middleton dep.txt
done to make the determination that that had been
caused by an exposure to asbestos?
    A.    The B-readers are trained to identify
changes that are consistent with those caused by
asbestos.
    Q.    Are any of those types of changes -- let's
for example, you are familiar with the term "pleural
plaque," aren't you?
    A.    Yes.
    Q.    How would you define a pleural plaque?
How would you define a circumscribed pleural plaque?
    A.    Well, a pleural plaque is a thickening of
the pleura.
    Q.    And that is how you define it, thickening
of the pleura?
    A.    I think that the asbestos, the B-readers
are trained to identify changes consistent with
asbestos exposure.  I am not a B-reader.
    Q.    Are you aware of any factors, other than
asbestos exposure, that can lead to a thickening of
the pleura?
    A.    Yes.
    Q.    What are some of those other factors that
can lead to a thickening of the pleura?
    A.    I don't know what factors would lead to a
thickening of the pleura that would be identical to
those seen by asbestos exposure.
    Q.    That is not what I asked.  I asked what
other factors are you aware of that can lead to a
thickening of the pleura?
    A.    I don't think that is an area that I am an
expert in, so I don't think I want to answer it.
    Q.    You can't answer that question?
    A.    It would not be -- it would be conjecture.
    Q.    So you are not aware of any other factors
that might lead to pleural thickening other than
asbestos exposure?
    A.    Not with certainty.
    Q.    Well, do you have the qualifications to
give an opinion that asbestos exposure causes
thickening of the pleura?
    A.    That it can, is that the question?
    Q.    No.  I am trying to understand.  You are
saying, if I am fairly summarizing what you just
said, I believe you said that you don't believe that
you have the expertise to tell me what factors lead
to thickening of the pleura; is that correct?
    A.    I can't -- with a high level of
confidence, no.
    Q.    Would that also apply to asbestos exposure
and thickening of the pleura, your lack of expertise
and being able to tell me that asbestos exposure
might cause thickening of the pleura?
    A.    I am not specifically trained to identify
the changes associated with asbestos exposure.  We
had B-readers.
    Q.    So, you really can't tell me today whether
or not even asbestos exposure can lead to a
thickening of the pleura; is that right?
    A.    I know that it -- the question, would you
repeat it again?
    Q.    Okay.  I am just trying to get my arms
around your expertise.  And if I understand you

Exhibit 4 -- Middleton dep.txt

correctly, based on your training, your training
doesn't qualify you to give an opinion as to what
factors, including asbestos exposure, can lead to
pleural thickening?

A.      I know for a fact that asbestos exposure
can lead to a thickening of pleura. I am sure there
are other factors, I just -- I am not -- I don't
think I can give you a definitive answer so that is
why I am -- don't want to conjuncture.

Q.      But wouldn't it also be conjuncture on
your part with respect to asbestos exposure and
pleural thickening since it is not in your area of
expertise, determine the cause of pleural thickening?

A.      I really don't understand the question, I
am sorry. Would you say what your question is again.

Q.      Okay. You tell me, what are your
qualifications for determining the cause of pleural
thickening?

A.      There is a huge body of literature to
support the association between asbestos and
interstitial and pleural disease.

Q.      That is fine but that is not my question.
You have been talking about at least one factor that
causes pleural thickening. And when I asked you
about other causes of pleural thickening, you told me
you were not qualified, you would be --

A.      Can't give you a definitive answer.

Q.      Right. And I am wondering what are your
qualifications to tell me that asbestos exposure
causes pleural thickening when you tell me you are
unqualified to tell me that other things might cause
pleural thickening, although you know that other
things do cause pleural thickening?

A.      There is a huge body of literature
associating asbestos and pleural disease. Beyond
that, I am not sure I know what you are asking.

Q.      I am asking you to tell me what your
qualifications are. I am not asking about
literature. I am asking what are your qualifications
to make an assessment or determination that pleural
thickening has a causal relationship with asbestos
exposure?

A.      You know, I have looked at the x-rays for
the people in the study, but the link between
asbestos exposure and pleural disease was
accomplished over a long period with many researchers
studying people who were exposed to asbestos and
finding that those are the people that have pleural
disease. The association is from many studies and it
is well established in the literature. I don't
know -- if you are asking -- I mean --

Q.      I am asking about your personal
qualifications. And is the answer the same answer
that you gave me with respect to other causes of
pleural thickening?

A.      No, because we have been involved with
Libby for the last two years and before that I had,
you know, read about asbestos and the relationship
between asbestos and pleural disease. Just been
aware of it for many years.

And certainly pleural plaques, you know,
have been -- there is no real question about the
association. Are you asking me if I have

Page 10

Exhibit 4 -- Middleton dep.txt

independently done a study that linked the two?

Q.    No.  Let me move on.  Let me move on.
Was this study peer reviewed?

A.    Yes.

Q.    Did any of the peer reviewers comment that
it was incorrect to characterize pleural plaques as
asbestos-related disease?

A.    I don't remember.

Q.    Did Bruce Case review this study?

A.    Yes.

Q.    Does that refresh your recollection as to
whether anyone made a criticism that it was incorrect
to characterize the pleural plaque as an
asbestos-related disease?

A.    I don't remember the specifics of what he
said.  I do remember that he was critical in some
ways.

Q.    Do you recall whether he was critical
about that aspect of the report characterizing
pleural plaque as an asbestos-related disease?

□    A.    I am not -- you know, you have the
comments.  If they are in the comments that you have,
I am sure that is true.  I don't remember the
specifics of what he said.

Q.    I am just asking in general.  Did you
recall the comment that it is improper to
characterize a pleural plaque as an asbestos-related
disease?

A.    Right now, I don't remember the specifics
of his criticism.

Q.    I wasn't asking for the specifics.  Just
generally, do you recall that comment that it is
improper to characterize the pleural plaque as an
asbestos-related disease?

A.    I don't remember.

Q.    Do you recall any comments indicating that
pleural plaques are markers of exposure but not
indications of disease?

A.    I don't remember.

Q.    Have you ever heard that before, that
pleural plaques are merely markers of exposure and
not disease in and of itself?

A.    Yes.

Q.    Where have you heard that before?

A.    I understand it is Grace's contention.

□    Q.    And you don't recall hearing that from
your own peer reviewer?

A.    Why don't I just read what he said?  I
don't understand what this is about.

Q.    I am just asking you what you recall.

A.    I don't recall what he said.

Q.    And you don't recall responding to that
comment?

A.    No, not specifically.  I remember he was
critical in some ways, and I responded, but I don't
remember the specifics of his criticism.  But you
have what he said and what I said back.  I don't
understand what this is about.

Q.    "Goal one, confirm environmental cases of
asbestos-related pulmonary disease."  How do you
define an environmental case for the purposes of this
study?

A.    Well, it generally, it was more or less a
Page 11

Exhibit 4 -- Middleton dep.txt
process of exclusion. If there was a -- certain
questions that would cause us to believe that they
had an occupational exposure that could have resulted
in their disease, we would -- if you go through the
report, people are screened out through various
questions that they answer. For example, if they
worked at Libby, I mean, worked at the mine.
☐     Q.     Let me just ask the question again. How
did you define an environmental case? Can you tell
me what are the characteristics of an environmental
case for purposes of your study?
      A.     Yeah, in general we try to find some
confirmation of the disease and look to see if there
was another -- if there was an occupational
explanation that could explain it, and if there was
an occupational explanation, then we didn't call
it -- it would be picked up -- those screens would
pick up people that had that.
      Q.     So would it be fair to say you started
with an assumption that all of the cases identified
were environmental and then you went through a series
of screens to rebut that assumption?
      A.     I think we tried to identify cases that
had another -- had an occupational explanation for
their disease. I mean those screens were designed,
for example, did you live -- were you household
contact.
      Q.     Okay. Dr. Middleton, let's start with how
did you select, in the beginning, how were the cases
that were subject to this study selected?
      A.     Dr. Whitehouse selected them from his --
all the patients -- among all the patients he had
☐seen from the Libby area, he selected people who were
not known to have, you know, a direct tie to the
mine. Basically that hadn't either been mine
employees or household contacts.
      Q.     Did you, in those criteria, were those
decided by ATSDR, that you would select from
Dr. Whitehouse's patients those who had not been
employed in the vermiculite industry in Libby, or
household contact? Who determined those criteria for
looking at Dr. Whitehouse's patient files?
      A.     I believe that was ATSDR.
      Q.     And who decided that those were going to
be the criteria going to Dr. Whitehouse?
      A.     I assume it was interaction between
Dr. Miller and myself. I don't remember the
specifics of it.
      Q.     Did you also attempt to, in this initial
screen, the initial request to Dr. Whitehouse, to try
and screen out other types of occupational exposures
that might not have been directly related to
employment at the mine or mill or other vermiculite
processing facilities?
             MR. ASKMAN:  Object to the form. Go
      ahead.
             THE WITNESS:  I am sorry, what did
☐     you say?
             MR. ASKMAN:  I said object to the
      form of the question but you can go ahead
      and answer.
             THE WITNESS:  Okay. Ask it again.
      Even though you object, can you ask it
                                            Page 12

Exhibit 4 -- Middleton dep.txt

again?
   Q.    (By Mr. McCarthy)  Sure.  When you
initially were asking Dr. Whitehouse to give you a
pool of participants for your study --
   A.    Right.
   Q.    -- did you also ask him to screen out
people who might have had other types of occupational
exposure to asbestos other than working directly for
the vermiculite mine or processing facilities in
Libby?
   A.    I believe that what we asked him to do was
screen out mine workers and at least what the
protocol asked was mine workers and people who had
lived with former mine workers, is the way I would
call it, anyway.
   Q.    When you made this request of
Dr. Whitehouse, how many people did he identify?
   A.    27.
   Q.    27.  At any time did he tell you there
☐were more than 27?
   A.    I think that there was a cutoff point.  I
think that he gave us -- I would have to go back to
the protocol, but I believe they were up through --
well, I don't remember exactly what it was to be
honest with you, but it was sometime between when we
started in 2000 and the report.  But, there was a
cutoff point and he did indicate that there were
more, but I believe he identified he had seen up to a
certain point.
   Q.    Certain point in time?
   A.    Yes.
   Q.    But you believe that he told you that
there were actually more than 27?
   A.    Yes.
   Q.    And what did you do with that information
that there were more than 27, did you want to get
that information?
   A.    We didn't pursue that.  We had to have
some cutoff point, so we selected a cutoff point.
   Q.    Now, you said you did a number of screens
on the 27.
   A.    Right.
   Q.    And had you been very clear to
Dr. Whitehouse that you wanted to exclude, as you
☐said, former vermiculite employees and household
contacts?
   A.    Yes.
   Q.    But, didn't you find in your screens that
actually he had included three household contacts?
   A.    Yes.
   Q.    Did that cause you to question, perhaps,
the rigor with which Dr. Whitehouse was following
your request, following your protocol?
   A.    I think we always assumed that he would
identify to the best of his knowledge the people who
didn't -- had had disease and were not directly tied
to the mine.  I don't think we assumed that he would
always have all of the information.
   Q.    Wouldn't it be, I guess, typical of a
treating physician, though, to get background medical
history, residential history, employment history from
his patients?
            MR. ASKMAN:  Object to the form of
                              Page 13

Exhibit 4 -- Middleton dep.txt

the question.  Go ahead.
          THE WITNESS:  Actually, it is not as
typical as it should be in the world.
          Q.     (By Mr. McCarthy)  And you think that --
when you say it should be, do you think that that is
something that should be done but isn't always done?
    ꓳ     A.     I don't know that I would say it should --
that it is always important, but any time there is
a -- but -- I think it should be done more than it
is.  Maybe not in every case, if somebody has an
infection, for example, that might not -- you know,
some infections that are transmitted occupationally,
so there are -- but in general, it is an important
piece of history, yes.
          Q.     And apparently at least for three of the
people selected for the study, this wasn't done or
this was missed by Dr. Whitehouse?
          A.     He did give us those three names and they
did happen to be household contacts.
          Q.     Did you also -- what were the other
screens, household contacts -- so that came out.
               Did you find there were other people who
had been occupationally exposed to asbestos that were
in the 27 that were selected?
          A.     Yes.
          Q.     About how many?
          A.     I can look through the report.
          Q.     Would you agree that there are 11 others
that had some kind of occupational exposure, such as
being a secondary contractor at W. R. Grace?
          A.     There were some who indicated that they
ꓳhad been secondary contractors.
          Q.     Did some indicate that they had had other
occupational exposures to asbestos?
          A.     Yes.
          Q.     Isn't it true that you, after you had
these 27, after you peeled off those who had other
occupational exposures or household contact
exposures, you were down to eight patients?
          A.     Yes.
          Q.     When you are choosing participants for
this study, -- I am sorry, go ahead.
          A.     There were some cases that we had to make
a decision as to what would be an environmental
exposure, and our decision ultimately was that if
they were -- even if the exposure was vermiculite
contaminated with asbestos, and they were exposed at
work, then we, for the purpose of this report, which
was very specific, we called those occupational.  But
those aren't ones that I would have expected
Dr. Whitehouse to have identified.
          Q.     Did Dr. Whitehouse know the purpose of
this study was to try to identify environmental
exposures?
          A.     Yes.
          Q.     So don't you think it would have been --
ꓳif he knew that was your purpose, he would have tried
to screen out people that had other types of asbestos
exposure in their jobs?
          MR. ASKMAN:  Hold on one second.  Are you
     asking whether or not Dr. Middleton thinks
     that Dr. Whitehouse thought that that was
     the purpose of the study?  Is that the
                    Page 14

Exhibit 4 -- Middleton dep.txt

question?

Q.    (By Mr. McCarthy)  You informed
Dr. Whitehouse the purpose of your study?

A.    Yes, but in the protocol, as I recall,
what we asked him to give us specifically were people
who had not worked at Grace or lived with someone who
had.

Q.    But had you communicated to him the
ultimate purpose of your study, that you were trying
to identify environmental exposures?

A.    I know he was aware of that.

Q.    So, would it then surprise you if he knew
what you were trying to do was get at environmental
exposures, he would select for you potential
participants who had other types of occupational
exposures to asbestos?

A.    I think there was a protocol.  I can only
assume he was trying to follow it.  I mean, if you
□have the protocol, but what I recall we asked him to
identify people who had not worked at the mine or
household contacts of someone who had worked at the
mine.

Q.    So, you think it was perfectly appropriate
for Dr. Whitehouse to, being aware of the purpose of
your study, to recommend to you as environmental
exposures people who had other occupational exposures
to asbestos, such as being in the shipbuilding
industry, pipefitters, things of that nature?

A.    If he knew that, I don't think he would
have -- basically, the reason I said the Libby area,
although it wasn't specifically in the protocol, if
he knew that someone had a long history of working in
an asbestos industry, you know, he might well have
not -- I mean if he had categorized them essentially
as chrysotile exposure, he might not have given us
that name.

Q.    But, in fact, you did find that there were
several people that he gave you who had those types
of exposures to other types of asbestos through other
occupations; isn't that right?

A.    As far as I am aware, the only thing he
gave us that really -- we wouldn't have expected in
the protocol was the three household contacts.  The
□rest of those people, you know, we administer our own
questionnaire.

Q.    So it didn't surprise you that he sent you
pipefitters, people who had worked on brake linings,
people who had been in the shipbuilding industry,
that didn't surprise you?

A.    I don't remember really -- I mean, I guess
my -- I don't think it -- I don't think that
particularly surprised me.  I guess I thought I would
have -- just as somebody doing the study, I would
have hoped that more -- that we would have had more
clearly environmental cases.

But we took a fairly -- we didn't -- it
didn't take much evidence to exclude someone.  We
were trying to find cases that were clearly -- it was
clearly as we could get to environmental.

The examples of -- you know, some of them
we clearly wouldn't have -- people he picked where
people said they were exposed to a lot of environment
but they weren't industries associated with the mine.

Exhibit 4 -- Middleton dep.txt
But the exposure came in other ways.
        Q.      And you would have expected him or would
have hoped that he would have screened those out for
you in advance?
        A.      I don't -- if what you are asking, were
☐there fewer people that appeared to -- you know, that
turned out to be environmental, I -- if you had asked
me at the beginning of the study, do I think there
would be more, I probably would have said yes.  Is
that what you are asking?
        Q.      No.
        A.      I don't think --
        Q.      What I asked is, would you have expected
Dr. Whitehouse, since he knew what your study was
about, what the purpose was, would you have hoped
that he wouldn't have sent you people that worked in
other industries other than, you know, mining in
Libby, that were involved in occupational exposures
to asbestos?
        A.      You know, if you are asking what I
personally would have liked, I suppose so.  But we
did have a protocol and what it said, as I recall,
was miners or household contacts.  So we didn't feel
like -- it wouldn't be fair for me to say he had done
something inappropriate if they -- if he didn't
believe they were one of those two.  But, -- so.
        Q.      So, he followed the letter but perhaps not
the spirit of your protocol?
                MR. ASKMAN:  Object to the form.
                THE WITNESS:  But go ahead and
☐       answer?
                MR. ASKMAN:  Go ahead and answer.
                THE WITNESS:  I don't really have a
        comment on that.  I am not even sure I know
        what the question is.
        Q.      (By Mr. McCarthy)  Let me ask it again.
Okay.  It would be fair then to say that although he
followed the letter of your protocol, he didn't
follow the spirit of it?
        A.      I don't think that would be fair because
that would have asked him to do something -- that
would have been judging him for not holding people
out that the protocol didn't specifically ask him to.
        Q.      When you were formulating the protocols
for this study and the design of this study, had you
had an expectation that there would have been more of
these environmental cases than you actually found?
        A.      Yes.
        Q.      And was that based on your discussions
with Dr. Whitehouse about all of these patients that
he had from Libby?
        A.      Yes.
        Q.      Had he represented to you that there were
many cases that he had of people who had no
occupational exposures, either at the mine or other
☐employment, that he had diagnosed as having
asbestos-related disease?
        A.      Obviously we didn't know what exactly what
we were going to find in terms of occupational
history for these people.  So there was a little bit
of an unknown.  I did expect that we would end up
with more.  I think at the beginning I probably
thought we would have had more.
                                Page 16

Exhibit 4 -- Middleton dep.txt

Q.    Is that because of representations that
had been made to you before you started the study
about the number of people that didn't have
occupational exposures that were being treated by
Dr. Whitehouse?
    A.    Well, the only number I have would have
been from Dr. Whitehouse, so I --
    Q.    So it is a fair statement?
    A.    I think that it is a more complex
question.  You really do have to think carefully what
you are going to call occupational and what you are
going to call environmental and I wouldn't have
expected him to pull out all of those patients that
we ultimately characterized as occupational.  Because
they worked in industries that were not vermiculite
industries.
    Q.    But they were industries that were
Ucommonly associated with asbestos exposure?
    A.    No, that is not what I am talking about.
I am sorry, what is your question again?
    Q.    The question before was your expectation
of finding more of these so-called environmental
cases was based upon representations that had been
made to you by Whitehouse, and I think you agreed
with that, right?
    A.    I did expect more, but I think that the --
he couldn't possibly -- I couldn't possibly have
known how many of these people would --
    Q.    That is not the question.  The question
was, was your expectation based upon the
representations of Dr. Whitehouse?
    A.    Generally I think the answer to that
question is yes, but I think it doesn't take on
meaning until you really specify what you mean by
occupational -- what you mean by environmental.
    Q.    That is where I started.  What do you mean
by environmental cases?
    A.    Well, I think that we weren't very
rigorous in what we really asked him to do in the
protocol thinking that we would --
    Q.    No.  No.  No.  The question posed was what
do you mean by environmental cases?
    A.    Yeah.  Okay.  You have to be confirmed by
our epidemiologic definition of a case, and we --
that is the case.
    Q.    That is one.
    A.    And the environmental part is that they
don't report another exposure that is likely to --
you know, may be more likely to have explained
their -- what happened to them.
    Q.    Now, other criteria for selecting these
participants -- well, first, they had to be diagnosed
by Dr. Whitehouse to have an asbestos-related
disease; is that right?
    A.    That is true.
    Q.    Isn't it true that with respect to at
least four of these 22 that had been diagnosed by
Dr. Whitehouse as having asbestos-related disease,
neither your three B-readers nor the CT reviewer
identified any changes consistent with
asbestos-related disease?
    A.    I believe that is true.  I think all four
of them had CT scans.  That is the only reserve I
Page 17

Exhibit 4 -- Middleton dep.txt
have got about that question but I believe all four
of them did.
     Q.    And that is about a 27 percent rate of
error in one of the primary selection criteria,
Dright, having a diagnosis of asbestos-related
disease?
     A.    They were patients that he had diagnosed,
correct.
     Q.    With respect to these four that the
reviewers in your study had found did not have lung
changes consistent with asbestos-related disease, how
did Dr. Whitehouse react to that?
     A.    He was upset.
     Q.    Did he tell you why he was upset?
     A.    I don't think so.
     Q.    How did he express that state of being
upset, did he call you?
     A.    Yes.
     Q.    And --
     A.    Yes.  He did call me at least once to
discuss it.
     Q.    And can you --
     A.    Well, I can't recall if I called him or he
called me but we talked.
     Q.    You had a conversation?
     A.    Yes.
     Q.    What was the nature of what -- what did he
express to you about those findings?
     A.    He was very upset that the B-readers had
Dnot confirmed his reading of x-rays.
     Q.    And did he give you any opinion?  What did
he tell you about the B-reader's results, what did he
say about it?
     A.    I don't remember specifically.  He was
upset that they had disagreed with him and certainly
believed he was correct.
     Q.    Did he ask you to redo the study with
respect to those people?
     A.    I think he -- not redo the study, I think
he was -- his first question -- what we do is a case
series and he asked if we could just leave them out.
     Q.    And you didn't leave them out, though,
right?
     A.    No.
     Q.    Why not?
     A.    It wouldn't have been a complete -- it
would have been inappropriate.
     Q.    Did you tell him that?
     A.    Yes.
     Q.    Was that a cause for greater upset?
     A.    No.  I think once he understood why we
thought that wouldn't be appropriate conduct, he
accepted it.
     Q.    Did he ever threaten to take his name off
Dyour poster?
     A.    Yes.
     Q.    When did that occur?
     A.    About the week before the poster was to be
presented, I think.
     Q.    Was that in that same telephone
conversation?
     A.    No.
     Q.    Did he give you the reasons -- when did
                       Page 18

Exhibit_4 -- Middleton dep.txt
that telephone conversation take place?  If the
poster was May of 2002, when did you have that
telephone conversation about the B-reader results?
     A.     You know, I really don't remember.  It was
obviously before that, sometime, you know, -- I think
it was probably a few months but I don't remember.
     Q.     What was the -- did he give you any
reasons for wanting to take his name off the poster?
     A.     There was -- he wanted his sentence -- I
don't remember the specifics, but essentially it was
that -- I believe it was that other -- I honestly
.don't remember exactly, but it had to do with other
physicians agreeing with his interpretation of the --
either the x-rays or the CT.  But I really don't
remember exactly --
     Q.     Was it the same issue, though, that you
Dhad discussed on the telephone, because I think on
the telephone you had mentioned the B-readers, and --
     A.     Oh, no, he accepted that.  He didn't bring
that up again.
     Q.     So with respect to the poster, it was the
interpretation of the CT-readers?
     A.     I don't -- honestly, what I think he
wanted was that in most of these cases there had been
at least one other physician who had, for example,
the CT-reader who gave him a report, and he wanted a
statement providing that support for him.
     Q.     I don't think I quite understood what you
just said.  He wanted the CT-reader to provide --
     A.     No.
     Q.     I don't -- I misunderstood.
     A.     I wish I could remember the exact
sentence, but I don't.  But it had to do with another
physician having -- I think it was essentially
another physician had possibly read the films and
agreed with him or -- it was something like that.
     Q.     With respect to these four cases?
     A.     No.  It was -- I can't remember whether it
was one of the four cases or all four cases.
     Q.     And he had found some other doctor who
agreed with him but not your panel of experts?
     A.     No.  I am sure -- what he was referring to
was like when the diagnosis was made.
     Q.     So, he wanted you to include in the poster
that he had gotten a second opinion of his diagnoses?
     A.     I don't know that the second opinion is
exactly the right word but in general that is the
right -- the content of it was essentially that.  Not
a second opinion in a sense.  Not a second medical
opinion.  Not a second separate position that they
would see as a primary physician, but I think -- it
had to do with reading the films.
     Q.     And did you make the change that he
suggested?
     A.     No.
     Q.     Was this second -- do you know who the
second physician was that Dr. Whitehouse had wanted
you to include in his opinion?
     A.     I assume it was the pulmonary radiologist
that he works with because that is generally who read
his CT scans.
     Q.     Do you know who that was?
     A.     I can't think of -- I don't remember his

Exhibit 4 -- Middleton dep.txt
name.
Q.    Was it Dr. Teel?
A.    Was he in Spokane?  That sounds --
☐    Q.    I don't know.
A.    This doctor is in Spokane also.  And I
think -- what is Dr. Teel's first name?
Q.    Don't know.
A.    Don't know.  That sounds familiar but I
can't tell you for sure.
Q.    Okay.  Was there any disagreement between
ATSDR and Dr. Whitehouse with respect to the
selection or the identification of the final eight
that you identified in your report as potential
environmental cases?
A.    I don't think so.  I don't remember.  I
don't remember him disagreeing with that.
Q.    Now, one of the other criteria for
selecting these cases, I believe, was that all of
these participants had to live in Libby prior to
1991; is that correct?
A.    Yes.
Q.    Why was that?  Was that an important
criteria?
A.    Up to a point.  It is a case series, so
the -- you are not making specific statistical
comparisons, so I would say it is not as important as
it is in a formal epidemiological study.
Q.    Why did you chose 1991 was a cutoff?
☐    A.    Just because it was being used -- it is
what was being selected for the screening.
Q.    And was 1991, or the pre 1991 period, was
that the period in which the mining, milling and
other vermiculite processes were occurring in Libby?
A.    Sometime during the period of 1990, I know
the plant stopped mining.
Q.    Was that important to you in your study in
using that 1991 cutoff for participants?
A.    It was selected originally in the
screening and we were trying to maintain some
similarity to the way that was done.
What is the question?
Q.    I think you answered the question.  So,
the only reason that you used 1991 was because it had
been used before, it had no significance to you in
your study?
A.    Well, it had significance when it was
selected for the screening study.  I mean, I think we
accepted that because it was used in the screening
study, but, yeah, it wasn't chosen arbitrarily.  It
was essentially trying to pick up people who had been
in the area when, generally, when the mine operated.
Q.    Is that because you assume that potential
levels of exposure were the greatest while the mine
☐and vermiculite processing facilities were in
operation?
A.    I think that the airborne exposures would
have been when they were the greatest.
Q.    At that time before 1991?
A.    Yes.
Q.    Okay.  Now, the changes that you were
looking for radiographically in your participants, is
there a latency period that applies to that?
A.    Yes.

Page 20

Exhibit 4 -- Middleton dep.txt

Q.      Can you give me a general idea what those
latency periods are for the time period that you were
looking for?

A.      Not specifically, but it is a matter of
several years.

Q.      Is it more than five?

A.      Usually.

Q.      More than ten?

A.      I think at ten years you might begin to
see changes, but not everybody would have changes
after 10 years, some people might have 15 or 20 years
later.

Q.      Given your pre 1991 selection criteria and
these latency periods, would it be fair to say that
your study is not relevant to current day exposures
☐in Libby?

        MR. ASKMAN:  Object to the form, you used
    the word "relevant."

Q.      (By Mr. McCarthy)  You can answer.

A.      You know, I am trying to figure out what
the question is.  Is my study relevant --

Q.      Well, you said there is this pre 1991
selection criteria, right?

A.      Yeah.

Q.      And you said the airborne exposures you
assumed in Libby were at the highest prior to 1991,
right?

A.      The airborne exposures most likely were,
yes.

Q.      And you also said that the latency period
for these disease -- for these radiographic changes
is at least ten years, right?

A.      I think I need to take a break.  My mind
is just like -- I am not -- he is like talking and I
am just like what.  Can we take --

        MR. ASKMAN:  Let's get the question out
    and the answer out.  And then if we are
    done with that, it is a good place to take
    a break.  We will take one.

Q.      (By Mr. McCarthy)  That is fine.

☐   A.      I will try to listen.

Q.      Let me start over again.  There is a
little bit of wind-up with this question, if you
don't mind, and then we can take a break.

A.      I am not sure my sugar level is my
problem.  Okay.

Q.      Okay.  You stated that the pre 1991
selection criteria for these participants was in part
related to your assumption that exposures prior to
1991 were the highest because the mine and milling
operations were in operation, right?

        MR. ASKMAN:  Objection, that
    mischaracterizes the previous testimony.

Q.      (By Mr. McCarthy)  Is that right?

A.      I am sorry, what did you say?  I am really
not trying to be difficult, if I can get you to
repeat it.

Q.      We will try it again.  You said that, I
believe, you assumed that prior to 1991 exposures
were higher because the mine and mill were in
operation, right?

A.      I believe that it is probable that the
ambient exposures were higher while the mine was

                                            Page 21

Exhibit 4 -- Middleton dep.txt
operating which would have been prior to 1991.
Q.      Okay.  And you excluded people from your
study who didn't have a pre 1991 exposure for at
least six months, right?
A.      As I recall, these were like long-term
residents.
Q.      Wasn't one of your protocols that any
participant had to have been a resident of Libby for
at least six months prior to 1991?
A.      I believe that is true.
Q.      And you believe, you just stated that the
latency period for the radiographic changes that you
were looking for in your study were at least ten
years?
A.      I didn't see at least ten years.  They
vary among people, and after ten years is a -- it is
not like you go from zero to a hundred, there is an
increase in prevalence as the years go by.
Q.      And ten years is, would you say, would
generally be a latency period associated with the
types of changes you are looking for, at least ten
years?
A.      I am not making a huge distinction between
seven and ten, but in general I think ten years is a
reasonable latency period to begin looking at a
population.
Q.      Okay.  And then my question was, given
your pre 1991 residency selection criteria, and the
latency periods associated with the radiographic
changes you are looking for, wouldn't you agree that
your case series isn't really relevant to current day
exposures in Libby now 12 years later?
        MR. ASKMAN:  The same objection I had the
    first time the question was asked.
        THE WITNESS:  I don't think I would
    exactly agree with that.  I think the
    airborne exposures, in other words, just
    walking down the street in Libby, are less
    now than they were -- post 1991, than they
    were prior to that; but other exposures,
    you know, may or may not still continue.
Q.      (By Mr. McCarthy)  Do you believe that the
potential nonoccupational levels of exposure today
are the same as those that existed prior to 1991?
A.      I think the ambient levels are different.
Q.      How --
        MR. ASKMAN:  Can we take a break, I think
    he is struggling?
        MR. MCCARTHY:  Yes, why don't we take
    a break now.
            (A recess was taken.)
Q.      (By Mr. McCarthy)  We were talking about
nonoccupational exposures and I just want to ask a
couple of questions and then I want to go into
another subject matter but I will probably circle
back --
A.      Okay.
Q.      -- to your exposure pathways.
A.      Okay.  I think the report has the answers
to most of the questions and it is laid out
sequentially.  I am sorry, I know you have read the
report, that was a silly thing to say.
Q.      That's I read the Cliff Notes.

Exhibit 4 -- Middleton dep.txt
          Let's go to your report for a minute.
Page 6, Exhibit 155. At the bottom of the page, it
talks about -- well, this page, it starts the
discussion of the radiologic evaluation. Can you
please describe briefly the radiologic evaluation
that was conducted in connection with this study?
     A.    The radiologic evaluation involved sending
the chest x-rays to three B-readers and asking them
to read the films according to NIOSH's B-reading --
you know, to use the report that NIOSH has. These
are all certified B-readers and they were using NIOSH
reporting for B-readers.
          And then there was a -- the films were --
there was some blinding that NORC did so they could
Dlook at the second film and not -- and read it
independently of the first. And then after they had
done that, they were given the code so that they
could compare them looking at the films, and that is
what I remember.
     Q.    With respect to the B-readers, they had
two tasks then, if I am understanding you, one was
for all of the participants to look at at least one
x-ray; is that right?
     A.    They looked at a P-A film for each
participant, yes.
     Q.    And then for a certain other number of the
participants, they looked at two films?
     A.    I think there was six participants that
had two films that they -- and they did look at both
films.
     Q.    What was the purpose of looking at the two
films with the other six participants?
     A.    It was to look for progression.
     Q.    What do you mean by that, progression?
     A.    An increase in radiologic findings,
essentially. That would be the evidence of disease
progression.
     Q.    If there were a larger quantity of
changes?
D    A.    Right. You would expect the changes to be
larger and there to be more of them. If you were
looking at somebody who had -- if there had been
enough time for progression to occur and --
     Q.    And with those six participants, did your
study conclude that there was progression?
     A.    We didn't conclude there was progression.
I mean, there were reasons. The period between
films, it just turned out in this group was
relatively short.
     Q.    But the ultimate -- you had a small group
of total participants, right?
     A.    Right.
     Q.    But the ultimate conclusion was based on
what evidence you did have before you found no
progression?
     A.    We did not see progression in those six.
Generally that is not -- there was one reader that,
perhaps, had it but in general I do agree that our
conclusion was we could not say it was progression
for those six participants.
     Q.    Was that finding of your study, regarding
progression, was that discussed with Dr. Whitehouse?
     A.    I don't remember if we discussed it or
                         Page 23

Exhibit 4 -- Middleton dep.txt
not.  I know he was sent copies of the reports so he
□was aware of it.  But I don't remember discussing it
with him.
     Q.    So, you don't have the same recollection
of him being upset with respect to your findings of
progression as he was with respect to the findings of
your B-readers?
     A.    I don't remember discussing it with him.
     Q.    Back to Exhibit 155, the report, the final
report on your study at the bottom of Page 6.  It
also discusses CT scans that were done; is that
correct?
     A.    Yes.
     Q.    Could you describe this CT review
component of your radiologic evaluation?
     A.    Well, there were not all participants but
some participants had CT scans done as part of their
diagnosis and when they were available, we sent them
to an independent reader to get an opinion on how he
interpreted the film.
     Q.    Were these, the CT scans that you sent to
the reader, were they uniform?
     A.    What do you mean by uniform?
     Q.    Did they all have the same view?
     A.    I think one may have been essentially
intended to be an abdominal view but had some of the
□chest, but that part of the exam was interpretable.
     Q.    Do you know whether the CT scans were
performed on the same machine?
     A.    I don't believe they were.
     Q.    You believe there was more than one
machine involved?
     A.    I do, because there were -- some were high
resolution and it seems like there was a scan or two
that were not high resolution scans.  Several were
done on the same machine, but not all.
     Q.    And do you know whether the same
technician performed the scans?
     A.    I don't know what technician performed any
of them.
     Q.    Do you know whether the same contrast
media was used in each of the scans?
     A.    I think that some were with and without
contrast media, as I recall.  So it wouldn't have
been the same.
     Q.    Would you say that the lack of uniformity
in the CT scans would have been something of a
concern in this part of your evaluation?
     A.    It would have been preferable if they
would have been done uniformly, or more uniformly.
     Q.    Is that because it is difficult to compare
□CT scans that aren't done uniformly?
     A.    Well, not so much, it is just as an
epidemiologist it is always your preference.  I think
it is easier to compare films that are done on the
same machine at the same resolution, if that is what
your question is.
     Q.    And that wasn't the case here?
     A.    No.
     Q.    Now, at the bottom of Page 6, you state
that, "There is no validated and widely accepted
method for interpreting dust related changes on CT
scans," is that correct?

                         Page 24

Exhibit 4 -- Middleton dep.txt

A.      There is the standard of practice, but
there is not something that is comparable to the
B-reader program for chest x-rays.

Q.      And as a consequence of that, does that
mean it is difficult to compare results from CT
scanning analysis from study to study?

A.      I am sorry, would you say that again.

Q.      Well, I guess what I am wondering is if
there is no validated or accepted method for
interpreting changes that are detected on CT scans,
how could you compare this study with, say, another
study that wasn't using the protocol that you use?

A.      I don't think we did compare CT scans to
another study.  These were records from an ongoing
clinical practice that we didn't have the -- it
wasn't like the screening that was done in Libby
where you could start out and set up the program
that -- you know, that set the program up.  We were
taking films that were already done.

Q.      So you just had to take them for what they
were?

A.      We couldn't change the films and we didn't
have the option of repeating them.

Q.      And with the CT films, were those also
copies of films?

A.      Yes.

Q.      It also says here that the method that was
used to analyze the CT films was a semiquantitative
scheme.  What do you mean by a semiquantitative
scheme?

A.      I think something resembling the B-reader
format.

Q.      I guess it implies to me, semiquantitative
would mean it is also semiqualitative, is that fair?

A.      I don't really know if I know what you are
asking.

Q.      What part of the scheme is subjective, it
seems it is only semiquantitative, meaning partly
quantitative, what part of this methodology isn't
quantitative?

A.      Well, quantitative -- semiquantitative
means that you can't, like for example, if you -- I
am trying to think of a comparison, but it
basically -- semiquantitative means that you would
expect it to be different from a one and three to be
different from both of them, but it doesn't mean that
a three is -- the same mathematical relationship that
you would have in other things, like gasoline gallons
or something.

Q.      Okay.  Now, would the B-readers -- you
used three B-readers, right?

A.      Yes.

Q.      Why did you use three?

A.      As opposed to?

Q.      One.

A.      In order to have -- well, with three you
-- if two agreed and one didn't, then you could
accept the view of the two.

Q.      Why would you want to do that, is that a
quality assurance measure?

A.      It is generally -- a lot of studies have
used that approach.

Q.      But why?

Page 25

Exhibit 4 -- Middleton dep.txt
☐    A.    It is believed to increase your confidence
in the validity of the outcome.
    Q.    Is that because --
    MR. ASKMAN:  Hang on just one second.  If
you want to doodle, doodle on that.
    THE WITNESS:  Sorry.  It is just
lines.  It is not impressive there.
    MR. ASKMAN:  If Mr. McCarthy wants to
see the doodle, you can show it to him
then.
    THE WITNESS:  There is not much
information there.  I am just trying to
stay focused.
    (The record was read by the
reporter.)
    Q.    (By Mr. McCarthy)  Is that because there
are oftentimes differences of opinion between
B-readers as to what is on a particular x-ray?
    A.    There are oftentimes differences between
doctors for almost any question you ask them.  But it
certainly -- but it is true that two physicians
looking at the same film, particularly if the changes
are minimal, might come up with a different
conclusion.
    Q.    And you use the third for quality
☐assurance purposes?
    A.    I hadn't thought of it particularly as a
quality assurance issue, but, you know, then you
have -- you are not tied to one B-reader, you have
more input into what your discussion -- your
epidemiologic decision is for categorizing a person.
    Q.    Do you feel there is at least greater
accuracy in the result?
    A.    Do I feel -- the question is do I feel at
least a greater accuracy?  I don't know.
    Q.    Were you concerned with accuracy?  I mean
you wanted accurate results, didn't you?
    A.    If you mean by -- what do you mean by
accurate?
    Q.    Well, if you are looking for changes in
the lung or pleura, you would want the record of
·change or lack of change to be accurate, wouldn't
you, otherwise why do the study?
    A.    I think what I would say is I would like
to identify changes when they are present and not
identify them when they are not.
    Q.    And you would like to be accurate in
making that distinction, right?
    A.    Accurate, words like accurate and
precision and all have meanings that are -- I don't
☐think I want to go with the word accurate because I
would have to have it defined very carefully to me
before I used it.  But what I said really covers it,
if I want to identify changes when they are present
and not identify them when they are not.
    Q.    And you think you are more likely to
identify changes when they are present when you have
three B-readers as opposed to one?
    A.    What you said was you are more likely to
identify changes.
    Q.    Or the lack of changes, but by using
three, did you feel you were more likely to identify ·
changes when they were there and not identify them
                              Page 26

Exhibit 4 -- Middleton dep.txt

when they are not there?

A.    I think the -- I don't -- it might depend on the B-readers. One B-reader might be accurate -- more accurate -- if accurate, if you mean by what I mean accurate, identify when they are present and not when they are not. One B-reader might be more accurate than a panel, but you don't know which B-reader that is, so the input from three people increases your confidence that you are not looking at some idiosyncracy of one B-reader.

Q.    Who were your B-readers?

A.    I know Jack Parker was one and Jim Lockey ☐was one. And I don't know the other guy's name -- I always forget the other guy's name because I don't know him personally.

Q.    Were they the same B-readers that were used in the screening study you referred to earlier?

A.    I believe so. I am sure about Jim and Jack Parker. And I believe Art Teel uses the same three, and I believe those are the same three.

Q.    Was Ralph Shipley the other B-reader?

A.    If that is what it says there. I always forget his name. I don't know him.

Q.    And was Dr. David Lynch your CT-reader?

A.    Yes.

Q.    Do you know if Dr. Kenneth Roseman was consulted in this study?

A.    Who is he?

Q.    You don't know Dr. Kenneth Roseman?

A.    The name sounds familiar, but I -- at the moment I can't think of who that is.

Q.    Were there any other -- other than Doctors Parker, Lockey and Shipley, were any other B-readers asked to look at these chest radiographs?

A.    No, I think it may have been one draft where I was confused about the name of the third guy because I can't remember his name. But there were ☐three B-readers and they didn't change.

Q.    And you are not sure whether or not all of these guys were the same guys that were the B-readers --

A.    I think they were. I think they were. It has just been a long time since we made that decision. Because we already had a contract with NORC and they already had a relationship -- N-O-R-C, National Opinion Research Corporation, something like that, but anyway, it is -- that is actually in the credits, too. But they -- so our attempt was to continue under that contract and use the same three B-readers and that is my understanding of what we did.

Q.    Now, with respect to the CD scans, you only used one CT reviewer; is that correct?

A.    Correct.

Q.    Why didn't you use three?

A.    I think we were -- it just wasn't -- we wanted to have some time to increase our confidence in the form we were using and it also was going to be expensive, so we decided for this study to just use the one person and make sure we were -- that the form was what we wanted to be before we used it on anything else.

☐    Q.    So the form was kind of an experiment with

Page 27

Exhibit 4 -- Middleton dep.txt

this case?

A.    I don't know if experiment is exactly the right word, but it was not one that had been -- it was certainly -- it wasn't equivalent to the B-reader form which had been used extensively over all the world.

Q.    Since you only had one CT-reader, did you use any quality assurance controls to assure that he was reading changes when they were there and not reading them when they weren't?

A.    When you started that question, did you say we only had one CT-reader?

Q.    CT-reader.

A.    Okay. We did not have a second independent CT-reader.

Q.    And you didn't have a third either, right?

A.    I don't think I understand what you are asking me.

Q.    I guess it seems curious to me you would use three B-readers for the x-rays and only one CT-reader and you said one of the concerns, I guess, is cost, right?

A.    Right.

Q.    But how did you then obtain the kind of ▯confidence that you had in the B-readers since you had three, with only one CT-reader? Maybe the question -- let me start again.

Did you have the same confidence in the accuracy of the results of the CT review as you did with the B-readers?

A.    Well, I do have a lot of confidence -- I do have confidence in Dr. Lynch. I think that if we -- the study was a pilot, if we went forward with another study, we would -- the plan was to use three CT-readers.

Q.    Why is that? Why would you have used three CT-readers, you know, in a further study?

A.    Well, it is the same issue as the B-reader. It would increase your confidence that you weren't dealing with one person who was not in the mainstream.

Q.    Are you going forward with further studies?

A.    I don't think so, but I don't know the final. Let me ask you, what are you talking about? You mean will be -- I don't know that I understand what you are asking me.

Q.    You just told me if you were going to do further study, you would use three CT-readers, and I ▯asked if --

A.    -- if I was going to do another case series review, I would use three CT-readers.

Q.    Have there been --

MR. ASKMAN: Excuse me for a second, make sure he gets the question out completely before you walk on it, so the court reporter can get it, so I can hear the question.

THE WITNESS: I am sorry.

MR. ASKMAN: Thank you.

Q.    (By Mr. McCarthy) Have there been discussion of doing further studies looking for environmental exposures?

Page 28

Exhibit 4 -- Middleton dep.txt

A.      No.

Q.      There have been no discussion of that?

A.      Not in the context of this study.  I am
not sure what purposes the Libby data set, if there
will be other studies related to that, or at least
in-houses.

Q.      What other studies were you just talking
about that are being considered?

A.      Well, when we -- we had thought we might
do a larger -- this was a pilot so we, you know, we
would iron out the issues like the CT form and
Dpossibly proceed to -- we talked about doing all of
Dr. Whitehouse's Libby patients but that wasn't to be
specifically environmental.

Q.      And have you decided against now doing all
of Dr. Whitehouse's patients?

A.      I would say it looks unlikely at this
point.

Q.      Why is that?

A.      Well, he is published -- he decided to go
ahead and publish his pulmonary function data for all
of his patients.  So I don't know if it is published
or in press or accepted or what its status is, but he
is actually going to go ahead and do that on his own.

Q.      Why would that stop you from doing your
study?

A.      It wouldn't necessarily, but it would be
-- it is taking part of what we could do in addition
to what he would have already done.

Q.      Your study doesn't really, at least the
final report, doesn't even include a discussion of
pulmonary function, why is that?

A.      Basically for the reason I just gave you,
he is going to publish his pulmonary function
separately so that we could -- I mean, this report
deals with the radiologic findings.

D               What are you asking me?  We have talked
about a lot of different stuff.  I don't really know
what you are asking me.

Q.      Okay.  You said that you are considering
doing all of Whitehouse's patients.

A.      All of his Libby patients.

Q.      All of his Libby patients.  And you said
that -- now you just said that this report is really
a radiologic study, right?

A.      Yes.  Right.

Q.      And then you said Dr. Whitehouse is --

A.      There is some other information in there,
but the focus is certainly radiologic findings.

Q.      Then you said Dr. Whitehouse is publishing
something that is related to pulmonary function
testing on his patients --

A.      -- right.

Q.      Well, what is it to stop you from
continuing the radiologic study of Dr. Whitehouse's
patients?

A.      I don't think there is anything that
would -- I mean that we couldn't do it, it is just is
that the best use of resources.

Q.      Why?  You felt it was a good use of
resources to do this pilot study.  What is it about
Dthe pilot study that indicates to you that it is not
worth doing a similar study on all of

Page 29

Exhibit 4 -- Middleton dep.txt

Dr. Whitehouse's patients?
          MR. ASKMAN:  Object to the form of the
     question.
     Q.    (By Mr. McCarthy)  You can answer.
     A.    You know, I -- you know, I don't -- first
of all, I don't think -- I didn't solely decide to do
this study.  It was -- I mean, I had a lot of input,
but it was like assigned to me.  So your preface is
not exactly a hundred percent correct.
          Why would we not go forward with
radiologic findings?  I think the decision was
based -- I think we are going to do further studies,
but I just don't think this one is -- I don't think
this is a very high priority at this point.
     Q.    Why is that?  Why would that be?
     A.    We already have -- it was very -- it was
expensive and we already have data from like about
7,000, 6 or 7,000 people in the screening study.
     Q.    And did you feel that Dr. Whitehouse's --
after your experience with Dr. Whitehouse's database,
I guess if you could call it that, did you find that
there were problems with the reliability of the
information that he provided you?
     A.    I don't -- no, I don't think that is a
fair statement.
     Q.    Can you tell me some of the reasons that
were discussed as to why not to -- why ATSDR decided
not to continue with the radiologic study based on
the whitehouse database?  I think you mentioned one?
     A.    Yeah.  Well, I think one reason
probably -- you know, one important reason was the
things -- the issues that we have discussed about --
Dr. whitehouse sees things from a very clinical
viewpoint and the epidemiological viewpoint is, for
example, wouldn't be -- it is very critical to a
clinician -- I can't really speculate what
Dr. whitehouse thinks, but I can say I am not
surprised in epidemiology when things aren't a
hundred percent and I think that --
          THE WITNESS:  Would you quit that?
          MS. KUCHINSKY:  Sorry.
          THE WITNESS:  I don't think that is
     exactly his viewpoint.
     Q.    (By Mr. McCarthy)  So he didn't want to
work with you anymore, is that --
     A.    No, that is not true.  I mean he didn't
say anything --
     Q.    I am asking what were ATSDR's reasons for
not continuing?  Is it fair to say from what you just
said that one of those things was you and
Dr. whitehouse had some kind of, I guess,
disagreement as to how to view the information?
          MR. ASKMAN:  Let me interject here, first
     of all, that Dr. Middleton is not a
     spokesman for ATSDR and what ATSDR's
     reasons may or may not have been for
     furthering this study or conducting another
     study may be beyond his knowledge.
          If you are asking what ATSDR, what
     their reasons for this were, he can
     certainly answer that question, if he knows
     what ATSDR's reasons were.  If you are
     asking him what his opinion of that is or
                                    Page 30

Exhibit 4 -- Middleton dep.txt
what he believes, he can answer that as
well.  But I would like to make it clear
that he is answering one question and not
the other.  Okay.
          THE WITNESS:  Okay.
     Q.   (By Mr. McCarthy)  Answer any question,
please, Dr. Middleton.
     A.   I think that my thoughts on it, and I
guess I am not sure I can speak for ATSDR, my
thoughts on it were that because Dr. Whitehouse
□hadn't really -- didn't have a long history of
epidemiological background and training, that it was
not easy to work with him on an epi-related study.
     Q.   And that was one of the reasons you
decided not to go forward, it was difficult to work
with him?
     A.   It was one of the reasons that I thought
that it could be problematic.
     Q.   Do you feel that the information that he
has in his patient files, that is not essential to
ATSDR's investigations at Libby?
     A.   I don't think that --
          MR. ASKMAN:  One second, are you asking
     what Dr. Middleton thinks?
          MR. MCCARTHY:  Yes, he is the guy who
     is here.
          MR. ASKMAN:  I understand that, but
     sometimes when you say "you," I think you
     mean ATSDR and sometimes I think you mean
     Dan, and I just want to make sure I
     understand.  Well, I may --
     Q.   (By Mr. McCarthy)  And, Dr. Middleton, if
you don't understand my questions, please just let me
know.
     A.   Yes, sir.  Would you state it again.  Or
□let her read it.
     Q.   Well, you said it was difficult to work
with Dr. Whitehouse.  But you state in the beginning
of your report that he has this, what, 200-patient
database, and I guess is it your assessment then that
having access to that database is not that important,
it is not that valuable to overcome these
difficulties of working with Dr. Whitehouse?
          MR. ASKMAN:  Object to the
     characterization.
          THE WITNESS:  Yeah, I don't think I can
     make that characterization.  So I guess
     I --
     Q.   (By Mr. McCarthy)  Can you answer the
question?  Can you make the assessment of the value
of the information that he has?
     A.   Well, there is a lot of information
available, much of it we collected in Libby in the
screening study.  That information we have and is
not -- you know, doesn't cost lots of money.  We
don't have to pay B-readers or CT-readers.
          I think some of my concern had to do with
like the issue about the poster when he sent us a --
when he sent an email saying he might want his name
off of -- first thing, he said he did.
□         I didn't want to -- I think I would have
some hesitation about getting involved in a project,
a big one, where we would spend a lot of money and
                                        Page 31

Exhibit 4 -- Middleton dep.txt
then possibly, you know, if there was some -- that he
might then withdraw from.

So, I guess my concern was if we started
it, we might not be able to finish it. And then the
other aspect has to do with the pulmonary function
test, that that would have been something we would
like to have explored.

But the same issues.

Q.      With respect to the pulmonary function
test, you included some analysis of pulmonary
function in an early draft of the report; is that
correct?

A.      Right.

Q.      And is it fair to say that preliminary
analysis found with respect to the people selected
for your study that the results were negative for
restrictive pulmonary function changes?

A.      No.

Q.      No.  How would you describe it?

A.      Again, I am not an expert.  I attended
courses, I treated patients when I was in practice,
but I am not an expert pulmonary function reader.

☐         But it did -- in looking at it, you know,
just my opinion and the opinion of, you know, others
around was that there certainly -- there were
obstructive changes and there were restrictive
changes and there were mixed -- you know, and I am
not really -- wasn't qualified to sort of sort that
all out.

I think we decided if we were to continue
with it, it would have to be in a format similar to
the B-reader where we selected experts who could do
quality assurance on the test that were done by
looking at the curves and then make, you know -- that
had, you know, really a lot of experience and
expertise in assigning categories.

Q.      And you couldn't do that in this study?

A.      We could.

Q.      Why didn't you?

A.      Well, these are included in the results
that Dr. Whitehouse is publishing.  It also would
have held up the report a long time because we would
have had to have identified and established a
contract and find money in the budget and we reached
that -- we sort of reached the point that we could
publish what we had.

And I can't tell you that that won't be
☐done but right now I think it is less likely because
there are other things that people are working on
that are apparently a higher priority.

The clear decision we made was to separate
the two.  We may go ahead with the pulmonary function
data that we have, or depending on what he publishes
we may not.

Q.      That decision hasn't been made?

A.      It has been discussed, but I would say my
feeling is that we won't, but I am not always the
person that makes that decision.

Q.      Who will be the person who makes that
decision?

A.      Somewhere -- well, I know Dr. Miller is
interested in working on it.  It is possible he might
take the lead on that.

Page 32

Exhibit 4 -- Middleton dep.txt
```
      Q.    Dr. Miller doesn't work for ATSDR, does
he?
      A.    No.
      Q.    But as far as ATSDR is concerned, who is
the person who makes the decision?
      A.    I am not sure.  He would essentially have
to submit an analysis plan and approach to doing it
that would have to be approved, and I can't tell you
who would finally make that decision, it might be
DHenry Falk, I don't know.
      Q.    And he is with ATSDR, right?
      A.    (Nodded head affirmatively).  He is the
assistant administrator.
      Q.    You said in your opinion that wouldn't be
done, why is that, why in your opinion should that
study not be done?
      A.    Well, he is publishing those results
separately.  I think, you know, the whole -- the
issue of chest x-rays also might come up again.  I
don't think we can -- I would have concerns that
Dr. Whitehouse might -- the same concerns that I
described about the -- doing the larger study, that
if -- that he might not -- his viewpoint is more
clinical than epidemiologic.  And so if one person,
for example, is not credited, he -- well, I can't
speak for what he thinks, but it did upset him when
the B-readers didn't agree with him and I --
      Q.    So your concern is that he would become
upset if your epidemiologic findings differed from
his clinical findings?
      A.    I think that would make the study harder
to do and, again, I wouldn't be -- you know, the
experience with the poster made me concerned about
those disagreements being more than just trivial.
D     Q.    I would like to look at Table I of your
report, Dr. Middleton.  And that is the demographic
characteristics.  Page 21, I believe.
      A.    Okay.
      Q.    Here you have set forth a lot of the
demographic characteristics of the 22 participants;
is that right?
      A.    Yes.
      Q.    But ultimately you only found eight of
what you would classify as environmental exposures,
right?
      A.    I think, again, you have to ask -- there
were eight that we didn't assign potential
occupational causes.  That doesn't mean that the rest
of these participants weren't environmentally exposed
or even that most of their exposure for some of them
didn't come from an environmental pathway.
      Q.    I am not getting at that.  You have ended
up with eight people that you didn't screen out; is
that correct?
      A.    There were eight people who we didn't
identify -- right, who weren't selected, who didn't
answer yes to one of the occupational questions about
asbestos that was screened about.  Not screened about
but made them consider occupational rather than
Denvironmental.
      Q.    With respect to those eight, what I want
to know is looking at Table I, demographic
characteristic, out of the eight -- well, first of
```
                        Page 33

Exhibit 4 -- Middleton dep.txt
all, you collected demographic information, right, on
these study participants?
         A.    Yes.
         Q.    Sex, age, smoking history, years lived in
Libby, yes?
         A.    Yes.
         Q.    Okay.  The eight environmental cases, do
you know how many were male?
         A.    Not offhand, no.
         Q.    Were there any females?
         A.    I believe that there were, but we removed
gender to protect confidentiality.
         Q.    So you are not aware that there were any
females in the eight that remained after you did your
screening for occupational exposures?
         A.    No, that is not what I said.  I said I
think I do remember at least one of the eight being
female, but I would have to go back to the records to
be sure.
         Q.    Do you believe there was more than one
female in the eight?
     ▯   A.    I am not sure.
         Q.    Looking at the next variable there, age.
What I am trying to find out, you have this
demographic table, does this have anything to do with
the eight cases, or is this in any way
representative?  I am going to go down each one.
               With respect to age, do you recall with
the eight whether there are any that fell in your 40
to 49 age group level?
         A.    I don't know.
         Q.    Would you agree that they were all over
the age 40?
         A.    I don't know.
         Q.    Well, you don't have an age category below
40, do you?
         A.    Oh.  Let me see.  This table says they
were 40 or older.
         Q.    So would it be fair to say that in your
eight, everybody was over 40?
         A.    That they were at least 40.
         Q.    Do you recall if there were any that were
over 50?
         A.    No.  I don't remember.
         Q.    Not a single one?
         A.    I assume there was, but I would have to go
▯back and look at the ages of the eight cases.
         Q.    So you have no idea as you sit here today
the ages of any of the eight?
         A.    I don't remember the ages of those
participants.
         Q.    What about Number 11, the one you used in
your poster, wasn't he at least 70 years old?
         A.    He was elderly, I remember that.  I am not
sure.  I think that is probably true, but I am not
sure.
         Q.    Do you recall, just generally, how many
you would consider elderly?
         A.    No.  I don't recall.
         Q.    What about one, do you recall one was
elderly, right, Number 11?
         A.    You said he was over 70 and I think that
was true.

Page 34

Exhibit 4 -- Middleton dep.txt

Q.     Do you recall any others that were like
that?

A.     I don't recall.  I don't know the ages of
these eight participants.

Q.     I am not asking for the exact ages.  I am
trying to figure, you have these ten year age groups.
Do you recall whether most of them were in the over
70 age group?

A.     I don't recall.  There was only one that
was in the 40 to 49, so most of them had to be 50 or
over.

Q.     I am wondering about the eight?

A.     I don't know about the others.  I mean
obviously most of them had to be 50 or older.  I
don't remember what their ages were.

Q.     And I am not asking again for you to tell
me exactly what their ages are, just generally
whether they were, perhaps --

A.     I do remember that gentleman was elderly,
I don't remember the others.  Or at least to the
extent that -- I think that is about the age he was,
though.

Q.     You don't recall with respect to any of
the other eight?

A.     No.

Q.     Anything other than that they were over
40?

A.     No.  Well, I don't recall the -- all the
participants were 40 or older, so.

Q.     Again, these questions are going to be
about the eight where you had screened out
occupational --

A.     They are not broken out in this table.

Q.     I know.  That is why I am asking you
because I couldn't tell from the table?

A.     Yeah, I don't remember.

Q.     Now, the smoking history, talking about
the eight.  Do you know whether any of the eight had
a history of smoking?

A.     Well, you can -- I think you can tell that
from the tables.

Q.     Which table?

A.     If you look at -- apparently I am wrong.
But smoking was -- a number of them either smoked or
had smoked.  I don't remember for the eight.  I am
sure some of them did, but I don't remember at all
how many of them did.

Q.     Would that be important to know whether or
not someone smoked?

A.     It doesn't cause restrictive disease.

Q.     Smoking causes restrictive disease?

A.     It doesn't.

Q.     But would it be important to know whether
someone smoked for the purposes of your study?

A.     I don't think that it would affect the
radiologic characterization of asbestos-related
changes, but yes, smoking is important with regard to
cancer.

Q.     But you don't believe that smoking is
important with respect to radiologic changes in the
lung?

A.     It certainly is important with regard to
radiologic changes, but I don't think that it either

Page 35

Exhibit 4 -- Middleton dep.txt
will cause you to identify or -- you can't -- the
asbestos-related changes are not caused by smoking.

Q.     Well, I guess if you assume that they are
caused by asbestos that would be true, but if you are
simply looking at radiologic changes, smoking would
have no effect on finding a radiologic change in an
x-ray, is that your opinion?

A.     I can't tell why you are doing that, but
you are mixing up -- it sounds like you are
intentionally misusing change. Smoking can cause
some change on an x-ray, but it doesn't cause the
same changes as asbestos.

        MR. MCCARTHY: I would like to mark
    another exhibit. The ones you gave us were
    so small I hope this helps.
        (Exhibit 156 was marked for
    identification.)

Q.     (By Mr. McCarthy) The court reporter has
just handed you what has been marked as Exhibit 156.
Could you identify that document for the record?

D   A.     Well, it looks like a fairly low quality
version of my poster, the poster I presented at ATS.

Q.     We got all this stuff from you guys.

A.     I don't believe you have the latest
version, though.

Q.     You mean you have changed the poster
since --

A.     No, I don't mean that. I don't think
that -- the layout is just a little bit different. I
don't think -- the one we gave you electronically was
the one I used. Or did we give it to him
electronically?

Q.     I don't believe we got it electronically,
because I had to use Xeroxes to blow this up.

        MR. ASKMAN: Yeah. I know where this came
    from. It is my understanding the
    electronic version was available last week
    as well. I can call Heidi and confirm that
    as well. If you would like.

        MR. MCCARTHY: It wasn't available before
    I got on the plane to come out here.

Q.     (By Mr. McCarthy) What I would just
like to point your attention to, and tell me if this
has changed, but if you look at the columns here, I
would say column 5 where it starts case study,
Dparticipant 11?

A.     Right.

Q.     If we go down right above the B-reader
chart, paragraph number 2 that says: "This patient
also has minimal centrilobular emphysema in the
apires and mild centrilobular ground glass opacity in
the apires," if I am pronouncing that correctly,
which I am sure I am not.

        "This latter finding is of uncertain
significance. It could represent mild respiratory
bronchitis if the patient is a smoker."

        Do you see that?

A.     Yes.

Q.     So then would you agree then that knowing
whether or not a patient is a smoker has some
significance with respect to your study in
identifying radiographic changes?

A.     Let me say this says the seventh decade,
                    Page 36

Exhibit 4 -- Middleton dep.txt
so I am assuming this was a 60-year-old person.  The
other thing is that some of the changes that we made
were removing the gender and age because what we were
trying to do -- but we promised confidentiality to
the extent we could deliver it and we were trying to
do that.
       Q.     Can I stop you right there, can you answer
my question first, and then we can get into that.
       A.     What is your question?
       Q.     We just looked at that paragraph number 2,
above the box that says independent review by
B-reader panel members.
       A.     Right.
       Q.     And we had just had this discussion about
smoking, remember?
       A.     Right.
       Q.     This comment here is saying, when they are
talking about a radiographic finding, it says this
could represent mild respiratory bronchitis if the
patient is a smoker, right?
       A.     Uh-huh.
       Q.     Do you see that?
       A.     Yes.
       Q.     And the question was, doesn't that infer
that whether or not a patient smokes is relevant to
finding radiographic changes in your study?
       A.     It is -- if you are talking about
radiographic changes associated with asbestos, I
think the answer is no.  If you mean bronchiectasis,
not one of the changes is associated with asbestos.
       Q.     Well, I know, and what it appears this
person is saying is that the change that is detected
might be respiratory bronchiolitis if the patient is
a smoker, isn't that what this says?
       A.     He raises that possibility.  But he is
only -- if that is what he is addressing, it only has
to do with that one comment.
       Q.     Okay.
       A.     He does say this latter finding is of
uncertain significance.  I can't add anything to
that.  He says it is uncertain.  Go ahead.
       Q.     No, I just guess that somebody thought
that smoking was relevant, otherwise I am wondering
why it is in your demographic Table I?
              MR. ASKMAN:  I am going to object to the
       characterization, the form of that
       question.
              THE WITNESS:  Was it a question?
       Q.     (By Mr. McCarthy)  Why is smoking history
in Table I if it is irrelevant?
       A.     Well, it is relevant because if there had
been cases of lung cancer, smoking and asbestos
exposures interact to increase the likelihood of
developing cancer.
              Also smoking does lead to lung disease,
which is of some significance, but it doesn't
cause -- it is not part of the B-reader exam to tell
them if the person does or doesn't smoke.  They are
trained to look for changes associated with asbestos.
Of course this is, I assume he is looking at a -- let
me see, what is he looking at.  It is P-A chest
x-ray.  Okay.  I guess he is looking at an x-ray
there.

Exhibit 4 -- Middleton dep.txt
          MR. ASKMAN:  Is this 156?
          MR. MCCARTHY:  Yes.
     Q.    (By Mr. McCarthy)  So would you agree, at
least, whoever the commentor is on your poster,
saying that smoking can explain this abnormality that
was found in the x-ray?
     A.    Let me see.  Well, he says he has mild
centrilobular emphysema so he is implying there are
obstructive changes there.
          So because there are -- those changes, I
can just -- I am just assuming, but I am just assuming he
is saying there are some changes here related to
smoking, so these other changes that we see I may be
confusing them with inflammation in the bronchials.
     Q.    Let me ask you another question about the
x-rays.  Now, you have expressed some familiarity
with the screening study that was done by ATSDR?
     A.    Some.
     Q.    Were you involved in that study at all?
 □   A.    I was involved in helping develop the
protocol.
     Q.    You helped develop the protocol?
     A.    Right.
     Q.    The screening study ATSDR considered in
addition to potential exposure pathways, they
considered other factors, didn't they, that could
result in radiographic changes on x-rays?
     A.    Would you repeat that, please.
          MR. MCCARTHY:  Could you read that back,
     please.
          (The record was read by the
     reporter.)
          THE WITNESS:  What do you mean by
     environmental pathways?  What do you mean
     now?
     Q.    (By Mr. McCarthy)  Well, what was your
involvement in developing the protocol for the
screening study?
     A.    I was with help with input from a lot of
experts and a panel of experts and we convened along
with Dr. Miller, up to the point that it went to the
RB, I was heavily involved in like in writing it and
making things, the sections fit together.
          So I claim a lot of input into writing the
□protocol, but not -- because I -- there was input
from so many different people it is not novel or
something along that line.
     Q.    And you are familiar that the screening
study, they asked similar questions to the questions
that were asked here about potential exposure
sources?  Do you recall that, or exposure pathways, I
think you called them in your report?
     A.    I am not really sure.  Can you give me a
specific example?  I am not sure what you are
referring to.
     Q.    Let's turn to Page 8 of your report.
     A.    Page 8.
          MR. ASKMAN:  I need a break for a minute.
          (A recess was taken.)
     Q.    (By Mr. McCarthy)  I want to just bring
your attention to Page 7 of your report,
Dr. Middleton.
     A.    Okay.
                              Page 38

Exhibit 4 -- Middleton dep.txt

Q.      And it is where you are talking about the
criteria for an epidemiologic case.

A.      Right.

Q.      And for this study, am I correct that
the -- there were two criteria, one was chest x-ray,
which two or more B-readers agreed had some kind of
□abnormality, is that one of the criteria?

A.      Well, I mean it says specifically pleural
abnormalities or interstitial abnormalities.

Q.      And then the second was --

A.      Sorry I interrupted.  They had to agree.
Like both pleural or both interstitial.  You couldn't
have one -- we didn't accept one pleural and one
interstitial.

Q.      And then the other criteria for the
epidemiologic case was if this CT scan reviewer found
either a pleural or parenchymal abnormality, correct?

A.      Yes.

Q.      On Page 7, is that a true statement, it
would be the second full paragraph, the first
sentence says, "Note the confirming an epidemiologic
case is not equivalent to making or refuting a
clinical disease diagnose."

        Would you agree with that statement?

A.      Yes.

Q.      Wanted to change topics and get back to
what we were talking about before the break.

        You identified certain environmental, what
you called environmental exposure pathways that you
used in connection with this study; is that right?

A.      Yes.  Are you talking about the
□vermiculite pathways?

Q.      Turn to Page 9 of your report, please.
You tell me.  This is your report.  There is a
section that is headed Environmental Exposure
Pathways?

A.      Uh-huh.

Q.      So, is it correct that at least for the
purpose of this report you identified a number of
what you termed pathways of exposure?

A.      Page 8 or Page 9 does list exposure
pathways that we considered to be environmental.

Q.      Now, are these some of the same pathways
that were identified and used in the health screening
study in which you were involved?

A.      Yes.

Q.      Now, do you recall in the health screening
study that in addition to potential exposure
pathways, ATSDR also looked at other factors, such as
age, body mass index, things of that nature?

A.      In the interim report the -- basically
there were other factors that were looked at in terms
of -- they were either included or controlled for in
the analysis.

Q.      And what were those, do you recall what
those factors were?  Do you recall was age one of the
□factors?

A.      I am pretty sure age was.

Q.      Was sex?

A.      I know that some of the tables -- yeah,
they did, sex was there.

Q.      Was smoking history one of the factors
that was controlled for in the screening study?

                                Page 39

Exhibit 4 -- Middleton dep.txt

        A.    I don't remember specifically.  I would
assume.  That was presented at least in the
demographics.  I didn't remember if it was in the
final model, if that is what you are asking.
        Q.    Was BMI a factor that was involved for,
and by that I mean body mass index?
        A.    I am not sure.  Honestly, I am not just
really -- I didn't write that report and I am just
not really familiar with it.  And in general I am
familiar with it and I know BMI came up as an issue.
        Q.    How did that come up as an issue?
        A.    People who had a higher -- who were more
obese were more likely to be or more -- not
molecularly but more commonly the B-reader identified
as pleural change is I believe the way it was.
        Q.    And is that because there is a possibility
of mistaking subpleural or extrapleural fat for
pleural thickening?
☐       A.    I am not sure about what is because of
what, but I think there is some concern that fat
makes the interpretation more difficult.
        Q.    Was that a concern that you had in your
study that we are discussing today?
        A.    This is -- wasn't the formal
epidemiological study in the same way.  We didn't do
comparisons.  We didn't have thousands of people, we
didn't do statistical comparisons and we didn't
control for -- in the same way.
        Q.    So you didn't try to control for high BMI?
        A.    We did not.
        Q.    Do you happen to know with respect to the
22 participants where they fell in ranges of BMI?
        A.    No.  I mean, in general the answer is no.
I can't -- the answer is no.  I don't.
        Q.    And so that wasn't really considered in
your study?
        A.    We did not consider -- we did not consider
BMI in this case here of 22.  It seems like there was
one patient there was really thin.  But I don't
remember in general -- overall I don't remember
whether the participants were -- what their BMI would
be, and we certainly -- it would vary by participant
and we did not control for it in the analysis.
☐             We did not do an analysis in the same way
a formal epi study does, so it wasn't an issue that
we addressed.
        Q.    So, it is possible then that BMI could
have been a factor but it simply wasn't addressed in
your study?
        A.    I -- this was not -- I think this is a
case series and we didn't really have the capacity
for -- what do I want to say?  It is a case series.
I think in any -- it may be that that occasionally is
a factor in trying to read a film but it is not -- it
doesn't invalidate the B-reader approach and it is
the one that is used by everyone -- you know, quite
extensively.
        Q.    Are there other factors that were
considered in the screening study that could affect
the ability to read the x-rays similar to BMI?
        A.    Well, the reader himself had to designate
whether -- he always had the option of not reading
the film and he had the option of, you know, not
                        Page 40

Exhibit 4 -- Middleton dep.txt
reading it indicating why or -- so whatever factors
there were, if the film wasn't good enough for him to
read it, he had the option of not reading it.
    Q.    But are there other things that can cause
a reading, let's say, pleural abnormalities, such as,
you know, such as BMI?
    A.    You mean characteristic of a person?
    Q.    Such as a prior chest surgery, it was one
of the things that was looked at in the screening
study as a possible confounder. Prior chest surgery
was an example. Was that considered in your study?
    A.    I am not sure what you mean by considered.
It was a case series. If it was used as a --
included in -- I don't remember, but if it was
concluded as a confounder in the screening study, I
don't remember whether it was or wasn't, but it was
only considered to the extent that the individual
B-reader look at the film and said this is -- I can
read this film and I see changes consistent with
asbestos-related disease or I don't.
    We didn't -- there was no analysis like
the one screening where you have confounders and
interactions to deal with.
    Q.    So you didn't consider other -- you didn't
consider confounders in this study?
    A.    To any -- the B-readers were asked to read
the films according to B-reader protocols. This was
a case series, it wasn't a formal epidemiologic
study.
    MR. MCCARTHY: Okay. Why don't we take a
   break for lunch if that is all right.
    THE WITNESS: Good thing.
    (Luncheon recess from 12:10 until
12:50).
    Q.    (By Mr. McCarthy) Dr. Middleton, I would
like to go back to Table I of your report, Page 21,
the demographic characteristics.
    A.    Table I.
    Q.    Yes, Table I, Page 21.
    A.    okay.
    Q.    Before asking a question about that, the
report is dated August 2002. Am I correct, this
report?
    A.    Yes.
    Q.    When did you finish this report?
    A.    Well, you know, in terms of -- it was --
until like last week, I guess, it -- it depends on
what you mean by finish.
    Q.    Do you consider this report finished,
complete, final?
    A.    We have sent it to the printers, you know,
or towards the printers, anyway.
    Q.    when did you feel it was at that state
that you didn't need to change it anymore?
    A.    We -- it was continuing to change right up
to, say, a week ago because it went to the editors
and we had several rounds of editing, you know, just
this is the best way to say that. So, you know, it
continued. But the changes, you try to take them out
so there are no huge mistakes.
    Q.    would it be fair to say that now, you
know, I guess a week or so after you finish it, that
you are as familiar with the information in the
Page 41

Exhibit 4 -- Middleton dep.txt
report as you are probably ever going to be?
     A.    Well, I don't know.  I am as familiar -- I
think there probably were periods when I was actively
working with the data, that I had been more familiar.
But it hasn't been like a really long time ago.
     Q.    When was the last time you were really
actively looking at the data?
     A.    When would I look -- when was I -- I guess
I don't understand the question.  I don't know what
you are asking -- up until a week ago we were still
revising the report.
     Q.    So you are still actively working with it
then, too, right?
     A.    Not really.  I mean, I was -- within the
last week I have gone back and glanced through some
of the data fields, but for the most part I haven't
worked with them for -- you know, we were -- it has
□probably been a month or maybe something like that --
     Q.    Okay.  I just wanted to --
     A.    -- manipulating things and changing things
and actively working on the report.
     Q.    I want to turn now back to Table I,
Page 21.
     A.    Okay.
     Q.    which is again characteristics, demo
characteristics of 22.  And I want to focus on the
eight that were identified as the so-called
environmental cases.  And when we look at the years
lived in the Libby area, do you see that there is one
participant that didn't live in Libby noted on the
table, or there is a zero?
     A.    Yes.
     Q.    One never lived in Libby?
     A.    Yes.
     Q.    Do you know, was that person one of the
eight that you identified as environmental cases?
     A.    I don't know.
     Q.    Not even a clue?
     A.    I really don't know.  We made a decision
to look at all 22.
     Q.    With respect to these numbers that we see
here where -- with the exception of that one, about a
□third, a third lived in these various -- in
Libby for these various time periods, 1 to 15 years,
16 to 30, and 31-plus, do you see that?
     A.    Yes.
     Q.    would you say that that is representative
of the eight also?
     A.    I don't know.
     Q.    Do you have any idea if any of the eight
lived in Libby longer than 15 years?
     A.    I don't remember.  You know, I don't
remember.
     Q.    Do you have any idea whether any of the
eight lived in Libby longer than 30 years?
     A.    I don't know how long the eight lived
there.  I don't remember at this point in time how
long they lived there.
     Q.    Do you recall if any lived longer than 30
years in Libby?
     A.    I don't recall.  What did we say about
this guy?
     Q.    You are talking about Number 11?

Exhibit 4 -- Middleton dep.txt

A.     Yes.  I don't think it says, though.  He
was -- he lived there, let me see -- he was born in
Libby.  That doesn't really say how long he lived
there.  I don't know the number of years that the
Deight lived in -- each of the eight lived in Libby.
Q.     I want to turn to Table II, which is the
next page of your report.  Exhibit 155.
A.     Okay.
Q.     Actually not Table II, I want to look at
Table III, which is Page 23.
A.     Okay.
Q.     What is the purpose of this table,
Dr. Middleton?
A.     Exposure pathways by participant.  These
were to look at occupational pathways that -- for
occupational but not directly working for the -- I
think these are people who didn't work for the mine
and were not secondary contractors or household
contacts for the mine.
Q.     If we look at the -- under occupational
non-mining, the second one, it says dust other job,
do you see that?
A.     Yes.
Q.     What does that mean?
A.     It was a question that said other -- did
you have a job -- well, you have the questionnaire.
It essentially was did you work in a job where you
were exposed to a lot of dust.
Q.     Okay.  And you had five participants
Dresponding affirmatively to that question?
A.     Yes.
Q.     And what did you do --
A.     Well, now, I am not -- is this all of
the -- see this isn't all the participants, right?
One -- 13 -- five of these 13 responded
affirmatively.
Q.     Okay.  And what did you do when someone
said they had been exposed to dust in another job,
did they continue on in your screening process to
make it to the eight?
A.     I think that if they didn't report -- if
that is all they reported, yes, I think these -- I
don't know that they made it to the end, but they
were -- in other words, some of them also reported,
even in this table, some of them also reported
vermiculite exposure -- exposure to a lot of
vermiculite in other jobs.  So they would have --
those, the two that had both exposures would drop
out.
Q.     But those that simply had dust other job
wouldn't have dropped out?
A.     The three would have continued on, right.
Q.     Did you make any efforts to determine what
type of dust these individuals that had said dust
Dother job, did you make any efforts to determine what
type of dust they had been exposed to in these other
jobs?
A.     We did look back at the verbatim files
that allowed them to tell us a little bit about what
they had done.
Q.     Did you find -- were you able to get
information about what types of dust these people had
been exposed to?

Page 43

Exhibit 4 -- Middleton dep.txt
     A.     Well, not the content of the dust.  If you
want to -- the report, this guy says these three
particularly.  On Page 9.
     Q.     Page 9?
     A.     Yes.  About the second paragraph down.
Three participants who had made it to this table,
basically, reported a lot of dust exposure at work
but did not report occupational vermiculite exposure.
And then there is a little summary of what we saw in
your job verbatim files.
     Q.     When you say patient care, was that the
dental hygienist?
     A.     How do you know that?
     Q.     I think there is some information --
     A.     Oh, in one of the things.  Yeah, see, I
really hate that because how many dental hygienists
□are there in Libby.
     Q.     I don't know and I probably will never use
her.
     A.     Can I refer to my counsel about
confidentiality before we go on?
          MR. ASKMAN:  It depends.  Is there a
     question pending?
          THE WITNESS:  Yes.
          MR. ASKMAN:  What is the question?
          MR. McCARTHY:  I think I asked if the
     patient that was referred to as having a
     job involved in patient care was the dental
     hygienist.
          MR. ASKMAN:  Would you like to confer
     about that?
          THE WITNESS:  Yes.
          MR. ASKMAN:  Okay.  Go off the record
     for a minute and step outside.
          (Discussion ensued off the record.)
             (A recess was taken.)
          MR. ASKMAN:  I talked with
     Dr. Middleton and he inquired about the
     question which you had asked and I am not
     going to object to the question.  I told
     him that he should answer that question.
□         We will, however, if there are
     questions which we think lead to the -- or
     meant to lead to the identity of
     individuals who are included in this study,
     we will be objecting to those because that
     information is, as we have maintained
     throughout this litigation, confidential.
          This question is not one that I have
     deemed to seek that information and seems
     as if you have the answer to the question
     already, so I have told him to answer that
     question.
          THE WITNESS:  Yes.
     Q.     (By Mr. McCarthy)    Did you do any
inquiries to determine what type of dust the dental
hygienist would be exposed to occupationally?
     A.     I didn't.  I mean I am aware of some of
the things that dental hygienist -- well, I did not
do any further inquiries about that.
     Q.     Did anybody?
     A.     I don't believe so.  We didn't believe
that asbestos was going to be an issue.
                              Page 44

Exhibit 4 -- Middleton dep.txt

Q. What type of dust did you assume a dental hygienist would be exposed to?

A. Well, really, it would be more -- a worker in a dental lab would be exposed to some hazardous substances. I would not assume she worked there, though.

Q. So, but that didn't -- that wasn't curious to you that a -- I guess it was interesting to me that a dental hygienist would say she was in a job where she was exposed to a lot of dust and I would have been curious?

A. I felt that was -- I didn't understand that response.

Q. But you didn't do anything to try to understand it further?

A. Like what?

Q. Like, I guess, trying to find out what type of dust she had been exposed to?

A. No, we didn't.

Q. And was one of the people that you identified as having this dust exposure a logger?

A. I am not sure. I think patient care, janitor work, plywood manufacturing. I don't remember that as being true for one of these three, but --

Q. I think I am mistaken. With the three, I guess one was referred to as being involved in some kind of a lumber mill. It says here plywood manufacturer?

A. Right.

Q. Was there any investigation to see what type of dust that worker was exposed to?

A. No. No.

Q. You were going to say something else, Dr. Middleton?

A. I remember Dr. Miller, I believe he did some research in that they came to the conclusion that these industries -- I can't remember specifically so I probably shouldn't say anything.
I don't think either one of us were aware of any of these three occupations being associated with asbestos-like changes.

Q. And the third occupation, I guess would be participant 21, would be janitorial; is that correct?

A. I am not sure what the number was, but one of the three was janitorial work.

Q. And again with that participant, no further investigation was done to see what type of dust that might have been?

A. No.

Q. That he claimed to be exposed to?

A. No, we did no further investigation.

Q. Did you say it was Dr. Miller that looked into these industries to make some kind of a determination as to whether or not they would have been industries where asbestos exposure was likely?

A. I am not sure if it was these or the industries where the persons said they were exposed to a lot of vermiculite. I think his contention was that -- I believe what he said was that the industries like logging, for example, is not associated with changes consistent with asbestos-related disease.

Page 45

Exhibit 4 -- Middleton dep.txt

That is one of the specifics that I
remember.  I am not sure exactly which ones looked
into.
    Q.    But you did exclude loggers?
    A.    If they said -- we didn't exclude people
because they said they were loggers but we exclude
them if they said they were exposed to a lot of
vermiculite.
    Q.    And they happened to be loggers, okay?
    A.    Exactly.  I can't remember.  I would have
to look back to see if that was one of the things we
listed.  You know, working in a lumber mill was one.
I don't remember specifically about where the logger
issue came in.
    But, it wasn't about -- the way we
Dexcluded people was if they said -- you know,
vermiculite is pretty recognizable and people said
they were exposed to a lot of it.  If it was at work.
    Even if it was an industry that you
wouldn't expect vermiculite exposure or asbestos
exposure, we considered that to be an occupational
exposure, just because it happened at work.
    Q.    I would like to turn to Table IV.  Page 24
of Exhibit 155.
    Can you tell me what this table is,
Dr. Middleton?
    A.    Turning to the wrong place.  Table IV.
    Q.    Don't get them out of order.  We will be
in all sorts of trouble.
    A.    As you can see, I am not into
housekeeping.  What was your question?
    Q.    Can you explain Table IV for me briefly.
    A.    These were the participants who were not
picked up on one of the vermiculite asbestos screens
for having -- for occupational exposure, and this
just describes some of the environmental pathways
they indicated that they had.
    Q.    Are these some of the same environmental
exposure pathways that were used in the screening
study?
D    A.    Yes.
    Q.    And is that where you got some of these?
    A.    Yes.
    Q.    Do you recall, were any of the
participants of your study also people who had
participated in the screening study?
    A.    You know, I didn't recall for sure, but we
did have a -- I think there probably were a few and
we had a provision that that questionnaire could be
used instead of ours to -- for the data collection.
    Q.    So you think there were a few in the 22?
    A.    I think so.
    Q.    Do you know if there were any in the
eight?
    A.    I don't know.  I really don't know.
    Q.    Do you recall that in the screening study
they did a multivariate regression analysis with
respect to the various pathways?
    A.    Well, you must be talking about -- what
analysis are you talking about?
    Q.    What we have been calling the screening
study, that was the study of the 6,000 some former
and current Libby residents?

Exhibit 4 -- Middleton dep.txt

A.      That --
Q.      That you said you participated in
□developing the protocol, et cetera?
A.      Yeah.  I know what study you are talking
about.  It was two years of sampling and I am not --
one report has been released and there will be
another one soon.
Q.      There was a report that was released, the
one I am thinking of is August 23, 2001?
A.      Yes, the interim report.
Q.      There is an interim report in February of
2001 and then there was something called a final
report in August 2001?
A.      It didn't include -- there was two years
screening, you know.  I am not sure what you are
referring to.  Those analyses are still ongoing.
Q.      Have you ever seen this report, that is
the one I am referring to?
A.      Yes.  I have seen it.
        MR. ASKMAN:  I hate to say this but can we
    mark that?
        MR. McCARTHY:  I don't know, I don't
    have any copies for you.
        MR. ASKMAN:  Maybe we should make
    some copies.
        MR. GRAHAM:  I don't have any copies
    and I have internal markings in it.  I just
□   wanted him to look at the cover of it.
Q.      (By Mr. McCarthy)    This is what I have
been referring to as the screening study, this is
what I have been referring to.
A.      I think that is what I would call the -- I
don't think it included -- well, it could be -- well,
I know there is like an analysis ongoing that lumps
the two -- see I didn't write that.  There is one
analysis ongoing right now that will include both of
the summers of screening.  So I --
Q.      This only includes one --
A.      The first summer?
Q.      Yes.
A.      Yes.
Q.      Do you then recall this report?
A.      Yes.
Q.      And this study?
A.      Yes.
Q.      Do you recall that they did a multivariate
regression analysis?
A.      Well, I don't think I am even an author on
this one, but I do --
Q.      No, you are not an author on this one.
        MR. ASKMAN:  For the record, what we have
    been referring to is the cover page of a
□   document titled Year 2000 Medical Testing
    of Individuals Potentially Exposed to
    Asbestiform Minerals Associated With
    Vermiculite in Libby, Montana, and the date
    is August 23, 2001.
Q.      (By Mr. McCarthy)    And I thought that is
the report that you had referred to being involved
in --
A.      Well, you know, I think I may have given
one set of comments or something.  But, right, the
protocol that led to that, I was involved in.
                                        Page 47

Exhibit 4 -- Middleton dep.txt
Q.      And you recall that -- recalled it called
for performing a multivariate regression analysis
with respect to various factors, including the
exposure pathways?
A.      I recall that they did one.  I am not
sure -- I don't remember the details of that --
exactly what was in the protocol.  There was a short
analysis plan.  If you say it is there, I believe
you.
Q.      No, I am just asking what you recall.  Do
you recall that in doing that multivariate regression
analysis that there were findings of certain factors
that presented statistically significant associations
with radiographic changes?
□    A.    I thought that is what we had already
talked about.  Like, you know, the fat issue or the
adipose issue, BMI.  Is that not what you were
talking about --
Q.      Those are some of the factors but I am
just asking if you remember that a regression
analysis was performed with respect to, among other
things, some of these exposure pathways that are
listed here in Table IV, to determine whether or not
there was an association between, you know, any
particular factor and a change or radiographic
change?
A.      I know they did.  They did simple
descriptive statistics and there was a regression
analysis.  I don't honestly remember what factors
were included or not included.
Q.      Would it be important for you to know, if
we are looking back now at Table IV on Page 25 of
Exhibit 155, would it be important for you to know
whether or not, for example, the first pathway you
have listed here, insulation home, would it be
important for you to know whether ATSDR had made a
determination as to whether there was a statistically
significant association between that exposure pathway
and radiographic changes in the study population?
□    A.    It wouldn't change these results.  I mean,
this is what they told us.
Q.      What was what they told us?
A.      The pathways are checked once they are
reported.
Q.      Well, wasn't one of your goals to find --
and I am looking back on Page 4 of your report,
Exhibit 155, identify important environmental
exposure pathways.  Wasn't that one of the goals of
your study?
A.      I think we said to the extent possible.  I
can't remember the language.
Q.      But is it true that one of your goals was
to identify important environmental exposure
pathways?
A.      To the extent that that was possible, yes.
Q.      And now going back to Table IV.  Wouldn't
it be important to know whether or not ATSDR had
found that there was or was not a statistically
significant association between a particular exposure
pathway and radiographic change?
A.      I think what I am reporting here is a case
series of 22 patients.  I wasn't obligated to report
the larger screening results.

Exhibit 4 -- Middleton dep.txt
      Q.      That is not what I am asking.  You stated
Das a purpose, one of the purposes was to find the
important environmental exposure pathways, and in
trying to determine what was important, would you
think it is relevant to know whether or not ATSDR had
made a finding that there was a statistically
significant association between a particular exposure
pathway and an elevation in findings of radiographic
changes?
      A.      I think these results are independent of
the screening results.
      Q.      But that wasn't my question.  Would it be
relevant to attaining your goal of finding important
environmental pathways, would it be relevant to that
to know whether or not ATSDR found that a particular
pathway had a statistically significant association
with radiographic changes, the same types of
radiographic changes that you are looking at here?
      A.      Would you repeat the question, please.
      Q.      Okay.  And I am not trying to trick you.
I am just trying to -- is it relevant to your goal of
finding important environmental exposure pathways to
know whether ATSDR has determined a particular
exposure pathway, it has an association with
radiographic changes to a degree of statistical
significance?
      A.      It wouldn't change -- I mean, this is a
report of 22 patients.  Someone who is trying to sum
over several different reports could consider each of
them in context and come to their own decision.
             This report does not deal with the people
in the first, second or -- the second screening or
all of them together.  This is just one look at the
evidence.  There are other looks that should be
judged independently.
      Q.      Well, what did you mean by important
exposure pathways?  How are you determining that one
pathway is important and another is not important?
      A.      Well, this is a case series, so it
doesn't -- it doesn't have the sorts of analyses that
are present in the other study.  It would be a more
qualitative sort of assessment.
             For example, I mean, I can describe
scenarios where I would say, well, he would have
potentially identified an important pathway, but for
example, if everyone who -- if all eight of these --
I mean it would be a fictitious thing, so why don't I
just not, but there are findings that would make you
say, hey, I am really suspicious of this pathway.
This may really be, you know, -- among people who
don't have occupational exposure maybe this is a
Dreally important pathway.
      Q.      And would you be interested to know what
·ATSDR found about those pathways in the screening
study of 6,000 as far as whether they found a
statistically significant association between a
particular pathway and radiographic changes in the
subjects?
      A.      I would report the results that I found
and they would report the results that they found.  I
assume that both of us would be interested in what
the other one said.
      Q.      What did you -- what were your criteria
                        Page 49

Exhibit 4 -- Middleton dep.txt
for determining a pathway was important or did you
determine that any of these pathways were important?
Maybe that is the first question, did you determine
that any pathways were important?

A.      I don't think we determined that any
specific pathway was more important than another. I
mean, just -- I am sorry, I lost my train of thought.
I lost it.  I don't know what I was going to say.

Q.      You can ask her to read back what you were
saying.

A.      What I said was I don't -- I remember the
first part.  I don't think that we were able to rank
the pathways in terms of importance.

☐      Q.      Was that one of your goals at the
beginning, to be able to rank them?

A.      I think realistically with such a small
number of participants we were not sure we would be
able to do that, we just thought it was a
possibility.

Q.      And that is, I think as you stated
earlier, you had been expecting going in that you
would actually get more participants than you
actually did, right?

A.      I don't know that I expected more
participants.  I did -- it is probably true to say
that I expected that more of the 22 would be
environmental.

Q.      If we are now looking at Table IV, we have
seven pathways listed.  Did you try to determine
whether or not there were other ways in which these
participants could have been exposed to asbestos
other than these that are listed in the screens that
you did before that?

A.      I did look back at the -- there is a
listing of like other occupations that -- I forget
what question it is, but it is maybe 18 on the
questionnaire.  I am not sure.  Or 17 maybe.  I don't
remember for sure.  But, there was a listing of -- I
☐have forgotten exactly what it said, but it
essentially was other occupations.  There is a list
of occupations.

Q.      Now, you excluded people who were
household contacts of vermiculite workers, right?

A.      As we progress down the chain, right, they
came -- right.  They came out as household contacts.

Q.      But you found that there were other people
that had occupational exposures to vermiculite that
didn't work at the mine or the mill, right?

A.      Yes.

Q.      Did you inquire of the --

A.      Well, the mine or the mill?  What mill are
you talking about?

Q.      I am sorry.  The mine, the vermiculite
mine, the vermiculite mill, or any of the other
vermiculite processing facilities in Libby?

A.      Yes.

Q.      Okay.  Did you do a similar question for
people that you found that had occupational exposures
to vermiculite other than those working at the mill
or the mine, et cetera, did you ask people whether or
not they had household contacts with people who were
occupationally exposed but were not working at the
mill or the mine?

Exhibit 4 -- Middleton dep.txt
0     A.     The mill or the mine?  I don't understand
the question.
      Q.     Let me ask it again.  You screen out
people who worked in the vermiculite processing
facilities in Libby, right?
      A.     Yes.
      Q.     You also screened out the family contacts
of people that worked at the vermiculite processing
facilities in Libby, right?
      A.     Well, the mining and processing
facilities.
      Q.     Why do you make a distinction there?  I am
just trying to talk the same language.  What am I
saying that is not being understood and I --
      A.     I guess you are using a different
vernacular --
      Q.     Tell me what you use --
      A.     The mine was located up on -- I don't know
where it was located.  What is the mountain?  It was
on a mountain.  But there were processing facilities
down the mountain and in Libby where it was either
graded or -- you know, or expanded or things like
that.
      Q.     Right.
      A.     So if you say Grace's mining and
Dprocessing facilities, that is the way I would
typically hear.  When you say mining, I am not quite
sure if you are including, for example, the
processing plants where it is expanded or --
      Q.     Let's say whenever I say vermiculite
processing facilities, I mean the vermiculite mine,
mill, and all the processing facilities that are in
Libby.  Is that understandable?
      A.     I think so, yes.
      Q.     So if I say vermiculite processing
facilities, that is what I mean?
      A.     You include the mine in that, okay.
      Q.     Everything down the chain that is in
Libby?
      A.     Okay.
      Q.     Okay.
      A.     It was all owned by Grace, essentially.
      Q.     Yes.  And you excluded the people who were
household contacts with people that were employed at
the vermiculite processing facilities; is that
correct, as one of your screens?
      A.     Yes.
      Q.     Okay.  You also screened out people that
had occupational exposures to asbestos that hadn't
been employed at the vermiculite processing
Dfacilities, right?
      A.     Yes, none of the eight, right.
      Q.     Okay.  And then my question was, did you
also try to find out if people had been household
contacts with people who had occupational exposures
to asbestos that weren't related to the vermiculite
process?
      A.     No.
      Q.     So it is possible that there are some
people that made it to the eight that were household
contacts of people who were in these other asbestos,
potential asbestos exposure occupations?
      A.     It is possible.

                                        Page 51

Exhibit 4 -- Middleton dep.txt

Q.     Okay.  I notice on Exhibit 156, the
poster, participant 11 is one of your environmental
cases, right, one of the eight, is your case study of
one of these so-called environmental exposures,
right?
A.     Well, let's see if he is listed.  Yes,
that is true.  He is listed.
Q.     You can look at Table IV.
A.     Yes, this is true.
Q.     Okay.  I guess I wasn't understanding why
he would be in the case study if he wasn't one of
them.
   A.     He probably wasn't -- you know, just
trying to be accurate.
Q.     No, that is all right.  But, you note here
that in the first paragraph under history, he says he
had a family member with asbestosis.  It is the very
last sentence in the paragraph under history, the
fifth column, Exhibit 156.
A.     Right.
Q.     Did you do any investigation to determine
whether that family member that had asbestosis was
employed at the vermiculite processing facilities?
A.     I am not sure.  I really don't remember
who that person was.
Q.     But if one of your eight had informed
you --
A.     Yeah.  The family member with asbestosis.
He didn't indicate that -- anybody in his family,
which would presumably be your immediate family,
worked at the mine or the processing facility.  So, I
am assuming that person -- you know, I just don't
know who that person was.  My presumption would be
that they weren't.  I don't know -- actually, I just
don't know who that person is or how they got
asbestosis.
Q.     And you didn't do any investigation to see
what kind of contacts that participant 11 might have
had with that family member who had asbestosis?
A.     No.  But I am not sure even when their
exposure occurred or what it may have -- I don't know
what the -- I don't know what this was.
Q.     And as part of this study, it wasn't part
of this study to get that information to do that
further investigation?
A.     We didn't -- other than the questionnaire,
we didn't -- at least I didn't go back and contact
participants.  We didn't do that.
Q.     Back to Table IV, Dr. Middleton.
A.     Okay.
Q.     Table IV.  That is not --
A.     Not that Table IV.
Q.     I am sorry.  It might be the same Table IV
but I think some of the numbers changed.
A.     I think so.  Okay.
Q.     You have listed down there as, I guess it
is the fifth exposure pathway, the ball field.
A.     Yes.
Q.     Do you know whether that ball field, in
1999 when you were first contacted, was that ball
field still in existence in Libby?
A.     It was -- I don't know if it was being
used as a ball field, but the field was still there.
Page 52

Exhibit 4 -- Middleton dep.txt

Q.      But you don't know whether that was being
actively used by the community of Libby?

A.      I don't know for sure. I just don't know.

Q.      Would that be relevant to your study to
know whether or not a potential exposure pathway
still existed?

A.      Well, when I was there, it actually was
like in early -- I mean -- I don't believe in early
2001 they were still using it. I mean early 2000
they were still using it because when we went there
that was one of the places we visited.

It was next door to the vermiculite
processing facility and that is one of the things
that was pointed out to us as an important -- or as a
pathway. So my understanding was it wasn't in use
anymore. But, I just don't remember.

I don't know when it stopped being used
but I don't believe it was being used then. But the
field itself was still there. I don't remember if
there were any baseball accoutrements around it or
not.

Q.      Would you agree, Dr. Middleton, that the
number of potential exposure pathways that you
considered in your study are not a surrogate measure
Dof exposure?

A.      Oh, I think they are not. They are not a
good surrogate measure of exposure. I mean I would
expect -- I don't have any -- I don't believe that
they are -- like one pathway was another one, so the
number is going to -- it is worth looking at, but you
could have a massive exposure in one pathway and the
other pathways you listed could be trivial. So the
number is -- especially in a small group of patients
is not going to be -- it is not clear at all.

I really don't know, I guess is the answer
to that question, but I don't have any reason to
believe it would be very representative of the
overall exposure. Relative exposure ranking one
person and another one.

Q.      In trying to determine which of the
exposure pathways are important, did you attempt to
quantify the potential exposure from any given
pathway?

A.      No. Other than the method that you
mentioned, which certainly has shortcomings, the
number of pathways. We didn't have any way to do
that.

Q.      So, you haven't -- for -- if we look at
Table IV, those four exposure pathways, you have no
Didea what type of exposures, if any, were posed by
home insulation?

A.      It would depend. I mean, just the -- no,
just the checking that box I don't. It would depend
on the condition of the structure.

Q.      Why? Why would it depend on the condition
of the structure?

A.      If you had a house that was in bad repair,
for example, that could lead to vermiculite being
released into the house.

Q.      So that could lead to an actual exposure
to a vermiculite, is that what you are saying?

A.      I am saying that would greatly increase
whatever exposure there was.

Exhibit 4 -- Middleton dep.txt

Q.     What exposure would exist if there was no
contact with vermiculite insulation?
A.     I don't know.
Q.     Did you attempt to find out what those
one, two, three, I guess four participants listed
there in Table I, did you attempt to find out whether
or not they actually had any contact with home
insulation?
A.     There was a question, insulation of home.
I believe the question read something like, did any
of your homes in this county be insulated with
□vermiculite, and the next one has to do with handling
or not to handle it.
Q.  .  I am just asking about the first one.  How
could that be -- I guess how could that be an
exposure pathway if --
A.     I am sorry.  I was talking over you, go
ahead.
Q.     We were just looking at the first one,
insulation home.  How does that tell you that there
was an exposure?
A.     Well, I certainly can't quantify the
exposure.  I can't say whether it was a lot or a
little.  But, for example, if it was in the attic and
you went into the attic at times and had stored
things up there and brought them back down, there is
certainly -- there is a potential for exposure.
Q.     Isn't that speculation, though?  Did you
actually ask people whether they went into their
attics?
A.     No.
Q.     So for these four participants, we don't
have that information?
A.     Well, that is not entirely true because if
you look at the next line in the table, it says, did
you handle vermiculite insulation.  And all four of
□them said yes.
Q.     With that first category, can you say that
for any of these participants that home insulation
was the source of a significant exposure to asbestos?
A.     I can't say what their -- I can't really
speculate on their relative contribution of handling
on these pathways.
Q.     The same would go for handling insulation,
you don't have an opinion that that was -- whether or
not that is a significant pathway of potential
exposure or pathway of exposure?
A.     I can give you, you know, a scenario.  I
think --
Q.     No, just answer this question and then if
you need to explain more, I am sure Mr. Askman will
help you do that.  But can you --
       MR. ASKMAN:  I am sure I will.
Q.     (By Mr. McCarthy)  Do you have an opinion
as to whether the people who -- I guess this is
participant 1, 2, 7, 11, 18 and 21, if handling
insulation was a significant or important exposure
pathway?
A.     You would be one that was concerned about.
Q.     Would you describe that as a significant
exposure pathway?
□  A.     I don't really know for any participant
how to rank the exposure pathways.  These are
                    Page 54

Exhibit 4 -- Middleton dep.txt
pathways that they indicated -- I don't remember the
exact question, but these were pathways indicated by
the participants and we didn't try to -- again, if it
had turned out, for example, if it had been
fortuitus, for example, all the participants had one
particular exposure pathway, and none of the other
exposure pathways, your index of suspicion for that
pathway would have been really high.
        It didn't really happen like that and I
can't really rank -- handling insulation jumps out at
me as if that went over a long period of time, like
years. That is when I would be  --
    Q.    Well, let me ask you this. Do you know
the duration of any of these particular contacts?
You said it might be important if it went over a
number of years. Did you gather --
    A.    I don't think that would be the only
instance of importance so --
    Q.    Let me ask you. Do you know or did you
have access to the information that would tell you
the duration of any exposure? Let's take handling
insulation, do you have any of that information?
    A.    I don't think so.
 □    Q.    And did you intentionally gather it? Was
there anything that you did to gather that
information duration exposure to insulation through
handling --
    A.    Yeah, went back to the questionnaire.
Insulation home, I think there would have been on the
original --
    Q.    I am sorry, I am talking about handling
insulation --
    A.    I can't remember, really, if we had a
start and stop date for that or not, but I don't
remember one.
    Q.    Did you try to determine the frequency of
contacts through that exposure pathway?
    A.    I don't remember exact. Some of these
questions I did collapse the question, some of them
were frequently, sometimes, never, those sorts of
things. And because it was so few participants, I
collapsed like frequently and sometimes to yes.
    Q.    But in determining the importance of a
particular exposure pathway, wouldn't it be helpful
to you to know --
    A.    But we didn't determine -- I am sorry.
    Q.    I guess I am going back to the goal. Is
that goal stated incorrectly, I guess, then? And
□maybe that is just where we are at. The goal of
identifying, on Page 4, important environmental
exposure pathways, is that really not something that
was done in this study?
    A.    I think that it was something we tended to
do, if possible.
    Q.    But did it end up that you didn't have
information that allowed you to identify pathways
that could be ranked in terms of importance?
    A.    I think that it turned out that all of
these participants had several pathways. And I don't
know which of those pathways contributed the most or
the least to their exposure.
    Q.    Do you know if they contributed at all to
the radiographic changes that were noted?

Page 55

Exhibit 4 -- Middleton dep.txt
       A.     What?
       Q.     Do you know if any of these pathways at
all had a causal association with radiographic
changes that were also noted in the study?
       A.     I think -- we are not -- this is a case
series.  You don't set out to prove or disprove a
hypothesis.  You are just looking at the situation
for information about the cases and you look at it in
a more -- in a less formal way.
            I think the fact that these people, you
☐know, made it this far in the tables and then listed
several potential environmental pathways suggests
that that may well be how some of them, at least, and
maybe all of them, got their -- you know, developed
the disease, any shape of the disease process.
       Q.     Couldn't they also have listed watching
television?  How is there any connection between any
of these pathways and -- well, let me ask the
question again.
            Does this report, and maybe this isn't the
purpose of the report, but does this report provide
evidence of a significant causal association between
any of these pathways and radiographic changes?
       A.     I think it provides evidence that the
environmental pathways may have been important for
some people.  I don't think it proves any particular
pathway led to any particular disease.
       Q.     And you say the number of the pathways
isn't any kind of surrogate for exposure?
       A.     I don't think it is any kind of surrogate.
You would think more pathways might mean more
exposure, but I don't know.  That's certainly -- I
don't think that would be true in every case.  If you
had a lot more participants than this, it might do
better as a surrogate measure or it might not.
☐     Q.     But wouldn't you have to know what the
exposure was for each pathway before you could start
adding them up?
       A.     I --
       Q.     I mean what if some of these pathways have
absolutely no exposure and you are adding them up,
you are adding up zeros, you really don't know, do
you?
       A.     You might want to go to Libby.  I mean,
these people will tell you they literally pop the
·stuff on the stove which will release asbestos
fibers.  There were piles of vermiculite that
children played in.
            And the processing plant even wasn't like
·locked on the weekends and kids would go and swing
and drop into piles of vermiculite.  There definitely
was exposure here.  For any particular pathway I
would be hard-pressed to quantify it or even rank it
very accurately.
       Q.     Talking about the processing plant where
you are saying kids used to swing and drop into
piles, did that exposure pathway still exist when you
were doing this study?
       A.     The building was still there.  I don't
really believe that -- I would say no, based on the
☐level of concern and EPA was there in residence.  So
my assumption was not.
       Q.     And that facility had closed in 1990,
                        Page 56

Exhibit 4 -- Middleton dep.txt

right?
A.      I think so.
Q.      So, do you have any --
A.      I am assuming the processing plant closed
when the mining stopped or about the same time.
Q.      Do you have any evidence that that
processing plant was available for children playing
after the facility closed?
A.      I know that the contamination around the
plant was there for -- after that for a long time.
Q.      But I am talking specifically, because one
of your exposure pathways is piles, and I think it
was described as children playing in piles.  Was this
exposure pathway something that was a current
exposure pathway in 1999 when EPA and ATSDR --
A.      It was 2000 which we were there.  I
believe the answer to that is yes, but --
Q.      What is the basis of that belief?
A.      Discussions with people in Libby and with
EPA and --
Q.      That after 1999 were there children
dropping into piles in the processing plant?
□     A.      No.  No.  No.  That the piles around the
plant were still there for several years after that
and children -- I don't really know.  I guess the
answer is I don't know.
Q.      So you don't know whether that, for
example, the piles on Table IV, you have piles --
A.      I know it is still a potential pathway.  I
would assume that parents are now more knowledgeable
and are aware not to let their children play on them.
But I am sorry, what is the question?
Q.      Okay.  Would the popping of the
vermiculite, did you do a study to see if any
asbestos was released from popping vermiculite, what
the concentration might be?
A.      I didn't.
Q.      So, but you just assumed that it would --
that popping vermiculite would result in some
unacceptable exposure?
A.      It is hard to see how it wouldn't.  I
believe there are studies, I just am not the one that
did them.
Q.      So you don't have any basis for that
assertion that popping vermiculite would have caused
an exposure that was unacceptable, an exposure to
asbestos?
□     A.      Well, I would have to do -- go back and do
some research.  I have either forgotten but -- but I
believe there is research into the release of --
about the release of fibers, but I can't really quote
anything at the moment.  But, how could it not, you
know.  I mean, you are talking about heated gas --
mineral complex and then --
Q.      Don't you have to know whether or not that
vermiculite has any asbestos in it in the first
place?
A.      We know that vermiculite mined in Libby
has asbestos in it.
Q.      All the vermiculite has asbestos in it?
A.      I think I mean the quantity might vary,
but not all vermiculite, but the vermiculite in Libby
was contaminated.

Page 57

Exhibit 4 -- Middleton dep.txt
    Q.    Does it matter if the concentration of
asbestos in a particular sample of vermiculite, does
it matter what the concentration of asbestos is in
that sample if you are concerned about exposures?
    A.    I don't think any is good. I think more
would be worse.
    Q.    But you don't have any information as far
as what concentrations might or might not have been
in -- no, I am asking about you, about your
Dknowledge, because you just made the statement?
        MR. ASKMAN: Let's try to let him answer
    completely the question. If you are not
    able to answer a question completely, let
    us know and we will let you answer it, and
    then we will get to the next one.
        THE WITNESS: Okay. You know the
    focus, these were potential pathways. Many
    of which, I think, were described by
    residents in Libby as ways that they
    believe people were exposed, so this is one
    of the -- that is sort of the origin of the
    pathways as I understand it.
        I don't have specify evidence, but,
    you know, there are documented cases around
    the expansion facilities where they were
    actively processing vermiculite and that
    process is essentially the same as popping
    it on your stove.
        So if you are going to have cases of
    asbestos-related disease around these
    expansion facilities, then popping it on
    your stove can't be a good thing.
    Q.    (By Mr. McCarthy) But you can't cite to
me any of these studies that you just mentioned?
D   A.    No.
    Q.    Okay.
    A.    Well, you mean right now as we sit?
    Q.    Well, that is where we are.
        Okay. As part of your questionnaire with
respect to people that played in piles when they were
children, piles of vermiculite, you also asked them
to identify the location of the piles. Is that
correct, as part of your questionnaire?
    A.    I don't remember.
    Q.    Do you recall if any of the -- anyone
identified, like you just mentioned one about kids
jumping into piles inside the processing building.
Is that information that you got --
    A.    And outside.
    Q.    And outside, okay. Where did you get that
information, was that part -- I mean did your
questionnaire solicit that information?
    A.    No, that is from talking to a man in
Libby.
    Q.    So you made no attempt in your study to
determine whether or not any of these particular
exposure pathways, let's say a particular pile, you
didn't try to locate it?
    A.    Not that I -- I didn't. I don't remember
Dthat from the questionnaire. But if you say it was
there. We didn't try to -- I didn't follow up on
that. Piles means it could have been in the
processing plant, it could have been around the
                                        Page 58

Exhibit 4 -- Middleton dep.txt
processing plant, it could have been in their yard,
it could have been in their backyard.  It is just did
you play in piles of vermiculite.
    Q.    You weren't concerned with trying to
locate those piles?
    A.    Well, these were like adults and we are
talking about things that they did as a child, so I
have not tried to locate the piles.  I guess that is
the answer to your question.
    Q.    Looking back at Table IV, we have
participant Number 1.  You have checked the box for
all of these so-called environmental exposure
pathways; is that correct?
    A.    Yes.
    Q.    And isn't it true that for participant 1,
neither your B-reader panel nor your CT reviewer
found that he had any abnormal radiographic changes?
    A.    I think -- well, I think it is true that
one of the three B-readers read pleural changes --
    Q.    But that didn't meet your protocol, did
it?
☐    A.    No, not for a positive.
    Q.    What did that indicate to you?
    A.    What did that indicate to me?
    Q.    The fact that you had this participant
Number 1 had checked all of your boxes and for
exposure pathways and according to your protocol did
not exhibit radiographic changes?
    A.    I think that is what you state, so what is
the question?
    Q.    What did that indicate to you?
    A.    I don't know that I can generalize from
that.  This is one participant among a very small
number of participants.
    Q.    Would you say that your sample here is
really too small to draw any conclusions whatsoever
one way or another?
    A.    I think that a case series really doesn't
set out to, you know, statistically prove anything.
It is a way of looking at the information and looking
for evidence.
    Q.    But, would it be fair then to say that the
case series really can't be used to prove anything
one way or another with respect to causal association
between pathways and radiographic changes?
    A.    I think it is one piece of evidence.
☐    Q.    And isn't it one piece of evidence that
participate Number 1 was -- had all of your exposures
and had no radiographic changes noted by your panel
or the CT-reader?
    A.    That is true, but I don't really
generalize from that.
    Q.    You just generalize from the eight but not
the one?
        MR. ASKMAN:  I am going to object to that
    statement.  I don't know if that is a
    statement or a question.  If it is a
    question, I object to it as
    mischaracterizing testimony.
        THE WITNESS:  I don't know that it
    means.  What did you say?
    Q.    (By Mr. McCarthy)   You don't find it
significant that participant Number 1 had no
Page 59

Exhibit 4 -- Middleton dep.txt
radiographic changes and yet was exposed to all these
pathways that you used in the study?

A.      I don't know what -- I don't know.  It is
only one participant.  It is possible -- anything is
possible.  I don't know why that -- I don't know if
there was a -- when they checked the box, if they
were more sensitive than about other reporting
people.

☐          I don't really know if this participant
was particularly worried about the -- I mean, I don't
know if that represents -- I mean, this is sort of
a -- this case does stand out as why didn't they
check all those boxes, and it is possible that they
were more concerned than other people.

But, it is only one participant and we are
not -- I don't think you can generalize from one
participant or even know why that participant said
what they said.

Q.      Couldn't you say the same thing for the
other seven?

A.      I think if you look at it as a group, and
that is really what this is about, trying to look at
it as a group, you don't -- you know, you are looking
at evidence from the group of people, not from one
person.

Q.      Is this group large enough to make any
type of conclusive findings?

A.      We didn't test any hypothesis, so I didn't
prove one.

Q.      I am going to turn, Dr. Middleton, to
Page 14, you discuss limitations.

A.      Did you say Page 14?

Q.      Page 14, the limitations.  What was the
☐purpose of this section of your report,
Dr. Middleton?

A.      It is a standard part of meeting all type
of epidemiologic investigations where you basically
describe the things that you didn't consider optimal.

Q.      One of those things was the fact that you
had to use copies of the P-A films, right?

A.      Right.

Q.      And one of the reasons that is not optimal
is that it is not approved by NIOSH to use copies of
films, right?

A.      I don't know that NIOSH has a statement on
it but they haven't approved the use of copies.

Q.      You also say that one of the problems with
your study is the sample size; is that correct?  Did
you consider that a limitation, your study?

A.      Where is that?

Q.      In the second paragraph.

A.      This was referring to the progression and
there was very few -- only six patients had two films
and they were not spaced in time very widely, so it
just wasn't a situation where you could look at
disease progression.  I mean we looked at it, but not
finding it doesn't mean very much.

Q.      If we look at the third paragraph here
☐where you are talking about the differences between
the local pulmonary radiologist and your independent
reviewer, what is the nature of that limitation?

A.      You end up with two CT reviewers and like
when they differ, you don't have a way of -- there is

Page 60

Exhibit 4 -- Middleton dep.txt
not like a gold standard to say who is right and who
is wrong.
     Q.     But your protocol didn't call for two CT
reviewers, correct?
     A.     No, here I am talking about -- it is true
that the B-readers were three all independent.  But
in this particular case we have the local CT-reader
and the local -- and the independent CT-reader.  I
was just in that context I was just explaining why a
third reader was useful.
     Q.     And that would have been helpful if you
had had a third reader?
     A.     It would have been helpful if we had had
three readers.  Our intention, if we do go forward,
it would be with probably with three CT-readers.
     Q.     Why are you even discussing the local
pulmonary radiologist when he wasn't part of your
study, or was he?
     A.     Only -- I think on the ones that we didn't
confirm we went back and looked at the medical
□records to see what they said.
     Q.     And did they disagree with your CT
reviewer that you choose for this study?
     A.     For those four.
     Q.     Later on in this paragraph, the third
paragraph on Page 14, you say, "The films that were
not confirmed by the independent CT reviewer reviewed
clinically as having minimal findings consistent with
asbestos-related disease."
          Does that mean that you kept them in your
study as a, I guess, a positive finding even though
they weren't confirmed by your independent CT-reader?
     A.     No.
     Q.     What does that mean?
     A.     What does what mean?
     Q.     That sentence.
     A.     What, the one that starts "the films"?
     Q.     Right.
     A.     These films were not -- that were not
confirmed by the independent CT reviewer were
clinical -- minimal findings.  What I was saying
there was that the places where they deferred were
places where there wasn't very much disease.
     Q.     But, you didn't -- but in your study you
only used your CT reviewer's results, right?
□     A.     Yes.
     Q.     Now, in the next sentence in this
paragraph, you say, "While there are frequently
inter-observer differences between the way two
readers interpret earlier minimal changes, the
difference between interpretations was not random and
remains to be explained."
          What do you mean by that?
     A.     That in each case the independent
reviewer -- they agreed on quite a number but in the
cases where they disagreed in each case, the
independent reviewer did not identify the changes and
the local pulmonary radiologist did.
     Q.     And what remains to be explained?
     A.     Why that difference exists.
     Q.     And are there any plans to do things to
explain that difference?
     A.     Not at the present time.  If we did
                                              Page 61

Exhibit 4 -- Middleton dep.txt
continue or if we do continue, then they would be
subjected to the three CT-readers and we would have a
stronger sense of what the right answer was. But,
right now there is not an active plan to do that.
     Q.     What do you mean when you say that the
difference in interpretations wasn't random?
     A.     It was directional.
ᴼ    Q.     What does that mean?
     A.     Why are you laughing? It means that it
was directional. Each case the local pulmonologist
said yes, there are changes. And the independent or
CT reviewer did not identify changes. If it was
random, it would be random.
     Q.     Meaning that sometimes your independent
reviewer would have findings and the local
radiologist would find that the lines were clean, is
that what you are saying, you would expect to have
that variation?
     A.     Yeah, except it may not be a fair --
probably not an entirely fair statement because the
local pulmonologist, he had to have called it, for
the most part, for them to be considered cases and
end up in our studies, so it may not be entirely
fair. But in each of these four cases he had to find
changes, as I recall, and our guy didn't. In other
words, you are sort of setting him up.
          For example, if you went the other way
with the independent reviewer, you took films he had
identified as positive, and gave a hundred of them to
the local reader, it is possible that a couple of
those he might not identify changes.
          I don't know that, but I was just
ᴼcommenting that there was that difference and it
was -- that the local doctor had called us for
patients, although the independent reader had not.
     Q.     So, by not random and by directional, you
mean that in each case where there was a difference,
a local radiologist always found an abnormality, and
in all those cases your independent CT reviewer did
not?
     A.     Yes. That is true. But it is also true
that it almost couldn't have been another way if you
look at the study design. You know, in other words,
if the local reader had said these films are
negative, then the person might not have been
identified as a case and sent to us to send to the
independent reviewer who said that they were -- these
are a case or not a case.
     Q.     But they might have been identified
pursuant to a chest x-ray, right?
     A.     The CT scan is usually considered to be
more sensitive to changes. So, it is possible, but I
think that the CT scan is generally considered to be
more sensitive so you wouldn't expect not to, in most
cases, to find something on chest x-ray and not see
it on a CT can.
     Q.     What is the basis for your statement there
ᴼthat CT scans are more sensitive? That was debated a
little bit in your report, wasn't it?
     A.     This study wasn't an assessment of CT
scans, but -- it wasn't a comparison between CT scans
and chest x-rays. But, I don't think there is
really -- you know, a hundred different types of
Page 62

Exhibit 4 -- Middleton dep.txt
discussions where you are talking about lesions in
the lung, the chest x-ray is less sensitive and
has -- the lesion has to be larger than -- in the
chest x-ray.
        Let me back up again.  It has to be larger
in the chest x-ray for you to see it than it does in
the CT scan.
        So in that sense, it is more sensitive.
    Q.    But, isn't it true that --
    A.    I can't cite you a reference, but it is
true.
    Q.    Then how do you know it is true if -- you
are not a radiologist, are you?
    A.    No.
    Q.    Then do you really have the expertise to
make that assertion, the CT scan is more sensitive?
    A.    I think that with regard to --
independently no, but I think there is a lot of
literature supporting that, that lesions in the lung
□are picked up in much smaller -- much smaller with a
CT scan than when they are -- if you are going with a
chest x-ray.
    Q.    But you can't cite any of that literature
here today?
    A.    Not here today, no.
    Q.    Okay.  And isn't it true that you state in
your report that there is no validated method for
interpreting dust-related changes on CT scans?
    A.    There wasn't something comparable to the
B-reader program.
    Q.    So is that correct, that there is no
validated method of interpreting dust-related changes
on CT scans?  Is that a true statement?
    A.    I think that may overstate the case.
There is a standard of practice among people who read
CT scans, but there is not a semi quantity -- you
know, a semiquantitative form like the B-reader form
that is accepted by everybody.
    Q.    Matter of fact, there is no widely
accepted method for interpreting dust-related changes
on CT scans; isn't that right?
    A.    I don't think I -- I don't know -- I don't
think that is true.
    Q.    Well, could you turn to Page 6 of your
□report where you say that.
    A.    All right.
    Q.    We are down second or last sentence.
"There are no validated and widely accepted methods
for interpreting dust-related changes on CT scans."
Is that true?
    A.    It is referring to semiquantitative
changes.  I think what you are talking about is a way
of recording CT changes in a way that they could be
compared semiquantitatively.
    Q.    I am not trying to put words in your mouth
but I think you say methods for interpreting
dust-related changes and not recording, don't you?
    A.    But it is in the context of
semiquantitative schemes.
    Q.    So this is not a true statement, that
there are no validated and widely accepted methods
for interpreting dust-related changes on CT scan;
that is not a true statement?
                                    Page 63

Exhibit 4 -- Middleton dep.txt

     A.    I think what that refers to is recording those changes. It doesn't mean that the CT-reader wouldn't see them and describe them in some manner, but what we are talking about here is recording them in a standardized way.

     Q.    So you don't mean the method of interpreting when you say methods for interpreting --

     A.    -- context of interpreting it in a semiquantitative scheme.

     MR. MCCARTHY:   I would like to take a break for a minute.

     (A recess was taken.)

     Q.    (By Mr. McCarthy)  Dr. Middleton, in your conclusions on Page 15, conclusion Number 3, you state that "the contributions of various environmental pathways cannot be fully assessed with the information available."

     Is that right?

     A.    Yes.

     Q.    Would you agree that as we sit here today that you can't opine to a reasonable degree of scientific certainty whether or not any of these study participants, the radiographic changes that were found on your study participants, were attributable to exposures in Libby after 1991?

     A.    That was a long, hard question. Can she read it back to me.

     Q.    Let me try it again.

     You can't state to a reasonable degree of scientific certainty that any of the radiographic changes reported for these participants were attributable to exposures in Libby that have existed after 1991?

     A.    I mean, you know, we didn't test any hypothesis, so we certainly didn't test that one.

     Q.    So you would agree with that statement, that you can't determine whether or not any of the participants here, any of the radiographic changes noted on the participants here, are attributable to exposures in Libby after 1991?

     A.    The exposure is cumulative, so any exposure matters -- but can I separate the exposures that they had before '91 from the ones after and say which did what?  No.

     Q.    Do you know if any of the study participants first began living in Libby after 1975?

     A.    I don't know.

     Q.    Is that information that you gathered in your study?

     A.    We did collect -- and again, we collected residency -- residences and dates of residence.

     Q.    But you just don't know?

     A.    Right.

     Q.    Can you say to a reasonable degree of scientific or medical certainty --

     A.    I am sorry, let me interrupt you. Did you ask me before 1975?  What was it you asked me?

     Q.    About residents.  I said are you aware of any of the participants in this study who began to live in Libby, their first time they moved to Libby was after 1975.

     A.    Oh, I don't know.  I don't know the answer to that question.  I want to make sure I was

Page 64

Exhibit 4 -- Middleton dep.txt
answering the right question.
    Q.    Dr. Middleton, can you state to a
reasonable degree of scientific certainty that anyone
in Libby is going to get asbestos-related disease as
a result of the exposures that have existed in Libby
since 1991?
    A.    I didn't look at that question.  I haven't
anything -- you know, I do believe exposures have
gone down and so, you know, especially the ambient
pathway.

    I can't really say -- I know if you get
.enough exposure, that you will ultimately -- some
people will develop asbestos-related disease.  And I
do believe it is still possible, but I can't say who
or how many or even -- you know, the odd case of the
kid who finds a pile of vermiculite that is left over
and plays in it every day sort of haunts me, I guess,
so I can't say no one will, but --
 ☐   Q.    That is not the question.  The question I
asked you is not whether it was possible, but I want
to know whether you can say to a reasonable degree of
scientific certainty that people exposed to the
current, whatever the current levels of exposure to
asbestos in Libby are, as of 1991, if those exposures
will cause asbestos-related diseases?
    A.    Somebody who had no exposure prior to
1991?
    Q.    Okay, let's go there.
    A.    .The word "scientific certainty" haunts me
a little bit.  I do know of some specific examples of
children who have had pretty significant exposures.
They are not like -- it is not like a big number.
But I suspect that there are -- since 1991 -- since
January 1, 1990, that exposures have occurred that
could potentially be due to these.
    Q.    Can you say to a degree of probability --
anything is possible, right, that is what people say,
things are possible?
    A.    I didn't think -- see, there is like host
factors and exposure factors, so it is not possible
for me to say any particular person is probably.  And
like for the few examples I know, it is not possible
for me to say they will probably develop disease, but
☐I think I do know people who are at risk because of
exposure level they had.
    Q.    But you don't believe that you can say
that anyone in Libby whose exposures were post 1991
is probably going to get asbestos-related disease?
    A.    I don't think I am qualified to answer
that question.  I really don't know.  I haven't tried
to study it and I don't know the answer to it.
    Q.    That is fair enough.  And the same with
people who, today, regardless of when they moved to
Libby, can you say to a reasonable degree of
scientific certainty or probability that exposure
since 1991 will cause asbestos-related disease?
    A.    I believe it is -- I have got to preface
it.  I believe it is possible --
    Q.    Answer that question first and then we can
get to that.
    A.    I haven't -- I haven't studied that
question and I haven't -- I don't know the answer to
it.  But I do know that I am concerned, you know,
                                     Page 65

Exhibit 4 -- Middleton dep.txt
that there are --
Q.     That is a different question and that is
fine, that is a different question.  That wasn't the
one that I asked, though.
A.     Okay.
Q.     On Table IV, we looked at this before,
Table IV of your report, Page 24, you list these
various exposure pathways.
A.     Yes.
Q.     Do you believe that there are any other
pathways, non-occupational pathways of exposure than
those listed there?
A.     Yes.  Probably.
Q.     Can you list them?
A.     Not really.  Anywhere there is vermiculite
and people can be exposed to it would be, you know --
no, I can't list them.
Q.     But, are there other potential exposure
pathways to asbestos, not just vermiculite, but
asbestos that these people might be exposed to or
might have been exposed to?
A.     Okay.  Ask me that question again?
Q.     Do you believe that there are other
potential pathways for the people on your study to
have been exposed to asbestos other than vermiculite?
And in particular I am concerned with the eight
participants?
A.     Oh, the eight participants.  I don't --
well, they are like background levels that are
relatively low, but I don't know of any specific
exposures that they had to asbestos.
Q.     For the purpose of your study, did you
assume that the exposure pathways listed were the
only other types of exposures?
A.     No.  I just -- we just assumed those were
some of the -- maybe I don't understand the question.
Are you talking about these pathways?
Q.     Yes.  Did you assume that those, for those
8, those are the only pathways?
A.     No.
Q.     You didn't assume that?
A.     No.
Q.     How did you take that into consideration
then in your study?
A.     I put down the pathways that we -- you
know, we knew about and we believed could be
important for some people and ask about them.  That
is all.
       That also would be one of the reasons that
the number of pathways doesn't fully describe a
participant because there may be a number of other
pathways that we didn't ask about that would change
the relative exposures.
       (Exhibit 157 was marked for
       identification.)
Q.     (By Mr. McCarthy)   I would like to hand
you what has been marked as Exhibit 157.  Let me
represent to you that it was in a box of documents
that I got yesterday.
A.     Really?
Q.     Do you recognize that?  Can you identify
that document?
A.     I mean, I can recognize the form.
                                        Page 66

Exhibit 4 -- Middleton dep.txt

Q.      Is that a form that you used in this
study?
A.      I believe it is the last page of the
progression form.
Q.      Last page of the progression form?
A.      Uh-huh, for B-readers.
Q.      If we look -- now on this form, it looks
like they have found some pleural changes; is that
correct?  Is that right?
A.      You have got to understand, they read the
films independently and then they read them together.
And this apparently was after they were given the
crossover code to compare film one and film two.
Q.      But would you agree that they had found
some indication of pleural changes?  Is that what
that means when they check pleural calcifications?
A.      Well, this is only one B-reader's
□interpretation.  But it does appear that he is -- he
did say pleural calcifications increases noted, that
is correct.
.  Q.      If we look down at the bottom, there is
something handwritten in there.  I think it "says
some changes may be secondary to film tech"?
A.      Probably technique.
Q.      Technique.  Would that -- is that an
indication to you that he thought that, perhaps, the
changes noted were due to the film as opposed to,
perhaps, an actual change?
            MR. ASKMAN:  I am going to object that
       that calls for speculation as to what the
       writer meant.  But you can answer the
       question --
            THE WITNESS:  Yes, any case, the film
       he is talking about appears -- he says some
       of the changes may be secondary to film
       technique, so I am assuming he is saying
       some of the things he saw on the second
       film compared to the first one are -- he
       believes could be due to technique.
            And in any case, for what it is
       worth, this particular film that he is
       talking about wouldn't have been one of the
□      ones that we used to categorize people
       because we only used the diagnostic film,
       the first -- in other words, when they
       presented for an evaluation, that is the
       film we used in the table for the
       B-readers.
            So this film is not represented in
       the table of the -- the film I believe he
       is talking about I believe is not the film
       that is discussed in the B-reader table.
Q.      (By Mr. McCarthy)  It would be film one?
A.      Film one would be in the B-reader table.
Q.      What would you do if in your B-reader
comments if you got a comment like this, what would
you do with the results?
A.      I don't believe we had anything like that.
But that would be speculation.  I don't remember
seeing anything like that.
            MR. McCARTHY:  Would you please mark this.
            (Exhibit 158 was marked for
       identification.)
                              Page 67

Exhibit 4 -- Middleton dep.txt

Q.     (By Mr. McCarthy)  You just have been
handed Exhibit 158.  Can you identify that document,
Dr. Middleton?

A.     It is the B-reader form.

☐    Q.    This is the B-reader form that was used in
your study?

A.     Yes, I believe so.

Q.     And does this indicate that there were --
in 3-A, it says there were pleural abnormalities?

A.     Right.

Q.     And then we look down into box 4-D, what
is the purpose of that box in the right-hand corner?

A.     It is any comments they want to make that
aren't -- that don't come up in the -- as they mark
through the form.

Q.     What is the comment that is made at the
bottom of this exhibit?

A.     Changes may be adipose tissue.

Q.     What does that mean?

MR. ASKMAN:  Objection, calls for
speculation as to what the writer meant.
If you know what the writer meant, you
should certainly be able to comment on that
or answer the question.  And if you are
asking about the interpretation, the
objection is the same.

Q.     (By Mr. McCarthy)  What do you understand
that to mean?

A.     He -- you know, this would just be a
☐speculation.  He appears to be saying that he -- let
me look at it first.  If I had to speculate, I would
say that he may be saying that he may be concerned
that the changes that he is seeing could be adipose
tissue.

Q.     What is adipose tissue?

A.     Fat.

Q.     And what, in your study, what did you do
if the B-reader made a comment like that, that the
changes may be due to adipose tissue?

A.     You are talking about it as though it was
some generalized process.  I mean, this is just 22
people here.

I assume in this instance we used the
numbers because it was up to him to decide if he
could make the reader or not and if he said it was
consistent with pneumoconiosis, we accepted that
outcome.

Q.     Is it true, though, that adipose tissue
can provide results that look like pleural thickening
consistent with pneumoconiosis?

A.     Is it true that adipose tissue -- I think
that is one of the decisions that they have to make
as to what they are looking at.  I know it has come
up, now that you have mentioned, in looking at the
☐BMI, that it could make that more complicated.

And apparently he is saying here that on
this particular one film he is not -- even though he
called it, he is concerned that it could be adipose
tissue.  I mean that is speculation on my part but I
believe that is what he is saying.

Q.     But, in your study you didn't deal with
that issue of, perhaps, having false positives?

A.     No.  This was a case series.  We

Page 68

Exhibit 4 -- Middleton dep.txt
basically, if they -- if he indicated that there were
pleural abnormalities consistent with pneumoconiosis,
we accepted his interpretation. He didn't say they
weren't consistent with pneumoconiosis, he said that
he has some concern about other things.
        But how many of those were there?  This is
probably the only one.
    Q.    You kept saying that the finding's
consistent with asbestos-related disease.  Are there
other things that can cause radiographic
abnormalities that are consistent with
asbestos-related disease, such as adipose tissue?
    A.    You know, I know that is an issue that
people talk about.  I don't know the answer.  I mean,
I don't know how often that occurs or if it is a big
problem or if it is -- I just don't know the status
Dof it.  I have heard it discussed and I just don't
personally know the answer to it.
    Q.    But for the purposes of this case here,
you didn't try to distinguish between other factors
that could result in radiographic changes that are
similar to those that are consistent with
asbestos-related disease, like adipose tissue or
scarring from prior chest surgeries, et cetera?
    A.    I don't know that -- well, as I said, I
believe in this particular case, where you have
changes, maybe adipose tissue, I believe we would
just go to that as pleural abnormalities consistent
with pneumoconiosis, because that was his call and
then he just -- he expressed his concern about
adipose tissue, so I do believe he had some concern
that the changes he saw could be adipose tissue.
        But we didn't use this information.  He
had to make a call one way or the other and we
accepted his call.
    Q.    I am going to switch back to exposure
pathways.  With respect to the exposure pathways, and
let's talk about the eight that are listed on
Table IV, what was the basis for determining that a
participant was exposed or potentially exposed to one
of the exposure pathways listed?
D   A.    Did they answer that question?
    Q.    So it was self-reporting?
    A.    Yes.
    Q.    Are there any issues in doing case series
studies or epidemiologic studies with self-reporting?
    A.    Yes.
    Q.    What are those issues?
    A.    People are sometimes concerned that a
person's -- an individual is concerned about their
exposure -- for example, are concerned about the
environment they live in by -- usually it has to do
with answering health questions.
        Like, for example, if I live in a
contaminated place and you ask me questions about my
health, people are sometimes concerned that I will
be, not necessarily miss -- not lying, but the
concern would affect my answer.
    Q.    Was that a concern here in this study,
self-reporting, that people would report more
exposure pathways?
    A.    No, not really.
    Q.    Why not, that is a typical concern?
                    Page 69

Exhibit 4 -- Middleton dep.txt

A.      I think that all these people lived in
Libby and were exposed to vermiculite and we were
just trying to find out how.
☐       Q.      So you did nothing to control for
self-reporting bias?
A.      No.
Q.      Now, in addition to x-rays, didn't
Dr. Whitehouse provide you also with medical records
of all of these participants?
A.      Yes.
Q.      What did you do with those medical
records?
A.      Do you mean where are they?
Q.      What did you do with them?  How did you
use them in the report?
A.      We used them -- in the report?  They
played very little role in this report.
Q.      Did they have any role in the report?
A.      Just, you know, for things that -- for
example, where we decided we looked at what the
independent CT-reader said.  I didn't find the report
changes.  We did go back to the medical records to
see what -- how --. to see what Dr. Whitehouse and
Dr. -- what did you say his name was?  Starts with a
T.
Q.      Teel?
A.      Is it Gordon Teel?  Somehow that jumps out
at me.  See what the person, the pulmonary
☐radiologist reading the CT scan, what Dr. Whitehouse
said about it.  So we used them in that way and we
used them -- we actually, we abstracted the pulmonary
function test but we haven't used those for anything
yet.
Q.      Is that the only thing that you abstracted
from the --
A.      No.  We abstracted clinical information
also.
Q.      I am sorry, what kind of information?
A.      Clinical.
Q.      Clinical information.  And in doing the
abstractions, you removed all identifiers from these
patients to preserve privacy?
A.      We tried to.  Actually, I believe, my office, I
believe, made an attempt before they sent them to us
and then we -- my secretary went back over them again
because we were never -- we weren't supposed to get
names.
Q.      You didn't produce those abstracts to the
Defendants in this case, did you?
A.      No.  I am sorry, what did you say?
Q.      You didn't produce those abstracts --
A.      The abstracts of records, no.
Q.      Why not?
☐   A.      Well, --
Q.      You had removed the identifiers, right?
A.      Okay.  Are you talking about the medical
records, the hard copies or the --
Q.      The abstracts?
A.      where we abstracted information from them?
We had -- there were a couple of concerns, one is
confidentiality, the other related to just that we
didn't really use the records in the support.
Q.      But they were requested in discovery?
Page 70

Exhibit 4 -- Middleton dep.txt

A.      The lawyer actually told me that wasn't
why we were supplying them, so I understand.  We
thought that they would compromise the -- that people
could use these records to identify people, other
participants.
Q.      Even though you had removed the
identifiers from the abstracts?
A.      Yes.
Q.      And did you make that decision?
MR. ASKMAN:  Before you answer that, if --
I just want to caution counsel, if any
question calls for any information which
is -- which you have been told by your
attorney as legal advice, I would direct
you not to answer a question which will
☐     divulge that kind of information.
Otherwise, with regard to these
documents, if they are not produced, they
will be on the privilege log which is in a
couple of weeks, as per our agreement -- or
not our agreement, but Heidi and
Katherine's agreement last week.
MR. McCARTHY:  But again, it is kind of
difficult to depose people when you don't
know what has been produced and things are
getting produced very shortly before the
depositions.  But I don't think that that
question, though, went to attorney/client
privilege because --
MR. ASKMAN:  I didn't think it did
either but I wanted to make sure I made
that point and let the witness know prior
to answering these questions not to divulge
anything which either that you told to an
attorney or an attorney told to you
regarding this --
MR. McCARTHY:  For the purposes of
securing legal services.
MR. ASKMAN:  Particularly for that
reason.
☐     Q.      (By Mr. McCarthy)  Did you make that
decision?
A.      Along with others at ATSDR.
Q.      And so despite the fact that there is a
valid discovery request, you independently decided
that you weren't going to produce those documents?
MR. ASKMAN:  I am going to object to that
question.  If you had advice from counsel
as to whether or not to produce those
documents, including counsel from the
Department of Justice or counsel, in-house
counsel at ATSDR, it is something I don't
want you to answer and direct you not to
answer.
Q.      (By Mr. McCarthy)   Can you answer the
question?
A.      I don't know.
Q.      Those making the decisions weren't
lawyers, were they?
A.      We discussed it.  We discussed it with
lawyers.  Although most of the discussions centered
around -- centered around the hard copies themselves.
But some of the same concerns would apply to the
Page 71

Exhibit 4 -- Middleton dep.txt
abstract of records.

Q.    But you and the non-lawyers at ATSDR made
☐decisions not to produce those documents?

A.    I think it was along with -- in
conjunction with discussions with lawyers.

Q.    You also, in your report, used
self-reported symptoms; is that correct?

A.    Yes.

Q.    How were they used in your report?  And I
am looking at now Table 8, Page 28 of Exhibit 155.

A.    Okay.

Q.    How was that used in your study, that
information?

A.    I don't think I understand what you mean
by use.

Q.    You gathered this information, how did you
analyze it?  How did you use it in this study or did
you just gather it for no reason?

A.    These tables are descriptive presentation
of the prevalence of the symptom identified by the 22
participants, so -- and one use was to present, among
this group, the prevalence of various symptoms.  I
believe --

Q.    No, go ahead.

A.    I thought it came up again in the
recommendations or in the conclusions.

Q.    But I asked you -- okay.  It is helping
☐you answer the question by looking at the
conclusions?

A.    That is what I am trying to do.  I mean,
that is one of the uses of the information.

Q.    Okay.

A.    It is Number 4, I think that is the one I
was thinking about.

Q.    And what is significant about that?

A.    Just noting that among the small group of
exposed people showing some mild exertion -- what it
is really talking about is if people that have been
exposed to asbestos have that symptom, then that is a
group that may need to be further evaluated.

But, it even goes on to say that even though
that is a common symptom among this group, the
specificity or the -- there are other causes of the
symptoms, so it is not pathognomonic by any means.

Q.    But you thought it was significant enough
to include in your conclusions, right?

A.    Yes.

Q.    But -- okay.  What are some of the other
causes of shortness of breath?  They are fairly
numerous, right?

A.    Right.

Q.    For example, I think with our participant
☐number 11 in the poster, I think you note that he has
diabetes, heart disease and has had bypass surgery.
Could those types of things lead to shortness of
breath?

A.    Well, heart disease in and of itself, if
you are talking about cardiovascular disease probably
wouldn't, but if the heart was damaged to the extent
that, for example, the left ventricle wasn't really
pumping all the blood returning to it, then that
complete the pressure of the lung and could lead to
shortness of breath and exertion.

Page 72

Exhibit 4 -- Middleton dep.txt
    Q.    With each of the eight that you finally
identified, did you do anything to explore the
possible alternative causes to the shortness of
breath that was exhibited?
    A.    No.
    Q.    And matter of fact, I guess I didn't ask
you this, do you know whether any of the eight had
indicated that they experienced the shortness of
breath?
    A.    What?
    Q.    With respect to the eight, what you have
termed environmental cases, do you know whether any
of those participants --
    A.    I don't know.
    Q.    Let me finish.
    A.    Okay.
    Q.    Do you know whether any of the eight
participants that you identified as environmental
exposures, whether or not they indicated that they
had a symptom of shortness of breath?
    A.    Well, some of them would have had to
because 19 participants reported it so that would
only leave three that didn't.
    Q.    With respect to those eight, you did
nothing to find out whether there are alternative
possible causes?
    A.    No.
    Q.    Okay.  On Page 14 of your report, of your
report, the limitations.  In the last paragraph you
state that, "There are important differences between
epidemiological studies and clinical medicine in
purposes, information available, case criteria, range
of outcomes assigned, and significance for
individuals."
        Do you see that?
    A.    Yes.
    Q.    Why did you put that in here?
    A.    Well, first of all, because it is true.
    Q.    How is it relevant to your report?
    A.    I think that part of the way this came
about was, again, Dr. Whitehouse is concerned there
wasn't a hundred percent validation of his -- of the
x-ray findings, and so we kept trying to -- you know,
this was -- this is certainly true, but in part it
was to sort of be explicit about that we weren't --
this was not a grading of his medical practice.
    Q.    So that was really just put in as a salve
to Dr. Whitehouse, is that fair?
        MR. ASKMAN:  Objection to the form of the
question.
        THE WITNESS:  No, I don't think that
is quite fair.  I think that it, in
general, is important for it to be there so
that people -- just so we are up front that
we didn't do our own independent medical
history like physician medical history,
physical exam, follow up, diagnosis.  This
was an epidemiologic study where we had
certain criteria and the -- it is different
than a clinical evaluation.
    Q.    (By Mr. McCarthy)  In that it doesn't end
up with a diagnosis, a clinical diagnosis of disease,
right?

Page 73

Exhibit 4 -- Middleton dep.txt

A.      It does not end up with a clinical
□diagnosis of disease, that is correct.
        Q.      Okay.  What do you mean, you said that --
and maybe I am just -- and I am not trying to catch
you or anything but you just told us an
epidemiological study that you stated numerous times
that this is a case series.
        A.      Right.
        Q.      This is not an epidemiological -- is
this -- what is this?  You are going to tell me it is
a case --
        A.      Yeah.
        Q.      It is also done using epidemiological
methods, right?
        A.      There are many different approaches to
doing epi studies.  This is not a formal
epidemiological investigation, where, for example,
you calculate beforehand how many people you needed.
You probably have a control population.  You do have
statistical methods to -- you know, there is all
sorts of aspects to a formal epidemiological -- but
there is various kinds of investigations, and there
are health investigations, for example, that are also
epidemiologic investigations, but they don't maybe
have the same -- they may or may not have the control
population and there is not -- you may be just
□dealing with the situation that you have.
        The case series is not -- is one of the
types that is really not designed to pose and test a
hypothesis.  That is one of the fundamental
differences.  It is a look at these 22 people.
        Q.      I am still wondering why you all did this.
Just simply to see if Dr. Whitehouse was accurate in
his characterization of these environmental cases?
        A.      Well, I believe that Dr. whitehouse
actually offered to Jeff -- to, you know, to -- he
wanted him to participate in something like this, but
it is true that when we met Dr. Whitehouse two years
ago I didn't -- I, of course, had never heard of him
before so I thought it was reasonable to do some
outside validation of what at that point were just
things he had told us.
        Q.      And was that one of the primary purposes,
to see if you could validate what he had been telling
you?
        A.      I think that was the purpose.  I don't
know.  I think one of the big things in this was to
look, to see if there was evidence for environmental
cases.  So in that sense, I suppose so.
        Q.      But you didn't get any evidence of
environmental cases, did you?
□     A.      I think there is evidence of people with
radiologic changes that, you know, that we couldn't
really -- that we attributed to environmental
exposures in the absence of an occupational exposure
that would really explain it or fully explain it.
        Q.      But I think you said you couldn't really
say with any kind of -- to any degree of scientific
probability that any of these so-called environmental
pathways actually are causally associated with the
pleural changes or the radiographic changes that you
reported?
        A.      We didn't feel like we could attribute
                                Page 74

Exhibit 4 -- Middleton dep.txt
them to occupational exposures.  People don't have
these normally and they lived in Libby.  Exactly
which pathways are important is certainly for
individuals and, you are right, -- and since you are
right, I can't really gauge the importance of these
various pathways.
          But, if you are not -- if it is not -- if
you have these changes and it is not from an
occupational exposure, where do you think they came
from.
     Q.    Well, I can't answer questions in
depositions.
          MR. ASKMAN:  That is a cop-out.  He could
□      answer if he wanted to.
          THE WITNESS:  I wish I could do that
     if I wanted to.
     Q.    (By Mr. McCarthy)   But you assumed --
then did you go into this assuming that if you
eliminated occupational exposures, was the premise of
the study then that anything left would be an
environmental exposure, what you call an
environmental exposure?
     A.    What you are talking about is like a -- is
it a diagnosis of exclusion.  We didn't have a way to
know all of the pathways that people had or the
relative contribution as it turns out, so -- I am
sorry, I lost my train of thought.
          I think what you are -- we did arrive at
environmental by excluding occupational causes.
     Q.    So you didn't positively find
environmental causes, you simply excluded the
occupational exposures that you were aware of, right?
     A.    I didn't find any -- I think that we
assumed that there was -- to have the disease, you
have to have the exposures, so we looked to see if we
could explain it by occupational -- you know,
something in their occupation.  And when there
wasn't, we know that people in Libby were exposed to
□asbestos that was mined with the vermiculite.
     Q.    But were these particular -- let's say
these eight, you say that you know that they had
asbestos-related changes, and yet we looked at --
     A.    Changes consistent with asbestos-related
disease.
     Q.    Okay.  But you really didn't seek to
eliminate other factors that could cause those same
radiographic changes, such as BMI or scarring from
prior chest surgery, et cetera?
     A.    How could we have eliminated them.  I
mean --
     Q.    That is your job, I guess.
     A.    We took the people who Dr. Whitehouse
identified.  We didn't have the luxury of choosing
thin people, you know, as a requirement.
          Again, you are going to get mad, it is a
case series, you can't really control -- you don't
recall -- I mean you control is like a mathematical
approach to when you have enough numbers to support
it.
     Q.    But, is it true that your methodology was
basically you had this group and you identified
certain radiographic changes, right?
     A.    Yeah.

                                   Page 75

Exhibit 4 -- Middleton dep.txt

☐     Q.     And then you peeled off occupational
exposures that you knew about, that you were able to
determine from your questionnaire, right?

     A.     That was the approach.

     Q.     But you weren't able to peel off any other
types of exposures that weren't on the questionnaire,
right?  You never dug deeper than what was on the
questionnaire?

     A.     No.

     Q.     For example, we discussed some of this
earlier, for example, if a particular participant had
been a household contact with someone who had worked
in an industry where they were exposed to asbestos
and might have brought it home but it wasn't one of
the vermiculite facilities?

     A.     We didn't look at that.

     Q.     Are you aware of any exposures in Libby in
the post 1991 time period that are as high as what
workers were exposed to in the '60s and '70s?

     A.     I would say I don't think I am -- I am not
aware of any that I believe would be that high.

          MR. McCARTHY:  Why don't we take another
     short break if that is okay.

          (A recess was taken.)

     Q.     (By Mr. McCarthy)   Dr. Middleton, with
☐respect to the eight so-called environmental
participants, were there any that had what you would
term clinically significant asbestos-related disease?

     A.     I don't have a sense of their relative
status.

     Q.     Would you agree that there were some, at
least, whose x-ray changes were not associated with
gross physiologic or functional impairment?

     A.     I am a little biased.  I consider
asbestos-related changes to be pathologic.  I don't
really remember how the eight fall out.  I didn't
look at that question.

     Q.     How the what fell out?

     A.     How the eight fall out.  This report goes
with radiologic -- radiographic findings.  Although
they are subtle differences between them.

     Q.     Do you recall Dr. Miller taking exception
for the draft that he had of recommendations
suggesting that there are asbestos-related findings
that are not clinically significant?

     A.     I am sorry, what is the question?

     Q.     Do you recall Dr. Miller protesting to you
against language that you had in a draft of this
report that suggested that there are asbestos-related
findings that are not clinically significant?

☐     A.     I don't remember that specific occurrence.

     Q.     Do you recall telling him that you could
remove the word "clinical" if it bothered him but
there are clearly x-ray changes that are not
associated with gross physiologic or functional
impairment?

     A.     Can I look at what you are looking at?  I
remember a discussion where I basically tried to say
that there is a whole range -- the point is that
there is a range of findings and they start from, you
know, small lesions that the person is not aware of
and they end with lesions that cause the person not
to be able to breathe.  And I think I remember

                              Page 76

Exhibit 4 -- Middleton dep.txt
generally that discussion.  I don't remember the
specifics of what you are saying.
          MR. MCCARTHY:  Well, why don't I go ahead
     and have this marked as an exhibit.
          (Exhibit 159 was marked for
     identification.)
     Q.     (By Mr. McCarthy)   This is Exhibit Number
159.  Can you identify Exhibit Number 159 for the
record, Dr. Middleton?
     A.     Yes.  It seems to have email
correspondence between myself and Dr. Miller.
     Q.     If we look in the second half of the first
□page here, it is the email from Aubrey Miller to you
dated May 9, 2002.  Do you see that?
     A.     Yes.
     Q.     And do you see where under Paragraph
Number 2, it says recommendation section, and he
recommends some changes?
     A.     Yes.
     Q.     And I am looking down here and he says
that some language that you had that we don't have
before us now, raises the issue of what is and not
clinically significant asbestos-related disease and
suggests that there are asbestos-related disease
findings which are not clinically significant.
          Do you see that?
     A.     Yes.
     Q.     What was his problem with having any
mention that there could possibly be asbestos-related
findings that were not clinically significant?
          MR. ASKMAN:  Objection, it calls for
     speculation as to what Dr. Miller meant by
     this.  If you know what he meant by this,
     you can answer.
     Q.     (By Mr. McCarthy)  I assume you are
communicating with him here, right?  It is an email
from him to you?
□    A.     Yeah.  Well, we are communicating.  You
know, I don't remember the exact language but looking
at this, I apparently suggest -- you know, I must
have said something about distinguishing between
early disease and disease that becomes clinically
significant and he is responding to that.
     Q.     But didn't you then state that there were
x-ray changes that are not, at the time of
evaluation, associated with gross physiologic or
functional impairment?
          If we look up now saying Exhibit 159, it
is your email from -- it is your email dated May 10,
2002 to Aubrey Miller?
     A.     Sure.  Yeah.  I think the key word there
is "gross."  Gross means large, a lot.  Physiologic
functional impairment.  It is not the same as
someone -- it is not the range that I discussed.
     Q.     Isn't it true, though, that there can -- a
patient can exhibit pleural plaques or pleural
thickening and not have any functional impairment?
     A.     I don't know.  When you say pleural
thickening, that makes me nervous.
     Q.     Why?
     A.     Diffused pleural thickening I think could
be a real problem.
□    Q.     What about circumscribed pleural plaques,
                       Page 77

Exhibit 4 -- Middleton dep.txt
are you aware that there can be patients with
circumscribed pleural plaques that don't exhibit
functional impairment?
     A.     This is not like -- the issue is you have
to talk about this in context.  There is a range of
pathologic outcomes and there is nothing about a
pleural plaque that is not pathologic but it goes
from there all the way up to the point where a person
knows something is wrong and goes to the doctor and
to the point where they are not able to breathe.
     Q.     I am talking about pulmonary function,
aren't there patients that will have pleural plaques
indicated on their x-rays and they won't have any
functional impairment?
     A.     There are patients who have pleural
plaques.  If you are talking about the very earliest
smallest plaques, you probably wouldn't be able to
measure the difference between that pulmonary
function test and their pulmonary function before
that plaque began.  But as time goes on, you know,
when the pathology increases, that becomes eventually
not true.
     Q.     But that pathology doesn't always
increase, does it?
     A.     I can't really answer that, but I can say
that it does change in different rates in different
people.
     Q.     Well, didn't you find in your study of
progression, although it was limited, that there was
no progression?
     A.     I don't think you can make -- there was
six patients for one year and we were looking
at x-rays, so -- I don't think it is fair to say we
found no progression, but I think we did not
demonstrate progression.
     Q.     And you had been trying to?
     A.     We looked at the two films and compared
them to see if there was progression.
     Q.     And isn't it -- I think we discussed this
earlier that Dr. Case, one of your peer reviewers,
stated that as far as generally accepted medical
thinking, that circumscribed pleural plaques are
generally thought of as markers of exposure to
asbestos as opposed to asbestos-related disease?
          MR. ASKMAN:  I am sorry, I object to the
     characterization of the previous testimony.
     I don't think the witness remembered what
     Dr. Case had said.
          THE WITNESS:  I do remember he was
     critical, but I -- I don't remember the
     specifics of what he said.  But we
     furnished you that review, so if you read
     it.  You have that review so you know
     exactly what he said.
     Q.     (By Mr. McCarthy)    But you don't
remember --
     A.     I know he was critical.  I just don't
remember the specifics of his issues.
     Q.     But we have already gone over that issue
before?
     A.     Yes.
     Q.     Do you consider yourself an expert in
asbestos-related diseases, Dr. Middleton?
                         Page 78

Exhibit 4 -- Middleton dep.txt
A.    An expert?  No.
Q.    You had mentioned at the beginning of the
deposition that you had been involved in a deposition
in a malpractice case?
A.    Yes.
Q.    Who were the parties to that case?
THE WITNESS:  Can he ask that?
MR. ASKMAN:  Sure.
THE WITNESS:  The patient's -- do I
have to tell him the patient's name?
MR. ASKMAN:  Before I say sure.  I
□    should tell you that unless the case has
been put under seal by the court in which
the case was either litigated or settled,
then the participants in that case are
subject to public scrutiny just as the
parties in this case.
THE WITNESS:  It was Lincoln -- I
believe it was settled in '80 -- it was
like in the middle '80s and the patient's
name was Kay Bradshaw.
Q.    (By Mr. McCarthy)  Who is the other party?
A.    I don't understand the question.
Q.    Were you the defendant in that case?
A.    Oh, yeah, she sued me.
Q.    I wasn't sure that you were a party.
A.    Oh, yeah.  But how is that relevant?
Q.    And what was the nature of the action?
You said malpractice, but what was the particular
claim?
A.    I don't understand the question.  Oh, what
was the particular claim?  She had presented in the
emergency room with a headache and I -- she had been
treated, she presented before and had been treated by
other people with headaches.
And in this case I treated her and sent
□her home and I did call to check on her later, but
ultimately the people staying with her denied that I
called to check on her.  And she presented the next
day with some sort of intracranial bleed, I am not
sure.  And so the contention was I should have
diagnosed it when I saw her the day before.
Q.    Had nothing to do with asbestos-related
disease?
A.    Oh, no.  No.
Q.    Dr. Middleton, do you now how the peer
review panel is selected, the peer review panel?
A.    We have a -- there is a person who is sort
of responsible for -- she is an officer of the
assistant director for science, and I am trying to
remember if I -- you know, they do ask us for -- to
submit names but they are usually -- they don't -- I
don't think they ever or at least almost never use
all of the names, so they may use one of three names.
I submitted the names, I think, that came from -- we
had an asbestos panel that was looking to discuss the
possibility of having a registry.
I wasn't an employer other than just going
to some of the sessions, but they -- these were names
of experts that had been, you know, at the panel.  So
I just took those names and forwarded them to her as
□people that she could consider.
Q.    And who were those people that you
Page 79

Exhibit 4 -- Middleton dep.txt

forwarded to -- do you remember the name of this
woman --

A.      Bruce Case.
Q.      I remember Bruce Case.
A.      There was a Margaret somebody and I don't
remember the other name.  But, you know, they are
with those that we turned over.
Q.      Did you only submit three names?
A.      No, I submitted everybody, I think,
that -- on the panel that was -- that seemed
reasonable.  And I don't even know.  I think Bruce
Case was on that panel, but I am not sure if the
other names came off the list I gave her or if she
got them from somebody else.  I don't remember.
Q.      Is it normal for someone who presents a
paper to submit a list of people to peer review the
paper?  Is that the normal process?
A.      I don't know if it is normal.  You can.
But they don't take -- they don't let you select your
reviewers, so I might submit a couple and they might
come up with a couple of their own or something.
        But, you know -- they are usually careful
not to let you select all three reviewers or whatever
Obut I don't really know.  Other than that, I remember
him being at that conference.  I don't know the three
people that ultimately reviewed it.
Q.      Okay.  I am going to change topics again,
sorry.
        With respect to Dr. Miller, at any time
did he request that his name be taken off the poster
or the paper?
A.      I don't think so.
Q.      Did you have many disagreements with
Dr. Miller as you were going through this?  I guess I
find one, where he had a different opinion with
respect to the clinical significance of pleural
plaques?
A.      Right.  Yeah, we had a number of
disagreements.  Yes.
Q.      Well, besides this clinical significance
of pleural plaques, what other disagreements did you
have as you were going about this study with
Dr. Miller?
A.      Well, one of the issues was he wanted to
consider people who had been exposed -- who were
not -- that were not -- once you got by the Grace
employees, the household contacts and the secondary
contractors, people who work other places that you
Owouldn't have expected vermiculite, and they said I
was exposed to a lot of vermiculite at work.  He
wanted to call that group the environmental.  And
that was one of the disagreements that we had.
        And I thought, because I understood his
argument, but it would have been hard to sort of
explain because in most situations occupational means
the exposure occurred at work.  At least that is the
way I interpreted it.  So my position was that --
Q.      Are there any other issue areas where you
and Dr. Miller didn't see eye to eye?
A.      Yeah.  We frequently debated over -- one
of the issues for me was we would have a period where
I would ask for comments and then he sometimes would
respond outside of that period and later, and then he

Page 80

Exhibit 4 -- Middleton dep.txt

would be -- Aubrey would be unhappy that I didn't
take all of his comments.

So it was just, you know -- it was the
typical sorts of disagreements that occur, but
perhaps with a little more than usual.

Q.    Any more substantive disagreements, such
as who gets put into your nonoccupational group, the
significance of pleural plaques?

A.    What other -- okay.  I don't know -- let
me back up.  I don't know that we actually -- I don't
Dknow that it is true that we disagree about pleural
plaques.  There was that exchange and we certainly --
I was arguing for a, you know -- it is not like
basically a more complex -- you know, more
categories, I guess, and he was arguing for fewer.

But I don't know that ultimately it is
fair to say that we disagree.  We both think that
pleural plaques are a bad thing.

Q.    Are there other areas where there were
issues in contention between you two?

A.    I think there probably were.  Right now, I
don't remember the specifics except sometimes I
wouldn't incorporate it -- language that he gave me.
I would, perhaps, read it and make changes based on
that to my draft and -- whereas he would have
preferred I cut and paste it, those sorts of
disagreements.

Q.    Did you have the final say, though, on
what went in and what came out of the report?

A.    Yes.

MR. MCCARTHY:  I am done unless you bring
up anything that I want to get into.

MR. ASKMAN:  I am going to stand
silent.

MR. MCCARTHY:  Okay.
D        MR. ASKMAN:  I don't have anything.
MR. MCCARTHY:  Thank you very much,
Dr. Middleton.
                    -   -   -
(Deposition concluded at 4:00 p.m.)

D              INDEX TO EXHIBITS

Exhibit            Description              Page

Exhibit 4 -- Middleton dep.txt

| 155 | Final Report | 13 |
| 156 | Poster | 89 |
| 157 | Last Page of Progression Form | 166 |
| 158 | Libby Community Environmental | |
| | Health Project report form | 169 |
| 159 | Emails to and from Dr. Miller | and Dr. Middleton |
| 192 | | |

(Original Exhibits 155 through 159 have been attached to the original transcript.)

□

C E R T I F I C A T E

STATE OF GEORGIA:
COUNTY OF FULTON:
            I hereby certify that the foregoing
      transcript was taken down, as stated in
      the caption, and the questions and answers
      thereto were reduced to typewriting under
      my direction; that the foregoing pages 1
      through 205 represent a true, complete, and
      correct transcript of the evidence given
      upon said hearing, and I further certify
      that I am not of kin or counsel to the
      parties in the case; am not in the regular
      employ of counsel for any of said parties;
      nor am I in anywise interested in the result
      of said case.
            This, the 29th day of August, 2002.


                  FRANCES BUONO, B-791                    My commission expires
on the
                  25th day of April, 2003.

□            COURT REPORTER DISCLOSURE
DEPOSITION OF:  DANNIE C. MIDDLETON, Ph.D.
      Pursuant to Article 8.B. of the Rules andRegulations of the Board of Court
Reporting of the
Judicial Council of Georgia which states: "Each courtreporter shall tender a
disclosure form at the time
of the taking of the deposition stating thearrangements made for the reporting
services of the
certified court reporter, by the certified courtreporter, the court reporter's
employer, or the
referral source for the deposition, with any party tothe litigation, counsel to the
parties or other
entity.  Such form shall be attached to thedeposition transcript," I make the
following

Exhibit 4 -- Middleton dep.txt
disclosure:     I am a Georgia Certified Court Reporter.    I am
here as a representative of Brown Reporting, Inc.      Brown Reporting was contacted
by the offices of
Holme, Roberts & Owen, L.L.P.to provide court reporting services for the
deposition.   Brown Reporting will not be taking thisdeposition under any contract
that is prohibited by
O.C.G.A. 15-14-37(a) and (b).       Brown Reporting has no contract/agreement to
provide reporting services with any party to thecase, any counsel in the case, or
any reporter or
reporting agency from whom a referral might have beenmade to cover this deposition.
Brown Reporting will
charge its usual and customary rates to all partiesin the case, and a financial
discount will not be
given to any party to this litigation.
/s/ Frances Buono, B-791              8/12/02
Signature of attorneys present: Date:
/s/
/s/
/s/
/s/
Return this form after review and/or signatures tothe court reporter for inclusion
in the record.
Please use reverse side for additional signatures.
☐     DEPOSITION OF DANNIE C. MIDDLETON, Ph.D./FCB
     I do hereby certify that I have read allquestions propounded to me and all
answers given
by me on the 12th day of August, 2002, taken beforeFrances Buono, and that:
     1)   There are no changes noted.
     2)   The following changes are noted:
     Pursuant to Rule 30(e) of the Federal Rules ofCivil Procedure and/or the
Official Code of Georgia
Annotated 9-11-30(e), both of which read in part:Any changes in form or substance
which you desire to
make shall be entered upon the deposition...with astatement of the reasons
given...for making them.
Accordingly, to assist you in effecting corrections,please use the form below:

Page No.          Line No.          should read:

Page No.          Line No.          should read:

Page No.          Line No.          should read:

Page No.          Line No.          should read:

Page No.          Line No.          should read:

Page No.          Line No.          should read:

Page No.          Line No.          should read:
Page No.          Line No.          should read:

☐     DEPOSITION OF DANNIE C. MIDDLETON, Ph.D./FCB
Page No.          Line No.          should read:

Page No.          Line No.          should read:

Page No.          Line No.          should read:

Page No.          Line No.          should read:

Page No.          Line No.          should read:

Page 83

Exhibit_4 -- Middleton dep.txt
Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

☐    DEPOSITION OF DANNIE C. MIDDLETON, Ph.D./FCB
Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

☐    DEPOSITION OF DANNIE C. MIDDLETON, Ph.D./FCB
Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

Page No.        Line No.        should read:

If supplemental or additional pages are necessary,
please furnish same in typewriting annexed to thisdeposition.

        DANNIE C. MIDDLETON, Ph.D.
Sworn to and subscribed before me,
this the        day of        , 20    .
Notary Public
                        Page 84

Exhibit 4 -- Middleton dep.txt

My commission expires:
D