IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>W. R. GRACE & CO., et al.,<br><br>Debtors. | Chapter 11<br>Case No. 01-01139 (JKF)<br>(Jointly Administered)<br><br>**Response Deadline: March 1, 2006**<br>**Hearing Date: TBD**<br>**Re: Docket No. 9315** |

| PD CLAIM # | ENTITY / BUILDING |
|---|---|
| 8370 | CONGREGATION OF ST. PHILIP NERI CATHOLIC CHURCH - 6600 Kawanee Ave., Metairie, Louisiana 70003 – School Building (Classroom s/ Administration) |

## RESPONSE OF CONGREGATION OF ST. PHILIP NERI CATHOLIC CHURCH TO DEBTORS' FIFTEENTH OMNIBUS OBJECTION (SUBSTANTIVE) TO ASBESTOS PROPERTY DAMAGE CLAIMS

Comes now CONGREGATION OF ST. PHILIP NERI CATHOLIC CHURCH ("Claimant")[1] and files this response to Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims ("Fifteenth Omnibus Objection") and would show as follows:

## I. CLAIMANT'S RESPONSES TO DEBTORS' OBJECTIONS TO PROOFS OF CLAIM

In April 2002, the Bankruptcy Court, after protracted debate and hearings, ordered Property Damage Claimants to file a Proof of Claim for each building at issue. This Order and the claim form approved by the Court required specific information to be provided regarding each building, including, but not limited to, the date of construction, the date that Debtors' asbestos-containing materials ("ACM") were installed, the identity of the specific Debtors' ACM installed in the building, the actions taken that impacted the Debtors' ACM, and any bulk and/or air sampling taken in such buildings. In addition to the information required in the Proof of

---

[1] Attached hereto as Exhibit A is a list of claims filed by Claimant, the claim number, identity of the building and the specific objections filed by Debtors.

Claim, Claimants were to also provide copies of any documents relating or referring to the installation of the Debtors' ACM in the building, the presence of asbestos in the building, and to efforts to remove, contain and/or abate the Debtors' ACM. If the requested documents were too voluminous, Claimants were allowed to attach a summary of the documents, including the name of each document, date of each document, a brief description of each document, the location of each document, and who has possession and control of each document.

In June, 1983, Claimant first became aware of the existence of asbestos in the products at issue as a result of bulk sample analysis performed by the Physics Department of Southern University. Claimant did not take any remedial action at that time, or plan for the same, concerning this asbestos-containing material, as none was deemed necessary at that time.

Also in 1983, without the knowledge or participation of Claimant, a national class-action was filed in the United States District Court for the Eastern District of Pennsylvania against the Debtor and many other asbestos manufacturers on behalf of all of the nation's public school districts and private elementary and secondary schools (the "National School Class Action").[2] As to school building owners seeking punitive damages, the District Court certified a mandatory class action, which prevented Claimant and similarly situated public and private schools in the nation from opting out of the National School Class Action. Not until 1986, following appellate review by the Third Circuit Court of Appeals, was the Order certifying the mandatory class action vacated, and Claimant was allowed to pursue its claims on its own behalf in a different suit.[3]

---

[2] In Re: Asbestos School Litigation, Master File No. 83-0268, U. S. District Court for Eastern District of Pennsylvania.

[3] See *In re School Asbestos Litigation,* 789 F.2d 996 (3rd Cir. 1986). The Third Circuit affirmed the District Court's order certifying an opt-out class for those claimants seeking compensatory damages, and vacated the District Court's order certifying the mandatory class for those claimants seeking punitive damages.

The Louisiana Legislature, in 1985, enacted a specific statute involving the prescriptive period (statute of limitations) allowed for asbestos claims. The statute, effective September 6, 1985, was codified as La. R.S. 9:5644 (the "Louisiana Asbestos Act"). This Act, as will be set forth in greater detail below, generally provided that a party seeking to recover for the cost of abatement of asbestos-containing materials has five (5) years to bring suit from the date that such party completed the abatement work or discovered the identity of the manufacturer of the materials which require abatement, whichever later.

On October 22, 1986, President Reagan signed into law the Asbestos Hazard Emergency Response Act (AHERA) of 1986 (PL-519). Under AHERA, the Environmental Protection Agency (EPA) was directed to promulgate regulations by October 17, 1987, to provide a framework for addressing asbestos problems in public and private elementary and secondary schools. The regulations were effective December 14, 1987. As a result, inspections were now required by accredited inspectors to examine each building in all areas to identify the location of all ACM.

Even during such period of time that Claimant learned of the existence of asbestos in its building(s), the Claimant had not been able to identify the manufacturers of the various materials. As a result of the above, besides General Counsel, Claimant retained additional counsel, Martin Dies, who represented cities, counties, housing authorities and states and their universities, colleges, agencies and departments to determine the course of action and possible legal remedies. In that connection, efforts began to determine the manufacturers of various materials involving ceiling applications and fire-proofing applications. In preparing for filing a lawsuit, additional efforts were made with the assistance of Martin Dies to determine the manufacturer of these asbestos-containing surface treatment materials. As a result of such efforts, a lawsuit was filed on August 31, 1988, by Claimant, along with the Roman Catholic

Archdiocese of New Orleans, and several Louisiana school governing authorities in the United States District Court for the Eastern District of Louisiana.[4]  In the course of the lawsuit in the Eastern District of Louisiana, bulk samples of suspect materials in the Claimant's building(s) at issue were taken in 1989, and were later subjected to micro-chemical analysis, that confirmed the presence of asbestos and which identified Debtor as the manufacturer of the ACM.

In this proceeding, Claimant was asked to produce documentation regarding product identification, as well as building-specific information required by the Court for each building identified as containing Debtors' ACM. Although all of such documents in existence have previously been produced to Debtors in the underlying Louisiana lawsuit, another exhaustive review of these construction and abatement-related documents was undertaken for this proceeding.  The representatives of the Claimant and its counsel have spent a very significant number of hours attempting to locate, review and copy responsive documents that contain information requested by Debtors.   This would include, but is not limited to, plans, specifications, original construction documents, and renovation-related documents. Documents referring or related to the management and abatement of Debtors' ACM were also reviewed and relevant portions copied.  These documents also included asbestos building surveys, asbestos operations and management policies, and testing results identifying the Debtor as the manufacturer of the asbestos present in the facilities.[5]

On July 19, 2005, this Court entered an order which waived various provisions of Local Rule 3007-1, thereby allowing Debtors to file Gateway Objections regarding a) claims with substantially incomplete Proof of Claim Forms; b) claims that contain materially insufficient supporting information; c) claims that fail to include product identification information;

---

[4] This lawsuit remains pending in the U. S. District Court, Eastern District of Louisiana as Suit No. 88-3824. However, proceedings are stayed as a result of the bankruptcy of the Debtor.
[5] Many of the documents requested were prepared over thirty-five years ago and may have been destroyed or misplaced during the intervening time.

d) claims that are barred by applicable statutes of limitations or repose; e) claims that are barred by laches; and f) claims that are barred by prior settlements. However, the Court's Order further provided that, prior to asserting any objection to a claim on the basis of Materially Insufficient Supporting Information, Debtors must serve written notice of their intent to object to such claim. To the best of Claimant's knowledge, Claimant did not receive any such notices of intent to object to the claim(s) of Claimant.

## II.    DEBTORS' OBJECTIONS TO CLAIMANT'S CLAIMS

### A.    Debtors Have Failed to Identify the Specific Objections to Claims

On September 1, 2005, Debtors filed their Fifteenth Omnibus Objections to Asbestos Property Damage Claims. The exhibits referenced in Debtors' objections which identified the particular claimant and applicable objections, were not served until October 3, 2005. Because of the arrival of Hurricane Katrina on August 29, 2005, Claimant was not in a position to respond. At that time, counsel for Claimant was without telephone or internet services and the Claimant's facilities were uninhabitable. As a result, Claimant has been granted an extension to respond to the objections until March 1, 2006.

In most instances, Claimant could determine the specific objection asserted by Debtors. In some instances, it is impossible because Debtors state their objection in the alternative. For example, Debtors assert that certain claims of Claimant failed to have attached requested documents. *See* Exhibit C-2. In this regard, Debtors assert that

> Claimant (1) indicated it had documentation relating to the purchase and/or installation of the product on the property but did not attach those documents or a summary of them; or (2) indicated it made an effort to remove, contain and/or abate the Grace product for which the claim is made but did not attach documents or a summary of them relating to such efforts; and/or (3) did not attach documents relating to the purchase and/or installation of the product in the property and did not attach documents relating or referring to the presence of asbestos in the property for which the claim is made.

In instances such as this, it is impossible for Claimant to know exactly what objection is made.  If Debtors claim that relevant documents or summaries have not been provided, they should identify them rather than state alternative propositions, which make it impossible to determine the exact nature of the objection.

### B.    Debtors Are Not Entitled to Have Claims Expunged or Disallowed

Debtors request that the claims identified in Exhibit "A-1" through "H-1" of their Fifteenth Omnibus Objection be disallowed and expunged, except as otherwise expressly noted in their objections (Omnibus Objections, Conclusions, p 67).   Claimants would show that a) Debtors have failed to comply with the Gateway Objection Order; and b) the alleged failure of Claimants to produce documents or summaries is not dispositive of Debtors' liability and therefore does not justify disallowance.

### 1.    Debtors' Failure to Give Notice of Intent to file Gateway Objections

Debtors assert that claims which fail to provide requested information or documentation should be disallowed and expunged as such failure precludes Debtors from properly preparing objections to such.   Information sought in questions where responses are alleged to be "Facially Incomplete," they argue, is critical to the preparation of their defenses and "where, as here, notice has already been given of the claim's failings and the claimant has still failed to respond adequately – the Debtors cannot evaluate the claim and the claim should be disallowed and expunged" (Fifteenth Omnibus Objection, ¶ 53).  Debtors also assert that claims with insufficient documentation should be disallowed and expunged because "[p]ursuant to this Court's Gateway Objection Order dated July 19, 2004, the Debtors have already served each of these claimants … with at least one notice of intent to object and, therefore, the respective PD Claimants have already had an opportunity to supplement their documentation" (Fifteenth Omnibus Objection, ¶ 59).   These statements are simply incorrect. Claimant, not Debtors, have been prejudiced as a

result of Debtors' failure to follow the procedures outlined by the Court in its Gateway Objection Order, as this has precluded Claimant from addressing the concerns now raised in these objections. Claimant should therefore be allowed sufficient time to file supplemental information or documentation based on the objections raised.

### 2.    Debtors Have Not Met Their Burden of Proof

A proof of claim is deemed allowed unless a party in interest objects under 11 U.S.C. § 502(a) and constitutes "prima facie evidence of the validity and amount of the claim" pursuant to Bankruptcy Rule 3001(f). *See also* Fed. R. Bankr. P. 3007. The filing of an objection to a Proof of Claim "creates a dispute which is a contested matter" within the meaning of Bankruptcy Rule 9014 and must be resolved after notice and opportunity for hearing upon a motion for relief. *See* Adv. Comm. Notes to Fed. R. Bankr. P. 9014.

The Debtors' objections to the Claimants' Claims listed in Exhibit C to the Omnibus Objection, which are based on the contention that the Proofs of Claim filed in respect to such claims were "facially incomplete," are without any basis in the law. The rubric for proofs of claim and objections thereto were articulated by the Third Circuit Court of Appeals in *In re Allegheny International, Inc.*, 954 F.2d 167 (3rd Cir. 1992), as follows:

> The burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A. §502(a) rests on different parties at different times. Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is '*prima facie*' valid. [citations omitted.] In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. The burden of going forward then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim. It is often said that the objector must produce evidence equal in force to the *prima facie* case. [citations omitted.] In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. [citations omitted.]

954 F.2d at 173-74.

Thus, the pertinent inquiry is whether the Proofs of Claim filed by Claimants sets forth sufficient evidence of a claim against the Debtors, not whether the Proofs of Claim provide sufficient information for the Debtors to formulate their defenses and objections to the claim. If it does, the burden of production shifts to the Debtors to produce evidence that the claim is invalid, regardless of whether it would be useful for the Proofs of Claim to provide additional information for the Debtors to assess their defenses, as such information is obtainable in discovery.

The omission of some information in the Proofs of Claim by Claimants is not sufficient grounds for the disallowance of any Claimant's claim, which otherwise makes a prima facie showing of the Debtors' liability. Said another way, Claimants' claims may only be disallowed for one or more of the nine grounds for disallowance enumerated in Section 502(b) of the Bankruptcy Code. *In re Taylor*, 289 B.R. 379, 384 (Bankr. N.D. Ind. 2003). Indeed, the Court has no discretion in this regard and cannot disallow a claim for reasons beyond those stated in the statute. *Id.* None of the grounds for disallowance set forth in Section 502(b) involves the failure to provide information beyond that which establishes a prima facie claim against the Debtors' estates. *In re Guidry*, 321 B.R. 712 (Bankr. N.D. Ill. 2005).

The Debtors' objections are clearly premature and without basis. Until the Debtors come forward with specific evidence and authority to refute the Claimants' Claims, it is presumed that these properly filed Claims are valid. *See Lundell v. Anchor Construction Specialist, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000).

III.    **CLAIMANT'S RESPONSE TO DEBTORS' FACTUAL ALLEGATIONS REGARDING THE HISTORY OF GRACE PRODUCTS AND USES**

A.    **Grace's Asbestos-Containing Surface Treatment Material ("Surface Treatment ACM") is Classified as Friable by the EPA**

Grace argues that its Surface Treatment ACM is "cementitious" and therefore does not release asbestos fibers during normal and foreseeable building operations. Nothing could be further from the truth. One need look no further than the statements of the EPA to see that such statements are absurd.

Grace's Surface Treatment ACM is classified as "friable" Surface Treatment ACM by the EPA. Thus, even though Grace characterizes Mono-Kote as "cementitious" material, Mono-Kote is nevertheless considered by the EPA to fall within the definition of friable surface treatment.[6] According to NESHAPs, friable materials are those likely to readily release fibers "… when dry … can be easily crumbled, pulverized or reduced to powder by hand pressure … reduced to powder mean(s) … changed to a dust or powder that **can become airborne.**"[7] Further, "**ACM that is sprayed or troweled on ceilings and walls is often the main source of airborne asbestos in the building ….**"[8]

B.    **Grace's Objections to Claimant's Product Identification Reports Are Without Merit**

1.    **Grace's Surface Treatment ACM was Manufactured Pursuant to Grace's Formula and Mixing Instructions by Twenty-Three Licensee Plants Throughout the Country**

In April 1963, Grace purchased the Zonolite Company. After purchasing Zonolite, Grace immediately began selling the Zonolite brand of Surface Treatment ACM through its construction products division. Grace's Surface Treatment ACM products, which primarily

---

[6] *See Guidance For Controlling Asbestos-Containing Materials In Buildings* ("Purple Book"), EPA 560/5-85-024, June 1985, Chapter 2, Sec. 2.2.2, at pp. 2-4, "Friable forms (Surfacing materials) are either … fibrous … or granular and cementitious …."

[7] EPA Part III (40 CFR Part 61 – NESHAPs Revision:  Final Rule) Tuesday, November 20, 1990.

[8] *Ibid.* "Purple Book," Ch. 3, Sec. 3.3.1, at pp. 3-2.

consisted of two types described below, were predominant in the United States construction industry and are uniquely identifiable because of their three primary ingredients. The two types of Grace Surface Treatment ACM were:

> (1) Fireproofing and acoustical ACM with the primary ingredients vermiculite, chrysotile asbestos, and gypsum, which were sold predominantly under the trade names Zonolite Mono-Kote 1 ("MK-1"), and Mono-Kote 3 ("MK-3"), and also sold as Spra-Insulation, Z-Tex (aka EZ-Tex), Zono-Coustic (aka "Zonocoustic") and Hi-Sorb Acoustical Plaster or Oyster White Hi-Sorb (collectively referred to as "Mono-Kote"); and

> (2) Acoustical plaster ACM with the primary ingredients vermiculite, chrysotile asbestos, and bentonite clay, which were sold predominantly under the trade names Zonolite Acoustical Plaster or Plastic ("ZAP") and Zonolite Finish Coat (collectively referred to as "ZAP").

Both Mono-Kote and ZAP incorporated vermiculite mined by Grace primarily at Libby, Montana,[9] and they were manufactured according to Grace's specifications at vermiculite expansion plants owned and operated by twenty-three separate Grace Licensees across the country. These Licensees included, among others, Texas Vermiculite Company ("Texas Vermiculite"), Ari-Zonolite, Inc., Vermiculite-Northwest, Inc., California Zonolite/Diversified Insulation, Vermiculite of Hawaii, Inc. ("Vermiculite of Hawaii") and Western Mineral Products Company ("Western Mineral") (collectively referred to as "Licensees"). Texas Vermiculite's plant was located in Dallas, Texas. Vermiculite of Hawaii's plant was located in Honolulu, Hawaii. Other Grace Licensee plants were located throughout the United States, Canada and in other countries.

### 2. The Constituents and Their Proportions as Identified in a Bulk Sample of In-Place Grace Surface Treatment May Vary From the Formula List Prepared by Grace's Counsel For Its Litigation Defense

Grace provided its Licensees with product formulas and mixing instructions for manufacturing Mono-Kote and ZAP in batches of hundreds of pounds and with a specifications

---

[9] Grace also had a much smaller vermiculite mine in South Carolina which provided at least some of the vermiculite used in its South Carolina manufacturing operations.

list of approved vendors from which the Licensees were to purchase the raw materials required by the formulas. Grace's manufacturing formulas measured the primary ingredients by weight, as these raw materials were generally sold by vendors in bags of 50 to 100 pounds. The **primary** ingredient supplied by Grace was vermiculite, added either according to weight or by cubic feet, which was shipped to the Licensees from Grace's Libby Montana mine and expanded in furnaces in the Licensee's plants before being used in these products. In litigation, Grace's longtime product identification expert, Dr. Richard J. Lee, has repeatedly testified that he has never seen or been provided copies of the actual formulas, instructions and specifications used by Grace's Licensees in manufacturing the products. Instead, he has uniformly relied upon a list of Grace ACM products with percentages of ingredients, which he identifies by volume rather than weight, and which he believes were extrapolated from actual Grace manufacturing formulas by one or more attorneys from a law firm that represented Grace. This litigation formula list as it has been amended or added to over time by Grace's attorneys, has been the basis of his opinions as to whether the ingredients he found in bulk samples of in-place ACM were or were not "consistent with" Grace's "formulas."

Some variation in Grace's Surface Treatment ACM products as commercially manufactured according to the formulations and instructions provided by Grace was foreseeable and inevitable. These variations often involved the amount or percentage of the raw ingredients as specified in Grace's formulas, or the inclusion of impurities that occur naturally in the mined raw materials (such as tremolite asbestos in Grace's vermiculite, or quartz accompanying gypsum or bentonite) or contaminants from the Licensee's use of the same industrial equipment to manufacture both types of products (*i.e.*, the Mono-Kote products containing gypsum and the ZAP products containing bentonite). Grace's own analysis of bulk samples of its surface treatment materials from the Construction Products Division - Denver plant found ingredients

that were not listed in the Grace manufacturing formulas. Dr. Yang, a longtime Grace research employee, duly noted on one such report that "numerous XRD analysis have been made due to the presence of some unidentifiable compounds ...."[10] Some variation from the actual formulas was a reality given these types of building products, the raw material ingredients whose very specifications anticipated they would contain a certain percentage of contaminants, the manner in which they were manufactured, and the absence of a quality assurance program uniformly administered by Grace over the Licensees.[11]

Some difference in the amount or percentages of particular ingredients also often resulted from actions taken during the application of the Surface Treatment ACM. Grace's employees knew of and sometimes even suggested these actions. For example, applicators may have added chrysotile asbestos to Grace's product at the jobsite. Mono-Kote and ZAP were delivered to job sites in sealed bags. Applicators at the job site opened the bags and poured the dry material into a hopper or mixer where water was added and mechanically mixed prior to spraying the fireproofing or acoustical plaster. According to Grace employees, it was not uncommon for applicators on the jobsite to add additional chrysotile asbestos to aid in the pumping or spraying of the material.[12] Grace was not only aware of the ways in which applicators changed the portions of ingredients in its products, but, in fact encouraged such practices. For example, in a memorandum of test report dated January 9, 1968, Grace concluded

---

[10] "Request for Technical Service," dated 10/20/88, Material Research and Analytical Group, W.R. Grace & Co., Julie C. Yang.

[11] Memorandum from F.L. Veltman to T.G. Gibian, Grace Research Division, dated December 6, 1971, "There are numerous potential causes for problems to erupt in the Mono-Kote business. Notably, Grace has 13 suppliers of gypsum, and the product is manufactured in 23 locations".

[12] Oral Deposition of Thomas Cheatham, Grace employee, taken on December 12, 1991 (Volume I) in *Dayton Independent School District, et al. v. U. S. Mineral Products Company, W.R. Grace & Co. and United States Gypsum Company*, No. CA-B-87-00507 (E.D. Tex). *See* Testimony at p. 163, "... it was not uncommon ... to add asbestos ... it dealt generally with pumping ... they had to play with the recipe."

there is no doubt that Calcium … in the form of gypsum … or lime … was added to (the) Decorator's White Acoustical Plastic at the rate of approximately 10% by weight.[13]

In a memo to C.A. Pratt, the owner of Western Mineral, one of its employees reported that "I have also seen gypsum added to our acoustical plaster in repairing fallouts and it has resulted in an excellent job. I hope that something simple like an additive to … acoustical to make it harder can be found. This will make it so much easier for us in sales to continue selling our present acoustical with an improvement."[14] Thus, variations in the amount of raw ingredients specified by Grace's formulas occurred as a result of application techniques among the various licensees which Grace knew of and sometimes encouraged.

Component variations in bulk samples of in-place Surface Treatment ACM from the original manufacturing formulas also were known to occur because the material sometimes undergoes chemical changes after installation as a result of normal environmental conditions. For example, in March 1955, Western Mineral submitted two samples of ZAP to Twin City Testing Engineering Laboratory ("Twin City") for testing. One sample came from a ceiling from the Southeast High School in Lincoln, Nebraska while the other sample was of ZAP from Western Mineral's Minneapolis plant stock. Western Mineral had submitted the sample from Southeast High School because of a complaint that a discoloration had occurred in the ZAP as applied to the high school ceiling. Twin City reported to Western Mineral that the sample of ZAP from its plant contained no carbonate and no sulfate, and that the sample taken from Southeast High School in Lincoln, Nebraska contained no carbonate but was **very high in sulfate**. Twin City concluded that

---

[13] Zonolite Division of W.R. Grace & Co., Test Result #1444, "Decorator's White Acoustical Plastic From Lake City Junior College and Forest Rangers School, Florida," dated January 9, 1968.

[14] Interoffice Memo from Warren to C.A. Pratt, Western Mineral Products Company, Grace document 25022422.

We therefore believe that the effervescence you mentioned is a calcium sulfate deposited by water leeching through the Gypsum plaster above the acoustical plastic. The moisture causing this leeching could be either the high moister content which is prevalent ... or could be from possible leaks in the roof.[15]

The mere fact that there may be some variations in the percentages of the three primary ingredients in Grace Mono-Kote or ZAP as compared to the formulas, or the presence of minor amounts of raw materials or ingredient contaminants not listed in the formulas, does not preclude such product from having been manufactured by Grace or its Licensees.[16] Even with variations, these Grace products were so predominant and unique within the industry by their formulation using vermiculite, chrysotile asbestos and either gypsum or bentonite, that they remain clearly identifiable as Grace Surface Treatment ACM.

### 3. Grace and Its Product Identification Expert Deliberately Ignore the Product Variations Such That Their Product Identification Analyses Are Consistently Flawed

Since the first asbestos property damage case was filed in the early 1980's, building owners have proved the manufacturer of the ACM in its building by obtaining bulk samples of the in-place ACM. These bulk samples are then analyzed by laboratories such as MAS, who conduct constituent analysis of the sample and, as in the instant case, determine that they are consistent with actual plant formulas and application information for Grace's Surface Treatment ACM.

In prior litigation, Grace has consistently denied that its Surface Treatment ACM was in buildings at issue because the constituents in bulk samples from such buildings either contained small amounts of ingredients that are not listed in Grace's litigation formula list, or contained

---

[15] Twin City report to Western Mineral Products Company re: Southeast High School, Lincoln, Nebraska, dated March 17, 1955; WRG 006192.

[16] Oral Deposition of Ian Stewart, taken on July 14, 1998, in *State of Hawaii v W. R. Grace & Co.-Conn., et al.,* Civil No. 93-4161-10, In the Circuit Court of the First Circuit, Hawaii, an employee of RJ Lee Group and a consultant for Grace testified that the ranges of variation in an analysis of a bulk sample was plus or minus about ten percent (10%). "Very often that will show up in specifications or formulations that are provided. You'll be given a range of acceptable level, something they say it should be about 10 to 15. But generally I allow a little margin [8 to 20 percent] beyond that ..." at p. 69.

Grace's signature key ingredients, but in proportions that differ from those listed in Grace's litigation formula list. The same objections are once again asserted in this matter. *See* Fifteenth Omnibus Objection, ¶ 83, p. 30. Grace was unable to sustain its position in the prior suits, and likewise such objections in the instant case are untenable. In prior litigation, as long as a claimant could show by appropriate expert state-of-the-art product identification analysis that a particular bulk sample from a building at issue contained the signature ingredients of Mono-Kote or ZAP, even if present in percentages which did not precisely match Grace's formulas, Grace inevitably admitted product identification or settled the claim.[17]

In the case, *State of Hawaii v. W.R. Grace*, Grace's longtime product identification expert, Dr. Richard J. Lee, denied that most of the State's bulk samples of ZAP from hundreds of buildings were a Grace product because the scanning electron microscope which he had invented and for which he had programmed the software did not find the "Wyoming montmorillinite" type of bentonite used by Grace in the split bulk samples that he analyzed. MAS had previously reported the bulk samples as representing a Grace product. The Discovery Master ordered that Dr. Lee's microscope and unconventional software, which was not used, much less relied upon by any other laboratory in the country, be produced for analysis by the State's experts. After the State's experts analyzed the microscope and software, and before trial, Grace abruptly settled the case which included payment on all of the buildings Dr. Lee had previously disputed.

Dr. Lee consistently opined that Hawaii's product identification reports, which identified bulk samples of surface treatment material as a Grace product, were incorrect. His opinion was based solely on his comparison of such samples to the Grace litigation formula list prepared and provided by Grace's lawyers. Dr. Lee testified he has never made any effort to acquire

---

[17] Reference is made to state-of-the-art product identification analysis performed by a laboratory, such as MAS which product identification reports, even if initially denied by Grace, were eventually proven correct in thousands upon thousands of bulk sample reports.

knowledge of Grace's actual manufacturing formulas for Surface Treatment ACM or how the products might vary depending on manufacturing or application techniques.

Dr. Lee also conceded that Grace had never provided him with a "sample of known ZAP that (he) analyzed ... to use as a standard for determining whether an unknown bulk sample was ZAP ..."[18]  Instead, Grace provided Dr. Lee a "vial" of vermiculite, which is a primary ingredient of both types of its Surface Treatment ACM, and that he relied on this sample as "being, a, quote, standard for the vermiculite ...."[19]  Under cross-examination, Dr. Lee admitted that he had no knowledge that Grace had a range of different grades of vermiculite which varied from approximately 95.3% vermiculite (with the remainder being contaminant materials) down to approximately 81.3% vermiculite (with the remainder contaminant materials), and that he did not have samples of the other grades for purposes of a standard.[20]

Debtors' assertion that the products in Claimant's building were not manufactured by Grace is incorrect.  Moreover, Dr. Lee's findings and Debtors' objections are flawed as they are based on a litigation strategy developed by Debtors and Dr. Lee which is intentionally designed to eliminate bulk samples clearly containing Grace's signature ingredients because of certain variables that routinely occur during and subsequent to the application of the Grace Surface Treatment ACM or that are merely artifacts of the type of analysis Grace and Dr. Lee choose to perform.

## C.    Grace's Libby Montana Vermiculite is Contaminated with Tremolite Asbestos

The signature ingredients of Mono-Kote were gypsum, vermiculite aggregate, and chrysotile asbestos and of ZAP were bentonite, vermiculite aggregate and chrysotile asbestos. As

---

[18] Oral Deposition of Richard Lee, Ph.D., taken on October 15, 1998 in *State of Hawaii v W. R. Grace & Co.-Conn., et al.,* Civil No. 93-4161-10, In the Circuit Court of the First Circuit, Hawaii, at p. 1201.
[19] *Ibid.,* p. 1205.
[20] *Ibid.,* p. 1224.

previously discussed, the vermiculite supplied by Grace came from its Libby, Montana mine. This vermiculite is contaminated with tremolite asbestos. Tremolite is amphibole asbestos and is also recognized as a potent carcinogen. Thus, it is important to recognize that dust released from Mono-Kote or ZAP contains not only chrysotile asbestos which was an additive to the formulas, but may also contain tremolite asbestos. High levels of tremolite present in vermiculite dust are released during the manufacturing process of Mono-Kote. This continued to pose problems in the plants long after chrysotile asbestos was eliminated as an additive in 1973 pursuant to federal law.[21] Hence, there can be no question that an exposure to a Grace Surface Treatment ACM may include both chrysotile and tremolite exposure.

**D.    Grace's Licensees Continued to Manufacture and Sell ZAP on an On-Going Basis Post-1969**

Grace has asserted that "with rare exception Grace stopped selling acoustical plaster containing asbestos in 1969 ..." (Fifteenth Omnibus Objection, ¶ 92, p. 32). This is utterly false. Grace's Licensees continued to manufacture and sell acoustical asbestos-containing products right up to, and even past the July 1973 EPA ban. In fact, ZAP was the most popular Grace product even as late as 1971.[22] Curtis Gibson, the plant manager of Texas Vermiculite, testified that he received a memorandum from Mike Moran, president of Texas Vermiculite, to eliminate asbestos from the products, **"during the (1973) time frame"**.[23] Likewise, Stephan Sheeran, a sales representative for Texas Vermiculite, stated that "the Dallas plant shipped material to job

---

[21] Oral Deposition of Curtis Gipson taken on January 27, 1992, in *Dayton Independent School District, et al. v. U.S. Mineral Products Company, W.R. Grace & Co. and United States Gypsum Company*, No. CA-B-87-00507 (E.D. Tex). Tremolite exposure was a "continual concern ..." in the Dallas plant. *See* Ex. 4, Memo from Grace Cambridge, "... We are investigating further to determine the cause of this unacceptable level of tremolite in the air ..." at p. 177.

[22] *Ibid.*, Deposition of Curtis Gipson, p. 28.

[23] *Ibid.*, Deposition of Curtis Gipson, p. 136.

sites into **June** of **1973**."[24]  This is particularly revealing since Texas Vermiculite was the only

Licensee that was majority owned by W.R. Grace.

John York, who was president of another major Grace licensee, Vermiculite of Hawaii,

testified that submittals from his office for ZAP which were dated **April 27, 1972** and **August 7,**

**1972**, related to "acoustical plastic" that was installed at Honolulu International Airport

**subsequent** to the date of the submittals.[25]  Mr. York further testified that Mono-Kote 3 was also

manufactured and shipped to the airport by Vermiculite of Hawaii during the same period.  The

amounts of Grace Surface Treatment ACM required for installation at the Honolulu International

Airport were so large, that in addition to the large quantities supplied by Vermiculite of Hawaii,

additional bags of Surface Treatment ACM was shipped from mainland Grace Licensees direct

to the jobsite in Hawaii.[26]  In a letter dated May 15, 1974 to a potential customer in San

Francisco, Mr. York offered to supply asbestos-containing **ZAP** as long as he received "fourteen

days lead time to fill an order."[27]  Mr. York also testified that during the entire time that

Vermiculite of Hawaii was a Licensee for Grace's Surface Treatment ACM, such Grace products

had the dominant market share in Hawaii.[28]

William V. Culver was employed as district manager for W.R. Grace Construction

Products Division from 1966 to 1973 for the area that included the states of Oregon,

Washington, Alaska, the Panhandle of Idaho, and North and Western Montana.[29]  All of Grace's

Vermiculite products were manufactured at the Vermiculite Northwest plants located at Portland,

---

[24]*Ibid.*, Deposition of Stephan John Sheeran, p. 17; *see also* Exhibit 5-A which shows that Texas Vermiculite shipped MK-3 to Oklahoma, as well.

[25] Oral Deposition of John C. York, taken on April 14, 1999, in *State of Hawaii v. W.R. Grace & Co., et al.,* Civil No. 93-4161-10 (1st Cir. Ct. Hawaii) at pp. 74, 75, 76 and 77.

[26] *Ibid.*, Deposition of John York, pp. 15, 16, and 78.

[27] Letter from John C. York, President of Vermiculite of Hawaii, to Buddy Redmond dated May 15, 1974.

[28] *Ibid.*, p. 13 (Vermiculite of Hawaii continued to operate as a Grace Licensee through at least April 1982 – *Ibid.,* p. 82).

[29] Deposition of William V. Culver taken on December 12, 1988, in *The 3250 Wilshire Boulevard Building, et al. v. Metropolitan Life Insurance Company, et al.*, No. 87-06048 WMB (CHKX), in the United States District Court for the Central District of California at p. 10.

Oregon and at Spokane, Washington.[30] Mr. Culver testified that in **March 1972** it continued to be his "responsibility to sell as much of the Grace products …" as he could.[31]

As a practical matter, it remained business as usual and the Licensees were trying to sell as much of the product as they could before the July 1973 cutoff date. Claimant believes that additional discovery will further confirm that Grace's contention is not supported by the facts.

### E.      Grace's Knowledge of the Health Hazards of Asbestos

The body of facts representing Grace's longstanding knowledge regarding the hazards of the asbestos in its Surface Treatment ACM is far too voluminous to set forth in this response. However, Grace's knowledge of the health hazards associated with asbestos date back to the 1930's through it ownership of the Dewey and Almy Chemical Co. and Multibestos Company, who, in turn, acquired the Walpole Asbestos Carding Factory in 1931, through its purchase of the Zonolite Company (collectively referred to as "Grace") and its operation of the Libby Montana vermiculite mine.   This knowledge was acquired well before its ACM was installed in Claimants' buildings.  Grace therefore knew that its ACM was defective, and would result in asbestos fibers (both chrysotile and tremolite) being released into the air to be breathed and inhaled by building occupants.  Grace was also aware of the grave health hazards associated with inhalation of asbestos fibers.  Yet, as previously discussed, Grace not only did not disclose the asbestos content of its ACM, it also failed to provide any cautions or warnings whatsoever in connection with the products' asbestos hazards.

### F.      Grace's Efforts to Prevent Building Owners From Removing Surface Treatment ACM and/or Seeking Cost Recovery From Grace

Despite Grace's intimate knowledge of the hazard of its Surface Treatment ACM, from at least the early 1950's, Grace has been a primary sponsor of a massive public relations effort to

---

[30] *Ibid.*, pp. 45, 46.
[31] *Ibid.*, p. 180.

convince building owners, the public, and regulatory and legislative bodies, that its Surface Treatment ACM presents no hazard to building occupants and should not be removed. Grace's efforts were channeled through the activities of the "Safe Buildings Alliance (the "SBA")," an organization composed of former leading building material companies which formerly manufactured ACM building products.[32]

Working through the SBA, Grace has acted on many fronts to: (1) reduce the members' liability to building owners for property damage asbestos claims by encouraging building owners to forego the removal of asbestos based upon incorrect and/or misleading scientific and technical information; and (2) to lobby and influence Congress, state legislatures, and federal and state regulatory agencies to limit removal of in-place ACM. SBA literature was sent to building owners across the country, entities managing buildings, and the public in general asserting that there was no hazard associated with the use of in-place ACM during normal building activities such as manufactured by Grace. At the same time, SBA launched massive litigation to have courts set aside the laws and regulations dealing with in-place ACM such as AHERA and NESHAPs.[33]

Grace's representations to building owners were false and misleading, and were intentionally designed to prevent building owners from taking actions to remove and/or replace the Grace Surface Treatment ACM and to prevent or suppress legal actions against them. For example, Grace hired former Gov. Hugh Carey as an Executive Vice President for the "newly established" "Office of Environmental Policy". Gov. Carey's function apparently was to lobby Congress, state legislatures and the EPA to pull back with regard to their policies intended to minimize the hazards of in-place ACM. His testimony provided to Congress was not modest in

---

[32] Members of the "Safe Buildings Alliance" include W.R. Grace & Co., the Celotex Corporation and United States Gypsum Company.

[33] See Safe Bldg. Alliance v. E.P.A., 846 F.2d 79 (D.C. Cir. 1988).

its attempts to create the impression that Grace's in-place ACM was safe, "In fact these products were specified under national and state building codes to protect human life and safety ... when Grace manufactured these products, we believed then – as we believe now—that properly installed and maintained asbestos-containing fireproofing does not endanger building occupants."[34]

Contrast Gov. Carey's statement with the testimony of Walter Payment, Grace Research Director, that the reason for the use of asbestos in the (Mono-Kote) fireproofing had nothing to do with a fireproofing purpose, but rather was added to the product to increase "pumpability," or, in other words, to increase the profitability of the product.[35] Mr. Payment testified that Grace knew that by 1969 the asbestos in Mono-Kote provided no increased fireproofing ability to Mono-Kote. Grace could have easily determined this fact, if they had wanted to, by the early 1960's.[36] Yet Grace was still repeating the falsehood that Grace developed its Mono-Kote fireproofing "to protect human life and safety" almost 20 years after Mr. Payment says he had determined as Grace's Research Director that this claim was false! Grace also made similar written misrepresentations directly to building owners, architects and to the public. This example is merely the tip of the iceberg of deceit with regard to Grace's attempts to mislead building owners to neither remove their ACM, nor to seek legal damages from Grace for their damages. Grace should not now be allowed to avoid liability by claiming that building owners failed to timely file suit where it has intentionally for years sought to prevent claimants from pursuing causes of action based on such representations.

---

[34] Oral Deposition of Kenneth Young Millian taken March 1, 1992, in *Dayton Independent School District, et al. v. U. S. Mineral Products Co., et al.,* No. B-87-00507-CA (E.D. Tex); *see* Exhibit 22, "Testimony of Hugh L. Carey, Executive Vice President, W.R. Grace & Co., On Behalf Of The Safe Buildings Alliance On The Public Policy Issue Of How To Deal With Asbestos In Buildings, Before The Subcommittee On Hazardous Waste And Toxic Substances, United States Senate, September 27, 1988," Grace document KM006137.

[35] *Ibid.*, Payment Deposition, pp. 74-75.

[36] *Ibid.*, p. 81.

### G. Jury Verdicts and Settlements by Grace in the Underlying Litigation Have Established the Prima Facie Validity of PD Claims

For almost twenty-five years property damage claimants have recovered their damages against Grace through litigation in various state and federal courts. Not only have such courts consistently found Grace to be liable under principles of state law, Grace's conduct in connection with its sale of Surface Treatment ACM has been found to constitute gross negligence entitling the claimant to punitive damages. In *City of Greenville v. W. R. Grace & Co.*, the City was awarded millions of dollars in compensatory and punitive damages related to Mono-Kote fireproofing in the Greenville, South Carolina City Hall, which had to be removed because of the hazard posed.[37]

The numerous underlying cases which have held Grace liable for their Mono-Kote and/or ZAP ACM are reported and are part of the record in this case. As a matter of record, Grace has paid several hundred million dollars in settlement of claims of various governmental entity claimants similar in all pertinent aspects of knowledge, bulk sample constituents and expert findings to the Claimant.[38]

### H. Claimant's Causes of Action

Claimant seeks to recover the costs that it has incurred or will be forced to incur in maintaining, removing and replacing the Debtors' Surface Treatment ACM from its building(s). It asserts state law causes of action, including breach of express and implied warranty, civil conspiracy, fraudulent concealment and misrepresentations, negligence, nuisance and strict

---

[37] *See City of Greenville v. W. R. Grace & Co.*, 640 F. Supp. 559, *aff'd*, 827 F.2d 975 (4th Cir. 1987). *See also The Corporation of Mercer University v. National Gypsum Co., et al.*, No. 85-126-3-MAC (M.D. Ga. 1986) (reversed on a Certified Question to the Georgia Supreme Court by the Eleventh Cir. on grounds involving the applicability of the Georgia statute of repose).

[38] *See Dayton Independent School District, et al. v. W.R. Grace & Co., et al.*, Civil No. B-81-277-CA consolidated with Civil No. B-81-293-CA; *Dayton Independent School District, et al. v. U. S. Mineral Products Co., et al.*, No. B-87-00507-CA (E.D. Tex.); *Kirbyville Independent School District, et al., Individually, and on Behalf of All Texas Political Entities v. Asbestospray Corporation, W. R. Grace & Co.-Conn., and United States Gypsum*, No. 1:94CV412 (E.D. Tex.); *The State of Utah, et al. v. W. R. Grace & Co.-Conn., et al.*, No. 940906356, In the Third Judicial District Court, Salt Lake County, State of Utah; *State of Hawaii v W. R. Grace & Co.-Conn., et al.*, Civil No. 93-4161-10, In the Circuit Court of the First Circuit, State of Hawaii.

liability/products liability. These causes of action not only arise out of acts and omissions that took place before and at the time of the sale and installation of Grace's Surface Treatment ACM, but also acts and omissions that occurred after the sale and installation of such products.[39]

### I.    Preservation of Discovery Rights

Claimant has discussed only a small fraction of the evidence that would and will be further explored through discovery in connection with Debtors' objections. Claimant preserves and does not hereby waive its rights to obtain further discovery from Debtor once Debtor clarifies the basis of said objections, most of which are simply contentions with no supporting facts or foundation whatsoever.

## IV.    CLAIMANT'S RESPONSES TO DEBTORS' OBJECTIONS

Debtors have alleged numerous objections to Claimant's claims, including, but not limited to, a) the PD claims provide insufficient information; b) the PD claims are brought too late; and c) the PD Claims provide no proof of hazard. Claimant's response to each such objection follows:

### A.    Missing Basic Information About the Property at Issue (Grace Ex. C-1(d))

The Debtors object to Claimant's claim(s) on the ground that the "PD Claim Form fails to provide information relating to the Claimant's knowledge ..." (the "C-1(d) Objection"). Debtors allege that the Proof of Claim(s) "does not provide one or more of the following: (1) information regarding prior asbestos-related property damage lawsuits or claims for the property; (2) the date that the product at issue was installed at the property; (3) the date that the claimant learned that

---

[39] In regard to Claimant's allegations of continuing duty to warn, Claimant alleges that even after the Debtors' Surface Treatment ACM was installed in Claimant's buildings, Grace learned of additional information concerning the hazards of its Surface Treatment ACM, and yet failed to warn Claimant, other building owners, and the public in general of such hazards. Faced with this new and additional information, Grace not only failed to warn Claimant of such, it also embarked on a "public relations" campaign whereby it affirmatively misrepresented to Claimant, other building owners and the public in general that its Surface Treatment ACM was safe for continued use in buildings and that they posed no hazard to building occupants, and that no further corrective actions were necessary.

the product at issue contained asbestos; or (4) the date the claimant learned of the presence of asbestos on the property." For the reasons set forth in Section II as well as those below, Claimant requests that this objection be denied.

Debtors do not provide clear information regarding what information Debtors believe is missing from the Claimant's claims regarding "knowledge" of these matters. In fact, Claimant is left to guess as to which of these four categories of information Debtors contend was not supplied by Claimant with respect to these claims. Accordingly, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further clarification is provided by Debtors. Clearly, Debtors have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I), which makes it difficult, if not impossible, for Claimant to understand what documentation Debtors believe is missing from Claimant's claim.

Counsel for Claimant has reviewed the Proof of Claim for Claim No. 8370 (Congregation of St. Philip Neri Catholic Church), and has determined that Claimant inadvertently failed to answer Part 4, Sub-part A, Question Nos. 1 and 2 of the Proof of Claim. These questions ask Claimant whether Claimant has ever filed any asbestos-related property damage lawsuit or claims against Grace or any other party relating to the property at issue. Although Debtor states that it served on Claimant a Notice of Intent to Object (pursuant to the Court's Gateway Objection Order dated July 19, 2004), to the best of Claimant's knowledge, Claimant never received any such notice. Had such a notice been served, Claimant would have much earlier provided the supplemental information responsive to this question. In any event, Claimant has already provided the Claims Agent and counsel for Debtors with a Supplemental Information to Asbestos Property Damage Claim Form, which contains the responses to the question referenced herein. Moreover, Claimant has previously identified in Part 4, Sub-part B that Claimant has

filed such an asbestos-related property damage lawsuit against W.R. Grace and other parties. Accordingly, the inadvertent failure to provide the information sought has not prejudiced Debtors, as Debtors are now (and in fact always have been) in possession of such information. Accordingly, this objection should be denied.

**B.    Claims With Insufficient Documentation (Grace Ex. C-2)**

The Debtors object to Claimant's claims on the grounds that Claimant provided insufficient supporting documentation of the claim and that the claim has at least one of the following deficiencies:

> A.    The claimant indicates that it has documentation "relating to the purchase and/or installation of the product on the property" but did not attach these documents or a summary of them;
>
> B.    The claimant indicates that "it made an effort to remove, contain and/or abate the Grace product for which you are making the claim" but did not attach documents or a summary of documents relating or referring to such efforts; or
>
> C.    The claimant did not attach documents or a summary of documents "relating to the purchase and/or installation of the product in the property" and did not attach documents or a summary of documents "relating or referring to the presence of asbestos in the property for which you are making this claim."

For the reasons set forth in Section II and those below, Debtors' objection should be denied.

Debtors do not provide clear information regarding what documentation the Debtors believe is missing from the Claimant's claims. In fact, Claimant is left to guess as to which of these three categories of information Debtors contend was not supplied by Claimant with respect to these claims. Accordingly, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further clarification is provided by Debtors. Clearly, Debtors have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I), which makes it difficult, if not impossible, for Claimant to understand what documentation Debtors believe is missing from Claimant's claim.

If Claimant had documentation that relates to the purchase, installation or abatement of Debtors' products in the buildings at issue, such documents, or a summary thereof, have been provided to Debtors. In fact, to the extent that documentation responsive to this objection exists and is in the possession of Claimant, such documentation has either been produced to Debtors or a summary thereof attached to the Proof of Claim. In the event that Debtors advise Claimant of the documentation that it contends was not provided, Claimant will endeavor to locate such documentation, to the extent that it still exists, and provide the same to Debtors in a timely manner.

## C.   Inconsistent Product Identification (Grace Ex. C-3(f))

The Debtors object to Claimant's claims on the grounds that they are invalid because they are accompanied by bulk sampling data that is inconsistent with a Grace product (the "C-3(f) Objection").[40]   For the reasons set forth below, Claimant requests that this objection be denied.

Debtors have failed to provide "sufficient detail as to why the claim should be disallowed," Del. Bankr. LR 3007-1(e)(iii)(I), and this makes it difficult, if not impossible, for Claimant to understand what documentation Debtors believe is missing from Claimant's claims. In any event, the actual percentages of particular ingredients that comprise Grace's asbestos-containing products have varied throughout the time during which they were manufactured.    Not only did the ingredients and the proportions used in these asbestos-containing products often vary from facility to facility, they also varied year to year in the same facility.

Debtors are also aware that ingredients not contained in their products are often present in bulk sample analysis.  For example, Debtors' ACM that is used for acoustical or decorative

---

[40] Debtors allege that the bulk sample results "either (i) indicate that the product found at the building was missing a key ingredient that would have been found if the product at issue was manufactured by Grace; (ii) contain ingredients that are not found in Grace product; (iii) contain key ingredients but in the wrong proportionality of those used by Grace; or (iv) provide data insufficient to determine consistency with a Grace product."

purposes is typically painted by building owners after a number of years. Bulk samples of this material will often include paint, and the bulk sample analysis will include ingredients in the paint that are not present in the Debtors' ACM. Additionally, individuals applying fireproofing products occasionally added raw chrysotile asbestos while mixing such under various circumstances. Thus, the fact that there may be additional ingredients in the bulk sample or more of a certain ingredient does not preclude such from being the Debtors' ACM. *See* discussion, Section III.B above (Debtors' assertion that it did not manufacture the ACM in Claimant's building because of the date of installation, variances in the constituents, or the percentages of the constituents is without basis).

Debtors also state that "because of the size of this Fifteenth Omnibus Objection, the Debtors' analysis of bulk sampling results attached to the claimants' PD Claims is not attached as an Exhibit," but will be made available upon request. The Claimant has made such a request, and is entitled to review and conduct discovery regarding the same before this objection is considered. More specifically, Debtors must disclose and provide proof of what "key" ingredients are missing, what ingredients that are not found in Grace products are present, what key ingredients are allegedly included but in the wrong proportionality to those used by Grace, or what data provided is insufficient to determine consistency with a Grace product. Presently, the claims of Claimant are prima facie valid, and Debtors' objection should be denied.

Further, in prior asbestos property damage litigation, experts retained by Debtors to perform constituent analysis of bulk samples designed their software programs and/or calibrated their equipment so as to alter the constituent results. *See also* discussion Section III.B, pp.9-15, Grace's Objections to Claimant's Product Identification Reports Are Without Merit). Accordingly, Claimant is entitled to conduct appropriate discovery regarding the Debtors' bulk

sample analysis reports, the testing methodology used, and the software and equipment used in analyzing the bulk samples at issue.

Even more important, this objection is substantively without basis as Claimant has attached to its Proof of Claim a constituent analysis regarding the asbestos-containing product in the building in issue, which establishes that the ACM in Claimant's buildings was manufactured by Grace. This objection is without merit, and should be denied.

**D.    Claims for Buildings Built Before 1969 (Grace Ex. D-1(c))**

The Debtors object to Claimant's claims on the grounds that any acoustical plaster installed in buildings built before 1969 would have been replaced years ago (the "D-1(c) Objection"). For the reasons set forth below, Debtors' objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection to the Claimant's claims. As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its responses to the extent further information is produced. Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claims, *see In re Allegheny*, *supra*, and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

There are three problems with Debtors' objection: First, the assertion that Grace's acoustical plaster installed prior to 1969 would have been replaced by now is contrary to the representations made in its own sales and marketing literature. Counsel for Claimant has been litigating with Debtors regarding the manufacture and sale of Grace ACM for over twenty years, and this is the first time that they have ever seriously raised this argument. Debtors continually touted the durability of their products in literature provided to architects, contractors and building owners. Second, even if the product has been removed in whole or in part, such removal does not bar Claimant's claim. Claimant would still have incurred significant costs associated with

the maintenance and removal of the acoustical plaster that would not have been incurred if the product was not asbestos-containing. Last, but most importantly, Claimant has submitted evidence that the acoustical plaster in the building(s) in issue was manufactured by Grace. Claimant has already provided to Debtors a constituent analysis which establishes that the ACM in Claimant's building was manufactured by Grace.

**E.    Claims Allegedly Barred by the Statute of Limitations Based Upon Constructive Notice (Grace Ex. D-2)**

The Debtors object to Claimant's claims asserting that such are barred "under the applicable statutes of limitations, based upon the doctrine of constructive notice …" (the "D-2 Objection"). For the reasons set forth below, Debtors' objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection to the Claimant's claims. They have also failed to identify the specific statutes of limitations or decisional rulings that they allege bar these claims. As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further information is produced. Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claims, *see In re Allegheny*, *supra*, and have failed to provide "sufficient detail as to why the claims should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

In the early to mid 1980's, public school districts, as well as private schools, were being made aware of a growing concern about the exposure to asbestos by school children. As a result, and in general, school districts and private schools began the process of inspecting their facilities to determine whether asbestos-containing materials existed in the facilities, and if so, whether any remedial action should be taken. In many instances, school districts and private school owners were simply being advised to encapsulate or paint any potential friable asbestos

containing material so as to prevent any contamination or release from occurring, even if there

was not an immediate hazard being posed by such asbestos-containing materials.

As previously mentioned, in 1983 the National School Class Action was filed, which

included the potential claims of Claimant.   It was also in 1983 that Claimant first learned that

the products at issue in its building(s) even contained asbestos. As to school building owners

seeking punitive damages, the District Court certified a mandatory class action, which prevented

Claimant and similarly situated public and private schools in the nation from opting out of the

National School Class Action, even if its causes of action had accrued.  Not until 1986, following

appellate review by the Third Circuit Court of Appeals, was the Order certifying the mandatory

class action vacated, and Claimant was allowed to pursue its claims on its own behalf in a

different suit. [41]

The Louisiana Legislature, in 1985, enacted a specific statute involving the prescriptive

period (statute of limitations) allowed for asbestos claims.  The statute, effective September 6,

1985, was codified as La. R.S. 9:5644 and provides as follows:

A. Asbestos abatement shall include any of the following:

(1) The removal of asbestos or materials containing asbestos from any building.

(2) Any other measures taken to detect, correct, or ameliorate any problem related to asbestos in a building.

(3) Reimbursement for the removal, correction, or amelioration of asbestos or materials containing asbestos.

B. Notwithstanding any other provision of law to the contrary, any time limitation or prescriptive period which may be applicable to any action to recover for asbestos abatement work shall not apply or expire until five years after the date on which the party seeking to recover has completed the abatement work or discovered the identity of the manufacturer of the materials which require abatement, whichever is later.

---

[41] See *In re School Asbestos Litigation,* 789 F.2d 996 (3rd Cir. 1986).  The Third Circuit affirmed the District Court's order certifying an opt-out class for those claimants seeking compensatory damages, and vacated the District Court's order certifying the mandatory class for those claimants seeking punitive damages.

C. Any person who has an action to recover for asbestos abatement work under the provisions of this Section but whose action is barred by the prescriptive period provided in R.S. 9:5644 shall have one year from the effective date of this Act within which to bring an action or be forever barred.

D. Nothing in this Section is intended to nor shall it have the effect of changing in any respect the applicable prescription periods fixed by law for benefits under the worker's compensation law for claims for damages due to asbestos related injury or disease.

The Claimant, when finally authorized in the Pennsylvania class-action to opt out of the lawsuit, did opt out. In filing the lawsuit on August 31, 1988, in the Eastern District of Louisiana with the other school systems in the state, and in performing additional discovery and inspections, the School Board was able to identify the Debtor as a manufacturer of some of the asbestos-containing materials in its buildings. In fact, not until 1990 did Claimant learn that W.R. Grace was the manufacturer of the asbestos-containing materials at issue in its buildings. Accordingly, Claimant did not have knowledge of the identity of the manufacturer of such asbestos-containing products until after the enactment of La. R.S. 9:5644, which allowed for a period of five years from that determination to file suit. Further, even if some of Claimant's causes of action resulting from the Debtor's asbestos-containing materials accrued before the enactment of La. R.S. 9:5644, which they did not, such cause(s) of action did not accrue more than one year prior to the filing of the National School Class-Action in Pennsylvania.

Notwithstanding the above, Debtors wrongly assert that Claimant had constructive knowledge and knew or should have known of the hazards associated with its asbestos-containing products because of various governmental regulations passed in the 1970's and early 1980's, and that therefore such claims should be disallowed based on the Third Circuit Court of Appeals' decision in *Prudential v. United States Gypsum Co.*, 359 F.3d 226 (3rd Cir. 2004). Their reliance on *Prudential* is misplaced as it is both factually and legally distinguishable from the claims at bar. First, *Prudential* only involved a RICO claim, while Claimant herein seeks redress through state law claims that require different accrual analyses than used in RICO cases.

The Court, in *Prudential,* placed great emphasis on the "actual knowledge" held by Prudential and the fact that Prudential "is a very sophisticated company that operates a large casualty insurance business and an extensive estate investment business ... [which] provided Prudential with more opportunities than an average plaintiff to access ACM-related information." *Id.* at 234-36.

Debtors have also failed to prove that limitations have run on Claimant's claims. The issue of when Claimant had constructive notice of "potential dangers" of asbestos is not the relevant inquiry regarding accrual of Claimant's cause of action. The courts throughout this country have consistently held that general knowledge regarding the hazards of asbestos does not cause injury, much less property damage. *See, e.g., MDU Res. Group v. W. R. Grace & Co.,* 14 F.3d 1274, 1278-79 (8th Cir. 1994), *cert. denied,* 15 U.S. 824 (1994) (rejecting Grace's argument that knowledge of the mere presence of asbestos triggers the statute of limitations, and holding that the proper question was when MDU could have learned, with the exercise of reasonable diligence, that its building had been contaminated by asbestos); *Adams-Arapahoe Sch. Dist. v. GAF Corp.,* 959 F.2d 868, 872 (10th Cir. 1992) ("[o]nly asbestos contamination constitutes a physical injury compensable under tort law."); *Kansas City v. W.R. Grace & Co.,* 778 S.W.2d 264, (Mo. App. 1989) (simply because Kansas City had notice of NESHAPs, its causes of action for negligence and strict liability were not caused to accrue); *California Sansome Co. v. U.S. Gypsum,* 55 F.3d 1402, 1403 (9th Cir. 1995) (ruling that articles, publications, regulations, and seminars on the hazards of asbestos did not put plaintiff "on inquiry notice" of asbestos contamination).

In a case dealing with the **removal** of asbestos containing material, not just the encapsulation of it, the Louisiana Supreme Court in *Cameron Parish School Board v. ACandS, Inc., et al.,* 687 So.2d 84 (1997) stated on page 88:

"Though prescription under La. C.C. art. 3492 begins to run from the day injury or damage is sustained, damage is considered to have been sustained only when it has manifested itself with sufficient certainty to support accrual of a cause of action. *Cole v. Celotex Corp.*, 620 So.2d 1154, 1156 (La. 1993). As this court stated in *Jordan v. Employee Transfer Corp.*, 509 So.2d 420, 423 (La. 1987):

Prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong. Prescription should not be used to force a person who believes he may have been damaged in some way to rush to file suit against all parties who might have caused that damage. On the other hand, a plaintiff will be responsible to seek out those whom he believes may be responsible for a specific injury. When prescription begins to run depends on the reasonableness of a plaintiff's action or inaction.

The question, therefore, is whether, in light of the information known, a plaintiff was *reasonable* to delay in filing suit. *Cole*, 620 So.2d at 1156 (citing *89Knaps v. B & B Chemical Co., Inc.*, 828 F.2d 1138, 1140 (5th Cir. 1987

Because the Cameron Parish School Board had actually passed a resolution seeking bids for the removal of its asbestos-containing materials in November, 1981, the Louisiana Supreme Court held that the School Board's cause of action accrued more than one year prior to the filing of the National School Class Action. The facts relating to the claims of Claimant are completely different than the facts set forth in the *Cameron Parish School Board* case. Other than learning in 1983 that the ceiling materials at issue contained asbestos, Claimant took no remedial actions at that time, nor planned for the same, and had no knowledge or understanding of any injuries or damages resulting from such asbestos-containing materials until after the enactment of the five (5) year prescriptive period set forth in La. R.S. 9:5644, noted above.

The issue of constructive knowledge for the purpose of prescription (statute of limitations) claims is fact-driven and complex. For example, when a school board in Louisiana claimed damages to its property as a result of gas pipelines, the court, on appeal, said:

"An investigation into causation need not be made and constructive notice need not be imputed, until damage becomes apparent. . . . and it was legal error for the district court to hold that the Board's failure to hire an expert or investigate the erosion at the time it became aware of the damage does not prevent prescription

from commencing." *Terrebonne Parish School Board v. Columbia Gulf Transmission et al,* 290 F.3d 303, 323 (5th Cir. 2002).

In this case, Debtors have wholly failed to establish that Claimant had "constructive knowledge" of its cause of action on any date earlier than the date that it filed its lawsuit against Debtor in 1988.

In further response to Debtors' D-2 Objection, Claimant hereby incorporates by reference as if fully contained herein the Response and Memorandum of Law of the Official Committee of Asbestos Property Damage Claimants in Opposition to Debtors' Brief in Support of an Estimation Hearing on Constructive Notice in Property Damage Claims (the "PDC Constructive Notice Brief"; Document No. 10940).

Finally, Debtors' own pleading and representations to Claimant and the Court are totally at odds with its D-2 Objection. Time and time again, Debtors have argued that its asbestos-containing materials are not hazardous and do not cause property damage. See Fifteenth Omnibus Objection, ¶¶ 119-120, p. 39; see also Hearing Transcript July 19, 2005, pp. 33-34. The Debtors' contention that building owners should have known of the hazards of its asbestos-containing building products is inconsistent with their prior claim that their ACM is not harmful in the first place. The Eight Circuit Court of Appeals recognized this inconsistency in reversing a statute of limitations verdict for Grace, stating:

> Grace argued at trial not only that the statute of limitations had run, but also that the plaintiff had suffered no injury from the asbestos Monokote. The arguments are inconsistent: if MDU has suffered no injury from the Monokote, then it has no cause of action – until an injury is suffered, the statute of limitations cannot begin to run.

*MDU Resources Group v. W. R. Grace & Co.*, 14 F.3d 1274 (8th Cir. 1994).  To put it another way, if, as Debtors claim, their asbestos-containing products pose no hazard, limitations would not have begun to run regarding such Claimant's claim, let alone expire. Yet, on the other hand,

Grace implies that Claimant should have long ago known that its asbestos-containing product(s) caused Claimant to sustain injury and damages, such that prescription accrued on its claims. Claimant had no such knowledge, nor was it ever placed on notice by Grace that its asbestos-containing products were contaminating its building(s) with asbestos fibers. As stated in *Our Lady of the Lake Hospital v. Carboline Company, et al.*, 632 So.2d 339 (La. App. 1st Cir. 1994), *writs denied* 635 So.2d 228 (La. App. 1st Cir. 1994) and 637 So.2d 1052 (La. 1994):

> "Contra non valentem is a judicially created exception to the general rule of prescription. *Rajinowski v. St. Patrick's Hospital*, 564 So.2d 671, 674 (La. 1990). The doctrine of contra non valentem prevents the running of liberative prescription where the cause of action is not known or reasonably knowable by the plaintiff. *Cole v. Celotex Corporation*, 620 So.2d 1154, 1156 (La. 1993). One situation in which this doctrine is applicable is where the debtor himself has done some act effectively to prevent the creditor from availing himself of his cause of action. Thus, if the debtor's conduct constitutes concealment, misrepresentation, fraud, or other ill practices that prevents plaintiff from availing itself of its cause of action or lulls plaintiff into a false sense of security, the doctrine of contra non valentem is triggered….. Moreover, under Louisiana products liability law, a manufacturer of a product who, after the product has left its control, acquires knowledge of a characteristic of the product that may cause damage must act reasonably to provide an adequate warning of such characteristic and its danger to users. As long as a defendant with a duty to disclose possesses knowledge and yet fails to act, the tort is a continuing one which renews itself from day to day. Prescription in such a case will not begin to run until the plaintiff learns that it has been injured by the failure to disclose."

It is the Debtors who have long-known, but who concealed from Claimant, that its asbestos-containing products were unreasonably dangerous and would contaminate Claimant's buildings. Even to this day, Debtors have failed to warn Claimant of the product dangers that they know exist. This objection should be denied.

F.   **Claims Allegedly Barred by the Statute of Limitations Pursuant to Actual Notice (Grace Ex. D-4)**

The Debtors object to Claimant's claim(s) "because they are barred by the statute of limitations based upon claimants' actual knowledge of their claims ..." (the "D-4 Objections"). For the reasons set forth below, Debtors' objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection to the Claimant's claims. They have also failed to identify the specific statutes of limitations or decisional rulings that they allege bar these claims. As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further information is produced. Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claim, *see In re Allegheny, supra,* and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

In further response to this objection, Claimant incorporates its response to the Debtors' "D-2 Objection" as set forth above.

The general prescriptive period (statute of limitations) is provided in Louisiana Civil Code Article 3492, which provides for a liberative prescription of one year. Debtors have produced no facts or evidence to prove that, prior to January 17, 1983, the date that the National School Class Action was filed, Claimant had sustained actual damages to such a sufficient extent to put Claimant on notice that liberative prescription was beginning to run on its claims under Louisiana law. In *Cameron Parish School Board v. ACandS, Inc., et al., supra,* the court noted:

> While we further noted in *Cole* that "[i]t is often difficult to identify a precise point in time at which the claimant becomes aware of sufficient facts to begin the running of prescription ...," our review of the record in the instant case reveals no such problem. In the instant case, the Board, sufficiently aware of the hazards posed by the continuing presence of asbestos in its school buildings, decided on November 9, 1981, to seek bids for the removal of the asbestos at one of its schools. At this point in time, the Board clearly was aware it had asbestos in at

least some of its buildings, the asbestos posed a serious health problem to its employees and students, the problem was severe enough to warrant immediate removal of the material, and the removal of the material would cost the Board a significant amount of money. *Supra at page 89.*

Unlike the facts existing in the *Cameron Parish School Board* case, Claimant did not even learn until 1983 that the ceiling materials at issue contained asbestos, and took no remedial actions at that time, nor planned for the same, concerning such materials. Claimant had no knowledge or understanding of any injuries or damages resulting from such asbestos-containing materials until after the enactment of the five (5) year prescriptive period set forth in La. R.S. 9:5644, noted above.

Even more important, La. R.S. 9:5644 provides that any time limit or prescriptive period applicable to an action to recover for asbestos abatement work shall not apply or expire until five years after the date on which the party seeking to recover has completed the abatement work or discovered the identity of the manufacturer of the materials which require abatement, whichever is later. This determination of when the expiration of this time period occurs is fact-driven and is applicable to each separate claim.

Debtors have not presented any evidence that the Claimant's claims were prescribed before 1985 or that the prescriptive period provided in La. R.S. 9:5644 had run.   In fact, Claimant did not remove any of Debtors' asbestos-containing products from its building(s), or discover from micro-chemical analysis reports that Grace was the manufacturer of the asbestos-containing products at issue, until 1990, which was after the date that Claimant filed its lawsuit against Grace (1988).

An example of the application of La. R.S. 9:5644 is set forth in *Jefferson Parish Hospital Service District No. 2 v. W. R. Grace & Co., et al.,* 1994 WL 577357 (E.D. La. 1994). In that case, the hospital claimed that it did not discover until March 1991 that fire-proofing material in

its building contained asbestos. W. R. Grace, the defendant, had argued that the hospital actually knew of the asbestos no later than March 1990. The hospital did not file suit against Grace until March 1992, which was beyond a one-year prescriptive period. The United States District Court court held that La. R.S. 9:5644 suspends for five years the prescriptive period for any action to recover for asbestos abatement. The court stated that the Plaintiff's cause of action prescribed only if it filed suit more than five years after finishing the abatement work or discovering the identity of the manufacturer of the asbestos. W. R. Grace had not presented any evidence that the Hospital's claims were prescribed before 1985, or that the prescriptive period provided in La. R.S. 9:5644 had run. Here too, Debtors provide no evidence.

Another Louisiana case involving damages caused by asbestos-containing materials, and the prescriptive period associated therewith, is *Orleans Parish School Board v. Asbestos Corp. Ltd. et al.,* 114 F.3d 66 (5th Cir. 1997). In that case, by the year 1980, the Orleans Parish School Board prepared an "Asbestos Survey and Estimate" which reflected that the cost of removing asbestos would be approximately $5,000,000, and that same year actually began to remove asbestos from its school buildings. Upon appeal, the United States Court of Appeals for the Fifth Circuit affirmed the District Court's finding that the claim of the School Board had prescribed by the time that suit was filed in 1988. Specifically, the Court of Appeal stated that "the School Board knew by sometime in 1980 that asbestos was a serious problem and that it necessitated an extensive and expensive removal process. The one-year liberative prescription for delictual actions began to accrue against the School Board at that time." Further, the Court of Appeal, relying on the state court decision involving *Cameron Parish School Board,* determined that La. R.S. 9:5644 could not be retroactively applied to claims to which prescription had already accrued.

In Louisiana, like most other jurisdictions, a cause of action generally accrues when a wrongful act causes some legal injury. It is the Debtors who bear the burden of establishing that the wrongdoing and the injury occurred outside the limitations period. *Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481 (3rd Cir. 1985). The courts throughout this country have consistently ruled that the mere presence of asbestos-containing products does not trigger the running of limitations. *MDU Resources v. W.R. Grace*, 14 F.3d 1276 (8th Cir. 1994) (injury is the contamination of building, rejecting argument that knowledge of the mere presence of asbestos triggers the statute of limitations); *Adams-Arapahoe Sch. Dist. v. GAF Corp.*, 959 F.2d 868, 872 (10th Cir. 1992) ("[o]nly asbestos contamination constitutes a physical injury compensable under tort law."); *THS Northstar v. W. R. Grace & Co.*, 66 F.3d 173 (8th Cir. 1995) ("the distinction between the mere presence of asbestos-containing materials in a building and actual release and contamination is critical" because "no cause of action exists until there has been a substantial release"); *San Francisco Unified School Dist. v. W. R. Grace & Co.*, 37 Cal. App. 4th 1318, 44 Cal. Rptr. 2d 305 ("[T]he mere presence of asbestos constitutes only a threat of future harm … [c]ontamination by friable asbestos is the physical injury and the actual, appreciable harm that must exist before a property owner's strict liability or tort cause of action against the asbestos manufacturer accrues and limitations period commences.").

Further, Louisiana has also adopted the discovery rule. *See, Bailey v. Khoury,* 891 So.2d 1268 (La. 2005); *Griffin v. Kinberger,* 507 So.2d 821 (La. 1987); *Grefer v. Alpha Technical,* 901 So.2d 1117 (La. App. 4th Cir. 2005). In applying the discovery rule, the relevant inquiry for statute of limitations purposes is when a plaintiff knew (*i.e.*, had actual knowledge) or should have known (*i.e.*, had constructive knowledge) that its particular building was actually contaminated with asbestos. *See San Francisco Unified*, 37 Cal. App. 4th at 1336; 44 Cal. Rptr. 2d at 315. In remanding the case, the Court of Appeals instructed the trial court that both (i) "the

dates of actual contamination of each school" were "issues of fact" that must be resolved on remand, and (ii) the ultimate inquiry on remand for purposes of Grace's statute of limitations affirmative defense was "when [the plaintiff] should have reasonably discovered that each school's contamination [had] occurred." *Id.* (Emphasis added). This process is not only fact specific, it is also building specific. A claimant's general knowledge regarding the hazards of asbestos is not determinative.

Debtors have failed to come forward with any evidence establishing when Claimant knew of its injury. In fact, the Debtors assert that Claimant has suffered no injury from its asbestos-containing materials. If this is true, limitations as a matter of law cannot have commenced to run.

### G.    Claims Allegedly Barred by Laches (Grace Ex. D-6)

The Debtors object to Claimant's claims because Claimants "have delayed in asserting their claims against Grace, often for decades ..." (the "D-6 Objection"). For the reasons set forth below, Debtors' objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection to the Claimant's claims. As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further information is produced. Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity of Claimant's claims, *see In re Allegheny, supra,* and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I). Debtor ignores the fact that Claimant filed suit against it, as noted earlier, in August 1988.

More importantly, the doctrine of laches is not applicable under Louisiana law. In *Fishbien v. State of Louisiana through Louisiana Health Sciences Center, 898 So. 2d 1260 (2005)*, the Louisiana Supreme Court stated:

Regarding that portion of plaintiff's claim that is not prescribed, we find no merit in defendant's affirmative defense of estoppel. As the court of appeal correctly stated in the instant case, equitable considerations and estoppel cannot be permitted to prevail when in conflict with positive written law. *See* La. C.C. art. 4 ("When no rule for a particular situation can be derived from legislation or custom, the court is bound to proceed according to equity...."); *Morris v. Friedman*, 94-2808, p. 10 (La.11/27/95), 663 So.2d 19, 26; *Palermo Land Co. v. Planning Comm'n of Calcasieu Parish*, 561 So.2d 482, 488 (La.1990). La. C.C. art. 3457 provides, "There is no prescription other than that established by legislation." Comment (b), which explicitly addresses the doctrine of laches, states, "Under the Louisiana legal system, there is no room for the common law doctrine of laches." Citing article 3457, this court has previously concisely stated, "The common law doctrine of laches does not prevail in Louisiana and the legislature may create, shorten, lengthen or abolish prescriptive periods at its discretion." *Picone v. Lyons*, 601 So.2d 1375, 1377 (La.1992). *See also Corbello v. Sutton*, 446 So.2d 301, 302 (La.1984) ( "[T]he doctrine of laches has no place in the law of this state."). While the legislature and the opinions of this court have made it clear that the common law doctrine of laches does not belong in Louisiana's system of civil law, there are nevertheless opinions by this court that leave open the possibility of the application of the doctrine in certain cases. *See e.g. T.D. v. M.M.M.*, 98-0167 (La.3/2/99), 730 So.2d 873; *Bradford v. City of Shreveport*, 305 So.2d 487 (La.1974). Because the doctrine of laches is in conflict with this state's civil laws of prescription, the statements contained in those civil opinions that suggest the doctrine of laches may be applicable under certain circumstances are hereby repudiated. We find no other equitable basis upon which LSU can be afforded relief as to plaintiff's claims that have not prescribed; therefore, we reject its affirmative defense of estoppel." *Supra,* at page 1270.

This objection lodged by Debtors should be denied.

## H.    Claims Relying on Air Sampling Results That Are Inapplicable (Grace Ex. E-3)

The Debtors object to Claimant's claims because "the only evidence of airborne asbestos levels is air sampling data related to abatement and/or other situations irrelevant to show risk during normal operations in a building ..." (the "E-3 Objection"). For the reasons set forth below, Debtors' E-3 Objection should be denied.

Debtors do not provide any information or evidence regarding the basis for this objection to the Claimant's claims. As such, Claimant cannot fully respond to this objection, and Claimant reserves its right to supplement or amend its response to the extent further information is produced. Moreover, Debtors have failed to offer any evidence to rebut the prima facie validity

of Claimant's claims, *see In re Allegheny, supra*, and have failed to provide "sufficient detail as to why the claim should be disallowed." Del. Bankr. LR 3007-1(e)(iii)(I).

Air sampling taken during abatement-related activities is relevant to potential health hazards and, in fact, reflects the release of fibers that will occur during the normal and foreseeable operations in a building.[42]   Moreover, the results of static area air sampling as advocated by Debtors is not a basis upon which to determine the need for corrective action. This issue was addressed in depth in the PDC Methodology Brief, and Claimant also adopts by reference the discussions set forth in that brief.

## V.   CLAIMANT'S AFFIRMATIVE DEFENSES

Debtors assert that the Claimant's claims are time-barred by applicable statutes of limitations and/or the common law doctrine of laches.

Equitable tolling and equitable estoppel are "based primarily on the view that a defendant should not be permitted to escape liability by engaging in misconduct that prevents the plaintiff from filing her claim on time." *In re: Enron,* 310 F. Supp 819 (S.D. 2004).   The primary difference in these doctrines is that equitable estoppel focuses its attention on the defendant's conduct while equitable tolling focuses on the claimant's excusable neglect.

The doctrine of equitable estoppel includes a number of interrelated, but separate, defenses, including equitable estoppel, quasi-equitable estoppel, judicial estoppel[43] and fraudulent concealment. These doctrines are recognized by virtually all jurisdictions in one form or another and are founded upon principles of fair dealing. The underlying premise for these doctrines is that a party should not be allowed to gain an advantage by asserting inconsistent

---

[42] *See* discussion regarding Grace's knowledge of building activities that would impact the performance of its Surface Treatment ACM, Section III.D., above.

[43] Some jurisdictions refer to judicial estoppel as "the doctrine against the assertion of inconsistent positions." *Scarano v. Central R. Co. of New Jersey,* 203 F.2d 510, 513 (3rd Cir. 1953).

positions or mutually contradictory positions, which either results in an unfair advantage to one party or detriment to the other party. In applying estoppel in the context of litigation, the focus is on preventing parties from "playing fast and loose with the court" and to "protect the integrity of the judicial process." *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir. 1982).

As discussed earlier, almost every state has adopted the discovery rule either as part of its statutory scheme regarding accrual of limitations or its courts have judicially adopted such a rule to determine when a plaintiff's cause of action accrues. The discovery rule holds that the limitations period is tolled until the plaintiff discovers, or through the exercise of reasonable diligence should have discovered, the nature of his or her injury. The discovery rule is an affirmative defense to limitations.

Time and time again, Debtors have represented to building owners and now to this Court, in both their pleadings and in oral argument, that their asbestos-containing products pose no hazard to building occupants. Yet, in the same breath they assert that Claimant's claim is time-barred. Grace cannot have it both ways: On one hand asserting no hazard, and then on the other hand asserting that the Claimant's claim is time-barred.

The Debtors' conduct is exactly what these equitable doctrines are designed to prevent – allowing a party from asserting its rights under a general technical rule of law when it has so conducted itself that it would be contrary to equity and good conscience to do so.

## VI.    DEBTORS ARE NOT ENTITLED TO ASSERT ADDITIONAL OBJECTIONS TO CLAIMANT'S CLAIMS

Claimant opposes and objects to Debtors' request that 1) it not be required to comply with Del. Bankr. LR 3007-1 (this rule requires all "substantive objections" to a particular proof of claim be asserted in a single omnibus objection or such objection is waived); and 2) they have the opportunity to make further objection if and when it is determined that information provided by Claimant is untrue and inaccurate. *Id.* at ¶¶ 217-19, pp. 64-65. Both requests should be

denied. Debtors have now had two occasions to raise objections to Claimant's claims. The Court has previously accepted Debtors' proposal regarding information to be included in the claim form. Claimants provided this information over two years ago. Debtors have had more than sufficient time to review this information and formulate their objections to Claimant's claims. Debtors should not be allowed to continue to raise objections, in repeated piecemeal fashion, as this will unduly prolong the estimation process, rather than provide an efficient means of resolving claims.

## VII.    CLAIMANT'S RIGHT TO FILE SUPPLEMENTAL RESPONSE TO OBJECTIONS

Debtors have failed to comply with Del. Bankr. LR 3007-1(e)(iii)(I) by providing sufficient detail regarding objections to Claimant's claim. This has prevented Claimant from being able to fully and completely respond to such objections. Claimant reserves the right to supplement its responses should Debtors provide additional information, including, but not limited to, 1) the specific key elements not present in bulk samples; 2) specific documents not provided in response to questions; and 3) the specific statutes of limitations or repose, or the decisional law that supports Debtors' argument that Claimant's claims are barred.

### [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## VIII.  CONCLUSION

For the reasons set forth hereinabove Claimant, requests that:

1.  Debtors' objections be denied;

2.  Debtors be required to provide "sufficient detail as to why the claims should be disallowed" pursuant to Del. Bankr. LR 3007-1(e)(iii)(I); and

3.  Claimant be allowed to conduct discovery regarding all of Debtors' objections before any such objection is sustained.

DATED:  February 22, 2006

_____
Christopher D. Loizides (No. 3968)
Miichael J. Joyce (No. 4563)
LOIZIDES & ASSOCIATES
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 654-0248
Facsimile: (302) 654-0728
Email:            loizides@loizides.com

*Local Counsel for Congregation of St. Philip Neri Catholic Church*

-- and --

Richard A. Bordelon
DENECHAUD AND DENECHAUD, L.L.P
1010 Common Street, Suite 3010
Telephone: (504) 522-4756
Facsimile: (504) 568-0783
Email:     rablaw@bellsouth.net

*General Counsel for Congregation of St. Philip Neri Catholic Church*

-- and --

Martin W. Dies
DIES & HILE
1009 Green Avenue
Orange, TX 77630
Telephone: (409) 883-4394
Facsimile: (409) 883-8414

*Special Counsel for Congregation of St. Philip Neri Catholic Church*