UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          .      Chapter 11
                                .
W.R. GRACE & CO., *et al.*,     .      Case No. 01-01139(JKF)
                                .      Jointly Administered
        Debtors.                .
                                .      Feb. 21, 2006 (2:03 p.m.)
                                .      (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1               THE COURT: Good afternoon, please be seated.  This

2    is the matter of W.R. Grace, 01-1139.  Is Court-Call

3    connected?

4               THE CLERK: This is Judge Fitzgerald's courtroom.

5               TELEPHONE OPERATOR: Thank you.

6               THE CLERK: Hello?

7               TELEPHONE OPERATOR: I'll let your operator know

8    you're on the line.  Just one moment.

9               THE CLERK: Thank you very much.

10              TELEPHONE OPERATOR: I believe your operator will be

11   Brian.

12              THE CLERK: Thank you, sir.

13              OPERATOR: This is Brian.

14              THE CLERK: Good afternoon, Brian.  Are all

15   participants on the line?

16              OPERATOR: Quite a few are, not all of them.

17              THE CLERK: Okay.  We are going to begin, so if you

18   wanted to put whoever's on through, we would appreciate it.

19              OPERATOR: I will do that.

20              THE CLERK: Thank you.

21              OPERATOR: Counsel's live.

22              THE COURT: Thank you.  The parties I have listed in

23   the Grace case to participate by phone: George Calhoun,

24   Stephen Vogel, Sarah Edwards, Jacob Cohn, David Liebman,

25   David Parsons, Marti Murray, Michael Insalaco, Michael Davis,

1   Richard Park, Robert Phillips, Richard Finke, Curtis Plaza,

2   John O'Connell, Sara Gooch, Tiffany Cobb, Andrew Craig, Peter

3   Shawn, Brian Kasprzak, Leslie Epley, Christopher Candon,

4   Michael Lastowski, Barbara Seniawski - I'm sorry, S-e-n--I-a-

5   w-s-k-I, Darrell Scott, Richard Wyron, Stuart Kovensky,

6   Monique Almy, Jonathan Brownstein, Saul Bianca, Barbara

7   Harding, Christina Kang, Brenda Diluigi, Elizabeth

8   DeCristofaro, Barry West, Mark Shelnitz, David Siegel, Paul

9   Norris.  Good afternoon.

10          MR. BERNICK: Good afternoon, Your Honor.  David

11   Bernick for Grace.

12          MS. BROWDY: Michelle Browdy for Grace.

13          MS. BAER: Janet Baer for Grace.

14          MR. O'NEILL: James O'Neill for . . . (microphone

15   not recording).

16          MR. KRUGER: Lewis Kruger on behalf of the Official

17   Committee . . . (microphone not recording).

18          MR. BAENA: May it please the Court, Scott Baena and

19   Jay Sakalo on behalf of the PD Committee.

20          MR. LOCKWOOD: Peter Lockwood for the Asbestos

21   Claimants Committee, Your Honor.

22          MR. FRANKEL: Good afternoon, Your Honor.  Roger

23   Frankel for David Austern.  Your Honor, I wanted to alert the

24   Court that as of February 6th, we have moved over to Orick,

25   Harrington & Sutcliffe.  I think we filed papers with the

1    Court.

2            THE COURT: Oh, okay, I haven't seen them.  Thank

3    you.

4            MR. FRANKEL: Thank you.

5            MR. HURFORD: Good afternoon, Your Honor.  Mark

6    Hurford, Campbell & Levine on behalf of the ACC.

7            MR. BECKER: Good afternoon, Your Honor.  Gary

8    Becker, Kramer Levin Naftalis & Frankel for the Equity

9    Committee.

10           MR. ESSERMAN: Good afternoon, Your Honor.  Sander

11   Esserman on behalf of various firms Barron & Budd, Provost,

12   Humphrey, Angelos, two more that we filed papers on, thank

13   you.

14           MR. BROWN: Good afternoon, Your Honor.  Michael

15   Brown for Seaton Insurance Company and One Beacon American

16   Insurance Company.

17           MR. MANGAN: Good afternoon, Your Honor.  Kevin

18   Mangan, Monzack & Monaco on behalf of the State of Montana as

19   well as Canada.

20           MS. ALCABUS: Good afternoon, Your Honor.  Lisa

21   Alcabus, Simpson Thatcher & Bartley for Travelers.

22           MR. GLOSBAND: Good afternoon, Your Honor.  Dan

23   Glosband from Goodman Proctor for CNA Insurance.

24           MR. PHILLIPS: Mark Phillips of Connolly Bove Lodge

25   & Hutz for Maryland Casualty Company.

1          MR. SCHEPACARTER: Good afternoon, Your Honor.

2    Richard Schepacarter for the United States Trustee.

3          MR. CHEHI: Your Honor, Mark Chehi of Skadden Arps

4    for Sealed Air Corporation.

5          MR. BERNICK: Just like a reunion, Your Honor.  I

6    guess -

7          THE COURT: Is this good news, Mr. Bernick?

8          MR. BERNICK: I hope it's the harbinger of good

9    news, Your Honor.  I think that Ms. Baer will take up the

10   first several items on the agenda.

11     MS. BAER: Your Honor, I'll try to get through all the

12   routine matters quickly so we can get onto matters that most

13   of the parties are in court for.  Your Honor, matter number 1

14   on the agenda was the motion of the debtors to expand the

15   retention of Steptoe & Johnson to include some new tax

16   related matters and tax litigation for which they were not

17   previously retained.  A certificate of counsel was filed,

18   Your Honor, with a slightly revised order.  I do have a copy

19   of the order in court, Your Honor.

20         THE COURT: I think I had a question about this, and

21   I think I misplaced my question.  I wanted to be sure, based

22   on the affidavit of Anne Moran that was filed, that in fact

23   there is not going to be some conflict.  I understand that

24   there is a representation for some of the insurance companies

25   and that they were in the process of informing those entities

1    about the expanded representation here, but I do want to make

2    sure that neither the debtor nor the insurance companies have

3    ascertained that there's going to be a conflict.

4            MS. BAER: The debtor certainly has not.  I have not

5    heard anything from insurance carriers.  To the best of my

6    knowledge, there are no conflicts.

7            THE COURT: Okay.  I'll take the order then.

8            MS. BAER: Thank you, Your Honor.

9            THE COURT: Thank you.  Okay, that's entered.

10           MS. BAER: Your Honor, agenda item number 2 was the

11    debtor's motion to expand the retention of Baker, Donelson.

12    Baker, Donelson has been doing some lobbying-related efforts

13    for us, especially in China.  They had a point in time where

14    they were doing certain specific services.  We want to

15    continue those services.  There were no objections, and we

16    did file a certificate of no objection on this.  Again, I do

17    have the order with me.

18           THE COURT: I'll take that order too.  I just didn't

19    get that one entered.  Thank you.  Okay.

20           MS. BAER: Your Honor, item number 3 was the motion

21    of The Scotts Company to modify our preliminary injunction so

22    that they could proceed with respect to a declaratory

23    judgment action they have filed to obtain a declaration as to

24    whether or not certain of debtor's insurance would also cover

25    actions that have been filed against Scotts.  This was on

1    your agenda, believe it or not, about a year ago, and we were

2    asked to put it back on for this month.  It is on for status.

3    We've spoken with The Scotts Company, and we've agreed that

4    this matter should be continued over to the April agenda.  In

5    the meantime, we are trying to work out an order that would

6    essentially maintain the status quo as appropriate.  I know

7    that counsel for Scotts is on the line.  This is her motion,

8    and I'm sure she may want to address it.

9        MS. COBB (TELEPHONIC): Good afternoon, Your Honor.

10   Tiffany Cobb of the Vorys, Sater, Seymour & Pease law firm on

11   behalf of Scotts Company.  Under the current set of

12   circumstances, we do think that there is a way to adequately

13   protect Scotts' rights and any of the insurance policies

14   between now and confirmation and through the date we

15   ultimately litigate the coverage issue.  So, I agree with Ms.

16   Baer that we - if we kick this until April, I am hopeful that

17   between now and then we can work together towards a proposed

18   agreed order.

19        THE COURT: All right, thank you.

20        MS. COBB (TELEPHONIC): Thank you.

21        MS. BAER: Thank you, Your Honor.  We'll put that

22   back on for the April agenda.

23        THE COURT: All right.

24        MS. BAER: Item number 4, Your Honor, is the motion

25   of BDM Construction Company for an order modifying the

1    automatic stay.  Your Honor, we are trying to work out an

2    order with BDM whereby they can potentially pursue insurance

3    coverage if there is insurance coverage.  That's what we're

4    trying to work through, and we may be able to come to an

5    agreement, we may not.  What we've agreed with BDM is that

6    this matter will be continued to the March agenda, by then,

7    hopefully, we will have determined whether or not we can come

8    to an agreement or if we need to argue the merits of the

9    motion.

10         THE COURT: All right, that's fine.

11         MS. BAER: Your Honor, I'm going to skip item number

12   5 for a moment, which is exclusivity, so we can take care of

13   a couple of the other routine matters.  Item number 6 on the

14   agenda is the debtor's fifth omnibus objections to claims.

15   There are two sets of claims left.  There are the claims of

16   the Archers and the claims of Weatherford.  The Weatherford

17   claims are being handled by Delaware counsel, the Pachulski

18   firm.  They are working on a settlement, offers have been

19   exchanged, and they're still in that process.  On the Archer

20   claims, Your Honor, they are just simply a mess.  It is a

21   little unclear right now whether we will need discovery,

22   whether motions for summary judgment may be in order, or

23   whether simply we will reply and ask the Court to set a

24   hearing.  Under these circumstances, Your Honor, we'd like to

25   continue this matter - this matter as well as Weatherford to

1   the March 27th hearing, by that time, hopefully, we will have

2   determined what makes the most practical sense in terms of

3   how to proceed with the Archers.  I do have an order, Your

4   Honor, on that.

5          THE COURT: All right, that's fine.  Thanks.  Okay,

6   that order is signed.

7          MS. BAER: Thank you, Your Honor.  Items 7 and 8 on

8   the agenda, both refer to the New Jersey matter, the debtor's

9   motion for an injunction vis-a-vis the State of New Jersey

10  action against the debtors and the debtor's motion for leave

11  to file a complaint in order to request that injunction.  The

12  parties are in settlement discussions because of the change

13  of authority at New Jersey but they've needed more time to go

14  up the line in order to prepare a settlement offer to the

15  debtor so the State has asked us to continue this matter to a

16  March 27th hearing.  I have an order prepared which likewise

17  continues the stay of the matter until the March 27th hearing.

18         THE COURT: All right, that's fine.  Thanks.  Okay.

19         MS. BAER: Your Honor, that took care of all of the

20  routine matters on the agenda, and we're now back to item

21  number 5, which is exclusivity, and I'll turn the matter over

22  to Mr. Bernick.

23         THE COURT: You were doing so well, Ms. Baer.

24         MS. BAER: I'm speechless.  Thanks.

25         MR. BERNICK: Well, we might be able to make a bet

1    here, Your Honor.  I guess I'm armed with a little bit more

2    information than the Court has at this point, but maybe the

3    best way to proceed is I'm assuming that Your Honor had the

4    opportunity to take a look at the status report the debtors

5    filed.

6              THE COURT: Yes.

7              MR. BERNICK: And I think that that would obviate

8    the need for me to kind of set the backdrop for where we are

9    here today.  I had a chart prepared that I'm afraid that

10   we're not going to be able to talk about because I think we

11   have at least some concurrence with respect to some of the

12   constituencies on how we should proceed.  And maybe beginning

13   on what I hope to be an optimistic note, it would be

14   appropriate for the other constituencies to report to the

15   Court on where they are, and then, I'd be happy to respond to

16   those statements.  A lot of discussions have just taken place

17   out in the hall before we convened here today.  So maybe if I

18   can ask for Mr. Lockwood to make a report on behalf of the

19   Personal Injury Committee and then perhaps, Mr. Frankle, I

20   don't think I've heard formally back from Mr. Frankle, that

21   would be the Personal Injury folks, and then other people can

22   chime in, and then I'd to reserve some time to respond, Your

23   Honor.

24             THE COURT: All right.  Mr. Lockwood?

25             MR. LOCKWOOD: Good morning, Your Honor - or

1   afternoon, Your Honor.  The Committee has read also the

2   status report and also taken into account what the Court said

3   at the last hearing on this subject as we understand it and

4   as set forth in the status report.  The debtor is suggesting

5   that we have mediation and that the Court basically continue

6   exclusivity for sixty days pending the mediation, and that is

7   acceptable to the Committee.  I have discussed briefly with

8   Mr. Bernick the issue of a mediator, and I think he will

9   address that more fully, perhaps later, but the only thing I

10  would say is that I agree with him that we don't want to have

11  the sixty days spent trying to reach agreement on who the

12  mediator is, and that, therefore, we would support some

13  process that would give the constituents a very short window

14  to agree on somebody, and if they're unsuccessful doing so,

15  ask the Court to appoint somebody.  I know the Court had

16  mentioned at the last hearing that that was something that

17  Your Honor might be inclined to do anyway, and so, we would

18  urge the Court to do that.  Thank you, Your Honor.

19          THE COURT: All right.  Mr. Frankle?

20          MR. FRANKEL: Your Honor, we're fine with that

21  approach.  We would again like to see a mediator early in the

22  sixty days so that there can be some productive discussions

23  during the sixty days, and that when we're back here we have

24  a much better sense of whether or not we're going to be able

25  to reach an agreement or not.  Thank you, Your Honor.

1          THE COURT: Mr. Baena?

2          MR. BAENA: I wasn't sure when the unwashed masses

3     got to chime in, Judge.

4          MR. BERNICK: I'm glad we finally established that.

5          MR. BAENA: May it please the Court, Scott Baena on

6     behalf of the Property Damage Committee.  Your Honor, I -

7     what we've struggled with over the last while, since we were

8     before you on exclusivity in December, was how the Court

9     wanted to proceed and how the Court described it wanted to

10    proceed if parties could come to agreements and the parties

11    couldn't.  And as we described at the last hearing, Mr. Dies

12    launched a proposal to the ACC, and that's what precipitated

13    that discussion.  While an agreement hasn't been reached

14    between PI and PD including Zormalight (phonetical) at this

15    point in time.  We, nonetheless, reflect on what the court

16    said would happen if that were the case, and at that hearing,

17    the Court said if an agreement wasn't arrived at then you

18    were going to appoint some professional person.  You weren't

19    sure at that point in time what you would denominate that

20    person to be, and you would designate a period of time for

21    that person to make assessments about the prospects for a

22    consensual plan, and although you didn't at that point in

23    time wish to characterize that person as a mediator, it

24    sounded like a person to facilitate a consensual plan akin to

25    a mediator.  And then you said if that person wasn't

1   successful at the end of that period of time, exclusivity was

2   terminated, and the proposal that's being advanced now, which

3   was first described to me, as I was walking into the

4   courtroom, not to suggest surprise, but I don't want you to

5   think it's been something that's been subject to a great deal

6   of discussion and here's Mr. Baena once again objecting.  It

7   came late in this process.  The process that they are

8   suggesting sort of borrows a little bit here and there from

9   what the Court was saying, but it's not quite what the Court

10  said, and our position is, we ought to do what the Court said

11  we should be doing.  We are not adverse to a mediation

12  process.  Indeed, the PD Committee's interest in reaching a

13  consensual resolution of this case has the testimony of Mr.

14  Dies' efforts as an example of our interest in seeing that

15  process occur.  Whether we need an official professional or

16  estate professional to oversee that process, we would have

17  hoped not, but if that's the Court's position, we will work

18  within that framework.  In terms of how that process evolves

19  as is indicative of the proposal - the progress that we did

20  try to make, we thought it was important to reach decisions

21  about reorganization in a systemic fashion, and we thought it

22  was important for the asbestos constituencies to reach

23  agreements and then for the asbestos constituencies and non-

24  asbestos constituencies to then reach agreements, and that's

25  what we were trying to facilitate.  But if the Court feels

1  that there should be one of these larger exercises, we will

2  abide by it, but, we go back to what the Court said about

3  what happens if it doesn't work.  Now, our bonafides, I think

4  are best demonstrated by the fact that we've attempted to

5  launch this process ourselves.  So, if anybody is going to

6  argue next, Well, we're just looking for opportunities here

7  to close the door, that there's just no foundation or basis

8  for that argument.  We're fully invested in the process.

9  But, if the process doesn't work within the period of time

10  that they're talking about, we think you've ruled.  We think

11  you said, You're terminating exclusivity.  And we don't

12  understand how many different bites of the apple the debtor

13  gets in regard to this particular issue, which is not a

14  phenomena five years into a case to have to come back to the

15  Court repeatedly to take exclusivity away from the debtor as

16  opposed to the debtor keeping it.  And that's what it's been

17  like.  We're trying to get it away from them, and we think

18  that the calculus has to change.  We also think that by

19  changing that calculus, you may even change the prospects for

20  a successful resolution of this case.  But we're being held

21  hostage.  We continue to be held hostage.  We think you

22  ruled, and we think we all ought to abide by your ruling.

23  Additionally, one of the details that Mr. Lockwood omitted at

24  least one that was shared with me, and I don't attribute any

25  bad motives to this, I'm just pointing out it wasn't

```
 1   mentioned, is that in this period of time that the parties
 2   have bargained for this process to go on, there's going to be
 3   a further stay, if you will, in respect of that questionnaire
 4   that was propounded in respect to personal injury claimants,
 5   as I understood it.  They will not be doing that during this
 6   period of time, and I understand that.  I do understand how
 7   some might come to the conclusion that it's counterproductive
 8   to be litigating and trying to settle at the same time.  We
 9   don't have to commit people to this process after five years.
10   It's not like the first week of a bankruptcy where sometimes
11   to get everybody's attention you need to be litigating.
12   We've been litigating for five years, and so, that litigation
13   really doesn't enhance the prospects of success, and if
14   there's real seriousness about getting to a deal, this should
15   be a mutual environment in which we are negotiating.  And so,
16   I understand why the ACC would like to not have to go through
17   that process during this point in time, at this point in
18   time, first because it's deleterious to a settlement, and
19   second, because it's a large distraction of time.  We don't
20   understand why property damage is in a different boat.  We
21   just don't get it.  We don't understand why the estimation
22   process for PD is any different, particularly when it's
23   characteristically described as a much simpler process where
24   there are finite number of claims that we know we're talking
25   about.  If everybody wants to create the perfect environment
```

1    for a settlement, then we really ought to stop positioning

2    ourselves for a moment and create that opportunity, and we

3    think that that opportunity is one where we are all at a

4    standstill.  We have been faithfully and doggedly pursuing

5    the PD estimation proceeding, but we don't understand why

6    that should continue to distract us and utilize our resources

7    while this process that hopefully resolves this entire case

8    is also going on at the same time.  The natural effect may

9    well be to repel us from the process, which doesn't advance

10    anyone's best interests, and so, we would suggest, first,

11    that the Court reiterate that exclusivity will terminate at

12    the end of the period you designate for this process to be

13    undertaken.  It's done.  We don't have to argue it again.

14    Second, that all parties will be involved meaningfully in

15    this mediation proceeding, and third, that there's a

16    standstill as to all activity in regard to the sizing of

17    asbestos liabilities.  Thank you, Your Honor.

18          THE COURT: Okay.

19          MR. KRUGER: Good afternoon, Your Honor.  Louis

20    Kruger for the Official Unsecured Creditors Committee.  I'd

21    to support the suggestion that we ought to have a time to see

22    if mediation might be successful after lo these many months

23    and years to bring the parties to a consensual transaction,

24    and I think it's artificial in a way to suggest to the Court,

25    as Mr. Baena has just done, that there ought to be some magic

1    time period during which mediation will either be successful

2    or failure and the results of failure is that automatically

3    exclusivity should terminate.  It may well be that Your Honor

4    needs to keep tabs, obviously, on what happens in the

5    mediation process, whether that sixty days from now we come

6    back and report as to where we are, whether it is still

7    ongoing, not ongoing, perhaps more detail than that.  Your

8    Honor can always then decide what to do about exclusivity,

9    but I think to judge now before the process has even begun

10   seems to me to be not a sensible way to approach the issue,

11   particularly after all of this time has gone by and with the

12   prospect, perhaps, that the parties and maybe Mr. Dies and

13   others are beginning to talk to each other more seriously,

14   maybe there is the prospect for the first time of a

15   consensual plan, which obviously would be to the advantage of

16   all of the parties as well as the Court.  So, I would think

17   that there ought not to be any artificial barrier to that by

18   concluding that if the effort is not successful, whether it's

19   in thirty days, sixty days, or ninety days, that there ought

20   to be a consequence that is now determined without knowing

21   the input as a result of the process itself.  So I would

22   suggest that we ought to keep the process ongoing.  With

23   respect to Mr. Baena's request that somehow or other the PDs

24   ought to be treated the same as the ACC, I'll let my

25   colleague Mr. Bernick address that.

1          THE COURT: Mr. Monaco?

2          MR. MONACO: Good afternoon, Your Honor.  For the

3    record Frank Monaco for the State of Montana and Her Majesty

4    in Right of Canada, the Queen.

5          THE COURT: Your colleague only addressed it as

6    Canada.  It wasn't nearly as eloquent.

7          MR. MONACO: Your Honor, both my clients are

8    similarly situated in this case.  Both have contribution

9    indemnification claims against the debtor stemming from non-

10   bankruptcy litigation where they have been sued on the basis

11   of direct claims against both clients.  Your Honor, we filed

12   limited responses to the extension request filed by the

13   debtor to continue their exclusive right to file a plan and

14   solicit acceptances.  The present plan does not address the

15   contribution indemnification claims of either of my clients,

16   and we have just initiated discussions with the debtor about

17   how best to resolve those through a plan of reorganization.

18   This is the first I've heard of this mediation idea, and I

19   think it's consistent with good faith settlement

20   negotiations, and I would just request that both my clients

21   be able to participate or be given the opportunity to

22   participate because I think it will end in a - will assist in

23   a consensual resolution of our claims.  I've not had an

24   opportunity to speak to them about this concept, but at this

25   point I don't see it as being inconsistent with what we're

1    trying to accomplish here.  Thank you.

2            THE COURT: Yes, good afternoon.

3            MS. ALCABUS: Good afternoon, Your Honor.

4    Lisa Alcabus for Travelers.  Your Honor, this too is somewhat

5    news to Travelers in terms of the mediation proposal.  We

6    wouldn't be opposed to the idea of going to mediation.  We

7    just wanted to express one concern which is that we notice

8    that the status report was silent on insurance issues.  We

9    recently had a conference call with Ms. Baer and the insurers

10   in which she spoke for quite awhile but really didn't provide

11   any information to the insurers with respect to how the plan

12   was going or how the negotiations were going.  My concern is,

13   and perhaps Mr. Bernick will address this, you know, what

14   role will the insurers play if any in any kind of a

15   mediation?  Will they be invited to the mediation?  Will they

16   not be invited to mediation?   I know that Mr. Bernick has

17   pointed to the BMW case as a model for a mediation case, a

18   mediation situation that worked.  I just want to point out

19   that the mediation that resolved the BMW case resolved it

20   among the plan proponents and then there was several weeks of

21   testimony at the confirmation hearing by insurance companies

22   because the insurance companies were not part of the

23   mediation.  They were locked out of it.  And to the extent

24   that there really is a genuine interest in mediating this

25   case to a final consensual resolution, it seems to me that to

1   avoid any confrontation with the insurers, it makes sense at

2   least to find out how they feel about things.  So I would

3   just encourage Mr. Bernick to address that issue.  Thank you,

4   Your Honor.

5       THE COURT: Anyone else?  Mr. Bernick?  Do you want

6   to change that to about six more years instead of sixty days?

7       MR. BERNICK: Well, if that's a response to the -

8   Well, I should say, maybe if the insurers are in the room

9   that may require that - no, I'm being facetious.  I think the

10  sixty days still makes sense, and probably the reason I think

11  it makes sense is that we know that it falls within the zone

12  of comfort for the people who have spoken in favor of sixty

13  days.  Maybe it will be that we can't get it done, but I

14  don't think that there's any utility in providing a longer

15  period for the extension at this time.  I think we should

16  always keep the time pressure on, and I think that that's a

17  good thing to have take place.  So, as I've tried to keep

18  track of the tally, first question is whether there ought to

19  be an extension of exclusivity for sixty days, and as long as

20  I listen to Mr. Baena speak, always with pleasure because he

21  is as always articulate and eloquent.  I didn't hear an

22  object to the extension of exclusivity for sixty days, and of

23  course, as soon as the words slip my lips, maybe Mr. Baena

24  will rise to articulate that objection, but I don't believe

25  that there really has been an objection put for the

1    extension, and we would, therefore, ask, reiterate our

2    request for the sixty-day extension of exclusivity.  The

3    second issue that came up is, well, what happens if we're not

4    successful?  And Your Honor did make some statements last

5    time that I think were more in the area of, you know, options

6    that might be available to the Court down the road if we

7    still don't have a consensual plan, and we all know that

8    there are many, many different options.  Indeed, our status

9    report reflects there are a lot of different activities that

10   bear ultimately on the question of whether this case will

11   have a successful resolution.  It may be that other parties

12   will come forward and say at that time there should not be an

13   extension of exclusivity.  But, it doesn't seem to me that

14   there is any sense, merit that's productive in any way,

15   shape, or form to anticipate that failure and to have

16   somehow, Your Honor, quote or reiterate a ruling that Your

17   Honor never made.  That's a negotiation with the Court, it's

18   an effort to somehow get the Court to say that it ruled at

19   that time, that is last time, and it did not.  You,

20   therefore, get to the question of, well, would it make sense

21   to have a reiteration of some statement from the Court about

22   what will happen if things fail, and we believe that that

23   would be unproductive.  It would be unproductive certainly

24   from the point of view of the argument that's been made by

25   counsel for the PD Committee.  The argument is that somehow

1   the PD Committee has been held hostage.  The Committee has

2   not been held hostage in any way, shape, or form.  The

3   Committee has commented on the plans that are on file.  The

4   Committee has initiated with the cooperation, indeed, support

5   of the debtor from the very first that it took place, efforts

6   by Mr. Dies to negotiate an overall package for this plan and

7   for this case.  So, there's not been any impediment there,

8   certainly not any impediment that we have created and indeed

9   what we proposed would lead Mr. Dies free to continue to be

10  active albeit in the context perhaps of a more systematically

11  arranged mediation effort.  But most telling, the property

12  damage folks do not have the ability to drive this ship.

13  They don't have the ability to drive this case.  They don't,

14  they never will have.  They are a constituency, and they are

15  the only constituency this afternoon that has seen fit to

16  predict in essence that there will not be success and have

17  the Court comment in advance and in perhaps what is suggested

18  to be a binding fashion of what will happen then.  There is

19  no utility to that.  All that is, is an effort to posture, to

20  get the Court to make some statement that then counsel

21  believes can be used later on either in the negotiations or

22  in subsequent proceedings before the Court.  There is no

23  utility to that, and we believe that we ought to stick with

24  our need today.  If things do not work out there will be a

25  lot of people coming forward and making a lot of proposals

1   for the Court.  The third issue that was raised was whether

2   in fact there should be a stand-down with respect to the

3   litigation of matters concerning the PD claims, and, as Your

4   Honor knows, there are a whole variety of activities that

5   relate to the PD claims.  Ultimately they all converge on the

6   same thing which is estimation, but along the way, work is

7   being done that is not contingent upon whether there's an

8   estimation or not.  Work is being done on the question of who

9   is a proper claimant, and what is a proper claim?  In as much

10  time as that's taken, and as much effort as that's taken,

11  both by the Court and by the parties, that whole effort to

12  date, while it has produced a fairly dramatic shift of the

13  number of claims, is only for the sake of getting to the

14  point where we even have identified what claims should still

15  be pending, and we're still not done with that process.  So,

16  that's been a critical process.  It has not been focused on

17  the property damage claimants in their entirety.  Most of

18  it's been focused on Mr. Speights for reasons that we've

19  articulated before the Court.  That process should continue.

20  Should there be a suspense in the estimation work?

21  Absolutely not, and indeed, to a certain extent, there is a

22  significant chance that if there's a consensual plan in this

23  case, it may not include the property damage claimants as

24  Your Honor has seen in the case of the USG matter.  And in

25  that event, there's going to have to be some process of

1   determining what to do with the property damage claims.  So,

2   both because of those factors and also because as we pointed

3   out, a lot of our motivation or the debtor's motivation

4   originally in going down that road, was that in prior

5   negotiations this enormous population of Speights claims had

6   already proven to be an obstacle in the negotiation process,

7   we believe is absolutely of the essence to continue during

8   this period of time and to not let up the process of moving

9   forward with respect to the property damage claims.  And that

10  is, also the approach that Your Honor has dictated or has

11  indicated would be followed through the last sixty days,

12  which is, we suspended the period of time for the personal

13  injury questionnaires, but we continued with the property

14  damage litigation.  There's also another distinguishing

15  feature which is the personal injury questionnaires create a

16  significant burden both for the claimant and for the law

17  firms that are involved, and there are a whole series - or

18  hundreds of thousands of claimants and there are numerous law

19  firms that are involved, and it also gives them more time to

20  make sure that the information that's provided, if it becomes

21  necessary to complete that process, will be good information.

22  So there are affirmative reasons why that additional period

23  of time probably makes an awful lot of sense.  So, we then

24  get to the second major substantive point, which is beyond

25  the extension of exclusivity; what do we do concerning the

1    mediation effort?  And we do have some thoughts along those

2    lines.  First of all, I want to say on behalf of the debtor

3    that we very much do appreciate the efforts that Mr. Dies has

4    undertaken during the period of time that he's been involved

5    in these discussions, and we don't - we're neither far from

6    faulting him or taking issue with somehow the bonafides of

7    that effort as was suggested by counsel.  To the contrary, we

8    think that Mr Dies is acting absolutely in good faith and is

9    trying to get an overall deal done, and we think that those

10   efforts are significant for the intent that they reflect

11   which is to bring resolution to this case.  Nonetheless, the

12   fact remains that Mr. Dies had an ambitious goal, which was

13   to develop an overall package for this case, and that is a

14   complex process, and it's a process in which, you know,

15   everybody knows he is an interested party who represents a

16   constituency himself.  And the question really is, whether

17   that is the best way to go, that is, an overall package

18   that's negotiated through essentially one representative on

19   behalf of, in an advised sense, a whole series of

20   constituencies including the debtor.  Maybe that will work

21   out.  Maybe it won't, but certainly our perspective is that

22   we shouldn't put all of our eggs in that basket, and the

23   merit of having a mediator is that we can see whether, you

24   know, exactly where the sticking points are, and perhaps a

25   deal can be worked out among - less than all of the

1   constituencies and thereby provide a building block for

2   moving them to include more folks.  That's what flexibility

3   is there through the process of mediation, and that's one of

4   the main reasons that we wanted to assure that we're really

5   aiming towards a mediator in the event that the negotiations

6   between the parties themselves are not successful.  So, we

7   think that there ought to be a mediator.  We think that to

8   the extent that the mediator believes that the relationship

9   between Mr. Dies and the person with whom he's speaking on

10  behalf of the personal injury claimants can continue as

11  productive, that can be something that comes up in the

12  context of mediation.  We would suggest to the Court

13  concretely that the parties be given, say, a week in which to

14  see if they can reach agreement on a mediator, and if a

15  mediator - can't reach agreement on a mediator, then the

16  Court should select a mediator.  With respect to what then

17  happens, I think that certainly from the debtor's point of

18  view, there is flexibility but there are a couple of

19  principals that would be important to put in place.  One, is

20  that we believe that that mediator should have communications

21  with the Court only with respect to process not with respect

22  to the substance of the mediation.

23        THE COURT: Oh, absolutely.

24        MR. BERNICK: Well, I understand that, but you know,

25  we're operating in the context where that has perhaps not

1   always been the case.  So, we want to make sure that that is

2   so.  And -

3        THE COURT: I don't expect any communication from

4   the mediator unless there is some issue involving process or

5   getting someone to the table or something that he or she

6   thinks the Court's assistance is necessary, and I'll get a

7   report at the end as that will be something simple that is;

8   yes, there is an agreement or no, there isn't.

9        MR. BERNICK: Well, but at the same time Your Honor

10  may want to, and this is something that, as I said, we want

11  to think about a little bit, you may want to have flexibility

12  so that, you know, one of the problems that we've had in

13  talking about the progress in the negotiations is well, who's

14  really giving the Court the full story, and, you know, what

15  are the true facts of what's going on.  Very delicate balance

16  about getting a report from the mediator that is both neither

17  - both non-substantive and also gives the Court a reflection

18  of whether progress is being made, but there's still maybe

19  some merit in the idea that the mediator can express at least

20  some view about whether progress is being made and whether it

21  makes sense to continue the mediation process.  That's what

22  I'm really getting at.

23       THE COURT: Well, I think the mediator at some point

24  in time if he or she thinks she's not effective or has done

25  everything that can be done in that process is going to tell

1    me that, but I don't think that has to involve me in the

2    details of the negotiation.

3         MR. BERNICK: Yeah.  The other feature is, in a

4    sense, if we don't reach agreement and who does the Court

5    select.  I had a good discussion with counsel at least for

6    the personal injury constituencies.  I think I also talked

7    about this a little bit with Mr. Baena.  There are very, very

8    few people who could act as a mediator who have a lot of

9    substantive knowledge about the overwhelming complexity of

10   negotiating a deal in the asbestos case, and I guess it was

11   my sense, as I conveyed it to Mr. Lockwood and perhaps he

12   shared that sense, that we're probably not talking about

13   that.  We're talking about somebody who will act as a

14   convener and facilitator rather than somebody who is going to

15   have substantive expertise and be able to express views

16   about, you know, well, ultimately, why don't you do this,

17   that, or the other, and my own feeling is, this isn't going

18   to work out even if there's a mediator unless the parties

19   really want to make something happen, and in fact, are the

20   drivers for consensus, and I expressed the hope with Mr.

21   Lockwood, and I know he shares it, see if we can actually,

22   you know, be the engines ourselves, but with the

23   encouragement of the mediator and with the discipline of

24   getting together as a group with some degree of regularity.

25   So, again, to be clear, if we put it back to Your Honor, I

1    think that the issue is going to be to appoint someone who

2    doesn't necessarily have a substantial background with

3    respect to asbestos or mass tort, but somebody that should

4    believe, Your Honor, will be good at just keeping the process

5    going and keeping people coming to the table.

6           THE COURT: What's the biggest hammer that can be

7    built between now and whenever this facilitator is going to

8    be appointed.

9           MR. BERNICK: Well, no, the biggest hammer - I think

10   the biggest hammer - Well, the hammer is, in a sense, Your

11   Honor, whatever it is.  I mean that probably gets them to the

12   substance of what's driving the mediation.  I think our

13   status report attempted to identify some of the major factors

14   that are out there, and I think that those are the factors.

15   What actually - what those factors mean with respect to

16   dollars and cents and what each constituency really wants to

17   accomplish is, you know, it's illusive enough that nobody's

18   been able to figure it out particularly well, other than the

19   people that are sitting down at the table reaching a deal.

20   So, I think that whatever motivations are out there now to

21   get it done within a short period of time, are there.  There

22   have been proposals that have been put on the table.  They've

23   been responded to.  So this is not like we're beginning some

24   new process.  This is an old discussion that's been going on

25   for quite some time.  Again, I think that nobody here really

 1   wants to have to have a mediation process.  They want to see

 2   if a deal can be done or not.  So, you know, I think

 3   everybody's available.  Everybody knows that it would be

 4   unwise to impose upon Your Honor to go through a process that

 5   really is not necessary.  We'll see if we can get it done,

 6   and I take what I've heard from, really everybody at face

 7   value, and that is that they really do want to see if a deal

 8   can be done.  A lot of things have happened in the last

 9   couple/three/four weeks also that are, you know, are

10   material.  How they actually cut, we could probably talk

11   about for the next five hours.  In any event, one last thing

12   is that concerns have been raised both by the insurers and

13   also by Montana and other sovereign royal bodies about the

14   desire to continue with - include the insurers and to

15   continue whatever discussions are underway with respect to

16   the State of Montana and the Canadian government.  No problem

17   with that at all.   We anticipate that anybody else who wants

18   to be part of this process in the sense of having a

19   particular issue that needs to be mediated like Montana or

20   Canada, we don't believe that they should be excluded, and

21   that can continue.  I don't know that it has to involve

22   everybody else, but that certainly can continue.  We have no

23   sense that somehow this should impair that process.  With

24   respect to the insurers, the Babcock case was a very, very

25   different case in many, many respects.  Don't believe that

1    somehow we're looking down the road to some contested

2    proceeding with evidence and things of that nature with

3    respect to the insurers, but I just don't know, and there's

4    certainly no effort to exclude the insurers in this process.

5    As to when they're at the table with respect to whom, that's

6    a more general question of when it makes sense to have people

7    at the table talking with one another and that's something

8    that, again, we can, you know, it's really the mediator's

9    job.  So, there's no desire to exclude the insurers, and

10   we're happy to bring them up to speed, and I know that there

11   have been some discussions, and I expect that those will

12   continue.  So, kind of a long speech, but I think that that's

13   the full tally.  We'd ask Your Honor to extend exclusivity

14   for sixty days.  The parties will endeavor to see if they can

15   reach agreement concerning a mediator within a week.  Failing

16   that, the debtor will undertake to notify the Court about

17   whether we need the Court's assistance in appointing a

18   mediator, and then I suppose we would have to have some order

19   that we would tender to the Court for the actual appointment

20   of a mediator, and I think that that would bring us to a

21   close.  I've now agreed on behalf of the debtor that with

22   respect to the personal injury question or that date, the

23   deadline, would be further extended by sixty days.

24            THE COURT: Okay.  Tell me with respect to the

25   property damage and the estimation process.  Mr. Baena's

1    asking for a complete standstill.  The debtor wants to move

2    forward, but I'm not sure that you want to move forward on

3    everything because I'm not totally clear what happens next?

4         MR. BERNICK: Well, I think - and Ms. Browdy is

5    here, obviously, to address any specifics in greater detail.

6    We're still not done with the process of kind of focusing on

7    which claims - as to which claims there was authority and

8    some evidence of product ID which is kind of a minimum to get

9    to the point where we've got a claim.  That clearly has to

10   continue.   With respect to the estimation on the merits, you

11   know, Your Honor, we have a phased process, and that phased

12   process contemplates, you know, expert reports and expert

13   discovery on certain issues then going forward, and I know

14   that there is some discovery of experts that's expected to

15   take place within the next sixty days.  Our feeling, Your

16   Honor, is that that absolutely should continue.  We're not

17   talking about asking Your Honor to rule on any substantive

18   estimation matters in the next sixty days.  We're just

19   saying, let's just keep it going.  It's taking time, but

20   let's just keep it going.   And the question of whose got a

21   claim is going to have to get resolved, I mean, in a sense of

22   having authority and having a product.  There's no way those

23   claims as to which there's not authority or product ID are in

24   some fashion going to get paid in this case.  So we believe

25   that that should continue.  Now, if in fact, we're making

1  progress in the substantive negotiations, I'll represent to

2  Mr. Baena that we're totally happy with the idea that if it

3  looks like we're getting close, we don't have to have people

4  running around taking depositions and discovery on matters

5  that really reach the ultimate merits of the estimation.  But

6  I don't think we're there yet at all, and I have not had any

7  substantive contact with anybody on behalf of the property

8  damage claimants that is substantive contact with respect to

9  a settlement.  Mr. Dies has had whatever dialogue he's had

10  with the folks he's talking to.  We've not been included in

11  those, and even though I have asked for the information on

12  what those entail insofar as the debtor and the property

13  damage claimants are concerned, I've not received that

14  information back nor to my knowledge has my client.  So we're

15  kind of, with respect to property damage, again, very

16  respectful with respect to Mr. Dies' efforts but our main

17  task right now is to kind of clear the playing field with

18  respect to the property damage because we know, even what the

19  population of claims is, and I don't have information of a

20  substantive nature on the settlement discussions that's

21  sufficient for me to say that on behalf of the debtor, that

22  litigation process should be suspended.  I just don't.

23          THE COURT: Okay.  Mr. Dies?

24          MR. DIES: Your Honor, may it please the Court,

25  Martin Dies, a member of the Property Damage Committee.  I

1   feel like I must rise to say a few things here.  First of

2   all, Grace has been very involved in my discussions.  I spoke

3   with Mr. Beaver twice yesterday, so I guess Mr. Bernick

4   doesn't know about that, but I really feel that we're at a

5   crossroads here, and I want to explain why.  When Mr. Budd

6   and myself and Mr. Beaver began in early 2005 to try to

7   resurrect the Austern 2004 proposal, the framework was

8   established by Mr. Budd, and that concept was a consensual

9   plan -

10          MR. BERNICK: I'm sorry, I apologize, Mr. Dies.  I

11   specifically did not get into the substance of those

12   discussions, and I certainly didn't get into the dialog that

13   I've had with Mr. Beaver, and we most certainly are in touch

14   with Mr. Beaver.  If Mr. Dies wants to go down this road and

15   start talking about the substance of the discussion, I

16   suppose that's fine with me.  I don't see the utility of that

17   today and it certainly is going to open the door for my

18   talking with the Court about what's happened.  This was a

19   very serious problem last time, as Your Honor will recall, is

20   that there was one side of the story that was told and not

21   the other side of the story.  I'm not suggesting that Mr.

22   Dies is in some fashion, a thought we made clear in our

23   papers, I'm not saying that at all, but I can't sit here for

24   a second hearing and listen to a discussion abut what's

25   happened in these discussions and not rise and address our

1   side of what's happened in connection with those discussions.

2   So, I guess I'm just alerting Mr. Dies and the Court of the

3   fact that we're opening a door here that may be a door of

4   some consequence.

5       THE COURT: All right, well, with respect to what

6   Mr. Dies has said so far, which is that the concept is to try

7   to resurrect a consensual plan, that's not a surprise.  I

8   sort of gathered that that's what the whole process is all

9   about.  So, just on my own, having put two and two together

10  without Mr. Dies having said a word, I intuited that.

11      MR. BERNICK: Well, but Your Honor, actually that's

12  not exactly what he said.  What he said was the Austern

13  proposal -

14      THE COURT: I have no idea what the Austern proposal

15  is, nor do I care.

16      MR. BERNICK: Well, I understand though but that is

17  a very meaningful statement.  It's news to me.  I didn't

18  realize that that's what they were doing.  Never been told.

19      THE COURT: Well, in any event -

20      MR. DIES: Your Honor -

21      THE COURT:  - let's just get to the point that the

22  issue is whether or not somebody can help facilitate a

23  consensual plan.  Mr. Dies and some others decided that they

24  would undertake that effort; is that enough to get me to

25  where you want to -

1       MR. DIES: I should have stated, Your Honor, the

2  Austern negotiations, no particular proposal, and I am not

3  going to talk about any conversations.  I specifically didn't

4  do that at the last hearing in December because I felt it

5  would be disadvantageous.  I tried to be very factual about

6  the progress in terms of proposals.  So, I'm not going to

7  talk about who said what to whom, but it's important here

8  because what we had been trying to do is to have a consensual

9  plan, and that would involve first an agreement between

10  property damage and bodily injury.  Now, unfortunately, a lot

11  hasn't happened in the last sixty days in this bankruptcy.  A

12  lot's happened in other bankruptcies and the legislative

13  front, but I do believe that our proposal is alive.  It

14  hasn't been rejected.  I had been in discussion with Mr. Budd

15  and Mr. Beaver.  I believe it's alive, and I believe that the

16  crossroads here for us is this is not USG, and I think what

17  Mr. Bernick is proposing would effectively exclude property

18  damage, and I'll tell you why without going into discussions

19  of what's been said.  I think that W.R. Grace cannot even

20  contend that if they do a deal with bodily injury that

21  property damage would emerge unimpaired, et cetera.  So, I

22  thinks it's - We should be trying to facilitate a consensual

23  deal, not exclude property damage.  Now, I believe, Your

24  Honor, that, without going into the substance, I've been made

25  aware of certain issues that the parties need to address

1    before we can finalize any negotiations, and I think the idea

2    for a mediation relates to that, and I support that, and

3    property damage supports whatever process Your Honor

4    implements, and insofar as what Mr. Baena said, there was a

5    legitimate question in my mind and Mr. Baena's mind about

6    what the Court had said and ruled last time.  And that's all

7    we're saying.  We're not sure which process you want to go

8    down.   But herein is the problem, Your Honor, if in fact

9    this is going to be an effort to get a consensual plan and

10   not freeze PD out so we're going to have some process that's

11   going to go on for years, objections, appeals, et cetera,

12   there's a very practical problem here and that is, as special

13   counsel to the Committee, I have to launch off into discovery

14   on the facial and methodology discovery which really began

15   last - this Monday, and it's simply not possible for me to be

16   involved in this process in a meaningful way, but more

17   importantly, from the standpoint of property damage and the

18   reason I think a stand-down is appropriate is, I'm the person

19   that went out and sought to do what bodily injury wanted,

20   which is secure a joint proposal from PD.  That was no easy

21   matter.  There are a lot of factions here.  ZAI, tradition

22   PD, and factions within that.  It took many months.  My

23   concern is, this litigation program is constantly changing

24   the posture of the parties, and I think that is not conducive

25   to a deal, that is not conducive, and Mr. Bernick in his

1    status report, employs the court to rule on, for example, the

2    ZAI matter.  I happen to disagree with that, myself.  I

3    haven't talked to anybody else about that because I think

4    that - I know how hard it is and was to get people to the

5    table, and once that changes, the whole posture changes,

6    people have to become positional.  So I just think it's wrong

7    to try to design something that excludes PD because I do

8    think that we have been the party who tried to put this

9    together.  I think it's still alive.  I think we can make

10   input, but I just don't think we can - in the next thirty to

11   sixty days we cannot be doing and responding to this

12   litigation and making meaningful benefit to the process.  So,

13   in that respect, I disagree with that.  I do think we need a

14   stand-down if we're going to be part of this process to

15   produce something that is consensual, which I believe is what

16   the parties want.  Thank you.

17          THE COURT: All right.  I don't want details, so

18   please, do not - Mr. Dies, don't leave.  I don't want

19   details, so please don't interpret this as a question for

20   details, but what I am looking for, I guess, is an opinion.

21   Are the property damage constituents, and I include ZAI in

22   that property damage constituency, engaged in some process

23   through you or elsewhere whereby they are coming up with a

24   proposal that's going to be transmitted to other parties?

25   I'm really clueless as to what's taking place.

1          MR. DIES: Your Honor, the only reason I tried to be

2     obscure about this is learning from experience, if you say

3     too much it's a poison pill.  We, after several months of

4     work, we came up with a proposal, a joint proposal as

5     requested -

6          THE COURT: Who's the "we"?

7          MR. DIES: Property damage through me, ZAI,

8     traditional PD, a joint proposal which I made in writing on

9     December the 2nd, delivered it to bodily injury, Mr. Budd, and

10    that proposal is still on the table.  Hadn't been rejected,

11    and I am aware there is another issue now that the parties

12    ought to address, and I think it's very important to keep the

13    status quo because that proposal - I don't want to get into

14    what anybody has said, Your Honor, but it is out there, and

15    it hasn't been rejected, and it hasn't been accepted, but I

16    think it's a meaningful start.

17         THE COURT: All right.

18         MR. BERNICK: Let me peel off the layer only so far

19    as Mr. Dies has gone because what he just said to the Court

20    is very, very important.  First, there's no effort in what we

21    have proposed going forward to exclude PD at all, not at all.

22    The whole idea -

23         THE COURT: Well, the issue isn't, I think, an

24    intent to exclude.  It's a question of practicality.  Can

25    they be litigating on one front with the time and people

1    involved and attempting to participate meaningfully in the

2    settlement on the other?

3          MR. BERNICK: And I want to address that

4    specifically, but let me get to the contour first so that

5    Your Honor has now heard a couple more facts.  Your Honor has

6    heard the fact that there's never to revive the Austern

7    negotiations and that's fair.  That's a little different from

8    the Austern, the Austern negotiations which actually were

9    simply the continuation of the negotiations that were

10   associated with our filing of a plan in the fall of '04 and

11   in anticipation of having to file a plan.  The plan set out

12   certain basic economic terms with the hope that that would

13   lead to discussions.  It led to discussions.  It came very

14   close.  They then failed, for reasons that are not apparent,

15   obviously - not obvious.  Mr. Austern then made an effort,

16   admirably so, to revive those negotiations, and that effort

17   revival did not work, and again, why it did not work and

18   who's responsible, I'm not going to get into.  It just didn't

19   work.  So, Mr. Dies then says, Well, there was an effort to

20   revive those discussions, and that is accurate.  That effort

21   revival was done with the complete cooperation and

22   encouragement of Mr. Beaver who is acting as our

23   representative, and I think Mr. Dies would acknowledge that.

24   I haven't heard that acknowledgment, but I'm assuming that he

25   - Well, it's fairly important, Your Honor, because a lot of

1  arrows that have been cast at the debtor here in this

2  process, like we're sitting around doing nothing including, I

3  would respectfully say - suggest was also by the Court, and

4  that is the sense from last time, and that is just not

5  accurate.

6          THE COURT: Well, I don't know, Mr. Bernick, I mean,

7  several months ago, I think I asked that you make a weekly

8  phone call to all parties to find out what was going on in

9  the case, you specifically.

10         MR. BERNICK: Yes.

11         THE COURT: I'm pretty sure that hasn't been done.

12         MR. BERNICK: Well, let me address that very

13  specifically, Your Honor, because I know that that's on your

14  mind.

15         THE COURT: It is on my mind.  A lots on my mind.

16         MR. BERNICK: And that's why I'm prepared to tell

17  you, Your Honor, that rather than prejudge that on the basis

18  of the facts that are not before the Court, what I would say

19  to Your Honor is very, very simple, and it is set out in the

20  Beaver affidavit.  What happened after Your Honor made that

21  statement is, that I convened a meeting in Washington, D.C.

22  to get the ball rolling, and let me say it was not easy to

23  get that meeting taking place in Washington, D.C.  We talked

24  about a mediator.  That didn't go particularly far in terms

25  of a substantive matter, and then within, it must have been a

1    couple/three weeks of that, we had this fork in the road.

2    And the fork in the road was whether to continue with the

3    efforts that were then underway by Mr. Dies and who has now

4    been identified as Mr. Budd, to do an overall package, and

5    that was an effort that was - we've never known the substance

6    of it, and Mr. Dies suggests that Mr. Beaver has.  I can only

7    know what Mr. Beaver has shared with his client, which is

8    that we have not known the substance of those discussions,

9    and on the other hand, opening up a direct line of

10   communication with the personal injury claimants.  I

11   personally followed up on that, personally.  I set up the

12   meeting in New York City with Mr. Lockwood's partner, Mr.

13   Inselbuch, with Mr. Weis and with Mr. Budd to take up that

14   very issue.  They made the proposal at that time that we

15   initiate a separate line of communication with the personal

16   injury folks to see if there could not be a deal with them

17   that was just standing by itself and then if we could do a

18   deal with others, fine, sobeit.  So, we then had these two

19   alternatives, and my client, with my concurrence, decided

20   that based upon what we thought to be the strength of the

21   relationship between Mr. Dies and Mr. Budd, that rather than

22   aiming for a piece, we should aim for the whole.  And I

23   deferred to my client's judgment.  I concurred with him, I

24   deferred to it, and I deferred to the judgment of all the

25   folks that supported that saying that it was better to aim

1    for the whole rather than to aim for a part.  So, far from

2    being in default with respect to my obligations to the Court,

3    a very deliberate decision was made that gave proper

4    deference to the fact that maybe I was not the best person to

5    negotiate with the personal injury folks on this issue, maybe

6    Mr. Dies was.  That's exactly what happened.  I've learned

7    for the first time today that there was a written joint

8    proposal made on December the 2nd on behalf of these different

9    property damage constituencies.  The first I have ever heard

10   of that.  I knew that there was a proposal that had been

11   made, didn't know whether it was writing, didn't know whether

12   - thought it included everybody but had no affirmation that

13   it in fact included everybody.  Your Honor will also recall

14   that that's fairly close to the time that Your Honor

15   initiated a telephone conference with respect to ZAI, and the

16   upshot of that conference was that we had a window of

17   opportunity before Your Honor ruled at the end of January to

18   see if we could do a deal, and Mr. Westbrook was on that

19   call, and I think that he and I completely agreed, that this

20   was a good window of opportunity.  That was not lost on us,

21   but that again became wrapped up in the discussions that Mr.

22   Dies was having with Mr. Budd.  Now, at the last hearing,

23   there were people who reported to the Court that the debtor

24   deserved no credit for anything that was going on, asked for

25   the termination of exclusivity because we were in default of

1   our obligations to the Court, and I think Your Honor has been

2   candid in saying this afternoon, you tended to share some of

3   that feud because you had imposed upon me personally an

4   obligation to move forward whereas in fact the truth was that

5   I discharged that obligation.  My client discharged that

6   obligation, and it was our judgment that what was best for

7   the prosecution of a conclusion to this case, was to defer to

8   a discussion between Mr. Dies and Mr. Budd.  Following that

9   hearing, the very next day, and after talking with my client,

10  I said, We can no longer afford to be dependent upon what Mr.

11  Dies and Mr. Budd are doing.  Mr. Dies does not represent the

12  debtor.  We do not know the substance of what he is talking

13  about with the other side.  We didn't know what the

14  discussion was as concerns the unsecured creditors, as

15  concerns equity, as concerns ZAI, as concerns anything, and I

16  thought, and my client agreed, that we'd be in default of our

17  obligations with respect to the Court if we were to simply

18  sit by passively and allow the status quo to continue.  So

19  during the last sixty days, I have reached out directly to

20  the Personal Injury Committee, both their counsel and members

21  of that Committee, to establish a separate line of

22  communication in the event that the package is too ambitious

23  to begin with, in the event that the more productive

24  discussion to take place initially is directed between the

25  debtor and the personal injury constituency.  I can go

1 through chapter and verse of what's happened to advance that

2 process including calls on a weekly basis, pushing, pushing,

3 pushing to be able to establish an alternative way of

4 negotiating, Your Honor.  I'm happy to do that, Your Honor, I

5 don't think Your Honor would want to take up our time this

6 afternoon to do it, I'm prepared to submit an affidavit to

7 the Court to that effect.  So, we've pursued that.  At the

8 same time we've done nothing to foreclose the continuation of

9 the dialogue between Mr. Dies and Mr. Budd.  Indeed, when I

10 contacted the personal injury folks, I said, I don't want to

11 do anything to impair the process of your trying to work out

12 an overall deal between all constituencies, but I can no

13 longer rest upon either these reports to the Court on matters

14 that we're not familiar with or in a process that may be too

15 ambitious.  Now, it turns out, that Mr. Dies has now said

16 that there was a proposal on the table more than two months

17 ago, and he believes that there's not been a response to it.

18 That's my whole point is that we have got to figure out a

19 better way to bring people to the table and make this thing

20 happen, but I think it's completely unfair to suggest that in

21 some fashion this debtor has been anything less than

22 completely active in that process in trying to reach out to

23 all constituencies that make this thing happen.  Now, my own

24 personal feeling about this is, that to look for the whole

25 package is too ambitious in the sense that we can't have a

1  proposal that's kind of take all these pieces or take none of

2  them, because what happens is that people end up negotiating

3  relationships between each other, like how much does PI get

4  versus PD?  How much does ZAI get versus traditional PD?  And

5  it may be that that's actually impeding the process of people

6  understanding what the individual claimant's positions are,

7  and I suspect that that's probably one of the impediments

8  that Mr. Dies has faced, is that he brings a joint proposal

9  to the table that's got a variety of pieces in it that are

10  all property pieces, and maybe the personal injury people

11  don't agree with all those individual pieces, maybe the

12  debtor wouldn't but we could reach agreement with respect to

13  some of them.  That's the whole idea of having a mediation so

14  that Grace is not faced with and the general unsecured

15  creditors are not faced with negotiating through Mr. Dies

16  with the Personal Injury Committee when he may be preserving

17  to the property damage folks more money than for example the

18  debtor will want to pay, because we've got to pay these guys

19  some more money or we've got to reserve money for Montana.

20  Now, I'm not prejudging any of that.  The whole idea of a

21  mediation is to leave it totally open.  There is no desire to

22  exclude property.  There's no desire to do anything with

23  respect to property that's any different from any other

24  constituency.  They've got their own issues.  With respect to

25  ZAI, we said in our papers that Your Honor should decide ZAI

1   because it's fully briefed, and it's before the Court to

2   decide.  Are we happy to have that issue deferred for some

3   time if we actually see some progress, if Your Honor wants to

4   defer it, that's not a big deal with respect to us.  It's the

5   issuance of an opinion, I agree with Mr. Dies, maybe it will

6   change the applecart, but people have got to believe the

7   applecart's going to change here, otherwise they also don't

8   have a motivation to do the negotiations.  Feel very

9   differently about the work that's designed to focus on which

10  the property damage claims actually are.  We started out with

11  4,000 claims.  We're now down to under a 1,000 and there's

12  not been a single adjudication on the merits.  It's only a

13  question of finding out what's a real claim?  That process

14  has to continue because otherwise we don't know what we're

15  talking about.  Mr. Speights says he's got hundreds or

16  thousands of claims, and turns out he didn't.  We still have

17  issues there.  So we need to know what it is that we're

18  talking about for the negotiations to be meaningful.  We have

19  information gaps with respect to personal injury.  I think

20  they're probably in terms of the claims, somewhat less

21  substantial at this point, albeit they're very severe and if

22  we have to estimate personal injury, we will, but there

23  there's the countervailing interest of having claimants fill

24  out a bunch of questionnaires.  With respect to Mr. Dies' own

25  personal situation, I acknowledge that Mr. Dies has got

1  different things on his plate.  Maybe that's all the more

2  reason to have a mediator, but I don't think it's appropriate

3  to say that because Mr. Dies was appointed as special counsel

4  to deal with these litigation issues and because he is also

5  the person that's been appointed to do the negotiation, but

6  somehow that ought to change in any way, shape, or form the

7  arena for the negotiations or the necessity for getting this

8  litigation work done.  Mr. Baena's here.  He's got all kinds

9  of people from his firm who have been working on the case.

10  They're also represented by local counsel.  We've got all

11  kinds of people who can do the negotiations.  With all due

12  respect to Mr. Dies, he is not indispensable to the

13  negotiations in the sense that there's nobody else who can do

14  it.  And Mr. Dies, we have deferred matters as concerned with

15  Mr. Dies' own claims, for example, in Louisiana, that was not

16  a problem.  We can't have a situation where because Mr. Dies

17  is involved in the negotiations, we're not learning again

18  more and more which of the Speights claims are real claims,

19  and we're not advancing the cause and taking the depositions

20  of experts that they've been used for twenty/thirty years.

21  So, no desire to exclude PD.  Want to break the logjam if the

22  relationship, the overall package is not the way to go, then,

23  you know, Mr. Speights and Mr. Dies can stand here and we

24  agree that he's made, you know, an important effort, but

25  maybe it's not the right effort to be pursuing here, and

1   that's why we've taken the position that we have, Your Honor.

2   I'm sorry to go on for so long.

3          MR. DIES: Your Honor, very briefly, not to be

4   positional, very danger in that.  I think the problem with

5   these negotiations are always personalities, and I want to

6   get away from that if I can.  I would just say, in response

7   to Mr. Bernick, that the framework that was explained to us

8   and Mr. Beaver and Mr. Budd and I worked on, was one to get

9   away from how much is A getting or B getting and so the

10  proposal that we made, as I said on the record in December,

11  was a joint proposal designed to avoid that type of a

12  problem.  Now, if bodily injury people don't want us in the

13  room, that's one thing, but I have not heard that.  I have

14  not heard that.  I've had conversations as late as last night

15  about what the problem may be and how we go about that.  So,

16  I'm not sure Mr. Bernick is speaking for the other

17  constituencies.  The issue, Your Honor, about my particular

18  problem, I didn't ask for this job.  It just developed in

19  this bankruptcy, and I've got claimants that had hurricane

20  problems.  Indeed my office was destroyed, my home was

21  rendered unhabitable.  I moved to Austin.  I've had a few

22  issues.  No problem.  I can deal with that, but if he wants

23  to take me out and do discovery all over the country, the

24  same time as the mediation, if there's any chance this can

25  happen, we should not let this fail.  We've worked hard on

1   it.  Maybe it will fail.  Sounds like certain parties - but,

2   I think it is still alive.  That's my point.

3        MR. LOCKWOOD: I think I was just invited to speak.

4   So I'm going to keep it short.  The Personal Injury Committee

5   understands that property damage interests will be

6   participants in the mediation and has no interest in

7   excluding them in any way, shape, or form from that.

8   Secondly, I do not believe that it is appropriate in a public

9   forum, and in particularly - or for that matter, in a private

10  forum in front of this Court who may have to adjudicate

11  contested matters, to get into whose positions or what

12  positions or whatever in these negotiations.  Even - We

13  supported mediation because we think it's useful to have all

14  the parties.  Indeed, we are hoping that some of the parties

15  we haven't heard from today, like the United States

16  Government, is going to participate in these.  The idea that

17  there would - as part of the mediation or as separate and a

18  part from the mediation, there could be continuing

19  discussions between particular constituencies about potential

20  joint approaches to the debtor and other constituencies, that

21  is not inconsistent with having a mediation, and we certainly

22  have no notion of trying to foreclose any such communications

23  including responses of the sort Mr. Dies referred to.  So, I

24  don't see that there's any issue here as far as that's

25  concerned.  As I see it, the only real issue is whether or

1   not Mr. Dies rolled in some portion - I take it it's not all,

2   but in some portion of the PD litigation that's going on in

3   front of this Court is sufficiently time consuming and

4   substantial that it would interfere with his and the PD's

5   ability to responsibly and profitably participate in the

6   mediation and the negotiations.  On that matter, my Committee

7   has no view.  We don't know enough about what's going on, and

8   we don't think it's really - We don't have a dog in that

9   fight, if you will.  We would leave that to the Court to

10  determine on the basis of what Mr. Dies has had to say and

11  what the basis of what the debtor has had to say.  Thank you,

12  Your Honor.

13        THE COURT: Okay.  Mr. Baena, with respect to Mr.

14  Dies, I agree that Mr. Dies can't be in two places at one

15  time.  Much as we sometimes like to try, it hasn't yet

16  happened.  So, what is the ability of the Committee to pursue

17  the discovery aspects of the estimation process without Mr.

18  Dies?

19        MR. BAENA: Your Honor, the discussion between Mr.

20  Dies and Ms. Browdy, the most recent discussion that I'm

21  aware of, is that experts will be deposed commencing after

22  March 3, two weeks from now.  Mr. Dies was promoted to this

23  Court as being necessary and instrumental for this estimation

24  process because of his prior familiarity with those

25  witnesses.   As Mr. Bernick says, these are not witnesses who

1    are new.  These are people and these are issues that have

2    been litigated before, and so we told you it made absolute

3    sense to not reinvent the wheel.  And Mr. Dies was available

4    to do that.  So, how do I answer this question other than to

5    say, we are undoing the purpose of his involvement, and if I

6    have to get up to speed on pure science issues in the next

7    two weeks, I think that that's an undue expectation.  We

8    weren't prepared to take those examinations.  I have, as you

9    well know, a full week this week on another matter, and we

10   certainly think that we would be unduly prejudiced if we lost

11   him to this process.

12          MR. BERNICK: If I could make a suggestion, Your

13   Honor.  I just asked Ms. Browdy - again there are different

14   slices of PD.  There's the objections to authority, lack of

15   authority, there are objections to substantive objections,

16   there are the product ID matters.  I believe that Mr. Dies,

17   at least in so far as he's been dealing with us is concerned,

18   is involved in expert discovery relating to dust sampling,

19   and there's some depositions that have to be taken during

20   March.  I believe that they've got three - or we've got four

21   expert and they've got four.  Maybe it's three and four, and

22   to the extent that Mr. Dies was intending to participate in

23   those particular depositions, we would not object to the

24   deferral of those depositions to whatever time is necessary

25   to see if this process can work.  I suppose we're now at

1   February 21, so until sometime within the thirty days

2   commencing April 21, we'd be happy to defer those depositions

3   to that point in time.  But I'm saying that on the theory

4   that Mr. Dies' role is focused on those depositions, on that

5   expert work, and that's not what my understanding is.

6          THE COURT: Okay, well, what else is coming up on

7   the estimation issues in the next sixty days?

8          MR. BERNICK: Well, maybe Ms. Browdy can -

9          MR. BAENA: On - Excuse me, on phase one, that's the

10  most emergent activity.  On phase two, we are in the midst of

11  discovery right now, and the more arduous process of document

12  review is about to begin.

13         THE COURT: And are you doing that?

14         MR. BAENA: I'm doing that.

15         THE COURT: Does that have to be stopped?

16         MR. BAENA: Can we have two minutes, Your Honor?

17         THE COURT: Yes.  Yes, we'll take a recess until

18  4:30.

19         UNIDENTIFIED SPEAKER: 3:30.

20         THE COURT: 3:30?  3:30, thank you.  I can't see the

21  clock from here.

22         (Whereupon at 3:23 p.m.  a recess was taken in the

23  hearing in this matter.)

24         (Whereupon at 3:40 p.m. the hearing in this matter

25  reconvened and the following proceedings were had:)

1        THE COURT: Please be seated.  Mr. Baena?

2        MR. BAENA: Yes.  Your Honor, may it please the

3   Court, Scott Baena again on behalf of the Property Damage

4   Committee.  If I could just have two minutes to give you a

5   better and more accurate assessment of where PD stands

6   procedurally.  It may clear the air here a little bit.  Your

7   Honor will recall that the debtor filed the so-called

8   fifteenth omnibus objection to property damage claims, and it

9   had hundreds of objections to hundreds of claims.  Of all of

10  those objections, only the Speights and Runyon claims

11  objections are pending before this Court on notices of

12  hearing.  Everything else is just out there, hasn't been set

13  for hearing, to the best of my knowledge, and I don't believe

14  could be brought before the Court at this juncture, before

15  April in any event.  On the estimation side, I've already

16  described that on phase one, which is limited to the

17  methodology issue, air versus dust, we have each exchanged

18  expert reports.  We have received the rebuttal expert reports

19  from the debtor's experts, and the experts can now be

20  deposed.  And as I described to you, by discussion between

21  Mr. Dies and Ms. Browdy, there was an intention, it appeared

22  to me, to try starting to conduct those depositions

23  commencing on and after March 3, just two weeks away.  On

24  phase two, we have been engaged largely in paper discovery.

25  Indeed, you'll recall, Your Honor, that you entered the PD

1    estimation CMO on August 29 of last year.  Prior to you

2    entering that CMO we requested and you indicated that we

3    might do so without the power of subpoena or any other formal

4    process, a documentation from the debtor regarding certain

5    matters that we thought relevant to that estimation process.

6    We were still collecting that production from the debtor.

7    Not suggesting they had been dilatory or anything of that

8    sort, it's just taken since before August of last year to get

9    that discovery, and we have, indeed, made formal discovery

10   requests which were quite substantial, everyone of which

11   engendered an objection and which entailed several meet and

12   confers and a motion to compel in respect of one category of

13   production that we sought.  And parenthetically, I would

14   point out that the Court saw fit in respect to the motion to

15   compel to prescribe a thirty-day briefing period on that

16   motion to compel, and it won't be ripe for determination by

17   the Court before mid-March.  In short, the program is going

18   forward, but I wouldn't suggest for a moment that on either

19   side, claims, objections, or estimation, that there's such

20   momentum at this point in time that delaying that process

21   just by adding sixty days to every due date is going to

22   change the course of human events or the prospects for

23   reorganization.  Now, I can't take dispute with the fact that

24   - or the statement that Mr. Bernick made, that, you know, in

25   the course of settlement negotiations, it's nice to know what

1    it is we're trying to settle.  But, you know, Judge, it's not

2    like we're having this conversation in the early stages of

3    this bankruptcy proceeding.  This is occurring five years

4    into the process, and five years into the process, a process

5    which really didn't get rolling until last fall, we're being

6    told that sixty days is going to bring this reorganization to

7    some sort of a screeching halt.  We were also told, in

8    another sound-bite. that property damage is not a driving

9    force of this reorganization.  You heard him say that.  We're

10   not a driving force of the settlement.  Which is it, Judge?

11   It seems to me that we ought to step back and remember how

12   all of this started.  It started with the Court saying that

13   the debtor is out of time.  You waited too long.  Not because

14   the creditors have slowed them down, not because the

15   creditors have been dragging their feet, for whatever reason,

16   they have not performed to the Court's satisfaction in the

17   case of reorganizing this debtor.  And so, for them now to

18   use exclusivity as a chip, a bargaining chip, it's almost

19   ironic.  It's almost ironic that they would still wish to

20   have everybody engage in that same old litigation fanfare

21   that's fueled the animus that's prohibited the reorganization

22   to be consensual up to now.  And so, Judge, if the inmates

23   are going to run this place, then I guess we ought to just

24   keep duking it out, but Judge, if you don't stay the PD

25   estimation, I think what you're implicitly doing in all due

1   respect is coming to the conclusion that this whole process

2   is going to fail.  This discussion about a settlement is

3   going to fail because it's only relevant if it does fail.

4   And so, I say take the highroad.  I say let Mr. Dies

5   participate fully.  I say, let him have maybe the benefit of

6   a lawyer every once in awhile.  I say, let's not be in a

7   position where even I can't come into this room any more to

8   argue about the litigation getting in the way.  Let's defuse

9   the situation.  That's precisely what everybody has agreed in

10   respect to PI.  I don't get the difference between them and

11   us.  No bar date.  We had a bar date.  No questionnaire.

12   We've got claims objections.  We've got property damage

13   estimation proceedings that must be concluded.  Why?  Why?

14   It's polarizing a material constituency, and there is a

15   method to that madness on their part, but not from the

16   perspective of the Court that only wishes to effect the

17   reorganization of this estate.  Judge, respectfully, we think

18   it makes eminent sense to call off the dogs of war.  Let's

19   see if the dogs of peace can bring some harmony to this.

20        MR. BERNICK: Your Honor, I would say that that was

21   an attempt to rival the passion of Gettysburg, but it took

22   far longer than the Gettysburg Address, and I'm not going to

23   respond to any of it, because none of it's germane.  This is

24   all a bunch of elaboration and ornamentation and all of it

25   self-serving.  None of it is to the point.  For once, I'm not

1   going to rise to the occasion.  The question on the table

2   was, very simple.  What is Mr. Dies involved in that is -

3   that threatens to take up his time away from his activities

4   as a negotiator?  And again, Your Honor knows our position,

5   which is, it's their choice to have him be the negotiator.

6   It's not ours, and I don't think that the debtor's estate and

7   I don't think this Court should be - I won't say held

8   hostage, but should be impeded in its work by the fact that

9   they've made the choice to have him serve in both capacities.

10          THE COURT: Well, no, I don't think the Court should

11  be impeded in its work either, but the reality is, I think,

12  that sometimes it's necessary just to let things cool off,

13  and I'm hearing loud and clear from the Property Damage

14  Committee that this is the time to let things cool off.  Mr.

15  Bernick -

16          MR. BERNICK: Your Honor, no, that is a very, very

17  different issue.  Your Honor, I'm sorry, bear with me.

18  That's an extremely different issue.  It's Mr. Baena and his

19  constituency, maybe they're all riled up.

20          THE COURT: Maybe they are.

21          MR. BERNICK: Maybe they are.  Maybe all of the

22  constituencies are all riled up.  The way to get this case

23  done is to focus on substantive matters that are an

24  impediment to proceeding here.

25          THE COURT: Mr. Bernick, you know, you've been

1    arguing this since the beginning of the case, so I'm not -

2    this is in no way an issue of, you know, the pot trying to

3    call the kettle black or putting fault in or whatever symbol

4    you would like to use.  You have been saying since the

5    beginning of the case that we need to get the litigation

6    concluded in order to get the case finished.  That has been

7    your position on behalf of this estate -

8            MR. BERNICK: That's correct.

9            THE COURT:  - since the first day that I met you in

10    connection with this case.

11            MR. BERNICK: That's correct.

12            THE COURT: And to a certain extent, that track has

13    been stymied and not really through any fault of anybody.

14    It's just been stymied in some respects.  There was one other

15    - I'll call it cooling off period, I think, earlier on about

16    the time that the debtor was filing the plan when it appeared

17    that maybe some settlement negotiations were going to come to

18    fruition.  They failed.  I think I am willing at this point

19    because it is five years into the case, to agree that another

20    sixty day cooling off period will be fine, but I'm not going

21    to do it again.  So, that is a ruling.  I will give sixty

22    days to let these negotiations attempt to get finished

23    without involving anybody else being sidetracked in any way,

24    shape, or form, but at the end of that sixty days, if in fact

25    there is not a consensus by everyone that it should be

1  continued - this, in quote, "standstill" should be continued

2  for some other period of time, then we're marching down

3  litigation road again, and at that point we'll just let the

4  chips fall where they may on dual tracks.

5       MR. BERNICK: That's fine, Your Honor, and the only

6  thing that I would then ask to be precise there, is that that

7  literally is true.  That is that we're not going to hear

8  sixty days from now all we have - no, we've taken time off

9  and it's going to take us more time to wrap up, that is, the

10  dates that we've all agreed to are deferred by sixty days,

11  and we'll see where things are.

12       THE COURT: That's what I think we should do.

13       MR. BERNICK: That's fine, Your Honor.

14       THE COURT: When is the status conference, I'm

15  saying sixty days, but it may actually be a little bit

16  different time.  When is the status conference set in April?

17       MS. BAER: April 17th.

18       THE COURT: Okay, well, it seems to me that that's a

19  good time to put all these issues back on, because on April

20  17th, you ought to be able to tell me whether one more week is

21  going to do it or not, and at that point, if in fact, as I

22  said, there is not some consensus that you in fact are moving

23  towards settlement and that some additional period of time

24  should be agreed on, then we're going to go down parallel

25  tracks.  So, Mr. Baena, you've got your sixty days, but

1    that's it.

2              MR. BAENA: Thank you, Judge.

3              THE COURT: With respect to the concept of whether

4    there is a drop-dead order or a drop-dead period for the

5    debtor's exclusivity, I'm not prepared to rule on that today.

6    I am not prepared to issue an opinion with respect to ZAI

7    until I know how this process goes, but, folks, I have an

8    opinion ready on ZAI and so you've got sixty days.

9              MR. BERNICK: Thank you, Your Honor.  Does that mean

10   that - I take it that that means that because all of the

11   other matters on the agenda relate to that same area, which

12   is PD, that Your Honor does not wish - because we're prepared

13   to proceed with that now.

14             THE COURT: Well, let me find out.  I mean, I'm

15   prepared too, so, if you want to go forward with the rest of

16   the arguments and everything today that seems, you know, we

17   can do them.  Otherwise, if you want to wait and see how

18   things happen in April, we'll -

19             MR. BERNICK: You know what our view on that is

20   going to be.  I'm really asking - Your Honor has been very

21   clear in saying, here's what you want and add that, and I

22   don't want to verge upon the Court a proposition just for the

23   sake of having the argument.  If you believe that it's time

24   to take this time aside, that's fine.

25             THE COURT: I don't know if -

 1          MR. BERNICK: Our argue is that we should continue

 2   or -

 3          THE COURT: All right.  I don't know if I believe

 4   it, I'm hearing that this might be a good time to let things

 5   sit for a few - for sixty days, and I'm going to accept that

 6   proposition, but I'm not going to accept it again, because

 7   this case is very old, and if you can't do it in sixty days

 8   after five years, folks, I don't have much hope that you're

 9   going to do it after that.  So, maybe you will, but, you

10   know, stranger things have happened, but that's it, sixty

11   days.  So, having said that, what kind of order am I going to

12   get from all of you?

13          MR. BERNICK: Well, I think that we'll propose an -

14   we'll submit an order, we'll circulate it to other counsel

15   that simply extends exclusivity for sixty days.  I suppose

16   there would be a separate order with respect to property

17   damage that would be by way of an amendment to the - or in

18   connection with the prior case management order that says

19   that the dates set forth are simply continued for sixty days.

20   With respect to a mediator, rather than our tendering an

21   order to the Court immediately with respect to a mediator, as

22   I suggested, I think we take a week to see if we can reach

23   agreement, and if we cannot reach agreement, then we'll see

24   if we can at least reach agreement on what the order

25   appointing a mediator should say, and then submit that to the

1    Court, but our intent is to engage in substantive mediation

2    discussions for as much of that period of time as we can.

3        THE COURT: Okay.  With respect to this - you know

4    mediator, facilitator, I don't really care necessarily what

5    the title is that this person has, I do care that it is

6    someone that you will all work with to try to come to some

7    resolution.  If you can't agree on a name, then, you know, I

8    don't want to be in a position, let me state it clearly, I do

9    not want to be in the position of having to in quotes, "force

10   a person on you."  I would much prefer that it's someone that

11   you can all live with, but if you can't, for whatever reason,

12   come up with somebody who's satisfactory, then I am going to

13   force someone on you and order you to cooperate with that

14   person so that's the way it's going to have to be because I'm

15   giving you sixty days to get this done, and, you know, you

16   need someone.  Now, I would appreciate it if you, when you

17   file this motion to, I guess, confirm, I am ordering the

18   appointment of a mediator so you can submit an order that

19   will confirm that order.  It would be helpful if the person

20   has done a conflicts check and can assert, you can assert in

21   the motion that whoever it is doesn't have a conflict, so I

22   can just sign that order.  Otherwise, we're going to be back

23   here in a month without a mediator.

24       MR. BERNICK: Yeah, I understand.

25       THE COURT: Okay?

1          MR. BERNICK: The message from Your Honor is pretty

2     simple which is, let's just get it done so that we get this

3     process underway, and I think everybody - I think everybody

4     has that objective in mind, so -

5          THE COURT: Okay, now, did I give you trial dates on

6     the PD?  I really don't remember.

7          MR. BAENA: Yes.  Yes, Your Honor.

8          THE COURT: Okay, those are going to have to be

9     continued too, and I can't affirm to you without getting the

10     schedule that they're going to be exactly sixty days from

11     when they were currently set, so, who's going to work on this

12     order?  Ms. Baer?  Ms. Browdy?

13          MR. BERNICK: Yeah, the -

14          THE COURT: The two of you?  One of you, talk to Ms.

15     Baker before you submit the order so that I can give you new

16     dates for the hearing, and you can just put it into the

17     order, please.

18          MR. LOCKWOOD: Your Honor, one nit on this.  Ms.

19     Baer and I have - Ms. Baer's prepared and I've reviewed an

20     order on the sixty-day questionnaire extension which

21     basically says sixty days, and says, we'll submit an

22     appropriate amendment to the CMO to the other dates, and we

23     both believe it would be useful to get that order entered

24     today so that it can be distributed to the very, very large

25     number of claimants who don't -

1          THE COURT: Do you have one?

2          MR. LOCKWOOD: Ms. Baer has one.

3          THE COURT: Thank you.  Okay, this extends the time

4    for all the asbestos PI pre-petition litigation claims to

5    complete and serve the questionnaires until May 10th - I'm

6    sorry, May 12th, and then says that another order will be

7    submitted later to modify other dates.  That's fine.

8          MR. ESSERMAN: Your Honor, just one quick

9    clarification.  The mediation that's going to occur that's

10   going to include all parties not just PI and PD but

11   governmental entities also?

12         THE COURT: Well, I would like to have it include as

13   many parties as necessary, but, you know, depending on who

14   you choose as the mediator, that person may have a

15   methodology within which he or she wants to work.  So, you

16   know, I think -

17         MR. BERNICK: I certainly would endorse Mr.

18   Esserman's proposal that the mediation ought to include all

19   interested parties with respect to the estate, and I think

20   that the reason he's standing up to say that is that there's

21   been a lot of focus on the folks who are most active before

22   the Court, but really if it's designed to produce an overall

23   plan, it ought to have a pretty broad reach that goes beyond

24   the folks that are necessarily -

25         THE COURT: Yeah -

1        MR. ESSERMAN: That's exactly where I was coming

2    from.  Mr. Bernick's correct.

3        THE COURT: I wholeheartedly agree.  I guess the

4    issue is the scheduling.  That's what I was trying to

5    address.

6        MR. BERNICK: That's fine.  Again, all people

7    sitting here understand that, but I think that if the order

8    appointing a mediator has that kind of broad reach that then

9    it's something that really makes clear the Court's intent to

10   have this be a comprehensively inclusive process, and it's

11   then up to us who are present here to make sure that we

12   exercise our efforts to make that happen.  If we had an order

13   that was more limited, there's nothing for us to talk about.

14       THE COURT: The purpose for the Court at this late

15   stage in this case appointing a mediator is to attempt to get

16   a global resolution of all issues.  If that fails, then at

17   least it is an effort to resolve some issues so that not

18   everything has to be litigated in the context of a plan

19   confirmation hearing, and that includes all constituents who

20   have claims against this estate, whether they're governmental

21   or not.  So -

22       MR. ESSERMAN: That's it, that's fine, thank you,

23   Your Honor.

24       MS. BAER: Your Honor, I think it probably makes

25   sense to go through the rest of the agenda just to make sure

1    we have dates for everything and there are a couple of

2    cleanup things.  Your Honor, agenda item number 9 was matters

3    related to the Speights & Runyan claims.  We understand from

4    Your Honor's ruling today that all matters are continued for

5    sixty days so those matters will automatically be continued

6    to the hearing on 4/17.

7        THE COURT: Well, let me ask.  I mean, Mr. Speights

8    is here and I don't know whether he wants all those

9    continued.  He may be invested enough in this process that he

10   doesn't, so -

11       MS. BAER: We're fine either way, Your Honor.

12       THE COURT: Good afternoon.

13       MR. SPEIGHTS: Good afternoon, Your Honor.  Dan

14   Speights, Speights & Runyan claimants.  I have a thirty

15   minute speech which I'll reduce it to the last line.  I think

16   it would be counterproductive to go forward with these

17   matters today with the mediation to be held over the next

18   sixty days.  Sometimes the best way to resolve things is to

19   have a few balls in the air, and there are relatively few

20   balls in the air now, in reality, Your Honor, so, I would

21   accept what I believe was your indication that these matters

22   would be continued as well, and I will actively participate

23   in the mediation and assist Mr. Baena and Mr. Dies as much as

24   humanly possible.

25       THE COURT: All right, they're deferred.  Thank you.

1          MS. BAER: Your Honor, agenda item number 10 is also

2    related to the Anderson Memorial class action matters.  Those

3    are Mr. Speights' matters.  Again, we'll continue those to

4    the 4/17 hearing.

5          THE COURT: All right.

6          MS. BAER: Agenda item number 11, the same thing.

7    More Anderson Memorial related matters.

8          THE COURT: All right.

9          MS. BAER: Your Honor, agenda item number 12 was the

10    debtor's motion to strike or compel full disclosure of the

11    property damage phase one fact witnesses, that can actually

12    be taken off the agenda.  All the parties are working through

13    that, and we don't anticipate it will need to come back on.

14    If it does, we'll talk about when it should come back on.

15          THE COURT: All right.  So you're going to formally

16    withdraw it without prejudice?

17          MS. BAER: Yes, Your Honor.

18          THE COURT: All right.

19          MS. BAER: Your Honor, then there are just two

20    cleanup matters not on the agenda that will take thirty

21    seconds.  Number one, Your Honor, you may recall back in

22    November we argued a matter with respect to the retention of

23    Bear Sterns to help us in a transaction.  We submitted

24    dueling orders with the U.S. Trustee on a certification of

25    counsel on the first of February, Docket No. 11694.  Your

1    Honor, that transaction is not going through.   The debtors

2    were not the successful bidder.   Bear Stearns' fees were

3    contingent on being the successful bidder, therefore, we will

4    withdraw that motion.

5              THE COURT: What was the docket number?

6              MS. BAER: Docket No. 11694.

7              THE COURT: All right, you'll formally withdraw

8    that.

9              MS. BAER: We'll formally withdraw that.

10             THE COURT: All right.

11             MS. BAER: And then last but not least, Your Honor,

12   just a cleanup matter, I have an order entering a default on

13   four property damage claims.   Mr. Baena has seen this and was

14   aware of some of those, a couple are *pro se*.   It's just a

15   cleanup thing for our records that we'd like to get entered.

16             THE COURT: Al right.   Mr. Baena?

17             MR. BAENA: I have no objections.

18             (The remainder of this page is intentionally left

19   blank.)

20

21

22

23

24

25

1          THE COURT: Thank you.  Okay that order is signed.

2          MS. BAER: Your Honor, that concludes the agenda.

3          THE COURT: Okay, anything else by anyone?  Okay, go

4     forth and settle.  We're adjourned.

5          (Whereupon at 4:04 p.m. the hearing in this matter

6     was concluded for this date.)

7

8

9

10

11

12

13

14

15

16

17

18

19          I, Elaine M. Ryan, approved transcriber for the

20     United States Courts, certify that the foregoing is a correct

21     transcript from the electronic sound recording of the

22     proceedings in the above-entitled matter.

23

24     /s/ Elaine M. Ryan                    February 27, 2006
       Elaine M. Ryan
       2801 Faulkland Road
       Wilmington, DE 19808
       (302) 683-0221