# Exhibit "A"

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|                             |     |                          |
| --------------------------- | --- | ------------------------ |
| In re:                      | :   |                          |
|                             | :   | Chapter 11               |
| W.R. GRACE & CO., et. al.,  | :   | Case No. 01-1139 (JKF)   |
|                             | :   | (Jointly Administered)   |
|              Debtors.       | :   |                          |

**DECLARATION OF JOSEPH J. RADECKI, JR. UNDER FED. R. BANKR. P. 2014, 2016 AND 5002 IN SUPPORT OF THE APPLICATION OF DAVID T. AUSTERN, FUTURE CLAIMANTS' REPRESENTATIVE, FOR AUTHORIZATION TO EMPLOY PIPER JAFFRAY & CO. AS FINANCIAL ADVISOR**

I, Joseph J. Radecki, Jr., state:

1.      I am a Managing Director in the Financial Restructuring Group of Piper Jaffray & Co. ("PJC"), which maintains offices at 405 Lexington Avenue, New York, NY 10174.  This declaration is submitted pursuant to Fed. R. Bankr. P. 2014, 2016 and 5002, in support of the Application of David T. Austern, Future Claimants' Representative, for Authorization to Employ Piper Jaffray & Co. as Financial Advisor (the "Application"), filed by David T. Austern, the Future Claimants' Representative appointed by the Court in the above-captioned cases (the "FCR" or "Mr. Austern").[1]

2.      Except as otherwise provided below, the facts set forth in this declaration are based upon my personal knowledge, upon records maintained by PJC in the ordinary course of its business, which have been reviewed by me and/or by other employees of PJC at my direction, or upon information known by other employees of PJC and conveyed to me.

---

[1] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the Application

## PJC's Qualifications and the Scope of PJC's Retention

3.      PJC is a full service investment bank, which offers a comprehensive set of products and services for its corporate and institutional clients. PJC provides investment banking and financial advisory services from offices located throughout the United States and Europe.

4.      The FCR previously sought employment of CIBC World Markets Corp. ("CIBC") as his financial advisor, which was approved by the United States Bankruptcy Court for the District of Delaware (the "Court") pursuant to an Order entered on September 27, 2004 [Bankr. Dkt. No. 6479]. I and the other former CIBC professionals primarily responsible for this representation joined PJC effective as of February 13, 2006 (the "Former CIBC Professionals"). On February 16, 2006, the FCR terminated the employment of CIBC, effective as of February 10, 2006, and has now selected PJC to represent him in these cases because he desires to continue his engagement of these financial advisors, and to engage our new firm to continue to represent him in these cases. Since February 13, 2006, PJC has been providing the FCR with financial advisory services. A copy of the engagement letter between Mr. Austern and PJC, dated February 16, 2006, effective as of February 13, 2006 (the "Engagement Agreement") is attached hereto as Exhibit 1. The Engagement Agreement is substantially the same in all material respects as the terminated engagement agreement between the FCR and CIBC and, particularly, the provisions relating to indemnification are identical.

5.      Since June 4, 2004, in connection with Mr. Austern's role as the legal representative for future asbestos claimants against W.R. Grace & Co. and 61 of its affiliated entities ("Grace" or the "Debtors"), the Former CIBC Professionals, now with PJC, have provided advice to Mr. Austern in his capacity as the FCR.

6.　　As a result of the Former CIBC Professionals' experience in these cases and in other asbestos bankruptcy cases, particularly as financial advisor to future claimants' representatives in such cases, the Former CIBC Professionals are familiar with these cases, and with the concerns and issues important to the Future Claimants' Representative and to asbestos personal injury claimants who may assert claims or demands in the future.

7.　　The FCR has requested that PJC render the following services in connection with these cases:

　　　　a.　assist the FCR in analyzing and reviewing the acts, conduct, assets, liabilities and financial condition of the Debtors;

　　　　b.　familiarize itself to the extent appropriate with the operation of the Debtors' businesses, advise the FCR with respect to a proposed restructuring of the Debtors and implementation of a trust as contemplated under Section 524(g) of the Bankruptcy Code including analyzing, negotiating and effecting a plan of reorganization or recapitalization for the Debtors, and, to the extent necessary, performing valuation analyses on the Debtors and their assets;

　　　　c.　evaluate the financial effect of the implementation of any plan of reorganization upon the assets or securities of the Debtors; and

　　　　d.　any other tasks as mutually agreed upon by PJC and the FCR.

Subject to the Court's approval of the Application, PJC is willing to serve as financial advisor to the FCR and to perform the services described above.

### Disinterestedness of PJC

8.　　In order to prepare this declaration, PJC has taken various steps to determine whether any conflict of interest exists that would preclude PJC from serving as financial advisor to the FCR. In connection with PJC's proposed engagement in these cases, I reviewed or caused to be reviewed PJC's business records to determine, among other things, (i) whether PJC already represents any other client in connection with the proposed new matter, (ii) whether PJC already represents any other client in a capacity that may be adverse to the proposed client, or where the

proposed representation might be adverse to the interests of such other client, and (iii) whether

PJC has any connections with the Debtors, their creditors and other parties identified to me as

parties in interest.

   9.  Once this review process identified a potential connection between PJC and a

listed party in interest, I or employees working under my supervision elicited information to

discern the nature and scope of the representation or connection for appropriate disclosure in this

declaration.

   10.  Based upon the review of the business records, as set forth above, and the

resulting inquiries, and responses from individual PJC officers, directors and/or employees, I

have identified the following matters:

     a. The Court previously granted the FCR's application to employ Swidler Berlin
       LLP ("Swidler") as his bankruptcy counsel in these chapter 11 cases. As of
       February 6, 2006, the attorneys primarily responsible for these cases are no longer
       with Swidler and have joined Orrick, Herrington & Sutcliffe LLP ("Orrick"). The
       FCR has now selected Orrick as his bankruptcy counsel because he desires to
       continue his engagement of the individuals who advised him while at Swidler,
       and intends to file an application to employ Orrick effective as of February 6,
       2006. Orrick has represented PJC on various matters in the past, and currently
       represents PJC on certain employment law matters and certain financial
       transactions. None of these matters are related to the Debtors or these chapter 11
       cases.

   11.  The Debtors have or may have other parties in interest, and PJC may have

rendered or may be rendering services to certain of such parties, or may become involved in

matters unrelated to these cases in which such parties, or attorneys or accountants for such

parties, were, are or become, involved. PJC also may have or represent interests adverse to such

creditors or parties in interest in matters unrelated to these cases. Based on the information

currently available, PJC believes that no such matter involves representation of any interest

adverse to the FCR on the matters upon which PJC is to be engaged.

12.    In addition to the foregoing, PJC's officers, directors and employees may have business associations with, professional and social relationships with, or interests adverse to, creditors or parties in interest, or their attorneys, accountants or advisors; as far as I have been able to ascertain, none of these associations, relationships, or interests have any connection with these cases. As part of its practice, PJC provides its services in cases, proceedings and transactions throughout the United States involving many different parties, and works together with many different parties, which may include creditors or parties in interest, or attorneys, accountants or other professional firms or advisors who may represent creditors or parties in interest in these cases.

13.    To the best of my knowledge, no officer, director or employee at PJC is related to any United States District Judge or United States Bankruptcy Judge for the District of Delaware or to the United States Trustee for this district or to any known employee of his office.

14.    None of the representations described above are materially adverse to the interests of the Debtors, their estates, any class of creditors or equity security holders, the future asbestos claimants, or the FCR. Thus, PJC is disinterested and may serve as financial advisor to the FCR notwithstanding its connection to parties in interest in the unrelated matters described above.

15.    As far as I have been able to ascertain to date and to the best of my knowledge, and except as otherwise set forth herein, PJC (a) does not hold or represent any interest adverse to the FCR on the matters upon which PJC is to be engaged and (b) has no connection with the Debtors, creditors, any other party in interest, their respective attorneys and retained professionals, the United States Trustee or any person employed in his office (to the extent identified to PJC).

### Professional Compensation

16.    PJC and the Future Claimants' Representative entered into an Engagement
Agreement, pursuant to which PJC will act as the Future Claimants' Representative's financial
advisor if authorized by this Court. Pursuant to the May 24, 2004 Order appointing the FCR,
compensation, including professional fees and reimbursement of expenses, shall be payable to
the Future Claimants' Representative and his professionals from the Debtors' estates, in
accordance with the terms and conditions negotiated by the FCR and the Debtors, subject to
approval by the Court and subject to the Administrative Compensation Order. The terms and
conditions of PJC's retention are set forth in the Engagement Agreement attached hereto.

17.    PJC intends to apply for compensation for professional services rendered in
connection with this case, and for reimbursement of actual and necessary expenses incurred, in
accordance with section 328(a) of the Bankruptcy Code, and the applicable provisions of the
Bankruptcy Rules, the Local Rules and orders of this Court, including the Administrative
Compensation Order. PJC has agreed to accept as compensation such sums as may be allowed
by the Court for fees incurred for professional services and for reimbursement of reasonable and
necessary expenses.

18.    Pursuant to the Engagement Agreement, PJC agreed to perform the requested
services for the following compensation:

(a) for the initial twelve (12) months of the engagement, starting upon the effective date of
the Engagement Agreement, a cash fee of $100,000 per month, payable monthly in
arrears; and

(b) following the initial twelve (12) month period, a fee to be negotiated that is mutually
acceptable to the FCR and PJC, subject to approval of the Court, for each month
thereafter up through the month of the effective date of a plan of reorganization or
termination of the Engagement Agreement, whichever first occurs.

6

In addition, the Engagement Agreement provides for reimbursement of reasonable out-of-pocket expenses incurred in connection with the provision of services thereunder. Such expenses include, but are not limited to, reasonable fees and expenses of its legal counsel, travel and lodging expenses, word processing charges, messenger and duplicating services, facsimile expenses and other customary expenditures.

19.    PJC has agreed to invoice for these expenses in a manner and at rates consistent with charges made generally to PJC's other clients. Both PJC and the FCR recognize and acknowledge that the compensation proposed has been accepted by all parties based on their understanding of the proposed transaction. The fees to be paid to PJC pursuant to the terms of the Engagement Agreement are subject to the standard of review provided in section 328(a) of the Bankruptcy Code and are not subject to any other standard of review, under section 330 of the Bankruptcy Code or otherwise, provided, however, that the FCR may, on a monthly basis, confer with PJC whether any adjustment shall be made in the monthly fee based on PJC's activity level for such month. The FCR would then submit any agreement reached with PJC with respect to any adjustment to this Court for approval.

20.    The Former CIBC Professionals, while members of CIBC, and the FCR, after consultation, did on numerous occasions voluntarily reduce the monthly fee payable to CIBC under the CIBC engagement agreement. Similar to the FCR's Engagement Agreement with PJC, the CIBC engagement agreement provided for fees of $100,000 per month since December 2004, with a similar monthly review to determine whether adjusting the monthly fee was warranted given the level of activity. In accordance with this provision, the fee payable to CIBC was reduced to $25,000 from the nominal $100,000 monthly cap for the months of August 2005

through December 2005, which resulted in an average hourly rate of $303 - $330 during these months.

21. The Engagement Agreement is substantially the same in all material respects as the prior engagement agreement that existed between the FCR and CIBC. Furthermore, the provisions that relate to the indemnification (Annex A to the Engagement Agreement) are identical to the provisions of the prior engagement agreement between the FCR and CIBC.

22. To the best of my knowledge, no promises have been received by PJC nor any officer, director or employee thereof as to payment or compensation in connection with the above-captioned cases other than in accordance with applicable provisions of the Bankruptcy Code. To the best of my knowledge, PJC has no agreement with any other entity to share with such entity compensation received by PJC in connection with the Debtors' bankruptcy cases, except as permitted by Section 504(b)(1) of the Bankruptcy Code.

\* \* \* \* \* \*

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information and belief.

Executed on *February 21*, 2006

Joseph J. Radecki, Jr

Sworn to before me this
27th day of *February* 2006.

NOTARY PUBLIC

EUGENIE FRANCOIS
Notary Public  State of New York
No. 01FR6032065
Qualified in N.Y. & Ulster County
Commission Expires : *04-19-06*

9

# Exhibit 1

Tel: 212 284 9383  |  Fax: 212 284 9354

CONFIDENTIAL

February 16, 2006

David T. Austern
Claims Resolution Management Corporation
3110 Fairview Park Drive, Suite 200
Falls Church, VA 22042-0683

Dear Mr. Austern:

This letter confirms the agreement (the "Agreement") between David T. Austern, the Court appointed representative for future asbestos claimants (the **"Future Representative" or "you"**) to W.R. Grace & Co. (together with its subsidiaries and affiliates, the "Company"), and Piper Jaffray & Co. (**"Piper Jaffray" or "we" or "us"**) to engage us. subject to Bankruptcy Court approval, as your exclusive financial advisor in connection with a proposed restructuring of the Company and implementation of a trust as contemplated under Section 524(g) of the Bankruptcy Code (the "Transaction"). The Future Representative will undertake to apply to the Bankruptcy Court, which has jurisdiction over the Company's chapter 11 bankruptcy proceeding, for authorization to employ Piper Jaffray in accordance with the terms and conditions of this Agreement, with this Agreement attached as an exhibit to such application. Subject to the terms and conditions hereof, we agree to accept as compensation for the services that we render pursuant to the terms hereof such sums as may be allowed by the Bankruptcy Court for fees incurred for professional services and for reimbursement of reasonable and necessary expenses.

Notwithstanding anything to the contrary contained in this letter agreement: (a) Piper Jaffray makes no representations or warranties about the Company's ability to (1) successfully improve its operations, (ii) maintain sufficient liquidity to operate its business or (iii) successfully complete a transaction, and (b) Piper Jaffray makes no representation, warranty or commitment to underwrite, place or purchase any securities or provide any form of financing to the Company.

### SERVICES

Subject to approval of the Bankruptcy Court, the Future Representative hereby retains Piper Jaffray as the financial advisor to the Future Representative in connection with the Transaction. We agree to provide the following services during the term of our engagement:

- assist the Future Representative in analyzing and reviewing the acts, conduct, assets, liabilities and financial condition of the Company;

1

- familiarize ourself to the extent appropriate with the operation of the Company's businesses, advise the Future Representative with respect to a proposed restructuring of the Company and implementation of a trust as contemplated under Section 524(g) of the Bankruptcy Code including analyzing, negotiating and effecting a plan of reorganization or recapitalization for the Company, and, to the extent necessary, performing valuation analyses on the Company and its assets;

- evaluate the financial effect of the implementation of any plan of reorganization upon the assets or securities of the Company; and

- any other tasks as mutually agreed upon by Piper Jaffray and the Future Representative.

It is expressly understood that Piper Jaffray is working for and will take direction solely from the Future Representative and will share any work product with the Company only with the permission of the Future Representative.

In rendering its services to the Future Representative hereunder, Piper Jaffray is not assuming any responsibility for the Company's underlying business decision to pursue any business strategy or to effect or not to effect any Transaction.

*FEES AND EXPENSES*

In full payment for services rendered and to be rendered hereunder by Piper Jaffray, the Company shall pay to Piper Jaffray, in cash, subject to Bankruptcy Court approval, monthly fees (the "Monthly Fees") as follows:

(a) for the initial twelve (12) months of this engagement, starting upon February 13, 2006, the effective date of this letter agreement, a fee of $100,000.00 per month, payable monthly in arrears; and

(b) following the initial twelve (12) month period, a fee to be negotiated that is mutually acceptable to the Future Representative and Piper Jaffray, subject to Bankruptcy Court approval, for each month thereafter up through the month of the effective date of a plan of reorganization or termination of this letter agreement, whichever first occurs.

Both Piper Jaffray and the Future Representative recognize and acknowledge that the compensation proposed has been accepted by all parties based on their understanding of the proposed Transaction. The Monthly Fee to be paid to Piper Jaffray pursuant to the terms of this letter agreement shall be subject to the standard of review provided in Section 328(a) of the Bankruptcy Code and is not subject to any other standard of review, under section 330 of the Bankruptcy Code or otherwise, provided, however, that the Future Representative may, on a monthly basis, confer with Piper Jaffray whether any adjustment shall be made in the Monthly Fee based on Piper Jaffray's activity level for such month.

Subject to Bankruptcy Court approval, the Company shall periodically reimburse Piper Jaffray promptly when invoiced for all of our reasonable out-of-pocket expenses, including, without limitation, reasonable fees and disbursements of counsel, travel and lodging expenses, word processing charges, messenger and duplicating services, and database, courier and communication costs, and other customary expenditures in connection with the performance of our services hereunder, regardless of whether or not a Transaction occurs. Upon termination of this letter agreement or completion of a Transaction, subject to Bankruptcy Court approval, the Company shall pay promptly in cash any unreimbursed expenses that have accrued as of such date.

This reimbursement obligation is in addition to the reimbursement of fees and expenses set forth below relating to attendance by us at proceedings or to indemnification and contribution as contemplated elsewhere in this agreement.

To the extent our personnel assist in, or provide testimony in trial or deposition for any action, suit or proceeding relating to a Transaction or our engagement hereunder after the consummation of a Transaction or termination of our engagement hereunder, subject to Bankruptcy Court approval, the Company shall pay Piper Jaffray a per diem charge, together with reimbursement of all out-of-pocket expenses and disbursements, for the services of such officers in an amount to be mutually agreed upon by the Future Representative and Piper Jaffray prior to such assistance.

## TERM

The term of this agreement shall commence on February 13, 2006 and terminate 30 days from the date on which the Future Representative or Piper Jaffray, as the case may be, receives written notice from the other of termination of this engagement. Piper Jaffray may resign at any time and the Future Representative may terminate Piper Jaffray's services at any time, each by giving written notice to the other. If terminated, Piper Jaffray shall be entitled to receive any fees for any monthly period which are due and owing Piper Jaffray upon the effective date of termination; however, such amounts will be prorated for any incomplete monthly period of service, and Piper Jaffray will be entitled to reimbursement for out-of-pocket expenses as described herein, subject to Bankruptcy Court approval. Termination of Piper Jaffray's engagement hereunder shall not affect or impair the Company's continuing obligation to indemnify Piper Jaffray and certain related persons as provided in the Indemnification and Contribution Section below and Annex A and the Other Matters Relating To Our Engagement Section below.

If Joseph J. Radecki, Jr. shall cease to be employed by Piper Jaffray, Piper Jaffray shall give prompt notice to the Future Representative and the Future Representative shall have the right to terminate this Agreement immediately by giving notice to Piper Jaffray and the Company shall not be obligated to pay Piper Jaffray the fees outlined above beyond the effective date of such termination under such circumstances. Piper Jaffray will also provide appropriate levels of staffing to complete the engagement in a timely and commercially reasonable manner.

3

## LIABILITY FOR FEES AND EXPENSES

Subject to approval by the Bankruptcy Court, the Company shall be solely responsible for the payment of compensation and reimbursement of expenses to Piper Jaffray under this Agreement. The Future Representative shall not be liable for the payment of any compensation or reimbursement of any expenses to Piper Jaffray hereunder.

## INDEMNIFICATION AND CONTRIBUTION

Subject to Bankruptcy Court approval, in addition to the payment of fees and reimbursement of expenses provided for above, and regardless if any Transaction is consummated, the Company shall agree to indemnify Piper Jaffray with regard to the matters contemplated herein, as set forth in Annex A, attached hereto, which is hereby incorporated into this agreement by reference and made a part of this agreement as if fully set forth herein. Such indemnification shall survive any termination, expiration or completion of this agreement.

## DISCLOSURE OF ADVICE AND INFORMATION

Except as required by law, this Agreement and the services, information and advice to be provided by Piper Jaffray hereunder is for the confidential use of the Future Representative and shall not be disclosed to third parties without Piper Jaffray's written permission.

The Future Representative shall use its reasonable best efforts to have the Company furnish to Piper Jaffay such information as Piper Jaffray requests for purposes of performing services under this letter engagement (the "Information"). The Future Representative will use its reasonable best efforts to have the Company agree and represent that all Information relating to the Company furnished to Piper Jaffray will be accurate and complete in all material respects at the time provided, and that, if the Company is aware of any Information becoming materially inaccurate, incomplete or misleading during the engagement hereunder, the Company will promptly advise Piper Jaffray. The Future Representative recognizes and confirms that Piper Jaffray assumes no responsibility for the accuracy and completeness of the Information and will be using and relying upon the Information (and Information available from generally recognized public sources) without assuming responsibility for independent verification or independent evaluation of any of the assets or liabilities of the Company.

You agree that we may place advertisements in mailings and financial and other newspapers and journals at our expense describing our services to you for any publicly announced or completed Transaction.

## OTHER MATTERS RELATING TO OUR ENGAGEMENT

You acknowledge that you have retained us solely to provide the services set forth in this agreement. In rendering such services, we will act as an independent contractor, and not as an agent or otherwise, and we owe our duties arising out of this engagement solely to the Future Representative. You acknowledge that nothing in this agreement is

4

intended to create duties to the Company's creditors or securityholders or any third party in connection with our engagement hereunder, all of which are expressly waived, and we and you specifically disclaim the creation of any fiduciary relationship between, or the imposition of any fiduciary duties on, any party.  No one other than the Future Representative is authorized to rely upon the engagement of Piper Jaffray hereunder or any statements, advice, opinions or conduct by Piper Jaffray.  The Future Representative further acknowledges that Piper Jaffray may perform certain of the services described herein through one or more of its affiliates and any such affiliates shall be entitled to the benefit of this Agreement.

The Future Representative agrees that any reference to Piper Jaffray, as financial advisor in any release or communication or materials distributed, is subject to our prior written approval, unless such release or communication is required by law or regulation. If Piper Jaffray resigns prior to the dissemination of any such release, communication or material, no reference shall be made therein to Piper Jaffray.

The Future Representative represents and warrants that, subject to Bankruptcy Court approval, it has all requisite power and authority, and all necessary authorizations, to enter into and carry out the terms and provisions of this Agreement and the execution, delivery and performance of this Agreement does not breach or conflict with any agreement, document or instrument to which it is a party or bound.

The Future Representative represents and warrants to Piper Jaffray that there are no brokers, representatives or other persons which have an interest in compensation due to Piper Jaffray from any transaction contemplated herein or which would otherwise be due any fee, commission or remuneration upon consummation of any Transaction.

The Future Representative agrees and acknowledges that Piper Jaffray and its affiliates shall have no obligation to disclose any information acquired in connection with various investment banking, commercial banking and financial advisory relationships with, or services for, other clients and customers, to the Company or to use such information in connection with any transaction contemplated by this letter agreement.

You acknowledge that we are not an advisor as to legal, tax, accounting or regulatory matters in any jurisdiction.  You should consult with your own advisors concerning such matters and are responsible for making your own independent investigation and appraisal of the transactions contemplated by this agreement, and we have no responsibility or liability to you with respect such matters.

*MISCELLANEOUS*

This agreement shall be governed by and construed in accordance with the laws of New York, without regard to its conflict of law principles.  You and we hereby waive all right to trial by jury in any action, proceeding, or counterclaim (whether based upon contract, tort or otherwise) in connection with any dispute arising out of this agreement or any matters contemplated by this agreement.  This agreement embodies the entire agreement and understanding between you and us and supersedes all prior

5

agreements and understandings relating to the subject matter of this agreement. This agreement may be executed in any number of counterparts. The invalidity or unenforceability of any provision of this agreement shall not affect the validity or enforceability of any other provisions of this agreement, which shall remain in full force and effect. This agreement is solely for the benefit of you and us, and no other person (other than the Indemnified Persons set forth in Annex A hereto) shall acquire or have any rights by virtue of this agreement.

If this letter correctly sets forth the understanding between us, please so indicate by signing on the designated space below and returning a signed copy to us.

Sincerely,

PIPER JAFFRAY & CO

By _____
Name: Joseph J. Radecki, Jr.
Title: Managing Director

Agreed to as of the date first above written:

Future Representative of W.R. Grace & Co.

By _____
Name: David T. Austern
Title: Future Representative

7

### Annex A to Engagement Letter

(A)   In consideration of Piper Jaffray's agreement to act on behalf of the Future Representative, notwithstanding any limitations set forth herein, subject to approval by the Bankruptcy Court, the Company agrees to indemnify and hold harmless Piper Jaffray and its affiliates and their representative present and former directors, officers, employees, agents and controlling persons within the meaning of section 15 of the Securities Act of 1933, as amended (each such person, including Piper Jaffray, an "Indemnified Party" and collectively the "Indemnified Parties") to the fullest extent permitted by law from and against any losses, claims, damages and liabilities, joint or several (collectively, the "Damages"), to which such Indemnified Party may become subject in connection with or otherwise relating to or arising from (i) any transaction or matter in any way relating to or referred to in this letter agreement or arising out of the matters contemplated by this letter agreement or the engagement of or performance of services or any involvement or alleged involvement in a Transaction (as defined in this letter agreement) by Piper Jaffray thereunder or (ii) an untrue statement or an alleged untrue statement of a material fact or the omission or alleged omission to state a material fact necessary in order to make a statement not misleading in light of the circumstances under which it was made, and will reimburse each Indemnified Party for all fees and expenses (including the fees and expenses of counsel) (collectively, "Expenses") as incurred, subject to the provisions of paragraph (D), below, in connection with investigating, preparing, pursuing or defending any threatened or pending claim, action, proceeding or investigation (collectively, the "Proceedings") arising therefrom, whether or not such Indemnified Party is a formal party to such Proceeding; provided, that the Company will not be liable to any such Indemnified Party to the extent that any Damages are found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from the bad faith, gross negligence or willful malfeasance of the Indemnified Party seeking indemnification hereunder or any breach by Piper Jaffray of this letter agreement. The Company also agrees that no Indemnified Party will have any liability (whether direct or indirect, in contract, tort or otherwise) to the Company or any person asserting claims on behalf of the Company arising out of or in connection with any transactions contemplated by this letter agreement or the engagement of or performance of services by any Indemnified Party thereunder except to the extent that any Damages are found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from the bad faith, gross negligence or willful malfeasance of the Indemnified Party or any breach of Piper Jaffray of this letter agreement.

(B)   If for any reason other than in accordance with this letter agreement, the foregoing indemnity is unavailable to an Indemnified Party in respect of any Damages (including all Expenses incurred) referred to herein or insufficient to hold an Indemnified Party harmless, then the Company agrees that in lieu of indemnifying such Indemnified Party, the Company shall contribute to the amount paid or

payable by such Indemnified Party as a result of such Damages (including all Expenses incurred) (i) in such proportion as is appropriate to reflect the relative benefits to the Company and/or its stockholders on the one hand, and of the Indemnified Party on the other hand, from the services rendered under this letter agreement or (ii) if the allocation provided by clause (i) above is not permitted by applicable by law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of the Company on the one hand and of the Indemnified Party on the other. The Company agrees that for purposes of this paragraph the relative benefits to the Company and/or its stockholders and Piper Jaffray in connection with the matters covered by this letter agreement will be deemed to be in the same proportion that the total value paid or received or to be paid or received by the Company and/or its stockholders in connection with the transactions contemplated by this letter agreement, whether or not consummated, bears to the fees paid to Piper Jaffray under this letter agreement; provided, that in no event will the total contribution of all Indemnified Parties to all such Damages exceed the amount of fees actually received and retained by Piper Jaffray under this letter agreement (excluding any amounts received by Piper Jaffray as reimbursement of expenses). Relative fault shall be determined by reference to, among other things, whether any alleged untrue statement or omission or any alleged conduct relates to information provided by the Company or other conduct by the Company (or its employees or other agents) on the one hand, or by Piper Jaffray, on the other hand.

(C)    The Company agrees not to enter into any waiver, release or settlement of any Proceeding (whether or not Piper Jaffray or any other Indemnified Party is a formal party to such Proceeding) in respect of which indemnification may be sought hereunder without the prior written consent of Piper Jaffray (which consent will not be unreasonably withheld), unless such waiver, release or settlement (i) includes an unconditional release of Piper Jaffray and each Indemnified Party from all liability arising out of such Proceeding and (ii) does not contain any factual or legal admission by or with respect to any Indemnified Party or any adverse statement with respect to the character, professionalism, expertise or reputation of any Indemnified Party or any action or inaction of any Indemnified Party. In the event that a cause of action is asserted against an Indemnified Party arising out of or relating to the performance of his, her or its duties as financial advisor to the Future Representative, the Indemnified Party shall have the right to choose its own counsel.

(D)    If, before the earlier of (i) the entry of an order confirming a chapter 11 plan in the Company's chapter 11 bankruptcy cases (that order having become a final order no longer subject to appeal), and (ii) the entry of an order closing the Company's chapter 11 bankruptcy cases, Piper Jaffray believes that it is entitled to the payment of any amounts by the Company on account of the Company's indemnification, contribution and/or reimbursement obligations under this letter agreement or arising out of the matters contemplated by this letter agreement or

2

the engagement of or performance of services by an Indemnified Party thereunder, including without limitation, the advancement of defense costs, Piper Jaffray must file an application therefore with the Bankruptcy Court, and the Company may not pay any such amounts to Piper Jaffray before the entry of an order by the Bankruptcy Court approving payment. This paragraph is intended only to specify the period of time under which the Bankruptcy Court shall have jurisdiction over any request for fees and expenses by Piper Jaffray for indemnification, contribution or reimbursement and not to limit the duration of the Company's obligation to indemnify Piper Jaffray.

(E)   The indemnity, reimbursement and contribution obligations of the Company hereunder will be in addition to any liability which the Company may have at common law or otherwise to any Indemnified Party and will be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company or an Indemnified Party. The provisions of this Annex will survive the modification or termination of this letter agreement.