IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*
In re                                       \*        Chapter 11
                                            \*
W.R. GRACE & CO., et al.,                   \*        Case No. 01-01139 (JKF)
                                            \*        Jointly Administered
            Debtor.                         \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*        Hearing Date: March 27, 2006 at 2:00 p.m.
                                                     Objection Deadline: March 16, 2006 at 12:00 a.m.
                                                     (extended for Libby Claimants)
                                                     Related Docket No.: 11850

## OBJECTION OF LIBBY CLAIMANTS TO DEBTORS' MOTION FOR AUTHORIZATION TO SEEK DISCOVERY FROM DR. ALAN C. WHITEHOUSE AND FOR A PROTECTIVE ORDER RELATING TO PRODUCTION OF DOCUMENTS FROM DR. ALAN C. WHITEHOUSE

Claimants injured by exposure to tremolite asbestos from Grace's operations in and near Libby, Montana[1] (the "Libby Claimants"), by and through their counsel, Cohn Whitesell & Goldberg LLP and Landis Rath & Cobb LLP, hereby oppose W.R. Grace & Company's Motion for Authorization to Seek Discovery from Dr. Alan C. Whitehouse and for a Protective Order Relating to Production of Documents from Dr. Alan C. Whitehouse dated February 17, 2006 [Docket No. 11850] (the "Motion"), wherein Grace seeks to obtain discovery from Dr. Alan C. Whitehouse that far exceeds the discovery that was permitted by Federal District Court Judge Donald Molloy in the criminal proceeding currently pending in the United States District Court for the District of Montana (Missoula Division), U.S. v. W.R. Grace, CR-05-07-M-DWM (the "Criminal Proceeding"). As set forth more fully below, the Motion should be denied because Grace deceptively seeks to circumvent the Protective Order issued by Judge Molloy on November 23, 2005 (the "Protective Order"), a copy of which is attached to the Motion as

---

[1] As identified in the Amended and Restated Verified Statement of Cohn Whitesell & Goldberg LLP and Landis Rath & Cobb LLP Pursuant to Fed. R. Bankr. P. 2019 [Docket No. 11624], as it may be amended and restated from

393.001-11561.doc

Exhibit 1, by requesting discovery from Dr. Whitehouse that the Protective Order expressly prohibits Grace from obtaining. To the extent this Court considers the Motion at all, this Court should honor the balance struck by Judge Molloy's Protective Order, properly balancing Grace's need for discovery from Dr. Whitehouse versus the Libby patients' right to privacy. In support of this Objection, the Libby Claimants state:

## Introduction

Through the Center for Asbestos Related Disease (the "CARD Clinic") in Libby, Montana, Dr. Whitehouse and Dr. C. Brad Black have diagnosed at least 1,500 patients with asbestos related disease due to exposure to Libby tremolite asbestos in or near Libby, Montana. Motion, Exh. 3, Dr. Whitehouse Affidavit (the "Whitehouse Affidavit"), ¶ 2. Since 1980, Dr. Whitehouse has evaluated or treated 700 patients for asbestos disease from Libby tremolite asbestos exposure. Whitehouse Affidavit, ¶ 5. Dr. Whitehouse has also authored the study, "Asbestos Related Pleural Disease Due to Tremolite Associated With Progressive Loss of Lung Function: Serial Observation in 123 Miners, Family Members, and Residents of Libby, Montana," 43 Am. J. Indus. Med. 219 (2004) (the "Whitehouse Study"). Because of his expertise in Libby tremolite asbestos disease, Dr. Whitehouse has been designated an expert in the Criminal Proceeding, and by the Libby Claimants in the estimation of asbestos personal injury claims (the "PI Claims Estimation").

---

time to time.

## Objection

I. **The Motion Deceptively Seeks to Circumvent the Protective Order**

A. **The Motion Seeks Discovery from Dr. Whitehouse in Violation of the Protective Order**

Despite Grace's pledge that it does not intend to circumvent the Protective Order, if the Motion is approved Grace will have succeeded in doing just that. By the Motion, Grace purportedly seeks only to obtain the "same documents" produced by Dr. Whitehouse (the "Whitehouse Records") in the Criminal Proceeding for use in the PI Claims Estimation. Because the Protective Order limits the use of the Whitehouse Records to the Criminal Proceeding, Grace attempts to present the Motion as nothing more than a cautionary request by Grace for equal access of the identical Whitehouse Records for use in the PI Claims Estimation, stating that the Motion is filed "[o]ut of abundance of caution, and in deference to the [Protective Order] . . . ." Motion at p.4.

Pursuant to the Motion, Grace seeks approval of a draft subpoena duces tecum to Dr. Whitehouse (the "Draft Subpoena"). Motion at p.10, Exh. 5. Review of the Draft Subpeona leaves no doubt that Grace is seeking much more than the "same" Whitehouse Records produced in the Criminal Proceeding. The Draft Subpoena lists 15 separate document requests before even reaching the request that Dr. Whitehouse produce all documents that he produced in the Criminal Proceeding. One must dig deeply into the hundreds of pages of the Motion's exhibits to find at Exh. 5, Attachment A, p.11, under the Draft Subpoena that the documents requested include, among many others:

    1.    All medical records . . . related to your contention that "there generally appears to be a distinct pattern" for "Libby tremolite disease."

3

      2.      All medical records . . . related to your contention that Libby tremolite disease is highly progressive.

These first two requests of the Draft Subpoena go to all records of the CARD Clinic's 1,500 patients, which is obviously much greater than what has been produced, or even requested, in the Criminal Proceeding. See Whitehouse Affidavit, ¶ 2.

Moreover, Grace has not fairly informed this Court of the distinction between the **redacted** records that the government has delivered to Grace in the Criminal Proceeding and the **unredacted** records that Grace is attempting to obtain by means of the Motion. In the Criminal Proceeding, the only unredacted records that have been delivered to Grace are those of the 46 patients that the government has listed as witnesses to be called at the September trial. Motion, Exh 1., p.19, item 2. All other medical records delivered to date have been in **redacted** form, including medical charts on the 123 patients in the Whitehouse Study and on 30 patients who were excluded from the study, and Dr. Whitehouse's database on approximately 550 patients maintained as a follow-up on the study of the 123 patients.[2] Patient names were redacted from the database copy.

The issue of what records Grace is entitled to receive and in what form has been actively litigated in the Criminal Proceeding, and is still *sub judice*. On January 13, 2006, the government filed in the Criminal Proceeding the Supplemental Witness Disclosure of Dr. Alan C. Whitehouse. Motion, Exh. 9. Therein the government offered to make the medical charts on the 550 patients in the database available to Grace in **redacted** form subject to the Protective Order. Id., p.3. Grace then filed a motion in the Criminal Proceeding for all 550 charts in **unredacted** form. Exh. 1, attached hereto. The government answered on March 1, 2006, and

---

[2] It is important to note that these figures overlap. For example, the 550 patients in the database include the 123 patients in the Whitehouse Study, and some of the 46 patients whom the government has designated as witnesses in the Criminal Proceeding.

4

Grace replied on March 3, 2006. Exhs. 2 and 3, attached hereto. The District Court in the Criminal Proceeding has not yet ruled on Grace's motion for the 550 charts in **unredacted** form, including all patient names and personal information.

Now the Draft Subpoena seeks **all 1,500 charts in unredacted** form.[3] This is far beyond what the District Judge Molloy has permitted in the Criminal Proceeding, where he was required to consider the vital interest that criminal defendants have in their defense, but also medical patients' right to privacy, the burden on Dr. Whitehouse and the non-profit CARD Clinic for which he works, and the reasonableness of the discovery requests of Grace and its codefendants. Grace has the same counsel in this case and in the Criminal Proceeding; and the Motion presents a high degree of awareness of Grace's motions in the Criminal Proceeding. See Motion, pp.1-4, 7, and 9-10. Other than as a stratagem to mislead this Court, there can be no explanation for a false and deceptive statement like "Grace seeks this court's authorization to obtain access to the **same documents** for use in the bankruptcy PI estimation proceedings." Motion at p.2.

Perhaps the Motion has been crafted for the purpose of creating deniability. Grace may assert that the plain words of the Draft Subpoena have been misconstrued. A very important question that Grace should be called upon to answer is: If Grace's intention is simply to use in the PI Claims Estimation proceeding solely those documents obtained in the Criminal Proceeding, why has Grace not directed the request to Judge Molloy in the first instance, to find out whether he would have any objection to Grace's use in other litigation of documents obtained in the Criminal Proceeding, subject to the same limitations and protections that he has imposed in the Criminal Proceeding? Upon obtaining Judge Molloy's consent, it would appear that Grace

---

[3] This is directly contrary to the Protective Order, which states that as to patients not testifying "the government shall remove all identifying information, including participants names and all contact information." Motion, Exh. 1, p.21, item 9. Grace's proposed form of order for this Court leaves out the redacting provision of the Protective Order.

might have no need for any relief from this Court at all. Instead Grace has sought relief from this Court in the first instance, without explaining that its request goes far beyond what Judge Molloy has permitted. The Motion is improperly presented and for an improper purpose. Accordingly, it should be denied.

### B. The Motion is Based on Mischaracterization of the Whitehouse Study

The Motion is also misleading as to the need for the discovery. In seeking to establish the need to review data underlying the published, peer-reviewed study of Dr. Whitehouse—the type of study that medical expert witnesses as well as physicians treating actual patients rely upon as authoritative—Grace offers an opinion of its expert, Dr. Al Franzblau, that is erroneous on its face. Motion, Exh. 8 (the "Franzblau Affidavit"). For example, Grace claims based on Dr. Franzblau's affidavit that the loss of lung function in patients in the Whitehouse study may be due to smoking. Grace quotes its expert as follows:

> The entire study is confounded and/or flawed since these other diseases were not considered in the statistical analyses and much or all of the observed excess decline in pulmonary function may be attributable to non-asbestos pulmonary disease, such as smoking. Franzblau Affidavit at ¶ 9.

Motion, p.6. What Dr. Franzblau ignores is that patients with smoking disease were excluded from the Whitehouse Study, as were patients with non-asbestos disease. See Whitehouse Study, p.220. All 123 patients had asbestos disease and no other lung disease. There are other examples of what appears to be a deliberate mischaracterization of the Whitehouse Study by Dr. Franzblau:

- Dr. Franzblau tries to cast doubt on the Whitehouse Study by professing not to understand why "only" 123 patients were included. Then he notes that "only patients with two or more sets of pulmonary function tests were considered." Franzblau Affidavit at ¶ 8. This was exactly the reason why there were only 123 patients in the study. Whitehouse Study, p.221.

---

Motion, Exh. 10.

6

- Dr. Franzblau wonders "if an individual were suffering from a non-asbestos pulmonary condition such information would be included in Dr. Whitehouse's medical records." Franzblau Affidavit at ¶ 10. Again, he ignored the fact that Dr. Whitehouse excluded patients with a "non-asbestos related condition" from the study. Whitehouse Study, p.220.

- Dr. Franzblau opines that the use of parameters total lung capacity, forced vital capacity, and diffusion capacity are "not justified." Franzblau Affidavit at ¶ 11. This is directly contrary to the authoritative text, Fishman's Pulmonary Diseases and Disorders, 3d Ed. (1998), p.883, which states "the characteristic pulmonary function changes of asbestosis are a restrictive impairment with a reduction in lung volumes (especially FVC and total lung capacity) decreased diffusion capacity, and atrial hypoxemia." See Motion, Exh. 3, ¶ 19.

In sum, Dr. Franzblau's Affidavit is rife with misreadings and statements contrary to the medical literature.[4] Grace has not presented a basis for the breadth of discovery that it seeks.

### C. The Motion is an End Run Around the Protective Order

The Motion represents an improper attempt by Grace to make an end run around the limitations on discovery imposed by Judge Molloy. The scope of discovery differs in civil and criminal cases. Fed. R. Civ. P. 26(b)(1) provides that a party to a civil litigation is presumptively entitled to "obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending case." Fed. R. Crim. P. 16(a)(1) is more restrictive: the defendant is entitled thereunder to those documents "which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial. . . ."

Where, as here, there are parallel criminal and civil proceedings relating to the similar subject matter, the court is confronted with the conflict inherent in providing fair discovery

---

[4] In addition to the misleading Franzblau Affidavit, the Motion also incorrectly states that the Agency for Toxic Substances and Disease Registry (ATSDR) "found that 27% of the cases which Dr. Whitehouse had diagnosed with asbestos-disease, did not show any sign of asbestos-related disease." Motion at p. 5. In fact, of the 48 Libby patients for whom the Grace plan denied any asbestos disease, on 47 of 48 the ATSDR readings agreed with those of Dr. Whitehouse and the CARD Clinic, and on one of 48, the ATSDR agreed with the Grace plan.

sufficient to allow the defendants adequately to defend their civil case while at the same time protecting the government's interest and greater evidentiary burden in prosecuting the criminal case. The scope of the district court's discretion thereon is substantial. Ross v. Bolton, 106 F.R.D. 22, 23 (S.D.N.Y. 1985) ("District courts are granted wide discretion in supervising the extent of discovery before trial, and in limiting discovery where there is a showing of good cause.").

The leading case addressing the problem of balancing discovery interests in parallel proceedings is Campbell v. Eastland, 307 F.2d 478 (5th Cir. 1962) (Wisdom, J.), cert. denied, 371 U.S. 955 (1963). Judge Wisdom, speaking for the Fifth Circuit, has pointed out that the *public interest* in the criminal case is entitled to precedence over the civil litigant: "a trial judge should give substantial weight to [the public interest in law enforcement] in balancing the policy against the right of a civil litigant to a reasonably prompt determination of his civil claims or liabilities." Id. 487. When faced with parallel proceedings, judicial discretion and procedural flexibility should be utilized to harmonize the conflicting rules and to prevent the rules and policies applicable to one suit from doing violence to those pertaining to the other. Id.

In such situations, a stay of all civil proceedings, or at least of all disclosure, or the imposition of protective orders is well within the informed discretion of the court; therefore, of course, so are less severe remedies such as the temporary deferral of discovery. SEC v. Dresser Industries, Inc., 628 F.2d 1368, 1375 (D.C.Cir. 1980), cert. denied, 449 U.S. 993 (1980) ("a court may decide in its discretion to stay civil proceedings, postpone civil discovery, or impose protective orders and conditions ...."). The Second Circuit in SEC v. Chestman, 861 F.2d 49, 50 (2d Cir.1988) (per curiam) (dicta), implicitly approved the District Court's grant of a stay of discovery in a civil case, noting the Government's interest in preventing "discovery in the civil

case from being used to circumvent the more limited scope of discovery in the criminal matter." In an analogous situation, in United States v. One 1964 Cadillac Coupe DeVille, 41 F.R.D. 352, 354 (S.D.N.Y. 1966), granted the government's motion to defer the time in which the government must answer interrogatories in a civil case until after completion of the criminal case, similarly stating "a defendant in a criminal case should not be permitted to use the liberal civil discovery procedures to gather evidence which he might not be entitled to under the more restrictive criminal rules."

Insofar as the Motion seeks broader discovery than Judge Molloy has permitted in the Criminal Proceeding, it should be denied as an improper attempt to obtain additional discovery in a criminal case. While the Criminal Proceeding remains pending, Grace should be permitted discovery relating thereto—whether or not labeled by Grace as discovery in connection with the PI Claims Estimation proceeding—only as permitted by Judge Molloy. Grace should not be permitted to make an end run around the restrictions imposed by Judge Molloy by obtaining relief pursuant to the Motion.

## II. To the Extent this Court Considers the Motion at all, this Court should Honor the Balance Struck by the U. S. District Court for the District of Montana in the Protective Order

Notwithstanding what has been said about the differing scope of discovery in criminal and civil proceedings, Judge Molloy did decide to permit Grace to take discovery of Dr. Whitehouse, taking into consideration that the government would finance and supervise the redaction project. In so doing, he considered issues of patient privacy and the burden on Dr. Whitehouse. Balancing these considerations against Grace's need for discovery, he permitted extensive discovery—albeit less than Grace would have liked, and with restrictions that Grace now seeks to circumvent. Grace will have access to Dr. Whitehouse's entire database of patients

with Libby tremolite asbestos disease, including patients included in the Whitehouse Study, patients excluded from the Whitehouse Study (such as those with smoking disease discussed above), and patients who came to be treated by Dr. Whitehouse after he performed his study. As a matter of comity (how will it reflect on the federal judiciary for this Court to consider the exact same balancing of interests as the District Court, and potentially reach a different result?), judicial economy (given this Court's already substantial workload, why delve into a complex matter that has already been resolved by another federal judge?), and fairness (why should Grace get two bites at the apple on the same issue?), this Court should defer to Judge Molloy on the issue of what medical records and data will be produced by Dr. Whitehouse, in what form, and subject to what protections against impermissible disclosure.

### III. If this Court Chooses to Grant Greater Discovery than in the Criminal Proceeding, Patient Privacy Rights under Montana State Law along with the Costs Associated with Grace's Requests Must be Considered

#### A. The Motion must be denied because Grace has failed to follow the procedures or meet the substantive standards imposed by Montana law to protect the privacy of patients

**(1)  Grace's requests for hundreds of medical files of patients who are without counsel violate the constitutional right of privacy and the due process right to notice and an opportunity to be heard.**

Montana Constitution, Art. II § 10 provides:

Right of Privacy. The right of individual privacy is essential to the well being of a free society and shall not be infringed without the showing of a compelling state interest.

State v. Bilant, 36 P.3d 883, 887 (Mont. 2001) notes:

This Court has held that medical records are quintessentially private and deserve the utmost constitutional protection.

Id. (citing State v. Nelson, 941 P.2d 441, 448 (Mont. 1997)).

Case 01-01139-AMC    Doc 12065    Filed 03/15/06    Page 11 of 20

Under <u>Plumb v. Fourth Jud. Dist.</u>, 927 P.2d 1011 (Mont. 1996), any party can raise the issue of due process rights of a non-party, and the non-party if affected by the proceeding has due process rights. (The undersigned counsel represent some but not all of the patients whose medical records Grace is seeking pursuant to the Motion and the Draft Subpoena.) As a matter of due process, the over 800 patients who are not represented by the undersigned counsel have the right to notice of the invasion of privacy sought by Grace and an opportunity to be heard. Specifically, Section 50-16-812, MCA requires as follows:

(1)  Unless the court for good cause shown determines that the notification should be waived or modified, if health care information is sought . . . in a civil proceeding or investigation under 50-16-811(1)(h), the person seeking compulsory process or discovery **shall mail a notice by first class mail to the patient** or the patient's attorney of record of the compulsory process or discovery request at least 10 days before presenting the certificate required under subsection (2) of this section to the health care provider.

(2)  Service of compulsory process or discovery requests upon a health care provider must be accompanied by a **written certification**, signed by the person seeking to obtain health care information of why the person's authorized representative identifying at least one subsection of 50-16-811 under which compulsory process or discovery is sought. . . .

Grace has not provided notice, nor proposed any procedure for supplying notice, to the 800 unrepresented patients of Dr. Whitehouse whose medical records may be compromised. The Grace motion is facially inadequate and should be denied.

> **(2)   Grace fails to meet the substantive requirement of Montana law that there be a "compelling state interest" before medical files will be released.**

Montana law provides extensive protection of the privacy rights of medical patients, going beyond even those that federal law imposes under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").[5] The Montana Supreme Court has explained that in

---

[5] HIPAA will not be discussed in this Objection because it offers no protection beyond Montana laws.

11

Montana, "privacy has been defined as the ability to control access to information about oneself." Montana Human Rights Div. v. City of Billings, 649 P.2d 1283, 1287 (Mont. 1982). Moreover, said the court:

> Montana adheres to one of the most stringent protections of its citizens' right to privacy in the country. Mont. Const. Art. II § 10. Montana's treatment of privacy rights is more stringent than that offered by the Federal Constitution.

State v. Burns, 830 P.2d 1318, 1320 (Mont. 1992) (citing Montana Human Rights Div., 649 P.2d at 1286). Moreover, on the subject of patients' medical information, the Montana Supreme Court recently observed:

> This Court has held medical records are **quintessentially private and deserve the utmost constitutional protection.**

Bilant, 36 P.3d at 887 (citing Nelson, 941 P.2d at 448) (emphasis in original). See also Fisch v. SCIF, 2000 MTWCC 55, ¶ 18.

In recognition of the above, the Montana legislature, at § 50-16-801, MCA, has entered findings that:

> (1)   Health care information is personal and sensitive information that if improperly used or released may do significant harm to a patient's interests in privacy and health care or other interests. . . .
>
> (4)   It is in the best interests of the citizens of Montana to have certain requirements with respect to the use or release of health care information by health care providers that are more restrictive than or additional to the health care privacy protections of HIPAA.

Accordingly, under § 50-16-811, MCA:

> (1)   Healthcare information **may not be disclosed** by a health care provider pursuant to compulsory legal process or discovery in any judicial, legislative, or administrative proceeding unless:
>    . . .
>
>    (h)   A court has determined that particular health care information is subject to compulsory legal process or discovery because the party seeking the

12

> information has demonstrated that there is a **compelling state interest** that outweighs the patient's privacy interest,

(Emphasis added.) This subsection (h) supplies the only exception to the ban on release of health care information which Grace's request for over 800 medical files of unrepresented patients could possibly meet.[6]

Grace has failed even to attempt to identify a "compelling state interest" served by its proposed discovery. This Court could speculate that Grace's purpose is to attack Dr. Whitehouse's credibility by discrediting the Whitehouse Study, thus permitting Grace under its theory of estimation—whereby this Court is to disregard the substantial verdicts and settlements achieved by Libby plaintiffs and instead attempt to apply to hundreds of individual claims a series of medical criteria contrived by Grace—to achieve a lower estimation of the portion of its asbestos liability attributable to Libby claims. Whatever the merits of this approach as a litigation tactic, it certainly does not qualify as a "compelling state interest" as required by Montana law.

---

[6] The other exceptions are:

(a) the patient has authorized in writing the release of the health care information in response to compulsory process or a discovery request;
(b) the patient has waived the right to claim confidentiality for the health care information sought;
(c) the patient is a party to the proceeding and has placed the patient's physical or mental condition in issue;
(d) the patient's physical or mental condition is relevant to the execution or witnessing of a will or other document;
(e) the physical or mental condition of a deceased patient is placed in issue by any person claiming or defending through or as a beneficiary of the patient;
(f) a patient's health care information is to be used in the patient's commitment proceeding;
(g) the health care information is for use in any law enforcement proceeding or investigation in which a health care provider is the subject or a party, except that health care information so obtained may not be used in any proceeding against the patient unless the matter relates to payment for the patient's health care or unless authorized under subsection (1)(i); and
(i) the health care information is requested pursuant to an investigative subpoena issued under 46-4-301 or similar federal law.

§ 50-16-811, MCA

The Montana courts have had occasion to consider what is a "compelling state interest" in the context of a proposed invasion of privacy. In <u>State v. Ingraham</u>, 966 P.2d 103 (Mont. 1998), medical records of the defendant were sought by the state in a criminal prosecution. A "compelling state interest" was found. In <u>State v. Burns</u>, 830 P.2d 1318 (Mont. 1992), the defendant's church personnel file was sought by the state in a criminal prosecution, to rebut character witness affidavits submitted by the defendant. <u>Burns</u>, 830 P.2d at 1320. No compelling state interest was found. <u>Id</u>. at 1321-22. In <u>Great Falls Tribune v. Cascade County Sheriff</u>, 775 P.2d 1267 (Mont. 1989), the newspaper sought the names of sheriffs deputies disciplined for brutality. Against a privacy claim, a "compelling state interest" was found, based upon the constitutional right to know. In <u>Montana Human Rights Div.</u>, <u>supra</u>, the agency was investigating sex and race discrimination in promotions, and sought employment files and test scores on other applicants. A "compelling state interest" was found in the Human Rights Division's investigation for protection against discrimination.

In stark contrast to the above cases, Grace can present no state interest at all (it is a private corporation), nor any constitutional right to know that might be balanced against the constitutional right to privacy of medical records held by the over 800 patients of Dr. Whitehouse who are without counsel in this case. For this reason, the Grace motion must be denied.

Even as to the Libby Claimants who are represented by counsel, if production of documents were to be required at all, the invasion of privacy should be minimized through redaction and limited access to any discoverable Whitehouse Records. In that sense, this Court should follow the lead of Judge Malloy by protecting the confidentiality of the Whitehouse

Records in a manner consistent with the protections detailed in Protective Order. Motion, Exh. 1.

### B. The Grace motion should be denied because the steps necessary to protect patients' privacy would be unreasonably burdensome.

Even patients whose records must be produced are entitled to the reasonable protection of their right to privacy, which can only be provided by redaction. In this case redaction would require adequate time for it to be done without disrupting the provision of medical services by the CARD Clinic and would require substantial expense, which should be borne by Grace. In the Criminal Proceeding, the government has undertaken the massive task of redacting the 550 medical charts of the patients in Dr. Whitehouse's database. The government will pay for the redaction and oversee the project. Given the government's involvement in the redaction process, the legitimate concerns surrounding the burdens imposed by such a project have been tempered, but certainly not eliminated. In this instance, the costs and risks associated with the production of the Whitehouse Records falls entirely on Dr. Whitehouse and the CARD Clinic staff.

### (1) The request is unreasonable as a reasonable alternative is available.

Grace's request exceeds standard practice in the medical field. The Whitehouse Study has been peer reviewed on two separate occasions, first by Dr. James Lockey, author of articles on asbestos disease, and second by the reviewers at the American Journal of Industrial Medicine. The article as published is medically authoritative. If, nevertheless, this Court were to decide that Grace is entitled to discovery, reasonable alternatives are available. Rather than copy **each medical file** (apparently to permit Grace to confirm the raw numbers), a copy of the **database covering all files** can be delivered (in redacted form) so that doctors hired by Grace can review the data to generally verify the study results. It can be assumed that the data was properly entered into the database. The size of the cohort in the study (123 patients) exceeds the norm.

The size of the cohort currently in the database (over 550 patients with full pulmonary function test results in series) is virtually unprecedented. The numbers are so large that an error here or there can have no effect. Dr. Whitehouse's study results "for decline of pulmonary were statistically significant at $P < .001$." Motion, Exh. 6, p.223. Values at $P < .01$ are standard practice. Delivery of the database on over 550 patients is a reasonable alternative to delivery of over medical files, given the need to redact records before delivery.

### (2) The request is unreasonably burdensome.

Grace requests over 1,500 medical files, including all chest x-rays and CT scans. To comply, Dr. Whitehouse is required to undertake the following tasks:

1. Redact all personal identification data.

2. Assign an I.D. number to each of 1,500 files.

    a. 1-123 shall be the 123 in the article
    b. 124-153 shall be the 30 excluded from the article
    c. 154-550 plus shall be the other patients in Dr. Whitehouse's database.
    d. 551-1,500 comprise the rest.

3. Maintain a patient log with a number assigned to each patient name.

The original medical files will remain at the office of Dr. Whitehouse. The task then is to redact the files, then copy and deliver 1,500 files.

### (a) Redact personal identification information.

Redacted information will include patient names, names of relatives and friends, dates relative to the individual, address, medical record numbers, date of visit, and any reference to a unique characteristic of the individual. See Protective Order, p.21, item 9. In a case of occupational disease due to asbestos exposure, an extensive history is taken. **Dr. Whitehouse will need to carefully read each page of each chart to redact personal identifying information.** Great care will be necessary in the redaction project. Under Montana law a doctor

16

who releases personal medical information without authority from the patient is subject to disciplinary action for violation of medical ethics, as well as liability for civil damages, a $5,000 penalty, attorney fees and litigation expenses. § 50-16-817, MCA. Dr. Whitehouse will be responsible to ensure that the redaction project is 100% correct. If he misses one item of personal information, he is subject to financial and professional penalties.

This process is enormously time-consuming, and much of it will need to be Dr. Whitehouse's personal time. Dr. Whitehouse will need to examine handwritten notes, as others may not be able to read his handwriting. Dr. Whitehouse will need to examine each x-ray to ensure that personal identifying information has been redacted. At request No. 14, Grace requests copies of hard drives. These contain many patient names and cannot be redacted.

A staff person can first copy all of the charts, then make the obvious redactions on each page of each patient's file. Then Dr. Whitehouse can read each page of each medical file to perform his personal responsibilities and to make other necessary redactions. It is estimated that the redaction process will take an average of one half hour per chart for the staff person, and one-half hour per chart for Dr. Whitehouse. A minority of charts contain just one visit. Others run to over a 100 pages. Included in the 400 hours (below) for redaction by Dr. Whitehouse are all hours for supervising and administering the entire project.

      **(b)    Copying, organizing and delivery.**

Copying must be done by the CARD Clinic staff on overtime. Dr. Whitehouse estimates an average of eight chest x-rays per medical file. It will take about one-half hour to copy the chest x-rays for each chart. Likewise, each chart will require a half hour to copy, organize and deliver. The assistant's hourly rate of $19, plus one-quarter for benefits, comes to $24 per hour.

**Summary for 1,500 medical files (assuming 700 Libby Claimants and 800 patients without counsel)**

| | |
|---|---:|
| Dr. Whitehouse review and redaction: 800 charts (with chest x-rays and CT scans) x 1/2 hour per chart @ $300 per hour = | $120,000[7] |
| Assistant: redaction of 800 charts x 1/2 hour @ $24 per hour = | $9,600 |
| Copy charts: staff: 1,500 charts x 1/2 hour @ $24 per hour = | $18,000 |
| Copy x-rays and CT scans, staff: 1,500 charts x 1/2 hour @ $24 per hour = | $18,000 |
| Cost of copying x-rays: 1,500 charts x 8 per patient @ $20 | $240,000 |
| Copy CT scans est. 700 x one-quarter hour @ $24 per hour | $4,200 |
| Cost of CT scans 700 x 5 per patient @ $35 per CD | $17,500 |
| Cost of paper: 1,500 charts x 30 pages average @ $.50 = | $22,500 |
| Total | $449,800 |

**(c) Disruption of the CARD Clinic and limits on Dr. Whitehouse's availability.**

The project asks Dr. Whitehouse to add about 400 hours to his existing duties and responsibilities. Dr. Whitehouse's time on this project would be overtime, and quite taxing for someone who is 68 years old and has had one heart operation. Dr. Whitehouse sees patients eight days per month at the CARD Clinic. Sixteen days per month would be full time. Already Dr. Whitehouse spends in all about 10 days per month on CARD Clinic matters. This leaves six days free. If he devotes four of those days to this project, a total of 32 hours per month, the 400 hour project will take over a year to complete. Even if a new staff person is hired, and even if Dr. Whitehouse returns to essentially full time work in order to expedite the redaction of records, only about 50 hours per month could be added to his schedule and the project would still require about eight months to complete.

Considering the lack of a clear purpose for such an enormous project, as well as the

---

[7] Even this figure assumes redaction only of 800 records (patients unrepresented by counsel). However, as discussed above, the privacy of all patients should be protected by redaction.

absence of a compelling state interest as required for the unrepresented patients, it is unreasonable to require the enormous dislocation that the complying with Grace's discovery demand, while still protecting patient privacy, would entail.

### (3) Without strict financial arrangements, the request is unreasonably burdensome and expensive.

It is unreasonable for Grace to inflict the costs of the above records copying and redaction project upon Dr. Whitehouse, who is a non-party, without making financial arrangements in advance. The Grace requests are improper and objectionable on this ground alone.

Dr. Whitehouse and the CARD Clinic would incur a large amount of expense and time spent in responding to discovery in response to Grace's requests. He must be protected from this. Grace should pay the reasonable expenses of the redaction project in advance. Dr. Whitehouse, as treating physician and the Center for Asbestos Related Disease, as non-parties to this action, cannot incur the overhead and out-of-pocket costs[8] or the risk that Grace will litigate the bill. Obviously there are many problems with the Draft Subpoena that Grace proposes. If Grace were actually to serve such a subpoena, it would be necessary for him (or someone acting on his behalf, such as the Libby Claimants) to seek a protective order.

---

[8] The CARD Clinic is in dire financial straits as the Grace Plan has expanded its payment arrears, greatly increased its denials of oxygen, its denials of patient exam bills, and its demands for additional certifications, pre-service approvals and demands for all chart records on each patient, greatly increasing the overhead burden.

## Conclusion

Based on the foregoing, Grace's motion seeking to obtain discovery from Dr. Whitehouse should be denied.

Dated: March 15, 2006

LANDIS RATH & COBB LLP

/s/ Kerri Mumford
Adam G. Landis (No. 3407)
Kerri Mumford (No. 4186)
919 Market Street, Suite 600
P.O. Box 2087
Wilmington, DE 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

-and-

Daniel C. Cohn, Esq.
Christopher M. Candon, Esq.
COHN WHITESELL & GOLDBERG LLP
101 Arch Street
Boston, MA 02110
Telephone: (617) 951-2505
Facsimile: (617) 951-0679

Counsel for the Libby Claimants