EXHIBIT D

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) )  Chapter 11 |
| W. R. GRACE & CO., *et al.*, | )  Case No. 01-1139 (JKF) )  (Jointly Administered) |
| Debtors. | ) ) ) |

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF W.R. GRACE & CO.'S MOTION TO APPROVE PI CMO AND QUESTIONNAIRE

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet Baer
Jonathan P. Friedland
Salvatore F. Bianca
Joseph Nacca
Andrea L. Johnson
200 East Randolph Drive
Chicago, IL 60601
Telephone:    (312) 861-2000
Facsimile:    (312) 861-2200

KIRKLAND & ELLIS LLP
Barbara M. Harding
Brian T. Stansbury
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:    (202) 879-5000
Facsimile:    (202) 879-5200

Dated:  May 10, 2005

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
Laura Davis Jones (Bar No. 2436)
David Carickhoff (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession

## <u>TABLE OF CONTENTS</u>

TAB 1        Recent Procedural History

TAB 2        Relevant Factual History – How Did We Get Here?

TAB 3        Legal Argument

TAB 4        The Questionnaire

TAB 5        Conclusion

TAB 6        Appendix

i

# TAB 1

## RECENT PROCEDURAL HISTORY

## I.    THE PLAN AND DISCLOSURE STATEMENT

The Debtors filed their Plan and Disclosure Statement on November 15, 2004 (Docket Nos. 6895 and 6896) and Amended Plan and Disclosure Statement on January 13, 2005 (Docket Nos. 7560 and 7559) (when used herein, the term "Plan" refers to the Amended Plan).

The Plan divides Asbestos Claims[1] into two categories: (1) Asbestos PI Claims and (2) Asbestos PD Claims.    The Plan further divides Asbestos PI Claims into two Classes: (a) Asbestos PI-SE Claims (a.k.a. Asbestos Personal Injury Symptomatic/Eligible Claims), and (b) Asbestos PI-AO Claims (a.k.a. Asbestos Personal Injury Asymptomatic/Other Claims).

All Asbestos Claims would be channeled to an Asbestos Trust pursuant to the Plan and Bankruptcy Code § 1124(g), at which point the Holders of Asbestos PI Claims would have the option of settling their Claims with the Asbestos Trust or litigating such Claims against the Asbestos Trust.

## II.    THE ESTIMATION MOTION

Contemporaneously with filing the Plan and Disclosure Statement, the Debtors filed their Estimation Motion seeking an order that, among other things, estimates the total amount (to be contributed to the Asbestos Trust) that would fully satisfy asbestos-related claims as well as the expenses of the Asbestos Trust.    *See* Motion for Entry of an Order Seeking the Estimation of Asbestos Claims and Certain Related Relief (Docket No. 6899).  The Debtors intend to use such estimates to demonstrate the feasibility of the Plan and in support of the other factual findings that must be made to confirm the Plan.

---

[1]    Capitalized terms not defined in the Brief have the same meaning ascribed to them in the Plan.

1

At the January 21, 2005 hearing, the Court determined that it would estimate the value of asbestos-related claims and instructed the Debtors to work with the Asbestos PI Committee and the FCR and negotiate a Case Management Order for the estimation. Integral to an estimation process is the solicitation of information from Holders of Asbestos PI Claims that will assist the Debtors and the Court in determining the actual value of the Asbestos PI Claims. The Court already has approved the use of a questionnaire for this purpose in connection with asbestos property damage claims and has indicated that the same should be done for personal injury claims:

> It seems to me that if the debtor thinks that it has some value to do a questionnaire, and you know, the form of discovery, I think, is somewhat within the discretion of the Court and we could treat it as though it's a series of interrogatories . . . But, coming down to a reasonable type of questionnaire to get some information, so that the debtor's experts can decide what the debtor thinks is a proper valuation, it may have relevance to the committee. The committee may choose to use it for different purposes, I don't know. But, I'm not sure that it hurts to get that step done . . . But, I do agree with you, that the appropriate way to do this is through a battle of experts. So, whatever spin the experts put on the questionnaire, maybe they'll be the same spin. Maybe it won't be the same spin. I don't know. But, I think that should be an expert analysis function that goes forward.

Tr. of Hr'g. at 132-33 (Jan. 21, 2005). *See also id.* at 139 ("[T]he information that the debtor wants, I think, is appropriate for an expert to take a look at. Whether I'm going to consider it, what value I'll place on it, whether it meets *Daubert* or not, I think is an issue down the road. What the debtor intends to do seems to me, in an estimation process, to be calculated to lead to relevant admissible evidence. And for a discovery on an estimation process, that's all I need."); *id.* at 155 ("I think the questionnaire's a good idea, but it's not going to be 50 pages."); Order Setting Briefing Schedule and Hearing Regarding Case Management Order and Proof of Claim/Questionnaire for the Estimation of Asbestos Personal Injury Liabilities (Docket No.

2

8324) ("[A]t the Estimation Motion Hearing, the Court ordered the [PI Committee], the [FCR], and the Debtors to (a) negotiate a case management order to govern the estimation of asbestos personal injury claims [], and (b) the form of the Debtors' proposed proof of claim/questionnaire for asbestos personal injury pre-petition litigation claims [].").

Nonetheless, after considerable negotiation, the Asbestos PI Committee and FCR remain unwilling to agree to the Debtors' Questionnaire.   The Debtors therefore seek the Court's approval of the CMO and Questionnaire.

3

# TAB 2

## RELEVANT FACTUAL HISTORY -

## HOW DID WE GET HERE?

# I.    OVERVIEW

Courts, Congress, the medical community, legal commentators, and even certain plaintiffs' lawyers all have recognized the rampant problems and abuses that have plagued asbestos litigation for years.  For instance, the U.S. Supreme Court has called the situation an "elephantine mass"[1] and a "crisis."[2]  The Third Circuit has called it "an unparalleled situation in American tort law,"[3] while the U.S. District Courts have described it as a "crisis"[4] and "a festering wound on our society."[5]  Legal commentators have characterized asbestos litigation as a process which renders individualized justice a "chimera"[6] and as "a massively fraudulent enterprise" amounting to a legal "swindle[]."[7]

This section of the Brief chronicles the defects of the past asbestos claims resolution process, both in the tort and bankruptcy systems.  These problems are not a matter merely of historical interest.  Rather, this case has inherited those problems and cannot be further advanced unless the problems are addressed. Specifically, as described below, the common thread and

---

[1]  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 821 (1999).

[2]  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 597 (1997).

[3]  *In re School Asbestos Litig.*, 789 F.2d 996, 1000 (3d Cir. 1986).

[4]  *G-I Holdings, Inc. v. Baron & Budd*, 179 F.Supp.2d 233, 237 (S.D.N.Y. 2001).

[5]  *In re Joint E&S Dists. Asbestos Litig.*, 237 F. Supp. 2d 297, 300 (E&S.D.N.Y. 2002) (citation omitted).

[6]  Rand Institute for Civil Justice, *Asbestos Litigation Costs and Compensation:  An Interim Report*, 88 (2002) (hereinafter "Rand Report, 2002") (Appendix Exhibit A).   (Note that a pre-publication final version of the report, *Asbestos Litigation*, was issued on May 10, 2005, the day this brief was filed, and can be found at http://www.rand.org/pubs/monographs/2005/RAND_MG162.pdf.   The Debtors have not reviewed the newly issued report at the time of the filing of this Brief but may seek the Court's permission to address it at a later time in a supplemental filing.)

[7]  *The Fairness in Asbestos Injury Resolution Act of 2003*, S. Rep. No. 108-118, at 98 (2003) (statement by Sen. Jon Kyl, Member, Sen. Comm. on the Judiciary) (quoting Lester Brickman, *The Great Asbestos Swindle*, Wall St. J., Jan. 6, 2003, at A18).

1

primary flaw of past attempts to manage asbestos litigation has been the failure to link the payment of an asbestos personal injury claim to: (1) the production of reliable medical evidence of a legally cognizable asbestos-related disease; and (2) reliable objective evidence of exposure to the defendant's product sufficient to cause disease. The Debtors seek the opportunity to propose an estimation procedure that avoids these problems. By contrast, an estimation based on historical settlements, as proposed by the Asbestos PI Committee and FCR, would knowingly perpetuate and magnify the mistakes of the past.

## II.   THE VICIOUS CYCLE OF ASBESTOS LITIGATION: MASSIVE CLAIMS LEAD TO MASS SETTLEMENTS AND LAX EVIDENTIARY REQUIREMENTS -- WHICH, IN TURN, LEAD AGAIN TO MEDICALLY IMPOSSIBLE NUMBERS OF NEW CLAIMS

This section traces the emergence of problems in asbestos litigation from the original Manville Trust through the unprecedented new wave of claims in 1999-2000 that directly precipitated Grace's decision to file for bankruptcy under Chapter 11. A basic proposition emerges from this history. To wit: In an attempt to manage massive numbers of claims, defendants, debtors, and the courts have chosen "efficiency based" solutions over "evidence based" solutions, and thereby prompted a further massive influx of claims lacking a sound evidentiary basis.

### A.   The Johns-Manville Trust: Claims Surge and Medical Data Deteriorate When Medical and Exposure Evidence Are Not Required.

Under the original, negotiated plan of reorganization in Johns-Manville, Manville's asbestos injury legal obligations were assumed (and expected to be fully satisfied) by the Manville Personal Injury Settlement Trust. *See Findley v. Blinken (In re Joint E&S Dists. Asbestos Litig.)*, 129 B.R. 710, 752 (E.&S.D.N.Y. 1991), *vacated by* 982 F.2d 721 (2d Cir. 1992), *opinion modified on reh'g*, 993 F.2d 7 (2d Cir. 1993). The Trust had no pre-determined evidentiary requirements concerning submission of proof of exposure to Manville asbestos or

2

proof of disease, and claimants were also allowed to re-enter the tort system.  *See id.* at 755-58.[8]

Consequently, within the first two years of operation, the Manville Trust "faced almost 50%

more claims than the *highest projection* made at the time of confirmation for the total number of

claims to be filed during the entire life of the Trust."  *In re Joint E&S Dists. Asbestos Litig.*, 129

B.R. at 758, 769 (at confirmation, highest estimate for the life of the trust was 80-100,000 claims

but after only 2 years, over 240,000 claims filed).  Judge Weinstein stepped in to stay claims

processing before the money ran out.  *Id.* at 762.

    During "arduous and extensive" negotiations and related litigation between 1990 and

1995, the Manville Trust's payment process was restructured.  *Id.* at 766.  Access to the tort

system, for all practical purposes, was eliminated.  *Id.*  However, the reorganized process still did

not require scientifically reliable medical evidence of an asbestos-related disease.  *In re Joint*

*E&S Dists. Asbestos Litig.*, 237 F. Supp. 2d 297, 314 (E.&S.D.N.Y. 2002) ("[I]t [was] difficult if

not impossible to determine on the basis of the information required to be submitted to the Trust

the percentage of claimants who did or did not suffer impairment in their daily lives.").  The

Manville Trust's adoption of lax payment criteria prompted a massive influx of asbestosis

claims.  *See* Patricia G. Houser Dep. at 195-97, *Falise v. Am. Tobacco Co.*, CV 97-7640

(E.D.N.Y. Sept. 20, 1999) (Executive Director of Johns-Mansville Trust acknowledging that as a

result of numerous claims filed against the trust relying on X-rays and PFT's of a "highly

questionable nature and quality," annual "asbestosis claims exceeded projections by

approximately 50 percent.").

---

[8]    Lester Brickman, *Lawyers' Ethics and Fiduciary Obligations in the Brave New World of Aggregative
Litigation*, 26 Wm. & Mary Environ. L. & Pol'y Rev. 243, 292 n. 136 (2001) (hereinafter "Brickman
2001")(Appendix Exhibit B).

In response to the flood of claims, the Manville Trust conducted an outside claims audit. This audit revealed massive abuse: 41% of claims presented *no* evidence of asbestos-related disease. *See* A.R. Localio *et al.*, Biostatics Section, Dept. of Health Evaluation Serv., Penn. State Univ. College of Medicine & Center for Clinical Epidemiology and Biostatics, *The Manville Personal Injury Settlement Trust X-ray Audit: An Assessment of the Identification of the Underlying Disease Process Implications for Medical Review by Certified B-Readers* at 14 (1998) (Appendix Exhibit C) (hereinafter, the "Penn. State Audit"). [9]  For a substantial percentage of the remaining claims, independent doctors could not replicate the diagnosis of an asbestos-related disease. *Id.*



---

[9]    For a further discussion of the audit and the circumstances surrounding it, *see* Lester Brickman, *On the Theory Class's Theories of Asbestos Litigation: The Disconnect Between Scholarship and Reality*, 31 PEPP. L. REV. 34, 132 n. 344 (2003) (hereinafter "Brickman 2003") (Appendix Exhibit D); and Rand Report, 2002, *supra*.

Failure rates for replication were highest among a small group of doctors, as seen in the above chart. *Id.* Indeed, 63% of the asbestosis claims supported by this handful of doctors could not be replicated by independent experts and over 1/3 of these claims showed *no evidence* of asbestos-related disease. *Id.* The audit also discovered a statistically significant correlation between the failure rate of a doctor and the law firm by whom the doctor was retained. *Id.*[10] But the most startling fact of all was the revelation that this handful of doctors accounted for almost ½ of the *total claims* against the Manville Trust. *Id.*



As the chart above demonstrates -- for the single most active doctor, 49% of his claims showed *no evidence of disease* whatsoever. *Id.* Not surprisingly, referrals to this doctor

---

[10] *The Fairness in Asbestos Injury Resolution Act of 2003*, S. Rep. No. 108-118, at 98 (2003) (statement by Sen. Jon Kyl, Member, Sen. Comm. on the Judiciary). The biostatisticians conducting the audit concluded, in a written report submitted to the trust in February 1998, that the particular law firm that submitted any given claim was "a strikingly significant predictor" of whether that claim would fail the audit, and that those findings exhibited "huge levels of statistical significance."

5

increased over time.  *Id.*  In 1983, he submitted fewer than 1% of asbestosis claims received by

the Manville Trust.  *Id.*  By 1996, as shown in the above chart, the diagnoses of this *one* doctor

supported almost *one-third* of all asbestosis claims received by the Manville Trust.  *Id.*

Given the level of abuse uncovered by the audit, the Manville Trust sought to expand the

audit program to include audits of all claims submitted by certain law firms and doctors.  *See The

Fairness in Asbestos Injury Resolution Act of 2003*, S. Rep. No. 108-118, at 98 (2003) (statement

by Sen. Jon Kyl, Member, Sen. Comm. on the Judiciary.)  Plaintiffs' attorneys, however, resisted

the Trust's attempts to expand the audit program.  *See* Brickman 2001 at 290.[11]    Judge

Weinstein accepted the plaintiffs' lawyers' arguments, and the Trust abandoned its audit

program.[12]   Thus, the Manville Trust was forced to continue to pay substantial numbers of

dubious claims.

The influx of claims over the following years ultimately became so severe that Manville

temporarily imposed a moratorium on new claims in spring of 2001, then in June 2001 cut its

payout in half, from ten cents on the dollar to just five cents on the dollar.  *See In re Joint E&S

Dists. Asbestos Litig.* 237 F. Supp. 2d at 314.[13]

---

[11]  Nine plaintiffs' firm sued to stop the audits in 1998.  Brickman 2001, *supra,* at 290.  The case was heard by Judge Weinstein sitting without a jury.  *Id*.

[12]  Judge Weinstein questioned the authority of the trust to audit the claims, stating that "the Trust had no business medically auditing claims (regardless of any authority to do so in the Trust documents) and that absent 'manifest fraud' . . . the Trust was expected to pay every claim filed for the full amount of the claim." Brickman 2003, *supra*, at 134 (citing Letter from David T. Austern, President, Claims Resolution Management Corporation for the Manville Personal Injury Settlement Trust, to Lester Brickman (Oct. 3, 2001)); Brickman 2001, *supra*, at 291 (same).

[13]  Manville Trust, Highlights of the 4th Quarter 2001 Filing (2001), available at http://www.mantrust.org/FILINGS/q4_01/4THQTR01.htm (last visited May 6, 2005);  MEALEY'S LITIG. REP.: ASBESTOS (August 3, 2001) at 14.

6

The Manville Trust's payment standards were changed again in 2002. *See* 237 F. Supp. 2d at 324. The new "TDP" adds a provision mandating that all diagnoses be based on physical examinations. In addition, the Trust must be satisfied that all medical evidence submitted is:

> [c]redible and consistent with recognized medical standards and may direct the submission of such documentation as it requires to support this determination. These provisions will allow the Trust to ensure that claims meet adequate standards of proof (that is, standards of proof that would entitle them to compensation in the tort system). These requirements will likely require most facilities currently conducting asbestos screening to change their processing of potential claimants.

*Id.* Critics have asserted that these evidentiary requirements are still "inadequate to ensure that 'medical evidence provided in support of . . . claim[s] is credible and consistent with recognized medical standards'" and do "not adequately address the root of the problems facing the Trust, mass screenings." *Id.* at 328 (citations omitted).

## B.    Inventory Settlements Not Tied to Valid Medical and Exposure Evidence Caused Claims to Soar In the Tort System.

The Manville trends were also reflected in claiming trends against asbestos defendants as a whole. In order to avoid the same fate as Manville, many companies chose to pursue a privatized claims resolution process in which they agreed to settle claims on a mass basis in lieu of traditional tort system litigation.[14] These inventory settlements, however, repeated the mistakes of the Manville Trust because they were not adequately anchored to traditional proof of liability. Instead, they focused on settling claims -- regardless of real validity -- simply to stave

---

[14]    *See In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1298 (7th Cir. 1995) (observing that aggregation exposes the defendant to "intense pressure to settle"); *id.* at 1304 ("The number of asbestos cases was so great as to exert a well-nigh irresistible pressure to bend the normal rules."); Francis E. McGovern, *Rethinking Cooperation Among Judges in Mass Tort Litigation*, 44 U.C.L.A. L. Rev. 1851, 1858 (1997) ("Plaintiffs' attorneys rush to their favorite judges and demand draconian procedures to pressure defendants to make block settlements.); Jack B. Weinstein, *Ethical Dilemmas in Mass Tort Litigation*, 88 Nw. U. L. Rev. 469, 521 (1994) ("Often the pressure for block settlements comes from plaintiffs' attorneys who hope to get something for a large mass of questionable cases. Some attorneys ... will take almost any case without regard to its merit, hoping for a global settlement.") (footnote omitted).

the tide of thousands of suits in hundreds of courts around the nation. We now know that this *pay the ransom* strategy failed miserably, since the lax evidentiary requirements for settlement led to the prosecution of even more baseless claims.

The deficiencies of the inventory settlement approach are illustrated by the experience of Babcock & Wilcox ("B&W"). B&W negotiated its own inventory settlements with each plaintiffs' law firm to settle claims en masse. *In re The Babcock & Wilcox Co.*, Report to the Court Regarding Asbestos Developments Generally and the Proofs of Claim Filed Here, Case Nos. 00-0558, 00-10992, Docket No. 101, at 28 (Bankr. E.D. La. Oct. 18, 2001). However, B&W required "only minimal proofs of the claimant's medical condition and purported exposure to a B&W boiler." *Id*. Indeed, claimants were not required to submit any back-up documentation including X-rays or PFT results. *Id.* at 28, 36.[15] Plaintiffs' lawyers took advantage of B&W's minimal claim criteria by submitting unsupportable claims. *Id.* at 31. During its Chapter 11 bankruptcy, B&W and its claim experts analyzed its historical database against other audits. *See Expert Report of Frederick C. Dunbar, ACC v. Babcock & Wilcox Inv. Co. (In re Babcock & Wilcox Co.)*, Case No. 01-1155 (Bankr. E.D. La. 2001) (hereinafter "Dunbar Report"). Among the claims B&W could match, it found that 45% of the lung cancer claims, 100% of the asbestosis claims and over 50% of the disabling asbestosis had no evidence to support the claimed disease. *Id.* at 23. Because B&W required little documentation to support a claim, many claims were filed against B&W and paid for a "more severe disease than against other defendants." *Id.* at 27 (for settlement purposes, B&W treated 3,720 claims as more severe diseases than similar claims were treated for settlement purposes by Manville). B&W's claim

---

[15]  The rationale for this approach was to clear out large volumes of claims for low settlement amounts, thus, it was hoped, minimizing the overall dollars to be paid.

experts also found that the top 10 highest-volume doctors from the Manville Trust Audit were also responsible for more than 50% of the asbestosis claims against B&W.  *Id.* at 27.

In sum, rather than bringing about closure, these inventory settlements encouraged more filings because they made it easier for claimants to be paid even though they lacked scientifically reliable medical and exposure evidence.[16]

### C.    By 2000, the Real Cost of the Broken System Emerged

Beginning in late 1999 and early 2000, dramatic increases occurred in claims presented both to traditional asbestos defendants and even to those defendants and companies who had very little asbestos litigation exposure in the past and whose products contained only trace amounts of asbestos.  The massive increase in claims, however, was not supported, and indeed was contradicted by, trends in asbestos exposure and actual disease incidence.  Thus, defendants and courts found themselves flooded with asbestos claims that lacked proper foundation either in law or in science.

### 1.    Asbestos Claims Soar, Again

In 2000, defendants, debtors and the courts began observing "a dramatic increase in the total and rate of filing of asbestos lawsuits and claims."  *In re Joint E&S Dists. Asbestos Litig.*, 237 F. Supp. 2d at 300. Companies already in bankruptcy experienced this surge, and many of the companies entering the bankruptcy system around that time cited these increases, or "spikes," in the claims filed against them and in settlement demands as precipitating their bankruptcy petitions:

---

[16]    *See* Equitas Limited Reports and Accounts for the Year Ended 31 March 2001, 22-23 ("[I]nventory settlements have failed to reduce defendants' asbestos liabilities and now appear to have made the situation worse.  Many defendants have reported an increase in the number of pending asbestos claims . . . Inventory settlements have encouraged the filing of new claims because they have made it *increasingly easy for claimants' attorneys to recover money for unimpaired claimants.*") (emphasis added).

- ***Manville:***  As seen in the chart below, claim filings against Manville nearly doubled in 2000 as compared to 1999 and "[a]bout July of 2000, the Manville Trust began to experience a dramatic and unanticipated rise in the number of claims being filed and expansion in scope of the industries and occupations which generated those claims."[17]



- ***Owens Corning:***  "[T]he cost of resolving current and future claims, together with a flurry of recent new filings from plaintiff lawyers not participating in the NSP, led us to the conclusion that a Chapter 11 reorganization was prudent and necessary."[18]

- ***Eagle-Picher:***  In October 2000, the Eagle-Picher Trust saw "a significant increase in claim filings over and above what our expert consultants had predicted two years ago."[19]

- ***UNR:***  The UNR Trust also experienced a sharp and unexpected jump in claim filings.  In 2000, the UNR Trust cited a 33% rise in asbestos claims from the year

---

[17]  *See In re Joint E&S Dists. Asbestos Litig.*, 237 F. Supp. 2d at 313.  In 2001, the claim filing rate was more than double the rate in 2000 (which itself represented nearly a doubling from 1999).  In the first quarter of 2001, the Manville Trust received 24,500 new claims, in contrast to 10,400 new claims received in the first quarter of 2000 and 5,700 received during the first quarter of 1999.  Mealey's Litig. Rep.: Asbestos ( May 4, 2001) at 7.

[18]  *Owens Corning Files Voluntary Chapter 11 Petition to Resolve Asbestos Liability,* PR Newswire, Oct. 5, 2000.

[19]  Letter from William B. Nurre, Executive Director, EPI Trust, to Claimants' Counsel (Oct. 9, 2000).

before and noted that the forecast of new claims after the year 2000 had nearly doubled from 1998 projections.[20]

- **USG:**  The number of claims against USG, a minor user of asbestos in certain building materials, grew "dramatically as a result of the filing of thousands upon thousands of claims by plaintiffs without any legally cognizable bodily injury."[21] USG was deluged with claims "brought by people who did not work either with or near U.S. Gypsum products or in the construction trades at all," predominantly "unimpaired claimants."[22]

- **Burns & Roe**:  This engineering firm filed for bankruptcy in December 2000 because "[o]ver the past 12 months, demands from plaintiffs' lawyers spiked to levels dramatically above the historic pattern."[23]

- **Armstrong**:  Armstrong World Industries filed for bankruptcy in December 2000, stating that "companies that have had involvement with asbestos-containing products have seen the number of claims made each year escalate far beyond what one might expect based upon medical and scientific data" and that, as other defendants have "dropped out" of the tort system by filing Chapter 11, plaintiffs' lawyers "have focused more of their efforts on the [remaining] companies."[24]

- **G-I Holdings:**  Having already paid $1.5 billion to settle more than 500,000 asbestos claims, G-I Holdings (formerly GAF) filed for Chapter 11 in January 2001 due to a "dramatic increase in the number of claims," which the tort system was "not equipped to handle . . . efficiently and fairly."[25]

- **U.S. Mineral:**  In July 2001, U.S. Mineral filed for Chapter 11 protection due to an "overwhelming number" of asbestos claims.  *See* Mealey's Litig. Rep.:

---

[20]  *See* UNR Asbestos Trust Letter, Mealey's Litig. Rep. 21 (12/1/00) at D-1.

[21]  USG 6/27/01 Informational Br. at 1-2, 4, 10.  *See also,* P. Callahan, *USG Files for Chapter 11 After Referring to Senate's Power Shift as Latest Setback*, Wall St. J., June 26, 2001, at A4; USG 10-Q filed 8/8/00; M. Garza, CHI. TRIB., June 26, 2001, at 1 ("The Chapter 11 process was the only alternative to prevent the value drain that has been occurring as U.S. Gypsum was forced to pay for the asbestos costs of other companies that already had filed for Chapter 11," quoting W. Foote, USG CEO).

[22]  *Id.*

[23]  *Asbestos Woe Leads Burns & Roe to File for Bankruptcy Relief*, Eng. News-Rec., Dec. 18, 2000, at 22.

[24]  Aff. of W. Rodraun ¶¶ 26, 33, *In re Armstrong World Indus.*, No. 00-4471 (D. Del. Dec. 5, 2000).

[25]  Wall St. J., Jan. 8, 2001, at B12 (G-I said "there was no ebb in the tide of personal-injury claims," indeed "there was a 'dramatic increase in the number of claims.'")  *See also* 14 Asbestos & Lead Abatement Rep., Feb. 1, 2001 (almost 70,000 claims filed against G-I in 2000, nearly double the number filed in 1996).

Asbestos, Aug. 3, 2001, at 12-13. Between 1954 and 1972, the company sold approximately $14 million of spray-applied fire resistive material that contained asbestos. *Id.* It has since spent more than $275 million litigating more than 40,000 asbestos claims, and now has "more than 223,000 asbestos claims filed against it with more than 165,000 claims pending." *Id.*

- **Babcock & Wilcox**: Faced with hundreds of thousands of asbestos claims and increasing settlement demands, Babcock & Wilcox, a company that designed large commercial boiler systems, was compelled to seek refuge under Chapter 11 in February 2000.[26]

- **Pittsburg Corning:** In connection with its April 2000 filing, Pittsburgh Corning stated that "[h]igh defense costs and administrative costs, coupled with sharply increasing demands, combined to threaten PCC's long-term financial health and left it with no alternative means for resolving the [asbestos] claims brought against it."[27]

- **Federal-Mogul:** Over 59,000 new claims were filed against Federal-Mogul in the first six months of 2001. *See* Federal-Mogul Form 10-Q, at 10 (Aug. 1, 2001). On October 1, 2001, Federal-Mogul filed for Chapter 11 protection after being "overwhelmed by asbestos litigation." *Id.* The company and its subsidiaries faced over 365,000 asbestos claims, despite the fact that Federal-Mogul had "only limited involvement with asbestos." *Id.* Among the pending claims were thousands based on alleged exposure to asbestos from industrial gaskets that contained only "a small amount of asbestos bound in a latex material and surrounded by steel."[28]

    **2.**    **The Surge in Claims Ran Counter to the Incidence of Asbestos Exposure and Real Disease Rates, Which Have Been Decreasing.**

Examples of the dramatic increase in claims discussed in the previous section are reflected in the chart below. *See* Rand Report, 2002, *supra*, at 44. As the chart below reflects,

---

[26] *See Babcock & Wilcox Cite Asbestos Settlements in Filing for Bankruptcy,* Mealey's Litig. Rep.: Asbestos 18 (Mar. 3, 2000); Melanie Trottman, *Babcock Files for Protection of Chapter 11*, Wall. St. J., Feb. 23, 2000, at A10; Alan Sayre, *Babcock & Wilcox Seeks Bankruptcy*, AP Online (Feb. 22, 2000).

[27] *Pittsburgh Corning Files for Bankruptcy Protection*, Mealey's Litig. Rep.: Asbestos 6 (Apr. 21, 2000).

[28] Asbestos Primer, *at* http://www.federal-mogul.com/cda/content/front/0,2194,2336_2903_4292,00.html. *See also* M. Pacelle, *Federal-Mogul Plans to Seek Chapter 11 Protection*, Wall St. J., Oct. 1, 2001, at A3.

12

nonmalignant claims shot up steeply beginning around 1999, and the trend departed suddenly and substantially from the filings of malignant disease claims.  *Id.*



This increase in claims is not and *cannot* possibly be attributable to actual exposure or disease trends for several reasons.  *See In re E.&S Dists. Asbestos Litig.*, 237 F. Supp. 2d at 305 (attributing increase in claims to: electronic filing permitting plaintiffs' lawyers to file duplicative claims at little cost, plaintiffs' firms advertising and mass screenings, and suing peripheral defendants).

It has been almost 40 years since Dr. Irving Selikoff began publishing his medical studies describing the dangers of asbestos dust to asbestos workers.[29]   The enactment of strict government regulations followed, and the use of new asbestos essentially ceased in the United

---

[29]    I.J. Selikoff, J. Churg & E.C. Hammond, *The Occurrence of Asbestosis Among Insulation Workers in the United States*, 132 Annals of the N.Y. Academy of Sciences 139 (1965)

States.[30]  As the following timeline shows, use of asbestos – and consequently, worker exposures

started to fall around 1950 and then fell off dramatically after OSHA set low exposure limits in

1971.



As exposures decreased dramatically, medical experts, including Drs. Doll & Peto,

universally predicted a downward trend in both malignant and non-malignant diseases.  *See* R.

Doll & J. Peto, *Asbestos: Effects on Health of Exposure to Asbestos*, HMS, (1988)*; In re Joint*

*E&S Dists. Asbestos Litig.*, 237 F. Supp. 2d at 311 ("Mesothelioma and asbestos-related lung

cancers are expected to result primarily from the sort of direct occupational exposure that was

phased out as a result of increasingly stringent federal regulation.")

---

[30]    *In re Joint E&S Dists. Asbestos Litig.*, 129 B.R. at 737 (noting that with "the increased awareness of dangers and new government regulations, use of new asbestos essentially ceased in the United States in the early 1970's") (citations omitted).  *See also* Brickman 2003, *supra*, at 35-36; *Asbestos Litigation, Hearing Before the Senate Comm. on the Judiciary*, 107th Cong. 3 (2002) (statement of Steven Kazan) (quoting Rand Report, 2002, *supra*, at 12 ("drastic reduction in asbestos usage")); Alex Berenson, *Panel Urges Complete Ban on Product With Asbestos*, N.Y. Times, May 10, 2003, at C4 (noting that the "use of asbestos . . .  has fallen drastically since the early 1970s").

In keeping with the predictions of the scientific community, the actual incidence of asbestos-related disease has been declining in the U.S. since at least the early 1990s.[31]  Asbestos-related malignant disease (mesothelioma and lung cancer) rates are declining and have been for at least the past 12 years.[32] National Cancer Institute data indicate that death rates for mesothelioma, the disease that requires the least amount of asbestos exposure and has a long latency period, *have been declining since 1992*.[33]   As shown below, data on the incidence of mesothelioma among U.S. males confirms that there has been less and less asbestos disease in the U.S. population over the past decade.[34]



---

[31]   Surveillance, Epidemiology and End Results (SEER) data from the National Cancer Institute available at http://seer.cancer.gov/faststats/html/inc_mesoth.html.

[32]   *Id.*

[33]   *Id.*

[34]   *Id.*

15

As expected, data for real asbestosis reflects a more precipitous downward trend.  It is generally recognized that exposures substantial enough to induce asbestosis have not been present in occupational settings in the U.S. for decades.  *See* Nicholason WJ, *Airborne Asbestos Health Assessment Update.* Washington: Office of Health and Environmental Assessment, US Environmental Protection Agency (1986) (25 fiber years of asbestos exposure required for induction of asbestosis); *see also* Asbestos: US Consumption & Threshold Limit Value or Permissible Exposure Level chart, *supra* (depicting declining asbestos exposures in U.S.). Consequently, since the early 1990s, leading medical researchers had stated that asbestosis was a "disappearing disease." *In re Joint E&S Dists. Asbestos Litig.*, 237 F. Supp. 2d at 311.  In 1991, the authors of a published study of asbestos-exposed workers reported that "we have not seen a single case of significant asbestosis with first exposure during the past 30 years." Gaensler, Jederlinic & Churg, *Idiopathic Pulmonary Fibrosis in Asbestos-exposed Workers*, 144(3) AM. REV. OF RESP. DISEASE 689-696 (1991) (emphasis added).

As reported by Dr. Andrew Churg, a leading pathologist of asbestos diseases, this "progressive lowering of standards [by OSHA] for permitted occupational exposure to asbestos has markedly decreased the incidence and severity of asbestosis."[35]  This is because, as Drs. Doll and Peto have reported, "With reduction in the amount of exposure, the development of incapacitating fibrosis slows down and the reaction becomes so slight and its spread so slow that no person with otherwise healthy lungs would develop significant disability before reaching an age when he was likely to die of other causes."  R. Doll & J. Peto, *Asbestos: Effects on Health of Exposure to Asbestos*, HMS, at 2 (1988).  Indeed Dr. Bertram Price observed, based on an

---

[35]  *Neoplastic Asbestos-Induced Disease,* in Pathology of Occupational Lung Disease 339 (Churg & Green, eds., 2d ed. 1998).

analysis of the incidence of asbestos-related disease, that U.S. asbestos disease has peaked, because "[a]sbestos regulations promulgated by the U.S. Occupational Safety and Health Administration (OSHA) in the early 1970s have led to dramatic reductions in exposure."[36]

Despite the overwhelming consensus that asbestosis as a real *disease* has been in decline *for decades* in this country -- asbestosis *claims* have been increasing dramatically both in total numbers, and as a proportion of all claims, as depicted in the chart below.[37]



The scientific facts thus belie the growth in claims. Despite the clear medical and scientific evidence demonstrating that there has been less and less actual asbestos-related *disease* in the U.S. population, *claims* for asbestos-related diseases have been growing astronomically, and, what's more, the claims have been growing fastest in the disease category in which the

---

36   Dr. Bertram Price, *Mesothelioma Trends in the United States: An Update Based on Surveillance, Epidemiology, and End Results Program Data for 1973 through 2003*, AM. J. EPIDEMIOLOGY, 159:107, 112 (2004).

37   Rand Report, 2002, *supra*, at 46.

scientific and medical evidence most clearly indicates that claim numbers should be falling.  *See In re Joint E&S Distrs. Asbestos Litig.*, 237 F. Supp. 2d at 305 (recognizing disconnect between decrease in incidence of exposure and disease and increase in asbestos claims).  There simply is no foundation in science for the large numbers of asbestos claims currently pending against asbestos defendants in and out of bankruptcy.  As Senator Orrin Hatch recently stated:  "This defies common sense."[38]

### III.    LAX EVIDENTIARY REQUIREMENTS IN MASS SETTLEMENTS HAVE RESULTED IN ABUSES IN THE CLAIMS PROCESS

There is virtually universal agreement that the recent dramatic increases in asbestos claims are the result of lax evidentiary requirements, giving rise to abuse in claims filings.  The courts, Congress, the medical community and even plaintiff lawyers now agree that such abuse exists.

Long ago, in *Raymark Indus., Inc. v. Stemple*, No. 88-1014-K, 1990 WL 72588 (D. Kan. May 30, 1990), the court found the process in which the attorneys "recklessly acquiesce[d to] the filing of a constant, steady flow of faulty claims" to be a "professional farce," noting that it "makes a mockery of the practices of law and medicine."  *Id.* at *2.  The court stated that if it chose to acquiesce to the faulty claims  "it would make a 'laughingstock' of the court!"  *Id.* Matters have only deteriorated since.

---

[38] *Asbestos Litigation Crisis Continues: It is Time for Congress to Act, Hearing Before the Senate Committee on the Judiciary*, 108th Cong. (Mar. 5, 2003) (statement of Sen. Orrin Hatch); Brickman 2003, *supra*, at 36 ("Proving impervious to the predictions of medical science, the litigation has not only continued to grow, but has been reinvigorated by a huge influx of newly recruited claimants, most of whom share a common characteristic: they have no discernable illness.").

The following section outlines how (1) baseless diagnoses are made, (2) hard data now confirms the existence of unfounded diagnoses, and (3) these problems are exacerbated by loose claims about exposure to defendants' products.

### A.  Problems in the Diagnosis of Non-Malignant Asbestos-Related Disease.

This sub-section outlines the unreliability of medical evidence of asbestos-related diseases, including mass screenings, use of accommodating B-Readers who "over-read" X-rays, and manipulation of pulmonary function tests.

### 1.  Mass Screenings Manufacture Claims.

Starting around the mid-1980s and continuing today, huge numbers of claims have been based upon mass screenings sponsored by plaintiffs' law firms.  *See* Suzanne L. Oliver & Leslie Spencer, *Who Will the Monster Devour Next?*, Forbes, Feb. 18, 1991, at 75; Michelle J. White, *Why the Asbestos Genie Won't Stay in the Bankruptcy Bottle*, 70 U. CIN. L. REV. 1319, 1330-31 (2002).  Generally, it has been reported that plaintiffs' attorneys solicit new clients through advertisements, require them to sign a retainer agreement prior to any screenings, and herd them through mass screening programs held in mobile X-ray units set up in parking lots, hotel and motel rooms, and local union halls.[39]  Once these potential clients are assembled, accommodating pro-plaintiff (and sometimes unlicensed and untrained) B-readers and doctors, take X-rays and perform pulmonary function tests.  Mass screening doctors typically give no medical counseling or treatment plan.[40]

---

[39]  *See discussion supra; see, e.g.,* Griffin B. Bell, *Asbestos & the Sleeping Constitution*, 31 PEPP. L. REV. 1, 5 (2003).

[40]  *See, e.g., id.* at 5 (2003) (Many of the screenings do not even comply with federal or state health or safety laws and "[t]here often is no medical purpose for these screenings and claimants receive no medical followup.").

Courts, asbestos defendants, commentators, and even certain plaintiffs' counsel (in moments of interested candor) have criticized these mass screenings:

- "Claimants today are diagnosed largely through plaintiff-lawyer arranged mass screening programs targeting possibly asbestos-exposed workers and attraction of potential claimants through the mass media. The programs rely almost solely on chest X-rays and pro-plaintiff readers to identify the injured." *In re Joint E&S Dists. Asbestos Litig.*, 237 F. Supp. 2d 297, 309 (E.&S.D.N.Y. 2002) (internal citation omitted).

- Plaintiffs' counsel working with unions arrange to take X-rays at medical trailers of thousands of workers without manifestations of disease and then file complaints for those with "any hint of pleural plaque." *In re Joint E.&S. Dists. Asbestos Litig.*, 129 B.R. 710, 748. (E.&S.D.N.Y. 1991).

- Plaintiffs' attorneys founded a mass screening company in which they purchased an "examobile," toured the country giving free X-rays to those clients that signed a retainer and employed doctors who diagnosed "asbestos-related injuries" without regard to diagnostic standards, producing a "steady flow of faulty claims" and a "fraud on the court." *Raymark Indus.*, 1990 WL 72588, at *2, *5, *8, *22.

- Law firms aggressively advertise the mass screenings using such memorable and catchy slogans as "Find out if YOU have MILLION DOLLAR LUNGS."[41] The court in *Raymark Industries* described the defendant attorneys' "deceptive and coercive solicitation process" and noted that it was a "*knowing* violation of rules against solicitation." *Raymark Indus.*, 1990 WL 72588, at *15.

- Judge Fullam of the District Court of Delaware noted that "[l]abor unions, attorneys, and other persons with suspect motives caused large numbers of people to undergo X-ray examinations (at no cost), thus triggering thousands of claims by persons who had never experienced adverse symptoms." *Owens Corning v. Credit Suisse First Boston*, Mem. & Order, Case No. 04-00905, Docket No. 106, at 6 (D. Del. Mar. 31, 2005).

- As Judge Weinstein observed when presiding over the Johns-Manville bankruptcy, some plaintiffs' attorneys "have filed all of their cases without regard to the extent of injury." *In re Joint E&S Dists. Asbestos Litig.*, 129 B.R. at 748. *See also Eagle-Picher Indus. v. Am. Employers' Ins. Co.*, 718 F. Supp. 1053, 1057 (D. Mass. 1989) ("[M]any of these cases result from mass X-ray screenings at occupational locations conducted by unions and/or plaintiffs' attorneys, and many claimants are functionally asymptomatic when suit is filed.

---

41    Stuart Taylor Jr., *The Greedy vs. the Sick*, Legal Times 60 (Sept. 30, 2002).

- In concluding that accepting evidence from a certain B-reader would "contravene public policy," the court noted that the B-reader had "participated in union screenings of certain plaintiffs, performed examinations, rendered diagnoses, and recommended treatment without being licensed in Washington, a criminal offense. He also relied for his diagnoses on radiology reports from unregistered and uncertified technicians or radiologists using unregistered and uncertified equipment." Brickman 2003, *supra*, at 66 n. 98 (citing Order by the Honorable Sharon S. Armstrong, ACR XXIII (Superior Court of King County, Washington, October 15, 2002)).

- In one matter, a steelworker's widow sued the radiologist of a mass screening company for failing to inform her husband of his diagnosis. The court found that there existed no doctor-patient relationship to justify a medical malpractice cause of action against the radiologist noting that he "never saw the individuals whose X-rays [he was] reviewing, and [he] had no information about the individuals other than their names." *Adams v. Harron*, 191 F.3d 447, 1999 WL 710326, *1 (4th Cir. 1999) (unpublished opinion).

- Indeed, even the most dedicated plaintiffs' experts have acknowledged the problem: plaintiff's lawyers "shop around" X-rays to numerous B-readers until a positive readings is reported. David Egilman, Letter to the Editor, *Asbestos Screenings*, 42 Am. J. of Indus. Med. 163 (2002).

Certain plaintiffs' counsel have candidly acknowledged that such practices have burdened the courts with unmeritorious claims:

- Ron Motley, a prominent plaintiff's attorney, acknowledged in the early 1990s that "[t]here are gross abuses of our system. We have lawyers who have absolutely no ethical concerns for their own clients that they represent — we have untrammeled screenings of marginally exposed people and the dumping of tens of thousands of cases in our court system, which is wrong [and] should be stopped."[42]

- Plaintiffs' attorney Steven Kazan stated much more recently that the increase in claims "is conjured up through systematic, for-profit screening programs designed to find potential plaintiffs with some X-ray evidence consistent with asbestosis" and concluded that "[i]f this were medicine, it would be malpractice. But it is not medicine: It is the medical side of legal entrepreneurship." *Asbestos Litigation Crisis Continues: It is Time for Congress to Act, Hearing Before the Senate*

---

[42] *An Administrative Alternative to Tort Litigation to Resolve Asbestos Claims.* Transcript of the Administrative Conference of the United States 15 (Oct. 31, 1991) (remarks of Ronald L. Motley).

*Committee on the Judiciary*, 108th Cong. (Mar. 5, 2003) (statement of Mr. Steven Kazan).

In perhaps the most telling indication of the skepticism associated with mass screenings, Judge Weiner of the Eastern District of Pennsylvania, overseeing all asbestos cases in federal courts, *dismissed* all non-malignant asbestos-related lawsuits that were based only on lung X-rays obtained from mass screenings. *In re Asbestos Prods. Liab. Litig.*, No. MDL 875, 2002 WL 32151574, at *1 (E.D. Pa. Jan. 16, 2002). In doing so, Judge Weiner found that "the filing of mass screening cases is tantamount to a race to the courthouse and has the effect of depleting funds, some already stretched to the limit, which would otherwise be available for compensation to deserving plaintiffs." *Id*.

Another reported recurring problem with mass screenings is that the B-readers often are unqualified and highly motivated to find "positive" results. Certain doctors are known for "over-reading" X-rays. Other doctors are not educated in diagnosing asbestos-related conditions. *Eagle-Picher Indus.*, 718 F.Supp. at 1057 ("Moreover, many diagnoses are made by physicians not well schooled in the American Thoracic Society's criteria for the diagnosis of asbestosis and the medical literature does not provide standards for judging the diagnosability of asbestos-related disease."). In some cases, they are not even board certified or licensed to practice medicine. *Raymark Indus.*, 1990 WL 72588, at *5.[43] These accommodating pro-plaintiff B

---

[43] "[T]he medical defendant possessed, at best, the most limited of credentials - Bharadwaja was not licensed in the United States, Rao was a radiologist and not qualified to diagnose asbestos disease, and Gelbard had been previously sued for misrepresenting her qualifications and for submitting incompetent medical reports." *Raymark Indus.*, 1990 WL 72588, at *5. Dr. Bharadwaja testified that he "considered pleural plaques and pleural thickening to be the same thing" and did not know the latency period for asbestosis. *Id*. at *6 The court indicated that "the attorneys' certifications and the physicians' diagnoses are somehow intended to 'pass muster.' Not with this court!" *Id*. at *7; *Abadie v. Metro. Life Ins. Co.*, 784 So.2d 46, 72 (La. Ct. App. 2001) (the court noted that the doctor who examined most of the plaintiffs and whose reports were relied on by diagnosing doctors was *not* a board certified lung specialist).

readers have been described as "hired guns"[44] who would basically agree to find disease and attribute it to asbestos in order to get paid large sums of money.[45]   Other asbestos bankruptcy cases have found that a few accommodating "over-reading" B-readers are responsible for a large percentage of previously paid claims.[46]

Judge Fullam of the District of Delaware found that "[c]ertain pro-plaintiff B-readers were so biased that their readings were simply unreliable." *Owens Corning v. Credit Suisse First Boston*, Memorandum & Order, Case No. 04-00905, Docket No. 106, at 6 (D. Del. Mar. 31, 2005).   Finally, in 1998, David Austern, general counsel for the Manville Trust, explained the lawyers' role:  "Part of the problem was sort of an amazing elasticity—which is about as calm a word as I can think of—on the part of claimants' lawyers to find doctors  who will say that somebody suffers from minimal asbestos disease."[47]   Commentator Lester Brickman has summarized the B-reader, mass screening problem as follows:  A substantial portion of asbestos litigation is supported by "specious medical evidence" including "evidence generated by the

---

[44]   David E. Bernstein, *Keeping Junk Science Out of Asbestos Litigation*, 31 PEPP. L. REV. 11, 15 (2003).

[45]   In one case, two doctors allegedly were paid a total of $650,000 and $225,000 to diagnose X-rays in an assembly line fashion (100-150 potential plaintiffs were 'examined' each day).  *Raymark Indus.*, 1990 WL 72588, at *5, *14.  Another doctor employed by a screening company testified in a deposition that he was paid more than $1 million for diagnosing *every* potential plaintiff (14,000 in total) as having asbestosis even though he was not an expert in asbestosis, unfamiliar with medical criteria for asbestos-related diseases, unlicensed in the state he was working in and did not write his own reports.  *Id.*  Some screening companies charge substantially higher fees for readings showing asbestos-related diseases.  Brickman 2003, *supra*, at 122 (Testing service charged $700 for a positive result and $400 for a negative result).

[46]   For instance, in the Babcock & Wilcox bankruptcy, 16,267 asbestos claims paid by B&W – approximately one out of every seven asbestosis claims paid by B&W where the identity of the doctor was known – were diagnosed by the *same* doctor.  *See Dunbar Report* at *Ex. III-21A.*

[47]   Christine Biederman, Thomas Korosec, Julie Lyons & Patrick Williams, *Toxic Justice*, Dallas Observer Aug. 13, 1998 (Austern is currently both General Counsel of the Manville Trust and President and General Counsel of the Claims Resolution Management Corporation (CRMC) (a fully-owned subsidiary of the Manville Trust and its' and three other asbestos trusts' claims processing facility)).

23

entrepreneurial medical screening enterprises and B-readers -- specially certified X-ray readers that the enterprises or plaintiff lawyers select, who often conform their findings and reports to the expectations of the plaintiffs' lawyers who retain them."[48]   There simply is no dispute that, currently, massive numbers of asbestos claims, including substantial claims against this debtor (as discussed *infra*) have emanated from the practice of mass screenings - a practice that is loudly decried by the medical community and courts.

### 2.       Pulmonary Function Tests Also Have Been Abused.

Another recurring problem is that pulmonary function tests (PFTs) -- tests used to measure lung impairment -- can be easily manipulated.  *See Owens Corning v. Credit Suisse First Boston*, No. 04-00905, Docket No. 106, at 8 (D. Del. March 31, 2005).   Claimants are aware that in order to be eligible for compensation (or higher levels of compensation), they often must "fail" the PFT.[49]   Failing a PFT is easily accomplished by simply smoking cigarettes prior to the test, failing to inhale deeply or exhale completely, eating a large meal, wearing tight clothing, drinking alcohol or performing strenuous activity prior to the test.[50]   Because the PFT

---

[48]    Brickman 2003, *supra*, at 41.

[49]    *See* Brickman 2003 *supra*, at 94 (citing Dep. of Larry M. Mitchell, M.D. at 149, taken on June 19, 1996, *In re Consolidation of Maples & Lomax, P.A., Asbestos Pers. Injury Cases, Flight 1* (Miss. Cir. Ct. 1996) (supervisor of PFTs at a mass screening enterprise stated "we had some people that came in [for pulmonary function testing]... that didn't try.  They tried to give you an invalid test....  They wanted a positive test.  We had a lot of those."); Dep. of Charles E. Foster at 177, taken on June 4, 1996, *In re Consolidation of Maples & Lomax, P.A., Asbestos Pers. Injury Cases, Flight 1* (Miss. Cir. Ct. 1996) (Foster ran a mass screening enterprise and acknowledged that the "litigants" openly talked about how they can influence the PFT outcome by failing to exhale fully and thus "earn" a settlement check");  Dep. of Leon Hammonds at 280-81, taken on Feb. 21, 1996, *In re Consolidation of Maples & Lomax, P.A., Asbestos Pers. Injury Cases, Flight 1* (Miss. Cir. Ct. 1996) (head PFT technician at a mass screening enterprise acknowledged that "litigants" understood that failing the PFTs was "good" and that some deliberately tried to get a "failing" reading)).

[50]    *See* Brickman 2003, *supra*, at 94.

results are so sensitive and easily manipulated, the American Thoracic Society has established certain standards intended to limit the variability of these tests and make them more reliable.[51]

However, PFTs often do not conform to ATS standards. For instance, a complete PFT should take up to 90 minutes to complete,[52] but mass screening PFT's typically take only 10 to 15 minutes.[53] Another ATS guideline requires strict replication of results prior to their acceptance.[54]

The problems with both the sensitivity of pulmonary function tests and the way they are administered in practice, have contributed to the asbestos litigation crisis by making it easy for claimants to claim impairment when none truly exists. Although compliance with standards from the American Thoracic Society and the American Medical Association are designed to address these problems, those standards have not been seriously integrated into asbestos claims resolution processes, either in the tort or bankruptcy systems. For example, Owens Corning discovered that mass screening enterprises deviated from the required PFT standards in order to create false "positive" readings.[55] As shown in the graphic below, Owens Corning's medical

---

[51]   ATS, *Lung Function Testing: Selection of Reference Values and Interpretive Strategies,* AM. REV. RESPIR. DIS., 144:1202 (1991).

[52]   The American Association for Respiratory Care Uniform Reporting Manual for Diagnostic Services (1999).

[53]   *See* Brickman 2003, *supra*, at 94-95 (citing Dep. of Deloris Bailey at 61, taken on May 21, 1996, *In re Consolidation of Maples & Lomax, P.A., Asbestos Pers. Injury Cases, Flight 1* (Miss.Cir. Ct. 1996) (stating that the PFTs she did at a mass screening enterprise required 15 minutes per test); Dep. of Charles Foster at 142, 165, taken on Aug. 6, 2002, *Morehouse v. N. Am. Refractories Co.* (Ala. Cir. Ct. 2002) (indicating that another mass screening enterprise took even less time to perform PFTs); Dep. of Michael G. Conner, M.D. at 67-70, taken on Mar. 29, 1993, *In re Asbestos Pls. v. Borden, Inc., No. 91-18397* (La Dist. Ct. 1993) (mass screening enterprise took 16-22 minutes per PFT).

[54]   ATS, *Lung Function Testing: Selection of Reference Values and Interpretive Strategies*, AM. REV. RESPIR. DIS. 144:1202 (1991).

[55]   Brickman 2003, *supra*, at 117-28 (citing Compl. at 5, *Owens Corning v. McNeese*, Civil Act 3:97CV29WS (S.D. La. 1997); Compl. at 60-67, *Owens Corning v. Pitts*, No. 96-CV-2095 (E.D. La. June 19, 1996)). *See*

(Continued…)

experts found that *over 95%* of 1,900 "positive" PFT cases did not meet ATS standards in the first case[56] and *over 98%* of 3,486 "positive" PFT cases did not meet ATS standards in the second case.[57]



### B.    Hard Data Now Confirms the Magnitude of the Problem.

While the problems with the medical data and tests, including their abuse, have long been known by defendants, judges, and politicians, hard data now confirms the severity and pervasiveness of these problems throughout the tort and bankruptcy systems.  As shown in the

---

*also,* Tr. of Hr'g at 29-33, *Owens Corning v. Credit Suisse First Boston*, No. 04-CV-905 (Bankr. D. Del. Jan. 13, 2005) (Clyde M. Leff) (settled RICO claims against certain mass screening enterprises with false "positive" PFTs for "just under $3 million dollars").

56    Brickman 2003, *supra*, at 119-20 (citing Compl. at 60-67, *Owens Corning v. Pitts*, No. 96-CV-2095 (E.D. La. June 19, 1996)).

57    Brickman 2003, *supra*, at 126-27 n. 326 (citing Compl. at 60-62, *Owens Corning v. McNeese*, Civil Act 3:97CV29WS (S.D. La. 1997)).

chart below, the following scientific studies and expert analyses confirm the consistent and prevalent over-diagnosis of asbestos-related conditions:[58]



These studies demonstrate the abuse associated with a large percentage of asbestos-related claims. Indeed, in the most recent study, over 95% of the claims *failed* to meet minimal diagnostic criteria.[59]

---

[58] R.B. Reger, W.S. Cole, E.N. Sargent & P.S. Wheeler, *Cases of Alleged Asbestos-Related Disease: A Radiologic Re-Evaluation,* Vol. 32, No. 11, Journal of Occupational Medicine 1088 (Nov. 1990) (Appendix Exhibit E) (hereinafter "Tire Workers Study"); Penn State Audit, *supra*; Babcock & Wilcox Claims Analyses, *In re The Babcock & Wilcox Co.*, B&W's Supplemental Brief in Further Support of its Proposed Litigation Protocol & Report to the Court Regarding Asbestos Developments Generally and the Proofs of Claim Filed Here, Case Nos. 00-0558, 00-10992 at 45, (Oct. 18, 2001 & Jan. 7, 2002) (hereinafter "Babcock & Wilcox Claims Analyses"); Expert Report of Dr. Gary K. Friedman, *In re Owens-Corning,* Case Nos. 00-3837 to 3854 at 4 (Bankr. D. Del. 2002) (Appendix Exhibit F) (hereinafter "Friedman Expert Report in *Owens Corning*"); and Joseph N. Gitlin, Leroy L. Cook, Otha W. Linton & Elizabeth Garrett-Mayer*, Comparison of "B" Readers' Interpretations of Chest Radiographs for Asbestos Related Changes,* Acad. Radiol. 2004; 11:843-856 (Appendix Exhibit G) (hereinafter "Johns Hopkins Study").

[59] *See* Johns Hopkins Study, *supra,* at 855.

In addition to the scientific studies, independent studies by courts demonstrate the problem of poor and/or fraudulent medical data in asbestos litigation. In the late 1980s, the United States District Court for the Southern District of Ohio appointed a standing panel of ten neutral experts to review the medical records of 65 pending asbestos bodily injury cases. Hon. Carl Rubin & Laura Ringenbach, *The Use of Court Experts in Asbestos Litigation*, 137 F.R.D. 35, 37, 39 (1991). Although all the plaintiffs claimed some asbestos-related condition, the court-appointed experts found that 65% *had no asbestos-related condition whatsoever. Id.*[60]

In another example, Raymark Industries sued certain attorneys and medical screeners alleging they had defrauded the company in connection with a class action settlement with tire workers allegedly injured from exposure to asbestos products. *See Raymark Indus.,* 1990 WL 72588 at *2, *8, *22. The court overseeing the case found that the medical screeners departed from accepted medical standards by diagnosing asbestos-related "injuries" that failed to meet minimum American Thoracic Society diagnostic criteria. *Id.* As a result, the court concluded that "many, if not most" of the cases were "without merit" and denied the attorneys' and medical screeners' motion for summary judgment on the fraud and RICO charges. *Id.* (Overall, the court concluded that the screening program produced a "steady flow of faulty claims" and a "fraud on the court.").

---

[60] In approximately 80% of the cases, the court-appointed experts found no asbestos disease, and in thirteen of sixteen cases in which the expert testified, the jury agreed with the expert. *Id*. at 41 ("The conclusion is inescapable: A Court's expert will be a persuasive witness and will have a significant effect upon a jury."). Judge Rubin concluded that Federal Rule of Evidence 706 which allows a federal court to appoint experts "on its own motion" was essential to guard against a "Battle of the Experts" and resolved to use Rule 706 in future asbestos cases where appropriate.

### C.    Problems in the Medical Data are Exacerbated by Other Litigation Abuses.

Problems with the medical data in asbestos personal injury cases have been exacerbated by poor exposure data.  As discussed *infra*, in an effort to gain control over massive numbers of claims, defendants and courts have required only minimal evidence of a claimant's exposure to a defendant's product.  As with medical data, the failure to require reliable evidence of exposure has had dire consequences.

The most prevalent, and perhaps the most costly and abusive, practice in asbestos litigation -- spawned by lax exposure evidence criteria -- is the shifting of large numbers of asbestos claims to newly-targeted asbestos defendants, without regard to whether the claimants ever were significantly exposed to the asbestos-containing product of the new defendants.  Evidence of this problem abounds -- and is largely undisputed by even the plaintiff's bar.  It clearly emerges when claims are (1) audited for reliable exposure evidence; (2) compared against the total population disease incidence; or (3) found to spike against a single defendant.

First, when defendants are able to audit asbestos claims, it becomes apparent that many claimants have no reliable evidence of exposure to the defendants' products. This was the experience of B&W, when it had an opportunity to audit its claims once in bankruptcy.  B&W found that the vast majority of proofs of claim failed to provide the most basic information needed to establish liability, including, in most cases, even a *prima facie* showing that the claimant worked near a B&W boiler or had exposure sufficient to cause disease.  Babcock & Wilcox Claims Analyses, *In re The Babcock & Wilcox Co.*, B&W's Supplemental Brief in Further Support of its Proposed Litigation Protocol & Report to the Court Regarding Asbestos Developments Generally and the Proofs of Claims Filed Here, Case Nos. 00-0558, 00-10992 (Oct. 18, 2001 & Jan. 7, 2002).  According to information provided in their proofs of claim, over

29

68% of the approximately 221,000 B&W claims (i.e., over 150,000 claims), were based on alleged exposures at sites that were shown to have *never housed B&W boilers. Id.* at 47.  This is just one example demonstrating the specious nature of exposure evidence in substantial numbers of asbestos claims as asserted.

Second, statistics alone prove that many asbestos claims against defendants result from the transporting of existing claims to new or different defendants, without regard to actual exposure.[61]  It has become clear that numerous defendants are *each* being sued for large proportions of the *total* number of *actual* cases in any given year.  As just one example, from 1993-1999, B&W was presented with nearly 1/3 *of all* the mesothelioma cases that occurred during that entire time period across the United States, *see* Expert Report of Mark A. Peterson, *ACC v. Babcock & Wilcox Inv. Co.* (*In re Babcock & Wilcox Co.*), Case No. 01-1155 16-17 (Bankr. E.D. La. 2001) (hereinafter "Peterson Report"); R. at 60, *ACC v. Babcock & Wilcox Inv. Co.* (*In re Babcock & Wilcox Co.*), Case No. 01-1155 (Bankr. E.D. La. Oct. 23, 2001), even though B&W boilers could not have produced asbestos exposures that caused 1/3 of the nation's mesothelioma incidence during that time period.  Indeed, there are now legions of examples of claims being shifted to new defendants without regard to actual exposures of the claimants.  *Id.* It is now generally recognized that loss of cash flow (from bankrupt defendants, or depleted trusts) spawned searches for new defendants, like B&W "as plaintiff's attorneys s[ought] to

---

[61]   *See* Court, Congress, Leave Asbestos-Taint Companies to Vultures, DAILY BANKR. REV. 4, 11-12 (June 6, 2001) ("due to the declining number of solvent asbestos-tainted companies that lawsuits can target, attorneys are 'rushing to get claims in, because as more companies file for bankruptcy protection, the fewer there are to sue'" (quoting Omar Jama, Associate Director of Fitch bond rating agency); A.M. Best, *Asbestos Claims Surge Set to Dampen Earnings for Commercial Insurers* 3 (May 7, 2001) ("A key driver of the explosion [in new asbestos claims] is the acceleration of bankruptcy filings by major asbestos producers seeking relief from rapidly escalating asbestos claims.  As increasing numbers of producers opt for federal bankruptcy protection, remaining defendants are targeted to shoulder larger shares of asbestos costs.").

recoup 'lost' settlements."[62]  Thus, claims that already have been "worked up" are simply copied and filed against other defendants.[63]

Third, every time a new peripheral defendant has a spike in claims, this is evidence of the abuse in the system.  There is no explanation for why a peripheral defendant would experience a spike in claims other than that plaintiffs firms already had the claims put together and were merely searching for a new deep pocket.  The chart below shows the increase of claims in the Manville Trust for these peripheral defendants.[64]

---

[62]   A.M. Best, *Asbestos Claims Surge Set to Dampen Earnings for Commercial Insurers* 4 (May 7, 2001) ("Anecdotal evidence suggests that peripheral defendants (those that either produced or used asbestos in small quantities within their products) are being sued for increasing sums as the resources available from the large, more traditional defendants become exhausted.").  Whereas "prebankruptcy testimony in Philadelphia Naval Yard Cases put Manville's share of product use as high as 80 percent, postbankruptcy testimony had Manville exposure accounting for a quarter or less of the volume of asbestos-containing materials encountered by plaintiffs."  Lester Brickman, *The Asbestos Claim Management Act of 1991*, 13 CARDOZO L. REV. 1891, 1917 n.13 (1992); *see also id.* at 1894 n.13 (noting that after the Johns-Manville filing, "plaintiffs' testimony (and that of their witnesses) abruptly shifted from a predominantly Manville exposure frame to a predominantly 'other defendants' exposure").  The latest estimate is that over 6,000 companies have faced asbestos suits.  Rand Report, 2002, *supra*, at 49.

[63]   *See, e.g., G-I Holdings, Inc. v. Baron & Budd*, 179 F.Supp.2d 233, 239 (S.D.N.Y. 2001) ("after the Manville bankruptcy, asbestos plaintiffs' testimony abruptly appeared to shift from targeting Manville products to targeting the products of other still-solvent manufacturers."); Lester Brickman, *The Asbestos Claims management Act of 1991. A Proposal to the United States Congress,* 13 Cardozo L. Rev. 1891, 1917 n. 13 ("after the Manville bankruptcy, plaintiffs' testimony (and that of their witnesses) abruptly shifted from a predominantly Manville exposure frame to a predominantly 'other defendants' exposure; whereas prebankruptcy testimony in Philadelphia Naval Yard Cases put Manville's share of product use as high as 80%, postbankruptcy testimony had Manville exposure accounting for a quarter or less of the volume of asbestos-containing materials encountered by plaintiffs.").

[64]   Graph, "Manville Filings by Selected Industry," *in* D. Austern's Mealey's Presentation (July 2, 2001).



The automotive industry in particular was singled out as part of a broad initiative by plaintiffs to find a new, solvent target. From 1999 to 2000, as depicted in the chart below, claims by the auto maintenance industry against the Manville Trust increased by a staggering 631.9%.[65] This was the largest one-year increase for any of the recorded industries, and claims continued to increase.[66]

---

[65]  Table, "Number of Claims by Year Received and Industry," *in* D. Austern Mealey's Presentation (July 2, 2001) (reporting 631.9% increase from 1999 to 2000 for "auto maintenance" claims).

[66]  *Id.*



This increase occurred despite mounting epidemiological evidence demonstrating no evidence of asbestos-related disease among brake workers.[67]

It has been reported that this claims shifting is achieved, in some cases, by witness coaching practices.   In 1997, a twenty-page memorandum entitled "Preparing for Your Deposition" was inadvertently disclosed during a deposition by an attorney at a plaintiffs' law firm.[68]   The court in *Abner v. Elliott*, 706 N.E.2d 765 (Ohio 1999), described this "script memo" as "purported to advise plaintiffs in asbestos personal-injury cases to testify in a manner that

---

[67]   Goodman, M, MJ Teta, PA Hessel, DH Garabrant, VA Craven, CG Scrafford, and MA Kelsh.   2004. Mesothelioma and lung cancer among motor vehicle mechanics: A meta-analysis.  Ann Occup Hyg 48(4):309-326.

[68]   Some of the explicit instructions can be found at Appendix Exhibit H.  *See, e.g.,*  L. Brickman & R. Rotunda, *When Witnesses Are Told What to Say*, WASH. POST, Jan. 13, 1998, at A15; Rogers,  *Witness Preparation Memos Raise Questions About Ethical Limits*, 14 ABA/BNA LAWYERS MANUAL ON PROF. CONDUCT 48, 48-50 (1998); A. Nelson, *Deposition Conduct: Texas's New Discovery Rules End Up Taking Another Jab at the Rambos of Litigation*, 30 TEX. TECH. L. REV. 1471, 1476 (1999) (former Texas Supreme Court justice terming the memorandum a "cancer on the legal system").

33

would not necessarily be consistent with the truth." *Id.* at 767.  Senator Orrin Hatch described the memorandum as "a sad but startling insight into how asbestos claims are created and spun into recoveries."[69]

In summary, the problems with unreliable or nonexistent exposure evidence are just as pronounced as those associated with the unreliable medical evidence.  *See* White, *supra*, at 1330 (Economies of scale encourage such multiple filing since much of the costs (advertisement, mass screening, X-ray readings by B-readers, plaintiff interviews, drafting complaints) are fixed, regardless of how many defendants are sued).

### D.    There Is Virtual Universal Recognition of the Problem

The severity of the problems with unreliable medical and exposure data in asbestos litigation is almost universally recognized.  It is not only asbestos defendants who are taking notice of the problem.  Courts, Congress, state legislatures, and even some plaintiffs' attorneys recognize the reality of abuse in asbestos litigation.

As Justice Breyer summed up, "up to one-half of asbestos claims are now being filed by people who have little or no physical impairment.  Many of these claims produce substantial payments (and substantial costs) even though the individual litigants will never become impaired." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 629 (1997) (Breyer, J., concurring in part and dissenting in part) (citations omitted).  Former United States Attorney General Griffin Bell noted that litigation "is worsening at a much more rapid pace than even the most pessimistic projections."  Hon. Griffin B. Bell, *Asbestos Litigation and Judicial Leadership: The Courts' Duty to Help Solve the Asbestos Litigation Crisis*, Vol. 6, No. 6, June 2002, at 2 (Nat'l Legal

---

[69]   Sen. Orrin Hatch, Floor Statement: S.2290: *Some Lawyers are Improperly Coaching Clients*, April 22, 2004.