Center for Pub. Interest Monograph), available at http://www.nlcpi.org.  Senator Orrin Hatch

stated, "I don't think there can be any doubt that the crisis in asbestos litigation is a serious

problem. And it continues to get worse as the abuse continues and Congress has failed to act,

even as the Supreme Court has suggested that we must act in order to resolve this wreck, this

train wreck." *Asbestos Litigation Crisis Continues: It is Time for Congress to Act, Hearing

Before the Senate Committee on the Judiciary*, 108th Cong. (Mar. 5, 2003) (statement of Sen.

Orrin Hatch).

Several states have recognized the severity of the problems in asbestos litigation and have

begun to take action.  For example, the practice of consolidating cases has been curtailed and/or

eliminated in several key jurisdictions where it occurred frequently in the past.  *See*, *e.g.*, Tex.

Code Ann. § 15.003 (requiring each plaintiff in a multi-plaintiff case to establish venue

independently); Miss. Code Ann. § 11-11-3 (same).  Also, in recent years, many state courts

have adopted inactive dockets, where a court does not consider unimpaired claims and tolls the

limitations period, ensuring that if impairment subsequently develops, the claimant has preserved

the right to sue.  Thus, unimpaired claimants are not compensated or litigated; a case only

becomes active if the claimant later becomes impaired.  State courts using this approach include

California, Georgia, Illinois, Maryland, Massachusetts, New York, Pennsylvania, South

Carolina, and Wisconsin.  *See* Victor E. Schwartz, et al., *Addressing the "Elephantine Mass" of

Asbestos Cases: Consolidation Versus Inactive Dockets (Pleural Registries) and Case

Management Plans that Defer Claims Filed by the Non-Sick*, 31 PEPP. L. REV. 271 (2004).

Ohio, which was among the top five states for asbestos filings in recent years, enacted a statute

in 2004 which prohibits unimpaired claimants from recovering any compensation.  *See* OHIO

REV. CODE ANN. § 2307.92(B) ("No person shall bring or maintain a tort action alleging an

asbestos claim based on a nonmalignant condition in the absence of a prima-facie showing . . . that the physical impairment is a result of a medical condition, and that the person's exposure to asbestos is a substantial contributing factor to the medical condition."). On April 12, 2005, Georgia enacted H.B. 416, which (1) requires, among other things, "prima-facie evidence of physical impairment" resulting from a medical condition for which exposure to asbestos was a substantial contributing factor, (2) prohibits claims relating to multiple plaintiffs from being joined for a single trial unless all parties agree, and (3) prohibits filing of asbestos claims outside of the county where the plaintiff resides or in which the exposure occurred. Recently, similar bills were passed by the Texas (SB15, passed on April 27, 2005) and Florida (HB1019, passed on May 6, 2005) state legislatures and are expected to be signed by their respective governors.

Some states have even curtailed the mass screening practice. For example, in Ohio, a statute was enacted in 2004 which effectively bans mass-screening by requiring that evidence supporting an asbestos-related impairment must be made by a treating physician who has or had a doctor-patient relationship with the claimant. *See* Ohio Rev. Code Ann. § 2307.91(Z) (defining a "competent medical authority" as a medical doctor who is, among other things, "actually treating or has treated the exposed person and has or had a doctor-patient relationship with the person."). The law enacted in Georgia and the bills passed by the Texas and Florida state legislatures contain similar provisions.

Trusts, too, are reacting. For example, as discussed earlier, in response to these issues, the Manville Trust somewhat tightened its medical and exposure criteria in 2002. *See* 237 F. Supp. 2d at 324. For example, the Manville Trust began to require evidence of significant occupational exposure for many of the disease categories. *Id.* The Manville Trust increased the medical criteria of those non-malignant claims that are entitled to receive a higher level of

36

payment than the rest of the non-malignant claims. *Id.* Other recent trusts, such as the Pittsburgh

Corning Trust and the DII Trust (a Halliburton subsidiary) contain similar criteria.

Defendants and debtors, their stockholders, creditors and employees are not the only

entities impacted by the problems in asbestos litigation. The impact on U.S. state and federal

courts has been extensively documented. *See generally* Rand Report, 2002, *supra*. But also,

those with true asbestos-related injuries suffer the results of massive numbers of baseless claims.

As discussed previously, the massive increase in new claims at the turn of the century came

largely from non-malignant claims. For most of these claims, there exists no medical

foundation. As the chart below illustrates, though, a substantial portion of the money available

to pay claims goes to these nonmalignant claimants and their lawyers. Rand Report, 2002,

*supra,* at 64.



Consequently, the Manville Trust, Eagle-Picher Trust and UNR Trust have all been forced to significantly reduce their payouts for *all* claims, including payouts for claims relating to persons with mesothelioma, a fatal cancer.[70]  Judge Helen E. Freedman noted the problem:

> Recoveries by unimpaired or minimally impaired plaintiffs deplete the funds needed to compensate present and future claimants with serious illnesses, and resources are dwindling as the "elephantine mass of asbestos cases" nationwide drives large numbers of potentially culpable parties into bankruptcy.

*In re New York City Asbestos Litig.*, No. 40000/88, 2002 WL 32151568, at *1-2 (Sup. Ct. N.Y. Dec. 19, 2002).

## IV.    GRACE HAS THE SAME PROBLEMS:  MASSIVE NUMBERS OF CLAIMS WITH NO RELIABLE MEDICAL DATA AND EXPOSURE EVIDENCE

Grace finds itself in the same position as other bankrupt defendants -- it is faced with thousands of claims that have no basis in medicine or law and the potential for unlimited filings of such claims in the future.   The same lawyers are implicated, the same B-readers are implicated, and the same abusive claims practices are implicated.

### A.    Grace Experienced the Same Unpredicted and Unexplainable Increase in Claims as Other Asbestos Manufacturers.

The Debtors' bankruptcies were necessitated by a sudden and scientifically unexplainable surge of asbestos claim filings against the company. *See* W.R. Grace 4/2/01 Informational Br. at

---

[70]  *See* Mealey's Litig. Rep.: Asbestos (Aug. 3, 2001) at 14;  *Findley v. Trs. of the Manville Pers. Injury Settlement Trust (In re Joint E.&S Dists. Asbestos Litig.)*, 2001 WL 1464362, at *1 (E.&S.D.N.Y. 2001) ("The courts note that there is a continuing rise in the number of claims and that the amount payed [sic] pro rata on claims has been reduced from 10 percent to 5 percent of the original value."); Letter from William B. Nurre, Executive Director, EPI Trust, to claimants' counsel (Oct. 9, 2000)   (In October 2000, the Eagle-Picher Trust had to reduce its payout from 31.9 percent to 25.7 percent.); UNR Asbestos Trust Letter, Mealey's Litig. Rep. 21 (Dec. 1, 2000) at D-1 (In fall of 2000, claims against the UNR Trust had jumped so quickly that it was forced to lower its payout from 12.9 percent to 7.8 percent.).

38.[71]  Asbestos claims against Grace peaked in 1996 and showed a pronounced downward trend. *Id.*  The downward trend continued for two more years with no sign of abating. *Id.*  But the trend reversed with a 28 % increase in 1999 and an 81% increase in 2000. *Id.*  In January 2001, claims were served on Grace at a rate 374% higher than the year before, and in February 2001 at a rate 207% higher than the year before. *Id.*  In April 2001, Grace was forced to file Chapter 11. *Id.*



As reflected in the chart above, claims that had been declining suddenly skyrocketed in 2000, overwhelming the Debtors' ability to resolve them through the tort system.

---

[71]    See also Andrews Asbestos Litig. Rep. 23(7) (April 12, 2001); WALL ST. J. B8 (4/3/01).



In addition, the recent surge in claims against Grace was *not* due to an increase in the most serious and best documented claims, *i.e.*, cancer claims, but overwhelmingly was due to non-malignant, unimpaired claims.   As depicted in the chart above, based upon Grace's statistical survey, *less than 7%* of the 1997 claims were for mesothelioma, lung cancer, or other cancers.   Seventeen percent of the claims included so little information that the type of disease could not even be determined.   And the remaining 76% were for non-malignant conditions.   The percentage of malignant claims declined even further in 2000.   *Less than 6%* of the claims were for cancer.   More than 30% of the year 2000 claims presented so little information that no disease could be identified.   The remaining 64% were for non-malignant conditions.   As discussed earlier, there's no valid medical or scientific foundation for these dramatic increases in claims.

### B.      Many Claims Filed Against Grace Lack Foundation and are Based on Unreliable Medical and Exposure Data.

Asbestos claims filed against Grace suffer all of the problems identified throughout this brief.   In a July 19, 2002 deposition taken by the Asbestos PI Committee's counsel, Grace's

40

senior counsel responsible for asbestos personal injury claims testified that the sheer volume of the claims against Grace in the mid- to later-1990s forced the company to settle the claims on a mass scale even though it knew most were of doubtful validity:

> Leaving aside the quality, the sheer volume of the cases and the resources available in the courts and the resources available to the company to defend the cases made an individual trial of the cases impossible. . . . In a situation where there's hundreds of thousands of cases being filed . . . . even though we knew and were well aware that there were significant problems with the credibility of most of this evidence and, but for the problems associated with the volumes of the cases, the money associated with the cases, that these cases probably were not legitimate claims against Grace, we were forced to pay them.

J. Hughes Dep. at 48-49 (July 19, 2002) (emphasis added).  Moreover, as Dr. Mark Peterson outlined in his affidavit of September 9, 2001, plaintiffs' lawyers have routinely sued first, and asked questions about the merits of their claims against Grace later – if at all.  Dr. Peterson arranged for a sample survey to be conducted of the information *in the plaintiff attorneys' own files* relating to the pre-petition claims against Grace and found that the claims lacked basic evidentiary support:

- Information indicating the claimant had actually been exposed to Grace's products was found in only 5 of the 24 sample claims.  *"Overall, no [product identification] information was available for 79 percent of claims."*  Peterson Aff. ¶ 34 (Sept. 9, 2001) (emphasis added)

- Peterson confirmed that *information showing an actual asbestos-related injury* (much less an injury attributable to Grace's products) *was even more lacking*:  The survey found that only one-third of the files contained the information about diagnosing physicians, less than half had all of the requested medical reports, only half had X-rays, and "only half [of the plaintiff attorneys] thought they could provide information about whether any doctors had identified alternative or non-asbestos causes." *Id.* at 36.

In light of those findings, and as detailed in the Debtors' February 12, 2002 CMO reply brief to this Court, Grace retained Dr. Daniel Rourke to perform a statistical study of 1,000 randomly selected pre-petition claims (500 each filed in 1997 and 2000).  *See* Rourke Decl.

(Nov. 12, 2001).  For each of the sample claims, Dr. Rourke used the Grace claims files as well

as the CCR and Manville Trust claims database to compile as much information as possible

about the occupational and medical histories of each claimant.[72]  The combined data from that

survey confirms that the vast majority of the 1997 claims were invalid or of doubtful validity,

and that valid claims in the year 2000 are even more scarce.  The analysis showed that the vast

majority of the claims:

- provided no evidence of impairment (as demonstrated in the chart below),[73]

- failed to establish exposure to Grace's products, (See chart below)[74] and

---

[72]   *See* Claims Report, Exhibit K to Grace's Consolidated Reply in Support of CMO, Bar Date, Claim Form and Notice Program.

[73]   *Id.* (Analysis of diagnostic data relating to the sampled claims demonstrates that no new wave of disease is responsible for the new wave of claims.  When diagnostic criteria are applied to Grace's 1997 and 2000 sample claims, the claims are found to be grossly wanting.  Even if the 33 cancer claims in the 1997 sample are excluded, *less than 21.6%* of the remaining claims presented ILO ratings of 1/0 or higher and PFT results meeting the AMA criteria of "mild impairment."  Similarly, *only 11.4%* of the 2000 sample claims satisfied both standards.  In sum, the majority of the non-malignant claimants in both years failed to present the minimum medical evidence needed to substantiate *any* injury at all.)

[74]   *Id.* (The recent sampling of Grace's 1997 and 2000 claims also shows that very few claimants can establish any actionable exposure to Grace's asbestos products, either because they provide no exposure information or because the claimants worked in industries and occupations in which exposure to Grace's products would have been unlikely or impossible.  Half of the claims provide no exposure information whatsoever.  Of the 1997 sample claims, 47% provide no information about the site or location where the alleged exposure occurred, the worker's employer or industry, or the Grace product to which he was exposed.  Fifty-two percent of the 2000 sample claims fail to provide any of that critical information.  Even when Grace attempted to fill in these gaps by cross-referencing the claimant's Social Security number to the Manville Trust and CCR databases, it was unable to identify the industry involved for 20% of the 1997 sample claims, and 29% of the 2000 claims.  And, of course, the Manville Trust and CCR data provide no information about any exposures to Grace products.  For the other half of the claims, the meager exposure information that is provided rarely implicates Grace.  For example, Grace's Monokote-3 fireproofing product was applied by plasterers primarily at high rise steel construction sites.  Yet, only two of the 500 sample 1997 claims and only one of the year 2000 claims were filed by plasterers.  Indeed, only 8% of the 1997 Grace sample claimants and 3% of the 2000 claimants identified themselves as construction workers. Even after the Manville and CCR data was used to identify as many of the "unknown" claimants as possible, only 16% of the 1997 sample claims, and 12% of the 2000 claims, were found to be filed by construction workers.  The majority of the sample claims in which the claimant's industry can be identified (using the combined information from the Grace claim file as well as the Manville and CCR databases) were filed by workers who should *not* have been exposed to any Grace products.  Not surprisingly, most of these claimants submit no information about exposure to any Grace product.  When an attempt is made to implicate a Grace product, the product identification often makes no sense.  For example, seven sample claimants from the Kaiser Steel plant in Chicago claimed to have been exposed at that plant to

(Continued…)

- appeared to be the result of mass screenings.[75]



Thus, Grace now stands in shoes similar to past asbestos debtors, but seeks not to repeat the mistakes of those bankruptcy cases.  Grace is not asking the court to fix the whole system of asbestos litigation -- but merely to employ a legally *available* and scientifically *valid* process to reduce the likelihood that fraudulent and invalid claims will be considered in estimating Grace's aggregate legal liability.

---

"Zonolite Spra-Tex," a *decorative* ceiling  product that never would be used in a steel works.  Others at the same plant listed "Zonolite Monokote," the fireproofing product used in *commercial* high-rise buildings.)

[75]  *Id.*  (Many of these new claims appear to be the result of recent mass screenings and claim recruiting efforts at large industrial plants.  For example, during the Fall of 2000, a single plaintiffs' law firm submitted 1,672 claims to Grace, nearly all of which were for steelworkers in Pennsylvania, West Virginia and Ohio.  In the winter of 2001, that same law firm submitted another 400 claims from a single plant in Gary, Indiana.)

43

**TAB 3**

## LEGAL ARGUMENT

# I.    INTRODUCTION

It is undisputed that previous asbestos bankruptcy estimates have been woefully inaccurate and have underestimated the magnitude of future claims.  However, the original forecasts in these previous asbestos bankruptcy cases did not  inaccurately predict *actual* future disease rates or actual debtor liability.  Rather, the inaccuracies in the original forecasts were due in large part to the failure of the debtors, courts and the trusts responsible for the estimations (1) to require scientifically reliable evidence of asbestos-related disease; (2) to require reliable evidence of exposure to debtor's asbestos-containing products capable of causing asbestos-related diseases; and (3) to anticipate the level of abuse that would be involved in the filing of claims when this evidence is not required.

Grace, and the Court, now have the opportunity to ensure that estimation of Grace's present and future liability does not suffer from the same problems.  The solution is to determine, in connection with estimating Grace's current liability, the magnitude of invalid claims that ultimately may be disallowed.  This can be accomplished by adopting the Debtors' proposed PI CMO, which will set in motion a process that will permit the Debtors to gather necessary evidence to demonstrate that many of its current claims are invalid under state substantive law and pursuant to the Federal Rules of Evidence and Rule 9017 of the Federal Rules of Bankruptcy Procedure.

The estimation methodology advocated by the Asbestos PI Committee and FCR does not attempt in any way to distinguish between valid and invalid claims for estimation of either current or future liability.  Indeed, the Asbestos PI Committee and FCR would have this Court ignore the failings of past asbestos bankruptcy trusts and allow baseless claims to go unquestioned by adopting an estimation based solely on past litigation settlement history. Settlement history cannot be adopted as the basis for estimation because: (1) it is fraught, by

1

many accounts, with unfounded claims, and (2) it is barred as a basis for estimation by both the Federal Rules of Evidence and applicable bankruptcy law.

By contrast, the Debtors' proposal comports with the law set out in the Bankruptcy Code and the Federal Rules of Evidence.  To be considered in the estimation under the procedures proposed by the Debtors, claims must have reliable medical data and reliable exposure data that is admissible under the standards of *Daubert*, as incorporated in Federal Rule of Evidence 702.

It is important to keep in mind that use of the Debtors' PI CMO & Questionnaire *does not* automatically wed the Court to any particular estimation methodology or definition.  Rather, it simply will permit the Debtors to gather data on existing claims and notify the claimants as to the methodologies and definitions the Debtors intend to advocate at the estimation proceeding.  That data will then be used by the Debtors to demonstrate to the Court that substantial numbers of existing claims should be valued at zero for the purpose of estimating current liability because they cannot meet the threshold evidentiary requirements.  Without this information, the Debtors are foreclosed even from presenting their proposed estimation methodology.

## II.    THE ESTIMATION PROCESS MUST CONSIDER THE VALIDITY OF CLAIMS.

The Bankruptcy Code requires a specific claims objection process to ensure that only valid claims receive compensation.  A debtor must be afforded the opportunity to make objections to any asserted claims.  *See* 11 U.S.C. § 502(a).  Once a properly supported objection is lodged, the underlying burden is on the claimant to show, by a preponderance of the evidence, that the claim is valid.  *See* 9 Collier on Bankruptcy ¶ 3001.09[2] at 3001–26 (15th ed. revised).

The Third Circuit has summarized the state of the law as follows:

> The burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A. § 502(a) rests on different parties at different times. Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of

2

> sufficiency, it is 'prima facie' valid. . . . The burden of going forward then shifts to the objector to produce evidence sufficient to negate the prima facie validity of the filed claim. . . . In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence.

*In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173–74 (3d Cir. 1992) (citations omitted).

Under the plain language of the Bankruptcy Code, these procedures must be employed to eliminate claims for which the debtor is not liable. *See, e.g., In re G.I. Indus. Inc.*, 204 F.3d 1276, 1281 (9th Cir. 2000) ("[A] claim cannot be allowed [under section 502(b)(1)] if it is unenforceable under nonbankruptcy law."); *In re Sanford*, 979 F.2d 1511, 1513 (11th Cir. 1992) ("A claim against the bankruptcy estate will not be allowed in a bankruptcy proceeding if the same claim would not be enforceable against the debtor outside of bankruptcy."); *In re Buchholz*, 224 B.R. 13, 19 (Bankr. D.N.J. 1998) (disallowing claim that was "defective under both Federal and New Jersey State law").

Not only does the Bankruptcy Code contemplate objections to the validity of claims, it expressly reserves the debtor's right to assert any and all defenses to claims: "[]the estate shall have the benefit of a defense available to the debtor as against any entity . . . including statute of limitations, statutes of brands, usury and other personal defenses." 11 U.S.C. § 558. *See In re Nuisance Corp.*, 17 B.R. 80, 82 (Bankr. D.N.J. 1981) ("If . . . the claim falls within one of the paragraphs of § 502(b), it is simply not allowable. . . . To the extent that applicable law, including state law, provides the debtor a defense to the claim of a creditor, absent bankruptcy, such defense is available . . . in objecting to the claim.").

Bankruptcy courts repeatedly have indicated that estimation is a streamlined adjudication to determine the merits of asserted claims. In conducting an estimation, "[t]he court is bound by the legal rules which may govern the ultimate value of the claim." *Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134, 136 (3d Cir. 1982)). *See also In re O.P.M. Leasing Serv., Inc.*, 79 B.R. 161, 166 (S.D.N.Y. 1987) (same). Accordingly, courts have made clear that these rules apply in *estimation* proceedings, as well as in the *liquidation* of individual claims. *See Bittner,* 691 F.2d at 135-47 (affirming bankruptcy court's estimation where the bankruptcy court "estimated the value of . . . stockholder's claims according to the ultimate merits of their state court action"). *See also In re Brints Cotton Mktg., Inc.*, 737 F.2d 1338, 1340-41 (5th Cir. 1984) (affirming a bankruptcy court's estimation of the value of certain contingent "on-call" contracts for purposes of a liquidation based on applicable principles of bankruptcy law and state law); *In re Aspen Limousine Serv., Inc.*, 193 B.R. 325, 337 (D. Colo. 1996) (holding that in conducting an estimation, "the court is bound by the legal rules governing the ultimate value of the claim"). As the Third Circuit has recognized:

> [i]f parties were barred from presenting defenses and affirmative defenses to claims which have been filed against them, they would not only be unconstitutionally deprived of their opportunity to be heard, but they would invariably lose on the merits of the claims brought against them. Such a serious deprivation of property without due process of law *cannot be countenanced in our constitutional system.*

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. City Savings, F.S.B.*, 28 F.3d 376, 394 (3d Cir. 1994) (emphasis added).

Thus, an estimation based on extrapolations from settlement history, particularly in asbestos litigation, ignores the clear requirements of the Bankruptcy Code. By contrast, approval of the PI CMO and Questionnaire will provide this Court and all parties in interest the

4

information and opportunity to evaluate the validity of claims in accordance with the Bankruptcy

Code and the Federal Rules of Evidence.

### III.    IN THE ESTIMATION PROCESS, THE COURT SHOULD ASSIGN VALUE ONLY TO CLAIMS THAT ARE SUPPORTED BY EVIDENCE <u>ADMISSIBLE UNDER THE FEDERAL RULES OF EVIDENCE.</u>

As demonstrated above, the Bankruptcy Code requires that only valid claims receive

consideration during an estimation process.  Although the validity of a claim is determined by

application of state substantive law, the Court must apply the Federal Rules of Evidence to the

estimation proceedings.  Accordingly, an estimation of Grace's asbestos liability, both current

and future, should assign value only to claims that are supported by evidence (1) admissible

under the Federal Rules of Evidence, and (2) establishing each element of liability under state

substantive law.

### A.    The Validity of a Claim For Estimation Purposes Is Determined By Application of State Substantive Law and Federal Procedural Law.

The estimation process is governed by the Bankruptcy Rules, which require the courts to

apply the Federal Rules of Evidence.  *See* Fed. R. Bankr. P. 9017 ("The Federal Rules of

Evidence . . . apply in cases under the Code.").  Accordingly, courts have universally recognized

that even though bankruptcy courts can apply state substantive law, they are required to apply the

Federal Rules of Evidence.  *See*, *e.g.*, *In re Lids Corp.*, 281 B.R. 535, 541 n. 3 (Bankr. D. Del.

2002) ("Federal Rules of Bankruptcy Procedure makes the Federal Rules of Evidence applicable

in bankruptcy cases.").[1]

---

[1]    *See also In re Rafsky*, 300 B.R. 152, 153 (Bankr. D. Conn. 2003) ("Fed. R. Bankr. P. 9017 provides that the Federal Rules of Evidence apply in cases brought under the bankruptcy code."); *In re Barnes*, 266 B.R. 397, 403 (8th Cir. B.A.P. 2001) (holding that "even when the bankruptcy court applies state law to resolve substantive issues, it must apply the Federal Rules of Evidence to resolve evidentiary questions").

The applicability of the Federal Rules of Evidence to bankruptcy cases and proceedings is not altered in the estimation context. For example, in *In re USG Corp.*, 290 B.R. 223 (Bankr. D. Del. 2003), the court held that in presenting its defenses during an estimation proceeding regarding asbestos personal injury claims, the debtors may "attack certain medical evidence under the Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm.* . . . ." *Id.* at 227. *See also In re CLC of Am., Inc.*, 68 B.R. 512, 515 (Bankr. E.D. Mo. 1986) (applying Federal Rules of Evidence in estimation proceeding to determine admissibility of admissions made by debtor in underlying state court action). Accordingly, the Federal Rules of Evidence govern admission of evidence during the estimation proceeding that will take place in these Chapter 11 cases.

### B.    Federal Rules of Evidence Prohibit Consideration of Past Litigation Settlement History For Purposes of Estimating Liability.

As a threshold matter, the estimation procedure sought by the Asbestos PI Committee would *violate* the Federal Rules of Evidence and the Bankruptcy Code and simply is *not* an available option for the Court in this matter. Rule 408 of the Federal Rules of Evidence *prohibits* using settlement history to determine liability. Rule 408 makes clear that such evidence "is not admissible to prove liability for . . . the claim or its amount." Fed. R. Evid. 408.[2] The rationale of Rule 408's prohibition on the use of settlement history is equally applicable in an estimation proceeding. The exclusion of evidence of past settlements in determining liability is based upon

---

[2]    *See also Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1247 (3d Cir. 1993) (same), *cert. denied*, 510 U.S. 994 (1993); *New Jersey Turnpike Auth. v. PPG Indus., Inc.*, 16 F. Supp. 2d 460, 473 (D.N.J. 1998) (administrative consent order for environmental claims inadmissible in CERCLA cost recovery action); *In re Dow Corning Corp.*, 250 B.R. 298, 342 (Bankr. E.D. Mich. 2000) ("[T]he Debtor's tentative offer to settle with breast implant claimants has no bearing on whether it will be found liable in tort."); *Belton v. Fibreboard Corp.*, 724 F.2d 500, 505 (5th Cir. 1984) (improper for trier of fact to consider amounts of settlements with settling defendants as proof of amount of claim against non-settling asbestos defendants).

the recognition that a party may settle a particular case or a group of cases for any number of reasons unrelated to the actual merits of the dispute or the validity of the underlying claims. Conversely, allowing past settlements as evidence of liability would create a disincentive for parties to reach compromises for fear that such compromises subsequently would be used against them.[3]  Indeed, there most likely is no place where application of this rule, and its rationale, is more important than in the context of asbestos personal injury litigation, where the motivation to settle -- for these debtors, and for scores of other defendant debtors -- has virtually *no* connection to the underlying merits of most cases.

Rule 408 typically is not invoked in other Chapter 11 asbestos cases because other cases appear to involve estimations in which settlement history is used *with the consent of the debtors*. For example, in *Owens Corning,* the issue of whether past settlement history was admissible in estimating liability was not raised by any party in the case.[4]  Because all parties sought an estimation based on past settlement history, the only issue the court addressed was the extent to which adjustments should be made to historical values to account for changed circumstances.  *Id.* This and similar precedents, however, do not support the mandatory imposition of such methods over the objection of the debtor, and in clear violation of existing law.

---

[3]    As the Ninth Circuit stated, "[t]wo principles underlie Rule 408: (1) '[t]he evidence [of compromise] is irrelevant, since the offer may be motivated by desire for peace rather than from any concession of weakness of position;' (2) '[a] more consistently impressive ground is promotion of the public policy favoring the compromise and settlement of disputes.'"  *Hudspeth v. Comm'r of Internal Revenue Service*, 914 F.2d 1207, 1213-14 (9th Cir. 1990) (quoting Fed. R. Evid. 408 advisory committee's note and finding that Commissioner of IRS would be inhibited from entering into settlements if such settlements could be binding in subsequent cases). *See also Playboy Enters., Inc. v. Chuckleberry Pub'g, Inc.,* 486 F. Supp. 414, 423 (S.D.N.Y. 1980) (in prohibiting use of settlement history, court stated that the policy underlying Rule 408 applied because "[a] host of factors may affect a litigant's decision to settle" and the fact that a party "might have made a mistake in not pursuing its rights with appropriate zeal" should not preclude it from protecting its rights going forward against another parties).

[4]    *See Owens Corning v. Credit Suisse First Boston*, Memorandum & Order, Case No. 04-00905, Docket No. 106 (D. Del. Mar. 31, 2005).

7

To extent the court in *Owens Corning* stands for the proposition that an estimation is of the cost of resolving claims in the tort system rather than actual liability, the decision was erroneously decided.  In its order, the court recognized that:

> The claims being valued arise under state law, hence state law determines their validity and value.  "The 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress 'generally left the determination of property rights in the assets of a bankrupt's estate to state law.'"  *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000), (*quoting Butner v. United States*, 440 U.S. 48, 54 (1979)).  The same principle applies to estimation proceedings under § 502(c).  *Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134, 135 (3d Cir. 1982).

*Owens Corning v. Credit Suisse First Boston*, Memorandum & Order, Case No. 04-00905, Docket No. 106, at 3 (D. Del. Mar. 31, 2005).  It is, however, a logical fallacy to conclude that merely because state substantive law determines a claim's validity and value, claims are to be valued according to what would happen in the state tort system.  There is a distinct difference between valuing claims pursuant to state law and valuing claims according to state court awards/settlements.  Indeed, it was undisputed in *Owens Corning* that although state substantive law applies in determining the validity of claims, federal procedural law applies in the estimation process.  Accordingly, an estimation must acknowledge claims will be determined under the application of federal procedures rather than state procedures.  Moreover, claims cannot be attributed tort system values when such claims would not be paid at tort system values due to limits on the allowance of claims in bankruptcy cases.  For example, Bankruptcy Code limitations on allowed claims such as Section 502(b)(6) are absolute notwithstanding what applicable state law would otherwise provide.

8

**C.    The Federal Rules of Evidence Require Scientifically Reliable Evidence for Proof of a Valid State Law Claim.**

The U.S. Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), established that a federal trial "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id*. at 589.  In 2000, Rule 702 of the Federal Rules of Evidence was amended to incorporate, among other things, the "reliability" requirement of *Daubert*.  Fed. R. Evid. 702 advisory committee's note (noting that the amendment affirms the trial court's responsibility to ensure the reliability of expert evidence).  As discussed above, estimation proceedings are governed by the Federal Rules of Evidence.  Thus, since an estimation proceeding is governed by the Federal Rules of Evidence, the assessment of whether proffered expert testimony is admissible under Fed. R. Evid. 702 and 703 in such proceeding must include an analysis of the reliability standards established in *Daubert*.  *See* Fed. R. Evid. 104(a); *Daubert*, 509 U.S. at 592-93; Tr. of Hr'g at 139 (Jan. 21, 2005).

The Supreme Court set forth the following non-exclusive factors for trial courts to use in determining reliability of expert testimony:  (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review; (3) the known or potential rate of error of the technique or theory; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.[5]  *See Daubert,* 509 U.S. at 593-94.  In addition, the trial court must

---

[5]    The Third Circuit subsequently added three additional factors to be considered during a *Daubert*-type analysis of expert testimony, namely: (1) the relationship of the technique to methods which have been established to be reliable; (2) the qualifications of the expert witness testifying based on the methodology; and (3) the non-judicial uses to which the method has been put.  *In re Paoli R.R. Yard PCB Litig*., 35 F.3d 717, 742 n. 8 (3d Cir. 1994).  *See also In re Townsend*, 309 B.R. 179, 183 (Bankr. W.D. Pa. 2004) (Fitzgerald, J.).

determine whether the proffered evidence is relevant, that is, "whether expert testimony proffered in the case is sufficiently tied to the facts of the case" and is a good "fit." *Id.* at 591-92.[6]

In fulfilling its obligation to ensure the reliability of scientific evidence, the court must make an "assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." This requires the court to bar "subjective belief" and "unsupported speculation" – that is, *junk science* – from entering the courtroom under the guise of expert testimony. *Daubert,* 509 U.S. at 593-94.

Thus, under *Daubert*, causation evidence is admissible only if it is based on reliable scientific data and methods, and the conclusions flow logically from those data and methods. *Daubert*, at 589-90; Fed. R. Evid. 702; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). In the context of personal injury claims brought on the basis of exposure to asbestos-containing materials, to prove causation, claimants must demonstrate that they were exposed to the alleged tortfeasor's products and that it is more likely than not that such exposure was a substantial factor in causing their injuries. *See*, *e.g.*, *In re Jackson v. Anchor Packing Co.*, 994 F.2d 1295, 1303 (8th Cir. 1993); *Joint E&S Dists. Asbestos Litig.*, 963 F. Supp. 314, 316-17 (E.&S.D.N.Y. 1997); *Hall v. John Crane-Houdaille, Inc.*, No. 86-3401 1990 WL 17827, at *9 (E.D. Pa. Feb. 16, 1990); *Vodanovich v. A.P. Green Indus., Inc.*, 869 So.2d 930, 932 (La. Ct. App. 2004); *Diel*

---

[6]    Under *Daubert*, claimants have the burden of demonstrating to the Court that their evidence is reliable. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Elkins v. Richardson-Merrell, Inc.*, 8 F.3d 1068, 1071 (6th Cir. 1993) (affirming grant of summary judgment on *Daubert* grounds). The "proponent of the expert testimony" must "prove by a preponderance of the evidence that the testimony is reliable." *Tanner v. Westbrook*, 174 F.3d 542, 546 (5th Cir. 1999). *See also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994) (same); *In re TMI Litig. Cases Consol. II*, 911 F. Supp. 775, 830 (M.D. Pa. 1996) (same).

*v. Flintkote Co.*, 204 A.D.2d 53, 54 (N.Y.A.D. 1994).   Pursuant to *Daubert*, the evidence demonstrating that exposure to the defendant's product causes disease must be "reliable." *See Daubert*, 509 U.S. AT 589.   Evidence linking a specific chemical or toxin, like asbestos, to disease is inadmissible unless there is "an established scientific connection between exposure and illness," including "information on the level of exposure necessary for a person to sustain injuries. . . ." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 278 (5th Cir. 1998); *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996) ("[S]cientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case."). Courts routinely exclude expert evidence of causation in toxic tort cases when the testimony or its basis is not reliable pursuant to *Daubert.   See, e.g.*, *Soldo v. Sandoz Pharmaceuticals Corporation*, 244 F.Supp.2d 434, 534 (W.D. Pa. 2003) (in case in which plaintiff claimed that a drug taken for control of postpartum lactation caused her to have a stroke, plaintiff's experts' hypothesis about medical causation was not scientifically reliable); *Glastetter v. Novartis Pharmaceuticals Corp.*, 107 F.Supp.2d 1015, 1028 (E.D. Mo. 2000) (concluding that doctors' testimony that ingestion of drug caused plaintiff to suffer an intracerebral hemorrhage did not pass the reliability standards under *Daubert*); *In re Breast Implant Litigation*, 11 F.Supp.2d 1217, 1244 (D. Col. 1998) (holding that with respect to product liability claims brought against manufacturers of silicone breast implants, plaintiffs failed to meet their burden of proof in establishing that medical opinions regarding causation (1) were based on valid, scientific principles and reliable scientific methods, processes, reasoning, and data; (2) were based upon

---

data reasonably relied upon by experts in the field; and (3) would assist the trier of fact in resolving a factual dispute).

Similarly, expert medical testimony related to a medical diagnosis is only admissible if it is based upon reliable scientific data and methods. *See Daubert*, 509 U.S. at 589-90; *GE v. Joiner*, 522 U.S. 136, 146 (1997). S*ee also Summers v. Missouri Pacific R.R. Sys.*, 132 F.3d 599, 603-04 (10th Cir. 1997) (doctor's diagnosis of "chemical sensitivity" was inadmissible under *Daubert* and Fed.R.Evid. 702 because such diagnosis was based on tests that "have been the subject of much criticism by the scientific community as not having met acceptable scientific levels of methodology and criteria, and are not designed to test for the recognized medical condition of chemical sensitivity"); *Prohaska v. Sofamor, S.N.C.*, 138 F. Supp. 2d 422, 438-42 (W.D.N.Y. 2001) (medical expert's opinion was insufficiently reliable to be admissible in product liability suit against bone screw manufacturer where expert had never examined plaintiff, read her deposition testimony, spoken with any of her physicians, reviewed any of her diagnostic tests, and was unable to conclude to a reasonable degree of medical certainty that the plaintiff's pain was caused by defective screws); *Dombrowski v. Gould Elecs., Inc.*, 31 F.Supp.2d 436, 442-42 (M.D. Pa. 1998) (expert testimony regarding bone lead testing technology in connection with proposed medical monitoring program for lead poisoning was inadmissible under *Daubert* to establish plaintiffs' medical monitoring claim because (1) there was no set standard for comparison of test readings, (2) test results could vary significantly depending on the nature of the instrument and the person using it, and (3) the testing method had not gained wide acceptance in the scientific or medical communities).

Finally, the principles of *Daubert*, as articulated above, are relevant and applicable in bankruptcy claims estimation proceedings. Indeed, bankruptcy courts, pursuant to Rule 702 and

*Daubert*, have excluded unreliable scientific and medical evidence in contested proceedings involving the evaluation of bankruptcy claims.

For example, in *In re Armstrong*, 285 B.R. 864 (Bankr. D. Del. 2002), a proceeding to determine on the merits whether certain asbestos property damage claims were valid, the bankruptcy court excluded evidence of the amount of airborne asbestos in approximately 600 properties on the ground that the method used to measure such contamination did not meet the standards of scientific reliability and validity mandated by *Daubert*.  Specifically, the *Armstrong* court found that (1) the method in question was not a scientifically valid method of quantifying the level of asbestos contamination in a room or building, and (2) because there was no statistical correlation between surface dust (which was collected by the method in question and then used to calculate the amount of airborne dust in the room or building) and airborne dust (which the method was meant to measure, ultimately), the method had "no valid scientific connection to the pertinent inquiry." *Id*. at 870-71.   Because the proferred evidence in question did not meet the *Daubert* criteria, the *Armstrong* court granted the debtors' motion to exclude such evidence. *Id.; see also In re Townsend*, 309 B.R. 179 (Bankr. W.D. Pa. 2004) (Fitzgerald, J.) (*citing Armstrong*, and *Daubert* in the context of a Chapter 13 claim objection and disallowing expert evidence because the expert's methodology was unreliable and not generally accepted).

Just as bankruptcy courts subject evidence to *Daubert* standards before admitting such evidence in the context of determining whether claims should be allowed on the merits,  this Court should, *a fortiori*, apply those same standards to the estimation process to determine whether evidence offered by claimants to demonstrate the validity of their claims is admissible for estimation purposes.

13

In summary, although state substantive law governs an estimation proceeding, it is the Federal Rules of Evidence that govern *what evidence* can be considered during the proceeding. Accordingly, for all the reasons discussed above, values of previous settlements are explicitly prohibited by the Federal Rules of Evidence, and they are not relevant in an estimation where the Court must not consider any evidence - and in turn any claims - that fail to meet the requirements of *Daubert*.

14

# TAB 4

# __THE QUESTIONNAIRE__

**THE PROPOSED QUESTIONNAIRE IS THE MOST EFFECTIVE
AND REASONABLE MEANS OF GATHERING
INFORMATION NECESSARY TO MAKE AN ESTIMATION
BASED ON ADMISSIBLE EVIDENCE**

As discussed in the Motion, the estimation process proposed by the Debtors envisions the following steps:

> *First*, the Questionnaire will be sent to those claimants who filed a lawsuit against Grace before the Petition Date.
>
> *Second*, those claimants will complete and return the Questionnaire.
>
> *Third*, information from the Questionnaire will be compiled into a navigable database made available to the Debtors and the official committees' experts.
>
> *Fourth*, parties will submit expert reports and conduct discovery relevant to estimating the Debtors' asbestos liability.
>
> *Fifth,* the Court will hold a trial on the contested issues.
>
> *Finally*, the Court will weigh the proposed estimations based on the merits and evidence in the record and issue findings.

The following section explains how adoption of the Debtors' PI CMO and requiring an Asbestos PI Claimant to respond to the proposed Questionnaire is the only way for this Court to acquire the information necessary to distinguish valid from invalid claims and estimate the value of the valid asbestos claims based on the requirements of the Federal Rules of Evidence.  The question portion of the document is less than 20 pages.  The information called for is *specific* and *central*, not voluminous or tangential.

The Questionnaire is designed to elicit information necessary to determine the following two threshold evidentiary issues:  (a) whether the claim for an asbestos-related injury is supported by objective and verifiable medical tests, performed in accordance with applicable standards; and (b) whether the claim is supported by objective and verifiable evidence of an

1

exposure to a Grace asbestos-containing product sufficient to cause disease. Indeed, as this Court has stated, the Questionnaire is "calculated to lead to relevant admissible evidence." Tr. of Hr'g. at 155 (Jan. 21, 2005).

The Debtors maintain, and plan to argue, that the Court should consider, for estimation purposes, only those claims that can meet these threshold evidentiary standards. Importantly, without the information in the Questionnaire, the Debtors will be precluded from even presenting their estimation case.

> **A.     The Questionnaire Requires A Claimant To Demonstrate Exposure to a Grace Asbestos-Containing Product at a Level That Could Cause Asbestos Injury.**

As discussed further below, Claimants who allege that they have been injured because of exposure to a Grace asbestos-containing product are asked to disclose:

- The time periods in which they were exposed to Grace's products as well as those of other defendants;

- Their industry, occupation, and employer(s);

- The site locations where they were exposed to Grace's products;

- The name(s) of the Grace asbestos-containing products and how close they were to those products while they were being installed.

*Objective and reliable* exposure information is essential because without it, a claimant cannot prove (and it will be difficult for Grace to refute) that he or she was exposed to sufficient levels of Grace asbestos containing products such that Grace asbestos containing products could be a substantial contributing factor to whatever disease the claimant suffers.

Exposure evidence in asbestos litigation has been highly controversial (as chronicled extensively in Tab 2). Indeed, in this bankruptcy, an audit already has demonstrated that few claimants worked in industries and occupations where the possibility of exposure to a Grace asbestos-containing product was even present. The proposed Questionnaire herein simply seeks

2

basic information that will permit the Court to determine whether a claim is supported, on its face, by *any* objective and reliable evidence of exposure to a Grace asbestos-containing product. *See* Questionnaire, at 5-10.

The mere fact of exposure to a Grace asbestos-containing product, however, is not sufficient to pass the threshold evidentiary criteria applicable to this estimation proceeding. Again, as detailed in the discussion of asbestos litigation history, a significant problem, arising both in prior litigation and in the sample Grace claims noted above, is the lack of evidence of dose and exposure *sufficient to cause harm*. Virtually every person in North America has been exposed to asbestos.[1] Thus, in toxic tort cases, merely working at a site where an asbestos product was present does not give rise to a cause that is sustainable under the Federal Rules of Evidence. Plaintiffs must show that they were exposed to defendant's allegedly hazardous product or material at a level that has been demonstrated, through scientifically reliable evidence, to cause injury.

Unless and until the claimant establishes the existence of a harmful dose of a Grace asbestos-containing product – and further establishes actual exposure to an amount in excess of that dose – the trier of fact is left to *guess* whether that particular claimant's exposure was sufficient to cause disease. Guesswork is insufficient under *Daubert* or any other rule of evidence, and clearly is not sufficient in an estimation proceeding. In *Mitchell v. Gencorp.*, 165

---

[1]    Indeed, pathology data show that individuals in the general population have thousands, even millions, of asbestos fibers in their lungs with no adverse effect. A. Churg, *Nomneopathic: Disease Caused by Asbestos*, Pathology of Occupational Disease, 293 (Churg & Green, 2d ed. 1998). According to Dr. Andrew Churg, a leading pathologist of asbestos diseases, "one may find as many as 40 million fibers of chrysotile, 40 million fibers of tremolite, and 400,000 fibers of amosite or crocidolite in the lungs of the general population of Vancouver, along with 40,000 asbestos bodies." *Id.* Even so, "there is no evidence that this fiber burden produces asbestos-related disease in the general population." *Id.* Hence, not every person who worked near a Grace asbestos-containing product can demonstrate causation of injury.

F.3d 778 (10th Cir. 1999), the Tenth Circuit affirmed summary judgment because the plaintiff had not shown sufficient reliable scientific information of "levels of exposure that are hazardous to human beings generally, as well as the plaintiff's actual level of exposure to the defendant's toxic substance." *Mitchell*, at 781. As the court explained: "Absent supporting scientific data, . . . estimates and . . . conclusions are little more than guesswork. Guesses, even if educated, are insufficient to prove the level of exposure in a toxic tort case." *Id.*

Thus, in addition to actual exposure to a Grace asbestos-containing product, a claimant has the burden of proving – by reliable and reproducible evidence – that (1) there is an established level of exposure to a Grace asbestos-containing product that causes disease in humans (*i.e.,* general causation) and (2) the claimant was in fact exposed to the requisite dose (*i.e.,* specific causation).[2] Absent "accurate information on the level of [plaintiff's] exposure," a plaintiff's causation testimony must be excluded and summary judgment granted. *Moore v. Ashland Chem. Co.*, 151 F.3d 269, 278 (5th Cir. 1998).

Accordingly, the proposed Questionnaire asks each Asbestos PI Claimant to provide the specific information about the extent of the claimant's exposure to a Grace asbestos-containing product. *See* Questionnaire at 5-10. The Asbestos PI Claimant must list the duration of his or her employment at a job site in which he or she was exposed to Grace asbestos-containing products, as well as the nature of his or her employment at that job site, utilizing a list of industry and occupation codes. *See* Questionnaire, at 5. Additionally, an Asbestos PI Claimant must identify

---

[2]    *See Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1106 (8th Cir. 1996) ("[A] plaintiff in a toxic tort case must prove the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover."). *See also Reference Guide on Epidemiology, in* Federal Judicial Center, Reference Manual on Scientific Evidence 382 (2000) ("The plaintiff must establish not only that the defendant's agent is capable of causing disease, but also that it did not cause the plaintiff's disease.").

4

the specific Grace asbestos-containing product to which he or she was exposed and the basis of the identification. *Id.* at 6. Answers to those questions will identify the approximate level of exposure, if any, of a claimant to a Grace asbestos-containing product. Finally, the Questionnaire asks Asbestos PI Claimants to list *all* of their other exposures to asbestos products, their job history, as well as other information indicating whether they have sued or recovered from other companies or trusts for the same or similar alleged injuries. *Id.* at 7-14. These requirements will provide information about other potential causes of the disease.

In sum, these requests go to basic information about the claimants' exposures -- information that already should be known by the claimants and their lawyers in light of the fact that each had filed lawsuits, attesting that proper investigation into the facts underlying the lawsuits had been performed prior to their filing. *See* Fed. R. Civ. P. 11 (b)(3) ("By presenting to the court . . . a pleading . . . an attorney or unrepresented party is certifying that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances . . . the allegations and other factual contentions have evidentiary support . . . .").

**B.    The Questionnaire Requires Claimants to Supply Information Needed to Determine Whether Claims Are Supported by Reliable Medical Data in Accordance with *Daubert*.**

Claimants with legally cognizable asbestos-related *injuries* caused by Grace asbestos-containing products are entitled to compensation. Claimants without injuries are not entitled to compensation. And, under the Federal Rules of Evidence and *Daubert*, explained above, evidence of injury must be reliable before it can be considered in support of a claim used in an estimation proceeding.

The proposed Questionnaire asks for the following medical information so that Grace can put forth an estimation that values claims alleging no injury or alleging injury that is not supported by admissible evidence, at zero:

5

- The claimant's diagnosis, including the name of the diagnosing physician, the date of the diagnosis, and any non-asbestos causes identified in the diagnosis;

- The results of any X-rays and Pulmonary Function Tests;

- Basic information on the claimant's smoking history, if any; and

- Copies of the medical records relating to the diagnosis, along with any other X-ray results taken in the prior two years.

This information requested will provide objective data that the Court can consider in determining whether a claim alleges an actual injury and whether the evidence in support of the claim is reliable enough to pass muster under *Daubert* and Rule 702.

## 1.     Chest X-rays.

The Questionnaire requests each Asbestos PI Claimant to produce two B-reads, one independent, in support of a diagnosis of asbestosis, as well as the underlying, supporting X-rays. Such requirements are consistent with the standards set out by the American Thoracic Society and are the only way to ensure that claims for non-malignant lung disease are accurately diagnosed for the purpose of estimating the value of Grace's current and future asbestos personal injury liability.

As discussed in the Factual History Section of this Brief at Tab 2, substantial numbers of asbestos claims emanate from mass screenings where B-readers routinely "over-read" X-rays to find signs of asbestos-related disease despite the absence of true disease. The false or "over-read" X-rays are possible, to a large extent, because of the inherent variability and subjectivity associated with the reading of "ILO scores" given to the X-rays.[3] Numerous studies have shown

---

[3]    The International Labor Organization ("ILO") developed ILO Scores as part of a "standardized system for taking and classifying films for the presence of profusion and opacities consistent with pneumoconiosis and pleural changes . . . ." ATS, *Diagnosing and Initial Management of Nonmalignant Diseases Related to Asbestos*, Am. Journal of Resp. and Critical Care Med., Vol 170: 691, 696 (2004). "This system, which is the basis of the 'B-reader' qualification for designating persons as competent in classifying pneumoconiosis films,
(Continued…)

6

that lung X-rays are interpreted with tremendous variability by different readers (inter-observer variability) and even by the same reader at different times (intra-observer variability). The ILO itself acknowledges that "there is significant variation in repeated readings of the same radiograph, not only from reader to reader, but also between readings by the same reader."[4] The variability problem is particularly pronounced when an ILO reading is at the lower end of the classification scale. As Dr. Hans Weill, a leading pulmonologist and asbestos researcher, has written: "It is in the lower categories (0/1 to 1/1) that the greatest degree of interobserver variability (disagreement) occurs."[5]

Daubert forbids analyses based on "subjective speculation" and on data where the results have such an enormous known rate of error. Daubert, 509 U.S. at 590, 594. Indeed, courts have considered an ILO reading of 1/0 to be too uncertain for reliable diagnostic use. See, e.g., Eagle Picher Indus. v. Liberty Mutual Ins. Co., 829 F.2d 227, 236 n.14 (1st Cir. 1987) ("a reading of 1/0 is too uncertain to be used to diagnose a particular case."); Raymark Indus., Inc. v. Stempel, No. 88-1014-K, 1990 WL 72588, at * 7 (D. Kan. May 30, 1990) ("On the ILO scale, a reading of 1/0 is only a 'suspect' finding of fibrosis, and is not sufficient to diagnose asbestosis.").

---

was developed for grading the radiographic severity of pneumoconiosis in epidemiologic studies but has been applied to clinical settings to maintain consistency in classifying chest films." *Id.* The ATS has recognized that films with an ILO Score of 1/0 or higher are "positive" for asbestosis. *Id.*

[4] ILO 1980 International Classification of Radiographs of the Pneumoconioses International Labour Organization, Geneva 1980, at 20. As discussed above, NIOSH has further acknowledged that "[r]ecently, the [B-reader] program has been criticized, the main concern being that variability among readers is excessive despite the training and certification. ('1980 ILO Report") There is also the perception some B-readers systematically bias readings in legal proceedings." M. Attfield & D. Wagner, *A Report on a Workshop on the National Institute for Occupational Safety and Health B Reader Certification Program*, JOM 34: 875-78 (1992).

[5] H. Weill, *Diagnosis of Asbestos-Related Disease*, Chest 91:802-03 (1987).

7

In the face of these problems, accepted scientific methodology for the diagnosis of asbestosis requires that ILO readings must be confirmed by two independent and qualified readers.  In fact, the ILO itself "strongly recommend[s] that at *least two, and preferably three independent readings are made for each radiograph*" prior to a diagnosis of asbestosis being made.[6]  Other experts agree.  As Dr. Ducatman has stated, "[a]t present, individual diagnoses, legal decisions and population assessments ought to rely on multiple readings."[7]

Consequently, the only way to ensure that a radiographic reading is reliable and reproducible is to have it examined by more than one certified and independent B-reader.  Thus the Questionnaire requests an independent B-reading and the actual X-ray that formed the basis of the independent read to allow a subsequent B-reader to replicate the diagnosis.  Such requirements are consistent with the scientific standards articulated by the ATS and ILO and provides the basis for requesting such information in the Questionnaire.

## 2.    Pulmonary Function Tests.

One of the greatest threats to this Court reaching an accurate estimate involves the prevalence of claims alleging asbestosis or pleural thickening in which the claimant has no physical impairment.  Preliminary assessments of the claims against Grace - for which the alleged asbestos-related disease has been identified - indicate that there are more than 29,000 claimants alleging that they have sustained asbestosis but only 1,500 alleging mesothelioma. While asbestosis - under certain working conditions, most of which have not been present in the

---

[6]    1980 ILO REPORT at 20.

[7]    Ducatman et al., *B-Readers and Asbestos Medical Surveillance*, JOM 30:644-47, 646 (1988) (emphasis added).

US for over 30 years[8] - may cause lung impairment, many individuals are diagnosed with asbestosis (based on an ILO reading) but do not have any impairment whatsoever.[9]

Thus, as discussed above, an Asbestos PI Claimant must demonstrate actual impairment in order to recover for an alleged non-malignant disease. To diagnose "impairment," the medical community relies upon pulmonary function testing. According to the American Medical Association, Pulmonary Function Tests ("PFT"), "performed on standardized equipment with validated administration techniques provide the framework for evaluation of respiratory system impairment."[10] Thus, the Questionnaire requires a Claimant to submit the full results of all pulmonary function tests, including the following: The Asbestos PI Claimant's total lung capacity (TLC); forced vital capacity (FVC); the FEV1/FVC ration; the names(s) of the doctor who performed the test; the date of the test; a replication of the test; and the reports of the data underlying the tests, results and interpretations. *See* Questionnaire at iii-iv, 2.

The American Thoracic Society (ATS) has articulated standards governing the administration and interpretation of all aspects of pulmonary functions tests. Additionally, the American Medical Association (AMA) has established criteria, based on pulmonary function test results, for determining impairment. Consequently, the Questionnaire simply elicits the

---

[8]    Gaensler, Jederlinic & Churg, Idiopathic Pulmonary Fibrosis in Asbestos-exposed Workers, Am. Rev. Resp. Dis. 144(3): 689-696, 695 (1991) (emphasis added); Gaensler, et al., Radiographic Progression of Asbestosis With and Without Continued Exposure, in VIIth Int'l Pneumoconiosis Conf. (NIOSH-ILO), DHHS (NIOSH) Pub. No. 90-108, Part 1, 386-92 (1988) (study of all workers in 4 paper or asbestos product plants and all workers in certain occupational categories in 2 shipyards).

[9]    *Neoplastic Asbestos-Induced Disease,* in Pathology of Occupational Lung Disease (Churg & Green, eds., 2d ed. 1998) at 339. *See also* In re the Babcock & Wilcox Co., Road Map to B&W's Defenses to Asbestos Personal-Injury Claims, Case Nos. 00-0558, 00-10992, at VII-1 (Oct. 18, 2001) (130,945 out of 176,982 asbestosis Proofs of Claim reported no lung impairment, in that they either had no Forced Vital Capacity (FVC-predicted) score at all or scored normal on lung-impairment testing).

[10]    *AMA Guides to the Evaluation of Permanent Impairment*, § 5.4d, p. 93 (5th ed. 2000).

information sufficient for determining whether the claimants' evidence of impairment conforms with the standards and criteria established by the appropriate governing medical and scientific institutions.  Without the underlying tests and data supporting them, this analysis cannot be performed.

Once again, however, the court need not determine, at this juncture, whether or not the court will adopt in this proceeding the AMA and ATS criteria for purposes of the estimation.  Rather, the court need only decide whether it will permit the debtors to seek the underlying information from the claimants so that the debtors will have the opportunity to present an estimation that is based on those criteria.

### C. Precedent Supports the Use of the Questionnaire to Determine Present and Future Asbestos Liability.

Detailed claims forms have been approved by numerous asbestos trusts for the payment of claims.  The Manville Trust's Proof of Claim Form for the 2002 TDP requires information regarding the claimant's exposure to Manville asbestos, asbestos-related injury (including medical documentation), and smoking history.  *See* Manville Personal Injury Settlement Trust, 2002 TDP, Proof of Claim Form, *at* http://www.mantrust.org/FTP/POC02.PDF.  The Manville Trust utilized a 21-page form to evaluate each claim individually for the purposes of liquidation and payment.  Courts also utilized individualized review forms for the Celotex and Eagle-Picher Trusts.  *See In re Celotex Corp.*, 204 B.R. 586, 593 (Bankr. M.D. Fla. 1996) (discussing court-approved special asbestos proof of claim form); *In re Eagle-Picher Indus., Inc.*, 158 B.R. 713, 716 (Bankr. S.D. Ohio 1993) (referencing court-approved detailed asbestos proof of claim).[11]

---

[11] Even outside of Chapter 11, similar forms have been used to streamline mass tort litigation in large cases involving injuries allegedly arising from diet drugs, orthopedic bone screws, and latex.  *See, e.g., In re Diet Drugs*, No. MDL 1203, 1999 WL 387322 (E.D. Pa. May 19, 1999) (utilizing claim forms in order to "minimize
(Continued…)

10

Most recently, the court overseeing the B&W bankruptcy approved the use of a proof of claim form which is similar in nature but does not go far enough.  *See* Order, *In re The Babcock & Wilcox Co.*, No. 00-0558, Docket No. 70 (E.D. La. Oct. 30, 2000).  In that case, the proof of claim form allowed  the debtors to ask questions regarding *prima facie* evidence of liability, including requests for: diagnostic reports supporting the claimed asbestos injuries; PFT and ILO results; the total number of years of asbestos exposure and the year of the first and last exposure; and the specific locations where the claimant was exposed to debtors' boilers, and the industry and occupation codes associated with each such location.

The B&W court was one of the first to recognize the importance and utility of a "discovery-based" claim form in asbestos bankruptcy proceedings.  Although the claim form adopted by the court in B&W, was less specific than that requested here, several critical distinctions must be noted.  First, the B&W case was unique because, unlike most debtors whose asbestos-containing products entered the stream of commence, B&W designed and installed asbestos-containing boilers at fixed locations during particular times and had historical records generally establishing the locations of these boilers.  *See In re the Babcock & Wilcox Co.*, Road Map to B&W's Defenses to Asbestos Personal-Injury Claims, Case Nos. 00-0558, 00-10992, at I-3-I-4 (Oct. 18, 2001).  Thus, B&W had the ability to verify, by the address or location of the claimants' employment, whether the claimant could possibly have been exposed to a B&W asbestos-containing product.  *Id.*  Grace asbestos-containing products, however, are not traceable

---

time consuming and expensive exchanges of discovery" by numerous plaintiffs); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, No. MDL 1014, 1997 WL 704702, at *4 (E.D. Pa. Aug. 22, 1997) (noting use of "questionnaire that requested, among other things, pertinent medical, employment, and worker's compensation information"); *In re Food Lion, Inc.*, No. 94-2360, 1998 WL 322682, at *11 (4th Cir. June 4, 1998) (questionnaires utilized "to streamline discovery" and "provide basic information about each plaintiff's claim").

in that fashion, and thus a more extensive inquiry of the claimant's occupational exposures is necessary.

Second, this Court now has the benefit of even more scientific evidence demonstrating the problems with over-diagnosing B-readers and false "positive" PFTs and the need for and importance of the replication of test results (like PFT's and B-reads) in asbestos litigation. Thus, while the B&W court did not include these replication requirements in the final proof of claim, it is clear today that independent replication of test results is essential to assessing the validity of claims in an estimation proceeding.

Finally, and perhaps most important, in B&W, the court was not, as is the case here, asked to approve a questionnaire to be sent solely to litigants who had already instituted litigation against the debtors pre-petition. Rather, in B&W, the court approved the claim form for all possible holders of present asbestos claims (whether they were known or unknown to the debtors), the vast majority of whom had never filed suit against B&W. *See* Order, *In re The Babcock & Wilcox Co.*, No. 00-0558 (E.D. La. Oct. 30, 2000). Here, on the other hand, all Claimants who are to receive the Questionnaire already have initiated actions against the Debtors in the Tort System. Thus, they should already have much of the information sought by the Debtors in the Questionnaire. Because such a defined universe of Claimants already exists, and because those Claimants should already have much of the information requested by the Questionnaire, there is simply no need to water down the Questionnaire to facilitate the process for unknown claimholders who may not yet have the requisite information. Furthermore, given that a number of those who assert claims against Grace have likely asserted claims against the Manville Trust and other asbestos trusts, the burden of completing the Questionnaire is reasonable.

12

Finally, it is a "fundamental maxim of discovery that '[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation.'" *Societe Nationale Industrielle Aerospatiale v. United States Dist. Court*, 482 U.S. 522, 540 n.25 (1987). "Discovery, in other words, is not a one-way proposition." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). *See* Tr. of Hr'g at 118 (Jan. 21, 2005) (in response to Asbestos PI Committee's argument that the Debtors did not need information regarding claims, the Court stated that "Just like you said earlier, that discovery's a two-way street and the Federal Rules of Evidence apply both ways. I wholly endorse that concept and if there is additional discovery needed, I assure you, they're going to get it."). Thus, in light of the Asbestos PI Committee and FCR's suggested use of claims settlement data obtained from Grace in their proposed estimation approach, it is fundamentally reasonable for Grace to seek reciprocal discovery of the basis on which claims are asserted for use in its proposed estimation approach.

# TAB 5

# <u>CONCLUSION</u>

An estimate based on abusive litigation and past settlement history could render a debtor insolvent, depriving shareholders of property and decreasing the recoveries of other unsecured creditors. Thus, estimating asbestos personal injury claims beyond the amount of actual liability would render a plan unconfirmable because Bankruptcy Code § 1129(b) provides that treatment of a dissenting class of impaired creditors be "fair and equitable" -- no premiums are allowed. 11 U.S.C. § 1129(b). As explained by a leading commentator:

> [A] major component of the 'fair and equitable' requirement [of § 1129(b)] is that no creditor or interest holder be paid a 'premium' over the allowed amount of its claim. Once the participant receives or retains property equal to its claim, it may receive no more.
> ***
> With respect to this part of section 1129(b), the House Report provided that 'one requirement applies generally to all classes before the court may confirm under this subsection. No class may be paid more than in full.'

Collier on Bankruptcy, *supra*, at ¶ 1129.04[4][a] (footnotes omitted) (citing H.R. Rep. 95-595, at 414 (1977)). Indeed, this Court has previously recognized the importance of the issue. *See* Tr. of Hr'g at 155 (Jan. 21, 2005) ("But I agree with you with your ultimate conclusion, which is creditors have the right to determine whether distributions are fair and reasonable with -- coming either from the -- that the debtor would put into the trust, on the one hand, versus what the debtor would be paying to other creditors whose claims don't go into the trust, on the other.").

The proposed Questionnaire is consistent with previous asbestos claim forms and is neither overly burdensome nor prejudicial to the Asbestos PI Claimants. On the contrary, the proposed Questionnaire will require far less of an Asbestos PI Claimant than what is demanded of him or her in an average asbestos trial. *In fact, assuming that all of the actions against Grace were filed with a good faith factual basis, each attorney representing each Asbestos PI Claimant should have reviewed his or her client's medical, occupational, and residential history prior to*

1

*filing a lawsuit and already should have possession of that information.*  Any minimal burden the Questionnaire does generate is far outweighed by the possibility that it will reduce the calculation of fraudulent and unsupported claims from corrupting the estimation process.  This, in turn, will benefit the truly sick as well as the holders of other valid claims against, and interests in, the Debtors.

Dated:    May 10, 2005

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet Baer
Jonathan P. Friedland
Salvatore F. Bianca
Joseph Nacca
Andrea L. Johnson
200 East Randolph Drive
Chicago, IL 60601
Telephone:    (312) 861-2000
Facsimile:    (312) 861-2200

KIRKLAND & ELLIS LLP
Barbara M. Harding
Brian T. Stansbury
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:    (202) 879-5000
Facsimile:    (202) 879-5200

2

-and-

PACHULSKI, STANG, ZIEHL, YOUNG, JONES &
WEINTRAUB P.C.

_____
Laura Davis Jones (Bar No. 2436)
David W. Carickhoff, Jr. (Bar No. 3715)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:     (302) 652-4100
Facsimile:     (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession

3

# TAB 6

# <u>APPENDIX</u>